## UNITED STATES DISTRICT COURT

### DISTRICT OF delaware

| | | |
|---|---|---|
| COLLINS & AIKMAN CORPORATION and COLLINS & AIKMAN PRODUCTS CO., as Debtors in Possession, | ) ) ) ) | |
| Plaintiffs, | ) ) ) | |
| vs. | ) ) | Civil Action No. |
| DAVID A. STOCKMAN, J. MICHAEL STEPP, BRYCE M. KOTH, DAVID R. COSGROVE, PAUL C. BARNABA, ROBERT A. KRAUSE, JOHN A. GALANTE, CHARLES E. BECKER, ELKIN B. MCCALLUM, THOMAS E. EVANS, CYNTHIA HESS, DANIEL P. TREDWELL, W. GERALD MCCONNELL, SAMUEL VALENTI, III, HEARTLAND INDUSTRIAL PARTNERS, L.P., HEARTLAND INDUSTRIAL ASSOCIATES, L.L.C., HEARTLAND INDUSTRIAL GROUP, L.L.C., PRICEWATERHOUSECOOPERS LLP and KPMG LLP, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | **JURY TRIAL DEMANDED** |
| Defendants. | ) ) | |

---

## <u>COMPLAINT</u>

Plaintiffs Collins & Aikman Corporation and Collins & Aikman Products Co., as Debtors in Possession ("Plaintiffs") allege the following based upon the investigation of Plaintiffs' Special Counsel. Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## JURISDICTION AND VENUE

1.      The claims asserted herein arise under and pursuant to Sections 10(b), 14(a) of the Exchange Act [15 U.S.C. §§78j(b) and 78t(a)] and Rules 10b-5 and 14a-9 promulgated thereunder by the SEC [17 C.F.R. §240.10b-5] and applicable state law.

2.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act [15 U.S.C. §78aa].

3.      Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. §1391(b); Plaintiffs are Delaware corporations and many of the acts and practices complained of herein occurred in substantial part in this District.

4.      In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## THE PARTIES

**Plaintiffs**

**5.**     Plaintiffs Collins & Aikman Corporation and Collins & Aikman Products Co. are Delaware corporations.  Collins & Aikman Corporation, through its subsidiaries, was engaged in the design, manufacture and supply of automotive interior components.

6.     Plaintiffs Collins & Aikman Corporation and Collins & Aikman Products Co., together with thirty-six of their subsidiaries, each filed a petition for relief under Chapter 11 of Title 11 of the United States Code ("Bankruptcy Code") in the United States Bankruptcy Court for the Eastern District of Michigan, Southern Division ("Bankruptcy Court") on May 17, 2005.  Those Chapter 11 cases have been consolidated for administrative purposes under Chapter 11 Case No. 05-55927(SWR) pursuant to

order of the Bankruptcy Court, and each of those Chapter 11 cases remains pending in the Bankruptcy Court at the present time. The Plaintiffs and their debtor subsidiaries are debtors and debtors in possession in their Chapter 11 cases having all of the rights and powers, entitled to perform all of the functions and duties of a Chapter 11 trustee (with exceptions not here relevant) of a trustee serving in a case under Chapter 11 in accordance with section 1107 of the Bankruptcy Code, 11 USC section 1107.

7.       Plaintiffs and their debtor subsidiaries have proposed and expect to confirm a Chapter 11 plan of reorganization ("Plan") shortly, perhaps as soon as June 5, 2007, and to consummate the Plan within a reasonable period thereafter. Under the Plan, on the date the Plan is consummated, all claims and causes of action of Plaintiffs and their debtor subsidiaries against third parties, whether then pending or available to be brought in the future, are to be assigned to a litigation trust to be administered by a Litigation Trust Administrator for the benefit of the creditors of the Plaintiffs' estates. The proceeds thereof are to be distributed to the creditors of the Plaintiffs' estates according to the terms of the Plan, the Litigation Trust Agreement, and the orders of the Bankruptcy Court having jurisdiction over the Chapter 11 cases.

8.       This action is brought by Plaintiffs in their capacities as debtors in possession, qua trustees of their Chapter 11 estates, to fulfill their fiduciary duties for the benefit of the creditors of such estates who will share in any proceeds of this action. Upon the consummation of the Plan, this action shall be transferred to and carried on by the Litigation Trust formed pursuant to the Plan, under the supervision and direction of the Litigation Trust Administrator appointed by the Bankruptcy Court, and the Litigation Trust will seek to be substituted for the named Plaintiffs in this action.

**Defendants**

**Director and Officer Defendants**

9.      Defendant David A. Stockman ("Stockman") served as a Director of Collins & Aikman Corporation ("Collins & Aikman" or the "Company"), Chairman of the Board and CEO of the Company as follows:  Director from February 2001 to May 12, 2005; Chairman of the Board from August 2002 to May 12, 2005; and CEO from August 2003 to May 12, 2005.  Defendant Stockman was a Managing Member of Heartland LLC, as defined below, and was a founding partner and a Senior Managing Director of Heartland LP, as defined below.

10.      Defendant J. Michael Stepp ("Stepp") served as the Company's Vice President and Chief Financial Officer ("CFO") from January 2002 to October 2004, when he resigned as CFO.  Defendant Stepp also served as a Director of the Company and Vice Chairman of the Company's Board of Directors from 2000 until his resignation. Defendant Stepp was also a Senior Managing Partner of Heartland LP.

11.      Defendant Bryce Koth ("Koth") served as the Company's CFO starting on October 13, 2004.  Prior to serving as CFO, Defendant Koth served as the Company's Vice President, Tax of the Company from December 2002 to May 2004 when he was elevated to Vice President, Finance, Controller, and the Company's head of Tax.

12.      Defendant David R. Cosgrove served as the Company's Vice President of Finance from February to August 2002, Vice President for Financial Planning and Analysis from August 2002 until October 2004 and Corporate Controller until May 2005.

13.      Defendant Paul C. Barnaba served as the Director of Financial Analysis for the Company's purchasing department from April 2002 to December 2004 when he

became a Vice President and the Director of Purchasing for the Plastics Division, a position he held until April 2005.

14.     Defendant Robert A. Krause served as Vice President and Treasurer of the Company from October 2002 to October 2004 when he assumed the positions of Senior Vice President, Finance and Administration.

15.     Defendant John A. Galante served as Director, Strategic Planning from October 2002 to October 2004 and Vice President, Treasurer and Executive Officer of the Company from October 2004 to termination of his employment on July 29, 2005. Galante was also a Vice President of Heartland LP.

16.     Defendant Charles E. Becker ("Becker") served as Vice Chairman of the Board and a Director from July 2001 to his resignation on May 6, 2004.  Becker owned Becker Group LLC which was sold to Collins & Aikman in July, 2001.  Becker also served as interim-CEO for a period after Defendant Stockman resigned in May 2005. Defendant Becker was also a limited partner in Heartland LP.

17.     Defendant Elkin B. McCallum ("McCallum") served as a Director of the Company from September 2001 until his resignation on May 6, 2004.  McCallum was the Chairman of the Board and CEO of Joan Fabrics Corporation which sold Joan Automotive Fabrics to Collins & Aikman in September 2001.

18.     Defendant Thomas E. Evans served as President and CEO of the Company from April 1999 to August 2002 when he resigned his positions.

19.     Defendant Cynthia Hess ("Hess") served as Director of the Company from 2001 to 2003.  Hess was elected as a director of the Company in connection with

Heartland's acquisition of Collins & Aikman stock and was a Senior Managing Partner of Heartland LP.

20.     Defendant Daniel P. Tredwell served as a director of the Company from February 2001 to May 10, 2006 when he resigned his position.  Tredwell was also a co-founder of Heartland LP and a Member of Heartland LLC.

21.     Defendant W. Gerald McConnell served as a director of the Company from February 2001 to May 10, 2006 when he resigned his position.  McConnell was a Senior Managing Director of Heartland LP and was also a Member of Heartland LLC.

22.     Defendant Samuel Valenti, III, served as a director of the Company from February 2001 to September 30, 2004.  Valenti was a Senior Managing Director of Heartland LP.

23.     The Defendants referenced in ¶¶9-22 above are sometimes referred to herein as the "Director and Officer Defendants."

24.     Each officer and director of Collins & Aikman owed Collins & Aikman, its shareholders and creditors the duty to exercise a high degree of care, loyalty and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Director and Officer Defendants complained of herein involves fraudulent misconduct – a knowing, intentional and culpable violation of their obligations as officers/directors of Collins & Aikman and the absence of good faith on their part for their duties to the Company, its shareholders and its creditors.

25.     By reason of their positions as officers, directors and/or fiduciaries of Collins & Aikman and because of their ability to control the business and corporate

affairs of Collins & Aikman, the Director and Officer Defendants owed Collins &
Aikman, its shareholders and creditors fiduciary obligations of candor, trust, loyalty and
care, and were required to use their ability to control and manage Collins & Aikman in a
fair, just, honest and equitable manner, and to act in furtherance of the best interests of
Collins & Aikman, its shareholders and creditors and not in furtherance of their personal
interests or benefit.  In addition, as officers and/or directors of a publicly held company,
the Director and Officer Defendants had a duty to promptly disseminate accurate and
truthful information with respect to the Company's operations and financial condition so
as to fulfill their duty of candor and honesty to Collins & Aikman, the shareholders of
Collins & Aikman and its creditors.

26.    To discharge their duties, the directors of Collins & Aikman were required
at all times to exercise reasonable and prudent supervision over the management,
policies, practices and controls of the business and financial affairs of Collins & Aikman.
By virtue of such duties, the Director and Officer Defendants were required, among other
things, to at all times:

(a)    Manage, conduct, supervise and direct the business affairs of
Collins & Aikman in accordance with law (including the U.S. securities laws and
Sarbanes-Oxley), government rules and regulations and the charter and bylaws of Collins
& Aikman;

(b)    Neither violate nor knowingly permit any officer, director or
employee of Collins & Aikman to violate applicable laws, rules and regulations;

(c)    Remain informed as to the then current status of Collins &
Aikman's operations and upon receipt of notice or information of imprudent or unsound

practices, to make a reasonable and diligent inquiry in connection therewith, and to take steps to correct such conditions and practices and make such disclosures as were necessary to comply with the U.S. federal securities and other laws and their duty of candor to the Company's shareholders, creditors, suppliers, customers, employees and others doing business with the Company;

(d)    Establish and maintain systematic and accurate records and reports of the business and affairs of Collins & Aikman and procedures for the reporting of the business and affairs to the Board of Directors and periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)    Maintain and implement an adequate, functioning system of internal legal, financial and accounting controls, such that Collins & Aikman's financial statements would be accurate and complete and the actions of its officers and directors would be in compliance with all applicable laws;

(f)    Exercise reasonable control and supervision over public statements to the securities markets and over trading in Collins & Aikman stock by the officers and employees of Collins & Aikman; and

(g)    Supervise the preparation and filing of any financial reports or other information required by law from Collins & Aikman and examine and evaluate any reports of examinations, audits or other financial information concerning the financial condition and affairs of Collins & Aikman and make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

27.    During all times relevant hereto, each of the Director and Officer Defendants occupied a position with Collins & Aikman or was associated with the

Company in such a capacity as to make him or her privy to confidential and proprietary information concerning Collins & Aikman and its operations, finances and financial condition.  Because of these positions and such access, each of the Director and Officer Defendants knew that the true facts specified herein regarding Collins & Aikman's business and finances had not been disclosed to and were being concealed from its shareholders, its creditors, vendors, customers, employees and the public.  The Director and Officer Defendants, as corporate fiduciaries entrusted with non-public information, were obligated to disclose material adverse information regarding Collins & Aikman and to take any and all action necessary to ensure that the officers and directors of Collins & Aikman did not act upon such privileged non-public information in a manner which caused the Company to violate the law.  Because of the officer and director defendants' positions with the Company, they knew of the adverse non-public information about Collins & Aikman's operations and finances, as well as its accounting practices, markets and business prospects, via access to internal corporate documents (including Collins & Aikman's financial statements, operating plans, budgets and forecasts and reports of actual operations), conversations and connections with other corporate officers and employees, attendance at management and/or board of directors' meetings and meetings of committees thereof and via reports and other information provided to them in connection therewith.  Each of the officer and director defendants participated in the issuance and/or review of false and/or misleading statements, including the preparation of false and/or misleading press releases, SEC filings and reports to Collins & Aikman shareholders and/or creditors.

**Heartland Defendants**

28.     Defendant Heartland Industrial Partners, L.P. ("Heartland LP") is a limited partnership organized under the laws of Delaware.  The managing general partner of Heartland LP is Heartland LLC.  Heartland LP is a $1 billion private equity firm.  Defendant Stockman is the founding partner and a Senior Managing Director of Heartland LP; Director Defendants Tredwell, McConnell, and Valenti are all Senior Managing Directors of Heartland LP; and Director Defendant Hess was also a Senior Managing Director of Heartland LP.  Collins & Aikman is one of Heartland LP's largest investments, representing at least 30% of Heartland LP's total investments.

29.     Defendant Heartland Industrial Associates, L.L.C. ("Heartland LLC") is a limited liability company organized under the laws of Delaware.  As of July 1, 2004, Heartland LLC beneficially owned 33,574,772 shares of Collins & Aikman, 34,314,147 shares as of January 1, 2005, and 32,714,147 shares as of March 17, 2005, exclusive of shares owned by Heartland's partners and affiliates as the general partner of several limited partnerships.  In 2001, Heartland owned at least 59.7% of the outstanding common stock of Collins & Aikman and by January 1, 2005, owned 41% of the outstanding common stock.

30.     Defendant Heartland Industrial Group, L.L.C. ("Heartland Industrial") is a limited liability company organized under the laws of Delaware.

31.     Heartland LP, Heartland LLC and Heartland Industrial are collectively referred to herein as "Heartland" or the "Heartland Defendants."  As the managing general partner, Heartland LLC exercised complete control over Heartland LP and, accordingly, beneficially owns and exercises control over all of the Collins & Aikman common stock held by Heartland LP.  At all times relevant to the allegations herein,

Heartland controlled Collins & Aikman through its share ownership of the Company and by designating a majority of the members of the Company's Board of Directors. Moreover, Defendants Stockman and Stepp were Senior Managing Directors of Heartland LP, and John A. Galante, the Company's Treasurer since October 2004, was a Vice President of Heartland LP.

32.     In connection with Heartland's acquisition of Collins & Aikman stock, Heartland LP and Collins & Aikman entered into a Services Agreement dated February 23, 2001, which was subsequently amended on August 7, 2001 (collectively, the "Heartland Services Agreement"). Under the Heartland Services Agreement, Collins & Aikman was required to pay certain annual fees to Heartland equal to (a) a fee of $404,494.38 in cash for the period from the date of the closing of Heartland's purchase of Collins & Aikman stock through March 31, 2001; (b) $3,000,000 in cash for the balance of calendar year 2001; and (c) $4,000,000 for each calendar year thereafter, through the "Termination Date" as such term is defined in the Services Agreement. The Heartland Services Agreement required Collins & Aikman to pay to Heartland LP a fee of $12,000,000 and to reimburse Heartland LP and its affiliates for the reasonable out-of-pocket expenses incurred in connection with Heartland LP's purchase of Collins & Aikman stock. Furthermore, the Heartland Services Amendment provides that, in connection with the consummation of each acquisition or divestiture by the Company or any of its subsidiaries of any business constituting a going concern or any division or line of business or separable plant or manufacturing facility or significant set of related assets, with respect to which Heartland LP provides any significant advisory services, in negotiating, analyzing, arranging and executing such acquisitions and divestitures,

Collins & Aikman shall pay to Heartland LP or its designees a transaction fee  in an amount equal to 1% of the aggregate total enterprise value of the business or assets being acquired or divested.

33.    During 2001, 2002, 2003 and 2004, Heartland received total advisory fees from Collins & Aikman of $24.5 million, $5.7 million, $4.0 million, and $10.6 million, respectively – a total of more than $44 million.  Of these monies, $22 million went to Defendant Stockman personally.

**Auditor Defendants**

34.    Defendant PriceWaterhouseCoopers LLP ("PwC") was engaged by Collins & Aikman to provide independent auditing, accounting and/or consulting services to the Company, including the examination and review of Collins & Aikman's consolidated financial statements for fiscal years 2001 and 2002.  As a result of the services it rendered to the Company, PwC's representatives were frequently present at Collins & Aikman's corporate headquarters and financial offices during 2001, 2002 and a portion of 2003 and during that period had continual access to the Company's confidential corporate financial and business information, including internal and external financial statements and information as to Collins & Aikman's true financial condition and rebate accounting, which information PwC negligently disregarded.  PwC actively participated in the examination and review of Collins & Aikman's false financial statements for the years 2001 and 2002 and interim periods.  Defendant PwC issued unqualified audit opinions on Collins & Aikman's 2001 and 2002 financial statements.

35.    Defendant KPMG, LLP ("KPMG") was engaged by Collins & Aikman to provide independent auditing, accounting and/or consulting services to the Company, including the examination and review of Collins & Aikman's consolidated financial

statements for fiscal years 2003 and 2004 (the latter never having been completed). As a result of the services it rendered to the Company, KPMG's representatives were frequently present at Collins & Aikman's corporate headquarters and financial offices between part of 2002 and 2003 to 2005 and had continual access to the Company's internal and external financial statements and confidential corporate financial and business information, including information as to Collins & Aikman's true financial condition, internal and external financial statements and rebate accounting, which information KPMG negligently disregarded. KPMG actively participated in the examination and review of Collins & Aikman's false financial statements. Defendant KPMG issued unqualified audit reports on Collins & Aikman's 2003 financial statements.

## SUBSTANTIVE ALLEGATIONS
### Overview of the Destruction of Collins & Aikman

**36.**    Collins & Aikman was engaged in the design, manufacture and supply of automotive interior components. The Company sold its products to automotive original equipment manufacturers ("OEMs") such as GM, Ford, Chrysler and others.

37.    Heartland took control of Collins & Aikman in early 2001. Thereafter, at the direction of Heartland, Collins & Aikman went on an acquisition spree, acquiring various businesses in an effort to cement the Company's position as a Tier 1 supplier to OEMs. By the end of 2001, Collins & Aikman had announced and/or completed three major acquisitions which dramatically increased the size of the Company. This acquisition spree positioned the Company for disaster.

38.    Indeed, at the time that Collins & Aikman was aggressively growing its business, auto parts manufacturers and the OEMs were coming under increasing

competitive threats and adverse business conditions.  OEMs, the major automakers, were increasingly demanding lower prices and were squeezing the profit margins of Collins & Aikman and other car parts manufacturers.  At the same time, the prices of raw materials continued to rise, thereby further squeezing profits.  Adding to and exacerbating these negative trends, Collins & Aikman was struggling to integrate its acquisitions into its existing operations.

39.    By early 2002, these negative factors were dramatically depressing the Company's financial results and the Company was increasingly finding itself locked into long-term contracts with little upside earnings potential.  Unfortunately for Collins & Aikman, its creditors, shareholders, customers, vendors and employees, instead of dealing with the issues facing the Company in an open and legal manner, Defendants concealed the true financial results of operations and condition of the Company, embarking on a fraudulent accounting scheme which hastened the demise of the Company and left it unable to right itself.

40.    As detailed further herein, from the fourth quarter of 2001 to the time of the Company's bankruptcy filing, Defendants employed a variety of fraudulent schemes designed to artificially inflate the Company's reported financial results, avoid triggering debt covenants and enable Collins & Aikman to borrow additional funds, thereby deepening its insolvency.

41.    On May 12, 2005, Collins & Aikman filed for bankruptcy protection under Chapter 11.  Subsequently, Collins & Aikman determined that the best course for its creditors and employees would be the sale and liquidation of all of its businesses.  At

present, Collins & Aikman is in the process of selling off all of its businesses and other

assets and it will soon cease to exist.

### Heartland Takes Control of Collins & Aikman and Expands the Company's Business Through a Series of Acquisitions

42.     In February 2001, Heartland acquired a controlling interest in Collins &

Aikman.  As a result, Defendant Stockman and other Heartland representatives assumed

positions on the Company's Board of Directors and in Company management.  In addition,

Collins & Aikman and Heartland entered into the Heartland Services Agreement, as detailed

herein.

43.     Plaintiffs and Heartland L.P. entered into the Heartland Services

Agreement thereby giving Heartland contractual control and dominion over the

Company's affairs.  Thus, Heartland not only owed plaintiffs fiduciary duties, but also

owed them express and implied contractual obligations of good faith, fair dealing and

honest performance of the services it provided to the Company under the Heartland

Services Agreement and for which it was munificently compensated.

44.     In July 2001, Collins & Aikman acquired Becker Group L.L.C., which

manufactured plastic parts for automobiles (the "Becker Acquisition").  Collins &

Aikman paid 17 million shares of the Company's stock, issued a three year warrant to the

sellers for 500,000 shares at $5 per share and paid off $60 million of Becker Group debt

all as part of this purchase price for the Becker Acquisition.  In connection with the

acquisition, Heartland was paid an advisory fee of $12 million.

45.     In addition, the Company agreed to pay Becker $18 million for a non-

compete agreement, which was to be paid out over five years in equal annual installments

(the "Becker Non-Compete").  In March 2003, after making two years of such payments,

Collins & Aikman bought out the Becker Non-Compete for $11.3 million.  Under applicable law, Becker was obligated to not compete with the Company and, therefore, there was no reason to enter into a non-compete with him, and he was not entitled to receive any monies from the Company for his agreement not to compete.  At the time of the Becker Acquisition, Becker joined the Company's Board of Directors and served on the Board until he resigned his position on May 6, 2004.

46.      In September 2001, Collins & Aikman acquired Joan Automotive Fabrics from Joan Fabrics, Inc., which manufactured fabrics (the "Joan Fabrics Acquisition") in exchange for $100 million in cash and 12,760,000 shares of Collins & Aikman common stock.  In connection with the Joan Fabrics Acquisition, Defendant McCallum joined the Company's Board of Directors and served on the Board until he resigned his position on May 6, 2004.

47.      In December 2001, Collins & Aikman purchased the trim division of Textron Automotive Company, known as "TAC-Trim."  Collins & Aikman paid $1 billion in cash and assumed debt, 18 million shares of Collins & Aikman common stock and $245 million in preferred stock of Collins & Aikman Products Company for TAC-Trim.  Heartland was paid $12.5 million in connection with the TAC-Trim acquisition.

### Improper and Manipulative Accounting
### Practices Damage Collins & Aikman

**48.      The Joan Fabrics Roundtrip Transactions**: As detailed above, in September 2001, Collins & Aikman acquired Joan Automotive Fabrics from Joan Fabrics. Shortly thereafter, Defendants Stockman, Stepp and others acting at their direction engaged in a series of fraudulent "round-trip" transactions with Joan Fabrics which were designed to

enable Collins & Aikman to improperly increase its reported income and artificially inflate its reported financial results.

49. In the fourth quarter of 2001, Defendant Stepp asked Defendant McCallum, then Chairman of the Board and CEO of Joan Fabrics, for a $3 million payment that would be used to inflate Collins & Aikman's financial results for the fourth quarter of 2001. It was agreed at that time that the Company would repay the $3 million to Joan Fabrics in the future. In other words, the $3 million payment was nothing more than a short term loan. As detailed further herein, the $3 million payment was falsely characterized on Collins & Aikman's financial statements as a supplier rebate for past purchases, which permitted the Company to artificially inflate its fourth quarter of 2001 operating results.

50. Thereafter, Defendant Stockman personally negotiated additional round trip payments from Joan Fabrics with Defendant McCallum. In total, between the fourth quarter of 2001 and the first quarter of 2003, round-trip payments totaled $15 million. In each case, the "payment" was falsely characterized as a rebate for past purchases from or services provided by Joan Fabrics. As McCallum knew, Joan Fabrics had no legal obligation to make the payments and had only done so at his direction with the agreement that Joan Fabrics would be repaid in the future.

51. Defendants Stockman, Stepp and others acting at their direction, repaid the "rebates" through a series of transactions which were structured so as to obscure the fact that Joan Fabrics was being repaid. The following payments took place:

- the Company gave back certain looms to Joan Fabrics which were worth $3.1 million for no consideration. In March 2002, Stockman and McCallum had agreed that the Company would repay the $3 million

payment from the fourth quarter of 2001 by  transferring the looms to Joan Fabrics for no cost;

- the Company overpaid McCallum the purchase price for Southwest Laminates Inc. in March 2002.  Specifically, in exchange for future "rebate" payments, the Company purchased Southwest for $17 million, which was at least $7 million more than the Company estimated it was worth;

- the Company deliberately overpaid to purchase air jet texturing machines from a subsidiary of Joan Fabrics; and

- the Company purportedly purchased looms from Joan Fabrics for the purpose of running a furniture fabrics business.  The Company purchased the looms for $4.7 million even though they were only worth approximately $2 million.

52.     By engaging in round-trip transactions with Joan Fabrics and improperly accounting for the payments as rebates, Collins & Aikman's financial results were artificially inflated by at least $14.9 million between 2001 and 2003.

53.     **The Rebate Scheme**: Commencing in early 2002, Defendants caused or allowed Collins & Aikman to begin improperly recognizing rebates from the Company's suppliers before the rebates had actually been earned by the Company.

54.     In the automotive industry, supply contracts generally provide that suppliers will pay rebates to customers in return for a specified volume or type of future business.  Under GAAP, rebates should be recorded as reductions in cost.  Rebates can only be recognized when the promised purchases have been made.

55.     Starting in early 2002, Defendants caused Collins & Aikman to inflate its earnings by improperly recognizing rebates in three ways (the "Rebate Scheme").  First, rebates would be improperly pulled forward, *i.e.* taken before they were earned.  Under this scenario, the Company and a supplier would agree to price reductions over future quarters based on projected purchases.  Defendants pulled these rebates forward into the

current quarter, and in order to hide the fraudulent scheme, they had the supplier provide

a side letter which stated that the rebate was for past purchases when, in fact, it was not.

Second, similarly, rebates would be recognized immediately when they were contingent

on future events, usually additional business, which had not yet occurred.  Again, the

supplier would provide a side letter attributing the rebate to past purchases when that was

not the case.  Finally, some of the improperly recognized rebates involved capital

expenditures by the Company.  Under this scenario, the Company would purchase some

capital equipment and would receive a rebate from the seller characterized as a rebate for

past purchases of spare parts and/or maintenance.  In truth, the Company had purchased

the equipment or maintenance services for above-market, deliberately inflated prices and

then received back the difference between the cost and the true market price as a

"rebate."  These "rebates" were booked as income in the current quarter as opposed to a

reduction in the cost basis of the equipment and/or maintenance purchased.

56.    The following chart sets forth some of the improperly accounted for

rebates and the suppliers who aided and abetted Defendants in their scheme:

| Name | Rebate Amount (Quarter Recognized) |
|---|---|
| ATC, Inc. | $123,470 (Q4 2002) |
| The Brown Corporation of America | $900,000 (Q3 2002)<br>$500,000 (Q2 2003) |
| Clariant Corporation | $49,000 (Q2 2004) |
| The Dow Chemical Company | $400,000 (Q2 2003) |
| Invista Inc., formerly known as DuPont Textiles & Interiors Inc. | $1,200,000 (Q2 2003) |
| Flambeau Corporation | $235,000 (Q3 2002)<br>$1,000,000 (Q3 2003) |
| Momentive Performance Materials Inc., formerly known as GE Advanced Materials. | $1,500,000 (Q2 2004) |
| Jackson Plastics, Inc. | $138,750 (Q3 2002)<br>$46,250 (Q4 2002) |

| Name | Rebate Amount (Quarter Recognized) |
|---|---|
| M. Dohmen, U.S.A., Inc. | $150,000 (Q2 2004) |
| Manufacturer's Products Co. | $150,000 (Q2 2003) |
| Pine River Plastics, Inc. | $67,000 (Q4 2002) |
| PPG Industries, Inc. | $500,000 (Q2 2002) |
| Reko International Group, Inc. | $250,000 (Q4 2003) |
| Unifi, Inc. | $200,000 (Q2 2004) |

57.     In 2004, as noted above, Defendants expanded the rebate scheme to capital equipment expenditures. The following chart sets forth some of the transactions in the capital equipment scheme and the suppliers who aided and abetted Defendants in this scheme:

| Name | Rebate Amount (Quarter Recognized) |
|---|---|
| The Conair Group, Inc. | $38,000 (Q4 2004) |
| Demag Plastics Group | $1,000,000 (Q2 and Q3 2004) $92,000 (Q4 2004) |
| Milacron Inc., formerly known as Cincinnati Milacron Inc. | $1,000,000 (Q3 2004) |
| Krauss Maffei Corp. | €165,000 or roughly $224,000 (Q4 2004) |

58.     By engaging in the Rebate Scheme, Collins & Aikman's financial results were artificially inflated, as detailed further herein.

**Collins & Aikman Suffers a Liquidity Crisis and Avoids Triggering Debt Covenants Through Improper Accounting Practices**

59.     By early 2002, Collins & Aikman was struggling under the weight of money-losing long term contracts, increasing pricing pressures from OEMs and increasing raw material prices. In order to avoid triggering debt covenants, Defendant Stockman and others acting at his direction engaged in the accounting schemes detailed herein which served to artificially inflate the Company's operating results so that the Company could satisfy its debt covenants.

60.     In August 2004, Collins & Aikman sold approximately $415 million in 12.875% Senior Subordinated Notes due 2012 (the "August Senior Note Offering"). The

offering materials used to sell the notes presented materially false and misleading financial results for the Company as they included financial results that were artificially inflated due to the accounting improprieties detailed herein. In addition, the August Senior Note Offering further deepened the insolvency of the Company by providing it with funds it would rapidly lose and be unable to repay due to the huge hidden operating losses it already had incurred and was continuing to incur.

61.    Indeed, during the time that Defendant Stockman and his confederates ran the Company, Collins & Aikman's debt load had dramatically increased from approximately $884 million as of December 30, 2000 to approximately $1.6 billion as of December 31, 2004.

62.    By January 2005, just a few months after raising the $415 million in the August Senior Note Offering, the liquidity crisis at Collins & Aikman worsened.

63.    At or around this time, Defendant Stockman and others acting at his direction engaged in a scheme to defraud General Electric Capital Corporation ("GECC"). In December 2004, GECC and the Company entered into an agreement whereby GECC factored certain of Collins & Aikman's receivables and advanced monies to the Company based on collateral consisting of a pool of eligible accounts receivable – referred to as the "borrowing base." The amount of money that the Company could "borrow" was determined by calculating the amount of the borrowing base and comparing it to the outstanding debt owed to GECC. If the borrowing base amount exceeded the amount owed to GECC, Collins & Aikman could receive an amount equal to the difference from GECC.

64.     In January 2005, Defendant Stockman and others learned that under the GECC agreement, the Company owed $21.8 million to GECC, money which it was unable to pay.  In order to avoid alerting GECC to the amount owed and the fact that the Company did not have the money to pay what it owed GECC, Defendant Stockman and others acting at his direction improperly and fraudulently included tens of millions of dollars of receivables in the borrowing base that were not eligible for inclusion.  In this way, they were able to artificially and fraudulently reduce the amount of money then owed to GECC – from $21.8 million to $11.8 million.  Thereafter, Defendant Stockman and others acting at his direction continued to include tens of millions of dollars of ineligible receivables in the borrowing base.  In short, Defendant Stockman and others acting at his direction engaged in a pattern of fraudulent conduct with respect to GECC that, when discovered, caused great harm to the Company, its relations with GECC – a major lender to the Company, and its reputation in the business community.

65.     On March 17, 2005, Collins & Aikman issued a press release announcing that it was delaying the issuance of its financial results for fiscal year 2004 while it conducted an internal review of how it accounted for supplier rebates.  The Company further announced that it expected to restate its financial results for the nine months ended September 30, 2004, to reflect the correct accounting for those rebates and that it was continuing to evaluate whether a restatement of prior periods was necessary.  The press release stated that based on an "internal review of vendor rebates" "net adjustments of approximately $10-12 million are required primarily occurring during fiscal 2004."  The press release also indicated that the Company had liquidity of $86 million as of December 31, 2004.

66.    The representations in the press release about the rebate accounting, the scope of that problem and the liquidity of the Company were materially false, fraudulent, and misleading when made.  As Defendants knew, the rebate accounting issue spanned a period as far back to late 2001 and covered substantially all of the rebates that the Company had recognized during that time, as detailed herein, and the Company did not possess $86 million in liquidity - - rather, Collins & Aikman only had $12 million of liquidity due to restrictions on its borrowings.

67.    Following the earnings release, Defendant Stockman and others held a conference call to discuss the Company's financial results.  During that call, Defendant Stockman continued to conceal the true scope of the accounting fraud at the Company, concealed the true liquidity of the Company and deliberately misrepresented the predicted future performance of the Company.  For example, Defendant Stockman told investors on the call that the Company would have EBITDA of between $65-75 million for the first quarter of 2005, even though at that time internal information indicated that the figure would be half that amount (the quarter only had two weeks to go at this point).  Defendant Stockman told investors that the Company's capital expenditures for the first quarter of 2005 would be $30 million when at that time they already exceeded $30 million and would be $50 million.  Finally, during the conference call, Defendant Stockman denied that the Company was experiencing liquidity issues when he knew that the Company was then experiencing a severe liquidity crisis.

68.    On March 24, 2005, Defendant Stockman made a presentation to JP Morgan Chase and Credit Suisse First Boston Corporation for the purpose of securing a waiver of compliance with financial covenants in its credit agreements.  During the

presentation, Defendant Stockman concealed the true financial condition of the Company and again understated the Company's capital expenditures for the first quarter of 2005.

69.    Also on March 24, 2005, Collins & Aikman issued a press release announcing that the Audit Committee of the Board of Directors had retained independent counsel to conduct a review of the supplier rebate accounting.  Again, the press release understated the scope of the problem at the Company.

70.    In early April 2005, Defendant Stockman and others sought additional financing for the Company from Credit Suisse First Boston Corporation.  In order to induce Credit Suisse to lend the Company additional money, Defendant Stockman and others acting at his direction made numerous materially false and misleading statements to Credit Suisse First Boston Corporation  concerning the Company's liquidity, capital expenditures and prior and projected financial results.  Based, in material part, on these misrepresentations, Credit Suisse First Boston Corporation agreed to lend Collins & Aikman an additional $75 million in financing.

71.    On April 4, 2005, Collins & Aikman issued a press release announcing that it had obtained a commitment from Credit Suisse to provide $75 million in financing and stating, among other things, that the Company had liquidity of $86 million as of December 31, 2004, and $81 million as of March 31, 2005.  The representations concerning liquidity were materially false, fraudulent and misleading when made because due to covenant restrictions the Company did not have $86 million of liquidity as of December 31, 2004, but rather had only $12 million, and its liquidity as of March 31, 2005, was $9 million not $81 million.

72.    Because the Company was hemorrhaging cash and losing money at a furious pace, this particular $75 million borrowing further deepened the insolvency of the Company.

73.    Five days later, on May 12, 2005, Collins & Aikman issued a press release announcing, among other things, that Defendant Stockman had been forced by the Board of Directors to resign his positions at the Company.

74.    On May 17, 2005, Collins & Aikman and its subsidiaries filed for protection under Chapter 11 of the Bankruptcy code.

**Defendants Caused Collins & Aikman to File**
**False and Misleading Reports with the SEC and**
**to Issue False and Misleading Statements to Investors**

**75.**    From the fourth quarter of 2001 to the time that the Company filed for bankruptcy protection, Defendants caused Collins & Aikman to file false and misleading quarterly and annual reports with the SEC and to issue materially false and misleading statements to investors concerning the Company's financial performance, operations and prospects.  These filings and statements were materially false and misleading because, among other reasons, they contained financial results which were artificially inflated by the improper accounting practices detailed herein.  Indeed, Defendants' positive statements falsely portrayed the Company as well positioned to succeed and financially sound when, in truth and in fact, the Company's business was dramatically deteriorating and it was suffering a deepening liquidity crisis.  Had the truth been known, Collins & Aikman would have never been able to continue raising money from the public and investment banks.

76.    On or about August 26, 2004, Defendants caused Collins & Aikman to circulate an offering memorandum in connection with the August Senior Note Offering. The offering memorandum incorporated the Company's financial statements for fiscal

years 2001 through the second quarter of 2004.  Those financial statements were
materially false and misleading because they were not prepared in accordance with
GAAP and materially overstated the Company's financial performance, as detailed
herein.  Using the materially false and misleading offering memorandum, Defendants
caused Collins & Aikman to sell and issue the $415 million in 12.875% Senior
Subordinated Notes due 2012, thereby causing it to incur additional debt that it could not
service and repay and which further deepened the Company's insolvency.

77.    During 2002, 2003 and 2004, Defendants caused Collins & Aikman to file
and disseminate to its shareholders materially false and misleading Proxy Statements
which failed to disclose that the Company was reporting financial results which were
artificially inflated by the improper accounting practices detailed herein.  In each of the
Proxy Statements, Collins & Aikman sought shareholder approval for, among other
things the election of directors, employee stock option plans and compensation policies.

**PwC's and KPMG's Professional Negligence and Accounting Malpractice and
Aiding and Abetting Defendants' Breaches of Fiduciary Duty and Violations of Law**

**78.**    In the performance of their audits and reviews of Collins & Aikman's
financial statements, Defendants PwC and KPMG each owed Collins & Aikman a duty to
act with reasonable care and competence and perform the services they rendered pursuant
to their professional standards.  However, PwC and KPMG each violated numerous
professional standards and acted with such lack of care that they were indifferent to
numerous red flags warning them of the massive financial fraud alleged herein.

79.    Defendant PwC knew or should have known that it issued false audit
opinions on Collins & Aikman's false and misleading financial statements for the years
ended December 31, 2002 and 2001, and that the Company's interim financial statements

for the quarters ended March 31, 2001 through the quarter ended June 30, 2003, which it

reviewed, were materially false and misleading.

80.    Similarly, Defendant KPMG knew or should have known that it issued a

false audit opinion on Collins & Aikman's false and misleading financial statements for

the year ended December 31, 2003, and that the Company's interim financial statements

for the quarters ended September 30, 2003 through the quarter ended September 30,

2004, which it reviewed, were materially false and misleading.

81.    In connection with their audits and reviews of Collins & Aikman's

financial statements, both PwC and KPMG had virtually limitless access to the

Company's personnel and corporate information and documents, and accounting books

and records.  PwC and KPMG personnel were regularly present at Collins & Aikman's

headquarters and had access to its employees via face-to-face meetings, e-mail and

telephone.  Given their intimate knowledge of Collins & Aikman's business, PwC and

KPMG knew or should have known about the numerous accounting irregularities and

improprieties alleged herein, and that the Company's financial statements, and related

financial information, were materially false and misleading because, among other things,

they violated GAAP in numerous respects.[1]

82.    To ensure PwC's and KPMG's loyalty, Collins & Aikman also retained

PwC and KPMG to provide it with lucrative non-auditing services.  In fact, from 2001

---

[1] GAAP are those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practices at a particular time. Generally Accepted Auditing Standard ("GAAS") §AU 411.02.  Regulation S-X [17 C.F.R §210.4-01(a)(1)] states that financial statements filed with the SEC that are not prepared in conformity with GAAP are presumed to be misleading and inaccurate.  Additionally, Regulation S-X requires that interim financial statements must also comply with GAAP.  [17 C.F.R. 210.01-01]

through 2003, the fees Collins & Aikman paid KPMG and PwC totaled $1.4 million and

$11.8 million, respectively.[2]  PwC and KPMG partners who were responsible for the

Collins & Aikman engagement were particularly motivated to appease Collins & Aikman

and the Director and Officer Defendants because their remuneration was closely tied to

the fees generated from Collins & Aikman engagements.  In addition, the Detroit offices

of both PwC and KPMG pressured its partners to establish and maintain a reputation for

having a strong presence in the automotive industry and rewarded them financially for

their successes in obtaining and maintaining client relationships.  Accordingly, the

partners of both PwC and KPMG were pressured to compromise themselves by helping

their firms create and maintain this reputation and such client relationships.

### PwC's and KPMG's False and Misleading Audit Reports

**83.**    As detailed herein, PwC and KPMG knew or should have known they falsely

represented that Collins & Aikman's financial statements were presented in conformity with

GAAP.  In addition, PwC and KPMG knew or should have known they falsely represented

that their audits were performed in accordance with GAAS and the standards of the Public

Company Accounting Oversight Board ("PCAOB").[3]

84.    PwC issued the following false and misleading unqualified audit report,

dated February 26, 2002, on Collins & Aikman's financial statements for the year ended

December 31, 2001:[4]

---

[2] KPMG's fees subsequent to 2003 are currently unknown.

[3] The PCAOB is a private-sector corporation created by the Sarbanes Oxley Act ("SOX")
to oversee the auditors of public companies.  Section 103 of SOX directs the PCAOB to
establish auditing, quality control, ethics, and independence standards and rules to be used
by registered public accounting firms in the preparation and issuance of audit reports.

[4] The index in Item 14(a)(1) of the Company's 2001 Form 10-K listed the following
financial statements of Collins & Aikman: (i) Consolidated Statements of Operations for the
fiscal years ended December 31, 2001, December 31, 2000 and December 25, 1999; (ii)

To the Board of Directors and Shareholders of Collins & Aikman Corporation:In our opinion, *the 2001 consolidated financial statements* listed in the index appearing under Item 14(a)(1) *present fairly, in all material respects, the financial position of Collins & Aikman Corporation and its subsidiaries at December 31, 2001, and the results of their operations and their cash flows for the year then ended in conformity with accounting principles generally accepted in the United States of America.* In addition, in our opinion, the financial statement schedules listed in the index appearing under Item 14(a)(2) present fairly, in all material respects, the information set forth therein when read in conjunction with the related consolidated financial statements. These financial statements and financial statement schedules are the responsibility of the Company's management; our responsibility is to express an opinion on these financial statements and financial statement schedules based on our audit. *We conducted our audit of these statements in accordance with auditing standards generally accepted in the United States of America*, which require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation. We believe that our audit provides a reasonable basis for our opinion. [Emphasis added.]

85.    PwC issued the following false and misleading unqualified audit report dated February 18, 2003, on Collins & Aikman's financial statements for the years ended December 31, 2002 and 2001:[5]

_____

Consolidated Balance Sheets at December 31, 2001 and December 31, 2000; (iii) Consolidated Statements of Cash Flows for the fiscal years ended December 31, 2001, December 31, 2000 and December 25, 1999; (iv) Consolidated Statements of Common Stockholders' Equity (Deficit) for the fiscal years ended December 31, 2001, December 31,2000 and December 25, 1999; and (v) Notes to Consolidated Financial Statements.

[5] The index in Item 15(a)(1) of the Company's 2002 Form 10-K listed the following financial statements of Collins & Aikman: (i) Consolidated Statements of Operations for the years ended December 31, 2002, December 31, 2001 and fiscal year ended December 31, 2000; (ii) Consolidated Balance Sheets at December 31, 2002 and December 31, 2001; (iii) Consolidated Statements of Cash Flows for the years ended December 31, 2002, December 31, 2001 and fiscal year ended December 31, 2000; (iv) Consolidated Statements of Common Stockholders' Equity (Deficit) for the years ended December 31, 2002, December 31, 2001 and fiscal year ended December 31, 2000; and (v) Notes to Consolidated Financial Statements.

To the Board of Directors and Shareholders of Collins & Aikman Corporation:In our opinion, ***the 2002 and 2001 consolidated financial statements*** listed in the index appearing under Item 15(a)(1) ***present fairly, in all material respects, the financial position of Collins & Aikman Corporation and its subsidiaries at December 31, 2002 and 2001, and the results of their operations and their cash flows for the years then ended in conformity with accounting principles generally accepted in the United States of America.*** In addition, in our opinion, the financial statement schedules listed in the index appearing under Item 15(a)(2) present fairly, in all material respects, the 2002 and 2001 information set forth therein when read in conjunction with the related consolidated financial statements. These financial statements and financial statement schedules are the responsibility of the Company's management; our responsibility is to express an opinion on these financial statements and financial statement schedules based on our audits. ***We conducted our audits of these statements in accordance with auditing standards generally accepted in the United States of America,*** which require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion. The financial statements of Collins & Aikman Corporation as of December 31, 2000, and for the year then ended, were audited by other independent accountants who have ceased operations. Those independent accountants expressed an unqualified opinion on those financial statements in their report dated February 14, 2001 (except with respect to the matter discussed in Note 24 (which in the current report on Form 10‑K is Note 23), as to which the date is March 28, 2002).

As discussed in Note 2 to the consolidated financial statements, effective January 1, 2002, the Company changed its method of accounting for goodwill in accordance with the adoption of Statement of Financial Accounting Standards No. 142, "Goodwill and Other Intangible Assets". [Emphasis added.]

86.    KPMG issued the following false and misleading unqualified audit report, dated March 15, 2004, on Collins & Aikman's financial statements for the year ended December 31, 2003:[6]

---

[6] The index in Item 15(a)(1) of the Company's 2003 Form 10-K listed the following financial statements of Collins & Aikman: (i) Consolidated Statements of Operations for the years ended December 31, 2003, 2002 and 2001; (ii) Consolidated Balance Sheets at

To The Board of Directors and Stockholders of Collins & Aikman Corporation:We have audited the 2003 consolidated financial statements of Collins & Aikman Corporation and subsidiaries as listed in the accompanying index.  These consolidated financial statements and financial statement schedules are the responsibility of the Company's management.  Our responsibility is to express an opinion on these consolidated financial statements and financial statement schedules based on our audit.***We conducted our audit in accordance with auditing standards generally accepted in the United States of America.***  Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement.  An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements.  An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation.  We believe that our audit provides a reasonable basis for our opinion.In our opinion, ***the consolidated financial statements referred to above present fairly, in all material respects, the financial position of Collins & Aikman Corporation and subsidiaries as of December 31, 2003, and the results of their operations and their cash flows for the year then ended, in conformity with accounting principles generally accepted in the United States of America***.  Also in our opinion, the related 2003 financial statement schedules, when considered in relation to the basic consolidated financial statements taken as a whole, present fairly in a material respects, the information set forth herein.As discussed in Note 2 to the financial statements, the Company changed its method of accounting for crib supply inventories in 2003.  [Emphasis added.]

87.    In addition, at all times relevant to this action, Article 10 of

Regulation S-X [17 C.F.R. 210.10 01(d)] required PwC and KPMG to review, in

accordance with professional standards, the 2001, 2002, 2003 and 2004 quarterly

financial statements Collins & Aikman filed with the SEC on Form 10-Q.

**PwC and KPMG Knew or Should Have Known that Collins &Aikman's Financial Statements Were Materially Misstated and Violated GAAP**

---

December 31, 2003 and 2002; (iii) Consolidated Statements of Cash Flows for the years ended December 31, 2003, 2002 and 2001; (iv) Consolidated Statements of Common Stockholders' Equity (Deficit) for the years ended December 31, 2003, 2002 and 2001; and (v) Notes to Consolidated Financial Statements.

88. The above-noted audit reports were false and misleading because Collins & Aikman's financial statements violated GAAP in numerous respects, including:

- the Company's accounting for "round-trip" transactions with McCallum;

- the Company's accounting for cash received from suppliers and capital equipment vendors;

- the Company's failure to timely record an impairment in the value of its long-lived assets, goodwill;

- the Company's overstatement of its deferred tax assets;

- the Company's improper reporting of related party transactions; and

- the Company's failure to provide appropriate disclosure about its liquidity issues and ability to continue as a going concern.

89. Indeed, the myriad of ways in which Collins & Aikman's financial statements violated GAAP, coupled with the materiality and duration of such violations and Collins & Aikman's numerous internal control deficiencies is indicative of PwC's and KPMG's negligence in the "auditing" of such financial statements. In fact, Collins & Aikman has now admitted that in addition to violating GAAP, *it also violated its internal accounting policies and practices*, as PwC and KPMG knew or should have known.

**Improper Accounting of "Round-Trip" Transactions with McCallum**

90. Collins & Aikman's improper accounting of transactions with Defendant McCallum began in late 2001 when the Company sought $3 million from him solely to increase Collins & Aikman's reported income during the fourth quarter 2001. At the time the transaction was consummated, Collins & Aikman arranged to

repay the $3 million to Defendant McCallum during the subsequent quarter. Therefore, this "round-trip" transaction was, in substance, a loan arrangement which should not have had any positive effect on Collins & Aikman's 2001 reported income.

91.     Nonetheless, Director and Officer Defendants caused Collins & Aikman to improperly account for $2.8 million of the $3 million as a reduction of its operating expenses during the fourth quarter of 2001, thereby inflating its pre-tax earnings during the quarter by a like amount.  As a result of the improper accounting of this transaction alone, Collins & Aikman's operating loss during the fourth quarter of 2001 was understated by more than 17% and its annual 2001 operating income was overstated by approximately 9%.

92.     Collins & Aikman's violations of GAAP in its accounting for transactions with Defendant McCallum continued into 2002 when Director and Officer Defendants caused Collins & Aikman to improperly account for businesses and assets it purchased from Defendant McCallum.

93.     During 2002, Collins & Aikman purchased two businesses, Southwest Laminates and Dutton Yarns, from Defendant McCallum.  With respect to Southwest Laminates, Collins & Aikman improperly inflated the fair value of the $10 million business by at least $7 million, or 70%, and improperly valued the transaction at $17 million in its financial statements.  With respect to Dutton Yards, Collins & Aikman improperly inflated the fair value of the $2 million business by $2.2 million, or 110%, and valued the transaction in its financial statements at $4.2 million.

94.     Similarly, during 2002, Collins & Aikman purchased furniture loom assets from Defendant McCallum worth $2 million for $4.7 million, or approximately 135% more than its fair value, and improperly valued the assets at $4.7 million in its financial statements.

95.     In exchange for receiving approximately $11.9 million in excess consideration for Southwest Laminates, Dutton Yarns and furniture loom assets, Defendant McCallum agreed to have one of his companies, Joan Fabrics, reimburse Collins & Aikman in an equal amount over time, which Collins & Aikman falsely recorded as supplier rebates in its financial statements.

96.     In doing so, the financial statements audited by PwC and KPMG were presented in violation of at least the following provisions of GAAP:

(a)     Statement of Financial Accounting Standards ("SFAS") No. 141, with respect to Collins & Aikman's accounting for business combinations;

(b)     FASB Statement of Concepts ("Concept Statement") No. 2, with respect to accounting for a transaction's economic substance over its form;

(c)     SEC Staff Accounting Bulletin ("SAB") No. 101, Concept Statement Nos. 2 and 5; SFAS No. 48; ARB No. 43; Opinion No. 10; Statement of Position ("SOP") 97-2, Emerging Issues Task Force ("EITF") Abstract Nos. 00-21, 01-09, 02-16, and Technical Practice Aids § 5100, with respect to the recognition of revenues;

(d)     Concept Statement No. 6, with respect to the characteristics of a loan;

(e)     Accounting Principles Board ("APB") Opinion No. 6, with respect to the cost of fixed assets;

(f)     Accounting Research Bulletin ("ARB") No. 43, with respect to fixed asset depreciation;

(g)     SFAS No. 95, with respect to the financial reporting of cash flows; and

(h)     SFAS No. 57, with respect to the financial reporting of related party transactions.

97.     As a result of the above-noted violations of GAAP, Collins & Aikman's financial statements, audited by PwC and/or KPMG improperly:

- overstated the value of its reported goodwill in its audited 2002 and 2003 financial statements by approximately 9.2 million;

- overstated the amount of its reported fixed assets in its audited 2002 and 2003 financial statements by $2.7 million;

- understated the amount of its loss from continuing operations in its audited 2002 and 2003 financial statements by approximately $10.8 million, or approximately 25%, and $1.2 million, respectively;

- overstated the amount of its reported depreciation expense in its audited 2002 and 2003 financial statements;

- overstated the amount of its cash flows from operations in its audited 2002 and 2003 financial statements by approximately $10.8 million, or approximately 25%, and $1.2 million, respectively; and

- overstated the amount of cash used for investing activities in its audited 2002 financial statements by 9.2 million.

**Improper Accounting of Cash Received**

**from Suppliers and Capital Equipment Vendors**

98.    As noted herein, beginning in at least 2002, Defendants caused Collins & Aikman to engage in a scheme to inflate the Company's earnings by improperly and systematically recognizing rebates tied to the future purchases of goods and services. As part of this scheme, Defendants caused Collins & Aikman to falsely account for rebates it received from suppliers as though they had been earned on past purchases when, in fact, such rebates were contingent upon meeting future purchase volume thresholds. Director and Officer Defendants then arranged for the Company's suppliers to provide the Company with side-letters which falsely represented the terms of their rebate arrangements with the Company. Defendants procured such documentation because they understood that GAAP precluded the immediate recognition of the rebates in income until the future volume thresholds were satisfied.

99.    In 2004, Director and Officer Defendants caused the Company to expand its fraudulent rebate accounting scheme to include capital equipment purchases. As part of this scheme, Director and Officer Defendants caused Collins & Aikman to improperly account for discounts it received on capital equipment purchases as rebates earned on prior purchases of goods and services. Director and Officer Defendants then arranged for the Company's capital equipment vendors to provide the Company with side-letters falsely representing the terms of the rebate arrangement with Collins & Aikman because they understood that GAAP required the capital equipment discounts to be accounted for as a reduction of the equipment's cost and not as a component of reported earnings.

100.    As a result of the above accounting machinations, the financial statements audited and reviewed by PwC and KPMG were presented in violation of at least the following provisions of GAAP:

(a)    SEC Staff Accounting Bulletin ("SAB") No. 101, Concept Statement Nos. 2 and 5; SFAS No. 48; ARB No. 43; Opinion No. 10; Statement of Position ("SOP") 97-2, Emerging Issues Task Force ("EITF") Abstract Nos. 00-21, 01-09, 02-16, and Technical Practice Aids § 5100, with respect to the recognition of revenues;

(b)    Accounting Principles Board ("APB") Opinion No. 6, with respect to the cost of fixed assets;

(c)    Accounting Research Bulletin ("ARB") No. 43, with respect to fixed asset depreciation;

(d)    SFAS No. 95, with respect to the financial reporting of cash flows; and

(e)    FASB Concept Statement No. 2, with respect to accounting for a transaction's economic substance over its form.

101.    As a result of its accounting for vendor rebates in violation of GAAP, Collins & Aikman's financial statements audited and reviewed by PwC and/or KPMG improperly overstated its operating income or understated its operating loss as follows:

| | Reported Operating Income (Loss) | Improperly Recorded Supplier | % Over |
|---|---|---|---|

| | ($mil) | Reba tes ($mils) | s t a t e d ( U n d e r s t a t e d ) |
|---|---|---|---|
| Q4 2001 | (16.3) | 2.8 | ( 1 7 % ) |
| Q1 2002 | 49.4 | 5.0 | 1 0 % |
| Q2 2002 | 79.2 | 2.3 | 3 % |
| Q3 2002 | (7.6) | 3.3 | ( 4 3 % ) |
| Q4 2002 | 33.9 | 2.2 | 6 % |
| Q1 2003 | 17.5 | 1.7 | 1 0 % |
| Q2 2003 | 41.1 | 3.0 | 7 % |
| Q3 2003 | 4.1 | 4.2 | 1 0 2 % |
| Q4 2003 | 25.7 | 4.7 | 1 8 % |

| Q1 2004 | 28.8 | 1.1 | 4% |
| Q2 2004 | 20.7 | 5.4 | 26% |
| Q3 2004 | 1.6 | 7.9 | 494% |

102.    The above noted material financial misstatements did not simply end with Collins & Aikman's completely distorted audited and reviewed income statements.  For example, Collins & Aikman's audited and reviewed statements of cash flows balance sheets and statements of shareholders' equity were also materially misstated.  As noted in the SEC's SAB No. 99:

> *[T]he staff believes that* a registrant and the *auditors* of its financial statements *should not assume that even small intentional misstatements in financial statements, for example those pursuant to actions to "manage" earnings, are immaterial*.  While the intent of management does not render a misstatement material, it may provide significant evidence of materiality.  The evidence may be particularly compelling where management has intentionally misstated items in the financial statements to "manage" reported earnings.  In that instance, it presumably has done so believing that the resulting amounts and trends would be significant to users of the registrant's financial statements.  *The staff believes that investors generally would regard as significant a management practice to over- or under-state earnings up to an amount just short of a percentage threshold in order to "manage" earnings*.  Investors presumably also would regard as significant an accounting practice that, in essence, rendered all earnings figures subject to a management-directed margin of misstatement.  [Footnotes deleted, emphasis added.]

**Failure to Timely Record an Impairment
in the Value of Its Long-Lived Assets and Goodwill**

**103.**    In March 2005, Collins & Aikman announced $325 million and $175 million goodwill impairment charges associated with its U. S. and Mexico Plastics and Global Fabric divisions, respectively.  Pursuant to GAAP, *i.e.*, SFAS Nos. 142

and 144, long-lived assets and goodwill are to be tested for impairment whenever events or circumstances indicate that such assets may not be recoverable.

104.    Collins & Aikman's March 2005 announcement disclosed that the above-noted impairment charges were recorded after giving consideration to the impact of increases in raw material prices, pricing pressures from customers, general economic conditions, the state of the automotive industry, and other factors beyond management's control.  Indeed, these same conditions, which indicated to Collins & Aikman that the value of its reported long-lived and goodwill assets was impaired, were in existence long before Collins & Aikman was on the brink of bankruptcy in March 2005.

105.    For example, Collins & Aikman's U. S. and Mexico Plastics division was under such financial stress that, during the fourth quarter of 2003, it terminated approximately 500 of the division's employees and undertook a major restructuring initiative.  In fact, according to a July 27, 2005 article in the Detroit Free Press, the Company was losing an estimated $50 million a year on a single long-term plastics and fabrics contract with DaimlerChrysler.  Nonetheless, the Collins & Aikman financial statements audited and reviewed by KPMG failed to timely record an impairment in the value of the Company's long-lived assets and goodwill.

106.    As a result of the foregoing, the financial statements audited and reviewed by KPMG were presented in violation of at least the following provisions of GAAP:

(a)     SFAS No. 142, with respect to the impairment of goodwill;
and

(b)     SFAS No. 144, with respect to the impairment of long-
lived assets.

### Overstatement of Its Deferred Tax Assets

107.     Financial statements report a deferred tax asset to recognize an entity's probable future tax benefits.  Pursuant to GAAP, *i.e.*, SFAS No. 109, deferred tax assets must be realizable; that its, the entity's anticipated taxable income should be sufficient to support the value of the deferred tax asset.  When it is more likely than not that some portion or all of the tax deferred benefits will not be realized due to an uncertainty about an entity's future taxable income, GAAP requires that an appropriate portion of deferred tax assets be written off

108.     In March 2005, Collins & Aikman announced that its provision for income taxes for the fourth quarter of 2004 included a $175 million write-down of net deferred tax assets.  In recording the charge, Collins & Aikman determined that its deferred tax assets might not be realizable based on its analysis of the Company's future taxable income.

109.     Indeed, the realizeability of the Company's deferred assets was in question long before March 2005.  In fact, without giving effect to the artificial inflation of the Company's earnings resulting from the malfeasance alleged herein, Collins & Aikman's reported losses from its continuing operations totaled $171 million during the three years ended December 31, 2003.  In addition, the Company's operating results were adversely impacted by high acquired business

integration costs during 2001 and it was being squeezed between OEM cost-reduction mandates and raw material price increases as early as 2001.

110.    These conditions indicated that it was more likely than not that some portion of its deferred tax assets was not realizable.  Nonetheless, the Collins & Aikman's financial statements audited and reviewed by KPMG failed to timely record a write-down in the value of its deferred tax assets.  As a result, the financial statements audited and reviewed by PwC and KPMG were presented in violation of SFAS No. 109.

### Improper Reporting of Related Party Transactions

**111.**    GAAP, in SFAS No. 57, provides that an "enterprise's financial statements may not be complete without additional explanations of and information about related party transactions and thus may not be reliable."[7]  Accordingly, SFAS No. 57 requires that financial statements identify material related party transactions and disclose: (a) the nature of the relationship(s); (b) a description of the transaction(s); (c) the dollar amount of transactions for each period for which an income statement is presented; and (d) the amounts due from or to the related parties as of the date of each balance sheet.

---

[7] SFAS No. 57 defines related parties as: affiliates of the enterprise; entities for which investments are accounted for by the equity method by the enterprise; trusts for the benefit of employees; principal owners of the enterprise; its management; members of the immediate families of principal owners of the enterprise and its management; and other parties with which the enterprise may deal if one party controls or can significantly influence the management or operating policies of the other to an extent that one of the transacting parties might be prevented from fully pursuing its own separate interests.  Another party also is a related party if it can significantly influence the management or operating policies of the transacting parties or if it has an ownership interest in one of the transacting parties and can significantly influence the other to an extent that one or more of the transacting parties might be prevented from fully pursuing its own separate interests.

112.    In addition, the SEC's SAB Topic 4E, provides:

[I]n some cases, the significance of an amount may be independent of the amount involved.  For example, amounts due to and from officers and directors, because of their special nature and origin, ought generally to be set forth separately [in financial statements] even though the dollar amounts involved are relatively small.

113.    The Collins & Aikman financial statements audited and reviewed by PwC and KPMG failed to provide the disclosure called for under the above provisions of GAAP associated with its transactions with defendants Becker, McCallum and entities that they controlled.  As a result, the financial statements audited and reviewed by PwC and KPMG were presented in violation of at least GAAP's SFAS No. 57 and SAB Topic 4.

## Failure to Provide Appropriate
## Disclosure About its Ability to Continue as a Going Concern

114.    When there is substantial doubt about an entity's ability to continue as a going concern, GAAP, in the SEC's Codification of Financial Reporting Policies ("CFRP") §607.02, (via reference to Statement on Auditing Standards No. 34), requires financial statements to disclose the principal conditions that raise questions about the entity's ability to exist, the possible effects of such conditions, management's evaluation of the significance of those conditions and any mitigating factors.

115.    Despite these provisions of GAAP, the Collins & Aikman financial statements audited and reviewed by KPMG failed to provide the disclosure about Collins & Aikman's ability to continue as a going concern.

116.    As noted herein, as early as 2001, Collins & Aikman's operating results were adversely impacted by high business integration costs and were being

squeezed between OEM cost-reduction mandates and raw material price increases. As a result, the Company's reported losses from its continuing operations during the three years ended December 31, 2003, without giving effect to the fraud alleged herein, totaled $171 million. These conditions adversely impacted Collins & Aikman's liquidity, which deteriorated rapidly while its net debt nearly doubled, rising from $884 million at December 30, 2000, to approximately $1.6 billion at December 31, 2004.

117.    As a result of this liquidity crisis, Collins & Aikman was unable to pay for the staffing required by its customer contracts, causing projects to be grossly understaffed and mismanaged. This contributed to serious quality control issues resulting in a repeated inability of the Company's products to pass required inspection processes.

118.    In addition, as noted herein, Collins & Aikman was locked into a significant number of long-term money-losing contracts, particularly those with DaimlerChrysler. These internal adversities, coupled with the problems experienced by the U.S. automobile industry in general, created substantial doubt about Collins & Aikman's ability to continue as a going concern at least as early as 2003.

119.    Nonetheless, in violation of CFRP §607.02, the financial statements audited and reviewed by KPMG, improperly failed to provide appropriate disclosure about the Company's doubtful ability to continue as a going concern.

**Other Violations of GAAP**

**120.**    In addition to the accounting violations noted above, Defendants caused the Company to present its financial statements in a manner that also violated at least the following provisions of GAAP:

(a)    The concept that financial reporting should provide information that is useful to present to potential investors and creditors and other users in making rational investment, credit and similar decisions (Concepts Statement No. 1, 34);

(b)    The concept that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and the effects of transactions, events and circumstances that change resources and claims to those resources (Concepts Statement No. 1, 40);

(c)    The concept that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it. To the extent that management offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective investors and to the public in general (Concepts Statement No. 1, 50);

(d)    The concept that financial reporting should provide information about an enterprise's financial performance during a period. Investors and creditors often use information about the past to help in assessing the prospects of an enterprise. Thus, although investment and credit decisions reflect investors' expectations about future enterprise performance, those

expectations are commonly based at least partly on evaluations of past enterprise performance (Concepts Statement No. 1, 42);

(e)     The concept that financial reporting should be reliable in that it represents what it purports to represent.  That information should be reliable as well as relevant is a notion that is central to accounting (Concepts Statement No. 2, 58-59);

(f)     The concept of completeness, which means that nothing is left out of the information that may be necessary to ensure that it validly represents underlying events and conditions (Concepts Statement No. 2, 79); and

(g)     The concept that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered.  The best way to avoid injury to investors is to try to ensure that what is reported represents what it purports to represent (Concepts Statement No. 2, 95, 97).

121.    As a result of its numerous violations of GAAP, Collins & Aikman's true GAAP financial statements for the years ended December 31, 2001, 2002, and 2003 bear little resemblance to the financial statements "audited" by Defendants PwC and KPMG.  Indeed, the myriad of ways in which Collins & Aikman's financial statements violated GAAP, coupled with the duration of such violations and the magnitude of Collins & Aikman's financial misstatements, evidences PwC's and KPMG's negligence in the performance of their respective "audits" of Collins & Aikman's financial statements.

**PwC and KPMG Knew or Should Have Known that
Their "Audits" of Collins & Aikman's Financial Statements Were
Not Conducted in Accordance with GAAS**

122.    In certifying the Company's financial statements, Defendants PwC

and KPMG also falsely represented that their audits were conducted in accordance

with GAAS, which requires that:[8]

(a)    The audit is to be performed by a person or persons having

adequate technical training and proficiency as an auditor;

(b)    In all matters relating to the assignment, an independence

in mental attitude is to be maintained by the auditor or auditors;

(c)    Due professional care is to be exercised in the performance

of the audit and the preparation of the report;

(d)    The work is to be adequately planned and assistants, if any,

are to be properly supervised;

(e)    A sufficient understanding of the internal control structure

is to be obtained to plan the audit and to determine the nature, timing and extent

of the tests to be performed;

(f)    Sufficient competent evidential matter is to be obtained

through inspection, observation, inquiries and confirmations to afford a

reasonable basis for an opinion regarding the financial statements under audit;

(g)    Informative disclosures in the financial statements are to be

regarded as reasonably adequate unless otherwise stated in the report; and

---

[8] Prior to the creation of the PCAOB, the AICPA promulgated U.S. auditing standards. To
the extent they have not been superseded or amended by the PCAOB, the auditing standards
issued by the AICPA (which are codified and referred to as AU §___) have been adopted by
the PCAOB as its interim standards to be used on an initial, transitional basis.

(h)    The report shall either contain an expression of an opinion regarding the financial statements, taken as a whole, or an assertion to the effect that an opinion cannot be expressed.  When an overall opinion cannot be expressed, the report should contain a clear-cut indication of the character of the auditor's work, if any, and the degree of responsibility the auditor is taking.

123.    PwC's and KPMG's audit opinions on the Company's financial statements falsely represented that they performed their audits in accordance with U.S. auditing standards.  In fact, PwC and KPMG violated GAAS in numerous respects during the course of their "audits" of Collins & Aikman's financial statements.

124.    For example, GAAS, as set forth in AU §326, required PwC and KPMG to:

- Obtain sufficient competent evidential matter through inspection, observation, inquiries and confirmations to afford a reasonable basis for an opinion regarding the financial statements under audit;

- Consider whether specific audit objectives have been achieved in evaluating evidential matter;

- Be thorough in the search for evidential matter and unbiased in its evaluation;

- Design audit procedures to obtain competent evidential matter; and

- Consider relevant evidential matter regardless of whether it appears to corroborate or to contradict the assertions in the client's financial statements.

125.    In violation of the above GAAS standard, PwC and KPMG did not obtain sufficient competent evidential matter in the performance of their audits.

126.    For example, Defendants caused the Company to routinely arrange for third parties to create "false side-letters" which were provided to PwC and

KPMG as "proof" that the Company properly recorded the rebates in its accounting records. As noted in the AICPA's 1998/1999 *Audit Risk Alert*, side-agreements are "agreements hidden from an entity's Board of Directors and outside auditors that materially alter the terms and conditions of recorded [transactions]."[9]

127.    Here, however, false side-agreements were provided to PwC and KPMG as "proof" that Collins & Aikman properly recorded the rebates in their accounting record as being associated with achieved, rather than future, milestones. The mere presence of these false side letters clearly indicated to PwC and KPMG that either: (a) the original vendor agreements did not contain the provisions set forth in the side-agreements; or (b) the original vendor agreements contained terms which indicated the rebates were for *future* and not *achieved* milestones.

128.    Had PwC and KPMG examined Collins & Aikman's original supplier agreements in accordance with GAAS, they would have learned, if they did not already know, that such agreements contained provisions that were contrary to or silent about when Collins & Aikman was entitled to millions of dollars in rebates. In either case, it was highly irregular and implausible that the Company needed to procure numerous side-agreements since nearly all of the Company's original contracts with its suppliers either did not contain key terms or contained terms contrary to those set forth in the side letters regarding its entitlement to multi-million dollar rebates.

---

[9] *Audit Risk Alerts* are published by the AICPA to provide auditors with an overview of recent economic and professional developments that may affect the audits they perform.

129.    The conflicting or missing contractual supplier rebate entitlement provisions that Collins & Aikman had to repeatedly obtain in the form of side-agreements were a red flag which should have warned PwC and KPMG of an elevated risk that Collins & Aikman's financial statements may be materially misstated due to management fraud.  Nonetheless, both PwC and KPMG negligently failed to investigate or ignored this red flag and, in violation of GAAS, failed to obtain the audit evidence necessary to assess the propriety of Collins & Aikman's rebate accounting.  Indeed, PwC and KPMG did so in spite of repeated warnings by the SEC and AICPA which alerted them about the use of side-agreements to perpetrate financial fraud.  In fact, AICPA Audit and Accounting guides issued by the AICPA specifically indicate that the mere existence of side-agreements is a risk factor of material misstatement due to fraudulent financial reporting.

130.    It has now been determined that 84% of the rebate transactions constituting 96% of the total dollar value of all rebates were improperly recorded. Had PwC and KPMG obtained sufficient competent evidential matter in the course of "auditing" Collins & Aikman's financial statements in accordance with GAAS, they would have learned of, if they it did not already know, *that nearly all* of Collins & Aikman's recorded rebates were accounted for improperly.

131.    In addition, GAAS, in AU §316, required PwC and KPMG to plan and perform their audits in a manner which provided them reasonable assurance that Collins & Aikman's financial statements were free from misstatements caused by error or fraud.  This mandate included evaluating the business rationale

for significant, unusual transactions and events, such as Collins & Aikman's on-going need to procure side letters from vendors to justify its accounting for rebates.  In fact, AU §316 required PwC and KPMG to "gain an understanding of the business rationale for such transactions and whether that rationale (or the lack thereof) suggests that the transactions may have been entered into to engage in fraudulent financial reporting or conceal misappropriation of assets."

132.    AU §316 also should have put PwC and KPMG on notice of material financial misstatement risk factors arising from fraudulent financial reporting, which were present at Collins & Aikman including:

- A failure by management to display and communicate an appropriate attitude regarding internal control and the financial reporting process.  Specific indicators might include:

    (i)    Inadequate monitoring of significant controls;

    (ii)    Management failing to correct known reportable conditions on a timely basis;

    (iii)    Management continuing to employ ineffective accounting, information technology and internal auditing staff; and

    (iv)    Management setting unduly aggressive financial targets and expectations for operating personnel;

- High turnover of senior management, counsel, or board members;

- Strained relationship between management and the current or predecessor auditor.  Specific indicators might include:

    (v)    Frequent disputes with the current or predecessor auditor on accounting, auditing, or reporting matters; and

> (vi)    Domineering management behavior in dealing with the auditor, especially involving attempts to influence the scope of the auditor's work;

- High degree of competition or market saturation, accompanied by declining margins;

- Declining industry with increasing business failures and significant declines in customer demands;

- Significant related-party transactions not in the ordinary course of business or with related entities not audited or audited by another firm;

- Significant, unusual, or highly complex transactions, especially those close to year end, that pose difficult "substance over form" questions;

- Unusually high dependence on debt or marginal ability to meet debt repayment requirements; debt covenants that are difficult to maintain;

- Threat of imminent bankruptcy or foreclosure, or hostile takeover; and

- Significant pressure to obtain additional capital necessary to stay competitive considering the financial position of the entity – including need for funds to finance major research and development or capital expenditures.

133.    Each of the above risk factors, all of which were present at Collins & Aikman, was a red flag that should have warned PwC and KPMG about the risk of material misstatements in the Company's financial statements. Nonetheless, PwC and KPMG ignored these red flags and failed to adequately plan and perform their audit procedures in a manner reasonably designed to identify the numerous financial improprieties alleged herein. Such failures permitted Collins & Aikman to issue materially false and misleading financial statements over a multi-year period.

134.    Moreover, Section 10A of the Securities Exchange Act required PwC and KPMG to "determine," in the course of their audits, whether an illegal act occurred and to notify the SEC if they became aware of information indicating that an illegal act occurred (if Collins & Aikman's management or Board of Directors failed to take appropriate remedial action with respect to the illegal acts). In fact, the financial fraud alleged herein was not perpetrated by rogue employees at some distant location. Rather, it occurred at Collins & Aikman's headquarters where PwC and KPMG had virtually limitless access to the Company's personnel and corporate records, evidencing their negligent disregard for the requirements imposed by Section 10A of the Securities Exchange Act in the performance of their "audits" of Collins & Aikman's year end financial statements.

135.    In addition, GAAS Standard of Field Work No. 2 required PwC and KPMG to make a proper study of Collins & Aikman's existing internal controls, including accounting, financial and managerial controls, to determine whether reliance thereon was justified and, if such controls were not reliable, to expand the nature and scope of their auditing procedures. The standard provides that a sufficient understanding of an entity's internal control structure must be obtained to adequately plan the audit and to determine the nature, timing and extent of audit tests they must perform.

136.    Arthur Andersen, LLP ("AA"), which audited Collins & Aikman's financial statements prior to December 31, 2001,[10] put both PwC and KPMG on

---

[10] AA was terminated by Collins & Aikman during 2001, approximately one year prior to its indictment for obstruction of justice in connection with Enron Corporation.

notice that Collins & Aikman was experiencing ongoing deficiencies with its system of internal controls over its financial reporting.[11]  For example, AA noted Collins & Aikman's internal control deficiencies associated with: (i) IT systems, including those resulting from it acquisition of companies with disparate technologies; (ii) records supporting transactions included in its accounting ledgers; and (iii) the insufficiency of its staff training.

137.    In fact, both PwC and KPMG knew of and turned a blind eye towards Collins & Aikman's significant internal control deficiencies.  For example, in the summer of 2003, PwC sent a letter to the Company's Audit Committee and management that described Collins & Aikman's "reportable conditions."[12]  Specifically, on June 26, 2003, Collins & Aikman filed a Form 8-K with the SEC which stated:

> In connection with its 2001 audit, PricewaterhouseCoopers LLP communicated to the Audit Committee and to management reportable conditions in the Company's internal control systems, attributable primarily to integration issues from an acquisition completed during the third quarter of 2001, personnel turnover at the corporate and plant level and failure of two manufacturing facilities to follow Company procedures related to account reconciliations.  Corrective actions were implemented in 2002.  In connection with its 2002 audit, PricewaterhouseCoopers LLP communicated to the Audit Committee and to management reportable conditions in the Company's internal control system related to timely preparation of cash account reconciliations, review of non-standard journal entries, revenue accounting, and currency translation at foreign locations and compliance with established Company accounting policies and procedures.  These conditions were attributable

---

[11] AU §315 requires a newly retained auditor to communicate with the predecessor auditor about the company to be audited including matters relating to the company's internal controls.

[12] Reportable conditions are matters, in an auditor's judgment, that need be communicated to an entity's audit committee because they represent significant deficiencies in the design or operation of an entity's internal control which could adversely affect the entity's ability to initiate, record, process and report financial data.  AU § 325

primarily to computer systems, process harmonization and personnel integration issues from the December 20, 2001, TAC- Trim acquisition.

138.    Nonetheless, KPMG and PwC both ignored these and other internal control related flags during the course of their "audits" and issued unqualified opinions on Collins & Aikman's financial statements.  In fact, just weeks before filing for bankruptcy, Collins & Aikman announced that these same internal control deficiencies identified by AA and PwC in prior years remained uncorrected:

> [P]otential material weaknesses identified include the following: (i) the adequacy of the Company's resources with appropriate accounting expertise to address accounting and reporting matters in certain areas, including revenue recognition, vendor arrangements and post-retirement benefits, and to supervise the Company's decentralized and disparate accounting environment and ensure an appropriate segregation of duties; (ii) the adequacy of the Company's internal audit function's resources and ability to monitor compliance with established policies and procedures; (iii) the effectiveness of certain information technology controls and the sufficiency of documentation to assess the effectiveness of such controls including embedded system application controls; (iv) the adequacy of procedures to consistently identify and reconcile fixed assets and periodically review assets for impairment; and (v) the completeness and consistent adherence to Company policies and procedures.  These issues include a range of documentation-related issues and reconciliation issues.

139.    Collins & Aikman's limited internal investigation concluded that material weaknesses in its system of internal control contributed to the financial fraud alleged herein.

140.    PwC and KPMG, as auditors, were obligated to assess Collins & Aikman's internal financial and accounting controls and determine whether such controls were effective and if they complied with the requirements of SOX.  PwC and KPMG were also required by GAAS to evaluate whether Collins & Aikman's

deficient internal controls might lead or contribute to the risk of fraud not being

detected.  Nonetheless, PwC and KPMG were aware of and turned a blind eye

toward such deficiencies.

141.    GAAS also requires that auditors examine related party

transactions to ensure that they are properly accounted for so as to reflect their

economic substance rather than form.  According to AU §334, PwC and KPMG

were required to:

- Obtain an understanding of the business purpose of the related party transactions;

- Examine invoices, executed copies of agreements, contracts, and other pertinent documents;

- Determine whether the transaction has been approved by the board of directors or other appropriate officials;

- Test for reasonableness the compilation of amounts to be disclosed, or considered for disclosure, in the financial statements;

- Arrange for the audits of inter-company account balances to be performed as of concurrent dates, even if the fiscal years differ, and for the examination of specified, important, and representative related party transactions by the auditors for each of the parties, with appropriate exchange of relevant information;

- Inspect or confirm and obtain satisfaction concerning the transferability and value of collateral.

142.    PwC and KPMG violated the requirements of GAAS's AU §334

and failed to determine that the values Collins & Aikman ascribed to entities that

it purchased from Defendant McCallum in its financial statements were millions

of dollars greater than their respective appraised values, which otherwise

evidenced PwC's and KPMG's negligence in the performance of their audits of

Collins & Aikman's financial statements.  In fact, KPMG's audit was conducted

with such lack of care that it issued an unqualified audit opinion on Collins &
Aikman's financial statements after Collins & Aikman disclosed how its Audit
Committee commenced an investigation after two former Collins & Aikman
executives called into question the integrity of the Company's financial reporting
as a result of the improper related party transactions alleged herein.

143.    In addition to the foregoing violations of GAAS, PwC and KPMG
violated at least the following provisions of GAAS in auditing Collins &
Aikman's financial statements:

(a)    General Standard No. 3, which requires that due
professional care be exercised by the auditor in the performance of the audit and
the preparation of the audit report.  Due professional care also requires that the
auditor maintain professional skepticism in the course of auditing a client's
financial statements.

(b)    GAAS Standard of Reporting No. 1, which requires the
audit report to state whether the financial statements are presented in accordance
with GAAP.  PwC's and KPMG's opinion falsely represented that Collins &
Aikman's financial statements were presented in conformity with GAAP when
they were not for the myriad of reasons herein alleged.

(c)    GAAS Standard of Reporting No. 4, which requires that
when an opinion on the financial statements as a whole cannot be expressed, the
reasons therefore must be stated.  PwC and KPMG were required to state that
either no opinion could be issued by them on Collins & Aikman's financial
statements or else issue an adverse opinion stating that such financial statements

were not fairly presented in conformity with GAAS. PwC's and KPMG's failure
to make such a qualification, correction, modification and/or withdrawal of its
audit opinions was a violation of GAAS, including the fourth standard of
reporting.

(d)    GAAS General Standard No. 2, which requires that
independence in mental attitude is to be maintained by the auditor in all matters
related to the audit.

(e)    GAAS General Standard No. 1, which requires that audits
be performed by persons having adequate technical training and proficiency.

(f)    GAAS Standard of Field Work No. 1, which requires that
the audit is to be adequately planned and that assistants should be properly
supervised.

(g)    GAAS Standard of Reporting No. 2, which requires that the
audit report identify circumstances in which GAAP has not been consistently
observed.

144.    As they knew or negligently ignored, Defendants PwC and KPMG
falsely represented that they conducted their audits of Collins & Aikman's
financial statements in accordance with each of the above-noted auditing
standards.

### KPMG's Additional Violations of GAAS

**145.**    GAAS, in AU§ 341, required KPMG to evaluate whether there was
substantial doubt about Collins & Aikman's ability to continue as a going concern
for a reasonable period of time after December 31, 2003. In fact, this assessment is
of such importance to an informed investment decision that, in 1995, Congress added

section 10A to the Exchange Act which requires each public company audit to include procedures to evaluate an issuer's ability to continue as a going concern.

146.    Had KPMG performed its audit in accordance with GAAS and Section 10A of the Exchange Act, it would have realized, if it did not already know, that Collins & Aikman's on-going liquidity crisis hampered its ability to continue as a going concern, that should have caused KPMG to appropriately modify its audit report to reflect such condition.

147.    For example, several existing tests can be used to help assess an entity's solvency.  These financial tests include:

(a)    <u>Balance Sheet Tests</u> – Balance sheet tests incorporate varying financial analyses that examine different relationships between an entity's tangible assets and liabilities.  These analyses include: (i) a Book Value Balance Sheet Analysis, which adjusts an entity's balance sheet to remove low value intangible assets and include off balance sheet liabilities; (ii) a Total Enterprise Value Analysis, which compares an entity's enterprise value to its total liabilities after adding certain off-balance sheet liabilities; and (iii), a Liquidation Analysis, which assesses the amount an entity would receive from its net assets sold in liquidation.

(b)    <u>Reasonable Capital Test</u> – The reasonable capital test examines whether an entity can meet its obligations as they come due, operate as a going concern and provide a margin of safety without being forced to make unplanned asset dispositions, materially change its operations, or restructure its debt.

      (c)   <u>Cash Flow Test</u> – The cash flow test examines whether an entity can reasonably expect to pay its debts as they come due.

148.   In fact, the above noted tests indicate that there was substantial doubt about Collins & Aikman's ability to continue as a going concern during the year ended December 31, 2003, which was the date of Collins & Aikman's financial statements audited by KPMG.

149.   PwC's and KPMG's failures to adequately perform their audit procedures to identify the improprieties alleged herein, and their failures to report the problems described herein, permitted the accounting irregularities and improprieties to continue over a multi-year period, leading to false and misstated financial statements and resulting in the Company's deepening insolvency.

150.   Defendants PwC and KPMG owed a duty to Collins & Aikman to perform their accounting and auditing services with reasonable care and competence.  As worldwide firms of Certified Public Accountants, auditors and business consultants, PwC and KPMG were well aware of their duties and obligations in serving as the Company's "independent auditor." Indeed the websites of PwC and KPMG proclaim:

> **PwC**The financial statement audit has never been more important.  In today's business environment there is more scrutiny and skepticism of a company's financial statements than ever before.  Investors have lost faith in corporate governance and reporting and they expect more: greater reliability, more oversight and clear evidence of internal controls. Corporate management, boards and audit committees, internal and external auditors, analysts and other investment professionals all have important roles to play in rebuilding investor trust by executing their respective responsibilities, keeping in mind both legal obligations and the heightened expectations of investors.  Meeting investor expectations begins with the completeness and accuracy of information contained in a company's financial statements.

\*\*\*

. . . PwC can provide high quality audit services. We can also address any specific regulatory reporting requirements such as those under Sarbanes-Oxley §404 for SEC registrants, including foreign private issuers.PwC's work takes into account all current and where appropriate, prospective auditing, accounting, and reporting regulations and guidance. Our audit clients include many of the world's leading multinational corporations, as well as many small and medium-sized companies and a significant number of local authorities and other public sector bodies.**KPMG**An independent audit of financial statements is one of the foundations for the effective operation of the capital markets. Audit quality is vital for maintaining trust in the financial reporting process and the integrity of financial information. Audit teams equipped with a high level of technical skills and empowered with professional skepticism provide the heart and soul of a good audit. In addition, we believe:Audit methodologies must focus on fundamentals and guide good audit judgments. Technology can provide for effective information gathering, allow for critical data comparisons, and enhance contextual analysis. Compliance tools help the auditor meet professional and regulatory requirements. Cultural values should encourage sound judgment and objectivity. KPMG's approach to audit services addresses each of these areas.A multidisciplinary approach means audit engagement teams include experienced professionals in such areas as forensics, tax, information risk management and valuation, providing them with a broad understanding of an organization, and enabling teams to focus on key areas of risk, adequacy of internal controls, and potential fraud.Using KPMG's global training platform, KPMG member firm professionals have access to industry training, technical skill building, and instruction in KPMG's audit methodology.Recognizing the importance of audit committees, KPMG established the Audit Committee Institute (ACI) to help provide a resource to audit committee members to help them keep pace with evolving business issues related to governance, audit issues, accounting, and financial reporting.KPMG understands the increased regulatory pressures that companies are facing. In 2004, KPMG launched the 404 Institute to provide a forum where organizations could learn more about the requirements of section 404 of the Sarbanes-Oxley Act, share leading practices, and discuss ways to address the evolution of effective internal controls.We believe organizational culture has a significant impact on audit quality. Central to our culture are our values and our code of conduct, which are fundamental to how business is done. KPMG member firms understand and value their role in the capital markets and will continually seek to enhance the perception of our profession by supporting our people, strengthening quality, and affirming the importance of trust and integrity.

151.    In truth and in fact, the personnel at PwC and KPMG abandoned

their roles as independent auditors and turned a blind eye to numerous red flags

and violations of GAAP, GAAS and PCAOB standards. PwC and KPMG negligently issued unqualified audit opinions on Collins & Aikman's financial statements to protect the lucrative business relationships they enjoyed with the Company and consented to the inclusion of their unqualified opinions on the Collins & Aikman's financial statements, including their SEC reports on Forms 10-K, which reports they knew, or should have known, were materially false and misleading.

152. The above facts demonstrate negligence by PwC's and KPMG's Detroit office personnel in the performance of their respective "audits" of the Company's year end 2001, 2002 and 2003 financial statements and reviews of Collins & Aikman's interim 2001, 2002, 2003 and 2004 financial statements filed with the SEC, which aided and abetted the Director and Officer Defendants in breaching their fiduciary duties to the Company.

## FIRST CLAIM FOR RELIEF

**Violations of Section 10(b) of the Exchange
Act and Rule 10b-5 Promulgated Thereunder
Against the Director and Officer Defendants**

153. Plaintiffs hereby incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein. This Claim for Relief is asserted against the Director and Officer Defendants.

154. The Director and Officer Defendants and others acting at their direction caused Collins & Aikman to issue materially false and misleading statements, as detailed above, which they knew, or deliberately disregarded that they were, misleading in that they contained misrepresentations and failed to

disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

155.    The Director and Officer Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they:

        (a)    Employed devices, schemes, and artifices to defraud;

        (b)    Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

        (c)    Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Collins & Aikman.

156.    Collins & Aikman sold securities in reliance on Director and Officer Defendants' materially false and misleading statements and has been damaged thereby.  Collins & Aikman sold securities and used the proceeds to prop up and sustain a business that was hemorrhaging cash.  The issuance of the securities deepened the Company's insolvency and it would not have been able to issue the securities had Director and Officer Defendants not engaged in the fraudulent scheme detailed herein.

157.    As a direct and proximate result of these Defendants' wrongful conduct, Collins & Aikman suffered damages in connection with its sales of securities and the issuance of the materially false and misleading statements alleged herein.

**SECOND CLAIM FOR RELIEF**

**Violations of Section 14(a) of the Exchange Act
and Rule 14a-9 Promulgated Thereunder
Against the Director and Officer Defendants**

**158.**    Plaintiffs hereby incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.  This Claim for Relief is asserted against the Director and Officer Defendants.

159.    Rule 14a-9, promulgated pursuant to Section 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading."  17 C.F.R. §240.14a-9.

160.    The 2002-2004 Proxy Statements violated Section14(a) and Rule 14a-9 because they omitted material facts, including that Collins & Aikman's reported financial results were artificially inflated through a variety of improper accounting practices and the Company was then experiencing severe liquidity constraints.

161.    In the exercise of reasonable care, Heartland and the Director and Officer Defendants should have known that the Proxy Statements were materially false and misleading.

162.    The misrepresentations and omissions in the Proxy Statements were material to shareholders of Collins & Aikman in voting pursuant to each Proxy Statement.  The Proxy Statements were an essential link in the accomplishment of the continuation of Defendants' fraudulent scheme, as revelations of the truth would have immediately thwarted a continuation of

shareholders' endorsement of the directors' positions, the executive officers' compensation and the Company's compensation policies.

163.    Collins & Aikman was damaged as a result of the material misrepresentations and omissions in the Proxy Statements.

### THIRD CLAIM FOR RELIEF

**Breach of Fiduciary Duty Against the
Director and Officer Defendants and Heartland**

**164.**    Plaintiffs hereby incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.  This Claim for Relief is asserted against the Director and Officer Defendants and Heartland.

165.    The Director and Officer Defendants were all either directors and/or officers of the Company who owed fiduciary duties of loyalty, good faith and care to the Company.  As the Company's controlling shareholder and by virtue of its designation of a majority of the Company's directors, Heartland owed Collins & Aikman fiduciary duties of loyalty and care not to take actions to benefit itself to the detriment of the Company.  Heartland breached these fiduciary duties by causing, permitting, enabling, acquiescing and aiding and abetting the fraudulent scheme detailed herein.

166.    The Director and Officer Defendants breached their duties of loyalty, good faith and care to the Company and the creditors of the Company by orchestrating, encouraging or utilizing various accounting schemes as set forth herein which materially misstated the financial condition of the Company.

167.    Collins & Aikman suffered damages as a result of these accounting schemes, including but not limited to incurring additional and unnecessary debt

and costs associated with certain debt, and using the proceeds thereof to cause and facilitate a deepening insolvency and a loss of opportunity to restructure itself as a going concern and institute a business strategy that recognized the true financial condition of the Company. Ultimately, the Company filed for bankruptcy protection and is being totally liquidated at a fraction of its going-concern value due to the irreparable damages suffered as a consequence thereof. Such misconduct constitutes a breach of the duties of good faith, care and loyalty owed by these Defendants, as well as corporate waste.

### FOURTH CLAIM FOR RELIEF

**Unjust Enrichment Against the Director**
**and Officer Defendants and Heartland**

**168.**    Plaintiffs hereby incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein. This Claim for Relief is asserted against the Director and Officer Defendants and Heartland.

169.    The Director and Officer Defendants and Heartland personally benefited by engaging in the conduct described above, including but not limited to causing Collins & Aikman to pay inflated prices for goods, services and corporate acquisitions; violating the federal securities laws; making false and misleading statements; and causing the Company to file materially false and misleading press releases and documents with the SEC in order to increase the borrowings of the Company to a level far in excess of its ability to pay.

170.    It is inequitable and unjust for the Director and Officer Defendants and Heartland to have received and retained such benefits as are described above.

The Director and Officer Defendants and Heartland are obligated to disgorge monies and securities obtained improperly.

### FIFTH CLAIM FOR RELIEF

**Fraud Against the Director and Officer Defendants**

171.    Plaintiffs hereby incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.  This Claim for Relief is asserted against the Director and Officer Defendants.

172.    Form late 2001 to May 2005, the Director and Officer Defendants made misrepresentations of material facts to Collins & Aikman's Board of Directors and Audit Committee relating to the true financial condition of the Company, as alleged herein.

173.    The conduct of the Director and Officer Defendants, whether intentional, reckless, grossly negligent or mistaken, constituted fraud.

174.    The Director and Officer Defendants knew or should have known that the Company, through its Board of Directors and Audit Committee, would rely and act on the misrepresentations.

175.    Collins & Aikman, through its Board of Directors, including its Audit Committee, in electing and appointing the defendant officers, justifiably relied upon the Director and Officer Defendants' misrepresentations.

176.    As a direct and proximate result of reliance on the misrepresentations of the Director and Officer Defendants, Collins & Aikman suffered damage and injury in that it was denied the opportunity to continue as a going concern and its value as a business enterprise significantly decreased. Moreover, as a direct result of the fraudulent conduct of the Director and Officer

Defendants, Collins & Aikman incurred unnecessary operating expenses and suffered deepening insolvency, resulting in its filing for bankruptcy protection in May of 2005.

### SIXTH CLAIM FOR RELIEF

**Against Heartland for Breach of
Express and Implied Contractual Obligations**

177.    Plaintiffs hereby incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.  This Claim for Relief is asserted against Heartland.

178.    By virtue of the Heartland Services Agreement, Heartland assumed express and implied contractual obligations to the Company.  These obligations included the responsibility to provide the Company with "advisory and consulting services in relation to the affairs . . . of the Company and its subsidiaries".  Through its representatives and designees, Heartland thereby exercised supervision and oversight of every aspect of the Company's affairs.  The Company reasonably relied upon Heartland to ensure that the Company's affairs were properly and lawfully conducted.  As alleged above, the Company paid Heartland tens of millions of dollars to perform the duties contemplated by the Heartland Services Agreement.

179.    In violation of its express and implied undertakings, including the obligations of good faith and fair dealing and honest performance of its contractual duties, Heartland, through its representatives and designees, failed to perform the contracted for services fairly, lawfully, and in a manner calculated to serve the best interests of the Company.  Instead, Heartland performed its duties

under the Heartland Services Agreement to serve its own ends to the detriment of the Company, as hereinabove alleged.

180.    As a direct and proximate result of Heartland's breach of contract, Collins & Aikman suffered serious damage and injury in that it was denied the opportunity to continue as a going concern and its value as a business enterprise significantly decreased, ultimately forcing the Company to file for bankruptcy protection in May of 2005.

## SEVENTH CLAIM FOR RELIEF

**Fraud Against PwC and KPMG**

**181.**    Plaintiffs hereby incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.  This Claim for Relief is asserted against PwC and KPMG.

182.    From 2001 to 2003, PwC made misrepresentations of material facts to Collins & Aikman through its audits and reviews of Collins & Aikman's financial statements, as alleged herein.

183.    From 2003 to 2005, KPMG made misrepresentations of material facts to Collins & Aikman through its audits and reviews of Collins & Aikman's financial statements, as alleged herein.

184.    PwC's conduct whether intentional, reckless, or mistaken constituted fraud.

185.    KPMG's conduct whether intentional, reckless, or mistaken constituted fraud.

186.    PwC knew or should have known that Collins & Aikman would act on the misrepresentations.

187.    KPMG knew or should have known that Collins & Aikman would act on the misrepresentations.

188.    The Company and its Board of Directors, including its Audit Committee, in hiring an experienced, independent auditor, justifiably relied upon PwC's misrepresentations.

189.    The Company and its Board of Directors, including its Audit Committee, in hiring an experienced, independent auditor, justifiably relied upon KPMG's misrepresentations.

190.    As a direct and proximate result of reliance on PwC's misrepresentations, Collins & Aikman suffered damage and injury in that it was denied the opportunity to continue as a going concern and its value as a business enterprise significantly decreased.  Additionally, Collins & Aikman suffered loss of use of its money and incurred significant debt as a direct result of PwC's fraudulent conduct.  Moreover, as a direct result of PwC's fraud, Collins & Aikman incurred unnecessary operating expenses, suffered deepening insolvency and filed for bankruptcy protection in May of 2005.

191.    As a direct and proximate result of reliance on KPMG's misrepresentations, Collins & Aikman suffered damage and injury in that it was denied the opportunity to continue as a going concern and its value as a business enterprise significantly decreased.  Additionally, Collins & Aikman suffered loss of use of its money and incurred significant debt as a direct result of KPMG's fraudulent conduct.  Moreover, as a direct result of KPMG's fraud, Collins &

Aikman incurred unnecessary operating expenses, suffered deepening insolvency and filed for bankruptcy protection in May of 2005.

## EIGHTH CLAIM FOR RELIEF

**Negligence/Malpractice Against PwC**

    **192.**    Plaintiffs hereby incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.  This Claim for Relief is asserted against PwC.

    193.    Having been engaged by Collins & Aikman to perform auditing services, PwC had a duty to exercise reasonable care and skill to comply with the applicable standard of care in performing its obligations to Collins & Aikman.

    194.    PwC breached its duty of care to Collins & Aikman in failing to comply with the standard of care by negligently permitting Collins & Aikman's financial statements to contain untrue statements of material facts and/or permitting the omission of material facts necessary to make the statements fairly represent the financial condition of Collins & Aikman.  PwC knew or reasonably should have known that Collins & Aikman, through its Board of Directors and Audit Committee, would rely upon such publicly disseminated statements.

## NINTH CLAIM FOR RELIEF

**Negligence/Malpractice Against KPMG**

    **195.**    Plaintiffs hereby incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.  This Claim for Relief is asserted against KPMG.

196.    Having been engaged by Collins & Aikman to perform auditing services, KPMG had a duty to exercise reasonable care and skill to comply with the applicable standard of care in performing its obligations to Collins & Aikman.

197.    KPMG breached its duty of care to Collins & Aikman in failing to comply with the standard of care by negligently permitting Collins & Aikman's financial statements to contain untrue statements of material facts and/or permitting the omission of material facts necessary to make the statements fairly represent the financial condition of Collins & Aikman.  KPMG knew or reasonably should have known that Collins & Aikman, through its Board of Directors and Audit Committee, would rely upon such publicly disseminated statements.

## TENTH CLAIM FOR RELIEF

**Breach of Contract Against PwC**

**198.**    Plaintiffs hereby incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.  This Claim for Relief is asserted against PwC.

199.    During the years 2001 and 2002, PwC and Collins & Aikman entered into service agreements whereby PwC would provide accounting and auditing services to Collins & Aikman.  The terms of the agreements required that PwC perform its services in accordance with generally accepted auditing standards and applicable standards promulgated by the American Institute of Certified Public Accountants.

200.    In performing its auditing, review and accounting services, PwC contractually obligated itself to report to the Company's Audit committee any

matters that would cause PwC to believe that the Company's year-end and interim financial statements were "probably" materially misstated as a result of a departure from GAAP.  In connection with the planning and performance of its audits, PwC had a contractual duty to communicate certain matters to the Audit Committee, including reporting any fraud that either involved senior management and/or caused a material misstatement in the financial statements.  Additionally, PwC had a contractual duty to report to the Audit Committee all significant deficiencies in the design or operation of internal controls adversely affecting the Company's ability to record, process, summarize and report financial data consistent with the assertions of management in the financial statements.

201.    PwC failed to perform pursuant to the agreements and materially breached the agreements by failing to comply with the terms of the agreements, including, but not limited to:

- Failing to perform the audits in accordance with GAAS and other applicable auditing standards;

- Failing to plan and perform its audits to obtain reasonable assurance as to whether the financial statements were free of material misstatements;

- Failing to properly examine, on a test basis, evidence to support the amounts and disclosures in financial statements; and

- Failing to ensure that the Audit Committee was adequately informed of all reportable conditions and/or fraud involving senior management or causing a material misstatement of the financial statements.

202.    Collins & Aikman paid substantial fees to PwC to perform its audits and quarterly reviews.  Collins & Aikman received inadequate value for the substantial fees paid for reasons previously detailed.

203.    As a direct and proximate result of PwC's breach of contract, Collins & Aikman suffered damage and injury in that it was denied the opportunity to continue as a going concern and its value as a business enterprise significantly decreased.  Additionally, the Company suffered a loss of use of money, and incurred significant debt as a direct result of PwC's breach of contract.  Moreover, as a direct and proximate result of PwC's breach of contract, the Company incurred unnecessary operating expenses and filed for bankruptcy protection in May of 2005.

## ELEVENTH CLAIM FOR RELIEF

**Breach of Contract Against KPMG**

**204.**    Plaintiffs hereby incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.  This Claim for Relief is asserted against KPMG.

205.    During the years 2001 and 2002, KPMG and Collins & Aikman entered into service agreements whereby KPMG would provide accounting and auditing services to Collins & Aikman.  The terms of the agreements required that KPMG perform its services in accordance with generally accepted auditing standards and applicable standards promulgated by the American Institute of Certified Public Accountants.

206.    In performing its auditing, review and accounting services, KPMG contractually obligated itself to report to the Company's Audit committee any matters that would cause KPMG to believe that the Company's year-end and interim financial statements were "probably" materially misstated as a result of a departure from GAAP.  In connection with the planning and performance of its

audits, KPMG had a contractual duty to communicate certain matters to the Audit

Committee, including reporting any fraud that either involved senior management

and/or caused a material misstatement in the financial statements.  Additionally,

KPMG had a contractual duty to report to the Audit Committee all significant

deficiencies in the design or operation of internal controls adversely affecting the

Company's ability to record, process, summarize and report financial data

consistent with the assertions of management in the financial statements.

207.    KPMG failed to perform pursuant to the agreements and materially

breached the agreements by failing to comply with the terms of the agreements,

including, but not limited to:

- Failing to perform the audits in accordance with GAAS and other applicable auditing standards;

- Failing to plan and perform its audits to obtain reasonable assurance as to whether the financial statements were free of material misstatements;

- Failing to properly examine, on a test basis, evidence to support the amounts and disclosures in financial statements; and

- Failing to ensure that the Audit Committee was adequately informed of all reportable conditions and/or fraud involving senior management or causing a material misstatement of the financial statements.

208.    Collins & Aikman paid substantial fees to KPMG to perform its

audits and quarterly reviews.  Collins & Aikman received inadequate value for

the substantial fees paid for reasons previously detailed.

209.    As a direct and proximate result of KPMG's breach of contract,

Collins & Aikman suffered damage and injury in that it was denied the

opportunity to continue as a going concern and its value as a business enterprise

significantly decreased.  Additionally, the Company suffered a loss of use of

money, and incurred significant debt as a direct result of KPMG's breach of

contract.  Moreover, as a direct and proximate result of KPMG's breach of

contract, the Company incurred unnecessary operating expenses and filed for

bankruptcy protection in May of 2005.

## TWELFTH CLAIM FOR RELIEF

**Aiding & Abetting Against PwC and KPMG**

210.    Plaintiffs hereby incorporate by reference and reallege each and every

allegation set forth above, as though fully set forth herein.  This Claim for Relief is

asserted against PwC and KPMG.

211.    Having been engaged by Collins & Aikman to perform auditing

services, PwC and KPMG had a duty to exercise reasonable care and skill to

comply with the appropriate standard of care in performing their obligations to

Collins & Aikman.

212.    The officers of Collins & Aikman owed fiduciary obligations to

Collins & Aikman.  Said officers breached their fiduciary duties owed to Collins

& Aikman and directly caused damages to Collins & Aikman as a result of their

breach.

213.    PwC and KPMG, by failing to comply with the standard of care,

and failing to perform their duties in compliance with GAAS, substantially

assisted, aided or encouraged the perpetuation of the breaches of the officers'

fiduciary duties.  By failing to bring material misstatements and fraudulent

conduct to the attention of the Board of Directors and the Audit Committee, and

the public if necessary, PwC and KPMG enabled the officers to continue their

breaches of fiduciary duties owed to Collins & Aikman on an ongoing basis, to the detriment of the Company.

214.    PwC and KPMG knew of the officers' breaches of fiduciary duty and knew that their conduct of failing to take proper action in accordance with accounting standards, including GAAS, and PwC's and KPMG's engagement contract with the Company, furthered the wrongful conduct of the officers.

215.    As a direct and proximate result of PwC's and KPMG's conspiracy with the officers, the officers were able to continue their breaches of fiduciary duties, without the knowledge of the Board of Directors and the Audit Committee.  As a direct and proximate result, Collins & Aikman suffered damage and injury in that it was denied the opportunity to continue as a going concern and its value as a business enterprise significantly decreased.  Additionally, the Company suffered a loss of use of money, and incurred significant debt as a direct result of PwC's and KPMG's conspiracy with the officers.  Moreover, as a direct and proximate result of PwC's and KPMG's conspiracy with the officers, the Company incurred unnecessary operating expenses and filed for bankruptcy protection in May of 2005.

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

(a)    Directing Defendants to account to Plaintiffs for all damages Plaintiffs sustained by reason of wrongs complained of herein;

(b)    Requiring the Director and Officer Defendants to repay to Plaintiffs all salaries and the value of other remuneration of any kind paid to them during the time they were in breach of the fiduciary duties they owed to Plaintiffs;

(c)    Directing the Director and Officer Defendants to make restitution to Plaintiffs for all sums of money and other things of value by which they were unjustly enriched as a result of the wrongs they committed;

(d)     Directing the Heartland Defendants to make restitution to Plaintiffs for all compensation, profits and other things of value by which they were unjustly enriched as a result of the wrongs they committed;

(e)     Requiring KPMG and PwC to repay to Plaintiffs all compensation and the value of all other remuneration of any kind paid to them by Plaintiffs during the time they were in breach of the duties they owed to Plaintiffs;

(f)     Directing Defendants to pay interest at the highest rate allowable by law on the amount of damages sustained by Plaintiffs as a result of Defendants' culpable conduct and all restitution and other monetary relief awarded to Plaintiffs.

(g)     Awarding Plaintiffs the costs and disbursements of this action, including reasonable attorneys' fees and expenses;

(h)     Granting such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.


DATED:  May 16, 2007

ROSENTHAL, MONHAIT & GODDESS, P.A.

*/s/ Joseph A. Rosenthal* Joseph A. Rosenthal (Del. Bar No. 234)
Carmella P. Keener (Del. Bar No. 2810)
919 N. Market Street, Suite 1401
P.O. Box 1070
Wilmington, DE  19899
(302) 656-4433jrosenthal@rmgglaw.comckeener@rmgglaw.com *Attorneys for Plaintiffs*



*Local Counsel*

LERACH COUGHLIN STOIA GELLER      RUDMAN & ROBBINS LLP
SAMUEL H. RUDMAN
DAVID A. ROSENFELD
58 South Service Road, Suite 200Melville, NY  11747
(631) 367-7100

LERACH COUGHLIN STOIA
GELLER       RUDMAN & ROBBINS LLP
PATRICK J. COUGHLIN
655 West Broadway, Suite 1900
San Diego, CA  92101-3301
(619) 231-1058

*Special Counsel for Collins & Aikman
Corporation, et al.*

JS 44 (Rev. 11/04)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.  (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

| I. (a)  PLAINTIFFS   Collins & Aikman Corporation and Collins & Aikman Products Co., as Debtors in Possession | DEFENDANTS   David A. Stockman, J. Michael Stepp, Bryce M. Koth, David R. Cosgrove, Paul C. Barnaba, Robert A. Krause, John A. Galante, Charles E. Becker, Elkin McCallum, (see attached) |
|---|---|
| **(b)** County of Residence of First Listed Plaintiff   New Castle, Delaware<br>(EXCEPT IN U.S. PLAINTIFF CASES) | County of Residence of First Listed Defendant<br>(IN U.S. PLAINTIFF CASES ONLY)<br>NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED. |
| **(c)** Attorney's (Firm Name, Address, and Telephone Number)<br>Joseph A. Rosenthal, Esquire, Rosenthal, Monhait & Goddess, P.A.<br>919 N. Market Street, Suite 1401, P.O. Box 1070, Wilmington, Delaware 19899 | Attorneys (If Known) |

| II.  BASIS OF JURISDICTION (Place an "X" in One Box Only) | | III.  CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant) | | | |
|---|---|---|---|---|---|
| | | (For Diversity Cases Only) | | | |
| ☐ 1   U.S. Government<br>Plaintiff | ☒ 3   Federal Question<br>(U.S. Government Not a Party) | | PTF   DEF | | PTF   DEF |
| | | Citizen of This State | ☐ 1    ☐ 1 | Incorporated or Principal Place<br>of Business In This State | ☐ 4    ☐ 4 |
| ☐ 2   U.S. Government<br>Defendant | ☐ 4   Diversity<br>(Indicate Citizenship of Parties in Item III) | Citizen of Another State | ☐ 2    ☐ 2 | Incorporated and Principal Place<br>of Business In Another State | ☐ 5    ☐ 5 |
| | | Citizen or Subject of a<br>Foreign Country | ☐ 3    ☐ 3 | Foreign Nation | ☐ 6    ☐ 6 |

## IV.  NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment<br>  & Enforcement of Judgment<br>☐ 151 Medicare Act<br>☐ 152 Recovery of Defaulted<br>  Student Loans<br>  (Excl. Veterans)<br>☐ 153 Recovery of Overpayment<br>  of Veteran's Benefits<br>☐ 160 Stockholders' Suits<br>☐ 190 Other Contract<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | **PERSONAL INJURY**<br>☐ 310 Airplane<br>☐ 315 Airplane Product<br>  Liability<br>☐ 320 Assault, Libel &<br>  Slander<br>☐ 330 Federal Employers'<br>  Liability<br>☐ 340 Marine<br>☐ 345 Marine Product<br>  Liability<br>☐ 350 Motor Vehicle<br>☐ 355 Motor Vehicle<br>  Product Liability<br>☐ 360 Other Personal<br>  Injury | **PERSONAL INJURY**<br>☐ 362 Personal Injury -<br>  Med. Malpractice<br>☐ 365 Personal Injury -<br>  Product Liability<br>☐ 368 Asbestos Personal<br>  Injury Product<br>  Liability<br>**PERSONAL PROPERTY**<br>☐ 370 Other Fraud<br>☐ 371 Truth in Lending<br>☐ 380 Other Personal<br>  Property Damage<br>☐ 385 Property Damage<br>  Product Liability | ☐ 610 Agriculture<br>☐ 620 Other Food & Drug<br>☐ 625 Drug Related Seizure<br>  of Property 21 USC 881<br>☐ 630 Liquor Laws<br>☐ 640 R.R. & Truck<br>☐ 650 Airline Regs.<br>☐ 660 Occupational<br>  Safety/Health<br>☐ 690 Other<br>**LABOR**<br>☐ 710 Fair Labor Standards<br>  Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt.Reporting<br>  & Disclosure Act<br>☐ 740 Railway Labor Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc.<br>  Security Act | ☐ 422 Appeal 28 USC 158<br>☐ 423 Withdrawal<br>  28 USC 157<br>**PROPERTY RIGHTS**<br>☐ 820 Copyrights<br>☐ 830 Patent<br>☐ 840 Trademark<br>**SOCIAL SECURITY**<br>☐ 861 HIA (1395ff)<br>☐ 862 Black Lung (923)<br>☐ 863 DIWC/DIWW (405(g))<br>☐ 864 SSID Title XVI<br>☐ 865 RSI (405(g))<br>**FEDERAL TAX SUITS**<br>☐ 870 Taxes (U.S. Plaintiff<br>  or Defendant)<br>☐ 871 IRS—Third Party<br>  26 USC 7609 | ☐ 400 State Reapportionment<br>☐ 410 Antitrust<br>☐ 430 Banks and Banking<br>☐ 450 Commerce<br>☐ 460 Deportation<br>☐ 470 Racketeer Influenced and<br>  Corrupt Organizations<br>☐ 480 Consumer Credit<br>☐ 490 Cable/Sat TV<br>☐ 810 Selective Service<br>☒ 850 Securities/Commodities/<br>  Exchange<br>☐ 875 Customer Challenge<br>  12 USC 3410<br>☐ 890 Other Statutory Actions<br>☐ 891 Agricultural Acts<br>☐ 892 Economic Stabilization Act<br>☐ 893 Environmental Matters<br>☐ 894 Energy Allocation Act<br>☐ 895 Freedom of Information<br>  Act<br>☐ 900 Appeal of Fee Determination<br>  Under Equal Access<br>  to Justice<br>☐ 950 Constitutionality of<br>  State Statutes |
| **REAL PROPERTY**<br>☐ 210 Land Condemnation<br>☐ 220 Foreclosure<br>☐ 230 Rent Lease & Ejectment<br>☐ 240 Torts to Land<br>☐ 245 Tort Product Liability<br>☐ 290 All Other Real Property | **CIVIL RIGHTS**<br>☐ 441 Voting<br>☐ 442 Employment<br>☐ 443 Housing/<br>  Accommodations<br>☐ 444 Welfare<br>☐ 445 Amer. w/Disabilities -<br>  Employment<br>☐ 446 Amer. w/Disabilities -<br>  Other<br>☐ 440 Other Civil Rights | **PRISONER PETITIONS**<br>☐ 510 Motions to Vacate<br>  Sentence<br>**Habeas Corpus:**<br>☐ 530 General<br>☐ 535 Death Penalty<br>☐ 540 Mandamus & Other<br>☐ 550 Civil Rights<br>☐ 555 Prison Condition | | | |

| V.  ORIGIN (Place an "X" in One Box Only) | | | | | | Appeal to District<br>Judge from<br>Magistrate<br>Judgment |
|---|---|---|---|---|---|---|
| ☒ 1 Original<br>Proceeding | ☐ 2 Removed from<br>State Court | ☐ 3 Remanded from<br>Appellate Court | ☐ 4 Reinstated or<br>Reopened | ☐ 5 Transferred from<br>another district<br>(specify) | ☐ 6 Multidistrict<br>Litigation | ☐ 7 |

| VI.  CAUSE OF ACTION | Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):<br>15 U.S.C. Sections 78j(b), 78t(a)<br>Brief description of cause:<br>Violations of Securities Exchange Act |
|---|---|

| VII.  REQUESTED IN<br>COMPLAINT: | ☐ CHECK IF THIS IS A CLASS ACTION<br>UNDER F.R.C.P. 23 | DEMAND $ | CHECK YES only if demanded in complaint:<br>JURY DEMAND:   ☒ Yes   ☐ No |
|---|---|---|---|

| VIII.  RELATED CASE(S)<br>IF ANY | (See instructions): | JUDGE | DOCKET NUMBER |
|---|---|---|---|

DATE
May 16, 2007

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

**DEFENDANTS** (continued from page 1)

Daniel P. Tredwell, W. Gerald McConnell, Samuel Valenti, III,
Heartland Industrial Partners, L.P., Heartland Industrial
Associates, L.L.C., Heartland Industrial Group, L.L.C.,
PriceWaterHouseCoopers LLP and KPMG LLP

JS 44 Reverse (Rev. 11/04)

## INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

### Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I.    (a) Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

(b) County of Residence. For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

(c) Attorneys. Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.    Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.C.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.

United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.

United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.

Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.

Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; federal question actions take precedence over diversity cases.)

**III.    Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV.    Nature of Suit.** Place an "X" in the appropriate box. If the nature of suit cannot be determined, be sure the cause of action, in Section VI below, is sufficient to enable the deputy clerk or the statistical clerks in the Administrative Office to determine the nature of suit. If the cause fits more than one nature of suit, select the most definitive.

**V.    Origin.** Place an "X" in one of the seven boxes.

Original Proceedings. (1) Cases which originate in the United States district courts.

Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441. When the petition for removal is granted, check this box.

Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.

Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.

Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.

Multidistrict Litigation. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407. When this box is checked, do not check (5) above.

Appeal to District Judge from Magistrate Judgment. (7) Check this box for an appeal from a magistrate judge's decision.

**VI.    Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.** Example: U.S. Civil Statute: 47 USC 553
Brief Description: Unauthorized reception of cable service

**VII.    Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.

Demand. In this space enter the dollar amount (in thousands of dollars) being demanded or indicate other demand such as a preliminary injunction.

Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.    Related Cases.** This section of the JS 44 is used to reference related pending cases if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.

AO FORM 85 RECEIPT (REV. 9/04)

United States District Court for the District of Delaware

**0 7 - 2 6 5**

Civil Action No. _____

# ACKNOWLEDGMENT
# OF  RECEIPT  FOR AO FORM  85

## *NOTICE OF AVAILABILITY OF A*
## *UNITED STATES MAGISTRATE JUDGE*
## *TO EXERCISE JURISDICTION*

I HEREBY ACKNOWLEDGE RECEIPT OF ____2____ COPIES OF AO FORM 85.

_____5-16-07_____
(Date forms issued)

_____
(Signature of Party or their Representative)

_____Mark A Stanford_____
(Printed name of Party or their Representative)

Note: Completed receipt will be filed in the Civil Action