**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

COLLINS & AIKMAN CORPORATION and COLLINS  )
& AIKMAN PRODUCTS CO., as Debtors in Possession,  )
                                   )
        Plaintiffs,  )
                                   )
        v.  )       C.A. No. 07-265-***
                                   )
DAVID A. STOCKMAN, J. MICHAEL STEPP, BRYCE  )
M. KOTH, DAVID R. COSGROVE, PAUL C.  )
BARNABA, ROBERT A. KRAUSE, JOHN A.  )
GALANTE, CHARLES E. BECKER, ELKIN B.  )
MCCALLUM, THOMAS E. EVANS, CYNTHIA HESS,  )
DANIEL P. TREDWELL, W. GERALD MCCONNELL,  )
SAMUEL VALENTI, III, HEARTLAND INDUSTRIAL  )
PARTNERS, L.P., HEARTLAND INDUSTRIAL  )
ASSOCIATES, L.L.C., HEARTLAND INDUSTRIAL  )
GROUP, L.L.C., PRICEWATERHOUSECOOPERS LLP  )
and KPMG LLP,  )
                                   )
        Defendants.  )

**BRIEF IN SUPPORT OF
MOTION TO DISMISS OF DEFENDANTS
<u>ROBERT A. KRAUSE AND BRYCE M. KOTH</u>**

<div align="right">

Thomas P. Preston (Del. I.D. 2548)
BLANK ROME LLP
1201 Market Street, Suite 800
Wilmington, DE  19801
Telephone:  (302) 425-6478
E-mail:     preston-t@blankrome.com

*Attorneys for Defendants Bryce M. Koth and
Robert A. Krause*

</div>

OF COUNSEL:

Michael Joseph
Joseph O. Click
BLANK ROME LLP
600 New Hampshire Avenue, NW
Washington, DC  20037
Telephone:  (202) 772-5800
E-mail:     click@blankrome.com

Dated:  September 14, 2007

## TABLE OF CONTENTS

I.      INTRODUCTION ...................................................................................................1

II.     THE ALLEGATIONS OF THE COMPLAINT ...................................................2

        A.      The C&A Plaintiffs ....................................................................................2

        B.      Defendants Krause and Koth .....................................................................2

        C.      Substantive Allegations .............................................................................3

                1.      C&A's Precarious Status ................................................................3

                2.      Alleged Accounting Fraud ..............................................................3

                3.      The GECC Credit Facility ..............................................................5

        D.      General Allegations ...................................................................................6

        E.      Claims for Relief .......................................................................................7

III.    ARGUMENT .........................................................................................................7

        A.      Standard of Review ....................................................................................8

                1.      Rule 12(b)(6) ...................................................................................8

                2.      Rule 9(b) ..........................................................................................9

                3.      The PSLRA ....................................................................................10

        B.      The Complaint Fails To State A Claim Upon Which Relief Can Be Granted
                Against Defendants Koth Or Krause. ......................................................12

                1.      Claim 1: Section 10(b) of the Exchange Act and Rule 10b-5....................12

                2.      Claim 2: Section 14(a) of the Exchange Act and Rule 14a-9 ...................13

                3.      Claim 3:  Breach of Fiduciary Duty...........................................15

                4.      Claim 4:  Unjust Enrichment .......................................................16

                5.      Claim 5:  Common Law Fraud ....................................................17

        C.      The Complaint Should Be Dismissed with Prejudice as to Koth and Krause. ......18

IV.     CONCLUSION....................................................................................................19

# TABLE OF AUTHORITIES

## FEDERAL CASES

*In re Advanta Corp. Sec. Litigation,*
   180 F.3d 525 (3d Cir. 1999)..........................................................................13

*In re Alpharma Sec. Litigation,*
   372 F.3d 137 (3d Cir. 2004)..........................................................................13

*Banks v. Hayward,*
   221 Fed. Appx. 98, 101 (3d Cir. 2007)...........................................................18

*Bell Atlantic Corp. v. Twombly,*
   127 S. Ct. 1955 (2007)....................................................................................8

*California Public Emples'. Retirement System v. Chubb Corp.,*
   394 F.3d 126 (3d Cir. 2004)....................................................................10, 14

*Christidis v. First Penn. Mortg. Trust,*
   717 F.2d 96 (3d Cir. 1983).............................................................................9

*Dura Pharm., Inc. v. Broudo,*
   544 U.S. 336 (2005).......................................................................................12

*Florida State Board of Adm. v. Green Tree Finance Corp.,*
   270 F.3d 645 (8th Cir. 2001) .........................................................................11

*Petruska v. Gannon University,*
   462 F.3d 294 (3d Cir. 2006), cert. denied, 127 S. Ct. 2098 (2007) ...................9

*In re Rockefeller Ctr. Properties Securities Litigation,*
   311 F.3d 198 (3d Cir. 2002)..............................................................8, 9, 11, 13

*In re Suprema Specialties, Inc. Sec. Litigation,*
   438 F.3d 256 (3d Cir. 2006)..........................................................................12

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.,*
   127 S. Ct. 2499 (2007)..............................................................................11, 12

*Weiner v. Quaker Oats Co.,*
   129 F.3d 310 (3d Cir. 1997)..........................................................................10

## STATE CASES

*Buckley v. O'Hanlon,*
    2007 WL 956947 (D. Del. March 28, 2007)............................................................10

*DCB Holdings, Inc. v. Conagra, Inc.,*
    889 A.2d 954 (Del. 2005) ......................................................................................17

*Fleer Corp. v. Topps Chewing Gum,*
    539 A.2d 1060 (Del. 1988) ...................................................................................16

*Globis Capital Partners, L.P. v. Stonepath Group, Inc.,*
    2007 WL 1977236 (3d Cir. July 10, 2007) ..........................................................10

*Key Equity Investors, Inc. v. Sel-Leb Marketing, Inc.,*
    2007 WL 2510385 (3d Cir. Sept. 6, 2007) ..........................................................11

*Metropolitan Commun. Corp. BDI v. Advanced Mobilecomm Techs. Inc.,*
    854 A.2d 121 (Del. Ch. 2004)...........................................................................8, 17

*Schock v. Nash,*
    732 A.2d 217 (Del. 1999) ......................................................................................16

*Trenwick America Litigation Trust v. Ernst & Young, L.L.P.,*
    906 A.2d 168 (Del. Ch. 2006)...............................................................................17

*VLIW Tech., L.L.C. v. Hewlett-Packard Co.,*
    840 A.2d 606 (Del. 2003) ......................................................................................15

*Zoren v. Genesis Energy, L.P.,*
    836 A.2d 521 (Del. Ch. 2003)...............................................................................15

## DOCKETED CASES

*In re Astea International, Inc. Sec. Litigation,*
    C.A. No. 06-1467 (E.D. Pa. (Aug. 9, 2007) ........................................................11

## FEDERAL STATUTES

15 U.S.C. § 78n(a) ...........................................................................................................13

17 C.F.R. § 14a-4(a)(1)....................................................................................................14

17 C.F.R. § 240.14a-9 ......................................................................................................13

28 U.S.C. 1367(c) ............................................................................................................18

Fed. R. Civ. P. 12(b)(6)..........................................................................................................8

Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b) ...............................................1

## I.    **INTRODUCTION**

In this action, Collins & Aikman Corporation and its subsidiary Collins & Aikman Products Company (collectively "C&A" or the "Company"), debtors-in-possession in bankruptcy pending in Detroit, Michigan, sue their former officers and directors, as well as their former auditors and controlling stockholder, asserting securities fraud claims under the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b) and 78t(a), and various state law claims.

The Complaint purports to be based upon "the investigation of Plaintiffs' Special Counsel," *i.e.*, based on a studied analysis of the acts or omissions of the various defendants. *See* Compl., ¶¶ 1-8. With respect to defendants Bryce Koth and Robert Krause, however, the Complaint is remarkable in that it accuses them of absolutely nothing. In the entire 215 paragraphs and 80 pages of the Complaint, each is mentioned a grand total of one time:

> 11.    Defendant Bryce Koth ("Koth") served as the Company's CFO starting on October 13, 2004. Prior to serving as CFO, Defendant Koth served as the Company's Vice President, Tax of the Company [sic] from December 2002 to May 2004 when he was elevated to Vice President, Finance, Controller, and the Company's head of Tax.
>
> \*    \*    \*
>
> 14.    Defendant Robert A. Krause served as Vice President and Treasurer of the Company from October 2002 to October 2004 when he assumed the positions of Senior Vice President, Finance and Administration.

Contrary to applicable pleading requirements, C&A has made no effort to identify what acts or omissions were committed by Koth or Krause, when those acts or omissions occurred, or the basis for concluding any such acts or omissions were material or were relied upon by C&A or anyone else. Plaintiffs' inability to articulate any specific claim against Krause or Koth,

particularly in light of the investigation of C&A and its Special Counsel, establishes a firm basis for dismissal.[1]   These defendants should not be dragged through this litigation if, as the Complaint demonstrates, C&A and its Special Counsel cannot begin to allege facts supporting even an inference of wrongdoing by either of them.

## II.   THE ALLEGATIONS OF THE COMPLAINT

### A.   The C&A Plaintiffs

Collins & Aikman Corporation, through its various subsidiaries including Collins & Aikman Products Company, was engaged in the design, manufacture and supply of automotive interior components that it sold to automotive original equipment manufacturers (OEMs), such as GM, Ford and Chrysler.   Compl., ¶¶ 5, 36.   On May 17, 2005, the Company and its subsidiaries filed a petition for relief under Chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the Eastern District of Michigan, Southern Division. Compl., ¶ 6.

### B.   Defendants Krause and Koth

Defendant Koth joined C&A in December 2002 as Vice President, Tax, and served in that position until May 2004, when he became Vice President, Finance and Controller and Head of Tax.   Compl., ¶ 11.   Although he became C&A's CFO in mid-October 2004, he served in that position for only seven months.   *Id.*

Defendant Krause began working for C&A October 2002 as Vice President and Treasurer and served in that position until October 2004, when he was given the title of Senior Vice

---

[1]   The SEC and a federal grand jury have also investigated the acts underlying the allegations of the present Complaint, resulting in an indictment and a civil complaint against a number of defendants earlier in 2007.   Neither Koth nor Krause was named as a defendant in either the indictment or the SEC complaint.

President, Finance and Administration. Compl., ¶ 14. Krause resigned and left C&A five months later, in March 2005.

**C.    Substantive Allegations**

Virtually all of C&A's claims, whether under federal or Delaware law, are based on purported fraudulent schemes by which C&A inflated its reported revenue or defrauded one of its creditors.

**1.    C&A's Precarious Status**

By early 2002—before Koth and Krause even began to work at C&A—"negative factors," such as "competitive threats" facing OEMs, "adverse business conditions" facing the automotive industry in general, increasing prices for raw materials, and OEM demands for price concessions from suppliers, were "dramatically depressing" C&A's performance and results. Compl., ¶¶ 38, 39. Shortly prior to that time, C&A had come under the control of defendant Heartland Industrial Partners L.P.—an entity with which Koth and Krause are not alleged to have had any relationship of any kind at any time—which led the Company on an aggressive "acquisition spree" that positioned it for disaster. Compl., ¶¶ 37, 42-47.

**2.    Alleged Accounting Fraud**

In order to offset these difficult business conditions, C&A engaged in two "accounting schemes" involving rebates that allegedly resulted in the Company issuing fraudulent financial statements.

**"Round Trip" Rebates.** First, certain specified defendants—but not including either Krause or Koth—arranged for a supplier, Joan Fabrics, to make "rebate" payments to C&A purportedly in consideration of prior purchases, while agreeing that C&A would repay the rebates to the supplier in the future. These "round trip" rebates were included in C&A's reported

3

revenues, although they were nothing more than short-term loans. Compl., ¶¶ 48-52. This scheme began in 2001, before either Koth or Krause was employed by C&A. Although the scheme continued through the first quarter of 2003 (*id.*, ¶ 50), the Complaint does not identify either Koth nor Krause—who were then employed in C&A's Tax and Treasury Departments—as having any knowledge of or involvement in this scheme.

**Supplier Rebates.** In early 2002 C&A also began to account improperly for rebates it received from other suppliers. Compl., ¶¶ 53-58. The Complaint describes three variations: "pulling ahead" rebates due in future quarters to the current quarter, prematurely recognizing rebates that were contingent upon (and thus not eligible for recognition until) the occurrence of some future event, and improperly characterizing rebates on capital equipment as rebates for past purchases of spare parts or maintenance. Compl., ¶ 55. The rebates involved in these three schemes were allegedly recognized immediately and improperly as revenue, when such recognition should have been deferred to some unspecified future period, thus inflating C&A's income and earnings. *Id.* Significantly, the Complaint alleges that the various suppliers who paid the rebates also provided to C&A documentation that supported immediate recognition of the rebates. *E.g.*, *id.* at ¶ 99.

Again, C&A nowhere identifies either Koth or Krause as having been involved in, or even having knowledge of, these schemes or any improper accounting with respect to rebates. Neither Krause nor Koth was working at C&A when these transactions commenced in early 2002 and worked in C&A's Tax and Treasury Departments when the vast majority of the rebates were allegedly improperly recognized. Compl., ¶¶ 56, 57. Although about $350,000 of rebates are alleged to have been improperly recognized in the fourth quarter of 2004 (*id.* ¶¶ 56-57), when Koth became CFO, the Complaint further makes clear that C&A never issued financial

4

statements that included fourth-quarter 2004 results. *Id.*, ¶ 65. The Complaint admits that the allegedly improper rebates were discovered in the first quarter of 2005 (the first quarter in which Koth served as CFO) while the Company was closing out its fourth quarter and year, *id.*, suggesting that Koth was involved in uncovering, rather than perpetuating, any improper accounting with respect to rebates. *Id.*

### 3.    The GECC Credit Facility

The Complaint alleges that in the first quarter of 2005, prior to C&A's bankruptcy filing, certain defendants launched a scheme to defraud General Electric Capital Corporation (GECC) in connection with a receivables factoring facility under which GECC advanced C&A money limited by a collateral pool of "eligible" receivables comprising a "borrowing base." Compl., ¶ 63. C&A allegedly fraudulently inflated the "borrowing base," and thus the amount it could obtain from GECC, by including "ineligible" receivables. Compl., ¶ 64. Apparently in recognition of the fact that this alleged scheme provided C&A with liquidity that it would not otherwise have had during the first quarter of 2005, the Complaint alleges that the scheme damaged C&A's relations with GECC and its reputation in the business community. *Id.* Indeed, it is not clear from the Complaint if or how any of the alleged fraudulent schemes resulted in economic damage to C&A.

While the Complaint again identifies certain defendants—but not Krause or Koth—as being involved in this scheme to defraud GECC, there is no basis for inferring that Krause or Koth were involved. Although Koth was CFO at this time, there are no allegations suggesting that he was responsible for determining what receivables were to be included in the borrowing base, or reporting to GECC the amount and composition of the "borrowing base." Moreover, as

the Complaint makes clear, Krause had ceased working in the Treasury Department, and nothing suggests that he was in any way involved with the GECC facility at all.

**D.    General Allegations**

The Complaint contains a number of boilerplate allegations concerning the obligations of defendants. It alleges that all of C&A's officers and directors owed fiduciary duties to C&A and thus were required to exercise reasonable and prudent supervision over the Company. Compl. at ¶¶ 25-26. It also states that the officers and directors occupied positions that made them "privy to confidential and proprietary information concerning Collins & Aikman and its operations, finances and financial condition." Compl. at ¶ 27. It also alleges that as a result of positions occupied by the various officers and directors (none of whom are named), they "knew of the adverse non-public information about Collins & Aikman's operations and finances, as well as its accounting practices, markets and business prospects, via access to internal corporate documents …." Paragraph 27 of the Complaint alleges generally that "[e]ach of the officer and director defendants participated in the issuance and/or review of false and/or misleading statements, including the preparation of false and/or misleading press releases, SEC filings and reports to Collins & Aikman shareholders and/or creditors."

The Complaint further alleges that in August 2004 C&A provided inaccurate financial information to the purchasers of $415 million of its Senior Subordinated Notes. Compl. at ¶¶ 59-62. It cites to certain press releases publicized in the two months before C&A filed for bankruptcy that allegedly included false financial information. ¶¶ 65-74. Not once is Koth or Krause mentioned in this section of the Complaint.

Dozens of paragraphs of the Complaint are devoted to allegations of improper conduct and/or of breaches of duty by PricewaterhouseCoopers and KPMG, C&A's auditors. Once

again, neither Koth nor Krause is mentioned in any of these paragraphs, nor is there any apparent basis upon which either would have had responsibility for the work performed by the auditors. Compl. ¶¶ 78-152.

### E.    Claims for Relief

Based on the foregoing allegations, plaintiffs assert, in their first through fifth claims for relief, that all of the director and officer defendants (1) violated Section 10(b) of the Securities Exchange Act and Rule 10b-5 thereunder by causing C&A to issue materially false and misleading financial statements, (2) violated Section 14(a) of the Exchange Act and Rule 14a-9 thereunder by virtue of C&A's issuance of false and misleading proxy statements, (3) violated their fiduciary duties to C&A by engaging in the alleged "accounting schemes," (4) were unjustly enriched by receiving benefits unspecified by the Complaint, and (5) engaged in common law fraud by misleading C&A's board of directors as to the Company's true financial condition.  As with the rest of the Complaint, none of these five claims for relief makes any effort to identify what Koth or Krause did or failed to do.

## III.    ARGUMENT

Vice Chancellor Strine, of the Delaware Court of Chancery, in a vintage analysis of a poorly-pled complaint, stated:

> The complaint contains six counts … regrettably, [plaintiff] has chosen to throw a large pie with the works at every one of the defendants, leaving the court to determine what justly sticks to the various defendants and to clean the rest off the floor.  That is, the complaint generally asserts each of these claims against most or all of the defendants without regard to whether there is any factual or legal basis for doing so.

*Metro Commun. Corp. BDI v. Advanced Mobilecomm Techs. Inc.*, 854 A.2d 121, 137 (Del. Ch. 2004). This is precisely what C&A has done here. In most instances, it is virtually impossible to determine from the Complaint which defendant did what and when, and what was on that defendant's mind. This is especially so with respect to defendants Koth and Krause. As noted, they are mentioned by name in only two of the Complaint's 215 paragraphs, and then only to allege the times at which they were employed by C&A, and the positions they held. More importantly, not only does the Complaint fall well short of pleading any claim against these two defendants, its allegations suggest that they did not violate any duty to C&A or its shareholders.

A.    **Standard of Review**

1.    **Rule 12(b)(6)**

Generally, in deciding whether a complaint states a claim for which relief can be granted under Fed. R. Civ. P. 12(b)(6), the Court is required to accept as true all well-pled allegations of fact in the complaint, as well as those reasonable inferences properly drawn from those facts. *In re Rockefeller Ctr. Props. Secs. Litig.*, 311 F.3d 198, 215 (3d Cir. 2002). The Court need not, however, credit bald assertions or legal conclusions masquerading as factual allegations. *Rockefeller*, 311 F.3d at 216. The Supreme Court recently made clear that even under the liberal pleading standards of Rule 8, a complaint will not survive a motion to dismiss if its allegations only give rise to a "possibility" that the plaintiff is entitled to relief. *Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1966 (2007). Rather, to survive dismissal, a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Id.* at 1974.[2]

---

[2] See *id.* (a complaint "must be dismissed" where plaintiffs fails to "nudge[] their claims across the line from conceivable to plausible").

8

2.    **Rule 9(b)**

In addition, all of the claims alleged against defendants Koth and Krause are governed by the heightened pleading standards set forth in Rule 9(b) of the Federal Rules of Civil Procedure, which provides that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity.  Malice, intent, knowledge, and other condition of mind of a person may be averred generally."   The Third Circuit has elaborated on these requirements:

> Rule 9(b) requires, at a minimum, that plaintiffs support their allegations of securities fraud with all of the essential factual background [of] ... the 'who, what, when, where, and how' of the events at issue.

*Rockefeller*, 311 F.3d at 217 (quoting *In re Burlington*, 114 F.3d at 1422).

Rule 9(b) plainly applies to C&A's common law fraud claim and federal securities claims, as those claims are based on allegations that defendants made knowing false and misleading statements.  *See Petruska v. Gannon Univ.*, 462 F.3d 294, 309-10 (3d Cir. 2006), *cert. denied*, 127 S. Ct. 2098 (2007) (applying Rule 9(b) to state law fraudulent misrepresentation claim); *Christidis v. First Penn. Mortg. Trust*, 717 F.2d 96, 99 (3d Cir. 1983). While Rule 9(b) does not normally apply to claims for breach of fiduciary duty and unjust enrichment, it applies to those claims here because the purported conduct underlying these claims are the very same schemes underlying C&A's fraud claims.  *See* Compl., ¶ 166 ("The Director and Officer Defendants breached their duties of loyalty, good faith and care ... by orchestrating, encouraging or utilizing various accounting schemes as forth herein which materially misstated the financial condition of the Company") Compl., ¶ 169 (Defendants "personally benefited by engaging in the conduct described above, including ... violating the

9

federal securities laws; making false and misleading statements; and causing the Company to file materially false and misleading press releases and documents with the SEC …"). Rule 9(b), by its plain terms, applies to all "averments" of fraud, not fraud "claims" or causes of action, *California Pub. Emples'. Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 160 (3d Cir. 2004), and this Court has previously acknowledged that it applies to breach of fiduciary duty claims that, as here, "sound in fraud." *Buckley v. O'Hanlon*, 2007 WL 956947 at *5 (D. Del. March 28, 2007).[3]

### 3.    The PSLRA

Plaintiffs' claims under the federal securities laws are also subject to the heightened pleading standards in the Private Securities Litigation Reform Act of 1995 (PSLRA), 15 U.S.C. § 78u-4(b), which augment and enlarge Rule 9(b)'s already-heightened pleading standards. First, the PSLRA provides that in "any action" brought under the federal securities laws based on a false or misleading statement, the plaintiff must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading …." 15 U.S.C. § 78u-4(b)(1).

Further, the PSLRA requires that "the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a *strong inference* that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2) (emphasis added). This, of course, is a higher standard even than that required under Rule 9, which permits general pleading with respect to defendant's scienter. *Globis Capital Partners,*

---

[3] C&A cannot claim that it is entitled to a relaxation of Rule 9(b)'s requirements because "plaintiffs cannot be expected to have personal knowledge of the details of corporate internal affairs." *Weiner v. Quaker Oats Co.*, 129 F.3d 310, 319 (3d Cir. 1997). As the corporation that employed the officer and director defendants, C&A clearly has had access to all of the information that was ever in defendants' control. Indeed, defendants have not had access to the information for several years.

*L.P. v. Stonepath Group, Inc.*, 2007 WL 1977236 (3d Cir. July 10, 2007); *In re Astea Int'l., Inc. Sec. Litig*, C.A. No. 06-1467, E.D. Pa. (Aug. 9, 2007) at 16-17 (copy attached).

In *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 127 S. Ct. 2499 (2007), the Supreme Court further strengthened the "strong inference" standard by directing federal courts, in reviewing a plaintiffs' complaint under the PSLRA, to "consider plausible nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff" in determining whether the pleaded facts give rise to a "strong inference" of scienter. *Id*. It concluded that a complaint gives rise to a strong inference of scienter "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 127 S. Ct. at 2510. A reasonable inference of scienter is insufficient to meet the pleading requirement. *Id.*

Where a complaint, such as C&A's here, makes no effort to attribute specific acts or omissions to particular defendants, the Third Circuit has made clear that the PSLRA denies to plaintiffs those inferences that might have been justified under a traditional Rule 12(b)(6) analysis. *In re Rockefeller*, 311 F.3d at 224. Indeed, under the PSLRA, the court "must … disregard 'catch-all' or 'blanket' assertions that do not live up to the particularity requirements of the statute." *Id*. at 224 n. 19 (quoting *Florida State Bd. of Adm. v. Green Tree Fin. Corp.*, 270 F.3d 645, 660 (8th Cir. 2001). A plaintiff is not entitled to "the benefit [of] inferences flowing from vague or unspecific allegations." *Key Equity Investors, Inc. v. Sel-Leb Marketing, Inc.*, 2007 WL 2510385 at *5 (3d Cir. Sept. 6, 2007).

As shown below, C&A has made no effort to plead facts establishing that defendants Koth and Krause acted improperly or with the requisite state of mind and is therefore not entitled

11

to any supporting inferences.    Indeed, the Court is compelled, under *Tellabs*, to rule in defendants' favor.

**B.     The Complaint Fails To State A Claim Upon Which Relief Can Be Granted Against Defendants Koth Or Krause.**

**1.     Claim 1: Section 10(b) of the Exchange Act and Rule 10b-5**

The elements of a claims under Section 10(b) and Rule 10(b)(5) are (1) a material misrepresentation (or omission); (2)  scienter, *i.e.*, wrongful state of mind; (3) a connection with the purchase or sale of a security; (4) reliance,  often  referred  to  in  cases  involving  public securities markets (fraud-on-the-market cases) as "transaction causation;" (5) economic loss; and (6) "loss causation," *i.e.*, a causal connection between the material misrepresentation and the loss.  *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 275 (3d Cir. 2006) (*quoting Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 341-42 (2005) (citations and emphasis omitted)).

C&A's complaint fails to satisfy the standards of Rule 9(b) and the PSLRA, and fails to allege any claim under section 10(b) or Rule 10b-5 against Koth and Krause.   While the Complaint alleges that C&A's financial statements included inflated revenue, it fails to identify the particular financial statements containing those results, the amount of revenue actually reported, or even the amount by which revenue was inflated.[4]   There are no allegations even suggesting that defendants Koth or Krause were involved in any of the allegedly fraudulent schemes described in the Complaint or otherwise had any reason to know that revenue was

---

[4]     The Complaint's two charts setting forth some allegedly improper rebates, their amounts, and the quarters in which the revenue was recognized are insufficient.  The allegations here are that C&A *prematurely* recognized revenue before it was earned, not that the rebates were never earned.  Thus, for example, if C&A prematurely recognized $1.2 million in rebates in the second quarter of 2003 (Compl., ¶ 56) it does not follow that revenues were overstated by this amount, because it is entirely possible that rebates prematurely recognized in other quarters should have and would have been recognized in the second quarter of 2003 if they had been properly accounted for.

overstated. The allegations that the suppliers providing the prematurely recognized rebates provided C&A with documentation supporting their immediate recognition suggests that only those persons directly involved in the alleged schemes would have known that revenue was overstated.

Viewed in its totality, with respect to Koth and Krause the Complaint alleges little more than the positions within the Company that they held at various times. Such allegations are insufficient to raise a strong inference of scienter. *See In re Alpharma Sec. Litig.*, 372 F.3d 137, 149 (3d Cir. 2004); *In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 359 (3d Cir. 1999). To the contrary, the allegations here give rise to inferences that Koth and Krause were not involved in the schemes and lacked scienter: during the time that these schemes were carried out, they did not hold positions that would have made them privy to, much less participants in, the schemes.

### 2.    Claim 2: Section 14(a) of the Exchange Act and Rule 14a-9

Section 14(a) of the Exchange Act prohibits the solicitation of proxies by means of proxy statements that violate applicable SEC rules, while Rule 14a-9 prohibits the use of proxy statements that are false or misleading. 15 U.S.C. § 78n(a); 17 C.F.R. § 240.14a-9; *In re Rockefeller*, 311 F.3d at 211-12. C&A contends that its 2002-2004 proxy statements violated these provisions because they failed to disclose defendants' alleged fraudulent schemes and were an "essential link" to accomplish those schemes. Because these claims sound in fraud, they are, as noted, subject to the heightened pleading standards of Rule 9(b) and the PSLRA.

C&A fails to allege that Krause or Koth (as opposed to the board of directors) solicited proxies at all, let alone by means of the false or misleading proxy statements. Indeed, C&A fails to identify who solicited proxies. Nor does the Complaint provide any reason to believe that either Krause or Koth solicited proxies. Given their respective positions as Treasurer (Krause)

and in the Tax Department (Koth), it is almost certain that they did not. *See* 17 C.F.R. § 14a-4(a)(1) (form of proxy shall prominently state if proxy is solicited by board of directors or other shareholder).

Further, C&A makes no effort to identify with anything approaching particularity the false statements that were made in the proxy statements, when they were issued, and who made them. And again, given Koth's and Krause's positions in the Company at the time, it is unlikely that they made any statements at all in the proxy statements. It is hard to imagine what responsibility either Koth or Krause could possibly have had for statements in the proxies, given their respective positions at the time the 2002-2004 proxies were compiled and mailed to stockholders.

Given these failures, the Court cannot possibly determine whether any alleged misstatements were material. And C&A fails to allege any loss that resulted from the allegedly false proxy statements, much less establish any link between that loss and anything that Koth or Krause may have done. *See Chubb*, 394 F.3d at 144 (citing *Gen. Elec. Co. v. Cathcart*, 980 F.2d 927, 932 (3d Cir. 1992)) (plaintiff must allege that false proxy statements "[were] an essential link in the accomplishment of the transaction.").

The Court need not, and cannot, guess at what connection Plaintiffs think existed between Koth and Krause and the subject proxy statements. C&A is required to provide that information, *i.e.*, to identify the false and misleading statements or omissions, and how Koth or Krause are responsible for those statements or omissions. No such effort has been undertaken. Just as the Rule 10b-5 claim fails to satisfy the particularity standard, the proxy statement claim fails that test, as well as the other claim requirements. Dismissal is required.

14

### 3.    Claim 3:  Breach of Fiduciary Duty

C&A's sole support for its breach of fiduciary duty claim is its allegation, in paragraph 166 of the Complaint, that the director and officer defendants " ... breached their duties of loyalty, good faith and care to the Company and the creditors of the Company by orchestrating, encouraging or utilizing various accounting schemes as set forth herein which materially misstated the financial condition of the Company."  While Koth and Krause owed duties of loyalty, good faith and due care to C&A, there is simply no basis in this Complaint for concluding that either of them "orchestrated, encouraged or utilized" anything in connection with any accounting scheme, never mind one that materially misstated C&A's financial condition.

While the ordinary breach of fiduciary duty claim is not subject to heightened pleading, a complaint is required to state facts with at least contain sufficient specificity to notify the defendant of the bad acts of which they are being accused.  *VLIW Tech., L.L.C. v. Hewlett-Packard Co.*, 840 A.2d 606, 611 (Del. 2003); *Zoren v. Genesis Energy, L.P.*, 836 A.2d 521, 528 (Del. Ch. 2003).  In this case, Plaintiffs have not even made an effort to provide that direction.  More importantly, as noted, because the breach of fiduciary duty claims here are ground in the same fraud that is the subject of C&A's securities and common law fraud claims—*i.e.*, "the various accounting schemes as set forth herein" (Compl., ¶ 166)—they *are* subject to the heightened pleading requirements of Rule 9(b).

What accounting schemes involved Koth or Krause?  In what way were these defendants responsible for "orchestrating, encouraging or utilizing" any of those schemes?  How did these alleged schemes materially misstate the financial condition of the Company and what involvement did Koth or Krause allegedly have in that material misstatement?  As the Complaint's allegations make clear, Krause was in the Treasury Department at the time of the

alleged accounting fraud, while Koth was in the Tax Department during most of that period, and the problems in accounting for rebates was discovered when C&A was closing out the first quarter for which he was CFO. Moreover, for purposes of breach of fiduciary duty, in what manner did Koth or Krause place their interests above those of C&A, or personally benefit at C&A's expense?

In short, this Complaint fails even the modest standard for pleading a typical breach of fiduciary duty, let alone the heightened requirements of Rule 9(b), and fails to provide Koth and Krause even the minimum notice of the conduct by them C&A believes was improper.

### 4.     Claim 4:  Unjust Enrichment

The elements of an unjust enrichment claim are relatively simple. "Unjust enrichment is defined as 'the unjust retention of a benefit to the loss of another, or the retention of money or property of another against the fundamental principles of justice or equity and good conscience.'" *Fleer Corp. v. Topps Chewing Gum,* 539 A.2d 1060, 1062 (Del. 1988); *Schock v. Nash*, 732 A.2d 217, 232 (Del. 1999). C&A alleges (Compl., ¶ 169, *et seq.*) that the director and officer defendants "personally benefited by engaging in the conduct described above, including but not limited to causing Collins & Aikman to pay inflated prices for goods, services and corporate acquisitions; violating the federal securities laws, making false and misleading statements; and causing the Company to file materially false and misleading press releases and documents with the SEC in order to increase the borrowings of the Company to a level far in excess of its ability to pay."

Nowhere does the Complaint attempt to identify any benefit that any defendant, let alone Koth or Krause, obtained from the conduct alleged. Further, it is hard to imagine, based on the Complaint's allegations, what possible benefit Koth or Krause could have unjustly obtained from

16

C&A, or retained to the detriment of C&A. This claim fails to satisfy even the barest requirements for stating a claim, and must be dismissed.

## 5.    Claim 5:  Common Law Fraud

The elements of a common law fraud claim under Delaware law are well established and similar to those under the federal securities law:

> To state a claim for common law fraud, the [Plaintiffs] must plead facts supporting an inference that:  (1) the defendants falsely represented or omitted facts that the defendant had a duty to disclose; (2) the defendants knew or believed that the representation was false or made the representation with a reckless indifference to the truth; (3) the defendants intended to induce the plaintiff to act or refrain from acting; (4) the plaintiff acted in justifiable reliance on the representation; and (5) the plaintiff was injured by its reliance.

*Trenwick Am. Litig. Trust v. Ernst & Young, L.L.P.*, 906 A.2d 168, 207 (Del. Ch. 2006), referencing *DCB Holdings, Inc. v. Conagra, Inc.*, 889 A.2d 954, 958 (Del. 2005); *see also Metro Commun.*, 854 A.2d at 143.  A common law fraud claim is, of course, subject to Rule 9(b)'s heightened pleading standards.

For all of the reasons discussed above, the Complaint here fails with respect to each element.  The allegedly false statements are not identified with particularity, and there is no effort to link Koth or Krause to any particular misrepresentation or omission.  There is no allegation that Koth or Krause knew or believed that any representation or omission was false or was made with reckless indifference; there are no allegations as to the intentions of Koth or Krause.  Finally, C&A has alleged nothing to establish that the Company justifiably relied on any representation or omission of either Koth or Krause, or that they were injured as a result of any such reliance.

17

C.    **The Complaint Should Be Dismissed with Prejudice as to Koth and Krause.**

The events alleged in the Complaint occurred up to six years ago.  The prematurely recognized rebates were disclosed to the public over two years ago, in March 2005.  The various acquisitions occurred largely in 2001.  The plaintiff here is not a purchaser of securities who claims to have been defrauded, or a shareholder bringing a derivative action that the Company declined to bring.  Rather it is Collins & Aikman itself.  C&A has continuously had all of the documentation and other evidence concerning its claims here.  Further, according to the Complaint, C&A's Special Counsel conducted a full investigation, and this Complaint reflects the conclusion that C&A's Special Counsel drew.  Yet, nowhere is there any suggestion of wrongdoing by Koth or Krause.

Under these circumstances, this Complaint should be dismissed with prejudice.  There is no basis for dragging these Defendants through this legal morass, and Plaintiffs have held ample opportunity to plead their case.[5]

---

[5] Should the Court dismiss C&A's federal claims, but determine that C&A's complaint states a claim with respect to the state law claims, the Court should nonetheless decline to exercise supplemental jurisdiction over those claims, and dismiss them.  28 U.S.C. 1367(c); *Banks v. Hayward*, 221 Fed. Appx. 98, 101 (3d Cir. 2007).  C&A's principal place of business is in Michigan, and defendant Koth (as well as others) is a citizen of Michigan, so that there is a lack of the complete diversity required to otherwise confer jurisdiction over the state law claims.

18

IV.    **CONCLUSION**

For the foregoing reasons, the Court should dismiss the complaint against Defendants

Bryce M. Koth and Robert A. Krause with prejudice.

<div style="margin-left: 45%;">

Respectfully submitted,

BLANK ROME LLP

By: _____

Thomas P. Preston
DE I.D. No. 2548
1201 Market Street, Suite 800
Wilmington, DE  19801
(302) 425-6478
preston-t@blankrome.com

*Attorneys for Defendants Bryce M.
Koth and Robert A. Krause*

</div>

OF COUNSEL:

Michael Joseph
Joseph O. Click
BLANK ROME LLP
600 New Hampshire Avenue, NW
Washington, DC  20037
Telephone:  (202) 772-5800
E-mail:  click@blankrome.com

September 14, 2007

# UNREPORTED CASE 1

Westlaw.

Slip Copy                                                                                      Page 1

Slip Copy, 2007 WL 956947 (D.Del.)
**(Cite as: Slip Copy)**

**C**
Buckley v. O'Hanlon
D.Del.,2007.
Only the Westlaw citation is currently available.
United States District Court,D. Delaware.
Dennis J. BUCKLEY, as Trustee of the DVI
Liquidating Trust Plaintiff,
v.
Michael A. O'HANLON, Steven R. Garfinkel,
Richard E. Miller, John P. Boyle, Anthony J. Turek,
Raymond D. Fear, William S. Goldberg, Gerald D.
Cohn, John E. McHugh, Harry T.J. Roberts, and
Nathan Shapiro, Defendants.
**No. 04-955GMS.**

March 28, 2007.

Francis A. Monaco, Jr., Joseph J. Bodnar, Monzack
& Monaco, P.A., Wilmington, DE, for Plaintiff.
Dennis J. Buckley, pro se.
David E. Brand, Prickett, Jones & Elliott, P.A.,
David A. Felice, Cozen O'Connor, Arthur G.
Connolly, Jr., Connolly, Bove, Lodge & Hutz,
Joanne Ceballos, Adam L. Balick, Bifferato
Gentilotti Biden & Balick, Martin James Weis,
Dilworth Paxson LLP, Wilmington, DE, Gregory P.
Miller, Michael A. Morse, Miller, Alfano &
Raspanti, P.C., Philadelphia, PA, for Defendants.

SLEET, J.

**I. INTRODUCTION**

**\*1** The Official Committee of Unsecured Creditors
of DVI, Inc. (the "Committee") filed this action on
August 19, 2004. The Committee was dissolved,
and Dennis J. Buckley was appointed as Trustee for
the DVI Liquidating Trust ("Buckley") by order of
the United States Bankruptcy Court for the District
of Delaware (the "Bankruptcy Court") on
November 24, 2004. Buckley was substituted as
plaintiff in this action in this court's Order of April

6, 2006. The complaint states claims for breach of
fiduciary duty and deepening insolvency as to the
officer defendants (Michael A. O'Hanlon, Steven R.
Garfinkel, Richard E. Miller, John P. Boyle,
Anthony J. Turek, and Raymond D. Fear) and the
director defendants/audit committee members
(O'Hanlon, William S. Goldberg, Gerald D. Cohn,
John E. McHugh, Harry T.J. Roberts, and Nathan
Shapiro). The complaint also includes a claim for
fraud as to O'Hanlon, Garfinkel, and Miller.
Presently before the court are eight motions to
dismiss.

**II. LEGAL STANDARD**

Pursuant to the motion of a party, a court may
dismiss a complaint for failure to state a claim upon
which relief can be granted. Fed.R.Civ.P. 12(b)(6).
In making this determination, the court must accept
as true all allegations in the complaint, and must
draw all reasonable inferences in the light most
favorable to the plaintiff. *Trump Hotels & Casino
Resorts, Inc. v. Mirage Resorts, Inc.,* 140 F.3d 478,
483 (3d Cir.1998). The defendant must show "
beyond doubt" that the plaintiff can prove no set of
facts which would entitle him to relief. *Conley v.
Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d
80 (1957).

**III. BACKGROUND** [FN1]

FN1. This section is a summary of facts,
taken from the pleadings, and do not
constitute findings of fact.

DVI and its subsidiaries are Delaware corporations
with principal places of business in Pennsylvania.
(D.I.1, ¶ 11.) Prior to filing for bankruptcy, DVI
extended lease and loan financing to healthcare
providers to facilitate the purchase of sophisticated
medical equipment, and extended revolving lines of

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

credit that were secured by liens on accounts receivable generated by that provider's operations. (D.I.1, ¶¶ 13-15.) To raise capital and maintain their lines of credit, DVI used a securitization system, through which financial contracts were pledged as collateral to lenders. (D.I.1, ¶ 33.) Recognizing losses or establishing reserves on underperforming contracts would have negatively affected the securitization system, so although the payment histories of impaired leases and loans worsened in the years leading up to filing, DVI's loss reserves and level of write-offs for bad credit remained fairly static. (D.I.1, ¶ 39.) By 1999, DVI began experiencing shortages of capital, so the defendants used irregular financial practices to make ends meet while at the same time investing large amounts of cash in ill-performing markets and non-core businesses. (D.I.1, ¶ 54.) Defendants O'Hanlon, Garfinkel, and Miller were allegedly the first to implement such practices, as they had access to DVI's record keeping software. Apparently, the other defendants discovered, ignored, or participated in the practices. (D.I.1, ¶¶ 92-100.)

*2 The plaintiff alleges that, to maintain the appearance of solvency, the defendants injured DVI and its creditors by repurchasing delinquent loans and leases without receiving commensurate value, and transferring funds within DVI's subsidiaries and among select borrowers to disguise underperforming accounts. (D.I.1, ¶¶ 60-68.) Other irregular practices that the defendants are alleged to have committed include investing substantial amounts of money in consistently unprofitable or non-core businesses, obtaining otherwise-unavailable lines of credit by pledging the same collateral to several lenders, ignoring internal controls and reporting procedures, and disregarding numerous warnings from DVI's outside auditor and the SEC. (Id.)The independent auditor resigned in June 2003 after refusing to approve DVI's Form 10-Q for the quarterly period ending March 31, 2003. DVI also began defaulting on its loans in June 2003, and ultimately filed for bankruptcy on August 25, 2003. (D.I.1, ¶ 57.)

IV. DISCUSSION

"When a motion under Rule 12 is based on more than one ground, the court should consider the 12(b)(1) challenge first because if it must dismiss the complaint for lack of subject matter jurisdiction, all other defenses and objections become moot."In Re Corestates Trust Fee Litig., 837 F.Supp. 104, 105 (E.D.Pa.1993), aff'd39 F.3d 61 (3d Cir.1994)." Standing represents a jurisdictional requirement which remains open to review at all stages of the litigation."National Org. for Women v. Scheidler, 510 U.S. 249, 255, 114 S.Ct. 798, 127 L.Ed.2d 99 (1994). Therefore, the court will address the issue of standing first.

A. Standing

Defendant Roberts posits that the causes of action pursued in the complaint are beyond the scope of the remedies contemplated by the statutory predicates cited in the Motion to Authorize Official Committee of Unsecured Creditors to Investigate and Pursue Causes of Action Against Pre-Petition Officers and Directors. In the May 10, 2004 Order approving that motion, however, the Bankruptcy Court authorized the Debtors to "investigate, and, if appropriate, pursue, any causes of action of the Debtors' estates against the Defendants."(D.I.27, Ex. A) (emphasis added). Whether this Order granted to the Committee greater authority than the Committee requested is immaterial; the court had the power to do so. The plain language of the Bankruptcy Court's Order makes clear that Buckley has standing to assert claims on behalf of DVI's debtors.

Other defendants argue that Buckley cannot bring claims on behalf of the creditors because the Committee had standing as to the debtors only. In support of their argument, the defendants rely on the Supreme Court's decision in Caplin v. Marine Midland Grace Trust Co., 406 U.S. 416, 434, 92 S.Ct. 1678, 32 L.Ed.2d 195 (1972), wherein the Court held that a trustee in bankruptcy does not have standing to pursue claims on behalf of creditors of the debtor company's estate. In response, Buckley argues that, as trustee, it is empowered to pursue claims on behalf of the debtors' creditors because the Bankruptcy Court

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                          Page 3

Slip Copy, 2007 WL 956947 (D.Del.)
**(Cite as: Slip Copy)**

confirmed the assignment of the creditors' claims to the trustee under the provisions of the Plan and Confirmation Order, dated November 24, 2004.

**\*3** While the court acknowledges that, in theory, a bankruptcy trustee can pursue claims that the debtors' creditors assigned to it, a plaintiff must have standing to pursue its claims at the time of filing. *See Minneapolis & St. Louis R.R. Co. v. Peoria & Pekin Union Ry. Co.,* 270 U.S. 580, 586, 46 S.Ct. 402, 70 L.Ed. 743 (1926) ("The jurisdiction of the lower court depends upon the state of things existing at the time the suit was brought."). Here, the complaint was filed in August 2004 but the trustee did not obtain an assignment of rights from a subset of creditors until four months later, in December 2004, when the Bankruptcy Court's Plan and Confirmation Order became effective. Moreover, since that Order, Buckley has not sought to supplement the existing complaint.

The court will not proceed with claims for which the plaintiff obtained standing after the lawsuit was filed. As Judge Longobardi so aptly stated in *Procter & Gamble Co. v. Paragon Trade Brands, Inc.:*
As a general matter, parties should possess rights before seeking to have them vindicated in court. Allowing a subsequent assignment to automatically cure a standing defect would unjustifiably expand the number of people who are statutorily authorized to sue. Parties could justify the premature initiation of an action by averring to the court that their standing through assignment is imminent. Permitting non-owners and licensees the right to sue, so long as they eventually obtain the rights they seek to have redressed, would enmesh the judiciary in abstract disputes, risk multiple litigation, and provide incentives for parties to obtain assignments in order to expand their arsenal and the scope of litigation. Inevitably, delay and expense would be the order of the day.

917 F.Supp. 305, 310 (D.Del.1995) (*quoted in Gaia Technologies, Inc. v. Reconversion Technologies, Inc.,* 93 F.3d 774, 780 (Fed.Cir.1996), *as amended on rehearing,* 104 F.3d 1296 (Fed.Cir.1996)). The court will dismiss, without prejudice, any claims Buckley asserts on behalf of the debtors' creditors.

### B. Breach of Fiduciary Duty Claim

Delaware law provides that corporate officers and directors owe the corporation a triad of fiduciary duties: loyalty, good faith, and due care.*McMullin v. Beran,* 765 A.2d 910, 917 (Del.2000). To state a claim for breach of fiduciary duty, a plaintiff may allege that the officers and directors of a company knew or should have known that violations of the law were occurring, that they took no good faith steps to ameliorate the situation, and that the company suffered losses as a result.[FN2]*In re Caremark Intern. Inc. Deriv. Lit.,* 698 A.2d 959, 971 (Del.Ch.1996) (stating that liability may be based upon either an ill-advised or negligent decision, or an unconsidered failure to act when due attention would arguably have prevented the loss). The Court of Chancery later elaborated on what constitutes such an ill-advised decision in *Guttman v. Huang,* 823 A.2d 492, 507 (Del.Ch.2003) (listing as an example "that the audit committee had clear notice of serious accounting irregularities and simply chose to ignore them or, even worse, to encourage their continuation").

> FN2. Delaware law provides that fiduciary duties are owed to a corporation by both officers and directors. *Arnold v. Soc'y for Savings Bancorp, Inc.,* 678 A.2d 533, 539 (Del.1996). Therefore, to the extent that cases cited in this memorandum refer only to one of these groups, the court will consider them as applicable to both.

**\*4** Buckley alleges that the defendants either knew or should have known that violations of law were occurring, that they took no good faith steps to ameliorate the situation, and that DVI and its creditors suffered damages. Buckley also alleges that the officer defendants perpetuated an array of irregular accounting practices, of which the director defendants were aware, and which they ignored. All of the director defendants were alleged to be members of DVI's audit committee. Buckley's complaint is consistent with the *Guttman* pleading example, in that it alleges that the officer defendants eliminated the Criticized Asset Reporting system and manipulated delinquent loans and leases to

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                    Page 4

Slip Copy, 2007 WL 956947 (D.Del.)
**(Cite as: Slip Copy)**

make them appear profitable. Also, as in *Guttman,* Buckley alleges that the audit committee received eleven warning letters over eight years from their independent auditor, and that the auditor resigned after no action was taken in response to the alert. Buckley further avers that a series of inquiries from the SEC were also ignored by both the audit committee and the board of directors.

Several of the defendants have attempted to analogize the facts in this case to those in *Guttman* because the Court of Chancery viewed that plaintiff's allegations as overly conclusory. In *Guttman,* however, the complaint made sweeping accusations regarding accounting irregularities without discussing how management was expected to be aware of the problem, or even the presence of an audit committee. Here, the court finds that the contents of Buckley's complaint dictate a different result.

The defendants also challenge Buckley's claim for breach of fiduciary duty by disputing many of the substantive contentions. For example, several state that they lacked knowledge or notice of the accounting irregularities, that they held their relevant positions for only a portion of the time in which DVI allegedly was put on notice of the irregularities, that they immediately attempted to rectify the situation upon learning of the problem, that the letters sent by DVI's outside auditor or the SEC could not be expected to alert them to the problems, or that the Examiner's Report painted a different picture of the internal workings of DVI. These responses address, however, the substantive merits of Buckley's claim. Because Buckley's allegations are accepted as true for the purposes of these motions, such factual disputes are not appropriately resolved on motions to dismiss. Rather, the court must focus its consideration on the sufficiency of the complaint.

1. Sufficiency of Pleading

Several of the defendants insist that, because they are not mentioned individually in many of Buckley's allegations, the claims are too broad to proceed. " When group pleading is utilized by a plaintiff 'the

identification of the individual sources of statements is unnecessary when the fraud allegations arise from the misstatements or omissions in group-published documents, such as annual reports, prospectuses, registration statements, press releases or other group-published information that presumably constitute the collective actions of those individuals involved in the day-to-day affairs of the corporation. " ' *Tracinda Corp. v. DaimlerChrysler AG,* 197 F.Supp.2d 42, 85 (D.Del.2002) (citations and internal quotations omitted). Therefore, group pleading may be sufficient in some circumstances.

**\*5** Defendant Roberts argues that breach of fiduciary duty claims must satisfy the particularity requirements of Federal Rule of Civil Procedure 9(b). Such an assertion is correct when the allegations of breach of fiduciary duty sound in fraud. *ePlus Group v. Panoramic Communications, Inc.,* No. 02-7992, 2003 WL 21512229 at \*2 (S.D.N.Y. July 2, 2003). However, in the absence of such allegations, Rule 9(b) does not apply. *In re Fruehauf Trailer Corp.,* 250 B.R. 168, 197 (D.Del.2000) (stating that the heightened pleading requirement generally does not apply to state law claims for breach of fiduciary duty). In *Fruehauf,* Rule 9(b) was not triggered even in the presence of multiple allegations that the defendant knew or should have known that certain representations were false and misleading. Neither was particularized pleading required when the plaintiff's complaint included such statements as "knew or should have known the financial statements ... misrepresented to System One the Division's financial condition."*In re InaCom Corp.,* No. 00-2426, 2001 WL 1819987 at \*3 (Bankr.D.Del. Aug.7, 2001) (finding the claim did not sound in fraud).

While not all of Buckley's allegations name the involved defendants individually, Buckley did separate the list of defendants into smaller groups who worked together on various committees and boards. Although Buckley frequently refers simply to "defendants" in the body of the complaint, the parties involved in each alleged practice of bad-faith were identified expressly in the introductory paragraphs of Buckley's complaint, and later, in his factual allegations and claims. (D.I.1, ¶¶ 16-28.) The court accepts that Buckley

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                      Page 5

Slip Copy, 2007 WL 956947 (D.Del.)
(Cite as: Slip Copy)

uses the categories of officers and directors merely as substitutes for listing names, rather than using them as sweeping terms to avoid having to associate specific parties to particularized conduct. Wherein much of the alleged conduct involved collective action and decision making, Buckley has sufficiently identified the small groups within DVI and their roles in approving or participating in each alleged bad-faith practice.

The court rejects Defendant Roberts' assertion that Buckley's allegations sound in fraud. Granted, Buckley describes much of the defendants' conduct as intentional or knowing, however, Buckley's choice of terms, which are also seen in fraud claims, do not transform claims for breach of fiduciary duty into claims based in fraud. In fact, the fiduciary duty claims in Buckley's complaint are very similar in structure to what were deemed acceptable fiduciary duty claims in *Fruehauf* and *InaCom*. Buckley's allegations for breach of fiduciary duty, while they must not be conclusory, need not be pled with the particularity required of fraud claims.

### 2. Applicability of Business Judgment Rule

The business judgment rule is a presumption that a board's actions are entitled to deference, because it would be overly harsh to condemn such a decision that only in hindsight was poorly conceived. This presumption is rebutted, however, when a plaintiff pleads particularized facts sufficient to raise a reason to doubt that the action was taken in good faith or on an informed basis. *In re The Walt Disney Co. Deriv. Litig.*, 825 A.2d 275, 286 (Del.Ch.2003). Such doubt is raised when officers and directors fail to be "active monitors of corporate performance," *Caremark*, 698 A.2d at 968 (providing as an example the replacement of a board of directors following the discovery of large losses caused by phantom trades by a prominent trader). Nor may officers and directors consciously disregard visible " red flags." *See Rattner v. Bidzos*, No. 19700, 2003 WL 22284323 at *13 (Del.Ch. Sept.30, 2003). Neither may officers and directors make decisions " so egregious as to constitute corporate waste."*In re Tower Air, Inc. .*, 416 F.3d 229, 238 (3d Cir.2005). The standard for holding officers and directors

liable is one of gross negligence. *Smith v. Van Gorkom*, 488 A.2d 858, 873 (Del.1985).

**\*6** In *Smith*, the decision to approve a proposed merger met that standard because it was made solely on the basis of a twenty-minute presentation. On the other end of the spectrum, gross negligence was not found when directors recommended a merger after consulting financial advisors, meeting several times over a six-week period, and reviewing challenges to the idea. *Rabkin v. Philip A. Hunt Chem. Corp.*, 547 A.2d 963, 970 (Del.Ch.1986) (defining gross negligence as reckless indifference to, or a deliberate disregard of, the stockholders).

Buckley used language similar to that in the above cases in describing defendants' alleged conduct and its results, including allegations of wasting corporate assets, willfully disregarding warnings, and ceasing to review delinquent accounts. Buckley alleges that DVI's officers and directors acted in bad faith, disguising poorly-performing accounts and ignoring the advice of its outside auditor and the inquiries of the SEC. Buckley has satisfied the *Disney* requirement by pleading particularized facts that raise doubts as to whether the officers and directors were acting in good faith.

### 3. Effect of Exculpatory Clause

Several defendants argue that the exculpatory clause in DVI's Certificate of Incorporation, which is based on section 102(b)(7) of the Delaware General Corporation Law, bars the claims against them because it states that no director shall be personally liable to DVI or its stockholders. However, the clause contains exceptions to this protection when a director breaches his duty of loyalty to DVI, or for acts not taken in good faith, involving intentional misconduct, or a knowing violation of law. For example, in *Official Committee of Unsecured Creditors of Integrated Health Serv., Inc. v. Elkins*, such a provision was found not to insulate the directors from liability when they acted with knowing and deliberate indifference by approving a loan program without consideration, deliberation, or advice from an expert. No. 20228, 2004 WL 1949290 at *15 (Del.Ch. Aug.24, 2004). Similarly

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                    Page 6

Slip Copy, 2007 WL 956947 (D.Del.)
**(Cite as: Slip Copy)**

in *McCall v. Scott*, defendants were not protected by the exculpatory clause when they acted in bad faith by intentionally ignoring "red flags." 250 F.3d 997, 1001 (6th Cir.2001) (finding allegations of "conscious disregard of known risks" to necessarily be conduct undertaken in bad faith).

Buckley's allegations fall into the "bad faith" exception to DVI's Certificate of Incorporation exculpatory clause. Buckley alleges that the defendants here, as was alleged in *Elkins*, acted with "knowing and deliberate indifference," when they stopped examining delinquent accounts. Further, Buckley alleges that the defendants consciously disregarded "red flags," as in *McCall*, when the defendants paid no attention to the warnings allegedly contained in the auditor's and SEC's letters. Buckley has sufficiently pled breach of the duties of loyalty and good faith. As a result, the Certificate of Incorporation cannot operate to insulate the defendants from a breach of fiduciary duty claim. Consequently, the claim will proceed on the merits.

### C. Deepening Insolvency Claim

*7 To plead insolvency, a plaintiff must aver facts that establish, for pleading purposes, that the corporation had a deficiency of assets below liabilities with no reasonable prospect that the business will succeed, or that it was unable to meet maturing obligations as they fell due in the ordinary course of business. *Production Resources Group, L.L.C. v. NCT Group, Inc.,* 863 A.2d 772, 782 (Del.Ch.2004).

Buckley alleges that financial practices similar to those employed by the debtors in *Production Resources* occurred at DVI. *Id.* at 783-4.Specifically, the complaint avers that DVI had great difficulty raising capital, shuffled delinquent accounts to make them appear healthy, and could only obtain advances from its line of credit by erroneously certifying impaired loans and leases. Buckley expressly alleged that DVI became insolvent in June 2003, when it began defaulting on its loan obligations. Again, here, as in *Production Resources*, it can be reasonably inferred that the

officers' and directors' alleged conduct caused the insolvency. The court thus concludes that Buckley has sufficiently pled that DVI was in the "zone of insolvency."

### 1. Recognition of Deepening Insolvency Claim

The U.S. Bankruptcy Court for the District of Delaware predicted that, in the absence of an opinion by the Delaware Supreme Court and given the Third Circuit's analysis in *Official Committee of Unsecured Creditors v. R.F. Lafferty & Co.,* Delaware law would likely recognize a claim for deepening insolvency. *In re Oakwood Homes Corp.,* 340 B.R. 510, 531 (Bankr.D.Del.2006). Although the elements of such a claim have yet to be enunciated, the Third Circuit acknowledged such a claim when a plaintiff alleges "fraudulent expansion of corporate debt and prolongation of corporate life." *Official Committee of Unsecured Creditors v. R.F. Lafferty & Co.,* 267 F.3d 340, 347 (3d Cir.2001). A successful claim for deepening insolvency requires a showing of harm to the corporation because of such fraud. *Oakwood Homes,* 340 B.R. at 534 (also explaining that fraud requires a representation of material fact, falsity, scienter, reliance, and injury). In *Oakwood Homes,* fraud was found when the defendants, acting as the debtors' fiduciaries, misrepresented the sustainability of the company's finances with the intent to induce the debtors into maintaining the *status quo,* because it could be inferred from the complaint that such misrepresentation was with knowledge.

Here, as in *Oakwood Homes,* Buckley pled that the defendants, placed in positions of trust and control within DVI, knowingly misrepresented the state of DVI's financial health with the intent to cause DVI to continue incurring more liabilities than it could repay. The defendants allegedly disguised failing accounts and misrepresented DVI's creditworthiness without justification. Rather than constituting a valid attempt to restore DVI to solvency, the defendants' conduct is alleged to have fraudulently expanded DVI's corporate debt and prolonged DVI's life. These allegations, as framed, satisfy the pleading standard observed in *Lafferty.*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy

Slip Copy, 2007 WL 956947 (D.Del.)
(Cite as: Slip Copy)

### 2. Applicability of *In Pari Delicto* Doctrine

**\*8** The doctrine of *in pari delicto*[FN3] provides that "a party is barred from recovering damages if his losses are substantially caused by activities the law forbade him to engage in."*Lafferty,* 267 F.3d at 354 (citations omitted). Under this equitable doctrine, when a plaintiff is "standing in the shoes" of the bankrupt corporation, its claim is barred if the defendants' purported wrongdoing is imputed on the bankrupt corporation itself. *Id.* at 354, 358-59.

> FN3.*In pari delicto* is Latin for "in equal fault." *Black's Law Dictionary* 806 (8th ed.2004).

Whether the *in pari delicto* doctrine applies in this case depends on whether the defendants' conduct can be imputed to the debtors and hence to the Trust, which, under bankruptcy law, stands in the shoes of the debtors. Imputation refers to the attribution of one person's wrongdoing to another person. Under the law of imputation, courts impute the fraud of an officer to a corporation when the officer commits the fraud (1) in the course of his employment, and (2) for the benefit of the corporation. *Id.* at 358.

The defendants' argue that *in pari delicto* serves as a bar to Buckley's deepening insolvency claim because Buckley stands in the shoes of the debtor corporations, seeking relief from the defendants for damages purportedly caused by the debtors' allegedly fraudulent conduct. (D.I.29.) To support this argument, Defendants Boyle and Fear state that the allegations buttressing Buckley's deepening insolvency claim satisfy both prongs of the imputation test. In response, Buckley argues that because the *in pari delicto* doctrine is an affirmative defense, the court should not consider the issue on a motion to dismiss. Further, Buckley contends that if the court reached the merits of whether *in pari delicto* is applicable, the court should find imputation inappropriate because the second prong of the imputation test is not met.

It is generally true that an affirmative defense should not be used to dismiss a plaintiff's complaint

under Rule 12(b)(6).*In re Adams Golf, Inc. Sec. Litig.,* 381 F.3d 267, 277 (3d Cir.2004). That being said, in *Lafferty,* the Third Circuit did affirm a district court's dismissal of a deepening insolvency claim on the basis of the *in pari delicto* doctrine, which the Circuit acknowledged as an affirmative defense. *Lafferty* and *Adams Golf,* however, are not necessarily in conflict. Indeed, dismissal is only appropriate when the plaintiff can prove *no set of facts* that would entitle him to relief. *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957) (emphasis added). In this case, Buckley disputes that the criteria for imputation is met. Specifically, Buckley invokes the adverse interest exception, which provides that fraudulent conduct will not be imputed to the corporation if the fraud was not "for the benefit of the corporation."*Lafferty,* 267 F.3d at 359. As Judge Cowen observed in his *Lafferty* dissent, "an equitable doctrine like *in pari delicto* is highly sensitive to the facts and readily adapted to achieve equitable results."*Lafferty,* 267 F.3d at 362. Simply put, the court finds it premature to bar Buckley's deepening insolvency claim on *in pari delicto* grounds. While it may eventually come to pass that the defense will prevail, the determination will be made on further development of the facts. After considering the pleadings and the positions of the parties, the court is not satisfied that Buckley is unable to prove any facts that would entitle the DVI Liquidating Trust to relief for deepening insolvency.

### 3. Applicability of the Business Judgment Rule

**\*9** In Delaware, there is no general duty to liquidate an insolvent company. *Trenwick Am. Litig. Trust v. Ernst & Young, L.L.P.,* 906 A.2d 168 (Del.Ch.2004) . Similar to the application of the business judgment rule in the fiduciary duty context discussed earlier, it would be harsh to judge the actions of corporate officers and directors, in hindsight, for a failed good-faith attempt to bring a company out of insolvency. Allegations of bad faith, however, also make recovery for deepening insolvency possible under Delaware law. *In re RSL COM PRIMECALL USA, Inc.,* Nos. 01-11457 through 01-11469, 03-2176, 2003 WL 22989669 at \*8 (Bankr.S.D.N.Y. December 11, 2003). If bad faith

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                 Page 8

Slip Copy, 2007 WL 956947 (D.Del.)
**(Cite as: Slip Copy)**

is alleged, prolongation of operations would "smack of self-dealing, constitute a breach of fiduciary duty, and open up recovery under the theory of deepening insolvency."*In re Global Service Group LLC,* 316 B.R. 451, 465 (Bankr.S.D.N.Y.2004) (requiring a complaint to allege bad faith or fraudulent intent as opposed to mere bad judgment).

As the court has already concluded, Buckley's complaint makes sufficient allegations of bad faith. Buckley stated that, rather than attempting in good faith to revive DVI and avoid liquidation, the defendants disguised the true nature of DVI's finances to obtain more funding with no expectation that such funding would restore DVI to solvency. (D.I.1, ¶ 68.) One can reasonably infer that such activities extend beyond the mere exercise of poor judgment, deemed insufficient in *Global Service.* The court finds that, based on the pleadings, the business judgment rule does not preclude a deepening insolvency claim against the defendants.

### D. Fraud Claim

To state a claim for fraud, a plaintiff must allege that a defendant made a false statement, knowing or recklessly assuming it to be true, with the intent that plaintiff act or refrain from acting in reliance, that plaintiff justifiably relied, and that plaintiff suffered damages. *Kronenberg v. Katz,* 872 A.2d 568, 585 n. 25 (Del.Ch.2004). Allegations of fraud must be pled with particularity. Fed.R.Civ.P. 9(b). Provided that a plaintiff alleges sufficiently particularized allegations, there is no *per se* rule that group pleading cannot satisfy Rule 9(b); otherwise, " sophisticated defrauders" could easily conceal their wrongdoing. *MBIA Ins. Corp. v. Royal Indem. Co.,* 221 F.R.D. 419, 421 (D.Del.2004). The Third Circuit has stated that plaintiffs must plead the circumstances of the alleged fraud such that defendants may be placed on notice; although stating the "date, place, and time" clearly fulfills this requirement, plaintiffs may use any alternative method of "injecting precision and some measure of substantiation" into the allegations of fraud.*Seville Indus. Mach. Corp. v. Southmost Mach. Corp.,* 742 F.2d 786, 791 (3d Cir.1984).

In *Asbestemps, Inc. v. Diversified Energy Group, Inc.,* allegations that defendants represented a corporation as fiscally sound to persuade another company to provide labor were not made verbatim, nor were the time and place identified, but the court found that fraud was properly pled. No. 87-2623, 1987 WL 16662 (E.D.Pa. Sept.9, 1987). Plaintiffs need only provide sufficient factual specificity to provide assurance that they have investigated the alleged fraud and reasonably believe that a wrong has occurred. *Tracinda Corp. v. DaimlerChrysler AG,* 197 F.Supp.2d 42, 54 (D.Del.2002). For example, even absent allegations with respect to the exact factual context or words, a description of the nature and subject matter of the representation was found to be enough in *CFTC v. American Metal Exch.,* 693 F.Supp. 168, 190 (D.N.J.1988).

\*10 Buckley sufficiently alleges the elements of fraud: that defendants O'Hanlon, Garfinkel, and Miller knowingly misrepresented DVI's financial situation, with the intent to obtain unjustifiable credit, that DVI and its creditors relied on this misinformation, and that it suffered damages to the extent of bankruptcy. As in *CFTC,* Buckley's complaint describes the nature and subject matter of the alleged fraud by asserting that the three defendants intentionally concealed a number of improper accounting practices, ceased normal account monitoring practices, and diverted millions of dollars from DVI when DVI could least afford it. Although Buckley does not state specific dates and places regarding the allegedly fraudulent actions, as in *Asbestemps,* Buckley sufficiently explained the role each defendant (or in some instances, the three defendants acting together) played in each allegedly fraudulent practice in enough detail to satisfy the " injecting precision" standard enunciated in *Seville.*

### V. CONCLUSION

Buckley does not have standing to pursue any claims on behalf of the creditors. As such the court will grant the defendants' motions to dismiss to the extent that they seek relief on behalf of the creditors. The court will deny the defendants' motions to dismiss claims brought on behalf of the debtors.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                            Page 9

Slip Copy, 2007 WL 956947 (D.Del.)
**(Cite as: Slip Copy)**


For the reasons set forth in the court's memorandum issued contemporaneously herewith, IT IS HEREBY ORDERED that:

1. The Defendants' Motions to Dismiss (D.I. 23, 25, 26, 28, 30, 32, 34, and 36) are hereby GRANTED IN PART and DENIED IN PART.

2. The Plaintiff's Motion for Leave to File an Omnibus Brief (D.I.48) is GRANTED.

D.Del.,2007.
Buckley v. O'Hanlon
Slip Copy, 2007 WL 956947 (D.Del.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**UNREPORTED CASE 2**

Westlaw.

Slip Copy

Slip Copy, 2007 WL 1977236 (C.A.3 (Pa.))
**(Cite as: Slip Copy)**

Page 1

Globis Capital Partners, L.P. v. Stonepath Group,
Inc.
C.A.3 (Pa.),2007.
Only the Westlaw citation is currently
available.This case was not selected for publication
in the Federal Reporter.Not for Publication in
West's Federal Reporter See Fed. Rule of Appellate
Procedure 32.1 generally governing citation of
judicial decisions issued on or after Jan. 1, 2007.
See also Third Circuit LAR, App. I, IOP 5.7. (Find
CTA3 App. I, IOP 5.7)
    United States Court of Appeals,Third Circuit.
    GLOBIS CAPITAL PARTNERS, L.P., On Behalf
    of Itself and All Others Similarly Situated; Judi
    Friedman; Antonio Sottle; Robert Enger; Jeff Farr
    v.
    STONEPATH GROUP, INC.; Dennis L. Pelino;
    Bohn H. Crain; Thomas L. Scully.
    Globis Capital Partners, L.P., Appellant.
    **No. 06-2560.**

    Submitted Pursuant to Third Circuit LAR 34.1(a)
    June 4, 2007.
    Filed July 10, 2007.

On Appeal from the United States District Court for
the Eastern District of Pennsylvania, (D.C. Civil
No. 04-cv-04515), District Judge: Hon. Stewart
Dalzell.

Deborah R. Gross, Law Offices of Bernard M.
Gross Juniper & Market Streets, Philadelphia, PA,
U. Seth Ottensoser, Bernstein, Liebhard & Lifshitz,
New York, NY, for Globis Capital Partners, L.P.
Steven E. Bizar, Thomas P. Manning, Buchanan
Ingersoll, Philadelphia, PA, for Stonepath Group,
Inc.; Dennis L. Pelino; Bohn H. Crain; Thomas L.
Scully.

Before SMITH and COWEN, and SILER [FN*],
Circuit Judges.

FN* Honorable Eugene E. Siler, Jr.,
Senior United States Circuit Judge, U.S.
Court of Appeals for the Sixth Circuit,
sitting by designation.

OPINION
COWEN, Circuit Judge.
*1 Globis Capital Partners, LP ("Globis") appeals
an order of the United States District Court for the
Eastern District of Pennsylvania granting a motion
to dismiss filed by Stonepath Group, Inc. ("
Stonepath") and Stonepath executives Dennis L.
Pelino, Bohn H. Crain, and Thomas L. Scully. For
the reasons discussed below, we will affirm.

I.

Stonepath is a non-asset based third-party logistics
services company. In 2001, Stonepath commenced
a series of acquisitions through its two primary
subsidiaries: Domestic Services and International
Services. Among the companies acquired through
Domestic Services was Air Plus. As part of this
acquisition, Stonepath agreed to make a series of
earn-out payments to Air Plus's shareholders if Air
Plus met certain earning targets in subsequent years.
Stonepath named the co-founder and majority
shareholder of Air Plus, Gary A. Koch, CEO of
Domestic Services. Domestic Services also had its
own CFO and controller, and continued to use Air
Plus's legacy information system. International
Services-Stonepath's other major subsidiary-had
separate officers and used a different legacy
information system.

During the class period, Stonepath restated its
financial results three times. The first restatement,
which was announced in August 2003, related to
allocating more value to the customer relationship
intangible assets for the company's acquisitions and
revising the amortization method and life used for
such assets. Second, in January 2004, Stonepath

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                          Page 2

Slip Copy, 2007 WL 1977236 (C.A.3 (Pa.))
**(Cite as: Slip Copy)**

announced that it would restate its results for the last three quarters of fiscal year 2002 and the first three quarters of fiscal year 2003, because of an error in International Services' accounting process. Most simply, International Services' accounting figures mistakenly included transfers between International Services and one of its subsidiaries, which resulted in corresponding overstatements of revenues and costs. After this occurred, Stonepath executives stated that they were working with their internal and external auditors to ensure that such an error did not recur. However, in September 2004, Stonepath announced the need for a third restatement because Domestic Services had overstated its earnings by failing to adjust its transportation cost estimates to reflect its actual costs. This resulted in Domestic Services' overstating its income by a total of $16.3 million for 2001, 2002, 2003, and the first six months of 2004. On the day of this announcement, Stonepath's stock dropped from $1.59 per share to $0.86 per share.

Four days after the announcement, Globis filed a putative class action complaint seeking recovery under section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, and section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a). Globis alleged that press releases and SEC filings discussing Stonepath's financial results were false and misleading, and sought relief on behalf of itself and all others who purchased Stonepath common stock from March 29, 2002, through September 20, 2004. After permitting Globis to file a second amended complaint, the District Court granted appellees' motion to dismiss under Fed.R.Civ.P. 12(b)(6). Globis then appealed.

II.

**\*2** We have jurisdiction over this appeal by virtue of 28 U.S.C. § 1291. Our review of a district court's dismissal of a complaint under Fed.R.Civ.P. 12(b)(6) is plenary. *Lum v. Bank of Am.,* 361 F.3d 217, 223 (3d Cir.2004). A motion to dismiss pursuant to Rule 12(b)(6) should be granted only if, accepting as true the facts alleged and all reasonable inferences that can be drawn therefrom, there is no

reasonable reading upon which the plaintiff may be entitled to relief. *Id.*

III.

Globis argues that the District Court erred in dismissing its securities fraud complaint. The gravamen of the complaint is the section 10(b) claim, which is enforced through Rule 10b-5. *See In re Advanta Corp. Sec. Litig.,* 180 F.3d 525, 535 (3d Cir.1999). In order to state a claim under section 10(b) and Rule 10b-5, a plaintiff must plead that the defendant "(1) made a misstatement or an omission of a material fact (2) with scienter (3) in connection with the purchase or the sale of a security (4) upon which the plaintiff reasonably relied and (5) that the plaintiff's reliance was the proximate cause of his or her injury."*In re Ikon Office Solutions, Inc.,* 277 F.3d 658, 666 (3d Cir.2002).

The District Court dismissed Globis's complaint because it concluded that the complaint failed adequately to plead scienter. The Private Securities Litigation Reform Act (PSLRA) requires the complaint to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."15 U.S.C. § 78u-4(b)(2). The complaint may present a "strong inference" of scienter, as relevant here, "by alleging facts that constitute strong circumstantial evidence of ... recklessness."*In re Alpharma Inc. Sec. Litig.,* 372 F.3d 137, 148 (3d Cir.2004). Recklessness involves "not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it."*Advanta,* 180 F.3d at 539 (internal quotation marks omitted). We employ a demanding standard of recklessness to ensure that "the culpability attaching to such reckless conduct closely approaches that which attaches to conscious deception."*In re Digital Island Sec. Litig.,* 357 F.3d 322, 332 (3d Cir.2004) (internal quotation marks omitted).

Globis argues that it was reckless of Stonepath to rely on Domestic Services' accounting reports.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                              Page 3

Slip Copy, 2007 WL 1977236 (C.A.3 (Pa.))
**(Cite as: Slip Copy)**

Generally, we will not "presume recklessness or intentional misconduct from a parent corporation's reliance on its subsidiary's internal controls."*In re Comshare Inc. Sec. Litig.,* 183 F.3d 542, 554 (6th Cir.1999); *see also Chill v. Gen. Elec. Co.,* 101 F.3d 263, 271 (2d Cir.1996) (same). Globis argues that this case departs from that norm for three reasons. First, it argues that appellees were aware that Domestic Services' internal controls were deficient because Stonepath had previously been forced to restate its financial results. This argument, however, misses the mark. Globis does not, and could not, argue that the first restatement notified appellees of widespread internal-control problems. The second restatement-which Globis does rely on-concerned accounting problems at International Services, which used an entirely different accounting system than Domestic Services. The fact that one subsidiary failed to eliminate certain inter-company transactions from its ledger provided appellees no warning that a different subsidiary would improperly fail to alter its estimated transportation costs to capture actual costs.

*3 Second, Globis contends that appellees were reckless in relying on Domestic Services' accounting because the CEO of Domestic Services, Koch, would be rewarded under the earn-out arrangement if Air Plus (an important component of Domestic Services) reached earning targets. According to Globis, Koch's interest imposed a heightened duty on appellees to monitor Domestic Services. However, Globis presents no caselaw recognizing this heightened duty, and it is inconsistent with the fact that executives commonly have financial interests in their companies. As we have explained in a similar context: "In every corporate transaction, the corporation and its officers have a desire to complete the transaction, and officers will usually reap financial benefits from a successful transaction. Such allegations alone cannot give rise to a 'strong inference' of fraudulent intent."*GSC Partners CDO Fund v. Washington,* 368 F.3d 228, 237 (3d Cir.2004). Further, as the District Court recognized, Domestic Services had its own CFO and controller, and Stonepath was entitled to rely on those disinterested individuals to participate in managing the internal controls of Domestic Controls. Thus, the fact that

Koch was interested in the earnings of Domestic Services does not demonstrate that appellees were reckless in depending upon Domestic Services' accounting reports.

Finally, Globis argues that the scope of the error and the fact that it concerned Stonepath's most important source of earnings means that appellees were reckless in failing to catch it. However, the error in this case was relatively small: as the District Court determined, in a generous calculation, Domestic Services understated its transportation costs by only 5.7% in 2003 and less than 3.8% in 2002. Moreover, the earnings reported by Domestic Services were entirely in line with expectations. While there may be cases where the figures presented by a subsidiary are so startling that it would be reckless for the parent company to fail to investigate, this is not such a case. *Cf. Alpharma,* 372 F.3d 137, 151 (3d Cir.2004) (explaining that spike in small subsidiary's revenue did not put company on notice that subsidiary engaged in fraud). Nor does the fact that the faulty report concerned Stonepath's core financial metric change this conclusion. As we stated above, recklessness requires "an extreme departure from the standards of ordinary care."*Advanta,* 180 F.3d at 539 (internal quotation marks omitted); *see also Chill,* 101 F.3d at 269 (explaining that "showing of recklessness must be such that it gives rise to a strong inference of fraudulent intent" (internal quotation marks omitted)). Globis does not claim that Stonepath's internal or external auditors alerted appellees to this accounting error, nor does Globis assert that appellees should have otherwise been aware that Domestic Services' internal controls were deficient. *See Kushner v. Beverly Enters., Inc.,* 317 F.3d 820, 829 (8th Cir.2003) (finding it "telling" that company's "outside auditors did not question its accounting practices"). Thus, while viewed in retrospect it may have been a poor decision for Stonepath to rely on Domestic Services' accounting, "[r]ecklessness is not intended to encompass ' claims essentially grounded on corporate mismanagement.' " *Digital Island,* 357 F.3d at 332 (quoting *Advanta,* 180 F.3d at 540). Accordingly, we agree with the District Court that Globis has failed to allege facts that constitute strong evidence of recklessness.[FN1]

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                    Page 4

Slip Copy, 2007 WL 1977236 (C.A.3 (Pa.))
**(Cite as: Slip Copy)**

> FN1. In *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* the Supreme Court held that, under the PSLRA, "an inference of scienter must be more than merely plausible or reasonable-it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent."--- S.Ct. ----, 2007 WL 1773208, at *4 (2007). The Court's *Tellabs* decision removes any doubt that the PSLRA's scienter pleading requirement is a significant bar to litigation that Globis has failed to meet.

*4 Our conclusion is fortified by the fact that the three individual appellees were acquiring substantial amounts of Stonepath stock throughout the period that they were allegedly acting recklessly. As we explained in *Digital Island,* because appellees' interests "were at all times tied to the value of their shares, we have no basis to infer the sort of conscious disregard and deliberate ignorance required to plead scienter."357 F.3d at 332.

For the foregoing reasons,[FN2] the judgment of the District Court entered on April 4, 2006, will be affirmed.

> FN2. Globis also brought a claim under section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a). However, because Globis failed to plead a predicate violation of section 10(b) and Rule 10b-5, its section 20(a) claim must also be dismissed. *See In re Rockefeller Ctr. Props., Inc. Sec. Litig.,* 311 F.3d 198, 211 (3d Cir.2002)

C.A.3 (Pa.),2007.
Globis Capital Partners, L.P. v. Stonepath Group, Inc.
Slip Copy, 2007 WL 1977236 (C.A.3 (Pa.))

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**UNREPORTED CASE 3**

Westlaw.

Slip Copy                                                              Page 1

Slip Copy, 2007 WL 2510385 (C.A.3 (N.J.))
**(Cite as: Slip Copy)**

**H**
Key Equity Investors, Inc. v. Sel-Leb Marketing Inc.
C.A.3 (N.J.),2007.
Only the Westlaw citation is currently
available.This case was not selected for publication
in the Federal Reporter.Not for Publication in
West's Federal Reporter See Fed. Rule of Appellate
Procedure 32.1 generally governing citation of
judicial decisions issued on or after Jan. 1, 2007.
See also Third Circuit LAR, App. I, IOP 5.7. (Find
CTA3 App. I, IOP 5.7)
United States Court of Appeals,Third Circuit.
KEY EQUITY INVESTORS INC., Appellant
v.
SEL-LEB MARKETING INC.; Hal Markowitz;
Jack Koegel; Paul Sharp; George Fischer; Jh Cohn
LLP.
**No. 06-1052.**

Submitted pursuant to Third Circuit LAR 34.1(a)
June 28, 2007.
Filed Sept. 6, 2007.

On Appeal from the United States District Court for
the District of New Jersey, (04-cv-01675), District
Judge: Honorable Dennis M. Cavanaugh.

Key Equity Inv Inc, Jean-Marc Zimmerman,
Westfield, NJ, for Appellant.
Gabriel H. Halpern, Morristown, Nj, Richard B.
Harper, New York, NY, for Sel-Leb Marketing Inc.

Before BARRY, FUENTES and GARTH, Circuit
Judges.

OPINION OF THE COURT
FUENTES, Circuit Judge.
**\*1** In this securities appeal, we review the District
Court's decision to dismiss the complaint of Key
Equity Investors, Inc. ("Key Equity") for failure to
satisfy the pleading requirements of the Private
Securities Litigation Reform Act of 1995, 15 U.S.C.
§ 78u-4 et seq. ("PSLRA"). Appellant, Key Equity,

alleged that defendants issued materially false and
misleading statements about the financial health of a
company called Sel-Leb Marketing, Inc. ("Sel-Leb"
). For the reasons that follow, we will affirm.

**I. Factual and Procedural Background**

A. *Factual Background*[FN1]

FN1. On review of a motion to dismiss, we
"accept all well-pled allegations in the
complaint as true and draw all reasonable
inferences in favor of the non-moving
party."*Brown v. Card Service Center,* 464
F.3d 450, 452 (3d Cir.2006). Our review is
limited to the contents of the complaint
and any attached exhibits. *Yarris v. County
of Delaware,* 465 F.3d 129, 134 (3d
Cir.2006).

Sel-Leb is a New York corporation that distributes
and markets consumer merchandise to retailers. At
all relevant times, Harold Markowitz, Paul Sharp,
Jack Koegel, and George Fischer were company
directors, and J.H. Cohn, LLP was a company
auditor. In the period between April 5, 2002 and
February 25, 2004 (the putative class period),
during which Key Equity purchased company stock,
Sel-Leb made numerous statements relevant to this
appeal.

Two of the statements concerned the past financial
performance of the company. First, on April 5,
2002, Sel-Leb filed a form with the Securities and
Exchange Commission ("SEC") reporting a net
income of $443,669 for fiscal year 2001. In the
disclosure, J.H. Cohn stated that it audited the
company's financial statements and that they
conformed with generally accepted accounting
principles ("GAAP"). Second, SelLeb issued a
press release on August 15, 2002 announcing

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2007 WL 2510385 (C.A.3 (N.J.))
**(Cite as: Slip Copy)**

$418,370 in pre-tax earnings for the first six months of 2002.

In contrast to these statements of prior earnings, many of Sel-Leb's other statements expressed its " glowingly optimistic expectations for fiscal year 2002."(A50) For instance, in April 2002, the company said it was "slated to begin to generate strong revenue and earnings growth in 2002."(A51 (internal quotation marks omitted)) In May, the company "anticipate[d] ... report[ing] record revenues for its fiscal year end[ing] December 31, 2002."(A51) In August and September, it reiterated its optimism about 2002. And in November, although recognizing the financial difficulties of " several of our major customers," Sel-Leb predicted " a significant increase in the sales and earnings" for the fourth quarter of 2002.(A52) Notably, in November the company also stated that it had renegotiated and renewed the terms of a $3.8 million "credit facility" with Merrill Lynch Business Financial Services, Inc. ("Merrill Lynch" ). (A53)

In late 2002, Sel-Leb's expectations about its financial health "began to dim." (A53) On December 24, 2002, it issued a press release indicating that "sales for the fourth quarter of 2002 will be substantially lower than the revised projection previously issued by the Company." (A53) The company cited "generally weak economic conditions," and "production problems" with a third-party manufacturer that had "caused the Company to miss shipping orders during the fourth quarter."(A53) Moreover, throughout early 2003, the company was unable to make required financial disclosures "due to unforeseen difficulties in obtaining information essential to these estimates." (A54) Specifically, Sel-Leb had been unable to obtain information "from an independent third party, which is an integral and important part of the Company's operations."(A54) As a result, Sel-Leb announced that it would be "delisted from the Nasdaq SmallCap Market with the opening of business on Friday, May 23, 2003."(A54)

**\*2** Sel-Leb later disclosed, on July 24, 2003, that it was "not in compliance with certain net worth and cash flow covenants of its Merrill Lynch credit

facility," and on October 15, 2003, revealed that the credit facility had been terminated. (A54) On February 24, 2004, the company indicated that its operations had been significantly curtailed due to decreased sales and lack of funding. Finally, it stated that it had incurred a pre-tax loss of $3.8 million for fiscal year 2002, and also had to revise downward by $1.8 million its pre-tax income for fiscal year 2001.

According to the complaint, although Sel-Leb's stock had traded as high as $4.00 per share, its disclosures about financial health had rendered the company's shares worthless.[FN2]

> FN2. We may take judicial notice under Federal Rule of Evidence 201 of facts not found by the district court, even when reviewing its ruling on a motion to dismiss.

### B. District Court Opinion

On April 9, 2004, Key Equity filed a class action complaint in the United States District Court for the District of New Jersey. Based on the foregoing facts, Key Equity alleged that Sel-Leb, and its directors and accountant, (collectively, "defendants" ) had made materially false and misleading statements in violation of section 10(b) of the Securities Exchange Act of 1934.[FN3]In particular, Key Equity alleged that Sel-Leb had "failed to disclose" that: (1) pre-tax earnings for fiscal year 2001 were overstated by approximately $1.8 million; (2) the company incurred a pre-tax loss of approximately $3.8 million for fiscal year 2002; (3) the company was in default on the terms of its credit facility with Merrill Lynch; and (4) the company's financial statements were not prepared in accordance with GAAP.

> FN3. In a separate count, Key Equity alleged a violation of section 20(a) of the Exchange Act on the part of Sel-Leb's directors. Section 20(a) "imposes joint and several liability on any person who ' controls a person liable under any provision of the [Exchange Act].' " In re

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2007 WL 2510385 (C.A.3 (N.J.))
**(Cite as: Slip Copy)**

*Alpharma Inc. Sec. Litig.,* 372 F.3d 137, 153 (3d Cir.2004) (quoting *Shapiro v. UJB Financial Corp.,* 964 F.2d 272, 279 (3d Cir.1992)). As we affirm dismissal of the § 10(b) claim, we likewise affirm the dismissal of this claim. *Id.*

According to the complaint, defendants concealed information about the "true state of the Company's deteriorating affairs" in order to "maintain the credit facility with Merrill Lynch." (A57) In Key Equity's view, "[h]ad Merrill Lynch discovered the adverse information about the Company earlier, it would have called for termination of the credit facility immediately."(A57)

On defendants' motion, the District Court dismissed Key Equity's complaint for failure to state a claim on which relief could be granted, under Federal Rule of Civil Procedure 12(b)(6), and failure to plead facts with particularity, under Rule 9(b) and the PSLRA. The Court reached the following conclusions. Regarding the allegation that the company's financial statements did not conform to GAAP, Key Equity had not "alleged with any detail what principles ... were violated by Defendants." (A16) Regarding the allegation that the company renegotiated its credit line because of financial trouble, Key Equity had relied merely on " information and belief," and thus did not plead with particularity. (A17) Regarding the allegations that the company had misstated its 2001 and 2002 earnings, Key Equity failed to plead with particularity facts giving rise to a "strong inference" of *scienter.*(A17-20) Finally, the Court concluded that all of the statements concerning the company's future financial health were "forward looking" and, therefore, did not give rise to liability. (A20-21)

**\*3** On December 29, 2005, Key Equity filed a Notice of Appeal. We have jurisdiction pursuant to 28 U.S.C. § 1291, and exercise plenary review over the District Court's order granting the defendants' motion to dismiss. *Cal. Pub. Employees' Ret. Sys. v. Chubb Corp.,* 394 F.3d 126, 143 (3d Cir.2004).

### II. Legal Background

"Section 10(b) of the Securities Exchange Act of 1934 forbids the 'use or employ, in connection with the purchase or sale of any security ..., [of] any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe....' " *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 127 S.Ct. 2499, 2507 (June 21, 2007) (quoting 15 U.S.C. § 78j(b)). "Pursuant to this statutory authority, the [SEC has] promulgated Rule 10b-5, which creates a private cause of action for investors harmed by materially false or misleading statements." *In re Suprema Specialties, Inc. Sec. Litig.,* 438 F.3d 256, 275 (3d Cir.2006).[FN4]

> FN4. The rule makes it unlawful "for any person '[t]o make any untrue statement of a material fact or to omit to state a material fact necessary to make the statements made[,] in light of the circumstances under which they were made, not misleading ... in connection with the purchase or sale of any security.' " *Id.* (quoting 17 C.F.R. § 240.10b-5(b)).

To state a claim for a violation of section 10(b), a plaintiff must plead the following elements: "(1) a material misrepresentation (or omission); (2) *scienter, i.e.,* a wrongful state of mind; (3) a connection with the purchase or sale of a security; (4) reliance, often referred to in cases involving public securities markets (fraud-on-the-market cases) as 'transaction causation;' (5) economic loss; and (6) 'loss causation,' i.e., a causal connection between the material misrepresentation and the loss."*Id.* (quoting *Dura Pharm., Inc. v. Broudo,* 544 U.S. 336, 341 (2005)). In assessing the sufficiency of § 10(b) pleadings, we "accept all factual allegations in the complaint as true," and " consider the complaint in its entirety, as well as ... sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss."*Tellabs,* 127 S.Ct. at 2509.

More importantly, in assessing the sufficiency of a § 10(b) claim, we also observe the heightened pleading requirements of Federal Rule of Civil Procedure 9(b) and the PSLRA.[FN5]Under these

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2007 WL 2510385 (C.A.3 (N.J.))
**(Cite as: Slip Copy)**

requirements, a plaintiff must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, [a plaintiff must] state with particularity all facts on which that belief is formed."In re *Alpharma Inc. Sec. Litig.,* 372 F.3d 137, 147 (3d Cir.2004) (quoting 15 U.S.C. § 78u-4(b)(1)(B)). In other words, the complaint should set out the "who, what, when, where and how" of the events at issue. *DiLeo v. Ernst & Young,* 901 F.2d 624, 627 (7th Cir.1990) (quoted in *In re Advanta Corp. Sec. Litig.,* 180 F.3d 525, 534 (3d Cir.1999)).

> FN5. The purpose of Rule 9(b) is to "give defendants notice of the claims against them, provide an increased measure of protection for their reputations, and reduce[ ] the number of frivolous suits brought solely to extract settlements."*In re Suprema Specialties,* 438 F.3d at 270 (internal quotation marks omitted). The purpose of the PSLRA is "to restrict abuses in securities class-action litigation." *In re Advanta Corp. Sec. Litig.,* 180 F.3d 525, 531 (3d Cir.1999). To the extent that Rule 9(b) conflicts with the PSLRA, the statute supersedes it. *Id.* at 531 n. 5.

Regarding allegations of *scienter,* a plaintiff must " state with particularity facts giving rise to a *strong inference* that the defendant acted with the required state of mind."*In re Alpharma,* 372 F.3d at 148 (quoting 15 U.S.C. § 78u-4(b)(2) (emphasis added)). To do so, the complaint may allege (1) " facts to show that defendants had both motive and opportunity to commit fraud," or (2) "facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness."*Id.* (quoting *In re Burlington Coat Factory Sec. Litig.,* 114 F.3d 1410, 1418 (3d Cir.1997)). As the Supreme Court has made clear, a complaint gives rise to a "strong inference" of *scienter* only if a reasonable person would deem the inference of *scienter* cogent and at least as compelling as any opposing inference one could draw from the facts alleged."*Tellabs,* 127 S.Ct. at 2510.

*4 "Stated in another way, unless plaintiffs in securities fraud actions allege facts supporting their contentions of fraud with the requisite particularity mandated by Rule 9(b) and the [PSLRA], they may not benefit from inferences flowing from vague or unspecific allegations-inferences that may arguably have been justified under a traditional Rule 12(b)(6) analysis."*In re Rockefeller Center Properties, Inc. Sec. Litig.,* 311 F.3d 198, 224 (3d Cir.2002). If a complaint fails to meet the stringent pleadings requirements for sustaining a § 10(b) claim, the " appropriate sanction ... is dismissal." *In re Alpharma,* 372 F.3d at 148;*In re Rockefeller,* 311 F.3d at 224 (citing 15 U.S.C. § 78u-4(b)(3)(A)).

### III. Discussion

On appeal, Key Equity offers four reasons for us to vacate the order of the District Court and reinstate its complaint. First, Key Equity argues that it did not have to plead with particularity "which provisions of GAAP had been violated in order to satisfy the pleading requirements of the PSLRA and Rule 9(b)." Br. at 9. Second, it argues that it " pleaded with particularity that defendants were in default of the $3.8 million credit facility with Merrill Lynch." Br. at 11. Third, it contends that its complaint sufficiently alleged "motive and opportunity" to satisfy the pleading requirements for *scienter.*Br. at 13. Finally, it contends that " defendants' press releases and financial statements" were not "forward looking" and were "thus not entitled to the PSLRA's safe harbor protection."Br. at 15.

We reject these contentions and conclude that Key Equity's complaint fails to satisfy the heightened pleading requirements of Rule 9(b) and the PSLRA. FN6 We agree with the decision of the District Court primarily for two reasons.FN7First, almost all the statements identified by Key Equity were projections about the company's financial growth, or expressions of general optimism about its financial health. Such positive portrayals of the company, however, are not actionable under § 10(b). As we stated in In re *Advanta,*"vague and general statements of optimism 'constitute no more than 'puffery' and are understood by reasonable

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2007 WL 2510385 (C.A.3 (N.J.))
**(Cite as: Slip Copy)**

investors as such.' " 180 F.3d at 538 (quoting *In re Burlington Coat,* 114 F .3d at 1428 n. 14). Accordingly, the company's optimistic statements that it was, for example, "slated to begin to generate strong revenue and earnings growth in 2002," do not give rise to liability under § 10(b).[FN8]

> FN6. For the purposes of brevity, we do not distinguish between defendants in our discussion of the issues. Notably, Key Equity does not do so on appeal. Its failure to specify which facts support a claim against which defendants-i.e., which defendants said and knew what at what time-supports our conclusion that the complaint is not pleaded with sufficient particularity.

> FN7. J.H. Cohn also points out that Key Equity failed to adequately plead "loss causation," i.e., that "the drop in the value of a security is related to the alleged misrepresentation."*Berckeley Inv. Group, Ltd. v. Colkitt,* 455 F.3d 195, 223 (3d Cir.2006). Although it appears that no facts establish a causal connection between the misstatements and the decline in the value of the stock, we, like the District Court, need not reach this issue.

> FN8. To the extent these statements could be considered materially misleading to a reasonable investor, they were "identified as ... forward-looking" and "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement."15 U.S.C. § 78u-5(c)(1)(A)(i).

Second, although the District Court concluded that the complaint adequately identified Sel-Leb's earnings statements for 2001 and the first half of 2002 as materially misleading,[FN9] it concluded that Key Equity had failed to accompany these statements with sufficient allegations of *scienter.*In order to establish *scienter,* Key Equity relies on the defendants' "motive and opportunity" to commit

fraud. Presumably, the inference we are to draw is that defendants had a motive to fraudulently misstate earnings because Sel-Leb needed the Merrill Lynch line of credit to operate. Because the company could not meet the requirements for sustaining this line of credit, defendants decided to overstate SelLeb's 2001 and 2002 earnings. Moreover, by stating that it was only "renewing" the credit line, the defendants attempted to disguise the company's deteriorating financial condition from investors.

> FN9. We observe that, arguably, the complaint fails to adequately plead that the earnings statement for the first six months of 2002 was misleading. A $3.8 million loss for the year as a whole is not necessarily inconsistent with gains in the first half of that year. In fact, the press releases indicate that in the latter portion of 2002 a large number of orders could not be filled, leading to financial difficulties. (A43)

*5 We conclude that these allegations have been pleaded with insufficient particularity to meet the heightened pleading requirements of Rule 9(b) and the PSLRA. Specifically, the facts allegedly supporting a strong inference of *scienter* have not been adequately pled.[FN10]As the Supreme Court recently stated, "omissions and ambiguities count against inferring *scienter,* for plaintiffs must 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.' " *Tellabs,* 127 S.Ct. at 2511 (quoting 15 U.S.C. § 78u-4(b)(2)).

> FN10. We also note that the complaint sets out nothing more than an ordinary business motive, which is typically insufficient to support a strong inference of fraud. *See GSC Partners CDO Fund v. Washington,* 368 F.3d 228, 237 (3d Cir.2004) (" Motives that are generally possessed by most corporate directors and officers do not suffice; instead, plaintiffs must assert a concrete and personal benefit to the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2007 WL 2510385 (C.A.3 (N.J.))
**(Cite as: Slip Copy)**

individual defendants resulting from this fraud.") (internal quotation marks omitted).

In this case, although Key Equity alleges that Sel-Leb falsified its earnings to maintain its credit line, its complaint is bereft of any facts or details supporting this conclusion. We are therefore left to speculate about what particular information was hidden, what financial figures were manipulated, and when any of the defendants knew of or implemented such fraudulent devices. *Cf. In re Burlington Coat,* 114 F.3d at 1417-18 ("[W]here plaintiffs allege that defendants distorted certain data disclosed to the public by using unreasonable accounting practices, we have required plaintiffs to state what the unreasonable practices were and how they distorted the disclosed data."). Inferring *scienter* in these circumstances would impermissibly provide Key Equity the "benefit [of] inferences flowing from vague or unspecific allegations."*In re Rockefeller,* 311 F.3d at 224. In other words, because of the complaint's omissions, it fails to set out the "who, what, when, where and how" of the events at issue. *DiLeo,* 901 F.2d at 627. FN11

> FN11. Our dissenting colleague relies on the tightening of Merrill Lynch's credit line as a motive to commit fraud. The complaint states only that, on information and belief, Sel-Leb had to renegotiate its credit line because it could not repay certain obligations to Merrill Lynch. (A53) With this allegation alone, an inference that defendants renegotiated Sel-Leb's credit line in the ordinary course of business (when it was up for renewal) is more likely than an inference of *scienter.* *See Tellabs,* 127 S.Ct. at 2513.

Furthermore, we conclude that the complaint fails to adequately plead facts "that constitute strong circumstantial evidence of conscious misbehavior or recklessness."*In re Alpharma,* 372 F.3d at 148. To do so, Key Equity would have to allege "an extreme departure from the standards of ordinary care [that] presents a danger of misleading buyers or sellers that is either known to the defendant or is

so obvious that the actor must have been aware of it ."*In re Advanta,* 180 F.3d at 535 (quoting *McLean v. Alexander,* 599 F.2d 1190, 1197 (3d Cir.1979)). Although Key Equity does not appear to pursue a recklessness theory on appeal, its complaint nonetheless fails to satisfy the requirements for doing so. The mere fact of a misstatement is not evidence of recklessness, and Key Equity provides no detail to support a stronger conclusion than: there must have been fraud. We have previously rejected such conclusory pleading as precisely what the PSLRA was intended to weed out.*GSC Partners CDO Fund v. Washington,* 368 F.3d 228, 239 (3d Cir.2004) ("Of course, it is not enough for plaintiffs to merely allege that defendants 'knew' their statements were fraudulent or that defendants 'must have known' their statements were false."); *In re Advanta,* 180 F.3d at 539 (rejecting as inadequate allegation that defendants "must have been aware of impending losses").FN12

> FN12. Our dissenting colleague would infer *scienter* from what he believes to be a 400% overstatement of Sel-Leb's 2001 earnings. We disagree with his calculations. As the record reveals, the original 2001 net earnings of $443,669 resulted from gross income of $21,451,140 and expenses (including taxes) of $21,007,471. The revised figure for that year reflected a reduction of about $1.8 million in pre-tax earnings. Assuming this $1.8 million is a reduction in Sel-Leb's gross income of over $21 million, the misstatement reflects an error of less than 10%. *Cf. PR Diamonds, Inc. v. Chandler,* 364 F.3d 671, 686 (6th Cir.2004) (" Accepting Plaintiffs' allegations as true, Intrenet represented itself as a barely profitable company, when in fact it was a barely unprofitable company. It simply cannot be said that Intrenet's accounting improprieties, by virtue of their type and size, should have been obvious."). In any event, the complaint provides insufficient details from which to determine what errors the misstatement resulted from, or whether any "red flags" had warned any of

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                      Page 7

Slip Copy, 2007 WL 2510385 (C.A.3 (N.J.))
**(Cite as: Slip Copy)**

the defendants about them.

### IV. Conclusion

**\*6** For the foregoing reasons, we conclude that Key Equity's complaint failed to meet the heightened pleading requirements applicable to a securities fraud claim under § 10(b). We therefore affirm.

GARTH, Circuit Judge, dissenting:
I find it difficult to understand how the majority opinion can overlook the magnitude of Sel-Leb's overstatement of earnings ($1.8 million) which was 400% below its reported income in 2001. Moreover, I find it even more difficult to understand how the majority opinion can overlook Sel-Leb's failure to disclose Merrill Lynch's significant modifications to Sel-Leb's credit agreement because of Sel-Leb's precarious financial condition. The majority opinion does so by characterizing Sel-Leb's rosy projections about its financial health and future growth as "puffery." I cannot join in the majority's "puffery" analysis and I therefore respectfully dissent.

### I.

The facts alleged in the complaint, taken together with Sel-Leb's SEC filings which we are permitted to consider on a motion under Rule 12(b)(6), [FN13] are more than sufficient to plead and satisfy a " strong inference" that the director defendants acted fraudulently and with scienter as required under the Private Securities Litigation Reform Act of 1995 (" PSLRA").[FN14]

> FN13. *See Oran v. Stafford.,* F.3d 275, 289 (3d Cir2000) (adopting the reasoning of " [a] number of our sister circuits [that] ... in deciding a motion for judgment on the pleadings [we may] take judicial notice of properly-authenticated public disclosure documents filed with the SEC); see also *Kramer v. Time Warner, Inc.,* 937 F.2d 767, 774 (2d Cir.1991).
> Moreover, I emphasize that this is a Fed.R.Civ.P. 12(b)(6) proceeding. In

reviewing a dismissal for failure to state a claim, a judge must accept as true all of the factual allegations contained in the complaint and may take judicial notice of SEC documents. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 127 S.Ct. 2499, 2509 (2007). As the Supreme Court recently noted, "[t]he inquiry ... is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard. "*Id.* (emphasis in original).

> FN14. I concur with the majority that the complaint was properly dismissed as to J.H. Cohn, Sel-Leb's auditor, on the grounds that it stood to gain no "concrete and personal benefit" from such misstatements. *GSC Partners CDO Fund v. Washington,* 368 F.3d 228, 237 (3d Cir.2004); see also *Rothman v. Gregor,* 220 F.3d 81, 98 (2d Cir.2000) (holding that an auditor may be found liable for recklessness in certifying financial misstatements only if its conduct was " highly unreasonable, representing an extreme departure from the standards of ordinary care [and] must, in fact, approximate an actual intent to aid in the fraud being perpetrated by the audited company").

First, Merrill Lynch's repeated material modifications of Sel-Leb's loan agreements in mid-2002 strongly point to the fact that Merrill Lynch was seriously concerned about SelLeb's financial position.[FN15]I find it rather quixotic that in its effort to minimize Sel-Leb's intent to commit fraud, the majority opinion recites in its footnote 11-and without the context, language, and facts found in paragraph 30 of the complaint-that Sel-Leb's renegotiation of its credit line was no more than in the "ordinary course of business." The majority opinion's footnote 11 states:

> FN15. It is convenient for the majority opinion to infer that Sel-Leb's credit line

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                    Page 8

Slip Copy, 2007 WL 2510385 (C.A.3 (N.J.))
**(Cite as: Slip Copy)**

was renegotiated only in the ordinary course of business. *See* maj op. n. 11. This is the same litany that Sel-Leb would have us believe. However, as I point out, what Sel-Leb did was bury its "renewal" to disguise the true purpose and effect of renegotiating its credit with Merrill Lynch. One need only take a cursory look at the modifications made by Merrill Lynch-which critically tightened Sel-Leb's credit (and were instituted not only once, but twice, in a span of four months)-to understand that this was no mere "ordinary course of business." This was financial desperation!

... The complaint states only that, on information and belief, Sel-Leb had to renegotiate its credit line because it could not repay certain obligations to Merrill Lynch. (A53) With this allegation alone, an inference that defendants renegotiated Sel-Leb's credit line in the ordinary course of business (when it was up for renewal) is more likely than an inference of *scienter. See Tellabs,* 127 S.Ct. at 2513.

However, paragraph 30 of the complaint in which the majority opinion finds comfort-*in full* alleges not just the last sentence cited by the majority-but rather those facts and details giving rise to the renegotiation of the credit agreement. Paragraph 30 of the complaint alleges that:
This disclosure [that fourth quarter 2002 sales would be substantially lower than projected] occurred shortly after defendants filed their quarterly report for the third quarter of 2002. Buried in the quarterly report was the disclosure that Sel-Leb had been required to renegotiate the terms of a $3.8 million credit facility with Merrill Lynch Business Financial Services, Inc. ("Merrill Lynch") and to postpone its obligation to repay the $3,717,249 outstanding balance on the credit facility from October 31, 2002 to October 31, 2003. Upon information and belief, the Company had to renegotiate the terms of the credit facility with Merrill Lynch because it could not make the payment as required on October 31, 2002.

**\*7** These concerns obviously caused Merrill Lynch

problems. Despite these troubling concerns of Sel-Leb's principal lender, the director defendants reported in a November 18, 2002 press release that Sel-Leb was merely "pleased to announce" that it was "*renewing* [not renegotiating] our Operating Line of Credit." A42 (emphasis added). From the entire allegations (not just the last sentence) contained in paragraph 30 of the complaint, it appears that the director defendants had actual *knowledge,* to a far greater degree than they disclosed, of Sel-Leb's troubled financial position.

Second, the sheer size of Sel-Leb's overstatements-over 400% of earnings in fiscal year 2001 alone-are indicative of fraudulent intent. The complaint alleges that without these *enormous* overstatements of earnings (which actually were losses, not positive income), Sel-Leb would have breached and defaulted on the terms of its credit agreement, causing Merrill Lynch to terminate its credit at once and "exercis[e] remedies available to it as a secured lender."Comp. ¶¶ 44-45. Would reasonable investors truly regard a misstatement of over 400% of reported income as mere "puffery?" Nor is it an answer to say that the 400% overstatement of earnings have been miscalculated as the majority claims in its footnote 12.

The majority opinion's hypothesis (evaluating the extent of revenues and expenses) as to the source of the misstatement-"a decrease of about 10%" of revenues-is nothing more than pure speculation since neither the record nor the SEC filings state the reason for the 400% overstatement of earnings.[FN16] All the record and the SEC filings reveal is that SelLeb turned from a profitable venture into a bankrupt company because, in part, its 2001 earnings were overstated by 400%. *See* A50; *Sel-Leb Form 8-K,* filed Feb. 24, 2004. To a reasonable investor, it is inconsequential whether such a significant misstatement of earnings retained by shareholders arises from an overstatement of revenues and/or an understatement of expenses.

FN16. The majority opinion could have attempted to further dilute the size of the 400% earnings misstatement by speculating that it resulted from a 4.2%

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                 Page 9

Slip Copy, 2007 WL 2510385 (C.A.3 (N.J.))
**(Cite as: Slip Copy)**

overstatement of revenues and a 4.3% understatement of expenses (both percentages equaling in total to about $1.8 million of the misstated net earnings).

The SEC documents and reports, which the majority opinion has taken pains not to address, disclose that Sel-Leb was not a "barely unprofitable company" (see maj. op. n. 12) but was rather in deep financial trouble-trouble which it chose not to disclose to its investors or to Merrill Lynch. Moreover, by affirming the erroneous dismissal of Key Equity's complaint the majority has now precluded Key Equity from providing by proofs the further facts and details as to Sel-Leb's losses and its fraud.

Finally, the need to falsify Sel-Leb's asset statements in order to prevent a default leading to an end of its crucial credit line constitutes a motive to commit fraud that is probative of scienter. In this regard, the complaint alleges that "[d]efendants were motivated to issue materially false statements .. . in large part to maintain the credit facility with Merrill Lynch. Had Merrill Lynch discovered the adverse information about the Company earlier, it would have called for termination of the credit facility immediately."Comp. ¶ 45. Such motivation provides further probative support for plaintiffs' assertion that the director defendants acted with fraudulent intent.

**\*8** These allegations, separately and particularly in combination, adequately plead a "strong inference" of scienter as required by the PSLRA.

### II.

The majority opinion states that Key Equity's allegations in its complaint have not been adequately pled and are "bereft of any facts or details supporting" the conclusion that Sel-Leb concealed its financial condition to maintain its credit line. Maj. op. p. 12. Let's examine what Key Equity really and factually charged.

#### *Sel-Leb's Failure to Disclose Modifications of its Credit Agreement*

Sel-Leb's Form 10-KSB contained, as an attachment, a loan agreement dated November 8, 1999, under which Merrill Lynch agreed to provide a revolving line of credit to Sel-Leb. One of the covenants contained in this loan agreement, under the heading "Minimum Tangible Net Worth," required that "Customer's 'tangible net worth' shall at all times exceed $6,500,000.00."A27. In 2002, amidst Sel-Leb's now evident catastrophic losses, Merrill Lynch modified the loan agreement two times. On June 6, 2002, Merrill Lynch increased the tangible net worth requirement to $8 million. A28. *Just four months later,* on October 18, 2002, the tangible net worth requirement was further increased to $8.5 million. A29.

Sel-Leb *did not report* either of these modifications in its subsequent August 15, 2002 or September 13, 2002 press releases that accompanied its second quarter 2002 or third quarter 2002 financial reports. Finally, in a November 18, 2002 press release, Sel-Leb cheerfully reported that it was "pleased to announce that we have signed an agreement with our major lending institution, *renewing* our Operating Line of Credit through October 31, 2003. "A42 (emphasis added). This announcement made no mention of nor did it contain any indication of the changes to Sel-Leb's loan agreement. Moreover, the very term "renewing" used by Sel-Leb to characterize the modifications to its loan agreement was itself misleading and fraudulent. The complaint alleges that this was not a renewal but at best a significant renegotiation. Comp. ¶ 30. (Puffery?).

The November 18, 2002 press release also reported positive earnings for the nine months ended September 30, 2002, and stated "we expect to continue to show growth in both sales and earnings for the fiscal year 2002."*Id.* It was only later that Sel-Leb disclosed that it had sustained a $3.8 million loss for fiscal year 2002. Comp. ¶¶ 39-40.

The allegations containing and referring to these facts demonstrate that the director defendants had actual knowledge or at the very least behaved recklessly with respect to SelLeb's deteriorating financial condition. Merrill Lynch's fears-as expressed by its decisions to twice modify Sel-Leb's loan covenants-were obvious warnings putting the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy

Page 10

Slip Copy, 2007 WL 2510385 (C.A.3 (N.J.))
**(Cite as: Slip Copy)**

director defendants on notice of Sel-Leb's seriously unstable financial condition. Even more revealing of the director defendants' state of mind, however, is the misleading manner by which Sel-Leb reported the extension of its credit facility-i.e., that it was " pleased" to be "renewing" the facility-without so much as a hint that in fact Merrill Lynch had twice within the last five months materially tightened the terms of Sel-Leb's credit. Comp. ¶¶ 30, 36, 45, 54. These allegations and facts are alone sufficient to create a strong inference of scienter permitting this case to go forward.

**\*9** The director defendants argue that "the reason why Sel-Leb had to renegotiate the terms of the credit facility on October 31, 2002 ... was because October 31 was the annual date for renewal of the credit facility."Def. Br. at 23. This still fails to explain why the materially adverse renegotiated terms were not disclosed. Instead, the director defendants whitewashed those changes with a report that Sel-Leb's credit facility had merely been " renew[ed]." Comp. ¶ 30. In any event, the issue whether the October 31, 2002 extension was simply an annual renewal or, as Key Equity maintains, "a renegotia[tion] ... because [Sel-Leb] could not make the payment as required on October 31, 2002" is a matter for discovery, not resolution on a motion under Rule 12(b)(6).*Id.* The allegations amply reveal that the actions of the director defendants were not the result of unfortunate business conditions, but were rather fraudulent efforts to disguise Sel-Leb's failing enterprise.

III.

*Size of Misstatements and Errors in Financial Reports*

The inference of scienter here is further heightened by the sizable magnitude of the overstatements in Sel-Leb's 2001 and 2002 financial statements. According to the complaint, Sel-Leb's pre-tax earnings for fiscal year 2001 were overstated by $1.8 million, and were thus actually *over 400%* below Sel-Leb's $443,669 reported 2001 income. Comp. ¶¶ 41, 44. And, while reporting positive

pre-tax income of $339,000 for first quarter 2002 and positive, though declining, pre-tax income of $418,370, and $132,276 for the six and nine month periods ending June 30, 2002 and September 30, 2002, Sel-Leb later admitted *no income* for those periods but rather a $3.8 million *loss* for fiscal year 2002. Comp. ¶¶ 24, 26, 40, 44. These facts can hardly be called "puffery" or a vague and general statement of optimism (maj.op. p. 10-11) or forward-looking (maj.op. n. 8).

The magnitude of the overstatements in corporate financial statements has repeatedly been held to constitute corroborating circumstances of fraudulent intent. *See Gen. Elec. Capital Corp. v. Acosta (In re Acosta),* 406 F.3d 367, 372 (5th Cir.2005) ("An intent to deceive may be inferred from "reckless disregard for the truth or falsity of a statement combined with the *sheer magnitude of the resultant misrepresentation*.") (emphasis added); *PR Diamonds, Inc. v. Chandler,* 364 F.3d 671, 684 (6th Cir.2004) ("[A]n inference of knowledge or recklessness may be drawn from allegations of accounting violations that are so simple, basic, and pervasive in nature, and *so great in magnitude,* that they should have been obvious to a defendant.") (emphasis added); *In re MicroStrategy, Inc. Sec. Litig.,* 115 F.Supp.2d 620, 637 (D.Va.2000) (" [T]he ... restatements are of such a great magnitude-amounting to a night-and-day difference with regard to MicroStrategy's representations of profitability-as to *compel an inference* that fraud or recklessness was afoot.") (emphasis added).[FN17]

FN17.*See also Rothman v. Gregor,* 220 F.3d 81, 92 (2d. Cir.2000) (agreeing that the magnitude of write-offs involved " renders less credible" defendants' argument that they acted without scienter); *In re Baan Co. Sec. Litig.,* 103 F.Supp.2d 1, 21 (D.D.C.2000) (observing that "the magnitude of the error can play a role" in inferring scienter); *In re Ancor Communications, Inc.,* 22 F.Supp.2d 999, 1005 (D.Minn.1998) (finding support for a strong inference of conscious behavior from a company's substantial overstatements of revenues); *In re First*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                          Page 11

Slip Copy, 2007 WL 2510385 (C.A.3 (N.J.))
**(Cite as: Slip Copy)**

*Merchants Acceptance Corp. Sec. Litig.,* No. 97-C-2715, 1998 U.S. Dist. LEXIS 17760, at *30-*31 (N.D.Ill. Nov. 4, 1998) ( "Other circumstances suggesting fraudulent intent can include ... the magnitude of the fraud alleged."); *Carley Capital Group v. Deloitte & Touche, L.L.P.,* 27 F.Supp.2d 1324, 1339 (N.D.Ga.1998) (holding that a misapplication of GAAP "when combined with a drastic overstatement of financial results can give rise to a strong inference of scienter"); *Rehm v. Eagle Fin. Corp.,* 954 F.Supp. 1246, 1255 (D.Ill.1997) (citing the defendants' 91% overstatement of revenues as an "egregious miscalculation of credit losses" indicative of fraudulent intent); *Marksman Partners, L.P. v. Chantal Pharm. Corp.,* 927 F.Supp. 1297, 1314 (D.Cal.1996) ("The facts that the allegedly overstated revenues constituted such a significant portion of Chantal's total revenues ... tend [s] to support the conclusion that the defendants acted with scienter.").

*10 Here, Sel-Leb overstated its earnings by over 400% in 2001 and reported hundreds of thousands of dollars in earnings in 2002 while in reality sustaining a massive $3.8 million loss. The enormity of these overstatements, taken together with the serious consequences the director defendants knew would result from a disclosure that Sel-Leb breached the covenants in its credit facility, are prime indicia of scienter under the PSLRA and Rule 9(b).

IV.

We have held that scienter may be adequately pleaded either (1) by "alleging facts establishing a *motive* and an *opportunity* to commit fraud;" or (2) by "setting forth facts that constitute circumstantial evidence of either reckless or conscious behavior." *In re Advanta Corp. Sec. Litig.,* 180 F.3d 525, 534-35 (3d Cir.1999). As discussed above, the plaintiffs here have alleged "conscious behavior" in that the director defendants knew of Merrill Lynch's

concerns and concealed those concerns by reporting merely that Sel-Leb's credit facility had been " renew[ed]." But the complaint also alleges that the director defendants had the "motive and opportunity " to commit fraud. In particular, the complaint asserts that the director "[d]efendants were motivated to issue materially false statements ... in large part to maintain the credit facility with Merrill Lynch." Comp ¶ 45. Such motivations are highly probative of an intent to defraud. Allegations that a company's life hinges upon a credit facility, and that its lender is growing concerned about the company's financial state-coupled, as here, with severely overstated financials-present a starkly different scenario than the sort of generalized and commonplace motivations that the majority opinion finds to warrant dismissal under Rule 12(b)(6). The present complaint alleges that (1) absent financial overstatements, a corporation would default on a credit facility necessary to its survival; and (2) anxious lenders are repeatedly stiffening the terms of loan covenants, suggest a more specific and less common motivation and, therefore, are more probative of fraudulent intent.

Several courts have found such allegations probative of scienter. In *Howard v. Everex Sys.,* 228 F.3d 1057 (9th Cir.2000), the court found scienter had been sufficiently established through plaintiffs' evidence that "Everex had a motivation to overstate its net value so as not to violate loan covenants with its principal lender CIT."*Id.* at 1064.Everex's lender had required it to maintain a net worth of $90 million and at the end of fiscal year 1991, Everex had a net worth of $92.1 million. The court stated that, given Everex's "projected possible first quarter FY1992 losses of $2.1 million, resulting in a net worth of exactly $90 million," the defendant director and CEO had the incentive to overstate Everex's value." *Id.* The court concluded that "the demonstration of [the defendant's] possible motive, combined with the red flags of Everex's financial condition, are sufficient to withstand a motion for JMOL."*Id.*[FN18]

> FN18.*Howard* arose in the context of a motion for judgment as a matter of law rather than on a motion to dismiss, in

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                    Page 12

Slip Copy, 2007 WL 2510385 (C.A.3 (N.J.))
**(Cite as: Slip Copy)**

which context the Ninth Circuit has interpreted the PSLRA to discount allegations of motive and opportunity as a means of establishing scienter. *See Fischer v. Vantive Corp.(In Re Vantive Corp. Secs. Litig.),* 283 F.3d 1079, 1097 (9th Cir.2002)
.

**\*11** Similarly, in *PR Diamonds, Inc. v. Chandler,* 364 F.3d 671 (6th Cir.2004), the court found significant the plaintiffs' allegations that the defendants used improper accounting practices to forestall the company's impending default under certain financial covenants of its bank loan agreement:

[T]he allegations that the Individual Defendants were motivated to engage in fraud in order to forestall Intrenet's default of its bank loan agreement and to preserve the Company's ability to borrow pursuant to its credit facility warrant closer scrutiny. *These more particularized sorts of motive allegations are more probative of scienter. For example, as part of the mix of factors contributing to an inference of scienter, the Ninth Circuit has considered a defendant's motivation to overstate a company's reported net value so as not to violate loan covenants with its lender and to improve the prospects of increasing its credit line. Howard v. Everex Sys., Inc.,* 228 F.3d 1057, 1064 (9th Cir.2000). We view the motive allegations concerning the bank loan and credit facility as suggestive of scienter, although standing alone they do not establish a strong inference.

*Id.* at 690 (emphasis added).

In the present case, the complaint's allegations that the director defendants were *motivated* to avoid defaulting on Sel-Leb's credit facility do not stand alone. Read together with Sel-Leb's SEC filings, the pleadings show that Merrill Lynch twice within a four-month period tightened Sel-Leb's loan covenants, the most plausible explanation for which is Merrill Lynch's concern about Sel-Leb's financial situation. The director defendants knew of these concerns but did not disclose them; in fact, the complaint alleges that the director defendants hid or "buried" those concerns, *see* Comp. ¶ 30 (*supra* n. 3), behind the pretense that the facility was being "

renew[ed]." A42.

The question for us is not whether there are benign and "puffery" ways of interpreting these events; there may be many. Rather, the issue is whether plaintiffs have pled facts "rendering an inference of scienter *at least as likely* as any plausible opposing inference."*Tellabs,* 127 S.Ct. 2499, 2513 (2007) (emphasis in original). I would hold that they have met this burden, and have therefore properly and adequately pled the "strong inference" of scienter required under the PSLRA.

I therefore respectfully dissent from the majority's judgment, which upholds the district court's dismissal of plaintiffs' complaint pursuant to Fed.R.Civ.P. 12(b)(6) and thus precludes plaintiffs from proving the fraud and intent of the defendant directors-which plaintiffs have abundantly and appropriately alleged in the complaint.

C.A.3 (N.J.),2007.
Key Equity Investors, Inc. v. Sel-Leb Marketing Inc.
Slip Copy, 2007 WL 2510385 (C.A.3 (N.J.))

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

## CERTIFICATE OF SERVICE

I, Thomas P. Preston, hereby certify that on this 14th day of September, 2007, a copy of the foregoing **BRIEF IN SUPPORT OF MOTION TO DISMISS OF DEFENDANTS ROBERT A. KRAUSE AND BRYCE M. KOTH** was served on the following counsel:

| | |
|---|---|
| **BY ELECTRONIC SERVICE**<br><br>Joseph A. Rosenthal<br>Carmella P. Keener<br>Rosenthal, Monhait & Goddess, P.A<br>919 N. Market Street, Suite 1401<br>Wilmington, DE 19899 | **BY FIRST-CLASS MAIL**<br><br>Samuel H. Rudman<br>Lerach Coughlin Stoia Geller Rudman &<br>  Robbins LLP<br>58 South Service Road, Suite 200<br>Melville, NY 11747 |
| **BY ELECTRONIC SERVICE**<br><br>Robert S. Saunders<br>Skadden, Arps, Slate, Meagher & Flom LLP<br>One Rodney Square<br>P.O. Box 636<br>Wilmington, DE 19899 | **BY FIRST-CLASS MAIL**<br><br>Craig A. Stewart<br>Ken L. Hashimoto<br>Monique A. Gaylor<br>Arnold & Porter LLP<br>399 Park Avenue<br>New York, NY 10022 |
| **BY ELECTRONIC SERVICE**<br><br>Michael J. Maimone<br>Joseph B. Cicero<br>Edwards Angell Palmer & Dodge LLP<br>919 North Market Street, 15th Floor<br>Wilmington, DE 19801 | **BY FIRST-CLASS MAIL**<br><br>Michael Joseph<br>Joseph O. Click<br>Blank Rome LLP<br>600 New Hampshire Ave., N.W.<br>Washington, DC 20037 |
| **BY ELECTRONIC SERVICE**<br><br>Anne C. Foster<br>Robert J. Stearn, Jr.<br>Richard Layton & Finger, P.A.<br>One Rodney Square<br>920 North King Street<br>Wilmington, DE 19801 | **BY FIRST-CLASS MAIL**<br><br>Jonathan J. Lerner<br>Lea Haber Kuck<br>Skadden, Arps, Slate, Meagher & Flom LLP<br>Four Times Square<br>New York, NY 10036 |

| | |
|---|---|
| **BY ELECTRONIC SERVICE**<br><br>Christian Douglas Wright<br>Young, Conaway, Stargatt & Taylor<br>1000 West Street, 17th Floor<br>P.O. Box 391<br>Wilmington, DE 19899-0391 | **BY FIRST-CLASS MAIL**<br><br>Gandolfo V. DiBlasi<br>Stacey R. Friedman<br>David E. Swarts<br>Sullivan & Cromwell LLP<br>125 Broad Street<br>New York, NY 10004 |
| **BY ELECTRONIC SERVICE**<br><br>Thomas G. Macauley<br>Zuckerman Spaeder LLP<br>919 Market Street, Suite 990<br>Wilmington, DE 19801 | **BY FIRST-CLASS MAIL**<br><br>Christopher Harris<br>Seth L. Friedman<br>Latham & Watkins LLP<br>885 Third Avenue<br>New York, NY 10022 |
| **BY FIRST-CLASS MAIL**<br><br>Andrew B. Weissman<br>Michele L. Taylor<br>Wilmer Cutler Pickering Hale and Dorr LLP<br>1875 Pennsylvania Ave., N.W.<br>Washington, DC 20006 | **BY FIRST-CLASS MAIL**<br><br>Thomas G. Rafferty<br>Antony L. Ryan<br>Cravath, Swaine & Moore LLP<br>825 Eighth Avenue<br>New York, NY 10019-7475 |
| **BY FIRST-CLASS MAIL**<br><br>Michael Shapiro<br>Gerald Griffin<br>Carter Ledyard & Milburn LLP<br>2 Wall Street<br>New York, NY 10005 | **BY FIRST-CLASS MAIL**<br><br>Richard M. Strassberg<br>Jeffrey A. Simes<br>Laurie L. Leven<br>599 Lexington Avenue<br>New York, NY 10022 |
| **BY FIRST-CLASS MAIL**<br><br>Carl S. Kravits<br>Zuckerman Spaeder LLP<br>1800 M Street, N.W.<br>Washington, DC 20036 | **BY FIRST-CLASS MAIL**<br><br>Richard A. Spehr<br>Joseph De Simone<br>Mayer, Brown, Rowe & Maw LLP<br>1675 Broadway<br>New York, NY 10019-5820 |

| **BY FIRST-CLASS MAIL** | **BY FIRST-CLASS MAIL** |
|---|---|
| Stephen L. Ascher<br>Jenner & Block<br>919 Third Avenue<br>New York, NY 10022-3908 | Lynn Brimer<br>Strobl & Sharp, P.C.<br>300 East Long Lake Road, Suite 200<br>Bloomfield Hills, MI 48304-2376 |

Thomas P. Preston
I.D. No. 2548