IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

COLLINS & AIKMAN CORPORATION and
COLLINS & AIKMAN PRODUCTS CO., as
Debtors in Possession,

                Plaintiffs,

                vs.

DAVID A. STOCKMAN, J. MICHAEL
STEPP, BRYCE M. KOTH, DAVID R.
COSGROVE, PAUL C. BARNABA, ROBERT
A. KRAUSE, JOHN A. GALANTE,
CHARLES E. BECKER, ELKIN B.
MCCALLUM, THOMAS E. EVANS,
CYNTHIA HESS, DANIEL P. TREDWELL,
W. GERALD MCCONNELL, SAMUEL
VALENTI, III, HEARTLAND INDUSTRIAL
PARTNERS, L.P., HEARTLAND
INDUSTRIAL ASSOCIATES, L.L.C.,
HEARTLAND INDUSTRIAL GROUP, L.L.C.,
PRICEWATERHOUSECOOPERS LLP and
KPMG LLP,

                Defendants.

C.A. No. 07-265-***

## DECLARATION OF CHRISTIAN DOUGLAS WRIGHT

I, Christian Douglas Wright, declare as follows:

1.     I am an attorney with Young Conaway Stargatt & Taylor, LLP, counsel for Thomas E. Evans in connection with the above-captioned matter. I make this declaration in support of the Opening Brief in Support of Defendant Thomas E. Evans' Motion to Dismiss.

2.     Attached hereto as Exhibit 1 is a true and correct copy of Collins & Aikman's 2002 Proxy Statement, dated April 25, 2002.

3.     Attached hereto as Exhibit 2 is a true and correct copy of the By-Laws of Collins & Aikman Holdings Corporation.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge, information, and belief.  Executed this 14th day of September, 2007, at Wilmington, Delaware.

Christian Douglas Wright

066380.1001

## CERTIFICATE OF SERVICE

I, Christian Douglas Wright, Esquire, hereby certify that on September 14, 2007, I caused to be electronically filed a true and correct copy of the foregoing document with the Clerk of the Court using CM/ECF, which will send notification that such filing is available for viewing and downloading to the following counsel of record:

Joseph A. Rosenthal
Carmella P. Keener
Rosenthal, Monhait & Goddess, P.A.
919 Market Street, Suite 1401
P.O. Box 1070
Wilmington, DE 19899
(302) 656-4433
jrosenthal@rmgglaw.com
ckeener@rmgglaw.com

Anne C. Foster
Robert J. Stearn, Jr.
Richards, Layton & Finger, P.A.
One Rodney Square
920 North King Street
Wilmington, DE 19801
(302) 651-7700
foster@rlf.com
stearn@rlf.com

Thomas P. Preston
Blank Rome LLP
1201 North Market Street
Suite 800
Wilmington, DE 19801-4226
(302) 425-6400
preston-t@blankrome.com

James L. Holzman
J. Clayton Athey
Prickett, Jones & Elliott, P.A.
1310 King St.
P.O. Box 1328
Wilmington, DE 19899
(302) 888-6500
jlholzman@prickett.com
jcathey@prickett.com

Michael J. Maimone
Joseph B. Cicero
Edwards Angell Palmer & Dodge LLP
919 North Market Street, 15th Floor
Wilmington, DE 19801
(302) 777-7770
mmaimone@eapdlaw.com
jcicero@eapdlaw.com

Peter B. Ladig
Stephen B. Brauerman
The Bayard Firm
222 Delaware Avenue, Suite 900
P.O. Box 25130
Wilmington, DE 19899
(302) 655-5000
pladig@bayardfirm.com
sbrauerman@bayardfirm.com

Thomas G. Macauley
Zuckerman Spaeder LLP
919 Market Street, Suite 1705
P.O. Box 1028
Wilmington, DE 19899
(302) 427-0400
tmacauley@zuckerman.com

Vernon R. Proctor
Proctor Heyman LLP
1116 West Street
Wilmington, DE 19801
(302) 472-7300
vproctor@proctorheyman.com

Robert S. Saunders
Skadden, Arps, Slate, Meagher & Flom LLP
One Rodney Square
P.O. Box 636
Wilmington, DE 19899
(302) 651-3000
rsaunder@skadden.com

I further certify that on September 14, 2007, I caused a copy of the foregoing document

to be served by e-mail on the above-listed counsel of record and on the following:

Samuel H. Rudman
David A. Rosenfeld
Coughlin Stoia Geller
   Rudman & Robbins LLP
58 South Service Road, Suite 200
Melville, NY 11747
(631) 367-7100
SRudman@csgrr.com
DRosenfeld@csgrr.com

Thomas G. Rafferty
Antony L. Ryan
Cravath, Swaine, & Moore LLP
825 Eighth Avenue
New York, NY 10019-7475
(212) 474-1000
trafferty@cravath.com
aryan@cravath.com

Craig A. Stewart
Ken L. Hashimoto
Arnold & Porter LLP
399 Park Avenue
New York, NY 10022-4690
(212) 715-1000
Craig.Stewart@aporter.com
Ken.Hashimoto@aporter.com

Christopher Harris
Seth L. Friedman
Latham & Watkins LLP
885 Third Avenue
New York, NY 10022
(212) 906-1200
christopher.harris@lw.com
seth.friedman@lw.com

Stephen L. Ascher
Jenner & Block LLP
919 Third Avenue
New York, NY 10022
(212) 891-1600
sascher@jenner.com

Andrew B. Weissman
Michele L. Taylor
Wilmer Cutler Pickering Hale and Dorr LLP
1875 Pennsylvania Avenue, NW
Washington, DC 20006
(202) 663-6000
andy.weissman@wilmerhale.com
michele.taylor@wilmerhale.com

Carl S. Kravitz
Zuckerman Spaeder LLP
1800 M. Street, NW Suite 1000
Washington, DC 20036-5802
(202) 778-1800
ckravitz@zuckerman.com

Jonathon J. Lerner
Lea Haber Kuck
Skadden, Arps, Slate, Meagher & Flom LLP
Four Times Square
New York, NY 10036
(212) 735-3000
jlerner@skadden.com
lkuck@skadden.com

Michael Shapiro
Gerald Griffin
Carter Ledyard & Millburn LLP
2 Wall Street
New York, NY 10005
(212) 732-3200
mshapiro@clm.com
griffin@clm.com

Lynn Brimer
Strobl & Sharp, P.C.
300 East Long Lake Road, Suite 200
Bloomfield Hills, MI 48304
(248) 205-2772
lbrimer@stroblpc.com

Michael Joseph
Joseph O. Click
Blank Rome LLP
600 New Hampshire Avenue, NW
Washington, DC 20037
(202) 772-5800
joseph@blankrome.com
click@blankrome.com

Gandolfo V. DiBlasi
Stacey R. Friedman
Sullivan & Cromwell LLP
125 Broad Street
New York, NY 10004
(212) 558-4000
diblasig@sullcrom.com
friedmans@sullcrom.com

Richard M. Strassberg
Jeffrey A. Simes
Goodwin Procter LLP
599 Lexington Avenue
New York, NY 10022
(212) 813-8859
rstrassberg@goodwinprocter.com
jsimes@goodwinprocter.com

YOUNG CONAWAY STARGATT & TAYLOR, LLP

*/s/ Christian Douglas Wright*
Christian Douglas Wright (No. 3554)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE 19801
302-571-6600
*cwright@ycst.com*

# EXHIBIT 1

# COLLINS & AIKMAN CORP

250 STEPHENSON HWY
TROY, MI 48083
248. 824.2500

# DEF 14A

**DEFINITIVE PROXY STATEMENT**
**Filed on 04/25/2002 − Period: 05/16/2002**
File Number 001−10218



LIVEDGAR® Information Provided by Global Securities Information, Inc.
800.669.1154
www.gsionline.com

**Table of Contents**

SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

SCHEDULE 14A INFORMATION

**PROXY STATEMENT PURSUANT TO SECTION 14(a) OF THE
SECURITIES EXCHANGE ACT OF 1934**

Filed by the Registrant [X]
Filed by a Party other than the Registrant [ ]

Check the appropriate box:

[ ]   Preliminary Proxy Statement

[ ]   Confidential, for Use of the Commission Only (as permitted by Rule 14a−6(e)(2))

[X]   Definitive Proxy Statement

[ ]   Definitive Additional Materials

[ ]   Soliciting Material Pursuant to Section 240.14a−11(c) or Section 240.14a−12

Collins & Aikman Corporation

---

(Name of Registrant as Specified in Its Charter)

Not Applicable

---

(Name of Person(s) Filing Proxy Statement, if other than the Registrant)

Payment of Filing Fee (Check the appropriate box):

[X]   No fee required.

[ ]   Fee computed on table below per Exchange Act Rules 14a−6(i)(1) and 0−11.

    1)      Title of each class of securities to which transaction applies:

---

    2)      Aggregate number of securities to which transaction applies:

---

    3)      Per unit price or other underlying value of transaction computed pursuant to Exchange Act Rule 0−11 (set forth the amount on which the filing fee is calculated and state how it was determined):

---

    4)      Proposed maximum aggregate value of transaction:

---

    5)      Total fee paid:

[ ]    Fee paid previously with preliminary materials.

[ ]    Check box if any part of the fee is offset as provided by Exchange Act Rule 0−11(a)(2) and identify the filing for which the offsetting fee was paid previously. Identify the previous filing by registration statement number, or the Form or Schedule and the date of its filing.

1)Amount Previously Paid:

2)Form, Schedule or Registration Statement No.:

3)Filing Party:

4)Date Filed:

Table of Contents



Collins & Aikman Corporation
250 Stephenson Highway
Troy, Michigan 48083

April 25, 2002

Dear Stockholder:

You are cordially invited to attend the Annual Meeting of Stockholders of Collins & Aikman Corporation to be held on May 16, 2002 at The Waldorf–Astoria Hotel, the Norse Suite, 301 Park Avenue, New York, NY 10022, at 11:00 a.m., Eastern Daylight Savings Time.

You are urged to read carefully the formal notice of the meeting and the Proxy Statement which follow. After reading them, please sign, date and mail the enclosed proxy card so that your shares will be represented at the meeting. A prepaid return envelope is provided for this purpose.

We look forward to seeing you at the meeting.

Sincerely,

Thomas E. Evans
Chairman of the Board
and Chief Executive Officer

Table of Contents

## NOTICE OF ANNUAL MEETING OF STOCKHOLDERS

### To Be Held May 16, 2002

To the Stockholders of
COLLINS & AIKMAN CORPORATION:

NOTICE IS HEREBY GIVEN that the Annual Meeting (the "Meeting") of the holders of common stock, par value $0.01 per share (the "Common Stock"), of COLLINS & AIKMAN CORPORATION, a Delaware corporation (the "Company"), will be held on May 16, 2002 at The Waldorf–Astoria Hotel, the Norse Suite, 301 Park Avenue, New York, NY 10022, commencing at 11:00 a.m., Eastern Daylight Savings Time, for the purpose of considering and voting upon the following matters:

I. the election of five directors to hold office until the 2005 Annual Meeting and thereafter until their successors are elected and qualified;

II. the approval of the Company's 2002 Employee Stock Option Plan;

III. the approval of a proposal to effect a one–for–two and one–half reverse stock split of the Company's Common Stock; and

IV. such other matters as may properly come before the Meeting or any adjournment or postponement thereof.

The Board of Directors has fixed the close of business on April 2, 2002 as the record date for the determination of stockholders entitled to notice of and to vote at the Meeting. Therefore, only holders of record of Common Stock at the close of business on such date will be entitled to notice of and to vote at the Meeting.

A complete list of stockholders entitled to notice of and to vote at the Meeting will be available at our offices at 250 Stephenson Highway, Troy, Michigan 48083, at least ten days prior to the Meeting. The list will also be available for inspection by stockholders at the Meeting.

Stockholders are requested to sign and date the enclosed proxy card and return it promptly in the enclosed pre–addressed reply envelope, whether or not they plan to attend the Meeting, so that their shares may be represented. Any proxy may be revoked by filing with the Secretary of the Company, in care of the First Union Customer Information Service Center at the address set forth in the accompanying Proxy Statement, either a written notice of revocation bearing a later date than the proxy card or a subsequent proxy relating to the same shares at any time prior to the time the proxy is voted. Further, any person who has executed a proxy card and is present at the Meeting may vote in person instead of by proxy, thereby canceling any proxy previously given.

By Order of the Board of Directors,

Ronald T. Lindsay
*Secretary*

PLEASE EXECUTE, DATE AND RETURN THE ENCLOSED PROXY CARD WHETHER OR NOT YOU INTEND TO BE PRESENT AT THE MEETING.

April 25, 2002

## TABLE OF CONTENTS

PROXY STATEMENT
PROPOSAL I ELECTION OF DIRECTORS
REPORT OF THE AUDIT COMMITTEE
COMPENSATION COMMITTEE REPORT ON EXECUTIVE COMPENSATION
EXECUTIVE OFFICERS OF THE COMPANY
EXECUTIVE COMPENSATION
Performance Graph
PROPOSAL II APPROVAL OF THE COMPANY'S 2002 EMPLOYEE STOCK OPTION PLAN
PROPOSAL III APPROVAL OF THE ONE−FOR−TWO AND ONE−HALF REVERSE STOCK SPLIT
CHANGES IN CERTIFYING ACCOUNTANT
STOCKHOLDER PROPOSALS
ANNUAL REPORT
OTHER MATTERS
Definitive Proxy Statement

Table of Contents

## PROXY STATEMENT

### COLLINS & AIKMAN CORPORATION
250 Stephenson Highway
Troy, Michigan 48083

### ANNUAL MEETING OF STOCKHOLDERS

### To Be Held May 16, 2002

**General Information**

This Proxy Statement is furnished in connection with the solicitation by the Board of Directors of Collins & Aikman Corporation, a Delaware corporation (the "Company"), of proxies for use at the Annual Meeting of Stockholders of the Company to be held on May 16, 2002 at The Waldorf–Astoria Hotel, the Norse Suite, 301 Park Avenue, New York, NY 10022, commencing at 11:00 a.m., Eastern Daylight Savings Time, and at any adjournment or postponement thereof (the "Meeting").

The presence, in person or by proxy, of stockholders holding a majority of the shares entitled to vote at the Meeting is necessary to constitute a quorum at the Meeting.

All shares of the common stock, par value $0.01 per share (the "Common Stock"), of the Company which are entitled to vote and are represented at the Meeting by properly executed proxies received prior to or at the Meeting, and not revoked, will be voted at the Meeting in accordance with the instructions indicated on such proxies. If no instructions are indicated, such proxies will be voted for the election of the five nominees for director named below (or if any nominee becomes unavailable, such other person as the Nominating Committee of the Board of Directors or the Company selects), for the approval of the Company's 2002 Employee Stock Option Plan, for the approval of the proposed one–for–two and one–half reverse stock split and in accordance with the Board of Directors' recommendations with respect to any other matter that may properly come before the Meeting.

The Board of Directors has fixed the close of business on April 2, 2002 as the record date (the "Record Date") for the determination of stockholders entitled to notice of and to vote at the Meeting. Therefore, only holders of record of Common Stock at the close of business on the Record Date will be entitled to notice of and to vote at the Meeting.

Any proxy may be revoked by the person giving it at any time before it is voted. A proxy may be revoked by filing, with the Secretary of the Company (in care of the First Union Customer Information Service Center, Client Service Group, 1525 West W.T. Harris Boulevard, 3C3, Charlotte, North Carolina, 28288–1153, Attention: Proxy Department) at any time prior to the time the proxy is voted, either a written notice of revocation bearing a later date than the proxy card or a subsequent proxy relating to the same shares, or by attending the Meeting and voting in person (although attendance at the Meeting will not in and of itself constitute revocation of a proxy).

All expenses of this solicitation, including the cost of preparing and mailing this Proxy Statement, will be borne by the Company. In addition to solicitation by use of the mails, proxies may be solicited by directors, officers and employees of the Company in person or by telephone, telegram or other means of communication. Such directors, officers and employees will not be additionally compensated, but may be reimbursed for out–of–pocket expenses in connection with such solicitation. Arrangements will also be made with custodians, nominees and fiduciaries for forwarding of proxy solicitation materials to beneficial owners of Common Stock held of record by such custodians, nominees and fiduciaries, and the Company may reimburse such custodians, nominees and fiduciaries for reasonable expenses incurred in connection therewith.

Table of Contents

This Proxy Statement and the accompanying proxy card are being mailed to stockholders commencing on or about April 25, 2002.

### Voting Securities

On the Record Date, 167,997,131 shares of Common Stock were outstanding. Only holders of Common Stock of record at the close of business on the Record Date are entitled to notice of and to vote at the Meeting. Each stockholder of record is entitled to one vote for each share of Common Stock held on all matters to come before the Meeting.

### Security Ownership of Management and Principal Stockholders

Set forth in the table below is certain information as of March 12, 2002 regarding the beneficial ownership of equity securities of the Company by (i) persons who are known to the Company to own beneficially more than five percent (5%) of the Company's voting stock, (ii) directors of the Company (excepting Stephen V. O'Connell and Neil P. Simpkins, who resigned from the Board of Directors effective March 15, 2002), (iii) the executive officers of the Company named in the Summary Compensation Table set forth in this Proxy Statement (and referred to herein as the "Named Executive Officers") and (iv) the directors and executive officers of the Company as a group. Unless otherwise indicated, the beneficial owner has sole voting power and sole investment power over the securities shown below.

| Title of Class | Name of Beneficial Owner | Amount and Nature of Beneficial Ownership | Percent of Class |
|---|---|---|---|
| Common Stock, par value $0.01 per share | Brian Batey | 0 | |
| | Blackstone Capital Partners L.P. | 12,225,571(1) | 7.3% |
| | 345 Park Avenue | | |
| | New York, NY | | |
| | Charles E. Becker | 18,848,156(2) | 11.2% |
| | Robert C. Clark | 80,000(3) | * |
| | Marshall A. Cohen | 10,000(3) | * |
| | Thomas E. Evans | 1,570,405(4) | * |
| | Heartland Industrial Partners L.P. | 67,200,000(5) | 40.0% |
| | 55 Railroad Avenue | | |
| | Greenwich, CT | | |
| | Cynthia L. Hess | 0(14) | |
| | Joan Fabrics Corporation | 12,760,000(6) | 7.6% |
| | 100 Vesper Executive Park | | |
| | Tyngsboro, MA | | |
| | Timothy D. Leuliette | 0(14) | |
| | Ronald T. Lindsay | 86,109(7) | * |
| | Elkin McCallum | 12,859,000(6) | 7.7% |
| | W. Gerald McConnell | 0(14) | |
| | Warren B. Rudman | 70,000(3) | * |
| | Rajesh K. Shah | 135,000(8) | * |
| | J. Michael Stepp | 75,167(9) | * |
| | David A. Stockman | 0(14) | |
| | Textron Inc. | 18,000,000(10) | 10.7% |
| | 40 Westminster Street | | |
| | Providence, RI | | |
| | Daniel P. Tredwell | 0(14) | |

2

Table of Contents

| Title of Class | Name of Beneficial Owner | Amount and Nature of Beneficial Ownership | Percent of Class |
|---|---|---|---|
| | Samuel Valenti, III | 0(14) | |
| | Wasserstein/C&A Holdings, L.L.C. | 13,199,800(11) | 7.9% |
| | 1301 Avenue of the Americas | | |
| | New York, NY | | |
| | Reed A. White | 115,108(12) | * |
| | Executive officers and directors as a group (19 persons) | 33,854,875(13) | 20.1% |

\* Less than one percent of shares of Common Stock outstanding.

(1) Of these shares (i) 9,624,442 shares are held directly by Blackstone Capital Partners L.P., a Delaware limited partnership ("Blackstone Partners"), the sole general partner of which is Blackstone Management Associates L.P. ("Blackstone Associates"), (ii) 496,588 shares are held directly by Blackstone Family Investment Partnership I L.P., a Delaware limited partnership ("BFIP"), the sole general partner of which is Blackstone Management Associates I L.L.C. ("BMA"), (iii) 43,642 shares are held directly by Blackstone Advisory Directors Partnership L.P., a Delaware limited partnership ("BADP"), the sole general partner of which is Blackstone Associates, and (iv) 2,060,899 shares are held directly by Blackstone Capital Company II L.L.C., a Delaware limited liability company, all the ownership interest of which is owned directly and indirectly by Blackstone Partners, BFIP and BADP.

(2) Such shares represent (a) 13,600,000 shares acquired by Mr. Becker as consideration for the Becker acquisition, (b) 848,156 shares acquired by Mr. Becker immediately following the closing of the Becker acquisition from one of the other former Becker shareholders, (c) 400,000 shares subject to presently exercisable warrants to purchase such common stock at $5.00 per share acquired by Mr. Becker as consideration for the Becker acquisition and (d) 4,000,000 shares acquired by Becker Ventures LLC ("Becker Ventures") as part of the financing for the Company's acquisition of Textron Automotive Company's trim division ("TAC–Trim"). Mr. Becker is the managing member of Becker Ventures and holds a controlling interest in Becker Ventures. Mr. Becker became a C&A director and Vice Chairman upon completion of the Becker acquisition.

(3) Represents shares underlying options granted under the 1994 Directors Stock Option Plan which (i) are vested or (ii) will vest within 60 days unless the director ceases to be a director prior to that time.

(4) Of these shares, (i) 245,000 are held directly, (ii) 65,405 shares are held indirectly in the Stock Fund of the 401(k) and Shadow Retirement Income Plans and (iii) 1,260,000 represent shares underlying options granted under the 1994 Plan which are vested.

(5) The 67,200,000 shares beneficially owned are indirectly owned by Heartland Industrial Associates L.L.C. as the general partner of each of the following limited partnerships, which hold the shares directly: (a) 814,190 shares are held directly by Heartland Industrial Partners (FF), L.P., a Delaware limited partnership, (b) 878,516 shares are held directly by Heartland Industrial Partners (E1), L.P., a Delaware limited partnership, (c) 528,052 shares are held directly by Heartland Industrial Partners (K1), L.P., a Delaware limited partnership, (d) 264,026 shares are held directly by Heartland Industrial Partners (C1), L.P., a Delaware limited partnership, and (e) 64,715,216 shares are held directly by Heartland Industrial Partners, L.P., a Delaware limited partnership.

(6) Of these shares (a) 12,760,000 shares were acquired by Joan Fabrics Corporation ("Joan Fabrics") as a part of the consideration for the sale of Joan Automotive Industries, Inc. ("Joan Automotive") to us, (b) 75,000 shares were previously acquired by Mr. McCallum and his spouse and (c) 24,000 were shares previously acquired by the McCallum Family Foundation. The sole stockholder of Joan Fabrics is JFC Holding Trust, in which Elkin McCallum is the Trustee and has a 75% beneficial interest and his spouse, Donna McCallum, owns the balance. Mr. McCallum became a director of C&A upon the consummation of the Joan acquisition.

(7) Of these shares, (i) 7,300 are held directly, (ii) 44,924 represent shares underlying options granted under the 1993 Employee Stock Option Plan (the "1993 Plan") which are vested, (iii) 26,667 represent

3

Table of Contents

shares underlying options under the 1994 Plan which are vested and (iv) 7,218 shares are held indirectly in the Stock Fund of the 401(k) and Shadow Retirement Income Plans.

(8)   Represents shares underlying options granted under the 1994 Plan which are vested.

(9)   Of these shares, (i) 65,000 are held directly and (ii) 10,167 are held indirectly in the Stock Fund of the 401(k) and Shadow Retirement Income Plans.

(10)  Such shares are beneficially owned by Textron Inc. ("Textron"). Under the purchase agreement for the TAC–Trim acquisition, Textron has the right to designate a director to serve on the Collins & Aikman Corporation Board of Directors. As of this date, it has not yet identified the individual that it will designate. Accordingly, the table does not include the Textron designee, who is expected to disclaim beneficial ownership of all securities beneficially owned by Textron.

(11)  Of these shares (i) 13,119,409 are held directly by Wasserstein/ C&A Holdings, L.L.C. (the "Wasserstein L.L.C."), which is controlled by Wasserstein Perella Partners, L.P. ("WP Partners"), the sole general partner of which is Wasserstein Perella Management Partners, Inc. ("Wasserstein Management"), which is controlled by Cypress Capital Advisors, LLC ("CCA"), (ii) 18,000 are held directly by WPPN, Inc., an indirect subsidiary of WP Group, (iii) 45,000 shares are held directly 33% by each of three trusts for which Bruce Wasserstein, the Chairman and Chief Executive Officer of Wasserstein Management (who is also a director and stockholders of WP Group), is the Co–Trustee, (iv) 10,503 are owned directly by Bruce Wasserstein and (v) 6,887 are held by Bruce Wasserstein's descendants' trusts.

(12)  Of these shares, (i) 101,774 represent shares underlying options granted under the 1993 Plan which are vested and (ii) 13,334 represent shares underlying options granted under the 1994 Plan which are vested.

(13)  Excludes shares held by Heartland and its affiliates, Joan Fabrics and its affiliates, Becker Ventures and its affiliates, Textron Inc. and its affiliates, Blackstone Partners and its affiliates and Wasserstein L.L.C. and its affiliates. Also excludes shares held by Brian Batey and Rajesh K. Shah, who resigned their employment prior to March 12, 2002.

(14)  As described under (5) above, 67,200,000 shares are beneficially owned by Heartland Industrial Associates, L.L.C. Mr. Stockman is the Managing Member of Heartland Industrial Associates, L.L.C., but disclaims beneficial ownership of such shares. Messrs. Leuliette, McConnell, Stepp, Tredwell and Valenti and Ms. Hess are also members of Heartland Industrial Associates, L.L.C. and also disclaim beneficial ownership of the shares.

## Voting

As of March 12, 2002, Heartland and its affiliates, Blackstone Partners and its affiliates and Wasserstein L.L.C., which is controlled by WP Partners, and its affiliates, Charles E. Becker and Becker Ventures, Elkin McCallum and Joan Fabrics, and Textron and its affiliates (collectively, the "Investors") beneficially own or have the right to vote in the aggregate approximately 84.7% of the outstanding Common Stock. See "Security Ownership of Management and Principal Stockholders" and "Certain Relationships and Related Transactions — Certain Relationships." The Investors have advised the Company that they intend to vote all such shares in favor of Proposals I, II and III. Accordingly, assuming that the Investors vote as indicated, the presence of a quorum at the meeting and the approval and adoption of Proposals I, II and III are assured.

## PROPOSAL I

### ELECTION OF DIRECTORS

The Restated Certificate of Incorporation provides that the Board of Directors of the Company is divided into three classes serving staggered three–year terms. Five Class II directors will be elected at the Meeting, each to hold office until his or her term expires at the year 2005 Annual Meeting and until his or her successor is elected and qualified, subject, however, to prior death, resignation, retirement, disqualification or removal from office. All the nominees except Mr. Dauch are currently directors of the Company. Proxies will be voted for the election of the nominees listed below and identified as Nominees for Election at the Meeting, unless contrary instructions are set forth on the proxy card. If any nominee shall be unavailable to serve as a director,

Table of Contents

proxies will be voted for the election of such other person or persons as the Nominating Committee of the Board of Directors or the Company may select. The Company is not aware of any circumstances likely to render any nominee unavailable. According to the bylaws of the Company, directors shall be elected by a plurality of the votes cast. Therefore, the five persons receiving the greatest number of votes cast at the Meeting for the election of directors shall be elected as directors, and abstentions and broker non–votes shall be counted for purposes of determining whether a quorum is present but will not affect the outcome of the election.

**Information as to Nominees and Other Directors**

Set forth below, as of March 20, 2002, are the name, age and principal occupation or employment during the last five years of each nominee for election to the Board of Directors and all other directors whose terms have not expired. On March 15, 2002, Stephen V. O'Connell and Neil P. Simpkins resigned from the Board of Directors. Effective April 1, 2002, the Board of Directors by unanimous written consent decreased the number of members of the Board of Directors from fifteen to fourteen. None of the nominees or other directors is related to any executive officer or other director of the Company by blood, marriage or adoption. The affiliations between the Company and Heartland, WP Management, WP Group, WP & Co., Blackstone, Charles E. Becker, Becker Ventures, Elkin McCallum, Joan Fabrics and Textron (as such terms are defined herein) are set forth under "Security Ownership of Management and Principal Stockholders" and "Certain Relationships and Related Transactions — Certain Relationships."

Management recommends that stockholders vote FOR the election of each of Messrs. Rudman, Valenti, Dauch and Cohen and Ms. Hess.

**Nominees for Election at the Meeting — Class II Directors**

| | |
|---|---|
| Warren B. Rudman | Age 71. Mr. Rudman has been a director of the Company since June 1995. Mr. Rudman has been a partner in the law firm of Paul, Weiss, Rifkind, Wharton & Garrison since January 1993. Mr. Rudman served as a United States Senator from New Hampshire from 1980 through 1992 and as Attorney General of New Hampshire from 1970 until 1976. Mr. Rudman is also a director of the Chubb Corporation, Allied Waste, Boston Scientific, the Raytheon Company and an independent trustee of several mutual funds of the Dreyfus Corporation. |
| Cynthia L. Hess | Age 45. Ms. Hess is the owner and CEO of Hess Group, LLC. Prior to forming Hess Group in 2002, Ms. Hess was a senior managing director of Heartland Industrial Partners L.P. ("Heartland") (See "Certain Relationships and Related Transactions — Certain Relationships — Heartland"). She was formerly Vice President of corporate quality for DaimlerChrysler, where she led the corporate strategy for quality improvement and facilitated quality plan execution. In her 22 years with DaimlerChrysler, Ms. Hess held various engineering, manufacturing and procurement supply positions. Ms. Hess is also a director of Metaldyne Corporation (formerly known as MascoTech, Inc.), a diversified industrial manufacturing company ("Metaldyne"). |
| Samuel Valenti, III | Age 56. Mr. Valenti has been a director of the Company since February 2001. He is a senior managing director of Heartland, Chairman of Valenti Capital LLC, and has been a director of Metaldyne Corporation since January 2001 Mr. Valenti is a director of Masco Capital Corporation and has been its President since 1988. Mr. Valenti was formerly Vice President — Investments of Masco Corporation, a home improvement and building products company. Mr. Valenti is also a director of Collins & Aikman |

5

**Table of Contents**

Products Co. ("Products"), a wholly-owned subsidiary of the Company.

David C. Dauch

Age 37. Mr. Dauch has been vice president of manufacturing — driveline division of American Axle & Manufacturing since 2001, a company he joined in 1995 as manager, sales administration. In 1996, he became director of sales, GM full size truck programs and was named vice president of sales and marketing in 1998. From 1987 to 1995, Mr. Dauch was employed by Products at which he held positions of product manager, account executive, and director of Ford sales and marketing for the Automotive Carpet and Fabric Groups.

Marshall A. Cohen

Age 67. Mr. Cohen has been a director of the Company since April 2001. Mr. Cohen has been Counsel at Cassels Brock and Blackwell, a Canadian law firm, since October 1996. From 1988 until September 1996, Mr. Cohen served as President and Chief Executive Officer of The Molson Companies Ltd., a brewing company. Mr. Cohen is also a director of The Toronto-Dominion Financial Group, Barrick Gold Corporation, American International Group, Inc., Lafarge Corporation, SMK Speedy International Inc., The Goldfarb Corporation, Premcor Inc., The Quorum Group (Vice Chairman), Haynes International, Inc., Metaldyne and Golf Town Canada Inc. Mr. Cohen serves on the Advisory Boards of The Blackstone Group and Heartland.

**Directors Whose Terms Expire at the 2003 Annual Meeting — Class III Directors**

Charles E. Becker

Age 55. Mr. Becker is Vice Chairman of the Board and has been a director since July 2001. For over 25 years, through 1998, Mr. Becker was the CEO and co-owner of Becker Group, Inc., a global automotive interiors components supplier. Becker Group, Inc. was sold to Johnson Controls, Inc. in 1998. In January 1999, Mr. Becker re-acquired 10 North American plastic molding and tooling operations from Johnson Controls, which subsequently became Becker Group, LLC. Mr. Becker is also the owner and chairman of Becker Ventures, LLC, which was established in 1998 to invest in a variety of business ventures, including the manufacturing, real estate and service industries.

Robert C. Clark

Age 58. Mr. Clark has been a director of the Company since October 1994. Mr. Clark is Dean of the Harvard Law School and Royal Professor of Law. Mr. Clark joined Harvard Law School in 1979 after four years at Yale Law School, where he was a tenured professor, and became Dean in 1989. Mr. Clark is a corporate law specialist and author of numerous texts and legal articles. Prior to his association with academia, he was in private practice with Ropes & Gray. Mr. Clark is also a director of American Lawyer Media Holdings, Inc. and American Lawyer Media, Inc. and a trustee of Teachers Insurance Annuity Association (TIAA).

David A. Stockman

Age 55. Mr. Stockman has been a director of the Company since February 2001. Mr. Stockman is also a director of Metaldyne, and Springs Industries, Inc. He is the senior managing director and the founder of Heartland. Prior to founding Heartland, he was a senior managing director of The Blackstone Group L.P. and had been with Blackstone since 1988. Mr. Stockman also served as the director of the Office of Management and Budget in the Reagan Administration, and represented Southern Michigan in the U.S. House of Representatives from 1976 to 1981.

**Table of Contents**

Daniel P. Tredwell

Age 44. Mr. Tredwell has been a director of the Company since February 2001. Mr. Tredwell is also a director of Metaldyne and Springs Industries, Inc. He is a senior managing director and a co-founder of Heartland. He has more than a decade of leveraged financing experience. Mr. Tredwell served as a Managing Director at Chase Securities Inc. and had been with Chase Securities since 1985. From 1980 to 1985, Mr. Tredwell was employed as the Press Secretary to U.S. Representative Robert L. Livingston.

**Directors Whose Terms Expire at the 2004 Annual Meeting — Class I Directors**

Thomas E. Evans

Age 50. Mr. Evans has been Chairman of the Board and Chief Executive Officer of the Company since April 1999. Previously, he was President of Tenneco Automotive, an automotive supplier and a division of Tenneco, Inc., from 1995 until April 1999. Prior to that, Mr. Evans served for six years with Case Corporation, a manufacturer of farm machinery and construction equipment and a subsidiary of Tenneco, Inc., in a series of senior management positions, the last being Senior Vice President of Worldwide Operations. Prior to his employment with Case Corporation, he spent sixteen years in the automotive industry with Rockwell International and Federal Mogul Corporation. Mr. Evans is also a director of the Motor & Equipment Manufacturers Association, the National Association of Manufacturers and the Institute of Textile Technology. Mr. Evans is also a director of Products.

Timothy D. Leuliette

Age 52. Mr. Leuliette was elected as a director of the Company in February 2001 and has been a director of Metaldyne since November 2000. He is currently President and Chief Executive Officer of Metaldyne. He is a co-founder of Heartland. Prior to joining Heartland, Mr. Leuliette joined the Penske Corporation as President and Chief Operating Officer in 1996. From 1991 to 1996 Mr. Leuliette served as President and Chief Executive Officer of ITT Automotive, an automotive company. He also serves on a number of corporate and charitable boards, including serving as director of The Federal Reserve of Chicago, Detroit Branch.

Elkin McCallum

Age 58. Mr. McCallum was elected as a director of the Company in September 2001. Mr. McCallum has been the Chairman of the Board and CEO of Joan Fabrics Corporation since 1989 and has also been the Chairman and CEO of Tyng Textiles LLC since 1996. Mr. McCallum is currently Vice Chairman of the Board of Trustees of Bentley College and chairman elect for the next academic year.

W. Gerald McConnell

Age 38. Mr. McConnell was elected as a director of the Company in February 2001 and has been a senior managing director of Heartland since its founding in 2000. Mr. McConnell was formerly a managing director at Deutsche Bank Alex. Brown (formerly Bankers Trust Co.), a banking firm, from 1997 until 1999. From 1991 until 1999, Mr. McConnell specialized in leveraged finance and financial sponsor coverage at Deutsche Bank Alex. Brown. Mr. McConnell also serves on the board of directors of Springs Industries, Inc.

**Table of Contents**

J. Michael Stepp

Age 57. Mr. Stepp was elected as a director of the Company in February 2001. Mr. Stepp was previously Executive Vice President and Chief Financial Officer of the Company from April 1995 through December 1999. Mr. Stepp was a consultant to the Company and was an independent mergers and acquisitions advisor from January 2000 through February 2001. Since March 2001, Mr. Stepp has been a senior managing director of Heartland. He is also a director of Products.

**Certain Relationships and Related Transactions**

*Certain Relationships*

*Heartland*

Heartland is a private equity firm established in 1999 for the purpose of acquiring and expanding industrial companies operating in various industrial sectors of the American manufacturing economy that are well positioned for global consolidation and growth. Six of the Company's directors, Messrs. Stockman, Leuliette, Tredwell, Stepp, McConnell and Valenti, are also employed by Heartland. As of March 12, 2002, Heartland beneficially owned approximately 40% of the outstanding Common Stock.

The Company is a party to a services agreement with Heartland under which Heartland provides the Company with advisory and consulting services, including services with respect to developments in the automotive industry and supply markets, advice on financial and strategic plans and alternatives and other matters as the Company may reasonably request and are within Heartland's expertise. The services agreement terminates on the earlier of its tenth anniversary or the date upon which Heartland ceases to own Company shares equivalent to 25% of those owned by them on February 23, 2001. Pursuant to the agreement, the Company is obligated to pay to Heartland a $4 million annual advisory fee on a quarterly basis and to reimburse its out−of−pocket expenses related to the services Heartland provides to the Company. The Company has also agreed to pay a fee of 1% of the total enterprise value of certain acquisitions and dispositions. In connection with Heartland's initial investment in the Company on February 23, 2001, the Company paid Heartland a fee of $12 million and reimbursed it for the reasonable out−of−pocket expenses incurred in connection with that initial investment. A fee of $12.5 million was paid by the Company to Heartland as a result of its advisory services in connection with the TAC−Trim acquisition. During 2001, the Company also reimbursed Heartland for $1.5 million of expenses that Heartland incurred in relation to the Becker acquisition.

*Blackstone and Wasserstein*

Blackstone Partners is a Delaware limited partnership formed in 1987 for the purpose of, among other things, (i) committing capital to facilitate corporate restructurings, leveraged buyouts, bridge financings and other investments and (ii) capitalizing affiliates that will engage in investment and merchant banking activities. The sole general partner of Blackstone Partners is Blackstone Associates, a Delaware limited partnership. At present, the business of Blackstone Associates consists of performing the function of, and serving as, the general partner of certain limited partnerships, including Blackstone Partners. One of the Company's directors, Mr. Simpkins, is also a member of Blackstone Management Partners L.L.C., which is the general partner of Blackstone Management Partners L.P. ("Blackstone Management"), and BMA, which is the general partner of BFIP.

WP Partners is a Delaware limited partnership, the sole general partner of which is Wasserstein Management, which is controlled by CCA (fka Wasserstein & Co., Inc.). WP Partners was formed by Wasserstein Perella Group, Inc. ("WP Group") for the purpose of participating in merchant banking activities, including committing capital to the organization and consummation of private equity investments and leveraged buyout transactions. On January 3, 2001, WP Group merged with Dresdner Bank AG and spun off CCA, as a result of which Wasserstein Management and its affiliates are no longer affiliated with WP Group. Wasserstein Management serves as general partner of WP Partners and as such is engaged in

Table of Contents

managing WP Partners. Mr. O'Connell is also a director of Wasserstein & Co., LP, a newly created entity involved in merchant banking activities, which is affiliated with Wasserstein Management.

In connection with Heartland's initial investment in the Company on February 23, 2001, the Company paid WP Partners an investment banking fee of $2 million. Wasserstein Perella Securities, Inc., a wholly−owned subsidiary of WP Group, has acted, and may in the future act, as agent for the Company in the repurchase from time to time of shares of common stock.

### Charles E. Becker
In July 2001, the Company completed the acquisition of Becker Group LLC. As a result of the Becker acquisition and a purchase of Common Stock immediately afterwards, Charles Becker became one of the Company's principal stockholders. Charles Becker became Vice Chairman and a member of the Company's Board of Directors upon closing of the Becker acquisition. The Company agreed to make $18 million in non−compete payments over five years to Mr. Becker at the time of the acquisition. In addition, Becker Ventures LLC, an affiliate of Mr. Becker, acquired additional shares of Common Stock as part of the financings in connection with the acquisition of TAC−Trim at a price of $5.00 per share. See the information under the heading "Security Ownership of Management and Principal Stockholders" for a discussion of Mr. Becker's beneficial ownership of Common Stock.

### Elkin McCallum
In September 2001, the Company completed the acquisition of Joan Automotive, a leading supplier of body cloth to the automotive industry, and all of the operating assets of Joan Automotive's affiliated year dying operation, Western Avenue Dyers, L.P. As a result of the Joan acquisition, Joan Fabrics, a company controlled by Elkin McCallum, became a principal stockholder of the Company. Upon completion of the Joan acquisition, Mr. McCallum because a member of the Company's Board of Directors. See "Security Ownership of Management and Principal Stockholders" for a discussion of Joan Fabrics' and Mr. McCallum's beneficial ownership of Common Stock.

### Certain Agreements and Transactions

#### Blackstone/ Wasserstein/ Heartland Stockholders Agreement

The Company is a party to a stockholders agreement (the "Initial Stockholders Agreement") with Heartland and certain affiliates (the "Heartland parties"), Blackstone and certain of its affiliates (the "Blackstone parties") and the Wasserstein L.L.C. and certain of its affiliates (the "Wasserstein parties"). The Initial Stockholders Agreement contains (i) rights of first refusal on private sales of Common Stock by the Blackstone parties and the Wasserstein parties in favor of the Heartland parties, (ii) tag−along rights in favor of the Blackstone parties and the Wasserstein parties in the event of certain transfers of Common Stock by Heartland and (iii) for so long as Heartland has a right to designate directors, a drag−along right enabling Heartland to cause the Blackstone parties and Wasserstein parties to sell all of their Common Stock with Heartland when Heartland is selling all of its Common Stock to a third party (including by merger). The Initial Stockholders Agreement further provides that the stockholder parties thereto will vote their Common Stock to ensure that seven members of the Company's board will be designated by Heartland, one by the Wasserstein parties and one by the Blackstone parties, in each case so long as each of Heartland, the Wasserstein parties and the Blackstone parties (in each case, together with its affiliates) continue to beneficially own at least 25% of the Common Stock owned by them as of February 23, 2001. In addition, there must be three independent directors not otherwise affiliated with the Company, the Blackstone parties, the Wasserstein parties or Heartland. The Company's chief executive officer will also serve as a director. Certain rights inure to the benefit of, and certain obligations bind, subsequent transferees of Common Stock, but none of the rights or obligations apply to public sales, whether under Rule 144 or under a registration statement.

The Initial Stockholders Agreement also contains certain restrictions on the Company's ability to enter into transactions with Heartland and its affiliates. The Company and its subsidiaries may not enter into any such transaction or series of related transactions involving payments or other consideration in excess of

9

Table of Contents

$500,000 without the consent of (i) each of the Blackstone parties and the Wasserstein parties, so long as each holds at least 25% of the Common Stock held by it as of February 23, 2001, for so long as Heartland and its affiliates directly or indirectly beneficially own at least 50% of the outstanding Common Stock and (ii) a majority of the members of the board who are disinterested with respect to the particular transaction and were not designated for election by Heartland so long as Heartland and its affiliates own at least 25% of the Common Stock owned by them on the date of the Initial Stockholders Agreement. The restrictions described above will not apply to (i) an advisory fee on certain acquisitions and divestitures by the Company in an amount not exceeding 1% of the enterprise value thereof and related out–of–pocket fees and expenses, (ii) transactions involving the sale, purchase or lease of goods and services in the ordinary course of business and on an arms–length basis between the Company and portfolio companies of Heartland in an amount involving not more than $1.25 million in any transaction, and (iii) certain other transactions.

*Becker/ Joan/ Heartland Stockholders Agreement*

There is also a stockholders agreement (the "Becker/ Joan Stockholders Agreement") among Charles E. Becker, Michael E. McInerney and Jens Höhnel (the "Becker parties"), Joan Fabrics Corporation, JFC Holdings Trust, Mr. Elkin McCallum and Donna McCallum (the "Joan parties"), the Heartland parties and C&A. The Becker/ Joan Stockholders Agreement contains (i) rights of first refusal on private sales of Common Stock by the Becker parties and the Joan parties in favor of the Heartland parties, (ii) tag–along rights in favor of the Becker parties and the Joan parties in the event of certain transfers of Common Stock by Heartland and (iii) for so long as Heartland has a right to designate directors, a drag–along right enabling Heartland to cause the Becker parties and Joan parties to sell all of their Common Stock with Heartland when Heartland is selling all of its Common Stock to a third party (including by merger).

The Becker/ Joan Stockholders Agreement further provides that the Becker parties, the Joan parties and Heartland will each vote their Common Stock to ensure that Charles E. Becker and Elkin McCallum are each members of the Company's board of directors, so long as the Becker parties and the Joan parties, respectively, continue to hold shares representing 25% of the Common Stock originally acquired by them. The Becker/ Joan Stockholders Agreement also provides that the Becker parties will vote their shares in favor of the election of Heartland's designees to the Company's board of directors and the TAC–Trim acquisition. Certain rights inure to the benefit of, and certain obligations bind, subsequent transferees of Common Stock, but none of the rights or obligations apply to public sales, whether under Rule 144 or under a registration statement.

*Charles E. Becker Transactions*

In June 2001, the Company entered into sale–leaseback transactions with each of New King, L.L.C. ("New King") and Anchor Court, L.L.C. ("Anchor Court"), which are affiliates of Becker Ventures LLC. Becker Ventures is controlled by Charles Becker, a Company director.

In connection with these sale–leaseback transactions, C&A Products sold and contemporaneously leased back real property located in Troy, Michigan and Plymouth, Michigan from New King and Anchor Court, respectively, for net proceeds of $15.1 million in aggregate. The initial lease term in each transaction is 20 years and each lease has two successive ten–year renewal options. The basic rent for the Troy, Michigan property is $1.3 million per year, and the basic rent for the Plymouth, Michigan property is $.5 million per year. The rental rates in each case are subject to adjustment after expiration of the initial term.

The purpose of these sale–leaseback transactions was to reduce the Company's outstanding debt. The Company believes that the terms of the sale–leaseback transactions with Becker Ventures are on terms substantially similar to those which could have been negotiated in arms–length transactions of the same type. These sale–leaseback transactions were authorized by the independent members of the Company's board of directors.

In connection with the Becker acquisition, the Company entered into a lease agreement with Becker Ventures for the Company's headquarters at 250 Stephenson Highway, with the effective date of the lease being January 1, 2002. In March, 2002, the Company entered into lease agreements with Becker Ventures, effective January 1, 2002, for 150 Stephenson Highway and 350 Stephenson Highway. The base rent for all

10

Table of Contents

three premises is $13.25 per sq. ft. Total square footage for all three locations is approximately 286,000. The leases have 20 year terms, and we have two five-year renewal options.

Collins & Aikman Products Co. is also party to a lease with an affiliate of Becker Ventures for five manufacturing facilities totaling 884,000 square feet. The current term of the lease is ten years, and the base rent for all of the facilities is $3.6 million per year. The Company is currently negotiating with the landlord to extend the term of the lease for at least an additional ten years.

*Elkin McCallum Transactions*

In connection with the Joan acquisition (as described above under the heading "— Certain Relationships"), the Company entered into a Supply Agreement dated September 21, 2001 (the "Supply Agreement") with Main Street Textiles, L.P. ("Main Street"). Main Street is controlled by Elkin McCallum, a director of the Company. Under the Supply Agreement, the Company agreed to purchase all of its requirements for flat woven automotive fabric from Main Street for a five year period beginning on the date of the Supply Agreement. The prices which the Company will pay for fabric under the agreement will equal the costs of the raw materials plus an amount which represents Main Street's standard labor and overhead costs incurred in manufacturing fabric for us. During the term of the Supply Agreement, Main Street is prohibited from manufacturing automotive fabric products for third parties without the Company's prior consent but may sell seconds and close-out items in bona fide transactions. The Supply Agreement is also terminable by mutual written consent, upon the occurrence of certain events of bankruptcy, the appointment of a receiver or trustee, an assignment for the benefit of creditors, or in the event of a material breach. In addition, either party may terminate the Supply Agreement upon 270 days' prior notice to the other party in the event that the parties are unable to agree on the pricing of fabric covered by the Supply Agreement.

The Company is also a party to a Transition Services Agreement dated September 21, 2001 with Joan Fabrics Corporation, another company controlled by Mr. McCallum. Under this agreement Joan Fabrics will provide C&A Products with transitional and support services for a period not to exceed twelve months in order to support the continued and uninterrupted operation of the businesses acquired by C&A Products in the Joan acquisition. As a part of these services, pending the Company's disassembly and removal of machinery and equipment that the Company purchased from Joan Fabrics, Joan Fabrics will use that machinery and equipment to manufacture for us all of the Company's requirements for some types of knitted and woven automotive fabrics. The terms of the Company's agreement with respect to this fabric production are substantially similar to those under the Supply Agreement.

Mr. McCallum became a related party as a result of the Joan acquisition. The terms of the Supply Agreement and the Transition Agreement were reached through arm's-length negotiations prior to Mr. McCallum becoming a related party.

On April 12, 2002, the Company signed and closed on a merger agreement with Mr. McCallum and Southwest Railroad Inc., a company wholly-owned by Mr. McCallum, pursuant to which Southwest Railroad Inc. was merged into a wholly-owned subsidiary of the Company. As consideration in the transaction, Mr. McCallum received approximately one million shares of Common Stock and approximately $2.5 million in cash. Pursuant to the merger agreement, debt owing to Mr. McCallum of approximately $6.7 million was also repaid.

*Textron Transactions*

*Sale-Leaseback Transactions.* Prior to the TAC-Trim acquisition, TAC-Trim entered into an $86.9 million sale and leaseback transaction (the "Textron Leasing Transaction") with two separate single purpose affiliates of Textron Financial Corporation, as lessor and purchaser, with respect to a portfolio of manufacturing equipment situated in different locations throughout the United States and Canada. Payments under the Textron leasing transaction are guaranteed by C&A Products and secured by a first perfected mortgage lien over certain real property with a value equal to $25 million. Each lease is for an initial term of three years with three one-year renewal options. As is customary, the documentation for the Textron leasing

11

Table of Contents

transaction incorporates covenants by reference, from the Company's credit facility, that may be amended or waived by the senior lenders, and also contain events of default.

*License Agreements.* In connection with the TAC–Trim acquisition the Company acquired intellectual property rights to various products and processes including the patented Intellimold™ injection molding control process for use in its business. The Intellimold™ patents are related to methods and/or apparatus for injection molding. TAC–Trim has also developed certain skin materials and compounding solutions that provide the capability to design cost–effective materials with outstanding performance and aesthetic qualities. Examples of these materials include Envirosoft™ castable thermoplastic materials, high performance PVC alloys, high–definition grain and texture formulation and vacuum thermoplastic applications. TAC–Trim has also developed the Invisitec™ invisible passenger air bag system, which provides improved appearance and craftsmanship at reduced cost. Invisitec™ systems, which integrate the air bag door with the panel and top cover, have been commercialized for soft–cast and vacuum–formed panels and hard injection molded instrument panels. In total, TAC–Trim holds approximately 270 U.S. and approximately 1200 foreign active patents and has approximately 350 patents pending. The intellectual property acquired in the TAC–Trim Acquisition is subject to certain limitations on the Company's use and creates continuing obligations to Textron.

As part of the TAC–Trim acquisition, the Company entered into three intellectual property license agreements with Textron. In two of these agreements, the Company licensed back to Textron certain intellectual property that was acquired in the transaction (the "Intellimold Agreement" and the "Licensed–Back IP Agreement"). In the third agreement, the Company licensed from Textron other intellectual property that it did not acquire in the transaction (the "Retained IP Agreement"). The Company is providing general descriptions of these agreements although these descriptions do not contain all the material terms in the contracts.

In all three agreements, the ability to use the intellectual property is limited based on whether the proposed use falls inside or outside a defined field of automotive products (the "Restricted Field").

In the Intellimold Agreement, the Company gave Textron an exclusive worldwide, perpetual, irrevocable license to use outside the Restricted Field its rights in the Intellimold process and any enhancements developed by it. Textron was also granted a royalty–free, worldwide, perpetual, irrevocable license to use the Company's rights in the Intellimold process and any enhancements developed by the Company within the Restricted Field solely in connection with its and certain affiliates' manufacturing, sales and development operations. The Intellimold Agreement also includes an exclusive, royalty–free, worldwide, perpetual, irrevocable license for the Company to use within the Restricted Field any enhancements to the Intellimold process developed by Textron. In the Licensed–Back IP Agreement, the Company granted Textron a non–exclusive, worldwide, royalty–free, perpetual and irrevocable license to use solely outside the Restricted Field certain intellectual property including over 50 U.S. patents on air bag related products. In the Retained IP Agreement, Textron granted to the Company a non–exclusive, worldwide, royalty–free, perpetual and irrevocable license to use solely within the Restricted Field certain intellectual property. These patents could have applicability to the automotive industry but such use is somewhat secondary to the use of such technology outside the automotive field.

*Common Stock Registration Rights Agreement.* In connection with the TAC–Trim acquisition, the Company entered into a common stock registration rights agreement which provides that Textron will have rights to demand registration under the Securities Act of shares of Common Stock held by it at various times. In addition, it will have piggy–back registration rights in the event the Company registers shares of Common Stock for its own account or for the account of any of the Company's other stockholders. The common stock registration rights agreement contains customary provisions regarding lock–ups, holdbacks, payment of expenses, indemnification and contribution.

*Transition Agreement.* In connection with the TAC–Trim acquisition, the Company entered into a transition agreement with Textron. The transition agreement facilitated the transition of certain aspects of the businesses which the Company acquired from Textron. Pursuant to the transition agreement, the Company

12

Table of Contents

and Textron have agreed to provide reasonably requested assistance to ensure a smooth transition of ownership of TAC−Trim from Textron. Some of the matters covered by the transition agreement are:

- the agreement by Textron to make available to employees and former employees of the subsidiaries which are acquired in the TAC−Trim acquisition certain benefit plans for up to nine months following the closing of the TAC−Trim acquisition, at the Company's cost;

- the agreement by the Company and Textron to supply each other with certain products and components for specified periods;

- the Company's agreement to sublease to Textron certain property in Troy, Michigan through December 31, 2004;

- the agreement by Textron, upon the Company's written request, to arrange for AT&T Solutions, Inc. and Electronic Data Systems Corporation to provide certain support services for the subsidiaries which were acquired in the TAC−Trim acquisition for certain specified periods; and

- the agreement by the Company and Textron to negotiate in good faith appropriate transition arrangements with respect to contracts, including payroll services, which are shared between the subsidiaries which were acquired in the TAC−Trim acquisition and Textron and its subsidiaries.

*Preferred Stock Registration Rights Agreement.* The Company is a party to a preferred stock registration and other rights agreement with Textron concerning registration and other rights which the Company has granted to Textron with respect to the preferred stock consideration received by Textron in connection with the TAC−Trim acquisition.

*Italian Joint Venture Documents.* As part of the TAC−Trim acquisition, the Company acquired a 50% interest in an Italian joint venture. On December 20, 2001, the Company entered into agreements relating to the Italian joint venture as follows: a joint venture and shareholders agreement principally pertaining to the governance of the joint venture, an administrative services agreement under which the Company will provide services to the joint venture for annual fees to the Company of approximately $3.2 million, an engineering and technical support agreement under which the Company will provide certain reimbursable support to the joint venture and a technology license agreement under which the Company will license certain patents and know−how to the joint venture for customary license fees.

There are put and call provisions under the purchase agreement pertaining to the joint venture interests not owned by the Company. The arrangement permits Textron to require the Company to purchase Textron's interests in the joint venture for an aggregate of approximately $23.1 million, subject to an increase by $5.0 million under certain circumstances, after the third anniversary of closing. Additionally, the arrangement permits the Company to require Textron to sell its interests in the joint venture to the Company for fair market value following the third anniversary of the closing. The Company cannot be sure that it will have adequate liquidity to satisfy any put, or exercise any call, of the Textron interest.

In addition, the Company's credit facility may restrict such further acquisition or any further financing of the joint venture. While the Company will be permitted, and required, to provide certain guarantees and letters of credit support, it may not be permitted to further finance the joint venture and this may adversely affect the value of the interests which the Company could be required to purchase at a fixed price in the future.

Textron became a related party as a result of its receipt of the consideration in the TAC−Trim acquisition and the above−described agreements were reached through arm's−length negotiations prior to TAC−Trim becoming a related party.

**Meetings and Committees of the Board of Directors**

*Meetings and Attendance*
In 2001, the Board of Directors held a total of four meetings and took action by unanimous written consent on eight occasions. Each incumbent director participated in at least 75% of the aggregate of the total

13

Table of Contents

number of Board proceedings and the total number of proceedings of the Committees on which the member served during 2001 whether through in-person meeting, teleconference or written consent.

### Committees of the Board

The Board of Directors has designated the Audit Committee, which currently consists of Mr. Clark, Mr. Rudman and Mr. Cohen, the Compensation Committee, which currently consists of Mr. Stockman, Mr. Tredwell and Mr. Cohen, and the Executive Committee, which currently consists of Mr. Evans, Mr. Stockman and Mr. Tredwell. In addition, the Company's Restated Certificate of Incorporation provides for the Nominating Committee, which currently consists of all members of the Board of Directors other than Mr. Evans.

The Audit Committee held seven meetings in 2001. The Audit Committee's function is to meet with the Company's independent public accountants and with management to make inquiries regarding the manner in which the responsibilities of each are being discharged. The Audit Committee reviews the scope of audit and non-audit assignments and related fees, the Company's accounting principles and the adequacy of internal controls. See "Report of the Audit Committee."

The Compensation Committee took action by unanimous written consent on one occasion in 2001. The Compensation Committee's function is to determine compensation for executive officers of the Company and to decide matters and policies with respect to the compensation of such executive officers, including the entry into employment agreements and the grant of awards under, and administration of, the Company's option plans. The Compensation Committee is not entitled to award or authorize any compensation to be paid to any executive officer of the Company who is also a partner or employee of Heartland, Blackstone Partners, WP Partners, Becker Ventures, Joan Fabrics, Textron or their affiliates. See "Compensation Committee Report on Executive Compensation."

The Executive Committee had no meetings in 2001. The Executive Committee's function is generally to act on behalf of the Board of Directors during the intervals between meetings of the Board in the management of the business and affairs of the Company.

The Nominating Committee took action by unanimous written consent on three occasions in 2001. The Nominating Committee's function is to nominate, by a majority vote thereof, persons for election to the Board of Directors at any annual meeting of stockholders or at any special meeting of stockholders called for the purpose of electing directors. Stockholders wishing to recommend director candidates for consideration by the Nominating Committee may do so by writing to the Secretary of the Company, giving the recommended candidate's name, biographical data and qualifications, not later than the date by which stockholder proposals for action must be submitted.

### REPORT OF THE AUDIT COMMITTEE

The role of the Audit Committee is to assist the Board of Directors in its oversight of the Company's financial reporting processes. The Board of Directors, in its business judgment, has determined that the members of the Committee are "independent", as required by applicable listing standards of the New York Stock Exchange. The Committee operates pursuant to a written Charter, a copy of which is attached to the Company's Proxy Statement for the annual meeting held in 2001. As set forth in the Charter, management of the Company is responsible for the preparation, presentation and integrity of the Company's financial statements, and maintaining appropriate accounting and financial reporting principles, policies, internal controls and procedures designed to assure compliance with accounting standards and applicable laws and regulations. The independent auditors are responsible for planning and carrying out a proper audit of the Company's annual financial statements and expressing an opinion as to the fairness of the financial statements in conformity with generally accepted accounting principles.

The Audit Committee met with the independent auditors, management and internal auditors to assure that all were carrying out their respective responsibilities. The Committee reviewed the performance and fees of the independent auditors prior to recommending their appointment, and met with them to discuss the scope and results of their audit work, including the adequacy of internal controls and the quality of financial

14

Table of Contents

reporting. The Committee discussed with the independent auditors their judgments regarding the quality and acceptability of the Company's accounting principles, the clarity of its disclosures and the degree of aggressiveness or conservatism of its accounting principles and underlying estimates. The Committee discussed with and received the written disclosures and the letter from the independent auditors required by Independence Standards Board Standard No. 1 confirming their independence. The independent auditors had full access to the Committee, including meetings without management present.

Based upon the reports and discussions described in this report, and subject to the limitations on the role and responsibilities of the Committee referred to above and in the Charter, the Committee recommended to the Board of Directors that the audited financial statements be included in the Company's Annual Report on Form 10–K for the year ended December 31, 2001 filed with the Securities and Exchange Commission.

By:   The Collins & Aikman Corporation Audit Committee

Robert C. Clark, *Chair*
Warren B. Rudman
Marshall A. Cohen

Fees for all services provided by PricewaterhouseCoopers LLP for year 2001 are as follows:

**Audit Fees**

Aggregate fees for professional services rendered by PricewaterhouseCoopers LLP ("PricewaterhouseCoopers") in connection with its audit of the Company's consolidated financial statements as of and for the year ended December 31, 2001 and its limited reviews of the Company's unaudited consolidated interim financial statements were $1.0 million.

**Financial Information Systems Design and Implementation Fees**

During the year ended December 31, 2001, PricewaterhouseCoopers rendered no professional services to the Company in connection with the design and implementation of financial information systems.

**All Other Fees**

In addition to the fees described above, aggregate fees of $5.4 million were billed by PricewaterhouseCoopers during the year ended December 31, 2001, primarily for the following professional services (in millions):

| | |
|---|---|
| Audit–related services(a) | $ 3.7 |
| Income tax compliance and related tax services | $ 0.9 |
| Other(b) | $ 0.8 |

(a)    Audit related fees include fees for acquisition support activities, issuance of comfort letter and audits of the Company's employee benefit plans.

(b)    Actuarial valuation services.
PricewaterhouseCoopers expects to have a representative at the meeting who will have the opportunity to make a statement and who will be available to answer appropriate questions.

15

**Table of Contents**

## COMPENSATION COMMITTEE

## REPORT ON EXECUTIVE COMPENSATION

The Company's executive compensation program is administered by the Compensation Committee of the Board of Directors. The Committee is responsible for the design, administration and oversight of all senior management compensation and benefit policies, plans, programs and agreements.

### Executive Officer Compensation

The Company's compensation programs for its executive officers are intended to attract and retain qualified executives for the Company, to recognize individual performance in conjunction with overall corporate performance and to link a significant portion of the compensation paid to executives with the Company's current and long-term performance. The Compensation Committee believes that these goals are best implemented by providing a compensation package consisting of three major components: base salary, short-term incentive compensation and long-term incentive compensation.

The Compensation Committee is not empowered to award or authorize any compensation to be paid to any executive officer of the Company who is also a partner or employee of Heartland, Blackstone Partners, WP Partners, Becker Ventures, Joan Fabrics, Textron or their affiliates. None of the Company's current executive officers, except Mr. Stepp who is the interim chief financial officer, is a partner or employee of Heartland, Blackstone Partners, WP Partners, Becker Ventures, Joan Fabrics, Textron or their affiliates.

### Base Salary

When determining base salaries for the executive officers, the Compensation Committee considers the Company's retention needs, individual experience, individual and Company performance and individual responsibilities, the salaries of other officers and employees within the Company and management's recommendations. No relative weights are assigned to any factor. In addition, the Compensation Committee considers previously obtained, survey-based compensation data for companies of similar size with jobs similar to those of the Company in magnitude, complexity and scope of responsibility. While some of the companies identified in the peer group performance graph participate in these surveys, the Compensation Committee believes its competitors for executive talent are broader than this group due to the varied businesses in which its divisions compete for executive talent. As a matter of policy, base salaries are generally targeted at the 50th percentile of this broader group of automotive supply and general industry companies.

Salaries of executive officers are reviewed periodically by the Compensation Committee, generally on a 12 to 18 month cycle. Salary adjustments are determined by subjectively evaluating the factors described in the previous paragraph.

In the opinion of the Compensation Committee, competitive base salaries contribute to the Company's overall performance by attracting and retaining high quality management.

### Short-Term Incentive Compensation

The second major component of the executive compensation program is the Company's Executive Incentive Compensation Plan (the "Bonus Plan") adopted each year. The objectives of this plan are to:

    A. Motivate key employees to achieve and exceed the Company's financial goals;

    B. Maintain management's focus on the importance of earnings and cash flows;

    C. Focus on annual business results to lead to improvement in shareholder value; and

    D. Attract and retain key employees of the quality required to manage the Company's businesses successfully.

Under the Bonus Plan, the Company's executive officers and other key employees who the Committee deems to be in a position to have an impact on the attainment of the earnings and cash flow goals of the Company and its operating divisions have the opportunity to earn annual performance bonuses. While the

16

Table of Contents

number of persons participating in the Bonus Plan varies from year to year, approximately 600 persons participated in 2001. The bonus pool for each group of participants is based on Earnings Before Taxes (EBT) and Free Cash Flow (FCF). At the beginning of the year, EBT/FCF goals are established for Threshold (lowest), Target (expected) and Maximum performance for each operating division; such EBT/FCF goals correspond with Threshold, Target and Maximum bonus levels established for each group of participants. The amount of bonus actually paid under the Bonus Plan to participants is initially calculated based on the extent to which unit performance meets or exceeds the predetermined goals, thereby linking pay and unit performance and can range from 75% (for Threshold) to 200% (for Maximum) of the target award. Department heads, operating unit presidents, human resources and the Chief Executive Officer may change the allocation of bonus amounts among individuals, but not the aggregate bonus pool awarded. The target award for executive officers ranges from 40% to 150% of base salary depending on the participant's position with a subsidiary of the Company. The 2001 targets required an improvement over 2000 results. Bonus calculations will be based, for operating unit participants, 70% upon the relevant operating unit performance and 30% upon general Company performance, and 100% upon general Company performance for corporate participants.

Three of the current executive officers received a bonus for 2001 under the Bonus Plan. For two executive officers, the target bonuses equaled 50% of base salary, for two of such officers 40% of base salary and for the other such officer 150% of base salary. Bonuses actually awarded were 136%, 0%, 0%, 24% and 8% of annual base salary for all current executive officers. Messrs. Batey and Shah received payments described under "Executive Compensation — Employment Agreements" rather than bonuses under the 2001 Bonus Plan. The payments were determined based upon the provisions of their employment agreements, management's recommendations and the Committee's subjective judgment of what was appropriate.

## Long–Term Incentive Compensation

The third major component of the Company's executive compensation program is its long–term incentive compensation plans. Through the 1993 Plan and the 1994 Plan, the Company seeks to align the interests of key employees, at or above a level selected by the Committee in its subjective judgment (including all executive officers), more closely with those of the Company's stockholders, and to motivate and reward actions which lead to long–term value creation for stockholders. Stock option grants provide a direct link between any rewards executives may receive and the results achieved for stockholders. Stock options are intended to serve as compensation over a period of several years.

Stock option grants were not made to any Named Executive Officer during 2001.

Stock option grants are made based on the Committee's subjective evaluation of the duties and responsibilities of the individual, his or her present and potential contributions to the long–term growth and success of the Company, the number of options previously granted to such person, the number of options granted to persons in similar positions both at the Company and at other companies deemed comparable to the Company (based on the Committee members' knowledge of options granted by other companies), the number of options required to attract and retain qualified management personnel, the number of options remaining available for grant and management's recommendations. The Committee's policy is to grant options with a term of ten years to provide a long–term incentive. In addition, the Committee's policy is generally to grant options that vest over a specific period to provide the executive with an incentive to remain with the Company. The Committee's policy is also to provide new executives with options to attract them to the Company based on negotiations with new executives, management's recommendations and the Committee's subjective judgment primarily after reviewing the number of options granted to similar executives of the Company. Stock options granted to the Named Executive Officers during the last fiscal year and year–end option values of options granted to the Named Executive Officers are reflected in the tables provided below.

## Termination and Other Benefits

The Company generally determines termination benefits for executive officers based on the executive officer's employment agreement (if applicable), the Company's general severance policies for "exempt

17

Table of Contents

employees" (if applicable) or an agreement with the departing executive officer at the time of separation. The Committee's policy generally has been to have employment agreements and change–in–control agreements with each of the Company's executive officers to provide them with severance benefits. These benefits are intended to permit these executives to focus their attention on performing their duties to the Company, rather than on the security of their employment. The Company has also adopted a supplement to the Personal Savings Plan and an Excess Benefit Plan relating to the Employee's Pension Account Plan to provide the benefits the underlying plans would have provided to executives but for legal limitations under the Employee Retirement Income Security Act of 1974 and Internal Revenue Service regulations.

### Chief Executive Officer Compensation

The compensation of the Company's Chief Executive Officer is consistent with the compensation philosophy of the Company described above. Mr. Evans was paid a base salary of $735,000, based primarily on the Committee's subjective evaluation of Mr. Evans' experience and responsibilities, management's recommendation and survey–based compensation data. No particular weight was given to any of these factors. The terms of Mr. Evans' employment agreement are described under "Executive Compensation — Employment Agreements" below.

In addition to his base salary, Mr. Evans received annual incentive compensation under the Bonus Plan and the final $350,000 of his signing bonus as a result of the Heartland transaction in February 2001. Mr. Evans' target bonus opportunity under the Bonus Plan was 150 percent of current annual base salary, with a maximum opportunity of 300 percent of current annual base salary. EBT/ FCF goals have been established by the Compensation Committee at the beginning of each fiscal year; award calculations are based on the same factors as are bonuses for all executive officers. Mr. Evans received an annual bonus award of $1,000,000 in view of his leadership of the Company in regard to acquisitions and the integration thereof during 2001. Mr. Evans' signing bonus was determined based on the Committee's subjective judgment of the amount necessary to attract him to the Company.

The Compensation Committee, in its sole discretion, determines the amount of any stock options to be granted to Mr. Evans based on the factors described above. During the most recent fiscal year no stock options were granted to Mr. Evans.

The Compensation Committee believes the total compensation program for Mr. Evans is competitive with that provided by comparable companies, matches the responsibilities of his office and reflects his personal contributions to the Company's performance. Since joining the Company in April 1999, Mr. Evans has repositioned the focus of the Company as a global supplier of automotive interior systems, has developed a comprehensive corporate strategy of leveraging the Company's core competencies in acoustic technologies and design and styling excellence, has enhanced and accelerated the Company's restructuring program to reposition the Company and to reduce costs to better serve the needs of global customers and has relocated the Company headquarters to Troy, Michigan. Mr. Evans also initiated a series of acquisitions, including Joan Automotive, Becker and TAC–Trim, nearly doubling the Company's sales.

### Deductibility of Compensation in Excess of $1 Million a Year

In 1993, Congress enacted Section 162(m) of the U.S. Internal Revenue Code of 1986, effective for tax years beginning in 1994. This legislation precludes a public corporation from taking a federal income tax deduction for compensation in excess of $1 million per year for its chief executive officer and any of its four other highest paid executive officers required to be in the summary compensation table below (with exceptions for certain performance–based compensation).

The Company will continue to review its executive compensation practices and plans on an ongoing basis with respect to Section 162(m). Where it deems advisable, the Company will take appropriate action to preserve the tax deductibility of its executive compensation, but it believes the more important objective is maintaining competitive compensation. To retain highly skilled managers and remain competitive with other employers, the Compensation Committee retains the authority to authorize other payments, including salary

18

Table of Contents

and bonuses that would not be deductible for federal income tax purposes, including payments under the 2000 and 2001 Bonus Plans and the Company's stock option plans.

Compensation Committee of the Board of Directors of Collins & Aikman Corporation:

David A. Stockman
Daniel P. Tredwell
Marshall A. Cohen

### EXECUTIVE OFFICERS OF THE COMPANY

The following is a list of the names and ages, as of March 28, 2002, of the executive officers of the Company and a description of all positions and offices with the Company held by each such person and each such person's principal occupations and employment during the past five years. All executive officers hold office at the pleasure of the Company's Board of Directors.

| Name | Age | Position |
|------|-----|----------|
| Thomas E. Evans | 50 | Chairman of the Board and Chief Executive Officer |
| J. Michael Stepp | 57 | Chief Financial Officer (Interim) |
| Gerald E. Jones | 56 | Executive Vice President Global Manufacturing Operations, Fabrics |
| Millard L. King | 57 | Executive Vice President Global Manufacturing Operations, Carpet and Acoustics Systems |
| Bernd Lattemann | 60 | President and Managing Director European Operations |
| Ronald T. Lindsay | 51 | Senior Vice President, General Counsel and Secretary |
| Michael A. Mitchell | 58 | President Global Commercial Operations |
| Jerry L. Mosingo | 50 | Executive Vice President Global Manufacturing Operations, Plastics & Cockpit Systems |
| Jonathan L. Peisner | 42 | Senior Vice President, Treasurer |
| Jeffrey A. Rose | 42 | Senior Vice President Global Product Development and Technology |
| Russell N. Stroud | 59 | Senior Vice President Global Supply Chain Management and Company–Wide Cost Optimization |
| Gregory L. Tinnell | 41 | Senior Vice President, Human Resources |
| Reed A. White | 54 | President of Collins & Aikman Dura Convertible Systems |

*Thomas E. Evans* has been Chairman of the Board and Chief Executive Officer of the Company since April 1999. Previously, he was President of Tenneco Automotive, an automotive supplier and a division of Tenneco, Inc., from 1995 until April 1999. Prior to that, Mr. Evans served for six years with Case Corporation, a manufacturer of farm machinery and construction equipment and a subsidiary of Tenneco, Inc., in a series of senior management positions, the last being Senior Vice President of Worldwide Operations. Prior to his employment with Case Corporation, he spent sixteen years in the automotive industry with Rockwell International and Federal Mogul Corporation. Mr. Evans is also a director of the Motor & Equipment Manufacturers Association, the National Association of Manufacturers and the Institute of Textile Technology. Mr. Evans is also a director of Products.

*J. Michael Stepp* has been serving as Chief Financial Officer on an interim basis for the Company since the resignation of Mr. Shah effective January 7, 2002. Mr. Stepp has been a director of the Company since March 2001 and is also a director of Products. Mr. Stepp will continue to serve as Chief Financial Officer of

Table of Contents

the Company until a successor to the office is elected by the Board of Directors. In his interim capacity, Mr. Stepp is receiving compensation from the Company of $1 per year.

*Gerald E. Jones* has been Executive Vice President of Global Manufacturing Operations, Fabrics since November 2001 and an executive officer since March 2002. Mr. Jones, who has over 30 years of industry experience, joined the Company as a director of manufacturing in July 1995. From April 2000 until November 9, 2001, he was General Manager, Automotive Woven Fabrics.

*Millard L. King, Jr.* has been Chief Operating Officer of U.S. Automotive Carpet Systems since January 1999 and an executive officer of the Company since March 2002. Mr. King joined the Company in 1971. Prior to his current position with the Company, Mr. King most recently held the positions of Vice President of Operations for Automotive Knit Fabrics and then Chief Operating Officer of the Automotive Knit and Woven Operations.

*Bernd Lattemann* has been President and Managing Director of European Operations since January 2002 and an executive officer of the Company since March 2002. Mr. Lattemann has over 30 years of sales and manufacturing and automotive experience, including serving as an independent consultant from 1998 to 2002 and Chief Executive Officer from 1996 to 1998 for Becker Group Europe GmbH. Previously, Mr. Lattemann held several progressively responsible positions at SKF's Specialty Bearings Division.

*Ronald T. Lindsay* has been Senior Vice President, General Counsel and Secretary and an executive officer of the Company since 1999. He has been Senior Vice President since 1999, Vice President 1988–1999, and since 1988, General Counsel and Secretary of Products.

*Michael A. Mitchell* has been President, Global Commercial Operations since January 2002 and an executive officer of the Company since March 2002. Mr. Mitchell has over 40 years of industry experience, having previously held senior management positions at Chrysler Corporation and American Motors. He served as Executive Vice President, Business & Product Development from 1997 to 2002 and Executive Vice President of Engineering, Purchasing and Program Management from 1995 to 1997 for Textron Automotive Company.

*Jerry L. Mosingo* has been Executive Vice President, Global Plastics and Cockpit Systems since January 2002 and an executive officer of the Company since March 2002. Mr. Mosingo has over 30 years of industry experience, and he was previously Executive Vice President of Manufacturing from 1999 to 2002 and Senior Vice President of Operations in 1999 for Textron. Previously, he served as Vice President of Quality from 1997 to 1999 and Director of Operations from 1992 to 1997 for A.O. Smith.

*Jonathan L. Peisner* has been Senior Vice President and Treasurer since February 2002. Mr. Peisner joined the Company in 1999 as Senior Vice President of Communications and Investor Relations. From January 2000 until February 2002, he was Senior Vice President of Communications, Investor Relations and Business Planning. He has been an executive officer of the Company since February 2000. From 1997 until 1999, he was Director of Investor Relations and Business Planning for Lear Corporation, an automotive supplier, and from 1995 until 1997 he was director of Investor Relations. Mr. Peisner serves on the National Association of Manufacturers Public Affairs Steering Committee and the National Investor Relations Institute Small Cap Advisory Group.

*Jeffrey A. Rose* has been Senior Vice President, Global Product Development and Technology since January 2002 and an executive officer of the Company since March 2002. Mr. Rose has 20 years of industry experience, and he previously served as Vice President of Technology for TAC–Trim, which he joined in 1995 as Director of Interior Trim Engineering. Prior to 1995, he worked for Toyota at their Technical Center in Ann Arbor, Michigan.

*Russell N. Stroud* has been Senior Vice President, Global Supply Chain Management and Company–Wide Cost Optimization and an executive officer of the Company since March 2002. He has over 35 years of broad automotive experience with both OEMs and suppliers. Previously, he served as Vice President of Procurement from 2000 to 2002 and Vice President of Sales, Marketing and Strategic Planning from 1998 to

20

Table of Contents

2000 for New Venture Gear and President & COO for Thyssen Steel Group from 1996 to 1998 and held progressively responsible positions at Chrysler Corporation.

*Gregory L. Tinnell* has been Senior Vice President of Human Resources and an executive officer since April 2000. Previously, he was Vice President of Human Resources for the Company's southern and Mexican Operations, as well as Vice President of Global Compensation & Benefits. Tinnell joined the Company in 1995. Prior to Collins & Aikman, he served in various management positions with Sara Lee Corporation, Nabisco Foods Group and North American Refractories Company. Mr. Tinnell serves on the National Association of Manufacturers Human Resources Steering Committee.

*Reed A. White* has been President of Dura Convertible Systems, Inc. (also known as Collins & Aikman Dura Convertible Systems) since 1994, has been employed thereby in various management positions since April 1985 and has been an executive officer of the Company since February 2000.

See "Executive Compensation — Employment Agreements" for a description of employment agreements with Messrs. Evans, Lindsay and White, pursuant to which they are required to be elected to the offices they currently hold. Additionally, Messrs. Lattemann, Mitchell, Mosingo, Stroud, King, Jones, Rose and Tinnell have employment agreements and Mr. Peisner has a severance benefit agreement pursuant to which they are required to be elected to the offices they currently hold.

## EXECUTIVE COMPENSATION

The following table sets forth information concerning the compensation for services rendered to the Company and its subsidiaries by (i) all individuals serving as the Company's Chief Executive Officer during 2001, (ii) the Company's four most highly compensated executive officers (other than the Chief Executive Officer) whose total annual salary and bonus exceeded $100,000 and who were serving as executive officers at the end of the fiscal year ended December 31, 2001 and (iii) up to two of the Company's former executive officers whose compensation would have been reported herein if they had been serving as executive officers of the Company at the end of the fiscal year (the individuals named in clauses (i), (ii), and (iii) being referred to herein as the "Named Executive Officers"). All compensation shown has been paid by Products or by a subsidiary of Products (although any options shown as awarded are for Common Stock of the Company). The Company does not separately compensate its executive officers for their duties as officers of the Company (except for any such options).

### Summary Compensation Table

| Name and Principal Position | | Annual Compensation | | | Securities Underlying Options(#) | All Other Compensation($) |
| --- | --- | --- | --- | --- | --- | --- |
| | Year(1) | Salary($) | Bonus($) | Other Annual Compensation(2) | | |
| Thomas E. Evans | 2001 | 735,000 | 1,350,000(4) | 45,406 | — | 139,835(5) |
| Chairman of the Board and | 2000 | 729,167 | 175,000(6) | 35,955 | 60,000 | 77,158 |
| Chief Executive Officer(3) | 1999 | 485,513 | 1,325,000(7) | 28,508 | 1,200,000 | 19,950 |
| Brian Batey | 2001 | 291,672 | — | 0 | — | 0 |
| President, European | 2000 | 124,458 | 142,243 | 0 | 100,000 | 0 |
| Automotive Systems(8) | 1999 | N/A | N/A | N/A | N/A | N/A |
| Ronald T. Lindsay | 2001 | 222,500 | 53,400 | 12,609 | — | 9,308(9) |
| Senior Vice President, | 2000 | 220,625 | — | 52 | N/A | 12,830 |
| General Counsel and Secretary | 1999 | 177,950 | 100,000 | 63 | 40,000 | 8,385 |
| Rajesh K. Shah | 2001 | 345,000 | — | 15,851 | — | 14,837(10) |
| Executive Vice President & | 2000 | 333,750 | — | 48 | 35,000 | 21,654 |
| Chief Financial Officer(11) | 1999 | 130,769 | 200,000 | N/A | 100,000 | 2,887 |
| Reed A. White | 2001 | 250,000 | 20,000 | 11,032 | — | 10,701(12) |
| President, Collins & Aikman | 2000 | 237,500 | | 843 | 20,000 | 17,317 |
| Dura Convertible Systems | 1999 | 188,333 | 200,000 | 871 | N/A | 12,744 |

(1) The information given in this table is for the fiscal years indicated, rather than calendar years. 2001 indicates the fiscal year ended December 31, 2001. 2000 indicates the fiscal year ended December 31, 2000. 1999 indicates the fiscal year ended December 25, 1999.

Table of Contents

(2)   Total perquisites for each Named Executive Officer, except Mr. Evans in 2001, were less than the lesser of $50,000 or 10% of annual salary and bonus and, accordingly, the dollar value of such perquisites is not shown. The numbers shown for each Named Executive Officer reflect gross–ups for incremental federal and state income taxes related to such perquisites or relocation reimbursements. Perquisites for each Named Executive Officer may, but do not necessarily, include reimbursement for any of the following expenses: car; financial planning; executive fitness; executive physicals and medical; clubs and entertainment; and personal use of Company aircraft.

(3)   Mr. Evans joined the Company as Chairman of the Board of Directors and Chief Executive Officer and was named an executive officer of the Company in April 1999. Prior to April 1999, Mr. Evans held no position with the Company or its subsidiaries.

(4)   For 2001, as a result of the Heartland transaction Mr. Evans' bonus calculation includes a final $350,000 signing bonus payment made pursuant to his employment agreement, described under "Employment Agreements — Thomas E. Evans."

(5)   Amount for 2001 for Mr. Evans consists of (i) contributions in the amount of $39,060 to the non–qualified shadow retirement plan (the "SRP"), (ii) premiums in the amount of $4,570 and $954 paid for basic term life insurance and Accidental Death & Dismemberment insurance ("AD&D insurance"), respectively, under group life insurance policies, (iii) tax gross–ups of $49,679, (iv) perquisite allowance of $30,000 and (v) medical reimbursement of $15,572.

(6)   For 2000, Mr. Evans' bonus calculation includes a $175,000 signing bonus payment made pursuant to his employment agreement, described under "Employment Agreements — Thomas E. Evans."

(7)   For 1999, Mr. Evans' bonus calculation includes a $325,000 signing bonus payment made pursuant to his employment agreement, described under "Employment Agreements — Thomas E. Evans."

(8)   Mr. Batey joined the Company as President European Automotive Systems in August 2000. Prior to August 2000, Mr. Batey held no positions with the Company or its subsidiaries. His compensation is converted into USD as of 12/31/2001 (1 £=1.4515 USD). Mr. Batey resigned his employment effective February 28, 2002.

(9)   Amount for 2001 for Mr. Lindsay consists of (i) contributions in the amount of $8,010 to the SRP and (ii) premiums in the amount of $1,186 and $112 paid for basic term life insurance and AD&D insurance, respectively, under group life insurance policies.

(10)  Amount for 2001 for Mr. Shah consists of (i) contributions to the SRP in the amount of $12,420 and (iii) premiums in the amount of $2,145 and $272 paid for basic term life insurance and AD&D insurance, respectively, under group life insurance policies.

(11)  Mr. Shah joined the Company as Executive Vice President and Chief Financial Officer and was named an executive officer of the Company in July 1999. Prior to July 1999, Mr. Shah held no positions with the Company or its subsidiaries. Mr. Shah resigned his employment effective January 7, 2002.

(12)  Amount for 2001 for Mr. White consists of (i) contributions in the amount of $9,000 to the SRP and (ii) premiums in the amount of $1,554 and $147 paid for basic term life insurance and AD&D insurance, respectively, under group life insurance policies.

Table of Contents

## Option Grants in Last Fiscal Year

Shown below is information on grants of stock options made during the fiscal year ended December 31, 2001 to the Named Executive Officers.

| | Individual Grants | | | | |
|---|---|---|---|---|---|
| Name | Number of Securities Underlying Options Granted(#) | % of Total Options Granted to Employees in 2001 | Exercise Price ($/sh)(1) | Expiration Date | Grant Date Present Value($) |
| Thomas E. Evans | 0 | 0 | N/A | N/A | N/A |
| Brian Batey | 0 | 0 | N/A | N/A | N/A |
| Ronald T. Lindsay | 0 | 0 | N/A | N/A | N/A |
| Rajesh K. Shah | 0 | 0 | N/A | N/A | N/A |
| Reed A. White | 0 | 0 | N/A | N/A | N/A |

(1)    "N/A" appearing in the table denotes not applicable since no options were granted to the Named Executive Officer.

## Aggregated Option Exercises in Last Fiscal Year and Fiscal Year End Option Values

Shown below is information with respect to the exercise of stock options during the last fiscal year and the year-end value of unexercised options to purchase Common Stock granted to the Named Executive Officers and held by them as of December 31, 2001.

| | Shares | | Number of Unexercised Options/SARs at Fiscal Year-End(#) | | Value of Unexercised In-the-Money Options/SARs at Fiscal Year-End($) | |
|---|---|---|---|---|---|---|
| Name | Acquired on Exercise(#) | Value Realized($) | Exercisable | Unexercisable | Exercisable | Unexercisable |
| Thomas E. Evans | 0 | 0 | 1,260,000 | 0 | 3,383,250 | 0 |
| Brian Batey | 0 | 0 | 33,334 | 66,666 | 65,001 | 129,999 |
| Ronald T. Lindsay | 0 | 0 | 71,591 | 13,333 | 198,662(2) | 26,833 |
| Rajesh K. Shah | 0 | 0 | 78,334 | 56,666 | 137,022 | 110,290 |
| Reed A. White | 0 | 0 | 108,441 | 13,333 | 269,652(2) | 31,833(2) |

(1)    The value of in-the-money options is based on the difference between the exercise price of such options and the closing price of the Common Stock on the New York Stock Exchange on December 31, 2001 (the last trading day of the fiscal year ended December 31, 2000), which was $7.70.

(2)    Some options were not in-the-money at fiscal year-end because the exercise price of such options exceeded the closing price of the Common Stock on the New York Stock Exchange on December 31, 2001.

## Defined Benefit or Actuarial Plan Disclosure

*C&A Co. Plan.* Provided certain eligibility requirements are met, at the end of each calendar month, pay credits are applied to a participant's account under the Collins & Aikman Corporation Employees' Pension Account Plan (the "C&A Co. Plan") based on the participant's length of credited service and compensation (as defined) during that month. For participants aged 50 or older, the monthly pay credit is based on either credited service and compensation or age and compensation, whichever results in the higher amount.

Table of Contents

The following chart sets forth how pay credits are determined under the C&A Co. Plan:

| Eligibility Requirements | | | Percentage of Compensation Used to Determine Pay Credits | |
|---|---|---|---|---|
| Credited Service | —or— | Years of Age | Up to 1/3 of the S.S. Wage Base | Over 1/3 of the S.S. Wage Base |
| Less than 10 | | Less than 50 | 2.5% | 4.5% |
| 10 – 14 | | 50 – 54 | 3.0% | 5.5% |
| 15 – 19 | | 55 – 59 | 4.0% | 6.5% |
| 20 – 24 | | 60 – 64 | 5.0% | 8.0% |
| 25 or more | | 65 or more | 6.0% | 10.0% |

The dollar amounts that result from these percentages are added together and the total is the pay credit for the month.

In addition, interest credits are applied each month to the account balance. Participants make no contributions to the C&A Co. Plan. Employer contributions are 100% vested after five years of service or at age 65, whichever is earlier, and may vest under certain other circumstances as set forth in the C&A Co. plan. The estimated annual benefits payable upon retirement at normal retirement age under the C&A Co. Plan for Messrs. Evans, Lindsay, Shah, and White, assuming they use their account balances to purchase a single life annuity, are $6,459, $32,778, $4,881, $17,243, respectively. Participants in the C&A Co. Plan have the option, however, of receiving the value of their vested account in a lump sum following termination of employment.

*C&A Co. Excess Plan.* The Excess Benefit Plan of Collins & Aikman Corporation (the "C&A Co. Excess Plan") works in conjunction with the C&A Co. Plan (which is described above) and provides to the employee any benefit which the C&A Co. Plan would have provided but for certain legal limitations under the Employee Retirement Income Security Act of 1974 and Internal Revenue Service regulations. The pay credits and interest credits are determined as described with respect to the C&A Co. Plan as if no legal limitations existed, and then this plan provides any benefit which is in excess of the benefit provided under the C&A Co. Plan. The estimated annual benefits payable upon retirement at normal retirement age under the C&A Co. Excess Plan for Messrs. Evans, Lindsay, Shah, and White are $45,529, $7,032, $6,383 and $7,482, respectively.

*C&A Co. SRIP.* Participation in the Collins & Aikman Corporation Supplemental Retirement Income Plan (the "C&A Co. SRIP") is solely at the discretion of the Board of Directors of Products and is extended to a select group of key executives. The plan, which may be discontinued at any time, provides a participating employee with a retirement benefit at or after age 62 or between ages 55 and 61 on an actuarially reduced basis. A target benefit is first calculated for each employee based on Total Annual Compensation (final base salary plus the average of the bonuses paid for the last three fiscal years) and years of service at retirement. The benefit payable from the C&A Co. SRIP is determined as the excess of the target benefit over any pension benefits payable from Social Security and any other retirement plans sponsored by the Company. An employee does not become vested in a benefit until (i) reaching age 55 and completing 10 years of service or (ii) reaching age 62.

24

Table of Contents

The following table shows, for specified compensation and years of service classifications, the hypothetical annual target benefits under the C&A Co. SRIP for employees retiring at age 65, assuming that the retiring participant elects a single life annuity.

### Pension Plan Table

| Total Annual Compensation | Years of Service | | | | | |
|---|---|---|---|---|---|---|
| | 10 | 15 | 20 | 25 | 30 | 35 |
| $ 100,000 | $ 42,000 | $ 51,000 | $ 60,000 | $ 60,000 | $ 60,000 | $ 60,000 |
| 125,000 | 52,500 | 63,750 | 75,000 | 75,000 | 75,000 | 75,000 |
| 150,000 | 63,000 | 76,500 | 90,000 | 90,000 | 90,000 | 90,000 |
| 175,000 | 73,500 | 89,250 | 105,000 | 105,000 | 105,000 | 105,000 |
| 200,000 | 84,000 | 102,000 | 120,000 | 120,000 | 120,000 | 120,000 |
| 225,000 | 94,500 | 114,750 | 135,000 | 135,000 | 135,000 | 135,000 |
| 250,000 | 105,000 | 127,500 | 150,000 | 150,000 | 150,000 | 150,000 |
| 275,000 | 115,500 | 140,250 | 165,000 | 165,000 | 165,000 | 165,000 |
| 300,000 | 126,000 | 153,000 | 180,000 | 180,000 | 180,000 | 180,000 |
| 350,000 | 147,000 | 178,500 | 210,000 | 210,000 | 210,000 | 210,000 |
| 400,000 | 168,000 | 204,000 | 240,000 | 240,000 | 240,000 | 240,000 |
| 450,000 | 189,000 | 229,500 | 270,000 | 270,000 | 270,000 | 270,000 |
| 500,000 | 210,000 | 255,000 | 300,000 | 300,000 | 300,000 | 300,000 |
| 600,000 | 252,000 | 306,000 | 360,000 | 360,000 | 360,000 | 360,000 |
| 700,000 | 294,000 | 357,000 | 420,000 | 420,000 | 420,000 | 420,000 |
| 800,000 | 336,000 | 408,000 | 480,000 | 480,000 | 480,000 | 480,000 |
| 900,000 | 378,000 | 459,000 | 540,000 | 540,000 | 540,000 | 540,000 |
| 1,000,000 | 420,000 | 510,000 | 600,000 | 600,000 | 600,000 | 600,000 |
| 1,100,000 | 462,000 | 561,000 | 660,000 | 660,000 | 660,000 | 660,000 |
| 1,200,000 | 504,000 | 612,000 | 720,000 | 720,000 | 720,000 | 720,000 |
| 1,300,000 | 546,000 | 663,000 | 780,000 | 780,000 | 780,000 | 780,000 |
| 1,400,000 | 588,000 | 714,000 | 840,000 | 840,000 | 840,000 | 840,000 |
| 1,500,000 | 630,000 | 765,000 | 900,000 | 900,000 | 900,000 | 900,000 |
| 1,600,000 | 672,000 | 816,000 | 960,000 | 960,000 | 960,000 | 960,000 |
| 1,700,000 | 714,000 | 867,000 | 1,020,000 | 1,020,000 | 1,020,000 | 1,020,000 |
| 1,800,000 | 756,000 | 918,000 | 1,080,000 | 1,080,000 | 1,080,000 | 1,080,000 |
| 1,900,000 | 798,000 | 969,000 | 1,140,000 | 1,140,000 | 1,140,000 | 1,140,000 |
| 2,000,000 | 840,000 | 1,020,000 | 1,200,000 | 1,200,000 | 1,200,000 | 1,200,000 |
| 2,100,000 | 882,000 | 1,071,000 | 1,260,000 | 1,260,000 | 1,260,000 | 1,260,000 |
| 2,200,000 | 924,000 | 1,122,000 | 1,320,000 | 1,320,000 | 1,320,000 | 1,320,000 |
| 2,300,000 | 966,000 | 1,173,000 | 1,380,000 | 1,380,000 | 1,380,000 | 1,380,000 |
| 2,400,000 | 1,008,000 | 1,224,000 | 1,440,000 | 1,440,000 | 1,440,000 | 1,440,000 |
| $2,500,000 | $1,050,000 | $1,275,000 | $1,500,000 | $1,500,000 | $1,500,000 | $1,500,000 |

All the Named Executive Officers except Mr. Batey participated in the C&A Co. SRIP in 2001. As of December 31, 2001, Mr. Evans had 6 years, 8 months of plan service, and at age 65, he will have had an estimated 21 years, 3 months of plan service. As of December 31, 2001, Mr. Lindsay had 15 years, 6 months of plan service, and at age 65, he will have had an estimated 28 years, 11 months of plan service. As of December 31, 2001, Mr. White had 16 years, 7 months of plan service, and at age 65, he will have had an

**Table of Contents**

estimated 27 years, 6 months of plan service. Mr. Shah resigned his employment effective January 7, 2002 and he has no vested benefits under the C&A Co. SRIP.

**Employment Agreements**

*Thomas E. Evans.* In April 1999, Products entered into an employment agreement with Mr. Evans, pursuant to which he serves as the Company's Chief Executive Officer and as Chairman of the Board of Directors. The agreement provides for an initial base salary of $700,000 and participation in any executive bonus plan with a target bonus of 100% of base salary then in effect and a maximum of 200% of base salary. The agreement also provides for participation in benefit plans as generally in effect for executive officers and such perquisites as the Compensation Committee deems advisable from time to time, which may include the use of company aircraft, use of company automobiles (and reimbursement for gas and maintenance charges), and luncheon club and country club membership dues. Under the C&A Co. SRIP, Mr. Evans has received credit for four years of past service under the executive retirement plan of his former employer, with additional benefit accruals to occur in accordance with such plan for years of service to the Company. Under the terms of his employment agreement, Mr. Evans also received an $850,000 signing bonus, $325,000 of which was paid in April 1999 and $175,000 of which was to be paid on each of the first three anniversaries of the commencement of his employment, subject to the terms and conditions of the employment agreement. Mr. Evans was granted options under the 1994 Plan for 1,200,000 shares, which options vest 33 1/3% on each of the first three anniversaries of the commencement of his employment. Under the agreement, Mr. Evans may not sell more than 60,000 shares of Common Stock in any three month period or more than 180,000 in any one year period, unless a change of control of the Company occurs. As a result of the Heartland transaction in the first quarter of 2001, all options granted to Mr. Evans became fully vested and immediately exercisable, all benefits under the C&A Co. SRIP were fully vested and the unpaid portion of the signing bonus was paid to Mr. Evans. The agreement provides for employment for a period commencing April 22, 1999 and ending April 22, 2002. Thereafter, the agreement will be automatically renewed for additional one year periods unless Products or Mr. Evans provides 90 days' prior written notice. In the event of involuntary termination for reasons other than cause or termination by Mr. Evans for good reason (a demotion for Mr. Evans' position or a significant reduction in his responsibilities, other than as a result of a sale or other disposition of assets of the company), the agreement provides for severance benefits equal to Mr. Evans' base salary then in effect for a period of two years from the termination date, plus if such termination occurs during fiscal year 2000, two times the average of the target bonus for fiscal year 2000 and the greater of $575,000 and the actual bonus for fiscal year 1999. For fiscal year 2001 and thereafter, the additional amount shall be two times the average of the target bonus for the then fiscal year and Mr. Evans' actual bonus for the most recently completed fiscal year. Additionally, Mr. Evans would receive, in the event of involuntary termination for reasons other than cause, any unpaid portion of the signing bonus, the complete vesting and right to immediately exercise any options granted under the employment agreement, a pro rata portion of $575,000 or the target bonus for the then fiscal year, immediate and full vesting in all benefits under the C&A Co. SRIP, and one year after the termination date the restrictions on Mr. Evans' sale of Common Stock would expire. If Mr. Evans' employment is terminated due to his death or physical or mental disability, Products shall pay any unpaid portion of his signing bonus, any earned but unpaid bonus under the executive bonus plan, any unpaid salary prior to the termination date, one times his base salary on the termination date and, a ratable portion of the annual bonus he would have earned based on actual performance results for the current fiscal year. Additionally, a ratable portion of options granted to Mr. Evans under the agreement which would have vested on the next anniversary of the commencement date of his employment shall become vested and immediately exercisable based upon the period of service since the immediately preceding anniversary date of the commencement of his employment, and one year after the termination date, the restrictions on the sale of Mr. Evans' Common Stock would expire.

*Change of Control Agreements with Reed A. White and Ronald T. Lindsay.* The Company has entered into letter agreements with Mr. White and Mr. Lindsay which provide for certain benefits if, during the period commencing three months prior to a Change in Control (as defined) of the Company and ending one year thereafter (or 45 days after notice of intent to constructively terminate employment, if later) (a "Change in Control Period"), (i) the executive's employment is involuntarily terminated other than for cause or (ii) there

26

Table of Contents

is a constructive termination of the executive's employment (which is a termination by the executive due to involuntary relocation, a material reduction in executive's total compensation and benefit package or a significant reduction in executive's responsibilities, position or authority). The benefits payable in a lump sum to the executive in such an event are as follows: (a) the executive's base salary through the date of termination; (b) a pro rata share equal to the executive's target bonus immediately preceding the Change in Control Period multiplied by a fraction, the numerator of which is the number of months in the year prior to termination and the denominator of which is twelve; (c) twenty–four months of base salary; and (d) two times the executive's target annual bonus in effect immediately preceding the Change in Control Period. The Company shall also (w) offer the executive an opportunity to purchase his Company automobile at its net book value, (x) deem the executive to continue as an employee of the Company for two years following termination for purposes of eligibility and vesting (but not benefit accrual) under retirement plans, (y) allow the executive to continue to participate in welfare benefit plans for two years (or until new employment) and (z) reimburse the executive for costs of continued coverage for executive and dependents under the Company's group health plans at the end of the welfare benefit continuation period described in (y). The letter agreements provide that any such benefits to an executive which constitute "Parachute Payments" under Section 280G of the U.S. Internal Revenue Code of 1986 (the "Code") may be reduced so that the Company shall not be caused to have paid an "Excess Parachute Payment" under Section 280G of the Code. In addition, any lump sum payment shall be reduced by the amount of cash severance or salary continuation benefits paid to the executive under any other plan or policy of the Company or a written employment agreement between the Company (or one of its affiliates) and the executive.

*Rajesh K. Shah.* In July 1999, the Company entered into a Severance Benefit Agreement with Mr. Shah for a period of two years ending July 25, 2001 with an automatic one–year extension. In the event Mr. Shah's employment would be terminated by the Company without cause or by Mr. Shah due to "constructive termination" prior to the expiration of the term of the agreement, Mr. Shah would receive (i) any unpaid cash bonus for the prior fiscal year, (ii) accrued and vested benefits under the employee benefit plans sponsored by the Company, (iii) 1.5 times the executive's target bonus under the executive incentive compensation plan for the current fiscal year and (iv) the base salary for the greater of eighteen months or the remainder of the agreement.

In March 2002, Mr. Shah entered into an agreement, effective January 7, 2002, with Products which supersedes his Severance Benefit Agreement. Mr. Shah resigned his employment with Products effective January 7, 2002. Mr. Shah received a lump–sum payment in the amount of $425,000 and a monthly payment of $35,416 for a 12 month period ending January 31, 2003. Mr. Shah will be eligible to continue participation in the Company's medical plan, executive medical plan and continuation of the perquisite allowance for an 18 month period. Pursuant to the agreement, all stock options awarded to Mr. Shah while he was employed by the Company will be repriced at $5, will immediately vest and remain exercisable for one year after the Agreement Date. The agreement also contains provisions regarding noncompetition, nonsolicitation of employees and a general release by Mr. Shah.

*Brian Batey.* In August 2000, Collins & Aikman Products GmbH entered into an employment agreement with Mr. Batey for an undefined period, subject to the terms and conditions of the agreement. The agreement provided for an initial base salary of 200,000 Pounds Sterling per year. Mr. Batey's target bonus under the annual executive incentive compensation plan was set at 50% of his base salary with a guaranteed cash bonus of 100,000 Pounds Sterling from the plan for the 2000 fiscal year. Mr. Batey was granted options under the 1994 Collins & Aikman Stock Option Plan for 100,000 shares of Common Stock, which would vest 1/3 after the first year, 1/3 after the second year and the remainder after the third year. The agreement provided for employee benefits and such other fringe benefits as were available to executives of the Company including an allowance of 1,000 Pounds Sterling for an automobile along with reimbursement of normal gasoline and maintenance charges. In the event Mr. Batey's employment would be terminated by Products GmbH without cause or by Mr. Batey due to "constructive termination" prior to age 65, Mr. Batey would receive a monthly fixed salary multiplied by 15 plus a pro rata target bonus. The compensation payment would be paid as a lump–sum on the date of the expiration of the prohibition of competition period. Additionally, Mr. Batey

27

Table of Contents

would receive 50 percent of the contractual base salary remuneration per month for the 12 month prohibition of competition period.

In February 2002, Mr. Batey entered into an agreement with Collins & Aikman Products GmbH which supersedes his employment agreement, whereby he resigned his employment with Products GmbH effective February 28, 2002. Under the agreement, Mr. Batey will receive 350,000 Pounds Sterling lump–sum payment and 31,060 Euros net of income taxes to pay pension contributions for the INPDAI Pension Scheme for Managers in Italy. Additionally, Mr. Batey will receive a payment of 150,000 Pounds Sterling payable in 12 monthly installments for the non–competition and non–solicitation obligation. Mr. Batey received 100,000 stock options of which 33,334 previously vested and 33,333 stock options will vest on August 2002.

*Ronald T. Lindsay.* In October 1999, Products entered into an employment agreement with Mr. Lindsay for a period of three years ending September 30, 2002, subject to the terms and conditions of the agreement. The agreement provides for an initial base salary of $215,000 per year. Mr. Lindsay's target bonus under the annual executive incentive compensation plan is set at 40% of his base salary. Pursuant to the agreement, Mr. Lindsay was granted options under the 1994 Plan for 40,000 shares of Common Stock, which vest 1/3 after the first year, 1/3 after the second year and the remainder after the third year. The agreement provides for employee benefits and such other fringe benefits as are available to executives of the Company, including the use of an automobile (and reimbursement for gas and maintenance charges) and country club membership. The agreement also provides for (i) reimbursement of reasonable expenses incurred by Mr. Lindsay in connection with the relocation from Charlotte, North Carolina to Troy, Michigan, and (ii) a one–time relocation allowance $50,000 (plus a gross–up of income taxes), payable in a lump sum upon completion of the purchase of a principal residence in the Troy, Michigan area. In the event Mr. Lindsay's employment is terminated by Products without cause or by Mr. Lindsay due to "constructive termination" prior to the expiration of the term of the agreement, Mr. Lindsay shall receive the greater of twelve months' base salary or the remaining term of the agreement and a standard bonus payment. In such event, all outstanding stock options will immediately vest and remain exercisable for a period of 90 days after termination.

*Reed A. White.* In December 2000, Products entered into an employment agreement with Mr. White for a period of three years ending November 30, 2003, subject to the terms and conditions of the agreement. The agreement provides for an initial base salary of $250,000 per year. Mr. White's target bonus under the annual executive incentive compensation plan is set at 40% of his base salary. The agreement provides for employee benefit and such other fringe benefit as are available to executives of the Company including a perquisite allowance of $20,000 (plus a gross–up for income taxes) to be used for the lease/ purchase of an automobile, associated automobile insurance, club memberships and financial planning. In the event Mr. White's employment is terminated by Products without cause or by Mr. White due to "constructive termination" prior to the expiration of the term of the agreement, Mr. White shall receive twenty–four months' base salary and a standard bonus payment. In such event, all outstanding stock options will immediately vest and remain exercisable for a period of 90 days after termination.

28

Table of Contents

**Performance Graph**

The following graph compares the cumulative total stockholder return from December 27, 1996 through December 31, 2001 of (i) the Company, (ii) the S&P 500 and (iii) a peer group of companies selected by the Company (consisting of Lear Corporation, Magna International Inc., Johnson Controls, Inc., Superior Industries International Inc., Arvin Meritor, Inc., Dana Corporation, Eaton Corporation and Borg Warner Automotive Inc.) (the "Automotive Peer Group"). Dividend reinvestment has been assumed and, with respect to the companies in the Automotive Peer Group, the returns of each such company have been weighted to reflect relative stock market capitalization. The graph assumes an investment of $100 on December 27, 1996 in each of the Common Stock and the stocks comprising the S&P 500 and the Automotive Peer Group.

## CUMULATIVE TOTAL RETURN

### Based Upon an Initial Investment of $100.00 on December 27, 1996
### With Dividends Reinvested



|  | Collins & Aikman Corp. | S&P 500 | Automotive Peer Group |
|---|---|---|---|
| 12/27/96 | 100.00 | 100.00 | 100.00 |
| 12/26/97 | 126.83 | 123.74 | 147.08 |
| 12/24/98 | 120.48 | 162.04 | 78.91 |
| 12/29/99 | 104.70 | 192.70 | 106.03 |
| 12/29/00 | 100.72 | 174.46 | 78.91 |
| 12/31/01 | 138.36 | 151.70 | 145.01 |

**Compensation of Directors**

Under the 1994 Directors Stock Option Plan, each non–employee director of the Company who is not affiliated with a major stockholder, and was not affiliated with a major stockholder at the time of his or her election to the Board of Directors, received an annual automatic grant of ten–year options for 10,000 shares of Common Stock each November. The options have a per share exercise price equal to the closing sales price of the Common Stock on the New York Stock Exchange on the date of grant and are exercisable six months and one day after the date of grant. Any options not exercisable prior to a termination of directorship are canceled. Such non–employee directors may be granted options on the same schedule pursuant to the 2002 Plan (defined below and discussed under the heading "Proposal II"), if such plan is approved by the stockholders. Each such director also receives a fee of $55,000 per year, payable quarterly. Currently, only Mr. Clark,

29

Table of Contents

Mr. Rudman and Mr. Cohen are eligible to receive future grants under the 2002 Plan, if such plan is approved by the stockholders.

**Compensation Committee Interlocks and Insider Participation**

From April 27, 2000 to February 23, 2001, the Compensation Committee was composed of Mr. Richard Lappin and Mr. O'Connell. From April 10, 2001 to March 15, 2002, the Compensation Committee was composed of Messrs. Stockman, O'Connell and Tredwell. Since April 1, 2002, the Compensation Committee has been composed of Messrs. Stockman, Tredwell and Cohen. None of Messrs. Lappin, Stockman, O'Connell, Cohen or Tredwell is or has been an employee of the Company or any of its subsidiaries, including Products, or is or has been separately compensated for serving as an officer of the Company or any of its subsidiaries, including Products. See "Compensation Committee Report on Executive Compensation." None of the executive officers who are separately compensated for serving as executive officers (or who received options) serve on the Compensation Committee.

Mr. Lappin, who resigned as a director on February 23, 2001, is a Senior Managing Director of Blackstone. Mr. O'Connell, who resigned as a director on March 15, 2002, is a director of Wasserstein & Co., LP, which is affiliated with Wasserstein Management and which was formerly affiliated with WP Group. Messrs. Stockman and Tredwell are senior managing directors of Heartland Industrial Partners, L.P. See "Security Ownership of Management and Principal Stockholders" and "Certain Relationships and Related Transactions — Certain Relationships." Mr. Cohen is counsel at the Canadian law firm of Cassels Brock and Blackwell.

Wasserstein Perella Securities, Inc. ("WP Securities"), a wholly-owned subsidiary of WP Group, has acted, and may in the future act, as agent for the Company in the repurchase from time to time of shares of Common Stock.

For a description of the relationships of the Company or the Company's directors with any of Heartland, BGH, Blackstone Partners, Blackstone Management, WP Partners, WP & Co. or WP Management, see "Security Ownership of Management and Principal Stockholders" and "Certain Relationships and Related Transactions" above.

**Section 16(a) Beneficial Ownership Reporting Compliance**

Section 16(a) of the Exchange Act requires the Company's officers and directors, and persons who own more than ten percent of a registered class of the Company's equity securities, to file reports of ownership and changes in ownership with the Securities and Exchange Commission (the "SEC"). Officers, directors and greater than ten percent stockholders are required by SEC regulation to furnish the Company with copies of all Section 16(a) reports they file. Based solely on review of the copies of such reports furnished to the Company during or with respect to fiscal 2001, or written representations that no Forms 5 were required, the Company believes that during the fiscal year ended December 31, 2001 all Section 16(a) filing requirements applicable to its officers, directors and greater than ten percent beneficial owners were complied with.

<div align="center">PROPOSAL II</div>

<div align="center">APPROVAL OF THE COMPANY'S 2002 EMPLOYEE STOCK OPTION PLAN</div>

The Compensation Committee of the Company and the Board of Directors of the Company have approved the submission of the Company's 2002 Employee Stock Option Plan ("2002 Plan") for approval at the 2002 annual meeting of stockholders of the Company. The following summary of the 2002 Plan is qualified in its entirety by express reference to the 2002 Plan, which is attached as *Appendix A* to this Proxy Statement.

The purpose of the 2002 Plan is to provide key employees and executive consultants of the Company and its subsidiaries and non-employee directors of the Company with an increased incentive to make contributions to the long-term performance and growth of the Company, to join the interests of key employees, executive

<div align="center">30</div>

Table of Contents

consultants and non–employee directors with the interests of stockholders of the Company and to facilitate attracting and retaining key employees, executive consultants and non–employee directors of the Company.

The vote required for approval of Proposal II is the affirmative vote of the holders of a majority of the total number of votes cast on the proposal at the annual meeting of stockholders. Abstentions, withheld votes and broker non–votes will not be deemed affirmative or negative votes in determining approval of this proposal, but will be counted in determining the number of shares of Common Stock present or represented by proxy in determining whether a quorum is present. The Board has approved the 2002 Plan subject to shareholder approval. In addition, the Board has terminated the 2000 Employee Stock Option Plan and no options were granted thereunder.

**Summary of the Principal Terms and Conditions of the 2002 Plan**

*Shares Subject to Options*
The 2002 Plan authorizes the issuance of up to 16,500,000 shares (6,400,000 shares in the event that the reverse stock split proposal is approved and effected see "Proposal III" below) of Common Stock, par value $0.01 per share, upon the exercise of incentive stock options ("ISOs") and nonqualified stock options ("NQSOs") granted to key employees and NQSOs granted to executive consultants and non–employee directors of the Company under the 2002 Plan. Unless the 2002 Plan has terminated, shares covered by the unexercised portion of canceled, expired or otherwise terminated options under the 2002 Plan would be available for option grants. The shares of Common Stock authorized for the 2002 Plan will be subject to adjustment in the case of any stock dividend, stock split, combination of shares, recapitalization or other change in the capital structure of the Company, merger or consolidation of the Company, spin–off, reorganization, partial or complete liquidation, issuance of rights or warrants to purchase securities or any other corporate transaction or event having an effect similar to the foregoing. Key employees are those active executive officers or other valuable employees of the Company that are selected by the Compensation Committee to participate in the 2002 Plan. Executive consultants are those executive–level consultants of the Company that are selected by the Compensation Committee to participate in the 2002 Plan. Non–United States employees may participate in the 2002 Plan, and modifications may be made to the terms and conditions of awards made under the 2002 Plan to comply with local laws. No ISO may be granted under the 2002 Plan after March 28, 2012.

*Options*
In the case of ISOs, the exercise price of an option may not be less than 100% of the fair market value of a share of Common Stock at the time of grant (or 110% of such fair market value if the grantee owns more than 10% of the shares of Common Stock outstanding at the time of grant (a "Ten Percent Shareholder")). NQSOs issued pursuant to the 2002 Plan will be exercisable at such price as may be fixed by the Compensation Committee, which may be less than the fair market value of the Common Stock at the time of grant. The closing price for the Common Stock on the New York Stock Exchange on April 22, 2002 was $7.50 per share. No more than 5,000,000 shares of Common Stock (2,000,000 shares in the event that the reverse stock split proposal is approved and effected, see "Proposal III" below) may be subject to options granted to any employee or executive consultant under the 2002 Plan in any calendar year, with any unused portion thereof carried forward. Shares purchased pursuant to the exercise of options must be paid for at the time of exercise as follows: (i) in cash or by check, bank draft or money order; (ii) if the shares are traded on a national securities exchange, through the delivery of instructions to a broker to deliver the purchase price; or (iii) on other terms acceptable to the Compensation Committee (which may include payment by transfer of shares of Common Stock owned by the participant for at least six months or the surrender of options).

The Compensation Committee selects the optionees and sets the number of shares, the exercise price and the schedule of exercisability with regard to each option grant, subject to acceleration in the event of a Change in Control of the Company (as defined in the 2002 Plan). No option may be exercisable after the expiration of ten years from the date of its grant (or five years, in the case of ISOs granted to a Ten Percent Shareholder). No ISO may be transferred, assigned, pledged or hypothecated in any way except by will or under applicable

31

Table of Contents

laws of descent and distribution. NQSOs may be transferred to any family member (as defined in the 2002 Plan) of the participant for or without consideration.

In consideration of the grant of options, each employee is required to agree not to engage, without the written consent of the Compensation Committee, in any Competitive Activity (as defined in the 2002 Plan) during the participant's employment by the Company, and in the event any options vest, for a period of one year following termination of employment. Options that were exercisable upon a participant's termination of service other than for cause remain exercisable following such termination for a period of: (i) one year, in the case of death or disability, (ii) 90 days, in the case of retirement or termination other than for cause and (iii) in all other instances, 30 days following such termination, in each case subject to extension by the Compensation Committee. Options that were exercisable upon a participant's termination of service for cause are canceled upon such termination. Except as otherwise determined by the Compensation Committee, options that were not exercisable at the time of a participant's termination of service by the Company shall automatically be canceled upon such termination. The Compensation Committee has the discretion under the 2002 Plan to impose in a participant's option agreement such other conditions, limitations and restrictions as it determines are appropriate in its sole discretion, including any waivers of rights which a participant may have.

The 2002 Plan provides for the Compensation Committee to have the right to make appropriate adjustments in the number and kind of securities receivable upon the exercise of options or the exercise price in the event of a stock split, stock dividend, merger, consolidation, reorganization, spinoff, partial or complete liquidation or other similar changes in the capital structure or other corporate transactions. The 2002 Plan also gives the Compensation Committee the option to terminate all outstanding options effective upon the consummation of a merger or consolidation in which the Company is not the surviving entity or of any other transaction that results in the acquisition of substantially all of the Company's outstanding Common Stock by a single person or entity or by a group of persons and/or entities acting in concert, or upon the consummation of the sale or transfer of all of the Company's assets (any such event an "Acquisition Event"), subject to the right of participants, if such termination right is exercised, to exercise all outstanding options prior to the effective date of the Acquisition Event.

The Compensation Committee may modify, extend or assume outstanding options or may accept the cancellation of outstanding options (whether granted by the Company under the 2002 Plan or another plan or by another issuer) in return for the grant of new options for the same or a different number of shares and at the same or a different purchase price. In addition, the Compensation Committee may place certain conditions on the shares upon exercise of an option.

As of the date of this Proxy Statement approximately 900 key employees, no executive consultants and three non-employee directors (excluding Mr. Dauch, who is a nominee for election at the Meeting and may be eligible to participate in the 2002 Plan) are currently eligible to participate in the 2002 Plan. No options have yet been granted under the 2002 Plan.

Persons deemed to be affiliates of the Company, i.e., persons who directly or indirectly through one or more intermediaries, control, are controlled by, or are under common control with, the Company, must resell securities acquired under the 2002 Plan pursuant to a registration statement under the Securities Act of 1933, as amended, and the rules and regulations thereunder (the "Securities Act"), Rule 144 under the Securities Act or an applicable exemption under the Securities Act.

The Company is the issuer of the securities offered pursuant to the 2002 Plan. The shares of Common Stock of the Company issuable upon exercise of options granted under the 2002 Plan may be either authorized and unissued or reacquired shares of Common Stock of the Company. The 2002 Plan is not subject to any provisions of the Employee Retirement Income Security Act of 1974 and is not qualified under Section 401(a) of the Code.

### *Amendment or Termination of the 2002 Plan*
The Compensation Committee may terminate or amend the 2002 Plan, or amend any option under the 2002 Plan, at any time; provided that no such termination or amendment may materially impair a participant's rights under any option previously granted under the 2002 Plan without the consent of such participant.

Table of Contents

*Option Grants*
See the information under the heading "Executive Compensation" for a description of the options granted under the Company's plans.

*Federal Income Tax Consequences*
The rules governing the tax treatment of options and shares acquired upon the exercise of options are quite technical. Therefore, the description of federal income tax consequences set forth below is necessarily general in nature and does not purport to be complete. Moreover, statutory provisions are subject to change, as are their interpretations, and their application may vary in individual circumstances. Finally, the tax consequences under applicable state and local income tax laws may not be the same as under the federal income tax laws.

Under federal income tax law as currently in effect, neither ISOs nor NQSOs require a participant to recognize income at the time of grant. Upon the exercise of a NQSO, the participant will recognize ordinary income in an amount equal to the excess of the fair market value of the Common Stock received over the aggregate exercise price. Subsequent appreciation or decline in the value of the shares will generally be treated as capital gain or loss on the sale or other disposition of the shares. With respect to an ISO, no income is recognized by the participant in connection with the exercise, although the excess of the fair market value of the Common Stock at exercise over the aggregate exercise price results in alternative minimum income which is used in determining alternative minimum tax liability of the participant. The participant will be subject to taxation at the time shares acquired upon the exercise of an ISO are sold or otherwise disposed of. If the sale occurs at least two years after the date the ISO was granted and at least one year after the date it was exercised, the participant generally will recognize long–term capital gain or loss in an amount equal to the excess of the proceeds of the sale over the aggregate exercise price of the shares sold. If the participant disposes of such shares within two years of the date the ISO was granted or within one year of receipt of the shares pursuant to the exercise of the ISO, the participant will recognize ordinary income, in an amount equal to the excess of the fair market value of the shares on the date of the exercise over the exercise price or the gain on disposition, if lower. The excess, if any, of the amount realized upon disposition of such shares over the fair market value of the shares on the date of exercise will be long– or short–term capital gain, depending upon the holding period of the shares, providing the participant holds the shares as a capital asset at the time of disposition. If such disposition of the shares by the participant within two years of the date of grant of the ISO or one year of its exercise is a sale or exchange with respect to which a loss (if sustained) would be recognized by the participant, then the amount which is includable in the gross income of the participant shall not exceed the excess (if any) of the amount realized on the sale or exchange over the adjusted basis of such shares.

The Company's tax consequences will also depend upon whether an option is an ISO or a NQSO. In the case of a NQSO, the Company will generally be entitled, subject to the possible application of Sections 162(m) discussed below, to a deduction in connection with the participant's exercise in an amount equal to the income recognized by the participant. If the Option is an ISO, however, the Company will not be entitled to a deduction if the participant satisfies holding period requirements and recognizes capital gain. If those requirements are not satisfied, the Company will generally be entitled to a deduction corresponding to the ordinary income recognized by the participant, subject to the possible application of Section 162(m) of the Code as discussed below.

Section 162(m) of the Code precludes a publicly held corporation from claiming a compensation deduction for compensation in excess of $1 million paid to the chief executive officer or any of the four most highly compensated executive officers other than the chief executive officer required to be shown in the Summary Compensation Table. This limitation does not apply, however, to "qualified performance–based compensation." Because the Compensation Committee members are affiliated with the Company's principal stockholders and those stockholders have reportable related–party transactions with the Company, compensation from the exercise of options may not qualify as "qualified performance–based compensation" for purposes of Section 162(m) of the Code.

Management recommends a vote FOR Proposal II.

33

Table of Contents

## PROPOSAL III

## APPROVAL OF THE ONE–FOR–TWO AND ONE–HALF REVERSE STOCK SPLIT

The Company's Board of Directors deems advisable and recommends to the stockholders an amendment to the Company's Restated Certificate of Incorporation to effectuate a one–for–two and one–half reverse stock split of the issued and outstanding Common Stock. The reverse stock split will be accomplished by reclassifying all of the issued and outstanding shares of Common Stock into a proportionally fewer number of shares of Common Stock, such that every two and one–half shares will be converted into one post–split share.

The approval of two–thirds of the outstanding Common Stock is required for the approval of the proposed reverse stock split. Abstentions and broker non–votes will be equivalent of votes cast against the proposed reverse stock split. In the event that the reverse stock split is approved by the stockholders, the Board of Directors will fix a record date for the reverse stock split which will be as soon as practicable after such approval. The Company will publicly announce the record date once it has been fixed.

### Reasons for the Proposed Reverse Stock Split

The Board of Directors believes that per share market prices of a common stock can affect its acceptability by portions of the financial community and the investing public. The number of shares of a stock outstanding should not, by itself, affect its marketability, the type of investor who acquires it or the Company's reputation in the financial community. However, certain types of investors look upon lower priced stocks as possibly speculative in nature and, as a matter of policy, avoid investment in such stocks. Marketability of lower–priced shares can also be adversely affected by the reluctance of many leading brokerage firms to recommend these stocks to their clients. While the Company cannot assure you that the price of the common stock after the reverse stock split will actually increase in an amount proportionate to the decrease in the number of outstanding shares, the proposed stock reverse stock split is intended to result in a price level for the common stock that will maintain and enhance investor interest.

### Principal Effects

The principal effects of the proposed reverse stock split would be the following:

*Number of Shares Outstanding.* As of April 2, 2002, 167,997,131 shares of Common Stock were issued and outstanding and 132,002,869 shares were unissued. The reverse stock split will not alter the number of shares of Common Stock that the Company is authorized to issue but will only reduce the number of shares of Common Stock issued and outstanding.

*Options.* In addition, the Company has previously issued options which, if exercised, would require the Company to issue an additional 2,713,236 shares of Common Stock. All options would be adjusted on a one–for–two and one–half basis and the exercise price per share for each option would correspondingly increase to two and one–half times the pre–split exercise price.

The following table illustrates the principal effects of the proposed reverse stock split discussed in the preceding paragraphs (share information as of April 2, 2002):

| Number of Shares of Common Stock | Prior To Reverse Stock Split | After Reverse Stock Split |
|---|---|---|
| Authorized | 300,000,000 | 300,000,000 |
| Outstanding | 167,997,131 | 67,198,852 |
| Shares of Common Stock Subject to Outstanding Options | 2,713,236 | 1,085,294 |
| Total Fully–Diluted | 170,710,367 | 68,284,146 |

*General.* The proposed reverse stock split would not affect the proportionate equity interest in the Company of any holder of Common Stock. The proposed reverse stock split will not affect the registration of the Common Stock under the Securities Exchange Act of 1934 or the listing of the Common Stock on the New York Stock Exchange.

Table of Contents

There are certain advantages and disadvantages of voting for a reverse stock split, including:

- The Board of Directors believes that per share market prices of a company's stock can affect its acceptability by portions of the financial community and the investing public. The number of shares of a stock outstanding should not, by itself, affect its marketability, the type of investor who acquires it or the company's reputation in the financial community. However, certain types of investors look upon lower priced stocks as possibly speculative in nature and, as a matter of policy, avoid investment in such stocks. Marketability of lower–priced shares can also be adversely affected by the reluctance of many leading brokerage firms to recommend these stocks to their clients. The proposed reverse stock split is intended to result in a price level for the Common Stock that will maintain and enhance investor interest.

- Theoretically, the overall value of the Company will not change as a result of the reverse stock split so that reducing the number of shares outstanding by a factor of two and one–half would increase the per share price by a value of two and one–half. There is no mathematical certainty as to the increase in the price per share that might be expected as a result of the reverse stock split, and there can be no assurance that the per share price will increase proportionately to the reverse stock split. If the per share price increases by a factor less than the one–for–two and one–half reverse stock split, then the overall market capitalization of the Company (its total market value) will be reduced.

- The reverse stock split will reduce our outstanding Common Stock to approximately 67,198,852 shares. This reduced number of shares could result in decreased liquidity in the trading market and potential mismatches between supply and demand in the market for the common stock at any given time, which could result in changes in the trading price unrelated to the activities or prospects of the Company.

- The reverse stock split may leave certain stockholders with one or more "odd lots" of the Company's Common Stock, i.e., stock in amounts of less than 100 shares. These shares may be more difficult to sell, or require a greater commission per share to sell, than shares in even multiples of 100.

Assuming the proposed amendment to the Certificate effecting the reverse stock split is approved, a Certificate of Amendment (substantially in the form of *Appendix B* hereto) amending the Restated Certificate is expected to be filed with the Secretary of State of the State of Delaware. The amendment and the proposed reverse stock split would become effective upon the date of filing (the "effective date"). The Company expects to file the Certificate of Amendment as promptly as possible after approval at the meeting.

The Board of Directors, in its discretion, maintains the authority not to proceed with the reverse stock split in the event that it determines that the reverse stock split is not in the best interest of the Company's stockholders.

### Exchange of Stock Certificates

As soon as possible after approval is obtained, holders of Common Stock will be notified and requested to surrender their present Common Stock certificates for new certificates representing the number of whole shares of Common Stock after the reverse stock split.

The Company expects that its transfer agent will act as the exchange agent for the reverse stock split. As soon as practicable after the effective date, the Company would notify its stockholders that the reverse stock split has been implemented. Each stockholder will receive a letter of transmittal requesting stockholders to exchange their stock certificates for stock certificates reflecting the appropriately adjusted number of shares. For shares held in brokerage accounts or "street" name, stockholders will not need to take any further actions to exchange their certificates. The Company will not issue new certificates until stockholders have first surrendered their outstanding certificate(s) together with the properly completed and executed transmittal letter to the exchange agent. Until surrender, each certificate representing shares before the reverse stock split will continue to be valid and would represent the adjusted number of shares based on the 2.5–for–1 exchange ratio of the reverse stock split. Stockholders should not destroy any stock certificate and should not submit any certificates until you receive a letter of transmittal.

Table of Contents

**Fractional Share Procedures**

No fractional shares, or certificates representing such fractional interests, will be issued as a result of the reverse stock split. With respect to any stockholder holding a number of shares of Common Stock (immediately prior to the reverse stock split) not evenly divisible by 2.5, the fractional interests otherwise issuable to such stockholder in the reverse stock split ("fractional interests") will be covered by an arrangement to be implemented by the Company in accordance with Section 155 of the General Corporation Law of the State of Delaware ("DGCL") (such arrangement being referred to herein as the "Fractional Share Procedures"). (DGCL Section 155 specifies alternative procedures that may be used by a corporation that elects not to issue fractional shares.)

Under the Fractional Share Procedures, as more fully described below, stockholders holding fractional interests will be given the option, in the letter of transmittal to be delivered to each stockholder relating to the exchange of stock certificates described above under "— Exchange of Stock Certificates," to either round their holdings of Common Stock up to the nearest whole number of shares or receive cash for their fractional interests.

In order to implement these Fractional Share Procedures, the Company will deposit with the exchange agent that number of shares of Common Stock as is equal to the aggregate number of fractional interests of stockholders electing to receive cash, rounded upwards to the next whole number. The exchange agent will use its commercially reasonable efforts to sell such shares in brokers' transactions at the highest prevailing market prices it is able to obtain. The exchange agent will remit to each holder electing to receive cash for its fractional interests, upon receipt by the exchange agent of the transmittal documents, its pro rata share in cash of the aggregate proceeds received for the sale of the bundled fractional interests, based on such holder's fractional interest compared to the fractional interests of all holders electing to receive cash, net of commissions.

The Company will not make any payment to holders in respect of fractional interests. The Company will not determine or influence the bid or sale price for such shares. The Company will pay the exchange agent a flat fee to cover the costs of the Fractional Share Procedures. No action will be required by any stockholder with respect to any of the foregoing procedures.

No assurance can be given that there will be a market for such bundled shares; that the exchange agent will be successful in marketing and selling such shares on behalf of the holders thereof; or that the consideration, if any, received by such holder in exchange for its fractional interest, will be equal to the corresponding percentage of a share of Common Stock represented by such fractional interest at prevailing market prices.

**Changes in Stockholders' Equity**

The Company's stated capital, which consists of the par value per share of Common Stock, multiplied by the number of shares of Common Stock issued, will be reduced by approximately $268,795 to approximately $1,411,176. Consequently, the Company's additional paid-in capital, which consists of the difference between stated capital and the aggregate amount paid to the Company upon our issuance of all currently outstanding Common Stock, will be increased by approximately $268,795 to $1,123,368,795.

**Federal Income Tax Consequences**

The following is a general discussion of certain federal income tax consequences of the proposed reverse stock split of the Common Stock, and is not intended to be applicable to all categories of investors, some of which, such as dealers in securities, banks, insurance companies, tax-exempt organizations and foreign persons, may be subject to special rules. The discussion is based on current provisions of the Internal Revenue Code of 1986, as amended (the "Code"), and administrative and judicial interpretations as of the date hereof, all of which are subject to change. Holders of Common Stock are advised to consult their own tax advisors regarding the federal, state, local and foreign tax consequences of the proposed reverse stock split.

Table of Contents

The proposed reverse stock split is intended to be a tax–free recapitalization for the Company and its stockholders. The new shares of Common Stock in the hands of a stockholder will have an aggregate basis for computing gains or loss equal to the aggregate basis of shares of Common Stock held by that stockholder immediately prior to the proposed reverse stock split.

A stockholder's holding period for the new shares of Common Stock will be the same as the holding period for the shares of Common Stock exchanged therefor.

With respect to fractional interests sold pursuant to the Fractional Share Procedures, a holder will recognize gain or loss equal to the difference, if any, between the holder's basis allocated to the fractional interest sold and the amount of cash received therefor. The gain or loss will be a capital gain or loss if the holder held Common Stock as a capital asset at the effective time.

**Management recommends a vote FOR the approval of an amendment to the Company's restated certificate of incorporation to effect a one–for–two and one–half reverse stock split.**

## CHANGES IN CERTIFYING ACCOUNTANT

On April 10, 2001, the Company notified Arthur Andersen LLP that it was changing its independent accountants to PricewaterhouseCoopers LLP for the fiscal year ending December 31, 2001. The Audit Committee of the Board of Directors and the Board of Directors of the Company approved the decision to replace Arthur Andersen LLP. The Company's Annual Report on Form 10–K for the fiscal year ended December 31, 2000 was filed on April 2, 2001. It included financial statements covering each of the past two fiscal years ended December 31, 2000 and December 25, 1999, accompanied by the report of Arthur Andersen LLP. Such report did not include any adverse opinion or disclaimer of opinion, or any qualification as to audit scope or accounting principles.

During the fiscal years ended December 31, 2000 and December 25, 1999 and through the date of this proxy statement, there were no disagreements with Arthur Andersen LLP on any matter of accounting principles or practices, financial statement disclosure or audit scope. During this period, there were also no disagreements which, if not resolved to the satisfaction of Arthur Andersen LLP, would have caused them to make reference to the subject matter of such disagreement in their reports on the financial statements for such years.

During the fiscal years ended December 31, 2000 and December 25, 1999, PricewaterhouseCoopers LLP has not been engaged as an independent accountant to audit either the financial statements of the Company or any of its subsidiaries, nor has it been consulted regarding the application of the Company's accounting principles to a specified transaction, either completed or proposed, or the type of audit opinion that might be rendered on the Company's financial statements.

As a result of its 1999 audit, Arthur Andersen LLP reported material weaknesses in the Company's internal control systems. The identified conditions specifically related to four of the Company's foreign locations, most of which were recently acquired. These weaknesses were primarily attributable to the effects of implementing a new computer system as part of the Company's acquisition integration strategy and Year 2000 compliance efforts. Issues at these locations primarily related to the detail records supporting the general ledger and staff training needs. As a result, in 2000, the Company committed significant resources to addressing the issues, including the re–implementation of certain systems, implementing an internal audit function and replacing controllers at three of the four locations. The Company made significant progress in addressing these issues; however Arthur Andersen LLP continued to report material weaknesses following its 2000 audit because two of these four foreign locations were assessed as continuing to have similar material weaknesses as in 1999. Improvement efforts at these locations were hampered by personnel turnover and continuing acquisition integration efforts.

Arthur Andersen did not modify its report on the Company's 1999 and 2000 audited financial statements as a consequence of these material weaknesses.

37

Table of Contents

The Company is continuing its efforts to address these matters and believes that it has corrected all these matters during 2001.

## STOCKHOLDER PROPOSALS

Any stockholder who wishes to submit a proposal for action to be included in the proxy materials for the Company's Year 2003 Annual Meeting must submit such proposal so that it is received by the Secretary of the Company not later than December 21, 2002. Proposals must be in writing and sent via registered, certified or express mail. Facsimile or other forms of electronic submissions will not be accepted.

The federal proxy rules specify what constitutes timely submission for a stockholder proposal to be included in the Proxy Statement, as discussed above under "Stockholder Proposals." If a stockholder desires to bring business before an annual meeting which is not the subject of a proposal timely submitted for inclusion in the Proxy Statement, the stockholder must follow procedures outlined in the Company's bylaws. A copy of these bylaw procedures is available upon request from the Secretary of the Company, 250 Stephenson Highway, Troy, Michigan 48083. One of the procedural requirements in the bylaws is timely notice in writing of the business the stockholder proposes to bring before the annual meeting. Notice must be received not less than 90 days nor more than 120 days prior to the anniversary date of the immediately preceding annual meeting of stockholders (which is between January 15, 2003 and February 14, 2003 for the purposes of the 2003 Annual Meeting); provided, however, that if the annual meeting is called for a date that is not within 30 days before or after such anniversary date, notice by the stockholder in order to be timely must be so received not later than the close of business on the tenth day following the day on which notice of the date of the annual meeting was mailed or public disclosure was made, whichever occurs first. It should be noted that those bylaw procedures govern proper submission of business to be put before an annual meeting and do not preclude discussion by any stockholder of any business properly brought before an annual meeting.

For a description of the requirements for recommending director candidates for consideration to the Nominating Committee, see "Meetings and Committees of the Board of Directors — Committees of the Board." If a stockholder wants to nominate a person for election to the Board of Directors other than a director nominated by the Nominating Committee, notice of the proposed nomination must be delivered to or mailed and received by the Secretary of the Company at the address set forth in the previous paragraph by the time periods set forth in the previous paragraph in the case of an annual meeting and, in the case of a special meeting called for the purpose of electing directors, by the close of business on the tenth day following the day on which public disclosure of the date of the special meeting was made. The bylaw provision contains other requirements for notice and a copy thereof is available upon request from the Secretary of the Company.

## ANNUAL REPORT

The Company's Annual Report on Form 10–K for the fiscal year ended December 31, 2001, including financial statements and financial statement schedules, is being sent to the stockholders of the Company as a part of the 2001 Annual Report to Stockholders.

The Annual Report on Form 10–K (and any of the financial statements contained therein) is not to be considered filed as part of this Proxy Statement or deemed soliciting material.

38

Table of Contents

## OTHER MATTERS

As of the date of mailing this Proxy Statement, the Company has received no notice of any other matters to be brought by a stockholder before the Meeting. Accordingly, no other matters may be brought before the Meeting, unless the Company in its sole discretion waives the advance notice bylaw provision discussed above or unless the matter is incident to the conduct of the Meeting. If the Company in its sole discretion waives the advance notice bylaw provision or there is a matter incident to the conduct of the Meeting and consequently a matter not described in this Proxy Statement properly comes before the Meeting, the persons named in the accompanying proxy will vote the proxy in accordance with their best judgment unless a stockholder, by striking out the appropriate provision of the proxy, chooses to withhold authority to vote on such matters.

By Order of the Board of Directors,

Ronald T. Lindsay
*Secretary*

PLEASE MARK, SIGN AND DATE THE ENCLOSED PROXY CARD AND MAIL IT PROMPTLY. NO POSTAGE STAMP IS NECESSARY IF MAILED IN THE UNITED STATES.

39

Table of Contents

APPENDIX A

COLLINS & AIKMAN CORPORATION

2002 EMPLOYEE STOCK OPTION PLAN

As Adopted March 28, 2002

Table of Contents

## COLLINS & AIKMAN CORPORATION

## 2002 EMPLOYEE STOCK OPTION PLAN

### (Adopted March 28, 2002)

### I.  Purposes of the Plan

The purposes of this 2002 Employee Stock Option Plan (the "Plan") are to enable Collins & Aikman Corporation (formerly Collins & Aikman Holdings Corporation) (the "Company") and Related Persons (as defined herein) to attract, retain and motivate the employees, consultants and non-employee directors who are important to the success and growth of the business of the Company and Related Persons and to create a long-term mutuality of interest between the Key Employees and Executive Consultants (as defined herein) and the stockholders of the Company by granting the Key Employees and Executive Consultants options to purchase Common Stock (as defined herein). This document shall supersede all other material describing this Plan, including, but not limited to, prior drafts hereof and any documents incorporating the terms and provisions of any such prior drafts.

### II.  Definitions

In addition to the terms defined elsewhere herein, for purposes of this Plan, the following terms will have the following meanings when used herein with initial capital letters:

A. "Act" means the Securities Exchange Act of 1934, as amended, and all rules and regulations promulgated thereunder.

B. "Board" means the Board of Directors of the Company.

C. "Cause" means that the Committee shall have determined that any of the following events has occurred: (1) an act of fraud, embezzlement, misappropriation of business or theft committed by a Participant in the course of his or her employment or consultancy or any intentional or gross negligent misconduct of a Participant which injures the business or reputation of the Company or Related Persons; (2) intentional or gross negligent damage committed by a Participant to the property of the Company or Related Persons; (3) a Participant's willful failure or refusal to perform the customary duties and responsibilities of his or her position or consultancy with the Company or Related Persons; (4) a Participant's breach of fiduciary duty, or the making of a false representation, to the Company or Related Persons; (5) a Participant's material breach of any covenant, condition or obligation required to be performed by him or her pursuant to this Plan, the Option Agreement or any other agreement between him or her and the Company or Related Persons or a Participant's intentional or gross negligent violation of any material written policy of the Company or Related Persons; (6) a Key Employee's willful failure or refusal to act in accordance with any specific lawful instructions of a majority of the Board of Directors of the Company; or (7) commission by a Participant of a felony or a crime involving moral turpitude. Cause shall be deemed to exist as of the date any of the above events occur even if the Committee's determination is later and whether or not such determination is made before or after Termination of Employment or Termination of Consultancy.

D. "Code" means the Internal Revenue Code of 1986, as amended (or any successor statute).

E. "Committee" means such committee, if any, appointed by the Board to administer the Plan, consisting of two or more directors as may be appointed from time to time by the Board. If the Board does not appoint a committee for this purpose, "Committee" means the Board.

F. "Common Stock" means the common stock of the Company, par value $.01 per share, any Common Stock into which the Common Stock may be converted and any Common Stock resulting from any reclassification of the Common Stock.

G. "Company" means Collins & Aikman Corporation, a Delaware corporation.

H. "Competitive Activity" means (a) being employed by, consulting to or being a director of any business, or engaging directly or indirectly in any business activity, that is competitive with any material business of any of the Company, a Related Person or of the division that the Participant is or was employed by

A–1

Table of Contents

or (b) soliciting for employment or consulting, employing or retaining, or assisting another Person to employ or retain, directly or indirectly, any employees of the Company or Related Persons or any Person who was an employee of the Company or Related Persons in the prior six months, provided, however, that employing or retaining, or assisting another Person to employ or retain, any Person whose employment or consultancy with the Company or a Related Person has been terminated without Cause by the Company or any Person that is non–exempt under the Federal Fair Labor Standards Act, 29 USC § 213(a)(1), shall not be considered Competitive Activity.

I. "Disability" means a permanent and total disability, as determined by the Committee in its sole discretion. A Disability shall only be deemed to occur at the time of the determination by the Committee of the Disability.

J. "Executive Consultants" shall mean executive–level consultants of the Company or Related Persons, as determined by the Committee, and non–employee members of the Board.

K. "Fair Market Value" shall mean, for purposes of this Plan, unless otherwise required by any applicable provision of the Code or any regulations issued thereunder, as of any date, the last sales prices reported for the Common Stock on the applicable date, (i) as reported by the principal national securities exchange in the United States on which it is then traded, or (ii) if not traded on any such national securities exchange, as quoted on an automated quotation system sponsored by the National Association of Securities Dealers, or if the sale of the Common Stock shall not have been reported or quoted on such date, on the first day prior thereto on which the Common Stock was reported or quoted. If the Common Stock is not readily tradable on a national securities exchange or any system sponsored by the National Association of Securities Dealers, its Fair Market Value shall be set by the Committee based upon its assessment of the cash price that would be paid between a fully informed buyer and seller under no compulsion to buy or sell (without giving effect to any discount for a minority interest or any restrictions on transferability or any lack of liquidity of the stock).

L. "Incentive Stock Option" shall mean any Option awarded under this Plan intended to be and designated as an "Incentive Stock Option" within the meaning of Section 422 of the Code.

M. "Incumbent Board" means the individuals who, as of the Effective Date, constitute the Board; provided, however, that any individual who becomes a member of the Board subsequent to the Effective Date whose election, or nomination for election by the Company's shareholders, was approved by a vote of at least a majority of the directors then comprising the Incumbent Board shall be considered as though such individual were a member of the Incumbent Board.

N. "Key Employee" means any person who is an executive officer or other valuable employee of the Company or a Related Person, as determined by the Committee. A Key Employee may, but need not, be an officer or director of the Company or a Related Person.

O. "Non–Qualified Stock Option" shall mean any Option awarded under this Plan that is not an Incentive Stock Option.

P. "Option" means the right to purchase one Share at a prescribed purchase price on the terms specified in the Plan.

Q. "Participant" means a Key Employee or Executive Consultant who is granted Options under the Plan which Options have not expired; provided, however, that any Executive Consultant shall be a Participant for purposes of the Plan solely with respect to grants of Non–Qualified Stock Options and shall be ineligible for Incentive Stock Options.

R. "Person" means any individual or entity, and the heirs, executors, administrators, legal representatives, successors and assigns of such Person as the context may require.

S. "Related Person or Related Persons" means (a) any corporation that is defined as a subsidiary corporation in Section 424(f) of the Code or (b) any corporation that is defined as a parent corporation in

Table of Contents

Section 424(e) of the Code. An entity shall be deemed a Related Person only for such periods as the requisite ownership relationship is maintained.

T. "Securities Act" means the Securities Act of 1933, as amended, and all rules and regulations promulgated thereunder.

U. "Share" means a share of Common Stock.

V. "Ten Percent Shareholder" shall mean a person owning Common Stock of the Company possessing more than ten percent (10%) of the total combined voting power of all classes of stock of the Company as defined in Section 422 of the Code.

W. "Termination of Consultancy" with respect to an individual means that individual is no longer acting as an Executive Consultant to the Company or a Related Person. In the event an entity shall cease to be a Related Person, there shall be deemed a Termination of Consultancy of any individual who is not otherwise an Executive Consultant of the Company or another Related person at the time the entity ceases to be a Related Person.

X. "Termination of Employment" with respect to an individual means that individual is no longer actively employed by the Company or a Related Person on a full–time basis, irrespective of whether or not such employee is receiving salary continuance pay, is continuing to participate in other employee benefit programs or is otherwise receiving severance type payments. In the event an entity shall cease to be a Related Person, there shall be deemed a Termination of Employment of any individual who is not otherwise an employee of the Company or another Person at the time the entity ceases to be a Related Person. A Termination of Employment shall not include a leave of absence approved for purposes of the Plan by the Committee.

Y. "Termination of Relationship" means a Termination of Consultancy or a Termination of Employment where the individual is no longer a consultant to, or employee of, the Company.

## III. Effective Date

The Plan became effective on March 28, 2002 (the "Effective Date"), subject to approval by the shareholders of the Company at its next annual general meeting of shareholders.

## IV. Administration

A. *Duties of the Committee.* The Plan shall be administered by the Committee. The Committee shall have full authority to interpret the Plan and to decide any questions and settle all controversies and disputes that may arise in connection with the Plan; to establish, amend and rescind rules for carrying out the Plan; to administer the Plan, subject to its provisions; to select Participants in, and grant Options under, the Plan; to determine the terms, exercise price and form of exercise payment for each Option granted under the Plan; to determine the consideration to be received by the Company in exchange for the grant of the Options; to determine whether and to what extent Incentive Stock Options and Non–Qualified Stock Options, or any combination thereof, are to be granted hereunder to one or more Key Employees and to determine whether and to what extent Non–Qualified Stock Options are to be granted hereunder to one or more Executive Consultants; to prescribe the form or forms of instruments evidencing Options and any other instruments required under the Plan (which need not be uniform) and to change such forms from time to time; and to make all other determinations and to take all such steps in connection with the Plan and the Options as the Committee, in its sole discretion, deems necessary or desirable. The Committee shall not be bound to any standards of uniformity or similarity of action, interpretation or conduct in the discharge of its duties hereunder, regardless of the apparent similarity of the matters coming before it. Any determination, action or conclusion of the Committee shall be final, conclusive and binding on all parties.

B. *Advisors.* The Committee may employ such legal counsel, consultants and agents as it may deem desirable for the administration of the Plan, and may rely upon any advice or opinion received from any such

Table of Contents

counsel or consultant and any computation received from any such consultant or agent. Expenses incurred by the Committee in the engagement of such counsel, consultant or agent shall be paid by the Company.

C. *Indemnification.* To the maximum extent permitted by applicable law, no officer of the Company or member or former member of the Committee or of the Board shall be liable for any action or determination made in good faith with respect to the Plan or any Option granted under it. To the maximum extent permitted by applicable law, the Certificate of Incorporation and By–Laws of the Company, each such officer and member or former member of the Committee or of the Board shall be indemnified and held harmless by the Company against any cost or expense (including reasonable fees of counsel reasonably acceptable to the Company) or liability (including any sum paid in settlement of a claim with the approval of the Company), and advanced amounts necessary to pay the foregoing at the earliest time and to the fullest extent permitted, arising out of any act or omission to act in connection with the Plan, except to the extent arising out of such officer's, member's or former member's own fraud or bad faith. Such indemnification shall be in addition to any rights of indemnification the officers, members or former members may have as directors under applicable law or under the Certificate of Incorporation or By–Laws of the Company or Related Persons.

D. *Meetings of the Committee.* The Committee shall adopt such rules and regulations as it shall deem appropriate concerning the holding of its meetings and the transaction of its business. Any member of the Committee may be removed from the Committee at any time either with or without cause by resolution adopted by the Board and any vacancy on the Committee may at any time be filled by resolution adopted by the Board. All determinations by the Committee shall be made by the affirmative vote of a majority of its members. Any such determination may be made at a meeting duly called and held at which a majority of the members of the Committee are in attendance in person or through telephonic communication. Any determination set forth in writing and signed by all the members of the Committee shall be as fully effective as if it had been made by a majority vote of the members at a meeting duly called and held.

E. *Determinations.* Each determination, interpretation or other action made or taken pursuant to the provisions of this Plan by the Committee shall be final, conclusive and binding for all purposes and upon all persons, including, without limitation, the Participants, the Company and Related Persons, directors, officers and other employees of the Company and Related Persons, and the respective heirs, executors, administrators, personal representatives and other successors in interest of each of the foregoing.

## V. Shares; Adjustment Upon Certain Events

A. *Shares to be Delivered; Fractional Shares.* Shares to be issued under the Plan shall be made available, at the sole discretion of the Committee, either from authorized but unissued Shares or from Shares reacquired by the Company and held in treasury. No fractional Shares will be issued or transferred upon the exercise of any Option. In lieu thereof, the Company shall pay a cash adjustment equal to the same fraction of the Fair Market Value of one Share on the date of exercise.

B. *Number of Shares.* Subject to adjustment as provided in this Article V, the maximum aggregate number of Shares that may be issued under the Plan shall be 16,500,000. If Options granted under this Plan are for any reason canceled, or expire or terminate unexercised, the Shares covered by such Options shall again be available for the grant of Options, subject to the foregoing limit.

C. *Adjustments; Recapitalization, etc.* The existence of the Plan and the Options granted hereunder shall not affect in any way the right or power of the Board or the stockholders of the Company to make or authorize any adjustment, recapitalization, reorganization or other change in the Company's capital structure or its business, any merger or consolidation of the Company, any issue of bonds, debentures, preferred or prior preference stocks ahead of or affecting Common Stock, the dissolution or liquidation of the Company or Related Persons, any sale or transfer of all or part of its assets or business or any other corporate act or proceeding. The Committee may make or provide for such adjustments in the maximum number of Shares specified in Article V(B) and VI(A), in the number of Shares covered by outstanding Options granted hereunder, and/or in the Purchase Price (as hereinafter defined) applicable to such Options or such other adjustments in the number and kind of securities or other property received upon the exercise of Options, as the Committee in its sole discretion may determine is equitably required to prevent dilution or enlargement of

A–4

Table of Contents

the rights of Participants or to otherwise recognize the effect that otherwise would result from any stock dividend, stock split, combination of shares, recapitalization or other change in the capital structure of the Company, merger, consolidation, spin-off, reorganization, partial or complete liquidation, issuance of options or warrants to purchase securities or any other corporate transaction or event having an effect similar to any of the foregoing. In the event of a merger or consolidation in which Company is not the surviving entity or in the event of any transaction that results in the acquisition of substantially all of Company's outstanding Common Stock by a single person or entity or by a group of persons and/or entities acting in concert, or in the event of the sale or transfer of all of the Company's assets (the foregoing being referred to as "Acquisition Events), then the Committee may in its sole discretion terminate all outstanding Options effective as of the consummation of the Acquisition Event by delivering notice of termination to each Participant at least 20 days prior to the date of consummation of the Acquisition Event; provided that, during the period from the date on which such notice of termination is delivered to the consummation of the Acquisition Event, each Participant shall have the right to exercise in full all the Options that are then outstanding (without regard to limitations on exercise otherwise contained in the Options) but contingent on occurrence of the Acquisition Event, and, provided that, if the Acquisition Event does not take place within a specified period after giving such notice for any reason whatsoever, the notice and exercise shall be null and void. Except as hereinbefore expressly provided, the issuance by the Company of shares of stock of any class, or securities convertible into shares of stock of any class, for cash, property, labor or services, upon direct sale, upon the exercise of rights or warrants to subscribe therefor or upon conversion of shares or other securities, and in any case whether or not for fair value, shall not affect, and no adjustment by reason thereof shall be made with respect to, the number and class of shares and/or other securities or property subject to Options theretofore granted or the Purchase price (as hereinafter defined).

## VI.  Awards and Terms of Options

A. *Grant.* The Committee may grant Non-Qualified Stock Options or Incentive Stock Options, or any combination thereof to Key Employees and may grant Non-Qualified Stock Options to Executive Consultants, provided, that the maximum number of Shares with respect to which Options may be granted to any Key Employee or Executive Consultant during any calendar year may not exceed 5,000,000. To the extent that the maximum number of authorized Shares with respect to which Options may be granted are not granted in a particular calendar year to a Participant (beginning with the year in which the Participant receives his or her first grant of Options hereunder), such ungranted Options for any year shall increase the maximum number of Shares with respect to which Options may be granted to such Participant in subsequent calendar years during the term of the Plan until used. Any Incentive Stock Option shall be granted within ten years of the date the Plan is adopted by the Board or approved by shareholders, whichever is earlier. To the extent that any Option does not qualify as an Incentive Stock Option (whether because of its provisions or the time or manner of its exercise or otherwise), such Option, or the portion thereof which does not qualify, shall constitute a separate Non-Qualified Stock Option. Each Option shall be evidenced by an Option agreement (the "Option Agreement") in such form as the Committee shall approve from time to time.

B. *Exercise Price.* The purchase price per Share (the "Purchase Price") deliverable upon the exercise of a Non-Qualified Stock Option shall be determined by the Committee and set forth in a Participant's Option Agreement. The Purchase Price deliverable upon the exercise of an Incentive Stock Option shall be determined by the Committee and set forth in a Participant's Option Agreement but shall be not less than 100% of the Fair Market Value of a Share at the time of grant; provided, however, if an Incentive Stock Option is granted to a Ten Percent Shareholder, the Purchase Price shall be no less than 110% of the Fair Market Value of a Share.

C. *Number of Shares.* The Option Agreement shall specify the number of Options granted to the Participant, as determined by the Committee in its sole discretion.

D. *Exercisability.* At the time of grant, the Committee shall specify when and on what terms the Options granted shall be exercisable. In the case of Options not immediately exercisable in full, the Committee may at any time accelerate the time at which all or any part of the Options may be exercised and may waive any other conditions to exercise. No Option shall be exercisable after the expiration of ten years

Table of Contents

from the date of grant; provided, however, the term of an Incentive Stock Option granted to a Ten Percent Shareholder may not exceed five years. Each Option shall be subject to earlier termination as provided in Article VII below.

E. *Acceleration of Exercisability*. Unless otherwise provided in the Participant's Option Agreement, all options granted and not previously exercisable shall become fully exercisable immediately upon a Change of Control (as defined herein). For this purpose, a "Change of Control" shall be deemed to have occurred upon:

(a) an acquisition by any individual, entity or group (within the meaning of Section 13d–3 or 14d–1 of the Act) of beneficial ownership (within the meaning of Rule 13d–3 promulgated under the Act) of more than 50% of the combined voting power of the then outstanding voting securities of the Company entitled to vote generally in the election of directors, including, but not limited to, by merger, consolidation or similar corporate transaction or by purchase; excluding, however, the following: (x) any acquisition by the Company, Related Persons, Heartland Industrial Partners, L.P., any group of which Heartland Industrial Partners, L.P. is a member, or an affiliate of any of the foregoing, or (y) any acquisition by an employee benefit plan (or related trust) sponsored or maintained by the Company or Related Persons; or

(b) the approval of the stockholders of the Company of (i) a complete liquidation or dissolution of the Company or (ii) the sale or other disposition of more than 80% of the gross assets of the Company and Related Persons on a consolidated basis (determined under generally accepted accounting principles as determined in good faith by the Committee); excluding, however, such sale or other disposition to a corporation with respect to which, following such sale or other disposition, (x) more than 50% of the combined voting power of the then outstanding voting securities of such corporation entitled to vote generally in the election of directors will be then beneficially owned, directly or indirectly, by the individuals and entities who were the beneficial owners of the outstanding Shares immediately prior to such sale or other disposition, (y) no Person (other than the Company, Related Persons, and any employee benefit plan (or related trust) of the Company or Related Persons or such corporation and any Person beneficially owning, immediately prior to such sale or other disposition, directly or indirectly, 50% or more of the outstanding Shares) will beneficially own, directly or indirectly, 50% or more of the combined voting power of the then outstanding voting securities of such corporation entitled to vote generally in the election of directors and (z) individuals who were members of the Incumbent Board will constitute at least a majority of the members of the board of directors of such corporation.

F. Exercise of Options

1. A Participant may elect to exercise one or more Options by giving written notice to the Committee of such election and of the number of Options such Participant has elected to exercise, accompanied by payment in full of the aggregate Purchase Price for the number of Shares for which the Options are being exercised; provided, however, that, in the case of a notice of exercise delivered to the Committee by facsimile, such payment may be made by delivery of payment to the Committee on the business day next following the date on which such notice of exercise is delivered (such delivery being deemed to have been duly made if the Participant giving such facsimile notice shall have dispatched such payment by a nationally recognized overnight courier service guaranteeing delivery on such next business day, provided such payment is actually received by the Company).

2. Shares purchased pursuant to the exercise of Options shall be paid for as follows:

(a) in cash or by check, bank draft or money order payable to the order of the Company;

(b) if the Shares are traded on a national securities exchange, through the delivery of irrevocable instructions to a broker to deliver promptly to the Company an amount equal to the aggregate Purchase Price; or

(c) on such other terms and conditions as may be acceptable to the Committee (which may include payment in full or in part by the transfer of Shares which have been owned by the Participant

A–6

Table of Contents

for at least 6 months or the surrender of Options owned by Participant) and in accordance with applicable law.

3. Upon receipt of payment, the Company shall deliver to the Participant as soon as practicable a certificate or certificates for the Shares then purchased.

G. *Non–Competition and Other Provisions.* In consideration of the grant of Options, by accepting the grant of Options the Participant agrees during employment and, in the event any Options vest, for a period ending one year following the date of the Participant's Termination of Employment, not to engage in any Competitive Activity, except to the extent consented to by the Committee in writing. Each Participant by accepting a grant of Options hereunder acknowledges that the Company or a Related Person will suffer irreparable harm in the event such Participant engages in any Competitive Activity during this period, and agrees that in addition to its remedies at law, the Company and a Related Person shall be entitled to injunctive relief as a consequence of a violation or threatened violation of this covenant. Notwithstanding the foregoing, nothing in this Plan shall prohibit or penalize ownership by a Participant of the shares of a business that is registered under Section 12 of the Act and constitutes, together with all such shares owned by any immediate family member or affiliate of, or person acting in concert with, such Participant, less than 2% of the outstanding registered shares of such business. The Committee will have the discretion to impose in a Participant's Option Agreement such other conditions, limitations and restrictions as it determines are appropriate in its sole discretion, including any waivers of rights which a Participant may have.

H. *Incentive Stock Option Limitations.* To the extent that the aggregate Fair Market Value (determined as of the time of grant) of the Common Stock with respect to which Incentive Stock Options are exercisable for the first time by the Participant during any calendar year under the Plan and/or any other stock option plan of the Company or any subsidiary or parent corporation (within the meaning of Section 424 of the Code) exceeds $100,000, such Options shall be treated as Options which are not Incentive Stock Options.

To the extent permitted under Section 422 of the Code, or the applicable regulations thereunder or any applicable Internal Revenue Service pronouncement, if (i) a Participant's employment with the Company or Related Person is terminated by reason of death, Disability, retirement or termination without Cause, and (ii) the portion of any Incentive Stock Option that would be exercisable during the post–termination period, specified under Article VII but for the $100,000 limitation currently contained in Section 422(d) of the Code, is greater than the portion of such Stock Option that is immediately exercisable as an "incentive stock option" during such post–termination period under Section 422, such excess shall be treated as a Non–Qualified Stock Option. If the exercise of an Incentive Stock Option is accelerated for any reason, any portion of such Option that is not exercisable as an Incentive Stock Option by reason of the $100,000 limitation contained in Section 422(d) of the Code shall be treated as a Non–Qualified Stock Option.

I. *Modification or Exchange of Options.* Within the limitations of the Plan and subject to Section X.B hereof, the Committee may modify, extend or assume outstanding options or may accept the cancellation of outstanding options (whether granted by the Company under this Plan or another plan or by another issuer) in return for the grant of new Options for the same or a different number of Shares and at the same or a different Purchase Price.

## VII.  Effect of Termination of Relationship

A. *Death, Disability, Retirement, etc.* Except as otherwise provided in the Participant's Option Agreement, upon Termination of Relationship, all outstanding Options then exercisable and not exercised by the Participant prior to such Termination of Relationship (and any Options not previously exercisable but made exercisable by the Committee at or after the Termination of Relationship) shall remain exercisable by the Participant to the extent not exercised for the following time periods, or, if earlier, the prior expiration of the Option in accordance with the terms of the Plan and grant:

1. In the event of the Participant's death or Disability, such Options shall remain exercisable by the Participant (or by the Participant's estate or by the person given authority to exercise such Options by the Participant's will or by operation of law) for a period of one year from the date of the Participant's death

A–7

Table of Contents

or Disability, provided that the Committee, in its sole discretion, may at any time extend such time period.

2. In the event the Participant retires from employment at or after age 65 (or, with the consent of the Committee or under an early retirement policy of the Company or a Related Person, before age 65), or if the Participant's employment is terminated by the Company or a Related Person without Cause, such Options shall remain exercisable for 90 days from the date of the Participant's Termination of Employment, provided that the Committee, in its sole discretion, may at any time extend such time period.

B. *Cause.* Except as other provided in the Participant's Option Agreement, upon the Termination of Relationship of a Participant for Cause, or if the Company or a Related Person obtains or discovers information after Termination of Relationship that such Participant had engaged in conduct that would have justified a Termination of Relationship for Cause during employment or consultancy, all outstanding Options of such Participant shall immediately be canceled.

C. *Other Termination.* Except as other provided in the Participant's Option Agreement, in the event of Termination of Relationship for any reason other than as provided in Article VII(A) or VII(B), all outstanding Options not exercised by the Participant prior to such Termination of Relationship shall remain exercisable (to the extent exercisable by such Participant immediately before such termination) for a period of 30 days after such termination, provided that the Committee, in its sole discretion, may at any time extend such time period.

D. *Cancellation of Options.* Except as otherwise provided in Article VI(E) or as otherwise provided in the Participant's Option Agreement, no Options that were not exercisable during the period of employment or consultancy shall thereafter become exercisable upon a Termination of Relationship for any reason or no reason whatsoever, and such Options shall terminate and become null and void upon a Termination of Relationship, unless the Committee determines in its sole discretion that such Options shall be exercisable.

## VIII.    Transferability of Options

Except as provided in this Article VIII, each Option granted hereunder shall by its terms not be assignable or transferable other than by will or the laws of descent and distribution and may be exercised, during the Participant's lifetime, only by the Participant. A Non-Qualified Stock Option may be transferred to any family member (as hereinafter defined) of the Participant for or without consideration. For purposes of this Article VIII, "family member" shall mean any child, stepchild, grandchild, parent, stepparent, grandparent, spouse, former spouse, sibling, niece, nephew, mother-in-law, father-in-law, son-in-law, daughter-in-law, brother-in-law, or sister-in-law, including adoptive relationships, any person sharing the Participant's household (other than a tenant or employee), a trust in which these persons have more than fifty percent of the beneficial interest, a foundation in which these persons (or the Participant) control the management of assets, and any other entity in which these persons (or the Participant) own more than fifty percent of the voting interests.

## IX.    Rights as a Stockholder

A Participant (or a permitted transferee of an Option) shall have no rights as a stockholder with respect to any Shares covered by such Participant's Option until such Participant (or permitted transferee) shall have become the holder of record of such Shares, and no adjustments shall be made for dividends in cash or other property or distributions or other rights in respect to any such Shares, except as otherwise specifically provided in this Plan.

## X.    Termination, Amendment and Modification

A. *General Amendments.* The Committee may at any time, and from time to time, amend, in whole or in part, any or all of the provisions of the Plan (including any amendment deemed necessary to ensure that the Company may comply with any regulatory requirement referred to in Article XII), or suspend or terminate it,

Table of Contents

in whole or in part, retroactively or otherwise; provided, however, that, unless otherwise required by law, the rights of a Participant with respect to Options granted prior to such amendment, suspension or termination, may not be materially impaired without the consent of such Participant and, provided, further, without the approval of the stockholders of the Company entitled to vote, no amendment may be made which would require the approval of the stockholders of the Company for listing of the Shares issuable upon exercise of the Options on the New York Stock Exchange.

B. *Option Amendments.* The Committee may amend the terms of any Option granted, prospectively or retroactively, but no such amendment or other action by the Committee shall materially impair the rights of any Participant without the Participant's consent.

## XI.   Use of Proceeds

The proceeds of the sale of Shares subject to Options under the Plan are to be added to the general funds of Company and used for its general corporate purposes as the Board shall determine.

## XII.   General Provisions

A. *Right to Terminate Employment.* Neither the adoption of the Plan nor the grant of Options shall impose any obligation on the Company or Related Persons to continue the employment of any Participant, nor shall it impose any obligation on the part of any Participant to remain in the employ of the Company or Related Persons.

B. *Purchase for Investment.* If the Board or the Committee determines that the law so requires, the holder of an Option granted hereunder shall, upon any exercise or conversion thereof, execute and deliver to the Company a written statement, in form satisfactory to the Company, representing and warranting that such Participant is purchasing or accepting the Shares then acquired for such Participant's own account and not with a view to the resale or distribution thereof, that any subsequent offer for sale or sale of any such Shares shall be made either pursuant to (i) a Registration Statement on an appropriate form under the Securities Act, which Registration Statement shall have become effective and shall be current with respect to the Shares being offered and sold, or (ii) a specific exemption from the registration requirements of the Securities Act, and that in claiming such exemption the holder will, prior to any offer for sale or sale of such Shares, obtain a favorable written option, satisfactory in form and substance to the Company, from counsel acceptable to the Company as to the availability of such exception.

C. *Trusts, etc.* Nothing contained in the Plan and no action taken pursuant to the Plan (including, without limitation, the grant of any Option thereunder) shall create or be construed to create a trust of any kind, or a fiduciary relationship, between Company and any Participant or the executor, administrator or other personal representative or designated beneficiary of such Participant, or any other persons. Any reserves that may be established by Company in connection with the Plan shall continue to be part of the general funds of Company, and no individual or entity other than Company shall have any interest in such funds until paid to a Participant. If and to the extent that any Participant or such Participant's executor, administrator or other personal representative, as the case may be, acquires a right to receive any payment from Company pursuant to the Plan, such right shall be no greater than the right of an unsecured general creditor of Company.

D. *Notices.* Any notice to the Company required by or in respect of this Plan will be addressed to the Company at 250 Stephenson Highway, Troy, MI 48083, Attention: Sr. Vice President, Human Resources, or such other place of business as shall become the Company's principal executive offices from time to time, or sent to the Company by facsimile to (248) 824–1613, Attention: Sr. Vice President, Human Resources, or to such other facsimile number as the Company shall notify each Participant. Each Participant shall be responsible for furnishing the Committee with the current and proper address for the mailing to such Participant of notices and the delivery to such Participant of agreements, Shares and payments. Any such notice to the Participant will, if the Company has received notice that the Participant is then deceased, be given to the Participant's executor, administrator or personal representative if such representative has previously informed the Company of his status and address (and has provided such reasonable substantiating information as the Company may request) by written notice under this Section. Any notice required by or in

Table of Contents

respect of this Plan will be deemed to have been duly given when delivered in person or when dispatched by telegram or, in the case of notice to the Company, by facsimile as described above, or one business day after having been dispatched by a nationally recognized overnight courier service or three business days after having been mailed by United States registered or certified mail, return receipt requested, postage prepaid. The Company assumes no responsibility or obligation to deliver any item mailed to such address that is returned as undeliverable to the addressee and any further mailings will be suspended until the Participant furnishes the proper address.

E. *Severability of Provisions*. If any provisions of the Plan shall be held invalid or unenforceable, such invalidity or unenforceability shall not affect any other provisions of the Plan, and the Plan shall be construed and enforced as if such provisions had not been included.

F. *Payment to Minors, etc.* Any benefit payable to or for the benefit of a minor, an incompetent person or other person incapable of receipt thereof shall be deemed paid when paid to such person's guardian or to the party providing or reasonably appearing to provide for the care of such person, and such payment shall fully discharge the Committee, the Company and their employees, agents and representatives with respect thereto.

G. *Headings and Captions*. The headings and captions herein are provided for reference and convenience only. They shall not be considered part of the Plan and shall not be employed in the construction of the Plan.

H. *Controlling Law*. The Plan shall be construed and enforced according to the laws of the State of Delaware.

I. *Section 162(m) Deduction Limitation*. The Committee at any time may in its sole discretion limit the number of Options that can be exercised in any taxable year of the Company, to the extent necessary to prevent the application of Section 162(m) of the Code (or any similar or successor provision), provided that the Committee may not postpone the earliest date on which Options can be exercised beyond the last day of the stated term of such Options.

J. *Section 16(b) of the Act*. All elections and transactions under the Plan by persons subject to Section 16 of the Exchange Act involving shares of Common Stock are intended to comply with all exemptive conditions under Rule 16b−3. The Committee may establish and adopt written administrative guidelines, designed to facilitate compliance with Section 16(b) of the Act, as it may deem necessary or proper for the administration and operation of the Plan and the transaction of business thereunder.

K. *Lock−Up*. The Committee may, in its discretion, provide in an agreement evidencing an Option granted hereunder for restrictions on transfer of Shares obtained on exercise of an Option.

**XIII.    Issuance of Stock Certificates; Legends; Payment of Expenses**
A. *Stock Certificates*. Upon any exercise of an Option and payment of the exercise price as provided in such Option, a certificate or certificates for the Shares as to which such Option has been exercised shall be issued by Company in the name of the person or persons exercising such Option and shall be delivered to or upon the order of such person or persons.

B. *Legends*. Certificates for Shares issued upon exercise of an Option shall bear such legend or legends as the Committee, in its sole discretion, determines to be necessary or appropriate to prevent a violation of, or to perfect an exemption from, the registration requirements of the Securities Act or to implement the provisions of any agreements between Company and the Participant with respect to such Shares.

C. *Payment of Expenses*. The Company shall pay all issue or transfer taxes with respect to the issuance or transfer of Shares, as well as all fees and expenses necessarily incurred by the Company in connection with such issuance or transfer and with the administration of the Plan.

Table of Contents

**XIV.  Listing of Shares and Related Matters**

If at any time the Board or the Committee shall determine in its sole discretion that the listing, registration or qualification of the Shares covered by the Plan upon any national securities exchange or under any state or federal law, or the consent or approval of any governmental regulatory body, is necessary or desirable as a condition of, or in connection with, the grant of Options or the award or sale of Shares under the Plan, no Option grant shall be effective and no Shares will be delivered, as the case may be, unless and until such listing, registration, qualification, consent or approval shall have been effected or obtained, or otherwise provided for, free of any conditions not acceptable to the Board.

**XV.  Withholding Taxes**

The Company shall have the right to require prior to the issuance or delivery of any shares of Common Stock payment by the Participant of any Federal, state or local taxes required by law to be withheld.

The Committee may permit any such withholding obligation to be satisfied by reducing the number of shares of Common Stock otherwise deliverable. A person required to file reports under Section 16(a) of the Exchange Act with respect to securities of the Company may elect to have a sufficient number of shares of Common stock withheld to fulfill such tax obligations (hereinafter a "Withholding Election") only if the election complies with such conditions as are necessary to prevent the withholding of such shares from being subject to Section 16(b) of the Exchange Act. Any fraction of a share of Common Stock required to satisfy such tax obligations shall be disregarded and the amount due shall be paid instead in cash by the Participant.

A-11

Table of Contents

APPENDIX B

## PROPOSED CERTIFICATE OF AMENDMENT

OF
### AMENDED AND RESTATED CERTIFICATE OF
INCORPORATION
OF
### COLLINS & AIKMAN CORPORATION

Collins & Aikman Corporation, a corporation organized and existing under and by virtue of the General Corporation Law of the State of Delaware ("the Corporation"), DOES HEREBY CERTIFY:

*FIRST:* That at a meeting of the directors of the Corporation, a resolution was duly adopted setting forth a proposed amendment to the Restated Certificate of Incorporation of the Corporation, as previously amended, (the "Certificate") to effect a one (1) for two and one–half (2.5) reverse split of all of the Corporation's issued common stock, par value $0.01 per share (the "Common Stock") and such amendment was declared to be advisable, and such amendment was submitted to the stockholders of the Corporation for consideration at their annual meeting.

RESOLVED, that a new paragraph shall be added to Article FOURTH, clause (a) at the end of the such clause (a) consisting of the following text:

"Effective as of the close of business on the date of filing of this Certificate of Amendment to the Restated Certificate of Incorporation pursuant to the Delaware General Corporation Law (the "Effective Time"), each share of the Corporation's common stock, par value $0.01 per share (the "Old Common Stock"), issued and outstanding immediately prior to the Effective Time, will be automatically reclassified into two–fifths ( 2/5) of a share of common stock, par value $0.01 per share, of the Corporation (the "New Common Stock"). Each stockholder who, immediately prior to the Effective Time, owns a number of shares of Old Common Stock which is not evenly divisible by 2.5 shall, with respect to such fractional interest, be entitled, at his or her election, to receive either (a) cash in lieu of fractions of shares of New Common Stock from the disposition of such fractional interest as provided below or (b) an additional fraction of a share such that the number of such holder's shares of New Common Stock shall be rounded upward to the nearest whole share. Share interests due to rounding are given solely to save expense and inconvenience of issuing fractional shares and do not represent separately bargained for consideration. The Corporation shall arrange for the disposition of fractional interests by those otherwise entitled thereto but electing to receive cash by causing the transfer agent for the Corporation's common stock to (i) aggregate and sell such fractional interests and (ii) allocate and distribute the net proceeds received from such sale among the holders of the fractional interests as their respective interests appear on the record books of the Corporation. Each certificate that theretofore represented shares of Old Common Stock shall thereafter represent that number of shares of New Common Stock into which the shares of Old Common Stock represented by such certificate shall have been reclassified; provided, that each person holding of record a stock certificate or certificates that represented shares of Old Common Stock shall receive, upon surrender of such certificate or certificates, a new certificate or certificates evidencing and representing the number of shares of New Common Stock to which such person is entitled under the foregoing reclassification."

*SECOND:* That, a meeting of the stockholders of the Corporation was duly called and held, upon notice in accordance with Section 222 of the General Corporation Law of the State of Delaware at which meeting the necessary number of shares as required by the General Corporation Law of the State of Delaware voted in favor of the amendment.

*THIRD:* That such amendment of the Certificate was duly adopted in accordance with the provisions of Section 242 of the General Corporation Law of the State of Delaware.

B–1

**Table of Contents**

IN WITNESS WHEREOF, the Corporation has caused this certificate to duly signed and attested as of this        day of               , 2002.

COLLINS & AIKMAN CORPORATION

By: _____

Name: Ronald T. Lindsay
Title:          Senior Vice President, General Counsel and Secretary

ATTEST:

By:

Name: _____
Title:
                              B-2

Table of Contents

APPENDIX C

**PROXY**

<div align="center">

**COLLINS & AIKMAN CORPORATION**

</div>

This Proxy is solicited on behalf of the Board of Directors for the Annual Meeting of Stockholders to be held on May 16, 2002 and any adjournment or postponement thereof.

The undersigned hereby appoints Thomas E. Evans and Ronald T. Lindsay (the "Agents") as proxies (each with the power to act alone and to appoint a substitute) and hereby authorizes each of them to represent and to vote, as designated hereon, all the shares of Common Stock, par value $0.01 per share, of Collins & Aikman Corporation (the "Company") held of record by the undersigned at the close of business on April 2, 2002 at the Annual Meeting of Stockholders of the Company to be held on May 16, 2002 at 11:00 a.m., Eastern Daylight Savings Time, and at any adjournment or postponement thereof on the proposals referred to below.

This Proxy, when executed, will be voted in accordance with the specifications hereon. In the absence of such specifications, this Proxy will be voted FOR Proposals I (and if any nominee shall be unavailable to serve as a director, this proxy will be voted for the election of such other person or persons as the Nominating Committee of the Board of Directors or the Company may select), II and III.

Management recommends a vote FOR Proposals I, II and III.

The undersigned hereby revokes any proxies heretofore given and directs the Agents to vote as follows:

1.  *Proposal I:* Election of the following nominees as Directors: Warren B. Rudman, Samuel Valenti, III, David C. Dauch, Marshall A. Cohen and Cynthia L. Hess.

| FOR all nominees<br>(except as indicated)<br>☐ | WITHHOLD<br>AUTHORITY<br>for all nominees<br>☐ | If you wish to withhold (for authority to vote for any nominee(s), write his (their) name(s) on the lines below. |
|---|---|---|

2. *Proposal II:* Approval of the Company's 2002 Employee Stock Option Plan.

<div align="center">

FOR       AGAINST       ABSTAIN
☐       ☐       ☐

*(Continued and to be signed and dated on reverse side)*

</div>

3.  *Proposal III:* Approval of the one–for–two and one–half reverse stock split (to be effected pursuant to a Certificate of Amendment of the Restated Certificate of Incorporation in substantially the form attached hereto as Appendix B).

<div align="center">

FOR       AGAINST       ABSTAIN
☐       ☐       ☐

</div>

In their discretion, the Agents are authorized to vote on any other matters as may properly come before the meeting or any adjournment or postponement thereof.

The undersigned hereby ratifies and confirms all that these Agents may do by virtue hereof and hereby acknowledges receipt of the notice of Annual Meeting of Stockholders and the Proxy Statement.

Dated: _____, 2002

Signature(s)*
_____

\*  Please sign your name(s) exactly as if (they) appear(s) opposite. When shares are held by joint owners, all should sign. When signing as attorney, executor, administrator, trustee or guardian, please give full title as such. If a corporation, please sign in full corporate name by president or other authorized officer and indicate title. If a partnership, please sign in partnership name by authorized person and indicate title.

Please mark, sign, date and return this Proxy Card promptly using the enclosed envelope.    Votes should be indicated (x) in black or blue ink.

<div align="center">

C–1

</div>

# EXHIBIT 2

# COLLINS & AIKMAN CORP

250 STEPHENSON HWY
TROY, MI 48083
248. 824.2500

# EX–3

**HOLDINGS EXHIBIT 3.1**
**10–Q Filed on 06/14/1994 – Period: 04/30/1994**
File Number 001–10218



LIVEDGAR® Information Provided by Global Securities Information, Inc.
800.669.1154
www.gsionline.com

==============================================================================

BY-LAWS

OF

COLLINS & AIKMAN HOLDINGS CORPORATION

A Delaware Corporation

==============================================================================

BY-LAWS

OF

COLLINS & AIKMAN HOLDINGS CORPORATION

(a Delaware corporation)

(as amended through June 1, 1994)

ARTICLE I

Offices

SECTION 1.  Registered Office.  The registered office of the Corporation in the State of Delaware shall be 32 Lockerman Square, Suite L-100, City of Dover, County of Kent.  The name of the registered agent is The Prentice-Hall Corporation System, Inc.

SECTION 2.  Other Offices.  The Corporation may also have offices at other places, either within or without the State of Delaware, as the Board of Directors may from time to time determine or as the business of the Corporation may require.

ARTICLE II

Meeting of Stockholders

SECTION 1.  Annual Meetings.  The annual meeting of the stockholders for the election of directors and for the transaction of such other business as may properly come before the meeting shall be held at such place (within or without the State of Delaware), date and hour as shall be designated in the notice thereof, except that no annual meeting need be held if all actions, including the election of directors, required by the General Corporation Law of the State of Delaware to be taken at a stockholders' annual meeting are taken by written consent in lieu of a meeting pursuant to Section 9 of this Article II.

SECTION 2.  Special Meetings.  Special meetings of the stockholders for any purpose or purposes may be called by the Board, the Executive Committee, either Co-Chairman of the Board, the President or a stockholder or stockholders

holding of record at least 25% of all shares of the Corporation entitled to vote thereat to be held at such place (within or without the State of Delaware), date and hour as shall be designated in the notice thereof.

<END OF PAGE 1>

          SECTION 3.  Notice of Meetings.  Except as otherwise expressly required by law, notice of each meeting of the stockholders shall be given not less than 10 or more than 60 calendar days before the date of the meeting to each stockholder entitled to vote at such meeting by mailing such notice, postage prepaid, directed to each stockholder at the address of such stockholder as appears on the records of the Corporation.  Every such notice shall state the place, date and hour of the meeting and, in the case of a special meeting, the purpose or purposes for which the meeting is called.  Except as provided in the next immediate sentence or as otherwise expressly required by law, notice of any adjourned meeting of the stockholders need not be given if the time and place thereof are announced at the meeting at which the adjournment is taken.  If the adjournment is for more than 30 calendar days, or if after the adjournment a new record date is fixed for the adjourned meeting, notice of the adjourned meeting shall be given to each stockholder entitled to vote at such adjourned meeting.

          A written waiver of notice, signed by a stockholder entitled to notice, whether signed before or after the time set for a given meeting, shall be deemed equivalent to notice of such meeting.  Attendance of a stockholder in person or by proxy at a stockholders' meeting shall constitute a waiver of notice to such stockholder of such meeting, except when such stockholder attends the meeting for the express purpose of objecting at the beginning of the meeting to the transaction of any business because the meeting is not lawfully called or convened.

          SECTION 4.  List of Stockholders.  It shall be the duty of the Secretary or other officer of the Corporation who shall have charge of its stock ledger to prepare and make, at least 10 calendar days before every meeting of the stockholders, a complete list of the stockholders entitled to vote at the meeting, arranged in alphabetical order, and showing the address of each stockholder and the number of shares registered in the name of each stockholder. Such list shall be open to the examination of any stockholder, for any purpose germane to the meeting, during ordinary business hours, for a period of at least 10 calendar days prior to the meeting either at a place specified in the notice of the meeting within the city where the meeting is to be held or, if not so specified, at the place where the meeting is to be held.  Such list shall also be produced and kept at the time and place of the meeting during the whole time thereof, and may be inspected by any stockholder who is present.

          SECTION 5.  Quorum.  At each meeting of the stockholders, except as otherwise expressly required by law, stockholders holding a majority of the shares of stock of the

                                           2

Corporation issued, outstanding and entitled to be voted at the meeting shall be present in person or by proxy in order to constitute a quorum for the transaction of business.  In the absence of a quorum at any such meeting or any adjournment or adjournments thereof, a majority in voting interest of those present in person or by proxy and entitled to vote thereat or, in the absence therefrom of all the stockholders, any officer entitled to preside at, or to act as secretary of, such meeting may reschedule such meeting from time to time until stockholders holding the amount of stock requisite for a

quorum shall be present in person or by proxy. At any such rescheduled meeting at which a quorum may be present, any business may be transacted that might have been transacted at the meeting as originally called.

SECTION 6. Organization. At each meeting of the stockholders, one of the following shall act as chairman of the meeting and preside thereat, in the following order of precedence:

(a) the Co-Chairman of the Board designated by the Board to chair such meeting;

(b) if there is no Co-Chairman of the Board or if both Co-Chairmen of the Board shall be absent from such meeting, the President;

(c) if the Co-Chairmen of the Board and the President shall be absent from such meeting, any other officer or director of the Corporation designated by the Board or the Executive Committee to act as chairman of such meeting and to preside thereat; or

(d) a stockholder of record of the Corporation who shall be chosen chairman of such meeting by a majority in voting interest of the stockholders present in person or by proxy and entitled to vote thereat.

The Secretary or, if the Secretary shall be presiding over the meeting in accordance with the provisions of this Section or if he shall be absent from such meeting, the person (who shall be an Assistant Secretary, if an Assistant Secretary shall be present thereat) whom the chairman of such meeting shall appoint, shall act as secretary of such meeting and keep the minutes thereof.

SECTION 7. Order of Business. The order of business at each meeting of the stockholders shall be determined by the chairman of such meeting, but such order of business may be changed by a majority in voting interest of those present in person or by proxy at such meeting and entitled to vote thereat.

3

SECTION 8. Voting. Each holder of voting stock of the Corporation shall, at each meeting of the stockholders, be entitled to one vote in person or by proxy for each share of stock of the Corporation held by him and registered in his name on the books of the Corporation on the date fixed pursuant to the provisions of Section 4 of Article VIII of these By-laws as the record date for the determination of stockholders who shall be entitled to receive notice of and to vote at such meeting.

Shares of its own stock belonging to the Corporation or to another corporation, if a majority of the shares entitled to vote in the election of directors of such other corporation is held by the Corporation, shall neither be entitled to vote nor be counted for quorum purposes. Any vote of stock of the Corporation may be given at any meeting of the stockholders by the stockholders entitled to vote thereon either in person or by proxy appointed by an instrument in writing delivered to the Secretary or an Assistant Secretary of the Corporation or the secretary of the meeting. The attendance at any meeting of a stockholder who may theretofore have given a proxy shall not have the effect of revoking the same unless he shall in writing so notify the secretary of the meeting prior to the voting of the proxy. At all meetings of the stockholders, all matters, except as otherwise provided by law or in these By-laws, shall be decided by the vote of a majority of the votes cast by stockholders present in person or by proxy and entitled to vote thereat, a quorum being present. Except as otherwise expressly required by law, the vote at any meeting of the stockholders on any question need not be by ballot, unless so directed by the chairman of the

meeting.  On a vote by ballot, each ballot shall be signed by the stockholder voting, or by his proxy, if there be such proxy, and shall state the number of shares voted.

SECTION 9.  Action by Written Consent.  Except as otherwise provided by law or by the Certificate of Incorporation, any action required or permitted to be taken at any annual or special meeting of the stockholders may be taken without a meeting, without prior notice and without a vote if a consent or consents in writing, setting forth the action so taken, shall be signed by the holders of outstanding stock of the Corporation having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all shares of stock of the Corporation entitled to vote thereon were present and voted.

4

ARTICLE III

Board of Directors

SECTION 1.  General Powers.  The business and affairs of the Corporation shall be managed by or under the direction of the Board of Directors.

SECTION 2.  Number and Term of Office.  The Board of Directors shall consist of six members, but the number of members constituting the Board of Directors may be increased or decreased from time to time by resolution adopted by a majority of the whole Board.  Directors need not be stockholders or citizens or residents of the United States of America.  Each of the directors of the Corporation shall hold office until his term expires and until his successor is elected and qualified or until his earlier death or until his earlier resignation or removal in the manner hereinafter provided.

SECTION 3.  Election.  At each meeting of the stockholders for the election of directors at which a quorum is present, the person receiving the greatest number of votes, up to the number of directors to be elected, shall be the directors.

SECTION 4.  Resignation, Removal and Vacancies.  Any director may resign at any time by giving written notice of his resignation to either Co-Chairman of the Board, the President or the Secretary of the Corporation.  Any such resignation shall take effect at the time specified therein or, if the time when it shall become effective shall not be specified therein, when accepted by action of the Board.  Except as aforesaid, the acceptance of such resignation shall not be necessary to make it effective.

A director may be removed, either with or without cause, at any time by a vote of a majority in voting interest of the stockholders.

Any vacancy or newly created directorship occurring on the Board for any reason may be filled by a majority of the directors then in office, though less than a quorum, or by a sole remaining director.  The director elected to fill such vacancy or newly created directorship shall hold office for the unexpired term in respect of which such vacancy occurred or such newly created directorship was created.

SECTION 5.  Meetings.  (a) Annual Meetings.  As soon as practicable after each annual election of directors, the Board shall meet for the purpose of organization and the transaction of other business.

5

(b)  Regular Meetings.  Regular meetings of the Board shall be held at such times and places as the Board shall from time to time determine.

(c)  Special Meetings.  Special meetings of the Board shall be held whenever called by either Co-Chairman of the Board or the President or a majority of the directors at the time in office.  Any and all business may be transacted at a special meeting that may be transacted at a regular meeting of the Board.

(d)  Place of Meeting.  The Board may hold its meeting at such place or places within or without the State of Delaware as the Board may from time to time by resolution determine or as shall be designated in the respective notices or waivers of notice thereof.

(e)  Notice of Meetings.  Notices of regular meetings of the Board or of any adjourned meeting need not be given.

Notices of special meetings of the Board, or of any meeting of any committee of the Boards that has not been fixed in advance as to time and place by such committee, shall be mailed by the Secretary or an Assistant Secretary to each director or member of such committee, addressed to him at his residence or usual place of business, so as to be received at least one calendar day before the day on which such meeting is to be held, or shall be sent to him by telegraph, cable or other form of recorded communication or be delivered personally or by telephone not later than one calendar day before the day on which such meeting is to be held.  Such notice shall include the time and place of such meeting.  However, notice of any such meeting need not be given to any director or member of any committee if such notice is waived by him in writing or by telegraph, cable or other form of recorded communication, whether before or after such meeting shall be held, or if he shall be present at such meeting.

(f)  Quorum and Manner of Acting.  Except as otherwise provided by law, the Certificate of Incorporation or these By-laws, one-half of the total number of directors shall be present in person at any meeting of the Board in order to constitute a quorum for the transaction of business at such meeting. In each case the vote of a majority of those directors present at any such meeting at which a quorum is present shall be necessary for the passage of any resolution or any act of the Board, except as otherwise expressly required by law or these By-laws.  In the absence of a quorum for any such meeting, a majority of the directors present threat may adjourn such meeting from time to time until a quorum shall be present thereat.

6

(g)  Action by Communication Equipment.  The directors, or the members of any committee of the Board, may participate in a meeting of the Board, or of such committee, by mean of conference telephone or similar communications equipment by means of which all persons participating in the meeting can hear each other, and such participation shall constitute presence in person at such meeting.

(h)  Action by Consent.  Any action required or permitted to be taken at any meeting of the Board, or of any committee thereof, may be taken without a meeting if all members of the Board or committee, as the case may be, consent thereto in writing and such writing is filed with the minutes of the proceedings of the Board or such committee.

(i)  Organization.  At each meeting of the Board, one of the following

shall act as chairman of the meeting and preside thereat, in the following order
of precedence:  (a) the Co-Chairman of the Board chosen by a majority of the
directors present thereat; (b) the President; or (c) any director chosen by a
majority of the directors present thereat.  The Secretary or, in case of his
absence, any person (who shall be an Assistant Secretary, if an Assistant
Secretary shall be present thereat) whom the chairman shall appoint, shall act
as secretary of such meeting and keep the minutes thereof.

        SECTION 6.  Compensation.  Directors, as such, shall not receive any
stated salary for their services, but by resolution of the Board may receive a
fixed sum and expenses incurred in performing the functions of director and
member of any committee of the Board.  Nothing herein contained shall be
construed so as to preclude any director from serving the Corporation in any
other capacity and receiving compensation therefor.

                            ARTICLE IV

                            Committees

        SECTION 1.    (a)  Designation and Membership.  The Board may, by
resolution passed by a majority of the whole Board, designate one or more
committees consisting of such number of directors, not less than one, as the
Board shall appoint.  The Board may designate one or more directors as alternate
members of any committee, who may replace any absent or disqualified member at
any meeting of the committee.  Vacancies occurring on any committee for any
reason may be filled by the Board at any time.  Any member of any committee
shall be subject to removal, with or without cause, at any time by the Board or
by a majority in voting interest of the

                                7

stockholders.

        (b)  Functions and Powers.   Any such committee, subject to any
limitations prescribed by the Board, shall possess and may exercise, during the
intervals between meetings of the Board, all the powers and authority of the
Board in the management of the business and affairs of the Corporation, and may
authorize the seal of the Corporation to be affixed to all papers that may
require it; provided, however, that no such committee shall have such power or
authority in reference to amending the Certificate of Incorporation of the
Corporation (except that a committee may, to the extent authorized in
resolutions providing for the issuance of shares of stock adopted by the Board
of Directors, fix any of the preferences or rights of such shares relating to
dividends, redemption, dissolution, any distribution of assets of the
Corporation or the conversion into, or the exchange of such shares for, shares
of any other class or classes or any other series of the same or any other class
or classes of stock of the Corporation), adopting an agreement of merger or
consolidation under Section 251 or Section 252 of the General Corporation Law of
the State of Delaware, recommending to the stockholders the sale, lease or
exchange of all or substantially all of the Corporation's property and assets,
recommending to the stockholders a dissolution of the Corporation or a
revocation of a dissolution, filling vacancies on the Board, changing the
membership or filling vacancies on any committee of the Board or amending these
By-laws.  No such committee shall have the power and authority to declare
dividends, to authorize the issuance of stock of the Corporation or to adopt a
certificate of ownership and merger pursuant to Section 253 of the General
Corporation Law of the State of Delaware unless such power and authority shall
be expressly delegated to it by a resolution passed by a majority of the whole
Board.

(c)  Meetings, Quorum and Manner of Acting.  Each committee shall meet at such times and as often as may be deemed necessary and expedient and at such places as shall be determined by such committee.  A majority of each such committee shall constitute a quorum, and the vote of a majority of those members of each such committee present at any meeting thereof at which a quorum is present shall be necessary for the passage of any resolution or act of such committee.  The Board may designate a chairman for each such committee, who shall preside at meetings thereof, and a vice chairman, who shall preside at such meetings in the absence of the chairman.

8

## ARTICLE V

### Officers

SECTION 1.  Election, Appointment and Term of Office.  The officers of the Corporation shall be two Co-Chairmen of the Board, a President, who shall also be the Chief Executive Officer, such number of Vice Chairmen of the Board and Vice Presidents (including and Executive, Senior and/or First Vice Presidents) as the Board may determine from time to time, a Treasurer, one or more Assistant Treasurers, if any, as the Board may determine, as Secretary and one or more Assistant Secretaries, if any, as the Board may determine.  Any two or more offices may be held by the same person.  Officers need not be stockholders of the Corporation or citizens or residents of the United States of America.  The Co-Chairmen of the Board, any Vice Chairman of the Board and the President shall be elected by the Board from among its members at its annual meeting, and all other officers may be elected by the Board or the Executive Committee, and each such officer shall hold office until the next annual meeting of the Board or the Executive Committee, as the case may be, and until his successor is elected or until his earlier death or until his earlier resignation or removal in the manner hereinafter provided.

The Board or the Executive Committee may elect or appoint such other officers as it deems necessary, including a Corporate General Counsel and one or more Associate or Assistant Corporate General Counsels, Assistant Vice Presidents, Assistant Treasurers and Assistant Secretaries.  Each such officer shall have such authority and shall perform such duties as may be provided herein or as the Board or Executive Committee may prescribe.

If additional officers are elected or appointed during the year, each of them shall hold office until the next annual meeting of the Board or Executive Committee at which officers are regularly elected or appointed and until his successor is elected or appointed or until his earlier death or until his earlier resignation or removal in the manner hereinafter provided.

SECTION 2.  Resignation, Removal and Vacancies.  Any officer may resign at any time by giving written notice to the President or the Secretary of the Corporation, and such resignation shall take effect at the time specified therein or, if the time when it shall become effective shall not be specified therein, when accepted by action of the Board or the Executive Committee.  Except as aforesaid, the acceptance of such resignation shall not be necessary to make it effective.

9

All officers and agents elected or appointed by the Board or the Executive Committee shall be subject to removal at any time by the Board or the Executive Committee, as the case may be, with or without cause.

A vacancy in any office may be filled for the unexpired portion of the term in the same manner as provided for election or appointment to such office.

SECTION 3.  Duties and Functions.  (a)  Co-Chairmen of the Board.  The Co-Chairman of the Board, who shall be a member thereof, selected by the directors present thereat, shall preside at all meeting of the Board and of the stockholders at which one of them shall be present and each shall perform such other duties and exercise such powers as may from time to time be prescribed by the Board of Directors or the Executive Committee.

(b)  Vice Chairmen of the Board.  Each Vice Chairman of the Board shall be a member thereof and shall have such powers and duties as may from time to time be prescribed by the Board or the Executive Committee.

(c)  President.  The President shall be a member of the Board, shall be the Chief Executive Officer of the Corporation and shall perform such duties and exercise such powers as are incident to the office of chief executive, and shall perform such other duties and exercise such other powers as may from time to time be prescribed by the Board or the Executive Committee.

(d)  Vice Presidents.  Each Vice President shall have such powers and duties as shall be prescribed by the Board or the Executive Committee.

(e)  Treasurer.  The Treasurer shall have charge and custody of, and be responsible for, all funds and securities of the Corporation and shall deposit all such funds to the credit of the Corporation in such banks, trust companies or other depositaries as shall be selected in accordance with the provisions of these By-laws; he shall disburse the funds of the Corporation as may be ordered by the Board or the Executive Committee, making proper vouchers for such disbursements; and, in general, he shall perform all the duties incident to the office of Treasurer and such other duties as from time to time may be assigned to him by the Board, the Executive Committee or the President. To such extent as the Board or Executive Committee shall deem proper, the duties of the Treasurer may be performed by one or more assistants, to be appointed by the Board or Executive Committee.

10

(f)  Secretary.  The Secretary shall keep the records of all meetings of the stockholders and of the Board and committees of the Board.  He shall affix the seal of the Corporation to all instruments requiring the corporate seal when the same shall have been signed on behalf of the Corporation by a duly authorized officer.  The Secretary shall be the custodian of all contracts, deeds, documents and all other indicia of title to properties owned by the Corporation and of its other corporate records and in general shall perform all duties and have all powers incident to the office of Secretary.  To such extent as the Board or the Executive Committee shall deem proper, the duties of Secretary may be performed by one or more assistants, to be appointed by the Board or the Executive Committee.

(g)  Assistant Secretaries and Assistant Treasurers.  Each Assistant Secretary and each Assistant Treasurer shall perform the duties of and exercise the powers of the Secretary and the Treasurer, respectively, in the absence of the Secretary and the Treasurer, respectively.

ARTICLE VI

Contracts, Checks, Drafts,
Bank Accounts, Proxies, etc.

SECTION 1. Execution of Documents.  The President, each Vice President or any other officer, employee or agent of the Corporation designated by the Board, or designated in accordance with corporate policy as approved by the Board, shall have power to execute and deliver deeds, leases, contracts, mortgages, bonds, debentures, checks, drafts and other orders for the payment of money and other documents for an in the name of the Corporation, and such power may be delegated (including power to redelegate) by written instrument to other officers, employees or agents of the Corporation.

SECTION 2. Deposits.  All funds of the Corporation not otherwise employed shall be deposited from time to time to the credit of the Corporation or otherwise in accordance with corporate policy as approved by the Board.

SECTION 3. Proxies in Respect of Stock or Other Securities of Other Corporations.  The President or any other officer of the Corporation designated by the Board shall have the authority (a) to appoint from time to time an agent or agents of the Corporation to exercise in the name and on behalf of the Corporation the powers and rights which the Corporation may have as the holder of stock or other securities in any other corporation, (b) to vote or consent in

11

respect of such stock or securities and (c) to execute or cause to be executed in the name and on behalf of the Corporation and under its corporate seal, or otherwise, such written proxies, powers of attorney or other instruments as he may deem necessary or proper in order that the Corporation may exercise such powers and rights.  The President or any such designated officer may instruct any person or persons appointed as aforesaid as to the manner of exercising such powers and rights.

ARTICLE VII

Books and Records

The books and records of the Corporation may be kept at such places within or without the State of Delaware as the Board may from time to time determine.

ARTICLE VIII

Shares and Their Transfer; Fixing Record Date

SECTION 1. Certificate for Stock.  Every owner of stock of the Corporation shall be entitled to have a certificate certifying the number of shares owned by him in the Corporation and designating the class of stock to which such shares belong, which shall otherwise be in such form as the Board shall prescribe.  Each such certificate shall be signed by, or in the name of the Corporation by, a Co-Chairman of the Board, a Vice Chairman of the Board, the President or a Vice President and by the Treasurer, an Assistant Treasurer, the Secretary or an Assistant Secretary of the Corporation.  In case any officer who has signed or whose facsimile signature has been placed upon a certificate shall have ceased to be such officer before such certificate is issued, it may nevertheless be issued by the Corporation with the same effect as if he were such officer at the date of issue.

SECTION 2. Record.  A record shall be kept of the name of the person, firm or corporation owning the stock represented by each certificate for stock

of the Corporation issued, the number of shares represented by each such
certificate and the date thereof, and, in the case of cancellation, the date of
cancellation.  Except as otherwise expressly required by law, the person in
whose name shares of stock stand on the books of the Corporation shall be deemed
the owner thereof for all purposes as regards the Corporation.

      SECTION 3.  Lost, Stolen, Destroyed or Mutilated Certificates.  The
holder of any stock of the Corporation

<center>12</center>

shall immediately notify the Corporation of any loss, theft, destruction
or mutilation of the certificate therefor.  The Corporation may issued
a new certificate for stock in the place of any certificate theretofore
issued by it and alleged to have been lost, stolen, destroyed or mutilated, and
the Board or the President or Secretary may, in its or his discretion, require
the owner of the lost, stolen, mutilated or destroyed certificate or his legal
representatives to give the Corporation a bond in such sum, limited or
unlimited, in such form and with such surety or sureties as the Board shall
in its discretion determine, to indemnify the Corporation against any claim
that may be made against it on account of the alleged loss, theft, mutilation
or destruction of any such certificate or the issuance of any such new
certificate.

      SECTION 4.  Fixing Date for Determination of Stockholders of Record.
(a) In order that the Corporation may determine the stockholders entitled to
notice of or to vote at any meeting of stockholders or any adjournment thereof,
the Board may fix a record date, which shall not precede the date upon which the
resolution fixing the record date is adopted by the Board, and which shall not
be more than 60 or less than 10 calendar days before the date of such meeting.
If no record date is fixed by the Board, the record date for determining
stockholders entitled to notice of or to vote at a meeting of stockholders shall
be at the close of business on the day next preceding the day on which notice is
given, or if notice is waived, at the close of business on the day next
preceding the day on which the meeting is held.  A determination of stockholders
of record entitled to notice of or to vote at a meeting of stockholders shall
apply to any adjournment of the meeting; providing, however, that the Board may
fix a new record date for the adjourned meeting.

     (b)  In order that the Corporation may determine the stockholders entitled
to consent to corporate action in writing without a meeting, the Board may fix a
record date, which record date shall not precede the date upon which the
resolution fixing the record date is adopted by the Board and which date shall
not be more than 10 calendar days after the date upon which the resolution
fixing the record date is adopted by the Board.  If no record date has been
fixed by the Board, the record date for determining stockholders entitled to
consent to corporate action in writing without a meeting, when no prior action
by the Board is otherwise required, shall be the first date on which a signed
written consent setting forth the action taken or proposed to be taken is
delivered to the Corporation by delivery to its registered office in the State
of Delaware, its principal place of business, or an officer or agent of the
Corporation having custody of the book in which proceedings of meetings of
stockholders are recorded.  Delivery made to the registered office of the
Corporation

<center>13</center>

shall be by hand or by certified or registered mail, return receipt
requested.  If no record date has been fixed by the Board and prior action by
the Board is required, the record date for determining stockholder entitled to

consent to corporate action in writing without a meeting shall be at the close of business on the day on which the Board adopts the resolution taking such prior action.

(c)   In order that the Corporation may determine the stockholders entitled to receive payment of any dividend or other distribution or allotment of any rights or the stockholders entitled to exercise any rights in respect of any change, conversion or exchange of stock, or for the purpose of any other lawful action, the Board may fix a record date, which record date shall not precede the date upon which the resolution fixing the record date is adopted, and which record date shall be not more than 60 calendar days prior to such action.   If no record date is fixed, the record date for determining stockholders for any such purpose shall be at the close of business on the day on which the Board adopts the resolution relating thereto.

ARTICLE IX

Seal

The Board shall provide a corporate seal, which shall be in the form of a circle and shall bear the full name of the Corporation, the words "Corporate Seal Delaware" and in figures the year of its incorporation.

ARTICLE X

The fiscal year of the Corporation shall end on December 31 each year, or on such other date as the Board of Directors shall determine.

ARTICLE XI

Indemnification

SECTION 1.   Right to Indemnification.   The Corporation shall to the fullest extent permitted by applicable law as then in effect indemnify any person (the "Indemnitee") who is or was involved in any manner (including, without limitation, as a party or a witness) or is threatened to be made so involved in any threatened, pending or completed investigation, claim, action, suit or proceeding, whether civil, criminal, administrative or investigative (including,

14

without limitation, any action, suit or proceeding by or in the right of the Corporation to procure a judgment in its favor) (a "Proceeding") by reason of the fact that he is or was a director, officer, employee or agent of the Corporation, or is or was serving at the request of the Corporation as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise (including, without limitation, any employee benefit plan), against all expenses (including attorneys' fees), judgments, fines and amounts paid in settlement actually and reasonably incurred by the Indemnitee in connection with such Proceeding.   Such indemnification shall be a contract right and shall include the right to receive payment in advance of any expenses incurred by the Indemnitee in connection with such Proceeding, consistent with the provisions of applicable law as then in effect.

SECTION 2.   Insurance, Contracts and Funding.   The Corporation may purchase and maintain insurance to protect itself and any person entitled to indemnification under this Article XI against any expenses, judgments, fines and

amounts payable as specified in this Article XI, to the fullest extent permitted by applicable law as then in effect. The Corporation may enter into contracts with any person entitled to indemnification under this Article XI in furtherance of the provisions of this Article XI and may create a trust fund, grant a security interest or use other means (including, without limitation, a letter of credit) to ensure the payment of such amounts as may be necessary to effect indemnification as provided in this Article XI.

SECTION 3.  Indemnification Not Exclusive Right.  The right of indemnification provided in this Article XI shall not be exclusive of any other rights to which those seeking indemnification may otherwise be entitled, and the provisions of this Article XI shall inure to the benefit of the heirs and legal representatives of any person entitled to indemnification under this Article XI and shall be applicable to Proceedings commenced or continuing after the adoption of this Article XI, whether arising from acts or omissions occurring before or after such adoption.

SECTION 4.  Advancement of Expenses.  In furtherance and not in limitation of the foregoing provision, all reasonable expenses incurred by or on behalf of the Indemnitee in connection with any Proceeding shall be advanced to the Indemnitee by the Corporation within 20 calendar days after the receipt by the Corporation of a statement or statements from the Indemnitee requesting such advance or advances from time to time, whether prior to or after final disposition of such Proceeding. Such statement or statements shall reasonably evidence the expenses incurred by the Indemnitee and, if

15

required by law at the time of such advance, shall include or be accompanied by an undertaking by or on behalf of the Indemnitee to repay the amounts advanced if it shall ultimately be determined that the Indemnitee is not entitled to be indemnified against such expenses pursuant to this Article XI.

SECTION 5.  Effects of Amendments.  Neither the amendment or repeal of, nor the adoption of a provision inconsistent with, any provision of this Article XI (including, without limitation, this Section 5) shall adversely affect the rights of any Indemnitee under this Article XI with respect to any Proceeding commenced or threatened prior to such amendment, repeal or adoption of an inconsistent provision.

SECTION 6.  Severability.  If any provision or provisions of this Article XI shall be held to be invalid, illegal or unenforceable for any reason whatsoever: (a) the validity, legality and enforceability of the remaining provisions of this Article XI (including, without limitation, all portions of any paragraph of this Article XI containing any such provision held to be invalid, illegal or unenforceable) shall not in any way be affected or impaired thereby; and (b) to the fullest extent possible, the provisions of this Article XI (including, without limitation, all portions of any paragraph of this Article XI containing any such provision held to be invalid, illegal or unenforceable, that are not themselves invalid, illegal or unenforceable) shall be construed so as to give effect to the intent manifested by the provision held invalid, illegal or unenforceable.

ARTICLE XII

Amendments

These By-laws may be amended or repealed by the Board at any regular or special meeting thereof, subject to the power of the holders of a majority of the outstanding stock of the Corporation entitled to vote in respect thereof, by their vote at an annual meeting or at any special meeting, to amend or repeal any By-law.

16