IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

COLLINS & AIKMAN CORPORATION and     :
COLLINS & AIKMAN PRODUCTS CO.,        :
as Debtors in Possession,                 :
                                     :
                    Plaintiffs,       :
                                       :
                    v.                :      C.A. No. 07-265-***
                                       :
DAVID A. STOCKMAN, et al.,           :
                                       :
                    Defendants.      :

**DECLARATION OF VERNON R. PROCTOR
IN SUPPORT OF DEFENDANT DAVID R. COSGROVE'S
MOTION TO DISMISS THE COMPLAINT**

VERNON R. PROCTOR declares:

1.       I am an attorney admitted to Bar of the State of Delaware and the Bar of this Court, and a member of the firm of Proctor Heyman LLP, attorneys for defendant David R. Cosgrove. I submit this declaration in support of Mr. Cosgrove's motion to dismiss the Complaint.

2.       Attached hereto as Exhibit A is a true and correct copy of the Complaint filed in this action, dated May 16, 2007.

3.       Attached hereto as Exhibit B is a true and correct copy of excerpts from Collins & Aikman Corporation Monthly Operating Report for the Period of August 1, 2005 through August 31, 2005, filed in *In re Collins & Aikman Corporation*, No. 05-55927, Dkt. No. 1207 (Bankr. E.D. Mich. Sept. 20, 2007).

4.       Attached hereto as Exhibit C is a true and correct copy of an SEC Schedule 14A, Collins & Aikman Products Co., as filed with the Securities and Exchange

Commission.  Collins & Aikman Corp. SEC Form Schedule 14A for 2002, containing a proxy statement dated April 25, 2002.

5.       Attached hereto as Exhibit D is a true and correct copy of an SEC Schedule 14A, Collins & Aikman Products Co., as filed with the Securities and Exchange Commission.  Collins & Aikman Corp. SEC Form Schedule 14A for 2004, containing a proxy statement dated September 30, 2004.

6.       Attached hereto as Exhibit E is a true and correct copy of the Amended Class Action Complaint filed in *Mainstay High Yield Corporate Bond Fund v. Heartland Indus. Partners, L.P.*, No. 07 Civ. 10542 (AJT/SDP), Dkt. No. 13 (E.D. Mich. May 4, 2007).

7.       Attached hereto as Exhibit F is a true and correct copy of the First Amended Complaint to: (I) Avoid and Recover Transfers Pursuant to 11 U.S.C. §§ 544, 547, 548 and 550; and (II) Disallow Claims Pursuant to 11 U.S.C. § 502(d), filed in *Collins & Aikman Corp., et al. v. Cosgrove,* Adv. Pro. No. 07-05697 (SWR), Dkt. No. 3 (Bankr. E.D. Mich. May 17, 2007).

I declare under penalty of perjury that the foregoing is true and correct. Executed on September 14, 2007.

PROCTOR HEYMAN LLP

_Vernon R. Proctor_

Vernon R. Proctor (# 1019)
Email:  vproctor@proctorheyman.com
1116 West Street
Wilmington, DE  19801
(302) 472-7300
Attorneys for Defendant David R. Cosgrove

DATED:        September 14, 2007

2

# EXHIBIT A

# PART 1

**TO THE DECLARATION OF VERNON R. PROCTOR
IN SUPPORT OF DEFENDANT DAVID R. COSGROVE'S
MOTION TO DISMISS THE COMPLAINT**

UNITED STATES DISTRICT COURT

DISTRICT OF delaware

| | | |
|---|---|---|
| COLLINS & AIKMAN CORPORATION and COLLINS & AIKMAN PRODUCTS CO., as Debtors in Possession, | ) ) ) | |
| Plaintiffs, | ) ) | |
| vs. | ) ) | Civil Action No. |
| DAVID A. STOCKMAN, J. MICHAEL STEPP, BRYCE M. KOTH, DAVID R. COSGROVE, PAUL C. BARNABA, ROBERT A. KRAUSE, JOHN A. GALANTE, CHARLES E. BECKER, ELKIN B. MCCALLUM, THOMAS E. EVANS, CYNTHIA HESS, DANIEL P. TREDWELL, W. GERALD MCCONNELL, SAMUEL VALENTI, III, HEARTLAND INDUSTRIAL PARTNERS, L.P., HEARTLAND INDUSTRIAL ASSOCIATES, L.L.C., HEARTLAND INDUSTRIAL GROUP, L.L.C., PRICEWATERHOUSECOOPERS LLP and KPMG LLP, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | **JURY TRIAL DEMANDED** |
| Defendants. | ) ) | |

**COMPLAINT**

Plaintiffs Collins & Aikman Corporation and Collins & Aikman Products Co., as Debtors in Possession ("Plaintiffs") allege the following based upon the investigation of Plaintiffs' Special Counsel. Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## JURISDICTION AND VENUE

1.      The claims asserted herein arise under and pursuant to Sections 10(b), 14(a) of the Exchange Act [15 U.S.C. §§78j(b) and 78t(a)] and Rules 10b-5 and 14a-9 promulgated thereunder by the SEC [17 C.F.R. §240.10b-5] and applicable state law.

2.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act [15 U.S.C. §78aa].

3.      Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. §1391(b); Plaintiffs are Delaware corporations and many of the acts and practices complained of herein occurred in substantial part in this District.

4.      In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## THE PARTIES

**Plaintiffs**

**5.**     Plaintiffs Collins & Aikman Corporation and Collins & Aikman Products Co. are Delaware corporations.  Collins & Aikman Corporation, through its subsidiaries, was engaged in the design, manufacture and supply of automotive interior components.

6.     Plaintiffs Collins & Aikman Corporation and Collins & Aikman Products Co., together with thirty-six of their subsidiaries, each filed a petition for relief under Chapter 11 of Title 11 of the United States Code ("Bankruptcy Code") in the United States Bankruptcy Court for the Eastern District of Michigan, Southern Division ("Bankruptcy Court") on May 17, 2005.  Those Chapter 11 cases have been consolidated for administrative purposes under Chapter 11 Case No. 05-55927(SWR) pursuant to

order of the Bankruptcy Court, and each of those Chapter 11 cases remains pending in the Bankruptcy Court at the present time. The Plaintiffs and their debtor subsidiaries are debtors and debtors in possession in their Chapter 11 cases having all of the rights and powers, entitled to perform all of the functions and duties of a Chapter 11 trustee (with exceptions not here relevant) of a trustee serving in a case under Chapter 11 in accordance with section 1107 of the Bankruptcy Code, 11 USC section 1107.

7.    Plaintiffs and their debtor subsidiaries have proposed and expect to confirm a Chapter 11 plan of reorganization ("Plan") shortly, perhaps as soon as June 5, 2007, and to consummate the Plan within a reasonable period thereafter. Under the Plan, on the date the Plan is consummated, all claims and causes of action of Plaintiffs and their debtor subsidiaries against third parties, whether then pending or available to be brought in the future, are to be assigned to a litigation trust to be administered by a Litigation Trust Administrator for the benefit of the creditors of the Plaintiffs' estates. The proceeds thereof are to be distributed to the creditors of the Plaintiffs' estates according to the terms of the Plan, the Litigation Trust Agreement, and the orders of the Bankruptcy Court having jurisdiction over the Chapter 11 cases.

8.    This action is brought by Plaintiffs in their capacities as debtors in possession, qua trustees of their Chapter 11 estates, to fulfill their fiduciary duties for the benefit of the creditors of such estates who will share in any proceeds of this action. Upon the consummation of the Plan, this action shall be transferred to and carried on by the Litigation Trust formed pursuant to the Plan, under the supervision and direction of the Litigation Trust Administrator appointed by the Bankruptcy Court, and the Litigation Trust will seek to be substituted for the named Plaintiffs in this action.

## Defendants

### Director and Officer Defendants

9.      Defendant David A. Stockman ("Stockman") served as a Director of Collins

& Aikman Corporation ("Collins & Aikman" or the "Company"), Chairman of the Board

and CEO of the Company as follows:  Director from February 2001 to May 12, 2005;

Chairman of the Board from August 2002 to May 12, 2005; and CEO from August 2003 to

May 12, 2005.  Defendant Stockman was a Managing Member of Heartland LLC, as defined

below, and was a founding partner and a Senior Managing Director of Heartland LP, as

defined below.

10.      Defendant J. Michael Stepp ("Stepp") served as the Company's Vice

President and Chief Financial Officer ("CFO") from January 2002 to October 2004,

when he resigned as CFO.  Defendant Stepp also served as a Director of the Company

and Vice Chairman of the Company's Board of Directors from 2000 until his resignation.

Defendant Stepp was also a Senior Managing Partner of Heartland LP.

11.      Defendant Bryce Koth ("Koth") served as the Company's CFO starting on

October 13, 2004.  Prior to serving as CFO, Defendant Koth served as the Company's

Vice President, Tax of the Company from December 2002 to May 2004 when he was

elevated to Vice President, Finance, Controller, and the Company's head of Tax.

12.      Defendant David R. Cosgrove served as the Company's Vice President of

Finance from February to August 2002, Vice President for Financial Planning and

Analysis from August 2002 until October 2004 and Corporate Controller until May 2005.

13.      Defendant Paul C. Barnaba served as the Director of Financial Analysis

for the Company's purchasing department from April 2002 to December 2004 when he

became a Vice President and the Director of Purchasing for the Plastics Division, a
position he held until April 2005.

14.     Defendant Robert A. Krause served as Vice President and Treasurer of the
Company from October 2002 to October 2004 when he assumed the positions of Senior
Vice President, Finance and Administration.

15.     Defendant John A. Galante served as Director, Strategic Planning from
October 2002 to October 2004 and Vice President, Treasurer and Executive Officer of
the Company from October 2004 to termination of his employment on July 29, 2005.
Galante was also a Vice President of Heartland LP.

16.     Defendant Charles E. Becker ("Becker") served as Vice Chairman of the
Board and a Director from July 2001 to his resignation on May 6, 2004.  Becker owned
Becker Group LLC which was sold to Collins & Aikman in July, 2001.  Becker also
served as interim-CEO for a period after Defendant Stockman resigned in May 2005.
Defendant Becker was also a limited partner in Heartland LP.

17.     Defendant Elkin B. McCallum ("McCallum") served as a Director of the
Company from September 2001 until his resignation on May 6, 2004.  McCallum was the
Chairman of the Board and CEO of Joan Fabrics Corporation which sold Joan
Automotive Fabrics to Collins & Aikman in September 2001.

18.     Defendant Thomas E. Evans served as President and CEO of the
Company from April 1999 to August 2002 when he resigned his positions.

19.     Defendant Cynthia Hess ("Hess") served as Director of the Company from
2001 to 2003.  Hess was elected as a director of the Company in connection with

Heartland's acquisition of Collins & Aikman stock and was a Senior Managing Partner of Heartland LP.

20.     Defendant Daniel P. Tredwell served as a director of the Company from February 2001 to May 10, 2006 when he resigned his position.  Tredwell was also a co-founder of Heartland LP and a Member of Heartland LLC.

21.     Defendant W. Gerald McConnell served as a director of the Company from February 2001 to May 10, 2006 when he resigned his position.  McConnell was a Senior Managing Director of Heartland LP and was also a Member of Heartland LLC.

22.     Defendant Samuel Valenti, III, served as a director of the Company from February 2001 to September 30, 2004.  Valenti was a Senior Managing Director of Heartland LP.

23.     The Defendants referenced in ¶¶9-22 above are sometimes referred to herein as the "Director and Officer Defendants."

24.     Each officer and director of Collins & Aikman owed Collins & Aikman, its shareholders and creditors the duty to exercise a high degree of care, loyalty and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Director and Officer Defendants complained of herein involves fraudulent misconduct – a knowing, intentional and culpable violation of their obligations as officers/directors of Collins & Aikman and the absence of good faith on their part for their duties to the Company, its shareholders and its creditors.

25.     By reason of their positions as officers, directors and/or fiduciaries of Collins & Aikman and because of their ability to control the business and corporate

affairs of Collins & Aikman, the Director and Officer Defendants owed Collins &

Aikman, its shareholders and creditors fiduciary obligations of candor, trust, loyalty and

care, and were required to use their ability to control and manage Collins & Aikman in a

fair, just, honest and equitable manner, and to act in furtherance of the best interests of

Collins & Aikman, its shareholders and creditors and not in furtherance of their personal

interests or benefit. In addition, as officers and/or directors of a publicly held company,

the Director and Officer Defendants had a duty to promptly disseminate accurate and

truthful information with respect to the Company's operations and financial condition so

as to fulfill their duty of candor and honesty to Collins & Aikman, the shareholders of

Collins & Aikman and its creditors.

26. To discharge their duties, the directors of Collins & Aikman were required

at all times to exercise reasonable and prudent supervision over the management,

policies, practices and controls of the business and financial affairs of Collins & Aikman.

By virtue of such duties, the Director and Officer Defendants were required, among other

things, to at all times:

(a) Manage, conduct, supervise and direct the business affairs of

Collins & Aikman in accordance with law (including the U.S. securities laws and

Sarbanes-Oxley), government rules and regulations and the charter and bylaws of Collins

& Aikman;

(b) Neither violate nor knowingly permit any officer, director or

employee of Collins & Aikman to violate applicable laws, rules and regulations;

(c) Remain informed as to the then current status of Collins &

Aikman's operations and upon receipt of notice or information of imprudent or unsound

practices, to make a reasonable and diligent inquiry in connection therewith, and to take steps to correct such conditions and practices and make such disclosures as were necessary to comply with the U.S. federal securities and other laws and their duty of candor to the Company's shareholders, creditors, suppliers, customers, employees and others doing business with the Company;

(d)    Establish and maintain systematic and accurate records and reports of the business and affairs of Collins & Aikman and procedures for the reporting of the business and affairs to the Board of Directors and periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)    Maintain and implement an adequate, functioning system of internal legal, financial and accounting controls, such that Collins & Aikman's financial statements would be accurate and complete and the actions of its officers and directors would be in compliance with all applicable laws;

(f)    Exercise reasonable control and supervision over public statements to the securities markets and over trading in Collins & Aikman stock by the officers and employees of Collins & Aikman; and

(g)    Supervise the preparation and filing of any financial reports or other information required by law from Collins & Aikman and examine and evaluate any reports of examinations, audits or other financial information concerning the financial condition and affairs of Collins & Aikman and make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

27.    During all times relevant hereto, each of the Director and Officer Defendants occupied a position with Collins & Aikman or was associated with the

Company in such a capacity as to make him or her privy to confidential and proprietary information concerning Collins & Aikman and its operations, finances and financial condition. Because of these positions and such access, each of the Director and Officer Defendants knew that the true facts specified herein regarding Collins & Aikman's business and finances had not been disclosed to and were being concealed from its shareholders, its creditors, vendors, customers, employees and the public. The Director and Officer Defendants, as corporate fiduciaries entrusted with non-public information, were obligated to disclose material adverse information regarding Collins & Aikman and to take any and all action necessary to ensure that the officers and directors of Collins & Aikman did not act upon such privileged non-public information in a manner which caused the Company to violate the law. Because of the officer and director defendants' positions with the Company, they knew of the adverse non-public information about Collins & Aikman's operations and finances, as well as its accounting practices, markets and business prospects, via access to internal corporate documents (including Collins & Aikman's financial statements, operating plans, budgets and forecasts and reports of actual operations), conversations and connections with other corporate officers and employees, attendance at management and/or board of directors' meetings and meetings of committees thereof and via reports and other information provided to them in connection therewith. Each of the officer and director defendants participated in the issuance and/or review of false and/or misleading statements, including the preparation of false and/or misleading press releases, SEC filings and reports to Collins & Aikman shareholders and/or creditors.

**Heartland Defendants**

28.     Defendant Heartland Industrial Partners, L.P. ("Heartland LP") is a limited partnership organized under the laws of Delaware.   The managing general partner of Heartland LP is Heartland LLC.  Heartland LP is a $1 billion private equity firm.  Defendant Stockman is the founding partner and a Senior Managing Director of Heartland LP; Director Defendants Tredwell, McConnell, and Valenti are all Senior Managing Directors of Heartland LP; and Director Defendant Hess was also a Senior Managing Director of Heartland LP.  Collins & Aikman is one of Heartland LP's largest investments, representing at least 30% of Heartland LP's total investments.

29.     Defendant Heartland Industrial Associates, L.L.C. ("Heartland LLC") is a limited liability company organized under the laws of Delaware.  As of July 1, 2004, Heartland LLC beneficially owned 33,574,772 shares of Collins & Aikman, 34,314,147 shares as of January 1, 2005, and 32,714,147 shares as of March 17, 2005, exclusive of shares owned by Heartland's partners and affiliates as the general partner of several limited partnerships.  In 2001, Heartland owned at least 59.7% of the outstanding common stock of Collins & Aikman and by January 1, 2005, owned 41% of the outstanding common stock.

30.     Defendant Heartland Industrial Group, L.L.C. ("Heartland Industrial") is a limited liability company organized under the laws of Delaware.

31.     Heartland LP, Heartland LLC and Heartland Industrial are collectively referred to herein as "Heartland" or the "Heartland Defendants."  As the managing general partner, Heartland LLC exercised complete control over Heartland LP and, accordingly, beneficially owns and exercises control over all of the Collins & Aikman common stock held by Heartland LP.  At all times relevant to the allegations herein,

Heartland controlled Collins & Aikman through its share ownership of the Company and by designating a majority of the members of the Company's Board of Directors. Moreover, Defendants Stockman and Stepp were Senior Managing Directors of Heartland LP, and John A. Galante, the Company's Treasurer since October 2004, was a Vice President of Heartland LP.

32.    In connection with Heartland's acquisition of Collins & Aikman stock, Heartland LP and Collins & Aikman entered into a Services Agreement dated February 23, 2001, which was subsequently amended on August 7, 2001 (collectively, the "Heartland Services Agreement"). Under the Heartland Services Agreement, Collins & Aikman was required to pay certain annual fees to Heartland equal to (a) a fee of $404,494.38 in cash for the period from the date of the closing of Heartland's purchase of Collins & Aikman stock through March 31, 2001; (b) $3,000,000 in cash for the balance of calendar year 2001; and (c) $4,000,000 for each calendar year thereafter, through the "Termination Date" as such term is defined in the Services Agreement. The Heartland Services Agreement required Collins & Aikman to pay to Heartland LP a fee of $12,000,000 and to reimburse Heartland LP and its affiliates for the reasonable out-of-pocket expenses incurred in connection with Heartland LP's purchase of Collins & Aikman stock. Furthermore, the Heartland Services Amendment provides that, in connection with the consummation of each acquisition or divestiture by the Company or any of its subsidiaries of any business constituting a going concern or any division or line of business or separable plant or manufacturing facility or significant set of related assets, with respect to which Heartland LP provides any significant advisory services, in negotiating, analyzing, arranging and executing such acquisitions and divestitures,

Collins & Aikman shall pay to Heartland LP or its designees a transaction fee in an amount equal to 1% of the aggregate total enterprise value of the business or assets being acquired or divested.

33.     During 2001, 2002, 2003 and 2004, Heartland received total advisory fees from Collins & Aikman of $24.5 million, $5.7 million, $4.0 million, and $10.6 million, respectively – a total of more than $44 million. Of these monies, $22 million went to Defendant Stockman personally.

**Auditor Defendants**

34.     Defendant PriceWaterhouseCoopers LLP ("PwC") was engaged by Collins & Aikman to provide independent auditing, accounting and/or consulting services to the Company, including the examination and review of Collins & Aikman's consolidated financial statements for fiscal years 2001 and 2002. As a result of the services it rendered to the Company, PwC's representatives were frequently present at Collins & Aikman's corporate headquarters and financial offices during 2001, 2002 and a portion of 2003 and during that period had continual access to the Company's confidential corporate financial and business information, including internal and external financial statements and information as to Collins & Aikman's true financial condition and rebate accounting, which information PwC negligently disregarded. PwC actively participated in the examination and review of Collins & Aikman's false financial statements for the years 2001 and 2002 and interim periods. Defendant PwC issued unqualified audit opinions on Collins & Aikman's 2001 and 2002 financial statements.

35.     Defendant KPMG, LLP ("KPMG") was engaged by Collins & Aikman to provide independent auditing, accounting and/or consulting services to the Company, including the examination and review of Collins & Aikman's consolidated financial

statements for fiscal years 2003 and 2004 (the latter never having been completed). As a result of the services it rendered to the Company, KPMG's representatives were frequently present at Collins & Aikman's corporate headquarters and financial offices between part of 2002 and 2003 to 2005 and had continual access to the Company's internal and external financial statements and confidential corporate financial and business information, including information as to Collins & Aikman's true financial condition, internal and external financial statements and rebate accounting, which information KPMG negligently disregarded. KPMG actively participated in the examination and review of Collins & Aikman's false financial statements. Defendant KPMG issued unqualified audit reports on Collins & Aikman's 2003 financial statements.

## SUBSTANTIVE ALLEGATIONS
**Overview of the Destruction of Collins & Aikman**

36.     Collins & Aikman was engaged in the design, manufacture and supply of automotive interior components. The Company sold its products to automotive original equipment manufacturers ("OEMs") such as GM, Ford, Chrysler and others.

37.     Heartland took control of Collins & Aikman in early 2001. Thereafter, at the direction of Heartland, Collins & Aikman went on an acquisition spree, acquiring various businesses in an effort to cement the Company's position as a Tier 1 supplier to OEMs. By the end of 2001, Collins & Aikman had announced and/or completed three major acquisitions which dramatically increased the size of the Company. This acquisition spree positioned the Company for disaster.

38.     Indeed, at the time that Collins & Aikman was aggressively growing its business, auto parts manufacturers and the OEMs were coming under increasing

competitive threats and adverse business conditions.  OEMs, the major automakers, were

increasingly demanding lower prices and were squeezing the profit margins of Collins &

Aikman and other car parts manufacturers.  At the same time, the prices of raw materials

continued to rise, thereby further squeezing profits.  Adding to and exacerbating these

negative trends, Collins & Aikman was struggling to integrate its acquisitions into its

existing operations.

39.    By early 2002, these negative factors were dramatically depressing the

Company's financial results and the Company was increasingly finding itself locked into

long-term contracts with little upside earnings potential.  Unfortunately for Collins &

Aikman, its creditors, shareholders, customers, vendors and employees, instead of

dealing with the issues facing the Company in an open and legal manner, Defendants

concealed the true financial results of operations and condition of the Company,

embarking on a fraudulent accounting scheme which hastened the demise of the

Company and left it unable to right itself.

40.    As detailed further herein, from the fourth quarter of 2001 to the time of

the Company's bankruptcy filing, Defendants employed a variety of fraudulent schemes

designed to artificially inflate the Company's reported financial results, avoid triggering

debt covenants and enable Collins & Aikman to borrow additional funds, thereby

deepening its insolvency.

41.    On May 12, 2005, Collins & Aikman filed for bankruptcy protection

under Chapter 11.  Subsequently, Collins & Aikman determined that the best course for

its creditors and employees would be the sale and liquidation of all of its businesses.  At

present, Collins & Aikman is in the process of selling off all of its businesses and other assets and it will soon cease to exist.

### Heartland Takes Control of Collins & Aikman and Expands the Company's Business Through a Series of Acquisitions

**42.**     In February 2001, Heartland acquired a controlling interest in Collins & Aikman.  As a result, Defendant Stockman and other Heartland representatives assumed positions on the Company's Board of Directors and in Company management.  In addition, Collins & Aikman and Heartland entered into the Heartland Services Agreement, as detailed herein.

43.     Plaintiffs and Heartland L.P. entered into the Heartland Services Agreement thereby giving Heartland contractual control and dominion over the Company's affairs.  Thus, Heartland not only owed plaintiffs fiduciary duties, but also owed them express and implied contractual obligations of good faith, fair dealing and honest performance of the services it provided to the Company under the Heartland Services Agreement and for which it was munificently compensated.

44.     In July 2001, Collins & Aikman acquired Becker Group L.L.C., which manufactured plastic parts for automobiles (the "Becker Acquisition").  Collins & Aikman paid 17 million shares of the Company's stock, issued a three year warrant to the sellers for 500,000 shares at $5 per share and paid off $60 million of Becker Group debt all as part of this purchase price for the Becker Acquisition.  In connection with the acquisition, Heartland was paid an advisory fee of $12 million.

45.     In addition, the Company agreed to pay Becker $18 million for a non-compete agreement, which was to be paid out over five years in equal annual installments (the "Becker Non-Compete").  In March 2003, after making two years of such payments,

Collins & Aikman bought out the Becker Non-Compete for $11.3 million.  Under

applicable law, Becker was obligated to not compete with the Company and, therefore,

there was no reason to enter into a non-compete with him, and he was not entitled to

receive any monies from the Company for his agreement not to compete.  At the time of

the Becker Acquisition, Becker joined the Company's Board of Directors and served on

the Board until he resigned his position on May 6, 2004.

46.    In September 2001, Collins & Aikman acquired Joan Automotive Fabrics

from Joan Fabrics, Inc., which manufactured fabrics (the "Joan Fabrics Acquisition") in

exchange for $100 million in cash and 12,760,000 shares of Collins & Aikman common

stock.  In connection with the Joan Fabrics Acquisition, Defendant McCallum joined the

Company's Board of Directors and served on the Board until he resigned his position on

May 6, 2004.

47.    In December 2001, Collins & Aikman purchased the trim division of

Textron Automotive Company, known as "TAC-Trim."  Collins & Aikman paid $1

billion in cash and assumed debt, 18 million shares of Collins & Aikman common stock

and $245 million in preferred stock of Collins & Aikman Products Company for TAC-

Trim.  Heartland was paid $12.5 million in connection with the TAC-Trim acquisition.

**Improper and Manipulative Accounting
Practices Damage Collins & Aikman**

48.    **The Joan Fabrics Roundtrip Transactions**: As detailed above, in

September 2001, Collins & Aikman acquired Joan Automotive Fabrics from Joan Fabrics.

Shortly thereafter, Defendants Stockman, Stepp and others acting at their direction engaged

in a series of fraudulent "round-trip" transactions with Joan Fabrics which were designed to

enable Collins & Aikman to improperly increase its reported income and artificially inflate its reported financial results.

49.    In the fourth quarter of 2001, Defendant Stepp asked Defendant McCallum, then Chairman of the Board and CEO of Joan Fabrics, for a $3 million payment that would be used to inflate Collins & Aikman's financial results for the fourth quarter of 2001. It was agreed at that time that the Company would repay the $3 million to Joan Fabrics in the future. In other words, the $3 million payment was nothing more than a short term loan. As detailed further herein, the $3 million payment was falsely characterized on Collins & Aikman's financial statements as a supplier rebate for past purchases, which permitted the Company to artificially inflate its fourth quarter of 2001 operating results.

50.    Thereafter, Defendant Stockman personally negotiated additional round trip payments from Joan Fabrics with Defendant McCallum. In total, between the fourth quarter of 2001 and the first quarter of 2003, round-trip payments totaled $15 million. In each case, the "payment" was falsely characterized as a rebate for past purchases from or services provided by Joan Fabrics. As McCallum knew, Joan Fabrics had no legal obligation to make the payments and had only done so at his direction with the agreement that Joan Fabrics would be repaid in the future.

51.    Defendants Stockman, Stepp and others acting at their direction, repaid the "rebates" through a series of transactions which were structured so as to obscure the fact that Joan Fabrics was being repaid. The following payments took place:

- the Company gave back certain looms to Joan Fabrics which were worth $3.1 million for no consideration. In March 2002, Stockman and McCallum had agreed that the Company would repay the $3 million

payment from the fourth quarter of 2001 by transferring the looms to Joan Fabrics for no cost;

- the Company overpaid McCallum the purchase price for Southwest Laminates Inc. in March 2002. Specifically, in exchange for future "rebate" payments, the Company purchased Southwest for $17 million, which was at least $7 million more than the Company estimated it was worth;

- the Company deliberately overpaid to purchase air jet texturing machines from a subsidiary of Joan Fabrics; and

- the Company purportedly purchased looms from Joan Fabrics for the purpose of running a furniture fabrics business. The Company purchased the looms for $4.7 million even though they were only worth approximately $2 million.

52.     By engaging in round-trip transactions with Joan Fabrics and improperly accounting for the payments as rebates, Collins & Aikman's financial results were artificially inflated by at least $14.9 million between 2001 and 2003.

53.     **The Rebate Scheme**: Commencing in early 2002, Defendants caused or allowed Collins & Aikman to begin improperly recognizing rebates from the Company's suppliers before the rebates had actually been earned by the Company.

54.     In the automotive industry, supply contracts generally provide that suppliers will pay rebates to customers in return for a specified volume or type of future business. Under GAAP, rebates should be recorded as reductions in cost. Rebates can only be recognized when the promised purchases have been made.

55.     Starting in early 2002, Defendants caused Collins & Aikman to inflate its earnings by improperly recognizing rebates in three ways (the "Rebate Scheme"). First, rebates would be improperly pulled forward, *i.e.* taken before they were earned. Under this scenario, the Company and a supplier would agree to price reductions over future quarters based on projected purchases. Defendants pulled these rebates forward into the

current quarter, and in order to hide the fraudulent scheme, they had the supplier provide

a side letter which stated that the rebate was for past purchases when, in fact, it was not.

Second, similarly, rebates would be recognized immediately when they were contingent

on future events, usually additional business, which had not yet occurred. Again, the

supplier would provide a side letter attributing the rebate to past purchases when that was

not the case. Finally, some of the improperly recognized rebates involved capital

expenditures by the Company. Under this scenario, the Company would purchase some

capital equipment and would receive a rebate from the seller characterized as a rebate for

past purchases of spare parts and/or maintenance. In truth, the Company had purchased

the equipment or maintenance services for above-market, deliberately inflated prices and

then received back the difference between the cost and the true market price as a

"rebate." These "rebates" were booked as income in the current quarter as opposed to a

reduction in the cost basis of the equipment and/or maintenance purchased.

     56.    The following chart sets forth some of the improperly accounted for

rebates and the suppliers who aided and abetted Defendants in their scheme:

| Name | Rebate Amount (Quarter Recognized) |
|---|---|
| ATC, Inc. | $123,470 (Q4 2002) |
| The Brown Corporation of America | $900,000 (Q3 2002)<br>$500,000 (Q2 2003) |
| Clariant Corporation | $49,000 (Q2 2004) |
| The Dow Chemical Company | $400,000 (Q2 2003) |
| Invista Inc., formerly known as DuPont Textiles & Interiors Inc. | $1,200,000 (Q2 2003) |
| Flambeau Corporation | $235,000 (Q3 2002)<br>$1,000,000 (Q3 2003) |
| Momentive Performance Materials Inc., formerly known as GE Advanced Materials. | $1,500,000 (Q2 2004) |
| Jackson Plastics, Inc. | $138,750 (Q3 2002)<br>$46,250 (Q4 2002) |

| Name | Rebate Amount (Quarter Recognized) |
|---|---|
| M. Dohmen, U.S.A., Inc. | $150,000 (Q2 2004) |
| Manufacturer's Products Co. | $150,000 (Q2 2003) |
| Pine River Plastics, Inc. | $67,000 (Q4 2002) |
| PPG Industries, Inc. | $500,000 (Q2 2002) |
| Reko International Group, Inc. | $250,000 (Q4 2003) |
| Unifi, Inc. | $200,000 (Q2 2004) |

57.     In 2004, as noted above, Defendants expanded the rebate scheme to capital equipment expenditures. The following chart sets forth some of the transactions in the capital equipment scheme and the suppliers who aided and abetted Defendants in this scheme:

| Name | Rebate Amount (Quarter Recognized) |
|---|---|
| The Conair Group, Inc. | $38,000 (Q4 2004) |
| Demag Plastics Group | $1,000,000 (Q2 and Q3 2004) $92,000 (Q4 2004) |
| Milacron Inc., formerly known as Cincinnati Milacron Inc. | $1,000,000 (Q3 2004) |
| Krauss Maffei Corp. | €165,000 or roughly $224,000 (Q4 2004) |

58.     By engaging in the Rebate Scheme, Collins & Aikman's financial results were artificially inflated, as detailed further herein.

**Collins & Aikman Suffers a Liquidity Crisis and Avoids Triggering Debt Covenants Through Improper Accounting Practices**

59.     By early 2002, Collins & Aikman was struggling under the weight of money-losing long term contracts, increasing pricing pressures from OEMs and increasing raw material prices. In order to avoid triggering debt covenants, Defendant Stockman and others acting at his direction engaged in the accounting schemes detailed herein which served to artificially inflate the Company's operating results so that the Company could satisfy its debt covenants.

60.     In August 2004, Collins & Aikman sold approximately $415 million in 12.875% Senior Subordinated Notes due 2012 (the "August Senior Note Offering"). The

offering materials used to sell the notes presented materially false and misleading financial results for the Company as they included financial results that were artificially inflated due to the accounting improprieties detailed herein. In addition, the August Senior Note Offering further deepened the insolvency of the Company by providing it with funds it would rapidly lose and be unable to repay due to the huge hidden operating losses it already had incurred and was continuing to incur.

61.     Indeed, during the time that Defendant Stockman and his confederates ran the Company, Collins & Aikman's debt load had dramatically increased from approximately $884 million as of December 30, 2000 to approximately $1.6 billion as of December 31, 2004.

62.     By January 2005, just a few months after raising the $415 million in the August Senior Note Offering, the liquidity crisis at Collins & Aikman worsened.

63.     At or around this time, Defendant Stockman and others acting at his direction engaged in a scheme to defraud General Electric Capital Corporation ("GECC"). In December 2004, GECC and the Company entered into an agreement whereby GECC factored certain of Collins & Aikman's receivables and advanced monies to the Company based on collateral consisting of a pool of eligible accounts receivable – referred to as the "borrowing base." The amount of money that the Company could "borrow" was determined by calculating the amount of the borrowing base and comparing it to the outstanding debt owed to GECC. If the borrowing base amount exceeded the amount owed to GECC, Collins & Aikman could receive an amount equal to the difference from GECC.

64.     In January 2005, Defendant Stockman and others learned that under the GECC agreement, the Company owed $21.8 million to GECC, money which it was unable to pay.  In order to avoid alerting GECC to the amount owed and the fact that the Company did not have the money to pay what it owed GECC, Defendant Stockman and others acting at his direction improperly and fraudulently included tens of millions of dollars of receivables in the borrowing base that were not eligible for inclusion.  In this way, they were able to artificially and fraudulently reduce the amount of money then owed to GECC – from $21.8 million to $11.8 million.  Thereafter, Defendant Stockman and others acting at his direction continued to include tens of millions of dollars of ineligible receivables in the borrowing base.  In short, Defendant Stockman and others acting at his direction engaged in a pattern of fraudulent conduct with respect to GECC that, when discovered, caused great harm to the Company, its relations with GECC – a major lender to the Company, and its reputation in the business community.

65.     On March 17, 2005, Collins & Aikman issued a press release announcing that it was delaying the issuance of its financial results for fiscal year 2004 while it conducted an internal review of how it accounted for supplier rebates.  The Company further announced that it expected to restate its financial results for the nine months ended September 30, 2004, to reflect the correct accounting for those rebates and that it was continuing to evaluate whether a restatement of prior periods was necessary.  The press release stated that based on an "internal review of vendor rebates" "net adjustments of approximately $10-12 million are required primarily occurring during fiscal 2004."  The press release also indicated that the Company had liquidity of $86 million as of December 31, 2004.

66.     The representations in the press release about the rebate accounting, the scope of that problem and the liquidity of the Company were materially false, fraudulent, and misleading when made.  As Defendants knew, the rebate accounting issue spanned a period as far back to late 2001 and covered substantially all of the rebates that the Company had recognized during that time, as detailed herein, and the Company did not possess $86 million in liquidity - - rather, Collins & Aikman only had $12 million of liquidity due to restrictions on its borrowings.

67.     Following the earnings release, Defendant Stockman and others held a conference call to discuss the Company's financial results.  During that call, Defendant Stockman continued to conceal the true scope of the accounting fraud at the Company, concealed the true liquidity of the Company and deliberately misrepresented the predicted future performance of the Company.  For example, Defendant Stockman told investors on the call that the Company would have EBITDA of between $65-75 million for the first quarter of 2005, even though at that time internal information indicated that the figure would be half that amount (the quarter only had two weeks to go at this point). Defendant Stockman told investors that the Company's capital expenditures for the first quarter of 2005 would be $30 million when at that time they already exceeded $30 million and would be $50 million.  Finally, during the conference call, Defendant Stockman denied that the Company was experiencing liquidity issues when he knew that the Company was then experiencing a severe liquidity crisis.

68.     On March 24, 2005, Defendant Stockman made a presentation to JP Morgan Chase and Credit Suisse First Boston Corporation for the purpose of securing a waiver of compliance with financial covenants in its credit agreements.  During the

presentation, Defendant Stockman concealed the true financial condition of the Company and again understated the Company's capital expenditures for the first quarter of 2005.

69.    Also on March 24, 2005, Collins & Aikman issued a press release announcing that the Audit Committee of the Board of Directors had retained independent counsel to conduct a review of the supplier rebate accounting. Again, the press release understated the scope of the problem at the Company.

70.    In early April 2005, Defendant Stockman and others sought additional financing for the Company from Credit Suisse First Boston Corporation. In order to induce Credit Suisse to lend the Company additional money, Defendant Stockman and others acting at his direction made numerous materially false and misleading statements to Credit Suisse First Boston Corporation concerning the Company's liquidity, capital expenditures and prior and projected financial results. Based, in material part, on these misrepresentations, Credit Suisse First Boston Corporation agreed to lend Collins & Aikman an additional $75 million in financing.

71.    On April 4, 2005, Collins & Aikman issued a press release announcing that it had obtained a commitment from Credit Suisse to provide $75 million in financing and stating, among other things, that the Company had liquidity of $86 million as of December 31, 2004, and $81 million as of March 31, 2005. The representations concerning liquidity were materially false, fraudulent and misleading when made because due to covenant restrictions the Company did not have $86 million of liquidity as of December 31, 2004, but rather had only $12 million, and its liquidity as of March 31, 2005, was $9 million not $81 million.

72.     Because the Company was hemorrhaging cash and losing money at a furious pace, this particular $75 million borrowing further deepened the insolvency of the Company.

73.     Five days later, on May 12, 2005, Collins & Aikman issued a press release announcing, among other things, that Defendant Stockman had been forced by the Board of Directors to resign his positions at the Company.

74.     On May 17, 2005, Collins & Aikman and its subsidiaries filed for protection under Chapter 11 of the Bankruptcy code.

### Defendants Caused Collins & Aikman to File False and Misleading Reports with the SEC and to Issue False and Misleading Statements to Investors

75.     From the fourth quarter of 2001 to the time that the Company filed for bankruptcy protection, Defendants caused Collins & Aikman to file false and misleading quarterly and annual reports with the SEC and to issue materially false and misleading statements to investors concerning the Company's financial performance, operations and prospects. These filings and statements were materially false and misleading because, among other reasons, they contained financial results which were artificially inflated by the improper accounting practices detailed herein. Indeed, Defendants' positive statements falsely portrayed the Company as well positioned to succeed and financially sound when, in truth and in fact, the Company's business was dramatically deteriorating and it was suffering a deepening liquidity crisis. Had the truth been known, Collins & Aikman would have never been able to continue raising money from the public and investment banks.

76.     On or about August 26, 2004, Defendants caused Collins & Aikman to circulate an offering memorandum in connection with the August Senior Note Offering. The offering memorandum incorporated the Company's financial statements for fiscal

years 2001 through the second quarter of 2004. Those financial statements were materially false and misleading because they were not prepared in accordance with GAAP and materially overstated the Company's financial performance, as detailed herein. Using the materially false and misleading offering memorandum, Defendants caused Collins & Aikman to sell and issue the $415 million in 12.875% Senior Subordinated Notes due 2012, thereby causing it to incur additional debt that it could not service and repay and which further deepened the Company's insolvency.

77.    During 2002, 2003 and 2004, Defendants caused Collins & Aikman to file and disseminate to its shareholders materially false and misleading Proxy Statements which failed to disclose that the Company was reporting financial results which were artificially inflated by the improper accounting practices detailed herein. In each of the Proxy Statements, Collins & Aikman sought shareholder approval for, among other things the election of directors, employee stock option plans and compensation policies.

**PwC's and KPMG's Professional Negligence and Accounting Malpractice and Aiding and Abetting Defendants' Breaches of Fiduciary Duty and Violations of Law**

78.    In the performance of their audits and reviews of Collins & Aikman's financial statements, Defendants PwC and KPMG each owed Collins & Aikman a duty to act with reasonable care and competence and perform the services they rendered pursuant to their professional standards. However, PwC and KPMG each violated numerous professional standards and acted with such lack of care that they were indifferent to numerous red flags warning them of the massive financial fraud alleged herein.

79.    Defendant PwC knew or should have known that it issued false audit opinions on Collins & Aikman's false and misleading financial statements for the years ended December 31, 2002 and 2001, and that the Company's interim financial statements

for the quarters ended March 31, 2001 through the quarter ended June 30, 2003, which it reviewed, were materially false and misleading.

80.    Similarly, Defendant KPMG knew or should have known that it issued a false audit opinion on Collins & Aikman's false and misleading financial statements for the year ended December 31, 2003, and that the Company's interim financial statements for the quarters ended September 30, 2003 through the quarter ended September 30, 2004, which it reviewed, were materially false and misleading.

81.    In connection with their audits and reviews of Collins & Aikman's financial statements, both PwC and KPMG had virtually limitless access to the Company's personnel and corporate information and documents, and accounting books and records.  PwC and KPMG personnel were regularly present at Collins & Aikman's headquarters and had access to its employees via face-to-face meetings, e-mail and telephone.  Given their intimate knowledge of Collins & Aikman's business, PwC and KPMG knew or should have known about the numerous accounting irregularities and improprieties alleged herein, and that the Company's financial statements, and related financial information, were materially false and misleading because, among other things, they violated GAAP in numerous respects.[1]

82.    To ensure PwC's and KPMG's loyalty, Collins & Aikman also retained PwC and KPMG to provide it with lucrative non-auditing services.  In fact, from 2001

---

[1] GAAP are those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practices at a particular time. Generally Accepted Auditing Standard ("GAAS") §AU 411.02.  Regulation S-X [17 C.F.R §210.4-01(a)(1)] states that financial statements filed with the SEC that are not prepared in conformity with GAAP are presumed to be misleading and inaccurate.  Additionally, Regulation S-X requires that interim financial statements must also comply with GAAP. [17 C.F.R. 210.01-01]

through 2003, the fees Collins & Aikman paid KPMG and PwC totaled $1.4 million and $11.8 million, respectively.[2] PwC and KPMG partners who were responsible for the Collins & Aikman engagement were particularly motivated to appease Collins & Aikman and the Director and Officer Defendants because their remuneration was closely tied to the fees generated from Collins & Aikman engagements. In addition, the Detroit offices of both PwC and KPMG pressured its partners to establish and maintain a reputation for having a strong presence in the automotive industry and rewarded them financially for their successes in obtaining and maintaining client relationships. Accordingly, the partners of both PwC and KPMG were pressured to compromise themselves by helping their firms create and maintain this reputation and such client relationships.

### PwC's and KPMG's False and Misleading Audit Reports

83.     As detailed herein, PwC and KPMG knew or should have known they falsely represented that Collins & Aikman's financial statements were presented in conformity with GAAP. In addition, PwC and KPMG knew or should have known they falsely represented that their audits were performed in accordance with GAAS and the standards of the Public Company Accounting Oversight Board ("PCAOB").[3]

84.     PwC issued the following false and misleading unqualified audit report, dated February 26, 2002, on Collins & Aikman's financial statements for the year ended December 31, 2001:[4]

---

[2] KPMG's fees subsequent to 2003 are currently unknown.

[3] The PCAOB is a private-sector corporation created by the Sarbanes Oxley Act ("SOX") to oversee the auditors of public companies. Section 103 of SOX directs the PCAOB to establish auditing, quality control, ethics, and independence standards and rules to be used by registered public accounting firms in the preparation and issuance of audit reports.

[4] The index in Item 14(a)(1) of the Company's 2001 Form 10-K listed the following financial statements of Collins & Aikman: (i) Consolidated Statements of Operations for the fiscal years ended December 31, 2001, December 31, 2000 and December 25, 1999; (ii)

To the Board of Directors and Shareholders of Collins & Aikman Corporation:In our opinion, *the 2001 consolidated financial statements* listed in the index appearing under Item 14(a)(1) *present fairly, in all material respects, the financial position of Collins & Aikman Corporation and its subsidiaries at December 31, 2001, and the results of their operations and their cash flows for the year then ended in conformity with accounting principles generally accepted in the United States of America.* In addition, in our opinion, the financial statement schedules listed in the index appearing under Item 14(a)(2) present fairly, in all material respects, the information set forth therein when read in conjunction with the related consolidated financial statements. These financial statements and financial statement schedules are the responsibility of the Company's management; our responsibility is to express an opinion on these financial statements and financial statement schedules based on our audit. *We conducted our audit of these statements in accordance with auditing standards generally accepted in the United States of America*, which require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation. We believe that our audit provides a reasonable basis for our opinion. [Emphasis added.]

85. PwC issued the following false and misleading unqualified audit

report dated February 18, 2003, on Collins & Aikman's financial statements for

the years ended December 31, 2002 and 2001:[5]

---

Consolidated Balance Sheets at December 31, 2001 and December 31, 2000; (iii) Consolidated Statements of Cash Flows for the fiscal years ended December 31, 2001, December 31, 2000 and December 25, 1999; (iv) Consolidated Statements of Common Stockholders' Equity (Deficit) for the fiscal years ended December 31, 2001, December 31,2000 and December 25, 1999; and (v) Notes to Consolidated Financial Statements.

[5] The index in Item 15(a)(1) of the Company's 2002 Form 10-K listed the following financial statements of Collins & Aikman: (i) Consolidated Statements of Operations for the years ended December 31, 2002, December 31, 2001 and fiscal year ended December 31, 2000; (ii) Consolidated Balance Sheets at December 31, 2002 and December 31, 2001; (iii) Consolidated Statements of Cash Flows for the years ended December 31, 2002, December 31, 2001 and fiscal year ended December 31, 2000; (iv) Consolidated Statements of Common Stockholders' Equity (Deficit) for the years ended December 31, 2002, December 31, 2001 and fiscal year ended December 31, 2000; and (v) Notes to Consolidated Financial Statements.

To the Board of Directors and Shareholders of Collins & Aikman Corporation:In our opinion, *the 2002 and 2001 consolidated financial statements* listed in the index appearing under Item 15(a)(1) *present fairly, in all material respects, the financial position of Collins & Aikman Corporation and its subsidiaries at December 31, 2002 and 2001, and the results of their operations and their cash flows for the years then ended in conformity with accounting principles generally accepted in the United States of America.* In addition, in our opinion, the financial statement schedules listed in the index appearing under Item 15(a)(2) present fairly, in all material respects, the 2002 and 2001 information set forth therein when read in conjunction with the related consolidated financial statements. These financial statements and financial statement schedules are the responsibility of the Company's management; our responsibility is to express an opinion on these financial statements and financial statement schedules based on our audits. *We conducted our audits of these statements in accordance with auditing standards generally accepted in the United States of America,* which require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion. The financial statements of Collins & Aikman Corporation as of December 31, 2000, and for the year then ended, were audited by other independent accountants who have ceased operations. Those independent accountants expressed an unqualified opinion on those financial statements in their report dated February 14, 2001 (except with respect to the matter discussed in Note 24 (which in the current report on Form 10-K is Note 23), as to which the date is March 28, 2002).

As discussed in Note 2 to the consolidated financial statements, effective January 1, 2002, the Company changed its method of accounting for goodwill in accordance with the adoption of Statement of Financial Accounting Standards No. 142, "Goodwill and Other Intangible Assets". [Emphasis added.]

86.    KPMG issued the following false and misleading unqualified audit

report, dated March 15, 2004, on Collins & Aikman's financial statements for the

year ended December 31, 2003:[6]

---

[6] The index in Item 15(a)(1) of the Company's 2003 Form 10-K listed the following financial statements of Collins & Aikman: (i) Consolidated Statements of Operations for the years ended December 31, 2003, 2002 and 2001; (ii) Consolidated Balance Sheets at

To The Board of Directors and Stockholders of Collins & Aikman Corporation:We have audited the 2003 consolidated financial statements of Collins & Aikman Corporation and subsidiaries as listed in the accompanying index. These consolidated financial statements and financial statement schedules are the responsibility of the Company's management. Our responsibility is to express an opinion on these consolidated financial statements and financial statement schedules based on our audit.*We conducted our audit in accordance with auditing standards generally accepted in the United States of America.* Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audit provides a reasonable basis for our opinion.In our opinion, *the consolidated financial statements referred to above present fairly, in all material respects, the financial position of Collins & Aikman Corporation and subsidiaries as of December 31, 2003, and the results of their operations and their cash flows for the year then ended, in conformity with accounting principles generally accepted in the United States of America.* Also in our opinion, the related 2003 financial statement schedules, when considered in relation to the basic consolidated financial statements taken as a whole, present fairly in a material respects, the information set forth herein.As discussed in Note 2 to the financial statements, the Company changed its method of accounting for crib supply inventories in 2003. [Emphasis added.]

87.     In addition, at all times relevant to this action, Article 10 of

Regulation S-X [17 C.F.R. 210.10.01(d)] required PwC and KPMG to review, in

accordance with professional standards, the 2001, 2002, 2003 and 2004 quarterly

financial statements Collins & Aikman filed with the SEC on Form 10-Q.

**PwC and KPMG Knew or Should Have Known that Collins &Aikman's Financial Statements Were Materially Misstated and Violated GAAP**

---

December 31, 2003 and 2002; (iii) Consolidated Statements of Cash Flows for the years ended December 31, 2003, 2002 and 2001; (iv) Consolidated Statements of Common Stockholders' Equity (Deficit) for the years ended December 31, 2003, 2002 and 2001; and (v) Notes to Consolidated Financial Statements.

88.     The above-noted audit reports were false and misleading because Collins & Aikman's financial statements violated GAAP in numerous respects, including:

- the Company's accounting for "round-trip" transactions with McCallum;

- the Company's accounting for cash received from suppliers and capital equipment vendors;

- the Company's failure to timely record an impairment in the value of its long-lived assets, goodwill;

- the Company's overstatement of its deferred tax assets;

- the Company's improper reporting of related party transactions; and

- the Company's failure to provide appropriate disclosure about its liquidity issues and ability to continue as a going concern.

89.     Indeed, the myriad of ways in which Collins & Aikman's financial statements violated GAAP, coupled with the materiality and duration of such violations and Collins & Aikman's numerous internal control deficiencies is indicative of PwC's and KPMG's negligence in the "auditing" of such financial statements. In fact, Collins & Aikman has now admitted that in addition to violating GAAP, *it also violated its internal accounting policies and practices*, as PwC and KPMG knew or should have known.

**Improper Accounting of "Round-Trip" Transactions with McCallum**

90.     Collins & Aikman's improper accounting of transactions with Defendant McCallum began in late 2001 when the Company sought $3 million from him solely to increase Collins & Aikman's reported income during the fourth quarter 2001. At the time the transaction was consummated, Collins & Aikman arranged to

repay the $3 million to Defendant McCallum during the subsequent quarter. Therefore, this "round-trip" transaction was, in substance, a loan arrangement which should not have had any positive effect on Collins & Aikman's 2001 reported income.

91.    Nonetheless, Director and Officer Defendants caused Collins & Aikman to improperly account for $2.8 million of the $3 million as a reduction of its operating expenses during the fourth quarter of 2001, thereby inflating its pre-tax earnings during the quarter by a like amount. As a result of the improper accounting of this transaction alone, Collins & Aikman's operating loss during the fourth quarter of 2001 was understated by more than 17% and its annual 2001 operating income was overstated by approximately 9%.

92.    Collins & Aikman's violations of GAAP in its accounting for transactions with Defendant McCallum continued into 2002 when Director and Officer Defendants caused Collins & Aikman to improperly account for businesses and assets it purchased from Defendant McCallum.

93.    During 2002, Collins & Aikman purchased two businesses, Southwest Laminates and Dutton Yarns, from Defendant McCallum. With respect to Southwest Laminates, Collins & Aikman improperly inflated the fair value of the $10 million business by at least $7 million, or 70%, and improperly valued the transaction at $17 million in its financial statements. With respect to Dutton Yards, Collins & Aikman improperly inflated the fair value of the $2 million business by $2.2 million, or 110%, and valued the transaction in its financial statements at $4.2 million.

94.     Similarly, during 2002, Collins & Aikman purchased furniture loom assets from Defendant McCallum worth $2 million for $4.7 million, or approximately 135% more than its fair value, and improperly valued the assets at $4.7 million in its financial statements.

95.     In exchange for receiving approximately $11.9 million in excess consideration for Southwest Laminates, Dutton Yarns and furniture loom assets, Defendant McCallum agreed to have one of his companies, Joan Fabrics, reimburse Collins & Aikman in an equal amount over time, which Collins & Aikman falsely recorded as supplier rebates in its financial statements.

96.     In doing so, the financial statements audited by PwC and KPMG were presented in violation of at least the following provisions of GAAP:

(a)     Statement of Financial Accounting Standards ("SFAS") No. 141, with respect to Collins & Aikman's accounting for business combinations;

(b)     FASB Statement of Concepts ("Concept Statement") No. 2, with respect to accounting for a transaction's economic substance over its form;

(c)     SEC Staff Accounting Bulletin ("SAB") No. 101, Concept Statement Nos. 2 and 5; SFAS No. 48; ARB No. 43; Opinion No. 10; Statement of Position ("SOP") 97-2, Emerging Issues Task Force ("EITF") Abstract Nos. 00-21, 01-09, 02-16, and Technical Practice Aids § 5100, with respect to the recognition of revenues;

(d)     Concept Statement No. 6, with respect to the characteristics of a loan;

(e)    Accounting Principles Board ("APB") Opinion No. 6, with respect to the cost of fixed assets;

(f)    Accounting Research Bulletin ("ARB") No. 43, with respect to fixed asset depreciation;

(g)    SFAS No. 95, with respect to the financial reporting of cash flows; and

(h)    SFAS No. 57, with respect to the financial reporting of related party transactions.

97.    As a result of the above-noted violations of GAAP, Collins & Aikman's financial statements, audited by PwC and/or KPMG improperly:

- overstated the value of its reported goodwill in its audited 2002 and 2003 financial statements by approximately 9.2 million;

- overstated the amount of its reported fixed assets in its audited 2002 and 2003 financial statements by $2.7 million;

- understated the amount of its loss from continuing operations in its audited 2002 and 2003 financial statements by approximately $10.8 million, or approximately 25%, and $1.2 million, respectively;

- overstated the amount of its reported depreciation expense in its audited 2002 and 2003 financial statements;

- overstated the amount of its cash flows from operations in its audited 2002 and 2003 financial statements by approximately $10.8 million, or approximately 25%, and $1.2 million, respectively; and

- overstated the amount of cash used for investing activities in its audited 2002 financial statements by 9.2 million.

**Improper Accounting of Cash Received**

**from Suppliers and Capital Equipment Vendors**

98.    As noted herein, beginning in at least 2002, Defendants caused Collins & Aikman to engage in a scheme to inflate the Company's earnings by improperly and systematically recognizing rebates tied to the future purchases of goods and services. As part of this scheme, Defendants caused Collins & Aikman to falsely account for rebates it received from suppliers as though they had been earned on past purchases when, in fact, such rebates were contingent upon meeting future purchase volume thresholds. Director and Officer Defendants then arranged for the Company's suppliers to provide the Company with side-letters which falsely represented the terms of their rebate arrangements with the Company. Defendants procured such documentation because they understood that GAAP precluded the immediate recognition of the rebates in income until the future volume thresholds were satisfied.

99.    In 2004, Director and Officer Defendants caused the Company to expand its fraudulent rebate accounting scheme to include capital equipment purchases. As part of this scheme, Director and Officer Defendants caused Collins & Aikman to improperly account for discounts it received on capital equipment purchases as rebates earned on prior purchases of goods and services. Director and Officer Defendants then arranged for the Company's capital equipment vendors to provide the Company with side-letters falsely representing the terms of the rebate arrangement with Collins & Aikman because they understood that GAAP required the capital equipment discounts to be accounted for as a reduction of the equipment's cost and not as a component of reported earnings.

100.    As a result of the above accounting machinations, the financial statements audited and reviewed by PwC and KPMG were presented in violation of at least the following provisions of GAAP:

(a)      SEC Staff Accounting Bulletin ("SAB") No. 101, Concept Statement Nos. 2 and 5; SFAS No. 48; ARB No. 43; Opinion No. 10; Statement of Position ("SOP") 97-2, Emerging Issues Task Force ("EITF") Abstract Nos. 00-21, 01-09, 02-16, and Technical Practice Aids § 5100, with respect to the recognition of revenues;

(b)      Accounting Principles Board ("APB") Opinion No. 6, with respect to the cost of fixed assets;

(c)      Accounting Research Bulletin ("ARB") No. 43, with respect to fixed asset depreciation;

(d)      SFAS No. 95, with respect to the financial reporting of cash flows; and

(e)      FASB Concept Statement No. 2, with respect to accounting for a transaction's economic substance over its form.

101.    As a result of its accounting for vendor rebates in violation of GAAP, Collins & Aikman's financial statements audited and reviewed by PwC and/or KPMG improperly overstated its operating income or understated its operating loss as follows:

|  | Reported Operating Income (Loss) | Improperly Recorded Supplier | % Over |
|---|---|---|---|

| | ($mil) | Rebates ($mils) | stated (Understated) |
|---|---|---|---|
| Q4 2001 | (16.3) | 2.8 | (17%) |
| Q1 2002 | 49.4 | 5.0 | 10% |
| Q2 2002 | 79.2 | 2.3 | 3% |
| Q3 2002 | (7.6) | 3.3 | (43%) |
| Q4 2002 | 33.9 | 2.2 | 6% |
| Q1 2003 | 17.5 | 1.7 | 10% |
| Q2 2003 | 41.1 | 3.0 | 7% |
| Q3 2003 | 4.1 | 4.2 | 102% |
| Q4 2003 | 25.7 | 4.7 | 18% |

| Q1 2004 | 28.8 | 1.1 | 4% |
| Q2 2004 | 20.7 | 5.4 | 26% |
| Q3 2004 | 1.6 | 7.9 | 494% |

102.    The above noted material financial misstatements did not simply end with Collins & Aikman's completely distorted audited and reviewed income statements.  For example, Collins & Aikman's audited and reviewed statements of cash flows balance sheets and statements of shareholders' equity were also materially misstated.  As noted in the SEC's SAB No. 99:

> *[T]he staff believes that* a registrant and the *auditors* of its financial statements *should not assume that even small intentional misstatements in financial statements, for example those pursuant to actions to "manage" earnings, are immaterial.*  While the intent of management does not render a misstatement material, it may provide significant evidence of materiality.  The evidence may be particularly compelling where management has intentionally misstated items in the financial statements to "manage" reported earnings.  In that instance, it presumably has done so believing that the resulting amounts and trends would be significant to users of the registrant's financial statements.  *The staff believes that investors generally would regard as significant a management practice to over- or under-state earnings up to an amount just short of a percentage threshold in order to "manage" earnings.*  Investors presumably also would regard as significant an accounting practice that, in essence, rendered all earnings figures subject to a management-directed margin of misstatement.  [Footnotes deleted, emphasis added.]

### Failure to Timely Record an Impairment in the Value of Its Long-Lived Assets and Goodwill

**103.**    In March 2005, Collins & Aikman announced $325 million and $175 million goodwill impairment charges associated with its U. S. and Mexico Plastics and Global Fabric divisions, respectively.  Pursuant to GAAP, *i.e.*, SFAS Nos. 142

and 144, long-lived assets and goodwill are to be tested for impairment whenever events or circumstances indicate that such assets may not be recoverable.

104.    Collins & Aikman's March 2005 announcement disclosed that the above-noted impairment charges were recorded after giving consideration to the impact of increases in raw material prices, pricing pressures from customers, general economic conditions, the state of the automotive industry, and other factors beyond management's control.  Indeed, these same conditions, which indicated to Collins & Aikman that the value of its reported long-lived and goodwill assets was impaired, were in existence long before Collins & Aikman was on the brink of bankruptcy in March 2005.

105.    For example, Collins & Aikman's U. S. and Mexico Plastics division was under such financial stress that, during the fourth quarter of 2003, it terminated approximately 500 of the division's employees and undertook a major restructuring initiative.  In fact, according to a July 27, 2005 article in the Detroit Free Press, the Company was losing an estimated $50 million a year on a single long-term plastics and fabrics contract with DaimlerChrysler.  Nonetheless, the Collins & Aikman financial statements audited and reviewed by KPMG failed to timely record an impairment in the value of the Company's long-lived assets and goodwill.

106.    As a result of the foregoing, the financial statements audited and reviewed by KPMG were presented in violation of at least the following provisions of GAAP:

# EXHIBIT A

# PART 2

**TO THE DECLARATION OF VERNON R. PROCTOR
IN SUPPORT OF DEFENDANT DAVID R. COSGROVE'S
MOTION TO DISMISS THE COMPLAINT**

(a)    SFAS No. 142, with respect to the impairment of goodwill;

and

(b)    SFAS No. 144, with respect to the impairment of long-

lived assets.

### Overstatement of Its Deferred Tax Assets

107.    Financial statements report a deferred tax asset to recognize an

entity's probable future tax benefits.    Pursuant to GAAP, *i.e.*, SFAS No. 109,

deferred tax assets must be realizable; that its, the entity's anticipated taxable income

should be sufficient to support the value of the deferred tax asset.    When it is more

likely than not that some portion or all of the tax deferred benefits will not be

realized due to an uncertainty about an entity's future taxable income, GAAP

requires that an appropriate portion of deferred tax assets be written off

108.    In March 2005, Collins & Aikman announced that its provision for

income taxes for the fourth quarter of 2004 included a $175 million write-down

of net deferred tax assets.    In recording the charge, Collins & Aikman determined

that its deferred tax assets might not be realizable based on its analysis of the

Company's future taxable income.

109.    Indeed, the realizeability of the Company's deferred assets was in

question long before March 2005.    In fact, without giving effect to the artificial

inflation of the Company's earnings resulting from the malfeasance alleged

herein, Collins & Aikman's reported losses from its continuing operations totaled

$171 million during the three years ended December 31, 2003.    In addition, the

Company's operating results were adversely impacted by high acquired business

integration costs during 2001 and it was being squeezed between OEM cost-reduction mandates and raw material price increases as early as 2001.

110.    These conditions indicated that it was more likely than not that some portion of its deferred tax assets was not realizable. Nonetheless, the Collins & Aikman's financial statements audited and reviewed by KPMG failed to timely record a write-down in the value of its deferred tax assets. As a result, the financial statements audited and reviewed by PwC and KPMG were presented in violation of SFAS No. 109.

### Improper Reporting of Related Party Transactions

111.    GAAP, in SFAS No. 57, provides that an "enterprise's financial statements may not be complete without additional explanations of and information about related party transactions and thus may not be reliable."[7] Accordingly, SFAS No. 57 requires that financial statements identify material related party transactions and disclose: (a) the nature of the relationship(s); (b) a description of the transaction(s); (c) the dollar amount of transactions for each period for which an income statement is presented; and (d) the amounts due from or to the related parties as of the date of each balance sheet.

---

[7] SFAS No. 57 defines related parties as: affiliates of the enterprise; entities for which investments are accounted for by the equity method by the enterprise; trusts for the benefit of employees; principal owners of the enterprise; its management; members of the immediate families of principal owners of the enterprise and its management; and other parties with which the enterprise may deal if one party controls or can significantly influence the management or operating policies of the other to an extent that one of the transacting parties might be prevented from fully pursuing its own separate interests. Another party also is a related party if it can significantly influence the management or operating policies of the transacting parties or if it has an ownership interest in one of the transacting parties and can significantly influence the other to an extent that one or more of the transacting parties might be prevented from fully pursuing its own separate interests.

112.   In addition, the SEC's SAB Topic 4E, provides:

[I]n some cases, the significance of an amount may be independent of the amount involved.  For example, amounts due to and from officers and directors, because of their special nature and origin, ought generally to be set forth separately [in financial statements] even though the dollar amounts involved are relatively small.

113.   The Collins & Aikman financial statements audited and reviewed by PwC and KPMG failed to provide the disclosure called for under the above provisions of GAAP associated with its transactions with defendants Becker, McCallum and entities that they controlled.  As a result, the financial statements audited and reviewed by PwC and KPMG were presented in violation of at least GAAP's SFAS No. 57 and SAB Topic 4.

### Failure to Provide Appropriate Disclosure About its Ability to Continue as a Going Concern

**114.**   When there is substantial doubt about an entity's ability to continue as a going concern, GAAP, in the SEC's Codification of Financial Reporting Policies ("CFRP") §607.02, (via reference to Statement on Auditing Standards No. 34), requires financial statements to disclose the principal conditions that raise questions about the entity's ability to exist, the possible effects of such conditions, management's evaluation of the significance of those conditions and any mitigating factors.

115.   Despite these provisions of GAAP, the Collins & Aikman financial statements audited and reviewed by KPMG failed to provide the disclosure about Collins & Aikman's ability to continue as a going concern.

116.   As noted herein, as early as 2001, Collins & Aikman's operating results were adversely impacted by high business integration costs and were being

squeezed between OEM cost-reduction mandates and raw material price increases. As a result, the Company's reported losses from its continuing operations during the three years ended December 31, 2003, without giving effect to the fraud alleged herein, totaled $171 million. These conditions adversely impacted Collins & Aikman's liquidity, which deteriorated rapidly while its net debt nearly doubled, rising from $884 million at December 30, 2000, to approximately $1.6 billion at December 31, 2004.

117. As a result of this liquidity crisis, Collins & Aikman was unable to pay for the staffing required by its customer contracts, causing projects to be grossly understaffed and mismanaged. This contributed to serious quality control issues resulting in a repeated inability of the Company's products to pass required inspection processes.

118. In addition, as noted herein, Collins & Aikman was locked into a significant number of long-term money-losing contracts, particularly those with DaimlerChrysler. These internal adversities, coupled with the problems experienced by the U.S. automobile industry in general, created substantial doubt about Collins & Aikman's ability to continue as a going concern at least as early as 2003.

119. Nonetheless, in violation of CFRP §607.02, the financial statements audited and reviewed by KPMG, improperly failed to provide appropriate disclosure about the Company's doubtful ability to continue as a going concern.

**Other Violations of GAAP**

120.    In addition to the accounting violations noted above, Defendants caused the Company to present its financial statements in a manner that also violated at least the following provisions of GAAP:

(a)    The concept that financial reporting should provide information that is useful to present to potential investors and creditors and other users in making rational investment, credit and similar decisions (Concepts Statement No. 1, 34);

(b)    The concept that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and the effects of transactions, events and circumstances that change resources and claims to those resources (Concepts Statement No. 1, 40);

(c)    The concept that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it. To the extent that management offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective investors and to the public in general (Concepts Statement No. 1, 50);

(d)    The concept that financial reporting should provide information about an enterprise's financial performance during a period. Investors and creditors often use information about the past to help in assessing the prospects of an enterprise. Thus, although investment and credit decisions reflect investors' expectations about future enterprise performance, those

expectations are commonly based at least partly on evaluations of past enterprise performance (Concepts Statement No. 1, 42);

      (e)    The concept that financial reporting should be reliable in that it represents what it purports to represent. That information should be reliable as well as relevant is a notion that is central to accounting (Concepts Statement No. 2, 58-59);

      (f)    The concept of completeness, which means that nothing is left out of the information that may be necessary to ensure that it validly represents underlying events and conditions (Concepts Statement No. 2, 79); and

      (g)    The concept that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered. The best way to avoid injury to investors is to try to ensure that what is reported represents what it purports to represent (Concepts Statement No. 2, 95, 97).

      121.    As a result of its numerous violations of GAAP, Collins & Aikman's true GAAP financial statements for the years ended December 31, 2001, 2002, and 2003 bear little resemblance to the financial statements "audited" by Defendants PwC and KPMG. Indeed, the myriad of ways in which Collins & Aikman's financial statements violated GAAP, coupled with the duration of such violations and the magnitude of Collins & Aikman's financial misstatements, evidences PwC's and KPMG's negligence in the performance of their respective "audits" of Collins & Aikman's financial statements.

**PwC and KPMG Knew or Should Have Known that
Their "Audits" of Collins & Aikman's Financial Statements Were
Not Conducted in Accordance with GAAS**

122.    In certifying the Company's financial statements, Defendants PwC and KPMG also falsely represented that their audits were conducted in accordance with GAAS, which requires that:[8]

(a)    The audit is to be performed by a person or persons having adequate technical training and proficiency as an auditor;

(b)    In all matters relating to the assignment, an independence in mental attitude is to be maintained by the auditor or auditors;

(c)    Due professional care is to be exercised in the performance of the audit and the preparation of the report;

(d)    The work is to be adequately planned and assistants, if any, are to be properly supervised;

(e)    A sufficient understanding of the internal control structure is to be obtained to plan the audit and to determine the nature, timing and extent of the tests to be performed;

(f)    Sufficient competent evidential matter is to be obtained through inspection, observation, inquiries and confirmations to afford a reasonable basis for an opinion regarding the financial statements under audit;

(g)    Informative disclosures in the financial statements are to be regarded as reasonably adequate unless otherwise stated in the report; and

---

[8] Prior to the creation of the PCAOB, the AICPA promulgated U.S. auditing standards. To the extent they have not been superseded or amended by the PCAOB, the auditing standards issued by the AICPA (which are codified and referred to as AU §___) have been adopted by the PCAOB as its interim standards to be used on an initial, transitional basis.

(h)    The report shall either contain an expression of an opinion regarding the financial statements, taken as a whole, or an assertion to the effect that an opinion cannot be expressed.  When an overall opinion cannot be expressed, the report should contain a clear-cut indication of the character of the auditor's work, if any, and the degree of responsibility the auditor is taking.

123.    PwC's and KPMG's audit opinions on the Company's financial statements falsely represented that they performed their audits in accordance with U.S. auditing standards.  In fact, PwC and KPMG violated GAAS in numerous respects during the course of their "audits" of Collins & Aikman's financial statements.

124.    For example, GAAS, as set forth in AU §326, required PwC and KPMG to:

- Obtain sufficient competent evidential matter through inspection, observation, inquiries and confirmations to afford a reasonable basis for an opinion regarding the financial statements under audit;

- Consider whether specific audit objectives have been achieved in evaluating evidential matter;

- Be thorough in the search for evidential matter and unbiased in its evaluation;

- Design audit procedures to obtain competent evidential matter; and

- Consider relevant evidential matter regardless of whether it appears to corroborate or to contradict the assertions in the client's financial statements.

125.    In violation of the above GAAS standard, PwC and KPMG did not obtain sufficient competent evidential matter in the performance of their audits.

126.    For example, Defendants caused the Company to routinely arrange for third parties to create "false side-letters" which were provided to PwC and

KPMG as "proof" that the Company properly recorded the rebates in its accounting records. As noted in the AICPA's 1998/1999 *Audit Risk Alert*, side-agreements are "agreements hidden from an entity's Board of Directors and outside auditors that materially alter the terms and conditions of recorded [transactions]."[9]

127. Here, however, false side-agreements were provided to PwC and KPMG as "proof" that Collins & Aikman properly recorded the rebates in their accounting record as being associated with achieved, rather than future, milestones. The mere presence of these false side letters clearly indicated to PwC and KPMG that either: (a) the original vendor agreements did not contain the provisions set forth in the side-agreements; or (b) the original vendor agreements contained terms which indicated the rebates were for *future* and not *achieved* milestones.

128. Had PwC and KPMG examined Collins & Aikman's original supplier agreements in accordance with GAAS, they would have learned, if they did not already know, that such agreements contained provisions that were contrary to or silent about when Collins & Aikman was entitled to millions of dollars in rebates. In either case, it was highly irregular and implausible that the Company needed to procure numerous side-agreements since nearly all of the Company's original contracts with its suppliers either did not contain key terms or contained terms contrary to those set forth in the side letters regarding its entitlement to multi-million dollar rebates.

---

[9] *Audit Risk Alerts* are published by the AICPA to provide auditors with an overview of recent economic and professional developments that may affect the audits they perform.

129.    The conflicting or missing contractual supplier rebate entitlement provisions that Collins & Aikman had to repeatedly obtain in the form of side-agreements were a red flag which should have warned PwC and KPMG of an elevated risk that Collins & Aikman's financial statements may be materially misstated due to management fraud.  Nonetheless, both PwC and KPMG negligently failed to investigate or ignored this red flag and, in violation of GAAS, failed to obtain the audit evidence necessary to assess the propriety of Collins & Aikman's rebate accounting.  Indeed, PwC and KPMG did so in spite of repeated warnings by the SEC and AICPA which alerted them about the use of side-agreements to perpetrate financial fraud.  In fact, AICPA Audit and Accounting guides issued by the AICPA specifically indicate that the mere existence of side-agreements is a risk factor of material misstatement due to fraudulent financial reporting.

130.    It has now been determined that 84% of the rebate transactions constituting 96% of the total dollar value of all rebates were improperly recorded.  Had PwC and KPMG obtained sufficient competent evidential matter in the course of "auditing" Collins & Aikman's financial statements in accordance with GAAS, they would have learned of, if they it did not already know, *that nearly all* of Collins & Aikman's recorded rebates were accounted for improperly.

131.    In addition, GAAS, in AU §316, required PwC and KPMG to plan and perform their audits in a manner which provided them reasonable assurance that Collins & Aikman's financial statements were free from misstatements caused by error or fraud.  This mandate included evaluating the business rationale

for significant, unusual transactions and events, such as Collins & Aikman's on-going need to procure side letters from vendors to justify its accounting for rebates. In fact, AU §316 required PwC and KPMG to "gain an understanding of the business rationale for such transactions and whether that rationale (or the lack thereof) suggests that the transactions may have been entered into to engage in fraudulent financial reporting or conceal misappropriation of assets."

132.    AU §316 also should have put PwC and KPMG on notice of material financial misstatement risk factors arising from fraudulent financial reporting, which were present at Collins & Aikman including:

- A failure by management to display and communicate an appropriate attitude regarding internal control and the financial reporting process. Specific indicators might include:

    (i)    Inadequate monitoring of significant controls;

    (ii)    Management failing to correct known reportable conditions on a timely basis;

    (iii)    Management continuing to employ ineffective accounting, information technology and internal auditing staff; and

    (iv)    Management setting unduly aggressive financial targets and expectations for operating personnel;

- High turnover of senior management, counsel, or board members;

- Strained relationship between management and the current or predecessor auditor. Specific indicators might include:

    (v)    Frequent disputes with the current or predecessor auditor on accounting, auditing, or reporting matters; and

                              (vi)     Domineering management behavior in dealing with the auditor, especially involving attempts to influence the scope of the auditor's work;

- High degree of competition or market saturation, accompanied by declining margins;

- Declining industry with increasing business failures and significant declines in customer demands;

- Significant related-party transactions not in the ordinary course of business or with related entities not audited or audited by another firm;

- Significant, unusual, or highly complex transactions, especially those close to year end, that pose difficult "substance over form" questions;

- Unusually high dependence on debt or marginal ability to meet debt repayment requirements; debt covenants that are difficult to maintain;

- Threat of imminent bankruptcy or foreclosure, or hostile takeover; and

- Significant pressure to obtain additional capital necessary to stay competitive considering the financial position of the entity – including need for funds to finance major research and development or capital expenditures.

133. Each of the above risk factors, all of which were present at Collins & Aikman, was a red flag that should have warned PwC and KPMG about the risk of material misstatements in the Company's financial statements. Nonetheless, PwC and KPMG ignored these red flags and failed to adequately plan and perform their audit procedures in a manner reasonably designed to identify the numerous financial improprieties alleged herein. Such failures permitted Collins & Aikman to issue materially false and misleading financial statements over a multi-year period.

134.    Moreover, Section 10A of the Securities Exchange Act required PwC and KPMG to "determine," in the course of their audits, whether an illegal act occurred and to notify the SEC if they became aware of information indicating that an illegal act occurred (if Collins & Aikman's management or Board of Directors failed to take appropriate remedial action with respect to the illegal acts). In fact, the financial fraud alleged herein was not perpetrated by rogue employees at some distant location. Rather, it occurred at Collins & Aikman's headquarters where PwC and KPMG had virtually limitless access to the Company's personnel and corporate records, evidencing their negligent disregard for the requirements imposed by Section 10A of the Securities Exchange Act in the performance of their "audits" of Collins & Aikman's year end financial statements.

135.    In addition, GAAS Standard of Field Work No. 2 required PwC and KPMG to make a proper study of Collins & Aikman's existing internal controls, including accounting, financial and managerial controls, to determine whether reliance thereon was justified and, if such controls were not reliable, to expand the nature and scope of their auditing procedures. The standard provides that a sufficient understanding of an entity's internal control structure must be obtained to adequately plan the audit and to determine the nature, timing and extent of audit tests they must perform.

136.    Arthur Andersen, LLP ("AA"), which audited Collins & Aikman's financial statements prior to December 31, 2001,[10] put both PwC and KPMG on

---

[10] AA was terminated by Collins & Aikman during 2001, approximately one year prior to its indictment for obstruction of justice in connection with Enron Corporation.

notice that Collins & Aikman was experiencing ongoing deficiencies with its system of internal controls over its financial reporting.[11]  For example, AA noted Collins & Aikman's internal control deficiencies associated with: (i) IT systems, including those resulting from it acquisition of companies with disparate technologies; (ii) records supporting transactions included in its accounting ledgers; and (iii) the insufficiency of its staff training.

137.    In fact, both PwC and KPMG knew of and turned a blind eye towards Collins & Aikman's significant internal control deficiencies.  For example, in the summer of 2003, PwC sent a letter to the Company's Audit Committee and management that described Collins & Aikman's "reportable conditions."[12]  Specifically, on June 26, 2003, Collins & Aikman filed a Form 8-K with the SEC which stated:

> In connection with its 2001 audit, PricewaterhouseCoopers LLP communicated to the Audit Committee and to management reportable conditions in the Company's internal control systems, attributable primarily to integration issues from an acquisition completed during the third quarter of 2001, personnel turnover at the corporate and plant level and failure of two manufacturing facilities to follow Company procedures related to account reconciliations.  Corrective actions were implemented in 2002.  In connection with its 2002 audit, PricewaterhouseCoopers LLP communicated to the Audit Committee and to management reportable conditions in the Company's internal control system related to timely preparation of cash account reconciliations, review of non-standard journal entries, revenue accounting, and currency translation at foreign locations and compliance with established Company accounting policies and procedures.  These conditions were attributable

---

[11] AU §315 requires a newly retained auditor to communicate with the predecessor auditor about the company to be audited including matters relating to the company's internal controls.

[12] Reportable conditions are matters, in an auditor's judgment, that need be communicated to an entity's audit committee because they represent significant deficiencies in the design or operation of an entity's internal control which could adversely affect the entity's ability to initiate, record, process and report financial data.  AU § 325

primarily to computer systems, process harmonization and personnel integration issues from the December 20, 2001, TAC- Trim acquisition.

138.    Nonetheless, KPMG and PwC both ignored these and other internal control related flags during the course of their "audits" and issued unqualified opinions on Collins & Aikman's financial statements.  In fact, just weeks before filing for bankruptcy, Collins & Aikman announced that these same internal control deficiencies identified by AA and PwC in prior years remained uncorrected:

> [P]otential material weaknesses identified include the following: (i) the adequacy of the Company's resources with appropriate accounting expertise to address accounting and reporting matters in certain areas, including revenue recognition, vendor arrangements and post-retirement benefits, and to supervise the Company's decentralized and disparate accounting environment and ensure an appropriate segregation of duties; (ii) the adequacy of the Company's internal audit function's resources and ability to monitor compliance with established policies and procedures; (iii) the effectiveness of certain information technology controls and the sufficiency of documentation to assess the effectiveness of such controls including embedded system application controls; (iv) the adequacy of procedures to consistently identify and reconcile fixed assets and periodically review assets for impairment; and (v) the completeness and consistent adherence to Company policies and procedures.  These issues include a range of documentation-related issues and reconciliation issues.

139.    Collins & Aikman's limited internal investigation concluded that material weaknesses in its system of internal control contributed to the financial fraud alleged herein.

140.    PwC and KPMG, as auditors, were obligated to assess Collins & Aikman's internal financial and accounting controls and determine whether such controls were effective and if they complied with the requirements of SOX.  PwC and KPMG were also required by GAAS to evaluate whether Collins & Aikman's

deficient internal controls might lead or contribute to the risk of fraud not being

detected. Nonetheless, PwC and KPMG were aware of and turned a blind eye

toward such deficiencies.

141. GAAS also requires that auditors examine related party

transactions to ensure that they are properly accounted for so as to reflect their

economic substance rather than form. According to AU §334, PwC and KPMG

were required to:

- Obtain an understanding of the business purpose of the related party transactions;

- Examine invoices, executed copies of agreements, contracts, and other pertinent documents;

- Determine whether the transaction has been approved by the board of directors or other appropriate officials;

- Test for reasonableness the compilation of amounts to be disclosed, or considered for disclosure, in the financial statements;

- Arrange for the audits of inter-company account balances to be performed as of concurrent dates, even if the fiscal years differ, and for the examination of specified, important, and representative related party transactions by the auditors for each of the parties, with appropriate exchange of relevant information;

- Inspect or confirm and obtain satisfaction concerning the transferability and value of collateral.

142. PwC and KPMG violated the requirements of GAAS's AU §334

and failed to determine that the values Collins & Aikman ascribed to entities that

it purchased from Defendant McCallum in its financial statements were millions

of dollars greater than their respective appraised values, which otherwise

evidenced PwC's and KPMG's negligence in the performance of their audits of

Collins & Aikman's financial statements. In fact, KPMG's audit was conducted

with such lack of care that it issued an unqualified audit opinion on Collins &

Aikman's financial statements after Collins & Aikman disclosed how its Audit

Committee commenced an investigation after two former Collins & Aikman

executives called into question the integrity of the Company's financial reporting

as a result of the improper related party transactions alleged herein.

143.    In addition to the foregoing violations of GAAS, PwC and KPMG

violated at least the following provisions of GAAS in auditing Collins &

Aikman's financial statements:

(a)    General Standard No. 3, which requires that due

professional care be exercised by the auditor in the performance of the audit and

the preparation of the audit report. Due professional care also requires that the

auditor maintain professional skepticism in the course of auditing a client's

financial statements.

(b)    GAAS Standard of Reporting No. 1, which requires the

audit report to state whether the financial statements are presented in accordance

with GAAP. PwC's and KPMG's opinion falsely represented that Collins &

Aikman's financial statements were presented in conformity with GAAP when

they were not for the myriad of reasons herein alleged.

(c)    GAAS Standard of Reporting No. 4, which requires that

when an opinion on the financial statements as a whole cannot be expressed, the

reasons therefore must be stated. PwC and KPMG were required to state that

either no opinion could be issued by them on Collins & Aikman's financial

statements or else issue an adverse opinion stating that such financial statements

were not fairly presented in conformity with GAAS.  PwC's and KPMG's failure

to make such a qualification, correction, modification and/or withdrawal of its

audit opinions was a violation of GAAS, including the fourth standard of

reporting.

      (d)    GAAS General Standard No. 2, which requires that

independence in mental attitude is to be maintained by the auditor in all matters

related to the audit.

      (e)    GAAS General Standard No. 1, which requires that audits

be performed by persons having adequate technical training and proficiency.

      (f)    GAAS Standard of Field Work No. 1, which requires that

the audit is to be adequately planned and that assistants should be properly

supervised.

      (g)    GAAS Standard of Reporting No. 2, which requires that the

audit report identify circumstances in which GAAP has not been consistently

observed.

    144.    As they knew or negligently ignored, Defendants PwC and KPMG

falsely represented that they conducted their audits of Collins & Aikman's

financial statements in accordance with each of the above-noted auditing

standards.

## KPMG's Additional Violations of GAAS

    **145.**    GAAS, in AU§ 341, required KPMG to evaluate whether there was

substantial doubt about Collins & Aikman's ability to continue as a going concern

for a reasonable period of time after December 31, 2003.  In fact, this assessment is

of such importance to an informed investment decision that, in 1995, Congress added

section 10A to the Exchange Act which requires each public company audit to include procedures to evaluate an issuer's ability to continue as a going concern.

146.    Had KPMG performed its audit in accordance with GAAS and Section 10A of the Exchange Act, it would have realized, if it did not already know, that Collins & Aikman's on-going liquidity crisis hampered its ability to continue as a going concern, that should have caused KPMG to appropriately modify its audit report to reflect such condition.

147.    For example, several existing tests can be used to help assess an entity's solvency.  These financial tests include:

(a)    Balance Sheet Tests – Balance sheet tests incorporate varying financial analyses that examine different relationships between an entity's tangible assets and liabilities.  These analyses include: (i) a Book Value Balance Sheet Analysis, which adjusts an entity's balance sheet to remove low value intangible assets and include off balance sheet liabilities; (ii) a Total Enterprise Value Analysis, which compares an entity's enterprise value to its total liabilities after adding certain off-balance sheet liabilities; and (iii), a Liquidation Analysis, which assesses the amount an entity would receive from its net assets sold in liquidation.

(b)    Reasonable Capital Test – The reasonable capital test examines whether an entity can meet its obligations as they come due, operate as a going concern and provide a margin of safety without being forced to make unplanned asset dispositions, materially change its operations, or restructure its debt.

(c)    <u>Cash Flow Test</u> – The cash flow test examines whether an entity can reasonably expect to pay its debts as they come due.

148.    In fact, the above noted tests indicate that there was substantial doubt about Collins & Aikman's ability to continue as a going concern during the year ended December 31, 2003, which was the date of Collins & Aikman's financial statements audited by KPMG.

149.    PwC's and KPMG's failures to adequately perform their audit procedures to identify the improprieties alleged herein, and their failures to report the problems described herein, permitted the accounting irregularities and improprieties to continue over a multi-year period, leading to false and misstated financial statements and resulting in the Company's deepening insolvency.

150.    Defendants PwC and KPMG owed a duty to Collins & Aikman to perform their accounting and auditing services with reasonable care and competence.  As worldwide firms of Certified Public Accountants, auditors and business consultants, PwC and KPMG were well aware of their duties and obligations in serving as the Company's "independent auditor."  Indeed the websites of PwC and KPMG proclaim:

> **PwC**The financial statement audit has never been more important.  In today's business environment there is more scrutiny and skepticism of a company's financial statements than ever before.  Investors have lost faith in corporate governance and reporting and they expect more: greater reliability, more oversight and clear evidence of internal controls. Corporate management, boards and audit committees, internal and external auditors, analysts and other investment professionals all have important roles to play in rebuilding investor trust by executing their respective responsibilities, keeping in mind both legal obligations and the heightened expectations of investors.  Meeting investor expectations begins with the completeness and accuracy of information contained in a company's financial statements.

\*\*\*

. . . PwC can provide high quality audit services. We can also address any specific regulatory reporting requirements such as those under Sarbanes-Oxley §404 for SEC registrants, including foreign private issuers.PwC's work takes into account all current and where appropriate, prospective auditing, accounting, and reporting regulations and guidance. Our audit clients include many of the world's leading multinational corporations, as well as many small and medium-sized companies and a significant number of local authorities and other public sector bodies.**KPMG**An independent audit of financial statements is one of the foundations for the effective operation of the capital markets. Audit quality is vital for maintaining trust in the financial reporting process and the integrity of financial information. Audit teams equipped with a high level of technical skills and empowered with professional skepticism provide the heart and soul of a good audit. In addition, we believe:Audit methodologies must focus on fundamentals and guide good audit judgments.  Technology can provide for effective information gathering, allow for critical data comparisons, and enhance contextual analysis. Compliance tools help the auditor meet professional and regulatory requirements.  Cultural values should encourage sound judgment and objectivity. KPMG's approach to audit services addresses each of these areas.A multidisciplinary approach means audit engagement teams include experienced professionals in such areas as forensics, tax, information risk management and valuation, providing them with a broad understanding of an organization, and enabling teams to focus on key areas of risk, adequacy of internal controls, and potential fraud.Using KPMG's global training platform, KPMG member firm professionals have access to industry training, technical skill building, and instruction in KPMG's audit methodology.Recognizing the importance of audit committees, KPMG established the Audit Committee Institute (ACI) to help provide a resource to audit committee members to help them keep pace with evolving business issues related to governance, audit issues, accounting, and financial reporting.KPMG understands the increased regulatory pressures that companies are facing. In 2004, KPMG launched the 404 Institute to provide a forum where organizations could learn more about the requirements of section 404 of the Sarbanes-Oxley Act, share leading practices, and discuss ways to address the evolution of effective internal controls.We believe organizational culture has a significant impact on audit quality. Central to our culture are our values and our code of conduct, which are fundamental to how business is done. KPMG member firms understand and value their role in the capital markets and will continually seek to enhance the perception of our profession by supporting our people, strengthening quality, and affirming the importance of trust and integrity.

151.    In truth and in fact, the personnel at PwC and KPMG abandoned

their roles as independent auditors and turned a blind eye to numerous red flags

and violations of GAAP, GAAS and PCAOB standards. PwC and KPMG negligently issued unqualified audit opinions on Collins & Aikman's financial statements to protect the lucrative business relationships they enjoyed with the Company and consented to the inclusion of their unqualified opinions on the Collins & Aikman's financial statements, including their SEC reports on Forms 10-K, which reports they knew, or should have known, were materially false and misleading.

152.    The above facts demonstrate negligence by PwC's and KPMG's Detroit office personnel in the performance of their respective "audits" of the Company's year end 2001, 2002 and 2003 financial statements and reviews of Collins & Aikman's interim 2001, 2002, 2003 and 2004 financial statements filed with the SEC, which aided and abetted the Director and Officer Defendants in breaching their fiduciary duties to the Company.

## FIRST CLAIM FOR RELIEF

**Violations of Section 10(b) of the Exchange
Act and Rule 10b-5 Promulgated Thereunder
Against the Director and Officer Defendants**

**153.**    Plaintiffs hereby incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein. This Claim for Relief is asserted against the Director and Officer Defendants.

154.    The Director and Officer Defendants and others acting at their direction caused Collins & Aikman to issue materially false and misleading statements, as detailed above, which they knew, or deliberately disregarded that they were, misleading in that they contained misrepresentations and failed to

disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

155.    The Director and Officer Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they:

(a)    Employed devices, schemes, and artifices to defraud;

(b)    Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)    Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Collins & Aikman.

156.    Collins & Aikman sold securities in reliance on Director and Officer Defendants' materially false and misleading statements and has been damaged thereby. Collins & Aikman sold securities and used the proceeds to prop up and sustain a business that was hemorrhaging cash. The issuance of the securities deepened the Company's insolvency and it would not have been able to issue the securities had Director and Officer Defendants not engaged in the fraudulent scheme detailed herein.

157.    As a direct and proximate result of these Defendants' wrongful conduct, Collins & Aikman suffered damages in connection with its sales of securities and the issuance of the materially false and misleading statements alleged herein.

## SECOND CLAIM FOR RELIEF

**Violations of Section 14(a) of the Exchange Act**
**and Rule 14a-9 Promulgated Thereunder**
**Against the Director and Officer Defendants**

**158.**   Plaintiffs hereby incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein. This Claim for Relief is asserted against the Director and Officer Defendants.

159.   Rule 14a-9, promulgated pursuant to Section 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.

160.   The 2002-2004 Proxy Statements violated Section14(a) and Rule 14a-9 because they omitted material facts, including that Collins & Aikman's reported financial results were artificially inflated through a variety of improper accounting practices and the Company was then experiencing severe liquidity constraints.

161.   In the exercise of reasonable care, Heartland and the Director and Officer Defendants should have known that the Proxy Statements were materially false and misleading.

162.   The misrepresentations and omissions in the Proxy Statements were material to shareholders of Collins & Aikman in voting pursuant to each Proxy Statement. The Proxy Statements were an essential link in the accomplishment of the continuation of Defendants' fraudulent scheme, as revelations of the truth would have immediately thwarted a continuation of

shareholders' endorsement of the directors' positions, the executive officers' compensation and the Company's compensation policies.

163.    Collins & Aikman was damaged as a result of the material misrepresentations and omissions in the Proxy Statements.

## THIRD CLAIM FOR RELIEF

**Breach of Fiduciary Duty Against the
Director and Officer Defendants and Heartland**

**164.**    Plaintiffs hereby incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein. This Claim for Relief is asserted against the Director and Officer Defendants and Heartland.

165.    The Director and Officer Defendants were all either directors and/or officers of the Company who owed fiduciary duties of loyalty, good faith and care to the Company. As the Company's controlling shareholder and by virtue of its designation of a majority of the Company's directors, Heartland owed Collins & Aikman fiduciary duties of loyalty and care not to take actions to benefit itself to the detriment of the Company. Heartland breached these fiduciary duties by causing, permitting, enabling, acquiescing and aiding and abetting the fraudulent scheme detailed herein.

166.    The Director and Officer Defendants breached their duties of loyalty, good faith and care to the Company and the creditors of the Company by orchestrating, encouraging or utilizing various accounting schemes as set forth herein which materially misstated the financial condition of the Company.

167.    Collins & Aikman suffered damages as a result of these accounting schemes, including but not limited to incurring additional and unnecessary debt

and costs associated with certain debt, and using the proceeds thereof to cause and

facilitate a deepening insolvency and a loss of opportunity to restructure itself as a

going concern and institute a business strategy that recognized the true financial

condition of the Company.  Ultimately, the Company filed for bankruptcy

protection and is being totally liquidated at a fraction of its going-concern value

due to the irreparable damages suffered as a consequence thereof.  Such

misconduct constitutes a breach of the duties of good faith, care and loyalty owed

by these Defendants, as well as corporate waste.

## FOURTH CLAIM FOR RELIEF

**Unjust Enrichment Against the Director
and Officer Defendants and Heartland**

**168.**    Plaintiffs hereby incorporate by reference and reallege each and every

allegation set forth above, as though fully set forth herein.  This Claim for Relief is

asserted against the Director and Officer Defendants and Heartland.

169.    The Director and Officer Defendants and Heartland personally

benefited by engaging in the conduct described above, including but not limited

to causing Collins & Aikman to pay inflated prices for goods, services and

corporate acquisitions; violating the federal securities laws; making false and

misleading statements; and causing the Company to file materially false and

misleading press releases and documents with the SEC in order to increase the

borrowings of the Company to a level far in excess of its ability to pay.

170.    It is inequitable and unjust for the Director and Officer Defendants

and Heartland to have received and retained such benefits as are described above.

The Director and Officer Defendants and Heartland are obligated to disgorge monies and securities obtained improperly.

## FIFTH CLAIM FOR RELIEF

### Fraud Against the Director and Officer Defendants

**171.**    Plaintiffs hereby incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.  This Claim for Relief is asserted against the Director and Officer Defendants.

172.    Form late 2001 to May 2005, the Director and Officer Defendants made misrepresentations of material facts to Collins & Aikman's Board of Directors and Audit Committee relating to the true financial condition of the Company, as alleged herein.

173.    The conduct of the Director and Officer Defendants, whether intentional, reckless, grossly negligent or mistaken, constituted fraud.

174.    The Director and Officer Defendants knew or should have known that the Company, through its Board of Directors and Audit Committee, would rely and act on the misrepresentations.

175.    Collins & Aikman, through its Board of Directors, including its Audit Committee, in electing and appointing the defendant officers, justifiably relied upon the Director and Officer Defendants' misrepresentations.

176.    As a direct and proximate result of reliance on the misrepresentations of the Director and Officer Defendants, Collins & Aikman suffered damage and injury in that it was denied the opportunity to continue as a going concern and its value as a business enterprise significantly decreased. Moreover, as a direct result of the fraudulent conduct of the Director and Officer

Defendants, Collins & Aikman incurred unnecessary operating expenses and suffered deepening insolvency, resulting in its filing for bankruptcy protection in May of 2005.

## SIXTH CLAIM FOR RELIEF

**Against Heartland for Breach of
Express and Implied Contractual Obligations**

177.    Plaintiffs hereby incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein. This Claim for Relief is asserted against Heartland.

178.    By virtue of the Heartland Services Agreement, Heartland assumed express and implied contractual obligations to the Company. These obligations included the responsibility to provide the Company with "advisory and consulting services in relation to the affairs . . . of the Company and its subsidiaries". Through its representatives and designees, Heartland thereby exercised supervision and oversight of every aspect of the Company's affairs. The Company reasonably relied upon Heartland to ensure that the Company's affairs were properly and lawfully conducted. As alleged above, the Company paid Heartland tens of millions of dollars to perform the duties contemplated by the Heartland Services Agreement.

179.    In violation of its express and implied undertakings, including the obligations of good faith and fair dealing and honest performance of its contractual duties, Heartland, through its representatives and designees, failed to perform the contracted for services fairly, lawfully, and in a manner calculated to serve the best interests of the Company. Instead, Heartland performed its duties

under the Heartland Services Agreement to serve its own ends to the detriment of the Company, as hereinabove alleged.

180.    As a direct and proximate result of Heartland's breach of contract, Collins & Aikman suffered serious damage and injury in that it was denied the opportunity to continue as a going concern and its value as a business enterprise significantly decreased, ultimately forcing the Company to file for bankruptcy protection in May of 2005.

## SEVENTH CLAIM FOR RELIEF

**Fraud Against PwC and KPMG**

**181.**    Plaintiffs hereby incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.  This Claim for Relief is asserted against PwC and KPMG.

182.    From 2001 to 2003, PwC made misrepresentations of material facts to Collins & Aikman through its audits and reviews of Collins & Aikman's financial statements, as alleged herein.

183.    From 2003 to 2005, KPMG made misrepresentations of material facts to Collins & Aikman through its audits and reviews of Collins & Aikman's financial statements, as alleged herein.

184.    PwC's conduct whether intentional, reckless, or mistaken constituted fraud.

185.    KPMG's conduct whether intentional, reckless, or mistaken constituted fraud.

186.    PwC knew or should have known that Collins & Aikman would act on the misrepresentations.

187. KPMG knew or should have known that Collins & Aikman would act on the misrepresentations.

188. The Company and its Board of Directors, including its Audit Committee, in hiring an experienced, independent auditor, justifiably relied upon PwC's misrepresentations.

189. The Company and its Board of Directors, including its Audit Committee, in hiring an experienced, independent auditor, justifiably relied upon KPMG's misrepresentations.

190. As a direct and proximate result of reliance on PwC's misrepresentations, Collins & Aikman suffered damage and injury in that it was denied the opportunity to continue as a going concern and its value as a business enterprise significantly decreased. Additionally, Collins & Aikman suffered loss of use of its money and incurred significant debt as a direct result of PwC's fraudulent conduct. Moreover, as a direct result of PwC's fraud, Collins & Aikman incurred unnecessary operating expenses, suffered deepening insolvency and filed for bankruptcy protection in May of 2005.

191. As a direct and proximate result of reliance on KPMG's misrepresentations, Collins & Aikman suffered damage and injury in that it was denied the opportunity to continue as a going concern and its value as a business enterprise significantly decreased. Additionally, Collins & Aikman suffered loss of use of its money and incurred significant debt as a direct result of KPMG's fraudulent conduct. Moreover, as a direct result of KPMG's fraud, Collins &

Aikman incurred unnecessary operating expenses, suffered deepening insolvency and filed for bankruptcy protection in May of 2005.

## EIGHTH CLAIM FOR RELIEF

**Negligence/Malpractice Against PwC**

**192.** Plaintiffs hereby incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein. This Claim for Relief is asserted against PwC.

193. Having been engaged by Collins & Aikman to perform auditing services, PwC had a duty to exercise reasonable care and skill to comply with the applicable standard of care in performing its obligations to Collins & Aikman.

194. PwC breached its duty of care to Collins & Aikman in failing to comply with the standard of care by negligently permitting Collins & Aikman's financial statements to contain untrue statements of material facts and/or permitting the omission of material facts necessary to make the statements fairly represent the financial condition of Collins & Aikman. PwC knew or reasonably should have known that Collins & Aikman, through its Board of Directors and Audit Committee, would rely upon such publicly disseminated statements.

## NINTH CLAIM FOR RELIEF

**Negligence/Malpractice Against KPMG**

**195.** Plaintiffs hereby incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein. This Claim for Relief is asserted against KPMG.

196.    Having been engaged by Collins & Aikman to perform auditing services, KPMG had a duty to exercise reasonable care and skill to comply with the applicable standard of care in performing its obligations to Collins & Aikman.

197.    KPMG breached its duty of care to Collins & Aikman in failing to comply with the standard of care by negligently permitting Collins & Aikman's financial statements to contain untrue statements of material facts and/or permitting the omission of material facts necessary to make the statements fairly represent the financial condition of Collins & Aikman.  KPMG knew or reasonably should have known that Collins & Aikman, through its Board of Directors and Audit Committee, would rely upon such publicly disseminated statements.

## TENTH CLAIM FOR RELIEF

**Breach of Contract Against PwC**

198.    Plaintiffs hereby incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.  This Claim for Relief is asserted against PwC.

199.    During the years 2001 and 2002, PwC and Collins & Aikman entered into service agreements whereby PwC would provide accounting and auditing services to Collins & Aikman.  The terms of the agreements required that PwC perform its services in accordance with generally accepted auditing standards and applicable standards promulgated by the American Institute of Certified Public Accountants.

200.    In performing its auditing, review and accounting services, PwC contractually obligated itself to report to the Company's Audit committee any

matters that would cause PwC to believe that the Company's year-end and interim financial statements were "probably" materially misstated as a result of a departure from GAAP. In connection with the planning and performance of its audits, PwC had a contractual duty to communicate certain matters to the Audit Committee, including reporting any fraud that either involved senior management and/or caused a material misstatement in the financial statements. Additionally, PwC had a contractual duty to report to the Audit Committee all significant deficiencies in the design or operation of internal controls adversely affecting the Company's ability to record, process, summarize and report financial data consistent with the assertions of management in the financial statements.

201. PwC failed to perform pursuant to the agreements and materially breached the agreements by failing to comply with the terms of the agreements, including, but not limited to:

- Failing to perform the audits in accordance with GAAS and other applicable auditing standards;

- Failing to plan and perform its audits to obtain reasonable assurance as to whether the financial statements were free of material misstatements;

- Failing to properly examine, on a test basis, evidence to support the amounts and disclosures in financial statements; and

- Failing to ensure that the Audit Committee was adequately informed of all reportable conditions and/or fraud involving senior management or causing a material misstatement of the financial statements.

202. Collins & Aikman paid substantial fees to PwC to perform its audits and quarterly reviews. Collins & Aikman received inadequate value for the substantial fees paid for reasons previously detailed.

203.    As a direct and proximate result of PwC's breach of contract, Collins & Aikman suffered damage and injury in that it was denied the opportunity to continue as a going concern and its value as a business enterprise significantly decreased. Additionally, the Company suffered a loss of use of money, and incurred significant debt as a direct result of PwC's breach of contract. Moreover, as a direct and proximate result of PwC's breach of contract, the Company incurred unnecessary operating expenses and filed for bankruptcy protection in May of 2005.

## ELEVENTH CLAIM FOR RELIEF

**Breach of Contract Against KPMG**

204.    Plaintiffs hereby incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein. This Claim for Relief is asserted against KPMG.

205.    During the years 2001 and 2002, KPMG and Collins & Aikman entered into service agreements whereby KPMG would provide accounting and auditing services to Collins & Aikman. The terms of the agreements required that KPMG perform its services in accordance with generally accepted auditing standards and applicable standards promulgated by the American Institute of Certified Public Accountants.

206.    In performing its auditing, review and accounting services, KPMG contractually obligated itself to report to the Company's Audit committee any matters that would cause KPMG to believe that the Company's year-end and interim financial statements were "probably" materially misstated as a result of a departure from GAAP. In connection with the planning and performance of its

audits, KPMG had a contractual duty to communicate certain matters to the Audit Committee, including reporting any fraud that either involved senior management and/or caused a material misstatement in the financial statements. Additionally, KPMG had a contractual duty to report to the Audit Committee all significant deficiencies in the design or operation of internal controls adversely affecting the Company's ability to record, process, summarize and report financial data consistent with the assertions of management in the financial statements.

207. KPMG failed to perform pursuant to the agreements and materially breached the agreements by failing to comply with the terms of the agreements, including, but not limited to:

- Failing to perform the audits in accordance with GAAS and other applicable auditing standards;

- Failing to plan and perform its audits to obtain reasonable assurance as to whether the financial statements were free of material misstatements;

- Failing to properly examine, on a test basis, evidence to support the amounts and disclosures in financial statements; and

- Failing to ensure that the Audit Committee was adequately informed of all reportable conditions and/or fraud involving senior management or causing a material misstatement of the financial statements.

208. Collins & Aikman paid substantial fees to KPMG to perform its audits and quarterly reviews. Collins & Aikman received inadequate value for the substantial fees paid for reasons previously detailed.

209. As a direct and proximate result of KPMG's breach of contract, Collins & Aikman suffered damage and injury in that it was denied the opportunity to continue as a going concern and its value as a business enterprise

significantly decreased.  Additionally, the Company suffered a loss of use of

money, and incurred significant debt as a direct result of KPMG's breach of

contract.  Moreover, as a direct and proximate result of KPMG's breach of

contract, the Company incurred unnecessary operating expenses and filed for

bankruptcy protection in May of 2005.

## TWELFTH CLAIM FOR RELIEF

### Aiding & Abetting Against PwC and KPMG

**210.**    Plaintiffs hereby incorporate by reference and reallege each and every

allegation set forth above, as though fully set forth herein.  This Claim for Relief is

asserted against PwC and KPMG.

211.    Having been engaged by Collins & Aikman to perform auditing

services, PwC and KPMG had a duty to exercise reasonable care and skill to

comply with the appropriate standard of care in performing their obligations to

Collins & Aikman.

212.    The officers of Collins & Aikman owed fiduciary obligations to

Collins & Aikman.  Said officers breached their fiduciary duties owed to Collins

& Aikman and directly caused damages to Collins & Aikman as a result of their

breach.

213.    PwC and KPMG, by failing to comply with the standard of care,

and failing to perform their duties in compliance with GAAS, substantially

assisted, aided or encouraged the perpetuation of the breaches of the officers'

fiduciary duties.  By failing to bring material misstatements and fraudulent

conduct to the attention of the Board of Directors and the Audit Committee, and

the public if necessary, PwC and KPMG enabled the officers to continue their

breaches of fiduciary duties owed to Collins & Aikman on an ongoing basis, to the detriment of the Company.

214.  PwC and KPMG knew of the officers' breaches of fiduciary duty and knew that their conduct of failing to take proper action in accordance with accounting standards, including GAAS, and PwC's and KPMG's engagement contract with the Company, furthered the wrongful conduct of the officers.

215.  As a direct and proximate result of PwC's and KPMG's conspiracy with the officers, the officers were able to continue their breaches of fiduciary duties, without the knowledge of the Board of Directors and the Audit Committee.  As a direct and proximate result, Collins & Aikman suffered damage and injury in that it was denied the opportunity to continue as a going concern and its value as a business enterprise significantly decreased.  Additionally, the Company suffered a loss of use of money, and incurred significant debt as a direct result of PwC's and KPMG's conspiracy with the officers.  Moreover, as a direct and proximate result of PwC's and KPMG's conspiracy with the officers, the Company incurred unnecessary operating expenses and filed for bankruptcy protection in May of 2005.

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

(a)  Directing Defendants to account to Plaintiffs for all damages Plaintiffs sustained by reason of wrongs complained of herein;

(b)  Requiring the Director and Officer Defendants to repay to Plaintiffs all salaries and the value of other remuneration of any kind paid to them during the time they were in breach of the fiduciary duties they owed to Plaintiffs;

(c)  Directing the Director and Officer Defendants to make restitution to Plaintiffs for all sums of money and other things of value by which they were unjustly enriched as a result of the wrongs they committed;

(d)     Directing the Heartland Defendants to make restitution to Plaintiffs for all compensation, profits and other things of value by which they were unjustly enriched as a result of the wrongs they committed;

(e)     Requiring KPMG and PwC to repay to Plaintiffs all compensation and the value of all other remuneration of any kind paid to them by Plaintiffs during the time they were in breach of the duties they owed to Plaintiffs;

(f)     Directing Defendants to pay interest at the highest rate allowable by law on the amount of damages sustained by Plaintiffs as a result of Defendants' culpable conduct and all restitution and other monetary relief awarded to Plaintiffs.

(g)     Awarding Plaintiffs the costs and disbursements of this action, including reasonable attorneys' fees and expenses;

(h)     Granting such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

DATED: May 16, 2007

ROSENTHAL, MONHAIT &
GODDESS, P.A.
/s/ Joseph A. Rosenthal Joseph A.
Rosenthal (Del. Bar No. 234)
Carmella P. Keener (Del. Bar No. 2810)
919 N. Market Street, Suite 1401
P.O. Box 1070
Wilmington, DE 19899
(302) 656-
4433jrosenthal@rmgglaw.comckeener@
rmgglaw.com *Attorneys for Plaintiffs*

*Local Counsel*

LERACH COUGHLIN STOIA
GELLER    RUDMAN & ROBBINS LLP
SAMUEL H. RUDMAN
DAVID A. ROSENFELD
58 South Service Road, Suite
200Melville, NY 11747
(631) 367-7100

LERACH COUGHLIN STOIA
GELLER     RUDMAN & ROBBINS LLP
PATRICK J. COUGHLIN
655 West Broadway, Suite 1900
San Diego, CA  92101-3301
(619) 231-1058

*Special Counsel for Collins & Aikman
Corporation, et al.*

# EXHIBIT B

**TO THE DECLARATION OF VERNON R. PROCTOR
IN SUPPORT OF DEFENDANT DAVID R. COSGROVE'S
MOTION TO DISMISS THE COMPLAINT**

# Collins & Aikman Corporation
## Index to Monthly Operating Report
### For the Period of August 1, 2005 through August 31, 2005

| Description | Page(s) |
|---|---|
| Notes to Monthly Operating Report | 1.1-1.4 |
| Debtors Certification of Compliance (Form 1) | 2.1-2.38 |
| Debtors Operating Statements (Form 2): | |
|     Income Statement – August 2005 | 3.1-3.4 |
|     Statement of SG&A Expenses – August 2005 | 3.5-3.9 |
|     Income Statement – May 17, 2005 to August 31, 2005 | 3.10-3.13 |
|     Statement of SG&A Expenses - May 17, 2005 | |
|        to August 31, 2005 | 3.14-3.18 |
| Debtors Balance Sheets (Form 3): | |
|     Balance Sheet | 4.1-4.5 |
|     Liabilities – Subject to Compromise | 4.6-4.10 |
|     Accounts Payable Detail | 4.11-4.14 |
| Debtors Summary of Operations (Form 4): | |
|     Schedule of Post-Petition Payroll Taxes Payable | 5.1 |
|     Schedules of Property Taxes Payable | 5.2-5.12 |
| Accounts Receivable Trade Ageing – By DIP (Post-Petition) | 6.1-6.2 |
| Accounts Payable Trade Ageing – By DIP (Post-Petition | 6.3 |
| Inter-Company Post-Petition Balances | 6.4-6.19 |
| Debtors Monthly Cash Statements (Form 5): | |
|     Allocation of Disbursements Schedule | 7.1-7.2 |
|     Bank Account Rollforward Schedules | 7.3-7.27 |
|     General Disbursement Account – Disbursements | 7.28-7.131 |
| Debtors Monthly Statement of Compensation (Form 6) | 8.1-8.5 |
| Debtors Schedule of In-force Insurance (Form 7) | 9.1-9.4 |
| Copies of all Income & Business Tax Extensions | 10.1-10.35 |
| Copies of Most Recent Bank Reconciliations and | |
|   Bank Statements | 11 |

0555927050920000000000000016

**Collins & Aikman Corporation**
**Notes to Monthly Operating Report**
**For the Period of August 1, 2005 through August 31, 2005**

<u>General</u>

The unaudited financial statements and supplemental information contained herein, represents the financial information for the debtors only and does not include Collins & Aikman's non-debtor subsidiaries.  The Debtors are as follows:

| | |
|---|---|
| Collins & Aikman Corporation | Collins & Aikman Canada Domestic Holding Company |
| Collins & Aikman Products, Co. | JPS Automotive, Inc. |
| Dura Convertible Systems, Inc. | Collins & Aikman Automotive (Argentina), Inc. |
| Wickes Manufacturing Company | Collins & Aikman Automotive Mats, LLC |
| Collins & Aikman Interiors, Inc. | Collins & Aikman Europe, Inc. |
| Collins & Aikman Development Company | Comet Acoustics, Inc. |
| Owosso Thermal Forming, LLC | Gamble Development Company |
| Southwest Laminates, Inc. | Collins & Aikman Intellimold, Inc. |
| Amco Convertible Fabrics, Inc. | Becker Group, LLC |
| Collins & Aikman International Corporation | Collins & Aikman Automotive Overseas Investment, Inc. |
| Collins & Aikman Accessory Mats, Inc. | CW Management Corporation |
| Collins & Aikman Automotive Interiors, Inc. | Collins & Aikman Automotive International, Inc. |
| Brut Plastics, Inc. | Collins & Aikman Automotive Services, LLC |
| Collins & Aikman Automotive Exteriors, Inc. | Collins & Aikman Carpet & Acoustics (MI), Inc. |
| Collins & Aikman Asset Services, Inc. | Collins & Aikman Carpet & Acoustics (TN), Inc. |
| Collins & Aikman Plastics, Inc. | Collins & Aikman Automotive International Services, Inc. |
| Wickes Asset Management, Inc. | Collins & Aikman (Gibraltar) Limited |
| Collins & Aikman Fabrics, Inc. | Collins & Aikman Automotive (Asia), Inc. |
| Collins & Aikman Properties, Inc. | New Baltimore Holdings, Inc. |

# Collins & Aikman Corporation
## Notes to Monthly Operating Report (Continued)
### For the Period of August 1, 2005 through August 31, 2005

The information furnished in this report includes primarily normal recurring adjustments and reflects adjustments which are, in the opinion of management, necessary for a fair presentation of such financial information based on the best available information. Certain information and footnote disclosures normally included in financial statements prepared in accordance with accounting principles generally accepted in the United States of America ("GAAP") have been condensed or omitted pursuant to the requirements of Accounting Principles Board Opinion No. 28 – "Interim Financial Reporting" and should be read in conjunction with the audited financial statements and notes thereto included in the Company's Annual Report on Form 10-K for the year ended December 31, 2003.

The results of operations reflected in this report are not necessarily indicative of the results of operations of Collins & Aikman Corporation and all of its subsidiaries on a consolidated basis, as the consolidated financial statements include both debtors and non-debtors. Please refer to Collins & Aikman's Forms 8-K, 10-K and 10-Q as filed with the United States Securities and Exchange Commission for further information.

Chapter 11 Reorganization Proceedings

On May 17, 2005, Collins & Aikman Corporation and most of its United States subsidiaries ("Debtors") filed a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code ("Bankruptcy Code") in the United States Bankruptcy Court Eastern District of Michigan ("The Court"). The cases were consolidated for the purpose of joint administration. The Debtors are operating their businesses as debtors-in-possession ("DIP") pursuant to the Bankruptcy Code. An official committee of unsecured creditors has been appointed.

Pursuant to the provisions of the Bankruptcy Code, substantially all actions to collect upon any of the Debtors' liabilities as of the petition date or to enforce pre-petition date contractual obligations are automatically stayed. Absent approval from the Court, the debtors are prohibited from paying pre-petition obligations. In addition, as a consequence of the Chapter 11 filing, pending litigation against the Debtors is generally stayed, and no party may take any action to collect pre-petition claims except pursuant to an order of the Court. However, the Court approved the payment of certain pre-petition liabilities, such as payments related to employee wages and benefits and certain other pre-petition obligations. Since the filing, all orders sufficient to enable the Debtors to conduct normal business activities, including approval of the Debtors' DIP financing have been entered by the Court and approved. While the Debtors are subject to Chapter 11, generally all transactions of the Debtors outside the ordinary course of business will require the prior approval of the Court.

# Collins & Aikman Corporation
## Notes to Monthly Operating Report (Continued)
### For the Period of August 1, 2005 through August 31, 2005

The provisions in Statement of Position 90-7, "Financial Reporting by Entities in reorganization Under the Bankruptcy Code ("SOP 90-7") apply to the Debtors' financial statements while the Debtors operate under the provisions of Chapter 11. SOP 90-7 does not change the application of GAAP in the preparation of financial statements. However, SOP 90-7 does require that the financial statements for periods including and subsequent to the filing of the Chapter 11 petition distinguish transactions and events that are directly associated with the reorganization from the ongoing operations.

Petition Date Financial Information
The financial information filed as of the petition date is subject to change. Collins & Aikman Corporation may, at a future date, amend its schedules for updated financial information.

Intercompany Transactions
These Financial Statements were prepared on a stand alone basis, and as such, intercompany transactions between the Debtors have been eliminated. Intercompany transactions with the Company's non-debtor subsidiaries have not been eliminated in these financial statements and are reflected as intercompany receivables and payables.

Customer Price Increases
In July of 2005, the Company received price increases from each of its major suppliers in the amount of $82.5 million. These price increases are for products shipped from July 1, 2005 through September 30, 2005. $33.3 million was recognized as income in Collins & Aikman Products Co. for the month of August 2005 based on actual units shipped to the customers.

Income Taxes
Collins & Aikman Corporation accounts for income taxes on a consolidated basis. Accordingly, income tax expense/benefit and income tax assets and liabilities in the accompanying statements of operations and balance sheets, respectively, do not necessarily reflect the entities current income tax position for the periods presented.

# Collins & Aikman Corporation
## Notes to Monthly Operating Report (Continued)
## For the Period of August 1, 2005 through August 31, 2005

<u>Investment in European Operations</u>
On July 15, 2005, Collins & Aikman European Group filed for Administration with the English High Court, in London. At that time, court appointed Administrators obtained control over the daily operations of the entities within that group. Therefore, consolidation of those entities by Collins & Aikman Corporation ceased at that time with its interest in those entities reported as an investment. To more accurately state the financial condition of the DIP entities, we have excluded the investment from the Monthly Operating Reports because the net realizable value of that investment is more likely than not zero.

**TRANSMITTAL OF FINANCIAL REPORTS AND**
**CERTIFICATION OF COMPLIANCE WITH**
**UNITED STATES TRUSTEE OPERATING REQUIREMENTS FOR**
**THE PERIOD ENDED:  August 31, 2005**

| | | |
|---|---|---|
| IN RE: | : | |
| | : | **CASE NO.:**    452-05-55927-SWR |
| | : | **Chapter 11** |
| | | **Judge:**    **Steven W. Rhodes** |
| **Collins & Aikman Corporation** | : | |
| **Debtor** | : | |
| | : | |

As debtor in possession, I affirm:

1.     That I have reviewed the financial statements attached hereto, consisting of:

| | | | |
|---|---|---|---|
| X | Operating Statement | (Form 2) | See Tab #3 |
| X | Balance Sheet | (Form 3) | See Tab #4 |
| | Summary of Operations | (Form 4) | |
| | Monthly Cash Statement | (Form 5) | |
| | Statement of Compensation | (Form 6) | |
| X | Schedule of In-Force Insurance | (Form 7) | See Tab #9 |

and that they have been prepared in accordance with normal and customary accounting practices, and fairly and accurately reflect the debtor's financial activity for the period stated;

2.     That the insurance, including workers' compensation and unemployment insurance, as described in Section 4 of the Reporting Requirements For Chapter 11 Cases is in effect; and, (If not, attach a written explanation)     YES___X___          NO_____

3.     That all postpetition taxes as described in Sections 1 and 14 of the Operating Instructions and Reporting Requirements For Chapter 11 cases are current. (If not, attach a written explanation)     YES___X___          NO_____

4.     No professional fees (attorney, accountant, etc.) have been paid without specific court authorization. (If not, attach a written explanation)     YES___X___          NO_____

5.     All United States Trustee Quarterly fees have been paid and are current.
                                                                                        YES___X___          NO_____

6.     Have you filed your prepetition tax returns. (If not, attach a written explanation)     YES_____          NO___X___

I hereby certify, under penalty of perjury, that the information provided above and in the attached documents is true and correct to the best of any information and belief.

Dated: September 19, 2005              /s/ David Cosgrove
                                                       **Responsible Officer of the Debtor in Possession**

(248)-824-2717                              **Senior Vice President - Financial Planning and Controller**
**Phone**                                              **Title**

FORM 1

TRANSMITTAL OF FINANCIAL REPORTS AND
CERTIFICATION OF COMPLIANCE WITH
UNITED STATES TRUSTEE OPERATING REQUIREMENTS FOR
THE PERIOD ENDED:  August 31, 2005

IN RE:                                          :

                                                  CASE NO.  452-05-55930-SWR
                                           :  Chapter 11
                                                 Judge:   Steven W. Rhodes

**Collins & Aikman Canada Domestic Holding Company**     :
                       **Debtor**

                                                  :

As debtor in possession, I affirm:

1.        That I have reviewed the financial statements attached hereto, consisting of:

| | | | |
|---|---|---|---|
| X | Operating Statement | (Form 2) | See Tab #3 |
| X | Balance Sheet | (Form 3) | See Tab #4 |
| | Summary of Operations | (Form 4) | |
| | Monthly Cash Statement | (Form 5) | |
| | Statement of Compensation | (Form 6) | |
| X | Schedule of In-Force Insurance | (Form 7) | See Tab #9 |

and that they have been prepared in accordance with normal and customary accounting
practices, and fairly and accurately reflect the debtor's financial activity for the period stated;

2.        That the insurance, including workers' compensation and unemployment insurance,
as described in Section 4 of the Reporting Requirements For Chapter 11 Cases is in effect; and,
(If not, attach a written explanation)      YES___X___            NO_____

3.        That all postpetition taxes as described in Sections 1 and 14 of the Operating
Instructions and Reporting Requirements For Chapter 11 cases are current.
(If not, attach a written explanation)      YES___X___            NO_____

4.        No professional fees (attorney, accountant, etc.) have been paid without specific
court authorization.
(If not, attach a written explanation)      YES___X___            NO_____

5.        All United States Trustee Quarterly fees have been paid and are current.
                                        YES___X___            NO_____

6.        Have you filed your prepetition tax returns.
(If not, attach a written explanation)      YES_____             NO___X___

I hereby certify, under penalty of perjury, that the information provided above and in the attached documents
is true and correct to the best of any information and belief.

                                         /s/ David Cosgrove
Dated: September 19, 2005          **Responsible Officer of the Debtor in Possession**

(248)-824-2717                       **Senior Vice President - Financial Planning and Controller**
**Phone**                                           **Title**

**TRANSMITTAL OF FINANCIAL REPORTS AND
CERTIFICATION OF COMPLIANCE WITH
UNITED STATES TRUSTEE OPERATING REQUIREMENTS FOR
THE PERIOD ENDED:  August 31, 2005**

IN RE:                                    :

                                          :     CASE NO.  452-05-55932-SWR
                                                **Chapter 11**
                                                Judge:     **Steven W. Rhodes**

Collins & Aikman Products, Co.            :
                              **Debtor**

                                          :

As debtor in possession, I affirm:

1.        That I have reviewed the financial statements attached hereto, consisting of:

|      |                                   |            |             |
|------|-----------------------------------|------------|-------------|
| X    | Operating Statement               | (Form 2)   | See Tab #3  |
| X    | Balance Sheet                     | (Form 3)   | See Tab #4  |
| X    | Summary of Operations             | (Form 4)   | See Tab #5  |
| X    | Monthly Cash Statement            | (Form 5)   | See Tab #7  |
| X    | Statement of Compensation         | (Form 6)   | See Tab #8  |
| X    | Schedule of In-Force Insurance    | (Form 7)   | See Tab #9  |

and that they have been prepared in accordance with normal and customary accounting
practices, and fairly and accurately reflect the debtor's financial activity for the period stated;

2.        That the insurance, including workers' compensation and unemployment insurance,
as described in Section 4 of the Reporting Requirements For Chapter 11 Cases is in effect; and,
(If not, attach a written explanation)          YES___X___          NO_____

3.        That all postpetition taxes as described in Sections 1 and 14 of the Operating
Instructions and Reporting Requirements For Chapter 11 cases are current.
(If not, attach a written explanation)          YES___X___          NO_____

4.        No professional fees (attorney, accountant, etc.) have been paid without specific
court authorization.
(If not, attach a written explanation)          YES___X___          NO_____

5.        All United States Trustee Quarterly fees have been paid and are current.
                                                YES___X___          NO_____

6.        Have you filed your prepetition tax returns.
(If not, attach a written explanation)          YES_____          NO___X___

I hereby certify, under penalty of perjury, that the information provided above and in the attached documents
is true and correct to the best of any information and belief.

/s/ David Cosgrove

Dated: September 19, 2005          **Responsible Officer of the Debtor in Possession**

(248)-824-2717                     **Senior Vice President - Financial Planning and Controller**
     **Phone**                                    **Title**

**TRANSMITTAL OF FINANCIAL REPORTS AND
CERTIFICATION OF COMPLIANCE WITH
UNITED STATES TRUSTEE OPERATING REQUIREMENTS FOR
THE PERIOD ENDED: August 31, 2005**

IN RE:                              :      CASE NO.   452-05-55935-SWR
                                   :      Chapter 11
                                        Judge:     Steven W. Rhodes

JPS Automotive, Inc. (d/b/a PACJ, Inc.)     :
                  **Debtor**

                                   :

As debtor in possession, I affirm:

1.      That I have reviewed the financial statements attached hereto, consisting of:

| | | | |
|---|---|---|---|
| X | Operating Statement | (Form 2) | See Tab #3 |
| X | Balance Sheet | (Form 3) | See Tab #4 |
| X | Summary of Operations | (Form 4) | See Tab #5 |
| X | Monthly Cash Statement | (Form 5) | See Tab #7 |
| | Statement of Compensation | (Form 6) | |
| X | Schedule of In-Force Insurance | (Form 7) | See Tab #9 |

and that they have been prepared in accordance with normal and customary accounting practices, and fairly and accurately reflect the debtor's financial activity for the period stated;

2.      That the insurance, including workers' compensation and unemployment insurance, as described in Section 4 of the Reporting Requirements For Chapter 11 Cases is in effect; and,
(If not, attach a written explanation)      YES___X___      NO_____

3.      That all postpetition taxes as described in Sections 1 and 14 of the Operating Instructions and Reporting Requirements For Chapter 11 cases are current.
(If not, attach a written explanation)      YES___X___      NO_____

4.      No professional fees (attorney, accountant, etc.) have been paid without specific court authorization.
(If not, attach a written explanation)      YES___X___      NO_____

5.      All United States Trustee Quarterly fees have been paid and are current.
                                            YES___X___      NO_____

6.      Have you filed your prepetition tax returns.
(If not, attach a written explanation)      YES_____      NO___X___

I hereby certify, under penalty of perjury, that the information provided above and in the attached documents is true and correct to the best of any information and belief.

                                   /s/ David Cosgrove
Dated:   September 19, 2005          **Responsible Officer of the Debtor in Possession**

(248)-824-2717                    **Senior Vice President - Financial Planning and Controller**
      **Phone**                                          **Title**

**TRANSMITTAL OF FINANCIAL REPORTS AND
CERTIFICATION OF COMPLIANCE WITH
UNITED STATES TRUSTEE OPERATING REQUIREMENTS FOR
THE PERIOD ENDED:  August 31, 2005**

IN RE:                                    :

                                          :        CASE NO.  452-05-55942-SWR
                                                   Chapter 11
                                          :        Judge:    Steven W. Rhodes

Dura Convertible Systems, Inc.            :
                          Debtor

                                          :

As debtor in possession, I affirm:

1.        That I have reviewed the financial statements attached hereto, consisting of:

| | | | |
|---|---|---|---|
| X | Operating Statement | (Form 2) | See Tab #3 |
| X | Balance Sheet | (Form 3) | See Tab #4 |
| | Summary of Operations | (Form 4) | |
| X | Monthly Cash Statement | (Form 5) | See Tab #7 |
| | Statement of Compensation | (Form 6) | |
| X | Schedule of In-Force Insurance | (Form 7) | See Tab #9 |

and that they have been prepared in accordance with normal and customary accounting
practices, and fairly and accurately reflect the debtor's financial activity for the period stated;

2.        That the insurance, including workers' compensation and unemployment insurance,
as described in Section 4 of the Reporting Requirements For Chapter 11 Cases is in effect; and,
(If not, attach a written explanation)          YES___X___          NO_____

3.        That all postpetition taxes as described in Sections 1 and 14 of the Operating
Instructions and Reporting Requirements For Chapter 11 cases are current.
(If not, attach a written explanation)          YES___X___          NO_____

4.        No professional fees (attorney, accountant, etc.) have been paid without specific
court authorization.
(If not, attach a written explanation)          YES___X___          NO_____

5.        All United States Trustee Quarterly fees have been paid and are current.
                                                YES___X___          NO_____

6.        Have you filed your prepetition tax returns.
(If not, attach a written explanation)          YES_____          NO___X___

I hereby certify, under penalty of perjury, that the information provided above and in the attached documents
is true and correct to the best of any information and belief.

/s/ David Cosgrove
Dated: September 19, 2005          Responsible Officer of the Debtor in Possession

(248)-824-2717                     Senior Vice President - Financial Planning and Controller
        Phone                                          Title

**TRANSMITTAL OF FINANCIAL REPORTS AND
CERTIFICATION OF COMPLIANCE WITH
UNITED STATES TRUSTEE OPERATING REQUIREMENTS FOR
THE PERIOD ENDED:  August 31, 2005**

IN RE:                                         :

                                   :        CASE NO.  452-05-55965-SWR

**Collins & Aikman Automotive (Argentina), Inc. (f/k/a**   :        **Chapter 11**
  **Textron Automotive (Argentina), Inc.)**           **Judge:**   **Steven W. Rhodes**
                      **Debtor**      :

                                   :

As debtor in possession, I affirm:

1.       That I have reviewed the financial statements attached hereto, consisting of:

| | | | |
|---|---|---|---|
| X | Operating Statement | (Form 2) | See Tab #3 |
| X | Balance Sheet | (Form 3) | See Tab #4 |
| | Summary of Operations | (Form 4) | |
| | Monthly Cash Statement | (Form 5) | |
| | Statement of Compensation | (Form 6) | |
| X | Schedule of In-Force Insurance | (Form 7) | See Tab #9 |

and that they have been prepared in accordance with normal and customary accounting
practices, and fairly and accurately reflect the debtor's financial activity for the period stated;

2.       That the insurance, including workers' compensation and unemployment insurance,
as described in Section 4 of the Reporting Requirements For Chapter 11 Cases is in effect; and,
(If not, attach a written explanation)        **YES___X___**        **NO_____**

3.       That all postpetition taxes as described in Sections 1 and 14 of the Operating
Instructions and Reporting Requirements For Chapter 11 cases are current.
(If not, attach a written explanation)        **YES___X___**        **NO_____**

4.       No professional fees (attorney, accountant, etc.) have been paid without specific
court authorization.
(If not, attach a written explanation)        **YES___X___**        **NO_____**

5.       All United States Trustee Quarterly fees have been paid and are current.
                                  **YES___X___**        **NO_____**

6.       Have you filed your prepetition tax returns.
(If not, attach a written explanation)        **YES_____**        **NO___X___**

I hereby certify, under penalty of perjury, that the information provided above and in the attached documents
is true and correct to the best of any information and belief.

Dated: September 19, 2005        **/s/ David Cosgrove**
                                **Responsible Officer of the Debtor in Possession**

**(248)-824-2717**               **Senior Vice President - Financial Planning and Controller**
    **Phone**                                **Title**

**TRANSMITTAL OF FINANCIAL REPORTS AND**
**CERTIFICATION OF COMPLIANCE WITH**
**UNITED STATES TRUSTEE OPERATING REQUIREMENTS FOR**
**THE PERIOD ENDED:  August 31, 2005**

| | | |
|---|---|---|
| IN RE: | : | CASE NO.   452-05-55968-SWR |
| | : | Chapter 11 |
| | | Judge:    Steven W. Rhodes |
| **Wickes Manufacturing Company** | : | |
| Debtor | : | |
| | : | |

As debtor in possession, I affirm:

1.        That I have reviewed the financial statements attached hereto, consisting of:

| | | | |
|---|---|---|---|
| X | Operating Statement | (Form 2) | See Tab #3 |
| X | Balance Sheet | (Form 3) | See Tab #4 |
| | Summary of Operations | (Form 4) | |
| | Monthly Cash Statement | (Form 5) | |
| | Statement of Compensation | (Form 6) | |
| X | Schedule of In-Force Insurance | (Form 7) | See Tab #9 |

and that they have been prepared in accordance with normal and customary accounting practices, and fairly and accurately reflect the debtor's financial activity for the period stated;

2.        That the insurance, including workers' compensation and unemployment insurance, as described in Section 4 of the Reporting Requirements For Chapter 11 Cases is in effect; and, (If not, attach a written explanation)        YES___X___        NO_____

3.        That all postpetition taxes as described in Sections 1 and 14 of the Operating Instructions and Reporting Requirements For Chapter 11 cases are current. (If not, attach a written explanation)        YES___X___        NO_____

4.        No professional fees (attorney, accountant, etc.) have been paid without specific court authorization. (If not, attach a written explanation)        YES___X___        NO_____

5.        All United States Trustee Quarterly fees have been paid and are current.
                YES___X___        NO_____

6.        Have you filed your prepetition tax returns. (If not, attach a written explanation)        YES_____        NO___X___

I hereby certify, under penalty of perjury, that the information provided above and in the attached documents is true and correct to the best of any information and belief.

|  |  |
|---|---|
| | /s/ David Cosgrove |
| Dated: September 19, 2005 | **Responsible Officer of the Debtor in Possession** |
| (248)-824-2717 | **Senior Vice President - Financial Planning and Controller** |
| **Phone** | **Title** |

**TRANSMITTAL OF FINANCIAL REPORTS AND
CERTIFICATION OF COMPLIANCE WITH
UNITED STATES TRUSTEE OPERATING REQUIREMENTS FOR
THE PERIOD ENDED:  August 31, 2005**

IN RE:                                                            :

                                               :      CASE NO.  452-05-55969-SWR
                                                           Chapter 11

**Collins & Aikman Automotive Mats, LLC**      :      **Judge:**   Steven W. Rhodes
                          **Debtor**

                                                 :

As debtor in possession, I affirm:

1.        That I have reviewed the financial statements attached hereto, consisting of:

| | | | |
|---|---|---|---|
| X | Operating Statement | (Form 2) | See Tab #3 |
| X | Balance Sheet | (Form 3) | See Tab #4 |
| | Summary of Operations | (Form 4) | |
| | Monthly Cash Statement | (Form 5) | |
| | Statement of Compensation | (Form 6) | |
| X | Schedule of In-Force Insurance | (Form 7) | See Tab #9 |

and that they have been prepared in accordance with normal and customary accounting
practices, and fairly and accurately reflect the debtor's financial activity for the period stated;

2.        That the insurance, including workers' compensation and unemployment insurance,
as described in Section 4 of the Reporting Requirements For Chapter 11 Cases is in effect; and,
(If not, attach a written explanation)      YES___X___      NO_____

3.        That all postpetition taxes as described in Sections 1 and 14 of the Operating
Instructions and Reporting Requirements For Chapter 11 cases are current.
(If not, attach a written explanation)      YES___X___      NO_____

4.        No professional fees (attorney, accountant, etc.) have been paid without specific
court authorization.
(If not, attach a written explanation)      YES___X___      NO_____

5.        All United States Trustee Quarterly fees have been paid and are current.
                                        YES___X___      NO_____

6.        Have you filed your prepetition tax returns.
(If not, attach a written explanation)      YES_____      NO___X___

I hereby certify, under penalty of perjury, that the information provided above and in the attached documents
is true and correct to the best of any information and belief.

                                       **/s/ David Cosgrove**

Dated: September 19, 2005          **Responsible Officer of the Debtor in Possession**

(248)-824-2717               **Senior Vice President - Financial Planning and Controller**
      **Phone**                               **Title**

TRANSMITTAL OF FINANCIAL REPORTS AND
CERTIFICATION OF COMPLIANCE WITH
UNITED STATES TRUSTEE OPERATING REQUIREMENTS FOR
THE PERIOD ENDED:  August 31, 2005

IN RE:                                    :

                                          :        CASE NO.  452-05-55970-SWR
                                                   Chapter 11
                                          :        Judge:    Steven W. Rhodes

Collins & Aikman Interiors, Inc.          :
                        Debtor

                                          :

As debtor in possession, I affirm:

1.        That I have reviewed the financial statements attached hereto, consisting of:

| | | | |
|---|---|---|---|
| X | Operating Statement | (Form 2) | See Tab #3 |
| X | Balance Sheet | (Form 3) | See Tab #4 |
| X | Summary of Operations | (Form 4) | See Tab #5 |
| X | Monthly Cash Statement | (Form 5) | See Tab #7 |
|   | Statement of Compensation | (Form 6) | |
| X | Schedule of In-Force Insurance | (Form 7) | See Tab #9 |

and that they have been prepared in accordance with normal and customary accounting
practices, and fairly and accurately reflect the debtor's financial activity for the period stated;

2.        That the insurance, including workers' compensation and unemployment insurance,
as described in Section 4 of the Reporting Requirements For Chapter 11 Cases is in effect; and,
(If not, attach a written explanation)        YES___X___        NO_____

3.        That all postpetition taxes as described in Sections 1 and 14 of the Operating
Instructions and Reporting Requirements For Chapter 11 cases are current.
(If not, attach a written explanation)        YES___X___        NO_____

4.        No professional fees (attorney, accountant, etc.) have been paid without specific
court authorization.
(If not, attach a written explanation)        YES___X___        NO_____

5.        All United States Trustee Quarterly fees have been paid and are current.
                                              YES___X___        NO_____

6.        Have you filed your prepetition tax returns.
(If not, attach a written explanation)        YES_____        NO___X___

I hereby certify, under penalty of perjury, that the information provided above and in the attached documents
is true and correct to the best of any information and belief.

Dated: September 19, 2005        /s/ David Cosgrove
                                 Responsible Officer of the Debtor in Possession

(248)-824-2717                   Senior Vice President - Financial Planning and Controller
        Phone                            Title

**TRANSMITTAL OF FINANCIAL REPORTS AND**
**CERTIFICATION OF COMPLIANCE WITH**
**UNITED STATES TRUSTEE OPERATING REQUIREMENTS FOR**
**THE PERIOD ENDED:  August 31, 2005**

IN RE:                                          :

                                                :     CASE NO.  452-05-55971-SWR
                                                      Chapter 11
                                                :     Judge:     Steven W. Rhodes

Collins & Aikman Europe, Inc.                   :
                      Debtor

                                                :

As debtor in possession, I affirm:

1.        That I have reviewed the financial statements attached hereto, consisting of:

|      |                               |          |            |
|------|-------------------------------|----------|------------|
| X    | Operating Statement           | (Form 2) | See Tab #3 |
| X    | Balance Sheet                 | (Form 3) | See Tab #4 |
|      | Summary of Operations         | (Form 4) |            |
|      | Monthly Cash Statement        | (Form 5) |            |
|      | Statement of Compensation     | (Form 6) |            |
| X    | Schedule of In-Force Insurance| (Form 7) | See Tab #9 |

and that they have been prepared in accordance with normal and customary accounting
practices, and fairly and accurately reflect the debtor's financial activity for the period stated;

2.        That the insurance, including workers' compensation and unemployment insurance,
as described in Section 4 of the Reporting Requirements For Chapter 11 Cases is in effect; and,
(If not, attach a written explanation)          YES___X___          NO_____

3.        That all postpetition taxes as described in Sections 1 and 14 of the Operating
Instructions and Reporting Requirements For Chapter 11 cases are current.
(If not, attach a written explanation)          YES___X___          NO_____

4.        No professional fees (attorney, accountant, etc.) have been paid without specific
court authorization.
(If not, attach a written explanation)          YES___X___          NO_____

5.        All United States Trustee Quarterly fees have been paid and are current.
                                                YES___X___          NO_____

6.        Have you filed your prepetition tax returns.
(If not, attach a written explanation)          YES_____          NO___X___

I hereby certify, under penalty of perjury, that the information provided above and in the attached documents
is true and correct to the best of any information and belief.

Dated: September 19, 2005                 **/s/ David Cosgrove**
                                          **Responsible Officer of the Debtor in Possession**

(248)-824-2717                            **Senior Vice President - Financial Planning and Controller**
      **Phone**                                   **Title**

**TRANSMITTAL OF FINANCIAL REPORTS AND**
**CERTIFICATION OF COMPLIANCE WITH**
**UNITED STATES TRUSTEE OPERATING REQUIREMENTS FOR**
**THE PERIOD ENDED:  August 31, 2005**

IN RE:                                    :

                                          :        CASE NO.  452-05-55943-SWR
                                                   Chapter 11
                                                   Judge:     Steven W. Rhodes
**Collins & Aikman Development Company**   :
                 **Debtor**

                                          :

As debtor in possession, I affirm:

1.          That I have reviewed the financial statements attached hereto, consisting of:

|     |     |     |     |
|-----|-----|-----|-----|
| X | Operating Statement | (Form 2) | See Tab #3 |
| X | Balance Sheet | (Form 3) | See Tab #4 |
|   | Summary of Operations | (Form 4) |   |
| X | Monthly Cash Statement | (Form 5) | See Tab #7 |
|   | Statement of Compensation | (Form 6) |   |
| X | Schedule of In-Force Insurance | (Form 7) | See Tab #9 |

and that they have been prepared in accordance with normal and customary accounting
practices, and fairly and accurately reflect the debtor's financial activity for the period stated;

2.          That the insurance, including workers' compensation and unemployment insurance,
as described in Section 4 of the Reporting Requirements For Chapter 11 Cases is in effect; and,
(If not, attach a written explanation)          YES___X___          NO_____

3.          That all postpetition taxes as described in Sections 1 and 14 of the Operating
Instructions and Reporting Requirements For Chapter 11 cases are current.
(If not, attach a written explanation)          YES___X___          NO_____

4.          No professional fees (attorney, accountant, etc.) have been paid without specific
court authorization.
(If not, attach a written explanation)          YES___X___          NO_____

5.          All United States Trustee Quarterly fees have been paid and are current.
                                                YES___X___          NO_____

6.          Have you filed your prepetition tax returns.
(If not, attach a written explanation)          YES_____          NO___X___

I hereby certify, under penalty of perjury, that the information provided above and in the attached documents
is true and correct to the best of any information and belief.

                                          /s/ David Cosgrove
    Dated: September 19, 2005             Responsible Officer of the Debtor in Possession

    (248)-824-2717                        Senior Vice President - Financial Planning and Controller
         Phone                                            Title

**TRANSMITTAL OF FINANCIAL REPORTS AND
CERTIFICATION OF COMPLIANCE WITH
UNITED STATES TRUSTEE OPERATING REQUIREMENTS FOR
THE PERIOD ENDED:  August 31, 2005**

IN RE:                                          :

                                                :        CASE NO.  452-05-55946-SWR
                                                         **Chapter 11**
                                                         **Judge:**    **Steven W. Rhodes**
Owosso Thermal Forming, LLC                     :
                    **Debtor**

                                                :

As debtor in possession, I affirm:

1.       That I have reviewed the financial statements attached hereto, consisting of:

| | | | |
|---|---|---|---|
| X | Operating Statement | (Form 2) | See Tab #3 |
| X | Balance Sheet | (Form 3) | See Tab #4 |
| | Summary of Operations | (Form 4) | |
| | Monthly Cash Statement | (Form 5) | |
| | Statement of Compensation | (Form 6) | |
| X | Schedule of In-Force Insurance | (Form 7) | See Tab #9 |

and that they have been prepared in accordance with normal and customary accounting
practices, and fairly and accurately reflect the debtor's financial activity for the period stated;

2.       That the insurance, including workers' compensation and unemployment insurance,
as described in Section 4 of the Reporting Requirements For Chapter 11 Cases is in effect; and,
(If not, attach a written explanation)          YES___X___          NO_____

3.       That all postpetition taxes as described in Sections 1 and 14 of the Operating
Instructions and Reporting Requirements For Chapter 11 cases are current.
(If not, attach a written explanation)          YES___X___          NO_____

4.       No professional fees (attorney, accountant, etc.) have been paid without specific
court authorization.
(If not, attach a written explanation)          YES___X___          NO_____

5.       All United States Trustee Quarterly fees have been paid and are current.
                                                YES___X___          NO_____

6.       Have you filed your prepetition tax returns.
(If not, attach a written explanation)          YES_____          NO___X___

I hereby certify, under penalty of perjury, that the information provided above and in the attached documents
is true and correct to the best of any information and belief.

Dated: September 19, 2005         **/s/ David Cosgrove**
                                   **Responsible Officer of the Debtor in Possession**

(248)-824-2717                     **Senior Vice President - Financial Planning and Controller**
      **Phone**                           **Title**

**TRANSMITTAL OF FINANCIAL REPORTS AND**
**CERTIFICATION OF COMPLIANCE WITH**
**UNITED STATES TRUSTEE OPERATING REQUIREMENTS FOR**
**THE PERIOD ENDED:  August 31, 2005**

IN RE:                                                    :

                                                         :         CASE NO.  452-05-55948-SWR
                                                                   Chapter 11
Southwest Laminates, Inc. (d/b/a Southwest              :         Judge:    Steven W. Rhodes
  Fabric Laminators Inc.)
                              Debtor         :

                                                         :

As debtor in possession, I affirm:

1.        That I have reviewed the financial statements attached hereto, consisting of:

|   |   |   |   |
|---|---|---|---|
| X | Operating Statement | (Form 2) | See Tab #3 |
| X | Balance Sheet | (Form 3) | See Tab #4 |
| X | Summary of Operations | (Form 4) | See Tab #5 |
| X | Monthly Cash Statement | (Form 5) | See Tab #7 |
|   | Statement of Compensation | (Form 6) |  |
| X | Schedule of In-Force Insurance | (Form 7) | See Tab #9 |

and that they have been prepared in accordance with normal and customary accounting
practices, and fairly and accurately reflect the debtor's financial activity for the period stated;

2.        That the insurance, including workers' compensation and unemployment insurance,
as described in Section 4 of the Reporting Requirements For Chapter 11 Cases is in effect; and,
(If not, attach a written explanation)         YES___X___         NO_____

3.        That all postpetition taxes as described in Sections 1 and 14 of the Operating
Instructions and Reporting Requirements For Chapter 11 cases are current.
(If not, attach a written explanation)         YES___X___         NO_____

4.        No professional fees (attorney, accountant, etc.) have been paid without specific
court authorization.
(If not, attach a written explanation)         YES___X___         NO_____

5.        All United States Trustee Quarterly fees have been paid and are current.
                                             YES___X___         NO_____

6.        Have you filed your prepetition tax returns.
(If not, attach a written explanation)         YES_____         NO___X___

I hereby certify, under penalty of perjury, that the information provided above and in the attached documents
is true and correct to the best of any information and belief.

                              /s/ David Cosgrove
Dated: September 19, 2005      Responsible Officer of the Debtor in Possession

(248)-824-2717                Senior Vice President - Financial Planning and Controller
        Phone                              Title

TRANSMITTAL OF FINANCIAL REPORTS AND
CERTIFICATION OF COMPLIANCE WITH
UNITED STATES TRUSTEE OPERATING REQUIREMENTS FOR
THE PERIOD ENDED:  August 31, 2005

IN RE:                                              :

                                                    :       CASE NO.   452-05-55949-SWR
                                                            Chapter 11
                                                    :       Judge:   Steven W. Rhodes

Amco Converitble Fabrics, Inc.                      :
                          Debtor
                                                    :

As debtor in possession, I affirm:

1.      That I have reviewed the financial statements attached hereto, consisting of:

| | | | |
|---|---|---|---|
| __X__ | Operating Statement | (Form 2) | See Tab #3 |
| __X__ | Balance Sheet | (Form 3) | See Tab #4 |
| _____ | Summary of Operations | (Form 4) | |
| _____ | Monthly Cash Statement | (Form 5) | |
| _____ | Statement of Compensation | (Form 6) | |
| __X__ | Schedule of In-Force Insurance | (Form 7) | See Tab #9 |

and that they have been prepared in accordance with normal and customary accounting
practices, and fairly and accurately reflect the debtor's financial activity for the period stated;

2.      That the insurance, including workers' compensation and unemployment insurance,
as described in Section 4 of the Reporting Requirements For Chapter 11 Cases is in effect; and,
(If not, attach a written explanation)       YES___X___          NO_____

3.      That all postpetition taxes as described in Sections 1 and 14 of the Operating
Instructions and Reporting Requirements For Chapter 11 cases are current.
(If not, attach a written explanation)       YES___X___          NO_____

4.      No professional fees (attorney, accountant, etc.) have been paid without specific
court authorization.
(If not, attach a written explanation)       YES___X___          NO_____

5.      All United States Trustee Quarterly fees have been paid and are current.
                                             YES___X___          NO_____

6.      Have you filed your prepetition tax returns.
(If not, attach a written explanation)       YES_____          NO___X___

I hereby certify, under penalty of perjury, that the information provided above and in the attached documents
is true and correct to the best of any information and belief.

Dated: September 19, 2005                    /s/ David Cosgrove
                                             Responsible Officer of the Debtor in Possession

(248)-824-2717                               Senior Vice President - Financial Planning and Controller
        Phone                                                   Title

**TRANSMITTAL OF FINANCIAL REPORTS AND
CERTIFICATION OF COMPLIANCE WITH
UNITED STATES TRUSTEE OPERATING REQUIREMENTS FOR
THE PERIOD ENDED:  August 31, 2005**

IN RE:                                          :

                                                :          CASE NO.  452-05-55951-SWR
                                                           **Chapter 11**
                                                           **Judge:**    **Steven W. Rhodes**

**Collins & Aikman International Corporation**  :
                    **Debtor**

                                                :

As debtor in possession, I affirm:

1.        That I have reviewed the financial statements attached hereto, consisting of:

| | | | |
|---|---|---|---|
| X | Operating Statement | (Form 2) | See Tab #3 |
| X | Balance Sheet | (Form 3) | See Tab #4 |
| | Summary of Operations | (Form 4) | |
| X | Monthly Cash Statement | (Form 5) | See Tab #7 |
| | Statement of Compensation | (Form 6) | |
| X | Schedule of In-Force Insurance | (Form 7) | See Tab #9 |

and that they have been prepared in accordance with normal and customary accounting
practices, and fairly and accurately reflect the debtor's financial activity for the period stated;

2.        That the insurance, including workers' compensation and unemployment insurance,
as described in Section 4 of the Reporting Requirements For Chapter 11 Cases is in effect; and,
(If not, attach a written explanation)          YES___X___          NO_____

3.        That all postpetition taxes as described in Sections 1 and 14 of the Operating
Instructions and Reporting Requirements For Chapter 11 cases are current.
(If not, attach a written explanation)          YES___X___          NO_____

4.        No professional fees (attorney, accountant, etc.) have been paid without specific
court authorization.
(If not, attach a written explanation)          YES___X___          NO_____

5.        All United States Trustee Quarterly fees have been paid and are current.
                                                YES___X___          NO_____

6.        Have you filed your prepetition tax returns.
(If not, attach a written explanation)          YES_____          NO___X___

I hereby certify, under penalty of perjury, that the information provided above and in the attached documents
is true and correct to the best of any information and belief.

Dated: September 19, 2005          /s/ David Cosgrove
                                   **Responsible Officer of the Debtor in Possession**

(248)-824-2717                     **Senior Vice President - Financial Planning and Controller**
**Phone**                          **Title**

**TRANSMITTAL OF FINANCIAL REPORTS AND
CERTIFICATION OF COMPLIANCE WITH
UNITED STATES TRUSTEE OPERATING REQUIREMENTS FOR
THE PERIOD ENDED:  August 31, 2005**

IN RE:                                          :

                                                :       CASE NO.  452-05-55952-SWR

**Collins & Aikman Accessory Mats, Inc. (f/k/a**        Chapter 11
 **the Akro Corporation**                       :       Judge:    **Steven W. Rhodes**

                        **Debtor**              :

                                                :

As debtor in possession, I affirm:

1.          That I have reviewed the financial statements attached hereto, consisting of:

|       |                              |          |             |
|-------|------------------------------|----------|-------------|
| X     | Operating Statement          | (Form 2) | See Tab #3  |
| X     | Balance Sheet                | (Form 3) | See Tab #4  |
| X     | Summary of Operations        | (Form 4) | See Tab #5  |
| X     | Monthly Cash Statement       | (Form 5) | See Tab #7  |
|       | Statement of Compensation    | (Form 6) |             |
| X     | Schedule of In-Force Insurance | (Form 7) | See Tab #9 |

and that they have been prepared in accordance with normal and customary accounting
practices, and fairly and accurately reflect the debtor's financial activity for the period stated;

2.          That the insurance, including workers' compensation and unemployment insurance,
as described in Section 4 of the Reporting Requirements For Chapter 11 Cases is in effect; and,
(If not, attach a written explanation)          YES___X___          NO_____

3.          That all postpetition taxes as described in Sections 1 and 14 of the Operating
Instructions and Reporting Requirements For Chapter 11 cases are current.
(If not, attach a written explanation)          YES___X___          NO_____

4.          No professional fees (attorney, accountant, etc.) have been paid without specific
court authorization.
(If not, attach a written explanation)          YES___X___          NO_____

5.          All United States Trustee Quarterly fees have been paid and are current.
                                                YES___X___          NO_____

6.          Have you filed your prepetition tax returns.
(If not, attach a written explanation)          YES_____          NO___X___

I hereby certify, under penalty of perjury, that the information provided above and in the attached documents
is true and correct to the best of any information and belief.

                                        **/s/ David Cosgrove**
     Dated: **September 19, 2005**       **Responsible Officer of the Debtor in Possession**

  **(248)-824-2717**                     **Senior Vice President - Financial Planning and Controller**
        **Phone**                                **Title**

TRANSMITTAL OF FINANCIAL REPORTS AND
CERTIFICATION OF COMPLIANCE WITH
UNITED STATES TRUSTEE OPERATING REQUIREMENTS FOR
THE PERIOD ENDED:  August 31, 2005

IN RE:                                         :

                                     :     CASE NO.   452-05-55956-SWR

                                     :     Chapter 11

Collins & Aikman Automotive Interiors, Inc. (f/k/a          Judge:    Steven W. Rhodes
 Textron Automotive Interiors, Inc.)        :
                      Debtor

                                   :

As debtor in possession, I affirm:

1.        That I have reviewed the financial statements attached hereto, consisting of:

| | | | |
|---|---|---|---|
| X | Operating Statement | (Form 2) | See Tab #3 |
| X | Balance Sheet | (Form 3) | See Tab #4 |
| X | Summary of Operations | (Form 4) | See Tab #5 |
| X | Monthly Cash Statement | (Form 5) | See Tab #7 |
| | Statement of Compensation | (Form 6) | |
| X | Schedule of In-Force Insurance | (Form 7) | See Tab #9 |

and that they have been prepared in accordance with normal and customary accounting
practices, and fairly and accurately reflect the debtor's financial activity for the period stated;

2.        That the insurance, including workers' compensation and unemployment insurance,
as described in Section 4 of the Reporting Requirements For Chapter 11 Cases is in effect; and,
(If not, attach a written explanation)        YES___X___        NO_____

3.        That all postpetition taxes as described in Sections 1 and 14 of the Operating
Instructions and Reporting Requirements For Chapter 11 cases are current.
(If not, attach a written explanation)        YES___X___        NO_____

4.        No professional fees (attorney, accountant, etc.) have been paid without specific
court authorization.
(If not, attach a written explanation)        YES___X___        NO_____

5.        All United States Trustee Quarterly fees have been paid and are current.
                                YES___X___        NO_____

6.        Have you filed your prepetition tax returns.
(If not, attach a written explanation)        YES_____        NO___X___

I hereby certify, under penalty of perjury, that the information provided above and in the attached documents
is true and correct to the best of any information and belief.

                                   /s/ David Cosgrove
  Dated: September 19, 2005           Responsible Officer of the Debtor in Possession

  (248)-824-2717                  Senior Vice President - Financial Planning and Controller
        Phone                              Title

TRANSMITTAL OF FINANCIAL REPORTS AND
CERTIFICATION OF COMPLIANCE WITH
UNITED STATES TRUSTEE OPERATING REQUIREMENTS FOR
THE PERIOD ENDED:  August 31, 2005

IN RE:                                          :

                                                :        CASE NO.   452-05-55957-SWR
                                                         Chapter 11
                                                         Judge:    Steven W. Rhodes
Brut Plastics, Inc.                             :
                          Debtor

                                                :

As debtor in possession, I affirm:

1.        That I have reviewed the financial statements attached hereto, consisting of:

|   |   |   |   |
|---|---|---|---|
| X | Operating Statement | (Form 2) | See Tab #3 |
| X | Balance Sheet | (Form 3) | See Tab #4 |
|   | Summary of Operations | (Form 4) | |
|   | Monthly Cash Statement | (Form 5) | |
|   | Statement of Compensation | (Form 6) | |
| X | Schedule of In-Force Insurance | (Form 7) | See Tab #9 |

and that they have been prepared in accordance with normal and customary accounting
practices, and fairly and accurately reflect the debtor's financial activity for the period stated;

2.        That the insurance, including workers' compensation and unemployment insurance,
as described in Section 4 of the Reporting Requirements For Chapter 11 Cases is in effect; and,
(If not, attach a written explanation)          YES___X___          NO_____

3.        That all postpetition taxes as described in Sections 1 and 14 of the Operating
Instructions and Reporting Requirements For Chapter 11 cases are current.
(If not, attach a written explanation)          YES___X___          NO_____

4.        No professional fees (attorney, accountant, etc.) have been paid without specific
court authorization.
(If not, attach a written explanation)          YES___X___          NO_____

5.        All United States Trustee Quarterly fees have been paid and are current.
                                                YES___X___          NO_____

6.        Have you filed your prepetition tax returns.
(If not, attach a written explanation)          YES_____          NO___X___

I hereby certify, under penalty of perjury, that the information provided above and in the attached documents
is true and correct to the best of any information and belief.

                                                /s/ David Cosgrove
      Dated: September 19, 2005                 Responsible Officer of the Debtor in Possession

(248)-824-2717                                  Senior Vice President - Financial Planning and Controller
         Phone                                                    Title

**TRANSMITTAL OF FINANCIAL REPORTS AND
CERTIFICATION OF COMPLIANCE WITH
UNITED STATES TRUSTEE OPERATING REQUIREMENTS FOR
THE PERIOD ENDED:  August 31, 2005**

| | | |
|---|---|---|
| IN RE: | : | |
| | : | CASE NO.   452-05-55958-SWR |
| | | Chapter 11 |
| **Collins & Aikman Automotive Exteriors, Inc. (f/k/a** | : | Judge:    Steven W. Rhodes |
| **Textron Automotive Exteriors, Inc.)** | : | |
| Debtor | | |
| | : | |

As debtor in possession, I affirm:

1.        That I have reviewed the financial statements attached hereto, consisting of:

|   | | | |
|---|---|---|---|
| X | Operating Statement | (Form 2) | See Tab #3 |
| X | Balance Sheet | (Form 3) | See Tab #4 |
| X | Summary of Operations | (Form 4) | See Tab #5 |
| X | Monthly Cash Statement | (Form 5) | See Tab #7 |
|   | Statement of Compensation | (Form 6) | |
| X | Schedule of In-Force Insurance | (Form 7) | See Tab #9 |

and that they have been prepared in accordance with normal and customary accounting
practices, and fairly and accurately reflect the debtor's financial activity for the period stated;

2.        That the insurance, including workers' compensation and unemployment insurance,
as described in Section 4 of the Reporting Requirements For Chapter 11 Cases is in effect; and,
(If not, attach a written explanation)        YES___X___        NO_____

3.        That all postpetition taxes as described in Sections 1 and 14 of the Operating
Instructions and Reporting Requirements For Chapter 11 cases are current.
(If not, attach a written explanation)        YES___X___        NO_____

4.        No professional fees (attorney, accountant, etc.) have been paid without specific
court authorization.
(If not, attach a written explanation)        YES___X___        NO_____

5.        All United States Trustee Quarterly fees have been paid and are current.
                                        YES___X___        NO_____

6.        Have you filed your prepetition tax returns.
(If not, attach a written explanation)        YES_____        NO___X___

I hereby certify, under penalty of perjury, that the information provided above and in the attached documents
is true and correct to the best of any information and belief.

|  |  |
|---|---|
| | /s/ David Cosgrove |
| Dated: September 19, 2005 | Responsible Officer of the Debtor in Possession |
| (248)-824-2717 | Senior Vice President - Financial Planning and Controller |
| Phone | Title |

**TRANSMITTAL OF FINANCIAL REPORTS AND
CERTIFICATION OF COMPLIANCE WITH
UNITED STATES TRUSTEE OPERATING REQUIREMENTS FOR
THE PERIOD ENDED: August 31, 2005**

IN RE:                                        :        CASE NO.  452-05-55959-SWR
                                              :        Chapter 11
                                              :        Judge:    Steven W. Rhodes
Collins & Aikman Asset Services, Inc.         :
                    Debtor
                                              :

As debtor in possession, I affirm:

1.        That I have reviewed the financial statements attached hereto, consisting of:

| | | | |
|---|---|---|---|
| X | Operating Statement | (Form 2) | See Tab #3 |
| X | Balance Sheet | (Form 3) | See Tab #4 |
| | Summary of Operations | (Form 4) | |
| | Monthly Cash Statement | (Form 5) | |
| | Statement of Compensation | (Form 6) | |
| X | Schedule of In-Force Insurance | (Form 7) | See Tab #9 |

and that they have been prepared in accordance with normal and customary accounting practices, and fairly and accurately reflect the debtor's financial activity for the period stated;

2.        That the insurance, including workers' compensation and unemployment insurance, as described in Section 4 of the Reporting Requirements For Chapter 11 Cases is in effect; and, (If not, attach a written explanation)        YES___X___        NO_____

3.        That all postpetition taxes as described in Sections 1 and 14 of the Operating Instructions and Reporting Requirements For Chapter 11 cases are current. (If not, attach a written explanation)        YES___X___        NO_____

4.        No professional fees (attorney, accountant, etc.) have been paid without specific court authorization. (If not, attach a written explanation)        YES___X___        NO_____

5.        All United States Trustee Quarterly fees have been paid and are current. YES___X___        NO_____

6.        Have you filed your prepetition tax returns. (If not, attach a written explanation)        YES_____        NO___X___

I hereby certify, under penalty of perjury, that the information provided above and in the attached documents is true and correct to the best of any information and belief.

Dated: September 19, 2005        /s/ David Cosgrove
                                 Responsible Officer of the Debtor in Possession

(248)-824-2717                   Senior Vice President - Financial Planning and Controller
        Phone                            Title

**TRANSMITTAL OF FINANCIAL REPORTS AND**
**CERTIFICATION OF COMPLIANCE WITH**
**UNITED STATES TRUSTEE OPERATING REQUIREMENTS FOR**
**THE PERIOD ENDED:  August 31, 2005**

IN RE:                                    :

                                          :          CASE NO.  452-05-55960-SWR
                                                     Chapter 11
                                          :          Judge:    Steven W. Rhodes

Collins & Aikman Plastics, Inc.           :
                        **Debtor**

                                          :

As debtor in possession, I affirm:

1.       That I have reviewed the financial statements attached hereto, consisting of:

|   |   |   |   |
|---|---|---|---|
| __X__ | Operating Statement | (Form 2) | See Tab #3 |
| __X__ | Balance Sheet | (Form 3) | See Tab #4 |
| _____ | Summary of Operations | (Form 4) | |
| _____ | Monthly Cash Statement | (Form 5) | |
| _____ | Statement of Compensation | (Form 6) | |
| __X__ | Schedule of In-Force Insurance | (Form 7) | See Tab #9 |

and that they have been prepared in accordance with normal and customary accounting practices, and fairly and accurately reflect the debtor's financial activity for the period stated;

2.       That the insurance, including workers' compensation and unemployment insurance, as described in Section 4 of the Reporting Requirements For Chapter 11 Cases is in effect; and, (If not, attach a written explanation)          YES___X___          NO_____

3.       That all postpetition taxes as described in Sections 1 and 14 of the Operating Instructions and Reporting Requirements For Chapter 11 cases are current. (If not, attach a written explanation)          YES___X___          NO_____

4.       No professional fees (attorney, accountant, etc.) have been paid without specific court authorization. (If not, attach a written explanation)          YES___X___          NO_____

5.       All United States Trustee Quarterly fees have been paid and are current.
                                          YES___X___          NO_____

6.       Have you filed your prepetition tax returns. (If not, attach a written explanation)          YES_____          NO___X___

I hereby certify, under penalty of perjury, that the information provided above and in the attached documents is true and correct to the best of any information and belief.

                                          /s/ David Cosgrove
     Dated: September 19, 2005            **Responsible Officer of the Debtor in Possession**

     (248)-824-2717                       **Senior Vice President - Financial Planning and Controller**
         **Phone**                            **Title**

**TRANSMITTAL OF FINANCIAL REPORTS AND
CERTIFICATION OF COMPLIANCE WITH
UNITED STATES TRUSTEE OPERATING REQUIREMENTS FOR
THE PERIOD ENDED:  August 31, 2005**

IN RE:                                          :          CASE NO.  452-05-55962-SWR
                                                :          Chapter 11
                                                :          Judge:    Steven W. Rhodes

Wickes Asset Management, Inc.                   :
                        Debtor                  :

As debtor in possession, I affirm:

1.      That I have reviewed the financial statements attached hereto, consisting of:

| | | | |
|---|---|---|---|
| __X__ | Operating Statement | (Form 2) | See Tab #3 |
| __X__ | Balance Sheet | (Form 3) | See Tab #4 |
| _____ | Summary of Operations | (Form 4) | |
| _____ | Monthly Cash Statement | (Form 5) | |
| _____ | Statement of Compensation | (Form 6) | |
| __X__ | Schedule of In-Force Insurance | (Form 7) | See Tab #9 |

and that they have been prepared in accordance with normal and customary accounting
practices, and fairly and accurately reflect the debtor's financial activity for the period stated;

2.      That the insurance, including workers' compensation and unemployment insurance,
as described in Section 4 of the Reporting Requirements For Chapter 11 Cases is in effect; and,
(If not, attach a written explanation)          YES___X___          NO_____

3.      That all postpetition taxes as described in Sections 1 and 14 of the Operating
Instructions and Reporting Requirements For Chapter 11 cases are current.
(If not, attach a written explanation)          YES___X___          NO_____

4.      No professional fees (attorney, accountant, etc.) have been paid without specific
court authorization.
(If not, attach a written explanation)          YES___X___          NO_____

5.      All United States Trustee Quarterly fees have been paid and are current.
                                                YES___X___          NO_____

6.      Have you filed your prepetition tax returns.
(If not, attach a written explanation)          YES_____          NO___X___

I hereby certify, under penalty of perjury, that the information provided above and in the attached documents
is true and correct to the best of any information and belief.

/s/ David Cosgrove
Dated: September 19, 2005        Responsible Officer of the Debtor in Possession

(248)-824-2717                   Senior Vice President - Financial Planning and Controller
        Phone                                    Title

**TRANSMITTAL OF FINANCIAL REPORTS AND
CERTIFICATION OF COMPLIANCE WITH
UNITED STATES TRUSTEE OPERATING REQUIREMENTS FOR
THE PERIOD ENDED:  August 31, 2005**

IN RE:                                          :

                                                :          CASE NO.  452-05-55963-SWR
                                                           Chapter 11
Collins & Aikman Fabrics, Inc. (f/k/a Joan                 Judge:    Steven W. Rhodes
 Automotive Industries, Inc.)                   :
                          **Debtor**

                                                :

As debtor in possession, I affirm:

1.       That I have reviewed the financial statements attached hereto, consisting of:

| | | | |
|---|---|---|---|
| X | Operating Statement | (Form 2) | See Tab #3 |
| X | Balance Sheet | (Form 3) | See Tab #4 |
| X | Summary of Operations | (Form 4) | See Tab #5 |
| X | Monthly Cash Statement | (Form 5) | See Tab #7 |
| | Statement of Compensation | (Form 6) | |
| X | Schedule of In-Force Insurance | (Form 7) | See Tab #9 |

and that they have been prepared in accordance with normal and customary accounting
practices, and fairly and accurately reflect the debtor's financial activity for the period stated;

2.       That the insurance, including workers' compensation and unemployment insurance,
as described in Section 4 of the Reporting Requirements For Chapter 11 Cases is in effect; and,
(If not, attach a written explanation)          YES___X___          NO_____

3.       That all postpetition taxes as described in Sections 1 and 14 of the Operating
Instructions and Reporting Requirements For Chapter 11 cases are current.
(If not, attach a written explanation)          YES___X___          NO_____

4.       No professional fees (attorney, accountant, etc.) have been paid without specific
court authorization.
(If not, attach a written explanation)          YES___X___          NO_____

5.       All United States Trustee Quarterly fees have been paid and are current.
                                                YES___X___          NO_____

6.       Have you filed your prepetition tax returns.
(If not, attach a written explanation)          YES_____          NO___X___

I hereby certify, under penalty of perjury, that the information provided above and in the attached documents
is true and correct to the best of any information and belief.

                                       /s/ David Cosgrove
  Dated: September 19, 2005             **Responsible Officer of the Debtor in Possession**

  (248)-824-2717                        **Senior Vice President - Financial Planning and Controller**
      **Phone**                                    **Title**

**TRANSMITTAL OF FINANCIAL REPORTS AND**
**CERTIFICATION OF COMPLIANCE WITH**
**UNITED STATES TRUSTEE OPERATING REQUIREMENTS FOR**
**THE PERIOD ENDED:  August 31, 2005**

IN RE:                                          :

                                                :       CASE NO.  452-05-55964-SWR
                                                        Chapter 11
                                                        Judge:    Steven W. Rhodes
**Collins & Aikman Properties, Inc.**            :
                              **Debtor**

                                                :

As debtor in possession, I affirm:

1.       That I have reviewed the financial statements attached hereto, consisting of:

|  |  |  |  |
|---|---|---|---|
| X | Operating Statement | (Form 2) | See Tab #3 |
| X | Balance Sheet | (Form 3) | See Tab #4 |
|  | Summary of Operations | (Form 4) |  |
| X | Monthly Cash Statement | (Form 5) | See Tab #4 |
|  | Statement of Compensation | (Form 6) |  |
| X | Schedule of In-Force Insurance | (Form 7) | See Tab #9 |

and that they have been prepared in accordance with normal and customary accounting practices, and fairly and accurately reflect the debtor's financial activity for the period stated;

2.       That the insurance, including workers' compensation and unemployment insurance, as described in Section 4 of the Reporting Requirements For Chapter 11 Cases is in effect; and,
(If not, attach a written explanation)        YES___X___        NO_____

3.       That all postpetition taxes as described in Sections 1 and 14 of the Operating Instructions and Reporting Requirements For Chapter 11 cases are current.
(If not, attach a written explanation)        YES___X___        NO_____

4.       No professional fees (attorney, accountant, etc.) have been paid without specific court authorization.
(If not, attach a written explanation)        YES___X___        NO_____

5.       All United States Trustee Quarterly fees have been paid and are current.
                                              YES___X___        NO_____

6.       Have you filed your prepetition tax returns.
(If not, attach a written explanation)        YES_____        NO___X___

I hereby certify, under penalty of perjury, that the information provided above and in the attached documents is true and correct to the best of any information and belief.

                                   /s/ David Cosgrove
    Dated: September 19, 2005      Responsible Officer of the Debtor in Possession

(248)-824-2717                     Senior Vice President - Financial Planning and Controller
    Phone                               Title

**TRANSMITTAL OF FINANCIAL REPORTS AND
CERTIFICATION OF COMPLIANCE WITH
UNITED STATES TRUSTEE OPERATING REQUIREMENTS FOR
THE PERIOD ENDED:  August 31, 2005**

IN RE:                                              :

                                                    :          CASE NO.  452-05-55972-SWR
                                                    :          Chapter 11
                                                               Judge:    Steven W. Rhodes
Comet Acoustics, Inc.                               :
                          **Debtor**

                                                    :

As debtor in possession, I affirm:

1.          That I have reviewed the financial statements attached hereto, consisting of:

|  |  |  |  |
|---|---|---|---|
| __X__ | Operating Statement | (Form 2) | See Tab #3 |
| __X__ | Balance Sheet | (Form 3) | See Tab #4 |
| _____ | Summary of Operations | (Form 4) | |
| _____ | Monthly Cash Statement | (Form 5) | |
| _____ | Statement of Compensation | (Form 6) | |
| __X__ | Schedule of In-Force Insurance | (Form 7) | See Tab #9 |

and that they have been prepared in accordance with normal and customary accounting
practices, and fairly and accurately reflect the debtor's financial activity for the period stated;

2.          That the insurance, including workers' compensation and unemployment insurance,
as described in Section 4 of the Reporting Requirements For Chapter 11 Cases is in effect; and,
(If not, attach a written explanation)          YES___X___          NO_____

3.          That all postpetition taxes as described in Sections 1 and 14 of the Operating
Instructions and Reporting Requirements For Chapter 11 cases are current.
(If not, attach a written explanation)          YES___X___          NO_____

4.          No professional fees (attorney, accountant, etc.) have been paid without specific
court authorization.
(If not, attach a written explanation)          YES___X___          NO_____

5.          All United States Trustee Quarterly fees have been paid and are current.
                                                YES___X___          NO_____

6.          Have you filed your prepetition tax returns.
(If not, attach a written explanation)          YES_____          NO___X___

I hereby certify, under penalty of perjury, that the information provided above and in the attached documents
is true and correct to the best of any information and belief.

                                    __/s/ David Cosgrove_____
   Dated: _September 19, 2005___    **Responsible Officer of the Debtor in Possession**

   _(248)-824-2717_____         **Senior Vice President - Financial Planning and Controller**
        **Phone**                        **Title**

**TRANSMITTAL OF FINANCIAL REPORTS AND
CERTIFICATION OF COMPLIANCE WITH
UNITED STATES TRUSTEE OPERATING REQUIREMENTS FOR
THE PERIOD ENDED: August 31, 2005**

IN RE:                              :

                                    :        CASE NO.  452-05-55974-SWR
                                             Chapter 11
                                             Judge:    Steven W. Rhodes

**Gamble Development Company**             :
                    **Debtor**

                                    :

As debtor in possession, I affirm:

1.        That I have reviewed the financial statements attached hereto, consisting of:

|   |   |   |   |
|---|---|---|---|
| X | Operating Statement | (Form 2) | See Tab #3 |
| X | Balance Sheet | (Form 3) | See Tab #4 |
|   | Summary of Operations | (Form 4) |   |
|   | Monthly Cash Statement | (Form 5) |   |
|   | Statement of Compensation | (Form 6) |   |
| X | Schedule of In-Force Insurance | (Form 7) | See Tab #9 |

and that they have been prepared in accordance with normal and customary accounting
practices, and fairly and accurately reflect the debtor's financial activity for the period stated;

2.        That the insurance, including workers' compensation and unemployment insurance,
as described in Section 4 of the Reporting Requirements For Chapter 11 Cases is in effect; and,
(If not, attach a written explanation)        YES___X___        NO_____

3.        That all postpetition taxes as described in Sections 1 and 14 of the Operating
Instructions and Reporting Requirements For Chapter 11 cases are current.
(If not, attach a written explanation)        YES___X___        NO_____

4.        No professional fees (attorney, accountant, etc.) have been paid without specific
court authorization.
(If not, attach a written explanation)        YES___X___        NO_____

5.        All United States Trustee Quarterly fees have been paid and are current.
                                             YES___X___        NO_____

6.        Have you filed your prepetition tax returns.
(If not, attach a written explanation)        YES_____        NO___X___

I hereby certify, under penalty of perjury, that the information provided above and in the attached documents
is true and correct to the best of any information and belief.

                                             /s/ David Cosgrove
Dated: September 19, 2005                    **Responsible Officer of the Debtor in Possession**

(248)-824-2717                               **Senior Vice President - Financial Planning and Controller**
**Phone**                                         **Title**

**TRANSMITTAL OF FINANCIAL REPORTS AND
CERTIFICATION OF COMPLIANCE WITH
UNITED STATES TRUSTEE OPERATING REQUIREMENTS FOR
THE PERIOD ENDED:  August 31, 2005**

IN RE:                                                    :

                                                     CASE NO.  452-05-55976-SWR

                                               :                                                    Chapter 11

**Collins & Aikman Intellimold, Inc. (f/k/a M&C**                     Judge:    Steven W. Rhodes
 **Advanced Processes, Inc.**                    :
                           **Debtor**

As debtor in possession, I affirm:

1.       That I have reviewed the financial statements attached hereto, consisting of:

| | | | |
|---|---|---|---|
| X | Operating Statement | (Form 2) | See Tab #3 |
| X | Balance Sheet | (Form 3) | See Tab #4 |
| ___ | Summary of Operations | (Form 4) | |
| ___ | Monthly Cash Statement | (Form 5) | |
| ___ | Statement of Compensation | (Form 6) | |
| X | Schedule of In-Force Insurance | (Form 7) | See Tab #9 |

and that they have been prepared in accordance with normal and customary accounting
practices, and fairly and accurately reflect the debtor's financial activity for the period stated;

2.       That the insurance, including workers' compensation and unemployment insurance,
as described in Section 4 of the Reporting Requirements For Chapter 11 Cases is in effect; and,
(If not, attach a written explanation)       **YES___X___**       **NO_____**

3.       That all postpetition taxes as described in Sections 1 and 14 of the Operating
Instructions and Reporting Requirements For Chapter 11 cases are current.
(If not, attach a written explanation)       **YES___X___**       **NO_____**

4.       No professional fees (attorney, accountant, etc.) have been paid without specific
court authorization.
(If not, attach a written explanation)       **YES___X___**       **NO_____**

5.       All United States Trustee Quarterly fees have been paid and are current.
                                     **YES___X___**       **NO_____**

6.       Have you filed your prepetition tax returns.
(If not, attach a written explanation)       **YES_____**       **NO___X___**

I hereby certify, under penalty of perjury, that the information provided above and in the attached documents
is true and correct to the best of any information and belief.

                                     **/s/ David Cosgrove**

Dated: **September 19, 2005**       **Responsible Officer of the Debtor in Possession**

**(248)-824-2717**                        **Senior Vice President - Financial Planning and Controller**
**Phone**                                          **Title**

**TRANSMITTAL OF FINANCIAL REPORTS AND
CERTIFICATION OF COMPLIANCE WITH
UNITED STATES TRUSTEE OPERATING REQUIREMENTS FOR
THE PERIOD ENDED:  August 31, 2005**

IN RE:                                          :

                                  :     CASE NO.  452-05-55977-SWR

                                  :     Chapter 11

**Becker Group, LLC (d/b/a Collins & Aikman**           Judge:     **Steven W. Rhodes**

 **Premier Mold**
                        **Debtor**

                                  :

As debtor in possession, I affirm:

1.       That I have reviewed the financial statements attached hereto, consisting of:

| | | | |
|---|---|---|---|
| X | Operating Statement | (Form 2) | See Tab #3 |
| X | Balance Sheet | (Form 3) | See Tab #4 |
| X | Summary of Operations | (Form 4) | See Tab #5 |
| X | Monthly Cash Statement | (Form 5) | See Tab #7 |
| | Statement of Compensation | (Form 6) | |
| X | Schedule of In-Force Insurance | (Form 7) | See Tab #9 |

and that they have been prepared in accordance with normal and customary accounting practices, and fairly and accurately reflect the debtor's financial activity for the period stated;

2.       That the insurance, including workers' compensation and unemployment insurance, as described in Section 4 of the Reporting Requirements For Chapter 11 Cases is in effect; and, (If not, attach a written explanation)     YES___X___     NO_____

3.       That all postpetition taxes as described in Sections 1 and 14 of the Operating Instructions and Reporting Requirements For Chapter 11 cases are current. (If not, attach a written explanation)     YES___X___     NO_____

4.       No professional fees (attorney, accountant, etc.) have been paid without specific court authorization. (If not, attach a written explanation)     YES___X___     NO_____

5.       All United States Trustee Quarterly fees have been paid and are current.      YES___X___     NO_____

6.       Have you filed your prepetition tax returns. (If not, attach a written explanation)     YES_____     NO___X___

I hereby certify, under penalty of perjury, that the information provided above and in the attached documents is true and correct to the best of any information and belief.

                                    **/s/ David Cosgrove**

Dated: **September 19, 2005**       **Responsible Officer of the Debtor in Possession**

**(248)-824-2717**                **Senior Vice President - Financial Planning and Controller**
     **Phone**                             **Title**

TRANSMITTAL OF FINANCIAL REPORTS AND
CERTIFICATION OF COMPLIANCE WITH
UNITED STATES TRUSTEE OPERATING REQUIREMENTS FOR
THE PERIOD ENDED:  August 31, 2005

IN RE:                                        :        CASE NO.  452-05-55978-SWR
                                              :        Chapter 11
                                              :        Judge:    Steven W. Rhodes
Collins & Aikman Automotive Overseas
 Investment, Inc.
                        Debtor                :

                                              :

As debtor in possession, I affirm:

1.        That I have reviewed the financial statements attached hereto, consisting of:

| | | | |
|---|---|---|---|
| __X__ | Operating Statement | (Form 2) | See Tab #3 |
| __X__ | Balance Sheet | (Form 3) | See Tab #4 |
| _____ | Summary of Operations | (Form 4) | |
| _____ | Monthly Cash Statement | (Form 5) | |
| _____ | Statement of Compensation | (Form 6) | |
| __X__ | Schedule of In-Force Insurance | (Form 7) | See Tab #9 |

and that they have been prepared in accordance with normal and customary accounting
practices, and fairly and accurately reflect the debtor's financial activity for the period stated;

2.        That the insurance, including workers' compensation and unemployment insurance,
as described in Section 4 of the Reporting Requirements For Chapter 11 Cases is in effect; and,
(If not, attach a written explanation)        YES___X___        NO_____

3.        That all postpetition taxes as described in Sections 1 and 14 of the Operating
Instructions and Reporting Requirements For Chapter 11 cases are current.
(If not, attach a written explanation)        YES___X___        NO_____

4.        No professional fees (attorney, accountant, etc.) have been paid without specific
court authorization.
(If not, attach a written explanation)        YES___X___        NO_____

5.        All United States Trustee Quarterly fees have been paid and are current.
                                              YES___X___        NO_____

6.        Have you filed your prepetition tax returns.
(If not, attach a written explanation)        YES_____        NO___X___

I hereby certify, under penalty of perjury, that the information provided above and in the attached documents
is true and correct to the best of any information and belief.

                                              /s/ David Cosgrove
   Dated: September 19, 2005                   Responsible Officer of the Debtor in Possession

   (248)-824-2717                              Senior Vice President - Financial Planning and Controller
        Phone                                                   Title

TRANSMITTAL OF FINANCIAL REPORTS AND
CERTIFICATION OF COMPLIANCE WITH
UNITED STATES TRUSTEE OPERATING REQUIREMENTS FOR
THE PERIOD ENDED:  August 31, 2005

IN RE:                                    :

                                          :        CASE NO.  452-05-55979-SWR
                                                   Chapter 11
                                                   Judge:    Steven W. Rhodes
CW Management Corporation                 :
                        Debtor

                                          :

As debtor in possession, I affirm:

1.        That I have reviewed the financial statements attached hereto, consisting of:

|  | | | |
|---|---|---|---|
| X | Operating Statement | (Form 2) | See Tab #3 |
| X | Balance Sheet | (Form 3) | See Tab #4 |
|   | Summary of Operations | (Form 4) | |
|   | Monthly Cash Statement | (Form 5) | |
|   | Statement of Compensation | (Form 6) | |
| X | Schedule of In-Force Insurance | (Form 7) | See Tab #9 |

and that they have been prepared in accordance with normal and customary accounting
practices, and fairly and accurately reflect the debtor's financial activity for the period stated;

2.        That the insurance, including workers' compensation and unemployment insurance,
as described in Section 4 of the Reporting Requirements For Chapter 11 Cases is in effect; and,
(If not, attach a written explanation)        YES___X___        NO_____

3.        That all postpetition taxes as described in Sections 1 and 14 of the Operating
Instructions and Reporting Requirements For Chapter 11 cases are current.
(If not, attach a written explanation)        YES___X___        NO_____

4.        No professional fees (attorney, accountant, etc.) have been paid without specific
court authorization.
(If not, attach a written explanation)        YES___X___        NO_____

5.        All United States Trustee Quarterly fees have been paid and are current.
                                              YES___X___        NO_____

6.        Have you filed your prepetition tax returns.
(If not, attach a written explanation)        YES_____        NO___X___

I hereby certify, under penalty of perjury, that the information provided above and in the attached documents
is true and correct to the best of any information and belief.


                                          /s/ David Cosgrove
    Dated: September 19, 2005              Responsible Officer of the Debtor in Possession

    (248)-824-2717                         Senior Vice President - Financial Planning and Controller
         Phone                                              Title

**TRANSMITTAL OF FINANCIAL REPORTS AND**
**CERTIFICATION OF COMPLIANCE WITH**
**UNITED STATES TRUSTEE OPERATING REQUIREMENTS FOR**
**THE PERIOD ENDED:  August 31, 2005**

IN RE:                                        :
                                              :        CASE NO.  452-05-55980-SWR
                                              :        Chapter 11
                                              :        Judge:     Steven W. Rhodes
Collins & Aikman Automotive International, Inc.    :
                        Debtor                 :
                                              :

As debtor in possession, I affirm:

1.        That I have reviewed the financial statements attached hereto, consisting of:

|  |  |  |  |
|---|---|---|---|
| X | Operating Statement | (Form 2) | See Tab #3 |
| X | Balance Sheet | (Form 3) | See Tab #4 |
|  | Summary of Operations | (Form 4) |  |
|  | Monthly Cash Statement | (Form 5) |  |
|  | Statement of Compensation | (Form 6) |  |
| X | Schedule of In-Force Insurance | (Form 7) | See Tab #9 |

and that they have been prepared in accordance with normal and customary accounting
practices, and fairly and accurately reflect the debtor's financial activity for the period stated;

2.        That the insurance, including workers' compensation and unemployment insurance,
as described in Section 4 of the Reporting Requirements For Chapter 11 Cases is in effect; and,
(If not, attach a written explanation)        YES___X___        NO_____

3.        That all postpetition taxes as described in Sections 1 and 14 of the Operating
Instructions and Reporting Requirements For Chapter 11 cases are current.
(If not, attach a written explanation)        YES___X___        NO_____

4.        No professional fees (attorney, accountant, etc.) have been paid without specific
court authorization.
(If not, attach a written explanation)        YES___X___        NO_____

5.        All United States Trustee Quarterly fees have been paid and are current.
                                                YES___X___        NO_____

6.        Have you filed your prepetition tax returns.
(If not, attach a written explanation)        YES_____        NO___X___

I hereby certify, under penalty of perjury, that the information provided above and in the attached documents
is true and correct to the best of any information and belief.

                                        /s/ David Cosgrove
    Dated: September 19, 2005           Responsible Officer of the Debtor in Possession

(248)-824-2717                          Senior Vice President - Financial Planning and Controller
      Phone                                             Title

**TRANSMITTAL OF FINANCIAL REPORTS AND
CERTIFICATION OF COMPLIANCE WITH
UNITED STATES TRUSTEE OPERATING REQUIREMENTS FOR
THE PERIOD ENDED:  August 31, 2005**

IN RE:                                          :

                                                :        CASE NO.  452-05-55981-SWR
                                                         Chapter 11
                                                         Judge:    Steven W. Rhodes

Collins & Aikman Automotive Services, LLC       :
                        Debtor

                                                :

As debtor in possession, I affirm:

1.        That I have reviewed the financial statements attached hereto, consisting of:

| | | | |
|---|---|---|---|
| X | Operating Statement | (Form 2) | See Tab #3 |
| X | Balance Sheet | (Form 3) | See Tab #4 |
| | Summary of Operations | (Form 4) | |
| | Monthly Cash Statement | (Form 5) | |
| | Statement of Compensation | (Form 6) | |
| X | Schedule of In-Force Insurance | (Form 7) | See Tab #9 |

and that they have been prepared in accordance with normal and customary accounting
practices, and fairly and accurately reflect the debtor's financial activity for the period stated;

2.        That the insurance, including workers' compensation and unemployment insurance,
as described in Section 4 of the Reporting Requirements For Chapter 11 Cases in in effect; and,
(If not, attach a written explanation)        YES___X___        NO_____

3.        That all postpetition taxes as described in Sections 1 and 14 of the Operating
Instructions and Reporting Requirements For Chapter 11 cases are current.
(If not, attach a written explanation)        YES___X___        NO_____

4.        No professional fees (attorney, accountant, etc.) have been paid without specific
court authorization.
(If not, attach a written explanation)        YES___X___        NO_____

5.        All United States Trustee Quarterly fees have been paid and are current.
                                               YES___X___        NO_____

6.        Have you filed your prepetition tax returns.
(If not, attach a written explanation)        YES_____        NO___X___

I hereby certify, under penalty of perjury, that the information provided above and in the attached documents
is true and correct to the best of any information and belief.

                                          /s/ David Cosgrove
    Dated: September 19, 2005              Responsible Officer of the Debtor in Possession

    (248)-824-2717                         Senior Vice President - Financial Planning and Controller
         Phone                                          Title

**TRANSMITTAL OF FINANCIAL REPORTS AND**
**CERTIFICATION OF COMPLIANCE WITH**
**UNITED STATES TRUSTEE OPERATING REQUIREMENTS FOR**
**THE PERIOD ENDED:  August 31, 2005**

IN RE:                                                    :

                                                         :        CASE NO.   452-05-55984-SWR
                                                                  Chapter 11
                                                         :        Judge:    Steven W. Rhodes
Collins & Aikman Carpet & Acoustics (TN), Inc.          :
                        Debtor
                                                         :

As debtor in possession, I affirm:

1.        That I have reviewed the financial statements attached hereto, consisting of:

|  |  |  |  |
|---|---|---|---|
| X | Operating Statement | (Form 2) | See Tab #3 |
| X | Balance Sheet | (Form 3) | See Tab #4 |
| | Summary of Operations | (Form 4) | |
| | Monthly Cash Statement | (Form 5) | |
| | Statement of Compensation | (Form 6) | |
| X | Schedule of In-Force Insurance | (Form 7) | See Tab #9 |

and that they have been prepared in accordance with normal and customary accounting practices, and fairly and accurately reflect the debtor's financial activity for the period stated;

2.        That the insurance, including workers' compensation and unemployment insurance, as described in Section 4 of the Reporting Requirements For Chapter 11 Cases is in effect; and, (If not, attach a written explanation)        YES___X___        NO_____

3.        That all postpetition taxes as described in Sections 1 and 14 of the Operating Instructions and Reporting Requirements For Chapter 11 cases are current. (If not, attach a written explanation)        YES___X___        NO_____

4.        No professional fees (attorney, accountant, etc.) have been paid without specific court authorization. (If not, attach a written explanation)        YES___X___        NO_____

5.        All United States Trustee Quarterly fees have been paid and are current.        YES___X___        NO_____

6.        Have you filed your prepetition tax returns? (If not, attach a written explanation)        YES_____        NO___X___

I hereby certify, under penalty of perjury, that the information provided above and in the attached documents is true and correct to the best of any information and belief.

Dated: September 19, 2005                /s/ David Cosgrove
                                          Responsible Officer of the Debtor in Possession

(248)-824-2717                           Senior Vice President - Financial Planning and Controller
       Phone                                              Title

TRANSMITTAL OF FINANCIAL REPORTS AND
CERTIFICATION OF COMPLIANCE WITH
UNITED STATES TRUSTEE OPERATING REQUIREMENTS FOR
THE PERIOD ENDED:  August 31, 2005

IN RE:                                    :        CASE NO.  452-05-55989-SWR
                                          :        Chapter 11
                                          :        Judge:     Steven W. Rhodes
Collins & Aikman (Gibralter) Limited      :
                        Debtor            :
                                          :

As debtor in possession, I affirm:

1.        That I have reviewed the financial statements attached hereto, consisting of:

| | | | |
|---|---|---|---|
| X | Operating Statement | (Form 2) | See Tab #3 |
| X | Balance Sheet | (Form 3) | See Tab #4 |
| | Summary of Operations | (Form 4) | |
| | Monthly Cash Statement | (Form 5) | |
| | Statement of Compensation | (Form 6) | |
| X | Schedule of In-Force Insurance | (Form 7) | See Tab #9 |

and that they have been prepared in accordance with normal and customary accounting
practices, and fairly and accurately reflect the debtor's financial activity for the period stated;

2.        That the insurance, including workers' compensation and unemployment insurance,
as described in Section 4 of the Reporting Requirements For Chapter 11 Cases is in effect; and,
(If not, attach a written explanation)          YES___X___          NO_____

3.        That all postpetition taxes as described in Sections 1 and 14 of the Operating
Instructions and Reporting Requirements For Chapter 11 cases are current.
(If not, attach a written explanation)          YES___X___          NO_____

4.        No professional fees (attorney, accountant, etc.) have been paid without specific
court authorization.
(If not, attach a written explanation)          YES___X___          NO_____

5.        All United States Trustee Quarterly fees have been paid and are current.
                                                YES___X___          NO_____

6.        Have you filed your prepetition tax returns.
(If not, attach a written explanation)          YES_____          NO___X___

I hereby certify, under penalty of perjury, that the information provided above and in the attached documents
is true and correct to the best of any information and belief.

                                          /s/ David Cosgrove
    Dated: September 19, 2005              Responsible Officer of the Debtor in Possession

    (248)-824-2717                         Senior Vice President - Financial Planning and Controller
         Phone                                            Title

**TRANSMITTAL OF FINANCIAL REPORTS AND
CERTIFICATION OF COMPLIANCE WITH
UNITED STATES TRUSTEE OPERATING REQUIREMENTS FOR
THE PERIOD ENDED:  August 31, 2005**

IN RE:                                        :

                                              :        CASE NO.  452-05-55985-SWR
                                                       Chapter 11
**Collins & Aikman Automotive International**          Judge:    **Steven W. Rhodes**
**Services, Inc.**
                        **Debtor**            :

                                              :

As debtor in possession, I affirm:

1.       That I have reviewed the financial statements attached hereto, consisting of:

|   |   |   |   |
|---|---|---|---|
| X | Operating Statement | (Form 2) | See Tab #3 |
| X | Balance Sheet | (Form 3) | See Tab #4 |
|   | Summary of Operations | (Form 4) |   |
|   | Monthly Cash Statement | (Form 5) |   |
|   | Statement of Compensation | (Form 6) |   |
| X | Schedule of In-Force Insurance | (Form 7) | See Tab #9 |

and that they have been prepared in accordance with normal and customary accounting
practices, and fairly and accurately reflect the debtor's financial activity for the period stated;

2.       That the insurance, including workers' compensation and unemployment insurance,
as described in Section 4 of the Reporting Requirements For Chapter 11 Cases is in effect; and,
(If not, attach a written explanation)            YES___X___            NO_____

3.       That all postpetition taxes as described in Sections 1 and 14 of the Operating
Instructions and Reporting Requirements For Chapter 11 cases are current.
(If not, attach a written explanation)            YES___X___            NO_____

4.       No professional fees (attorney, accountant, etc.) have been paid without specific
court authorization.
(If not, attach a written explanation)            YES___X___            NO_____

5.       All United States Trustee Quarterly fees have been paid and are current.
                                                  YES___X___            NO_____

6.       Have you filed your prepetition tax returns.
(If not, attach a written explanation)            YES_____            NO___X___

I hereby certify, under penalty of perjury, that the information provided above and in the attached documents
is true and correct to the best of any information and belief.

Dated: _September 19, 2005_          /s/ David Cosgrove
                                     **Responsible Officer of the Debtor in Possession**

_(248)-824-2717_                     **Senior Vice President - Financial Planning and Controller**
**Phone**                            **Title**

**TRANSMITTAL OF FINANCIAL REPORTS AND
CERTIFICATION OF COMPLIANCE WITH
UNITED STATES TRUSTEE OPERATING REQUIREMENTS FOR
THE PERIOD ENDED:  August 31, 2005**

IN RE:                                                   :

                                                         :        CASE NO.   452-05-55991-SWR
                                                                  Chapter 11
Collins & Aikman Automotive (Asia), Inc. (f/k/a                   Judge:     Steven W. Rhodes
 Textron Automotive (Asia), Inc.)                        :
                            Debtor

                                                         :

As debtor in possession, I affirm:

1.        That I have reviewed the financial statements attached hereto, consisting of:

|          |                              |          |            |
|----------|------------------------------|----------|------------|
| X        | Operating Statement          | (Form 2) | See Tab #3 |
| X        | Balance Sheet                | (Form 3) | See Tab #4 |
|          | Summary of Operations        | (Form 4) |            |
|          | Monthly Cash Statement       | (Form 5) |            |
|          | Statement of Compensation    | (Form 6) |            |
| X        | Schedule of In-Force Insurance | (Form 7) | See Tab #9 |

and that they have been prepared in accordance with normal and customary accounting
practices, and fairly and accurately reflect the debtor's financial activity for the period stated;

2.        That the insurance, including workers' compensation and unemployment insurance,
as described in Section 4 of the Reporting Requirements For Chapter 11 Cases is in effect; and,
(If not, attach a written explanation)        YES___X___        NO_____

3.        That all postpetition taxes as described in Sections 1 and 14 of the Operating
Instructions and Reporting Requirements For Chapter 11 cases are current.
(If not, attach a written explanation)        YES___X___        NO_____

4.        No professional fees (attorney, accountant, etc.) have been paid without specific
court authorization.
(If not, attach a written explanation)        YES___X___        NO_____

5.        All United States Trustee Quarterly fees have been paid and are current.
                                              YES___X___        NO_____

6.        Have you filed your prepetition tax returns.
(If not, attach a written explanation)        YES_____        NO___X___

I hereby certify, under penalty of perjury, that the information provided above and in the attached documents
is true and correct to the best of any information and belief.

Dated: September 19, 2005        /s/ David Cosgrove
                                 Responsible Officer of the Debtor in Possession

(248)-824-2717                   Senior Vice President - Financial Planning and Controller
Phone                            Title

**TRANSMITTAL OF FINANCIAL REPORTS AND
CERTIFICATION OF COMPLIANCE WITH
UNITED STATES TRUSTEE OPERATING REQUIREMENTS FOR
THE PERIOD ENDED:  August 31, 2005**

IN RE:                                                      :

                                                           :          CASE NO.  452-05-55992-SWR
                                                                      Chapter 11
                                                                      Judge:     Steven W. Rhodes

New Baltimore Holdings, LLC                       :
                            Debtor

                                                           :

As debtor in possession, I affirm:

1.          That I have reviewed the financial statements attached hereto, consisting of:

| | | | |
|---|---|---|---|
| X | Operating Statement | (Form 2) | See Tab #3 |
| X | Balance Sheet | (Form 3) | See Tab #4 |
| X | Summary of Operations | (Form 4) | See Tab #5 |
| X | Monthly Cash Statement | (Form 5) | See Tab #7 |
| | Statement of Compensation | (Form 6) | |
| X | Schedule of In-Force Insurance | (Form 7) | See Tab #9 |

and that they have been prepared in accordance with normal and customary accounting practices, and fairly and accurately reflect the debtor's financial activity for the period stated;

2.          That the insurance, including workers' compensation and unemployment insurance, as described in Section 4 of the Reporting Requirements For Chapter 11 Cases is in effect; and, (If not, attach a written explanation)          YES___X___          NO_____

3.          That all postpetition taxes as described in Sections 1 and 14 of the Operating Instructions and Reporting Requirements For Chapter 11 cases are current. (If not, attach a written explanation)          YES___X___          NO_____

4.          No professional fees (attorney, accountant, etc.) have been paid without specific court authorization. (If not, attach a written explanation)          YES___X___          NO_____

5.          All United States Trustee Quarterly fees have been paid and are current.
                                                           YES___X___          NO_____

6.          Have you filed your prepetition tax returns. (If not, attach a written explanation)          YES_____          NO___X___

I hereby certify, under penalty of perjury, that the information provided above and in the attached documents is true and correct to the best of any information and belief.

                                                           /s/ David Cosgrove
          Dated: September 19, 2005                Responsible Officer of the Debtor in Possession

          (248)-824-2717                           Senior Vice President - Financial Planning and Controller
                    Phone                                                   Title

**TRANSMITTAL OF FINANCIAL REPORTS AND**
**CERTIFICATION OF COMPLIANCE WITH**
**UNITED STATES TRUSTEE OPERATING REQUIREMENTS FOR**
**THE PERIOD ENDED:  August 31, 2005**

IN RE:                                                    :

                                                          :          CASE NO.  452-05-55982-SWR
                                                                     Chapter 11
                                                          :          Judge:    Steven W. Rhodes

Collins & Aikman Carpet & Acoustics (MI), Inc.           :
                      Debtor

                                                          :

As debtor in possession, I affirm:

1.          That I have reviewed the financial statements attached hereto, consisting of:

|  |  |  |  |
|---|---|---|---|
| X | Operating Statement | (Form 2) | See Tab #3 |
| X | Balance Sheet | (Form 3) | See Tab #4 |
|  | Summary of Operations | (Form 4) |  |
|  | Monthly Cash Statement | (Form 5) |  |
|  | Statement of Compensation | (Form 6) |  |
| X | Schedule of In-Force Insurance | (Form 7) | See Tab #9. |

and that they have been prepared in accordance with normal and customary accounting
practices, and fairly and accurately reflect the debtor's financial activity for the period stated;

2.          That the insurance, including workers' compensation and unemployment insurance,
as described in Section 4 of the Reporting Requirements For Chapter 11 Cases is in effect; and,
(If not, attach a written explanation)        YES___X___          NO_____

3.          That all postpetition taxes as described in Sections 1 and 14 of the Operating
Instructions and Reporting Requirements For Chapter 11 cases are current.
(If not, attach a written explanation)        YES___X___          NO_____

4.          No professional fees (attorney, accountant, etc.) have been paid without specific
court authorization.
(If not, attach a written explanation)        YES___X___          NO_____

5.          All United States Trustee Quarterly fees have been paid and are current.
                                              YES___X___          NO_____

6.          Have you filed your prepetition tax returns.
(If not, attach a written explanation)        YES_____          NO___X___

I hereby certify, under penalty of perjury, that the information provided above and in the attached documents
is true and correct to the best of any information and belief.

/s/ David Cosgrove
     Dated: September 19, 2005          **Responsible Officer of the Debtor in Possession**

(248)-824-2717                          **Senior Vice President - Financial Planning and Controller**
        **Phone**                                      **Title**

# EXHIBIT C

# PART 1

**TO THE DECLARATION OF VERNON R. PROCTOR
IN SUPPORT OF DEFENDANT DAVID R. COSGROVE'S
MOTION TO DISMISS THE COMPLAINT**

DEF 14A 1 k69050def14a.htm DEFINITIVE PROXY STATEMENT

Table of Contents

SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

SCHEDULE 14A INFORMATION

**PROXY STATEMENT PURSUANT TO SECTION 14(a) OF THE
SECURITIES EXCHANGE ACT OF 1934**

Filed by the Registrant [X]
Filed by a Party other than the Registrant [ ]

Check the appropriate box:

[ ]   Preliminary Proxy Statement

[ ]   Confidential, for Use of the Commission Only (as permitted by Rule 14a-6(e)(2))

[X]   Definitive Proxy Statement

[ ]   Definitive Additional Materials

[ ]   Soliciting Material Pursuant to Section 240.14a-11(c) or Section 240.14a-12

Collins & Aikman Corporation

(Name of Registrant as Specified in Its Charter)

Not Applicable

(Name of Person(s) Filing Proxy Statement, if other than the Registrant)

Payment of Filing Fee (Check the appropriate box):

[X]   No fee required.

[ ]   Fee computed on table below per Exchange Act Rules 14a-6(i)(1) and 0-11.

1)   Title of each class of securities to which transaction applies:

2)   Aggregate number of securities to which transaction applies:

3)   Per unit price or other underlying value of transaction computed pursuant to Exchange Act Rule 0-11 (set forth the amount on which the filing fee is calculated and state how it was determined):

4)  Proposed maximum aggregate value of transaction:

5)  Total fee paid:

[ ]  Fee paid previously with preliminary materials.

[ ]  Check box if any part of the fee is offset as provided by Exchange Act Rule 0-11(a)(2) and identify the filing for which the offsetting fee was paid previously. Identify the previous filing by registration statement number, or the Form or Schedule and the date of its filing.

1)  Amount Previously Paid:

2)  Form, Schedule or Registration Statement No.:

3)  Filing Party:

4)  Date Filed:

Table of Contents



Collins & Aikman Corporation
250 Stephenson Highway
Troy, Michigan 48083

April 25, 2002

Dear Stockholder:

You are cordially invited to attend the Annual Meeting of Stockholders of Collins & Aikman Corporation to be held on May 16, 2002 at The Waldorf-Astoria Hotel, the Norse Suite, 301 Park Avenue, New York, NY 10022, at 11:00 a.m., Eastern Daylight Savings Time.

You are urged to read carefully the formal notice of the meeting and the Proxy Statement which follow. After reading them, please sign, date and mail the enclosed proxy card so that your shares will be represented at the meeting. A prepaid return envelope is provided for this purpose.

We look forward to seeing you at the meeting.

Sincerely,

Thomas E. Evans
Chairman of the Board
and Chief Executive Officer

Table of Contents

## NOTICE OF ANNUAL MEETING OF STOCKHOLDERS
### To Be Held May 16, 2002

To the Stockholders of
COLLINS & AIKMAN CORPORATION:

NOTICE IS HEREBY GIVEN that the Annual Meeting (the "Meeting") of the holders of common stock, par value $0.01 per share (the "Common Stock"), of COLLINS & AIKMAN CORPORATION, a Delaware corporation (the "Company"), will be held on May 16, 2002 at The Waldorf-Astoria Hotel, the Norse Suite, 301 Park Avenue, New York, NY 10022, commencing at 11:00 a.m., Eastern Daylight Savings Time, for the purpose of considering and voting upon the following matters:

I. the election of five directors to hold office until the 2005 Annual Meeting and thereafter until their successors are elected and qualified;

II. the approval of the Company's 2002 Employee Stock Option Plan;

III. the approval of a proposal to effect a one-for-two and one-half reverse stock split of the Company's Common Stock; and

IV. such other matters as may properly come before the Meeting or any adjournment or postponement thereof.

The Board of Directors has fixed the close of business on April 2, 2002 as the record date for the determination of stockholders entitled to notice of and to vote at the Meeting. Therefore, only holders of record of Common Stock at the close of business on such date will be entitled to notice of and to vote at the Meeting.

A complete list of stockholders entitled to notice of and to vote at the Meeting will be available at our offices at 250 Stephenson Highway, Troy, Michigan 48083, at least ten days prior to the Meeting. The list will also be available for inspection by stockholders at the Meeting.

Stockholders are requested to sign and date the enclosed proxy card and return it promptly in the enclosed pre-addressed reply envelope, whether or not they plan to attend the Meeting, so that their shares may be represented. Any proxy may be revoked by filing with the Secretary of the Company, in care of the First Union Customer Information Service Center at the address set forth in the accompanying Proxy Statement, either a written notice of revocation bearing a later date than the proxy card or a subsequent proxy relating to the same shares at any time prior to the time the proxy is voted. Further, any person who has executed a proxy card and is present at the Meeting may vote in person instead of by proxy, thereby canceling any proxy previously given.

By Order of the Board of Directors,

Ronald T. Lindsay
*Secretary*

PLEASE EXECUTE, DATE AND RETURN THE ENCLOSED PROXY CARD WHETHER OR NOT YOU INTEND TO BE PRESENT AT THE MEETING.

April 25, 2002

## **TABLE OF CONTENTS**

PROXY STATEMENT
PROPOSAL I ELECTION OF DIRECTORS
REPORT OF THE AUDIT COMMITTEE
COMPENSATION COMMITTEE REPORT ON EXECUTIVE COMPENSATION
EXECUTIVE OFFICERS OF THE COMPANY
EXECUTIVE COMPENSATION
Performance Graph
PROPOSAL II APPROVAL OF THE COMPANY'S 2002 EMPLOYEE STOCK OPTION PLAN
PROPOSAL III APPROVAL OF THE ONE-FOR-TWO AND ONE-HALF REVERSE STOCK SPLIT
CHANGES IN CERTIFYING ACCOUNTANT
STOCKHOLDER PROPOSALS
ANNUAL REPORT
OTHER MATTERS
Definitive Proxy Statement

Table of Contents

# PROXY STATEMENT

# COLLINS & AIKMAN CORPORATION
### 250 Stephenson Highway
### Troy, Michigan 48083

## ANNUAL MEETING OF STOCKHOLDERS
## To Be Held May 16, 2002

**General Information**

This Proxy Statement is furnished in connection with the solicitation by the Board of Directors of Collins & Aikman Corporation, a Delaware corporation (the "Company"), of proxies for use at the Annual Meeting of Stockholders of the Company to be held on May 16, 2002 at The Waldorf-Astoria Hotel, the Norse Suite, 301 Park Avenue, New York, NY 10022, commencing at 11:00 a.m., Eastern Daylight Savings Time, and at any adjournment or postponement thereof (the "Meeting").

The presence, in person or by proxy, of stockholders holding a majority of the shares entitled to vote at the Meeting is necessary to constitute a quorum at the Meeting.

All shares of the common stock, par value $0.01 per share (the "Common Stock"), of the Company which are entitled to vote and are represented at the Meeting by properly executed proxies received prior to or at the Meeting, and not revoked, will be voted at the Meeting in accordance with the instructions indicated on such proxies. If no instructions are indicated, such proxies will be voted for the election of the five nominees for director named below (or if any nominee becomes unavailable, such other person as the Nominating Committee of the Board of Directors or the Company selects), for the approval of the Company's 2002 Employee Stock Option Plan, for the approval of the proposed one-for-two and one-half reverse stock split and in accordance with the Board of Directors' recommendations with respect to any other matter that may properly come before the Meeting.

The Board of Directors has fixed the close of business on April 2, 2002 as the record date (the "Record Date") for the determination of stockholders entitled to notice of and to vote at the Meeting. Therefore, only holders of record of Common Stock at the close of business on the Record Date will be entitled to notice of and to vote at the Meeting.

Any proxy may be revoked by the person giving it at any time before it is voted. A proxy may be revoked by filing, with the Secretary of the Company (in care of the First Union Customer Information Service Center, Client Service Group, 1525 West W.T. Harris Boulevard, 3C3, Charlotte, North Carolina, 28288-1153, Attention: Proxy Department) at any time prior to the time the proxy is voted, either a written notice of revocation bearing a later date than the proxy card or a subsequent proxy relating to the same shares, or by attending the Meeting and voting in person (although attendance at the Meeting will not in and of itself constitute revocation of a proxy).

All expenses of this solicitation, including the cost of preparing and mailing this Proxy Statement, will be borne by the Company. In addition to solicitation by use of the mails, proxies may be solicited by directors, officers and employees of the Company in person or by telephone, telegram or other means of communication. Such directors, officers and employees will not be additionally compensated, but may be reimbursed for out-of-pocket expenses in connection with such solicitation. Arrangements will also be made with custodians, nominees and fiduciaries for forwarding of proxy solicitation materials to beneficial owners of Common Stock held of record by such custodians, nominees and fiduciaries, and the Company may reimburse such custodians, nominees and fiduciaries for reasonable expenses incurred in connection therewith.

Table of Contents

This Proxy Statement and the accompanying proxy card are being mailed to stockholders commencing on or about April 25, 2002.

## Voting Securities

On the Record Date, 167,997,131 shares of Common Stock were outstanding. Only holders of Common Stock of record at the close of business on the Record Date are entitled to notice of and to vote at the Meeting. Each stockholder of record is entitled to one vote for each share of Common Stock held on all matters to come before the Meeting.

## Security Ownership of Management and Principal Stockholders

Set forth in the table below is certain information as of March 12, 2002 regarding the beneficial ownership of equity securities of the Company by (i) persons who are known to the Company to own beneficially more than five percent (5%) of the Company's voting stock, (ii) directors of the Company (excepting Stephen V. O'Connell and Neil P. Simpkins, who resigned from the Board of Directors effective March 15, 2002), (iii) the executive officers of the Company named in the Summary Compensation Table set forth in this Proxy Statement (and referred to herein as the "Named Executive Officers") and (iv) the directors and executive officers of the Company as a group. Unless otherwise indicated, the beneficial owner has sole voting power and sole investment power over the securities shown below.

| Title of Class | Name of Beneficial Owner | Amount and Nature of Beneficial Ownership | Percent of Class |
|---|---|---|---|
| Common Stock, par value $0.01 per share | Brian Batey | 0 | |
| | Blackstone Capital Partners L.P. | 12,225,571(1) | 7.3% |
| | 345 Park Avenue | | |
| | New York, NY | | |
| | Charles E. Becker | 18,848,156(2) | 11.2% |
| | Robert C. Clark | 80,000(3) | * |
| | Marshall A. Cohen | 10,000(3) | * |
| | Thomas E. Evans | 1,570,405(4) | * |
| | Heartland Industrial Partners L.P. | 67,200,000(5) | 40.0% |
| | 55 Railroad Avenue | | |
| | Greenwich, CT | | |
| | Cynthia L. Hess | 0(14) | |
| | Joan Fabrics Corporation | 12,760,000(6) | 7.6% |
| | 100 Vesper Executive Park | | |
| | Tyngsboro, MA | | |
| | Timothy D. Leuliette | 0(14) | |
| | Ronald T. Lindsay | 86,109(7) | * |
| | Elkin McCallum | 12,859,000(6) | 7.7% |
| | W. Gerald McConnell | 0(14) | |
| | Warren B. Rudman | 70,000(3) | * |
| | Rajesh K. Shah | 135,000(8) | * |
| | J. Michael Stepp | 75,167(9) | * |
| | David A. Stockman | 0(14) | |
| | Textron Inc. | 18,000,000(10) | 10.7% |
| | 40 Westminster Street | | |
| | Providence, RI | | |
| | Daniel P. Tredwell | 0(14) | |

2

Table of Contents

| Title of Class | Name of Beneficial Owner | Amount and Nature of Beneficial Ownership | Percent of Class |
|---|---|---|---|
| | Samuel Valenti, III | 0(14) | |
| | Wasserstein/C&A Holdings, L.L.C. | 13,199,800(11) | 7.9% |
| | 1301 Avenue of the Americas | | |
| | New York, NY | | |
| | Reed A. White | 115,108(12) | * |
| | Executive officers and directors as a group | | |
| | (19 persons) | 33,854,875(13) | 20.1% |

\* Less than one percent of shares of Common Stock outstanding.

(1) Of these shares (i) 9,624,442 shares are held directly by Blackstone Capital Partners L.P., a Delaware limited partnership ("Blackstone Partners"), the sole general partner of which is Blackstone Management Associates L.P. ("Blackstone Associates"), (ii) 496,588 shares are held directly by Blackstone Family Investment Partnership I L.P., a Delaware limited partnership ("BFIP"), the sole general partner of which is Blackstone Management Associates I L.L.C. ("BMA"), (iii) 43,642 shares are held directly by Blackstone Advisory Directors Partnership L.P., a Delaware limited partnership ("BADP"), the sole general partner of which is Blackstone Associates, and (iv) 2,060,899 shares are held directly by Blackstone Capital Company II L.L.C., a Delaware limited liability company, all the ownership interest of which is owned directly and indirectly by Blackstone Partners, BFIP and BADP.

(2) Such shares represent (a) 13,600,000 shares acquired by Mr. Becker as consideration for the Becker acquisition, (b) 848,156 shares acquired by Mr. Becker immediately following the closing of the Becker acquisition from one of the other former Becker shareholders, (c) 400,000 shares subject to presently exercisable warrants to purchase such common stock at $5.00 per share acquired by Mr. Becker as consideration for the Becker acquisition and (d) 4,000,000 shares acquired by Becker Ventures LLC ("Becker Ventures") as part of the financing for the Company's acquisition of Textron Automotive Company's trim division ("TAC-Trim"). Mr. Becker is the managing member of Becker Ventures and holds a controlling interest in Becker Ventures. Mr. Becker became a C&A director and Vice Chairman upon completion of the Becker acquisition.

(3) Represents shares underlying options granted under the 1994 Directors Stock Option Plan which (i) are vested or (ii) will vest within 60 days unless the director ceases to be a director prior to that time.

(4) Of these shares, (i) 245,000 are held directly, (ii) 65,405 shares are held indirectly in the Stock Fund of the 401(k) and Shadow Retirement Income Plans and (iii) 1,260,000 represent shares underlying options granted under the 1994 Plan which are vested.

(5) The 67,200,000 shares beneficially owned are indirectly owned by Heartland Industrial Associates L.L.C. as the general partner of each of the following limited partnerships, which hold the shares directly: (a) 814,190 shares are held directly by Heartland Industrial Partners (FF), L.P., a Delaware limited partnership, (b) 878,516 shares are held directly by Heartland Industrial Partners (E1), L.P., a Delaware limited partnership, (c) 528,052 shares are held directly by Heartland Industrial Partners (K1), L.P., a Delaware limited partnership, (d) 264,026 shares are held directly by Heartland Industrial Partners (C1), L.P., a Delaware limited partnership, and (e) 64,715,216 shares are held directly by Heartland Industrial Partners, L.P., a Delaware limited partnership.

(6) Of these shares (a) 12,760,000 shares were acquired by Joan Fabrics Corporation ("Joan Fabrics") as a part of the consideration for the sale of Joan Automotive Industries, Inc. ("Joan Automotive") to us, (b) 75,000 shares were previously acquired by Mr. McCallum and his spouse and (c) 24,000 were shares previously acquired by the McCallum Family Foundation. The sole stockholder of Joan Fabrics is JFC Holding Trust, in which Elkin McCallum is the Trustee and has a 75% beneficial interest and his spouse, Donna McCallum, owns the balance. Mr. McCallum became a director of C&A upon the consummation of the Joan acquisition.

(7) Of these shares, (i) 7,300 are held directly, (ii) 44,924 represent shares underlying options granted under the 1993

Employee Stock Option Plan (the "1993 Plan") which are vested, (iii) 26,667 represent

3

Table of Contents

shares underlying options under the 1994 Plan which are vested and (iv) 7,218 shares are held indirectly in the Stock Fund of the 401(k) and Shadow Retirement Income Plans.

(8)   Represents shares underlying options granted under the 1994 Plan which are vested.

(9)   Of these shares, (i) 65,000 are held directly and (ii) 10,167 are held indirectly in the Stock Fund of the 401(k) and Shadow Retirement Income Plans.

(10)  Such shares are beneficially owned by Textron Inc. ("Textron"). Under the purchase agreement for the TAC-Trim acquisition, Textron has the right to designate a director to serve on the Collins & Aikman Corporation Board of Directors. As of this date, it has not yet identified the individual that it will designate. Accordingly, the table does not include the Textron designee, who is expected to disclaim beneficial ownership of all securities beneficially owned by Textron.

(11)  Of these shares (i) 13,119,409 are held directly by Wasserstein/ C&A Holdings, L.L.C. (the "Wasserstein L.L.C."), which is controlled by Wasserstein Perella Partners, L.P. ("WP Partners"), the sole general partner of which is Wasserstein Perella Management Partners, Inc. ("Wasserstein Management"), which is controlled by Cypress Capital Advisors, LLC ("CCA"), (ii) 18,000 are held directly by WPPN, Inc., an indirect subsidiary of WP Group, (iii) 45,000 shares are held directly 33% by each of three trusts for which Bruce Wasserstein, the Chairman and Chief Executive Officer of Wasserstein Management (who is also a director and stockholders of WP Group), is the Co-Trustee, (iv) 10,503 are owned directly by Bruce Wasserstein and (v) 6,887 are held by Bruce Wasserstein's descendants' trusts.

(12)  Of these shares, (i) 101,774 represent shares underlying options granted under the 1993 Plan which are vested and (ii) 13,334 represent shares underlying options granted under the 1994 Plan which are vested.

(13)  Excludes shares held by Heartland and its affiliates, Joan Fabrics and its affiliates, Becker Ventures and its affiliates, Textron Inc. and its affiliates, Blackstone Partners and its affiliates and Wasserstein L.L.C. and its affiliates. Also excludes shares held by Brian Batey and Rajesh K. Shah, who resigned their employment prior to March 12, 2002.

(14)  As described under (5) above, 67,200,000 shares are beneficially owned by Heartland Industrial Associates, L.L.C. Mr. Stockman is the Managing Member of Heartland Industrial Associates, L.L.C., but disclaims beneficial ownership of such shares. Messrs. Leuliette, McConnell, Stepp, Tredwell and Valenti and Ms. Hess are also members of Heartland Industrial Associates, L.L.C. and also disclaim beneficial ownership of the shares.

## Voting

As of March 12, 2002, Heartland and its affiliates, Blackstone Partners and its affiliates and Wasserstein L.L.C., which is controlled by WP Partners, and its affiliates, Charles E. Becker and Becker Ventures, Elkin McCallum and Joan Fabrics, and Textron and its affiliates (collectively, the "Investors") beneficially own or have the right to vote in the aggregate approximately 84.7% of the outstanding Common Stock. See "Security Ownership of Management and Principal Stockholders" and "Certain Relationships and Related Transactions — Certain Relationships." The Investors have advised the Company that they intend to vote all such shares in favor of Proposals I, II and III. Accordingly, assuming that the Investors vote as indicated, the presence of a quorum at the meeting and the approval and adoption of Proposals I, II and III are assured.

## PROPOSAL I

## ELECTION OF DIRECTORS

The Restated Certificate of Incorporation provides that the Board of Directors of the Company is divided into three classes serving staggered three-year terms. Five Class II directors will be elected at the Meeting, each to hold office until his or her term expires at the year 2005 Annual Meeting and until his or her successor is elected and qualified, subject, however, to prior death, resignation, retirement, disqualification or removal from office. All the nominees except Mr. Dauch are

currently directors of the Company. Proxies will be voted for the election of the nominees listed below and identified as Nominees for Election at the Meeting, unless contrary instructions are set forth on the proxy card. If any nominee shall be unavailable to serve as a director,

4

proxies will be voted for the election of such other person or persons as the Nominating Committee of the Board of Directors or the Company may select. The Company is not aware of any circumstances likely to render any nominee unavailable. According to the bylaws of the Company, directors shall be elected by a plurality of the votes cast. Therefore, the five persons receiving the greatest number of votes cast at the Meeting for the election of directors shall be elected as directors, and abstentions and broker non-votes shall be counted for purposes of determining whether a quorum is present but will not affect the outcome of the election.

## Information as to Nominees and Other Directors

Set forth below, as of March 20, 2002, are the name, age and principal occupation or employment during the last five years of each nominee for election to the Board of Directors and all other directors whose terms have not expired. On March 15, 2002, Stephen V. O'Connell and Neil P. Simpkins resigned from the Board of Directors. Effective April 1, 2002, the Board of Directors by unanimous written consent decreased the number of members of the Board of Directors from fifteen to fourteen. None of the nominees or other directors is related to any executive officer or other director of the Company by blood, marriage or adoption. The affiliations between the Company and Heartland, WP Management, WP Group, WP & Co., Blackstone, Charles E. Becker, Becker Ventures, Elkin McCallum, Joan Fabrics and Textron (as such terms are defined herein) are set forth under "Security Ownership of Management and Principal Stockholders" and "Certain Relationships and Related Transactions — Certain Relationships."

**Management recommends that stockholders vote FOR the election of each of Messrs. Rudman, Valenti, Dauch and Cohen and Ms. Hess.**

### Nominees for Election at the Meeting — Class II Directors

| | |
|---|---|
| Warren B. Rudman | Age 71. Mr. Rudman has been a director of the Company since June 1995. Mr. Rudman has been a partner in the law firm of Paul, Weiss, Rifkind, Wharton & Garrison since January 1993. Mr. Rudman served as a United States Senator from New Hampshire from 1980 through 1992 and as Attorney General of New Hampshire from 1970 until 1976. Mr. Rudman is also a director of the Chubb Corporation, Allied Waste, Boston Scientific, the Raytheon Company and an independent trustee of several mutual funds of the Dreyfus Corporation. |
| Cynthia L. Hess | Age 45. Ms. Hess is the owner and CEO of Hess Group, LLC. Prior to forming Hess Group in 2002, Ms. Hess was a senior managing director of Heartland Industrial Partners L.P. ("Heartland") (See "Certain Relationships and Related Transactions — Certain Relationships — Heartland"). She was formerly Vice President of corporate quality for DaimlerChrysler, where she led the corporate strategy for quality improvement and facilitated quality plan execution. In her 22 years with DaimlerChrysler, Ms. Hess held various engineering, manufacturing and procurement supply positions. Ms. Hess is also a director of Metaldyne Corporation (formerly known as MascoTech, Inc.), a diversified industrial manufacturing company ("Metaldyne"). |
| Samuel Valenti, III | Age 56. Mr. Valenti has been a director of the Company since February 2001. He is a senior managing director of Heartland, Chairman of Valenti Capital LLC, and has been a director of Metaldyne Corporation since January 2001 Mr. Valenti is a director of Masco Capital Corporation and has been its President since 1988. Mr. Valenti was formerly Vice President — Investments of Masco Corporation, a home improvement and building products company. Mr. Valenti is also a director of Collins & Aikman |

Table of Contents

Products Co. ("Products"), a wholly-owned subsidiary of the Company.

| | |
|---|---|
| David C. Dauch | Age 37. Mr. Dauch has been vice president of manufacturing — driveline division of American Axle & Manufacturing since 2001, a company he joined in 1995 as manager, sales administration. In 1996, he became director of sales, GM full size truck programs and was named vice president of sales and marketing in 1998. From 1987 to 1995, Mr. Dauch was employed by Products at which he held positions of product manager, account executive, and director of Ford sales and marketing for the Automotive Carpet and Fabric Groups. |
| Marshall A. Cohen | Age 67. Mr. Cohen has been a director of the Company since April 2001. Mr. Cohen has been Counsel at Cassels Brock and Blackwell, a Canadian law firm, since October 1996. From 1988 until September 1996, Mr. Cohen served as President and Chief Executive Officer of The Molson Companies Ltd., a brewing company. Mr. Cohen is also a director of The Toronto-Dominion Financial Group, Barrick Gold Corporation, American International Group, Inc., Lafarge Corporation, SMK Speedy International Inc., The Goldfarb Corporation, Premcor Inc., The Quorum Group (Vice Chairman), Haynes International, Inc., Metaldyne and Golf Town Canada Inc. Mr. Cohen serves on the Advisory Boards of The Blackstone Group and Heartland. |

## Directors Whose Terms Expire at the 2003 Annual Meeting — Class III Directors

| | |
|---|---|
| Charles E. Becker | Age 55. Mr. Becker is Vice Chairman of the Board and has been a director since July 2001. For over 25 years, through 1998, Mr. Becker was the CEO and co-owner of Becker Group, Inc., a global automotive interiors components supplier. Becker Group, Inc. was sold to Johnson Controls, Inc. in 1998. In January 1999, Mr. Becker re-acquired 10 North American plastic molding and tooling operations from Johnson Controls, which subsequently became Becker Group, LLC. Mr. Becker is also the owner and chairman of Becker Ventures, LLC, which was established in 1998 to invest in a variety of business ventures, including the manufacturing, real estate and service industries. |
| Robert C. Clark | Age 58. Mr. Clark has been a director of the Company since October 1994. Mr. Clark is Dean of the Harvard Law School and Royal Professor of Law. Mr. Clark joined Harvard Law School in 1979 after four years at Yale Law School, where he was a tenured professor, and became Dean in 1989. Mr. Clark is a corporate law specialist and author of numerous texts and legal articles. Prior to his association with academia, he was in private practice with Ropes & Gray. Mr. Clark is also a director of American Lawyer Media Holdings, Inc. and American Lawyer Media, Inc. and a trustee of Teachers Insurance Annuity Association (TIAA). |
| David A. Stockman | Age 55. Mr. Stockman has been a director of the Company since February 2001. Mr. Stockman is also a director of Metaldyne, and Springs Industries, Inc. He is the senior managing director and the founder of Heartland. Prior to founding Heartland, he was a senior managing director of The Blackstone Group L.P. and had been with Blackstone since 1988. Mr. Stockman also served as the director of the Office of Management and Budget in the Reagan Administration, and represented Southern Michigan in the U.S. House of Representatives from 1976 to 1981. |

6

Table of Contents

| Daniel P. Tredwell | Age 44. Mr. Tredwell has been a director of the Company since February 2001. Mr. Tredwell is also a director of Metaldyne and Springs Industries, Inc. He is a senior managing director and a co-founder of Heartland. He has more than a decade of leveraged financing experience. Mr. Tredwell served as a Managing Director at Chase Securities Inc. and had been with Chase Securities since 1985. From 1980 to 1985, Mr. Tredwell was employed as the Press Secretary to U.S. Representative Robert L. Livingston. |

## Directors Whose Terms Expire at the 2004 Annual Meeting — Class I Directors

| Thomas E. Evans | Age 50. Mr. Evans has been Chairman of the Board and Chief Executive Officer of the Company since April 1999. Previously, he was President of Tenneco Automotive, an automotive supplier and a division of Tenneco, Inc., from 1995 until April 1999. Prior to that, Mr. Evans served for six years with Case Corporation, a manufacturer of farm machinery and construction equipment and a subsidiary of Tenneco, Inc., in a series of senior management positions, the last being Senior Vice President of Worldwide Operations. Prior to his employment with Case Corporation, he spent sixteen years in the automotive industry with Rockwell International and Federal Mogul Corporation. Mr. Evans is also a director of the Motor & Equipment Manufacturers Association, the National Association of Manufacturers and the Institute of Textile Technology. Mr. Evans is also a director of Products. |

| Timothy D. Leuliette | Age 52. Mr. Leuliette was elected as a director of the Company in February 2001 and has been a director of Metaldyne since November 2000. He is currently President and Chief Executive Officer of Metaldyne. He is a co-founder of Heartland. Prior to joining Heartland, Mr. Leuliette joined the Penske Corporation as President and Chief Operating Officer in 1996. From 1991 to 1996 Mr. Leuliette served as President and Chief Executive Officer of ITT Automotive, an automotive company. He also serves on a number of corporate and charitable boards, including serving as director of The Federal Reserve of Chicago, Detroit Branch. |

| Elkin McCallum | Age 58. Mr. McCallum was elected as a director of the Company in September 2001. Mr. McCallum has been the Chairman of the Board and CEO of Joan Fabrics Corporation since 1989 and has also been the Chairman and CEO of Tyng Textiles LLC since 1996. Mr. McCallum is currently Vice Chairman of the Board of Trustees of Bentley College and chairman elect for the next academic year. |

| W. Gerald McConnell | Age 38. Mr. McConnell was elected as a director of the Company in February 2001 and has been a senior managing director of Heartland since its founding in 2000. Mr. McConnell was formerly a managing director at Deutsche Bank Alex. Brown (formerly Bankers Trust Co.), a banking firm, from 1997 until 1999. From 1991 until 1999, Mr. McConnell specialized in leveraged finance and financial sponsor coverage at Deutsche Bank Alex. Brown. Mr. McConnell also serves on the board of directors of Springs Industries, Inc. |

Table of Contents

| J. Michael Stepp | Age 57. Mr. Stepp was elected as a director of the Company in February 2001. Mr. Stepp was previously Executive Vice President and Chief Financial Officer of the Company from April 1995 through December 1999. Mr. Stepp was a consultant to the Company and was an independent mergers and acquisitions advisor from January 2000 through February 2001. Since March 2001, Mr. Stepp has been a senior managing director of Heartland. He is also a director of Products. |
|---|---|

## Certain Relationships and Related Transactions

### Certain Relationships

#### Heartland

Heartland is a private equity firm established in 1999 for the purpose of acquiring and expanding industrial companies operating in various industrial sectors of the American manufacturing economy that are well positioned for global consolidation and growth. Six of the Company's directors, Messrs. Stockman, Leuliette, Tredwell, Stepp, McConnell and Valenti, are also employed by Heartland. As of March 12, 2002, Heartland beneficially owned approximately 40% of the outstanding Common Stock.

The Company is a party to a services agreement with Heartland under which Heartland provides the Company with advisory and consulting services, including services with respect to developments in the automotive industry and supply markets, advice on financial and strategic plans and alternatives and other matters as the Company may reasonably request and are within Heartland's expertise. The services agreement terminates on the earlier of its tenth anniversary or the date upon which Heartland ceases to own Company shares equivalent to 25% of those owned by them on February 23, 2001. Pursuant to the agreement, the Company is obligated to pay to Heartland a $4 million annual advisory fee on a quarterly basis and to reimburse its out-of-pocket expenses related to the services Heartland provides to the Company. The Company has also agreed to pay a fee of 1% of the total enterprise value of certain acquisitions and dispositions. In connection with Heartland's initial investment in the Company on February 23, 2001, the Company paid Heartland a fee of $12 million and reimbursed it for the reasonable out-of-pocket expenses incurred in connection with that initial investment. A fee of $12.5 million was paid by the Company to Heartland as a result of its advisory services in connection with the TAC-Trim acquisition. During 2001, the Company also reimbursed Heartland for $1.5 million of expenses that Heartland incurred in relation to the Becker acquisition.

#### Blackstone and Wasserstein

Blackstone Partners is a Delaware limited partnership formed in 1987 for the purpose of, among other things, (i) committing capital to facilitate corporate restructurings, leveraged buyouts, bridge financings and other investments and (ii) capitalizing affiliates that will engage in investment and merchant banking activities. The sole general partner of Blackstone Partners is Blackstone Associates, a Delaware limited partnership. At present, the business of Blackstone Associates consists of performing the function of, and serving as, the general partner of certain limited partnerships, including Blackstone Partners. One of the Company's directors, Mr. Simpkins, is also a member of Blackstone Management Partners L.L.C., which is the general partner of Blackstone Management Partners L.P. ("Blackstone Management"), and BMA, which is the general partner of BFIP.

WP Partners is a Delaware limited partnership, the sole general partner of which is Wasserstein Management, which is controlled by CCA (fka Wasserstein & Co., Inc.). WP Partners was formed by Wasserstein Perella Group, Inc. ("WP Group") for the purpose of participating in merchant banking activities, including committing capital to the organization and consummation of private equity investments and leveraged buyout transactions. On January 3, 2001, WP Group merged with Dresdner Bank AG and spun off CCA, as a result of which Wasserstein Management and its affiliates are no longer affiliated with WP Group. Wasserstein Management serves as general partner of WP Partners and as such is engaged in

8

Table of Contents

managing WP Partners. Mr. O'Connell is also a director of Wasserstein & Co., LP, a newly created entity involved in merchant banking activities, which is affiliated with Wasserstein Management.

In connection with Heartland's initial investment in the Company on February 23, 2001, the Company paid WP Partners an investment banking fee of $2 million. Wasserstein Perella Securities, Inc., a wholly-owned subsidiary of WP Group, has acted, and may in the future act, as agent for the Company in the repurchase from time to time of shares of common stock.

### Charles E. Becker

In July 2001, the Company completed the acquisition of Becker Group LLC. As a result of the Becker acquisition and a purchase of Common Stock immediately afterwards, Charles Becker became one of the Company's principal stockholders. Charles Becker became Vice Chairman and a member of the Company's Board of Directors upon closing of the Becker acquisition. The Company agreed to make $18 million in non-compete payments over five years to Mr. Becker at the time of the acquisition. In addition, Becker Ventures LLC, an affiliate of Mr. Becker, acquired additional shares of Common Stock as part of the financings in connection with the acquisition of TAC-Trim at a price of $5.00 per share. See the information under the heading "Security Ownership of Management and Principal Stockholders" for a discussion of Mr. Becker's beneficial ownership of Common Stock.

### Elkin McCallum

In September 2001, the Company completed the acquisition of Joan Automotive, a leading supplier of body cloth to the automotive industry, and all of the operating assets of Joan Automotive's affiliated year dying operation, Western Avenue Dyers, L.P. As a result of the Joan acquisition, Joan Fabrics, a company controlled by Elkin McCallum, became a principal stockholder of the Company. Upon completion of the Joan acquisition, Mr. McCallum because a member of the Company's Board of Directors. See "Security Ownership of Management and Principal Stockholders" for a discussion of Joan Fabrics' and Mr. McCallum's beneficial ownership of Common Stock.

### Certain Agreements and Transactions

#### Blackstone/ Wasserstein/ Heartland Stockholders Agreement

The Company is a party to a stockholders agreement (the "Initial Stockholders Agreement") with Heartland and certain affiliates (the "Heartland parties"), Blackstone and certain of its affiliates (the "Blackstone parties") and the Wasserstein L.L.C. and certain of its affiliates (the "Wasserstein parties"). The Initial Stockholders Agreement contains (i) rights of first refusal on private sales of Common Stock by the Blackstone parties and the Wasserstein parties in favor of the Heartland parties, (ii) tag-along rights in favor of the Blackstone parties and the Wasserstein parties in the event of certain transfers of Common Stock by Heartland and (iii) for so long as Heartland has a right to designate directors, a drag-along right enabling Heartland to cause the Blackstone parties and Wasserstein parties to sell all of their Common Stock with Heartland when Heartland is selling all of its Common Stock to a third party (including by merger). The Initial Stockholders Agreement further provides that the stockholder parties thereto will vote their Common Stock to ensure that seven members of the Company's board will be designated by Heartland, one by the Wasserstein parties and one by the Blackstone parties, in each case so long as each of Heartland, the Wasserstein parties and the Blackstone parties (in each case, together with its affiliates) continue to beneficially own at least 25% of the Common Stock owned by them as of February 23, 2001. In addition, there must be three independent directors not otherwise affiliated with the Company, the Blackstone parties, the Wasserstein parties or Heartland. The Company's chief executive officer will also serve as a director. Certain rights inure to the benefit of, and certain obligations bind, subsequent transferees of Common Stock, but none of the rights or obligations apply to public sales, whether under Rule 144 or under a registration statement.

The Initial Stockholders Agreement also contains certain restrictions on the Company's ability to enter into transactions with Heartland and its affiliates. The Company and its subsidiaries may not enter into any such transaction or series of related transactions involving payments or other consideration in excess of

9

Table of Contents

$500,000 without the consent of (i) each of the Blackstone parties and the Wasserstein parties, so long as each holds at least 25% of the Common Stock held by it as of February 23, 2001, for so long as Heartland and its affiliates directly or indirectly beneficially own at least 50% of the outstanding Common Stock and (ii) a majority of the members of the board who are disinterested with respect to the particular transaction and were not designated for election by Heartland so long as Heartland and its affiliates own at least 25% of the Common Stock owned by them on the date of the Initial Stockholders Agreement. The restrictions described above will not apply to (i) an advisory fee on certain acquisitions and divestitures by the Company in an amount not exceeding 1% of the enterprise value thereof and related out-of-pocket fees and expenses, (ii) transactions involving the sale, purchase or lease of goods and services in the ordinary course of business and on an arms-length basis between the Company and portfolio companies of Heartland in an amount involving not more than $1.25 million in any transaction, and (iii) certain other transactions.

*Becker/ Joan/ Heartland Stockholders Agreement*

There is also a stockholders agreement (the "Becker/ Joan Stockholders Agreement") among Charles E. Becker, Michael E. McInerney and Jens Höhnel (the "Becker parties"), Joan Fabrics Corporation, JFC Holdings Trust, Mr. Elkin McCallum and Donna McCallum (the "Joan parties"), the Heartland parties and C&A. The Becker/ Joan Stockholders Agreement contains (i) rights of first refusal on private sales of Common Stock by the Becker parties and the Joan parties in favor of the Heartland parties, (ii) tag-along rights in favor of the Becker parties and the Joan parties in the event of certain transfers of Common Stock by Heartland and (iii) for so long as Heartland has a right to designate directors, a drag-along right enabling Heartland to cause the Becker parties and Joan parties to sell all of their Common Stock with Heartland when Heartland is selling all of its Common Stock to a third party (including by merger).

The Becker/ Joan Stockholders Agreement further provides that the Becker parties, the Joan parties and Heartland will each vote their Common Stock to ensure that Charles E. Becker and Elkin McCallum are each members of the Company's board of directors, so long as the Becker parties and the Joan parties, respectively, continue to hold shares representing 25% of the Common Stock originally acquired by them. The Becker/ Joan Stockholders Agreement also provides that the Becker parties will vote their shares in favor of the election of Heartland's designees to the Company's board of directors and the TAC-Trim acquisition. Certain rights inure to the benefit of, and certain obligations bind, subsequent transferees of Common Stock, but none of the rights or obligations apply to public sales, whether under Rule 144 or under a registration statement.

*Charles E. Becker Transactions*

In June 2001, the Company entered into sale-leaseback transactions with each of New King, L.L.C. ("New King") and Anchor Court, L.L.C. ("Anchor Court"), which are affiliates of Becker Ventures LLC. Becker Ventures is controlled by Charles Becker, a Company director.

In connection with these sale-leaseback transactions, C&A Products sold and contemporaneously leased back real property located in Troy, Michigan and Plymouth, Michigan from New King and Anchor Court, respectively, for net proceeds of $15.1 million in aggregate. The initial lease term in each transaction is 20 years and each lease has two successive ten-year renewal options. The basic rent for the Troy, Michigan property is $1.3 million per year, and the basic rent for the Plymouth, Michigan property is $.5 million per year. The rental rates in each case are subject to adjustment after expiration of the initial term.

The purpose of these sale-leaseback transactions was to reduce the Company's outstanding debt. The Company believes that the terms of the sale-leaseback transactions with Becker Ventures are on terms substantially similar to those which could have been negotiated in arms-length transactions of the same type. These sale-leaseback transactions were authorized by the independent members of the Company's board of directors.

In connection with the Becker acquisition, the Company entered into a lease agreement with Becker Ventures for the Company's headquarters at 250 Stephenson Highway, with the effective date of the lease being January 1, 2002. In March, 2002, the Company entered into lease agreements with Becker Ventures, effective January 1, 2002, for 150 Stephenson Highway and 350 Stephenson Highway. The base rent for all

10

Table of Contents

three premises is $13.25 per sq. ft. Total square footage for all three locations is approximately 286,000. The leases have 20 year terms, and we have two five-year renewal options.

Collins & Aikman Products Co. is also party to a lease with an affiliate of Becker Ventures for five manufacturing facilities totaling 884,000 square feet. The current term of the lease is ten years, and the base rent for all of the facilities is $3.6 million per year. The Company is currently negotiating with the landlord to extend the term of the lease for at least an additional ten years.

*Elkin McCallum Transactions*

In connection with the Joan acquisition (as described above under the heading "— Certain Relationships"), the Company entered into a Supply Agreement dated September 21, 2001 (the "Supply Agreement") with Main Street Textiles, L.P. ("Main Street"). Main Street is controlled by Elkin McCallum, a director of the Company. Under the Supply Agreement, the Company agreed to purchase all of its requirements for flat woven automotive fabric from Main Street for a five year period beginning on the date of the Supply Agreement. The prices which the Company will pay for fabric under the agreement will equal the costs of the raw materials plus an amount which represents Main Street's standard labor and overhead costs incurred in manufacturing fabric for us. During the term of the Supply Agreement, Main Street is prohibited from manufacturing automotive fabric products for third parties without the Company's prior consent but may sell seconds and close-out items in bona fide transactions. The Supply Agreement is also terminable by mutual written consent, upon the occurrence of certain events of bankruptcy, the appointment of a receiver or trustee, an assignment for the benefit of creditors, or in the event of a material breach. In addition, either party may terminate the Supply Agreement upon 270 days' prior notice to the other party in the event that the parties are unable to agree on the pricing of fabric covered by the Supply Agreement.

The Company is also a party to a Transition Services Agreement dated September 21, 2001 with Joan Fabrics Corporation, another company controlled by Mr. McCallum. Under this agreement Joan Fabrics will provide C&A Products with transitional and support services for a period not to exceed twelve months in order to support the continued and uninterrupted operation of the businesses acquired by C&A Products in the Joan acquisition. As a part of these services, pending the Company's disassembly and removal of machinery and equipment that the Company purchased from Joan Fabrics, Joan Fabrics will use that machinery and equipment to manufacture for us all of the Company's requirements for some types of knitted and woven automotive fabrics. The terms of the Company's agreement with respect to this fabric production are substantially similar to those under the Supply Agreement.

Mr. McCallum became a related party as a result of the Joan acquisition. The terms of the Supply Agreement and the Transition Agreement were reached through arm's-length negotiations prior to Mr. McCallum becoming a related party.

On April 12, 2002, the Company signed and closed on a merger agreement with Mr. McCallum and Southwest Railroad Inc., a company wholly-owned by Mr. McCallum, pursuant to which Southwest Railroad Inc. was merged into a wholly-owned subsidiary of the Company. As consideration in the transaction, Mr. McCallum received approximately one million shares of Common Stock and approximately $2.5 million in cash. Pursuant to the merger agreement, debt owing to Mr. McCallum of approximately $6.7 million was also repaid.

*Textron Transactions*

*Sale-Leaseback Transactions.* Prior to the TAC-Trim acquisition, TAC-Trim entered into an $86.9 million sale and leaseback transaction (the "Textron Leasing Transaction") with two separate single purpose affiliates of Textron Financial Corporation, as lessor and purchaser, with respect to a portfolio of manufacturing equipment situated in different locations throughout the United States and Canada. Payments under the Textron leasing transaction are guaranteed by C&A Products and secured by a first perfected mortgage lien over certain real property with a value equal to $25 million. Each lease is for an initial term of three years with three one-year renewal options. As is customary, the documentation for the Textron leasing

Table of Contents

transaction incorporates covenants by reference, from the Company's credit facility, that may be amended or waived by the senior lenders, and also contain events of default.

*License Agreements.* In connection with the TAC-Trim acquisition the Company acquired intellectual property rights to various products and processes including the patented Intellimold™ injection molding control process for use in its business. The Intellimold™ patents are related to methods and/or apparatus for injection molding. TAC-Trim has also developed certain skin materials and compounding solutions that provide the capability to design cost-effective materials with outstanding performance and aesthetic qualities. Examples of these materials include Envirosoft™ castable thermoplastic materials, high performance PVC alloys, high-definition grain and texture formulation and vacuum thermoplastic applications. TAC-Trim has also developed the Invisitec™ invisible passenger air bag system, which provides improved appearance and craftsmanship at reduced cost. Invisitec™ systems, which integrate the air bag door with the panel and top cover, have been commercialized for soft-cast and vacuum-formed panels and hard injection molded instrument panels. In total, TAC-Trim holds approximately 270 U.S. and approximately 1200 foreign active patents and has approximately 350 patents pending. The intellectual property acquired in the TAC-Trim Acquisition is subject to certain limitations on the Company's use and creates continuing obligations to Textron.

As part of the TAC-Trim acquisition, the Company entered into three intellectual property license agreements with Textron. In two of these agreements, the Company licensed back to Textron certain intellectual property that was acquired in the transaction (the "Intellimold Agreement" and the "Licensed-Back IP Agreement"). In the third agreement, the Company licensed from Textron other intellectual property that it did not acquire in the transaction (the "Retained IP Agreement"). The Company is providing general descriptions of these agreements although these descriptions do not contain all the material terms in the contracts.

In all three agreements, the ability to use the intellectual property is limited based on whether the proposed use falls inside or outside a defined field of automotive products (the "Restricted Field").

In the Intellimold Agreement, the Company gave Textron an exclusive worldwide, perpetual, irrevocable license to use outside the Restricted Field its rights in the Intellimold process and any enhancements developed by it. Textron was also granted a royalty-free, worldwide, perpetual, irrevocable license to use the Company's rights in the Intellimold process and any enhancements developed by the Company within the Restricted Field solely in connection with its and certain affiliates' manufacturing, sales and development operations. The Intellimold Agreement also includes an exclusive, royalty-free, worldwide, perpetual, irrevocable license for the Company to use within the Restricted Field any enhancements to the Intellimold process developed by Textron. In the Licensed-Back IP Agreement, the Company granted Textron a non-exclusive, worldwide, royalty-free, perpetual and irrevocable license to use solely outside the Restricted Field certain intellectual property including over 50 U.S. patents on air bag related products. In the Retained IP Agreement, Textron granted to the Company a non-exclusive, worldwide, royalty-free, perpetual and irrevocable license to use solely within the Restricted Field certain intellectual property. These patents could have applicability to the automotive industry but such use is somewhat secondary to the use of such technology outside the automotive field.

*Common Stock Registration Rights Agreement.* In connection with the TAC-Trim acquisition, the Company entered into a common stock registration rights agreement which provides that Textron will have rights to demand registration under the Securities Act of shares of Common Stock held by it at various times. In addition, it will have piggy-back registration rights in the event the Company registers shares of Common Stock for its own account or for the account of any of the Company's other stockholders. The common stock registration rights agreement contains customary provisions regarding lock-ups, holdbacks, payment of expenses, indemnification and contribution.

*Transition Agreement.* In connection with the TAC-Trim acquisition, the Company entered into a transition agreement with Textron. The transition agreement facilitated the transition of certain aspects of the businesses which the Company acquired from Textron. Pursuant to the transition agreement, the Company

and Textron have agreed to provide reasonably requested assistance to ensure a smooth transition of ownership of TAC-Trim from Textron. Some of the matters covered by the transition agreement are:

- the agreement by Textron to make available to employees and former employees of the subsidiaries which are acquired in the TAC-Trim acquisition certain benefit plans for up to nine months following the closing of the TAC-Trim acquisition, at the Company's cost;

- the agreement by the Company and Textron to supply each other with certain products and components for specified periods;

- the Company's agreement to sublease to Textron certain property in Troy, Michigan through December 31, 2004;

- the agreement by Textron, upon the Company's written request, to arrange for AT&T Solutions, Inc. and Electronic Data Systems Corporation to provide certain support services for the subsidiaries which were acquired in the TAC-Trim acquisition for certain specified periods; and

- the agreement by the Company and Textron to negotiate in good faith appropriate transition arrangements with respect to contracts, including payroll services, which are shared between the subsidiaries which were acquired in the TAC-Trim acquisition and Textron and its subsidiaries.

*Preferred Stock Registration Rights Agreement.* The Company is a party to a preferred stock registration and other rights agreement with Textron concerning registration and other rights which the Company has granted to Textron with respect to the preferred stock consideration received by Textron in connection with the TAC-Trim acquisition.

*Italian Joint Venture Documents.* As part of the TAC-Trim acquisition, the Company acquired a 50% interest in an Italian joint venture. On December 20, 2001, the Company entered into agreements relating to the Italian joint venture as follows: a joint venture and shareholders agreement principally pertaining to the governance of the joint venture, an administrative services agreement under which the Company will provide services to the joint venture for annual fees to the Company of approximately $3.2 million, an engineering and technical support agreement under which the Company will provide certain reimbursable support to the joint venture and a technology license agreement under which the Company will license certain patents and know-how to the joint venture for customary license fees.

There are put and call provisions under the purchase agreement pertaining to the joint venture interests not owned by the Company. The arrangement permits Textron to require the Company to purchase Textron's interests in the joint venture for an aggregate of approximately $23.1 million, subject to an increase by $5.0 million under certain circumstances, after the third anniversary of closing. Additionally, the arrangement permits the Company to require Textron to sell its interests in the joint venture to the Company for fair market value following the third anniversary of the closing. The Company cannot be sure that it will have adequate liquidity to satisfy any put, or exercise any call, of the Textron interest.

In addition, the Company's credit facility may restrict such further acquisition or any further financing of the joint venture. While the Company will be permitted, and required, to provide certain guarantees and letters of credit support, it may not be permitted to further finance the joint venture and this may adversely affect the value of the interests which the Company could be required to purchase at a fixed price in the future.

Textron became a related party as a result of its receipt of the consideration in the TAC-Trim acquisition and the above-described agreements were reached through arm's-length negotiations prior to TAC-Trim becoming a related party.

## Meetings and Committees of the Board of Directors

### Meetings and Attendance

In 2001, the Board of Directors held a total of four meetings and took action by unanimous written consent on eight occasions. Each incumbent director participated in at least 75% of the aggregate of the total

13

Table of Contents

number of Board proceedings and the total number of proceedings of the Committees on which the member served during 2001 whether through in-person meeting, teleconference or written consent.

### Committees of the Board

The Board of Directors has designated the Audit Committee, which currently consists of Mr. Clark, Mr. Rudman and Mr. Cohen, the Compensation Committee, which currently consists of Mr. Stockman, Mr. Tredwell and Mr. Cohen, and the Executive Committee, which currently consists of Mr. Evans, Mr. Stockman and Mr. Tredwell. In addition, the Company's Restated Certificate of Incorporation provides for the Nominating Committee, which currently consists of all members of the Board of Directors other than Mr. Evans.

The Audit Committee held seven meetings in 2001. The Audit Committee's function is to meet with the Company's independent public accountants and with management to make inquiries regarding the manner in which the responsibilities of each are being discharged. The Audit Committee reviews the scope of audit and non-audit assignments and related fees, the Company's accounting principles and the adequacy of internal controls. See "Report of the Audit Committee."

The Compensation Committee took action by unanimous written consent on one occasion in 2001. The Compensation Committee's function is to determine compensation for executive officers of the Company and to decide matters and policies with respect to the compensation of such executive officers, including the entry into employment agreements and the grant of awards under, and administration of, the Company's option plans. The Compensation Committee is not entitled to award or authorize any compensation to be paid to any executive officer of the Company who is also a partner or employee of Heartland, Blackstone Partners, WP Partners, Becker Ventures, Joan Fabrics, Textron or their affiliates. See "Compensation Committee Report on Executive Compensation."

The Executive Committee had no meetings in 2001. The Executive Committee's function is generally to act on behalf of the Board of Directors during the intervals between meetings of the Board in the management of the business and affairs of the Company.

The Nominating Committee took action by unanimous written consent on three occasions in 2001. The Nominating Committee's function is to nominate, by a majority vote thereof, persons for election to the Board of Directors at any annual meeting of stockholders or at any special meeting of stockholders called for the purpose of electing directors. Stockholders wishing to recommend director candidates for consideration by the Nominating Committee may do so by writing to the Secretary of the Company, giving the recommended candidate's name, biographical data and qualifications, not later than the date by which stockholder proposals for action must be submitted.

## REPORT OF THE AUDIT COMMITTEE

The role of the Audit Committee is to assist the Board of Directors in its oversight of the Company's financial reporting processes. The Board of Directors, in its business judgment, has determined that the members of the Committee are "independent", as required by applicable listing standards of the New York Stock Exchange. The Committee operates pursuant to a written Charter, a copy of which is attached to the Company's Proxy Statement for the annual meeting held in 2001. As set forth in the Charter, management of the Company is responsible for the preparation, presentation and integrity of the Company's financial statements, and maintaining appropriate accounting and financial reporting principles, policies, internal controls and procedures designed to assure compliance with accounting standards and applicable laws and regulations. The independent auditors are responsible for planning and carrying out a proper audit of the Company's annual financial statements and expressing an opinion as to the fairness of the financial statements in conformity with generally accepted accounting principles.

The Audit Committee met with the independent auditors, management and internal auditors to assure that all were carrying out their respective responsibilities. The Committee reviewed the performance and fees of the independent auditors prior to recommending their appointment, and met with them to discuss the scope and results of their audit work, including the adequacy of internal controls and the quality of financial

14

Table of Contents

reporting. The Committee discussed with the independent auditors their judgments regarding the quality and acceptability of the Company's accounting principles, the clarity of its disclosures and the degree of aggressiveness or conservatism of its accounting principles and underlying estimates. The Committee discussed with and received the written disclosures and the letter from the independent auditors required by Independence Standards Board Standard No. 1 confirming their independence. The independent auditors had full access to the Committee, including meetings without management present.

Based upon the reports and discussions described in this report, and subject to the limitations on the role and responsibilities of the Committee referred to above and in the Charter, the Committee recommended to the Board of Directors that the audited financial statements be included in the Company's Annual Report on Form 10-K for the year ended December 31, 2001 filed with the Securities and Exchange Commission.

By: The Collins & Aikman Corporation Audit Committee

Robert C. Clark, *Chair*
Warren B. Rudman
Marshall A. Cohen

Fees for all services provided by PricewaterhouseCoopers LLP for year 2001 are as follows:

## Audit Fees

Aggregate fees for professional services rendered by PricewaterhouseCoopers LLP ("PricewaterhouseCoopers") in connection with its audit of the Company's consolidated financial statements as of and for the year ended December 31, 2001 and its limited reviews of the Company's unaudited consolidated interim financial statements were $1.0 million.

## Financial Information Systems Design and Implementation Fees

During the year ended December 31, 2001, PricewaterhouseCoopers rendered no professional services to the Company in connection with the design and implementation of financial information systems.

## All Other Fees

In addition to the fees described above, aggregate fees of $5.4 million were billed by PricewaterhouseCoopers during the year ended December 31, 2001, primarily for the following professional services (in millions):

| | |
|---|---|
| Audit-related services(a) | $3.7 |
| Income tax compliance and related tax services | $0.9 |
| Other(b) | $0.8 |

(a) Audit related fees include fees for acquisition support activities, issuance of comfort letter and audits of the Company's employee benefit plans.

(b) Actuarial valuation services.

PricewaterhouseCoopers expects to have a representative at the meeting who will have the opportunity to make a statement and who will be available to answer appropriate questions.

15

Table of Contents

## COMPENSATION COMMITTEE
## REPORT ON EXECUTIVE COMPENSATION

The Company's executive compensation program is administered by the Compensation Committee of the Board of Directors. The Committee is responsible for the design, administration and oversight of all senior management compensation and benefit policies, plans, programs and agreements.

### Executive Officer Compensation

The Company's compensation programs for its executive officers are intended to attract and retain qualified executives for the Company, to recognize individual performance in conjunction with overall corporate performance and to link a significant portion of the compensation paid to executives with the Company's current and long-term performance. The Compensation Committee believes that these goals are best implemented by providing a compensation package consisting of three major components: base salary, short-term incentive compensation and long-term incentive compensation.

The Compensation Committee is not empowered to award or authorize any compensation to be paid to any executive officer of the Company who is also a partner or employee of Heartland, Blackstone Partners, WP Partners, Becker Ventures, Joan Fabrics, Textron or their affiliates. None of the Company's current executive officers, except Mr. Stepp who is the interim chief financial officer, is a partner or employee of Heartland, Blackstone Partners, WP Partners, Becker Ventures, Joan Fabrics, Textron or their affiliates.

### Base Salary

When determining base salaries for the executive officers, the Compensation Committee considers the Company's retention needs, individual experience, individual and Company performance and individual responsibilities, the salaries of other officers and employees within the Company and management's recommendations. No relative weights are assigned to any factor. In addition, the Compensation Committee considers previously obtained, survey-based compensation data for companies of similar size with jobs similar to those of the Company in magnitude, complexity and scope of responsibility. While some of the companies identified in the peer group performance graph participate in these surveys, the Compensation Committee believes its competitors for executive talent are broader than this group due to the varied businesses in which its divisions compete for executive talent. As a matter of policy, base salaries are generally targeted at the 50th percentile of this broader group of automotive supply and general industry companies.

Salaries of executive officers are reviewed periodically by the Compensation Committee, generally on a 12 to 18 month cycle. Salary adjustments are determined by subjectively evaluating the factors described in the previous paragraph.

In the opinion of the Compensation Committee, competitive base salaries contribute to the Company's overall performance by attracting and retaining high quality management.

### Short-Term Incentive Compensation

The second major component of the executive compensation program is the Company's Executive Incentive Compensation Plan (the "Bonus Plan") adopted each year. The objectives of this plan are to:

A. Motivate key employees to achieve and exceed the Company's financial goals;

B. Maintain management's focus on the importance of earnings and cash flows;

C. Focus on annual business results to lead to improvement in shareholder value; and

D. Attract and retain key employees of the quality required to manage the Company's businesses successfully.

Under the Bonus Plan, the Company's executive officers and other key employees who the Committee deems to be in a position to have an impact on the attainment of the earnings and cash flow goals of the Company and its operating divisions have the opportunity to earn annual performance bonuses. While the

16

number of persons participating in the Bonus Plan varies from year to year, approximately 600 persons participated in 2001. The bonus pool for each group of participants is based on Earnings Before Taxes (EBT) and Free Cash Flow (FCF). At the beginning of the year, EBT/FCF goals are established for Threshold (lowest), Target (expected) and Maximum performance for each operating division; such EBT/FCF goals correspond with Threshold, Target and Maximum bonus levels established for each group of participants. The amount of bonus actually paid under the Bonus Plan to participants is initially calculated based on the extent to which unit performance meets or exceeds the predetermined goals, thereby linking pay and unit performance and can range from 75% (for Threshold) to 200% (for Maximum) of the target award. Department heads, operating unit presidents, human resources and the Chief Executive Officer may change the allocation of bonus amounts among individuals, but not the aggregate bonus pool awarded. The target award for executive officers ranges from 40% to 150% of base salary depending on the participant's position with a subsidiary of the Company. The 2001 targets required an improvement over 2000 results. Bonus calculations will be based, for operating unit participants, 70% upon the relevant operating unit performance and 30% upon general Company performance, and 100% upon general Company performance for corporate participants.

Three of the current executive officers received a bonus for 2001 under the Bonus Plan. For two executive officers, the target bonuses equaled 50% of base salary, for two of such officers 40% of base salary and for the other such officer 150% of base salary. Bonuses actually awarded were 136%, 0%, 0%, 24% and 8% of annual base salary for all current executive officers. Messrs. Batey and Shah received payments described under "Executive Compensation — Employment Agreements" rather than bonuses under the 2001 Bonus Plan. The payments were determined based upon the provisions of their employment agreements, management's recommendations and the Committee's subjective judgment of what was appropriate.

## Long-Term Incentive Compensation

The third major component of the Company's executive compensation program is its long-term incentive compensation plans. Through the 1993 Plan and the 1994 Plan, the Company seeks to align the interests of key employees, at or above a level selected by the Committee in its subjective judgment (including all executive officers), more closely with those of the Company's stockholders, and to motivate and reward actions which lead to long-term value creation for stockholders. Stock option grants provide a direct link between any rewards executives may receive and the results achieved for stockholders. Stock options are intended to serve as compensation over a period of several years.

Stock option grants were not made to any Named Executive Officer during 2001.

Stock option grants are made based on the Committee's subjective evaluation of the duties and responsibilities of the individual, his or her present and potential contributions to the long-term growth and success of the Company, the number of options previously granted to such person, the number of options granted to persons in similar positions both at the Company and at other companies deemed comparable to the Company (based on the Committee members' knowledge of options granted by other companies), the number of options required to attract and retain qualified management personnel, the number of options remaining available for grant and management's recommendations. The Committee's policy is to grant options with a term of ten years to provide a long-term incentive. In addition, the Committee's policy is generally to grant options that vest over a specific period to provide the executive with an incentive to remain with the Company. The Committee's policy is also to provide new executives with options to attract them to the Company based on negotiations with new executives, management's recommendations and the Committee's subjective judgment primarily after reviewing the number of options granted to similar executives of the Company. Stock options granted to the Named Executive Officers during the last fiscal year and year-end option values of options granted to the Named Executive Officers are reflected in the tables provided below.

## Termination and Other Benefits

The Company generally determines termination benefits for executive officers based on the executive officer's employment agreement (if applicable), the Company's general severance policies for "exempt

17

Table of Contents

employees" (if applicable) or an agreement with the departing executive officer at the time of separation. The Committee's policy generally has been to have employment agreements and change-in-control agreements with each of the Company's executive officers to provide them with severance benefits. These benefits are intended to permit these executives to focus their attention on performing their duties to the Company, rather than on the security of their employment. The Company has also adopted a supplement to the Personal Savings Plan and an Excess Benefit Plan relating to the Employee's Pension Account Plan to provide the benefits the underlying plans would have provided to executives but for legal limitations under the Employee Retirement Income Security Act of 1974 and Internal Revenue Service regulations.

## Chief Executive Officer Compensation

The compensation of the Company's Chief Executive Officer is consistent with the compensation philosophy of the Company described above. Mr. Evans was paid a base salary of $735,000, based primarily on the Committee's subjective evaluation of Mr. Evans' experience and responsibilities, management's recommendation and survey-based compensation data. No particular weight was given to any of these factors. The terms of Mr. Evans' employment agreement are described under "Executive Compensation — Employment Agreements" below.

In addition to his base salary, Mr. Evans received annual incentive compensation under the Bonus Plan and the final $350,000 of his signing bonus as a result of the Heartland transaction in February 2001. Mr. Evans' target bonus opportunity under the Bonus Plan was 150 percent of current annual base salary, with a maximum opportunity of 300 percent of current annual base salary. EBT/ FCF goals have been established by the Compensation Committee at the beginning of each fiscal year; award calculations are based on the same factors as are bonuses for all executive officers. Mr. Evans received an annual bonus award of $1,000,000 in view of his leadership of the Company in regard to acquisitions and the integration thereof during 2001. Mr. Evans' signing bonus was determined based on the Committee's subjective judgment of the amount necessary to attract him to the Company.

The Compensation Committee, in its sole discretion, determines the amount of any stock options to be granted to Mr. Evans based on the factors described above. During the most recent fiscal year no stock options were granted to Mr. Evans.

The Compensation Committee believes the total compensation program for Mr. Evans is competitive with that provided by comparable companies, matches the responsibilities of his office and reflects his personal contributions to the Company's performance. Since joining the Company in April 1999, Mr. Evans has repositioned the focus of the Company as a global supplier of automotive interior systems, has developed a comprehensive corporate strategy of leveraging the Company's core competencies in acoustic technologies and design and styling excellence, has enhanced and accelerated the Company's restructuring program to reposition the Company and to reduce costs to better serve the needs of global customers and has relocated the Company headquarters to Troy, Michigan. Mr. Evans also initiated a series of acquisitions, including Joan Automotive, Becker and TAC-Trim, nearly doubling the Company's sales.

## Deductibility of Compensation in Excess of $1 Million a Year

In 1993, Congress enacted Section 162(m) of the U.S. Internal Revenue Code of 1986, effective for tax years beginning in 1994. This legislation precludes a public corporation from taking a federal income tax deduction for compensation in excess of $1 million per year for its chief executive officer and any of its four other highest paid executive officers required to be in the summary compensation table below (with exceptions for certain performance-based compensation).

The Company will continue to review its executive compensation practices and plans on an ongoing basis with respect to Section 162(m). Where it deems advisable, the Company will take appropriate action to preserve the tax deductibility of its executive compensation, but it believes the more important objective is maintaining competitive compensation. To retain highly skilled managers and remain competitive with other employers, the Compensation Committee retains the authority to authorize other payments, including salary

18

and bonuses that would not be deductible for federal income tax purposes, including payments under the 2000 and 2001 Bonus Plans and the Company's stock option plans.

Compensation Committee of the Board of Directors of Collins & Aikman Corporation:

David A. Stockman
Daniel P. Tredwell
Marshall A. Cohen

## EXECUTIVE OFFICERS OF THE COMPANY

The following is a list of the names and ages, as of March 28, 2002, of the executive officers of the Company and a description of all positions and offices with the Company held by each such person and each such person's principal occupations and employment during the past five years. All executive officers hold office at the pleasure of the Company's Board of Directors.

| Name | Age | Position |
|------|-----|----------|
| Thomas E. Evans | 50 | Chairman of the Board and Chief Executive Officer |
| J. Michael Stepp | 57 | Chief Financial Officer (Interim) |
| Gerald E. Jones | 56 | Executive Vice President Global Manufacturing Operations, Fabrics |
| Millard L. King | 57 | Executive Vice President Global Manufacturing Operations, Carpet and Acoustics Systems |
| Bernd Lattemann | 60 | President and Managing Director European Operations |
| Ronald T. Lindsay | 51 | Senior Vice President, General Counsel and Secretary |
| Michael A. Mitchell | 58 | President Global Commercial Operations |
| Jerry L. Mosingo | 50 | Executive Vice President Global Manufacturing Operations, Plastics & Cockpit Systems |
| Jonathan L. Peisner | 42 | Senior Vice President, Treasurer |
| Jeffrey A. Rose | 42 | Senior Vice President Global Product Development and Technology |
| Russell N. Stroud | 59 | Senior Vice President Global Supply Chain Management and Company-Wide Cost Optimization |
| Gregory L. Tinnell | 41 | Senior Vice President, Human Resources |
| Reed A. White | 54 | President of Collins & Aikman Dura Convertible Systems |

*Thomas E. Evans* has been Chairman of the Board and Chief Executive Officer of the Company since April 1999. Previously, he was President of Tenneco Automotive, an automotive supplier and a division of Tenneco, Inc., from 1995 until April 1999. Prior to that, Mr. Evans served for six years with Case Corporation, a manufacturer of farm machinery and construction equipment and a subsidiary of Tenneco, Inc., in a series of senior management positions, the last being Senior Vice President of Worldwide Operations. Prior to his employment with Case Corporation, he spent sixteen years in the automotive industry with Rockwell International and Federal Mogul Corporation. Mr. Evans is also a director of the Motor & Equipment Manufacturers Association, the National Association of Manufacturers and the Institute of Textile Technology. Mr. Evans is also a director of Products.

*J. Michael Stepp* has been serving as Chief Financial Officer on an interim basis for the Company since the resignation of Mr. Shah effective January 7, 2002. Mr. Stepp has been a director of the Company since March 2001 and is also a director of Products. Mr. Stepp will continue to serve as Chief Financial Officer of

19

Table of Contents

the Company until a successor to the office is elected by the Board of Directors. In his interim capacity, Mr. Stepp is receiving compensation from the Company of $1 per year.

*Gerald E. Jones* has been Executive Vice President of Global Manufacturing Operations, Fabrics since November 2001 and an executive officer since March 2002. Mr. Jones, who has over 30 years of industry experience, joined the Company as a director of manufacturing in July 1995. From April 2000 until November 9, 2001, he was General Manager, Automotive Woven Fabrics.

*Millard L. King, Jr.* has been Chief Operating Officer of U.S. Automotive Carpet Systems since January 1999 and an executive officer of the Company since March 2002. Mr. King joined the Company in 1971. Prior to his current position with the Company, Mr. King most recently held the positions of Vice President of Operations for Automotive Knit Fabrics and then Chief Operating Officer of the Automotive Knit and Woven Operations.

*Bernd Lattemann* has been President and Managing Director of European Operations since January 2002 and an executive officer of the Company since March 2002. Mr. Lattemann has over 30 years of sales and manufacturing and automotive experience, including serving as an independent consultant from 1998 to 2002 and Chief Executive Officer from 1996 to 1998 for Becker Group Europe GmbH. Previously, Mr. Lattemann held several progressively responsible positions at SKF's Specialty Bearings Division.

*Ronald T. Lindsay* has been Senior Vice President, General Counsel and Secretary and an executive officer of the Company since 1999. He has been Senior Vice President since 1999, Vice President 1988-1999, and since 1988, General Counsel and Secretary of Products.

*Michael A. Mitchell* has been President, Global Commercial Operations since January 2002 and an executive officer of the Company since March 2002. Mr. Mitchell has over 40 years of industry experience, having previously held senior management positions at Chrysler Corporation and American Motors. He served as Executive Vice President, Business & Product Development from 1997 to 2002 and Executive Vice President of Engineering, Purchasing and Program Management from 1995 to 1997 for Textron Automotive Company.

*Jerry L. Mosingo* has been Executive Vice President, Global Plastics and Cockpit Systems since January 2002 and an executive officer of the Company since March 2002. Mr. Mosingo has over 30 years of industry experience, and he was previously Executive Vice President of Manufacturing from 1999 to 2002 and Senior Vice President of Operations in 1999 for Textron. Previously, he served as Vice President of Quality from 1997 to 1999 and Director of Operations from 1992 to 1997 for A.O. Smith.

*Jonathan L. Peisner* has been Senior Vice President and Treasurer since February 2002. Mr. Peisner joined the Company in 1999 as Senior Vice President of Communications and Investor Relations. From January 2000 until February 2002, he was Senior Vice President of Communications, Investor Relations and Business Planning. He has been an executive officer of the Company since February 2000. From 1997 until 1999, he was Director of Investor Relations and Business Planning for Lear Corporation, an automotive supplier, and from 1995 until 1997 he was director of Investor Relations. Mr. Peisner serves on the National Association of Manufacturers Public Affairs Steering Committee and the National Investor Relations Institute Small Cap Advisory Group.

*Jeffrey A. Rose* has been Senior Vice President, Global Product Development and Technology since January 2002 and an executive officer of the Company since March 2002. Mr. Rose has 20 years of industry experience, and he previously served as Vice President of Technology for TAC-Trim, which he joined in 1995 as Director of Interior Trim Engineering. Prior to 1995, he worked for Toyota at their Technical Center in Ann Arbor, Michigan.

*Russell N. Stroud* has been Senior Vice President, Global Supply Chain Management and Company-Wide Cost Optimization and an executive officer of the Company since March 2002. He has over 35 years of broad automotive experience with both OEMs and suppliers. Previously, he served as Vice President of Procurement from 2000 to 2002 and Vice President of Sales, Marketing and Strategic Planning from 1998 to

20

Table of Contents

2000 for New Venture Gear and President & COO for Thyssen Steel Group from 1996 to 1998 and held progressively responsible positions at Chrysler Corporation.

*Gregory L. Tinnell* has been Senior Vice President of Human Resources and an executive officer since April 2000. Previously, he was Vice President of Human Resources for the Company's southern and Mexican Operations, as well as Vice President of Global Compensation & Benefits. Tinnell joined the Company in 1995. Prior to Collins & Aikman, he served in various management positions with Sara Lee Corporation, Nabisco Foods Group and North American Refractories Company. Mr. Tinnell serves on the National Association of Manufacturers Human Resources Steering Committee.

*Reed A. White* has been President of Dura Convertible Systems, Inc. (also known as Collins & Aikman Dura Convertible Systems) since 1994, has been employed thereby in various management positions since April 1985 and has been an executive officer of the Company since February 2000.

See "Executive Compensation — Employment Agreements" for a description of employment agreements with Messrs. Evans, Lindsay and White, pursuant to which they are required to be elected to the offices they currently hold. Additionally, Messrs. Lattemann, Mitchell, Mosingo, Stroud, King, Jones, Rose and Tinnell have employment agreements and Mr. Peisner has a severance benefit agreement pursuant to which they are required to be elected to the offices they currently hold.

## EXECUTIVE COMPENSATION

The following table sets forth information concerning the compensation for services rendered to the Company and its subsidiaries by (i) all individuals serving as the Company's Chief Executive Officer during 2001, (ii) the Company's four most highly compensated executive officers (other than the Chief Executive Officer) whose total annual salary and bonus exceeded $100,000 and who were serving as executive officers at the end of the fiscal year ended December 31, 2001 and (iii) up to two of the Company's former executive officers whose compensation would have been reported herein if they had been serving as executive officers of the Company at the end of the fiscal year (the individuals named in clauses (i), (ii), and (iii) being referred to herein as the "Named Executive Officers"). All compensation shown has been paid by Products or by a subsidiary of Products (although any options shown as awarded are for Common Stock of the Company). The Company does not separately compensate its executive officers for their duties as officers of the Company (except for any such options).

### Summary Compensation Table

| Name and Principal Position | Year(1) | Annual Compensation | | | Securities Underlying Options(#) | All Other Compensation($) |
| | | Salary($) | Bonus($) | Other Annual Compensation(2) | | |
|---|---|---|---|---|---|---|
| Thomas E. Evans | 2001 | 735,000 | 1,350,000(4) | 45,406 | — | 139,835(5) |
| Chairman of the Board and | 2000 | 729,167 | 175,000(6) | 35,955 | 60,000 | 77,158 |
| Chief Executive Officer(3) | 1999 | 485,513 | 1,325,000(7) | 28,508 | 1,200,000 | 19,950 |
| Brian Batey | 2001 | 291,672 | — | 0 | — | 0 |
| President, European | 2000 | 124,458 | 142,243 | 0 | 100,000 | 0 |
| Automotive Systems(8) | 1999 | N/A | N/A | N/A | N/A | N/A |
| Ronald T. Lindsay | 2001 | 222,500 | 53,400 | 12,609 | — | 9,308(9) |
| Senior Vice President, | 2000 | 220,625 | — | 52 | N/A | 12,830 |
| General Counsel and Secretary | 1999 | 177,950 | 100,000 | 63 | 40,000 | 8,385 |
| Rajesh K. Shah | 2001 | 345,000 | — | 15,851 | — | 14,837(10) |
| Executive Vice President & | 2000 | 333,750 | | 48 | 35,000 | 21,654 |
| Chief Financial Officer(11) | 1999 | 130,769 | 200,000 | N/A | 100,000 | 2,887 |
| Reed A. White | 2001 | 250,000 | 20,000 | 11,032 | — | 10,701(12) |
| President, Collins & Aikman | 2000 | 237,500 | | 843 | 20,000 | 17,317 |
| Dura Convertible Systems | 1999 | 188,333 | 200,000 | 871 | N/A | 12,744 |

(1)  The information given in this table is for the fiscal years indicated, rather than calendar years. 2001 indicates the fiscal year ended December 31, 2001. 2000 indicates the fiscal year ended December 31, 2000. 1999 indicates the fiscal year ended December 25, 1999.

21

# EXHIBIT C

# PART 2

**TO THE DECLARATION OF VERNON R. PROCTOR**
**IN SUPPORT OF DEFENDANT DAVID R. COSGROVE'S**
**MOTION TO DISMISS THE COMPLAINT**

Table of Contents

(2) Total perquisites for each Named Executive Officer, except Mr. Evans in 2001, were less than the lesser of $50,000 or 10% of annual salary and bonus and, accordingly, the dollar value of such perquisites is not shown. The numbers shown for each Named Executive Officer reflect gross-ups for incremental federal and state income taxes related to such perquisites or relocation reimbursements. Perquisites for each Named Executive Officer may, but do not necessarily, include reimbursement for any of the following expenses: car; financial planning; executive fitness; executive physicals and medical; clubs and entertainment; and personal use of Company aircraft.

(3) Mr. Evans joined the Company as Chairman of the Board of Directors and Chief Executive Officer and was named an executive officer of the Company in April 1999. Prior to April 1999, Mr. Evans held no position with the Company or its subsidiaries.

(4) For 2001, as a result of the Heartland transaction Mr. Evans' bonus calculation includes a final $350,000 signing bonus payment made pursuant to his employment agreement, described under "Employment Agreements — Thomas E. Evans."

(5) Amount for 2001 for Mr. Evans consists of (i) contributions in the amount of $39,060 to the non-qualified shadow retirement plan (the "SRP"), (ii) premiums in the amount of $4,570 and $954 paid for basic term life insurance and Accidental Death & Dismemberment insurance ("AD&D insurance"), respectively, under group life insurance policies, (iii) tax gross-ups of $49,679, (iv) perquisite allowance of $30,000 and (v) medical reimbursement of $15,572.

(6) For 2000, Mr. Evans' bonus calculation includes a $175,000 signing bonus payment made pursuant to his employment agreement, described under "Employment Agreements — Thomas E. Evans."

(7) For 1999, Mr. Evans' bonus calculation includes a $325,000 signing bonus payment made pursuant to his employment agreement, described under "Employment Agreements — Thomas E. Evans."

(8) Mr. Batey joined the Company as President European Automotive Systems in August 2000. Prior to August 2000, Mr. Batey held no positions with the Company or its subsidiaries. His compensation is converted into USD as of 12/31/2001 (1 £=1.4515 USD). Mr. Batey resigned his employment effective February 28, 2002.

(9) Amount for 2001 for Mr. Lindsay consists of (i) contributions in the amount of $8,010 to the SRP and (ii) premiums in the amount of $1,186 and $112 paid for basic term life insurance and AD&D insurance, respectively, under group life insurance policies.

(10) Amount for 2001 for Mr. Shah consists of (i) contributions to the SRP in the amount of $12,420 and (iii) premiums in the amount of $2,145 and $272 paid for basic term life insurance and AD&D insurance, respectively, under group life insurance policies.

(11) Mr. Shah joined the Company as Executive Vice President and Chief Financial Officer and was named an executive officer of the Company in July 1999. Prior to July 1999, Mr. Shah held no positions with the Company or its subsidiaries. Mr. Shah resigned his employment effective January 7, 2002.

(12) Amount for 2001 for Mr. White consists of (i) contributions in the amount of $9,000 to the SRP and (ii) premiums in the amount of $1,554 and $147 paid for basic term life insurance and AD&D insurance, respectively, under group life insurance policies.

22

Table of Contents

## Option Grants in Last Fiscal Year

Shown below is information on grants of stock options made during the fiscal year ended December 31, 2001 to the Named Executive Officers.

| | Individual Grants | | | | |
| Name | Number of Securities Underlying Options Granted(#) | % of Total Options Granted to Employees in 2001 | Exercise Price ($/sh)(1) | Expiration Date | Grant Date Present Value($) |
|---|---|---|---|---|---|
| Thomas E. Evans | 0 | 0 | N/A | N/A | N/A |
| Brian Batey | 0 | 0 | N/A | N/A | N/A |
| Ronald T. Lindsay | 0 | 0 | N/A | N/A | N/A |
| Rajesh K. Shah | 0 | 0 | N/A | N/A | N/A |
| Reed A. White | 0 | 0 | N/A | N/A | N/A |

(1) "N/A" appearing in the table denotes not applicable since no options were granted to the Named Executive Officer.

## Aggregated Option Exercises in Last Fiscal Year and Fiscal Year End Option Values

Shown below is information with respect to the exercise of stock options during the last fiscal year and the year-end value of unexercised options to purchase Common Stock granted to the Named Executive Officers and held by them as of December 31, 2001.

| Name | Shares Acquired on Exercise(#) | Value Realized($) | Number of Unexercised Options/SARs at Fiscal Year-End(#) | | Value of Unexercised In-the-Money Options/SARs at Fiscal Year-End($) | |
|---|---|---|---|---|---|---|
| | | | Exercisable | Unexercisable | Exercisable | Unexercisable |
| Thomas E. Evans | 0 | 0 | 1,260,000 | 0 | 3,383,250 | 0 |
| Brian Batey | 0 | 0 | 33,334 | 66,666 | 65,001 | 129,999 |
| Ronald T. Lindsay | 0 | 0 | 71,591 | 13,333 | 198,662(2) | 26,833 |
| Rajesh K. Shah | 0 | 0 | 78,334 | 56,666 | 137,022 | 110,290 |
| Reed A. White | 0 | 0 | 108,441 | 13,333 | 269,652(2) | 31,833(2) |

(1) The value of in-the-money options is based on the difference between the exercise price of such options and the closing price of the Common Stock on the New York Stock Exchange on December 31, 2001 (the last trading day of the fiscal year ended December 31, 2000), which was $7.70.

(2) Some options were not in-the-money at fiscal year-end because the exercise price of such options exceeded the closing price of the Common Stock on the New York Stock Exchange on December 31, 2001.

## Defined Benefit or Actuarial Plan Disclosure

*C&A Co. Plan.* Provided certain eligibility requirements are met, at the end of each calendar month, pay credits are applied to a participant's account under the Collins & Aikman Corporation Employees' Pension Account Plan (the "C&A Co. Plan") based on the participant's length of credited service and compensation (as defined) during that month. For participants aged 50 or older, the monthly pay credit is based on either credited service and compensation or age and compensation, whichever results in the higher amount.

23

Table of Contents

The following chart sets forth how pay credits are determined under the C&A Co. Plan:

| Eligibility Requirements | | | Percentage of Compensation Used to Determine Pay Credits | |
|---|---|---|---|---|
| Credited Service | -or- | Years of Age | Up to 1/3 of the S.S. Wage Base | Over 1/3 of the S.S. Wage Base |
| Less than 10 | | Less than 50 | 2.5% | 4.5% |
| 10 - 14 | | 50 - 54 | 3.0% | 5.5% |
| 15 - 19 | | 55 - 59 | 4.0% | 6.5% |
| 20 - 24 | | 60 - 64 | 5.0% | 8.0% |
| 25 or more | | 65 or more | 6.0% | 10.0% |

The dollar amounts that result from these percentages are added together and the total is the pay credit for the month.

In addition, interest credits are applied each month to the account balance. Participants make no contributions to the C&A Co. Plan. Employer contributions are 100% vested after five years of service or at age 65, whichever is earlier, and may vest under certain other circumstances as set forth in the C&A Co. plan. The estimated annual benefits payable upon retirement at normal retirement age under the C&A Co. Plan for Messrs. Evans, Lindsay, Shah, and White, assuming they use their account balances to purchase a single life annuity, are $6,459, $32,778, $4,881, $17,243, respectively. Participants in the C&A Co. Plan have the option, however, of receiving the value of their vested account in a lump sum following termination of employment.

*C&A Co. Excess Plan.* The Excess Benefit Plan of Collins & Aikman Corporation (the "C&A Co. Excess Plan") works in conjunction with the C&A Co. Plan (which is described above) and provides to the employee any benefit which the C&A Co. Plan would have provided but for certain legal limitations under the Employee Retirement Income Security Act of 1974 and Internal Revenue Service regulations. The pay credits and interest credits are determined as described with respect to the C&A Co. Plan as if no legal limitations existed, and then this plan provides any benefit which is in excess of the benefit provided under the C&A Co. Plan. The estimated annual benefits payable upon retirement at normal retirement age under the C&A Co. Excess Plan for Messrs. Evans, Lindsay, Shah, and White are $45,529, $7,032, $6,383 and $7,482, respectively.

*C&A Co. SRIP.* Participation in the Collins & Aikman Corporation Supplemental Retirement Income Plan (the "C&A Co. SRIP") is solely at the discretion of the Board of Directors of Products and is extended to a select group of key executives. The plan, which may be discontinued at any time, provides a participating employee with a retirement benefit at or after age 62 or between ages 55 and 61 on an actuarially reduced basis. A target benefit is first calculated for each employee based on Total Annual Compensation (final base salary plus the average of the bonuses paid for the last three fiscal years) and years of service at retirement. The benefit payable from the C&A Co. SRIP is determined as the excess of the target benefit over any pension benefits payable from Social Security and any other retirement plans sponsored by the Company. An employee does not become vested in a benefit until (i) reaching age 55 and completing 10 years of service or (ii) reaching age 62.

Table of Contents

The following table shows, for specified compensation and years of service classifications, the hypothetical annual target benefits under the C&A Co. SRIP for employees retiring at age 65, assuming that the retiring participant elects a single life annuity.

## Pension Plan Table

| Total Annual Compensation | Years of Service | | | | | |
|---|---|---|---|---|---|---|
| | 10 | 15 | 20 | 25 | 30 | 35 |
| $ 100,000 | $ 42,000 | $ 51,000 | $ 60,000 | $ 60,000 | $ 60,000 | $ 60,000 |
| 125,000 | 52,500 | 63,750 | 75,000 | 75,000 | 75,000 | 75,000 |
| 150,000 | 63,000 | 76,500 | 90,000 | 90,000 | 90,000 | 90,000 |
| 175,000 | 73,500 | 89,250 | 105,000 | 105,000 | 105,000 | 105,000 |
| 200,000 | 84,000 | 102,000 | 120,000 | 120,000 | 120,000 | 120,000 |
| 225,000 | 94,500 | 114,750 | 135,000 | 135,000 | 135,000 | 135,000 |
| 250,000 | 105,000 | 127,500 | 150,000 | 150,000 | 150,000 | 150,000 |
| 275,000 | 115,500 | 140,250 | 165,000 | 165,000 | 165,000 | 165,000 |
| 300,000 | 126,000 | 153,000 | 180,000 | 180,000 | 180,000 | 180,000 |
| 350,000 | 147,000 | 178,500 | 210,000 | 210,000 | 210,000 | 210,000 |
| 400,000 | 168,000 | 204,000 | 240,000 | 240,000 | 240,000 | 240,000 |
| 450,000 | 189,000 | 229,500 | 270,000 | 270,000 | 270,000 | 270,000 |
| 500,000 | 210,000 | 255,000 | 300,000 | 300,000 | 300,000 | 300,000 |
| 600,000 | 252,000 | 306,000 | 360,000 | 360,000 | 360,000 | 360,000 |
| 700,000 | 294,000 | 357,000 | 420,000 | 420,000 | 420,000 | 420,000 |
| 800,000 | 336,000 | 408,000 | 480,000 | 480,000 | 480,000 | 480,000 |
| 900,000 | 378,000 | 459,000 | 540,000 | 540,000 | 540,000 | 540,000 |
| 1,000,000 | 420,000 | 510,000 | 600,000 | 600,000 | 600,000 | 600,000 |
| 1,100,000 | 462,000 | 561,000 | 660,000 | 660,000 | 660,000 | 660,000 |
| 1,200,000 | 504,000 | 612,000 | 720,000 | 720,000 | 720,000 | 720,000 |
| 1,300,000 | 546,000 | 663,000 | 780,000 | 780,000 | 780,000 | 780,000 |
| 1,400,000 | 588,000 | 714,000 | 840,000 | 840,000 | 840,000 | 840,000 |
| 1,500,000 | 630,000 | 765,000 | 900,000 | 900,000 | 900,000 | 900,000 |
| 1,600,000 | 672,000 | 816,000 | 960,000 | 960,000 | 960,000 | 960,000 |
| 1,700,000 | 714,000 | 867,000 | 1,020,000 | 1,020,000 | 1,020,000 | 1,020,000 |
| 1,800,000 | 756,000 | 918,000 | 1,080,000 | 1,080,000 | 1,080,000 | 1,080,000 |
| 1,900,000 | 798,000 | 969,000 | 1,140,000 | 1,140,000 | 1,140,000 | 1,140,000 |
| 2,000,000 | 840,000 | 1,020,000 | 1,200,000 | 1,200,000 | 1,200,000 | 1,200,000 |
| 2,100,000 | 882,000 | 1,071,000 | 1,260,000 | 1,260,000 | 1,260,000 | 1,260,000 |
| 2,200,000 | 924,000 | 1,122,000 | 1,320,000 | 1,320,000 | 1,320,000 | 1,320,000 |
| 2,300,000 | 966,000 | 1,173,000 | 1,380,000 | 1,380,000 | 1,380,000 | 1,380,000 |
| 2,400,000 | 1,008,000 | 1,224,000 | 1,440,000 | 1,440,000 | 1,440,000 | 1,440,000 |
| $2,500,000 | $1,050,000 | $1,275,000 | $1,500,000 | $1,500,000 | $1,500,000 | $1,500,000 |

All the Named Executive Officers except Mr. Batey participated in the C&A Co. SRIP in 2001. As of December 31, 2001, Mr. Evans had 6 years, 8 months of plan service, and at age 65, he will have had an estimated 21 years, 3 months of plan service. As of December 31, 2001, Mr. Lindsay had 15 years, 6 months of plan service, and at age 65, he will have had an estimated 28 years, 11 months of plan service. As of December 31, 2001, Mr. White had 16 years, 7 months of plan service, and at age 65, he will have had an

25

Table of Contents

estimated 27 years, 6 months of plan service. Mr. Shah resigned his employment effective January 7, 2002 and he has no vested benefits under the C&A Co. SRIP.

## Employment Agreements

*Thomas E. Evans.* In April 1999, Products entered into an employment agreement with Mr. Evans, pursuant to which he serves as the Company's Chief Executive Officer and as Chairman of the Board of Directors. The agreement provides for an initial base salary of $700,000 and participation in any executive bonus plan with a target bonus of 100% of base salary then in effect and a maximum of 200% of base salary. The agreement also provides for participation in benefit plans as generally in effect for executive officers and such perquisites as the Compensation Committee deems advisable from time to time, which may include the use of company aircraft, use of company automobiles (and reimbursement for gas and maintenance charges), and luncheon club and country club membership dues. Under the C&A Co. SRIP, Mr. Evans has received credit for four years of past service under the executive retirement plan of his former employer, with additional benefit accruals to occur in accordance with such plan for years of service to the Company. Under the terms of his employment agreement, Mr. Evans also received an $850,000 signing bonus, $325,000 of which was paid in April 1999 and $175,000 of which was to be paid on each of the first three anniversaries of the commencement of his employment, subject to the terms and conditions of the employment agreement. Mr. Evans was granted options under the 1994 Plan for 1,200,000 shares, which options vest 33 1/3% on each of the first three anniversaries of the commencement of his employment. Under the agreement, Mr. Evans may not sell more than 60,000 shares of Common Stock in any three month period or more than 180,000 in any one year period, unless a change of control of the Company occurs. As a result of the Heartland transaction in the first quarter of 2001, all options granted to Mr. Evans became fully vested and immediately exercisable, all benefits under the C&A Co. SRIP were fully vested and the unpaid portion of the signing bonus was paid to Mr. Evans. The agreement provides for employment for a period commencing April 22, 1999 and ending April 22, 2002. Thereafter, the agreement will be automatically renewed for additional one year periods unless Products or Mr. Evans provides 90 days' prior written notice. In the event of involuntary termination for reasons other than cause or termination by Mr. Evans for good reason (a demotion for Mr. Evans' position or a significant reduction in his responsibilities, other than as a result of a sale or other disposition of assets of the company), the agreement provides for severance benefits equal to Mr. Evans' base salary then in effect for a period of two years from the termination date, plus if such termination occurs during fiscal year 2000, two times the average of the target bonus for fiscal year 2000 and the greater of $575,000 and the actual bonus for fiscal year 1999. For fiscal year 2001 and thereafter, the additional amount shall be two times the average of the target bonus for the then fiscal year and Mr. Evans' actual bonus for the most recently completed fiscal year. Additionally, Mr. Evans would receive, in the event of involuntary termination for reasons other than cause, any unpaid portion of the signing bonus, the complete vesting and right to immediately exercise any options granted under the employment agreement, a pro rata portion of $575,000 or the target bonus for the then fiscal year, immediate and full vesting in all benefits under the C&A Co. SRIP, and one year after the termination date the restrictions on Mr. Evans' sale of Common Stock would expire. If Mr. Evans' employment is terminated due to his death or physical or mental disability, Products shall pay any unpaid portion of his signing bonus, any earned but unpaid bonus under the executive bonus plan, any unpaid salary prior to the termination date, one times his base salary on the termination date and, a ratable portion of the annual bonus he would have earned based on actual performance results for the current fiscal year. Additionally, a ratable portion of options granted to Mr. Evans under the agreement which would have vested on the next anniversary of the commencement date of his employment shall become vested and immediately exercisable based upon the period of service since the immediately preceding anniversary date of the commencement of his employment, and one year after the termination date, the restrictions on the sale of Mr. Evans' Common Stock would expire.

*Change of Control Agreements with Reed A. White and Ronald T. Lindsay.* The Company has entered into letter agreements with Mr. White and Mr. Lindsay which provide for certain benefits if, during the period commencing three months prior to a Change in Control (as defined) of the Company and ending one year thereafter (or 45 days after notice of intent to constructively terminate employment, if later) (a "Change in Control Period"), (i) the executive's employment is involuntarily terminated other than for cause or (ii) there

26

Table of Contents

is a constructive termination of the executive's employment (which is a termination by the executive due to involuntary relocation, a material reduction in executive's total compensation and benefit package or a significant reduction in executive's responsibilities, position or authority). The benefits payable in a lump sum to the executive in such an event are as follows: (a) the executive's base salary through the date of termination; (b) a pro rata bonus equal to the executive's target bonus immediately preceding the Change in Control Period multiplied by a fraction, the numerator of which is the number of months in the year prior to termination and the denominator of which is twelve; (c) twenty-four months of base salary; and (d) two times the executive's target annual bonus in effect immediately preceding the Change in Control Period. The Company shall also (w) offer the executive an opportunity to purchase his Company automobile at its net book value, (x) deem the executive to continue as an employee of the Company for two years following termination for purposes of eligibility and vesting (but not benefit accrual) under retirement plans, (y) allow the executive to continue to participate in welfare benefit plans for two years (or until new employment) and (z) reimburse the executive for costs of continued coverage for executive and dependents under the Company's group health plans at the end of the welfare benefit continuation period described in (y). The letter agreements provide that any such benefits to an executive which constitute "Parachute Payments" under Section 280G of the U.S. Internal Revenue Code of 1986 (the "Code") may be reduced so that the Company shall not be caused to have paid an "Excess Parachute Payment" under Section 280G of the Code. In addition, any lump sum payment shall be reduced by the amount of cash severance or salary continuation benefits paid to the executive under any other plan or policy of the Company or a written employment agreement between the Company (or one of its affiliates) and the executive.

*Rajesh K. Shah.* In July 1999, the Company entered into a Severance Benefit Agreement with Mr. Shah for a period of two years ending July 25, 2001 with an automatic one-year extension. In the event Mr. Shah's employment would be terminated by the Company without cause or by Mr. Shah due to "constructive termination" prior to the expiration of the term of the agreement, Mr. Shah would receive (i) any unpaid cash bonus for the prior fiscal year, (ii) accrued and vested benefits under the employee benefit plans sponsored by the Company, (iii) 1.5 times the executive's target bonus under the executive incentive compensation plan for the current fiscal year and (iv) the base salary for the greater of eighteen months or the remainder of the agreement.

In March 2002, Mr. Shah entered into an agreement, effective January 7, 2002, with Products which supersedes his Severance Benefit Agreement. Mr. Shah resigned his employment with Products effective January 7, 2002. Mr. Shah received a lump-sum payment in the amount of $425,000 and a monthly payment of $35,416 for a 12 month period ending January 31, 2003. Mr. Shah will be eligible to continue participation in the Company's medical plan, executive medical plan and continuation of the perquisite allowance for an 18 month period. Pursuant to the agreement, all stock options awarded to Mr. Shah while he was employed by the Company will be repriced at $5, will immediately vest and remain exercisable for one year after the Agreement Date. The agreement also contains provisions regarding noncompetition, nonsolicitation of employees and a general release by Mr. Shah.

*Brian Batey.* In August 2000, Collins & Aikman Products GmbH entered into an employment agreement with Mr. Batey for an undefined period, subject to the terms and conditions of the agreement. The agreement provided for an initial base salary of 200,000 Pounds Sterling per year. Mr. Batey's target bonus under the annual executive incentive compensation plan was set at 50% of his base salary with a guaranteed cash bonus of 100,000 Pounds Sterling from the plan for the 2000 fiscal year. Mr. Batey was granted options under the 1994 Collins & Aikman Stock Option Plan for 100,000 shares of Common Stock, which would vest 1/3 after the first year, 1/3 after the second year and the remainder after the third year. The agreement provided for employee benefits and such other fringe benefits as were available to executives of the Company including an allowance of 1,000 Pounds Sterling for an automobile along with reimbursement of normal gasoline and maintenance charges. In the event Mr. Batey's employment would be terminated by Products GmbH without cause or by Mr. Batey due to "constructive termination" prior to age 65, Mr. Batey would receive a monthly fixed salary multiplied by 15 plus a pro rata target bonus. The compensation payment would be paid as a lump-sum on the date of the expiration of the prohibition of competition period. Additionally, Mr. Batey

27

Table of Contents

would receive 50 percent of the contractual base salary remuneration per month for the 12 month prohibition of competition period.

In February 2002, Mr. Batey entered into an agreement with Collins & Aikman Products GmbH which supersedes his employment agreement, whereby he resigned his employment with Products GmbH effective February 28, 2002. Under the agreement, Mr. Batey will receive 350,000 Pounds Sterling lump-sum payment and 31,060 Euros net of income taxes to pay pension contributions for the INPDAI Pension Scheme for Managers in Italy. Additionally, Mr. Batey will receive a payment of 150,000 Pounds Sterling payable in 12 monthly installments for the non-competition and non-solicitation obligation. Mr. Batey received 100,000 stock options of which 33,334 previously vested and 33,333 stock options will vest on August 2002.

*Ronald T. Lindsay.* In October 1999, Products entered into an employment agreement with Mr. Lindsay for a period of three years ending September 30, 2002, subject to the terms and conditions of the agreement. The agreement provides for an initial base salary of $215,000 per year. Mr. Lindsay's target bonus under the annual executive incentive compensation plan is set at 40% of his base salary. Pursuant to the agreement, Mr. Lindsay was granted options under the 1994 Plan for 40,000 shares of Common Stock, which vest 1/3 after the first year, 1/3 after the second year and the remainder after the third year. The agreement provides for employee benefits and such other fringe benefits as are available to executives of the Company, including the use of an automobile (and reimbursement for gas and maintenance charges) and country club membership. The agreement also provides for (i) reimbursement of reasonable expenses incurred by Mr. Lindsay in connection with the relocation from Charlotte, North Carolina to Troy, Michigan, and (ii) a one-time relocation allowance $50,000 (plus a gross-up of income taxes), payable in a lump sum upon completion of the purchase of a principal residence in the Troy, Michigan area. In the event Mr. Lindsay's employment is terminated by Products without cause or by Mr. Lindsay due to "constructive termination" prior to the expiration of the term of the agreement, Mr. Lindsay shall receive the greater of twelve months' base salary or the remaining term of the agreement and a standard bonus payment. In such event, all outstanding stock options will immediately vest and remain exercisable for a period of 90 days after termination.

*Reed A. White.* In December 2000, Products entered into an employment agreement with Mr. White for a period of three years ending November 30, 2003, subject to the terms and conditions of the agreement. The agreement provides for an initial base salary of $250,000 per year. Mr. White's target bonus under the annual executive incentive compensation plan is set at 40% of his base salary. The agreement provides for employee benefit and such other fringe benefit as are available to executives of the Company including a perquisite allowance of $20,000 (plus a gross-up for income taxes) to be used for the lease/ purchase of an automobile, associated automobile insurance, club memberships and financial planning. In the event Mr. White's employment is terminated by Products without cause or by Mr. White due to "constructive termination" prior to the expiration of the term of the agreement, Mr. White shall receive twenty-four months' base salary and a standard bonus payment. In such event, all outstanding stock options will immediately vest and remain exercisable for a period of 90 days after termination.

Table of Contents

## Performance Graph

   The following graph compares the cumulative total stockholder return from December 27, 1996 through December 31, 2001 of (i) the Company, (ii) the S&P 500 and (iii) a peer group of companies selected by the Company (consisting of Lear Corporation, Magna International Inc., Johnson Controls, Inc., Superior Industries International Inc., Arvin Meritor, Inc., Dana Corporation, Eaton Corporation and Borg Warner Automotive Inc.) (the "Automotive Peer Group"). Dividend reinvestment has been assumed and, with respect to the companies in the Automotive Peer Group, the returns of each such company have been weighted to reflect relative stock market capitalization. The graph assumes an investment of $100 on December 27, 1996 in each of the Common Stock and the stocks comprising the S&P 500 and the Automotive Peer Group.

### CUMULATIVE TOTAL RETURN
### Based Upon an Initial Investment of $100.00 on December 27, 1996
### With Dividends Reinvested



| | Collins & Aikman Corp. | S&P 500 | Automotive Peer Group |
|---|---|---|---|
| 12/27/96 | 100.00 | 100.00 | 100.00 |
| 12/26/97 | 126.83 | 123.74 | 147.08 |
| 12/24/98 | 120.48 | 162.04 | 78.91 |
| 12/29/99 | 104.70 | 192.70 | 106.03 |
| 12/29/00 | 100.72 | 174.46 | 78.91 |
| 12/31/01 | 138.36 | 151.70 | 145.01 |

## Compensation of Directors

   Under the 1994 Directors Stock Option Plan, each non-employee director of the Company who is not affiliated with a major stockholder, and was not affiliated with a major stockholder at the time of his or her election to the Board of Directors, received an annual automatic grant of ten-year options for 10,000 shares of Common Stock each November. The options have a per share exercise price equal to the closing sales price of the Common Stock on the New York Stock Exchange on the date of grant and are exercisable six months and one day after the date of grant. Any options not exercisable prior to a termination of directorship are canceled. Such non-employee directors may be granted options on the same schedule pursuant to the 2002 Plan (defined below and discussed under the heading "Proposal II"), if such plan is approved by the stockholders. Each such director also receives a fee of $55,000 per year, payable quarterly. Currently, only Mr. Clark,

Table of Contents

Mr. Rudman and Mr. Cohen are eligible to receive future grants under the 2002 Plan, if such plan is approved by the stockholders.

### Compensation Committee Interlocks and Insider Participation

From April 27, 2000 to February 23, 2001, the Compensation Committee was composed of Mr. Richard Lappin and Mr. O'Connell. From April 10, 2001 to March 15, 2002, the Compensation Committee was composed of Messrs. Stockman, O'Connell and Tredwell. Since April 1, 2002, the Compensation Committee has been composed of Messrs. Stockman, Tredwell and Cohen. None of Messrs. Lappin, Stockman, O'Connell, Cohen or Tredwell is or has been an employee of the Company or any of its subsidiaries, including Products, or is or has been separately compensated for serving as an officer of the Company or any of its subsidiaries, including Products. See "Compensation Committee Report on Executive Compensation." None of the executive officers who are separately compensated for serving as executive officers (or who received options) serve on the Compensation Committee.

Mr. Lappin, who resigned as a director on February 23, 2001, is a Senior Managing Director of Blackstone. Mr. O'Connell, who resigned as a director on March 15, 2002, is a director of Wasserstein & Co., LP, which is affiliated with Wasserstein Management and which was formerly affiliated with WP Group. Messrs. Stockman and Tredwell are senior managing directors of Heartland Industrial Partners, L.P. See "Security Ownership of Management and Principal Stockholders" and "Certain Relationships and Related Transactions — Certain Relationships." Mr. Cohen is counsel at the Canadian law firm of Cassels Brock and Blackwell.

Wasserstein Perella Securities, Inc. ("WP Securities"), a wholly-owned subsidiary of WP Group, has acted, and may in the future act, as agent for the Company in the repurchase from time to time of shares of Common Stock.

For a description of the relationships of the Company or the Company's directors with any of Heartland, BGH, Blackstone Partners, Blackstone Management, WP Partners, WP & Co. or WP Management, see "Security Ownership of Management and Principal Stockholders" and "Certain Relationships and Related Transactions" above.

### Section 16(a) Beneficial Ownership Reporting Compliance

Section 16(a) of the Exchange Act requires the Company's officers and directors, and persons who own more than ten percent of a registered class of the Company's equity securities, to file reports of ownership and changes in ownership with the Securities and Exchange Commission (the "SEC"). Officers, directors and greater than ten percent stockholders are required by SEC regulation to furnish the Company with copies of all Section 16(a) reports they file. Based solely on review of the copies of such reports furnished to the Company during or with respect to fiscal 2001, or written representations that no Forms 5 were required, the Company believes that during the fiscal year ended December 31, 2001 all Section 16(a) filing requirements applicable to its officers, directors and greater than ten percent beneficial owners were complied with.

## PROPOSAL II

## APPROVAL OF THE COMPANY'S 2002 EMPLOYEE STOCK OPTION PLAN

The Compensation Committee of the Company and the Board of Directors of the Company have approved the submission of the Company's 2002 Employee Stock Option Plan ("2002 Plan") for approval at the 2002 annual meeting of stockholders of the Company. The following summary of the 2002 Plan is qualified in its entirety by express reference to the 2002 Plan, which is attached as *Appendix A* to this Proxy Statement.

The purpose of the 2002 Plan is to provide key employees and executive consultants of the Company and its subsidiaries and non-employee directors of the Company with an increased incentive to make contributions to the long-term performance and growth of the Company, to join the interests of key employees, executive

consultants and non-employee directors with the interests of stockholders of the Company and to facilitate attracting and retaining key employees, executive consultants and non-employee directors of the Company.

The vote required for approval of Proposal II is the affirmative vote of the holders of a majority of the total number of votes cast on the proposal at the annual meeting of stockholders. Abstentions, withheld votes and broker non-votes will not be deemed affirmative or negative votes in determining approval of this proposal, but will be counted in determining the number of shares of Common Stock present or represented by proxy in determining whether a quorum is present. The Board has approved the 2002 Plan subject to shareholder approval. In addition, the Board has terminated the 2000 Employee Stock Option Plan and no options were granted thereunder.

### Summary of the Principal Terms and Conditions of the 2002 Plan

#### Shares Subject to Options

The 2002 Plan authorizes the issuance of up to 16,500,000 shares (6,400,000 shares in the event that the reverse stock split proposal is approved and effected see "Proposal III" below) of Common Stock, par value $0.01 per share, upon the exercise of incentive stock options ("ISOs") and nonqualified stock options ("NQSOs") granted to key employees and NQSOs granted to executive consultants and non-employee directors of the Company under the 2002 Plan. Unless the 2002 Plan has terminated, shares covered by the unexercised portion of canceled, expired or otherwise terminated options under the 2002 Plan would be available for option grants. The shares of Common Stock authorized for the 2002 Plan will be subject to adjustment in the case of any stock dividend, stock split, combination of shares, recapitalization or other change in the capital structure of the Company, merger or consolidation of the Company, spin-off, reorganization, partial or complete liquidation, issuance of rights or warrants to purchase securities or any other corporate transaction or event having an effect similar to the foregoing. Key employees are those active executive officers or other valuable employees of the Company that are selected by the Compensation Committee to participate in the 2002 Plan. Executive consultants are those executive-level consultants of the Company that are selected by the Compensation Committee to participate in the 2002 Plan. Non-United States employees may participate in the 2002 Plan, and modifications may be made to the terms and conditions of awards made under the 2002 Plan to comply with local laws. No ISO may be granted under the 2002 Plan after March 28, 2012.

#### Options

In the case of ISOs, the exercise price of an option may not be less than 100% of the fair market value of a share of Common Stock at the time of grant (or 110% of such fair market value if the grantee owns more than 10% of the shares of Common Stock outstanding at the time of grant (a "Ten Percent Shareholder")). NQSOs issued pursuant to the 2002 Plan will be exercisable at such price as may be fixed by the Compensation Committee, which may be less than the fair market value of the Common Stock at the time of grant. The closing price for the Common Stock on the New York Stock Exchange on April 22, 2002 was $7.50 per share. No more than 5,000,000 shares of Common Stock (2,000,000 shares in the event that the reverse stock split proposal is approved and effected, see "Proposal III" below) may be subject to options granted to any employee or executive consultant under the 2002 Plan in any calendar year, with any unused portion thereof carried forward. Shares purchased pursuant to the exercise of options must be paid for at the time of exercise as follows: (i) in cash or by check, bank draft or money order; (ii) if the shares are traded on a national securities exchange, through the delivery of instructions to a broker to deliver the purchase price; or (iii) on other terms acceptable to the Compensation Committee (which may include payment by transfer of shares of Common Stock owned by the participant for at least six months or the surrender of options).

The Compensation Committee selects the optionees and sets the number of shares, the exercise price and the schedule of exercisability with regard to each option grant, subject to acceleration in the event of a Change in Control of the Company (as defined in the 2002 Plan). No option may be exercisable after the expiration of ten years from the date of its grant (or five years, in the case of ISOs granted to a Ten Percent Shareholder). No ISO may be transferred, assigned, pledged or hypothecated in any way except by will or under applicable

31

laws of descent and distribution. NQSOs may be transferred to any family member (as defined in the 2002 Plan) of the participant for or without consideration.

In consideration of the grant of options, each employee is required to agree not to engage, without the written consent of the Compensation Committee, in any Competitive Activity (as defined in the 2002 Plan) during the participant's employment by the Company, and in the event any options vest, for a period of one year following termination of employment. Options that were exercisable upon a participant's termination of service other than for cause remain exercisable following such termination for a period of: (i) one year, in the case of death or disability, (ii) 90 days, in the case of retirement or termination other than for cause and (iii) in all other instances, 30 days following such termination, in each case subject to extension by the Compensation Committee. Options that were exercisable upon a participant's termination of service for cause are canceled upon such termination. Except as otherwise determined by the Compensation Committee, options that were not exercisable at the time of a participant's termination of service by the Company shall automatically be canceled upon such termination. The Compensation Committee has the discretion under the 2002 Plan to impose in a participant's option agreement such other conditions, limitations and restrictions as it determines are appropriate in its sole discretion, including any waivers of rights which a participant may have.

The 2002 Plan provides for the Compensation Committee to have the right to make appropriate adjustments in the number and kind of securities receivable upon the exercise of options or the exercise price in the event of a stock split, stock dividend, merger, consolidation, reorganization, spinoff, partial or complete liquidation or other similar changes in the capital structure or other corporate transactions. The 2002 Plan also gives the Compensation Committee the option to terminate all outstanding options effective upon the consummation of a merger or consolidation in which the Company is not the surviving entity or of any other transaction that results in the acquisition of substantially all of the Company's outstanding Common Stock by a single person or entity or by a group of persons and/or entities acting in concert, or upon the consummation of the sale or transfer of all of the Company's assets (any such event an "Acquisition Event"), subject to the right of participants, if such termination right is exercised, to exercise all outstanding options prior to the effective date of the Acquisition Event.

The Compensation Committee may modify, extend or assume outstanding options or may accept the cancellation of outstanding options (whether granted by the Company under the 2002 Plan or another plan or by another issuer) in return for the grant of new options for the same or a different number of shares and at the same or a different purchase price. In addition, the Compensation Committee may place certain conditions on the shares upon exercise of an option.

As of the date of this Proxy Statement approximately 900 key employees, no executive consultants and three non-employee directors (excluding Mr. Dauch, who is a nominee for election at the Meeting and may be eligible to participate in the 2002 Plan) are currently eligible to participate in the 2002 Plan. No options have yet been granted under the 2002 Plan.

Persons deemed to be affiliates of the Company, i.e., persons who directly or indirectly through one or more intermediaries, control, are controlled by, or are under common control with, the Company, must resell securities acquired under the 2002 Plan pursuant to a registration statement under the Securities Act of 1933, as amended, and the rules and regulations thereunder (the "Securities Act"), Rule 144 under the Securities Act or an applicable exemption under the Securities Act.

The Company is the issuer of the securities offered pursuant to the 2002 Plan. The shares of Common Stock of the Company issuable upon exercise of options granted under the 2002 Plan may be either authorized and unissued or reacquired shares of Common Stock of the Company. The 2002 Plan is not subject to any provisions of the Employee Retirement Income Security Act of 1974 and is not qualified under Section 401(a) of the Code.

### Amendment or Termination of the 2002 Plan

The Compensation Committee may terminate or amend the 2002 Plan, or amend any option under the 2002 Plan, at any time; provided that no such termination or amendment may materially impair a participant's rights under any option previously granted under the 2002 Plan without the consent of such participant.

Table of Contents

### Option Grants

See the information under the heading "Executive Compensation" for a description of the options granted under the Company's plans.

### Federal Income Tax Consequences

The rules governing the tax treatment of options and shares acquired upon the exercise of options are quite technical. Therefore, the description of federal income tax consequences set forth below is necessarily general in nature and does not purport to be complete. Moreover, statutory provisions are subject to change, as are their interpretations, and their application may vary in individual circumstances. Finally, the tax consequences under applicable state and local income tax laws may not be the same as under the federal income tax laws.

Under federal income tax law as currently in effect, neither ISOs nor NQSOs require a participant to recognize income at the time of grant. Upon the exercise of a NQSO, the participant will recognize ordinary income in an amount equal to the excess of the fair market value of the Common Stock received over the aggregate exercise price. Subsequent appreciation or decline in the value of the shares will generally be treated as capital gain or loss on the sale or other disposition of the shares. With respect to an ISO, no income is recognized by the participant in connection with the exercise, although the excess of the fair market value of the Common Stock at exercise over the aggregate exercise price results in alternative minimum income which is used in determining alternative minimum tax liability of the participant. The participant will be subject to taxation at the time shares acquired upon the exercise of an ISO are sold or otherwise disposed of. If the sale occurs at least two years after the date the ISO was granted and at least one year after the date it was exercised, the participant generally will recognize long-term capital gain or loss in an amount equal to the excess of the proceeds of the sale over the aggregate exercise price of the shares sold. If the participant disposes of such shares within two years of the date the ISO was granted or within one year of receipt of the shares pursuant to the exercise of the ISO, the participant will recognize ordinary income, in an amount equal to the excess of the fair market value of the shares on the date of the exercise over the exercise price or the gain on disposition, if lower. The excess, if any, of the amount realized upon disposition of such shares over the fair market value of the shares on the date of exercise will be long- or short-term capital gain, depending upon the holding period of the shares, providing the participant holds the shares as a capital asset at the time of disposition. If such disposition of the shares by the participant within two years of the date of grant of the ISO or one year of its exercise is a sale or exchange with respect to which a loss (if sustained) would be recognized by the participant, then the amount which is includable in the gross income of the participant shall not exceed the excess (if any) of the amount realized on the sale or exchange over the adjusted basis of such shares.

The Company's tax consequences will also depend upon whether an option is an ISO or a NQSO. In the case of a NQSO, the Company will generally be entitled, subject to the possible application of Sections 162(m) discussed below, to a deduction in connection with the participant's exercise in an amount equal to the income recognized by the participant. If the Option is an ISO, however, the Company will not be entitled to a deduction if the participant satisfies holding period requirements and recognizes capital gain. If those requirements are not satisfied, the Company will generally be entitled to a deduction corresponding to the ordinary income recognized by the participant, subject to the possible application of Section 162(m) of the Code as discussed below.

Section 162(m) of the Code precludes a publicly held corporation from claiming a compensation deduction for compensation in excess of $1 million paid to the chief executive officer or any of the four most highly compensated executive officers other than the chief executive officer required to be shown in the Summary Compensation Table. This limitation does not apply, however, to "qualified performance-based compensation." Because the Compensation Committee members are affiliated with the Company's principal stockholders and those stockholders have reportable related-party transactions with the Company, compensation from the exercise of options may not qualify as "qualified performance-based compensation" for purposes of Section 162(m) of the Code.

**Management recommends a vote FOR Proposal II.**

# PROPOSAL III

## APPROVAL OF THE ONE-FOR-TWO AND ONE-HALF REVERSE STOCK SPLIT

The Company's Board of Directors deems advisable and recommends to the stockholders an amendment to the Company's Restated Certificate of Incorporation to effectuate a one-for-two and one-half reverse stock split of the issued and outstanding Common Stock. The reverse stock split will be accomplished by reclassifying all of the issued and outstanding shares of Common Stock into a proportionally fewer number of shares of Common Stock, such that every two and one-half shares will be converted into one post-split share.

The approval of two-thirds of the outstanding Common Stock is required for the approval of the proposed reverse stock split. Abstentions and broker non-votes will be equivalent of votes cast against the proposed reverse stock split. In the event that the reverse stock split is approved by the stockholders, the Board of Directors will fix a record date for the reverse stock split which will be as soon as practicable after such approval. The Company will publicly announce the record date once it has been fixed.

### Reasons for the Proposed Reverse Stock Split

The Board of Directors believes that per share market prices of a common stock can affect its acceptability by portions of the financial community and the investing public. The number of shares of a stock outstanding should not, by itself, affect its marketability, the type of investor who acquires it or the Company's reputation in the financial community. However, certain types of investors look upon lower priced stocks as possibly speculative in nature and, as a matter of policy, avoid investment in such stocks. Marketability of lower-priced shares can also be adversely affected by the reluctance of many leading brokerage firms to recommend these stocks to their clients. While the Company cannot assure you that the price of the common stock after the reverse stock split will actually increase in an amount proportionate to the decrease in the number of outstanding shares, the proposed stock reverse stock split is intended to result in a price level for the common stock that will maintain and enhance investor interest.

### Principal Effects

The principal effects of the proposed reverse stock split would be the following:

*Number of Shares Outstanding.* As of April 2, 2002, 167,997,131 shares of Common Stock were issued and outstanding and 132,002,869 shares were unissued. The reverse stock split will not alter the number of shares of Common Stock that the Company is authorized to issue but will only reduce the number of shares of Common Stock issued and outstanding.

*Options.* In addition, the Company has previously issued options which, if exercised, would require the Company to issue an additional 2,713,236 shares of Common Stock. All options would be adjusted on a one-for-two and one-half basis and the exercise price per share for each option would correspondingly increase to two and one-half times the pre-split exercise price.

The following table illustrates the principal effects of the proposed reverse stock split discussed in the preceding paragraphs (share information as of April 2, 2002):

| Number of Shares of Common Stock | Prior To Reverse Stock Split | After Reverse Stock Split |
|---|---|---|
| Authorized | 300,000,000 | 300,000,000 |
| Outstanding | 167,997,131 | 67,198,852 |
| Shares of Common Stock Subject to Outstanding Options | 2,713,236 | 1,085,294 |
| Total Fully-Diluted | 170,710,367 | 68,284,146 |

*General.* The proposed reverse stock split would not affect the proportionate equity interest in the Company of any holder of Common Stock. The proposed reverse stock split will not affect the registration of the Common Stock under the

Securities Exchange Act of 1934 or the listing of the Common Stock on the New York Stock Exchange.

34

Table of Contents

There are certain advantages and disadvantages of voting for a reverse stock split, including:

- The Board of Directors believes that per share market prices of a company's stock can affect its acceptability by portions of the financial community and the investing public. The number of shares of a stock outstanding should not, by itself, affect its marketability, the type of investor who acquires it or the company's reputation in the financial community. However, certain types of investors look upon lower priced stocks as possibly speculative in nature and, as a matter of policy, avoid investment in such stocks. Marketability of lower-priced shares can also be adversely affected by the reluctance of many leading brokerage firms to recommend these stocks to their clients. The proposed reverse stock split is intended to result in a price level for the Common Stock that will maintain and enhance investor interest.

- Theoretically, the overall value of the Company will not change as a result of the reverse stock split so that reducing the number of shares outstanding by a factor of two and one-half would increase the per share price by a value of two and one-half. There is no mathematical certainty as to the increase in the price per share that might be expected as a result of the reverse stock split, and there can be no assurance that the per share price will increase proportionately to the reverse stock split. If the per share price increases by a factor less than the one-for-two and one-half reverse stock split, then the overall market capitalization of the Company (its total market value) will be reduced.

- The reverse stock split will reduce our outstanding Common Stock to approximately 67,198,852 shares. This reduced number of shares could result in decreased liquidity in the trading market and potential mismatches between supply and demand in the market for the common stock at any given time, which could result in changes in the trading price unrelated to the activities or prospects of the Company.

- The reverse stock split may leave certain stockholders with one or more "odd lots" of the Company's Common Stock, i.e., stock in amounts of less than 100 shares. These shares may be more difficult to sell, or require a greater commission per share to sell, than shares in even multiples of 100.

Assuming the proposed amendment to the Certificate effecting the reverse stock split is approved, a Certificate of Amendment (substantially in the form of *Appendix B* hereto) amending the Restated Certificate is expected to be filed with the Secretary of State of the State of Delaware. The amendment and the proposed reverse stock split would become effective upon the date of filing (the "effective date"). The Company expects to file the Certificate of Amendment as promptly as possible after approval at the meeting.

The Board of Directors, in its discretion, maintains the authority not to proceed with the reverse stock split in the event that it determines that the reverse stock split is not in the best interest of the Company's stockholders.

## Exchange of Stock Certificates

As soon as possible after approval is obtained, holders of Common Stock will be notified and requested to surrender their present Common Stock certificates for new certificates representing the number of whole shares of Common Stock after the reverse stock split.

The Company expects that its transfer agent will act as the exchange agent for the reverse stock split. As soon as practicable after the effective date, the Company would notify its stockholders that the reverse stock split has been implemented. Each stockholder will receive a letter of transmittal requesting stockholders to exchange their stock certificates for stock certificates reflecting the appropriately adjusted number of shares. For shares held in brokerage accounts or "street" name, stockholders will not need to take any further actions to exchange their certificates. The Company will not issue new certificates until stockholders have first surrendered their outstanding certificate(s) together with the properly completed and executed transmittal letter to the exchange agent. Until surrender, each certificate representing shares before the reverse stock split will continue to be valid and would represent the adjusted number of shares based on the 2.5-for-1 exchange ratio of the reverse stock split. Stockholders should not destroy any stock certificate and should not submit any certificates until you receive a letter of transmittal.

Table of Contents

## Fractional Share Procedures

No fractional shares, or certificates representing such fractional interests, will be issued as a result of the reverse stock split. With respect to any stockholder holding a number of shares of Common Stock (immediately prior to the reverse stock split) not evenly divisible by 2.5, the fractional interests otherwise issuable to such stockholder in the reverse stock split ("fractional interests") will be covered by an arrangement to be implemented by the Company in accordance with Section 155 of the General Corporation Law of the State of Delaware ("DGCL") (such arrangement being referred to herein as the "Fractional Share Procedures"). (DGCL Section 155 specifies alternative procedures that may be used by a corporation that elects not to issue fractional shares.)

Under the Fractional Share Procedures, as more fully described below, stockholders holding fractional interests will be given the option, in the letter of transmittal to be delivered to each stockholder relating to the exchange of stock certificates described above under "— Exchange of Stock Certificates," to either round their holdings of Common Stock up to the nearest whole number of shares or receive cash for their fractional interests.

In order to implement these Fractional Share Procedures, the Company will deposit with the exchange agent that number of shares of Common Stock as is equal to the aggregate number of fractional interests of stockholders electing to receive cash, rounded upwards to the next whole number. The exchange agent will use its commercially reasonable efforts to sell such shares in brokers' transactions at the highest prevailing market prices it is able to obtain. The exchange agent will remit to each holder electing to receive cash for its fractional interests, upon receipt by the exchange agent of the transmittal documents, its pro rata share in cash of the aggregate proceeds received for the sale of the bundled fractional interests, based on such holder's fractional interest compared to the fractional interests of all holders electing to receive cash, net of commissions.

The Company will not make any payment to holders in respect of fractional interests. The Company will not determine or influence the bid or sale price for such shares. The Company will pay the exchange agent a flat fee to cover the costs of the Fractional Share Procedures. No action will be required by any stockholder with respect to any of the foregoing procedures.

No assurance can be given that there will be a market for such bundled shares; that the exchange agent will be successful in marketing and selling such shares on behalf of the holders thereof; or that the consideration, if any, received by such holder in exchange for its fractional interest, will be equal to the corresponding percentage of a share of Common Stock represented by such fractional interest at prevailing market prices.

## Changes in Stockholders' Equity

The Company's stated capital, which consists of the par value per share of Common Stock, multiplied by the number of shares of Common Stock issued, will be reduced by approximately $268,795 to approximately $1,411,176. Consequently, the Company's additional paid-in capital, which consists of the difference between stated capital and the aggregate amount paid to the Company upon our issuance of all currently outstanding Common Stock, will be increased by approximately $268,795 to $1,123,368,795.

## Federal Income Tax Consequences

The following is a general discussion of certain federal income tax consequences of the proposed reverse stock split of the Common Stock, and is not intended to be applicable to all categories of investors, some of which, such as dealers in securities, banks, insurance companies, tax-exempt organizations and foreign persons, may be subject to special rules. The discussion is based on current provisions of the Internal Revenue Code of 1986, as amended (the "Code"), and administrative and judicial interpretations as of the date hereof, all of which are subject to change. Holders of Common Stock are advised to consult their own tax advisors regarding the federal, state, local and foreign tax consequences of the proposed reverse stock split.

Table of Contents

The proposed reverse stock split is intended to be a tax-free recapitalization for the Company and its stockholders. The new shares of Common Stock in the hands of a stockholder will have an aggregate basis for computing gains or loss equal to the aggregate basis of shares of Common Stock held by that stockholder immediately prior to the proposed reverse stock split.

A stockholder's holding period for the new shares of Common Stock will be the same as the holding period for the shares of Common Stock exchanged therefor.

With respect to fractional interests sold pursuant to the Fractional Share Procedures, a holder will recognize gain or loss equal to the difference, if any, between the holder's basis allocated to the fractional interest sold and the amount of cash received therefor. The gain or loss will be a capital gain or loss if the holder held Common Stock as a capital asset at the effective time.

**Management recommends a vote FOR the approval of an amendment to the Company's restated certificate of incorporation to effect a one-for-two and one-half reverse stock split.**

## CHANGES IN CERTIFYING ACCOUNTANT

On April 10, 2001, the Company notified Arthur Andersen LLP that it was changing its independent accountants to PricewaterhouseCoopers LLP for the fiscal year ending December 31, 2001. The Audit Committee of the Board of Directors and the Board of Directors of the Company approved the decision to replace Arthur Andersen LLP. The Company's Annual Report on Form 10-K for the fiscal year ended December 31, 2000 was filed on April 2, 2001. It included financial statements covering each of the past two fiscal years ended December 31, 2000 and December 25, 1999, accompanied by the report of Arthur Andersen LLP. Such report did not include any adverse opinion or disclaimer of opinion, or any qualification as to audit scope or accounting principles.

During the fiscal years ended December 31, 2000 and December 25, 1999 and through the date of this proxy statement, there were no disagreements with Arthur Andersen LLP on any matter of accounting principles or practices, financial statement disclosure or audit scope. During this period, there were also no disagreements which, if not resolved to the satisfaction of Arthur Andersen LLP, would have caused them to make reference to the subject matter of such disagreement in their reports on the financial statements for such years.

During the fiscal years ended December 31, 2000 and December 25, 1999, PricewaterhouseCoopers LLP has not been engaged as an independent accountant to audit either the financial statements of the Company or any of its subsidiaries, nor has it been consulted regarding the application of the Company's accounting principles to a specified transaction, either completed or proposed, or the type of audit opinion that might be rendered on the Company's financial statements.

As a result of its 1999 audit, Arthur Andersen LLP reported material weaknesses in the Company's internal control systems. The identified conditions specifically related to four of the Company's foreign locations, most of which were recently acquired. These weaknesses were primarily attributable to the effects of implementing a new computer system as part of the Company's acquisition integration strategy and Year 2000 compliance efforts. Issues at these locations primarily related to the detail records supporting the general ledger and staff training needs. As a result, in 2000, the Company committed significant resources to addressing the issues, including the re-implementation of certain systems, implementing an internal audit function and replacing controllers at three of the four locations. The Company made significant progress in addressing these issues; however Arthur Andersen LLP continued to report material weaknesses following its 2000 audit because two of these four foreign locations were assessed as continuing to have similar material weaknesses as in 1999. Improvement efforts at these locations were hampered by personnel turnover and continuing acquisition integration efforts.

Arthur Andersen did not modify its report on the Company's 1999 and 2000 audited financial statements as a consequence of these material weaknesses.

37

Table of Contents

The Company is continuing its efforts to address these matters and believes that it has corrected all these matters during 2001.

## STOCKHOLDER PROPOSALS

Any stockholder who wishes to submit a proposal for action to be included in the proxy materials for the Company's Year 2003 Annual Meeting must submit such proposal so that it is received by the Secretary of the Company not later than December 21, 2002. Proposals must be in writing and sent via registered, certified or express mail. Facsimile or other forms of electronic submissions will not be accepted.

The federal proxy rules specify what constitutes timely submission for a stockholder proposal to be included in the Proxy Statement, as discussed above under "Stockholder Proposals." If a stockholder desires to bring business before an annual meeting which is not the subject of a proposal timely submitted for inclusion in the Proxy Statement, the stockholder must follow procedures outlined in the Company's bylaws. A copy of these bylaw procedures is available upon request from the Secretary of the Company, 250 Stephenson Highway, Troy, Michigan 48083. One of the procedural requirements in the bylaws is timely notice in writing of the business the stockholder proposes to bring before the annual meeting. Notice must be received not less than 90 days nor more than 120 days prior to the anniversary date of the immediately preceding annual meeting of stockholders (which is between January 15, 2003 and February 14, 2003 for the purposes of the 2003 Annual Meeting); provided, however, that if the annual meeting is called for a date that is not within 30 days before or after such anniversary date, notice by the stockholder in order to be timely must be so received not later than the close of business on the tenth day following the day on which notice of the date of the annual meeting was mailed or public disclosure was made, whichever occurs first. It should be noted that those bylaw procedures govern proper submission of business to be put before an annual meeting and do not preclude discussion by any stockholder of any business properly brought before an annual meeting.

For a description of the requirements for recommending director candidates for consideration to the Nominating Committee, see "Meetings and Committees of the Board of Directors — Committees of the Board." If a stockholder wants to nominate a person for election to the Board of Directors other than a director nominated by the Nominating Committee, notice of the proposed nomination must be delivered to or mailed and received by the Secretary of the Company at the address set forth in the previous paragraph by the time periods set forth in the previous paragraph in the case of an annual meeting and, in the case of a special meeting called for the purpose of electing directors, by the close of business on the tenth day following the day on which public disclosure of the date of the special meeting was made. The bylaw provision contains other requirements for notice and a copy thereof is available upon request from the Secretary of the Company.

## ANNUAL REPORT

The Company's Annual Report on Form 10-K for the fiscal year ended December 31, 2001, including financial statements and financial statement schedules, is being sent to the stockholders of the Company as a part of the 2001 Annual Report to Stockholders.

The Annual Report on Form 10-K (and any of the financial statements contained therein) is not to be considered filed as part of this Proxy Statement or deemed soliciting material.

Table of Contents

## OTHER MATTERS

As of the date of mailing this Proxy Statement, the Company has received no notice of any other matters to be brought by a stockholder before the Meeting. Accordingly, no other matters may be brought before the Meeting, unless the Company in its sole discretion waives the advance notice bylaw provision discussed above or unless the matter is incident to the conduct of the Meeting. If the Company in its sole discretion waives the advance notice bylaw provision or there is a matter incident to the conduct of the Meeting and consequently a matter not described in this Proxy Statement properly comes before the Meeting, the persons named in the accompanying proxy will vote the proxy in accordance with their best judgment unless a stockholder, by striking out the appropriate provision of the proxy, chooses to withhold authority to vote on such matters.

By Order of the Board of Directors,

Ronald T. Lindsay
*Secretary*

PLEASE MARK, SIGN AND DATE THE ENCLOSED PROXY CARD AND MAIL IT PROMPTLY. NO POSTAGE STAMP IS NECESSARY IF MAILED IN THE UNITED STATES.

39

Table of Contents

APPENDIX A

**COLLINS & AIKMAN CORPORATION**

**2002 EMPLOYEE STOCK OPTION PLAN**

**As Adopted March 28, 2002**

Table of Contents

# COLLINS & AIKMAN CORPORATION

## 2002 EMPLOYEE STOCK OPTION PLAN
### (Adopted March 28, 2002)

## I.   Purposes of the Plan

The purposes of this 2002 Employee Stock Option Plan (the "Plan") are to enable Collins & Aikman Corporation (formerly Collins & Aikman Holdings Corporation) (the "Company") and Related Persons (as defined herein) to attract, retain and motivate the employees, consultants and non-employee directors who are important to the success and growth of the business of the Company and Related Persons and to create a long-term mutuality of interest between the Key Employees and Executive Consultants (as defined herein) and the stockholders of the Company by granting the Key Employees and Executive Consultants options to purchase Common Stock (as defined herein). This document shall supersede all other material describing this Plan, including, but not limited to, prior drafts hereof and any documents incorporating the terms and provisions of any such prior drafts.

## II.   Definitions

In addition to the terms defined elsewhere herein, for purposes of this Plan, the following terms will have the following meanings when used herein with initial capital letters:

A. "Act" means the Securities Exchange Act of 1934, as amended, and all rules and regulations promulgated thereunder.

B. "Board" means the Board of Directors of the Company.

C. "Cause" means that the Committee shall have determined that any of the following events has occurred: (1) an act of fraud, embezzlement, misappropriation of business or theft committed by a Participant in the course of his or her employment or consultancy or any intentional or gross negligent misconduct of a Participant which injures the business or reputation of the Company or Related Persons; (2) intentional or gross negligent damage committed by a Participant to the property of the Company or Related Persons; (3) a Participant's willful failure or refusal to perform the customary duties and responsibilities of his or her position or consultancy with the Company or Related Persons; (4) a Participant's breach of fiduciary duty, or the making of a false representation, to the Company or Related Persons; (5) a Participant's material breach of any covenant, condition or obligation required to be performed by him or her pursuant to this Plan, the Option Agreement or any other agreement between him or her and the Company or Related Persons or a Participant's intentional or gross negligent violation of any material written policy of the Company or Related Persons; (6) a Key Employee's willful failure or refusal to act in accordance with any specific lawful instructions of a majority of the Board of Directors of the Company; or (7) commission by a Participant of a felony or a crime involving moral turpitude. Cause shall be deemed to exist as of the date any of the above events occur even if the Committee's determination is later and whether or not such determination is made before or after Termination of Employment or Termination of Consultancy.

D. "Code" means the Internal Revenue Code of 1986, as amended (or any successor statute).

E. "Committee" means such committee, if any, appointed by the Board to administer the Plan, consisting of two or more directors as may be appointed from time to time by the Board. If the Board does not appoint a committee for this purpose, "Committee" means the Board.

F. "Common Stock" means the common stock of the Company, par value $.01 per share, any Common Stock into which the Common Stock may be converted and any Common Stock resulting from any reclassification of the Common Stock.

G. "Company" means Collins & Aikman Corporation, a Delaware corporation.

H. "Competitive Activity" means (a) being employed by, consulting to or being a director of any business, or engaging

directly or indirectly in any business activity, that is competitive with any material business of any of the Company, a Related Person or of the division that the Participant is or was employed by

A-1

Table of Contents

or (b) soliciting for employment or consulting, employing or retaining, or assisting another Person to employ or retain, directly or indirectly, any employees of the Company or Related Persons or any Person who was an employee of the Company or Related Persons in the prior six months, provided, however, that employing or retaining, or assisting another Person to employ or retain, any Person whose employment or consultancy with the Company or a Related Person has been terminated without Cause by the Company or any Person that is non-exempt under the Federal Fair Labor Standards Act, 29 USC § 213(a)(1), shall not be considered Competitive Activity.

I. "Disability" means a permanent and total disability, as determined by the Committee in its sole discretion. A Disability shall only be deemed to occur at the time of the determination by the Committee of the Disability.

J. "Executive Consultants" shall mean executive-level consultants of the Company or Related Persons, as determined by the Committee, and non-employee members of the Board.

K. "Fair Market Value" shall mean, for purposes of this Plan, unless otherwise required by any applicable provision of the Code or any regulations issued thereunder, as of any date, the last sales prices reported for the Common Stock on the applicable date, (i) as reported by the principal national securities exchange in the United States on which it is then traded, or (ii) if not traded on any such national securities exchange, as quoted on an automated quotation system sponsored by the National Association of Securities Dealers, or if the sale of the Common Stock shall not have been reported or quoted on such date, on the first day prior thereto on which the Common Stock was reported or quoted. If the Common Stock is not readily tradable on a national securities exchange or any system sponsored by the National Association of Securities Dealers, its Fair Market Value shall be set by the Committee based upon its assessment of the cash price that would be paid between a fully informed buyer and seller under no compulsion to buy or sell (without giving effect to any discount for a minority interest or any restrictions on transferability or any lack of liquidity of the stock).

L. "Incentive Stock Option" shall mean any Option awarded under this Plan intended to be and designated as an "Incentive Stock Option" within the meaning of Section 422 of the Code.

M. "Incumbent Board" means the individuals who, as of the Effective Date, constitute the Board; provided, however, that any individual who becomes a member of the Board subsequent to the Effective Date whose election, or nomination for election by the Company's shareholders, was approved by a vote of at least a majority of the directors then comprising the Incumbent Board shall be considered as though such individual were a member of the Incumbent Board.

N. "Key Employee" means any person who is an executive officer or other valuable employee of the Company or a Related Person, as determined by the Committee. A Key Employee may, but need not, be an officer or director of the Company or a Related Person.

O. "Non-Qualified Stock Option" shall mean any Option awarded under this Plan that is not an Incentive Stock Option.

P. "Option" means the right to purchase one Share at a prescribed purchase price on the terms specified in the Plan.

Q. "Participant" means a Key Employee or Executive Consultant who is granted Options under the Plan which Options have not expired; provided, however, that any Executive Consultant shall be a Participant for purposes of the Plan solely with respect to grants of Non-Qualified Stock Options and shall be ineligible for Incentive Stock Options.

R. "Person" means any individual or entity, and the heirs, executors, administrators, legal representatives, successors and assigns of such Person as the context may require.

S. "Related Person or Related Persons" means (a) any corporation that is defined as a subsidiary corporation in Section 424(f) of the Code or (b) any corporation that is defined as a parent corporation in

A-2

Table of Contents

Section 424(e) of the Code. An entity shall be deemed a Related Person only for such periods as the requisite ownership relationship is maintained.

T. "Securities Act" means the Securities Act of 1933, as amended, and all rules and regulations promulgated thereunder.

U. "Share" means a share of Common Stock.

V. "Ten Percent Shareholder" shall mean a person owning Common Stock of the Company possessing more than ten percent (10%) of the total combined voting power of all classes of stock of the Company as defined in Section 422 of the Code.

W. "Termination of Consultancy" with respect to an individual means that individual is no longer acting as an Executive Consultant to the Company or a Related Person. In the event an entity shall cease to be a Related Person, there shall be deemed a Termination of Consultancy of any individual who is not otherwise an Executive Consultant of the Company or another Related person at the time the entity ceases to be a Related Person.

X. "Termination of Employment" with respect to an individual means that individual is no longer actively employed by the Company or a Related Person on a full-time basis, irrespective of whether or not such employee is receiving salary continuance pay, is continuing to participate in other employee benefit programs or is otherwise receiving severance type payments. In the event an entity shall cease to be a Related Person, there shall be deemed a Termination of Employment of any individual who is not otherwise an employee of the Company or another Person at the time the entity ceases to be a Related Person. A Termination of Employment shall not include a leave of absence approved for purposes of the Plan by the Committee.

Y. "Termination of Relationship" means a Termination of Consultancy or a Termination of Employment where the individual is no longer a consultant to, or employee of, the Company.

## III.    Effective Date

The Plan became effective on March 28, 2002 (the "Effective Date"), subject to approval by the shareholders of the Company at its next annual general meeting of shareholders.

## IV.    Administration

A. *Duties of the Committee.* The Plan shall be administered by the Committee. The Committee shall have full authority to interpret the Plan and to decide any questions and settle all controversies and disputes that may arise in connection with the Plan; to establish, amend and rescind rules for carrying out the Plan; to administer the Plan, subject to its provisions; to select Participants in, and grant Options under, the Plan; to determine the terms, exercise price and form of exercise payment for each Option granted under the Plan; to determine the consideration to be received by the Company in exchange for the grant of the Options; to determine whether and to what extent Incentive Stock Options and Non-Qualified Stock Options, or any combination thereof, are to be granted hereunder to one or more Key Employees and to determine whether and to what extent Non-Qualified Stock Options are to be granted hereunder to one or more Executive Consultants; to prescribe the form or forms of instruments evidencing Options and any other instruments required under the Plan (which need not be uniform) and to change such forms from time to time; and to make all other determinations and to take all such steps in connection with the Plan and the Options as the Committee, in its sole discretion, deems necessary or desirable. The Committee shall not be bound to any standards of uniformity or similarity of action, interpretation or conduct in the discharge of its duties hereunder, regardless of the apparent similarity of the matters coming before it. Any determination, action or conclusion of the Committee shall be final, conclusive and binding on all parties.

B. *Advisors.* The Committee may employ such legal counsel, consultants and agents as it may deem desirable for the administration of the Plan, and may rely upon any advice or opinion received from any such

Table of Contents

counsel or consultant and any computation received from any such consultant or agent. Expenses incurred by the Committee in the engagement of such counsel, consultant or agent shall be paid by the Company.

C. *Indemnification.* To the maximum extent permitted by applicable law, no officer of the Company or member or former member of the Committee or of the Board shall be liable for any action or determination made in good faith with respect to the Plan or any Option granted under it. To the maximum extent permitted by applicable law, the Certificate of Incorporation and By-Laws of the Company, each such officer and member or former member of the Committee or of the Board shall be indemnified and held harmless by the Company against any cost or expense (including reasonable fees of counsel reasonably acceptable to the Company) or liability (including any sum paid in settlement of a claim with the approval of the Company), and advanced amounts necessary to pay the foregoing at the earliest time and to the fullest extent permitted, arising out of any act or omission to act in connection with the Plan, except to the extent arising out of such officer's, member's or former member's own fraud or bad faith. Such indemnification shall be in addition to any rights of indemnification the officers, members or former members may have as directors under applicable law or under the Certificate of Incorporation or By-Laws of the Company or Related Persons.

D. *Meetings of the Committee.* The Committee shall adopt such rules and regulations as it shall deem appropriate concerning the holding of its meetings and the transaction of its business. Any member of the Committee may be removed from the Committee at any time either with or without cause by resolution adopted by the Board and any vacancy on the Committee may at any time be filled by resolution adopted by the Board. All determinations by the Committee shall be made by the affirmative vote of a majority of its members. Any such determination may be made at a meeting duly called and held at which a majority of the members of the Committee are in attendance in person or through telephonic communication. Any determination set forth in writing and signed by all the members of the Committee shall be as fully effective as if it had been made by a majority vote of the members at a meeting duly called and held.

E. *Determinations.* Each determination, interpretation or other action made or taken pursuant to the provisions of this Plan by the Committee shall be final, conclusive and binding for all purposes and upon all persons, including, without limitation, the Participants, the Company and Related Persons, directors, officers and other employees of the Company and Related Persons, and the respective heirs, executors, administrators, personal representatives and other successors in interest of each of the foregoing.

## V.    Shares; Adjustment Upon Certain Events

A. *Shares to be Delivered; Fractional Shares.* Shares to be issued under the Plan shall be made available, at the sole discretion of the Committee, either from authorized but unissued Shares or from Shares reacquired by the Company and held in treasury. No fractional Shares will be issued or transferred upon the exercise of any Option. In lieu thereof, the Company shall pay a cash adjustment equal to the same fraction of the Fair Market Value of one Share on the date of exercise.

B. *Number of Shares.* Subject to adjustment as provided in this Article V, the maximum aggregate number of Shares that may be issued under the Plan shall be 16,500,000. If Options granted under this Plan are for any reason canceled, or expire or terminate unexercised, the Shares covered by such Options shall again be available for the grant of Options, subject to the foregoing limit.

C. *Adjustments; Recapitalization, etc.* The existence of the Plan and the Options granted hereunder shall not affect in any way the right or power of the Board or the stockholders of the Company to make or authorize any adjustment, recapitalization, reorganization or other change in the Company's capital structure or its business, any merger or consolidation of the Company, any issue of bonds, debentures, preferred or prior preference stocks ahead of or affecting Common Stock, the dissolution or liquidation of the Company or Related Persons, any sale or transfer of all or part of its assets or business or any other corporate act or proceeding. The Committee may make or provide for such adjustments in the maximum number of Shares specified in Article V(B) and VI(A), in the number of Shares covered by outstanding Options granted hereunder, and/or in the Purchase Price (as hereinafter defined) applicable to such Options or such other adjustments in the number and kind of securities or other property received upon the exercise of Options, as the Committee in its sole discretion may determine is equitably required to prevent dilution or enlargement of

A-4

the rights of Participants or to otherwise recognize the effect that otherwise would result from any stock dividend, stock split, combination of shares, recapitalization or other change in the capital structure of the Company, merger, consolidation, spin-off, reorganization, partial or complete liquidation, issuance of rights or warrants to purchase securities or any other corporate transaction or event having an effect similar to any of the foregoing. In the event of a merger or consolidation in which Company is not the surviving entity or in the event of any transaction that results in the acquisition of substantially all of Company's outstanding Common Stock by a single person or entity or by a group of persons and/or entities acting in concert, or in the event of the sale or transfer of all of the Company's assets (the foregoing being referred to as "Acquisition Events"), then the Committee may in its sole discretion terminate all outstanding Options effective as of the consummation of the Acquisition Event by delivering notice of termination to each Participant at least 20 days prior to the date of consummation of the Acquisition Event; provided that, during the period from the date on which such notice of termination is delivered to the consummation of the Acquisition Event, each Participant shall have the right to exercise in full all the Options that are then outstanding (without regard to limitations on exercise otherwise contained in the Options) but contingent on occurrence of the Acquisition Event and, provided that, if the Acquisition Event does not take place within a specified period after giving such notice for any reason whatsoever, the notice and exercise shall be null and void. Except as hereinbefore expressly provided, the issuance by the Company of shares of stock of any class, or securities convertible into shares of stock of any class, for cash, property, labor or services, upon direct sale, upon the exercise of rights or warrants to subscribe therefor or upon conversion of shares or other securities, and in any case whether or not for fair value, shall not affect, and no adjustment by reason thereof shall be made with respect to, the number and class of shares and/or other securities or property subject to Options theretofore granted or the Purchase price (as hereinafter defined).

## VI.   Awards and Terms of Options

A. *Grant.* The Committee may grant Non-Qualified Stock Options or Incentive Stock Options, or any combination thereof to Key Employees and may grant Non-Qualified Stock Options to Executive Consultants, provided, that the maximum number of Shares with respect to which Options may be granted to any Key Employee or Executive Consultant during any calendar year may not exceed 5,000,000. To the extent that the maximum number of authorized Shares with respect to which Options may be granted are not granted in a particular calendar year to a Participant (beginning with the year in which the Participant receives his or her first grant of Options hereunder), such ungranted Options for any year shall increase the maximum number of Shares with respect to which Options may be granted to such Participant in subsequent calendar years during the term of the Plan until used. Any Incentive Stock Option shall be granted within ten years of the date the Plan is adopted by the Board or approved by shareholders, whichever is earlier. To the extent that any Option does not qualify as an Incentive Stock Option (whether because of its provisions or the time or manner of its exercise or otherwise), such Option, or the portion thereof which does not qualify, shall constitute a separate Non-Qualified Stock Option. Each Option shall be evidenced by an Option agreement (the "Option Agreement") in such form as the Committee shall approve from time to time.

B. *Exercise Price.* The purchase price per Share (the "Purchase Price") deliverable upon the exercise of a Non-Qualified Stock Option shall be determined by the Committee and set forth in a Participant's Option Agreement. The Purchase Price deliverable upon the exercise of an Incentive Stock Option shall be determined by the Committee and set forth in a Participant's Option Agreement but shall be not less than 100% of the Fair Market Value of a Share at the time of grant; provided, however, if an Incentive Stock Option is granted to a Ten Percent Shareholder, the Purchase Price shall be no less than 110% of the Fair Market Value of a Share.

C. *Number of Shares.* The Option Agreement shall specify the number of Options granted to the Participant, as determined by the Committee in its sole discretion.

D. *Exercisability.* At the time of grant, the Committee shall specify when and on what terms the Options granted shall be exercisable. In the case of Options not immediately exercisable in full, the Committee may at any time accelerate the time at which all or any part of the Options may be exercised and may waive any other conditions to exercise. No Option shall be exercisable after the expiration of ten years

A-5

Table of Contents

from the date of grant; provided, however, the term of an Incentive Stock Option granted to a Ten Percent Shareholder may not exceed five years. Each Option shall be subject to earlier termination as provided in Article VII below.

E. *Acceleration of Exercisability*. Unless otherwise provided in the Participant's Option Agreement, all options granted and not previously exercisable shall become fully exercisable immediately upon a Change of Control (as defined herein). For this purpose, a "Change of Control" shall be deemed to have occurred upon:

(a) an acquisition by any individual, entity or group (within the meaning of Section 13d-3 or 14d-1 of the Act) of beneficial ownership (within the meaning of Rule 13d-3 promulgated under the Act) of more than 50% of the combined voting power of the then outstanding voting securities of the Company entitled to vote generally in the election of directors, including, but not limited to, by merger, consolidation or similar corporate transaction or by purchase; excluding, however, the following: (x) any acquisition by the Company, Related Persons, Heartland Industrial Partners, L.P., any group of which Heartland Industrial Partners, L.P. is a member, or an affiliate of any of the foregoing, or (y) any acquisition by an employee benefit plan (or related trust) sponsored or maintained by the Company or Related Persons; or

(b) the approval of the stockholders of the Company of (i) a complete liquidation or dissolution of the Company or (ii) the sale or other disposition of more than 80% of the gross assets of the Company and Related Persons on a consolidated basis (determined under generally accepted accounting principles as determined in good faith by the Committee); excluding, however, such a sale or other disposition to a corporation with respect to which, following such sale or other disposition, (x) more than 50% of the combined voting power of the then outstanding voting securities of such corporation entitled to vote generally in the election of directors will be then beneficially owned, directly or indirectly, by the individuals and entities who were the beneficial owners of the outstanding Shares immediately prior to such sale or other disposition, (y) no Person (other than the Company, Related Persons, and any employee benefit plan (or related trust) of the Company or Related Persons or such corporation and any Person beneficially owning, immediately prior to such sale or other disposition, directly or indirectly, 50% or more of the outstanding Shares) will beneficially own, directly or indirectly, 50% or more of the combined voting power of the then outstanding voting securities of such corporation entitled to vote generally in the election of directors and (z) individuals who were members of the Incumbent Board will constitute at least a majority of the members of the board of directors of such corporation.

F. Exercise of Options

1. A Participant may elect to exercise one or more Options by giving written notice to the Committee of such election and of the number of Options such Participant has elected to exercise, accompanied by payment in full of the aggregate Purchase Price for the number of Shares for which the Options are being exercised; provided, however, that, in the case of a notice of exercise delivered to the Committee by facsimile, such payment may be made by delivery of payment to the Committee on the business day next following the date on which such notice of exercise is delivered (such delivery being deemed to have been duly made if the Participant giving such facsimile notice shall have dispatched such payment by a nationally recognized overnight courier service guaranteeing delivery on such next business day, provided such payment is actually received by the Company).

2. Shares purchased pursuant to the exercise of Options shall be paid for as follows:

(a) in cash or by check, bank draft or money order payable to the order of the Company;

(b) if the Shares are traded on a national securities exchange, through the delivery of irrevocable instructions to a broker to deliver promptly to the Company an amount equal to the aggregate Purchase Price; or

(c) on such other terms and conditions as may be acceptable to the Committee (which may include payment in full or in part by the transfer of Shares which have been owned by the Participant

A-6

Table of Contents

for at least 6 months or the surrender of Options owned by Participant) and in accordance with applicable law.

3. Upon receipt of payment, the Company shall deliver to the Participant as soon as practicable a certificate or certificates for the Shares then purchased.

G. *Non-Competition and Other Provisions*. In consideration of the grant of Options, by accepting the grant of Options the Participant agrees during employment and, in the event any Options vest, for a period ending one year following the date of the Participant's Termination of Employment, not to engage in any Competitive Activity, except to the extent consented to by the Committee in writing. Each Participant by accepting a grant of Options hereunder acknowledges that the Company or a Related Person will suffer irreparable harm in the event such Participant engages in any Competitive Activity during this period, and agrees that in addition to its remedies at law, the Company and a Related Person shall be entitled to injunctive relief as a consequence of a violation or threatened violation of this covenant. Notwithstanding the foregoing, nothing in this Plan shall prohibit or penalize ownership by a Participant of the shares of a business that is registered under Section 12 of the Act and constitutes, together with all such shares owned by any immediate family member or affiliate of, or person acting in concert with, such Participant, less than 2% of the outstanding registered shares of such business. The Committee will have the discretion to impose in a Participant's Option Agreement such other conditions, limitations and restrictions as it determines are appropriate in its sole discretion, including any waivers of rights which a Participant may have.

H. *Incentive Stock Option Limitations*. To the extent that the aggregate Fair Market Value (determined as of the time of grant) of the Common Stock with respect to which Incentive Stock Options are exercisable for the first time by the Participant during any calendar year under the Plan and/or any other stock option plan of the Company or any subsidiary or parent corporation (within the meaning of Section 424 of the Code) exceeds $100,000, such Options shall be treated as Options which are not Incentive Stock Options.

To the extent permitted under Section 422 of the Code, or the applicable regulations thereunder or any applicable Internal Revenue Service pronouncement, if (i) a Participant's employment with the Company or Related Person is terminated by reason of death, Disability, retirement or termination without Cause, and (ii) the portion of any Incentive Stock Option that would be exercisable during the post-termination period, specified under Article VII but for the $100,000 limitation currently contained in Section 422(d) of the Code, is greater than the portion of such Stock Option that is immediately exercisable as an "incentive stock option" during such post-termination period under Section 422, such excess shall be treated as a Non-Qualified Stock Option. If the exercise of an Incentive Stock Option is accelerated for any reason, any portion of such Option that is not exercisable as an Incentive Stock Option by reason of the $100,000 limitation contained in Section 422(d) of the Code shall be treated as a Non-Qualified Stock Option.

I. *Modification or Exchange of Options*. Within the limitations of the Plan and subject to Section X.B hereof, the Committee may modify, extend or assume outstanding options or may accept the cancellation of outstanding options (whether granted by the Company under this Plan or another plan or by another issuer) in return for the grant of new Options for the same or a different number of Shares and at the same or a different Purchase Price.

## VII.   Effect of Termination of Relationship

A. *Death, Disability, Retirement, etc.* Except as otherwise provided in the Participant's Option Agreement, upon Termination of Relationship, all outstanding Options then exercisable and not exercised by the Participant prior to such Termination of Relationship (and any Options not previously exercisable but made exercisable by the Committee at or after the Termination of Relationship) shall remain exercisable by the Participant to the extent not exercised for the following time periods, or, if earlier, the prior expiration of the Option in accordance with the terms of the Plan and grant:

1. In the event of the Participant's death or Disability, such Options shall remain exercisable by the Participant (or by the Participant's estate or by the person given authority to exercise such Options by the Participant's will or by operation of law) for a period of one year from the date of the Participant's death

A-7

Table of Contents

or Disability, provided that the Committee, in its sole discretion, may at any time extend such time period.

2. In the event the Participant retires from employment at or after age 65 (or, with the consent of the Committee or under an early retirement policy of the Company or a Related Person, before age 65), or if the Participant's employment is terminated by the Company or a Related Person without Cause, such Options shall remain exercisable for 90 days from the date of the Participant's Termination of Employment, provided that the Committee, in its sole discretion, may at any time extend such time period.

B. *Cause.* Except as other provided in the Participant's Option Agreement, upon the Termination of Relationship of a Participant for Cause, or if the Company or a Related Person obtains or discovers information after Termination of Relationship that such Participant had engaged in conduct that would have justified a Termination of Relationship for Cause during employment or consultancy, all outstanding Options of such Participant shall immediately be canceled.

C. *Other Termination.* Except as other provided in the Participant's Option Agreement, in the event of Termination of Relationship for any reason other than as provided in Article VII(A) or VII(B), all outstanding Options not exercised by the Participant prior to such Termination of Relationship shall remain exercisable (to the extent exercisable by such Participant immediately before such termination) for a period of 30 days after such termination, provided that the Committee, in its sole discretion, may at any time extend such time period.

D. *Cancellation of Options.* Except as otherwise provided in Article VI(E) or as otherwise provided in the Participant's Option Agreement, no Options that were not exercisable during the period of employment or consultancy shall thereafter become exercisable upon a Termination of Relationship for any reason or no reason whatsoever, and such Options shall terminate and become null and void upon a Termination of Relationship, unless the Committee determines in its sole discretion that such Options shall be exercisable.

## VIII.    Transferability of Options

Except as provided in this Article VIII, each Option granted hereunder shall by its terms not be assignable or transferable other than by will or the laws of descent and distribution and may be exercised, during the Participant's lifetime, only by the Participant. A Non-Qualified Stock Option may be transferred to any family member (as hereinafter defined) of the Participant for or without consideration. For purposes of this Article VIII, "family member" shall mean any child, stepchild, grandchild, parent, stepparent, grandparent, spouse, former spouse, sibling, niece, nephew, mother-in-law, father-in-law, son-in-law, daughter-in-law, brother-in-law, or sister-in-law, including adoptive relationships, any person sharing the Participant's household (other than a tenant or employee), a trust in which these persons have more than fifty percent of the beneficial interest, a foundation in which these persons (or the Participant) control the management of assets, and any other entity in which these persons (or the Participant) own more than fifty percent of the voting interests.

## IX.    Rights as a Stockholder

A Participant (or a permitted transferee of an Option) shall have no rights as a stockholder with respect to any Shares covered by such Participant's Option until such Participant (or permitted transferee) shall have become the holder of record of such Shares, and no adjustments shall be made for dividends in cash or other property or distributions or other rights in respect to any such Shares, except as otherwise specifically provided in this Plan.

## X.    Termination, Amendment and Modification

A. *General Amendments.* The Committee may at any time, and from time to time, amend, in whole or in part, any or all of the provisions of the Plan (including any amendment deemed necessary to ensure that the Company may comply with any regulatory requirement referred to in Article XII), or suspend or terminate it,

A-8

Table of Contents

in whole or in part, retroactively or otherwise; provided, however, that, unless otherwise required by law, the rights of a Participant with respect to Options granted prior to such amendment, suspension or termination, may not be materially impaired without the consent of such Participant and, provided, further, without the approval of the stockholders of the Company entitled to vote, no amendment may be made which would require the approval of the stockholders of the Company for listing of the Shares issuable upon exercise of the Options on the New York Stock Exchange.

B. *Option Amendments.* The Committee may amend the terms of any Option granted, prospectively or retroactively, but no such amendment or other action by the Committee shall materially impair the rights of any Participant without the Participant's consent.

## XI.    Use of Proceeds

The proceeds of the sale of Shares subject to Options under the Plan are to be added to the general funds of Company and used for its general corporate purposes as the Board shall determine.

## XII.    General Provisions

A. *Right to Terminate Employment.* Neither the adoption of the Plan nor the grant of Options shall impose any obligation on the Company or Related Persons to continue the employment of any Participant, nor shall it impose any obligation on the part of any Participant to remain in the employ of the Company or Related Persons.

B. *Purchase for Investment.* If the Board or the Committee determines that the law so requires, the holder of an Option granted hereunder shall, upon any exercise or conversion thereof, execute and deliver to the Company a written statement, in form satisfactory to the Company, representing and warranting that such Participant is purchasing or accepting the Shares then acquired for such Participant's own account and not with a view to the resale or distribution thereof, that any subsequent offer for sale or sale of any such Shares shall be made either pursuant to (i) a Registration Statement on an appropriate form under the Securities Act, which Registration Statement shall have become effective and shall be current with respect to the Shares being offered and sold, or (ii) a specific exemption from the registration requirements of the Securities Act, and that in claiming such exemption the holder will, prior to any offer for sale or sale of such Shares, obtain a favorable written option, satisfactory in form and substance to the Company, from counsel acceptable to the Company as to the availability of such exception.

C. *Trusts, etc.* Nothing contained in the Plan and no action taken pursuant to the Plan (including, without limitation, the grant of any Option thereunder) shall create or be construed to create a trust of any kind, or a fiduciary relationship, between Company and any Participant or the executor, administrator or other personal representative or designated beneficiary of such Participant, or any other persons. Any reserves that may be established by Company in connection with the Plan shall continue to be part of the general funds of Company, and no individual or entity other than Company shall have any interest in such funds until paid to a Participant. If and to the extent that any Participant or such Participant's executor, administrator or other personal representative, as the case may be, acquires a right to receive any payment from Company pursuant to the Plan, such right shall be no greater than the right of an unsecured general creditor of Company.

D. *Notices.* Any notice to the Company required by or in respect of this Plan will be addressed to the Company at 250 Stephenson Highway, Troy, MI 48083, Attention: Sr. Vice President, Human Resources, or such other place of business as shall become the Company's principal executive offices from time to time, or sent to the Company by facsimile to (248) 824-1613, Attention: Sr. Vice President, Human Resources, or to such other facsimile number as the Company shall notify each Participant. Each Participant shall be responsible for furnishing the Committee with the current and proper address for the mailing to such Participant of notices and the delivery to such Participant of agreements, Shares and payments. Any such notice to the Participant will, if the Company has received notice that the Participant is then deceased, be given to the Participant's executor, administrator or personal representative if such representative has previously informed the Company of his status and address (and has provided such reasonable substantiating information as the Company may request) by written notice under this Section. Any notice required by or in

A-9

Table of Contents

respect of this Plan will be deemed to have been duly given when delivered in person or when dispatched by telegram or, in the case of notice to the Company, by facsimile as described above, or one business day after having been dispatched by a nationally recognized overnight courier service or three business days after having been mailed by United States registered or certified mail, return receipt requested, postage prepaid. The Company assumes no responsibility or obligation to deliver any item mailed to such address that is returned as undeliverable to the addressee and any further mailings will be suspended until the Participant furnishes the proper address.

E. *Severability of Provisions.* If any provisions of the Plan shall be held invalid or unenforceable, such invalidity or unenforceability shall not affect any other provisions of the Plan, and the Plan shall be construed and enforced as if such provisions had not been included.

F. *Payment to Minors, etc.* Any benefit payable to or for the benefit of a minor, an incompetent person or other person incapable of receipt thereof shall be deemed paid when paid to such person's guardian or to the party providing or reasonably appearing to provide for the care of such person, and such payment shall fully discharge the Committee, the Company and their employees, agents and representatives with respect thereto.

G. *Headings and Captions.* The headings and captions herein are provided for reference and convenience only. They shall not be considered part of the Plan and shall not be employed in the construction of the Plan.

H. *Controlling Law.* The Plan shall be construed and enforced according to the laws of the State of Delaware.

I. *Section 162(m) Deduction Limitation.* The Committee at any time may in its sole discretion limit the number of Options that can be exercised in any taxable year of the Company, to the extent necessary to prevent the application of Section 162(m) of the Code (or any similar or successor provision), provided that the Committee may not postpone the earliest date on which Options can be exercised beyond the last day of the stated term of such Options.

J. *Section 16(b) of the Act.* All elections and transactions under the Plan by persons subject to Section 16 of the Exchange Act involving shares of Common Stock are intended to comply with all exemptive conditions under Rule 16b-3. The Committee may establish and adopt written administrative guidelines, designed to facilitate compliance with Section 16(b) of the Act, as it may deem necessary or proper for the administration and operation of the Plan and the transaction of business thereunder.

K. *Lock-Up.* The Committee may, in its discretion, provide in an agreement evidencing an Option granted hereunder for restrictions on transfer of Shares obtained on exercise of an Option.

## XIII. Issuance of Stock Certificates; Legends; Payment of Expenses

A. *Stock Certificates.* Upon any exercise of an Option and payment of the exercise price as provided in such Option, a certificate or certificates for the Shares as to which such Option has been exercised shall be issued by Company in the name of the person or persons exercising such Option and shall be delivered to or upon the order of such person or persons.

B. *Legends.* Certificates for Shares issued upon exercise of an Option shall bear such legend or legends as the Committee, in its sole discretion, determines to be necessary or appropriate to prevent a violation of, or to perfect an exemption from, the registration requirements of the Securities Act or to implement the provisions of any agreements between Company and the Participant with respect to such Shares.

C. *Payment of Expenses.* The Company shall pay all issue or transfer taxes with respect to the issuance or transfer of Shares, as well as all fees and expenses necessarily incurred by the Company in connection with such issuance or transfer and with the administration of the Plan.

Table of Contents

**XIV.    Listing of Shares and Related Matters**

If at any time the Board or the Committee shall determine in its sole discretion that the listing, registration or qualification of the Shares covered by the Plan upon any national securities exchange or under any state or federal law, or the consent or approval of any governmental regulatory body, is necessary or desirable as a condition of, or in connection with, the grant of Options or the award or sale of Shares under the Plan, no Option grant shall be effective and no Shares will be delivered, as the case may be, unless and until such listing, registration, qualification, consent or approval shall have been effected or obtained, or otherwise provided for, free of any conditions not acceptable to the Board.

**XV.    Withholding Taxes**

The Company shall have the right to require prior to the issuance or delivery of any shares of Common Stock payment by the Participant of any Federal, state or local taxes required by law to be withheld.

The Committee may permit any such withholding obligation to be satisfied by reducing the number of shares of Common Stock otherwise deliverable. A person required to file reports under Section 16(a) of the Exchange Act with respect to securities of the Company may elect to have a sufficient number of shares of Common stock withheld to fulfill such tax obligations (hereinafter a "Withholding Election") only if the election complies with such conditions as are necessary to prevent the withholding of such shares from being subject to Section 16(b) of the Exchange Act. Any fraction of a share of Common Stock required to satisfy such tax obligations shall be disregarded and the amount due shall be paid instead in cash by the Participant.

A-11

Table of Contents

APPENDIX B

**PROPOSED CERTIFICATE OF AMENDMENT**
**OF**
**AMENDED AND RESTATED CERTIFICATE OF**
**INCORPORATION**
**OF**
**COLLINS & AIKMAN CORPORATION**

Collins & Aikman Corporation, a corporation organized and existing under and by virtue of the General Corporation Law of the State of Delaware ("the Corporation"), DOES HEREBY CERTIFY:

FIRST: That at a meeting of the directors of the Corporation, a resolution was duly adopted setting forth a proposed amendment to the Restated Certificate of Incorporation of the Corporation, as previously amended, (the "Certificate") to effect a one (1) for two and one-half (2.5) reverse split of all of the Corporation's issued common stock, par value $0.01 per share (the "Common Stock") and such amendment was declared to be advisable, and such amendment was submitted to the stockholders of the Corporation for consideration at their annual meeting.

RESOLVED, that a new paragraph shall be added to Article FOURTH, clause (a) at the end of the such clause (a) consisting of the following text:

"Effective as of the close of business on the date of filing of this Certificate of Amendment to the Restated Certificate of Incorporation pursuant to the Delaware General Corporation Law (the "Effective Time"), each share of the Corporation's common stock, par value $0.01 per share (the "Old Common Stock"), issued and outstanding immediately prior to the Effective Time, will be automatically reclassified into two-fifths ( 2/5) of a share of common stock, par value $0.01 per share, of the Corporation (the "New Common Stock"). Each stockholder who, immediately prior to the Effective Time, owns a number of shares of Old Common Stock which is not evenly divisible by 2.5 shall, with respect to such fractional interest, be entitled, at his or her election, to receive either (a) cash in lieu of fractions of shares of New Common Stock from the disposition of such fractional interest as provided below or (b) an additional fraction of a share such that the number of such holder's shares of New Common Stock shall be rounded upward to the nearest whole share. Share interests due to rounding are given solely to save expense and inconvenience of issuing fractional shares and do not represent separately bargained for consideration. The Corporation shall arrange for the disposition of fractional interests by those otherwise entitled thereto but electing to receive cash by causing the transfer agent for the Corporation's common stock to (i) aggregate and sell such fractional interests and (ii) allocate and distribute the net proceeds received from such sale among the holders of the fractional interests as their respective interests appear on the record books of the Corporation. Each certificate that theretofore represented shares of Old Common Stock shall thereafter represent that number of shares of New Common Stock into which the shares of Old Common Stock represented by such certificate shall have been reclassified; provided, that each person holding of record a stock certificate or certificates that represented shares of Old Common Stock shall receive, upon surrender of such certificate or certificates, a new certificate or certificates evidencing and representing the number of shares of New Common Stock to which such person is entitled under the foregoing reclassification."

SECOND: That, a meeting of the stockholders of the Corporation was duly called and held, upon notice in accordance with Section 222 of the General Corporation Law of the State of Delaware at which meeting the necessary number of shares as required by the General Corporation Law of the State of Delaware voted in favor of the amendment.

THIRD: That such amendment of the Certificate was duly adopted in accordance with the provisions of Section 242 of the General Corporation Law of the State of Delaware.

Table of Contents

IN WITNESS WHEREOF, the Corporation has caused this certificate to duly signed and attested as of this          day of
, 2002.

COLLINS & AIKMAN CORPORATION

By: _____

Name: Ronald T. Lindsay
Title:      Senior Vice President, General Counsel and Secretary

ATTEST:

By: _____

Name:
Title:

B-2

Table of Contents

APPENDIX C

**PROXY**

## COLLINS & AIKMAN CORPORATION

This Proxy is solicited on behalf of the Board of Directors for the Annual Meeting of Stockholders to be held on May 16, 2002 and any adjournment or postponement thereof.

The undersigned hereby appoints Thomas E. Evans and Ronald T. Lindsay (the "Agents") as proxies (each with the power to act alone and to appoint a substitute) and hereby authorizes each of them to represent and to vote, as designated hereon, all the shares of Common Stock, par value $0.01 per share, of Collins & Aikman Corporation (the "Company") held of record by the undersigned at the close of business on April 2, 2002 at the Annual Meeting of Stockholders of the Company to be held on May 16, 2002 at 11:00 a.m., Eastern Daylight Savings Time, and at any adjournment or postponement thereof on the proposals referred to below.

This Proxy, when executed, will be voted in accordance with the specifications hereon. In the absence of such specifications, this Proxy will be voted FOR Proposals I (and if any nominee shall be unavailable to serve as a director, this proxy will be voted for the election of such other person or persons as the Nominating Committee of the Board of Directors or the Company may select), II and III.

Management recommends a vote FOR Proposals I, II and III.

The undersigned hereby revokes any proxies heretofore given and directs the Agents to vote as follows:

1. *Proposal I:* Election of the following nominees as Directors: Warren B. Rudman, Samuel Valenti, III, David C. Dauch, Marshall A. Cohen and Cynthia L. Hess.

|  FOR all nominees<br>(except as indicated)<br>☐  |  WITHHOLD<br>AUTHORITY<br>for all nominees<br>☐  |  If you wish to withhold (for authority to vote for any nominee(s),<br>write his (their) name(s) on the lines below.<br>————————————————————<br>————————————————————  |

2. *Proposal II:* Approval of the Company's 2002 Employee Stock Option Plan.

|  FOR<br>☐  |  AGAINST<br>☐  |  ABSTAIN<br>☐  |

*(Continued and to be signed and dated on reverse side)*

3. *Proposal III:* Approval of the one-for-two and one-half reverse stock split (to be effected pursuant to a Certificate of Amendment of the Restated Certificate of Incorporation in substantially the form attached hereto as Appendix B).

|  FOR<br>☐  |  AGAINST<br>☐  |  ABSTAIN<br>☐  |

In their discretion, the Agents are authorized to vote on any other matters as may properly come before the meeting or any adjournment or postponement thereof.

The undersigned hereby ratifies and confirms all that these Agents may do by virtue hereof and hereby acknowledges receipt of the notice of Annual Meeting of Stockholders and the Proxy Statement.

Dated: _____, 2002

Signature(s)*

_____

\* Please sign your name(s) exactly as if (they) appear(s) opposite. When shares are held by joint owners, all should sign. When signing as attorney, executor, administrator, trustee or guardian, please give full title as such. If a corporation, please sign in full corporate name by president or other authorized officer and indicate title. If a partnership, please sign in partnership name by authorized person and indicate title.

Please mark, sign, date and return this Proxy Card promptly using the enclosed envelope.          Votes should be indicated (x) in black or blue ink.

C-1

# EXHIBIT D

# PART 1

**TO THE DECLARATION OF VERNON R. PROCTOR
IN SUPPORT OF DEFENDANT DAVID R. COSGROVE'S
MOTION TO DISMISS THE COMPLAINT**

DEF 14A 1 x88116def14a.htm DEFINITIVE PROXY STATEMENT

Table of Contents

| OMB APPROVAL | |
|---|---|
| OMB Number: | 3235-0059 |
| Expires: | August 31, 2004 |
| Estimated average burden hours per response | 14.73 |

# UNITED STATES
## SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

### SCHEDULE 14A

Proxy Statement Pursuant to Section 14(a) of the Securities
Exchange Act of 1934 (Amendment No.     )

Filed by the Registrant ☒

Filed by a Party other than the Registrant ☐

Check the appropriate box:

☐ Preliminary Proxy Statement

☐ **Confidential, for Use of the Commission Only (as permitted by Rule 14a-6(e)(2))**

☒ Definitive Proxy Statement

☐ Definitive Additional Materials

☐ Soliciting Material Pursuant to §240.14a-12

Collins and Aikman Corporation

(Name of Registrant as Specified In Its Charter)

(Name of Person(s) Filing Proxy Statement, if other than the Registrant)

Payment of Filing Fee (Check the appropriate box):

☒ No fee required.

☐ Fee computed on table below per Exchange Act Rules 14a-6(i)(1) and 0-11.

1) Title of each class of securities to which transaction applies:

2) Aggregate number of securities to which transaction applies:

3) Per unit price or other underlying value of transaction computed pursuant to Exchange Act Rule 0-11 (set forth the amount on which the filing fee is calculated and state how it was determined):

4) Proposed maximum aggregate value of transaction:

5) Total fee paid:

☐  Fee paid previously with preliminary materials.

☐  Check box if any part of the fee is offset as provided by Exchange Act Rule 0-11(a)(2) and identify the filing for which the offsetting fee was paid previously. Identify the previous filing by registration statement number, or the Form or Schedule and the date of its filing.

1) Amount Previously Paid:

2) Form, Schedule or Registration Statement No.:

3) Filing Party:

4) Date Filed:

SEC 1913 (02-02)    **Persons who potentially are to respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB control number.**

Table of Contents



Collins & Aikman Corporation
250 Stephenson Highway
Troy, Michigan 48083

September 30, 2004

To Our Stockholders:

You are cordially invited to attend the annual meeting of stockholders of Collins & Aikman Corporation to be held at our offices located at 250 Stephenson Highway, Troy, Michigan 48083, on October 13, 2004 at 10:30 a.m., Eastern Daylight Savings Time.

Whether or not you plan to attend, submitting your proxy by completing, signing and mailing your proxy card will both assure your shares are represented at the meeting and minimize the cost of proxy solicitation. Thank you for your continued support of Collins & Aikman.

Sincerely,

David A. Stockman
*Chairman
and Chief Executive Officer*

Table of Contents



## NOTICE OF ANNUAL MEETING OF STOCKHOLDERS

Date: Wednesday, October 13, 2004
Time: 10:30 AM Eastern Daylight Time
Location: Collins & Aikman Corporation
World Headquarters
250 Stephenson Highway
Troy, Michigan

To Our Stockholders,

We invite you to attend our 2004 Annual Meeting of Stockholders at our World Headquarters. At this meeting, you and the other stockholders will be able to vote for the following purpose, together with any other business that may properly come before the meeting:

*Elect four directors to the Board of Directors for three-year terms.* The Board has nominated for re-election Anthony Hardwick, Timothy D. Leuliette, W. Gerald McConnell and J. Michael Stepp, all current directors.

You may vote on this proposal in person or by proxy. If you cannot attend the meeting, we urge you to vote by proxy, so that your shares will be represented and voted at the meeting in accordance with your instructions. (See the attached proxy statement for details on voting by proxy.) Of course, if you attend the meeting, you may withdraw your proxy and vote your shares. Only stockholders of record at the close of business on August 30, 2004, will be entitled to vote at the meeting or any adjournment thereof.

By order of the Board of Directors,

Jay B. Knoll
*Secretary*

Troy, Michigan
September 30, 2004

---

## CONTENTS

INTRODUCTION                                      1
VOTING                                            1
  How to Vote Your Shares              1
  How to Revoke Your Proxy             2
  Required Vote                         2
  Where to Find Voting Results          2
PROPOSAL                                          3
  Election of Directors                 3
  Other Matters                         4
BOARD OF DIRECTORS                                4

Directors Continuing in Office ... 4
Meetings and Committees ... 5
Director Compensation ... 7
Compensation Committee Interlocks and Insider Participation ... 7
Section 16(a) Beneficial Ownership Reporting Compliance ... 7
Director Nomination Process ... 7
Certain Litigation ... 8
INDEPENDENT AUDITORS ... 8
Fees ... 8
Pre-Approval Policy ... 9
REPORT OF THE AUDIT COMMITTEE ... 9
CERTAIN RELATIONSHIPS AND RELATED
  TRANSACTIONS ... 11
Security Ownership of Management and Principal Stockholders ... 11
Other Relationships and Transactions ... 12
EXECUTIVE COMPENSATION ... 18
Executive Officers ... 18
Summary Compensation ... 19
Option Grants in Last Fiscal Year ... 21
Aggregate Option Exercises in Last Fiscal Year and Fiscal Year
  End Option Values ... 21
Option Cancellation/ Repricing Program ... 21
2004 Option Exchange Program ... 22
10-Year Option/ SAR Repricing Table ... 22
Defined Benefit or Actuarial Plan Disclosure ... 23
Pension Plan Table ... 25
Employment Agreements ... 26
COMPENSATION COMMITTEE REPORT ON EXECUTIVE
  COMPENSATION ... 28
ADDITIONAL INFORMATION ... 30
Annual Report ... 30
Code of Business Conduct ... 31
Stockholder Proposals and Nominations ... 31
Stockholder Communications with the Board of Directors ... 31
Appendix A — Performance Graph ... A-1
Appendix B — Collins & Aikman Director Independence
  Guidelines ... B-1

i

Table of Contents

# COLLINS & AIKMAN CORPORATION

**250 Stephenson Highway**
**Troy, Michigan 48083**

---

## PROXY STATEMENT

---

September 30, 2004

## INTRODUCTION

The Board of Directors is soliciting your proxy to encourage your participation in the voting at the Annual Meeting. You are invited to attend the Annual Meeting and vote your shares directly. However, even if you do not attend, you may vote by proxy, which allows you to direct another person to vote your shares at the meeting on your behalf.

There are two parts to this solicitation: the proxy card and this proxy statement. The proxy card is a means by which you may authorize another person to vote your shares in accordance with your instructions. This proxy statement provides you with a variety of information on the proposal and other matters that you may find useful in determining how to vote.

Collins & Aikman Corporation ("Collins & Aikman" or the "Company") will bear the cost of this solicitation, including the cost of preparing and mailing this proxy statement. In addition to the solicitation of the proxies by use of the mails, some of our directors, officers and employees, without extra remuneration, may solicit proxies personally, or by telephone or otherwise. The Company may retain a proxy solicitation firm for assistance in connection with the solicitation of proxies for the Annual Meeting, should the Board of Directors deem such action prudent. The Company will also make arrangements with brokerage houses and other custodians, nominees and fiduciaries to forward proxies and proxy material to their principals, and will reimburse them for their expenses in forwarding soliciting materials.

This proxy statement and accompanying proxy are being distributed on or about September 30, 2004.

## VOTING

You are entitled to one vote at the Annual Meeting for each share of the Company's common stock that you owned of record at the close of business on August 30, 2004.

On August 30, 2004, we had issued and outstanding 83,630,087 shares of common stock and there were approximately 120 stockholders of record. A list of the stockholders of record entitled to vote at the Annual Meeting will be available for review by any stockholder, for any purpose related to the meeting, between 9:00 a.m. and 5:00 p.m. at the principal offices of the Company, located at 250 Stephenson Highway, Troy, Michigan 48083, for ten days before the Annual Meeting.

### How to Vote Your Shares

You may vote your shares at the Annual Meeting in person or by proxy. To vote in person, you must attend the Annual Meeting, and obtain and submit a ballot, which will be provided at the meeting. To vote by proxy, you must complete and mail the enclosed proxy card.

By completing and submitting your proxy, you will direct the designated persons (known as "proxies") to vote your shares at the Annual Meeting in accordance with your instructions. The Board has appointed J. Michael Stepp and Jay B. Knoll to serve as the proxies for the Annual Meeting.

Table of Contents

Your proxy will be valid only if it is received before the polls are closed at the Annual Meeting. If you do not provide voting instructions with your proxy, then the designated proxies will vote your shares for the election of the nominated directors. If any nominee for election to the Board of Directors is unable to serve, which is not anticipated, or if any other matters properly come before the meeting, then the designated proxies will vote your shares in accordance with their best judgment.

## How to Revoke Your Proxy

You may revoke your proxy at any time *before it is exercised* by any of the following means:

• Notifying the Company's Secretary in writing.

• Submitting a later dated proxy.

• Attending the Annual Meeting and voting. Your attendance at the Annual Meeting will not by itself revoke a proxy; you must also vote your shares.

## Required Vote

The Company's bylaws require that a majority of the Company's common stock be represented at the Annual Meeting, whether in person or by proxy, for a quorum which is needed to transact any business.

*Election of Directors.* The affirmative vote of a plurality of the votes cast at the meeting is required for the election of directors. A properly executed proxy marked "Withhold Authority" with respect to the election of one or more directors will not be voted with respect to the director or directors indicated, although it will be counted for purposes of determining whether there is a quorum.

*Other Proposals.* For proposals other than the election of directors, the affirmative vote of the holders of a majority of the shares represented in person or by proxy and entitled to vote on the proposal will be required for approval. A properly executed proxy marked "Abstain" with respect to any such matter will not be voted, although it will be counted for purposes of determining whether there is a quorum. Accordingly, an abstention will have the effect of a negative vote.

If you hold your shares in "street name" through a broker or other nominee and you do not give voting instructions, then your broker or other nominee may exercise voting discretion only with respect to matters considered to be "routine" by the New York Stock Exchange, such as the election of directors. On non-routine matters, the brokers or other nominees cannot vote your shares absent voting instructions from the beneficial holder, resulting in so-called "broker non-votes." Broker non-votes are not deemed to be votes cast, and as a result have no effect on the outcome of any matters presented, but will be counted in determining whether there is a quorum.

As of August 30, 2004, Heartland Industrial Partners LLC, Charles E. Becker and Elkin McCallum and their affiliates beneficially own or have the right to vote in the aggregate approximately 55% of the Company's outstanding common stock. (For a description of these stockholdings and relationships, see "Certain Relationships and Related Transactions," page 11.) We expect that these investors will vote all of their shares in favor of of the nominated directors. Accordingly, assuming that these investors vote as expected, the election of the nominated directors is assured.

## Where to Find Voting Results

We will publish the voting results in our 2004 Form 10-K, which we plan to file with the Securities and Exchange Commission in the first quarter of 2005.

Table of Contents

# PROPOSAL

## Election Of Directors

The proposal on the agenda for the Annual Meeting will be electing four directors to serve as Class I directors for a three-year term beginning at this Annual Meeting and expiring at the 2007 Annual Meeting of Stockholders. (For a description of the three classes of directors, see the "Board of Directors," page 4.) The nominees receiving the greatest number of votes cast will be elected.

We expect each nominee for election as a director to be able to serve if elected. If any nominee is not able to serve, proxies will be voted in favor of the remainder of those nominated and may be voted for substitute nominees, unless the Board of Directors chooses to reduce the number of directors serving on the Board.

The Board of Directors has nominated Anthony Hardwick, Timothy D. Leuliette, W. Gerald McConnell and J. Michael Stepp for re-election as Class I directors. The following is a brief biography of each nominee. You will find information on their holdings of the Company's common stock in "Certain Relationships and Related Transactions," page 11.

*Anthony Hardwick* has been a director of the Company since September 2004. Mr. Hardwick is currently Executive Vice President and Chief Financial Officer of Easley Custom Plastics, Inc., a supplier of injection molded plastic parts to the industrial, building and construction, transportation, and power tool markets. Easley Custom Plastics is a wholly-owned subsidiary of CH Industries, Inc., of which Mr. Hardwick is co-owned and co-founder. Previously, he was senior managing director of Source Companies, LLC, a Pittsburgh-based investment banking and business consulting firm, from 2001 to 2004, and Chief Financial Officer of AstenJohnson, Inc., a privately held producer of paper machine clothing sold to paper manufacturers on a global basis, from 1996 to 2001. Mr. Hardwick is a director of Consolidated Systems, Inc., a fabricator of metal decking and support systems, and Curo Source, Inc., a company which recovers and stores cord blood stem cells. Mr. Hardwick was employed by the Company from 1979 to 1996, where he served as Vice President, Administration and Control of the Company's Automotive Group and then Vice President and Controller. He is a certified public accountant. Mr. Hardwick is 59 years old.

*Timothy D. Leuliette* has been a director of the Company since February 2001 and has been a director of Metaldyne Corp. since November 2000 and a director of TriMas Corp. since 2002. He is currently Chairman, President and Chief Executive Officer of Metaldyne. He is a senior managing director and one of the co-founders of Heartland. Prior to joining Heartland, Mr. Leuliette joined the Penske Corporation as President and Chief Operating Officer in 1996. From 1991 to 1996, Mr. Leuliette served as President and Chief Executive Officer of ITT Automotive, an automotive company. He also serves on a number of corporate and charitable boards and served as Chairman for The Federal Reserve of Chicago, Detroit Branch. Mr. Leuliette is 54 years old.

*W. Gerald McConnell* has served as director of the Company since February 2001 and has been a senior managing director of Heartland since its founding. Mr. McConnell was formerly a managing director at Deutsche Bank Alex. Brown (formerly Bankers Trust Co.) from 1997 until 1999. From 1991 until 1999, Mr. McConnell specialized in leveraged finance and financial sponsor coverage at Deutsche Bank Alex. Brown. Mr. McConnell also serves on the board of directors of Springs Industries, Inc. and TriMas. Mr. McConnell is 40 years old.

*J. Michael Stepp* has been a director of the Company since February 2001. Mr. Stepp is currently Vice Chairman of the Board of Directors and Chief Financial Officer. He was previously Executive Vice President and Chief Financial Officer from May 2002 through July 2002 (after serving as interim Chief Financial Officer from January 2002 through April 2002) and from April 1995 through December 1999. Mr. Stepp was a consultant to the Company and was an independent mergers and acquisitions advisor from January 2000 through February 2001. Since March 2001, Mr. Stepp has been a senior managing director of Heartland but has not been an employee of Heartland since April 2002. He is also a director of Collins & Aikman Products Co. ("Products"), the Company's wholly-owned operating subsidiary. Mr. Stepp is 60 years old.

3

Table of Contents

**Other Matters**

Neither the Company nor its directors intend to bring before the Annual Meeting any matters other than the election of the three directors. Also, they have no present knowledge that any other matters will be presented by others for action at the meeting.

## BOARD OF DIRECTORS

The Board of Directors consists of eleven directors divided into three classes (Class I, Class II and Class III) serving staggered three-year terms. The Class I directors are up for election at the Annual Meeting as described under "Proposal-Election of Directors" (page 3), and the nominees for election are all currently Class I directors.

**Directors Continuing in Office**

The Class II and III directors will continue in office following this Annual Meeting, and their terms will expire in 2005 (Class II) or 2006 (Class III). The following are brief biographies of each of these directors. You will find information on their holdings of the Company's common stock in "Certain Relationships and Related Transactions," page 11.

*David A. Stockman* has been a director of the Company since February 2001, and his current term as a Class III director expires in 2006. He has also been Chairman of the Board since August 2002 and Chief Executive Officer since August 2003. Mr. Stockman is also a director of Metaldyne, Springs and TriMas. He is a senior managing director and the founder of Heartland. Prior to founding Heartland, he was a senior managing director of The Blackstone Group L.P. and had been with Blackstone since 1988. Mr. Stockman also served as the director of the Office of Management and Budget in the Reagan Administration, and represented Southern Michigan in the U.S. House of Representatives from 1976 to 1981. Mr. Stockman is 57 years old.

*Robert C. Clark* has been a director of the Company since October 1994, and his current term as a Class III director expires in 2006. Mr. Clark is a Harvard University Distinguished Service Professor, Harvard Law School. Mr. Clark joined Harvard Law School in 1979 after four years at Yale Law School, where he was a tenured professor, and served as Dean from 1989 to 2003. Mr. Clark is a corporate law specialist and author of numerous texts and legal articles. Prior to his association with academia, he was in private practice with Ropes & Gray. Mr. Clark is also a director of Omnicom Group, Inc. and Time Warner, Inc., and is a trustee of Teachers Insurance Annuity Association (TIAA). Dean Clark is 60 years old.

*Marshall A. Cohen* has been a director of the Company since April 2001, and his current term as a Class II director expires in 2005. Mr. Cohen has been Counsel at Cassels Brock and Blackwell, a Canadian law firm, since October 1996. Mr. Cohen is also a director of The Toronto-Dominion Financial Group, Barrick Gold Corporation, American International Group, Inc., Lafarge Corporation, The Goldfarb Corporation, Premcor Inc., Metaldyne, and Golf Town Canada Inc. Mr. Cohen serves on the Advisory Boards of Blackstone and Heartland. Mr. Cohen is 69 years old.

*David C. Dauch* has been a director of the Company since 2002, and his current term as a Class II director expires in 2005. He has been the Senior Vice President-Commercial of American Axle & Manufacturing since June 2004, a company he joined in 1995 as Manager, Sales Administration. In 1996, he became Director of Sales, GM Full Size Truck Programs and was named Vice President of Sales and Marketing in 1998. In 2001, he became Vice President, Manufacturing-Driveline Division and assumed the position of Senior Vice President, Sales, Marketing and Driveline Division in September 2003. From 1987 to 1995, Mr. Dauch was employed by the Company where he held positions as product manager, account executive, and Director of Ford Sales and Marketing for the Automotive Carpet and Fabric Groups. Mr. Dauch is 40 years old.

*Richard C. Jelinek* has been a director of the Company since September 2004, and his current term as a Class II director expires in 2005. Mr. Jelinek is the former Chairman of Lifemark Corporation, a position in

4

Table of Contents

which he served from 1994 until it merged with United Health Group in 2001. Mr. Jelinek is currently a member of the Executive Committee of the Aspen Valley Medical Foundation and a board member of the Aspen Valley Community Foundation. He is also on the advisory board of the School of Public Health at the University of Michigan. Mr. Jelinek is 67 years old.

*Warren B. Rudman* has been a director of the Company since June 1995, and his current term as a Class II director expires in 2005. Mr. Rudman was a partner in the law firm of Paul, Weiss, Rifkind, Wharton & Garrison from 1993 through 2002, and since January 2003 Mr. Rudman has been of counsel to the law firm. Mr. Rudman served as a United States Senator from New Hampshire from 1980 through 1992 and as Attorney General of New Hampshire from 1970 until 1976. Mr. Rudman is also a director of Allied Waste, Boston Scientific and the Raytheon Company, and is an independent trustee of several mutual funds of the Dreyfus Corporation. Senator Rudman is 74 years old.

*Daniel P. Tredwell* has been a director of the Company since February 2001, and his current term as a Class III director expires in 2006. Mr. Tredwell is also a director of Metaldyne, TriMas and Springs. He is a senior managing director and a co-founder of Heartland. He has two decades of leveraged financing and buyout experience. Mr. Tredwell served as a Managing Director at Chase Securities Inc. and had been with Chase Securities since 1985. Mr. Tredwell is 46 years old.

## Meetings and Committees

During 2003, our Board of Directors held five meetings and took action by written consent three times in lieu of additional meetings. All of the directors attended at least 75% of all meetings of the board and board committees on which they served during 2003, except Messrs. Leuliette and McConnell, who missed two meetings. Under the Company's Corporate Governance Guidelines, directors are expected to attend all regularly scheduled Board meetings and all committee meetings of committees on which they serve, and should attend the Company's Annual Meeting of Stockholders. Three directors attended the Company's 2003 Annual Meeting of Stockholders.

Our Board of Directors has four standing committees: the Audit Committee, the Compensation Committee, the Executive Committee and the Nominating and Corporate Governance Committee. The Board of Directors approved a charter for each of the Audit, Compensation and Nominating and Governance Committees, which charters are available on our website, www.collinsaikman.com. We also have a Nominating Committee designated in our charter documents.

The Board of Directors has determined that the following directors are independent pursuant to the Collins & Aikman Director Independence Guidelines (a copy of which is attached as Appendix B): Robert C. Clark, Marshall A. Cohen, David C. Dauch, Anthony Hardwick, Richard C. Jelinek and Warren B. Rudman. It has also confirmed that a majority of the Board of Directors and all members of the Audit, Compensation and Nominating and Governance Committees are independent.

Under our Corporate Governance Guidelines, the Board of Directors will schedule regular executive sessions at which non-management directors meet without management participation. If this group includes directors who do not meet the Company's independence standards, the directors who are so independent will also meet in executive session at least once a year. The Chairman of the Nominating and Governance Committee (who also serves as Lead Director) will preside at each executive session.

The principal responsibilities of each committee are described in the following paragraphs.

### Audit Committee

Our Audit Committee is composed of Marshall A. Cohen (Chairman), Robert C. Clark and Anthony Hardwick. The purpose of the Committee is to assist the Board of Directors in fulfilling its oversight responsibility relating to (a) the integrity of our financial statements and financial reporting process and our systems of internal accounting and financial controls; (b) the performance of the internal audit function; (c) the annual independent audit of our financial statements, the engagement of the independent auditors and

Table of Contents

the evaluation of the independent auditors' qualifications, independence and performance; and (d) the fulfillment of the other responsibilities set out in the Audit Committee charter.

The Board of Directors has confirmed that all members of the Audit Committee are "financially literate" within the meaning of the New York Stock Exchange rules and applicable law, and that Mr. Hardwick is an "audit committee financial expert".

During 2003, the Audit Committee held nine meetings and did not take action by written consent in lieu of additional meetings. During 2003 and until September 2004, the Audit Committee was composed of Robert C. Clark (Chairman), Marshall A. Cohen and Warren B. Rudman.

### Compensation Committee

Our Compensation Committee is composed of Richard Jelinek (Chairman), Marshall A. Cohen, David C. Dauch and Warren B. Rudman. The purpose of the Committee is to discharge the responsibility of the Board of Directors relating to compensation of the Company's directors, executive officers and such other employees as the Committee may determine and related matters.

During 2003, the Compensation Committee held no meetings and took action by written consent five times in lieu of meetings. During 2003 and until September 2004, the Compensation Committee was comprised of David A. Stockman (Chairman), Marshall A. Cohen and Daniel P. Tredwell.

### Executive Committee

Our Executive Committee is composed of David Stockman (Chairman), Marshall A. Cohen and Daniel P. Tredwell. Our Executive Committee's primary function is to assist our Board of Directors by acting upon matters when the Board of Directors is not in session. The Executive Committee has the full power and authority of the Board of Directors, except to the extent limited by law or our certificate of incorporation or bylaws.

The Executive Committee did not meet during 2003.

### Nominating and Governance Committee

The Nominating and Governance Committee is composed of Marshall A. Cohen (Chairman), David C. Dauch and Richard Jelinek. The purpose of the Committee is to identify individuals qualified to become members of the Board of Directors, consistent with criteria approved by the Board of Directors, to recommend Director nominees for each annual meeting of stockholders and nominees for election to fill any vacancies on the Board of Directors and to address related matters. The Committee also develops and recommends to the Board of Directors corporate governance principles applicable to the Company and is responsible for leading the annual review of the performance of management and the Board of Directors.

The Nominating and Governance Committee was formed in September 2004.

### Nominating Committee

The Nominating Committee is designated by our charter documents and is composed of all the members of the Board of Directors other than those directors who are salaried employees of the Company (currently, only J. Michael Stepp). The purpose of this committee is to nominate, by a majority vote, persons for election to the Board of Directors at any annual meeting of stockholders or at any special meeting of stockholders called for the purpose of electing directors.

During 2003, the Nominating Committee held one meeting and did not take action by written consent in lieu of additional meetings.

6

## Director Compensation

Collins & Aikman pays directors who are not employees of the Company or its affiliates an annual cash retainer of $80,000, and additional fees for attendance at committee meetings. Committee members receive $5,000 per meeting and committee chairpersons receive $7,000 per meeting. Directors are reimbursed their out-of-pocket expenses incurred in connection with their activities as a member of the Board and its committees. In addition, under the Company's 2002 Stock Option Plan, each non-employee director who is not affiliated with a major stockholder, and was not affiliated with a major stockholder at the time of his or her election to the Board of Directors, receives an annual grant of ten-year options for 4,000 shares of Collins & Aikman common stock each November. The options are exercisable six months and one day after the date of grant. Any options not exercisable prior to a termination of the directorship are canceled. Currently, Messrs. Clark, Cohen, Dauch, Hardwick, Jelinek and Rudman receive compensation as directors and are eligible to receive future grants under the 2002 Plan.

## Compensation Committee Interlocks and Insider Participation

From April 2002 to September 2004, the Compensation Committee was composed of Messrs. Stockman, Cohen and Tredwell. Neither Mr. Cohen nor Mr. Tredwell is or has been an employee of the Company or any of its subsidiaries, including Products, or is or has been separately compensated for serving as an officer of the Company or any of its subsidiaries, including Products. Mr. Stockman became our Chief Executive Officer in August 2003, but does not receive any compensation for such service. (For more information regarding compensation arrangements for Mr. Stockman's service to us as Chief Executive Officer, see "Certain Relationships and Related Transactions", page 11, and "Executive Compensation", page 18.) None of the executive officers who are separately compensated for serving as executive officers (or who received options) serve on the Compensation Committee. Mr. Stockman also serves on the Compensation Committee of Metaldyne. Mr. Leuliette, a director of the Company, is Chairman, President and Chief Executive Officer of Metaldyne.

Messrs. Stockman and Tredwell are senior managing directors of Heartland. (For more information regarding Heartland, see "Certain Relationships and Related Transactions", page 11.) Mr. Cohen is Counsel at the Canadian law firm of Cassels Brock and Blackwell.

## Section 16(a) Beneficial Ownership Reporting Compliance

Section 16(a) of the Securities Exchange Act of 1934, requires our executive officers and directors and persons who beneficially own more than 10% of our common stock to file initial reports of ownership and reports of changes of ownership with the Securities and Exchange Commission. Executive officers, directors and greater than 10% beneficial owners are required by SEC regulations to furnish us with copies of all Section 16(a) forms they file. To our knowledge, based solely on our review of the copies of the Section 16(a) forms furnished to us and representations from our executive officers, directors and greater than 10% beneficial owners, all persons subject to the Section 16(a) filing requirements filed the required reports on a timely basis during 2003.

## Director Nomination Process

The Nominating and Corporate Governance Committee identifies and evaluates nominees for director in accordance with its charter, the Company's Corporate Governance Guidelines, the Company's charter documents and applicable stockholder agreements granting to certain stockholders the right to designate directors. (For a description of these stockholder agreements, see "Certain Relationships and Related Transactions," page 11.)

Candidates for director are reviewed in the context of the current composition of the Board, the operating requirements of Collins & Aikman and the long-term interests of the stockholders. Although specific qualifications for Board membership may vary from time to time, desired qualities to be considered include: (a) the highest ethical character, integrity and shared values with Collins & Aikman; (b) loyalty to Collins & Aikman and concern for its success and welfare; (c) high-level leadership experience and achievement at a

policy-making level in business; (d) educational or professional activities; (e) breadth of knowledge about issues affecting Collins & Aikman; (f) ability to contribute special competencies to Board activities, such as financial, technical, international business or other expertise, or industry knowledge; (g) willingness to apply sound, independent business judgment; (h) awareness of a director's vital role in the Company's good corporate citizenship and corporate image; and (i) sufficient time and availability to effectively carry out a director's duties. In addition, incumbent directors are evaluated based upon, among other things, his or her meeting attendance record and contributions to the activities of the Board. The committee will also evaluate all director candidates to determine whether or not they are "independent" under applicable rules.

The Nominating and Corporate Governance Committee uses its network of contacts to compile potential director candidates, but may also engage, if it deems appropriate, a professional search firm. The committee then meets to discuss and consider such candidates' qualifications and then chooses a candidate by majority vote. Director nominations are also subject to approval of the Nominating Committee designated under the Company's charter documents.

The Nominating and Corporate Governance Committee will consider director candidates recommended by stockholders. Stockholder recommendations should be addressed to Corporate Secretary, Collins & Aikman Corporation, 250 Stephenson Highway, Troy, Michigan 48083, and contain the information required in the Company's bylaws for stockholder nomination of directors, which includes, among other things, the name, age, address, principal occupation and stockholdings of the proposed candidate, together with the name and stockholdings of the stockholder making the recommendation.

## Certain Litigation

A purported class action was filed on March 24, 2003 in the United States District Court for the Eastern District of Michigan, against the Company, Heartland and ten current and former senior officers and/or directors of the Company, alleging violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder. Four similar actions were subsequently filed in the United States District Court for the Eastern District of Michigan, purportedly filed on behalf of purchasers of the common stock of the Company between August 7, 2001 and August 2, 2002, which were identical to the purported class identified in the previously disclosed lawsuit, except in one instance in which the complaint alleged a class period beginning on July 5, 2001. On August 4, 2003, the court consolidated all five pending actions and appointed lead plaintiffs for the purported class. The Company believes that the claims are without merit and intends to vigorously defend the lawsuits. The Company does not believe that the suit will have a material impact on its financial condition, results of operations or cash flows.

## INDEPENDENT AUDITORS

KPMG LLP audited our consolidated financial statements for 2003 and will perform similar services for 2004. The Audit Committee has considered the nature of the services provided by KPMG and determined that they are compatible with their provision of independent audit services. The Audit Committee has discussed these services with KPMG and management to determine that they are permitted under the Code of Professional Conduct of the American Institute of Certified Public Accountants and the auditor independence requirements of the Securities and Exchange Commission. A representative of KPMG will be present at the annual meeting with the opportunity to make a statement and to answer questions.

## Fees

The following describes the fees paid to KPMG for 2003 and to PricewaterhouseCoopers (which served as the Company's independent accountants during the year ended December 31, 2002) for 2002.

*Audit Fees.* The aggregate fees for professional services rendered by KPMG in connection with their audit of our consolidated financial statements, reviews of the consolidated condensed financial statements included in our quarterly reports on Form 10-Q and other services normally provided in connection with statutory or regulatory engagements for 2003 was $1.1 million. The aggregate fees for professional services

8

Table of Contents

rendered by PricewaterhouseCoopers in connection with their audit of our consolidated financial statements, reviews of the consolidated condensed financial statements included in our quarterly reports on Form 10-Q and other services normally provided in connection with statutory or regulatory engagements for 2002 was $1.4 million.

*Audit-Related Fees.* The aggregate fees billed for audit-related services rendered by KPMG in 2003, which consisted primarily of assurance services related to benefit plans, was approximately $100,000. The aggregate fees billed for audit-related services rendered by PricewaterhouseCoopers in 2002, which consisted primarily of acquisition support activities, issuance of comfort letters and audits of the Company's employee benefit plans, was approximately $3.4 million.

*Tax Fees.* KPMG did not render tax services in 2003. The aggregate fees billed for tax services rendered by PricewaterhouseCoopers in 2002, which consisted primarily of tax consulting services and compliance services, was approximately $1.6 million.

*All Other Fees.* The aggregate fees billed for all other services rendered by KPMG in 2003 was approximately $200,000. These fees related primarily to ISO compliance services in Europe. PricewaterhouseCoopers did not render any other services during 2002.

**Pre-approval Policy**

The Audit Committee has adopted a policy requiring pre-approval of audit and non-audit services provided by the independent auditors. The primary purpose of this policy is to ensure that we engage our public accountants to provide only audit and non-audit services that are compatible with maintaining independence. The Audit Committee is required to pre-approve all services performed for us by our independent auditors and the related fees for such services. The Audit Committee must also approve fees incurred for pre-approved services that are in excess of the approved amount prior to payment, except as provided below. Our independent auditors are prohibited from performing any service prohibited by applicable law.

The Audit Committee's pre-approval policy permits the Company to engage KPMG to provide audit-related services, tax services and non-audit services, subject to the following conditions:

(1) KPMG will not be engaged to provide any services that may compromise its independence under applicable laws and regulations, including rules and regulations of the Securities and Exchange Commission, the Public Company Accounting Oversight Board, and the New York Stock Exchange;

(2) KPMG and the Company will enter into engagement letters authorizing the specific audit-related tax or non-audit services and setting forth the cost of such services;

(3) The Company is authorized, without additional Audit Committee Approval, to engage KPMG to provide (a) audit-related and tax services, including due diligence and tax planning related to acquisitions where KPMG does not audit the target company, to the extent that the cost of such engagement does not exceed $250,000 per calendar quarter, (b) due diligence and tax planning related to acquisitions where KPMG audits the target company, to the extent the cost of such engagement does not exceed $20,000 per calendar quarter, and (c) services not otherwise covered by (a) or (b) above to the extent the cost of such engagements does not exceed $150,000 per calendar quarter; provided, however, that the aggregate amount of all such engagements under (a), (b) and (c) may not exceed $350,000 in any calendar quarter; and

(4) The Chairman of the Audit Committee will be promptly notified of each engagement, and the Audit Committee will be updated quarterly on all engagements, including fees.

## REPORT OF THE AUDIT COMMITTEE

The role of the Audit Committee is to assist the Board of Directors in its oversight of the Company's financial reporting processes. The Board of Directors, in its business judgment, has determined that the

9

Table of Contents

members of the Committee are "independent", as required by applicable listing standards of the New York Stock Exchange. The Committee operates pursuant to a written Charter. As set forth in the Charter, management of the Company is responsible for the preparation, presentation and integrity of the Company's financial statements, and maintaining appropriate accounting and financial reporting principles, policies, internal controls and procedures designed to assure compliance with accounting standards and applicable laws and regulations. The independent auditors are responsible for planning and carrying out a proper audit of the Company's annual financial statements and expressing an opinion as to the fairness of the financial statements in conformity with generally accepted accounting principles.

The Audit Committee met with the independent auditors, management and internal auditors to assure that all were carrying out their respective responsibilities. The Committee reviewed the performance and fees of the independent auditors prior to recommending their appointment, and met with them to discuss the scope and results of their audit work, including the adequacy of internal controls and the quality of financial reporting. The Committee discussed with the independent auditors their judgments regarding the quality and acceptability of the Company's accounting principles, the clarity of its disclosures and the degree of aggressiveness or conservatism of its accounting principles and underlying estimates. The Committee discussed with and received the written disclosures and the letter from the independent auditors required by Independence Standards Board Standard No. 1, confirming their independence. The independent auditors had full access to the Committee, including meetings without management present.

Based upon the reports and discussions described in this report, and subject to the limitations on the role and responsibilities of the Committee referred to above and in the Charter, the Committee recommended to the Board of Directors that the audited financial statements be included in the Company's Annual Report on Form 10-K for the year ended December 31, 2003 filed with the Securities and Exchange Commission.

By:  The Audit Committee of the Board of Directors
of Collins & Aikman Corporation

Robert C. Clark, *Chair*
Warren B. Rudman
Marshall A. Cohen

10

Table of Contents

## CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS

**Security Ownership of Management and Principal Stockholders**

Set forth in the table below is certain information as of August 30, 2004 regarding the beneficial ownership of the Company's common stock by (i) persons who are known to the Company to own beneficially more than five percent of the Company's voting stock, (ii) directors of the Company, (iii) the executive officers of the Company named in the Summary Compensation Table set forth in this Proxy Statement (and referred to herein as the "Named Executive Officers") and (iv) the directors and executive officers of the Company as a group. Unless otherwise indicated, the beneficial owner has sole voting power and sole investment power over the securities shown below.

| Name of Beneficial Owner | Amount and Nature of Beneficial Ownership | Percent of Class |
|---|---|---|
| Heartland Industrial Partners, L.P. | 33,656,672(1) | 40.2% |
| 55 Railroad Avenue | | |
| Greenwich, CT | | |
| Charles E. Becker | 7,539,262(2) | 9.0% |
| Elkin McCallum | 4,813,900(3) | 5.8% |
| Joan Fabrics Corporation | 4,783,900(3) | 5.7% |
| 100 Vesper Executive Park | | |
| Tyngsboro, MA | | |
| David A. Stockman | 177,475(4) | * |
| J. Michael Stepp | 30,067(4)(5) | * |
| Robert C. Clark | 40,000(6) | * |
| Marshall A. Cohen | 12,000(6) | * |
| David C. Dauch | 8,000(6) | * |
| Anthony Hardwick | 0 | * |
| Richard C. Jelinek | 38,000 | * |
| Timothy D. Leuliette | 0(4) | * |
| W. Gerald McConnell | 0(4) | * |
| Warren B. Rudman | 36,000(6) | * |
| Daniel P. Tredwell | 0(4) | * |
| Millard L. King, Jr. | 762(7) | * |
| Michael G. Torakis | 0(8) | * |
| Eric J. White | 0(8) | * |
| Wallace W. Creek | 0 | * |
| Michael A. Mitchell | 0 | * |
| Jerry L. Mosingo | 0 | * |
| Executive officers and directors as a Group (16 persons) | 354,804(9) | * |

\* Less than one percent of shares of common stock outstanding.

(1) The 33,656,672 shares beneficially owned are indirectly owned by Heartland Industrial Associates L.L.C. as the general partner of each of the following limited partnerships, which hold the indicated shares directly: (a) 387,743 shares are held directly by Heartland Industrial Partners (FF), L.P., a Delaware limited partnership, (b) 1,653,112 shares are held directly by HIP Side-by-Side Partners L.P., a Delaware limited partnership, (c) 251,496 shares are held directly by Heartland Industrial Partners (K1), L.P., a Delaware limited partnership, (d) 75,442 shares are held directly by Heartland Industrial Partners (C1), L.P., a Delaware limited partnership, and (e) 31,288,879 shares are held directly by Heartland.

11

Table of Contents

(2)  Such shares represent (a) 5,440,000 shares acquired by Mr. Becker as consideration for the acquisition of Becker Group L.L.C., ("Becker"), (b) 339,262 shares acquired by Mr. Becker immediately following the closing of the Becker acquisition from one of the other former Becker shareholders, (c) 160,000 shares subject to presently exercisable warrants to purchase such common stock at $5.00 per share acquired by Mr. Becker as consideration for the Becker acquisition and (d) 1,600,000 shares acquired by Becker Ventures LLC ("Becker Ventures") as part of the financing for the Company's acquisition of Textron Automotive Company's trim division. Mr. Becker is the managing member of and holds a controlling interest in Becker Ventures. Mr. Becker became a director of Collins & Aikman upon completion of the Becker acquisition and was Vice Chairman of the Company's Board from July 2001 until July 2002. Effective May 6, 2004, Mr. Becker resigned as a director of Collins & Aikman. Mr. Becker is a limited partner of Heartland and disclaims beneficial ownership of all shares held by Heartland.

(3)  Of these shares (a) 4,783,900 shares are held by Joan Fabrics Corporation ("Joan Fabrics") as a part of the consideration for the sale of Joan Automotive Industries, Inc. ("Joan Automotive") to a Company subsidiary, and (b) 30,000 shares are held by Mr. McCallum and his spouse. The sole stockholder of Joan Fabrics is JFC Holding Trust, in which Mr. McCallum is the trustee and has a 75% beneficial interest and his spouse, Donna McCallum, owns the balance. Mr. McCallum became a director of Collins Aikman upon the consummation of the Joan acquisition. Effective May 6, 2004, Mr. McCallum resigned as a director of Collins & Aikman.

(4)  As described under (1) above, 33,656,672 shares are beneficially owned by Heartland. Mr. Stockman is the Managing Member of Heartland, but disclaims beneficial ownership of such shares. Messrs. Leuliette, McConnell, Stepp and Tredwell are also members of Heartland and also disclaim beneficial ownership of the shares.

(5)  Of these shares, (a) 26,000 are held directly, and (b) 4,067 are held indirectly in the Stock Fund of the 401(k) Plan and the Non-Qualified Shadow Retirement Income Plan (the "SRIP"). Pursuant to the 2004 Stock Option Exchange Program described elsewhere in this proxy statement, Mr. Stepp exchanged 440,000 options for 431,200 options and 8,800 restricted stock units that he will receive in December 2004.

(6)  Represents shares underlying options granted under the 1994 Directors Stock Option Plan (the "1994 Directors Plan") and the 2002 Plan which either are vested or will vest within 60 days unless the director ceases to be a director prior to that time.

(7)  These shares are held indirectly in the Stock Fund of the 401(k) Plan and the SRIP. Pursuant to the 2004 Stock Option Exchange Program described elsewhere in this proxy statement, Mr. King exchanged 392,000 options for 384,160 options and 7,840 restricted stock units that he will receive in December 2004.

(8)  Pursuant to the 2004 Stock Option Exchange Program described elsewhere in this proxy statement, Mr. Torakis and Mr. White each exchanged 240,000 options for 235,200 options and 4,800 restricted stock units that they will each receive in December 2004.

(9)  Excludes shares held by entities owning more than 5% of the Company's common stock. Includes shares representing options granted to all directors and officers that were vested as of August 30, 2004 or will vest within 60 days thereafter.

## Other Relationships and Transactions

### Heartland Transactions

Heartland is a private equity firm established in 1999 for the purpose of acquiring and expanding industrial companies operating in various sectors of the North American economy that are well positioned for global consolidation and growth. The managing general partner of Heartland is Heartland Industrial Associates, L.L.C. Certain of our directors and officers are members of the general partner, specifically Mr. Stockman (a Director and our Chairman and Chief Executive Officer), Mr. Stepp (a Director and our Vice Chairman and Chief Financial Officer) and Messrs. Tredwell, Leuliette and McConnell (each a

12

Table of Contents

Director). Messrs. Charles E. Becker and Elkin McCallum, formerly directors of the Company, are limited partners in Heartland with interests representing less than 5% of the commitments in Heartland. Heartland has informed us that its limited partners include many financial institutions, private and government employee pension funds and corporations, among other types of investors. We may, in the ordinary course of business, have on a normal, customary and arms' length basis relationships with certain of Heartland's limited partners, including banking, insurance and other relationships. As of August 30, 2004, Heartland beneficially owned approximately 40.2% of Collins & Aikman's outstanding common stock.

We are a party to a Services Agreement with Heartland under which Heartland provides us advisory and consulting services, including services with respect to developments in the automotive industry and supply markets, advice on financial and strategic plans and alternatives and other matters as we may reasonably request and are within Heartland's expertise. The Services Agreement terminates on the earlier of its tenth anniversary or the date upon which Heartland ceases to own Collins & Aikman shares equivalent to 25% of that owned by them on February 23, 2001.

Under the Services Agreement, we are obligated to pay to Heartland a $4.0 million annual advisory fee payable in quarterly installments and reimburse its out-of-pocket expenses related to the services it provides. We have also agreed to pay a fee of 1% of the total enterprise value of certain acquisitions and dispositions. During 2003, 2002 and 2001 we recorded total fees of $4.0 million, $5.7 million and $24.5 million, respectively.

The Services Agreement with Heartland contemplates that we may pay additional fees to Heartland for services rendered in connection with a range of financing transactions. In March 2004, Collins & Aikman's Board of Directors, including the disinterested and independent directors of the Board, approved a fee of $1 million to Heartland for its services rendered in connection with the 2004 amendments to our senior secured credit facility to add a supplemental revolving credit facility. On May 6, 2004, Collins & Aikman's Board of Directors, including the disinterested and independent directors of the Board, approved an amendment of the Services Agreement to provide for a fee of up to $5.0 million related to services rendered in connection with the August 2004 senior subordinated note offering and amendment and restatement of our senior secured credit facility, and a fee of 1% of the gross proceeds of certain future financings. The $5.0 million fee will be paid to Heartland in connection with the closing of the applicable transactions.

*Charles E. Becker Transactions*

Mr. Becker resigned as a Director of Collins & Aikman, effective May 6, 2004. In July 2001, we completed the acquisition of Becker Group, L.L.C. ("Becker"). As a result of the Becker acquisition and a purchase of Collins & Aikman's common stock immediately afterwards, Charles Becker became one of Collins & Aikman's principal stockholders. Charles Becker became a member of Collins & Aikman's Board of Directors upon closing of the Becker acquisition and was Vice Chairman of the Board from July 2001 until July 2002. In addition, Becker Ventures, an affiliate of Mr. Becker, acquired additional shares of common stock as part of the financings in connection with the acquisition of Textron Automotive Company's Trim Division ("TAC-Trim") at a price of $5.00 per share. At the time of his resignation, Mr. Becker beneficially owned 7,539,262 shares of Collins & Aikman's common stock. A related party of Mr. Becker is also a limited partner in Heartland.

On March 27, 2003, we entered into a termination agreement and release to buy out the non-compete agreement between us and Mr. Becker. We paid $11.3 million in April 2003 as part of the termination agreement and release. The non-compete agreement, which was entered into as part of the Becker acquisition, required us to make periodic payments. As a result of the termination of the non-compete agreement, we incurred a loss of $10.4 million, which is primarily due to the write-off of intangible assets initially recorded in conjunction with the Becker acquisition.

During 2002, we engaged Mr. Becker to serve as Vice Chairman and assist us with strategic planning activities, such as developing sales strategies, managing key customer relationships and recruiting senior management for Collins & Aikman's European operations. We paid Mr. Becker $300,000 for such services. Mr. Becker's consulting arrangement and position as Vice Chairman ended in 2002.

Table of Contents

We entered into a lease agreement with Becker Ventures L.L.C. ("Becker Ventures"), an entity controlled by Mr. Becker, for our headquarters at 250 Stephenson Highway, Troy, Michigan with the effective date of the lease being January 1, 2002. In March 2002, we entered into lease agreements with Becker Ventures, effective January 1, 2002, for 150 Stephenson Highway and 350 Stephenson Highway, Troy, Michigan. The base rent for all three premises is $13.25 per sq. ft., subject to annual CPI adjustments. Total square footage for all three locations is approximately 286,000. The leases have 20-year terms, and we have two five-year renewal options. The 2004 base rent for the facilities will be approximately $4.0 million. In 2004, these leases were amended to provide that we would assume responsibility for property management with a corresponding elimination of certain aspects of the property management fees. In addition, we are also party to a lease with Becker Ventures for five manufacturing facilities totaling 884,000 square feet. In 2002, we extended the lease term an additional ten years to expire in 2021, with the base rent for these facilities totaling $3.6 million per year.

In June 2001, Collins & Aikman Products Co. ("Products") sold and contemporaneously leased back real property located in Troy, Michigan and Plymouth, Michigan from New King, L.L.C. and Anchor Court, L.L.C., respectively, which are affiliates of Becker Ventures, for net proceeds of $15.1 million in aggregate. The initial lease term in each transaction is 20 years and each lease has two successive ten year renewal options. The basic rent for the Troy, Michigan property is $1.3 million per year, and the basic rent for the Plymouth, Michigan property is $0.5 million per year. The rental rates in each case are subject to adjustment after expiration of the initial term.

*Elkin McCallum Transactions*

Mr. McCallum resigned as a Director of Collins & Aikman, effective May 6, 2004. In September 2001, we completed the acquisition of Joan Automotive, a leading supplier of body cloth to the automotive industry, and all of the operating assets of Joan Automotive's affiliated yarn dying operation, Western Avenue Dyers, L.P. As a result of the Joan acquisition, Joan Fabrics Corporation ("Joan Fabrics"), a company controlled by Elkin McCallum, became a principal stockholder of Collins & Aikman. Upon completion of the Joan acquisition, Mr. McCallum became a member of Collins & Aikman's Board of Directors. At the time of his resignation, Mr. McCallum beneficially owned 5,699,000 shares of Collins & Aikman's common stock. A related party of Mr. McCallum is a limited partner in Heartland.

In the first quarter of 2003, we purchased equipment from Joan Fabrics and entered into a supply agreement with Joan Fabrics to supply certain types of fabrics. Under the supply agreement, we supply fabric to Joan Fabrics and Joan Fabrics is responsible for all marketing, design, customer service, distribution and sales functions related to these fabrics. We paid Joan Fabrics $4.7 million of consideration for these transactions, a portion of which we have allocated to the purchased equipment (based on its appraised value) and the remainder of which we are amortizing over the five-year term of the supply agreement.

On December 31, 2002, we acquired an air jet texturing business from Dutton Yarns (an affiliate of Mr. McCallum) for approximately $4.2 million. The purchased assets included equipment, inventory and intellectual property. We had preliminarily accounted for this transaction as an acquisition of assets, but finalized our accounting during the first quarter of 2003, and recorded the transaction as a purchase of a business.

On April 12, 2002, we signed and closed on a merger agreement with Mr. McCallum and a lamination company wholly owned by Mr. McCallum pursuant to which the acquired company was merged into a wholly owned subsidiary of us. As consideration in the transaction, Mr. McCallum received 400,000 shares of Collins & Aikman's common stock and was repaid $2.5 million in cash as reimbursement for amounts previously invested to fund the lamination company's working capital needs. Subsequent to the merger, debt owing to Mr. McCallum of $6.7 million was repaid. We acquired the lamination business to optimize the supply chain on certain of our fabric products and provide low cost lamination products and services to Tier-1 customers. As part of this acquisition, we inherited a lease pursuant to which we lease a portion of a manufacturing facility in El Paso, Texas from an entity controlled by Mr. McCallum. We continue to occupy these premises pursuant to such lease.

14

Table of Contents

In April 2002, we amended the merger agreement with Joan Automotive to clarify ownership of certain equipment listed in a schedule attached to that agreement. The original merger agreement schedule included a list of approximately 84 looms that ultimately exceeded our manufacturing requirements and facility capacity. Upon determining that the excess looms would have been uneconomically expensive to relocate and store, we declined to take possession of 48 of these looms, which were left in place at Joan Fabrics' Hickory, North Carolina plant. The amendment clarifies that these looms are owned by Joan Fabrics.

As part of the Joan acquisition, we inherited a lease pursuant to which we lease from an entity controlled by Mr. McCallum, a technical center in Lowell, Massachusetts. The operations formerly conducted in these premises have been moved to other company facilities, however we remain obligated for the related lease.

In connection with the Joan acquisition, we entered into a Supply Agreement dated September 21, 2001 (the "Supply Agreement") with Main Street Textiles, L.P. ("Main Street"), which is controlled by Mr. McCallum, and a Transition Services Agreement dated September 21, 2001 (the "Transition Agreement") with Joan Fabrics. Under the Supply Agreement, which was mutually terminated effective as of January 1, 2004, we agreed to purchase all of our requirements for flat woven automotive fabric from Main Street for a five-year period beginning on the date of the Supply Agreement. The prices which we agreed to pay for fabric under the agreement equaled the costs of the raw materials plus an amount representing Main Street's standard labor and overhead costs incurred in manufacturing fabric for us. Under the Transition Agreement, Joan Fabrics provided Products transitional and support services for a period not to exceed twelve months in order to support the continued and uninterrupted operation of the businesses acquired by Products in the Joan acquisition. As a part of these services, pending our disassembly and removal of machinery and equipment purchased from Joan Fabrics, Joan Fabrics was permitted to continue to use that machinery and equipment to manufacture for us all of our requirements for some types of knitted and woven automotive fabrics. The terms of our agreement with respect to this fabric production are substantially similar to those under the Supply Agreement. Actual prices paid by us for fabric under the Supply Agreement and Transition Agreement were subject to the rebates described below.

In 2002 and 2003, we engaged in ordinary course transactions with entities controlled by Mr. McCallum for the purchase and sale of goods and services as part of ongoing business relationships. We recorded purchases from entities controlled by Mr. McCallum, of $17.8 million (net of $1.2 million of rebates) in 2003, and $47.3 million (net of $10.5 million of rebates) in 2002 for goods and services purchased. These rebates received from Mr. McCallum relate to knit and woven automotive fabrics provided by entities controlled by Mr. McCallum under the Supply Agreement and Transition Agreement executed in connection with the 2001 Joan acquisition, which are described above. Supplier rebates such as these are common in the automotive industry as part of ongoing price negotiations and adjustments. These rebates from Mr. McCallum totaled $14.7 million over the duration of the agreements. In addition, we recorded sales to entities controlled by Mr. McCallum, of $6.4 million in 2003 and $31.8 million in 2002.

The following table summarizes the balances outstanding from entities controlled by Mr. McCallum (in millions):

|  | As of December 31, | |
|---|---|---|
|  | 2003 | 2002 |
| Accounts Receivable | $2.7 | $5.9 |
| Accounts Payable | $1.0 | $8.0 |

*Textron Transactions*

We are a party to various agreements and transactions with Textron. Textron became a related party as a result of its receipt of the consideration in the 2001 TAC-Trim acquisition. In May 2002, as part of the finalization of the purchase price and related working capital adjustments of the TAC-Trim acquisition, we paid Textron $15.5 million in cash.

15

Table of Contents

Prior to the TAC-Trim acquisition, TAC-Trim entered into an $86.9 million sale and leaseback transaction (the "Textron Leasing Transaction") with two separate single purpose affiliates of Textron Financial Corporation, as lessor and purchaser, with respect to a portfolio of manufacturing equipment situated in different locations throughout the United States and Canada. In January 2003, the FASB issued FASB Interpretation No. ("FIN") 46, "Consolidation of Variable Interest Entities ("VIE")," an interpretation of Accounting Research Bulletin No. 51, "Consolidated Financial Statements". As part of Collins & Aikman's implementation of FIN 46, it determined that one of the single purpose affiliates was a VIE. We and Textron agreed to have the lease restructured so it was required to be consolidated by the other party and not accounted for as a VIE. As consideration for this lease restructuring, we agreed to pay Textron Financial $150,000.

Payments under the Textron leasing transaction are guaranteed by Products and secured by a first perfected mortgage lien over certain real property with a value equal to $25 million. Each lease is for an initial term of three years with three one-year renewal options. At the end of the leases (including the expiration of all renewal options), there is the option of either purchasing all of the equipment for approximately $26 million or returning the equipment to the lessor. In the event the equipment is returned, arrangements will be made for the disposition of the equipment. Collins & Aikman is required to guarantee a minimum value to the lessor of up to approximately $21 million upon expiration of the leases. As is customary, the documentation for the Textron leasing transaction incorporates covenants by reference, from our credit facility, that may be amended or waived by the senior lenders, and also contain events of default.

As part of the TAC-Trim acquisition, we entered into three intellectual property license agreements with Textron. In two of these agreements, we license back to Textron certain intellectual property that was acquired in the transaction. In the third agreement, we license from Textron other intellectual property that was not acquired in the transaction. In addition, under the TAC-Trim acquisition agreement, we are permitted to use the "Textron" name for 18 months in exchange for payments of $13.0 million on December 15, 2002 and $6.5 million on December 15, 2003.

During 2003, we also engaged in various transactions with Textron, Inc. and its affiliates (formerly the beneficial owners of 6% of Collins & Aikman's outstanding common stock). Textron, Inc. and its affiliates sold all of their remaining shares of common stock of Collins & Aikman in open market transactions in January 2004. Textron continues to own all of the outstanding redeemable preferred stock of Products.

*Becker/ Joan/ Heartland Stockholders Agreement*

There is a stockholders agreement (the "Becker/ Joan Stockholders Agreement") among Charles E. Becker, Michael E. McInerney and Jens Höhnel (the "Becker parties"), Joan Fabrics, JFC Holdings Trust, Mr. Elkin McCallum and Donna McCallum (the "Joan parties"), the Heartland parties and Collins & Aikman. The Becker/ Joan Stockholders Agreement contains (a) rights of first refusal on private sales of common stock by the Becker parties and the Joan parties in favor of the Heartland parties, (b) tag-along rights in favor of the Becker parties and the Joan parties in the event of certain transfers of common stock by Heartland and (c) for so long as Heartland has a right to designate directors, a drag-along right enabling Heartland to cause the Becker parties and Joan parties to sell all of their common stock with Heartland when Heartland is selling all of its common stock to a third party (including by merger).

The Becker/ Joan Stockholders Agreement further provides that the Becker parties, the Joan parties and Heartland will each vote their common stock to ensure that Charles E. Becker and Elkin McCallum are each members of Collins & Aikman's Board of Directors, so long as the Becker parties and the Joan parties, respectively, continue to hold shares representing 25% of the common stock originally acquired by them. The Becker/ Joan Stockholders Agreement also provides that the Becker parties will vote their shares in favor of the election of Heartland's designees to Collins & Aikman's Board of Directors. Certain rights inure to the benefit of, and certain obligations bind, subsequent transferees of common stock, but none of the rights or obligations apply to public sales, whether under Rule 144 or under a registration statement.

16

# EXHIBIT D

# PART 2

**TO THE DECLARATION OF VERNON R. PROCTOR
IN SUPPORT OF DEFENDANT DAVID R. COSGROVE'S
MOTION TO DISMISS THE COMPLAINT**

Table of Contents

*Blackstone/ Wasserstein/ Heartland Stockholders Agreement*

Collins & Aikman is also a party to a stockholders agreement (the "Initial Stockholders Agreement") with Heartland and certain of its affiliates (the "Heartland parties"), Blackstone Capital Partners, L.P. and certain of its affiliates (the "Blackstone parties") and Wasserstein L.L.C. and certain of its affiliates (the "Wasserstein parties"). The Initial Stockholders Agreement contains (a) rights of first refusal on private sales of common stock by the Blackstone parties and the Wasserstein parties in favor of the Heartland parties, (b) tag-along rights in favor of the Blackstone parties and the Wasserstein parties in the event of certain transfers of common stock by Heartland and (c) for so long as Heartland has a right to designate directors, a drag-along right enabling Heartland to cause the Blackstone parties and Wasserstein parties to sell all of their common stock with Heartland when Heartland is selling all of its common stock to a third party (including by merger).

The Initial Stockholders Agreement further provides that the stockholder parties thereto will vote their common stock to ensure that seven members of Collins & Aikman's board will be designated by Heartland, one by the Wasserstein parties and one by the Blackstone parties (Blackstone and Wasserstein waived their right to each name a member of the board on March 15, 2002), in each case so long as each of Heartland, the Wasserstein parties and the Blackstone parties (in each case, together with its affiliates) continue to beneficially own at least 25% of the common stock owned by them as of February 23, 2001. In addition, there must be at least three independent directors not otherwise affiliated with Collins & Aikman, the Blackstone parties, the Wasserstein parties or Heartland. Collins & Aikman's chief executive officer will also serve as a director. Certain rights inure to the benefit of, and certain obligations bind, subsequent transferees of common stock, but none of the rights or obligations apply to public sales, whether under Rule 144 or under a registration statement.

The Initial Stockholders Agreement also contains certain restrictions on Collins & Aikman's ability to enter into transactions with Heartland and its affiliates. Collins & Aikman and its subsidiaries may not enter into any such transaction or series of related transactions involving payments or other consideration in excess of $500,000 without the consent of (a) each of the Blackstone parties and the Wasserstein parties, so long as each holds at least 25% of the common stock held by it as of February 23, 2001, for so long as Heartland and its affiliates directly or indirectly beneficially own at least 50% of the outstanding common stock and (b) a majority of the members of the board who are disinterested with respect to the particular transaction and were not designated for election by Heartland so long as Heartland and its affiliates own at least 25% of the common stock owned by them on the date of the Initial Stockholders Agreement. The restrictions described above will not apply to (a) an advisory fee on certain acquisitions and divestitures by Collins & Aikman in an amount not exceeding 1% of the enterprise value thereof and related out-of-pocket fees and expenses, (b) transactions involving the sale, purchase or lease of goods and services in the ordinary course of business and on an arms-length basis between Collins & Aikman and portfolio companies of Heartland in an amount involving not more than $1.25 million in any transaction, and (c) certain other transactions.

Blackstone Partners is a Delaware limited partnership formed in 1987 for the purpose of, among other things, (a) committing capital to facilitate corporate restructurings, leveraged buyouts, bridge financings and other investments and (b) capitalizing affiliates that will engage in investment and merchant banking activities. The sole general partner of Blackstone Partners is Blackstone Associates, a Delaware limited partnership. At present, the business of Blackstone Associates consists of performing the function of, and serving as, the general partner of certain limited partnerships, including Blackstone Partners. Blackstone Management Partners L.L.C. is the general partner of Blackstone Management Partners L.P. ("Blackstone Management"), and Blackstone Associates, which is the general partner of BFIP.

In July 2003, Wasserstein Management and its affiliates distributed all of their shares of Collins & Aikman's common stock to the partners of WP Partners, pro-rata to their respective interests in WP Partners. In September 2003, the Blackstone parties also disposed of all of their shares of Collins & Aikman common stock. As a result of these transactions, the Wasserstein parties and Blackstone parties are no longer parties to the Initial Stockholders Agreement.

17

Table of Contents

## EXECUTIVE COMPENSATION

**Executive Officers**

Biographical information regarding Mr. Stockman and Mr. Stepp can be found on pages 4 and 3, respectively. Set forth below is information regarding the other executive officers of the Company.

*Millard L. King, Jr.* has been President, Global Soft Trim since August 2003 and an executive officer since March 2002. From November 2001 to March 2002, he was Executive Vice President of Global Manufacturing Operations, Carpet and Acoustics Systems. Mr. King joined C&A in 1971. Prior to November 2001, Mr. King held the positions of Senior Vice President of Operations for Automotive Knit Fabrics and Chief Operating Officer of the U.S. automotive carpet systems and of automotive knit and woven operations. Mr. King is 59 years old.

*Robert A. Krause* has been Vice President and Treasurer since October 2002, and an executive officer since December 2002. Before joining C&A, Mr. Krause was associated with American Axle & Manufacturing Holdings, Inc., where he was Vice President and Treasurer from 1999 to August 2002, and Vice President-Investor Relations from August 2002 to October 2002, Treasurer and Acting Interim Chief Financial Officer during 1999, and Treasurer from 1998 to 1999. Mr. Krause is also a director of Products. Mr. Krause is 48 years old.

*L. Gregory Tinnell* has been Senior Vice President of Human Resources and an executive officer since April 2000. Previously, he was Vice President of Human Resources for our southern and Mexican operations, as well as Vice President of Global Compensation & Benefits. Mr. Tinnell joined C&A in 1995. Prior to joining C&A, he served in various management positions with Sara Lee Corporation, Nabisco Foods Group and North American Refractories Company. Mr. Tinnell serves on the National Association of Manufacturers Human Resources Steering Committee. Mr. Tinnell is 44 years old.

*Michael G. Torakis* has been President, International Plastics since August 2003 and an executive officer since March 2004. Mr. Torakis joined C&A in August 2003. Prior to joining C&A, Mr. Torakis was President of Venture Holdings Company, LLC and Chief Executive Officer of Peguform GmbH. On or about March 28, 2003, Venture Holdings Company, LLC and certain of its affiliates filed a petition for protection under the United States Bankruptcy Code. Mr. Torakis was President of Venture Holdings Company, LLC at the time of the bankruptcy filing. In addition, on or about May 28, 2002, Peguform GmbH, a subsidiary of Venture Holdings Company, LLC, filed for bankruptcy in Germany. Mr. Torakis was Chief Executive Officer of Peguform GmbH at the time of the filing. Mr. Torakis is 47 years old.

*Eric J. White* has been President, U.S. and Mexico Plastics since August 2003 and an executive officer since August 2002. From August 2002 to August 2003, he was Executive Vice President of Global Manufacturing, Interior Trim & Cockpit Systems. Prior to August 2002, Mr. White held the positions of Vice President Operations-Plastics with responsibility for multiple plant operations, and Vice President Operations for two operations with Textron Automotive Company, Inc. Mr. White is 48 years old.

18

Table of Contents

## Summary Compensation

The following table sets forth information concerning the compensation for services rendered to Collins & Aikman and its subsidiaries, including Products, by (i) both individuals serving as our Chief Executive Officer during 2003, (ii) our four most highly compensated executive officers (other than the Chief Executive Officer) whose total annual salary and bonus exceeded $100,000 and who were serving as executive officers at the end of the fiscal year ended December 31, 2003 and (iii) one of our former executive officers whose compensation would have been included if he had been serving as our executive officer at the end of the fiscal year (the individuals named in clauses (i), (ii) and (iii) are referred to as the "Named Executive Officers"). We do not separately compensate our executive officers for their duties as officers of us (except for any such options).

### Summary Compensation Table

| Name and Principal Position | | Annual Compensation | | | Securities Underlying Options(#) | All Other Compensation($) |
|---|---|---|---|---|---|---|
| | Year | Salary($) | Bonus($) | Other Annual Compensation($)(1) | | |
| David A. Stockman | 2003 | 0 | 0 | 0 | 0 | 0 |
| Chairman and Chief | 2002 | N/A | N/A | N/A | N/A | N/A |
| Executive Officer(2) | 2001 | N/A | N/A | N/A | N/A | N/A |
| J. Michael Stepp | 2003 | 484,176 | 112,500(3) | 14,699 | 0 | 3,319(4) |
| Vice Chairman of the | 2002 | 300,000 | 262,500 | 35,897 | 440,000 | 5,047 |
| Board and Chief | 2001 | N/A | N/A | N/A | N/A | N/A |
| Financial Officer | | | | | | |
| Millard L. King, Jr. | 2003 | 341,667 | 37,500(3) | 10,780 | 0 | 2,325(6) |
| President, Global | 2002 | 250,000 | 140,873 | 11,058 | 376,321 | 2,390 |
| Soft Trim(5) | 2001 | 209,917 | 66,627 | 4,080 | 0 | 11,216 |
| Eric White | 2003 | 307,917 | 25,000(3) | 11,954 | 200,000 | 9,584(8) |
| President, US & | 2002 | 199,590 | 25,000 | 3,822 | 40,000 | 1,062 |
| Mexico Plastics(7) | 2001 | N/A | N/A | N/A | N/A | N/A |
| Michael G. Torakis | 2003 | 194,423 | 76,932 | 4,228 | 0 | 1,236(10) |
| President, International | 2002 | N/A | N/A | N/A | N/A | N/A |
| Plastics(9) | 2001 | N/A | N/A | N/A | N/A | N/A |
| Wallace W. Creek | 2003 | 256,562 | 150,000 | 10,108 | 100,000 | 1,746(12) |
| Former Senior Vice | 2002 | 20,833 | N/A | 1,054 | 0 | 0 |
| President-Finance(11) | 2001 | N/A | N/A | N/A | N/A | N/A |
| Jerry L. Mosingo | 2003 | 459,677(14) | 0 | 5,963 | 210,000 | 840,211(15) |
| Former President and | 2002 | 475,833 | 0 | 9,652 | 440,000 | 2,379 |
| Chief Executive Officer(13) | 2001 | N/A | N/A | N/A | N/A | N/A |
| Michael A. Mitchell | 2003 | 400,000 | 50,000(3) | 14,789 | 0 | 2,637(17) |
| Former President Global | 2002 | 320,833 | 50,000 | 14,477 | 360,000 | 2,165 |
| Commercial Operations(16) | 2001 | N/A | N/A | N/A | N/A | N/A |

(1) Total perquisites for each Named Executive Officer were less than the lesser of $50,000 or 10% of annual salary and bonus and, accordingly, the dollar value of such perquisites is not shown. The numbers shown for each Named Executive Officer reflect gross-ups for incremental federal and state income taxes related to such perquisites or relocation reimbursements. Perquisites for each Named Executive Officer may, but do not necessarily, include reimbursement for any of the following expenses: car; financial planning; executive fitness; executive physicals and medical; clubs and entertainment; and personal use of Company aircraft.

(2) Mr. Stockman became our Chief Executive Officer in August 2003. He has been a director of Collins & Aikman since February 2001 and Chairman of the Board of Collins & Aikman since August 2002. Mr. Stockman does not receive any compensation for his services as Chief Executive Officer. Mr. Stockman's services are provided by Heartland under a services agreement. See "Certain Relationships and Related Transactions" for a description of the services agreement between us and

19

Table of Contents

Heartland. Heartland's compensation under the services agreement did not increase as a result of Mr. Stockman becoming our Chief Executive Officer.

(3)    Certain officers and key executives received a special recognition bonus in 2003. The bonus payments to Messrs. Stepp, King, Mitchell and White were $112,500, $37,500, $50,000 and $25,000, respectively.

(4)    Amount for 2003 for Mr. Stepp consists of premiums in the amounts of $3,010 and $309 paid for basic term life insurance and accidental death and dismemberment ("AD&D") insurance, respectively, under group life insurance policies.

(5)    Mr. King assumed the position of President Global Soft Trim in August of 2003. Previously he was Executive Vice President Global Manufacturing Operations, Carpel & Acoustics Systems.

(6)    Amount for 2003 for Mr. King consists of premiums in the amount of $2,124 and $201 paid for basic term life insurance and AD&D insurance, respectively, under group life insurance policies.

(7)    Mr. White became President of US & Mexico Plastics in August of 2003. He formerly held the position of Executive Vice President Global Manufacturing Operations Interior Trim & Cockpit Systems.

(8)    Amount for 2003 for Mr. White consists of premiums in the amounts of $1,864 and $176 paid for basic term life insurance and AD&D insurance, respectively, under group life insurance policies and relocation expenses of $7,544.

(9)    Mr. Torakis joined us in July 2003 as President, International Plastics.

(10)    Amount for 2003 for Mr. Torakis consists of premiums in the amounts of $1,166 and $70 paid for basic term life insurance and AD&D insurance, respectively, under group life insurance policies.

(11)    Mr. Creek left his position as Senior Vice President of Finance effective June 7, 2004.

(12)    Amount for 2003 for Mr. Creek consists of premiums in the amount of $1595 and $151 paid for basic term life insurance and AD&D insurance, respectively, under group life insurance policies.

(13)    In August 2003, Mr. Mosingo resigned his positions as a director and as our President and Chief Executive Officer.

(14)    Amount represents Mr. Mosingo's base salary for January through his resignation date.

(15)    Amount for 2003 for Mr. Mosingo consists of (i) premiums in the amount of $4,662 and $441 paid for basic term life insurance and AD&D insurance, respectively, under group life insurance policies, (ii) $290,333 in salary continuation, (iii) $17,970 of his perquisite allowance (pro-rata portion for termination period), (iv) $50,000 for legal fees, and (v) a $476,805 settlement payment.

(16)    Mr. Mitchell retired from his position as President Global Commercial Operations effective February 29, 2004.

(17)    Amount for 2003 for Mr. Mitchell consists of premiums in the amount of $2,409 and $228 paid for basic term life insurance and AD&D insurance, respectively, under group life insurance policies.

20

Table of Contents

**Option Grants in Last Fiscal Year**

Shown below is information on grants of new stock options made during the fiscal year ended December 31, 2003 to the Named Executive Officers.

| | Individual Grants | | | | |
| Name | Number of Securities Underlying Options Granted | % of Total Options Granted to Employees in 2003 | Exercise Price ($/sh) | Expiration Date | Grant Date Present Value($)(1) |
|---|---|---|---|---|---|
| David A. Stockman | 0 | 0% | N/A | N/A | N/A |
| J. Michael Stepp | 0 | 0% | N/A | N/A | N/A |
| Millard L. King, Jr. | 0 | 0% | N/A | N/A | N/A |
| Michael G. Torakis | 0 | 0% | N/A | N/A | N/A |
| Eric White | 200,000 | 12% | $8.00 | 4/7/2013 | 554,000 |
| Wallace Creek | 100,000(2) | 6% | $8.00 | 4/7/2013 | 277,000 |
| Jerry L. Mosingo | 210,000(3) | 12% | $8.00 | 4/7/2013 | 581,700 |
| Michael A. Mitchell | 0 | 0% | N/A | N/A | N/A |

(1) The fair value of each option grant was estimated using the Black-Scholes option pricing model. The assumptions used in the model were weighted average expected volatility of 77.5% weighted average, risk-free interest rate of return of 3.72%, dividend yield of 0% and expected life of seven years.

(2) 2003 option grants expired in September 2004, ninety days after Mr. Creek's departure in June 2004.

(3) 2003 option grants expired in November 2003, ninety days after Mr. Mosingo's resignation in August 2003.

**Aggregate Option Exercises in Last Fiscal Year and Fiscal Year End Option Values**

Shown below is information with respect to the exercise of stock options during the last fiscal year and the year-end value of unexercised options to purchase common stock of Collins & Aikman granted to the Named Executive Officers and held by them as of December 31, 2003.

| Name | Shares Acquired on Exercise(#) | Value Realized($) | Number of Unexercised Options at Fiscal Year-End | | Value of Unexercised In-the-Money Options at Fiscal Year-End($)(1) | |
| | | | Exercisable | Unexercisable | Exercisable | Unexercisable |
|---|---|---|---|---|---|---|
| David A. Stockman | 0 | 0 | 0 | 0 | 0 | 0 |
| J. Michael Stepp | 0 | 0 | 88,000 | 352,000 | 0 | 0 |
| Millard L. King, Jr | 0 | 0 | 98,944 | 301,056 | 0 | 0 |
| Eric White | 0 | 0 | 8,000 | 232,000 | 0 | 0 |
| Michael G. Torakis | 0 | 0 | 0 | 0 | 0 | 0 |
| Wallace Creek | 0 | 0 | 0 | 100,000 | 0 | 0 |
| Jerry L. Mosingo | 0 | 0 | 0 | 0 | 0 | 0 |
| Michael A. Mitchell | 0 | 0 | 72,000 | 288,000 | 0 | 0 |

(1) No options were in the money at fiscal year-end because the exercise price of such options exceeded the closing price of Collins & Aikman's common stock on the NYSE on December 31, 2003.

**Option Cancellation/ Repricing Program**

On March 24, 2003, Collins & Aikman cancelled 3,559,256 outstanding, variously priced options, and replaced them with options exercisable at $8.00 per share. Collins & Aikman "repriced" these options in an effort to continue their effectiveness as a component of our overall compensation strategy. The following table provides additional details regarding the 2003 repricing of options for each person who was an executive officer.

21

Table of Contents

of us on March 24, 2003, or who has since become an executive officer and had options repriced on March 24, 2003.

The Compensation Committee of the Board of Directors has approved the replacement of Option Cancellation/ Repricing Program with a Voluntary Stock Option Exchange Program during the second quarter of 2004.

All Collins & Aikman 2002 Employee Stock Option participants were provided an opportunity to participate in a Voluntary Stock Option Exchange Program. The program allowed participants a chance to exchange their existing $8 options for a combination of Restricted Stock Units and Stock Options to be priced at a future date at market prices.

The program provided one Restricted Stock Unit for every 50 Stock Options exchanged. Additionally, participants will be provided 98 Options for every 98 Options exchanged and will be priced at the market closing price not earlier than December 31, 2004. The Company has issued 68,218 Restricted Stock Units to participants during the quarter.

**2004 Option Exchange Program**

In June 2004, the Compensation Committee of the Board of Directors approved a Voluntary Stock Option Exchange Program. We offered option holders of grants under the 2002 Employee Stock Option Plan the opportunity to participate in this program and exchange all of their existing $8.00 options for a combination of restricted stock units and stock options. The program provided one restricted stock unit for every 50 stock options exchanged. Additionally, participants will be provided 98 options for every 100 options exchanged to be priced at the then market closing price no earlier than December 31, 2004. On June 29, 2004, 3.4 million options were exchanged, and the Company awarded 68,218 shares of restricted stock units. The restricted stock units vest in three equal annual installments on June 29, 2005, June 29, 2006 and June 29, 2007.

**10-Year Option/ SAR Repricing Table**

| Name | Date | Number of Securities Underlying Options/SARs Repriced or Amended (#)(1) | Market Price of Stock at Time of Repricing or Amendment ($)(2) | Exercise Price at Time of Repricing or Amendment ($)(1)(3) | New Exercise Price ($)(2) | Length of Original Option Term Remaining at Date of Repricing or Amendment (4) |
|---|---|---|---|---|---|---|
| **Gerald E. Jones** | 3/24/03 | 6,000 | 4.26 | 10.00 | 8.00 | 7/05/05 |
| Executive Vice President | | 2,000 | | 10.00 | | 3/22/10 |
| Global Manufacturing Operations, Fabrics | | 172,000 | | 10.00 | | 1/15/12 |
| **Millard L. King, Jr.** | 3/24/03 | 2,000 | 4.26 | 10.00 | 8.00 | 1/20/09 |
| President | | 2,000 | | 10.00 | | 12/01/09 |
| Global Soft Trim | | 6,000 | | 10.00 | | 3/22/10 |
| | | 13,679 | | 9.97 | | 1/28/04 |
| | | 376,321 | | 10.00 | | 1/15/12 |
| **Dianne E. Kokkinos** | 3/24/03 | 4,000 | 4.26 | 10.00 | 8.00 | 1/15/12 |
| Senior Vice President Global Supply Chain Management | | | | | | |
| **Dana Leavitt** | 3/24/03 | 40,000 | 4.26 | 10.00 | 8.00 | 1/15/12 |
| Former Executive Vice President Global Manufacturing Operations, Interior Trim and Cockpit | | | | | | |

22

Table of Contents

| Name | Date | Number of Securities Underlying Options/SARs Repriced or Amended (#)(1) | Market Price of Stock at Time of Repricing or Amendment ($)(2) | Exercise Price at Time of Repricing or Amendment ($)(1)(3) | New Exercise Price ($)(2) | Length of Original Option Term Remaining at Date of Repricing or Amendment (4) |
|---|---|---|---|---|---|---|
| **Michael M. Mitchell** Former President Global Commercial Operations | 3/24/03 | 360,000 | 4.26 | 10.00 | 8.00 | 1/15/12 |
| **Jeffrey A. Rose** Senior Vice President Global Product Development and Technology | 3/24/03 | 180,000 | 4.26 | 10.00 | 8.00 | 1/15/12 |
| **J. Michael Stepp** Vice Chairman of the Board and Chief Financial Officer | 3/24/03 | 440,000 | 4.26 | 10.00 | 8.00 | 1/15/12 |
| **L. Gregory Tinnell** Senior Vice President, Human Resources | 3/24/03 | 4,000 | 4.26 | 10.00 | 8.00 | 7/05/05 |
| | | 2,000 | | 10.00 | | 2/19/07 |
| | | 6,000 | | 10.00 | | 8/31/09 |
| | | 8,000 | | 10.00 | | 3/22/10 |
| | | 140,000 | | 10.00 | | 1/15/12 |
| **Reed A. White** President of Collins & Aikman Dura Convertible Systems | 3/24/03 | 13,353 | 4.26 | 9.9750 | 8.00 | 1/28/04 |
| | | 8,000 | | 10.00 | | 3/22/10 |
| | | 27,357 | | 9.9750 | | 1/28/04 |
| | | 101,290 | | 10.00 | | 1/15/12 |
| **Eric White** President U.S. and Mexico Plastics | 3/24/03 | 40,000 | 4.26 | 10.00 | 8.00 | 1/15/12 |

(1)  These numbers have been adjusted to reflect our 1-2.5 reverse stock split on May 28, 2002.

(2)  The public offering price of the offering of our common stock which occurred on March 22, 2003 was used to establish the exercise price of the replacement options.

(3)  These numbers are the exercise prices of the options cancelled in connection with the grant of replacement options.

(4)  These are the expiration dates of both the cancelled and replacement options on March 24, 2003.

**Defined Benefit or Actuarial Plan Disclosure**

*Collins & Aikman Plan.* Provided certain eligibility requirements are met, at the end of each calendar month, pay credits are applied to a participant's account under the Collins & Aikman Corporation Employees' Pension Account Plan (the "Collins & Aikman Plan") based on the participant's length of credited service and compensation (as defined) during that month. For participants age 50 or older, the monthly pay credit is based on either credited service and compensation or age and compensation, whichever results in the higher amount.

Table of Contents

The following chart sets forth how pay credits are determined under the Collins & Aikman Plan:

| Eligibility Requirements | | | Percentage of Compensation Used to Determine Pay Credits | |
|---|---|---|---|---|
| Years of Credited Service | -or- | Age | Up to 1/3 of the S.S. Wage Base | Over 1/3 of the S.S. Wage Base |
| Less than 10 | | Less than 50 | 2.5% | 4.5% |
| 10 - 14 | | 50-54 | 3.0% | 5.5% |
| 15 - 19 | | 55-59 | 4.0% | 6.5% |
| 20 - 24 | | 60-64 | 5.0% | 8.0% |
| 25 or more | | 65 or more | 6.0% | 10.0% |

The dollar amounts that result from these percentages are added together and the total is the pay credit for the month.

In addition, interest credits are applied each month to the account balance. Participants make no contributions to the Collins & Aikman Plan. Employer contributions are 100% vested after five years of service or at age 65, whichever is earlier, and may vest under certain other circumstances as set forth in the Collins & Aikman Plan. The estimated annual benefits payable upon retirement at normal retirement age under the Collins & Aikman Plan for Messrs. Stepp, King, Eric White, Creek and Torakis, assuming they use their account balances to purchase a single life annuity, are $11,785, $36,622, $64,722, $2,021 and $1,264, respectively. Participants in the Collins & Aikman Plan have the option, however, of receiving the value of their vested account in a lump sum following termination of employment. Mr. Stockman does not participate in the Collins & Aikman Plan.

*Collins & Aikman Excess Plan.* The excess benefit plan ("SRP") of Collins & Aikman works in conjunction with the Collins & Aikman Plan and provides to the employee any benefit which the Collins & Aikman Plan would have provided except for certain legal limitations under the Employee Retirement Income Security Act of 1974 and Internal Revenue Service regulations. The pay credits and interest credits are determined as described with respect to the Collins & Aikman Plan as if no legal limitations existed, and then this plan provides any benefit which is in excess of the benefit provided under the Collins & Aikman Plan. The estimated annual benefits payable upon retirement at normal retirement age under the SRP for Messrs. Stepp, King, Eric White and Creek are $37,158, $16,834, $3,795 and $897, respectively. Mr. Stockman does not participate in the SRP. Mr. Torakis did not participate in the SRP in 2003. The balances in the SRP accounts of Messrs. Mosingo and Mitchell as of December 31, 2003 were $46,365 and $42,489, respectively.

*Collins & Aikman SRIP.* Participation in the Collins & Aikman Corporation Supplemental Retirement Income Plan (the "Collins & Aikman SRIP") is solely at the discretion of the Board of Directors of Collins & Aikman and is extended to a select group of key executives. The plan, which may be discontinued on a prospective basis at any time, provides a participating employee with a retirement benefit at or after age 62 or between ages 55 and 61 on an actuarially reduced basis. A target benefit is first calculated for each employee based on Total Annual Compensation (final base salary plus the average of the bonuses paid for the last three fiscal years) and years of service at retirement. The benefit payable from the Collins & Aikman SRIP is determined as the excess of the target benefit over any pension benefits payable from Social Security and any other retirement plans sponsored by the us. An employee does not become vested in a benefit until (i) reaching age 55 and completing 10 years of service or (ii) reaching age 62.

24

Table of Contents

The following table shows, for specified compensation and years of service classifications, the hypothetical annual target benefits under the Collins & Aikman SRIP for employees retiring at age 65, assuming that the retiring participant elects a single life annuity.

**Pension Plan Table**

| Total Annual Compensation | Years of Service | | | | | |
|---|---|---|---|---|---|---|
| | 10 | 15 | 20 | 25 | 30 | 35 |
| $ 100,000 | $ 42,000 | $ 51,000 | $ 60,000 | $ 60,000 | $ 60,000 | $ 60,000 |
| 125,000 | 52,500 | 63,750 | 75,000 | 75,000 | 75,000 | 75,000 |
| 150,000 | 63,000 | 76,500 | 90,000 | 90,000 | 90,000 | 90,000 |
| 175,000 | 73,500 | 89,250 | 105,000 | 105,000 | 105,000 | 105,000 |
| 200,000 | 84,000 | 102,000 | 120,000 | 120,000 | 120,000 | 120,000 |
| 225,000 | 94,500 | 114,750 | 135,000 | 135,000 | 135,000 | 135,000 |
| 250,000 | 105,000 | 127,500 | 150,000 | 150,000 | 150,000 | 150,000 |
| 275,000 | 115,500 | 140,250 | 165,000 | 165,000 | 165,000 | 165,000 |
| 300,000 | 126,000 | 153,000 | 180,000 | 180,000 | 180,000 | 180,000 |
| 350,000 | 147,000 | 178,500 | 210,000 | 210,000 | 210,000 | 210,000 |
| 400,000 | 168,000 | 204,000 | 240,000 | 240,000 | 240,000 | 240,000 |
| 450,000 | 189,000 | 229,500 | 270,000 | 270,000 | 270,000 | 270,000 |
| 500,000 | 210,000 | 255,000 | 300,000 | 300,000 | 300,000 | 300,000 |
| 600,000 | 252,000 | 306,000 | 360,000 | 360,000 | 360,000 | 360,000 |
| 700,000 | 294,000 | 357,000 | 420,000 | 420,000 | 420,000 | 420,000 |
| 800,000 | 336,000 | 408,000 | 480,000 | 480,000 | 480,000 | 480,000 |
| 900,000 | 378,000 | 459,000 | 540,000 | 540,000 | 540,000 | 540,000 |
| 1,000,000 | 420,000 | 510,000 | 600,000 | 600,000 | 600,000 | 600,000 |
| 1,100,000 | 462,000 | 561,000 | 660,000 | 660,000 | 660,000 | 660,000 |
| 1,200,000 | 504,000 | 612,000 | 720,000 | 720,000 | 720,000 | 720,000 |
| 1,300,000 | 546,000 | 663,000 | 780,000 | 780,000 | 780,000 | 780,000 |
| 1,400,000 | 588,000 | 714,000 | 840,000 | 840,000 | 840,000 | 840,000 |
| 1,500,000 | 630,000 | 765,000 | 900,000 | 900,000 | 900,000 | 900,000 |
| 1,600,000 | 672,000 | 816,000 | 960,000 | 960,000 | 960,000 | 960,000 |
| 1,700,000 | 714,000 | 867,000 | 1,020,000 | 1,020,000 | 1,020,000 | 1,020,000 |
| 1,800,000 | 756,000 | 918,000 | 1,080,000 | 1,080,000 | 1,080,000 | 1,080,000 |
| 1,900,000 | 798,000 | 969,000 | 1,140,000 | 1,140,000 | 1,140,000 | 1,140,000 |
| 2,000,000 | 840,000 | 1,020,000 | 1,200,000 | 1,200,000 | 1,200,000 | 1,200,000 |
| 2,100,000 | 882,000 | 1,071,000 | 1,260,000 | 1,260,000 | 1,260,000 | 1,260,000 |
| 2,200,000 | 924,000 | 1,122,000 | 1,320,000 | 1,320,000 | 1,320,000 | 1,320,000 |
| 2,300,000 | 966,000 | 1,173,000 | 1,380,000 | 1,380,000 | 1,380,000 | 1,380,000 |
| 2,400,000 | 1,008,000 | 1,224,000 | 1,440,000 | 1,440,000 | 1,440,000 | 1,440,000 |
| $2,500,000 | $1,050,000 | $1,275,000 | $1,500,000 | $1,500,000 | $1,500,000 | $1,500,000 |

All the Named Executive Officers except Messrs. Stockman and Creek participated in the Collins & Aikman SRIP in 2003. As of December 31, 2003, Mr. Stepp had 9 years, 0 months of plan service, and at age 65, he will have had an estimated 14 years, 0 months of plan service. As of December 31, 2003, Mr. King had 33 years, 0 months of plan service, and at age 65, he will have had an estimated 38 years, 11 months of plan service. As of December 31, 2003, Mr. Eric White has had 2 years, 3 months of plan service, and at age 65, he will have had an estimated 18 years, 8 months of plan service. Mr. Torakis did not participate in the

Table of Contents

plan in 2003. As of December 31, 2003, Mr. Mosingo had 5 years, 0 months of plan service and was vested under the plan pursuant to the terms of his August 2003 separation agreement with us, described below under "Employment Agreements." As of December 31, 2003, Mr. Mitchell had two years, 3 months of plan service.

## Employment Agreements

*J. Michael Stepp.* In January 2004, we entered into an employment agreement with Mr. Stepp for a period of three years subject to the terms and conditions of the agreement. The agreement provides for an initial base salary of $600,000 per year. Mr. Stepp's target bonus under the annual executive incentive compensation plan is set at 100% of his base salary. The agreement provides for employee benefits and such other fringe benefits as are available to our executives, including a perquisite allowance of $30,000 grossed up for income taxes. This allowance must be used for the lease/purchase of a company automobile, automobile insurance and maintenance, country club dues, financial planning or income tax preparation. In the event Mr. Stepp's employment is terminated by us without cause or by Mr. Stepp due to "constructive termination" prior to the expiration of the term of the agreement. Mr. Stepp shall receive (i) his base salary for 24 months based on the rate in effect immediately preceding termination date, (ii) an amount equal to the amount determined by multiplying Mr. Stepp's average actual annual bonus for the prior three years by a fraction, where the numerator is the number of whole months of service worked during the year when the termination occurs and the denominator is 12, and (iii) an amount equal to his target bonus for the year in which such termination occurs. He will also continue to participate in the benefit plans, programs and arrangements during the severance period (with the exception of the executive physical program, long-term disability plan, and the supplemental retirement income plan) unless comparable benefit plans, programs or arrangements are offered to Mr. Stepp through another employer during the severance period. The salary continuation is to be paid in accordance with our normal pay practice and the bonus would be payable in a lump sum upon the expiration of the severance period. In such event, all outstanding stock options will immediately vest and remain exercisable until the earlier of 90 days after termination or the original expiration date of said options. The agreement also provides that all of Mr. Stepp's outstanding options immediately vest upon a "Change of Control" (as defined in the agreement). In addition, we have agreed to credit Mr. Stepp under our Supplemental Retirement Income Plan with all of his years of service that preceded his break of service, and to deem him to have satisfied vesting requirements under such plan under certain circumstances.

*Millard L. King, Jr.* In August 2003, we entered into an employment agreement with Mr. King for a period of three years subject to the terms and conditions of the agreement. The agreement provides for an initial base salary of $450,000 per year. Mr. King's target bonus under the annual executive incentive compensation plan is set at 40% of his base salary. The agreement provides for employee benefits and such other fringe benefits as are available to executives, including a perquisite allowance of $20,000 grossed up for income taxes. This allowance must be used for the lease/purchase of a company automobile, automobile insurance and maintenance, country club dues, financial planning or income tax preparation. In the event Mr. King's employment is terminated by us without cause or by Mr. King due to "constructive termination" prior to the expiration of the term of the agreement, Mr. King shall receive his base salary for 24 months based on the rate in effect immediately preceding the termination date, an amount equal to the amount determined by multiplying Mr. King's average actual, annual bonus for the prior three years by a fraction, where the numerator is the number of whole months of service worked during the year when the termination occurs and the denominator is 12. He will also continue to participate in the benefit plans, programs and arrangements during the severance period (with the exception of the executive physical program, long-term disability plan, and the supplemental retirement income plan) unless Mr. King is offered comparable benefits plans, programs, or arrangements with another employer during the severance period. The salary continuation is to be paid in accordance with our normal pay practice and the bonus would be payable in a lump sum upon the expiration of the severance period. In such event, all outstanding stock options will immediately vest and remain exercisable for a period of 90 days after termination or the original expiration date of said options.

*Eric White.* In August 2003, we entered into an employment agreement with Mr. White for a period of three years subject to the terms and conditions of the agreement. The agreement provides for an initial base salary of $400,000 per year. Mr. White's target bonus under the annual executive incentive compensation plan

26

Table of Contents

is set at 40% of his base salary. The agreement provides for employee benefits and such other fringe benefits as are available to our executives, including a perquisite allowance of $20,000 grossed up for income taxes. This allowance must be used for the lease/purchase of a company automobile, automobile insurance and maintenance, country club dues, financial planning or income tax preparation. In the event Mr. White's employment is terminated by us without cause or by Mr. White due to "constructive termination" prior to the expiration of the term of the agreement, Mr. White shall receive his base salary for 24 months based on the rate in effect immediately preceding the termination date, an amount equal to the amount determined by multiplying Mr. White's average actual annual bonus for the prior three years by a fraction, where the numerator is the number of whole months of service worked during the year when the termination occurs and the denominator is 12. He will also continue to participate in the benefit plans, programs and arrangements during the severance period (with the exception of the executive physical program, long-term disability plan, and the supplemental retirement income plan) unless comparable benefit plans, programs or arrangements are offered to Mr. White through another employer during the severance period. The salary continuation is to be paid in accordance with our normal pay practice and the bonus would be payable in a lump sum upon the expiration of the severance period. In such event, all outstanding stock options will immediately vest and remain exercisable until the earlier of 90 days after termination or the original expiration date of said options.

   *Michael G. Torakis.* In August 2003, we entered into an employment agreement with Mr. Torakis for a period of three years subject to the terms and conditions of the agreement. The agreement provides for an initial base salary of $450,000 per year. Mr. Torakis' target bonus under the annual executive incentive compensation plan is set at 40% of his base salary, with such bonus guaranteed for 2003 (on a proportionate basis, based on the portion of 2003 in which Mr. Torakis was employed by us) and 2004. The agreement provides for employee benefits and such other fringe benefits as are available to our executives, including a perquisite allowance of $20,000 grossed up for income taxes. This allowance must be used for the lease/purchase of a company automobile, automobile insurance and maintenance, country club dues, financial planning or income tax preparation. In the event Mr. Torakis' employment is terminated by us without cause or by Mr. Torakis due to "constructive termination" prior to the expiration of the term of the agreement, Mr. Torakis shall receive his base salary for 24 months based on the rate in effect immediately preceding the termination date, an amount equal to the amount determined by multiplying Mr. Torakis' average actual annual bonus for the prior three years by a fraction, where the numerator is the number of whole months of service worked during the year when the termination occurs and the denominator is 12. He will also continue to participate in the benefit plans, programs and arrangements during the severance period (with the exception of the executive physical program, long-term disability plan, and the supplemental retirement income plan) unless comparable benefit plans, programs or arrangements are offered to Mr. Torakis through another employer during the severance period. The salary continuation is to be paid in accordance with our normal pay practice and the bonus would be payable in a lump sum upon the expiration of the severance period. In such event, all outstanding stock options will immediately vest and remain exercisable until the earlier of 90 days after termination or the original expiration date of said options. We also committed to grant Mr. Torakis options to purchase 240,000 shares of Collins & Aikman's common stock.

   *Jerry L. Mosingo.* In August 2003, at the time of his resignation, Mr. Mosingo entered into a separation agreement with us. As part of this agreement, Mr. Mosingo's pre-existing employment agreement and a separate pre-existing letter agreement with us were terminated. Pursuant to the August 2003 separation agreement, Mr. Mosingo received a cash payment of $400,000, a bonus settlement of $76,805 and attorney fees of $50,000 payable upon execution of the agreement. We agreed to pay Mr. Mosingo his salary of $750,000 per year for eighteen months from the termination date. Further, it was agreed that he will receive a perquisite allowance of $30,000 per year grossed up for income taxes during the salary continuation period and be provided with continued use of the company car and all maintenance and insurance costs associated therewith. All outstanding options immediately vested and continued to be fully exercisable for 90 days. Mr. Mosingo will continue to participate in our benefit plans, programs, and arrangements until the earlier of the end of the salary continuation period and the time at which he is eligible to receive benefits of another employer. We will pay a benefit under the Collins & Aikman SRIP as if Mr. Mosingo were eligible for retirement at the end of the salary continuation period with 5 years of service credit and without reduction for early commencement.

27

Table of Contents

*Michael A. Mitchell.* Mr. Mitchell's employment relationship with us ended upon his retirement in February 2004. He entered into a separation agreement with us on February 29, 2004. This agreement replaced Mr. Mitchell's pre-existing employment agreement, which was terminated. He is to receive 24 months of salary continuation at a rate of $34,375 per month in addition to continuation of his perquisite allowance in the amount of $30,000 per year grossed up for income taxes. He received a $75,000 lump sum payment upon execution of the agreement and will receive a $225,000 incentive payment equal to his target bonus for services during 2003. It is payable in accordance with normal incentive plan payments. Further, all vested stock options remain exercisable for 180 days following the date of the separation agreement.

*Wallace Creek.* Mr. Creek's employment relationship with us ended upon his retirement in June 2004. He entered into a separation agreement with us on June 7, 2004. He is to receive 13 weeks of salary continuation at a rate of $21,562.50 per month.

*Other Named Executives.* We do not have and did not have an employment agreement with Mr. Stockman.

## COMPENSATION COMMITTEE
## REPORT ON EXECUTIVE COMPENSATION

The Company's executive compensation program is administered by the Compensation Committee of the Board of Directors. The Committee is responsible for the design, administration and oversight of all senior management compensation and benefit policies, plans, programs and agreements.

### Executive Officer Compensation

The Company's compensation programs for its executive officers are intended to attract and retain qualified executives for the Company, to recognize individual performance in conjunction with overall corporate performance and to link a significant portion of the compensation paid to executives with the Company's current and long-term performance. The Compensation Committee believes that these goals are best implemented by providing a compensation package consisting of three major components: base salary, short-term incentive compensation and long-term incentive compensation.

### Base Salary

When determining base salaries for the executive officers, the Compensation Committee considers the Company's retention needs, individual experience, individual and Company performance and individual responsibilities, the salaries of other officers and employees within the Company and management's recommendations. No relative weights are assigned to any factor. In addition, the Compensation Committee considers previously obtained, survey-based compensation data for companies of similar size with jobs similar to those of the Company in magnitude, complexity and scope of responsibility. While some of the companies identified in the peer group performance graph under the heading "Performance Graph" participated in these surveys, the Compensation Committee believes its competitors for executive talent are broader than this group due to the varied businesses in which its divisions compete for executive talent. As a matter of policy, base salaries are generally targeted at the 50th percentile of this broader group of automotive supply and general industry companies.

Salaries of executive officers are reviewed periodically by the Compensation Committee, generally on a 12 to 18 month cycle. Salary adjustments are determined by subjectively evaluating the factors described in the previous paragraph.

In the opinion of the Compensation Committee, competitive base salaries contribute to the Company's overall performance by attracting and retaining high quality management.

### Short-Term Incentive Compensation

The second major component of the executive compensation program is the Company's Executive Incentive Compensation Plan (the "Bonus Plan") adopted each year. The objectives of this plan are to

28

Table of Contents

motivate key employees to achieve and exceed the Company's financial goals; maintain management's focus on the importance of earnings and cash flows; focus on annual business results to lead to improvement in stockholder value; and attract and retain key employees of the quality required to manage the Company's businesses successfully.

Under the Bonus Plan, the Company's executive officers and other key employees whom the Committee deems to be in a position to have an impact on the attainment of the earnings and cash flow goals of the Company and its operating divisions have the opportunity to earn annual performance bonuses. While the number of persons participating in the Bonus Plan varies from year to year, approximately 950 persons participated in 2003. The bonus pool for each group of participants is based on Earnings Before Interest Taxes Depreciation and Amortization (EBITDA). At the beginning of the year, EBITDA goals are established for each operating division. The Compensation Committee determines the amount of bonus actually paid under the Bonus Plan. The Chief Executive Officer may change the allocation of bonus amounts among the business units, but not the aggregate bonus pool awarded. The Company's Presidents, Executive Vice Presidents and the Senior Vice President of Human Resources may change the allocation of bonus amounts among individuals but not their respective aggregate amounts. The target award for executive officers ranges from 40% to 100% of base salary, depending on the participant's position with a subsidiary of the Company. The 2003 targets required an improvement over 2002 results.

None of the current executive officers received a bonus for 2003 under the Bonus Plan.

## Long-Term Incentive Compensation

The third major component of the Company's executive compensation program is long-term incentive compensation. Through the 2002 Collins & Aikman Stock Option Plan, the Company seeks to align the interests of key employees, including all executive officers, at or above a level selected by the Committee in its subjective judgment, more closely with those of the Company's stockholders, and to motivate and reward actions which lead to long-term value creation for stockholders. Grants under the 2002 Plan provide a direct link between any rewards executives may receive and the results achieved for stockholders. Stock options, restricted stock and stock appreciation rights are each intended to serve as compensation over a period of several years.

Stock option grants, grants of restricted stock and stock appreciation rights are made based on the Committee's subjective evaluation of the duties and responsibilities of the individual, his or her present and potential contributions to the long-term growth and success of the Company, the number of options previously granted to such person, the number and relative value of options, shares of restricted stock and stock appreciation rights granted to persons in similar positions both at the Company and at other companies deemed comparable to the Company (based on the Committee members' knowledge of options granted by other companies), the number of options, shares of restricted stock or stock appreciation rights required to attract and retain qualified management personnel, the number of options, shares of restricted stock or stock appreciation rights remaining available for grant and management's recommendations. The Committee's policy is to grant options with a term of ten years to provide a long-term incentive. In addition, the Committee's policy is generally to grant options, shares of restricted stock or stock appreciation rights that vest over a specific period to provide the executive with an incentive to remain with the Company. The Committee's policy is also to provide new executives with options, shares of restricted stock or stock appreciation rights to attract them to the Company based on negotiations with new executives, management's recommendations and the Committee's subjective judgment primarily after reviewing the number and relative value of options, shares of restricted stock or stock appreciation rights granted to similar executives of the Company. Stock options granted to the Named Executive Officers during the last fiscal year, year-end option values of options granted to the Named Executive Officers and details regarding our 2002 option cancellation/repricing program are reflected in the tables provided in the Company's proxy statement for its 2004 annual meeting.

29

Table of Contents

**Termination and Other Benefits**

The Company generally determines termination benefits for executive officers based on the executive officer's employment agreement (if applicable), the Company's general severance policies for "exempt employees" (if applicable) or an agreement with the departing executive officer at the time of separation. The Committee's policy generally has been to have employment agreements and change-in-control agreements with each of its executive officers to provide them with severance benefits. These benefits are intended to permit these executives to focus their attention on performing their duties to the Company, rather than on the security of their employment. The Company has also adopted a supplement to the Personal Savings Plan and an Excess Benefit Plan relating to the Employee's Pension Account Plan to provide the benefits the underlying plans would have provided to executives but for legal limitations under the Employee Retirement Income Security Act of 1974 and Internal Revenue Service regulations.

**Chief Executive Officer Compensation**

The compensation of the Company's Chief Executive Officer is consistent with the Company's compensation philosophy described above. However, Mr. Stockman is not currently compensated by the Company for his services to the Company.

Mr. Mosingo was Chief Executive Officer of the Company until his retirement in August 2003. During 2003 he received an annual salary of $750,000. He entered into a Separation and Consultancy Agreement with the Company in August 2003. See "Employment Agreements — Jerry L. Mosingo".

**Deductibility of Compensation in Excess of $1 Million a Year**

In 1993, Congress enacted Section 162(m) of the U.S. Internal Revenue Code of 1986, effective for tax years beginning in 1994. This legislation precludes a public corporation from taking a federal income tax deduction for compensation in excess of $1 million per year for its chief executive officer and any of its four other highest paid executive officers required to be in the summary compensation table below (with exceptions for certain performance-based compensation).

The Company will continue to review its executive compensation practices and plans on an ongoing basis with respect to Section 162(m). Where it deems advisable, the Company will take appropriate action to preserve the tax deductibility of its executive compensation, but it believes the more important objective is maintaining competitive compensation. To retain highly skilled managers and remain competitive with other employers, the Compensation Committee retains the authority to authorize other payments, including salary and bonuses that would not be deductible for federal income tax purposes, including payments under the 2003 Bonus Plans and the Company's stock option plans.

By:  The Compensation Committee of the Board of
Directors of Collins & Aikman Corporation:

David A. Stockman, *Chair*
Daniel P. Tredwell
Marshall A. Cohen

## ADDITIONAL INFORMATION

**Annual Report**

We will provide without charge to each or our stockholders, on his or her written request, a copy of our Annual Report on Form 10-K for the year ended December 31, 2003, including the financial statements and financial statement schedules. Copies can be obtained from Investor Relations, Collins & Aikman Corporation, 250 Stephenson Highway, Troy, Michigan 48083. Our periodic and current reports, including our Annual Report on Form 10-K, are also available through our website, www.collinsaikman.com.

30

Table of Contents

## Code of Business Conduct

We have adopted a Code of Business Conduct, applicable to all of our directors and employees. Copies can be obtained from Investor Relations, Collins & Aikman Corporation, 250 Stephenson Highway, Troy, Michigan 48083, or our website, www.collinsaikman.com. We plan to disclose waivers for our executive officers or directors from the code on our website, www.collinsaikman.com.

## Stockholder Proposals and Nominations

Any stockholder who wishes to submit a proposal for action to be included in the proxy materials for the Company's 2005 Annual Meeting must submit such proposal so that it is received by the Secretary of the Company not later than December 21, 2004. Proposals must be in writing and sent via registered, certified or express mail. Facsimile or other forms of electronic submissions will not be accepted.

If a stockholder desires to bring business before an annual meeting which is not the subject of a proposal timely submitted for inclusion in the proxy statement, the stockholder must follow procedures outlined in the Company's bylaws. A copy of these bylaw procedures is available upon request from the Company's Secretary, 250 Stephenson Highway, Troy, Michigan 48083. One of the procedural requirements in the bylaws is timely notice in writing of the business the stockholder proposes to bring before the annual meeting. Notice must be received not less than 90 days nor more than 120 days prior to the anniversary date of the immediately preceding annual meeting of stockholders; provided, however, that if the annual meeting is called for a date that is not within 30 days before or after such anniversary date, notice by the stockholder in order to be timely must be so received not later than the close of business on the tenth day following the day on which notice of the date of the annual meeting was mailed or public disclosure was made, whichever occurs first. It should be noted that these bylaw procedures govern proper submission of business to be put before an annual meeting and do not preclude discussion by any stockholder of any business properly brought before an annual meeting.

If a stockholder wants to nominate a person for election to the Board of Directors other than a director nominated by the Nominating and Governance Committee, notice of the proposed nomination must be delivered to or mailed and received by the Company's Secretary at the address and by the time periods set forth in the previous paragraph, in the case of an annual meeting and, in the case of a special meeting called for the purpose of electing directors, by the close of business on the tenth day following the day on which public disclosure of the date of the special meeting was made. The bylaw provision contains other requirements for notice and a copy thereof is available upon request from the Company's Secretary. For a description of the requirements for recommending director candidates for consideration to the Nominating and Governance Committee, see "Board of Directors — Director Nomination Process", page 7.

## Stockholder Communications with the Board of Directors

Stockholders may communicate with the Board of Directors, the Lead Director or the independent directors through the Secretary of Collins & Aikman by mail at Collins & Aikman's World Headquarters at 250 Stephenson Highway, Troy, Michigan 48083 or by e-mail at secretary@colaik.com. All messages will be reviewed by our Secretary's office, and all (other than frivolous messages) will be forwarded to the Board of Directors, the Lead Director or the independent directors, as appropriate.

Table of Contents

APPENDIX A

## PERFORMANCE GRAPH

The following graph compares the percentage change in the cumulative total stockholder return on the Company's common stock during the period beginning on December 24, 1998 and ending on December 31, 2003 with the cumulative total return of a peer group and the Standard & Poor's 500 composite index.

### 5-YEAR CUMULATIVE TOTAL RETURN AMONG COLLINS & AIKMAN CORPORATION, S&P 500 INDEX AND PEER GROUP INDICES



| Company/Market/Index | 12/24/98 | 12/29/99 | 12/29/00 | 12/31/01 | 12/31/02 | 12/31/03 |
|---|---|---|---|---|---|---|
| Collins & Aikman Corporation(1) | 100 | 130.45 | 95.01 | 174.69 | 40.38 | 39.29 |
| Peer Group(2) | 100 | 83.82 | 62.46 | 84.46 | 67.66 | 102.53 |
| S&P 500 Index(3) | 100 | 121.04 | 110.02 | 96.95 | 75.52 | 97.18 |

### Notes to Table

(1) Collins & Aikman Corporation.*

(2) The peer group consists of the following companies: American Axle & Manufacturing, Arvinmeritor Inc., Borg Warner Inc., Dana Corporation, Delphi Corporation, Dura Automotive Systems, Intier Automotive, Johnson Controls, Inc., Lear Corporation, Tower Automotive Inc. and Visteon Corporation.*

(3) S&P 500 — Standard & Poor's 500 Total Return Index.*

  * As compiled by Media General Financial Services of Richmond, Virginia.

A-1

Table of Contents

APPENDIX B

## COLLINS & AIKMAN DIRECTOR INDEPENDENCE GUIDELINES

A director will be deemed "independent," and to have no direct or indirect material relationship with the company (either directly or as a partner, shareholder or officer of an organization that has a relationship with the company), if he/she meets all of the following criteria:

1. within the last three years, has not (a) been an employee of Collins & Aikman or its subsidiaries, (b) been a partner, controlling shareholder, or executive officer of an organization that has a business relationship with the company, or (b) had a direct business relationship with the company (e.g., a consultant);

2. has not been affiliated with or employed by Collins & Aikman's present or former independent auditor within the last three years;

3. has not been employed by a company in which, concurrently with such employment, an executive officer of Collins & Aikman served on the compensation committee of such company within the last three years;

4. has not received more than $100,000 per year in direct compensation from Collins & Aikman or its subsidiaries within the last three years, other than director or committee fees and pensions or other forms of deferred compensation for prior service (and not contingent on continued service);

5. is not currently an executive officer or employee of a company that, within the past three years, has made payments to, or received payments from, Collins & Aikman or its subsidiaries for property or services in an amount which, in any single fiscal year, exceeded the greater of $1 million or 2% of such other company's consolidated gross revenues for such year;

6. has no immediate family member* who (i) has been employed by Collins & Aikman as an officer, (ii) has been employed by Collins & Aikman's independent auditor as a partner, principal or manager, (iii) has been employed as an officer of another company where a Collins & Aikman executive officer served on the compensation committee of that company, (iv) received more than $100,000 per year in direct compensation from Collins & Aikman or its subsidiaries other than pensions or other forms of deferred compensation for prior service (and not contingent on continued service), or (v) is currently an officer of a company that has made payments to, or received payments from, Collins & Aikman or its subsidiaries for property or services in an amount which, in any single fiscal year, exceeded the greater of $1 million or 2% of such other company's consolidated gross revenues for such year, in each case, within the last three years.

7. is not currently an executive officer of a charitable organization that has received, within the preceding three years, contributions from Collins & Aikman or its subsidiaries in any single fiscal year in excess of the greater of $1 million or 2% of such charitable organization's consolidated gross revenues for such year.

---

* A director's immediate family means his or her spouse, parents, children, siblings, mothers- and fathers-in-law, sons- and daughters-in-law and brothers- and sisters-in-law and anyone (other than domestic employees) who shares such director's home.

B-1

Table of Contents

∨ **FOLD AND DETACH HERE** ∨

## PROXY

### COLLINS & AIKMAN CORPORATION

**This Proxy is solicited on behalf of the Board of Directors for the Annual Meeting of Stockholders to be held on October 13, 2004 and any adjournment or postponement thereof.**

The undersigned hereby appoints J. Michael Stepp and Jay B. Knoll (the "Agents") as proxies (each with the power to act alone and to appoint a substitute) and hereby authorizes each of them to represent and to vote, as designated hereon, all the shares of Common Stock, par value $.0.01 per share, of Collins & Aikman Corporation (the "Company") held of record by the undersigned at the close of business on August 30, 2004 at the Annual Meeting of Stockholders of the Company to be held on October 13, 2004 at 10:30 a.m., Eastern Daylight Savings Time, and at any adjournment or postponement thereof on the proposals referred to below.

This Proxy, when executed, will be voted in accordance with the specifications hereon. **In the absence of such specifications, this Proxy will be voted FOR Proposal I and if any nominee shall be unavailable to serve as a director, this Proxy will be voted for the election of such other person or persons as the Nominating Committee of the Board of Directors or the Company may select.**

(Continued and to be signed and dated on reverse side)

Table of Contents

∨ **FOLD AND DETACH HERE** ∨

---

**THE BOARD OF DIRECTORS RECOMMENDS A VOTE FOR PROPOSAL I.**

**The undersigned hereby revokes any proxies heretofore given and directs the Agents to vote as follows:**

| | FOR all nominees (except as indicated) | WITHHOLD AUTHORITY for all nominees |
|---|---|---|
| | ☐ | ☐ |

1. **Proposal I:** Election of the following nominees as Directors: Anthony Hardwick, Timothy D. Leuliette, W. Gerald McConnell and J. Michael Stepp.

If you wish to withhold authority to vote for any nominee(s), write his (their) name(s) on the lines below.

_____ _____ _____ _____

In their discretion, the Agents are authorized to vote on any other matters as may properly come before the meeting or any adjournment or postponement thereof.

The undersigned hereby ratifies and confirms all that these Agents may do by virtue hereof and hereby acknowledges receipt of the Notice of Annual Meeting of Stockholders and the Proxy Statement.

Dated: _____,
2004

_____

Signature

_____

Signature if held jointly

Please sign your name(s) exactly as if (they) appear(s) opposite. When shares are held by joint owners, all should sign. When signing as attorney, executor, administrator, trustee or guardian, please give full title as such. If a corporation, please sign in full corporate name by president or other authorized officer and indicate title. If a partnership, please sign in partnership name by authorized person and indicate title.

Votes should be indicated (x) in black or blue ink.

Please mark, sign, date and return this Proxy Card promptly using the enclosed envelope.

# EXHIBIT E

# PART 1

**TO THE DECLARATION OF VERNON R. PROCTOR
IN SUPPORT OF DEFENDANT DAVID R. COSGROVE'S
MOTION TO DISMISS THE COMPLAINT**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MAINSTAY HIGH YIELD
CORPORATE BOND FUND,
on behalf of itself and all others
similarly situated,

        Plaintiff,               Case No. 2:07-cv-10542-AJT-SDP

v

HEARTLAND INDUSTRIAL PARTNERS, L.P.,
a Delaware limited liability partnership,
HEARTLAND INDUSTRIAL ASSOCIATES, L.L.C.,
a Delaware limited company, DAVID A. STOCKMAN,
J. MICHAEL STEPP, TIMOTHY D. LEULIETTE,
DANIEL P. TREDWELL, W. GERALD MCCONNELL,
SAMUEL VALENTI, III, JOHN A. GALANTE,
BRYCE M. KOTH, ROBERT A. KRAUSE,
GERALD E. JONES, DAVID R. COSGROVE,
ELKIN B. MCCALLUM, PAUL C. BARNABA,
THOMAS V. GOUGHERTY and
CHRISTOPHER M. WILLIAMS

        Defendants.

---

| | |
|---|---|
| MAX W. BERGER | MAYER MORGANROTH  (P17966) |
| STEVEN B. SINGER | JEFFREY B. MORGANROTH  (P41670) |
| JOHN C. BROWNE | MORGANROTH & MORGANROTH, |
| JEREMY P. ROBINSON | PLLC |
| BERNSTEIN LITOWITZ BERGER & | *Local Counsel for Plaintiff* |
| GROSSMANN, LLP | 3000 Town Center, Suite 1500 |
| *Counsel for Plaintiff* | Southfield, MI  48075 |
| 1285 Avenue of the Americas | (248) 355-3084 |
| New York, New York  10019 | |
| (212) 554-1400 | |

---

## AMENDED CLASS ACTION
## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff MainStay High Yield Corporate Bond Fund ("Plaintiff") brings this case as a class action, individually and on behalf of all other persons and entities who purchased or otherwise acquired Collins & Aikman Corporation ("C&A" or the "Company") 12.875% Notes and 10.75% Notes (together, "C&A Notes") through their duly authorized investment adviser, MacKay Shields LLC ("MacKay Shields"), during the period between August 11, 2004 through and including May 17, 2005 ("the Class Period").[1] Plaintiff alleges the following upon knowledge, with respect to its own acts, and upon other facts obtained through an investigation conducted by counsel, which included, *inter alia*, review of the Indictment filed in *United States of America v. David A. Stockman et al.*, 07 Crim. 0220 (SDNY) (the "Criminal Indictment"), the complaint filed by the United States Securities and Exchange Commission (the "SEC") action captioned *Securities and Exchange Commission v. Collins & Aikman Corp., et al.*, 07-CV-2419 (SDNY) (the "SEC Complaint"), filings with the SEC made by C&A and Heartland; press releases and other public statements; media reports; interviews with former C&A employees; and a review of documents Defendants provided MacKay Shields to induce MacKay Shields to

---

[1]   Defendants in this Action are the individuals and entities that owned and operated C&A during the Class Period: (i) Heartland Industrial Partners, L.P.; (ii) Heartland Industrial Associates, L.L.C. (together with Heartland Industrial Partners, L.P., "Heartland"); (iii) David A. Stockman ("Stockman"), Chairman and Chief Executive Officer of C&A and Senior Managing Director of Heartland; (iv) J. Michael Stepp ("Stepp"), Chief Financial Officer of C&A and Senior Managing Director of Heartland; (v) John A. Galante ("Galante"), Vice President and Treasurer of C&A and Vice President of Heartland; (vi) Bryce M. Koth ("Koth"), Senior Vice President and Chief Financial Officer of C&A; Robert A. Krause ("Krause"), Senior Vice President, Finance and Administration of C&A; (vii) Timothy D. Leuliette ("Leuliette"), Director of C&A and Senior Managing Director of Heartland; (viii) Daniel P. Tredwell ("Tredwell"), Director of C&A and Senior Managing Director of Heartland; (ix) W. Gerald McConnell ("McConnell"), Director of C&A and Senior Managing Director of Heartland; (x) Samuel Valenti, III ("Valenti"), Director of C&A and Senior Managing Director of Heartland; (xi) Gerald E. Jones ("Jones"), Chief Operating Officer and Executive Vice President of C&A's Fabrics Division; (xii) David R. Cosgrove ("Cosgrove"), C&A's Vice President of Finance, Vice President for Financial Planning and Analysis and, as of October 2004, C&A's Senior Vice President, Financial Planning and Controller; (xiii) Elkin B. McCallum ("McCallum"), Director of C&A and the Chief Executive officer and owner of Joan Fabrics; (xiv) Paul C. Barnaba ("Barnaba"), Director of Financial analysis for C&A's Purchasing Department and, eventually, vice president and the Director of Purchasing for the Plastics Division (xv) Thomas V. Gougherty ("Gougherty"), Controller of C&A's International Plastics Division and subsequently Vice President of Finance and CFO of C&A's Global Plastics Division; and (xvi) Christopher M. Williams ("Williams"), Executive Vice President of C&A's Business Development and Specialty Products groups from November 2004 through May 2005 (collectively, the "Defendants").

purchase approximately $153 million worth of C&A Notes on behalf of Plaintiff and other members of the Class (as defined below).

## NATURE OF THE ACTION

1.        Plaintiff brings this class action on behalf of a class of institutional investors who purchased, through their investment adviser, MacKay Shields, more than $153 million face value of C&A Notes (the "Class") during the Class Period.  The Class asserts claims under the Securities Exchange Act of 1934 (the "Exchange Act") against the individuals and entities that owned and operated C&A, a now-bankrupt automotive parts manufacturer located in Michigan. The Defendants include David Stockman, C&A's former CEO and Chairman, and his investment fund, Heartland, which owned a controlling stake in C&A and employed the Company's Chairman and CEO, Vice Chairman and CFO, Treasurer, and a majority of its Board.

2.        Between August 2004 and May 2005, Defendants conducted several face-to-face meetings with MacKay Shields' representatives for the sole purpose of inducing MacKay Shields to purchase C&A Notes on behalf of Plaintiff and the Class.  In marketing C&A Notes to MacKay Shields and in public filings on which MacKay Shields relied, Defendants touted C&A as one of the world's foremost designers, manufacturers and suppliers of automotive interior components, and highlighted the Company's supposedly improving financial results.  MacKay Shields reasonably relied upon this information and purchased tens of millions of dollars worth of C&A Notes on behalf of Plaintiff and the Class.

3.        As would later become clear, Defendants' statements were materially false and misleading.  From at least 2001 through May 2005, Defendants were engaged in a pervasive fraud designed to conceal from MacKay Shields and others the true state of C&A's business and operations.  Indeed, four of the Defendants—including Defendant Stockman, C&A's CEO and the founding partner of Heartland—have been <u>criminally indicted for, among other things, lying</u>

2

to MacKay Shields. Specifically, in August 2004, an investment banker acting at the request of Defendant Stockman contacted MacKay Shields regarding a $415 million Private Placement of C&A Notes. At Defendant Stockman's request, representatives of MacKay Shields agreed to a face-to-face meeting, which took place on or about August 11, 2004. At that meeting, Defendant Stockman—with the knowledge and approval of the other Defendants—made a presentation about C&A's financial condition, and also provided MacKay Shields with a Private Placement Memorandum dated August 3, 2004 (the "PPM"), and an "August 2004 Presentation to Potential Bond Investors" (the "August 2004 Presentation").

4.      Both the PPM and the August 2004 Presentation Defendants provided to MacKay Shields contained numerous materially false and misleading statements about C&A's financial results and business operations. Indeed, as stated in the Criminal Indictment:

> In or about August 2004, C&A offered, and the public purchased, approximately $415 million in [C&A Notes] based, in part, on offering materials that were false and fraudulent in that they included results of operations that had been falsely and materially inflated.

Criminal Indictment ¶48 (emphasis added). At the August 11, 2004 meeting, Defendants also misrepresented and concealed from MacKay Shields a number of serious business and operational problems facing the Company. These problems were diminishing C&A's ability to obtain new business and severely straining the Company's working capital. In fact, C&A's liquidity problems were so severe that it could not afford to pay for the supplies it needed to manufacture parts for its customers. None of this was disclosed to MacKay Shields.

5.      In reliance on Defendants' misrepresentations about C&A, between August 12, 2004 and August 20, 2004, MacKay Shields purchased on behalf of Plaintiff and the other members of the Class approximately $83 million face value of C&A's 12.875% Notes offered in the Private Placement. Between October 15, 2004 and March 2, 2005, MacKay Shields

purchased on behalf of Plaintiff and the other Class members an additional $45 million face value of C&A Notes.

6. Defendants continued to lie to Plaintiff and C&A's other investors. On March 17, 2005, the Company announced that: (i) it would restate its reported financial results for the first three quarters of 2004 and perhaps 2003 as a result of accounting irregularities; (ii) it was going to take a $500 million goodwill impairment charge and a $177 million charge to write off certain deferred tax assets; and (iii) the Audit Committee of the Board had undertaken an internal investigation of the accounting improprieties. However, these disclosures were also materially false and misleading and failed to disclose the true disastrous state of C&A's financial and business situation. Indeed, as stated in the Criminal Indictment, the Company's March 17, 2005 announcement was "materially misleading" and "intended to mislead investors." Criminal Indictment¶74.

7. Following the materially misleading March 17, 2005 announcement, Defendants arranged another face-to-face meeting with MacKay Shields where they, once again, lied about C&A's true financial and operational condition. On March 23, 2005, Defendants Stockman, Koth and Galante—with the knowledge and approval of the other Defendants—met with MacKay Shields. The Criminal Indictment confirms that, at this meeting, Defendants made false statements directly to MacKay Shields in order to induce MacKay Shields to purchase C&A Notes on behalf of the Class. As stated in the Criminal Indictment:

> On March 23, 2005, C&A made a presentation to MacKay Shields, holders of C&A's bonds. Defendant Stockman presented the same slides he had used during the March 17, 2005 earnings call, which contained the material misrepresentations regarding EBITDA and capital expenditures described above. In addition, defendant Stockman sought to assure the MacKay Shields investors that C&A had sufficient liquidity to meet its needs, when he knew that it did not.

Criminal Indictment¶76 (emphasis added).

4

8.    As a direct result of these false statements, between April 6, 2005 and May 11, 2005, MacKay Shields, on behalf of the Class, reasonably relied on Defendants' misrepresentations and purchased on behalf of Plaintiff and the other Class members approximately $17 million face value of the 12.875% C&A Notes and $4.5 million face value of other C&A Notes.

9.    On May 12, 2005—just one day after MacKay Shields made its final purchase of C&A debt—C&A stunned the market by announcing that the restatement would likely be larger than previously announced, the Company was now investigating "other matters that have arisen in the course of its investigation," and Defendant Stockman had resigned from the Company. The price of C&A's Notes dropped dramatically as a result of this disclosure.

10.    On May 16, 2005—only nine months after C&A successfully completed the Private Placement—C&A filed for bankruptcy in the United States Bankruptcy Court for the Eastern District of Michigan. The price of the Company's 12.875% Notes dropped from an offering price of $96.416 down to approximately $3.00, and the price of the 10.75% Notes, which were trading above $90 before the truth about C&A was revealed, dropped to approximately $23.00.

11.    On or about March 26, 2007, after investigating the circumstances surrounding C&A's collapse for nearly two years, the United States Attorney for the Southern District of New York released the detailed sixty-four page Criminal Indictment against Defendants Stockman, Stepp, Cosgrove and Barnaba, charging them with, among other things, securities fraud, conspiracy to commit securities fraud, and wire fraud. On the same day, the United States Attorney announced that Defendants Galante, Williams, Jones and Gougherty had pled guilty to criminal violations of the securities laws. Also on March 26, 2007, the SEC filed the SEC

Complaint against Defendants Stockman, Stepp, Jones, Cosgrove, McCallum, Barnaba, Galante, Williams and Gougherty, charging each of them with, among other things, violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

12.     As described below, the wide-ranging accounting fraud perpetrated by Defendants is staggering in its scope and audacity. For more than three years (from at least the fourth quarter of 2001 until May 2005), Defendants—including the highest ranking officers and directors of C&A and Heartland—caused the Company to artificially inflate its earnings by (i) conducting numerous fraudulent "round-trip" transactions; (ii) improperly recognizing income from supplier rebates; (iii) improperly booking price discounts on purchases of capital equipment as "income" in violation of Generally Accepted Accounting Principles ("GAAP"); (iv) manipulating EBITDA by improperly categorizing operating expenses as restructuring and impairment charges; and (v) reporting artificially inflated carrying values for goodwill.

13.     This fraudulent scheme was designed to conceal from investors the Company's deteriorating financial condition, secure additional financing for the Company, and allow C&A to maintain the appearance of financial viability. The fraud also permitted Defendant Heartland to collect approximately $45 million in management fees and other payments from C&A (which, in turn enriched the Defendants who were partners of Heartland). Further, as the Criminal Indictment acknowledges, the scheme allowed C&A to avoid filing for bankruptcy, "which would have acknowledged the failure of Stockman's leadership and resulted in the loss of Stockman's and [Heartland's] investment in C&A." Criminal Indictment ¶ 49.

14.     On March 26, 2007, in commenting on the Criminal Indictment and the Guilty Pleas, the United States Attorney for the Southern District of New York confirmed the following:

> In the years that Stockman and his co-conspirators forestalled bankruptcy through lies and fraud, Collins & Aikman sold hundreds of millions of new bonds to public investors […] <u>Those bond [] holders are now left with nothing as a direct result of the fraud we have charged today.</u>

(Emphasis added). The bondholders that the United States Attorney described as being "left with nothing" include Plaintiff and other members of the Class. This Action has been commenced to recover the substantial damages that Plaintiff and the other Class members suffered as a result of Defendants' materially false and misleading statements during the Class Period.

## JURISDICTION AND VENUE

15.     The claims alleged herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C.§78j(b) and 78t(a), and Rule 10b-5, 17 C.F.R.§240.10b-5 promulgated thereunder.

16.     The jurisdiction of this Court is based on Section 27 of the Exchange Act, 15 U.S.C.§78aa, and 28 U.S.C.§1331 and 1337.

17.     Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C.§1391(b).

18.     In connection with the acts, transactions and conduct alleged herein, the Defendants used the means and instrumentalities of interstate commerce, including the United States mails, interstate telephone communications and the facilities of national securities exchanges and markets.

## PARTIES

### I.  PLAINTIFF AND RELATED NON-PARTY MACKAY SHIELDS

19.     Plaintiff MainStay High Yield Corporate Bond Fund is a separate investment series of The Mainstay Funds, a Massachusetts business trust that is registered with the Securities and Exchange Commission as an open-end investment company under the Investment

Company Act of 1940, as amended (the "1940 Act").  Plaintiff is a mutual fund having its own

investment objectives and policies.  MacKay Shields is the duly authorized investment adviser

for Plaintiff and has full discretionary authority to make investment decisions on its behalf.

MacKay Shields is an "investment adviser" of Plaintiff, as defined in Section 2(a)(20) of the

1940 Act.  As set forth in the certification attached hereto as Exhibit A, Plaintiff purchased C&A

12.875% Notes and 10.75% Notes through MacKay Shields during the Class Period as follows:

(a) $33,645,000 in face value of the 12.875% Notes; and (b) $6,430,000 in face value of the

10.75% Notes.

20.     Non-party MacKay Shields is a multi-product investment advisory firm that

manages assets across the capital markets on behalf of a wide range of institutional clients,

including state and local pension systems.  As investment adviser for Plaintiff and the Class,

MacKay Shields had full investment discretion to make all investment decisions with respect to

the Plaintiff's and the Class's transactions in C&A Notes.  As set forth below, beginning in

August 2004, MacKay Shields purchased for the benefit of Plaintiff and the Class approximately

$129 million face value of C&A's 12.875% Notes for approximately $107 million, and more

than $24 million face value of C&A's 10.75% Notes for approximately $21 million.

## II.   DEFENDANTS

### A.    The Heartland Entities

21.     **Heartland Industrial Partners, L.P.:**  Heartland LP is a limited partnership

organized under the laws of Delaware.  Heartland LP is a $1 billion private equity firm

purportedly established for the purpose of acquiring and expanding industrial companies

operating in various sectors of the North American economy that are well positioned for global

consolidation and growth.  During the relevant period, Defendant Stockman was the founding

partner and a Senior Managing Director of Heartland LP, and also during the relevant period,

Defendants Leuliette, Tredwell, McConnell, and Valenti, III were all Senior Managing Directors of Heartland LP. The managing general partner of Heartland LP was Heartland LLC. C&A was one of Heartland LP's largest investments, representing at least 30% of Heartland LP's total investments.

22.    **Heartland Industrial Associates, L.L.C.:**  Heartland LLC is a limited liability company organized under the laws of Delaware. As of July 1, 2004, Heartland LLC beneficially owned 33,574,772 shares of C&A (34,314,147 shares as of January 1, 2005, and 32,714,147 shares as of March 17, 2005) as the general partner of each of the following limited partnerships, which hold the indicated shares directly: Heartland Industrial Partners (FF), L.P., a Delaware limited partnership; HIP Side-by-Side Partners L.P., a Delaware limited partnership; HIP Side-By-Side I-A, LLC, a Delaware limited liability company; Heartland Industrial Partners (C1), L.P., a Delaware limited partnership; and Heartland LP. At the time MacKay Shields first purchased C&A Notes on behalf of Plaintiff and other members of the Class and thereafter, Defendant Stockman was the Managing Member of Heartland LLC; and Defendant Stepp, a Director of C&A and the Company's Vice Chairman and CFO, and Defendants Tredwell, Leuliette and McConnell, each a Director of C&A, were members of Heartland LLC.

23.    During the time period relevant to this Action, Heartland owned a controlling stake in C&A and controlled and operated the Company. As of January 1, 2005, Heartland owned approximately 41% of C&A's outstanding common stock. As the PPM stated:

> Heartland and its affiliates are able to strongly influence or effectively control actions to be taken by our stockholders or directors . . . In addition, Mr. Stockman, the Chairman of the C&A Board and our Chief Executive Officer, and Mr. Stepp, our Chief Financial Officer, are both Senior Managing Directors of Heartland.

According to the Criminal Indictment, from at least February 2001 through May 2005, Heartland had a "controlling share of C&A's equity," and Stockman and Heartland "were in control of C&A" and had "operating control of C&A." Criminal Indictment ¶¶ 8, 11, 18.

24.    Indeed, a majority of C&A's Board (six of eleven directors) were affiliated with Heartland. Further, the Company's most senior officers, Defendants Stockman and Stepp were Senior Managing Directors of Heartland LP, and Defendant Galante, C&A's Treasurer since October 2004, was a Vice President of Heartland LP. Stockman was not paid any compensation by C&A for serving as CEO and Chairman; rather, his salary was paid directly by Heartland.

25.    C&A and Heartland entered into a services agreement under which Heartland provided advisory and consulting services in return for a $4.0 million annual advisory fee and additional fees of 1% of the total enterprise value of certain acquisitions. According to the PPM, Heartland provided C&A with strategic, operational and financial guidance, and the loss of such guidance could have a material adverse effect upon the Company. Heartland, in turn, benefited significantly from its relationship with C&A. During 2001, 2002, 2003 and 2004, Heartland received total advisory fees from C&A of $24.5, $5.7 million, $4.0 million, and $10.6 million, respectively—a total of more than $44 million. According to the SEC Complaint, over $22 million of this amount was eventually paid directly to Defendant Stockman.

26.    During the relevant period, Heartland LP and Heartland LLC were effectively one entity for purposes of exercising control over C&A. Heartland LLC was the managing general partner of Heartland LP, and as such exercised complete control over Heartland LP, and beneficially owned and exercised control over all of the C&A common stock held by Heartland LP. Heartland LP employed as Senior Managing Directors Defendants Stockman, Tredwell, Leuliette, and McConnell, all of whom were members of Heartland LLC and directors of C&A.

In addition, Defendant Stockman, a founding partner, Senior Managing Director and "Buyout Partner" of Heartland LP, was the Managing Member of Heartland LLC, and as such had and exercised the authority to act on behalf of Heartland LLC and Heartland LP, as demonstrated by, among other things, signing SEC filings on behalf of Heartland LLC and Heartland LP.

27.    C&A, which is headquartered in Troy, Michigan, is not named as a defendant in this action because it filed a petition for bankruptcy protection under Chapter 11 of the U.S. Bankruptcy Code on May 16, 2005.

28.    According to a March 26, 2007 press release issued by the United States Attorney's Office for the Southern District of New York ("USAO"), the Government has entered into a non-prosecution agreement with C&A. In that press release, United States Attorney Michael J. Garcia stated that the USAO had:

> reached a non-prosecution agreement with the Collins & Aikman corporation [sic]. While the fraud at Collins & Aikman went to the highest levels of the company . . . , the extensive cooperation provided by Collins & Aikman to date, as well as its current financial circumstances, prompted our conclusion that the public interest did not require that the company be charged.

(Emphasis added.) The SEC named C&A as a defendant in the SEC Complaint. According to a March 26, 2007 press release issued by the SEC, C&A has consented to the entry of a final judgment permanently enjoining the Company from violating the anti-fraud, reporting, record-keeping, and internal controls provisions of the federal securities laws.

**B.     The Individual Defendants**

29.    **David A. Stockman.** Defendant Stockman is a resident of Greenwich, Connecticut. Until his resignation in May 2005, Stockman was C&A's CEO (appointed in August 2003), was a Director of C&A (beginning in February 2001), and was Chairman of C&A's Board of Directors (beginning in August 2002). Stockman served on C&A's

compensation committee from April 2002 through at least September 2004. According to the SEC Complaint, "Stockman played a hands-on role in C&A's day-to-day operations before he became CEO in August 2003." Stockman did not receive any compensation from C&A for serving as the Company's CEO; instead, his services were provided by Heartland under a services agreement which obligated the Company to pay Heartland a multi-million annual advisory fee and reimburse Heartland's out-of-pocket expenses related to the services it provided. According to the PPM, Stockman was central to C&A's operations, and the loss of his services could have a material adverse effect on the Company.

30.     Stockman was formerly a senior managing director of The Blackstone Group, L.P. a highly successful private equity group. Prior to joining Blackstone, Stockman was a managing director in the corporate finance department of Salomon Brothers, Inc. Before Salomon Brothers, Stockman served as the director of the Office of Management and Budget in the Reagan Administration. During the relevant period, Stockman was also the Managing Member of Heartland LLC, and was a founding partner and a Senior Managing Director of Heartland LP, which listed him as its "Buyout Partner."

31.     Stockman personally participated in C&A's "road shows" to sell C&A's 12.875% Notes, met with senior portfolio managers of MacKay Shields in August of 2004, and was the Company's main spokesman to the financial media. In face-to-face meetings with representatives of MacKay Shields, Stockman personally made statements concerning C&A's operations, income, liquidity and financial performance, including EBITDA, on which MacKay Shields relied in connection with its purchases of the C&A Notes on behalf of Plaintiff and the other members of the Class. As of January 1, 2005, Stockman personally owned 331,000 shares of C&A common stock. On May 12, 2005, Stockman was forced to resign as Chairman and

CEO of C&A for withholding information from C&A's Board. Stockman signed C&A's Forms 10-K for the Fiscal Years ended December 31, 2001, December 31, 2002 and December 31, 2003 and C&A's Form 10-K/A for the Fiscal Year ended December 31, 2001. Stockman also signed C&A's Form S-4 dated April 16, 2002, Form S-4 dated January 27, 2005 (which incorporated each of C&A's previous documents filed with the SEC, including the Company's previous-filed From 10-Qs and Form 10-Ks, and attached C&A's financial statements for the years ended December 31, 2003, 2002 and 2001 and for the quarters ended September 30, 2004 and 2003), Form S-3 dated April 16, 2002, Form S-3/A dated May 21, 2002, Form S-3/A dated May 23, 2002, Form S-3/A dated June 5, 2002, Form S-4/A dated June 17, 2002 and Form S-3 dated June 24, 2002. In addition, Stockman provided certifications pursuant to Sections 302 and 906 of the Sarbanes Oxley Act attesting to the accuracy of C&A's Forms 10-Q for the Periods Ended June 30, 2003, September 30, 2003, March 31, 2004, June 30, 2004 and September 30, 2004; C&A's Forms 10-Q/A for the Periods Ended June 30, 2003, September 30, 2003 and September 30, 2004, and C&A's Form 10-K for the Fiscal Year Ended December 31, 2003.

32.    **J. Michael Stepp.** Defendant Stepp is a resident of Charlotte, North Carolina. From February 2001 until his resignation on April 27, 2006, Stepp was a Director of the Company, and was Vice Chairman of the Board of Directors. From 1995 through 1999 Stepp was C&A's CFO, and served as a consultant and Executive Vice President to the Company from 1999 through 2002. In May 2002, Stepp returned as the Company's CFO and remained in that position until he left the Company in October 2004. He previously served as interim CFO from January 2002 through April 2002, and as Executive Vice President and CFO from April 1995 through December 1999. Stepp was also a Senior Managing Director of Heartland (from March 2001).

33.    Stepp signed C&A's Forms 10-Q for the Periods Ended March 31, 2002, June 30, 2002, September 30, 2002, March 31, 2003, June 30, 2003, September 30, 2003, March 31, 2004 and June 30, 2004; C&A's Forms 10-Q/A for the Periods Ended March 31, 2002, June 30, 2003 and September 30, 2003. Stepp also signed C&A's Form 10-K for the Fiscal Years Ended December 31, 2001, December 31, 2002 and December 31, 2003 and C&A's 10-K/A for the Fiscal Year ended December 31, 2001. Stepp signed C&A's Form S-4 dated January 27, 2005, Form S-4 dated April 16, 2002, Form S-3 dated April 16, 2002, Form S-3/A dated May 21, 2002, Form S-3/A dated May 23, 2002, Form S-3/A dated June 5, 2002, Form S-4/A dated June 17, 2002, Form S-3 dated June 24, 2002 and Form 8-K dated August 5, 2002. Moreover, Stepp provided certifications pursuant to Sections 302 and 906 of the Sarbanes Oxley Act attesting to the accuracy of C&A's Forms 10-Q for the Periods Ended March 31, 2003, June 30, 2003, September 30, 2003, March 31, 2004 and June 30, 2004, C&A's Forms 10-Q/A for the Periods Ended June 30, 2003 and September 30, 2003, and C&A's Form 10-K for the Fiscal Year Ended December 31, 2003.

34.    **Timothy D. Leuliette.** Defendant Leuliette is a resident of Michigan. During the relevant period, Leuliette was a Director of C&A (beginning in February 2001). Leuliette was also a Senior Managing Director and one of the co-founders of Heartland LP, and a Member of Heartland LLC. Leuliette signed C&A's Forms 10-K for the Fiscal Years ended, December 31, 2001, December 31, 2002 and December 31, 2003, and C&A's 10-K/A for the Fiscal Year ended December 31, 2001. Leuliette also signed C&A's Form S-4 dated January 27, 2005m Form S-4 dated April 16, 2002, Form S-3 dated April 16, 2002, Form S-3/A dated May 21, 2002, Form S-3/A dated May 23, 2002, Form S-3/A dated June 5, 2002, Form S-4/A dated June 17, 2002 and Form S-3 dated June 24, 2002.

14

35.   **Daniel P. Tredwell.** Defendant Tredwell is a resident of Connecticut. From February 2001 until he resigned on May 10, 2006, Tredwell was a Director of C&A. From April 2002 through at least September 2004, Tredwell served on C&A's Compensation Committee. Tredwell was also a Senior Managing Director and a co-founder of Heartland LP and a member of Heartland LLC. Tredwell signed C&A's Forms 10-K for the Fiscal Years ended, December 31, 2001, December 31, 2002 and December 31, 2003, and C&A's 10-K/A for the Fiscal Year ended December 31, 2001. Tredwell also signed C&A's Form S-4 dated January 27, 2005, Form S-4 dated April 16, 2002, Form S-3 dated April 16, 2002, Form S-3/A dated May 21, 2002, Form S-3/A dated May 23, 2002, Form S-3/A dated June 5, 2002, Form S-4/A dated June 17, 2002 and Form S-3 dated June 24, 2002.

36.   **W. Gerald McConnell.** Defendant McConnell is a resident of New York. From February 2001 until his resignation on May 10, 2006, McConnell served as a Director of C&A. McConnell was also a Senior Managing Director of Heartland LP throughout the relevant period (and had been since its founding). At all relevant times, he was also a member of Heartland LLC. McConnell signed C&A's Forms 10-K for the Fiscal Years ended, December 31, 2001, December 31, 2002 and December 31, 2003, and C&A's 10-K/A for the Fiscal Year ended December 31, 2001. McConnell also signed C&A's Form S-4 dated January 27, 2005, Form S-4 dated April 16, 2002, Form S-3 dated April 16, 2002, Form S-3/A dated May 21, 2002, Form S-3/A dated May 23, 2002, Form S-3/A dated June 5, 2002, Form S-4/A dated June 17, 2002 and Form S-3 dated June 24, 2002.

37.   **Samuel Valenti, III.** Defendant Valenti is a resident of Michigan. Valenti was a Director of C&A from February 2001 through September 30, 2004. During the relevant period, Valenti was also a Senior Managing Director of Heartland LP. Valenti signed C&A's Forms 10-

K for the Fiscal Years ended, December 31, 2001, December 31, 2002 and December 31, 2003, and C&A's 10-K/A for the Fiscal Year ended December 31, 2001. Valenti also signed C&A's Form S-4 dated April 16, 2002, Form S-3 dated April 16, 2002, Form S-3/A dated May 21, 2002, Form S-3/A dated May 23, 2002, Form S-3/A dated June 5, 2002, Form S-4/A dated June 17, 2002 and Form S-3 dated June 24, 2002.

38.    **John A. Galante.** Defendant Galante is a resident Frisco, Texas. From October 2004 until his employment terminated on July 29, 2005, Galante was Vice President and Treasurer, and an Executive Officer, of the Company. He was previously Director, Strategic Planning from October 2002 to October 2004. At all relevant times, Galante was also a Vice President of Heartland LP, which he joined in October 2002. According to a March 26, 2007 press release issued by the USAO, Defendant Galante has "entered a plea of guilty to a three-count Information charging him with conspiracy, securities fraud, and bank fraud." Galante is also a named defendant in the SEC Complaint and is charged with, among other things, violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. Galante signed C&A's Form S-4 dated January 27, 2005.

39.    **Bryce M. Koth.** Defendant Koth is a resident of Michigan. During the relevant period, Koth was Senior Vice President and CFO of the Company (beginning in October 2004). He was previously Vice President, Finance & Controller, and head of Tax of the Company since May 2004. He joined the Company in December 2002 as Vice President, Tax. Koth signed C&A's Form 10-Q for the Period Ended September 30, 2004 and C&A's Form 10-Q/A for the Period Ended September 30, 2004, C&A's Form S-4 dated January 27, 2005, and certain Form 8-K's as specified below. Koth also provided certifications pursuant to Sections 302 and 906 of

the Sarbanes Oxley Act of the accuracy of C&A's Form 10-Q for the Period Ended September 30, 2004 and C&A's Form 10-Q/A for the period Ended September 30, 2004.

40.    **Robert A. Krause.**  Defendant Krause is a resident of Michigan.  During the relevant period, Krause was Senior Vice President, Finance and Administration of the Company (beginning in October 2004).  He was previously Vice President and Treasurer of the Company (beginning in October 2002).  Krause was also a director of Collins & Aikman Products Co., a wholly-owned subsidiary of C&A.

41.    **Gerald E. Jones.**  Defendant Jones is a resident of Bahama, North Carolina. From 2000 through the end of 2006, he served as Chief Operating Officer and Executive Vice President of C&A's Fabrics Division.  According to a March 26, 2007 press release issued by the USAO, Defendant Jones has "entered a plea of guilty to a one-count Information charging him with obstruction of an agency proceeding."  Jones is also a named defendant in the SEC Complaint and is charged with, among other things, violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.  Jones signed C&A's Form S-4 dated April 16, 2002, Form S-3 dated April 16, 2002, Form S-3/A dated May 21, 2002, Form S-3/A dated May 23, 2002, Form S-3/A dated June 5, 2002 and Form S-4/A dated June 17, 2002 (each of which contained C&A's publicly reported financial information for previous quarters).

42.    **David R. Cosgrove.**  Defendant Cosgrove is a resident of Rochester, Michigan. Cosgrove was C&A's Vice President of Finance from February to August 2002, and Vice President for Financial Planning and Analysis from August 2002 until October 2004.  In October 2004, Cosgrove became C&A's Senior Vice President, Financial Planning and Controller, remaining in that position through May 2005.  Cosgrove resides in Rochester, Michigan. Cosgrove is a named defendant in the Criminal Indictment, in which he is charged with, among

other things, conspiracy, securities fraud, and wire fraud.  Cosgrove is also a named defendant in the SEC Complaint and is charged with, among other things, violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.  Cosgrove signed C&A's Form S-4 dated January 27, 2005.

43.    **Elkin B. McCallum.**  Defendant McCallum is a resident of Tyngsboro, Massachusetts.  McCallum is the Chief Executive officer and owner of Joan Fabrics, a supplier to C&A.  From September 2001 through May 2004, McCallum served on C&A's Board of Directors.  McCallum also sold businesses to C&A during the relevant period.  According to the SEC Complaint, McCallum was a significant shareholder in C&A during the relevant period.  Cosgrove is also a named defendant in the SEC Complaint and is charged with, among other things, violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.  McCallum signed C&A's Forms 10-K for the Fiscal Years ended, December 31, 2001, December 31, 2002 and December 31, 2003, and C&A's 10-K/A for the Fiscal Year ended December 31, 2001.  McConnell also signed C&A's Form S-4 dated April 16, 2002, Form S-3 dated April 16, 2002, Form S-3/A dated May 21, 2002, Form S-3/A dated May 23, 2002, Form S-3/A dated June 5, 2002, Form S-4/A dated June 17, 2002 and Form S-3 dated June 24, 2002.

44.    **Paul C. Barnaba.**  Defendant Barnaba is a resident of Orion, Michigan.  Barnaba was the Director of Financial analysis for C&A's Purchasing Department from April 2002 until December 2004.  In December 2004, Barnaba became a vice president and the Director of Purchasing for the Plastics Division.  Barnaba left C&A in April 2005.  Barnaba is a named defendant in the Criminal Indictment, in which he is charged with, among other things, conspiracy, securities fraud, and wire fraud.  Barnaba is also a named defendant in the SEC

Complaint and is charged with, among other things, violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

45.    **Thomas V. Gougherty.** Defendant Gougherty is a resident of Gosslie, Michigan. Gougherty was Controller of C&A's International Plastics Division from July 2003 until September 2004, when he became Vice President of Finance and CFO of C&A's Global Plastics Division. He remained at C&A through at least May 2005. According to a March 26, 2007 press release issued by the USAO, Defendant Gougherty has "a plea of guilty to a two-count Information charging him with conspiracy and securities fraud." Gougherty is also a named defendant in the SEC Complaint and is charged with, among other things, violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

46.    **Christopher M. Williams.** Defendant Williams is a resident of Troy, Michigan. Williams joined C&A in 2000 as Director of Commercial Management for its contracts with Ford Motor Company. He was the Executive Vice President of the Business Development and Specialty Products groups from November 2004 through May 2005. Williams left C&A in January 2006. According to a March 26, 2007 press release issued by the USAO, Defendant Williams has "a plea of guilty to a one-count Information charging him with conspiracy." Gougherty is also a named defendant in the SEC Complaint and is charged with, among other things, violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

47.    Defendants Stockman, Stepp, Galante, Barnaba, Cosgrove, Gougherty, Jones, Williams, McCallum, Krause, and Koth, as a result of their senior operating and financial employment positions with C&A; their role as directors of C&A; and/or their employment with Heartland LP, which controlled C&A; their membership in Heartland LLC, which controlled Heartland LP as its managing general partner, possessed the power and authority to control the

contents of the oral and written statements that were made to MacKay Shields' representatives in connection with their one-on-one meetings with the C&A Defendants, as well as the contents of C&A's quarterly reports, annual reports and press releases, all of which MacKay Shields reviewed and relied upon when deciding to purchase C&A Notes on behalf of Plaintiff and the other Class members. Further, on information and belief, these Defendants were provided with copies of the presentations, SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.

48.    Because of their positions and access to material non-public information, these Defendants each knew that the material facts described herein had not been disclosed to MacKay Shields and, in fact, were being concealed from MacKay Shields, and that numerous representations made to MacKay Shields during its representatives' one-on-one meetings with Defendants Stockman, Stepp, Galante, Krause and Koth were materially false and misleading at the time they were made. Pursuant to the "group pleading" doctrine, these Defendants are liable for each of the false and misleading statements alleged herein, for each of those statements constituted "group published" information and, thus, were the result of the collective actions of these defendants in connection with their direct involvement and participation in the one-on-one meetings with MacKay Shields, as well as the day-to-day business of the Company.

49.    Defendants Tredwell, Leuliette, McConnell and Valenti, through their positions as Senior Managing Directors at Heartland and members of the C&A Board of Directors, had the power to, and did, directly and indirectly exercise control over C&A, including the content and dissemination of statements to representatives of MacKay Shields that Plaintiff alleges were false and misleading. Indeed, as alleged herein, these Defendants regularly certified the accuracy of

C&A's (materially false and misleading) financial statements and other statements that were filed with SEC and disseminated to the public.

**C.    Defendants' Knowledge of C&A's Financial Results and Operations**

50.    Defendants were intimately familiar with C&A's operating results. As described above, Heartland was C&A's largest shareholder and exercised complete control over C&A. Further, Defendants Stockman, Stepp, Leuliette, Tredwell, McConnell, Valenti, and Galante were closely affiliated with Heartland as employees or partners, as well as having senior roles at C&A. As C&A's majority shareholder, Heartland placed each of these Defendants on C&A's Board of Directors, and/or made him an officer of C&A, so that Heartland could exercise control over C&A. Defendants Stockman, Stepp, Galante, Barnaba, Cosgrove, Gougherty, Jones, Williams, McCallum, Krause, and Koth were senior officers of C&A with intimate knowledge of C&A's financial and operational condition. Defendant McCallum was a Director of C&A and, as described in more detail below, was directly involved in efforts to manipulate C&A's reported financial results.

51.    Each of these Defendants reviewed, approved, and, by operation of applicable laws and regulations, had a duty to know and understand the representations about C&A's financial and business condition made in C&A's public disclosures and in the materials that Defendants provided to MacKay Shields. Further, each of these Defendants knew or should have known that MacKay Shields would rely on C&A's publicly filed financial statements, its public disclosures, and on the information provided to MacKay Shields by Defendants, when deciding whether to purchase C&A Notes on behalf of its clients.

52.    According to the Criminal Indictment, at all relevant times, C&A tracked its sales, EBITDA, operating income, capital expenditures and other financial metrics on a monthly basis through a series of internal reports. These internal reports were generated at each C&A plant,

which would update an internal computer system with that plant's monthly or quarterly forecasts as compared to actual results. The results from each plant were then "rolled-up" to the corresponding divisions, which then consolidated the results into divisional reports. The divisional reports, in turn, were sent to the Financial Planning and Analysis group (which was headed by Defendant Cosgrove) and were consolidated into a company-wide reports that tracked actual results as compared to forecasted results. According to the Criminal Indictment, Defendant Stockman led periodic meetings to discuss C&A's operating results and, in connection with those meetings, Defendants "Stockman, Stepp, Cosgrove, and others reviewed documents that summarized information, including sales, expenses, and other anticipated accounting entries that would affect C&A's revenues in the current quarter and in following months." Criminal Indictment ¶17 (emphasis added).

53.    Defendant Stockman, acting on behalf of Heartland, was particularly familiar with C&A's finances and operations. According to Confidential Informant Number 1 ("CI 1"), a former Quality Manager at a Collins & Aikman plant in Canton, Ohio from March 2000 through September 2003, the carpet and acoustics division held Financial Business Operating Systems meetings, commonly known within the Company as BOSS meetings, approximately once a month with Stockman. Those meetings would address the financial operations of twelve plants. CI 1 attended those meetings along with Millard King, the President of the Global Soft Trim operating unit, Michael Geaghan, the Canton Plant's Vice President of Operations, and Daniel Bednarz, Divisional Controller. CI 1 described Stockman as smart and numbers-oriented, with a comprehensive knowledge of each plant's financial results. Specifically, Stockman carried large binders of each plant's financial data, and was intimately familiar with each plant's operations and finances.

54.     Confidential Informant No. 2 ("CI 2"), a former Vice President and General Manager at a C&A facility in Troy, Michigan, who was with the Company from February 2000 through December 2004, and who had direct interaction with Stockman from mid-2003 through the end of 2004, also said that Stockman had complete mastery over C&A's finances, and that at every quarterly management meeting Stockman recited financial information down to single digit thousands on each line of a plant's financial statements, at times even questioning CI 2 about matters as small as the potential cost savings of replacing two security guards with cameras.

55.     The information provided by CI 1 and CI 2 is confirmed and corroborated by the Criminal Indictment. As stated in the Criminal Indictment, Defendant Stockman "regularly met with C&A employees to discuss the financial results and projections reflected in [] various documents." Criminal Indictment ¶ 17.

56.     Defendants Stockman, Stepp, Leuliette, Tredwell, McConnell, Valenti and Galanti also familiarized themselves with C&A's operations in order to monitor and preserve Heartland's huge equity stake in C&A's business. As Senior Managing Directors of Heartland, these defendants had an incentive to (and did) closely monitor Heartland's huge investment of 33,574,772 shares of C&A (which was approximately 30% of Heartland's total fund). It was critically important to each of these defendants that C&A remain solvent in order to ensure the value of Heartland's investment. Moreover, as of August 2004, defendants Stockman and Stepp personally owned tens of thousands of shares of C&A, respectively. Defendant Stepp also received a "special recognition" bonus of $112,500.00 in 2003, which was in addition to his salary and other compensation at C&A. If C&A failed, Heartland would suffer disastrous losses, and these Defendants' own personal fortunes would be significantly impacted.

57.   In addition, on information and belief, Defendants Stockman, Stepp, Galante, Barnaba, Cosgrove, Gougherty, Jones, Williams, McCallum, Krause, and Koth personally owned shares of C&A stock and participated in C&A's employee stock option plan, pursuant to which 68,218 options to purchase shares of restricted C&A stock were issued to Company employees and executive officers on June 29, 2004.  These options were scheduled to vest in three equal annual installments on June 29, 2005, June 29, 2006 and June 29, 2007.  Accordingly, these Defendants knew that a bankruptcy filing by C&A would render their stock holdings and restricted stock options essentially worthless, imperil their own lucrative positions at the Company, and expose them to personal liability for previous public statements they had made about C&A's financial condition.

58.   As described below, Defendant McCallum knowingly participated and helped to engineer a series of fraudulent "round-trip" transactions that had no legitimate business purpose and were designed to artificially inflate C&A's reported financial results.  McCallum benefited directly from these arrangements through, among other things, sales of McCallum-owned business to C&A for amounts worth millions of dollars more than the actual value of the business.

59.   Additional allegations regarding Defendants' knowledge of C&A's financial results and operations, as well as allegations regarding their involvement in the fraudulent scheme set forth herein, are described below.

## CLASS ACTION ALLEGATIONS

60.   Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of itself and all other persons and entities for whom MacKay Shields, acting as their investment adviser, purchased or otherwise acquired C&A 12.875%

Notes and 10.75% Notes during the period August 11, 2004 through and including May 17, 2005.

61.    The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. During the Class Period, MacKay Shields purchased C&A Notes on behalf of more than sixty persons, including Plaintiff.

62.    There is a well-defined community of interest in the questions of law and fact involved in this case. MacKay Shields was authorized to invest in securities on behalf of each member of the Class, and each member of the Class purchased or otherwise acquired C&A Notes through MacKay Shields. In addition, questions of law and fact common to the members of the Class, which predominate over questions which may affect individual Class members, include:

- Whether Defendants violated the Exchange Act;

- Whether Defendants omitted and/or misrepresented material facts;

- Whether Defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

- Whether Defendants knew or deliberately disregarded that their statements were false and misleading;

- Whether the prices of C&A Notes were artificially inflated; and

- The extent of damages sustained by Class members and the appropriate measure of damages.

63.    Plaintiff's claims are typical of the claims of the other members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

64.    Plaintiff will adequately protect the interests of the other members of the Class and have retained counsel competent and experienced in class action securities litigation. Plaintiff has no interests which may conflict with other members of the Class.

65.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.

## SUBSTANTIVE ALLEGATIONS

I.    **C&A'S BUSINESS AND OPERATIONS**

66.    Prior to filing for bankruptcy, C&A held itself out as one of the world's foremost designers, manufacturers and suppliers of automotive interior components.  C&A sold its products to automotive original equipment manufacturers ("OEMs") such as GM, Ford and Chrysler, and others.  As the PPM that Defendants provided to MacKay Shields stated:

> We are a global leader in the design, engineering and manufacturing of automotive interior components, including instrument panels, fully assembled cockpit modules, floor and acoustic systems, automotive fabric, interior trim and convertible top systems.
>
> * * *
>
> Our customers include all North American automotive original equipment manufacturers (or OEMs), transplants (such as Toyota, Honda and Nissan) and certain Tier I auto suppliers.

67.    C&A supplied its products through three operating segments: (i) U.S. and Mexico Plastics, (ii) International Plastics, and (iii) Global Soft Trim.  Through its U.S. and Mexico Plastics and International Plastics segments, C&A manufactured "nearly every kind of component of the plastic interior trim within a vehicle," including cockpit modules, automotive instrument panels, door panels, sidewall trim, airflow systems, consol systems, headrests, and cupholders.  C&A's Global Soft Trim segment produced carpet, acoustic management products, fabric and convertible top systems, including floor carpets and mats, trunk trim, seat fabrics and headliner fabrics.

26

68.     Because the automotive supply industry is very competitive, maintaining sufficient liquidity and working capital was critical to C&A's success.  In securing new business from OEMs, C&A typically was forced to expend significant amounts of capital for engineering, development, tooling and other costs that generally were not recouped until the launch of a vehicle line, or over time based upon projected build levels.  Accordingly, any decline in liquidity and/or working capital materially impacted C&A's ability obtain to achieve new business and fulfill its existing contracts.

## II.    DEFENDANTS' FRAUDULENT SCHEME

69.     As discussed above, in or about February 2001, Heartland acquired a controlling stake in C&A.  Soon thereafter, in accordance with Heartland's stated investment strategy, Defendants Stockman, Heartland and others caused C&A to embark on a series of acquisitions designed to transform C&A into a "Mega Tier II" supplier of fabrics and other automotive components.  First, in or about July 2001, C&A acquired Becker Group L.L.C., a company that manufactured plastic parts for automobiles.  Second, in or about September 2001, C&A acquired Joan Automotive Fabrics, which was part of Joan Fabrics—a supplier to C&A that was owned by Defendant McCallum.  In December 2001, C&A made its largest acquisition by purchasing the trim division of Textron Automotive Company—known as "TAC-trim," for approximately $1.3 billion.  According to a press release issued by C&A on December 2001:

> David Stockman, founder of Collins & Aikman's largest shareholder, Heartland Industrial Partners, stated, "It is extremely gratifying to have completed this acquisition.  When Heartland was formed nearly two years ago, my vision was to do exactly this - take advantage of industry cyclicality to buy premier automotive properties, like TAC-Trim, at attractive prices.  This vision, in tandem with the support of Heartland's investors . . . have enabled us to rapidly build and grow Collins & Aikman into a global leader in the automotive interiors industry."

70.    These acquisitions were an important part of the overall financial plan and investment story that Defendants Stockman, Heartland and others had developed for C&A. However, it soon became apparent to Defendants that the financial climate was declining, and C&A began to face increasing pressures in its business operations (which represented C&A's major expense).  The Company was squeezed between cost-reduction mandates from its OEM clients and increases to the price of raw materials the Company needed to make its products. C&A's operating results faced further negative pressures from the high costs of integrating the businesses acquired during 2001 into the existing C&A operations.  By December 2001, these severe operational pressures, among other issues, placed C&A in danger of violating a series of financial covenants in its credit facilities.

71.    A failure to satisfy its covenants would have been catastrophic to C&A and devastating to Defendants' personal reputations and fortunes.  At the time, C&A had between $575 million and $675 million in outstanding revolving credit facilities and term loans, which required that C&A satisfy certain financial covenants.  For example, C&A was required to satisfy a "leverage covenant," which was computed by dividing C&A's net debt by its EBITDA. If C&A failed to satisfy the "leverage covenant" or other covenants, it would be deemed to be in default under its credit facilities.  According to the Criminal Indictment, C&A's financial covenants became more stringent over time, such that C&A was expected to meet more rigorous performance targets and/or reduce its overall debt levels in order to remain in compliance with its covenants.  Failure to satisfy these covenants would not only place C&A in default on its credit facilities with its lenders, but due to a series of cross-default provisions in the Company's agreements with its bondholders, a default on the credit facilities would also trigger a default on

C&A's Notes. In essence, a default on its covenants would place C&A in danger of immediate collapse and bankruptcy.

72.     Consequently, Defendants faced significant pressure to keep C&A's financial performance at a level that would (a) satisfy investors that Heartland's financial plan for C&A was successful; and (b) enable C&A to comply with the covenants in its credit facilities.

73.     As described below, rather than face the dire consequences of C&A's failing business, Defendants embarked on a massive fraudulent scheme designed to misstate C&A's publicly-reported financial results and raise hundreds of millions of dollars from unsuspecting investors, including the clients for whom MacKay Shields acted as investment adviser. This fraudulent scheme involved (1) fraudulent "round-trip" transactions designed to artificially inflate C&A's reported financial results; (2) improper recognition of supplier and other rebates; and (3) improper treatment of discounts on capital equipment purchases as "income" in violation of GAAP.

**A.     The Fraudulent "Round Trip" Transactions With Defendant McCallum**

74.     In response to the operational pressures outlined above, starting in late 2001, Defendants orchestrated a series of "round-trip" transactions between C&A and Defendant McCallum for the purpose of misrepresenting C&A's financial condition. In September 2001, at Stockman's direction, C&A acquired a company called Joan Automotive Fabrics, which was a supplier of automotive fabrics and a division of Joan Fabrics. Following that acquisition, Defendant McCallum, the CEO of Joan Fabrics, became a member of C&A's Board of Directors.

75.     Starting in or about late 2001, Defendants caused C&A to enter into numerous improper "round-trip" transactions with Defendant McCallum. These sham transactions had no legitimate business purpose and were designed solely to falsify C&A's publicly-reported

financial statements. Specifically, in a series of meetings over the course of several years,

Defendants Stockman, Stepp and Jones agreed with Defendant McCallum that McCallum would

make approximately $14.8 million in cash payments to C&A on a quarterly basis starting in the

fourth quarter 2001 and continuing through the first quarter of 2003. At the same time each of

these agreements was reached, these Defendants agreed that C&A and McCallum would arrange

a series of sham transactions to surreptitiously repay McCallum, with the net result being that

these payments were simply transfers of cash from McCallum to C&A and then from C&A back

to McCallum. Despite the round-trip nature of these transfers, C&A improperly recorded the

payments received from McCallum as supplier "rebates" that increased C&A's reported income

and artificially inflated its EBITDA and other financial results. Under GAAP and other relevant

accounting rules and regulations, these round-trip transactions should have had no impact on

C&A's income statement.

  76. The Criminal Indictment describes the "round-trip" transactions between C&A

and Joan Fabrics as follows:

> In the fourth quarter of 2001, Stockman, Stepp, and others realized that
> C&A's fourth quarter results were going to fall short of expectations.
> Therefore, Stepp, with Stockman's knowledge and approval, asked
> [Defendant McCallum] for a $3 million payment from Joan Fabrics to C&A
> that would be used to boost C&A's EBITDA for the fourth quarter of 2001.
> In return, Stockman, Stepp, and others promised to repay Joan Fabrics in
> the future. As Stockman and Stepp intended, this $3 million payment was
> characterized as a supplier rebate to allow C&A to account for it as a
> reduction in cost for the fourth quarter of 2001, and therefore increase
> C&A's EBITDA for that period. This characterization was false, as
> Stockman and Stepp had agreed that C&A would make Joan Fabrics
> "whole" for the payment at some point in the future. Therefore the
> transaction was a round trip of cash, not a supplier rebate, and should not
> have factored into C&A's EBITDA.
>
> After this first "rebate," Stockman negotiated additional payments from
> Joan Fabrics in order to boost C&A's EBITDA. Stockman negotiated these
> payments personally with [Defendant McCallum], which totaled nearly $15
> million in "rebates" between the fourth quarter of 2001 and the first quarter

of 2003. As with the first "rebate," C&A booked each payment as a
reduction in cost, and increased its EBITDA. Neither Joan Fabrics nor
entities controlled by [Defendant McCallum] had a contractual obligation to
make these payments, and they in fact only agreed to do so with the
understanding that Joan Fabrics would be repaid.

Criminal Indictment¶28, 29 (emphasis added).

77.     C&A falsely characterized the payments received from Defendant McCallum as
"supplier rebates," so that C&A could account for them as a reduction in costs, which would
artificially increase the Company's reported operating income and EBITDA for the
corresponding quarter. This characterization, however, was a blatant violation of GAAP and
other relevant accounting rules and regulations because Defendants had agreed that C&A would
"repay" McCallum for the full amounts of the so-called "rebates." Thus the transactions were
simply sham round-trip transactions of cash, not supplier rebates, and should not have impacted
C&A's financial results or reported EBITDA. *See* Criminal Indictment¶28.

78.     According to the Criminal Indictment and the SEC Complaint, Defendants
Stockman and Stepp agreed to repay the approximately $14.8 million in total "rebate" payments
that McCallum extended to C&A by structuring additional sham transactions with McCallum.
Each of these sham transactions lacked any legitimate business purpose and was designed solely
to allow C&A to repay the "rebates" extracted from McCallum. These sham transactions
included:

        a.     On or about April 19, 2002, C&A returned to Joan Fabrics certain looms

that C&A had obtained as part of the original purchase of Joan Automotive. While these

looms were worth approximately $3.1 million, they were returned by C&A for no

consideration to Joan Fabrics in order to "repay" McCallum for the $3 million received

for the fourth quarter of 2002.

b.    In March 2002, Stockman caused C&A to purchase one of McCallum's businesses, Southwest Laminates, Inc., for approximately $17 million, at least $7 million more than it was worth.

c.    In late 2002, Stockman and McCallum agreed that C&A would overpay for additional businesses and assets owned by McCallum, in order to repay additional "rebate" payments received from Joan Fabrics.  Soon thereafter, Stockman caused C&A to pay McCallum $4.2 million for Dutton Yarns (which had just been appraised at approximately $2 million), and $4.7 million for furniture looms that were worth only about $2 million.

79.    The sham "round-trip" transactions resulted in C&A falsely reporting its pre-tax operating income for each of the fourth quarter 2001 through the first quarter 2003 (as discussed herein, this information was publicly-filed with the SEC and set forth in the PPM that Defendants provided to MacKay Shields to induce MacKay Shields to purchase C&A Notes on behalf of the Class).  The impact of these misrepresentations are reflected in the following chart:

|  | 4Q 2001 | 1Q 2002 | 2Q 2002 | 3Q 2002 | 4Q 2002 | 1Q 2003 |
|---|---|---|---|---|---|---|
| C&A's reported Operating Income | ($13.5) | $54.4 | $81.5 | ($4.3) | $36.1 | $19.2 |
| C&A's actual Operating Income (not including improper McCallum payments) | ($16.3) | $49.4 | $79.7 | ($6.3) | $34.1 | $18.0 |
| Percent impact due to McCallum payments | 17% | 10% | 2% | 32% | 6% | 7% |

80.    According to the SEC Complaint, Defendants Stockman, Stepp, McCallum and Jones were directly involved in each of these fraudulent round-trip transactions.  Specifically, Stockman personally negotiated the transactions with McCallum, Stepp arranged and collected

the payments from McCallum, while Jones helped collect the payments from McCallum and

assisted in the transactions through which McCallum was repaid.  As stated in the SEC

Complaint, "Stockman, McCallum, Stepp, and Jones knew, or were reckless in not knowing, that

the McCallum payments were actually improper round-trip transactions intended to inflate

C&A's earnings and that the false earnings figures would materially affect C&A's financial

statements and the reports . . . C&A filed with the SEC."  SEC Complaint¶25.

### B.    Improper Accounting for Supplier And Purchaser Rebates

81.    It is commonplace in the automotive industry for customers who consume raw

materials (such as C&A) to negotiate rebate payments from their suppliers in return for specified

volume purchases or guarantees of future business.  Under relevant accounting rules, customers

such as C&A are permitted to record those rebates as reductions in cost (which, in turn, increase

income) in certain circumstances.  However, because the customer is not permitted to receive the

rebate until the promised volume of purchases is made, or the promised future business is

provided, it is a violation of GAAP for the customer to immediately recognize the entire amount

of the future rebate.

82.    During the Class Period, C&A sought to negotiate rebates from its suppliers.

Thus, when C&A was awarded a contract from an OEM—for instance, a contract to make

interior components for the Ford Fusion—C&A would attempt to negotiate long-term contracts

with its own suppliers who would be providing the raw materials for the components that C&A

would construct for the OEM.  As part of these efforts, C&A often negotiated certain price

reductions in the contracts so that C&A would be entitled to either volume discounts or an

upfront lump sum payment.  According to the Criminal Indictment, Defendant Stockman

referred to these lump sum payments as, among other things, "pay-to-play," or "slotting fees."

*See* Criminal Indictment¶36.  C&A's suppliers advanced these "pay-to-play" lump sum

payments in return from a commitment from C&A to provide the supplier with future business. In the case of either volume discounts or lump-sum payments, the "rebates" due to C&A were contingent on C&A either purchasing larger amounts of product from the supplier in the future (in the case of volume discounts), or entering into future business arrangements with the supplier (in the case of lump-sum payments). Pursuant to GAAP and other relevant accounting principles, these "rebates" could not be recognized on C&A's books (and thus reduce C&A's costs and increase its income) until C&A had "earned" the rebate by satisfying all of its contractual obligations to its supplier. For example, in the case of volume discounts, C&A would have to purchase the required amount of product from the supplier, while in the case of lump-sum payments, C&A would have to provide the supplier with the contractually-guaranteed amount of future business (which would entitle C&A to retain the lump-sum payment).

83.    According to the Criminal Indictment and the SEC Complaint, for each financial quarter beginning in early 2002 and continuing through March 2005, Defendants Stockman, Stepp, Galante, Cosgrove, Barnaba, Jones and Gougherty participated in a fraudulent scheme designed to recognize the cost reductions from the "rebate" transactions before the rebates had been earned by C&A. In blatant violation of GAAP, these "rebates" were recognized so that C&A could artificially lower its costs in each quarter and thereby inflate its earnings and EBITDA for that period. The Criminal Indictment describes this scheme as follows:

> Defendants Stockman, Stepp, and Cosgrove routinely attended meetings with members of the C&A Purchasing Department, including Barnaba, and knew that Barnaba and other employees from the C&A Purchasing Department were promising future business to suppliers in order to obtain up-front "rebates." In many cases, Stockman directed C&A employees to get rebates from specific suppliers; Stockman would specify the amount of the rebate to be requested and the specific future business to be promised to the supplier. Once Stockman identified a rebate, it became part of the C&A Purchasing Department's target goal for the quarter. At times relevant to this Indictment, Stockman, Stepp, and Cosgrove received weekly written

reports from the C&A Purchasing Department which included updated information concerning rebate transactions. These weekly updates often referred to the fact that future business was being promised to suppliers in exchange for rebates being booked immediately.

Beginning at least as early as in or about March 2002, defendants Stockman and Cosgrove directed employees in C&A's Purchasing Department to pull income forward into the current reporting period and thereby falsely pad C&A's reported income. Defendants Stockman and Cosgrove understood that C&A's employees were therefore soliciting false documentation from suppliers to allow C&A to account for rebates improperly, using a template letter approved by Cosgrove. In particular, defendants Stockman and Cosgrove directed C&A's employees, when documenting supplier rebates that were contingent on future business, to obtain side letters or separate documents that falsely attributed the supplier rebate to past purchases. . . . . Stockman, Stepp, Cosgrove and Barnaba used the false documents to justify immediate recognition of the supplier rebates in C&A's books and records and in its financial reports filed with the SEC.

Criminal Indictment ¶ 40.

84.     The Criminal Indictment sets out in detail the role Defendants Stockman, Stepp,

Barnaba and Cosgrove played in this aspect of the fraudulent scheme, stating:

Stockman specifically approved various contingent supplier rebates that were improperly booked in the current quarter. For example, Stockman approved the following rebates, with the knowledge and approval of Stepp and Cosgrove, each of which, as they each well knew, was contingent on future business, each of which was falsely documented to hide the contingency, and each of which was recognized in whole or in part in the current quarter:

> a. Third quarter 2003: $1 million rebate from a plastic parts supplier;

> b. Fourth quarter 2003: $250,000 rebate from a tooling supplier.

Stockman directed employees, such as Barnaba, to seek Cosgrove's guidance in "booking" the "rebates" in the current quarter, despite knowing that it would be improper to book the "rebates" in the current quarter because they were contingent on future events. Cosgrove reviewed false side letters obtained or prepared by Barnaba and C&A's Purchasing Department, with knowledge that they did not accurately reflect the true nature of the "rebates," and edited false side letters for the purpose of removing references to future business.

Criminal Indictment ¶ 41-42.

85.    The SEC Complaint confirms the allegations above and sets forth additional information regarding the fraudulent rebate transactions effected by Defendants.  *See* SEC Complaint ¶ 26-42.  These fraudulent transactions included the following:

a.    On April 2002, PPG Industries, Inc. ("PPG") agreed to pay C&A a $500,000 rebate in exchange for a specified volume of new business.  Defendant Barnaba solicited a side letter from PPG that falsely stated that the rebate was based on past purchases.  Barnaba knew that the purpose of obtaining the side letter was to give C&A a pretext to improperly recognize the full amount of the $500,000 "rebate" in the second quarter of 2002.

b.    Defendants Stockman, Stepp, Cosgrove and Barnaba used the PPG side-letter as a template to improperly recognize income from "rebate" payments received from a number of other suppliers throughout 2002, including a $900,000 rebate paid by Brown Corporation and improperly recognized in the third quarter 2002, a $138,750 rebate paid by Jackson Plastics, Inc. and improperly recognized in the third quarter 2002, a $123,470 rebate paid by ATC, Inc. and improperly recognized in the fourth quarter 2002, a $67,000 rebate paid by Pine River Plastics, Inc. and improperly recognized in the fourth quarter 2002, and another $46,250 rebate paid by Jackson Plastics, Inc. and improperly recognized by C&A in the fourth quarter 2002.

c.    In the second quarter of 2003, C&A improperly recognized rebates paid from Brown Corporation (in the amount of $500,000), Dow (in the amount of $400,000), and Manufacturer's Products (in the amount of $150,000).  In addition, in the second quarter 2003, C&A improperly recognized a $1.2 million "rebate" from DuPont Textiles

& Interiors ("DuPont") even though the "rebate" was actually a loan from DuPont to C&A.

     d.     In the third quarter of 2003, C&A improperly recognized a $1.56 million "rebate" from Exxon Mobil Corp. ("Exxon"), even though the agreement with Exxon provided that the rebate was not due until the fourth quarter of 2003 and was contingent on purchases by C&A in that next quarter, and C&A was obligated to refund part of the "rebate" if the Company did not make additional purchases from Exxon in 2004. In the third quarter of 2003, C&A also improperly booked a $1 million "rebate" from Flambeau Corporation ("Flambeau") by promising future business to Flambeau.

     e.     In the fourth quarter of 2003, C&A improperly recognized a $250,000 "rebate" payment received from Reko International Group, Inc. ("Reko"), even though the payment was contingent on C&A providing Reko with a guarantee of future business.

     f.     In the second quarter of 2004, C&A improperly recognized a $1.5 million "rebate" payment received from GE Advanced Materials ("GE"), even though the rebate was negotiated such that it would be contingent on future purchases by C&A from G&E, and the deal between G&E and C&A never materialized and the rebate was never paid by G&E. Also in the second quarter of 2004, C&A's Fabric Division (headed by Defendant Jones) was directly involved in improperly recognizing "rebate" payments in the amounts of $200,000 (from Unifi), $150,000 (from M. Dohmen, U.S.A.), $150,000 (Allied Waste), and $49,000 (from Clariant Corp). In addition, during the second quarter of 2004, C&A improperly recognized a "rebate" payment from LVM in the amount of $430,000 even though the contract was not signed until February 2005.

# EXHIBIT E

# PART 2

**TO THE DECLARATION OF VERNON R. PROCTOR
IN SUPPORT OF DEFENDANT DAVID R. COSGROVE'S
MOTION TO DISMISS THE COMPLAINT**

g.      In the third quarter of 2004, C&A improperly recognized "rebate"

payments from Angell Manufacturing ($97,197), Exxon ($44,000), and Trim Stamping

($227,850).

h.      While C&A did not file a report with the SEC reflecting its results for the

fourth quarter of 2004, the Company released fraudulent earnings figures for this quarter

on March 17, 2005 (as described in more detail below).  For this period, C&A improperly

recognized "rebate" payments in the amount of $40,000 (from Aerotex), $75,000 (from

Vichem) and $69,000 (from Meurdter).

*See* SEC Complaint ¶¶ 28-29, 32-41.

86.      Defendants Stockman, Stepp, Cosgrove, Barnaba, Galante, Jones, and Gougherty

directly participated in these rebate schemes and knew, or were reckless in not knowing, that

C&A's recognition of the rebate payments was improper and resulted in the overstatement of

C&A's publicly-reported financial results.

87.      According to the SEC Complaint, Stockman was aware of, approved, and directed

the scheme to increase income by prematurely recognizing rebates on supply contracts . . .

Stockman knew, or was reckless in not knowing, that C&A was not entitled to the rebates . . . and

that C&A's immediate recognition of the rebates in income was improper."  SEC Complaint ¶ 42.

From at least the second quarter of 2003, Stockman himself met quarterly with employees of

C&A's Purchasing Department and emphasized the importance of negotiating supplier rebates.

For instance, in one meeting, held on May 27, 2003, Defendant Stockman spoke on a conference

call with employees of three C&A divisions.  During that call, Defendant Stockman instructed

C&A employees to increase income for the second quarter of 2003 by "pulling ahead" rebates

that should have properly been recognized, if at all, in future quarters.  In addition, during all

relevant times, Stockman identified the suppliers most likely to extend rebates, chose the amount of rebates to be sought and the incentives to offer the suppliers in order to induce the "rebate" payments. Further, Stockman personally directed that the rebates be used to artificially inflate income in the quarter in which the rebate was negotiated, even though he knew or should have known that such recognition was improper. *See* SEC Complaint¶31. Stockman also participated personally in the Exxon rebate transaction (indeed, he personally negotiated the rebate agreement, was regularly briefed on the status of the negations and knew the terms of the final rebate agreement), as well as the Flambeau and Reko transactions, and approved of recording the GE rebate on C&A's books. *Id.*¶36, 42. Defendant Stockman and Defendant Stepp were also directly involved in C&A's fraudulent accounting for the DuPont transaction.

88.    Defendant Stepp was directly involved, along with Defendants Stockman and Galante in the negotiation of the Reko rebate and also participated in internal meetings of C&A's purchasing department employees at which the rebate scheme was discussed (along with Defendants Stockman, Cosgrove and Barnaba). Further, Stepp was aware that the Flambeau rebate was improper. *See* SEC Complaint¶42; Criminal Indictment¶38-40. In addition, Defendant Stepp, along with Defendants Stockman and Cosgrove "received weekly written reports from the C&A Purchasing Department which included information concerning rebate transactions . . . these weekly updates often referred to the fact that future business was being promised to suppliers in exchange for rebates being booked immediately." Criminal Indictment¶ 39.

89.    Defendants Cosgrove and Barnaba were directly involved with the rebate scheme from its inception through the end of the Class Period. Defendant Cosgrove obtained the side letters and provided the language for those letters, while Defendant Barnaba ensured that C&A

employees obtained the side letters and that the letters provided an apparent basis for C&A's improper accounting. Defendant Cosgrove obtained the side letters and provided the language for those letters, while Defendant Barnaba ensured that C&A employees obtained the side letters and that the letters provided an apparent basis for C&A's improper accounting. *See* SEC Complaint¶42.

90.     Defendant Galante was directly involved in the Reko transaction and personally arranged for that "rebate" payment to be described in one letter and the guarantee of future business to be set forth in a separate letter. *Id.*

91.     Defendant Jones was involved in the "rebate" transactions that were conducted through the Fabrics Division and, according to the SEC Complaint, Jones "knew that employees in his division were carrying out Stockman's instructions and therefore knew, or was reckless in not knowing, that the rebates were accounted for improperly." SEC Complaint¶37.

92.     Defendant Gougherty instructed employees in C&A's International Plastics Division to improperly recognize the $430,000 "rebate" payment from LVM booked in the second quarter of 2004 (as described above). *See* SEC Complaint¶42.

93.     As stated in the SEC Complaint, Defendants "Stockman, Stepp, Jones, Cosgrove, Barnaba, and Gougherty knew, or were reckless in not knowing, that C&A's treatment of the rebates . . . was intended to falsely inflate C&A's reported current earnings." SEC Complaint¶42. The Criminal Indictment similarly confirms that Defendants "Stockman, Stepp, Cosgrove, and Barnaba schemed to inflate C&A's income by systematically recognizing 'rebates' from C&A's suppliers before those cost reductions had in fact been earned by C&A." Criminal Indictment¶34.

C.    **Improper Recognition of Rebates on Purchases of Capital Equipment**

94.    By the beginning of 2004, Defendants realized that the "rebate" scheme described above was coming to an end. The Company had obtained or tried to obtain volume purchase rebates from the vast majority of its suppliers, and had already leveraged most of its new business opportunities in order to obtain up-front lump some payments. As the costs of raw materials continued to rise, suppliers were becoming more and more reluctant to make lump sum payments to customers such as C&A. In the face of these circumstances, it became obvious to Defendants that C&A needed to find a new source of "rebates" in order to continue to misstate the Company's financial condition and continue to perpetrate their fraudulent scheme. Thus, Defendants Stockman, Stepp, Cosgrove, Barnaba and Gougherty expanded the rebate scheme to capital equipment being purchased by C&A. *See* Criminal Indictment ¶ 43-45; SEC Complaint ¶ 43-48.

95.    As Defendants knew, under GAAP, any discounts on the purchase of capital equipment are reflected in the cost basis of the asset and would have no impact whatsoever on EBITDA. Defendants were also aware that C&A had historically accounted for any discounts it received on capital equipment by reflecting those discounts in the cost basis of the equipment. By 2004, however, Defendants Stockman, Stepp, Cosgrove, Barnaba and Gougherty decided to inflate C&A's reported EBITDA and operating income by negotiating discounts on C&A's purchases of capital equipment and falsely documenting those discounts as "rebates" for past purchases of non-capital items.

96.    These Defendants convinced C&A's suppliers to provide documentation falsely showing that price discounts C&A negotiated on capital equipment were "rebates" received for past purchases of non-capital goods and services. C&A would then improperly recognize the rebates in income. Defendants convinced the Company's suppliers to agree to pay—and falsely

41

document—these "rebates" by having C&A offer to pay a higher price for the equipment than originally requested by the supplier, in return for a "rebate" for the difference (or a part of the difference) and false documentation attributing the rebate to non-capital items (such as the purchase of spare parts), which would appear to justify booking the rebate as income.

97.    According to the Criminal Indictment and the SEC Complaint, Defendants engaged in the following improper transactions relating to recognition of income on discounts negotiated for purchases of capital equipment:

a.    In February and April 2004, C&A negotiated a $1 million "rebate" in the cost of new machines the Company purchased through its Hermosillo plant. These machines were purchased from Demag Plastics Group ("Demag"). Defendant Stockman instructed Defendant Cosgrove (through Defendant Barnaba) to ensure that the rebate was falsely documented by requiring Demag to submit paperwork saying that the rebate was for the purchase of spare parts and other services. C&A improperly recognized the $1 million in "income" from this transaction in the second and third quarters of 2004. *See* SEC Complaint¶44; Criminal Indictment¶44.

b.    Later in 2004, C&A obtained a $1 million discount on machinery purchased from a company called Cincinnati Milacron. Stockman against instructed Defendants Cosgrove and Barnaba to prepare paperwork that could be used to falsely characterize the "rebate," this time as "implementation of training services technical support and continuous improvements." This $1 million was recognized in the third quarter of 2004, with at least $600,000 being recognized by Defendant Gougherty. *See* SEC Complaint¶45; Criminal Indictment¶44.

c.    In the fourth quarter of 2004, at the direction of Defendant Gougherty, C&A engaged in additional transactions similar to the ones described above, including a $224,000 transaction with Krauss Maffei, another $92,000 transaction from Demag, a $100,000 transaction from RPT and a $38,000 transaction from Conair. *See* SEC Complaint ¶47.

98.    Each of these transactions were reviewed and approved by Defendants Stockman, Stepp and Cosgrove, each of whom knew or should have known that they were fraudulent, and lacked any legitimate business purpose. Criminal Indictment ¶44. Indeed, Stockman directed and participated in this scheme with full knowledge that it would improperly inflate C&A's income. Cosgrove instructed C&A's purchasing department employees to obtain the false documents relating to the rebates, and Defendant Barnaba directed employees in implementing the false transactions. Defendant Gougherty instructed employees under his supervision and control to recognize the Cincinnait Milacron rebate as income and to solicit false documentation for the Krauss Maffei rebate. *See* Sec Complaint ¶48.

**D.    Impact on Financial Statements**

99.    By engaging in improper round-trip transactions and improperly accelerating the recognition of rebates in violation of GAAP, Defendants artificially increased the Company's operating results and EBITDA. As stated in the Criminal Indictment, the fraudulent scheme set forth above "made C&A's reported revenue and EBITDA materially misleading in reporting periods between the first quarter of 2002 and the first quarter of 2005." Criminal Indictment ¶46. As stated in the SEC Complaint, "[a]s a result of the round-trip transactions with McCallum and the fraudulent rebate scheme, C&A materially overstated its income, or reduced its losses, in its quarterly reports (Form 10-Q) and annual reports (Form 10-K) for each reporting period from

the fourth quarter of 2001 through the third quarter of 2004." SEC Complaint¶51. The impact of these misstatements on C&A's operating income are set forth in the following chart:

| Period | Operating Income (reported) | Operating Income (actual) | Percentage Impact |
|--------|------------------|------------------|-------------------|
| 4Q01 | ($13.5) | ($16.3) | 17% |
| 1Q02 | $54.4 | $49.4 | 10% |
| 2Q02 | $81.5 | $79.2 | 3% |
| 3Q02 | ($4.3) | ($7.6) | 43% |
| 4Q02 | $36.1 | $33.9 | 6% |
| 1Q03 | $19.2 | $17.5 | 10% |
| 2Q03 | $44.1 | $41.1 | 7% |
| 3Q03 | $8.3 | $4.1 | 102% |
| 4Q03 | $30.4 | $25.7 | 18% |
| 1Q04 | $29.9 | $28.8 | 4% |
| 2Q04 | $26.1 | $20.7 | 26% |
| 3Q04 | $9.5 | $1.6 | 494% |

100.    As discussed below, C&A has admitted that it improperly accounted for tens of millions of dollars worth of vendor rebates in 2004 and possibly 2003, and that it will be forced to restate its financial statements for certain of those periods as a result.

101.    In addition, as described in more detail below, while C&A did not file a 10-Q for the fourth quarter of 2004 or the first quarter 2005, Defendants issued numerous materially false and misleading statements regarding the Company's financial performance for those periods.

III.    **DEFENDANTS ADDITIONAL MISREPRESENTANTATIONS MADE IN CONNECTION WITH MARKETING C&A NOTES TO MACKAY SHIELDS**

102.    In addition to the fraudulent scheme set forth above, Defendants made numerous additional material misstatements in the course of marketing the C&A Notes to MacKay Shields and for the purpose of inducing MacKay Shields to purchase the C&A Notes on behalf of Plaintiff and the other members of the Class. These include (1) misrepresentations and distortions of C&A's EBITDA; (2) misrepresentations concerning C&A's business and operations; (3) misrepresentations concerning C&A's carrying value for goodwill; and (4) misrepresentations concerning C&A's internal controls over financial reporting.

A.    **Defendants' Additional Misrepresentations of C&A's EBITDA**

103.    EBITDA is an important consideration for debt investors because it measures a company's ability to generate sufficient operating cash to service and ultimately repay its debt – a fact which Defendants readily acknowledged. Indeed, in C&A's Form 10-Q for 2Q04 (the "2Q04 10-Q"), which was filed with the SEC on or about August 3, 2004, C&A emphasized the importance of EBITDA, calling it a "Key Indicator[s] of Performance." As the 2Q04 10-Q stated:

> [M]anagement . . . considers EBITDA to be a useful proxy for measuring the cash generated by our business and it is commonly used in the industry to analyze operating performance, liquidity and entity valuation . . . Management believes EBITDA to be a good measure of operating performance because cash generation is necessary for the Company to achieve many of the critical success factors outlined above, including investment in cost reduction activities, reducing leverage and improving liquidity.

104.    Accordingly, in the months leading up to the August 2004 Private Placement, Defendants repeatedly emphasized C&A's purportedly improving financial results and EBITDA in public filings, press releases, conference calls, and marketing materials provided to MacKay Shields and other investors.

105.   For example, on August 2, 2004, in a press release carried over *PR Newswire*, Defendants reported C&A's earnings for the second quarter of 2004 and the six months ended June 30, 2004 (the "August 2, 2004 Press Release").  That same day, the Company filed a Form 8-K with the SEC, signed by Defendant Stepp, which attached the August 2, 2004 Press Release. On information and belief, all of the Defendants reviewed, approved and authorized the press release before it was issued to the public.

106.   The August 2, 2004 Press Release reported "record second quarter 2004 net sales of $1.036 billion" and highlighted the Company's fourth consecutive quarter of improved EBITDA performance.  Defendant Stockman was quoted in the August 2, 2004 Press Release as follows:

> [f]or the fourth consecutive quarter [C&A's] EBITDA performance, excluding restructuring and impairment charges was up significantly from the prior year on a comparable basis.

107.   That same day, C&A held a conference call for institutional investors, which MacKay Shields participated in.  During the conference call, Defendant Stockman again emphasized C&A's EBITDA and represented that C&A was succeeding in spite of difficult market factors:

> I am pleased to report that we have now had our fourth straight quarter of very strong EBITDA gains in both dollars and margins. . . [W]e came in at [$]100.4 million before restructuring and impairment charges, in line with our expectations. This represents a 20 percent increase over the prior year, so we are making demonstrable progress. This also comes in light of some of the headwinds that we've had to push against, such as upward pressure on commodity costs and downward pressure on our selling prices. But since August 2003, when we made a change in our top management, we have accelerated the pace and the intensity of our consolidation cost-cutting and platform growth strategy, and have been able to overcome these adverse forces.

108.   Shortly after the Company announced its purportedly strong second quarter results, Defendant Stockman and other representatives of C&A contacted MacKay Shields—an

entity which Defendants knew was an investment adviser—and asked to set up a meeting to market C&A Notes to MacKay Shields, for a potential investment on behalf of its clients. MacKay Shields agreed to the meeting.

109.    Before meeting with C&A, MacKay Shields reviewed the Company's most recent prior filings with the SEC, including the Company's 2003 Form 10-K and its 2Q04 10-Q. Note 2 to the Condensed Consolidated Financial Statements in the 2Q04 10-Q included the following representation from C&A management:

> The consolidated financial statements include the accounts of the Company and its consolidated subsidiaries and in the opinion of management, contain all adjustments necessary for a fair presentation of financial position and results of operations.

Further, pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, defendants Stockman and Stepp certified that:

> the Report on Form 10-Q for the period ended June 30, 2004 of Collins & Aikman Corporation (the "Company") fully complies with the requirements of Section 13(a) or a Section 15(d) of the Securities Exchange Act of 1934 and that the information contained in such Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

110.    On or about August 11, 2004, MacKay Shields met with Defendants Stockman and Stepp. At this meeting, Defendants Stockman and Stepp represented that they had authority to speak on behalf of Heartland, C&A and the other Defendants, and provided MacKay Shields with the August 2004 Presentation and the PPM. The PPM included C&A's materially misleading financial statements for the fourth quarter 2001 through the second quarter of 2004. The PPM also included a section entitled "Selected Historical Financial Data", which included the Company's financial results for the fiscal years 2001, 2002, 2003 and the three months ended March 31, 2004. The PPM also attached C&A's consolidated financial statements for the years ended 2003 and 2002, and expressly incorporated each of C&A's previous filings with the SEC,

including the Company's Forms 10-Q for the fourth quarter 2001 through the second quarter of 2004, and its Form 10-K's for the fiscal years ended 2001, 2002, and 2003. MacKay Shields reviewed and relied on the information in the PPM in making its decision to purchase C&A Notes on behalf of Plaintiff and the Class. Both the SEC Complaint and the Criminal Indictment state that the offering materials by which Defendants marketed C&A Notes in August 2004 were "false and fraudulent" and "materially false or misleading." *See* Criminal Indictment¶48; SEC Complaint¶49.

111.    Like the PPM, the August 2004 Presentation—which was created for the sole purpose of marketing C&A Notes to debt investors such as MacKay Shields—was designed to create the impression that C&A was a healthy company with strong financials and good future prospects. For example, the August 2004 Presentation highlighted C&A's "2003 North American Interior Revenue", noting that it was more than double its next closest competitor. It also repeatedly focused on the Company's EBITDA for the second quarter of 2004. Among other things, the August 2004 Presentation stated that C&A's 2Q04 EBITDA, adjusted to exclude so-called non-operating restructuring and impairment charges, was $100.4 million, which (i) represented a "20% increase over prior year Q2"; (ii) was the "4th consecutive quarter of EBITDA improvement"; (iii) the "Best margin in last 8 quarters"; and (iv) "LTM EBITDA performance has rebounded significantly since the management change in August 2003, improving 15% from the Q2 2003 trough." Further, in a section entitled "2004 Guidance Update", the August 2004 Presentation confirmed that the Company was on track to achieve its EBITDA guidance for 2004 stating, among other things, "Our March guidance projected 2004 EBITDA before restructuring and impairment at levels between $355-$370 million . . . [d]uring

the second half we expect comparable results and to achieve the lower end of our range for the year."

112. The August 2004 Presentation also favorably compared C&A's reported EBITDA for the first and second quarters of 2003 against those same quarters for 2004. It stated that EBITDA for the first quarter of 2003 was $70.7, compared to $79.4 for the first quarter of 2004, a 12% increase. Similarly, the presentation stated that EBITDA for the second quarter of 2003 was $70.7, compared to $79.4 for the second quarter of 2004, for a 20% gain.

113. Based on these EBITDA numbers, the August 2004 presentation calculated the Company's "net leverage" (calculated by dividing C&A's last twelve months [LTM] EBITDA by its net outstanding debt) and its "pro forma credit statistics" (calculated based on C&A's reported $333.6 LTM [Last Twelve Months] EBITDA). The presentation stated that the Company had a net leverage ratio of 4.3x for 2Q04, and that this net leverage ratio was an improvement from the 4.5x net leverage ratio for 1Q04. According to the August 2004 Presentation, C&A's "pro forma credit statistics" were as follows:

| | |
|---|---|
| Senior Secured Debt/ Adjusted EBITDA | 1.7x |
| Senior Debt/Adjusted EBITDA | 3.2x |
| Total Debt/Adjusted EBITDA | 4.4x |
| Adjusted EBITDA/Pr Forma Cash Interest | 2.4x |
| (Adjusted EBITDA-Capex)/Pro Forma Cash Interest | 1.2x |

114. Defendants' statements regarding C&A's EBITDA were materially false and misleading as a result of the fraudulent scheme described above. Defendants' statements

regarding C&A's EBITDA were also materially false and misleading for the following additional reasons.

115.   *First*, Defendants were improperly classifying tens of millions of dollars of actual operating costs as "restructuring" or "impairment" charges.  When reporting EBITDA, Defendants repeatedly emphasized EBITDA <u>before</u> any extraordinary or unusual charges (such as restructuring or impairment charges) were incurred.  Defendants did so because they understood that investors would largely ignore these restructuring and impairment charges when making their investment decisions, because investors considered them to be "non-operating" or "nonrecurring" charges which did not impact the Company's core operations or future cash flow. Debt investors are not concerned with "non-operating" charges because they do not have an impact on EBITDA in subsequent periods and thus have little if any impact on the Company's ability to make its interest payments.

116.   Unbeknownst to MacKay Shields or Plaintiff, however, Defendants manipulated EBITDA before restructuring and impairment charges by improperly classifying ordinary operating costs as "restructuring" and "impairment" charges.  These manipulations were confirmed by CI 2, who said that he and his staff were always under pressure to categorize ordinary expenses as capital expenditures or non-operating expenses to avoid an immediate impact to EBITDA.  In fact, CI 2 said that C&A frequently tried to interpret routine operating expenses as "restructuring expenses," and that Stockman was always creative in the way he transformed expenses into capital outlays.

117.   CI 2 also said it was the Company's "standard mode of business" to evaluate every expenditure in an attempt to classify it as either capital or non-operating, and that during every quarter from at least mid-2003 through the end of 2004, Stockman encouraged C&A

50

facilities to classify operating expenses as non-operating, in a Company-wide effort to increase EBITDA. CI 2 even noted that when the President of his division, Reed White, retired in the third quarter of 2004, C&A recorded White's salary through the end of 2004, which is a classic example of a normal operating expense, as a restructuring expense.

118.   Had MacKay Shields known that the Company's EBITDA was materially overstated because Defendants were classifying routine operating expenses as "restructuring" and "impairment" charges, MacKay Shields would have known that the Company's financial condition was far worse than represented and, therefore, would not have purchased the C&A Notes on behalf of Plaintiff and the other members of the Class.

119.   *Second*, on information and belief, the Company's reported revenues and EBITDA were materially misrepresented because C&A artificially inflated its reported sales and receivables. As described in the Criminal Indictment (and discussed in more detail below), C&A "pre-billed" millions of dollars of receivables, and fabricated the documentation needed to support those receivables. On or about June 22, 2005, General Electric Capital Corporation ("GECC") filed a motion in the United States Bankruptcy Court for the Eastern District of Michigan seeking relief from the automatic stay imposed by the Bankruptcy Code. According to that motion, at the time of C&A's bankruptcy filing C&A owed GECC at least $78 million and GECC held a security interest in C&A's accounts receivables. The parties' agreements required C&A to deposit any collections in a lockbox for the benefit of GECC. However, C&A was instead converting such collections for its own use, rather than providing them to GECC. As a result, GECC was asking the Court to allow it to seize records maintained by C&A regarding its receivables and collections, and to receive the collections directly.

120.   According to exhibits filed in support of that motion, C&A was also pre-billing

receivables, and was repeatedly unable to provide information GECC had requested to verify that

the Company's receivables were valid.  Specifically, on June 3, 2005, GECC sent a letter to

C&A stating that "this morning, we were advised by KZC Services, LLC, the financial

consultants to C&A Products, that a potentially material portion of the Receivables owned by

[C&A] may constitute pre-billed tooling Receivables which had been incorrectly identified as

Eligible Receivables in various reports" provided to GECC.  The letter noted that GECC was

"gravely concerned" about this revelation and "expected to receive a comprehensive accounting

of the nature and amount" of the Company's receivables.  The letter further stated that C&A and

its financial consultant "will be working over this weekend [i.e., June 4-5, 2005] to obtain

detailed information concerning these Receivables," and would report their findings to GECC on

Monday, June 6.

121.   Significantly, C&A was unable to provide the information requested by GECC.

On June 13, 2005, GECC sent another letter to C&A, reiterating its concerns and stating that

while "we have received copies of invoices and purchase orders for the 50 largest tooling

Receivables as of April 30, 2005, we have yet to receive a full accounting of current balances

nor, despite our repeated requests, have we received copies of source documentation such as

customer acceptances, written consents to billing, or evidence that tooling is in volume

production."  As a result, GECC demanded to exercise its right under its agreement with C&A to

conduct an "onsite audit" on June 14 to verify C&A's receivables, which would include

"reconciliation of account receivable balances, recent customer remittances and recent payments

from the [customers], as well as review of the purchase orders, invoices and other documentation

relating to the Receivables."  Ultimately, GECC did not receive or obtain this information.

According to GECC's motion, which was filed on June 22, 2005, as of that date "GECC had been provided virtually no information by C&A."

122.    The information relating to C&A's accounts receivables that GECC requested are the fundamental records supporting outstanding accounts receivable which companies typically and routinely maintain, and such information should have been readily available from the records of C&A, specifically, within C&A's accounts receivables department.  Indeed, C&A's contract with GECC specifically required C&A to "keep and maintain all documents, books, records and other information reasonably necessary or advisable for the collection of all Receivables (including, without limitation, records adequate to permit the daily identification of each new Receivable and all Collections of and adjustments to each existing Receivable)", and as set forth above also allowed GECC to review such documents upon request.  Had this information existed, and C&A's accounts receivables been in order, C&A would have had no reason not to provide it to GECC, and in fact would have readily provided it to GECC.

123.    C&A's fraudulent manipulations of its sales and receivables and the falsification of the Company's documentation of its outstanding receivables is described in more detail below.

124.    Defendants' misrepresentations concerning C&A's EBITDA were material.  While C&A's reported financial results and EBITDA showed a company with ample liquidity and strong future prospects, C&A's true operating results would have depicted a company on the brink of financial ruin.  Had MacKay Shields known the truth about C&A's reported EBITDA, MacKay Shields would not have purchased C&A Notes on behalf of Plaintiff and the other members of the Class.

## B. **Defendants' Misrepresentations Concerning C&A's Business and Operations**

125.    In addition to misstating the Company's financial results, Defendants also made a series of material false statements regarding C&A's business. In the months leading up to C&A's private placement in August 2004, Defendants consistently touted C&A's supposedly "world-class" business facilities and operations, including its purported "new business wins," "unique and unusually attractive competitive position" and "superior business model." These statements were designed to convince investors that C&A was a leader in its industry that was overcoming difficult market conditions, and was a healthy company with bright future prospects.

126.    For example, in the August 2, 2004 Press Release, Defendants highlighted the supposedly superior quality of C&A's business, and touted the Company's "high-quality products," which it described as "the most effective in the industry." The press release also touted C&A's "New Business Wins," stating that "during the second quarter of 2004, Collins & Aikman continued to achieve good progress on increasing new business by adding $450 million of annual newly booked business." Defendants expanded on these statements on the August 2, 2004 conference call, where Defendant Stockman stated, among other things, that "we are continuing to be awarded new business at a very healthy pace that will sustain our growth trajectory that we have talked to you about previously."

127.    Defendant Stockman also emphasized the importance to C&A of being positioned "green" by the Company's major customers (*i.e.,* in the view of its customers, C&A was able to honor its contracts by consistently delivering conforming parts on a timely basis), stating "Now in order to take advantage of these opportunities—the long-term awards in a regular way and transfer or capture of business in the short run—we need to be positioned green, to quote, in the eyes of our major customers."

128.    The August 2004 Presentation and the PPM—the documents provided to MacKay Shields in connection with the August 11, 2004 meeting—likewise made unduly positive and misleading statements about C&A's business.  For example, among other things, the August 2004 Presentation stated that "C&A occupies a unique and unusually attractive competitive position," and stressed C&A's high-quality services and "competitive advantages," including an "extensive production footprint that can efficiently service nearly every OEM assembly plant." According to the August 2004 Presentation, C&A had recently achieved "Seven New World-Class Facility Launches" and had a "World class 'lean' manufacturing culture."

129.    The August 2004 Presentation also specifically highlighted C&A's new facility located in Hermosillo, Mexico.  C&A had designed and constructed the Hermosillo facility to build the interiors for the Ford Fusion, which was the largest and most important project in C&A's history.  The presentation called the Hermosillo project a "World Class Facility" with state-of-the-art equipment, and further noted that the facility was a "Strong Validation of C&A's Business Model."  These statements, as well as the others set forth herein, were designed to convince MacKay Shields that C&A had a bright future and a strong relationship with its customers.

130.    Defendants' statements regarding C&A's business and operations were materially false and misleading for several reasons.

131.    *First*, unbeknownst to MacKay Shields, C&A was not properly staffing and tooling its projects.  These problems were causing C&A's customers to cancel contracts and withhold payments, which, in turn, had a devastating effect on the Company's available cash and credit, two factors that were critical to MacKay Shields' determination to purchase the C&A Notes on behalf of Plaintiff and the other members of the Class.

132.    According to CI 1 and CI 2, OEMs required C&A to assign specific numbers of appropriate personnel to construction projects.  However, because of C&A's deteriorating financial condition, during the summer of 2004 the Company did not have anywhere near the number of staff required to service its existing projects, let alone the number needed to service any new business.

133.    According to CI 2, when a particular OEM demanded to meet with a project team it was not unusual for C&A to "play a shell game" by pulling design and engineering staff from other projects in order to show the OEM the required number of personnel.  These personnel were not actually assigned to these projects, however, and usually within a week, the counterfeit staff was back manning their original projects until the next time the OEM required a meeting.  For instance, CI 2 recounted occasions when Ford, which had required twenty-two designers and engineers to staff a project for the Mustang, called meetings of the C&A staff.  At the direction of his superiors, CI 2 first combed through C&A organization charts to try to dig up the required number of personnel.  When he failed to find enough people, Stockman appeared at two meetings with Ford to explain why C&A could not have all of the personnel in attendance.

134.    The problems experienced by C&A in staffing projects were confirmed by a former C&A executive, who was quoted in press reports in May 2005.  The former C&A executive, who left C&A in 2004, stated that C&A often cut back engineering, design and manpower for automaker programs, even though the Company had promised certain levels of engineering, or a certain number of people on a program.

135.    Another striking example of C&A's inability to properly staff its projects was the Hermosillo facility.  According to the former C&A executive, the Hermosillo project was severely understaffed.  This executive stated that while C&A had committed to Ford that it

56

would have a certain number of people for this project, it only had half that number of employees involved. This situation put the entire project at risk. According to a May 18, 2005 article in the Detroit Free Press:

> We committed to a certain number of people for Ford on the Fusion, but we had half as many as we said we did . . . Ford wanted regular meetings with us on the Fusion, so we'd send people to Dearborn who were managers that knew nothing about design or about the Fusion and tell Ford they were a designer to make it look like we had X number of bodies for Ford. They were just placeholders. Had Ford asked them a question about the Fusion it would have been ugly. It was outright deceit.

136.    Moreover, C&A was not properly supplying the Hermosillo facility with high-quality, modern equipment. Even though C&A represented that the facility would be a "world class" facility with all new equipment, C&A was actually stocking it with secondhand machinery. According to the May 17, 2005 article in the Detroit Free Press, after Ford learned of this it became "frustrated that C&A [had] sent secondhand machinery to the plant" and was "worried that, among other things, C&A's angry vendors could disrupt production and not deliver parts on time."

137.    *Second*, unbeknownst to MacKay Shields, C&A was increasingly producing non-conforming parts that did not meet its customers' specifications. This, in turn, led the Company to burn through its available cash and revolving credit.

138.    According to CI 2, the Company had a regularly recurring problem with the Production Part Approval Process, or "PPAP." Under PPAP, when C&A was ready to finally produce a part, the Company provided its customer with a prototype part for the customer's inspection. This normally occurred thirty days before the OEM's scheduled start of production. However, by the summer of 2004, the Company's production had become so poor that, according to CI 2, it increasingly had "bad launches" of components, and was frequently unable to pass PPAP on a timely basis. As set forth below, this created significant liquidity issues for

C&A, and seriously undermined C&A's relationships with OEMs, because those OEMS could not start production until C&A's parts passed PPAP.

139.   For example, CI 2 described how C&A's production issues created significant problems with General Motors, which accounted for approximately 22% of the Company's revenue in 2003.  During the early summer of 2004, C&A had six companywide "bad launches" of GM components.  The problems were so severe and pervasive that GM warned C&A that one more "bad launch" would automatically result in GM putting the Company on "new business hold," also known as "going red."  This meant that, in GM's view, C&A was unable to consistently deliver conforming parts and did not have a plan to remedy the problem.

140.   The seventh bad launch occurred in October 2004, while C&A was in position to be awarded contracts for GM's Hummer HX Mini Van and Theta Platform.  As a result, C&A lost both contracts.

141.   *Third*, unbeknownst to MacKay Shields, C&A's increasingly substandard production was draining the Company's available cash and credit, which was critical to MacKay Shields' decision to purchase the C&A Notes on behalf of Plaintiff and the other members of the Class.

142.   For a company such as C&A, manufacturing substandard products which do not conform to customer specifications or requirements often results in liquidity issues.  That is because automotive parts companies like C&A have to pay their vendors in order to keep supplies coming in, but do not get paid themselves until the parts they deliver are approved under PPAP by their OEM customers.  Indeed, C&A customarily advanced all costs incurred in connection with tool and design projects, and was only paid when the parts passed PPAP.  This meant that C&A was forced to front what was often millions of dollars in costs until PPAP

occurred. PPAP was supposed to occur thirty days before an OEM's start of production. However, according to CI 2, because of C&A's increasing incidents of production failure, C&A often did not pass PPAP until ninety days or more <u>after</u> the OEM's scheduled start of production. Thus, instead of being paid thirty days before the start of production, the Company was not being paid in many instances until ninety days or more after the start of production. This had a significantly negative effect on the Company's cash flow and liquidity.

143.    During the early summer of 2004, the cash and credit drain caused by the PPAP situation became so bad that, according to CI 2, C&A became what is known in the automotive parts industry as a "distressed supplier." C&A's manufacturing difficulties were so pervasive that it essentially had to beg OEMs to pay at least some portion of the contract price for those components that were close to conforming.

144.    By the time Defendants solicited MacKay Shields to purchase C&A Notes on behalf of its clients, these problems had already caused a substantial adverse effect on C&A's relationship with its own suppliers. According to CI 1, C&A routinely held its accounts payable until the Company started to receive collection notices from suppliers in a desperate measure to conserve cash. And CI 2 stated that C&A's practice of delaying payments to suppliers became so prevalent that, beginning no later than the second quarter of 2004, C&A's Treasurer, Defendant Galante, established an unwritten "rule" that no supplier would be paid unless that supplier first sent C&A a written threat to shut down delivery. The statements of CI 1 and CI2 are corroborated and confirmed by the Criminal Indictment. As stated in the Criminal Indictment, by no later than at least January 2005, "at Stockman's direction, C&A delayed paying its bills as long as possible, and many of C&A's suppliers were being paid only when they threatened to stop supplying C&A with goods." Criminal Indictment ¶ 54.

145.    Defendants' misrepresentations concerning C&A's business and operating condition were material.  The materials Defendants provided to MacKay Shields and disclosed to the markets described a "world-class" company with sufficient staff, top-of-the-line equipment, good relationships with its customers, significant "new business wins," and ample liquidity.  The truth, however, was that C&A's business was in chaos; its relationships with its suppliers were deteriorating; it was unable to properly staff and tool its projects; and its cash and credit were quickly evaporating.

146.    Had MacKay Shields known the truth about C&A's business and operating condition, MacKay Shields would not have purchased the C&A Notes on behalf of Plaintiff and the other members of the Class.

### C.    Defendants' Misrepresentations Concerning C&A's Carrying Values for Goodwill and Deferred Tax Assets

147.    Defendants also misrepresented C&A's goodwill and deferred tax assets.

148.    At the time Defendants were marketing the C&A Notes to MacKay Shields, the goodwill and intangible assets reported by C&A were approximately 45% of the Company's assets.  For instance, the 2Q04 10-Q reported goodwill of $1.361 billion and other intangible assets of $47.8 billion.  In C&A's financial statements for the year ended December 31, 2003, which were attached to the PPM provided to MacKay Shields in connection with the August 11, 2004 meeting, C&A stated that it had net deferred tax assets of $203.3 million.  These materials further stated:

> Management has reviewed the Company's operating results for recent years as well as the outlook for its continuing operations and concluded that it is more likely than not that the net deferred tax assets of $203.3 million at December 31, 2003 will be realized.

149.    These statements were false.  As discussed in more detail below, on March 17, 2005, Defendants announced that C&A would write off $500 million of goodwill for the

Company's U.S./Mexico Plastics and Global Fabrics reporting units, and $177 million of deferred tax assets related to the U.S. and Italy. Under relevant generally accepted accounting principles, Statement of Financial Account Standards No. 142, "Goodwill and Other Intangible Assets" ("SFAS 142"), those write-offs mean that (a) the present value of the discounted cash flow from those two reporting units was insufficient to support the carrying value of goodwill, and (b) the anticipated taxable income in the U.S. and Italy was insufficient to support carrying the deferred tax assets.

150.    At the time they were marketing C&A Notes to MacKay Shields, Defendants knew or recklessly disregarded that C&A's operating results and industry conditions existing at the time Defendants offered C&A debt to MacKay Shields required Defendants to undertake an impairment analysis. Such an analysis would have revealed that the carrying values of the goodwill and deferred tax assets were materially overstated and would have required C&A to record a substantial impairment charge. Moreover, an impairment charge would have indicated to MacKay Shields that C&A's underlying business was not nearly as healthy as it was portrayed, and that the Company's liquidity and creditworthiness was not nearly as MacKay Shields had been lead to believe.

151.    Had MacKay Shields known about the insufficiency of C&A's operating cash flow to support the carrying values of the Company's goodwill or deferred tax assets, MacKay Shields would not have purchased the C&A Notes on behalf of Plaintiff and the other members of the Class.

**D.      Defendants' Misrepresentations Concerning C&A's Substantial Material Weaknesses in Internal Controls**

152.    Defendants also made public statements about the quality of C&A's internal controls over its financial reporting. Defendants knew that an important consideration for

investors is whether the company has sufficient internal controls in order to provide accurate financial information to investors. Internal controls are critical safeguards for investors because they provide comfort that the Company keeps accurate financial information and can meaningfully evaluate operating performance. Internal controls are particularly important in a large and diverse company such as C&A, which had operations and employees all over the world.

153.    In connection with filing C&A's 2Q04 10-Q, Defendants Stockman and Stepp executed a certification pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. Specifically, Stockman and Stepp certified that they were "responsible" for establishing and maintaining C&A's disclosure controls and procedures, and that they had:

a.    Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under their supervision, to ensure that material information relating to C&A, including its consolidated subsidiaries, was made known to them by others within those entities;

b.    Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under their supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles; and

c.    Evaluated the effectiveness of the Company's disclosure controls and procedures and presented in the 2Q04 10-Q their conclusions about the effectiveness of the disclosure controls and procedures.

154.    Likewise, each of the Company's SEC filings for previous periods contained similar Section 302 certifications regarding C&A's internal controls: (i) C&A's Form 10-Q for the First Quarter of 2003 was certified by defendant Stepp; (ii) its Form 10-Q for the Second Quarter of 2003 was certified by defendants Stockman and Stepp; (iii) its Form 10-Q for the Third Quarter of 2003 was certified by defendants Stockman and Stepp; (iv) its Form 10-K for the fiscal year ended December 31, 2003 was certified by defendants Stockman and Stepp; and (v) its Form 10-Q for the First Quarter of 2004 was certified by defendants Stockman and Stepp.

155.    These statements were materially false and misleading. According to CI 2, at the time Defendants were marketing and selling C&A Notes to MacKay Shields, C&A was suffering from a variety of material weaknesses over its internal controls that were well known inside the Company. Indeed, C&A's internal control weaknesses were reported to C&A management by PricewaterhouseCoopers in December 2003, but never disclosed to investors. CI 2 stated that C&A failed in seven out of eight categories in the PricewaterhouseCoopers review, and these failures, which included basic internal controls over things like accounts receivables and payables recognition, were not rectified.

156.    Defendants knew about or recklessly disregarded C&A's substantial material weaknesses in internal controls and Defendants' failure to correct them. Had MacKay Shields known these facts, it would not have purchased the C&A Notes on behalf of Plaintiff and the other members of the Class.

### III.    IN RELIANCE ON DEFENDANTS' STATEMENTS ABOUT C&A, MACKAY SHIELDS PURCHASED ON BEHALF OF CLASS MEMBERS ROUGHLY $83 MILLION FACE VALUE OF THE C&A NOTES IN AUGUST 2004

157.    Based on the materially false and misleading representations outlined above, and without knowledge of their falsity, MacKay Shields purchased on behalf of Plaintiff and the other Class members $75,820,000 face amount of the 12.875% Notes on the offering on August

12, 2004 for over $73.1 million, and another $6,960,000 face amount of those C&A Notes on

August 20, 2005 for approximately $5.9 million, for a total purchase of $82,780,000 face amount

of 12.875% Notes for approximately $79 million.

158.    As described above, Defendants knew or recklessly disregarded that the

statements made to MacKay Shields and publicly disclosed to the market concerning C&A's

financial health, business and operating condition, goodwill and deferred tax assets, and internal

controls were materially false and misleading.  Defendants also knew or should have known that

MacKay Shields would rely on these statements in making their decision whether to purchase

C&A Notes on behalf of its clients.

159.    The Criminal Indictment confirms that:

> In or about August 2004, C&A offered, and the public [including MacKay
> Shields on behalf of Plaintiff and other Class members] purchased,
> approximately $415 million in 12.875% Senior Subordinated Notes due
> 2012 based, in part, on offering materials that <u>were false and fraudulent in
> that they included results of operations that had been falsely and materially
> inflated by the rebate schemes described above.</u>

Criminal Indictment ¶ 48 (emphasis added).

160.    Had MacKay Shields known the truth about C&A's financial and operating

condition, MacKay Shields would not have purchased the C&A Notes on behalf of Plaintiff and

the other members of the Class.

## IV.    DEFENDANTS' SUBSEQUENT MATERIAL MISREPRESENTATIONS INDUCE MACKAY SHIELDS TO PURCHASE MORE C&A NOTES ON BEHALF OF PLAINTIFF AND THE CLASS

161.    Following the August 2004 Private Placement, Defendants continued to issue

false statements about the Company.  Indeed, Defendant Stockman periodically made phone

calls directly to representatives of MacKay Shields to assure it that C&A's financial information

was accurate and that C&A's business and financial condition enabled it to continue paying interest on its debt, and would allow it to redeem the debt at maturity.

### October 7, 2004 Presentation

162.    On October 7, 2004, Defendants Stockman, Stepp and Krause participated in the Deutsche Bank 12th Annual Global High Yield Conference. The presentation materials Defendants provided to MacKay Shields (the "October 7, 2004 Presentation") at this conference were substantially the same as the August 2004 Presentation, but added the fact that C&A had completed the private placement of the 12.875% Notes. Based on statements made by Defendants Stockman, Stepp and Krause, MacKay Shields understood that all Defendants had reviewed and approved the October 7, 2004 Presentation before it was provided to MacKay Shields.

163.    The October 7, 2004 Presentation materially misrepresented C&A's EBITDA, financial performance and business prospects, and was materially false and misleading for the reasons described herein. Among others, the false statements included in the October 7, 2004 Presentation included that (1) "for the LTM period ended June 30, 2004, C&A has an EBITDA margin of 8.4%, 130 bps higher than the next best performer", (2) "Free Cash from operations was positive $26 million during Q1/Q2004," (3) the Company had "Improving Operating Free Cash Flow", and (4) the Company had $4,018 million in sales for LTM ended June 30, 2004. The presentation also falsely stated the Company's EBITDA for prior quarters as $55.6 (3Q02), $82.3 (4Q02), $70.7 (1Q03, $84.0 (2Q03), $66.0 (3Q03), $90.5 (4Q 03), $79.4 (1Q04), $100.4 (2Q04).

164.    Defendants knew or recklessly disregarded that these statements were materially false and misleading. Defendants also knew that MacKay Shields and other investors would rely

on these statements in making their decision whether to purchase the C&A Notes. Had MacKay

Shields known that these statements were materially false and misleading, it would not have

purchased the C&A Notes on behalf of Plaintiff and the other members of the Class.

165.    In reliance on Defendants' materially false and misleading representations, and

without knowledge of their falsity, MacKay Shields purchased on behalf of Plaintiff and the

other members of the Class another $2,000,000 face amount of the 12.875% Notes on October

15, 2004 for over $1.6 million.

**November 9, 2004 Press Release**

166.    On November 9, 2004, in a press release carried over *PR Newswire*, Defendants

published C&A's earnings for 3Q04 and the nine months ended September 30, 2004. The

November 9, 2004 Press Release was attached to a Form 8-K filed with the SEC, which was

signed by Defendant Koth. On information and belief, all Defendants reviewed, approved and

authorized the November 9, 2004 Press Release before it was issued. The November 9, 2004

press release included the following statement by Defendant Stockman:

> For the fifth consecutive quarter our EBITDA performance, excluding
> restructuring and impairment charges, was up from the prior year on a
> comparable basis.

167.    This statement was materially false and misleading for the reasons described

herein, including that C&A's EBITDA for 3Q04 did not represent the "fifth consecutive quarter"

of increasing EBITDA. Further, the November 9, 2004 press release materially misrepresented

C&A's EBITDA, financial performance and business prospects, and was materially false and

misleading for the reasons described herein

168.    Defendants knew or recklessly disregarded that these statements were materially

false and misleading. Defendants also knew or should have known that MacKay Shields and

other investors would rely on these statements in making their decision whether to purchase

C&A Notes. Had MacKay Shields known that these statements were materially false and misleading, it would not have purchased the C&A Notes on behalf of Plaintiff and the other members of the Class.

### November 9, 2004 Conference Call and 3Q04 Presentation

169.    Also on November 9, 2004, Defendants, through Stockman, Krause and Koth, held an earnings call, and provided a presentation (the "3Q04 Earnings Presentation") to MacKay Shields. On information and belief, all Defendants approved and authorized the statements made on the conference call and in the 3Q04 Earnings Presentation.

170.    On the call, Defendant Stockman spoke positively about the Company's continuing "EBITDA improvement," stating:

> We are pleased to announce that this marks the fifth consecutive quarter of EBITDA improvement for C&A. Our Q3 EBITDA was 68 million before restructuring and impairment. That's up 3% over prior year. We achieved these gains despite a [$]37 million, or 4%, decline in sales versus Q3'03, principally due to lower Big 3 volume as all of you are aware. Our resulting EBITDA margin with sales down and EBITDA up was 7.9%, a 60-basis point improvement over Q3, 2003

171.    Similarly, Defendant Koth stated:

> the Company also has—had ample liquidity at September 30, with approximately [$]175 million of availability under its existing credit facilities.

172.    The 3Q04 Earnings Presentation Defendants provided to MacKay Shields was similar in form to the August 2004 Presentation and the October 7, 2004 Presentation. Among other things, it stated that C&A's 3Q04 EBITDA for the quarter, adjusted to exclude so-called non-operating restructuring and impairment charges, was $68 million, and that this represented a 7.9% 3Q04 lagging twelve-month EBITDA margin; the Company's lagging twelve-month EBITDA was $338 million and had improved 15% since 2Q03, and that there was a trend since 2Q03 of five straight quarters with increasing lagging twelve-month EBITDA; and C&A's

lagging twelve-month EBITDA margin for 2Q04 was 8.4%, or was 130 basis points (1.3%) higher than the next best performer in the Company's peer group, and 300 basis points (3.0%) higher than the 5.7% average margin for the entire peer group.

173.   These statements were materially false and misleading for the reasons set forth herein.  The Defendants knew or recklessly disregarded that the statements made on the conference call and in the 3Q04 Earnings Presentation were materially false and misleading. The Defendants also knew that investors like MacKay Shields would rely on these statements in making their decision whether to purchase the C&A Notes.  Had MacKay Shields known that these statements were materially false and misleading, it would not have purchased the C&A Notes on behalf of Plaintiff and the other members of the Class.

### The Company's 3Q04 10-Q

174.   On or about November 9, 2004, Defendants filed with the SEC C&A's Form 10-Q for 3Q04 (the "3Q04 10-Q"), and on or about November 17, 2004 filed with the SEC C&A's amended Form 10-Q for 3Q04 (the "3Q04 10-Q/A").  The 3Q04 10-Q was signed by Defendant Koth and, as discussed below, certified by Defendants Stockman and Koth.  On information and belief, all Defendants reviewed, approved and authorized the 3Q04 10-Q before it was filed with the SEC.

175.   The 3Q04 10-Q and 3Q04 10-Q/A repeated the materially misleading financial information contained in the November 9, 2004 3Q04 earnings release, and was materially false and misleading for the reasons described herein.  Defendants Stockman and Koth represented that "in the opinion of management, contain all adjustments necessary for a fair presentation of financial position and results of operations."  Moreover, pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, Defendants Stockman and Koth certified that these documents "fairly

present[], in all material respects, the financial condition and results of operations of the Company." Stockman and Koth also certified, pursuant to Section 302 of the Sarbanes-Oxley Act of 2002, that C&A's internal controls over financial reporting "provide reasonable assurance regarding the reliability of financial reporting and the preparation of the financial statements for external purposes in accordance with generally accepted accounting principles."

176.    These statements were materially false and misleading.  As discussed above, Defendants improperly classified operating expenses as non-operating "restructuring" and "impairment" charges, failed to properly account for supplier rebates, failed to perform an impairment analysis of the carrying values of C&A's goodwill and deferred tax assets, and concealed C&A's material weaknesses in its internal controls over financial reporting.

177.    The Defendants knew or recklessly disregarded that the statements made in the 3Q04 10-Q were materially false and misleading.  The Defendants also knew that investors such as MacKay Shields would rely on the 3Q04 10-Q in making their decision whether to purchase the C&A Notes.  Had MacKay Shields known that the 3Q04 10-Q was materially false and misleading, it would not have purchased the C&A Notes on behalf of Plaintiff and the other members of the Class.

**January 12, 2005 Presentation**

178.    On January 12, 2005, Defendants provided another presentation to MacKay Shields (the "January 12, 2005 Presentation), and encouraged MacKay Shields to purchase additional C&A Notes on behalf of its clients.  On information and belief, all Defendants reviewed and approved the January 12, 2005 Presentation before it was provided to MacKay Shields.

179.    Among other things, the January 12, 2005 Presentation misleadingly highlighted the Ford Fusion and the Hermosillo facility.  For example, it touted the Fusion project as a "Multi-Billion $ Ford Mid-Sized Vehicle Award"; devoted an entire page to showcasing the organization of the Hermosillo factory; and referred to it as one of the Company's "2005 Launch Highlights."  As discussed herein, Defendants knew or recklessly disregarded that C&A had substantially understaffed the Fusion project, and tooled the "world class" Hermosillo facility with secondhand machinery.  The January 12, 2005 Presentation also misrepresented the Company's "Interior & Exterior Trim" sales for 2003 as $2.5 billion.

180.    Based on Defendants' materially false and misleading representations, and without knowledge of their falsity, MacKay Shields purchased on behalf of Plaintiff and the Class another $26,559,000 face amount of the 12.875% Notes between January 31, 2005 and March 2, 2005 for over $17.8 million, and purchased on behalf of Plaintiff and the Class $19,635,000 face amount of the 10.75% Notes on March 2, 2005 and March 4, 2005 for approximately $18 million.

181.    Defendants knew or recklessly disregarded that the statements made in the January 12, 2005 Presentation were materially false and misleading.  Defendants also knew that MacKay Shields would rely on the statements set forth in the January 12, 2005 Presentation in making their decision whether to purchase C&A Notes.  Had MacKay Shields known that the January 12, 2005 Presentation was materially false and misleading, it would not have purchased the C&A Notes on behalf of Plaintiff and the other members of the Class.

## V.    THE FIRST QUARTER 2005 LIQUIDITY CRISES

182.    Unbeknownst to investors, By January 2005, the problems at C&A had reached crisis proportions.  The Company was fully drawn on its revolving credit facilities and was lacking sufficient liquidity to pay its bills.  Rather than face reality and admit that they could no

longer conceal C&A's problems from the market, Defendants hatched yet another fraudulent scheme designed to prolong C&A's survival. As the Criminal Indictment puts it, the motivation behind this scheme was to "avoid filing for bankruptcy, which would have acknowledged the failure of Stockman's leadership and resulted in the loss of Stockman's and [Heartland's] investment in C&A." Criminal Indictment¶49. This scheme involved falsification of invoices in order to increase available liquidity under C&A's accounts receivable securitization facility. The scheme also involved making false statements to C&A's investors. *See* Criminal Indictment¶49-61.

183.    As discussed above, C&A was party to a credit facility with GECC, pursuant to which GECC extended a line of credit to C&A that was secured by the Company's outstanding accounts receivable. C&A's accounts receivables often consisted of millions of dollars because there was a delay between the time that C&A would send an invoice for payment to its OEM customers and when the OEM would actually pay the invoice (typically, this delay was between 60 and 120 days). Under C&A's credit agreement with GECC, GECC agreed to provide C&A a "borrowing base" calculated by reference to the amount of "eligible receivables" the Company had outstanding on any given day. In order to constitute an "eligible receivable" (and thus be included in the calculation of the borrowing base), C&A was required to have sent an invoice that an OEM had *agreed* to pay.

184.    C&A was required to send daily reports to GECC that updated the status of the outstanding invoices and payment agreements and thus the current amount of the borrowing base. These reports were prepared by employees in the Treasury Department, acting under the supervision and direction of, among others, Defendant Galante. It typically took C&A two days to prepare the daily reports, such that each report that GECC received actually reflected the state

of play from two business days earlier. The reports included a calculation of the level of eligible receivables and also stated whether C&A was able to borrow more money from GECC (if the borrowing base had increased) or whether C&A had to make a payment to GECC (if the borrowing base had decreased). Because the cost of financing was lower under C&A's agreement with GECC than it was with C&A's other lenders, Defendants typically sought to borrow the maximum amount from GECC that was supported by the pool of eligible receivables and the borrowing base available each day.

185.   On or about January 6, 2005, C&A prepared a daily report showing that the eligible receivables had decreased (thus diminishing the borrowing base) and that C&A had to make an immediate payment to GECC of $21.8 million. Defendants realized that C&A did not have sufficient liquidity to make the payment to GECC. With the knowledge and approval of Defendant Stockman, Defendant Galante and others in C&A's treasury department concealed the fact that the Company owed $21.8 million to GECC and falsely stated to GECC that a computer malfunction had delayed their ability to provide the required daily reports until the following Monday, January 10, 2005.

186.   At the same time, and with the knowledge and approval of Defendant Stockman, C&A employees began a systematic effort to send out invoices by January 10, 2005 such that the pool of eligible receivables (and the borrowing base) would be artificially increased (and the payment owed to GECC artificially decreased). At Defendants' direction, C&A employees worked throughout the weekend to manually invoice millions of dollars of receivables for the sole purpose of inflating the borrowing base and avoiding the $21.8 million payment due to GECC—a payment that C&A lacked the liquidity to make. Because these invoices were just being sent out, C&A's OEM customers had obviously not yet *agreed* to pay these invoices, and

therefore they could not be properly included in the pool of eligible receivables. Nonetheless, on January 10, 2005—just two days before the meeting with MacKay Shields described above—Defendants submitted a report to GECC that falsely stated that C&A owed GECC only $11.8 million.

187.    Following this narrowly-averted crises, Defendant Stockman began to personally review C&A's liquidity situation on a daily based and choose himself which of C&A's suppliers and creditors would get paid.

188.    As discussed above, following the January 2005 liquidity crises, Defendants also began to fraudulently "pre-bill" GECC for "tooling" receivables relating to payment for tools and other machines used to make auto parts. In the automotive industry, OEMs typically agree to pay for tooling receivables only after certifying that the equipment is performing to specifications (through a process called the Production Part Approval Process, or "PPAP"). While target dates for completion of the PPAP process are typically agreed upon, it was common industry knowledge, shared by Defendants, that the PPAP process often was not complete until after the target date, and OEMs usually withheld an agreement to make a payment until after the PPAP process was *actually* complete.

189.    Nonetheless, in January 2005, C&A began to include tooling receivables in the calculation of the borrowing base under its agreement with GECC even though the PPAP approval had not been completed and the OEM had not agreed to pay the invoice. Defendants knew or should have known that there was no agreement to pay the invoices and that the invoices were therefore not eligible for inclusion in the calculation of borrowing base. Nonetheless, Defendants included these invoices for "the sole purpose of improperly inflating the GECC borrowing base, thus generating cash and liquidity for C&A." Criminal Indictment¶

60 (C&A added more than $100 million in ineligible receivables to the borrowing base between January 2005 and April 2005); *see* SEC Complaint¶71 (Defendants Stockman, Williams and Galante knew of, and participated, in the fraudulent scheme to misrepresent C&A's liquidity to investors).

## VI.   ON MARCH 17, 2005, C&A ANNOUNCES THAT IT IS UNABLE TO FILE ITS FORM 10-K FOR FISCAL YEAR 2004

190.   On March 17, 2005, C&A announced that the filing of its 2004 Form 10-K was going to be delayed because, among other things, the Company had to restate its previously reported financial results for 2004 and potentially 2003 as a result of improper accounting.  The Form 8-K filed with the SEC and attaching the March 17, 2005 press release was signed by Defendant Koth.  On information and belief, all Defendants had reviewed and approved the March 17, 2005 press release before it was issued.

191.   The press release disclosed for the first time that the Company had improperly accounted for its supplier rebates, which would impact its previously reported EBITDA.  Among other things, the press release stated:

> During the course of finalizing its financial statements for its fiscal year ended December 31, 2004, the Company identified certain accounting for supplier rebates that led to premature or inappropriate revenue recognition or that was inconsistent with relevant accounting standards and the Company's policies and practices.

192.   With respect to C&A's previously reported amounts for goodwill, the press release stated:

> The Company determined that the fair values of its U.S. and Mexico Plastics reporting unit and its Global Fabrics reporting unit were less than the respective units' carrying values.  As a result, the Company expects to recognize an impairment charge of approximately $500 million, which will reduce U.S. and Mexico Plastics' goodwill by approximately $325 million and Global Fabrics' goodwill by $175 million.

# EXHIBIT E

# PART 3

**TO THE DECLARATION OF VERNON R. PROCTOR**
**IN SUPPORT OF DEFENDANT DAVID R. COSGROVE'S**
**MOTION TO DISMISS THE COMPLAINT**

193.    With respect to C&A's previously reported amounts for deferred tax assets, the press release stated:

> The Company has also performed an analysis of future taxable income and believes that there is now sufficient negative evidence and uncertainty as to the timing of when the appropriate level of taxable income will be generated in the U.S. to recover the deferred tax assets, necessitating a full valuation allowance against those deferred tax assets. As a result, the Company's provision for income taxes for the fourth quarter of 2004 includes a write down of the U.S. and Italian net deferred tax assets of $175 million. In addition, the impact of the valuation allowance on the 2004 operating results for the U.S. and Italy was approximately $25 million.

194.    In the March 17, 2005 press release, C&A also announced a series of material weaknesses reported by its auditor:

> The Company is working towards completion of its assessment of internal controls over financial reporting required under Section 404 of the Sarbanes-Oxley Act and has concluded that certain material weaknesses, in addition to the matters leading to the restatement described above, existed at December 31, 2004, but its assessment of the effectiveness of the Company's control over financial reporting is ongoing and the extent of those material weaknesses remains under review. The Company's outside auditor is in the process of completing its audit of internal controls over financial reporting and has communicated the existence of material weaknesses. The potential material weaknesses identified include the following: (i) the adequacy of the Company's resources with appropriate accounting expertise to address accounting and reporting matters in certain areas, including revenue recognition, vendor arrangements and post-retirement benefits, and to supervise the Company's decentralized and disparate accounting environment and ensure an appropriate segregation of duties; (ii) the adequacy of the Company's internal audit function's resources and ability to monitor compliance with established policies and procedures; (iii) the effectiveness of certain information technology controls and the sufficiency of documentation to assess the effectiveness of such controls including embedded system application controls; (iv) the adequacy of procedures to consistently identify and reconcile fixed assets and periodically review assets for impairment; and (v) the completeness and consistent adherence to Company policies and procedures. These issues include a range of documentation-related issues and reconciliation issues. Other material weaknesses may be identified as a result of further investigation of the circumstances surrounding the expected restatement arising from vendor rebates. Our review and the audit is [sic] ongoing.

195.    As discussed below (and recognized in the Criminal Indictment and the SEC Complaint), these statements were materially false and misleading.

## VII.    DEFENDANTS CONTINUE TO LIE TO MACKAY SHIELDS AND OTHERS ABOUT C&A'S FINANCIAL AND OPERATION PERFORMANCE

196.    Defendants immediately tried to downplay the probable impact of the issues raised in the press release on C&A's financial results and business operations.  Just a few hours after issuing the March 17, 2005 press release, C&A held a conference call with investors (the "March 17, 2005 Conference Call").  On that call, Defendant Stockman made a series of statements designed to allay investor concerns over the scope and size of the accounting issues and internal investigation disclosed in the March 17, 2005 press release, and to reassure investors that C&A was a healthy company with ample liquidity and strong future prospects.

197.    For example, Stockman stressed that C&A would obtain waivers from its lenders and would continue to have access to its credit facilities, stating "flatly, clearly, and unequivocally, we will remain in compliance with our covenants . . . ."  Stockman also reassured investors that the Company had thoroughly investigated the supplier rebate issues identified in the press release.  In defendant Stockman's words, "the prudent thing to do, the right thing to do, and the proactive thing to do" was to "look at every entry" relating to supplier rebates made since January 2002.  Stockman characterized this as an "around-the-clock effort" involving "a large group of people," and that it represented "management's best effort."  According to Stockman, "it was comprehensive, it was intensive, it covered everything, it left no stone unturned . . . it is our assessment at the moment and, as we indicated, that [the investigation] may lead to a restatement of a – of a modest magnitude in '04."

198.    Moreover, Defendant Stockman reassured investors that the Company's "restructuring" program was completed, stating:  "we have taken a million dollar restructuring

charge. We expect to this quarter, and that will be it." As discussed above, Stockman knew that debt investors such as MacKay Shields would be reassured by this statement, because it confirmed that C&A's restructuring charges were limited, one-time "non-operating" charges that would not impact the Company's EBITDA results in future periods.

199.    In connection with the conference call, C&A prepared and distributed a presentation entitled "Fourth Quarter and Full Year 2004 Results" (the "March 17, 2005 Presentation"). The March 17, 2005 Presentation repeated many of the points addressed by Stockman on the conference call, and was similarly designed to minimize investor concerns about the overall scope and impact of the issues disclosed in the March 17, 2005 press release. For example, the presentation stated that C&A expected "2005 sales will be modestly up from 2004 level," and "Full year EBITDA before restructuring and impairment is expected to meet or exceed comparable 2004 levels." The presentation further boasted about the EBITDA performance of the Company in the period since Defendants Stockman and Heartland had taken over, stating that "LTM EBITDA performance has rebounded significantly since the management change in August 2003, improving 10% from the Q2 2003 trough."

200.    In addition, the March 17, 2005 Presentation devoted an entire section to addressing—and minimizing—the issues relating to the Company's improper accounting for supplier rebates. In a section titled "Results of Comprehensive Internal Review of 2002-2004 Supplier Rebates," the presentation made statements designed to lead investors to believe that the Company had thoroughly investigated this issue and determined that it would not have any further impact on C&A's financial results. Among other things, the presentation stated that C&A had reviewed "more than 350 supplier rebate entries . . . for 12 quarter period (2002-

2004)", and that "approximately 315 or about 90% were found to conform to relevant accounting standards (EITF 02-16) and the Company's internal policies and practices regarding rebates."

201.   The Criminal Indictment has confirmed that Defendants' statements in the March 17, 2005 Press Release and in the accompanying earnings call and investor presentation were false and misleading.  Criminal Indictment¶64.  For instance, as stated in the Criminal Indictment:

      a.     "Stockman's description of the internal investigation of the improper accounting for supplier rebates in the March 17, 2005 press releases was intended to mislead investors and the public by minimizing the size of the restatement of C&A's financial statements, and exaggerating the degree to which management had explored, quantified and rectified the situation."

      b.     Contrary to the statements in the press release, "no meaningful review of 2002 rebates was conducted, and 2002 rebates, including those negotiated with Joan Fabrics . . . were not restated even though Stockman knew they were clearly accounted for improperly."

      c.     "the figures included in the press release regarding the proposed amount to be restated did not accurately reflect the true income earned for prior periods."

      d.     "the press release understated the degree to which previous financial statements needed to be restated based on 2003 and 2004 rebates, because the internal investigation upon which the press release was designed to justify C&A's previous accounting, rather than account for rebates properly."

      e.     "the press release attributed the improper accounting to a failure of 'controls' and 'procedures' and to 'other circumstances.'  This description was intended

to give the impression that the improper accounting was inadvertent and at worst the result of negligence. As described above, however, the truth was that the improper accounting was intentional and the result of a concerted scheme by Stockman, Stepp, Cosgrove, Barnaba, and other C&A employees."

     f.       During the March 17, 2005 earnings call "Stockman provided a forecast for EBITDA for the first quarter of 2005 that he knew would not be attained. He stated that EBITDA would be between $65-75 million for the first quarter of 2005, even though the most current financial information for the company, including the actual results for January and February, showed that EBITDA for the first quarter would only be roughly half that figure."

     g.      "Stockman highlighted a slide representing that capital expenditures in 2005 would be limited to $30 million quarterly as a sign that C&A was conserving cash. This statement was misleading because Stockman knew that his projections showed that C&A would spend more than $50 million in the first quarter of 2005 and knew that C&A had actually already spent more than $30 million in capital expenditures during January and February 2005. This misrepresentation was material because, among other reasons, Stockman emphasized this limitation on capital expenditures to reassure investors and the public that C&A was preserving cash and holding down its costs."

     h.      Stockman concealed C&A's liquidity crises by responding to a question 'intra quarter are you tapping out your liquidity?' with the answer 'no.' . . . this statement was a lie designed to hide the fact, well known to Stockman, that C&A was suffering a major liquidity crises."

Criminal Indictment¶66-75; *see also* SEC Complaint¶56 (the March 17, 2005 Press Release stated that fourth quarter 2004 EBITDA was $72-73 million, which "included at least $5.8 million in improperly recorded rebates, making the press release false or misleading.")

202.    All Defendants knew, or were reckless in not knowing, that the statements in the March 17, 2005 Press Release, earnings call and accompanying investor presentation were false and misleading, and Defendants had a duty to correct those statements. *See* SEC Complaint¶66 (Defendant Cosgrove reviewed the charts that Stockman used on the call and Cosgrove "knew, or was reckless in not knowing, that these charts contained false or misleading statements regarding EBITDA and capital expenditures.")

203.    In a further effort to convince investors that the issues identified in the March 17, 2005 press release would not have a materially negative impact on C&A's future performance, Defendants announced that Heartland had entered into an agreement to purchase approximately $300 million face value of C&A preferred stock from Textron Inc. ("Textron"). This announcement was designed to convince debt investors that Defendants continued to have complete confidence in C&A's financial health and viability. Indeed, during the March 17, 2005 conference call, defendant Stockman stated:

> We remain convinced … that we have a business model that can work, and that we have a place in the industry where we can thrive economically and in terms of our earnings and cash flow over time. For that reason, Heartland Industrial Partners, of — of which I am the founding partner, as you know, has reached an agreement in recent days with Textron, that owns all of our preferred stock, that it got at the time of the original transaction. Face value today is around $300 million. We've reached an agreement to buy a majority of that stock, and an option on the rest, at a total price of around $45 million. So we will be able to take control of all of the equity, the preferred equity, and our position in the common, but the preferred equity for about $45 million, or 15, 16 percent of its liquidation value. We see that as a very strong vote of confidence in our future as a company, and in the strategies and initiatives we're going to talk about now that we're

undertaking to deal with some very unprecedented and some very unusual circumstances. (Emphasis added.)

This agreement was also highlighted in the March 17, 2005 Presentation, which stated that "Heartland <u>has committed</u> to purchase a majority of the Preferred Stock for cash and an exchange of various securities and rights." [Emphasis added]

204.    Defendants knew that investors such as MacKay Shields would rely on these statements because, if Heartland was willing to purchase C&A's stock, investors would reasonably believe that Defendants, including Heartland, believed that there was still ample liquidity and significant value in C&A's business.

205.    In reality, however, Heartland's so-called "commitment" to purchase C&A preferred stock from Textron was a ruse designed to bolster investor confidence in C&A without actually obligating Heartland to purchase any shares of the Company. Defendants did not disclose that, under the terms of the agreement between Textron and Heartland, Heartland had no obligation to purchase Textron's shares until C&A filed a Form 10-K for 2004 (which it still has not done). Moreover, Heartland could unilaterally terminate the agreement if C&A did not file a Form 10-K for 2004 by December 31, 2005, or if C&A experienced an event of bankruptcy or insolvency. In other words, unbeknownst to MacKay Shields and the market, rather than show "confidence" in C&A, Heartland was deliberately misrepresenting its supposed "commitment" to purchase C&A preferred stock.

### March 23, 2005 Presentation

206.    In furtherance of their fraudulent scheme to mislead investors about the true scope of C&A's financial and business problems, Defendants met with MacKay Shields on March 23, 2005 and encouraged MacKay Shields to purchase additional C&A Notes on behalf of its clients. At this meeting, Defendants Stockman, Koth and Galante reiterated the positive statements

regarding C&A's future prospects and the status of the accounting investigation that were made in the March 17, 2005 Conference Call and in the accompanying March 17, 2005 Presentation. These Defendants assured MacKay Shields that the disclosures in the March 17, 2005 press release were complete and accurate, and that there was no additional materially negative information about C&A that was yet to be disclosed.  Further, they assured MacKay Shields that C&A had ample liquidity and a strong business and financial outlook, and repeatedly referenced the supposed agreement by Heartland to purchase Textron's holdings of C&A preferred stock as proof that Heartland and the other Defendants continued to believe in the financial viability of C&A.  Based on the statements that these defendants made at this meeting, MacKay Shields understood that they were speaking with the authority and approval of Heartland, C&A and the other Defendants.

207.    Defendants knew or recklessly disregarded that these statements were materially false and misleading.  Defendants also knew that MacKay Shields and other investors would rely on these statements in making their decision whether to purchase C&A Notes.  Had MacKay Shields known that these statements were materially false and misleading, it would not have purchased C&A Notes on behalf of Plaintiff and the other members of the Class.

208.    The Criminal Indictment confirms that Defendants' March 23, 2005 presentation to MacKay Shields was materially false and misleading:

> On March 23, 2005, C&A made a presentation to MacKay Shields, holders of C&A's bonds.  Defendant Stockman presented the same slides he had used during the March 17, 2005 earnings call, which contained the material misrepresentations regarding EBITDA and capital expenditures described above.  In addition, defendant Stockman sought to assure the MacKay Shields investors that C&A had sufficient liquidity to meet its needs, when he knew that it did not.

Criminal Indictment ¶76 (emphasis added). As explained above, Defendants Koth and

Galante also participated in this presentation and presented to MacKay Shields the

materially false information set forth above.

**March 24, 2005 Press Release**

209.    On March 24, 2005, C&A issued a press release (the "March 24, 2005 Press

Release"), which was attached to a Form 8-K filed with the SEC and signed by Defendant Koth.

As stated in the Criminal Indictment, in this press release "C&A repeated its earlier disclosures

concerning the scope of the rebate accounting problem, with the intent of minimizing investors'

concerns about the size of the restatement to C&A's financial statements." Criminal Indictment ¶

81.

**April 4, 2005 Press Release**

210.    On April 4, 2005, C&A issued a press release (the "April 4, 2005 Press Release"),

which was attached to a Form 8-K filed with the SEC and signed by Defendant Koth. The press

release stated "The Company's available liquidity (cash and unutilized commitments under

revolving credit and account receivables facilities) was approximately $81 million at March 31,

2005, as compared with approximately $86 million at December 31, 2004."

211.    This statement was materially false and misleading because (1) C&A had no more

than $12 million in available liquidity as of December 31, 2004; (2) C&A had less than $9

million of available liquidity on March 31, 2005; and (3) it did not disclose that any liquidity

C&A did have was a result of the fraudulent scheme described above. *See* Criminal Indictment ¶

87-88 (explaining that the April 4, 2005 Press Release was materially false and misleading).

212.    In reliance on the materially false and misleading statements set forth above

(including the Company's Form S-4 that was filed on January 27, 2005), MacKay Shields

purchased $17,511,000 face value of the 12.875% Notes between April 6, 2005 and May 10, 2005 for over $8.5 million, and $4,455,000 face value of the 10.75% Notes May 10, 2005 and May 11, 2005 for approximately $3 million, for total purchases of $21,966,000 face value of the C&A Notes for over $11.5 million on behalf of Plaintiff and the other members of the Class.

## VIII.   C&A FILES FOR BANKRUPTCY PROTECTION ON MAY 17, 2005

213.   Defendants' scheme finally unraveled just weeks after their last face-to-face meeting with MacKay Shields.

214.   On May 12, 2005—just *one day* after MacKay Shields' final purchase of C&A Notes on behalf of Plaintiff and the Class—the C&A Board unanimously sought Stockman's resignation over concerns that he was misleading the Board.  According to a May 13, 2005 article in the *Detroit Free Press*, a C&A source stated that:

> It was unanimous and it was fast.  Go.  Now.  There seemed to be a pattern of not sharing all of the information with his financial staff and with the board.  The first quarter was worse than he said it would be and the board got hot.

215.   C&A also announced on May 12, 2005 that the Company had effectively burned through its available cash and credit, with just $13.4 million left, that the investigation into the accounting matters was continuing, that the previously disclosed amounts necessary to restate previously reported financial results were likely understated, and that the continuing investigation also was looking into whether the Company issued misleading forecasts for 1Q05 and related matters, as well as other matters that had arisen in the course of the investigation.

216.   The May 12, 2005 announcement confirmed that the March 17, 2005 press release was materially false and misleading and, for the first time, exposed just how severe the problems facing C&A were.  The May 12, 2005 announcement stated:

> The company further commented on the status of the ongoing investigation by the Board's audit committee into the company's accounting for certain

supplier rebates. The company previously reported that it had identified certain accounting for supplier rebates that led to premature or inappropriate revenue recognition or that was inconsistent with relevant accounting standards and the company's policies and practices. While the investigation is ongoing, the audit committee has preliminarily indicated that it believes that the company's previously announced estimated adjustments to reported periods to correct the accounting for these rebates will likely be understated, but it has not yet quantified the extent of this and has not submitted its findings to management for review at this time. In addition to vendor rebates, the audit committee's investigation also is reviewing the company's forecasts for the first quarter of 2005 and related matters, as well as other matters that have arisen in the course of its investigation. The company cannot currently comment upon the timing for completion of, or the ultimate scope or outcome of, the audit committee investigation, the audit or any necessary restatements. As previously discussed, the company has not yet filed its annual report on Form 10-K for 2004 due to this accounting matter and the need for additional time for completion of the 2004 audit and the review of internal controls over financial reporting under Section 404 under Sarbanes-Oxley, and it does not expect to make its first quarter 2005 filing on a timely basis. (Emphasis added.)

217.    Five days later, on May 17, 2005, C&A announced that it had sought Chapter 11 bankruptcy protection the previous day in the United States Bankruptcy Court for the Eastern District of Michigan, and warned of significant near-term liquidity problems. On May 25, 2005, the *New York Times* reported in an article entitled "A Reagan Budget Czar Grapples With Investment Woes," that Stockman had turned over control of Heartland to two of his partners, Defendants Leuliette and Tredwell.

218.    The market's reaction to this news was dramatic. The value of the C&A Notes dropped precipitously. The price of the 12.875% Notes nose-dived from an offering price of $96.416 down to $3.00, and the price of the 10.75% Notes, which was trading above $90 before the truth about C&A was revealed, dropped to $23.00. Had Defendants been truthful about C&A's operations, finances and financial condition, MacKay Shields would not have purchased the C&A Notes. As a result of Defendants' fraudulent misrepresentations, MacKay Shields' clients, including Plaintiff and the other members of the Class, suffered substantial damages.

## GAAP VIOLATIONS

219.    GAAP are the generally accepted accounting principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practices at a particular time.  GAAP principles are the official standards accepted by the SEC and promulgated in part by the American Institute of Certified Public Accountants ("AICPA").  GAAP consists of a hierarchy of authoritative literature.  The highest authority is comprised of Financial Accounting Standards Board ("FASB") Statements of Financial Accounting Statements ("SFAS"), followed by FASB Interpretations ("FIN"), Accounting Principles Board Opinions ("APB Opinion"), and AICPA Accounting Research Bulletins ("ARB").  GAAP provides other authoritative pronouncements including, among others, the FASB Concept Statements ("FASCON").

220.    SEC Regulation S-X (17 C.F.R. § 210.4-01(a)(1)) provides that financial statements filed with the SEC which are not prepared in accordance with GAAP will be presumed to be false or misleading, despite footnote or other disclosures.

221.    As detailed above, C&A issued materially false financial statements from at least the fourth quarter 2001 through the third quarter 2003, and made further false statements regarding its financial performance through May 2005.

222.    By failing to disclose the recurring, "round-trip" transactions between the Company and Defendant McCallum, described above, C&A violated SFAS No. 57, Related Party Transactions, which states in relevant part:

> Financial statements shall include disclosures of material related party transactions, other than compensation arrangements, expense allowances, and other similar items in the ordinary course of business. However, disclosure of transactions that are eliminated in the preparation of consolidated or combined financial statements is not required in those statements.  The disclosures shall include:

86

a.    The nature of the relationship(s) involved;

b.    A description of the transactions, including transactions to which no amounts or nominal amounts were ascribed, for each of the periods for which income statements are presented, and such other information deemed necessary to an understanding of the effects of the transactions on the financial statements;

c.    The dollar amounts of transactions for each of the periods for which income statements are presented and the effects of any change in the method of establishing the terms from that used in the preceding period; [and]

d.    Amounts due from or to related parties as of the date of each balance sheet presented and, if not otherwise apparent, the terms and manner of settlement.

223.    C&A's financial statements also violated several general principles of GAAP, including:

- FASCON No. 1¶34: "Financial reporting should provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit, and similar decisions."

- FASCON No. 1¶40: "Financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and the effects of transactions, events, and circumstances that change resources and claims to those resources."

- FASCON No. 1¶50: "Financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it . . . . To the extent that management offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective investors and to the public in general."

- FASCON No. 2¶58-59: "That information should be reliable as well as relevant is a notion that is central to accounting . . . . The reliability of a measure rests on the faithfulness with which it represents what it purports to represent . . . ."

- FASCON No. 2¶79, 80: Financial statements should be complete and contain all material information necessary for investors and creditors to make informed economic decisions.

87

- FASCON No. 2 ¶95, 97: Conservatism in financial reporting should be used as a prudent reaction to uncertainty to ensure that risk is adequately considered. "The best way to avoid the injury to investors that imprudent reporting creates is to try to ensure that what is reported represents what it purports to represent."

- FASCON No. 6 ¶145: "[R]ecognition of revenues, expenses, gains, and losses and the related increments or decrements in assets and liabilities-including matching of costs and revenues, allocation, and amortization is the essence of using accrual accounting to measure performance of entities."

224. The Company's financial statements were not prepared in accordance with these general principles of GAAP because, as described above, the Company had engaged in fraudulent round-trip transactions that served no legitimate business purpose, improperly recognized supplier "rebates" as income, improperly recognized discounts on purchases of capital equipment as "income," manipulated the Company's reported EBITDA, and overstated the Company's carrying values for goodwill.

225. SEC Staff Accounting Bulletin No. 101 ("SAB 101"), <u>Revenue Recognition in Financial Statements</u>, drawing from Regulation S-K, Article 303, and Financial Reporting Release 36, also reiterated the importance of MD&A in financial statements:

> Management's Discussion & Analysis (MD&A) requires a discussion of liquidity, capital resources, results of operations and other information necessary of a registrant's financial condition, changes in financial condition and results of operations. This includes unusual or infrequent transactions, known trends, or uncertainties that have had, or might reasonably be expected to have, a favorable or unfavorable material effect on revenue, operating income or net income and the relationship between revenue and the costs of the revenue. Changes in revenue should not be evaluated solely in terms of volume and price changes, but should also include an analysis of the reasons and factors contributing to the increase or decrease. The Commission stated in Financial Reporting Release 36 that MD&A should "give investors an opportunity to look at the registrant through the eyes of management by providing a historical and prospective analysis of the registrant's financial condition and results of operations, with a particular emphasis on the registrant's prospects for the future."

226.    Item 7 of Form 10-K and Item 2 of Form 10-Q, requires the issuer to furnish information required by Item 303 of Regulation S-K [17 C.F.R. § 229.303]. In discussing results of operations, Item 303 of Regulation S-K requires the registrant to "[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable or unfavorable impact on net sales or revenues or income from continuing operations."

227.    The Instructions to Paragraph 303(a) further state, "[t]he discussion and analysis shall focus specifically on material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results." Thus, under these standards, the management of a public corporation must disclose in its periodic reports filed with the SEC, "known trends or any known demands, commitments, events or uncertainties" that are reasonably likely to have a material impact on a company's sales revenues, income or liquidity, or cause previously reported financial information not to be indicative of future operating results. 17 C.F.R. § 229.303(a)(l)-(3) and Instruction 3.

228.    As described herein, C&A's filings with the SEC during the Class Period failed to comply with applicable MD&A disclosure requirements because the MD&A in each of these filings was materially false and misleading as a result of the fraudulent scheme described herein.

## LOSS CAUSATION

229.    Throughout the Class Period, as detailed above, the prices of the C&A Notes were artificially inflated as a result of Defendants' misrepresentations and omissions regarding the Company. Following the Company's March 17, 2005 disclosure that the Company would need to restate its financial results for 2004 and potentially 2003 as a result of improper accounting, the price of C&A 12.875% Notes fell from $68.75 to $44.50—a decline of 35.3%—and the price

of C&A 10.75% Notes dropped 7.5%. Then, at the time of C&A's announcement on May 12, 2005 that (i) the Company had effectively burned through its available cash and credit, (ii) the investigation into the accounting was continuing, and (iii) the previously disclosed amounts necessary to restate previously reported financial results were likely understated, the price of C&A's 12.875% Notes fell from $28.25 to $7.00—a 75% decline in value—while C&A's 10.75% Notes dropped from $70.5 on May 10, 2005 to $32.875 on May 16, 2005—a decline of more than 53% over a six day period.

230.    The declines in the value of C&A Notes following the Company's incomplete and misleading disclosure in March 2005 and the Company's subsequent announcement in May 2005, and the resulting damages suffered by Plaintiff and the other members of the Class, are directly attributable to the market's reaction to the disclosure of information that had been previously misrepresented or concealed by Defendants, and to the market's adjustment of the Company's securities prices to reflect the newly emerging truth about the Company's financial condition. Had MacKay Shields known of the material adverse information not disclosed by Defendants, or been aware of the truth behind Defendants' material misstatements, it would not have purchased the C&A Notes on behalf of Plaintiff and the other Class members at artificially inflated prices.

## INAPPLICABILITY OF THE STATUTORY SAFE HARBOR

231.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false or misleading statements pleaded in this Complaint. The statements alleged to be false or misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false or misleading may be characterized as forward-looking, they were not adequately identified as

forward-looking statements when made, and there were no meaningful cautionary statements identifying important facts that could cause actual results to differ materially from those in the purportedly forward-looking statements. To the extent that the statutory safe harbor is intended to apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the defendants had actual knowledge that the particular forward-looking statement was materially false or misleading. In addition, to the extent any of the statements set forth above were accurate when made, they became inaccurate or misleading because of subsequent events, and defendants failed to update the those statements which later became inaccurate.

## STATUTE OF LIMITATIONS

232. The claims asserted herein were properly asserted within the applicable statute of limitations. Specifically, the claims were brought within two years after the discovery of the fraud and within five years of the making of the statements alleged herein to be materially false and misleading. Moreover, the claims asserted herein have been tolled by, and relate back to the date of, the filing of the initial class action complaint in this action on February 5, 2007, as well as the filing of the complaint in *MacKay Shields LLC v. Heartland Industrial Partners, LP., et. al.,* Case No. 05-520229-CZ (State of Michigan, Circuit Court for Wayne County) on July 8, 2005 (the "State Court Action"). Further, following C&A's disclosures stated above, proposed lead counsel for the class conducted a diligent investigation into the facts and circumstances surrounding the fraudulent activity (which investigation included contacting knowledgeable witnesses and drafting and filing the complaint in the State Court Action and the initial class complaint in this action). To the extent that new information regarding the fraud is included in this Complaint, that information was not discovered—and could not have been discovered

through a diligent investigation—until the Criminal Indictment and the SEC Complaint were released on or about March 26, 2007.

## COUNT I

### Against Defendants Stockman, Stepp, Leuliette, Tredwell, McConnell, Valenti, Galante, Koth, Krause, Jones, Cosgrove, McCallum, Barnaba, Gougherty and Williams For Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder

233.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

234.    Throughout the Class Period, Stockman, Stepp, Leuliette, Tredwell, McConnell, Valenti, Galante, Koth, Krause, Jones, Cosgrove, McCallum, Barnaba, Gougherty and Williams (the "Section 10(b) Defendants"), directly and indirectly, by the use of means and instrumentalities of interstate commerce, the United States mails and a national securities exchange, employed a device, scheme and artifice to defraud, made untrue statements of material fact and omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, and engaged in acts, practices and a course of business which operated as a fraud and deceit upon Plaintiff and the members of the Class. The materially false statements and omissions made by the Section 10(b) Defendants, and/or their role in the fraudulent schemes are set forth above. The fraudulent statements alleged above include statements made in face-to-face meetings with MacKay Shields (including the PPM), statements made in documents provided directly to MacKay Shields, statements made in documents publicly filed with the SEC (including Form S-3's, Form S-3/A's, Form S-4's, Form 10-Q's, Form 10-Q/A's, Form 8-K's and accompanying press releases, and Form 10-K's), statements made on earnings conference calls and other statements as set forth above, which MacKay Shields relied upon in deciding to purchase C&A Notes on behalf of the Class. With respect to the documents filed with the SEC, each of these documents contained

materially false and misleading financial information relating to C&A's earnings, revenue, income, sales and other measures of financial performance, as set forth above. As set forth in the SEC Complaint "C&A materially overstated its income, or reduced its losses, in its quarterly reports (Form 10-Q) and annual reports (Form 10-K) for each reporting period from the fourth quarter of 2001 through the third quarter of 2004." SEC Complaint¶51. The Criminal Indictment also confirms that "the quarterly and annual reports filed by C&A for the fourth quarter of 2001 through the third quarter of 2004 included financial statements that reflected . . . fraudulent adjustments to C&A's expenses and revenue." Criminal Indictment¶92. MacKay Shields reasonably relied, on behalf of Plaintiff and the Class, on these materially false and misleading statements.

235.   The Section 10(b) Defendants, as the most senior officers of C&A during the time when the false and misleading statements were made, are liable as direct participants in all of the wrongs complained of herein. As described above, during numerous one-on-one meetings with MacKay Shields' representatives, many of the Section 10(b) Defendants personally made false and misleading statements regarding C&A's finances and operations, which MacKay Shields reasonably relied upon when deciding whether to purchase C&A Notes for Plaintiff and the Class. Moreover, through their positions of control and authority, the Section 10(b) Defendants were in a position to and did control all of the Company's false and misleading statements and omissions, including the false and misleading statements contained in C&A's public filings and press releases as more particularly set forth above. In addition, the false and misleading statements made in the Company's published documents (including its press releases and publicly issued financial statements) constitute "group published information," which the Section 10(b) Defendants were responsible for creating. Each of the Section 10(b) Defendants had direct

involvement in the daily business of the Company and participated in the preparation and dissemination of the Company's "group published documents."

236.    As detailed above, the Section 10(b) Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were readily available to them.  The material misrepresentations and/or omissions detailed above were made knowingly or recklessly and for the purpose and effect of concealing C&A's operating condition and future business prospects from investors such as MacKay Shields and supporting the artificially inflated price of the Company's securities.  In addition to the information set forth above, the scienter of the Section 10(b) Defendants is further established by the following facts:

a.    The Criminal Indictment charges Defendants Stockman, Stepp, Cosgrove and Barnaba with, among other things, securities fraud and violations of Section 10(b) and Rule 10b-5 in connection with the activities alleged above.

b.    The SEC Complaint charges Defendants Stockman, Stepp, Jones, Cosgrove, McCallum, Barnaba, Gougherty, Galante, and Williams with, among other things, securities fraud and violations of Section 10(b) and Rule 10b-5 in connection with the activities alleged above.

c.    Defendants Galante, Jones, Williams and Gougherty have pled guilty to criminal violations of various laws arising out of the activities alleged above.  For instance:

(i)    Galante pled guilty to, among other things, conspiracy to commit fraud in the connection with the purchase and sale of securities, making false and

94

misleading statements to the SEC, and falsifying books and records of C&A. In so doing, Galante, among other things, admitted that he was "aware of the false and misleading statements concerning, among other things, Collins & Aikman's earnings and liquidity being presented to the investing public," and that he "prepared documents in support of the misleading statements that were made to the public investors." Galante Guilty Plea at 14-15.

(ii) Jones pled guilty to conspiracy and obstruction of justice. In so doing, Jones admitted, among other things, that "beginning in approximately 2003 . . . I learned of illegal conduct by [C&A] corporate executives the purpose of which was to disguise the company's true operating performance and financial results. I learned that certain figures for EBITDA, operating income and other financial information had been falsely inflated on the company's books by improperly recognizing cost reductions. . . I and other executives knew that the effect of these transactions . . . was to present a false and misleading picture of the company's true operating performance and financial results." Jones Guilty Plea at 10-11.

(iii) Williams pled guilty to conspiracy. In so doing, Williams admitted, among other things, that he was involved in the falsification of invoices and other records as they related to the fraudulent scheme surrounding GECC's accounts receivables securitization facility, as described above. *See generally* Williams Guilty Plea.

(iv) Gougherty pled guilty to securities fraud, conspiracy to commit securities fraud, and making false statements in SEC filings. In so doing, Gougherty

95

admitted, among other things, "During 2004 and 2005 I, along with others, engaged in conduct by which Collins & Aikman wrongly included certain supplier rebates as income . . . for certain SEC reporting periods, even though these rebates were contingent on future events or actually for capital equipment purchases and, therefore, they could not be properly included as income for those periods" and that he was "involved in the making of false financial statements that [he] knew would go into documents that were going to be filed with the SEC." Gougherty Guilty Plea at 10-12.

     d.    As described above, Defendant McCallum was directly involved with numerous blatantly fraudulent "round-trip" transactions with C&A. McCallum knew or was reckless in not knowing that these transactions were fraudulent and rendered C&A's publicly-filed financial statements materially false and misleading (including the SEC filings that he signed). Nonetheless, McCallum participated in these fraudulent transactions because it enabled him to profit through lucrative business deals with C&A, as described above. Indeed, McCallum had a long history of profiting through his deals with Defendants Stockman and Heartland. According to a March 11, 2004 press release, McCallum was "directly or indirectly" a limited partner in Heartland. Indeed, McCallum and his affiliates received approximately $100.0 million from C&A in 2001 in connection with C&A's purchases of Joan Automotive Industries, Inc. and Western Avenue Dyers, L.P., businesses in which McCallum had a substantial ownership interest. As a result of his close ties to Defendants Stockman and Heartland, as well as his status as a Director of C&A (with whom he conducted numerous business transactions), McCallum had a

special relationship with the Company and had the same access to information as the other corporate insiders.

  e.  According to former employees who worked closely with the Defendants, Stockman and Stepp had "a comprehensive knowledge of each plant's financial results" and were "intimately familiar with each plant's operations and finances."

  f.  According to a press release issued on March 26, 2007 by the USAO:

> Stockman did not have only money at stake: his reputation was on the line as well. In 2003 he told a reporter with the *New York Times* "[C&A's business plan] was my idea; I'm going to stick with it. I'm going to make it happen and make sure it becomes a success." Stockman stuck with it at the cost of the investing public, the financial integrity of the company and the truth.

  g.  CI 1 also stated that C&A management (including Stockman and Stepp) exerted constant pressure on the executives at certain facilities to report financial results that were better than they actually were.

  h.  CI 1 stated that C&A management was "cooking the books" in order to show improving results to the Company's lenders.

  i.  CI 2 stated that Stockman did everything in his power to make C&A's financial results appear better than they actually were. Indeed, CI 2 stated that Stockman improperly manipulated all of the accurate data that plant management provided to him to achieve whatever results he wanted to show to outsiders.

  j.  CI 2 also stated that Stockman participated in the fraud by, among other things, encouraging C&A facilities to classify operating expenses as non-operating for the purpose of increasing the Company's EBITDA.

k.      CI 1 and CI 2 further stated that, by the summer of 2004, Stockman knew

that C&A could not adequately staff its projects, and appeared at two meetings with Ford

to explain why C&A could not have sufficient personnel in attendance.

l.      Stockman and Stepp regularly certified C&A's internal controls pursuant

to Section 302 of the Sarbanes-Oxley Act of 2002. According to CI 2, however,

PricewaterhouseCoopers reported internal control weaknesses to C&A management

(including Stockman and Stepp) in December 2003. Further, CI 2 stated that C&A failed

in seven out of eight categories in PricewaterhouseCoopers' review, and these failures,

which included basic internal controls over things like accounts receivables and payables

recognition, were not rectified.

m.      In June 2005, the Section 10(b) Defendants knew or should have known

that GECC had informed C&A's management that it was "gravely concerned" that C&A

was pre-billing certain receivables. Moreover, the Section 10(b) Defendants knew or

should have known that, when C&A could not find any documentation to verify that

these receivables were valid, GECC demanded an on-site audit of C&A's receivables.

n.      The Section 10(b) Defendants' scienter is further demonstrated by the fact

that, after auditing C&A for only one year, PricewaterhouseCoopers withdrew in the

Summer of 2003 after sending a letter to the Company's management describing certain

"reportable conditions."

o.      Defendants Stockman, Galante, Leuliette, Valenti, Tredwell, McConnell

and Koth also misled investors like MacKay Shields in March 2005 regarding

Heartland's so-called "commitment" to purchase approximately $300 million face value

of C&A's preferred stock from Textron. In reality, these Defendants knew or should

have known that, under this "commitment," Heartland was under no obligation to purchase these preferred shares until C&A filed a Form 10-K for 2004 (which it still has not done), and that Heartland could unilaterally terminate the agreement if C&A experienced an event of bankruptcy or insolvency.

p.      As detailed above, the Section 10(b) Defendants also had a motive and opportunity to commit fraud. The fraudulent scheme allowed C&A to avoid bankruptcy for years and thus preserve the massive investment made by Heartland (of which Defendants Stockman, Stepp, Galanti, Tredwell, McConnell, Leuliette and Valenti were senior directors, partners and/or employees). Accordingly, if these Defendants were to reveal C&A's problems, they stood to lose tens of millions of dollars in connection with their personal ownership of C&A stock, as well as Heartland's ownership of approximately 41% of C&A.

q.      These Defendants' senior positions at Heartland also provided them with a motive and opportunity to commit fraud, as Heartland received lucrative consulting fees, totaling more than $44 million between 2001 and 2004. Moreover, approximately 30% of Heartland's investment portfolio was dedicated to C&A.

r.      The remaining Section 10(b) Defendants also had a motive and opportunity to commit fraud, as, on information and belief, they personally owned shares of C&A stock and/or participated in C&A's employee stock option plan, pursuant to which 68,218 options to purchase shares of restricted C&A stock were issued to Company employees and executive officers on June 29, 2004. These options were scheduled to vest in three equal annual installments on June 29, 2005, June 29, 2006 and June 29, 2007. Accordingly, the Section 10(b) Defendants knew that a bankruptcy filing

by C&A would render these stock holdings and restricted stock options essentially worthless, endanger their lucrative positions at C&A (and, for certain Section 10(b) Defendants, endanger their lucrative positions at Heartland—which was heavily invested in C&A), and subject them to personal liability regarding the false and misleading financial statements that he signed and certified.

237. The scienter of Defendants Leuliette, Tredwell, McConnell and Valenti is further demonstrated by the fact that they were each Senior Members and Directors of Heartland, as well as Directors of C&A. As Directors of both Heartland and C&A, these Defendants were part of a small group of insiders who effectively owned and controlled C&A. They worked closely with Defendants Stockman, Stepp and Galante (also members of Heartland) both at Heartland and in connection with the management of C&A. By virtue of their status as directors of both C&A and Heartland, these Defendants had a special relationship with the Company, which enabled them to have access to the same information as other corporate insiders. Indeed, as the consummate insiders, these Defendants had unfettered access to C&A's books and records and an undisputed duty to monitor the information within their control in order to ensure that the Company's financial statements were accurate.

238. Despite their positions of seniority and control, Defendants Leuliette, Tredwell, McConnell and Valenti knowingly or recklessly permitted the fraudulent scheme to continue unabated for years. In doing so, each of these insiders either knew about, or was willfully blind toward, a host of red flags concerning the fraudulent scheme. Indeed, as the Criminal Indictment and the SEC Complaint make clear, the fraudulent scheme could have been discovered from a review of the most basic Company documents—documents which these Defendants had access to and a duty to monitor. The Criminal Indictment explains that:

> at the close of each month and each quarter of C&A's fiscal year, employees in C&A's finance and accounting departments collected and summarized information reflecting C&A's operating performance and financial results for the particular period in question. <u>This information was reflected in various financial statements and reports</u> . . .
>
> at all times relevant to this Indictment, <u>C&A tracked its sales, EBITDA, operating income, capital expenditures and other financial metrics on a monthly basis through the use of internal reports</u> . . .
>
> At the corporate level, the results from each division were aggregated and combined with the home office results . . . <u>the consolidated reports tracked actual results and compared them to forecasted results.</u>

Criminal Indictment ¶ 15-17 (emphasis added). The Criminal Indictment also confirms that certain Defendants "received weekly written reports . . . which included updated information concerning rebate transactions. These weekly updates often referred to the fact that future business was being promised to suppliers in exchange for rebates being booked immediately [*i.e.*, the fraudulent "rebate" scheme described above]." *Id.* ¶ 39.

239. Thus, readily-available internal C&A reports tracked on a weekly, monthly and quarterly basis C&A's most critical financial metrics—including the EBITDA, operating income and capital expenditure numbers that MacKay Shields and other investors relied upon (and which were falsely stated in C&A's public filings). These reports also compared C&A's actual results to its forecasted results. Had any of Defendants Leuliette, Tredwell, McConnell and Valenti (or the other Defendants) bothered to review these reports, it would have been readily apparent to them that C&A's publicly reported financial information was materially false and misleading. For instance, it would have been readily apparent from the face of the reports that C&A's actual results were falling so far behind its forecasted results that C&A's financial statements were obviously falsified. Moreover, the Criminal Indictment makes clear that these documents were available to the Defendants and that Defendant Stockman held numerous

meetings where these reports were discussed: "Stockman regularly met with C&A employees to discuss the financial results and projections reflected in the various documents presented during these meetings." Defendants Leuliette, Tredwell, McConnell and Valenti either reviewed these reports and/or attended these meetings (which would have alerted them to the fraud) or recklessly failed to do so in abdication of their duties.

240. Defendants Leuliette, Tredwell, McConnell and Valenti also either knew, or were reckless in not knowing, that Defendant Stockman's statements on March 17, 2005 were materially false and misleading. As stated in the Criminal Indictment, on March 17, 2005, Stockman told investors that C&A's "EBITDA would be between $65-75 million for the first quarter of 2005, even though the most current financial information for the company, including the actual results for January and February, showed that EBITDA for the first quarter would only be roughly half that figure." *Id.* ¶ 71 (emphasis added). Had these Defendants bothered to consult the Company's actual results for January and February, as they should have done, it would have been obvious to them that Stockman's statements on March 17, 2005 were false and misleading. The failure of these Defendants (who were also partners in Heartland) to review these most basic Company document was egregiously reckless, particularly given that, Stockman also disclosed on March 17, 2005 that Heartland (of which these Defendants were Directors) was purportedly "committed" to purchase $300 million in additional C&A stock. As set forth above, this statement of Heartland's "commitment" was itself materially misleading (as each of Defendants Leuliette, Tredwell, McConnell and Valenti also knew or should have known).

241. Plaintiff and the other members of the Class, through MacKay Shields, relied upon the false and misleading statements alleged above in purchasing C&A Notes at artificially inflated prices.

242.   As a direct and proximate cause of the wrongful conduct described herein,

Plaintiff and the other members of the Class suffered damages in connection with their purchases

of C&A Notes through MacKay Shields.  Had MacKay Shields known of the material adverse

information not disclosed by Defendants, or been aware of the truth behind Defendants' material

misstatements, it would not have purchased C&A Notes at artificially inflated prices on behalf of

Plaintiff and the other members of the Class.

243.   By virtue of the foregoing, the Section 10(b) Defendants violated Section 10(b) of

the Exchange Act and Rule 10b-5 promulgated thereunder and, therefore, are liable to Plaintiff

and the members of the Class, each of whom has been damaged as a result of such violations.

## COUNT II

### For Violations of Section 20(a) of the Exchange Act
### Against Defendants Heartland, Stockman, Stepp, Leuliette, Tredwell,
### McConnell, Valenti, Galante, Koth, Cosgrove, and McCallum

244.   Plaintiff repeats and realleges each and every allegation contained above as if

fully set forth herein.

245.   This claim is asserted against Defendants Heartland, Stockman, Stepp, Leuiliette,

Tredwell, McConnell, Valenti, Galante, Koth, Cosgrove, and McCallum (collectively, the

"Section 20(a) Defendants").  Throughout the Class Period, the Section 20(a) Defendants, by

virtue of their positions, stock ownership and/or specific acts described above, were controlling

persons of C&A within the meaning of Section 20(a) of the Exchange Act.

246.   As alleged herein, C&A violated Section 10(b) of the Exchange Act and Rule

10b-5 promulgated thereunder by making false and misleading statements in connection with the

purchase or sale of securities and by participating in a fraudulent scheme and course of business

or conduct, all in connection with the purchase or sale of securities.  This fraudulent conduct was

undertaken with scienter because C&A is charged with the knowledge and scienter of its senior

directors, officers and employees (including Stockman and the Defendants who have entered

Guilty Pleas) who knew of or recklessly disregarded the falsity of the Company's statements and

of the fraudulent nature of its scheme. But for the fact that C&A has filed for bankruptcy

protection, the Company would be named as a Defendant on the Section 10(b) claim alleged

herein.

247.    The Section 20(a) Defendants had the power to, and did, directly and indirectly,

exercise control over C&A, including the content and dissemination of statements which

Plaintiff alleges are false and misleading. The Section 20(a) Defendants were each provided

with and/or had access to reports, filings, press releases and other statements alleged to be

misleading prior to and/or shortly after they were issued and had the ability to prevent the

issuance or correct the statements. Defendants had direct and supervisory involvement in the

day-to-day operations of the Company and induced C&A to engage in the acts constituting

violations of the federal securities laws, as set forth in Count One above.

248.    Defendant Stockman exercised control over the Company through his positions as

Chief Executive and Chairman of the Board of Directors, membership on the Company's

Compensation Committee, and his role as (i) a Managing Member of Heartland, (ii) a Senior

Managing Director of Heartland, and (iii) the "Buyout Partner" of Heartland. In the PPM, C&A

admitted that Stockman was central to C&A's operations, and the loss of his services could

materially and adversely affect the Company. Additionally, as alleged above, Stockman had the

power to control the Company's public statements, and exercised such control throughout the

Class Period, both by personally making false and misleading statements to MacKay Shields

regarding C&A's finances and operations during one-on-one meetings, and by directly

disseminating false information to the market or causing such information to be disseminated

through press releases and analyst conference calls. Finally, Stockman exercised control over C&A's financial reporting through his management responsibilities and his certification of the Company's fraudulent financial statements.

249.    Defendant Stepp exercised control over the Company through his positions as the Vice Chairman of C&A's Board and the Company's CFO until October 2004 and as a Senior Managing Director of Heartland. He controlled the contents of C&A's public financial statements and exercised further influence through his certification of those statements. Additionally, as alleged above, Stepp had the power to control the Company's public statements about C&A's finances and operations, and he exercised such control throughout the Class Period by personally making false and misleading statements to MacKay Shields regarding C&A's finances and operations during one-on-one meetings, and by making and participating in various statements about the Company's performance to the market, both through press releases and analyst conference calls.

250.    Defendant Koth exercised control over the Company through his positions as the Senior Vice President and CFO of the Company since October 2004, and previously was C&A's Vice President, Finance & Controller, and head of tax since May 2004. Additionally, as alleged above, Koth had the power to control the Company's public statements about C&A's finances and operations, and he exercised such control throughout the Class Period by personally making false and misleading statements to MacKay Shields regarding C&A's finances and operations during one-on-one meetings, and by participating in various statements about the Company's performance, both, through press releases and analyst conference calls.

251.    Defendant Krause exercised control over the Company through his position as Senior Vice President, Finance and Administration of the Company since October 2004, and his

position as the Company's Vice President and Treasurer from October 2002 through September 2004. Additionally, as alleged above, Krause had the power to control the Company's public statements about C&A's finances and operations, and he exercised such control during the Class Period through his involvement in preparing the Company's press releases, quarterly reports and annual reports, each of which was relied upon by MacKay Shields.

252.    Defendant Cosgrove exercised control over the Company through his senior positions as Vice President of Finance, Vice President for Financial Planning and Analysis, and Senior Vice President, Financial Planning and control. Additionally, as alleged above, Cosgrove had the power to control the Company's public statements about C&A's finances and operations, and he exercised such control during the Class Period through his involvement in preparing the Company's press releases, quarterly reports and annual reports, each of which was relied upon by MacKay Shields.

253.    Defendant McCallum exercised control over the Company through his position as a Director and significant shareholder of C&A. Further, as alleged above, McCallum was a limited partner in Heartland and had engaged in numerous fraudulent transactions with C&A (which had personally enriched McCallum by many millions of dollars). McCallum's close relationship with Defendants Stockman and Heartland enabled him to exercise dominion and control over C&A for his own personal gain.

254.    Defendant Galante exercised control over the Company through his position as Vice President and Treasurer of C&A since October 2004, and his position as Vice President of Heartland. Additionally, as alleged above, Galante had the power to control the Company's public statements about C&A's finances and operations, and he exercised such control throughout the Class Period by personally making false and misleading statements to MacKay

Shields regarding C&A's finances and operations during one-on-one meetings, and through his involvement in preparing C&A's press releases, quarterly reports and annual reports, each of which was relied upon by MacKay Shields.

255. Defendants Tredwell, Leuliette, McConnell and Valenti exercised control over the Company through their positions as Directors of C&A and Senior Managing Directors of Heartland, which owned approximately 41% of C&A. Additionally, as alleged above, Tredwell, Leuliette, McConnell and Valenti had the power to control the Company's public statements about C&A's finances and operations, and exercised such control throughout the Class Period by reviewing and approving the false and misleading information that certain Section 10(b) Defendants provided to MacKay Shields during face-to-face meetings, and through their involvement in preparing the Company's press releases, quarterly reports and annual reports, each of which was relied upon by MacKay Shields.

256. Defendant Heartland controlled C&A throughout the Class Period. Specifically, as of January 1, 2005, Heartland owned approximately 41% of the Company. In addition to the facts set forth above, Heartland's control over C&A is demonstrated by the following:

      a. There were six members of C&A's eleven-member Board that were affiliated with Heartland.

      b. Stockman, the Chairman of the C&A Board and the Company's CEO, and Stepp, the Vice Chairman of the C&A Board and the Company's CFO, both were Senior Managing Directors of Heartland LP.

      c. Galante, a Vice President of Heartland, served as C&A's Treasurer.

      d. In the PPM provided directly to MacKay Shields by Defendants and on which MacKay Shields relied, C&A expressly stated that "[w]e are controlled by

Heartland," and further disclosed that Heartland provided C&A with valuable strategic, operational and financial guidance, and that the loss of such guidance also could have a material adverse effect upon the Company.

e.    When Stockman, Stepp and Galante met with MacKay Shields, they expressly stated that they had authority to speak on behalf of Heartland.

f.    C&A's Form 10-K for the year ended 2001 stated "During the first quarter of 2001, Heartland acquired a controlling interest in the Company."

g.    C&A's April 20, 2001 Proxy statement on Form DEF 14A stated "As of March 15, 2001, Heartland . . . beneficially owned or has the right to vote in the aggregate approximately 91% of the outstanding Common Stock."

h.    Heartland regularly forced C&A to enter into transactions that enriched Heartland.  For instance, in addition to the multi-millions of dollars in management fees set forth above, C&A's Form 10-K for the year ended 2001 stated that C&A "has also agreed to pay [to Heartland] a fee of 1% of the total enterprise value of certain acquisitions and dispositions . . . a fee of $12.5 million was paid by the company to Heartland as a result of [Heartland's] advisory services in connection with the TAC-Trim acquisition."

i.    In 2001, Heartland caused C&A to acquire Becker Group LLC, which was owned directly or indirectly by Thomas Becker, who, according to press reports, was a Heartland limited partner.  Becker benefited immensely from this transaction, realizing in excess of $18 million.

257.    Accordingly, throughout the Class Period, Heartland exercised domination and control over facet of C&A's business and operations.

258.    The Section 20(a) Defendants culpably participated in the matters alleged herein because, among other things, they knew, or were reckless in not knowing, that the statements set forth above were materially false and misleading, or omitted material information.  Facts giving rise to the Section 20(a) Defendants' culpable participation are set forth in detail above.  In addition to those facts, Defendant Heartland culpably participated in the matters alleged herein by virtue of Defendant Stockman (Heartland's founding partner)'s role in designing, orchestrating and carrying out the fraudulent schemes set forth above.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment as follows:

Determining this action to be a proper class action pursuant to Rule 23 of the Federal Rules of Civil Procedure;

A.    Awarding Plaintiff and the members of the Class compensatory damages;

B.    Awarding Plaintiff and the members of the Class pre-judgment interest and post-judgment interest, as well as their reasonable attorneys' fees, expert witness fees, and costs;

D.    Awarding extraordinary, equitable and/or injunctive relief as permitted by law, equity and the applicable federal statutory provisions, pursuant to Rules 64 and 65 of the Federal Rules of Civil Procedure to assure that the Class has an effective remedy; and

E.    Awarding such other relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury of all issues so triable.

Respectfully submitted,

BERNSTEIN LITOWITZ BERGER
& GROSSMANN, LLP

By:    /s/ Steven B. Singer
MAX W. BERGER
STEVEN B. SINGER
JOHN C. BROWNE
JEREMY P. ROBINSON
*Counsel for Plaintiff*
1285 Avenue of the Americas
New York, New York  10019
(212) 554-1400

MORGANROTH & MORGANROTH, PLLC
MAYER MORGANROTH (P17966)
JEFFREY B. MORGANROTH (P41670)
*Local Counsel for Plaintiff*
3000 Town Center, Suite 1500
Southfield, MI  48075
(248) 355-3084

Dated:  May 4, 2007

## CERTIFICATE OF SERVICE

I hereby certify that on May 4, 2007, I electronically filed Plaintiff's Amended Class Action Complaint and Demand for Jury Trial with the Clerk of the Court using the ECF system, which will send notification of such filings to those parties registered with the ECF system.

In addition, I hereby certify that a copy Plaintiff's Amended Class Action Complaint and Demand for Jury Trial will also be sent by United States Postal Service and email to the parties listed below:

Lea Haber Kuck
Jeffrey S. Geier
**Skadden, Arps, Slate, Meagher & Flom LLP**
Four Times Square
New York, New York 10036
Tel: (212) 735-2978
Fax: (212) 735-2000/1

Michael Joseph
Joseph Click
**Blank Rome LLP**
Watergate
600 New Hampshire Avenue NW
Washington, DC 20037
Tel: (202) 772-5800
Fax: (202) 772-5858

Michael Shapiro
Gerald Griffin
**Carter Ledyard & Milburn LLP**
2 Wall Street
New York, NY 10005
Tel: (212) 238-8676
Fax: (212) 732-3232

Gandolfo V. DiBlasi
David E. Swarts
**Sullivan & Cromwell**
125 Broad Street
New York, NY 10004
Tel: (212) 558-4000
Fax: (212) 558-3588

Andrew B. Weissman
**Wilmer Cutler Pickering Hale and Dorr LLP**
1875 Pennsylvania Avenue, NW
Washington, DC 20006
Tel: (202) 663-6612
Fax: (202) 663-6363

Charles A. Stillman
Scott M. Himes
**Stillman, Friedman & Shechtman, P.C.**
425 Park Avenue
New York, NY 10022
Tel: (212) 223-0200
Fax: (212) 223-1942

Thomas G. McNeill (P36895)
**Dickinson Wright, PLLC**
500 Woodward Avenue, Suite 4000
Detroit, MI 48226
(313) 223-3500

Further, the following parties will be served pursuant to the Federal Rules of Civil Procedure:

Paul C. Barnaba
David R. Cosgrove
Thomas V. Gougherty
Gerald E. Jones
Elkin B. McCallum
Christopher M. Williams

MAX W. BERGER
STEVEN B. SINGER
GERALD H. SILK
JOHN C. BROWNE
STEPHEN W. TOUNTAS
BERNSTEIN LITOWITZ BERGER &
GROSSMANN LLP
Attorneys for Plaintiff
(Pro Hac Vice Motions To Be Filed)
1285 Avenue of the Americas, 38th Floor
New York, New York  10019
212-554-1400

/s/ Jeffrey B. Morganroth
MAYER MORGANROTH
MORGANROTH & MORGANROTH, PLLC
Local Counsel for Plaintiff
3000 Town Center, Suite 1500
Southfield, MI  48075
(248) 355-3084
Email: jmorganroth@morganrothlaw.com
[P17966]

# EXHIBIT F

**TO THE DECLARATION OF VERNON R. PROCTOR
IN SUPPORT OF DEFENDANT DAVID R. COSGROVE'S
MOTION TO DISMISS THE COMPLAINT**

THE UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION - DETROIT

In re:

COLLINS & AIKMAN CORPORATION, *et al.,* [1]

Debtors.

)
)
)
)
)
)
)
)
)

Chapter 11
Case No. 05-55927 (SWR)
(Jointly Administered)
(Tax Identification #13-3489233)
Hon. Steven W. Rhodes

COLLINS & AIKMAN CORPORATION and
COLLINS & AIKMAN PRODUCTS CO.,

Plaintiffs,

– against –

DAVID R. COSGROVE,

Defendant.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Adv. Pro. No. 07-05697 (SWR)

**TRACK II**

**FIRST AMENDED COMPLAINT TO: (I) AVOID AND RECOVER
TRANSFERS PURSUANT TO 11 U.S.C. §§ 544, 547, 548 AND 550;
AND (II) DISALLOW CLAIMS PURSUANT TO 11 U.S.C. § 502(d)**

---

[1] The Debtors in the jointly administered cases include: Collins & Aikman Corporation; Amco Convertible Fabrics, Inc., Case No. 05-55949; Becker Group, LLC (d/b/a Collins & Aikman Premier Mold), Case No. 05-55977; Brut Plastics, Inc., Case No. 05-55957; Collins & Aikman (Gibralter) Limited, Case No. 05-55989; Collins & Aikman Accessory Mats, Inc. (f/k/a the Akro Corporation), Case No. 05-55952; Collins & Aikman Asset Services, Inc., Case No. 05-55959; Collins & Aikman Automotive (Argentina), Inc. (f/k/a Textron Automotive (Argentina), Inc.), Case No. 05-55965; Collins & Aikman Automotive (Asia), Inc. (f/k/a Textron Automotive (Asia), Inc.), Case No. 05-55991; Collins & Aikman Automotive Exteriors, Inc. (f/k/a Textron Automotive Exteriors, Inc.), Case No. 05-55958; Collins & Aikman Automotive Interiors, Inc. (f/k/a Textron Automotive Interiors, Inc.), Case No. 05-55956; Collins & Aikman Automotive International, Inc., Case No. 05-55980; Collins & Aiken International Services, Inc. (f/k/a Textron Automotive International Services, Inc.), Case No. 05-55985; Collins & Aikman Automotive Mats, LLC, Case No. 05-55969; Collins & Aikman Automotive Overseas Investment, Inc. (f/k/a Textron Automotive Overseas Investment, Inc.) Case No. 05-55978; Collins & Aikman Automotive Services, LLC, Case No. 05-55981; Collins & Aikman Canada Domestic Holding Company, Case No. 05-55930; Collins & Aikman Carpet & Acoustics (MI), Inc., Case No. 05-55982; Collins & Aikman Carpet & Acoustics (TN), Inc., Case No. 05-55984; Collins & Aikman Development Company, Case No. 05-55943; Collins & Aikman Europe, Inc., Case No. 05-55971; Collins & Aikman Fabrics, Inc. (d/b/a Joan Automotive Industries, Inc.), Case No. 05-55963; Collins & Aikman Intellimold, Inc. (d/b/a M&C Advanced Processes, Inc.), Case No. 05-55976; Collins & Aikman Interiors, Inc., Case No. 05-55970; Collins & Aikman International Corporation, Case No. 05-55951; Collins & Aikman Plastics, Inc., Case No. 05-55960; Collins & Aikman Products, Co., Case No. 05-55932; Collins & Aikman Properties, Inc., Case No. 05-55964; Comet Acoustics, Inc., Case No. 05-55972; CW Management Corporation, Case No. 05-55979; Dura Convertible Systems, Inc., Case No. 05-66942; Gamble Development Company, Case No. 05-55974; JPS Automotive, Inc. (d/b/a PACJ, Inc.), Case No. 05-55935; New Baltimore Holdings, LLC, Case No. 05-55992; Owosso Thermal Forming, LLC, Case No. 05-55946; Southwest Laminates, Inc. (d/b/a Southwest Fabric Laminators Inc.), Case No. 05-55948; Wickes Asset Management, Inc., Case No. 05-55962; and Wickes Manufacturing Company, Case No. 05-55968.

Collins & Aikman Corporation and Collins & Aikman Products Co., the plaintiffs herein (collectively the "Plaintiff"), alleges that:

## JURISDICTION AND VENUE

1.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.

2.      This adversary proceeding is brought pursuant to Rule 7001, *et seq.* of the Federal Rules of Bankruptcy Procedure and 11 U.S.C. §§ 502(d), 544, 547, 548 and 550.

3.      Venue in this Court is proper pursuant to 28 U.S.C. § 1409 as this adversary proceeding arises under and in connection with a case under 11 U.S.C. § 101, *et seq.* (the "Bankruptcy Code"), which is pending in this District.

4.      This is a core proceeding as defined by 28 U.S.C. § 157(b)(2)(A), (F) and (O).

## PARTIES AND BACKGROUND FACTS

5.      On May 17, 2005 (the "Petition Date"), Plaintiff and the above-captioned debtors each filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code and continues to operate as a debtor in possession.

6.      Upon information and belief, David R. Cosgrove ("Defendant") was a creditor of the Plaintiff prior to the filing of the Plaintiff's Chapter 11 case.

7.      Upon information and belief, Defendant was an insider pursuant to section 101(31) of the Bankruptcy Code.

8.      Plaintiff retains the right to enforce, sue on, settle or compromise all causes of action belonging to the Plaintiff, including claims under §§ 502(d), 544, 547, 548 and 550 of the Bankruptcy Code.

9.    During the two years prior to the Petition Date, Plaintiff made or caused to be made the transfers (the "Transfers") on or about the dates listed in Exhibit A attached hereto and incorporated herein by reference, totaling $454,726.79.

## CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION
#### (Avoidance and Recovery of Preferential Transfers)

10.    Plaintiff repeats, realleges and incorporates by reference the allegations contained in paragraphs 1 through 9 of this Complaint as though set forth at length herein.

11.    Within one year preceding the Petition Date, the Plaintiff made, or caused to be made, one or more of the Transfers (the "One-Year Transfers") to or for the benefit of Defendant totaling $261,724.24.

12.    The One-Year Transfers were of a property interest of the Plaintiff.

13.    The One-Year Transfers were made to or for the benefit of Defendant as a creditor of the Plaintiff.

14.    Plaintiff made, or caused to be made, the One-Year Transfers for, or on account of, antecedent debt(s) owed by the Plaintiff before such Transfers were made.

15.    The One-Year Transfers were made while the Plaintiff was insolvent.

16.    The One-Year Transfers enabled Defendant to receive more than Defendant would receive if: (a) the Plaintiff's bankruptcy case was administered under Chapter 7 of the Bankruptcy Code; (b) the One-Year Transfers had not been made; and (c) Defendant received payment of such debt to the extent provided by the provisions of the Bankruptcy Code.

17.    Interest on the One-Year Transfers has accrued and continues to accrue from the date each of the Transfers was made.

18.    Defendant was the initial transferee of the One-Year Transfers, or the entity for whose benefit the One-Year Transfers were made, or was the immediate or mediate transferee of the initial transferee receiving the One-Year Transfers.

19.    The One-Year Transfers, to the extent they are avoided pursuant to § 547(b) of the Bankruptcy Code, may be recovered by the Plaintiff pursuant to § 550 of the Bankruptcy Code.

## SECOND CAUSE OF ACTION
### (Avoidance and Recovery of Fraudulent Transfers pursuant 11 U.S.C. §§ 548 and 550)

20.    Pleading in the alternative, Plaintiff repeats, realleges and incorporates by reference the allegations contained in paragraphs 1 through 19 of this Complaint as though set forth at length herein.

21.    Within one year preceding the Petition Date, the Plaintiff made, or caused to be made, the One-Year Transfers.

22.    The One-Year Transfers were to, or for the benefit of, the Defendant.

23.    Upon information and belief, Plaintiff received less than reasonably equivalent value in exchange for the One-Year Transfers.

24.    Upon information and belief, the Plaintiff was: (i) insolvent on the dates of the One-Year Transfers, or became insolvent as a result of the One-Year Transfers; and/or (ii) engaged in business or a transaction for which any property remaining with the Plaintiff was an unreasonably small capital at the time of, or as a result of, the One-Year Transfers.

4

25.    The One-Year Transfers, to the extent they are avoided pursuant to § 548 of the Bankruptcy Code, may be recovered by the Plaintiff pursuant to § 550 of the Bankruptcy Code.

## THIRD CAUSE OF ACTION
### (Avoidance and Recovery of Fraudulent Transfers pursuant 11 U.S.C. §§ 544(b) and 550)

26.    Pleading in the alternative, Plaintiff repeats, realleges and incorporates by reference the allegations contained in paragraphs 1 through 25 of this Complaint as though set forth at length herein.

27.    Pursuant to Bankruptcy Code section 544(b), Plaintiff has the rights of an existing unsecured creditor of Plaintiff.  Section 544(b) permits Plaintiff to assert claims and causes of action that such a creditor could assert under applicable state law.

28.    Plaintiff made, or caused to be made, all of the Transfers to or for the benefit of the Defendant.

29.    Plaintiff did not receive reasonably equivalent value or fair consideration in exchange for the Transfers.

30.    Plaintiff was insolvent, or became insolvent as a result of the Transfers; was engaged in business or a transaction, or was about to engage in business or a transaction, for which their remaining property was unreasonably small capital; and/or intended to incur, or believed that they would incur, debts that would be beyond their ability to pay as such debts matured.

31.    Based on the foregoing, the Transfers constitute fraudulent transfers, pursuant to the Uniform Fraudulent Transfers Act as adopted by the State of Michigan, including Michigan Compiled Laws Annotated § 566.34, which are avoidable by Plaintiff pursuant to sections 544(b) and 550 of the Bankruptcy Code.

## FOURTH CAUSE OF ACTION
### (Disallowance of Claims)

32.    Plaintiff repeats, realleges and incorporates by reference the allegations contained in paragraphs 1 through 31 of this Complaint as though set forth at length herein.

33.    Defendant is the recipient of the Transfers, which are recoverable pursuant to sections 544, 547, 548 and 550 of the Bankruptcy Code, and Defendant has not returned the Transfers to Plaintiff.

34.    Based upon the foregoing and pursuant to section 502(d) of the Bankruptcy Code, the claims, if any, must be disallowed since Defendant has not paid or surrendered the Transfers to Plaintiff.

WHEREFORE, Plaintiff prays that this Court enter a judgment against Defendant:

a.    On Plaintiff's First Cause of Action, in favor of Plaintiff and against Defendant in an amount not less than the One-Year Transfers, plus interest from the date of such One-Year Transfers until full payment is made to Plaintiff, together with the costs and expenses of this action, including, without limitation, attorneys' fees, and directing Defendant to turnover such sum to Plaintiff pursuant to Bankruptcy Code §§ 547(b) and 550(a);

b.    On Plaintiff's Second Cause of Action, in favor of Plaintiff and against Defendant in an amount not less than the One-Year Transfers, plus interest from the date of such One-Year Transfers until full payment is made to Plaintiff, together with the costs and expenses of this action, including, without limitation, attorneys' fees; and directing Defendant to turnover such sum to Plaintiff pursuant to Bankruptcy Code §§548(a)(1)(B) and 550(a);

c.    On Plaintiff's Third Cause of Action, in favor of Plaintiff and against Defendant in an amount not less than all of the Transfers, plus interest from the date of such Transfers until full payment is made to Plaintiff, together with the costs and expenses of this action, including, without limitation, attorneys' fees; and directing Defendant to turnover such sum to Plaintiff pursuant to Bankruptcy Code §§ 544(b) and 550(a);

d.    On Plaintiff's Fourth Cause of Action, in favor of Plaintiff and against Defendant disallowing the Claims unless and until Defendant returns the Transfers to Plaintiff pursuant to Bankruptcy Code § 502(d); and

e.    Granting such other and further relief as this Court may deem just and proper.

DATED:    May 17, 2007

COLLINS & AIKMAN
CORPORATION., *et al.*,
Debtors and Debtors in Possession
 and Plaintiffs,
By their Special Counsel,
TOGUT, SEGAL & SEGAL LLP
By:

_____/s/ Neil Berger_____
ALBERT TOGUT (AT-9759)
NEIL BERGER (NB-3599)
Members of the Firm
One Penn Plaza, Suite 3335
New York, New York 10119
(212) 594-5000

EXHIBIT "A"

COLLINS & AIKMAN CORPORATION, ET AL.
v.
DAVID R. COSGROVE

| Transfer Date | Transfer Amount | Transfer Type |
|---|---|---|
| 5/30/2003 | $14,960.55 | DIRECT DEPOSIT CHECK |
| 5/30/2003 | $815.00 | DIRECT DEPOSIT CHECK |
| 6/30/2003 | $14,960.55 | DIRECT DEPOSIT CHECK |
| 6/30/2003 | $789.26 | DIRECT DEPOSIT CHECK |
| 7/31/2003 | $718.91 | DIRECT DEPOSIT CHECK |
| 7/31/2003 | $14,960.55 | DIRECT DEPOSIT CHECK |
| 8/29/2003 | $14,960.55 | DIRECT DEPOSIT CHECK |
| 8/29/2003 | $718.91 | DIRECT DEPOSIT CHECK |
| 9/30/2003 | $14,931.05 | DIRECT DEPOSIT CHECK |
| 9/30/2003 | $718.91 | DIRECT DEPOSIT CHECK |
| 10/31/2003 | $14,931.05 | DIRECT DEPOSIT CHECK |
| 10/31/2003 | $718.91 | DIRECT DEPOSIT CHECK |
| 11/26/2003 | $14,931.05 | DIRECT DEPOSIT CHECK |
| 11/26/2003 | $718.91 | DIRECT DEPOSIT CHECK |
| 12/31/2003 | $14,931.05 | DIRECT DEPOSIT CHECK |
| 12/31/2003 | $718.91 | DIRECT DEPOSIT CHECK |
| 12/31/2003 | $718.91 | DIRECT DEPOSIT CHECK |
| 1/30/2004 | $14,934.55 | DIRECT DEPOSIT CHECK |
| 1/30/2004 | $788.03 | DIRECT DEPOSIT CHECK |
| 2/27/2004 | $14,934.55 | DIRECT DEPOSIT CHECK |
| 2/27/2004 | $788.03 | DIRECT DEPOSIT CHECK |
| 3/31/2004 | $0.00 | CHECK |
| 3/31/2004 | $14,934.55 | DIRECT DEPOSIT CHECK |
| 3/31/2004 | $788.03 | DIRECT DEPOSIT CHECK |
| 4/30/2004 | $18,843.75 | DIRECT DEPOSIT CHECK |
| 4/30/2004 | $788.03 | DIRECT DEPOSIT CHECK |
| 5/28/2004 | $18,843.75 | DIRECT DEPOSIT CHECK |
| 5/28/2004 | $788.03 | DIRECT DEPOSIT CHECK |
| 6/30/2004 | $18,843.75 | DIRECT DEPOSIT CHECK |
| 6/30/2004 | $788.03 | DIRECT DEPOSIT CHECK |

| Date | Amount | Type |
|---|---|---|
| 7/1/2004 | $46.50 | CHECK |
| 7/30/2004 | $18,843.75 | DIRECT DEPOSIT CHECK |
| 7/30/2004 | $717.88 | DIRECT DEPOSIT CHECK |
| 8/26/2004 | $1,187.44 | CHECK |
| 8/31/2004 | $18,843.75 | DIRECT DEPOSIT CHECK |
| 8/31/2004 | $717.88 | DIRECT DEPOSIT CHECK |
| 10/1/2004 | $18,843.75 | DIRECT DEPOSIT CHECK |
| 10/1/2004 | $717.88 | DIRECT DEPOSIT CHECK |
| 11/1/2004 | $18,843.75 | DIRECT DEPOSIT CHECK |
| 11/1/2004 | $717.88 | DIRECT DEPOSIT CHECK |
| 12/1/2004 | $18,843.75 | DIRECT DEPOSIT CHECK |
| 12/1/2004 | $717.88 | DIRECT DEPOSIT CHECK |
| 1/3/2005 | $18,843.75 | DIRECT DEPOSIT CHECK |
| 1/3/2005 | $788.03 | DIRECT DEPOSIT CHECK |
| 1/26/2005 | $169.61 | CHECK |
| 2/1/2005 | $6,249.99 | DIRECT DEPOSIT CHECK |
| 2/1/2005 | $20,927.08 | DIRECT DEPOSIT CHECK |
| 2/1/2005 | $788.03 | DIRECT DEPOSIT CHECK |
| 3/1/2005 | $20,927.08 | DIRECT DEPOSIT CHECK |
| 3/1/2005 | $788.03 | DIRECT DEPOSIT CHECK |
| 4/1/2005 | $20,927.08 | DIRECT DEPOSIT CHECK |
| 4/1/2005 | $788.03 | DIRECT DEPOSIT CHECK |
| 5/2/2005 | $20,927.08 | DIRECT DEPOSIT CHECK |
| 5/2/2005 | $717.88 | DIRECT DEPOSIT CHECK |
| 5/16/2005 | $10,576.92 | DIRECT DEPOSIT CHECK |

TOTAL:     $454,726.79