## UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

| | |
|---|---|
| COLLINS & AIKMAN CORPORATION and COLLINS & AIKMAN PRODUCTS CO., as Debtors in Possession,<br><br>Plaintiffs,<br><br>v.<br><br>DAVID A. STOCKMAN, J. MICHAEL STEPP, BRYCE M. KOTH, DAVID R. COSGROVE, PAUL C. BARNABA, ROBERT A. KRAUSE, JOHN A. GALANTE, CHARLES E. BECKER, ELKIN B. MCCALLUM, THOMAS E. EVANS, CYNTHIA HESS, DANIEL P. TREDWELL, W. GERALD MCCONNELL, SAMUEL VALENTI, III, HEARTLAND INDUSTRIAL PARTNERS, L.P., HEARTLAND INDUSTRIAL ASSOCIATES, L.L.C., HEARTLAND INDUSTRIAL GROUP, L.L.C., PRICEWATERHOUSECOOPERS LLP, and KPMG LLP,<br><br>Defendants. | C.A. No. 07-265-*** |

## <u>DECLARATION OF STACEY R. FRIEDMAN</u>

STACEY R. FRIEDMAN hereby declares:

1.    I am a member of Sullivan & Cromwell LLP, counsel for defendant J. Michael Stepp in the above-captioned action.  I submit this declaration for the purpose of placing before the Court certain documents referred to in the Memorandum of Law of J. Michael Stepp in Support of His Motion to Dismiss the Complaint.

2.    Attached hereto as Exhibit A is a true and correct copy of C&A SEC Form 10-Q, filed November 14, 2001.

3.    Attached hereto as Exhibit B is a true and correct copy of C&A SEC Form 10-K/A, filed June 7, 2002.

4.      Attached hereto as Exhibit C is a true and correct copy of C&A SEC Form 10-K, filed March 26, 2003.

5.      Attached hereto as Exhibit D is a true and correct copy of C&A SEC Form 10-K, filed March 17, 2004.

6.      Attached hereto as Exhibit E is a true and correct copy of C&A SEC Form 10-Q, filed November 9, 2004.

7.      Attached hereto as Exhibit F is a true and correct copy of the closing stock prices of Collins & Aikman Corp. for the period May 1, 2003 through May 17, 2005, from Factiva, a Dow Jones and Reuters Company.

8.      Attached hereto as Exhibit G is a true and correct copy of the closing stock prices of Dana Corp. for the period May 1, 2003 through March 3, 2006, from Factiva, a Dow Jones and Reuters Company.

9.      Attached hereto as Exhibit H is a true and correct copy of the closing stock prices of Delphi Corp. for the period May 1, 2003 through October 10, 2005, from Factiva, a Dow Jones and Reuters Company.

10.     Attached hereto as Exhibit I is a true and correct copy of the closing stock prices of Tower Automotive, Inc. for the period May 1, 2003 through February 2, 2005, from Factiva, a Dow Jones and Reuters Company.

11.     Attached hereto as Exhibit J is a true and correct copy of the closing stock prices of Intermet Corp. for the period May 1, 2003 through September 29, 2004, from Factiva, a Dow Jones and Reuters Company.

12.    Attached hereto as Exhibit K is a true and correct copy of the Restated Certificate of Incorporation of Collins & Aikman Corporation, filed August 10, 1999.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on September 13, 2007 in New York, New York.

_____
Stacey R. Friedman

- 3 -

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

## CERTIFICATE OF SERVICE

I, Richard L. Horwitz, hereby certify that on September 14, 2007, the attached document

was electronically filed with the Clerk of the Court using CM/ECF which will send notification

to the registered attorney(s) of record that the document has been filed and is available for

viewing and downloading.

Joseph A. Rosenthal
Carmella P. Kenner
Rosenthal, Monhait & Goddess, P.A.
919 N. Market Street, Suite 1401
Wilmington, DE  19899

Peter B. Ladig
Stephen B. Brauerman
The Bayard Firm
222 Delaware Avenue, Suite 900
P. O. Box 25130
Wilmington, DE  19899

Thomas P. Preston
Blank Rome LLP
1201 North Market Street, Suite 800
Wilmington, DE  19801-4226

Vernon R. Proctor
Proctor Heyman LLP
1116 West Street
Wilmington, DE  19801

Thomas G. Macauley
Zuckerman Spaeder LLP
919 Market Street, Suite 1705
P. O. Box 1028
Wilmington, DE  19899

James L. Holzman
J. Clayton Athey
Stephen L. Ascher
Prickett, Jones & Elliott, P.A.
1310 King Street
P. O. Box 1328
Wilmington, DE  19899

Andrew Auchincloss Lundgren
Young, Conaway, Stargatt & Taylor
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, DE  19899-0391

Anne Churchill Foster
Robert J. Stearn, Jr.
Richards, Layton & Finger
One Rodney Square
P.O. Box 551
Wilmington, DE  19899

Michael J. Maimone
Joseph Benedict Cicero
Edwards Angell Palmer & Dodge LLP
919 North Market Street, Suite 1500
Wilmington, DE  19801

I further certify that on September 14, 2007, I have Federal Expressed the documents to

the following person(s):

Samuel H. Rudman
Lerach Coughlin Stoia Geller Rudman &
    Robbins LLP
58 South Service Road, Suite 200
Melville, NY  11747

Joseph O. Click
Blank Rome, LLP
600 New Hampshire Ave., N.W.
Washington, DC  20037

Carl S. Kravitz
Zuckerman Spaeder LLP
1800 M Street, NW, Suite 1000
Washington, DC  20036

Stephen L. Ascher
Jenner & Block LLP
919 Third Avenue, 37th Floor
New York, NY  10022

Joseph De Simone
Mayer Brown LLP
1675 Broadway
New York, NY  10019

Jonathan Lerner
Skadden, Arps, Slate, Meagher & Flom LLP
Four Times Square
New York, NY  10036

Seth L. Friedman,
Latham & Watkins LLP
885 Third Avenue
New York, NY  10022

Andrew Weissman
Wilmer Cutler Pickering Hale and
    Dorr LLP
1875 Pennsylvania Ave., N.W.
Washington, DC  20006

Craig A. Stewart
Arnold & Porter LLP
399 Park Avenue
New York, NY  10022

Michael Shapiro
Carter Ledyard & Milburn LLP
2 Wall Street
New York, NY  10005

Richard M. Strassberg
Goodwin Proctor LLP
599 Lexington Avenue
New York, NY  10022

Lynn Brimer
Strobl & Sharp, P.C.
300 East Long Lake Road, Suite 200
Bloomfield Hills, MI  48304

Thomas G. Rafferty
Cravath, Swaine & Moore LLP
825 Eighth Avenue
New York, NY  10019

By:  /s/ Richard L. Horwitz
      Richard L. Horwitz (#2246)
      Peter J. Walsh (#2437)
      Hercules Plaza, 6th Floor
      1313 N. Market Street
      Wilmington, Delaware 19899-0951
      Tel:  (302) 984-6000
      rhorwitz@potteranderson.com
      pwalsh@potteranderson.com

818858 / 33280

3

# EXHIBIT A

# PART 1

# COLLINS & AIKMAN CORP

## FORM 10-Q
(Quarterly Report)

## Filed 11/14/2001 For Period Ending 9/30/2001

| | |
|---|---|
| Address | 250 STEPHENSON HWY |
| | TROY, Michigan 48083 |
| Telephone | 248-824-2500 |
| CIK | 0000846815 |
| Industry | Auto & Truck Parts |
| Sector | Consumer Cyclical |
| Fiscal Year | 12/31 |

Generated by EDGAR Online Pro
http://pro.edgar-online.com



Contact EDGAR Online
Customer Service: 203-852-5666
Corporate Sales: 212-457-8200

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
## Washington D.C. 20549

# FORM 10-Q

(Mark One)

X Quarterly Report Pursuant to Section 13 or 15(d)
of the Securities Exchange Act of 1934

For the quarterly period ended September 30, 2001
or
Transition Report Pursuant to Section 13 or 15(d)
of the Securities Exchange Act of 1934

For the transition period from to

*Commission File Number 1-10218*

# COLLINS & AIKMAN CORPORATION
(Exact name of registrant, as specified in its charter)

Delaware                                    13-3489233
(State or other jurisdiction of             (IRS Employer Identification No.)
incorporation or organization)

5755 New King Court
Troy, Michigan 48098
(Address of principal executive offices, including zip code)

(248) 824-2500
(Registrant's telephone number, including area code)

Indicate by check mark whether the Registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the Registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes X No .

As of November 9, 2001, the number of outstanding shares of the Registrant's common stock, $.01 par value, was 117,879,593 shares

PART I -- FINANCIAL INFORMATION

**ITEM 1. FINANCIAL STATEMENTS.**

**COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES**
**CONDENSED CONSOLIDATED STATEMENTS OF OPERATIONS**
**(UNAUDITED)**

(IN THOUSANDS, EXCEPT FOR PER SHARE DATA)

| | QUARTER ENDED | | NINE MONTHS ENDED | |
|---|---|---|---|---|
| | SEPTEMBER 30, 2001 (13 WEEKS) | SEPTEMBER 30, 2000 (13 WEEKS) | SEPTEMBER 30, 2001 (39 WEEKS) | SEPTEMBER 30, 2000 (40 WEEKS) |
| Net sales | $ 430,430 | $423,001 | $1,341,148 | $1,464,971 |
| Cost of goods sold | 377,061 | 369,806 | 1,164,681 | 1,243,928 |
| Gross profit | 53,369 | 53,195 | 176,467 | 221,043 |
| Selling, general and administrative expenses | 41,830 | 34,177 | 118,188 | 115,713 |
| Restructuring charges | -- | -- | 9,200 | -- |
| Operating income | 11,539 | 19,018 | 49,079 | 105,330 |
| Interest expense, net | 20,437 | 23,208 | 64,325 | 72,699 |
| Loss on sale of receivables | 1,039 | 1,697 | 4,719 | 7,503 |
| Other expense (income) | 892 | (550) | 6,735 | 897 |
| Income (loss) before income taxes | (10,829) | (5,337) | (26,700) | 24,231 |
| Income tax expense (benefit) | 2,931 | (1,235) | (7,623) | 10,214 |
| Income (loss) from continuing operations before extraordinary charge | (13,760) | (4,102) | (19,077) | 14,017 |
| Income from discontinued operations, net of income taxes of $951 for the quarter ended September 30, 2001 and $5,731 and $4,400 for the nine months ended September 30, 2001 and 2000, respectively | 1,397 | -- | 8,817 | 6,600 |
| Income (loss) before extraordinary charge | (12,363) | (4,102) | (10,260) | 20,617 |
| Extraordinary charge, net of income taxes of $457 for the quarter ended September 30, 2000 and $227 and $457 for the nine months ended September 30, 2001 and 2000, respectively | -- | (686) | (340) | (686) |
| Net income (loss) | $ (12,363) | $ (4,788) | $ (10,600) | $ 19,931 |
| Net income (loss) per basic and diluted common share: | | | | |
| Continuing operations | $ (0.13) | $ (0.07) | $ (0.22) | $ 0.22 |
| Discontinued operations | 0.01 | -- | 0.10 | 0.11 |
| Extraordinary charge | -- | (0.01) | -- | (0.01) |
| Net income (loss) | $ (0.12) | $ (0.08) | $ (0.12) | $ 0.32 |
| Average common shares outstanding: | | | | |
| Basic | 106,310 | 61,895 | 88,351 | 61,888 |
| Diluted | 106,310 | 61,895 | 88,351 | 62,457 |

The accompanying notes are an integral part of the financial statements.

I-2

**COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES**
**CONDENSED CONSOLIDATED BALANCE SHEETS**
(IN THOUSANDS)

| | (UNAUDITED) SEPTEMBER 30, 2001 | DECEMBER 31, 2000 |
|---|---|---|
| **ASSETS** | | |
| **Current Assets:** | | |
| Cash and cash equivalents | $ 58,166 | $ 20,862 |
| Accounts and other receivables, net of allowances of $7,470 and $8,097 | 182,778 | 196,451 |
| Inventories | 115,485 | 131,720 |
| Other | 72,462 | 75,852 |
| Total current assets | 428,891 | 424,885 |
| Property, plant and equipment, net of accumulated depreciation of $363,088 and $343,182 | 416,013 | 434,147 |
| Deferred tax assets | 94,342 | 97,314 |
| Goodwill, net | 500,693 | 245,509 |
| Other assets | 100,200 | 78,435 |
| TOTAL ASSETS | $ 1,540,139 | $1,280,290 |
| **LIABILITIES AND COMMON STOCKHOLDERS' EQUITY** | | |
| **Current Liabilities:** | | |
| Short-term borrowings. | $ 2,801 | $ 3,835 |
| Current maturities of long-term debt | 40,811 | 84,302 |
| Accounts payable | 220,645 | 178,483 |
| Accrued expenses | 148,826 | 123,109 |
| Total current liabilities | 413,083 | 389,729 |
| Long-term debt | 778,667 | 799,677 |
| Other, including post-retirement benefit obligation | 238,983 | 245,870 |
| Commitments and contingencies | -- | -- |
| Common stock (300,000 shares authorized, 117,882 shares issued and 117,880 shares outstanding at September 30, 2001; 150,000 shares authorized, 70,521 shares issued and 62,024 shares outstanding at December 31, 2000) | 1,178 | 705 |
| Other paid-in capital | 802,754 | 585,481 |
| Accumulated deficit | (647,240) | (636,640) |
| Accumulated other comprehensive loss. | (47,274) | (42,924) |
| Treasury stock, at cost (2 shares at September 30, 2001 and 8,497 shares at December 31, 2000) | (12) | (61,608) |
| Total common stockholders' equity (deficit) | 109,406 | (154,986) |
| TOTAL LIABILITIES AND COMMON STOCKHOLDERS' EQUITY | $ 1,540,139 | $1,280,290 |

The accompanying notes are an integral part of the financial statements.

**COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES**
**CONDENSED CONSOLIDATED STATEMENTS OF CASH FLOWS**
(UNAUDITED)

(IN THOUSANDS)

| | QUARTER ENDED | | NINE MONTHS ENDED | |
|---|---|---|---|---|
| | SEPTEMBER 30, 2001 (13 WEEKS) | SEPTEMBER 30, 2000 (13 WEEKS) | SEPTEMBER 30, 2001 (39 WEEKS) | SEPTEMBER 30, 2000 (40 WEEKS) |
| OPERATING ACTIVITIES | | | | |
| Income (loss) from continuing operations ........ | $ (13,760) | $ (4,102) | $ (19,077) | $ 14,017 |
| Adjustments to derive cash flow from continuing operating activities: | | | | |
| Deferred income tax expense (benefit) ........ | (4,879) | (3,484) | (18,169) | 1,853 |
| Depreciation and amortization ............... | 21,847 | 17,438 | 61,944 | 54,692 |
| Loss on sale of property, plant and equipment ..................................... | 841 | -- | 4,337 | -- |
| Decrease in accounts and other receivables ............................... | 25,656 | 11,639 | 21,018 | 38,105 |
| Decrease (increase) in inventories .......... | 13,117 | (6,977) | 37,038 | (6,655) |
| Increase (decrease) in accounts payable ...................................... | (6,362) | 5,994 | (11,837) | (23,705) |
| Increase in interest payable ................ | 12,344 | 14,744 | 11,830 | 16,246 |
| Other, net ................................... | (13,358) | (6,686) | 4,306 | 10,158 |
| Net cash provided by continuing operating activities ...................... | 35,446 | 28,566 | 91,390 | 104,711 |
| Net cash provided by (used in) discontinued operations ................... | (58) | (2,017) | 14,393 | 2,229 |
| INVESTING ACTIVITIES | | | | |
| Additions to property, plant and equipment ...... | (13,279) | (19,713) | (37,640) | (50,285) |
| Sales of property, plant and equipment .......... | 23,490 | 1,258 | 39,468 | 1,832 |
| Acquisition of businesses, net of cash acquired ...................................... | (163,818) | -- | (171,159) | -- |
| Disposition of business ........................ | -- | -- | 3,520 | -- |
| Net cash used in investing activities ....... | (153,607) | (18,455) | (165,811) | (48,453) |
| FINANCING ACTIVITIES | | | | |
| Issuance of long-term debt ..................... | -- | -- | 50,000 | -- |
| Debt issuance costs ............................ | -- | -- | (10,747) | -- |
| Repayment of long-term debt .................... | (1,648) | (38,592) | (73,565) | (60,045) |
| Proceeds from (reduction of) participating interest in accounts receivable ............... | 14,668 | 8,250 | 63,533 | (1,570) |
| Net borrowings (repayments) on revolving credit facilities ............................. | 104,988 | (10,606) | (42,345) | 15,599 |
| Increase in short-term borrowings .............. | 649 | 1,643 | 2,071 | 5,917 |
| Reissuance (purchase) of treasury stock, net..... | -- | 18 | 61,313 | (83) |
| Proceeds from issuance of stock ................ | 471 | -- | 47,412 | -- |
| Early extinguishment of debt, net of income taxes ........................................ | -- | (686) | (340) | (686) |
| Net cash provided by (used in) financing activities ...................... | 119,128 | (39,973) | 97,332 | (40,868) |
| Net increase (decrease) in cash and cash equivalents .................................. | 909 | (31,879) | 37,304 | 17,619 |
| Cash and cash equivalents at beginning of period ....................................... | 57,257 | 63,478 | 20,862 | 13,980 |
| Cash and cash equivalents at end of period ...... | $ 58,166 | $ 31,599 | $ 58,166 | $ 31,599 |

The accompanying notes are an integral part of the financial statements.

I-4

## COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES

### NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
(UNAUDITED)

## A. ORGANIZATION:

Collins & Aikman Corporation (the "Company") is a Delaware corporation. Heartland Industrial Partners, L.P. and its affiliates ("Heartland") acquired an approximate 60% interest in the Company on February 23, 2001 through a purchase of 25.0 million shares of common stock from the Company and a purchase of 27.0 million shares from Blackstone Capital Partners, L.P. and its affiliates ("Blackstone Partners") and Wasserstein Perella Partners, L.P. and its affiliates ("WP Partners"). As a result of the sale of shares, the Company received gross proceeds of $125.0 million, or approximately $105.3 million after fees and expenses associated with the transactions. In addition, the Company had to pay $10.7 million in transaction-related costs to obtain change in control consents, fees related to the new Term Loan D Facility and other amendments to the Company's Credit Agreement Facilities, resulting in net proceeds to the Company of $94.6 million. The Company also received a profit participation right on certain future common stock sales by Heartland. Prior to the transaction, as of December 31, 2000, Blackstone Partners and WP Partners collectively owned approximately 87% of the common stock of the Company.

As a result of the above transactions (collectively the "Heartland Transaction"), the Company's total shares outstanding increased from approximately 62.0 million shares to approximately 87.0 million shares and Blackstone Partners' and WP Partners' ownership percentage in the Company declined to approximately 31%. Furthermore, pursuant to an agreement with Blackstone Partners and WP Partners, Heartland is entitled to designate a majority of the Company's Board of Directors.

As of September 30, 2001, Heartland Industrial Partners, L.P. and its affiliates ("Heartland") owned approximately 44% of the Company while Blackstone Partners and WP Partners owned approximately 23%. The decrease in ownership interest subsequent to the Heartland Transaction primarily resulted from the issuance of approximately 29.8 million shares of common stock in conjunction with two acquisitions (Note P).

The Company conducts all of its operating activities through its wholly-owned Collins & Aikman Products Co. ("C&A Products") subsidiary.

## B. BASIS OF PRESENTATION:

The condensed consolidated financial statements include the accounts of the Company and its subsidiaries. In the opinion of management, the accompanying condensed consolidated financial statements reflect all adjustments necessary for a fair presentation of financial position and results of operations. Certain prior year items have been reclassified to conform with the fiscal 2001 presentation. Results of operations for interim periods are not necessarily indicative of results for the full year.

In fiscal year 2000, the Company changed its year-end to a calendar year-end. The 2001 fiscal year will consist of 52 weeks, whereas the 2000 fiscal year consisted of 53 weeks. As a result, the nine months ended September 30, 2001 consisted of 39 weeks, while the nine months ended September 30, 2000 consisted of 40 weeks. The quarters ended September 30, 2001 and September 30, 2000 each consisted of 13 weeks.

For further information, refer to the consolidated financial statements and footnotes thereto included in the Collins & Aikman Corporation Annual Report on Form 10-K for the fiscal year ended December 31, 2000.

## C. FOREIGN CURRENCY PROTECTION PROGRAMS:

The primary purpose of the Company's foreign currency hedging activities is to manage the volatility associated with intercompany funding arrangements, third party loans and foreign currency purchase and sale transactions. Corporate policy prescribes the range of allowable hedging activity. The Company primarily utilizes forward exchange contracts and purchased options with durations of generally less than 12 months. The Company has in place forward exchange contracts denominated in multiple currencies which will mature during fiscal 2001. These contracts aggregated a U.S. dollar equivalent of $200.1 million at September 30, 2001. The fair value of these contracts approximated the carrying value at September 30, 2001.

**COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**
(UNAUDITED)

During 2000, the Company purchased option contracts giving the Company the right to purchase U.S. dollars for use by its Canadian operations. The premiums associated with these contracts were amortized over the contracts' terms which were one year or less. The total notional amount purchased in 2000 was $24.5 million with associated premiums of $0.2 million. At September 30, 2001, there was no notional amount outstanding.

During fiscal 2001, the Company purchased option contracts with a total notional amount of $28.2 million and associated premiums of $0.3 million. These contracts give the Company the right to sell Canadian dollars collected by the Company. The premiums associated with these contracts are expensed by marking the time value of each option contract to fair market value. The contract terms are one year or less. The total notional amount outstanding at September 30, 2001 was $14.9 million.

During fiscal 2000, in order to comply with the provisions of the New Receivables Facility, the Company purchased a series of option contracts, each of which gave Carcorp Inc., a wholly-owned bankruptcy remote subsidiary of the Company, the right to sell 70.0 million Canadian dollars in exchange for U.S. dollars. The premiums associated with these contracts were amortized over the contracts' terms, which were one year or less. The total U.S. dollar notional amount purchased during 2000 to comply with the New Receivables Facility was $173.9 million, with associated premiums of $0.4 million. During 2001, the Company purchased contracts with a U.S. dollar notional amount of $86.4 million, with associated premiums of $0.6 million. The total notional amount outstanding at September 30, 2001 was $43.2 million.

### D. INVENTORIES:

Inventory balances are summarized below (in thousands):

|  | SEPTEMBER 30, 2001 | DECEMBER 31, 2000 |
|---|---|---|
| Raw materials .......... | $ 61,018 | $ 80,811 |
| Work in process ......... | 26,411 | 28,545 |
| Finished goods .......... | 28,056 | 22,364 |
|  | $ 115,485 | $ 131,720 |

### E. CUSTOMER ENGINEERING AND TOOLING:

In September 1999, the Financial Accounting Standards Board's ("FASB's") Emerging Issues Task Force ("EITF") reached a consensus regarding EITF Issue No. 99-5, "Accounting for Pre-Production Costs Related to Long-term Supply Arrangements". EITF No. 99-5 requires that design and development costs for products to be sold under long-term supply arrangements be expensed as incurred, and costs incurred for molds, dies and other tools that will be used in producing the products under long-term supply arrangements be capitalized and amortized over the shorter of the expected useful life of the assets or the term of the supply arrangement. The Company adopted the provisions of EITF No. 99-5 on a prospective basis at the beginning of fiscal year 2000. The adoption of EITF No. 99-5 did not have a material effect on the consolidated financial position or the results of operations of the Company. At September 30, 2001, the Company had assets of approximately $6.1 million recognized pursuant to agreements that provide for contractual reimbursement of pre-production design and development costs, approximately $32.2 million (of which all is reimbursable) for molds, dies and other tools that are customer-owned and approximately $2.6 million for molds, dies and other tools that the Company owns.

### F. GOODWILL:

Goodwill, representing the excess of purchase price over the fair value of net assets of acquired entities, obtained prior to June 30, 2001 is being amortized on a straight-line basis over a period of forty years. Amortization of goodwill applicable to continuing operations was $1.8 million for the quarters ended September 30, 2001 and

**COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**
(UNAUDITED)

2000, and $5.3 million for the nine months ended September 30, 2001 and 2000. Accumulated amortization at September 30, 2001 was $37.4 million. In accordance with SFAS No. 142, "Goodwill and Other Intangible Assets", goodwill in the amount of $258.9 million acquired subsequent to June 30, 2001 is not being amortized (Note O). If assets being tested for impairment were acquired in a business combination, the goodwill that arose in that transaction is included as part of the asset grouping in determining recoverability. In instances where goodwill is identified with assets that are subject to an impairment loss, the carrying amount of the identified goodwill is eliminated before making any reduction of the carrying amounts of those assets.

## G. LONG-TERM DEBT:

On February 23, 2001, C&A Products entered into amended and restated credit facilities. At September 30, 2001, the facilities consist of: (i) a senior secured term loan A facility in the principal amount of $51.2 million, payable in quarterly installments until final maturity on December 31, 2003 (the "Term Loan A Facility"); (ii) a senior secured term loan B facility in the principal amount of $115.0 million, payable in quarterly installments until final maturity on June 30, 2005 (the "Term Loan B Facility"); (iii) a senior secured term loan C facility in the principal amount of $93.0 million, payable in quarterly installments through December 31, 2005 (the "Term Loan C Facility"); (iv) a senior secured term loan D facility in the principal amount of $49.5 million payable in quarterly installments through January 2006, (the "Term Loan D Facility"; together with the Term Loan A, Term Loan B and Term Loan C Facilities, the "Term Loan Facilities"); and (v) a senior secured revolving credit facility in an aggregate principal amount of up to $250.0 million, terminating on December 31, 2003, of which $60.0 million (or the equivalent thereof in Canadian dollars) is available to two of the Company's Canadian subsidiaries ("the Canadian Borrowers") and of which up to $50.0 million is available as a letter of credit facility (the "Revolving Credit Facility", and together with the Term Loan Facilities, the "Credit Agreement Facilities"). At September 30, 2001, there was approximately $106.6 million outstanding under the Revolving Credit Facility, of which $73.0 million and $33.6 million were utilized by companies in the United States and Canada, respectively. Availability under the revolving credit facility was reduced by outstanding letters of credit of $28.9 million as of September 30, 2001.

On March 28, 2001, proceeds from the Term Loan D Facility were used to retire all outstanding JPS Automotive 11⅛% Senior Notes due June 2001. The Company recognized an extraordinary charge of $0.3 million in connection with this repurchase of the remaining outstanding JPS Automotive Senior Notes at prices in excess of carrying values.

The Credit Agreement Facilities, which are guaranteed by the Company and its U.S. subsidiaries (subject to certain exceptions), contain restrictive covenants including maintenance of interest coverage and leverage ratios and various other restrictive covenants which are customary for such facilities. In connection with seeking the amendment and restatement in February 2001, the Company received waivers of the interest coverage and leverage ratio covenants for the period ended December 31, 2000. The primary purpose of the amendments was to permit the change of control precipitated by the Heartland Transaction and to provide for the Term Loan D Facility. As a part of this amendment and restatement, the Company provided collateral additional to the previous pledge of stock of C&A Products and its significant subsidiaries and certain intercompany indebtedness and guarantees from the Company and its U.S. subsidiaries (subject to certain exceptions). This additional collateral consists of a first priority lien on substantially all of the assets of the Company, C&A Products and its U.S. and Canadian subsidiaries with certain exceptions, including assets included in the Company's receivables facilities, certain scheduled assets and certain assets whose value relative to cost of lien perfection is considered too low to include. The Company also obtained amendments adjusting the interest coverage and leverage ratio covenants as well as adjustments to certain definitions and calculations, giving the Company increased operating flexibility. These amendments, together with the credit environment, resulted in increased interest rates charged under the existing Credit Agreement Facilities.

Indebtedness under the Term Loan A Facility and U.S. dollar-denominated indebtedness under the Revolving Credit Facility as amended February 23, 2001 bear interest at a per annum rate equal to the Company's choice of: (i) The Chase Manhattan Bank's ("Chase's") Alternate Base Rate (which is the highest of Chase's announced prime rate, the Federal Funds Rate plus 0.5% or Chase's base certificate of deposit rate plus 1.0%) plus a margin (the

COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES
NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
(UNAUDITED)

"ABR/Canadian Prime Rate Margin") ranging from 1.25% to 2.00%; or (ii) the offered rates for Eurodollar deposits ("LIBOR") of one, two, three, six, nine or twelve months, as selected by the Company, plus a margin (the "LIBOR/BA Margin") ranging from 2.25% to 3.00%. Margins, which are subject to adjustment based on changes in the Company's ratio of funded debt to EBITDA (i.e., earnings before interest, taxes, depreciation, amortization, other non-cash charges and certain other adjustments), were 2.75% in the case of the LIBOR/BA Margin and 1.75% in the case of the ABR/Canadian Prime Rate Margin on September 30, 2001. Canadian-dollar denominated indebtedness incurred by the Canadian Borrowers under the Revolving Credit Facility bears interest at a per annum rate equal to the Canadian Borrowers' choice of: (i) the Canadian Prime Rate (which is the greater of Chase's prime rate for Canadian dollar-denominated loans in Canada or the Canadian dollar-denominated one month bankers' acceptance rate plus 1.00%) plus the ABR/Canadian Prime Rate Margin; or (ii) the bill of exchange rate ("Bankers' Acceptance" or "BA") denominated in Canadian dollars for one, two, three or six months plus the LIBOR/BA Margin. Indebtedness under the Term Loan B Facility as amended February 23, 2001 bears interest at a per annum rate equal to the Company's choice of: (i) Chase's Alternate Base Rate (as described above) plus a margin ranging from 2.50% to 2.75% (the "Tranche B ABR Margin"); or (ii) LIBOR of one, two, three, or six months, as selected by the Company, plus a margin ranging from 3.50% to 3.75% (the "Tranche B LIBOR Margin"). The Tranche B ABR Margin and the Tranche B LIBOR Margin, were 2.50% and 3.50%, respectively, at September 30, 2001. Indebtedness under the Term Loan C Facility, as amended February 23, 2001 bears interest at a per annum rate equal to the Company's choice of: (i) Chase's Alternate Base Rate (as described above) plus a margin of 2.75% (the "Tranche C ABR Margin"); or (ii) LIBOR of one, two, three, or six months, as selected by the Company, plus a margin of 3.75% (the "Tranche C LIBOR Margin"). Indebtedness under the Term Loan D Facility bears interest at a per annum rate equal to the Company's choice of: (i) Chase's Alternate Base Rate (as described above) plus a margin of 3.25%; or (ii) LIBOR of one, two, three, or six months, as selected by the Company, plus a margin of 4.25%. The weighted average rate of interest on the Credit Agreement Facilities at September 30, 2001 was 6.99%.

In addition, under the Credit Agreement Facilities, C&A Products is generally prohibited from paying dividends or making other distributions to the Company except to the extent necessary to allow the Company to (i) pay taxes and ordinary expenses, (ii) make permitted repurchases of shares or options, (iii) make permitted investments in finance, foreign or acquired subsidiaries and (iv) pay permitted dividends. The Company is permitted to pay dividends and repurchase shares of the Company: (i) in an aggregate amount up to $25.0 million; and (ii) if certain financial ratios are satisfied, for the period from April 28, 1996 through the last day of the Company's most recently ended fiscal quarter, in an aggregate amount equal to 50% of the Company's cumulative consolidated net income for that period.

C&A Products has outstanding $400.0 million in 11 1/2% Senior Subordinated Notes due 2006 (the "Senior Subordinated Notes"). In connection with the Heartland Transaction, the indenture governing the Senior Subordinated Notes was amended to ensure that the Heartland Transaction would not result in a change of control which would require that C&A Products make an offer to repurchase the Senior Subordinated Notes. Other modifications to certain covenants were made to facilitate the Heartland Transaction and provide greater financing flexibility. In connection with the amendments, a consent fee was paid to the holders of the Senior Subordinated Notes.

The Senior Subordinated Notes indenture contains restrictive covenants (including, among others, limitations on the incurrence of indebtedness, asset dispositions and transactions with affiliates) which are customary for such securities. These covenants are also subject to a number of significant exceptions.

## H. RECEIVABLES FACILITY:

The Company has a receivables facility that utilizes funding provided by commercial paper conduits sponsored by three of the Company's lenders under its Credit Agreement Facilities. Carcorp Inc., a wholly-owned, bankruptcy-remote subsidiary of C&A Products ("Carcorp"), purchases virtually all trade receivables generated by C&A Products and its subsidiaries (the "Sellers") in the United States and Canada, transferring rights to collections on those receivables to the conduits. The conduits in turn issue commercial paper which is collateralized by those rights. The liquidity facilities backing the receivables facility have terms of 364 days, renewable annually for up to five years.

I-8

**COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**
(UNAUDITED)

The total maximum funding available to the Company on a revolving basis under the receivables facility is $171.6 million, depending primarily on the amount of receivables generated by the Sellers from sales, the rate of collection on those receivables and other characteristics of those receivables which affect their eligibility (such as the bankruptcy or credit downgrading of the obligor, delinquency and excessive concentration). The Company retains the collection responsibility with respect to the receivables.

At September 30, 2001, $146.0 million was funded under the receivables facility. The discount on sold interests is equal to the interest rate paid by the conduits to the holders of the commercial paper plus a margin of 0.7% and dealer fees of 0.05% (3.98% at September 30, 2001). In addition, the Company pays 0.25% on the unused committed portion of the facility. In connection with the receivables sales, a loss of $1.0 million was incurred under the receivables facility for continuing operations in the third quarter of fiscal 2001, compared to a loss of $1.7 million for the third quarter of fiscal 2000. For the year-to-date period, a loss of $4.7 million was incurred in 2001 compared to a loss of $7.5 million in 2000.

As of September 30, 2001, the conduits and the holders of term certificates and variable funding certificates collectively had invested $146.0 million to purchase an undivided senior interest (net of settlements in transit) in the receivables pool and, accordingly, such receivables were not reflected in the Company's accounts and other receivables balances as of that date. As of September 30, 2001, Carcorp's total receivables pool was $228.1 million. When the Company's subsidiaries sell receivables to Carcorp, a subordinated interest in the receivables sold is retained. The Company estimates the fair value of its retained interest by considering two key assumptions: the payment rate, which is derived from the average life of the accounts receivable, which is less than 60 days, and the rate of expected credit losses. Based on the Company's favorable collection experience and very short-term nature of receivables, both assumptions are considered to be highly predictable. Therefore, the Company's estimated fair value of the retained interests in the pool of eligible receivables is approximately equal to the previous cost, less the associated allowance for doubtful accounts.

The proceeds received by Carcorp from collections on receivables, after the payment of expenses and amounts due, are used to purchase new receivables from the Sellers. During the third quarter of 2001, Carcorp had net cash collections of approximately $289.6 million. These funds were used to purchase new receivables from the Sellers under the revolving agreement. The level of funding provided by the commercial paper conduits increased $14.7 million during the third quarter of fiscal 2001.

The receivables facility contains certain other restrictions on Carcorp (including maintenance of $40.0 million net worth) and on the Sellers (including limitations on liens on receivables, modifications of the terms of receivables and change in credit and collection practices) customary for facilities of this type. The commitments under the receivables facility are subject to termination prior to their term upon the occurrence of certain events, including payment defaults, breach of covenants, including defined interest coverage and leverage ratios, bankruptcy, insufficient eligible receivables to support the outstanding funding, default by C&A Products in servicing the receivables and failure of the receivables to satisfy certain performance criteria.

## I. RESTRUCTURING:

During the first quarter of 2001 the Company undertook a restructuring program resulting in a charge of $9.2 million. The goal of the 2001 restructuring program is to further de-layer management in the North American, European and Specialty operations. The pre-tax $9.2 million charge includes $8.4 million of severance costs and $0.8 million of asset impairments.

The Company recognized severance costs for over 700 operating personnel at the Company's convertible tops, fabrics, accessory floormats, plastics, carpet and acoustics locations in North America and the Company's plastics, accessory floormats, carpet and acoustics operations in Europe. The Company also recognized severance costs for management and administrative personnel at its World Headquarters, North American Automotive Interior Systems division and European Automotive Interior Systems division.

## COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES
### NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
#### (UNAUDITED)

The 2001 restructuring program also includes the closure of the Warwick, UK manufacturing facility that is expected to occur during the fourth quarter 2001. The asset impairments, primarily related to machinery and equipment located at the site, are based on management's estimates of the values to be realized upon disposition of the assets.

The activity related to severance costs is as follows (in thousands):

|  | ORIGINAL RESERVE | CASH PAYMENTS | REMAINING RESERVE |
|---|---|---|---|
| Anticipated severance benefits ......... | $ 8,400 | $ (5,206) | $ 3,194 |

On February 10, 1999, the Company announced a comprehensive plan (the "Reorganization") to reorganize its global automotive carpet, acoustics, plastics and accessory floormats businesses. The Company undertook the Reorganization to reduce costs and improve operating efficiencies throughout the Company's operations and to more effectively respond to the original equipment manufacturers' demand for complete interior trim systems and more sophisticated components. Upon final completion of the Reorganization plan, the Company recognized a pre-tax restructuring charge of $33.4 million, including $13.4 million of asset impairments, $15.0 million of severance costs and $5.0 million related to the termination of sales commission contracts at the Company's North American plastics operations. The 1999 Reorganization included the closure of three facilities. The Homer, Michigan plastics facility was closed in August 1999 and its operations were relocated to an existing plastics facility. The Cramerton, North Carolina fabrics facility was sold in September 1999 and the relocation of its operations to another fabrics facility was completed in fiscal 2000. The acoustics facility in Vastra Frolunda, Sweden, was closed in September 2000 and its operations were relocated to other facilities in Europe. The $13.4 million in asset impairments recognized by the Company were primarily related to buildings, machinery and equipment located at these three sites. In addition to the plant closures, the Company recognized severance costs for operating personnel at the Company's plastics operations in the United Kingdom and the Company's fabrics, convertibles and accessory floormats operations in North America. The Company also recognized severance costs for management and administrative personnel at the Company's former North Carolina headquarters and North American Automotive Interior Systems division.

During fiscal 2000, certain modifications were made to the Reorganization, which changed the original estimates. Severance costs for individuals and payments for the termination of sales commission arrangements originally contemplated in the Reorganization were approximately $3.1 million lower than the original estimates. The reduction consisted of $2.0 million of severance benefits and $1.1 million of payments for termination of sales commission arrangements. However, during fiscal 2000, there were additional personnel terminations made as the Company continued to reshape its management team. The Company estimates indicate that the adjustment to reduce the original restructuring provision approximates the provision required for the additional personnel terminated in fiscal 2000. As of September 30, 2001, the Company's Reorganization efforts, as modified, were substantially complete and approximately 1,000 employees had been terminated.

The components of the reserves for the restructuring charges are as follows (in thousands):

|  | ORIGINAL RESERVE | CASH PAYMENTS | REMAINING RESERVE |
|---|---|---|---|
| Anticipated severance benefits ......................... | $ 15,061 | $ (15,061) | $ -- |
| Anticipated payments related to the termination of sales commission arrangements .............................. | 4,969 | (3,472) | 1,497 |
|  | $ 20,030 | $ (18,533) | $ 1,497 |

## J. RELATED PARTY TRANSACTIONS:

Under the terms of an agreement among the Company, C&A Products, Blackstone Partners and WP Partners, the Company was obligated to pay to each of Blackstone Partners and WP Partners an annual monitoring fee of

**COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**
(UNAUDITED)

$1.0 million. As a result of the Heartland Transaction, this agreement was terminated. Under a new, 10-year Services Agreement between the Company, C&A Products and Heartland, the Company will pay Heartland an annual advisory fee of $4.0 million, payable in four equal quarterly installments. The Services Agreement also provides for the Company to pay a 1% transaction fee on certain acquisitions and divestitures.

The Company will pay aggregate fees of $3.7 million for the year ending December 31, 2001 to Heartland, Blackstone Partners and WP Partners under the terms of the old agreement and the new Services Agreement. Heartland received an advisory fee of $2.4 million as of September 30, 2001 and Blackstone Partners and WP Partners, or their respective affiliates each received a final monitoring fee of $150,000 during the first quarter of 2001. The Company expensed total payments of $1.0 million and $2.7 million for the quarter and nine months ended September 30, 2001, respectively.

In connection with the Heartland Transaction, the Company paid Heartland a transaction fee of $12.0 million and paid WP Partners an investment banking fee of $2.0 million.

During 2001, the Company entered into a sale and leaseback transaction for certain non-manufacturing properties with entities that are controlled by one of the Company's current directors. The transaction was consummated after the appointment of the director and represents an arms length transaction. Refer to "Note N" for additional information regarding the transaction. Additionally, in connection with the Joan acquisition, the Company entered into a Supply Agreement and a Transition Service Agreement with entities controlled by the former owner of Joan who is currently a director and shareholder of the Company.

## K. INFORMATION ABOUT THE COMPANY'S OPERATIONS:

The Company's continuing operations primarily supply automotive interior systems -- textile and plastic products, acoustics and convertible top systems -- to the global automotive industry.

North American Automotive Interior Systems and European Automotive Interior Systems include the following product groups: molded floor carpet, luggage compartment trim, acoustical products, accessory floormats and plastic-based interior trim modules, systems and components. The Specialty Automotive Products division includes automotive fabrics and convertible top systems. The three divisions also produce other automotive and non-automotive products.

The Company evaluates performance based on profit or loss from operations before interest expense, foreign exchange gains and losses, loss on sale of receivables, other income and expense, and income taxes.

Information about the Company's divisions is presented below (in thousands):

|  | NORTH AMERICAN AUTOMOTIVE INTERIOR SYSTEMS | EUROPEAN AUTOMOTIVE INTERIOR SYSTEMS | SPECIALTY AUTOMOTIVE PRODUCTS | OTHER (A) | TOTAL |
|---|---|---|---|---|---|
| External revenues | $ 285,273 | $ 56,716 | $ 88,441 | $ -- | $ 430,430 |
| Inter-segment revenues | 3,349 | 6,600 | 61 | (10,010) | -- |
| Depreciation and amortization | 11,099 | 5,849 | 4,490 | 409 | 21,847 |
| Operating income (loss) | 20,933 | (4,633) | (1,794) | (2,967) | 11,539 |
| Total assets | 850,095 | 209,374 | 418,605 | 62,065 | 1,540,139 |
| Capital expenditures | 8,726 | 1,956 | 2,341 | 256 | 13,279 |

QUARTER ENDED SEPTEMBER 30, 2001 (13 WEEKS)

QUARTER ENDED SEPTEMBER 30, 2000 (13 WEEKS)

| | NORTH AMERICAN AUTOMOTIVE INTERIOR SYSTEMS | EUROPEAN AUTOMOTIVE INTERIOR SYSTEMS | SPECIALTY AUTOMOTIVE PRODUCTS | OTHER (A) | TOTAL |
|---|---|---|---|---|---|
| External revenues ................. | $ 266,521 | $ 55,801 | $ 100,679 | $ -- | $ 423,001 |
| Inter-segment revenues ........... | 6,537 | 8,712 | 5,274 | (20,523) | -- |
| Depreciation and amortization ..... | 9,067 | 4,662 | 3,324 | 385 | 17,438 |
| Operating income (loss) .......... | 17,776 | 1,262 | (510) | 490 | 19,018 |
| Total assets .................... | 752,684 | 215,292 | 243,697 | 83,918 | 1,295,591 |
| Capital expenditures ............. | 8,500 | 5,207 | 5,728 | 278 | 19,713 |

## COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES
## NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
### (UNAUDITED)

NINE MONTHS ENDED SEPTEMBER 30, 2001 (39 WEEKS)

| | NORTH AMERICAN AUTOMOTIVE INTERIOR SYSTEMS | EUROPEAN AUTOMOTIVE INTERIOR SYSTEMS | SPECIALTY AUTOMOTIVE PRODUCTS | OTHER (A) | TOTAL |
|---|---|---|---|---|---|
| External revenues ................. | $ 840,340 | $ 191,248 | $ 309,560 | $ -- | $ 1,341,148 |
| Inter-segment revenues ........... | 10,443 | 23,119 | 138 | (33,700) | -- |
| Depreciation and amortization ..... | 34,524 | 15,303 | 11,036 | 1,081 | 61,944 |
| Operating income (loss) .......... | 61,559 | (10,358) | 12,970 | (15,092) | 49,079 |
| Total assets .................... | 850,095 | 209,374 | 418,605 | 62,065 | 1,540,139 |
| Capital expenditures ............. | 19,255 | 9,186 | 8,431 | 768 | 37,640 |

NINE MONTHS ENDED SEPTEMBER 30, 2000 (40 WEEKS)

| | NORTH AMERICAN AUTOMOTIVE INTERIOR SYSTEMS | EUROPEAN AUTOMOTIVE INTERIOR SYSTEMS | SPECIALTY AUTOMOTIVE PRODUCTS | OTHER (A) | TOTAL |
|---|---|---|---|---|---|
| External revenues ................. | $ 908,588 | $ 219,016 | $ 337,367 | $ -- | $ 1,464,971 |
| Inter-segment revenues ........... | 14,954 | 27,517 | 26,755 | (69,226) | -- |
| Depreciation and amortization ..... | 30,636 | 13,352 | 9,579 | 1,125 | 54,692 |
| Operating income (loss) .......... | 77,061 | 8,619 | 19,982 | (332) | 105,330 |
| Total assets .................... | 752,684 | 215,292 | 243,697 | 83,918 | 1,295,591 |
| Capital expenditures ............. | 25,404 | 12,897 | 12,408 | (424) | 50,285 |

(a) Other includes the Company's discontinued operations, non-operating units, the effect of eliminating entries and restructuring charges.

Sales for the Company's primary product groups are as follows (in thousands):

I-12

COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES
NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
(UNAUDITED)

|  | QUARTER ENDED | | NINE MONTHS ENDED | |
|---|---|---|---|---|
|  | SEPTEMBER 30, 2001 (13 WEEKS) | SEPTEMBER 30, 2000 (13 WEEKS) | SEPTEMBER 30, 2001 (39 WEEKS) | SEPTEMBER 30, 2000 (40 WEEKS) |
| Molded floor carpet | $ 98,653 | $101,795 | $ 326,362 | $ 346,634 |
| Luggage compartment trim | 11,506 | 16,916 | 43,690 | 64,228 |
| Acoustical products | 46,690 | 42,322 | 164,275 | 164,712 |
| Accessory floormats | 36,382 | 36,704 | 110,676 | 119,387 |
| Plastic-based interior trim modules, systems and components | 126,507 | 101,188 | 314,629 | 368,205 |
| Automotive fabrics | 62,695 | 76,088 | 193,734 | 218,505 |
| Convertible top systems | 19,804 | 14,738 | 96,333 | 82,757 |
| Other | 28,193 | 33,250 | 91,449 | 100,543 |
| Total | $430,430 | $423,001 | $1,341,148 | $1,464,971 |

The Company performs periodic credit evaluations of its customers' financial condition and, although the Company does not generally require collateral, it does require cash payments in advance when the assessment of credit risk associated with a customer is substantially higher than normal. Receivables generally are due within 45 days of shipment, and credit losses have consistently been within management's expectations and are provided for in the consolidated financial statements.

Direct and indirect sales to significant customers in excess of ten percent of consolidated net sales from continuing operations are as follows:

|  | NINE MONTHS ENDED | |
|---|---|---|
|  | SEPTEMBER 30, 2001 | SEPTEMBER 30, 2000 |
| General Motors Corporation | 28.9% | 30.9% |
| Ford Motor Company | 22.7% | 20.7% |
| DaimlerChrysler AG | 18.8% | 17.5% |

Sales for the Company's continuing operations in different geographic areas are presented below (in thousands):

|  | QUARTER ENDED | | NINE MONTHS ENDED | |
|---|---|---|---|---|
|  | SEPTEMBER 30, 2001 (13 WEEKS) | SEPTEMBER 30, 2000 (13 WEEKS) | SEPTEMBER 30, 2001 (39 WEEKS) | SEPTEMBER 30, 2000 (40 WEEKS) |
| United States | $323,270 | $263,069 | $ 982,405 | $ 852,588 |
| Canada | 39,638 | 89,892 | 128,775 | 318,071 |
| Mexico | 10,806 | 14,240 | 38,721 | 75,297 |
| United Kingdom | 27,405 | 22,570 | 87,613 | 90,365 |
| Other (a) | 29,311 | 33,230 | 103,634 | 128,650 |
| Consolidated | $430,430 | $423,001 | $1,341,148 | $1,464,971 |

(a) Other includes Sweden, Spain, Belgium, Germany, Austria, France and the Netherlands.

I-13

## COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES
## NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
### (UNAUDITED)

Long-lived assets for the Company's continuing operations in different geographical regions are presented below (in thousands):

|  | SEPTEMBER 30, 2001 | SEPTEMBER 30, 2000 |
|---|---|---|
| United States ................... | $ 782,743 | $527,718 |
| Canada ......................... | 78,940 | 85,525 |
| Mexico ......................... | 32,569 | 24,887 |
| United Kingdom .................. | 59,853 | 53,420 |
| Other (a) ...................... | 62,801 | 66,665 |
| Consolidated ................... | $1,016,906 | $758,215 |

(a) Other includes Sweden, Spain, Belgium, Germany, Austria, France and the Netherlands.

## L. COMMITMENTS AND CONTINGENCIES:

The ultimate outcome of the legal proceedings to which the Company is a party will not, in the opinion of the Company's management, based on the facts presently known to it, have a material effect on the Company's consolidated financial condition or future results of operations.

See also "PART I -- FINANCIAL INFORMATION, Item 2. Management's Discussion and Analysis of Financial Condition and Results of Operations -- Environmental Matters."

During the third quarter of 2001, the Company entered into a sale and leaseback transaction for certain manufacturing equipment. Net proceeds from the transaction were approximately $24.0 million. As a result, the Company is required to make aggregate annual lease payments of $4.0 million through 2009 subject to normal adjustment clauses. This transaction resulted in the recognition of an $8.1 million deferred asset that is being amortized over the lease term. This deferred asset represents the excess of carrying value of the assets sold over the net proceeds received.

During the second quarter of 2001, the Company entered into a sale and leaseback transaction for certain non-manufacturing properties. Net proceeds from the transaction were $15.1 million. As a result, the Company is required to make aggregate annual lease payments of $1.7 million through 2021 subject to normal adjustment clauses. This transaction resulted in the recognition of a $3.9 million loss.

The Company has assigned leases related to real and personal property of divested businesses. Although the Company has obtained releases from the lessors of certain of these properties, the Company remains contingently liable under most of the leases. The Company's future liability for these leases, in management's opinion, based on the facts presently known will not have a material effect on the Company's consolidated financial condition or future results of operations.

During the second and third quarters of 2001, the Company received payments of $14.5 million on environmental claims related to discontinued operations. Of the $14.5 million in payments, the Company recorded $8.8 million, net of income taxes of $5.7 million, as income from discontinued operations.

During the quarter ended July 1, 2000, the Company settled claims for certain other environmental matters related to discontinued operations for a total of $20.0 million. Settlement proceeds will be paid to the Company in three installments. Installments of $7.5 million were received on June 30, 2000 and June 30, 2001. The Company anticipates receiving the final payment of $5.0 million on June 30, 2002. Of the $20.0 million settlement, the Company recorded the present value of the settlement as $7.0 million of additional reserves, based on its assessment of potential environmental exposures, and $6.6 million, net of income taxes of $4.4 million, as income from discontinued operations.

**COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**
(UNAUDITED)

**M. COMMON STOCKHOLDERS' EQUITY:**

Total comprehensive loss for the quarters ended September 30, 2001 and September 30, 2000 was $(6.5) million and $(9.5) million, respectively. For the nine months ended September 30, 2001 and September 30, 2000, comprehensive income (loss) was $(15.0) million and $6.3 million, respectively. Activity in common stockholders' equity since December 31, 2000 is as follows (in thousands):

|  | CURRENT YEAR COMPREHENSIVE INCOME (LOSS) | TOTAL | ACCUMULATED DEFICIT |
|---|---|---|---|
| Balance at December 31, 2000 ......... |  | $(154,986) | $ (636,640) |
| Comprehensive income: |  |  |  |
| Net loss ......................... | $ (10,600) | (10,600) | (10,600) |
| Other comprehensive income (loss), net of tax: |  |  |  |
| Foreign currency |  |  |  |
| translations adjustments ........ | (4,349) | (4,349) |  |
| Pension equity adjustment ........ | (1) | (1) |  |
|  | $ (14,950) |  |  |
| Compensation expense ................ |  | 654 |  |
| Issuance of common stock ............ |  | 217,375 |  |
| Reissue of treasury stock ........... |  | 61,313 |  |
| Balance at September 30, 2001 ........ |  | $ 109,406 | $ (647,240) |

|  | ACCUMULATED OTHER COMPREHENSIVE LOSS | COMMON STOCK | OTHER PAID-IN CAPITAL | TREASURY STOCK |
|---|---|---|---|---|
| Balance at December 31, 2000 ......... | $ (42,924) | $ 705 | $ 585,481 | $ (61,608) |
| Comprehensive income: |  |  |  |  |
| Net loss ......................... |  |  |  |  |
| Other comprehensive income (loss), net of tax: |  |  |  |  |
| Foreign currency |  |  |  |  |
| translations adjustments ........ | (4,349) |  |  |  |
| Pension equity adjustment ........ | (1) |  |  |  |
| Compensation expense ................ |  |  | 654 |  |
| Issuance of common stock ............ |  | 473 | 216,902 |  |
| Reissue of treasury stock ........... |  |  | (283) | 61,596 |
| Balance at September 30, 2001 ........ | $ (47,274) | $ 1,178 | $ 802,754 | $ (12) |

The accumulated balances and current period activity for each component of Accumulated Other Comprehensive Loss are as follows (in thousands):

|  | FOREIGN CURRENCY TRANSLATION ADJUSTMENTS | PENSION EQUITY ADJUSTMENT | ACCUMULATED OTHER COMPREHENSIVE LOSS |
|---|---|---|---|
| Balance at December 31, 2000 ......... | $ (42,695) | $(229) | $ (42,924) |
| Current period change ................ | (4,349) | (1) | (4,350) |
| Balance at September 30, 2001 ........ | $ (47,044) | $(230) | $ (47,274) |

**N. SIGNIFICANT SUBSIDIARY:**

The Company conducts all of its operating activities through its wholly-owned subsidiary, C&A Products, and its subsidiaries. Condensed consolidating financial information is not presented because the parent company has no material independent assets or operations. The absence of separate financial statements of C&A Products is also based upon the fact that C&A Products' outstanding Senior Subordinated Notes have been fully and unconditionally guaranteed by the Company.

**O. NEWLY ISSUED ACCOUNTING STANDARDS:**

In August 2001, the FASB issued SFAS No. 144, "Accounting for the Impairment or Disposal of Long-Lived Assets" effective for fiscal years beginning after December 15, 2001. In general, the provisions of SFAS 144 are to be applied prospectively. SFAS No. 144, supersedes SFAS No. 121 "Accounting for the Impairment of Long-Lived Assets and for Long-Lived Assets to Be Disposed Of" and the provisions of APB Opinion No. 30, "Reporting the Results of Operations -- Reporting the Effects of Disposal of a Segment of a Business," for the disposal of segments of a business. SFAS No. 144 requires that one accounting model be used for long-lived assets to be disposed of by sale and extends the use of this accounting to discontinued operations. Long-lived assets will be

I-15

## COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES
### NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
(UNAUDITED)

measured at the lower of carrying amount or fair value less cost to sell, regardless of whether it is reported in continuing or discontinued operations. Additionally, SFAS No. 144 broadens the reporting of discontinued operations to include certain disposal transactions that were not included in previous standards. The Company is currently reviewing the provisions of SFAS No.144 and assessing the impact of adoption.

In June 2001, the FASB approved SFAS No. 141, "Business Combinations" and SFAS No. 142, "Goodwill and Other Intangible Assets" effective for fiscal years beginning after December 15, 2001. SFAS No. 141 requires that the purchase method of accounting be used for all business combinations initiated after June 30, 2001. Under SFAS No. 142, goodwill will no longer be amortized. Amortization of goodwill resulting from business combinations initiated prior to July 1, 2001, will cease as of January 1, 2002, and beginning July 1, 2001, goodwill resulting from business combinations initiated after June 30, 2001 will not be amortized. All goodwill and intangible assets will be tested for impairment in accordance with the provisions of SFAS No. 142. The Company continues to review the provisions of SFAS No. 141 and 142 and assess the impact of the standard. In accordance with the provisions of SFAS No.142, the Company is not amortizing any of the goodwill associated with its acquisitions made subsequent to June 30, 2001 (Notes F & P).

In September 2000, the FASB issued SFAS No. 140, "Accounting for Transfers and Servicing of Financial Assets and Extinguishment of Liabilities", which replaces SFAS No. 125, also titled "Accounting for Transfers and Servicing of Financial Assets and Extinguishments of Liabilities". SFAS No. 140 provides accounting and reporting standards for transfers and servicing of financial assets and extinguishments of liabilities. Those standards are based on consistent application of a financial-components approach that focuses on control. After a transfer of financial assets, an entity recognizes the financial and servicing assets it controls and the liabilities it has incurred, derecognizes financial assets when control has been surrendered, and derecognizes liabilities when extinguished. SFAS No. 140 is effective for recognition and reclassification of collateral and for disclosures relating to

securitization transactions and collateral for fiscal years ending after December 15, 2000 (See Note H) and for transfers and servicing of financial assets and extinguishments of liabilities occurring March 31, 2001. The adoption of SFAS No. 140 did not have a material impact on the consolidated financial position and the results of operations of the Company.

The Company adopted SFAS No. 133 and SFAS No. 138 on January 1, 2001. The adoption of SFAS No. 133 and SFAS 138 did not have a material impact on the consolidated financial position and the results of operations of the Company.

## P. ACQUISITIONS AND JOINT VENTURES:

On September 21, 2001, the Company completed its acquisition of the automotive fabric operations of Joan Fabrics, a leading supplier of bodycloth to the automotive industry, and all of the operating assets in Joan Fabric's affiliated yarn dying operation, Western Avenue Dyers (collectively "Joan"). Consideration included $102.0 million in cash, including acquisition fees, and 12.76 million shares of the Company's common stock, valued at $90.2 million.

On August 7, 2001, the Company announced that it had signed a definitive agreement with Textron Inc. ("Textron") to acquire its automotive trim division ("TAC-Trim"), a leading supplier of fully-integrated cockpits, with 2000 reported sales of approximately $1.9 billion. TAC-Trim is a major automotive plastics manufacturer in North America, Europe, and South America for instrument panels, interior trim and exterior components. Its global reach extends to 38 manufacturing facilities located in nine countries. TAC-Trim's workforce numbers approximate 12,900 employees. Completion of the transaction is subject to certain terms and conditions, including the availability of financing. The Company is currently in negotiations with Textron concerning financing alternatives and revisions to the acquisition terms, with the objective of closing the transaction in the fourth quarter of 2001. As presently structured, total consideration consists of $1.0 billion in cash and assumed debt, 18.0 million shares of the Company's common stock and preferred stock of C&A Products having a $245.0 million liquidation preference.

On July 3, 2001, the Company completed its acquisition of Becker Group, LLC ("Becker"), a supplier of plastic components to the automotive industry. Consideration included $61.8 million in cash, including acquisition fees,

COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES
NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
(UNAUDITED)

$18.0 million in non-compete agreements (to be paid out over 5 years), 17.0 million shares of the Company's common stock, valued at $79.1 million, and warrants to purchase 500,000 shares of the Company's common stock at an exercise price of $5.00 per share, valued at $0.7 million.

On December 4, 1997, the Company entered into a 50% joint venture with Courtaulds Textiles (Holdings) Limited ("Courtaulds") to manufacture automotive interior fabrics in the United Kingdom. During the first quarter of 2001, the Company purchased the remaining 50% from Courtaulds for $3.8 million, net of cash acquired.

As part of the 1996 acquisition of Perstorp, the Company acquired 75% of Collins & Aikman Carpet and Acoustics, S.A. de C.V. joint venture. During the first quarter of 2001, the Company acquired the remaining 25% of the Collins & Aikman Carpet and Acoustics, S.A. de C.V. joint venture and related intangible assets for $3.5 million.

## Q. PRO FORMA CONDENSED CONSOLIDATED FINANCIAL STATEMENTS:

The following unaudited pro forma summary presents information as if the acquisition of Joan and Becker became effective at the beginning of the respective periods noted in the table below. The acquisitions have been accounted for using the purchase method. The allocation of the purchase price is preliminary and may be revised up to one year from the date of the acquisitions due to adjustments in the estimated fair value of the assets acquired and liabilities assumed. Appraisals are in progress for Becker and Joan. The excess purchase price of approximately $258.9 million was classified as goodwill. These acquisitions are intended to solidify the Company's position as a "Mega Tier 2" supplier of interior components and automotive fabrics.

The unaudited pro forma information does not reflect any benefits from synergies that might be achieved from combining operations and does not reflect the actual results that would have occurred nor is it necessarily indicative of future results of operations of the combined companies. The unaudited pro forma amounts include adjustments that are based upon available information and various assumptions that the Company believes are reasonable.

The unaudited pro forma information for the quarter and nine month periods ended September 30, 2000 includes a non-recurring credit adjustment of $2.6 million (net of tax), or $0.03 per share, resulting from a change in estimate of a previously recorded restructuring charge at Becker.

|  | QUARTER ENDED | | NINE MONTHS ENDED | |
|---|---|---|---|---|
|  | SEPTEMBER 30, 2001 (13 WEEKS) | SEPTEMBER 30, 2000 (13 WEEKS) | SEPTEMBER 30, 2001 (39 WEEKS) | SEPTEMBER 30, 2000 (40 WEEKS) |
| (IN THOUSANDS, EXCEPT FOR PER SHARE DATA) |  |  |  |  |
| Net sales ............................................. | $ 461,841 | $503,312 | $1,539,530 | $ 1,768,041 |
| Income (loss) before extraordinary charge ............. | (10,370) | 1,128 | (4,511) | 44,761 |
| Net income (loss) .................................... | (10,370) | 442 | (4,851) | 44,075 |
| Net income (loss) per basic and diluted share ......... | (0.09) | -- | (0.04) | 0.48 |

As discussed in "Note P" the Company paid $163.8 million in cash to acquire Joan and Becker. Despite the cash consideration that was paid, the Company was able to reduce total outstanding borrowings (excluding short-term borrowings) by $64.5 million from $884.0 at December 31, 2000 to $819.5 million at September 30, 2001. Additionally, interest expense for the nine months ended September 30, 2001 decreased $8.4 million to $64.3 million as compared to the nine months ended September 30, 2000.

## R. DISPOSITION OF BUSINESS:

On June 11, 2001, the Company completed the sale of its wholly owned subsidiary, Akro Mats, L.L.C. ("Akro Mats") to Superior Manufacturing Group, Inc. Akro Mats, which had sales of approximately $20.0 million in fiscal 2000, was Collins & Aikman's non-automotive retail and commercial floormat business. Net proceeds from the sale were $3.5 million.

I-17

**COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES**

**ITEM 2. MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS**

**RECENT DEVELOPMENTS**

**HEARTLAND TRANSACTION**

In February 2001, Heartland Industrial Partners, L.P. and its affiliates ("Heartland") acquired approximately 60% of the outstanding common stock of Collins & Aikman Corporation (the "Company") through a purchase of 25.0 million shares of common stock from the Company and 27.0 million shares from the Company's former controlling shareholders. As a result of this transaction, the Company received gross proceeds of $125.0 million, or approximately $105.3 million after fees and expenses (the "Heartland Transaction"). The Company had to pay $10.7 million in transaction-related costs to obtain change in control consents, fees related to the new Term Loan D Facility and other amendments to the Company's Credit Agreement Facilities. The Company also received a profit participation interest in certain future common stock sales by Heartland.

In connection with Heartland's acquisition, the Company amended and restated its credit agreement principally to:

o permit the change of control

o modify covenants to reflect the Company's new circumstances and provide greater operating flexibility

o waive certain covenant defaults at December 31, 2000

o increase interest rates

o add a Term Loan D facility of $50 million to fund the redemption of the JPS Senior Notes due in June 2001

See "Liquidity and Capital Resources".

**ACQUISITIONS**

On September 21, 2001, the Company completed its acquisition of the automotive fabric operations of Joan Fabrics, a leading supplier of bodycloth to the automotive industry, and all of the operating assets in Joan Fabric's affiliated yarn dying operation, Western Avenue Dyers (collectively "Joan"). Consideration included $102.0 million in cash, including acquisition fees, and 12.76 million shares of the Company's common stock, valued at $90.2 million.

On August 7, 2001, the Company signed a definitive agreement with Textron Inc. ("Textron") to acquire its automotive trim division ("TAC-Trim"), a leading supplier of fully-integrated cockpits, with 2000 reported sales of approximately $1.9 billion. TAC-Trim is a major automotive plastics manufacturer in North America, Europe, and South America for instrument panels, interior trim and exterior components. Its global reach extends to 38 manufacturing facilities located in nine countries. TAC-Trim's workforce numbers approximate 12,900 employees. Completion of the transaction is subject to certain terms and conditions, including the availability of financing. The Company is currently in negotiations with Textron concerning financing alternatives and revisions to the acquisition terms, with the objective of closing the transaction in the fourth quarter of 2001. As presently structured, total consideration consists of $1.0 billion in cash and assumed debt, 18.0 million shares of the Company's common stock and preferred stock of C&A Products having a $245.0 million liquidation preference. If the Company completes the TAC-Trim acquisition, it will significantly alter the Company's capital structure. To finance the acquisition, the Company expects to refinance the existing credit facility, enter into a new receivables financing and use proceeds from new debt borrowings, receivables financing and the issuance of equity.

On July 3, 2001, the Company completed its acquisition of Becker Group, LLC ("Becker"), a supplier of plastic components to the automotive industry. Consideration included $61.8 million in cash, including acquisition fees, $18.0 million in non-compete agreements (to be paid out over 5 years), 17.0 million shares of the Company's common stock, valued at $79.1 million, and warrants to purchase 500,000 shares of the Company's common stock at an exercise price of $5.00 per share, valued at $0.7 million.

The above acquisitions are intended to solidify the Company's position as a "Mega Tier 2" supplier of interior components and automotive fabrics. The TAC-Trim acquisition is expected to strengthen the Company's competitive position in the industry by enhancing the scale and scope of the Company's competencies in product and production process technology, via the addition of over 250 proprietary patents. Together with the Company's Becker and Joan acquisitions, the Company expects its global presence will increase to approximately 120 facilities, with over 25,000 employees in 15 countries.

## RESULTS OF OPERATIONS

In fiscal year 2000, the Company changed its year-end to a calendar year-end. The 2001 fiscal year will consist of 52 weeks, whereas the 2000 fiscal year consisted of 53 weeks. As a result, the nine months ended September 30, 2001 consisted of 39 weeks, while the nine months ended September 30, 2000 consisted of 40 weeks. The quarters ended September 30, 2001 and September 30, 2000 each consisted of 13 weeks.

## QUARTER ENDED SEPTEMBER 30, 2001 VERSUS QUARTER ENDED SEPTEMBER 30, 2000

NET SALES: Net sales for the third quarter of 2001 increased 1.8% or $7.4 million to $430.4 million from the third quarter of 2000. Overall, the increase in net sales was primarily driven by our acquisition of Becker ($43.8 million) partially offset by a decrease in North American vehicle production of 7.0% versus 2000. Additionally, third quarter 2001 sales were impacted by customer price reductions, and weaker Canadian and European currencies ($2.7 million), partially offset by increased content or volume on certain North American vehicles mentioned below.

Net sales for the North American Automotive Interior Systems division (NAAIS) increased $18.8 million to $285.3 million for the third quarter of 2001. Excluding the impact of the Becker acquisition, net sales for NAAIS decreased 9.4% from the same period last year. This reduction is due largely to the lower overall vehicle production in 2001 and higher production reductions on certain platforms (particularly the Ford Taurus and Econoline and several GM passenger car programs where the Company has significant plastics content). These decreases were partially offset by increased volume and higher acoustics content on the Ford Explorer and Chrysler Minivans as compared to the prior year.

Net sales for the European Automotive Interior Systems division (EAIS) increased 1.6% to $56.7 million during the third quarter of 2001. The increase is primarily due to the launch of the BMW R50 (Mini) and slightly higher vehicle volumes on the Ford Transit and MG Rover "25", despite flat overall vehicle production and the $1.8 million negative impact of foreign currency translation.

Net sales for the Specialty Automotive Products division decreased 12.2% to $88.4 million compared to the third quarter of 2000. The decrease is due primarily to lower North American industry volume and non-renewal of certain automotive fabrics programs and lower non-automotive fabric volumes, partially offset by increased Chrysler Sebring and Ford Thunderbird convertible volumes as compared to the third quarter of 2000.

GROSS MARGIN: For the third quarter of 2001, gross margin was 12.4%, down from 12.6% in the comparable 2000 period. This decrease is primarily due to the impact of customer price reductions in Europe, launch costs associated with the BMW R50 (Mini) and Ford Thunderbird convertible, and the Becker acquisition. These items and decreased operating leverage related to lower volumes in North America, were partially offset by ongoing purchasing savings, commercial recoveries and improvements in operating performance at NAAIS and fabric operations.

SELLING, GENERAL AND ADMINISTRATIVE EXPENSES: Selling, general and administrative expenses for the third quarter of 2001 were $41.8 million compared to $34.2 million in the 2000 period. The increase is primarily due to additional costs assumed from the Becker and other acquisitions ($3.7 million), and non-recurring credits in the third quarter of 2000 relating to pensions and sale of property (totaling $2.0 million). These items offset the benefit in the third quarter 2001 of cost reductions from earlier restructuring programs and reduced spending. As a percentage of sales, selling, general and administrative expenses were 9.7% and 8.1% for the third quarters of 2001 and 2000, respectively.

OPERATING INCOME HIGHLIGHTS BY DIVISION: The NAAIS results reflect improvement in operating performance driven by prior restructuring programs, improvements at the Company's Springfield acoustic facilities, purchasing savings and commercial recoveries, which more than offset the impact of lower industry production volumes, customer price reductions and impact of the Becker acquisition.

European operating performance was adversely impacted by customer price reductions, launch costs associated with the BMW R50 (Mini) and quality performance issues at carpet operations in the UK. Benefits from earlier restructuring programs and purchasing savings reduced the negative impact of these items. In addition, during the third quarter of 2001, European results include a $1.1 million loss on sale of a small metal pressings operation in the UK.

Specialty Automotive Products division margins declined slightly as compared to the third quarter of 2000 due to slightly lower performance in the convertible operations due largely to start-up costs associated with the Ford Thunderbird convertible launch, partially offset by improved performance at the fabric operations despite lower industry volumes.

INTEREST EXPENSE: Interest expense for the third quarter of 2001, decreased $2.8 million to $20.4 million as compared to the third quarter of 2000. The decrease in interest expense is primarily attributed to lower average debt balances resulting from the Heartland Transaction, and lower borrowing rates in North America. The benefit of working capital reductions and sale and leaseback transactions offset increased amortization expense resulting from the Heartland Transaction.

LOSS ON SALE OF RECEIVABLES: The Company sells on a continuous basis, through its Carcorp subsidiary, interests in a pool of accounts receivable. In connection with the receivables sales, a loss of $1.0 million was recognized during the third quarter of 2001, compared to a loss of $1.7 million for the third quarter of 2000. The $0.7 million decrease is attributable to lower interest rates offset by increased utilization of the receivables facility during the third quarter of 2001.

OTHER EXPENSE (INCOME): The Company recognized other expense of $0.9 million in the third quarter of 2001, compared to other income of $0.6 million in the third quarter of 2000. The increase in other expense resulted primarily from higher foreign exchange losses incurred during the third quarter of 2001.

INCOME TAXES: On a quarterly basis, the Company makes an estimate of its overall effective tax rate for the full year. The overall effective tax rate for the year may fluctuate due to changes in estimated income for the full year and the mix of income and losses in different tax jurisdictions. Certain state taxes and permanent differences, such as non-deductible goodwill, that do not fluctuate with income, also impact the effective rate. The Company recognized income tax expense of $2.9 million in the third quarter of 2001 compared to an income tax benefit of $1.2 million in the third quarter of 2000. The recognition of tax expense in the third quarter 2001 is primarily the result of an adjustment required, on a year-to-date basis, to reflect the Company's current estimate of its tax rate for fiscal 2001.

DISCONTINUED OPERATIONS: During the third quarter of 2001, the Company received a payment on environmental claims related to discontinued operations for $2.3 million. Of this amount, $1.4 million was recorded as income from discontinued operations in the third quarter of 2001, net of income taxes of $0.9 million.

EXTRAORDINARY CHARGE: During the third quarter of 2000, the Company recognized an extraordinary charge of $0.7 million in connection with the repurchase of JPS Automotive Senior Notes at prices in excess of carrying values.

NET INCOME: The combined effect of the foregoing resulted in a net loss of $12.4 million in the third quarter of 2001, compared to a net loss of $4.8 million in the third quarter of 2000.

**NINE MONTHS ENDED SEPTEMBER 30, 2001 VERSUS NINE MONTHS ENDED SEPTEMBER 30, 2000**

NET SALES: Net sales for the nine months ended September 30, 2001 decreased 8.5% (11.8% excluding Becker) to $1,341.1 million, down $123.8 million from the nine months ended September 30, 2000. Overall, the reduction in net sales was primarily driven by a decrease in North American vehicle production of 11.0% versus 2000, net of increased sales as a result of the Becker acquisition ($43.8 million). Sales for the 2001 period were also impacted by customer price reductions, and weaker Canadian and European currencies ($18.5 million), partially offset by increased content or volume on certain North American vehicles.

Driven by lower vehicle production in 2001, net sales for NAAIS were down 7.5% (12.3% excluding Becker) to $840.3 million. While the divisions net sales benefited from the acquisition of Becker, increased acoustics content on the Ford Explorer and Chrysler Minivans, and higher volumes on GMT 800 Series trucks versus the prior year,

these increases were offset by higher volume reductions on the Cadillac Deville and other GM passenger cars, and the Ford Taurus and Econoline, where the Company has significant plastics content.

Net sales for EAIS were down 12.7% to $191.2 million during the nine months ended September 30, 2001. The decrease in Europe was primarily due to a $13.6 million negative impact of foreign currency translation and customer pricing. In addition, certain unprofitable product lines divested in the second half of 2000 as part of the closure of the Vastra Frolunda plant in 2000 accounted for the remaining decline.

Net sales for the Specialty Automotive Products division decreased 8.2% to $309.6 million compared to the nine months ended 2000. The decrease is due primarily to lower North American industry volume, non-renewal of certain automotive fabric programs and lower non-automotive fabrics volumes, offset partially by increased Chrysler Sebring and Ford Thunderbird convertible volumes compared with the same period in 2000.

GROSS MARGIN: For the nine months ended September 30, 2001, gross margin was 13.2%, down from 15.1% in the comparable 2000 period. This decrease is primarily a result of decreased operating leverage related to lower volumes in both North America and Europe. Additionally, the impact of launch costs associated with the Ford Thunderbird convertible and BMW R50 (Mini), and the Becker acquisition adversely impacted gross margin for the nine months ended September 30, 2001. During 2001, the Company incurred $2.5 million of costs related to the sale of the retail/commercial floormat business and the shutdown of a small accessory floormat facility. These items as well as the impact of customer price reductions were partially offset by ongoing purchasing savings, commercial recoveries and improvements in operating performance at NAAIS and our fabrics operations.

SELLING, GENERAL AND ADMINISTRATIVE EXPENSES: Selling, general and administrative expenses for the nine months ended September 30, 2001 were $118.2 million, compared to $115.7 million in the 2000 period. Relative to the first nine months of 2001, the comparable 2000 period included an extra week of costs due to the fiscal year change mentioned earlier. The increase is primarily due to additional costs assumed from the Becker and other acquisitions ($5.0 million), non-recurring credits in the third quarter of 2000 relating to pensions and sale of property (totaling $2.0 million), provisions of $2.0 million for receivables in Europe, settlement of a legal case at a cost of $0.9 million and approximately $0.7 million in charges for the sale of the retail/commercial floormat business in North America. These items offset the benefit in 2001 of cost reductions from earlier restructuring programs and reduced spending. As a percentage of sales, selling, general and administrative expenses were 8.8% and 7.9% for the nine months ended September 30, 2001 and September 31, 2000, respectively.

RESTRUCTURING CHARGE: During the first quarter of 2001, the Company undertook a restructuring program resulting in a charge of $9.2 million. The goal of the 2001 restructuring program is to de-layer management in the North American, European and Specialty operations. The pre-tax $9.2 million charge includes $8.4 million of severance costs and $0.8 million of asset impairments. For an additional discussion of the restructuring program see Note I to the Condensed Consolidated Financial Statements.

OPERATING INCOME HIGHLIGHTS BY DIVISION: NAAIS results reflected the impact of lower industry production volumes. Improvements in operating performance, particularly at certain carpet and acoustic facilities in the United States and purchasing savings which more than offset customer price reductions during the nine-months ended September 30, 2001. The year-to-date results for 2001 also included costs of $3.2 million related to the sale of the retail/commercial floormat business and the shutdown of a small accessory floormat facility. These items were somewhat offset by commercial recoveries, changes in customer pricing accruals and benefits from restructuring actions.

EAIS operating performance continued to be adversely impacted by product mix and customer price reductions. During the second quarter of 2001, EAIS recorded provisions totaling $6.0 million for receivables, inventory and certain accruals associated with these issues. Additionally, European operating performance was adversely impacted by launch costs associated with the BMW R50 (Mini) as well as a $1.1 million loss on the sale of a small metal pressings operation in the UK. Benefits from earlier restructuring programs and purchasing savings reduced the negative impact of these items.

The Specialty Automotive Products division margins declined in the nine months ended September 30, 2001 as compared to the nine months ended September 30, 2000, due to the ramp-up of the Chrysler Sebring convertible in the early part of 2001 and the start-up of the new Ford Thunderbird convertible in the second quarter of 2001. Margins in the fabrics business remained consistent with 2000, as better operating performance offset the margin impact of lower net sales driven by lower industry production.

I-21

INTEREST EXPENSE: Interest expense for the nine months ended September 30, 2001 decreased $8.4 million to $64.3 million as compared to the nine months ended September 30, 2000. The decrease in interest expense is primarily attributed to lower average debt balances resulting from the Heartland Transaction, and lower borrowing rates in North America. The benefit of working capital reductions and sale and lease back transactions offset increased amortization expense resulting from the Heartland Transaction.

LOSS ON SALE OF RECEIVABLES: The Company sells on a continuous basis, through its Carcorp subsidiary, interests in a pool of accounts receivable. In connection with the receivables sales, a loss of $4.7 million was recognized during the nine-months ended September 30, 2001, compared to a loss of $7.5 million for the same period in 2000. The $2.8 million decrease is attributable to the incurrence of a one-time expense for fees totaling $1.6 million during the first quarter of 2000 associated with a new accounts receivable securitization arrangement. The remaining year-to-date decrease is primarily due to lower interest rates during 2001.

OTHER EXPENSE (INCOME): The Company recognized other expense of $6.7 million in the nine months ended September 30, 2001, compared to other expense of $0.9 million in the corresponding period of 2000. The increase in other expense resulted primarily from a $3.9 million loss on the sale and leaseback of real estate completed at the end of the second quarter 2001. The remaining increase in expense is primarily due to higher foreign currency transaction losses.

INCOME TAXES: On a quarterly basis, the Company makes an estimate of its overall effective tax rate for the full year. The overall effective tax rate for the year may fluctuate due to changes in estimated income for the full year and the mix of income and losses in different tax jurisdictions. Certain state taxes and permanent differences, such as non-deductible goodwill, that do not fluctuate with income, also impact the effective rate by: (1) reducing the effective tax rate when a loss exists and a tax benefit is recorded or (2) increasing the effective tax rate when the Company has income and tax expense is recorded. The Company recognized an income tax benefit of $7.6 million in the nine months ended September 30, 2001 compared to an income tax expense of $10.2 million in the corresponding 2000 period.

DISCONTINUED OPERATIONS: During fiscal 2001, the Company received payments on environmental claims related to discontinued operations of $14.5 million. During fiscal 2000, the Company settled claims for certain other environmental matters for $20.0 million (Note L). Of these amounts, $8.8 million and $6.6 million were recorded as income from discontinued operations in fiscal 2001 and 2000, respectively, net of income taxes of $5.7 million and $4.4 million, respectively.

EXTRAORDINARY CHARGE: During 2001 and 2000, the Company recognized an extraordinary charge of $0.3 million and $0.7 million, respectively, in connection with the repurchase of JPS Automotive Senior Notes at prices in excess of carrying values.

NET INCOME: The combined effect of the foregoing resulted in net loss of $10.6 million for the nine months ended September 30, 2001, compared to net income of $19.9 million in 2000.

## LIQUIDITY AND CAPITAL RESOURCES

The Company and its subsidiaries had cash and cash equivalents totaling $58.2 million and $20.9 million at September 30, 2001 and December 31, 2000, respectively. The Company had $135.5 million of unutilized borrowing availability under its credit arrangements as of September 30, 2001. The total was comprised of $114.5 million under the Company's revolving credit facility
(including $26.4 million available to certain of our Canadian subsidiaries)
and approximately $21.0 million under bank demand lines of credit in Canada, Austria and certain other European locations. Availability under the revolving credit facility was reduced by outstanding letters of credit of $28.9 million as of September 30, 2001.

The Company's principal sources of funds are cash generated from continuing operating activities, borrowings under the Credit Agreement Facilities, the sale of receivables under the New Receivables Facility and common stock sales in 2001. The Company intends to seek means to generate additional cash for debt reduction and its growth strategy. Among other things, the Company will seek to further improve working capital management and continue a lease financing strategy. The amended and restated credit agreement permits various sale and leaseback financings to fund capital expenditures. In addition, up to $50 million in proceeds from sale and leasebacks of scheduled assets are permitted from time to time for any purpose without any term loan prepayment

I-22

requirements. As of September 30, 2001, $39.1 million of the $50.0 million has been utilized. The Company intends to further utilize this provision to enhance its liquidity and ability to finance its growth initiatives and acquisitions.

## OPERATING ACTIVITIES

Net cash provided by the continuing operating activities of the Company was $35.4 million for the quarter ended September 30, 2001, compared to $28.6 million in the quarter ended September 30, 2000. Net cash provided by continuing operating activities of the Company was $91.4 million for the nine months ended September 30, 2001 compared to $104.7 million for the nine months ended September 30, 2000. The increase in cash provided by operating activities for the quarter ended September 30, 2001 is due primarily to the increase in cash generated from accounts receivable collections and a decrease in inventory (due primarily to the sale of substantially all of the Joan inventory back to the seller in conjunction with a transitional contract manufacturing arrangement), partially offset by a decrease in income from continuing operations and a decrease in accounts payable. The decrease in cash provided by operating activities for the nine months ended September 30, 2001 compared with the nine months ended September 30, 2000 is due primarily to the decrease in income from continuing operations, offset by reductions in working capital.

## INVESTING ACTIVITIES

During the third and second quarter of 2001, C&A Products entered into sale and leaseback transactions and received net proceeds of approximately $24.0 million and $15.1 million, respectively.

On September 21, 2001 and July 3, 2001, the Company completed its acquisition of Joan and Becker, respectively. Cash consideration, including acquisition fees, was $102.0 million for Joan and $61.8 million for Becker. Refer to "Note P" for additional discussion.

## FINANCING ACTIVITIES

The Company continues to reduce debt during 2001 despite using $163.8 million in cash to acquire Joan and Becker. At September 30, 2001, the Company had total outstanding indebtedness of $819.5 million (excluding short-term borrowings) at a weighted average interest rate of 9.2% per annum. Comparatively, at December 31, 2000, the Company had total outstanding indebtedness of $884.0 million. Of the total outstanding indebtedness at September 30, 2001, $815.3 million relates to the Credit Agreement Facilities and the Senior Subordinated Notes.

During the first quarter of 2001, Heartland acquired 25.0 million shares of common stock from the Company at a price of $5.00 per share, representing a cash investment in the Company of $125.0 million before fees and expenses. Net proceeds paid to the Company from the equity transaction were $105.3 million. A portion of the proceeds were used to pay $10.7 million in transaction related costs to obtain change in control consents, fees related to the new Term Loan D Facility and other amendments to the Company's Credit Agreement Facilities. The remaining proceeds ($94.6 million) were used to pay down the Company's Revolving Credit Facility. Unutilized revolving credit borrowings may be utilized in the future for general corporate purposes, including acquisitions.

On February 23, 2001, C&A Products entered into amended and restated credit facilities. At September 30, 2001, facilities consist of: (i) a senior secured term loan A facility in the principal amount of $51.2 million, payable in quarterly installments until final maturity on December 31, 2003 (the "Term Loan A Facility"); (ii) a senior secured term loan B facility in the principal amount of $115.0 million, payable in quarterly installments until final maturity on June 30, 2005 (the "Term Loan B Facility"); (iii) a senior secured term loan C facility in the principal amount of $93.0 million, payable in quarterly installments through December 2005 (the "Term Loan C Facility"); (iv) a senior secured term loan D facility in the principal amount of $49.5 million payable in quarterly installments through January 2006 (the "Term Loan D Facility"; together with the Term Loan A, Term Loan B and Term Loan C Facilities, the "Term Loan Facilities"); and (v) a senior secured revolving credit facility in an aggregate principal amount of up to $250.0 million, terminating on December 31, 2003, of which $60.0 million (or the equivalent thereof in Canadian dollars) is available to two of the Company's Canadian subsidiaries ("the Canadian Borrowers") and of which up to $50.0 million is available as a letter of credit facility (the "Revolving Credit Facility", and together with the Term Loan Facilities, the "Credit Agreement Facilities"). At September 30, 2001, there was approximately $106.6 million outstanding under the Revolving Credit Facility.

I-23

The proceeds from the Term Loan D Facility were used to retire all outstanding JPS Automotive 11⅛% Senior Notes due June 2001 in full on March 28, 2001 at a redemption price equal to their principal amount with interest accrued to the redemption date. The Company recognized an extraordinary charge of $0.3 million in connection with this repurchase of the remaining outstanding JPS Automotive Senior Notes at prices in excess of carrying values. For additional discussion of the Credit Agreement Facilities, related restrictive covenants and the redemption of the JPS Automotive 11⅛% Senior Notes, see Note G to the Condensed Consolidated Financial Statements and Note 10 to the Consolidated Financial Statements included in the Company's Annual Report on Form 10-K for the year ended December 31, 2000 (the "10-K").

The Company's receivables facility utilizes funding provided by commercial paper conduits sponsored by three of the Company's lenders under its Credit Agreement Facilities. Carcorp, Inc., a wholly-owned bankruptcy-remote subsidiary of C&A Products ("Carcorp"), purchases virtually all trade receivables generated by C&A Products and its subsidiaries (the "Sellers") in the United States and Canada, transferring rights to collections on those receivables to the conduits. The conduits in turn issue commercial paper which is collateralized by those rights. The liquidity facilities backing the receivables facility have terms of 364 days, renewable annually for up to five years.

The total maximum funding available to the Company on a revolving basis under the receivables facility is $171.6 million, depending primarily on the amount of receivables generated by the Sellers from sales, the rate of collection on those receivables and other characteristics of those receivables which affect their eligibility (such as the bankruptcy or downgrading below investment grade of the obligor, delinquency and excessive concentration). The Company retains the collection responsibility with respect to the receivables.

At September 30, 2001, $146.0 million was funded under the receivables facility. The discount on sold interests is equal to the interest rate paid by the conduits to the holders of the commercial paper plus a margin of 0.70% and dealer fees of 0.05% (3.98% at September 30, 2001). In addition, the Company pays 0.25% on the unused committed portion of the facility. See Note H to the Condensed Consolidated Financial Statements for further information regarding the receivables facility.

## OUTLOOK

The Company's principal uses of funds from operating activities and borrowings for the next several years are expected to be to fund interest and principal payments on its indebtedness, net working capital increases, income tax payments, costs associated with the Company's previously divested businesses, capital expenditures, lease expenses and acquisitions. If the Company completes the TAC-Trim acquisition, it will materially increase debt levels and have significant new additional liquidity requirements to launch some of TAC-Trim's projected new book of business, particularly cockpit programs, and to finance capital expenditures at TAC-Trim. The following discussion does not give effect to the TAC-Trim acquisition.

INTEREST AND PRINCIPAL PAYMENTS: The current maturities of long-term debt primarily consist of the current portion of the Credit Agreement Facilities, vendor financing, an industrial revenue bond and other miscellaneous debt. At September 30, 2001, the scheduled repayment of long-term debt is as follows (in thousands):

```
Remainder of fiscal year 2001 ...........  $ 14,691
Fiscal year 2002 ........................    34,841
Fiscal year 2003 ........................   132,466
Fiscal year 2004 ........................    70,700
Fiscal year 2005 ........................   150,740
Later years .............................   416,040
                                           ---------
                                           $819,478
                                           =========
```

In addition, the Credit Agreement Facilities provide for mandatory prepayments of the Term Loan Facilities with certain excess cash flow of the Company, net cash proceeds of certain asset sales or other dispositions by the Company, net cash proceeds of certain sale and leaseback transactions and net cash proceeds of certain issuances of debt obligations. The indenture governing the Senior Subordinated Notes provides that in the event of certain asset dispositions, C&A Products must apply net proceeds (to the extent not reinvested in the business) first to repay Senior Indebtedness (as defined, which includes the Credit Agreement Facilities) and then, to the extent of

I-24

remaining net proceeds, to make an offer to purchase outstanding Senior Subordinated Notes at 100% of their principal amount plus accrued interest. C&A Products must also make an offer to purchase outstanding Senior Subordinated Notes at 101% of their principal amount plus accrued interest if a change in control (as defined in the agreement) of the Company occurs.

Cash interest paid for the quarters ended September 30, 2001 and September 30, 2000 was $7.0 million and $9.2 million, respectively. Cash interest paid for the nine months ended September 30, 2001 and September 30, 2000 was $51.0 million and $57.6 million, respectively. Due to the variable interest rates under the Credit Agreement Facilities and the New Receivables Facility, the Company is sensitive to changes in interest rates. Based upon amounts outstanding at September 30, 2001, a 0.5% increase in each of one month, LIBOR and Canadian bankers' acceptance rates (2.63% and 3.48%, respectively, at September 30, 2001) would increase interest costs by approximately $2.1 million annually on the Credit Agreement Facilities and $0.7 million annually on the New Receivables Facility.

CAPITAL EXPENDITURES: The Company makes capital expenditures on a recurring basis for replacements and improvements. As of September 30, 2001, the Company's continuing operations had approximately $9.6 million in outstanding capital expenditure commitments. The Company currently anticipates that its capital expenditures for continuing operations for fiscal 2001, excluding acquisitions, will be approximately $60 million, a portion of which may be financed through leasing arrangements. The Company's capital expenditures in future years will depend upon demand for the Company's products and changes in technology.

ACQUISITIONS: On August 7, 2001, the Company signed a definitive agreement with Textron to acquire TAC-Trim (See "Note P"). Completion of the transaction is subject to certain terms and conditions, including the availability of financing. The Company is currently in discussions with Textron concerning financing alternatives and revisions to the acquisition terms, with the objective of closing the transaction in the fourth quarter of 2001. As presently structured, total consideration consists of $1.0 billion in cash and assumed debt, 18.0 million shares of the Company's common stock and preferred stock of C&A Products having a $245.0 million liquidation preference. The cash portion of the transaction is expected to be financed through the issuance of shares of the Company's common stock for cash, debt and receivable financing. It is expected that the $400.0 million principal amount of 11 1/2% Senior Subordinated Notes due 2006 (the "Senior Subordinated Notes") will remain outstanding. The price for all newly issued shares of common stock will be $5.00 per share.

DISCONTINUED OPERATIONS: The Company has significant obligations related to post-retirement, casualty, environmental, product liability, lease and other liabilities of discontinued operations. The nature of many of these contingent liabilities is such that they are difficult to quantify and uncertain in terms of amount. Based upon the information available to management and our experience to date, we believe that these liabilities will not have a material adverse effect on our financial condition or results of operations. In addition, we have primary, excess and umbrella insurance coverage for various periods that we expect to cover certain of these liabilities. However, there can be no assurances that unknown contingent liabilities will not arise or that known contingent liabilities or related claims will not exceed our expectations or that insurance will be available to cover these liabilities. Management currently estimates a net cash outflow related to discontinued operations of approximately $2.6 million for the remainder of 2001. Management believes that its existing sources of liquidity, insurance policies and cash from operations will satisfy the Company's known liabilities. Because the cash requirements of our operations are substantially a function of these contingencies, it is possible that our actual net cash requirements could differ materially from these estimates.

LEASES: During the third quarter 2001, C&A Products entered into sale and leaseback transactions for certain manufacturing equipment and is required to make aggregate annual lease payments of $4.0 million through 2009, subject to normal adjustment clauses. The transactions resulted in the recognition of an $8.1 million deferred asset that is being amortized over the lease term (Note L).

During the second quarter of 2001, C&A Products entered into a sale and leaseback transaction for certain non-manufacturing properties and is required to make aggregate annual lease payments of $1.7 million through 2021 subject to normal adjustment clauses. This transaction resulted in the recognition of a $3.9 million loss.

Excluding the aforementioned sale and leaseback transactions, the Company has other equipment lease agreements with several lessors that, subject to specific approval, provide availability of funding for operating leases

I-25

and sale and leasebacks as allowed in its other financing agreements. During the third quarter of 2001, the Company made lease payments under these equipment lease agreements related to continuing operations of approximately $1.2 million. The Company expects lease payments for continuing operations under these equipment lease agreements to be approximately $2.1 million during the remainder of fiscal 2001.

OTHER: At September 30, 2001, approximately $1.0 million remained authorized by the Company's Board of Directors to repurchase shares of the Company's common stock at management's discretion. The Company believes it has sufficient liquidity under its existing credit arrangements to effect the repurchase program. The Company made no repurchases during the nine months ended September 30, 2001 compared to share repurchases of approximately $140.0 thousand for the nine months ended September 30, 2000.

The Company is sensitive to price movements in its raw materials supply base. Prices for most of the Company's primary raw materials remained constant with price levels at December 31, 2000. While the Company may not be able to pass on future raw materials price increases to its customers, it believes that a significant portion of the increased cost can be offset by continued results of its engineering/value analysis in conjunction with its major customers and by continued reductions in the cost of off-quality products and processes.

## OTHER INFORMATION

C&A Products has outstanding Senior Subordinated Notes. The Senior Subordinated Notes indenture contains restrictive covenants (including, among others, limitations on the incurrence of indebtedness, asset dispositions and transactions with affiliates) which are customary for such securities. These covenants are also subject to a number of significant exceptions. During the first quarter of 2001, the Company solicited and received consent from holders of the Senior Subordinated Notes allowing the change of control precipitated by the Heartland Transaction. Other modifications to certain covenants were made to facilitate the Heartland Transaction and provide greater financing flexibility.

## TAX MATTERS

At December 31, 2000, the Company had outstanding net operating loss carryforwards ("NOLs") of approximately $315.0 million for United States federal income tax purposes. Substantially all of these NOLs expire over the period from 2008 to 2020. The Company also has unused United States federal tax credits of approximately $20.9 million, of which $8.7 million expire during the period 2001 to 2020.

As a result of the Heartland Transaction, Heartland owned approximately 60 percent of the outstanding shares as of February 23, 2001, 44 percent as of September 30, 2001 (Note A). This constitutes a "change in control" that results in annual limitations on the Company's use of its NOLs and unused tax credits. This annual limitation on the use of NOLs and tax credits depends on the value of the equity of the Company and the amount of "built-in gain" or "built-in loss" in the Company's assets at the date of the "change in control". Based on the expiration dates of the NOLs and tax credits as well as anticipated levels of domestic income, management does not believe that the transaction will have a material impact on these deferred tax assets.

Management has reviewed the Company's operating results for recent years as well as the outlook for its continuing operations and concluded that it is more likely than not that the net deferred tax assets of $104.5 million at September 30, 2001 will be realized. The Company announced a reorganization on February 10, 1999 (see Note I to the Condensed Consolidated Financial Statements) to better align itself in the marketplace. A major goal of this reorganization is to lower the overall cost structure of the Company and thereby increase profitability. The infusion of cash from the Heartland Transaction lowered the overall debt of the Company and reduced its interest expense. These factors, along with the timing of the reversal of its temporary differences, certain tax planning strategies and the expiration date of its NOLs were also considered in reaching this conclusion. The Company's ability to generate future taxable income is dependent on numerous factors, including general economic conditions, the state of the automotive industry and other factors beyond management's control. Therefore, there can be no assurance that the Company will meet its expectation of future taxable income.

The valuation allowance at September 30, 2001 provides for certain deferred tax assets that in management's assessment may not be realized due to tax limitations on the use of such amounts or that relate to tax attributes that are subject to uncertainty due to the long-term nature of their realization.

ENVIRONMENTAL MATTERS

The Company is subject to federal, state and local environmental laws and regulations that: (i) affect ongoing operations and may increase capital costs and operating expenses; and (ii) impose liability for the costs of investigation and remediation and otherwise relate to on-site and off-site contamination. The Company's management believes that it has obtained, and is in material compliance with, all material environmental permits and approvals necessary to conduct its various businesses. Environmental compliance costs for continuing businesses currently are accounted for as normal operating expenses or capital expenditures of such business units, except for certain costs incurred at acquired locations. Environmental compliance costs relating to conditions existing at the time the locations were purchased are generally charged to reserves established in purchase accounting. In the opinion of management, based on the facts presently known to it, such environmental compliance costs will not have a material adverse effect on the Company's consolidated financial condition or future results of operations.

The Company is legally or contractually responsible or alleged to be responsible for the investigation and remediation of contamination at various sites. It also has received notices that it is a potentially responsible party ("PRP") in a number of proceedings. The Company may be named as a PRP at other sites in the future, including with respect to divested and acquired businesses. The Company is currently engaged in investigation or remediation at certain sites. In estimating the total cost of investigation and remediation, the Company has considered, among other things, the Company's prior experience in remediating contaminated sites, remediation efforts by other parties, data released by the United States Environmental Protection Agency, the professional judgment of the Company's environmental experts, outside environmental specialists and other experts, and the likelihood that other parties which have been named as PRPs will have the financial resources to fulfill their obligations at sites where they and the Company may be jointly and severally liable. Under the theory of joint and several liability, the Company could be liable for the full costs of investigation and remediation even if additional parties are found to be responsible under the applicable laws. It is difficult to estimate the total cost of investigation and remediation due to various factors including incomplete information regarding particular sites and other PRPs, uncertainty regarding the extent of environmental problems and the Company's share, if any, of liability for such problems, the selection of alternative compliance approaches, the complexity of environmental laws and regulations and changes in cleanup standards and techniques. When it has been possible to provide reasonable estimates of the Company's liability with respect to environmental sites, provisions have been made in accordance with generally accepted accounting principles. As of September 30, 2001, excluding sites at which the Company's participation is anticipated to be de minimis or otherwise insignificant or where the Company is being indemnified by a third party for the liability, there are 22 sites where the Company is participating in the investigation or remediation of the site, either directly or through financial contribution, and 11 additional sites where the Company is alleged to be responsible for costs of investigation or remediation. As of September 30, 2001, the Company's estimate of its liability for these 33 sites, is approximately $24.2 million. As of September 30, 2001, the Company has established reserves of approximately $35.1 million for the estimated future costs related to all of its known environmental sites. In the opinion of management, based on the facts presently known to it, the environmental costs and contingencies will not have a material adverse effect on the Company's consolidated financial condition or future results of operations. However, there can be no assurance that the Company has identified or properly assessed all potential environmental liability arising from the activities or properties of the Company, its present and former subsidiaries and their corporate predecessors.

During the second and third quarters of fiscal, 2001, the Company received payments of $14.5 million on environmental claims related to discontinued operations. Of the $14.5 million in payments, the Company recorded $8.8 million, net of income taxes, as income from discontinued operations.

During the quarter ended July 1, 2000, the Company settled claims for certain other environmental matters related to discontinued operations for a total of $20.0 million. Settlement proceeds will be paid to the Company in three installments. Installments of $7.5 million were received on June 30, 2000 and June 30, 2001. The Company anticipates receiving the final payment of $5.0 million on June 30, 2002. Of the $20.0 million settlement, the Company recorded the present value of the settlement as $7.0 million of additional reserves, based on its assessment of potential environmental exposures, and $6.6 million, net of income taxes, as income from discontinued operations.

**SAFE HARBOR STATEMENT**

This Report on Form 10-Q contains "forward-looking" information, as that term is defined by the federal securities laws, about our financial condition, results of operations and business. You can find many of these statements by looking for words such as "may," "will," "expect," "anticipate," "believe," "estimate," "should," "continue," "predict," and similar words used in this Quarterly Report. The forward-looking statements in this Form 10-Q are intended to be subject to the safe harbor protection provided by the federal securities laws.

These forward-looking statements are subject to numerous assumptions, risks and uncertainties (including trade relations and competition). Because the statements are subject to risks and uncertainties, actual results may differ materially from those expressed or implied by the forward-looking statements. We caution readers not to place undue reliance on the statements, which speak only as of the date of this Form 10-Q.

The cautionary statements set forth above should be considered in connection with any subsequent written or oral forward-looking statements that we or persons acting on our behalf may issue. We do not undertake any obligation to review or confirm analysts' expectations or estimates or to release publicly any revisions to any forward-looking statements to reflect events or circumstances after the date of this report or to reflect the occurrence of unanticipated events.

This Quarterly Report contains forward-looking statements within the meaning of the Private Securities Litigation Reform Act of 1995. Actual results and events may differ materially from those that are anticipated because of certain risks and uncertainties, including but not limited to general economic conditions in the markets in which the Company operates, fluctuations in the production of vehicles for which the Company is a supplier, changes in the popularity of particular car models or particular interior trim packages, the loss of programs on particular car models, labor disputes involving the Company or its significant customers, changes in consumer preferences, dependence on significant automotive customers, the level of competition in the automotive supply industry, pricing pressure from automotive customers, changes in labor costs, the substantial leverage of the Company and its subsidiaries, limitations imposed by the Company's debt facilities, risks associated with the Company's acquisition strategy and reorganization plans of the Company, charges made in connection with the integration of operations acquired by the Company, risks associated with conducting business in foreign countries and other risks detailed from time-to-time in the Company's Securities and Exchange Commission filings including without limitation, in items 1, 7, 7a and 8 of the Company's Annual Report on Form 10-K for the year-ended December 31, 2000 and part 1 of this Quarterly Report on Form 10-Q.

**ITEM 3. QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK.**

For the period ended September 30, 2001, the Company did not experience any material changes from the quantitative and qualitative disclosures about market risk presented in the 10-K.

PART II -- OTHER INFORMATION

## ITEM 6. EXHIBITS AND REPORTS ON FORM 8-K.

### (A) EXHIBITS.

| EXHIBIT NUMBER | | DESCRIPTION |
|---|---|---|
| 2.1 | -- | Agreement and Plan of Merger dated May 14, 2001 by and among Collins & Aikman Corporation, Collins & Aikman Products Co., Becker Group, L.L.C., CE Becker Inc., ME McInerney Inc., J Hoehnel Inc. and the individuals party thereto as sellers is hereby incorporated by reference to Exhibit 2.1 of Collins & Aikman Corporation's Current Report on Form 8-K dated July 13, 2001. |
| 2.2 | -- | Agreement and Plan of Merger dated as of August 17, 2001 by and among Collins & Aikman Corporation, Collins & Aikman Products Co., JAII Acquisition Co., Elkin McCallum, Joan Fabrics Corporation and Joan Automotive Industries, Inc is hereby incorporated by reference to Exhibit 2.1 of Collins & Aikman Corporation's Current Report on Form 8-K dated September 21, 2001. |
| 2.3 | -- | First Amendment to Agreement and Plan of Merger by and among Collins & Aikman Corporation, Collins & Aikman Products Co., JAII Acquisition Co., Elkin McCallum, Joan Fabrics Corporation and Joan Automotive Industries, Inc dated as of September 21, 2001 is hereby incorporated by reference to Exhibit 2.2 of Collins & Aikman Corporation's Current Report on Form 8-K dated September 21, 2001. |
| 2.4 | -- | Purchase Agreement dated as of August 7, 2001 by and among Textron Inc., Collins & Aikman Corporation and Collins & Aikman Products Co., including Exhibit 1 (Certificate of Designation of the 15% Series A Redeemable Preferred Stock, the 16% Series B Redeemable Preferred Stock and the 16% Series C Redeemable Preferred Stock) and Exhibit 7 (Asset Purchase Agreement dated as of August 7 by and between Textron Automotive Exteriors Inc. and JPS Automotive, Inc.). |
| | | The Table of Contents of the Purchase Agreement listed as Exhibit 2.4 contains a list briefly identifying the contents of all omitted schedules and exhibits. Collins & Aikman Corporation will supplementally furnish a copy of any omitted schedule or exhibit to the Commission upon request. |
| 3(i).1 | -- | Restated Certificate of Incorporation of Collins & Aikman Corporation is hereby incorporated by reference to Exhibit 3.1 of Collins & Aikman Corporation's Quarterly Report on Form 10-Q for the fiscal quarter ended June 26, 1999. |
| 3(i).2 | -- | Certificate of Amendment to the Restated Certificate of Incorporation of Collins & Aikman Corporation is hereby incorporated by reference to Exhibit 3.2 of Collins & Aikman Corporation's Annual Report on Form 10-K for the fiscal year ended December 31, 2000. |
| 3(i).3 | -- | Certificate of Elimination of Cumulative Exchangeable Redeemable Preferred Stock of Collins & Aikman Corporation is hereby incorporated by reference to Exhibit 3.3 of Collins & Aikman Corporation's Quarterly Report on Form 10-Q for the fiscal quarter ended October 28, 1995. |
| 3(ii) | -- | By-laws of Collins & Aikman Corporation, as amended, are hereby incorporated by reference to Exhibit 3.2 of Collins & Aikman Corporation's Annual Report on Form 10-K for the fiscal year ended January 27, 1996. |
| | | Collins & Aikman Corporation agrees to furnish to the Commission upon request in accordance with Item 601 (b)(4) (iii) (A) of Regulation S-K copies of instruments defining the rights of holders of long-term debt of Collins & Aikman Corporation or any of its subsidiaries, which debt does not exceed 10% of the total assets of Collins & Aikman Corporation and its subsidiaries on a consolidated basis. |
| 4 | -- | Form of Warrant is hereby incorporated by reference to Exhibit 4.1 of Collins & Aikman Corporation's Current Report on Form 8-K dated July 13, 2001. |
| 11 | -- | Computation of Earnings Per Share. |

II-1

(B) REPORTS ON FORM 8-K

The Company filed the following Reports on Form 8-K covering the following items:

**October 26, 2001 -- Item 5 (Other Events)**

**September 21, 2001 -- Item 2 (Acquisition or Disposition of Assets) and Item 7**
(Exhibits)

September 21, 2001 -- Item 2 (Acquisition or Disposition of Assets) and Item 7 (Financial Statements of Business Acquired, Pro Forma Financial Information and Exhibits) Audited financial statements are presented for the years ended June 30, 2001, July 1, 2000 and July 3, 1999. *

**August 7, 2001 -- Item 5 (Other Events) and Item 7 (Exhibits)**

**July 3, 2001 -- Item 2 (Acquisition or Disposition of Assets) and Item 7**
(Exhibits)

```
July 3, 2001 --   Item 2 (Acquisition or Disposition of Assets) and Item 7
                  (Financial Statements of Business Acquired, Pro Forma
                  Financial Information and Exhibits) Audited financial
                  statements are presented for the years ended December 31,
                  2000, December 31, 1999 and for the periods from July 1, 1998
                  to December 31, 1998 and January 1, 1998 to June 30, 1998.
                  Unaudited financial statements are presented for the six
                  months ended June 30, 2001 and June 30, 2000.*
```

* These Reports were filed on Form 8-K/A in accordance with Item 7(a)(4)and item 7(b)(2) of Form 8-K

II-2

**SIGNATURE**

Pursuant to the requirements of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

Dated: November 13, 2001

**COLLINS & AIKMAN CORPORATION**
(Registrant)

By: /s/ Rajesh K. Shah
------------------------------------------
Rajesh K. Shah

Chief Financial Officer and Executive Vice President

(On behalf of the Registrant and as Principal Financial and Chief Accounting Officer)

PURCHASE AGREEMENT

BY AND AMONG

TEXTRON INC.

COLLINS & AIKMAN CORPORATION

AND

COLLINS & AIKMAN PRODUCTS CO.

AUGUST 7, 2001

# TABLE OF CONTENTS

## ARTICLE I

## DEFINITIONS

1.1 Definitions............................................................1

## ARTICLE II

## PURCHASE AND SALE OF SHARES

2.1    Purchase and Sale of Shares.........................................12
2.2    Purchase and Sale of Assets.........................................13
2.3    Restructuring.......................................................13
2.4    Purchase Price Adjustment...........................................13
2.5    Allocation of Consideration; Tax Filings............................16
2.6    Closing.............................................................17
2.7    Closing Obligations.................................................18

## ARTICLE III

## REPRESENTATIONS AND WARRANTIES OF PARENT

3.1    Corporate Organization, Qualification, Power and Authority..........19
3.2    Stock of Subsidiaries...............................................20
3.3    Consents and Approvals; No Violations...............................21
3.4    Financial Statements................................................22
3.5    Absence of Certain Changes or Events................................22
3.6    No Undisclosed Liabilities..........................................24
3.7    Litigation..........................................................24
3.8    Taxes...............................................................24
3.9    Employee Benefit Plans and Agreements...............................25
3.10   Labor Matters.......................................................28
3.11   Environmental Laws and Regulations..................................28
3.12   Compliance with Laws................................................29
3.13   Properties..........................................................29
3.14   Material Contracts..................................................29
3.15   Intellectual Property...............................................30
3.16   Product Warranties; Recalls.........................................31
3.17   Brokers and Finders.................................................31
3.18   Customers and Suppliers.............................................31
3.19   Additional Representations and Warranties by Parent.................31
3.20   Indebtedness........................................................32

i

3.21     R&D People.........................................................32

ARTICLE IV

REPRESENTATIONS AND WARRANTIES OF HOLDINGS AND C&A PRODUCTS

4.1     Corporate Organization, Qualification, Power and Authority..........32
4.2     Capitalization of Holdings and C&A Products........................34
4.3     Stock of Subsidiaries..............................................36
4.4     Valid Issuance of Stock............................................36
4.5     Consents and Approvals; No Violations..............................36
4.6     SEC Filings; Financial Statements..................................37
4.7     Absence of Certain Changes or Events...............................37
4.8     No Undisclosed Liabilities.........................................38
4.9     Litigation.........................................................38
4.10    Financing..........................................................38
4.11    Certain Agreements.................................................39
4.12    Brokers and Finders................................................39

ARTICLE V

COVENANTS RELATING TO CONDUCT OF BUSINESS AND OTHER AGREEMENTS

5.1     Conduct of the Business............................................39
5.2     Access to Information...............................................42
5.3     Competition Filings................................................42
5.4     Consents and Reasonable Efforts....................................43
5.5     Further Assurances.................................................44
5.6     Publicity..........................................................45
5.7     Employee Matters...................................................46
5.8     Tax Matters........................................................52
5.9     Bison Financial Statements.........................................61
5.10    Observer Rights....................................................62
5.11    Non-Competition....................................................63
5.12    Intercompany Transactions..........................................64
5.13    Additional Covenant of C&A and Holdings............................64
5.14    Certain Pre-Closing Restrictions...................................64
5.15    Closing Date Indebtedness..........................................65
5.16    Tax Reporting......................................................65
5.17    R&D Employees......................................................65
5.18    IRB................................................................66

# ARTICLE VI

## CONDITIONS TO CONSUMMATION OF THE TRANSACTION

6.1     Conditions to Each Party's Obligations to Complete the
        Transactions.........................................................66
6.2     Additional Conditions to the Obligation of Holdings and C&A
        Products.............................................................67
6.3     Additional Conditions to the Obligation of Parent....................68

# ARTICLE VII

## TERMINATION

7.1     Termination by Mutual Consent........................................69
7.2     Termination by Any Party.............................................69
7.3     Termination by Parent................................................69
7.4     Effect of Termination................................................69

# ARTICLE VIII

## OBLIGATIONS AFTER CLOSING

8.1     Survival of Representations, Warranties and Covenants;
        Indemnification......................................................70
8.2     Environmental Indemnification........................................75
8.3     Quota Purchase Agreement Indemnification.............................81
8.4     Name Changes.........................................................82

# ARTICLE IX

## MISCELLANEOUS AND GENERAL

9.1     Interpretation.......................................................82
9.2     Principle of Construction............................................83
9.3     Payment of Expenses and Other Payments...............................83
9.4     Amendment............................................................83
9.5     Waiver and Extension.................................................83
9.6     Counterparts.........................................................83
9.7     Governing Law........................................................83
9.8     Notices..............................................................84
9.9     Entire Agreement; Assignment.........................................85
9.10    Parties in Interest..................................................85
9.11    Validity.............................................................85
9.12    Captions.............................................................85
9.13    Transfer, Sales and Stamp Taxes......................................85

iii

SCHEDULE A - Directly Purchased Subsidiaries SCHEDULE B - Subsidiaries of the Directly Purchased Subsidiaries SCHEDULE C - Restructuring
SCHEDULE D - Allocation of Purchase Price SCHEDULE E - Subsidiaries of Holdings
SCHEDULE F - Acquiring Entities


EXHIBIT 1 - Certificate of Designation
EXHIBIT 2 - Assignment and Assumption Agreement EXHIBIT 3A - Intellimold License Agreement EXHIBIT 3B - Retained IP - License Agreement EXHIBIT 3C - Licensed IP - License Agreement EXHIBIT 4 - Transition Agreement
EXHIBIT 5 - Preferred Stock Registration Rights Agreement EXHIBIT 6 - Common Stock Registration Rights Agreement EXHIBIT 7 - Asset Purchase Agreement

iv

## PURCHASE AGREEMENT

PURCHASE AGREEMENT, dated as of August 7, 2001 (the "Agreement") by and between Textron Inc., a Delaware corporation ("Parent"), Collins & Aikman Corporation, a Delaware corporation ("Holdings"), and Collins & Aikman Products Co., a Delaware corporation ("C&A Products") and a wholly owned subsidiary of Holdings.

WHEREAS, Parent desires to sell and C&A Products and certain of its Subsidiaries desire to purchase the exterior and interior automotive trim operations currently managed as a unit of Textron Automotive Company Inc.;

NOW, THEREFORE, in consideration of the mutual representations, warranties, covenants and agreements set forth in this Agreement and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Parent, Holdings and C&A Products, intending to be legally bound, agree as follows:

### ARTICLE I

### DEFINITIONS

1.1 Definitions. For purposes of this Agreement, except as otherwise expressly provided or unless the context clearly requires otherwise:

"Actuary Firm" shall have the meaning ascribed to it in Section 5.7(c)(vii).

"Adjustment Schedule" shall have the meaning ascribed to it in Section 2.5(a).

"Affiliate" of any Person shall mean any other Person that directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such first Person.

"After-Acquired Business" shall have the meaning ascribed to it in Section 5.11(b).

"After Tax Amount" shall have the meaning ascribed to it in Section 5.8(g).

"Agreement" shall have the meaning ascribed to it in the preamble.

"Allocation Dispute Notice" shall have the meaning ascribed to it in Section 2.5(b).

1

"Antitrust Division" shall have the meaning ascribed to it in Section 5.3(a).

"Balance Sheet Indebtedness" shall mean Indebtedness of the type referenced in clauses (a), (b) and (c) of the definition thereof plus accrued interest on said Indebtedness in each case determined in accordance with GAAP.

"Bank" shall have the meaning ascribed to it in Section 4.10(a).

"Bison Plan" shall have the meaning ascribed to it in Section 3.9(a).

"Bison Properties" shall mean all parcels of and interests in real property owned in fee or leased by Parent or its Subsidiaries and used in the Business as of the date hereof or the Closing Date.

"Bison Subsidiaries" shall have the meaning ascribed to it in Section 2.3.

"Brazilian Entities" shall have the meaning ascribed to it in Section 5.8(a)(i).

"Business" shall mean the Textron exterior and interior automotive trim operations currently managed as a unit of Textron Automotive Company Inc.

"C&A Products" shall have the meaning ascribed to it in the preamble.

"C&A Products' Hourly Pension Plan" shall have the meaning ascribed to it in Section 5.7(c)(iii).

"C&A Products' Salaried Pension Plan" shall have the meaning ascribed to it in Section 5.7(c)(ii).

"C&A Products' Savings Plan" shall have the meaning ascribed to it in Section 5.7(d).

"C&A Products' Trustee" shall have the meaning ascribed to it in Section 5.7(c)(iv).

"Certificate of Designation" shall have the meaning ascribed to it in Section 2.1(b).

"Claim" shall have the meaning ascribed to it in Section 8.1(e).

"Closing" shall have the meaning ascribed to it in Section 2.6.

"Closing Cash" shall mean cash as shown on the Closing Financial Statement; provided, however, that with respect to Plascar Participacoes Industriais S.A. and TATB, only 56.6% of the foregoing items shall constitute Closing Cash. Closing Cash

2

includes cash in any account in which cash has been withheld or otherwise set aside for the benefit of an applicable Taxing Authority to satisfy Taxes, provided that Holdings or C&A Products has directly or indirectly received control over such account. (For avoidance of doubt, outstanding checks and negative cash attributable to negative cash balances will be taken into account when computing Closing Cash unless the item is included in Balance Sheet Indebtedness or the computation of Working Capital.)

"Closing Date" shall have the meaning ascribed to it in Section 2.6.

"Closing Financial Statement" shall have the meaning ascribed to it in Section 2.4(a).

"Code" shall mean the Internal Revenue Code of 1986, as amended.

"Commitment Letters" shall have the meaning ascribed to it in Section 4.10(a).

"Confidentiality Agreement" shall mean the agreement dated as of February 23, 2001 by and between Parent and Heartland Industrial Partners, L.P.

"Consent" shall mean any consent, approval, authorization, clearance, exemption, waiver, or similar affirmation by, or filing with or notification to, a Person pursuant to any Contract, Law, Order or Permit.

"Contract" shall mean any agreement, arrangement, commitment, contract, indenture, instrument, lease or other obligation of any kind or character that is binding on any Person or its capital stock, properties or business.

"Debt Commitment Letter" shall have the meaning ascribed to it in Section 4.10(a).

"December 30, 2000 Statement of Net Assets to be Sold" shall have the meaning ascribed to it in Section 3.4.

"Default" shall mean (i) any breach or violation of or default under any Contract, Order or Permit, (ii) any occurrence of any event that with the passage of time or the giving of notice or both would constitute a breach or violation of or default under any Contract, Order or Permit or (iii) any occurrence of any event that with the passage of time or the giving of notice or both would give rise to any right of termination, cancellation or acceleration under any Contract, Order or Permit.

"Direct Claim" shall have the meaning ascribed to it in Section 8.1(e).

"Directly Purchased Subsidiary" shall mean the Subsidiaries of Parent listed on Schedule A hereto.

3

"Disclosure Schedule" shall mean the Disclosure Schedule prepared by Parent and delivered to Holdings and C&A Products concurrently with the execution of this Agreement.

"Dispute Notice" shall have the meaning ascribed to it in Section 2.4(e).

"E&Y" shall mean Ernst & Young LLP, independent accountants of Parent and the Bison Subsidiaries.

"Employee Agreement" shall have the meaning ascribed to it in Section 5.7(f)(iii).

"Employees" shall mean employees employed by a Bison Subsidiary on the Closing Date.

"Environmental Laws" means the common law and all domestic and foreign, federal, state and local Laws, relating to pollution or protection of the environment, including employee health and safety and natural resource damages, and including Laws relating to releases or threatened releases of Hazardous Substances into the environment (including ambient air, indoor air, surface water, groundwater, land, surface and subsurface strata).

"Environmental Losses" shall have the meaning ascribed to it in Section 8.2(e).

"Equity Commitment Letters" shall have the meaning ascribed to it in Section 4.10(a).

"Equity Consideration" shall have the meaning ascribed to it in Section 3.19(a).

"Equity Sources" shall have the meaning ascribed to it in Section 4.10(a).

"ERISA" shall have the meaning ascribed to it in Section 3.9(a).

"ERISA Affiliate" shall have the meaning ascribed to it in Section 3.9(a).

"FAS 87" shall have the meaning ascribed to it in Section 5.7(c)(v).

"Final Allocation Schedule" shall have the meaning ascribed to it in Section 2.5(c).

"Financial Statements" shall have the meaning ascribed to it in Section 3.4.

4

"Financing Agreements" shall have the meaning ascribed to it in Section 5.5(b).

"Foreign Competition Laws" shall mean foreign statutes, ordinances, rules, regulations, orders, decrees, administrative and judicial directives, and other foreign laws, that are designed or intended to prohibit, restrict or regulate actions having the purpose or effect of monopolization, lessening of competition or restraint of trade or creating or strengthening a dominant position.

"Foreign Plan" shall have the meaning ascribed to it in Section 3.9(l).

"Former Employee" shall mean any (a) person whose employment by a Bison Subsidiary, or by Textron Automotive Company Inc. if such person's entire salary was directly charged to the Business, was terminated on or before the Closing Date (whether by retirement or otherwise), excluding persons who were employed by Parent, a Non-Bison Subsidiary or any of their other Affiliates, as of the Closing Date and (b) employee who is on short-term medical disability as of the Closing Date and who thereafter becomes eligible for long-term medical disability.

"FTC" shall have the meaning ascribed to it in Section 5.3(a).

"GAAP" shall mean United States generally accepted accounting principles.

"Governmental Authority" shall mean any domestic or foreign agency, authority, board, judicial body, commission, legislature, instrumentality or office of any federal, state, county, district, municipal, city or other government unit.

"Guarantees" shall have the meaning ascribed to it in Section 5.4(b).

"Hazardous Substances" shall mean any chemical, material or substance defined as or included in the definition of "hazardous substances", "hazardous wastes", "hazardous materials", "hazardous constituents", "restricted hazardous materials", "extremely hazardous substances", "toxic substances", "contaminants", "pollutants", "toxic pollutants", or words of similar meaning and regulatory effect under any applicable Environmental Law, including petroleum and asbestos.

"Heartland" means Heartland Industrial Partners, L.P. and its Affiliates.

"Holdings" shall have the meaning ascribed to it in the preamble.

"Holdings Common Stock" shall have the meaning ascribed to it in Section 2.1(b).

"Holdings Indemnified Parties" shall have the meaning ascribed to it in Section 8.1(b).

5

"Holdings Material Adverse Effect" shall mean any adverse change in the business, properties, financial condition or results of operations of Holdings or any of its Subsidiaries, which, individually or together with any other such adverse change, is material to C&A and its Subsidiaries, taken as a whole, other than any such effect attributable to or resulting from (i) the public announcement of the transactions contemplated hereby or (ii) any adverse change in general economic conditions or in conditions affecting the automotive supplier industry generally.

"Holdings SEC Reports" shall have the meaning ascribed to it in Section 4.7(a).

"HSR Act" shall have the meaning ascribed to it in Section 3.3(a).

"Indemnified Party" shall have the meaning ascribed to it in Section 8.1(d)(ii).

"Indemnifying Party" shall have the meaning ascribed to it in Section 8.1(d)(ii).

"Indebtedness" of any Person shall mean without duplication, (a) all indebtedness of such Person for borrowed money or for the deferred purchase price of property or services (other than current trade liabilities incurred in the ordinary course of business), (b) any other indebtedness of such Person which is evidenced by a note, bond, debenture or similar instrument, (c) all capital lease obligations of such Person, (d) all obligations of such Person in respect of bankers' acceptances or letters of credit issued or created for the account of such Person, (e) all obligations of others secured by (or for which the holder of such obligation has an existing right, contingent or otherwise, to be secured by) any Lien on any property owned or acquired by such Person even though such Person has not assumed or otherwise become liable for the payment thereof, (f) all obligations of such Person in respect of interest rate and currency swap or hedge agreements and (g) all guarantees by such Person of Indebtedness of others. The Indebtedness of any Person shall include the Indebtedness of any partnership in which such Person is a general partner; provided that, if the sole asset of such Person is its general partnership interest in such partnership, the amount of such Indebtedness shall be deemed equal to the value of such general partnership interest and the amount of any Indebtedness in respect of any guarantee of such partnership Indebtedness shall be limited to the same extent as such guarantee may be limited.

"Independent Accounting Firm" shall have the meaning ascribed to it in Section 2.4(e).

"Intellectual Property" means (a) all inventions and discoveries (whether patentable or unpatentable and whether or not reduced to practice), all improvements thereto, and all patents, patent applications and patent disclosures, together with all re-issuances, continuations, continuations-in-part, revisions, extensions and reexaminations

6

thereof, (b) all trademarks and service marks, including all goodwill associated therewith, and all applications, registrations and renewals in connection therewith, (c) all copyrightable works, all copyrights and all applications, registrations and renewals in connection therewith, (d) all know-how, trade secrets, technical information and confidential business information (whether patentable or unpatentable and whether or not reduced to practice), including, ideas, research and development, formulas, compositions, manufacturing and production processes, techniques and methods, technical data, designs, drawings, blue prints, patterns, specifications, assembly procedures, test procedures, instruction manuals, operation manuals, maintenance manuals, reliability data, quality control data, customer and supplier lists, parts lists, pricing and cost information and business and marketing plans and proposals, (e) all computer software (excluding generally commercially available software licensed on standard terms) used solely in the conduct of the Business (including data and related documentation), (f) all other proprietary rights and (g) all copies and tangible embodiments thereof (in whatever form or medium), in each case necessary for the conduct of the Business as currently conducted.

"Interest Rate" shall mean 6.5% per year calculated on the basis of a 365 day year and charged for the actual number of days elapsed.

"Law" shall mean any domestic or foreign federal, state or local law, statute, ordinance, rule, regulation, and any other executive or legislative proclamation.

"Lien" shall mean any mortgage, pledge, security interest, attachment, encumbrance, lien or charge of any kind (including any agreement to give any of the foregoing) or right of others of any similar nature; provided, however, that the term "Lien" shall not include (i) statutory liens for Taxes, which are not yet due and payable or are being contested in good faith by appropriate proceedings, (ii) statutory or common law liens to secure landlords, lessors or renters under leases or rental agreements confined to the premises rented, (iii) deposits or pledges made in connection with, or to secure payment of, worker's compensation, unemployment insurance, old age pension or other social security programs mandated under applicable Laws, (iv) statutory or common law liens in favor of carriers, warehousemen, mechanics and materialmen to secure claims for labor, materials or supplies and other like liens and (v) restrictions on transfer of securities imposed by applicable state and federal securities Laws.

"Litigation" shall mean any suit, action, arbitration, cause of action, claim, complaint, criminal prosecution, investigation, demand letter, governmental or other administrative proceeding, whether at law or at equity, before or by any domestic or foreign federal, state or local court, tribunal, or agency or before any arbitrator.

"Losses" shall mean any and all actual losses, liabilities, costs and expenses (including reasonable attorneys' fees and costs of investigation), after giving effect to any related Tax Benefit and Tax Detriment and net of any reserves and amounts recovered from third parties, including amounts recovered under insurance policies purchased by Parent or a Subsidiary of Parent prior to the Closing Date, with respect to such Losses; provided, that Losses shall not include any costs or expenses of any

7

Indemnified Party related to the time spent on any indemnified matter by employees or management of the Indemnified Party.

"Material Adverse Effect" shall mean any adverse change in the business, properties, financial condition or results of operations of any of the Bison Subsidiaries (after giving effect to the Restructuring), which, individually or together with any other such adverse change, is material to the Business, taken as a whole, other than any such effect attributable to or resulting from (i) the public announcement of the transactions contemplated hereby, (ii) any act or omission of Parent or any Bison Subsidiary taken with the prior written consent of Holdings, (iii) actions taken by Parent or any Bison Subsidiary at the specific written request of Holdings or (iv) any adverse change in general economic conditions or in conditions affecting the tier one automotive supplier industry generally.

"Material Contract" shall have the meaning ascribed to it in Section 3.14(b).

"Non-Bison Subsidiary" shall have the meaning ascribed to it in Section 2.4(g).

"Off-Site Location" shall have the meaning ascribed to it in Section 8.2(e).

"Order" shall mean any decision or award, decree, injunction, judgment, order, quasi-judicial decision or award, ruling, or writ of any domestic or foreign federal, state or local or other court, arbitrator (with binding effect), tribunal, administrative agency or authority.

"Ownership Percentage" shall have the meaning ascribed to it in Section 5.8(c)(iii).

"Parent" shall have the meaning ascribed to it in the preamble.

"Parent Entity" shall mean (i) Parent and its Subsidiaries (other than the Bison Subsidiaries), so long as such subsidiary remains an Affiliate of Parent, and (ii) any Person who directly or indirectly acquires more than 50% of the voting control of Parent as a result of a nonacquisitive reorganization such as a merger pursuant to Section 251(g) of the Delaware General Corporation Law and any Subsidiaries of such Person.

"Parent Indemnified Parties" shall have the meaning ascribed to it in Section 8.1(c).

"Parent Names" shall have the meaning ascribed to it in Section 8.4.

"Parent's Hourly Master Pension Benefit" shall have the meaning ascribed to it in Section 5.7(c)(iii).

8

"Parent's Salaried Pension Benefit" shall have the meaning ascribed to it in Section 5.7(c)(ii).

"Parent's Trustee" shall have the meaning ascribed to it in Section 5.7(c)(iv).

"Permali" shall have the meaning ascribed to it in Section 5.8(a)(i).

"Permit" shall mean, with respect to any Person, any domestic or foreign federal, state or local governmental approval, authorization, certificate, declaration, easement, filing, franchise, license, notice, permit, variance, clearance, exemption or right to which such Person is a party or that is or may be binding upon or inure to the benefit of such Person or its securities, properties or business.

"Person" shall mean any individual, corporation, partnership, limited liability company, joint venture, trust, association, organization or other entity.

"Preferred Stock" shall have the meaning ascribed to it in Section 2.1(b).

"Plascar" shall have the meaning assigned to it in Section 3.8(a).

"Remediation" shall have the meaning ascribed to it in Section 8.2(e).

"Remediation Standard" shall have the meaning ascribed to it in Section 8.2(e).

"Representatives" shall have the meaning ascribed to it in Section 5.2(a).

"Requesting Party" shall have the meaning ascribed to it in Section 5.16(b).

"Required Amount" shall have the meaning ascribed to it in Section 4.10(a).

"Required Financial Statements" shall have the meaning ascribed to it in Section 5.9(b).

"Requisite Regulatory Approvals" shall have the meaning ascribed to it in Section 3.3(a).

"Restricted Field" shall have the meaning ascribed to it in Section 5.11(a).

"Restricted Portion" shall have the meaning ascribed to it in Section 5.11(b).

"Restriction" shall have the meaning ascribed to it in Section 8.2(b)(i).

"Restructuring" shall have the meaning ascribed to it in Section 2.3.

"Retention Payment" shall have the meaning ascribed to it in Section 5.7(f)(iv).

"Rosario" shall have the meaning ascribed to it in Section 5.8(a)(i).

"SEC" shall have the meaning ascribed to it in Section 4.6(a).

"Securities Act" shall mean the Securities Act of 1933, as amended.

"Series A Preferred Stock" shall have the meaning ascribed to it in Section 2.1(b).

"Series B Preferred Stock" shall have the meaning ascribed to it in Section 2.1(b).

"Series C Preferred Stock" shall have the meaning ascribed to it in Section 2.1(b).

"Severance Payment" shall have the meaning ascribed to it in Section 5.7(f)(iii).

"Shares" shall have the meaning ascribed to it in Section 2.1(a).

"Stand-Alone Pension Plans" shall have the meaning ascribed to it in Section 5.7(c)(i).

"Straddle Period" shall mean a taxable year or period beginning on or before, and ending after, the Closing Date.

"Subsidiary" shall mean any corporation, partnership, limited liability company, joint venture or other legal entity of which a Person, either alone or together with any other Subsidiary, owns, directly or indirectly, more than 50% of the stock or other equity interests of such corporation or other legal entity.

"TATB" shall have the meaning ascribed to it in Section 3.8(a).

"Tax" or "Taxes" shall mean all United States federal, state, provincial, local, territorial and foreign income, profits, franchise, license, capital, transfer, ad valorem, wage, severance, occupation, import, custom, gross receipts, payroll, sales, employment, use, property, real estate, excise, value added, estimated, stamp, alternative or add-on minimum, environmental, withholding and any other taxes, duties, assessments or governmental charges of any kind whatsoever.

10

"Tax Authority" shall mean any domestic or foreign federal, national, state, provincial, county or municipal or other local government, any subdivision, agency, commission or authority thereof, or any quasi-governmental body exercising any taxing authority or any other authority exercising Tax regulatory authority.

"Tax Benefit" shall mean the amount of any refund, credit or reduction in otherwise required Tax payments, including any interest payable thereon, actually realized, provided, that, for these purposes, Tax items shall be taken into account in accordance with the ordering principles of the Code or other applicable Law.

"Tax Detriment" shall mean the amount of any increase in otherwise required Tax payments, including any interest payable thereon, actually realized, provided, that, for these purposes, Tax items shall be taken into account in accordance with the ordering principles of the Code or other applicable Law.

"Tax Indemnitee" shall have the meaning ascribed to it in Section 5.8(k)(i).

"Tax Indemnitor" shall have the meaning ascribed to it in Section 5.8(k)(i).

"Tax Return" shall mean any return, report or similar statement required to be filed with respect to any Tax (including any attached schedules), including any information return, claim for refund, amended return or declaration of estimated Tax.

"Third Party" shall have the meaning ascribed to it in Section 8.1(g)(i).

"Third Party Claim" shall have the meaning ascribed to it in Section 8.1(e).

"Transactions" shall mean the actions set forth in Sections 2.1 and 2.2.

"Transaction Agreements" shall mean this Agreement, the Transition Agreement attached hereto as Exhibit 4, the Assignment and Assumption Agreement attached hereto as Exhibit 2, the License Agreements attached hereto as Exhibits 3A, 3B and 3C and the Registration Rights Agreements attached hereto as Exhibits 5 and 6, the Asset Purchase Agreement attached hereto as Exhibit 7 and the other agreements and certificates contemplated to be delivered hereby and thereby.

"Transition Agreement" shall mean the Transition Agreement, the form of which is attached hereto as Exhibit 4.

"Transferred Employee" shall have the meaning ascribed to it in Section 5.7(a).

"Two-Month Cash Amount" shall have the meaning ascribed to it in Section 2.4(c)(i).

"U.S. Bison Subsidiary" shall mean a Bison Subsidiary organized under the laws of a state of the United States of America.

"WARN Act" shall have the meaning ascribed to it in Section 3.10(b).

"Working Capital" shall mean (a) the sum of net accounts receivable, inventory and other current assets, excluding cash and cash equivalents and income Tax assets, minus (b) the sum of net accounts payable and other current liabilities, excluding the current portion of Balance Sheet Indebtedness of the Bison Subsidiaries, accrued interest and any liability for income Taxes. Working Capital shall be computed without regard to any changes in GAAP since December 30, 2000 using the same accounting principles used in computing the working capital set forth in Section 2.4(c) of the Disclosure Schedule.

ARTICLE II

PURCHASE AND SALE OF SHARES

2.1 Purchase and Sale of Shares.

(a) Subject to the terms and conditions of this Agreement, at the Closing, Parent shall sell, transfer, convey, assign and deliver, or shall cause its applicable Subsidiaries to sell, transfer, convey, assign and deliver, to the entities specified on Schedule F hereto, and said entities shall purchase, acquire and accept or cause its wholly owned Subsidiaries to purchase, acquire and accept, from Parent or its applicable Subsidiaries, all of the issued and outstanding shares of capital stock of the Directly Purchased Subsidiaries (excluding directors' qualifying shares) (the "Shares"), free and clear of all Liens (without regard to subsections (i) through (iv) of the provision in the definition of "Liens") for an amount of cash equal to nine hundred forty-three million dollars ($943,000,000) minus the amount of Balance Sheet Indebtedness of the Bison Subsidiaries existing on the Closing Date.

(b) Subject to the terms and conditions of this Agreement, at the Closing, Parent shall cause its applicable Subsidiary to contribute all of the issued and outstanding shares of capital stock of Textron Automotive Exteriors Inc., a Delaware corporation and a wholly owned indirect Subsidiary of Parent, free and clear of all Liens (without regard to subsections (i) through (iv) of the provision in the definition of Liens) to C&A Products in exchange for (i) 130,000 shares of Series A1 Redeemable Preferred Stock, liquidation preference $1,000 per share, of C&A Products (the "Series A Preferred Stock"), (ii) 95,000 shares of Series B1 Redeemable Preferred Stock, liquidation preference $1,000 per

12

share, of C&A Products (the "Series B Preferred Stock"), (iii) 20,000 shares of Series C1 Redeemable Preferred Stock, liquidation preference $1,000 per share, of C&A Products (the "Series C Preferred Stock"), (iv) eighteen million (18,000,000) shares of common stock, par value $.01 per share, of Holdings (the "Holdings Common Stock"), and (v) cash equal to forty-two million dollars ($42,000,000). The relative rights, preferences and limitations of the Series A Preferred Stock, Series B Preferred Stock and Series C Preferred Stock (collectively, the "Preferred Stock") will be as set forth in the Certificate of Designation of C&A Products attached hereto as Exhibit 1 (the "Certificate of Designation"). Parent, Holdings and C&A Products hereby agree that the fair market value of the Preferred Stock is equal to six hundred fifty dollars ($650) per share.

2.2 Purchase and Sale of Assets.

(a) Parent shall cause one of its Subsidiaries to sell, transfer, convey, assign and deliver to the entity specified on Schedule F all Intellectual Property identified in Section C-2 of the Disclosure Schedule which is, as of the date hereof, owned and in the name of Textron Automotive Company Inc., a Delaware corporation, for a purchase price of fifteen million dollars ($15,000,000) payable in cash. (A list of the Intellectual Property being sold pursuant to this section together with appropriate documents of transfer will be provided to C&A Products or its designated Subsidiary at the Closing.)

(b) On the day prior to the Closing Date, certain assets currently owned by Textron Automotive Exteriors Inc. shall be sold to JPS Automotive, Inc., a Subsidiary of C&A Products, pursuant to an Asset Purchase Agreement substantially in the form attached hereto as Exhibit 7. The parties agree that the fair market value of the assets sold pursuant to said agreement is one hundred twenty-five million dollars ($125,000,000).

2.3 Restructuring. Prior to the Closing Date, Parent shall take such actions as may be necessary or appropriate to (a) cause the Subsidiaries of the Directly Purchased Subsidiaries to be those listed on Schedule B hereto and (b) effect the transfers of the Subsidiaries, assets, liabilities, businesses and employees listed on Schedule C hereto (such actions are collectively referred to as the "Restructuring"). The Directly Purchased Subsidiaries together with their Subsidiaries listed on Schedule B and Textron Automotive Exteriors Inc. are collectively referred to herein as the "Bison Subsidiaries."

2.4 Purchase Price Adjustment.

(a) As soon as practicable, but in any event not more than 60 days after the Closing Date, unless otherwise extended by the mutual agreement of Parent and Holdings, Parent shall deliver to Holdings a statement of net assets to be sold as of the Closing Date, including information necessary to determine the Working Capital and Closing Cash at such date (but without giving effect to the Closing or the transactions covered by the Asset Purchase Agreement specified in Section 2.2(b)) (the "Closing Financial Statement"), together with a report of E&Y thereon to the effect that such statement fairly presents in all material respects the financial position of the Bison Subsidiaries as of said date, and that such statement has been prepared in accordance with

13

GAAP applied on a basis consistent with the December 30, 2000 Statement of Net Assets to be Sold (including the elimination of the corporate overhead items identified in Part B of Section 3.4 of the Disclosure Schedule but except that M&C Advanced Processes is included in the Closing Financial Statements), except

(i) for any accounting changes mandated by accounting regulators and (ii) as set forth in Part A of Section 3.4 of the Disclosure Schedule. All costs and expenses incurred by Parent in connection with the preparation and delivery of the Closing Financial Statement shall be borne equally by Parent and Holdings.

(b) Subject to Section 2.4(e), if Working Capital on the Closing Date is less than negative thirty two million dollars ($-32,000,000), the difference between Working Capital and negative $32,000,000 shall be paid by Parent to C&A Products. Subject to Section 2.4(e), if Working Capital on the Closing Date is more than negative thirty two million dollars ($-32,000,000), the difference between Working Capital and negative $32,000,000 shall be paid by C&A Products to Parent.

(c) (i) Subject to Section 2.4(e), if the Closing Cash on the Closing Date is greater than zero, the difference between zero and the Closing Cash shall be paid by C&A Products to Parent. Subject to
Section 2.4(e), if the Closing Cash on the Closing Date is less than zero, the difference between zero and the Closing Cash shall be paid by Parent to C&A Products. If the Closing Cash on the Closing Date of any Bison Subsidiary incorporated in a jurisdiction other than a state of the United States of America is greater than the sum of payments to employees and suppliers during the last two fiscal months ended prior to the Closing Date (the "Two-Month Cash Amount"), then the amount payable to Parent pursuant to the first sentence of Section 2.4(c) shall be reduced by the amount of the Closing Cash on the Closing Date of the applicable Subsidiary which is in excess of the Two-Month Cash Amount multiplied by the withholding Tax rate applicable to dividends paid by the applicable Bison Subsidiary; provided that during such two-month period payments to employees and suppliers shall be made consistent with past practice.

(ii) Subject to Section 2.4(e), if the Closing has not occurred prior to the Capital Expenditure Date, C&A Products will pay Parent any amount by which capital expenditures for assets not recorded on the financial statements prior to the Capital Expenditure Date during the period beginning on the Capital Expenditure Date and ending on the Closing Date exceed depreciation attributable to the Business during that period. No later than the delivery of the Closing Financial Statement, Parent shall deliver a certificate of its Chief Financial Officer certifying to the amount payable, if any, pursuant to this section. The term "Capital Expenditure Date" shall mean October 1, 2001; provided, however, that if the financial statements required to be delivered to C&A Products pursuant to Section 5.9(a), are not delivered by August 31, 2001, the Capital Expenditure Date shall be extended by the number of days by which the deadline is not met.

14

(d) Subject to Section 2.4(e), payments required pursuant to Section 2.4 shall be made within 60 days after the date of receipt by Holdings of the Closing Financial Statement by wire transfer of immediately available funds to one or more accounts specified at least two business days prior to such date by the party who shall receive the funds. Any such payment shall be made together with interest thereon at the Interest Rate, payable for the period commencing on the Closing Date and ending on the day immediately prior to the date such payment is made.

(e) Holdings may dispute any amounts used in the calculation of the purchase price adjustment pursuant to Sections 2.4(b) or 2.4(c)(i) as reflected on the Closing Financial Statement or the purchase price adjustment pursuant to
Section 2.4(c)(ii) that involves a proposed adjustment with respect to any single item of more than $50,000 but only to the extent that proposed adjustments exceeding $50,000 exceed, in the aggregate, $500,000; provided, however, that Holdings shall notify Parent in writing (the "Dispute Notice") of each disputed item, specifying the amount thereof in dispute and setting forth, in reasonable detail, the basis for such dispute, within 45 days of Holdings' receipt of the Closing Financial Statement; provided further, however, that if an account or item is recorded or treated in a manner consistent with past practice and, if applicable, with the December 30, 2000 Statement of Net Assets to be Sold, then, provided that such recording or treatment does not prevent the Closing Financial Statement from being in accordance with GAAP, it must be accepted as correct by Holdings for purposes of this Section 2.4. Holdings shall submit only one Dispute Notice containing all disputed items. In the event of such a dispute, Holdings and Parent shall attempt to reconcile their difference, and any resolution by them as to any disputed amounts shall be final, binding and conclusive. If Holdings and Parent are unable to reach a resolution with such effect within 30 days of the receipt by Parent of the Dispute Notice, Holdings and Parent shall submit the items remaining in dispute for resolution to the Independent Accounting Firm which shall, within 30 days after submission, determine and report to the parties upon such remaining disputed items, and such report shall be final, binding and conclusive on the parties hereto. All costs and expenses of the Independent Accounting Firm relating to the disputed items shall be allocated between Parent and Holdings in the same proportion that the aggregate dollar amount of the items unsuccessfully disputed by each party bears to the total dollar amount of the items disputed under such notice. The term "Independent Accounting Firm" shall mean Deloitte & Touche LLP or such other firm as Holdings and Parent shall agree.

(f) Notwithstanding any dispute pursuant to Section 2.4(e) of any amounts payable pursuant to this Section 2.4, the applicable party shall at the time specified in Section 2.4 pay that portion of the amounts payable by it pursuant to this Section 2.4 that are not subject at the time of such payment to any dispute. Any amount payable following resolution of a matter specified in a Dispute Notice shall be paid within five (5) business days following the resolution thereof.

(g) During the periods in which (i) the Closing Financial Statement is being prepared or (ii) any dispute is raised as contemplated by Section 2.4(e), Parent and Holdings shall provide each other, including their Representatives, with

15

reasonable access, during normal business hours and without disruption to their day-to-day business, to their respective books, records and facilities pertaining to the Bison Subsidiaries and the Transactions to the extent affecting the Bison Subsidiaries, including any consolidated or combined returns, schedules, consolidated or combined work papers and other related documents; provided, however, that with respect to consolidated, combined, unitary or similar Tax Returns which include Parent (or any Subsidiary of Parent, other than a Bison Subsidiary (a "Non-Bison Subsidiary")) on the one hand and any of the Bison Subsidiaries on the other hand, Holdings shall only have access to portions of such Tax Returns relevant to the Bison Subsidiaries.

2.5 Allocation of Consideration; Tax Filings.

(a) The consideration attributable to the purchase of the Directly Purchased Subsidiaries shall be allocated among the Shares as set forth in Schedule D hereto. Within 30 days after the determination of the adjustments pursuant to Section 2.4, Parent shall deliver to Holdings a schedule (the "Adjustment Schedule") allocating said adjustments among the Shares, and also accounting for any difference between the Balance Sheet Indebtedness of the Bison Subsidiaries existing on the Closing Date and $80,000,000, in a manner consistent with the allocation methodology used in determining the allocation set forth in Schedule D.

(b) Holdings may dispute any allocation set forth on the Adjustment Schedule; provided, however, that (i) Holdings shall not dispute any of the original allocations set forth in Schedule D and (ii) Holdings shall notify Parent in writing (the "Allocation Dispute Notice") of each disputed item, specifying the allocation in dispute and setting forth, in reasonable detail, the basis for such dispute within 30 days of Holdings' receipt of the schedule. Holdings shall submit only one Allocation Dispute Notice containing all disputed allocations. In the event of such a dispute, Holdings and Parent shall attempt to reconcile their differences and any resolution by them as to any disputed allocations shall be final, binding and conclusive. If Holdings and Parent are unable to reach a resolution with such effect within 30 days of the receipt by Parent of the Allocation Dispute Notice, Holdings and Parent shall submit the items remaining in dispute for resolution to the Independent Accounting Firm which shall, within 30 days after submission, determine and report to the parties upon such remaining disputed allocations, and such report shall be final, binding and conclusive on the parties hereto. All costs and expenses of the Independent Accounting Firm relating to the disputed allocations shall be borne equally by Parent and Holdings; provided, however, that if the Independent Accounting Firm determines that the position asserted by one of the parties in such dispute is substantially in error, then all such costs and expenses shall be borne by the party so determined to be in error.

(c) Upon agreement of the parties with respect to the Adjustment Schedule, or the completion of a report prepared by the Independent Accounting Firm pursuant to Section 2.5(b), a schedule (the "Final Allocation Schedule") setting forth the allocation among the Shares as specified in Section 2.5(a) and modified pursuant to Section 2.5(b) shall be prepared by the parties. Each of Holdings and Parent shall (i) timely file with each relevant Tax Authority all forms and Tax Returns required to be filed

16

in connection with the allocation set forth in the Final Allocation Schedule, (ii) be bound by such allocation for purposes of determining Taxes, (iii) prepare and file, and cause their respective Affiliates to prepare and file, their Tax Returns on a basis consistent with such allocation, and (iv) not take any position, or cause their respective Affiliates to take any position, inconsistent with such allocation on any Tax Return, in any audit or proceeding before any Tax Authority or in any report made for Tax purposes; provided, however, that, notwithstanding anything in this Section 2.5 to the contrary, (i) the parties shall be permitted to take a position inconsistent with that set forth in this Section 2.5 if required to do so by a final and unappealable decision, judgment, decree or other order by any court of competent jurisdiction, and (ii) with respect to any of the transactions contemplated by this Agreement, Parent, Holdings or C&A Products may pursue a pre-filing agreement in accordance with Revenue Procedure 2001-22 (or any successor pronouncement), and upon the request of the party pursuing a pre-filing agreement the other parties shall (and shall cause their respective Affiliates to) provide their reasonable cooperation and assistance in obtaining any such pre-filing agreement.

(d) (i) Parent, Holdings and C&A Products hereby agree to treat the transactions pursuant to Section 2.1(a) for Tax purposes as taxable sales of the Shares in exchange for the consideration set forth in Section 2.1(a) subject to the recognition of gains or losses, as the case may be, pursuant to Section 1001(c) of the Code.

(ii) Parent, Holdings and C&A Products hereby agree to treat the transaction pursuant to Section 2.1(b) for Tax purposes as a transaction described in Section 351 of the Code.

(iii) Parent, Holdings and C&A Products hereby agree to treat the transaction pursuant to Section 2.2(a) for Tax purposes as a taxable sale of the Intellectual Property in exchange for the consideration set forth in Section 2.2(a) subject to the recognition of gain or loss, as the case may be, pursuant to Section 1001(c) of the Code.

(iv) Parent, Holdings and C&A Products hereby agree to treat the transaction pursuant to Section 2.2(b) for Tax purposes as a taxable sale of the assets described in the Asset Purchase Agreement in exchange for the consideration set forth in the Asset Purchase Agreement subject to the recognition of gain or loss, as the case may be, pursuant to Section 1001(c) of the Code.

2.6 Closing. Parent shall as promptly as possible notify Holdings, and Holdings shall as promptly as possible notify Parent, when the conditions set forth in Article VI to such party's obligations to complete the Transactions have been satisfied or waived. The closing of the Transactions (the "Closing") shall take place at the offices of Skadden, Arps, Slate, Meagher & Flom LLP, Four Times Square, New York, New York at 10:00 a.m. New York time on the second business day following the satisfaction or waiver of the conditions set forth in Article VI, or at such other time, date and place as Parent and Holdings may agree; provided, however, that the Closing Date shall not be earlier than 45 days after the delivery of the financial statements required by Sections 5.9(a)(i) and (ii),

17

and provided further that, with respect to the purchase and sale of the issued and outstanding shares of capital stock of any Directly Purchased Subsidiary which is organized in a foreign jurisdiction, at the request of Parent, Holdings shall agree to have the closing with respect to the purchase and sale of such shares of capital stock take place in the jurisdiction in which the Directly Purchased Subsidiary is organized. The date on which the Closing occurs is referred to herein as the "Closing Date."

2.7 Closing Obligations.

(a) At the Closing, Parent shall deliver to Holdings or C&A Products:

(i) certificates representing the Shares and all of the issued and outstanding shares of capital stock of Textron Automotive Exteriors Inc. duly endorsed (or accompanied by duly executed stock powers) for transfer to C&A Products or a designated Subsidiary or Subsidiaries of C&A Products;

(ii) the Officer's Certificate described in Section 6.2(c);

(iii) the resignation of any officer or director of any Bison Subsidiary who is an employee or director of Parent or a Non-Bison Subsidiary;

(iv) a certificate under Section 1445(b)(2) of the Code providing that Parent is not a foreign person, in form and substance reasonably satisfactory to Holdings;

(v) a duly executed Assignment and Assumption Agreement and Transition Agreement substantially in the forms attached hereto as Exhibits 2 and 4 respectively;

(vi) duly executed License Agreements substantially in the forms attached hereto as Exhibits 3A, 3B and 3C;

(vii) duly executed Registration Rights Agreements substantially in the forms attached hereto as Exhibits 5 and 6; and

(viii) duly executed documents to effect the sale and transfer of Intellectual Property required by Section 2.2(a).

(b) At the Closing, Holdings and C&A Products shall deliver to Parent or a designated Subsidiary of Parent:

18

(i) one or more certificates representing the number of shares of Holdings Common Stock specified in Section 2.1(b);

(ii) certificates representing the Preferred Stock;

(iii) the Officer's Certificate described in Section 6.3(c);

(iv) a duly executed Assignment and Assumption Agreement and Transition Agreement substantially in the forms attached hereto as Exhibits 2 and 4 respectively;

(v) duly executed License Agreements substantially in the forms attached hereto as Exhibits 3A, 3B and 3C;

(vi) duly executed Registration Rights Agreements substantially in the forms attached hereto as Exhibits 5 and 6; and

(vii) the cash amounts set forth in Sections 2.1 and 2.2 by wire transfer of immediately available funds to accounts designated by Parent in writing at least two business days prior to the Closing Date.

### ARTICLE III

#### REPRESENTATIONS AND WARRANTIES
#### OF PARENT

Parent represents and warrants to Holdings and C&A Products, subject to the exceptions set forth in the Disclosure Schedule (which exceptions shall specifically identify a Section to which such exception relates, it being understood and agreed that each such exception shall be deemed to be disclosed both under such Section and any other Section to which such disclosure on its face relates), that:

3.1 Corporate Organization, Qualification, Power and Authority.

(a) Parent and each of the Bison Subsidiaries is a corporation duly organized, validly existing and in good standing (where applicable) under the Laws of its jurisdiction of incorporation. Each of the Bison Subsidiaries is qualified and in good standing (where applicable) as a foreign corporation in each jurisdiction where the properties owned, leased or operated, or the business conducted, by it requires such qualification, except where any failure to be so qualified or be in good standing would not, individually or in the aggregate, be reasonably likely to

19

have a Material Adverse Effect. Each of the Bison Subsidiaries has all requisite corporate power and corporate authority and all necessary Permits to own, lease and operate its properties and to carry on its business as it is now being conducted, except where any failure to have such power and authority or Permits would not, individually or in the aggregate, be reasonably likely to have a Material Adverse Effect. Parent has or will have made available to Holdings prior to the Closing complete and correct copies of the articles of organization or articles of or certificates of incorporation, as the case may be, and by-laws or other equivalent organizational documents of it and each Bison Subsidiary as in effect as of the date hereof.

(b) Parent and its Subsidiaries have the requisite corporate power and corporate authority to execute and deliver the Transaction Agreements (to the extent each is a party thereto) and to consummate the transactions contemplated thereby. The Transaction Agreements and the consummation by Parent and said Subsidiaries of the transactions contemplated thereby have been duly and validly authorized by the Boards of Directors of Parent and Textron Automotive Company Inc., and the general partner of Textron Innovations L.P. (to the extent each is a party thereto), and no other corporate proceeding on the part of Parent or its Subsidiaries is necessary to authorize the Transaction Agreements or to consummate the transactions contemplated thereby. This Agreement has been duly and validly executed and delivered by Parent and, assuming this Agreement constitutes the valid and binding agreement of Holdings and C&A Products, constitutes the valid and binding agreement of Parent, enforceable against Parent in accordance with its terms, except as such enforcement may be limited by (a) applicable bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium or other similar Laws now or hereinafter in effect relating to or affecting creditors' rights generally and (b) general principles of equity (regardless of whether enforceability is considered in a proceeding in equity or at law). When executed and delivered by Parent and its Subsidiaries to Holdings and C&A Products at the Closing, the Transaction Agreements (other than this Agreement) will be duly and validly executed and delivered by Parent and its Subsidiaries (to the extent each is a party thereto) and, assuming such agreements constitute the valid and binding agreements of the other parties thereto, constitute the valid and binding agreements of Parent and its Subsidiaries (to the extent each is a party thereto), enforceable against Parent and said Subsidiaries, in accordance with their terms, except as such enforcement may be limited by (a) applicable bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium or other similar Laws now or hereinafter in effect relating to or affecting creditors' rights generally and (b) general principles of equity (regardless of whether enforceability is considered in a proceeding in equity or at law).

3.2 Stock of Subsidiaries.

(a) Schedule B to this Agreement identifies each entity that will be a Subsidiary of the Directly Purchased Subsidiaries on the Closing Date. As of the Closing Date, the Directly Purchased Subsidiaries will not own, directly or indirectly, any equity interests in any other Person.

(b) All of the shares of capital stock of the Directly Purchased Subsidiaries, except for any directors' qualifying shares, are owned by Parent, or one or more of its Subsidiaries free and clear of all Liens (without regard to subsections (i) through (iv) of the proviso in the definition of "Liens"), and have been duly authorized, validly issued and are fully paid and nonassessable and were not issued in violation of any preemptive or similar rights. Except for any director's qualifying shares and except as

20

otherwise set forth on Schedule B, all of the shares of capital stock of the Subsidiaries listed on Schedule B will, as of the Closing Date, be owned by one or more of the other Bison Subsidiaries as set forth on Schedule B, free and clear of all Liens (without regard to subsections (i) through (iv) of the proviso in the definition of "Liens"), and said shares, together with the outstanding common stock of Textron Automotive Exteriors Inc., have been duly authorized, validly issued and are fully paid and nonassessable and were not issued in violation of any preemptive or similar rights, except for any Liens or where any failure to be duly authorized, validly issued and fully paid or nonassessable would not, individually or in the aggregate, be reasonably likely to have a Material Adverse Effect.

(c) There are no options, warrants, convertible securities or other rights, agreements, arrangements or commitments relating to the capital stock of, or other equity interest in, any Bison Subsidiary obligating Parent or any Bison Subsidiary to issue, sell, transfer, vote or otherwise dispose of or sell any shares of capital stock of, or other equity interest in, any Bison Subsidiary or obligating Parent or any Bison Subsidiary to grant, extend or enter into any such option, warrant, convertible security or other right, agreement, arrangement or commitment. There are no voting trusts, proxies or other voting agreements or understandings to which Parent or any of its Subsidiaries is a party or by which it or they are bound with respect to the shares of capital stock of any of the Bison Subsidiaries.

3.3 Consents and Approvals; No Violations.

(a) Except for (i) the filing of notification and report forms with the United States Federal Trade Commission and the United States Department of Justice under the Hart-Scott-Rodino Antitrust Improvements Act of 1976 (the "HSR Act") and the expiration or termination of any applicable waiting period thereunder, (ii) the filing of the applications and notices, as applicable, listed in Section 3.3(a)(ii) of the Disclosure Schedule with foreign Governmental Authorities under the Foreign Competition Laws, the issuance of consents, authorizations or approvals of such applications by such authorities, if required, and the expiration or termination of any applicable waiting periods thereunder, (iii) compliance with any applicable environmental transfer statutes and (iv) the notices to or consultations with any works council, personnel committee or similar employee council or committee listed in Schedule 3.3(a)(iv) of the Disclosure Schedule, no material applications, notices to, consultations with, Consents of, or filings with, any Government Authority, self-regulatory authority or third party are necessary in connection with the execution and delivery by Parent and its Subsidiaries of the Transaction Agreements (to the extent each is a party thereto) and the consummation by Parent and its Subsidiaries of the transactions contemplated thereby. The notices, notifications, filings, consents, authorizations, approvals, and expirations or terminations of waiting periods referred in clauses 3.3(a)(i) and 3.3(a)(ii) are hereinafter referred to as the "Requisite Regulatory Approvals."

(b) Neither the execution, delivery or performance of the Transaction Agreements by Parent and its Subsidiaries nor the consummation by Parent and its Subsidiaries of the transactions contemplated thereby does or will (i) conflict with

21

or result in any breach of any provisions of the certificate of incorporation or by-laws of Parent or the certificate of incorporation or by-laws or other equivalent organizational documents of any of its Subsidiaries; (ii) conflict with, result in or constitute a Default under, any of the terms, conditions or provisions of (A) any Contract to which Parent is a party or by which it or any of its properties or assets may be bound and (B) any Contract relating to the Business to which any of Parent's Subsidiaries is a party or by which any of them or any of their respective properties or assets may be bound; (iii) conflict with, result in or constitute a Default under, any of the terms, conditions or provisions of any Permit relating to the Business of Parent or any of its Subsidiaries; or (iv) subject to giving the notices, the occurrence of the required consultations, compliance with applicable environmental transfer statutes and obtaining the Requisite Regulatory Approvals referred to in clauses

(i) through (iv) in paragraph (a) above, conflict with or violate any Order or Law applicable to (A) Parent or any of its properties or assets or (B) any of Parent's Subsidiaries engaged in the conduct of the Business or any of their properties or assets to the extent used in the conduct of the Business, except, in the case of clauses (ii), (iii) or (iv) of this paragraph (b) for conflicts or Defaults which would not, individually or in the aggregate, be reasonably likely to have a Material Adverse Effect.

3.4 Financial Statements. Parent has delivered to Holdings the following financial statements for the Bison Subsidiaries (as adjusted to give effect to the Restructuring) (collectively, the "Financial Statements"): a statement of net assets to be sold as at December 30, 2000 and January 1, 2000 and statements of earnings for each of the 12 months then ended. The December 30, 2000 statement of net assets to be sold (the "December 30, 2000 Statement of Net Assets to be Sold") has been audited and was delivered together with a report of E&Y thereon. Except as set forth in the notes to the Financial Statements or Section 3.4 of the Disclosure Schedule, the Financial Statements have been prepared in conformity with GAAP and present fairly in all material respects the financial position of the Bison Subsidiaries (as adjusted to give effect to the Restructuring) and their results of operations for the periods covered therein.

3.5 Absence of Certain Changes or Events. Except as a consequence of, or as expressly contemplated by, this Agreement, since December 30, 2000 through and including the date hereof:

(a) the Business has been conducted in the ordinary course of business consistent with past practice;

(b) the Business has not experienced any events, developments or changes which, individually or in the aggregate, would be reasonably likely to have, or have had, a Material Adverse Effect;

(c) except for the Restructuring and except in the ordinary course of business consistent with past practice, neither Parent nor any of its Subsidiaries has sold, transferred, conveyed, assigned or otherwise disposed of any material assets or properties related to the Business;

22

(d) neither Parent nor any of its Subsidiaries has waived, released or canceled any material claims against third parties or debts owing to it, or any material rights which have any value and which relate to the Business, other than in the ordinary course of business consistent with past practice pursuant to Contracts which are not Material Contracts with Persons that are not Affiliates of Parent;

(e) neither Parent nor any of its Subsidiaries has made any changes in their accounting systems, policies, principles or practices related to the Business;

(f) none of the Bison Subsidiaries has authorized for issuance, issued, sold, delivered or agreed or committed to issue, sell or deliver (whether through the issuance or granting of options, warrants, convertible or exchangeable securities, commitments, subscriptions, rights to purchase or otherwise) any Shares or any of its other securities, or amended any of the terms of any shares of its capital stock or such other securities;

(g) the Bison Subsidiaries have not made any loans, advances or capital contributions to, or investments in, any Person other than a Subsidiary of Parent;

(h) as of Closing, there will be no loans or advances outstanding between Parent and the Non-Bison Subsidiaries on the one hand, and the Bison Subsidiaries on the other hand, and the Bison Subsidiaries will not have any accounts payable to, or investments in, Parent or the Non-Bison Subsidiaries, other than accounts payable in connection with commercial transactions in the ordinary course of business consistent with past practice;

(i) except in the ordinary course of business consistent with past practice and except as set forth in Section 3.9(e) of the Disclosure Schedule, neither Parent nor any of its Subsidiaries has increased in any manner the compensation or fringe benefits of any employee of the Business or entered into any contract, agreement, commitment or arrangement to do any of the foregoing;

(j) except in the ordinary course of business consistent with past practice, neither Parent nor any of its Subsidiaries has, except in connection with the Restructuring, acquired or leased any assets relating to the Business, or made any material amount of property of the Business, subject to any Lien whatsoever;

(k) as of Closing, no assets or property owned or leased by the Bison Subsidiaries or used in the Business will be subject to any Lien securing Balance Sheet Indebtedness;

(l) there have been no capital expenditures with respect to the Business which, in the aggregate, are in excess of one hundred fifteen million dollars ($115,000,000), except for capital expenditures not exceeding fifty-five million dollars ($55,000,000) in support of sales to Fiat by Textron Automotive Company Italia s.r.l.;

23

(m) neither Parent nor any of its Subsidiaries has made any material Tax election or settled or compromised any material domestic or foreign federal, national, state, provincial, county, municipal or local Tax liability, or waived or extended the statute of limitations in respect of any such Taxes in each case with respect to the Business; and

(n) neither Parent nor any of its Subsidiaries has paid any amount, performed any obligation or agreed to pay any amount or perform any obligation, in settlement or compromise of any suits or claims of liability with respect to the Business or any of the officers, members, managers, employees or agents of the Bison Subsidiaries in excess of $5,000,000.

3.6 No Undisclosed Liabilities. As of the date hereof, except to the extent of the amounts specifically reflected or reserved in the December 30, 2000 Statement of Net Assets to be Sold and except for liabilities and obligations incurred in the ordinary course of business, since December 30, 2000, (a) none of the Bison Subsidiaries has any liabilities or obligations of any nature (whether accrued, absolute, contingent or otherwise) required by GAAP to be recognized or disclosed on a statement of net assets to be sold of the Bison Subsidiaries, as adjusted to give effect to the Restructuring, or in the notes thereto, except for liabilities or obligations which would not, individually or in the aggregate, be reasonably likely to have a Material Adverse Effect and (b) to the knowledge of the persons identified in Section 3.6 of the Disclosure Schedule, none of the Bison Subsidiaries has any liability or obligation of any nature (whether accrued, absolute, contingent or otherwise) except for liabilities or obligations which would not, individually or in the aggregate, be reasonably likely to have a Material Adverse Effect.

3.7 Litigation. As of the date hereof, there are no Litigations pending, or to Parent's knowledge, threatened against Parent or any of its Subsidiaries with respect to the Business, the outcomes of which, individually or in the aggregate, are reasonably likely to have a Material Adverse Effect.

3.8 Taxes.

(a) Tax Returns Filed and Taxes Paid. Each of the Bison Subsidiaries has filed or had filed on its behalf all material Tax Returns that it was required to file or have filed on its behalf on or before the date of this Agreement, and all such Tax Returns were correct and complete in all material respects. Each of the Bison Subsidiaries has paid all material Taxes due or owing. Each of Plascar Participacoes Industriais S.A. ("Plascar") and Textron Automotive Trim Brasil Ltda. ("TATB") has made adequate provision for the payment of all material Taxes not yet due.

(b) Tax Positions. No position has been asserted in writing by any Tax Authority with respect to Taxes of any of the Bison Subsidiaries which, if asserted by such Tax Authority in a Tax period ending after the Closing Date, would be reasonably likely to have a Material Adverse Effect.

24

(c) No Affiliated Group Liability. No liability has been asserted against any of the Bison Subsidiaries with respect to Taxes of any affiliated group within the meaning of Section 1504(a) of the Code of which any of the Bison Subsidiaries has been a member and of which Parent was not the common parent corporation.

(d) No Tax Indemnities. No liability has been asserted against any of the Bison Subsidiaries with respect to Taxes of any other Person pursuant to any Tax allocation or sharing agreement with any such Person, or any agreement to indemnify any such Person with respect to Taxes.

3.9 Employee Benefit Plans and Agreements.

(a) A "Bison Plan" shall mean any (i) "welfare" plan, fund or program (within the meaning of Section 3(1) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA")) and any comparable foreign plan; (ii) "pension" plan, fund or program (within the meaning of Section 3(2) of ERISA) and any comparable foreign plan; (iii) deferred compensation plan or incentive compensation plan; (iv) employment, termination or severance agreement with any officer of a Directly Purchased Subsidiary whose principal office is located in the United States other than officers who are employed by a Non-Bison Subsidiary; (v) stock bonus, stock option, restricted stock, stock appreciation right, stock purchase, bonus, severance or vacation plans; and (vi) any other material employee benefit plans, funds or programs, in each case, that are sponsored or maintained by or contributed to or required to be contributed to by a Bison Subsidiary or by any trade or business, whether or not incorporated (an "ERISA Affiliate"), that together with a Bison Subsidiary would be deemed a "single employer" within the meaning of Section 4001(b) of ERISA or to which a Bison Subsidiary or an ERISA Affiliate is party, for the benefit of any employee or former employee of a Bison Subsidiary (or of Textron Automotive Company Inc. if such person's entire salary was directly charged to the Business), or with respect to which a Bison Subsidiary could incur liability and any comparable foreign plan. Section 3.9 of the Disclosure Schedule lists each material Bison Plan applicable to any Bison Subsidiary having its jurisdiction of organization within the United States and all foreign pension plans. A copy of each material Bison Plan (and, if applicable, related amendments, trust agreements, current summary plan descriptions, most recent Form 5500, most recent Internal Revenue Service determination letter and most recent actuarial report) applicable solely to any Bison Subsidiary having its jurisdiction of organization within the United States has been made available to Holdings, and a copy of each material Bison Plan from which assets will be transferred from Parent to C&A Products pursuant to Section 5.7 will be made available to Holdings prior to Closing.

(b) No liability under Title IV or Section 302 of ERISA has been incurred by any Bison Subsidiary or any ERISA Affiliate that has not been satisfied in full, and, to Parent's knowledge, no condition exists that presents a material risk to a Bison Subsidiary of incurring any such liability, other than liability for premiums due the Pension Benefit Guaranty Corporation (which premiums have been paid when due).

25

(c) Each Bison Plan (other than a Foreign Plan) has been operated and administered in accordance with its terms and with the requirements (including funding requirements) of applicable Law, including ERISA and the Code, except where any failure to be so operated and administered would not, individually or in the aggregate, be reasonably likely to have a Material Adverse Effect. All material contributions required to be made under the terms of any Bison Plan (other than a Foreign Plan) as of the Closing Date have been made or will be timely made on or prior to the Closing Date. With respect to any Bison Plan subject to Section 412 of the Code or Section 302 of ERISA, there has been no application for or waiver of the minimum funding standards imposed by Section 412 of the Code, and no such plan has incurred an "accumulated funding deficiency" within the meaning of Section 412(a) of the Code as of the end of the most recently completed plan year.

(d) Each Bison Plan intended to be "qualified" within the meaning of
Section 401(a) of the Code has received a determination letter from the Internal Revenue Service stating that it is so qualified, and no event has occurred since the date of such determination that would adversely affect such determination or result in the imposition of any material liability, penalty or tax under ERISA or the Code.

(e) The consummation of the Transactions will not (i) entitle any employee of any Bison Subsidiary to severance pay payable by a Bison Subsidiary,
(ii) accelerate the time of payment or vesting or trigger any payment of compensation or benefits under, increase the amount payable or trigger any other material obligation pursuant to, any of the Bison Plans, (iii) result in any material Default under, any of the Bison Plans or (iv) result in or satisfy a condition to the payment of compensation that would, in combination with any other payment, result in an "excess parachute payment" with respect to any Employee within the meaning of Section 280G(b) of the Code.

(f) With respect to any Bison Plan subject to Title IV of ERISA, there is not any amount of "unfunded benefit liabilities" (as defined in Section 4001(a)(18) of ERISA) under such plan, and the Parent is not aware of any facts or circumstances that would materially change the funded status of any such plan.

(g) No Bison Subsidiary or any ERISA Affiliate has liability (including any contingent liability under Section 4204 of ERISA) with respect to any multiemployer plan, within the meaning of Section 3(37) of ERISA.

(h) There are (i) to Parent's knowledge, no investigations pending by any governmental entity (including the Pension Benefit Guaranty Corporation) involving Bison Plans, and (ii) no pending or, to Parent's knowledge, threatened claims (other than routine claims for benefits), suits or proceedings against any Bison Plans, or against any fiduciary of any Bison Plan which would, individually or in the aggregate, be reasonably likely to have a Material Adverse Effect.

(i) None of the Bison Subsidiaries or any employee of the foregoing, nor any trustee or administrator with respect to the Bison Plans, has engaged in

26

a "prohibited transaction" (as such term is defined in Section 4975 of the Code or Section 406 of ERISA) that could result in a tax or penalty under Section 4975 of the Code or Section 502(i) of ERISA which would, individually or in the aggregate, be reasonably likely to have a Material Adverse Effect.

(j) Since January 1, 2000, the Bison Subsidiaries, and any ERISA Affiliates which maintain a "group health plan" within the meaning of Section 5000(b)(1) of the Code have complied in all material respects with the "COBRA" notice and continuation requirements.

(k) Except as would not, individually or in the aggregate, be reasonably likely to have a Material Adverse Effect, each Bison Plan subject to ERISA that is an employee pension benefit plan and is not qualified under
Section 401(a) of the Code is exempt from Part 2, 3 and 4 of Title I of ERISA as an unfunded plan that is maintained primarily for the purpose of providing deferred compensation for a select group of management or highly compensated employees, pursuant to Sections 201(2), 301(a) (3) and 401(a)(1) of ERISA.

(l) Each Foreign Plan has been operated and administered in accordance with its terms and with the requirements of applicable Law, except where any failure to be so operated and administered would not, individually or in the aggregate, be reasonably likely to have a Material Adverse Effect. All material contributions required to be made under the terms of any Foreign Plan as of the Closing Date have been made or will be timely made on or prior to the Closing Date, and no Bison Subsidiary has incurred any unpaid obligation in connection with the termination or withdrawal from any Foreign Plan. With respect to any unfunded retirement plan which is a Foreign Plan for which GAAP or applicable Law requires that reserves be recorded on a statement of financial position, reserves have been recorded on the December 30, 2000 Statement of Net Assets to be Sold in a manner which is consistent with GAAP and applicable Law. With respect to funded retirement plans which are Foreign Plans, the plans have been funded in accordance with applicable Law. Copies of the most recent actuarial valuation reports or FAS 87 reports for Foreign Plans, to the extent that they exist, have been made available to Holdings. There are no actions, suits or claims (other than routine claims for benefits) pending or threatened with respect to any Foreign Plan that would, individually, or in the aggregate, be reasonably likely to result in a Material Adverse Effect. For purposes hereof, the term "Foreign Plan" shall mean any Bison Plan maintained or contributed to primarily for the benefit of any employee or former employee of a Bison Subsidiary employed outside the United States.

(m) Notwithstanding any other provision of this Agreement, Section 3.4 and this Section 3.9 set forth the sole representations and warranties in Article III of this Agreement with respect to the compliance by Parent and any Bison Subsidiary with ERISA, sections of the Code and any other Law applicable to the operation or administration of any Bison Plan.

27

# EXHIBIT A

# PART 2

3.10 Labor Matters.

(a) Since January 1, 1999, except as will not, individually or in the aggregate, be reasonably likely to have a Material Adverse Effect, (i) none of the Bison Subsidiaries has or is now engaged in any unfair labor practice, nor is any complaint against any Bison Subsidiary pending or, to Parent's knowledge, threatened before the National Labor Relations Board; (ii) there is no labor strike, dispute, slowdown or stoppage pending or, to Parent's knowledge, threatened with respect to any employees of any Bison Subsidiary; and (iii) no grievance is pending arising out of any collective bargaining agreement or in accordance with any Bison Subsidiaries' established procedures for handling grievances.

(b) The Bison Subsidiaries are in compliance in all material respects with their obligations pursuant to the Worker Adjustment and Retraining Notification Act of 1988 (the "WARN Act"). Since January 1, 1999 through and including the date hereof, none of the Bison Subsidiaries has effectuated (i) a "mass layoff" (as defined in the WARN Act) in the United States affecting any site of employment or facility or operating unit within any site of employment or facility of any Bison Subsidiary or (ii) a "plant closing" (as defined in the WARN Act) in the United States affecting any Bison Subsidiary site of employment or facility. Since January 1, 1999 through and including the date hereof, no Bison Subsidiary has been affected by any transaction or engaged in lay-offs or employment terminations sufficient in number to trigger the application of any Law similar to the WARN Act.

(c) Section 3.10(c) of the Disclosure Schedule lists each collective bargaining agreement involving a Bison Subsidiary facility located in the United States or Canada.

3.11 Environmental Laws and Regulations. To the knowledge of the individuals identified in Section 3.11 of the Disclosure Schedule and except as would not, individually or in the aggregate, be reasonably likely to have, and have not had, a Material Adverse Effect:

(a) As of the date hereof, each of Parent and its Subsidiaries with respect to the Business is in compliance with all applicable Environmental Laws, including possessing all Permits required for the operation of the Business under applicable Environmental Laws. Notwithstanding any other provision of this Agreement, this Section 3.11(a) sets forth the sole representation and warranty in Article III of this Agreement with respect to the compliance by Parent and its Subsidiaries with any Environmental Law applicable to the Business.

(b) As of the date hereof, there is no pending or threatened Litigation against Parent or any of its Subsidiaries with respect to the Business, and no events have occurred or matters exist that might reasonably be expected to result in Litigation, under or pursuant to any Environmental Law; provided, however, that the

28

representation made in this Section 3.11(b) with respect to pending Litigation and Orders are made without reference to knowledge. As of the date hereof, neither Parent nor any of its Subsidiaries is subject to any Order with respect to the Business in connection with any Environmental Law. This Section 3.11(b) sets forth the sole representation and warranty in Article III of this Agreement with respect to Litigation under or pursuant to any Environmental Law.

3.12 Compliance with Laws. Each of Parent and its Subsidiaries is in compliance with all applicable Laws, Orders and Permits with respect to the Business, except for instances of noncompliance which, individually or in the aggregate, would not be reasonably likely to have, and have not had, a Material Adverse Effect.

3.13 Properties. Except as would not be reasonably likely to have a Material Adverse Effect, Parent or its Subsidiaries, collectively, have good and marketable title, free and clear of all Liens, to all of the real property and personal property used in the conduct of the Business other than (i) Intellectual Property (which is covered in Section 3.15), (ii) assets not used within the Business and (iii) assets which are leased or licensed, with respect to which the Parent or its Subsidiaries, collectively, have valid and enforceable Contracts under which there exists no Default by Parent or its Subsidiaries.

3.14 Material Contracts.

(a) Each Contract applicable to the Business is (i) in full force and effect and is a valid and binding obligation of Parent or its Subsidiaries and (ii) enforceable in accordance with its terms (except that the enforcement thereof may be limited by (A) bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium or other similar Laws now or hereafter in effect relating to creditors' rights generally and (B) general principles of equity, regardless of whether enforceability is considered in a proceeding in equity or at law), except, in each case, as would not be reasonably likely to have a Material Adverse Effect. The execution and delivery by Parent of the Transaction Agreements and the consummation by Parent of the transactions contemplated thereby will not, and no condition exists or event has occurred which would, constitute a Default by Parent or its Subsidiaries of any Contract applicable to the Business, except for such Defaults as would not, individually or in the aggregate, be reasonably likely to have a Material Adverse Effect.

(b) Section 3.14(b) of the Disclosure Schedule lists all Material Contracts involving the licensing of any Intellectual Property, including any Intellectual Property which is the subject of any of the License Agreements attached hereto as Exhibits 3A, 3B and 3C, from any third party and any Material Contract involving the licensing of any such Intellectual Property by Parent or its Subsidiaries to any third party, other than Contracts entered into in the ordinary course of business consistent with past practice. A "Material Contract" shall mean any contract which is material to the Business.

(c) Neither Parent nor any of its Subsidiaries is a party to or bound by any non-competition agreement or similar agreement or obligation which

29

purports to limit in any material respect the manner in which, or the localities in which, all or any material portion of the Business is conducted.

(d) Section 3.14(d) of the Disclosure Schedule identifies each Contract to which a Bison Subsidiary is a party relating to indebtedness for borrowed money or capital leases, in each case, involving an obligation which exceeds $250,000. Copies of any written Contract relating to said indebtedness will be provided to Holdings prior to Closing.

3.15 Intellectual Property.

(a) Except as would not be reasonably likely to have a Material Adverse Effect:

(i) Parent and its Subsidiaries, collectively, own, or are licensed or otherwise possess legally enforceable rights to use the Intellectual Property.

(ii) Neither Parent nor any of its Subsidiaries is, nor will, as a result of the execution and delivery of the Transaction Agreements or the performance by Parent of any of its obligations thereunder, be in breach of any license, sublicense or other agreement relating to the Intellectual Property.

(iii) (A) Each patent, trademark, service mark and copyright owned by either Parent or its Subsidiaries which is used in the Business as currently conducted is subsisting and, to Parent's knowledge, valid and enforceable; (B) neither Parent nor its Subsidiaries, as of the date hereof, is a party to any currently pending Litigation which involves a claim of infringement of any patent, trademark, service mark or copyright or violation of any trade secret or other proprietary right of any third party, or has received written notice of any such threatened claim; (C) to Parent's knowledge, the manufacturing, marketing, licensing or sale of any products of the Business, taken as a whole, in the manner currently manufactured, marketed, sold or licensed by the Business, does not infringe any patent, trademark, service mark, copyright, trade secret or other proprietary right of any third party.

(b) After the Closing Date, the Bison Subsidiaries will have the right to use all Intellectual Property material to the Business (i) which is used in the Business as of the date hereof or (ii) which the Bison Subsidiaries have the right to use in the Business as of the date hereof, in each case to the extent that such Intellectual Property is held by the Bison Subsidiaries from Parent or the Non-Bison Subsidiaries and in each case solely to the extent of the Bison Subsidiaries' rights of use in such Intellectual Property as of the date hereof; provided, however, that the foregoing representation and warranty shall not apply with respect to the Retained IP (at that term is defined in the

30

Retained IP Agreement), the rights to which are exclusively as set forth in the Retained IP Agreement.

3.16 Product Warranties; Recalls.

(a) Since January 1, 1999 through and including the date hereof, there have been no warranty claims with respect to products sold by the Business, except for such warranty claims which would not, individually or in the aggregate, be reasonably likely to have a Material Adverse Effect, nor, as of the date hereof, are there any pending warranty claims with respect to products sold by the Business, except for such warranty claims which would not, individually or in the aggregate, be reasonably likely to have a Material Adverse Effect.

(b) Since January 1, 1999 through and including the date hereof, there have been no product recalls, retrofits, field campaigns or service campaigns by a Governmental Authority with respect to the products manufactured, distributed or sold by the Business; and no such recalls, retrofits, field campaigns or service campaigns are pending or, to Parent's knowledge, threatened by any Governmental Authority.

3.17 Brokers and Finders. Parent has not employed any investment banker, broker, finder, consultant or intermediary in connection with the transactions contemplated by this Agreement which would be entitled to any investment banking, brokerage, finder's, financial advisory or similar fee or commission from any Bison Subsidiary in connection with this Agreement or the transactions contemplated hereby.

3.18 Customers and Suppliers. Since January 1, 2001 through and including the date hereof, none of the top five customers of or top ten suppliers to the Business, measured by dollar volume for the twelve months ended as of December 31, 2000, has (i) notified any senior executive of Textron Automotive Company Inc. that it intends to discontinue its relationship with the Bison Subsidiaries or the Business or (ii) materially changed the terms on which it is prepared to purchase from, trade with or supply the Bison Subsidiaries or the Business.

3.19 Additional Representations and Warranties by Parent.

(a) Parent hereby acknowledges that Holdings intends to offer and issue the Holdings Common Stock and C&A Products intends to offer and issue the Preferred Stock (collectively, the "Equity Consideration") representing a portion of the purchase price relating to parts of the Transactions to Parent in a transaction which is exempt from registration under the Securities Act and applicable state securities laws.

(b) Parent hereby represents and warrants that: (i) it is an "accredited investor" within the meaning of Regulation D under the Securities Act; (ii) it shall acquire the Equity Consideration for its own account and not with a view to or for sale in connection with any "sale", "offer for sale", "offer to sell", "offer" or "distribution" thereof within the meaning of the Securities Act; (iii) it has sufficient knowledge and

31

experience in financial, tax, and business matters to enable it to evaluate the merits and risks of investment in the Equity Consideration; and (iv) it has been provided with access to, and the opportunity to ask questions of, management of Holdings and C&A Products, and to obtain additional information concerning Holdings and C&A Products.

(c) Parent hereby acknowledges that: (i) the Equity Consideration is not, and, subject to the Registration Rights Agreements attached as Exhibits 5 and 6 hereof, will not be, registered under the Securities Act or any state securities laws and cannot be resold without registration thereunder or exemption therefrom; and (ii) the certificates representing the unregistered Equity Consideration to be delivered at the Closing shall bear substantially the following legend:

"The shares represented by this certificate have not been registered under the Securities Act of 1933, as amended, and may not be sold, transferred or otherwise disposed of in the absence of an effective registration statement under such Act or an opinion of counsel satisfactory to the company to the effect that such registration is not required."

3.20 Indebtedness. Section 3.20 of the Disclosure Schedule lists total Indebtedness of the Bison Subsidiaries (after giving effect to the Restructuring and excluding intercompany accounts that will be settled prior to Closing), separated into the categories "a" through "g" contained in the definition of Indebtedness, as of June 29, 2001.

3.21 R&D People. To the best knowledge of the persons identified in Section 3.21 of the Disclosure Schedule, without inquiry, no material amount of people whose activities as of March 31, 2001 related primarily to research and development and product development related to the Business have been, as of the date of this Agreement, transferred to a Non-Bison Subsidiary.

# ARTICLE IV

## REPRESENTATIONS AND WARRANTIES OF HOLDINGS AND C&A PRODUCTS

Holdings and C&A Products jointly and severally represent and warrant to Parent, subject to the exceptions set forth in the Holdings Disclosure Schedule (which exceptions shall specifically identify a Section to which such exception relates, it being understood and agreed that each such exception shall be deemed to be disclosed both under such Section and any other Section to which such disclosure on its face relates), that:

4.1 Corporate Organization, Qualification, Power and Authority.

(a) Holdings is a corporation duly organized, validly existing and in good standing under the Laws of the State of Delaware. Holdings is qualified and in good standing as a foreign corporation in each jurisdiction where the properties owned,

32

leased or operated, or the business conducted, by it requires such qualification, except where any failure to be so qualified or be in good standing would not, individually or in the aggregate, be reasonably likely to have a Holdings Material Adverse Effect. Holdings has all requisite corporate power and corporate authority and all necessary Permits to own, lease and operate its properties and to carry on its business as it is now being conducted, except where any failure to have such power and authority or Permits would not, individually or in the aggregate, be reasonably likely to have a Holdings Material Adverse Effect. Holdings has or will have made available to Parent prior to the Closing complete and correct copies of its certificate of incorporation and by-laws as in effect as of the date hereof.

(b) C&A Products is a corporation duly organized, validly existing and in good standing under the Laws of the State of Delaware. C&A Products is qualified and in good standing as a foreign corporation in each jurisdiction where the properties owned, leased or operated, or the business conducted, by it requires such qualification, except where any failure to be so qualified or be in good standing would not, individually or in the aggregate, be reasonably likely to have a Holdings Material Adverse Effect. C&A Products has all requisite corporate power and corporate authority and all necessary Permits to own, lease and operate its properties and to carry on its business as it is now being conducted, except where any failure to have such power and authority or Permits would not, individually or in the aggregate, be reasonably likely to have a Holdings Material Adverse Effect. C&A Products has or will have made available to Parent prior to the Closing complete and correct copies of its certificate of incorporation and by-laws as in effect as of the date hereof.

(c) Holdings has the requisite corporate power and corporate authority to execute and deliver the Transaction Agreements (to the extent it is party thereto) and to consummate the transactions contemplated thereby. Such Transaction Agreements and the consummation by Holdings of the transactions contemplated thereby have been duly and validly authorized by the Board of Directors of Holdings, and no other corporate proceedings on the part of Holdings are necessary to authorize such Transaction Agreements or to consummate the transactions contemplated thereby, except for such proceedings relating to approval of the definitive Financing Agreements, which such proceedings will be completed prior to Closing. This Agreement has been duly and validly executed and delivered by Holdings and, assuming this Agreement constitutes the valid and binding agreement of Parent, constitutes the valid and binding agreement of Holdings, enforceable against Holdings in accordance with its terms, except as such enforcement may be limited by (a) applicable bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium or other similar Laws now or hereafter in effect relating to or affecting creditors' rights generally and (b) general principles of equity (regardless of whether enforceability is considered in a proceeding in equity or at law). When executed and delivered to Parent at the Closing, the Transaction Agreements (other than this Agreement) (to the extent it is party thereto) will be duly and validly executed and delivered by Holdings and, assuming such agreements constitute the valid and binding agreements of the other parties thereto, constitute the valid and binding agreements of Holdings, enforceable against it in accordance with their terms, except that the

33

enforcement thereof may be limited by (a) applicable bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium or other similar Laws now or hereafter in effect relating to or affecting creditors' rights generally and (b) general principles of equity (regardless of whether enforceability is considered in a proceeding in equity or at law).

(d) C&A Products has the requisite corporate power and corporate authority to execute and deliver the Transaction Agreements (to the extent it is a party thereto) and to consummate the transactions contemplated thereby. Such Transaction Agreements and the consummation by C&A Products of the transactions contemplated thereby have been duly and validly authorized by the Board of Directors of C&A Products, and no other corporate proceedings on the part of C&A Products are necessary to authorize such Transaction Agreements or to consummate the transactions contemplated thereby, except for such proceedings relating to approval of the definitive Financing Agreements, which such proceedings will be completed prior to Closing. This Agreement has been duly and validly executed and delivered by C&A Products and, assuming this Agreement constitutes the valid and binding agreement of Parent, constitutes the valid and binding agreement of C&A Products, enforceable against C&A Products in accordance with its terms, except such enforcement may be limited by (a) applicable bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium or other similar Laws now or hereafter in effect relating to or affecting creditors' rights generally and (b) general principles of equity (regardless of whether enforceability is considered in a proceeding in equity or at law). When executed and delivered to Parent at the Closing, the Transaction Agreements (other than this Agreement) to the extent it is a party thereto will be duly and validly executed and delivered by C&A Products and, assuming such agreements will constitute the valid and binding agreements of the other parties thereto, constitute the valid and binding agreements of C&A Products, enforceable against it in accordance with their terms, except that the enforcement thereof may be limited by (a) applicable bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium or other similar Laws now or hereafter in effect relating to or affecting creditors' rights generally and (b) general principles of equity (regardless of whether enforceability is considered in a proceeding in equity or at law).

4.2 Capitalization of Holdings and C&A Products.

(a) The authorized capital stock of Holdings consists of (i) 300,000,000 shares of Holdings Common Stock of which, as of July 31, 2001, 105,122,130 shares were issued and outstanding, all of which are duly authorized, validly issued, fully paid and nonassessable and were not issued in violation of any preemptive or similar rights and (ii) 16,000,000 shares of preferred stock, par value $.01 per share, none of which are issued and outstanding. Except as reflected in the Holdings SEC Reports (including for pending acquisitions) and for employee, officer and director compensation arrangements in the ordinary course of business, there are no options, warrants, convertible securities or other rights, agreements, arrangements or commitments relating to the capital stock of, or other equity interest in, Holdings obligating Holdings to issue, sell, transfer, vote or otherwise dispose of or sell any shares of capital stock of, or other equity interest in, Holdings or its Subsidiaries or obligating Holdings or any of its Subsidiaries to grant, extend or enter into any such option, warrant, convertible security or other right,

34

agreement, arrangement or commitment that would, in any such case, materially affect the ability of C&A Products to perform its obligations and agreements relating to the Preferred Stock. As of the date hereof, except as reflected in the Holdings SEC Reports (including for pending acquisitions) and for employee, officer and director compensation arrangements in the ordinary course of business, there are no options, warrants, convertible securities or other rights, agreements, arrangements or commitments relating to the capital stock of, or other equity interest in, Holdings obligating Holdings to issue, sell, transfer, vote or otherwise dispose of or sell any shares of capital stock of, or other equity interest in, Holdings or its Subsidiaries or obligating Holdings or any of its Subsidiaries to grant, extend or enter into any such option, warrant, convertible security or other right, agreement, arrangement or commitment. There are no voting trusts, proxies or other voting agreements or understandings to which Holdings is a party or by which it is bound with respect to the shares of capital stock of Holdings.

(b) The authorized capital stock of C&A Products consists of (i) 2000 shares of common stock, without par value, of which 1,000 shares are issued and outstanding as of July 31, 2001, all of which are duly authorized, validly issued, fully paid, nonassessable and were not issued in violation of any preemptive or similar rights and are owned by Holdings, and (ii) 1000 shares of preferred stock, without par value, none of which are issued. Prior to the Closing, Holdings and C&A Products will take such actions necessary to cause there to be sufficient capital stock authorized to meet the requirements of the Transaction Agreements and immediately prior to the Closing, 130,000 (plus such number of shares as is necessary to meet C&A Products' obligations to issue additional shares of Series A1 Redeemable Preferred Stock) shares will have been designated as Series A1 Redeemable Preferred Stock, none of which are issued and outstanding, 130,000 (plus such number of shares as is necessary to meet C&A Products' obligations to issue additional shares of Series A2 Redeemable Preferred Stock) shares will have been designated as Series A2 Redeemable Preferred Stock, none of which are issued and outstanding, 95,000 (plus such number of shares as is necessary to meet C&A Products' obligations to issue additional shares of Series B1 Redeemable Preferred Stock) shares will have been designated as Series B1 Redeemable Preferred Stock, none of which are issued and outstanding, 95,000 (plus such number of shares as is necessary to meet C&A Products' obligations to issue additional shares of Series B2 Redeemable Preferred Stock) shares will have been designated as Series B2 Redeemable Preferred Stock, none of which are issued and outstanding, 20,000 (plus such number of shares as is necessary to meet C&A Products' obligations to issue additional shares of Series C1 Redeemable Preferred Stock) shares will have been designated as Series C1 Redeemable Preferred Stock, none of which are issued and outstanding and 20,000 (plus such number of shares as is necessary to meet C&A Products' obligations to issue additional shares of Series C2 Redeemable Preferred Stock) shares of Series C2 Redeemable Preferred Stock, none of which are issued and outstanding. On the Closing Date, the relative rights, preferences, and limitations of the Preferred Stock will be substantially as set forth in the Certificate of Designation of C&A Products attached hereto as Exhibit 1. There are no options, warrants, convertible securities or other rights, agreements, arrangements or commitments relating to the capital stock of, or other equity interest in, C&A Products obligating C&A

35

Products to issue, sell, transfer, vote or otherwise dispose of or sell any shares of capital stock of, or other equity interest in, C&A Products or its Subsidiaries or obligating C&A Products or any of its Subsidiaries to grant, extend or enter into any such option, warrant, convertible security or other right, agreement, arrangement or commitment that would in any such case materially affect the ability of C&A Products to perform its obligations and agreements relating to the Preferred Stock. As of the date hereof, there are no options, warrants, convertible securities or other rights, agreements, arrangements or commitments relating to the capital stock of, or other equity interest in, C&A Products obligating C&A Products to issue, sell, transfer, vote or otherwise dispose of or sell any shares of capital stock of, or other equity interest in, C&A Products or its Subsidiaries or obligating C&A Products or any of its Subsidiaries to grant, extend or enter into any such option, warrant, convertible security or other right, agreement, arrangement or commitment. There are no voting trusts, proxies or other voting agreements or understandings to which C&A Products is a party or by which it is bound with respect to the shares of capital stock of any of its Subsidiaries.

4.3 Stock of Subsidiaries. Schedule E to this Agreement identifies each entity that is a Subsidiary of Holdings as of the date hereof. All of the shares of capital stock of the Subsidiaries listed on Schedule E are owned as of the date hereof by Holdings or one of its Subsidiaries, free and clear of all Liens (without regard to subsections (i) through (iv) of the provision in the definition of "Liens" and other than Liens to secure Indebtedness of Holdings or one of its Subsidiaries), and have been duly authorized, validly issued and are fully paid and nonassessable and were not issued in violation of any preemptive or similar rights, except for any such Liens or where any failure to be duly authorized, validly issued and fully paid or nonassessable would not, individually or in the aggregate, be reasonably likely to have a Holdings Material Adverse Effect.

4.4 Valid Issuance of Stock.

(a) The shares of Holdings Common Stock, when issued, sold and delivered pursuant to this Agreement, will be duly authorized, validly issued, fully paid and nonassessable, will not be subject to any preemptive rights or Liens and, assuming the accuracy of Parent's representations in Section 3.19, will be issued in compliance with applicable federal and state securities laws.

(b) The shares of Series A Preferred Stock and Series B Preferred Stock, when issued, sold and delivered pursuant to this Agreement, will be duly authorized, validly issued, fully paid and nonassessable, will not be subject to any preemptive rights or Liens and, assuming the accuracy of Parent's representations in Section 3.19, will be issued in compliance with applicable federal and state securities laws.

4.5 Consents and Approvals; No Violations. The issuance of the debt and equity securities contemplated by the Commitment Letter, the execution, delivery or performance of the Transaction Agreements by Holdings and C&A Products (to the extent each is a party thereto), and the consummation by Holdings and C&A Products of the transactions contemplated thereby do not or will not (i) conflict with or result in any breach of any provision of the certificate of incorporation or by-laws of Holdings and C&A

36

Products; (ii) conflict with, result in or constitute a Default under, any of the terms, conditions or provisions of any Contract to which any of C&A Products or Holdings is a party or by which any of them or any of their respective properties or assets may be bound; (iii) conflict with, result in or constitute a Default under, any of the terms, conditions or provisions of any Permit applicable to Holdings or C&A Products; or (iv) except as set forth in Section 4.5 of the Holdings Disclosure Schedule and subject to giving the notices, the occurrence of the required consultations, compliance with applicable environmental transfer statutes and obtaining the Requisite Regulatory Approvals referred to in clauses (i) through (iv) in Section 3.3(a), conflict with or violate any Order or Law applicable to C&A Products or Holdings or any of their respective properties or assets, except, in the case of clauses (ii), (iii) or

(iv) of this Section 4.5 for conflicts or Defaults which would not, individually or in the aggregate, be reasonably likely to have a Holdings Material Adverse Effect or a material adverse effect on Holdings' and C&A Products' ability to consummate the Transactions. The terms of the Preferred Stock as set forth in the Certificate of Designation attached hereto as Exhibit 1 do not breach, conflict with, violate or otherwise constitute a Default under any Contract to which Holdings or C&A Products or any of their Subsidiaries is a party, including any Contract relating to Indebtedness or any Contract relating to any equity security of Holdings and C&A Products.

4.6 SEC Filings; Financial Statements.

(a) Holdings has timely filed all forms, reports, schedules, statements and other documents required to be filed by Holdings with the Securities and Exchange Commission (the "SEC") since December 31, 1998 (collectively, the "Holdings SEC Reports") and such Holdings SEC Reports are publicly available. The Holdings SEC Reports, at the time filed, did not contain as of their respective dates (or if amended or superseded by a filing prior to the date of this Agreement, then on the date of such additional filing), or if filed after the date hereof, will not contain, any untrue statement of a material fact or omit to state a material fact required to be stated in such Holdings SEC Reports or necessary in order to make the statements in such Holdings SEC Reports, in light of the circumstances under which they were made, not misleading.

(b) Each of the consolidated financial statements, including any related notes thereto, contained in the Holdings SEC Reports, complied, as of its respective date, in all material respects with all applicable accounting requirements and the published rules and regulations of the SEC with respect thereto, was prepared in accordance with GAAP applied on a consistent basis with prior periods (except as otherwise noted therein) and fairly present the consolidated financial position of Holdings and its Subsidiaries as at the dates indicated therein and the consolidated results of its operations and cash flows for the periods indicated therein, subject to, in the case of unaudited interim financial statements, normal and recurring year-end adjustments which were not likely to be material in amount.

4.7 Absence of Certain Changes or Events. Except as a consequence of, or as expressly contemplated by, this Agreement and except as disclosed in the Holdings SEC Reports filed and publicly available prior to the date of this Agreement, since

37

December 31, 2000, Holdings and its Subsidiaries have not experienced any event, development or change which would, individually or in the aggregate, be reasonably likely to have a Holdings Material Adverse Effect.

4.8 No Undisclosed Liabilities. Except as disclosed in the Holdings SEC Reports filed and publicly available prior to the date of this Agreement and except for liabilities and obligations incurred in the ordinary course of business, since December 31, 2000, (a) neither Holdings nor any of its Subsidiaries has any liabilities or obligations of any nature (whether accrued, absolute, contingent or otherwise) required by GAAP to be recognized or disclosed in their financial statements, or in the notes thereto, except for liabilities or obligations which would not, individually or in the aggregate, be reasonably likely to have a Holdings Material Adverse Effect and (b) to the knowledge of the persons identified in Section 4.8 of the Holdings Disclosure Schedule, Holdings does not have any liability or obligation of any nature (whether accrued, absolute, contingent or otherwise) except for liabilities or obligations which would not, individually or in the aggregate, be reasonably likely to have a Holdings Material Adverse Effect.

4.9 Litigation. Except as disclosed in the Holdings SEC Reports filed and publicly available prior to the date hereof, there are no Litigations pending, or to Holdings' knowledge, threatened against Holdings or any of its Subsidiaries, the outcomes of which, individually or in the aggregate, are reasonably likely to have a Holdings Material Adverse Effect.

4.10 Financing.

(a) Holdings and C&A Products have received and furnished copies to Parent of (i) a commitment letter to provide debt and receivables financing to C&A Products and its Subsidiaries (including the Summaries of Terms and Conditions annexed thereto, the "Debt Commitment Letter") with The Chase Manhattan Bank, J.P. Morgan Securities Inc., Credit Suisse First Boston, Deutsche Banc Alex. Brown Inc., Bankers Trust Company, Merrill Lynch Capital Corporation and Credit Suisse First Boston, Cayman Islands Branch (collectively the "Bank") dated as of August 7, 2001, and (ii) equity commitment letters (the "Equity Commitment Letters" and, together with the Debt Commitment Letter, the "Commitment Letters") to provide equity financing to Holdings from the persons named therein in the amount contemplated by the Debt Commitment Letter (the "Equity Sources"). The funds which the Bank and the Equity Sources have agreed to provide, subject to the terms and conditions of the Commitment Letters, will be sufficient, when taken together with other funds available to Holdings and C&A Products, to consummate the Transactions and the other transactions contemplated by the Commitment Letters and to pay and all related fees and expenses of Holdings and C&A Products relating to the Transactions and the other transactions contemplated by the Commitment Letters (collectively, the "Required Amount").

(b) As of the date hereof (i) the Commitment Letters have not been withdrawn and are in full force and effect and (ii) neither Holdings nor C&A Products has

38

any reason to believe that any of the conditions set forth in the Commitment Letters will not be satisfied at or prior to the Closing Date.

4.11 Certain Agreements. Section 4.11 of the Holdings Disclosure Schedule lists each Contract to which Holdings or C&A Products is a party relating directly or indirectly to indebtedness for borrowed money in excess of ten million dollars ($10,000,000) or the registration, voting or transfer of, or preemptive rights with respect to, any equity security of Holdings or C&A Products.

4.12 Brokers and Finders. No investment banker, broker, finder, or intermediary or other Person is or will be entitled to any investment banking, brokerage, finder's, financial advisory or similar fee or commission from Parent or any Non-Bison Subsidiary in connection with this Agreement or the transactions contemplated hereby as a result of any arrangement made by Holdings.

ARTICLE V

COVENANTS RELATING TO CONDUCT OF
BUSINESS AND OTHER AGREEMENTS

5.1 Conduct of the Business. Except as otherwise set forth in Section 5.1 of the Disclosure Schedule, during the period from the date of this Agreement to the Closing Date, unless Holdings shall otherwise consent in writing (which shall include electronic mail), which consent shall not be unreasonably withheld, conditioned or delayed, and except as otherwise expressly contemplated by this Agreement, the Transition Agreement or the Assignment and Assumption Agreement, or as is reasonably necessary to effect the Restructuring, Parent will conduct, and will cause its Subsidiaries to conduct, the Business in the ordinary course of business and shall use their commercially reasonable efforts to keep available the services of their current officers and employees, maintain their Permits and Contracts and preserve their relationships with customers, suppliers, creditors, agents and others having business dealings with the Business. Without limiting the generality of the foregoing, and except as consented to in writing by Holdings, which consent shall not be unreasonably withheld, conditioned or delayed, or as otherwise contemplated by this Agreement, the Transition Agreement or the Assignment or Assumption Agreement or as is reasonably necessary to effect the Restructuring, Parent agrees as to itself and its Subsidiaries (unless otherwise stated) that:

(a) Capital Stock and Other Securities. The Bison Subsidiaries shall not issue, sell, grant, dispose of, pledge or otherwise encumber or transfer, or cause, authorize or propose the issuance, sale, grant, disposition or pledge or other encumbrance or transfer of (i) any additional shares of capital stock of any class of any Bison Subsidiary, or any securities or rights convertible into, exchangeable for, or

39

evidencing the right to subscribe for any such shares of capital stock, or any rights, warrants, options, calls, commitments or any other agreements of any character to purchase or acquire any such shares of capital stock or any securities or rights convertible into, exchangeable for, or evidencing the right to subscribe for, any such shares of capital stock or (ii) any other securities in respect of, in lieu of, or in substitution for, shares of any Bison Subsidiary outstanding on the date hereof. No Bison Subsidiary shall split, combine, subdivide or reclassify any shares of its capital stock.

(b) Reorganization. Neither Parent nor any of the Bison Subsidiaries shall adopt a plan of complete or partial liquidation, dissolution, merger, consolidation, restructuring, recapitalization or other reorganization of any Bison Subsidiary.

(c) Capital Expenditures. Except for capital expenditures in 2001 not exceeding fifty-five million dollars ($55,000,000) in support of sales to Fiat by Textron Automotive Company Italia s.r.l., the Bison Subsidiaries will not make or commit to make any capital expenditures relating to a single project in excess of fifteen million dollars ($15,000,000) or in the aggregate, in 2001, in excess of one hundred fifteen million dollars ($115,000,000). Except for capital expenditures in 2001 not exceeding fifty-five million dollars ($55,000,000) in support of sale to Fiat by Textron Automotive Company Italia s.r.l., Parent or a Subsidiary of Parent shall consult with C&A Products with respect to any proposed commitment to make a capital expenditure relating to a single project in excess of five million dollars ($5,000,000).

(d) No Dispositions. Except for sales of inventory in the ordinary course of business consistent with past practice, neither Parent nor any of its Subsidiaries shall sell, lease, license to third parties or otherwise encumber, subject to a Lien or dispose of any material assets of the Business.

(e) No Acquisitions. No Bison Subsidiary shall acquire or agree to acquire (i) by merging or consolidating with, or by purchasing a substantial portion of the assets of, or by any other manner, any business or any corporation, limited liability company, partnership, joint venture, association or other entity or division thereof or, (ii) except in the ordinary course of business consistent with past practice, any assets that, individually or in the aggregate, except as otherwise permitted by Section 5.1(c), have a purchase price exceeding one million dollars ($1,000,000), nor shall Parent or any of its Subsidiaries take any such action relating to the Business set forth in clause (ii).

(f) Governing Documents. No Bison Subsidiary shall adopt any amendment to its articles of organization or articles or certificate of incorporation, as the case may be, or its by-laws or other equivalent organizational documents, or alter through merger, liquidation, reorganization, restructuring or in any other fashion the corporate structure or ownership of any Bison Subsidiary.

(g) Contracts. Except in the ordinary course of business consistent with past practice, neither Parent nor any of its Subsidiaries shall enter into any Material Contract with a term extending beyond the Closing Date, and neither Parent nor any of its Subsidiaries shall modify or amend in any material respect or transfer or terminate any

40

Material Contract to which Parent or any of its Subsidiaries is a party or waive, release or assign any material rights or claims thereunder.

(h) Employee Matters. Except as required by Law or an existing Contract, neither Parent nor any of its Subsidiaries shall (i) except in the ordinary course of business consistent with past practice, increase the compensation or fringe benefits of any employee of the Business, (ii) enter into any Contract with an officer or director of a U.S. Bison Subsidiary regarding his or her employment, compensation or benefits or (iii) except pursuant to collective bargaining, adopt or amend any material Bison Plan to the extent such adoption or amendment would create or increase in any material respect any liability or obligation on the part of any Bison Subsidiary.

(i) Accounting Policies and Procedures. Neither Parent nor any of its Subsidiaries shall make any material change to its accounting methods, principles or practices with respect to the Business, except as may be required by GAAP or accounting standards applicable to foreign Bison Subsidiaries.

(j) Liens. Parent shall not, and shall not permit any of its Subsidiaries to, create, incur, suffer to exist or assume (i) any Lien to secure Balance Sheet Indebtedness of a Bison Subsidiary or (ii) any other Lien on any of the material assets of the Business.

(k) Claims. Neither Parent nor any of its Subsidiaries shall settle any material Litigation relating to the Business or waive, assign or release any material rights or claims with respect to the Business, except in either case
(i) in the ordinary course of business or (ii) if the settlement of any such Litigation would not impose material restrictions on the conduct of the Business.

(l) Taxes. Neither Parent nor any of its Subsidiaries shall make any Tax election or settle or compromise any Tax liability relating to the Business, except in the ordinary course of business; provided, however, that the foregoing restrictions shall not apply to any Tax election or Tax matter involving a Tax Return which includes (i) a Bison Subsidiary as part of any combined, unitary, consolidated or similar group which includes Parent or any Non-Bison Subsidiary and such Tax election or Tax matter would not individually result in additional post-Closing Taxes in excess of seventy five thousand dollars ($75,000) being owed by any Bison Subsidiary or (ii) Textron Canada Limited and such Tax election is solely with respect to, or such Tax matter solely involves adjustments with respect to, one or more of the Subsidiaries or businesses listed in Item 1. of Schedule C hereto.

(m) Investments. Except as permitted by Section 5.1(e), no Bison Subsidiary shall lend any money or make a capital contribution to, or other investment in any Person other than a Bison Subsidiary.

(n) Affiliate Contracts. Except for Contracts and relationships contemplated by the Transition Agreement, no Bison Subsidiary shall enter into any

41

Contract with Parent or any of its Subsidiaries other than (i) Contracts containing commercially reasonable terms for Contracts between unrelated parties or (ii) Contracts which do not contain obligations to receive or deliver products or services after February 1, 2002. Neither Parent nor any of its Subsidiaries shall modify any Contract existing on the date hereof between a Bison Subsidiary and Parent or one of the Non-Bison Subsidiaries in a manner which would involve the addition of terms or conditions which would not be commercially reasonable for Contracts between unrelated parties.

(o) No Agreements. Neither Parent nor any of its Subsidiaries shall authorize or announce an intention to do any of the foregoing, or agree or enter into any Contract to do any of the foregoing.

5.2 Access to Information.

(a) In order to evaluate the transactions contemplated by this Agreement, upon reasonable advance notice, Parent shall (and shall cause each of the Bison Subsidiaries to) provide Holdings and its Subsidiaries and Heartland Industrial Partners, L.P., and their respective agents and representatives ("Representatives"), with reasonable access, during normal business hours and without disruption to their day-to-day business, from the date of this Agreement to the earlier of the Closing Date or termination of this Agreement, to the books and records pertaining to the Bison Subsidiaries and, during such period, it shall (and shall cause each of the Bison Subsidiaries to) furnish promptly to such Representatives all financial, operating and other data and other information concerning its business, properties and personnel as may reasonably be requested. Upon reasonable request and for reasonable periods of time, Parent will make senior executives of Bison Subsidiaries available to provide information to Persons who have executed Commitment Letters and their Representatives for the purpose of providing information responsive to reasonable due diligence inquiries relating to the financing contemplated by the Commitment Letters.

(b) Holdings agrees that it will, and will cause its Representatives to, use any information obtained pursuant to this Section 5.2 only in connection with the evaluation of the transactions contemplated by this Agreement.

(c) The Confidentiality Agreement shall apply with respect to Information, as defined therein, furnished pursuant to this Section 5.2.

5.3 Competition Filings.

(a) Parent and Holdings shall, as promptly as practicable but in any event not more than 10 business days after the date hereof, file, or cause to be filed all required notification and report forms under the HSR Act with the Federal Trade Commission (the "FTC") and the Antitrust Division of the United States Department of Justice (the "Antitrust Division") and will use their respective commercially reasonable efforts to respond as promptly as practicable to all inquiries received from the FTC and the

42

Antitrust Division for additional information or documentation and to cause the waiting periods under the HSR Act to terminate or expire at the earliest possible date.

(b) Parent and Holdings shall, as promptly as practicable but in any event not more than 15 business days after the date hereof, file, or cause to be filed (i) all required forms and letters under the EC Commission Regulation 4064/89 with the European Commission, (ii) all required forms and letters under the Canadian Competition Act with the Canadian Competition Bureau and (iii) all required notices to and applications with Governmental Authorities in connection with the transactions contemplated hereby, and, in each case, will use their respective commercially reasonable efforts to respond as promptly as practicable to all inquiries received from the European Commission, the Canadian Competition Bureau or any other Governmental Authority for additional information or documentation, and to cause the waiting period under the Canadian Competition Act or any Foreign Competition Laws to terminate or expire at the earliest possible date, or consents, approvals or authorizations to be adopted at the earliest possible date under the EC Commission Regulation 4064/89 or any Foreign Competition Laws, as may apply.

(c) Parent and Holdings will each furnish to the other such information and assistance as the other may reasonably request in connection with its preparation of any filings necessary under the provisions of the HSR Act, EC Commission Regulation 4064/89, the Canadian Competition Act and any applicable Foreign Competition Laws.

(d) The parties shall promptly furnish to each other copies of all filings and correspondence relating to the Transactions with any Governmental Authority specified in this Section 5.3.

5.4 Consents and Reasonable Efforts.

(a) Parent, Holdings and C&A Products shall, as promptly as practical, use all commercially reasonable efforts (unless otherwise stated herein) to satisfy the conditions to Closing set forth in Article VI and consummate the transactions contemplated by this Agreement, including obtaining any required Consents. Parent, Holdings and C&A Products shall furnish to each other such information and assistance as the other may reasonably request in connection with required filings, applications and Consents, and they shall keep each other advised of the progress of making all such filings, applications and Consents.

(b) Parent, Holdings and C&A Products shall use all commercially reasonable efforts to terminate the guarantees by Parent or any Non-Bison Subsidiary of obligations of Bison Subsidiaries identified in Section 5.4(b) of the Disclosure Schedule (the "Guarantees") and arrange for C&A Products to assume the obligations of Parent under the Guarantees as soon as possible after the Closing Date. If the obligations under any Guarantee relating to Balance Sheet Indebtedness of a Bison Subsidiary has not been assumed by C&A Products or a Subsidiary of C&A Products as of the date thirty days after

43

the Closing Date, Holdings and C&A Products shall, within sixty days after the Closing Date, pay or cause to be paid all such indebtedness covered by the Guarantee in a manner which will permit Parent to promptly thereafter terminate the Guarantee. If any Guarantee shall be in effect after Closing, Holdings and C&A Products shall pay or cause to be paid all debt covered by the Guarantee as the same shall become due and payable, and shall indemnify and hold Parent and any Non-Bison Subsidiary harmless with respect to any payments made by Parent or any Non-Bison Subsidiary pursuant to any Guarantee, provided, that such payments have been made in good faith.

(c) Parent, Holdings and C&A Products shall use all commercially reasonable efforts to cause the Contracts identified in Section 5.4(c) of the Disclosure Schedule to be assigned to, and assumed by, C&A Products or one or more of its Subsidiaries (including the Bison Subsidiaries), and to cause Parent and the Non-Bison Subsidiaries to be released from any further obligations thereunder, on or before the Closing Date. In the event that Parent or a Non-Bison Subsidiary is required to guarantee, or otherwise remain liable for, the performance by C&A Products or any of its Subsidiaries (including the Bison Subsidiaries) of any such Contract following the assignment to, and assumption by, C&A Products or its Subsidiaries of such Contract, (i) on or before the Closing Date, Parent shall deliver to C&A Products a list of such Contracts and any corresponding guarantee and (ii) C&A Products or a Subsidiary of C&A Products shall indemnify Parent and the Non-Bison Subsidiaries from and against and in respect of any and all Losses incurred by Parent or a Non-Bison Subsidiary to the extent relating to or arising out of any such guarantee.

(d) Prior to the Closing, Parent shall, and shall cause its Subsidiaries and their respective Representatives to, provide reasonably requested support to Holdings and C&A Products in connection with the marketing efforts related to obtaining the financing contemplated by the Debt Commitment Letters. In addition, Parent shall request that E&Y provide a comfort letter of the type customarily required by underwriters in connection with the financing contemplated by the Debt Commitment Letters.

5.5 Further Assurances.

(a) On and after the Closing Date, Parent, Holdings and C&A Products shall use all commercially reasonable efforts to take or cause to be taken all necessary or appropriate actions and do, or cause to be done, all things necessary or appropriate to consummate and make effective the transactions contemplated hereby and by the other Transaction Agreements, including the execution of any additional documents or instruments of any kind (not containing additional representations and warranties) which may be reasonably necessary or appropriate to carry out any of the provisions hereof. Parent, Holdings and C&A Products shall cause the License Agreements attached hereto as Exhibits 3A, 3B and 3C, the Assignment and Assumption Agreement attached hereto as Exhibit 2 and the Registration Rights Agreements attached hereto as Exhibits 5 and 6 to be executed on or prior to Closing.

44

(b) Holdings and C&A Products shall use their respective reasonable best efforts to obtain financing in an amount at least equal to the Required Amount, including by executing definitive agreements for the financing contemplated by the Commitment Letters on or prior to the Closing Date. Holdings and C&A Products shall not engage in any transaction outside of the ordinary course of business that is reasonably likely to jeopardize obtaining funding in an amount at least equal to the Required Amount. The definitive agreements for such financing (along with any other document pursuant to which Holdings, C&A Products or any of their Subsidiaries intend to obtain financing of all or a portion of the Required Amount) are referred to herein collectively as the "Financing Agreements."

(c) Without limiting the generality of the foregoing, in the event that at any time it may be reasonably likely that funds will not be made available under the Commitment Letters or Financing Agreements so as to enable Holdings and C&A Products to proceed with the Transactions in a timely manner, Holdings and C&A Products shall (i) immediately notify Parent, (ii) use their respective reasonable best efforts to obtain alternative funding in an amount at least equal to the amount committed pursuant to the Debt Commitment Letters on terms and conditions comparable to those provided in the applicable Financing Agreements or on terms that are not materially more onerous in the aggregate to Holdings and C&A Products than those in the applicable Debt Commitment Letter and on other reasonable and customary terms and (iii) shall continue to use their respective reasonable best efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary, proper or advisable under applicable Laws and regulations to consummate the Transactions; provided that the foregoing shall not require that Holdings or C&A Products secure equity financing in excess of the amounts contemplated by the Debt Commitment Letter. Holdings and C&A Products shall promptly notify Parent of all communications between Holdings and C&A Products and the parties to the Commitment Letters which are reasonably likely to (A) affect Parent's rights or obligations thereunder or hereunder, (B) impact the terms of the Preferred Stock or (C) delay the Closing. Holdings and C&A Products shall promptly deliver a copy of any such communication to Parent.

(d) Beginning as soon as practical after the date of this Agreement, Parent and C&A Products will work together in good faith to identify and resolve issues relating to the transition from Parent ownership and operation of the Business to C&A Products ownership and operation of the Business.

5.6 Publicity. Parent and Holdings will consult with each other and will mutually agree upon any press release or public announcement pertaining to the Transactions and shall not issue any such press release or public announcement prior to such consultation and agreement, except as may be required by applicable Law or by obligations pursuant to any listing agreement with any national securities exchange, in which case the party proposing to issue such press release or public announcement shall use its reasonable efforts to consult in good faith with the other party before issuing any such press release or public announcement.

45

5.7 Employee Matters.

(a) Employment Status. C&A Products or one of its Subsidiaries shall continue to employ all of the Employees who are actively employed by a Bison Subsidiary on the Closing Date (each such employee being hereafter referred to as a "Transferred Employee"), it being agreed that persons who are on lay-off or leave and who have a right to return to work at a Bison Subsidiary or who are on short-term (not more than six months) medical disability (including pregnancy leave) who do not thereafter become eligible for long-term medical disability, or other authorized leave (such as military, family or other leaves where return to work is subject to statutory requirements) are to be considered Employees who are actively employed but that persons on long-term medical disability or whose short-term medical disability thereafter becomes a long-term medical disability and persons whose employment has terminated or will terminate prior to the Closing Date without any right to return to work are not to be considered Employees who are actively employed; provided, however, that the provisions of this Section 5.7(a) shall not be construed to limit the ability of C&A Products to terminate any such Employee at any time for any reason. For the purposes of this Agreement the terms "layoff", "right to return to work", "short-term disability", "long-term disability" and "pregnancy leave" shall be construed in accordance with the personnel policies of the Bison Subsidiaries and the collective bargaining agreements covering Employees as of the Closing Date, if applicable.

(b) Benefits and Compensation.

(i) C&A Products shall establish, effective as of the Closing Date, employee compensation and benefit plans, programs, policies and arrangements (including fringe benefits and severance pay) that will provide benefits and compensation to the Transferred Employees that are for a period of at least one year after the Closing Date (or such longer period as may be required by applicable Law) substantially comparable in the aggregate to those provided by Bison Subsidiaries to the Transferred Employees immediately prior to the Closing Date. Notwithstanding anything to the contrary contained in this Agreement, C&A Products shall not terminate any Stand-Alone Pension Plan assumed pursuant to Section 5.7(c)(i) or any pension plan into which Parent has caused assets to be transferred pursuant to Section 5.7(c) for a period of at least 12 months after the Closing Date.

(ii) C&A Products shall assume responsibility for providing all Former Employees (including all Former Employees or Employees who are on long-term disability as of the Closing Date) with all medical (including Medicare Part B), dental and life insurance benefits being provided by Parent or any Affiliate of Parent for Former Employees as of the date hereof for a period of at least 12 months.

(iii) Following the Closing Date, with respect to each employee benefit plan in which any Transferred Employee participates, for

46

purposes of determining eligibility to participate, vesting and entitlement to benefits, including severance benefits and vacation entitlement (but not accrual of pension benefits), service with the Bison Subsidiaries (or predecessor employers to the extent the Bison Subsidiaries provided past service credit) shall be treated as service with C&A Products; provided, however, that such service shall not be recognized to the extent that such recognition would result in a duplication of benefits. Such service shall also apply for purposes of satisfying any waiting periods, evidence of insurability requirements or the application of any pre-existing condition limitations. Each such plan shall waive pre-existing condition limitations to the same extent waived under the applicable plan of the Bison Subsidiary. Transferred Employees shall be given credit under the applicable plan of Holdings or any Affiliate thereof for amounts paid under a corresponding benefit plan during the same period for purposes of applying deductibles, co-payments and out-of-pocket maximums as though such amounts had been paid in accordance with the terms and conditions of the successor or replacement plan.

(c) Pension Plans.

(i) As of the Closing Date, C&A Products shall assume the stand-alone pension plans listed in Section 5.7(c)(i) of the Disclosure Schedule (the "Stand-Alone Pension Plans") and all liabilities, and shall receive all assets held, thereunder as of the Closing Date.

(ii) C&A Products shall establish, or shall amend one of its existing pension plans, as of the Closing Date, or as soon as practicable after the Closing Date, to include, a tax-qualified defined benefit plan ("C&A Products' Salaried Pension Plan") for salaried Employees and Former Employees participating in the Textron Master Retirement Plan Addendum A ("Parent's Salaried Pension Benefit"). Subject to the transfer of assets described in
Section 5.7(c)(iv), C&A Products' Salaried Pension Plan shall assume the liabilities as of the Closing Date for the benefits of all Employees and Former Employees participating in Parent's Salaried Pension Benefit.

(iii) C&A Products shall establish, or shall amend one of its existing pension plans as of the Closing Date, or as soon as practicable after the Closing Date, to include a tax-qualified defined benefit plan ("C&A Products' Hourly Pension Plan") for hourly Employees and Former Employees participating in the Textron Master Retirement Plan Addenda B, H, L and O ("Parent's Hourly Master Pension Benefit"). Subject to the transfer of assets described in
Section 5.7(c)(iv), C&A Products' Hourly Pension Plan shall assume the liabilities as of the Closing Date for the benefits of all Employees and Former Employees participating in Parent's Hourly Master Pension Benefit.

47

(iv) On a day which is within 60 days after the later of (i) the date upon which C&A Products delivers to the Parent notice that C&A Products' actuaries, pursuant to Section 5.7(c)(vii) of this Agreement, have reviewed the calculations of Parent's actuaries and are satisfied that such calculations are in accordance with this Agreement, or (ii) the day upon which C&A Products delivers to Parent a favorable Internal Revenue Service determination letter or an opinion, reasonably satisfactory to Parent's counsel, of C&A Products' counsel to the effect that the terms of C&A Products' Salaried Pension Plan and C&A Products' Hourly Pension Plan and their related trusts qualify, as to form, under Section 401(a) and Section 501(a) of the Code, Parent shall cause the trustee under the Parent's Salaried Pension Benefit and Parent's Hourly Master Pension Benefit ("Parent's Trustee") to transfer to the trustee of C&A Products' Salaried Pension Plan and C&A Products' Hourly Pension Plan ("C&A Products' Trustee") cash assets in an amount equal to the amount computed pursuant to the following paragraph, but not less than the amount necessary to satisfy the applicable requirements of Section 414(1) and 401(a)(12) of the Code.

(v) The assets to be transferred from Parent's Trustee to C&A Products' Trustee shall be cash only and shall equal 120% of the projected benefit obligation as of the Closing Date of the Employees and Former Employees under Parent's Salaried Pension Benefit and Parent's Hourly Master Pension Benefit. The calculation of 120% of the projected benefit obligation will be calculated using the actual census information as of the Closing Date and by applying (i) a discount rate calculated pursuant to the methodologies utilized in Parent's December 31, 2000 audit disclosure prepared for purpose of Statement of Financial Accounting Standards Number 87 published by the FASB ("FAS 87") and (ii) other actuarial assumptions, methods and methodologies utilized in Parent's FAS 87 audit disclosure, each as set forth in Section 5.7(c)(vii) of the Disclosure Schedule.

(vi) The amount transferred pursuant to Section 5.7(c)(iv) shall be adjusted for investment earnings or losses of the trust in which Textron Master Retirement Plan assets are held for the period between the Closing Date and the actual date of transfer and reduced by the amount of any benefit payments from such plan to Employees and Former Employees during such period and a proportionate share of administrative expenses for such period if such administrative expenses are properly chargeable (and are actually charged) to the Parent's Salaried Pension Benefit or Parent's Hourly Master Pension Benefit. Parent shall estimate such earnings as of the actual date of transfer and then within 90 days of the actual date of transfer, Parent shall cause Parent's trust to remit to C&A Products' trust or C&A Products shall cause C&A Products' trust to remit to Parent's trust, as appropriate, an amount equal to the difference between the

48

actual rate of earnings for such period and the estimated amount transferred as of the actual date of transfer (such difference to be adjusted for investment earnings at the State Street Bank short-term rate for the period between the actual date of transfer and the date such difference is paid to Parent or C&A Products). Notwithstanding anything in this Section 5.7(c) to the contrary, following the Closing Date and until the date of the respective transfers of assets to trusts under C&A Products' pension plans, Parent shall cause the trusts under the pension plans of Parent or an Affiliate covered by this Section 5.7(c) to continue to provide benefits to plan participants in accordance with the terms of the applicable pension plan to the extent that such benefits have accrued on or before the Closing Date. To the extent that benefits have accrued after the Closing Date, following the transfer of assets pursuant to Section 5.7(c)(iv), C&A Products shall pay such benefits to plan participants (retroactively, if applicable) in accordance with the terms of the applicable pension plan.

(vii) The assets caused to be transferred pursuant to Section 5.7(c) shall be calculated by Parent's actuary, and shall be subject to review by C&A Products' actuary for the purpose of confirming that the calculation was made in accordance with (i) the actuarial assumptions and methods set forth in this Section 5.7(c) and in Section 5.7(c)(vii) of the Disclosure Schedule and (ii) generally accepted actuarial practice. As soon as practicable after the Closing Date, Parent shall provide C&A Products with a detailed summary of the calculations described in this Section 5.7(c) and any back-up data reasonably requested by C&A Products. If C&A Products or C&A Products' actuary does not notify Parent to the contrary within 60 days after the delivery to C&A Products of such detailed summary and data, the calculations of Parent's actuary pursuant to this Section 5.7(c) shall be deemed to be final, conclusive and binding on the parties. If, however, C&A Products notifies Parent in writing within such period that it and its actuaries believe that the calculations were not prepared in accordance with the requirements of this Section 5.7(c) and such notice specifies (i) the precise items of the calculations challenged, (ii) the basis of the challenge and (iii) the amount of the adjustment they propose with respect to each such item, the parties will then attempt to resolve their differences with respect thereto. C&A Products shall only be entitled to dispute any individual item that involves a proposed adjustment of more than $25,000 or items collectively aggregating $100,000 or more. If the parties are unable to resolve their dispute within 30 days after the date C&A Products notifies Parent of the disputed items, the disputed items shall be referred to an international benefits consulting firm (the "Actuary Firm") mutually acceptable to C&A Products and Parent. The Actuary Firm shall be asked to resolve such disputes and report to Parent and C&A Products upon such remaining disputed items within 45 days after such referral. The decision of the Actuary Firm shall be final, conclusive and binding on the

49

parties hereto. The fees and expenses of the Actuary Firm in conducting this assignment shall be borne equally by Parent and C&A Products.

(d) Defined Contribution Plan. As soon as practical after the Closing Date and following delivery by C&A Products to Parent of a favorable Internal Revenue Service determination letter regarding a defined contribution plan of C&A Products ("C&A Products' Savings Plan") or an opinion, reasonably satisfactory to Parent, of C&A Products' counsel to the effect that the terms of the C&A Products' Savings Plan and its related trust qualify, as to form, under
Section 401(a) and Section 501(a) of the Code, Parent shall cause the trustee of the Parent Savings Plan to transfer all of the assets and liabilities thereof attributable to Employees and Former Employees of Bison Subsidiaries to the C&A Products' Savings Plan. Unless otherwise agreed by Parent and C&A Products, the assets to be transferred shall be cash, promissory notes for loans made to Employees and Former Employees of the Bison Subsidiaries under the terms of the Parent Savings Plan, and, if requested by C&A Products, Parent stock held in accounts of the Employees and Former Employees of the Bison Subsidiaries.

(e) Collective Bargaining Agreements. Effective as of the Closing Date, C&A Products or a Subsidiary of C&A Products shall assume the collective bargaining agreements listed in Section 5.7(e) of the Disclosure Schedule. C&A Products acknowledges that at Closing, C&A Products or such Subsidiary of C&A Products will become a successor employer under such collective bargaining agreements and agree to assume all obligations of any Bison Subsidiary under such agreements.

(f) Severance and Other Liability.

(i) Except as otherwise set forth in this Section 5.7(f), C&A Products or a Subsidiary of C&A Products shall assume, discharge, pay and be solely liable for and shall indemnify and hold Parent harmless from and against all Losses relating to any Claim or liability arising out of the employment of the Employees and Former Employees which is payable after the Closing, including Claims or liability under any Bison Plan; provided, however, that C&A Products and its Subsidiaries shall not be liable for any Claim arising from an event occurring prior to Closing to the extent that it is covered by insurance carried by Parent or a Subsidiary of Parent.

(ii) Parent shall retain any and all liability for Losses relating to severance costs incurred by Parent or its Subsidiaries (including the Bison Subsidiaries) on or prior to the Closing that relate to employees of any Subsidiary of Parent, whether or not any such employee is transferred to a Bison Subsidiary on or prior to the Closing Date, except for Losses relating to the termination of employees at the written request of Holdings or C&A Products.

50

(iii) C&A Products shall pay 50%, and Parent shall pay the other 50%, of any Severance Payment payable to persons identified in Section 5.7(f)(A) of the Disclosure Schedule if such amount is payable as a result of such person's termination of his or her employment after the Closing Date and during the term of said agreement for "good reason", as defined in the agreement relating to such person listed in Section 5.7(f)(A) of the Disclosure Schedule; provided, however, that C&A Products and its Subsidiaries shall not be responsible for Severance Payments to such persons in excess of 50% of the amount set forth for each such person in Section 5.7(f)(B) of the Disclosure Schedule, and any remaining amount shall be paid by Parent. Except as set forth in the preceding sentence, C&A Products shall pay 100% of any Severance Payment if such amount is payable as a result of a Qualifying Termination, as defined in the agreement relating to such person listed in Section 5.7(f)(A) of the Disclosure Schedule (each an "Employee Agreement"), which occurs after the Closing Date; provided, that Parent shall reimburse C&A for the cost of any such payment above the amount set forth in Section 5.7(f)(B) of the Disclosure Schedule. "Severance Payment" shall mean the severance benefits payable pursuant to the Employment Agreements.

(iv) C&A Products shall pay the portion of any Retention Payment payable to persons identified in Sections 5.7(f)(A) of the Disclosure Schedule equal to a fraction (the "Fraction") whose numerator is 365 minus the number of days elapsed from and including January 1, 2001, through the Closing Date, and whose denominator is 365, up to a maximum amount for each person equal to the amount set forth in Section 5.7 (f)(B) of the Disclosure Schedule multiplied by the Fraction. Parent shall pay the balance of the Retention Payments. The term "Retention Payment" shall mean the retention awards and any special operating incentive and divestiture incentive awards payable pursuant to the Employment Agreements.

(v) Except for payments by C&A Products described in Sections 5.7(f)(iii) and 5.7(f)(iv), C&A Products shall not be liable for any severance or retention payments payable under any written agreement signed by an Employee and existing prior to Closing, excluding agreements entered into in the ordinary course of business with Employees of a Bison Subsidiary organized under the laws of a jurisdiction other than the United States and excluding collective bargaining agreements (it being understood and agreed that company policies generally applicable to all or a class of employees shall not be deemed to be an agreement for the purposes of this subsection).

(vi) Except as set forth in Section 5.1(h) of the Disclosure Schedule, neither Parent nor its Subsidiaries shall amend, or cause to be amended, any term or provision in any agreement listed in

51

Section 5.7(f)(A) of the Disclosure Schedule without the prior written consent of Holdings.

(vii) Payments which are the responsibility of Parent under Sections 5.7(f)(ii), (iii), (iv) and (v) shall be paid to the person by C&A Products within five days after receipt from Parent of funds equal to the amount of said payments.

(g) Worker's Compensation Claims. C&A Products shall assume liability for all suits, claims, proceedings and actions pending as of or commenced after the Closing Date resulting from actual or alleged harm or injury to Employees or Former Employees regardless of when the incident or accident giving rise to such liability occurred or occurs. Holdings will make all necessary arrangements to assume all worker's compensation claim files, whether open or closed, as of the Closing Date, and will make the necessary arrangements for assuming the continued management of such liabilities.

(h) Foreign Plans. To the extent that Employees and Former Employees are located in a jurisdiction outside of the United States and are covered by defined benefit plans or similar plans which also cover persons employed by Parent, any Non-Bison Subsidiary or their Affiliates, Holdings will cause similar plans to be established for such Employees in accordance with applicable Law, labor agreements and customary practice, and Parent will cause assets to be transferred to the applicable trusts of such successor plans established by C&A Products, it being agreed that the amount of assets to be transferred to such trusts will be the minimum amount required by applicable Law.

5.8 Tax Matters

(a) Tax Returns. Except as provided in Section 9.13,

(i) Parent shall file or cause to be filed when due all Tax Returns that are required to be filed by or with respect to each of the Bison Subsidiaries (other than Permali do Brasil Industria e Comercio Ltda. ("Permali"), Rosario Project S.A. ("Rosario"), Plascar, and TATB, collectively, the "Brazilian Entities") for taxable years or periods ending on or before the Closing Date, and Parent shall remit (or cause to be remitted) any Taxes due in respect of such Tax Returns.

(ii) Parent shall file or cause to be filed when due all Tax Returns that are required to be filed by or with respect to each of the Brazilian Entities that are due on or before the Closing Date, and Parent shall remit (or cause to be remitted) any Taxes due in respect of such Tax Returns.

(iii) Holdings shall file or cause to be filed when due all Tax Returns that are required to be filed by or with respect to each of the

52

Brazilian Entities that are due after the Closing Date with respect to taxable years or periods ending on or before the Closing Date or Straddle Periods, and Holdings shall remit (or cause to be remitted) any Taxes due in respect of such Tax Returns.

(iv) Holdings shall file or cause to be filed when due all Tax Returns that are required to be filed by or with respect to each of the Bison Subsidiaries (other than the Brazilian Entities) for taxable years or periods ending after the Closing Date, and Holdings shall remit (or cause to be remitted) any Taxes due in respect of such Tax Returns.

(v) Any Tax Return required to be filed by Holdings relating to any Straddle Period shall be submitted (with copies of any relevant schedules, work papers and other documentation then available) to Parent for Parent's approval not less than 45 days prior to the due date (including extensions) for the filing of such Tax Return, which approval shall not be unreasonably withheld, conditioned or delayed. Parent shall have the option of providing to Holdings, at any time at least 30 days prior to the due date, written instructions as to how Parent wants any, or all, of the items for which it may be liable reflected on such Tax Return. Holdings shall, in preparing such return, cause the items for which Parent is liable hereunder to be reflected in accordance with Parent's instructions (unless, in the opinion of nationally recognized tax advisor to Holdings, complying with Parent's instructions would likely subject Holdings to any criminal penalty or to one or more civil penalties under Sections 6662 through 6664 of the Code or similar provisions of applicable state, local or foreign laws) and, in the absence of having received such instructions, in accordance with past practice, if any, to the extent permissible under applicable Law.

(vi) Upon the written request of Holdings setting forth in detail the computation of the amount owed, Parent shall pay to Holdings, no later than 2 days prior to the due date for the applicable Tax Return, the Taxes for which Parent is liable pursuant to Section 5.8(b) but which are payable with any Tax Return to be filed by Holdings with respect to any Straddle Period.

(vii) Within 120 days after the Closing Date, Holdings shall cause each of the Bison Subsidiaries to prepare and provide to Parent a package of Tax information materials, including schedules and work papers required by Parent to enable Parent to prepare and file all Tax Returns required to be prepared and filed by it pursuant to Section 5.8(a)(i). Holdings shall prepare such package in good faith in a manner substantially consistent with Parent's past practice.

(viii) Parent may amend any Tax Return filed or required to be filed by or with respect to each of the Bison Subsidiaries

53

(other than the Brazilian Entities) for any taxable years or periods ending on or before the Closing Date; provided, that no such amendment shall be permitted if it would result in any Tax Detriment to any Bison Subsidiary after the Closing.

(b) Computation of Tax Liabilities.

(i) To the extent permitted or required by law or administrative practice, (A) the taxable year of each Bison Subsidiary which includes the Closing Date shall be treated as closing on (and including) the Closing Date and, notwithstanding the foregoing, (B) all transactions not in the ordinary course of business occurring after the Closing Date shall be reported on Holdings' consolidated United States federal income Tax Return to the extent permitted by Treasury Regulation Section 1.1502-76(b)(1)(ii)(B) and shall be similarly reported on other Tax Returns of Holdings or its Affiliates to the extent permitted by applicable Law. For purposes of Sections 5.8, where it is necessary to apportion between Parent and Holdings the Tax liability of an entity for a Straddle Period (which is not treated under the immediately preceding sentence as closing on the Closing Date), such liability shall be apportioned between the period deemed to end at the close of the Closing Date, and the period deemed to begin at the beginning of the day following the Closing Date on the basis of an interim closing of the books, except that Taxes (such as real property Taxes) imposed on a periodic basis shall be allocated on a daily basis.

(ii) In determining Parent's liability for Taxes pursuant to this Agreement, Parent shall be credited with the amount of estimated Taxes paid by or on behalf of any of the Bison Subsidiaries prior to the Closing. To the extent that Parent's liability for Taxes for a taxable year or period is less than the amount of estimated income Taxes previously paid by or on behalf of any of the Bison Subsidiaries with respect to all or a portion of such taxable year or period, Holdings shall pay Parent the difference within two days of filing the Tax Return relating to such income Taxes.

(c) Refunds.

(i) Any Tax refund (including any interest in respect thereof) received by Holdings, C&A Products or any of the Bison Subsidiaries (other than the Brazilian Entities), and any amounts credited against Tax to which Holdings, C&A Products or any of the Bison Subsidiaries (other than the Brazilian Entities) becomes entitled (including by way of any amended Tax Returns or any carryback filing), that relate to any taxable period, or portion thereof, ending on or before the Closing Date shall be for the account of Parent, and Holdings shall pay over to Parent any

54

such refund or the amount of any such credit within 15 days after receipt of such credit or entitlement thereto.

(ii) Any Tax refund (including any interest in respect thereof) received by Permali or Rosario, and any amounts credited against Tax to which Permali or Rosario becomes entitled (including by way of any amended Tax Returns or any carryback filing), that relate to any taxable period, or portion thereof, ending on or before the Closing Date shall be for the account of Parent, and Holdings shall pay over to Parent any such refund or the amount of any such credit within 15 days after receipt of such credit or entitlement thereto.

(iii) The percentage (the "Ownership Percentage"), equal to the lesser of (A) 56.6% or (B) the percentage of issued and outstanding stock of Plascar held by Permali, of any Tax refund (including any interest in respect thereof) received by Plascar or TATB or any amounts credited against Tax to which Plascar or TATB becomes entitled (including by way of any amended Tax Returns or any carryback filing), that relate to any taxable period, or portion thereof, ending on or before the Closing Date shall be for the account of Parent, and Holdings shall pay over to Parent the Ownership Percentage of any such refund or credit within 15 days after receipt of such credit or entitlement thereto.

(iv) Holdings shall pay Parent interest at the rate prescribed under Section 6621(a)(1) of the Code, compounded daily, on any amount not paid when due under this Section 5.8(c). For purposes of this Section 5.8(c), where it is necessary to apportion a refund or credit between Holdings and Parent for a Straddle Period, such refund or credit shall be apportioned between the period deemed to end at the close of the Closing Date and the period deemed to begin at the beginning of the day following the Closing Date on the basis of an interim closing of the books of each of the Bison Subsidiaries, except that refunds or credits of Taxes imposed on a periodic basis (e.g., real property Taxes) shall be allocated on a daily basis.

(v) Holdings shall cooperate, and cause C&A Products and each of the Bison Subsidiaries to cooperate, in obtaining, at Parent's expense, any Tax refund (other than a refund based on a carryback from a taxable year or period beginning after the Closing Date) that Parent reasonably believes is available based on substantial authority, including through filing appropriate forms with the applicable Tax Authority; provided, that if the refund would result in any Tax Detriment to any Bison Subsidiary after the Closing, Parent shall reimburse Holdings the amount of such Tax Detriment.

55

(d) Certain Post-Closing Settlement Payments.

(i) If the examination of any federal, state, local or other Tax Return of Parent for any taxable period ending on or before the Closing Date shall result (by settlement or otherwise) in any adjustment which permits Holdings, C&A Products or any of the Bison Subsidiaries to increase deductions, losses or tax credits or decrease the income, gains or recapture of tax credits which would otherwise (but for such adjustments) have been reported or taken into account (including by way of any increase in basis) by Holdings, C&A Products or any of the Bison Subsidiaries for one or more periods ending within ten years after the Closing Date, Parent shall notify Holdings and provide it with adequate information so that Holdings can reflect on its, C&A Products' or the applicable Bison Subsidiary's Tax Returns such increases in deductions, losses or tax credits or decreases in income, gains or recapture of tax credits. Holdings shall pay to Parent, within 30 days of the realization of any resulting Tax Benefits, the amount of any resulting Tax Benefits.

(ii) If the examination of any federal, state, local or other Tax Return of Holdings, C&A Products or any of the Bison Subsidiaries for any taxable period ending after the Closing Date shall result (by settlement or otherwise) in any adjustment which permits Parent to increase deductions, losses or tax credits or decrease the income, gains or recapture of tax credits which would otherwise (but for such adjustments) have been reported or taken into account (including by way of any increase in basis) by Parent for one or more periods ending on or before the Closing Date, Holdings shall notify Parent and provide it with adequate information so that Parent can reflect on its Tax Returns such increases in deductions, losses or tax credits or decreases in income, gains or recapture of tax credits. Parent shall pay to Holdings, within 30 days of the receipt of such information, the amount of any resulting Tax Benefits.

(e) Post-Closing Actions which Affect Parent's Liability for Taxes.

(i) Holdings shall not take, or cause or permit C&A Products or any of the Bison Subsidiaries (or any of their Affiliates) to take, any action, with respect to the taxable year or period of Holdings, C&A Products, such Bison Subsidiary, or Affiliate, as applicable, which includes the Closing Date, which would be reasonably likely to increase Parent's or any Non-Bison Subsidiaries (or any of their Affiliates) liability for Taxes (including any liability of Parent to indemnify Holdings for Taxes pursuant to this Agreement) including, for example, any action which would be reasonably likely to, result in, or change the character of, any income or gain (including any Subpart F income) that Parent or any Non-Bison Subsidiary (or any of their Affiliates) must report on any Tax Return.

56

(ii) None of Holdings or any Affiliate of Holdings (including C&A Products) shall (or shall cause or permit any of the Bison Subsidiaries to) amend, refile or otherwise modify any Tax Return relating in whole or in part to any of the Bison Subsidiaries with respect to any taxable year or period ending on or before the Closing Date (or with respect to any Straddle Period) without the prior written consent of Parent, which consent may be withheld in the sole discretion of Parent.

(iii) Except to the extent otherwise required by Law, none of Holdings or any Affiliate of Holdings (including C&A Products) shall (or shall cause or permit any of the Bison Subsidiaries to) carryback for federal, state, local or foreign tax purposes to any taxable period, or portion thereof, of any of the Bison Subsidiaries or Parent or any Affiliate of Parent ending before, or which includes, the Closing Date any operating losses, net operating losses, capital losses, tax credits or similar items arising in, resulting from, or generated in connection with a taxable year of Holdings or any Affiliate of Holdings (including C&A Products), or portion thereof, ending on or after the Closing Date.

(f) Assistance and Cooperation. After the Closing Date, each of Parent and Holdings shall, (and shall cause their respective Affiliates to), provide information to the other party regarding any of the Bison Subsidiaries or the Business in connection with (i) the other party preparing any Tax Returns which such other party is responsible for preparing and filing, and (ii) the other party preparing for any audits of, or disputes with any Tax Authority regarding, any Tax Returns of any of the Bison Subsidiaries. In connection therewith, Holdings, C&A Products and Parent shall not dispose of any Tax work papers, books or records relating to any of the Bison Subsidiaries during the six-year period following the Closing Date, and thereafter shall give the other parties reasonable written notice before disposing of such items.

(g) Section 338(g) Elections. Holdings shall ensure that C&A Products does not make any election under Section 338(g) of the Code (or any analogous provision of state, local, or foreign law) with respect to the purchase of the stock of any foreign Bison Subsidiary without the prior written consent of Parent, which consent may be withheld in the sole discretion of Parent. If Parent does so consent, Holdings shall be liable for, and shall pay, any Tax attributable to, or resulting from, the making of such election and will indemnify Parent from and against any Tax liability or other adverse consequences attributable to, or resulting directly or indirectly from, the making of such election. Any indemnification obligation of Holdings pursuant to this Section 5.8(g) shall be increased by the relevant After Tax Amount. For purposes of this Section 5.8(g), "After Tax Amount" means any additional amount necessary to reflect the tax consequences of the receipt or accrual of such reimbursement payment (including the payment of an additional amount or amounts hereunder) determined by using the actual marginal federal, state, foreign or local rates for the relevant taxable period.

57

(h) Stock Options. Holdings and its Affiliates (including C&A Products and the Bison Subsidiaries) shall not claim any Tax deduction arising by reason of any exercise of an employee stock option to acquire Parent stock held by employees of any Bison Subsidiary. If, however, all or any part of a Tax deduction claimed by Parent with respect to the exercise of an option to acquire Parent stock held by employees of any Bison Subsidiary is disallowed to Parent, then, to the extent permitted by law, Holdings, C&A Products or a Bison Subsidiary (or their appropriate Affiliate) shall claim such Tax deduction. If Holdings, C&A Products or a Bison Subsidiary (or any of their Affiliates) receives any Tax Benefit in any taxable period as a result of any Tax deduction claimed by Holdings, C&A Products or a Bison Subsidiary (or any of their Affiliates) pursuant to this Section 5.8(h), Holdings shall promptly pay to Parent the amount of such Tax Benefit.

(i) Indemnification by Parent. Notwithstanding any other provision of this Agreement, Parent shall indemnify Holdings from and against and in respect of any and all Losses incurred by Holdings, which may be imposed on, sustained, incurred or suffered by or assessed against Holdings, directly or indirectly, to the extent relating to or arising out of:

(i) any liability for income Taxes imposed on any of the Bison Subsidiaries (other than the Brazilian Entities) as members of the "affiliated group" (within the meaning of Section 1504(a) of the Code) of which Parent (or any predecessor or successor) is the common parent that arises under Treasury Regulation Section 1.1502-6(a) or comparable provisions of foreign, state or local Law;

(ii) any liability for Taxes (including Taxes resulting from the Restructuring), imposed on any of the Bison Subsidiaries (other than the Brazilian Entities) for any taxable year or period that ends on or before the Closing Date and, with respect to any Straddle Period, the portion of such Straddle Period deemed to end on and include the Closing Date;

(iii) any liability for Taxes (including Taxes resulting from the Restructuring), imposed on Permali or Rosario for any taxable year or period that ends on or before the Closing Date and, with respect to any Straddle Period, the portion of such Straddle Period deemed to end on and include the Closing Date, but only to the extent such Taxes exceed the accrual or reserve for Taxes (excluding any reserve for deferred Taxes established to reflect timing differences between book and Tax income) recorded in the December 30, 2000 Statement of Net Assets to be Sold, as adjusted to take into account the extent to which (A) Parent's indemnification for a liability for Taxes pursuant to any clause of this Section 5.8(i) has previously been reduced or eliminated as a result of the application of such accrual or reserve for Taxes and (B) Holdings' indemnification for a liability for Taxes pursuant to any clause of Section

58

5.8(j) has previously been paid as a result of the application of such accrual or reserve for Taxes, and

(iv) the Ownership Percentage of any liability for Taxes (including Taxes resulting from the Restructuring), imposed on Plascar or TATB for any taxable year or period that ends on or before the Closing Date and, with respect to any Straddle Period, the portion of such Straddle Period deemed to end on and include the Closing Date, but only to the extent such liability exceeds the Ownership Percentage of the accrual or reserve for Taxes (excluding any reserve for deferred Taxes established to reflect timing differences between book and Tax income) recorded in the December 30, 2000 Statement of Net Assets to be Sold, as adjusted to take into account the extent to which (A) Parent's indemnification for a liability for Taxes pursuant to any clause of this Section 5.8(i) has previously been reduced or eliminated as a result of the application of such accrual or reserve for Taxes and (B) Holdings' indemnification for a liability for Taxes pursuant to any clause of Section 5.8(j) has previously been paid as a result of the application of such accrual or reserve for Taxes.

(v) indemnification pursuant to this Section 5.8(i) shall be the sole and exclusive remedy of Holdings and C&A Products against Parent with respect to any and all Losses arising under or related to any liability for Taxes.

(j) Indemnification by Holdings. Notwithstanding any other provision of this Agreement, Holdings shall indemnify Parent from and against and in respect of any and all Losses incurred by Parent, which may be imposed on, sustained, incurred or suffered by or assessed against Parent, directly or indirectly, to the extent relating to or arising out of:

(i) any liability for Taxes imposed on any of the Bison Subsidiaries for any taxable year or period that begins after the Closing Date and, with respect to any Straddle Period, the portion of such Straddle Period beginning the day after the Closing Date;

(ii) any liability for Taxes imposed on Permali or Rosario for any taxable year or period that ends on or before the Closing Date and, with respect to any Straddle Period, the portion of such Straddle Period deemed to end on and include the Closing Date, but only to the extent of the accrual or reserve for Taxes (excluding any reserve for deferred Taxes established to reflect timing differences between book and Tax income) recorded in December 30, 2000 Statement of Net Assets to be Sold, as adjusted to take into account the extent to which (A) Parent's indemnification for a liability for Taxes pursuant to any clause of Section 5.8(i) has previously been reduced or eliminated as a result of the application of such accrual or reserve for Taxes and (B) Holdings'

59

indemnification for a liability for Taxes pursuant to any clause of this Section 5.8(j) has previously been paid as a result of the application of such accrual or reserve for Taxes;

(iii) the Ownership Percentage of any liability for Taxes imposed on Plascar or TATB for any taxable year or period that ends on or before the Closing Date and, with respect to any Straddle Period, the portion of such Straddle Period deemed to end on and include the Closing Date, but only to the extent of the Ownership Percentage of the accrual or reserve for Taxes (excluding any reserve for deferred Taxes established to reflect timing differences between book and Tax income) recorded in December 30, 2000 Statement of Net Assets to be Sold, as adjusted to take into account the extent to which (A) Parent's indemnification for a liability for Taxes pursuant to any clause of Section 5.8(i) has previously been reduced or eliminated as a result of the application of such accrual or reserve for Taxes and (B) Holdings' indemnification for a liability for Taxes pursuant to any clause of this Section 5.8(j) has previously been paid as a result of the application of such accrual or reserve for Taxes;

(iv) any liability, or increase in a liability, for Taxes imposed on Parent or any of its Affiliates as a result of any failure by Holdings to perform or comply with its obligations under Section 5.8(e)(i) of this Agreement;

(v) indemnification pursuant to this Section 5.8(j) shall be the sole and exclusive remedy of Parent against Holdings and C&A Products with respect to any and all Losses arising under or related to any liability for Taxes.

(k) Contests.

(i) Notice. After the Closing Date, Holdings and Parent each shall notify the other party in writing within 15 days of the commencement of any Tax audit or administrative or judicial proceeding affecting the Taxes of any of the Bison Subsidiaries, which, if determined adversely to the taxpayer ("Tax Indemnitee") or after the lapse of time would be grounds for indemnification under this Section 5.8 by the other party ("Tax Indemnitor"). Such notice shall contain factual information describing any asserted Tax liability in reasonable detail and shall include copies of any notice or other document received from any Tax Authority in respect of any such asserted Tax liability. If either Holdings or Parent fails to give the other party prompt notice of an asserted Tax liability as required under this Agreement, then (A) if the Tax Indemnitor is precluded by the failure to give prompt notice from contesting the asserted Tax liability in any judicial forum, then such party shall not have any obligation to indemnify the other party for any Losses arising out of such asserted Tax

60

liability and (C) as the Tax Indemnitor is also prejudiced from such failure to give pro-9/06 notice required to the Tax Indemnitor, then any amount which the Tax Indemnitor is otherwise required to pay pursuant to this Section 5.8 with respect to such liability shall be reduced by the amount of such detriment.

(ii) Control of Contests Involving Pre-Closing Periods or Straddle Periods. In the case of an audit or administrative or judicial proceeding involving any asserted liability for Taxes relating to any taxable years or periods ending on or before the Closing Date or any Straddle Period of any Bison Subsidiaries, Parent shall have the right, at its expense, to control the conduct of such audit or proceeding; provided, however, that (i) Parent shall keep Holdings reasonably informed with respect to the status of such audit or proceeding and provide Holdings with copies of all written correspondence with respect to such audit or proceeding in a timely manner and (ii) if such audit or proceeding would be reasonably expected to result in a material increase in Tax liability of any Bison Subsidiaries for which Holdings would be liable under this Section 5.8, (A) Holdings may participate in the conduct of such audit or proceeding at its own expense and (B) Parent shall not settle any such audit or proceeding without the consent of Holdings, which consent shall not be unreasonably withheld.

(iii) Control of Contests Involving Post-Closing Periods. In the case of an audit or administrative or judicial proceeding involving any asserted liability for Taxes relating to any taxable years or periods beginning after the Closing Date, Holdings shall have the right, at its expense, to control the conduct of such audit or proceeding; provided, however, that if such audit or proceeding would be reasonably expected to result in a material increase in Tax liability of any Bison Subsidiaries for which Parent would be liable under this Section 5.8, (A) Parent may participate in the conduct of such audit or proceeding at its own expense and (B) Holdings shall not settle any such audit or proceeding without the consent of Parent, which consent shall not be unreasonably withheld.

(l) As of the Closing Date, Parent shall cause all Tax sharing, Tax allocation, or Tax indemnity agreements between Parent or any Non-Bison Subsidiary on the one hand, and any Bison Subsidiary on the other hand, to be terminated.

5.9 Bison Financial Statements.

(a) Parent shall deliver to C&A Products and Holdings, at Parent's expense:

(i) statements of financial position with respect to the Business as at December 30, 2000 and January 1, 2000, and statements

61

of income, cash flows and changes in net worth for each of the fiscal years ended December 30, 2000, January 1, 2000 and January 2, 1999, together with an audit report of E&Y thereon prepared in accordance with the accounting requirements and the published rules and regulations of the SEC applicable to a registration statement relating to an offering of debt securities, which report for the fiscal year 2000 will be substantially to the effect of E&Y's report relating to the Statement of Net Assets to be Sold at December 30, 2000 dated February 28, 2001, adapted as appropriate for inclusion of a statement of income and cash flows and as otherwise appropriate for its purpose; and

(ii) an unaudited statement of financial position for the interim period ended June 30, 2001 and unaudited statements of income and cash flows for the interim period ended June 30, 2001 and the corresponding period in 2000, in each case prepared in accordance with GAAP consistently applied for the periods presented and with the accounting requirements and the published rules and regulations of the SEC applicable to a registration statement relating to an offering of debt securities, provided, however, that if the Closing occurs on or after November 15, 2001, Parent shall deliver to C&A Products and Holdings not later than November 15, 2001 comparable financial statements for the interim period ended September 30, 2001 and the corresponding period in 2000.

(b) Parent shall deliver to C&A Products and Holdings a summary of financial information in the form set forth in Section 5.9(b) of the Disclosure Schedule for each fiscal month beginning immediately after the last quarterly statement provided pursuant to Section 5.9(a) and ending with the fiscal month which ends at least thirty days prior to the Closing Date, and the summary shall be delivered within 28 days after the end of said month.

The financial statements required by this Section 5.9 are referred to herein as the "Required Financial Statements".

(c) E&Y and Parent shall provide to Holdings and C&A and its auditors reasonable cooperation in the preparation of such pro forma financial information as may be required for the financing of the Transactions on the basis contemplated hereby.

5.10 Observer Rights. For so long as Parent or its Affiliates hold at least 50% of the Holdings Common Stock issued pursuant to this Agreement, Parent shall have the right to designate two representatives to serve as observers on the Board of Directors of Holdings. Such observers shall have the right to receive all notices and meeting materials provided to members of the Board of Directors of Holdings and committees of the Board of Directors of Holdings and to attend and participate in all meetings of the Board of Directors of Holdings and meetings of committees of the Board of Directors of Holdings. For so long as Parent or its Affiliates hold at least 50% of the Preferred Stock issued pursuant to this Agreement, Parent shall have the right to designate two representatives to

serve as observers at the Board of Directors of C&A Products, shall have the right to receive all books and meeting materials provided to members of the Board of Directors of C&A Products and committees of the Board of Directors of C&A Products and to attend and participate in all meetings of the Board of Directors of C&A Products and meetings of committees of the Board of Directors of C&A Products.

5.11 Non-Competition.

(a) Prior to the third anniversary of the Closing Date, the Parent Entities shall not engage in the business of (i) manufacturing or selling overhead systems, headliners, interior instrument panels, interior quarter panel/sidewall trim, interior trim consoles, lift-gate trim panels, painted or unpainted fascia and bumpers, claddings/exterior trim moldings, exterior grilles, structural composite bumpers, or signal, taillight and other lighting or (ii) assembling or selling cockpit systems or front-end modules, in each case as currently manufactured, assembled or sold by the Bison Subsidiaries and in each case for use in automotive passenger cars and light and heavy trucks (the "Restricted Field"). For the avoidance of doubt, the continued operation of the existing businesses of Parent and the Non-Bison Subsidiaries shall not be a violation of this Section 5.11(a).

(b) Notwithstanding the foregoing, the Parent Entities may acquire, directly or indirectly, all or substantially all of the capital stock or assets of any Person (an "After-Acquired Business") which derives 33% or less of its gross sales revenues from the Restricted Field, if Parent or such Parent Entity promptly grants to Holdings an option to acquire the portion of the After-Acquired Business which engages in the Restricted Field (the "Restricted Portion") upon the terms and conditions set forth in this Section 5.11(b) and promptly gives notice to Holdings of such option (but in no event later than the date the After-Acquired Business was acquired). The purchase price for the Restricted Portion shall be an amount equal to the aggregate purchase price, including any liabilities assumed by a Parent Entity, paid by a Parent Entity for the After-Acquired Business, multiplied by a fraction, the numerator of which shall be the net operating profit or other mutually acceptable measure of value of the Restricted Portion during the most recently completed fiscal year prior to the date such Parent Entity acquired the After-Acquired Business and the denominator of which shall be the net operating profit or other mutually acceptable measure of value of the After-Acquired Business during the same period.

(i) The purchase of the Restricted Portion by Holdings will be subject to the execution by the Parent Entity and Holdings of a mutually satisfactory definitive agreement for such purchase and the obtaining of all necessary regulatory approvals from any Governmental Authority and material third party Consents (in each case at no out-of-pocket cost or expense to the Parent Entity) and the expiration or termination of any applicable waiting period under the HSR Act and any applicable Foreign Competition Laws. The Parent Entity's representations and warranties in the definitive purchase agreement for the Restricted Portion shall be limited to reasonable assurances that the applicable Parent

63

Entity had caused the Restricted Portion to be operated in the ordinary course of business during the period of such Parent Entity's ownership, and the Parent Entity shall use all commercially reasonable efforts to cause its rights under the purchase agreement by which it acquired the After-Acquired Business to the extent relating to the Restricted Portion to be assigned or otherwise made available to Holdings. The definitive purchase agreement shall provide that such agreement may be terminated at the option of either a Parent Entity (or the applicable Non-Bison Subsidiary) or Holdings if such transaction is not consummated by the six month anniversary of the date the After-Acquired Business was acquired by a Parent Entity.

(ii) If Holdings fails to give Parent notice of its intent to exercise this option on or before the one month anniversary of the date the After-Acquired Business was acquired or the sale of the Restricted Portion to Holdings is not consummated, other than because of a default by a Parent Entity, the Parent Entity may retain ownership of the After-Acquired Business, including the Restricted Portion.

5.12 Intercompany Transactions. Intercompany transactions shall be treated in accordance with the Transition Agreement.

5.13 Additional Covenant of C&A and Holdings. Neither Holdings nor C&A Products shall amend or cause to be amended any of the Commitment Letters (except to add new lenders) without the prior written consent of Parent, which consent shall not be unreasonably withheld, conditioned or delayed.

5.14 Certain Pre-Closing Restrictions. Prior to the Closing, Products will comply with the following provisions of the Certificate of Designation as though in effect on the date hereof:

(a) Section 7(c), provided that the term "Issuance Date of the Series A1 Redeemable Preferred Stock, the Series B1 Redeemable Preferred Stock and the Series C1 Redeemable Preferred Stock" shall be deemed to refer to the date of this Purchase Agreement;

(b) Section 7(f), provided that the consent of Textron and its Subsidiaries shall be required to the extent stated therein notwithstanding the Preferred Stock has not been issued and in no event shall such provisions prevent any of the Transactions and related matters, including but not limited to any payments pursuant to the Advisory Agreement (as defined in the Certificate of Designation) as amended through the date of the Closing;

(c) Section 7(h); and

(d) Section 7(b), provided that (i) the term "Restricted Payments" shall only include Restricted Payments of a type described in clauses (i) and (ii), (ii) clause

64

Section 7(b) shall be construed to include those exceptions in C&A Products' existing 11-1/2% Senior Subordinated Notes due 2006 in any case in which there is a blank or bracketed amount and (iv) insofar as Restricted Payments of the type referred to in clause (iii) of the term "Restricted Payments" is concerned, C&A Products will abide by the provisions applicable to such types of Restricted Payments in its existing 11-1/2% Senior Subordinated Notes due 2006.

5.15 Closing Date Indebtedness. On or prior to the Closing Date, Parent shall provide to Holdings and C&A Products a schedule listing total Indebtedness of the Bison Subsidiaries (after giving effect to the Restructuring and excluding intercompany accounts that have been settled prior to Closing), separated into the categories "a" through "g" contained in the definition of Indebtedness, as of the Closing Date.

5.16 Tax Reporting.

(a) Holdings, C&A Products and Parent shall classify the Preferred Stock as equity for tax purposes and shall not take any position inconsistent with such classification.

(b) Parent, Holdings and C&A Products shall take the position that there will not be any constructive distributions (or series of constructive distributions) with respect to the Preferred Stock under Section 305 of the Code or the Treasury Department regulations promulgated thereunder ("Tax Law"). None of Parent, Holdings or C&A Products shall take any position inconsistent with such position; provided, however, that if Parent, Holdings or C&A Products determines that under then applicable Tax Law the parties may be required to take a position inconsistent with that set forth in this Section 5.16(b), the party making such determination (the "Requesting Party") shall notify the other parties of such determination and, if the other parties do not agree that the parties will be required under then applicable Tax Law to take a position inconsistent with the position set forth in this Section 5.16(b), Parent, Holdings and C&A Products shall retain a mutually agreed upon nationally recognized tax counsel to advise the parties as to whether they will be required under then applicable Tax Law to take a position inconsistent with the position set forth in this Section 5.16(b). In the event that the parties agree, or the mutually agreed upon nationally recognized tax counsel determines, that the parties will be required under then applicable Tax Law to take a position inconsistent with the position set forth in this Section 5.16(b), then the parties shall take the position so agreed upon or determined. All costs and expenses of the mutually agreed upon nationally recognized tax counsel relating to such advice shall be borne equally by Parent and Holdings; provided, however, that if the mutually agreed upon nationally recognized tax counsel determines that the parties will not be required under then applicable Tax Law to take a position inconsistent with the position set forth in this Section 5.16(b), then all such costs and expenses shall be borne by the Requesting Party.

5.17 R&D Employees. Persons whose activities prior to the date hereof related primarily to research and development and product development related to the Business shall not be continuously employed by Parent or a Subsidiary of Parent after the

Closing. For a period of two years from the date of this Agreement, Parent and its Affiliates shall not, without the written consent of C&A Products, solicit for employment any Transferred Employee whose activities prior to the date hereof related primarily to research and development or product development. This non-solicitation covenant shall not apply to general advertisements for available employment positions.

5.18 IRB. On or prior to the Closing, Holdings shall either (i) cause the Indebtedness under the Loan Agreement dated as of August 1, 1991 between C&A Products (formerly Collins & Aikman Corporation) and the Michigan Strategic Fund (the "Loan Agreement") to be completely paid and retired and terminate all obligations under the Loan Agreement and the Reimbursement Agreement dated as of August 1, 1991 between C&A Products (formerly Collins & Aikman Corporation and NBD Bank, N.A.) (the "Reimbursement Agreement") or (ii) obtain amendments to or waivers of any terms of the Reimbursement Agreement, the Loan Agreement and any other Contract relating thereto such that the Reimbursement Agreement, the Loan Agreement and the related Contracts will not in any manner adversely affect the ability of C&A Products to pay dividends on or redeem (other than redemptions solely at the option of C&A Products) the Preferred Stock or adversely affect the ability of Holdings or C&A Products to complete the transactions contemplated by the Transaction Agreements or the Commitment Letters.

## ARTICLE VI

## CONDITIONS TO CONSUMMATION OF THE TRANSACTION

6.1 Conditions to Each Party's Obligations to Complete the Transactions. The respective obligations of each party to complete the Transactions are subject to the satisfaction at or prior to the Closing Date of the following conditions:

(a) Injunction. There shall not be in effect any Law or Order of any Governmental Authority of competent jurisdiction directing that the Transactions not be consummated as provided herein.

(b) Governmental Filings and Consents. The regulatory approvals listed in Section 6.1(b) of the Disclosure Schedule shall have been obtained and be in effect as of the Closing Date, and the waiting period under HSR Act shall have expired or early termination thereof shall have been granted.

(c) Works Councils. All required notices to any works council, personnel committee or similar employee council or committee shall have been made, and any required consultation with any works council, personnel committee or similar employee council or committee shall have occurred.

(d) Restructuring. Parent shall have completed the Restructuring in all material respects.

66

6.2 Additional Conditions to the Obligations of Holdings and C&A Products. The obligation of Holdings and C&A Products to complete the Transactions is subject to the satisfaction at or prior to the Closing Date of the following conditions, any and all of which may be waived in whole or in part by Holdings to the extent permitted by applicable Law:

(a) Representations and Warranties. The representations and warranties of Parent contained in this Agreement shall be true and correct on the date of this Agreement and on the Closing Date as though made on and as of the Closing Date (except to the extent that a representation or warranty expressly speaks as of a specified date or period of time); provided, however, that for purposes of this Section 6.2(a), such representations and warranties shall be deemed to be true and correct unless the failure or failures of such representations and warranties to be so true and correct, without regard to any materiality or Material Adverse Effect qualifiers contained therein, individually or in the aggregate, results or would reasonably be likely to result in a Material Adverse Effect.

(b) Performance. Parent shall have performed in all material respects all of its covenants and agreements under this Agreement to be performed or complied with on or prior to the Closing Date; provided that Parent shall be provided the opportunity to cure any failure to so perform or comply, if a cure is possible, within a reasonable time after receiving written notice of such failure from Holdings.

(c) Officer's Certificate. Holdings shall have received on the Closing Date a certificate dated the Closing Date and executed by the Chief Operating Officer or the Chief Financial Officer of Parent certifying to the fulfillment of the conditions specified in Sections 6.1(d), 6.2(a) and 6.2(b).

(d) Bison Financial Statements. Parent shall have delivered the Required Financial Statements pursuant to Section 5.9.

(e) Agreements. Parent and its Subsidiaries (to the extent each is a party thereto) shall have executed the License Agreements attached hereto as Exhibits 3A, 3B and 3C, the Assignment and Assumption Agreement attached hereto as Exhibit 2, the Registration Rights Agreements attached hereto as Exhibits 5 and 6 and the Transition Agreement attached hereto as Exhibit 4.

(f) Financing. The financing contemplated by the Debt Commitment Letter shall have been completed on substantially the terms and conditions identified in such Debt Commitment Letter or on such other terms and conditions or involving such other financing sources, as are not materially more onerous in the aggregate to Holdings and C&A Products than those in the applicable Debt Commitment Letter and on other reasonable and customary terms (but not requiring more equity financing than is contemplated by the Debt Commitment Letter); provided, that this condition shall be deemed satisfied if the failure of this condition is due to a breach by Holdings, C&A Products, Heartland or any of their respective Affiliates of any covenant contained in any

Financing Agreement, except if any such breach would not occur but for a breach by Parent or any of its Affiliates of any of its covenants, representations or warranties contained herein or a failure of Parent or any of its Affiliates to comply with a reasonable request of Holdings in respect of the financing contemplated by the Debt Commitment Letter or an adverse change in the business, operations, assets, financial condition, contingent liabilities or material agreements of the Business or the Bison Subsidiaries.

6.3 Additional Conditions to the Obligation of Parent. The obligation of Parent to complete the Transactions is subject to the satisfaction at or prior to the Closing Date of the following conditions, any and all of which may be waived in whole or in part by Parent to the extent permitted by applicable Law:

(a) Representations and Warranties. The representations and warranties of Holdings and C&A Products contained in this Agreement shall be true and correct on the date of this Agreement and on the Closing Date as though made on and as of the Closing Date (except to the extent that a representation or warranty expressly speaks as of a specified date or period of time); provided, however, that for purposes of this Section 6.3 (a), such representations and warranties shall be deemed to be true and correct unless the failure or failures of such representations and warranties to be so true and correct, without regard to any materiality or Holdings Material Adverse Effect qualifiers contained therein, individually or in the aggregate, results or would reasonably be likely to result in a Material Adverse Effect.

(b) Performance. Holdings shall have performed in all material respects its covenants and agreements under this Agreement to be performed or complied with on or prior to the Closing Date; provided that Holdings shall be provided the opportunity to cure any failure to so perform or comply, if a cure is possible, within a reasonable time after receiving written notice of such failure from Parent.

(c) Officer's Certificate. Parent shall have received on the Closing Date a certificate dated the Closing Date and executed by the Chief Operating Officer or the Chief Financial Officer of Holdings certifying to the fulfillment of the conditions specified in Sections 6.3(a) and (b) hereof.

(d) Agreements. Holdings and C&A Products shall have executed the License Agreements attached hereto as Exhibits 3A, 3B and 3C, the Assignment and Assumption Agreement attached hereto as Exhibit 2, the Registration Rights Agreements attached hereto as Exhibits 5 and 6 and the Transition Agreement attached hereto as Exhibit 4.

(e) Certificate of Designation. The Certificate of Designation shall have been duly filed with the Secretary of State of the State of Delaware, shall be in full force and effect and shall not have been amended or modified.

68

TERMINATION

7.1 Termination by Mutual Consent. This Agreement may be terminated and the Transactions may be abandoned at any time prior to the Closing Date, by the mutual written consent of Parent and Holdings.

7.2 Termination by Any Party. This Agreement may be terminated and the Transactions may be abandoned by any party hereto by prompt written notice to the others if (a) any court of competent jurisdiction or other Governmental Authority shall have issued an Order permanently restraining, enjoining or otherwise prohibiting the Transactions, and such Order shall have become final and nonappealable; provided, however, that the party seeking to terminate this Agreement pursuant to this clause (a) shall have used all commercially reasonable efforts to have such Order vacated, or (b) the Closing shall not have occurred by December 31, 2001; provided, however, that the right to terminate this Agreement pursuant to this Section 7.2(b) shall not be available to any party whose failure to fulfill any of its material obligations under this Agreement results in the failure of the Closing to occur on or prior to such date.

7.3 Termination by Parent.

(a) This Agreement may be terminated by Parent at any time if (a) any condition contained in any Commitment Letter shall fail to be satisfied and such failure is not cured within 30 days of Holdings' or C&A Products' notice of such failure or (b) one or more of the Commitment Letters is withdrawn, terminated or revoked; provided, however, that in the event an Equity Commitment Letter is withdrawn, terminated or revoked, Holdings and C&A Products shall have 30 days to cause such Equity Commitment Letter to be reinstated or the commitment covered by said Equity Commitment Letter replaced by another investor pursuant to a commitment letter containing the same terms, except for the identity of the parties; provided, further, however that Parent's right to terminate this Agreement pursuant to this Section 7.3 will not be available if Parent fails to fulfill any of its obligations under this Agreement and such failure results in the failure of the applicable condition to Closing.

7.4 Effect of Termination. In the event this Agreement is terminated pursuant to this Article VII, the transactions contemplated hereby shall be abandoned, without further action by any of the parties hereto, and this Agreement shall become void and have no further force and effect, except that
(i) the obligations of Heartland Industrial Partners, C&A, Holdings and C&A Products set forth in the Confidentiality Agreement shall remain in effect, (ii) neither party shall be relieved from any liabilities or damages arising out of a willful breach of any provision of this Agreement and (iii) the respective obligations of the parties set forth in Section 9.3 shall remain in effect.

69

ARTICLE VIII

OBLIGATIONS AFTER CLOSING

8.1 Survival of Representations, Warranties and Covenants; Indemnification. (a) Survival. All representations and warranties contained in this Agreement shall survive until the first anniversary of the Closing Date, except (i) the representations and warranties contained in Sections 3.2 (b) and

(c) and Section 4.4(a) and (b) of this Agreement, which shall survive the Closing and (ii) the representations and warranties contained in Section 3.8 and

Section 3.11, which shall not survive the Closing. This Section 8.1(a) shall not limit any covenant or agreement of the parties hereto which by its express terms contemplates performance after the Closing, including Parent's indemnification obligations for certain environmental matters and Taxes set forth in Sections 8.2 and 5.8(i).

(b) Indemnification by Parent. Subject to the other provisions of this Section 8.1, Parent shall indemnify Holdings, its Subsidiaries and their present and former directors, officers, employees and agents (collectively, the "Holdings Indemnified Parties") from and against and in respect of any and all Losses incurred by a Holdings Indemnified Party, which may be imposed on, sustained, incurred or suffered by or assessed against a Holdings Indemnified Party, directly or indirectly, to the extent relating to or arising out of:

(i) the failure of any of the representations or warranties of Parent contained in Article III (excluding the representations and warranties contained in Section 3.8 and Section 3.11) to be true and correct on the date of this Agreement and on the Closing Date as though made on and as of the Closing Date (except to the extent that a representation or warranty expressly speaks as of a specified date or period of time and except as modified hereafter in this Section 8.1(b)(i)); provided, that solely for the purpose of this Section 8.1(b)(i), the representations and warranties in Sections 3.6(a) and 3.7 shall be read without regard to the words "as of the date hereof" and the representations and warranties in Sections 3.16(a) and (b) shall be read without regard to the words "through and including the date hereof"; provided, further, that solely for the purpose of Section 8.1(b)(i), the representations and warranties in Sections 3.3(b), 3.6(a) and (b), 3.7, 3.12 and 3.16 shall be read without regard to any materiality or Material Adverse Effect qualifiers contained therein;

(ii) any failure by Parent to perform or comply with its covenants and agreements contained in this Agreement (excluding any covenant contained in Section 5.8 for which the exclusive remedy of Holdings shall be indemnification pursuant to Section 5.8), the Transition Agreement and the Assignment and Assumption Agreement; and

70

Section 8.2 and Section 8.3, the businesses, operations and assets of Parent or any Non-Bison Subsidiary (giving effect to the Restructuring and Closing), other than Losses relating to or arising out of the operation and conduct of the Business, commercial transactions with the Bison Subsidiaries in the ordinary course of business pre-Closing and commercial transactions with the Bison Subsidiaries post-Closing.

(c) Indemnification by Holdings and C&A Products. Subject to the other provisions of this Section 8.1, Holdings and C&A Products shall indemnify Parent, its Subsidiaries and their present and former directors, officers, employees and agents (collectively, the "Parent Indemnified Parties") from and against and in respect of any and all Losses incurred by a Parent Indemnified Party, which may be imposed on, sustained, incurred or suffered by or assessed against a Parent Indemnified Party, directly or indirectly, to the extent relating to or arising out of:

(i) the failure of any of the representations or warranties of Holdings or C&A Products contained in Article IV to be true and correct on the date of this Agreement and on the Closing Date as though made on and as of the Closing Date (except to the extent that a representation or warranty expressly speaks as of a specified date or period of time); provided, however, that for purposes of this Section 8.1(c)(i), such representations and warranties that are qualified by reference to materiality or Holdings Material Adverse Effect shall be true and correct and such representations and warranties that are not so qualified shall be true and correct in all material respects;

(ii) any failure by Holdings or C&A Products to perform or comply with their respective covenants and agreements contained in this Agreement (excluding any covenant contained in Section 5.8 for which the exclusive remedy of Parent shall be indemnification pursuant to Section 5.8), the Transition Agreement and the Assignment and Assumption Agreement;

(iii) the use of any Parent Name from and after the Closing Date; and

(iv) except as set forth in Section 5.8, Section 8.1(g),
Section 8.2 and Section 8.3, the businesses, operations and assets of any Bison Subsidiary (giving effect to the Restructuring and Closing), other than Losses relating to or arising out of the operation and conduct of the businesses conducted by Parent and the Non-Bison Subsidiaries (other than the Business), and commercial transactions with the Non-Bison Subsidiaries in the ordinary course of business pre-Closing and commercial transactions with the Bison Subsidiaries post-Closing.

71

(d) Limitation of Liability. The obligations and liabilities of Parent, Holdings and C&A Products under Sections 8.1(b)(i) and (c)(i), respectively, shall be subject to the following additional limitations:

(i) Parent shall not have any liability with respect to the payment of any indemnification amounts which Holdings Indemnified Parties would be entitled pursuant to Section 8.1(b)(i), whether or not asserted pursuant to Section 8.1(b)(i), until such time as the aggregate amount of Losses incurred by Holdings Indemnified Parties for which Holdings Indemnified Parties would otherwise be entitled to indemnification pursuant to Section 8.1(b)(i) exceeds ten million dollars ($10,000,000) and thereafter, only to the extent of such Losses in excess of ten million dollars ($10,000,000); provided, however, that (A) with respect to Losses relating to or arising out of the breach of any representation or warranty in Sections 3.3(b), 3.6, 3.7, 3.12 and 3.16, a Holdings Indemnified Party shall not make any claim against Parent which individually does not exceed five hundred thousand dollars ($500,000), and such claims not meeting this threshold shall not be applied in calculating the ten million dollar ($10,000,000) minimum specified above, (B) with respect to any Losses for which Holdings Indemnified Parties would be entitled pursuant to Section 8.1(b)(i) other than those referred to in Section 8.1(d)(i)(A), a Holdings Indemnified Party shall not make any Claim against Parent which individually does not exceed fifty thousand dollars ($50,000) and such Claims not meeting this threshold shall not be applied in calculating the ten million dollar ($10,000,000) minimum specified above, and (C) Parent's maximum aggregate indemnification liability for which Holdings Indemnified Parties would be entitled pursuant to Section 8.1(b)(i) and
Section 8.2(a) (excluding liability for any and all Environmental Losses related to, or arising out of, (A) the Dover Municipal Landfill located in Dover, New Hampshire and (B) the Cardinal Landfill located in Farmington, New Hampshire, which such Environmental Losses shall not be subject to any maximum aggregate indemnification liability cap) shall be one hundred million dollars ($100,000,000); and provided, further, that Parent's indemnification obligation for breach of any representation or warranty contained in Section 3.2(b) or (c) and pursuant to Sections 8.1(b)(ii) and (iii) shall not be subject to the provisions of this Section 8.1(d)(i); and

(ii) No party shall be liable for any Losses pursuant to Sections 8.1(b) or (c) unless the party seeking such indemnification (the "Indemnified Party") has (x) delivered the notice of Claim in respect of such Loss required by Section 8.1(e) below and (y) such notice of Claim is received by the party from which indemnification is sought (the "Indemnifying Party") within 30 days after the first anniversary of the Closing Date, except that (A) for any Losses relating to or arising out of

72

delivered at any time, (B) for breach of any covenant or agreement, such notice of Claim may be delivered at any time prior to the expiration of the applicable statute of limitation and (C) for Environmental Losses such notice of Claim may be delivered on or prior to the period specified in Section 8.2. Indemnification under Section 8.1(b)(i) and (ii) and Section 8.1(c)(i) and (ii) shall be the exclusive remedy of Holdings, C&A Products and Parent, as applicable, for breach of any representation, warranty, covenant or agreement (excluding breach of any covenant contained in Section 5.8 for which the exclusive remedy of Holdings, C&A Products and Parent, as applicable, shall be indemnification pursuant to Section 5.8) contained in this Agreement, the Transition Agreement and the Assignment and Assumption Agreement.

(e) Notice of Claim. If the Indemnified Party shall become aware of any claim, proceeding or other matter (a "Claim") which may give rise to a Loss or Environmental Loss that will be taken into account for purposes of calculating whether the Indemnifying Party's indemnification obligation arises pursuant to Section 8.1(b) or Section 8.1(c) above or Section 8.2(a) or Section 8.3 below, the Indemnified Party shall promptly give notice thereof to the Indemnifying Party. Such notice shall specify whether the Claim arises as a result of a Claim by a Person against the Indemnified Party (a "Third Party Claim") or whether the Claim does not so arise (a "Direct Claim"), and shall also specify with reasonable particularity (to the extent that the information is available) the factual basis for the Claim and the amount of the Claim, if known. If the Indemnified Party does not promptly give notice of any Claim as specified above, such failure shall not be deemed a waiver of the Indemnified Party's right to indemnification or application to the applicable deductible set forth in Section 8.1(d), Section 8.2(a)(iii) or Section 8.2 (a)(iv) hereunder for Losses or Environmental Losses in connection with such Claim, but the amount of reimbursement to which the Indemnified Party is entitled or application to the applicable deductible shall be reduced by the amount, if any, by which the Indemnified Party's Losses or Environmental Losses would have been reduced had such notice been promptly delivered.

(f) Direct Claims. With respect to any Direct Claim, following receipt of notice from the Indemnified Party of the Claim, the Indemnifying Party shall have 90 days to make such investigation of the Claim as is considered necessary or desirable. For the purpose of such investigation, the Indemnified Party shall make available to the Indemnifying Party the information relied upon by the Indemnified Party to substantiate the Claim, together with all such other information as the Indemnifying Party may reasonably request. If both parties agree at or prior to the expiration of such 90-day period (or any mutually agreed upon extension thereof) to the validity and amount of such Claim, they shall agree to apply it to the applicable deductible, or if the applicable deductible has been satisfied, the Indemnifying Party shall immediately pay to the Indemnified Party the full agreed upon amount of the Claim, failing which the matter shall be referred to binding arbitration in such manner as the parties may agree or shall be determined by a court of competent jurisdiction in the State of Delaware.

(i) With respect to any Third Party Claims, the Indemnifying Party shall have the right, at its expense and at its election, to assume control of the negotiation, settlement and defense of the Claim through counsel of its choice reasonably acceptable to the other party; provided, that it irrevocably agrees that the Claim is covered by

Section 8.1(b) or (c), as the case may be. In such event, the Indemnifying Party shall reimburse the Indemnified Party for all the Indemnified Party's reasonable out-of-pocket expenses as a result of such assumption. The election of the Indemnifying Party to assume such control shall be made within the latter of 90 days of receipt of notice of the Third Party Claim or thirty days after the indemnification obligation arises, failing which the Indemnifying Party shall be deemed to have elected not to assume such control. If the Indemnifying Party elects to assume such control, the Indemnified Party shall have the right to be informed and consulted with respect to the negotiation, settlement or defenses of such Third Party Claim and to retain counsel to act on its behalf, but the fees and disbursements of such counsel shall be paid by the Indemnified Party unless the Indemnifying Party consents to the retention of such counsel or unless the named parties to any action or proceeding include both the Indemnifying Party and the Indemnified Party and a representation of both the Indemnifying Party and the Indemnified Party by the same counsel would be inappropriate due to the actual or potential differing interests between them (such as the availability of different defenses). If the Indemnifying Party, having elected to assume such control, thereafter fails to defend the Third Party Claim within a reasonable period of time, the Indemnified Party shall be entitled to assume such control, and the Indemnifying Party shall be bound by the results obtained by the Indemnified Party with respect to the Third Party Claim. If any Third Party Claim is of a nature such that the Indemnified Party is required by applicable Law to make a payment to any Person (a "Third Party") with respect to the Third Party Claim before the completion of settlement negotiations or related legal proceedings, the Indemnified Party may make such payment and the Indemnifying Party shall, subject to the provisions of Section 8.1, Section 8.2 and Section 8.3, after demand by the Indemnified Party, reimburse the Indemnified Party for such payment. If the amount of any liability of the Indemnified Party under the Third Party Claim in respect of which such payment was made, as finally determined, is less than the amount which was paid by the Indemnifying Party to the Indemnified Party, the Indemnified Party shall, promptly after receipt of the difference from the Third Party, pay the amount of such difference to the Indemnifying Party.

74

(ii) If the Indemnifying Party fails to assume control of the defense of or having assumed such control fails to defend any Third Party Claim, the Indemnified Party shall have the exclusive right to consent, settle or pay the amount claimed, in which case the Indemnifying Party shall be responsible for paying any such Claim or, if paid by the Indemnified Party, reimbursing the Indemnified Party. Whether or not the Indemnifying Party assumes control of the negotiation, settlement or defense of any Third Party Claim, the Indemnifying Party shall not settle any Third Party Claim without the written consent of the Indemnified Party, which consent shall not be unreasonably withheld, conditioned or delayed, unless such settlement provides solely for monetary damages or other monetary payments.

(iii) The Indemnified Party and the Indemnifying Party shall cooperate fully with each other with respect to Third Party Claims and, regardless of which party has control thereof as provided for herein, shall keep each other reasonably advised with respect thereto.

(h) Notwithstanding anything in Section 8.1, Section 8.2 or Section 8.3 to the contrary, the Indemnifying Party shall not be liable for any Losses or Environmental Losses arising out of any matter to the extent that the Losses or Environmental Losses with respect to such matter have been mitigated as a result of having been reflected as a liability or the subject matter of a specific result in the Closing Financial Statement.

8.2 Environmental Indemnification.

(a) (i) Except for the environmental matters set forth in Section 8.2(a)(i) of the Disclosure Schedule, Parent shall indemnify the Holdings Indemnified Parties from and against and in respect of any and all Environmental Losses incurred by a Holdings Indemnified Party, which may be imposed on, sustained, incurred or suffered by or assessed against a Holdings Indemnified Party, directly or indirectly, to the extent relating to or arising out of: (A) the Remediation of Hazardous Substances that were disposed of or released on or into the air, soils, groundwater, surface water, sediments or similar environmental media, at, on, under or migrating from or to any Bison Property on or before the Closing Date; (B) Litigation by Third Parties in respect of bodily injury or property damage as a result of Hazardous Substances that were disposed of or released into the soils, groundwater, surface water, sediments or similar environmental media, on or before the Closing Date, at, on, under or migrating from any Bison Property; (C) the disposal, storage, transportation, discharge, release, treatment or recycling of Hazardous Substances, or the arrangement for the same activities, by Parent or any of its Subsidiaries with respect to the Business, prior to the Closing Date, at any Off-Site Location, including Environmental Losses related to bodily injury, property damage or the Remediation of such Hazardous Substances; and (D) any violation by Parent or any of its Subsidiaries of any Environmental Law applicable to the Business (including Permits or other

75

authorizations issued pursuant to any applicable Environmental Law) on or prior to the Closing Date.

(ii) Parent's obligation to indemnify the Holdings Indemnified Parties for the matters addressed in Section 8.2(a)(i)(A) through (C) shall be limited to those matters as to which Holdings provides Parent with written notice of said Claim in the manner set forth in Section 8.1(e) within 10 years after the Closing Date. Parent's obligation to indemnify the Holdings Indemnified Parties for matters addressed in Section 8.2(a)(i)(D) shall be limited to those matters as to which Holdings provides Parent with written notice of said Claim in the manner set forth in Section 8.1(e) within two years after the Closing Date.

(iii) Notwithstanding the foregoing, Parent shall not have any liability with respect to the payment of any indemnification amounts pursuant to Section 8.2(a)(i)(A) through (D) until such time as the aggregate amount of such Environmental Losses incurred by the Holdings Indemnified Parties, excluding any and all Environmental Losses related to, or arising out of, (A) the Dover Municipal Landfill located in Dover, New Hampshire and (B) the Cardinal Landfill located in Farmington, New Hampshire, for which such parties would otherwise be entitled to indemnification pursuant to Section 8.2(a)(i)(A) through (D) exceeds five million dollars ($5,000,000) and thereafter, Parent shall only be liable to the extent of such Environmental Losses in excess of five million dollars ($5,000,000); provided, however, that (A) Holdings shall not make any claim against Parent which individually does not exceed fifty thousand dollars ($50,000), and such claims not meeting this threshold shall not be applied in calculating the five million dollar ($5,000,000) limitation specified above, and (B) Parent's maximum aggregate indemnification liability pursuant to
Section 8.2(a)(i) shall be subject to and included within the dollar limitation contained in Section 8.1(d)(i)(B).

(iv) Notwithstanding any other provision of this Agreement, Parent shall not have any liability with respect to the payment of any indemnification amounts pursuant to Section 8.2(a)(i)(A) through (D) with respect to Environmental Losses related to, or arising out of, (A) the Dover Municipal Landfill located in Dover, New Hampshire and (B) the Cardinal Landfill located in Farmington, New Hampshire until such time as the aggregate amount of such Environmental Losses incurred by the Holdings Indemnified Parties for which such parties would otherwise be entitled to indemnification pursuant to Section 8.2(a)(i)(A) through (D) exceeds ten million dollars ($10,000,000) and thereafter, Parent shall be liable for fifty percent (50%) of such Environmental Losses in excess of ten million dollars ($10,000,000).

(v) Notwithstanding any other provision of this Agreement, if a Holdings Indemnified Party has a claim pursuant to Section 8.2(a)(i)(D) of this Agreement, Parent shall indemnify the Holdings Indemnified Parties with respect to (A) any claims for fines or penalties arising out of said noncompliance and (B) Environmental Losses arising out of any expenditures made or actions taken by or on behalf of Holdings or C&A Products after the Closing Date to correct such noncompliance, but only to the extent that the Environmental Losses relate to the least expensive, commercially reasonable alternative necessary to correct such noncompliance; provided, that Holdings shall not make any claim against Parent pursuant to this

Section 8.2(a)(v)(B) which individually does not exceed fifty thousand dollars ($50,000) with respect to any single occurrence of noncompliance; provided, further, that with respect to any single occurrence of noncompliance, Parent shall only be liable for such Environmental Losses in excess of fifty thousand dollars ($50,000). If Holdings elects to correct such noncompliance by any means other than the least expensive, commercially reasonable alternative, subject to the provisions of this Section 8.2, Parent shall indemnify the Holdings Indemnified Parties for Environmental Losses up to an amount equal to the difference between the Environmental Losses that otherwise would have been incurred if the least expensive, commercially reasonable alternative had been implemented and five hundred thousand dollars ($500,000). Further, with respect to claims pursuant to Section 8.2(a)(i)(D) which involve a violation that commenced prior to the Closing Date and continues after the Closing Date, Parent's indemnification obligation with respect to such continuing violation shall apply only with respect to the time period prior to the Closing Date. Notwithstanding the above, the foregoing shall not be interpreted to preclude the Holdings Indemnified Parties from indemnification with respect to the Remediation of Hazardous Substances that are present on or before the Closing Date in any environmental media at, on, under or migrating from or to, any Bison Property, as otherwise provided in this Agreement, including with respect to Hazardous Substances that were discharged into the environment prior to the Closing Date and continue to exist in the environment after the Closing Date.

(b) With respect to claims to indemnify Holdings Indemnified Parties that are described by Section 8.2(a)(i)(A):

(i) Parent shall only be required to indemnify Holdings Indemnified Parties to the extent that, after the deductible set forth in Section 8.2(a)(iii) is met: (A) the Remediation of the Hazardous Substances is required pursuant to an applicable Environmental Law that is in effect as of the Closing Date; (B) the Remediation Standards applicable to the Remediation are the most cost effective Remediation Standards required under Environmental Law assuming continued industrial use of the property, provided, that it is a Bison Property and where it is not, such other

use then associated with such non-Bison Property; and (C) the Remediation shall be conducted in a reasonable, cost effective manner consistent with applicable Environmental Law or as may be otherwise required by a Governmental Authority. Holdings shall accept appropriate engineering controls or institutional controls, including, if necessary, deed restrictions limiting property to an industrial use or limitations on the drilling and use of water wells on Bison Properties (individually or collectively, a "Restriction"), if such controls are needed in order to complete a Remediation consistent with the use of the least stringent Remediation Standards. Holdings shall not be required to consent to any Restriction in connection with completing a Remediation if the Restriction would materially impair or otherwise unreasonably interfere with the continued operations of the Bison Subsidiary or if the Governmental Authority having jurisdiction for such matter does not approve of reliance on such Restriction.

(ii) For the sole purpose of seeking indemnification for Environmental Losses pursuant to Section 8.2(a)(i) of this Agreement, after the Closing Date, neither Holdings nor its Affiliates shall undertake any effort to discover whether there has been a release of Hazardous Substances at, on, underneath or migrating from any Bison Property, including the collection of soil, groundwater, or surface water samples or samples of other environmental media, except that Holdings or its authorized representatives may take such samples and the Holdings Indemnified Parties may seek indemnification therefor if:
(A) required pursuant to an applicable Environmental Law or a lawful order of a Governmental Authority; (B) required by a potential acquirer of said Bison Property or the Business or a lessee of said Bison Property; (C) required in connection with defending against or pursuing a third party claim; or (D) required by Holdings' or C&A Products' lender or financial underwriter prior to five years from the Closing Date. If Holdings fails to comply in any material respect with this provision, Parent shall have no obligation to provide any Holdings Indemnified Party with an indemnity for the Remediation of Hazardous Substances on such Bison Property or for any Claims for bodily injury or property damage related to Hazardous Substances on such property; provided, however, that this limitation on indemnification shall apply only the extent that any Environmental Losses incurred by a Holdings Indemnified Party for which indemnification is sought are identified solely as a result of such material noncompliance.

(c) Claims brought pursuant to this Section 8.2 shall be subject to the procedures for indemnification set forth in Section 8.1(g) if such Claims are Third Party Claims. Claims that involve or also involve the Remediation of Hazardous Substances at any Bison Property shall also be subject to the procedures set forth in Section 8.2(f).

78

(d) If Holdings or any of its Affiliates conducts a sale, lease or other agreement by any Bison Subsidiary, Bison Property, Holdings or said Affiliate shall include, as a condition of such sale, lease or other agreement, terms and conditions that will ensure that all Restrictions that have been accepted with respect to the Bison Property are not disturbed (or, if such Restrictions will be disturbed, that they will be restored at the expense of the party causing the disturbance or, if additional Remediation is required as a result of the disturbance of such Restrictions, that such additional Remediation will be performed at the sole cost and expense of the party causing the disturbance).

(e) For purposes of this Agreement: (1) the term "Environmental Losses" shall only include the following costs and expenses (after giving effect to any related reduction in Taxes and amounts recovered from third parties, including amounts recovered under insurance policies, with respect to such Environmental Losses): (A) costs and expenses to implement a Remediation; (B) damages for third party bodily injury and third party property damage; (C) fines and penalties; and (D) reasonable attorneys' fees, consultants' fees and expenses associated with (A), (B) or (C), including costs and expenses associated with Litigation; (2) the term "Remediation Standard" means a numerical standard (whether resulting from an enacted statute, promulgated regulation, guidance or policy document issued by a Governmental Authority, or developed on a case-by-case basis through a risk assessment or other methodology authorized pursuant to an applicable Environmental Law and, if appropriate, approved by a Governmental Authority) that defines the concentrations of Hazardous Substances that may be permitted to remain in any environmental media after an investigation, remediation or containment of a release of Hazardous Substances;
(3) the term "Remediation" means any action of any kind to investigate and/or clean up and/or otherwise respond a release of Hazardous Substances into an environmental medium, including the following activities: (A) monitoring, investigation, assessment, treatment, cleanup, containment, removal, mitigation, remediation, corrective action, response or restoration work; (B) obtaining any permits, consents, approvals or authorizations of any Governmental Authority necessary to conduct any such activity; (C) preparing and implementing any plans or studies for any such activity; and (D) obtaining a written notice from a Governmental Authority with jurisdiction over the site being addressed under Environmental Laws that no additional work is required by such Governmental Authority; and (4) the term "Off-Site Location" means any location other than
(x) any Bison Property or (y) property adjacent to any Bison Property which has been impacted by a release of Hazardous Substances at, on, under or from any Bison Property.

(f) Procedures for Remedial Actions.

(i) Parent shall be entitled to assume control of Remediations at or with respect to any Bison Property (other than the Dover Municipal Landfill and the Cardinal Landfill) if the deductible set forth in Section 8.2(a)(iii) is met. The election of Parent to assume control of any such Remediation shall be made within a reasonable time. In the event that Parent shall control any Remediation, it shall promptly provide copies to

79

Holdings of all notices, correspondence, draft reports, submissions, draft and final work plans and final reports and shall give Holdings a reasonable opportunity (at Holding's expense) to comment on any submissions Parent intends to deliver or submit to the appropriate regulatory body prior to said submission. The party not controlling any Remediation may, at its own expense, hire its own consultants, attorneys or other professionals to monitor the work performed by the party controlling such Remediation, including any field work undertaken by such party. Notwithstanding the foregoing, Parent and Holdings, as applicable, agree to cooperate with each other, directly and through their respective consultants and counsel, to effect the successful completion of the Remediation within such period as may be specified by a Governmental Authority or under applicable Environmental Laws, or otherwise within a reasonable period of time; provided, however, that neither party shall take any actions that could unreasonably delay or unreasonably interfere with the performance of the work of the party controlling any Remediation.

(ii) If Holdings is required to or desires to undertake a Remediation at or with respect to the Dover Municipal Landfill or the Cardinal Landfill that either Holdings or Parent determines is reasonably likely to cause the deductible set forth in Section 8.2(a)(iv) to be met, then Holdings shall notify Parent prior to undertaking such Remediation, and Parent and Holdings shall consult with each other, in good faith, to implement a mutually agreeable course of action to effect such Remediation. In the event of such determination, Holdings shall promptly provide copies to Parent of all notices, correspondence, draft reports, submissions, draft and final work plans and final reports and shall give Parent a reasonable opportunity (at Parent's expense) to comment on any submissions Holdings intends to deliver or submit to the appropriate regulatory body prior to said submission. Parent may, at its own expense, hire its own consultants, attorneys or other professionals to monitor the work performed by Holdings, including any field work undertaken by Holdings. Parent and Holdings, as applicable, agree to cooperate with each other, directly and through their respective consultants and counsel, to effect the successful completion of the Remediation within such period as may be specified by a Governmental Authority or under applicable Environmental Laws, or otherwise within a reasonable period of time; provided, however, that neither party shall take any actions that could unreasonably delay or unreasonably interfere with the performance of the Remediation.

(g) Exclusive Remedy for Environmental Matters; Indemnification by Holdings. Notwithstanding anything to the contrary in this Agreement, Holdings hereby agrees that its sole and exclusive remedy against any Parent Indemnified Party with respect to any and all Losses arising under or related to any Environmental Law or any Hazardous Substances or the environment, including statutory or common law claims for

80

Environmental losses, damages, fines, penalties or response costs related to Hazardous Substances or the environment, in connection with the Bison Subsidiaries, shall be the indemnity set forth in this Section 8.2. Except with respect to the remedy referred to in the preceding sentence, Holdings hereby waives, to the fullest extent permitted under applicable Law, and forever releases the Parent Indemnified Parties, in connection with the Bison Subsidiaries from, and shall indemnify the Parent Indemnified Parties against, any and all Environmental Losses arising under or related to Environmental Laws or Hazardous Substances. Parent Indemnified Parties shall not make any claim against Holdings for indemnification for any Loss, including any Environmental Loss, pursuant to this Section 8.2(g) which individually does not exceed fifty thousand dollars ($50,000). Holdings' obligation to indemnify the Parent Indemnified Parties pursuant to this Section 8.2(g) shall be limited to those matters as to which Parent provides Holdings with written notice of said Claim in the manner set forth in Section 8.1(e).

(h) Disputes. In the event of any dispute between Parent and Holdings or C&A Products concerning a Claim for indemnification for Environmental Losses under this Section 8.2 which cannot be resolved within thirty (30) days, such dispute shall be promptly referred to an independent third party having expertise in the matters at issue and mutually acceptable to the parties (or if the parties cannot agree, the CPR Institute for Dispute Resolution, in New York, New York shall select a recognized expert who shall be independent from each of the parties), whose fees and expenses shall be shared equally by the parties, and who shall evaluate the facts and circumstances at issue and recommend a course of action that the expert believes in its good faith judgment satisfies the requirements of this Agreement and applicable Environmental Laws. Such recommendations shall be final and binding on the parties. The parties agree to act as promptly as practicable in implementing the foregoing procedures; provided, however, that in the event that actions are required to be taken by a Governmental Authority or in an emergency to avoid imminent and substantial harm to health or the environment before the foregoing procedures can be implemented, Holdings or C&A Products may undertake such actions without prejudice to its rights under this Section 8.2 to seek indemnification for Environmental Losses. In all other situations, Holdings' or C&A Products' failure to comply with the requirements of this Section 8.2(h) shall not limit or reduce the obligations of Parent under this Agreement except to the extent Parent is actually and materially prejudiced thereby.

(i) Other. Nothing contained in this Section 8.2 shall restrict Holdings or C&A Products from taking any action (and, if appropriate pursuant to Section 8.2(a)(i), seeking indemnification therefore) where required to be taken by any Governmental Authority or in an emergency to avoid imminent and substantial harm to health or the environment.

8.3 Quota Purchase Agreement Indemnification. Holdings and C&A Products shall indemnify Parent from and against and in respect of any and all Losses incurred by Parent under any guarantee agreement by and between Parent and S.W. Industries Inc., or any successor thereto, relating to any assignment by Parent to C&A Products of Parent's rights, and the assumption by C&A Products of Parent's obligations,

81

under the Quota Purchase Agreement dated as of May 31, 2000 by and between Textron International Holdings, S.L. and S.W. Industries Inc., or if no such assignment has occurred prior to the Closing, the parties hereto shall take the actions relating to the Brazilian Entities specified in the Transition Agreement.

8.4 Name Changes. On or before the six month anniversary of the Closing Date, Holdings or C&A Products will change the names of the entities listed in
Section 8.4 of the Disclosure Schedule and cease using the name "Parent" in any manner. Holdings and C&A Products agree that from and after the Closing Date,
(i) the name "Parent" and all similar related names (all such names being the "Parent Names") shall be owned by Parent or a Non-Bison Subsidiary, (ii) neither Holdings, C&A Products nor any Bison Subsidiary shall have any rights in, and shall not, after the three month anniversary of the Closing Date, use, any Parent Name and (iii) neither Holdings, C&A Products nor any Bison Subsidiary shall contest the ownership or validity of any rights of Parent or any Non-Bison Subsidiary in or to the Parent Names.

## ARTICLE IX

## MISCELLANEOUS AND GENERAL

9.1 Interpretation.

(a) Whenever the words "include", "includes" or "including" are used in this Agreement they shall be deemed to be followed by the words "without limitation."

(b) The words "hereof", "hereby", "herein" and "herewith" and words of similar import shall, unless otherwise stated, be construed to refer to this Agreement as a whole and not to any particular provision of this Agreement, and article, section, paragraph, exhibit and schedule references are to the articles, sections, paragraphs, exhibits and schedules of this Agreement unless otherwise specified.

(c) The plural of any defined term shall have a meaning correlative to such defined term, the singular of any defined term shall have a meaning correlative to such term defined in the plural and words denoting any gender shall include all genders. Where a word or phrase is defined herein, each of its other grammatical forms shall have a corresponding meaning.

(d) A reference to any party to this Agreement or any other agreement or document shall include such party's permitted successors and permitted assigns.

(e) A reference to any legislation or to any provision of any legislation shall include any amendment, modification or re-enactment thereof, any legislative provision substituted therefore and all regulations and statutory instruments issued thereunder or pursuant thereto.

82

(f) The parties have participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties, and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any provisions of this Agreement.

9.2 Principle of Construction. In construing this Agreement, for the avoidance of doubt, those Contracts and assets not owned as of any date of determination by a Bison Subsidiary (and the related liabilities) but which are intended to be made the subject of the transfer and assignment contemplated by the Assignment and Assumption Agreement shall be construed as pertaining to the business, operations, assets, properties, liabilities and Contracts of the Bison Subsidiaries and the Business. In furtherance thereof, any action not permitted to be taken by a Bison Subsidiary with respect to the Business shall apply to Parent and its Subsidiaries.

9.3 Payment of Expenses and Other Payments. Whether or not the Transactions shall be consummated and except as otherwise provided in this Agreement, each party hereto shall pay its own expenses incident to preparing, entering into and carrying out this Agreement and the consummation of the transactions contemplated hereby.

9.4 Amendment. This Agreement may be amended only by a written agreement signed by each of the parties hereto.

9.5 Waiver and Extension. At any time prior to the Closing Date, the parties may (a) extend the time for the performance of any of the obligations or other acts of the other parties hereto, (b) waive any inaccuracies in the representations and warranties contained herein or in any document delivered pursuant hereto or (c) except to the extent prohibited by Law, waive compliance with any of the agreements described or conditions contained herein. Any agreement on the part of a party hereto to any such extension or waiver shall be valid only if set forth in an instrument in writing signed by such party. The failure of any party at any time or times to demand performance of any provision hereof shall in no manner affect the right of such party at a later time to enforce the same or any other provision of this Agreement. No waiver of any condition or the breach of any term contained in this Agreement in one or more instances shall be deemed to be a, or construed as a further or continuing, waiver of such condition or breach.

9.6 Counterparts. For the convenience of the parties hereto, this Agreement may be executed in any number of counterparts, each such counterpart being deemed to be an original instrument, and all such counterparts shall together constitute one agreement.

9.7 Governing Law. This Agreement shall be governed by, and construed in accordance with, the Laws of the State of Delaware.

83

9.8 Notices. Any notice, request, instruction or other document to be given hereunder by any party to another party shall be in writing and shall be deemed given when delivered personally, upon receipt of a transmission confirmation (with a confirming copy sent by overnight courier) if sent by facsimile or like transmission and on the next business day when sent by Federal Express, United Parcel Service, Express Mail, or other reputable overnight courier, as follows:

(a) If to Parent, to:

Textron Inc.
40 Westminster Street Providence, RI 02903 Attention: Terrance O'Donnell Executive Vice President and General Counsel
(401) 457-2555 (telephone)
(401) 457-2418 (facsimile)

with a copy to:

b) If to Holdings or C&A Products to:

Collins & Aikman Corporation 5755 New King Court Troy, Michigan 48098 Attention: Thomas E. Evans, CEO
(248) 824-1510 (telephone)
(248) 824-1512 (facsimile)

and
Attention: Ronald T. Lindsay, General Counsel
(248) 824-1633 (telephone)
(248) 824-1882 (facsimile)

84

Cahill, Gordon & Reindel 80 Pine Street New York, NY 10005 Attention: W. Leslie Duffy, Esq.

Jonathan Schaffzin, Esq.

(212) 701-3000 (telephone)
(212) 269-5420 (facsimile)

or to such other persons or addresses as may be designated in writing by the party to receive such notice. Nothing in this Section 9.7 shall be deemed to constitute consent to the manner and address for service of process in connection with any legal proceeding (including Litigation arising out of or in connection with this Agreement), which service shall be effected as required by applicable Law.

9.9 Entire Agreement; Assignment. The Transaction Agreements (including all exhibits and schedules to such agreements) together (a) constitute the entire agreement among the parties with respect to the subject matter hereof and supersede all other prior agreements and understandings, both written and oral, among the parties or any of them with respect to the subject matter hereof and (b) shall not be assigned or transferred by operation of law or otherwise without the prior written consent of each other party hereto.

9.10 Parties in Interest. This Agreement is not intended to confer any rights or remedies upon any Person except the parties hereto and their respective successors and assigns and any other Person which is indemnified under this Agreement pursuant to Sections 8.1 and 8.2.

9.11 Validity. The invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provisions of this Agreement, each of which shall remain in full force and effect.

9.12 Captions. The Article, Section and paragraph captions herein are for convenience of reference only, do not constitute part of this Agreement and shall not be deemed to limit or otherwise affect any of the provisions hereof.

9.13 Transfer, Sales and Stamp Taxes. All transfer, value added, sales and stamp taxes and similar charges, fees and assessments incurred in connection with the Transactions, shall be borne equally by Parent and C&A Products. Holdings and C&A Products shall prepare and file (or cause to be filed), to the extent required by, or permissible under, applicable Law, all necessary Tax Returns and other documentation with respect to all such transfer, value added, sales and stamp taxes and similar charges,

85

fees and assessments, and, if required by applicable Law, Parent shall join in the execution of any such Tax Returns and other documentation as reasonably requested by Holdings.

**[SIGNATURE PAGE FOLLOWS]**

**TEXTRON INC.**

By: _____
　　　　　　　　　Name:
　　　　　　　　　Title:

## COLLINS & AIKMAN CORPORATION

By: _____
　　　　　　　　　Name:
　　　　　　　　　Title:

## COLLINS & AIKMAN PRODUCTS CO.

By: _____
　　　　　　　　　Name:
　　　　　　　　　Title:

**Signature Page to Purchase Agreement**

SCHEDULE A

## DIRECTLY PURCHASED SUBSIDIARIES

| Subsidiary | Jurisdiction of Organization |
| --- | --- |
| Textron Automotive Interiors Inc. | Delaware |
| Textron S.A. de C.V. | Mexico |
| Textron Canada Limited | Canada |
| Textron Properties Inc. | Delaware |
| Textron Automotive MIP Limited | United Kingdom |
| Permali do Brasil Industria e Comercio Ltda. | Brazil |
| Textron Automotive Belgium B.V.B.A. | Belgium |
| Textron Automotive B.V. | Netherlands |
| Textron Automotive Holdings Italy S.r.l. | Italy |

A-1

SCHEDULE B

## SUBSIDIARIES OF THE DIRECTLY PURCHASED SUBSIDIARIES

| Directly Purchased Subsidiary | Subsidiary | Jurisdiction of Organization |
|---|---|---|
| Textron Automotive Holdings Italy S.r.l. | Textron Automotive Company Italia S.r.l.(1) (formerly, Textron Breed Automotive S.r.l.) | Italy |
| | A.P.C.O. - Advanced Plastic Company S.r.l. | Italy |
| | FAS S.p.A. | Italy |
| Textron Automotive B.V. | Textron Automotive Moravia s.r.o. | Czech Republic |
| Permali do Brasil Industria e Comercio Ltda. | Rosario Project S.A. | Argentina |
| | Plascar Participacoes Industriais S.A.(2) | Brazil |
| | Textron Automotive Trim Brasil Ltda.(3) | Brazil |
| Textron Automotive MIP Limited | AS Textron Ltd. | United Kingdom |
| | Textron Automotive Ltd. | United Kingdom |
| Textron Automotive Interiors Inc. | Textron Automotive (Asia) Inc. | Delaware |
| | Textron Automotive (Argentina) Inc. | Delaware |
| | Riopelle Realty Ltd. | Ontario |
| | Textron Automotive Overseas Investment Inc. | Delaware |

(1) 10% of the issued and outstanding shares of capital stock of Textron Automotive Company Italia S.r.l. are owned by Magneti Marelli Holding S.p.A.

(2) Preferred shares representing 43.4% of the issued and outstanding shares of capital stock of Plascar Participacoes Industriais S.A. are publicly held.

(3) 0.5% of the issued and outstanding shares of capital stock of Textron Automotive Trim Brasil Ltda. which is a subsidiary of Plascar, are owned by Kautex Textron Iberica, S.L.

B-1

| Directly Purchased Subsidiary | Subsidiary | Jurisdiction of Organization |
|---|---|---|
| | Textron Automotive International Services Inc. | Delaware |
| | M&C Advanced Processes, Inc. | Michigan |
| Textron S.A. de C.V. | Textron Executive Services Mexico, S.A. de C.V. | Mexico |
| | Textron Automotive Management Services Company de Cuautitlan, S.A. de C.V. | Mexico |
| | Textron Automotive Company de Mexico, S. A. de C.V. | Mexico |
| | Textron Automotive Management Services Company Mexico, S.A. de C.V. | Mexico |
| Textron Automotive Belgium B.V.B.A. | Textron Automotive Germany GmbH(4) | Germany |

(4) Textron Automotive Germany GmbH is in the process of being organized.

B-2

## RESTRUCTURING

1. The following subsidiaries and businesses and their related assets and liabilities will be divested from the Bison Subsidiaries prior to Closing:

Kautex Textron de Mexico S.A. de C.V. (which owns Kautex Textron Management Services Company de Puebla S.A. de C.V.)

### Camcar Textron de Mexico S.A. de C.V.

49% interest in Helicopteros Bell de Mexico s.r.l.

### Abuco Inc.

### Bell Helicopter Canada International Inc.

### Kautex Corporation (Canada)

### 3724140 Canada Inc.

Bell Calgary division

Bell Mirabel division

Avdel Canada division

Flexalloy Canada division

Camcar Canada division

Greenlee Canada division

### BTHC Properties Company, Inc.

Assets and liabilities of A.P.C.O. Advanced Plastic Company relating to the operations of the Kautex Unit of Textron Automotive Company Inc. (for their book value).

In addition, Parent will retain ownership to the intellectual property set forth on Section C-1 of the Disclosure Schedule.

C-1

2. Prior to the Closing, except as otherwise agreed by Parent and Holdings, employees of Textron Automotive Company Inc. ("TAC") whose entire salaries are directly charged to the Trim Division shall be transferred to a Bison Subsidiary.

3. Immediately after Closing, Textron Automotive Company Inc. will assign its 49% interest in Synova Plastics LLC to Holdings. (51% of the membership interest in Synova Plastics LLC is owned by Jackson Plastics Inc.)

4. The following assets and liabilities will be transferred to a Bison Subsidiary on or before the Closing Date:

(a) assets and liabilities (other than Contracts) which are used primarily in or relate primarily to the Business including the following:

(i) to the extent permitted by law, assets and liabilities reflected on the December 30, 2000 Statement of Net Assets to be sold, which is part of the Financial Statements, which have not been disposed of or satisfied subsequent to December 30, 2000 and which are in the name of a Non-Bison Subsidiary; excluding, however, the assets being transferred pursuant to Section 2.2(a) of the Purchase Agreement; and

(ii) to the extent permitted by law, assets and liabilities acquired or incurred subsequent to December 30, 2000 which (i) have not been disposed or satisfied prior to the Closing Date, (ii) are in the name of a Non-Bison Subsidiary and (iii) which are used primarily in or relate primarily to the business of a Bison Subsidiary;

(b) Contracts relating solely to the business of a Bison Subsidiary which are in the name of a Non-Bison Subsidiary and which can be assigned on or before the Closing Date;

(c) Contracts currently in effect with a customer of the Business which can be assigned on or before the Closing Date; and

(d) intellectual property listed on Section C-2 of the Disclosure Schedule which is in the name of a Non-Bison Subsidiary; excluding, however, the assets being transferred pursuant to Section 2.2(a) of the Purchase Agreement. (This list includes intellectual property currently held in the name of Bison Subsidiaries as well as intellectual property currently held in the name of Non-Bison Subsidiaries.)

5. Title to the real property covered by the deeds identified in Section 5.4(c) part A of the Disclosure Schedule will be transferred on or before the Closing Date to a Bison Subsidiary.

C-2

ALLOCATION OF PURCHASE PRICE

This schedule assumes Balance Sheet Indebtedness on the Closing Date is $80 million.

| DIRECTLY PURCHASED SUBSIDIARY | FAIR MARKET VALUE OF INTEREST BEING SOLD (IN USD MILLIONS) |
|---|---|
| Textron Automotive Belgium B.V.B.A. | 20 |
| Permali do Brasil Industria e Comercio Ltda | 10 |
| Textron Canada Limited | 124 |
| Textron Properties Inc. | 226 |
| Textron Automotive Holdings Italy S.r.l. | 45 |
| Textron S.A. de C.V. | 107 |
| Textron Automotive B.V. | 59 |
| Textron Automotive MIP Limited | 20 |
| Textron Automotive Interiors Inc. | 252 |
| TOTAL | 863 |

D-1

SCHEDULE E

## SUBSIDIARIES OF COLLINS & AIKMAN CORPORATION

| COMPANY | JURISDICTION |
|---|---|
| Collins & Aikman Products Co. | Delaware |
| Carcorp, Inc. | Delaware |
| Collins & Aikman Accessory Mats, Inc. | Delaware |
| Akro Mats, LLC | Delaware |
| Collins & Aikman Automotive Mats, LLC | Delaware |
| Collins & Aikman Asset Services, Inc. | Delaware |
| CW Management Corporation (1) | Delaware |
| Hopkins Services, Inc. (2) | Minnesota |
| SAF Services Corporation (3) | Delaware |
| Collins & Aikman Automotive International, Inc. | Delaware |
| Collins & Aikman Carpet & Acoustics (MI), Inc. | Delaware |
| Collins & Aikman Carpet & Acoustics (TN), Inc. | Tennessee |
| Collins & Aikman Export Corporation | U.S. Virgin Isles |
| Collins & Aikman Holdings Canada Inc. | Canada |
| Collins & Aikman Canada Inc. | Canada |
| C & A Canada International Holdings Limited (4) | Canada |
| Collins & Aikman Luxembourg, S.A. | Luxembourg |
| Imperial Wallcoverings (Canada) Inc. | Canada |
| Collins & Aikman International Corporation | Delaware |
| Collins & Aikman Europe, Inc. | Delaware |
| Collins & Aikman (Gibraltar) Limited | Gibraltar/Delaware |
| C & A Canada International Holding Company | Canada |
| Collins & Aikman Europe S.A. (5) | Luxembourg |
| C&A (Gibraltar) | Gibraltar |
| C&A (Gibraltar) No. 2 | Gibraltar |
| Collins & Aikman Automotive Holding GmbH | Germany |
| Collins & Aikman Automotive Systems GmbH | Germany |
| Dura Convertible Systems GmbH | Germany |
| Collins & Aikman Automotive Systems Italy S.r.l. (6) | Italy |

------------
(1)    10% owned by Willis Corroon Corporation of North Carolina
(2)    10% owned by O'Brien & Gere of North America, Inc.
(3)    10% owned by Unicare, Inc.
(4)    50% owned by Collins & Aikman Plastics, Ltd.
(5)    30% owned by Collins & Aikman Luxembourg, S.A; 49% by Collins & Aikman (Gibraltar) Ltd.
(6)    25% owned by Collins & Aikman Europe B.V.

E-1

| | |
|---|---|
| Collins & Aikman Automotive Systems N.V. (7) | Belgium |
| Collins & Aikman Automotive Systems S.L. (8) | Spain |
| Collins & Aikman Europe B.V. | Netherlands |
|     Collins & Aikman Automotive Floormats Europe, B.V. | Netherlands |
| Collins & Aikman Holding AB | Sweden |
|     Collins & Aikman Automotive Systems AB | Sweden |
| Collins & Aikman Products GmbH | Austria |
| Collins & Aikman Holdings Limited | United Kingdom |
|     Collins & Aikman Automotive Fabrics Limited | United Kingdom |
|     Collins & Aikman Automotive Interior Systems Europe Limited | United Kingdom |
|       Collins & Aikman Automotive Systems Limited | United Kingdom |
|         Collins & Aikman Automotive Carpet Products (UK) Limited | United Kingdom |
|       Abex Plastic Products Limited | United Kingdom |
|       Manchester Kigass International Limited | United Kingdom |
|       Premier Springs & Pressings Limited | United Kingdom |
| Collins & Aikman Holdings, S.A. de C.V. (9) | Mexico |
|     Amco de Mexico, S.A. de C.V. | Mexico |
|     Collins & Aikman de Mexico, S.A. de C.V. (10) | Mexico |
|     Collins & Aikman Carpet & Acoustics, S.A. de C.V. (11) | Mexico |
|     Dura Convertible Systems de Mexico, S.A. de C.V. (12) | Mexico |
|     Industrias Enjema, S.A. de C.V. (13) | Mexico |
|     Servitop, S.A. de C.V. (14) | Mexico |
|     Servitrim, S.A. de C.V. (15) | Mexico |
| Collins & Aikman Plastics, Inc. | Delaware |
|     Becker Group, LLC | Michigan |
|       Brut Plastics, Inc. | Michigan |
|       Engineered Plastic Products, Inc. (16) | Michigan |

----------

(7)   Ten shares owned by Collins & Aikman Automotive Systems AB
(8)   One share owned by Collins & Aikman Holdings Limited
(9)   One share owned by Habinus Trading Company
(10)   One share owned by Collins & Aikman Accessory Mats, Inc.
(11)   One share of Series "A" owned by Collins & Aikman International Corporation
(12)   One share owned by Dura Convertible Systems, Inc.
(13)   One share owned by Collins & Aikman International Corporation
(14)   One share owned by Amco de Mexico, S.A. de C.V.
(15)   One share owned by Dura Convertible Systems de Mexico, S.A. de C.V.
(16)   55% owned by Gerald Edwards

| COMPANY | JURISDICTION |
|---|---|
| Collins & Aikman Plastics, Ltd. | Canada |
| Aguirre, Collins & Aikman Plastics, L.L.C. (17) | Michigan |
| Collins & Aikman Properties, Inc. | Delaware |
| Comet Acoustics, Inc. | Delaware |
| Dura Convertible Systems, Inc. | Delaware |
| Amco Convertible Fabrics, Inc. | Delaware |
| Gamble Development Company | Minnesota |
| Grefab, Inc. | New York |
| JPS Automotive, Inc. | Delaware |
| JPS Automotive Products Corp. | Delaware |
| Waterstone Insurance, Inc. | Vermont |
| Wickes Asset Management, Inc. | Delaware |
| Wickes Manufacturing Company | Delaware |

NON-PROFIT CORPORATIONS
-----------------------

| | |
|---|---|
| Collins & Aikman Foundation | California |
| Collins & Aikman Disaster Relief Fund, Inc. | North Carolina |

------------
(17)  53% owned by Mexican Industries in Michigan, Inc.

E-3

# EXHIBIT A

# PART 3

# ACQUIRING ENTITIES

| TARGET | ACQUIRER |
| ------ | -------- |
| TAC Inc. Intangibles | Collins & Aikman Development Company |
| Textron Automotive Belgium B.V.B.A. | Collins & Aikman Europe S.A. and/or one or more of its wholly owned subsidiaries |
| Permali do Brasil Industria e Comercio Ltda | Collins & Aikman International Corporation and/or one or more of its wholly owned subsidiaries |
| Textron Canada Limited | Collins & Aikman Canada Domestic Holding Company and/or one or more of its wholly owned subsidiaries |
| Textron Properties Inc. | Collins & Aikman Canada Domestic Holding Company and/or one or more of its wholly owned subsidiaries |
| Textron Automotive Holdings Italy S.r.l. | Collins & Aikman Europe S.A. and/or one or more of its wholly owned subsidiaries |
| Textron S.A. de C.V. | Collins & Aikman International Corporation and/or one or more of its wholly owned subsidiaries |
| Textron Automotive B.V. | Collins & Aikman Europe S.A. and/or one or more of its wholly owned subsidiaries |
| Textron Automotive MIP Limited | Collins & Aikman Europe S.A. and/or one or more of its wholly owned subsidiaries |
| Textron Automotive Interiors Inc. | Collins & Aikman Interiors, Inc. |
| Textron Automotive Exteriors Inc. Americus and Evart | Collins & Aikman Products Co. JPS Automotive, Inc. |

F-1

EXHIBIT 1

CERTIFICATE OF DESIGNATION OF THE
POWERS, PREFERENCES AND RELATIVE,
PARTICIPATING, OPTIONAL AND OTHER
SPECIAL RIGHTS OF THE 15% SERIES A
REDEEMABLE PREFERRED STOCK, THE 16%
SERIES B REDEEMABLE PREFERRED STOCK
AND THE 16% SERIES C REDEEMABLE
PREFERRED STOCK AND QUALIFICATIONS,
LIMITATIONS OR RESTRICTIONS THEREOF

Pursuant to Section 151 of the General Corporation Law of the State of Delaware

Collins & Aikman Products Co. (the "COMPANY"), a corporation organized and existing under the General Corporation Law of the State of Delaware, does hereby certify that, pursuant to authority conferred upon the Board of Directors of the Company by its Certificate of Incorporation (hereinafter referred to as the "CERTIFICATE OF INCORPORATION") and pursuant to the provisions of Section 151 of the General Corporation Law of the State of Delaware, said Board of Directors, by unanimous written consent dated [ ], 2001, duly approved and adopted the following resolution (the "RESOLUTION"):

RESOLVED, that pursuant to the authority vested in the Board of Directors by the Certificate of Incorporation, the Board of Directors hereby creates, authorizes and provides for the issuance of six series of Preferred Stock of the Company, designated as (1) 15% Series A1 Redeemable Preferred Stock, without par value, of the Company, (2) 16% Series B1 Redeemable Preferred Stock, without par value, of the Company, (3) 16% Series C1 Redeemable Preferred Stock, without par value, of the Company, (4) 15% Series A2 Redeemable Preferred Stock, without par value, of the Company, (5) 16% Series B2 Redeemable Preferred Stock, without par value, of the Company and (6) 16% Series C2 Redeemable Preferred Stock, without par value, of the Company, having the designations, preferences, relative, participating, optional and other special rights of the shares of each such series, and the qualifications, limitations and restrictions thereof that are set forth in the Certificate of Incorporation and in this Resolution, as follows:

SECTION 1. Designation, Amount and Issuance. (a) Of the six series of Preferred Stock authorized by this Resolution, the Series A1 Redeemable Preferred Stock, the Series B1 Redeemable Preferred Stock and the Series C1 Redeemable Preferred Stock are to be initially issued in connection with the Acquisition and the Series A2 Redeemable Preferred

Stock, the Series B2 Redeemable Preferred Stock and the Series C2 Redeemable Preferred Stock are to be initially issued as necessary to comply with the registration and exchange provisions of the Registration Rights Agreement. Additional shares of Redeemable Preferred Stock may also be issued in accordance with Section 1(b), additional shares of Series A1 Redeemable Preferred Stock or Series A2 Redeemable Preferred Stock may be issued in accordance with Section 7(d) and additional shares of Series B1 Redeemable Preferred Stock or Series B2 Redeemable Preferred Stock may also be issued in accordance with Section 5(e). The designations for the six series of Preferred Stock authorized by this Resolution shall be (1) the 15% Series A1 Redeemable Preferred Stock, without par value (the "SERIES A1 REDEEMABLE PREFERRED STOCK"), (2) the 16% Series B1 Redeemable Preferred Stock, without par value (the "SERIES B1 REDEEMABLE PREFERRED STOCK"), (3) the 16% Series C1 Redeemable Preferred Stock, without par value (the "SERIES C1 REDEEMABLE PREFERRED STOCK"), (4) the 15% Series A2 Redeemable Preferred Stock, without par value (the "SERIES A2 REDEEMABLE PREFERRED STOCK" and, together with the Series A1 Redeemable Preferred Stock, the "SERIES A REDEEMABLE PREFERRED STOCK"), (5) the 16% Series B2 Redeemable Preferred Stock, without par value (the "SERIES B2 REDEEMABLE PREFERRED STOCK" and, together with the Series B1 Redeemable Preferred Stock, the "SERIES B REDEEMABLE PREFERRED STOCK"), and (6) the 16% Series C2 Redeemable Preferred Stock, without par value (the "SERIES C2 REDEEMABLE PREFERRED STOCK" and, together with the Series C1 Redeemable Preferred Stock, the "SERIES C REDEEMABLE PREFERRED STOCK" and such Series C Redeemable Preferred Stock, together with the Series A Redeemable Preferred Stock and the Series B Redeemable Preferred Stock, the "REDEEMABLE PREFERRED Stock"). The liquidation preference of the Series A1 Redeemable Preferred Stock, the Series B1 Redeemable Preferred Stock and the Series C1 Redeemable Preferred Stock at their Issuance Date is $1,000 per share and the original issue price for each such share is $1,000. The issue price per share or Liquidation Preference of the Redeemable Preferred Stock shall not for any purpose be considered to be a determination by the Board of Directors with respect to the capital and surplus of the Company. The liquidation preference of the Series A2 Redeemable Preferred Stock, the Series B2 Redeemable Preferred Stock and the Series C2 Redeemable Preferred Stock at their Issuance Date will equal the Liquidation Preference of the Series A1 Redeemable Preferred Stock, the Series B1 Redeemable Preferred Stock and the Series C1 Redeemable Preferred Stock, respectively, at such Issuance Date pursuant to the terms of the Registration Rights Agreement (which is inclusive of an amount of Series A Accrued Dividends, Series B Accrued Dividends and Series C Accrued Dividends, respectively, equal to that of the Series A1 Redeemable Preferred Stock, the Series B1 Redeemable Preferred Stock and the Series C1 Redeemable Preferred Stock at such time). The number of shares constituting the Series A1 Redeemable Preferred Stock shall be 130,000 shares. The number of shares constituting the Series B1 Redeemable Preferred Stock shall be 95,000 shares. The number of shares constituting the Series C1 Redeemable Preferred Stock shall be 20,000 shares. The number of shares constituting the Series A2 Redeemable Preferred Stock shall be 130,000 shares. The number of shares constituting the Series B2 Redeemable Preferred Stock

shall be 95,000 shares. The number of shares constituting the Series C2 Redeemable Preferred Stock shall be 20,000 shares. In addition, each series of Redeemable Preferred Stock shall be constituted by up to an additional [ ] shares of such series to be available for issuance from time to time as provided for in Sections 1(b) and 7(d) and each series of Series B Preferred Stock shall be further constituted by up to an additional [ ] shares of such series to be available for issuance as provided in Section 5(e). None of the shares of Redeemable Preferred Stock acquired by the Company by reason of redemption, purchase or otherwise shall be reissued as such, but may be redesignated for reissuance as shares of a different class or series of Preferred Stock in compliance with the terms hereof. Except as provided in Section 1(b), Section 7(d) and Section 5 (e), the Company shall only issue the shares of the Series A2 Redeemable Preferred Stock, the Series B2 Redeemable Preferred Stock and the Series C2 Redeemable Preferred Stock to the Holders of the Series A1 Redeemable Preferred Stock, the Series B1 Redeemable Preferred Stock and the Series C1 Redeemable Preferred Stock, as applicable, as is necessary to comply with the registration and exchange provisions of the Registration Rights Agreement.

(b) In the event that the Company shall be required to pay Liquidated Damages pursuant to the Registration Rights Agreement and shall elect to pay such Liquidated Damages in kind, on each Dividend Payment Date the Company shall issue to each Holder entitled to Liquidated Damages in respect of shares of a series of Redeemable Preferred Stock held by such Holder such number of newly issued shares of such series of Redeemable Preferred Stock as is equal to (x) the Liquidated Damages then due to such Holder in respect of shares of Redeemable Preferred Stock of such series held by such Holder, divided by (y) the Liquidation Preference plus Total Cash Dividends in Arrears (inclusive of Additional Dividends and accrued regular dividends from the preceding Dividend Payment Date if not concurrently paid or accrued in accordance with the terms hereof) in respect of each share of Redeemable Preferred Stock of such series as of such Dividend Payment Date. Each newly issued share of Redeemable Preferred Stock of a series issued to a Holder shall be identical in all respects, including Liquidation Preference and Total Cash Dividends in Arrears, to all other shares of Redeemable Preferred Stock of the same series held by such Holder. In lieu of any issuing any fractional shares of Redeemable Preferred Stock of any series, the Company may deliver to a Holder an amount in cash equal to such fraction multiplied by the amount set forth in clause (y) of the preceding sentence with respect to such series.

SECTION 2. Dividends. (a) Subject to Section 7(d) in the case of Textron Shares only, all shares of Redeemable Preferred Stock will bear dividends, whether or not earned or declared, out of funds legally available therefor, from the Issuance Date thereof accruing on the Liquidation Preference thereof at the rate of (x) 15% per annum (the "SERIES A DIVIDEND RATE") in the case of the Series A Redeemable Preferred Stock, (y) 16% per annum (the "SERIES B DIVIDEND RATE") in the case of the Series B Redeemable Preferred Stock and (z) 16% per annum (the "SERIES C DIVIDEND RATE" and, together with the Series A Dividend

Rate and the Series B Dividend Rate, the "DIVIDEND RATE") in the case of the Series C Redeemable Preferred Stock and, in each case, will be payable quarterly in arrears on each Dividend Payment Date, commencing on March 1, 2002, to Holders of record on the February 15, May 15, August 15 and November 15 immediately preceding the relevant Dividend Payment Date. In calculating the amount of dividends due on any Dividend Payment Date, the Liquidation Preference utilized shall be the Liquidation Preference in effect on the first business day following the immediately preceding Dividend Payment Date. The Company may, at its option and without notice, elect to accrue up to (but not more than) an amount (rounded to the nearest $.01) equivalent to 7% per annum of the dividends on the Series A Redeemable Preferred Stock payable on any Dividend Payment Date and up to (but not more than) an amount (rounded to the nearest $.01) equivalent to 8% per annum of the dividends on each of the Series B Redeemable Preferred Stock and the Series C Redeemable Preferred Stock payable on any Dividend Payment Date in lieu of payment of such dividends in cash and, in each such case, any such accrued dividends (respectively, the "SERIES A ACCRUED DIVIDENDS," "SERIES B ACCRUED DIVIDENDS" and "SERIES C ACCRUED DIVIDENDS") will be added to the Liquidation Preference of the applicable series of Redeemable Preferred Stock. Additional dividends are payable in cash in respect of Series A 7(d) ("LIQUIDITY DIVIDENDS"). For the avoidance of doubt, Liquidity Dividends shall not be subject to accrual as provided in the second preceding sentence but shall be treated as dividends payable in cash for all purposes of this Section
2. Dividends shall cease to accumulate in respect of the shares of Redeemable Preferred Stock upon their redemption unless the Company shall have failed to pay the relevant redemption price on the Redemption Date.

(b) All dividends (including pursuant to Section 2(f)) paid with respect to shares of the Redeemable Preferred Stock pursuant to this Certificate of Designation shall be paid pro rata to the Holders entitled thereto.

(c) Dividends with respect to Redeemable Preferred Stock are payable when, as and if declared by the Board of Directors, and nothing contained in this Certificate of Designation shall in any way or under any circumstances be construed or deemed to require the Board of Directors to declare, or the Company to pay or set apart for payment, any dividends on shares of the Redeemable Preferred Stock at any time. Dividends on the Redeemable Preferred Stock will accrue whether or not the Company has earnings or profits, whether or not there are funds legally available for the payment of such dividends and whether or not dividends are declared. The accrual of dividends as Series A Accrued Dividends, Series B Accrued Dividends or Series C Accrued Dividends as permitted by Section 2(a) shall be deemed to be a payment of dividends and shall fulfill the Company's obligations with respect to the payment of such portion of the dividends payable upon the Redeemable Preferred Stock for all purposes hereof. Other dividends will accumulate to the extent they are not paid on the Dividend Payment Date for the period to which they relate as Cash

Dividends in Arrears and accumulated and unpaid dividends which are required to be paid in cash will bear Additional Dividends until paid on the same basis as set forth in Section 2(a) of this Certificate of Designation, compounded quarterly on each Dividend Payment Date.

(d) Subject to the Company's option to accrue a portion of the dividends provided for in Section 2(a), Holders shall be entitled to receive the cash dividends provided for in this Certificate of Designation (including the Total Cash Dividends in Arrears) in preference to and in priority over any cash dividends (including accumulated and unpaid dividends) payable upon any Junior Securities.

(e) At the Issuance Date of the Series A2 Redeemable Preferred Stock and the Series B2 Redeemable Preferred Stock and the Series C2 Redeemable Preferred Stock, such shares shall be issued with Total Cash Dividends in Arrears and accumulated and unpaid dividends for the then current dividend period equal to that of the Series A1 Redeemable Preferred Stock, the Series B1 Redeemable Preferred Stock and the Series C1 Redeemable Preferred Stock for which it is exchanged pursuant to the Registration Rights Agreement.

(f) At any time and from time to time when there shall be Total Cash Dividends in Arrears, the Company may declare and pay, to the Holders of record of the Redeemable Preferred Stock on any record date chosen by the Company (which record date shall be not less than 10 and not more than 60 days prior to the payment date for such special dividend) for such dividends, a special dividend per share of Redeemable Preferred Stock equal to all or a portion of the Total Cash Dividends in Arrears as of the payment date. Upon payment of such a dividend, if less than the Total Cash Dividends in Arrears with respect to a share has been paid, the Cash Dividends in Arrears and Additional Dividends with respect to such share shall be reduced on a pro rata basis by the amount of such dividend.

(g) No full dividends may be declared or paid or funds set apart for the payment of dividends on, and the Company shall not make any other distribution with respect to, any Parity Securities for any period unless the entire Total Cash Dividends in Arrears for all issued and outstanding shares of Redeemable Preferred Stock shall have been declared and paid in full, except as provided below. If at any time there shall exist Total Cash Dividends in Arrears, the Redeemable Preferred Stock will share dividends pro rata with the Parity Securities (on the basis of the relative unpaid amount of Cash Dividends in Arrears and Additional Dividends, in the case of the Redeemable Preferred Stock and of cumulative accrued and unpaid dividends, in the case of such Parity Securities).

(h) Cash Dividends in Arrears, Additional Dividends and other dividends in connection with any redemption may be declared and paid at any time, without reference to any regular Dividend Payment Date, to Holders of record of the Redeemable Preferred Stock on such date, not more than 60 days prior to the payment thereof, as may be fixed by the Board of Directors.

(i) Dividends payable on the Redeemable Preferred Stock shall be computed on the basis of a 360-day year of twelve 30-day months and the actual number of days elapsed in the period for which dividends are payable and shall be deemed to accrue on a daily basis.

SECTION 3. Liquidation Preference. Upon any voluntary or involuntary liquidation, dissolution or winding-up of the Company, Holders will be entitled to be paid, out of the assets of the Company available for distribution to stockholders, the Liquidation Preference per share of Redeemable Preferred Stock, plus, without duplication, an amount in cash equal to all accumulated and unpaid dividends (including any Total Cash Dividends in Arrears), if any, thereon to the date fixed for liquidation, dissolution or winding-up (including an amount equal to a prorated dividend for the period from the last Dividend Payment Date to the date fixed for liquidation, dissolution or winding-up), plus, in the case of the Series C Redeemable Preferred Stock only, an amount in cash equal to the Common Participation Amount, before any distribution is made on any Junior Securities, including, without limitation, on any Common Stock of the Company. If, upon any voluntary or involuntary liquidation, dissolution or winding-up of the Company, the amounts payable with respect to the Redeemable Preferred Stock and all other Parity Securities are not paid in full, the Holders of the Redeemable Preferred Stock and the holders of the Parity Securities will share equally and ratably in any distribution of assets of the Company in proportion to their relative liquidation preferences, together with all accumulated and unpaid dividends to which each is entitled. After payment of the full amount of the Liquidation Preference and, without duplication, accumulated and unpaid dividends (including any Total Cash Dividends in Arrears) to which they are entitled, and, in the case of the Series C Redeemable Preferred Stock only, an amount in cash equal to the Common Participation Amount, Holders will not be entitled to any further participation in any distribution of assets of the Company. For the avoidance of doubt, the Series A Redeemable Preferred Stock, the Series B Redeemable Preferred Stock and the Series C Redeemable Preferred Stock shall constitute Parity Securities with respect to one another. For the purposes of this Section 3, neither the sale, conveyance, exchange or transfer (for cash, shares of stock, securities or other consideration) of all or substantially all of the property or assets of the Company nor the consolidation or merger of the Company with one or more entities shall be deemed to be a liquidation, dissolution or winding-up of the Company. Any payment of accumulated and unpaid dividends shall be paid prior to any other payments called for pursuant to this Section 3.

SECTION 4. Voting Rights. (a) Except as otherwise required under the laws of the State of Delaware or as set forth below, Holders shall not be entitled or permitted to vote on any matter required or permitted to be voted upon by the stockholders of the Company.

(b) If (i) after December 1, 2002, there shall exist any Total Cash Dividends in Arrears remaining in arrears and unpaid for any two consecutive quarterly dividend periods;

(ii) the Company fails to discharge its obligation to redeem Redeemable Preferred Stock on any Redemption Date to the extent required by Section 5;

(iii) the Company fails to make a Par Offer if such offer is required by the second paragraph of Section 7(d) hereof or fails to purchase shares of Series A Redeemable Preferred Stock from Holders who elect to have such shares purchased pursuant to such Par Offer; (iv) a breach or violation of any other provisions contained in Section 7 hereof occurs and the breach or violation continues for a period of 45 days or more after the Company receives notice thereof specifying the default from the Holders of at least 25% of the shares of Redeemable Preferred Stock then outstanding; (v) Indebtedness of the Company and/or any Restricted Subsidiary having an individual or aggregate outstanding principal amount of $25,000,000 or more is declared due and payable following an event of default prior to its scheduled stated maturity or is not paid in full upon its scheduled stated maturity; (vi) a decree or order is entered by a court having jurisdiction in the premises granting relief in respect of any Significant Subsidiary in any involuntary case under the Federal Bankruptcy Code, adjudging such Significant Subsidiary a bankrupt, or approving as properly filed a petition seeking reorganization, arrangement, adjustment or composition of or in respect of any Significant Subsidiary under any Bankruptcy Law, or appointing a receiver, liquidator, custodian, assignee, trustee, sequestrator (or other similar official) of any Significant Subsidiary, or of substantially all of its properties, or ordering the winding-up or liquidation of its affairs under any such law, and any such decree or order continues unstayed and in effect for a period of 60 consecutive days; or (vii) any Significant Subsidiary institutes proceedings to be adjudicated a bankrupt, or any Significant Subsidiary consents to the institution of bankruptcy proceedings against it, or any Significant Subsidiary files a petition or answer or consent seeking reorganization or relief under any Bankruptcy Law, or any Significant Subsidiary consents to the filing of any such petition or to the appointment of a receiver, liquidator, custodian, assignee, trustee, sequestrator (or other similar official) of any Significant Subsidiary, or of substantially all of its properties under any such law, then, in each such case, the Holders of the majority of the then outstanding affected series of Redeemable Preferred Stock (voting or consenting, as the case may be, as one class to the extent such Voting Rights Triggering Event relates to both series of Redeemable Preferred Stock) will be entitled to elect two members of the Board of Directors of the Company; provided, however, that in no event shall such Holders be entitled to elect more than two such members. Such voting rights will continue until such time as (x) in the case of a dividend default described in clause (i) above, all Total Cash Dividends in Arrears on the Redeemable Preferred Stock are paid in full, (y) in the case of an event described in clause (v) above, any such acceleration or event of default has been rescinded, cured or waived or the Indebtedness relating to such acceleration has been paid, redeemed, repurchased or defeased in full and (z) in all other cases, any failure, breach, default or event giving rise to such voting rights is remedied, cured or waived by the Holders of at least a majority of the then outstanding affected series of Redeemable Preferred Stock (voting or consenting, as the case may be, as one class to the extent such Voting Rights Triggering Event relates to both series of Redeemable Preferred Stock), after which time the term of the directors elected pursuant to

the provisions of this paragraph shall terminate. Each such event described in clauses (i) through (vii) above is referred to herein as a "VOTING RIGHTS TRIGGERING EVENT."

(c) The Company shall not modify, change, affect or amend (including in connection with a merger or consolidation, except to the limited extent contemplated by Section 7(e)) the Certificate of Incorporation or this Certificate of Designation to affect materially and adversely the specified rights, preferences, privileges or voting rights of the Holders of the Redeemable Preferred Stock, or authorize the issuance of any additional shares of Redeemable Preferred Stock, without the affirmative vote or consent of Holders of at least a majority of the shares of Redeemable Preferred Stock then outstanding, voting or consenting, as the case may be, as one class. In addition, the Company shall not authorize, create (by way of reclassification, merger, consolidation or otherwise) or issue (i) any Parity Securities, or any obligation or security convertible into or evidencing the right to purchase any Parity Securities, without the affirmative vote or consent of the Holders of a majority of the then outstanding shares of Redeemable Preferred Stock, (ii) any Senior Securities, or any obligation or security convertible into or evidencing the right to purchase Senior Securities, without the affirmative vote or consent of the Holders of at least a majority of the outstanding shares of the Redeemable Preferred Stock and (iii) any Junior Securities constituting Disqualified Stock, or any obligation or security convertible into or evidencing the right to purchase Junior Securities constituting Disqualified Stock, without the affirmative vote or consent of the Holders of at least a majority of the outstanding shares of the Redeemable Preferred Stock, in each case voting or consenting, as the case may be, as one class. Except as expressly set forth above, (i) the creation, authorization or issuance of any shares of Junior Securities, Parity Securities or Senior Securities, including the designation of series thereof within the existing class of Preferred Stock of the Company, or

(ii) the increase or decrease in the amount of authorized Capital Stock of any class, including any Preferred Stock of the Company (other than the Redeemable Preferred Stock), shall not require the consent of the Holders and shall not be deemed to affect materially and adversely the specified rights, preferences, privileges or voting rights of Holders. The affirmative vote or consent of Holders of at least a majority of the then issued and outstanding shares of Redeemable Preferred Stock shall be required to increase the amount of authorized Redeemable Preferred Stock. No vote of the Holders shall be required to decrease the number of authorized shares of the Redeemable Preferred Stock; provided, however, that such number shall not be decreased below the number of the then currently issued and outstanding shares of Redeemable Preferred Stock.

(d) Immediately after voting power to elect directors shall have become vested and be continuing in the Holders pursuant to Section 4(b) or if vacancies shall exist in the offices of directors elected by the Holders, Holders of at least 10% of the then issued and outstanding shares of Redeemable Preferred Stock or a proper officer of the Company shall call a special meeting of the Holders for the purpose of electing the directors which such

-9-

Holders are entitled to elect. Any such meeting shall be held at the earliest practicable date, and the Company shall provide Holders with access to the lists of Holders. At any meeting held for the purpose of electing directors at which the Holders shall have the right, voting separately as a class, to elect directors, the presence in person or by proxy of the Holders of at least a majority of the outstanding shares of Redeemable Preferred Stock shall be required to constitute a quorum of such Holders.

(e) Any vacancy occurring in the office of a director elected by the Holders shall be filled by the Holders.

(f) In any case in which the Holders shall be entitled to vote pursuant to this Section 4 or pursuant to the General Corporation Law of the State of Delaware, each Holder shall be entitled to one vote for each share of Redeemable Preferred Stock held.

(g) Holders of at least a majority of the then outstanding shares of Redeemable Preferred Stock, voting or consenting, as the case may be, separately as a single class, may waive compliance with any provision of this Certificate of Designation.

SECTION 5. Redemption and Series C Exchange.

(a) Optional Redemption. (i) The Series A Redeemable Preferred Stock and the Series B Redeemable Preferred Stock will be redeemable at the election of the Company, as a whole or from time to time in part, at any time on or after December 1, 2006, at the applicable redemption prices (expressed as a percentage of the Liquidation Preference thereof) set forth below, plus, without duplication, an amount in cash equal to a prorated dividend for the period from the Dividend Payment Date immediately prior to the date of redemption (the "OPTIONAL REDEMPTION DATE") to the Optional Redemption Date, if redeemed during the 12-month period beginning on December 1 of the years indicated below.

|  | Redemption Price | |
|---|---|---|
| Year | Series A Redeemable Preferred Stock | Series B Redeemable Preferred Stock |
| 2006..................... | 107.500% | 108.000% |
| 2007..................... | 105.000% | 105.333% |
| 2008..................... | 102.500% | 102.667% |
| 2009 and thereafter...... | 100.000% | 100.000% |

(ii) No optional redemption may be made unless prior to such redemption any Total Cash Dividends in Arrears shall have been fully paid on all shares of the Redeemable Preferred Stock. If less than all the Redeemable Preferred Stock of any series is to be redeemed, the particular shares of such series to be redeemed will be determined pro rata among Holders of such series, except that the Company may redeem such shares held by

any Holder of fewer than 100 shares without regard to such pro rata redemption requirement. If any Redeemable Preferred Stock is to be redeemed in part, the Redemption Notice that relates to such Redeemable Preferred Stock shall state the portion of the Liquidation Preference to be redeemed. New shares of the same series of Redeemable Preferred Stock having an aggregate Liquidation Preference equal to the unredeemed portion will be issued in the name of the Holder thereof upon cancellation of the original shares of Redeemable Preferred Stock.

(b) Mandatory Redemption. (i) The Company shall redeem all outstanding Series A Redeemable Preferred Stock and Series B Redeemable Preferred Stock (subject to the legal availability of funds therefor) in whole on December 1, 2012; provided that such date shall be automatically changed upon the issuance of the Acquisition Notes to be the date that is the first Business Day which is one year following the final stated maturity date of the Acquisition Notes (without giving effect to any amendment, modification or waiver thereof), at a redemption price equal to 100% of the Liquidation Preference thereof, plus, without duplication, all accumulated and unpaid dividends (including any Total Cash Dividends in Arrears), if any, to the Maturity Redemption Date. The Company shall redeem all outstanding Series C Redeemable Preferred Stock (subject to the legal availability of funds therefor) in whole on January 1, 2022, at a redemption price equal to 100% of the Liquidation Preference thereof, plus, without duplication, all accumulated and unpaid dividends (including any Total Cash Dividends in Arrears), if any, to the Maturity Redemption Date, plus the Common Participation Amount.

(ii) The Company shall make an offer to redeem (a "CHANGE OF CONTROL OFFER") all outstanding Redeemable Preferred Stock (subject to legal availability of funds therefor) not later than 60 days following a Change of Control (the "CHANGE OF CONTROL REDEMPTION DATE") at a redemption price equal to 100% of the Liquidation Preference thereof, plus, without duplication, all accumulated and unpaid dividends (including any Total Cash Dividends in Arrears), if any, to the Change of Control Redemption Date, plus, in the case of the Series C Redeemable Preferred Stock only, an amount equal to the Common Participation Amount; provided that (A) no redemption under this Section 5(b)(ii) shall be required unless (i) all Existing Notes shall have ceased to be outstanding, (ii) the Company shall have consummated a defeasance with respect to the Existing Notes in accordance with the terms thereof or (iii) the holders of Existing Notes shall have consented to the Company's performance of its obligations under this Section 5(b)(ii) and (B) no redemption shall be effected until after the Company has performed all of its obligations arising upon a "change of control" under any debt instruments of the Company. The Company shall not consummate a transaction resulting in a Change of Control unless at the time of or prior to the Change of Control, the Company shall have entered into customary financial and/or other arrangements which permit the timely redemption of the Redeemable Preferred Stock under this Section 5(b)(ii) (disregarding the proviso of the preceding sentence). The Company may (but

-11-

shall not be obligated to) discharge any obligation arising under this Section 5(b)(ii) if a Person other than the Company (whether or not an Affiliate) makes and consummates a Change of Control Offer in the manner contemplated, and as required by, this Certificate of Designation.

(iii) In the event of any Asset Disposition resulting in Net Cash Proceeds to the Company or any Restricted Subsidiary required by the terms of the Company's then outstanding Indebtedness to be applied towards the repayment of, or any offer to repay, any outstanding Indebtedness of the Company to the extent that such Net Cash Proceeds are not applied by the Company within 365 days following such Asset Disposition toward the repayment of any such Indebtedness or are not reinvested in the business of the Company and the Restricted Subsidiaries within 365 days following such Asset Disposition, first the Company shall apply such Net Cash Proceeds towards the making and consummation of any remaining obligation to offer to purchase or other repayment of any outstanding Indebtedness of the Company to the extent required by, and in accordance with, the terms thereof, and towards any fees and expenses associated therewith, and, second, to the extent that any Net Cash Proceeds remain after any such purchase or repayment and payment of associated fees and expenses (such remaining proceeds being "NET AVAILABLE PROCEEDS") and provided no default or event of default would result under the terms of any Indebtedness of the Company, the Company shall (a) declare a special dividend pursuant to Section 2(e) in an amount equal to the lesser of (x) the full amount of the entire Total Cash Dividends in Arrears (together with all other dividends payable in respect thereof) or (y) the amount of such Net Available Proceeds, and (b) after fulfilling any obligations with respect to special dividends referred to in the preceding clause (a), apply any remaining Net Available Proceeds ("REMAINING NET AVAILABLE PROCEEDS") towards the making and consummation of an offer (an "ASSET DISPOSITION OFFER") to redeem shares of Redeemable Preferred Stock, at a redemption price equal to 100% of the Liquidation Preference thereof, plus, without duplication, all accumulated and unpaid dividends (including any Total Cash Dividends in Arrears), if any, to the redemption date (the "ASSET DISPOSITION REDEMPTION DATE"), which shall be not more than 60 nor less than 30 days following the Company's satisfaction of all obligations in respect of such Asset Disposition and the application of the Net Cash Proceeds therefrom required hereby to be performed prior to the making of an Asset Disposition Offer, plus, in the case of the Series C Redeemable Preferred Stock only, an amount equal to the Common Participation Amount. Notwithstanding anything herein to the contrary, the amount of Net Available Proceeds may be recalculated to take account of the pro rata rights of any holders of Parity Securities, if any.

(c) Dividend Payment. Any payment of accumulated and unpaid dividends shall be made prior to the payment of any redemption price made pursuant to this
Section 5. In addition, the Company shall declare and pay a special dividend as provided in Section 2(e) in respect of the full amount of any Total Cash Dividends in Arrears prior to the payment of

any redemption price made pursuant to this Section 5. Notwithstanding anything herein to the contrary, this Section 5(c) shall not result in any requirement to make a duplicative payment upon any redemption hereunder.

(d) Procedure for Redemptions. (i) Not more than 60 and not less then 30 days prior to any Redemption Date (or, in the case of a redemption pursuant to Section 5(b)(ii), not more than 60 and not less than 5 Business Days prior to any Redemption Date), written notice (the "REDEMPTION NOTICE") shall be given by first-class mail, postage prepaid, to each Holder of record of shares to be redeemed on the record date fixed for such redemption of the Redeemable Preferred Stock or entitled to the benefits of a Change of Control Offer or Asset Disposition Offer, as the case may be, at such Holder's address as the same appears on the stock register of the Company; provided, however, that (1) a Redemption Notice may be given with respect to a redemption pursuant to Section 5(b)(ii) on a basis that is conditioned upon and subject to the occurrence of a Change of Control upon a date that may be subsequently changed (a "CONDITIONAL REDEMPTION NOTICE") and (2) no failure to give such notice nor any deficiency therein shall affect the validity of the procedure for the redemption of any shares of Redeemable Preferred Stock to be redeemed except as to the Holder or Holders to whom the Company has failed to give such notice or except as to the Holder or Holders whose notice was defective. The Redemption Notice shall state:

(A) in the case of a Change of Control Offer or Asset Disposition Offer only, that a Change of Control has occurred or that Remaining Net Available Proceeds resulting from an Asset Disposition exist, as the case may be, and that such Holder has the right to require the Company to redeem such Holder's Redeemable Preferred Stock at the within mentioned Redemption Price, in the case of an Asset Disposition Offer, up to a maximum aggregate Redemption Price equal to the Remaining Net Available Proceeds less the amount of fees and expenses associated with the making and consummation of the Asset Disposition Offer;

(B) the Redemption Price or, if unascertainable, how the Redemption Price will be calculated;

(C) in the case of an optional redemption only, whether all or less than all the outstanding shares of a series of Redeemable Preferred Stock are to be redeemed and the total number of shares of such Redeemable Preferred Stock being redeemed;

(D) in the case of an optional redemption only, the number and series of shares of Redeemable Preferred Stock held by the Holder that the Company intends to redeem;

(E) in the case of an Asset Disposition Offer only, the aggregate Remaining Net Available Proceeds available to redeem shares of Redeemable Preferred Stock

pursuant to the Asset Disposition Offer and to pay fees and expenses associated therewith;

(F) in the case of an Asset Disposition Offer only, that any shares of Redeemable Preferred Stock tendered in excess of the maximum number able to be repurchased with the Remaining Net Available Proceeds (net of fees and expenses associated with the Asset Disposition Offer) will be returned to the Holder and will be treated for all purposes as if such shares had not been tendered for redemption, and that in the event of such an excess tender, the Company shall select the shares of Redeemable Preferred Stock to be redeemed as nearly as practicable on a pro rata basis;

(G) the Redemption Date or, in the case of a Conditional Redemption Notice, the first possible and intended Redemption Date;

(H) in the case of an optional redemption or maturity date redemption only, that the Holder is to surrender to the Company, at the place or places that shall be designated in such Redemption Notice, its certificates representing the shares of Redeemable Preferred Stock to be redeemed;

(I) in the case of a Change of Control Offer or Asset Disposition Offer only, that the Holder is to surrender to the Company, at the place or places that shall be designated in such Redemption Notice, its certificates representing the shares of Redeemable Preferred Stock that such Holder has elected to be redeemed;

(J) that dividends on the shares of any Redeemable Preferred Stock to be redeemed shall cease to accumulate on the day prior to such Redemption Date unless the Company defaults in the payment of the redemption price; and

(K) the name of any bank or trust company performing the duties referred to in subsection (d)(iv) below.

(ii) On or before a Redemption Date, each Holder of Redeemable Preferred Stock to be redeemed shall surrender the certificate or certificates representing such shares of Redeemable Preferred Stock to the Company, in the manner and at the place designated in the Redemption Notice, and on the Redemption Date the full redemption price for such shares shall be payable in cash to the person whose name appears on such certificate or certificates as the owner thereof, and each surrendered certificate shall be returned to authorized but unissued shares. In the event that less than all of the shares represented by any such certificate are redeemed, a new certificate shall be issued representing the unredeemed shares.

(iii) On and after the Redemption Date, unless the Company defaults in the payment in full of the applicable redemption price, dividends on the Redeemable Preferred Stock called or tendered for redemption shall cease to accumulate on the day prior to the Redemption Date, and the Holders of such shares shall cease to have any further rights with respect thereto on the Redemption Date, other than the right to receive the redemption price, without interest.

(iv) If a Redemption Notice shall have been duly given or if the Company shall have given to the bank or trust company hereinafter referred to irrevocable authorization promptly to give such notice, and if on or before the Redemption Date specified therein the funds necessary for such redemption shall have been deposited by the Company with such bank or trust company in trust for the pro rata benefit of the Holders of the Redeemable Preferred Stock called or tendered for redemption, then, notwithstanding that any certificate for shares so called for redemption shall not have been surrendered for cancellation, from and after the time of such deposit, all shares so called or tendered, or to be so called or tendered pursuant to such irrevocable authorization, for redemption shall no longer be deemed to be outstanding and all rights with respect to such shares shall forthwith cease and terminate, except only the right of the Holders thereof to receive from such bank or trust company at any time after the time of such deposit the funds so deposited, without interest. The aforesaid bank or trust company shall be organized and in good standing under the laws of the United States of America or of any state within the United States, shall have capital, surplus and undivided profits aggregating at least $25,000,000 (a "QUALIFIED BANK") and shall be identified in the Redemption Notice. Any interest accrued on such funds from and after the Redemption Date shall be paid to the Company from time to time. Any funds so set aside or deposited, as the case may be, and unclaimed at the end of one year from such Redemption Date shall, to the extent permitted by law, be released or repaid to the Company, after which release or repayment the Holders of the shares so called for redemption shall look only to the Company for payment thereof.

(e) Exchange of Series C Redeemable Preferred Stock for Series B Redeemable Preferred Stock. At any time after the second anniversary of the Issuance Date of the Series C1 Redeemable Preferred Stock but prior to the third anniversary of the Issuance Date of the Series C1 Redeemable Preferred Stock, at the option of the Company or upon the written request of Holders of a majority of the outstanding shares of Series C Redeemable Preferred Stock, the Company shall exchange, in whole and not in part, all outstanding shares of Series C Redeemable Preferred Stock for newly issued shares of Series B Redeemable Preferred Stock. If any Series B Redeemable Preferred Stock shall be outstanding immediately prior to such exchange, all newly issued shares of Series B Redeemable Preferred Stock shall be of the same series as all other outstanding shares of Series B Redeemable Preferred Stock at such time and identical to such outstanding shares in all respects, including as to Liquidation Preference, Total Cash Dividends in Arrears (inclusive of any Additional

Dividends accruing from the most recent Dividend Payment Date), accrued regular dividends and, if previously obtained with respect to outstanding Series B Redeemable Preferred Stock, CUSIP number. If no shares of Series B Redeemable Preferred Stock shall be outstanding immediately prior to such exchange, all newly issued shares of Series B Redeemable Preferred Stock shall be issued with the same Liquidation Preference, Total Cash Dividends in Arrears (inclusive of any Additional Dividends accruing from the most recent Dividend Payment Date) and accrued regular dividends as the shares of Series C Redeemable Preferred Stock immediately prior to such exchange (and the Common Exchange Factor shall be calculated on such basis). The ratio of exchange shall be one share of Series B Redeemable Preferred Stock multiplied by the Common Exchange Factor for each share of Series C Redeemable Preferred Stock exchanged. In lieu of issuing any fractional shares of Series B Redeemable Preferred Stock, the Company may deliver to a Holder an amount in cash equal to such fraction multiplied by the sum of the Liquidation Preference plus Total Cash Dividends in Arrears (inclusive of any Additional Dividends accruing from the most recent Dividend Payment Date) plus accrued regular dividends in respect of each share of Series B Redeemable Preferred Stock being issued.

Not more than 60 and not less than 10 days prior to an exchange provided for in the preceding paragraph , written notice (the "EXCHANGE NOTICE") shall be given by first-class mail, postage prepaid, to each Holder of record of shares to be exchanged on the record date fixed for such exchange of Series B Redeemable Preferred Stock for Series C Redeemable Preferred Stock, at such Holder's address as the same appears on the stock register of the Company; provided, however, that no failure to give such notice nor any deficiency therein shall affect the validity of the procedure for such exchange. The Exchange Notice shall state (i) the date set for exchange, (ii) the method used to calculate the Common Exchange Factor, (iii) that the Holder is to surrender to the Company, at the place or places that shall be designated in such Exchange Notice, its certificates representing the shares of Series C Redeemable Preferred Stock to be exchanged, (iv) that following the date set for exchange, such Holder's shares of Series C Redeemable Preferred Stock shall cease to accrue dividends, whether or not submitted for exchange, and (v) that following the date set for exchange, dividends on newly issued shares of Series B Redeemable Preferred Stock shall accrue from the most recent Dividend Payment Date.

SECTION 6. Ranking. The Redeemable Preferred Stock shall, with respect to dividends and distributions upon liquidation, winding-up and dissolution of the Company, rank (a) senior to all classes of Common Stock of the Company, and to each other class of Capital Stock or series of Preferred Stock of the Company established after the Issuance Date of the Series A1 Redeemable Preferred Stock, Series B1 Redeemable Preferred Stock and Series C1 Redeemable Preferred Stock the terms of which expressly provide that it ranks junior to the Redeemable Preferred Stock as to dividends and distributions upon liquidation, winding-up and dissolution of the Company (collectively referred to, together with all classes

of Common Stock of the Company, as "JUNIOR SECURITIES"), (b) subject to any required approval of the Holders in accordance with Section 4(c) hereof, on a parity with each other class of Capital Stock or series of Preferred Stock established after the Issuance Date of the Series A1 Redeemable Preferred Stock, Series B1 Redeemable Preferred Stock and Series C1 Redeemable Preferred Stock the terms of which expressly provide that such class or series will rank on a parity with the Redeemable Preferred Stock as to dividends and distributions upon liquidation, winding-up and dissolution of the Company (collectively referred to as "PARITY SECURITIES"), and (c) subject to any required approval of the Holders in accordance with Section 4(c) hereof, junior to each class of Capital Stock or series of Preferred Stock established after the Issuance Date of the Series A1 Redeemable Preferred Stock, Series B1 Redeemable Preferred Stock and Series C1 Redeemable Preferred Stock by the Board of Directors and the terms of which do not expressly provide that such class or series will rank junior to, or on a parity with, the Redeemable Preferred Stock as to dividends and distributions upon liquidation, winding-up and dissolution of the Company (collectively referred to as "SENIOR SECURITIES"). For the avoidance of doubt, each series of Redeemable Preferred Stock shall constitute Parity Securities with respect to one another.

SECTION 7. Certain Additional Provisions.

(a) Limitation on Indebtedness. The Company shall not Incur any Indebtedness, and the Company shall not permit any of the Restricted Subsidiaries to Incur any Indebtedness, other than, in any such case, Permitted Indebtedness; provided that the Company or a Restricted Subsidiary may Incur Indebtedness if immediately after giving pro forma effect thereto and the use of the proceeds thereof (in accordance with the definition of "Consolidated Coverage Ratio"), the Consolidated Coverage Ratio is at least equal to [ ]:1.00.(a)

For purposes of determining compliance with this Section 7(a),
(i) in the event that an item of Indebtedness meets the criteria of more than one of the types of Permitted Indebtedness or the provisions of the first paragraph of this Section 7(a), the Company in its sole discretion may classify, and may from time to time reclassify, such item of Indebtedness and only be required to include the amount of such Indebtedness as one of such types and such item of Indebtedness may be divided and classified in more than one of such types, (ii) the

---

(a) To be set with 0.25:1.00 greater capacity than provided for in the Acquisition Notes or, if the Acquisition Notes are not issued on or before the first Issuance Date, at a level reasonably acceptable to the Company and Textron. In no event will the Consolidated Coverage Ratio be greater than 2.0:1.00.

liquidation preference of any Preferred Stock will be the amount of all obligations of such Person with respect to the redemption of such Preferred Stock at its stated maturity or upon liquidation or dissolution (whichever is greater) and (iii) in no event shall the accrual of dividends or interest or issuance of pay-in-kind dividends or interest subsequent to the issuance or Incurrence of Indebtedness or Preferred Stock giving rise thereto constitute an Incurrence required to be tested under this Section 7(a).

(b) Limitations on Restricted Payments. Without limiting other prohibitions in this Certificate of Designation (including Sections 4(c) and 5(a)(ii)), the Company shall not, and shall not permit any Restricted Subsidiary to, directly or indirectly, (i) declare or pay any dividend or make any distribution to the holders of any Junior Securities or Parity Securities (other than dividends or distributions payable solely in shares of Qualified Capital Stock or in options, warrants or other rights to purchase shares of Qualified Capital Stock); (ii) purchase, redeem or otherwise acquire or retire for value any Junior Securities or Parity Securities or any options, warrants or other rights to acquire Junior Securities or Parity Securities (other than such options, warrants or rights owned by the Company or a Restricted Subsidiary); or (iii) make any Investment (other than a Permitted Investment) in any Person (any of the foregoing actions described in clause (i), (ii) or (iii), other than the exclusions therefrom, are collectively referred to herein as "RESTRICTED PAYMENTS"), unless at the time the Company or such Restricted Subsidiary makes such Restricted Payment:

(1) no Voting Rights Triggering Event shall have occurred and be continuing (or result therefrom);

(2) after giving effect to such Restricted Payment, the Consolidated Coverage Ratio shall be equal to or greater than [ ]:1.00;(a)

(3) the aggregate amount of such Restricted Payment and all other Restricted Payments declared or made subsequent to the Issuance Date of the Series A1 Redeemable Preferred Stock, Series B1 Redeemable Preferred Stock and Series C1 Redeemable Preferred Stock would not exceed the sum of (without duplication):

(A) 50% of the Consolidated Net Income accrued during the period (treated as one accounting period) from the Issuance Date of the Series A1 Redeemable Preferred Stock, Series B1 Redeemable Preferred Stock and Series C1 Redeemable Preferred Stock to the end of the most recent fiscal quarter ending prior to the date of such Restricted Payment as to which

---

(a) To be the same as set forth in the first paragraph of Section 7(a).

-18-

financial results are available (or, in case such Consolidated Net Income shall be a deficit, minus 100% of such deficit); plus

(B) the aggregate net cash proceeds or fair market value of property received by the Company from the issue or sale of Qualified Capital Stock of the Company or other capital contributions in respect of Qualified Capital Stock of the Company subsequent to the Issuance Date of the Series A1 Redeemable Preferred Stock, Series B1 Redeemable Preferred Stock and Series C1 Redeemable Preferred Stock, provided that any such net proceeds received, directly or indirectly, by the Company from an employee stock ownership plan financed by loans from the Company or a Subsidiary of the Company shall be included only to the extent such loans have been repaid with cash on or prior to the date of determination; plus

(C) the amount by which Indebtedness of the Company or a Restricted Subsidiary (other than, in either case, Indebtedness owed to the Company or a Restricted Subsidiary) is reduced on the Company's consolidated balance sheet upon the conversion or exchange subsequent to the Issuance Date of the Series A1 Redeemable Preferred Stock, Series B1 Redeemable Preferred Stock and Series C1 Redeemable Preferred Stock of any such Indebtedness into or for Qualified Capital Stock of the Company (less the amount of any cash, or other property, distributed by the Company or such Restricted Subsidiary, as applicable, upon such conversion or exchange on account of such Indebtedness other than on account of interest or dividends in respect thereof); plus

(D) to the extent not included in Consolidated Net Income, the net reduction (received by the Company or any Restricted Subsidiary in cash) in Investments (other than Permitted Investments) made by the Company and the Restricted Subsidiaries since the Issuance Date of the Series A1 Redeemable Preferred Stock, Series B1 Redeemable Preferred Stock and Series C1 Redeemable Preferred Stock (including if such reduction occurs by reason of the return of equity capital, the repayment of the principal of loans or advances or the redesignation of an Unrestricted Subsidiary as a Restricted Subsidiary), not to exceed, in the case of any Investments in any Person, the amount of Investments (other than Permitted Investments) made by the Company and its Restricted Subsidiaries in such Person since the Issuance Date of the Series A1 Redeemable Preferred Stock, Series B1 Redeemable Preferred Stock and Series C1 Redeemable Preferred Stock.

Notwithstanding the foregoing paragraph, so long as no Voting Rights Triggering Event shall have occurred and be continuing (except as to clauses
(i), (ii), (iii), (vi), (viii), (ix) and (x) below) the foregoing provisions shall not prohibit the following actions:

(i) retirements, redemptions, dividends and other distributions made or paid within 60 days after the date of declaration or issuance of notice of redemption or retirement if at such date of declaration or issuance of notice of redemption or retirement such dividend would have complied with this Section 7(b);

(ii) any purchase, retirement or redemption of Capital Stock of the Company made (x) by exchange for, or out of the proceeds of any substantially concurrent capital contribution in respect of or substantially concurrent sale of, Qualified Capital Stock of the Company (other than Capital Stock issued or sold to a Subsidiary) or (y) by exchange for shares of Capital Stock of Parent;

(iii) any purchase, retirement or redemption of Parity Securities effected together with a purchase or redemption of the Redeemable Preferred Stock on a basis that is in proportion to their relative liquidation preferences and otherwise in compliance with this Certificate of Designation;

(iv) payments (including through dividends or distributions to Parent to enable it to make payments) (A) of amounts necessary and when necessary to purchase, redeem, acquire, cancel or otherwise retire for value Capital Stock of Parent of the Company, in each case held by full time officers, directors or employees of Parent, the Company or any of the Company's Subsidiaries, upon, in connection with or following death, disability, retirement, severance or termination of employment or service or pursuant to any agreement or plan under which such Capital Stock was issued or which was otherwise approved by the Board of Directors of the Parent or the Company and creates an obligation on the part of the Parent or the Company with respect to its Capital Stock of the type contemplated by this subclause (A), (B) to redeem or repurchase stock purchase or similar rights in respect of Capital Stock or (C) to make cash payments to holders of Capital Stock in lieu of the issuance of fractional shares of its Capital Stock; provided, however, that the amount of such payments pursuant to subclauses (A), (B) and (C) of this clause (iv) after the Issuance Date of the Series A1 Redeemable Preferred Stock, Series B1 Redeemable Preferred Stock and Series C1 Redeemable Preferred Stock does not exceed $[ ] million in

any fiscal year plus any unutilized portion of such amount in any prior fiscal year and $[ ] million in the aggregate after such Issuance Date;(a)

(v) Restricted Payments (other than Investments and other Restricted Payments otherwise permitted hereunder) in an aggregate amount not to exceed $[ ] million;*

(vi) the payment of dividends or distributions to Parent in amounts and at the times necessary to permit Parent to pay amounts, if any, owing by Parent in connection with the Acquisition, the Credit Facility, the Receivables Facility, the Acquisition Notes, the Bridge Financing, the Redeemable Preferred Stock and fees and expenses related to any of the foregoing;

(vii) Investments (other than Permitted Investments or Investments otherwise permitted hereunder) in an aggregate amount not to exceed $[ ] million.*

(viii) subject to compliance with the other applicable provisions hereof, the payment of dividends or distributions in respect of the Redeemable Preferred Stock or other Preferred Stock issued pursuant to and in compliance with this Certificate of Designation and purchases, retirements or redemptions of any shares of Redeemable Preferred Stock in accordance with the terms hereof;

(ix) dividends or other Restricted Payments (including tax sharing payments) to Parent to the extent used by Parent to pay its operating and administrative expenses incurred in the ordinary course of its business, including directors' fees, legal and audit expenses, listing fees, judgments, awards or settlements payable by Parent arising from the businesses of the Company or its Subsidiaries or Parent's status as a public company, public company compliance expenses and corporate, franchise and other taxes; or

(x) any Investment made by the exchange for, or out of the proceeds of a capital contribution in respect of or the substantially concurrent sale of, Qualified Capital Stock of the Company or by exchange for shares of Capital Stock of Parent.

---

(a) To provide 15% additional flexibility in amount as provided for in the Acquisition Notes or, if the Acquisition Notes are not issued on or prior to the first Issuance Date, in amounts to be reasonably acceptable to the Company and Textron.

-21-

Notwithstanding any other provision of this Section 7(b), for so long as any Textron Shares remain issued and outstanding, the Company shall not, and shall not permit any Restricted Subsidiary to, directly or indirectly make any Restricted Payment of the type described in clause (i) or (ii) of the definition thereof other than (a) Restricted Payments permitted by clauses (ii), (iii),
(iv), (vi), (viii) and (ix) of the preceding paragraph, (b) any dividend or distribution to Parent to the extent required by Parent to service Indebtedness owing to any Person that is not an Affiliate of Parent or the Company if such Restricted Payment would otherwise be permitted by this Section 7(b), and (c) any dividend or distribution to Parent to the extent required by Parent in connection with any financing of the Acquisition in lieu of any of the debt financing contemplated by the Debt Commitment Letter (as defined in the Purchase Agreement), including the Acquisition Notes and any Refinancing of the Bridge Financing. The provisions of this paragraph shall operate solely for the benefit of Textron and its Subsidiaries in their capacity as holders of Textron Shares. Notwithstanding anything in this Certificate of Designation to the contrary, in the event of a breach of these provisions and no other provision of this Certificate of Designation, the sole affected Holders entitled to voting rights under Section 4 shall be the Holders of the Textron Shares.

The amount of any non-cash Restricted Payment shall be the fair market value, on the date such Restricted Payment is made, of the assets or securities proposed to be transferred or issued by the Company pursuant to such Restricted Payment. For the purposes of calculating the aggregate amount of Restricted Payments made for the purposes of clause (2) of the first paragraph of this
Section 7(b), any payment made pursuant to clauses (i), (ii), (iv), (v) and, (x) of the second preceding paragraph shall be included and any payment made pursuant to clauses (iii), (vi), (vii), (viii) and (ix) of the second preceding pragraph shall be excluded.

(c) Limitation on Dividend and Other Payment Restrictions Affecting Subsidiaries. The Company shall not, and shall not permit any Restricted Subsidiary to, directly or indirectly, create or otherwise cause or suffer to become effective any consensual encumbrance or restriction on the ability of any Restricted Subsidiary (i) to pay dividends (in cash or otherwise) or make any other distributions in respect of its Capital Stock owned by the Company or any other Restricted Subsidiary or pay any Indebtedness or other obligation owed to the Company or any other Restricted Subsidiary; (ii) to make loans or advances to the Company or any other Restricted Subsidiary; or (iii) to transfer any of its property or assets to the Company or any other Restricted Subsidiary. Notwithstanding the foregoing, the Company may, and may permit any Restricted Subsidiary to, create or otherwise cause or suffer to become effective any such encumbrance or restriction (A) pursuant to any agreement in effect on the Issuance Date of the Series A1 Redeemable Preferred Stock, the Series B1 Redeemable Preferred Stock and the Series C1 Redeemable Preferred Stock; (B) pursuant to the terms of any Credit Facility, Currency Agreement, Interest Rate Agreement, Commodity

Agreement, Receivables Facility or Indebtedness Incurred pursuant to clause
(iii) or (iv) of the definition of "Permitted Indebtedness"; provided that the Company determines in good faith that the provisions relating to such encumbrance or restriction at the time any such agreement is entered into (i) are customary in similar agreements entered into by Persons of a comparable size and credit worthiness to the Company and (ii) could not reasonably be expected to materially adversely affect the Company's ability to make required cash dividend payments with respect to the Redeemable Preferred Stock or to redeem the Redeemable Preferred Stock on the Maturity Redemption Date; (C) pursuant to an agreement existing prior to the date on which such Person became a Subsidiary of the Company and outstanding on such date and not created in anticipation of becoming a Subsidiary, which encumbrance or restriction is not applicable to any other Person or the properties or assets of any other Person; (D) pursuant to an agreement effecting a renewal, refunding or extension of Indebtedness Incurred or Preferred Stock issued pursuant to an agreement referred to in clause (A), (B) or (C) above or this clause (D), provided that the provisions contained in such renewal, refunding or extension agreement relating to such encumbrance or restriction are not, in the aggregate, more restrictive in any material respect than the provisions contained in the agreement the subject thereof, as determined in good faith by the Company; (E) in the case of clause (iii) above, restrictions contained in any mortgage, security or lease agreement (including a capital or operating lease) securing Indebtedness of a Subsidiary or relating to property or assets of a Subsidiary otherwise permitted hereunder, but only to the extent such restrictions restrict the transfer of the property or asset subject to such mortgage, security or lease agreement; (F) in the case of clause
(iii) above, customary nonassignment provisions entered into in the ordinary course of business consistent with past practice in leases and other contracts to the extent such provisions restrict the transfer or subletting of any such lease or the assignment of rights under such contract; (G) any restriction with respect to a Subsidiary of the Company imposed pursuant to an agreement which has been entered into for the sale or disposition of Capital Stock or assets of such Subsidiary; (H) any encumbrance or restriction with respect to a Foreign Subsidiary pursuant to an agreement relating to Indebtedness or Liens Incurred by such Foreign Subsidiary which is permitted hereunder; provided, that the Company determines in good faith that the provisions relating to such encumbrance or restriction at the time any such agreement is entered into (i) are customary in similar agreement entered into by persons of a comparable size and credit worthiness to the Company and (ii) could not reasonably be expected to materially adversely affect the Company's ability to make required cash dividend payments with respect to the Redeemable Preferred Stock or to redeem the Redeemable Preferred Stock on the Maturity Redemption Date; or (I) any encumbrance or restriction which by its terms permits payments to the Company to the extent needed to pay dividends on any Dividend Payment Date or as otherwise required hereunder.


(d) Textron Share Liquidity Provisions. The provisions of this Section 7(d) are solely for the benefit of Holders of Series A Redeemable Preferred Stock that constitute Textron Shares. In the event that either (I) both (A) the Liquidity Condition is satisfied at any

-23-

time and (B) no Par Offer has been properly made on or before the First Dividend Payment Date and all Textron Shares purchased pursuant thereto or (II) both (A) the Existing Notes are repaid at their final Stated Maturity and (B) no Par Offer has been properly made on or before the final Stated Maturity of the Existing Notes, the Series A Dividend Rate applicable solely to Textron Shares will increase by 1.00% per annum for the first dividend period commencing on the first day after the First Dividend Payment Date and by an additional 0.50% per annum for each dividend period thereafter; provided that (1) the Series A Dividend Rate applicable to Textron Shares in effect at any time shall not exceed 20% per annum and (2) the Series A Dividend Rate will return to the Dividend Rate otherwise applicable under Section 2(a) once a Par Offer has been properly made and all Textron Shares purchased pursuant thereto. The period during which the increased Series A Dividend Rate in respect of Textron Shares shall be in effect under the immediately preceding sentence is referred to herein as the "RESTRICTED PERIOD." During the Restricted Period, if any, the Company and the Restricted Subsidiaries shall not Incur any Indebtedness (other than Permitted Restricted Period Debt or Indebtedness Incurred for the purpose financing a Par Offer) unless the Adjusted Consolidated Coverage Ratio (or, if there has been an Asset Acquisition after the Issuance Date of the Series A1 Preferred Stock, the Adjusted Consolidated Pro Forma Coverage Ratio) after giving effect to the Incurrence of such Indebtedness is equal to or greater than the ratios specified below for the four fiscal quarter periods ending when specified below:

```
Periods ending on or prior to December 31, 2002...................... 3.00:1.0
Periods ending on or between January 1, 2003 and December 31, 2003.... 3.25:1.0
Periods ending on and after January 1, 2004.......................... 3.50:1.0.
```

For so long as there are any issued and outstanding Textron Shares, the Company will not, and will not permit any Restricted Subsidiary to, refinance, repay, retire or defease Existing Notes (other than at their final Stated Maturity) in an aggregate principal amount greater than $25 million, unless prior to or concurrently therewith a Par Offer shall have been made.

For so long as there are any issued and outstanding Textron Shares, within 60 days after an Asset Acquisition occurring following the Issuance Date of the Series A1 Preferred Stock and prior to a Par Offer, the Company shall deliver a certificate of its Chief Financial Officer to the Holders of Textron Shares certifying that attached five full fiscal year "stand alone" projections (the "CERTIFIED PROJECTIONS") of Consolidated Cash Flow and Consolidated Interest Expense for the Persons or assets acquired pursuant to such Asset Acquisition (assuming for the purposes of such projections that such Persons or assets are the "Company and the Restricted Subsidiaries" and disregarding clause (viii) of the definition of Consolidated Interest Expense) are (1) projections that are utilizing consistent operating assumptions with any projections delivered to lenders to the Company in connection with the

particular Asset Acquisition (it being agreed that the Certified Projections are "stand alone" projections and will accordingly give no effect to any impact of combining or integrating the acquired Person or assets with the Company and the Restricted Subsidiaries) or (2) in the absence of the projections referred to in the preceding clause (1), the projections utilized by the Board of Directors of the Company (or any duly authorized Committee thereof) in approving the particular Asset Acquisition. Such Certified Projections may include a prospective reasonable methodology for allocating the indicated Consolidated Cash Flow and Consolidated Interest Expense across quarters for the entire period covered by the Certified Projections.

The benefit of the provisions of this Section 7(d) are solely intended for Textron and its Subsidiaries and shall terminate as to any shares of Series A Redeemable Preferred Stock that are transferred or otherwise disposed of to any other Person, regardless of their subsequent reacquisition by Textron or any of its Subsidiaries.

In the event of any transfer of Textron Shares to a Person other than Textron or its Subsidiaries (a "NON-TEXTRON TRANSFEREE"), if immediately prior to such transfer there shall exist Total Liquidity Dividends in Arrears with respect to such Textron Shares, then immediately following such transfer such Total Liquidity Dividends in Arrears shall cease to exist with respect to such transferred Textron Shares (the "TRANSFERRED SHARES") and the Transferred Shares shall be for all purposes shares of Series A Redeemable Preferred Stock not entitled to any of the benefits afforded to Textron Shares. For the avoidance of doubt, but without limitation, the Transferred Shares shall have a Liquidation Preference and be entitled to Total Cash Dividends in Arrears, if any, as if such shares (or any predecessor shares) had never been Textron Shares. As promptly as practicable following a written notice of a transfer of Textron Shares to a Non-Textron Transferee, the Company shall issue to such Non-Textron Transferee additional shares of Series A Redeemable Preferred Stock identical to the Transferred Shares in all respects (including, without limitation, as to Liquidation Preference, Total Cash Dividends in Arrears, if any, and accrued regular dividends), with the number of such newly issued shares being equal to
(x) the Total Liquidity Dividends in Arrears formerly applicable to the Transferred Shares, divided by (y) the Liquidation Preference plus Total Cash Dividends in Arrears (inclusive of Additional Dividends accruing from the most recent Dividend Payment Date) plus accrued regular dividends from the most recent Dividend Payment Date in respect of each share of newly issued Series A Redeemable Preferred Stock as of its date of issuance. In lieu of any issuing any fractional shares of Series A Redeemable Preferred Stock, the Company may deliver to a Non-Textron Transferee an amount in cash equal to such fraction multiplied by the amount set forth in clause (y) of the preceding sentence. The Company may require reasonable certifications and indemnities from Textron and/or any Non-Textron Transferee concerning the transfer of Textron Shares as a condition to issuing additional shares of Series A Redeemable Preferred Stock (or cash payments in respect of fractional shares) as contemplated by this paragraph.

-25-

(e) Consolidation, Merger and Sale of Assets. The Company shall not, in a single transaction or through a series of transactions, consolidate with or merge with or into any other Person or sell, assign, convey, transfer, lease or otherwise dispose of all or substantially all of its properties and assets to any other Person or Persons or permit any of the Restricted Subsidiaries to enter into any such transaction or series of transactions if such transaction or series of transactions, in the aggregate, would result in the sale, assignment, conveyance, transfer, lease or other disposition of all or substantially all of the properties and assets of the Company and the Restricted Subsidiaries on a consolidated basis to any other Person or Persons, unless at the time and immediately after giving effect thereto:

(i) either (a) the Company shall be the continuing corporation or (b) the Person (if other than the Company) formed by such consolidation or into which the Company or such Subsidiary is merged or the Person that acquires by sale, assignment, conveyance, transfer, lease or disposition all or substantially all the properties and assets of the Company and the Restricted Subsidiaries on a consolidated basis (the "SURVIVING ENTITY") shall be a corporation duly organized and validly existing under the laws of the United States of America, any state thereof or the District of Columbia;

(ii) the Redeemable Preferred Stock shall be converted into or exchanged for and shall become shares of the Surviving Entity having in respect of the Surviving Entity the same rights and privileges that the Redeemable Preferred Stock had immediately prior to such transaction or series of transactions with respect to the Company;

(iii) no Voting Rights Triggering Event shall have occurred and be continuing; and

(iv) after giving effect to such transaction or series of transactions, the Consolidated Coverage Ratio shall be equal to or greater than [ ]:1.00.(a)

Any Surviving Entity shall file an appropriate certificate of designation with respect to the preferred stock referred to in clause (ii) above with the Secretary of State (or similar public official) of the jurisdiction under whose laws it is organized. In such event, the Company shall be released from its obligations under this Certificate of Designation.

(f) Limitation on Transactions with Affiliates. The Company shall not, and shall not permit any of the Restricted Subsidiaries to, directly or indirectly, enter into or

---

(a) To be the same as the first paragraph of Section 7(a).

conduct any transaction or series of related transactions (including the purchase, sale, lease or exchange of any property or the rendering of any service) involving payments or value to such Affiliate with or for the benefit of any Affiliate of the Company or any of the Restricted Subsidiaries (an "AFFILIATE TRANSACTION") unless the terms of such Affiliate Transaction are either (x) fair to the Company or such Restricted Subsidiary from a financial point of view or (y) no less favorable to the Company or such Restricted Subsidiary, as the case may be, than those that could be obtained at the time of such transaction in arm's-length dealings with a Person who is not such an Affiliate. For any transaction that involves in excess of $1,000,000, a majority of the disinterested members of the Board of Directors shall determine that the transaction satisfies the criteria of the preceding sentence. For any Affiliate Transaction that involves in excess of $25,000,000, the Company shall obtain an opinion from a nationally recognized independent investment banking firm or other firm with experience in evaluating or appraising the terms and conditions of the type of transaction (or series of related transactions) for which the opinion is required (an "INDEPENDENT EVALUATION FIRM") stating in substance that the terms of such Affiliate Transaction are in compliance with either clause (x) or (y) above. For any Affiliate Transaction (other than as set forth in clauses
(i) through (x) (other than clause (viii)) below) that involves in excess of $1,000,000, for so long as Textron and its Subsidiaries are the Holders of at least a majority of the aggregate Liquidation Preference of any of the Series A Redeemable Preferred Stock, the Series B Redeemable Preferred Stock or the Series C Redeemable Preferred Stock, the Company shall obtain the prior consent of Textron unless the Company shall have obtained an opinion from an Independent Evaluation Firm stating in substance that the terms of such Affiliate Transaction are in compliance with either clause (x) or (y) above.

The requirements of the immediately preceding paragraph shall not apply to:

(i) any Restricted Payment permitted to be made pursuant to Section 7(b);

(ii) any issuance of securities, or other payments, awards or grants in cash, securities or otherwise pursuant to employment arrangements, or any stock options and stock ownership plans for the benefit of employees, officers and directors, consultants and advisors approved by the Board of Directors of the Company, or any loans or advances to employees in the ordinary course of business of the Company or any of its Subsidiaries;

(iii) any transaction between or among the Company and any Restricted Subsidiary or between or among Restricted Subsidiaries so long as, in the case of any Restricted Subsidiary that is not a Wholly Owned Subsidiary, no Affiliate of the Company (other than a Restricted Subsidiary) owns any Capital Stock (other than directors' qualifying shares) in such Restricted Subsidiary;

-27-

(iv) indemnification agreements with, and the payment of fees and indemnities to, directors, officers and employees of the Company and its Subsidiaries or any employment, noncompetition or confidentiality agreements entered into by the Company or any of its Subsidiaries with its directors, officers or employees in the ordinary course of business;

(v) the issuance of Capital Stock of the Company or the receipt of capital contributions by the Company otherwise in compliance with this Certificate of Designation;

(vi) transactions pursuant to agreements as in existence on the Issuance Date of the Series A1 Redeemable Preferred Stock, Series B1 Redeemable Preferred Stock and Series C1 Redeemable Preferred Stock;

(vii) payments contemplated by the Advisory Agreement and payments in connection with the Acquisition, including the reimbursement of out-of-pocket expenses incurred in connection with the Acquisition;

(viii) for so long as Textron and its Subsidiaries are the Holders of at least a majority of the aggregate Liquidation Preference of any of the Series A Redeemable Preferred Stock, the Series B Redeemable Preferred Stock or the Series C Redeemable Preferred Stock, any Affiliate Transaction with respect to which the Company shall have obtained the prior consent of Textron;

(ix) any management, service, purchase, supply or similar agreement relating to operations of a business entered into in the ordinary course of the Company's business between the Company or any Restricted Subsidiary and any Affiliate (including an Unrestricted Subsidiary), so long as any such agreement is on terms no less favorable to the Company than those that could be obtained in a comparable arm's-length transaction with an entity that is not an Affiliate or a Related Person; and

(x) any reasonable corporate service agreements, tax sharing agreements and other agreements customary in connection with spin-off transactions entered into between the Company or any Restricted Subsidiary and any spun-off entity.

(g) Reports. At all times during which the Parent continues to file reports on Form 10-K and Form 10-Q with the Securities and Exchange Commission (the "COMMISSION") containing the information required by the Securities Exchange Act of 1934 and the rules and regulations promulgated thereunder, the Company will provide (i) to each Holder, within 10 Business Days following the filing of any such report with the Commission, a copy (if necessary) of any reconciliation of any material differences between the

-28-

consolidated financial statements of the Parent contained in such report and the consolidated financial results and condition of the Company and its Subsidiaries during the relevant period or as of the relevant date, as the case may be, to the extent required to evaluate financial differences between the legal entities and (ii) at all times that (A) the Company is not subject to Section 13 or 15(d) of the Exchange Act and (B) the requesting Holder is unable to transfer its Redeemable Preferred Stock pursuant to Rule 144(k) under the Securities Act, within 10 Business Days of any written request by a Holder, to the requesting Holder or a proposed transferee of such Holder the information required to be provided by Rule 144A(d)(4) under the Securities Act. If at any time the Parent shall cease to file such reports on Form 10-K and Form 10-Q with the Commission, the Company shall provide to each Holder (i) within 135 days of the end of each fiscal year of the Company, audited year end financial statements of the Company (including a balance sheet, income statement and statement of changes in cash flows) prepared in accordance with GAAP, and (ii) within 60 days after the end of each of the first three fiscal quarters of each fiscal year of the Company, unaudited quarterly consolidated financial statements (including a balance sheet, income statement and statement of changes in cash flows) prepared in accordance with GAAP.

(h) Limitation on Issuance of Preferred Stock of Restricted Subsidiaries. The Company will not sell, and will not permit any Restricted subsidiary to issue or sell, any Preferred Stock of a Restricted Subsidiary except (i) to the Company or a Restricted Subsidiary, (ii) the issuance and sale of Preferred Stock of a Foreign Subsidiary, (iii) upon the request of the lenders party to the Debt Commitment Letter in accordance with the agreements relating to the various financings referred to therein, the issuance and sale of Preferred Stock issued in lieu of any of the debt financing contemplated by the Debt Commitment Letter, including the Acquisition Notes and any Refinancing of the Bridge Financing, (iv) the issuance of Preferred Stock by a Restricted Subsidiary which is a joint venture with a third party which is not an Affiliate of the Company or a Restricted Subsidiary, and (v) pursuant to obligations with respect to the issuance or sale of Preferred Stock of a Restricted Subsidiary which exist at the time it becomes a Restricted Subsidiary of the Company.

SECTION 8. Exchange.

(a) Requirements. The outstanding Series A1 Redeemable Preferred Stock, Series A2 Redeemable Preferred Stock, Series B1 Redeemable Preferred Stock, Series B2 Redeemable Preferred Stock, Series C1 Redeemable Preferred Stock and Series C2 Redeemable Preferred Stock are exchangeable, as a whole but not in part, solely at the option of the Company on any Dividend Payment Date for, respectively, the Company's Series A1, 15% Subordinated Notes (the "SERIES A1 EXCHANGE NOTES"), Series A2, 15% Subordinated Notes (the "SERIES A2 EXCHANGE NOTES"), Series B1, 16% Subordinated Notes (the "SERIES B1 EXCHANGE NOTES"), Series B2, 16% Subordinated Notes (the "SERIES B2 EXCHANGE NOTES"), Series C1, 16% Subordinated Notes (the "SERIES C1 EXCHANGE NOTES")

or Series C2, 16% Subordinated Notes (the "SERIES C2 EXCHANGE Notes" and, together with the Series A1 Exchange Notes, Series A2 Exchange Notes, Series B1 Exchange Notes, Series B2 Exchange Notes and Series C1 Exchange Notes, the "EXCHANGE NOTES"), each to be substantially in the form set forth in the Exchange Indenture, provided that any such exchange may only be made if on or prior to the date of such exchange no Total Cash Dividends in Arrears shall exist and the Company otherwise has paid all accumulated dividends on the Redeemable Preferred Stock (including the dividends payable on the date of exchange); provided, further, that for so long as Textron and its Subsidiaries are the Holders of at least a majority of the aggregate Liquidation Preference of any of the Series A Redeemable Preferred Stock, the Series B Redeemable Preferred Stock or the Series C Redeemable Preferred Stock, as the case may be, the Company shall obtain the written consent of Textron (which consent may be withheld by Textron in its sole discretion) prior to initiating the procedures for exchange with respect to such series of Redeemable Preferred Stock. The exchange rate shall be $1.00 principal amount of Exchange Notes for each $1.00 of the aggregate Liquidation Preference of Redeemable Preferred Stock, including, to the extent necessary, Exchange Notes in principal amounts less than $1,000.

(b) Procedure for Exchange. (i) At least thirty (30) days and not more than sixty (60) days prior to the date fixed for exchange, written notice (the "EXCHANGE NOTICE") shall be given by first class mail, postage prepaid, to each Holder of record on the record date fixed for such exchange of the Redeemable Preferred Stock at such Holder's address as the same appears on the share books of the Company, provided that no failure to give such notice nor any deficiency therein shall affect the validity of the procedure for the exchange of any Redeemable Preferred Stock to be exchanged except as to the Holder or Holders to whom the Company has failed to give said notice or except as to the Holder or Holders whose notice was defective. The Exchange Notice shall state:

(A) the Exchange Date;

(B) that the Holder is to surrender to the Company, in the manner and at the place or places designated, his certificate or certificates representing the Redeemable Preferred Stock to be exchanged;

(C) that dividends on the Redeemable Preferred Stock to be exchanged shall cease to accrue on such Exchange Date whether or not certificates for Redeemable Preferred Stock are surrendered for exchange on such Exchange Date unless the Company shall default in the delivery of Exchange Notes; and

(D) that interest on the Exchange Notes shall accrue from the Exchange Date whether or not certificates for Redeemable Preferred Stock are surrendered for exchange on such Exchange Date.

(ii) On or before the Exchange Date, each Holder of Redeemable Preferred Stock shall surrender the certificate or certificates representing such Redeemable Preferred Stock, in the manner and at the place designated in the Exchange Notice. The Company shall cause the Exchange Notes to be executed on the Exchange Date and, upon surrender in accordance with the Exchange Notice of the certificates for any Redeemable Preferred Stock so exchanged, duly endorsed (or otherwise in proper form for transfer, as determined by the Company), such shares shall be exchanged by the Company into Exchange Notes. The Company shall pay interest on the Exchange Notes at the rate and on the dates specified therein from the Exchange Date.

(iii) If notice has been mailed as aforesaid, and if before the Exchange Date specified in such notice (1) the Exchange Indenture shall have been duly executed and delivered by the Company and the trustee thereunder and
(2) all Exchange Notes necessary for such exchange shall have been duly executed by the Company and delivered to the trustee under the Exchange Indenture with irrevocable instructions to authenticate the Exchange Notes necessary for such exchange, then the rights of the Holders of Redeemable Preferred Stock so exchanged as shareholders of the Company shall cease (except the right to receive Exchange Notes, an amount equal to the amount of accrued and unpaid dividends to the Exchange Date), and the Person or Persons entitled to receive the Exchange Notes issuable upon exchange shall be treated for all purposes as the registered Holder or Holders of such Exchange Notes as of the Exchange Date.

(c) No Exchange in Certain Cases. Notwithstanding the foregoing provisions of this Section 8, the Company shall not be entitled to exchange the Redeemable Preferred Stock for Exchange Notes if such exchange, or any term or provision of the Exchange Indenture or the Exchange Notes, or the performance of the Company's obligations under the Exchange Indenture or the Exchange Notes, shall materially violate or conflict with any applicable law or if, at the time of such exchange, the Company is insolvent or if it would be rendered insolvent by such exchange.

(d) Exchange Indenture. The Exchange Notes shall be issued pursuant to an indenture (the "EXCHANGE INDENTURE") to be entered into between the Company and a trustee acceptable to it substantially in the form of Annex A hereto.(a)

-------

(a) The Exchange Indenture will be prepared prior to closing. The Exchange Notes and the Exchange Indenture shall (i) be subordinated to all obligations (including trade payables) and Indebtedness of the Company on terms imposed by senior lenders to the Company and its Subsidiaries (including with respect to payment blockages), (ii) not

Footnote continued on next page.

(e) Exchange Taxes. The Company shall be responsible for any transfer or stamp tax imposed as a result of any exchange made pursuant to this Section 8, regardless of upon whom such tax is imposed (collectively, "EXCHANGE TAXES"). The Company shall indemnify and hold the Holders harmless against any Exchange Taxes and shall gross-up Holders and their Affiliates any additional amount necessary to reflect the tax consequences to the Holders or their Affiliates (without taking into account any loss credit or other offset against Tax) of the receipt or accrual of any payments required to be made under this Section 8(e).

SECTION 9. Conversion or Exchange. The Holders of Redeemable Preferred Stock shall not have any rights hereunder to convert such shares into or exchange such shares for shares of any other class or classes or of any other series of any class or classes of Capital Stock of the Company.

SECTION 10. Reissuance of Senior Preferred Stock. Shares of Redeemable Preferred Stock reacquired pursuant to the exchange offer contemplated by the Registration Rights Agreement may be designated and reissued as Preferred Stock of another series or class; provided that any issuance of such shares of Preferred Stock must be in compliance with the terms hereof.

---

Footnote continued from previous page.

be guaranteed by any of the Company's Subsidiaries or otherwise, (iii) contain the covenants and provisions set forth in Section 7 (with respect to the Exchange Notes), and the related definitions of Section 13 hereof, except that the limitations in Sections 7(a), (b) and (c) will not restrict the ability of the Company or any of its Subsidiaries to issue Preferred Stock, (iv) contain events of default that are equivalent to the Voting Rights Triggering Events listed in clauses (i) through (v) of
Section 4(b) of this Resolution and customary remedies provisions for subordinated high yield debt instruments (and no shareholder or governance voting rights in any event), (v) provide for quarterly payments of interest in cash and/or in-kind or by accrual at the rates and on the same basis and dates as set forth in Section 2, (vi) mature as provided in
Section 5(b)(i) and be subject to redemption as provided in Sections 5(a) and 5(b)(ii) (with appropriate provisions to ensure the prior payment of senior debt) and (vii) contain such other immaterial terms as are appropriate to a high yield debt indenture. Subject to the foregoing, the Exchange Notes and the Exchange Indenture shall be mutually acceptable to the parties.

SECTION 11. Business Day. If any payment or redemption shall be required by the terms hereof to be made on a day that is not a Business Day, such payment or redemption shall be made on the immediately succeeding Business Day.

SECTION 12. Transfer Restrictions. (a) The Redeemable Preferred Stock will bear a legend to the following effect (as applicable) unless otherwise agreed by the Company and the Holder thereof:

THE SHARES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, AND MAY NOT BE SOLD, TRANSFERRED, OR OTHERWISE DISPOSED OF IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT UNDER SUCH ACT OR PURSUANT TO AN EXEMPTION FROM THE REGISTRATION REQUIREMENTS THEREOF.

In addition, each share of Redeemable Preferred Stock shall also bear the following legend:

THE COMPANY WILL FURNISH WITHOUT CHARGE TO EACH STOCKHOLDER WHO SO REQUESTS THE POWERS, DESIGNATIONS, PREFERENCES AND RELATIVE PARTICIPATING, OPTIONAL OR OTHER SPECIAL RIGHTS OF EACH CLASS OF STOCK OF THE COMPANY OR SERIES THEREOF AND THE QUALIFICATIONS, LIMITATIONS OR RESTRICTIONS OF SUCH PREFERENCES AND/OR RIGHTS.

(b) The transfer agent for the Preferred Stock may refuse to register any transfer of Redeemable Preferred Stock in violation of the restrictions contained in the legend provided for in Section 12(a).

(c) The legend provided for in the first paragraph of Section 12(a) may be removed if the Redeemable Preferred Stock has been registered pursuant to an effective registration statement under the Securities Act and will be removed as to Redeemable Preferred Stock held by any Holder after the expiration of the holding period applicable to sales of the Redeemable Preferred Stock under Rule 144(k) under the Securities Act upon the written representation of such Holder that such Holder is not an affiliate (as defined in Rule 144 under the Securities Act) of the Company and has not been an affiliate of the Company at any time during the three months preceding such request.

SECTION 13. Definitions. As used in this Certificate of Designation, the following terms shall have the following meanings (with terms defined in the singular having

comparable meanings when used in the plural and vice versa), unless the context otherwise requires:

"ACQUISITION" means the acquisition by the Company of the Bison Subsidiaries (as defined in the Purchase Agreement) pursuant to the Purchase Agreement and the related transactions.

"ACQUISITION NOTES" means the debt securities issued by the Company at or prior to the date of the Acquisition to finance, in part, the Acquisition or any debt securities first issued by the Company after the date of the Acquisition to refinance in whole or in part any bridge or interim loans (including any rollover or exchange notes issued in exchange therefor or upon the maturity thereof) issued or incurred on or prior to the date of the Acquisition to finance, in part, the Acquisition, as the same may be amended, modified, waived or refinanced with new debt securities.

"ADDITIONAL DIVIDENDS" means, with respect to a series of Redeemable Preferred Stock, the Series A Additional Dividends, the Series B Additional Dividends or the Series C Additional Dividends, as applicable.

"ADJUSTED CONSOLIDATED COVERAGE RATIO" means, as of any date of determination, the Consolidated Coverage Ratio as of such date; provided that in calculating Consolidated Cash Flow and Consolidated Interest Expense for such purpose, clause (viii) of the definition of Consolidated Interest Expense shall be disregarded.

"ADJUSTED CONSOLIDATED PRO FORMA COVERAGE RATIO" means, as of any date of determination, the ratio of (i) the aggregate amount of Consolidated Cash Flow for the period of the four most recent fiscal quarters of the Company, minus Projected Time Adjusted Acquisition Cash Flow to (ii) Consolidated Interest Expense for such four fiscal quarter period (without giving effect to clause (viii) of the definition thereof), minus Projected Time Adjusted Acquisition Interest Expense.

"ADVISORY AGREEMENT" means the Services Agreement dated as of February 23, 2001, as amended on the date of the Purchase Agreement, among the Parent, the Company and Heartland Industrial Partners, L.P. (or any other Affiliate thereof), as the same may be amended or modified from time to time; but without giving effect to any amendment or modification after the Issuance Date of the Series A1 Redeemable Preferred Stock, the Series B1 Redeemable Preferred Stock and the Series C1 Redeemable Preferred Stock that would increase the net fees payable thereunder to Heartland Industrial Partners, L.P. and its Affiliates that have not been made subject to compliance with the provisions of Section 7(f).

"AFFILIATE" of any specified Person means any other Person, directly or indirectly, controlling or controlled by or under direct or indirect common control with such

-34-

specified Person. For the purposes of this definition, "control" when used with respect to any Person means the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise and the terms "controlling" and "controlled" have meanings correlative to the foregoing.

"ASSET ACQUISITION" means (i) an Investment by the Company or any Restricted Subsidiary in any other Person pursuant to which such Person will become a Restricted Subsidiary or will be merged or consolidated with or into the Company or any Restricted Subsidiary or (ii) the acquisition by the Company or any Restricted Subsidiary of the assets of any Person which constitute substantially all of the assets of such Person or any division or line of business of such Person.

"ASSET DISPOSITION" means any sale, lease, transfer, issuance or other disposition (or series of related sales, leases, transfers, issuances or dispositions that are part of a common plan) of shares of Capital Stock of (or other equity interests in) a Restricted Subsidiary (other than directors' qualifying shares), or of any other property or other assets (each referred to for the purposes of this definition as a "disposition") by the Company or any of its Restricted Subsidiaries (including any disposition by means of a merger, consolidation or similar transaction) other than (i) a disposition by a Restricted Subsidiary to the Company or by the Company or a Restricted Subsidiary to a Restricted Subsidiary, (ii) any disposition in the ordinary course of business, and (iii) any disposition of obsolete or worn out equipment or equipment that is no longer used or useful in the conduct of the business of the Company and its Restricted Subsidiaries and that is disposed of in each case in the ordinary course of business. Notwithstanding anything to the contrary contained above, a Restricted Payment or other payment made in compliance with

Section 7(b) shall not constitute an Asset Disposition.

"ASSET DISPOSITION OFFER" has the meaning specified in Section 5(b)(iii) hereof.

"ASSET DISPOSITION OFFER REDEMPTION DATE" has the meaning specified in Section 5(b)(iii) hereof.

"BRIDGE FINANCING" means collectively the "Senior Unsecured Facility" and the "Subordinated Facility", in each case as defined in the Debt Commitment Letter.

"BUSINESS DAY" means each Monday, Tuesday, Wednesday, Thursday and Friday which is not a day on which banking institutions in New York City or place of payment are authorized or obligated by law, regulation or executive order to close.

"CAPITAL STOCK" of any Person means any and all shares, interests, rights to purchase, warrants, options, participations or other equivalents of or interests in (however

designated) equity of such Person, including any Preferred Stock, but excluding any debt securities convertible into such equity.

"CAPITALIZED LEASE OBLIGATIONS" means an obligation to pay rent or other payment amounts under a lease that is required to be classified and accounted for as a capitalized lease or a liability for financial reporting purposes in accordance with GAAP, and the amount of Indebtedness represented by such obligation shall be the capitalized amount of such obligation determined in accordance with GAAP.

"CASH DIVIDENDS IN ARREARS" means, with respect to a share of Redeemable Preferred Stock at any date of determination, the Series A Cash Dividends in Arrears, the Series B Cash Dividends in Arrears or the Series C Cash Dividends in Arrears, as applicable, at such date of determination.

"CERTIFIED PROJECTIONS" has the meaning specified in Section 7(d) hereof.

"CHANGE OF CONTROL" means the occurrence of any of the following events: (A) any "person" or "group" (as such terms are used in Sections 13(d) and 14(d) of the Exchange Act), excluding Sponsor and, in the case of the Company, Parent, shall become the "beneficial owner" (as defined in Rules 13d-3 and 13d-5 under the Exchange Act), directly or indirectly, of more than 50% of the total voting power of the then outstanding Voting Stock of the Company or of Parent; provided, however, that (1) any such Person or group shall be deemed to beneficially own any Voting Stock beneficially owned by any other Person (the "PARENT ENTITY") so long as such Person or group beneficially owns, directly or indirectly, a majority of the then outstanding Voting Stock of the parent entity and no other Person or group has the right to designate or appoint a majority of the directors (or similar governing body) of such parent entity, and (2) the effect of any stockholders agreements with respect to voting for directors that exist on the date of, and after giving effect to, the Acquisition will be disregarded, or (B) any other event constituting a "change of control" under any Acquisition Notes that constitutes either an event of default or a circumstance that permits holders of Acquisition Notes to require that the Company repurchase their Acquisition Notes.

"CHANGE OF CONTROL REDEMPTION DATE" has the meaning specified in Section 5(b)(ii) hereof.

"CODE" means the Internal Revenue Code of 1986, as amended.

"COMMISSION" means the Securities and Exchange Commission, as from time to time constituted, created under the Exchange Act.

"COMMODITY AGREEMENT" means any commodity future contract, commodity option or other similar agreement or arrangement entered into by the Company or any

Restricted Subsidiary that is designed to protect the Company or any Restricted Subsidiary against fluctuations in the price of commodities used by the Company or a Restricted Subsidiary as raw materials in the ordinary course of business.

"COMMON FAIR MARKET VALUE" means the fair market value per share of Common Stock of the Company, as determined from time to time by the board of directors of the Company acting in good faith, which determination shall be conclusive.

"COMMON EQUIVALENT SHARES" means, with respect to each share of Series C Redeemable Preferred Stock, (x) as of the initial Issuance Date of the Series C1 Redeemable Preferred Stock, [ ](a) shares of Common Stock of the Company and (y) as of any other date, such number of shares of Common Stock of the Company, as increased or decreased from time to time by the board of directors of the Company acting in good faith, which determination shall be conclusive, to reflect (A) dividends and distributions in respect of Common Stock of the Company paid in Common Stock of the Company, (B) subdivisions, combinations and reclassifications of Common Stock of the Company, (C) the issuance to all holders of Common Stock of the Company of rights, options or warrants entitling such holders to purchase from the Company its Common Stock at a price below the Common Fair Market Value at the record date with respect to the issuance of such rights, options or warrants, and (D) capital contributions to the Company either (i) not accompanied by any issuance of Common Stock of the Company to the Person making any such capital contribution, or (ii) accompanied by the issuance of Common Stock of the Company (or securites convertible into or exchangeable therefor) to the person making any such capital contribution at an implied price per share of Common Stock of the Company that is less than the Common Fair Market Value as of the date of such capital contribution.

---

(a) As of the Issuance Date of the Series C1 Redeemable Preferred Stock, and only as of such date, this number will equal a fraction, (i) the numerator of which is (x) $1,000 (the initial Liquidation Preference of the Series C1 Redeemable Preferred Stock), multiplied by (y) the number of outstanding shares of Common Stock of Collins & Aikman Products Co. on such date, and (ii) the denominator of which is (x) the number of outstanding shares of Common Stock of Collins & Aikman Corporation on such date (after giving effect to the transactions contemplated by the Purchase Agreement), multiplied by (y) $5 per share. After the Issuance Date of the Series C1 Redeemable Preferred Stock, this number will be adjusted from time to time as set forth in the definition.

"COMMON EXCHANGE FACTOR" means as of any date of determination (x) the Liquidation Preference per share of the Series C Redeemable Preferred Stock as of such date, plus the Total Cash Dividends in Arrears (inclusive of any Additional Dividends accruing from the most recent Dividend Payment Date) with respect to a share of Series C Redeemable Preferred Stock as of such date, plus accrued regular dividends per share of Series C Redeemable Preferred Stock as of such date, plus the Common Participation Amount, divided by (y) the Liquidation Preference per share of the Series B Redeemable Preferred Stock as of such date, plus the Total Cash Dividends in Arrears (inclusive of any Additional Dividends accruing from the most recent Dividend Payment Date) with respect to a share of Series B Redeemable Preferred Stock as of such date, plus accrued regular dividends per share of Series B Redeemable Preferred Stock as of such date.

"COMMON PARTICIPATION AMOUNT" means fifteen percent of the difference between (x) the product of the number of Common Equivalent Shares multiplied by the Common Fair Market Value, in each case as of the time of any event requiring the calculation of the Common Participation Amount, minus (y) the product of the number of Common Equivalent Shares multiplied by the Common Fair Market Value, in each case as of the Issuance Date of the Series C1 Redeemable Preferred Stock; provided that (i) the Common Participation Amount shall not exceed an amount per share of Series C Redeemable Preferred Stock equal to (p) $2,000,000 divided by (q) the total number of outstanding shares of Series C Redeemable Preferred Stock as of the time of any event requiring the calculation of the Common Participation Amount and (ii) the Common Participation Amount cannot be less than zero.

"COMMON STOCK" of any Person means any and all shares, interests or other participations in, and other equivalents (however designated, whether voting or non-voting) of such Person's common stock, whether outstanding on the Issuance Date or issued after the Issuance Date, and includes, without limitation, all series and classes of such common stock.

"COMPANY" means the Person named as the "Company" in the first paragraph of this Certificate of Designation until a successor or other Person shall have become such pursuant to the applicable provisions of this Certificate of Designation, and thereafter "Company" shall mean such successor Person.

"CONSOLIDATED CASH FLOW" for any period means the Consolidated Net Income for such period, plus the following to the extent deducted in calculating such Consolidated Net Income: (i) consolidated income tax expense; (ii) Consolidated Interest Expense; (iii) depreciation expense; (iv) amortization expense; (v) all other noncash items reducing Consolidated Net Income; (vi) all management and other fees directly or indirectly paid during such period to Sponsor to the extent permitted hereunder; and (vii) non-recurring and customary fees and expenses related to any issue of Capital Stock, Incurrence of Indebtedness or other financing transaction. Notwithstanding the foregoing, the consolidated

-38-

income tax expense, depreciation expense and amortization expense of a Subsidiary of the Company shall be included in Consolidated Cash Flow only to the extent (and in the same proportion) that the net income of such Subsidiary was included in calculating Consolidated Net Income.

"CONSOLIDATED COVERAGE RATIO" as of any date of determination means the ratio of (i) the aggregate amount of Consolidated Cash Flow for the period of the most recent four consecutive fiscal quarters ending prior to the date of such determination and as to which financial statements are available to (ii) Consolidated Interest Expense for such four fiscal quarters; provided that (1) if the Company or any of the Restricted Subsidiaries has Incurred any Indebtedness since the beginning of such period through the date of determination of the Consolidated Coverage Ratio that remains outstanding or if the transaction giving rise to the need to calculate Consolidated Coverage Ratio is an incurrence of Indebtedness, Consolidated Cash Flow and Consolidated Interest Expense for such period shall be calculated after giving effect on a pro forma basis to (A) such Indebtedness (provided that, if such Indebtedness is Incurred under a revolving credit facility (or similar arrangement or under any predecessor revolving credit or similar arrangement), only that portion of such Indebtedness that constitutes the one year projected average balance of such Indebtedness (as determined in good faith by senior management of the Company) shall be deemed outstanding for purposes of this calculation) and (B) the discharge of any other Indebtedness repaid, repurchased, defeased or otherwise discharged with the proceeds of such new Indebtedness as if such discharge had occurred on the first day of such period, (2) if since the beginning of such period any Indebtedness of the Company or any of the Restricted Subsidiaries has been repaid, repurchased, defeased or otherwise discharged (other than Indebtedness under a revolving credit or similar arrangement unless such revolving credit Indebtedness has been permanently repaid and has not been replaced), Consolidated Interest Expense for such period shall be calculated after giving pro forma effect thereto as if such Indebtedness had been repaid, repurchased, defeased or otherwise discharged on the first day of such period,
(3) if since the beginning of such period the Company or any of the Restricted Subsidiaries shall have made any Asset Disposition or if the transaction giving rise to the need to calculate the Consolidated Coverage Ratio involves an Asset Disposition, Consolidated Cash Flow for such period shall be reduced by an amount equal to the Consolidated Cash Flow (if positive) attributable to the assets which are the subject of such Asset Disposition for such period or increased by an amount equal to the Consolidated Cash Flow (if negative) attributable thereto for such period, and Consolidated Interest Expense for such period shall be reduced by an amount equal to the Consolidated Interest Expense attributable to any Indebtedness of the Company or any of the Restricted Subsidiaries repaid, repurchased, defeased or otherwise discharged with respect to the Company and its continuing Restricted Subsidiaries in connection with such Asset Disposition for such period (or, if the Capital Stock of any Restricted Subsidiary of the Company is sold, transferred or otherwise disposed of, the Consolidated Interest Expense for such period directly attributable to the Indebtedness of such Restricted Subsidiary to the extent

the Company and the continuing Restricted Subsidiaries are no longer liable for such Indebtedness after such sale, transfer or other disposition), (4) if since the beginning of such period the Company or any of the Restricted Subsidiaries (by merger or otherwise) shall have made an Asset Acquisition, Consolidated Cash Flow and Consolidated Interest Expense for such period shall be calculated after giving pro forma effect thereto (including the incurrence of any Indebtedness) as if such Asset Acquisition occurred on the first day of such period and (5) if since the beginning of such period any Person that subsequently became a Restricted Subsidiary or was merged with or into the Company or any Restricted Subsidiary since the beginning of such period shall have made any Asset Disposition or Asset Acquisition that would have required an adjustment pursuant to clause (3) or (4) above if made by the Company or a Restricted Subsidiary during such period, Consolidated Cash Flow and Consolidated Interest Expense for such period shall be calculated after giving pro forma effect thereto as if such Asset Disposition or Asset Acquisition occurred on the first day of such period. For purposes of this definition, whenever pro forma effect is to be given to an Asset Acquisition, the amount of income or earnings relating thereto and the amount of Consolidated Interest Expense associated with any Indebtedness Incurred in connection therewith, the pro forma calculations shall be determined in good faith by the Company. If any Indebtedness or Preferred Stock bears a floating rate of interest or dividends and is being given pro forma effect, the interest expense on such Indebtedness shall be calculated as if the rate in effect on the date of determination had been the applicable rate for the entire period (taking into account any Interest Rate Agreement applicable to any such Indebtedness if such Interest Rate Agreement has a remaining term that extends at least until the end of such period).(a)

"CONSOLIDATED INTEREST EXPENSE" means, for any period, the total interest expense of the Company and the Restricted Subsidiaries for such period as determined on a consolidated basis in accordance with GAAP, plus, to the extent not included in such interest expense, (i) interest expense attributable to capital leases, (ii) amortization of debt discount, (iii) capitalized interest, (iv) noncash interest expense, (v) commissions, discounts and other fees and charges owed with respect to letters of credit and bankers acceptance financing, (vi) interest actually paid by the Company or any such Restricted Subsidiary under any guarantee of Indebtedness or other obligation of any other Person and (vii) net payments

---

(a) Solely for purposes of Sections 7(a), (b) and (e), this definition and the definitions of Consolidated Net Income, Consolidated Cash Flow and Consolidated Interest Expense will be conformed to the similar interest coverage calculations and definitions in the Acquisition Notes if the Acquisition Notes are issued on or prior to the first Issuance Date.

(whether positive or negative) pursuant to Interest Rate Agreements and, to the extent related to Indebtedness, Currency Agreements. Notwithstanding the foregoing, consolidated interest expense and the other items referred to in the preceding clauses of a Subsidiary of the Company shall be included only to the extent (and in the same proportion) that the net income of such Subsidiary was included in calculating Consolidated Interest Expense.

"CONSOLIDATED NET INCOME" means, for any period, the net income (loss) of the Company and the consolidated Restricted Subsidiaries for such period determined in accordance with GAAP; provided, however, that there shall not be included in such Consolidated Net Income: (i) any gain or loss realized upon the sale or other disposition of any assets of the Company or the Restricted Subsidiaries (including pursuant to any sale/leaseback transaction) which are not sold or otherwise disposed of in the ordinary course of business and any gain or loss realized upon the sale or other disposition of any Capital Stock of any Person; (ii) any extraordinary or nonrecurring gain or loss; (iii) the cumulative effect of a change in accounting principles; (iv) any noncash expenses attributable to grants or exercises of employee stock options or other employee benefit arrangements; (v) the net income or loss of any Person acquired in a pooling of interests transaction for any period prior to the date of such acquisition; and (vi) any net income or loss of any Restricted Subsidiary to the extent such Restricted Subsidiary is subject to restrictions on the payment of dividends or the making of distributions by such Restricted Subsidiary, directly or indirectly, to the Company.

"CREDIT FACILITIES"(a) means (i) the credit agreement dated as of [ ], 2001, among [ ], [ ], as administrative agent and each of the lenders that is a signatory thereto, together with the related documents thereto (including, without limitation, any guarantee agreements and security documents), in each case as such agreements may be amended (including any amendment and restatement thereof), supplemented or otherwise modified from time to time, including any agreement extending the maturity of, refinancing, replacing, increasing the total commitment of, or otherwise restructuring (including by way of adding Subsidiaries of the Company as additional borrowers or guarantors thereunder) all or any portion of the Indebtedness under such agreement or any successor or replacement agreement and whether by the same or any other agent, lender or group of lenders, (ii) any other senior term or revolving credit facilities with one or more financial institutions and (iii) any refinancing, refunding, renewal, replacement or extension in whole or in part of any of the foregoing.

---

(a) Information to be completed at closing.

"CURRENCY AGREEMENT" means in respect of a Person any foreign exchange contract, currency swap agreement or other similar agreement as to which such Person is a party or a beneficiary.

"DEBT COMMITMENT LETTER" has the meaning specified in the Purchase Agreement, as amended, supplemented or modified from time to time.

"DISQUALIFIED STOCK" means (a) any Capital Stock of the Company which, by its terms (or by the terms of any security into which it is convertible or for which it is exchangeable) or upon the happening of any event (i) matures (excluding any maturity as the result of an optional redemption by the issuer thereof) or is mandatorily redeemable pursuant to a sinking fund obligation or otherwise or is redeemable at the option of the holder thereof, in whole or in part, on or prior to the Mandatory Redemption Date, or (ii) is convertible into or exchangeable (unless at the sole option of the issuer thereof) for (a) Indebtedness of the Company or any Restricted Subsidiary or (b) any Capital Stock referred to in (i) above, in each case at any time prior to the Mandatory Redemption Date. Notwithstanding the preceding sentence, (1) any Capital Stock that would constitute Disqualified Stock solely because the holders of the Capital Stock have the right to require the Company to repurchase such Capital Stock upon the occurrence of a change of control or an asset sale shall not constitute Disqualified Stock if the terms of such Capital Stock provide that the Company may not repurchase or redeem any such Capital Stock if prohibited by the terms hereof and (2) Capital Stock in respect of which the Company may have an obligation of the type referred to in clause (iv) of the second paragraph of Section 7(b)(iv) shall not constitute Disqualified Stock. For avoidance of doubt, the Redeemable Preferred Stock is not Disqualified Stock.

"DIVIDEND PAYMENT DATE" means each March 1, June 1, September 1 and December 1 of each year on which dividends shall be paid or are payable, any Redemption Date and any other date on which dividends in arrears may be paid.

"DIVIDEND RATE" has the meaning specified in Section 2(a) hereof.

"EXCHANGE ACT" means the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated by the Commission thereunder.

"EXCHANGE DATE" means the date on which Redeemable Preferred Stock is exchanged by the Company for Exchange Notes.

"EXCHANGE NOTES" shall have the meaning ascribed to it in Section 6 hereof.

"EXCHANGE NOTICE" shall have the meaning ascribed to it in Section 6 hereof.

"EXCHANGE OFFER" means the exchange offer contemplated by the Registration Rights Agreement.

"EXISTING NOTES" means the Company's 11 1/2% Senior Subordinated Notes Due 2006 and the related indenture and supplemental indentures, as each may be amended or modified from time to time (including in connection with the Acquisition).

"FAIR MARKET VALUE" means, with respect to any asset or property, the price which could be negotiated in an arm's-length transaction, for cash, between an informed and willing seller under no compulsion to sell and an informed and willing buyer under no compulsion to buy. Fair market value shall be conclusively determined by the Board of Directors of the Company acting in good faith.

"FIRST DIVIDEND PAYMENT DATE" means the first Dividend Payment Date following the occurrence of a Liquidity Condition.

"FOREIGN SUBSIDIARY" means a Subsidiary that is organized under the laws of any country other than the United States and substantially all of the assets of which are located outside the United States.

"GAAP" means generally accepted accounting principles in the United States of America as in effect from time to time, including those set forth in the opinions and pronouncements of the Accounting Principles Board of the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board or in such other statements by such other entity as approved by a significant segment of the accounting profession.

"GUARANTEE" means any obligation, contingent or otherwise, of any Person directly or indirectly guaranteeing any Indebtedness of any other Person and any obligation, direct or indirect, contingent or otherwise, of such Person
(i) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness of such other Person (whether arising by virtue of partnership arrangements, or by agreement to keep-well, to purchase assets, goods, securities or services, to take-or-pay, or to maintain financial statement conditions or otherwise) or (ii) entered into for purposes of assuring in any other manner the obligee to such Indebtedness of the payment thereof or to protect such obligee against loss in respect thereof (in whole or in part); provided, however, that the term "guarantee" shall not include endorsements for collection or deposit in the ordinary course of business. The term "guarantee" used as a verb has a corresponding meaning.

"HOLDER" means the record holder of shares of Redeemable Preferred Stock.

"INCUR" means issue, assume, guarantee, incur or otherwise become liable for; provided, however, that any Indebtedness of a Person existing at the time such person becomes a Restricted Subsidiary (whether by merger, consolidation, acquisition or otherwise) shall be deemed to be Incurred by such Restricted Subsidiary at the time it becomes a Restricted Subsidiary.

"INDEBTEDNESS" means, (a) with respect to any Person on any date of determination (without duplication), (i) the principal of and premium (if any) in respect of indebtedness of such Person for borrowed money, (ii) the principal of and premium (if any) in respect of obligations of such Person evidenced by bonds, debentures, notes or other similar instruments, (iii) all obligations of such Person in respect of letters of credit or other similar instruments (including reimbursement obligations with respect thereto) (other than obligations with respect to letters of credit securing obligations (other than obligations described in clauses (i), (ii) and (v)) entered into in the ordinary course of business of such Person to the extent that such letters of credit are not drawn upon or, if and to the extent drawn upon, such drawing is reimbursed no later than the tenth Business Day following receipt by such Person of a demand for reimbursement following payment on the letter of credit), (iv) all obligations of such Person to pay the deferred and unpaid purchase price of property or services (except trade payables and accrued expenses incurred in the ordinary course of business), (v) all Capitalized Lease Obligations of such Person, (vi) all Indebtedness of other Persons secured by a Lien on any asset of such Person, whether or not such Indebtedness is assumed by such Person; provided, however, that the amount of such Indebtedness shall be the lesser of the fair market value of such asset at such date of determination and the amount of such Indebtedness of such other Person, and (vii) all Indebtedness of other Persons to the extent guaranteed by such Person and (b) any Preferred Stock of any Restricted Subsidiary permitted under Section 7(h).

"INDEPENDENT EVALUATION FIRM" has the meaning specified on Section 7(f) hereof.

"INTEREST RATE AGREEMENT" means with respect to any Person any interest rate protection agreement, interest rate future agreement, interest rate option agreement, interest rate swap agreement, interest rate cap agreement, interest rate collar agreement, interest rate hedge agreement or other similar agreement or arrangement as to which such Person is party or a beneficiary.

"INVESTMENT" by any Person means any loan, advance or other extension of credit or capital contribution (by means of transfers of cash or other property to others or payments for property or services for the account or use of others, or otherwise) to, or purchase or acquisition of Capital Stock, bonds, notes, debentures or other securities or evidence of Indebtedness issued by, any other Person, including any payment on a guarantee of any obligation of such other Person, but shall not include trade accounts receivable in the

ordinary course of business. Upon any issuance or sale of Capital Stock of any Restricted Subsidiary such that it ceases to be a Restricted Subsidiary, the Company shall be deemed to have made an Investment in the retained Capital Stock and other Investments in such Subsidiary at such time. For purposes of Section 7(b) and the definitions of "Permitted Investments" and "Unrestricted Subsidiary," with respect to a Restricted Subsidiary that is designated as an Unrestricted Subsidiary, "Investment" shall include the portion (proportionate to the Company's equity interest in such Subsidiary) of the fair market value of the net assets of such Subsidiary at the time that such Subsidiary is designated an Unrestricted Subsidiary and, with respect to a Person that is designated as an Unrestricted Subsidiary simultaneously with its becoming a Subsidiary of the Company, "Investment" shall mean the Investment made by the Company and the Restricted Subsidiaries to acquire such Subsidiary.

"ISSUANCE DATE" means (1) in the case of the Series A1 Redeemable Preferred Stock, the Series B1 Redeemable Preferred Stock and the Series C1 Redeemable Preferred Stock, the date on which such Redeemable Preferred Stock is originally issued under this Certificate of Designation and (2) in the case of the Series A2 Redeemable Preferred Stock, the Series B2 Redeemable Preferred Stock and the Series C2 Redeemable Preferred Stock, the Exchange Date.

"JUNIOR SECURITIES" has the meaning specified in Section 6 hereof.

"LIEN" means any mortgage, pledge, security interest, encumbrance, lien or charge of any kind (including any conditional sale or other title retention agreement or lease in the nature thereof).

"LIQUIDATED DAMAGES" has the meaning specified in the Registration Rights Agreement.

"LIQUIDATION PREFERENCE" means, with respect to a series of Redeemable Preferred Stock, the Series A Liquidation Preference, the Series B Liquidation Preference or the Series C Liquidation Preference, as applicable.

"LIQUIDITY CONDITION" means the date upon which audited annual or unaudited quarterly consolidated financial information for the Company and the Restricted Subsidiaries is available reflecting that the Company's Adjusted Consolidated Pro Forma Coverage Ratio is greater than or equal to the ratios specified below for the periods specified below:

| | |
|---|---|
| Periods Ending on or prior to December 31, 2002.................................................. | 3.75:1.0 |
| Periods ending on or between January 1, 2003 and March 31, 2003.............................................. | 3.50:1.0 |
| Period ending on or between April 1, 2003 and June 30, 2003.................................................. | 3.25:1.0 |
| Periods ending on or between July 1, 2003 and December 31, 2003............................................. | 3.00:1.0 |
| Periods ending on or between January 1, 2004 and December 31, 2004....................................... | 2.75:1.0 |
| Periods ending on and after January 1, 2005............... | 2.50:1.0. |

"MATURITY REDEMPTION DATE" with respect to a series of Redeemable Preferred Stock means the mandatory redemption date for such series specified in
Section 5(b)(i) hereof.

"NET AVAILABLE PROCEEDS" has the meaning specified in Section 5(b)(iii) hereof.

"NET CASH PROCEEDS" means the aggregate cash proceeds received by the Company or any of its Restricted Subsidiaries in respect of any Asset Disposition (including, without limitation, any cash received upon the sale or other disposition of any non-cash consideration received in any Asset Disposition), net of the direct costs relating to such Asset Disposition (including, without limitation, legal, accounting and investment banking fees, and sales commissions) and any related expenses Incurred as a result thereof, taxes paid or payable as a result thereof, amounts required to be applied to the repayment of Indebtedness secured by a lien on the asset or assets that were the subject of such Asset Disposition and any reserve for adjustment in respect of the sale price of such asset or assets established in accordance with GAAP.

"OPTIONAL REDEMPTION DATE" has the meaning specified in Section 5(a)(i) hereof.

"PARENT" means Collins & Aikman Corporation, a Delaware corporation, and any successor thereto that continues to control the Company.

"PAR OFFER" means any offer to purchase for cash any and all Textron Shares at a purchase price per share equal to the aggregate Liquidation Preference of the Textron Shares, plus accumulated and unpaid dividends (including Total Cash Dividends in Arrears), if any; provided that (1) any such offer shall be made pursuant to a written notice addressed to Textron, with instructions as to the manner in which the offer may be accepted and Textron Shares tendered for purchase, and shall remain available for acceptance for not less than 10

Business Days and (2) any and all Textron Shares as to which an acceptance has been made, and in respect of which certificates therefor have been timely delivered to the offeror, shall have been purchased. The written notice shall state that (i) it is a Par Offer; (ii) any Textron Shares not delivered and duly endorsed for transfer to the offeror on a timely basis will remain outstanding and continue to accumulate dividends, but will have no further benefit of
Section 7(d); (iii) unless the offeror defaults in the payment of the Par Offer, all Textron Shares delivered for payment pursuant to the Par Offer will cease to accumulate dividends upon payment; and (iv) the Par Offer must be accepted by the offeror in whole and may not be accepted in part. A "PAR OFFER" may be made and consummated by any Person, whether or not the Company or one of its Affiliates, pursuant to these provisions and shall nonetheless be an effective Par Offer.

"PARITY SECURITIES" has the meaning specified in Section 6 hereof.

## "PERMITTED INDEBTEDNESS AND PREFERRED STOCK" means:

(i) Indebtedness Incurred by the Company or any Restricted Subsidiary pursuant to one or more Credit Facilities; provided, however, that the aggregate principal amount of all Indebtedness Incurred pursuant to this clause (i) does not exceed $[ ] million at any time outstanding less the amount of any Net Cash Proceeds from an Asset Disposition used to permanently reduce the availability under the term loan portion of any such Credit Facilities;(a)

(ii) Indebtedness of the Company or any Restricted Subsidiary under [the Bridge Financing and] any Acquisition Notes and any replacement, refunding, refinancing, renewal or extension thereof in an aggregate principal amount or liquidation preference not to exceed $[ ] million at any time outstanding;(b)

(iii) Indebtedness of any Foreign Subsidiary (other than a Foreign Subsidiary organized under the laws of Canada) incurred for working capital purposes

---

(a) To provide 15% flexibility in amount as compared with the similar basket in the Acquisition Notes or, if the Acquisition Notes are not issued on or prior to the first Issuance Date, the amount will equal the total commitments under Credit Facility to be entered into in connection with the Acquisition plus an additional 15% to allow for future growth.

(b) To equal amount of Bridge Financing or Acquisition Notes.

not to exceed at any time outstanding the sum of (x) the consolidated book value of the accounts receivable of such Foreign Subsidiary plus (y) the consolidated book value of the inventories of such Foreign Subsidiary;(a)

(iv) Indebtedness of the Company or any Restricted Subsidiary constituting and any replacement, refunding or refinancing of a Receivables Facility and any replacement, refunding, refinancing, renewal or extension thereof; provided that the aggregate principal amount of Indebtedness Incurred pursuant to this clause (iv) shall not exceed $[ ] million at any time outstanding;(b)

(v) Indebtedness of the Company or any Restricted Subsidiary represented by Capitalized Lease Obligations, mortgage financing or purchase money obligations, in each case Incurred for the purpose of financing all or any part of the purchase price or cost of construction or improvement of property or Incurred to refinance any such purchase price or cost of construction or improvement, in each case Incurred no later than 365 days after the date of such acquisition or the date of completion of such construction or improvement;(c)

(vi) Indebtedness of the Company or any Restricted Subsidiary in a principal amount or liquidation preference not to exceed $[ ] million outstanding at any time (it being understood that any Indebtedness Incurred under this clause (vi) shall cease to be outstanding for purposes of this clause (vi) but shall be deemed to be Incurred or issued for purposes of the first paragraph of Section 7(a) from and after the first date on which the Company or such Restricted Subsidiary could have Incurred such Indebtedness under the first paragraph of Section 7(a) without reliance upon this clause
(vi));(d)

---

(a) To be limited in the same manner as the Acquisition Notes, if any, plus a 15% margin in the case of a dollar limitation or receivables plus inventory limitation.

(b) To provide 25% in excess of an amount equal to the US/Canadian Receivables Facility entered into at Acquisition closing.

(c) To be limited to a dollar amount if so provided in the Acquisition Notes, plus a 15% margin.

(d) To equal amount of "rainy day" basket in Acquisition Notes plus 20% or, if Acquisition Notes are not issued, an amount to be reasonably acceptable to the

Footnote continued on next page.

(vii) (A) Indebtedness of the Company owing to and held by any Restricted Subsidiary or (B) Indebtedness of a Restricted Subsidiary owing to and held by the Company or any Restricted Subsidiary; provided, however, that any subsequent issuance (other than directors' qualifying shares) or transfer of any Capital Stock or any other event which results in any such Restricted Subsidiary ceasing to be a Restricted Subsidiary or any subsequent transfer of any such Indebtedness (except, in the case of subclause (A), to a Restricted Subsidiary or, in the case of subclause (B), to the Company or a Restricted Subsidiary) shall be deemed in each case to constitute the Incurrence of such Indebtedness;

(viii) (A) other Indebtedness outstanding on the Issuance Date of the Series A1 Redeemable Preferred Stock, the Series B1 Redeemable Preferred Stock and the Series C1 Redeemable Preferred Stock, including without limitation the Existing Notes and Indebtedness assumed by reason of the Acquisition, and any refinancing, replacement, refunding, renewal or extension thereof and (B) any refinancing, replacement, refunding, renewal or extension of any Indebtedness Incurred under the first paragraph of Section 7(a);

(ix) Indebtedness of the Company or any Restricted Subsidiary (A) in respect of performance bonds, bankers' acceptances and surety or appeal bonds provided by the Company or any of the Restricted Subsidiaries to their customers in the ordinary course of their business and not for money borrowed, (B) in respect of performance bonds or similar obligations of the Company or any of the Restricted Subsidiaries for or in connection with pledges, deposits or payments made or given in the ordinary course of business and not for money borrowed in connection with or to secure statutory, regulatory or similar obligations, including obligations under health, safety or environmental obligations, (C) arising from guarantees to suppliers, lessors, licensees, contractors, franchises or customers of obligations (other than Indebtedness) incurred in the ordinary course of business and not for money borrowed and (D) under Currency Agreements, Interest Rate Agreements and Commodity Agreements; provided, however, that in the case of subclause (D), such agreements are entered into for bona fide hedging purposes of the Company or any of the Restricted Subsidiaries (as determined in good faith by the Company);

---

Footnote continued from previous page.

Company and Textron, but not less than $60 million (i.e., 120% of the rainy day basket under Existing Notes) in any event.

(x) Indebtedness of the Company or any Restricted Subsidiary arising from agreements providing for indemnification, adjustment of purchase price or similar obligations, or from guarantees or letters of credit, surety bonds or performance bonds securing any obligations of the Company or any of the Restricted Subsidiaries pursuant to such agreements, in each case Incurred or issued in connection with the disposition of any business, assets or Subsidiary of the Company in a principal amount or liquidation preference not to exceed the gross proceeds actually received by the Company or any of the Restricted Subsidiaries in connection with such disposition;

(xi) Indebtedness consisting of (A) guarantees by the Company or any Restricted Subsidiary of Indebtedness Incurred or Preferred Stock issued by a Restricted Subsidiary otherwise permitted hereunder, (B) guarantees by a Restricted Subsidiary of Indebtedness or Preferred Stock Incurred or issued by the Company otherwise permitted hereunder, or (C) guarantees by the Company or any Restricted Subsidiary of Indebtedness Incurred by a Foreign Subsidiary in the ordinary course of business; and

(xii) Indebtedness consisting of Preferred Stock of Restricted Subsidiaries to the extent that such Preferred Stock is issued or sold in accordance with
Section 7(h) hereof.

For the purposes of determining Indebtedness permitted above in connection with a replacement, refunding, refinancing, renewal or extension of such Indebtedness (a "REFINANCING" and the term "REFINANCED" having a correlative meaning), the aggregate principal amount of Indebtedness Incurred in connection with such Refinancing shall not exceed the principal amount of the Indebtedness being Refinanced, plus the amount of any premium required to be paid in connection with such Refinancing pursuant to the terms of the Indebtedness being Refinanced or the amount of any premium reasonably determined by the Company as necessary to accomplish such Refinancing by means of a tender offer or privately negotiated purchase or repayment, plus the fees and expenses of the Company or Restricted Subsidiary, as the case may be, Incurred in connection with such Refinancing.

"PERMITTED INVESTMENTS"(a) means (i) Investments in cash equivalents,
(ii) any Investments included in the definition of Permitted Indebtedness, including in respect of

---

(a) Baskets and concepts are to be modified to provide equivalent flexibility to the Acquisition Notes plus additional flexibility reasonably acceptable to the Company and Textron; if Acquisition Notes are not issued on or prior to the first Issuance Date, the Company and Textron will negotiate to complete the blank information and to

Footnote continued on next page.

Currency Agreements, Interest Rate Agreements and Commodity Agreements, (iii) Investments in existence on the Issuance Date of the Series A1 Redeemable Preferred Stock, Series B1 Redeemable Preferred Stock and Series C1 Redeemable Preferred Stock, (iv) Investments in any Restricted Subsidiary by the Company or any Restricted Subsidiary, including any Investment made to acquire such Restricted Subsidiary, (v) Investments in any Receivables Facility, (vi) Investments in the Company by any Restricted Subsidiary, (vii) sales of goods or services on trade credit terms consistent with the Company's and its Subsidiaries' past practices or otherwise consistent with trade credit terms in common use in the industry and recorded as accounts receivable on the balance sheet of the Person making such sale, (viii) loans or advances to employees for purposes of purchasing common stock of Parent or the Company in an aggregate amount outstanding at any one time not to exceed $[ ] million and other loans and advances to employees of the Company and its Subsidiaries in the ordinary course of business, including travel, moving and other like advances, (ix) loans or advances to vendors or contractors of the Company and its Subsidiaries (other than Affiliates of the Company) in the ordinary course of business, (x) lease, utility and other similar deposits in the ordinary course of business, (xi) stock, obligations or securities received in the ordinary course of business in settlement of debts owing to the Company or a Subsidiary thereof as a result of foreclosure, perfection, enforcement of any Lien or in a bankruptcy proceeding,

(xii) Investments in Unrestricted Subsidiaries, partnerships or joint ventures involving the Company or its Restricted Subsidiaries if the amount of such Investment (after taking into account the amount of all other Investments made pursuant to this clause (xii), less any return of capital realized or any repayment of principal received on such Permitted Investments, or any release or other cancellation of any guarantee constituting such Permitted Investment, which has not at such time been reinvested in Permitted Investments made pursuant to this clause (xii)) does not exceed the greater of $[ ] million or [ ]% of the consolidated assets of the Company and the Restricted Subsidiaries,

(xiii) Investments in Persons to the extent any such Investment represents the non-cash consideration received by the Company or the Restricted Subsidiaries in connection with an Asset Disposition and (xiv) Investments consisting of guarantees of Indebtedness of Foreign Subsidiaries Incurred in the ordinary course of business.

"PERMITTED RESTRICTED PERIOD DEBT" means Indebtedness (i) under any revolving credit or letter of credit facility required for funding the Company and the Restricted

---

Footnote continued from previous page.

supplement this definition for additional identified ordinary course needs on a basis reasonably acceptable to each of them.

-51-

Subsidiaries in the ordinary course of business (including under the Credit Facility), (ii) of the type set forth in clauses (i), (iii), (iv), (v), (vi), (vii), (viii), (ix), (x) and (xi) of the definition of "Permitted Indebtedness" and any Refinancing thereof and (iii) Incurred for the purpose of Refinancing Indebtedness of the Company or a Restricted Subsidiary having a Stated Maturity within one year of the date of such Incurrence; provided in each case that the proceeds to the Company and the Restricted Subsidiaries from the Incurrence of any such Indebtedness are not applied as consideration in respect of any Asset Acquisition.

"PERSON" means any individual, corporation, limited liability company, partnership, joint venture, association, joint-stock company, trust, unincorporated organization or government or any agency or political subdivision thereof.

"PREFERRED STOCK", means Capital Stock of any class or classes (however designated) which is preferred as to the payment of dividends or distribution of funds, or as to the distribution of assets upon any voluntary or involuntary liquidation or dissolution of such corporation, over shares of Capital Stock of any other class of such corporation.

"PROJECTED CONSOLIDATED INTEREST EXPENSE" means, with respect to a particular Asset Acquisition, the projected Consolidated Interest Expense (without giving effect to clause (viii) thereof and assuming for this purpose that the acquired Persons or assets are the "Company and the Restricted Subsidiaries") attributable to Indebtedness Incurred or assumed to effect the particular Asset Acquisition, as set forth in the Certified Projections with respect to such Asset Acquisition, for the time period for which the Adjusted Consolidated Pro Forma Coverage Ratio is being calculated (but not to cover any time period in which the particular Asset Acquisition had not been made).

"PROJECTED PERIOD CASH FLOW" means, with respect to a particular Asset Acquisition, the projected Consolidated Cash Flow (assuming for this purpose that the acquired Persons or assets are the "Company and the Restricted Subsidiaries") of the Persons or assets which are the subject of such Asset Acquisition, as set forth in the Certified Projections with respect to such Asset Acquisition, for the time period for which the Adjusted Consolidated Pro Forma Coverage Ratio is being calculated (but not to cover any time period in which the particular Asset Acquisition had not been made).

"PROJECTED TIME ADJUSTED ACQUISITION CASH FLOW" means the sum of the following calculations determined for each Asset Acquisition effected after the Issuance Date of the Series A1 Redeemable Preferred Stock, Series B1 Redeemable Preferred Stock and Series C1 Redeemable Preferred Stock. The following calculation shall be made for each Asset Acquisition utilizing the time periods of the Certified Projections for the Subject Acquisition for which the Adjusted Consolidated Pro Forma Coverage Ratio is being calculated: the Time Period Factor for the subject Acquisition shall be multiplied by the Projected Period Cash Flow of such Asset Acquisition.

"PROJECTED TIME ADJUSTED ACQUISITION INTEREST EXPENSE" means the sum of the following calculations determined for each Asset Acquisition effected after the Issuance Date of the Series A1 Redeemable Preferred Stock, Series B1 Redeemable Preferred Stock and Series C1 Redeemable Preferred Stock. For each Asset Acquisition the following calculation shall be made utilizing the time periods of the Certified Projections for which the Adjusted Consolidated Pro Forma Coverage Ratio is being calculated: the Time Period Factor with respect to the subject Acquisition shall be multiplied by the Projected Consolidated Interest Expense of such Asset Acquisition.

"PURCHASE AGREEMENT" means the Purchase Agreement dated August 7, 2001 among Textron, Parent and the Company.

"QUALIFIED BANK" has the meaning specified in Section 5(c)(iv) hereof.

"QUALIFIED CAPITAL STOCK" of the Company shall mean any Capital Stock of the Company which is not Disqualified Stock.

"RECEIVABLES FACILITY" means any receivables financing facilities pursuant to which the Company or any of its Subsidiaries sells, transfers, assigns or pledges its accounts receivable and/or any rights ancillary thereto to a special purpose entity or trust and in connection therewith such entity or trust Incurs Indebtedness secured by such accounts receivable and/or ancillary rights with customary repurchase obligations for breaches of representations warranties or covenants or recourse based upon the collectability of the accounts receivable or ancillary rights sold, including, without limitation the Receivables Facility contemplated by the Debt Commitment Letter.

"RECEIVABLES FINANCING SUBSIDIARY" means a Subsidiary formed for the purpose of monetizing accounts receivable of the Company and/or one or more of its Subsidiaries whose assets consent of cash, such accounts receivable and related intangibles and assets.

"REDEEMABLE PREFERRED STOCK" has the meaning set forth in Section 1 hereof.

"REDEMPTION DATE" means the Optional Redemption Date, the Maturity Redemption Date, the Change of Control Redemption Date or the Asset Disposition Redemption Date, as the case may be.

"REDEMPTION NOTICE" has the meaning specified in Section 5(c)(i) hereof.

"REDEMPTION PRICE" means the price at which the Redeemable Preferred Stock may be redeemed.

"REGISTRATION RIGHTS AGREEMENT" means that certain Exchange and Registration Rights Agreement, dated as of [ ], 2001, by and between the Company and Textron, as amended or modified in accordance with its terms.

"REMAINING NET AVAILABLE PROCEEDS" has the meaning specified in Section 5(b)(iii) hereof.

"RESTRICTED PAYMENT" has the meaning specified in Section 7(b) hereof.

"RESTRICTED PERIOD" has the meaning specified in Section 7(d) hereof.

"RESTRICTED SUBSIDIARY" means any Subsidiary of the Company other than an Unrestricted Subsidiary.

"SECURITIES ACT" means the Securities Act of 1933, as amended, and the rules and regulations promulgated by the Commission thereunder.

"SENIOR SECURITIES" has the meaning specified in Section 6 hereof.

"SERIES A ACCRUED DIVIDENDS" has the meaning specified in Section 2(a) hereof.

"SERIES A ADDITIONAL DIVIDENDS" means, as of any date of determination with respect to a share of Series A Redeemable Preferred Stock, the aggregate amount of dividends accrued upon the Series A Cash Dividends in Arrears in respect of such share pursuant to Section 2 (c), to the extent that payment in cash of such dividends has not been made on or prior to such date of determination.

"SERIES A CASH DIVIDENDS IN ARREARS" means, as of any date of determination with respect to a share of Series A Redeemable Preferred Stock, the aggregate of all accumulated and unpaid dividends upon such share of Series A Redeemable Preferred Stock that were required to be paid in cash on any Dividend Payment Date occurring prior to such date of determination, to the extent that payment in cash of such dividends has not been made on or prior to such date of determination.

"SERIES A DIVIDEND RATE" has the meaning set forth in Section 2(a) hereof.

"SERIES A LIQUIDATION PREFERENCE" means with respect to a share of Series A Redeemable Preferred Stock, $1,000 plus the aggregate amount of all Series A Accrued Dividends in respect of such share through and including the date of determination.

"SERIES A REDEEMABLE PREFERRED STOCK" shall have the meaning ascribed to it in Section 1(a) hereof.

"SERIES A1 EXCHANGE NOTES" shall have the meaning ascribed to it in
Section 6 hereof.

"SERIES A1 REDEEMABLE PREFERRED STOCK" shall have the meaning ascribed to it in Section 1(a) hereof.

"SERIES A2 EXCHANGE NOTES" shall have the meaning ascribed to it in
Section 6 hereof.

"SERIES A2 REDEEMABLE PREFERRED STOCK" shall have the meaning ascribed to it in Section 1(a) hereof.

"SERIES B ACCRUED DIVIDENDS" has the meaning specified in Section 2(a) hereof.

"SERIES B ADDITIONAL DIVIDENDS" means, as of any date of determination with respect to a share of Series B Redeemable Preferred Stock, the aggregate amount of dividends accrued upon the Series B Cash Dividends in Arrears in respect of such share pursuant to Section 2(c), to the extent that payment in cash of such dividends has not been made on or prior to such date of determination.

"SERIES B CASH DIVIDENDS IN ARREARS" means, as of any date of determination with respect to a share of Series B Redeemable Preferred Stock, the aggregate of all accumulated and unpaid dividends upon such share of any Series B Redeemable Preferred Stock that were required to be paid in cash on any Dividend Payment Date occurring prior to such date of determination, to the extent that payment in cash of such dividends has not been made on or prior to such date of determination.

"SERIES B DIVIDEND RATE" has the meaning set forth in Section 2(a) hereof.

"SERIES B LIQUIDATION PREFERENCE" means $1,000 plus the aggregate amount of all Series B Accrued Dividends through and including the date of determination.

"SERIES B REDEEMABLE PREFERRED STOCK" shall have the meaning ascribed to it in Section 1(a) hereof.

"SERIES B1 EXCHANGE NOTES" shall have the meaning ascribed to it in
Section 6 hereof.

"SERIES B1 REDEEMABLE PREFERRED STOCK" shall have the meaning ascribed to it in Section 1(a) hereof.

"SERIES B2 EXCHANGE NOTES" shall have the meaning ascribed to it in
Section 6 hereof.

"SERIES B2 REDEEMABLE PREFERRED STOCK" shall have the meaning ascribed to it in Section 1(a) hereof.

"SERIES C ACCRUED DIVIDENDS" has the meaning specified in Section 2(a) hereof.

"SERIES C ADDITIONAL DIVIDENDS" means, as of any date of determination with respect to a share of Series C Redeemable Preferred Stock, the aggregate amount of dividends accrued upon the Series C Cash Dividends in Arrears in respect of such share pursuant to Section 2 (c), to the extent that payment in cash of such dividends has not been made on or prior to such date of determination.

"SERIES C CASH DIVIDENDS IN ARREARS" means, as of any date of determination with respect to a share of Series C Redeemable Preferred Stock, the aggregate of all accumulated and unpaid dividends upon such share of any Series C Redeemable Preferred Stock that were required to be paid in cash on any Dividend Payment Date occurring prior to such date of determination, to the extent that payment in cash of such dividends has not been made on or prior to such date of determination.

"SERIES C DIVIDEND RATE" has the meaning set forth in Section 2(a) hereof.

"SERIES C LIQUIDATION PREFERENCE" means $1,000 plus the aggregate amount of all Series C Accrued Dividends through and including the date of determination.

"SERIES C REDEEMABLE PREFERRED STOCK" shall have the meaning ascribed to it in Section 1(a) hereof.

"SERIES C1 EXCHANGE NOTES" shall have the meaning ascribed to it in
Section 6 hereof.

"SERIES C1 REDEEMABLE PREFERRED STOCK" shall have the meaning ascribed to it in Section 1(a) hereof.

"SERIES C2 EXCHANGE NOTES" shall have the meaning ascribed to it in
Section 6 hereof.

"SERIES C2 REDEEMABLE PREFERRED STOCK" shall have the meaning ascribed to it in Section 1(a) hereof.

"SIGNIFICANT SUBSIDIARY" means any Restricted Subsidiary that would be a "significant subsidiary" of the Company within the meaning of Rule 1-02 under Regulation S-X promulgated by the Securities and Exchange Commission.

"SPONSOR" means Heartland Industrial Partners, L.P. and its Affiliates.

"STATED MATURITY" means, with respect to any other Indebtedness, means the date specified in the instrument governing such Indebtedness as the fixed date on which the principal of such Indebtedness, or any installment of interest thereon, is due and payable.

"SUBSIDIARY" of any Person means any corporation, association, partnership or other business entity of which more than 50% of the total voting power of shares of Capital Stock or other interests (including partnership interests) entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees thereof is at the time owned or controlled, directly or indirectly, by (i) such Person, (ii) such Person and one or more Subsidiaries of such Person or (iii) one or more Subsidiaries of such Person. Unless otherwise specified herein, each reference to a Subsidiary shall refer to a Subsidiary shall refer to a Subsidiary of the Company.

"SURVIVING ENTITY" has the meaning specified in Section 7(e)(i).

"TEXTRON" means Textron, Inc. and its legal successors.

"TEXTRON SHARES" means all shares of Series A Redeemable Preferred Stock held beneficially and of record solely by Textron and/or any of Textron's Subsidiaries to the extent solely and continuously beneficially owned since the Issuance Date of the Series A1 Preferred Stock; provided that the Company may require reasonable certifications and indemnities from Textron as to such beneficial ownership and continuous beneficial ownership since the Issuance Date of the Series A1 Preferred Stock as a condition to complying with the provisions of, or determining eligibility for, a Par Offer or for ascertaining the need to comply with the penultimate paragraph of Section 7(b).

"TIME PERIOD FACTOR" is to be utilized in order to determine the portion of the annual Certified Projections to be utilized when the four fiscal quarter period for which the Adjusted Consolidated Pro Forma Coverage Ratio is being calculated doesn't match. To that end, the portion of any fiscal year set forth in the Certified Projections to be utilized will be based upon, with respect to a particular Asset Acquisition, the fraction obtained by dividing (1) the actual

number of days of a particular fiscal year of the Company to be reflected in Adjusted Consolidated Pro Forma Coverage Ratio by (2) 365 days. In addition, to the extent an Asset Acquisition was consummated during the four fiscal quarter period for which the Adjusted Consolidated Pro Forma Coverage Ratio is being calculated (i.e., less than a full year), the Time Period Factor will equal the fraction obtained by dividing (1) the actual

number of days for which the Asset Acquisition has been included in Consolidated Cash Flow of the Company by (2) 365 days.

"TOTAL CASH DIVIDENDS IN ARREARS" means, with respect to any share of Redeemable Preferred Stock at any date of determination, the total of (1) the Cash Dividends in Arrears with respect to such share, if any, at the date of determination and (2) the associated Additional Dividends with respect to such share at such date of determination.

"TOTAL LIQUIDITY DIVIDENDS IN ARREARS" means, with respect to any Textron Share at any date of determination, the total of (1) the aggregate of all accumulated and unpaid Liquidity Dividends upon such Textron Share, if any, at the date of determination and (2) the associated Additional Dividends with respect to such share at such date of determination.

"UNRESTRICTED SUBSIDIARY" means (i) any Subsidiary of the Company that at the time of determination shall be designated an Unrestricted Subsidiary by the Board of Directors in the manner provided below, (ii) any Receivables Financing Subsidiary and (iii) any Subsidiary of an Unrestricted Subsidiary. The Board of Directors may designate any Subsidiary of the Company (including any newly acquired or newly formed Subsidiary of the Company) to be an Unrestricted Subsidiary unless such Subsidiary or any of its Subsidiaries owns any Capital Stock or Indebtedness of, or owns or holds any Lien on any property of, the Company or any Restricted Subsidiary of the Company that is not a Subsidiary of the Subsidiary to be so designated to the extent not otherwise permitted hereby; provided, however, that after giving effect to any such designation, the Company could (1) Incur $1.00 of Indebtedness under the first paragraph of Section 7(a) and (2) make an Investment in such Subsidiary under Section 7(b). Any such designation shall be deemed to have resulted in an Investment by the Company for purposes of Section 7(b). The Board of Directors may designate any Unrestricted Subsidiary (other than a Receivables Financing Subsidiary) to be a Restricted Subsidiary; provided, however, that all Indebtedness of such Unrestricted Subsidiary outstanding immediately following such designation, if Incurred at such time, would have been permitted to be Incurred for all purposes of this Certificate of Designation. Any such designation by the Board of Directors shall be evidenced to the holders of the Redeemable Preferred Stock by promptly delivering to the transfer agent for the Preferred Stock a copy of the Board Resolution giving effect to such designation and an Officers' Certificate certifying that such designation complied with the foregoing provisions. Notwithstanding the foregoing, any Subsidiary which shall be designated an "Unrestricted Subsidiary" in accordance with the terms of the Acquisition Notes shall be deemed to be an Unrestricted Subsidiary for purposes hereunder.

"VOTING RIGHTS TRIGGERING EVENT" has the meaning set forth above in Section 4(b) hereof.

"VOTING STOCK" means any class or classes of Capital Stock pursuant to which the holders thereof have the general voting power under ordinary circumstances to elect at least a majority of the board of directors, managers or trustees of any Person (irrespective of whether or not, at the time, stock of any other class or classes shall have, or might have, voting power by reason of the happening of any contingency).

"WHOLLY OWNED SUBSIDIARY" of any Person means a Subsidiary of such Person all of the outstanding Capital Stock or other ownership interests of which (other than directors' qualifying shares) shall at the time be owned by such Person or by one or more Wholly Owned Subsidiaries of such Person or by such Person and one or more Wholly Owned Subsidiaries of such Person.

-59-

IN WITNESS WHEREOF, the Company has caused this Certificate of Designation to be duly executed in its corporate name on this day of ,
2001.

**COLLINS & AIKMAN PRODUCTS CO.**

By:

Name:

Title:

By:

Name:

Title:

EXHIBIT 9

**ASSET PURCHASE AGREEMENT**

ASSET PURCHASE AGREEMENT (the "Agreement") dated as of August 7, 2001 between Textron Automotive Exteriors Inc., a Delaware corporation ("Exteriors") and JPS Automotive, Inc., a Delaware corporation ("JPS "). Except as expressly defined herein, capitalized terms used in this Agreement shall have the meaning ascribed to them in the Purchase Agreement dated as of August 7, 2001 (the "Purchase Agreement") by and among Textron Inc. ("Parent"), Collins & Aikman Products Co., a Delaware corporation ("C&A Products") and Collins & Aikman Corporation, a Delaware corporation.

WHEREAS, the Purchase Agreement provided for the sale of certain of Parent's automotive trim operations currently managed as a unit of Textron Automotive Corporation Inc. a Delaware corporation, to C&A Products and those entities specified in the Purchase Agreement;

WHEREAS, Exteriors desires to sell and assign to JPS, and JPS to purchase and assume from Exteriors, certain assets, Contracts, other obligations and liabilities relating to the business conducted by Exteriors; and

NOW, THEREFORE, in consideration of the foregoing and the mutual covenants contained herein and in the Purchase Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound, agree as follows:

1. Sale and Purchase of Assets. (a) On the terms and subject to the conditions of this Agreement, at the Closing, Exteriors shall sell, transfer, assign and deliver to JPS, or cause to be sold, transferred, assigned and delivered to JPS, free and clear of any Liens (other than Permitted Liens), and JPS shall purchase and assume from Exteriors, all of Exteriors' right, title and interest in and to the Transferred Assets. To the extent that the Transferred Assets consist of written documents (including microfilms and computer files) which are necessary to the maintenance of Exteriors' records in accordance with reasonable practice, Exteriors may either deliver to JPS a duplicate copy of such documents and retain the original or deliver to JPS the original of such documents and retain a duplicate copy; provided, however, that Exteriors shall deliver the original of any such document when delivery of the original is necessary to effectuate the transfer of any Transferred Asset.

(b) For purposes of this Agreement, "Transferred Assets" shall mean the Evart, Michigan and Americus, Georgia plants (the "Plants") including, the following used primarily at or related primarily to the Plants:

(i) the real estate, buildings thereon, fixtures, equipment and other personal property in the buildings,

(ii) Contracts, to the extent their transfer is permitted by their terms, for products produced at the Plants;

(iii) to the extent their transfer is permitted by Law, all Permits relating to the Plants issued to Exteriors by any Governmental Authority;

(iiii) all rights in and to products sold (including, without limitation, products hereafter repossessed or returned and unpaid, Exteriors, rights of replevin, rescission, reclamation and rights to stoppage in transit) which were manufactured at the Plants;

(iv) all rights of way, easements, appurtenances and similar realty interests of Exteriors pertaining to the real property on which the Plants are located;

(v) all machinery, equipment, furniture, furnishings, vehicles and other fixed assets used primarily on or relating primarily to the Plants;

(vi) all leases of vehicles and of tangible assets which are used primarily at or related primarily to the Plants;

(viii) all inventories of raw materials, work-in-progress, spare parts, replacement and component parts, office and other supplies and finished goods for the Plants (the "Inventory");

(vii) all Contracts relating primarily to the Plants to the extent their transfer is permitted by their terms (the "Purchased Contracts"), including, without limitation, any right to receive payment for products sold or services rendered, and to receive goods and services, pursuant to such agreements;

(x) all customer lists relating primarily to the Plants (the "Customer Lists");

(viii) all Pre-paid Expenses, credits, deferred charges, advance payments, security deposits and other prepaid items related primarily to the Transferred Assets;

(ixi) all rights, claims, credits, causes of action or rights of set-off against third parties related primarily to the Transferred Assets or the Assumed Liabilities, including, without limitation, unliquidated rights under manufacturers' and vendors' warranties and rights under insurance policies covering the Transferred Assets, other than in relation to liabilities that are the obligations of Exteriors and rights to sue for and remedies against past, present and future infringements of any Intellectual Property rights;

(xiii) all trade accounts and notes receivable and payments for services as of the Closing Date which arose from the operation of the Plants in the ordinary course prior to the Closing Date;

2

(xi) all books, records, manuals and other materials (in any form or medium) including, without limitation, all advertising materials, catalogues, price lists, correspondence, mailing lists, distribution lists, photographs, production data, sales and promotional materials and records, purchasing materials and records, personnel records, manufacturing and quality control records and procedures, blueprints, research and development files, records, data and laboratory books, media materials and plates, accounting records, customer records, sales order files and litigation files used primarily in or relating primarily to the Plants;

(xii) all guarantees, warranties, indemnities and similar rights in favor of Exteriors with respect to any Transferred Asset;

(xiii) any and all of the databases, software, source codes, object codes, documentation, technical data, manuals, comments and instructions, and computer processes used primarily at or relating primarily to the Plants;

(xiv) all goodwill and any other intangible assets related primarily to the Plants, including without limitation all relationships with brokers and representatives relating to the sales, marketing, distribution or promotion of products manufactured in the Plants; and

(xv) all other assets (other than Contracts) which are used primarily at or relate primarily to the business of such plants.

2. Purchase Price. (a) The purchase price for the Transferred Assets shall be one hundred twenty-five million dollars ($125,000,000) minus the estimated amount of Assumed Liabilities which are treated as liabilities for income tax purposes as of the Closing Date (the "Purchase Price"). The estimate of said Assumed Liabilities shall be made by the parties in good faith shortly prior to the closing. JPS shall deliver to Exteriors at the Closing a promissory note in the principal amount of the Purchase Price bearing 11% interest compounded annually and payable quarterly in arrears maturing on the fifth anniversary of the Closing. Such note shall have terms and provisions as are acceptable to both Exteriors and JPS.

(b) Real property, personal property and other ad valorem Taxes of Exteriors related to the Transferred Assets shall be allocated between JPS and Exteriors on the basis of a daily proration and the net amount owing from JPS to Exteriors or from Exteriors to JPS on account of such proration shall be paid promptly upon written request by the party entitled to receive such payment. If an assessment for the tax period that includes the Closing Date (the "Current Period") has not been made by the time that payment is due under the preceding sentence, a tentative payment shall be made at that time based on the assessment for the immediately preceding tax period, and JPS or Exteriors, as the case may be, shall make an appropriate adjusting payment within 10 days following receipt of the assessment for the Current Period.

3

(c) Upon the terms and subject to the conditions of this Agreement and the Purchase Agreement, at the Closing JPS shall, by appropriate instruments to be executed and delivered at Closing, assume and agree to buy, perform and discharge in accordance with the terms thereof, when due all of the liabilities and obligations related primarily to the Plants on the Closing Date of whatever kind or nature, absolute or contingent, known or unknown, whenever arising (the "Assumed Liabilities").

(d) On terms and subject to the conditions of this Agreement, the closing of the Transaction (the "Closing") shall take place at the offices of Skadden, Arps, Slate, Meagher & Flom LLP, Four Times Square, New York, New York at 8:00 a.m. (New York time) as promptly as practicable, but no later than the second Business Day following the satisfaction or waiver of the conditions set forth in Section 3 (other than conditions which by their nature are to be satisfied at Closing, but subject to those conditions) or at such other time, date or place as JPS and Exteriors may agree. The date on which the Closing occurs is hereinafter referred to as the "Closing Date"

3. Conditions. The obligation of each party to complete the purchase of the Plants by JPS are subject to the satisfaction on or prior to the Closing Date of the conditions set forth in Section 6.1 of the Purchase Agreement. The obligations of JPS to complete the purchase of the Plants is subject to the satisfaction on or prior to the Closing Date of the conditions set forth in Section 6.2 or the Purchase Agreement. The obligations of Exteriors to complete the sale of the Plants is subject to the satisfaction on or prior to the closing date of the conditions set forth in Section 6.3 or the Purchase Agreement.

4. Rescission. In the event that the Closing pursuant to the Purchase Agreement does not occur within two Business Days after the Closing pursuant to this Agreement, Exteriors and JPS shall rescind the purchase of the Transferred Assets and the assumption of the Assumed Liabilities by JPS.

5. Termination. This Agreement may be terminated at any time prior to the Closing by either Exterior or JPS if the Purchase Agreement has been terminated.

6. Miscellaneous. (a) This Agreement shall be construed and the rights and duties of the parties determined in accordance with the laws of the State of Delaware.

(b) This Agreement shall inure to the benefit of and shall be binding upon the parties hereto and their respective assigns and successors.

(c) This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

(d) This Agreement may be amended only by a written agreement signed by JPS and Exteriors.

4

(e) Any notice, request, instruction or other document to be given hereunder by any party to another party shall be given in the manner and to the parties specified in the Purchase Agreement.

(f) In case any term, provision, covenant or restriction of this Agreement is held to be invalid, illegal or unenforceable in any jurisdiction. the validity, legality and enforceability of the remaining terms, provisions, covenants or restrictions, or of such term provision, covenant or restriction in any other jurisdiction, shall not in any way be affected or impaired thereby.

(g) In the event of any conflict between this Agreement and the agreements attached as Exhibits 2, 3A, 3B, 3C and 4 to the Purchase Agreement, the latter agreements shall apply.

(h) Upon the reasonable request of JPS, Exteriors shall on and after the Closing Date execute and deliver to JPS such other documents, releases, assignments and other instruments as may be required to effectuate completely the transactions contemplated hereby, and to otherwise carry out the purposes of this Agreement. Upon the reasonable request of Exteriors, JPS shall on the Closing Date execute and deliver to Exteriors such other documents, releases, assignments and other instruments as may be required to effectuate completely the transactions.

[SIGNATURE PAGE FOLLOWS]

5

IN WITNESS WHEREOF, the parties hereto have caused this Asset Purchase Agreement to be executed and delivered as of the date and year first written above.

**TEXTRON AUTOMOTIVE EXTERIORS INC.**

By: _____

Name:

Title:

**JPS AUTOMOTIVE, INC.**

By: _____

Name:

Title:

6

# COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES

## COMPUTATION OF EARNINGS PER SHARE
### (UNAUDITED)

### (IN THOUSANDS, EXCEPT PER SHARE DATA)

|  | Quarter Ended | | Nine Months Ended | |
|---|---|---|---|---|
|  | September 30, | September 30, | September 30, | September 30, |
|  | 2001 | 2000 | 2001 | 2000 |
|  | (13 weeks) | (13 weeks) | (39 weeks) | (40 weeks) |
| Average shares outstanding during the period............ | 106,310 | 61,895 | 88,351 | 61,888 |
| Incremental shares under stock options computed under the price of issuer's stock during the period........ | -- | -- | -- | 569 |
| Total shares for diluted EPS..................... | 106,310 | 61,895 | 88,351 | 62,457 |
| Income (loss) from continuing operations before extraordinary charge............................... $ | (13,760) | $ (4,102) | $ (19,077) | $ 14,017 |
| Income from discontinued operations, net of income taxes of $951 for the quarter ended September 30, 2001 and $5,731 and 4,400 for the nine months ended September 30, 2001 and 2000, respectively................ | 1,397 | -- | 8,817 | 6,600 |
| Extraordinary charge, net of income taxes of $457 for the quarter ended September 30, 2000 and $227 and $457 for the nine months ended September 30, 2001 and 2000, respectively . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | -- | (686) | (340) | (686) |
| Net income........................................ $ | (12,363) | $ (4,788) | $ (10,600) | $ 19,931 |
| Net income (loss) per basic and diluted common share: | | | | |
| Continuing operations............................ $ | (0.13) | $ (0.07) | $ (0.22) | $ 0.22 |
| Discontinued operations......................... | 0.01 | -- | 0.10 | 0.11 |
| Extraordinary charge............................ | -- | (0.01) | -- | (0.01) |
| Net income........................................ $ | (0.12) | $ (0.08) | $ ( 0.12) | $ 0.32 |

**End of Filing**

Powered By EDGAR

© 2005 | EDGAR Online, Inc.

# Exhibit B

# COLLINS & AIKMAN CORP

## FORM 10-K/A
(Amended Annual Report)

## Filed 6/7/2002 For Period Ending 12/31/2001

| | |
|---|---|
| Address | 250 STEPHENSON HWY |
| | TROY, Michigan 48083 |
| Telephone | 248-824-2500 |
| CIK | 0000846815 |
| Industry | Auto & Truck Parts |
| Sector | Consumer Cyclical |
| Fiscal Year | 12/31 |



# UNITED STATES SECURITIES AND EXCHANGE COMMISSION
## WASHINGTON, D.C. 20549

# FORM 10-K/A

(MARK ONE)

[X] ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(D)
OF THE SECURITIES EXCHANGE ACT OF 1934
FOR THE FISCAL YEAR ENDED DECEMBER 31, 2001
OR
[ ] TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(D)
OF THE SECURITIES EXCHANGE ACT OF 1934

*COMMISSION FILE NUMBER 1-10218*

---

# COLLINS & AIKMAN CORPORATION
(Exact name of registrant as specified in its charter)

| DELAWARE | 13-3489233 |
|---|---|
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification Number) |

**250 STEPHENSON**
**TROY, MICHIGAN 48083**
(Address of principal executive offices, including zip code)

**REGISTRANT'S TELEPHONE NUMBER, INCLUDING AREA CODE:**
(248) 824-2500
**SECURITIES REGISTERED PURSUANT TO SECTION 12(B) OF THE ACT:**

| TITLE OF EACH CLASS | NAME OF EACH EXCHANGE ON WHICH REGISTERED |
|---|---|
| Common Stock, $.01 par value | New York Stock Exchange |

**SECURITIES REGISTERED PURSUANT TO SECTION 12(G) OF THE ACT:**
NONE

Indicate by check mark whether the Registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the Registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes [X] No [ ]

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of Registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. [X]

The aggregate market value of voting stock held by non-affiliates of the Registrant was $391,879,266 as of March 20, 2002. (Treats as non-affiliates certain holders of restricted shares who have relinquished Board designation and other rights and as an affiliate a shareholder as to whom there is an issue.)

As of March 20, 2002, the number of outstanding shares of the Registrant's common stock, $.01 par value, was 167,993,798 shares.

**DOCUMENTS INCORPORATED BY REFERENCE:**

The information required by Part III (Items 10, 11, 12 and 13) is incorporated by reference to portions of the registrant's definitive Proxy Statement for the 2002 Annual Meeting of Stockholders, which will be filed within 120 days of December 31, 2001.

This filing amends our previously filed Form 10-K, but only as to those items that are specifically set forth herein.

**COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES**

**FORM 10-K/A ANNUAL REPORT INDEX**

**PAGE**

**Item 7. Management's Discussion and Analysis of Financial Condition and**
Results of Operations ........................................... 2

Item 8. Financial Statements and Supplementary Data ..................... F-1

PART I

This Report on Form 10-K/A contains "forward-looking" information, as that term is defined by the federal securities laws, about our financial condition, results of operations and business. You can find many of these statements by looking for words such as "may," "will," "expect," "anticipate," "believe," "estimate," "should," "continue," "predict," and similar words used in this Annual Report. The forward-looking statements in this Form 10-K/A are intended to be subject to the safe harbor protection provided by the federal securities laws.

These forward-looking statements are subject to numerous assumptions, risks and uncertainties (including trade relations and competition). Because the statements are subject to risks and uncertainties, actual results may differ materially from those expressed or implied by the forward-looking statements. We caution readers not to place undue reliance on the statements, which speak only as of the date of this Annual Report.

The cautionary statements set forth above should be considered in connection with any subsequent written or oral forward-looking statements that the Company or persons acting on its behalf may issue. We do not undertake any obligation to review or confirm analysts' expectations or estimates or to release publicly any revisions to any forward-looking statements to reflect events or circumstances after the date of this report or to reflect the occurrence of unanticipated events.

This Annual Report contains forward-looking statements within the meaning of the Private Securities Litigation Reform Act of 1995. Actual results and events may differ materially from those that are anticipated because of certain risks and uncertainties, including but not limited to general economic conditions in the markets in which the Company operates and industry based factors such as:

o declines in the North American, South American and European automobile and light truck builds,

o labor costs and strikes at our major customers and at our facilities,

o changes in consumer preferences,

o dependence on significant automotive customers,

o the level of competition in the automotive supply industry and pricing pressure from automotive customers and

o risks associated with conducting business in foreign countries.

In addition, factors more specific to us could cause actual results to vary materially from those anticipated in the forward-looking statements included in this report such as substantial leverage, limitations imposed by the Company's debt instruments, the Company's ability to successfully integrate acquired businesses including actions it has identified as providing cost saving opportunities, and pursue our prime contractor business strategy, the Company's customer concentration and risks associated with the formerly owned operations of the Company.

The Company's divisions may also be affected by changes in the popularity of particular vehicle models or particular interior trim packages or the loss of programs on particular vehicle models.

For a discussion of certain of these and other important factors which may affect our operations, products and markets, see "ITEM 1. BUSINESS" in our previously filed Form 10-K and "ITEM 7. MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS" and also our other filings with the Securities and Exchange Commission.

1

## GENERAL

The Company is a global leader in the design, engineering and manufacturing of automotive interior components, including instrument panels, fully assembled cockpit modules, floor and acoustic systems, automotive fabric, interior trim and convertible top systems. The Company has the number one or two North American market share position in seven out of ten major automotive interior categories tracked by CSM Worldwide and is also the largest North American supplier of convertible top systems. As a result of the TAC-Trim acquisition, the Company became a leading global supplier of fully assembled cockpit modules, a growing market segment. Sales are primarily made to North American and European automotive OEMs and Tier I total interior integrators. In North America, the Company manufactures components for approximately 90% of all light vehicle production platforms. The automotive supply industry in which the Company competes is cyclical and is influenced by the level of North American and European vehicle production.

The Company's net sales in 2001 were $1,823.3 million compared to $1,901.8 million in 2000. In fiscal year 2000, the Company changed its year-end to a calendar year-end. The 2000 fiscal year consisted of 53 weeks. Capitalized terms that are used in this discussion and not defined herein have the meanings assigned to such terms in the Notes to Consolidated Financial Statements.

In February 2001, Heartland acquired a controlling interest in C&A. Heartland is a private equity firm formed to focus on investments in industrial companies. As a result of the transaction, Heartland is entitled to designate a majority of the Company's Board of Directors. Heartland's strategy is to facilitate the growth of its controlled companies through acquisitions and internal growth. Since Heartland's initial investment in February 2001, the Company has aggressively pursued acquisitions in furtherance of its strategy to become a prime contractor to Tier I integrators and OEMs.

## RECENT ACQUISITIONS

The Company completed three key acquisitions in 2001. The acquisition of Becker Group L.L.C. (Becker), a leading supplier of plastic components to the automotive industry, was completed in July 2001; the acquisition of Joan Automotive Fabrics (Joan), a leading supplier of body cloth to the automotive industry, and Joan's affiliated yarn dyeing operation, Western Avenue Dyers, L.P., in September 2001. The Becker and Joan acquisitions were financed through issuances of the Company's common stock, warrants to purchase the Company's common stock, cash on hand and borrowings under a revolving credit facility and sales of the acquired companies' accounts receivable under the receivables facility. The TAC-Trim acquisition completed in December 2001, the refinancing of the Company's then existing credit agreement and the replacement of the receivables facility were funded through the offering of $500 million in notes, the issuance of $160 million of the Company's common stock for cash, borrowings under a new senior secured credit facility and sales of receivables under a new receivables facility. The Company also issued to Textron, the seller, 18 million shares of the Company's common stock and 0.3 million shares of preferred stock with an estimated fair value at the time of the acquisition of $160.9 million and $146.9 million respectively. Commitments under the new senior secured credit facility total $575.0 million, and are comprised of $400.0 million of term loans, and a $175.0 million revolving credit facility that allows funding of up to $75.0 million for Canadian subsidiaries in Canadian dollars.

These acquisitions and financing transactions will substantially increase revenues and cash flow and have materially altered the Company's capital and operating structure. As a result of these acquisitions and financing transactions, historical results of operations are not necessarily indicative of future results and will not be comparable. Key ratios and indicators may change as a result of the acquisitions. For example, while cockpit sales are expected to comprise an increasing portion of gross revenues, cockpits generally have a lower gross margin, partially offset by lower selling, general and administrative expenses. The cockpit business is generally less asset-intensive then the Company's traditional businesses.

2

Additionally, the integration of these three acquisitions into the Company will be challenging and the Company may not realize any or all of the cost savings or benefits that it expects. Given how recently these acquisitions have been completed, the cost savings and efficiencies associated with them have not been material to the periods discussed below.

## RESULTS OF OPERATIONS

### 2001 Compared to 2000

Net Sales: Net sales for 2001 decreased 4.1% to $1,823.3 million, down $78.5 million from 2000. Excluding the favorable impact of sales from acquired businesses during 2001 of approximately $127.2 million, net sales would have decreased 10.8%. The reduction in net sales, excluding the effect of acquisitions, was primarily driven by a decrease in North American vehicle production of 10% versus 2000 ($135.0 million). The Company was particularly adversely impacted by the recession and declining consumer confidence as well as by the recent terrorist attacks in the United States. These factors led to substantially reduced inventory levels at the Company's customers in the fourth quarter as customers sold vehicles in an uncertain and difficult economic environment. Sales for the 2001 period were also primarily impacted by customer price reductions, ($30.0 million) and weaker Canadian and European currencies ($24.0 million), and a in reduction in Headliner Fabrics Business ($20.0 million).

Net sales for North America Automotive Interior Systems (NAAIS) during 2001 were down 2.6% to $1,145.0 million, a decrease of $30.6 million from fiscal 2000. Excluding the favorable impact of sales from the Tac-Trim and Becker acquisition during 2001 of approximately $95.2 million, net sales would have decreased 10.8%. The decline in net sales, excluding the effect of the Becker acquisition was primarily driven by a decrease in North American vehicle production ($100.0 million) and customer price reductions ($24.0 million).

Net sales for European Automotive Interior Systems (EAIS) were down $26.3 million to $258.2 million during 2001, a decrease of 9.2% from fiscal 2000. The decrease in Europe was primarily due to the negative impact caused by changes in foreign currency exchange rates ($16.0 million) and customer price reductions ($6.0 million).

Net sales for the Specialty Automotive Products division decreased 4.9% to $420.1 million in 2001, down $21.6 million from 2000. Excluding the favorable impact of sales from the Joan acquisition during 2001 of approximately $31.4 million, net sales would have decreased 12.0%. The decrease, excluding the impact of the Joan acquisition, was due primarily to lower North American vehicle production ($35.0 million) and a reduction in headliner fabric business ($20.0 million).

Gross Margin: For 2001, gross margin was 12.0%, down from 14.0% in 2000. Excluding the effect of acquisitions, our gross margin would have been 12.4%. This decrease is primarily a result of decreased operating leverage related to lower volumes in both North America and Europe. Additionally, during 2001 gross margin was adversely impacted by the following items:

o TAC-Trim Acquisition: Due to the closing of the TAC-Trim acquisition on December 20, 2001, the Company incurred eleven days of fixed costs during a normal industry shutdown period with less than $6 million in sales. This resulted in a gross margin loss for the eleven days of $4.2 million.

o Launch Costs: The Company incurred launch costs during the second and third quarters of 2001 related to the Ford Thunderbird convertible program in the Company's Specialty Automotive Products division. In Europe, the Company's plastics facility in the UK experienced difficulties principally related to an outside paint supplier on the launch of the new BMW R50 (Mini) program during the second half of 2001.

o Integration Costs: The Company incurred $2.5 million of costs during the fourth quarter of 2001 related to acquisition integration. The majority of these costs related to the Becker and Joan acquisitions.

3

o Facility Closure Costs: In addition, during 2001, the Company incurred $2.5 million of costs related to the sale of the retail/commercial floormat business in North America and the shutdown of a small accessory floormat facility.

These unfavorable items were exacerbated by various customer price reductions of approximately $40 million, but were partially offset by commercial recoveries of $6.9 million and improvements in operating performance at NAAIS of $10.3 million and at the fabrics operations of $5.5 million.

Selling, General and Administrative Expenses: Selling, general and administrative expenses for 2001 were $164.4 million, compared to $158.5 million in 2000. Relative to 2001, the comparable 2000 period included an extra week of costs due to the fiscal year change mentioned earlier. The increase is primarily due to additional costs assumed from acquisitions ($7.4 million), credits in 2000 relating to a pension related actuarial benefit and the sale of property (totaling $2.0 million) and additional expense in 2001 related to management incentive compensation plans of $3.0 million. These items more than offset the benefit in 2001 of cost reductions from earlier restructuring programs and reduced spending. As a percentage of sales, selling, general and administrative expenses were 9.0% and 8.3% for 2001 and 2000, respectively.

Restructuring Charge: During 2001, the Company undertook two restructuring programs resulting in charges totaling $18.8 million. The goal of the first quarter of 2001 restructuring program (charge of $9.2 million) was to de-layer management in the North American, European and Specialty operations. The second program resulted in a fourth quarter charge of $9.6 million. The objective of this program was to downsize three facilities in North America via better utilization of manufacturing and warehouse floor space (including associated headcount reductions) and to reduce headcount in our Mexican operations. The pre-tax $18.8 million charge includes $11.2 million of severance costs and $7.6 million of asset impairment charges.

Operating Income Highlights by Division: Operating income at NAAIS declined to $73.9 million for 2001 from $87.2 million for the prior year. The decline in NAAIS operating income primarily reflected the impact of lower North American production volumes of $8.7 million as well as restructuring charges of $8.2 million which were offset by improvements in operating performance of $10.3 million. The results for 2001 also included costs of $3.2 million related to the sale of the retail/commercial floormat business and the shutdown of a small accessory floormat facility.

Operating income at EAIS declined to a loss of $22.3 million for 2001 from income of $1.1 million for 2000. The decline in EAIS operating income primarily reflected the impact of product mix and customer price reductions along with the recognition of restructuring charges. Additionally, EAIS operating performance was adversely impacted by launch costs associated with the BMW R50 (Mini) during the second half of 2001 as well as a $1.1 million loss on the sale of a small metal pressing operation in the UK in the third quarter of 2001. Benefits from earlier restructuring programs and purchasing savings reduced the negative impact of these items.

Operating income at the Specialty Automotive Products division declined to $13.0 million for 2001 from $22.8 million for 2000. The decline in Specialty Automotive Products division operating income primarily reflects expenses incurred due to the ramp-up of the Chrysler Sebring convertible in the early part of 2001 ($6.1 million), the start-up of the new Ford Thunderbird convertible in mid-year 2001 ($1.5 million) and the impact of restructuring charges ($1.7 million). Margins, as a percentage of sales, for the fabrics business remained consistent with 2000, as better operating performance and benefits of added volume from the Joan acquisition offset the margin impact of lower net sales driven by lower industry production and reduction in headliner fabric business.

Interest Expense: Interest expense for 2001 decreased $12.3 million to $84.3 million as compared to 2000. The decrease in interest expense is primarily attributed to lower average debt balances resulting from the Heartland Transaction, and lower borrowing rates in North America partially offset by increased amortization of debt issue costs resulting from the Heartland Transaction. The benefit of working capital reductions and sale and leaseback transactions also offset increased borrowings related to acquisitions.

4

Loss on Sale of Receivables: The Company sells on a continuous basis through its Carcorp subsidiary, an interest in a pool of accounts receivable. In connection with the sale of accounts receivables, a loss of $10.8 million was recognized during 2001, compared to a loss of $9.2 million for 2000. Included in the 2001 and 2000 losses were up-front fees related to the new accounts receivable facilities put in place during both periods. In December 2001, the Company entered into a new larger facility in connection with the TAC-Trim acquisition, resulting in up-front fees of $5.6 million. During the first quarter of 2000, the Company incurred fees of $1.6 million associated with a new accounts receivable securitization replacing one that had expired. Excluding these expenses, the remaining decrease of $2.4 million, is primarily due to lower interest rates during 2001.

Subsidiary Preferred Stock Requirements: The Company's subsidiary, Collins & Aikman Products Co. ("C&A Products") issued to the seller preferred stock with a $326.4 million liquidation value and an estimated fair market value of $146.9 million in connection with the TAC-Trim acquisition. The 2001 charge represents dividends accrued of $1.5 million and accretion of discount of $0.9 million.

Other Expense (Income): The Company recognized other expense of $6.4 million in 2001, compared to other expense of $1.5 million in 2000. The increase in other expense resulted primarily from an $8.1 million loss on the sale and leaseback of real estate transactions completed during the second and fourth quarters of 2001, offset by a gain of $6.2 million on shares received as result of the Prudential Financial demutualization and initial public offering. The remaining increase in expense is primarily due to higher foreign currency transaction losses.

Income Taxes: The Company recognized an income tax benefit of $18.6 million in 2001 compared to an income tax expense of $2.2 million in 2000. The overall effective tax rate for 2001 was 27.2 percent compared to 276 percent for 2000. Certain state taxes and permanent differences, that do not fluctuate with income, such as non-deductible goodwill and dividends and accretion of preferred stock impacted the effective rate by: (1) reducing the effective tax rate when a loss exists and a tax benefit is recorded, or (2) increasing the effective tax rate when we have income and tax expense is recorded.

Discontinued Operations: During 2001, the Company received payments on environmental claims related to discontinued operations of $14.5 million. During 2000, the Company settled claims for certain other environmental matters for $20.0 million. In fiscal 2001 and 2000, $8.8 million and $6.6 million were recorded as income from discontinued operations, respectively, net of income taxes of $5.7 million and $4.4 million, respectively.

Extraordinary Charge: During 2001 and 2000, the Company recognized extraordinary charges of $5.3 million and $0.7 million, respectively. Of the 2001 charge, $5.0 million represents a charge off of debt issue costs associated with our old credit facility, which was replaced by a new credit facility entered into in conjunction with the Company's TAC-Trim acquisition. In addition, during 2001 and 2000 charges were recorded in connection with the repurchase of JPS Automotive Senior Notes at prices in excess of carrying values of $0.3 million and $0.7 million, respectively.

Net Income: The combined effect of the foregoing resulted in a net loss of $46.2 million for 2001, compared to net income of $4.5 million in 2000.

## 2000 Compared to 1999

The Company's 2000 fiscal year consisted of 53 weeks as compared to a 52-week year in fiscal 1999. Therefore, all sales and associated costs and expenses were impacted by the longer reporting period in fiscal 2000. In a 53-week year, the Company's policy is to include the additional week in the first quarter of the year. There were no material acquisitions within either period.

Net Sales: Net sales of $1,901.8 million for 2000 were relatively flat compared to the prior year. Net sales for the NAAIS division increased 2.1% to $1,175.6 million, up $23.9 million from 1999. The increase in sales was primarily driven by higher industry production volume as well as a favorable product mix. Net sales for the EAIS division decreased 7.1% to $284.5 million, down $21.9 million from 1999. This decrease was primarily due to the negative impact of foreign currency translation offset by slightly higher industry production volume. Net sales for the Specialty Automotive Products division were relatively flat with the

5

prior year at $441.3 million. Production volume increases in the fabrics business were offset largely by lower convertible volumes, primarily due to a reduction in Chrysler Sebring production levels.

Gross Margin: Gross margin was 14.0% in 2000, down from 15.0% in 1999. This decrease was primarily due to one-time costs related to various commercial customer recovery issues, performance issues at the Springfield operation, certain asset write-offs, lower convertible build volumes and operating issues relating to the relocation of headliner production to the Farmville facility. These decreases were partially offset by the benefits recognized from a restructuring program implemented in 1999 and 2000 and improved performance at the Manchester, Michigan plastics facility.

Selling, General and Administrative Expenses: Selling, general and administrative expenses increased 3.8% to $158.6 million, up $5.8 million from 1999. The increase is primarily due to one-time costs related to the aforementioned commercial customer recovery issues and the impact of an additional week in the first quarter of fiscal 2000 partially offset by one-time pension-related actuarial benefits driven by the restructuring program and the reduction of the Company's bonus accrual. As a percentage of sales, selling, general and administrative expenses increased to 8.3% in 2000, compared to 8.0% in 1999.

Operating Income Highlights by Division: Operating income for the NAAIS division decreased by 2.5% to $87.2 million, operating income for the EAIS division decreased to $1.1 million from $2.3 million and operating income for the Specialty Automotive Products division decreased by 42.4% to $22.8 million for the reasons described above.

Restructuring Charge: the Company recognized a $33.4 million charge in 1999 relating to its 1999 reorganization plan.

Interest Expense: Interest expense, net of interest income of $3.4 million and $2.5 million in 2000 and 1999, respectively, increased $4.6 million to $96.6 million in 2000. The increase is primarily attributed to higher average interest rates and higher average debt balances in 2000. The weighted average interest rates were 10.0% and 9.6% at December 31, 2000 and December 25, 1999, respectively.

Loss on the Sale of Receivables: In connection with receivables sales, a loss of $9.2 million was recognized in 2000, compared to a loss of $5.4 million in 1999. During the first quarter of 2000, the Company entered into a new accounts receivable securitization arrangement resulting in one-time expenses for initial fees totaling $1.6 million. The remaining increase is due to higher interest rates and increased sales of eligible receivables. The prior securitization facility expired and a new facility came into effect on December 27, 1999.

Other Expense: The Company recognized other expense of $1.5 million, compared to other expense of $2.2 million in 1999. The decrease is primarily due to lower option premiums resulting from a lower volume of hedging activity in 2000 offset, partially by increased foreign exchange transaction losses and higher losses from joint ventures in 2000.

Income Taxes: The Company recognized income tax expense of $2.2 million in 2000, compared to income tax expense of $0.2 million in 1999. The Company's effective tax rate was 276% in 2000, compared to (22%) in 1999. The increase in the Company's effective tax rate is primarily due to the impact of prior year non-recurring tax credits, along with the effects of certain state taxes and non-deductible goodwill, which do not fluctuate with income.

Discontinued Operations: In 2000, the Company settled environmental claims related to discontinued operations for a total of $20 million. Of this amount, $6.6 million was recorded as income from discontinued operations, net of income taxes of $4.4 million.

Extraordinary Charge: In 2000, the Company recognized an extraordinary charge of $0.7 million, net of income taxes of $0.5 million, in connection with the repurchase of $38 million principal amount of JPS Automotive Senior Notes on the market at prices in excess of carrying values.

Cumulative Effect of a Change in Accounting Principle: The Company adopted the provisions of Statement of Position No. 98-5, "Reporting on the Cost of Start-Up Activities" ("SOP 98-5") at the beginning of 1999. SOP 98-5 provides guidance on the financial reporting of start-up costs and

6

organization costs and requires that all non-governmental entities expense the costs of start-up activities as these costs are incurred instead of being capitalized and amortized. The cumulative effect of adopting SOP 98-5 resulted in a charge of $8.8 million, net of income taxes of $5.1 million, in 1999.

Net Income (Loss): The combined effect of the foregoing resulted in net income of $4.5 million in 2000, compared to a net loss of $(10.2) million in 1999, which included a restructuring charge of $33.4 million.

## LIQUIDITY AND CAPITAL RESOURCES

The Company and its subsidiaries had cash and cash equivalents totaling $73.9 million and $20.9 million at December 31, 2001 and December 31, 2000, respectively. The Company had $253.1 million of unutilized availability under its credit facility and the accounts receivable facility as of December 31, 2001. The total was comprised of $106.4 million under the Company's revolving credit facility (including $75.0 million available to certain Canadian subsidiaries), $118.6 under the accounts receivable facility and approximately $28.1 million under bank demand lines of credit in Canada, Austria, South America and other European locations. Availability under the revolving credit facility was reduced by outstanding letters of credit of $68.6 million as of December 31, 2001.

The completion of the TAC-Trim acquisition on December 20, 2001 significantly increased debt levels and has added significant new liquidity requirements in order to launch part of TAC-Trim's projected new book of business and to finance capital expenditures at TAC-Trim. These new liquidity requirements will relate primarily to tooling and advanced engineering and development. While the Company ultimately expects to be entitled to recover these amounts from customers, it will need to finance these requirements to achieve its revenue goals. Otherwise, much of the increased capital expenditures relate to the Company's larger size and are expected to be readily serviced by the larger cash flow base.

The Company's principal source of funds is cash generated from continuing operating activities, borrowings under credit agreement facilities, and the sale of accounts receivable under accounts receivable facilities and the issuance of common stock. The Company continues to seek means to generate additional cash for debt reduction and its growth strategy. Among other things, the Company seeks to further improve working capital management and continue to utilize a lease financing strategy.

### Operating Activities

Net cash provided by the continuing operating activities of the Company was $131.4 million for the year ended December 31, 2001, compared to $130.9 million for the year ended December 31, 2000. The increase in cash provided by operating activities is due primarily to the increase in cash generated from reductions in working capital (primarily facilitated by receivable collections at TAC-Trim and a decrease in inventory volumes), partially offset by a decrease in income from continuing operations.

### Investing Activities

During 2001, C&A Products entered into sale and leaseback transactions that generated net proceeds of $86.2 million. See the information under the heading "-- Leases" for additional discussion.

As discussed above in "-- Recent Acquisitions," during 2001 the Company completed several key acquisitions. Cash consideration, net of cash received and including acquisition fees, was $61.8 million for Becker, $102.0 million for Joan and $589.4 million for TAC-Trim.

Additional acquisition costs in the amount of $7.3 million resulted from purchasing the remaining 50% interest of a joint venture established in the UK to manufacture automotive interior fabrics and the acquisition of the remaining 25% interest in Collins & Aikman Carpet and Acoustics, SA. De C.V (an automotive supply operation primarily of acoustical and plastic components in Sweden, Belgium and France).

### Financing Activities

At December 31, 2001, the Company had total outstanding indebtedness of $1,301.9 million (excluding short-term borrowings and approximately $68.6 million of outstanding letters of credit at a weighted average interest rate of 9.82% per annum. Comparatively, at December 31, 2000, the Company had total indebtedness of $884.0 million.

7

During 2001, Heartland, and certain other investors, acquired 57.0 million shares of common stock from the Company at a price of $5.00 per share, representing a cash investment in the Company of $285.0 million before fees and expenses. Net proceeds paid to the Company from the equity transactions were $264.3 million. A portion of the proceeds were used to pay $10.7 million in transaction related costs to obtain change in control consents, fees related to term loan facilities and other amendments to credit agreement facilities. The remaining proceeds of $253.6 million were used to pay down a revolving credit facility and to fund part of the TAC-Trim acquisition.

During 2001, C&A Products used proceeds from an amended and restated credit facility to retire all outstanding JPS Automotive 11 1/8% Senior Notes. The notes which were due June 2001, were repaid in full on March 28, 2001, at a redemption price equal to their principal amount with interest accrued to the redemption date. The Company recognized an extraordinary charge of $0.3 million in connection with this repurchase of the remaining outstanding JPS Automotive Senior Notes at prices in excess of carrying values. The amended and restated credit facility was repaid during 2001 with proceeds from various financing arrangements that the Company entered into as part of the TAC-Trim acquisition. These financing arrangements included entering into new Senior Credit Facilities and a new Receivables Facility along with the issuance of preferred stock of a subsidiary and Senior Notes due in 2011.

The new senior credit facility consists of a revolving credit facility and tranche A and tranche B term loan facilities. The revolving credit facility will provide for revolving loans and extensions of credit up to a maximum principal amount of $175.0 million. A portion of the revolving credit facility will be available to Canadian subsidiaries in Canadian dollars and a portion of the revolving credit facility will be available in the form of letters of credit. The tranche A facility is comprised of term loans in an aggregate principal amount of $100.0 million and the tranche B facility is comprised of term loans in an aggregate principal amount of $300.0 million. The revolving credit facility, the tranche A term loan and the tranche B term loan mature in December 2005. Borrowings under the new senior credit facilities will bear interest at variable rates based on a spread to the adjusted LIBOR or a base rate, at our option. At December 31, 2001 the company had $400 million in term loans outstanding under this facility.

On an ongoing basis, the Company has entered into an agreement to sell trade accounts receivable of certain business operations to a bankruptcy-remote, special purpose subsidiary, wholly owned by the Company. The Company's receivables subsidiary will, subject to certain conditions, from time to time, sell an undivided fractional ownership interest in a pool of domestic and certain Canadian receivables, up to a balance of $250 million, to bank-sponsored multi-seller commercial paper conduits under a committed facility. As of December 31, 2001, the Company had $118.6 million undrawn under the receivables facility.

New receivables will be added to the pool as collections reduce previously sold receivables. The Company expects to service, administer and collect the receivables on behalf of the receivables subsidiary and the conduits. The proceeds of sale will be less than the face amount of accounts receivable sold by an amount that approximates the purchaser's financing costs. The receivables facility has a term of 364 days, extendible for additional 364-day periods with the agreement of all parties. The new receivables facility will be an important source of ongoing liquidity to the Company. This facility could be extended on less favorable terms and if it were not extended, the Company may be unable to obtain a replacement facility or otherwise find an alternative source of funds providing it with comparable liquidity.

C&A Products issued Textron 182,700 shares of its series A redeemable preferred stock, 123,700 shares of series B redeemable preferred stock and 20,000 shares of series C redeemable preferred stock. The preferred stock was recorded at its estimated fair value of $146.9 million, which is less than the liquidation value of $1,000 per share or $326.4 million. The estimated fair value is based on market prices for securities with similar terms, maturities and risk characteristics, and includes a liquidation discount to reflect market conditions.

C&A Products also issued $500 million of 10 3/4% Senior Notes due in 2011 in connection with the TAC-Trim acquisition. The Company also amended the existing $400 million of 11 1/2% senior subordinated notes due in 2006 to make each subsidiary guarantor of the Senior Notes a senior subordinated guarantor of the existing notes.

8

The Company's principal uses of funds from operating activities and borrowings for the next several years are expected to fund interest and principal payments on its indebtedness, net working capital increases, costs associated with the Company's previously divested businesses, capital expenditures and lease expenses. The completion of the TAC-Trim acquisition on December 20, 2001 significantly increased debt levels and has added significant new liquidity requirements in order to launch part of TAC-Trim's projected new book of business and to finance capital expenditures at TAC-Trim. These new liquidity requirements will relate primarily to tooling and advanced engineering and development. While the Company ultimately expects to be entitled to recover these amounts from customers, it will need to finance these requirements to achieve its revenue goals. Otherwise, much of the increased capital expenditures relate to the Company's larger size and are expected to be readily serviced by the larger cash flow base. Management believes cash flow from operations, the recent inflow of capital, debt financings and related refinancings of indebtedness provide adequate sources of liquidity for the Company.

### Contractual Obligations:

Below is table that identifies the Company's significant contractual obligations. Following the table is a more detailed description of these obligations.

|  | TOTAL | LESS THAN 1 YEAR | 1-3 YEARS | 4-5 YEARS | AFTER 5 YEARS |
|---|---|---|---|---|---|
|  |  |  | (IN MILLIONS) |  |  |
| Long-Term Debt .............. | $ 1,301.9 | $ 19.5 | $ 51.4 | $ 731.0 | $ 500.0 |
| Preferred Stock* ............ | 326.4 |  |  |  | 326.4 |
| Operating Leases ............ | 284.0 | 57.2 | 94.1 | 47.5 | 85.2 |
| Capital Expenditures ........ | 8.2 | 8.2 |  |  |  |
| Total Obligations ........... | $ 1,920.5 | $ 84.9 | $ 145.5 | $ 778.5 | $ 911.6 |

PAYMENT DUE BY PERIOD

* Mandatorily Redeemable Preferred Stock of Subsidiary

### Senior Secured Credit Facilities

General: As noted in the liquidity section, the Company entered into a new senior secured credit facility that allows funding in the aggregate of up to $575 million. Borrowings under the credit facility are secured by all the assets of the Company and C&A Products and certain subsidiaries of each, and are unconditionally and irrevocably guaranteed jointly and severally by the Company and each existing and subsequently acquired or organized domestic subsidiaries (other than by the Company's receivables subsidiary). Available funding under this credit facility is reduced if the program size or commitment level under the Company's new receivable facility (discussed below) exceeds $250.0 million.

Interest Rates and Fees: Borrowings bear interest, at the Company's option, at either (a) adjusted LIBOR plus a 3.75% margin in the case of the revolving credit and tranche A facilities and 4.00% margin in the case of the tranche B facilities, in all cases subject to a minimum LIBOR of 3.00% or (b) the highest of (i) JPMorgan Chase Bank's prime rate, (ii) the federal funds effective rate plus 1/2 of 1.00% and (iii) the base CD rate plus 1.00%. A commitment fee on any unused commitments under the revolving portion of the credit facility equal to 1.00% per annum is payable quarterly in arrears and is subject to adjustment based on attaining certain performance targets.

Covenants: The credit facility requires that the Company meet certain financial tests, including, without limitation, the following tests: a maximum leverage ratio, a minimum interest coverage ratio and certain prescribed limitations on capital expenditures at levels to be agreed upon between the Company and the agents. The credit facility also contains customary covenants and restrictions, including, among others, limitations or prohibitions on declaring dividends and other distributions, redeeming and repurchasing capital stock, prepaying, redeeming and repurchasing other indebtedness, loans and investments, additional indebtedness, liens, sale-leaseback transactions, preferred stock, capital expenditures, recapitalizations, mergers, acquisitions and asset sales and transactions with affiliates.

9

Events of Default: The credit facility contains certain customary events of default, including, among others, cross-default and cross-acceleration to other indebtedness (including to the receivables facility).

## 11 1/2% Senior Subordinated Notes due 2006

C&A Products has outstanding $400 million in principal amount of 11 1/2% senior subordinated notes due 2006. In connection with the TAC-Trim acquisition, the Company amended the indenture governing these notes to make each subsidiary guarantor of the 10 3/4% Senior Notes due in 2011 a guarantor of these notes on a senior subordinated basis. The indenture governing these notes contains restrictive covenants (including, among others, limitations on indebtedness, restricted payments, liens, asset dispositions, change of control and transactions with affiliates) that are customary for such securities.

## 10 3/4% Senior Notes due 2011

As discussed above, in connection with the TAC-Trim acquisition, Products sold $500,000,000 principal amount of 103/4% senior notes due 2011. The indenture governing these notes contains restrictive covenants (including, among others, limitations on indebtedness, restricted payments, liens, asset dispositions, change of control and transactions with affiliates) that are customary for such securities.

## Mandatorily Redeemable Preferred Stock of Subsidiary

General: As discussed above, as part of the consideration paid to Textron for the TAC-Trim acquisition, C&A Products issued mandatorily redeemable preferred stock to Textron with an estimated fair market value of $146.9 million and a liquidation value of $326.4 million.

Dividends: Holders of this preferred stock are entitled to receive dividends accruing on the liquidation preference thereof at a rate of 11% per annum, in respect of dividend periods ending on or prior to July 1, 2003, and 15% per annum, in respect of dividend periods ending after July 1, 2003, in the case of the series A preferred stock, 12% per annum, in respect of dividend periods ending on or prior to July 1, 2003, and 16% per annum, in respect of dividend periods ending after July 1, 2003, in the case of the series B preferred stock, 12% per annum, in respect of dividend periods ending on or prior to July 1, 2003, and 16% per annum, in respect of dividend periods ending after July 1, 2003 and in the case of the series C preferred stock, in each case payable quarterly in arrears, commencing on April 1, 2002 and accumulating from the date of issuance. C&A Products may, at its option, elect to accrue up to an amount equivalent to 7% per annum of the dividends on the series A preferred stock, an amount equivalent to 8% per annum of the dividends on the series B preferred stock and an amount equivalent to 8% per annum of the dividends on the series C preferred stock in lieu of cash payment of such dividends and, in each case, any accrued dividends will be added to the liquidation preference of the applicable series of preferred stock. Under certain circumstances, C&A Products may, at its option, at all times through and including January 1, 2004 accrue up to the full amount of all dividends on the preferred stock in lieu of cash payment of such dividends and, in each case, any accrued dividends will be added to the liquidation preference of the applicable series of preferred stock.

Liquidation Preference: Upon any voluntary or involuntary liquidation, dissolution or winding-up of C&A Products, holders of the preferred stock will be entitled to be paid out of the assets of C&A Products available for distribution to stockholders in the amount of $1,000 per share plus the aggregate amount of accrued dividends prior to any distribution to any holders of equity securities which rank junior to the preferred stock. In addition, upon any voluntary or involuntary liquidation, dissolution or winding-up of C&A Products, the holders of series C preferred stock will be entitled to a participation in distributions to C&A Products' common equity tied to any appreciation in the value of C&A Products' common equity subsequent the issuance date, not to exceed an aggregate of $2 million for all series C preferred stock outstanding.

Mandatory Redemption: C&A Products is required to redeem all of the series A preferred stock and series B preferred Stock outstanding on January 1, 2013 at a redemption price equal to 100% of the liquidation preference thereof, plus accrued and unpaid dividends to the date of redemption. C&A

10

Products is also required to redeem all of the series C preferred stock outstanding on February 9, 2022 at a redemption price equal to 100% of the liquidation preference thereof, plus accrued and unpaid dividends to the date of redemption, plus common equity participation.

### Leases

During 2001, C&A Products entered into sale and leaseback transactions for certain manufacturing equipment and non-manufacturing properties. The transactions resulted in the recognition of a $4.4 million net deferred asset that is being amortized over the lease term, and the recognition of an $8.7 million loss.

During 2001, the Company received net proceeds (after fees) of approximately $86.2 million from sale and leasebacks of real property and equipment, which it used to reduce outstanding debt. The aggregate lease expenses associated with these leases will be $88.8 million, $12.5 million of which relates to 2002. To the extent permitted by the credit facility, the Company may enter into additional similar leasing arrangements from time to time. As part of these sale-leaseback transactions, C&A Products sold and contemporaneously leased back real property from unrelated third parties, and received net proceeds (after fees) of $46.4 million.

In June 2001, the Company entered into sale-leaseback transactions with each of New King, L.L.C. ("New King") and Anchor Court, L.L.C. ("Anchor Court"), which are affiliates of Becker Ventures LLC. Becker Ventures is controlled by Charles Becker, a Company director. See the information under the heading "-- Other Information -- Effect of Transactions with Related Parties."

In connection with these sale-leaseback transactions, C&A Products sold and contemporaneously leased back real property located in Troy, Michigan and Plymouth, Michigan from New King and Anchor Court, respectively, for net proceeds of $15.1 million in aggregate. The initial lease term in each transaction is 20 years and each lease has two successive ten year renewal options. The basic rent for the Troy, Michigan property is $1.3 million per year, and the basic rent for the Plymouth, Michigan property is $.5 million per year. The rental rates in each case are subject to adjustment after expiration of the initial term.

Prior to the TAC Trim acquisition, TAC-Trim entered into an $86.9 million sale and leaseback transaction (the "Textron Leasing Transaction") with two separate single purpose affiliates of Textron Financial Corporation, as lessor and purchaser, with respect to a portfolio of manufacturing equipment situated in different locations throughout the United States and Canada. Payments under the Textron leasing transaction are guaranteed by C&A Products and secured by a first perfected mortgage lien over certain real property with a value equal to $25 million. Each lease is for an initial term of three years with three one-year renewal options. As is customary, the documentation for the Textron leasing transaction incorporates covenants by reference, from the Company's credit facility, that may be amended or waived by the senior lenders, and also contain events of default. See the information under the heading "-- Other Information -- Effect of Transactions with Related Parties."

The Company also has other equipment lease agreements with several lessors that, subject to specific approval, provide availability of funding for operating leases and sale and leasebacks as allowed in its other financing agreements.

Refer to Note 12, "Leases" of the financial statements included in this report for information regarding future minimum lease payments.

### Capital Expenditures

The Company makes capital expenditures on a recurring basis for replacements and improvements. During 2001, the Company had approximately $54.5 million in capital expenditures for continuing operations. Capital expenditures will materially increase with the expanded book of business in 2002 and in future years will depend upon demand for our products and changes in technology. Estimates for capital expenditures in 2002 range from approximately $130 to $150 million. A portion of capital expenditures may be financed through leasing arrangements.

11

Sources of Liquidity

The table below identifies the Company's significant sources of liquidity:

| | MAXIMUM AMOUNT AVAILABLE | AVAILABILITY EXPIRATION PER PERIOD | | | |
| --- | --- | --- | --- | --- | --- |
| | | LESS THAN 1 YEAR | 1-3 YEARS | 4-5 YEARS | AFTER 5 YEARS |
| | | | (IN MILLIONS) | | |
| Receivable Facility ................... | $ 250.0 | $ 250.0 | $ -- | $ -- | $ -- |
| Revolving Credit Facility(1) ......... | 175.0 | -- | -- | 175.0 | -- |
| Lines of Credit ...................... | 55.0 | 55.0 | -- | -- | -- |
| Total Available ...................... | $ 480.0 | $ 305.0 | $ -- | $ 175.0 | $ -- |

(1) At December 31, 2001, $68.6 million of outstanding letters of credit reduce the maximum amount available under the Revolving Credit Facility.

## Receivables Facility

General: As discussed above, in connection with the TAC-Trim acquisition, the Company entered into an agreement to sell, on an ongoing basis, the trade accounts receivable of certain business operations to a bankruptcy-remote, special purpose subsidiary, wholly owned and consolidated by the Company. The receivables subsidiary (Carcorp) will, subject to certain conditions, from time to time, sell an undivided fractional ownership interest in a pool of domestic and certain Canadian receivables, up to $250 million, to various multi-seller commercial paper conduits supported by a committed liquidity facility. Upon sale to the conduit, Carcorp will hold a subordinated retained interest in the receivables. Under the terms of the agreement, new receivables are added to the pool as collections reduce previously sold receivables. The Company expects to service, administer and collect the receivables on behalf of Carcorp and the conduit. The proceeds of sale will be less than the face amount of accounts receivable sold by an amount that approximates the purchaser's financing costs. The term of the receivables facility will initially be 364 days, and may be extended for additional 364-day periods with the agreement of all parties.

Restrictions: This receivables facility contains certain restrictions on Carcorp (including maintenance of $60.0 million net worth) and on the sellers (including limitations on liens on receivables, modifications of the terms of receivables, and changes in credit and collection practices) customary for facilities of this type. The commitments under the receivables facility are subject to termination prior to their term upon the occurrence of certain events, including payment defaults, breach of covenants, including defined interest coverage and leverage ratios, bankruptcy, default by the Company in servicing the receivables and failure of the receivables to satisfy certain performance criteria.

## Commercial Commitments

Following is a discussion of significant commercial commitments of the Company.

Letters of Credit: The Company acquired a 50% interest in an unconsolidated Italian joint venture as part of the TAC-Trim acquisition. The Italian joint venture will incur indebtedness in connection with its ongoing capital expenditure program to service three new vehicle lines of Fiat at Fiat's Cassina plant and other planned capital expenditures. The Company agreed to initially issue letters of credit of up to $10.0 million to support this debt. If such letters of credit are drawn, there can be no assurance that this Italian joint venture will have sufficient assets to reimburse the Company.

Put and Call Arrangement: The Company entered into a put and call arrangement with respect to the 50% interest in the Italian joint venture. The arrangement permits Textron to require the Company to purchase Textron's interests in the joint venture for an aggregate of approximately $23.1 million, subject to an increase by $5.0 million under certain circumstances, after the third anniversary of closing. Additionally, the arrangement permits the Company to require Textron to sell its interests in the joint venture to the Company for fair market value following the third anniversary of the closing. The Company cannot be sure that it will have adequate liquidity to satisfy any put, or exercise any call, of the Textron interest.

12

In addition, the Company's credit facility may restrict such further acquisition of any further financing of the joint venture. While the Company will be permitted, and required, to provide certain guarantees and letters of credit support, it may not be permitted to further finance the joint venture and this may adversely affect the value of the interests which the Company could be required to purchase at a fixed price in the future.

Contingent Consideration and Purchase Price Adjustments: Under the TAC-Trim acquisition agreement, the purchase price paid by the Company is subject to adjustment based upon working capital and debt levels and the seller is entitled to a return of any cash left in the business at closing and reimbursement of certain capital expenditures made by it after September 30, 2001. The Company and Textron have agreed to a purchase price adjustment pursuant to the purchase agreement for the purchase of TAC-Trim. The Company agreed to pay to Textron, for the cash, cash equivalents or other short-term assets of TAC-Trim transferred to the Company at the closing, $10.0 million on May 24, 2002 and a further $20.0 million on or before August 31, 2002, in each case with interest at 11½% from the December 20, 2001 closing. At the Company's option, through December 31, 2002, the Company can repurchase at 75% of liquidation value plus accrued dividends either approximately $133.33 million in liquidation value of the Products series A preferred stock or all of the $182.7 million in liquidation value of the series A preferred stock. If the Company repurchases $133.33 million in liquidation value of the Product series A preferred stock, the cash payment referred to above would be reduced to $15.0 million (rather than the aggregate of $30.0 million) and if the Company repurchases all, the effective cash payment would be $10.0 million (rather than $30.0 million). Additionally, the Company has an option from September 1, 2002 through August 31, 2003 to acquire all of the outstanding Products Preferred Stock owned by Textron at a discount to its liquidation value plus accrued dividends.

As part of the TAC-Trim acquisition agreement, the Company may be obligated to make additional aggregate payments to Textron of $15.0 million to $125.0 million in the event that the Company's cumulative EBITDA (which is defined in the purchase agreement to adjust for the expected effect of acquisitions after the closing of the TAC-Trim acquisition and the related financings) for the five year period ending December 31, 2006 is between $2,908.0 million and $4,691.0 million.

If the Company's material debt instruments prohibit this payment, then it will be entitled to issue additional preferred stock having terms equivalent to the series B preferred stock, except that it will be required to mandatorily redeem such preferred stock at its liquidation preference, with accrued and unpaid dividends, at such time as, and to the extent that, it is permitted to do so under our material debt instruments. In addition, under the TAC-Trim acquisition agreement, the Company is permitted to use the "Textron" name for 18 months in exchange for payments of $13.0 million on December 15, 2002 and $6.5 million on December 15, 2003.

Becker Ventures holds 4.0 million shares of the Company which were acquired as part of the financing for the TAC-Trim acquisition. Mr. Becker is the managing member of Becker Ventures and holds a controlling interest in Becker Ventures.

## OTHER INFORMATION

## EFFECTS OF CERTAIN TRANSACTIONS WITH RELATED PARTIES

### Heartland Transactions

The Company is a party to a services agreement with Heartland under which Heartland provides it with advisory and consulting services, including services with respect to developments in the automotive industry and supply markets, advice on financial and strategic plans and alternatives and other matters as it may reasonably request and are within Heartland's expertise. The services agreement terminates on the earlier of its 10th anniversary or the date upon which Heartland ceases to own Company shares equivalent to 25% of that owned by them on February 23, 2001.

Under the services agreement, the Company is obligated to pay to Heartland a $4.0 million annual advisory fee on a quarterly basis and to reimburse its out-of-pocket expenses related to the services it

13

provides. The Company has also agreed to pay a fee of % of the total enterprise value of certain acquisitions and dispositions. In connection with Heartland's initial investment in the Company on February 23, 2001, it paid Heartland a fee of $12.0 million and reimbursed it for its reasonable out-of-pocket expenses incurred in connection with its initial investment. A fee of $12.5 million was paid by the company to Heartland as a result of its advisory services in connection with the TAC-Trim acquisition.

## Charles E. Becker Transactions

In July 2001, the Company completed the acquisition of Becker. As a result of the Becker acquisition and a purchase of Company common stock immediately afterwards, Charles Becker became one of the Company's principal stockholders. Charles Becker became Vice Chairman and a member of the Company's Board of Directors upon closing of the Becker acquisition. The Company agreed to make $18.0 million in non-compete payments over five years to Mr. Becker at the time of the acquisition. In addition, Becker Ventures, an affiliate of Mr. Becker, acquired additional shares of Company common stock as part of the financings in connection with the TAC-Trim acquisition at a price of $5.00 per share.

As discussed above under "-- Leases," the Company is a party to certain sale-leaseback transactions with certain affiliates of Becker Ventures LLC, an entity that is controlled by Charles Becker, a director of the Company. The purpose of these sale-leaseback transactions was to reduce the Company's outstanding debt. The Company believes that the terms of the sale-leaseback transactions with Becker Ventures are on terms substantially similar to those which could have been negotiated in arms-length transactions of the same type. These sale-leaseback transactions were authorized by the independent members of the Company's board of directors.

## Elkin McCallum Transactions

In September 2001, the Company completed the acquisition of Joan Automotive Industries, a leading supplier of bodycloth to the automotive industry, and all of the operating assets of Joan's affiliated yarn dying operation, Western Avenue Dyers, L.P. As a result of the Joan acquisition, Joan Fabrics Corp., a company controlled by Elkin McCallum, became a principal stockholder of the Company. Upon completion of the Joan acquisition, Mr. McCallum became a member of the Company's Board of Directors.

In connection with the Joan acquisition, the Company entered into a Supply Agreement dated September 21, 2001 (the "Supply Agreement") with Main Street Textiles, L.P. ("Main Street"). Main Street is controlled by Elkin McCallum, a director of the Company. Under the Supply Agreement, the Company agreed to purchase all of its requirements for flat woven automotive fabric from Main Street for a five year period beginning on the date of the Supply Agreement. The prices which the Company will pay for fabric under the agreement will equal the costs of the raw materials plus an amount which represents Main Street's standard labor and overhead costs incurred in manufacturing fabric for us. During the term of the Supply Agreement, Main Street is prohibited from manufacturing automotive fabric products for third parties without the Company's prior consent but may sell seconds and close-out items in bona fide transactions. The Supply Agreement is also terminable by mutual written consent, upon the occurrence of certain events of bankruptcy, the appointment of a receiver or trustee, an assignment for the benefit of creditors, or in the event of a material breach. In addition, either party may terminate the Supply Agreement upon 270 days prior notice to the other party in the event that the parties are unable to agree on the pricing of fabric covered by the Supply Agreement.

The Company is also a party to a Transition Services Agreement dated September 21, 2001 with Joan Fabrics Corporation ("Joan Fabrics"), another company controlled by Mr. McCallum. Under this agreement Joan Fabrics will provide C&A Products with transitional and support services for a period not to exceed twelve months in order to support the continued and uninterrupted operation of the businesses acquired by C&A Products in the Joan acquisition. As a part of these services, pending the Company's disassembly and removal of machinery and equipment that we purchased from Joan Fabrics, Joan Fabrics will use that machinery and equipment to manufacture for us all of our requirements for some types of

14

knitted and woven automotive fabrics. The terms of the Company's agreement with respect to this fabric production are substantially similar to those under the Supply Agreement.

Mr. McCallum became a related party as a result of the Joan acquisition. The terms of the Supply Agreement and the Transition Agreement were reached through arms-length negotiations prior to Mr. McCallum becoming a related party.

**Textron Transactions**

As discussed above under "-- Leases," "Business -- Technology and Intellectual Property," "Business -- Joint Ventures" and "-- Put and Call Arrangement" the Company is a party to various agreements and transactions with Textron. Textron became a related party as a result of its receipt of the consideration in the TAC-Trim acquisition.

## DISCONTINUED OPERATIONS

Net cash flows from discontinued operations in 2001 were $12.2 million, representing recoveries, net of cash outflows. However, the Company has significant obligations related to post-retirement, casualty, environmental, product liability, lease and other liabilities of discontinued operations. The nature of many of these contingent liabilities is such that they are difficult to quantify and uncertain in terms of amount. The company has accrued $10.0 million for casualty reserves, $38.9 million for post retirement costs and $40.7 million for environmental and product liability costs. Based upon the information available to management and the Company's experience to date, the Company believes that these liabilities will not have a material effect on our financial condition, results of operations or cash flows. In addition, the Company has primary, excess and umbrella insurance coverage for various periods that the Company expects to cover certain of these liabilities. However, there can be no assurances that contingent liabilities will not arise or that known contingent liabilities or related claims will not exceed the Company's expectations or that insurance will be available to cover these liabilities. Because the cash requirements of the Company's operations are substantially a function of these contingencies, it is possible that actual net cash requirements could differ materially from the Company's estimates.

## RECENT AND FUTURE REORGANIZATION PLANS

In 1999 a reorganization was undertaken to reduce costs, improve operating efficiencies throughout the operations and to more effectively respond to the OEMs' demand for complete interior trim systems and more sophisticated components. In general, the reorganization involved, among other things; the reorganization of Company's operating segments, the closure or sale of various facilities, and the termination of approximately 1,000 employees.

Upon final completion of the 1999 reorganization plan, as modified in 2000, the Company recognized a pre-tax restructuring charge of $33.4 million, including $13.4 million of asset impairments, $15.0 million of severance costs and $5.0 million related to the termination of sales commission contracts.

During the first quarter of 2001, the Company undertook a restructuring program resulting in a charge of $9.2 million. The goal of this restructuring program is to further de-layer management in the North American, European and Specialty operations. The pre-tax $9.2 million charge includes $8.4 million of severance costs and $0.8 million of asset impairments.

During the fourth quarter of 2001, the Company incurred charges totaling $9.6 million including $2.8 million of severance costs and $6.8 million for the write-off of long-lived assets. The Company may elect to implement additional restructuring activities as opportunities to achieve cost savings arise in future periods.

## STOCK REPURCHASE PLAN

At December 31, 2001, approximately $1.0 million remained authorized by the Company's Board of Directors to repurchase shares of the Company's common stock at management's discretion. The Company believes it has sufficient liquidity under its existing credit arrangements to effect the repurchase program. The Company made no repurchases during the fiscal 2001 compared to share repurchases of approximately $.5 million for fiscal 2000.

15

The preparation of consolidated financial statements in conformity with accounting principles generally accepted in the United States of America requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the consolidated financial statements and the reported amounts of revenues and expenses during the reporting period. Considerable judgment is often involved in making these determinations, and therefore, actual results could differ from those estimates.

Goodwill Impairment Testing: In June 2001, the FASB approved SFAS No. 142, "Goodwill and Other Intangible Assets" effective for fiscal years beginning after December 15, 2001. Under SFAS No. 142, goodwill will no longer be amortized. Amortization of goodwill resulting from business combinations initiated prior to July 1, 2001, will cease as of January 1, 2002, and beginning July 1, 2001, goodwill resulting from business combinations initiated after June 30, 2001 was not amortized. Beginning in 2002, all goodwill and intangible assets will be tested at least annually for impairment in accordance with the provisions of SFAS No. 142. The Company continues to review the provisions of SFAS No. 142, but cannot determine the complete impact of the standard until such time as it can complete the first-step of a two-step impairment test. The first-step will be performed by June 30, 2002. If an impairment loss were identified as a result of these tests, it would be reported as a cumulative effect of a change in accounting principle.

Realization of Deferred Tax Assets: Assessing the need for and amount of a valuation allowance for deferred tax assets requires significant judgment. The fact that a benefit may be expected for a portion but not all of a deferred tax asset increases the judgmental complexity. Future realization of deferred tax assets ultimately depends on the existence of sufficient taxable income of the appropriate character in either the carryback or carryforward period under the tax law.

During 2001, Heartland acquired approximately 60 percent of the outstanding shares of the Company. This constituted a "change in control" that results in annual limitations on the Company's use of its NOLs and unused tax credits. This annual limitation on the use of NOLs and tax credits depends on the value of the equity of the Company and the amount of "built-in gain" or "built-in loss" in the Company's assets at the date of the "change in control". Based on the expiration dates of the NOLs and tax credits as well as anticipated levels of domestic income, management does not believe that the transaction will have a material impact on these deferred tax assets. Management has reviewed the Company's operating results for recent years as well as the outlook for its continuing operations and concluded that it is more likely than not that the net deferred tax assets of $141.7 million at December 31, 2001 will be realized.

Management took into consideration, among other factors, the expected impact of current year acquisitions, the impact of recent restructuring plans, and the infusion of cash from Heartland. These factors along with the timing of the reversal of its temporary differences, certain tax planning strategies and the expiration date of its NOLs were also considered in reaching this conclusion. The Company's ability to generate future taxable income is dependent on numerous factors, including general economic conditions, the state of the automotive industry and other factors beyond management's control. Therefore, there can be no assurance that the Company will meet its expectation of future taxable income.

Environmental Contingencies: The Company is subject to federal, state, local and foreign environmental, and health and safety, laws and regulations that (i) affect ongoing operations and may increase capital costs and operating expenses in order to maintain compliance with such requirements and (ii) impose liability relating to contamination at facilities, and at other locations such as former facilities, facilities where the Company has sent wastes for treatment or disposal, and other properties to which the Company may be linked. Such liability may include, for example, investigation and clean-up of the contamination, personal injury and property damage caused by the contamination, and damages to natural resources. Some of these liabilities may be imposed without regard to fault, and may also be joint and several (which can result in a liable party being held responsible for the entire obligation, even where other parties are also liable).

16

Management believes that it has obtained, and is in material compliance with, those material environmental permits and approvals necessary to conduct the Company's various businesses. Environmental compliance costs for continuing businesses are accounted for as normal operating expenses or capital expenditures, except for certain costs incurred at acquired locations. Environmental compliance costs relating to conditions existing at the time of an acquisition are generally charged to reserves established in purchase accounting. The Company accrues for environmental remediation costs when such obligations are known and reasonably estimable. In the opinion of management, based on the facts presently known to it, such environmental compliance and remediation costs will not have a material adverse effect on the Company's business, consolidated financial condition or future results of operations.

The Company is legally or contractually responsible or alleged to be responsible for the investigation and remediation of contamination at various sites, and for personal injury or property damages, if any, associated with such contamination. At some of these sites the Company has been notified that it is a potentially responsible party ("PRP") under the federal Superfund law or similar state laws. Other sites at which we may be responsible for contamination may be identified in the future, including with respect to divested and acquired businesses.

The Company is currently engaged in investigating or remediating certain sites as discussed below. In estimating the cost of investigation and remediation, the Company has considered, among other things, prior experience in remediating contaminated sites, remediation efforts by other parties, data released by the United States Environmental Protection Agency ("USEPA"), the professional judgment of the Company's environmental experts, outside environmental specialists and other experts, and the likelihood that other identified PRPs will have the financial resources to fulfill their obligations at sites where they and the Company may be jointly and severally liable. It is difficult to estimate the total cost of investigation and remediation due to various factors including:

o incomplete information regarding particular sites and other PRPs;

o uncertainty regarding the nature and extent of environmental problems and the Company's share, if any, of liability for such problems;

o the ultimate selection among alternative approaches by governmental regulators;

o the complexity and evolving nature of environmental laws, regulations and governmental directives; and

o changes in cleanup standards.

The Company is working with the Michigan Department of Environmental Quality (MDEQ) to investigate and remediate soil and groundwater contamination at a former manufacturing plant in Mancelona, MI and at adjacent owned property formerly used for the treatment and disposal of plating waste. MDEQ is likely to require remediation of groundwater. In addition, the Company is incurring costs in connection with the provision of alternate water supplies to residences in the area.

The current owner of one of the Company's former manufacturing plants located in Bowling Green, OH has entered into an Administrative Order on Consent with the Ohio Environmental Protection Agency (OEPA) requiring investigation and remediation of contamination at the site. The Company is reimbursing the current owner for costs associated with ongoing groundwater monitoring and, following selection of an appropriate remedy by OEPA, will assume 90% of future remediation costs.

In the 1980's and 1990's, the California Regional Water Quality Control Board (CRWQCB) and other state agencies ordered a predecessor of ours to investigate and remediate soil and groundwater contamination at a former lumber treatment plant in Elmira, Ca. In 1996, the Company entered into an agreement with the State of California to conduct long-term operation and maintenance of the remedy implemented at the site.

The Company has established accruals for certain contingent environmental liabilities and management believes such reserves comply with generally accepted accounting principles. The Company records reserves for environmental investigatory and non-capital remediation costs when litigation has com-

17

menced or a claim of assessment has been asserted or is imminent, the likelihood of an unfavorable outcome is probable, and the financial impact of such outcome is reasonably estimable. At January 1, 2001 the reserve aggregated $37.0 million. During 2001 reserves associated with acquired companies aggregated $23.6 million and net deductions aggregated $1.0 million. As of December 31, 2001, total reserves for those contingent environmental liabilities are approximately $59.6 million.

In the opinion of management, based on information presently known to it, identified environmental costs and contingencies will not have a material adverse effect on our consolidated financial condition, future results of operations or cash flows. However, we can give no assurance that we have identified or properly assessed all potential environmental liability arising from our business or properties, and those of our present and former subsidiaries and their corporate predecessors.

Allowance for uncollectible accounts: The allowance for uncollectibles provides for losses believed to be inherent within the company's "Accounts and Other Receivables," (primarily trade receivables and the retained interest in the receivables facility). Management evaluates both the creditworthiness of specific customers and the overall probability of losses based upon an analysis of the overall aging of receivables, past collection trends and general economic conditions. Management believes, based on its review, that the allowance for uncollectibles is adequate to cover potential losses. Actual results may vary as a result of unforeseen economic events and the impact those events could have on our customers.

Valuation of Mandatorily Redeemable Preferred Stock of Subsidiary: The Company issued preferred stock as part of the consideration given to Textron in the TAC-Trim acquisition. The preferred stock is recorded at fair value, which is less than the liquidation value of $1,000 per share or $326.4 million. Since the preferred stock is not publicly traded the use of an estimated fair value was required. The Company estimated the fair value to be $146.9 million based on market prices for securities with similar terms, maturities and risk characteristics, and included a liquidation discount to reflect market conditions. The difference between the initial recorded value and the initial liquidation preference will be accreted over the life of the stock.

18

PART IV

**ITEM 14. EXHIBITS, FINANCIAL STATEMENT SCHEDULES AND REPORTS ON FORM 8-K**

(A)(1) FINANCIAL STATEMENTS:

|                                                                                                                                          | PAGE NUMBER |
| ---------------------------------------------------------------------------------------------------------------------------------------- | ----------- |
| Report of Independent Accountants .....................................                                                                  | F-1         |
| Report of Independent Public Accountants .............................                                                                   | F-2         |
| Consolidated Statements of Operations for the fiscal years ended December 31, 2001, December 31, 2000 and December 25, 1999 ....         | F-3         |
| Consolidated Balance Sheets at December 31, 2001 and December 31, 2000                                                                   | F-4         |
| Consolidated Statements of Cash Flows for the fiscal years ended December 31, 2001, December 31, 2000 and December 25, 1999 ....         | F-5         |
| Consolidated Statements of Common Stockholders' Equity (Deficit) for the fiscal years ended December 31, 2001, December 31, 2000 and December 25, 1999 ...........................  | F-6         |
| Notes to Consolidated Financial Statements ...........................                                                                   | F-7         |

19

SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities and Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized, on the 6th day of June 2002.

**COLLINS & AIKMAN CORPORATION**

```
                    By: /s/ Thomas E. Evans
                        -------------------------------------
                        Thomas E. Evans
                        Chairman of the Board of Directors
```

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the Registrant and in the capacities and on the dates indicated.

| SIGNATURE | TITLE | DATE |
|---|---|---|
| /s/ Thomas E. Evans<br>-------------------------<br>Thomas E. Evans | Chairman of the Board of Directors<br>and Chief Executive Officer<br>(Principal Executive Officer) | June 6, 2002 |
| *<br>-------------------------<br>J. Michael Stepp | Chief Financial Officer and Director<br>(Principal Financial and<br>Accounting Officer) | June 6, 2002 |
| *<br>-------------------------<br>Charles E. Becker | Vice Chairman of the Board of<br>Directors | June 6, 2002 |
| *<br>-------------------------<br>Robert C. Clark | Director | June 6, 2002 |
| *<br>-------------------------<br>Marshall A. Cohen | Director | June 6, 2002 |
| *<br>-------------------------<br>Cynthia Hess | Director | June 6, 2002 |
| *<br>-------------------------<br>Timothy D. Leuliette | Director | June 6, 2002 |
| *<br>-------------------------<br>Elkin McCallum | Director | June 6, 2002 |
| *<br>-------------------------<br>W. Gerald McConnell | Director | June 6, 2002 |
| *<br>-------------------------<br>Warren B. Rudman | Director | June 6, 2002 |
| *<br>-------------------------<br>David A. Stockman | Director | June 6, 2002 |
| *<br>-------------------------<br>Daniel P. Tredwell | Director | June 6, 2002 |
| *<br>-------------------------<br>Samuel Valenti | Director | June 6, 2002 |

```
                    *By: /s/ Thomas E. Evans
                         ----------------------
                         Thomas E. Evans
                         Attorney-in-Fact
```

20

# REPORT OF INDEPENDENT ACCOUNTANTS

To the Board of Directors and Shareholders of Collins & Aikman Corporation:

In our opinion, the 2001 consolidated financial statements listed in the index appearing under Item 14(a)(1) present fairly, in all material respects, the financial position of Collins & Aikman Corporation and its subsidiaries at December 31, 2001, and the results of their operations and their cash flows for the year then ended in conformity with accounting principles generally accepted in the United States of America. In addition, in our opinion, the financial statement schedules listed in the index appearing under Item 14(a)(2) present fairly, in all material respects, the information set forth therein when read in conjunction with the related consolidated financial statements. These financial statements and financial statement schedules are the responsibility of the Company's management; our responsibility is to express an opinion on these financial statements and financial statement schedules based on our audit. We conducted our audit of these statements in accordance with auditing standards generally accepted in the United States of America, which require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation. We believe that our audit provides a reasonable basis for our opinion.

*/s/ PricewaterhouseCoopers LLP*

*Detroit, Michigan*
*February 21, 2002*

F-1

# REPORT OF INDEPENDENT PUBLIC ACCOUNTANTS

**To Collins & Aikman Corporation:**

We have audited the accompanying consolidated balance sheet of Collins & Aikman Corporation (a Delaware Corporation) and subsidiaries as of December 31, 2000 and the related consolidated statements of operations, cash flows, and common stockholders' deficit for each of the two fiscal years in the period ended December 31, 2000, as listed in the index appearing under Item 14(a)(1). These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audits in accordance with auditing standards generally accepted in the United States. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the financial statements referred to above present fairly, in all material respects, the financial position of Collins & Aikman Corporation and subsidiaries as of December 31, 2000 and the results of their operations and their cash flows for each of the two fiscal years in the period ended December 31, 2000, in conformity with accounting principles generally accepted in the United States.

Our audit was made for the purpose of forming an opinion on the basic financial statements taken as a whole. The schedule listed in the index appearing under item 14(a)(2) is presented for purposes of complying with the Securities and Exchange Commission's rules and is not part of the basic financial statements. This schedule has been subjected to the auditing procedures applied in the audit of the basic financial statements and, in our opinion, fairly states in all material respects the financial data required to be set forth therein in relation to the basic financial statements taken as a whole.

/s/ Arthur Andersen LLP

Charlotte, North Carolina,
February 14, 2001 (except with respect to the matter discussed in Note 24,
as to which the date is March 28, 2002)

F-2

# COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES

## CONSOLIDATED STATEMENTS OF OPERATIONS
### (IN MILLIONS, EXCEPT PER SHARE DATA)

|  | YEAR ENDED | | |
|---|---|---|---|
|  | DECEMBER 31, 2001 | DECEMBER 31, 2000 | DECEMBER 25, 1999 |
| Net sales | $ 1,823.3 | $ 1,901.8 | $ 1,898.6 |
| Cost of goods sold | 1,604.5 | 1,635.2 | 1,613.9 |
| Gross profit | 218.8 | 266.6 | 284.7 |
| Selling, general and administrative expenses | 164.4 | 158.5 | 152.8 |
| Restructuring charge and impairment of long-lived assets | 18.8 | -- | 33.4 |
| Operating income | 35.6 | 108.1 | 98.5 |
| Interest expense, net of interest income of $2.0, $3.4 and $2.5 | 84.3 | 96.6 | 92.1 |
| Loss on sale of receivables | 10.8 | 9.2 | 5.4 |
| Subsidiary preferred stock requirements | 2.4 | -- | -- |
| Other income | (12.0) | (0.7) | (0.5) |
| Other expense | 18.4 | 2.2 | 2.7 |
| Income (loss) from continuing operations before income taxes | (68.3) | 0.8 | (1.2) |
| Income tax (benefit) expense | (18.6) | 2.2 | 0.2 |
| Loss from continuing operations before extraordinary loss and cumulative effect of a change in accounting principle | (49.7) | (1.4) | (1.4) |
| Income from discontinued operations, net of income taxes of $5.7 and $4.4 | 8.8 | 6.6 | -- |
| Income (loss) before extraordinary loss and cumulative effect of change in accounting principle | (40.9) | 5.2 | (1.4) |
| Extraordinary loss on retirement of debt, net of income taxes of $2.7 and $0.5 | (5.3) | (0.7) | -- |
| Cumulative effect of a change in accounting principle, net of income taxes of $5.1 | -- | -- | (8.8) |
| Net income (loss) | $ (46.2) | $ 4.5 | $ (10.2) |
| Net income (loss) per basic and diluted common share: |  |  |  |
| Continuing operations | $ (0.51) | $ (0.03) | $ (0.02) |
| Discontinued operations | 0.09 | 0.11 | -- |
| Extraordinary loss | (0.05) | (0.01) | -- |
| Cumulative effect of a change in accounting principle | -- | -- | (0.14) |
| Net income (loss) | $ (0.47) | $ 0.07 | $ (0.16) |
| Average common shares outstanding: |  |  |  |
| Basic and Diluted | 97.2 | 61.9 | 62.0 |

The Notes to Consolidated Financial Statements are an integral part of these consolidated financial statements.

# COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES

## CONSOLIDATED BALANCE SHEETS
### (IN MILLIONS, EXCEPT PAR VALUE)

| | DECEMBER 31, 2001 | DECEMBER 31, 2000 |
|---|---|---|
| **ASSETS** | | |
| Current Assets: | | |
| Cash and cash equivalents ..................................... | $ 73.9 | $ 20.9 |
| Accounts and other receivables, net of allowances | | |
| of $14.6 and $8.1 .......................................... | 406.1 | 196.5 |
| Inventories ................................................... | 132.6 | 131.7 |
| Other ......................................................... | 131.9 | 75.9 |
| Total current assets .................................... | 744.5 | 425.0 |
| Property, plant and equipment, net ............................ | 612.6 | 434.1 |
| Deferred tax assets .......................................... | 136.5 | 97.3 |
| Goodwill, net ................................................. | 1,253.8 | 245.5 |
| Intangible assets ............................................ | 16.4 | -- |
| Investment in joint ventures ................................. | 23.0 | 4.8 |
| Other assets ................................................. | 201.1 | 73.6 |
| | $ 2,987.9 | $ 1,280.3 |
| **LIABILITIES AND COMMON STOCKHOLDERS' EQUITY (DEFICIT)** | | |
| Current Liabilities: | | |
| Short-term borrowings ........................................ | $ 35.7 | $ 3.8 |
| Current maturities of long-term debt ......................... | 19.5 | 84.3 |
| Accounts payable ............................................. | 468.7 | 178.5 |
| Accrued expenses ............................................. | 239.7 | 123.1 |
| Total current liabilities .............................. | 763.6 | 389.7 |
| Long-term debt ............................................... | 1,282.4 | 799.7 |
| Other, including post-retirement benefit obligations ......... | 404.3 | 245.8 |
| Commitments and contingencies ............................... | | |
| Minority interest in consolidated subsidiary ................. | 15.2 | -- |
| Mandatorily redeemable preferred stock of subsidiary ......... | 147.7 | -- |
| Common stock ($.01 par value, 300.0 shares authorized, | | |
| 168.0 shares issued and outstanding at December 31, 2001 | | |
| and 150.0 shares authorized, 70.5 shares issued and 62.0 | | |
| shares outstanding at December 31, 2000) ..................... | 1.7 | 0.7 |
| Other paid-in capital ........................................ | 1,123.1 | 585.5 |
| Accumulated deficit .......................................... | (682.8) | (636.6) |
| Accumulated other comprehensive loss ......................... | (67.3) | (42.9) |
| Treasury stock, at cost, 8.5 shares at December 31, 2000 ........ | -- | (61.6) |
| Total common stockholders' equity (deficit) ................... | $ 374.7 | $ (154.9) |
| | $ 2,987.9 | $ 1,280.3 |

The Notes to Consolidated Financial Statements are an integral part of these consolidated financial statements.

**COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES**

**CONSOLIDATED STATEMENTS OF CASH FLOWS**
**(IN MILLIONS)**

| | YEAR ENDED | | |
|---|---|---|---|
| | DECEMBER 31, 2001 | DECEMBER 31, 2000 | DECEMBER 25, 1999 |
| OPERATING ACTIVITIES | | | |
| Loss from continuing operations | $ (49.7) | $ (1.4) | $ (1.4) |
| Adjustments to derive cash flow from continuing operating activities: | | | |
| Impairment of long-lived assets | 7.6 | -- | 13.4 |
| Deferred income tax expense | (26.0) | (10.0) | (6.8) |
| Subsidiary preferred stock requirements | 2.4 | -- | -- |
| Depreciation and leasehold amortization | 64.2 | 59.1 | 58.2 |
| Goodwill amortization | 7.1 | 7.1 | 7.0 |
| Amortization of other assets | 10.5 | 8.5 | 6.2 |
| Loss (gain) on sale of property, plant and equipment | 8.7 | (1.0) | (0.3) |
| Decrease in accounts and other receivables | 135.0 | 78.2 | 1.8 |
| Decrease in inventories | 53.4 | 0.9 | 20.2 |
| Increase (decrease) in interest payable | (4.1) | 3.4 | 0.9 |
| Increase (decrease) in accounts payable | (31.9) | (20.0) | 28.7 |
| Changes in other assets | (6.5) | 24.5 | 2.4 |
| Changes in other liabilities | (39.3) | (18.4) | (30.2) |
| Net cash provided by continuing operating activities | 131.4 | 130.9 | 100.1 |
| Net cash provided by (used in) discontinued operations | 12.2 | 0.4 | (16.8) |
| INVESTING ACTIVITIES | | | |
| Additions to property, plant and equipment | (54.5) | (69.0) | (86.4) |
| Sales of property, plant and equipment | 88.1 | 5.6 | 10.1 |
| Acquisitions of businesses, net of cash acquired | (760.9) | -- | (0.4) |
| Sale of business | 3.5 | -- | -- |
| Other, net | -- | -- | (0.8) |
| Net cash used in investing activities | (723.8) | (63.4) | (77.5) |
| FINANCING ACTIVITIES | | | |
| Issuance of long-term debt | 950.0 | -- | 100.0 |
| Proceeds from (reduction of) participating interests in accounts receivable, net of redemptions | (2.6) | (34.0) | 2.0 |
| Cost of debt issuance | (59.4) | -- | (2.4) |
| Repayment of long-term debt | (383.2) | (66.6) | (20.6) |
| Increase (decrease) in short-term borrowings | 10.1 | 0.2 | (7.4) |
| Net borrowings (repayments) on revolving credit facilities | (150.2) | 39.0 | (35.3) |
| Net proceeds from issuance of common stock | 207.2 | -- | -- |
| Reissue (purchase) treasury stock, net | 61.3 | 0.4 | (1.7) |
| Dividends paid | -- | -- | (50.2) |
| Net cash provided by (used in) financing activities | 633.2 | (61.0) | (15.6) |
| Increase (decrease) in cash and cash equivalents | 53.0 | 6.9 | (9.8) |
| Cash and cash equivalents at beginning of year | 20.9 | 14.0 | 23.8 |
| Cash and cash equivalents at end of year | $ 73.9 | $ 20.9 | $ 14.0 |

The Notes to Consolidated Financial Statements are an integral part of these consolidated financial statements.

## COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES

### CONSOLIDATED STATEMENTS OF COMMON STOCKHOLDERS' EQUITY (DEFICIT)
#### (IN MILLIONS)

| | CURRENT YEAR COMPREHENSIVE INCOME (LOSS) | TOTAL | ACCUMULATED DEFICIT | ACCUMULATED OTHER COMPREHENSIVE LOSS(A) | COMMON STOCK | OTHER PAID-IN CAPITAL | TREASURY STOCK |
|---|---|---|---|---|---|---|---|
| BALANCE AT DECEMBER 26, 1998 ......... | | $ (79.7) | $ (580.7) | $ (23.5) | $ 0.7 | $ 585.5 | $ (61.7) |
| Comprehensive income: | | | | | | | |
| Net loss ................................ | $ (10.2) | (10.2) | (10.2) | -- | -- | -- | -- |
| Other comprehensive income, net of tax: | | | | | | | |
| Foreign currency translation adjustments ...................... | (10.6) | (10.6) | -- | (10.6) | -- | -- | -- |
| Pension equity adjustment (b) | 0.8 | 0.8 | -- | 0.8 | -- | -- | -- |
| | $ (20.0) | | | | | | |
| Compensation expense ................. | | 0.5 | -- | -- | -- | 0.5 | -- |
| Dividends ........................... | | (50.2) | (50.2) | -- | -- | -- | -- |
| Purchase of treasury stock (3.7 shares) ...................... | | (2.1) | -- | -- | -- | -- | (2.1) |
| Exercise of stock options (0.1 shares) ...................... | | 0.4 | -- | -- | -- | (0.5) | 0.9 |
| BALANCE AT DECEMBER 25, 1999 ......... | | (151.1) | (641.1) | (33.3) | 0.7 | 585.5 | (62.9) |
| Comprehensive income: | | | | | | | |
| Net Income ......................... | $ 4.5 | 4.5 | 4.5 | | | | |
| Other comprehensive income, net of tax: | | | | | | | |
| Foreign currency translation adjustments ...................... | (10.4) | (10.4) | -- | (10.4) | -- | -- | -- |
| Pension equity adjustment (b) | 0.8 | 0.8 | -- | 0.8 | -- | -- | -- |
| | $ (5.1) | | | | | | |
| Compensation expense ................. | | 0.9 | -- | -- | -- | 0.9 | -- |
| Purchase of treasury stock (0.4 shares) ...................... | | (0.5) | -- | -- | -- | -- | (0.5) |
| Exercise of stock options (0.2 shares) ...................... | | 0.9 | -- | -- | -- | (0.9) | 1.8 |
| BALANCE AT DECEMBER 31, 2000 ......... | | $ (154.9) | $ (636.6) | $ (42.9) | $ 0.7 | $ 585.5 | $ (61.6) |
| Comprehensive income: | | | | | | | |
| Net loss ........................... | $ (46.2) | (46.2) | (46.2) | | | | |
| Other comprehensive income: | | | | | | | |
| Foreign currency translation adjustments ...................... | (9.0) | (9.0) | -- | (9.0) | -- | -- | -- |
| Pension equity adjustment, net of tax (b) ...................... | (15.4) | (15.4) | -- | (15.4) | -- | -- | -- |
| | $ (70.6) | | | | | | |
| Compensation expense ................. | | 1.2 | -- | -- | -- | 1.2 | -- |
| Issue of common stock ............... | | 533.0 | -- | -- | 1.0 | 532.0 | -- |
| Reissue of treasury stock (8.5 shares) ...................... | | 61.3 | -- | -- | -- | (0.3) | 61.6 |
| Exercise of stock options (1.1 shares) ...................... | | 4.7 | -- | -- | -- | 4.7 | -- |
| BALANCE AT DECEMBER 31, 2001 ......... | | $ 374.7 | $ (682.8) | $ (67.3) | $ 1.7 | $ 1,123.1 | $ -- |

(a) The components of Accumulated Other Comprehensive Loss are $51.7 million of foreign currency translation adjustment and $15.6 million of pension equity adjustment as of December 31, 2001.

(b) For 2001, 2000 and 1999 the tax effect of the pension equity adjustment is $3.2 million, $0.4 million and $0.4 million, respectively.

The Notes to Consolidated Financial Statements are an integral part of these consolidated financial statements.

F-6

COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES

### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

## 1. ORGANIZATION

Collins & Aikman Corporation (the "Company") is a Delaware corporation, headquartered in Troy, Michigan. The Company conducts all of its operating activities through its wholly owned Collins & Aikman Products Co. ("Products") subsidiary. The Company is a global leader in design, engineering and manufacturing of automotive interior components, including instrument panels, fully assembled cockpit modules, floor and acoustic systems, automotive fabric, interior trim and convertible top systems. The Company operates through three divisions: North American Automotive Interior Systems, European Automotive Interior Systems and Specialty Automotive Products.

As of December 31, 2000, Blackstone Capital Partners L.P. and its affiliates ("Blackstone Partners") and Wasserstein Perella Partners L.P. and its affiliates ("WP Partners") collectively owned approximately 87% of the common stock of the Company.

During February 2001, Heartland Industrial Partners, L.P. and its affiliates ("Heartland") acquired a controlling interest equal to approximately 60% of the Company through a purchase of 25 million shares of common stock from the Company and a purchase of 27 million shares from Blackstone Partners and WP Partners. As a result of the sale of shares, the Company received gross proceeds of $125.0 million, or approximately $94.6 million after fees and expenses associated with the transactions. The Company also received a profit participation right that it shares with Blackstone Partners and WP Partners on future common stock sales by Heartland to non-permitted transferees subject to a limit, in the case of the Company, of approximately $6.25 million. As a result of the above transactions ("Heartland Transaction"), Heartland is entitled to designate a majority of the Company's Board of Directors (Note 3).

The Company completed its acquisition of Becker Group, LLC, a supplier of plastic components to the automotive industry and the automotive fabric operations of Joan Fabrics and an affiliate in July and September 2001, respectively. The acquisitions included the issuance of approximately 30 million shares of common stock with a market value of $169.3 million (Note 3).

In December 2001, the Company completed its acquisition of Textron Automotive Company's ("Textron's") automotive trim division ("TAC-Trim") for $940 million. The purchase price consisted primarily of: $632.2 million in cash and assumed debt; 18 million shares of common stock, with a market value of $160.9 million; and preferred stock of Products with an aggregate liquidation preference of $326.4 million, valued at $146.9 million. The cash purchase price was financed through a combination of the sale of an additional 32 million shares of common stock, valued at $160.0 million, to Heartland and debt financing (Note 3).

As a result of the above transactions, the Company's total shares outstanding increased from approximately 62 million shares to approximately 168 million shares. On December 31, 2001, Heartland owned approximately 40% of the outstanding shares; Blackstone Partners' and WP Partners' owned approximately 15%; Joan Fabrics Corp., Mr. Elkin McCallum and associates owned approximately 8%; Mr. Charles E. Becker and Textron, Inc. each owned approximately 11% \ (Note 3).

## 2. SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

BASIS OF PRESENTATION: The consolidated financial statements include the accounts of the Company and its consolidated subsidiaries. Investments in entities in which the Company has control are consolidated. Investments in 50% or less owned entities in which the Company has significant influence have been accounted for under the equity method. All significant intercompany items have been eliminated in the preparation of the consolidated financial statements. Certain prior year items have been reclassified to conform with the fiscal 2001 presentation.

USE OF ESTIMATES: The preparation of consolidated financial statements in conformity with generally accepted accounting principles requires management to make estimates and assumptions that affect the

F-7

COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS--(CONTINUED)

reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the consolidated financial statements and the reported amounts of revenues and expenses during the reporting period. Actual results could differ from those estimates.

FISCAL YEAR: During fiscal 2000, the Company changed its fiscal year-end to a calendar year-end. The 2000 fiscal year consisted of 53 weeks, which ended on December 31, 2000 whereas, fiscal 1999, which ended on December 25, 1999 had 52 weeks.

EARNINGS PER SHARE: Basic earnings per share is based on income available to common shareholders divided by the weighted average number of common shares outstanding. Diluted earnings per share is based on income available to common shareholders divided by the sum of the weighted average number of common shares outstanding and all potentially dilutive common shares. Potentially dilutive common shares include shares which may be issued upon the assumed exercise of employee stock options less the number of treasury shares assumed to be purchased from the proceeds, including applicable compensation expense (Note 23).

CASH AND CASH EQUIVALENTS: Cash and cash equivalents include all cash balances and highly liquid investments with an original maturity of three months or less.

ACCOUNTS AND OTHER RECEIVABLES: Accounts and other receivables consist primarily of the Company's trade receivables and the retained interest in the Receivables Facility (See Note 11). The Company has provided an allowance against uncollectible accounts.

INVENTORIES: Inventories are valued at the lower of cost or market, but not in excess of net realizable value. Cost is determined on the first-in, first-out basis.

PROPERTY, PLANT AND EQUIPMENT: Property, plant and equipment are stated at cost. Normal repairs and maintenance are expensed as incurred. Provisions for depreciation are primarily computed on a straight-line basis over the estimated useful lives as follows: 10-20 years for land improvements, 20-40 years for buildings, and 3-11 years for machinery and equipment. Leasehold improvements are amortized over the lesser of the lease term or the estimated useful lives of the improvements.

LONG-LIVED ASSETS: Statement of Financial Accounting Standards ("SFAS") No. 121, "Accounting for the Impairment of Long-Lived Assets and for Long-Lived Assets to be Disposed Of", establishes accounting standards for the impairment of long-lived assets, certain identifiable intangibles, and goodwill related to those assets to be held and used and for long-lived assets and certain identifiable intangibles to be disposed of. SFAS No. 121 requires that long-lived assets and certain identifiable intangibles to be held and used by an entity be reviewed for impairment whenever events or changes in circumstances indicate that the carrying amount of an asset may not be recoverable, and that certain long-lived assets and identifiable intangibles to be disposed of be reported at the lower of carrying amount or fair value less cost to sell. During 2001, the Company incurred asset impairment charges of $7.6 million recognized as part of restructuring programs (Note 15). In addition, during fiscal 1999, the Company incurred a charge of $13.4 million relating to asset impairments recognized in the Reorganization (See Note 15).

GOODWILL AND INTANGIBLES: Goodwill, representing the excess of purchase price over the fair value of net assets of the acquired entities, obtained prior to June 30, 2001 is being amortized on a straight-line basis over a period of forty years. Amortization of goodwill applicable to continuing operations was $7.1 million for the year ended December 31, 2001 and $7.1 million for fiscal 2000 and $7.0 million for fiscal 1999, respectively. Accumulated amortization at December 31, 2001 and December 30, 2000 was $35.7 million and $32.0 million, respectively. The carrying value of goodwill is reviewed periodically based on the non-discounted cash flows and pretax income of the entities acquired over the remaining amortization periods. The Company believes that no adjustment for impairment is required for the $1.3 billion of goodwill at December 31, 2001. In accordance with SFAS No. 142, "Goodwill and Other Intangible Assets," goodwill in the amount of $1.0 billion acquired subsequent to June 30, 2001 is not being

F-8

COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS--(CONTINUED)

amortized (Note 3). Beginning in 2002, as required by SFAS No. 142, goodwill will no longer be amortized, but will be subject to annual impairment tests. Other intangible assets that do not have an indefinite life will continue to be amortized over their useful lives. Intangible assets obtained in connection with acquisitions, including intellectual property rights, processes and tradenames, are recorded based on independent valuations and amortized over the estimated useful lives determined in connection with the valuations.

REVENUE RECOGNITION: The Company recognizes revenue from product sales when it has shipped the goods. Products are shipped FOB supplier using customer designated transportation companies with title passing at that time. The Company generally allows its customers the right of return only in the case of defective products. The Company provides a reserve for estimated defective product costs at the time of the sale of the products.

COST OF GOODS SOLD AND SELLING GENERAL AND ADMINISTRATIVE COSTS: Cost of goods sold is comprised of direct material, direct labor and manufacturing overhead. Manufacturing overhead consists of indirect labor, depreciation, amortization and other manufacturing expenses. Selling, general and administrative costs consist of selling, research and development, engineering and administrative expenses.

OTHER INCOME AND EXPENSE: In 2001, other income primarily included $5.0 million related to derivative gains and $6.2 million related to a stock demutualization. In 2001, other expenses primarily included $7.8 million of foreign currency transaction losses and $8.2 million of losses from sale and leaseback transactions. In 2000, other expenses included a $1.0 million derivative loss. In 1999, other expenses primarily included a $1.8 million derivative loss.

CUSTOMER ENGINEERING AND TOOLING: Engineering and tooling balances represent tools, dies and other items used in the manufacture of customer components. Amounts included in the consolidated balance sheets include Company-owned tools and costs incurred on customer-owned tools which are subject to reimbursement, pursuant to the terms of a customer contract. Company-owned tools balances are amortized over the tool's expected life or the life of the related vehicle program, whichever is shorter. Engineering, testing and other costs incurred in the design and development of production parts are expensed as incurred, unless the costs are reimbursable, as specified in a customer contract.

Emerging Issue Task Force EITF Issue No. 99-5, "Accounting for Pre-Production Costs Related to Long-Term Supply Arrangements" (EITF No. 99-5) requires that design and development costs for products to be sold under long-term supply arrangements be expensed as incurred, and costs incurred for molds, dies and other tools that will be used in producing the products under long-term supply arrangements be capitalized and amortized over the shorter of the expected useful life of the assets or the term of the supply arrangement. The Company adopted the provisions of EITF No. 99-5 on a prospective basis on December 26, 1999. At December 31, 2001, the Company had assets of approximately $22.7 million recognized pursuant to agreements that provide for contractual reimbursement of pre-production design and development costs, approximately $90.2 million (of which substantially all is reimbursable) for molds, dies and other tools that are customer-owned and approximately $9.1 million for molds, dies and other tools that the Company owns.

DERIVATIVE FINANCIAL INSTRUMENTS: The Company utilizes derivative financial instruments to manage risk associated with foreign exchange rate volatility. Currently, most of the Company's derivative transactions do not utilize the hedge provisions of SFAS No. 133, "Accounting for Derivative Instruments and Hedging Activities". The Company uses derivatives to hedge economic risks even though these derivatives may not qualify for hedge accounting in accordance with SFAS No. 133. Accordingly, these derivative instruments are marked to fair market value and reported on the balance sheet. Gains and losses on these instruments are reported in "Other Income" or "Other Expense" on the Consolidated Statements of Operations. From a risk management perspective, these gains and losses are intended to offset foreign currency transaction losses or gains. The Company also has several credit default swaps,

F-9

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS--(CONTINUED)

with a notional amount of 175 million. The purpose of entering these swaps is to reduce a potential loss in liquidity (provided by the Company's Receivable Facility) that would result from the downgrading of an obligor (Note 11). The fair value of these instruments was approximately $3.1 million as of December 31, 2001. These instruments do not qualify for hedge accounting under SFAS No. 133 and are marked to market with gains and losses reported in "Other Income" on the Consolidated Statement of Operations. Corporate policy prescribes the range of allowable risk management activity. The Company does not enter into derivative transactions for speculative purposes. Refer to Note 5. "Foreign Currency Protection Programs" for additional discussion.

FOREIGN CURRENCY: Foreign currency activity is reported in accordance with SFAS No. 52, "Foreign Currency Translation". SFAS No. 52 generally provides that the assets and liabilities of foreign operations be translated at the current exchange rates as of the end of the accounting period and that revenues and expenses be translated using average exchange rates. The resulting translation adjustments arising from foreign currency translations are accumulated as a component of other comprehensive income.

Gains and losses resulting from foreign currency transactions are recognized in other income (expense). The Company recognized a loss from foreign currency transactions of $2.8 million for the year ended December 31, 2001, a loss of $0.4 million in fiscal 2000 and a gain of $0.5 million in fiscal 1999.

ENVIRONMENTAL: The Company records an estimated loss when it is probable that an environmental liability has been incurred and the amount of the loss can be reasonably estimated. The Company also considers estimates of certain reasonably possible environmental liabilities in determining the aggregate amount of environmental reserves. The Company reviews all environmental claims from time to time and adjusts the reserves accordingly. Accruals for environmental liabilities are generally included in the consolidated balance sheet as other non-current liabilities at undiscounted amounts and exclude claims for recoveries from insurance or other third parties. Accruals for insurance or other third party recoveries for environmental liabilities are recorded when it is probable that the claim will be realized.

NEWLY ISSUED ACCOUNTING STANDARDS: In August 2001, the FASB issued SFAS No. 144, "Accounting for the Impairment or Disposal of Long-Lived Assets" effective for fiscal years beginning after December 15, 2001. The provisions of SFAS 144 are to be applied prospectively and have no impact on the accompanying financial statements. SFAS No. 144, supercedes SFAS No. 121 "Accounting for the Impairment of Long-Lived Assets and for Long-Lived Assets to Be Disposed Of" and the provisions of APB Opinion No. 30, " Reporting the Results of Operations -- Reporting the Effects of Disposal of a Segment of a Business," for the disposal of segments of a business. SFAS No. 144 requires that one accounting model be used for long-lived assets to be disposed of by sale and extends the use of this accounting to discontinued operations. Long-lived assets will be measured at the lower of carrying amount or fair value less cost to sell, regardless of whether it is reported in continuing or discontinued operations. Additionally, SFAS No. 144 broadens the reporting of discontinued operations to include certain disposal transactions that were not included in previous standards.

In June 2001, the FASB approved SFAS No. 141, "Business Combinations" and SFAS No. 142, "Goodwill and Other Intangible Assets" effective for fiscal years beginning after December 15, 2001. SFAS No. 141 requires that the purchase method of accounting be used for all business combinations initiated after June 30, 2001. Under SFAS No. 142, amortization of goodwill, including goodwill recorded in past business combinations, will discontinue upon adoption of this standard. In addition, goodwill recorded as a result of business combinations completed during the six-month period ending December 31, 2001 will not be amortized. All goodwill and intangible assets will be tested for impairment in accordance with the provisions of SFAS No. 142. The Company is currently reviewing the provisions of SFAS No. 141 and 142 and assessing the impact of adoption. The Company cannot determine the complete impact of SFAS 142 until such time as it can complete the first-step of a two-step impairment test. The Company is gathering information to prepare the first-step of the impairment test and expects to complete this step by June 30, 2002. If an impairment loss were identified as a result of these tests, it

F-10

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS--(CONTINUED)

would be reported as a cumulative effect of a change in accounting principle. In accordance with the provisions of SFAS No. 142 the Company is not amortizing any of the goodwill associated with its acquisitions made subsequent to June 30, 2001 (Note 3).

In September 2000, the Financial Accounting Standards Board ("FASB") issued SFAS No. 140, "Accounting for Transfers and Servicing of Financial Assets and Extinguishments of Liabilities", which replaced SFAS No. 125, also titled "Accounting for Transfers and Servicing of Financial Assets and Extinguishments of Liabilities". SFAS No. 140 provides accounting and reporting standards for transfers and servicing of financial assets and extinguishments of liabilities. Those standards are based on consistent application of a financial-components approach that focuses on control. After a transfer of financial assets, an entity recognizes the financial and servicing assets it controls and the liabilities it has incurred, derecognizes financial assets when control has been surrendered, and derecognizes liabilities when extinguished. SFAS No. 140 became effective for recognition and reclassification of collateral and for disclosures relating to securitization transactions and collateral for fiscal years ending after December 15, 2000 (See Note 11) and for transfers and servicing of financial assets and extinguishments of liabilities occurring after March 31, 2001.

In June 1998, the FASB issued SFAS No. 133 which established accounting and reporting standards requiring that every derivative instrument (including certain derivative instruments embedded in other contracts) be recorded in the balance sheet as either an asset or liability measured at its fair value. SFAS No. 133 requires that changes in the derivative's fair value be recognized currently in earnings unless specific hedge accounting criteria are met. Special accounting for qualifying hedges allows a derivative's gains and losses to offset related results on the hedged item in the income statement, and requires that a company formally document, designate, and assess the effectiveness of transactions that receive hedge accounting. In June 1999, the FASB issued SFAS No. 137, "Accounting for Derivative Instruments and Hedging Activities -- Deferral of the Effective Date of FASB Statement No. 133, an Amendment of FASB Statement No. 133". Under SFAS No. 137, SFAS No. 133 was made effective for fiscal years beginning after June 15, 2000. In June 2000, the FASB issued SFAS No. 138, "Accounting for Certain Derivative Instruments and Certain Hedging Activities -- An Amendment of FASB Statement No. 133," which provides additional guidance for certain derivative instruments and hedging activities addressed in SFAS No. 133. SFAS No. 138 must be adopted concurrently with the adoption of SFAS No. 133.

SFAS No. 133 and SFAS 138 were effective for the Company as of January 1, 2001. Adoption of these new accounting standards had no material effect on net income, other comprehensive income, assets and liabilities.

## 3. ACQUISITIONS AND JOINT VENTURES

In December 2001, the Company completed its acquisition of Textron Automotive Company's automotive trim division ("TAC-Trim"). TAC-Trim is a leading supplier of fully-integrated cockpits and a major automotive plastics manufacturer in North America, Europe, and South America for instrument panels, interior trim and exterior components. The purchase price consisted primarily of: $632.2 million in cash (net of cash received and assumed debt); 18 million shares of common stock, with a market value of $160.9 million; and preferred stock of Products with an aggregate liquidation preference of $326.4 million, valued at $146.9 million. The cash purchase price was financed through a combination of the sale of an additional 32 million shares of common stock, valued at $160.0 million, to Heartland and debt financing. As part of the Textron purchase agreement, the Company may be obligated to make additional payments to Textron of $15.0 million to $125.0 million in the event that the Company's cumulative EBITDA. (Under the purchase agreement, cumulative EBITDA is defined generally as (1) the sum of consolidated net income, consolidated income tax expense, consolidated interest expense, consolidated depreciation and amortization expense, non-cash items which reduce net income, management fees paid to Heartland, nonrecurring expenses associated with financings and other identified financing expenses, less (2) amounts equivalent to those referred to in the preceding clause (1) projected

F-11

COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS--(CONTINUED)

in respect of other acquisitions effected after the TAC-Trim acquisition at the time of acquisition, plus (3) amounts equivalent to those referred to in the preceding clause (1) in respect of the Company's Italian joint venture with Textron) for the five year period ending December 31, 2006 is between $2,908.0 million and $4,691.0 million. Additional payments, if necessary, would represent an adjustment to the TAC-Trim purchase price. If the then existing debt instruments prohibit these additional payments, then the Company is entitled to issue additional mandatorily redeemable preferred stock of its subsidiary.

In connection with the TAC-Trim acquisition, the Company has licensed certain of its acquired intellectual property to Textron and Textron has licensed certain retained intellectual property to the Company. These agreements contain customary limitations on use, particularly to a "restricted field." The field of use to which the intellectual property licensed by the Company is restricted is generally related to automotive businesses comparable to the Company's existing business and certain extensions thereof. The agreements relating to intellectual property provide for numerous customary continuing obligations to one another, such as with respect to cooperation concerning enhancements and extensions of use, non-infringement and engineering and other support services to ensure the proper use of the intellectual property.

In addition, under the TAC-Trim acquisition agreement, the purchase price paid by the Company is subject to adjustment based upon working capital and debt levels and the seller is entitled to a return of any cash left in the business at closing and reimbursement of certain capital expenditures made by it after September 30, 2001. Amounts paid would represent additional purchase price and would be included in goodwill.

In September 2001, the Company completed its acquisition of the automotive fabric operations of Joan Fabrics, a leading supplier of bodycloth to the automotive industry, and all of the operating assets in Joan Fabric's affiliated yarn dying operation, Western Avenue Dyers (collectively "Joan"). Consideration included $102.0 million in cash, including acquisition fees, and 12.76 million shares of the Company's common stock, valued at $90.2 million.

In July 2001, the Company completed its acquisition of Becker Group, LLC ("Becker"), a supplier of plastic components to the automotive industry. Consideration included $61.8 million in cash, including acquisition fees, $18.0 million in non-compete agreements (to be paid out over 5 years), 17.0 million shares of the Company's common stock, valued at $79.1 million, and warrants to purchase 500,000 shares of the Company's common stock at an exercise price of $5.00 per share, valued at $0.7 million.

During the first quarter of 2001, the Company purchased the remaining 50% from Courtaulds Textiles (Holdings) Limited ("Courtaulds") for $3.8 million, net of cash acquired. In December 1997, the Company had entered into a 50% joint venture with Courtaulds to manufacture automotive interior fabrics in the United Kingdom.

Also during the first quarter of 2001, the Company acquired the remaining 25% of the Collins & Aikman Carpet and Acoustics, S.A. de C.V. joint venture and related intangible assets for $3.5 million. As part of the 1996 acquisition of Perstorp, the Company acquired the initial 75% of Collins & Aikman Carpet and Acoustics, S.A. de C.V. joint venture.

The results of operations of the acquired companies are included in the Company's consolidated statements of operations from the dates of acquisition.

The acquisitions were accounted for under the purchase method of accounting. In accordance with SFAS No. 142, goodwill recorded as a result of business combinations completed during the six-month period ending December 31, 2001 was not amortized. Beginning in 2002, all goodwill and intangible assets will be tested for impairment in accordance with the provisions of SFAS No. 142. Under SFAS No. 142, amortization of goodwill, including goodwill recorded in past business combinations, will discontinue upon adoption of this standard. For acquisitions completed prior to July 1, 2001, the excess of the

F-12

COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS--(CONTINUED)

purchase price for each acquisition over the estimated fair value of the tangible and identifiable intangible net assets acquired was being amortized over a period of 40 years on a straight-line basis. It is not expected that the goodwill associated with Joan, Becker and TAC-Trim will be deductible for tax purposes.

The following table represents the effect of excluding goodwill from income (loss) from continuing operations, net income (loss) along with the respective earnings per share amounts.

### GOODWILL AND OTHER INTANGIBLE ASSETS -- ADOPTION OF STATEMENT 142

|  | FOR THE YEAR ENDED DECEMBER 31, | | |
|  | 2001 | 2000 | 1999 |
| (IN MILLIONS EXCEPT FOR EARNINGS-PER-SHARE AMOUNTS) | | | |
| Reported income (loss) from continuing operations | $ (49.7) | $ (1.4) | $ (1.4) |
| Add back: Goodwill amortization, net of tax | 6.1 | 6.1 | 6.0 |
| Adjusted income (loss) from continuing operations | $ (43.6) | $ 4.7 | $ 4.6 |
| Reported net income | $ (46.2) | $ 4.5 | $ (10.2) |
| Add back: Goodwill amortization, net of tax | 6.1 | 6.1 | 6.0 |
| Adjusted net income | $ (40.1) | $ 10.6 | $ (4.2) |
| Basic and diluted earnings per share from continuing operations: | | | |
| Reported income from continuing operations | $ (0.51) | $ (0.02) | $ (0.03) |
| Goodwill amortization, net of tax | 0.06 | 0.10 | 0.10 |
| Adjusted (loss) from continuing operations | $ (0.45) | $ 0.08 | $ 0.07 |
| Basic and diluted earnings per share: | | | |
| Reported net income | $ (0.48) | $ 0.07 | $ (0.17) |
| Goodwill amortization, net of tax | 0.06 | 0.10 | 0.10 |
| Adjusted (loss) income | $ (0.42) | $ 0.17 | $ (0.07) |

The following unaudited pro forma summary presents information as if the acquisition of TAC-trim, Joan and Becker became effective at the beginning of the respective periods noted in the table below. The acquisitions have been accounted for using the purchase method. The allocation of the purchase price is preliminary and may be revised upon the completion of our appraisals. Appraisals are in progress for TAC-Trim. Appraisals for Becker and Joan were preformed during 2001. For the Becker and Joan acquisitions, the Company recorded approximately $286.3 million as goodwill. These acquisitions are intended to solidify the Company's position as a "Mega Tier 2" supplier of interior components and automotive fabrics, as more fully described below.

The Becker acquisition was important to the Company because it elevated C&A from a sub-scale plastics player to a sizable, broad-range plastics supplier. Becker's large-tonnage press capabilities complement C&A's small-to-medium tonnage capabilities, rounding out the products C&A can offer its customers. Greater operating scale justifies greater investment in research and development, which leads to better customer relationships and future technology leadership. Synergies between Becker and C&A led the Company to pay well in excess of the fair value of Becker's identifiable assets: together the two businesses can negotiate lower prices on resin due to larger volume; several plants can be closed into larger plants with open capacity, saving overhead costs; Becker brings tooling operations which allow C&A to in-source tooling requirements and capture some profit; Charles Becker, a skilled and successful veteran of the auto industry, provides synergies by applying his expertise to C&A's plastics, tooling and European operations as C&A's Vice Chairman.

The Joan acquisition was important to the Company because it 1) increased C&A's marketshare in automotive fabrics and 2) gave C&A more control over product quality and supply-chain management

F-13

COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS--(CONTINUED)

through vertical integration. Greater operating scale justifies greater investment in research and development, which leads to better customer relationships and future technology leadership. Synergies between Joan and C&A led us to pay well in excess of the fair value of Joan's identifiable assets:

together the two businesses can negotiate lower prices on yarn and dye due to larger volume; Joan's Farmville and Hickory plants were not transferred because C&A had open capacity in its fabrics plants, saving all overhead costs at the former Joan facilities; Joan brings a package dying operation, Western Avenue Dyers, which allows C&A to in-source its package yarn dying requirements and capture some profit; the ability to package dye a portion of its requirements provides leverage on the suppliers who provide the balance of C&A's package-dyed yarn.

The TAC-Trim acquisition was important to the Company because it further elevated C&A from a sizeable plastics player to a leading supplier in scale and in manufacturing and product technology. Greater operating scale justifies greater investment in research and development, which leads to better customer relationships and future technology leadership. Synergies between TAC-Trim and C&A led us to pay well in excess of the fair value of TAC-Trim's identifiable assets: together the two businesses can negotiate lower prices on resin and MRO due to larger volume; TAC-Trim's leading manufacturing disciplines can be rolled out to C&A and Becker plants to increase profitability and decrease capital expenditures and working capital; before C&A's acquisition of TAC-Trim, the business bought parts for its cockpit products from outside manufacturers, but C&A can in-source many of these parts and capture profit; consolidation of overlapping headquarters functions generate savings on headcount and occupancy costs.

The unaudited pro forma information does not reflect any benefits from synergies that might be achieved from combining operations and does not reflect the actual results that would have occurred nor is it necessarily indicative of future results of operations of the combined companies. Included in the proforma amounts are charges related to the acquired subsidiaries; $11.4 million and $21.7 million of restructuring charges at December 31, 2001 and 2000, respectively; a $42.6 million loss on a sale-leaseback transaction at December 31, 2001; and a $59.1 million charge for a cumulative effect of a change in accounting principle (net of tax) at December 31, 2000. The unaudited pro forma amounts include adjustments that are based upon available information and various assumptions that the Company believes are reasonable.

| | YEAR ENDED | |
| | 2001 (52 WEEKS) | 2000 (53 WEEKS) |
| --- | --- | --- |
| | (IN MILLIONS, EXCEPT FOR PER SHARE DATA) | |
| Net sales | $ 3,485.2 | $ 4,030.4 |
| Restructuring charges | $ 30.2 | $ 21.7 |
| Income (loss) from continuing operations | $ (126.8) | $ (1.3) |
| Income (loss) before extraordinary charge | $ (118.0) | $ 5.3 |
| Net income (loss) | $ (118.3) | $ (54.5) |
| Net income (loss) per basic and diluted common share | $ (0.70) | $ (0.33) |

Following is the preliminary opening condensed balance sheet of the three significant acquisitions made during 2001:

F-14

COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS--(CONTINUED)

|  | BECKER | JOAN | TAC-TRIM |
|---|---|---|---|
|  |  | (IN MILLIONS) |  |
| Assets |  |  |  |
| Current Assets | $ 53.6 | $ 40.2 | $ 335.0 |
| Goodwill | 130.5 | 155.8 | 730.3 |
| Noncompete Agreement | 18.0 |  |  |
| Other Assets | 3.9 | 14.4 | 387.6 |
| Liabilities |  |  |  |
| Current Liabilities | 67.7* | 18.2 | 432.1 |
| Other Liabilities | 14.7 | -- | 80.8 |
| Cash Paid, net of cash received | 61.8 | 102.0 | 596.6 |
| Common Stock, Preferred Stock and Warrants | 79.8 | 90.2 | 307.8 |
| Assumed Debt and Other Consideration | 18.0 | -- | 35.6 |
| Total Consideration | $ 159.6 | $ 192.2 | 940.0 |

* Includes $5.3 million of restructuring liabilities recorded pursuant to a plan implemented upon consummation of the acquisition and $1.6 million of the total relates to severance for approximately 306 employees while the balance relates to contractual lease obligations.

4. CHANGE IN ACCOUNTING PRINCIPLE

In April 1998, the AICPA issued SOP 98-5, "Reporting on the Costs of Start-up Activities". SOP 98-5 provides guidance on the financial reporting of start-up costs and organization costs and requires that all non-governmental entities expense the costs of start-up activities as these costs are incurred instead of being capitalized and amortized. The Company adopted SOP 98-5 on December 27, 1998. The initial impact of adopting SOP 98-5 resulted in a charge of approximately $8.8 million, net of income taxes of $5.1 million, which has been reflected as a cumulative effect of a change in accounting principle in the accompanying consolidated statement of operations for the fiscal year ended December 25, 1999.

5. FOREIGN CURRENCY PROTECTION PROGRAMS

The primary purpose of the Company's foreign currency risk management activities is to protect against the volatility associated with intercompany funding arrangements, third party loans and foreign currency purchase and sale transactions. The Company primarily utilizes forward exchange contracts and purchased options with durations of generally less than 12 months.

The Company has in place forward exchange contracts, with third parties, denominated in multiple currencies which will mature during fiscal 2002. These forward contracts, which in notional terms aggregated a U.S. dollar equivalent of $558.2 million at December 31, 2001, are to manage the currency volatility associated with intercompany funding arrangements, third party loans and foreign currency purchase and sales transactions.

During fiscal 2001, 2000 and 1999, the Company purchased option contracts giving the Company the right to purchase U.S. dollars for use by its Canadian operations. During 2000 and 1999, the premiums associated with these contracts were amortized over the contracts' terms which were one year or less. Beginning January 1, 2001, the contracts are marked to fair market value and recorded on the balance sheet, per the requirements of SFAS No. 133. The total notional amount purchased over these three fiscal years was $114.2 million with associated premiums of $1.5 million. At December 31, 2001, the notional amount outstanding was $30.7 million.

In addition, during 2001, the Company purchased option contracts giving the Company the right to sell Canadian dollars received by its U.S. operations. The contracts are marked to fair market value and

F-15

COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES

### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS--(CONTINUED)

recorded on the balance sheet, per the requirements of SFAS No. 133. The total notional amount purchased was $28.7 million with associated premiums of $0.3 million. At December 31, 2001, the notional amount outstanding was $6.8 million.

During 2001, in order to comply with the provisions of the Receivables Facility, the Company purchased a series of option contracts, each of which gave Carcorp Inc., a wholly-owned bankruptcy remote subsidiary of the Company (See Note 11), the right to sell a total of $360.0 million Canadian dollars in exchange for U.S. dollars. The option contracts are marked to fair market value and recorded on the balance sheet, per the requirements of SFAS No. 133. The total U.S. dollar notional amount purchased to comply with the Receivables Facility was $226.0 million, with associated net premiums of $1.1 million. The total notional amount outstanding at December 31, 2001 was $84.7 million.

## 6. INVENTORIES

Inventory balances are summarized below (in millions):

|  | DECEMBER 31, 2001 | DECEMBER 31, 2000 |
|---|---|---|
| Raw materials ................ | $ 73.8 | $ 80.8 |
| Work in process .............. | 25.6 | 28.5 |
| Finished goods ............... | 33.2 | 22.4 |
|  | $ 132.6 | $ 131.7 |

## 7. OTHER CURRENT ASSETS

Other current asset balances are summarized below (in millions):

|  | DECEMBER 31, 2001 | DECEMBER 31, 2000 |
|---|---|---|
| Deferred tax asset ........... | $ 25.3 | $ 19.1 |
| Reimbursable tooling ......... | 53.7 | 27.7 |
| Other ........................ | 52.9 | 29.1 |
|  | $ 131.9 | $ 75.9 |

F-16

COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS--(CONTINUED)

8. PROPERTY, PLANT AND EQUIPMENT, NET

Property, plant and equipment, net, are summarized below (in millions):

|  | DECEMBER 31, 2001 | DECEMBER 31, 2000 |
| --- | --- | --- |
| Land and improvements | $ 25.5 | $ 18.7 |
| Buildings | 168.8 | 155.0 |
| Machinery and equipment | 823.3 | 549.7 |
| Leasehold improvements | 11.7 | 18.8 |
| Construction in progress | 45.0 | 35.1 |
|  | 1,074.3 | 777.3 |
| Less accumulated depreciation and amortization | (461.7) | (343.2) |
|  | $ 612.6 | $ 434.1 |

9. ACCRUED EXPENSES

Accrued expenses are summarized below (in millions):

|  | DECEMBER 31, 2001 | DECEMBER 31, 2000 |
| --- | --- | --- |
| Payroll and employee benefits | $ 48.4 | $ 26.9 |
| Interest | 14.8 | 17.0 |
| Insurance | 39.0 | 17.2 |
| Restructuring reserves | 8.0 | 2.5 |
| Other | 129.5 | 59.5 |
|  | $ 239.7 | $ 123.1 |

10. LONG-TERM DEBT, MANDATORILY REDEEMABLE PREFERRED STOCK AND SHORT-TERM BORROWINGS

A. LONG-TERM DEBT

Long-term debt is summarized below (in millions):

|  | DECEMBER 31, 2001 | DECEMBER 31, 2000 |
| --- | --- | --- |
| Senior Credit Facilities: |  |  |
| Tranche A Term Loan Facility | $ 100.0 | $ -- |
| Tranche B Term Loan Facility | 300.0 | -- |
| Revolving Credit Facility | -- | -- |
| Bank Credit Facilities: |  |  |
| Term Loan A Facility | -- | 66.3 |
| Term Loan B Facility | -- | 118.0 |
| Term Loan C Facility | -- | 96.0 |
| Revolving Credit Facility, including $17.3 million by the Canadian borrowers at December 31, 2000 | -- | 150.2 |
| Public Debt: |  |  |
| 111/2% Senior Subordinated Notes, due 2006 | 400.0 | 400.0 |
| 103/4% Senior Notes, due 2011 | 500.0 | -- |

F-17

COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS--(CONTINUED)

| | DECEMBER 31, 2001 | DECEMBER 31, 2000 |
|---|---|---|
| JPS Automotive 111/8% Senior Notes, including premiums of $-- and $0.3 million......................................... | -- | 48.3 |
| Other ................................................. | 1.9 | 5.2 |
| Total debt ............................................. | 1,301.9 | 884.0 |
| Less current maturities ............................... | ( 19.5) | ( 84.3) |
| | $ 1,282.4 | $ 799.7 |

## BANK CREDIT FACILITIES

In December 2001, in conjunction with the TAC-Trim acquisition, the Company entered into new Senior Credit Facilities, which refinanced its Bank Credit Facilities. The principal and interest on the Bank Credit Facilities totaled $362.5 million. The cost and expenses associated with the refinancing of the bank credit facilities totaling $25.7 million were deferred and will be amortized over the four-year life of the term loans described below. In addition, the Company incurred a $5.0 million, net of tax, extraordinary charge in connection with the retirement of the old Bank Credit Facilities.

The new Senior Credit Facilities include a floating rate Revolving Facility and two new floating rate Term Loan Facilities that mature on December 31, 2005. The Revolving Facility allows the Company to borrow revolving loans up to $175.0 million including Canadian dollars up to $75.0 million. The facility can be utilized for letters of credit. The Term Loan Facilities consist of a Tranche A Term Loan with a principal balance of $100.0 million and a Tranche B Term Loan with a principal balance of $300.0 million. As required by the credit agreement, the full amounts of the Term Loan Facilities were drawn down on the closing date. Amounts borrowed under the Term Loan Facilities that are repaid or prepaid cannot be reborrowed. The Tranche A Term Loan Facility is payable in quarterly installments that increase in amounts each year until maturity. The Tranche B Term Loan Facility is payable in quarterly installments of $0.8 million for the first three years and quarterly installments of $72.7 million during the final year.

Under the new Senior Credit Facilities, the interest rate on the Revolving Facility is, at the Company's option, London Inter-Bank Offer Rate ("LIBOR") plus 3.75% or the Alternate Base Rate ("ABR") plus 2.75%. The ABR is the highest of The JP Morgan Chase ("Chase's") announced prime rate, the Federal Funds Rate plus 0.5% and Chase's base certificate of deposit rate plus 1%. A per annum fee equal to the spread over the LIBOR plus a fronting fee of 0.25% accrue on the face amount of letters of credit. Also, there is a 1.00% commitment fee on the unused portion of the facility. The interest rates on the Canadian-dollar denominated debt is at the Company's option (the "Canadian Prime Rate") plus 3.75% or the bill of exchange rate ("Bankers' Acceptance" or "BA") denominated in Canadian dollars for one, two, three or six months plus 2.75%. The interest rate on the Tranche A Term Loan Facility is, at the Company's option, LIBOR plus 3.75% or the ABR plus 2.75%. The interest rates and commitment fees on the Revolving Facility and the Tranche A Term Loan Facility are subject to adjustment quarterly starting six months after the closing date based on performance targets. The interest rate on the Tranche B Term Loan Facility is, at our option, either LIBOR plus 4.00% or ABR plus 3.00%. On any Tranche B Term Loans repaid whether voluntary or mandatory there is a prepayment premium of 3.00% the first year, 2.00% the second year and 1.00% the third year. The Company may elect interest periods of 1, 2, 3, or 6 months (or 9 or 12 months, if available) for LIBOR borrowings. LIBOR shall not be less than 3.00% per annum. At December 31, 2001, LIBOR for 1, 3 and 6 months were 1.87%, 1.88% and 1.98%, respectively. The weighted average rate of interest on the new Senior Credit Facilities at December 31, 2001 was 7.67%.

In May 1998, Products entered into Bank Credit Facilities ("old Bank Credit Facilities") consisting of a senior secured Revolving Credit Facility and Term Loan Facilities. The Revolving Credit Facility

F-18

COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS--(CONTINUED)

allowed borrowings in an aggregate principal amount of up to $250.0 million, terminating on December 31, 2003, of which $60.0 million (or the equivalent thereof in Canadian dollars) was available to two of the Company's Canadian subsidiaries ("the Canadian Borrowers") and of which up to $50.0 million was available as a letter of credit facility (the "Revolving Credit Facility", and together with the Term Loan Facilities, the "Credit Agreement Facilities"). The Term Loan Facilities consisted of a Term Loan A Facility in the amount of $100 million payable in quarterly installments until final maturity on December 31, 2003 and a Term Loan B Facility in the amount of $125 million payable in quarterly installments until final maturity on June 30, 2005. In addition, the Term Loan Facilities included a provision for a Term Loan C Facility of up to $150 million. In May 1999, the Company closed on the Term Loan C Facility in the principal amount of $100 million. The Term Loan C Facility was payable in quarterly installments through final maturity on December 31, 2005. The Company used approximately $44 million of the proceeds from the Term Loan C Facility to pay a special dividend to shareholders on May 28, 1999 (See Note 16). The remaining proceeds were used to repay amounts outstanding on the Revolving Credit Facility and for general corporate purposes.

Effective February 2001, the Company amended and restated the Credit Agreement Facilities and received waivers of the interest coverage and leverage ratio covenants for the period ending December 31, 2000. The Company also received commitments from its lenders for a Term Loan D Facility in the amount of $50 million maturing January 2006, which was used to retire the outstanding JPS Automotive 11 1/8% Senior Notes due 2001. The primary purpose of the amendments was to allow the change of control precipitated by the Heartland Transaction and to provide for the Term Loan D Facility.

In March 2001, the proceeds from the Term Loan D Facility were used to retire all outstanding JPS Automotive 11 1/8% Senior Notes due June 2001. The Company recognized an extraordinary charge of $0.3 million in connection with this repurchase of the remaining outstanding JPS Automotive Senior Notes at prices in excess of carrying values.

The old Bank Credit Facilities were guaranteed by the Company and its U.S. subsidiaries (subject to certain exceptions). As a part of the amendment and restatement effective February 23, 2001, the Company provided collateral additional to the previous pledge of stock of Products and its significant subsidiaries and certain intercompany debt and guarantees from the Company and its U.S. subsidiaries (subject to certain exceptions). This additional collateral consisted of a first priority lien on the assets of the Company, Products and its U.S. and Canadian subsidiaries with certain exceptions including assets included in the Company's receivables facility, certain scheduled assets, and certain assets whose value relative to cost of lien perfection was deemed too low to include. Guarantees and security requirements of the new Senior Credit Facility are substantially the same as the old bank credit facilities as amended and restated except that they are extended to subsequently acquired or organized domestic subsidiaries.

The new Senior Credit Facilities and the old Credit Facilities contain restrictive covenants including maintenance of interest coverage and leverage ratios and various other restrictive covenants that are customary for such facilities. The covenants of the new Senior Credit Facilities limit investments, dividends or other distributions of capital stock, capital expenditures, the purchase of Preferred Stock of subsidiary, the prepayment of debt other than loans under the senior credit facilities, liens and certain lease transactions. Should the Company sell assets or incur debt over $20.0 million proceeds must be used to pre-pay the term loans in an amount based on excess cash flow as measured by the leverage ratio performance. The covenants permit the payment of dividends on the Preferred Stock not to exceed 8% per annum unless at least 50% of the Senior Secured Term Loan Facilities are repaid or the proforma total Leverage Ratio is less than 2.5 to 1. The covenants limit acquisitions including further investment in the Italian joint venture, Holdings (Italy) S.r.L. to $23.0 million subject to a purchase price adjustment up to $5.0 million provided that after the expenditure no default has occurred. The covenants require that the interest coverage ratio for any period of four consecutive fiscal quarters be less than 2.25 to 1.00 on September 30, 2002 increasing each quarter to 3.25 to 1.00 on December 31, 2005 and that the leverage ratio be no greater than 4.50 to 1.00 on September 30, 2002 decreasing each quarter to 3.00 to 1.00 on December 31, 2005.

F-19

COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS--(CONTINUED)

The interest rates under the old Bank Credit Facilities were at variable rates based determined similar to the new Senior Credit Facilities. The weighted average rate of interest on the old Bank Credit Facilities at December 31, 2000 was 9.05%.

**PUBLIC DEBT**

In December 2001, the C&A Products issued 10 3/4% Senior Subordinated Notes due 2011 in a total principal amount of $500.0 million. The Notes were not registered under the securities act of 1933 and were offered only to qualified institutional buyers. The Company used the net proceeds from the offering together with the proceeds from other financing to consummate the TAC-Trim acquisition, repay all principal, interest, fees and other amounts outstanding under the old Bank Credit Facilities, replace the Company's existing Receivables Facility and pay related fees and expenses. The cost of issuing the notes totaling about $23.1 million was deferred and will be amortized over 10 years.

The notes are unconditionally guaranteed on an unsecured senior basis by the parent and by each wholly owned domestic subsidiary that is a guarantor of the Bank Credit Facilities as of the issue date. This is all of the Company's wholly owned domestic subsidiaries other than its receivable and insurance subsidiaries. The Debt evidenced by the Notes and Parent and Subsidiary Guarantees are unsecured senior obligations of the Company ranking senior in right of payment to all existing and future Subordinated Debt including the Existing Notes and related Guarantees and future unsecured and unsubordinated Debt. The Notes are redeemable prior to December 31, 2004 only in the event the Company receives cash proceeds from one or more equity offerings in which case the Company may at its option use all or a portion of such cash proceeds to redeem up to 35% of the principal amount of the notes. The Notes will be subject to redemption at the option of the Company, in whole or in part at any time after December 31, 2006 at a stated premium redemption price expressed as a percentage in excess of the principal amount. After December 31, 2008, the redemption price is 100%. Within 30 days of the occurrence of a change of ownership control, unless the Company has mailed a redemption notice with respect to all outstanding Notes, the Company will be required to make an offer to purchase all outstanding Notes at a purchase price equal to 101% of their principal amount. The indenture governing the notes limits the Company's ability to issue more debt, pay dividends and make distributions, repurchase stock, make investments, merge or consolidate, transfer assets, enter into transactions with affiliates and issue stock of subsidiaries. These restrictive covenants are customary for such securities and are subject to a number of exceptions.

In June 1996, Products, issued at face value $400 million principal amount of 11 1/2% Senior Subordinated Notes due 2006 which are guaranteed by the Company. The indenture governing the 11 1/2% Senior Subordinated Notes generally prohibits the Company, Products and any Restricted Subsidiary (as defined) from making certain payments and investments unless a certain financial test is satisfied and the aggregate amount of such payments and investments since the issue date is less than a specified amount. The prohibition is subject to a number of significant exceptions, including dividends to stockholders of the Company or stock repurchases not exceeding $10 million in any fiscal year or $20 million in the aggregate, dividends to stockholders of the Company or stock repurchases in the amount of the net proceeds from the sale of the Company's Imperial Wallcoverings, Inc. subsidiary ("Wallcoverings") and dividends to the Company to permit it to pay its operating and administrative expenses. The indenture also contains other restrictive covenants (including, among others, limitations on the incurrence of debt, asset dispositions and transactions with affiliates), which are customary for such securities. These covenants are also subject to a number of significant exceptions.

The Company solicited and received consent from holders of a sufficient amount of the outstanding principal of the 11 1/2% Senior Subordinated Notes allowing the Change of Control precipitated by the Heartland Transaction. A Second Supplemental Indenture dated February 8, 2001 amended the Senior Subordinated Notes indenture to reflect this and certain other changes, including allowance for the

COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS--(CONTINUED)

incurrence of debt in the form of the Term Loan D Facility. In connection with the TAC-Trim acquisition, we further amended the indenture governing these notes to make each subsidiary guarantor of the new 10 3/4% Senior Notes a guarantor of these existing notes on a senior subordinated basis.

As of August 1998, the JPS Automotive acquisition date, $180 million principal amount of JPS Automotive 11 1/8% Senior Notes due 2001 (the "JPS Automotive Senior Notes") was outstanding. Of this amount, $68 million were purchased by the Company in the open market and subsequently contributed to or repurchased by JPS Automotive. The remaining $112 million face value of JPS Automotive Senior Notes were recorded at a market value of $117.2 million on the date of the acquisition. Through subsequent retirements of the JPS Automotive Senior Notes, the Company reduced the outstanding face value to $48.0 million at December 31, 2000. In March 2001, the Company retired the remaining JPS Automotive Senior Notes with proceeds from the Term Loan D Facility described above. The Company recognized an extraordinary charge of $0.3 million in connection with the retirement of the notes at prices in excess of carrying values.

At December 31, 2001, the scheduled annual maturities of long-term debt are as follows (in millions):

| YEAR ENDING | |
| --- | --- |
| 2002 ................ | $   19.5 |
| 2003 ................ | 23.4 |
| 2004 ................ | 28.0 |
| 2005 ................ | 331.0 |
| 2006 ................ | 400.0 |
| Later years ......... | 500.0 |
| | --------- |
| | $ 1,301.9 |
| | ========= |

Total interest paid by the Company on all debt was $76.3 million, $94.8 million and $91.9 million for 2001, 2000 and 1999, respectively.

## B. MANDATORILY REDEEMABLE PREFERRED STOCK OF SUBSIDIARY

As part of the consideration paid to Textron for the TAC-Trim acquisition, Products issued to Textron 182,700 shares of its Series A Redeemable Preferred Stock, 123,700 shares of Series B Redeemable Preferred Stock and 20,000 shares of Series C Redeemable Preferred Stock. The Preferred Stock is recorded at fair value, which is less than the liquidation value of $1,000 per share or $326.4 million. The estimated fair value of $146.9 million is based on market prices for securities with similar terms, maturities and risk characteristics, and includes a liquidation discount to reflect market conditions. The difference between the initial recorded value and the initial liquidation preference is as follows (in millions):

| | DECEMBER 31, 2001 CARRYING AMOUNT | LIQUIDATION VALUE | DIFFERENCE |
| --- | --- | --- | --- |
| Series A | $  82.6 | $ 183.1 | $ 100.5 |
| | 55.9 | 123.9 | 68.0 |
| | 9.2 | 20.2 | 11.0 |
| | ------- | ------- | -------- |
| | $ 147.7 | $ 327.2 | $ 179.5 |

The $179.5 million difference between the carrying amount and liquidation value will be accreted in the statement of operations through December 31, 2012, using the effective interest method.

Products is required to redeem all Series A and B Preferred Stock outstanding on January 1, 2013 and Series C Preferred Stock outstanding on February 1, 2022. The redemption price is equal to 100% of the liquidation preference plus accrued and unpaid dividends plus common equity participation for the Series

F-21

COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES

### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS--(CONTINUED)

C Preferred Stock. The Series A and Series B Preferred Stock are redeemable at Products' option, in whole or in part, on or after January 1, 2007 at a stated percent in excess of the liquidation preference plus accrued and unpaid dividends. The Series C Preferred stock is not optionally redeemable. However, at Products' option or the holders of a majority of outstanding shares of Series C Preferred Stock, the Series C Preferred Stock is exchangeable for Series B Preferred Stock at any time following the second anniversary of its issuance date but prior to the third anniversary of its issuance date.

Shareholders of Series A Preferred Stock are entitled to receive dividends accruing annually on the liquidation preference at a rate of 11% for dividend periods ending on or prior to July 1, 2003, and 15% thereafter. Holders of Series B and C Preferred Stock are entitled to receive dividends accruing annually on the liquidation preference at a rate of 12% for dividend periods ending on or prior to July 1, 2003, and 16% thereafter.

Products may at its option through January 1, 2004 accrue up to the full amount of all dividends in lieu of cash payment of such dividends. Thereafter, Products may at its option elect to accrue dividends of up to 7% of the liquidation value annually on Series A Preferred Stock and up to 8% of the liquidation value on Series B and C Preferred Stock. Accrued dividends will be added to the liquidation preference of the applicable series of Preferred Stock.

Upon voluntary or involuntary liquidation, dissolution or winding-up of Products, holders of the Preferred Stock are entitled to be paid out of the assets of Products available for distribution to stockholders in the amount of $1,000 per share plus the total accrued dividends prior to any distribution to holders of equity securities which ranks junior to the Preferred Stock. In addition, the holders of Series C Preferred Stock are entitled to a participation in distributions to Products common equity tied to appreciation in the value of Products common equity subsequent to the issuance date, not to exceed $2.0 million for all Series C Preferred Stock outstanding.

If Products experiences a change of ownership control, the holders of the Preferred Stock must be given the opportunity to sell to Products their Preferred Stock at 100% of the liquidation preference plus accrued and unpaid dividends, plus, in the case of Series C Preferred Stock, common equity participation. In the event that Products does not meet or exceed certain financial criteria based on interest coverage, the dividend rate applicable solely to Series A Preferred Stock will increase by 1.00% for the next full dividend period and by an additional 0.50% for each dividend period thereafter provided that the dividend rate does not exceed 20%. The provision of the certificate of designation limits Products ability to issue more debt, pay dividends and make distributions, repurchase stock, make investments, merge or consolidate, transfer assets, enter into transactions with affiliates and issue stock of subsidiaries. These covenants are subject to a number of important exceptions.

The 2001 results included dividends and accretion calculated using the effective interest method that totaled $2.4 million.

## C. SHORT-TERM BORROWINGS

At December 31, 2001, short-term borrowings was primarily comprised of borrowings at a newly acquired subsidiary and carried a fixed interest rate of approximately 23%.

## 11. RECEIVABLES FACILITY

In December 2001, as part of the refinancing completed in connection with the TAC-Trim acquisition, C&A Products entered into a new receivables facility (the "New Receivables Facility") and repaid the outstanding balance of $128.7 million of the Company's previous receivables facility (the "Old Receivables Facility") entered into in December 1999, which was not renewed. The Receivables Facility utilizes funding provided by commercial paper conduits. Carcorp, Inc., a wholly owned, bankruptcy-remote subsidiary of Products ("Carcorp") purchases virtually all trade receivables generated by Products and certain of its subsidiaries (the "Sellers") in the United States and Canada, transferring rights to

COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS--(CONTINUED)

collections on those receivables to the conduits. The conduits in turn issue commercial paper, which is collateralized by those rights. The New Receivables Facility has a 364-day term expiring December 2002. The Old Receivables Facility had 364-day terms, renewable annually for up to five years.

The total funding available to the Company on a revolving basis under the New Receivables facility was increased to $250.0 million compared to $171.6 million under the Old Receivables Facility. The funding available under both facilities depends primarily on the amount of receivables generated by the Sellers from sales, the rate of collection on those receivables and other characteristics of those receivables that affect their eligibility (such as the bankruptcy or downgrading below investment grade of the obligor, delinquency and excessive concentration). The Company retains the receivables collection responsibility.

In December 2001, the Company funded $79.9 million through the New Receivables Facility. The Company had $118.6 million available but unutilized at December 31, 2001. At December 31, 2000, the Old Receivables Facility was fully utilized at $82.5 million. The discount on sold interests is equal to the interest rate paid by the conduits to the holders of the commercial paper plus a usage fee. The discount rate at December 31, 2001, was 3.53% compared to 7.40% at December 31, 2000. Under the New Receivables Facility the usage fee was increased to 1.50% from 0.75% under the Old Receivables Facility. In addition, the Company pays a fee on the unused portion of the facility. Under the New Receivables Facility that fee was increased from .25% to .50%. During 2001, the loss on the sale of the receivables totaled $10.8 million. Included in the loss were fees and expenses of replacing the Old Receivables Facility totaling $5.6 million. During 2000 and 1999 the losses on the sale of receivables totaled $9.2 million and $5.4 million, respectively. The 2000 loss included $1.6 million in expenses and fees to replace the prior facility.

As of December 31, 2001 and 2000, the conduits collectively had invested $79.9 million and $82.5 million, respectively, to purchase an undivided senior interest (net of settlements in transit) in the receivables pool. Accordingly, such receivables were not reflected in the Company's financial statements as of those dates. As of December 31, 2001 and 2000, Carcorp's total receivables pool was $334.6 million and $174.9 million, respectively. When the Company sells receivables to Carcorp, it retains a subordinated interest in the receivables sold. The Company estimates the fair value of its retained interest by considering two key assumptions: the payment rate, which is derived from the average life of the accounts receivable, which is less than 60 days, and the rate of expected credit losses. Based on the Company's favorable collection experience and the short-term nature of its receivables, both assumptions are highly predictable. Therefore, the Company's estimated fair value of its retained interests in the pool of eligible receivables is approximately equal to the previous cost, less the associated allowance for doubtful accounts.

The proceeds received by Carcorp from collections on receivables, after the payment of expenses and amounts due, are used to purchase new receivables from the Sellers. During 2001 and 2000, Carcorp had net cash collections of approximately $1.6 billion and $1.5 billion, respectively. These funds were used to purchase new receivables from the Sellers, under the Old Receivables Facility.

The New Receivables Facility contains certain other restrictions on Carcorp (including maintenance of $60.0 million of net worth) and on the Sellers (including limitations on liens on receivables, modifications of the terms of receivables, and change in credit and collection practices) customary for facilities of this type. The commitments under the New Receivables Facility are subject to termination prior to their term upon the occurrence of certain events, including payment defaults, breach of covenants, including defined interest coverage and leverage ratios, bankruptcy, default by Products in servicing the receivables and failure of the receivables to satisfy certain performance criteria.

12. LEASES

The Company is the lessee under various long-term operating leases for land and buildings for periods up to twenty years. The majority of these leases contain renewal provisions. In addition, the Company leases transportation, operating and administrative equipment for periods ranging from one to twelve years.

F-23

COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS--(CONTINUED)

The Company has equipment lease agreements and building lease agreements with several lessors which, subject to specific approval, provide availability of funding for operating leases and sale-leasebacks as allowed in its other financing agreements. The Company has a purchase option on certain equipment at the end of the lease term based on the fair market value of the equipment and has additional options to cause the sale of some or all of the equipment or to purchase some or all of the equipment at prices determined under the agreement. The Company has classified the leases as operating.

At December 31, 2001, future minimum lease payments under operating leases for continuing operations are as follows (in millions):

| YEAR ENDING | |
| --- | --- |
| 2002 ................. | $ 57.2 |
| 2003 ................. | 50.3 |
| 2004 ................. | 43.8 |
| 2005 ................. | 25.0 |
| 2006 ................. | 22.5 |
| Later Years ......... | 85.2 |
| | $ 284.0 |

Rental expense of continuing operations under operating leases was $29.2 million, $20.8 million, and $21.5 million for fiscal 2001, 2000 and 1999, respectively. Obligations under capital leases are not significant.

During 2001, C&A Products entered into sale and leaseback transactions for certain manufacturing equipment and non-manufacturing properties. The transactions resulted in the recognition of a $4.4 million net deferred asset that is being amortized over the lease term, and the recognition of an $8.7 million loss.

During 2001, the Company received net proceeds (after fees) of approximately $86.2 million from sale and leasebacks of real property and equipment, which it used to reduce outstanding debt. The aggregate lease expenses associated with these leases will be $88.8 million, $12.5 million of which relates to 2002. To the extent permitted by the credit facility, the Company may enter into additional similar leasing arrangements from time to time. As part of these sale-leaseback transactions, C&A Products sold and contemporaneously leased back real property from unrelated third parties, and received net proceeds (after fees) of $46.4 million. Refer to Note 19 for a discussion regarding certain sale and leaseback transactions that were entered into with related parties.

13. EMPLOYEE BENEFIT PLANS

A. DEFINED BENEFIT PENSION AND POSTRETIREMENT BENEFIT PLANS

Subsidiaries of the Company have defined benefit pension plans covering substantially all employees who meet eligibility requirements. Plan benefits are generally based on years of service and employees' compensation during their years of employment. Funding of retirement costs for these plans complies with the minimum funding requirements specified by the Employee Retirement Income Security Act. Assets of the pension plans are invested primarily in equity and fixed income securities.

Subsidiaries of the Company have also provided postretirement life and health coverage for certain retirees under plans currently in effect. Many of the subsidiaries' domestic and Canadian employees may be eligible for coverage if they reach retirement age while still employed by the Company. Most of these plans are contributory. In general, future increases in costs are passed on fully to the retiree. However, future increases in costs for the Canadian divisions and limited domestic operations are shared between the Company and the retiree.

F-24

## COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES

### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS--(CONTINUED)

During fiscal year 2000, the Company recognized a net $1.0 million curtailment gain related to a reduction in employees participating in the Collins & Aikman Corporation Supplemental Retirement Income Plan, a plan whose participation is limited to a select group of key executives. The gain has been reflected in selling, general and administrative expenses in the accompanying statements of operations for the year ended December 31, 2000.

The following tables provide a reconciliation of the projected benefit obligation, a reconciliation of plan assets, the funded status of the plans, and amounts recognized in the Company's consolidated balance sheets at December 31, 2001 and December 31, 2000 (in millions).

|  | PENSION BENEFITS FISCAL YEAR ENDED | | POSTRETIREMENT BENEFITS FISCAL YEAR ENDED | |
|  | DECEMBER 31, 2001 | DECEMBER 31, 2000 | DECEMBER 31, 2001 | DECEMBER 31, 2000 |
|---|---|---|---|---|
| **Change in benefit obligation:** | | | | |
| Benefit obligation at beginning of year | $ 175.0 | $ 170.5 | $ 52.6 | $ 57.5 |
| Service cost | 6.8 | 6.7 | 1.0 | .9 |
| Interest cost | 12.7 | 12.8 | 3.8 | 3.6 |
| Employee contributions | -- | -- | .9 | .9 |
| Amendments | 1.4 | .4 | -- | -- |
| Actuarial gain | 2.3 | (.5) | (1.3) | (5.3) |
| Benefits paid | (14.1) | (11.6) | (4.7) | (4.7) |
| Currency adjustment | (1.7) | (3.3) | (.5) | (.3) |
| Benefit obligation at end of year | $ 182.4 | $ 175.0 | $ 51.8 | $ 52.6 |
| **Change in plan assets:** | | | | |
| Fair value of plan assets at beginning of year | $ 164.2 | $ 159.3 | $    -- | $    -- |
| Actual return on plan assets | (24.1) | 15.1 | -- | -- |
| Employer contributions | 4.3 | 4.2 | 3.8 | 3.8 |
| Employee contributions | -- | -- | .9 | .9 |
| Benefits paid | (14.1) | (11.6) | (4.7) | (4.7) |
| Currency adjustment | (1.6) | (2.8) | -- | -- |
| Fair value of plan assets at end of year | $ 128.7 | $ 164.2 | $    -- | $    -- |
| **Reconciliation of funded status to net amount recognized:** | | | | |
| Funded status | $ (53.7) | $ (10.8) | $ (51.8) | $ (52.6) |
| Unrecognized net loss (gain) | 48.1 | 7.0 | (21.5) | (22.0) |
| Unrecognized prior service cost (gain) | 4.4 | 3.3 | (6.4) | (7.8) |
| Net amount recognized | $ (1.2) | $ .5 | $ (79.7) | $ (82.4) |

The table above does not reflect the results of the TAC-Trim acquisition as the Company is still completing purchase accounting for the acquisition. The amounts included in the balance sheet reflect the preliminary value assigned to the TAC-Trim assets and obligations.

| Amounts recognized in the consolidated balance sheet consist of: | | | | |
|---|---|---|---|---|
| Prepaid benefit cost | $ 18.7 | $ 14.6 | $    -- | $    -- |
| Accrued benefit liability | (25.6) | (17.0) | (179.1) | (82.4) |
| Intangible asset | 5.8 | 1.5 | -- | -- |
| Accumulated other comprehensive loss | 19.0 | .4 | -- | -- |
| Net amount recognized | $ 17.9 | $ (.5) | $ (179.1) | $ (82.4) |

COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS--(CONTINUED)

The projected benefit obligation, accumulated benefit obligation and fair value of plan assets for the pension plans with accumulated benefit obligations in excess of plan assets were $175.2 million, $165.9 million and $121.7 million, respectively, as of December 31, 2001 and $21.8 million, $20.1 million and $4.2 million, respectively, as of December 31, 2000.

The net periodic benefit cost of continuing operations for fiscal 2001, 2000, and 1999 includes the following components (in millions):

|  | PENSION BENEFITS FISCAL YEAR ENDED | | |
| --- | --- | --- | --- |
|  | DECEMBER 31, 2001 | DECEMBER 31, 2000 | DECEMBER 25, 1999 |
| Components of net periodic benefit cost: |  |  |  |
| Service cost | $  6.8 | $  6.7 | $  9.1 |
| Interest cost | 12.7 | 12.8 | 11.0 |
| Expected return on plan assets | (14.6) | (14.6) | (12.4) |
| Amortization of prior service cost | .2 | .1 | -- |
| Settlement loss (gain) | (.1) | -- | -- |
| Curtailment gain | -- | (1.0) | -- |
| Recognized net actuarial loss | .1 | .1 | .7 |
| Net periodic benefit cost | $  5.1 | $  4.1 | $  8.4 |

|  | POSTRETIREMENT BENEFITS FISCAL YEAR ENDED | | |
| --- | --- | --- | --- |
|  | DECEMBER 31, 2001 | DECEMBER 31, 2000 | DECEMBER 25, 1999 |
| Components of net periodic benefit cost: |  |  |  |
| Service cost | $  1.0 | $   .9 | $  1.5 |
| Interest cost | 3.8 | 3.6 | 4.3 |
| Amortization of prior service cost | (1.4) | (1.4) | (1.4) |
| Recognized net actuarial gain | (1.7) | (2.0) | ( .9) |
| Net periodic benefit cost | $  1.7 | $  1.1 | $  3.5 |

Weighted average fiscal year-end assumptions are summarized as follows:

|  | PENSION BENEFITS | | POSTRETIREMENT BENEFITS | |
| --- | --- | --- | --- | --- |
|  | 2001 | 2000 | 2001 | 2000 |
| Discount rate | 7.2% | 7.4% | 7.5% | 7.6% |
| Expected return on plan assets | 9.0% | 9.0% | N/A | N/A |
| Rate of compensation increase | 3.1% | 4.5% | N/A | N/A |

Health care costs for domestic plans: (1) Dura Convertible was assumed to increase 11% during 2002; the rates were assumed to grade down by 0.5% per year to an ultimate rate of 6% and remain at that level thereafter. (2) Wickes Engineering Materials was assumed to increase 6% during 2002 and remain at that level thereafter. (3) TAC-Trim was assumed to increase 12% during 2002; the rates were assumed to grade down by 0.5% per year to an ultimate rate of 6% and remain at that level thereafter. Health care trend rates for Canadian Plans were assumed to increase approximately 8.5% during 2002 grading down by 0.5% per year to a constant level of 5% annual increase.

F-26

COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS--(CONTINUED)

Assumed health care cost trend rates may have a significant effect on the amounts reported for postretirement benefits. A one-percentage-point change in assumed health care cost trend rates would have the following effects:

|  | 1-PERCENTAGE-POINT INCREASE | 1-PERCENTAGE-POINT DECREASE |
|---|---|---|
| Effect on total of service and interest cost components ......... | $ .4 | $ (.3) |
| Effect on postretirement benefit obligation ..................... | $ 20.1 | $ (16.2) |

## B. DEFINED CONTRIBUTION PLANS

Subsidiaries of the Company sponsor defined contribution plans covering employees who meet eligibility requirements. Subsidiary contributions are based on formulas or are at the Company's discretion as specified in the plan documents. Contributions relating to continuing operations were $3.2 million, $4.0 million and $3.0 million in fiscal 2001, 2000 and 1999, respectively.

## 14. DISCONTINUED OPERATIONS

During fiscal 2000, the Company settled claims for certain environmental matters related to discontinued operations for a total of $20 million. Settlement proceeds will be paid to the Company in three installments. The first and second installments of $7.5 million and $7.5 million were received in June 2000 and June 2001, respectively with the third installment of $5.0 million to be received in June 2002. Of the total $20 million settlement, the Company recorded the present value of the settlement as $7.0 million of additional environmental reserves, based on its assessment of potential environmental exposures, and $6.6 million, net of income taxes, as income from discontinued operations.

The Company has significant obligations related to post-retirement, casualty, environmental, product liability, lease and other liabilities of discontinued operations. The nature of many of these contingent liabilities is such that they are difficult to quantify and uncertain in terms of amount. The company has accrued $10.0 million for casualty reserves, $38.9 million for post retirement costs and $40.7 million for environmental and product liability costs.

In connection with retained operating leases of certain discontinued operations, the Company believes that future sublease rental receipts will equal or exceed future minimum lease payments and accordingly has not recorded any liability for these leases.

## 15. RESTRUCTURING

During 2001, the Company undertook restructuring programs to rationalize operations in North American, European and Specialty operations resulting in a restructuring charge aggregating $18.8 million. The charge included $11.2 million of severance costs and $7.6 million of asset impairments. The Company recognized severance costs for over 900 operating personnel at the Company's convertible tops, fabrics, carpet and acoustics locations in North America and Specialty operations. The asset impairments, primarily related to machinery and equipment located at North American, European and Specialty operations sites, are based on management's estimates of values to be realized upon disposition of the assets.

In addition, the Company recorded a restructuring reserve in connection with the Becker acquisition aggregating $5.3 million of which $1.6 million was severance and $3.7 million for lease termination and other exit costs. Following is the rollforward of the restructuring accruals for 2001 (in thousands):

F-27

COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS--(CONTINUED)

| DESCRIPTION | BEGINNING OF YEAR | CHARGED TO COST AND EXPENSES | CHARGED (CREDITED) TO OTHER ACCOUNTS (A) | DEDUCTIONS (B) | END OF YEAR |
|---|---|---|---|---|---|
| (IN MILLIONS) Restructuring Reserves in the balance sheet for: 2001 ................... | $ 2.5 | $ 11.2 | $ 5.3 | $ (11.0) | $ 8.0 |

(a) Restructuring costs for acquired companies.

(b) Deductions, primarily representing cash utilized.

In fiscal 1999, the Company announced a comprehensive plan (the "Reorganization") to reorganize its global automotive carpet, acoustics, plastics and accessory floormats businesses. The Company undertook the Reorganization to reduce costs and improve operating efficiencies throughout the Company's operations and to more effectively respond to the OEMs' demand for complete interior trim systems and more sophisticated components. Upon final completion of the Reorganization plan, the Company recognized a pre-tax restructuring charge of $33.4 million, including $13.4 million of asset impairments, $15.0 million of severance costs and $5.0 million related to the termination of sales commission contracts at the Company's North American plastics operations. The 1999 Reorganization included the closure of three facilities. The Homer, Michigan plastics facility was closed in August 1999 and its operations were relocated to an existing plastics facility. The Cramerton, North Carolina fabrics facility was sold in September 1999 and the relocation of its operations to another fabrics facility was completed in fiscal 2000. The acoustics facility in Vastra Frolunda, Sweden, was closed in September 2000 and its operations were relocated to other facilities in Europe. The Company recognized $13.4 million in asset impairments, primarily relating to buildings, machinery and equipment located at these three sites. In addition to these closures, the Company recognized severance costs for operating personnel at the Company's plastics operations in the United Kingdom and the Company's fabrics, convertibles and accessory floormats operations in North America. The Company also recognized severance costs for management and administrative personnel at the Company's former North Carolina headquarters and North American Automotive Interior Systems division.

During fiscal 2000, certain modifications were made to the Reorganization, which changed the original estimates. Severance costs for individuals and payments for the termination of sales commission arrangements originally contemplated in the Reorganization were approximately $3.1 million lower than the original estimates. The reduction consisted of $2.0 million of severance benefits and $1.1 million of payments for termination of sales commission arrangements. However, during fiscal 2000, there were additional personnel terminations made as the Company continued to reshape its management team. The Company estimates indicate that the adjustment to reduce the original restructuring provision approximates the provision required for the additional personnel terminated in fiscal 2000. As of December 31, 2000, the Company's Reorganization efforts, as modified, were substantially complete and approximately 1,000 employees had been terminated.

16. COMMON STOCKHOLDERS' EQUITY

DIVIDENDS

On February 10, 1999, the Company declared a special dividend of approximately $6.2 million, representing $0.10 per share on all outstanding shares of common stock held by stockholders of record as of the close of business on February 22, 1999. The dividend was paid on March 1, 1999. On May 13, 1999, the Company declared another special dividend relating to the distribution of the proceeds from the sale of Wallcoverings of approximately $44.0 million, representing $0.71 per share on all outstanding shares of common stock held by stockholders of record as of the close of business on May 20, 1999. The dividend was paid on May 28, 1999.

F-28

COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES

### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS--(CONTINUED)

## STOCK OPTION PLANS

The 1994 Employee Stock Option Plan ("1994 Plan") was adopted as a successor to the 1993 Employee Stock Option Plan to facilitate awards to certain key employees and consultants. The 1994 Plan was amended in 1999 primarily to increase the number of shares available for issuance under the Plan from 2,980,534 to 3,980,534. The 1994 Plan provides that no options may be granted after 10 years from the effective date of this plan. Options vest, in each case, as specified by the Company's compensation committee, generally over three years after issuance. At December 31, 2001, options representing 1,272,718 shares of common stock were available for grants.

The Company also adopted the 1994 Directors Stock Option Plan, which provides for the issuance of options to acquire a maximum of 600,000 shares of common stock to directors who are not part of management and are not affiliated with a major stockholder. As of December 31, 2001, 170,000 options had been granted.

The Company adopted the 1997 United Kingdom Scheme, which provides for the issuance of options to key employees under the 1994 Plan. As of December 31, 2001, 32,474 options had been granted.

Stock option activity under the plans is as follows:

|  | DECEMBER 31, 2001 | | DECEMBER 31, 2000 | | DECEMBER 25, 1999 | |
|---|---|---|---|---|---|---|
|  | NUMBER OF SHARES | WEIGHTED AVERAGE EXERCISE PRICE | NUMBER OF SHARES | WEIGHTED AVERAGE EXERCISE PRICE | NUMBER OF SHARES | WEIGHTED AVERAGE EXERCISE PRICE |
| Outstanding beginning of year | 4,344,432 | $ 5.47 | 4,720,955 | $ 5.70 | 3,141,195 | $ 6.23 |
| Awarded | 40,000 | 5.76 | 827,500 | 5.65 | 2,024,000 | 5.19 |
| Cancelled | (458,090) | 7.48 | (983,732) | 7.07 | (337,000) | 8.10 |
| Exercised | (1,095,422) | 4.31 | (220,291) | 3.99 | (107,240) | 3.99 |
| Outstanding at end of year | 2,830,920 | 5.59 | 4,344,432 | $ 5.47 | 4,720,955 | $ 5.70 |

The following table summarizes information about stock options outstanding at December 31, 2001:

| RANGE OF EXERCISE PRICE | NUMBER OF SHARES OUTSTANDING | WEIGHTED AVERAGE REMAINING LIFE | WEIGHTED AVERAGE EXERCISE PRICE |
|---|---|---|---|
| $3.99 -- $4.43 | 267,071 | 2.9 | 4.07 |
| $5.00 -- $6.00 | 1,925,000 | 7.6 | 5.19 |
| $6.01 -- $11.75 | 638,849 | 6.4 | 7.41 |

SFAS No. 123, "Accounting for Stock-Based Compensation", encourages companies to adopt the fair value method for compensation expense recognition related to employee stock options. The accounting requirements of Accounting Principles Board Opinion No. 25 ("APB No. 25") use the intrinsic value method in determining compensation expense, which represents the excess of the market price of the stock over the exercise price on the measurement date. The Company has elected to continue to utilize the accounting provisions of APB No. 25 for stock options, and is required to provide pro forma disclosures of net income and earnings per share had the Company adopted the fair value method for recognition purposes. The following information is presented as if the Company had adopted SFAS No. 123 and restated its results (in millions, except per share amounts):

**COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS--(CONTINUED)**

|  | FISCAL YEAR ENDED | | |
|---|---|---|---|
|  | DECEMBER 31, 2001 | DECEMBER 31, 2000 | DECEMBER 25, 1999 |
| Net income (loss): | | | |
|   As reported .......... | $ (46.2) | $ 4.5 | $ (10.2) |
|   Pro forma ........... | (48.6) | 2.1 | (12.4) |
| Basic and Diluted EPS: | | | |
|   As reported ......... | $ (0.47) | $ 0.07 | $ (0.16) |
|   Pro forma ........... | (0.50) | 0.03 | (0.20) |

For the above information, the fair value of each option grant was estimated on the date of grant using the Black-Scholes option pricing model with the following assumptions used for grants in fiscal 2001, 2000 and 1999: expected volatility was 99%, 53% and 84% in 2001, 2000 and 1999, respectively; expected lives of 10 years, which equals the lives of the grants; a risk free interest rate ranging from 4.24% to 7.32% and a zero expected dividend rate. The weighted average grant-date fair value of an option granted during fiscal 2001, 2000 and 1999 was $5.22, $4.11 and $4.50, respectively.

Because the SFAS No. 123 method of accounting has not been applied to options granted prior to January 28, 1995, the above pro forma amounts may not be representative of the compensation costs to be expected in future years.

## 17. INCOME TAXES

The provisions for income taxes applicable to continuing operations for fiscal 2001, 2000 and 1999 are summarized as follows (in millions):

|  | FISCAL YEAR ENDED | | |
|---|---|---|---|
|  | DECEMBER 31, 2001 | DECEMBER 31, 2000 | DECEMBER 25, 1999 |
| Current: | | | |
|   Federal ..................... | $ -- | $ -- | $ -- |
|   State ...................... | 2.6 | 1.5 | 2.1 |
|   Foreign .................... | 4.8 | 10.7 | 4.9 |
|  | 7.4 | 12.2 | 7.0 |
| Deferred: | | | |
|   Federal ..................... | (19.0) | (3.5) | (6.3) |
|   State ...................... | (1.3) | (0.2) | (0.5) |
|   Foreign .................... | (5.7) | (6.3) | -- |
|  | (26.0) | (10.0) | (6.8) |
| Income tax expense ......... | $ (18.6) | $ 2.2 | $ 0.2 |

F-30

COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS--(CONTINUED)

Domestic and foreign components of income (loss) from continuing operations before income taxes are summarized as follows (in millions):

|  | FISCAL YEAR ENDED | | |
|---|---|---|---|
|  | DECEMBER 31, 2001 | DECEMBER 31, 2000 | DECEMBER 25, 1999 |
| Domestic ......... | $ (35.8) | $ (11.9) | $ (16.6) |
| Foreign .......... | (32.5) | 12.7 | 15.4 |
|  | $ (68.3) | $ 0.8 | $ (1.2) |

A reconciliation between income taxes computed at the statutory U.S. Federal rate of 35% and the provisions for income taxes applicable to continuing operations is as follows (in millions):

|  | FISCAL YEAR ENDED | | |
|---|---|---|---|
|  | DECEMBER 31, 2001 | DECEMBER 31, 2000 | DECEMBER 25, 1999 |
| Amount at statutory Federal rate ............... | $ (23.9) | $ 0.3 | $ (0.4) |
| State taxes, net of Federal income tax ......... | 0.9 | 0.8 | 1.0 |
| Tax differential on foreign earnings ........... | 2.9 | (0.3) | (0.8) |
| Amortization of goodwill ....................... | 1.5 | 1.5 | 1.5 |
| Preferred stock dividend ....................... | 0.8 | -- | -- |
| Change in valuation allowance .................. | (1.2) | 0.4 | 0.3 |
| General business tax credits ................... | (0.5) | (1.1) | (2.0) |
| Other .......................................... | 0.9 | 0.6 | 0.6 |
| Income tax expense ............................. | $ (18.6) | $ 2.2 | $ 0.2 |

Deferred income taxes are provided for the temporary differences between the financial reporting and tax basis of the Company's assets and liabilities. The components of the net deferred tax assets as of December 31, 2001 and 2000 were as follows (in millions):

|  | DECEMBER 31, 2001 | DECEMBER 31, 2000 |
|---|---|---|
| Deferred tax assets: |  |  |
| Employee benefits, including postretirement benefits ......... | $ 78.5 | $ 37.9 |
| Net operating loss carryforwards (NOLs) ...................... | 134.6 | 116.2 |
| General business tax credits carryforwards .................. | 11.4 | 10.0 |
| Alternative minimum tax credit carryforwards ................ | 12.2 | 12.2 |
| Other liabilities and reserves .............................. | 36.1 | 41.1 |
| Valuation allowance ......................................... | (49.2) | (57.1) |
| Total deferred tax assets ................................... | 223.6 | 160.3 |
| Deferred tax liabilities: |  |  |
| Property, plant and equipment ............................... | (74.7) | (55.4) |
| Undistributed earnings of foreign subsidiaries .............. | (7.2) | (7.2) |
| Total deferred tax liabilities .............................. | (81.9) | (62.6) |
| Net deferred tax asset ...................................... | $ 141.7 | $ 97.7 |

The valuation allowance at December 31, 2001 and December 31, 2000 provides for certain deferred tax assets that in management's assessment may not be realized due to tax limitations on the use of such

F-31

COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS--(CONTINUED)

amounts, due to expiration prior to utilization or that relate to tax attributes that are subject to uncertainty due to the long-term nature of their realization. During fiscal 2001, the valuation allowance decreased $7.9 million from fiscal 2000. This decrease resulted primarily from the future expectation of increased pretax income due to current year acquisitions. During fiscal 2000, the valuation allowance increased $5.0 million from fiscal 1999. This increase resulted primarily from the increase in tax credit and loss carryforwards that may not be realized in future periods.

The above amounts have been classified in the consolidated balance sheets as follows (in millions):

|  | DECEMBER 31, 2001 | DECEMBER 31, 2000 |
|---|---|---|
| Deferred tax assets (liabilities): |  |  |
| Current domestic and foreign, included in other current assets..... | $ 25.3 | $ 19.1 |
| Current foreign, included in accrued expenses ..................... | (2.1) | (2.6) |
| Noncurrent domestic and foreign ................................... | 136.5 | 97.3 |
| Noncurrent foreign, included in other noncurrent liabilities ...... | (18.0) | (16.1) |
|  | $ 141.7 | $ 97.7 |

Management has reviewed the Company's operating results for recent years as well as the outlook for its continuing operations and concluded that it is more likely than not that the net deferred tax assets of $141.7 million at December 31, 2001 will be realized. Management took into consideration, among other factors, the expected impact of current year acquisitions, the impact of recent restructuring plans, and the infusion of cash from Heartland. These factors along with the timing of the reversal of its temporary differences, certain tax planning strategies and the expiration date of its NOLs were also considered in reaching this conclusion. The Company's ability to generate future taxable income is dependent on numerous factors, including general economic conditions, the state of the automotive industry and other factors beyond management's control. Therefore, there can be no assurance that the Company will meet its expectation of future taxable income.

Deferred income taxes and withholding taxes have been provided on earnings of the Company's foreign subsidiaries to the extent it is anticipated that the earnings will be remitted in the future as dividends. Deferred income taxes and withholding taxes have not been provided on the remaining undistributed earnings of foreign subsidiaries as such amounts are deemed to be permanently reinvested. The cumulative undistributed earnings as of December 31, 2001 on which the Company has not provided deferred income taxes and withholding taxes is approximately $317.0 million.

At December 31, 2001, the Company had the following tax attribute carryforwards available for U.S. Federal income tax purposes (in millions):

F-32

COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS--(CONTINUED)

|  | AMOUNT | EXPIRATION DATES |
|---|---|---|
| Net operating losses -- regular tax: | | |
| Preacquisition, subject to limitations .......... | $ 4.7 | 2002-2009 |
| Subject to change in control provisions ......... | 11.7 | 2002-2007 |
| Subject to change in control provisions ......... | 103.2 | 2008-2012 |
| Subject to change in control provisions ......... | 199.6 | 2018-2021 |
| Unrestricted ................................... | 23.8 | 2021 |
| | $ 343.0 | |
| Net operating losses -- alternative minimum tax: | | |
| Preacquisition, subject to limitations .......... | $ 2.6 | 2002-2009 |
| Subject to change in control provisions ......... | 10.6 | 2002-2007 |
| Subject to change in control provisions ......... | 69.7 | 2008-2012 |
| Subject to change in control provisions ......... | 205.7 | 2018-2021 |
| Unrestricted ................................... | 20.3 | 2021 |
| | $ 308.9 | |
| General business tax credits: | | |
| Preacquisition, subject to limitations .......... | $ .6 | 2002-2003 |
| Subject to change in control provisions ......... | 9.0 | 2004-2021 |
| Unrestricted ................................... | .2 | 2021 |
| | $ 9.8 | |
| Alternative minimum tax credits .................. | $ 12.2 | |

As a result of the Heartland Transaction, a change in control occurred which results in annual limitations on the Company's use of its NOLs and unused tax credits. This annual limitation on the use of NOLs and tax credits depends on the value of the equity of the Company and the amount of "built-in gain" or "built-in loss" in the Company's assets at the date of the change in control. Based on the expiration dates of the NOLs and tax credits as well as anticipated levels of domestic income, management does not believe that the transaction will have a material impact on these deferred tax assets.

Future sales of common stock by the Company or its principal stockholders, or changes in the composition of its principal stockholders, could constitute a change in control that would result in additional annual limitations on the Company's use of its NOLs and unused tax credits. Management cannot predict whether such a change in control will occur.

Income taxes paid, net of refunds received, were $15.5 million, $4.8 million and $3.0 million for fiscal 2001, 2000 and 1999, respectively.

## 18. DISCLOSURES ABOUT FAIR VALUE OF FINANCIAL INSTRUMENTS

The estimated fair values of the Company's continuing operations financial instruments are summarized as follows (in millions):

|  | DECEMBER 31, 2001 | | DECEMBER 31, 2000 | |
|---|---|---|---|---|
|  | CARRYING AMOUNT | ESTIMATED FAIR VALUE | CARRYING AMOUNT | ESTIMATED FAIR VALUE |
| Long-term debt .............................. | $ 1,301.9 | $ 1,232.4 | $ 884.0 | $ 812.1 |
| Mandatorily redeemable preferred stock of subsidiary ........ | $ 147.7 | $ 147.7 | $ -- | $ -- |

F-33

COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS--(CONTINUED)

The following methods and assumptions were used to estimate these fair values:

Short-Term and Long-Term Debt -- The fair value of the Senior Subordinated Notes is based upon quoted market price. The fair value of the other long-term debt of the Company including the Preferred stock, along with the Company's and short-term debt approximates the carrying value.

Carrying amounts reported in the consolidated balance sheets for cash and cash equivalents, accounts and other receivables, accounts payable and accrued expenses approximate fair value due to the short-term nature of these instruments.

Fair value estimates are made at a specific point in time, based on relevant market information about the financial instruments. These estimates are subjective in nature and involve uncertainties and matters of significant judgement and therefore, cannot be determined with precision. Changes in assumptions could significantly affect these estimates.

19. RELATED PARTY TRANSACTIONS

During the first quarter of 2001, Heartland acquired a controlling interest equal to approximately 60% of the Company through a purchase of 25 million shares of common stock from the Company and a purchase of 27 million shares from Blackstone Partners and WP Partners. In the sale, the Company received gross proceeds of $125.0 million, or approximately $95.0 million after fees and expenses associated with the transactions. The purchase price also gave the Company a profit participation right on certain future common stock sales by Heartland. As a result of the transaction, Heartland is entitled to designate a majority of the Company's Board of Directors. Prior to the transaction, as of December 31, 2000, Blackstone Partners and WP Partners collectively owned approximately 87% of the Common Stock of the Company. In connection with the Heartland Transaction, the Company paid Heartland a transaction fee of $12.0 million and paid WP Partners an investment banking fee of $2.0 million.

During the first quarter of 2001, the Amended and Restated Stockholders' Agreement was terminated and a new, 10 year Services Agreement was entered into between the Company, Products and Heartland. Under this Services Agreement, the Company will pay Heartland an annual advisory fee of $4.0 million. The Services Agreement also provides for the Company to pay a 1% transaction fee on certain acquisitions and divestitures commencing on or after February 23, 2002. Under the former Amended and Restated Stockholders' Agreement among the Company, Products, Blackstone Partners and WP Partners, the Company paid each of Blackstone Partners and WP Partners, or their respective affiliates, an annual monitoring fee of $1.0 million.

In December 2001, Heartland, and certain co-investors that include a director of the Company, purchased an additional 32 million shares of common stock at a price of $5.00 per share, as part of the financing for the TAC-Trim acquisition. The average closing price of the stock three days before and three day after the definitive agreement announcement date was $8.94. Additionally, the Company paid Heartland transaction fees of $12.5 million in connection with the TAC-Trim acquisition. The Company also reimbursed Heartland for $1.5 million of expenses that Heartland incurred in relation to the Becker acquisition. (See Note 3)

As part of the TAC-Trim acquisition, the Company entered into three intellectual property license agreements with Textron. In two of these agreements, the Company licenses back to Textron certain intellectual property that was acquired in the transaction. In the third agreement, the Company licenses from Textron other intellectual property that was not acquire in the transaction. In addition, under the TAC-Trim acquisition agreement, we are permitted to use the "Textron" name for 18 months in exchange for payments of $13.0 million on December 15, 2002 and $6.5 million on December 15, 2003.

Prior to the TAC-Trim acquisition, TAC-Trim entered into an $86.9 million sale and leaseback transaction (the "Textron Leasing Transaction") with two separate single purpose affiliates of Textron Financial Corporation, as lessor and purchaser, with respect to a portfolio of manufacturing equipment

F-34

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS--(CONTINUED)

situated in different locations throughout the United States and Canada. Payments under the Textron Leasing Transaction are guaranteed by Products and secured by a first perfected mortgage lien over certain real property with a value equal to $25 million. Each Lease is for an initial term of three (3) years with three one (1) year renewal options. As is customary, the documentation for the Textron Leasing Transaction incorporates covenants by reference, from the new Senior Credit Facility, that may be amended or waived by the senior lenders, and also contain events of default.

During 2001, the Company entered into sale and leaseback transactions for certain non-manufacturing properties with entities that are controlled by one of the Company's current directors and shareholders. In connection with these sale-leaseback transactions, Products sold and contemporaneously leased back real property located in Troy, Michigan and Plymouth, Michigan for net proceeds of $15.1 million in aggregate. The initial lease term in each transaction is 20 years and each lease has two successive ten year renewal options. The basic rent for the Troy, Michigan property is $1.3 million per year, and the basic rent for the Plymouth, Michigan property is $0.5 million per year. The rental rates in each case are subject to adjustment after expiration of the initial term.

Additionally, in connection with the Joan acquisition, the Company entered into a Supply Agreement and a Transition Service Agreement with entities controlled by the former owner of Joan who is currently a director and shareholder of the Company. Under the Supply Agreement, the Company has agreed to purchase all of its requirements for flat woven automotive fabric from the controlled entities for a five-year period beginning on the date of the Supply Agreement. The prices for fabric under the agreement will equal the costs of the raw materials plus an amount that represents the entities' standard labor and overhead costs incurred in manufacturing fabric. Under Transition Service Agreement an entity controlled by the director will provide Products with transitional and support services for a period not to exceed twelve months in order to support the continued and uninterrupted operation of the businesses acquired by Products in the Joan acquisition. As a part of these services, pending disassembly and removal of machinery and equipment purchased as part of the acquisition, the controlled entity will use that machinery and equipment to manufacture all of the Company's requirements for some types of knitted and woven automotive fabrics.

On December 31, 2001, Heartland owned approximately 40% of the outstanding shares of the Company; Blackstone Partners' and WP Partners' owned approximately 15%; Joan Fabrics Corp., Mr. Elkin McCallum and associates owned approximately 8%; Mr. Charles E. Becker and Textron, Inc. each owned approximately 11%.

## 20. INFORMATION ABOUT THE COMPANY'S OPERATIONS

On February 10, 1999, the Company announced the Reorganization, a comprehensive plan to reorganize its global automotive carpet, acoustics, plastics and accessory floormats businesses into two divisions: North American Automotive Interior Systems, headquartered in the Detroit metropolitan area, and European Automotive Interior Systems, headquartered in Germany. As part of the Reorganization, the Company also established the Specialty Automotive Products division, which includes the Company's automotive fabrics and Dura Convertible Systems businesses. North American Automotive Interior Systems and European Automotive Interior Systems include the following product groups: molded floor carpet, luggage compartment trim, acoustical products, accessory floormats and plastic-based interior systems. The Specialty Automotive Products division includes automotive fabrics and convertible top systems. The three divisions also produce other automotive and non-automotive products.

The accounting policies of the divisions are the same as those described in the Summary of Significant Accounting Policies (See Note 2). The Company evaluates performance based on profit or loss from operations before interest expense, foreign exchange gains and losses, loss on sale of receivables, other income and expense and income taxes.

COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS--(CONTINUED)

Information about the Company's divisions is presented below (in millions):

| | YEAR ENDED DECEMBER 31, 2001 | | | | |
| | NORTH AMERICAN AUTOMOTIVE INTERIOR SYSTEMS | EUROPEAN AUTOMOTIVE INTERIOR SYSTEMS | SPECIALTY AUTOMOTIVE PRODUCTS | OTHER(A) | TOTAL |
|---|---|---|---|---|---|
| External revenues | 1,145.0 | 258.2 | 420.1 | | 1,823.3 |
| Inter-segment revenues | 12.0 | 30.2 | 0.2 | (42.4) | -- |
| Goodwill amortization | 6.3 | 0.7 | 0.1 | -- | 7.1 |
| Depreciation, amortization and subsidiary preferred stock requirements | 40.2 | 20.7 | 14.5 | 1.8 | 77.2 |
| Operating income (loss) | 73.9 | (22.3) | 13.0 | (29.0) | 35.6 |
| Total assets | 1,893.6 | 308.2 | 452.2 | 333.9 | 2,987.9 |
| Capital expenditures | 27.9 | 12.1 | 12.2 | 2.3 | 54.5 |
| Goodwill, net | 1,037.4 | 23.3 | 193.1 | -- | 1,253.8 |

| | FISCAL YEAR ENDED DECEMBER 31, 2000 | | | | |
| | NORTH AMERICAN AUTOMOTIVE INTERIOR SYSTEMS | EUROPEAN AUTOMOTIVE INTERIOR SYSTEMS | SPECIALTY AUTOMOTIVE PRODUCTS | OTHER(A) | TOTAL |
|---|---|---|---|---|---|
| External revenues | $ 1,175.6 | $ 284.5 | $ 441.7 | $ -- | $ 1,901.8 |
| Inter-segment revenues | 22.3 | 34.7 | 33.8 | (90.8) | -- |
| Goodwill amortization | 5.3 | 0.7 | 1.1 | -- | 7.1 |
| Depreciation and amortization | 38.0 | 15.9 | 12.4 | 1.4 | 67.7 |
| Operating income (loss) | 87.2 | 1.1 | 22.8 | ( 3.0) | 108.1 |
| Total assets | 696.8 | 228.6 | 234.6 | 120.3 | 1,280.3 |
| Capital expenditures | 34.3 | 18.3 | 15.6 | 0.8 | 69.0 |
| Goodwill, net | 182.0 | 26.2 | 37.3 | -- | 245.5 |

| | FISCAL YEAR ENDED DECEMBER 25, 1999 | | | | |
| | NORTH AMERICAN AUTOMOTIVE INTERIOR SYSTEMS | EUROPEAN AUTOMOTIVE INTERIOR SYSTEMS | SPECIALTY AUTOMOTIVE PRODUCTS | OTHER(A) | TOTAL |
|---|---|---|---|---|---|
| External revenues | $ 1,151.7 | $ 306.4 | $ 440.5 | $ -- | $ 1,898.6 |
| Inter-segment revenues | 85.2 | 27.4 | 16.7 | (129.3) | -- |
| Goodwill amortization | 5.2 | 0.7 | 1.1 | -- | 7.0 |
| Depreciation and amortization | 33.4 | 16.5 | 13.7 | 0.8 | 64.4 |
| Operating income (loss) | 89.3 | 2.3 | 39.6 | ( 32.7) | 98.5 |
| Total assets | 799.0 | 241.6 | 234.7 | 73.6 | 1,348.9 |
| Capital expenditures | 45.7 | 23.5 | 12.7 | 4.5 | 86.4 |
| Goodwill, net | 190.1 | 27.4 | 38.9 | -- | 256.4 |

(a) Other includes the Company's discontinued operations (See Note 14), non-operating units, the effect of eliminating entries and restructuring charges (See Note 15).

(b) Includes goodwill acquired in 2001 business combination of $860.8, $0, $155.8, $0 and $1,016.6, respectively.

Sales by product groups follow (in millions):

F-36

COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS--(CONTINUED)

|  | FISCAL YEAR ENDED | | |
|---|---|---|---|
|  | DECEMBER 31, 2001 | DECEMBER 31, 2000 | DECEMBER 25, 1999 |
| Molded floor carpet | $ 476.6 | $ 458.2 | $ 468.0 |
| Luggage compartment trim | 61.4 | 71.0 | 90.6 |
| Acoustical products | 222.9 | 231.4 | 209.8 |
| Accessory floormats | 148.7 | 160.4 | 165.9 |
| Plastic-based interior trim systems | 403.6 | 452.1 | 435.4 |
| Automotive fabrics | 278.5 | 290.5 | 269.5 |
| Convertible top systems | 118.4 | 105.2 | 118.9 |
| Other | 113.2 | 133.0 | 140.5 |
| Total | $ 1,823.3 | $ 1,901.8 | $ 1,898.6 |

The Company performs periodic credit evaluations of its customers' financial condition. Although the Company does not generally require collateral, it does require cash payments in advance when the assessment of credit risk associated with a customer is substantially higher than normal. Receivables generally are due within 45 days, and credit losses have consistently been within management's expectations and are provided for in the consolidated financial statements.

Direct and indirect sales to significant customers in excess of ten percent of consolidated net sales from continuing operations follow:

|  | FISCAL YEAR ENDED | | |
|---|---|---|---|
|  | 2001 | 2000 | 1999 |
| General Motors Corporation | 29.0% | 31.4% | 31.5% |
| Ford Motor Company | 21.5% | 20.6% | 20.4% |
| DaimlerChrysler AG | 18.7% | 16.8% | 18.9% |

Information about the Company's continuing operations in different geographic areas for fiscal 2001, 2000 and 1999 is presented below (in millions):

|  | YEAR ENDED DECEMBER 31, 2001 | | FISCAL YEAR ENDED DECEMBER 31, 2000 | | FISCAL YEAR ENDED DECEMBER 25, 1999 | |
|---|---|---|---|---|---|---|
|  | NET SALES | LONG-LIVED ASSETS | NET SALES | LONG-LIVED ASSETS | NET SALES | LONG-LIVED ASSETS |
| United States | $ 1,346.0 | $ 1,548.0 | $ 1,123.6 | $ 518.5 | $ 1,092.6 | $ 550.8 |
| Canada | 168.5 | 101.9 | 407.6 | 85.1 | 398.4 | 87.7 |
| Mexico | 50.5 | 52.9 | 86.1 | 26.2 | 101.2 | 20.3 |
| United Kingdom | 117.3 | 71.8 | 117.2 | 54.3 | 121.7 | 64.3 |
| Other (a) | 141.0 | 337.8 | 167.3 | 73.9 | 184.7 | 74.2 |
| Consolidated | $ 1,823.3 | $ 2,112.4 | $ 1,901.8 | $ 758.0 | $ 1,898.6 | $ 797.3 |

(a) Other includes South America, Asia and Europe including Sweden, Spain, Belgium, Germany, Austria, France, the Netherlands and the Czech Republic.

Intersegment sales between geographic areas are not material. For fiscal years 2001, 2000 and 1999, export sales from the United States to foreign countries were $146.2 million, $87.2 million and $84.7 million, respectively.

F-37

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS--(CONTINUED)

21. COMMITMENTS AND CONTINGENCIES

## ENVIRONMENTAL

The Company is subject to federal, state, local and foreign environmental, and health and safety, laws and regulations that (i) affect ongoing operations and may increase capital costs and operating expenses in order to maintain compliance with such requirements and (ii) impose liability relating to contamination at facilities, and at other locations such as former facilities, facilities where we have sent wastes for treatment or disposal, and other properties to which the Company may be linked. Such liability may include, for example, investigation and clean-up of the contamination, personal injury and property damage caused by the contamination, and damages to natural resources. Some of these liabilities may be imposed without regard to fault, and may also be joint and several (which can result in a liable party being held responsible for the entire obligation, even where other parties are also liable).

Management believes that it has obtained, and is in material compliance with, those material environmental permits and approvals necessary to conduct our various businesses. Environmental compliance costs for continuing businesses are accounted for as normal operating expenses or capital expenditures, except for certain costs incurred at acquired locations. Environmental compliance costs relating to conditions existing at the time of an acquisition are generally charged to reserves established in purchase accounting. The Company accrues for environmental remediation costs when such obligations are known and reasonably estimable. In the opinion of management, based on the facts presently known to it, such environmental compliance and remediation costs will not have a material effect on our business, consolidated financial condition, future results of operations or cash flows.

The Company is legally or contractually responsible or alleged to be responsible for the investigation and remediation of contamination at various sites, and for personal injury or property damages, if any, associated with such contamination. At some of these sites we have been notified that we are a potentially responsible party ("PRP") under the federal Superfund law or similar state laws. Other sites at which we may be responsible for contamination may be identified in the future, including with respect to divested and acquired businesses.

The Company is currently engaged in investigating or remediating certain sites. In estimating our cost of investigation and remediation, we have considered, among other things, our prior experience in remediating contaminated sites, remediation efforts by other parties, data released by the United States Environmental Protection Agency ("USEPA"), the professional judgment of our environmental experts, outside environmental specialists and other experts, and the likelihood that other identified PRPs will have the financial resources to fulfill their obligations at sites where they and we may be jointly and severally liable. It is difficult to estimate the total cost of investigation and remediation due to various factors including: incomplete information regarding particular sites and other PRPs; uncertainty regarding the nature and extent of environmental problems and our share, if any, of liability for such problems; the ultimate selection among alternative approaches by governmental regulators; the complexity and evolving nature of environmental laws, regulations and governmental directives; and changes in cleanup standards.

The Company is working with the Michigan Department of Environmental Quality (MDEQ) to investigate and remediate soil and groundwater contamination at a former company manufacturing plant in Mancelona, MI and at adjacent owned property formerly used for the treatment and disposal of plating waste. MDEQ is likely to require remediation of groundwater. In addition, the Company is incurring costs in connection with the provision of alternate water supplies to residences in the area.

The current owner of one of the Company's former manufacturing plants located in Bowling Green, OH has entered into an Administrative Order on Consent with the Ohio Environmental Protection Agency (OEPA) requiring investigation and remediation of contamination at the site. The Company is reimbursing the current owner for costs associated with ongoing groundwater monitoring and, following selection of an appropriate remedy by OEPA, will assume 90% of future remediation costs.

F-38

COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS--(CONTINUED)

In the 1980's and 1990's, the California Regional Water Quality Control Board (CRWQCB) and other state agencies ordered a predecessor of ours to investigate and remediate soil and groundwater contamination at a former lumber treatment plant in Elmira, Ca. In 1996, the Company entered into an agreement with the State of California to conduct long-term operation and maintenance of the remedy implemented at the site.

The Company has established accounting reserves for certain contingent environmental liabilities and management believes such reserves comply with generally accepted accounting principles. The Company records reserves for environmental investigatory and non-capital remediation costs when litigation has commenced or a claim or assessment has been asserted or is imminent, the likelihood of an unfavorable outcome is probable, and the financial impact of such outcome is reasonably estimable. At January 1, 2001 the reserve aggregated $37.0 million. During 2001 reserves associated with acquired companies aggregated $23.6 million and net deductions aggregated $1.0 million. As of December 31, 2001, total reserves for those contingent environmental liabilities are approximately $59.6 million.

In the opinion of management, based on information presently known to it, identified environmental costs and contingencies will not have a material effect on our consolidated financial condition, future results of operations or cash flows. However, we can give no assurance that we have identified or properly assessed all potential environmental liability arising from our business or properties, and those of our present and former subsidiaries and their corporate predecessors.

## LITIGATION

The Company and its subsidiaries have lawsuits and claims pending against them and have certain guarantees outstanding which were made in the ordinary course of business.

The ultimate outcome of the legal proceedings to which the Company is a party will not, in the opinion of the Company's management based on the facts presently known to it, have a material effect on the Company's consolidated financial condition, future results of operations or cash flows.

## OTHER COMMITMENTS

As of December 31, 2001, the Company's continuing operations had approximately $8.2 million in outstanding capital expenditure commitments. The majority of the leased properties of the Company's previously divested businesses have been assigned to third parties. Although releases have been obtained from the lessors of certain properties, C&A Products remains contingently liable under most of the leases. C&A Products' future liability for these leases, in management's opinion, based on the facts presently known to it, will not have a material effect on the Company's consolidated financial condition, future results of operations or cash flows.

22. QUARTERLY FINANCIAL DATA (UNAUDITED)

The quarterly financial data is summarized below (in millions, except per share amounts).

|  | 2001 | | | |
|  | FIRST QUARTER | SECOND QUARTER | THIRD QUARTER | FOURTH QUARTER |
|---|---|---|---|---|
| Net sales | $ 453.1 | $ 457.6 | $ 430.5 | $ 482.1 |
| Gross margin | 58.8 | 64.3 | 53.4 | 42.3 |
| Income (loss) from continuing operations | (7.1) | 1.8 | (13.8) | (30.6) |
| Income (loss) before extraordinary operations | (7.1) | 9.2 | (12.4) | (30.6) |
| Net income (loss) | (7.4) | 9.2 | (12.4) | (35.6) |
| Basic and diluted earnings (loss) per share | (.10) | .11 | (.12) | (.29) |
| Common stock prices: | | | | |

F-39

COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS--(CONTINUED)

|  | 2001 | | | |
|---|---|---|---|---|
|  | FIRST QUARTER | SECOND QUARTER | THIRD QUARTER | FOURTH QUARTER |
| High ........................................... | 5.6875 | 6.2000 | 8.5700 | 10.3000 |
| Low ............................................ | 3.5800 | 4.0500 | 3.9500 | 4.7600 |

|  | 2000 | | | |
|---|---|---|---|---|
|  | FIRST QUARTER | SECOND QUARTER | THIRD QUARTER | FOURTH QUARTER |
| Net sales ...................................... | $ 534.8 | $ 507.2 | $ 423.0 | $ 436.8 |
| Gross margin ................................... | 83.7 | 84.1 | 53.2 | 45.6 |
| Income (loss) from continuing operations ..... | 7.0 | 11.1 | ( 4.1) | ( 15.4) |
| Income (loss) before extraordinary operations ........ | 7.0 | 17.7 | ( 4.1) | ( 15.4) |
| Net income (loss) ............................. | 7.0 | 17.7 | ( 4.8) | ( 15.4) |
| Basic and diluted earnings (loss) per share .......... | .11 | .29 | ( .08) | ( .25) |
| Common stock prices: |  |  |  |  |
| High .......................................... | 6.1250 | 7.0000 | 6.1250 | 4.9375 |
| Low ........................................... | 4.5000 | 5.1250 | 4.6875 | 2.8750 |

The Company's operations are not subject to significant seasonal influences.

## 23. EARNINGS PER SHARE

The Company adopted SFAS No. 128, "Earnings Per Share," in December 1997. Basic earnings per common share were computed by dividing net income (loss) by the weighted average number of shares of common stock outstanding during the year. Diluted earnings per common share were determined assuming the exercise of the stock options issued under the Company's stock option plans (See Note 16). There were no reconciling items between basic earnings per common share and diluted earnings per common share for 2001, 2000 and 1999.

In 2001, 2000 and 1999, potentially dilutive securities have been excluded from the diluted earnings per share calculation since their inclusion would have been antidilutive. At December 31, 2001, the Company's potentially dilutive securities included 2.8 million stock options with a weighted average exercise price of $5.59 and 0.5 million warrants with an exercise price of $5.00. At December 31, 2000 and December 25, 1999, the Company's potentially dilutive securities included 4.3 million and 4.7 million stock options, respectively, with weighted average exercise prices of $5.47 and $5.70, respectively.

## 24. CONSOLIDATING FINANCIAL STATEMENTS

Products issued 10 3/4% Senior Subordinated Notes due 2011 in a total principal amount of $500.0 million in December 2001. These notes are guaranteed by certain subsidiaries of the Company (Guarantor Subsidiaries). The Guarantor Subsidiaries also guaranteed the Company's previously existing old Bank Credit Facilities (as defined in Note 10).

COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES

SUPPLEMENTAL GUARANTOR CONDENSED CONSOLIDATING FINANCIAL STATEMENTS
CONSOLIDATING STATEMENT OF INCOME

FOR THE YEAR ENDED DECEMBER 31, 2001

| | PARENT | ISSUER | GUARANTORS | NON-GUARANTORS | ELIMINATIONS | CONSOLIDATED TOTAL |
|---|---|---|---|---|---|---|
| | | | | (IN MILLIONS) | | |
| **OPERATING INCOME** | | | | | | |
| Net sales ............................. | $  -- | $ 612.2 | $ 676.4 | $ 577.1 | $ (42.4) | $ 1,823.3 |
| Cost of goods sold ..................... | -- | 506.3 | 598.2 | 542.4 | (42.4) | 1,604.5 |
| Selling, general & administrative | | | | | | |
| Expenses ........................... | 0.1 | 34.9 | 81.1 | 48.3 | -- | 164.4 |
| Restructuring charge and | | | | | | |
| impairment of long-lived assets ...... | -- | 7.3 | .9 | 10.6 | -- | 18.8 |
| **OPERATING INCOME (LOSS)** ............... | (0.1) | 63.7 | (3.8) | (26.2) | -- | 35.6 |
| Interest expense, net .................. | -- | 45.6 | 35.9 | 2.8 | -- | 84.3 |
| Intercompany interest expense | | | | | | |
| (income) ........................... | -- | 17.3 | (24.7) | 7.4 | -- | -- |
| Loss on sale of receivables ............ | -- | 6.1 | -- | 4.7 | -- | 10.8 |
| Subsidiaries preferred stock | | | | | | |
| Requirements ........................ | -- | 2.4 | -- | -- | -- | 2.4 |
| Other expense (income), net ............ | -- | 5.0 | 2.9 | 1.8 | (3.3) | 6.4 |
| **INCOME (LOSS) FROM CONTINUING** | | | | | | |
| OPERATIONS BEFORE INCOME TAXES ......... | (0.1) | (12.7) | (17.9) | (40.9) | 3.3 | (68.3) |
| Income tax expense (benefit) ........... | 0.2 | (11.9) | (5.6) | (1.3) | -- | (18.6) |
| **INCOME (LOSS) FROM CONTINUING** | | | | | | |
| OPERATIONS ........................... | (0.3) | (.8) | (12.3) | (39.6) | 3.3 | (49.7) |
| DISCONTINUED OPERATIONS INCOME .......... | -- | (8.8) | -- | -- | -- | (8.8) |
| EXTRAORDINARY LOSS ...................... | -- | 5.0 | 0.3 | -- | -- | 5.3 |
| EQUITY IN NET (INCOME) LOSS OF | | | | | | |
| SUBSIDIARIES ......................... | 45.9 | 48.9 | 33.5 | -- | (128.3) | -- |
| **NET INCOME (LOSS)** ..................... | $ (46.2) | $ (45.9) | $ (46.1) | $ (39.6) | $ 131.6 | $ (46.2) |

F-39

COLLINS & AIRMAN CORPORATION AND SUBSIDIARIES

SUPPLEMENTAL GUARANTOR CONDENSED CONSOLIDATING FINANCIAL STATEMENTS
CONSOLIDATING STATEMENT OF INCOME

FOR THE YEAR ENDED DECEMBER 31, 2000

| | PARENT | ISSUER | GUARANTORS | NON-GUARANTORS | ELIMINATIONS | CONSOLIDATED TOTAL |
|---|---|---|---|---|---|---|
| | | | | (IN MILLIONS) | | |
| **OPERATING INCOME** | | | | | | |
| Net sales ........................... | $   -- | $ 547.7 | $ 619.6 | $ 815.4 | $ (80.9) | $ 1,901.8 |
| Cost of goods sold ................... | -- | 464.4 | 554.1 | 697.6 | (80.9) | 1,635.2 |
| Selling, general & administrative Expenses ........................... | 0.1 | 36.0 | 53.5 | 68.9 | -- | 158.5 |
| OPERATING INCOME (LOSS) .............. | (0.1) | 47.3 | 12.0 | 48.9 | -- | 108.1 |
| Interest expense(income) ............. | (0.1) | 86.8 | 7.4 | 2.5 | -- | 96.6 |
| Intercompany interest expense (income) ........................... | -- | 19.9 | (16.2) | (3.7) | -- | -- |
| Loss on sale of receivables ......... | -- | 1.6 | -- | 7.6 | -- | 9.2 |
| Other expense (income), net ......... | -- | 2.1 | (13.6) | 9.9 | 3.1 | 1.5 |
| INCOME (LOSS) FROM CONTINUING OPERATIONS BEFORE INCOME TAXES ...... | -- | (63.1) | 34.4 | 32.6 | (3.1) | 0.8 |
| Income tax expense (benefit) ........ | -- | (24.1) | 15.3 | 12.2 | (1.2) | 2.2 |
| INCOME (LOSS) FROM CONTINUING OPERATIONS ........................ | -- | (39.0) | 19.1 | 20.4 | (1.9) | (1.4) |
| DISCONTINUED OPERATIONS INCOME ....... | -- | (6.6) | -- | -- | -- | (6.6) |
| EXTRAORDINARY LOSS ................... | -- | -- | 0.7 | -- | -- | 0.7 |
| EQUITY IN NET (INCOME) LOSS OF SUBSIDIARIES ....................... | (4.5) | (36.9) | (9.2) | -- | 50.6 | -- |
| NET INCOME (LOSS) ................... | $ 4.5 | $ 4.5 | $ 27.6 | $ 20.4 | $ (52.5) | $ 4.5 |

F-40

# COLLINS & AIRMAN CORPORATION AND SUBSIDIARIES

## SUPPLEMENTAL GUARANTOR CONDENSED CONSOLIDATING FINANCIAL STATEMENTS
## CONSOLIDATING STATEMENT OF INCOME

FOR THE YEAR ENDED DECEMBER 25, 1999

|  | PARENT | ISSUER | GUARANTORS | NON-GUARANTORS | ELIMINATIONS | CONSOLIDATED TOTAL |
|---|---|---|---|---|---|---|
|  | | | (IN MILLIONS) | | | |
| OPERATING INCOME | | | | | | |
| Net sales | $  -- | $ 547.7 | $ 616.9 | $ 837.8 | $ (103.8) | $ 1,898.6 |
| Cost of goods sold | -- | 447.3 | 555.6 | 714.8 | (103.8) | 1,613.9 |
| Selling, general & administrative expenses | 0.5 | 53.6 | 38.7 | 60.0 | -- | 152.8 |
| Restructuring charge and impairment of long-lived assets | -- | 6.9 | 16.4 | 10.1 | -- | 33.4 |
| OPERATING INCOME (LOSS) | (0.5) | 39.9 | 6.2 | 52.9 | -- | 98.5 |
| Interest expense (income) | (0.1) | 79.5 | 8.8 | 3.9 | -- | 92.1 |
| Intercompany interest expense (income) | -- | 22.1 | (15.4) | (6.7) | -- | -- |
| Loss on sale of receivables | -- | -- | -- | 5.4 | -- | 5.4 |
| Other expense, (income) net | -- | 7.5 | (19.3) | 7.3 | 6.7 | 2.2 |
| INCOME (LOSS) FROM CONTINUING OPERATIONS BEFORE INCOME TAXES | (0.4) | (69.2) | 32.1 | 43.0 | (6.7) | (1.2) |
| Income tax expense (benefit) | -- | (26.2) | 13.6 | 15.4 | (2.6) | 0.2 |
| INCOME (LOSS) FROM CONTINUING OPERATIONS | (0.4) | (43.0) | 18.5 | 27.6 | (4.1) | (1.4) |
| CUMULATIVE EFFECT OF ACCOUNTING CHANGE | -- | 2.4 | 4.0 | 2.4 | -- | 8.8 |
| EQUITY IN NET (INCOME) LOSS OF SUBSIDIARIES | 9.8 | (35.6) | (6.1) | -- | 31.9 | -- |
| NET INCOME (LOSS) | $ (10.2) | $ (9.8) | $ 20.6 | $ 25.2 | $ (36.0) | $ (10.2) |

F-41

## COLLINS & AIRMAN CORPORATION AND SUBSIDIARIES

### SUPPLEMENTAL GUARANTOR CONDENSED CONSOLIDATING FINANCIAL STATEMENTS
### CONSOLIDATING BALANCE SHEET

|  | PARENT | ISSUER | GUARANTORS | NON-GUARANTORS | ELIMINATIONS | CONSOLIDATED TOTAL |
|---|---|---|---|---|---|---|
| FOR THE YEAR ENDED DECEMBER 31, 2001 | | | | | | |
| (IN MILLIONS) | | | | | | |
| **ASSETS** | | | | | | |
| **Current Assets** | | | | | | |
| Cash and cash equivalents .................... | $ 0.2 | $ (3.8) | $ 12.7 | $ 64.8 | $ -- | $ 73.9 |
| Accounts and other receivables, net ......... | -- | 8.7 | 140.6 | 250.9 | 5.9 | 406.1 |
| Inventories ................................. | -- | 37.6 | 55.7 | 39.3 | -- | 132.6 |
| Other ....................................... | -- | 8.6 | 71.4 | 51.9 | -- | 131.9 |
| Total current assets ........................ | 0.2 | 51.1 | 280.4 | 406.9 | 5.9 | 744.5 |
| Investment in subsidiaries .................. | 374.5 | 1,784.9 | 396.5 | -- | (2,555.9) | -- |
| Property, plant and equipment, net .......... | -- | 63.9 | 254.7 | 294.0 | -- | 612.6 |
| Goodwill, net ............................... | -- | 23.7 | 1,101.3 | 133.0 | (4.2) | 1,253.8 |
| Other assets ................................ | -- | 195.9 | 106.6 | 74.5 | -- | 377.0 |
|  | 374.5 | 2,068.4 | 1,859.1 | 501.5 | (2,560.1) | 2,243.4 |
|  | $ 374.7 | $ 2,119.5 | $ 2,139.5 | $ 908.4 | $ (2,554.2) | $ 2,987.9 |
| **LIABILITIES & STOCKHOLDERS' EQUITY (DEFICIT)** | | | | | | |
| **Current Liabilities** | | | | | | |
| Short-term borrowings ....................... | -- | 10.1 | 0.1 | 25.5 | -- | 35.7 |
| Current portion of long-term debt ........... | -- | 18.0 | (0.1) | 1.6 | -- | 19.5 |
| Accounts payable ............................ | -- | 100.2 | 247.5 | 121.0 | -- | 468.7 |
| Accrued expenses ............................ | -- | 65.9 | 83.7 | 90.1 | -- | 239.7 |
| Total current liabilities ................... | -- | 194.2 | 331.2 | 238.2 | -- | 763.6 |
| Long-term debt .............................. | -- | 1,282.0 | (0.3) | 0.7 | -- | 1,282.4 |
| Intercompany payable (receivable) ........... | -- | (102.4) | 4.1 | 98.3 | -- | -- |
| Other noncurrent liabilities ................ | -- | 223.5 | 137.4 | 58.6 | -- | 419.5 |
| Mandatorily redeemable preferred stock of subsidiary .............................. | -- | 147.7 | -- | -- | -- | 147.7 |
|  | -- | 1,550.8 | 141.2 | 157.6 | -- | 1,849.6 |
| Stockholders equity ......................... | $ 374.7 | $ 374.5 | $ 1,667.1 | $ 512.6 | $ (2,554.2) | $ 374.7 |
|  | $ 374.7 | $ 2,119.5 | $ 2,139.5 | $ 908.4 | $ (2,554.2) | $ 2,987.9 |

# COLLINS & AIRMAN CORPORATION AND SUBSIDIARIES

## SUPPLEMENTAL GUARANTOR CONDENSED CONSOLIDATING FINANCIAL STATEMENTS
## CONSOLIDATING BALANCE SHEET

FOR THE YEAR ENDED DECEMBER 31, 2000

| | PARENT | ISSUER | GUARANTORS | NON-GUARANTORS | ELIMINATIONS | CONSOLIDATED TOTAL |
|---|---|---|---|---|---|---|
| | | | | (IN MILLIONS) | | |
| **ASSETS** | | | | | | |
| **Current Assets** | | | | | | |
| Cash and cash equivalents .............. | $ 0.5 | $ (4.2) | $ 1.0 | $ 23.6 | $ -- | $ 20.9 |
| Accounts and other Receivables, net..... | -- | 7.8 | 30.9 | 155.2 | 2.6 | 196.5 |
| Inventories ............................ | -- | 39.6 | 49.5 | 42.6 | -- | 131.7 |
| Other .................................. | -- | 20.4 | 14.4 | 41.1 | -- | 75.9 |
| Total current assets ................... | 0.5 | 63.6 | 95.8 | 262.5 | 2.6 | 425.0 |
| Investment in subsidiaries ............. | (152.9) | 831.7 | 297.4 | -- | (976.2) | -- |
| Property, plant and equipment, net ..... | -- | 94.4 | 152.7 | 187.7 | (0.7) | 434.1 |
| Goodwill, net .......................... | -- | -- | 111.5 | 138.2 | (4.2) | 245.5 |
| Other assets ........................... | -- | 122.4 | 20.7 | 32.6 | -- | 175.7 |
| | (152.9) | 1,048.5 | 582.3 | 358.5 | (981.1) | 855.3 |
| | $ (152.4) | $ 1,112.1 | $ 678.1 | $ 621.0 | $ (978.5) | $ 1,280.3 |
| **LIABILITIES & STOCKHOLDERS' EQUITY (DEFICIT)** | | | | | | |
| **Current Liabilities** | | | | | | |
| Short-term borrowings .................. | -- | 0.4 | -- | 3.4 | -- | 3.8 |
| Current portion of long-term debt ...... | -- | 35.6 | 48.3 | 0.4 | -- | 84.3 |
| Accounts payable ....................... | -- | 52.4 | 42.0 | 84.1 | -- | 178.5 |
| Accrued expenses ....................... | -- | 58.7 | 13.3 | 51.1 | -- | 123.1 |
| Total current liabilities .............. | -- | 147.1 | 103.6 | 139.0 | -- | 389.7 |
| Long-term debt ......................... | -- | 781.7 | -- | 18.0 | -- | 799.7 |
| Intercompany payable (receivable) ...... | -- | 234.6 | (245.9) | 11.3 | -- | -- |
| Other noncurrent liabilities ........... | 2.6 | 101.6 | 96.1 | 45.5 | -- | 245.8 |
| | 2.6 | 1,117.9 | (149.8) | 74.8 | | 1,045.5 |
| Stockholders equity (deficit) .......... | $ (155.0) | $ (152.9) | $ 724.3 | $ 407.2 | $ (978.5) | $ (154.9) |
| | $ (152.4) | $ 1,112.1 | $ 678.1 | $ 621.0 | $ (978.5) | $ 1,280.3 |

F-43

# COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES

## SUPPLEMENTAL GUARANTOR CONDENSED CONSOLIDATING FINANCIAL STATEMENTS
## CONSOLIDATING STATEMENT OF CASH FLOWS

| | FOR THE YEAR ENDED DECEMBER 31, 2001 | | | | | |
|---|---|---|---|---|---|---|
| | PARENT | ISSUER | GUARANTORS | NON-GUARANTORS | ELIMINATIONS | CONSOLIDATED TOTAL |
| | (IN MILLIONS) | | | | | |
| **OPERATING ACTIVITIES** | | | | | | |
| Net cash provided by continuing operating activities | $ (0.3) | $ (266.6) | $ 237.6 | $ 160.7 | $-- | $ 131.4 |
| Net cash provided by discontinued operations | -- | -- | -- | 12.2 | -- | 12.2 |
| **INVESTING ACTIVITIES** | | | | | | |
| Additions to property, plant and Equipment | -- | (14.8) | (14.5) | (25.2) | -- | (54.5) |
| Sales of property, plant and Equipment | -- | 62.2 | 24.0 | 1.9 | -- | 88.1 |
| Acquisitions of businesses, net of cash acquired | -- | (760.9) | -- | -- | -- | (760.9) |
| Sale of business | -- | -- | 3.5 | -- | -- | 3.5 |
| Net cash provided by (used in) investing activities | -- | (713.5) | 13.0 | (23.3) | -- | (723.8) |
| **FINANCING ACTIVITIES** | | | | | | |
| Issuance of long-term debt | -- | 950.0 | -- | -- | -- | 950.0 |
| Proceeds from (reduction of) participating interests in account receivable, net of redemptions | -- | -- | -- | (2.6) | -- | (2.6) |
| Cost of debt issuance | -- | (59.4) | -- | -- | -- | (59.4) |
| Repayment of long-term debt | -- | (383.2) | -- | -- | -- | (383.2) |
| Increase (decrease) in short-term borrowings | -- | 9.7 | 2.0 | (1.6) | -- | 10.1 |
| Net borrowings (repayments) on revolving credit facilities | -- | (133.4) | -- | (16.8) | -- | (150.2) |
| Net proceeds from issuance of common stock | 207.2 | -- | -- | -- | -- | 207.2 |
| Reissue (purchase) treasury stock, net | 61.3 | -- | -- | -- | -- | 61.3 |
| Intercompany transfers to (from) Subsidiary | (268.5) | 596.8 | (240.9) | (87.4) | -- | -- |
| Net cash provided by (used in) financing activities | -- | 980.5 | (238.9) | (108.4) | -- | 633.2 |
| Increase (decrease) in cash and cash equivalents | (0.3) | 0.4 | 11.7 | 41.2 | -- | 53.0 |
| Cash and cash equivalents at beginning of year | 0.5 | (4.2) | 1.0 | 23.6 | -- | 20.9 |
| Cash and cash equivalents at end of year | $ 0.2 | $ (3.8) | $ 12.7 | $ 64.8 | $-- | $ 73.9 |

F-44

COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES

**SUPPLEMENTAL GUARANTOR CONDENSED CONSOLIDATING FINANCIAL STATEMENTS**
**CONSOLIDATING STATEMENT OF CASH FLOWS**

|  | FOR THE YEAR ENDED DECEMBER 31, 2000 | | | | | |
|---|---|---|---|---|---|---|
|  | PARENT | ISSUER | GUARANTORS | NON-GUARANTORS | ELIMINATIONS | CONSOLIDATED TOTAL |
|  | (IN MILLIONS) | | | | | |
| OPERATING ACTIVITIES | | | | | | |
| Net cash provided by continuing operating activities ................. | $ 0.4 | $ 13.2 | $ 6.7 | $ 110.6 | $-- | $ 130.9 |
| Net cash provided by discontinued operations ........................... | -- | -- | 0.4 | -- | -- | 0.4 |
| INVESTING ACTIVITIES | | | | | | |
| Additions to property, plant and equipment ......................... | -- | (20.9) | (13.9) | (34.2) | -- | (69.0) |
| Sales of property, plant and Equipment ......................... | -- | 5.6 | -- | -- | -- | 5.6 |
| Net cash used in investing activities ......................... | -- | (15.3) | (13.9) | (34.2) | -- | (63.4) |
| FINANCING ACTIVITIES | | | | | | |
| Proceeds from (reduction of) participating interests in account receivable, net of redemptions ........ | -- | -- | -- | (34.0) | -- | (34.0) |
| Repayment of long-term debt ............. | -- | (27.5) | (38.1) | (1.0) | -- | (66.6) |
| Increase (decrease) in short-term borrowings ........................... | -- | -- | -- | 0.2 | -- | 0.2 |
| Net borrowings (repayments) on revolving credit facilities ........... | -- | 64.9 | -- | (25.9) | -- | 39.0 |
| Reissue (purchase) treasury stock, net ................................ | 0.4 | -- | -- | -- | -- | 0.4 |
| Intercompany transfers to (from) subsidiary ........................ | (0.4) | (37.8) | 43.7 | (5.5) | -- | -- |
| Net cash provided by (used in) financing activities ................ | -- | (.4) | 5.6 | (66.2) | -- | (61.0) |
| Increase (decrease) in cash and cash equivalents ........................ | 0.4 | (2.5) | (1.2) | 10.2 | -- | 6.9 |
| Cash and cash equivalents at beginning of year ................................ | 0.1 | (1.7) | 2.2 | 13.4 | -- | 14.0 |
| Cash and cash equivalents at end of year ................................. | $ 0.5 | $ (4.2) | $ 1.0 | $ 23.6 | $-- | $ 20.9 |

F-45

COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES

SUPPLEMENTAL GUARANTOR CONDENSED CONSOLIDATING FINANCIAL STATEMENTS
CONSOLIDATING STATEMENT OF CASH FLOWS

| | PARENT | ISSUER | GUARANTORS | NON-GUARANTORS | ELIMINATIONS | CONSOLIDATED TOTAL |
|---|---|---|---|---|---|---|
| | | | FOR THE YEAR ENDED DECEMBER 25, 1999 | | | |
| | | | (IN MILLIONS) | | | |
| **OPERATING ACTIVITIES** | | | | | | |
| Net cash provided by continuing operating activities ................. | $ 0.1 | $ 151.2 | $ 152.8 | $ (204.0) | $-- | $ 100.1 |
| Net cash provided by discontinued operations .......................... | -- | (9.8) | (7.0) | -- | -- | (16.8) |
| **INVESTING ACTIVITIES** | | | | | | |
| Additions to property, plant and equipment ............................ | -- | (32.1) | (16.6) | (37.7) | -- | (86.4) |
| Sales of property, plant and Equipment ............................. | -- | 4.6 | 5.5 | -- | -- | 10.1 |
| Acquisitions of businesses, net of cash acquired .......................... | -- | (0.4) | -- | -- | -- | (0.4) |
| Other, net ............................ | -- | (0.8) | -- | -- | -- | (0.8) |
| Net cash used in investing activities..... | -- | (28.7) | (11.1) | (37.7) | -- | (77.5) |
| **FINANCING ACTIVITIES** | | | | | | |
| Issuance of long-term debt ................. | -- | 100.0 | -- | -- | -- | 100.0 |
| Cost of debt issuance ...................... | -- | (2.4) | -- | -- | -- | (2.4) |
| Proceeds from (reduction of) participating interests in account receivable, net of redemptions ........... | -- | -- | -- | 2.0 | -- | 2.0 |
| Repayment of long-term debt ................. | -- | (19.4) | -- | (1.2) | -- | (20.6) |
| Increase (decrease) in short-term borrowings ............................. | -- | (0.4) | -- | (7.0) | -- | (7.4) |
| Net borrowings (repayments) on revolving credit facilities .............. | -- | (18.4) | (16.9) | -- | -- | (35.3) |
| Reissue (purchase) treasury stock, net .................................... | (1.7) | -- | -- | -- | -- | (1.7) |
| Dividends paid ............................. | (50.2) | -- | -- | -- | -- | (50.2) |
| Dividends paid from (by) Subsidiary ........ | 50.2 | (50.2) | -- | -- | -- | -- |
| Intercompany transfers to (from) subsidiary ............................. | 1.6 | (118.2) | (116.4) | 233.0 | -- | -- |
| Net cash provided by (used in) financing activities .................. | (0.1) | (109.0) | (133.3) | 226.8 | -- | (15.6) |
| Increase (decrease) in cash and cash equivalents .............................. | -- | 3.7 | 1.4 | (14.9) | -- | (9.8) |
| Cash and cash equivalents at beginning of year ................................. | 0.1 | (5.4) | 0.8 | 28.3 | -- | 23.8 |
| Cash and cash equivalents at end of year ...................................... | $ 0.1 | $ (1.7) | $ 2.2 | $ 13.4 | $-- | $ 14.0 |

F-46

COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES

## SCHEDULE I -- CONDENSED FINANCIAL INFORMATION OF REGISTRANT

The information required under this Schedule is included in Note 24 to the Notes to the Consolidated Financial Statements.

## COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES

## SCHEDULE II -- VALUATION AND QUALIFYING ACCOUNTS

## FOR THE FISCAL YEARS ENDED DECEMBER 31, 2001, DECEMBER 31, 2000 AND DECEMBER

### 25, 1999

| DESCRIPTION | BALANCE AT BEGINNING OF YEAR | ADDITIONS RESULTING FROM ACQUISITIONS | CHARGE TO COST AND EXPENSES | CHARGED TO OTHER ACCOUNTS | DEDUCTIONS | BALANCE AT END OF YEAR |
|---|---|---|---|---|---|---|
| | | | (IN MILLIONS) | | | |
| FISCAL YEAR ENDED DECEMBER 31, 2001: Allowance for doubtful accounts ............ | $ 8.1 | $ 6.8 | $ 6.6 | $ (.3)(a) | $ (6.6) | $ 14.6 |
| FISCAL YEAR ENDED DECEMBER 31, 2000: Allowance for doubtful accounts ............ | $ 8.5 | $ -- | $ 6.6 | $ (.9)(a) | $ (6.1)(b) | $ 8.1 |
| FISCAL YEAR ENDED DECEMBER 25, 1999: Allowance for doubtful accounts ............ | $ 7.2 | $ -- | $ 2.4 | $ 1.2(a) | $ (2.3)(b) | $ 8.5 |

(a) Reclassifications and collection of accounts previously written off.

(b) Reclassifications to other accounts, uncollectible amounts written off, and the elimination of amounts included in the allowance due from Enjema which was considered as a component of the Company's purchase cost for the remaining 50% interest in Enjema.

S-1

**End of Filing**

Powered By EDGAR Online

© 2005 | EDGAR Online, Inc.

# Exhibit C

# PART 1

# COLLINS & AIKMAN CORP

## FORM 10-K
(Annual Report)

## Filed 3/26/2003 For Period Ending 12/31/2002

| | |
|---|---|
| Address | 250 STEPHENSON HWY |
| | TROY, Michigan 48083 |
| Telephone | 248-824-2500 |
| CIK | 0000846815 |
| Industry | Auto & Truck Parts |
| Sector | Consumer Cyclical |
| Fiscal Year | 12/31 |

Generated by EDGAR Online Pro
http://pro.edgar-online.com



Contact EDGAR Online
Customer Service: 203-852-5666
Corporate Sales: 212-457-8200

# UNITED STATES SECURITIES AND EXCHANGE COMMISSION
### WASHINGTON, D.C. 20549

---

# Form 10-K

(Mark One)

☑  **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the fiscal year ended December 31, 2002**

**or**

☐  **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**Commission file number 1-10218**

---

# Collins & Aikman Corporation
*(Exact name of registrant as specified in its charter)*

| | |
|---|---|
| **Delaware** | **13-3489233** |
| *(State or other jurisdiction of incorporation or organization)* | *(I.R.S. Employer Identification Number)* |

**250 Stephenson Highway
Troy, Michigan 48083**
*(Address of principal executive offices, including zip code)*

**Registrant's telephone number, including area code:
(248) 824-2500**

**Securities registered pursuant to Section 12(b) of the Act:**

| Title of each class | Name of each exchange on which registered |
|---|---|
| Common Stock, $.01 par value | New York Stock Exchange |

**Securities registered pursuant to Section 12(g) of the Act:
None**

Indicate by check mark whether the Registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the Registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☑    No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of Registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☑

Indicate by check mark whether the registrant is an accelerated filer (as defined in Exchange Act Rule 12b-2). Yes ☑    No ☐ .

The aggregate market value of voting stock held by non-affiliates of the Registrant was $168,443,079 as of March 18, 2003.

As of February 28, 2003, the number of outstanding shares of the Registrant's common stock, $.01 par value, was 83,630,081 shares.

## DOCUMENTS INCORPORATED BY REFERENCE:

The information required by Part III (Items 10, 11, 12 and 13) is incorporated by reference to portions of the registrant's definitive Proxy Statement for the 2002 Annual Meeting of Stockholders, which will be filed within 120 days of December 31, 2002.

## WEBSITE ACCESS TO COMPANY'S REPORTS:

Collins and Aikman's internet website address is www.collinsaikman.com. The Company's annual report on Form 10-K, quarterly reports on Form 10-Q, current reports on Form 8-K, and amendment to those reports filed or furnished pursuant to Section 13(a) or 15(d) of the Exchange Act are available free of charge through the Company's website and as soon as reasonably practicable after the reports are electronically filed with, or furnished to the Securities and Exchange Commission.

**TABLE OF CONTENTS**

Item 1. Business
Item 2. Properties
Item 3. Legal Proceedings
Item 4. Submission of Matters to a Vote of Security Holders
Item 5. Market for Registrant's Common Equity and Related Stockholder Matters
Item 6. Selected Financial Data
Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations
Item 7A. Quantitative and Qualitative Disclosures About Market Risk
Item 8. Financial Statements and Supplementary Data
Item 9. Changes in and Disagreements with Accountants on Accounting and Financial Disclosure
Item 10. Directors and Executive Officers of the Registrant
Item 11. Executive Compensation
Item 12. Security Ownership of Certain Beneficial Owners and Management
Item 13. Certain Relationships and Related Transactions
Item 14. Controls and Procedures
Item 15. Exhibits, Financial Statement Schedules and Reports on Form 8-K
SIGNATURES
CERTIFICATION PURSUANT TO SECTION 302 OF THE SARBANES-OXLEY ACT OF 2002
REPORT OF INDEPENDENT ACCOUNTANTS
CONSOLIDATED STATEMENTS OF OPERATIONS
CONSOLIDATED BALANCE SHEETS
CONSOLIDATED STATEMENTS OF CASH FLOWS
CONSOLIDATED STATEMENTS OF COMMON STOCKHOLDERS' EQUITY (DEFICIT)
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
SUPPLEMENTAL GUARANTOR CONDENSED CONSOLIDATING FINANCIAL STATEMENTS
CONSOLIDATING STATEMENT OF INCOME
CONSOLIDATING STATEMENT OF INCOME
CONSOLIDATING BALANCE SHEET
CONSOLIDATING BALANCE SHEET
CONSOLIDATING STATEMENT OF CASH FLOWS
CONSOLIDATING STATEMENT OF CASH FLOWS
SCHEDULE I -- CONDENSED FINANCIAL INFORMATION OF REGISTRANT
SCHEDULE II -- VALUATION AND QUALIFYING ACCOUNTS
First Amendment to the Credit Agreement
Computation of Earnings Per Share
Computation of Ratio of Earnings to Fixed Charges
Subsidiaries of the Registrant
Consent of PricewaterhouseCoopers LLP
Powers of Attorney
906 Certification of CEO/CFO

# COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES

## FORM 10-K ANNUAL REPORT INDEX

|          |                                                                                      | Page |
|----------|--------------------------------------------------------------------------------------|------|
| Item 1.  | Business                                                                             | 7    |
| Item 2.  | Properties                                                                           | 16   |
| Item 3.  | Legal Proceedings                                                                    | 16   |
| Item 4.  | Submission of Matters to a Vote of Security Holders                                  | 19   |
| Item 5.  | Market for Registrant's Common Equity and Related Stockholder Matters                | 19   |
| Item 6.  | Selected Financial Data                                                              | 20   |
| Item 7.  | Management's Discussion and Analysis of Financial Condition and Results of Operations | 21   |
| Item 7A. | Quantitative and Qualitative Disclosures About Market Risk                           | 40   |
| Item 8.  | Financial Statements and Supplementary Data                                          | 41   |
| Item 9.  | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | 41   |
| Item 10. | Directors and Executive Officers of the Registrant                                   | 42   |
| Item 11. | Executive Compensation                                                               | 42   |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management                       | 42   |
| Item 13. | Certain Relationships and Related Transactions                                       | 42   |
| Item 14. | Controls and Procedures                                                              | 42   |
| Item 15. | Exhibits, Financial Statement Schedules and Reports on Form 8-K                      | 44   |

i

## PART I

This Report on Form 10-K contains "forward-looking" information, as that term is defined by the federal securities laws, about our financial condition, results of operations and business. You can find many of these statements by looking for words such as "may," "will," "expect," "anticipate," "believe," "estimate," "should," "continue," "predict," and similar words used in this Annual Report. The forward-looking statements in this Form 10-K are intended to be subject to the safe harbor protection provided by the federal securities laws.

These forward-looking statements are subject to numerous assumptions, risks and uncertainties (including trade relations and competition). Because the statements are subject to risks and uncertainties, actual results may differ materially from those expressed or implied by the forward-looking statements. We caution readers not to place undue reliance on the statements, which speak only as of the date of this Annual Report.

The cautionary statements set forth above should be considered in connection with any subsequent written or oral forward-looking statements that Collins and Aikman, Corporation (the Company) or persons acting on its behalf may issue. The Company does not undertake any obligation to review or confirm analysts' expectations or estimates or to release publicly any revisions to any forward-looking statements to reflect events or circumstances after the date of this report or to reflect the occurrence of unanticipated events.

This Annual Report contains forward-looking statements within the meaning of the Private Securities Litigation Reform Act of 1995. Actual results and events may differ materially from those that are anticipated because of certain risks and uncertainties, including but not limited to general economic conditions in the markets in which the Company operates and industry based factors such as:

*Demand in the automotive industry is significantly dependent on the U.S. and the global economies and the Company's business and profitability are exposed to current and future uncertainties.*

The Company's financial performance depends, in large part, on conditions in the global automotive markets and, generally, on the U.S. and global economies. Demand in the automotive industry fluctuates in response to overall economic conditions and is particularly sensitive to changes in interest rate levels, consumer confidence and fuel costs. The threat or act of terrorism and war, the recession and other recent developments adversely affected consumer confidence throughout the U.S. and much of the world and exacerbated the uncertainty in the Company's markets. The future impact on us is difficult to predict. We would be harmed by any sustained weakness in demand or continued downturn in the economy.

The Company's sales are impacted by retail inventory levels and production schedules. In 2002, Original Equipment Manufacturer (OEM) customers continued to significantly reduce their production and inventory levels due to the uncertain economic environment. In the current environment, it is extremely difficult to predict future production rates and inventory levels and the sustainability of any recovery.

*The base of customers which the Company serves is concentrated, and the loss of business from a major customer or the discontinuation of particular vehicle models could reduce the Company's sales and harm the Company's profitability.*

Because of the relative importance of a few large customers and the high degree of concentration of OEMs in the automotive industry, the Company's business is exposed to a high degree of risk related to customer concentration. DaimlerChrysler AG, General Motors Corporation and Ford Motor Company and their respective affiliates were the Company's three largest customers and they directly or indirectly accounted for approximately 31%, 23% and 23% of the Company's 2002 net sales, respectively. A loss of significant business from, or adverse performance by, any of these customers would be harmful to the Company's profitability. Although the Company receives purchase orders from most of the Company's customers, these purchase orders typically provide for the supply of a customer's annual requirements for a particular model or assembly plant, renewable on a year-to-year basis, rather than for the purchase of a specific quantity of products. It is difficult to accurately predict the level of new production for 2003 car sales. The loss of business with respect to significant vehicle models could have a material adverse effect.

2

In addition, there is substantial and continuing pressure from automotive manufacturers to reduce costs, including costs associated with outside suppliers like Collins and Aikman. For example, OEM customers in the automotive industry attempted to impose price decreases and givebacks throughout 2002. Such attempted price decreases were generally in the 3% to 8% range. Several reductions have been agreed to, and others are currently being negotiated with OEMs and pressures may increase if overall economic and industry conditions do not improve. It is difficult for the Company to offset downward pricing pressures through alternative, less costly sources of raw materials. In addition, throughout 2002, the Company has experienced pricing pressure from its suppliers. The Company cannot assure that it will not be materially and adversely affected by substantial and continuing pricing pressures.

*The prices that the Company can charge some of the Company's customers are predetermined and the Company bears the risk of costs in excess of its estimates.*

Sales contracts with some of the Company's customers require it to provide its products at predetermined prices. In some cases, these prices decline over the course of the contract. The costs that the Company incurs in fulfilling these contracts may vary substantially from its initial estimates. Unanticipated cost increases may occur as a result of several factors, including increases in the costs of labor, components or materials. In some cases, the Company may be permitted to pass on cost increases associated with specific materials to its customers. Cost overruns that the Company cannot pass on to its customers could have a material adverse effect.

*The Company may not be able to successfully integrate the Company's acquired operations or realize the intended benefits of the Company's acquisitions.*

The Company's future operations and cash flow will depend largely upon its ability to integrate acquisitions, achieve the strategic operating objectives for these acquisitions and realize significant synergies and cost savings as a result. Acquisitions since January 2001 account for 50 of the Company's 115 plants and facilities and approximately 50% of the Company's approximately 25,000 employees. The Textron Automotive Company's Trim division (TAC-Trim) acquisition in 2001 individually accounted for 41 of the Company's plants and facilities and approximately 12,000 of the Company's employees located across seven different countries, including two countries where the Company did not previously operate. The Company has not previously undertaken an integration process as large or complex as the integration plans required by these recent acquisitions collectively or by the TAC-Trim acquisition individually. In order to succeed, the Company will need to realize projected synergies and cost savings on a timely basis, consolidate information technologies, capitalize on the Company's increased purchasing power, effectively control the progress of the Company's integration process and associated costs, consolidate the Company's program management, research and development and engineering operations; capitalize on the Company's prime contractor strategy and the opportunities afforded by the Company's broader products offering; and maintain strong relationships with Tier I integrators and OEMs.

To the extent the Company has misjudged the nature and extent of industry trends or its competition, it may have difficulty in achieving its operating and strategic objectives. In addition, the Company's integration activities will place substantial demands on its management, operational resources and financial and internal control systems. The Company's future operating results will depend upon the Company's ability to implement and improve its operating and financial controls and to combine, train and manage the Company's employee base. There is a risk that the diversion of management attention, particularly in a difficult operating environment, will affect sales and the attention that management can devote to this and other operational, financial and strategic issues. In addition, in some of the Company's past non-U.S. acquisitions, the Company has encountered integration and systems difficulties typical of foreign transactions, which have given rise to material weaknesses that had to be subsequently corrected. The Company cannot assure you that it will not encounter similar difficulties going forward. All statements concerning the benefits, cost savings and synergies the Company expects to realize from its acquisitions are forward-looking statements.

3

*The Company may pursue additional acquisitions that further the Company's current strategies.*

The Company may selectively identify and acquire other businesses with complementary products, manufacturing capabilities or geographic markets and the Company expects to continually evaluate such opportunities. The Company cannot assure you that any business acquired will be successfully integrated with other operations or prove to be complementary in the manner expected or profitable. The Company could incur further indebtedness in connection with the Company's acquisition strategy and increase the Company's leverage. Acquisitions outside of North America may present unique difficulties and increase the Company's exposure to the risks attendant to international operations. The process of integrating acquired companies and operations into the Company's existing operations may result in unforeseen operating difficulties and may require significant financial resources that would otherwise be available for the ongoing development or expansion of existing operations.

*The Company may incur unanticipated contingent liabilities as a result of acquisitions and may experience unanticipated liabilities associated with former discontinued operations.*

The Company may incur unforeseen environmental, tax, pension, litigation or other liabilities in connection with the Company's recent or future acquisitions or the Company may underestimate the known liabilities. If such liabilities materialize or are greater than the Company estimates, they could have a material adverse effect on us. In addition, the Company has significant responsibilities related to some of its formerly owned businesses, or discontinued operations, such as those relating to post-retirement, casualty, environmental, product liability, lease and other matters. Based upon the information presently available and the Company's insurance coverage, the Company does not believe that any of these liabilities will have a material adverse effect upon the Company's financial condition or results of operations, however, the Company could be incorrect in its assumptions and the extent of those contingent liabilities of which the Company is aware may exceed its expectations and there may be other such liabilities of which the Company presently has no knowledge.

*If the Company is unable to meet future capital requirements, the Company's competitive position may be adversely affected.*

In securing new business, the Company is typically required to expend significant amounts of capital for engineering, development, tooling and other costs. Generally, the Company seeks to recoup these costs through pricing over time, but the Company may be unsuccessful due to competitive pressures and other market constraints or if a customer ceases production of a particular vehicle. While the Company believes that it will be able to fund capital expenditures through cash flow from operations, borrowings under the Company's credit facilities and sales of receivables under the Company's receivables facility, there can be no assurance that it will have adequate funds to make all the necessary capital expenditures or that the amount of future capital expenditures will not be materially in excess of its anticipated expenditures.

*Recent trends among the Company's customers will increase competitive pressures in the Company's businesses.*

In recent years, the competitive environment among suppliers to the vehicle manufacturers in the automotive industry has changed significantly as these manufacturers have sought to outsource more vehicular components, modules and systems and to use on-line auctions in order to obtain further price reductions. In addition, these sectors have experienced substantial consolidation as OEMs have sought to lower costs, improve quality and increasingly purchase complete systems and modules rather than separate components. This consolidation has caused, and its continuation will continue to amplify, the pricing pressures outlined above in the discussion of the concentration of the Company's customers. The Company's competitive strategy will be to position ourselves as the prime contractor of choice to both Tier I integrators and OEM assembly plants by supplying a full spectrum of integrated interior trim components. This strategy presents the risk that some of the Company's customers may be in competition with the Company as well. Furthermore, the trend toward consolidation among automotive parts suppliers is resulting in a smaller number of large suppliers like us who benefit from purchasing and distribution economies of scale. The Company may be

4

unable to achieve the cost savings and operational improvements expected from the Company's prime contractor business strategy, which could harm its ability to compete favorably in the future with other larger, consolidated companies.

*The Company's strategy may not succeed if anticipated outsourcing fails to occur due to union considerations.*

Because of the economic benefits inherent in outsourcing to suppliers and the costs associated with reversing a decision to purchase automotive interior systems and components from an outside supplier, automotive manufacturers' commitments to purchasing automotive interior systems and components from outside suppliers, particularly on a just-in-time basis, are contemplated to increase. However, under the contracts currently in effect in the United States and Canada between each of Ford, General Motors and DaimlerChrysler and the United Auto Workers ("UAW") and the Canadian Auto Workers ("CAW"), in order for any of such automotive manufacturers to obtain from external sources components that it currently produces, it must first notify the UAW or the CAW of such intention. If the UAW or the CAW objects to the proposed outsourcing, some agreement will have to be reached between the UAW or the CAW and the automotive manufacturer. Factors that will normally be taken into account by the UAW, the CAW and the automotive manufacturer include whether the proposed new supplier is technologically more advanced than the automotive manufacturer, whether the new supplier is unionized, whether cost benefits exist, and whether the automotive manufacturer will be able to reassign union members whose jobs are being displaced to other jobs within the same factories.

*The Company's products are subject to changing technology, which could place us at a competitive disadvantage relative to alternative products introduced by competitors.*

The Company believes that its customers rigorously evaluate their suppliers on the basis of product quality, price competitiveness, technical expertise and development capability, new product innovation, reliability and timeliness of delivery, product design capability, manufacturing expertise, operational flexibility, customer service and overall management. The Company's success will depend on its ability to continue to meet customers' changing specifications with respect to these criteria. The Company may, therefore, require significant ongoing and recurring additional capital expenditures and investment in research and development, manufacturing and other areas to remain competitive.

*The Company may be subject to work stoppages at its facilities or those of its principal customers, which could seriously impact the profitability of the Company's business.*

As of December 31, 2002, approximately 57% of the Company's global work force was unionized. If the Company's unionized workers were to engage in a strike, work stoppage or other slowdown in the future, the Company could experience a significant disruption of the Company's operations, which could have a material adverse effect on us. Many OEMs and their suppliers have unionized work forces. Work stoppages or slowdowns experienced by OEMs or their suppliers could result in slowdowns or closures of assembly plants where the Company's products are included in assembled vehicles. Furthermore, organizations responsible for shipping the Company's customers' products may be impacted by occasional strikes staged by the unions representing transportation employees. Any interruption in the delivery of the Company's customers' products would reduce demand for the Company's products.

*A growing portion of the Company's revenue may be derived from international sources, which exposes us to additional uncertainty.*

A significant portion of the Company's 2002 sales were derived from shipments to destinations outside of the United States and Canada. As part of the Company's business strategy, the Company intends to expand the Company's international operations and customer base. Sales outside of the U.S. and Canada, particularly sales to emerging markets, are subject to other various risks, including: governmental embargoes or foreign trade restrictions such as antidumping duties; changes in U.S. and foreign governmental regulations; tariffs; fuel duties; other trade barriers; political, economic and social instability; and foreign exchange risk. In

5

addition, there are tax inefficiencies in repatriating funds from non-U.S. subsidiaries. To the extent such repatriation is necessary for us to meet the Company's debt service or other obligations, this will adversely affect us. International operations are frequently conducted through joint venture arrangements that can materially limit the Company's operational and financial control of the business.

*The Company may incur material losses and costs as a result of product liability and warranty claims that may be brought against us.*

    The Company faces an inherent business risk of exposure to product liability claims in the event that the use of its current and formerly manufactured or sold products results, or is alleged to result, in bodily injury and/or property damage. The Company may experience material product liability losses in the future or incur significant costs to defend such claims. The Company's product liability insurance coverage will be inadequate for any liabilities that may ultimately be incurred or may be unavailable on acceptable terms in the future. In addition, if any of the Company's products are or are alleged to be defective, the Company may be required to participate in a government-required or OEM-instituted recall involving such products. Each vehicle manufacturer has its own policy regarding product recalls and other product liability actions relating to its suppliers.

    In addition, as suppliers become more integrally involved in the vehicle design process and assume more of the vehicle assembly functions, vehicle manufacturers are increasingly looking to their suppliers for contribution when faced with product liability claims. A successful claim brought against us in excess of the Company's available insurance coverage or a requirement to participate in a product recall may have a material adverse effect.

    In the ordinary course of the Company's business, contractual disputes over warranties can arise. In the past five years or more, the Company has not been required to make any material payments in respect of warranty claims. In most cases, financial responsibility for warranty costs are contractually retained by the Company's customer so long as the customers' specifications are met, but the Company may nonetheless be subjected to requests for cost sharing or pricing adjustments as a part of the Company's commercial relationship with the customer.

*The Company's business may be materially and adversely affected by compliance obligations and liabilities under environmental laws and regulations.*

    The Company is subject to federal, state, local and foreign environmental, and health and safety, laws and regulations that affect ongoing operations and may increase capital costs and operating expenses in order to maintain compliance with such requirements; and impose liability relating to contamination at the Company's facilities, and at other locations such as former facilities, facilities where the Company has sent wastes for treatment or disposal, and other properties to which the Company (or a company or business for which the Company is responsible) are linked. See Footnote 21 "Commitments and Contingencies — Environmental".

*The Company may not be able to manage its business as it might otherwise due to its high degree of leverage.*

    The Company has indebtedness that is substantial in relation to the Company's stockholders' equity and cash flow. At December 31, 2002, the Company had $1,289.2 million of outstanding total debt and short-term borrowings. The Company's percentage of total debt and outstanding preferred stock of its subsidiary, Products ("Products Preferred Stock") to total capitalization was 78% at December 31, 2002. The degree to which the Company is leveraged will have important consequences, including the following:

    • the Company's ability to obtain additional financing in the future for working capital, capital expenditures, acquisitions, business development efforts or general corporate purposes may be impaired;

6

- a substantial portion of the Company's cash flow from operations will be dedicated to the payment of interest and principal on the Company's indebtedness, dividends on Products Preferred Stock, and capital and operating lease expense, thereby reducing the funds available to us for other purposes;

- the Company's operations are restricted by the Company's debt instruments and the terms of the Products Preferred Stock, which contain material financial and operating covenants, and those restrictions will limit, among other things, the Company's ability to borrow money in the future for working capital, capital expenditures, acquisitions or other purposes;

- indebtedness under the Company's senior credit facilities and the financing cost associated with its receivables facility will be at variable rates of interest, which makes it vulnerable to increases in interest rates;

- the Company's leverage may place us at a competitive disadvantage as compared with the Company's less leveraged competitors and the Company's leverage will make it more vulnerable in the event of a downturn in general economic conditions or in any of the Company's businesses; and

- the Company's flexibility in planning for, or reacting to, changes in its business and the automotive industry may be limited.

The Company's ability to service or refinance, when required, the Products Preferred Stock and the Company's debt, lease and other obligations will depend principally upon the Company's future operating performance, which will be affected by prevailing economic conditions and financial, business and other factors, many of which are beyond the Company's control.

In addition, factors more specific to us could cause actual results to vary materially from those anticipated in the forward-looking statements included in this report such as substantial leverage, limitations imposed by the Company's debt instruments, the Company's ability to successfully integrate acquired businesses including actions it has identified as providing cost saving opportunities, and pursue our prime contractor business strategy, the Company's customer concentration and risks associated with the formerly owned operations of the Company.

The Company's divisions may also be affected by changes in the popularity of particular vehicle models or particular interior trim packages or the loss of programs on particular vehicle models.

For a discussion of certain of these and other important factors which may affect our operations, products and markets, see "Item 1. — Business" and "Item 7. — Management's Discussion and Analysis of Financial Condition and Results of Operations" and also our other filings with the Securities and Exchange Commission.

## Item 1.   *Business*

## The Company

The Company is a global leader in the design, engineering and manufacturing of automotive interior components, including instrument panels, fully assembled cockpit modules, floor and acoustic systems, automotive fabric, interior trim and convertible top systems and has the number one or two North American market share position in seven out of ten major automotive interior categories tracked by CSM Worldwide. The Company is also the largest North American supplier of convertible top systems. The Company expects the fully assembled cockpit modules market to grow significantly over the next five years and has positioned itself as a leading global supplier in this market. Sales are diversified among all North American OEMs, transplants such as Toyota, Honda and Nissan and major Tier I integrators. In North America, the Company manufactures components for approximately 90% of all light vehicle production. The Company has approximately 25,000 employees and more than 115 plants and facilities worldwide. The Company is a Delaware corporation formed on September 21, 1988. The Company conducts all of its operating activities through its wholly owned subsidiary Collins & Aikman Products Co. ("Products"). Predecessors of Products have been in operation since 1843.

7

In February 2001, Heartland Industrial Partners, L.P. acquired a controlling interest in the Company. Since the investment, the Company has pursued acquisitions that have furthered a strategy of serving as a prime contractor to both Tier I integrators, which are shifting capital and emphasis away from interior components manufacturing and towards electronics and the delivery of fully integrated interior modules, and to OEMs, which continue to increase their outsourcing of complete interior manufacturing. Significant acquisitions include:

- On July 3, 2001, the Company acquired the Becker Group, a leading supplier of plastic components to the automotive industry.

- On September 21, 2001, the Company acquired Joan Automotive Industries, a leading supplier of bodycloth to the automotive industry, and the assets of Joan's affiliated automotive yarn dyeing operation, Western Avenue Dyers, L.P.

- On December 20, 2001, the Company acquired TAC-Trim, one of the largest suppliers of instrument panels and fully assembled cockpit modules and a major automotive plastics manufacturer of interior and exterior trim components in North America, Europe and South America.

- On January 2, 2003, the Company acquired Delphi Corp.'s plastic injection molding plant and related equipment in Logroño, Spain.

- On January 17, 2003, the Company acquired from Textron the remaining 50% interest in Textron Automotive Holdings (Italy) S.r.L., a joint venture that was formed as part of the TAC-Trim acquisition. The joint venture includes four facilities producing interior and exterior automotive trim components for strategic global customers in the region.

Collins & Aikman through its recent acquisitions has created one of the industry's largest and most broadly based manufacturers of automotive interior components, systems and modules. The Company has the capability to supply diverse combinations of stylistically matched, functionally engineered and acoustically integrated interior trim components, systems and modules and markets interior products to customers through a single "global commercial operations" group, which supplies products from three primary categories: plastic components and cockpits, carpet and acoustics and automotive fabrics. In addition, the Company continues to market its convertible top systems through the Dura convertible group.

## Industry Trends

The Company's strategy is to capitalize on several important automotive industry trends, which are expected to drive demand for its products. These trends include:

- *Increasing OEM Demand for Modules, Systems and Complete Interiors.* To reduce costs and simplify assembly processes and design, OEMs increasingly expect their large-scale suppliers to provide fully engineered systems, pre-assembled combinations of components (systems or modules) and complete automotive interiors rather than individual components. OEMs also continue to increase their need for multiple products on any given assembly line, further driving the need for suppliers to be able to handle extreme complexity.

- *Accelerating Manufacturing Outsourcing by Tier I Total Interior Integrators.* The large total interior Tier I integrators are repositioning their assets and resources to focus on electronics design, assembly and "just-in-time" sequencing of modules, systems and complete interiors. As a result, they are seeking to divest or outsource the manufacturing of many component categories.

- *Growing Technological Content and Acoustical Performance Requirements.* The electronic and technological content of vehicles continues to expand, largely driven by demand for greater functionality and convenience. Changes to vehicle interiors, including hands-free cell phone systems, entertainment and navigational systems and voice-activated dashboard functions, are expected to require enhanced acoustical properties and increased sound field engineering relative to today's light vehicles.

8

- *Global Customer Requirements.* Due to the opportunity for significant cost savings, reduced product development cycle times, common global platforms and improved product quality and consistency, automotive manufacturers favor suppliers with the capability to manufacture automotive interior systems and components in multiple geographic markets.

## Corporate Strategy

The Company's goal is to become the leading manufacturer of automotive interior trim components to OEMs and Tier I integrators and to realize the integration, synergy and cost savings opportunities created by the combination of Collins & Aikman and its 2001 acquisitions. The Company intends to leverage its product development, patented new materials, continuous enhanced manufacturing capability, an unwavering dedication to lean, error proofing and APQP (Advanced Product Quality Planning) launch readiness systems to meet customers' demands. The following are the key elements of the strategy:

- *Provide integrated product solutions that combine interior styling, component systems and acoustical technologies.* The ability to bundle multiple components into integrated, custom packages distinguishes the Company from its competitors and provides an opportunity to increase content per vehicle. The Company is a leader in product innovation, design and styling in all of its business lines, producing components that cover substantially all of the non-glass interior surfaces of automobiles. This breadth of product offering affords the Company a significant advantage as OEMs increasingly view the vehicle interior as a major point of differentiation and rely upon automotive suppliers for research, engineering, design and styling capabilities. By employing a cross-disciplinary approach to acoustics, surface styling and product engineering that takes advantage of product development and technological capabilities, the Company can offer integrated product solutions to its customers.

- *Capitalize on position as prime contractor to OEMs and Tier I total interior integrators.* The Company believes that OEMs will accelerate modular and system sourcing in order to lower costs, reduce time to market and accommodate global platforms and that Tier I total interior integrators will increase the redeployment of assets and capital into the integrated design, assembly and "just in time" sequenced delivery of complete interior systems. The Company is well positioned to capitalize on these opportunities. Furthermore, the Company's products are used in approximately 90% of all North American light vehicle platforms and are sold to all North American OEMs, transplants such as Toyota, Nissan and Honda, and major Tier I integrators. The Company is also well positioned with respect to its Tier II competitors that have comparatively narrower product lines and significantly less size, scale and technological capabilities.

- *Increase content per vehicle.* The Company intends to take advantage of its current position to increase content per vehicle and has substantial new business awards from customers across all product categories, with the strongest growth in fully assembled cockpit modules. Projected sales growth is primarily attributable to TAC-Trim's expanded book of full cockpit programs. By increasing content per vehicle, sales are expected to increase at a rate in excess of changes in industry production rates.

- *Leverage technology to improve manufacturing efficiency.* The Company believes it has many opportunities to improve manufacturing efficiency and cost structure by rationalizing existing operations and incorporating manufacturing "best practices," processes, procedures and technologies into its operations. For example, TAC- Trim is believed to be among the most efficient plastics suppliers in North America and Europe due to numerous proprietary manufacturing technologies, such as Invisitec [TM] and Intellimold [TM] and Envirosoft [TM] patented processes that allow the Company to manufacture and combine multiple products to produce complex integrated interiors products. The Company believes the application of technologies such as Intellimold [TM] to the Company's other operations, as well as the continued roll-out of these technologies throughout TAC-Trim's operations, will significantly improve plastics manufacturing cycle times, labor costs and scrap rates.

- *Pursue cost savings opportunities.* The Becker, Joan and TAC-Trim acquisitions created cost savings in the first full year of operation. The Company expects to continue to realize additional savings through a number of initiatives, including purchasing savings, in-sourcing the majority of our plastics

9

tooling and yarn dyeing requirements, consolidating research and development and engineering functions, capacity rationalization and reducing global headquarters' costs. In an effort to achieve cost savings, the Company may also elect to implement restructuring activities in future periods above and beyond activities initiated during 2002.

## Segment and Geographical Information

For a discussion of the Company's operating segments and the geographic regions in which the Company operates, refer to Item 7 MD&A — "Results of Operations" and to Footnote 20 — "Information About the Company's Operations."

## Products

The Company markets the majority of its products to customers through a single "global commercial operations" group, which supplies products from four primary categories: plastic components and cockpits, carpet and acoustics, automotive fabrics, and convertible top systems.

## Plastic Components and Cockpits

The Company manufactures substantially all of the components of the plastic interior trim within a vehicle, including automotive instrument panels, door panels, sidewall trim, overhead systems, headrests and armrests, cupholders, air registers and bezels, slush molded skins, pillar trim, floor console systems, instrument panel components, and fully assembled cockpit modules. This broad portfolio of plastic components and cockpits products allows the Company to offer customers modules and systems that incorporate individual components. Some major products include:

- *Instrument Panels ("IP")*: As the most structurally important plastic component in the vehicle and as the plastic substrate directly in front of the driver, the IP occupies the most important piece of "real estate" in the interior. The Company believes that it is the number one IP supplier in North America. The advanced materials the Company employs include Envirosoft ™ castable thermoplastic materials, high performance PVC alloys, high-definition grain and texture formulation and vacuum forming. The Company also has the proprietary Invisitec ™ invisible passenger air bag system, which provides improved appearance and craftsmanship at reduced cost.

- *Cockpits*: The Company is a leading North American and European supplier of cockpits. The complete array and breadth of its plastic component offerings has enabled the Company to become a leader in offering customers a fully assembled IP system ("cockpit") delivered on a just-in-time basis. As most of the ancillary interior trim components revolve around the IP placement, the Company believes that it will be able to penetrate effectively the customer base by offering the IP along with complementary plastic accoutrements and additional products from its other business units. The Company sources various other parts that make up a fully assembled modular cockpit from outside suppliers (including radios, wire harnesses, cross-vehicle beams and steering columns). The Company expects that its position as a cockpit integrator will provide significant opportunities to in-source more manufactured content in the future. Through the proprietary Intelliquence ™ software, finished cockpits can be delivered to the OEMs on a just-in-time basis and installed on the assembly line.

- *Door Panels*: The Company believes that it is the second largest supplier of door panels in North America. This decorative plastic interior trim component is an important element to the overall styling theme of a vehicle's interior.

- *Exteriors*: Exterior trim components include plastic molded fascia systems, bodyside cladding, signal lamps, cowl grilles and wheel flares. The Company has taken advantage of the systems trend in the exterior trim product market by producing and assembling fascia with radiator grilles, energy absorbers, trim moldings and lamps to be delivered in sequence directly to the OEMs' assembly line.

10

## Carpet and Acoustics

The Company evolved from a North American carpet producer to become a market leader in a broad range of automotive floor systems, luggage compartment trim, dash insulators and other acoustic products with production capabilities in both North America and Europe. While acoustical products are often combined with molded floor carpet to provide complete interior floor systems, it is useful to describe four carpet and acoustics product categories:

- *Molded Floor Systems:* Molded floor systems consist of thermoformed compression molded carpets. These carpets are provided in either a barrier or an absorptive NVH (noise, vibration and harshness) system. The barrier system includes polyethylene, barrier back, and a fiber underlay system or a foam-in-place system. Products include Tuflor ™, the Company's proprietary thermoplastic flooring product, which is rugged, durable and washable. The products in molded floor systems are highly engineered, and their manufacture requires a high degree of precision and draws on the Company's robotics capabilities. The Company believes it is the number one producer of molded floor and acoustic systems in the North American market and manufactures molded floor systems for all of the North American and Japanese OEMs as well as a number of the European OEMs.

- *Luggage Compartment Trim:* The other major carpeted area of the vehicle is the luggage compartment, which includes one-piece molded trunk systems and assemblies, wheelhouse covers and center pan mats, seatbacks, tireboard covers and other trunk trim products. The Company believes that it is the number two supplier of luggage compartment trim in the North American market.

- *Accessory Floormats:* The Company manufactures automotive accessory floormats by vulcanizing rubber backing to tufted carpet and also manufactures cargo mats with value-added distinctive aesthetic and practical features such as hand-sewn appearance of edges and moisture trapping construction with our patented Akro Edge® floormats. Largely due to this product differentiation, the Company has become the largest fully integrated auto floormat producer in North America.

- *Acoustical Products:* Acoustical products include interior dash insulators that insulate the passenger compartment from engine compartment noise and heat; damping materials that control noise in the floor, overhead system and sides of the vehicle; and engine compartment NVH systems. Changes to vehicle interiors, including hands-free cell phone systems, navigational systems, entertainment systems and voice-activated Internet access, will require enhanced acoustical properties and increased sound field engineering relative to today's light vehicles.

## Automotive Fabrics

The Company is positioned as the market leader in the North American automotive fabrics market, with the 2001 acquisition and the completed integration of Joan Fabrics automotive business. The principal automotive products include body cloth (woven or knitted fabrics for seating surfaces and other interior applications) and headliner fabric. The Company is able to offer virtually every major weave/knit technology currently available in the marketplace including dobby velours, jacquard velours, flat wovens, double-needlebar knits, circular knits and tricot knits. This allows the Company to effectively serve changing customer styling and cost directives.

In addition, Joan and other acquisitions have allowed the Company to increase its backward and forward integration levels by adding yarn dye and fabric lamination operations. This additional value-add manufacturing and improved control of the supply chain have contributed to improved operational efficiencies and manufacturing performance.

## Dura Convertible Top Systems

Dura Convertible Systems (DCS) is the only vertically integrated full service supplier of convertible roof systems, which designs, engineers and manufactures all aspects of a convertible top including the framework, trim set, backlights, well slings, tonneau covers and power actuating system. Recently, in order to differentiate products in the marketplace, OEMs have been increasing the number of convertible and open roof derivative

11

vehicles on both existing and new platforms. The Company's management believes that this trend will continue to drive demand for convertibles and other innovative open roof systems. DCS is well positioned to secure additional business based upon demonstrated new innovative roof system concepts.

Top-in-a-Box ™ , a system pioneered by DCS, is an assembly-line-ready module containing all of the components of a convertible top that enables the OEM to install a complete convertible top system on the production line. This modular, "bolt-on" assembly significantly reduces the time and labor traditionally required to manufacture a convertible model, enabling OEMs to more profitably produce and sell convertibles. DCS has the industry's most complete line of fabric coverings for convertible and sport utility top covers for OEMs globally. The Company maintains final assembly and trim operations near the OEMs' plants, and thereby offers customers complete just-in-time delivery and sequencing capabilities.

## Customers

Customers include OEMs and Tier I total interior integrators, both of which have been increasingly divesting component manufacturing. OEMs have been typical direct customers for the Company's plastic components, cockpits, carpet and acoustic and convertible products, while Tier I total interior integrators have typically been direct customers for fabrics and carpet and acoustics.

Through strategic acquisitions, the Company has broadened its customer base globally, with European and South American sales representing 19% of total sales for 2002 versus 14% in 2001. DaimlerChrysler AG (including Mercedes, Chrysler, Mitsubishi and Smart), General Motors Corporation (including General Motors, Opel, Vauxhall and Saab) and Ford Motor Company (including Ford, Jaguar, Land Rover, Aston Martin and Volvo) directly and indirectly represented approximately 31%, 23% and 23% of 2002 sales, respectively. The following is a list of customers:

| | | | |
|---|---|---|---|
| • Alpha Romeo | • General Motors | • Mazda | • Scania |
| • Audi | • Honda | • Mitsubishi | • Seat |
| • BMW | • Intier | • Nissan | • Subaru |
| • CAMMI | • Isuzu | • NUMMI | • Toyota |
| • DaimlerChrysler | • Jaguar | • Opel | • Visteon |
| • Faurecia | • Johnson Controls | • Porsche | • Volkswagen |
| • Fiat | • Lear Corporation | • PSA | • Volvo |
| • Ford | • Magna | • Renault | |
| • Freightliner | • MAN | • Rover | |

The Company's supply relationships are typically sole-source and extend over the life of the model, which is generally four to seven years, and do not normally require the purchase by the customer of any minimum number of products. The Company receives blanket purchase orders that normally cover annual requirements for products to be supplied for a particular vehicle model which may be terminated at any time. In order to reduce reliance on any one model, the Company produces automotive interior and exterior systems and components for a broad cross-section of both new and more established models.

## Marketing, Engineering and Development

As a global leader in automotive interior and exterior components, the Company differentiates itself in the marketplace by consistently providing high quality products, outstanding customer service and program management, and cost effective automotive solutions to global customers. Historically, the Company marketed individual components, modules and complete systems to customers. The Company has realigned marketing efforts to sell integrated product "bundles" to customers in an effort to increase growth in sales and operating income while enhancing the value-add provided to customers. Central to this marketing strategy has been the development of products that enhance both the vehicles' interior aesthetics as well as its acoustic performance. Equally important, and unlike many other Tier I or Tier II automotive suppliers, is the development of marketing and program management teams specifically focused on supporting not only OEMs, but major Tier I customers as well. These dedicated teams, consisting of experienced automotive personnel

12

who are able to meet a customer's entire needs, provide a single interface for our customers and help avoid duplication of our sales and engineering efforts.

Products are sold directly to customers under sales contracts that are obtained primarily through competitive bidding. These sales are originated almost entirely by sales staff. This marketing effort is augmented by design and manufacturing engineers that work closely with automotive manufacturers from the preliminary design to the manufacture and supply of automotive modules, systems or components. A key element employed to increase sales is to develop increasingly higher value-added products through innovations in materials construction, product design, engineering and styling. The primary focus of the Global Product Development Division (GPDD), therefore, is to work closely with customer engineering personnel to develop new products, processes, innovations, etc. that are central to winning new business from customers. The Advanced Sales and Program Management Group serves as a "bridge" between the GPDD and customer focused sales groups who market the Company's products and are responsible for ensuring that customers' needs are being met.

Through sales offices in North America, South America, Europe and Asia-Pacific, the Company's marketing personnel maintain regular contact with their various customers' engineers and purchasing agents. The Company continually seeks new business from existing customers, as well as developing relationships with new customers. The Company markets its products by maintaining strong customer relationships, developed over an 80-plus year history in the automotive industry through:

- extensive technical and product development capabilities;

- reliable just-in-time delivery of high-quality products;

- strong customer service;

- innovative new products; and

- a competitive cost structure.

The emergence of modular sourcing favors suppliers with broad manufacturing capabilities and product lines, experience with diverse materials and modular coordination. Management believes that the Company's broad base of manufacturing expertise with interior surface resins and materials and its global leadership in delivering cockpits, favorably positions the Company in the global automotive interior industry. Automotive manufacturers have increasingly looked to suppliers to assume responsibility for introducing product innovations, shortening the development cycle of new models, decreasing tooling investment and labor costs, reducing the number of costly design changes in the early phases of production and improving automotive interior acoustics, comfort and functionality. Once the Company is engaged to develop the design for the automotive interior system or component of a specific vehicle model, it is also generally engaged to supply these items when the vehicle goes into production. Substantial resources have been dedicated toward improving engineering and technical capabilities, establishing strong in-house tooling capabilities and developing advanced technology centers in the United States and in Europe. Similarly, research and development are an integral part of the sales and marketing effort. Especially noteworthy are the Company's proprietary Intellimold $^{TM}$ injection molding control process, Invisitec $^{TM}$ invisible passenger air bag door system and Envirosoft castable TPU (Thermal Plastic Polyurethane) and TPO (Thermal Plastic Olefin) materials.

In order to effectively develop automotive interior systems, it is necessary to have global capabilities in the engineering, research, design, development and validation of the interior components, systems and modules being produced. The Company conducts research and development at design and technology centers in Dearborn, Michigan; Dover, New Hampshire; Auburn Hills, Michigan; Plymouth, Michigan; Heidelberg, Germany and Tyngsboro, Massachusetts and at several worldwide product engineering centers. At these centers, the Company designs, develops and engineers products to comply with applicable safety standards, meet quality and durability standards, respond to environmental conditions and conform to customer aesthetic and acoustic requirements. In particular, acoustic requirements and cockpit aesthetics have become more important than ever with the advent of in-vehicle telematics. Technologically advanced acoustics testing

13

centers are maintained in Plymouth, Michigan and Heidelberg, Germany and cockpit development centers are located in Auburn Hills and Dearborn, Michigan in order to capitalize on both of these trends.

## Manufacturing

The Company focuses on combining smaller manufacturing plants into larger scale plants that have efficient layouts and the ability to reduce fixed costs.

The Company possesses cross-disciplinary manufacturing expertise, including an ability to form and assemble multi-material combinations of hard-molded plastics, slush-molded soft skins and surfaces, carpet, fabric, foam, insulation, and other trim materials as well as stamping, welding, machining and painting of metals and cutting and sewing of fabric components. Management believes the sophistication of the Company's carpet tufting and dying processes, the foam-in-place process for molded floors and its small-part plastic moldings and assemblies capabilities creates a competitive advantage.

With the Joan acquisition, the Company gained a scaleable, low-cost package automotive yarn dyeing facility thereby bringing in-house an important source of supply for the manufacture of our fabrics products.

The acquisition of Becker, originally established as a tool shop, has supplemented existing operations with one of the industry's leading tool developers allowing the in-sourcing of a significant portion of the Company's tooling requirements. The addition of Becker's tooling expertise complemented the Company's manufacturing capabilities for carpet and acoustics products and TAC-Trim's large part injection molding process.

The TAC-Trim acquisition added advanced process technologies such as slush-molded skinning for high-end instrument panels, thermoplastic casting, and "molded-in" color and decoration insert capability and overall manufacturing discipline and acumen. Specific product and process additions brought on by TAC-Trim include: the patented Intellimold $^{TM}$ feedback control system for injection molding control which dramatically reduces cycle times, labor costs and scrap rates; and the proprietary Intelliquence $^{TM}$ software sequencing system which should enable product delivery on a just-in-time basis to global OEM customers. In addition, TAC-Trim significantly expands plastic manufacturing capabilities allowing the Company to provide substantially all of an automobile's interior plastic components.

## Technology and Intellectual Property

Significant resources are dedicated to research and development in order to maintain the position as a leading developer of technology innovations, some of which have been patented or are in the process of being patented, in the automotive interior industry. The Company has developed a number of patented and proprietary designs for innovative interior features, all focused on increasing value to the customer. Examples include the Company developed proprietary slimline cupholders, Cavelflex $^{TM}$ (stretch woven) fabrics and the "AcT $^{TM}$ family" of acoustically tunable products.

Patents and patent applications exist in five primary areas: automotive floor mats, automotive fabric products, acoustics, interiors and convertible systems. With respect to floormats, the Company holds several U.S. and foreign patents relating to the Akro Edge® floormats. Akro Edge® floormats are the industry standard for their functional and aesthetic appeal to OEMs and their customers. With respect to automotive fabric patents, the Company has numerous patents on headliners, trunkliners and floor panels. In the acoustics area, in addition to the proprietary Comet® acoustics software, the Company is actively seeking protection of various aspects of its AcT $^{TM}$ fiber technology and various other means for improving sound deadening and sound absorption in automotive interiors. The Company has various patents and patent applications directed to cup holders, air outlet assemblies, storage systems and convertible mechanisms. The Company owns the patents relating to Intellimold $^{TM}$ injection molding control process for use in its business. The Intellimold $^{TM}$ patents are related to methods and/or apparatus for injection molding. The Company also holds technology relating to certain skin materials and compounding solutions that provide the capability to design cost-effective materials with outstanding performance and aesthetic qualities. Examples of these materials include Envirosoft $^{TM}$ castable thermoplastic materials, high performance PVC alloys, high-definition grain and texture formulation and vacuum thermoplastic applications. The Company also holds technology relating to the

14

Invisitec ™ invisible passenger air bag system, which provides improved appearance and craftsmanship at reduced cost. Invisitec ™ systems, which integrate the air bag door with the panel and top cover, have been commercialized for soft-cast and vacuum-formed panels and hard injection molded instrument panels. In total, the Company holds approximately 370 U.S. and approximately 1,400 foreign active patents and has approximately 325 patents pending. The intellectual property acquired in the TAC-Trim Acquisition is subject to certain limitations on the Company's use and creates continuing obligations to Textron.

As part of the TAC-Trim acquisition, the Company entered into three intellectual property license agreements with Textron. In two of these agreements, the Company licensed back to Textron certain intellectual property that was acquired in the transaction (the "Intellimold Agreement" and the "Licensed-Back IP Agreement"). In the third agreement, the Company licensed from Textron other intellectual property that it did not acquire in the transaction (the "Retained IP Agreement"). The Company is providing general descriptions of these agreements although these descriptions do not contain all the material terms in the contracts. In all three agreements, the ability to use the intellectual property is limited based on whether the proposed use falls inside or outside a defined field of automotive products (the "Restricted Field").

In the Intellimold Agreement, the Company gave Textron an exclusive worldwide, perpetual, irrevocable license to use outside the Restricted Field its rights in the Intellimold process and any enhancements developed by it. Textron was also granted a royalty-free, worldwide, perpetual, irrevocable license to use the Company's rights in the Intellimold process and any enhancements developed by the Company within the Restricted Field solely in connection with its and certain affiliates' manufacturing, sales and development operations. The Intellimold Agreement also includes an exclusive royalty-free, worldwide, perpetual, irrevocable license for the Company to use within the Restricted Field any enhancements to the Intellimold process developed by Textron. In the Licensed-Back IP Agreement, the Company granted Textron a non-exclusive, worldwide, royalty-free, perpetual and irrevocable license to use solely outside the Restricted Field certain intellectual property including over 50 U.S. patents on air bag related products. In the Retained IP Agreement, Textron granted to the Company a non-exclusive, worldwide, royalty-free, perpetual and irrevocable license to use solely within the Restricted Field certain intellectual property. These patents could have applicability to the automotive industry but such use is somewhat secondary to the use of such technology outside the automotive field.

As described below under the heading "Management's Discussion and Analysis of Financial Condition and Results of Operations — Liquidity — Leases", the Company leases certain equipment from Textron. When those leases terminate, if Textron and its affiliates continue to own any interest in the equipment, they will be allowed to use the equipment for certain purposes and to use related intellectual property.

**Raw Materials**

Raw materials and other supplies used in our continuing operations are normally available from a variety of competing suppliers. With respect to most materials, the loss of a single or even a few suppliers would not have a material adverse effect on the Company. The Company is sensitive to price movements in its raw materials supply base and has not hedged against price fluctuations in commodity supplies, such as plastics and resins. While the Company may not be able to pass on any future raw materials price increases to customers, a significant portion of increased cost may be offset through volume purchase savings, value engineering/value analysis in conjunction with our major customers and reductions in the cost of off-quality products and processes. The Company may evaluate commodities hedging opportunities from time to time.

**Competition**

The Company is a leading supplier in automotive molded carpet and acoustics, auto fabrics, convertible top systems and automotive plastics components and cockpits, within each segment. Customers rigorously evaluate suppliers on the basis of product, quality, price competitiveness, technical expertise and development capability, new product innovation, reliability and timeliness of delivery, product design capability, leanness of facilities, operational flexibility, customer service and overall management. Some competitors may have greater financial resources than the Company or a competitive advantage in the production of any given

product that the Company manufactures, and there can be no assurance that the Company will be able to successfully compete in the markets for the products it currently provides.

## Joint Ventures

In January 2003, the Company acquired from Textron the remaining 50% interest in Textron Automotive Holdings (Italy) S.r.L., a joint venture that was formed as part of the TAC-Trim acquisition. Refer to Item 7. "Management's Discussion and Analysis of Financial Condition and Results of Operations" for additional discussion regarding this acquisition of the remaining 50% interest in the Italian joint venture.

## Labor Matters and Employees

As of December 31, 2002, the Company's continuing operations employed approximately 25,000 persons on a full-time or full-time equivalent basis. Approximately 57% of such employees were represented by labor unions in the United States, Canada and other countries. Each facility with represented employees has its own collective bargaining unit and management believes that its relations with employees represented by labor unions and other employees are generally good. From time to time in the ordinary course of our business, grievances are filed against the Company by employees and unions.

## Environmental Matters

A discussion of environmental matters is included in Item 3. "Legal Proceedings" and Item 7. "Management's Discussion and Analysis of Financial Condition and Results of Operations" and in Note 21 "Commitments and Contingencies" of this report.

## Item 2.    *Properties*

The Company has over 115 plants and facilities in North America, South America, Europe and Asia. Approximately 60% of the over 14 million total square footage of these facilities is owned and the remainder is leased. Many facilities are strategically located to provide product delivery to our customers on a just-in-time basis.

### Facilities by Geographic Region

| Type of Facility | North America | South America | Europe | Asia | Total |
|---|---|---|---|---|---|
| Manufacturing | 52 | 4 | 29 | — | 85 |
| Design, Research & Development, and Technical Centers | 19 | — | 7 | — | 26 |
| Sales Branches, Offices, Other | 13 | — | 5 | 2 | 20 |
| Total(1) | 84 | 4 | 41 | 2 | N/A |

(1) Total facilities shown per the table exceeds the 115 plants and facilities indicated above because certain facilities listed in the table serve in more than one of the indicated capacities.

## Item 3.    *Legal Proceedings*

Except as described below, the Company and its subsidiaries are not party to any material pending legal proceedings, but is involved in ordinary routine litigation incidental to the business.

*Environmental:* The Company is subject to federal, state, local and foreign environmental, and health and safety, laws and regulations that (i) affect ongoing operations and may increase capital costs and operating expenses in order to maintain compliance with such requirements and (ii) impose liability relating to contamination at facilities, and at other locations such as former facilities, facilities where we have sent wastes for treatment or disposal, and other properties to which the Company may be linked. Such liability may include, for example, investigation and clean-up of the contamination, personal injury and property damage

16

caused by the contamination, and damages to natural resources. Some of these liabilities may be imposed without regard to fault, and may also be joint and several (which can result in a liable party being held responsible for the entire obligation, even where other parties are also liable).

Management believes that it has obtained, and is in material compliance with those material environmental permits and approvals necessary to conduct its various businesses. Environmental compliance costs for continuing businesses are accounted for as normal operating expenses or capital expenditures, except for certain costs incurred at acquired locations. Environmental compliance costs relating to conditions existing at the time of an acquisition are generally charged to reserves established in purchase accounting. The Company accrues for environmental remediation costs when such obligations are known and reasonably estimable. In the opinion of management, based on the facts presently known to it, such environmental compliance and remediation costs will not have a material effect on the business, consolidated financial condition, future results of operations or cash flows.

The Company is legally or contractually responsible or alleged to be responsible for the investigation and remediation of contamination at various sites, and for personal injury or property damages, if any, associated with such contamination. At some of these sites the Company has been notified that it is a potentially responsible party ("PRP") under the federal Superfund law or similar state laws. Other sites at which the Company may be responsible for contamination may be identified in the future, including with respect to divested and acquired businesses.

The Company is currently engaged in investigating or remediating certain sites as discussed in the paragraphs below. In estimating the cost of investigation and remediation, the Company considered, among other things, its prior experience in remediating contaminated sites, remediation efforts by other parties, data released by the United States Environmental Protection Agency ("USEPA"), the professional judgment of the Company's environmental experts, outside environmental specialists and other experts, and the likelihood that other identified PRPs will have the financial resources to fulfill their obligations at sites where they and the Company may be jointly and severally liable. It is difficult to estimate the total cost of investigation and remediation due to various factors including: incomplete information regarding particular sites and other PRPs; uncertainty regarding the nature and extent of environmental problems and the Company's share, if any, of liability for such problems; the ultimate selection among alternative approaches by governmental regulators; the complexity and evolving nature of environmental laws, regulations and governmental directives; and changes in cleanup standards.

The Company has established accruals for certain contingent environmental liabilities. The Company accrues for environmental investigatory and non-capital remediation costs when litigation has commenced or a claim or assessment has been asserted or is imminent, the likelihood of an unfavorable outcome is probable, and the financial impact of such outcome is reasonably estimable. As of December 31, 2002 and 2001, total reserves for those contingent environmental liabilities are approximately $64.5 million and $59.6 million, respectively.

The Company is a party to a Consent Decree with the State of New Hampshire to remediate a former industrial landfill known as the Cardinal Landfill in Farmington, New Hampshire. Pursuant to that Consent Decree, the Company is currently conducting a pilot test for a proposed remediation of chlorinated compound contaminants in groundwater. The Consent Decree calls for a remedy to be in place by 2004. The Company is a defendant in two lawsuits filed by a total of 91 individual plaintiffs for alleged personal injuries arising from Cardinal Landfill conditions. The Company will vigorously contest these allegations. As of December 31, 2002, the Company has accrued $15.7 million for Cardinal Landfill.

The Company is a party, as a member of a PRP workgroup, to a Consent Decree entered with the USEPA for the remediation of a former municipal landfill in Dover, New Hampshire. The town of Dover, New Hampshire is also a member of the PRP group and a party to the Consent Decree. Pursuant to the terms of the Consent Decree, the PRP group is currently engaged in the preparation of a remediation design. The Consent Decree requires that a remedy for the site be in place by 2004. As of December 31, 2002, the Company has accrued $9.6 million for Dover.

17

Pursuant to a Consent Decree signed with the USEPA, the Company is currently engaged in a full-scale remediation for groundwater and soil contamination at the former Stamina Mills manufacturing facility in North Smithfield, Rhode Island. Remediation activities have been ongoing since 1998. The Company is also in negotiation with the USEPA regarding a claim for past oversight costs. A resolution of this matter is anticipated in 2003. As of December 31, 2002, the Company has accrued $14.1 million for Stamina Mills.

The Company is working with the Michigan Department of Environmental Quality (MDEQ) to investigate and remediate soil and groundwater contamination at a former manufacturing plant in Mancelona, MI and at adjacent owned property formerly used for the treatment and disposal of plating waste. MDEQ is likely to require remediation of groundwater. In addition, the Company is incurring costs in connection with the provision of alternate water supplies to residences in the area.

The current owner of one of the Company's former manufacturing plants located in Bowling Green, OH has entered into an Administrative Order on Consent with the Ohio Environmental Protection Agency (OEPA) requiring investigation and remediation of contamination at the site. The Company is reimbursing the current owner for costs associated with ongoing groundwater monitoring and, following selection of an appropriate remedy by OEPA, will assume 90% of future remediation costs.

In the 1980's and 1990's, the California Regional Water Quality Control Board (CRWQCB) and other state agencies ordered a predecessor of the Company to investigate and remediate soil and groundwater contamination at a former lumber treatment plant in Elmira, Ca. In 1996, the Company entered into an agreement with the State of California to conduct long-term operation and maintenance of the remedy implemented at the site.

In the opinion of management, based on information presently known to it, identified environmental costs and contingencies will not have a material effect on the Company's consolidated financial condition, future results of operations or cash flows. However, we can give no assurance that we have identified or properly assessed all potential environmental liability arising from the Company's business or properties, and those of the Company's present and former subsidiaries and their corporate predecessors.

During 2002, the Company received proceeds of $15.8 million on environmental claims related to discontinued operations. Of this amount, $9.5 million was recorded as income from discontinued operations, net of income taxes.

During 2001, the Company received proceeds of $14.5 million on environmental claims related to discontinued operations. Of this amount $8.8 million was recorded as income from discontinued operations, net of income taxes.

*Other Claims:* As of December 31, 2002, the Company is party to approximately 780 pending cases alleging personal injury from exposure to asbestos containing materials used in boilers manufactured before 1966 by former operations of the Company which were sold in 1966. Asbestos-containing refractory bricks lined the boilers and, in some instances, the Company's former operations installed asbestos-containing insulation around the boilers. These pending cases do not include cases that have been dismissed or are subject to agreements to dismiss due to the inability of the plaintiffs to establish exposure to a relevant product and cases that have been settled or are subject to settlement agreements. Total settlement costs for these cases have been less than $617,750 or an average of less than $10,127 per settled case. The defense and settlement costs have been substantially covered by our primary insurance carriers under a claims handling agreement that expires in August 2006. The Company has primary, excess and umbrella insurance coverage for various periods available for asbestos-related boiler and other claims. The Company's primary carriers have agreed to cover approximately 80% of certain defense and settlement costs up to a limit of approximately $70.5 million for all claims made, subject to reservations of rights. The excess insurance coverage, which varies in availability from year to year, is approximately $620 million in aggregate for all claims made. Based on the age of the boilers, the nature of the claims and settlements made to date, and the insurance coverage, management does not believe that these cases will have a material impact on the Company's financial condition, results of operations or cash flows. However, it cannot assure that the Company will not be subjected to significant

18

additional claims in the future, that insurance will be available as expected or that unanticipated damages or settlements in the future would not exceed insurance coverage.

A purported class action was filed on March 24, 2003 in the United States District Court for the Eastern District of Michigan (No. 03 CV 71173). The action was purportedly filed on behalf of purchasers of the common stock of the Company between August 7, 2001 and August 2, 2002 against the Company, Heartland Industrial Partners, L.P. and ten senior officers and/or directors of the Company. The complaint alleges that the defendants violated Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, and Rule 10b-5 promulgated thereunder, by issuing a series of materially false and misleading statements pertaining to, among other things, the anticipated benefits of the TAC-Trim acquisition. The Company believes that the claims are without merit and intends to vigorously defend the lawsuit. The Company does not believe that the suit will have a material impact on the Company's financial condition, results of operations or cash flow.

### Item 4.    *Submission of Matters to a Vote of Security Holders*

None during the fourth quarter of 2002.

### Item 5.    *Market for Registrant's Common Equity and Related Stockholder Matters*

The Company's Common Stock has been traded on the New York Stock Exchange under the symbol "CKC" since July 7, 1994. At March 18, 2003, there were approximately 120 holders of record. The following table lists the high and low closing prices for the Common Stock for the full quarterly periods during the two most recent years.

|  | 2002 | | 2001 | |
|---|---|---|---|---|
|  | **High** | **Low** | **High** | **Low** |
| First Quarter | 25.500(1) | 16.750(1) | 14.218(1) | 8.950(1) |
| Second Quarter | 28.375(1) | 9.000(1) | 15.500(1) | 10.125(1) |
| Third Quarter | 9.000 | 2.810 | 21.425(1) | 9.875(1) |
| Fourth Quarter | 4.450 | 2.450 | 25.750(1) | 11.900(1) |

(1)    Adjusted for May 28, 2002 2.5 to 1 reverse stock split.

On December 31, 2002, Heartland owned approximately 36% of the outstanding shares; Blackstone Partners and WP Partners owned approximately 11%; Joan Fabrics Corp. and Mr. Elkin McCallum and associates owned approximately 7%; Mr. Charles E. Becker and Textron each owned approximately 9%.

The Company has paid no dividends or made similar distributions with respect to its common stock during 2002 or 2001. Any payment of future dividends and the amounts thereof will be dependent upon the Company's earnings, financial requirements and other factors deemed relevant by the Company's Board of Directors. Certain restrictive covenants contained in the agreements governing the Company's credit facilities and senior subordinated notes limit the Company's ability to make dividend and other payments. See ITEM 7. "Management's Discussion and Analysis of Financial Condition and Results of Operations — Liquidity and Capital Resources" and Note 9 to the Consolidated Financial Statements.

**Item 6.**  *Selected Financial Data*

| | December 31, 2002 | December 31, 2001 | December 31, 2000 | December 25, 1999 | December 26, 1998 |
|---|---|---|---|---|---|
| | | | (in millions, except per share data) | | |
| **Statement of Operations Data:** | | | | | |
| Net sales | $ 3,885.8 | $ 1,823.3 | $ 1,901.8 | $ 1,898.6 | $ 1,825.5 |
| Gross profit | 518.1 | 218.8 | 266.6 | 284.7 | 248.2 |
| Selling, general and administrative expenses | 293.5 | 157.3 | 151.4 | 145.8 | 142.7 |
| Restructuring charge and impairment of long-lived assets(2) | 56.9 | 18.8 | — | 33.4 | — |
| Goodwill amortization | — | 7.1 | 7.1 | 7.0 | 7.0 |
| Operating income | 167.7 | 35.6 | 108.1 | 98.5 | 98.5 |
| Interest expense, net | 148.9 | 84.3 | 96.6 | 92.1 | 82.0 |
| Subsidiary preferred stock requirements | 38.4 | 2.4 | — | — | — |
| Loss on sale of receivables | 4.2 | 10.8 | 9.2 | 5.4 | 6.1 |
| Income (loss) from continuing operations before income taxes | (33.8) | (68.3) | 0.8 | (1.2) | 5.2 |
| Income tax expense (benefit) | 17.5 | (18.6) | 2.2 | 0.2 | 5.3 |
| (Loss) from continuing operations | (51.3) | (49.7) | (1.4) | (1.4) | (0.1) |
| Income from discontinued operations, including disposals, net of income taxes | 9.5 | 8.8 | 6.6 | — | — |
| Income (loss) before extraordinary items and cumulative effect of a change in accounting principle | (41.8) | (40.9) | 5.2 | (1.4) | (0.1) |
| Net income (loss)(3) | (53.5) | (46.2) | 4.5 | (10.2) | (3.8) |
| **Per Share Data(4):** | | | | | |
| (Loss) from continuing operations per basic and diluted share | (1.15) | (1.28) | (0.06) | (0.05) | — |
| Dividends per share | — | — | — | 0.32 | — |
| **Balance Sheet Data (at period end):** | | | | | |
| Total assets | $ 3,157.1 | $ 2,987.9 | $ 1,280.3 | $ 1,348.9 | $ 1,382.2 |
| Long-term debt, including current portion | 1,278.7 | 1,302.5 | 884.0 | 912.5 | 866.0 |
| Mandatorily redeemable preferred stock of subsidiary | 123.9 | 149.3 | — | — | — |
| Common stockholders' equity (deficit) | 397.5 | 374.7 | (154.9) | (151.1) | (79.8) |
| **Other Data:** | | | | | |
| Capital expenditures | $ 147.9 | $ 54.5 | $ 69.0 | $ 86.4 | $ 95.8 |
| Depreciation and amortization | 117.0 | 81.8 | 74.8 | 71.5 | 67.1 |

(1)  The years 2002 & 2001 were calendar years; fiscal year 2000 had 53 weeks; all other fiscal years had 52 weeks.

(2)  In 2002, the Company recorded a $56.9 million restructuring charge consisting of $18.0 million in asset impairments and $33.2 million primarily related to severance accruals and $5.7 million primarily related to other contractual obligations. In 2001, the Company recorded a restructuring charge consisting of $7.6 million in asset impairments and $11.2 million primarily related to severance accruals. In 1999, the Company recorded a restructuring charge consisting of $13.4 million in asset impairments and $20.0 million primarily related to severance accruals.

(3)  In 2002, the Company recorded an $11.7 million charge for the cumulative effect of a change in accounting principle related to an impairment loss. In 1999, the Company recorded an $8.8 million charge for the cumulative effect of a change in accounting principle related to start-up costs.

(4)  On May 28, 2002, the Company effected a one-for-2.5 reverse stock split of the Company's common stock. All shares and per share data have been adjusted retroactively for all periods presented to reflect the stock split.

**Item 7.**    *Management's Discussion and Analysis of Financial Condition and Results of Operations*

**General**

The Company is a global leader in the design, engineering and manufacturing of automotive interior components, including instrument panels, fully assembled cockpit modules, floor and acoustic systems, automotive fabric, interior trim and convertible top systems. The Company has the number one or two North American market share position in seven out of ten major automotive interior categories tracked by CSM Worldwide and is also the largest North American supplier of convertible top systems. Also, the Company is a leading global supplier of fully assembled cockpit modules, a growing market segment.

Sales are primarily made to North American and European automotive OEMs and Tier I total interior integrators. In North America, the Company manufactures components for approximately 90% of all light vehicle production platforms. The automotive supply industry in which the Company competes is cyclical and is influenced by the level of North American and European vehicle production.

The Company's net sales in 2002 were $3,885.8 million compared to $1,823.3 million in 2001. Capitalized terms that are used in this discussion and not defined herein have the meanings assigned to such terms in the Notes to Consolidated Financial Statements.

Investors can obtain free access to the Company's filings with the Securities and Exchange Commission by accessing the Company's website at http://www.collinsaikman.com/investor/docs.html.

**Results of Operations**

*2002 Compared to 2001*

*Net Sales:* Net sales for 2002 increased 113.1% to $3,885.8 million up $2,062.5 million from 2001. The increase in net sales was primarily driven by the acquisitions of TAC-Trim, Becker, Joan and Southwest Laminates (SWL), which contributed approximately $2,090 million. Sales for 2002 increased approximately $400.6 million or 11.5% over pro forma 2001 sales of $3,485.2 million. New programs, increased content, a higher North American build rate and the 2002 acquisition of SWL drove this sales increase. In North America the build rate increased about 6.0%. Pro forma 2001 sales are based on previous filings with the SEC and include TAC-Trim, Becker and Joan for the full year.

Excluding the impact of the acquisitions, net sales decreased 1.5% from last year. The decrease is due primarily to $31 million of discontinued non-automotive and low margin business and $42 million of customer price reductions offset by a $35 million increase in new business and a $10 million strengthening of foreign currencies.

Net sales for the North American Automotive Interior Systems division (NAAIS) increased $1,515.2 million to $2,613.4 million from 2001. Excluding the impact of the TAC-Trim and Becker acquisitions totaling approximately $1,526 million, net sales for NAAIS decreased 1.0%. This reduction is primarily due to $15 million of discontinued non-automotive mat business, a $29 million decline in plastics sales (of which $12 million was due to shutdowns of customer assembly plants), $17 million of customer price reductions and $3 million attributable to the weaker Canadian currency. These decreases were offset by a $55 million increase in Carpet and Acoustic volumes due to higher North American car builds when compared to the prior year.

Net sales for the European and Rest of World Automotive Interior Systems division (Europe and ROW), which includes South America, increased 177.5% to $718.0 million from 2001. Without the benefit of TAC-Trim sales totaling approximately $460 million, sales were essentially unchanged. Sales were impacted primarily by approximately $9 million of reduced production volume, $4 million of customer price reductions and $1 million of discontinued low margin business offset by a $13 million impact from the strengthening of European currencies.

Net sales for the Specialty Automotive Products division increased 18.9% to $554.4 million compared to 2001. Excluding the acquisition of Joan and SWL, which contributed approximately $103 million to net sales,

21

sales decreased 3.3%. The decline is primarily due to $15 million of customer price reductions and $14 million of discontinued low margin business. These decreases were partially offset by approximately $18 million related to increased production volumes.

*Gross Profit:* For 2002, gross profit increased to 13.3% from 12.0% in 2001. The combined gross profit of the NAAIS and of the Specialty Automotive Products divisions increased from 13.2% to 15.7%. The increases at these divisions resulted from approximately $62 million in manufacturing efficiencies and purchasing savings, partially offset by $32 million of customer price reductions net of commercial recoveries and rebates and $11 million of product launch and plant consolidation cost. The increase at these divisions was offset by a decline in the gross profit of Europe and ROW from 4.4% to 2.7%. This Europe and ROW decline was due primarily to a change in sales mix resulting in higher sales of its lower margin cockpit assembly business and operating inefficiencies.

*Selling, General and Administrative Expenses:* Selling, general and administrative expenses for 2002 were $293.5 million compared to $164.4 million in 2001. The increase is due to the additional costs assumed from the acquisitions offset by $6.1 million of goodwill amortization expensed in 2001. Due to the elimination of duplicate efforts, reduced headcount and reduced discretionary spending, selling, general and administrative expenses as a percentage of sales declined from 9.0% in 2001 to 7.6% in 2002.

*Restructuring Charge:* During 2002, the Company undertook three restructuring programs resulting in charges totaling $56.9 million. The goal of the first restructuring program that resulted in a charge of $9.1 million in the first quarter was to de-layer management in the North American, European and Specialty operations. The objective of the second program that resulted in a charge of $33.8 million in the third quarter was to realign the operations in North America. Included in the third quarter restructuring charge was $8.9 million related to the separation agreement with Thomas Evans, the former Chairman and CEO. The third program resulted in a charge of $14.1 million in the fourth quarter. The objective of this program was to consolidate plant operations in Europe and to further de-layer management in North America. The pre-tax fourth quarter charge includes $4.8 million of severance cost and cost related to other contractual obligations and $9.3 million of asset impairment charges. The 2002 restructuring programs resulted in the separation of over 1,100 personnel.

During 2001, the Company undertook two restructuring programs resulting in charges totaling $18.8 million. The goal of the first quarter 2001 restructuring program which, resulted in a charge of $9.2 million, was to de-layer management in the North American, European and Specialty operations. The second program resulted in a fourth quarter charge of $9.6 million. The objective of this program was to downsize three facilities in North America via better utilization of manufacturing and warehouse floor space (including associated headcount reductions) and to reduce headcount in our Mexican operations. The $18.8 million charge includes $11.2 million of severance costs and $7.6 million of asset impairment charges.

*Operating Income Highlights by Division:* The NAAIS results reflect a $42.4 million improvement in operating performance at the Carpet & Acoustics business. The improvement was primarily attributable to approximately $13 million of sales growth resulting from an increase in light vehicle build and $44 million of manufacturing improvements and purchasing savings, offset by $12 million of customer price reductions and $6 million of restructuring cost. After considering the approximate $141 million impact of acquisitions, the Plastic & Cockpit business operating income declined. The decline was driven by a $8 million decrease in sales volumes and resulting inefficiencies associated primarily with certain GM models, $11 million of product launch and plant consolidation costs, $2 million related to the decline in plastic sales due to the shutdown of customer assembly plants and $6 million of customer price reductions. These decreases were offset by $10 million of purchasing and spending savings and reductions in administrative expenses.

The Europe and ROW operating performance was adversely impacted by approximately $30 million loss related to locations acquired in 2001, $17 million of customer price reductions and operating inefficiencies including $10 million of launch costs associated with the BMW Mini program. These reductions were offset by $8 million of new business, spending and purchase savings and savings related to restructuring plans.

22

Specialty Automotive Products operating income increased $37.8 million primarily the result of $32 million of improved manufacturing performance, purchasing savings, reductions in administrative expense and savings related to restructuring plans, $4 million due to increased build volumes, and approximately $19 million from the impact of the acquisitions. These increases were partially offset by $14 million of customer price reductions.

*Interest Expense:* Net interest expense increased $64.6 million to $148.9 million for 2002. The increase in interest expense is primarily attributed to higher average debt balances and increased amortization of debt issue costs resulting from the TAC-Trim acquisition, partially offset by the benefit of working capital reductions.

*Loss on Sale of Receivables:* The Company has the ability to sell, through its Carcorp subsidiary, interests in a pool of accounts receivable. In connection with the receivable sales, a loss of $4.2 million was recognized during 2002, compared to a loss of $10.8 million for 2001. In December 2001, the Company entered into a new larger receivable facility in connection with the TAC-Trim acquisition, resulting in up-front fees of $5.6 million.

*Subsidiary Preferred Stock Accretion and Dividend:* In connection with the TAC-Trim acquisition on December 20, 2001, Products issued to Textron preferred stock with a liquidation preference of $326.4 million and an estimated fair market value of $146.9 million. In June 2002, Products repurchased $133.3 million of liquidation preference Series A preferred stock that was initially valued at $56.8 million, along with accrued dividends of $6.9 million. The difference between the initial recorded value and the initial liquidation preference will be accreted over the life of the stock using the effective interest method. The 2002 preferred stock accretion and dividend costs were $7.6 million and $30.8 million. The 2001 preferred stock accretion and dividend costs were $0.9 million and $1.5 million.

*Other expense, net:* In 2002, other expenses, net primarily included $12.6 million of losses related to derivatives used in the Company's foreign currency hedging strategy, $5.5 million of losses related to investments in joint ventures and $1.9 million of losses from sale and leaseback transactions offset by $5.9 million of foreign currency transaction gains and minority interest share of losses of a consolidated subsidiary of $6.5 million.

In 2001, "other expenses, net" primarily included $7.8 million of foreign currency transaction losses and $8.2 million of losses from sale and leaseback transactions offset by $5.0 million of derivatives gains and a $6.2 million gain related to a stock demutualization.

*Income Taxes:* The Company recognized an income tax expense of $17.5 million for 2002 compared to an income tax benefit of $18.6 million in 2001. Net cash taxes paid during the period were $12.8 million. The primary reasons for the Company's relatively high effective tax rate are non-deductible preferred stock dividends and accretion, foreign losses for which tax benefits are not recorded and certain taxes that do not fluctuate directly with income.

*Discontinued Operations:* During 2002 and 2001, the Company received payment on environmental claims related to discontinued operations, for which reserves were previously charged, and received proceeds of $15.8 million and $14.5 million, respectively. Of these amounts, $9.5 million and $8.8 million were recorded as income from discontinued operations in 2002 and 2001, respectively, net of income taxes of $6.3 million and $5.7 million, respectively.

*Extraordinary Charge:* During 2001, the Company recognized extraordinary charges of $5.3 million of which $5.0 million represents a write-off of debt issue costs associated with our old credit facility, which was replaced by a new credit facility entered into in conjunction with the Company's TAC-Trim acquisition. Also, during 2001 charges were recorded in connection with the repurchase of JPS Automotive Senior Notes at prices in excess of carrying values of $0.3 million.

*Cumulative Effect of Change in Accounting Principle:* During 2002, the Company completed its implementation of SFAS 142, Goodwill and Other Intangible Assets. Under SFAS 142 goodwill and indefinite-lived assets are no longer amortized but are tested for impairment. In accordance with SFAS 142,

23

the Company employed a discounted cash flow analysis in conducting its impairment test. As a result of the test, the Company recorded an impairment loss of $11.7 million relating to the UK Plastics business in the European and ROW segment.

*Net Loss:* The combined effect of the foregoing resulted in net loss of $53.5 million for 2002, compared to net loss of $46.2 million in 2001.

*Net (Loss) Available to Common Shareholders:* In June 2002, $100.0 million of proceeds from a 16 million share common stock offering was used to repurchase Series A preferred stock at a price of 75% of its liquidation preference of $133.3 million. The redeemed Series A preferred stock had a carrying value of $63.7 million. In accordance with generally accepted accounting principles, the difference between the $63.7 million in carrying value and the $100.0 million cash payment was excluded from net income and recorded directly to equity in the Company's accumulated deficit account. Although this $36.3 million equity charge is excluded from net income, the charge is included in the computation of earnings/(loss) per share and is included in the net loss available to common shareholders.

### *2001 Compared to 2000*

*Net Sales:* Net sales for 2001 decreased 4.1% to $1,823.3 million, down $78.5 million from 2000. Excluding the favorable impact of sales from acquired businesses during 2001 of approximately $127.2 million, net sales would have decreased 10.8%. The reduction in net sales, excluding the effect of acquisitions, was primarily driven by a decrease in North American vehicle production of 10% or $135.0 million versus 2000. The Company was particularly adversely impacted by the recession and declining consumer confidence as well as by terrorist attacks in the United States. These factors led to substantially reduced inventory levels at the Company's customers in the fourth quarter as customers sold vehicles in an uncertain and difficult economic environment. Sales for the 2001 period were also impacted by customer price reductions of $30.0 million, and weaker Canadian and European currencies of $24.0 million, and a reduction in headliner fabrics business of $20.0 million.

Net sales for NAAIS during 2001 were down 1.9% to $1,098.2 million, a decrease of $21.2 million from fiscal 2000. Excluding the favorable impact of sales from the Tac-Trim and Becker acquisition during 2001 of approximately $95.2 million, net sales would have decreased 10.4%. The decline in net sales, excluding the effect of the Becker acquisition, was primarily driven by a decrease in North American vehicle production of $100.0 million and customer price reductions of $24.0 million.

Net sales for Europe and ROW were down $25.8 million to $258.7 million during 2001, a decrease of 9.1% from fiscal 2000. The decrease in Europe was primarily due to the negative impact caused by changes in foreign currency exchange rates of $16.0 million and customer price reductions of $6.0 million.

Net sales for the Specialty Automotive Products division decreased 6.3% to $466.4 million in 2001, down $31.5 million from 2000. Excluding the favorable impact of sales from the Joan acquisition during 2001 of approximately $31.4 million, net sales would have decreased 12.6%. The decrease, excluding the impact of the Joan acquisition, was due primarily to lower North American vehicle production ($35.0 million) and a reduction in headliner fabric business ($20.0 million).

*Gross Profit:* For 2001, gross profit was 12.0%, down from 14.0% in 2000. This decrease was primarily a result of decreased operating leverage related to lower volumes in both North America and Europe. Additionally, during 2001 gross profit was adversely impacted by the following items:

- *TAC-Trim Acquisition:* Due to the closing of the TAC-Trim acquisition on December 20, 2001, the Company incurred eleven days of fixed costs during a normal industry shutdown period with less than $6 million in sales. This resulted in a gross margin loss for the eleven days of $4.2 million.

- *Launch Costs:* The Company incurred launch costs during the second and third quarters of 2001 related to the Ford Thunderbird convertible program in the Company's Specialty Automotive Products division. In Europe, the Company's plastics facility in the UK experienced difficulties principally

24

related to an outside paint supplier on the launch of the new BMW R50 (Mini) program during the second half of 2001.

- • *Integration Costs:* The Company incurred $2.5 million of costs during the fourth quarter of 2001 related to acquisition integration. The majority of these costs related to the Becker and Joan acquisitions.

- • *Facility Closure Costs:* In addition, during 2001, we incurred $2.5 million of costs related to the sale of the retail/commercial floormat business in North America and the shutdown of a small accessory floormat facility.

- • These unfavorable items were exacerbated by various customer price reductions of approximately $40.0 million but were partially offset by commercial recoveries of $6.9 million and improvements in operating performance at NAAIS of $10.3 million and at the fabrics operations of $5.5 million.

*Selling, General and Administrative Expenses:* Selling, general and administrative expenses for 2001 were $164.4 million, compared to $158.5 million in 2000. Relative to 2001, the comparable 2000 period included an extra week of costs due to the fiscal year change mentioned earlier. The increase is primarily due to additional costs assumed from acquisitions of $7.4 million, credits in 2000 relating to a pension related actuarial benefit and the sale of property totaling $2.0 million and additional expense in 2001 related to management incentive compensation plans of $3.0 million. These items more than offset the benefit in 2001 of cost reductions from earlier restructuring programs and reduced spending. As a percentage of sales, selling, general and administrative expenses were 9.0% and 8.3% for 2001 and 2000, respectively.

*Restructuring Charge:* During 2001, the Company undertook two restructuring programs resulting in charges totaling $18.8 million. The goal of the first quarter of 2001 restructuring program charge of $9.2 million was to delayer management in the North American, European and Specialty operations. The second program resulted in a fourth quarter charge of $9.6 million. The objective of this program was to downsize three facilities in North America via better utilization of manufacturing and warehouse floor space (including associated headcount reductions) and to reduce headcount in our Mexican operations. The pre tax $18.8 million charge includes $11.2 million of severance costs and $7.6 million of asset impairment charges.

*Operating Income Highlights by Division:* Operating income at NAAIS declined to $68.7 million for 2001 from $88.0 million for the prior year. The decline in NAAIS operating income primarily reflected the impact of lower North American production volumes of $8.7 million as well as restructuring charges of $8.2 million which were offset by improvements in operating performance of $10.3 million. The results for 2001 also included costs of $3.2 million related to the sale of the retail/commercial floormat business and the shutdown of a small accessory floormat facility.

Operating income at Europe and ROW declined to a loss of $24.9 million for 2001 from income of $0.6 million for 2000. The decline in operating income primarily reflected the impact of product mix and customer price reductions along with the recognition of restructuring charges. Additionally, Europe and ROW operating performance was adversely impacted by launch costs associated with the BMW R50 (Mini) during the second half of 2001 as well as a $1.1 million loss on the sale of a small metal pressing operation in the UK in the third quarter of 2001. Benefits from earlier restructuring programs and purchasing savings reduced the negative impact of these items.

Operating income at the Specialty Automotive Products division declined to $10.6 million for 2001 from $19.5 million for 2000. The decline in Specialty Automotive Products division operating income primarily reflects expenses incurred due to the ramp up of the Chrysler Sebring convertible in the early part of 2001 of $6.1 million, the start up of the new Ford Thunderbird convertible in mid-year 2001 of $1.5 million and the impact of restructuring charges of $1.7 million. Margins, as a percentage of sales, for the fabrics business remained consistent with 2000, as better operating performance and benefits of added volume from the Joan acquisition offset the margin impact of lower net sales driven by lower industry production and reduction in headliner fabric business.

25

*Interest Expense:* Interest expense for 2001 decreased $12.3 million to $84.3 million as compared to 2000. The decrease in interest expense is primarily attributed to lower average debt balances resulting from the Heartland Transaction, and lower borrowing rates in North America partially offset by increased amortization of debt issue costs resulting from the Heartland Transaction. The benefit of working capital reductions and sale and leaseback transactions also offset increased borrowings related to acquisitions.

*Loss on Sale of Receivables:* The Company has the ability to sell, through its Carcorp subsidiary, interests in a pool of accounts receivable. In connection with the receivable sales, a loss of $10.8 million was recognized during 2001, compared to a loss of $9.2 million for 2000. Included in the 2001 and 2000 losses were up-front fees related to the new accounts receivable facilities put in place during both periods. In December 2001, the Company entered into a new larger facility in connection with the TAC-Trim acquisition, resulting in up-front fees of $5.6 million. During the first quarter of 2000, the Company incurred fees of $1.6 million associated with a new accounts receivable securitization replacing one that had expired. Excluding these expenses, the remaining decrease of $2.4 million, is primarily due to lower interest rates during 2001.

*Subsidiary Preferred Stock Accretion and Dividends:* In connection with the TAC-Trim acquisition on December 20, 2001, Products issued to Textron preferred stock with a liquidation preference of $326.4 million and an estimated fair market value of $146.9 million. The 2001 charge represents dividends accrued of $1.5 million and accretion of discount of $0.9 million.

*Other Expense, net:* The Company recognized other expense of $6.4 million in 2001, compared to other expense of $1.5 million in 2000. The increase in other expense resulted primarily from an $8.1 million loss on the sale and leaseback of real estate transactions completed during the second and fourth quarters of 2001, offset by a gain of $6.2 million on shares received as result of a stock demutualization and initial public offering. The remaining increase in expense is primarily due to higher foreign currency transaction losses.

*Income Taxes:* The Company recognized an income tax benefit of $18.6 million in 2001 compared to an income tax expense of $2.2 million in 2000. The overall effective tax rate for 2001 was 27.2 percent compared to 276 percent for 2000. Certain state taxes and permanent differences, that do not fluctuate with income, such as non-deductible goodwill and dividends and accretion of preferred stock impacted the effective rate by: (1) reducing the effective tax rate when a loss exists and a tax benefit is recorded, or (2) increasing the effective tax rate when we have income and tax expense is recorded.

*Discontinued Operations:* During 2001, the Company received payments on environmental claims related to discontinued operations of $14.5 million. During 2000, the Company settled claims for certain other environmental matters for $20.0 million. In fiscal 2001 and 2000, $8.8 million and $6.6 million were recorded as income from discontinued operations respectively, net of income taxes of $5.7 million and $4.4 million, respectively.

*Extraordinary Charge:* During 2001 and 2000, the Company recognized extraordinary charges of $5.3 million and $0.7 million, respectively. Of the 2001 charge, $5.0 million represents a write-off of debt issue costs associated with our old credit facility, which was replaced by a new credit facility entered into in conjunction with the Company's TAC-Trim acquisition. In addition, during 2001 and 2000 charges were recorded in connection with the repurchase of JPS Automotive Senior Notes at prices in excess of carrying values of $0.3 million and $0.7 million, respectively.

*Net Income:* The combined effect of the foregoing resulted in a net loss of $46.2 million for 2001, compared to net income of $4.5 million in 2000.

## Liquidity and Capital Resources

The Company and its subsidiaries had cash and cash equivalents totaling $81.3 million and $73.9 million at December 31, 2002 and December 31, 2001, respectively. Additionally, the Company had $248.7 million of unutilized availability under its credit arrangements and receivables facility as of December 31, 2002. The total was comprised of $93.2 million under the Company's receivables facility, $129.5 million under the Company's revolving credit facility, approximately $26.0 million under uncommitted bank facilities in Canada

26

and other foreign locations. Availability under the revolving credit facility was reduced by outstanding letters of credit of $45.5 million as of December 31, 2002.

The Company's principal sources of funds are cash generated from operating activities and borrowings under credit facilities. In addition, to facilitate the collection of funds from operating activities, the Company has sold receivables under its receivables facility and has also entered into an accelerated payment collection program with two of its larger customers. During 2002, the Company issued common stock, although such issuances are not likely to be a consistent source of financing in the near-term. The Company continues to seek means to generate additional cash for debt reduction and its growth strategy. Among other things, the Company seeks to further improve working capital management and continue to utilize a lease financing strategy.

### Operating Activities

Net cash provided by the continuing operating activities of the Company was $189.5 million for the year ended December 31, 2002, compared to $141.0 million for the year ended December 31, 2001. The 2002 increase is primarily the result of a decrease in working capital attributable to increases in accounts payable from the timing of payments.

### Investing Activities

Net cash used in investing activities of the Company was $186.1 million for 2002, compared to net cash used of $723.8 million for 2001. The decrease in cash used in investing activities is primarily the result of the Company spending $715.3 million less in the payment of acquisition costs for acquiring businesses and receiving $74.8 million less in proceeds from the sale of property, plant and equipment. The decreased use of cash was offset by a $93.4 million increase in capital expenditures which were the result of the larger size of the Company in 2002 due to acquisitions, and an additional investment in a joint venture of $5.9 million in 2002.

### Financing Activities

Net cash provided from financing activities for 2002 was $4.0 million compared to net cash from financing activities for the 2001 of $635.8 million. This decrease in cash provided from financing activities is the result of $100.0 million used for the repurchase of preferred stock, $413.9 million decrease in net borrowings, and $117.9 million decrease in proceeds from the issuance of stock.

At December 31, 2002, the Company had total outstanding indebtedness of $1,278.7 million (excluding short-term borrowings and approximately $45.5 million of outstanding letters of credit) at a weighted average interest rate of 9.9% per annum. Comparatively, at December 31, 2001, the Company had total indebtedness of $1,302.5 million.

During 2001, Heartland, and certain other investors, acquired 22.8 million shares of common stock from the Company at a price of $12.50 per share, representing a cash investment in the Company of $285.0 million before fees and expenses. Net proceeds paid to the Company from the equity transactions were $264.3 million. A portion of the proceeds were used to pay $10.7 million in transaction related costs to obtain; change in control consents, fees related to term loan facilities, and other amendments to credit agreement facilities. The remaining proceeds of $253.6 million were used to pay down a revolving credit facility and to fund part of the TAC-Trim acquisition.

During 2001, Products used proceeds from an amended and restated credit facility to retire all outstanding JPS Automotive 11 1/8% Senior Notes. The notes which were due June 2001, were repaid in full on March 28, 2001, at a redemption price equal to their principal amount with interest accrued to the redemption date. The Company recognized an extraordinary charge of $0.3 million in connection with this repurchase of the remaining outstanding JPS Automotive Senior Notes at prices in excess of carrying values. Borrowings under prior bank facilities were repaid during 2001 with proceeds from various financing arrangements that the

Company entered into as part of the TAC-Trim acquisition. These financing arrangements included entering into a new senior secured credit facility and a new receivables facility along with the issuance of preferred stock of a subsidiary and senior notes due in 2011.

The senior secured credit facility consists of a revolving credit facility and tranche A and tranche B term loan facilities. The revolving credit facility provides for revolving loans and extensions of credit up to a maximum principal amount of $175.0 million. A portion of the revolving credit facility will be available to Canadian subsidiaries in Canadian dollars and a portion of the revolving credit facility will be available in the form of letters of credit. The revolving credit facility, the tranche A term loan and the tranche B term loan mature in December 2005. Borrowings under the senior credit facilities bear interest at variable rates based on a spread to the adjusted LIBOR or a base rate, at the Company's option. The Company had $377.6 million and $400.0 million in term loans outstanding under this facility at December 31, 2002 and 2001, respectively.

On an ongoing basis, the Company has entered into an agreement to sell trade accounts receivable of certain business operations to a bankruptcy-remote, special purpose subsidiary, wholly owned by the Company. The Company's receivables subsidiary will, subject to certain conditions, from time to time, sell an undivided fractional ownership interest in a pool of domestic and certain Canadian receivables, up to a balance of $250 million, to bank-sponsored multi-seller commercial paper conduits under a committed facility. As of December 31, 2002, the Company had $93.2 million undrawn under the receivables facility.

New receivables will be added to the pool as collections reduce previously sold receivables. The Company expects to service, administer and collect the receivables on behalf of the receivables subsidiary and the conduits. The proceeds of sale will be less than the face amount of accounts receivable sold by an amount that approximates the purchaser's financing costs. In September 2002, the Company amended the receivables facility lengthening its term to expire in December 2004. The receivables facility is an important source of ongoing liquidity to the Company.

In December 2001, Products issued 182,700 shares of its Series A Redeemable Preferred Stock, 123,700 shares of Series B Redeemable Preferred Stock and 20,000 shares of Series C Redeemable Preferred Stock. The Preferred Stock was recorded at estimated fair value of $146.9, which was less than the liquidation value of $1,000 per share or $326.4 million. The estimated fair value was based on market prices for securities with similar terms, maturities and risk characteristics, and included a liquidation discount to reflect market conditions and was agreed to by the Company and Textron as part of the TAC-Trim purchase agreement. The difference between the initial recorded value and the liquidation value is being accreted over the 11 year terms of the securities. The results for 2002 and 2001, included subsidiary preferred stock requirements calculated using the effective interest method of $38.4 million and $2.4 million, respectively. The preferred stock requirement includes both accretion and dividend costs of $7.6 million and $30.8 million, respectively, for 2002 and $0.9 million and $1.5 million, respectively, for 2001. The carrying value of the Redeemable Preferred Stock includes accretion and accrued dividends.

Products issued $500 million of 10 3/4% Senior Notes due in 2011 in connection with the TAC-Trim acquisition. The Company also amended the existing $400 million of 11 1/2% senior subordinated notes due in 2006 to make each subsidiary guarantor of the Senior Notes a senior subordinated guarantor of the existing notes.

The following table sets forth the ratings as of December 31, 2002 for securities issued by the Company and its subsidiaries:

|  | Standard & Poors | Moody's |
|---|---|---|
| **Public Debt:** | | |
| 11 1/2% Senior Subordinated Note, due 2006 | B | B2 |
| 10 3/4% Senior Notes, due 2011 | B | B1 |

28

**Outlook**

To further enhance North American automotive revenues, OEMs and transplants are continuing to offer incentives in 2003 that should enable production schedules to remain consistent with 2002 levels. The European market is expected to remain relatively soft, and that market has the potential for continuing declines in production compared to the prior year's levels. However, the Company remains cautiously optimistic that North American vehicle production will remain stable for 2003 as inventory levels at the OEM's appear to be at higher levels than in comparable periods.

The Company's principal uses of funds from operating activities and borrowings for the next several years are expected to fund interest and principal payments on its indebtedness, growth related working capital increases, costs associated with the Company's previously divested businesses, capital expenditures and lease expense. In addition, selective acquisitions to expand our geographic and customer presence continue to be explored. The completion of the TAC-Trim acquisition on December 20, 2001 significantly increased the debt levels and has required significant additional liquidity in order to launch part of the projected new book of business and to finance capital expenditures related to those operations. Management expects that the majority of additional liquidity requirements will be funded from cash generated from operating the acquired companies. These new capital requirements will relate primarily to tooling and advanced engineering and development. While the Company ultimately expects to be entitled to receive these amounts from customers, it will need to finance these requirements to achieve its revenue goals. Otherwise, much of the increased capital expenditures relate to the Company's larger size and are expected to be serviced by the larger cash flow base. Management believes cash flow from operations will provide adequate sources of liquidity for the Company and could, if necessary, be supplemented with additional proceeds from financing activities. However, the Company's sources of liquidity may be inadequate if it is unable to successfully integrate acquired businesses in accordance with its expectations, economic conditions worsen, or the Company is unable to meet financial or operating covenants as a result of the foregoing. The Company continues to explore other sources of liquidity, including additional debt, but existing debt instruments may limit the Company's ability to incur additional debt, and the Company may be unable to secure equity or other financings. The Company also believes it could obtain favorable modifications related to existing debt instruments and related covenants.

*Contractual Obligations*

Below is the table that identifies the Company's significant contractual obligations. Following the table is a more detailed description of these obligations.

| | | Payment due by Period | | | |
|---|---|---|---|---|---|
| | Total | Less than 1 year | 1-3 years | 4-5 years | After 5 Years |
| | | | (in millions) | | |
| Long-term debt and capital lease obligations | $ 1,278.7 | $     23.5 | $     355.2 | $     400.0 | $     500.0 |
| Preferred stock* | 123.9 | — | — | — | 123.9 |
| Short-term borrowings | 10.5 | 10.5 | — | — | — |
| Operating leases | 346.9 | 50.0 | 95.4 | 68.3 | 133.2 |
| Capital expenditures | 36.2 | 36.2 | — | — | — |
| Total obligations | $ 1,796.2 | $     120.2 | $     450.6 | $     468.3 | $     757.1 |

* Mandatorily Redeemable Preferred Stock of Subsidiary

*Senior Secured Credit Facilities*

*General:* The Company's senior secured credit facility allowed funding in the aggregate of up to $553 million at December 31, 2002. Borrowings under the credit facility are secured by all the assets of the

29

Company and Products and certain of its subsidiaries, and are unconditionally and irrevocably guaranteed jointly and severally by the Company and each existing and subsequently acquired or organized domestic subsidiaries (other than by the Company's receivables subsidiary). Available funding under this credit facility is reduced if the program size or commitment level under the Company's receivable facility (discussed below) exceeds $250.0 million.

*Interest Rates and Fees:* Borrowings bear interest, at the Company's option, at either (a) adjusted LIBOR plus a 3.75% margin in the case of the revolving credit and tranche A term loan facilities and 4.00% margin in the case of the tranche B term loan facilities, in all cases subject to a minimum LIBOR of 3.00% or (b) the highest of (i) JPMorgan Chase Bank's prime rate, (ii) the federal funds effective rate plus 1/2 of 1.00% and (iii) the base CD rate plus 1.00%. A commitment fee on any unused commitments under the revolving portion of the credit facility equal to 1.00% per annum is payable quarterly in arrears and is subject to adjustment based on attaining certain performance targets.

*Covenants:* The credit facility requires that the Company meet certain financial tests, including, without limitation, the following tests: a maximum leverage ratio, a minimum interest coverage ratio and certain prescribed limitations on capital expenditures at levels to be agreed upon between the Company and the agents. The credit facility also contains covenants and restrictions, including, among others, limitations or prohibitions on declaring dividends and other distributions, redeeming and repurchasing capital stock, prepaying, redeeming and repurchasing other indebtedness, loans and investments, additional indebtedness, liens, sale-leaseback transactions, preferred stock, capital expenditures, recapitalizations, mergers, acquisitions and asset sales and transactions with affiliates.

*Events of Default:* The credit facility contains certain customary events of default, including, among others cross-default and cross-acceleration to other indebtedness (including the receivables facility).

### 11 1/2% Senior Subordinated Notes due 2006

Products has outstanding $400 million in principal amount of 11 1/2% Senior Subordinated Notes due 2006. In connection with the TAC-Trim acquisition, the Company amended the indenture governing these notes to make each subsidiary guarantor of the 10 3/4% Senior Notes due in 2011 a guarantor of these notes on a senior subordinated basis. The indenture governing these notes contains restrictive covenants (including, among others, limitations on indebtedness, restricted payments, liens, asset dispositions, change of control and transactions with affiliates) that are customary for such securities.

### 10 3/4% Senior Notes due 2011

As discussed above, in connection with the TAC-Trim acquisition, Products sold $500 million principal amount of 10 3/4% senior notes due 2011. The indenture governing these notes contains restrictive covenants (including, among others, limitations on indebtedness, restricted payments, liens, asset dispositions, change of control and transactions with affiliates) that are customary for such securities.

### Mandatorily Redeemable Preferred Stock of Subsidiary

*General:* As discussed above, as part of the consideration paid to Textron for the TAC-Trim acquisition, Products issued mandatorily redeemable preferred stock to Textron with an estimated fair market value of $146.9 million and a liquidation value of $326.4 million.

*Dividends:* Holders of this preferred stock are entitled to receive dividends accruing on the liquidation preference thereof at a rate of 11% per annum, in respect of dividend periods ending on or prior to July 1, 2003, and 15% per annum, in respect of dividend periods ending after July 1, 2003, in the case of the Series A Preferred Stock, 12% per annum, in respect of dividend periods ending on or prior to July 1, 2003, and 16% per annum, in respect of dividend periods ending after July 1, 2003, in the case of the Series B Preferred Stock, 12% per annum, in respect of dividend periods ending on or prior to July 1, 2003, and 16% per annum, in respect of dividend periods ending after July 1, 2003 and in the case of the Series C Preferred Stock, in each case payable quarterly in arrears, commencing on April 1, 2002 and accumulating from the date of issuance.

Products may, at its option, elect to accrue up to an amount equivalent to 7% per annum of the dividends on the Series A Preferred Stock, an amount equivalent to 8% per annum of the dividends on the Series B Preferred Stock and an amount equivalent to 8% per annum of the dividends on the Series C Preferred Stock in lieu of cash payment of such dividends and, in each case, any accrued dividends will be added to the liquidation preference of the applicable series of preferred stock. Products may at its option through January 1, 2004 accrue up to the full amount of all dividends in lieu of cash payment of such dividends. Thereafter, Products may at its option elect to accrue dividends of up to 7% of the liquidation value annually on Series A Preferred Stock and up to 8% of the liquidation value on Series B and C Preferred Stock. Accrued dividends will be added to the liquidation preference of the applicable series of Preferred Stock.

*Repurchase:* In June 2002, $100.0 million of proceeds from the 16 million share common stock offering was used to repurchase preferred stock from Textron at a price of 75% of its liquidation preference of 133.0 million. The redeemed Series A Preferred Stock had a carrying value of $63.7 million.

*Liquidation Preference:* Upon any voluntary or involuntary liquidation, dissolution or winding-up of Products, holders of the preferred stock will be entitled to be paid out of the assets of Products available for distribution to stockholders in the amount of $1,000 per share plus the aggregate amount of accrued dividends prior to any distribution to any holders of equity securities which rank junior to the preferred stock. In addition, upon any voluntary or involuntary liquidation, dissolution or winding-up of Products, the holders of Series C Preferred Stock will be entitled to a participation in distributions to Products' common equity tied to any appreciation in the value of Products' common equity subsequent the issuance date, not to exceed an aggregate of $2 million for all Series C Preferred Stock outstanding.

*Mandatory Redemption:* Products is required to redeem all of the Series A Preferred Stock and Series B Preferred Stock outstanding on January 1, 2013 at a redemption price equal to 100% of the liquidation preference thereof, plus accrued and unpaid dividends to the date of redemption. Products is also required to redeem all of the series C preferred stock outstanding on February 1, 2022 at a redemption price equal to 100% of the liquidation preference thereof, plus accrued and unpaid dividends to the date of redemption, plus common equity participation.

### *Operating Leases*

During 2002, the Company received net proceeds (after fees) of approximately $14.8 million from sale and leasebacks of real property and equipment. The aggregate lease expenses associated with these leases will be $18.8 million, $2.6 million of which relates to 2003.

During 2001, Products entered into sale and leaseback transactions for certain manufacturing equipment and non-manufacturing properties. The transactions resulted in the recognition of a $4.4 million net deferred asset that is being amortized over the lease term, and the recognition of an $8.7 million loss.

During 2001, the Company received net proceeds (after fees) of approximately $86.2 million from sale and leasebacks of real property and equipment, which it used to reduce outstanding debt. The aggregate lease expenses associated with these leases will be $88.8 million, $12.5 million of which relates to 2002. To the extent permitted by the credit facility, the Company may enter into additional similar leasing arrangements from time to time. As part of these sale-leaseback transactions, Products sold and contemporaneously leased back real property from unrelated third parties, and received net proceeds (after fees) of $46.4 million.

In June 2001, the Company entered into sale-leaseback transactions with each of New King, L.L.C. ("New King") and Anchor Court, L.L.C. ("Anchor Court"), which are affiliates of Becker Ventures LLC. Becker Ventures is controlled by Charles Becker, a Company director. See the information under the heading "— Other Information — Effect of Transactions with Related Parties."

In connection with these sale-leaseback transactions, Products sold and contemporaneously leased back real property located in Troy, Michigan and Plymouth, Michigan from New King and Anchor Court, respectively, for net proceeds of $15.1 million in aggregate. The initial lease term in each transaction is 20 years and each lease has two successive ten year renewal options. The basic rent for the Troy, Michigan

property is $1.3 million per year, and the basic rent for the Plymouth, Michigan property is $0.5 million per year. The rental rates in each case are subject to adjustment after expiration of the initial term.

Prior to the TAC Trim acquisition, TAC-Trim entered into an $86.9 million sale and leaseback transaction (the "Textron Leasing Transaction") with two separate single purpose affiliates of Textron Financial Corporation, as lessor and purchaser, with respect to a portfolio of manufacturing equipment situated in different locations throughout the United States and Canada. Payments under the Textron leasing transaction are guaranteed by Products and secured by a first perfected mortgage lien over certain real property with a value equal to $25 million. Each lease is for an initial term of three years with three one-year renewal options. As is customary, the documentation for the Textron leasing transaction incorporates covenants by reference, from the Company's credit facility, that may be amended or waived by the senior lenders, and also contain events of default. See the information under the heading "— Other Information — Effect of Transactions with Related Parties."

The Company also has other equipment lease agreements with several lessors that, subject to specific approval, provide availability of funding for operating leases and sale and leasebacks as allowed in its other financing agreements.

Refer to Note 12, "Operating Leases" of the financial statements included in this report for information regarding future minimum lease payments.

### Capital Expenditures

The Company makes capital expenditures on a recurring basis for replacements and improvements. During 2002, the Company had approximately $148 million in capital expenditures for continuing operations. Capital expenditures will materially increase with the expanded book of business in 2003, and in future years will depend upon demand for the Company's products and changes in technology. Estimates for capital expenditures in 2003 range from approximately $145 to $165 million. A portion of capital expenditures may be financed through leasing arrangements.

### Sources of Liquidity

The table below identifies the Company's significant sources of liquidity:

| | December 31, 2002 | | Availability Expiration Per Period | | | |
| | Maximum Amount Available | Less than 1 Year | 1-3 Years | 4-5 Years | After 5 years |
|---|---|---|---|---|---|
| | | (in millions) | | | |
| Receivable Facility(1) | $ 93.2 | $ — | $ 93.2 | $ — | $ — |
| Revolving Credit Facility(2) | 129.5 | — | 129.5 | — | — |
| Short-term borrowings(3) | 26.0 | 26.0 | — | — | — |
| Total Available | $ 248.7 | $ 26.0 | $ 222.7 | $ — | $ — |

(1)   Total commitment under the facility is $250.0 million.

(2)   At December 31, 2002, $45.5 million of outstanding letters of credit reduced the maximum amount available under the Revolving Credit Facility.

(3)   Borrowings outstanding in addition to the amount available were $10.5 million.

### Receivables Facility

General: The Company has an agreement to sell, on an ongoing basis, the trade accounts receivable of certain business operations to a bankruptcy-remote, special purpose subsidiary, wholly owned and consolidated by the Company. The receivables subsidiary (Carcorp) will, subject to certain conditions, from time to time, sell an undivided fractional ownership interest in a pool of domestic and certain Canadian receivables, up to

$250 million, to various multi-seller commercial paper conduits supported by a committed liquidity facility. Upon sale to the conduit, Carcorp will hold a subordinated retained interest in the receivables. Under the terms of the agreement, new receivables are added to the pool as collections reduce previously sold receivables. The Company expects to service, administer and collect the receivables on behalf of Carcorp and the conduit. The proceeds of sale will be less than the face amount of accounts receivable sold by an amount that approximates the purchaser's financing costs. In September 2002, the Company amended the receivables facility lengthening its term to expire in December 2004.

*Restrictions:* This receivables facility contains certain restrictions on Carcorp (including maintenance of $60.0 million net worth) and on the sellers (including limitations on liens on receivables, modifications of the terms of receivables, and changes in credit and collection practices) customary for facilities of this type. The commitments under the receivables facility are subject to termination prior to their term upon the occurrence of certain events, including payment defaults, breach of covenants, including defined interest coverage and leverage ratios, bankruptcy, default by the Company in servicing the receivables and failure of the receivables to satisfy certain performance criteria.

### Commercial Commitments

*Put and Call Arrangement:* The Company entered into a put and call arrangement with respect to the acquisition of the initial 50% interest in the Italian joint venture. In January 2003, the Company acquired the remaining 50% interest in the Italian joint venture for $15 million, which also terminated the put call arrangement. The arrangement, that was exercisable in December 2004, permitted Textron to require the Company to purchase Textron's interests in the joint venture for an aggregate of approximately $28 million.

### Stock Options

As a result of repricing the Company's stock options during 2002, the repriced options were treated as variable-based awards in accordance with APB No. 25. Subsequent to December 31, 2002, the Company approved the repricing of approximately 3.6 million options with exercise prices of $10.00 to a new exercise price of $8.00. Since these options are considered to be variable-based awards, the Company will incur future compensation expense if the stock price exceeds the $8.00 exercise price to be established by repricing.

## Other Information

## Effects of Certain Transactions with Related Parties

### Heartland Transactions

The Company is a party to a services agreement with Heartland under which Heartland provides it with advisory and consulting services, including services with respect to developments in the automotive industry and supply markets, advice on financial and strategic plans and alternatives and other matters as it may reasonably request and are within Heartland's expertise. The services agreement terminates on the earlier of its 10th anniversary or the date upon which Heartland ceases to own Company shares equivalent to 25% of that owned by them on February 23, 2001.

Under the services agreement, the Company is obligated to pay to Heartland a $4.0 million annual advisory fee on a quarterly basis and to reimburse its out-of-pocket expenses related to the services it provides. The Company has also agreed to pay a fee of 1% of the total enterprise value of certain acquisitions and dispositions.

### Charles E. Becker Transactions

Subsequent to December 31, 2002, the Company entered into a letter of intent with Charles E. Becker, a member of the Company's Board of Directors, to buyout the non-compete agreement effective in early 2003. The non-compete agreement was entered into as part of the Becker acquisition. The Company will make a one-time payment to Mr. Becker of $11.3 million thereby terminating its remaining obligation of approximately $12.6 million and eliminate Mr. Becker's obligation not to compete. As a result of this transaction the

Company expects to record a loss of approximately $10 million, which is primarily due to the resulting write-off of the intangible assets initially recorded in conjunction with the Becker acquisition.

In July 2001, the Company completed the acquisition of Becker. As a result of the Becker acquisition and a purchase of Company common stock immediately afterwards, Charles Becker became one of the Company's principal stockholders. Charles Becker became Vice Chairman and a member of the Company's Board of Directors upon closing of the Becker acquisition. The Company agreed to make $18.0 million in non-compete payments over five years to Mr. Becker at the time of the acquisition.

The Company entered into a lease agreement with Becker Ventures, an entity controlled by one of the Company's current directors and shareholders, for the Company's headquarters at 250 Stephenson Highway, Troy, Michigan with the effective date of the lease being January 1, 2002. In March, 2002, the Company entered into lease agreements with Becker Ventures, effective January 1, 2002, for 150 Stephenson Highway and 350 Stephenson Highway, Troy, Michigan. The base rent for all three premises is $13.25 per sq. ft. Total square footage for all three locations is approximately 286,000. The leases have 20-year terms, and the Company has two five-year renewal options. The 2003 cost for the facilities will be approximately $3.8 million. For the years ended December 31, 2002 and 2001, the Company recorded a total cost of $17.1 million and $2.1 million, respectively, for rental expenses with related parties. In addition, the Company is also party to a lease with Becker Ventures for five manufacturing facilities totaling 884,000 square feet. In 2002, the Company extended the lease term an additional ten years to expire in 2021, with the base rent for these facilities totaling $3.6 million per year.

As discussed above under "— Operating Leases," the Company is a party to certain sale-leaseback transactions with certain affiliates of Becker Ventures LLC, an entity that is controlled by Charles Becker, a director of the Company. The purpose of these sale-leaseback transactions was to reduce the Company's outstanding debt. The Company believes that the terms of the sale-leaseback transactions with Becker Ventures are on terms substantially similar to those which could have been negotiated in arms-length transactions of the same type. These sale-leaseback transactions were authorized by the independent members of the Company's board of directors.

*Elkin McCallum Transactions*

In January 2003, the Company purchased equipment required to support an anticipated increase in the production of furniture fabrics from Joan Fabrics for $4.7 million. The Company also expects to spend another $4.7 million to outside vendors to prepare existing facilities to accommodate new furniture fabrics business. The Company also anticipates that it will enter into a supply agreement with Joan Fabrics in early 2003 to supply furniture fabrics. Elkin McCallum, a director of the Company, controls Joan Fabrics. Joan Fabrics would be responsible for all marketing, design, customer service and distribution functions and will also assume marketing responsibility for the Company's existing furniture fabrics business.

On December 31, 2002, the Company acquired certain assets from Dutton Yarns (an affiliate of Mr. McCallum) for approximately $4.2 million. These assets are used by the Company to texture yarn. As part of the transaction, Dutton Yarns has agreed to provide the Company transition services through December 31, 2003.

On April 12, 2002, the Company signed and closed on a merger agreement with Mr. McCallum (a current director and shareholder of the Company) and a lamination company wholly owned by Mr. McCallum pursuant to which the acquired company was merged into a wholly owned subsidiary of the Company. As consideration in the transaction, Mr. McCallum received 400,000 shares of Common Stock and was repaid $2.5 million in cash as reimbursement for amounts invested to fund the company's working capital needs. Subsequent to the merger, debt owing to Mr. McCallum of $6.7 million was repaid. The Company acquired the lamination business to optimize the supply chain on certain of its fabric products and provide low cost lamination products and services to Tier-1 customers.

34

In September 2001, the Company completed the acquisition of Joan Automotive Industries, a leading supplier of bodycloth to the automotive industry, and all of the operating assets of Joan's affiliated yarn dying operation, Western Avenue Dyers, L.P. As a result of the Joan acquisition, Joan Fabrics Corp., a company controlled by Elkin McCallum, became a principal stockholder of the Company. Upon completion of the Joan acquisition, Mr. McCallum became a member of the Company's Board of Directors.

In connection with the Joan acquisition, the Company entered into a Supply Agreement dated September 21, 2001 (the "Supply Agreement") with Main Street Textiles, L.P. ("Main Street"). Main Street is controlled by Elkin McCallum, a director of the Company. Under the Supply Agreement, the Company agreed to purchase all of its requirements for flat woven automotive fabric from Main Street for a five year period beginning on the date of the Supply Agreement. The prices which the Company will pay for fabric under the agreement will equal the costs of the raw materials plus an amount which represents Main Street's standard labor and overhead costs incurred in manufacturing fabric for us. During the term of the Supply Agreement, Main Street is prohibited from manufacturing automotive fabric products for third parties without the Company's prior consent but may sell seconds and close-out items in bona fide transactions. The Supply Agreement is also terminable by mutual written consent, upon the occurrence of certain events of bankruptcy, the appointment of a receiver or trustee, an assignment for the benefit of creditors, or in the event of a material breach. In addition, either party may terminate the Supply Agreement upon 270 days prior notice to the other party in the event that the parties are unable to agree on the pricing of fabric covered by the Supply Agreement.

The Company is also a party to a Transition Services Agreement dated September 21, 2001 with Joan Fabrics Corporation ("Joan Fabrics"), another company controlled by Mr. McCallum. Under this agreement Joan Fabrics will provide Products with transitional and support services for a period not to exceed twelve months in order to support the continued and uninterrupted operation of the businesses acquired by Products in the Joan acquisition. As a part of these services, pending the Company's disassembly and removal of machinery and equipment that we purchased from Joan Fabrics, Joan Fabrics will use that machinery and equipment to manufacture for us all of our requirements for some types of knitted and woven automotive fabrics. The terms of the Company's agreement with respect to this fabric production are substantially similar to those under the Supply Agreement.

Mr. McCallum became a related party as a result of the Joan acquisition. The terms of the Supply Agreement and the Transition Agreement were reached through arms-length negotiations prior to Mr. McCallum becoming a related party.

### Textron Transactions

As discussed above under "— Operating Leases and Mandatorily Redeemable Preferred Stock of Subsidiary," "Business — Technology and Intellectual Property," "Business — Joint Ventures" and "— Put and Call Arrangement" the Company is a party to various agreements and transactions with Textron. Textron became a related party as a result of its receipt of the consideration in the TAC-Trim acquisition.

## Discontinued Operations

Proceeds from discontinued operations in 2002 were $15.8 million, representing recoveries, net of cash outflows. However, the Company has significant obligations related to post-retirement, casualty, environmental, product liability, lease and other liabilities of discontinued operations. The nature of many of these contingent liabilities is such that they are difficult to quantify and uncertain in terms of amount. The company has accrued $23.0 million for post retirement costs and $53.4 million for environmental and product liability costs. Based upon the information available to management and the Company's experience to date, the Company believes that these liabilities will not have a material effect on its financial condition, results of operations or cash flows. In addition, the Company has primary, excess and umbrella insurance coverage for various periods that the Company expects to cover certain of these liabilities. However, there can be no assurances that contingent liabilities will not arise or that known contingent liabilities or related claims will not exceed the Company's expectations or that insurance will be available to cover these liabilities. Because the

cash requirements of the Company's operations are substantially a function of these contingencies, it is possible that actual net cash requirements could differ materially from the Company's estimates.

## Recent and Future Reorganization Plans

During the fourth quarter of 2002, the Company undertook a restructuring program primarily to realign the operations in Europe that resulted in a restructuring charge of $14.1 million. This restructuring charge included $4.0 million of severance costs, $0.8 million of costs related to the establishment of reserves for lease commitments and lease termination fees, and $9.3 million of costs related to fixed asset impairments. The severance costs related to over 300 personnel.

During the third quarter of 2002, the Company undertook a restructuring program primarily to realign the operations in North America that resulted in a restructuring charge of $33.8 million. This restructuring charge included $23.8 million of severance costs, $1.3 million of costs related to the establishment of reserves for lease commitments and lease termination fees, and $8.7 million of costs related to fixed asset impairments. The severance costs related to over 700 personnel.

Included in the third quarter 2002 restructuring charge severance costs was $8.9 million related to the separation agreement with Thomas Evans, the former Chairman and Chief Executive Officer (CEO). In August 2002, the Company's Board of Directors appointed Jerry L. Mosingo as President, CEO and Director of the Company. Under the terms of his separation agreement, Mr. Evans received $5.5 million on August 15, and will receive quarterly payments of $0.3 million through June 30, 2004.

During the first quarter of 2002, the Company undertook a restructuring program to rationalize operations in North America, Europe and Specialty operations that resulted in a restructuring charge of $9.1 million. This restructuring included $5.5 million of cash severance costs and $3.6 million of costs related to the establishment of reserves for lease commitments and lease termination fees. The Company incurred severance costs for over 100 personnel primarily at the Company's North America and European headquarters and additional reductions at its Specialty operations. The reserve for lease commitments relates to contractual obligations for the Company's former headquarters facility, while the termination fees relate to an aircraft lease on an aircraft that the company discontinued using. The Company relocated its headquarters to its current location in order to optimize and consolidate corporate operations.

During the first quarter of 2001, the Company undertook a restructuring program resulting in a charge of $9.2 million. The goal of this restructuring program was to further de-layer management in the North American, European and Specialty operations. The pre-tax $9.2 million charge includes $8.4 million of severance costs and $0.8 million of asset impairments.

During the fourth quarter of 2001, the Company incurred charges totaling $9.6 million including $2.8 million of severance costs and $6.8 million for the write-off of long-lived assets.

The company is continually evaluating the business and may elect to implement additional restructuring activities as opportunities to achieve cost savings arise in future periods.

## Stock Repurchase Plan

At December 31, 2002, approximately $1.0 million remained authorized by the Company's Board of Directors to repurchase shares of the Company's common stock at management's discretion. The Company believes it has sufficient liquidity under its existing credit arrangements to effect the repurchase program. The Company made no repurchases for the years ended 2002 and 2001.

## Accounting Policies

The preparation of consolidated financial statements in conformity with accounting principles generally accepted in the United States of America requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of

36

the consolidated financial statements and the reported amounts of revenues and expenses during the reporting period. Considerable judgment is often involved in making these determinations, the use of different assumptions could result in significantly different results. Management believes its assumptions and estimates are reasonable and appropriate, however actual results could differ from those estimates.

*Goodwill Impairment Testing:* During the second quarter of 2002, the Company completed the implementation of SFAS 142, "Goodwill and Other Intangible Assets". Under SFAS 142, goodwill is no longer amortized. Instead, goodwill and indefinite-lived intangible assets are tested for impairment in accordance with the provisions of SFAS 142. The Company employed a discounted cash flow analysis and a market comparable approach in conducting its impairment tests. The Company completed its initial impairment test in the second quarter of 2002 and recorded an impairment loss of $11.7 million (having no tax impact), or $0.15 per average basic and diluted share relating to the UK Plastics business in the European and Rest of World Automotive Systems segment. The impairment loss was reported as a cumulative effect of a change in accounting principle and, therefore, is accounted for as if it occurred on January 1, 2002. The Company completed this test again as of November 1, which indicated that the fair value of the reporting units exceeded the carrying values. Fair value was determined based upon the discounted cash flows of the reporting units using discount rates ranging from 11.5% to 14.0% dependant on the reporting unit and a residual growth rate of 2%. The market comparable approach consisted of an earnings multiple of 5 times forecasted EBITDA (operating income less — interest, taxes, depreciation and amortization) and a control premium on equity. Future cash flows and EBITDA are affected by future operating performance, which will be impacted by economic conditions, car builds, financial, business and other factors, many of which are beyond the Companies control. The North American Plastics reporting unit can be significantly impacted by an adverse change in assumptions.

*Realization of Deferred Tax Assets:* Assessing the need for and amount of a valuation allowance for deferred tax assets requires significant judgment. The fact that a benefit may be expected for a portion but not all of a deferred tax asset increases the judgmental complexity. Future realization of deferred tax assets ultimately depends on the existence of sufficient taxable income of the appropriate character in either the carryback or carryforward period under the tax law.

During 2001, Heartland acquired approximately 60 percent of the outstanding shares of the Company. This constituted a "change in control" that results in annual limitations on the Company's use of its NOLs and unused tax credits. This annual limitation on the use of NOLs and tax credits depends on the value of the equity of the Company and the amount of "built-in gain" or "built-in loss" in the Company's assets at the date of the "change in control". Based on the expiration dates of the NOLs and tax credits as well as anticipated levels of domestic income, management does not believe that the transaction will have a material impact on these deferred tax assets. Management has reviewed the Company's operating results for recent years as well as the outlook for its continuing operations and concluded that it is more likely than not that the net deferred tax assets of $190 million at December 31, 2002 will be realized.

Management took into consideration, among other factors, the expected impact of acquisitions, the impact of recent restructuring plans, and the infusion of cash from Heartland. These factors along with the timing of the reversal of its temporary differences, certain tax planning strategies and the expiration date of its NOLs were also considered in reaching this conclusion. The Company's ability to generate future taxable income is dependent on numerous factors, including general economic conditions, the state of the automotive industry and other factors beyond management's control. Therefore, there can be no assurance that the Company will meet its expectation of future taxable income.

*Pension and Postretirement Benefits Other than Pensions:* Annual net periodic expense and benefit liabilities under our defined benefit plans are determined on an actuarial basis. Assumptions used in the actuarial calculations have a significant impact on plan obligations and expense. Each September, the Company reviews the actual experience compared to the more significant assumptions used and make adjustments to the assumptions, if warranted. The healthcare trend rates are reviewed with the actuaries based upon the results of their review of claims experience. Discount rates are based upon an expected benefit payments duration analysis and the equivalent average yield rate for high-quality fixed-income investments.

37

Pension benefits are funded through deposits with trustees and the expected long-term rate of return on fund assets is based upon actual historical returns modified for known changes in the market and any expected change in investment policy. Postretirement benefits are not funded and our policy is to pay these benefits as they become due.

Certain accounting guidance, including the guidance applicable to pensions, does not require immediate recognition of the effects of a deviation between actual and assumed experience or the revision of an estimate. This approach allows the favorable and unfavorable effects that fall within an acceptable range to be netted. Although this netting occurs outside the basic financial statements, disclosure of the net amount is disclosed as an unrecognized gain or loss in the footnotes to our financial statements. The Company expects to incur approximately $19 million of pension expense in 2003. See Note 13 "Employee Benefit Plans" for additional discussion for the impact on income.

*Environmental Contingencies:* The Company is subject to federal, state, local and foreign environmental, and health and safety, laws and regulations that (i) affect ongoing operations and may increase capital costs and operating expenses in order to maintain compliance with such requirements and (ii) impose liability relating to contamination at facilities, and at other locations such as former facilities, facilities where the Company has sent wastes for treatment or disposal, and other properties to which the Company may be linked. Such liability may include, for example, investigation and clean-up of the contamination, personal injury and property damage caused by the contamination, and damages to natural resources. Some of these liabilities may be imposed without regard to fault, and may also be joint and several (which can result in a liable party being held responsible for the entire obligation, even where other parties are also liable).

Management believes that it has obtained, and is in material compliance with, those material environmental permits and approvals necessary to conduct the Company's various businesses. Environmental compliance costs for continuing businesses are accounted for as normal operating expenses or capital expenditures, except for certain costs incurred at acquired locations. Environmental compliance costs relating to conditions existing at the time of an acquisition are generally charged to reserves established in purchase accounting. The Company accrues for environmental remediation costs when such obligations are known and reasonably estimable. In the opinion of management, based on the facts presently known to it, such environmental compliance and remediation costs will not have a material adverse effect on the Company's business, consolidated financial condition or future results of operations.

The Company is legally or contractually responsible or alleged to be responsible for the investigation and remediation of contamination at various sites, and for personal injury or property damages, if any, associated with such contamination. At some of these sites the Company has been notified that it is a potentially responsible party ("PRP") under the federal Superfund law or similar state laws. Other sites at which we may be responsible for contamination may be identified in the future, including with respect to divested and acquired businesses.

The Company is currently engaged in investigating or remediating certain sites as discussed below. In estimating the cost of investigation and remediation, the Company has considered, among other things, prior experience in remediating contaminated sites, remediation efforts by other parties, data released by the United States Environmental Protection Agency ("USEPA"), the professional judgment of the Company's environmental experts, outside environmental specialists and other experts, and the likelihood that other identified PRPs will have the financial resources to fulfill their obligations at sites where they and the Company may be jointly and severally liable. It is difficult to estimate the total cost of investigation and remediation due to various factors including:

• incomplete information regarding particular sites and other PRPs;

• uncertainty regarding the nature and extent of environmental problems and the Company's share, if any, of liability for such problems;

• the ultimate selection among alternative approaches by governmental regulators;

38

- the complexity and evolving nature of environmental laws, regulations and governmental directives; and

- changes in cleanup standards.

The Company is a party to a Consent Decree with the State of New Hampshire to remediate a former industrial landfill known as the Cardinal Landfill in Farmington, New Hampshire. Pursuant to that Consent Decree, the Company is currently conducting a pilot test for a proposed remediation of chlorinated compound contaminants in groundwater. The Consent Decree calls for a remedy to be in place by 2004. The Company is a defendant in two lawsuits filed by a total of 91 individual plaintiffs for alleged personal injuries arising from Cardinal Landfill conditions. The Company will vigorously contest these allegations. As of December 31, 2002, the Company has accrued $15.7 million for Cardinal Landfill.

The Company is a party, as a member of a PRP workgroup, to a Consent Decree entered with the USEPA for the remediation of a former municipal landfill in Dover, New Hampshire. The town of Dover, New Hampshire is also a member of the PRP group and a party to the Consent Decree. Pursuant to the terms of the Consent Decree, the PRP group is currently engaged in the preparation of a remediation design. The Consent Decree requires that a remedy for the site be in place by 2004. As of December 31, 2002, the Company has accrued $9.6 million for Dover.

Pursuant to a Consent Decree signed with the USEPA, the Company is currently engaged in a full-scale remediation for groundwater and soil contamination at the former Stamina Mills manufacturing facility in North Smithfield, Rhode Island. Remediation activities have been ongoing since 1998. The Company is also in negotiation with the USEPA regarding a claim for past oversight costs. A resolution of this matter is anticipated in 2003. As of December 31, 2002, the Company has accrued $14.1 million for Stamina Mills.

The Company is working with the Michigan Department of Environmental Quality (MDEQ) to investigate and remediate soil and groundwater contamination at a former manufacturing plant in Mancelona, MI and at adjacent owned property formerly used for the treatment and disposal of plating waste. MDEQ is likely to require remediation of groundwater. In addition, the Company is incurring costs in connection with the provision of alternate water supplies to residences in the area.

The current owner of one of the Company's former manufacturing plants located in Bowling Green, OH has entered into an Administrative Order on Consent with the Ohio Environmental Protection Agency (OEPA) requiring investigation and remediation of contamination at the site. The Company is reimbursing the current owner for costs associated with ongoing groundwater monitoring and, following selection of an appropriate remedy by OEPA, will assume 90% of future remediation costs.

In the 1980's and 1990's, the California Regional Water Quality Control Board (CRWQCB) and other state agencies ordered a predecessor of the Company to investigate and remediate soil and groundwater contamination at a former lumber treatment plant in Elmira, CA. In 1996, the Company entered into an agreement with the State of California to conduct long-term operation and maintenance of the remedy implemented at the site.

The Company has established accruals for certain contingent environmental liabilities and management believes such reserves comply with generally accepted accounting principles. The Company records reserves for environmental investigatory and non-capital remediation costs when litigation has commenced or a claim or assessment has been asserted or is imminent, the likelihood of an unfavorable outcome is probable, and the financial impact of such outcome is reasonably estimable. As of December 31, 2002 and 2001, total reserves for those contingent environmental liabilities are approximately $64.5 million and $59.6 million, respectively.

In the opinion of management, based on information presently known to it, identified environmental costs and contingencies will not have a material adverse effect on our consolidated financial condition, future results of operations or cash flows. However, we can give no assurance that we have identified or properly assessed all potential environmental liability arising from our business or properties, and those of our present and former subsidiaries and their corporate predecessors.

39

*Allowance for uncollectible accounts:* The allowance for uncollectibles provides for losses believed to be inherent within the company's "Accounts and Other Receivables," (primarily trade receivables and the retained interest in the receivables facility). Management evaluates both the creditworthiness of specific customers and the overall probability of losses based upon an analysis of the overall aging of receivables, past collection trends and general economic conditions. Management believes, based on its review, that the allowance for uncollectibles is adequate to cover potential losses. Actual results may vary as a result of unforeseen economic events and the impact those events could have on our customers.

*Valuation of Mandatorily Redeemable Preferred Stock of Subsidiary:* The Company issued preferred stock as part of the consideration given to Textron in the TAC-Trim acquisition. The preferred stock is recorded at fair value, which is less than the liquidation value of $1,000 per share or $326.4 million. Since the preferred stock is not publicly traded the use of an estimated fair value was required. The Company estimated the fair value to be $146.9 million based on market prices for securities with similar terms, maturities and risk characteristics, and included a liquidation discount to reflect market conditions. The difference between the initial recorded value and the initial liquidation preference will be accreted over the life of the stock.

### Item 7A. *Quantitative and Qualitative Disclosures About Market Risk*

**Market Risk Sensitivity**

In the normal course of business, the Company is exposed to market risk associated with fluctuations in foreign exchange rates and interest rates. The Company manages these risks through the use of derivative financial instruments in accordance with management's guidelines. The Company enters into all hedging transactions for periods consistent with the underlying exposures. We do not enter into derivative instruments for trading purposes.

**Foreign Currency**

Operating results may be impacted by the Company buying, selling and financing in currencies other than the functional currency of our operating companies ("transactional exposure"). The Company mitigates this risk by entering into foreign currency forward, swap and option contracts. The foreign currency contracts are executed with banks that the Company believes are creditworthy.

The Company's most significant foreign currency transactional exposures relate to Mexico, Canada and the European Monetary Union. As of December 31, 2002, foreign currency contracts representing $97.4 million of notional amount were outstanding with maturities of less than one year. The fair value of these foreign exchange contracts as of December 31, 2002 was approximately $468,000. The table below provides a summary of the foreign exchange contracts that are outstanding as of December 31, 2002. The instrument's actual cash flows are denominated in U.S. dollars (dollar amounts in millions).

| Derivative Type | Currency Sold | Currency Purchased | USD Equivalent of Notional Amount | Weighted Average Contract Rate (per Convention) | Unrealized Gain/(Loss) |
|---|---|---|---|---|---|
| Forwards | GBP | EUR | $    3.4 | 0.6176 GBP per EUR | $   0.2 |
| Forwards | CAD | USD | 2.0 | 1.5853 CAD per USD | 0.0 |
| Spot | USD | EUR | 18.0 | 1.0478 USD per EUR | — |
| Options | CAD | USD | 74.0 | 1.6420 CAD per USD | 0.3 |
| | | | $   97.4 | | $   0.5 |

In addition to the transactional exposures, our operating results are impacted by the translation of our foreign operating income into U.S. dollars ("translation exposure"). We do not enter into foreign currency contracts to mitigate this exposure.

**Interest Rate**

As of December 31, 2002 approximately 70% of the Company's borrowings were on a fixed rate basis. The remainder of the Company's borrowings were on a variable rate basis and sensitive to changes in interest rates. While the Company has used interest rate swaps and other interest rate protection agreements to modify its exposure to interest rate movements and to reduce borrowing rates, no such agreements were in place at December 31, 2002. Because approximately $378 million of the Company's borrowings were subject to a minimum LIBOR floor of 3.0%, a 0.5% unfavorable increase in interest rates would not materially impact pre-tax earnings and cash flow.

**Item 8.**    *Financial Statements and Supplementary Data*

See the Consolidated Financial Statements of Collins & Aikman Corporation and subsidiaries included herein and listed on the Index to Financial Statements set forth in Item 15 (a) of this Form 10-K report.

**Item 9.**    *Changes in and Disagreements with Accountants on Accounting and Financial Disclosure*

On April 10, 2001, the Company notified Arthur Andersen LLP that it was changing its independent accountants to PricewaterhouseCoopers LLP for the fiscal year ending December 31, 2001. The Audit Committee of the Board of Directors and the Board of Directors of the Company approved the decision to replace Arthur Andersen LLP. The Company's Annual Report on Form 10-K for the fiscal year ended December 31, 2000 was filed on April 2, 2001. It included financial statements as of December 31, 2000 and December 25, 1999 and for each of the three periods ended December 2000, 1999 and 1998, accompanied by the report of Arthur Andersen LLP. Such report did not include any adverse opinion or disclaimer of opinion, or any qualification as to audit scope or accounting principles.

During the fiscal years ended December 31, 2000 and December 25, 1999, there were no disagreements with Arthur Andersen LLP on any matter of accounting principles or practices, financial statement disclosure or audit scope. During this period, there were also no disagreements which, if not resolved to the satisfaction of Arthur Andersen LLP, would have caused them to make reference to the subject matter of such disagreement in their reports on the financial statements for such years.

During the fiscal year ended December 31, 2000, PricewaterhouseCoopers LLP had not been engaged as an independent accountant to audit either the financial statements of the Company or any of its subsidiaries, nor had it been consulted regarding the application of our accounting principles to a specified transaction, either completed or proposed, or the type of audit opinion that might be rendered on our financial statements.

As a result of its 1999 audit, Arthur Andersen LLP reported material weaknesses in the Company's internal control systems. The identified conditions specifically related to four of our foreign locations, most of which were acquired in 2001. These weaknesses were primarily attributable to the effects of implementing a new computer system as part of our acquisition integration strategy and Year 2000 compliance efforts. Issues at these locations primarily related to the detail records supporting the general ledger and staff training needs. As a result, in 2000, the Company committed significant resources to addressing the issues, including the re-implementation of certain systems, implementing an internal audit function and replacing controllers at three of the four locations. The Company made significant progress in addressing these issues; however, Arthur Andersen LLP continued to report material weaknesses following its 2000 audit because two of these four foreign locations were assessed as continuing to have similar material weaknesses as in 1999. Improvement efforts at these locations were hampered by personnel turnover and continuing acquisition integration efforts.

Arthur Andersen LLP did not modify its report on the Company's 1999 and 2000 audited financial statements as a consequence of these material weaknesses. The Company is continuing its efforts to address these matters and believes that it corrected all these matters during 2001.

41

## PART III

**Item 10.**    *Directors and Executive Officers of the Registrant*

There is incorporated herein by reference the information required by this Item in the Company's definitive proxy statement for the 2003 Annual Meeting of Stockholders which will be filed with the Securities and Exchange Commission no later than 120 days after the close of the year ended December 31, 2002.

**Item 11.**    *Executive Compensation*

There is incorporated herein by reference the information required by this Item in the Company's definitive proxy statement for the 2003 Annual Meeting of Stockholders which will be filed with the Securities and Exchange Commission no later than 120 days after the close of the year ended December 31, 2002.

**Item 12.**    *Security Ownership of Certain Beneficial Owners and Management*

There is incorporated herein by reference the information required by this Item in the Company's definitive proxy statement for the 2003 Annual Meeting of Stockholders which will be filed with the Securities and Exchange Commission no later than 120 days after the close of the year ended December 31, 2002.

**Item 13.**    *Certain Relationships and Related Transactions*

There is incorporated herein by reference the information required by this Item in the Company's definitive proxy statement for the 2003 Annual Meeting of Stockholders which will be filed with the Securities and Exchange Commission no later than 120 days after the close of the year ended December 31, 2002.

**Item 14.**    *Controls and Procedures*

a. Evaluation of disclosure controls and procedures:

Within 90 days prior to the filing date of this report, the Company's Chief Executive Officer and the Company's Chief Financial Officer "the Certifying Officers" evaluated the effectiveness of the design and operation of the Company's "disclosure controls and procedures" (as defined in the Securities Exchange Act of 1934). Based on that evaluation, the Certifying Officers have concluded that the Company's disclosure controls and procedures are effective to ensure that information required to be disclosed by the Company in the reports that it files and submits under the Exchange Act is recorded, processed, summarized and reported as and when required, and are effective to ensure that such information is accumulated and communicated to the Company's management, including its Certifying Officers, as appropriate to allow timely decisions regarding required disclosure. In addition, the Certifying Officers also disclosed to the Company's auditors and the audit committee of the board of directors all significant deficiencies in the design or operation of internal controls that could adversely affect the Company's ability to record, process, summarize and report financial data. A summary of the key items disclosed and the changes in internal controls resulting from corrective actions are discussed below.

b. Changes in internal controls:

An evaluation of internal controls was conducted for the year ended December 31, 2002. The following paragraphs detail management's significant areas of focus to further enhance internal controls:

• The Company has implemented certain enhancements, or is in the process of enhancing, internal controls relating to data quality and process efficiency with respect to its current consolidation system and preparation of consolidated financial statements. Recent actions relate to improving the systematic roll-up of both financial and non-financial information that is reported in the Company's financial reports filed with the Securities & Exchange Commission. These actions have primarily focused on improving; (1) the entity structure utilized by the consolidation tool, (2) the collection and compilation of financial and non-financial data, and (3) the ability to identify and eliminate intercompany transactions and balances in a more efficient manner. The Company is currently making

42

these changes to its existing consolidation system and is in the process of implementing a new consolidation system. As part of the new system implementation process, the Company is examining additional means to improve its internal controls. The Company is also enhancing its procedures with respect to ensuring timely and adequate review of non-standard journal entries and account reconciliations, and adherence to existing corporate accounting policies and accounting principles generally accepted in the United States of America.

• Further, the Company is implementing controls to ensure that financial and non-financial information that is generated by accounting or other company functions is adequately reviewed prior to being recorded in the Company's books of record. As disclosed in Note 22 "Quarterly Financial Data," an error in the mathematical computation of foreign currency exchange gains was discovered and was reflected as a prior period adjustment in the third quarter 2002 financial statements. The error was detected as the result of a change in the individuals responsible for computing and reviewing the foreign currency exchange gain/loss. The Company is implementing new controls that are designed to improve the existing approval and authorization processes.

Other than the above, there were no significant changes in the Company's internal controls or in other factors that could significantly affect internal controls subsequent to the date of the most recently completed evaluation. The Company also intends to refine its internal control procedures on an ongoing basis as deemed appropriate with a view towards making improvements.

43

# PART IV

**Item 15.** *Exhibits, Financial Statement Schedules and Reports on Form 8-K*

(a)(1) Financial Statements:

| | Page Number |
|---|---|
| Report of Independent Accountants | F-1 |
| Report of Independent Public Accountants | F-2 |
| Consolidated Statements of Operations for the years ended December 31, 2002, December 31, 2001 and fiscal year ended December 31, 2000 | F-3 |
| Consolidated Balance Sheets at December 31, 2002 and December 31, 2001 | F-4 |
| Consolidated Statements of Cash Flows for the years ended December 31, 2002, December 31, 2001 and fiscal year ended December 31, 2000 | F-5 |
| Consolidated Statements of Common Stockholders' Equity (Deficit) for the years ended December 31, 2002, December 31, 2001 and fiscal year ended December 31, 2000 | F-6 |
| Notes to Consolidated Financial Statements | F-7 |

(a)(2) Financial Schedules:

The following financial statement schedules of Collins & Aikman Corporation for the year ended December 31, 2002, December 31, 2001, and the fiscal year ended December 31, 2000 are filed as part of this Report and should be read in conjunction with the Consolidated Financial Statements of Collins & Aikman Corporation.

| | Page Number |
|---|---|
| Schedule I — Condensed Financial Information of the Registrant | S-1 |
| Schedule II — Valuation and Qualifying Accounts | S-1 |

All other schedules, for which provision is made in the applicable accounting regulations of the Securities and Exchange Commission are omitted because they are not required, are inapplicable, or the information is included in the Consolidated Financial Statements or Notes thereto.

(a)(3) Exhibits:

*Please note that in the following description of exhibits, the title of any document entered into, or filing made, prior to July 7, 1994 reflects the name of the entity, a party thereto or filing, as the case may be, at such time. Accordingly, documents and filings described below may refer to Collins & Aikman Holdings Corporation, Collins & Aikman Group, Inc. or Wickes Companies, Inc., if such documents and filings were made prior to July 7, 1994.*

| Exhibit Number | Description |
|---|---|
| 2.1 | Agreement and Plan of Merger dated May 14, 2001 by and among Collins & Aikman Corporation, Collins & Aikman Products Co., Becker Group, L.L.C., CE Becker Inc., ME McInerney Inc., J Hoehnel Inc. and the individuals party thereto as sellers is hereby incorporated by reference to Exhibit 2.1 of Collins & Aikman Corporation's Current Report on Form 8-K dated July 13, 2001. |
| 2.2 | Agreement and Plan of Merger dated as of August 17, 2001 by and among Collins & Aikman Corporation, Collins & Aikman Products Co., JAII Acquisition Co., Elkin McCallum, Joan Fabrics Corporation and Joan Automotive Industries, Inc is hereby incorporated by reference to Exhibit 2.1 of Collins & Aikman Corporation's Current Report on Form 8-K dated September 21, 2001. |

44

| Exhibit Number | Description |
|---|---|
| 2.3 | First Amendment to Agreement and Plan of Merger by and among Collins & Aikman Corporation, Collins & Aikman Products Co., JAII Acquisition Co., Elkin McCallum, Joan Fabrics Corporation and Joan Automotive Industries, Inc dated as of September 21, 2001 is hereby incorporated by reference to Exhibit 2.2 of Collins & Aikman Corporation's Current Report on Form 8-K dated September 21, 2001. |
| 2.4 | Purchase Agreement dated as of August 7, 2001, as amended and restated as of November 30, 2001, by and among Textron Inc., Collins & Aikman Corporation and Collins & Aikman Products Co., including Exhibit 1 (Certificate of Designation of the 15% Series A Redeemable Preferred Stock, the 16% Series B Redeemable Preferred Stock and the 16% Series C Redeemable Preferred Stock) and Exhibit 7 (Asset Purchase Agreement dated as of August 7 by and between Textron Automotive Exteriors Inc. and JPS Automotive, Inc.), which is incorporated by reference to Collins and Aikman Corporation Current Report on Form 8-k dated December 20, 2001 and filed on January 4, 2002. The Table of Contents of the Purchase Agreement listed as Exhibit 2.4 contains a list briefly identifying the contents of all omitted schedules and exhibits. Collins & Aikman Corporation will supplementally furnish a copy of any omitted schedule or Exhibit to the Commission upon request. |
| 2.5 | Asset Purchase Agreement dated as of August 7, 2001, as amended and restated as of November 30, 2001, by and between Textron Automotive Exteriors Inc. and JPS Automotive, Inc., which is incorporated herein by reference to Exhibit 2.2 of Collins & Aikman Corporation's Current Report on Form 8-K dated December 20, 2001 and filed on January 4, 2002. |
| 2.6 | Asset Purchase Agreement dated as of August 17, 2001 by and among Collins & Aikman Products Co., Western Avenue Dyers, L.P., Elkin McCallum, Kerry McCallum, Penny Richards and Tyng Textiles LLC, which is incorporated by reference to Exhibit 2.3 to Collins & Aikman Corporation's Current Report on Form 8-K filed on October 4, 2001. |
| 2.7 | First Amendment to Asset Purchase Agreement dated as of September 21, 2001, which is incorporated by reference to Exhibit 2.4 to Collins & Aikman Corporation's Current Report on Form 8-K filed on October 4, 2001. |
| 3.1 | Restated Certificate of Incorporation of Collins & Aikman Corporation is hereby incorporated by reference to Exhibit 3.1 of Collins & Aikman Corporation's Report on Form 10-Q for the fiscal quarter ended June 26, 1999. |
| 3.2 | Certificate of Amendment to the Restated Certificate of Incorporation of Collins & Aikman Corporation, which is incorporated by reference to Exhibit 3.2 of Collins & Aikman Corporation's Annual Report on Form 10-K for the fiscal year ended December 31, 2000. |
| 3.3 | Certificate of Amendment of Amended and Restated Certificate of Incorporation is hereby incorporated by reference to Exhibit 3.5 of Collins & Aikman Corporation's Current Report on Form 8-K filed May 29, 2002. |
| 3.4 | By-laws of Collins & Aikman Corporation, as amended, are hereby incorporated by reference to Exhibit 3.2 of Collins & Aikman Corporation's Report on Form 10-K for the fiscal year ended January 27, 1996. |
| 3.5 | Certificate of Elimination of Cumulative Exchangeable Redeemable Preferred Stock of Collins & Aikman Corporation is hereby incorporated by reference to Exhibit 3.3 of Collins & Aikman Corporation's Report on Form 10-Q for the fiscal quarter ended October 28, 1995. |
| 4.1 | Specimen Stock Certificate for the Common Stock is hereby incorporated by reference to Exhibit 4.3 of Amendment No. 3 to Collins & Aikman Holdings Corporation's Registration Statement on Form S-2 (Registration No. 33-53179) filed June 21, 1994. |
| 4.2 | Indenture, dated as of June 1, 1996, between Collins & Aikman Products Co., Collins & Aikman Corporation and First Union National Bank of North Carolina, as Trustee, is hereby incorporated by reference to Exhibit 4.2 of Collins & Aikman Corporation's Report on Form 10-Q for the fiscal quarter ended April 27, 1996. |

45

| Exhibit Number | Description |
|---|---|
| 4.3 | First Supplemental Indenture dated as of June 1, 1996, between Collins & Aikman Products Co., Collins & Aikman Corporation and First Union National Bank of North Carolina, as Trustee, is hereby incorporated by reference to Exhibit 4.3 of Collins & Aikman Corporation's Report on Form 10-Q for the fiscal quarter ended April 27, 1996. |
| 4.4 | Waiver dated as of October 27, 1998 under the Credit Agreement dated as of May 28, 1998, among Collins & Aikman Products Co., Collins & Aikman Canada, Inc. and Collins & Aikman Plastics, Ltd., as Canadian Borrowers, Collins & Aikman Corporation, as Guarantor, the Lender Parties thereto, Bank of America, N.T.S.A., as Documentation Agent, The Chase Manhattan Bank, as Administrative Agent, and The Chase Manhattan Bank of Canada, as Canadian Administrative Agent is hereby incorporated by reference to Exhibit 4.5 of Collins & Aikman Corporation's Report on Form 10-Q for the fiscal quarter ended September 26, 1998. |
| 4.5 | Waiver dated as of December 22, 1998 under the Credit Agreement dated as of May 28, 1998, among Collins & Aikman Products Co., Collins & Aikman Canada, Inc. and Collins & Aikman Corporation, as Guarantor, the Lender Parties thereto, Bank of America, N.T.S.A., as Documentation Agent, The Chase Manhattan Bank, as Administrative Agent, and The Chase Manhattan Bank of Canada, as Canadian Administrative Agent is hereby incorporated by reference to Exhibit 4.6 of Collins & Aikman Corporation's Report on Form 10-K for the year ended December 26, 1998. |
| 4.6 | Amendment and Waiver dated as of March 8, 1999, among Collins & Aikman Products Co., Collins & Aikman Canada, Inc., Collins & Aikman Plastics Ltd., Collins & Aikman Corporation, as Guarantor, the Lender Parties thereto, Bank of America N.T.S.A., as Documentation Agent, The Chase Manhattan Bank, as Administrative Agent, and The Chase Manhattan Bank of Canada, as Canadian Administrative Agent is hereby incorporated by reference to Exhibit 4.7 of Collins & Aikman Corporation's Report on Form 10-K for the year ended December 26, 1998. |
| 4.7 | Tranche C Term Loan Supplement dated as of May 12, 1999 to the Credit Agreement dated as of May 28, 1998 among Collins & Aikman Products Co., Collins & Aikman Canada, Inc., Collins & Aikman Plastics, Ltd., Collins & Aikman Corporation, the Financial Institutions parties thereto, Bank of America N.T.S.A., as Documentation Agent, The Chase Manhattan Bank, as Administrative Agent, and The Chase Manhattan Bank of Canada, as Canadian Administrative Agent is hereby incorporated by reference to Exhibit 4.1 of Collins & Aikman Corporation's Report on Form 10-Q for the fiscal quarter ended June 26, 1999. |
| 4.8 | Indenture dated as of June 28, 1994, between JPS Automotive Products Corp., as Issuer, JPS Automotive L.P., as Guarantor and Shawmut Bank Connecticut, N.A., as Trustee, is hereby incorporated by reference to Exhibit 4.2 of JPS Automotive Corp.'s Registration Statement on Form S-1, Registration No. 33-75510. |
| 4.9 | First Supplemental Indenture, dated as of October 5, 1994, between JPS Automotive Products Corp. and JPS Automotive L.P., as Co-Obligors, and Shawmut Bank Connecticut, N.A., as Trustee is hereby incorporated by reference to Exhibit 4.48A of JPS Automotive L.P.'s and JPS Automotive Products Corp.'s Report on Form 10-Q for the fiscal quarter ended October 2, 1994. |
| 4.10 | Second Supplemental Indenture, dated as of February 8, 2001, by and among Collins & Aikman Products Co., as Issuer, Collins & Aikman Corporation, as Guarantor, and First Union National Bank, as Trustee, which is incorporated by reference to Exhibit 4.11 of Collins & Aikman Corporation's Annual Report on Form 10-K for the fiscal year ended December 31, 2000. |
| 4.11 | Form of Warrant is hereby incorporated by reference to Exhibit 4.1 of Collins & Aikman Corporation's Current Report on Form 8-K dated July 13, 2001. |
| 4.12 | Certificate of Designation of Series A Redeemable Preferred Stock, Series B Redeemable Preferred Stock and Series C Redeemable Preferred Stock, which is incorporated herein by reference to Exhibit 4.1 of Collins & Aikman Corporation's Current Report of Form 8-K dated December 20, 2001 and filed on January 4, 2002. |

46

| Exhibit Number | Description |
|---|---|
| 4.13 | Indenture dated as of December 20, 2001 by and among Collins & Aikman Products Co., as Issuer, the Guarantors parties thereto, and BNY Midwest Trust Company, as Trustee, which is incorporated herein by reference to Exhibit 4.2 of Collins & Aikman Corporation's Current Report on Form 8-K dated December 20, 2001 and filed on January 4, 2002. |
| 4.14 | Receivables Transfer Agreement dated as of December 20, 2001 by and among Carcorp, Inc., as Transferor, Collins & Aikman Products Co., individually and as Collection Agent, the persons parties thereto, as CP Conduit Purchasers, Committed Purchasers and Funding Agents and JPMorgan Chase Bank, as Administrative Agent, which is incorporated herein by reference to Exhibit 4.3 of Collins & Aikman Corporation's Current Report on Form 8-K dated December 20, 2001 and filed on January 4, 2002. |
| 4.15 | Amended and Restated Receivables Purchase Agreement dated as of December 20, 2001 among Collins & Aikman Products Co. and its wholly-owned direct and indirect subsidiaries named therein, as Sellers, and Carcorp, Inc., as Purchaser, and the other Sellers from time to time named therein, which is incorporated herein by reference to Exhibit 4.4 of Collins & Aikman Corporation's Current Report on Form 8-K dated December 20, 2001 and filed on January 4, 2002. |
| 4.16 | Credit Agreement dated as of December 20, 2001 among Collins & Aikman Products Co., as Borrower, Collins & Aikman Canada Inc., as a Canadian Borrower, Collins & Aikman Plastics, Ltd., as a Canadian Borrower, Collins & Aikman Corporation, the Lenders named therein, Deutsche Banc Alex. Brown Inc. and Merrill Lynch Capital Corporation, as Co-Documentation Agents, Credit Suisse First Boston Corporation, as Syndication Agent, JPMorgan Chase Bank, as Administrative Agent, and J.P.Morgan Bank Canada, as Canadian Administrative Agent, which is incorporated herein by reference to Exhibit 4.5 of Collins & Aikman Corporation's Current Report on Form 8-K dated December 20, 2001 and filed on January 4, 2002. |
| 4.17 | First Amendment dated as of December 13, 2002, to the Credit Agreement dated as of December 20, 2001 among Collins & Aikman Products Co., as Borrower, Collins & Aikman Canada Inc., as a Canadian Borrower, Collins & Aikman Plastics, Ltd., as a Canadian Borrower, Collins & Aikman Corporation, the Lenders named therein, Credit Suisse First Boston Corporation, as Syndication Agent, Deutsche Bank Securities Inc. (formerly known as Deutsche Banc Alex. Brown Inc.) and Merrill Lynch Capital Corporation, as Co-Documentation Agents, JPMorgan Chase Bank, as Administrative Agent, and J.P. Morgan Bank Canada, as Canadian Administrative Agent.* |
| 4.18 | Guarantee and Collateral Agreement dated as of December 20, 2001 by and among Collins & Aikman Corporation, Collins & Aikman Products Co. and certain of their subsidiaries and JPMorgan Chase Bank, as Collateral Agent, which is incorporated herein by reference to Exhibit 4.6 of Collins & Aikman Corporation's Current Report on Form 8-K dated December 20, 2001 and filed on January 4, 2002. |
| 4.19 | Third Supplemental Indenture, dated as of December 20, 2001, among Collins & Aikman Products Co., Collins & Aikman Corporation, the Subsidiary Guarantors listed on the signature page thereto, and First Union National Bank (as successor in interest to First Union National Bank of North Carolina), which is incorporated herein by reference to Exhibit 4.7 of Collins & Aikman Corporation's Current Report on Form 8-K dated December 20, 2001 and filed on January 4, 2002. |
| 10.1 | Stockholders Agreement, dated February 23, 2001, by and among Collins & Aikman Corporation, Heartland Industrial Partners, L.P. and other investor stockholders listed on Schedule 1 thereto, Blackstone Capital Company II, L.L.C., Blackstone Family Investment Partnership I L.P., Blackstone Advisory Directors Partnership L.P., Blackstone Capital Partners L.P., and Wasserstein/ C&A Holdings, L.L.C., incorporated by reference to Annex E to Exhibit 10.1 to Collins & Aikman Corporation's Current Report on Form 8-K dated January 12, 2001. |
| 10.2 | Employment Agreement dated as of July 18, 1990 between Wickes Companies, Inc. and an executive officer is hereby incorporated by reference to Exhibit 10.3 of Wickes Companies, Inc.'s Report on Form 10-K for the fiscal year ended January 26, 1991. |

47

| Exhibit Number | Description |
|---|---|
| 10.3 | Employment Agreement dated as of July 22, 1992 between Collins & Aikman Corporation and an executive officer is hereby incorporated by reference to Exhibit 10.7 of Collins & Aikman Holdings Corporation's Report on Form 10-K for the fiscal year ended January 30, 1993. |
| 10.4 | First Amendment to Employment Agreement dated as of February 24, 1994 between Collins & Aikman Corporation and an executive officer is hereby incorporated by reference to Exhibit 10.7 of Collins & Aikman Holdings Corporation's Registration Statement on Form S-2 (Registration No. 33-53179) filed April 19, 1994. |
| 10.5 | Second Amendment, dated as of October 3, 1996, to the Employment Agreement, dated as of July 22, 1992, as amended, between Collins & Aikman Products Co. and an executive officer is hereby incorporated by reference to Exhibit 10.26 of Collins & Aikman Corporation's Report on Form 10-Q for the fiscal quarter ended October 26, 1996. |
| 10.6 | Third Amendment dated as of August 1, 1997, to the Employment Agreement dated as of July 22, 1992, as amended, between the Corporation and an executive officer is hereby incorporated by reference to Exhibit 10.35 of Collins & Aikman Corporation's Report on Form 10-Q for the fiscal quarter ended September 27, 1997. |
| 10.7 | Letter Agreement dated March 23, 1999 with an executive officer is hereby incorporated by reference to Exhibit 10.7 of Collins & Aikman Corporation's Report on Form 10-K for the fiscal year ended December 26, 1998. |
| 10.8 | Amended and Restated Employment Agreement dated as of January 20, 1999 between Collins & Aikman Products Co. and an executive officer is hereby incorporated by reference to Collins & Aikman Corporation's Report on Form 10-K for the fiscal year ended December 26, 1998. |
| 10.9 | Employment Agreement dated as of January 20, 1999 between Collins & Aikman Products Co. and an executive officer is hereby incorporated by reference to Exhibit 10.9 of Collins & Aikman Corporation's Form 10-K for the fiscal year ended December 26, 1998. |
| 10.10 | Employment Agreement dated as of April 22, 1999 between Collins & Aikman Corporation and an executive officer is hereby incorporated by reference to Exhibit 10.10 of Collins & Aikman Corporation's Report on Form 10-Q for the fiscal quarter ended March 27, 1999. |
| 10.11 | Employment Agreement, dated as of March 29, 2000, between Collins & Aikman Products Co. and an executive officer is hereby incorporated by reference to Exhibit 10.1 of Collins & Aikman Corporation's Report on Form 10-Q for the fiscal quarter ended April 1, 2000. |
| 10.12 | Employment Agreement, dated as of April 1, 2000, between Collins & Aikman Products Co. and an executive officer is hereby incorporated by reference to Exhibit 10.3 of Collins & Aikman Corporation's Report on Form 10-Q for the fiscal quarter ended July 1, 2000. |
| 10.13 | Employment Agreement, dated as of August 1, 2000, between Collins & Aikman Products Co. and an executive officer is hereby incorporated by reference to Exhibit 10.6 of Collins & Aikman Corporation's Report on Form 10-Q for the fiscal quarter ended September 30, 2000. |
| 10.14 | Employment Agreement, dated as of August 1, 2000, between Collins & Aikman Products Co. and an executive officer is hereby incorporated by reference to Exhibit 10.8 of Collins & Aikman Corporation's Report on Form 10-Q for the fiscal quarter ended September 30, 2000. |
| 10.15 | Letter agreement, dated as of May 12, 1999, with an executive officer is hereby incorporated by reference to Exhibit 10.2 of Collins & Aikman Corporation's Report on Form 10-Q for the fiscal quarter ended June 26, 1999. |
| 10.16 | Letter agreement, dated as of April 7, 2000, between Collins & Aikman Corporation and an executive officer is hereby incorporated by reference to Exhibit 10.12 of Collins & Aikman Corporation's Report on Form 10-Q for the fiscal quarter ended September 30, 2000. |
| 10.17 | Letter agreement, dated as of July 13, 2000, between Collins & Aikman Corporation and an executive officer is hereby incorporated by reference to Exhibit 10.11 of Collins & Aikman Corporation's Report on Form 10-Q for the fiscal quarter ended September 30, 2000. |

| Exhibit Number | Description |
|---|---|
| 10.18 | Service contract between Collins & Aikman Products GmbH and an executive officer is hereby incorporated by reference to Exhibit 10.5 of Collins & Aikman Corporation's Report on Form 10-Q for the fiscal quarter ended September 30, 2000. |
| 10.19 | Settlement Agreement dated as of April 27, 2000, between Collins & Aikman Products Co. and an executive officer is hereby incorporated by reference to Exhibit 10.10 of Collins & Aikman Corporation's Report on Form 10-Q for the fiscal quarter ended September 30, 2000. |
| 10.20 | Collins & Aikman Corporation 1998 Executive Incentive Compensation Plan is hereby incorporated by reference to Exhibit 10.10 of Collins & Aikman Corporation's Report on Form 10-K for the fiscal year ended December 26, 1998. |
| 10.21 | Collins & Aikman Products Co. 2000 Executive Incentive Compensation Plan is hereby incorporated by reference to Exhibit 10.5 of Collins & Aikman Corporation's Report on Form 10-Q for the fiscal quarter ended July 1, 2000. |
| 10.22 | Collins & Aikman Corporation Supplemental Retirement Income Plan is hereby incorporated by reference to Exhibit 10.23 of Amendment No. 5 to Collins & Aikman Holdings Corporation's Registration Statement on Form S-2 (Registration No. 33-53179) filed July 6, 1994. |
| 10.23 | Amendment to Collins & Aikman Corporation Supplemental Retirement Income Plan is hereby incorporated by reference to Exhibit 10.12 of the Collins & Aikman Corporation's Report on Form 10-K for the fiscal year ended December 26, 1998. |
| 10.24 | 1993 Employee Stock Option Plan, as amended and restated, is hereby incorporated by reference to Exhibit 10.13 of Collins & Aikman Corporation's Report on Form 10-Q for the fiscal quarter ended April 29, 1995. |
| 10.25 | 1994 Employee Stock Option Plan, as amended through February 7, 1997, is hereby incorporated by reference to Exhibit 10.12 of Collins & Aikman Corporation's Report on Form 10-Q for the fiscal quarter ended March 29, 1997. |
| 10.26 | 2000 Employee Stock Option Plan is hereby incorporated by reference to Exhibit 10.6 of Collins & Aikman Corporation's Report on Form 10-Q for the fiscal quarter ended July 1, 2000. |
| 10.27 | 1994 Directors Stock Option Plan as amended and restated is hereby incorporated by reference to Exhibit 10.15 to Collins & Aikman Corporation's Report on Form 10-K for the year ended December 26, 1998. |
| 10.28 | Excess Benefit Plan of Collins & Aikman Corporation is hereby incorporated by reference to Exhibit 10.25 of Collins & Aikman Corporation's Report on Form 10-K for the fiscal year ended January 28, 1995. |
| 10.29 | 1994 Employee Stock Option Plan, as amended and restated through June 3, 1999 is hereby incorporated by reference to Exhibit 10.2 of Collins & Aikman Corporation's Report on Form 10-Q for the fiscal quarter ended June 26, 1999. |
| 10.30 | Change in Control Agreement, dated March 17, 1998, between Collins & Aikman Corporation and an executive officer is hereby incorporated by reference to Exhibit 10.17 of Collins & Aikman Corporation's Report on Form 10-K for the fiscal year ended December 27, 1997. |
| 10.31 | Change in Control Agreement, dated March 17, 1998, between Collins & Aikman Corporation and an executive officer is hereby incorporated by reference to Exhibit 10.18 of Collins & Aikman Corporation's Report on Form 10-K for the fiscal year ended December 27, 1997. |
| 10.32 | Change in Control Agreement, dated March 17, 1998, between Collins & Aikman Corporation and an executive officer is hereby incorporated by reference to Exhibit 10.19 of Collins & Aikman Corporation's Report on Form 10-K for the fiscal year ended December 27, 1997. |
| 10.33 | Change in Control Agreement, dated March 17, 1998, between Collins & Aikman Corporation and an executive officer is hereby incorporated by reference to Exhibit 10.20 of Collins & Aikman Corporation's Report on Form 10-K for the fiscal year ended December 27, 1997. |
| 10.34 | Change in Control Agreement, dated March 17, 1998, between Collins & Aikman Corporation and an executive officer is hereby incorporated by reference to Exhibit 10.22 of Collins & Aikman Corporation's Report on Form 10-Q for the fiscal quarter ended March 28, 1998. |

| Exhibit Number | Description |
|---|---|
| 10.35 | Change in Control Agreement, dated August 9, 1999, between Collins & Aikman Corporation and an executive officer is hereby incorporated by reference to Exhibit 10.25 of Collins & Aikman Corporation's Report on Form 10-K for the fiscal year ended December 25, 1999. |
| 10.36 | Change in Control Agreement, dated March 17, 1998, between Collins & Aikman Corporation and an executive officer is hereby incorporated by reference to Exhibit 10.26 of Collins & Aikman Corporation's Report on Form 10-K for the fiscal year ended December 25, 1999. |
| 10.37 | Change in Control Agreement, dated March 17, 1998, between Collins & Aikman Corporation and an executive officer is hereby incorporated by reference to Exhibit 10.27 of Collins & Aikman Corporation's Report on Form 10-K for the fiscal year ended December 25, 1999. |
| 10.38 | Change in Control Agreement, dated July 26, 1999, between Collins & Aikman Corporation and an executive officer is hereby incorporated by reference to Exhibit 10.28 of Collins & Aikman Corporation's Report on Form 10-K for the fiscal year ended December 25, 1999. |
| 10.39 | Change in Control Agreement, dated March 17, 1998, between Collins & Aikman Corporation and an executive officer is hereby incorporated by reference to Exhibit 10.29 of Collins & Aikman Corporation's Report on Form 10-K for the fiscal year ended December 25, 1999. |
| 10.40 | Change in Control Agreement, dated as of April, 2000, between Collins & Aikman Corporation and an executive officer is hereby incorporated by reference to Exhibit 10.2 of Collins & Aikman Corporation's Report on Form 10-Q for the fiscal quarter ended July 1, 2000. |
| 10.41 | Change in Control Agreement, dated as of April 1, 2000, between Collins & Aikman Products Co. and an executive officer is hereby incorporated by reference to Exhibit 10.4 of Collins & Aikman Corporation's Report on Form 10-Q for the fiscal quarter ended July 1, 2000. |
| 10.42 | Change in Control Agreement, dated as of August 1, 2000, between Collins & Aikman Corporation and an executive officer is hereby incorporated by reference to Exhibit 10.7 of Collins & Aikman Corporation's Report on Form 10-Q for the fiscal quarter ended September 30, 2000. |
| 10.43 | Change in Control Agreement, dated as of August 1, 2000, between Collins & Aikman Corporation and an executive officer is hereby incorporated by reference to Exhibit 10.9 of Collins & Aikman Corporation's Report on Form 10-Q for the fiscal quarter ended September 30, 2000. |
| 10.44 | Lease, executed as of the 1st day of June 1987, between Dura Corporation and Dura Acquisition Corp. is hereby incorporated by reference to Exhibit 10.24 of Amendment No. 5 to Collins & Aikman Holdings Corporation's Registration Statement on Form S-2 (Registration No. 33-53179) filed July 6, 1994. |
| 10.45 | Master Equipment Lease Agreement dated as of September 30, 1994, between NationsBanc Leasing Corporation of North Carolina and Collins & Aikman Products Co. is hereby incorporated by reference to Exhibit 10.27 of Collins & Aikman Corporation's Report on Form 10-Q for the fiscal quarter ended October 29, 1994. |
| 10.46 | Equity Purchase Agreement by and among JPSGP, Inc., Foamex-JPS Automotive L.P. and Collins & Aikman Products Co. dated August 28, 1996 is hereby incorporated by reference to Exhibit 2.1 of Collins & Aikman Corporation's Report on Form 10-Q for the fiscal quarter ended July 27, 1996. |
| 10.47 | Amendment No. 1 to Equity Purchase Agreement by and among JPSGP, Inc., Foamex-JPS Automotive L.P., Foamex International Inc. and Collins & Aikman Products Co. dated as of December 11, 1996 is hereby incorporated by reference to Exhibit 2.2 of Collins & Aikman Corporation's Current Report on Form 8-K dated December 10, 1996. |
| 10.48 | Equity Purchase Agreement by and among Seiren U.S.A. Corporation, Seiren Automotive Textile Corporation, Seiren Co., Ltd. and Collins & Aikman Products Co. dated December 11, 1996, is hereby incorporated by reference to Exhibit 2.3 of Collins & Aikman Corporation's Current Report on Form 8-K dated December 10, 1996. |
| 10.49 | Acquisition Agreement between Perstorp A.B. and Collins & Aikman Products Co. dated December 11, 1996 is hereby incorporated by reference to Exhibit 2.4 of Collins & Aikman Corporation's Current Report on Form 8-K dated December 10, 1996. |

50

| Exhibit Number | Description |
|---|---|
| 10.50 | Agreement among Perstorp A.B., Perstorp GmbH, Perstorp Biotec A.B. and Collins & Aikman Products Co. dated December 11, 1996 is hereby incorporated by reference to Exhibit 2.5 of Collins & Aikman Corporation's Current Report on Form 8-K dated December 10, 1996. |
| 10.51 | Settlement and Amendment Agreement dated as of December 16, 1997 by and among Collins & Aikman Products Co., Perstorp A.B., Perstorp GmbH, Collins & Aikman Holding A.B., Collins & Aikman Automotive Systems GmbH, Collins & Aikman Automotive Systems N.V., Collins & Aikman Automotive Systems A.B. and Perstorp Components GmbH and related Letter Amendment Agreement is hereby incorporated by reference to Exhibit 10.38 of Collins & Aikman Corporation's Report or Form 10-Q for the fiscal quarter ended September 26, 1998. |
| 10.52 | Acquisition Agreement dated as of December 9, 1996 among Collins & Aikman Products Co., Collins & Aikman Floor Coverings Group, Inc., Collins & Aikman Floor Coverings, Inc., CAF Holdings, Inc. and CAF Acquisition Corp. is hereby incorporated by reference to Exhibit 2.7 of Collins & Aikman Corporation's Current Report on Form 8-K dated December 10, 1996. |
| 10.53 | Mastercraft Group Acquisition Agreement dated as of April 25, 1997 among Collins & Aikman Products Co., Joan Fabrics Corporation and MC Group Acquisition Company L.L.C., is hereby incorporated by reference to Exhibit 2.1 of Collins & Aikman Corporation's Report on Form 10-Q for the fiscal quarter ended March 29, 1997. |
| 10.54 | Asset Purchase Agreement dated as of June 30, 1997 by and between JPS Automotive L.P. and Safety Components International, Inc. is hereby incorporated by reference to Exhibit 2.1 of JPS Automotive L.P.'s and JPS Automotive Products Corp.'s Current Report on Form 8-K dated July 24, 1997. |
| 10.55 | Closing Agreement dated July 24, 1997 between JPS Automotive L.P., Safety Components International, Inc. and Safety Components Fabric Technologies, Inc. is hereby incorporated by reference to Exhibit 2.2 of JPS Automotive L.P.'s and JPS Automotive Products Corp.'s Current Report on Form 8-K dated July 24, 1997. |
| 10.56 | Amended and Restated Acquisition Agreement dated as of November 4, 1997 and amended and restated as of March 9, 1998, among Collins & Aikman Products Co., Imperial Wallcoverings Inc. and BDPI Holdings Corporation is hereby incorporated by reference to Exhibit 2.4 of Collins & Aikman Corporation's Report on Form 10-K for the fiscal year ended December 27, 1997. |
| 10.57 | Share Purchase Agreement, dated as of January 12, 2001, between Collins & Aikman Corporation and Heartland Industrial Partners, L.P., is hereby incorporated by reference to Exhibit 10.1 of Collins & Aikman Corporation's Report on Form 8-K dated January 12, 2001., incorporated by reference to Exhibit 10.1 to Collins & Aikman Corporation's Current Report on Form 8-K dated January 12, 2001. |
| 10.58 | Registration Rights Agreement, dated February 23, 2001, by and among Collins & Aikman Corporation, Heartland Industrial Partners, L.P. and the other investor stockholders listed on Schedule 1 thereto, Blackstone Capital Company II, L.L.C., Blackstone Family Investment Partnership I L.P., Blackstone Advisory Directors Partnership L.P., Blackstone Capital Partners, L.P. and Wasserstein/ C&A Holdings, L.L.C., incorporated by reference to Annex D to Exhibit 10.1 to Collins & Aikman Corporation's Current Report on Form 8-K dated January 12, 2001. |
| 10.59 | Services Agreement, dated as of February 23, 2001, by and among Collins & Aikman Corporation, Collins & Aikman Products Co. and Heartland Industrial Partners, LP is hereby incorporated by reference to Exhibit 10.59 of Collins & Aikman Corporation's Report on Form 10-K for the year ended December 31, 2001. |
| 10.60 | Profit Participation Interest Agreement, dated as of February 23, 2001, by and among Heartland Industrial Partners, L.P. and the other investor stockholders listed on Schedule 1 thereto and each of Collins & Aikman Corporation, Blackstone Capital Company II, L.L.C. and Wasserstein/ C&A Holdings, L.L.C., incorporated by reference to Annex B to Exhibit 10.1 to Collins & Aikman Corporation's Current Report on Form 8-K dated January 12, 2001. |

| Exhibit Number | Description |
|---|---|
| 10.61 | Employment Agreement dated October 1, 1999 between Collins & Aikman Products Co. and an executive officer is hereby incorporated by reference to Exhibit 10.30 of Collins & Aikman Corporation's Report on Form 10-K for the fiscal year ended December 25, 1999. |
| 10.62 | Severance Benefit Agreement dated July 26, 1999 between Collins & Aikman Corporation and an executive officer is hereby incorporated by reference to Exhibit 10.31 of Collins & Aikman Corporation's Report on Form 10-K for the fiscal year ended December 25, 1999. |
| 10.63 | Severance Benefit Agreement dated August 9, 1999 between Collins & Aikman Corporation and an executive officer is hereby incorporated by reference to Exhibit 10.32 of Collins & Aikman Corporation's Report on Form 10-K for the fiscal year ended December 25, 1999. |
| 10.64 | Letter Agreement dated December 17, 1999 between Collins & Aikman Corporation and an executive officer is hereby incorporated by reference to Exhibit 10.33 of Collins & Aikman Corporation's Report on Form 10-K for the fiscal year ended December 25, 1999. |
| 10.65 | Employment Agreement dated December 1, 2000 between Collins & Aikman Products Co. and an executive officer, which is incorporated by reference to Exhibit 10.75 of Collins & Aikman Corporation's Annual Report on Form 10-K for the fiscal year ended December 31, 2000. |
| 10.66 | Separation Agreement dated as of March 12, 2001 between Collins & Aikman Products Co. and an executive officer, which is incorporated by reference to Exhibit 10.1 to the Company's Quarterly Report on Form 10-Q for the quarter ended March 31, 2001. |
| 10.67 | Employment Agreement dated as of March 29, 2000 between Collins & Aikman Products Co. and an executive officer is hereby incorporated by reference to Exhibit 10.1 of Collins & Aikman Corporation's Report on Form 10-Q for the quarter ended April 1, 2000. |
| 10.68 | Change in Control Agreement dated as of April 2000, between Collins & Aikman Corporation and an executive officer is hereby incorporated by reference to Exhibit 10.2 of Collins & Aikman Corporation's Report on Form 10-Q for the quarter ended July 1, 2000. |
| 10.69 | Employment Agreement dated as of April 1, 2000, between Collins & Aikman Products Co. and an executive officer is hereby incorporated by reference to Exhibit 10.3 of Collins & Aikman Corporation's Report on Form 10-Q for the quarter ended July 1, 2000. |
| 10.70 | Change in Control Agreement dated as of April 1, 2000, between Collins & Aikman Products Co. and an executive officer is hereby incorporated by reference to Exhibit 10.4 of Collins & Aikman Corporation's Report on Form 10-Q for the quarter ended July 1, 2000. |
| 10.71 | Service Contract between Collins & Aikman Products GmbH and an executive officer, which is incorporated by reference to Exhibit 10.5 of Collins & Aikman Corporation's Quarterly Report on Form 10-Q for the quarter ended June 30, 2001. |
| 10.72 | Employment Agreement dated as of August 1, 2000, between Collins & Aikman Products Co. and an executive officer, which is incorporated by reference to Exhibit 10.6 of Collins & Aikman Corporation's Quarterly Report on Form 10-Q for the quarter ended June 30, 2001. |
| 10.73 | Change in Control Agreement dated as of August 1, 2000, between Collins & Aikman Corporation and an executive officer, which is incorporated by reference to Exhibit 10.7 of Collins & Aikman Corporation's Quarterly Report on Form 10-Q for the quarter ended June 30, 2001. |
| 10.74 | Employment Agreement dated as of August 1, 2000, between Collins & Aikman Products Co. and an executive officer, which is incorporated by reference to Exhibit 10.8 of Collins & Aikman Corporation's Quarterly Report on Form 10-Q for the quarter ended June 30, 2001. |
| 10.75 | Change in Control Agreement dated as of August 1, 2000, between Collins & Aikman Corporation and an executive officer, which is incorporated by reference to Exhibit 10.9 of Collins & Aikman Corporation's Quarterly Report on Form 10-Q for the quarter ended June 30, 2001. |
| 10.76 | Settlement Agreement dated as of April 27, 2000, between Collins & Aikman Products Co. and an executive officer, which is incorporated by reference to Exhibit 10.10 of Collins & Aikman Corporation's Quarterly Report on Form 10-Q for the quarter ended June 30, 2001. |

| Exhibit Number | Description |
| --- | --- |
| 10.77 | Letter Agreement dated as of July 13, 2000, between Collins & Aikman Corporation and an executive officer, which is incorporated by reference to Exhibit 10.11 of Collins & Aikman Corporation's Quarterly Report on Form 10-Q for the quarter ended June 30, 2001. |
| 10.78 | Letter Agreement dated as of April 7, 2000, between Collins & Aikman Corporation and an executive officer, which is incorporated by reference to Exhibit 10.12 of Collins & Aikman Corporation's Quarterly Report on Form 10-Q for the quarter ended June 30, 2001. |
| 10.79 | Collins & Aikman Products Co. 2000 Executive Incentive Compensation Plan is hereby incorporated by reference to Exhibit 10.5 of Collins & Aikman Corporation's Report on Form 10-Q for the quarter ended July 1, 2000. |
| 10.80 | Agreement of Sale and Purchase, dated as of June 22, 2001, by and among Collins & Aikman Products Co. and New King, L.L.C is hereby incorporated by reference to Exhibit 10.81 of Collins & Aikman Corporation's Report on Form 10-K for the year ended December 31, 2001. |
| 10.81 | Lease Agreement, dated as of June 29, 2001, between New King, L.L.C., as landlord, and Collins & Aikman Products Co., as tenant is hereby incorporated by reference to Exhibit 10.82 of Collins & Aikman Corporation's Report on Form 10-K for the year ended December 31, 2001. |
| 10.82 | Agreement of Sale and Purchase, dated as of June 22, 2001, by and among Collins & Aikman Products Co. and Anchor Court, L.L.C is hereby incorporated by reference to Exhibit 10.83 of Collins & Aikman Corporation's Report on Form 10-K for the year ended December 31, 2001. |
| 10.83 | Lease Agreement, dated as of June 29, 2001, between Anchor Court, L.L.C., as landlord and Collins & Aikman Products Co., as tenant is hereby incorporated by reference to Exhibit 10.84 of Collins & Aikman Corporation's Report on Form 10-K for the year ended December 31, 2001. |
| 10.84 | Stockholders Agreement dated July 3, 2001, by and among Collins & Aikman Corporation, Heartland Industrial Partners, L.P. and the other Heartland Entities named therein, the Becker Stockholders party thereto and the Joan Stockholders party thereto is hereby incorporated by reference to Exhibit 10.85 of Collins & Aikman Corporation's Report on Form 10-K for the year ended December 31, 2001. |
| 10.85 | Registration Rights Agreement, dated July 3, 2001, by and among Collins & Aikman Corporation, Charles E. Becker, Michael E. McInerney and Jens Höhnel and, together with the Joan Investors (as defined therein) is hereby incorporated by reference to Exhibit 10.86 of Collins & Aikman Corporation's Report on Form 10-K for the year ended December 31, 2001. |
| 10.86 | First Amendment to Services Agreement, dated as of August 7, 2001, among Collins & Aikman Corporation, Collins & Aikman Products Co. and Heartland Industrial Partners, L.P is hereby incorporated by reference to Exhibit 10.87 of Collins & Aikman Corporation's Report on Form 10-K for the year ended December 31, 2001. |
| 10.87 | Equipment Lease, dated as of December 18, 2001, among Textron Automotive Exteriors Inc. and Textron Automotive Interiors Inc., collectively as lessee, and IAC TAX V, LLC, as lessor is hereby incorporated by reference to Exhibit 10.88 of Collins & Aikman Corporation's Report on Form 10-K for the year ended December 31, 2001. |
| 10.88 | Registration Rights Agreement, dated December 20, 2001, by and among Collins & Aikman Products Co., Collins & Aikman Corporation, and each of the subsidiaries listed on the signature pages thereof, and J.P. Morgan Securities Inc., Credit Suisse First Boston Corporation, Deutsche Banc Alex. Brown Inc. and Merrill Lynch, Pierce, Fenner & Smith Incorporated and the other several initial purchasers parties to the Purchase Agreement is hereby incorporated by reference to Exhibit 10.89 of Collins & Aikman Corporation's Report on Form 10-K for the year ended December 31, 2001. |
| 10.89 | Registration Rights Agreement dated as of December 20, 2001 by and among Becker Ventures, LLC, Dresdner Kleinwort Capital Partners 2001 LP, Masco Capital Corporation, ML IBK Positions, Inc. and Collins & Aikman Corporation is hereby incorporated by reference to Exhibit 10.90 of Collins & Aikman Corporation's Report on Form 10-K for the year ended December 31, 2001. |

| Exhibit Number | Description |
|---|---|
| 10.90 | Registration Rights Agreement, dated December 20, 2001, by and between Collins & Aikman Corporation, Textron Inc., and Textron Holdco Inc is hereby incorporated by reference to Exhibit 10.91 of Collins & Aikman Corporation's Report on Form 10-K for the year ended December 31, 2001. |
| 10.91 | Preferred Stock Registration and Other Rights Agreement, dated as of December 20, 2001, by and among Collins & Aikman Products Co. and Textron Inc is hereby incorporated by reference to Exhibit 10.92 of Collins & Aikman Corporation's Report on Form 10-K for the year ended December 31, 2001. |
| 10.92 | Intellimold Technology License and Support Agreement, dated as of December 20, 2001, by and between Textron, Inc. and Collins & Aikman Corporation and Collins & Aikman Products Co is hereby incorporated by reference to Exhibit 10.93 of Collins & Aikman Corporation's Report on Form 10-K for the year ended December 31, 2001. |
| 10.93 | Technology License Agreement (Retained IP), dated as of December 20, 2001, by and between Textron, Inc. and Collins & Aikman Corporation and Collins & Aikman Products Co is hereby incorporated by reference to Exhibit 10.94 of Collins & Aikman Corporation's Report on Form 10-K for the year ended December 31, 2001. |
| 10.94 | Technology License Agreement (Licensed-Back IP), dated as of December 20, 2001, by and between Textron, Inc. and Collins & Aikman Corporation and Collins & Aikman Products Co is hereby incorporated by reference to Exhibit 10.95 of Collins & Aikman Corporation's Report on Form 10-K for the year ended December 31, 2001. |
| 10.95 | Severance Agreement between Collins & Aikman Automotive Holding GmbH and an executive officer of the Company dated as of March 6, 2002 is hereby incorporated by reference to Exhibit 10.1 of Collins & Aikman Corporation's Report on Form 10-Q for the quarter ended March 31, 2002. |
| 10.96 | Separation Agreement and General Release between Products and an executive officer of the Company dated as of March 5, 2002 is hereby incorporated by reference to Exhibit 10.2 of Collins & Aikman Corporation's Report on Form 10-Q for the quarter ended March 31, 2002. |
| 10.97 | Employment Agreement between Products and an officer of the Company dated as of November 1, 2001 is hereby incorporated by reference to Exhibit 10.3 of Collins & Aikman Corporation's Report on Form 10-Q for the quarter ended March 31, 2002. |
| 10.98 | Employment Agreement between Products and an officer of the Company dated as of November 1, 2001 is hereby incorporated by reference to Exhibit 10.4 of Collins & Aikman Corporation's Report on Form 10-Q for the quarter ended March 31, 2002. |
| 10.99 | Employment Agreement between Products and an officer of the Company dated as of December 20, 2001 is hereby incorporated by reference to Exhibit 10.5 of Collins & Aikman Corporation's Report on Form 10-Q for the quarter ended March 31, 2002. |
| 10.100 | Employment Agreement between Products and an officer of the Company dated as of December 20, 2001 is hereby incorporated by reference to Exhibit 10.6 of Collins & Aikman Corporation's Report on Form 10-Q for the quarter ended March 31, 2002. |
| 10.101 | Employment Agreement between Products and an officer of the Company dated as of December 20, 2001 is hereby incorporated by reference to Exhibit 10.7 of Collins & Aikman Corporation's Report on Form 10-Q for the quarter ended March 31, 2002. |
| 10.102 | Separation and Consultancy Agreement dated July 31, 2002 is hereby incorporated by reference to Exhibit 10.1 to Collins & Aikman Corporation's Current report on Form 8-K filed August 2, 2002. |
| 10.103 | Severance Benefit Agreement between Collins and Aikman Corporation and an officer of the Company dated April 5, 2002 is hereby incorporated by reference to Exhibit 10.2 of Collins & Aikman Corporation's Report on Form 10-Q for the quarter ended June 30, 2002. |
| 10.104 | Employment and Consulting Agreement between Collins and Aikman Corporation and an Employee dated July 2002 is hereby incorporated by reference to Exhibit 10.1 of Collins & Aikman Corporation's Report on Form 10-Q for the quarter ended September 30, 2002. |

| Exhibit Number | Description |
|---|---|
| 10.105 | Separation Agreement between Collins and Aikman Corporation and an officer of the Company dated September 2002 is hereby incorporated by reference to Exhibit 10.2 of Collins & Aikman Corporation's Report on Form 10-Q for the quarter ended September 30, 2002. |
| 10.106 | Separation Agreement between Collins and Aikman Corporation and an officer of the Company dated October 2002 is hereby incorporated by reference to Exhibit 10.3 of Collins & Aikman Corporation's Report on Form 10-Q for the quarter ended September 30, 2002. |
| 11 | Computation of Earnings Per Share.* |
| 12.1 | Computation of Ratio of Earnings to Fixed Charges.* |
| 21 | Subsidiaries of the Registrant.* |
| 23.1 | Consent of PricewaterhouseCoopers LLP.* |
| 24.1 | Powers of Attorney.* |
| 99 | Voting Agreement between Blackstone Capital Partners L.P. and Wasserstein Perella Partners, L.P. is hereby incorporated by reference to Exhibit 99 of Amendment No. 4 to Collins & Aikman Holdings Corporation's Registration Statement on Form S-2 (Registration No. 33-53179) filed June 27, 1994. |
| 99.1 | Certification Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 (Chapter 63, Title 18 U.S.C. 1350(a) and (b)).* |

\* Indicates document filed herewith.

(b) Reports on Form 8-K

The Company filed the following Reports on Form 8-K covering the following items:

| November 21, 2002 | Item 5 (Other Events) |
|---|---|
| February 21, 2002 | Item 9 Regulation FD Disclosure |

55

## SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities and Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized, on the 24th day of March 2003.

COLLINS & AIKMAN CORPORATION

BY: /s/ JERRY L. MOSINGO

Jerry L. Mosingo
*President & Chief Executive Officer*

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the Registrant and in the capacities and on the dates indicated.

| Signature | Title | Date |
|---|---|---|
| /s/ JERRY L. MOSINGO<br><br>Jerry L. Mosingo | President & Chief Executive Officer | March 24, 2003 |
| *<br><br>J. Michael Stepp | Vice Chairman and Chief Financial Officer (Principal Financial Officer) | March 24, 2003 |
| *<br><br>David A. Stockman | Chairman of the Board of Directors | March 24, 2003 |
| *<br><br>Charles E. Becker | Director | March 24, 2003 |
| *<br><br>Robert C. Clark | Director | March 24, 2003 |
| *<br><br>Marshall A. Cohen | Director | March 24, 2003 |
| *<br><br>David C. Dauch | Director | March 24, 2003 |
| *<br><br>Cynthia Hess | Director | March 24, 2003 |
| *<br><br>Timothy D. Leuliette | Director | March 24, 2003 |
| *<br><br>Elkin McCallum | Director | March 24, 2003 |
| *<br><br>W. Gerald McConnell | Director | March 24, 2003 |
| *<br><br>Warren B. Rudman | Director | March 24, 2003 |
| *<br><br>Daniel P. Tredwell | Director | March 24, 2003 |
| *<br><br>Samuel Valenti | | |

*By: /s/ JERRY L. MOSINGO

Jerry L. Mosingo

## CERTIFICATION PURSUANT TO SECTION 302
## OF THE SARBANES-OXLEY ACT OF 2002

I, Jerry L. Mosingo, certify that:

1. I have reviewed this annual report on Form 10-K of Collins & Aikman Corporation;

2. Based on my knowledge, this annual report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this annual report;

3. Based on my knowledge, the financial statements, and other financial information included in this annual report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this annual report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-14 and 15d-14) for the registrant and we have:

   a. Designed such disclosure controls and procedures to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this annual report is being prepared;

   b. Evaluated the effectiveness of the registrant's disclosure controls and procedures as of a date within 90 days prior to the filing date of this annual report (the "Evaluation Date"); and

   c. Presented in this annual report our conclusions about the effectiveness of the disclosure controls and procedures based on our evaluation as of the Evaluation Date;

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation, to the registrant's auditors and the audit committee of registrant's board of directors:

   a. All significant deficiencies in the design or operation of internal controls which could adversely affect the registrant's ability to record, process, summarize and report financial data and have identified for the registrant's auditors any material weaknesses in internal controls; and

   b. Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal controls; and

6. The registrant's other certifying officer and I have indicated in this annual report whether or not there were significant changes in internal controls or in other factors that could significantly affect internal controls subsequent to the date of our most recent evaluation, including any corrective actions with regard to significant and material weaknesses.

Date: March 24, 2003

/s/ JERRY L. MOSINGO

_____

Jerry L. Mosingo
*President & Chief Executive Officer*

57

**CERTIFICATION PURSUANT TO SECTION 302**
**OF THE SARBANES-OXLEY ACT OF 2002**

I, J. Michael Stepp, certify that:

1. I have reviewed this annual report on Form 10-K of Collins & Aikman Corporation;

2. Based on my knowledge, this annual report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this annual report;

3. Based on my knowledge, the financial statements, and other financial information included in this annual report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this annual report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-14 and 15d-14) for the registrant and we have:

   a. Designed such disclosure controls and procedures to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this annual report is being prepared;

   b. Evaluated the effectiveness of the registrant's disclosure controls and procedures as of a date within 90 days prior to the filing date of this annual report (the "Evaluation Date"); and

   c. Presented in this annual report our conclusions about the effectiveness of the disclosure controls and procedures based on our evaluation as of the Evaluation Date;

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation, to the registrant's auditors and the audit committee of registrant's board of directors:

   a. All significant deficiencies in the design or operation of internal controls which could adversely affect the registrant's ability to record, process, summarize and report financial data and have identified for the registrant's auditors any material weaknesses in internal controls; and

   b. Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal controls; and

6. The registrant's other certifying officer and I have indicated in this annual report whether or not there were significant changes in internal controls or in other factors that could significantly affect internal controls subsequent to the date of our most recent evaluation, including any corrective actions with regard to significant and material weaknesses.

Date: March 24, 2003

/s/ J. MICHAEL STEPP

J. Michael Stepp
*Vice Chairman and Chief Financial Officer*
*(Principal Financial Officer)*

58

## REPORT OF INDEPENDENT ACCOUNTANTS

To the Board of Directors and Shareholders
of Collins & Aikman Corporation:

In our opinion, the 2002 and 2001 consolidated financial statements listed in the index appearing under Item 15(a)(1) present fairly, in all material respects, the financial position of Collins & Aikman Corporation and its subsidiaries at December 31, 2002 and 2001, and the results of their operations and their cash flows for the years then ended in conformity with accounting principles generally accepted in the United States of America. In addition, in our opinion, the financial statement schedules listed in the index appearing under Item 15(a)(2) present fairly, in all material respects, the 2002 and 2001 information set forth therein when read in conjunction with the related consolidated financial statements. These financial statements and financial statement schedules are the responsibility of the Company's management; our responsibility is to express an opinion on these financial statements and financial statement schedules based on our audits. We conducted our audits of these statements in accordance with auditing standards generally accepted in the United States of America, which require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion. The financial statements of Collins & Aikman Corporation as of December 31, 2000, and for the year then ended, were audited by other independent accountants who have ceased operations. Those independent accountants expressed an unqualified opinion on those financial statements in their report dated February 14, 2001 (except with respect to the matter discussed in Note 24 (which in the current report on Form 10-K is Note 23), as to which the date is March 28, 2002).

As discussed in Note 2 to the consolidated financial statements, effective January 1, 2002, the Company changed its method of accounting for goodwill in accordance with the adoption of Statement of Financial Accounting Standards No. 142, "Goodwill and Other Intangible Assets".

/s/ PRICEWATERHOUSECOOPERS LLP

Detroit, Michigan
February 18, 2003

F-1

The following report is a copy of a report previously issued by Arthur Andersen LLP, which has ceased operations, and has not been reissued by Arthur Andersen LLP. Note 24 referenced below is Note 23 and Item 14(a)(2) referenced below is Item 15(a)(2) in the current report on Form 10-K.

## REPORT OF INDEPENDENT PUBLIC ACCOUNTANTS

To Collins & Aikman Corporation:

We have audited the accompanying consolidated balance sheet of Collins & Aikman Corporation (a Delaware Corporation) and subsidiaries as of December 31, 2000 and the related consolidated statements of operations, cash flows, and common stockholders' deficit for each of the two fiscal years in the period ended December 31, 2000, as listed in the index appearing under Item 15(a)(1). These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audits in accordance with auditing standards generally accepted in the United States. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the financial statements referred to above present fairly, in all material respects, the financial position of Collins & Aikman Corporation and subsidiaries as of December 31, 2000 and the results of their operations and their cash flows for each of the two fiscal years in the period ended December 31, 2000, in conformity with accounting principles generally accepted in the United States.

Our audit was made for the purpose of forming an opinion on the basic financial statements taken as a whole. The schedule listed in the index appearing under item 14(a)(2) is presented for purposes of complying with the Securities and Exchange Commission's rules and is not part of the basic financial statements. This schedule has been subjected to the auditing procedures applied in the audit of the basic financial statements and, in our opinion, fairly states in all material respects the financial data required to be set forth therein in relation to the basic financial statements taken as a whole.

/s/ ARTHUR ANDERSEN LLP

Charlotte, North Carolina,
February 14, 2001 (except with respect to the matter discussed in Note 24,
as to which the date is March 28, 2002)

F-2

**COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES**

**CONSOLIDATED STATEMENTS OF OPERATIONS**
**(in millions, except per share data)**

| | Year Ended | | |
| | December 31, 2002 | December 31, 2001 | December 31, 2000 |
|---|---|---|---|
| Net sales | $  3,885.8 | $  1,823.3 | $  1,901.8 |
| Cost of goods sold | 3,367.7 | 1,604.5 | 1,635.2 |
| Gross profit | 518.1 | 218.8 | 266.6 |
| Selling, general and administrative expenses | 293.5 | 164.4 | 158.5 |
| Restructuring charge and impairment of long-lived assets | 56.9 | 18.8 | — |
| Operating income | 167.7 | 35.6 | 108.1 |
| Interest expense, net of interest income of $1.4, $2.0 and $3.4 | 148.9 | 84.3 | 96.6 |
| Loss on sale of receivables | 4.2 | 10.8 | 9.2 |
| Subsidiary preferred stock dividends | 30.8 | 1.5 | — |
| Subsidiary preferred stock accretion | 7.6 | 0.9 | — |
| Other expense, net | 10.0 | 6.4 | 1.5 |
| Income (loss) from continuing operations before income taxes | (33.8) | (68.3) | 0.8 |
| Income tax (benefit) expense | 17.5 | (18.6) | 2.2 |
| Loss from continuing operations before extraordinary loss and cumulative effect of a change in accounting principle | (51.3) | (49.7) | (1.4) |
| Income from discontinued operations, net of income taxes of $6.3, $5.7 and $4.4 | 9.5 | 8.8 | 6.6 |
| Income (loss) before extraordinary loss and cumulative effect of change in accounting principle | (41.8) | (40.9) | 5.2 |
| Extraordinary loss on retirement of debt, net of income taxes of $2.7 and $0.5 | — | (5.3) | (0.7) |
| Cumulative effect of a change in accounting principle, net of income taxes of $0 | (11.7) | — | — |
| Net income (loss) | $  (53.5) | $  (46.2) | $  4.5 |
| Earnings per share data: | | | |
| Net income (loss) | $  (53.5) | $  (46.2) | $  4.5 |
| Loss on redemption of subsidiary preferred stock | (36.3) | — | — |
| Net income (loss) available to common shareholders | $  (89.8) | $  (46.2) | $  4.5 |
| Net income (loss) per basic and diluted common share: | | | |
| Continuing operations | $  (1.15) | $  (1.28) | $  (0.06) |
| Discontinued operations | 0.12 | 0.23 | 0.27 |
| Extraordinary loss | — | (0.14) | (0.03) |
| Cumulative effect of a change in accounting principle | (0.15) | — | — |
| Net income (loss) available to common shareholders | $  (1.18) | $  (1.19) | $  0.18 |
| Average common shares outstanding: | | | |
| Basic and diluted | 76.3 | 38.9 | 24.8 |

The Notes to Consolidated Financial Statements are an integral
part of these consolidated financial statements.

F-3

## COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES

### CONSOLIDATED BALANCE SHEETS
(in millions)

|  | December 31, 2002 | December 31, 2001 |
|---|---|---|
| **ASSETS** | | |
| Current Assets: | | |
| Cash and cash equivalents | $ 81.3 | $ 73.9 |
| Accounts and other receivables, net of allowances of $18.6 and $14.6. | 373.0 | 406.1 |
| Inventories | 171.6 | 132.6 |
| Other | 177.4 | 131.9 |
| Total current assets | 803.3 | 744.5 |
| Property, plant and equipment, net | 737.8 | 612.6 |
| Deferred tax assets | 165.0 | 136.5 |
| Goodwill | 1,265.5 | 1,253.8 |
| Intangible assets, net | 85.3 | 23.6 |
| Other assets | 100.2 | 216.9 |
|  | $3,157.1 | $2,987.9 |
| **LIABILITIES AND COMMON STOCKHOLDERS' EQUITY** | | |
| Current Liabilities: | | |
| Short-term borrowings | $ 10.5 | $ 25.6 |
| Current maturities of long-term debt | 23.5 | 19.9 |
| Accounts payable | 580.5 | 468.7 |
| Accrued expenses | 314.9 | 249.4 |
| Total current liabilities | 929.4 | 763.6 |
| Long-term debt and capital lease obligations | 1,255.2 | 1,282.6 |
| Other, including pensions and post-retirement benefit obligations | 438.4 | 402.5 |
| Commitments and contingencies | | |
| Minority interest in consolidated subsidiary | 12.7 | 15.2 |
| Mandatorily redeemable preferred stock of subsidiary | 123.9 | 149.3 |
| Common stock ($.01 par value, 300.0 shares authorized, 83.6 shares issued and outstanding at December 31, 2002 and 300.0 shares authorized, 67.2 shares issued and outstanding at December 31, 2001) | 0.8 | 0.7 |
| Other paid-in capital | 1,282.3 | 1,124.1 |
| Accumulated deficit | (772.6) | (682.8) |
| Accumulated other comprehensive loss | (113.0) | (67.3) |
| Total common stockholders' equity | $ 397.5 | $ 374.7 |
|  | $3,157.1 | $2,987.9 |

The Notes to Consolidated Financial Statements are an integral
part of these consolidated financial statements.

F-4

## COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES

### CONSOLIDATED STATEMENTS OF CASH FLOWS
(in millions)

| | Year Ended | | |
|---|---|---|---|
| | December 31, 2002 | December 31, 2001 | December 31, 2000 |
| **OPERATING ACTIVITIES** | | | |
| Net income (loss) | $ (53.5) | $ (46.2) | $ 4.5 |
| Adjustments to derive cash flow operating activities: | | | |
| Impairment of goodwill | 11.7 | — | |
| Impairment of long-lived assets | 19.3 | 7.6 | — |
| Deferred income tax expense (benefit) | (3.6) | (26.0) | (10.0) |
| Subsidiary preferred stock requirements | 38.4 | 2.4 | |
| Depreciation | 97.0 | 64.2 | 59.1 |
| Goodwill amortization | — | 7.1 | 7.1 |
| Amortization of other assets | 20.0 | 10.5 | 8.5 |
| Loss (gain) on sale of property, plant and equipment | 3.4 | 8.7 | (1.0) |
| Decrease in accounts and other receivables | 23.7 | 135.0 | 78.2 |
| Proceeds from (reduction of) participating interests in accounts receivable, net of redemptions | (13.9) | (2.6) | (34.0) |
| Decrease (increase) in inventories | (26.6) | 53.4 | 0.9 |
| Increase (decrease) in accounts payable | 35.1 | (31.9) | (20.0) |
| Undistributed equity in earnings of joint ventures | 5.5 | — | — |
| Increase (decrease) in interest payable | (4.0) | (4.1) | 3.4 |
| Changes in other assets | 62.4 | (6.5) | 24.5 |
| Changes in other liabilities | (25.4) | (30.6) | (23.9) |
| Net cash provided by operating activities | 189.5 | 141.0 | 97.3 |
| **INVESTING ACTIVITIES** | | | |
| Additions to property, plant and equipment | (147.9) | (54.5) | (69.0) |
| Sales of property, plant and equipment | 13.3 | 88.1 | 5.6 |
| Additional investment in joint venture | (5.9) | — | — |
| Acquisitions of businesses, net of cash acquired | (6.8) | (760.9) | — |
| Payment of acquisition costs | (38.8) | — | — |
| Sale of business | — | 3.5 | — |
| Net cash used in investing activities | (186.1) | (723.8) | (63.4) |
| **FINANCING ACTIVITIES** | | | |
| Issuance of long-term debt | — | 950.0 | — |
| Debt issuance costs | — | (59.4) | — |
| Repayment of long-term debt | (23.9) | (383.2) | (66.6) |
| Repurchase of preferred stock | (100.0) | — | — |
| Increase (decrease) in short-term borrowings | (16.0) | 10.1 | 0.2 |
| Net borrowings (repayments) on revolving credit facilities | — | (150.2) | 39.0 |
| Net proceeds from issuance of common stock | 150.6 | 207.2 | — |
| Reissue of treasury stock, net | — | 61.3 | 0.4 |
| Repayment of debt assumed in acquisition | (6.7) | — | — |
| Net cash provided by (used in) financing activities | 4.0 | 635.8 | (27.0) |
| Increase in cash and cash equivalents | 7.4 | 53.0 | 6.9 |
| Cash and cash equivalents at beginning of year | 73.9 | 20.9 | 14.0 |
| Cash and cash equivalents at end of year | $ 81.3 | $ 73.9 | $ 20.9 |
| Supplementary information: | | | |
| Debt assumed in acquisition | $ 6.7 | $ — | $ — |
| Taxes paid | $ 12.8 | $ 15.5 | $ 4.8 |
| Interest paid | $ 139.9 | $ 76.3 | $ 94.8 |

The Notes to Consolidated Financial Statements are an integral
part of these consolidated financial statements.

F-5

## COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES

### CONSOLIDATED STATEMENTS OF COMMON STOCKHOLDERS' EQUITY (DEFICIT)
(in millions)

| | Current Year Comprehensive Income (Loss) | Total | Accumulated Deficit | Accumulated Other Comprehensive Loss(a) | Common Stock | Other Paid-in Capital | Treasury Stock |
|---|---|---|---|---|---|---|---|
| Balance at December 25, 1999 | | $(151.1) | $ (641.1) | $ (33.3) | $ 0.3 | $ 585.9 | $ (62.9) |
| Comprehensive income: | | | | | | | |
| Net Income | $ 4.5 | 4.5 | 4.5 | | | | |
| Other comprehensive income, net of tax: | | | | | | | |
| Foreign currency translation adjustments | (10.4) | (10.4) | — | (10.4) | — | — | — |
| Pension equity adjustment(b) | 0.8 | 0.8 | — | 0.8 | — | — | — |
| | $ (5.1) | | | | | | |
| Compensation expense | | 0.9 | — | — | — | 0.9 | — |
| Purchase of treasury stock (0.4 shares) | | (0.5) | — | — | — | — | (0.5) |
| Exercise of stock options (0.2 shares) | | 0.9 | — | — | — | (0.9) | 1.8 |
| Balance at December 31, 2000 | | (154.9) | (636.6) | (42.9) | 0.3 | 585.9 | (61.6) |
| Comprehensive income: | | | | | | | |
| Net loss | $ (46.2) | (46.2) | (46.2) | — | | | |
| Other comprehensive income: | | | | | | | |
| Foreign currency translation adjustments | (9.0) | (9.0) | — | (9.0) | — | — | — |
| Pension equity adjustment, net of tax(b) | (15.4) | (15.4) | — | (15.4) | — | — | — |
| | $ (70.6) | | | | | | |
| Compensation expense | | 1.2 | — | — | — | 1.2 | — |
| Issuance of common stock | | 533.0 | — | — | 0.4 | 532.6 | — |
| Reissue of treasury stock (8.5 shares) | | 61.3 | — | — | — | (0.3) | 61.6 |
| Exercise of stock options (1.1 shares) | | 4.7 | — | — | — | 4.7 | — |
| Balance at December 31, 2001 | | 374.7 | (682.8) | (67.3) | 0.7 | 1,124.1 | — |
| Comprehensive income: | | | | | | | |
| Net loss | $ (53.5) | (53.5) | (53.5) | — | | | |
| Other comprehensive income: | | | | | | | |
| Foreign currency translation adjustments | 10.7 | 10.7 | — | 10.7 | — | — | — |
| Pension equity adjustment, net of tax(b) | (56.4) | (56.4) | — | (56.4) | — | — | — |
| | $ (99.2) | | | | | | |
| Loss on redemption of subsidiary preferred stock | | (36.3) | (36.3) | — | — | — | — |
| Issuance of common stock | | 157.2 | — | — | 0.1 | 157.1 | — |
| Exercise of stock options (0.1 shares) | | 1.1 | — | — | — | 1.1 | — |
| Balance at December 31, 2002 | | $ 397.5 | $ (772.6) | $ (113.0) | $ 0.8 | $1,282.3 | $ — |

(a) The components of Accumulated Other Comprehensive Loss are $40.9 million of foreign currency translation adjustment and $72.1 million of pension equity adjustment as of December 31, 2002.

(b) For 2002, 2001 and 2000 the tax effect of the pension equity adjustment is $42.6 million, $3.2 million, and $0.4 million, respectively.

The Notes to Consolidated Financial Statements are an integral part
of these consolidated financial statements.

F-6

## COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

### 1. Organization

Collins & Aikman Corporation (the "Company") is a Delaware corporation, headquartered in Troy, Michigan. The Company conducts all of its operating activities through its wholly owned Collins & Aikman Products Co. ("Products") subsidiary. The Company is a global leader in design, engineering and manufacturing of automotive interior components, including instrument panels, fully assembled cockpit modules, floor and acoustic systems, automotive fabric, interior trim and convertible top systems. The Company operates through three divisions: North American Automotive Interior Systems, European and Rest of World Automotive Interior Systems and Specialty Automotive Products.

During February 2001, Heartland Industrial Partners, L.P. and its affiliates ("Heartland") acquired a controlling interest equal to approximately 60% of the Company through a purchase of 25 million shares of common stock from the Company and a purchase of 27 million shares from Blackstone Partners and WP Partners. As a result of the sale of shares, the Company received gross proceeds of $125.0 million, or approximately $94.6 million after fees and expenses associated with the transactions. The Company also received a profit participation right that it shares with Blackstone Partners and WP Partners on future common stock sales by Heartland to non-permitted transferees subject to a limit, in the case of the Company, of approximately $6.25 million. As a result of the above transactions ("Heartland Transaction"), Heartland is entitled to designate a majority of the Company's Board of Directors.

The Company completed its acquisition of Becker Group, LLC, a supplier of plastic components to the automotive industry and the automotive fabric operations of Joan Fabrics and an affiliate in July and September 2001, respectively. The acquisitions included the issuance of approximately 30 million shares of common stock with a market value of $169.3 million.

In December 2001, the Company completed its acquisition of Textron Automotive Company's ("Textron's") automotive trim division ("TAC-Trim") for $940 million. The purchase price consisted primarily of: $632.2 million in cash and assumed debt; 18 million shares of common stock, with a market value of $160.9 million; and preferred stock of Products with an aggregate liquidation preference of $326.4 million, valued at $146.9 million. The cash purchase price was financed through a combination of the sale of an additional 12.8 million shares of common stock, valued at $160.0 million, to Heartland and debt financing.

On December 31, 2002, Heartland owned approximately 36% of the outstanding shares; Blackstone Partners' and WP Partners' owned approximately 11%; Joan Fabrics Corp., Mr. Elkin McCallum and associates owned approximately 7%; Mr. Charles E. Becker and Textron, Inc. each owned approximately 9%.

### 2. Summary of Significant Accounting Policies

Basis of Presentation: The consolidated financial statements include the accounts of the Company and its consolidated subsidiaries and in the opinion of management, contain all adjustments, including adjustments of a normal and recurring nature, necessary for a fair presentation of financial position and results of operations. All significant intercompany items have been eliminated in the preparation of the consolidated financial statements. Certain prior year items have been reclassified to conform with the fiscal 2002 presentation.

Investments in entities in which the Company has control are consolidated. Investments in 50% or less owned entities in which the Company has significant influence have been accounted for under the equity method. In connection with the 2001 TAC-Trim acquisition, the Company acquired a 50% interest in Textron Automotive Holdings (Italy) S.r.L., an Italian joint venture, of which Textron indirectly owned the other 50% interest. The Company accounted for this investment under the equity method, the Company did not control the joint venture prior to December 31, 2002 but was required to provide certain administrative, technical and engineering services and to license certain patents and other know how to the Italian joint venture. The Company recorded certain fees and reimbursement of certain expenses in providing these services and

F-7

**COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES**

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

licensing these rights. In December 2002, the Company signed a letter-of-intent to purchase the remaining 50% and began consolidating the joint venture as of December 31, 2002. In January 2003, the Company acquired from Textron the remaining 50% interest in the Italian joint venture.

Reverse Stock Split: On May 28, 2002, the Company effected a one-for-2.5 reverse stock split of the Company's common stock. All shares and per share data have been adjusted retroactively for all periods presented to reflect the stock split.

Use of Estimates: The preparation of consolidated financial statements in conformity with generally accepted accounting principles requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the consolidated financial statements and the reported amounts of revenues and expenses during the reporting period. Management believes its assumptions and estimates are reasonable and appropriate, however actual results could differ from those estimates.

Fiscal Year: During fiscal 2000, the Company changed its fiscal year-end to a calendar year-end. The 2000 fiscal year-end consisted of 53 weeks, which ended on December 31, 2000.

Employee Stock Options: SFAS No. 148, "Accounting for Stock-Based Compensation — Transition and Disclosure amended SFAS No. 123, "Accounting for Stock-Based Compensation" to provide alternative methods of transition for a voluntary change to the fair value based method of accounting for stock based employee compensation and amended the required disclosures. SFAS No. 123 encourages companies to adopt the fair value method for compensation expense recognition related to employee stock options. The accounting requirements of Accounting Principles Board Opinion (APB) No. 25 use the intrinsic value method in determining compensation expense, which represents the excess of the market price of the stock over the exercise price on the measurement date. The Company has elected to continue to utilize the accounting provisions of APB No. 25 for stock options, and is required to provide pro forma disclosures of net income and earnings per share had the Company adopted the fair value method for recognition purposes. The following tabular information is presented as if the Company had adopted SFAS No. 123 and restated its results: (in millions, except per share amounts).

|  | Fiscal Year Ended | | | | | |
|  | December 31, 2002 | | December 31, 2001 | | December 31, 2000 | |
| --- | --- | --- | --- | --- | --- | --- |
| Net income (loss) available to shareholders: | | | | | | |
| As reported | $ | (89.8) | $ | (46.2) | $ | 4.5 |
| Total employee stock based compensation expense determined under fair value based method for all awards, net of tax | | (3.4) | | (2.4) | | (2.4) |
| Pro forma, net income (loss) | | (93.2) | | (48.6) | | 2.1 |
| Basic and Diluted EPS(a): | | | | | | |
| As reported | $ | (1.18) | $ | (1.19) | $ | 0.18 |
| Pro forma | | (1.22) | | (1.25) | | 0.08 |

(a)    Adjusted to reflect the impact of the reverse stock split.

Earnings Per Share: Basic earnings per share is based on income available to common shareholders divided by the weighted average number of common shares outstanding. Diluted earnings per share is based on income available to common shareholders divided by the sum of the weighted average number of common shares outstanding and all potentially dilutive common shares. Potentially dilutive common shares include

F-8

## COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES

### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

shares which may be issued upon the assumed exercise of employee stock options less the number of treasury shares assumed to be purchased from the proceeds, including applicable compensation expense (Note 16).

Cash and Cash Equivalents: Cash and cash equivalents include all cash balances and highly liquid investments with an original maturity of three months or less.

Accounts and Other Receivables: Accounts and other receivables consist primarily of the Company's trade receivables and the retained interest in the Receivables Facility (See Note 11). The Company has provided an allowance against uncollectible accounts.

Inventories: Inventories are valued at the lower of cost or market, but not in excess of net realizable value. Cost is determined on the first-in, first-out basis.

Property, Plant and Equipment: Property, plant and equipment are stated at cost. Normal repairs and maintenance are expensed as incurred. Provisions for depreciation are primarily computed on a straight-line basis over the estimated useful lives as follows: 10-20 years for land improvements, 20-40 years for buildings, and 3-11 years for machinery and equipment. Leasehold improvements are amortized over the lesser of the lease term or the estimated useful lives of the improvements.

Long-Lived Assets: Statement of Financial Accounting Standards ("SFAS") No. 121, "Accounting for the Impairment of Long-Lived Assets and for Long-Lived Assets to be Disposed of", established accounting standards for the impairment of long-lived assets, certain identifiable intangibles, and goodwill related to those assets to be held and used and for long-lived assets and certain identifiable intangibles to be disposed. SFAS No. 121 requires that long-lived assets and certain identifiable intangibles to be held and used by an entity be reviewed for impairment whenever events or changes in circumstances indicate that the carrying amount of an asset may not be recoverable, and that certain long-lived assets and identifiable intangibles to be disposed of be reported at the lower of carrying amount or fair value less cost to sell. In August 2001, this statement was superseded by the issuance of SFAS No. 144, "Accounting for the Impairment or Disposal of Long-Lived Assets." The statement retains the previously existing accounting requirements related to the recognition and measurement of the impairment of long-lived assets to be held and used while expanding the measurement requirements of long-lived assets to be disposed of by sale to include discontinued operations. It also expands the previously existing reporting requirements for discontinued operations to include a component of an entity that either has been disposed of or is classified as held for sale. The Company implemented SFAS No. 144 on January 1, 2002. This statement did not have a material impact on the Company's consolidated financial position or results of operations. During 2002, the Company incurred asset impairment charges of $18.0 million recognized as part of restructuring programs (Note 15). In addition, during fiscal 2001, the Company incurred a charge of $7.6 million relating to asset impairments recognized in the Reorganization (See Note 15).

Goodwill and Intangibles: During the second quarter of 2002, the Company completed the implementation of SFAS 142, "Goodwill and Other Intangible Assets". Under SFAS 142, goodwill is no longer amortized. Instead, goodwill and indefinite-lived intangible assets are tested for impairment in accordance with the provisions of SFAS 142. The Company employed a discounted cash flow analysis and a market comparable approach in conducting its impairment tests. The Company completed its initial impairment test in the second quarter of 2002 and recorded an impairment loss of $11.7 million (having no tax impact), or $0.15 per average basic and diluted share relating to the UK Plastics business in the European and Rest of World Automotive Systems segment. The impairment loss was reported as a cumulative effect of a change in accounting principle and, therefore, is accounted for as if it occurred on January 1, 2002. The Company completed this test again as of November 1, which indicated that the fair value of the reporting units exceeded the carrying values. Fair value was determined based upon the discounted cash flows of the reporting units using discount rates ranging from 11.5% to 14.0% dependant on the reporting unit and a residual growth rate of 2%. The market comparable approach consisted of an earnings multiple of 5 times forecasted EBITDA (operating income less — interest, taxes, depreciation and amortization) and a control premium on equity.

F-9

**COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

Future cash flows and EBITDA are affected by future operating performance, which will be impacted by economic conditions, car builds, financial, business and other factors, many of which are beyond the Company's control. The North American Plastics reporting unit can be significantly impacted by an adverse change in assumptions. Considerable judgment is often involved in making these determinations, the use of different assumptions could result in significantly different results. Management believes its assumptions and estimates are reasonable and appropriate, however actual results could differ from those estimates.

Pension and Postretirement Benefits Other than Pensions: Annual net periodic expense and benefit liabilities under our defined benefit plans are determined on an actuarial basis. Assumptions used in the actuarial calculations have a significant impact on plan obligations and expense. Each September, the Company reviews the actual experience compared to the more significant assumptions used and make adjustments to the assumptions, if warranted. The healthcare trend rates are reviewed with the actuaries based upon the results of their review of claims experience. Discount rates are based upon an expected benefit payments duration analysis and the equivalent average yield rate for high-quality fixed-income investments. Pension benefits are funded through deposits with trustees and the expected long-term rate of return on fund assets is based upon actual historical returns modified for known changes in the market and any expected change in investment policy. Postretirement benefits are not funded and our policy is to pay these benefits as they become due.

Certain accounting guidance, including the guidance applicable to pensions, does not require immediate recognition of the effects of a deviation between actual and assumed experience or the revision of an estimate. This approach allows the favorable and unfavorable effects that fall within an acceptable range to be netted. Although this netting occurs outside the basic financial statements, disclosure of the net amount is disclosed as an unrecognized gain or loss in the footnotes to our financial statements. Considerable judgment is often involved in making these determinations, the use of different assumptions could result in significantly different results. Management believes its assumptions and estimates are reasonable and appropriate, however actual results could differ from those estimates.

Revenue Recognition: The Company recognizes revenue from product sales when it has shipped the goods. Products are shipped FOB supplier using customer designated transportation companies with title passing at that time. The Company generally allows its customers the right of return only in the case of defective products. The Company provides a reserve for estimated defective product costs at the time of the sale of the products.

Cost of Goods Sold and Selling, General and Administrative Costs: Cost of goods sold is comprised of direct material, direct labor and manufacturing overhead. Manufacturing overhead consists of indirect labor, depreciation, amortization and other manufacturing expenses. Selling, general and administrative costs consist of selling, research and development, engineering and administrative expenses.

Other Expense, net: In 2002, "other expenses, net" primarily included $12.6 million of losses related to derivatives used in the Company's foreign currency hedging strategy, $5.5 million of losses related to investments in joint ventures and $1.9 million of losses from sale and leaseback transactions offset by $5.9 million of foreign currency transaction gains and minority interest share of losses of a consolidated subsidiary of $6.5 million. In 2001, "other expenses, net" primarily included $7.8 million of foreign currency transaction losses and $8.2 million of losses from sale and leaseback transactions offset by $5.0 million of derivatives gains and $6.2 million related to a stock demutualization. In 2000, "other expenses, net" included primarily a $1.0 million derivative loss.

Customer Engineering and Tooling: Engineering and tooling balances represent tools, dies and other items used in the manufacture of customer components. Amounts included in the consolidated balance sheets include Company-owned tools and costs incurred on customer-owned tools which are subject to reimbursement, pursuant to the terms of a customer contract. Company-owned tools balances are amortized over the

F-10

## COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES

### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

tool's expected life or the life of the related vehicle program, whichever is shorter. Engineering, testing and other costs incurred in the design and development of production parts are expensed as incurred, unless the costs are reimbursable, as specified in a customer contract.

Emerging Issue Task Force EITF Issue No. 99-5, "Accounting for Pre-Production Costs Related to Long-Term Supply Arrangements" (EITF No. 99-5) requires that design and development costs for products to be sold under long-term supply arrangements be expensed as incurred, and costs incurred for molds, dies and other tools that will be used in producing the products under long-term supply arrangements be capitalized and amortized over the shorter of the expected useful life of the assets or the term of the supply arrangement. The Company adopted the provisions of EITF No. 99-5 on a prospective basis on December 26, 1999.

The Company had assets of approximately $8.4 million and $22.7 million recognized pursuant to agreements that provide for contractual reimbursement of pre-production design and development costs, at December 31, 2002 and 2001, respectively. The Company also capitalized $77.1 million and $90.2 million in costs for molds, dies and other tools, at December 31, 2002 and 2001, respectively, that are reimbursable by customers. In addition, the Company had $11.0 million and $9.1 million at December 31, 2002 and 2001, respectively, for molds, dies and other tools that the Company owns.

Derivative Financial Instruments: All derivatives are recognized on the consolidated balance sheet at fair value as required by SFAS 133 "Accounting for Derivative Instruments and Hedging Activities". Gains and losses on the changes in fair value of the derivatives that qualify as hedges under SFAS No. 133, are recorded on the Balance Sheet as a component of "Other comprehensive income" to the extent that the hedges are effective and documented, until the underlying transactions are recognized in earnings. As of December 31, 2002, the Company had no derivatives designated as hedges under SFAS No. 133. The Company uses derivatives to hedge economic risks even though these derivatives may not be designated as hedges in accordance with SFAS No. 133. These derivative instruments are marked to fair market value and reported on the balance sheet. Gains and losses on these instruments are reported in "Other Income" or "Other Expense" on the Consolidated Statements of Operations. The gains and losses are intended to offset economic risk of foreign currency transaction losses or gains. The Company does not enter into derivative transactions for speculative purposes.

Foreign Currency Translation: Assets and liabilities of the Company's non-U.S. businesses generally are translated to U.S. Dollars at end-of-period exchange rates. The effects of the translations are reported as a component of "Other comprehensive income." Remeasurement of assets and liabilities of the Company's non-U.S. businesses that use the U.S. Dollar as functional currency are included in the Consolidated Statements of Operations as "Other income" or "Other expense". The Statement of Operations of the Company's non-U.S. businesses are translated to U.S. dollars at average exchange rates and are recognized as part of revenues, costs and expenses. Also included in "Other income" or "Other expense", are gains and losses arising from transactions denominated in a currency other than the functional currency of the business involved. Gains and losses resulting from foreign currency transactions are recognized in "Other income" or "Other expense".

Environmental: The Company records an estimated loss when it is probable that an environmental liability has been incurred and the amount of the loss can be reasonably estimated. The Company also considers estimates of certain reasonably possible environmental liabilities in determining the aggregate amount of environmental reserves. The Company reviews all environmental claims from time to time and adjusts the reserves accordingly. Accruals for environmental liabilities are generally included in the consolidated balance sheet as other non-current liabilities at undiscounted amounts and exclude claims for recoveries from insurance or other third parties. Accruals for insurance or other third party recoveries for environmental liabilities are recorded when it is probable that the claim will be realized.

F-11

## COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES

### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

New Accounting Pronouncements: In June 2002, the FASB issued SFAS No. 146 "Accounting for Costs Associated with Exit or Disposal Activities." This statement nullifies Emerging Issues Task Force (EITF) Issue No. 94-3, "Liability Recognition for Certain Employee Termination Benefits and Other Costs to Exit an Activity (including Certain Costs Incurred in a Restructuring)." This statement requires that a liability for a cost associated with an exit or disposal activity be recognized when the liability is incurred rather than the date of an entity's commitment to an exit plan. The Company is required to implement SFAS No. 146 on January 1, 2003. Management has not determined the impact, if any, that this statement will have on its consolidated financial position or results of operations.

In November 2002, the FASB issued FASB Interpretation (FIN) No. 45, "Guarantor's Accounting and Disclosure Requirements for Guarantees, Including Indirect Guarantees of Indebtedness of Others." FIN No. 45 requires a guarantor to recognize, at the inception of a qualified guarantee, a liability for the fair value of the obligation undertaken in issuing the guarantee. The Company is currently reviewing these recognition and measurement provisions, which are effective on a prospective basis for qualified guarantees issued or modified after December 31, 2002, to determine whether they will have a material impact on its consolidated financial statements. The disclosure requirements of FIN No. 45, which are effective for this quarter, are presented in the following paragraph.

In conjunction with divestitures and other transactions, the Company has provided indemnifications relating to legal and environmental issues, including products. The Company does not believe that any pending or threatened litigation or claims related to any such retained liabilities of discontinued operations are likely to result in any material loss.

In January 2003, the FASB issued FASB Interpretation No. 46 (FIN 46), "Consolidation of Variable Interest Entities, an interpretation of Accounting Research Bulletin No. 51, Consolidated Financial Statements." This interpretation provides guidance on the identification of variable interest entities, some of which may require consolidation based on factors beyond a majority voting interest. A variable interest entity is defined in FIN 46 as an entity in which either the equity investors (if any) do not have a controlling financial interest or the equity investment at risk is insufficient to finance that entity's activities without receiving additional subordinated financial support from other parties. FIN 46 applies immediately to variable interest entities created after January 31, 2003, and in the first fiscal year or interim period beginning after June 15, 2003, to variable interest entities in which an enterprise holds a variable interest that it acquired before February 1, 2003. The company is currently unaware of any entities that exist that would qualify as a variable interest entity.

## 3.  Acquisitions and Goodwill

### a.  Acquisitions

The Company completed its acquisitions of Textron Automotive Company's automotive trim division ("TAC-Trim") in December 2001, the automotive fabric operations of Joan Fabrics and all of the operating assets in Joan Fabric's affiliated yarn dying operation Western Avenue Dyers (collectively "Joan") in September 2001, and Becker Group, LLC ("Becker") a supplier of plastic components to the automotive industry in July 2001. The results of operations of the acquired companies are included in the Company's consolidated statements of operations from the dates of acquisition.

Appraisals for Becker and Joan were performed during 2001 and the related allocation of purchase price was completed. In the second quarter 2002, the Company's external consultants completed the valuations of all TAC-Trim acquired intangible and fixed assets. Based upon these valuations: 1) an intangible asset of $51.0 million for customer contracts was recorded based on the value of individual customer contracts — this intangible asset is being amortized over the contract's performance period, which extends through 2012; 2) the Company revised its first quarter estimate for patents and other specifically identifiable intangible assets

F-12

## COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES

### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

acquired as part of the TAC-Trim purchase from $40.0 to $24.0 million (the weighted average lives increased from 7 to 10 years); and 3) in June 2002, the valuations resulted in a $30.1 million increase in fixed assets and adjustment of their useful lives. In September 2002, the Company revised its valuation resulting in a $27.7 million increase in fixed assets and adjustment of their useful lives, based upon revised information from external consultants. The allocation of the purchase price for the TAC-Trim acquisition was completed in 2002. The Becker, Joan and TAC-Trim acquisitions are intended to solidify the Company's position as a premier supplier of interior components and automotive fabrics.

**b.  Goodwill**

During the second quarter of 2002, the Company completed the implementation of SFAS 142, "Goodwill and Other Intangible Assets". Under SFAS 142, goodwill is no longer amortized. Instead, goodwill and indefinite-lived intangible assets are tested for impairment in accordance with the provisions of SFAS 142. In accordance with its impairment policy, the Company employed a discounted cash flow analysis in conducting its impairment tests. As required, the Company completed its initial impairment test for goodwill recorded as of December 31, 2001, in the second quarter 2002 and recorded an impairment loss of $11.7 million (having no tax impact), or $0.15 per average basic and diluted share relating to the UK Plastics business in the European and Rest of World Automotive Interior Systems segment. The impairment loss was reported as a cumulative effect of a change in accounting principle and, therefore, was accounted for as if it occurred on January 1, 2002. In addition, as required under SFAS 142 the Company subsequently completed an annual impairment test of goodwill and recorded no additional impairment.

In accordance with the provisions of SFAS 142, the Company did not amortize goodwill during 2002. If goodwill amortization had not been recorded during 2001, net loss would have decreased $6.1 million to an adjusted net loss of $40.1 million. The related loss per share for fiscal 2001 would have decreased $0.14 per share resulting in adjusted loss per share of $1.05. If goodwill amortization had not been recorded during 2000, net income would have increased $6.1 million to an adjusted net income of $10.6 million. The related income per share for fiscal 2000 would have increased $0.25 per share resulting in adjusted income per share of $0.43.

The changes in the carrying amounts of goodwill for the year ended December 31, 2002 were as follows (in millions):

|  | North American Automotive Interior Systems | European and Rest of World Automotive Interior Systems | Specialty Automotive Products | Total |
|---|---|---|---|---|
| Balance as of December 31, 2001 | $    1,037.4 | $    23.3 | $    193.1 | $ 1,253.8 |
| Goodwill acquired during the period | — | — | 11.0 | 11.0 |
| FAS 142 Impairment | — | (11.7) | — | (11.7) |
| Purchase accounting adjustments, related to fixed assets and intangibles | (75.0) | — | — | (75.0) |
| Other adjustments, net(A) | 79.0 | 3.5 | 4.9 | 87.4 |
| Balance as of December 31, 2002 | $    1,041.4 | $    15.1 | $    209.0 | $ 1,265.5 |

(A) Includes effect of foreign currency translation.

F-13

**COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

*c.  Intangible Assets*

The components of the Company's acquired and other amortizable intangible assets as of December 31, 2002 were as follows (in millions):

|  | Cost | Accumulated Amortization | Net Carrying Amount |
|---|---|---|---|
| Customer contracts | $ 51.0 | $ 6.3 | $44.7 |
| Patents and other | 31.5 | 3.5 | 28.0 |
| Non-compete agreement | 18.0 | 5.4 | 12.6 |
|  | $100.5 | $15.2 | $85.3 |

Amortization expense for intangible assets for the periods ending December 31, 2003, 2004, 2005, 2006, and thereafter will be $14.1, $15.5, $15.6, $13.1, and $27.1, respectively.

**4.  Inventories**

Inventory balances are summarized below (in millions):

|  | December 31, 2002 | December 31, 2001 |
|---|---|---|
| Raw materials | $ 90.3 | $ 73.8 |
| Work in process | 33.7 | 25.6 |
| Finished goods | 47.6 | 33.2 |
|  | $171.6 | $132.6 |

**5.  Other Current Assets**

Other current asset balances are summarized below (in millions):

|  | December 31, 2002 | December 31, 2001 |
|---|---|---|
| Deferred tax asset | $ 25.3 | $ 25.3 |
| Reimbursable tooling and preproduction design and development | 83.0 | 53.7 |
| Other | 69.1 | 52.9 |
|  | $177.4 | $131.9 |

F-14

## COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES

### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

6. **Property, Plant and Equipment, Net**

Property, plant and equipment, net, are summarized below (in millions):

|  | December 31, 2002 | December 31, 2001 |
|---|---|---|
| Land and improvements | $ 26.1 | $ 25.5 |
| Buildings | 177.8 | 168.8 |
| Machinery and equipment | 959.6 | 823.3 |
| Leasehold improvements | 27.4 | 11.7 |
| Construction in progress | 106.2 | 45.0 |
|  | 1,297.1 | 1,074.3 |
| Less accumulated depreciation | (559.3) | (461.7) |
|  | $ 737.8 | $ 612.6 |

7. **Accrued Expenses**

Accrued expenses are summarized below (in millions):

|  | December 31, 2002 | December 31, 2001 |
|---|---|---|
| Payroll and employee benefits | $ 52.9 | $ 48.4 |
| Interest | 10.8 | 14.8 |
| Insurance | 16.9 | 39.0 |
| Restructuring reserves | 28.2 | 8.0 |
| Taxes payable | 12.0 | 4.6 |
| Other | 194.1 | 134.6 |
|  | $ 314.9 | $ 249.4 |

8. **Short-Term Borrowings**

The Company utilizes uncommitted lines of credit to satisfy a portion of its short-term working capital requirements of certain of its foreign affiliates. As of December 31, 2002, the Company had unsecured lines of credit from financial institutions of $36.5 million, of which $10.5 million was outstanding with $26.0 million available. The weighted average interest rate on the outstanding borrowings at December 31, 2002 was approximately 8.3%.

F-15

## COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES

### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

**9.   Long-Term Debt and Capital Lease Obligations**

Long-term debt and capital lease obligations are summarized below (in millions):

|  | December 31, 2002 | | December 31, 2001 | |
|---|---|---|---|---|
| Senior Secured Credit Facilities: | | | | |
| Tranche A Term Loan Facility | $ | 83.8 | $ | 100.0 |
| Tranche B Term Loan Facility | | 293.8 | | 300.0 |
| Revolving Credit Facility | | — | | — |
| Public Debt: | | | | |
| 11 1/2% Senior Subordinated Notes, due 2006 | | 400.0 | | 400.0 |
| 10 3/4% Senior Notes, due 2011 | | 500.0 | | 500.0 |
| Other (including capital lease obligations) | | 1.1 | | 2.5 |
| Total debt | | 1,278.7 | | 1,302.5 |
| Less current maturities (including current portion of capital lease obligations) | | (23.5) | | (19.9) |
| Total Long-term debt and capital lease obligations | $ | 1,255.2 | $ | 1,282.6 |

*Senior Secured Credit Facilities*

In December 2001, in conjunction with the TAC-Trim acquisition, the Company entered into new Senior Secured Credit Facilities, which refinanced its prior bank credit facilities. The principal and interest on the prior bank credit facilities totaled $362.5 million. The cost and expenses associated with the refinancing of the prior bank credit facilities totaling $25.7 million were deferred and will be amortized over the four-year life of the term loans described below. In addition, the Company incurred a $5.0 million, net of tax, extraordinary charge in connection with the retirement of the prior bank credit facilities.

The Senior Secured Credit Facilities include a floating rate Revolving Facility and two floating rate Term Loan Facilities that mature on December 31, 2005. The Revolving Facility allows the Company to borrow revolving loans up to $175.0 million including Canadian dollars up to $75.0 million. The facility can be utilized for letters of credit. The Term Loan Facilities consist of a Tranche A Term Loan with an original principal balance of $100.0 million and a Tranche B Term Loan with an original principal balance of $300.0 million. As required by the credit agreement, the full amounts of the Term Loan Facilities were drawn down on the closing date. As of December 31, 2002 the Tranche A Term Loan and Tranche B Term Loan had principal balances of $83.8 million and $293.8 million, respectively. Amounts borrowed under the Term Loan Facilities that are repaid or prepaid cannot be reborrowed. The Tranche A Term Loan Facility is payable in quarterly installments that increase in amounts each year until maturity. The Tranche B Term Loan Facility is payable in quarterly installments of $0.8 million for the first three years and quarterly installments of $72.7 million during the final year.

Under the Senior Secured Credit Facilities, the interest rate on the Revolving Facility is, at the Company's option, London Inter-Bank Offer Rate ("LIBOR") plus 3.75% or the Alternate Base Rate ("ABR") plus 2.75%. The ABR is the highest of The JP Morgan Chase ("Chase's") announced prime rate, the Federal Funds Rate plus 0.5% and Chase's base certificate of deposit rate plus 1%. A per annum fee equal to the spread over the LIBOR accrue on the face amount of letters of credit. Also, there is a 1.00% commitment fee on the unused portion of the facility. The interest rates on the Canadian-dollar denominated debt is at the Company's option (the "Canadian Prime Rate") plus 3.75% or the bill of exchange rate ("Bankers' Acceptance" or "BA") denominated in Canadian dollars for one, two, three or six months plus

F-16

## COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES

### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

2.75%. The interest rate on the Tranche A Term Loan Facility is, at the Company's option, LIBOR plus 3.75% or the ABR plus 2.75%, subject to adjustment quarterly, based on performance targets. The interest rate on the Tranche B Term Loan Facility is, at the Company's option, either LIBOR plus 4.00% or ABR plus 3.00%. On any Tranche B Term Loans repaid whether voluntary or mandatory, there is a prepayment premium of 3.00% the first year, 2.00% the second year and 1.00% the third year. The LIBOR rate shall not be less than 3.00% per annum. The weighted average rate of interest on the Senior Secured Credit Facilities at December 31, 2002 and 2001 was 6.94% and 7.67%, respectively.

Borrowings under the Senior Secured Credit Facility are secured by a first priority lien on the assets of the Company, Products and its U.S. and Canadian subsidiaries with certain exceptions including assets included in the Company's receivables facility, certain scheduled assets, and certain assets whose value relative to cost of lien perfection was deemed too low to include, as well as a pledge of stock of Products and its significant subsidiaries and certain intercompany debt and guarantees from the Company and its U.S. subsidiaries (subject to certain exceptions).

The Senior Secured Credit Facilities contain restrictive covenants including maintenance of interest coverage and leverage ratios and various other restrictive covenants that are customary for such facilities. The covenants of the Senior Credit Facilities limit investments, dividends or other distributions of capital stock, capital expenditures, the purchase of Preferred Stock of subsidiary, the prepayment of debt other than loans under the senior credit facilities, liens and certain lease transactions. Should the Company sell assets or incur debt over $20.0 million, proceeds must be used to pre-pay the term loans in an amount based on excess cash flow as measured by the leverage ratio performance. The covenants permit the payment of dividends on the Preferred Stock not to exceed 8% per annum unless at least 50% of the Senior Secured Term Loan Facilities are repaid or the proforma total Leverage Ratio is less than 2.5 to 1. The covenants require; that the interest coverage ratio be less than 2.35 to 1.00 for the quarter ended December 31, 2002, increasing each quarter with an ultimate ratio of 3.25 to 1.00 on December 31, 2005, and that the leverage ratio be no greater than 4.25 to 1.00 on December 31, 2002 decreasing each quarter with an ultimate ratio of 3.00 to 1.00 on December 31, 2005. The Company's sources of liquidity may be inadequate if it is unable to successfully integrate acquired businesses in accordance with its expectations, economic conditions worsen, or the Company is unable to meet financial or operating covenants as a result of the foregoing. The Company continues to explore other sources of liquidity, including additional debt, but existing debt instruments may limit the Company's ability to incur additional debt, and the Company may be unable to secure equity or other financings. The Company also believes it could obtain favorable modifications related to existing debt instruments and related covenants.

Effective December 2002, the Company amended its Senior Credit Facilities to provide for the purchase of certain assets in Spain and Portugal as well as the remaining 50% interest in the Company's joint venture in Italy.

### *Public Debt*

In December 2001, Products issued 10 3/4% Senior Notes due 2011 in a total principal amount of $500.0 million. The notes were not registered under the Securities Act of 1933 and were offered only to qualified institutional buyers. In June 2002, the Company effected and registered an exchange offer of a new and identical issue of 10 3/4% Senior Notes due 2011 of Products in exchange for the outstanding Senior Notes of Products. The exchange offer raised no new proceeds for the Company and was made in accordance with contractual commitments arising from the December 2001 issuance. The cost of issuing the notes totaling about $23.1 million was deferred and will be amortized over 10 years.

The notes are unconditionally guaranteed on an unsecured senior basis by the parent and by each wholly owned domestic subsidiary that is a guarantor of the Bank Credit Facilities as of the issue date. This is all of the Company's wholly owned domestic subsidiaries other than its receivable and insurance subsidiaries. The Debt evidenced by the Notes and Parent and Subsidiary Guarantees are unsecured senior obligations of the

F-17

## COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES

### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

Company ranking senior in right of payment to all existing and future Subordinated Debt including the Existing Notes and related Guarantees and future unsecured and unsubordinated Debt. The Notes are redeemable prior to December 31, 2004 only in the event the Company receives cash proceeds from one or more equity offerings in which case the Company may at its option use all or a portion of such cash proceeds to redeem up to 35% of the principal amount of the notes. The Notes will be subject to redemption at the option of the Company, in whole or in part at any time after December 31, 2006 at a stated premium redemption price expressed as a percentage in excess of the principal amount. After December 31, 2008, the redemption price is 100%. Within 30 days of the occurrence of a change of ownership control, unless the Company has mailed a redemption notice with respect to all outstanding Notes, the Company will be required to make an offer to purchase all outstanding Notes at a purchase price equal to 101% of their principal amount. The indenture governing the notes limits the Company's ability to issue more debt, pay dividends and make distributions, repurchase stock, make investments, merge or consolidate, transfer assets, enter into transactions with affiliates and issue stock of subsidiaries. These restrictive covenants are customary for such securities and are subject to a number of exceptions.

In June 1996, Products, issued at face value $400 million principal amount of 11 1/2% Senior Subordinated Notes due 2006 which are guaranteed by the Company. The indenture governing the 11 1/2% Senior Subordinated Notes generally prohibits the Company, Products and any Restricted Subsidiary (as defined) from making certain payments and investments unless a certain financial test is satisfied and the aggregate amount of such payments and investments since the issue date is less than a specified amount. The prohibition is subject to a number of significant exceptions, including dividends to stockholders of the Company or stock repurchases not exceeding $10 million in any fiscal year or $20 million in the aggregate, dividends to stockholders of the Company or stock repurchases in the amount of the net proceeds from the sale of the Company's Imperial Wallcoverings, Inc. subsidiary ("Wallcoverings") and dividends to the Company to permit it to pay its operating and administrative expenses. The indenture also contains other restrictive covenants (including, among others, limitations on the incurrence of debt, asset dispositions and transactions with affiliates), which are customary for such securities. These covenants are also subject to a number of significant exceptions.

The Company solicited and received consent from holders of a sufficient amount of the outstanding principal of the 11 1/2% Senior Subordinated Notes allowing the Change of Control precipitated by the Heartland Transaction. A Second Supplemental Indenture dated February 8, 2001 amended the Senior Subordinated Notes indenture to reflect this and certain other changes, including allowance for the incurrence of debt in the form of the Term Loan D Facility. In connection with the TAC-Trim acquisition, the Company further amended the indenture governing these notes to make each subsidiary guarantor of the new 10 3/4% Senior Notes a guarantor of these existing notes on a senior subordinated basis.

At December 31, 2002, the scheduled annual maturities of long-term debt and capital lease obligations are as follows (in millions):

| Year Ending | |
| --- | ---: |
| 2003 | $ 23.5 |
| 2004 | 27.8 |
| 2005 | 327.4 |
| 2006 | 400.0 |
| 2007 | — |
| Later years | 500.0 |
| | $ 1,278.7 |

Total interest paid by the Company on all debt was $139.9 million, $76.3 million, and $94.8 million for 2002, 2001, and 2000, respectively.

F-18

## COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES

### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

**10.    Mandatorily Redeemable Preferred Stock of Subsidiary**

In December 2001, Products issued 182,700 shares of its Series A Redeemable Preferred Stock, 123,700 shares of Series B Redeemable Preferred Stock and 20,000 shares of Series C Redeemable Preferred Stock. The Preferred Stock was recorded at fair value of $146.9 million, which was less than the liquidation value of $1,000 per share or $326.4 million. The estimated fair value was based on market prices for securities with similar terms, maturities and risk characteristics, and included a liquidation discount to reflect market conditions and was agreed to by the Company and Textron as part of the TAC-Trim purchase agreement. The difference between the initial recorded value and the liquidation value is being accreted over the 11 year terms of the securities. The 2002 and 2001 results included subsidiary preferred stock requirements calculated using the effective interest method of $38.4 million and $2.4 million, respectively. The preferred stock requirement includes both accretion and dividend costs of $7.6 million and $30.8 million, respectively for 2002 compared to $0.9 million and $1.5 million, respectively for 2001. The carrying value of the Redeemable Preferred Stock includes accretion and accrued dividends.

In June 2002, $100.0 million of proceeds from the 16 million share common stock offering was used to repurchase Series A preferred stock at a price of 75% of its liquidation preference of $133.3 million. The redeemed Series A preferred stock had a carrying value of $63.7 million. In accordance with generally accepted accounting principles, the difference between the $63.7 million in carrying value and the $100.0 million cash payment was excluded from net income and recorded as a charge to equity in the Company's accumulated deficit account. This $36.3 million equity charge is included in the computation of earnings/(loss) per share and is included in the net loss available to common shareholders.

Products is required to redeem all Series A and B Preferred Stock outstanding on January 1, 2013 and Series C Preferred Stock outstanding on February 1, 2022. The redemption price is equal to 100% of the liquidation preference plus accrued and unpaid dividends plus common equity participation for the Series C Preferred Stock. The Series A and Series B Preferred Stock are redeemable at Products' option, in whole or in part, on or after January 1, 2007 at a stated percent in excess of the liquidation preference plus accrued and unpaid dividends. The Series C Preferred stock is not optionally redeemable. However, at Products' option or the holders of a majority of outstanding shares of Series C Preferred Stock, the Series C Preferred Stock is exchangeable for Series B Preferred Stock at any time following the second anniversary of its issuance date but prior to the third anniversary of its issuance date.

Shareholders of Series A Preferred Stock are entitled to receive dividends accruing annually on the liquidation preference at a rate of 11% for dividend periods ending on or prior to July 1, 2003, and 15% thereafter. Holders of Series B and C Preferred Stock are entitled to receive dividends accruing annually on the liquidation preference at a rate of 12% for dividend periods ending on or prior to July 1, 2003, and 16% thereafter.

Products may at its option through January 1, 2004 accrue up to the full amount of all dividends in lieu of cash payment of such dividends. Thereafter, Products may at its option elect to accrue dividends of up to 7% of the liquidation value annually on Series A Preferred Stock and up to 8% of the liquidation value on Series B and C Preferred Stock. Accrued dividends will be added to the liquidation preference of the applicable series of Preferred Stock. The Company uses the effective interest method in calculating accretion.

Upon voluntary or involuntary liquidation, dissolution or winding-up of Products, holders of the Preferred Stock are entitled to be paid out of the assets of Products available for distribution to stockholders in the amount of $1,000 per share plus the total accrued dividends prior to any distribution to holders of equity securities which ranks junior to the Preferred Stock. In addition, the holders of Series C Preferred Stock are entitled to a participation in distributions to Products common equity tied to appreciation in the value of Products common equity subsequent to the issuance date, not to exceed $2.0 million for all Series C Preferred Stock outstanding.

## COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES

### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

If Products experiences a change of ownership control, the holders of the Preferred Stock must be given the opportunity to sell to Products their Preferred Stock at 100% of the liquidation preference plus accrued and unpaid dividends, plus, in the case of Series C Preferred Stock, common equity participation. In the event that Products does not meet or exceed certain financial criteria based on interest coverage, the dividend rate applicable solely to Series A Preferred Stock will increase by 1.00% for the next full dividend period and by an additional 0.50% for each dividend period thereafter provided that the dividend rate does not exceed 20%. The provision of the certificate of designation limits Products ability to issue more debt, pay dividends and make distributions, repurchase stock, make investments, merge or consolidate, transfer assets, enter into transactions with affiliates and issue stock of subsidiaries. These covenants are subject to a number of important exceptions.

## 11.  Receivables Facility

The Company has an agreement to sell, on an ongoing basis, the trade accounts receivable of certain business operations to a bankruptcy-remote, special purpose subsidiary, wholly owned and consolidated by the Company. The receivables subsidiary (Carcorp) will, subject to certain conditions, from time to time, sell an undivided fractional ownership interest in a pool of domestic and certain Canadian receivables, up to $250 million, to various multi-seller commercial paper conduits supported by a committed liquidity facility. Upon sale to the conduit, Carcorp will hold a subordinated retained interest in the receivables. Under the terms of the agreement, new receivables are added to the pool as collections reduce previously sold receivables. The Company expects to service, administer and collect the receivables on behalf of Carcorp and the conduit. The proceeds of sale will be less than the face amount of accounts receivable sold by an amount that approximates the purchaser's financing costs. In September 2002, the Company amended the receivables facility lengthening its term to expire in December 2004.

Restrictions: This receivables facility contains certain restrictions on Carcorp (including maintenance of $60.0 million net worth) and on the sellers (including limitations on liens on receivables, modifications of the terms of receivables, and changes in credit and collection practices) customary for facilities of this type. The commitments under the receivables facility are subject to termination prior to their term upon the occurrence of certain events, including payment defaults, breach of covenants, including defined interest coverage and leverage ratios, bankruptcy, default by the Company in servicing the receivables and failure of the receivables to satisfy certain performance criteria.

As of December 31, 2002 and 2001, Carcorp's total receivables pool was $253.3 million and $334.6 million, respectively. When the Company sells receivables to Carcorp, it retains a subordinated interest in the receivables sold. As of December 31, 2002, the utilization of the Receivables Facility was $66.0 million but there was approximately $93.2 million of available but unutilized funding. At December 31, 2001, utilization of the Receivables Facility was $79.9 million and an additional $118.6 million of funding was available but unutilized.

During 2002, the loss on the sale of the receivables totaled $4.2 million. During 2001 and 2000 the losses on the sale of receivables totaled $10.8 million and $9.2 million, respectively. The 2001 and 2000 loss included $5.6 million and $1.6 million in expenses and fees to replace the prior facility. The usage fee under the facility is 1.50%. In addition, the Company is required to pay a fee of 0.50% on the unused portion of the facility and a discount. The discount on sold interests is approximately equal to the interest rate paid by the conduits to the holders of the commercial paper plus a usage fee. The discount rate at December 31, 2002 was 1.45% compared to 3.53% at December 31, 2001.

In December 2001, as part of the refinancing completed in connection with the TAC-Trim acquisition, Products entered into a new receivables facility and repaid the outstanding balance of $128.7 million of the Company's previous receivables facility entered into in December 1999, which was not renewed. The maximum funding available to the Company on a revolving basis under the Old Receivables Facility was $171.6 million.

**COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES**

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

The Company estimates the fair value of its retained interest by considering two key assumptions: the payment rate, which is derived from the average life of the accounts receivable, which is less than 60 days, and the rate of expected credit losses. Based on the Company's favorable collection experience and the short-term nature of its receivables, both assumptions are highly predictable. Therefore, the Company's estimated fair value of its retained interests in the pool of eligible receivables is approximately equal to the previous cost, less the associated allowance for doubtful accounts.

The proceeds received by Carcorp from collections on receivables, after the payment of expenses and amounts due, are used to purchase new receivables from the Sellers. During 2002 and 2001, Carcorp had net cash collections of approximately $2.9 billion and $1.6 billion, respectively. These funds were used to purchase new receivables from the Sellers, under the Receivables Facility.

## 12. Operating Leases

The Company has operating leases for land and buildings for periods up to twenty years and transportation, operating and administrative equipment for periods ranging from one to twelve years. The majority of these leases contain renewal provisions.

The Company has equipment lease agreements and building lease agreements with several lessors which, subject to specific approval, provide availability of funding for operating leases and sale-leasebacks as allowed in its other financing agreements. The Company has a purchase option on certain equipment at the end of the lease term based on the fair market value of the equipment or to purchase some or all of the equipment at prices determined under the agreement. The Company has classified the leases as operating.

At December 31, 2002, future minimum lease payments under operating leases for continuing operations are as follows (in millions):

| Year Ending | |
|---|---|
| 2003. | $ 50.0 |
| 2004 | 57.3 |
| 2005 | 38.1 |
| 2006 | 34.7 |
| 2007 | 33.6 |
| Later Years | 133.2 |
| | $ 346.9 |

Rental expense of continuing operations under operating leases was $57.1 million, $29.2 million, and $20.8 million, for fiscal 2002, 2001, and 2000, respectively.

During 2002, the Company received net proceeds (after fees) of approximately $14.8 million from sale and leasebacks of real property and equipment. The aggregate lease expenses associated with these leases will be $18.8 million, $2.6 million of which relates to 2003.

During 2001, Products entered into sale and leaseback transactions for certain manufacturing equipment and non-manufacturing properties. The transactions resulted in the recognition of a $4.4 million net deferred asset that is being amortized over the lease term, and the recognition of an $8.7 million loss.

During 2001, the Company received net proceeds (after fees) of approximately $86.2 million from sale and leasebacks of real property and equipment, which it used to reduce outstanding debt. The aggregate lease expenses associated with these leases will be $88.8 million, $12.5 million of which related to 2002. To the extent permitted by the credit facility, the Company may enter into additional similar leasing arrangements

F-21

**COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

from time to time. As part of these sale-leaseback transactions, Products sold and contemporaneously leased back real property from unrelated third parties, and received net proceeds (after fees) of $46.4 million. Refer to Note 19 for a discussion regarding certain sale and leaseback transactions that were entered into with related parties.

**13.    Employee Benefit Plans**

   *A.    Defined Benefit Pension and Postretirement Benefit Plans*

   Subsidiaries of the Company have defined benefit pension plans covering substantially all employees who meet eligibility requirements. Plan benefits are generally based on years of service and employees' compensation during their years of employment. Funding of retirement costs for these plans complies with the minimum funding requirements specified by the Employee Retirement Income Security Act. Assets of the pension plans are invested primarily in equity and fixed income securities.

   Subsidiaries of the Company have also provided postretirement life and health coverage for certain retirees under plans currently in effect. Many of the subsidiaries' domestic and Canadian employees may be eligible for coverage if they reach retirement age while still employed by the Company. Most of these plans are contributory. In general, future increases in costs are passed on fully to the retiree. However, future increases in costs for the Canadian divisions and limited domestic operations are shared between the Company and the retiree.

F-22

## COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES

### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

The following tables provide a reconciliation of the projected benefit obligation, a reconciliation of plan assets, the funded status of the plans, and amounts recognized in the Company's consolidated balance sheets at December 31, 2002 and December 31, 2001 (in millions).

|  | Pension Benefits Fiscal Year Ended | | Postretirement Benefits Fiscal Year Ended | |
|  | December 31, 2002 | December 31, 2001 | December 31, 2002 | December 31, 2001 |
|---|---|---|---|---|
| Measurement Date | September 30 | September 30 | September 30 | September 30 |
| Change in benefit obligation: | | | | |
| Benefit obligation at beginning of year | $ 372.2 | $ 175.0 | $ 151.2 | $ 52.6 |
| Service cost | 11.3 | 6.8 | 1.7 | 1.0 |
| Interest cost | 23.9 | 12.7 | 6.9 | 3.8 |
| Employee contributions | 0.6 | — | 0.9 | 0.9 |
| Amendments | 2.3 | 1.0 | (62.6) | — |
| Actuarial gain | 16.9 | 2.3 | 15.0 | (1.3) |
| Purchase Accounting Adjustments/ Acquisitions | (26.4) | 190.2 | (12.4) | 99.4 |
| Benefits paid | (19.4) | (14.1) | (6.4) | (4.7) |
| Currency adjustment | 2.0 | (1.7) | — | (0.5) |
| Other | 0.8 | — | (0.5) | — |
| Benefit obligation at end of year | $ 384.2 | $ 372.2 | $ 93.8 | $ 151.2 |
| Change in plan assets: | | | | |
| Fair value of plan assets at beginning of year | $ 338.0 | $ 164.2 | $ — | $ — |
| Actual return on plan assets | (34.4) | (24.1) | — | — |
| Employer contributions | 6.6 | 4.3 | 5.5 | 3.8 |
| Employee contributions | 0.6 | — | 0.9 | 0.9 |
| Benefits paid | (19.4) | (14.1) | (6.4) | (4.7) |
| Purchase Accounting Adjustments/ Acquisitions | 11.3 | 209.3 | — | — |
| Currency adjustment | 0.3 | (1.6) | — | — |
| Fair value of plan assets at end of year | $ 303.0 | $ 338.0 | $ — | $ — |
| Reconciliation of funded status to net amount recognized: | | | | |
| Funded status | $ (81.2) | $ (34.2) | $ (93.8) | $ (151.2) |
| Unrecognized net loss (gain) | 131.7 | 48.1 | (5.0) | (21.5) |
| Unrecognized prior service cost (gain) | 5.0 | 4.0 | (63.4) | (6.4) |
| Net amount recognized | $ 55.5 | $ 17.9 | $ (162.2) | $ (179.1) |

F-23

**COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

| | Pension Benefits Fiscal Year Ended | | Postretirement Benefits Fiscal Year Ended | |
|---|---|---|---|---|
| | December 31, 2002 | December 31, 2001 | December 31, 2002 | December 31, 2001 |
| Amounts recognized in the consolidated balance sheet consist of: | | | | |
| Prepaid benefit cost | $ 2.1 | $ 18.7 | $ — | $ — |
| Accrued benefit liability | (67.6) | (25.6) | (162.2) | (179.1) |
| Intangible asset | 6.3 | 5.8 | — | — |
| Accumulated other comprehensive loss | 114.7 | 19.0 | — | — |
| Net amount recognized | $ 55.5 | $ 17.9 | $ (162.2) | $ (179.1) |

The projected benefit obligation, accumulated benefit obligation and fair value of plan assets for the pension plans with accumulated benefit obligations in excess of plan assets were $374.2 million, $363.9 million and $291.1 million, respectively, as of December 31, 2002 and $175.2 million, $165.9 million and $121.7 million, respectively, as of December 31, 2001.

The net periodic benefit cost of continuing operations for fiscal 2002, 2001, and 2000 includes the following components (in millions):

| | Pension Benefits Fiscal Year Ended | | |
|---|---|---|---|
| | December 31, 2002 | December 31, 2001 | December 31, 2000 |
| Components of net periodic benefit cost: | | | |
| Service cost | $ 11.3 | $ 6.8 | $ 6.7 |
| Interest cost | 23.9 | 12.7 | 12.8 |
| Expected return on plan assets | (31.6) | (14.6) | (14.6) |
| Amortization of prior service cost | 0.2 | 0.2 | 0.1 |
| Settlement loss (gain) | — | (0.1) | — |
| Curtailment loss (gain)(A) | 2.0 | — | (1.0) |
| Recognized net actuarial loss | 0.6 | 0.1 | 0.1 |
| Net periodic benefit cost | $ 6.4 | $ 5.1 | $ 4.1 |

(A)   Curtailment loss resulted from termination of employees that were covered under a Canadian plan.

| | Postretirement Benefits Fiscal Year Ended | | |
|---|---|---|---|
| | December 31, 2002 | December 31, 2001 | December 31, 2000 |
| Components of net periodic benefit cost: | | | |
| Service cost | $ 1.7 | $ 1.0 | $ 0.9 |
| Interest cost | 6.9 | 3.8 | 3.6 |
| Amortization of prior service cost | (5.6) | (1.4) | (1.4) |
| Recognized net actuarial gain | (1.4) | (1.7) | (2.0) |
| Curtailment loss (gain) | (0.6) | — | — |
| Net periodic benefit cost | $ 1.0 | $ 1.7 | $ 1.1 |

## COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES

### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

Weighted average fiscal year-end assumptions are summarized as follows(a):

|  | Pension Benefits | | Postretirement Benefits | |
|---|---|---|---|---|
|  | 2002 | 2001 | 2002 | 2001 |
| Discount rate | 6.7% | 7.2% | 7.0% | 7.5% |
| Expected return on plan assets | 8.5% | 9.3% | N/A | N/A |
| Rate of compensation increase | 3.1% | 3.1% | N/A | N/A |

(a)    These rates are used to compute the balances as of the end of the year and the expense for the following year.

Health care costs for domestic plans: (1) Dura Convertible was assumed to increase 10.5% during 2003; the rates were assumed to grade down by 0.5% per year to an ultimate rate of 6% and remain at that level thereafter. (2) Wickes Engineering Materials was assumed to increase 6% during 2003 and remain at that level thereafter. (3) TAC-Trim was assumed to increase 11.5% during 2003; the rates were assumed to grade down by 0.5% per year to an ultimate rate of 6% and remain at that level thereafter. Health care trend rates for Canadian Plans were assumed to increase approximately 8% during 2003 grading down by 0.5% per year to a constant level of 5% annual increase.

Assumed health care cost trend rates may have a significant effect on the amounts reported for postretirement benefits. A one-percentage-point change in assumed health care cost trend rates would have the following effects:

|  | 1-Percentage-Point Increase | | 1-Percentage-Point Decrease | |
|---|---|---|---|---|
| Effect on total of service and interest cost components | $ | 0.4 | $ | (0.3) |
| Effect on postretirement benefit obligation | $ | 4.8 | $ | (4.1) |

### B.    *Defined Contribution Plans*

Subsidiaries of the Company sponsor defined contribution plans covering employees who meet eligibility requirements. Subsidiary contributions are based on formulas or are at the Company's discretion as specified in the plan documents. Contributions were $6.2 million, $3.2 million, and $4.0 million in fiscal 2002, 2001, and 2000, respectively.

### 14.    Discontinued Operations

During the second quarters of 2002 and 2001, the Company received proceeds of $15.8 million and $12.2 million, respectively, on environmental claims related to discontinued operations, for which reserves were previously charged. Of these amounts, $9.5 million and $7.4 million were recorded as income from discontinued operations in the second quarter of 2002 and 2001, respectively, net of income taxes of $6.3 million and $4.8 million, respectively.

In addition, during the third quarter of 2001, the Company received payment of $2.3 million on environmental claims related to discontinued operations. Of this amount $1.4 million, net of taxes of $0.9 million, was recorded as income from discontinued operations in the quarter ended September 30, 2001.

During fiscal 2000, the Company settled claims for certain environmental matters related to discontinued operations for a total of $20 million. Settlement proceeds will be paid to the Company in three installments. The first and second installments of $7.5 million and $7.5 million were received in June 2000 and June 2001, respectively with the third installment of $5.0 million received in June 2002. Of the total $20 million settlement, the Company recorded the present value of the settlement as $7.0 million of additional

F-25

## COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES

### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

environmental reserves, based on its assessment of potential environmental exposures, and $6.6 million, net of income taxes, as income from discontinued operations.

The Company has significant obligations related to post-retirement, casualty, environmental, product liability, lease and other liabilities of discontinued operations. The nature of many of these contingent liabilities is such that they are difficult to quantify and uncertain in terms of amount. The company has accrued $23.0 million for postretirement costs and $53.4 million for environmental and product liability costs.

In connection with retained operating leases of certain discontinued operations, the Company believes that future sublease rental receipts will equal or exceed future minimum lease payments and accordingly has not recorded any liability for these leases.

## 15.  Restructuring

In the fourth quarter of 2002, the Company undertook a restructuring program primarily to European operations that resulted in a restructuring charge of $14.1 million. This restructuring charge included $4.0 million of severance costs, $0.8 million of costs related to other contractual obligations, and $9.3 million of costs related to fixed asset impairments. The severance costs related to over 300 personnel.

In the third quarter of 2002, the Company undertook a restructuring program primarily to realign the operations in North America that resulted in a restructuring charge of $33.8 million. This restructuring charge included $23.8 million of severance costs, $1.3 million of costs related to the establishment of reserves for lease commitments and lease termination fees, and $8.7 million of costs related to fixed asset impairments. The severance costs related to over 700 personnel.

Included in the third quarter 2002 restructuring charge severance costs was $8.9 million related to the separation agreement with Thomas Evans the former Chairman and CEO. In August 2002, the Company's Board of Directors appointed Jerry L. Mosingo as President, Chief Executive Officer (CEO) and Director of the Company. Mr. Mosingo replaced Thomas E. Evans, the Company's previous Chairman and CEO, as CEO. Under the terms of his separation agreement, Mr. Evans received $5.5 million on August 15, and will receive quarterly payments of $0.3 million through June 30, 2004.

In the first quarter of 2002, the Company undertook a restructuring program to rationalize operations in North America, Europe and Specialty operations that resulted in a restructuring charge of $9.1 million. This restructuring included $5.5 million of cash severance costs and $3.6 million of costs related to the establishment of reserves for lease commitments and lease termination fees. The Company incurred severance costs for over 100 personnel primarily at the Company's North America and European headquarters and additional reductions at its Specialty operations. The reserve for lease commitments relates to contractual obligations for the Company's former headquarters facility, while the termination fees relate to an aircraft lease on an aircraft that the company is no longer using. The Company relocated its headquarters to its new resource center in order to optimize and consolidate corporate operations.

In 2002, the Company also reserved for restructuring costs incurred as a result of acquisitions. The balance reserved totaled $15.2 million for lease costs and employee severance costs.

During 2001, the Company undertook restructuring programs to rationalize operations in North American, European and Specialty operations resulting in a restructuring charge aggregating $18.8 million. The charge included $11.2 million of severance costs and $7.6 million of asset impairments. The Company recognized severance costs for over 900 operating personnel at the Company's convertible tops, fabrics, carpet and acoustics locations in North America and Specialty operations. The asset impairments, primarily related to machinery and equipment located at North American, European and Specialty operations sites, are based on management's estimates of values to be realized upon disposition of the assets.

F-26

## COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES

### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

In addition, the Company recorded a restructuring reserve in connection with the Becker acquisition aggregating $5.3 million of which $1.6 million was severance and $3.7 million for lease termination and other exit costs. Following is the rollforward of the restructuring accruals for 2002 (in millions):

| Description | Beginning of Year | Additions Resulting from Acquisitions(a) | Charged to Cost and Expenses | Charged (credited) to Other Accounts(b) | Deductions(c) | End of Year |
|---|---|---|---|---|---|---|
| Restructuring Reserves in the balance sheet for: 2002 | $   8.0 | $   15.2 | $   56.9 | $   (18.0) | $   (33.9) | $   28.2 |

(a)  Restructuring costs for acquired companies.

(b)  Asset impairments

(c)  Deductions, primarily representing cash utilized.

Of the $28.2 million remaining reserve, $7.8 million relates to long-term leases expiring through 2004 and $20.4 million related to severance costs of which $18.7 million will be paid in 2003.

## 16.  Common Stockholders' Equity and Earnings Per Share

### A.  Common Stock

In April 2002, the Company issued 400,000 shares of common stock as part of the purchase of a lamination company wholly owned by a current director and shareholder of the Company. In June, the Company issued 16 million shares of common stock for $160 million before expenses. The Company used $100 million of the $152 million in net proceeds to redeem $133 million of face value Series A Redeemable Preferred Stock and the remainder for general corporate purposes.

### B.  Stock Option Plans

The 1994 Employee Stock Option Plan ("1994 Plan") was adopted as a successor to the 1993 Employee Stock Option Plan to facilitate awards to certain key employees and consultants. The 1994 Plan was amended in 1999 primarily to increase the number of shares available for issuance under the Plan from 2,980,534 to 3,980,534. The 1994 Plan provides that no options may be granted after 10 years from the effective date of this plan. Options vest, in each case, as specified by the Company's compensation committee, generally over three years after issuance. The Company also adopted the 1994 Directors Stock Option Plan, which provides for the issuance of options to acquire a maximum of 600,000 shares of common stock to directors who are not part of management and are not affiliated with a major stockholder. As of December 31, 2002, 170,000 options had been granted. The Company adopted the 1997 United Kingdom Scheme, which provides for the issuance of options to key employees under the 1994 Plan. The Company adopted the 2000 Employee Stock Option Plan, effective January 1, 2000, which provided for the issuance of up to 6,000,000 shares to key employees and consultants. The Company adopted the 2002 Employee Stock Option Plan, effective January 1, 2002, which provided for the issuance of up to 6,600,000 shares to key employees and consultants. Under the 2002 plan 60% of the issued options vest and become exercisable in 20% increments on January 1, 2003, January 1, 2004 and January 1, 2005. The remaining 40% vest subject to performance targets and become exercisable on January 1, 2012 or on an accelerated basis if performance targets are met.

The Company issued 5,182,929 options during the year and repriced 854,000 options that had an original average exercise price of $14.05 to an exercise price of $10.00. The impact of the reverse stock split reduced the beginning balance by 1,698,553 shares. At December 31, 2002, options representing 3,921,330 shares of common stock were available for grants.

F-27

## COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES

### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

Stock option activity under the plans is as follows:

|  | December 31, 2002 | | December 31, 2001 | | December 31, 2000 | |
|---|---|---|---|---|---|---|
|  | Number of shares | Weighted Average Exercise Price | Number of shares | Weighted Average Exercise Price | Number of shares | Weighted Average Exercise Price |
| Outstanding beginning of year | 2,830,920 | $ 5.59 | 4,344,432 | $ 5.47 | 4,720,955 | $ 5.70 |
| Impact of 2002 Stock Split | (1,698,553) | — | — | — | — | — |
| Adjusted Beginning Balance | 1,132,367 | 13.98 | — | — | — | — |
| Awarded | 5,182,929 | 10.00 | 40,000 | 5.76 | 827,500 | 5.65 |
| Cancelled | (1,819,634) | 10.14 | (458,090) | 7.48 | (983,732) | 7.07 |
| Exercised | (68,414) | 12.79 | (1,095,422) | 4.31 | (220,291) | 3.99 |
| Outstanding at end of year | 4,427,248 | $ 10.12 | 2,830,920 | $ 5.59 | 4,344,432 | $ 5.47 |

(a)    Weighted average exercise price is $10.86 after repricing 854,000 stock options.

The following table summarizes information about stock options outstanding at December 31, 2002:

| Range of Exercise Price | Number of Shares Outstanding | Weighted Average Remaining Life | Weighted Average Exercise Price |
|---|---|---|---|
| $ 9.98 — $12.60 | 4,363,248 | 8.7 | $ 10.01 |
| $10.92 — $25.00 | 64,000 | 9.1 | $ 17.10 |

SFAS No. 148, "Accounting for Stock-Based Compensation — Transition and Disclosure" amended SFAS No. 123, "Accounting for Stock-Based Compensation" to provide alternative methods of transition for a voluntary change to the fair value based method of accounting for stock based employee compensation and amended the required disclosures. SFAS No. 123 encourages companies to adopt the fair value method for compensation expense recognition related to employee stock options. The accounting requirements of APB No. 25 use the intrinsic value method in determining compensation expense, which represents the excess of the market price of the stock over the exercise price on the measurement date. The Company has elected to continue to utilize the accounting provisions of APB No. 25 for stock options, and is required to provide pro forma disclosures of net income and earnings per share had the Company adopted the fair value method for recognition purposes. See Note 2, "Summary of Significant Accounting Policies — Employee Stock Options" for the tabular presentation as if the Company had adopted SFAS No. 123 and restated its results.

For the above information, the fair value of each option grant was estimated on the date of grant using the Black-Scholes option pricing model with the following assumptions used for grants in fiscal 2002, 2001, and 2000: weighted average expected volatility was 72%, 99%, and 53%; expected lives of 6 years, 10 years and 10 years in 2002, 2001 and 2000, respectively; a weighted average risk free interest rate of 4.72% in 2002 and ranging from 4.24% to 7.32% in 2001 and 2002 and a zero expected dividend rate. The weighted average grant-date fair value of an option granted during fiscal 2002, 2001, and 2000 was $6.71, $5.22, and $4.11, respectively.

In accordance with SFAS No. 123, the 854,000 repriced options were revalued during 2002 to determine additional compensation cost that resulted from the difference in the fair value of the options prior to repricing and subsequent to repricing. As a result of the repricing $336,000 of additional compensation cost, net of tax, was incurred on a proforma basis. These options have a weighted average expected life of approximately

F-28

**COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

4 years. The assumptions used in valuing the repriced options are as follows: expected volatility ranged from 74% to 109%; expected lives ranged from 1 year to 5 1/2 years; the risk free interest rate ranged from 2.14% to 4.40% in 2002; and a zero expected dividend rate. Refer to Note 2, "Summary of Significant Accounting Policies — Employee Stock Options" for discussion related to the 2002 proforma cost related to options.

Additionally, as a result of repricing the Company's stock options, the options are treated as variable-based awards in accordance with APB No. 25. Since these options are considered to be variable-based awards, the Company will incur future compensation expense if the stock price exceeds the $10 exercise price established by repricing.

*C.   Earnings Per Share*

The Company adopted SFAS No. 128, "Earnings Per Share," in December 1997. Basic earnings per common share were computed by dividing net income (loss) by the weighted average number of shares of common stock outstanding during the year. Diluted earnings per common share were determined assuming the exercise of the stock options issued under the Company's stock option plans. There were no reconciling items between basic earnings per common share and diluted earnings per common share for 2002, 2001, and 2000.

In 2002, 2001, and 2000, potentially dilutive securities have been excluded from the diluted earnings per share calculation since their inclusion would have been antidilutive. At December 31, 2002, the Company's potentially dilutive securities included 4.4 million stock options with a weighted average exercise price of $10.12 and 0.5 million warrants with an exercise price of $10.00. At December 31, 2001, the Company's potentially dilutive securities included 2.8 million stock options, respectively, with weighted average exercise prices of $5.59 and 0.5 million warrants with an exercise price of $5.00. At December 31, 2000, the Company's potentially dilutive securities included 4.3 million stock options with weighted average exercise prices of $5.47.

F-29

**COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

**17.  Income Taxes**

The provisions for income taxes applicable to continuing operations for fiscal 2002, 2001, and 2000 are summarized as follows (in millions):

| | Fiscal Year Ended | | |
|---|---|---|---|
| | December 31, 2002 | December 31, 2001 | December 31, 2000 |
| Current: | | | |
| Federal | $     — | $     — | $     — |
| State | 5.8 | 2.6 | 1.5 |
| Foreign | 15.3 | 4.8 | 10.7 |
| | 21.1 | 7.4 | 12.2 |
| Deferred: | | | |
| Federal | 19.6 | (19.0) | (3.5) |
| State | 2.1 | (1.3) | (0.2) |
| Foreign | (25.3) | (5.7) | (6.3) |
| | (3.6) | (26.0) | (10.0) |
| Income tax expense (benefit) | $  17.5 | $  (18.6) | $   2.2 |

Domestic and foreign components of income (loss) from continuing operations before income taxes are summarized as follows (in millions):

| | Fiscal Year Ended | | |
|---|---|---|---|
| | December 31, 2002 | December 31, 2001 | December 31, 2000 |
| Domestic | $  45.4 | $  (35.8) | $  (11.9) |
| Foreign | (79.2) | (32.5) | 12.7 |
| | $  (33.8) | $  (68.3) | $   0.8 |

A reconciliation between income taxes computed at the statutory U.S. Federal rate of 35% and the provisions for income taxes applicable to continuing operations is as follows (in millions):

| | Fiscal Year Ended | | |
|---|---|---|---|
| | December 31, 2002 | December 31, 2001 | December 31, 2000 |
| Amount at statutory Federal rate | $  (11.8) | $  (23.9) | $   0.3 |
| State taxes, net of Federal income tax | 5.1 | 0.9 | 0.8 |
| Tax differential on foreign earnings | (0.7) | 2.9 | (0.3) |
| Nontaxable interest income | (3.9) | — | — |
| Amortization of goodwill | — | 1.5 | 1.5 |
| Subsidiary preferred stock dividends and accretion | 13.4 | 0.8 | — |
| Change in valuation allowance | 15.9 | (1.2) | 0.4 |
| General business tax credits | (1.5) | (0.5) | (1.1) |
| Other | 1.0 | 0.9 | 0.6 |
| Income tax expense | $  17.5 | $  (18.6) | $   2.2 |

**COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES**

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

Deferred income taxes are provided for the temporary differences between the financial reporting and tax basis of the Company's assets and liabilities. The components of the net deferred tax assets as of December 31, 2002 and 2001 were as follows (in millions):

|  | December 31, 2002 | December 31, 2001 |
|---|---|---|
| **Deferred tax assets:** | | |
| Employee benefits, including postretirement benefits | $    124.9 | $    78.5 |
| Net operating loss carryforwards (NOLs) | 162.5 | 134.6 |
| General business tax credit carryforwards | 10.7 | 11.4 |
| Alternative minimum tax credit carryforwards | 12.2 | 12.2 |
| Other liabilities and reserves | 33.7 | 36.1 |
| Valuation allowance | (78.4) | (49.2) |
| Total deferred tax assets | 265.6 | 223.6 |
| **Deferred tax liabilities:** | | |
| Property, plant and equipment | (68.1) | (74.7) |
| Undistributed earnings of foreign subsidiaries | (7.2) | (7.2) |
| Total deferred tax liabilities | (75.3) | (81.9) |
| Net deferred tax asset | $    190.3 | $    141.7 |

The company has net operating losses in its foreign jurisdictions of $76 million. These losses will begin expiring in 2003 through 2011. Additionally, the company has foreign net operating losses of $244 million which have no expiration date.

The valuation allowance at December 31, 2002 and December 31, 2001 provides for certain deferred tax assets that in management's assessment may not be realized due to tax limitations on the use of such amounts, due to expiration prior to utilization or that relate to tax attributes that are subject to uncertainty due to the long-term nature of their realization. During 2002, the valuation allowance increased $29.2 million from 2001. This increase resulted primarily from $19.8 million for current year net operating losses and $3.9 million release of valuation allowances.

The above amounts have been classified in the consolidated balance sheets as follows (in millions):

|  | December 31, 2002 | December 31, 2001 |
|---|---|---|
| **Deferred tax assets (liabilities):** | | |
| Current domestic and foreign, included in other current assets | $    25.3 | $    25.3 |
| Current foreign, included in accrued expenses | — | (2.1) |
| Noncurrent domestic and foreign | 165.0 | 136.5 |
| Noncurrent foreign, included in other noncurrent liabilities | — | (18.0) |
|  | $    190.3 | $    141.7 |

Management has reviewed the Company's operating results for recent years as well as the outlook for its continuing operations and concluded that it is more likely than not that the net deferred tax assets of $190.3 million at December 31, 2002 will be realized. Management took into consideration, among other factors, the expected impact of current year acquisitions, the impact of recent restructuring plans, and the infusion of cash from Heartland. These factors along with the timing of the reversal of its temporary differences, certain tax planning strategies and the expiration date of its NOLs were also considered in

F-31

**COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

reaching this conclusion. The Company's ability to generate future taxable income is dependent on numerous factors, including general economic conditions, the state of the automotive industry and other factors beyond management's control. Therefore, there can be no assurance that the Company will meet its expectation of future taxable income.

Deferred income taxes and withholding taxes have been provided on earnings of the Company's foreign subsidiaries to the extent it is anticipated that the earnings will be remitted in the future as dividends. Deferred income taxes and withholding taxes have not been provided on the remaining undistributed earnings of foreign subsidiaries as such amounts are deemed to be permanently reinvested. The cumulative undistributed earnings as of December 31, 2002 on which the Company has not provided deferred income taxes and withholding taxes is approximately $101.8 million.

At December 31, 2002, the Company had the following tax attribute carryforwards available for U.S. Federal income tax purposes (in millions):

|  | Amount | Expiration Dates |
|---|---|---|
| Net operating losses — regular tax: |  |  |
| Preacquisition, subject to limitations | $    2.8 | 2005-2009 |
| Subject to change in control provisions | 82.6 | 2008-2012 |
| Subject to change in control provisions | 200.2 | 2018-2021 |
|  | $ 285.6 |  |
| Net operating losses — alternative minimum tax: |  |  |
| Preacquisition, subject to limitations | $    1.4 | 2005-2009 |
| Subject to change in control provisions | 48.5 | 2008-2012 |
| Subject to change in control provisions | 206.8 | 2018-2021 |
|  | $ 256.7 |  |
| General business tax credits: |  |  |
| Preacquisition, subject to limitations | $    0.6 | 2003 |
| Subject to change in control provisions | 10.1 | 2004-2021 |
|  | $  10.7 |  |
| Alternative minimum tax credits | $  12.2 |  |

As a result of the Heartland Transaction, a change in control occurred which results in annual limitations on the Company's use of its NOLs and unused tax credits. This annual limitation on the use of NOLs and tax credits depends on the value of the equity of the Company and the amount of "built-in gain" or "built-in loss" in the Company's assets at the date of the change in control. Based on the expiration dates of the NOLs and tax credits as well as anticipated levels of domestic income, management does not believe that the transaction will have a material impact on these deferred tax assets.

Future sales of common stock by the Company or its principal stockholders, or changes in the composition of its principal stockholders, could constitute a change in control that would result in additional annual limitations on the Company's use of its NOLs and unused tax credits. Management cannot predict whether such a change in control will occur.

Income taxes paid, net of refunds received, were $12.8 million, $15.5 million, and $4.8 million for fiscal 2002, 2001, and 2000, respectively.

**COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

**18. Risk Management and Financial Instruments**

*Foreign Currency and Interest Rate Risk Management*

The company operates on a global basis and is exposed to the risk that its earnings, cash flows and stockholders' equity could be adversely impacted by fluctuations in currency exchange rates and interest rates. To manage the volatility relating to these exposures, the Company aggregates the exposures on a consolidated basis to take advantage of natural offsets. For exposures that are not offset within its operations, the Company may enter into various derivatives transactions pursuant to the its risk management policies. The primary purpose of the Company's foreign currency and interest rate risk management policies and activities is to manage these risks to acceptable levels.

To manage its risks, the Company primarily utilizes forward exchange contracts and purchased options with durations of generally less than 12 months. The Company has in place forward exchange contracts and purchased options with third parties, denominated in multiple currencies, which will mature during fiscal 2003. The details are as follows:

| Derivative Type | Currency Sold | Currency Purchased | USD Equivalent of Notional Amount | Weighted Average Contract Rate (per Convention) | Unrealized Gain/(Loss) |
|---|---|---|---|---|---|
| Forwards | GBP | EUR | $ 3.4 | 0.6176 GBP per EUR | $ 0.2 |
| Forwards | CAD | USD | 2.0 | 1.5853 CAD per USD | — |
| Spot | USD | EUR | 18.0 | 1.0478 USD per EUR | — |
| Options | CAD | USD | 74.0 | 1.6420 CAD per USD | 0.3 |
| | | | $ 97.4 | | $ 0.5 |

In order to manage the interest rate risk associated with our debt portfolio, the Company may enter into derivative transactions to manage its exposures to changes in global interest rates, although the Company did not have in place any interest rate derivatives in 2001 or 2002.

Gains and losses on derivatives qualifying as hedges under SFAS No. 133 "Accounting for Derivative Instruments and Hedging Activities", are recorded on the balance sheet as a component of "Other comprehensive income" to the extent that the hedges are effective until the underlying transactions are recognized in earnings. As of December 31, 2002, the Company had no derivatives designated as hedges under SFAS No. 133. Gains and losses from all derivatives that do not qualify as hedges under SFAS No. 133, are recorded in the income statement as required by SFAS No. 133 and the fair value is recorded in the balance sheet.

F-33

## COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES

### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

*Fair Value of Financial Instruments, Derivatives and Hedging Activities*

The estimated fair values of the Company's continuing operations financial instruments are summarized as follows (in millions):

|  | December 31, 2002 | | December 31, 2001 | |
|---|---|---|---|---|
|  | Carrying Amount | Estimated Fair Value | Carrying Amount | Estimated Fair Value |
| Short-term debt, long-term debt and capital lease obligations | $ 1,289.2 | $ 1,200.2 | $ 1,328.1 | $ 1,258.6 |
| Mandatorily redeemable preferred stock of subsidiary | $ 123.9 | $ 123.9 | $ 149.3 | $ 149.3 |
| Forwards | $ 0.2 | $ 0.2 | $ 0.6 | $ 0.6 |
| Options | $ 0.3 | $ 0.3 | $ 1.6 | $ 1.6 |

The following methods and assumptions were used to estimate these fair values:

The fair value of the Public Debt notes are based upon quoted market prices. The fair value of the other short-term and long-term debt of the Company approximates the carrying value due to the frequent resetting of interest rates.

The fair value of the forward contracts and purchase options are based upon quoted market prices and the aggregated notional amount outstanding in U.S. dollar equivalent of $97.4 million at December 31, 2002.

Carrying amounts reported in the consolidated balance sheets for cash and cash equivalents, accounts and other receivables, accounts payable and accrued expenses approximate fair value due to the short-term nature of these instruments.

*Concentration of credit risk*

In the normal course of business, the Company provides credit to customers in the automotive industry, performs credit evaluations of these customers and maintains reserves for potential credit losses. When realized, the losses have been within the range of management's allowance for doubtful accounts.

*Other Concentrations of Risk*

The Company invests the majority of its excess cash in money market accounts, where appropriate, diversifies the concentration of cash among financial institutions. With respect to financial institutions, the company has diversified its selection of counterparties and has arranged master-netting agreements, where allowed by law and the Company's policies, to minimize the risk of loss.

## 19. Related Party Transactions

On December 31, 2002, the Company acquired certain assets from Dutton Yarns (an affiliate of Mr. McCallum) for approximately $4.2 million. These assets are used by the Company to texture yarn. As part of the transaction, Dutton Yarns has agreed to provide the Company transition services through December 31, 2003.

In January 2003, the Company purchased equipment required to support an anticipated increase in the production of Furniture Fabrics from Joan Fabrics for $4.7 million. Elkin McCallum, a director of the Company, controls Joan Fabrics.

The Company entered into a lease agreement with Becker Ventures, an entity controlled by one of the Company's current directors and shareholders, for the Company's headquarters at 250 Stephenson Highway,

F-34

**COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES**

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

Troy, Michigan with the effective date of the lease being January 1, 2002. In March, 2002, the Company entered into lease agreements with Becker Ventures, effective January 1, 2002, for 150 Stephenson Highway and 350 Stephenson Highway, Troy, Michigan. The base rent for all three premises is $13.25 per sq. ft. Total square footage for all three locations is approximately 286,000. The leases have 20-year terms, and the Company has two five-year renewal options. The 2003 cost for the facilities will be approximately $3.8 million. For the years ended December 31, 2002 and 2001, the Company recorded a total cost of $17.1 million and $2.1 million, for rental expenses with related parties. In addition, the Company is also party to a lease with Becker Ventures for five manufacturing facilities totaling 884,000 square feet. In 2002, the Company extended the lease term an additional ten years to expire in 2021, with the base rent for these facilities totaling $3.6 million per year.

On April 12, 2002, the Company signed and closed on a merger agreement with Mr. McCallum (a current director and shareholder of the Company) and a lamination company wholly owned by Mr. McCallum pursuant to which the acquired company was merged into a wholly owned subsidiary of the Company. As consideration in the transaction, Mr. McCallum received 400,000 shares of Common Stock and was repaid $2.5 million in cash as reimbursement for amounts invested to fund the company's working capital needs. Subsequent to the merger, debt owing to Mr. McCallum of $6.7 million was repaid. The Company acquired the lamination business to optimize the supply chain on certain of its fabric products and provide low cost lamination products and services to Tier-1 customers.

In June 2002, the Company repurchased Series A preferred stock from Textron at a price of 75% of its liquidation preference of 133.3 million, which had a carrying value of $63.7 million (see Note 10). In addition, in May 2002, the Company and Textron finalized the purchase price and related working capital adjustments of TAC-Trim and paid Textron $15.5 million in cash.

During the first quarter of 2001, Heartland acquired a controlling interest equal to approximately 60% of the Company through a purchase of 25 million shares of common stock from the Company and a purchase of 27 million shares from Blackstone Partners and WP Partners. In the sale, the Company received gross proceeds of $125.0 million, or approximately $95.0 million after fees and expenses associated with the transactions. The purchase price also gave the Company a profit participation right on certain future common stock sales by Heartland. As a result of the transaction, Heartland is entitled to designate a majority of the Company's Board of Directors. Prior to the transaction, as of December 31, 2000, Blackstone Partners and WP Partners collectively owned approximately 87% of the Common Stock of the Company. In connection with the Heartland transaction, the Company paid Heartland a transaction fee of $12.0 million and paid WP Partners an investment banking fee of $2.0 million.

During the first quarter of 2001, the Amended and Restated Stockholders' Agreement was terminated and a new, 10 year Services Agreement was entered into between the Company, Products and Heartland. Under this Services Agreement, the Company will pay Heartland an annual advisory fee of $4.0 million. The Services Agreement also provides for the Company to pay a 1% transaction fee on certain acquisitions and divestitures commencing on or after February 23, 2002. Under the former Amended and Restated Stockholders' Agreement among the Company, Products, Blackstone Partners and WP Partners, the Company paid each of Blackstone Partners and WP Partners, or their respective affiliates, an annual monitoring fee of $1.0 million.

In December 2001, Heartland, and certain co-investors that include a director of the Company, purchased an additional 12.8 million shares of common stock at a price of $12.50 per share, as part of the financing for the TAC-Trim acquisition. The average closing price of the stock three days before and three day after the definitive agreement announcement date was $22.35. Additionally, the Company paid Heartland transaction fees of $12.5 million in connection with the TAC-Trim acquisition. The Company also reimbursed Heartland for $1.5 million of expenses that Heartland incurred on behalf of the Company in relation to the Becker acquisition.

F-35

**COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES**

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

As part of the TAC-Trim acquisition, the Company entered into three intellectual property license agreements with Textron. In two of these agreements, the Company licenses back to Textron certain intellectual property that was acquired in the transaction. In the third agreement, the Company licenses from Textron other intellectual property that was not acquired in the transaction. In addition, under the TAC-Trim acquisition agreement, the Company is permitted to use the "Textron" name for 18 months in exchange for payments of $13.0 million on December 15, 2002 and $6.5 million on December 15, 2003.

Prior to the TAC-Trim acquisition, TAC-Trim entered into an $86.9 million sale and leaseback transaction (the "Textron Leasing Transaction") with two separate single purpose affiliates of Textron Financial Corporation, as lessor and purchaser, with respect to a portfolio of manufacturing equipment situated in different locations throughout the United States and Canada. Payments under the Textron Leasing Transaction are guaranteed by Products and secured by a first perfected mortgage lien over certain real property with a value equal to $25 million. Each lease is for an initial term of three (3) years with three one (1) year renewal options. As is customary, the documentation for the Textron Leasing Transaction incorporates covenants by reference, from the Senior Secured Credit Facility, that may be amended or waived by the senior lenders, and also contain events of default.

During 2001, the Company entered into sale and leaseback transactions for certain non-manufacturing properties with entities that are controlled by one of the Company's current directors and shareholders. In connection with these sale-leaseback transactions, Products sold and contemporaneously leased back real property located in Troy, Michigan and Plymouth, Michigan for net proceeds of $15.1 million in aggregate. The initial lease term in each transaction is 20 years and each lease has two successive ten year renewal options. The basic rent for the Troy, Michigan property is $1.3 million per year, and the basic rent for the Plymouth, Michigan property is $0.5 million per year. The rental rates in each case are subject to adjustment after expiration of the initial term.

Additionally, in connection with the Joan acquisition, the Company entered into a Supply Agreement and a Transition Service Agreement with entities controlled by the former owner of Joan who is currently a director and shareholder of the Company. Under the Supply Agreement, the Company has agreed to purchase all of its requirements for flat woven automotive fabric from the controlled entities for a five-year period beginning on the date of the Supply Agreement. The prices for fabric under the agreement will equal the costs of the raw materials plus an amount that represents the entities' standard labor and overhead costs incurred in manufacturing fabric. Under Transition Service Agreement an entity controlled by the director will provide Products with transitional and support services for a period not to exceed twelve months in order to support the continued and uninterrupted operation of the businesses acquired by Products in the Joan acquisition. As a part of these services, pending disassembly and removal of machinery and equipment purchased as part of the acquisition, the controlled entity will use that machinery and equipment to manufacture all of the Company's requirements for some types of knitted and woven automotive fabrics.

On December 31, 2002, Heartland owned approximately 36% of the outstanding shares of the Company; Blackstone Partners' and WP Partners' owned approximately 11%; Joan Fabrics Corp., Mr. Elkin McCallum and associates owned approximately 7%; Mr. Charles E. Becker and Textron, Inc. each owned approximately 9%.

20.   **Information About the Company's Operations**

The Company primarily supplies automotive interior systems — textile and plastic products, acoustics and convertible top systems to the global automotive industry.

North American Automotive Interior Systems (NAAIS) and European and Rest of World Automotive Interior Systems (Europe and ROW) include the following product groups: molded floor carpet, luggage compartment trim, acoustical products, accessory floormats and plastic-based interior trim modules, systems

F-36

## COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES

### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

and components. The Specialty Automotive Products (Specialty) division includes automotive fabrics and convertible top systems. The three divisions also produce other automotive and non-automotive products.

The Company evaluates performance based on operating profit or loss. Information about the Company's divisions is presented below (in millions):

| | Year Ended December 31, 2002 | | | | |
| | North American Automotive Interior Systems | European and Rest of World Automotive Interior Systems | Specialty Automotive Products | Other(A) | Total |
|---|---|---|---|---|---|
| External revenues | $ 2,613.4 | $ 718.0 | $ 554.4 | $ — | $ 3,885.8 |
| Inter-segment revenues | 15.8 | 193.5 | 41.8 | (251.1) | |
| Preferred Stock Requirement | 38.4 | — | — | — | 38.4 |
| Depreciation and amortization | 65.3 | 30.1 | 16.9 | 4.7 | 117.0 |
| Operating income (loss) | 236.0 | (59.8) | 48.4 | (56.9) | 167.7 |
| Total assets | 1,872.2 | 553.9 | 449.6 | 281.4 | 3,157.1 |
| Capital expenditures | 85.5 | 24.0 | 12.2 | 26.2 | 147.9 |

| | Year Ended December 31, 2001 | | | | |
| | North American Automotive Interior Systems | European and Rest of World Automotive Interior Systems | Specialty Automotive Products | Other(A) | Total |
|---|---|---|---|---|---|
| External revenues | $ 1,098.2 | $ 258.7 | $ 466.4 | $ — | $ 1,823.3 |
| Inter-segment revenues | 12.0 | 30.2 | 0.2 | (42.4) | |
| Preferred Stock Requirement | 2.4 | — | — | — | 2.4 |
| Depreciation and amortization | 40.6 | 21.4 | 17.9 | 1.9 | 81.8 |
| Operating income (loss) | 68.7 | (24.9) | 10.6 | (18.8) | 35.6 |
| Total assets | 1,861.3 | 308.2 | 484.5 | 333.9 | 2,987.9 |
| Capital expenditures | 25.6 | 12.1 | 14.5 | 2.3 | 54.5 |

| | Year Ended December 31, 2000 | | | | |
| | North American Automotive Interior Systems | European and Rest of World Automotive Interior Systems | Specialty Automotive Products | Other(A) | Total |
|---|---|---|---|---|---|
| External revenues | $ 1,119.4 | $ 284.5 | $ 497.9 | $ — | $ 1,901.8 |
| Inter-segment revenues | 22.1 | 34.7 | 34.0 | (90.8) | — |
| Preferred Stock Requirement | — | — | — | — | — |
| Depreciation and amortization | 41.3 | 16.6 | 15.4 | 1.4 | 74.7 |
| Operating income (loss) | 88.0 | 0.6 | 19.5 | — | 108.1 |
| Total assets | 664.3 | 228.6 | 267.1 | 120.3 | 1,280.3 |
| Capital expenditures | 31.5 | 18.3 | 18.4 | 0.8 | 69.0 |

(A) Other includes the Company's non-operating units (See Note 14), the effect of eliminating entries and restructuring charges (See Note 15). During 2002, certain costs that were previously included at the divisional units were included as non-operating costs. In order for the information to be comparable, all non-operating costs have been allocated back to the segments based on sales and assets. For 2002, $134.6 million, $9.4 million and $29.7 million of costs were allocated back to NAAIS, Europe and ROW and Specialty, respectively.

F-37

COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

Sales by product groups follow (in millions):

|  | Fiscal Year Ended | | |
|---|---|---|---|
|  | December 31, 2002 | December 31, 2001 | December 31, 2000 |
| Plastic-based interior and exterior trim systems | $ 2,328.6 | $ 403.6 | $ 452.1 |
| Molded floor carpet | 481.6 | 476.6 | 458.2 |
| Automotive fabrics | 377.0 | 278.5 | 290.5 |
| Acoustical products | 266.8 | 222.9 | 231.4 |
| Accessory floormats | 156.2 | 148.7 | 160.4 |
| Convertible top systems | 129.3 | 118.4 | 105.2 |
| Luggage compartment trim | 70.1 | 61.4 | 71.0 |
| Other | 76.2 | 113.2 | 133.0 |
| Total | $ 3,885.8 | $ 1,823.3 | $ 1,901.8 |

Direct and indirect sales to significant customers in excess of ten percent of consolidated net sales from continuing operations follow:

|  | Fiscal Year Ended | | |
|---|---|---|---|
|  | 2002 | 2001 | 2000 |
| DaimlerChrysler AG | 31.0% | 18.7% | 16.8% |
| General Motors Corporation | 23.0% | 29.0% | 31.4% |
| Ford Motor Company | 23.0% | 21.5% | 20.6% |

Information about the Company's continuing operations in different geographic areas for fiscal 2002, 2001, and 2000 is presented below (in millions):

|  | Year Ended December 31, 2002 | | Fiscal Year Ended December 31, 2001 | | Fiscal Year Ended December 31, 2000 | |
|---|---|---|---|---|---|---|
|  | Net Sales | Long-Lived Assets | Net Sales | Long-Lived Assets | Net Sales | Long-Lived Assets |
| United States | $ 2,412.0 | $ 1,445.3 | $ 1,346.0 | $ 1,548.0 | $ 1,123.6 | $ 518.5 |
| Canada | 488.2 | 343.4 | 168.5 | 101.9 | 407.6 | 85.1 |
| Mexico | 230.7 | 96.8 | 50.5 | 52.9 | 86.1 | 26.2 |
| United Kingdom | 660.5 | 63.2 | 117.3 | 71.8 | 117.2 | 54.3 |
| Other | 94.4 | 240.1 | 141.0 | 337.8 | 167.3 | 73.9 |
| Consolidated | $ 3,885.8 | $ 2,188.8 | $ 1,823.3 | $ 2,112.4 | $ 1,901.8 | $ 758.0 |

Intersegment sales between geographic areas are not material. For fiscal years 2002, 2001, and 2000, export sales from the United States to foreign countries were $429.5 million, $146.2 million, and $87.2 million, respectively.

F-38

# EXHIBIT C

# PART 2

**COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

**21. Commitments and Contingencies**

*Environmental*

The Company is subject to federal, state, local and foreign environmental, and health and safety, laws and regulations that (i) affect ongoing operations and may increase capital costs and operating expenses in order to maintain compliance with such requirements and (ii) impose liability relating to contamination at facilities, and at other locations such as former facilities, facilities where we have sent wastes for treatment or disposal, and other properties to which the Company may be linked. Such liability may include, for example, investigation and clean-up of the contamination, personal injury and property damage caused by the contamination, and damages to natural resources. Some of these liabilities may be imposed without regard to fault, and may also be joint and several (which can result in a liable party being held responsible for the entire obligation, even where other parties are also liable).

Management believes that it has obtained, and is in material compliance with, those material environmental permits and approvals necessary to conduct the Company's various businesses. Environmental compliance costs for continuing businesses are accounted for as normal operating expenses or capital expenditures, except for certain costs incurred at acquired locations. Environmental compliance costs relating to conditions existing at the time of an acquisition are generally charged to reserves established in purchase accounting. The Company accrues for environmental remediation costs when such obligations are known and reasonably estimable. In the opinion of management, based on the facts presently known to it, such environmental compliance and remediation costs will not have a material effect on the Company's business, consolidated financial condition, future results of operations or cash flows.

The Company is legally or contractually responsible or alleged to be responsible for the investigation and remediation of contamination at various sites, and for personal injury or property damages, if any, associated with such contamination. At some of these sites the Company has been notified that it is a potentially responsible party ("PRP") under the federal Superfund law or similar state laws. Other sites at which the Company may be responsible for contamination may be identified in the future, including with respect to divested and acquired businesses.

The Company is currently engaged in investigating or remediating certain sites as discussed in the paragraphs below. In estimating the cost of investigation and remediation, the Company considered, among other things, its prior experience in remediating contaminated sites, remediation efforts by other parties, data released by the United States Environmental Protection Agency ("USEPA"), the professional judgment of the Company's environmental experts, outside environmental specialists and other experts, and the likelihood that other identified PRPs will have the financial resources to fulfill their obligations at sites where they and the Company may be jointly and severally liable. It is difficult to estimate the total cost of investigation and remediation due to various factors including: incomplete information regarding particular sites and other PRPs; uncertainty regarding the nature and extent of environmental problems and the Company's share, if any, of liability for such problems; the ultimate selection among alternative approaches by governmental regulators; the complexity and evolving nature of environmental laws, regulations and governmental directives; and changes in cleanup standards.

The Company is a party to a Consent Decree with the State of New Hampshire to remediate a former industrial landfill known as the Cardinal Landfill in Farmington, New Hampshire. Pursuant to that Consent Decree, the Company is currently conducting a pilot test for a proposed remediation of chlorinated compound contaminants in groundwater. The Consent Decree calls for a remedy to be in place by 2004. The Company is a defendant in two lawsuits filed by a total of 91 individual plaintiffs for alleged personal injuries arising from Cardinal Landfill conditions. The Company will vigorously contest these allegations. As of December 31, 2002, the Company has accrued $15.7 million for Cardinal Landfill.

F-39

**COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES**

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

The Company is a party, as a member of a PRP workgroup, to a Consent Decree entered with the USEPA for the remediation of a former municipal landfill in Dover, New Hampshire. The town of Dover, New Hampshire is also a member of the PRP group and a party to the Consent Decree. Pursuant to the terms of the Consent Decree, the PRP group is currently engaged in the preparation of a remediation design. The Consent Decree requires that a remedy for the site be in place by 2004. As of December 31, 2002, the Company has accrued $9.6 million for Dover.

Pursuant to a Consent Decree signed with the USEPA, the Company is currently engaged in a full-scale remediation for groundwater and soil contamination at the former Stamina Mills manufacturing facility in North Smithfield, Rhode Island. Remediation activities have been ongoing since 1998. The Company is also in negotiation with the USEPA regarding a claim for past oversight costs. A resolution of this matter is anticipated in 2003. As of December 31, 2002, the Company has accrued $14.1 million for Stamina Mills.

The Company is working with the Michigan Department of Environmental Quality (MDEQ) to investigate and remediate soil and groundwater contamination at a former manufacturing plant in Mancelona, MI and at adjacent owned property formerly used for the treatment and disposal of plating waste. MDEQ is likely to require remediation of groundwater. In addition, the Company is incurring costs in connection with the provision of alternate water supplies to residences in the area.

The current owner of one of the Company's former manufacturing plants located in Bowling Green, OH has entered into an Administrative Order on Consent with the Ohio Environmental Protection Agency (OEPA) requiring investigation and remediation of contamination at the site. The Company is reimbursing the current owner for costs associated with ongoing groundwater monitoring and, following selection of an appropriate remedy by OEPA, will assume 90% of future remediation costs.

In the 1980's and 1990's, the California Regional Water Quality Control Board (CRWQCB) and other state agencies ordered a predecessor of the Company to investigate and remediate soil and groundwater contamination at a former lumber treatment plant in Elmira, CA. In 1996, the Company entered into an agreement with the State of California to conduct long-term operation and maintenance of the remedy implemented at the site.

The Company has established accruals for certain contingent environmental liabilities and management believes such reserves comply with generally accepted accounting principles. The Company accrues for environmental investigatory and non-capital remediation costs when litigation has commenced or a claim or assessment has been asserted or is imminent, the likelihood of an unfavorable outcome is probable, and the financial impact of such outcome is reasonably estimable. As of December 31, 2002 and 2001, total reserves for these environmental costs are approximately $64.5 million and $59.6 million, respectively.

In the opinion of management, based on information presently known to it, identified environmental costs and contingencies will not have a material effect on the Company's consolidated financial condition, future results of operations or cash flows. However, we can give no assurance that we have identified or properly assessed all potential environmental liabilities arising from our business or properties, and those of our present and former subsidiaries and their corporate predecessors.

*Litigation*

The Company and its subsidiaries have lawsuits and claims pending against them and have certain guarantees outstanding which were made in the ordinary course of business.

The ultimate outcome of the legal proceedings to which the Company is a party will not, in the opinion of the Company's management based on the facts presently known to it, have a material effect on the Company's consolidated financial condition, future results of operations or cash flows.

F-40

**COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

*Other Commitments*

As of December 31, 2002, the Company's continuing operations had approximately $36.2 million in outstanding capital expenditure commitments. The majority of the leased properties of the Company's previously divested businesses have been assigned to third parties. Although releases have been obtained from the lessors of certain properties, Products remains contingently liable under most of the leases. Products' future liability for these leases, in management's opinion, based on the facts presently known to it, will not have a material effect on the Company's consolidated financial condition, future results of operations or cash flows.

Refer to Note 2, "New Accounting Pronouncements" regarding certain indemnifications and guarantees as required by FIN No. 45.

F-41

**COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

**22.    Quarterly Financial Data (Unaudited)**

The quarterly financial data is summarized below (in millions, except per share amounts).

|  | 2002 | | | |
|---|---|---|---|---|
|  | First Quarter | Second Quarter | Third Quarter | Fourth Quarter |
| Net sales | $ 914.8 | $1,085.3 | $922.5 | $963.2 |
| Gross profit | 131.1 | 158.5 | 100.7 | 127.8 |
| Income (loss) from continuing operations | (6.7) | 3.7 | (45.2) | (3.1) |
| Income (loss) before extraordinary items | (6.7) | 3.7 | (45.2) | (3.1) |
| Net income (loss) | (18.4) | 13.2 | (45.2) | (3.1) |
| Basic and diluted earnings (loss) per share Continuing operations | (0.11) | (0.46) | (0.54) | (0.04) |
| Discontinued operations |  | 0.12 | — | — |
| Cumulative effect of change in accounting principle | (0.17) | — | — | — |
| Extraordinary loss |  | — | — | — |
| Net income available to common shareholders | (0.27) | (0.33) | (0.54) | (0.04) |
| Common stock prices: |  |  |  |  |
| High | 25.500 | 28.375 | 9.000 | 4.450 |
| Low | 16.750 | 9.000 | 2.810 | 2.450 |

|  | 2001 | | | |
|---|---|---|---|---|
|  | First Quarter | Second Quarter | Third Quarter | Fourth Quarter |
| Net sales | $ 453.1 | $ 457.6 | $ 430.5 | $ 482.1 |
| Gross profit | 58.8 | 64.3 | 53.4 | 42.3 |
| Income (loss) from continuing operations | (7.1) | 1.8 | (13.8) | (30.6) |
| Income (loss) before extraordinary items | (7.1) | 9.2 | (12.4) | (30.6) |
| Net income (loss) | (7.4) | 9.2 | (12.4) | (35.6) |
| Basic and diluted earnings (loss) per share Continuing operations | (0.26) | 0.05 | (0.32) | (0.62) |
| Discontinued operations | — | 0.21 | 0.03 |  |
| Cumulative effect of change in accounting principle | — | — | — | — |
| Extraordinary loss | — | — | — | (0.10) |
| Net income available to common shareholders | (0.26) | 0.26 | (0.29) | (0.72) |
| Common stock prices: |  |  |  |  |
| High | 14.218 | 15.500 | 21.425 | 25.750 |
| Low | 8.950 | 10.125 | 9.875 | 11.900 |

The Company's operations are not subject to significant seasonal influences.

Impact of Prior Period Adjustment — During the Company's review of its financial information, an error in the mathematical computation of foreign currency exchange gains was discovered. The third quarter 2002

F-42

**Table of Contents**

## COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES

### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

financial statements reflect the correction of the error as a prior period adjustment. The impact of the adjustment on the prior period financial statements follows:

| | Three Months Ended | | | | Six Months Ended | |
|---|---|---|---|---|---|---|
| | March 31, 2002 (As Reported) | March 31, 2002 (Adjusted) | June 30, 2002 (As Reported) | June 30, 2002 (Adjusted) | June 30, 2002 (As Reported) | June 30, 2002 (Adjusted) |
| | (in millions, except per share data) | | | | | |
| Net sales | $ 914.8 | $ 914.8 | $ 1,085.3 | $ 1,085.3 | $ 2,000.1 | $ 2,000.1 |
| Cost of goods sold | 783.7 | 783.7 | 926.8 | 926.8 | 1,710.5 | 1,710.5 |
| Gross profit | 131.1 | 131.1 | 158.5 | 158.5 | 289.6 | 289.6 |
| Selling, general and administrative expenses | 67.6 | 67.6 | 77.0 | 77.0 | 144.6 | 144.6 |
| Restructuring charges and impairment of long lived assets | 9.1 | 9.1 | — | | 9.1 | 9.1 |
| Operating income | 54.4 | 54.4 | 81.5 | 81.5 | 135.9 | 135.9 |
| Other, net | 55.9 | 54.2 | 51.8 | 57.0 | 107.7 | 111.2 |
| Income (loss) from continuing operations before income taxes | (1.5) | 0.2 | 29.7 | 24.5 | 28.2 | 24.7 |
| Income tax expense | 5.9 | 6.9 | 23.2 | 20.8 | 29.1 | 27.7 |
| Income (loss) from continuing operations before extraordinary items | (7.4) | (6.7) | 6.5 | 3.7 | (0.9) | (3.0) |
| Income from discontinued operations, net of income taxes | — | — | 9.5 | 9.5 | 9.5 | 9.5 |
| Cumulative effect of change in accounting principle, net of income taxes(A) | (11.7) | (11.7) | — | | (11.7) | (11.7) |
| Net income (loss) | $ (19.1) | (18.4) | 16.0 | 13.2 | (3.1) | (5.2) |
| Earnings per share data: | | | | | | |
| Net income (loss) | $ (19.1) | (18.4) | 16.0 | 13.2 | (3.1) | (5.2) |
| Loss on redemption of subsidiary preferred stock | — | — | (36.3) | (36.3) | (36.3) | (36.3) |
| Net (loss) available to common shareholders | $ (19.1) | $ (18.4) | $ (20.3) | $ (23.1) | $ (39.4) | $ (41.5) |
| Net (loss) per basic and diluted common share | $ (0.28) | $ (0.27) | $ (0.29) | $ (0.33) | $ (0.57) | $ (0.60) |
| Average basic and diluted common shares outstanding: | 67.2 | 67.2 | 70.4 | 70.4 | 68.8 | 68.8 |

| | March 31, 2002 (As Reported) | March 31, 2002 (Adjusted) | June 30, 2002 (As Reported) | June 30, 2002 (Adjusted) |
|---|---|---|---|---|
| Accumulated deficit(A) | $ (701.9) | $ (701.2) | $ (722.1) | $ (724.2) |

(A)   Includes effect of $11.7 million (having no tax impact) cumulative effect of change in accounting principle recorded in June 2002, and

accounted for as if it occurred on January 1, 2002.

F-43

**COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

**23.   Consolidating Financial Statements**

Products issued Senior Notes in a total principal amount of $500.0 million in December 2001. The Senior Notes are guaranteed by the Company and all the Company's wholly owned domestic Subsidiaries other than its receivable, insurance and charitable subsidiaries (Guarantor Subsidiaries). The following are consolidating financial statements of the Company, Products, its guarantor and non-guarantor subsidiaries:

F-44

## COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES

### SUPPLEMENTAL GUARANTOR CONDENSED CONSOLIDATING FINANCIAL STATEMENTS

### CONSOLIDATING STATEMENT OF INCOME

**For the Year Ended December 31, 2002**

| | Parent | Issuer | Guarantors | Non-Guarantors | Eliminations | Consolidated Total |
|---|---|---|---|---|---|---|
| | | | | (in millions) | | |
| Net sales | $ — | $289.4 | $ 2,415.7 | $ 1,216.9 | $ (36.2) | $ 3,885.8 |
| Cost of goods sold | — | 181.8 | 2,110.0 | 1,112.1 | (36.2) | 3,367.7 |
| Selling, general and administrative expenses | 0.1 | 166.1 | 82.8 | 44.5 | — | 293.5 |
| Restructuring charges and impairment of long-lived assets | — | 16.5 | 8.3 | 32.1 | — | 56.9 |
| Operating income (loss) | (0.1) | (75.0) | 214.6 | 28.2 | — | 167.7 |
| Interest expense, net | (0.1) | 15.4 | 126.2 | 7.4 | — | 148.9 |
| Intercompany interest (income) expense | (6.6) | (5.9) | (23.8) | 36.3 | — | — |
| Loss on sale of receivables | — | 0.6 | — | 3.6 | — | 4.2 |
| Subsidiary preferred stock dividend | — | 30.8 | — | — | — | 30.8 |
| Subsidiary preferred stock accretion | — | 7.6 | — | — | — | 7.6 |
| Other expense, net | — | (45.8) | 40.4 | 12.5 | 2.9 | 10.0 |
| Income (loss) from continuing operations before income taxes | 6.6 | (77.7) | 71.8 | (31.6) | (2.9) | (33.8) |
| Income tax (benefit) expense | 2.5 | (16.2) | 42.4 | (11.2) | — | 17.5 |
| Income (loss) from continuing operations | 4.1 | (61.5) | 29.4 | (20.4) | (2.9) | (51.3) |
| Income from discontinued operations | — | 9.5 | — | — | — | 9.5 |
| Cumulative effect of a change in accounting principle | — | — | — | (11.7) | — | (11.7) |
| Equity in net (loss) income of subsidiaries | (57.6) | (5.6) | (60.3) | — | 123.5 | — |
| NET INCOME (LOSS) | $(53.5) | $(57.6) | $ (30.9) | $ (32.1) | $ 120.6 | $ (53.5) |

**For the Year Ended December 31, 2001**

| | Parent | Issuer | Guarantors | Non-Guarantors | Eliminations | Consolidated Total |
|---|---|---|---|---|---|---|
| | | | | (in millions) | | |
| Net sales | $ — | $612.2 | $ 676.4 | $ 577.1 | $ (42.4) | $ 1,823.3 |
| Cost of goods sold | — | 506.3 | 598.2 | 542.4 | (42.4) | 1,604.5 |
| Selling, general and administrative expenses | 0.1 | 34.9 | 81.1 | 48.3 | — | 164.4 |
| Restructuring charges and impairment of long-lived assets | — | 7.3 | 0.9 | 10.6 | — | 18.8 |
| Operating income (loss) | (0.1) | 63.7 | (3.8) | (24.2) | — | 35.6 |
| Interest expense, net | — | 45.6 | 35.9 | 2.8 | — | 84.3 |
| Intercompany interest (income) expense | — | 17.3 | (24.7) | 7.4 | — | — |
| Loss on sale of receivables | — | 6.1 | — | 4.7 | — | 10.8 |
| Subsidiary preferred stock dividend | — | 1.5 | — | — | — | 1.5 |
| Subsidiary preferred stock accretion | — | 0.9 | — | — | — | 0.9 |
| Other expense, net | — | 5.0 | 2.9 | 1.8 | (3.3) | 6.4 |
| Income (loss) from continuing operations before income taxes | (0.1) | (12.7) | (17.9) | (40.9) | 3.3 | (68.3) |
| Income tax (benefit) expense | 0.2 | (11.9) | (5.6) | (1.3) | — | (18.6) |
| Income (loss) from continuing operations | (0.3) | (0.8) | (12.3) | (39.6) | 3.3 | (49.7) |
| Income from discontinued operations | — | 8.8 | — | — | — | 8.8 |
| Extraordinary loss on retirement of debt | — | (5.0) | (0.3) | — | — | (5.3) |
| Equity in net (loss) income of subsidiaries | (45.9) | (48.9) | (33.5) | — | 128.3 | — |

| NET INCOME (LOSS) | $(46.2) | $(45.9) | $ (46.1) | $ (39.6) | $ 131.6 | $ (46.2) |
|---|---|---|---|---|---|---|

F-45

## COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES

### SUPPLEMENTAL GUARANTOR CONDENSED CONSOLIDATING FINANCIAL STATEMENTS

### CONSOLIDATING STATEMENT OF INCOME

| | Parent | Issuer | Guarantors | Non-Guarantors | Eliminations | Total Consolidated |
|---|---|---|---|---|---|---|
| | | | | (in millions) | | |
| Net sales | $ — | $547.7 | $619.6 | $815.4 | $(80.9) | $1,901.8 |
| Cost of goods sold | — | 464.4 | 554.1 | 697.6 | (80.9) | 1,635.2 |
| Selling, general and administrative expenses | 0.1 | 36.0 | 53.5 | 68.9 | — | 158.5 |
| Operating income (loss) | (0.1) | 47.3 | 12.0 | 48.9 | — | 108.1 |
| Interest expense, net | (0.1) | 86.8 | 7.4 | 2.5 | — | 96.6 |
| Intercompany interest (income) expense | — | 19.9 | (16.2) | (3.7) | — | — |
| Loss on sale of receivables | — | 1.6 | — | 7.6 | — | 9.2 |
| Other expense, net | — | 2.1 | (13.6) | 9.9 | 3.1 | 1.5 |
| Income (loss) from continuing operations before income taxes | — | (63.1) | 34.4 | 32.6 | (3.1) | 0.8 |
| Income tax (benefit) expense | — | (24.1) | 15.3 | 12.2 | (1.2) | 2.2 |
| Income (loss) from continuing operations | — | (39.0) | 19.1 | 20.4 | (1.9) | (1.4) |
| Income from discontinued operations | — | 6.6 | — | — | — | 6.6 |
| Extraordinary loss on retirement of debt | — | — | (0.7) | — | — | (0.7) |
| Equity in net income (loss) of subsidiaries | 4.5 | 36.9 | 9.2 | — | (50.6) | — |
| NET INCOME (LOSS) | $ 4.5 | $ 4.5 | $ 27.6 | $ 20.4 | $(52.5) | $ 4.5 |

For the Year Ended December 31, 2000

F-46

## COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES

### SUPPLEMENTAL GUARANTOR CONDENSED CONSOLIDATING FINANCIAL STATEMENTS

### CONSOLIDATING BALANCE SHEET

**For the Year Ended December 31, 2002**

| | Parent | Issuer | Guarantors | Non-Guarantors | Eliminations | Consolidated Total |
|---|---|---|---|---|---|---|
| | | | | (in millions) | | |
| **ASSETS** | | | | | | |
| Current Assets: | | | | | | |
| Cash and cash equivalents | $ — | $ 0.2 | $ 0.3 | $ 80.8 | $ — | $ 81.3 |
| Accounts and other receivables, net | — | 5.0 | 40.7 | 324.4 | 2.9 | 373.0 |
| Inventories | — | 13.0 | 106.7 | 51.9 | — | 171.6 |
| Other | — | 51.4 | 75.5 | 50.5 | — | 177.4 |
| Total current assets | — | 69.6 | 223.2 | 507.6 | 2.9 | 803.3 |
| Investment in subsidiaries | 397.5 | 1,794.5 | (54.8) | — | (2,137.2) | — |
| Property, plant and equipment, net | — | 51.2 | 316.9 | 370.4 | (0.7) | 737.8 |
| Goodwill | — | — | 1,144.8 | 120.7 | — | 1,265.5 |
| Other assets | — | 212.3 | 85.8 | 52.4 | — | 350.5 |
| | $ 397.5 | $ 2,127.6 | $ 1,715.9 | $ 1,051.1 | $ (2,135.0) | $ 3,157.1 |
| **LIABILITIES & STOCKHOLDERS' EQUITY (DEFICIT)** | | | | | | |
| Current Liabilities: | | | | | | |
| Short-term borrowings | — | — | — | 10.5 | — | 10.5 |
| Current maturities of long-term debt | — | 22.7 | 0.1 | 0.7 | — | 23.5 |
| Accounts payable | — | 58.5 | 269.7 | 252.3 | — | 580.5 |
| Accrued expenses | — | 157.5 | 50.8 | 106.6 | — | 314.9 |
| Total current liabilities | — | 238.7 | 320.6 | 370.1 | — | 929.4 |
| Long-term debt | — | 1,255.0 | 0.1 | 0.1 | — | 1,255.2 |
| Intercompany payable (receivable) | — | (92.1) | (359.9) | 452.0 | — | — |
| Other noncurrent liabilities | — | 204.6 | 140.8 | 105.7 | — | 451.1 |
| Mandatorily redeemable preferred stock of subsidiary | — | 123.9 | — | — | — | 123.9 |
| Total common stockholders' equity (deficit) | $ 397.5 | $ 397.5 | $ 1,614.3 | $ 123.2 | $ (2,135.0) | $ 397.5 |
| | $ 397.5 | $ 2,127.6 | $ 1,715.9 | $ 1,051.1 | $ (2,135.0) | $ 3,157.1 |

F-47

## COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES

### SUPPLEMENTAL GUARANTOR CONDENSED CONSOLIDATING FINANCIAL STATEMENTS

### CONSOLIDATING BALANCE SHEET

**For the Year Ended December 31, 2001**

| | Parent | Issuer | Guarantors | Non-Guarantors | Eliminations | Consolidated Total |
|---|---|---|---|---|---|---|
| | | | | (In millions) | | |
| **ASSETS** | | | | | | |
| Current Assets | | | | | | |
| Cash and cash equivalents | $ 0.2 | $ (3.8) | $ 12.7 | $ 64.8 | $ — | $ 73.9 |
| Accounts and other receivables, net | — | 8.7 | 140.6 | 250.9 | 5.9 | 406.1 |
| Inventories | — | 37.6 | 55.7 | 39.3 | — | 132.6 |
| Other | — | 8.6 | 71.4 | 51.9 | — | 131.9 |
| Total current assets | 0.2 | 51.1 | 280.4 | 406.9 | 5.9 | 744.5 |
| Investment in subsidiaries | 374.5 | 1,784.9 | 396.5 | — | (2,555.9) | — |
| Property, plant and equipment, net | — | 63.9 | 254.7 | 294.0 | — | 612.6 |
| Goodwill | — | 23.7 | 1,101.3 | 133.0 | (4.2) | 1,253.8 |
| Other assets | — | 195.9 | 106.6 | 74.5 | — | 377.0 |
| | 374.5 | 2,068.4 | 1,859.1 | 501.5 | (2,560.1) | 2,243.4 |
| | $ 374.7 | $ 2,119.5 | $ 2,139.5 | $ 908.4 | $ (2,554.2) | $ 2,987.9 |
| **LIABILITIES & STOCKHOLDERS' EQUITY (DEFICIT)** | | | | | | |
| Current Liabilities: | | | | | | |
| Short-term borrowings | — | — | 0.1 | 25.5 | — | 25.6 |
| Current maturities of long-term debt | — | 18.0 | 0.3 | 1.6 | — | 19.9 |
| Accounts payable | — | 100.2 | 247.5 | 121.0 | — | 468.7 |
| Accrued expenses | — | 76.0 | 83.3 | 90.1 | — | 249.4 |
| Total current liabilities | — | 194.2 | 331.2 | 238.2 | — | 763.6 |
| Long-term debt | — | 1,282.0 | (0.1) | 0.7 | — | 1,282.6 |
| Intercompany payable (receivable) | — | (102.4) | 4.1 | 98.3 | — | — |
| Other noncurrent liabilities | — | 221.9 | 137.2 | 58.6 | — | 417.7 |
| Mandatorily redeemable preferred stock of subsidiary | — | 149.3 | — | — | — | 149.3 |
| | — | 1,550.8 | 141.2 | 157.6 | — | 1,849.6 |
| Total common stockholders' equity (deficit) | $ 374.7 | $ 374.5 | $ 1,667.1 | $ 512.6 | $ (2,554.2) | $ 374.7 |
| | $ 374.7 | $ 2,119.5 | $ 2,139.5 | $ 908.4 | $ (2,554.2) | $ 2,987.9 |

F-48

**COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES**

**SUPPLEMENTAL GUARANTOR CONDENSED CONSOLIDATING FINANCIAL STATEMENTS**

**CONSOLIDATING STATEMENT OF CASH FLOWS**

| | Parent | Issuer | Guarantors | Non-Guarantors | Eliminations | Consolidated Total |
|---|---|---|---|---|---|---|
| | | | | For the Year Ended December 31, 2002 | | |
| | | | (in millions) | | | |
| **OPERATING ACTIVITIES** | | | | | | |
| Net cash provided by (used in) operating activities | $ (0.2) | $ 24.0 | $ (271.3) | $ 437.0 | $ — | $ 189.5 |
| **INVESTING ACTIVITIES** | | | | | | |
| Additions to property, plant and equipment | — | (31.2) | (71.9) | (44.8) | — | (147.9) |
| Sales of property, plant and equipment | — | — | 13.3 | — | — | 13.3 |
| Additional investment in joint venture | — | — | — | (5.9) | — | (5.9) |
| Acquisitions of businesses, net of cash acquired | — | — | (6.8) | — | — | (6.8) |
| Payment of acquisition costs | — | — | (38.8) | — | — | (38.8) |
| Net cash provided by (used in) investing activities | — | (31.2) | (104.2) | (50.7) | — | (186.1) |
| **FINANCING ACTIVITIES** | | | | | | |
| Repayment of long-term debt | — | (22.4) | (0.1) | (1.4) | — | (23.9) |
| Increase (decrease) in short-term borrowings | — | — | — | (16.0) | — | (16.0) |
| Net proceeds from issuance of common stock | 150.6 | — | — | — | — | 150.6 |
| Repayment of preferred stock | — | (100.0) | — | — | — | (100.0) |
| Repayment of debt assumed in acquisition | — | (6.7) | — | — | — | (6.7) |
| Intercompany transfers (from) to Subsidiary | (150.6) | 140.3 | 364.0 | (353.7) | — | — |
| Net cash provided by (used in) financing activities | — | 11.2 | 363.9 | (371.1) | — | 4.0 |
| Increase (decrease) in cash and cash equivalents | (0.2) | 4.0 | (11.6) | 15.2 | — | 7.4 |
| Cash and cash equivalents at beginning of year | 0.2 | (3.8) | 12.7 | 64.8 | — | 73.9 |
| Cash and cash equivalents at end of year | $ — | $ 0.2 | $ 1.1 | $ 80.0 | $ — | $ 81.3 |

F-49

## COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES

### SUPPLEMENTAL GUARANTOR CONDENSED CONSOLIDATING FINANCIAL STATEMENTS

### CONSOLIDATING STATEMENT OF CASH FLOWS — (Continued)

|  | Parent | Issuer | Guarantors | Non-Guarantors | Eliminations | Consolidated Total |
|---|---|---|---|---|---|---|
|  |  |  |  | (in millions) |  |  |
| **OPERATING ACTIVITIES** |  |  |  |  |  |  |
| Net cash provided by (used in) operating activities | $ (0.3) | $(266.6) | $ 237.6 | $ 170.3 | $ — | $ 141.0 |
| **INVESTING ACTIVITIES** |  |  |  |  |  |  |
| Additions to property, plant and equipment | — | (14.8) | (14.5) | (25.2) | — | (54.5) |
| Sales of property, plant and equipment | — | 62.2 | 24.0 | 1.9 | — | 88.1 |
| Acquisitions of businesses, net of cash acquired | — | (760.9) | — | — | — | (760.9) |
| Sale of business | — | — | 3.5 | — | — | 3.5 |
| Net cash provided by (used in) investing activities | — | (713.5) | 13.0 | (23.3) | — | (723.8) |
| **FINANCING ACTIVITIES** |  |  |  |  |  |  |
| Issuance of long-term debt | — | 950.0 | — | — | — | 950.0 |
| Debt issuance costs | — | (59.4) | — | — | — | (59.4) |
| Repayment of long-term debt | — | (383.2) | — | — | — | (383.2) |
| Increase (decrease) in short-term borrowings | — | 9.7 | 2.0 | (1.6) | — | 10.1 |
| Net borrowings (repayments) on revolving credit facilities | — | (133.4) | — | (16.8) | — | (150.2) |
| Net proceeds from issuance of common stock | 207.2 | — | — | — | — | 207.2 |
| Reissue (purchase) treasury stock, net | 61.3 | — | — | — | — | 61.3 |
| Intercompany transfers (from) to Subsidiary | (268.5) | 596.8 | (240.9) | (87.4) | — | — |
| Net cash provided by (used in) financing activities | — | 980.5 | (238.9) | (105.8) | — | 635.8 |
| Increase (decrease) in cash and cash equivalents | (0.3) | 0.4 | 11.7 | 41.2 | — | 53.0 |
| Cash and cash equivalents at beginning of year | 0.5 | (4.2) | 1.0 | 23.6 | — | 20.9 |
| Cash and cash equivalents at end of year | $ 0.2 | $ (3.8) | $ 12.7 | $ 64.8 | $ — | $ 73.9 |

**For the Year Ended December 31, 2001**

F-50

## COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES

### SUPPLEMENTAL GUARANTOR CONDENSED CONSOLIDATING FINANCIAL STATEMENTS

### CONSOLIDATING STATEMENT OF CASH FLOWS

| | Parent | Issuer | Guarantors | Non-Guarantors | Eliminations | Consolidated Total |
|---|---|---|---|---|---|---|
| | | | For the Year Ended December 31, 2000 | | | |
| | | | (in millions) | | | |
| **OPERATING ACTIVITIES** | | | | | | |
| Net cash provided by operating activities | $ 0.4 | $ 13.2 | $ 7.1 | $ 76.6 | $ — | $ 97.3 |
| **INVESTING ACTIVITIES** | | | | | | |
| Additions to property, plant and equipment | — | (20.9) | (13.9) | (34.2) | — | (69.0) |
| Sales of property, plant and equipment | — | 5.6 | — | — | — | 5.6 |
| Net cash used in investing activities | — | (15.3) | (13.9) | (34.2) | — | (63.4) |
| **FINANCING ACTIVITIES** | | | | | | |
| Repayment of long-term debt | — | (27.5) | (38.1) | (1.0) | — | (66.6) |
| Increase (decrease) in short-term borrowings | — | — | — | 0.2 | — | 0.2 |
| Net borrowings (repayments) on revolving credit facilities | — | 64.9 | — | (25.9) | — | 39.0 |
| Reissue (purchase) treasury stock, net | 0.4 | — | — | — | — | 0.4 |
| Intercompany transfers to (from) subsidiary | (0.4) | (37.8) | 43.7 | (5.5) | — | — |
| Net cash provided by (used in) financing activities | — | (0.4) | 5.6 | (32.2) | — | (27.0) |
| Increase (decrease) in cash and cash equivalents | 0.4 | (2.5) | (1.2) | 10.2 | — | 6.9 |
| Cash and cash equivalents at beginning of year | 0.1 | (1.7) | 2.2 | 13.4 | — | 14.0 |
| Cash and cash equivalents at end of year | $ 0.5 | $ (4.2) | $ 1.0 | $ 23.6 | $ — | $ 20.9 |

F-51

**COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES**

**SCHEDULE I — CONDENSED FINANCIAL INFORMATION OF REGISTRANT**

The information required under this Schedule is included in Note 23 of the Consolidated Financial Statements.

**COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES**

**SCHEDULE II — VALUATION AND QUALIFYING ACCOUNTS**
**For the Fiscal Years Ended December 31, 2002, December 31, 2001, and December 31, 2000**

| Description | Balance At Beginning of Year | | Additions Resulting from Acquisitions | | Charge to Cost And Expenses | | Charged to Other Accounts | | Deductions | | Balance at End of Year | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | (in millions) | | | | | | | |
| **Fiscal Year Ended December 31, 2002:** | | | | | | | | | | | | |
| Allowance for doubtful accounts | $ | 14.6 | $ | — | $ | 2.5 | $ | 4.8 | $ | (3.3) | $ | 18.6 |
| **Fiscal Year Ended December 31, 2001:** | | | | | | | | | | | | |
| Allowance for doubtful accounts | $ | 8.1 | $ | 6.8 | $ | 6.6 | $ | (0.3)(a) | $ | (6.6) | $ | 14.6 |
| **Fiscal Year Ended December 31, 2000:** | | | | | | | | | | | | |
| Allowance for doubtful accounts | $ | 8.5 | $ | — | $ | 6.6 | $ | (0.9)(a) | $ | (6.1)(b) | $ | 8.1 |

(a) Reclassifications and collection of accounts previously written off.

(b) Reclassifications to other accounts, uncollectible amounts written off, and the elimination of amounts included in the allowance due from Enjema which was considered as a component of the Company's purchase cost for the remaining 50% interest in Enjema.

S-1

**Exhibit Index**

| Exhibit Number | Description |
|---|---|
| 2.1 | Agreement and Plan of Merger dated May 14, 2001 by and among Collins & Aikman Corporation, Collins & Aikman Products Co., Becker Group, L.L.C., CE Becker Inc., ME McInerney Inc., J Hoehnel Inc. and the individuals party thereto as sellers is hereby incorporated by reference to Exhibit 2.1 of Collins & Aikman Corporation's Current Report on Form 8-K dated July 13, 2001. |
| 2.2 | Agreement and Plan of Merger dated as of August 17, 2001 by and among Collins & Aikman Corporation, Collins & Aikman Products Co., JAII Acquisition Co., Elkin McCallum, Joan Fabrics Corporation and Joan Automotive Industries, Inc is hereby incorporated by reference to Exhibit 2.1 of Collins & Aikman Corporation's Current Report on Form 8-K dated September 21, 2001. |
| 2.3 | First Amendment to Agreement and Plan of Merger by and among Collins & Aikman Corporation, Collins & Aikman Products Co., JAII Acquisition Co., Elkin McCallum, Joan Fabrics Corporation and Joan Automotive Industries, Inc dated as of September 21, 2001 is hereby incorporated by reference to Exhibit 2.2 of Collins & Aikman Corporation's Current Report on Form 8-K dated September 21, 2001. |
| 2.4 | Purchase Agreement dated as of August 7, 2001, as amended and restated as of November 30, 2001, by and among Textron Inc., Collins & Aikman Corporation and Collins & Aikman Products Co., including Exhibit 1 (Certificate of Designation of the 15% Series A Redeemable Preferred Stock, the 16% Series B Redeemable Preferred Stock and the 16% Series C Redeemable Preferred Stock) and Exhibit 7 (Asset Purchase Agreement dated as of August 7 by and between Textron Automotive Exteriors Inc. and JPS Automotive, Inc.), which is incorporated by reference to Collins and Aikman Corporation Current Report on Form 8-k dated December 20, 2001 and filed on January 4, 2002. The Table of Contents of the Purchase Agreement listed as Exhibit 2.4 contains a list briefly identifying the contents of all omitted schedules and exhibits. Collins & Aikman Corporation will supplementally furnish a copy of any omitted schedule or Exhibit to the Commission upon request. |
| 2.5 | Asset Purchase Agreement dated as of August 7, 2001, as amended and restated as of November 30, 2001, by and between Textron Automotive Exteriors Inc. and JPS Automotive, Inc., which is incorporated herein by reference to Exhibit 2.2 of Collins & Aikman Corporation's Current Report on Form 8-K dated December 20, 2001 and filed on January 4, 2002. |
| 2.6 | Asset Purchase Agreement dated as of August 17, 2001 by and among Collins & Aikman Products Co., Western Avenue Dyers, L.P., Elkin McCallum, Kerry McCallum, Penny Richards and Tyng Textiles LLC, which is incorporated by reference to Exhibit 2.3 to Collins & Aikman Corporation's Current Report on Form 8-K filed on October 4, 2001. |
| 2.7 | First Amendment to Asset Purchase Agreement dated as of September 21, 2001, which is incorporated by reference to Exhibit 2.4 to Collins & Aikman Corporation's Current Report on Form 8-K filed on October 4, 2001. |
| 3.1 | Restated Certificate of Incorporation of Collins & Aikman Corporation is hereby incorporated by reference to Exhibit 3.1 of Collins & Aikman Corporation's Report on Form 10-Q for the fiscal quarter ended June 26, 1999. |
| 3.2 | Certificate of Amendment to the Restated Certificate of Incorporation of Collins & Aikman Corporation, which is incorporated by reference to Exhibit 3.2 of Collins & Aikman Corporation's Annual Report on Form 10-K for the fiscal year ended December 31, 2000. |
| 3.3 | Certificate of Amendment of Amended and Restated Certificate of Incorporation is hereby incorporated by reference to Exhibit 3.5 of Collins & Aikman Corporation's Current Report on Form 8-K filed May 29, 2002. |
| 3.4 | By-laws of Collins & Aikman Corporation, as amended, are hereby incorporated by reference to Exhibit 3.2 of Collins & Aikman Corporation's Report on Form 10-K for the fiscal year ended January 27, 1996. |

| Exhibit Number | Description |
|---|---|
| 3.5 | Certificate of Elimination of Cumulative Exchangeable Redeemable Preferred Stock of Collins & Aikman Corporation is hereby incorporated by reference to Exhibit 3.3 of Collins & Aikman Corporation's Report on Form 10-Q for the fiscal quarter ended October 28, 1995. |
| 4.1 | Specimen Stock Certificate for the Common Stock is hereby incorporated by reference to Exhibit 4.3 of Amendment No. 3 to Collins & Aikman Holdings Corporation's Registration Statement on Form S-2 (Registration No. 33-53179) filed June 21, 1994. |
| 4.2 | Indenture, dated as of June 1, 1996, between Collins & Aikman Products Co., Collins & Aikman Corporation and First Union National Bank of North Carolina, as Trustee, is hereby incorporated by reference to Exhibit 4.2 of Collins & Aikman Corporation's Report on Form 10-Q for the fiscal quarter ended April 27, 1996. |
| 4.3 | First Supplemental Indenture dated as of June 1, 1996, between Collins & Aikman Products Co., Collins & Aikman Corporation and First Union National Bank of North Carolina, as Trustee, is hereby incorporated by reference to Exhibit 4.3 of Collins & Aikman Corporation's Report on Form 10-Q for the fiscal quarter ended April 27, 1996. |
| 4.4 | Waiver dated as of October 27, 1998 under the Credit Agreement dated as of May 28, 1998, among Collins & Aikman Products Co., Collins & Aikman Canada, Inc. and Collins & Aikman Plastics, Ltd., as Canadian Borrowers, Collins & Aikman Corporation, as Guarantor, the Lender Parties thereto, Bank of America, N.T.S.A., as Documentation Agent, The Chase Manhattan Bank, as Administrative Agent, and The Chase Manhattan Bank of Canada, as Canadian Administrative Agent is hereby incorporated by reference to Exhibit 4.5 of Collins & Aikman Corporation's Report on Form 10-Q for the fiscal quarter ended September 26, 1998. |
| 4.5 | Waiver dated as of December 22, 1998 under the Credit Agreement dated as of May 28, 1998, among Collins & Aikman Products Co., Collins & Aikman Canada, Inc. and Collins & Aikman Corporation, as Guarantor, the Lender Parties thereto, Bank of America, N.T.S.A., as Documentation Agent, The Chase Manhattan Bank, as Administrative Agent, and The Chase Manhattan Bank of Canada, as Canadian Administrative Agent is hereby incorporated by reference to Exhibit 4.6 of Collins & Aikman Corporation's Report on Form 10-K for the year ended December 26, 1998. |
| 4.6 | Amendment and Waiver dated as of March 8, 1999, among Collins & Aikman Products Co., Collins & Aikman Canada, Inc., Collins & Aikman Plastics Ltd., Collins & Aikman Corporation, as Guarantor, the Lender Parties thereto, Bank of America N.T.S.A., as Documentation Agent, The Chase Manhattan Bank, as Administrative Agent, and The Chase Manhattan Bank of Canada, as Canadian Administrative Agent is hereby incorporated by reference to Exhibit 4.7 of Collins & Aikman Corporation's Report on Form 10-K for the year ended December 26, 1998. |
| 4.7 | Tranche C Term Loan Supplement dated as of May 12, 1999 to the Credit Agreement dated as of May 28, 1998 among Collins & Aikman Products Co., Collins & Aikman Canada, Inc., Collins & Aikman Plastics, Ltd., Collins & Aikman Corporation, the Financial Institutions parties thereto, Bank of America N.T.S.A., as Documentation Agent, The Chase Manhattan Bank, as Administrative Agent, and The Chase Manhattan Bank of Canada, as Canadian Administrative Agent is hereby incorporated by reference to Exhibit 4.1 of Collins & Aikman Corporation's Report on Form 10-Q for the fiscal quarter ended June 26, 1999. |
| 4.8 | Indenture dated as of June 28, 1994, between JPS Automotive Products Corp., as Issuer, JPS Automotive L.P., as Guarantor and Shawmut Bank Connecticut, N.A., as Trustee, is hereby incorporated by reference to Exhibit 4.2 of JPS Automotive Corp.'s Registration Statement on Form S-1, Registration No. 33-75510. |
| 4.9 | First Supplemental Indenture, dated as of October 5, 1994, between JPS Automotive Products Corp. and JPS Automotive L.P., as Co-Obligors, and Shawmut Bank Connecticut, N.A., as Trustee is hereby incorporated by reference to Exhibit 4.48A of JPS Automotive L.P.'s and JPS Automotive Products Corp.'s Report on Form 10-Q for the fiscal quarter ended October 2, 1994. |

S-3

| Exhibit Number | Description |
|---|---|
| 4.10 | Second Supplemental Indenture, dated as of February 8, 2001, by and among Collins & Aikman Products Co., as Issuer, Collins & Aikman Corporation, as Guarantor, and First Union National Bank, as Trustee, which is incorporated by reference to Exhibit 4.11 of Collins & Aikman Corporation's Annual Report on Form 10-K for the fiscal year ended December 31, 2000. |
| 4.11 | Form of Warrant is hereby incorporated by reference to Exhibit 4.1 of Collins & Aikman Corporation's Current Report on Form 8-K dated July 13, 2001. |
| 4.12 | Certificate of Designation of Series A Redeemable Preferred Stock, Series B Redeemable Preferred Stock and Series C Redeemable Preferred Stock, which is incorporated herein by reference to Exhibit 4.1 of Collins & Aikman Corporation's Current Report of Form 8-K dated December 20, 2001 and filed on January 4, 2002. |
| 4.13 | Indenture dated as of December 20, 2001 by and among Collins & Aikman Products Co., as Issuer, the Guarantors parties thereto, and BNY Midwest Trust Company, as Trustee, which is incorporated herein by reference to Exhibit 4.2 of Collins & Aikman Corporation's Current Report on Form 8-K dated December 20, 2001 and filed on January 4, 2002. |
| 4.14 | Receivables Transfer Agreement dated as of December 20, 2001 by and among Carcorp, Inc., as Transferor, Collins & Aikman Products Co., individually and as Collection Agent, the persons parties thereto, as CP Conduit Purchasers, Committed Purchasers and Funding Agents and JPMorgan Chase Bank, as Administrative Agent, which is incorporated herein by reference to Exhibit 4.3 of Collins & Aikman Corporation's Current Report on Form 8-K dated December 20, 2001 and filed on January 4, 2002. |
| 4.15 | Amended and Restated Receivables Purchase Agreement dated as of December 20, 2001 among Collins & Aikman Products Co. and its wholly-owned direct and indirect subsidiaries named therein, as Sellers, and Carcorp, Inc., as Purchaser, and the other Sellers from time to time named therein, which is incorporated herein by reference to Exhibit 4.4 of Collins & Aikman Corporation's Current Report on Form 8-K dated December 20, 2001 and filed on January 4, 2002. |
| 4.16 | Credit Agreement dated as of December 20, 2001 among Collins & Aikman Products Co., as Borrower, Collins & Aikman Canada Inc., as a Canadian Borrower, Collins & Aikman Plastics, Ltd., as a Canadian Borrower, Collins & Aikman Corporation, the Lenders named therein, Deutsche Banc Alex. Brown Inc. and Merrill Lynch Capital Corporation, as Co-Documentation Agents, Credit Suisse First Boston Corporation, as Syndication Agent, JPMorgan Chase Bank, as Administrative Agent, and J.P.Morgan Bank Canada, as Canadian Administrative Agent, which is incorporated herein by reference to Exhibit 4.5 of Collins & Aikman Corporation's Current Report on Form 8-K dated December 20, 2001 and filed on January 4, 2002. |
| 4.17 | First Amendment dated as of December 13, 2002, to the Credit Agreement dated as of December 20, 2001 among Collins & Aikman Products Co., as Borrower, Collins & Aikman Canada Inc., as a Canadian Borrower, Collins & Aikman Plastics, Ltd., as a Canadian Borrower, Collins & Aikman Corporation, the Lenders named therein, Credit Suisse First Boston Corporation, as Syndication Agent, Deutsche Banc Alex. Brown Inc.) and Merrill Lynch Capital Corporation, as Co-Documentation Agents, JPMorgan Chase Bank, as Administrative Agent, and J.P. Morgan Bank Canada, as Canadian Administrative Agent.* |
| 4.18 | Guarantee and Collateral Agreement dated as of December 20, 2001 by and among Collins & Aikman Corporation, Collins & Aikman Products Co. and certain of their subsidiaries and JPMorgan Chase Bank, as Collateral Agent, which is incorporated herein by reference to Exhibit 4.6 of Collins & Aikman Corporation's Current Report on Form 8-K dated December 20, 2001 and filed on January 4, 2002. |
| 4.19 | Third Supplemental Indenture, dated as of December 20, 2001, among Collins & Aikman Products Co., Collins & Aikman Corporation, the Subsidiary Guarantors listed on the signature page thereto, and First Union National Bank (as successor in interest to First Union National Bank of North Carolina), which is incorporated herein by reference to Exhibit 4.7 of Collins & Aikman Corporation's Current Report on Form 8-K dated December 20, 2001 and filed on January 4, 2002. |

S-4

| Exhibit Number | Description |
|---|---|
| 10.1 | Stockholders Agreement, dated February 23, 2001, by and among Collins & Aikman Corporation, Heartland Industrial Partners, L.P. and other investor stockholders listed on Schedule 1 thereto, Blackstone Capital Company II, L.L.C., Blackstone Family Investment Partnership I L.P., Blackstone Advisory Directors Partnership L.P., Blackstone Capital Partners L.P., and Wasserstein/ C&A Holdings, L.L.C., incorporated by reference to Annex E to Exhibit 10.1 to Collins & Aikman Corporation's Current Report on Form 8-K dated January 12, 2001. |
| 10.2 | Employment Agreement dated as of July 18, 1990 between Wickes Companies, Inc. and an executive officer is hereby incorporated by reference to Exhibit 10.3 of Wickes Companies, Inc.'s Report on Form 10-K for the fiscal year ended January 26, 1991. |
| 10.3 | Employment Agreement dated as of July 22, 1992 between Collins & Aikman Corporation and an executive officer is hereby incorporated by reference to Exhibit 10.7 of Collins & Aikman Holdings Corporation's Report on Form 10-K for the fiscal year ended January 30, 1993. |
| 10.4 | First Amendment to Employment Agreement dated as of February 24, 1994 between Collins & Aikman Corporation and an executive officer is hereby incorporated by reference to Exhibit 10.7 of Collins & Aikman Holdings Corporation's Registration Statement on Form S-2 (Registration No. 33-53179) filed April 19, 1994. |
| 10.5 | Second Amendment, dated as of October 3, 1996, to the Employment Agreement, dated as of July 22, 1992, as amended, between Collins & Aikman Products Co. and an executive officer is hereby incorporated by reference to Exhibit 10.26 of Collins & Aikman Corporation's Report on Form 10-Q for the fiscal quarter ended October 26, 1996. |
| 10.6 | Third Amendment dated as of August 1, 1997, to the Employment Agreement dated as of July 22, 1992, as amended, between the Corporation and an executive officer is hereby incorporated by reference to Exhibit 10.35 of Collins & Aikman Corporation's Report on Form 10-Q for the fiscal quarter ended September 27, 1997. |
| 10.7 | Letter Agreement dated March 23, 1999 with an executive officer is hereby incorporated by reference to Exhibit 10.7 of Collins & Aikman Corporation's Report on Form 10-K for the fiscal year ended December 26, 1998. |
| 10.8 | Amended and Restated Employment Agreement dated as of January 20, 1999 between Collins & Aikman Products Co. and an executive officer is hereby incorporated by reference to Collins & Aikman Corporation's Report on Form 10-K for the fiscal year ended December 26, 1998. |
| 10.9 | Employment Agreement dated as of January 20, 1999 between Collins & Aikman Products Co. and an executive officer is hereby incorporated by reference to Exhibit 10.9 of Collins & Aikman Corporation's Form 10-K for the fiscal year ended December 26, 1998. |
| 10.10 | Employment Agreement dated as of April 22, 1999 between Collins & Aikman Corporation and an executive officer is hereby incorporated by reference to Exhibit 10.10 of Collins & Aikman Corporation's Report on Form 10-Q for the fiscal quarter ended March 27, 1999. |
| 10.11 | Employment Agreement, dated as of March 29, 2000, between Collins & Aikman Products Co. and an executive officer is hereby incorporated by reference to Exhibit 10.1 of Collins & Aikman Corporation's Report on Form 10-Q for the fiscal quarter ended April 1, 2000. |
| 10.12 | Employment Agreement, dated as of April 1, 2000, between Collins & Aikman Products Co. and an executive officer is hereby incorporated by reference to Exhibit 10.3 of Collins & Aikman Corporation's Report on Form 10-Q for the fiscal quarter ended July 1, 2000. |
| 10.13 | Employment Agreement, dated as of August 1, 2000, between Collins & Aikman Products Co. and an executive officer is hereby incorporated by reference to Exhibit 10.6 of Collins & Aikman Corporation's Report on Form 10-Q for the fiscal quarter ended September 30, 2000. |
| 10.14 | Employment Agreement, dated as of August 1, 2000, between Collins & Aikman Products Co. and an executive officer is hereby incorporated by reference to Exhibit 10.8 of Collins & Aikman Corporation's Report on Form 10-Q for the fiscal quarter ended September 30, 2000. |

| Exhibit Number | Description |
|---|---|
| 10.15 | Letter agreement, dated as of May 12, 1999, with an executive officer is hereby incorporated by reference to Exhibit 10.2 of Collins & Aikman Corporation's Report on Form 10-Q for the fiscal quarter ended June 26, 1999. |
| 10.16 | Letter agreement, dated as of April 7, 2000, between Collins & Aikman Corporation and an executive officer is hereby incorporated by reference to Exhibit 10.12 of Collins & Aikman Corporation's Report on Form 10-Q for the fiscal quarter ended September 30, 2000. |
| 10.17 | Letter agreement, dated as of July 13, 2000, between Collins & Aikman Corporation and an executive officer is hereby incorporated by reference to Exhibit 10.11 of Collins & Aikman Corporation's Report on Form 10-Q for the fiscal quarter ended September 30, 2000. |
| 10.18 | Service contract between Collins & Aikman Products GmbH and an executive officer is hereby incorporated by reference to Exhibit 10.5 of Collins & Aikman Corporation's Report on Form 10-Q for the fiscal quarter ended September 30, 2000. |
| 10.19 | Settlement Agreement dated as of April 27, 2000, between Collins & Aikman Products Co. and an executive officer is hereby incorporated by reference to Exhibit 10.10 of Collins & Aikman Corporation's Report on Form 10-Q for the fiscal quarter ended September 30, 2000. |
| 10.20 | Collins & Aikman Corporation 1998 Executive Incentive Compensation Plan is hereby incorporated by reference to Exhibit 10.10 of Collins & Aikman Corporation's Report on Form 10-K for the fiscal year ended December 26, 1998. |
| 10.21 | Collins & Aikman Products Co. 2000 Executive Incentive Compensation Plan is hereby incorporated by reference to Exhibit 10.5 of Collins & Aikman Corporation's Report on Form 10-Q for the fiscal quarter ended July 1, 2000. |
| 10.22 | Collins & Aikman Corporation Supplemental Retirement Income Plan is hereby incorporated by reference to Exhibit 10.23 of Amendment No. 5 to Collins & Aikman Holdings Corporation's Registration Statement on Form S-2 (Registration No. 33-53179) filed July 6, 1994. |
| 10.23 | Amendment to Collins & Aikman Corporation Supplemental Retirement Income Plan is hereby incorporated by reference to Exhibit 10.12 of the Collins & Aikman Corporation's Report on Form 10-K for the fiscal year ended December 26, 1998. |
| 10.24 | 1993 Employee Stock Option Plan, as amended and restated, is hereby incorporated by reference to Exhibit 10.13 of Collins & Aikman Corporation's Report on Form 10-Q for the fiscal quarter ended April 29, 1995. |
| 10.25 | 1994 Employee Stock Option Plan, as amended through February 7, 1997, is hereby incorporated by reference to Exhibit 10.12 of Collins & Aikman Corporation's Report on Form 10-Q for the fiscal quarter ended March 29, 1997. |
| 10.26 | 2000 Employee Stock Option Plan is hereby incorporated by reference to Exhibit 10.6 of Collins & Aikman Corporation's Report on Form 10-Q for the fiscal quarter ended July 1, 2000. |
| 10.27 | 1994 Directors Stock Option Plan as amended and restated is hereby incorporated by reference to Exhibit 10.15 to Collins & Aikman Corporation's Report on Form 10-K for the year ended December 26, 1998. |
| 10.28 | Excess Benefit Plan of Collins & Aikman Corporation is hereby incorporated by reference to Exhibit 10.25 of Collins & Aikman Corporation's Report on Form 10-K for the fiscal year ended January 28, 1995. |
| 10.29 | 1994 Employee Stock Option Plan, as amended and restated through June 3, 1999 is hereby incorporated by reference to Exhibit 10.2 of Collins & Aikman Corporation's Report on Form 10-Q for the fiscal quarter ended June 26, 1999. |
| 10.30 | Change in Control Agreement, dated March 17, 1998, between Collins & Aikman Corporation and an executive officer is hereby incorporated by reference to Exhibit 10.17 of Collins & Aikman Corporation's Report on Form 10-K for the fiscal year ended December 27, 1997. |
| 10.31 | Change in Control Agreement, dated March 17, 1998, between Collins & Aikman Corporation and an executive officer is hereby incorporated by reference to Exhibit 10.18 of Collins & Aikman Corporation's Report on Form 10-K for the fiscal year ended December 27, 1997. |

| Exhibit Number | Description |
|---|---|
| 10.32 | Change in Control Agreement, dated March 17, 1998, between Collins & Aikman Corporation and an executive officer is hereby incorporated by reference to Exhibit 10.19 of Collins & Aikman Corporation's Report on Form 10-K for the fiscal year ended December 27, 1997. |
| 10.33 | Change in Control Agreement, dated March 17, 1998, between Collins & Aikman Corporation and an executive officer is hereby incorporated by reference to Exhibit 10.20 of Collins & Aikman Corporation's Report on Form 10-K for the fiscal year ended December 27, 1997. |
| 10.34 | Change in Control Agreement, dated March 17, 1998, between Collins & Aikman Corporation and an executive officer is hereby incorporated by reference to Exhibit 10.22 of Collins & Aikman Corporation's Report on Form 10-Q for the fiscal quarter ended March 28, 1998. |
| 10.35 | Change in Control Agreement, dated August 9, 1999, between Collins & Aikman Corporation and an executive officer is hereby incorporated by reference to Exhibit 10.25 of Collins & Aikman Corporation's Report on Form 10-K for the fiscal year ended December 25, 1999. |
| 10.36 | Change in Control Agreement, dated March 17, 1998, between Collins & Aikman Corporation and an executive officer is hereby incorporated by reference to Exhibit 10.26 of Collins & Aikman Corporation's Report on Form 10-K for the fiscal year ended December 25, 1999. |
| 10.37 | Change in Control Agreement, dated March 17, 1998, between Collins & Aikman Corporation and an executive officer is hereby incorporated by reference to Exhibit 10.27 of Collins & Aikman Corporation's Report on Form 10-K for the fiscal year ended December 25, 1999. |
| 10.38 | Change in Control Agreement, dated July 26, 1999, between Collins & Aikman Corporation and an executive officer is hereby incorporated by reference to Exhibit 10.28 of Collins & Aikman Corporation's Report on Form 10-K for the fiscal year ended December 25, 1999. |
| 10.39 | Change in Control Agreement, dated March 17, 1998, between Collins & Aikman Corporation and an executive officer is hereby incorporated by reference to Exhibit 10.29 of Collins & Aikman Corporation's Report on Form 10-K for the fiscal year ended December 25, 1999. |
| 10.40 | Change in Control Agreement, dated as of April, 2000, between Collins & Aikman Corporation and an executive officer is hereby incorporated by reference to Exhibit 10.2 of Collins & Aikman Corporation's Report on Form 10-Q for the fiscal quarter ended July 1, 2000. |
| 10.41 | Change in Control Agreement, dated as of April 1, 2000, between Collins & Aikman Products Co. and an executive officer is hereby incorporated by reference to Exhibit 10.4 of Collins & Aikman Corporation's Report on Form 10-Q for the fiscal quarter ended July 1, 2000. |
| 10.42 | Change in Control Agreement, dated as of August 1, 2000, between Collins & Aikman Corporation and an executive officer is hereby incorporated by reference to Exhibit 10.7 of Collins & Aikman Corporation's Report on Form 10-Q for the fiscal quarter ended September 30, 2000. |
| 10.43 | Change in Control Agreement, dated as of August 1, 2000, between Collins & Aikman Corporation and an executive officer is hereby incorporated by reference to Exhibit 10.9 of Collins & Aikman Corporation's Report on Form 10-Q for the fiscal quarter ended September 30, 2000. |
| 10.44 | Lease, executed as of the 1st day of June 1987, between Dura Corporation and Dura Acquisition Corp. is hereby incorporated by reference to Exhibit 10.24 of Amendment No. 5 to Collins & Aikman Holdings Corporation's Registration Statement on Form S-2 (Registration No. 33-53179) filed July 6, 1994. |
| 10.45 | Master Equipment Lease Agreement dated as of September 30, 1994, between NationsBanc Leasing Corporation of North Carolina and Collins & Aikman Products Co. is hereby incorporated by reference to Exhibit 10.27 of Collins & Aikman Corporation's Report on Form 10-Q for the fiscal quarter ended October 29, 1994. |
| 10.46 | Equity Purchase Agreement by and among JPSGP, Inc., Foamex-JPS Automotive L.P. and Collins & Aikman Products Co. dated August 28, 1996 is hereby incorporated by reference to Exhibit 2.1 of Collins & Aikman Corporation's Report on Form 10-Q for the fiscal quarter ended July 27, 1996. |

| Exhibit Number | Description |
|---|---|
| 10.47 | Amendment No. 1 to Equity Purchase Agreement by and among JPSGP, Inc., Foamex-JPS Automotive L.P., Foamex International Inc. and Collins & Aikman Products Co. dated as of December 11, 1996 is hereby incorporated by reference to Exhibit 2.2 of Collins & Aikman Corporation's Current Report on Form 8-K dated December 10, 1996. |
| 10.48 | Equity Purchase Agreement by and among Seiren U.S.A. Corporation, Seiren Automotive Textile Corporation, Seiren Co., Ltd. and Collins & Aikman Products Co. dated December 11, 1996, is hereby incorporated by reference to Exhibit 2.3 of Collins & Aikman Corporation's Current Report on Form 8-K dated December 10, 1996. |
| 10.49 | Acquisition Agreement between Perstorp A.B. and Collins & Aikman Products Co. dated December 11, 1996 is hereby incorporated by reference to Exhibit 2.4 of Collins & Aikman Corporation's Current Report on Form 8-K dated December 10, 1996. |
| 10.50 | Agreement among Perstorp A.B., Perstorp GmbH, Perstorp Biotec A.B. and Collins & Aikman Products Co. dated December 11, 1996 is hereby incorporated by reference to Exhibit 2.5 of Collins & Aikman Corporation's Current Report on Form 8-K dated December 10, 1996. |
| 10.51 | Settlement and Amendment Agreement dated as of December 16, 1997 by and among Collins & Aikman Products Co., Perstorp A.B., Perstorp GmbH, Collins & Aikman Holding A.B., Collins & Aikman Automotive Systems GmbH, Collins & Aikman Automotive Systems N.V., Collins & Aikman Automotive Systems A.B. and Perstorp Components GmbH and related Letter Amendment Agreement is hereby incorporated by reference to Exhibit 10.38 of Collins & Aikman Corporation's Report or Form 10-Q for the fiscal quarter ended September 26, 1998. |
| 10.52 | Acquisition Agreement dated as of December 9, 1996 among Collins & Aikman Products Co., Collins & Aikman Floor Coverings Group, Inc., Collins & Aikman Floor Coverings, Inc., CAF Holdings, Inc. and CAF Acquisition Corp. is hereby incorporated by reference to Exhibit 2.7 of Collins & Aikman Corporation's Current Report on Form 8-K dated December 10, 1996. |
| 10.53 | Mastercraft Group Acquisition Agreement dated as of April 25, 1997 among Collins & Aikman Products Co., Joan Fabrics Corporation and MC Group Acquisition Company L.L.C., is hereby incorporated by reference to Exhibit 2.1 of Collins & Aikman Corporation's Report on Form 10-Q for the fiscal quarter ended March 29, 1997. |
| 10.54 | Asset Purchase Agreement dated as of June 30, 1997 by and between JPS Automotive L.P. and Safety Components International, Inc. is hereby incorporated by reference to Exhibit 2.1 of JPS Automotive L.P.'s and JPS Automotive Products Corp.'s Current Report on Form 8-K dated July 24, 1997. |
| 10.55 | Closing Agreement dated July 24, 1997 between JPS Automotive L.P., Safety Components International, Inc. and Safety Components Fabric Technologies, Inc. is hereby incorporated by reference to Exhibit 2.2 of JPS Automotive L.P.'s and JPS Automotive Products Corp.'s Current Report on Form 8-K dated July 24, 1997. |
| 10.56 | Amended and Restated Acquisition Agreement dated as of November 4, 1997 and amended and restated as of March 9, 1998, among Collins & Aikman Products Co., Imperial Wallcoverings Inc. and BDPI Holdings Corporation is hereby incorporated by reference to Exhibit 2.4 of Collins & Aikman Corporation's Report on Form 10-K for the fiscal year ended December 27, 1997. |
| 10.57 | Share Purchase Agreement, dated as of January 12, 2001, between Collins & Aikman Corporation and Heartland Industrial Partners, L.P., is hereby incorporated by reference to Exhibit 10.1 of Collins & Aikman Corporation's Report on Form 8-K dated January 12, 2001., incorporated by reference to Exhibit 10.1 to Collins & Aikman Corporation's Current Report on Form 8-K dated January 12, 2001. |

S-8

| Exhibit Number | Description |
|---|---|
| 10.58 | Registration Rights Agreement, dated February 23, 2001, by and among Collins & Aikman Corporation, Heartland Industrial Partners, L.P. and the other investor stockholders listed on Schedule 1 thereto, Blackstone Capital Company II, L.L.C., Blackstone Family Investment Partnership I L.P., Blackstone Advisory Directors Partnership L.P., Blackstone Capital Partners, L.P. and Wasserstein/ C&A Holdings, L.L.C., incorporated by reference to Annex D to Exhibit 10.1 to Collins & Aikman Corporation's Current Report on Form 8-K dated January 12, 2001. |
| 10.59 | Services Agreement, dated as of February 23, 2001, by and among Collins & Aikman Corporation, Collins & Aikman Products Co. and Heartland Industrial Partners, L.P is hereby incorporated by reference to Exhibit 10.59 of Collins & Aikman Corporation's Report on Form 10-K for the year ended December 31, 2001. |
| 10.60 | Profit Participation Interest Agreement, dated as of February 23, 2001, by and among Heartland Industrial Partners, L.P. and the other investor stockholders listed on Schedule 1 thereto and each of Collins & Aikman Corporation, Blackstone Capital Company II, L.L.C. and Wasserstein/ C&A Holdings, L.L.C., incorporated by reference to Annex B to Exhibit 10.1 to Collins & Aikman Corporation's Current Report on Form 8-K dated January 12, 2001. |
| 10.61 | Employment Agreement dated October 1, 1999 between Collins & Aikman Products Co. and an executive officer is hereby incorporated by reference to Exhibit 10.30 of Collins & Aikman Corporation's Report on Form 10-K for the fiscal year ended December 25, 1999. |
| 10.62 | Severance Benefit Agreement dated July 26, 1999 between Collins & Aikman Corporation and an executive officer is hereby incorporated by reference to Exhibit 10.31 of Collins & Aikman Corporation's Report on Form 10-K for the fiscal year ended December 25, 1999. |
| 10.63 | Severance Benefit Agreement dated August 9, 1999 between Collins & Aikman Corporation and an executive officer is hereby incorporated by reference to Exhibit 10.32 of Collins & Aikman Corporation's Report on Form 10-K for the fiscal year ended December 25, 1999. |
| 10.64 | Letter Agreement dated December 17, 1999 between Collins & Aikman Corporation and an executive officer is hereby incorporated by reference to Exhibit 10.33 of Collins & Aikman Corporation's Report on Form 10-K for the fiscal year ended December 25, 1999. |
| 10.65 | Employment Agreement dated December 1, 2000 between Collins & Aikman Products Co. and an executive officer, which is incorporated by reference to Exhibit 10.75 of Collins & Aikman Corporation's Annual Report on Form 10-K for the fiscal year ended December 31, 2000. |
| 10.66 | Separation Agreement dated as of March 12, 2001 between Collins & Aikman Products Co. and an executive officer, which is incorporated by reference to Exhibit 10.1 to the Company's Quarterly Report on Form 10-Q for the quarter ended March 31, 2001. |
| 10.67 | Employment Agreement dated as of March 29, 2000 between Collins & Aikman Products Co. and an executive officer is hereby incorporated by reference to Exhibit 10.1 of Collins & Aikman Corporation's Report on Form 10-Q for the quarter ended April 1, 2000. |
| 10.68 | Change in Control Agreement dated as of April 2000, between Collins & Aikman Corporation and an executive officer is hereby incorporated by reference to Exhibit 10.2 of Collins & Aikman Corporation's Report on Form 10-Q for the quarter ended July 1, 2000. |
| 10.69 | Employment Agreement dated as of April 1, 2000, between Collins & Aikman Products Co. and an executive officer is hereby incorporated by reference to Exhibit 10.3 of Collins & Aikman Corporation's Report on Form 10-Q for the quarter ended July 1, 2000. |
| 10.70 | Change in Control Agreement dated as of April 1, 2000, between Collins & Aikman Products Co. and an executive officer is hereby incorporated by reference to Exhibit 10.4 of Collins & Aikman Corporation's Report on Form 10-Q for the quarter ended July 1, 2000. |
| 10.71 | Service Contract between Collins & Aikman Products GmbH and an executive officer, which is incorporated by reference to Exhibit 10.5 of Collins & Aikman Corporation's Quarterly Report on Form 10-Q for the quarter ended June 30, 2001. |
| 10.72 | Employment Agreement dated as of August 1, 2000, between Collins & Aikman Products Co. and an executive officer, which is incorporated by reference to Exhibit 10.6 of Collins & Aikman Corporation's Quarterly Report on Form 10-Q for the quarter ended June 30, 2001. |

S-9

| Exhibit Number | Description |
|---|---|
| 10.73 | Change in Control Agreement dated as of August 1, 2000, between Collins & Aikman Corporation and an executive officer, which is incorporated by reference to Exhibit 10.7 of Collins & Aikman Corporation's Quarterly Report on Form 10-Q for the quarter ended June 30, 2001. |
| 10.74 | Employment Agreement dated as of August 1, 2000, between Collins & Aikman Products Co. and an executive officer, which is incorporated by reference to Exhibit 10.8 of Collins & Aikman Corporation's Quarterly Report on Form 10-Q for the quarter ended June 30, 2001. |
| 10.75 | Change in Control Agreement dated as of August 1, 2000, between Collins & Aikman Corporation and an executive officer, which is incorporated by reference to Exhibit 10.9 of Collins & Aikman Corporation's Quarterly Report on Form 10-Q for the quarter ended June 30, 2001. |
| 10.76 | Settlement Agreement dated as of April 27, 2000, between Collins & Aikman Products Co. and an executive officer, which is incorporated by reference to Exhibit 10.10 of Collins & Aikman Corporation's Quarterly Report on Form 10-Q for the quarter ended June 30, 2001. |
| 10.77 | Letter Agreement dated as of July 13, 2000, between Collins & Aikman Corporation and an executive officer, which is incorporated by reference to Exhibit 10.11 of Collins & Aikman Corporation's Quarterly Report on Form 10-Q for the quarter ended June 30, 2001. |
| 10.78 | Letter Agreement dated as of April 7, 2000, between Collins & Aikman Corporation and an executive officer, which is incorporated by reference to Exhibit 10.12 of Collins & Aikman Corporation's Quarterly Report on Form 10-Q for the quarter ended June 30, 2001. |
| 10.79 | Collins & Aikman Products Co. 2000 Executive Incentive Compensation Plan is hereby incorporated by reference to Exhibit 10.5 of Collins & Aikman Corporation's Report on Form 10-Q for the quarter ended July 1, 2000. |
| 10.80 | Agreement of Sale and Purchase, dated as of June 22, 2001, by and among Collins & Aikman Products Co. and New King, L.L.C is hereby incorporated by reference to Exhibit 10.81 of Collins & Aikman Corporation's Report on Form 10-K for the year ended December 31, 2001. |
| 10.81 | Lease Agreement, dated as of June 29, 2001, between New King, L.L.C., as landlord, and Collins & Aikman Products Co., as tenant is hereby incorporated by reference to Exhibit 10.82 of Collins & Aikman Corporation's Report on Form 10-K for the year ended December 31, 2001. |
| 10.82 | Agreement of Sale and Purchase, dated as of June 22, 2001, by and among Collins & Aikman Products Co. and Anchor Court, L.L.C is hereby incorporated by reference to Exhibit 10.83 of Collins & Aikman Corporation's Report on Form 10-K for the year ended December 31, 2001. |
| 10.83 | Lease Agreement, dated as of June 29, 2001, between Anchor Court, L.L.C., as landlord and Collins & Aikman Products Co., as tenant is hereby incorporated by reference to Exhibit 10.84 of Collins & Aikman Corporation's Report on Form 10-K for the year ended December 31, 2001. |
| 10.84 | Stockholders Agreement dated July 3, 2001, by and among Collins & Aikman Corporation, Heartland Industrial Partners, L.P. and the other Heartland Entities named therein, the Becker Stockholders party thereto and the Joan Stockholders party thereto is hereby incorporated by reference to Exhibit 10.85 of Collins & Aikman Corporation's Report on Form 10-K for the year ended December 31, 2001. |
| 10.85 | Registration Rights Agreement, dated July 3, 2001, by and among Collins & Aikman Corporation, Charles E. Becker, Michael E. McInerney and Jens Höhnel and, together with the Joan Investors (as defined therein) is hereby incorporated by reference to Exhibit 10.86 of Collins & Aikman Corporation's Report on Form 10-K for the year ended December 31, 2001. |
| 10.86 | First Amendment to Services Agreement, dated as of August 7, 2001, among Collins & Aikman Corporation, Collins & Aikman Products Co. and Heartland Industrial Partners, L.P is hereby incorporated by reference to Exhibit 10.87 of Collins & Aikman Corporation's Report on Form 10-K for the year ended December 31, 2001. |

| Exhibit Number | Description |
|---|---|
| 10.87 | Equipment Lease, dated as of December 18, 2001, among Textron Automotive Exteriors Inc. and Textron Automotive Interiors Inc., collectively as lessee, and IAC TAX V, LLC, as lessor is hereby incorporated by reference to Exhibit 10.88 of Collins & Aikman Corporation's Report on Form 10-K for the year ended December 31, 2001. |
| 10.88 | Registration Rights Agreement, dated December 20, 2001, by and among Collins & Aikman Products Co., Collins & Aikman Corporation, and each of the subsidiaries listed on the signature pages thereof, and J.P. Morgan Securities Inc., Credit Suisse First Boston Corporation, Deutsche Banc Alex. Brown Inc. and Merrill Lynch, Pierce, Fenner & Smith Incorporated and the other several initial purchasers parties to the Purchase Agreement is hereby incorporated by reference to Exhibit 10.89 of Collins & Aikman Corporation's Report on Form 10-K for the year ended December 31, 2001. |
| 10.89 | Registration Rights Agreement dated as of December 20, 2001 by and among Becker Ventures, LLC, Dresdner Kleinwort Capital Partners 2001 LP, Masco Capital Corporation, ML IBK Positions, Inc. and Collins & Aikman Corporation is hereby incorporated by reference to Exhibit 10.90 of Collins & Aikman Corporation's Report on Form 10-K for the year ended December 31, 2001. |
| 10.90 | Registration Rights Agreement, dated December 20, 2001, by and between Collins & Aikman Corporation, Textron Inc., and Textron Holdco Inc is hereby incorporated by reference to Exhibit 10.91 of Collins & Aikman Corporation's Report on Form 10-K for the year ended December 31, 2001. |
| 10.91 | Preferred Stock Registration and Other Rights Agreement, dated as of December 20, 2001, by and among Collins & Aikman Products Co. and Textron Inc is hereby incorporated by reference to Exhibit 10.92 of Collins & Aikman Corporation's Report on Form 10-K for the year ended December 31, 2001. |
| 10.92 | Intellimold Technology License and Support Agreement, dated as of December 20, 2001, by and between Textron, Inc. and Collins & Aikman Corporation and Collins & Aikman Products Co is hereby incorporated by reference to Exhibit 10.93 of Collins & Aikman Corporation's Report on Form 10-K for the year ended December 31, 2001. |
| 10.93 | Technology License Agreement (Retained IP), dated as of December 20, 2001, by and between Textron, Inc. and Collins & Aikman Corporation and Collins & Aikman Products Co is hereby incorporated by reference to Exhibit 10.94 of Collins & Aikman Corporation's Report on Form 10-K for the year ended December 31, 2001. |
| 10.94 | Technology License Agreement (Licensed-Back IP), dated as of December 20, 2001, by and between Textron, Inc. and Collins & Aikman Corporation and Collins & Aikman Products Co is hereby incorporated by reference to Exhibit 10.95 of Collins & Aikman Corporation's Report on Form 10-K for the year ended December 31, 2001. |
| 10.95 | Severance Agreement between Collins & Aikman Automotive Holding GmbH and an executive officer of the Company dated as of March 6, 2002 is hereby incorporated by reference to Exhibit 10.1 of Collins & Aikman Corporation's Report on Form 10-Q for the quarter ended March 31, 2002. |
| 10.96 | Separation Agreement and General Release between Products and an executive officer of the Company dated as of March 5, 2002 is hereby incorporated by reference to Exhibit 10.2 of Collins & Aikman Corporation's Report on Form 10-Q for the quarter ended March 31, 2002. |
| 10.97 | Employment Agreement between Products and an officer of the Company dated as of November 1, 2001 is hereby incorporated by reference to Exhibit 10.3 of Collins & Aikman Corporation's Report on Form 10-Q for the quarter ended March 31, 2002. |
| 10.98 | Employment Agreement between Products and an officer of the Company dated as of November 1, 2001 is hereby incorporated by reference to Exhibit 10.4 of Collins & Aikman Corporation's Report on Form 10-Q for the quarter ended March 31, 2002. |
| 10.99 | Employment Agreement between Products and an officer of the Company dated as of December 20, 2001 is hereby incorporated by reference to Exhibit 10.5 of Collins & Aikman Corporation's Report on Form 10-Q for the quarter ended March 31, 2002. |

| Exhibit Number | Description |
|---|---|
| 10.100 | Employment Agreement between Products and an officer of the Company dated as of December 20, 2001 is hereby incorporated by reference to Exhibit 10.6 of Collins & Aikman Corporation's Report on Form 10-Q for the quarter ended March 31, 2002. |
| 10.101 | Employment Agreement between Products and an officer of the Company dated as of December 20, 2001 is hereby incorporated by reference to Exhibit 10.7 of Collins & Aikman Corporation's Report on Form 10-Q for the quarter ended March 31, 2002. |
| 10.102 | Separation and Consultancy Agreement dated July 31, 2002 is hereby incorporated by reference to Exhibit 10.1 to Collins & Aikman Corporation's Current report on Form 8-K filed August 2, 2002. |
| 10.103 | Severance Benefit Agreement between Collins and Aikman Corporation and an officer of the Company dated April 5, 2002 is hereby incorporated by reference to Exhibit 10.2 of Collins & Aikman Corporation's Report on Form 10-Q for the quarter ended June 30, 2002. |
| 10.104 | Employment and Consulting Agreement between Collins and Aikman Corporation and an Employee dated July 2002 is hereby incorporated by reference to Exhibit 10.1 of Collins & Aikman Corporation's Report on Form 10-Q for the quarter ended September 30, 2002. |
| 10.105 | Separation Agreement between Collins and Aikman Corporation and an officer of the Company dated September 2002 is hereby incorporated by reference to Exhibit 10.2 of Collins & Aikman Corporation's Report on Form 10-Q for the quarter ended September 30, 2002. |
| 10.106 | Separation Agreement between Collins and Aikman Corporation and an officer of the Company dated October 2002 is hereby incorporated by reference to Exhibit 10.3 of Collins & Aikman Corporation's Report on Form 10-Q for the quarter ended September 30, 2002. |
| 11 | Computation of Earnings Per Share.* |
| 12.1 | Computation of Ratio of Earnings to Fixed Charges.* |
| 21 | Subsidiaries of the Registrant.* |
| 23.1 | Consent of PricewaterhouseCoopers LLP.* |
| 24.1 | Powers of Attorney.* |
| 99 | Voting Agreement between Blackstone Capital Partners L.P. and Wasserstein Perella Partners, L.P. is hereby incorporated by reference to Exhibit 99 of Amendment No. 4 to Collins & Aikman Holdings Corporation's Registration Statement on Form S-2 (Registration No. 33-53179) filed June 27, 1994. |
| 99.1 | Certification Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 (Chapter 63, Title 18 U.S.C. 1350(a) and (b)).* |

* Indicates document filed herewith.

S-12

## EXHIBIT 4.17

## FIRST AMENDMENT

FIRST AMENDMENT dated as of December 13, 2002 (this "Amendment"), to the CREDIT AGREEMENT, dated as of December 20, 2001, among COLLINS & AIKMAN PRODUCTS CO., a Delaware corporation (the "Company"), COLLINS & AIKMAN CANADA INC., a Canadian corporation, COLLINS & AIKMAN PLASTICS, LTD., a Canadian corporation, COLLINS & AIKMAN CORPORATION, a Delaware corporation ("Holdings"), the financial institutions parties thereto (the "Lenders"), CREDIT SUISSE FIRST BOSTON, as syndication agent, DEUTSCHE BANK SECURITIES INC. (formerly known as DEUTSCHE BANC ALEX. BROWN INC.) and MERRILL LYNCH CAPITAL CORPORATION, as co-documentation agents, JPMORGAN CHASE BANK, a New York banking corporation ("JPMorgan Chase Bank"), as administrative agent (in such capacity, the "Administrative Agent"), and J.P. MORGAN BANK CANADA, a Canadian chartered bank, as Canadian administrative agent.

WHEREAS pursuant to the Credit Agreement, the Lenders have agreed to make certain loans to the Borrowers; and

WHEREAS the Company has requested that certain provisions of the Credit Agreement be modified in the manner provided for in this Amendment, and the Lenders are willing to agree to such modifications as provided for in this Amendment.

NOW, THEREFORE, the parties hereto hereby agree as follows:

1. Defined Terms. Capitalized terms used and not defined herein shall have the meanings given to them in the Credit Agreement, as amended hereby.

2. Amendments to Section 1.01. Section 1.01 of the Credit Agreement is hereby amended as follows:

(a) the definition of "Capital Expenditures" is hereby amended by adding the following at the end thereof:

"Notwithstanding the foregoing and any contrary provision herein, to the extent that the Borrowers or any Restricted Subsidiary purchases, leases or otherwise acquires assets from any person in a manner which would be subject to Section 6.08 and, but for the first parenthetical herein, would constitute a Capital Expenditure, Holdings may elect to treat the expenditure for such transaction as a Capital Expenditure and such expenditure shall be deemed to be a Capital Expenditure and shall not be subject to the restrictions of Section 6.08."

(b) the definition of "EBITDA" is hereby amended (but not for purposes of determining the Applicable Margin) by deleting "$25,000,000" in clause (xii) thereof and substituting "$55,000,000" in its place.

(c) the definition of "Excluded Collateral" is hereby amended by deleting clause (v) thereof and adding the following in its place:

"(v) accounts receivable, related security, collections and proceeds with respect thereto sold, or purported to be sold, pursuant to a Permitted Receivables Financing (but only for so long as such accounts receivable, related security, collections and proceeds are subject to a Permitted Receivables Financing);"

(d) the definition of "Foreign Subsidiary Letter of Credit" is hereby amended by inserting the following language before the clause "or the Brazilian Subsidiary" at the end thereof:

", except to the extent that Indebtedness has been incurred under clause (viii) of Section 6.01(c),".

(e) the definition of "Prepayment Event" is hereby amended by deleting the word "and" which precedes clause (ii) thereof and adding the following at the end of clause (ii) and before the proviso clause:

"and (iii) any arrangement or transaction entered into in accordance with clause (d) of Section 6.06."

3. Amendment to Section 2.19. Section 2.19(a) of the Credit Agreement is hereby amended by replacing the phrase "the Letter of Credit Exposure in respect of Indebtedness of the Brazilian Subsidiary shall not exceed $30,000,000 and" in clause (i)(y) thereof with the following phrase "the Letter of Credit Exposure in respect of Indebtedness of the Brazilian Subsidiary shall not exceed an amount equal to $30,000,000 less the amount of any Indebtedness incurred under clause (viii) of Section 6.01(c) and".

4. Amendments to Section 5.

(a) Section 5.04(a)(ii) of the Credit Agreement is hereby amended by (i) adding the phrase "and Waterstone Insurance Inc." immediately following the phrase "Carcorp., Inc." therein; (ii) deleting the word "is" immediately following the phrase "Carcorp., Inc." and adding the word "are" in its place and (iii) deleting the phrase "Unrestricted Subsidiary" therein and adding the phrase "Unrestricted Subsidiaries" in its place.

(b) Section 5.04(b)(ii) of the Credit Agreement is hereby amended by (i) adding the phrase "and Waterstone Insurance Inc." immediately following the phrase "Carcorp., Inc." therein; (ii) deleting the word "is" immediately following the phrase "Carcorp., Inc." and adding the word "are" in its place and (iii) deleting the phrase "Unrestricted Subsidiary" therein and adding the phrase "Unrestricted Subsidiaries" in its place.

5. Amendments to Section 6.01.

(a) Section 6.01(a) of the Credit Agreement is hereby amended by adding the following proviso at the end thereof:

"; provided that the amount permitted under the preceding clauses (ii) and (iv) (to the extent relating to clause (ii)) shall be reduced by the amount of any Indebtedness incurred under clause (viii) of Section 6.01(c)";"

(b) Section 6.01(c) of the Credit Agreement is hereby amended by deleting clauses (iv) through (vi) thereof in their entirety and adding the following in its place:

"(iv) any Foreign Restricted Subsidiary to the Company or to any Domestic Restricted Subsidiary in a net aggregate principal amount not at any time in excess of $150,000,000 and evidenced by one or more Intercompany Notes pledged to the Applicable Collateral Agent under the applicable Security Document if the outstanding principal amount of such Indebtedness exceeds $10,000,000 in the aggregate, (v) Holdings to the Company in an aggregate principal amount not greater than $6,000,000 at any time, (vi) Collins & Aikman Plastics, to any Domestic Restricted Subsidiary in a net aggregate amount principal amount not to exceed $35,000,000, evidenced by one or more Intercompany Notes pledged to the Collateral Agent under the Guarantee and Collateral Agreement,"

(c) Section 6.01(c) of the Credit Agreement is further amended by deleting the semicolon at the end of clause (vii) thereof and adding the following at the end thereof:

",(viii) the Brazilian Subsidiary to the Company or to any Domestic Restricted Subsidiary (which Indebtedness may be loaned by the Company or a Domestic Restricted Subsidiary through a Foreign Restricted Subsidiary of the Company and on-loaned by such Foreign Restricted Subsidiary to the Brazilian Subsidiary) in an aggregate principal amount not at any time in excess of $30,000,000 (exclusive of capitalized interest) and evidenced by one or more of the Intercompany Notes held by the Company or a Domestic Restricted Subsidiary pledged to the Applicable Collateral Agent under the applicable Security Document if the outstanding principal amount of such Indebtedness exceeds $10,000,000 in the aggregate and (ix) any Foreign Restricted Subsidiary to the Company or to any Domestic Restricted Subsidiary representing an Investment permitted to be made as an intercompany loan by the Company and its Domestic Restricted Subsidiaries in such Foreign Restricted Subsidiary pursuant to Sections 6.07 (k), (m), (n) and (o) and the last paragraph of Section 6.07 and evidenced by one or more Intercompany Notes pledged to the Applicable Collateral Agent under the applicable Security Document if the outstanding principal amount of such Indebtedness exceeds $10,000,000 in the aggregate;"

6. Amendments to Section 6.06. Section 6.06 of the Credit Agreement is hereby amended by (i) deleting the word "and" before clause (c) thereof and adding a comma in its place and (ii) adding the following after clause (c) thereof:

", (d) such arrangements or transactions with respect to any of the real property of the Borrowers or any of the Restricted Subsidiaries located at 199 Blackhawk Road, Greenville, South Carolina and at 900 Queen Street, Ganonque, Ontario K7G 2W7 so long as the Net Proceeds thereof are used to prepay the Term Loans in accordance with
Section 2.12(g)(i) as though such arrangements or transactions constitute Prepayment

Events; and (e) any such arrangements or transactions (with respect to property not constituting Collateral or, if constituting Collateral, property that remains as Collateral) solely between wholly owned Foreign Restricted Subsidiaries or solely between wholly owned Domestic Restricted Subsidiaries (other than any Domestic Restricted Subsidiaries that are not Guarantors)."

7. Amendments to Section 6.07.

(a) Section 6.07(d) of the Credit Agreement is hereby amended by deleting such Section in its entirety and adding the following in its place:

"(d) intercompany loans permitted to be incurred as Indebtedness under Sections 6.01 (c) (other than clause (viii) thereof) and (r) and Guarantees permitted under Section 6.01;"

(b) Section 6.07(j) of the Credit Agreement is hereby amended deleting the phrase immediately preceding the first comma in its entirety and adding the following in its place:

"Investments to the extent that the consideration therefor is capital stock of Holdings and/or"

(c) Section 6.07(k) of the Credit Agreement is hereby amended by deleting such Section in its entirety and adding the following in its place:

"(k) other Investments, including joint ventures and Investments in Unrestricted Subsidiaries, provided that the consideration for all such Investments (whether cash or property as valued at the time of such Investment, but excluding any capital stock of Holdings or the proceeds thereof) does not exceed (net of any return representing return of capital of (but not return on) any such Investment) at any time $50,000,000 in the aggregate;"

(d) Section 6.07 of the Credit Agreement is further amended by
(i) deleting the word "and" at the end of clause (l) thereof, (ii) deleting the period at the end of clause (m) thereof and adding a semicolon in its place and
(iii) inserting the following below clause (m):

"(n) the acquisition by any Restricted Subsidiary of the business of Delphi Corporation and its subsidiaries conducted principally at facilities in Logrono, Spain; La Rioja, Spain; Zaragoza, Spain; and Azambuja, Portugal and related assets, provided that the purchase price for such acquisition (whether cash or property, as valued at the time of such Investment) does not exceed the equivalent of euro 15,000,000 together with the assumed liabilities, subject to purchase price adjustments based upon the assets and/or working capital delivered at closing; and

(o) Investments in Foreign Restricted Subsidiaries to the extent necessary to meet statutory capital requirements."

(e) The final paragraph of Section 6.07 of the Credit Agreement is amended by deleting the second sentence thereof in its entirety and adding the following in its place:

"Holdings and its Subsidiaries will not make Investments in the Italian JV or any of its businesses or purchase any Capital Stock of the Italian JV (whether by the purchase of Capital Stock or assets or otherwise) after the Closing Date, except (i) Investments made pursuant to Section 6.07(k), (ii) Investments in the form of a Guarantee of (or letter of credit support for) Indebtedness of the Italian JV as permitted by Section 6.01(a) or (iii) Investments necessary to meet the Italian JV's statutory capital requirements. Notwithstanding anything herein to the contrary, if no Default or Event of Default exists or would exist after giving effect thereto, the Company and the Restricted Subsidiaries may either (i) expend up to $23,140,000 (subject to purchase price adjustments of up to an additional $5,000,000 related to the Italian JV as provided in Section 5.20(c) in the Tac-Trim Purchase Agreement) to purchase Capital Stock of the Italian JV on a basis similar to the put/call arrangements set forth in Section 5.20 of the Tac-Trim Purchase Agreement at the times provided therein (or such earlier times as the Company may agree) if such purchase is accretive to Holdings (i.e., after giving effect to such purchase and the financing thereof, if any, and taking into account, without duplication, Indebtedness and outstanding factoring arrangements of the Italian JV and letters of credit issued for the account of or for the benefit of the Italian JV the pro forma Leverage Ratio of Holdings, calculated in a manner, and taking into account pro forma adjustments, satisfactory to the Administrative Agent, decreases) or (ii) purchase the remaining equity interests in the Italian JV not owned by them for an aggregate purchase price (whether cash or property, as valued at the time thereof, but excluding up to $10,000,000 of existing Indebtedness of the Italian JV) not to exceed $20,000,000."

8. Amendment to Section 6.08. Section 6.08(e) of the Credit Agreement is hereby amended by adding the following at the end thereof:

"and sales or other dispositions of worn-out, obsolete or surplus equipment in the ordinary course of business"

9. Amendments to Exhibit A.

(a) Exhibit A-7 to the Credit Agreement is hereby amended deleting the phrase "Adjusted LIBO Rate plus five (5) percent" in the first paragraph therein and adding the following in its place:

"[Insert interest rate, which interest rate shall be a market-based rate based upon the then prevailing market conditions]"

(b) Exhibit A-7 of the Credit Agreement is further amended by deleting the phrase immediately preceding the proviso in third sentence of the second paragraph therein and adding the following in its place:

"Payments of interest on this Intercompany Note shall be payable [Insert times when interest is payable] and on the Maturity Date by transfer of immediately available funds to such account of Payee as Payee may designate,"

10. Representations and Warranties. The Company hereby represents and warrants to the Administrative Agent and the Lenders that, as of the date hereof and after giving effect to the amendments and waivers contained herein:

(a) No Default or Event of Default has occurred and is continuing.

(b) The execution, delivery and performance by the Company of this Amendment has been duly authorized by all necessary corporate and other action and does not and will not require any registration with, consent or approval of, notice to or action by, any person (including any Governmental Authority) in order to be effective and enforceable. The Credit Agreement as amended by this Amendment constitutes the legal, valid and binding obligation of the Company, enforceable against each in accordance with its terms, subject to applicable bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium or other laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law.

(c) All representations and warranties of each Loan Party set forth in the Loan Documents as amended hereby are true and correct in all material respects.

11. Conditions Precedent to Effectiveness. This Amendment shall become effective on the date on which each of the following conditions is satisfied (the "Effective Date"):

(a) The Administrative Agent shall have received counterparts thereof duly executed and delivered by the Company, Holdings, the Borrowers and the Required Lenders;

(b) The Administrative Agent shall have received all fees and other amounts due and payable on or prior to the Effective Date, including, to the extent invoiced, reimbursement or payment of all out-of-pocket expenses (including reasonable fees, charges and disbursements of counsel) required to be reimbursed or paid by any Loan Party hereunder or under any other Loan Document; and

(c) The Company shall have paid to the Administrative Agent, in immediately available funds, for the account of each Lender that has delivered (including by telecopy) an executed counterpart of this Amendment to the Administrative Agent or its counsel prior to 5:00 p.m., New York time, on December 13, 2002, an amendment fee in an amount separately agreed to by the Company and such Lender.

12. Expenses. The Company agrees to pay or reimburse the Administrative Agent for its out-of-pocket expenses in connection with this Amendment, including the reasonable fees, charges and disbursements of Simpson Thacher & Bartlett, counsel for the Administrative Agent.

13. Governing Law; Counterparts. (a) This Amendment and the rights and obligations of the parties hereto shall be governed by, and construed and interpreted in accordance with, the laws of the State of New York.

(a) This Amendment may be executed by one or more of the parties to this Amendment on any number of separate counterparts, and all of said counterparts taken together shall be deemed to constitute one and the same instrument. This Amendment may be delivered by facsimile transmission of the relevant signature pages hereof.

**[REMAINDER OF PAGE INTENTIONALLY BLANK]**

IN WITNESS WHEREOF, the Company, the Canadian Borrowers, Holdings, the Agents, and the Lenders have caused this Amendment to be duly executed by their respective authorized officers as of the day and year first above written.

**COLLINS & AIKMAN PRODUCTS CO.**

By <u>         </u>

Title:

**COLLINS & AIKMAN CORPORATION**

By <u>         </u>

Title:

**COLLINS & AIKMAN CANADA INC.**

By <u>         </u>

Title:

**COLLINS & AIKMAN PLASTICS, LTD.**

By <u>         </u>

Title:

**JPMORGAN CHASE BANK,** as
Administrative Agent, Collateral
Agent and as a Lender

<u>By</u>

Title:

Address for Notices:

270 Park Avenue
New York, NY 10017
Attention:
Telecopy: (212) 270-

**JPMORGAN CHASE BANK, TORONTO**
BRANCH, as Canadian
Administrative Agent,
Canadian Collateral Agent
and Canadian Lender

<u>By</u>

Title:

Address for Notices:

200 Bay Street, Suite 1800
Royal Bank Plaza, South Tower
Toronto, Ontario M5J 2J2
Attention: Corporate Banking Officer
Telecopy: (416) 981-9128

Signature page to the First Amendment, dated as of December 23, 2002, to the Credit Agreement, dated as of December 20, 2001, among Collins & Aikman Products Co., Collins & Aikman Canada Inc., Collins & Aikman Plastics, Ltd., Collins & Aikman Corporation, the financial institutions parties thereto, the syndication agent and co-documentation agents named therein, JPMorgan Chase Bank, as administrative agent, and J.P. Morgan Bank Canada, as Canadian administrative agent

_____

[Name of Lender]

by _____ Title:

EXHIBIT H

## COLLINS & AIKMAN CORPORATION

## COMPUTATION OF EARNINGS PER SHARE IN MILLIONS, EXCEPT PER SHARE DATE

### (UNAUDITED)

|  | YEAR ENDED | |
|---|---|---|
|  | DECEMBER 31, 2002 | DECEMBER 31, 2001 |
| Average common shares outstanding during the period: | | |
| Basic ............................................... | 76.3 | 38.9 |
| Incremental shares under stock options computed under the price of issuer's stock during the period ........ | -- | -- |
| Total shares for basic EPS ........................... | 76.3 | 38.9 |
| Income (loss) from continuing operations before extraordinary item ........................... | (51.3) | (49.7) |
| Extraordinary loss on retirement of debt, net of income taxes of $2.7 and $0.5 ........................... | -- | (5.3) |
| Income from discontinued operations, net of income taxes of $6.3,and $5.7 ............................... | 9.5 | 8.8 |
| Cumulative effect of a change in accounting principle, Net of income taxes of $0 .......................... | (11.7) | -- |
| Net income (loss) ................................... | (53.5) | (46.2) |
| Loss on redemption of subsidiary preferred stock ... | (36.3) | |
| Net income (loss) available to common shareholders .. | (89.8) | (46.2) |
| Net income (loss) per basic and diluted common share: | | |
| Continuing operations .............................. | (1.15) | (1.28) |
| Discontinued operations ............................ | 0.12 | 0.23 |
| Extraordinary loss ................................. | -- | (0.14) |
| Cumulative effect of change in accounting principle .. | (0.15) | -- |
| Net income (loss) ................................... | (1.18) | (1.19) |

Adjusted to reflect the one-for-2.5 reverse stock split effected on May 28, 2002.

**EXHIBIT 12.1**

Collins & Aikman Corporation and Subsidiaries
RATIO OF EARNINGS TO COMBINED FIXED CHARGES
(IN $ MILLIONS)

|  | YEAR ENDING 31-Dec | |
|---|---|---|
|  | 2001 | 2002 |
| FIXED CHARGES |  |  |
| Interest expense, net ..................................... | $   84.3 | $   148.9 |
| Interest income ......................................... | 2.0 | 1.4 |
| Interest expense, gross from continuing ops ............. | 86.3 | 150.3 |
| Capitalized interest .................................... | -- | -- |
| Interest expense from discontinued operations ........... | -- | -- |
| Total interest expense, gross(*) ........................ | 86.3 | 150.3 |
| Interest portion of rental expense ...................... | 9.7 | 19.0 |
| Pre-tax earnings required to cover preferred stock dividends and accretion ........................................... | 4.0 | 59.0 |
| FIXED CHARGES - C&A ...................................... | $  100.0 | $   228.3 |
| Pre-tax income from continuing operations ............... | $  (68.3) | $   (33.8) |
| Minority interest in (income) loss of affiliates ........ | -- | -- |
| (Income) loss from equity investees ..................... | -- | -- |
| Total ................................................... | (68.3) | (33.8) |
| ADD: |  |  |
| Fixed charges ........................................... | 100.0 | 228.3 |
| Distributed income of equity investees |  |  |
| SUBTRACT: |  |  |
| (A) Interest capitalized ................................ |  | -- |
| TOTAL EARNINGS .......................................... | 31.7 | 194.5 |
| RATIO OF EARNINGS TO FIXED CHARGES ...................... | -- | -- |
| Dollar value of deficiency .............................. | 68.3 | 33.8 |

(*) - Includes amortization of debt issuance costs

EXHIBIT 21.0

## SUBSIDIARIES OF COLLINS & AIKMAN CORPORATION

**COMPANY JURISDICTION**

| Company | Jurisdiction |
|---|---|
| Collins & Aikman Products Co. | Delaware |
| Carcorp, Inc. | Delaware |
| Collins & Aikman Accessory Mats, Inc. | Delaware |
| Collins & Aikman Automotive Mats, LLC | Delaware |
| Collins & Aikman Asset Services, Inc. | Delaware |
| CW Management Corporation        (1) | Delaware |
| Hopkins Services, Inc.(2) | Minnesota |
| SAF Services Corporation (3) | Delaware |
| Collins & Aikman Automotive Exteriors, Inc. | Delaware |
| Synova Plastics, LLC (4) | Michigan |
| Collins & Aikman Automotive International, Inc. | Delaware |
| Collins & Aikman Canada Domestic Holding Company | Delaware |
| C & A Canada Holding Company | Nova Scotia |
| C & A Canada Holding Company I | Nova Scotia |
| C & A Canada Holding Company II | Nova Scotia |
| C & A Canada Holding Company III (*) | Nova Scotia |
| Textron Canada Limited (*) | Canada |
| Collins & Aikman Carpet & Acoustics (MI), Inc. | Delaware |
| Collins & Aikman Carpet & Acoustics (TN), Inc. | Tennessee |
| Collins & Aikman Development Company | Delaware |
| Collins & Aikman Export Corporation | U.S. Virgin Isles |
| Collins & Aikman Fabrics, Inc. | Delaware |
| Collins & Aikman Holdings Canada Inc. | Canada |
| Collins & Aikman Canada Inc. | Ontario |
| C & A Canada International Holdings Limited(5) | Ontario |
| Collins & Aikman Luxembourg, S.A.(6) | Luxembourg |
| Imperial Wallcoverings (Canada) Inc. | Canada |
| Collins & Aikman Interiors, Inc. | Delaware |
| Collins & Aikman Automotive Interiors, Inc. | Delaware |
| Collins & Aikman Intellimold, Inc. | Michigan |
| Riopelle Realty Limited | Ontario |
| Collins & Aikman Automotive (Asia), Inc. | Delaware |
| Collins & Aikman Automotive (Argentina), Inc. | Delaware |
| Collins & Aikman Automotive International Services, Inc. | Delaware |
| Collins & Aikman Automotive Overseas Investment, Inc. | Delaware |
| Collins & Aikman International Corporation | Delaware |
| Collins & Aikman Europe, Inc. | Delaware |
| Collins & Aikman (Gibraltar) Limited | Gibraltar/Delaware |
| C & A Canada International Holding Company | Nova Scotia |
| Collins & Aikman Europe S.A.        (7) | Luxembourg |
| C&A (Gibraltar) | Gibraltar |
| C&A (Gibraltar) No. 2 | Gibraltar |
| Collins & Aikman Automotive Holding GmbH | Germany |
| Collins & Aikman Automotive Systems GmbH | Germany |

| | |
|---|---|
| Dura Convertible Systems GmbH | Germany |
| Collins & Aikman Automotive Systems Italy, S.r.l . (8) | Italy |
| Collins & Aikman  Holdings Italy S.r.l. (8) | Italy |
| Collins & Aikman Automotive Company Italia S.r.l. | Italy |
| A.P.C.O. ( Advanced Plastic Company )S.r.l. | Italy |
| FAS S.p.A. | Italy |
| Collins & Aikman Automotive Trim B.V.B.A. | Belgium |
| Collins & Aikman Automotive Trim GrmbH | Germany |
| Collins & Aikman Automotive Systems S.L.(10) | Spain |
| Collins & Aikman Europe B.V. | Netherlands |
| Collins & Aikman Automotive Floormats Europe, B.V. | Netherlands |
| Collins & Aikman Holding AB | Sweden |
| Collins & Aikman Automotive Systems AB | Sweden |
| Collins & Aikman Holding B.V. | Netherlands |
| Collins & Aikman Automotive Trim B.V. | Netherlands |
| Collins & Aikman Automotive  s.r.o. | Czech Republic |
| Collins & Aikman Products GmbH (11) | Austria |
| Collins & Aikman Holdings Limited | United Kingdom |
| Collins & Aikman Automotive Fabrics Limited | United Kingdom |
| Collins & Aikman Automotive Limited(**) | United Kingdom |
| Collins & Aikman Automotive Interior Systems Europe Limited(**) | United Kingdom |
| Abex Plastic Products Limited | United Kingdom |
| Collins & Aikman Automotive Systems Limited | United Kingdom |
| Collins & Aikman Automotive Carpet Products (UK) Limited | United Kingdom |
| Manchester Kigass International Limited | United Kingdom |
| Premier Springs & Pressings Limited | United Kingdom |
| Collins & Aikman Automotive Trim Limited | United Kingdom |
| AS Collins & Aikman UK Ltd. | United Kingdom |
| Collins & Aikman Automotive UK Limited | United Kingdom |
| Collins & Aikman Holdings, S.A. de C.V. (12) | Mexico |
| Collins & Aikman Automotive Company de Mexico, S.A. de C.V. | Mexico |
| Amco de Mexico, S.A. de C.V. | Mexico |
| Collins & Aikman de Mexico, S.A. de C.V.(13) | Mexico |
| Collins & Aikman Carpet & Acoustics, S.A. de C.V. (14) | Mexico |
| Dura Convertible Systems de Mexico, S.A. de C.V.(15) | Mexico |
| Industrias Enjema, S.A. de C.V.(16) | Mexico |
| Servitop, S.A. de C.V. (17) | Mexico |
| Collins & Aikman Automotive Management Services Company Mexico S.A. de C.V.(18) | Mexico |
| Permali do Brasil Industria e Comercio Ltda (19) | Brazil |
| Plascar Participacoes Industriais S. A.(20) | Brazil |
| Rosario Project S. A. | Argentina |
| Collins & Aikman do Brasil Ltda (21) | Brazil |
| Collins & Aikman Plastics, Inc. | Delaware |
| ACAP, LLC (22) | Michigan |
| Becker Group, LLC | Michigan |
| Brut Plastics, Inc. | Michigan |

| | |
|---|---|
| Engineered Plastic Products, Inc. (23) | Michigan |
| Collins & Aikman Plastics, Ltd. | Ontario |
| Collins & Aikman Properties, Inc. | Delaware |
| Comet Acoustics, Inc. | Delaware |
| Dura Convertible Systems, Inc. | Delaware |
| Amco Convertible Fabrics, Inc. | Delaware |
| Gamble Development Company | Minnesota |
| Collins & Aikman Automotive Services, LLC (24) | Delaware |
| JPS Automotive, Inc. | Delaware |
| Moduko Co., Ltd, (25) | Japan |
| Southwest Laminates, Inc. | Delaware |
| Synova Carpets, LLC(26) | North Carolina |
| Waterstone Insurance, Inc. | Vermont |
| Wickes Asset Management, Inc. | Delaware |
| Wickes Manufacturing Company | Delaware |

NON-PROFIT CORPORATIONS

| | |
|---|---|
| Collins & Aikman Foundation | California |
| Collins & Aikman Disaster Relief Fund, Inc. | North Carolina |

| | |
|---|---|
| 1 | 10% owned by Willis Corroon Corporation of North Carolina |
| 2 | 10% owned by O'Brien & Gere of North America, Inc. |
| 3 | 10% owned by Unicare, Inc. |
| 4 | 51% owned by Jackson Plastics |
| 5 | 75% owned by Collins & Aikman Plastics, Ltd. And 25% owned by Collins & Aikman Canada, Inc. |
| 6 | 1% owned by Temmes Management Services, B.V. |
| 7 | 49% owned by Collins & Aikman (Gilbraltar)Ltd; 30% owned by Collins & Aikman Luxembourg S.A.; 21% owned by C&A Canada International Holding Limited |
| 8 | 25% owned by Collins & Aikman Europe, B. V.and 75% owned by Collins & Aikman Europe S.A. |
| 9 | 19779 shares owned by Collins & Aikman Europe S. A. and 1 share Collins & Aikman Automotive Systems AB |
| 10 | .00028% owned by Collins & Aikman Holding Limited |
| 11 | .02% owned by Collins & Aikman Products Co (US) |
| 12 | One Share owned by Habinus Trading Co. |
| 13 | One Share owned by Collins & Aikman Accessory Mats, Inc. |
| 14 | 25% owned by Collins & Aikman Products Co. |
| 15 | One share owned by Dura Convertible Systems, Inc. |
| 16 | One share(1%) owned by Collins & Aikman International Corporation |
| 17 | One share(1%) owned by Amco de Mexico, S.A. de C.V. |
| 18 | Minority interest shares owned by Collins & Aikman International Corporation |
| 19 | Minority interest owned by Collins & Aikman Products Co. |
| 20 | 100% of voting shares owned by Permali, but 43.4% of value is publicly traded preferred stock |

21 .5% of Collins & Aikman do Brasil Ltda. is owned by Collins & Aikman International Corporation (US)

22 Joint Venture 47% owned by Collins & Aikman Plastics, Inc. and 53% owned by Mexican Industries

23 Joint Venture 55% (550 Class A Common Stock) owned by Gerald Edwards and 45% (450 Class B Common Stock) owned by Becker Group, LLC

24 1% owned by Wikes Assets Management, Inc

25 Joint Venture 50% owned by Valco (France)and 50% owned by Collins & Aikman Products Co.

26 Joint Venture 55% membership interest held by Henry L. Jackson, an individual and 45 % membership interest held by Collins & Aikman Products Co.

(*) Textron Canada Limited has amalgamated with C&A Canada Holding Company III and the new company is Collins & Aikman Automotive Canada Company , Nova Scotia on January 1, 2003.

(**) Name Changed 2/20/03 from Collins & Aikman Automotive Interior Systems Europe Limited to Collins & Aikman Automotive Limited

EXHIBIT 23.1

## CONSENT OF INDEPENDENT ACCOUNTANTS

We hereby consent to the incorporation by reference in the Registration Statements on Form S-8 (No. 333-34569, No. 33-60997, No. 33-53321 and No. 33-53323) and on Form S-3 (No. 333-86394) of Collins & Aikman Corporation of our report dated February 18, 2003 relating to the financial statements and financial statement schedules, which appears in this Form 10-K.

Detroit, Michigan
March 24, 2003

## POWER OF ATTORNEY WITH RESPECT TO
## ANNUAL REPORT OF COLLINS & AIKMAN CORPORATION ON
## FORM 10-K FOR THE YEAR ENDED DECEMBER 31, 2002

Each of the undersigned appoints each of Jerry L. Mosingo, J. Michael Stepp and Jay B. Knoll as his or her true and lawful attorney and agent to do any and all acts and things and execute any and all instruments which the attorney and agent may deem necessary or advisable in order to enable Collins & Aikman Corporation (the "Corporation") to comply with the Securities Exchange Act of 1934, and any requirements of the Securities and Exchange Commission, in connection with the Corporation's Annual Report on Form 10-K for the year ended December 31, 2002, and any and all amendments thereto, including, but not limited to, power and authority to sign his or her name (whether on behalf of the Corporation, or as a director or officer of the Corporation, or by attesting the seal of the Corporation, or otherwise) to such instruments and to such Annual Report and any amendments thereto, and to file them with the Securities and Exchange Commission. The undersigned ratifies and confirms all that any of the attorneys and agents shall do or cause to be done by virtue hereof. Any one of the attorneys and agents shall have, and may exercise, all the powers conferred by this instrument.

Each of the undersigned has signed his or her name as of March 2003.

| | |
|---|---|
| /s/ Charles E. Becker | /s/ W. Gerald McConnell |
| Charles E. Becker | W. Gerald McConnell |
| /s/ Dean Robert C. Clark | /s/ Jerry L. Mosingo |
| Dean Robert C. Clark | Jerry L. Mosingo |
| /s/ Marshall A. Cohen | /s/ Senator Warren B. Rudman |
| Marshall A. Cohen | Senator Warren B. Rudman |
| /s/ David C. Dauch | /s/ J. Michael Stepp |
| David C. Dauch | J. Michael Stepp |
| /s/ Cynthia L. Hess | /s/ David. A. Stockman |
| Cynthia L. Hess | David. A. Stockman |
| /s/ Timothy D. Leuliette | /s/ Daniel P. Tredwell |
| Timothy D. Leuliette | Daniel P. Tredwell |
| /s/ Elkin McCallum | /s/ Samuel Valenti III |
| Elkin McCallum | Samuel Valenti III |

EXHIBIT 99.17

[COLLINS & AIKMAN LETTERHEAD]

**CERTIFICATION**
**ACCOMPANYING FORM 10-K REPORT**
**OF COLLINS & AIKMAN CORPORATION**
**PURSUANT TO SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**
(CHAPTER 63, TITLE 18 U.S.C. SUB-SECTION 1350(A) AND (B))

Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 (Chapter 63, Title 18 U.S.C. sub-sections 1350(a) and (b)), each of the undersigned hereby certifies that the Annual Report on Form 10-K for the period ended December 31, 2002 of Collins & Aikman Corporation (the "Company") fully complies with the requirements of Section 13(a) or a Section 15(d) of the Securities Exchange Act of 1934 and that the information contained in such Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

```
Dated: March 24, 2003        /s/ Jerry L. Mosingo
                             ----------------------------------------
                                         Jerry L. Mosingo
                             President & Chief Executive Officer


Dated: March 24, 2003        /s/ J. Michael Stepp
                             ----------------------------------------
                                          J. Michael Stepp
                             Vice Chairman & Chief Financial Officer
```

**End of Filing**

Powered By EDGAR Online

© 2005 | EDGAR Online, Inc.