UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| **COLLINS & AIKMAN CORPORATION** <br> **and COLLINS & AIKMAN PRODUCTS CO.,** <br> **as Debtors in Possession,** | ) <br> ) <br> ) | |
| Plaintiffs, | ) | C.A. No. 07-265-*** |
| | ) | |
| v. | ) | *Electronically Filed* |
| | ) | |
| **DAVID A. STOCKMAN, J. MICHAEL STEPP,** <br> **GERALD E. JONES, BRYCE M. KOTH,** <br> **DAVID R. COSGROVE, PAUL C. BARNABA,** <br> **ROBERT A. KRAUSE, JOHN A. GALANTE,** <br> **CHARLES E. BECKER, ELKIN B. MCCALLUM,** <br> **THOMAS E. EVANS, CYNTHIA HESS,** <br> **DANIEL P. TREDWELL, W. GERALD** <br> **MCCONNELL, SAMUEL VALENTI, III,** <br> **HEARTLAND INDUSTRIAL PARTNERS, L.P.,** <br> **HEARTLAND INDUSTRIAL ASSOCIATES,** <br> **L.L.C., HEARTLAND INDUSTRIAL GROUP,** <br> **L.L.C., PRICEWATERHOUSECOOPERS, LLP** <br> **and KPMG LLP.** | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) | |
| Defendants. | ) <br> ) | |

**OPENING BRIEF IN SUPPORT OF DEFENDANT**
**PAUL C. BARNABA'S MOTION TO DISMISS**

Thomas G. Macauley (ID No. 3411)
Elizabeth D. Power (ID No. 4135)
ZUCKERMAN SPAEDER LLP
919 Market Street, Suite 990
Wilmington, DE 19801
(302) 427-0400 Telephone
(302) 427-8242 Fax

*Attorneys for Defendant Paul Barnaba*

Dated:  September 14, 2007
        Wilmington, Delaware

## TABLE OF CONTENTS

NATURE AND STAGE OF PROCEEDINGS ........................................................... 1

SUMMARY OF ARGUMENT .............................................................................. 1

INTRODUCTION .............................................................................................. 2

STATEMENT OF FACTS ................................................................................... 6

ARGUMENT ..................................................................................................... 9

I.    PLAINTIFFS HAVE FAILED TO STATE A CLAIM AGAINST MR. BARNABA
      UNDER EXCHANGE ACT SECTION 10(b) AND RULE 10b-5 .................................... 9

      A.    Plaintiffs Have Not Alleged That Mr. Barnaba Engaged in Conduct
            Constituting a "Primary Violation" of Section 10(b) ............................................ 9

            1.    Plaintiffs Have Not Alleged "Manipulation" ........................................... 10

            2.    Plaintiffs Have Not Alleged "Deception" ................................................ 11

            3.    Plaintiffs Cannot Transform Mr. Barnaba Into a Primary Violator
                  by Alleging That He Participated in a "Scheme To Defraud" .................. 12

            4.    Group Pleading Is Not Sufficient ............................................................ 16

      B.    Plaintiffs Have Not Adequately Pled Scienter as to Mr. Barnaba ........................ 19

            1.    Plaintiffs Have Not Alleged that Mr. Barnaba Had Motive or
                  Opportunity to Commit Fraud ................................................................ 20

            2.    Plaintiffs Have Not Alleged Strong Circumstantial Evidence of
                  Recklessness or Intentional Misconduct by Mr. Barnaba ..................... 22

II.   PLAINTIFFS HAVE FAILED TO STATE A CLAIM AGAINST MR. BARNABA
      UNDER EXCHANGE ACT SECTION 14(a) AND RULE 14a-9 .................................. 25

      A.    Plaintiffs Do Not Plead Misstatements in the Proxy Statements
            with Particularity ................................................................................................. 26

      B.    Plaintiffs Do Not Allege That Mr. Barnaba Made a Material Misrepresentation
            or Omission in a Proxy Statement ........................................................................ 27

      C.    Plaintiffs Have Not Adequately Pled that Mr. Barnaba Acted
            with the Requisite Intent. ..................................................................................... 28

III.  THE COURT SHOULD DECLINE TO EXERCISE JURISDICTION OVER
      THE STATE LAW CLAIMS AGAINST MR. BARNABA ............................................ 29

IV.   THE COMPLAINT FAILS TO STATE A CLAIM THAT MR. BARNABA
      VIOLATED FIDUCIARY DUTIES ................................................................................ 29

      A.    Mr. Barnaba Did Not Owe Fiduciary Duties as a Director or Officer
            of Collins & Aikman ............................................................................................. 29

      B.    Even If Mr. Barnaba Could Be Considered an Officer of the Company
            Following His December 2004 Promotion, He Did Not Violate
            Any Fiduciary Duties ............................................................................................. 30

            1.    The Complaint Fails to Allege Breaches of the Duty of Loyalty or
                  Due Care Against Mr. Barnaba ................................................................. 30

            2.    Plaintiffs Do Not State a Claim for a Violation of the Duty of
                  Good Faith Against Mr. Barnaba .............................................................. 33

V.    THE UNJUST ENRICHMENT CLAIM MUST BE DISMISSED BECAUSE
      PLAINTIFFS DO NOT ALLEGE MR. BARNABA RECEIVED A BENEFIT ............. 34

VI.   PLAINTIFFS FAIL TO STATE A CLAIM FOR COMMON LAW FRAUD
      AGAINST MR. BARNABA ............................................................................................. 35

      A.    Plaintiffs Fail to Plead Fraud With Particularity ................................................... 35

      B.    Plaintiffs Fail to Allege Scienter .......................................................................... 36

CONCLUSION .......................................................................................................................... 37

## TABLE OF AUTHORITIES

**FEDERAL CASES**

*Acito v. IMCERA Group, Inc.*, 47 F.3d 47 (2d Cir. 1995) ............................................................. 21

*AES v. Corp. v. Dow Chemical Co.*, 2001 WL 34367296 (D. Del Jan. 19, 2001) ...................... 14

*Albert v. Alex. Brown Mgmt. Servs., Inc.*, 2005 WL 2130607 (Del. Ch. Aug. 26, 2005)............. 35

*Allison v. Brooktree Corp.*, 999 F. Supp. 1342 (S.D. Cal. 1998) ................................................. 17

*Anixter v. Home-Stake Prod. Co.*, 77 F.3d 1215 (10th Cir. 1996)............................................... 14

*Basic Inc. v. Levinson*, 485 U.S. 224 (1988)................................................................................ 19

*Berckeley Inv. Group, Ltd. v. Colkitt*, 455 F.3d 195 (3d Cir. 2006) ............................................ 19

*Billard v. Rockwell Int'l Corp.*, 526 F. Supp. 218 (S.D.N.Y. 1981) , aff'd, 683 F.2d 51
    (2d Cir. 1982)......................................................................................................................... 10

*Bond Opportunity Fund v. Unilab Corp.*, 2003 WL 21058251 (S.D.N.Y. 2003) ............ 25, 28, 29

*C.V. One v. Resources Group*, 1982 WL 172863 (Del. Super. Dec. 14, 1982)...................... 35, 37

*Central Bank of Denver, N.A. v. First Interstate Bank of Denver*, N.A., 5
    11 U.S. 164 (1994).......................................................................................................... passim

*Chu v. Sabratek Corp.*, 100 F. Supp. 2d 827 (N.D. Ill. 2000) ..................................................... 17

*Coates v. Heartland Wireless Communs., Inc.*, 26 F. Supp. 2d 910 (N.D. Tex. 1998) ................ 17

*Degulis v. LXR Biotechnology, Inc.*, 928 F. Supp. 1301 (S.D.N.Y. 1996) .................................. 19

*Dura Pharm., Inc. v. Broudo*, 544 U.S. 336 (2005)...................................................................... 19

*Fidel v. Farley*, 392 F.3d 220 (6th Cir. 2004)............................................................................... 10

*GFL Advantage Fund, Ltd. v. Colkitt*, 272 F.3d 189 (3d Cir. 2001) ............................................ 10

*Gould v. American-Hawaiian S.S. Co.*, 535 F.2d 761 (3d Cir. 1976) .......................................... 27

*Great Lakes Chem. Corp. v. Monsanto Co.*, 96 F. Supp. 2d 376 (D. Del. 2000) ........................ 29

*GSC Partners CDO Fund v. Washington*, 368 F.3d 228 (3d Cir. 2004) .............................. passim

*Howard v. Everex Sys., Inc.*, 228 F.3d 1057 (9th Cir. 2000) ....................................................... 12

*Hundahl v. United Ben. Life Ins. Co.*, 465 F. Supp. 1349 (N.D. Tex. 1979)................................ 11

*In re Advanta Corp. Sec. Litig.*, 180 F.3d 525 (3d Cir. 1999) ................................... 20, 22, 23, 24

*In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410 (3d Cir. 1997) ............................. 20, 21

*In re Charter Communication, Inc. Sec. Litig.*, 443 F.3d 987 (8th Cir. 2006),
  cert. granted, 127 S. Ct. 1873 (2007) .................................................................................... 4, 14

*In re Digital Island*, 223 F. Supp. 2d 546 (D. Del. 2002), aff'd, 357 F.3d 322
  (3d. Cir. 2004) ............................................................................................. 17, 23, 24, 28

*In re IKON Office Solutions, Inc. Sec. Litig.*, 277 F.3d 658 (3d Cir. 2002) ................................. 20

*In re Miller Indus., Inc. Sec. Litig.*, 12 F. Supp. 2d 1323 (N.D. Ga. 1998) .................................. 17

*In re PMA Capital Corp. Sec. Litig.*, 2005 WL 1806503 (E.D. Pa. Jul. 27, 2005) ...................... 17

*In re Reliance Sec. Litig.*, 135 F. Supp. 2d 480 (D. Del. 2001) ............................................ passim

*In re Rockefeller Ctr. Props., Inc. Sec. Litig.*, 184 F.3d 280 (3d Cir. 1999).................................... 7

*In re Tyson Foods, Inc. Sec. Litig.*, 155 F.App'x 53 (3d Cir. 2005) ......................................... 3, 12

*Irvine v. ImClone Systems, Inc.*, 2003 WL 21297285 (S.D.N.Y. 2003)........................................ 19

*Israeli v. Team Telecon Int'l, Ltd.*, 2006 WL 2883237 (D.N.J. Oct. 10, 2006) ........................... 17

*Kalnit v. Eichler*, 264 F.3d 131 (2d Cir. 2001) ...................................................................... 21, 22

*Lentell v. Merrill Lynch & Co.*, 396 F.3d 161 (2d Cir. 2005)............................................ 4, 11, 14

*Levine v. Metal Recovery Techs., Inc.*, 182 F.R.D. 102 (D. Del. 1998) ....................................... 15

*Levine v. Metal Recovery Techs., Inc.*, 182 F.R.D. 112 (D. Del. 1998) ....................................... 15

*Log On America, Inc. v. Promethean Asset Mgmt. L.L.C.*, 210 F. Supp. 2d 291
  (S.D.N.Y. 2001).................................................................................................................. 18

*Lum v. Bank of America*, 361 F.3d 217 (3d Cir. 2004)......................................................... 35, 36

*Maldonado v. Dominguez*, 37 F.3d 1 (1st Cir. 1998) ................................................................. 24

*Marra v. Tel-Save Holdings, Inc.*, 1999 WL 317103 (E.D. Pa. May 18, 1999) ........................... 17

*Morschbach v. Household Int'l, Inc.*, 2002 WL 187514 (D. Del. Feb. 6, 2002) ......................... 34

*P. Schoenfeld Asset Mgmt. LLC v. Cendant Corp.*, 142 F. Supp. 2d 589 (D.N.J. 2001).............. 17

*Rattner v. Bidzos*, 2003 WL 22284323 (Del. Ch. Oct. 7, 2003)............................................ 33, 34

iv

*Regents of the Univ. of Cal. v. Credit Suisse First Boston (USA), Inc.*, 482 F.3d 372
   (5th Cir. 2007)....................................................................................................... 14

*Robbins v. Banner Indus., Inc.*, 285 F. Supp. 758 (S.D.N.Y. 1966)............................................. 27

*San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos.*,
   75 F.3d 801 (2d Cir. 1996) ....................................................................................... 21

*SEC v. Resch-Cassin & Co.*, 362 F. Supp. 964 (S.D.N.Y. 1973) .................................................. 10

*Seville Indus. Mach. v. Southwest Mach. Corp.*, 742 F.2d 786 (3d Cir. 1984)............................. 35

*Simpson v. AOL Time Warner Inc.*, 452 F.3d 1040 (9th Cir. 2006) ....................................... 14, 16

*Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.*, 365 F.3d 353 (5th Cir. 2004) .................... 18

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 127 S. Ct. 2499 (2007) ................................ 4, 20, 25

*United States v. O'Hagan*, 521 U.S. 642 (1997)............................................................................ 13

*Wright v. Ernst & Young, LLP*, 152 F.3d 169 (2d Cir. 1998)................................................. 12, 14

*Ziemba v. Cascade Int'l, Inc.*, 256 F.3d 1194 (11th Cir. 2001) ............................................. 14, 15

## STATE CASES

*Brehm v. Eisner*, 746 A.2d 244 (Del. 2000) ................................................................................. 31

*Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345 (Del. 1993) ........................................................ 31

*Citron v. Fairchild Camera & Instrument Corp.*, 569 A.2d 53 (Del. 1989) ................................ 31

*Guttman v. Huang*, 823 A.2d 492 (Del. Ch. 2003)...................................................................... 33

*In re Caremark Int'l Inc. Derivative Litig.*, 698 A.2d 959 (Del. Ch. 1996)................................. 33

*Khanna v. McMinn*, 2006 WL 1388744 (Del. Ch. May 9, 2006)................................................. 32

*Lazard Debt Recovery GP, LLC v. Weinstock*, 864 A.2d 955 (Del. Ch. 2004)............................ 29

*Legatski v. Bethany Forest Assoc., Inc.*, 2006 WL 1229689
   (Del. Super. Ct. Apr. 28, 2006)................................................................................. 36

*Malone v. Brincat*, 722 A.2d 5 (Del. 1998) ................................................................................. 32

*Metro Commc'n Corp. BVI v. Advanced Mobilecomm Techs. Inc.*, 854 A.2d 121
   (Del. Ch. 2004) ....................................................................................... 32, 35, 36, 37

*St. James Recreation, LLC v. Rieger Opportunity Partners, LLC*, 2003 WL 22659875 (Del. Ch. Nov. 5, 2003) .................................................................................................. 36

*Steinman v. Levine*, 2002 WL 31761252 (Del Ch. Nov. 27, 2002) ............................................... 32

*Vague v. Bank One Corp.*, 2006 WL 290299 (Del. Ch. Feb. 1, 2006) ......................................... 36

## FEDERAL STATUTES

15 U.S.C. § 78j(b), Exchange Act § 10(b) ....................................................................................... 9

15 U.S.C. § 78n(a), Exchange Act § 14(a) ..................................................................................... 25

15 U.S.C. § 78u-4(b)(1), Exchange Act § 21D(b)(1) ....................................................... 16, 18, 26

15 U.S.C. § 78u-4(b)(2), Exchange Act § 21D(b)(2) ................................................. 17, 19, 20, 23

15 U.S.C. § 78u-4(b)(3)(B), Exchange Act § 21D(b)(3)(B) ......................................................... 18

15 U.S.C. § 78u-4(b)(4), Exchange Act § 21D(b)(4) ................................................................... 19

## FEDERAL RULES

Fed. R. Civ. P. 9(b) ....................................................................................................................... 35

## FEDERAL REGULATIONS

17 C.F.R. § 240.10b-5, Exchange Act Rule 10b-5 ........................................................................ 10

17 C.F.R. § 240.14a-9, Exchange Act Rule 14a-9......................................................................... 25

## NATURE AND STAGE OF PROCEEDINGS

Plaintiffs filed this action in their capacity as Debtors in Possession of Collins & Aikman Corporation and Collins & Aikman Products Company on May 16, 2007. Plaintiffs assert against Defendant Paul C. Barnaba violations of § 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Exchange Act Rule 10b-5 thereunder; § 14(a) of the Exchange Act and Rule 14a-9 thereunder; and common law claims for breach of fiduciary duty, unjust enrichment, and common law fraud.

## SUMMARY OF ARGUMENT

All of Plaintiffs' claims against Mr. Barnaba must be dismissed.

1.      Plaintiffs' Exchange Act § 10(b) and Rule 10b-5 claims against Mr. Barnaba fail because they have not alleged that Mr. Barnaba engaged in a "primary violation" of § 10(b). Plaintiffs fail to plead either of the required elements of "manipulation" or "deception" and cannot transform Mr. Barnaba into a primary violator by alleging that he participated in a "scheme to defraud," or by including him in an undifferentiated group of defendants. In addition, Plaintiffs have not adequately pled scienter.

2.      Plaintiffs fail to state a claim against Mr. Barnaba under Exchange Act § 14 and Rule 14a-9 because they do not plead misstatements in the proxy statements with particularity, do not allege that Mr. Barnaba made a material misrepresentation or omission in a proxy statement, and do not adequately plead that Mr. Barnaba acted with the requisite intent.

3.      Because Plaintiffs' federal claims against Mr. Barnaba must be dismissed, the Court should decline to exercise jurisdiction over Plaintiffs' state law claims.

4.      The breach of fiduciary duty claims against Mr. Barnaba must be dismissed because Mr. Barnaba was neither an officer nor a director of Collins & Aikman and therefore

1

owed no duty to the Company's shareholders, and because Plaintiffs' allegations are insufficient to state a claim for breach of fiduciary duty even if Mr. Barnaba had such a duty.

5.      Plaintiffs' unjust enrichment claims must be dismissed because Plaintiffs do not allege Mr. Barnaba received a benefit from his alleged conduct.

6.      Finally, the common law fraud claims fail, because Plaintiffs neither plead fraud with particularity nor allege the requisite scienter.

## INTRODUCTION

Mr. Barnaba joined Collins & Aikman ("C&A" or the "Company") in April 2002, as Director of Financial Analysis for C&A's Purchasing Department. Complaint ("Compl.") ¶ 13. In December 2004, a few months before he left the Company in May 2005, he "became a vice president and Director of the Purchasing Department for the Plastics Division." *Id.* Mr. Barnaba was not, and is not alleged to have been, a high-ranking corporate official at C&A. Nonetheless, the Complaint alleges that a large group of "Officer and Director Defendants," including Mr. Barnaba, perpetrated "fraudulent schemes" at C&A, primarily through improper accounting and false public statements. Despite alleging that he was, at most, a mid-level manager in Purchasing, Plaintiffs lump Mr. Barnaba together with the Company's Chief Executive and Chief Financial Officers.

Plaintiffs do not allege, however, that Mr. Barnaba is an accountant, played any role in C&A's accounting decisions or had any responsibility within the Company for any accounting or bookkeeping function. Nor is there any allegation that Mr. Barnaba falsified any financial record of the Company or even had any contact with the Company's auditors.

Nor do Plaintiffs allege that Mr. Barnaba played any role in the drafting, editing or preparation of any of the Company's public statements or proxy statements or that he had any

2

responsibility within the Company for that function. Indeed, the allegation that he was a mid-level manager from the Purchasing Department belies any such inference. Moreover, all of the allegedly false statements identified in the Complaint concerning the Company's finances were made by the Company or by individuals other than Mr. Barnaba.

Nonetheless, Plaintiffs assert in their First Claim for Relief that Mr. Barnaba committed a "primary violation" of § 10(b) of the Exchange Act and Rule 10b-5 thereunder, by engaging in acts or omissions "result[ing] in material overstatements of C&A's reported earnings" in a variety of statements by the Company. Compl. ¶¶ 153-157. They charge him in the Second Claim for Relief with violating § 14(a) of the Exchange Act and Rule 14a-9 thereunder, prohibiting false or misleading proxy statements. Compl. ¶¶ 158-163. Further, Plaintiffs charge in their Third, Fourth, and Fifth Claims for Relief that Mr. Barnaba is liable under state law for breach of fiduciary duty, unjust enrichment, and common law fraud. Compl. ¶¶ 164-176. All of these claims must be dismissed.

First, Mr. Barnaba cannot be liable for a "primary violation" of § 10(b) and Rule 10b-5 because Plaintiffs have not alleged that he made one of the material misrepresentations or omissions identified in the Complaint. In *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164 (1994), the Supreme Court held that § 10(b) proscribes two types of conduct: "deception" (which it defined as material misrepresentations and omissions) and "manipulation" (limited to certain practices not present in this case). In the Third Circuit, a defendant cannot be said to have "made" a statement – *i.e.*, violated the deception/misrepresentation prong of § 10(b) – where he did not have a role in drafting or preparing the alleged statements or reviewing them prior to issuance. *In re Tyson Foods, Inc. Sec. Litig.*, 155 F.App'x 53, 56 (3d Cir. 2005). Because Plaintiffs have alleged none of these

3

activities with respect to Mr. Barnaba, he did not "make" any of the misrepresentations identified in the Complaint and cannot be held liable for a "primary violation" of § 10(b) and Rule 10b-5.

Plaintiffs cannot avoid Supreme Court precedent by characterizing this case as involving "manipulation" or by labeling Mr. Barnaba as a participant in a "scheme to defraud" under Rule 10b-5(a) and (c). "Manipulation" is a term of art involving practices affecting the efficient operation of the market (*e.g.*, creating the false impression of demand), and as the Second Circuit made clear in *Lentell v. Merrill Lynch & Co.,* 396 F.3d 161 (2d Cir.), *cert. denied*, 546 U.S. 935 (2005), *does not* include claims, like the one asserted here, involving the provision to the market of allegedly false and misleading information. "Scheming" based on Rule 10b-5(a) and (c) is also not a viable approach for expanding the reach of § 10(b) to non-speakers like Mr. Barnaba. Because the language of the rule, under longstanding Supreme Court precedent, cannot be used to expand the ambit of liability under § 10(b), and because § 10(b) "prohibits only the making of a material misstatement (or omission) or the commission of a manipulative act," *Central Bank,* 511 U.S. at 177, "scheming" is not an independent basis for liability under the statute. As a result, only those who themselves commit a "manipulative" act (not this case) or a "deceptive" act (making a false statement or omission, which is not alleged as to Mr. Barnaba) can be liable as "primary violators" under § 10(b) and Rule 10b-5. *In re Charter Commc'n, Inc. Sec. Litig.*, 443 F.3d 987, 992 (8th Cir. 2006), *cert. granted*, 127 S. Ct. 1873 (2007).

Second, the claim that Mr. Barnaba committed a "primary violation" of § 10(b) must be dismissed for the additional, independent reason that Plaintiffs have failed to allege scienter with the required particularity. In *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 127 S. Ct. 2499, 2510 (2007), the Supreme Court held that, in considering whether a plaintiff has adequately pled scienter under the PSLRA, the court must consider "plausible nonculpable explanations for the

4

defendant's conduct, as well as inferences favoring the plaintiff" and that an inference of scienter must be "cogent and at least as compelling as any opposing inference one could draw from the facts alleged." Plaintiffs' allegations do not meet these tests.

Plaintiffs do not adequately allege that Mr. Barnaba had "motive" or "opportunity." The Complaint does not allege that he sold stock at artificially inflated prices (or even owned stock), was paid a bonus tied somehow to the fraud, or had some other concrete benefit he could have realized by virtue of the allegedly faulty accounting. Nor does it allege that Mr. Barnaba was in a position within C&A to influence the improper accounting and public statements, as would be required to have "opportunity," or make other sufficient allegations to meet the pleading requirements for scienter.

Third, the claim that Mr. Barnaba violated § 14(a) of the Exchange Act and Rule 14a-9 thereunder suffers from many defects. Plaintiffs fail to plead the existence of misstatements in C&A's proxy statements with particularity, instead alleging broadly that an unnamed number of proxy statements issued over a three-year period were misstated in an unspecified way. Compl. ¶ 77. Moreover, Plaintiffs do not allege that Mr. Barnaba signed, reviewed or approved any of the offending proxy statements or that he had any involvement whatsoever with their creation or issuance. Nor do Plaintiffs plead the requisite strong inference of negligence to state a claim against him under § 14(a).

Fourth, the various state law claims against Mr. Barnaba also fail as a matter of law. To begin, this Court should decline to exercise pendent jurisdiction over them given that the federal claims must be dismissed. Further, the breach of fiduciary duty claim against Mr. Barnaba has not been adequately pled because he is not alleged to have been an officer or director of C&A and therefore did not owe fiduciary duties to the Company's shareholders. Even if Mr. Barnaba

were an officer, the Complaint fails to state a claim for breach of fiduciary duty against him because it does not allege self-dealing in violation of the duty of loyalty, does not allege a failure to disclose pursuant to an obligation to do so in violation of the duty of care, and does not allege that Mr. Barnaba had responsibility over the Company's financial statements such that omissions in them violate his duty of good faith.  Nor do Plaintiffs adequately allege an unjust enrichment claim against Mr. Barnaba because they have not alleged that he received any benefit whatsoever from his activities at C&A.  Finally, Plaintiffs mention Mr. Barnaba by name only once in their lengthy Complaint.  Their group-pled allegations utterly fail to state a common law fraud claim against him with the requisite particularity.

## STATEMENT OF FACTS

According to the Complaint, C&A was engaged in the design, manufacture and supply of automotive interior components for companies such as Ford, GM and Chrysler.  Compl. ¶ 36.  In 2001, Defendants Heartland Industrial Partners, L.P., Heartland Industrial Associates L.L.C., and Heartland Industrial Group L.L.C. (collectively "Heartland" or the "Heartland Defendants"), acquired a controlling interest in the Company.  Compl. ¶ 37.  Under Heartland's management, C&A went on an "acquisition spree" in an effort to increase the Company's market position.  *Id.* This rapid expansion, coupled with adverse business conditions that reduced profit margins, ultimately proved disastrous for C&A.  Compl. ¶ 38.  The Company filed for bankruptcy protection on May 12, 2005.  Compl. ¶ 41.

Plaintiffs allege that from the fourth quarter of 2001 (before Mr. Barnaba joined as the third-ranking member in Purchasing) until Collins & Aikman's bankruptcy, all defendants contributed to the Company's collapse by engaging in a "variety of fraudulent schemes" intended to conceal the true state of the Company's finances.  Compl. ¶ 40.  Plaintiffs assert

6

claims against three groups of defendants: the Heartland Defendants (Compl. ¶¶ 28-33); the

Auditor Defendants – PriceWaterhouseCoopers ("PwC") and KPMG – (Compl. ¶¶ 34-35); and

the "Director and Officer Defendants" – Stockman, Stepp, Koth, Cogrove, Barnaba, Krause,

Galante, Becker, McCallum, Evans, Hess, Tredwell, McConnell, and Valenti.  (Compl. ¶¶ 9-23).

The 215-paragraph Complaint, as noted, mentions Mr. Barnaba only once.  That

paragraph states, in its entirety:  "Defendant Paul C. Barnaba served as the Director of Financial

Analysis for the Company's Purchasing Department from April 2002 to December 2004, when

he became a Vice President and the Director of Purchasing for the Plastics Division, a position

he held until April 2005."  Compl. ¶ 13.  While this description makes clear that Mr. Barnaba

was at most a mid-level manager whose duties related to purchasing, the remainder of the

Complaint lumps Mr. Barnaba together with the "Officer and Director Defendants," a group that

includes the Company's directors and Chief Executive and Chief Financial Officers.  Public

filings referenced in the Complaint show that Mr. Barnaba was neither a director nor an officer

of the Company.  *See* Collins & Aikman Corp., Proxy Statement (Apr. 25, 2002) at 5-8, 19-20

(identifying directors and officers); Collins & Aikman Corp., Form 10-K for the fiscal year

ended December 31, 2003 at 47-51 (same); Collins & Aikman Corp., Proxy Statement (Sep. 30,

2004) at 3-5, 18 (same); Statement of Financial Affairs, ¶ 21(b),  *In re Collins & Aikman Corp.,*

*et al.,* No. 05-55927 (Bankr. E. D. Mich.) (same).[1]

The Complaint describes three purported "fraudulent schemes."  First, Plaintiffs allege

that between the fourth quarter of 2001 and the first quarter of 2003, defendants "Stockman,

---

[1] Excerpts from these public filings are attached as Exhibits A through D, respectively.  The
Court may rely on a company's public filings referred to in a complaint in considering a motion
to dismiss.  *See In re Rockefeller Ctr. Props., Inc. Sec. Litig.*, 184 F.3d 280, 293 (3d Cir. 1999)
(holding district court could properly consider the authenticated copies of SEC filings submitted
by defendants on a motion to dismiss).

Stepp and others acting at their direction" engaged in fraudulent "round-trip" transactions with Joan Fabrics, Inc., a company controlled by defendant McCallum. Compl. ¶¶ 48-52. According to the Complaint, these defendants arranged for Joan Fabrics to provide short-term loans to C&A to inflate the Company's financial results. These loans allegedly were falsely characterized on C&A's financial statements as rebates for past purchases or services. *See* Compl. ¶¶ 50, 90-97. C&A allegedly repaid the loans through a series of transactions designed to obscure the fact that Joan Fabrics was being repaid. Compl. ¶ 51.

Second, Plaintiffs allege that between 2002 and 2004, "Defendants caused or allowed" the Company to account improperly for rebates from the Company's suppliers. Compl. ¶¶ 53-58, 98-102. Specifically, the Complaint alleges that the Company would agree to future price reductions and improperly book the rebate in the present quarters, or purchase capital equipment for inflated prices and receive the difference back as a "rebate." Compl. ¶ 55. Finally, Plaintiffs allege that in December 2004 and January 2005, "Stockman and others acting at his direction" manipulated Company accounts to reduce the amount of money the Company owed General Electric Capital Corporation ("GECC"). Compl. ¶ 63.

Plaintiffs allege that as a result of these "schemes," from fourth quarter 2001 until May 2005, the Company's quarterly and annual reports to the SEC were false and misleading, and that an August 2004 offering memorandum and 2002, 2003 and 2004 Proxy Statements contained false and misleading statements. Compl. ¶¶ 59-60; 75-77. In addition, Plaintiffs contend that "Stockman and others" made false statements on a March 2005 investor conference call. Compl. ¶ 67. The Complaint further alleges that Mr. Stockman concealed the true financial condition of the Company in a presentation to JP Morgan Chase and Credit Suisse First Boston on March 24, 2005, and made false statements to the banks to induce them to provide financing

8

to the Company in April 2005.  Compl. ¶¶ 68, 70.  Plaintiffs allege that the Company's press

releases on March 17 and April 4, 2005 contained false and misleading statements, and that the

Company's March 24, 2005 press release "understated the scope of the problem at the

Company."  Compl. ¶¶ 65-66, 69.

 In addition to the allegedly false statements, Plaintiffs also allege that the Company failed

to record timely an impairment in the value of its long-lived goodwill and assets, overstated its

deferred tax assets, improperly reported related party transactions, failed to provide appropriate

disclosure about the Company's ability to continue as a going concern, and committed other

violations of Generally Accepted Accounting Principles.  ¶¶ 103-21.  Plaintiffs contend that

Defendants PwC and KPMG acted negligently in performing their audits and reviews of the

Company's financial statements.  ¶¶ 78-88; 122-52.

 The Complaint does not contain a single allegation concerning Mr. Barnaba's role in any

of the alleged "schemes" and does not attribute any false statements to him.

## ARGUMENT

**I. PLAINTIFFS HAVE FAILED TO STATE A CLAIM AGAINST MR. BARNABA UNDER EXCHANGE ACT SECTION 10(b) AND RULE 10b-5.**

### A. Plaintiffs Have Not Alleged That Mr. Barnaba Engaged in Conduct Constituting a "Primary Violation" of Section 10(b).

 The conduct prohibited by § 10(b) and Rule 10b-5 is controlled by the text of the statute.

*Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 176 (1994).

Section 10(b) makes it unlawful "directly or indirectly, . . . [t]o use or employ, in connection

with the purchase or sale of any security, . . . any manipulative or deceptive device or

contrivance. . . ." 15 U.S.C. § 78j(b).  The statutory language "gives no indication that Congress

meant to prohibit any conduct not involving manipulation or deception." *Central Bank,* 511 U.S.

at 177 (quoting *Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 473 (1977)); *see also Fidel v. Farley*, 392 F.3d 220, 235 (6th Cir. 2004) ("Section 10(b) 'prohibits only the making of a material misstatement (or omission) or the commission of a manipulative act.' It does not proscribe 'giving aid to a person who commits a manipulative or deceptive act.'") (quoting *Central Bank*, 511 U.S. at 177). Therefore, to state a claim for a "primary violation" of § 10(b) *or* Rule 10b-5, 17 C.F.R. § 240.10b-5, a plaintiff must allege that a defendant engaged in conduct that "can be fairly viewed as 'manipulative or deceptive' within the meaning of the statute." *Santa Fe Indus.*, 430 U.S. at 474; *Central Bank*, 511 U.S. at 177-78. Plaintiffs have not alleged either type of conduct as to Mr. Barnaba.

        1.     *Plaintiffs Have Not Alleged "Manipulation."*

"'Manipulation' is 'virtually a term of art when used in connection with securities markets.'" *Santa Fe Indus.*, 430 U.S. at 476 (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 199 (1976)). It "refers generally to practices, such as wash sales, matched orders, or rigged prices, that are intended to mislead investors by artificially affecting market activity." *Id.* Courts in this Circuit and elsewhere have long recognized that manipulative devices are limited to certain practices not alleged in this case. *See, e.g.*, *GFL Advantage Fund, Ltd. v. Colkitt*, 272 F.3d 189, 205 (3d Cir. 2001) ("Manipulation . . . generally refers to practices, such as wash sales, matched orders or rigged prices, that are intended to mislead investors by artificially affecting market activity."); *Billard v. Rockwell Int'l Corp.*, 526 F. Supp. 218, 222 (S.D.N.Y. 1981), *aff'd*, 683 F.2d 51 (2d Cir. 1982) ("[t]he unifying element in the manipulative devices listed in *Santa Fe* is that they are 'used to persuade the public that activity in a security is the reflection of genuine demand instead of a mirage.'") (quoting *SEC v. Resch-Cassin & Co.*, 362 F. Supp. 964, 975 (S.D.N.Y. 1973)); *see also Hundahl v. United Ben. Life Ins. Co.*, 465 F. Supp. 1349, 1360

(N.D. Tex. 1979) (manipulation requires "practices in the marketplace which have the effect of either creating the false impression that certain market activity is occurring when in fact such activity is unrelated to actual supply and demand or tampering with the price itself").

The conduct alleged here – namely, that certain individuals other than Mr. Barnaba improperly accounted for certain transactions and provided false information to Plaintiffs and the market about the Company's finances, *see* Compl. ¶¶ 48-87, – is not "manipulation," as explained by the Second Circuit in *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 177 (2d Cir.), *cert. denied*, 546 U.S. 935 (2005). There, the circuit court flatly rejected the plaintiffs' attempt to characterize their claims "in terms of market manipulation, pursuant to Rule 10b-5(a) and (c)," explaining that "where the sole basis for [a § 10(b) claim] is alleged misrepresentations [or] omissions, plaintiffs have not made out a market manipulation claim under Rule 10b-5(a) and (c) . . . ." *Id.* That same conclusion applies here, where the sole basis for Plaintiffs' purported losses are alleged misrepresentations. *See* Compl. ¶¶ 155-157.

2.     *Plaintiffs Have Not Alleged "Deception."*

Nor have Plaintiffs alleged "deception," the other category of conduct proscribed by the statute. According to the Supreme Court, conduct is "deceptive" only when it involves a material misstatement or omission, neither of which is present here *as to Mr. Barnaba*. *See Central Bank*, 511 U.S. at 177 ("the statute prohibits only the making of a material misstatement (or omission) or the commission of a manipulative act"); *see also Santa Fe Indus.*, 430 U.S. at 474 (merger transaction not "deceptive" under § 10(b) where complaint does not allege a material misrepresentation or failure to disclose). Thus, a defendant must actually make a material misrepresentation or omission for which the defendant had "an affirmative duty of disclosure" in order to be held liable in a private action under § 10(b). *In re Sofamor Danek*

11

*Group, Inc.*, 123 F.3d 394, 400 (6th Cir. 1997). "Anything short of [actually making the alleged false statement] is merely aiding and abetting, and . . . is not enough to trigger liability under Section 10(b)." *Wright v. Ernst & Young, LLP*, 152 F.3d 169, 175 (2d Cir. 1998) (quoting *Shapiro v. Cantor*, 123 F.3d 717, 720 (2d. Cir. 1997)).

Plaintiffs do not, however, adequately allege that Mr. Barnaba "made" any of the purported misstatements identified in the Complaint. In *In re Tyson Foods, Inc. Sec. Litig.*, 155 F.App'x 53, 56 (3d Cir. 2005), the Third Circuit determined the standard for "making" a statement for the purpose of § 10(b). It considered the so-called "bright-line" test laid out in *Wright* – requiring that the defendant actually make a statement attributed to him at the time of dissemination – as well the more liberal "substantial participation" test embraced by the Ninth Circuit in *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1061 (9th Cir. 2000). It adopted neither, finding that the defendants could not be said to have "made" the alleged misrepresentations under § 10(b) because they had no role in drafting or preparing the allegedly false press releases and did not review them prior to their issuance. *In re Tyson Foods*, 155 F.App'x at 57.

Here, as in *Tyson Foods*, Plaintiffs do not allege that Mr. Barnaba "made" any of the purportedly false statements identified in the Complaint, had any role in the allegedly improper accounting decisions, or drafted, edited or signed C&A's public filings (or accompanying press releases). Under Supreme Court and Third Circuit precedent, therefore, Mr. Barnaba cannot be held liable because he did not "make" any of the alleged false statements. *See Central Bank*, 511 U.S. at 177; *Santa Fe Indus.*, 430 U.S. at 474; *In re Tyson*, 155 F.App'x at 56-57.

> 3.    *Plaintiffs Cannot Transform Mr. Barnaba Into a Primary Violator by Alleging That He Participated in a "Scheme To Defraud."*

Plaintiffs cannot avoid the Supreme Court's holding that § 10(b) proscribes only "manipulation" and "deception," nor the requirement that a defendant actually make a statement,

by alleging that Mr. Barnaba participated in a "fraudulent scheme" in violation of Rule 10b-5(a) and (c). *See, e.g.*, Compl. ¶¶ 40, 53, 55, 64, 155. The Supreme Court has stated on a number of occasions that notwithstanding the language of Rule 10b-5, liability "does not extend beyond conduct encompassed by § 10(b)'s prohibition." *United States v. O'Hagan*, 521 U.S. 642, 651 (1997); *see also Central Bank*, 511 U.S. at 173; *Santa Fe Indus.*, 430 U.S. at 472-74; *Ernst & Ernst*, 425 U.S. at 214. As a consequence, the language of Rule 10b-5(a) and (c) cannot be used to create additional categories of conduct proscribed by the statute. *See Central Bank*, 511 U.S. at 173; *Santa Fe Indus.*, 430 U.S. at 472-74; *Ernst & Ernst*, 425 U.S. at 214. Because the text of § 10(b), as interpreted by the Supreme Court, does not prohibit "scheming," it cannot be used as an independent basis for stating a "primary violation" against a non-speaker like Mr. Barnaba.

For this reason, the Eighth Circuit recently rejected a § 10(b) claim based on "scheming" in light of *Central Bank*, holding that "any defendant who does not make or affirmatively cause to be made a fraudulent misstatement or omission, or who does not directly engage in manipulative securities trading practices, is at most guilty of aiding and abetting and cannot be held liable under § 10(b) or any subpart of Rule 10b-5."[2] *In re Charter Commc's, Inc., Sec.*

---

[2] In *Charter Communications,* the plaintiffs alleged that Charter's vendors, who allegedly participated in sham transactions that Charter accounted for improperly were liable as primary violators of § 10(b) for "scheming" under Rule 10b-5(a) and (c). The Eighth Circuit rejected the claim as inconsistent with Supreme Court precedent:

> We conclude that *Central Bank* and the earlier cases on which it relied stand for three governing principles: (1) The Court's categorical declaration that a private plaintiff "may not bring a 10b-5 suit against a defendant for acts not prohibited by the text of § 10(b)," 511 U.S. at 173, included claims under Rule 10b-5(a) and (c), as well as Rule 10b-5(b). (2) A device or contrivance is not "deceptive," within the meaning of § 10(b), absent some misstatement or a failure to disclose by one who has a duty to disclose. *See Santa Fe Indus.*, 430 U.S. at 474-75. (3) The term "manipulative" in § 10(b) has the limited contextual meaning ascribed in *Santa Fe. Id.* at 476-77. Thus, any defendant who does not make or

*Litig.*, 443 F.3d 987, 992 (8th Cir. 2006), *cert. granted*, 127 S. Ct. 1873 (2007).   While the Third

Circuit has yet to consider the viability of scheme liability under § 10(b), the Second, Fifth,

Tenth, and Eleventh Circuits have adopted positions similar to the Eighth Circuit's, rejecting

scheme liability or requiring that a defendant commit a manipulative act or make a false

statement or omission to incur liability. *See Regents of the Univ. of Cal. v. Credit Suisse First

Boston (USA), Inc.*, 482 F.3d 372, 386-90 (5th Cir. 2007) (expressly rejecting "scheme" liability

and adopting Eighth Circuit's standard); *Lentell*, 396 F.3d at 177 (rejecting claim under Rule

10b-5(a) and (c) "where the sole basis for [the] claim is alleged misrepresentations or

omissions"); *see also Ziemba v. Cascade Int'l, Inc.*, 256 F.3d 1194, 1204-06 (11th Cir. 2001)

(defendant must make statement to be liable); *Wright*, 152 F.3d at 175 (same); *Anixter v. Home-

Stake Prod. Co.*, 77 F.3d 1215, 1225-27 (10th Cir. 1996) (same).   *But see Simpson v. AOL Time

Warner Inc.*, 452 F.3d 1040, 1048 (9th Cir. 2006) (expanding "deception" beyond Supreme

Court's definition to include a "scheme to defraud," where a defendant engaged "in conduct that

had the principal purpose and effect of creating a false appearance of fact in furtherance of the

scheme").

Previous decisions by this Court have permitted § 10(b) claims premised upon an alleged

"scheme" or "conspiracy" to defraud even after *Central Bank. See AES v. Corp. v. Dow

Chemical Co.*, No. Civ. A. 99-673-JJF, 2001 WL 34367296, at *3 (D. Del. Jan. 19, 2001)

(allowing primary § 10(b) claim based on allegation that defendant conspired to commit

---

> affirmatively cause to be made a fraudulent misstatement or omission, or
> who does not directly engage in manipulative securities trading practices,
> is at most guilty of aiding and abetting and cannot be held liable under §
> 10(b) or any subpart of Rule 10b-5.

*Id.* at 992 (footnote omitted.)  The Supreme Court has granted certiorari in the case and could
address the issue of "scheme" liability next term.

securities fraud); *Levine v. Metal Recovery Techs., Inc.*, 182 F.R.D. 102, 106 (D. Del. 1998) (allowing primary § 10(b) claim based on allegation that defendant participated in a scheme that operated as a fraud on the market); *Levine v. Metal Recovery Techs., Inc.*, 182 F.R.D. 112, 114-115 (D. Del. 1998) (allowing primary § 10(b) claim based on allegation that defendant conspired to commit securities fraud) (citing *AT&T v. Winback & Conserve Program, Inc.*, 42 F.3d 1421 (3d Cir. 1994) (permitting respondeat superior claims under the Lanham Act after *Central Bank*)). Mr. Barnaba respectfully submits that these decisions are inconsistent with Supreme Court precedent and the growing number of circuits rejecting "scheme liability" for non-speaking defendants, like Mr. Barnaba.

Indeed, the allegations that Mr. Barnaba participated in a "scheme" to inflate earnings, and thereby to misrepresent the Company's finances, are the very kind that *Central Bank* does not permit. *Central Bank* forecloses liability not only for aiding and abetting but also for "assisting" or "participating in" a § 10(b) violation and for conspiring with others to violate the statute. *See, e.g., Shapiro*, 123 F.3d at 720 ("Allegations of 'assisting,' 'participating in,' 'complicity in' and similar synonyms . . . fall within the prohibitive bar of *Central Bank*); *Ziemba*, 256 F.3d at 1205 ("allegations of substantial assistance in the fraud were the kinds of allegations that were rejected in *Central Bank*."). Re-labeling "assisting," "participating," or "conspiring" as "scheming" does not change the substance of the claim and cannot be used as an end run around *Central Bank*. An alleged participant in a "scheme to defraud," therefore, can be liable only if "*all* of the requirements for primary liability [] are met," as to him, *i.e.*, only if the plaintiff alleges that the individual actually made misstatements or omissions or committed manipulative acts. *Central Bank*, 511 U.S. at 191 (emphasis in original). Plaintiffs have not met this burden as to Mr. Barnaba.

15

Even assuming, *arguendo*, that scheme liability claims are still viable under § 10(b), Plaintiffs have not adequately alleged Mr. Barnaba's participation in a scheme. To state a scheme liability claim, the Ninth Circuit requires Plaintiffs to allege "that the defendant engaged in conduct that had the principal purpose and effect of creating a false appearance of fact in furtherance of that scheme." *Simpson*, 452 F.3d at 1048. Plaintiffs have made no such allegations against Mr. Barnaba here. As noted, the Complaint alleges only that Mr. Barnaba worked in the Company's Purchasing Department. He is not alleged to have committed a single act, much less one that had the effect of "creating a false appearance of fact." Further, even if Plaintiffs could allege that Mr. Barnaba participated in an allegedly fraudulent transaction, "[i]t is not enough that a *transaction* in which a defendant was involved had a deceptive purpose and effect; the defendant's *own conduct* contributing to the transaction or overall scheme must have had a deceptive purpose and effect." *Id.* (emphasis in original). Undoubtedly, in the absence of allegations specific to Mr. Barnaba, Plaintiffs have not alleged that his "own conduct" had a deceptive purpose or effect.

        4.    *Group Pleading Is Not Sufficient.*

Plaintiffs cannot use the "group pleading" doctrine to avoid the fact that they cannot identify any false statement by Mr. Barnaba. *See* Compl. ¶¶ 75-77. Said differently, Plaintiffs cannot plead a § 10(b) case by alleging, as they have tried to do, that an undifferentiated group of defendants made the Company's statements, without attributing specific statements to specific defendants.

First, the PSLRA requires that the plaintiff specify, as to "the defendant," "each statement alleged to have been misleading" and "the reason or reasons why the statement is misleading." 15 U.S.C. § 78u-4(b)(1). The plaintiff must also "state with particularity facts giving rise to a

strong inference that *the defendant* acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2) (emphasis added).  The group pleading doctrine, which creates a presumption at the pleading stage that a company's public filings are the collective work of a limited class of high-ranking executives who control the company (not Mr. Barnaba), and thereby relieves the plaintiff of the obligation to attribute particular misrepresentations to particular defendants, directly contradicts these requirements, as well as the particularity required by Rule 9(b).

Consequently, in *In re Digital Island Sec. Litig.*, this Court held that the PSLRA "effectively abolished the group pleading doctrine."  223 F. Supp. 2d 546, 553 (D. Del. 2002), *aff'd*, 357 F.3d 322 (3d Cir. 2004).  The Court reasoned that "the requirement under the PSLRA that scienter be pled with particularity as to each defendant would be rendered meaningless should group pleading survive."  *Id.*  Other district courts within the Third Circuit have reached the same result.  *See Israeli v. Team Telecon Int'l, Ltd.*, CA No. 04-CV-4305, 2006 WL 2883237, at *5 (D.N.J. Oct. 10, 2006) (noting that the prevailing authority within the district counsels that group pleading has been abolished); *P. Schoenfeld Asset Mgmt. LLC v. Cendant Corp.*, 142 F. Supp. 2d 589, 620 (D.N.J. 2001) (concluding that the PSLRA abolished the group pleading doctrine); *In re PMA Capital Corp. Sec. Litig.*, No. 03-6121, 2005 WL 1806503, at *12, (E.D. Pa. Jul. 27, 2005) (same).[3]

---

[3]    Although a small minority of district courts in other circuits continue to apply the doctrine, the majority do not.  *See, e.g., Coates v. Heartland Wireless Communs, Inc.*, 26 F. Supp. 2d 910, 916 (N.D. Tex. 1998) ("[i]t is nonsensical to require that a plaintiff specifically allege facts regarding scienter as to each defendant, but to allow him to rely on group pleading in asserting that the defendant made the statement or omission"); *Allison v. Brooktree Corp.*, 999 F. Supp. 1342, 1350 (S.D. Cal. 1998) ("[t]o permit a judicial presumption as to particularity simply cannot be reconciled with the statutory mandate that plaintiffs must plead specific facts as to each act or omission by the defendant"); *In re Miller Indus., Inc. Sec. Litig.*, 12 F. Supp. 2d 1323, 1329 (N.D. Ga. 1998); *Chu v. Sabratek Corp.*, 100 F. Supp. 2d 827, 835-37 (N.D. Ill. 2000); *Marra v. Tel-Save Holdings, Inc.*, No. 98-3145, 1999 WL 317103, at **4-5 (E.D. Pa. May 18, 1999).

Moreover, the sole court of appeals to consider the precise issue held that the group pleading doctrine "cannot withstand the PSLRA's specific requirement that the untrue statements or omissions be set forth with particularity as to 'the defendant' and that scienter be pleaded with regard to 'each act or omission' sufficient to give 'rise to a strong inference that the defendant acted with the required state of mind.'" *Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.*, 365 F.3d 353, 364 (5th Cir. 2004).[4]  Instead, the PSLRA requires that a plaintiff specify which allegedly false document is attributable to each defendant as well as "which portions or statements within these documents are assignable to each individual defendant." *Id.* at 365. Plaintiffs have failed utterly to meet that standard here.  They have not identified any particular document or filing that Mr. Barnaba assisted in drafting, much less identified an allegedly false statement within such a document that is attributable to Mr. Barnaba.

Second, and in any event, even if the group pleading doctrine survived the PSLRA and *Central Bank*, it could not be applied to Mr. Barnaba, because he was only a mid-level manager in the Purchasing Department, not a high-level corporate insider with control over the Company's statements.  The doctrine, even in other jurisdictions where it still exists, is

---

[4]  The group pleading doctrine also conflicts with the PSLRA's requirement that securities fraud claims must be pled with particularity based on the plaintiff's knowledge *at the time suit is filed*. The PSLRA imposes a stay of all discovery during the pendency of any motion to dismiss in order to "'protect[] . . . corporate defendants from plaintiffs' counsel 'discovering' their way into facts which could allow them to amend an initially frivolous complaint so as to state a claim.'" *Log On America, Inc. v. Promethean Asset Mgmt. L.L.C.*, 210 F. Supp. 2d 291, 293 (S.D.N.Y. 2001) (quoting *Tobias Holdings, Inc. v. Bank United Corp.*, 177 F. Supp. 2d 162, 164 (S.D.N.Y. 2001)); *see also* 15 U.S.C. § 78u-4(b)(3)(B).  Moreover, the requirement that, for allegations based on information and belief, "the complaint shall state with particularity all facts on which that belief is formed," 15 U.S.C. § 78u-4(b)(1), ensures that plaintiffs cannot simply sue first and discover the supporting facts later.  The group pleading doctrine, however, dispenses with all of these rules and allows a plaintiff to sue without knowing whether a particular defendant engaged in conduct constituting a "primary violation," without pleading the defendant's conduct with particularity, and with the express purpose of permitting the plaintiff to discover his case later.

"extremely limited in scope," *Irvine v. ImClone Systems, Inc.*, No. 02 Civ. 109 RO, 2003 WL 21297285, at *2 (S.D.N.Y. 2003), and applies only to those "highly ranked officers or directors who participated in the preparation and dissemination" of a corporation's statements in documents such as SEC filings, prospectuses, and press releases. *Degulis v. LXR Biotechnology, Inc.*, 928 F. Supp. 1301, 1311-12 (S.D.N.Y. 1996). Here, the Complaint alleges that Mr. Barnaba was a mid-level manager in Purchasing, which should foreclose any argument that he falls within the limited class of highly ranked corporate insiders as to whom the doctrine could apply.[5]

## B.    Plaintiffs Have Not Adequately Pled Scienter as to Mr. Barnaba.

Under the PSLRA, a plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind," 15 U.S.C. § 78u-4(b)(2); *see*

_____

[5] Reliance on a defendant's misstatement or omission is a required element of a claim under § 10(b). *Basic Inc. v. Levinson*, 485 U.S. 224, 243 (1988); *Berckeley Inv. Group, Ltd. v. Colkitt*, 455 F.3d 195 (3d Cir. 2006) ("In order to establish reliance, or transaction causation, a Section 10(b) plaintiff must prove that but for the fraudulent misrepresentation, the investor would not have purchased or sold the security.") (internal quotations and citations omitted). But because Plaintiffs have not alleged that Mr. Barnaba made a statement or omission, they likewise have not alleged that they relied on a statement by him in deciding to purchase or sell C&A securities. Indeed, one of the Supreme Court's reasons for holding in *Central Bank* that § 10(b) does not cover aiding and abetting was that otherwise "the defendant could be [held] liable without any showing that the plaintiff relied upon the aider and abettor's statements or actions." *Central Bank*, 511 U.S. at 180.

Similarly, Plaintiffs have not met the PSLRA's requirement to prove that a particular defendant's act or omission caused the loss for which the plaintiff seeks to recover damages. See 15 U.S.C. § 78u-4(b)(4); *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336 (2005). Under *Dura*, a loss must be directly tied to exposure of a company's fraudulent inflation of its securities. *Id.* Here, Plaintiffs weakly attempt to establish "loss causation" as to all defendants, including Mr. Barnaba, in one paragraph, in which they allege "as direct and proximate result of these Defendants' wrongful conduct, Collins & Aikman suffered damages in connection with its sales of securities and the issuance of the materially false and misleading statements alleged herein." (Compl. ¶ 157). Plaintiffs do not allege, however, how anything Mr. Barnaba, a non-speaker, did or said was a direct or proximate cause of its losses and therefore have not alleged "loss causation" with respect to him.

*also In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 530 (3d Cir. 1999), which for a § 10(b) claim is "'a mental state embracing an intent to deceive, manipulate or defraud.'" *In re IKON Office Solutions, Inc. Sec. Litig.*, 277 F.3d 658, 667 (3d Cir. 2002) (quoting *Ernst & Ernst*, 425 U.S. at 193 n.12). Moreover, "boilerplate and conclusory allegations will not suffice" to establish scienter. *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1418 (3d Cir. 1997).

Instead, as the Supreme Court just decided in *Tellabs,* "in determining whether the pleaded facts give rise to a 'strong' inference of scienter, the court must take into account plausible opposing inferences." 127 S. Ct. at 2509. In other words, "the inference of scienter must be more than merely 'reasonable' or 'permissible' – it must be cogent and compelling, thus strong in light of other explanations. A complaint will survive, we hold, only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id*. at 2510.

A plaintiff may establish a "strong inference" that the defendants acted with scienter by "either (a) alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *GSC Partners CDO Fund v. Washington*, 368 F.3d 228, 237 (3d Cir. 2004) (citing *In re Burlington*, 114 F.3d at 1418). Here, Plaintiffs have failed to allege either as to Mr. Barnaba.

           1.     *Plaintiffs Have Not Alleged that Mr. Barnaba Had Motive or Opportunity to Commit Fraud.*

Motive must be supported by facts stated "with particularity," and must give rise to a "strong inference" of scienter. *In re Advanta*, 180 F.3d at 535; 15 U.S.C. § 78u-4(b)(2). "'Blanket assertions of motive and opportunity' will not suffice, and 'catch-all allegations that defendants stood to benefit from wrongdoing and had the opportunity to implement a fraudulent

scheme are no longer sufficient, because they do not state facts with particularity or give rise to a strong inference of scienter.'" *GSC Partners*, 368 F.3d at 237 (quoting *In re Advanta*, 180 F.3d at 535).  Moreover, "[m]otives that are generally possessed by most corporate directors and officers do not suffice; instead, plaintiffs must assert a concrete and personal benefit to the individual defendants resulting from this fraud." *Id.* (citing *Kalnit v. Eichler*, 264 F.3d 131, 139 (2d Cir. 2001)).  Such insufficient motives include increasing company stock price or executive compensation, making the business appear to be profitable, and retaining one's position on the board of directors. *Kalnit*,  264 F.3d at 139-140 (citing cases); *see also San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos.*, 75 F.3d 801, 813-14 (2d Cir. 1996) (finding defendants' desire to maintain the company's high bond or credit rating insufficient to allege motive).  Allowing such generic motives to substantiate an intent to defraud would mean that "virtually every company in the United States that experiences a downturn in stock price could be forced to defend securities fraud actions." *Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 54 (2d Cir. 1995).

Here, Plaintiffs have wholly failed to plead either motive or opportunity as to the Director and Officer Defendants as a group, much less as to Mr. Barnaba specifically.  For example, Plaintiffs do not allege that any of the Officer and Director Defendants, including Mr. Barnaba, personally sold Company stock on the basis of material undisclosed information, an allegation which courts have held to be sufficient in certain circumstances to establish scienter. *E.g., In re Burlington*, 114 F.3d at 1424 (holding that plaintiffs may establish a strong inference of scienter if they allege insider trades "made at times and in quantities that were suspicious enough" to support such an inference).  Nor do Plaintiffs allege that any of the Officer and Director Defendants, including Mr. Barnaba, were compensated on the basis of the activities alleged in

the Complaint.  In fact, Plaintiffs do not use the word "motive" even once in their 215-paragraph Complaint.

As to opportunity, the bulk of Plaintiffs' allegations concern purported improper accounting.  *See, e.g.,* Compl. ¶¶ 48-52, 90-97, 53-58, 98-102.  But the Complaint contains no allegations that Mr. Barnaba was an accountant, had accounting responsibility, or communicated with the Company's auditors.  Nor does the Complaint, other than through impermissible group-pled allegations, allege that Mr. Barnaba was involved in drafting the Company's statements or ever reviewed them prior to issuance.  As noted, the Complaint mentions Mr. Barnaba only once, in a short paragraph naming his positions in C&A's plastics division.  Compl. ¶ 13.  There are simply no allegations specific to Mr. Barnaba that he ever participated in C&A's allegedly incorrect accounting decisions or public statements.  Given these failings and the strictures of the PSLRA, Plaintiffs have not pled a strong inference of scienter via motive or opportunity.

> 2.    *Plaintiffs Have Not Alleged Strong Circumstantial Evidence of Recklessness or Intentional Misconduct by Mr. Barnaba.*

Nor have Plaintiffs established scienter by the alternative means of alleging strong circumstantial evidence of recklessness or intentional conduct.  *See GSC Partners*, 368 F.3d at 237.  Further, because they have not pled (or even attempted to plead) motive and opportunity, the strength of their allegations indicating conscious behavior would need to be correspondingly greater in order to establish scienter.  *See id.* at 238 (citing *Kalnit*, 264 F.3d at 142).

As with motive and opportunity, Plaintiffs may not plead a strong inference of recklessness or intentional misconduct "with conclusory assertions that the defendants acted 'knowingly.'"  *In re Advanta*, 180 F.3d at 539.  Instead, because the PSLRA requires Plaintiffs to plead scienter with particularity, they "must support their allegations with the essential factual background that would accompany 'the first paragraph of any newspaper story – that is the who,

22

what, when, where and how of the events at issue.'" *GSC Partners*, 368 F.3d at 239 (quoting

*DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990)). In this context, a reckless

statement is one "'involving not merely simple, or even inexcusable negligence, but an extreme

departure from the standards of ordinary care, and which presents a danger of misleading buyers

or sellers that is either known to the defendant or so is obvious that the actor must have been

aware of it.'" *In re Advanta*, 180 F.3d at 535 (citing *McLean v. Alexander*, 599 F.2d 1190, 1197

(3d Cir. 1979)).

Plaintiffs have failed utterly to plead recklessness or intentional conduct with

particularity here. As noted several times, Plaintiffs mention Mr. Barnaba by name only once,

and then only to list his positions at the Company. Compl. ¶ 13. The numerous allegations as to

"Defendants" or the "Director and Officer Defendants" are no substitute for alleging specific

facts establishing Mr. Barnaba's scienter and are legally insufficient under the PSLRA. *See* 15

U.S.C. § 78u-4(b)(2) (requiring plaintiff to "state with particularity facts giving rise to a strong

inference that *the defendant* acted with the required state of mind") (emphasis added). *See also*

*In re Digital Island*, 223 F. Supp. 2d at 553-554 (noting that "courts have reasoned that the

requirement under the PSLRA that scienter be pled with particularity as to *each* defendant would

be rendered meaningless should group pleading survive") (emphasis added). Indeed, the

Complaint does not contain a single factual allegation establishing that Mr. Barnaba had

knowledge of incorrect accounting decisions or false statements.

Moreover, even if Plaintiffs' group-pled allegations of knowledge were directed

specifically toward Mr. Barnaba, they would be insufficient to plead scienter. The allegations

that the defendants knew or must have known of the purported fraudulent activity by virtue of

23

their positions with the Company[6] are insufficient as a matter of law to plead scienter.  *In re Advanta*, 180 F.3d at 539 ("Allegations that a securities-fraud defendant, because of his position within the company, 'must have known' a statement was false or misleading are 'precisely the types of inferences which [courts] on numerous occasions, have determined to be inadequate to withstand Rule 9(b) scrutiny.'") (citing *Maldonado v. Dominguez*, 37 F.3d 1, 10 (1st Cir. 1998)); *In re Digital Island*, 223 F. Supp. 2d at 555 (same, citing *In re Advanta*).  Likewise, Plaintiffs' bare allegations that "Defendants knew" that certain publicly filed statements were false[7] do not plead the "who, what, when, where and how" required to plead a strong inference of scienter. *See GSC Partners*, 368 F.3d at 239.  How did these Defendants know the statements were false? Which statements did they know were false?  Which Defendants knew?  Which document or

---

[6] *E.g.*, ¶ 27 ("Because of these positions and such access, each of the Director and Officer Defendants knew that the true facts specified herein regarding Collins & Aikman's business and finances had not been disclosed to and were being concealed from its shareholders, its creditors, vendors, customers, employees and the public."; "Because of the officer and director defendants' positions with the Company, they knew of the adverse non-public information about Collins & Aikman's operations and finances, as well as its accounting practices, markets and business prospects, via access to internal corporate documents (including Collins & Aikman's financial statements, operating plans, budgets and forecasts and reports of actual operations), conversations and connections with other corporate officers and employees, attendance at management and/or board of directors' meetings and meetings of committees thereof and via reports and other information provided to them in connection therewith.").

[7] *E.g.*, ¶ 66 ("The representations in the press release [of March 17, 2005] about the rebate accounting, the scope of that problem and the liquidity of the Company were materially false, fraudulent, and misleading when made. As Defendants knew, the rebate accounting issue spanned a period as far back to late 2001 and covered substantially all of the rebates that the Company had recognized during that time, as detailed herein, and the Company did not possess $86 million in liquidity – rather, Collins & Aikman only had $12 million of liquidity due to restrictions on its borrowings."); ¶ 154 ("The Director and Officer Defendants and others acting at their direction caused Collins & Aikman to issue materially false and misleading statements, as detailed above, which they knew, or deliberately disregarded that they were, misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.").

event alerted to them that fact that the publicly filed statements were false? Plaintiffs do not plead any of these facts in their Complaint.

Given these deficiencies, an inference that Mr. Barnaba individually acted with the intent to defraud is neither "cogent and compelling" nor as strong as other "plausible nonculpable explanations" for Mr. Barnaba's alleged conduct. *Tellabs,* 127 S. Ct. at 2510. Accordingly, Plaintiffs' § 10(b) claim against Mr. Barnaba must be dismissed for the additional reason that they have not adequately pled scienter.

## II. PLAINTIFFS HAVE FAILED TO STATE A CLAIM AGAINST MR. BARNABA UNDER EXCHANGE ACT SECTION 14(a) AND RULE 14a-9.

Plaintiffs further assert a claim that "the Director and Officer Defendants" violated Rule 14a-9, 17 C.F.R. § 240.14a-9, promulgated under § 14(a) of the Exchange Act, 15 U.S.C. § 78n(a). Compl. ¶¶ 160-61. Rule 14a-9 prohibits solicitation of proxies by means of false or misleading proxy statements. *In re Reliance Sec. Litig.*, 135 F. Supp. 2d 480, 511 (D. Del. 2001) (citing the Rule). To prevail on the merits of a § 14(a) claim, "a plaintiff must show that (1) the defendant made a material misrepresentation or omission in a proxy statement (2) with the requisite state of mind (3) that caused the plaintiff's injury and (4) the proxy solicitation was an essential link in the accomplishment of the transaction." *Id.* Further, like those under § 10(b), claims under § 14(a) are subject to the heightened pleading requirements of the PSLRA. *Bond Opportunity Fund v. Unilab Corp.*, No. 99 Civ. 11074 (JSM), 2003 WL 21058251, at *3 (S.D.N.Y. May 9, 2003).

Here, even assuming, *arguendo*, that C&A's proxy statements in fact contained material misrepresentations, Plaintiffs fail to plead a § 14(a) claim against Mr. Barnaba because the Complaint does not plead any alleged misstatements with particularity, does not allege that Mr.

Barnaba personally made or approved a misstatement or omission in the proxy statements, and does not allege with particularity that Mr. Barnaba acted with the requisite state of mind.

### A.    Plaintiffs Do Not Plead Misstatements in the Proxy Statements with Particularity.

To plead a misstatement with particularity as required by the PSLRA, a complaint must specify "each statement that is alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made upon information and belief, all facts with particularity on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). *See also Bond Opportunity Fund*, 2003 WL 21058251, at *3 (applying particularity requirement to § 14(a) claim). The Complaint, however, provides no such specificity and instead pleads only one substantive paragraph regarding the allegedly misstated proxy statements, which reads, in its entirety:

> During 2002, 2003 and 2004, Defendants caused Collins & Aikman to file and disseminate to its shareholders materially false and misleading Proxy Statements which failed to disclose that the Company was reporting financial results which were artificially inflated by the improper accounting practices detailed herein. In each of the Proxy Statements, Collins & Aikman sought shareholder approval for, among other things, the election of directors, employee stock option plans and compensation policies.

Compl. ¶ 77.

Plaintiffs do not identify what *was* disclosed in the proxy statements or describe what was omitted from each. Nor do Plaintiffs cite a single specific proxy statement that was materially false. Plaintiffs do not even identify how many proxy statements the Company issued over the course of those three years. A blanket allegation that some unknown number of Company statements issued over a period of several years were misstated is wholly insufficient to satisfy the PSLRA's heightened particularity standards.

**B.    Plaintiffs Do Not Allege That Mr. Barnaba Made a Material Misrepresentation or Omission in a Proxy Statement.**

As this Court has stated, to state a claim under § 14(a), a plaintiff must plead that "*the defendant* made a material misrepresentation or omission in a proxy statement." *In re Reliance*, 135 F. Supp. 2d at 511 (emphasis added). In other words, only defendants to whom misstatements or omissions in the proxy statements are attributable can be liable for those statements. *Id.* at 512. Misstatements or omissions cannot be attributed to every employee in a corporation; rather, "Plaintiffs can attribute the misstatements or omissions of the [p]roxy [s]tatement to the defendants *that approved the document*, if they can show that the defendants knew or should have known that the [p]roxy [s]tatement contained material misrepresentations at the time of approval." *Id.* (emphasis added). In *In re Reliance*, this Court therefore found that where officers and directors approved the company's proxy statements, they could be held liable for them even though they had not participated in the preparation or drafting of those statements. *Id.* at 511-512. Similarly, in *Gould v. American-Hawaiian S.S. Co.*, 535 F.2d 761, 776 (3d Cir. 1976), the Third Circuit permitted a corporation's director to be liable for misrepresentations in a proxy statement because he "saw and approved a draft of the proxy statement subsequently issued." *See also Robbins v. Banner Indus., Inc.*, 285 F. Supp. 758, 762 (S.D.N.Y. 1966) (holding complaint did not state a claim against individual under § 14(a) because plaintiff's attorney conceded that he was not the author of the offending proxies).

Plaintiffs allege no such "review" or "approval" here as to any particular Defendant and certainly not as to Mr. Barnaba. While certain of the Director and Officer Defendants may have reviewed and approved proxy statements issued by the Company between 2002 and 2004, Plaintiffs have not so alleged and in any event could not do so as to Mr. Barnaba, a mid-level manager in C&A's Purchasing Department. Moreover, to the extent Plaintiffs attempt to rely on

27

group pleading to resurrect their § 14(a) claim, as discussed above, group pleading is no longer viable after the enactment of the PSLRA. *In re Digital Island*, 223 F. Supp. 2d at 553; *Bond Opportunity Fund*, 2003 WL 21058251, at *4 (disregarding group pled allegations supporting § 14(a) claim because doctrine eliminated by the PSLRA). To allow Plaintiffs' § 14(a) claim to survive as pled would be tantamount to holding that every corporate employee, no matter his rank or responsibility, is potentially liable for misstatements or omissions in the corporation's proxy statements. Such a result is not possible under the PSLRA.

### C.   Plaintiffs Have Not Adequately Pled That Mr. Barnaba Acted with the Requisite Intent.

Unlike for a § 10(b) claim, the required state of mind for a § 14(a) claim is negligence. *In re Reliance*, 135 F. Supp. 2d at 511. But because the PSLRA governs claims brought under all of the Exchange Act, including § 14(a), Plaintiffs must plead with particularity facts that give rise to a "strong inference of negligence" on the part of defendants. *Bond Opportunity Fund*, 2003 WL 21058251, at *4. Nonetheless, with regard to the proxy statements specifically, Plaintiffs allege only that "Heartland and the Director and Officer Defendants should have known that the Proxy Statements were materially false or misleading." Compl. ¶ 161. Plaintiffs do not detail how these Defendants should have known this or describe what information they possessed that might have contradicted facts in the proxy statements. *See Bond,* 2003 WL 21058251, at *4 ("where plaintiffs contend that the defendants had access to facts contrary to those stated in the proxy materials, they must specifically identify the reports or statements containing this information").

Further, the bald assertion that the Officer and Director Defendants "should have known" that the proxy statements were misleading is insufficient. As for pleading scienter under § 10(b), pleading that insiders "must have known" the true facts of the proxy statement will not suffice.

*Id.* (citing *In re Reliance*, 135 F. Supp. 2d at 507). Accordingly, the Complaint's bare allegation of negligence with regard to the "Director and Officer Defendants" as a group is insufficient to plead a § 14(a) claim against Mr. Barnaba.

## III.    THE COURT SHOULD DECLINE TO EXERCISE JURISDICTION OVER THE STATE LAW CLAIMS AGAINST MR. BARNABA.

Because Plaintiffs' federal claims against Mr. Barnaba must be dismissed, the court should decline to exercise jurisdiction over their state law claims. *See Great Lakes Chem. Corp. v. Monsanto Co.,* 96 F. Supp. 2d 376, 394 (D. Del. 2000) (*citing United Mine Workers of America v. Gibbs*, 383 U.S. 715, 726 (1966)). In addition, all these claims must be dismissed for the reasons set forth below.

## IV.    THE COMPLAINT FAILS TO STATE A CLAIM THAT MR. BARNABA VIOLATED FIDUCIARY DUTIES.

### A.    Mr. Barnaba Did Not Owe Fiduciary Duties as a Director or Officer of Collins & Aikman.

Plaintiffs' fiduciary duty claim against Mr. Barnaba, as one of the Officer and Director Defendants, fails because Mr. Barnaba was not a director or officer of the Company and did not owe fiduciary duties to its creditors or shareholders.

As described above, Mr. Barnaba was an employee in C&A's Purchasing Department. *See* Compl. ¶ 13. He is not listed as an officer of the Company in C&A's public filings referred to in the Complaint. *See* page 7, *supra*. Unlike the Company's directors or senior management, Mr. Barnaba did not have the "ability to control the business affairs of Collins & Aikman." Compl. ¶ 25. Rather, as a Collins & Aikman employee, Mr. Barnaba acted as an agent of the Company. It is well-established that "[a]n agent's fiduciary duty is not without limits. To the contrary, an agent's fiduciary duty is limited by the scope of the agency…." *Lazard Debt Recovery GP, LLC v. Weinstock*, 864 A.2d 955, 966 (Del. Ch. 2004). In *Lazard*, the court

29

dismissed breach of fiduciary duty claims against two investment professionals because their alleged misconduct did not relate to investment decisions, the only area in which they owed fiduciary duties to investors. *Id.* Similarly, Mr. Barnaba cannot be held responsible for any corporate obligations that were beyond the scope of his authority at the Company.

Plaintiffs do not even attempt to plead what Mr. Barnaba's responsibilities were, let alone how he may have violated them. Plaintiffs acknowledge that Mr. Barnaba was only a mid-level manager, and do not allege that he had any role in the Company's accounting practices or in the preparation of its financial statements. Plaintiffs nonetheless claim that Mr. Barnaba had a fiduciary duty to, among other things, "[e]xercise reasonable control and supervision over public statements to the securities markets" and "[m]aintain and implement an adequate, functioning system of internal legal, financial and accounting controls." Compl. ¶ 26. It is clear from Plaintiffs' own description of Mr. Barnaba that he had no authority to do any of these things, and the fiduciary duty claims against him should therefore be dismissed.

**B.    Even If Mr. Barnaba Could Be Considered an Officer of the Company Following His December 2004 Promotion, He Did Not Violate Any Fiduciary Duties.**

Even assuming, *arguendo*, that Mr. Barnaba's position as Vice President and Director of Purchasing for the Plastics Division made him an "officer" of the Company from December 2004 until April 2005, a conclusion contradicted by the Company's public filings, Plaintiffs do not state a claim that he breached his fiduciary duties of "loyalty, good faith and care." Compl. ¶¶ 165-66.

1.    *The Complaint Fails to Allege Breaches of the Duty of Loyalty or Due Care Against Mr. Barnaba.*

The duty of loyalty "mandates that the best interest of the corporation and its shareholders takes precedence over any interest possessed by a director, officer or controlling

shareholder and not shared by the stockholders generally." *Cede & Co. v. Technicolor, Inc.,* 634 A.2d 345, 361 (Del. 1993). *See also In re Reliance*, 135 F. Supp. 2d at 520 n.7 (breach of duty of loyalty involves "some form of self-dealing or misuse of corporate office for personal gain"). "Classic examples" of breaches of the duty of loyalty involve a corporate director or officer "appearing on both sides of a transaction or … receiving a personal benefit from a transaction not received by the shareholders generally." *Cede*, 634 A.2d at 362.

The duty of due care is the duty of corporate directors and officers to "act on an informed basis." *Id*. at 367. A court considering a due care claim is confined to examining the process of the corporate official's decision-making, rather than the merits of the decision. *Citron v. Fairchild Camera & Instrument Corp.,* 569 A.2d 53, 66 (Del. 1989); *see also Brehm v. Eisner,* 746 A.2d 244, 264 (Del. 2000) ("Due care in the decisionmaking context is process due care only."). The claim may only survive if the plaintiff pleads facts to overcome the presumption that the officers' and directors' decisions are subject to the protections of the business judgment rule. *Citron,* 569 A.2d at 64.

Plaintiffs do not allege that Mr. Barnaba – or any of the Director and Officer Defendants – engaged in any interested transaction or any form of self-dealing. Nor does the Complaint challenge the process behind any corporate decision. Instead, Plaintiffs contend that the Director and Officer Defendants had a duty "to promptly disseminate accurate and truthful information with respect to the Company's operations and financial condition" and to "disclose material adverse information regarding Collins & Aikman." Compl. ¶¶ 25, 27. While corporate disclosures may implicate the fiduciary duties of care and loyalty, *see In re Reliance*, 135 F. Supp. 2d at 520, Plaintiffs' allegations fail to state such a claim against Mr. Barnaba.

A board of directors of a Delaware corporation has a duty to disclose "all material information within the board's control *when it seeks shareholder action.*" *Malone v. Brincat,* 722 A.2d 5, 9 (Del. 1998) (emphasis in original; internal quotation and citation omitted). However, a "board need not engage in 'self-flagellation.'" *Khanna v. McMinn*, No. Civ. A. 20545-NC, 2006 WL 1388744, at *29 (Del. Ch. May 9, 2006). In other words, the board "is not required to confess to wrongdoing prior to any adjudication of guilt, nor must it draw legal conclusions implicating itself in a breach of fiduciary duty from surrounding facts and circumstances prior to a formal adjudication of the matter." *Id.* (internal quotations and citations omitted).

When no shareholder action is sought, the fiduciary duty to disclose is much more limited, and prohibits "deliberately misinforming shareholders about the business of the corporation." *Malone,* 722 A.2d at 14. A plaintiff asserting such a claim must plead that the director or officer actually intended to mislead the shareholders, a "level of proof ... even more stringent than ... the level of scienter required for common law fraud." *Metro Commc'n Corp. BVI v. Advanced Mobilecomm Techs. Inc.*, 854 A.2d 121, 158 (Del. Ch. 2004). *See also Steinman v. Levine*, Civ. No. 19107, 2002 WL 31761252, at *13 (Del. Ch. Nov. 27, 2002) (dismissing breach of fiduciary duty claim where alleged misrepresentations were "not false communications from directors *who were deliberately misinforming shareholders*").

The Complaint does not allege that Mr. Barnaba participated in the dissemination of the Company's proxy statements or other materials seeking shareholder action. None of the alleged misstatements in the five-month period in which Mr. Barnaba held the title of Vice President and Director of the Purchasing for the Plastics Division occurred under circumstances in which shareholder action was requested. *See* Compl. ¶¶ 65-74. Mr. Barnaba thus had no obligation to

32

"disclose material adverse information" concerning the Company, even if he were a corporate officer for that brief period of time. Plaintiffs can only prevail on their duty to disclose theory if they can establish that Mr. Barnaba deliberately sought to mislead the Company's shareholders – a claim utterly unsupported by factual allegations in the Complaint.

2.    *Plaintiffs Do Not State a Claim for a Violation of the Duty of Good Faith Against Mr. Barnaba.*

Plaintiffs have similarly failed to plead a violation of the duty of good faith by Mr. Barnaba. The duty of good faith is a sub-part of the duty of loyalty. *See, e.g., Guttman v. Huang,* 823 A.2d 492, 506 n.34 (Del. Ch. 2003). To the extent Plaintiffs plead any facts related to the Director and Officer Defendants' duty of good faith, they appear to be alleging an "oversight" claim as recognized in *In re Caremark Int'l Inc. Derivative Litig.,* 698 A.2d 959, 971-72 (Del. Ch. 1996). *See* Compl. ¶ 26 & subparas. (a)-(g) (alleging that the Director and Officer Defendants had a duty to "exercise reasonable and prudent supervision over the management, policies, practices and controls" of Collins & Aikman). This claim also fails as a matter of law against Mr. Barnaba.

In *Caremark,* Chancellor Allen held that a breach of the duty of good faith lies if "director defendants were guilty of a sustained failure to exercise their oversight function." 698 A.2d at 971. Because it requires particularized facts showing gross negligence, "a claim for failure to exercise proper oversight is one of, if not the, most difficult theories on which to prevail." *Rattner v. Bidzos,* No. Civ. A. 19700, 2003 WL 22284323, at *12 (Del. Ch. Oct. 7, 2003).

In *Guttman,,* 823 A.2d at 507, the court dismissed a *Caremark* oversight claim because the

> conclusory complaint [was] empty of the kind of fact pleading that is critical to a *Caremark* claim, such as contentions that the

> company lacked an audit committee, that the company had an audit committee that met only sporadically and devoted patently inadequate time to its work, or that the audit committee had clear notice of serious accounting irregularities and simply chose to ignore them or, even worse, to encourage their continuation.

The same is true of the Complaint in this action. It is impossible to determine from the allegations in the Complaint "what role, if any, the Board or its members played in the internal processes of collecting and disseminating financial information." *Ratner*, 2003 WL 22284323, at *13. Rather, the Complaint makes clear that Collins & Aikman did have an Audit Committee, and that the Audit Committee instituted "corrective actions" when informed by its outside auditors of internal control issues. *See* Compl. ¶ 137.

Plaintiffs' putative oversight claim is even more deficient with respect to Mr. Barnaba. Mr. Barnaba is not alleged to have been a director or a member of the Audit Committee, and it strains credulity to imagine that his positions within the Purchasing Department permitted him to exercise any oversight function over the finances of the Company as a whole.

Because Plaintiffs do not state a claim that Mr. Barnaba breached any fiduciary duties to the Company or its shareholders, the fiduciary duty claims against him must be dismissed.

## V.    THE UNJUST ENRICHMENT CLAIM MUST BE DISMISSED BECAUSE PLAINTIFFS DO NOT ALLEGE THAT MR. BARNABA RECEIVED A BENEFIT.

To state a claim for unjust enrichment, plaintiffs must allege: "(1) an enrichment; (2) an impoverishment; (3) a relation between the enrichment and the impoverishment; (4) the absence of justification; and (5) the absence of a remedy provided by law." *Morschbach v. Household Int'l, Inc.*, No. Civ. A 01-262 GMS, 2002 WL 187514, at *5 (D. Del. Feb. 6, 2002) (citing *Jackson Nat. Life Ins. Co. v. Kennedy*, 741 A.2d 377, 393-94 (Del. Ch. 1999)). Plaintiffs do not even attempt to allege how Mr. Barnaba was "enriched." Plaintiffs allege in conclusory terms that the Director and Officer Defendants and Heartland "personally benefited" from their

allegedly wrongful conduct, but do not identify what this benefit was.  Compl. ¶¶ 169-170.

Moreover, as described above, the Complaint does not include a single factual allegation

attributing any misconduct to Mr. Barnaba personally.  It is impossible to ascertain from the

Complaint what "benefit" Plaintiffs seek to recoup from Mr. Barnaba, much less why his

retention of this benefit would be "unjust."  The unjust enrichment claim should be dismissed.

*See Albert v. Alex. Brown Mgmt. Servs., Inc.,* Nos. 762-N, 763-N, 2005 WL 2130607, at *8 (Del.

Ch. Aug. 26, 2005) (dismissing "bald claim that [defendants] were unjustly enriched at

[plaintiffs'] expense").

## VI.    PLAINTIFFS FAIL TO STATE A CLAIM FOR COMMON LAW FRAUD AGAINST MR. BARNABA.

### A.    Plaintiffs Fail to Plead Fraud With Particularity.

Plaintiffs' common law fraud claim, like their federal securities fraud claims, must be

pleaded with particularity.  *See* Fed. R. Civ. P. 9(b); *Metro Commc'n Corp.*, 854 A.2d at 144.  To

satisfy this standard, "plaintiffs must plead with particularity 'the circumstances of the alleged

fraud in order to place the defendants on notice of the precise misconduct with which they are

charged.'"  *Lum v. Bank of America*, 361 F.3d 217, 223-24 (3d Cir. 2004) (quoting *Seville Indus.*

*Mach. v. Southwest Mach. Corp.*, 742 F.2d 786, 791 (3d Cir. 1984).  The allegations "must be

specific enough to … enable defendant to prepare an effective response and defense."  *C.V. One*

*v. Resources Group*, No. 81C-OC95, 1982 WL 172863, at *2 (Del. Super. Dec. 14, 1982).  The

Complaint does not contain a single allegation concerning any fraudulent act allegedly

committed by Mr. Barnaba.  It must therefore be dismissed.

Plaintiffs' conclusory allegation that "[e]ach of the officer and director defendants

participated in the issuance and/or review of false and/or misleading statements," Compl. ¶ 27, is

unavailing.  "[O]blique references to false statements allegedly made by 'each defendant' will

not serve to attribute misrepresentations to all the defendants in an action." *Metro Commc'n Corp.*, 854 A.2d at 146 n.48.  Rather, Plaintiffs must demonstrate that Mr. Barnaba was an "actual participant" in the alleged fraud by showing that he "was responsible for the delivery of the written material" containing the false statements. *St. James Recreation, LLC v. Rieger Opportunity Partners, LLC*, No. Civ. A. 19346, 2003 WL 22659875, at *8 (Del. Ch. Nov. 5, 2003).  Plaintiffs fail to plead any facts that would support such an inference.

The Complaint is so deficient that it is impossible to determine what, if any, "misrepresentations of material facts to Collins & Aikman's Board of Directors and Audit Committee," Compl. ¶ 172, Plaintiffs attribute to Mr. Barnaba.  Because the fraud claim against Mr. Barnaba is insufficient to "place [him] on notice of the precise misconduct with which [he is] charged," *Lum,* 361 F.3d at 223-24, it must be dismissed.

### B.    Plaintiffs Fail to Allege Scienter.

Plaintiffs' common law fraud claim must be dismissed for the additional reason that it does not adequately allege scienter.  Plaintiffs' Claim for Relief states that the Director and Officer Defendants' acts, "whether intentional, reckless, grossly negligent or mistaken, constituted fraud." Compl. ¶ 173.  This allegation misstates the legal standard.  To state a claim for common law fraud, Plaintiffs must allege that Mr. Barnaba made a false representation with knowledge or reckless indifference as to the falsity of the statement. *See Vague v. Bank One Corp.,* No. 18741, 2006 WL 290299, at *7 (Del. Ch. Feb. 1, 2006) (plaintiff must allege "the defendant had knowledge or belief that the representation was false, or made the representation with requisite indifference to the truth"); *Legatski v. Bethany Forest Assoc., Inc.*, CA. No. 03C-10-011-RFS, 2006 WL 1229689, at *6 (Del. Super. Ct. Apr. 28, 2006) (same); *C.V. One*, 1982

WL 172863, at *2 (same). "[O]rdinary negligence" – and *a fortiori* mistake – "is insufficient to support a claim of common law fraud." *Metro Commc'n Corp.,* 854 A.2d at 148.

The bald allegation in paragraph 24 of the Complaint that the Director and Officer Defendants are guilty of "knowing" misconduct is insufficient to plead scienter, because neither Delaware nor federal law "permit[s] the conclusion that a defendant knew of certain facts involving an organization merely because the defendant had a position of responsibility within that organization." *Id.* at 148 n.50.

Because it does not allege the requisite scienter, Plaintiffs' common law fraud claim against Mr. Barnaba must be dismissed for this second, independent reason.

## CONCLUSION

For the reasons stated above, all claims against Mr. Barnaba should be dismissed.

Dated: September 14, 2007
       Wilmington, Delaware

Respectfully submitted,

By: *Elizabeth D. Power*

Thomas G. Macauley (ID No. 3411)
Elizabeth D. Power (ID No. 4135)
ZUCKERMAN SPAEDER LLP
919 Market Street, Suite 990
Wilmington, DE 19801
(302) 427-0400 Telephone
(302) 427-8242 Fax

-and-

Carl S. Kravitz, Esq.
Lenora Miles Rigby, Esq.
ZUCKERMAN SPAEDER LLP
1800 M Street, N.W., Suite 1000
Washington, D.C. 20036
(202) 778-1800 Telephone
(202) 822-8106 Fax

-and-

Laura Neish, Esq.
ZUCKERMAN SPAEDER LLP
1540 Broadway, Suite 1604
New York, NY 10036
(212) 704-9600 Telephone
(212) 704-4256 Fax

*Attorneys for Defendant Paul Barnaba*

EXHIBIT A

Table of Contents

SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

SCHEDULE 14A INFORMATION

**PROXY STATEMENT PURSUANT TO SECTION 14(a) OF THE
SECURITIES EXCHANGE ACT OF 1934**

Filed by the Registrant [X]
Filed by a Party other than the Registrant [ ]

Check the appropriate box:

[ ]    Preliminary Proxy Statement

[ ]    Confidential, for Use of the Commission Only (as permitted by Rule 14a-6(e)(2))

[X]    Definitive Proxy Statement

[ ]    Definitive Additional Materials

[ ]    Soliciting Material Pursuant to Section 240.14a-11(c) or Section 240.14a-12

Collins & Aikman Corporation

(Name of Registrant as Specified in Its Charter)

Not Applicable

(Name of Person(s) Filing Proxy Statement, if other than the Registrant)

Payment of Filing Fee (Check the appropriate box):

[X]    No fee required.

[ ]    Fee computed on table below per Exchange Act Rules 14a-6(i)(1) and 0-11.

   1)    Title of each class of securities to which transaction applies:

   2)    Aggregate number of securities to which transaction applies:

   3)    Per unit price or other underlying value of transaction computed pursuant to Exchange Act Rule 0-11 (set forth the amount on which the filing fee is calculated and state how it was determined):

4)   Proposed maximum aggregate value of transaction:

5)   Total fee paid:

[ ]   Fee paid previously with preliminary materials.

[ ]   Check box if any part of the fee is offset as provided by Exchange Act Rule 0-11(a)(2) and identify the filing for which the offsetting fee was paid previously. Identify the previous filing by registration statement number, or the Form or Schedule and the date of its filing.

1)   Amount Previously Paid:

2)   Form, Schedule or Registration Statement No.:

3)   Filing Party:

4)   Date Filed:

**Table of Contents**



Collins & Aikman Corporation
250 Stephenson Highway
Troy, Michigan 48083

April 25, 2002

Dear Stockholder:

You are cordially invited to attend the Annual Meeting of Stockholders of Collins & Aikman Corporation to be held on May 16, 2002 at The Waldorf-Astoria Hotel, the Norse Suite, 301 Park Avenue, New York, NY 10022, at 11:00 a.m., Eastern Daylight Savings Time.

You are urged to read carefully the formal notice of the meeting and the Proxy Statement which follow. After reading them, please sign, date and mail the enclosed proxy card so that your shares will be represented at the meeting. A prepaid return envelope is provided for this purpose.

We look forward to seeing you at the meeting.

Sincerely,

Thomas E. Evans
Chairman of the Board
and Chief Executive Officer

Table of Contents

## NOTICE OF ANNUAL MEETING OF STOCKHOLDERS
### To Be Held May 16, 2002

To the Stockholders of
COLLINS & AIKMAN CORPORATION:

      NOTICE IS HEREBY GIVEN that the Annual Meeting (the "Meeting") of the holders of common stock, par value $0.01 per share (the "Common Stock"), of COLLINS & AIKMAN CORPORATION, a Delaware corporation (the "Company"), will be held on May 16, 2002 at The Waldorf-Astoria Hotel, the Norse Suite, 301 Park Avenue, New York, NY 10022, commencing at 11:00 a.m., Eastern Daylight Savings Time, for the purpose of considering and voting upon the following matters:

    I. the election of five directors to hold office until the 2005 Annual Meeting and thereafter until their successors are elected and qualified;

    II. the approval of the Company's 2002 Employee Stock Option Plan;

    III. the approval of a proposal to effect a one-for-two and one-half reverse stock split of the Company's Common Stock; and

    IV. such other matters as may properly come before the Meeting or any adjournment or postponement thereof.

    The Board of Directors has fixed the close of business on April 2, 2002 as the record date for the determination of stockholders entitled to notice of and to vote at the Meeting. Therefore, only holders of record of Common Stock at the close of business on such date will be entitled to notice of and to vote at the Meeting.

    A complete list of stockholders entitled to notice of and to vote at the Meeting will be available at our offices at 250 Stephenson Highway, Troy, Michigan 48083, at least ten days prior to the Meeting. The list will also be available for inspection by stockholders at the Meeting.

    Stockholders are requested to sign and date the enclosed proxy card and return it promptly in the enclosed pre-addressed reply envelope, whether or not they plan to attend the Meeting, so that their shares may be represented. Any proxy may be revoked by filing with the Secretary of the Company, in care of the First Union Customer Information Service Center at the address set forth in the accompanying Proxy Statement, either a written notice of revocation bearing a later date than the proxy card or a subsequent proxy relating to the same shares at any time prior to the time the proxy is voted. Further, any person who has executed a proxy card and is present at the Meeting may vote in person instead of by proxy, thereby canceling any proxy previously given.

        By Order of the Board of Directors,

Ronald T. Lindsay
*Secretary*

PLEASE EXECUTE, DATE AND RETURN THE ENCLOSED PROXY CARD WHETHER OR NOT YOU INTEND TO BE PRESENT AT THE MEETING.

April 25, 2002

# TABLE OF CONTENTS

PROXY STATEMENT
PROPOSAL I ELECTION OF DIRECTORS
REPORT OF THE AUDIT COMMITTEE
COMPENSATION COMMITTEE REPORT ON EXECUTIVE COMPENSATION
EXECUTIVE OFFICERS OF THE COMPANY
EXECUTIVE COMPENSATION
Performance Graph
PROPOSAL II APPROVAL OF THE COMPANY'S 2002 EMPLOYEE STOCK OPTION PLAN
PROPOSAL III APPROVAL OF THE ONE-FOR-TWO AND ONE-HALF REVERSE STOCK SPLIT
CHANGES IN CERTIFYING ACCOUNTANT
STOCKHOLDER PROPOSALS
ANNUAL REPORT
OTHER MATTERS
Definitive Proxy Statement

Table of Contents

# PROXY STATEMENT

## COLLINS & AIKMAN CORPORATION
### 250 Stephenson Highway
### Troy, Michigan 48083

## ANNUAL MEETING OF STOCKHOLDERS
## To Be Held May 16, 2002

**General Information**

This Proxy Statement is furnished in connection with the solicitation by the Board of Directors of Collins & Aikman Corporation, a Delaware corporation (the "Company"), of proxies for use at the Annual Meeting of Stockholders of the Company to be held on May 16, 2002 at The Waldorf-Astoria Hotel, the Norse Suite, 301 Park Avenue, New York, NY 10022, commencing at 11:00 a.m., Eastern Daylight Savings Time, and at any adjournment or postponement thereof (the "Meeting").

The presence, in person or by proxy, of stockholders holding a majority of the shares entitled to vote at the Meeting is necessary to constitute a quorum at the Meeting.

All shares of the common stock, par value $0.01 per share (the "Common Stock"), of the Company which are entitled to vote and are represented at the Meeting by properly executed proxies received prior to or at the Meeting, and not revoked, will be voted at the Meeting in accordance with the instructions indicated on such proxies. If no instructions are indicated, such proxies will be voted for the election of the five nominees for director named below (or if any nominee becomes unavailable, such other person as the Nominating Committee of the Board of Directors or the Company selects), for the approval of the Company's 2002 Employee Stock Option Plan, for the approval of the proposed one-for-two and one-half reverse stock split and in accordance with the Board of Directors' recommendations with respect to any other matter that may properly come before the Meeting.

The Board of Directors has fixed the close of business on April 2, 2002 as the record date (the "Record Date") for the determination of stockholders entitled to notice of and to vote at the Meeting. Therefore, only holders of record of Common Stock at the close of business on the Record Date will be entitled to notice of and to vote at the Meeting.

Any proxy may be revoked by the person giving it at any time before it is voted. A proxy may be revoked by filing, with the Secretary of the Company (in care of the First Union Customer Information Service Center, Client Service Group, 1525 West W.T. Harris Boulevard, 3C3, Charlotte, North Carolina, 28288-1153, Attention: Proxy Department) at any time prior to the time the proxy is voted, either a written notice of revocation bearing a later date than the proxy card or a subsequent proxy relating to the same shares, or by attending the Meeting and voting in person (although attendance at the Meeting will not in and of itself constitute revocation of a proxy).

All expenses of this solicitation, including the cost of preparing and mailing this Proxy Statement, will be borne by the Company. In addition to solicitation by use of the mails, proxies may be solicited by directors, officers and employees of the Company in person or by telephone, telegram or other means of communication. Such directors, officers and employees will not be additionally compensated, but may be reimbursed for out-of-pocket expenses in connection with such solicitation. Arrangements will also be made with custodians, nominees and fiduciaries for forwarding of proxy solicitation materials to beneficial owners of Common Stock held of record by such custodians, nominees and fiduciaries, and the Company may reimburse such custodians, nominees and fiduciaries for reasonable expenses incurred in connection therewith.

Table of Contents

proxies will be voted for the election of such other person or persons as the Nominating Committee of the Board of Directors or the Company may select. The Company is not aware of any circumstances likely to render any nominee unavailable. According to the bylaws of the Company, directors shall be elected by a plurality of the votes cast. Therefore, the five persons receiving the greatest number of votes cast at the Meeting for the election of directors shall be elected as directors, and abstentions and broker non-votes shall be counted for purposes of determining whether a quorum is present but will not affect the outcome of the election.

### Information as to Nominees and Other Directors

Set forth below, as of March 20, 2002, are the name, age and principal occupation or employment during the last five years of each nominee for election to the Board of Directors and all other directors whose terms have not expired. On March 15, 2002, Stephen V. O'Connell and Neil P. Simpkins resigned from the Board of Directors. Effective April 1, 2002, the Board of Directors by unanimous written consent decreased the number of members of the Board of Directors from fifteen to fourteen. None of the nominees or other directors is related to any executive officer or other director of the Company by blood, marriage or adoption. The affiliations between the Company and Heartland, WP Management, WP Group, WP & Co., Blackstone, Charles E. Becker, Becker Ventures, Elkin McCallum, Joan Fabrics and Textron (as such terms are defined herein) are set forth under "Security Ownership of Management and Principal Stockholders" and "Certain Relationships and Related Transactions — Certain Relationships."

**Management recommends that stockholders vote FOR the election of each of Messrs. Rudman, Valenti, Dauch and Cohen and Ms. Hess.**

### Nominees for Election at the Meeting — Class II Directors

| | |
|---|---|
| Warren B. Rudman | Age 71. Mr. Rudman has been a director of the Company since June 1995. Mr. Rudman has been a partner in the law firm of Paul, Weiss, Rifkind, Wharton & Garrison since January 1993. Mr. Rudman served as a United States Senator from New Hampshire from 1980 through 1992 and as Attorney General of New Hampshire from 1970 until 1976. Mr. Rudman is also a director of the Chubb Corporation, Allied Waste, Boston Scientific, the Raytheon Company and an independent trustee of several mutual funds of the Dreyfus Corporation. |
| Cynthia L. Hess | Age 45. Ms. Hess is the owner and CEO of Hess Group, LLC. Prior to forming Hess Group in 2002, Ms. Hess was a senior managing director of Heartland Industrial Partners L.P. ("Heartland") (See "Certain Relationships and Related Transactions — Certain Relationships — Heartland"). She was formerly Vice President of corporate quality for DaimlerChrysler, where she led the corporate strategy for quality improvement and facilitated quality plan execution. In her 22 years with DaimlerChrysler, Ms. Hess held various engineering, manufacturing and procurement supply positions. Ms. Hess is also a director of Metaldyne Corporation (formerly known as MascoTech, Inc.), a diversified industrial manufacturing company ("Metaldyne"). |
| Samuel Valenti, III | Age 56. Mr. Valenti has been a director of the Company since February 2001. He is a senior managing director of Heartland, Chairman of Valenti Capital LLC, and has been a director of Metaldyne Corporation since January 2001 Mr. Valenti is a director of Masco Capital Corporation and has been its President since 1988. Mr. Valenti was formerly Vice President — Investments of Masco Corporation, a home improvement and building products company. Mr. Valenti is also a director of Collins & Aikman |

**Table of Contents**

|  | Products Co. ("Products"), a wholly-owned subsidiary of the Company. |
|---|---|
| David C. Dauch | Age 37. Mr. Dauch has been vice president of manufacturing — driveline division of American Axle & Manufacturing since 2001, a company he joined in 1995 as manager, sales administration. In 1996, he became director of sales, GM full size truck programs and was named vice president of sales and marketing in 1998. From 1987 to 1995, Mr. Dauch was employed by Products at which he held positions of product manager, account executive, and director of Ford sales and marketing for the Automotive Carpet and Fabric Groups. |
| Marshall A. Cohen | Age 67. Mr. Cohen has been a director of the Company since April 2001. Mr. Cohen has been Counsel at Cassels Brock and Blackwell, a Canadian law firm, since October 1996. From 1988 until September 1996, Mr. Cohen served as President and Chief Executive Officer of The Molson Companies Ltd., a brewing company. Mr. Cohen is also a director of The Toronto-Dominion Financial Group, Barrick Gold Corporation, American International Group, Inc., Lafarge Corporation, SMK Speedy International Inc., The Goldfarb Corporation, Premcor Inc., The Quorum Group (Vice Chairman), Haynes International, Inc., Metaldyne and Golf Town Canada Inc. Mr. Cohen serves on the Advisory Boards of The Blackstone Group and Heartland. |

**Directors Whose Terms Expire at the 2003 Annual Meeting — Class III Directors**

| Charles E. Becker | Age 55. Mr. Becker is Vice Chairman of the Board and has been a director since July 2001. For over 25 years, through 1998, Mr. Becker was the CEO and co-owner of Becker Group, Inc., a global automotive interiors components supplier. Becker Group, Inc. was sold to Johnson Controls, Inc. in 1998. In January 1999, Mr. Becker re-acquired 10 North American plastic molding and tooling operations from Johnson Controls, which subsequently became Becker Group, LLC. Mr. Becker is also the owner and chairman of Becker Ventures, LLC, which was established in 1998 to invest in a variety of business ventures, including the manufacturing, real estate and service industries. |
|---|---|
| Robert C. Clark | Age 58. Mr. Clark has been a director of the Company since October 1994. Mr. Clark is Dean of the Harvard Law School and Royal Professor of Law. Mr. Clark joined Harvard Law School in 1979 after four years at Yale Law School, where he was a tenured professor, and became Dean in 1989. Mr. Clark is a corporate law specialist and author of numerous texts and legal articles. Prior to his association with academia, he was in private practice with Ropes & Gray. Mr. Clark is also a director of American Lawyer Media Holdings, Inc. and American Lawyer Media, Inc. and a trustee of Teachers Insurance Annuity Association (TIAA). |
| David A. Stockman | Age 55. Mr. Stockman has been a director of the Company since February 2001. Mr. Stockman is also a director of Metaldyne, and Springs Industries, Inc. He is the senior managing director and the founder of Heartland. Prior to founding Heartland, he was a senior managing director of The Blackstone Group L.P. and had been with Blackstone since 1988. Mr. Stockman also served as the director of the Office of Management and Budget in the Reagan Administration, and represented Southern Michigan in the U.S. House of Representatives from 1976 to 1981. |

Table of Contents

| | |
|---|---|
| Daniel P. Tredwell | Age 44. Mr. Tredwell has been a director of the Company since February 2001. Mr. Tredwell is also a director of Metaldyne and Springs Industries, Inc. He is a senior managing director and a co-founder of Heartland. He has more than a decade of leveraged financing experience. Mr. Tredwell served as a Managing Director at Chase Securities Inc. and had been with Chase Securities since 1985. From 1980 to 1985, Mr. Tredwell was employed as the Press Secretary to U.S. Representative Robert L. Livingston. |

### Directors Whose Terms Expire at the 2004 Annual Meeting — Class I Directors

| | |
|---|---|
| Thomas E. Evans | Age 50. Mr. Evans has been Chairman of the Board and Chief Executive Officer of the Company since April 1999. Previously, he was President of Tenneco Automotive, an automotive supplier and a division of Tenneco, Inc., from 1995 until April 1999. Prior to that, Mr. Evans served for six years with Case Corporation, a manufacturer of farm machinery and construction equipment and a subsidiary of Tenneco, Inc., in a series of senior management positions, the last being Senior Vice President of Worldwide Operations. Prior to his employment with Case Corporation, he spent sixteen years in the automotive industry with Rockwell International and Federal Mogul Corporation. Mr. Evans is also a director of the Motor & Equipment Manufacturers Association, the National Association of Manufacturers and the Institute of Textile Technology. Mr. Evans is also a director of Products. |
| Timothy D. Leuliette | Age 52. Mr. Leuliette was elected as a director of the Company in February 2001 and has been a director of Metaldyne since November 2000. He is currently President and Chief Executive Officer of Metaldyne. He is a co-founder of Heartland. Prior to joining Heartland, Mr. Leuliette joined the Penske Corporation as President and Chief Operating Officer in 1996. From 1991 to 1996 Mr. Leuliette served as President and Chief Executive Officer of ITT Automotive, an automotive company. He also serves on a number of corporate and charitable boards, including serving as director of The Federal Reserve of Chicago, Detroit Branch. |
| Elkin McCallum | Age 58. Mr. McCallum was elected as a director of the Company in September 2001. Mr. McCallum has been the Chairman of the Board and CEO of Joan Fabrics Corporation since 1989 and has also been the Chairman and CEO of Tyng Textiles LLC since 1996. Mr. McCallum is currently Vice Chairman of the Board of Trustees of Bentley College and chairman elect for the next academic year. |
| W. Gerald McConnell | Age 38. Mr. McConnell was elected as a director of the Company in February 2001 and has been a senior managing director of Heartland since its founding in 2000. Mr. McConnell was formerly a managing director at Deutsche Bank Alex. Brown (formerly Bankers Trust Co.), a banking firm, from 1997 until 1999. From 1991 until 1999, Mr. McConnell specialized in leveraged finance and financial sponsor coverage at Deutsche Bank Alex. Brown. Mr. McConnell also serves on the board of directors of Springs Industries, Inc. |

7

J. Michael Stepp                   Age 57. Mr. Stepp was elected as a director of the Company in February 2001. Mr. Stepp was
                                   previously Executive Vice President and Chief Financial Officer of the Company from April 1995
                                   through December 1999. Mr. Stepp was a consultant to the Company and was an independent
                                   mergers and acquisitions advisor from January 2000 through February 2001. Since March 2001,
                                   Mr. Stepp has been a senior managing director of Heartland. He is also a director of Products.

## Certain Relationships and Related Transactions

### Certain Relationships

#### Heartland

Heartland is a private equity firm established in 1999 for the purpose of acquiring and expanding industrial companies operating in various industrial sectors of the American manufacturing economy that are well positioned for global consolidation and growth. Six of the Company's directors, Messrs. Stockman, Leuliette, Tredwell, Stepp, McConnell and Valenti, are also employed by Heartland. As of March 12, 2002, Heartland beneficially owned approximately 40% of the outstanding Common Stock.

The Company is a party to a services agreement with Heartland under which Heartland provides the Company with advisory and consulting services, including services with respect to developments in the automotive industry and supply markets, advice on financial and strategic plans and alternatives and other matters as the Company may reasonably request and are within Heartland's expertise. The services agreement terminates on the earlier of its tenth anniversary or the date upon which Heartland ceases to own Company shares equivalent to 25% of those owned by them on February 23, 2001. Pursuant to the agreement, the Company is obligated to pay to Heartland a $4 million annual advisory fee on a quarterly basis and to reimburse its out-of-pocket expenses related to the services Heartland provides to the Company. The Company has also agreed to pay a fee of 1% of the total enterprise value of certain acquisitions and dispositions. In connection with Heartland's initial investment in the Company on February 23, 2001, the Company paid Heartland a fee of $12 million and reimbursed it for the reasonable out-of-pocket expenses incurred in connection with that initial investment. A fee of $12.5 million was paid by the Company to Heartland as a result of its advisory services in connection with the TAC-Trim acquisition. During 2001, the Company also reimbursed Heartland for $1.5 million of expenses that Heartland incurred in relation to the Becker acquisition.

#### Blackstone and Wasserstein

Blackstone Partners is a Delaware limited partnership formed in 1987 for the purpose of, among other things, (i) committing capital to facilitate corporate restructurings, leveraged buyouts, bridge financings and other investments and (ii) capitalizing affiliates that will engage in investment and merchant banking activities. The sole general partner of Blackstone Partners is Blackstone Associates, a Delaware limited partnership. At present, the business of Blackstone Associates consists of performing the function of, and serving as, the general partner of certain limited partnerships, including Blackstone Partners. One of the Company's directors, Mr. Simpkins, is also a member of Blackstone Management Partners L.L.C., which is the general partner of Blackstone Management Partners L.P. ("Blackstone Management"), and BMA, which is the general partner of BFIP.

WP Partners is a Delaware limited partnership, the sole general partner of which is Wasserstein Management, which is controlled by CCA (fka Wasserstein & Co., Inc.). WP Partners was formed by Wasserstein Perella Group, Inc. ("WP Group") for the purpose of participating in merchant banking activities, including committing capital to the organization and consummation of private equity investments and leveraged buyout transactions. On January 3, 2001, WP Group merged with Dresdner Bank AG and spun off CCA, as a result of which Wasserstein Management and its affiliates are no longer affiliated with WP Group. Wasserstein Management serves as general partner of WP Partners and as such is engaged in

8

Table of Contents

and bonuses that would not be deductible for federal income tax purposes, including payments under the 2000 and 2001 Bonus Plans and the Company's stock option plans.

Compensation Committee of the Board of Directors of Collins & Aikman Corporation:

David A. Stockman
Daniel P. Tredwell
Marshall A. Cohen

### EXECUTIVE OFFICERS OF THE COMPANY

The following is a list of the names and ages, as of March 28, 2002, of the executive officers of the Company and a description of all positions and offices with the Company held by each such person and each such person's principal occupations and employment during the past five years. All executive officers hold office at the pleasure of the Company's Board of Directors.

| Name | Age | Position |
| --- | --- | --- |
| Thomas E. Evans | 50 | Chairman of the Board and Chief Executive Officer |
| J. Michael Stepp | 57 | Chief Financial Officer (Interim) |
| Gerald E. Jones | 56 | Executive Vice President Global Manufacturing Operations, Fabrics |
| Millard L. King | 57 | Executive Vice President Global Manufacturing Operations, Carpet and Acoustics Systems |
| Bernd Lattemann | 60 | President and Managing Director European Operations |
| Ronald T. Lindsay | 51 | Senior Vice President, General Counsel and Secretary |
| Michael A. Mitchell | 58 | President Global Commercial Operations |
| Jerry L. Mosingo | 50 | Executive Vice President Global Manufacturing Operations, Plastics & Cockpit Systems |
| Jonathan L. Peisner | 42 | Senior Vice President, Treasurer |
| Jeffrey A. Rose | 42 | Senior Vice President Global Product Development and Technology |
| Russell N. Stroud | 59 | Senior Vice President Global Supply Chain Management and Company-Wide Cost Optimization |
| Gregory L. Tinnell | 41 | Senior Vice President, Human Resources |
| Reed A. White | 54 | President of Collins & Aikman Dura Convertible Systems |

*Thomas E. Evans* has been Chairman of the Board and Chief Executive Officer of the Company since April 1999. Previously, he was President of Tenneco Automotive, an automotive supplier and a division of Tenneco, Inc., from 1995 until April 1999. Prior to that, Mr. Evans served for six years with Case Corporation, a manufacturer of farm machinery and construction equipment and a subsidiary of Tenneco, Inc., in a series of senior management positions, the last being Senior Vice President of Worldwide Operations. Prior to his employment with Case Corporation, he spent sixteen years in the automotive industry with Rockwell International and Federal Mogul Corporation. Mr. Evans is also a director of the Motor & Equipment Manufacturers Association, the National Association of Manufacturers and the Institute of Textile Technology. Mr. Evans is also a director of Products.

*J. Michael Stepp* has been serving as Chief Financial Officer on an interim basis for the Company since the resignation of Mr. Shah effective January 7, 2002. Mr. Stepp has been a director of the Company since March 2001 and is also a director of Products. Mr. Stepp will continue to serve as Chief Financial Officer of

19

the Company until a successor to the office is elected by the Board of Directors. In his interim capacity, Mr. Stepp is receiving compensation from the Company of $1 per year.

*Gerald E. Jones* has been Executive Vice President of Global Manufacturing Operations, Fabrics since November 2001 and an executive officer since March 2002. Mr. Jones, who has over 30 years of industry experience, joined the Company as a director of manufacturing in July 1995. From April 2000 until November 9, 2001, he was General Manager, Automotive Woven Fabrics.

*Millard L. King, Jr.* has been Chief Operating Officer of U.S. Automotive Carpet Systems since January 1999 and an executive officer of the Company since March 2002. Mr. King joined the Company in 1971. Prior to his current position with the Company, Mr. King most recently held the positions of Vice President of Operations for Automotive Knit Fabrics and then Chief Operating Officer of the Automotive Knit and Woven Operations.

*Bernd Lattemann* has been President and Managing Director of European Operations since January 2002 and an executive officer of the Company since March 2002. Mr. Lattemann has over 30 years of sales and manufacturing and automotive experience, including serving as an independent consultant from 1998 to 2002 and Chief Executive Officer from 1996 to 1998 for Becker Group Europe GmbH. Previously, Mr. Lattemann held several progressively responsible positions at SKF's Specialty Bearings Division.

*Ronald T. Lindsay* has been Senior Vice President, General Counsel and Secretary and an executive officer of the Company since 1999. He has been Senior Vice President since 1999, Vice President 1988-1999, and since 1988, General Counsel and Secretary of Products.

*Michael A. Mitchell* has been President, Global Commercial Operations since January 2002 and an executive officer of the Company since March 2002. Mr. Mitchell has over 40 years of industry experience, having previously held senior management positions at Chrysler Corporation and American Motors. He served as Executive Vice President, Business & Product Development from 1997 to 2002 and Executive Vice President of Engineering, Purchasing and Program Management from 1995 to 1997 for Textron Automotive Company.

*Jerry L. Mosingo* has been Executive Vice President, Global Plastics and Cockpit Systems since January 2002 and an executive officer of the Company since March 2002. Mr. Mosingo has over 30 years of industry experience, and he was previously Executive Vice President of Manufacturing from 1999 to 2002 and Senior Vice President of Operations in 1999 for Textron. Previously, he served as Vice President of Quality from 1997 to 1999 and Director of Operations from 1992 to 1997 for A.O. Smith.

*Jonathan L. Peisner* has been Senior Vice President and Treasurer since February 2002. Mr. Peisner joined the Company in 1999 as Senior Vice President of Communications and Investor Relations. From January 2000 until February 2002, he was Senior Vice President of Communications, Investor Relations and Business Planning. He has been an executive officer of the Company since February 2000. From 1997 until 1999, he was Director of Investor Relations and Business Planning for Lear Corporation, an automotive supplier, and from 1995 until 1997 he was director of Investor Relations. Mr. Peisner serves on the National Association of Manufacturers Public Affairs Steering Committee and the National Investor Relations Institute Small Cap Advisory Group.

*Jeffrey A. Rose* has been Senior Vice President, Global Product Development and Technology since January 2002 and an executive officer of the Company since March 2002. Mr. Rose has 20 years of industry experience, and he previously served as Vice President of Technology for TAC-Trim, which he joined in 1995 as Director of Interior Trim Engineering. Prior to 1995, he worked for Toyota at their Technical Center in Ann Arbor, Michigan.

*Russell N. Stroud* has been Senior Vice President, Global Supply Chain Management and Company-Wide Cost Optimization and an executive officer of the Company since March 2002. He has over 35 years of broad automotive experience with both OEMs and suppliers. Previously, he served as Vice President of Procurement from 2000 to 2002 and Vice President of Sales, Marketing and Strategic Planning from 1998 to

20

2000 for New Venture Gear and President & COO for Thyssen Steel Group from 1996 to 1998 and held progressively responsible positions at Chrysler Corporation.

*Gregory L. Tinnell* has been Senior Vice President of Human Resources and an executive officer since April 2000. Previously, he was Vice President of Human Resources for the Company's southern and Mexican Operations, as well as Vice President of Global Compensation & Benefits. Tinnell joined the Company in 1995. Prior to Collins & Aikman, he served in various management positions with Sara Lee Corporation, Nabisco Foods Group and North American Refractories Company. Mr. Tinnell serves on the National Association of Manufacturers Human Resources Steering Committee.

*Reed A. White* has been President of Dura Convertible Systems, Inc. (also known as Collins & Aikman Dura Convertible Systems) since 1994, has been employed thereby in various management positions since April 1985 and has been an executive officer of the Company since February 2000.

See "Executive Compensation — Employment Agreements" for a description of employment agreements with Messrs. Evans, Lindsay and White, pursuant to which they are required to be elected to the offices they currently hold. Additionally, Messrs. Lattemann, Mitchell, Mosingo, Stroud, King, Jones, Rose and Tinnell have employment agreements and Mr. Peisner has a severance benefit agreement pursuant to which they are required to be elected to the offices they currently hold.

## EXECUTIVE COMPENSATION

The following table sets forth information concerning the compensation for services rendered to the Company and its subsidiaries by (i) all individuals serving as the Company's Chief Executive Officer during 2001, (ii) the Company's four most highly compensated executive officers (other than the Chief Executive Officer) whose total annual salary and bonus exceeded $100,000 and who were serving as executive officers at the end of the fiscal year ended December 31, 2001 and (iii) up to two of the Company's former executive officers whose compensation would have been reported herein if they had been serving as executive officers of the Company at the end of the fiscal year (the individuals named in clauses (i), (ii), and (iii) being referred to herein as the "Named Executive Officers"). All compensation shown has been paid by Products or by a subsidiary of Products (although any options shown as awarded are for Common Stock of the Company). The Company does not separately compensate its executive officers for their duties as officers of the Company (except for any such options).

### Summary Compensation Table

| Name and Principal Position | Year(1) | Annual Compensation | | | Securities Underlying Options(#) | All Other Compensation($) |
|---|---|---|---|---|---|---|
| | | Salary($) | Bonus($) | Other Annual Compensation(2) | | |
| Thomas E. Evans | 2001 | 735,000 | 1,350,000(4) | 45,406 | — | 139,835(5) |
| Chairman of the Board and | 2000 | 729,167 | 175,000(6) | 35,955 | 60,000 | 77,158 |
| Chief Executive Officer(3) | 1999 | 485,513 | 1,325,000(7) | 28,508 | 1,200,000 | 19,950 |
| Brian Batey | 2001 | 291,672 | — | 0 | — | 0 |
| President, European | 2000 | 124,458 | 142,243 | 0 | 100,000 | 0 |
| Automotive Systems(8) | 1999 | N/A | N/A | N/A | N/A | N/A |
| Ronald T. Lindsay | 2001 | 222,500 | 53,400 | 12,609 | — | 9,308(9) |
| Senior Vice President, | 2000 | 220,625 | — | 52 | N/A | 12,830 |
| General Counsel and Secretary | 1999 | 177,950 | 100,000 | 63 | 40,000 | 8,385 |
| Rajesh K. Shah | 2001 | 345,000 | — | 15,851 | — | 14,837(10) |
| Executive Vice President & | 2000 | 333,750 | | 48 | 35,000 | 21,654 |
| Chief Financial Officer(11) | 1999 | 130,769 | 200,000 | N/A | 100,000 | 2,887 |
| Reed A. White | 2001 | 250,000 | 20,000 | 11,032 | — | 10,701(12) |
| President, Collins & Aikman | 2000 | 237,500 | | 843 | 20,000 | 17,317 |
| Dura Convertible Systems | 1999 | 188,333 | 200,000 | 871 | N/A | 12,744 |

(1)    The information given in this table is for the fiscal years indicated, rather than calendar years. 2001 indicates the fiscal year ended December 31, 2001. 2000 indicates the fiscal year ended December 31, 2000. 1999 indicates the fiscal year ended December 25, 1999.

Collins & Aikman Corporation - DEF 14A    Case 1:07-cv-00265-SLR-LPS    Document 40-2    Filed 09/14/2007    Page 16 of 16    Page 33 of 70

21

EXHIBIT B

# UNITED STATES SECURITIES AND EXCHANGE COMMISSION
## WASHINGTON, D.C. 20549

# Form 10-K

(Mark One)

☑        **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d)
OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the fiscal year ended December 31, 2003**

**or**

☐        **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d)
OF THE SECURITIES EXCHANGE ACT OF 1934**

**Commission file number 1-10218**

# Collins & Aikman Corporation

*(Exact name of registrant as specified in its charter)*

**Delaware**
*(State or other jurisdiction of
incorporation or organization)*

**13-3489233**
*(I.R.S. Employer
Identification Number)*

**250 Stephenson Highway
Troy, Michigan 48083**
*(Address of principal executive offices, including zip code)*

**Registrant's telephone number, including area code:
(248) 824-2500**

**Securities registered pursuant to Section 12(b) of the Act:**

| Title of each class | Name of each exchange on which registered |
|---|---|
| Common Stock, $.01 par value | New York Stock Exchange |

**Securities registered pursuant to Section 12(g) of the Act:
None**

Indicate by check mark whether the Registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the Registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☐  No ☑

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of Registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☑

Indicate by check mark whether the registrant is an accelerated filer (as defined in Exchange Act Rule 12b-2). Yes ☑ No ☐.

The aggregate market value of voting stock held by non-affiliates of the Registrant was $168,794,241 as of March 1, 2004.

As of February 26, 2004, the number of outstanding shares of the Registrant's common stock, $.01 par value, was 83,630,087 shares.

### WEBSITE ACCESS TO COMPANY'S REPORTS:

Collins & Aikman's internet website address is www.collinsaikman.com. The Company's annual report on Form 10-K, quarterly reports on Form 10-Q, current reports on Form 8-K and amendment to those reports filed or furnished pursuant to Section 13(a) or 15(d) of the Exchange Act are available free of charge through the Company's website and as soon as reasonably practicable after the reports are electronically filed with, or furnished to the Securities and Exchange Commission.

The Company's Code of Business Conduct is available free of charge through the Company's internet website. Any amendments to the Company's Code of Business Conduct and any waivers of the Code of Business Conduct involving executive officers or directors of the Company will also be made available on the Company's internet website. Printed copies of the Company's Code of Business Conduct are also available free of charge to any shareholder upon request to: Corporate Secretary, Collins & Aikman Corporation, 250 Stephenson Highway, Troy, MI 48083.

## PART III

**Item 10.    *Directors and Executive Officers of the Registrant***

The Restated Certificate of Incorporation of the Company provides that the Board of Directors of the Company is divided into three classes serving staggered three-year terms. Set forth below, as of March 1, 2004, are the name, age and principal occupation or employment during the last five years of each of the current directors of the Company. None of the directors is related to any executive officer or other director of the Company by blood, marriage or adoption. The affiliations between the Company and Heartland, Blackstone Partners, Charles E. Becker, Becker Ventures, Elkin McCallum, Joan Fabrics and Textron (as such terms are defined herein) are set forth under Item 12, "Security Ownership of Certain Beneficial Owners and Management" and Item 13, "Certain Relationships and Related Transactions."

**Directors Whose Terms Expire at the 2004 Annual Meeting — Class I Directors**

| | |
|---|---|
| Timothy D. Leuliette | Age 54. Mr. Leuliette was elected as a director of the Company in February 2001 and has been a director of Metaldyne Corporation ("Metaldyne") since November 2000 and a director of Trimas Corporation ("Trimas") since 2002. He is currently Chairman, President and Chief Executive Officer of Metaldyne. He is a senior managing director and one of the co-founders of Heartland. Prior to joining Heartland, Mr. Leuliette joined the Penske Corporation as President and Chief Operating Officer in 1996. From 1991 to 1996 Mr. Leuliette served as President and Chief Executive Officer of ITT Automotive, an automotive company. He also serves on a number of corporate and charitable boards, and served as chairman of the Board of Directors of The Federal Reserve Bank of Chicago, Detroit Branch. |
| Elkin McCallum | Age 60. Mr. McCallum was elected as a director of the Company in September 2001. Mr. McCallum has been the Chairman of the Board and Chief Executive Officer of Joan Fabrics since 1989 and was Chairman and Chief Executive Officer of Tyng Textiles L.L.C. from 1996 to 2003. Mr. McCallum is currently Chairman of the Board of Trustees of Bentley College. |
| W. Gerald McConnell | Age 40. Mr. McConnell was elected as a director of the Company in February 2001 and has been a senior managing director of Heartland since its founding. Mr. McConnell was formerly a managing director at Deutsche Bank Alex. Brown (formerly Bankers Trust Co.) from 1997 until 1999. From 1991 until 1999, Mr. McConnell specialized in leveraged finance and financial sponsor coverage at Deutsche Bank Alex. Brown. Mr. McConnell also serves on the boards of directors of Springs Industries, Inc. ("Springs") and Trimas. |
| J. Michael Stepp | Age 59. Mr. Stepp has been a director of the Company since February 2001. Mr. Stepp is currently Vice Chairman of the Board of Directors and Chief Financial Officer of the Company. He was previously Executive Vice President and Chief Financial Officer of the Company from May 2002 through July 2002 (after serving as interim Chief Financial Officer from January 2002 through April 2002) and from April 1995 through December 1999. Mr. Stepp was a consultant to the Company and was an independent mergers and acquisitions advisor from January 2000 through February |

47

2001. Since March 2001, Mr. Stepp has been a senior managing director of Heartland but has not been an employee of Heartland since April 2002. He is also a director of Products.

**Directors Whose Terms Expire at the 2005 Annual Meeting — Class II Directors**

| | |
|---|---|
| Warren B. Rudman | Age 73. Mr. Rudman has been a director of the Company since June 1995. Mr. Rudman was a partner in the law firm of Paul, Weiss, Rifkind, Wharton & Garrison from 1993 through 2002, and since January 2003 Mr. Rudman has been of counsel to the law firm. Mr. Rudman served as a United States Senator from New Hampshire from 1980 through 1992 and as Attorney General of New Hampshire from 1970 until 1976. Mr. Rudman is also a director of the Chubb Corporation (which term will expire in April, 2004), Allied Waste, Boston Scientific, the Raytheon Company and an independent trustee of several mutual funds of the Dreyfus Corporation. |
| Cynthia L. Hess | Age 47. Ms. Hess is the owner and Chief Executive Officer of Hess Group, LLC. Prior to forming Hess Group in 2002, Ms. Hess was a senior managing director of Heartland. She was formerly Vice President of Corporate Quality for DaimlerChrysler, where she led the corporate strategy for quality improvement and facilitated quality plan execution. In her 22 years with DaimlerChrysler, Ms. Hess held various engineering, manufacturing and procurement supply positions. Ms. Hess is also a director of Metaldyne. |
| Samuel Valenti, III | Age 58. Mr. Valenti has been a director of the Company since February 2001. He is a senior managing director of Heartland, chairman of Valenti Capital LLC, has been a director of Metaldyne since January 2001, and is Chairman of the Board of Directors of Trimas. Mr. Valenti is a director of Masco Capital Corporation and has been its President since 1988. Mr. Valenti was formerly Vice President — Investments of Masco Corporation, a home improvement and building products company, from May 1974 to October 1998. |
| David C. Dauch | Age 39. Mr. Dauch has been Senior Vice President of Sales, Marketing and Manufacturing — Driveline Division of American Axle & Manufacturing since 2003, a company he joined in 1995 as Manager, Sales Administration. In 1996, he became Director of Sales, GM Full Size Truck Programs and was named Vice President of Sales and Marketing in 1998. In 2001, he became Vice President of Manufacturing — Driveline Division. From 1987 to 1995, Mr. Dauch was employed by Products where he held positions of product manager, account executive, and Director of Ford Sales and Marketing for the Automotive Carpet and Fabric Groups. |
| Marshall A. Cohen | Age 69. Mr. Cohen has been a director of the Company since April 2001. Mr. Cohen has been Counsel at Cassels Brock and Blackwell, a Canadian law firm, since October 1996. Mr. Cohen is also a director of The Toronto-Dominion Financial Group, Barrick Gold Corporation, American International Group, Inc., Lafarge Corporation N.A., The Goldfarb Corporation, Premcor Inc., |

48

Metaldyne, and Golf Town Canada Inc. Mr. Cohen serves on the Advisory Boards of the Blackstone Group and Heartland.

**Directors Whose Terms Expire at the 2006 Annual Meeting — Class III Directors**

Charles E. Becker

Age 56. Mr. Becker has been a director since July 2001. He was Vice Chairman of the Board from July 2001 until July 2002. For over 25 years, through 1998, Mr. Becker was the Chief Executive Officer and co-owner of Becker Group, Inc., a global automotive interior components supplier. Mr. Becker is the owner and Chairman of Becker Ventures, which was established in 1998 to invest in a variety of business ventures, including the manufacturing, real estate and service industries. Mr. Becker is also a director of Metaldyne and Trimas.

Robert C. Clark

Age 60. Mr. Clark has been a director of the Company since October 1994. Mr. Clark is a Harvard University Distinguished Service Professor, Harvard Law School. Mr. Clark joined Harvard Law School in 1979 after four years at Yale Law School, where he was a tenured professor, and served as Dean of the Harvard Law School from 1989 to 2003. Mr. Clark is a corporate law specialist and author of numerous texts and legal articles. Prior to his association with academia, he was in private practice with Ropes & Gray. Mr. Clark is also a director of Omnicom Group, Inc., Time Warner Inc., and a trustee of Teachers Insurance Annuity Association (TIAA).

David A. Stockman

Age 57. Mr. Stockman has been a director of the Company since February 2001 and has been Chairman of the Board of the Company since August 2002. Mr. Stockman is also a director of Metaldyne, Springs and Trimas. He is a senior managing director and the founder of Heartland. Prior to founding Heartland, he was a senior managing director of The Blackstone Group L.P. ("Blackstone") and had been with Blackstone since 1988. Mr. Stockman also served as the director of the Office of Management and Budget in the Reagan Administration, and represented a district in southern Michigan in the U.S. House of Representatives from 1976 to 1981.

Daniel P. Tredwell

Age 45. Mr. Tredwell has been a director of the Company since February 2001. Mr. Tredwell is also a director of Metaldyne, Trimas and Springs. He is a senior managing director and a co-founder of Heartland. He has two decades of leveraged financing and buyout experience. Mr. Tredwell served as a Managing Director at Chase Securities Inc. and had been with Chase Securities since 1985.

**Arrangements Regarding Election of Directors**

See Item 12, "Security Ownership of Management and Principal Stockholders — Voting" of this Report.

49

## EXECUTIVE OFFICERS OF THE COMPANY

The following is a list of the names and ages, as of March 1, 2004, of the executive officers of the Company and a description of all positions and offices with the Company held by each such person and each such person's principal occupations and employment during the past five years. All executive officers hold office at the pleasure of the Company's Board of Directors.

| Name | Age | Position |
|------|-----|----------|
| David A. Stockman | 57 | Chairman of the Board and Chief Executive Officer |
| J. Michael Stepp | 59 | Vice Chairman of the Board and Chief Financial Officer |
| Wallace W. Creek | 65 | Senior Vice President-Finance |
| Millard L. King, Jr | 59 | President, Global Soft Trim |
| Robert A. Krause | 47 | Vice President and Treasurer |
| L. Gregory Tinnell | 43 | Senior Vice President, Human Resources |
| Michael G. Torakis | 47 | President, International Plastics |
| Eric J. White | 48 | President, U.S. and Mexico Plastics |

*David A. Stockman* has been a director of the Company since February 2001 and has been Chairman of the Board of the Company since August 2002. Mr. Stockman has been Chief Executive Officer of the Company since August 2003. Mr. Stockman is also a director of Metaldyne, Springs and Trimas. He is a senior managing director and the founder of Heartland. Prior to founding Heartland, he was a senior managing director of Blackstone and had been with Blackstone since 1988. Mr. Stockman also served as director of the Office of Management and Budget in the Reagan Administration, and represented a district in southern Michigan in the U.S. House of Representatives from 1976 to 1981.

*J. Michael Stepp* has been a director of the Company since February 2001. Mr. Stepp is currently Vice Chairman of the Board of Directors and Chief Financial Officer of the Company. He was previously Executive Vice President and Chief Financial Officer of the Company from May 2002 through July 2002 (after serving as interim Chief Financial Officer from January 2002 through April 2002), and from April 1995 through December 1999. Mr. Stepp was a consultant to the Company and was an independent mergers and acquisitions advisor from January 2000 through February 2001. Since March 2001, Mr. Stepp has been a senior managing director of Heartland but has not been an employee of Heartland since April 2002. He is also a director of Products.

*Wallace W. Creek* has been Senior Vice President — Finance since December 2002, and an executive officer of the Company since December 2002. Before joining the Company in 2002, Mr. Creek was corporate comptroller for General Motors. Mr. Creek is a director of Columbus McKinnon Corp.

*Millard L. King, Jr.* has been President, Global Soft Trim since August 2003 and an executive officer of the Company since March 2002. From November 2001 to March 2002, he was Executive Vice President of Global Manufacturing Operations, Carpet and Acoustics Systems. Mr. King joined the Company in 1971. Prior to November 2001, Mr. King held the positions of Senior Vice President of Operations for Automotive Knit Fabrics and Chief Operating Officer of the U.S. automotive carpet systems and of automotive knit and woven operations.

*Robert A. Krause* has been Vice President and Treasurer since October 2002, and an executive officer of the Company since December 2002. Before joining the Company, Mr. Krause was associated with American Axle & Manufacturing Holdings, Inc., where he was Vice President and Treasurer from 1999 to August 2002, and Vice President — Investor Relations from August 2002 to October 2002, Treasurer and Acting Interim Chief Financial Officer during 1999, and Treasurer from 1998 to 1999.

*L. Gregory Tinnell* has been Senior Vice President of Human Resources and an executive officer since April 2000. Previously, he was Vice President of Human Resources for the Company's southern and Mexican operations, as well as Vice President of Global Compensation & Benefits. Mr. Tinnell joined the Company in 1995. Prior to joining the Company, he served in various management positions with Sara Lee Corporation,

50

Nabisco Foods Group and North American Refractories Company. Mr. Tinnell serves on the National Association of Manufacturers Human Resources Steering Committee.

*Michael G. Torakis* has been President, International Plastics since August 2003 and an executive officer of the Company since March 2004. Mr. Torakis joined the Company in August 2003. Prior to joining the Company, Mr. Torakis was President of Venture Holdings Company, LLC and Chief Executive Officer of Peguform GmbH. On or about March 28, 2003, Venture Holdings Company, LLC and certain of its affiliates filed a petition for protection under the United States Bankruptcy Code. Mr. Torakis was President of Venture Holdings Company, LLC at the time of the bankruptcy filing. In addition, on or about May 28, 2002, Peguform GmbH, a subsidiary of Venture Holdings Company, LLC, filed for bankruptcy in Germany. Mr. Torakis was Chief Executive Officer of Peguform GmbH at the time of the filing.

*Eric J. White* has been President, U.S. and Mexico Plastics since August 2003 and an executive officer of the Company since August 2002. From August 2002 to August 2003, he was Executive Vice President of Global Manufacturing, Interior Trim & Cockpit Systems. Prior to August 2002, Mr. White held the positions of Vice President Operations — Plastics with responsibility for multiple plant operations, and Vice President Operations for two operations with Textron Automotive Company, Inc.

See "Executive Compensation — Employment Agreements" for a description of the Company's employment agreements with Messrs. Stepp, King, Torakis and White. Additionally, Mr. Tinnell has a written employment agreement.

Mr. Stockman does not receive any compensation for his service to the Company as Chief Executive Officer. Mr. Stockman's services are provided to the Company by Heartland pursuant to a services agreement that is more fully described in Item 13, "Certain Relationships and Related Transactions" of this Report. The assumption by Mr. Stockman of the office of Chief Executive Officer did not change the compensation due Heartland under the services agreement.

## Section 16(a) Beneficial Ownership Reporting Compliance

Section 16(a) of the Securities Exchange Act of 1934 requires the Company's officers and directors, and persons who own more than ten percent of a registered class of the Company's equity securities, to file reports of ownership and changes in ownership with the Securities and Exchange Commission (the "SEC"). Officers, directors and greater than ten percent stockholders are required by SEC regulation to furnish the Company with copies of all Section 16(a) reports they file. Based solely on review of the copies of such reports furnished to the Company during or with respect to fiscal 2003, or written representations that no Forms 5 were required, the Company believes that during the fiscal year ended December 31, 2003, all persons subject to the Section 16(a) filing requirements filed the required reports on a timely basis.

## Code of Ethics

Products has a code of ethics entitled "Collins & Aikman Products Co. Code of Business Conduct" which is applicable to all employees, consultants and contractors of Products, its subsidiaries and affiliates, including the Company. The above-referenced Code of Business Conduct is also applicable to the Company's principal executive officer, principal financial officer, principal accounting officer or controller and persons performing similar functions for the Company ("Senior Officers").

The Code of Business Conduct is available on the Company's website at www.collinsaikman.com. All amendments to the Code of Business Conduct will also be made available on the Company's website, along with all waivers of the Code of Business Conduct involving Senior Officers of the Company.

## Audit Committee Financial Expert

The Board of Directors of the Company has determined that none of the current members of the Audit Committee is an "audit committee financial expert," as the Board interprets that requirement in its business judgment. However, each member of the Audit Committee is financially literate, and each member of the Audit Committee satisfies the heightened independence requirements of Sections 303.01(B)(2)(a) and

EXHIBIT C

**Table of Contents**

| OMB APPROVAL | |
|---|---|
| OMB Number: | 3235-0059 |
| Expires: | August 31, 2004 |
| Estimated average burden hours per response | 14.73 |

# UNITED STATES
## SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

## SCHEDULE 14A

Proxy Statement Pursuant to Section 14(a) of the Securities Exchange Act of 1934 (Amendment No.    )

Filed by the Registrant  ☒

Filed by a Party other than the Registrant  ☐

Check the appropriate box:

☐  Preliminary Proxy Statement
☐  **Confidential, for Use of the Commission Only (as permitted by Rule 14a-6(e)(2))**
☒  Definitive Proxy Statement
☐  Definitive Additional Materials
☐  Soliciting Material Pursuant to §240.14a-12

Collins and Aikman Corporation

(Name of Registrant as Specified In Its Charter)

(Name of Person(s) Filing Proxy Statement, if other than the Registrant)

Payment of Filing Fee (Check the appropriate box):

☒  No fee required.
☐  Fee computed on table below per Exchange Act Rules 14a-6(i)(1) and 0-11.

   1) Title of each class of securities to which transaction applies:

   2) Aggregate number of securities to which transaction applies:

   3) Per unit price or other underlying value of transaction computed pursuant to Exchange Act Rule 0-11 (set forth the amount on which the filing fee is calculated and state how it was determined):

4) Proposed maximum aggregate value of transaction:

5) Total fee paid:

☐ Fee paid previously with preliminary materials.

☐ Check box if any part of the fee is offset as provided by Exchange Act Rule 0-11(a)(2) and identify the filing for which the offsetting fee was paid previously. Identify the previous filing by registration statement number, or the Form or Schedule and the date of its filing.

1) Amount Previously Paid:

2) Form, Schedule or Registration Statement No.:

3) Filing Party:

4) Date Filed:

SEC 1913 (02-02)     **Persons who potentially are to respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB control number.**

Table of Contents



Collins & Aikman Corporation
250 Stephenson Highway
Troy, Michigan 48083

September 30, 2004

To Our Stockholders:

You are cordially invited to attend the annual meeting of stockholders of Collins & Aikman Corporation to be held at our offices located at 250 Stephenson Highway, Troy, Michigan 48083, on October 13, 2004 at 10:30 a.m., Eastern Daylight Savings Time.

Whether or not you plan to attend, submitting your proxy by completing, signing and mailing your proxy card will both assure your shares are represented at the meeting and minimize the cost of proxy solicitation. Thank you for your continued support of Collins & Aikman.

Sincerely,

David A. Stockman
*Chairman*
*and Chief Executive Officer*

Table of Contents



# NOTICE OF ANNUAL MEETING OF STOCKHOLDERS

|  |  |
|---|---|
| Date: | Wednesday, October 13, 2004 |
| Time: | 10:30 AM Eastern Daylight Time |
| Location: | Collins & Aikman Corporation |
|  | World Headquarters |
|  | 250 Stephenson Highway |
|  | Troy, Michigan |

To Our Stockholders,

We invite you to attend our 2004 Annual Meeting of Stockholders at our World Headquarters. At this meeting, you and the other stockholders will be able to vote for the following purpose, together with any other business that may properly come before the meeting:

*Elect four directors to the Board of Directors for three-year terms.* The Board has nominated for re-election Anthony Hardwick, Timothy D. Leuliette, W. Gerald McConnell and J. Michael Stepp, all current directors.

    You may vote on this proposal in person or by proxy. If you cannot attend the meeting, we urge you to vote by proxy, so that your shares will be represented and voted at the meeting in accordance with your instructions. (See the attached proxy statement for details on voting by proxy.) Of course, if you attend the meeting, you may withdraw your proxy and vote your shares. Only stockholders of record at the close of business on August 30, 2004, will be entitled to vote at the meeting or any adjournment thereof.

By order of the Board of Directors,

Jay B. Knoll
*Secretary*

Troy, Michigan
September 30, 2004

## CONTENTS

| | |
|---|---|
| INTRODUCTION | 1 |
| VOTING | 1 |
|    How to Vote Your Shares | 1 |
|    How to Revoke Your Proxy | 2 |
|    Required Vote | 2 |
|    Where to Find Voting Results | 2 |
| PROPOSAL | 3 |
|    Election of Directors | 3 |
|    Other Matters | 4 |
| BOARD OF DIRECTORS | 4 |
|    Directors Continuing in Office | 4 |
|    Meetings and Committees | 5 |

| | |
|---|---|
| Director Compensation | 7 |
| Compensation Committee Interlocks and Insider Participation | 7 |
| Section 16(a) Beneficial Ownership Reporting Compliance | 7 |
| Director Nomination Process | 7 |
| Certain Litigation | 8 |
| INDEPENDENT AUDITORS | 8 |
| Fees | 8 |
| Pre-Approval Policy | 9 |
| REPORT OF THE AUDIT COMMITTEE | 9 |
| CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS | 11 |
| Security Ownership of Management and Principal Stockholders | 11 |
| Other Relationships and Transactions | 12 |
| EXECUTIVE COMPENSATION | 18 |
| Executive Officers | 18 |
| Summary Compensation | 19 |
| Option Grants in Last Fiscal Year | 21 |
| Aggregate Option Exercises in Last Fiscal Year and Fiscal Year End Option Values | 21 |
| Option Cancellation/ Repricing Program | 21 |
| 2004 Option Exchange Program | 22 |
| 10-Year Option/ SAR Repricing Table | 22 |
| Defined Benefit or Actuarial Plan Disclosure | 23 |
| Pension Plan Table | 25 |
| Employment Agreements | 26 |
| COMPENSATION COMMITTEE REPORT ON EXECUTIVE COMPENSATION | 28 |
| ADDITIONAL INFORMATION | 30 |
| Annual Report | 30 |
| Code of Business Conduct | 31 |
| Stockholder Proposals and Nominations | 31 |
| Stockholder Communications with the Board of Directors | 31 |
| Appendix A — Performance Graph | A-1 |
| Appendix B — Collins & Aikman Director Independence Guidelines | B-1 |

i

Table of Contents

# COLLINS & AIKMAN CORPORATION

**250 Stephenson Highway**
**Troy, Michigan 48083**

---

## PROXY STATEMENT

---

September 30, 2004

## INTRODUCTION

The Board of Directors is soliciting your proxy to encourage your participation in the voting at the Annual Meeting. You are invited to attend the Annual Meeting and vote your shares directly. However, even if you do not attend, you may vote by proxy, which allows you to direct another person to vote your shares at the meeting on your behalf.

There are two parts to this solicitation: the proxy card and this proxy statement. The proxy card is a means by which you may authorize another person to vote your shares in accordance with your instructions. This proxy statement provides you with a variety of information on the proposal and other matters that you may find useful in determining how to vote.

Collins & Aikman Corporation ("Collins & Aikman" or the "Company") will bear the cost of this solicitation, including the cost of preparing and mailing this proxy statement. In addition to the solicitation of the proxies by use of the mails, some of our directors, officers and employees, without extra remuneration, may solicit proxies personally, or by telephone or otherwise. The Company may retain a proxy solicitation firm for assistance in connection with the solicitation of proxies for the Annual Meeting, should the Board of Directors deem such action prudent. The Company will also make arrangements with brokerage houses and other custodians, nominees and fiduciaries to forward proxies and proxy material to their principals, and will reimburse them for their expenses in forwarding soliciting materials.

This proxy statement and accompanying proxy are being distributed on or about September 30, 2004.

## VOTING

You are entitled to one vote at the Annual Meeting for each share of the Company's common stock that you owned of record at the close of business on August 30, 2004.

On August 30, 2004, we had issued and outstanding 83,630,087 shares of common stock and there were approximately 120 stockholders of record. A list of the stockholders of record entitled to vote at the Annual Meeting will be available for review by any stockholder, for any purpose related to the meeting, between 9:00 a.m. and 5:00 p.m. at the principal offices of the Company, located at 250 Stephenson Highway, Troy, Michigan 48083, for ten days before the Annual Meeting.

### How to Vote Your Shares

You may vote your shares at the Annual Meeting in person or by proxy. To vote in person, you must attend the Annual Meeting, and obtain and submit a ballot, which will be provided at the meeting. To vote by proxy, you must complete and mail the enclosed proxy card.

By completing and submitting your proxy, you will direct the designated persons (known as "proxies") to vote your shares at the Annual Meeting in accordance with your instructions. The Board has appointed J. Michael Stepp and Jay B. Knoll to serve as the proxies for the Annual Meeting.

1

Table of Contents

## PROPOSAL

**Election Of Directors**

The proposal on the agenda for the Annual Meeting will be electing four directors to serve as Class I directors for a three-year term beginning at this Annual Meeting and expiring at the 2007 Annual Meeting of Stockholders. (For a description of the three classes of directors, see the "Board of Directors," page 4.) The nominees receiving the greatest number of votes cast will be elected.

We expect each nominee for election as a director to be able to serve if elected. If any nominee is not able to serve, proxies will be voted in favor of the remainder of those nominated and may be voted for substitute nominees, unless the Board of Directors chooses to reduce the number of directors serving on the Board.

The Board of Directors has nominated Anthony Hardwick, Timothy D. Leuliette, W. Gerald McConnell and J. Michael Stepp for re-election as Class I directors. The following is a brief biography of each nominee. You will find information on their holdings of the Company's common stock in "Certain Relationships and Related Transactions," page 11.

*Anthony Hardwick* has been a director of the Company since September 2004. Mr. Hardwick is currently Executive Vice President and Chief Financial Officer of Easley Custom Plastics, Inc., a supplier of injection molded plastic parts to the industrial, building and construction, transportation, and power tool markets. Easley Custom Plastics is a wholly-owned subsidiary of CH Industries, Inc., of which Mr. Hardwick is co-owned and co-founder. Previously, he was senior managing director of Source Companies, LLC, a Pittsburgh-based investment banking and business consulting firm, from 2001 to 2004, and Chief Financial Officer of AstenJohnson, Inc., a privately held producer of paper machine clothing sold to paper manufacturers on a global basis, from 1996 to 2001. Mr. Hardwick is a director of Consolidated Systems, Inc., a fabricator of metal decking and support systems, and Curo Source, Inc., a company which recovers and stores cord blood stem cells. Mr. Hardwick was employed by the Company from 1979 to 1996, where he served as Vice President, Administration and Control of the Company's Automotive Group and then Vice President and Controller. He is a certified public accountant. Mr. Hardwick is 59 years old.

*Timothy D. Leuliette* has been a director of the Company since February 2001 and has been a director of Metaldyne Corp. since November 2000 and a director of TriMas Corp. since 2002. He is currently Chairman, President and Chief Executive Officer of Metaldyne. He is a senior managing director and one of the co-founders of Heartland. Prior to joining Heartland, Mr. Leuliette joined the Penske Corporation as President and Chief Operating Officer in 1996. From 1991 to 1996, Mr. Leuliette served as President and Chief Executive Officer of ITT Automotive, an automotive company. He also serves on a number of corporate and charitable boards and served as Chairman for The Federal Reserve of Chicago, Detroit Branch. Mr. Leuliette is 54 years old.

*W. Gerald McConnell* has served as director of the Company since February 2001 and has been a senior managing director of Heartland since its founding. Mr. McConnell was formerly a managing director at Deutsche Bank Alex. Brown (formerly Bankers Trust Co.) from 1997 until 1999. From 1991 until 1999, Mr. McConnell specialized in leveraged finance and financial sponsor coverage at Deutsche Bank Alex. Brown. For Mr. McConnell also serves on the board of directors of Springs Industries, Inc. and TriMas. Mr. McConnell is 40 years old.

*J. Michael Stepp* has been a director of the Company since February 2001. Mr. Stepp is currently Vice Chairman of the Board of Directors and Chief Financial Officer. He was previously Executive Vice President and Chief Financial Officer from May 2002 through July 2002 (after serving as interim Chief Financial Officer from January 2002 through April 2002) and from April 1995 through December 1999. Mr. Stepp was a consultant to the Company and was an independent mergers and acquisitions advisor from January 2000 through February 2001. Since March 2001, Mr. Stepp has been a senior managing director of Heartland but has not been an employee of Heartland since April 2002. He is also a director of Collins & Aikman Products Co. ("Products"), the Company's wholly-owned operating subsidiary. Mr. Stepp is 60 years old.

3

Table of Contents

**Other Matters**

Neither the Company nor its directors intend to bring before the Annual Meeting any matters other than the election of the three directors. Also, they have no present knowledge that any other matters will be presented by others for action at the meeting.

## BOARD OF DIRECTORS

The Board of Directors consists of eleven directors divided into three classes (Class I, Class II and Class III) serving staggered three-year terms. The Class I directors are up for election at the Annual Meeting as described under "Proposal-Election of Directors" (page 3), and the nominees for election are all currently Class I directors.

**Directors Continuing in Office**

The Class II and III directors will continue in office following this Annual Meeting, and their terms will expire in 2005 (Class II) or 2006 (Class III). The following are brief biographies of each of these directors. You will find information on their holdings of the Company's common stock in "Certain Relationships and Related Transactions," page 11.

*David A. Stockman* has been a director of the Company since February 2001, and his current term as a Class III director expires in 2006. He has also been Chairman of the Board since August 2002 and Chief Executive Officer since August 2003. Mr. Stockman is also a director of Metaldyne, Springs and TriMas. He is a senior managing director and the founder of Heartland. Prior to founding Heartland, he was a senior managing director of The Blackstone Group L.P. and had been with Blackstone since 1988. Mr. Stockman also served as the director of the Office of Management and Budget in the Reagan Administration, and represented Southern Michigan in the U.S. House of Representatives from 1976 to 1981. Mr. Stockman is 57 years old.

*Robert C. Clark* has been a director of the Company since October 1994, and his current term as a Class III director expires in 2006. Mr. Clark is a Harvard University Distinguished Service Professor, Harvard Law School. Mr. Clark joined Harvard Law School in 1979 after four years at Yale Law School, where he was a tenured professor, and served as Dean from 1989 to 2003. Mr. Clark is a corporate law specialist and author of numerous texts and legal articles. Prior to his association with academia, he was in private practice with Ropes & Gray. Mr. Clark is also a director of Omnicom Group, Inc. and Time Warner, Inc., and is a trustee of Teachers Insurance Annuity Association (TIAA). Dean Clark is 60 years old.

*Marshall A. Cohen* has been a director of the Company since April 2001, and his current term as a Class II director expires in 2005. Mr. Cohen has been Counsel at Cassels Brock and Blackwell, a Canadian law firm, since October 1996. Mr. Cohen is also a director of The Toronto-Dominion Financial Group, Barrick Gold Corporation, American International Group, Inc., Lafarge Corporation, The Goldfarb Corporation, Premcor Inc., Metaldyne, and Golf Town Canada Inc. Mr. Cohen serves on the Advisory Boards of Blackstone and Heartland. Mr. Cohen is 69 years old.

*David C. Dauch* has been a director of the Company since 2002, and his current term as a Class II director expires in 2005. He has been the Senior Vice President-Commercial of American Axle & Manufacturing since June 2004, a company he jointed in 1995 as Manager, Sales Administration. In 1996, he became Director of Sales, GM Full Size Truck Programs and was named Vice President of Sales and Marketing in 1998. In 2001, he became Vice President, Manufacturing-Driveline Division and assumed the position of Senior Vice President, Sales, Marketing and Driveline Division in September 2003. From 1987 to 1995, Mr. Dauch was employed by the Company where he held positions as product manager, account executive, and Director of Ford Sales and Marketing for the Automotive Carpet and Fabric Groups. Mr. Dauch is 40 years old.

*Richard C. Jelinek* has been a director of the Company since September 2004, and his current term as a Class II director expires in 2005. Mr. Jelinek is the former Chairman of Lifemark Corporation, a position in

4

which he served from 1994 until it merged with United Health Group in 2001. Mr. Jelinek is currently a member of the Executive Committee of the Aspen Valley Medical Foundation and a board member of the Aspen Valley Community Foundation. He is also on the advisory board of the School of Public Health at the University of Michigan. Mr. Jelinek is 67 years old.

*Warren B. Rudman* has been a director of the Company since June 1995, and his current term as a Class II director expires in 2005. Mr. Rudman was a partner in the law firm of Paul, Weiss, Rifkind, Wharton & Garrison from 1993 through 2002, and since January 2003 Mr. Rudman has been of counsel to the law firm. Mr. Rudman served as a United States Senator from New Hampshire from 1980 through 1992 and as Attorney General of New Hampshire from 1970 until 1976. Mr. Rudman is also a director of Allied Waste, Boston Scientific and the Raytheon Company, and is an independent trustee of several mutual funds of the Dreyfus Corporation. Senator Rudman is 74 years old.

*Daniel P. Tredwell* has been a director of the Company since February 2001, and his current term as a Class III director expires in 2006. Mr. Tredwell is also a director of Metaldyne, TriMas and Springs. He is a senior managing director and a co-founder of Heartland. He has two decades of leveraged financing and buyout experience. Mr. Tredwell served as a Managing Director at Chase Securities Inc. and had been with Chase Securities since 1985. Mr. Tredwell is 46 years old.

## Meetings and Committees

During 2003, our Board of Directors held five meetings and took action by written consent three times in lieu of additional meetings. All of the directors attended at least 75% of all meetings of the board and board committees on which they served during 2003, except Messrs. Leuliette and McConnell, who missed two meetings. Under the Company's Corporate Governance Guidelines, directors are expected to attend all regularly scheduled Board meetings and all committee meetings of committees on which they serve, and should attend the Company's Annual Meeting of Stockholders. Three directors attended the Company's 2003 Annual Meeting of Stockholders.

Our Board of Directors has four standing committees: the Audit Committee, the Compensation Committee, the Executive Committee and the Nominating and Corporate Governance Committee. The Board of Directors approved a charter for each of the Audit, Compensation and Nominating and Governance Committees, which charters are available on our website, www.collinsaikman.com. We also have a Nominating Committee designated in our charter documents.

The Board of Directors has determined that the following directors are independent pursuant to the Collins & Aikman Director Independence Guidelines (a copy of which is attached as Appendix B): Robert C. Clark, Marshall A. Cohen, David C. Dauch, Anthony Hardwick, Richard C. Jelinek and Warren B. Rudman. It has also confirmed that a majority of the Board of Directors and all members of the Audit, Compensation and Nominating and Governance Committees are independent.

Under our Corporate Governance Guidelines, the Board of Directors will schedule regular executive sessions at which non-management directors meet without management participation. If this group includes directors who do not meet the Company's independence standards, the directors who are so independent will also meet in executive session at least once a year. The Chairman of the Nominating and Governance Committee (who also serves as Lead Director) will preside at each executive session.

The principal responsibilities of each committee are described in the following paragraphs.

*Audit Committee*

Our Audit Committee is composed of Marshall A. Cohen (Chairman), Robert C. Clark and Anthony Hardwick. The purpose of the Committee is to assist the Board of Directors in fulfilling its oversight responsibility relating to (a) the integrity of our financial statements and financial reporting process and our systems of internal accounting and financial controls; (b) the performance of the internal audit function; (c) the annual independent audit of our financial statements, the engagement of the independent auditors and

5

Table of Contents

## EXECUTIVE COMPENSATION

### Executive Officers

Biographical information regarding Mr. Stockman and Mr. Stepp can be found on pages 4 and 3, respectively. Set forth below is information regarding the other executive officers of the Company.

*Millard L. King, Jr.* has been President, Global Soft Trim since August 2003 and an executive officer since March 2002. From November 2001 to March 2002, he was Executive Vice President of Global Manufacturing Operations, Carpet and Acoustics Systems. Mr. King joined C&A in 1971. Prior to November 2001, Mr. King held the positions of Senior Vice President of Operations for Automotive Knit Fabrics and Chief Operating Officer of the U.S. automotive carpet systems and of automotive knit and woven operations. Mr. King is 59 years old.

*Robert A. Krause* has been Vice President and Treasurer since October 2002, and an executive officer since December 2002. Before joining C&A, Mr. Krause was associated with American Axle & Manufacturing Holdings, Inc., where he was Vice President and Treasurer from 1999 to August 2002, and Vice President-Investor Relations from August 2002 to October 2002, Treasurer and Acting Interim Chief Financial Officer during 1999, and Treasurer from 1998 to 1999. Mr. Krause is also a director of Products. Mr. Krause is 48 years old.

*L. Gregory Tinnell* has been Senior Vice President of Human Resources and an executive officer since April 2000. Previously, he was Vice President of Human Resources for our southern and Mexican operations, as well as Vice President of Global Compensation & Benefits. Mr. Tinnell joined C&A in 1995. Prior to joining C&A, he served in various management positions with Sara Lee Corporation, Nabisco Foods Group and North American Refractories Company. Mr. Tinnell serves on the National Association of Manufacturers Human Resources Steering Committee. Mr. Tinnell is 44 years old.

*Michael G. Torakis* has been President, International Plastics since August 2003 and an executive officer since March 2004. Mr. Torakis joined C&A in August 2003. Prior to joining C&A, Mr. Torakis was President of Venture Holdings Company, LLC and Chief Executive Officer of Peguform GmbH. On or about March 28, 2003, Venture Holdings Company, LLC and certain of its affiliates filed a petition for protection under the United States Bankruptcy Code. Mr. Torakis was President of Venture Holdings Company, LLC at the time of the bankruptcy filing. In addition, on or about May 28, 2002, Peguform GmbH, a subsidiary of Venture Holdings Company, LLC, filed for bankruptcy in Germany. Mr. Torakis was Chief Executive Officer of Peguform GmbH at the time of the filing. Mr. Torakis is 47 years old.

*Eric J. White* has been President, U.S. and Mexico Plastics since August 2003 and an executive officer since August 2002. From August 2002 to August 2003, he was Executive Vice President of Global Manufacturing, Interior Trim & Cockpit Systems. Prior to August 2002, Mr. White held the positions of Vice President Operations-Plastics with responsibility for multiple plant operations, and Vice President Operations for two operations with Textron Automotive Company, Inc. Mr. White is 48 years old.

18

EXHIBIT D

# UNITED STATES BANKRUPTCY COURT
# EASTERN DISTRICT OF MICHIGAN

```
------------------------------------------------------- x
  In re                                      :   Chapter 11
                                             :
  COLLINS & AIKMAN                           :
  CORPORATION, et al.,                       :   Case No. 05-55927 (SWR)
                                             :
                        Debtors.             :   (Jointly Administered)
                                             x
------------------------------------------------------- 
```

## This Statement of Financial Affairs Applies To:

| | | |
|---|---|---|
| X | Collins & Aikman Corporation (05-55927) | Collins & Aikman Development Company (05-55943) |
| | Amco Convertible Fabrics, Inc. (05-55949) | Collins & Aikman Europe, Inc. (05-55971) |
| | Becker Group, LLC (d/b/a/ Collins & Aikman Premier Mold) (05-55977) | Collins & Aikman Fabrics, Inc. (d/b/a Joan Automotive Industries, Inc.) (05-55963) |
| | Brut Plastics, Inc. (05-55957) | Collins & Aikman Intellimold, Inc. (d/b/a M&C Advanced Processes, Inc.) (05-55976) |
| | Collins & Aikman (Gibraltar) Limited (05-55989) | Collins & Aikman Interiors, Inc. (05-55970) |
| | Collins & Aikman Accessory Mats, Inc. (f/k/a the Akro Corporation) (05-55952) | Collins & Aikman International Corporation (05-55951) |
| | Collins & Aikman Asset Services, Inc. (05-55959) | Collins & Aikman Plastics, Inc. (05-55960) |
| | Collins & Aikman Automotive (Argentina), Inc. (f/k/a Textron Automotive (Argentina), Inc.) (05-55965) | Collins & Aikman Products Co. (05-55932) |
| | Collins & Aikman Automotive (Asia), Inc. (f/k/a Textron Automotive (Asia), Inc.) (05-55991) | Collins & Aikman Properties, Inc. (05-55964) |
| | Collins & Aikman Automotive Exteriors, Inc. (f/k/a Textron Automotive Exteriors, Inc.) (05-55958) | Comet Acoustics, Inc. (05-55972) |
| | Collins & Aikman Automotive Interiors, Inc. (f/k/a Textron Automotive Interiors, Inc.) (05-55956) | CW Management Corporation (05-55979) |
| | Collins & Aikman Automotive International, Inc. (05-55980) | Dura Convertible Systems, Inc. (05-55942) |
| | Collins & Aikman Automotive International Services, Inc. (f/k/a Textron Automotive International Services, Inc.) (05-55985) | Gamble Development Company (05-55974) |
| | Collins & Aikman Automotive Mats, LLC (05-55969) | JPS Automotive, Inc. (d/b/a PACJ, Inc.) (05-55935) |
| | Collins & Aikman Automotive Overseas Investment, Inc. (f/k/a Textron Automotive Overseas Investment, Inc.) (05-55978) | New Baltimore Holdings, LLC (05-55992) |
| | Collins & Aikman Automotive Services, LLC (05-55981) | Owosso Thermal Forming, LLC (05-55946) |
| | Collins & Aikman Canada Domestic Holding Company (05-55930) | Southwest Laminates, Inc. (d/b/a Southwest Fabric Laminators Inc.) (05-55948) |
| | Collins & Aikman Carpet & Acoustics (MI), Inc. (05-55982) | Wickes Asset Management, Inc. (05-55962) |
| | Collins & Aikman Carpet & Acoustics (TN), Inc. (05-55984) | Wickes Manufacturing Company (05-55968) |

## General Notes

**Note 1**: The Statement of Financial Affairs (the "Statement") has been prepared by the Debtor's management and are unaudited. While management of the Debtor has made every reasonable effort to ensure that the Statement is accurate and complete based upon information that was available at the time of preparation, the subsequent receipt of information may result in material changes in financial data contained in the Statement and inadvertent errors or omissions may exist. To the extent the Debtor discovers additional information that may suggest a material difference, the Debtor will amend the Statement to reflect such changes. Accordingly, the Debtor reserves all rights to amend its Statement as may be necessary or appropriate.

**Note 2**: Unless otherwise indicated, all amounts are listed as of the close of business on May 16, 2005.

**Note 3**: It would be prohibitively expensive and unduly burdensome to obtain current market valuations of the Debtor's property interests. Accordingly, unless otherwise indicated, the Statement reflects the net book values, rather than current market values, of the Debtor's assets and may not reflect the net realizable value.

**Note 4**: The Statement does not purport to represent financial statements prepared in accordance with Generally Accepted Accounting Principles, nor are they intended to fully reconcile to any financial statements otherwise prepared and/or distributed by the Debtor.

**Note 5**: The claims of individual creditors for, among other things, goods, products, services or taxes are listed as the amounts entered on the Debtor's books and records and may not reflect credits, allowances or other adjustments due from such creditors to the Debtor. The Debtor reserves all of its rights respecting such credits, allowances and other adjustments.

**Note 6**: The Debtor estimates that prior to May 17, 2005, it accrued certain current expenses and other long-term liabilities that either are not payable at this time or have not yet been reported and, therefore, are not otherwise set forth in the Statement. The accrued liabilities, for which the Debtor has accrued reserves, relate to, among other things, the Debtor's medical and pension plans, workers' compensation plans, vacation policies, litigation, environmental programs and federal, state and local taxes.

**Note 7**: All information relating to employee benefits and pension plans are set forth on a consolidated basis on the Statement of Collins & Aikman Products Co., Case No. 05-55932.

**Note 8**: With respect to any item of tooling listed on the Statement, the Debtor is still evaluating whether such tooling is property of the Debtor or whether the Debtor has any other rights in such tooling, and, accordingly, the Debtor reserves all rights with respect to such tooling.

FORM 7 (9/00)

# FORM 7 - STATEMENT OF FINANCIAL AFFAIRS
# UNITED STATES BANKRUPTCY COURT
### Eastern District of Michigan

**In re: Collins & Aikman Corporation**                                     **Case No. 05-55927(SWR)**

## STATEMENT OF FINANCIAL AFFAIRS

This statement is to be completed by every debtor. Spouses filing a joint petition may file a single statement on which the information for both spouses is combined. If the case is filed under chapter 12 or chapter 13, a married debtor must furnish information for both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed. An individual debtor engaged in business as a sole proprietor, partner, family farmer, or self-employed professional, should provide the information requested on this statement concerning all such activities as well as the individual's personal affairs.

Questions 1 - 18 are to be completed by all debtors. Debtors that are or have been in business, as defined below, also must complete Questions 19 - 25. If the answer to an applicable question is "None," mark the box labeled "None." If additional space is needed for the answer to any question, use and attach a separate sheet properly identified with the case name, case number (if known), and the number of the question.

*DEFINITIONS*

"In business." A debtor is "in business" for the purpose of this form if the debtor is a corporation or partnership. An individual debtor is "in business" for the purpose of this form if the debtor is or has been, within the six years immediately preceding the filing of this bankruptcy case, any of the following: an officer, director, managing executive, or owner of 5 percent or more of the voting or equity securities of a corporation; a partner, other than a limited partner, of a partnership; a sole proprietor or self-employed.

"Insider." The term "insider" includes but is not limited to: relatives of the debtor; general partners of the debtor and their relatives; corporations of which the debtor is an officer, director, or person in control; officers, directors, and any owner of 5 percent or more of the voting or equity securities of a corporate debtor and their relatives; affiliates of the debtor and insiders of such affiliates; any managing agent of the debtor. 11 U.S.C. § 101.

**1. Income from employment or operation of business**
State the gross amount of income the debtor has received from employment, trade, or profession, or from operation of the debtor's business from the beginning of this calendar year to the date this case was commenced. State also the gross amounts received during the **two years** immediately preceding this calendar year. (A debtor that maintains, or has maintained, financial records on the basis of a fiscal rather than a calendar year may report fiscal year income. Identify the beginning and ending dates of the debtor's fiscal year.) If a joint petition is filed, state income for each spouse separately. (Married debtors filing under chapter 12 or chapter 13 must state income of both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.)

**NONE    AMOUNT**                                                          **SOURCE (if more than one)**

X

**2. Income other than from employment or operation of business**
State the amount of income received by the debtor other than from employment, trade, profession, or operation of the debtor's business during the **two years** immediately preceding the commencement of this case. Give particulars. If a joint petition is filed, state income for each spouse separately. (Married debtors filing under chapter 12 or chapter 13 must state income for each spouse whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.)

**NONE    AMOUNT**                                                          **SOURCE (if more than one)**

X

0555927050812044410102190

**3. Payments to creditors**

a. List all payments on loans, installment purchases of goods or services, and other debts, aggregating more than $600 to any creditor, made within **90 days** immediately preceding the commencement of this case. (Married debtors filing under chapter 12 or chapter 13 must include payments by either or both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.)

| NONE | NAME AND ADDRESS OF CREDITOR | DATES OF PAYMENT | AMOUNT PAID | AMOUNT STILL OWING |
|------|------------------------------|------------------|-------------|---------------------|
| X    |                              |                  |             |                     |

b. List all payments made within **one year** immediately preceding the commencement of this case to or for the benefit of creditors who are or were insiders. (Married debtors filing under chapter 12 or chapter 13 must include payments by either or both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.)

| NONE | NAME AND ADDRESS OF CREDITOR | DATES OF PAYMENT | AMOUNT PAID | AMOUNT STILL OWING |
|------|------------------------------|------------------|-------------|---------------------|
| X    |                              |                  |             |                     |

**4. Suits and administrative proceedings, executions, garnishments and attachments**

a. List all suits and administrative proceedings to which the debtor is or was a party within **one year** immediately preceding the filing of this bankruptcy case. (Married debtors filing under chapter 12 or chapter 13 must include information concerning either or both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.)

| NONE | CAPTION OF SUIT AND CASE NUMBER | NATURE OF PROCEEDING | COURT OR AGENCY AND LOCATION | STATUS OR DISPOSITION |
|------|--------------------------------|----------------------|------------------------------|------------------------|
|      | See attachment to SOFA 4a      |                      |                              |                        |

b. Describe all property that has been attached, garnished or seized under any legal or equitable process within **one year** immediately preceding the commencement of this case. (Married debtors filing under chapter 12 or chapter 13 must include information concerning property of either or both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.)

| NONE | NAME AND ADDRESS OF PERSON FOR WHOSE BENEFIT PROPERTY WAS SEIZED | DATE OF SEIZURE | DESCRIPTION AND VALUE OF PROPERTY |
|------|------------------------------------------------------------------|-----------------|-----------------------------------|
| X    |                                                                  |                 |                                   |

**5. Repossessions, foreclosures and returns**

List all property that has been repossessed by a creditor, sold at a foreclosure sale, transferred through a deed in lieu of foreclosure or returned to the seller, within **one year** immediately preceding the commencement of this case. (Married debtors filing under chapter 12 or chapter 13 must include information concerning property of either or both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.)

| NONE | NAME AND ADDRESS OF CREDITOR OR SELLER | DATE OF REPOSSESSION, FORECLOSURE SALE, TRANSFER OR RETURN | DESCRIPTION AND VALUE OF PROPERTY |
|------|----------------------------------------|-----------------------------------------------------------|-----------------------------------|
| X    |                                        |                                                           |                                   |

**6. Assignments and receiverships**

a. Describe any assignment of property for the benefit of creditors made within **120 days** immediately preceding the commencement of this case. (Married debtors filing under chapter 12 or chapter 13 must include any assignment by either or both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.)

| NONE | NAME AND ADDRESS OF ASSIGNEE | DATE OF ASSIGNMENT | TERMS OF ASSIGNMENT OR SETTLEMENT |
|------|------------------------------|--------------------|-----------------------------------|
| X    |                              |                    |                                   |

b. List all property which has been in the hands of a custodian, receiver, or court-appointed official within **one year** immediately preceding the commencement of this case. (Married debtors filing under chapter 12 or chapter 13 must include information concerning property of either or both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.)

| NONE | NAME AND ADDRESS OF CUSTODIAN | NAME AND LOCATION OF COURT CASE TITLE NUMBER | DATE OF ORDER | DESCRIPTION AND VALUE OF PROPERTY |
|------|-------------------------------|----------------------------------------------|---------------|-----------------------------------|
| X    |                               |                                              |               |                                   |

### 7. Gifts

List all gifts or charitable contributions made within **one year** immediately preceding the commencement of this case except ordinary and usual gifts to family members aggregating less than $200 in value per individual family member and charitable contributions aggregating less than $100 per recipient. (Married debtors filing under chapter 12 or chapter 13 must include gifts or contributions by either or both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.)

| NONE | NAME AND ADDRESS OF PERSON OR ORGANIZATION | RELATIONSHIP TO DEBTOR, IF ANY | DATE OF GIFT | DESCRIPTION AND VALUE OF GIFT |
|------|---------------------------------------------|--------------------------------|--------------|-------------------------------|
| X    |                                             |                                |              |                               |

### 8. Losses

List all losses from fire, theft, other casualty or gambling within **one year** immediately preceding the commencement of this case **or since the commencement of this case.** (Married debtors filing under chapter 12 or chapter 13 must include losses by either or both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.)

| NONE | DESCRIPTION AND VALUE OF PROPERTY | DESCRIPTION OF CIRCUMSTANCE AND, IF LOSS WAS COVERED IN WHOLE OR IN PART BY INSURANCE, GIVE PARTICULARS | DATE OF LOSS |
|------|-----------------------------------|--------------------------------------------------------------------------------------------------------|--------------|
| X    |                                   |                                                                                                        |              |

### 9. Payments related to debt counseling or bankruptcy

List all payments made or property transferred by or on behalf of the debtor to any persons, including attorneys, for consultation concerning debt consolidation, relief under the bankruptcy law or preparation of a petition in bankruptcy within **one year** immediately preceding the commencement of this case.

| NONE | NAME AND ADDRESS OF PAYEE | DATE OF PAYMENT NAME OF PAYER IF OTHER THAN DEBTOR | AMOUNT OF MONEY OR DESCRIPTION AND VALUE OF PROPERTY |
|------|---------------------------|----------------------------------------------------|------------------------------------------------------|
| X    |                           |                                                    |                                                      |

### 10. Other transfers

List all other property, other than property transferred in the ordinary course of the business or financial affairs of the debtor, transferred either absolutely or as security within **one year** immediately preceding the commencement of this case. (Married debtors filing under chapter 12 or chapter 13 must include transfers by either or both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.)

| NONE | NAME AND ADDRESS OF TRANSFERREE, RELATIONSHIP TO DEBTOR | DATE | DESCRIBE PROPERTY TRANSFERRED AND VALUE RECEIVED |
|------|----------------------------------------------------------|------|--------------------------------------------------|
| X    |                                                          |      |                                                  |

**11. Closed financial accounts**

List all financial accounts and instruments held in the name of the debtor or for the benefit of the debtor which were closed, sold, or otherwise transferred within **one year** immediately preceding the commencement of this case. Include checking, savings, or other financial accounts, certificates of deposit, or other instruments; shares and share accounts held in banks, credit unions, pension funds, cooperatives, associations, brokerage houses and other financial institutions. (Married debtors filing under chapter 12 or chapter 13 must include information concerning accounts or instruments held by or for either or both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.)

| NONE | NAME AND ADDRESS OF INSTITUTION | TYPE AND NUMBER OF ACCOUNT AND AMOUNT OF FINAL BALANCE | AMOUNT AND DATE OF SALE OR CLOSING |
|---|---|---|---|
| X | | | |

**12. Safe deposit boxes**

List each safe deposit or other box or depository in which the debtor has or had securities, cash, or other valuables within **one year** immediately preceding the commencement of this case. (Married debtors filing under chapter 12 or chapter 13 must include boxes or depositories of either or both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.)

| NONE | NAME AND ADDRESS OF BANK OR OTHER DEPOSITORY | NAMES AND ADDRESSES OF THOSE WITH ACCESS TO THE BOX OR DEPOSITORY | DESCRIPTION OF CONTENTS | DATE OF TRANSFER OR SURRENDER, IF ANY. |
|---|---|---|---|---|
| X | | | | |

**13. Setoffs**

List all setoffs made by any creditor, including a bank, against a debt or deposit of the debtor within **90 days** preceding the commencement of this case. (Married debtors filing under chapter 12 or chapter 13 must include information concerning either or both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.)

| NONE | NAME AND ADDRESS OF CREDITOR | DATE OF SETOFF | AMOUNT OF SETOFF |
|---|---|---|---|
| X | | | |

**14. Property held for another person**

List all property owned by another person that the debtor holds or controls.

| NONE | NAME AND ADDRESS OF OWNER | DESCRIPTION AND VALUE OF PROPERTY | LOCATION OF PROPERTY |
|---|---|---|---|
| X | | | |

**15. Prior address of debtor**

If the debtor has moved within the **two years** immediately preceding the commencement of this case, list all premises which the debtor occupied during that period and vacated prior to the commencement of this case. If a joint petition is filed, report also any separate address of either spouse.

| NONE | ADDRESS | NAME USED | DATES OF OCCUPANCY |
|---|---|---|---|
| | 10101 Claude Freeman Drive Charlotte, NC 28262 | Collins & Aikman Corporation | June 2002 - December 2003 |
| | 250 Stephenson Hwy Troy, MI 48083 | Collins & Aikman Corporation | 2001 - Present |
| | 701 McCullough Drive Charlotte, NC 28262 | Collins & Aikman Corporation | 1994 - June 2002 |

**16. Spouses and Former Spouses**
If the debtor resides or resided in a community property state, commonwealth, or territory (including Alaska, Arizona, California, Idaho, Louisiana, Nevada, New Mexico, Puerto Rico, Texas, Washington, or Wisconsin) within the **six year period** immediately preceding the commencement of the case, identify the name of the debtor's spouse and of any former spouse who resides or resided with the debtor in the community property state.

| NONE | NAME |
|------|------|
| X | |

**17. Environmental Information.**
For the purpose of this question, the following definitions apply:
"Environmental Law" means any federal, state, or local statute or regulation regulating pollution, contamination, releases of hazardous or toxic substances, wastes or material into the air, land, soil, surface water, groundwater, or other medium, including, but not limited to, statutes or regulations regulating the cleanup of these substances, wastes, or material.
"Site" means any location, facility, or property as defined under any Environmental Law, whether or not presently or formerly owned or operated by the debtor, including, but not limited to, disposal sites. "Hazardous Material" means anything defined as a hazardous waste, hazardous substance, toxic substance, hazardous material, pollutant, or contaminant or similar term under an Environmental Law.

---

a. List the name and address of every site for which the debtor has received notice in writing by a governmental unit that it may be liable or potentially liable under or in violation of an Environmental Law. Indicate the governmental unit, the date of the notice, and, if known, the Environmental Law:

| NONE | SITE NAME AND ADDRESS | NAME AND ADDRESS OF GOVERNMENTAL UNIT | DATE OF NOTICE | ENVIRONMENTAL LAW |
|------|------|------|------|------|
| X | | | | |

b. List the name and address of every site for which the debtor provided notice to a governmental unit of a release of Hazardous Material. Indicate the governmental unit to which the notice was sent and the date of the notice.

| NONE | SITE NAME AND ADDRESS | NAME AND ADDRESS OF GOVERNMENTAL UNIT | DATE OF NOTICE | ENVIRONMENTAL LAW |
|------|------|------|------|------|
| X | | | | |

c. List all judicial or administrative proceedings, including settlements or orders, under any Environmental Law with respect to which the debtor is or was a party. Indicate the name and address of the governmental unit that is or was a party to the proceeding, and the docket number.

| NONE | NAME AND ADDRESS OF GOVERNMENTAL UNIT | DOCKET NUMBER | STATUS OR DISPOSITION |
|------|------|------|------|
| X | | | |

**18 . Nature, location and name of business**

a. If the debtor is an individual, list the names, addresses, taxpayer identification numbers, nature of the businesses, and beginning and ending dates of all businesses in which the debtor was an officer, director, partner, or managing executive of a corporation, partnership, sole proprietorship, or was a self-employed professional within the **six years** immediately preceding the commencement of this case, or in which the debtor owned 5 percent or more of the voting or equity securities within the **six years** immediately preceding the commencement of this case.

If the debtor is a partnership, list the names, addresses, taxpayer identification numbers, nature of the businesses, and beginning and ending dates of all businesses in which the debtor was a partner or owned 5 percent or more of the voting or equity securities, within the **six years** immediately preceding the commencement of this case.

If the debtor is a corporation, list the names, addresses, taxpayer identification numbers, nature of the businesses, and beginning and ending dates of all businesses in which the debtor was a partner or owned 5 percent or more of the voting or equity securities within the **six years** immediately preceding the commencement of this case.

| NONE | NAME AND ADDRESS | TAXPAYER ID NUMBER | NATURE OF BUSINESS | BEGINNING AND ENDING DATES OF OPERATION |
|------|------------------|--------------------|--------------------|------------------------------------------|
| | | | | |

*Please see Schedule B12 for a listing of affiliated parties which the Debtor may have been a partner or owned 5 percent or more of the voting or equity securities within six years immediately preceding the commencement of this case.*

b. Identify any business listed in response to subdivision a., above, that is "single asset real estate" as defined in 11 U.S.C. § 101.

| NONE | NAME | ADDRESS |
|------|------|---------|
| | | |

The following questions are to be completed by every debtor that is a corporation or partnership and by any individual debtor who is or has been, within the **six years** immediately preceding the commencement of this case, any of the following: an officer, director, managing executive, or owner of more than 5 percent of the voting or equity securities of a corporation; a partner, other than a limited partner, of a partnership; a sole proprietor or otherwise self-employed.

*(An individual or joint debtor should complete this portion of the statement **only** if the debtor is or has been in business, as defined above, within the six years immediately preceding the commencement of this case. A debtor who has not been in business within those six years should go directly to the signature page.)*

**19. Books, records and financial statements**

a. List all bookkeepers and accountants who within the **two years** immediately preceding the filing of this bankruptcy case kept or supervised the keeping of books of account and records of the debtor.

| NONE | NAME | ADDRESS | DATES SERVICES RENDERED |
|------|------|---------|-------------------------|
| | J. Michael Stepp | CFO<br>250 Stephenson Highway<br>Troy, MI 48083 | Until 10/13/2004 |
| | Dave Cosgrove | SVP - Financial Planning & Controller<br>250 Stephenson Highway<br>Troy, MI 48083 | 7/9/2005 - Present |
| | Bryce M. Koth | CFO<br>250 Stephenson Highway<br>Troy, MI 48083 | 10/13/2004 - 7/08/2005 |

b. List all firms or individuals who within the **two years** immediately preceding the filing of this bankruptcy case have audited the books of account and records, or prepared a financial statement of the debtor.

| NONE | NAME | ADDRESS | DATES SERVICES RENDERED |
|------|------|---------|-------------------------|
| | KPMG LLP | 150 West Jefferson<br>Suite 1200<br>Detroit, MI 48226 | 2003 and 2004 audits |

*Data as of 5/16/05*

c. List all firms or individuals who at the time of the commencement of this case were in possession of the books of account and records of the debtor. If any of the books of account and records are not available, explain.

| NONE | NAME | ADDRESS |
|------|------|---------|
|  | Robert Solomon - Director of<br>Corporate Accounting | 250 Stephenson Highway<br>Troy, MI 48083 |

d. List all financial institutions, creditors and other parties, including mercantile and trade agencies, to whom a financial statement was issued within the **two years** immediately preceding the commencement of this case by the debtor.

| NONE | NAME AND ADDRESS | DATE ISSUED |
|------|------------------|-------------|

*In the ordinary course of its business, the Debtor issued various financial statements to various interested parties including, but not limited to, shareholders, financial institutions, creditors and other parties. The Debtor did not maintain a record of the recipients of financial statements or the date the financial statements were issued.*

## 20. Inventories

a. List the dates of the last two inventories taken of your property, the name of the person who supervised the taking of each inventory, and the dollar amount and basis of each inventory.

| NONE | DATE OF INVENTORY | INVENTORY SUPERVISOR | DOLLAR AMOUNT OF INVENTORY<br>(Specify cost, market or other basis) |
|------|-------------------|----------------------|--------------------------------------------------------------------|
| X |  |  |  |

b. List the name and address of the person having possession of the records of each of the two inventories reported in a., above.

| NONE | DATE OF INVENTORY | NAME AND ADDRESS OF CUSTODIAN OF INVENTORY RECORDS |
|------|-------------------|----------------------------------------------------|
| X |  |  |

## 21 . Current Partners, Officers, Directors and Shareholders

a. If the debtor is a partnership, list the nature and percentage of partnership interest of each member of the partnership.

| NONE | NAME AND ADDRESS | NATURE OF INTEREST | PERCENTAGE OF INTEREST |
|------|------------------|--------------------|------------------------|
| X |  |  |  |

b. If the debtor is a corporation, list all officers and directors of the corporation, and each stockholder who directly or indirectly owns, controls, or holds 5 percent or more of the voting or equity securities of the corporation.

| NONE | NAME AND ADDRESS | TITLE | NATURE AND PERCENTAGE OF STOCK<br>OWNERSHIP |
|------|------------------|-------|---------------------------------------------|
|  | See attachment to SOFA 21b |  |  |

*Please also see Schedule B12 for a listing of parties who may control 5% or more of the voting or equity securities of the Debtor.*

## 22 . Former partners, officers, directors and shareholders

a. If the debtor is a partnership, list each member who withdrew from the partnership within **one year** immediately preceding the commencement of this case.

| NONE | NAME | ADDRESS | DATE OF WITHDRAWAL |
|------|------|---------|--------------------|
| X |  |  |  |

b. If the debtor is a corporation, list all officers or directors whose relationship with the corporation terminated within **one year** immediately preceding the commencement of this case.

| NONE | NAME AND ADDRESS | TITLE | DATE OF TERMINATION |
|---|---|---|---|
| | Charles E Becker | Director of C&A | 07/19/04 |

*Address information for former C&A Officers and Directors is available upon written request.*

| | Cynthia L Hess | Director of C&A | 09/30/04 |

*Address information for former C&A Officers and Directors is available upon written request.*

| | Elkin McCallum | Director of C&A | 07/19/04 |

*Address information for former C&A Officers and Directors is available upon written request.*

| | Samuel Valenti III | Director of C&A | 09/30/04 |

*Address information for former C&A Officers and Directors is available upon written request.*

**23 . Withdrawals from a partnership or distributions by a corporation**
If the debtor is a partnership or corporation, list all withdrawals or distributions credited or given to an insider, including compensation in any form, bonuses, loans, stock redemptions, options exercised and any other perquisite during **one year** immediately preceding the commencement of this case.

| NONE | NAME AND ADDRESS OF RECIPIENT, RELATIONSHIP TO DEBTOR | DATE AND PURPOSE OF WITHDRAWAL | AMOUNT OF MONEY OR DESCRIPTION AND VALUE OF PROPERTY |
|---|---|---|---|
| | See SOFA 3b | | |

**24. Tax Consolidation Group.**
If the debtor is a corporation, list the name and federal taxpayer identification number of the parent corporation of any consolidated group for tax purposes of which the debtor has been a member at any time within the **six-year period** immediately preceding the commencement of the case.

| NONE | NAME OF PARENT CORPORATION | TAXPAYER IDENTIFICATION NUMBER |
|---|---|---|
| | Collins & Aikman Corporation | EIN: 13-3489233 |

**25. Pension Funds.**
If the debtor is not an individual, list the name and federal taxpayer identification number of any pension fund to which the debtor, as an employer, has been responsible for contributing at any time within the **six-year period** immediately preceding the commencement of the case.

| NONE | NAME OF PENSION FUND | TAXPAYER IDENTIFICATION NUMBER |
|---|---|---|
| X | | |

**In re: Collins & Aikman Corporation**
**Case No. 05-55927**
Attachment 4a

| Matter Name | Description | Venue/Date Filed | Status |
|---|---|---|---|
| Clayton, Frances H. v. Collins & Aikman Products Co. and Collins & Aikman Corp. | Age discrimination, retaliation, wrongful termination case. | U.S. District Court, Middle District North Carolina | Discovery ongoing. |
| Keats, Linda and Ronald C. Spry v. Collins & Aikman Products Co. and Collins & Aikman Corporation | Keats alleges age and sex discrimination and Spry alleges age discrimination. | USDC, Middle District of NC | Discovery ongoing. |
| Langworth, Norman v. Collins & Aikman Corporation | Age discrimination. | U.S. District Court Western District of Michigan | Internal investigation and discovery proceeding. |
| Mosingo, Jerry L. v. Collins & Aikman Corporation | Breach of Resignation and Separation agreement for alleged violation of non-compete provision. | Oakland County Circuit Court, MI | Internal investigation and discovery proceeding. |
| Patterson, Wanda, et al. v. Heartland Industrial Partners LLP, Collins & Aikman Corporation and Collins and Aikman Products Company. | Plaintiffs allege that the USWA and its officials have requested and are receiving illegal things of value from an employer and/or its agents. | USDC ND OH ED - 7/28/03 | |
| Peisner, Jonathan v. Collins & Aikman Corporation | Breach of Separation Agreement for failing to pay medical benefits. | Michigan 52nd District | Internal investigation and discovery proceeding. |
| Sareini, Ali T. v. Collins & Aikman | Race discrimination case. | Wayne County Michigan | Newly filed. |
| Products Company, Inc. (f/k/a Collins & | Environmental contamination. | Palm Beach County Circuit Court | Tentative settlement. |
| Onebeacon America Insurance Company v. Collins & Aikman Co., et al. (Insurance recovery | Two different declaratory judgment actions; one re: Viacom and the other re: environmental claims. | Supreme Court of New York - 4/3/03 | |
| Allied Machinery Co. v. PGAM Advanced Technologies, Collins & Aikman Corp. and Premier Mold | Collection of commissions allegedly owed on sale of equipment from PMGA to Premier Mold.  PMGA is the primary defendant. | Malcomb County Michigan | Discovery proceeding. |
| Applied Material Solutions, Inc. v. Collins & Aikman Corporation | Alleged failure to pay for conveyor belts but belts were not completed in time. | St. Clair County, Michigan | Settlement negotiations ongoing; Case evaluation 5/20/05. |
| Arvinmeritor OE, LLC v. Textron, Inc. and Collins & Aikman Corporation | Breach of contract for clean up costs of Grenada, MS site. | Delaware State Court | Answer filed. |
| Yazaki North America, Inc. v. Collins & Aikman Corporation and Collins & Aikman Plastics | Alleged fraud arising out of joint venture with Mexican Industries for $1.4million. | Circuit Court of County of Wayne, Michigan | Discovery proceeding. |
| Bruno, Joseph, Individually and On Behalf of All Others Similarly Situated v. Collins & Aikman Corp., David Stockman, J. Michael Stepp and Bryce Koth | Shareholder's class action. | U.S. District Court Eastern District of Michigan | Newly filed. |
| Securities Litigation v. Collins & Aikman Corporation, Heartland Industrial Partners L.P., Thomas e. Evans, Terry Mosingo, Marshall A. Cohen, Cynthia Hess, Timothy D. Leuiliette, N. Gerald McConnell, J. Michael Stepp, David A. Stockman, Daniel P. Tredwel | This is a federal Class Action brought by the Plaintiff on behalf of himself and Class consisting of all other persons who purchased the publicly traded securities of Collins & Aikman (includes Dotson). | USDC ED Michigan - 3/27/02 | |
| Neese, Shannon Blakely  v. James Bradford Drye, Salem Leasing Corporation and Collins & Aikman  Products Co. f/k/a Collins & Aikman  Corporation. | Automobile accident where in Defendant Drye rear ended Plaintiff. Drye is alleged to have been in the scope of employment with C&A at the time. | District Court Division, Iredell County, NC; Filed 4/23/04 | Settled. |
| White, Haywood and Linda v. Collins & Aikman Corporation and City of Greenville | Plaintiff alleges he slipped and fell, and struck his head on the floor.  Plaintiff further alleges the Pro-Gym carpeting, manufactured by defendant's former floor coverings division was defectively manufactured, designed, formulated and/or processed. | Greenville Superior Court - 7/7/00 | Settled. |
| Landstar Logistics, Inc. v. Collins & Aikman Corporation | Landstar alleges that the defendants failed to compensate Landstar as required by a transportation logistics services contract. | Duval County Circuit Court - 8/11/00 | Settled. |
| Tenibac-Graphion, Inc. v. Collins & Aikman Corporation | Alleged failure to pay for repair services. | Clinton Township, Michigan | Settled. |

8/12/2005 4:44 AM
00022752

**In re: Collins & Aikman Corporation**
**Case No. 05-55927**
Attachment 4a

| Matter Name | Description | Venue/Date Filed | Status |
|---|---|---|---|
| Platinum Resources LLC v. Collins & Aikman Corporation | Collection of payment for temporary staffing services. | 14A-3 Judicial district Michigan | Dismissal with prejudice signed. |
| Steel Hector & Davis v. Collins & Aikman Corporation | Breach of contract for alleged failure to pay legal bills. | Palm Beach County Florida | Settled. |
| Hematite Manufacturing, a division of Pavaco Plastics, Inc. v. Collins & Aikman Corporation. | Collection for goods provided. | Oakland County Court, Michigan | Invoice paid. Closing paperwork pending. |
| Kent Adhesive Products Co. v. Collins & Aikman Corporation | Collection for goods provided. | Portage County Municipal Court, Kent, Ohio | Case dismissed. |

*Note 1:  Parties to "multi-plaintiff" cases relating to asbestos have not been listed but will be included in the creditor matrix for notice purposes.  A complete list as of May 17, 2005 is available upon written request to Kurtzman Carson Consultants.*

*Note 2:  Out of an abundance of caution, the Debtor has scheduled all suits and administrative proceedings under C&A Products Co.  To the extent the Debtor was able to identify the relevant legal entity, the action will be scheduled with that Debtor entity as well.*

*Note 3:  This listing shall not constitute an admission by the Debtor of any liability or that the actions or proceedings listed herein were correctly filed against the Debtor or any affiliate of the Debtor.  The Debtor reserves its rights to dispute or assert defenses to any suit or proceeding listed herein and to assert that neither the Debtor nor any other affiliated debtor in these jointly administered cases is an appropriate party to such actions or proceedings.*

8/12/2005 4:44 AM
00022752

**In re: Collins & Aikman Corporation**
**Case No. 05-55927**
Attachment 21b

| Name | Title | Nature and percentage of stock ownership |
|---|---|---|
| Charles Becker | Chief Executive Officer, Shareholder | 8.80% |
| Bryce M. Koth | Senior Vice President, Chief Financial Officer | |
| Jay B. Knoll | Vice President, General Counsel, Secretary | |
| John A. Galante | Vice President, Treasurer | |
| J. Michael Stepp | Class I Director | |
| Timothy D. Leuliette | Class I Director | |
| W. Gerald McConnell | Class I Director | |
| Anthony Hardwick | Class I Director | |
| Marshall A. Cohen | Class II Director (Chairman) | |
| David C. Dauch | Class II Director | |
| Richard Jelinek | Class II Director | |
| Warren B. Rudman | Class II Director | |
| Robert C. Clark | Class III Director | |
| Daniel P. Tredwell | Class III Director | |
| Heartland Industrial Partners | Shareholder | 39.10% |
| Aspen Advisors, LLC | Shareholder | 8.40% |
| | | |
| *Note: Data as of 5/16/05* | | |

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF MICHIGAN, SOUTHERN DIVISION**

**In re: Collins & Aikman Corporation**                                                    **Case No. 05-55927(SWR)**

# Declaration Concerning Debtors' Statement of Financial Affairs

I, David Cosgrove, Sr. Vice President - Fin. Planning and Controller of the corporation named as debtor in this case, declare under penalty of perjury that I have read the answers contained in the foregoing statement of financial affairs and any attachments thereto and that they are true and correct to the best of my knowledge, information and belief.

Date  8/12/2005                                        Signature: / s / David Cosgrove

                                                                    **David Cosgrove**

                                                                    **Sr. Vice President - Fin. Planning and Controller**

---

**Penalty for making a false statement or concealing property: Fine of up to $500,000 or imprisonment for up to 5 years or both.  18 U.S.C.§§ 152 and 3571.**

## CERTIFICATE OF SERVICE

I hereby certify that on September 14, 2007, I caused to be electronically filed the

"Opening Brief in Support of Defendant Paul C. Barnaba's Motion to Dismiss" with the Clerk of

Court using CM/ECF, which will send notification of such filing to the following:  Joseph A.

Rosenthal, Esquire and Carmella P. Keener, Esquire, Rosenthal, Monhait & Goddess, P.A., 919

N. Market Street, Suite 1401, Wilmington, DE 19801; Thomas P. Preston, Esquire, Blank Rome

LLP, 1201 Market Street, Suite 800, Wilmington, DE 19801; Anne C. Foster, Esquire and

Robert J. Stearn Jr., Esquire, Richards Layton & Finger P.A., One Rodney Square, 920 N. King

Street, Wilmington, DE 19801; Andrew Auchincloss Lundgren, Esquire, Young Conaway

Stargatt & Taylor LLP, 1000 West Street, 17th Floor, Wilmington, DE 19801; James Holzman,

Esquire and J. Clayton Athey, Esquire, Prickett, Jones & Elliott, P.A., 1310 King Street,

Wilmington, DE 19801; Michael J. Maimone, Esquire and Joseph Benedict Cicero, Esquire,

Edwards Angell Palmer & Dodge LLP, 919 N. Market Street, 15th Floor, Wilmington, DE

19801; Peter B. Ladig, Esquire and Stephen B. Brauerman, Esquire, The Bayard Firm, 222

Delaware Avenue, Suite 900, P.O. Box 25130, Wilmington, DE 19899; and Vernon R. Proctor,

Esquire, Proctor Heyman LLP, 1116 West Street, Wilmington, DE 19801.

I further certify that on September 14, 2007, I caused to be mailed first class United

States mail, postage prepaid, the document to the following non-registered participants:

Samuel H. Rudman, Esquire
Coughlin Stoia Geller
   Rudman & Robbins LLP
58 South Service Road, Suite 200
Melville, NY 11747

Lynn Brimer, Esquire
Strobl & Sharp, P.C.
300 East Long Lake Road, Suite 200
Bloomfield Hills, MI 48304

Michael Joseph, Esquire
Blank Rome LLP
600 New Hampshire Avenue, NW
Washington, DC 20037

Richard A. Spehr, Esquire
Joseph D. Simone, Esquire
Mayer  Brown LLP
1675 Broadway
New York, NY 10019

Craig A. Stewart, Esquire
Ken L. Hashimoto, Esquire
Monique A. Gaylor, Esquire
Arnold & Porter LLP
399 Park Avenue
New York, NY 10022

Gandolfo V. DiBlasi, Esquire
Stacey R. Friedman, Esquire
David E. Swarts, Esquire
Sullivan & Cromwell LLP
125 Broad Street
New York, NY 10004

Michael Shapiro, Esquire
Gerald Griffin, Esquire
Carter Ledyard & Milburn LLP
2 Wall Street
New York, NY 10005

Richard M. Strassberg, Esquire
Jeffrey A. Simes, Esquire
Laurie L. Levin, Esquire
Goodwin Procter LLP
599 Lexington Avenue
New York, NY 10022

Stephen L. Ascher, Esquire
Jenner & Block LLP
919 Third Avenue, 37th Floor
New York, NY 10022

Jonathan J. Lerner, Esquire
Lea Haber Kuck, Esquire
Skadden, Arps, Slate, Meagher & Flom LLP
Four Time Square
New York, NY 10036

Andrew B. Weissman, Esquire
Michele L. Taylor, Esquire
Wilmer Cutler Pickering Hale and Dorr LLP
1875 Pennsylvania Avenue, NW
Washington, DC 20006

Thomas G. Rafferty, Esquire
Antony L. Ryan, Esquire
Cravath, Swaine & Moore LLP
825 Eighth Avenue
New York, NY 10019

Christopher Harris, Esquire
Seth L. Friedman, Esquire
Latham & Watkins LLP
885 Third Avenue
New York, NY 10022

Elizabeth D. Power (ID No. 4135)