## UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

| | |
|---|---|
| COLLINS & AIKMAN CORPORATION and COLLINS & AIKMAN PRODUCTS CO., as Debtors in Possession,<br><br>Plaintiffs,<br><br>v.<br><br>DAVID A. STOCKMAN, J. MICHAEL STEPP, BRYCE M. KOTH, DAVID R. COSGROVE, PAUL C. BARNABA, ROBERT A. KRAUSE, JOHN A. GALANTE, CHARLES E. BECKER, ELKIN B. MCCALLUM, THOMAS E. EVANS, CYNTHIA HESS, DANIEL P. TREDWELL, W. GERALD MCCONNELL, SAMUEL VALENTI, III, HEARTLAND INDUSTRIAL PARTNERS, L.P., HEARTLAND INDUSTRIAL ASSOCIATES, L.L.C., HEARTLAND INDUSTRIAL GROUP, L.L.C., PRICEWATERHOUSECOOPERS LLP, and KPMG LLP,<br><br>Defendants. | C.A. No. 07-265-*** |

## DECLARATION OF STACEY R. FRIEDMAN

STACEY R. FRIEDMAN hereby declares:

1.      I am a member of Sullivan & Cromwell LLP, counsel for defendant J. Michael Stepp in the above-captioned action.  I submit this declaration for the purpose of placing before the Court certain documents referred to in the Memorandum of Law of J. Michael Stepp in Support of His Motion to Dismiss the Complaint.

2.      Attached hereto as Exhibit A is a true and correct copy of C&A SEC Form 10-Q, filed November 14, 2001.

3.      Attached hereto as Exhibit B is a true and correct copy of C&A SEC Form 10-K/A, filed June 7, 2002.

4.    Attached hereto as Exhibit C is a true and correct copy of C&A SEC Form 10-K, filed March 26, 2003.

5.    Attached hereto as Exhibit D is a true and correct copy of C&A SEC Form 10-K, filed March 17, 2004.

6.    Attached hereto as Exhibit E is a true and correct copy of C&A SEC Form 10-Q, filed November 9, 2004.

7.    Attached hereto as Exhibit F is a true and correct copy of the closing stock prices of Collins & Aikman Corp. for the period May 1, 2003 through May 17, 2005, from Factiva, a Dow Jones and Reuters Company.

8.    Attached hereto as Exhibit G is a true and correct copy of the closing stock prices of Dana Corp. for the period May 1, 2003 through March 3, 2006, from Factiva, a Dow Jones and Reuters Company.

9.    Attached hereto as Exhibit H is a true and correct copy of the closing stock prices of Delphi Corp. for the period May 1, 2003 through October 10, 2005, from Factiva, a Dow Jones and Reuters Company.

10.    Attached hereto as Exhibit I is a true and correct copy of the closing stock prices of Tower Automotive, Inc. for the period May 1, 2003 through February 2, 2005, from Factiva, a Dow Jones and Reuters Company.

11.    Attached hereto as Exhibit J is a true and correct copy of the closing stock prices of Intermet Corp. for the period May 1, 2003 through September 29, 2004, from Factiva, a Dow Jones and Reuters Company.

12.     Attached hereto as Exhibit K is a true and correct copy of the Restated Certificate of Incorporation of Collins & Aikman Corporation, filed August 10, 1999.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on September 13, 2007 in New York, New York.

_____
Stacey R. Friedman

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

### CERTIFICATE OF SERVICE

I, Richard L. Horwitz, hereby certify that on September 14, 2007, the attached document

was electronically filed with the Clerk of the Court using CM/ECF which will send notification

to the registered attorney(s) of record that the document has been filed and is available for

viewing and downloading.

Joseph A. Rosenthal
Carmella P. Kenner
Rosenthal, Monhait & Goddess, P.A.
919 N. Market Street, Suite 1401
Wilmington, DE 19899

Thomas P. Preston
Blank Rome LLP
1201 North Market Street, Suite 800
Wilmington, DE 19801-4226

Thomas G. Macauley
Zuckerman Spaeder LLP
919 Market Street, Suite 1705
P. O. Box 1028
Wilmington, DE 19899

Andrew Auchincloss Lundgren
Young, Conaway, Stargatt & Taylor
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, DE 19899-0391

Michael J. Maimone
Joseph Benedict Cicero
Edwards Angell Palmer & Dodge LLP
919 North Market Street, Suite 1500
Wilmington, DE 19801

Peter B. Ladig
Stephen B. Brauerman
The Bayard Firm
222 Delaware Avenue, Suite 900
P. O. Box 25130
Wilmington, DE 19899

Vernon R. Proctor
Proctor Heyman LLP
1116 West Street
Wilmington, DE 19801

James L. Holzman
J. Clayton Athey
Stephen L. Ascher
Prickett, Jones & Elliott, P.A.
1310 King Street
P. O. Box 1328
Wilmington, DE 19899

Anne Churchill Foster
Robert J. Stearn, Jr.
Richards, Layton & Finger
One Rodney Square
P.O. Box 551
Wilmington, DE 19899

I further certify that on September 14, 2007, I have Federal Expressed the documents to

the following person(s):

Samuel H. Rudman
Lerach Coughlin Stoia Geller Rudman &
     Robbins LLP
58 South Service Road, Suite 200
Melville, NY 11747

Joseph O. Click
Blank Rome, LLP
600 New Hampshire Ave., N.W.
Washington, DC 20037

Carl S. Kravitz
Zuckerman Spaeder LLP
1800 M Street, NW, Suite 1000
Washington, DC 20036

Stephen L. Ascher
Jenner & Block LLP
919 Third Avenue, 37th Floor
New York, NY 10022

Joseph De Simone
Mayer Brown LLP
1675 Broadway
New York, NY 10019

Jonathan Lerner
Skadden, Arps, Slate, Meagher & Flom LLP
Four Times Square
New York, NY 10036

Seth L. Friedman
Latham & Watkins LLP
885 Third Avenue
New York, NY 10022

Andrew Weissman
Wilmer Cutler Pickering Hale and
     Dorr LLP
1875 Pennsylvania Ave., N.W.
Washington, DC 20006

Craig A. Stewart
Arnold & Porter LLP
399 Park Avenue
New York, NY 10022

Michael Shapiro
Carter Ledyard & Milburn LLP
2 Wall Street
New York, NY 10005

Richard M. Strassberg
Goodwin Proctor LLP
599 Lexington Avenue
New York, NY 10022

Lynn Brimer
Strobl & Sharp, P.C.
300 East Long Lake Road, Suite 200
Bloomfield Hills, MI 48304

Thomas G. Rafferty
Cravath, Swaine & Moore LLP
825 Eighth Avenue
New York, NY 10019

By:  */s/ Richard L. Horwitz*
    Richard L. Horwitz (#2246)
    Peter J. Walsh (#2437)
    Hercules Plaza, 6th Floor
    1313 N. Market Street
    Wilmington, Delaware 19899-0951
    Tel:  (302) 984-6000
    rhorwitz@potteranderson.com
    pwalsh@potteranderson.com

818858 / 33280

3

# Exhibit D

# PART 1

# COLLINS & AIKMAN CORP

## FORM 10-K
(Annual Report)

## Filed 3/17/2004 For Period Ending 12/31/2003

| Address | 250 STEPHENSON HWY |
| --- | --- |
| | TROY, Michigan 48083 |
| Telephone | 248-824-2500 |
| CIK | 0000846815 |
| Industry | Auto & Truck Parts |
| Sector | Consumer Cyclical |
| Fiscal Year | 12/31 |



# UNITED STATES SECURITIES AND EXCHANGE COMMISSION
## WASHINGTON, D.C. 20549

---

# Form 10-K

(Mark One)

☑　ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d)
　　OF THE SECURITIES EXCHANGE ACT OF 1934

**For the fiscal year ended December 31, 2003**

or

☐　TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d)
　　OF THE SECURITIES EXCHANGE ACT OF 1934

**Commission file number 1-10218**

---

# Collins & Aikman Corporation
*(Exact name of registrant as specified in its charter)*

| **Delaware** | **13-3489233** |
|---|---|
| *(State or other jurisdiction of incorporation or organization)* | *(I.R.S. Employer Identification Number)* |

**250 Stephenson Highway**
**Troy, Michigan 48083**
*(Address of principal executive offices, including zip code)*

**Registrant's telephone number, including area code:**
**(248) 824-2500**

**Securities registered pursuant to Section 12(b) of the Act:**

| Title of each class | Name of each exchange on which registered |
|---|---|
| Common Stock, $.01 par value | New York Stock Exchange |

**Securities registered pursuant to Section 12(g) of the Act:**
**None**

Indicate by check mark whether the Registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the Registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☐　No ☑

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of Registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☑

Indicate by check mark whether the registrant is an accelerated filer (as defined in Exchange Act Rule 12b-2). Yes ☑　No ☐　.

The aggregate market value of voting stock held by non-affiliates of the Registrant was $168,794,241 as of March 1, 2004.

As of February 26, 2007, the number of outstanding shares of the Registrant's common stock, $.01 par value, was 83,680,086 shares.

## WEBSITE ACCESS TO COMPANY'S REPORTS:

Collins & Aikman's internet website address is www.collinsaikman.com. The Company's annual report on Form 10-K, quarterly reports on Form 10-Q, current reports on Form 8-K and amendment to those reports filed or furnished pursuant to Section 13(a) or 15(d) of the Exchange Act are available free of charge through the Company's website and as soon as reasonably practicable after the reports are electronically filed with, or furnished to the Securities and Exchange Commission.

The Company's Code of Business Conduct is available free of charge through the Company's internet website. Any amendments to the Company's Code of Business Conduct and any waivers of the Code of Business Conduct involving executive officers or directors of the Company will also be made available on the Company's internet website. Printed copies of the Company's Code of Business Conduct are also available free of charge to any shareholder upon request to: Corporate Secretary, Collins & Aikman Corporation, 250 Stephenson Highway, Troy, MI 48083.

## COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES

### FORM 10-K ANNUAL REPORT INDEX

**Page**

**PART I**

| | | |
|---|---|---|
| Item 1. | Business | 8 |
| Item 2. | Properties | 16 |
| Item 3. | Legal Proceedings | 17 |
| Item 4. | Submission of Matters to a Vote of Security Holders | 17 |

**PART II**

| | | |
|---|---|---|
| Item 5. | Market for Registrant's Common Equity and Related Stockholder Matters | 17 |
| Item 6. | Selected Financial Data | 18 |
| Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 19 |
| Item 7A. | Quantitative and Qualitative Disclosures About Market Risk | 44 |
| Item 8. | Financial Statements and Supplementary Data | 44 |
| Item 9. | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | 45 |
| Item 9A. | Controls and Procedures | 46 |

**PART III**

| | | |
|---|---|---|
| Item 10. | Directors and Executive Officers of the Registrant | 47 |
| Item 11. | Executive Compensation | 52 |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management | 63 |
| Item 13. | Certain Relationships and Related Transactions | 65 |
| Item 14. | Principal Accounting Fees and Services | 68 |

**PART IV**

| | | |
|---|---|---|
| Item 15. | Exhibits, Financial Statement Schedules and Reports on Form 8-K | 70 |

i

## PART I

**Cautionary Statements Regarding Forward-Looking Information and Risk Factors**

This Report on Form 10-K contains "forward-looking" information, as that term is defined by the federal securities laws, about our financial condition, results of operations and business. You can find many of these statements by looking for words such as "may," "will," "expect," "anticipate," "believe," "estimate," "should," "continue," "predict" and similar words used in this Annual Report. The forward-looking statements in this Form 10-K are intended to be subject to the safe harbor protection provided by the federal securities laws.

These forward-looking statements are subject to numerous assumptions, risks and uncertainties (including trade relations and competition). Because the statements are subject to risks and uncertainties, actual results may differ materially from those expressed or implied by the forward-looking statements. We caution readers not to place undue reliance on the statements, which speak only as of the date of this Annual Report.

The cautionary statements set forth above should be considered in connection with any subsequent written or oral forward-looking statements that Collins & Aikman Corporation (the "Company") or persons acting on its behalf may issue. The Company does not undertake any obligation to review or confirm analysts' expectations or estimates or to release publicly any revisions to any forward-looking statements to reflect events or circumstances after the date of this report or to reflect the occurrence of unanticipated events.

This Report on Form 10-K contains forward-looking statements within the meaning of the Private Securities Litigation Reform Act of 1995. Actual results and events may differ materially from those that are anticipated because of certain risks and uncertainties, including but not limited to general economic conditions in the markets in which the Company operates and industry based factors such as:

*Demand in the automotive industry is significantly dependent on the U.S. and the global economies and the Company's business and profitability are exposed to current and future uncertainties.*

The Company's financial performance depends, in large part, on conditions in the global automotive markets and, generally, on the U.S. and global economies. Demand in the automotive industry fluctuates in response to overall economic conditions and is particularly sensitive to changes in interest rate levels, consumer confidence and fuel costs. The threat or act of terrorism and war, the recession and other recent developments adversely affected consumer confidence throughout the U.S. and much of the world and exacerbated the uncertainty in the Company's markets. The future impact on us is difficult to predict. We would be harmed by any sustained weakness in demand or continued downturn in the economy.

The Company's sales are impacted by retail inventory levels and production schedules. In 2003, Original Equipment Manufacturer ("OEM") customers continued to significantly reduce their production and inventory levels due to the uncertain economic environment. In the current environment, it is extremely difficult to predict future production rates and inventory levels and the sustainability of any recovery.

*The base of customers which the Company serves is concentrated, and the loss of business from a major customer or the discontinuation of particular vehicle models could reduce the Company's sales and harm the Company's profitability.*

Because of the relative importance of a few large customers and the high degree of concentration of OEMs in the automotive industry, the Company's business is exposed to a high degree of risk related to customer concentration. DaimlerChrysler AG, General Motors Corporation and Ford Motor Company and their respective affiliates were the Company's three largest customers, and they directly or indirectly accounted for approximately 28%, 22% and 25% of the Company's 2003 net sales, respectively. A loss of significant business from, or adverse performance by, any of these customers would be harmful to the Company's profitability. Although the Company receives purchase orders from most of the Company's customers, these purchase orders typically provide for the supply of a customer's annual requirements for a particular model or assembly plant, renewable on a year-to-year basis, rather than for the purchase of a

specific quantity of products. It is difficult to accurately predict the level of new production for 2004 car sales. The loss of business with respect to significant vehicle models could have a material adverse effect.

In addition, there is substantial and continuing pressure from automotive manufacturers to reduce costs, including costs associated with outside suppliers like Collins & Aikman. For example, OEM customers in the automotive industry attempted to impose price decreases and givebacks throughout 2003. Such attempted price decreases were generally in the 2% to 4% range. Several reductions have been agreed to, and others are currently being negotiated with OEMs and pressures may increase if overall economic and industry conditions do not improve. It is difficult for the Company to offset downward pricing pressures through alternative, less costly sources of raw materials. In addition, throughout 2003, the Company has experienced pricing pressure from its suppliers. The Company cannot assure you that it will not be materially and adversely affected by substantial and continuing pricing pressures.

*The prices that the Company can charge some of the Company's customers are predetermined, and the Company bears the risk of costs in excess of its estimates.*

Sales contracts with some of the Company's customers require it to provide its products at predetermined prices. In some cases, these prices decline over the course of the contract. The costs that the Company incurs in fulfilling these contracts may vary substantially from its initial estimates. Unanticipated cost increases may occur as a result of several factors, including increases in the costs of labor, components or materials. In some cases, the Company may be permitted to pass on cost increases associated with specific materials to its customers. Cost overruns that the Company cannot pass on to its customers could have a material adverse effect.

*The Company may not be able to successfully integrate the Company's acquired operations or realize the intended benefits of the Company's acquisitions.*

The Company's future operations and cash flow will depend largely upon its ability to integrate acquisitions, achieve the strategic operating objectives for these acquisitions and realize significant synergies and cost savings as a result. Acquisitions since January 2001 account for 48 of the Company's current 102 plants and facilities and approximately 58% of the Company's approximately 23,900 employees. The Textron Automotive Company's Trim division ("TAC-Trim") acquisition in 2001, at that time, individually accounted for 41 of the Company's plants and facilities and approximately 12,000 of the Company's employees located across seven different countries, including two countries where the Company did not previously operate. The Company has not previously undertaken an integration process as large or complex as the integration plans required by these recent acquisitions collectively or by the TAC-Trim acquisition individually. In order to succeed, the Company will need to realize projected synergies and cost savings on a timely basis, consolidate information technologies, capitalize on the Company's increased purchasing power, effectively control the progress of the Company's integration process and associated costs, consolidate the Company's program management, research and development and engineering operations, capitalize on the Company's prime contractor strategy and the opportunities afforded by the Company's broader products offering and maintain strong relationships with Tier I integrators and OEMs.

To the extent the Company has misjudged the nature and extent of industry trends or its competition, it may have difficulty in achieving its operating and strategic objectives. In addition, the Company's integration activities will place substantial demands on its management, operational resources and financial and internal control systems. The Company's future operating results will depend upon the Company's ability to implement and improve its operating and financial controls and to combine, train and manage the Company's employee base. There is a risk that the diversion of management attention, particularly in a difficult operating environment, will affect sales and the attention that management can devote to this and other operational, financial and strategic issues. In addition, in some of the Company's past non-U.S. acquisitions, the Company has encountered integration and systems difficulties typical of foreign transactions, which have given rise to material weaknesses that had to be subsequently corrected. The Company cannot assure you that it will not encounter similar difficulties going forward. All statements concerning the benefits, cost savings and synergies the Company expects to realize from its acquisitions are forward-looking statements.

3

*The Company may pursue additional acquisitions that further the Company's current strategies.*

The Company may selectively identify and acquire other businesses with complementary products, manufacturing capabilities or geographic markets, and the Company expects to continually evaluate such opportunities. The Company cannot assure you that any business acquired will be successfully integrated with other operations or prove to be complementary in the manner expected or be profitable. The Company could incur further indebtedness in connection with the Company's acquisition strategy and increase the Company's leverage. Acquisitions outside of North America may present unique difficulties and increase the Company's exposure to the risks attendant to international operations. The process of integrating acquired companies and operations into the Company's existing operations may result in unforeseen operating difficulties and may require significant financial resources that would otherwise be available for the ongoing development or expansion of existing operations.

*The Company may incur unanticipated contingent liabilities as a result of acquisitions and may experience unanticipated liabilities associated with former discontinued operations.*

The Company might incur unforeseen environmental, tax, pension, litigation or other liabilities in connection with the Company's recent or future acquisitions, or the Company might underestimate the known liabilities. If such liabilities materialize or are greater than the Company estimates, they could have a material adverse effect on us. In addition, the Company has significant responsibilities related to some of its formerly owned businesses, or discontinued operations, such as those relating to post-retirement, casualty, environmental, product liability, lease and other matters. Based upon the information presently available and the Company's insurance coverage, the Company does not believe that any of these liabilities will have a material adverse effect upon the Company's financial condition or results of operations, however, the Company might be incorrect in its assumptions; and the extent of those contingent liabilities of which the Company is aware could exceed its expectations. In addition, there may be other such liabilities of which the Company presently has no knowledge.

*If the Company is unable to meet future capital requirements, the Company's competitive position may be adversely affected.*

In securing new business, the Company typically is required to expend significant amounts of capital for engineering, development, tooling and other costs. Generally, the Company seeks to recoup these costs through pricing over time, but the Company may be unsuccessful due to competitive pressures and other market constraints or if a customer ceases production of a particular vehicle. While the Company believes that it will be able to fund capital expenditures through cash flow from operations, borrowings under the Company's credit facilities, sale and leaseback agreements and sales of receivables including sales under the Company's receivables facility and factoring arrangements, there can be no assurance that it will have adequate funds to make all the necessary capital expenditures or that the amount of future capital expenditures will not be materially in excess of its anticipated expenditures.

*Recent trends among the Company's customers will increase competitive pressures in the Company's businesses.*

In recent years, the competitive environment among suppliers to the vehicle manufacturers in the automotive industry has changed significantly as these manufacturers have sought to outsource more vehicular components, modules and systems and to use on-line auctions in order to obtain further price reductions. In addition, these sectors have experienced substantial consolidation as OEMs have sought to lower costs, improve quality and increasingly purchase complete systems and modules rather than separate components. This consolidation has caused, and its continuation will continue to amplify, the pricing pressures outlined above in the discussion of the concentration of the Company's customers. The Company's competitive strategy will be to position itself as the prime contractor of choice to both Tier I integrators and OEM assembly plants by supplying a full spectrum of integrated interior trim components. This strategy presents the risk that some of the Company's customers may be in competition with the Company as well. Furthermore, the trend toward consolidation among automotive parts suppliers is resulting in a smaller number of large

4

suppliers like us who benefit from purchasing and distribution economies of scale. The Company may be unable to achieve the cost savings and operational improvements expected from the Company's prime contractor business strategy, which could harm its ability to compete favorably in the future with other larger, consolidated companies.

*The Company's strategy may not succeed if anticipated outsourcing fails to occur due to union considerations.*

Because of the economic benefits inherent in outsourcing to suppliers and the costs associated with reversing a decision to purchase automotive interior systems and components from an outside supplier, automotive manufacturers' commitments to purchasing automotive interior systems and components from outside suppliers, particularly on a just-in-time basis, are contemplated to increase. However, under the contracts presently in effect in the United States and Canada between each of Ford, General Motors and DaimlerChrysler and the United Auto Workers ("UAW") and the Canadian Auto Workers ("CAW"), in order for any of such automotive manufacturers to obtain from external sources components that it currently produces, it must first notify the UAW or the CAW of such intention. If the UAW or the CAW objects to the proposed outsourcing, some agreement will have to be reached between the UAW or the CAW and the automotive manufacturer. Factors that will normally be taken into account by the UAW, the CAW and the automotive manufacturer include whether the proposed new supplier is technologically more advanced than the automotive manufacturer, whether the new supplier is unionized, whether cost benefits exist and whether the automotive manufacturer will be able to reassign union members whose jobs are being displaced to other jobs within the same factories.

*The Company's products are subject to changing technology, which could place us at a competitive disadvantage relative to alternative products introduced by competitors.*

The Company believes that its customers rigorously evaluate their suppliers on the basis of product quality, price competitiveness, technical expertise and development capability, new product innovation, reliability and timeliness of delivery, product design capability, manufacturing expertise, operational flexibility, customer service and overall management. The Company's success will depend on its ability to continue to meet customers' changing specifications with respect to these criteria. The Company may, therefore, require significant ongoing and recurring additional capital expenditures and investment in research and development, manufacturing and other areas to remain competitive.

*The Company may be subject to work stoppages at its facilities or those of its principal customers, which could seriously impact the profitability of the Company's business.*

As of December 31, 2003, approximately 62% of the Company's global work force was unionized. If the Company's unionized workers were to engage in a strike, work stoppage or other slowdown in the future, the Company could experience a significant disruption of the Company's operations, which could have a material adverse effect on us. Many OEMs and their suppliers have unionized work forces. Work stoppages or slowdowns experienced by OEMs or their suppliers could result in slowdowns or closures of assembly plants where the Company's products are included in assembled vehicles. Furthermore, organizations responsible for shipping the Company's customers' products may be impacted by occasional strikes staged by the unions representing transportation employees. Any interruption in the delivery of the Company's customers' products would reduce demand for the Company's products.

*A growing portion of the Company's revenue may be derived from international sources, which exposes us to additional uncertainty.*

A significant portion of the Company's 2003 sales was derived from shipments to destinations outside of the United States and Canada. As part of the Company's business strategy, the Company intends to expand the Company's international operations and customer base. Sales outside of the U.S. and Canada, particularly sales to emerging markets, are subject to other various risks, including: governmental embargoes or foreign trade restrictions such as antidumping duties; changes in U.S. and foreign governmental regulations; tariffs;

5

fuel duties; other trade barriers; political, economic and social instability and foreign exchange risk. In addition, there are tax inefficiencies in repatriating funds from non-U.S. subsidiaries. To the extent such repatriation is necessary for us to meet the Company's debt service or other obligations, this will adversely affect us. International operations frequently are conducted through joint venture arrangements that can materially limit the Company's operational and financial control of the business.

*The Company may incur material losses and costs as a result of product liability and warranty claims that may be brought against us.*

The Company faces an inherent business risk of exposure to product liability claims in the event that the use of its current and formerly manufactured or sold products results, or is alleged to result, in bodily injury and/or property damage. The Company may experience material product liability losses in the future and incur significant costs to defend such claims. The Company's product liability insurance coverage will be inadequate for any liabilities that may ultimately be incurred or may be unavailable on acceptable terms in the future. In addition, if any of the Company's products are or are alleged to be defective, the Company may be required to participate in a government-required or OEM-instituted recall involving such products. Each vehicle manufacturer has its own policy regarding product recalls and other product liability actions relating to its suppliers.

In addition, as suppliers become more integrally involved in the vehicle design process and assume more of the vehicle assembly functions, vehicle manufacturers are increasingly looking to their suppliers for contribution when faced with product liability claims. A successful claim brought against us in excess of the Company's available insurance coverage or a requirement to participate in a product recall may have a material adverse effect.

In the ordinary course of the Company's business, contractual disputes over warranties can arise. In the past five years or more, the Company has not been required to make any material payments in respect of warranty claims. In most cases, financial responsibility for warranty costs are contractually retained by the Company's customer so long as the customers' specifications are met, but the Company may nonetheless be subjected to requests for cost sharing or pricing adjustments as a part of the Company's commercial relationship with the customer.

*The Company's business may be materially and adversely affected by compliance obligations and liabilities under environmental laws and regulations.*

The Company is subject to federal, state, local and foreign environmental, and health and safety, laws and regulations that affect ongoing operations and may increase capital costs and operating expenses in order to maintain compliance with such requirements and impose liability relating to contamination at the Company's facilities, other locations such as former facilities, facilities where the Company has sent wastes for treatment or disposal and other properties to which the Company (or a company or business for which the Company is responsible) are linked. See Note 21 "Commitments and Contingencies — Environmental."

*The Company may not be able to manage its business as it might otherwise due to its high degree of leverage.*

The Company has indebtedness that is substantial in relation to the Company's stockholders' equity and cash flow. At December 31, 2003, the Company had $1,285.2 million of outstanding total debt and short-term borrowings. The Company's percentage of total debt and outstanding preferred stock of its subsidiary, Collins & Aikman Products Co. ("Products") ("Products Preferred Stock") to total capitalization was 76.7% at December 31, 2003. The degree to which the Company is leveraged will have important consequences, including the following:

- the Company's ability to obtain additional financing in the future for working capital, capital expenditures, acquisitions, business development efforts or general corporate purposes may be impaired;

6

- a substantial portion of the Company's cash flow from operations will be dedicated to the payment of interest and principal on the Company's indebtedness, dividends on Products Preferred Stock and capital and operating lease expense, thereby reducing the funds available to us for other purposes

- the Company's operations are restricted by the Company's debt instruments and the terms of the Products Preferred Stock, which contain material financial and operating covenants, and those restrictions will limit, among other things, the Company's ability to borrow money in the future for working capital, capital expenditures, acquisitions or other purposes;

- indebtedness under the Company's senior credit facilities and the financing cost associated with its receivables facility will be at variable rates of interest, which makes it subject to increases in interest rates;

- the Company's leverage may place us at a competitive disadvantage as compared with the Company's less leveraged competitors, and the Company's leverage will make it more vulnerable in the event of a downturn in general economic conditions or in any of the Company's businesses; and

- the Company's flexibility in planning for, or reacting to, changes in its business and the automotive industry may be limited.

The Company has significant debt obligations maturing in 2005 and 2006. The Company's ability to service or refinance, when required, the Products Preferred Stock and the Company's debt, lease and other obligations will depend principally upon the Company's future operating performance, which will be affected by prevailing economic conditions and financial, business and other factors, many of which are beyond the Company's control.

In addition, factors more specific to us could cause actual results to vary materially from those anticipated in the forward-looking statements included in this report such as substantial leverage, limitations imposed by the Company's debt instruments, the Company's ability to successfully integrate acquired businesses including actions it has identified as providing cost saving opportunities and pursuing our prime contractor business strategy, the Company's customer concentration and risks associated with the formerly owned operations of the Company.

The Company's divisions may also be affected by changes in the popularity of particular vehicle models or particular interior trim packages or the loss of programs on particular vehicle models.

For a discussion of certain of these and other important factors which may affect our operations, products and markets, see "Item 1. — Business" and "Item 7. — Management's Discussion and Analysis of Financial Condition and Results of Operations" and also our other filings with the Securities and Exchange Commission.

## Completion of Audit Committee Inquiry

The Company's Audit Committee inquiry, initiated in August 2003, into certain assertions made by two former executives and related matters has been completed. The Audit Committee, aided by its independent counsel, Davis Polk & Wardwell, and by an outside accounting expert, reported its findings and recommendations to the Company's full Board of Directors. In general, the Audit Committee's inquiry extended into the following areas: (1) assertions regarding the Company's accounting for revenue and tooling, (2) a comprehensive review of related party transactions and (3) certain corporate governance procedures. The following summarizes the Committee's principal findings and recommendations:

- The Audit Committee has not become aware of any events that would necessitate a restatement of any previously issued financial statements.

- While the assertions concerning related party transactions were limited to certain transactions involving Charles Becker and Elkin McCallum and entities controlled by them, the Audit Committee reviewed all material transactions entered into between the Company and Heartland Industrial Partners, L.P., Mr. McCallum and Mr. Becker and their respective affiliates. Both Mr. Becker and Mr. McCallum are

7

directors and significant shareholders of the Company and are, directly or indirectly, limited partners in Heartland, the Company's largest shareholder.

The Audit Committee concluded that each of these transactions had a legitimate business purpose, was negotiated fairly, and was intended to advance the interests of the Company and not to benefit the related parties at the Company's expense. The Audit Committee further concluded that, by and large, these transactions were appropriately presented to and approved by the full Board of Directors of the Company and were properly documented and adequately disclosed.

The Audit Committee concluded that certain related party matters referred to below had not been formally submitted for Board approval, and that others should have been more appropriately documented. The Audit Committee recommended that disinterested members of the Board review those matters and take whatever procedural action may be deemed appropriate. Specifically, the matters to be reviewed are (1) with respect to Mr. Becker and his affiliates: leases of two buildings adjacent to the Company's headquarters, which was already the subject of a Board-approved lease from an affiliate of Mr. Becker; an amendment reducing the rent at the Company's headquarters to the rent at these two additional buildings; and amendments of existing plant leases with an affiliate of Mr. Becker to extend the term and reduce the rent for the initial term; and (2) with respect to Mr. McCallum and his affiliates, an amendment of the previously Board-approved Joan Automotive merger agreement clarifying ownership of certain equipment listed in a schedule attached to that agreement; and the final terms of a supply agreement contemplated at the time the Board approved a January 2003 purchase of certain fabrics equipment from an affiliate of Mr. McCallum. Subsequent to the Board's initial discussion with the Audit Committee on March 10, 2004, the Board has held a meeting and ratified all of these actions.

- The Audit Committee also recommended that the Company review its public filings to determine whether disclosure of certain aspects of the related party transactions reviewed by the Audit Committee should be enhanced and additionally, it proposed a resolution for the Board that will require pre-approval of all future related party transactions, even where pre-approval of the Board is not legally required. The resolution also reiterates procedures for ensuring proper documentation and disclosure of such transactions. Subsequent to the Board's initial discussion with the Audit Committee on March 10, 2004, the Board has adopted and approved this resolution.

As a result of the Audit Committee's recommendations, the Company has included enhanced disclosure in this Annual Report with respect to the following: (1) disclosure of the Board-approved payment of $300,000 as compensation to Mr. Becker in 2002 for his temporary service as Vice Chairman of the Company during that year; (2) an improved description of the 2003 fabrics and 2002 Dutton Yarns air-texturing operations transactions with Mr. McCallum; and (3) the dollar volume of previously disclosed ordinary course arrangements with Mr. McCallum, specifically, from transition services, supply and rebate arrangements.

The members of the Company's Audit Committee are Robert C. Clark, the former Dean of the Harvard Law School, Marshall A. Cohen, counsel at Cassels Brock and Blackwell, a Canadian law firm, and former Senator Warren B. Rudman. The accounting expert who advised the Audit Committee is Alex Arcady, a retired partner from Ernst & Young LLP, who spent the last ten years of his career in that firm's national office.

Item 1.    *Business*

## THE COMPANY

The Company is a global leader in the design, engineering and manufacturing of automotive interior components, including: instrument panels, fully assembled cockpit modules, floor and acoustic systems, automotive fabric, and interior trim, as well as exterior trim and convertible roof systems. In North America, the Company manufactures components for approximately 90% of all light vehicle production platforms. Sales are primarily made to North American based global OEMs, as well as Asian and European based global OEMs. The automotive supply industry in which the Company competes is cyclical and is influenced by the level of North American and European vehicle production. The Company has approximately 23,900

employees and 102 plants and facilities worldwide. The Company is a Delaware corporation formed on September 21, 1988. The Company conducts all of its operating activities through its wholly owned subsidiary Collins & Aikman Products Co. ("Products"). Predecessors of Products have been in operation since 1843.

Collins & Aikman is one of the industry's largest and most broadly based manufacturers of automotive interior components, systems and modules. The Company has the capability to supply diverse combinations of stylistically matched, functionally engineered and acoustically integrated interior trim components, systems and modules and markets interior products to customers through customer business units, which supplies products from three primary categories: plastic components and cockpits, carpet and acoustics, automotive fabrics and convertible roof systems.

## INDUSTRY TRENDS

The Company's strategy is to capitalize on several important automotive industry trends, which are expected to drive demand for its products. These trends include:

- *Increasing OEM Demand for Modules, Systems and Complete Interiors.* To reduce costs and simplify assembly processes and design, OEMs increasingly expect their large-scale suppliers to provide fully engineered systems, pre-assembled combinations of components (systems or modules) and complete automotive interiors rather than individual components. OEMs also continue to increase their need for multiple products on any given assembly line, further driving the need for suppliers to be able to handle extreme complexity.

- *Growing Technological Content and Acoustical Performance Requirements.* The electronic and technological content of vehicles continues to expand, largely driven by demand for greater functionality and convenience. Changes to vehicle interiors, including hands-free cell phone systems, entertainment and navigational systems and voice-activated dashboard functions, are expected to require enhanced acoustical properties and increased sound field engineering relative to today's light vehicles.

- *Global Customer Requirements.* Due to the opportunity for significant cost savings, reduced product development cycle times, common global platforms and improved product quality and consistency, automotive manufacturers favor suppliers with the capability to manufacture automotive interior systems and components in multiple geographic markets.

## CORPORATE STRATEGY

The Company's goal is to become the leading manufacturer of automotive interior trim components to OEMs and Tier I integrators and to realize the integration, synergy and cost savings opportunities created by the combination of its portfolio of products. The Company intends to leverage its product development, patented new materials, continuous enhanced manufacturing capability, an unwavering dedication to lean manufacturing, error proofing and APQP (Advanced Product Quality Planning) launch readiness systems to meet customers' demands. The following are the key elements of the strategy:

- *Provide integrated product solutions that combine interior styling, component systems and acoustical technologies.* The ability to bundle multiple components into integrated, custom packages distinguishes the Company from its competitors and provides an opportunity to increase content per vehicle. The Company is a leader in product innovation, design and styling in all of its business lines, producing components that cover substantially all of the non-glass interior surfaces of automobiles. This breadth of product offering affords the Company a significant advantage as OEMs increasingly view the vehicle interior as a major point of differentiation and rely upon automotive suppliers for research, engineering, design and styling capabilities. By employing a cross-disciplinary approach to acoustics, surface styling and product engineering that takes advantage of product development and technological capabilities, the Company can offer integrated product solutions to its customers.

- *Capitalize on position as full service provider to OEMs and Tier I total interior integrators.* The Company believes that OEMs will accelerate modular and system sourcing in order to lower costs, reduce time to market and accommodate global platforms and "just in time" sequenced delivery of

9

complete interior systems. The Company is well positioned to capitalize on these opportunities. Furthermore, the Company's products are used in approximately 90% of all North American light vehicle platforms and are sold to all North American OEMs, transplants such as Toyota, Nissan and Honda and major Tier I integrators. The Company is also well positioned with respect to its Tier II competitors that have comparatively narrower product lines and significantly less size, scale and technological capabilities.

- *Increase content per vehicle.* The Company intends to take advantage of its current position to increase content per vehicle and has substantial new business awards from customers across all product categories, with the strongest growth in fully assembled cockpit modules. Projected sales growth is primarily attributable to its expanded book of full cockpit programs. By increasing content per vehicle, sales are expected to increase at a rate in excess of changes in industry production rates.

- *Leverage technology to improve manufacturing efficiency.* The Company believes it has many opportunities to improve manufacturing efficiency and cost structure by rationalizing existing operations and incorporating manufacturing "best practices," processes, procedures and technologies into its operations. For example, the Company is believed to be among the most efficient plastics suppliers in North America and Europe due to numerous proprietary manufacturing technologies, such as Invisitec™ and Envirosoft™ patented processes that allow the Company to manufacture and combine multiple products to produce complex integrated interiors products. The Company believes the application of technologies to the Company's other operations, as well as the continued roll-out of these technologies throughout the Company's operations, will significantly improve plastics manufacturing cycle times, labor costs and scrap rates.

- *Pursue cost savings opportunities.* The Company expects to continue to realize savings through a number of initiatives, including purchasing savings, in-sourcing the majority of our plastics tooling and yarn dyeing requirements, consolidating research and development and engineering functions, capacity rationalization and reducing global headquarters' costs. While the Company believes that the majority of restructuring activities have already been undertaken, in an effort to achieve cost savings, the Company may also elect to implement restructuring activities in future periods above and beyond activities initiated during 2003.

## SEGMENT AND GEOGRAPHICAL INFORMATION

The Company changed the composition of its reportable segments on January 1, 2003 and further redefined the segments July 1, 2003 to reflect organizational changes and restated prior period segment data to be comparable. The Company operates through three segments: U.S. and Mexico Plastics, International Plastics and Global Soft Trim. For a discussion of the Company's operating segments and the geographic regions in which the Company operates, refer to Item 7 Management's Discussion and Analysis of Financial Condition and Results of Operations — "Results of Operations" and to Footnote 20 — "Information About the Company's Operations."

## PRODUCTS

The Company markets the majority of its products to customers through customer business units, which manage products from two primary categories: plastic components and cockpits, and soft trim which include: carpet and acoustics, automotive fabrics and convertible roof systems.

### Plastic Components and Cockpits

The U.S. and Mexico Plastics and International Plastics segments include interior trim components such as door panels, instrument panels, consoles, package trays and cargo management systems, exterior trim components such as bumper fascias and cladding and fully assembled cockpit systems and components

10

thereof. This broad portfolio of plastic components and cockpits products allows the Company to offer customers modules and systems that incorporate individual components. Some major products include:

- *Instrument Panels ("IP"):* As the most structurally important plastic component in the vehicle and as the plastic substrate directly in front of the driver, the IP occupies the most important piece of "real estate" in the interior. The Company believes that it is the number one IP supplier in North America. The advanced materials the Company employs include Envirosoft™ castable thermoplastic materials, high performance PVC alloys, high-definition grain and texture formulation and vacuum forming. The Company also has the proprietary Invisitec™ invisible passenger air bag system, which provides improved appearance and craftsmanship at reduced cost.

- *Cockpits:* The Company is a leading North American and European supplier of cockpits. The complete array and breadth of its plastic component offerings has enabled the Company to become a leader in offering customers a fully assembled IP system ("cockpit") delivered on a just-in-time basis. As most of the ancillary interior trim components revolve around the IP placement, the Company believes that it will be able to penetrate effectively the customer base by offering the IP along with complementary plastic accoutrements and additional products from its other business units. The Company sources various other parts that make up a fully assembled modular cockpit from outside suppliers (including radios, wire harnesses, cross-vehicle beams and steering columns). The Company expects that its position as a cockpit integrator will provide significant opportunities to in-source more manufactured content in the future. Through the proprietary Intelliquence™ software, finished cockpits can be delivered to the OEMs on a just-in-time basis and installed on the assembly line.

- *Door Panels:* The Company believes that it is the second largest supplier of door panels in North America. This decorative plastic interior trim component is an important element to the overall styling theme of a vehicle's interior.

- *Exteriors:* Exterior trim components include plastic molded fascia systems, bodyside cladding, signal lamps, cowl grilles and wheel flares. The Company has taken advantage of the systems trend in the exterior trim product market by producing and assembling fascia with radiator grilles, energy absorbers, trim moldings and lamps to be delivered in sequence directly to the OEMs' assembly line.

## Soft Trim

The Soft Trim segment includes the Company's global carpet and acoustics products, global automotive fabrics products and global convertible roof systems. Some of the major products of each group include:

### Carpet and Acoustics

Carpet and acoustics products includes molded non-woven and tufted carpet, alternative molded flooring, accessory mats and acoustics systems consisting of absorbing materials, damping materials, engine compartment noise vibration and harshness systems and interior insulators. The Company evolved from a North American carpet producer to become a market leader in a broad range of automotive floor systems, luggage compartment trim, dash insulators and other acoustic products with production capabilities in both North America and Europe. While acoustical products are often combined with molded floor carpet to provide complete interior floor systems, it is useful to describe four carpet and acoustics product categories:

- *Molded Floor Systems:* Molded floor systems consist of thermoformed compression molded carpets. These carpets are provided in either a barrier or an absorptive NVH (noise, vibration and harshness) system. The barrier system includes polyethylene, barrier back, and a fiber underlay system or a foam-in-place system. Products include Tuflor™, the Company's proprietary thermoplastic flooring product, which is rugged, durable and washable. The products in molded floor systems are highly engineered, and their manufacture requires a high degree of precision and draws on the Company's robotics capabilities. The Company believes it is the number one producer of molded floor and acoustic systems in the North American market and manufactures molded floor systems for all of the North American and Japanese OEMs as well as a number of the European OEMs.

11

- *Luggage Compartment Trim:* The other major carpeted area of the vehicle is the luggage compartment, which includes one-piece molded trunk systems and assemblies, wheelhouse covers and center pan mats, seatbacks, tireboard covers and other trunk trim products. The Company believes that it is the number two supplier of luggage compartment trim in the North American market.

- *Accessory Floormats:* The Company manufactures automotive accessory floormats by vulcanizing rubber backing to tufted carpet and also manufactures cargo mats with value-added distinctive aesthetic and practical features such as hand-sewn appearance of edges and moisture trapping construction with our patented Akro Edge® floormats. Largely due to this product differentiation, the Company has become the largest fully integrated auto floormat producer in North America.

- *Acoustical Products:* Acoustical products include interior dash insulators that insulate the passenger compartment from engine compartment noise and heat; damping materials that control noise in the floor, overhead system and sides of the vehicle; and engine compartment NVH systems. Changes to vehicle interiors, including hands-free cell phone systems, navigational systems, entertainment systems and voice-activated Internet access, will require enhanced acoustical properties and increased sound field engineering relative to today's light vehicles.

## Automotive Fabrics

The Company is positioned as the market leader in the North American automotive fabrics market. The principal automotive products include body cloth (woven or knitted fabrics for seating surfaces and other interior applications) and headliner fabric. The Company is able to offer virtually every major weave/knit technology currently available in the marketplace including dobby velours, jacquard velours, flat wovens, double-needlebar knits, circular knits and tricot knits. This allows the Company to effectively serve changing customer styling and cost directives.

Strategic acquisitions have allowed the Company to increase its backward and forward integration levels by adding yarn dyeing and fabric lamination operations. This additional value-add manufacturing and improved control of the supply chain have contributed to improved operational efficiencies and manufacturing performance.

## Convertible Roof Systems

The Company is the only vertically integrated full service supplier of convertible roof systems, which designs, engineers and manufactures all aspects of a convertible top including the framework, trim set, backlights, well slings, tonneau covers and power actuating system. Recently, in order to differentiate products in the marketplace, OEMs have been increasing the number of convertible and open roof derivative vehicles on both existing and new platforms. The Company's management believes that this trend will continue to drive demand for convertibles and other innovative open roof systems. The Company is well positioned to secure additional business based upon demonstrated new innovative roof system concepts.

Top-in-a-Box™, a system pioneered by the Company, is an assembly-line-ready module containing all of the components of a convertible top that enables the OEM to install a complete convertible top system on the production line. This modular, "bolt-on" assembly significantly reduces the time and labor traditionally required to manufacture a convertible model, enabling OEMs to more profitably produce and sell convertibles. The Company has the industry's most complete line of fabric coverings for convertible and sport utility top covers for OEMs globally. The Company maintains final assembly and trim operations near the OEMs' plants, and thereby offers customers complete just-in-time delivery and sequencing capabilities.

## CUSTOMERS

Customers include OEMs and Tier I total interior integrators, both of which have been increasingly divesting component manufacturing. OEMs have typically been direct customers for the Company's plastic components and cockpits, and soft trim products, while Tier I total interior integrators have typically been direct customers for fabrics and carpet and acoustics products.

Through strategic acquisitions, the Company has broadened its customer base globally, with European and South American sales representing 27% of total sales for 2003 versus 19% in 2002. DaimlerChrylser AG (including Mercedes, Chrysler, Mitsubishi and Smart), General Motors Corporation (including General Motors, Opel, Vauxhall and Saab) and Ford Motor Company (including Ford, Jaguar, Land Rover, Aston Martin and Volvo) directly and indirectly represented approximately 28%, 22% and 25% of 2003 sales, respectively. The following is a list of primary customers:

| | | | |
|---|---|---|---|
| • Alfa Romeo | • General Motors | • MAN | • MG Rover |
| • Audi | • Honda | • Mazda | • Saab |
| • BMW | • Intier | • Mitsubishi | • Scania |
| • CAMMI | • Isuzu | • Nissan | • Seat |
| • DaimlerChrysler | • Jaguar | • NUMMI | • Subaru |
| • Faurecia | • Johnson Controls | • Opel | • Toyota |
| • Fiat | • Land Rover | • Porsche | • Visteon |
| • Ford | • Lear Corporation | • PSA | • Volkswagen |
| • Freightliner | • Magna | • Renault | • Volvo |

The Company's supply relationships are typically sole-source and extend over the life of the model, which is generally four to seven years, and do not normally require the purchase by the customer of any minimum number of products. The Company receives blanket purchase orders that normally cover annual requirements for products to be supplied for a particular vehicle model which may be terminated at any time. In order to reduce reliance on any one model, the Company produces automotive interior and exterior systems and components for a broad cross-section of both new and more established models.

## MARKETING, ENGINEERING AND DEVELOPMENT

As a global leader in automotive interior and exterior components, the Company differentiates itself in the marketplace by consistently providing high quality products, outstanding customer service and program management and cost effective automotive solutions to global customers. Historically, the Company marketed individual components, modules and complete systems to customers. The Company has realigned marketing efforts to sell integrated product "bundles" to customers in an effort to increase growth in sales and operating income while enhancing the value-add provided to customers. Central to this marketing strategy has been the development of products that enhance both the vehicles' interior aesthetics as well as its acoustic performance.

Products are sold directly to customers under sales contracts that are obtained primarily through competitive bidding. These sales are originated almost entirely by sales staff. This marketing effort is augmented by design and manufacturing engineers that work closely with automotive manufacturers from the preliminary design to the manufacture and supply of automotive modules, systems or components. A key element employed to increase sales is to develop increasingly higher value-added products through innovations in materials construction, product design, engineering and styling. The primary focus of the Design Engineering and Technology, therefore, is to work closely with customer engineering personnel to develop new products, processes, innovations, etc. that are central to winning new business from customers.

Through sales offices in North America, South America, Europe and Asia-Pacific, the Company's marketing personnel maintain regular contact with their various customers' engineers and purchasing agents. The Company continually seeks new business from existing customers, as well as developing relationships with new customers. The Company markets its products by maintaining strong customer relationships, developed over an 80-plus year history in the automotive industry through:

• extensive technical and product development capabilities;

• reliable just-in-time delivery of high-quality products;

• strong customer service;

• innovative new products; and

• a competitive cost structure.

13

The emergence of modular sourcing favors suppliers with broad manufacturing capabilities and product lines, experience with diverse materials and modular coordination. Management believes that the Company's broad base of manufacturing expertise with interior surface resins and materials and its global leadership in delivering cockpits, favorably positions the Company in the global automotive interior industry. Automotive manufacturers have increasingly looked to suppliers to assume responsibility for introducing product innovations, shortening the development cycle of new models, decreasing tooling investment and labor costs, reducing the number of costly design changes in the early phases of production and improving automotive interior acoustics, comfort and functionality. Once the Company is engaged to develop the design for the automotive interior system or component of a specific vehicle model, it is also generally engaged to supply these items when the vehicle goes into production. Substantial resources have been dedicated toward improving engineering and technical capabilities, establishing strong in-house tooling capabilities and developing advanced technology centers in the United States and in Europe. Similarly, research and development are an integral part of the sales and marketing effort. Especially noteworthy are the Company's proprietary Invisitec™ invisible passenger air bag door system and Envirosoft castable TPU (Thermalplastic Polyurethane) and TPO (Thermalplastic Olefin) materials.

In order to effectively develop automotive interior systems, it is necessary to have global capabilities in the engineering, research, design, development and validation of the interior components, systems and modules being produced. The Company conducts research and development at design and technology centers in Dearborn, Michigan; Dover, New Hampshire; Troy, Michigan and Plymouth, Michigan; Heidelberg, Germany and Tyngsboro, Massachusetts and at several worldwide product engineering centers. At these centers, the Company designs, develops and engineers products to comply with applicable safety standards, meet quality and durability standards, respond to environmental conditions and conform to customer aesthetic and acoustic requirements. In particular, acoustic requirements and cockpit aesthetics have become more important than ever with the advent of in-vehicle telematics.

Technologically advanced acoustics testing centers are maintained in Plymouth, Michigan and Heidelberg, Germany and cockpit development centers are located in Troy and Dearborn, Michigan in order to capitalize on both of these trends.

## MANUFACTURING

The Company focuses on combining smaller manufacturing plants into larger scale plants that have efficient layouts and the ability to reduce fixed costs.

The Company possesses cross-disciplinary manufacturing expertise, including an ability to form and assemble multi-material combinations of hard-molded plastics, slush-molded soft skins and surfaces, carpet, fabric, foam, insulation and other trim materials as well as stamping, welding, machining and painting of metals and cutting and sewing of fabric components. Management believes the sophistication of the Company's carpet tufting and dyeing processes, the foam-in-place process for molded floors and its small-part plastic moldings and assemblies capabilities create a competitive advantage.

The Company also possesses a scaleable, low-cost package automotive yarn dyeing capability that provides an important source of supply for the manufacture of our fabrics products.

The Company possesses advanced process technologies such as slush-molded skinning for high-end instrument panels, thermoplastic casting, and "molded-in" color and decoration insert capability and overall manufacturing discipline and acumen. Specific product and processes include the proprietary Intelliquence™ software sequencing system which should enable product delivery on a just-in-time basis to global OEM customers.

Through its extensive in-house tooling resources, the Company has the ability to in-source a significant amount of its tooling requirements for manufacturing carpet, acoustic, and injection molded components.

14

## TECHNOLOGY AND INTELLECTUAL PROPERTY

Significant resources are dedicated to research and development in order to maintain the position as a leading developer of technology innovations, some of which have been patented or are in the process of being patented, in the automotive interior industry. The Company has developed a number of patented and proprietary designs for innovative interior features, all focused on increasing value to the customer. Examples include the Company developed proprietary slimline cupholders, Cavelflex™ (stretch woven) fabrics and the AcT™ family of acoustically tunable products.

Patents and patent applications exist in five primary areas: automotive floor mats, automotive fabric products, acoustics, interiors and convertible systems. With respect to floormats, the Company holds several U.S. and foreign patents relating to the Akro Edge® floormats. Akro Edge® floormats are the industry standard for their functional and aesthetic appeal to OEMs and their customers. With respect to automotive fabric patents, the Company has numerous patents on headliners, trunkliners and floor panels. In the acoustics area, in addition to the proprietary Fused Fiber™ technology, the Company is actively seeking protection of various aspects of its AcT™ fiber technology and various other means for improving sound deadening and sound absorption in automotive interiors. The Company has various patents and patent applications directed to cup holders, air outlet assemblies, storage systems and convertible mechanisms. The Company owns the patents relating to Intellimold™ injection molding control process for use in its business. The Intellimold™ patents are related to methods and/or apparatus for injection molding. The Company also holds technology relating to certain skin materials and compounding solutions that provide the capability to design cost-effective materials with outstanding performance and aesthetic qualities. Examples of these materials include Envirosoft™ castable thermoplastic materials, high performance PVC alloys, high-definition grain and texture formulation and vacuum thermoplastic applications. Additionally, a new patented process, TACII™ has been developed in concert with the castable Envirosoft™ materials. The Company also holds technology relating to the Invisitec™ invisible passenger air bag system, which provides improved appearance and craftsmanship at reduced cost. Invisitec™ systems, which integrate the air bag door with the panel and top cover, have been commercialized for soft-cast and vacuum-formed panels and hard injection molded instrument panels. In total, the Company holds approximately 390 U.S. and approximately 1,500 foreign active patents and has approximately 300 patents pending. The intellectual property acquired in the TAC-Trim Acquisition is subject to certain limitations on the Company's use and creates continuing obligations to Textron.

As part of the TAC-Trim acquisition, the Company entered into three intellectual property license agreements with Textron. In two of these agreements, the Company licensed back to Textron certain intellectual property that was acquired in the transaction (the "Intellimold Agreement" and the "Licensed-Back IP Agreement"). In the third agreement, the Company licensed from Textron other intellectual property that it did not acquire in the transaction (the "Retained IP Agreement"). The Company is providing general descriptions of these agreements although these descriptions do not contain all the material terms in the contracts. In all three agreements, the ability to use the intellectual property is limited based on whether the proposed use falls inside or outside a defined field of automotive products (the "Restricted Field").

In the Intellimold Agreement, the Company gave Textron an exclusive worldwide, perpetual, irrevocable license to use outside the Restricted Field its rights in the Intellimold process and any enhancements developed by it. Textron was also granted a royalty-free, worldwide, perpetual, irrevocable license to use the Company's rights in the Intellimold process and any enhancements developed by the Company within the Restricted Field solely in connection with its and certain affiliates' manufacturing, sales and development operations. The Intellimold Agreement also includes an exclusive royalty-free, worldwide, perpetual, irrevocable license for the Company to use within the Restricted Field any enhancements to the Intellimold process developed by Textron. In the Licensed-Back IP Agreement, the Company granted Textron a non-exclusive, worldwide, royalty-free, perpetual and irrevocable license to use solely outside the Restricted Field certain intellectual property including over 77 U.S. patents on air bag related products. In the Retained IP Agreement, Textron granted to the Company a non-exclusive, worldwide, royalty-free, perpetual and irrevocable license to use solely within the Restricted Field certain intellectual property. These patents could have applicability to the automotive industry, but such use is somewhat secondary to the use of such technology outside the automotive field.

15

As described below under the heading "Management's Discussion and Analysis of Financial Condition and Results of Operations — Other Information — Off-Balance Sheet Arrangements", the Company leases certain equipment from Textron. When those leases terminate, if Textron and its affiliates continue to own any interest in the equipment, they will be allowed to use the equipment for certain purposes and to use related intellectual property.

## RAW MATERIALS

Raw materials and other supplies used in our continuing operations are normally available from a variety of competing suppliers. With respect to most materials, the loss of a single or even a few suppliers would not have a material adverse effect on the Company. The Company is sensitive to price movements in its raw materials supply base and has not hedged against price fluctuations in commodity supplies, such as plastics and resins. While the Company may not be able to pass on any future raw materials price increases to customers, a significant portion of increased cost may be offset through volume purchase savings, value engineering/value analysis in conjunction with our major customers and reductions in the cost of off-quality products and processes. The Company may evaluate commodities hedging opportunities from time to time.

## COMPETITION

The Company is a leading supplier in automotive molded carpet and acoustics, auto fabrics, convertible top systems and automotive plastics components and cockpits. Customers rigorously evaluate suppliers on the basis of product, quality, price competitiveness, technical expertise and development capability, new product innovation, reliability and timeliness of delivery, product design capability, leanness of facilities, operational flexibility, customer service and overall management. Some competitors may have greater financial resources than the Company or a competitive advantage in the production of any given product that the Company manufactures, and there can be no assurance that the Company will be able to successfully compete in the markets for the products it currently provides.

## JOINT VENTURES

The Company forms joint ventures in order to facilitate the exchange of technical information, gain entry into new markets and expand product offerings to its customer base. The Company's investment in unconsolidated joint ventures totaled $2.5 million at December 31, 2003. In January 2003, the Company acquired from Textron the remaining 50% interest in Textron Automotive Holdings (Italy) S.r.L., a joint venture that was formed as part of the TAC-Trim acquisition. Refer to Item 7. "Management's Discussion and Analysis of Financial Condition and Results of Operations" for additional discussion regarding this acquisition of the remaining 50% interest in the Italian joint venture.

## LABOR MATTERS AND EMPLOYEES

As of December 31, 2003, the Company's continuing operations employed approximately 23,900 persons on a full-time or full-time equivalent basis. Approximately 62% of such employees were represented by labor unions in the United States, Canada and other countries. Each facility with represented employees has its own collective bargaining unit and management believes that its relations with employees represented by labor unions and other employees are generally good. From time to time in the ordinary course of our business, grievances are filed against the Company by employees and unions.

## ENVIRONMENTAL MATTERS

A discussion of environmental matters is included in Item 7. "Management's Discussion and Analysis of Financial Condition and Results of Operations" and in Note 21 "Commitments and Contingencies" of this report.

Item 2.    *Properties*

The Company has 102 plants and facilities in North America, South America, Europe and Asia. Approximately 45% of the over 12 million total square footage of these facilities is owned, and the remainder is

leased. Many facilities are strategically located to provide product delivery to our customers on a just-in-time basis.

## Facilities by Geographic Region

| Type of Facility | North America | South America | Europe | Asia | Total |
|---|---|---|---|---|---|
| Manufacturing | 51 | 3 | 27 | — | 81 |
| Design, Research & Development, and Technical Centers | 12 | — | 6 | — | 18 |
| Sales Branches, Offices, Other | 12 | — | 3 | 1 | 16 |
| Total(1) | 75 | 3 | 36 | 1 | 115 |

(1)   Total facilities shown per the table exceeds the 102 plants and facilities indicated above because certain facilities listed in the table serve in more than one of the indicated capacities.

**Item 3.**   *Legal Proceedings*

A discussion of environmental matters and litigation is included in Note 21 "Commitments and Contingencies" of this report.

**Item 4.**   *Submission of Matters to a Vote of Security Holders*

None during the fourth quarter of 2003.

**Supplemental Disclosure. Executive Officers of the Registrant**

Information regarding the Company's executive officers is included in "Directors and Executive Officers of the Registrant — Executive Officers of the Company."

## PART II

**Item 5.**   *Market for Registrant's Common Equity and Related Stockholder Matters*

The Company's Common Stock has been traded on the New York Stock Exchange under the symbol "CKC" since July 7, 1994. At March 1, 2004, there were approximately 120 holders of record. The following table lists the high and low closing prices for the Common Stock for the full quarterly periods during the two most recent years.

| | 2003 | | 2002 | |
|---|---|---|---|---|
| | High | Low | High | Low |
| First Quarter | 4.83 | 3.28 | 25.500 | 16.750 |
| Second Quarter | 4.18 | 2.82 | 28.375 | 9.000 |
| Third Quarter | 3.41 | 2.09 | 9.000 | 2.810 |
| Fourth Quarter | 4.33 | 2.43 | 4.450 | 2.450 |

As of December 31, 2003, Heartland Industrial Partners, L.P. ("Heartland") owned approximately 37% of the outstanding shares; Blackstone Capital Partners LP owned approximately 5%; Joan Fabrics Corp., Mr. Elkin McCallum and affiliates owned approximately 6%; Mr. Charles E. Becker owned approximately 9% and Textron, Inc. owned approximately 6% (Which it has subsequently sold). See Item 7, "Management's Discussion and Analysis of Financial Condition and Results of Operations — Effects of Certain Transaction with Related Parties" for further information about these parties.

The Company has paid no dividends or made similar distributions with respect to its common stock during 2003 or 2002. Any payment of future dividends and the amounts thereof will be dependent upon the Company's earnings, financial requirements and other factors deemed relevant by the Company's Board of Directors. Certain restrictive covenants contained in the agreements governing the Company's credit facilities and senior subordinated notes limit the Company's ability to make dividend and other payments. See Item 7,

17

"Management's Discussion and Analysis of Financial Condition and Results of Operations — Liquidity and Capital Resources" and Note 9, "Long-Term Debt and Capital Lease Obligations" of this report.

**Item 6.**   *Selected Financial Data*

| | Year Ended(1) | | | | |
| --- | --- | --- | --- | --- | --- |
| | December 31, 2003 | December 31, 2002 | December 31, 2001 | December 31, 2000 | December 25, 1999 |
| | (In millions, except per share data) | | | | |
| Statement of Operations Data: | | | | | |
| Net sales | $ 3,983.7 | $ 3,885.8 | $ 1,823.3 | $ 1,901.8 | $ 1,898.6 |
| Gross profit | 444.2 | 518.1 | 218.8 | 266.6 | 284.7 |
| Selling, general and administrative expenses (excluding goodwill amortization) | 273.2 | 293.5 | 157.3 | 151.4 | 145.8 |
| Restructuring charge and impairment of long-lived assets(2) | 69.0 | 56.9 | 18.8 | — | 33.4 |
| Goodwill amortization | — | — | 7.1 | 7.1 | 7.0 |
| Operating income | 102.0 | 167.7 | 35.6 | 108.1 | 98.5 |
| Interest expense, net | 151.3 | 148.9 | 84.3 | 96.6 | 92.1 |
| Interest expense from subsidiary preferred stock requirements | 37.3 | — | — | — | — |
| Subsidiary preferred stock requirements | — | 38.4 | 2.4 | — | — |
| Loss on sale of receivables | 7.3 | 4.2 | 10.8 | 9.2 | 5.4 |
| Income (loss) from continuing operations before income taxes | (61.0) | (33.8) | (76.3) | 0.8 | (1.2) |
| Income tax expense (benefit) | (1.9) | 17.5 | (21.3) | 2.2 | 0.2 |
| Loss from continuing operations | (59.1) | (51.3) | (55.0) | (1.4) | (1.4) |
| Income from discontinued operations, including disposals, net of income taxes | 1.6 | 9.5 | 8.8 | 6.6 | — |
| Income (loss) before cumulative effect of a change in accounting principle | (57.5) | (41.8) | (46.2) | 5.2 | (1.4) |
| Net income (loss)(3) | (57.5) | (53.5) | (46.2) | 4.5 | (10.2) |
| Per Share Data: | | | | | |
| Loss from continuing operations per basic and diluted share | (0.71) | (1.15) | (1.42) | (0.06) | (0.05) |
| Dividends per share | — | — | — | — | 0.32 |
| Balance Sheet Data (at period end): | | | | | |
| Total assets | $ 3,191.2 | $ 3,157.1 | $ 2,987.9 | $ 1,280.3 | $ 1,348.9 |
| Long-term debt, including current portion | 1,269.2 | 1,278.7 | 1,302.5 | 884.0 | 912.5 |
| Mandatorily redeemable preferred stock of subsidiary | 161.2 | 123.9 | 149.3 | — | — |
| Common stockholders' equity (deficit) | 440.3 | 397.5 | 374.7 | (154.9) | (151.1) |
| Other Data: | | | | | |
| Capital expenditures | $ 175.1 | $ 147.9 | $ 54.5 | $ 69.0 | $ 86.4 |
| Depreciation and amortization | 140.2 | 117.0 | 81.8 | 74.8 | 71.5 |

---

(1)   The years 2003, 2002 and 2001 were calendar years; fiscal year 2000 had 53 weeks; fiscal year 1999 had 52 weeks.

(2)   In 2003, the Company recorded $69.0 million in charges consisting of restructuring of $32.2 million in severance costs; $9.2 million in costs associated with global rationalization and other exit related costs and $28.4 million in asset impairments. Included in the 2003 charges are adjustments related to previously established accruals which did not require cash outlays of $0.8 million. In 2002, the Company recorded a $56.9 million restructuring charge consisting of $18.0 million in asset impairments and $33.2 million primarily related to severance accruals and $5.7 million primarily related to other contractual obligations. In 2001, the Company recorded a restructuring charge consisting of $7.6 million in asset impairments and $11.2 million primarily related to severance accruals. In 1999, the Company recorded a restructuring charge consisting of $13.4 million in asset impairments and $20.0 million primarily related to severance accruals.

(3)  In 2002, the Company recorded an $11.7 million charge for the cumulative effect of a change in accounting principle related to an impairment loss. In 1999, the Company recorded an $8.8 million charge for the cumulative effect of a change in accounting principle related to start-up costs.

## Item 7.    *Management's Discussion and Analysis of Financial Condition and Results of Operations*

## GENERAL

*The following discussion and analysis of our financial condition and results of operations includes statements concerning our expectations for our industry and our performance. These statements are forward-looking statements and are subject to numerous risks and uncertainties, including those highlighted elsewhere under "Cautionary Statements Concerning Forward-Looking Information and Risk Factors." Our actual results may differ materially from those contained or implied by the following discussion.*

### Introduction

The Company is a global leader in the design, engineering and manufacturing of automotive interior components, including instrument panels, fully assembled cockpit modules, floor and acoustic systems, automotive fabric and interior trim, as well as exterior trim and convertible roof systems. In reviewing the Company's results for the periods discussed, consideration should be given to the following critical events: the impact of the material acquisitions that we have made, the numerous restructuring and acquisition integration activities that we have undertaken, the material impact of general economic conditions in North America and within our industry specifically, the increasingly difficult customer and competitive environment, the capital intensive nature of our business and our high degree of leverage and liquidity and debt maturity position.

*Key Factors Impacting Our Reported Results.* Critical factors affecting our ability to succeed include the following:

* *Automotive Sales and OEM Production Levels.* In North America, the Company manufactures components for approximately 90% of all light vehicle production platforms. Sales are primarily made to North American based global OEMs, as well as Asian and European based global OEMs. The automotive supply industry in which the Company competes is cyclical and is influenced by the level of North American and Western European vehicle production. The Company's sales results are influenced heavily by the volume of OEM production of light vehicles ("builds") in the markets it serves. U.S. retail automotive sales were down 1.1% in 2003 versus 2002 and down 1.8% in 2002 versus 2001. Industry wide North American Free Trade Agreement ("NAFTA") builds were down 3.0% in 2003 versus 2002 and up 5.7% in 2002 versus 2001. Within NAFTA, the builds of the Big 3 OEM's were down 5.7% in 2003 versus 2002, and up 5.9% in 2002 versus 2001. In Western Europe, builds were down nearly 0.5% in 2003 versus 2002 and down 1.4% in 2002 versus 2001. In South America, builds were down 0.5% in 2003 versus 2002 and down 8.0% in 2002 versus 2001.

* *Our relationships with our customers.* Collins & Aikman does business with all of the world's largest vehicle manufacturers including Ford, General Motors, DaimlerChrysler, Toyota, Honda, Nissan, Volkswagen, Renault and Porsche. These relationships have typically developed over a period of many years, and have, in many cases, been enhanced by the Company's recent acquisitions, which has provided the Company with a resulting global footprint and capacity to supply a full range of interior products. In each case, there is a complex mutual dependency and cooperation between the Company and its customers necessary to ensure that vehicle programs are successful in key areas of quality, timing and cost. At the same time, customer expectations are evolving, as vehicle manufacturers continue to outsource more design and integration responsibilities to the Company and other Tier 1 suppliers. As a result, customer satisfaction, especially at critical inflexion points (such as new vehicle launches and vehicle refreshes), has become more complicated and places significant demands on the Company's resources. Also, there is an inherent tension between the Company and its customers resulting from intense competition and pricing pressures within the industry. For example, OEM customers in the automotive industry attempted to impose price decreases and givebacks throughout 2003. Such attempted price decreases were generally in the 2% to 4% range. Several reductions have

been agreed to, and others are currently being negotiated with OEMs and pressures may increase if overall economic and industry conditions do not improve. Finally, on some vehicle programs involving component integration at the Tier 1-level, the Company is either a supplier to, or a customer of, some of its largest Tier 1 competitors, such as Delphi, Visteon and Lear. These types of arrangements are becoming more common within the industry, and add a new level of complexity to customer relationships, including the relationship with the vehicle manufacturer as the ultimate customer.

• *Our ability to secure profitable new business.* The Company actively pursues new business opportunities with its traditional customer base as well as with potential new customers. The Company seeks to distinguish itself on a variety of factors, including its global footprint, its capacity to supply a full range of interior products and its full-service capabilities (such as design, engineering, manufacturing and quality services). There is intense competition and pricing pressure on all of these opportunities. Price is typically achieved through direct negotiations with the customer, but in certain instances customers have utilized auctions or relied on benchmarking data that have included reputed world class suppliers in emerging markets. At the same time, the Company seeks to manage its cost structure through a variety of strategies, such as vertical integration initiatives that provide greater cost control opportunities. For example, since the Company is a major purchaser of raw materials like resins, it can arrange favorable supply contracts and benefit broadly from material science developments and product simplification. Additionally, the Company believes that it has the world's largest fleet of injection molding equipment for automotive products, which provides a unique ability to benefit from process improvements and best practices with respect to its plastics products on a global basis.

• *Our ability to successfully realize the benefits of our restructuring and integration initiatives.* The Company has undertaken a series of restructuring and integration initiatives to rationalize first its global manufacturing footprint and more recently its salaried workforce, including home office headcount. These activities are expected to have the following primary benefits: First, the Company has closed about 20 subscale plants and other facilities such as warehouses and consolidated activity into 80 world-class operations, which will result in a significant densification of production and resulting gains in fixed cost absorption and operating efficiencies. Second, the Company is beginning to win more "bundled" awards — with a full range of slush molded, injection molded and carpet, acoustics and fabric components on new vehicle programs. And third, the Company's salaried workforce will shrink by more than 20% from the legacy levels, while effectiveness and customer service levels will improve due to consolidation, standardization and level-loading of support infrastructure.

• *The impact of raw materials and energy costs.* The Company is a significant consumer of resin and nylon feedstocks, which presents both a challenge and an opportunity for the Company. The challenge results from the Company's sensitivity to price movements in these raw materials (such as those related to recent short run spikes in the oil market), while the opportunity arises from the Company's ability to leverage its buying power as, in management's opinion, the largest single automotive grade resin buyer in the world. The Company has largely been able to avoid these pricing pressures due to its ability to negotiate with a variety of global suppliers, and to shift volume from one supplier to another. However, it is possible that the Company may begin to see increased cost pressure if the spikes in the oil market continue. The Company's customers have historically been reluctant to provide pricing relief based on this type of raw material cost increases, as recently demonstrated in the handling of the recent near tripling of global steel prices.

• *Our liquidity and capital resources.* The Company is highly leveraged, due primarily to financing associated with recent acquisitions. Another contributing factor has been that most new business awards in the automotive industry require that suppliers advance certain costs relating to tooling and engineering and design services, which in some cases are incurred years before vehicle launch and are reimbursed over many years following vehicle launch as part of the piece price. In February 2004, the Company obtained amendments to its credit facilities that significantly loosened the principal financial covenants. The Company also obtained an additional revolving credit facility of $100 million and a new term loan in the amount of $185 million, the proceeds of which were used to pre-fund debt

20

amortization requirements. As a result, the Company has greatly improved its financial flexibility and liquidity and has no significant amortization requirements until June 2005.

*Impact of Acquisitions.* Our results for the periods discussed have been impacted by several key acquisitions, which, together with related financing transactions, have substantially increased revenues and cash flow and materially altered the Company's capital and operating structure.

For example, in 2001, the Company completed three key acquisitions: (1) the acquisition of Becker Group L.L.C., a leading supplier of plastic components to the automotive industry, (2) the acquisition of Joan Automotive Fabrics, a leading supplier of body cloth to the automotive industry, and Joan's affiliated yarn dyeing operation, Western Avenue Dyers, L.P., and (3) the acquisition of Textron Automotive Company's Trim division (TAC-Trim), one of the largest suppliers of instrument panels and fully assembled cockpit modules and a major automotive plastics manufacturer of interior and exterior trim components in North America, Europe and South America. These acquisitions, together with the Company's 2002 acquisition of Southwest Laminates, a fabric lamination business, contributed approximately $2,090 million of additional net sales in 2002 and drove the 113% increase in net sales from the prior year. In addition, these acquisitions were financed by varying combinations of the Company's common stock and preferred stock, warrants to purchase the Company's common stock, cash on hand and borrowings under a revolving credit facility, public issuances of debt, and sales of the acquired companies' accounts receivable under the receivables facility.

The Company also completed the following acquisitions in 2002 and 2003: (1) the acquisition of Dutton Yarns' yarn texturizing business, (2) the acquisition of Delphi Corp.'s plastic injection molding plant and related equipment in Logroño, Spain, and (3) the acquisition from Textron of the remaining 50% interest of an Italian automotive joint venture. These transactions have likewise impacted the Company's financial results and capital structure, although not to the same degree as the transactions described above.

*Impact of Integration Activities and Restructuring Initiatives.* We have devoted considerable efforts throughout 2001, 2002 and 2003 to properly integrate the acquired companies. We have also implemented a series of restructuring initiatives to ensure that the resulting combined operations have the proper structure and necessary resources to perform on a profitable basis. These initiatives were directed initially at establishing a proper, global manufacturing footprint and included combining and rationalizing the Company's legacy and acquired operations in North America, Europe and South America. More recent restructuring initiatives have focused on developing an appropriate overhead structure, including strengthening and streamlining the senior management team on a worldwide basis. As a consequence of these restructuring initiatives, the Company has incurred significant restructuring and impairment charges in each of 2001, 2002 and 2003 for severance costs, plant and office closures, equipment and lease impairments, contractual obligations and other restructuring activities, which have impacted cash flow, operating income and net income. For a more detailed description of these charges, see footnote 15, "Results of Operations".

*Key Indicators of Performance.* In evaluating our business, our management uses operating income as an important indicator of performance. In addition management also considers EBITDA to be a useful proxy for measuring the cash generated by our business, and it is commonly used in the industry to analyze operating performance, liquidity and entity valuation. We define EBITDA as operating income plus depreciation and amortization. Management believes EBITDA to be a good measure of operating performance because cash generation is necessary for the Company to achieve many of the critical success factors outlined above, including investment in cost reduction activities, reducing leverage and improving liquidity. Additionally, management reviews return on invested capital, working capital changes and capital expenditures as critical financial performance metrics. Management also uses certain non-financial metrics of performance, including equipment utilization and efficiency; service, production and first time quality performance; set up and tool changeover time; employee turnover and absenteeism; and safety performance.

21

## SEGMENT INFORMATION

The following table summarizes financial information for our operating segments:

| | Year Ended December 31, 2003 | | | | |
| | U.S. and Mexico Plastics | International Plastics | Global Soft Trim | Other | Total |
|---|---|---|---|---|---|
| Net sales | $ 1,363.4 | $ 1,258.0 | $ 1,362.3 | $ — | $3,983.7 |
| Gross profit | 137.7 | 58.8 | 238.9 | 8.8 | 444.2 |
| Operating income (loss) | 73.6 | (22.5) | 140.5 | (89.6) | 102.0 |

| | Year Ended December 31, 2002 | | | | |
| | U.S. and Mexico Plastics | International Plastics | Global Soft Trim | Other | Total |
|---|---|---|---|---|---|
| Net sales | $ 1,512.2 | $ 899.0 | $ 1,474.6 | $ — | $3,885.8 |
| Gross profit | 179.9 | 48.2 | 274.6 | 15.4 | 518.1 |
| Operating income (loss) | 113.1 | (30.1) | 161.6 | (76.9) | 167.7 |

| | Year Ended December 31, 2001 | | | | |
| | U.S. and Mexico Plastics | International Plastics | Global Soft Trim | Other | Total |
|---|---|---|---|---|---|
| Net sales | $ 208.0 | $ 263.1 | $ 1,352.2 | $ — | $ 1,823.3 |
| Gross profit | 15.2 | 15.9 | 187.6 | 0.1 | 218.8 |
| Operating income (loss) | 1.6 | (2.4) | 48.7 | (12.3) | 35.6 |

Capitalized terms that are used in this discussion and not defined herein have the meanings assigned to such terms in the Notes to Consolidated Financial Statements.

Investors can obtain free access to the Company's filings with the Securities and Exchange Commission by accessing the Company's website at http://www.collinsaikman.com/investor/docs.html.

## RESULTS OF OPERATIONS

### 2003 Compared to 2002

*Net Sales:* Net sales for 2003 increased 2.5% or $97.9 million to $3,983.7 million from 2002. The increase in net sales was primarily driven by approximately $225 million from acquisitions, primarily from the remainder of an Italian joint venture from Textron Inc. and a manufacturing operation in Logroño, Spain, and $163 million as a result of strengthening European and Canadian currencies offset by weakening South American currencies. Without the benefit of the above acquisitions, net sales decreased 3.3%, consistent with industry trends. Excluding an $84 million reduction due to the termination of an agreement with a Tier 1 customer, net new business volume increased $17 million. Offsetting the increase was a $23 million loss from the May 2003 tornado that shutdown production at a customer assembly plant, a $20 million loss due to plant closures and other factors, including less continuing business of existing programs of $125 million and commercial items (includes pricing and contractual arrangements) of $46 million.

Net sales for the U.S. and Mexico Plastics segment decreased $148.8 million to $1,363.4 million from 2002. The decline was primarily due to a $84 million reduction due to the termination of an agreement with a Tier 1 customer, a $23 million loss from the May 2003 tornado that shutdown production at a customer assembly plant and other factors, including reduced production volume of approximately $14 million and commercial items (includes pricing and contractual arrangements) of $21 million. Contributing to the reduced production volume was an extended period of re-tooling for a new program launch at a customer assembly plant.

Net sales for the International Plastics segment increased $359.0 million to $1,258.0 million from 2002. The increase in net sales was primarily driven by approximately $214 million from acquisitions in Italy and Spain and $130 million as a result of strengthening European and Canadian currencies offset by weakening South American currencies. The increase was also due to net new business of $110 million, offset by a

22

decrease in continuing business of existing programs of $86 million and commercial items (includes pricing and contractual arrangements) of $6 million. Contributing to the reduced continuing business of existing programs was an extended period of re-tooling for new program launches at customer assembly plants in Canada, customer directed content changes in Europe and less content placed in vehicles in South America due to their poor economic situation.

Net sales for the Global Soft Trim segment decreased $112.3 million to $1,362.3 million from 2002. Included in 2003 net sales was approximately $10 million from small acquisitions and $34 million in exchange gains from strengthening Canadian and European currencies. The decrease primarily resulted from the reduced impacts of business volume of $78 million, $20 million due to plant closures and other factors, including a decrease in continuing business of existing programs of $39 million and commercial items of $18 million. Contributing to the reduced continuing business of existing programs was the overall decrease in automotive builds and lower cost products going into vehicles in comparison to the prior year.

*Gross Profit:* Gross profit for 2003 was $444.2 million, down $73.9 million from 2002. Gross margin for 2003 was 11.2% compared to 13.3% in 2002. Overall margins were impacted by a third and fourth quarter improvement at the 12 problem plants identified in the first half of 2003. The remainder of the impact is discussed as follows. The U.S. and Mexico Plastics segment had a decline in gross profit which was primarily attributed to an increase in the mix of the cockpit modules that carry a lower overall margin due to high purchased component content and commercial items of $21 million. Offsetting these decreases was $34 million from improved material and manufacturing efficiencies. The Global Soft Trim segment also contributed to the decline in gross profit primarily due to the mix of components, as well as commercial items of $28 million. The International Plastics segment's gross profit increased due to a $44 million improvement in material and manufacturing efficiencies offset by a decrease from volume and mix and $8 million in commercial items.

*Selling, General and Administrative Expenses:* Selling, general and administrative expenses for 2003 decreased $20.3 million to $273.2 million compared to $293.5 million in 2002. As a percentage of sales, selling, general and administrative expenses decreased from 7.6% for 2002 to 6.9% in 2003. Contributing to the cost decrease were savings realized in connection with the salaried workforce restructuring and the previously announced European restructuring programs and rationalization of selling, general and administrative functions. Offsetting these decreases were higher net engineering and design related costs for significant new program awards of $66 million, a $19 million increase from the prior year.

*Restructuring and Impairment of Long-Lived Assets Charges:* During 2003, the Company undertook three restructuring programs resulting in a $40.6 million charge. The goal of the first restructuring program, which resulted in a $4.9 million charge in the second quarter, was to rationalize operations on a worldwide basis with the primary focus on domestic operations. The charge included approximately $4.2 million of severance cost and $0.7 million of costs related to the establishment of reserves for lease commitments and other exit costs. The goal of the second restructuring program, which resulted in a $21.9 million charge in the third quarter and a $5.3 million charge in the fourth quarter, was to take actions aimed principally at rightsizing its support operations. The restructuring charge included approximately $20.4 million of severance costs and $6.8 million of costs related to the establishment of reserves for lease commitments and other exit costs. Included in the third quarter restructuring charge was $5.3 million related to the separation agreement with Jerry L. Mosingo, the former President and CEO. The goal of the third restructuring program, which resulted in a $9.3 million charge in the fourth quarter, was to rightsize the Company's overhead structure, reduce salaried headcount and strengthen and streamline the senior management team on a worldwide basis with the primary focus on domestic operations. The restructuring charge included approximately $7.6 million of severance costs and $1.7 million of costs related to the establishment of reserves for lease commitments and other exit costs. The 2003 restructuring programs affected nearly 3,100 personnel. Included in the 2003 charges are adjustments related to previously established accruals which did not require cash outlays of $0.8 million.

In addition, the Company recognized $28.4 million in asset impairment charges in 2003. Of the $28.4 million, $10.4 million related to the impairment of the Becker non-compete agreement, $7.5 million

23

related to the initial interest acquired in an Italian joint venture, $7.8 million related to the above restructuring programs and $2.7 million related to other intangible assets.

During 2002, the Company undertook three restructuring programs resulting in $38.9 million in restructuring charges and $18.0 million in related impairment charges. The goal of the first restructuring program that resulted in a charge of $9.1 million in the first quarter was to de-layer management in the North American and European operations. The objective of the second program that resulted in a $25.1 million restructuring charge and $8.7 million impairment charge in the third quarter was to realign the operations in North America. Included in the third quarter restructuring charge was $8.9 million related to the separation agreement with Thomas Evans, the former Chairman and CEO. The third program resulted in a restructuring charge of $4.8 million and impairment charge of $9.3 million in the fourth quarter. The objective of this program was to consolidate plant operations in Europe and to further de-layer management in North America. The 2002 restructuring programs resulted in the separation of over 1,100 personnel.

*Operating Income:* Operating income for 2003 decreased $65.7 million to $102.0 million compared to 2002. The decrease was primarily due to the problem plants identified in the first six months of 2003, higher net engineering and design related costs for significant new program awards of $19 million, the impact of sales mix of $58 million and commercial items (includes pricing and contractual arrangements) of $58 million, offset by material and manufacturing efficiencies of $96 million. Also, contributing to the decline was a $9.4 million increase in restructuring and impairment charges.

Operating income at the U.S. and Mexico Plastics segment declined $39.5 million primarily as a result of the problem plants identified in the first six months of 2003, higher net engineering and design related costs for significant new program awards, the impact of sales mix and commercial items (includes pricing and contractual arrangements) of $21 million. Offsetting these decreases were manufacturing efficiencies of $30 million. Included in 2003 operating income are $9.4 million in restructuring and $12.3 million in impairment charges compared to $0.8 million in restructuring and $1.2 million in impairment charges in 2002.

Operating loss at the International Plastics segment decreased $7.6 million. The reduction was primarily a result of material and manufacturing efficiencies of $43 million, offset by an increase in restructuring and impairment charges and the impact of sales mix of $37 million. Included in 2003 operating income are $8.9 million in restructuring and $9.2 million in impairment charges compared to $8.5 million of restructuring and $2.6 million in impairment charges in 2002.

The Global Soft Trim operating income decreased $21.1 million primarily as a result of sales mix of $13 million and commercial items (includes pricing and contractual arrangements) of $28 million. This decrease was partially offset by an improvement in material and manufacturing efficiencies of $19 million. Also offsetting the decrease was a reduced amount of restructuring and impairment charges from 2002 to 2003. Included in 2003 operating income are $10.7 million in restructuring and $3.6 million in impairment charges compared to $11.2 million in restructuring and $14.2 million in impairment charges in 2002.

*Interest Expense, Net:* Net interest expense from debt instruments increased $2.4 million to $151.3 million for 2003. The increase is primarily due to higher average borrowing levels during the year.

*Subsidiary Preferred Stock Requirements:* In connection with the TAC-Trim acquisition on December 20, 2001, Products issued to Textron Inc. preferred stock with a liquidation preference of $326.4 million and an estimated fair market value of $146.9 million. In June 2002, Products repurchased $133.3 million of liquidation preference Series A preferred stock that was initially valued at $56.8 million, along with accrued dividends of $6.9 million. The difference between the initial recorded value and the initial liquidation preference is being accreted over the life of the stock using the effective interest method. During 2003, interest expense from subsidiary preferred stock accretion and dividend costs were $5.3 million and $32.0 million, respectively. The 2002 preferred stock accretion and dividend costs were $7.6 million and $30.8 million, respectively.

Effective April 2004, the Company will, exercise its option to convert all 20,000 shares of the Series C Redeemable Preferred Stock to Series B Preferred Stock on an equivalent share basis. The primary difference between the Series C and Series B Preferred Stock was that Series C holders are entitled to participation in

24

distributions of Products common equity tied to the appreciation in the value of Products common equity subsequent to the issuance date of the securities. Each Series C Preferred Stock holder will receive one share of Series B Redeemable Preferred Stock on the equivalent share basis.

*Loss on Sale of Receivables:* In connection with the receivables sold to non-recourse facilities and through factoring arrangements, a loss of $7.3 million was recognized during 2003, compared to a loss of $4.2 million in 2002. The increase is due to new non-recourse factoring arrangements entered into during 2003.

*Other Expense (Income), Net:* In 2003, other expense (income), net primarily included $32.4 million of foreign currency transaction gains offset by $3.5 million of losses related to derivatives used in the Company's hedging strategies and the minority interest share of gains in a consolidated subsidiary of $5.6 million.

For 2002, other expense (income), net related primarily to $12.6 million of losses related to derivatives used in the Company's foreign currency hedging strategy reduced by $5.9 million of foreign currency transaction gains, $5.5 million of losses from an investment in a joint venture, $1.9 million of losses from sale and leaseback transactions and the minority interest share of losses of a consolidated subsidiary of $6.5 million.

*Income Taxes:* The Company recognized an income tax benefit of $1.9 million for 2003 compared to an income tax expense of $17.5 million in 2002. Net cash taxes paid during 2003 were $18.4 million. The primary reasons for the Company's effective tax rate being different from its statutory rate are non-deductible preferred stock dividends and accretion, foreign losses for which tax benefits are not recorded and state taxes that do not fluctuate directly with income, partially offset by the effect of a financing arrangement and a tax credit.

*Income from Discontinued Operations:* During 2003, the Company recognized $2.4 million from workers compensation claims related to discontinued operations, for which reserves were previously charged. Of these amounts, $1.6 million was recorded as income from discontinued operations, net of income taxes of $0.8 million.

During the second quarter 2002, the Company received proceeds of $15.8 million on environmental claims previously expensed related to discontinued operations. Of these amounts, $9.5 million was recorded as income from discontinued operations in the second quarter of 2002, net of income taxes of $6.3 million.

*Change in Accounting Principle:* During 2003, the Company implemented a change in the method of accounting for holiday pay so that such pay is accrued, and expense is recognized during the period for which the actual holiday occurs. Formerly, certain of the Company's businesses accrued holiday pay and recognized expense based upon an equal monthly amount within the fiscal year. The change in method better matches holiday expense with the period that the actual holiday occurs and the pay is earned. As the prior method allocated costs within the fiscal year, there is no effect on prior years. There was no effect on the entire fiscal year as the change only impacted interim periods.

Additionally, during 2003, the Company implemented a change in the method of accounting for crib supply inventories held at plants. Crib supply inventories include small motors, replacement parts for production equipment and other miscellaneous repair parts for building equipment and machinery. The Company implemented a perpetual crib supply inventory system and harmonized its policy to consistently account for the capitalization of crib supply inventories. Formerly, the Company had different capitalization thresholds following the various acquisitions in late 2001 and 2002, which ranged from not capitalizing any crib supply items to capitalizing only items greater than two thousand dollars. The new accounting method better matches the cost with the period benefiting from the expenditure, as such, inventories are charged to expense as they are placed into service and begin generating revenue. Pro forma and the cumulative effect amounts relating to the change in accounting for crib inventories is not determinable as perpetual records of crib inventory were not maintained at all the plants prior to the application of the new method in the second quarter of 2003. For the plants that previously had no perpetual records, the effect of the change was $1.8 million after tax or $0.02 per share recorded to increase inventory and reduce cost of sales in the three months ended June 30, 2003. For the year ended December 31, 2003, the incremental effect of the adoption had an insignificant effect.

During 2002, the Company completed its implementation of Statement of Financial Accounting Standards ("SFAS") No. 142, "Goodwill and Other Intangible Assets." Under SFAS No. 142, goodwill and indefinite-lived assets are no longer amortized but are tested for impairment. In accordance with SFAS No. 142, the Company employed a discounted cash flow analysis in conducting its impairment test. As a result of the test, the Company recorded an impairment loss of $11.7 million relating to the UK Plastics business in the International Plastics segment.

*Net Loss Attributable to Common Shareholders:* In June 2002, $100.0 million of proceeds from a 16 million share common stock offering was used to repurchase Series A preferred stock at a price of 75% of its liquidation preference of $133.3 million. The redeemed Series A preferred stock had a carrying value of $63.7 million. In accordance with generally accepted accounting principles, the difference between the $63.7 million in carrying value and the $100.0 million cash payment was excluded from net income and recorded directly to equity in the Company's accumulated deficit account. Although this $36.3 million equity charge is excluded from net income, the charge is included in the computation of earnings (loss) per share and is included in the net loss attributable to common shareholders.

### 2002 Compared to 2001

*Net Sales:* Net sales for 2002 increased 113.1% to $3,885.8 million up $2,062.5 million from 2001. The increase in net sales was primarily driven by the acquisitions of TAC-Trim, Becker, Joan and Southwest Laminates (SWL), which contributed approximately $2,090 million. Sales for 2002 increased approximately $400.6 million or 11.5% over pro forma 2001 sales of $3,485.2 million. New programs, increased content, a higher North American build rate and the 2002 acquisition of SWL drove this sales increase. In North America the build rate increased about 6.0%. Pro forma 2001 sales are based on previous filings with the Securities and Exchange Commission and include TAC-Trim, Becker and Joan for the full year.

Excluding the impact of the acquisitions, net sales decreased 1.5% from 2001. The decrease is due primarily to $31 million of discontinued non-automotive and low margin business and $42 million of commercial items offset by a $35 million increase in new business and a $10 million strengthening of foreign currencies.

Net sales for the U.S. and Mexico Plastics segment increased $1,304.2 million to $1,512.2 million from 2001. Excluding the impact of the TAC-Trim and Becker acquisitions totaling approximately $1,317 million, net sales for U.S. and Mexico Plastics decreased 6.3%. This reduction is primarily due to shutdowns of customer assembly plants.

Net sales for the International Plastics segment increased 241.7% to $899.0 million from 2001. Without the benefit of TAC-Trim sales totaling approximately $669 million, sales decreased 12.5%. The decrease was primarily due to customer price reductions.

Net sales for the Global Soft Trim segment increased 9.1% to $1,474.6 million compared to 2001. Excluding the acquisition of Joan and SWL, which contributed approximately $103 million to net sales, sales increased 1.4%. The increase is primarily due to increased production volumes and impact from continuing business, as well as a $10 million impact from strengthening European currencies, offset by the weaker Canadian currency and commercial items.

*Gross Profit:* For 2002, gross profit increased to 13.3% from 12.0% in 2001. Excluding the favorable impact on gross profit from the Tac-Trim and Becker acquisitions, the increase in gross profit was mainly attributable to the Global Soft Trim segment. The Global Soft Trim segment's increase resulted from approximately $65 million in material and manufacturing efficiencies, partially offset by $31 million of commercial items and rebates and $10 million of product launch and plant consolidation cost.

*Selling, General and Administrative Expenses:* Selling, general and administrative expenses for 2002 were $293.5 million compared to $164.4 million in 2001. The increase is due to the additional costs assumed from the acquisitions offset by $6.1 million of goodwill amortization expensed in 2001. Due to the elimination of duplicate efforts, reduced headcount and reduced discretionary spending, selling, general and administrative expenses as a percentage of sales declined from 9.0% in 2001 to 7.6% in 2002.

26

*Restructuring and Impairment of Long-Lived Assets Charges:* During 2002, the Company undertook three restructuring programs resulting in $38.9 million in restructuring charges and $18.0 million in related impairment charges. The goal of the first restructuring program that resulted in a charge of $9.1 million in the first quarter was to de-layer management in the North American and European operations. The objective of the second program that resulted in a $25.1 million restructuring charge and $8.7 million impairment charge in the third quarter was to realign the operations in North America. Included in the third quarter restructuring charge was $8.9 million related to the separation agreement with Thomas Evans, the former Chairman and CEO. The third program resulted in a restructuring charge of $4.8 million and impairment charge of $9.3 million in the fourth quarter. The objective of this program was to consolidate plant operations in Europe and to further de-layer management in North America. The 2002 restructuring programs resulted in the separation of over 1,100 personnel.

During 2001, the Company undertook two restructuring programs resulting in charges totaling $18.8 million. The goal of the first quarter 2001 restructuring program which, resulted in a charge of $9.2 million, was to de-layer management in the North American and European operations. The second program resulted in a fourth quarter charge of $9.6 million. The objective of this program was to downsize three facilities in North America via better utilization of manufacturing and warehouse floor space (including associated headcount reductions) and to reduce headcount in our Mexican operations. The $18.8 million charge includes $11.2 million of severance and other exit costs and $7.6 million of asset impairment charges.

*Operating Income:* Operating income increased $132.1 million from 2001. The majority of the increase was due to the acquisitions. However, material and manufacturing efficiencies also contributed to the increase, partially offset by commercial items, product launch and plant consolidations costs and an increase in restructuring charges.

The U.S. and Mexico Plastics segment results reflect a $111.5 million improvement in operating performance. After considering the approximate $111 million impact of acquisitions, the U.S. and Mexico Plastics business operating income remained unchanged. Negative effects on operating income included a decrease in sales volumes and resulting inefficiencies associated primarily with certain GM models, $11 million of product launch and plant consolidation costs, $2 million related to the decline in plastic sales due to the shutdown of customer assembly plants and commercial items. These decreases were offset by purchasing and spending savings and reductions in administrative expenses.

The International Plastics operating performance was adversely impacted by commercial items and operating inefficiencies, as well as $11 million due to restructuring charges. These reductions were offset by spending and purchase savings.

Global Soft Trim operating income increased $112.9 million primarily the result of $70 million of improved material and manufacturing efficiencies, $17 million of sales growth resulting from an increase in light vehicle build, $8 million of reductions in administrative expense, and approximately $19 million from the impact of the acquisitions. These increases were partially offset by $30 million of commercial items and $10 million of operating inefficiencies due to launch costs associated with the BMW Mini program.

*Interest Expense, Net:* Net interest expense increased $64.6 million to $148.9 million for 2002. The increase in interest expense is primarily attributed to higher average debt balances and increased amortization of debt issue costs resulting from the TAC-Trim acquisition, partially offset by the benefit of working capital reductions.

*Subsidiary Preferred Stock Requirements:* In connection with the TAC-Trim acquisition on December 20, 2001, Products issued to Textron preferred stock with a liquidation preference of $326.4 million and an estimated fair market value of $146.9 million. In June 2002, Products repurchased $133.3 million of liquidation preference Series A preferred stock that was initially valued at $56.8 million, along with accrued dividends of $6.9 million. The difference between the initial recorded value and the initial liquidation preference will be accreted over the life of the stock using the effective interest method. The 2002 preferred stock accretion and dividend costs were $7.6 million and $30.8 million, respectively. The 2001 preferred stock accretion and dividend costs were $0.9 million and $1.5 million, respectively.

27

*Loss on Sale of Receivables:* The Company has the ability to sell, through its Carcorp subsidiary, interests in a pool of accounts receivable. In connection with the receivable sales, a loss of $4.2 million was recognized during 2002, compared to a loss of $10.8 million for 2001. In December 2001, the Company entered into a new larger receivable facility in connection with the TAC-Trim acquisition, resulting in up-front fees of $5.6 million.

*Other Expense (Income), Net:* In 2002, other expense (income), net primarily included $12.6 million of losses related to derivatives used in the Company's foreign currency hedging strategy offset by $5.9 million of foreign currency transaction gains, $5.5 million of losses related to investments in joint ventures, $1.9 million of losses from sale and leaseback transactions and the minority interest share of losses of a consolidated subsidiary of $6.5 million.

In 2001, other expense (income), net primarily included a $8.0 million loss on early extinguishment of debt and $7.8 million of foreign currency transaction losses offset by $5.0 million of derivatives gains and a $6.2 million gain related to a stock demutualization. The Company adopted SFAS 145 during 2003 and reclassified $8.0 million loss on the early extinguishment of debt recorded for the year ended December 31, 2001 to other expense (income), net from an extraordinary item in the amount of $5.3 million (net of income taxes of $2.7 million).

*Income Taxes:* The Company recognized an income tax expense of $17.5 million for 2002 compared to an income tax benefit of $21.3 million in 2001. Net cash taxes paid during the period were $12.8 million. The primary reasons for the Company's relatively high effective tax rate are non-deductible preferred stock dividends and accretion, foreign losses for which tax benefits are not allowed and certain taxes that do not fluctuate directly with income.

*Discontinued Operations:* During 2002 and 2001, the Company received payment on environmental claims related to discontinued operations, for which reserves were previously charged, and received proceeds of $15.8 million and $14.5 million, respectively. Of these amounts, $9.5 million and $8.8 million were recorded as income from discontinued operations in 2002 and 2001, respectively, net of income taxes of $6.3 million and $5.7 million, respectively.

*Cumulative Effect of Change in Accounting Principle:* During 2002, the Company completed its implementation of SFAS 142, Goodwill and Other Intangible Assets. Under SFAS 142 goodwill and indefinite-lived assets are no longer amortized but are tested for impairment. In accordance with SFAS 142, the Company employed a discounted cash flow analysis in conducting its impairment test. As a result of the test, the Company recorded an impairment loss of $11.7 million relating to the UK Plastics business in the International Plastics segment.

*Net Loss Attributable to Common Shareholders:* In June 2002, $100.0 million of proceeds from a 16 million share common stock offering was used to repurchase Series A preferred stock at a price of 75% of its liquidation preference of $133.3 million. The redeemed Series A preferred stock had a carrying value of $63.7 million. In accordance with generally accepted accounting principles, the difference between the $63.7 million in carrying value and the $100.0 million cash payment was excluded from net income and recorded directly to equity in the Company's accumulated deficit account. Although this $36.3 million equity charge is excluded from net income, the charge is included in the computation of earnings (loss) per share and is included in the net loss attributable to common shareholders.

## LIQUIDITY AND CAPITAL RESOURCES

The Company and its subsidiaries had cash and cash equivalents totaling $13.2 million and $81.3 million at December 31, 2003 and December 31, 2002, respectively. The Company's ability to utilize availability under its various credit arrangements and receivables facility is limited, in accordance with covenants established under the senior secured credit facility. However, at December 31, 2003, there were no restrictions and the Company had $149.7 million in aggregate of unutilized availability.

The total availability at December 31, 2003 was comprised of $9.1 million under the Company's receivables facility, $119.5 million under the Company's revolving credit facility and approximately $21.1 million under

uncommitted bank facilities in foreign locations. The numbers indicated above under the revolving credit facility were further reduced by outstanding letters of credit of $49.2 million as of December 31, 2003. Funding limitations are based on the Company's financial performance and target levels established by the covenants. At December 31, 2003, there were no funding limitations.

In October 2003, the Company entered into third and fourth amendments to the Senior Secured Credit Facilities Credit Agreement. The principal changes resulting from these amendments were to permit the add-back of certain restructuring charges for covenant calculation purposes, to increase the maximum permitted leverage ratio for periods beginning with the third quarter of 2003 and make adjustments to the interest coverage ratio. Previously, in the second quarter, the Company executed a second amendment to the senior secured credit agreement. The principal changes were modifications of certain covenants, including an increase in the maximum permitted leverage covenant and a decrease in the minimum interest coverage ratio. The amendment is effective for periods following the first quarter 2003. Other modifications were made to the credit agreement and are detailed in Note 7 "Long-Term Debt and Capital Lease Obligations" as well as in the copy of the amendments, which are filed as an exhibit to this Form 10-K.

In February 2004, the Company entered into the fifth amendment to the Senior Secured Credit Facilities Credit Agreement which allowed the establishment of a new $100 million supplemental Revolving Credit Facility and the $185 million Tranch A-1 Term Loan. In connection with these new expanded facilities, $181.5 million was used to prepay existing Tranche A and Tranche B Term Loans in direct order of maturity.

The Company's principal sources of funds are cash generated from operating activities and borrowings under its revolving credit facilities, receivables arrangements and sales leaseback arrangements. In addition, to facilitate the collection of funds from operating activities, the Company has sold receivables under its receivables facility and has also entered into an accelerated payment collection program with two of its larger customers. If those additional liquidity sources were to become unavailable or limited by customer concentration or credit quality or otherwise, the Company would require additional capital, access to which is not assured. During 2002, the Company issued common stock, although such issuances are not likely to be a source of financing in the near-term. The Company continues to seek means to generate additional cash for debt reduction and its growth strategy. Among its potential cash generation projects, the Company seeks to further improve working capital management (including factoring of receivables) and to continue to utilize lease financings.

*Operating Activities*

Net cash provided by the continuing operating activities of the Company was $122.9 million for the year ended December 31, 2003, compared to $189.4 million for the year ended December 31, 2002. The 2003 decrease is primarily the result of increases in other asset balances, offset by increases in proceeds from non-recourse factoring facilities, increases in proceeds from participating interests in accounts receivable, reductions in accrued expenses and other liabilities, decreases in inventories and other positive working capital changes.

*Investing Activities*

Net cash used in investing activities of the Company was $189.9 million for 2003, compared to net cash used of $186.1 million for 2002. The increased use of cash was primarily the result of a $27.2 million increase in capital expenditures. The increased use of cash was offset by the Company spending $12.5 million less in the payment of acquisition costs for acquiring businesses, spending $5.9 million less on investments in joint ventures and receiving $5.0 million more in proceeds from the sale of property, plant and equipment.

*Financing Activities*

Net cash used from financing activities for 2003 was $4.8 million compared to net cash provided from financing activities for 2002 of $4.0 million. This increase in cash used from financing activities is the result of $150.6 million decrease in proceeds from the issuance of stock offset by $100.0 million used for the repurchase of preferred stock in 2002 and a $41.8 million decrease in cash used for net borrowings.

At December 31, 2003, the Company had total outstanding indebtedness of $1,285.2 million at a weighted average interest rate of 10.1% per annum. Comparatively, at December 31, 2002, the Company had total indebtedness of $1,289.2 million.

During 2001, Heartland, and certain other investors, acquired 22.8 million shares of common stock from the Company at a price of $12.50 per share, representing a cash investment in the Company of $285.0 million before fees and expenses. Net proceeds paid to the Company from the equity transactions were $264.3 million. A portion of the proceeds were used to pay $10.7 million in transaction related costs, including change in control consents, fees related to term loan facilities, and other amendments to credit agreement facilities. The remaining proceeds of $253.6 million were used to pay down a revolving credit facility and to fund part of the TAC-Trim acquisition.

The senior secured credit facility consists of a revolving credit facility and tranche A and tranche B term loan facilities. The revolving credit facility provides for revolving loans and extensions of credit up to a maximum principal amount of $175.0 million. A portion of the revolving credit facility will be available to Canadian subsidiaries in Canadian dollars and a portion of the revolving credit facility will be available in the form of letters of credit. The revolving credit facility, the tranche A term loan and the tranche B term loan mature in December 2005. Borrowings under the senior credit facilities bear interest at variable rates based on a spread to the adjusted LIBOR or a base rate, at the Company's option. The Company had $350.1 million and $377.6 million in term loans outstanding under this facility at December 31, 2003 and 2002, respectively. See discussion on additional changes in February 2004 on Senior Secured Credit Facilities discussion under "Liquidity and Capital Resources" section previously.

On an ongoing basis, the Company has entered into an agreement to sell trade accounts receivable of certain business operations to a bankruptcy-remote, special purpose subsidiary, wholly owned by the Company. The Company's receivables subsidiary will, subject to certain conditions, from time to time, sell an undivided fractional ownership interest in a pool of domestic and certain Canadian receivables, up to a balance of $250 million, to bank-sponsored multi-seller commercial paper conduits under a committed facility. As of December 31, 2003, the Company had $73.7 million outstanding and $9.1 million undrawn under the receivables facility. As of December 31, 2002, utilization of the receivables facility was $66.0 million and an additional $93.2 million of funding was available but unutilized.

New receivables will be added to the pool as collections reduce previously sold receivables. The Company expects to service, administer and collect the receivables on behalf of the receivables subsidiary and the conduits. The proceeds of sale will be less than the face amount of accounts receivable sold by an amount that approximates the purchaser's financing costs. In September 2002, the Company amended the receivables facility lengthening its term to expire in December 2004. The receivables facility is an important source of ongoing liquidity to the Company.

In December 2001, Products issued 182,700 shares of its Series A Redeemable Preferred Stock, 123,700 shares of Series B Redeemable Preferred Stock and 20,000 shares of Series C Redeemable Preferred Stock. The Preferred Stock was recorded at estimated fair value of $146.9 million, which was less than the liquidation value of $1,000 per share or $326.4 million. The estimated fair value was based on market prices for securities with similar terms, maturities and risk characteristics, and included a liquidation discount to reflect market conditions and was agreed to by the Company and Textron as part of the TAC-Trim purchase agreement. The difference between the initial recorded value and the liquidation value is being accreted over the 11 year terms of the securities. The results for 2003 and 2002 included subsidiary preferred stock requirements calculated using the effective interest method of $37.3 million and $38.4 million, respectively. The preferred stock requirement includes both accretion and dividend costs of $5.3 million and $32.0 million, respectively, for 2003 and $7.6 million and $30.8 million, respectively, for 2002. The carrying value of the Redeemable Preferred Stock includes accretion and accrued dividends.

Products issued $500 million of 10 3/4% Senior Notes due in 2011 in connection with the TAC-Trim acquisition. The Company also amended the existing $400 million of 11 1/2% senior subordinated notes due in 2006 to make each subsidiary guarantor of the Senior Notes a senior subordinated guarantor of the existing notes.

The following table sets forth the ratings as of December 31, 2003 for securities issued by the Company and its subsidiaries:

|  | Standard & Poors | Moody's |
|---|---|---|
| Public Debt: |  |  |
| 11 1/2% Senior Subordinated Notes, due 2006 | B- | B3 |
| 10 3/4% Senior Notes, due 2011 | B- | B2 |

## OUTLOOK

To further enhance North American automotive revenues, OEMs and transplants are continuing to offer incentives in 2004 that should enable production schedules to remain consistent with 2003 levels. The European market is expected to remain relatively soft, and that market has the potential for continuing declines in production compared to prior year levels. However, the Company remains cautiously optimistic that 2004 North American vehicle production and inventory levels will remain consistent with 2003 levels.

The Company's principal uses of funds from operating activities and borrowings for the next several years are expected to fund interest and principal payments on its indebtedness, growth related working capital increases, capital expenditures, product launches and lease expense. Consistent with the automotive supply industry, the Company continues to experience significant competitive pressure and expects to face continued downward cost pressure from vehicle manufacturers. The Company has an ongoing aggressive plan to improve the various operating performance at all of its facilities. While improvements are being made, further work remains to have all plants profitable on a continuing basis. In addition, the Company recently confirmed its strategy for new business, which involves pursuing sales growth based on criteria intended to more effectively allocate the Company's resources to the most promising new business opportunities. As part of this strategy, the Company reviewed its parts profitability for each plant and program worldwide. As a result, the Company concluded that a certain future business award is inconsistent with its criteria and is therefore in the process of cooperating in the transition of this award to another supplier.

Management believes cash flow from operations, together with its revolving credit facility, receivables arrangements, and sale and leaseback arrangements will provide adequate sources of liquidity for the Company to fund its operations. However, the Company's sources of liquidity may be inadequate if economic conditions worsen or if the Company is unable to meet financial or operating covenants as a result of the foregoing, and the Company will need to seek financing to refinance maturing debt. In addition, matters affecting the credit quality of our significant customers could adversely impact the availability of our receivables arrangements and our liquidity. The Company continues to explore other sources of liquidity, including additional debt, but existing debt instruments may limit the Company's ability to incur additional debt, and the Company may be unable to secure equity or other financing.

At the end of the second quarter, the Company received notice from one of its customers, DaimlerChrysler Corporation, of an issue regarding the calculation methods for determining the current year valuation of price givebacks. Discussions on this issue, as well as various aspects of the broader relationship, are continuing. While the Company seeks to improve the profitability of its programs with this and all of its customers, there can be no assurance that the Company will not lose desirable programs over time. While the Company continues to believe that all of these issues will be resolved to the mutual satisfaction of the parties, there can be no assurances that such a resolution is imminent or that actions by the customer with respect to the broader relationship will not have a material adverse impact on the Company.

31

*Contractual Obligations*

Below is the table that identifies the Company's significant contractual obligations. Following the table is a more detailed description of these obligations.

| | Total | | Payment due by Period | | |
| | | Less than 1 Year | 1-3 Years | 4-5 Years | After 5 Years |
|---|---|---|---|---|---|
| | | | (In millions) | | |
| Short-term borrowings | $ 16.0 | $ 16.0 | $ — | $ — | $ — |
| Long-term debt and capital lease obligations | 1,269.2 | 31.5 | 736.0 | 1.7 | 500.0 |
| Preferred stock(a) | 161.2 | — | — | — | 161.2 |
| Operating leases(b) | 357.9 | 55.0 | 113.1 | 78.4 | 111.4 |
| Environmental reserves | 51.2 | 7.6 | 21.5 | 8.5 | 13.6 |
| Capital expenditures | 30.3 | 30.3 | — | — | — |
| Total obligations | $ 1,885.8 | $ 140.4 | $ 870.6 | $ 88.6 | $ 786.2 |

(a)  Mandatorily Redeemable Preferred Stock of Subsidiary
(b)  Includes operating leases related to restructuring charges. See Note 15, "Restructuring." In addition to the operating lease obligations, at the end of the Textron Leasing Transaction for certain equipment leases (including the expiration of all renewal options), the Company is required to guarantee a minimum value of the equipment to the lessor of up to approximately $21 million.

*Senior Secured Credit Facilities*

*General:* The Company's senior secured credit facility allowed funding in the aggregate of up to $525.0 million at December 31, 2003. Borrowings under the credit facility are secured by all the assets of the Company and Products and certain of its subsidiaries, and are unconditionally and irrevocably guaranteed jointly and severally by the Company and each existing and subsequently acquired or organized domestic subsidiaries (other than the Company's receivables subsidiary). Available funding under this credit facility is reduced if the program size or commitment level under the Company's receivable facility (discussed below) exceeds $250.0 million.

*Interest Rates and Fees:* At December 31, 2003, borrowings bear interest, at the Company's option, at either (a) adjusted LIBOR plus a 4.00% margin in the case of the revolving credit and tranche A term loan facilities and 4.75% margin in the case of the tranche B term loan facility, in all cases subject to a minimum LIBOR of 3.00% or (b) the highest of (i) JPMorgan Chase Bank's prime rate, (ii) the federal funds effective rate plus 1/2 of 1.00% and (iii) the base CD rate plus 1.00% plus a 3.00% margin in the case of the revolving credit and tranche A term loan facilities and 3.75% margin in the case of the tranche B term loan facility. A commitment fee on any unused commitments under the revolving portion of the credit facility equal to 1.00% per annum is payable quarterly in arrears and is subject to adjustment based on attaining certain performance targets.

In February 2004, the Company entered into the fifth amendment to the Senior Secured Credit Facilities Credit Agreement which allowed the establishment of a new $100 million Supplemental Revolving Credit Facility and the $185 million Tranche A-1 Term Loan. In connection with these new facilities, $181.5 million was used to prepay existing Tranch A and Tranch B Term Loans in direct order of maturity. Applicable interest rates on the new facilities are, at the Company's option, either (a) adjusted LIBOR plus a 4.00% margin, subject to a minimum LIBOR of 2.00%, or (b) the highest of (i) JPMorgan Chase Bank's prime rate, (ii) the federal funds effective rate plus 1/2 of 1.00% and (iii) the base CD rate plus 1.00% plus 3.00% margin. There are no commitment fees on these new facilities.

*Covenants:* The credit facility requires that the Company meet certain financial tests, including, without limitation, the following tests: a maximum leverage ratio, a minimum interest coverage ratio and certain

prescribed limitations on capital expenditures at levels to be agreed upon between the Company and the agents. The credit facility also contains covenants and restrictions, including, among others, limitations or prohibitions on declaring dividends and other distributions, redeeming and repurchasing capital stock, prepaying, redeeming and repurchasing other indebtedness, loans and investments, additional indebtedness, liens, sale-leaseback transactions, preferred stock, capital expenditures, recapitalizations, mergers, acquisitions, asset sales and transactions with affiliates.

*Events of Default:* The credit facility contains certain customary events of default, including, among others cross-default and cross-acceleration to other indebtedness (including the receivables facility).

### 11 1/2% Senior Subordinated Notes due 2006 and 10 3/4% Senior Notes due 2011

Products has outstanding $400 million in principal amount of 11 1/2% Senior Subordinated Notes due 2006. The Company and substantially all domestic subsidiaries of Products have guaranteed these notes on a senior subordinated basis. The indenture governing these notes contains restrictive covenants (including, among others, limitations on indebtedness, restricted payments, liens, asset dispositions, change of control and transactions with affiliates) that are customary for such securities.

Products has issued $500 million principal amount of 10 3/4% senior notes due 2011. The Company and substantially all domestic subsidiaries of Products have guaranteed these notes on an unsecured senior basis. The indenture governing these notes contains restrictive covenants (including, among others, limitations on indebtedness, restricted payments, liens, asset dispositions, change of control and transactions with affiliates) that are customary for such securities.

### Mandatorily Redeemable Preferred Stock of Subsidiary

*General:* As part of the consideration paid to Textron for the TAC-Trim acquisition, Products issued mandatorily redeemable preferred stock to Textron with an estimated fair market value of $146.9 million and a liquidation value of $326.4 million.

*Dividends:* Holders of this preferred stock are entitled to receive dividends accruing as detailed in the table that follows:

| Dividend Periods Ending | Series A Preferred Stock | Series B Preferred Stock | Series C Preferred Stock |
|---|---|---|---|
| On or prior to July 1, 2003 | 11% | 12% | 12% |
| After July 1, 2003 | 15% | 16% | 16% |

In each case the dividends are payable quarterly in arrears, commencing on April 1, 2002 and accumulating from the date of issuance. Products may, at its option, elect to accrue up to an amount equivalent to 7% per annum of the dividends on the Series A Preferred Stock, an amount equivalent to 8% per annum of the dividends on the Series B Preferred Stock and an amount equivalent to 8% per annum of the dividends on the Series C Preferred Stock in lieu of cash payment of such dividends and, in each case, any accrued dividends will be added to the liquidation preference of the applicable series of preferred stock. Products may at its option through January 1, 2004 accrue up to the full amount of all dividends in lieu of cash payment of such dividends. Thereafter, Products may at its option elect to accrue dividends of up to 7% of the liquidation value annually on Series A Preferred Stock and up to 8% of the liquidation value on Series B and C Preferred Stock. Accrued dividends will be added to the liquidation preference of the applicable series of Preferred Stock.

*Repurchase:* In June 2002, $100.0 million of proceeds from the 16 million share common stock offering was used to repurchase preferred stock from Textron at a price of 75% of its liquidation preference of 133.0 million. The redeemed Series A Preferred Stock had a carrying value of $63.7 million.

*Liquidation Preference:* Upon any voluntary or involuntary liquidation, dissolution or winding-up of Products, holders of the preferred stock will be entitled to be paid out of the assets of Products available for distribution to stockholders in the amount of $1,000 per share plus the aggregate amount of accrued dividends prior to any distribution to any holders of equity securities which rank junior to the preferred stock. In

33

addition, upon any voluntary or involuntary liquidation, dissolution or winding-up of Products, the holders of Series C Preferred Stock will be entitled to a participation in distributions to Products' common equity tied to any appreciation in the value of Products' common equity subsequent the issuance date, not to exceed an aggregate of $2 million for all Series C Preferred Stock outstanding.

*Mandatory Redemption:* Products is required to redeem all of the Series A Preferred Stock and Series B Preferred Stock outstanding on January 1, 2013 at a redemption price equal to 100% of the liquidation preference thereof, plus accrued and unpaid dividends to the date of redemption. Products is also required to redeem all of the series C preferred stock outstanding on February 1, 2022 at a redemption price equal to 100% of the liquidation preference thereof, plus accrued and unpaid dividends to the date of redemption, plus common equity participation.

### Operating Leases

During 2003, the Company received net proceeds (after fees) of approximately $10.2 million from the sale and leasebacks of real property and equipment. The total minimum lease commitments under these leases will be $16.1 million, $0.5 million relates to 2003.

During 2002, the Company received net proceeds (after fees) of approximately $14.8 million from sale and leasebacks of real property and equipment. The total minimum lease commitments under these leases will be $18.8 million, $2.6 million of which relates to both 2003 and 2002.

During 2001, Products entered into sale and leaseback transactions for certain manufacturing equipment and non-manufacturing properties. The transactions resulted in the recognition of a $4.4 million net deferred loss that is being amortized over the lease term, and the recognition of an $8.7 million loss.

During 2001, the Company received net proceeds (after fees) of approximately $86.2 million from sale and leasebacks of real property and equipment, which it used to reduce outstanding debt. The aggregate lease expenses associated with these leases will be $88.8 million, $12.5 million of which relates to 2002. As part of these sale-leaseback transactions, Products sold and contemporaneously leased back real property from unrelated third parties, and received net proceeds (after fees) of $46.4 million.

The Company also has other equipment lease agreements with several lessors that, subject to specific approval, provide availability of funding for operating leases and sale and leasebacks as allowed in its other financing agreements. To the extent permitted by the credit facility, the Company may enter into additional similar leasing arrangements from time to time.

See "— Other Information —— Effects of Certain Transactions with Related Parties" for additional information. Refer to Note 12, "Operating Leases" of the financial statements included in this report for information regarding future minimum lease payments.

### Capital Expenditures

The Company incurs capital expenditures on a recurring basis for replacements and improvements. During 2003, the Company had approximately $175.1 million in capital expenditures for continuing operations. Capital expenditures will materially increase with the expanded book of business in 2004, and in future years will depend upon demand for the Company's products and changes in technology. Estimates for capital expenditures in 2004 range from approximately $145 to $155 million. A portion of capital expenditures may be financed through leasing arrangements.

34

*Sources of Liquidity*

The table below identifies the Company's significant sources of liquidity:

| | December 31, 2003 | Availability Expiration Per Period | | | |
|---|---|---|---|---|---|
| | Maximum Amount Available | Less than 1 Year | 1-3 Years | 4-5 Years | After 5 Years |
| | | (In millions) | | | |
| Receivable Facility(1) | $    9.1 | $   9.1 | $    — | $   — | $   — |
| Revolving Credit Facility(2) | 119.5 | — | 119.5 | — | — |
| Short-term borrowings | 21.1 | 21.1 | — | — | — |
| Total Available | $  149.7 | $ 30.2 | $  119.5 | $   — | $   — |

---

(1) Total commitment under the facility is $250 million.

(2) At December 31, 2003, $49.2 million of outstanding letters of credit reduced the maximum amount available under the Revolving Credit Facility.

The proforma table below identifies the Company's significant sources of liquidity adjusted to reflect the supplemental revolving credit facility:

| | December 31, 2003 | Availability Expiration Per Period | | | |
|---|---|---|---|---|---|
| | Maximum Amount Available | Less than 1 Year | 1-3 Years | 4-5 Years | After 5 Years |
| | | (In millions) | | | |
| Receivable Facility(1) | $    9.1 | $   9.1 | $    — | $   — | $   — |
| Revolving Credit Facility(2) | 168.7 | — | 168.7 | — | — |
| Supplemental Revolving Credit Facility(3) | 50.8 | — | 50.8 | — | — |
| Short-term borrowings | 21.1 | 21.1 | — | — | — |
| Total Available | $  249.7 | $ 30.2 | $  219.5 | $   — | $   — |

---

(1) Total commitment under the facility is $250 million.

(2) Subsequent to entering into the Supplemental Revolving Credit Facility there were no outstanding letters of credit reducing the maximum amount available under the Revolving Credit Facility.

(3) The $100 million Supplemental Revolving Credit Facility allows for up to $50 million of cash advances and up to $50 million for letters of credit. At December 31, 2003, $50 million was available for cash advances and $0.8 million for additional letters of credit, after adjusting for the transfer of $49.2 million of outstanding letters of credit transferred from the Revolving Credit Facility.

*Receivables Facility*

*General:* The Company has an agreement to sell, on an ongoing basis, the trade accounts receivable of certain business operations to a bankruptcy-remote, special purpose subsidiary, wholly owned and consolidated by the Company. The receivables subsidiary (Carcorp) will, subject to certain conditions, from time to time, sell an undivided fractional ownership interest in a pool of domestic and certain Canadian receivables, up to $250 million, to various multi-seller commercial paper conduits supported by a committed liquidity facility. Upon sale to the conduit, Carcorp will hold a subordinated retained interest in the receivables. Under the terms of the agreement, new receivables are added to the pool as collections reduce previously sold receivables. The Company expects to service, administer and collect the receivables on behalf of

that approximates the purchaser's financing costs. In September 2002, the Company amended the receivables facility lengthening its term to expire in December 2004.

*Restrictions:* This receivables facility contains certain restrictions on Carcorp (including maintenance of $60.0 million net worth) and on the sellers (including limitations on liens on receivables, modifications of the terms of receivables, and changes in credit and collection practices) which are customary for facilities of this type. The commitments under the receivables facility are subject to termination prior to their term upon the occurrence of certain events, including payment defaults, breach of covenants, including defined interest coverage and leverage ratios, bankruptcy, default by the Company in servicing the receivables and failure of the receivables to satisfy certain performance criteria.

### Commercial Commitments

*Put and Call Arrangement:* The Company previously entered into a put and call arrangement with respect to the acquisition of the initial 50% interest in the Italian joint venture. In January 2003, the Company acquired the remaining 50% interest in the Italian joint venture for $15 million, which also terminated the put and call arrangement. The arrangement, which was exercisable in December 2004, permitted Textron to require the Company to purchase Textron's interests in the joint venture for an aggregate of approximately $28 million.

### Stock Options

As a result of repricing the Company's stock options during 2002, the repriced options were treated as variable-based awards in accordance with APB No. 25. Subsequent to December 31, 2002, the Company approved the repricing of approximately 3.6 million options with an exercise price of $10.00 to a new exercise price of $8.00. Because these options are considered to be variable-based awards, the Company will incur future compensation expense if the stock price exceeds the new exercise price of $8.00.

## OTHER INFORMATION

### Off-balance Sheet Arrangements

Prior to the TAC Trim acquisition, TAC-Trim entered into an $86.9 million sale and leaseback transaction (the "Textron Leasing Transaction") with two separate single purpose affiliates of Textron Financial Corporation, as lessor and purchaser, with respect to a portfolio of manufacturing equipment situated in different locations throughout the United States and Canada. Payments under the Textron leasing transaction are guaranteed by Products and secured by a first perfected mortgage lien over certain real property with a value equal to $25 million. At the end of the Textron Leasing Transaction for certain equipment leases (including the expiration of all renewal options), the Company is required to guarantee a minimum value of the equipment to the lessor of up to approximately $21 million. Each lease is for an initial term of three years with three one-year renewal options. See "— Other Information — Effects of Certain Transactions with Related Parties" for additional information.

In November 2002, the Financial Accounting Standards Board ("FASB") issued FIN 45, "Guarantor's Accounting and Disclosure Requirements for Guarantees, Including Indirect Guarantees of Indebtedness of Others." FIN 45 requires a guarantor to recognize, at the inception of a qualified guarantee, a liability for the fair value of the obligation undertaken in issuing the guarantee. In conjunction with divestitures and other transactions, the Company has provided indemnifications relating to legal and environmental issues, including product liability. The Company does not believe that any pending or threatened litigation or claims related to any such retained liabilities of discontinued operations are likely to result in any material loss.

### Certain Transactions with Related Parties

#### Heartland Transactions

Heartland is a private equity firm established in 1999 for the purpose of acquiring and expanding industrial companies operating in various sectors of the North American economy that are well positioned for

36

global consolidation and growth. The managing general partner of Heartland is Heartland Industrial Associates, L.L.C. Certain directors and officers of the Company are members of the general partner, specifically Messrs. Stockman (a Director and our Chairman and Chief Executive Officer), Stepp (a Director and our Vice Chairman and Chief Financial Officer) and Tredwell, Leuliette, McConnell and Valenti (each Directors). Other of our directors or their affiliates, specifically Messrs. Becker and McCallum, are limited partners in Heartland with interests representing less than 5% of the commitments in Heartland. Heartland has informed us that its limited partners include many financial institutions, private and government employee pension funds and corporations, among other types of investors. The Company may, in the ordinary course of business, have on a normal, customary and arms' length basis relationships with certain of Heartland's limited partners, including banking, insurance and other relationships.

The Company is a party to a Services Agreement with Heartland under which Heartland provides advisory and consulting services, including services with respect to developments in the automotive industry and supply markets, advice on financial and strategic plans and alternatives and other matters as it may reasonably request and are within Heartland's expertise. The Services Agreement terminates on the earlier of its tenth anniversary or the date upon which Heartland ceases to own Company shares equivalent to 25% of that owned by them on February 23, 2001.

Under the Services Agreement, the Company is obligated to pay to Heartland a $4.0 million annual advisory fee payable in quarterly installments and reimburse its out-of-pocket expenses related to the services it provides. The Company has also agreed to pay a fee of 1% of the total enterprise value of certain acquisitions and dispositions. During 2003, 2002 and 2001 the Company recorded total fees of $4.0 million, $5.7 million and $24.5 million, respectively.

The Services Agreement with Heartland contemplates that the Company may pay additional fees to Heartland for services rendered in connection with a range of financing transactions. In March 2004, the Company's Board of Directors, including the disinterested and independent directors of the Board, approved a fee of $1 million to Heartland for its services rendered in connection with the 2004 amendments to the Company's credit facility to add synthetic revolving and letter of credit facilities.

### Charles E. Becker Transactions

On March 27, 2003, the Company entered into a termination agreement and release to buyout the non-compete agreement between the Company and Charles E. Becker, a member of the Company's Board of Directors and a limited partner in Heartland. The Company paid $11.3 million in April 2003 as part of the termination agreement and release. The non-compete agreement, which was entered into as part of the Becker acquisition, required the Company to make periodic payments. As a result of this transaction, the Company incurred a loss of $10.4 million, which is primarily due to the write-off of intangible assets initially recorded in conjunction with the Becker acquisition.

During 2002, the Company engaged Mr. Becker to serve as Vice Chairman and assist the Company with strategic planning activities, such as developing sales strategies, managing key customer relationships and recruiting senior management for the Company's European operations. The Company paid Mr. Becker $300,000 for such services. Mr. Becker's consulting arrangement and position as Vice Chairman ended in 2002.

The Company entered into a lease agreement with Becker Ventures L.L.C. ("Becker Ventures"), an entity controlled by Mr. Becker, for the Company's headquarters at 250 Stephenson Highway, Troy, Michigan with the effective date of the lease being January 1, 2002. In March 2002, the Company entered into lease agreements with Becker Ventures, effective January 1, 2002, for 150 Stephenson Highway and 350 Stephenson Highway, Troy, Michigan. The base rent for all three premises is $13.25 per sq. ft., subject to annual CPI adjustments. Total square footage for all three locations is approximately 286,000. The leases have 20-year terms, and the Company has two five-year renewal options. The 2004 base rent for the facilities will be approximately $4.0 million. In 2004, these leases were amended to provide that the Company would assume responsibility for property management with a corresponding elimination of certain aspects of the property management fees. In addition, the Company is also party to a lease with Becker Ventures for five

manufacturing facilities totaling 884,000 square feet. In 2002, the Company extended the lease term an additional ten years to expire in 2021, with the base rent for these facilities totaling $3.6 million per year.

In June 2001, Products sold and contemporaneously leased back real property located in Troy, Michigan and Plymouth, Michigan from New King, L.L.C. and Anchor Court, L.L.C., respectively, which are affiliates of Becker Ventures, for net proceeds of $15.1 million in aggregate. The initial lease term in each transaction is 20 years and each lease has two successive ten year renewal options. The basic rent for the Troy, Michigan property is $1.3 million per year, and the basic rent for the Plymouth, Michigan property is $0.5 million per year. The rental rates in each case are subject to adjustment after expiration of the initial term.

### Elkin McCallum Transactions

In the first quarter of 2003, the Company purchased equipment from Joan Fabrics Corporation ("Joan Fabrics"), and entered into a supply agreement with Joan Fabrics to supply certain types of fabrics. Elkin McCallum, a director of the Company, controls Joan Fabrics and is a limited partner in Heartland. Under the supply agreement, the Company supplies fabric to Joan Fabrics and Joan Fabrics is responsible for all marketing, design, customer service, distribution and sales functions related to these fabrics. The Company paid Joan Fabrics $4.7 million of consideration for these transactions, a portion of which the Company has allocated to the purchased equipment (based on its appraised value) and the remainder of which it is amortizing over the five-year term of the supply agreement.

On December 31, 2002, the Company acquired an air jet texturing business from Dutton Yarns (an affiliate of Mr. McCallum) for approximately $4.2 million. The purchased assets included equipment, inventory and intellectual property. The Company had preliminarily accounted for this transaction as an acquisition of assets, but finalized its accounting during the first quarter of 2003, and recorded the transaction as a purchase of a business.

On April 12, 2002, the Company signed and closed on a merger agreement with Mr. McCallum and a lamination company wholly owned by Mr. McCallum pursuant to which the acquired company was merged into a wholly owned subsidiary of the Company. As consideration in the transaction, Mr. McCallum received 400,000 shares of Common Stock and was repaid $2.5 million in cash as reimbursement for amounts previously invested to fund the lamination company's working capital needs. Subsequent to the merger, debt owing to Mr. McCallum of $6.7 million was repaid. The Company acquired the lamination business to optimize the supply chain on certain of its fabric products and provide low cost lamination products and services to Tier-1 customers. As part of this acquisition, the Company inherited a lease pursuant to which it leases from an entity controlled by Mr. McCallum, a portion of a manufacturing facility in El Paso, Texas. The Company continues to occupy these premises pursuant to such lease.

In April 2002, the Company amended the merger agreement with Joan Automotive to clarify ownership of certain equipment listed in a schedule attached to that agreement. The original merger agreement schedule included a list of approximately 84 looms that ultimately exceeded the Company's manufacturing requirements and facility capacity. Upon determining that the excess looms would have been uneconomically expensive to relocate and store, the Company declined to take possession of 48 of these looms, which were left in place at Joan Fabrics' Hickory, North Carolina plant. The amendment clarifies that these looms are owned by Joan Fabrics.

In September 2001, the Company completed the acquisition of Joan Automotive Industries, a leading supplier of bodycloth to the automotive industry, and all of the operating assets of Joan's affiliated yarn dying operation, Western Avenue Dyers, L.P. As a result of the Joan acquisition, Joan Fabrics became a principal stockholder of the Company. Upon completion of the Joan acquisition, Mr. McCallum became a member of the Company's Board of Directors. As part of this acquisition, the Company inherited a lease pursuant to which it leases from an entity controlled by Mr. McCallum, a technical center in Lowell, Massachusetts. The operations formerly conducted in these premises have been moved to other company facilities, however the Company remains obligated for the related lease.

38

In connection with the Joan acquisition, the Company entered into a Supply Agreement dated September 21, 2001 (the "Supply Agreement") with Main Street Textiles, L.P. ("Main Street"), which is controlled by Mr. McCallum, and a Transition Services Agreement dated September 21, 2001 (the "Transition Agreement") with Joan Fabrics. Under the Supply Agreement, which was mutually terminated effective as of January 1, 2004, the Company agreed to purchase all of its requirements for flat woven automotive fabric from Main Street for a five-year period beginning on the date of the Supply Agreement. The prices which the Company agreed to pay for fabric under the agreement equaled the costs of the raw materials plus an amount representing Main Street's standard labor and overhead costs incurred in manufacturing fabric for us. Under the Transition Agreement, Joan Fabrics provided Products transitional and support services for a period not to exceed twelve months in order to support the continued and uninterrupted operation of the businesses acquired by Products in the Joan acquisition. As a part of these services, pending the Company's disassembly and removal of machinery and equipment purchased from Joan Fabrics, Joan Fabrics was permitted to continue to use that machinery and equipment to manufacture for us all of our requirements for some types of knitted and woven automotive fabrics. The terms of the Company's agreement with respect to this fabric production are substantially similar to those under the Supply Agreement. Actual prices paid by the Company for fabric under the Supply Agreement and Transition Agreement were subject to the rebates described below.

In 2002 and 2003, the Company engaged in ordinary course transactions with entities controlled by Mr. McCallum for the purchase and sale of goods and services as part of ongoing business relationships. The Company recorded purchases from entities controlled by Mr. McCallum, of $17.8 million (net of $1.2 million of rebates) in 2003, and $47.3 million (net of $10.5 million of rebates) in 2002 for goods and services purchased. These rebates received from Mr. McCallum relate to knit and woven automotive fabrics provided by entities controlled by Mr. McCallum under the Supply Agreement and Transition Agreement executed in connection with the 2001 Joan acquisition, which are described above. Supplier rebates such as these are common in the automotive industry as part of ongoing price negotiations and adjustments. These rebates from Mr. McCallum totaled $14.7 million over the duration of the agreements. In addition, the Company recorded sales to entities controlled by Mr. McCallum, of $6.4 million in 2003 and $31.8 million in 2002.

The following table summarizes the balances outstanding from entities controlled by Mr. McCallum (in millions):

|  | As of December 31, | |
| --- | --- | --- |
|  | 2003 | 2002 |
| Accounts Receivable | $ 2.7 | $ 5.9 |
| Accounts Payable | $ 1.0 | $ 8.0 |

*Textron Transactions*

As discussed above under "— Mandatorily Redeemable Preferred Stock of Subsidiary," Item 1 "Business — Technology and Intellectual Property," Item 1 "Business — Joint Ventures" and "— Commercial Commitments — Put and Call Arrangement" the Company is a party to various agreements and transactions with Textron. Textron became a related party as a result of its receipt of the consideration in the 2001 TAC-Trim acquisition. In May 2002, as part of the finalization of the purchase price and related working capital adjustments of the TAC-Trim acquisition, the Company paid Textron $15.5 million in cash.

Prior to the TAC-Trim acquisition, TAC-Trim entered into an $86.9 million sale and leaseback transaction (the "Textron Leasing Transaction") with two separate single purpose affiliates of Textron Financial Corporation, as lessor and purchaser, with respect to a portfolio of manufacturing equipment situated in different locations throughout the United States and Canada. In January 2003, the FASB issued FASB Interpretation No. ("FIN") 46, "Consolidation of Variable Interest Entities ("VIE"), an interpretation of Accounting Research Bulletin No. 51, "Consolidated Financial Statements" (see Note 2 "Summary of Significant Accounting Policies" for further information on FIN 46). As part of the Company's implementation of FIN 46,

39

it determined that one of the single purpose affiliates was a VIE. The Company and Textron agreed to have the lease restructured so it was required to be consolidated by the other party and not accounted for as a VIE. As consideration for this lease restructuring, the Company agreed to pay Textron Financial $150,000.

Payments under the Textron leasing transaction are guaranteed by Products and secured by a first perfected mortgage lien over certain real property with a value equal to $25 million. Each lease is for an initial term of three years with three one-year renewal options. At the end of the leases (including the expiration of all renewal options), there is the option of either purchasing all of the equipment for approximately $26 million or returning the equipment to the lessor. In the event the equipment is returned, arrangements will be made for the disposition of the equipment. The Company is required to guarantee a minimum value to the lessor of up to approximately $21 million upon expiration of the leases. As is customary, the documentation for the Textron leasing transaction incorporates covenants by reference, from the Company's credit facility, that may be amended or waived by the senior lenders, and also contain events of default.

As part of the TAC-Trim acquisition, the Company entered into three intellectual property license agreements with Textron. In two of these agreements, the Company licenses back to Textron certain intellectual property that was acquired in the transaction. In the third agreement, the Company licenses from Textron other intellectual property that was not acquired in the transaction. In addition, under the TAC-Trim acquisition agreement, the Company is permitted to use the "Textron" name for 18 months in exchange for payments of $13.0 million on December 15, 2002 and $6.5 million on December 15, 2003.

## Discontinued Operations

The Company recognized in 2003 $2.4 million from discontinued operations and $15.8 million of proceeds, respectively, representing recoveries, net of cash outflows. However, the Company has significant obligations related to post-retirement, casualty, environmental, product liability, lease and other liabilities of discontinued operations. The nature of many of these contingent liabilities is such that they are difficult to quantify and uncertain in terms of amount. The Company has accrued $21.5 million for post retirement costs and $36.7 million for environmental and product liability costs. Based upon the information available to management and the Company's experience to date, the Company believes that these liabilities will not have a material effect on its financial condition, results of operations or cash flows. In addition, the Company has primary, excess and umbrella insurance coverage for various periods that the Company expects to cover certain of these liabilities. However, there can be no assurances that contingent liabilities will not arise or that known contingent liabilities or related claims will not exceed the Company's expectations or that insurance will be available to cover these liabilities. Because the cash requirements of the Company's operations are substantially a function of these contingencies, it is possible that actual net cash requirements could differ materially from the Company's estimates.

## Recent and Future Reorganization Plans

The Company has been restructuring its operations in order to rightsize its overhead structure, reduce salaried headcount and strengthen and streamline the senior management team on a worldwide basis. While the Company believes that the majority of restructuring activities have already been undertaken, the Company is continually evaluating the business and may elect to implement additional restructuring activities as opportunities to achieve cost savings arise in future periods. Refer to "Results of Operations" above and Note 15 "Restructuring" for additional information.

## Stock Repurchase Plan

At December 31, 2003, approximately $1.0 million remained authorized by the Company's Board of Directors to repurchase shares of the Company's common stock at management's discretion. The Company believes it has sufficient liquidity under its existing credit arrangements to effect the repurchase program. The Company made no repurchases for the years ended 2003 and 2002.

**Critical Accounting Estimates**

A summary of the Company's accounting policies is described in Note 2, "Summary of Significant Accounting Policies", of the consolidated financial statements. Critical accounting policies are those that are most important to the portrayal of the Company's financial condition and results. The preparation of consolidated financial statements in conformity with accounting principles generally accepted in the United States of America requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the consolidated financial statements and the reported amounts of revenues and expenses during the reporting period. Considerable judgment is often involved in making these determinations, the use of different assumptions could result in significantly different results. Management believes its assumptions and estimates are reasonable and appropriate, however actual results could differ from those estimates. Certain of the Company's more critical accounting estimates are described below.

*Goodwill and Intangibles:* During the second quarter of 2002, the Company completed the implementation of SFAS 142, "Goodwill and Other Intangible Assets." Under SFAS 142, goodwill is no longer amortized. Instead, goodwill and indefinite-lived intangible assets are tested for impairment in accordance with the provisions of SFAS 142. The Company employed a discounted cash flow analysis and a market comparable approach in conducting its impairment tests. The Company completed its initial impairment test in the second quarter of 2002 and recorded an impairment loss of $11.7 million (having no tax impact), or $0.15 per average basic and diluted share relating to the UK Plastics business in the former European and Rest of World Automotive Systems segment. The impairment loss was reported as a cumulative effect of a change in accounting principle and, therefore, is accounted for as if it occurred on January 1, 2002. The Company completed its annual impairment test on November 1, 2002 indicating that the fair value of the reporting units exceeded the carrying values.

The Company's first quarter 2003 results were below the forecasts utilized in testing for the goodwill impairment for the year ended December 31, 2002. The conditions in the markets in which the Company operates continued to deteriorate and customer production schedules continued to decline, and therefore, the Company reduced its operating and financial plans for 2003. As a result, the Company initiated an impairment test (outside of the annual testing date of November 1) during the second quarter 2003. During the second quarter, the Company carefully reviewed all of its assumptions regarding revenue growth, improved operating margins and planned capital expenditures. This analysis by each reporting unit focused on new business awards, implementation of strategic business initiatives such as restructuring, material savings, plant efficiencies, revenue growth and additional product/ process technology applications. While the Company is aggressively attacking its overall cost structure, the U.S. and Mexico Plastics reporting unit had even more definitive objectives initiated after the 2003 first quarter performance on a specific plant basis. As a result of these well-defined programs, the Company, utilizing an independent outside evaluator, completed the first step of the goodwill impairment test in the second quarter of 2003 which indicated that the fair value of the reporting units exceeded the carrying values, and therefore no additional impairment testing was necessary. The Company again, completed the annual impairment test as of November 1, 2003 indicating fair value of the reporting units exceeded the carrying values.

Fair value for all tests was determined based upon the discounted cash flows of the reporting units using discount rates ranging from 11.5% to 14.0% dependent on the reporting unit and a residual growth rate of 2%. The market comparable approach consisted of earnings multiples ranging from 5.2 to 6.5 times current year and forecasted Earnings Before Interest, Taxes, Depreciation and Amortization ("EBITDA") (operating income less depreciation and amortization) and a control premium on equity. Future cash flows and EBITDA are affected by future operating performance, which will be impacted by economic conditions, car builds, financial, business and other factors, many of which are beyond the Company's control. The U.S. and Mexico Plastics reporting unit can be significantly impacted by an adverse change in assumptions. Considerable judgment is often involved in making these determinations, the use of different assumptions could result in significantly different results. An approximate 50 basis point change in discount rates or an approximate 4% reduction in profit would result in a further goodwill impairment analysis as required by SFAS 142.

41

Management believes its assumptions and estimates are reasonable and appropriate, however actual results could differ from those estimates.

*Realization of Deferred Tax Assets:* Assessing the need for and amount of a valuation allowance for deferred tax assets requires significant judgment. The fact that a benefit may be expected for a portion but not all of a deferred tax asset increases the judgmental complexity. Future realization of deferred tax assets ultimately depends on the existence of sufficient taxable income of the appropriate character in either the carryback or carryforward period under the tax law.

During 2001, Heartland acquired approximately 60 percent of the outstanding shares of the Company. This constituted a "change in control" that results in annual limitations on the Company's use of its Net Operating Loss ("NOLs") and unused tax credits. This annual limitation on the use of NOLs and tax credits depends on the value of the equity of the Company and the amount of "built-in gain" or "built-in loss" in the Company's assets at the date of the "change in control." Based on the expiration dates of the NOLs and tax credits, as well as anticipated levels of domestic income, management does not believe that the transaction will have a material impact on these deferred tax assets. Management has reviewed the Company's operating results for recent years as well as the outlook for its continuing operations and concluded that it is more likely than not that the net deferred tax assets of $203.3 million at December 31, 2003 will be realized.

Management took into consideration, among other factors, the impact of recent restructuring plans, the timing of the reversal of its temporary differences, certain tax planning strategies and the expiration date of its NOLs. The Company's ability to generate future taxable income is dependent on numerous factors, including general economic conditions, the state of the automotive industry and other factors beyond management's control. Therefore, there can be no assurance that the Company will meet its expectation of future taxable income.

*Pension and Postretirement Benefits Other than Pensions:* Annual net periodic expense and benefit liabilities under our defined benefit plans are determined on an actuarial basis. Assumptions used in the actuarial calculations have a significant impact on plan obligations and expense. Each September, the Company reviews the actual experience compared to the more significant assumptions used and makes adjustments to the assumptions, if warranted. The healthcare trend rates are reviewed with the actuaries based upon the results of their review of claims experience. Discount rates are based upon an expected benefit payments duration analysis and the equivalent average yield rate for high-quality fixed-income investments. Pension benefits are funded through deposits with trustees and the expected long-term rate of return on fund assets is based upon actual historical returns modified for known changes in the market and any expected change in investment policy. Postretirement benefits are not funded and our policy is to pay these benefits as they become due.

The following table highlights the sensitivity of our pension obligations and expense to changes in assumptions (in millions):

| Change in Assumption | Impact on Pension Expense | Impact on PBO |
|---|---|---|
| 25 basis point ("bp") decrease in discount rate | 1.5 | 15.6 |
| 25 bp increase in discount rate | (1.5) | (15.1) |
| 25 bp decrease in long-term return on assets | 0.8 | — |
| 25 bp increase in long-term return on assets | (0.8) | — |

Certain accounting guidance, including the guidance applicable to pensions, does not require immediate recognition of the effects of a deviation between actual and assumed experience or the revision of an estimate. This approach allows the favorable and unfavorable effects that fall within an acceptable range to be netted. Although this netting occurs outside the basic financial statements, disclosure of the net amount is disclosed as an unrecognized gain or loss in the footnotes to our financial statements. The Company expects to incur approximately $18.8 million of pension expense in 2004. See Note 13 "Employee Benefit Plans" for additional discussion.

*Environmental Contingencies:* The Company is subject to federal, state, local and foreign environmental, and health and safety, laws and regulations that (i) affect ongoing operations and may increase capital costs and operating expenses in order to maintain compliance with such requirements and (ii) impose liability relating to contamination at facilities, and at other locations such as former facilities, facilities where the Company has sent wastes for treatment or disposal, and other properties to which the Company may be linked. Such liability may include, for example, investigation and clean-up of the contamination, personal injury and property damage caused by the contamination, and damages to natural resources. Some of these liabilities may be imposed without regard to fault, and may also be joint and several (which can result in a liable party being held responsible for the entire obligation, even where other parties are also liable).

Management believes that it has obtained, and is in material compliance with, those material environmental permits and approvals necessary to conduct the Company's various businesses. Environmental compliance costs for continuing businesses are accounted for as normal operating expenses or capital expenditures, except for certain costs incurred at acquired locations. Environmental compliance costs relating to conditions existing at the time of an acquisition are generally charged to reserves established in purchase accounting. The Company accrues for environmental remediation costs when such obligations are known and reasonably estimable. In the opinion of management, based on the facts presently known to it, such environmental compliance and remediation costs will not have a material adverse effect on the Company's business, consolidated financial condition or future results of operations.

The Company is legally or contractually responsible or alleged to be responsible for the investigation and remediation of contamination at various sites, and for personal injury or property damages, if any, associated with such contamination. At some of these sites the Company has been notified that it is a potentially responsible party ("PRP") under the federal Superfund law or similar state laws. Other sites at which we may be responsible for contamination may be identified in the future, including with respect to divested and acquired businesses.

The Company is currently engaged in investigating or remediating certain sites as discussed below. In estimating the cost of investigation and remediation, the Company has considered, among other things, prior experience in remediating contaminated sites, remediation efforts by other parties, data released by the United States Environmental Protection Agency ("USEPA"), the professional judgment of the Company's environmental experts, outside environmental specialists and other experts, and the likelihood that other identified PRPs will have the financial resources to fulfill their obligations at sites where they and the Company may be jointly and severally liable. It is difficult to estimate the total cost of investigation and remediation due to various factors including:

- incomplete information regarding particular sites and other PRPs;

- uncertainty regarding the nature and extent of environmental problems and the Company's share, if any, of liability for such problems;

- the ultimate selection among alternative approaches by governmental regulators;

- the complexity and evolving nature of environmental laws, regulations and governmental directives; and

- changes in cleanup standards.

Revenue Recognition: The Company recognizes revenue from product sales when it has shipped the goods. Products are shipped FOB shipping point using customer designated transportation companies with title passing at that time. Significant retroactive price adjustments are recognized in the period when such amounts become probable. Sales are recognized based upon the gross amount billed to a customer for those products in which the Company's customer has directed the sourcing of certain materials or components used in the manufacture of the final product. The Company generally allows its customers the right of return only in the case of defective products. The Company provides a reserve for estimated defective product costs at the time of the sale of the products.

43

*Allowance for uncollectible accounts:* The allowance for uncollectible accounts provides for losses believed to be inherent within the Company's "Accounts and Other Receivables," (primarily trade receivables and the retained interest in the receivables facility). Management evaluates both the creditworthiness of specific customers and the overall probability of losses based upon an analysis of the overall aging of receivables, past collection trends and general economic conditions. Management believes, based on its review, that the allowance for uncollectible accounts is adequate to cover potential losses. Actual results may vary as a result of unforeseen economic events and the impact those events could have on our customers.

**Item 7A.**     *Quantitative and Qualitative Disclosures About Market Risk*

## MARKET RISK SENSITIVITY

In the normal course of business, the Company is exposed to market risk associated with fluctuations in foreign exchange rates and interest rates. The Company manages these risks through the use of derivative financial instruments in accordance with management's guidelines. The Company enters into all hedging transactions for periods consistent with the underlying exposures. We do not enter into derivative instruments for speculative or trading purposes.

### Foreign Currency

Operating results may be impacted by the Company buying, selling and financing in currencies other than the functional currency of our operating companies ("transactional exposure"). The Company mitigates this risk by entering into foreign currency forward, swap and option contracts. The foreign currency contracts are executed with banks that the Company believes are creditworthy.

The Company's most significant foreign currency transactional exposures relate to Mexico, Canada and the European Monetary Union. As of December 31, 2003, foreign currency contracts representing $50 million of notional amount were outstanding with maturities of less than one year. The fair value of these foreign exchange contracts as of December 31, 2003 was approximately $44 thousand. The table below provides a summary of the foreign exchange contracts that are outstanding as of December 31, 2003. The instrument's actual cash flows are denominated in U.S. dollars (dollar amounts in millions).

| Derivative Type | Currency Sold | Currency Purchased | USD Equivalent of Notional Amount | Weighted Average Contract Rate (per Convention) | Unrealized Gain/(Loss) |
|---|---|---|---|---|---|
| Options | CAD | USD | $    50.0 | 1.5 | $    --- |

In addition to the transactional exposures, our operating results are impacted by the translation of our foreign operating income into U.S. dollars ("translation exposure"). We do not enter into foreign currency contracts to mitigate this exposure.

### Interest Rate

As of December 31, 2003 approximately 71% of the Company's borrowings were on a fixed rate basis. The remainder of the Company's borrowings were on a variable rate basis and sensitive to changes in interest rates. While the Company has used interest rate swaps and other interest rate protection agreements to modify its exposure to interest rate movements and to reduce borrowing rates, no such agreements were in place at December 31, 2003. Because approximately $356.4 million of the Company's borrowings were subject to a minimum LIBOR floor of 3.00%, a 1.00% unfavorable increase in interest rates would not materially impact pre-tax earnings and cash flow.

**Item 8.**     *Financial Statements and Supplementary Data*

See the Consolidated Financial Statements of Collins & Aikman Corporation and subsidiaries included herein and listed on the Index to Financial Statements set forth in Item 15 (a) of this Form 10-K report.

**Item 9.**     *Changes in and Disagreements with Accountants on Accounting and Financial Disclosure*

On June 20, 2003, the Audit Committee of the Board of Directors of Collins & Aikman Corporation approved the appointment of KPMG LLP as the Company's independent accountants for the year ending December 31, 2003 and the dismissal of PricewaterhouseCoopers LLP ("PwC"), which had previously served in this capacity.

During the years ended December 31, 2002 and 2001 and through June 20, 2003, KPMG LLP had not been engaged as an independent accountant to audit either the financial statements of the Company or any of its subsidiaries, nor had it been consulted regarding the application of accounting principles to any specified transaction, either completed or proposed, or the type of audit opinion that might be rendered on the Company's financial statements, or any matter that was the subject of a disagreement or reportable event.

PwC communicated in its February 2003 report to the Audit Committee that disagreements with respect to potential changes in measurement date and asset valuation methods for the Company's pension plans were resolved. In connection with its 2003 budgeting process, the Company had engaged an actuarial consultant to develop and evaluate prospective alternatives for its pension measurement date and asset valuation methods. These alternatives were reviewed with PwC in order to obtain their views on the appropriate accounting measurement dates and valuation methodologies. After full discussion with PwC, the Company's senior officers and PwC agreed to continue employing in 2003 the pension valuation and measurement methodologies the Company had employed in 2002. There were no other disagreements with PwC during the years ended December 31, 2002 and 2001 on any matter of accounting principles or practices, financial statement disclosure, or auditing scope or procedure which, if not resolved to the satisfaction of PwC, would have caused it to make reference to the subject matter of such disagreement in their reports on the financial statements for the year.

The reports of PwC on the financial statements for the years ended December 31, 2002 and 2001, did not include any adverse opinion or disclaimer of opinion, or any qualification or modification as to uncertainty, audit scope or accounting principles.

During the years ended December 31, 2002 and 2001 and through June 20, 2003, PwC reported no material weaknesses in the Company's internal control systems and there were no other reportable events as defined in Regulation S-K Item 304(a)(1)(v), other than those described in the next paragraph.

In connection with its 2001 audit, PwC communicated to the Audit Committee and to management reportable conditions in the Company's internal control systems, attributable primarily to integration issues from an acquisition completed during the third quarter of 2001, personnel turnover at the corporate and plant level and failure of two manufacturing facilities to follow Company procedures related to account reconciliations. Corrective actions were implemented in 2002. In connection with its 2002 audit, PwC communicated to the Audit Committee and to management reportable conditions in the Company's internal control system related to timely preparation of cash account reconciliations, review of non-standard journal entries, revenue accounting and currency translation at foreign locations and compliance with established Company accounting policies and procedures. These conditions were attributable primarily to computer systems, process harmonization and personnel integration issues from the December 20, 2001, TAC-Trim acquisition. Corrective actions have been developed and are being implemented to eliminate or reduce to an acceptable level the financial reporting risks associated with the conditions noted. PwC is not in a position to comment on the adequacy of these corrective actions. The Company believes that it has corrected all these conditions during 2003. PwC did not modify its report on the Company's 2001 and 2002 audited financial statements as a consequence of these reportable conditions.

The Company requested that PwC furnish it with a letter addressed to the Securities and Exchange Commission stating whether or not it agrees with the above statements. A copy of such letter, dated June 24, 2003, is filed as an Exhibit on Form 8-K filed with the Securities and Exchange Commission on June 26, 2003.

45

**Item 9A.**     *Controls and Procedures*

a. Evaluation of disclosure controls and procedures:

As of the end of the period covered by this report, the Company's Chief Executive Officer and the Company's Chief Financial Officer, "the Certifying Officers," evaluated the effectiveness of the design and operation of the Company's "disclosure controls and procedures" (as defined in the Securities Exchange Act of 1934). Based on that evaluation, the Certifying Officers have concluded that the Company's disclosure controls and procedures are effective to ensure that information required to be disclosed by the Company in the reports that it files and submits under the Exchange Act is recorded, processed, summarized and reported as and when required, and are effective to ensure that such information is accumulated and communicated to the Company's management, including its Certifying Officers, as appropriate to allow timely decisions regarding required disclosure. In addition, the Certifying Officers also disclosed to the Company's auditors and the audit committee of the Board of Directors all significant deficiencies in the design or operation of internal controls that could adversely affect the Company's ability to record, process, summarize and report financial data. A summary of the key items disclosed and the changes in internal controls resulting from corrective actions are discussed below.

b. Changes in internal controls:

An evaluation of internal controls was conducted for the year ended December 31, 2003. The following paragraphs detail management's significant areas of focus to further enhance internal controls:

• The Company has implemented certain enhancements, or is in the process of enhancing, internal controls relating to data quality and process efficiency with respect to its current consolidation system and preparation of consolidated financial statements. Recent actions relate to improving the systematic roll-up of both financial and non-financial information that is reported in the Company's financial reports filed with the Securities & Exchange Commission. These actions have primarily focused on improving: (1) the entity structure utilized by the consolidation tool, (2) the collection and compilation of financial and non-financial data and (3) the ability to identify and eliminate intercompany transactions and balances in a more efficient manner. The Company is currently making these changes to its existing consolidation system and is in the process of implementing a new consolidation system. As part of the new system implementation process, the Company is examining additional means to improve its internal controls. The Company is also enhancing its procedures with respect to ensuring timely and adequate review of non-standard journal entries and account reconciliations and adherence to existing corporate accounting policies and accounting principles generally accepted in the United States of America.

Other than the above, there were no significant changes in the Company's internal controls or in other factors that could significantly affect internal controls. The Company also intends to refine its internal control procedures on an ongoing basis as deemed appropriate with a view towards making improvements.

## PART III

**Item 10.** *Directors and Executive Officers of the Registrant*

The Restated Certificate of Incorporation of the Company provides that the Board of Directors of the Company is divided into three classes serving staggered three-year terms. Set forth below, as of March 1, 2004, are the name, age and principal occupation or employment during the last five years of each of the current directors of the Company. None of the directors is related to any executive officer or other director of the Company by blood, marriage or adoption. The affiliations between the Company and Heartland, Blackstone Partners, Charles E. Becker, Becker Ventures, Elkin McCallum, Joan Fabrics and Textron (as such terms are defined herein) are set forth under Item 12, "Security Ownership of Certain Beneficial Owners and Management" and Item 13, "Certain Relationships and Related Transactions."

### Directors Whose Terms Expire at the 2004 Annual Meeting — Class I Directors

| | |
|---|---|
| Timothy D. Leuliette | Age 54. Mr. Leuliette was elected as a director of the Company in February 2001 and has been a director of Metaldyne Corporation ("Metaldyne") since November 2000 and a director of Trimas Corporation ("Trimas") since 2002. He is currently Chairman, President and Chief Executive Officer of Metaldyne. He is a senior managing director and one of the co-founders of Heartland. Prior to joining Heartland, Mr. Leuliette joined the Penske Corporation as President and Chief Operating Officer in 1996. From 1991 to 1996 Mr. Leuliette served as President and Chief Executive Officer of ITT Automotive, an automotive company. He also serves on a number of corporate and charitable boards, and served as chairman of the Board of Directors of The Federal Reserve Bank of Chicago, Detroit Branch. |
| Elkin McCallum | Age 60. Mr. McCallum was elected as a director of the Company in September 2001. Mr. McCallum has been the Chairman of the Board and Chief Executive Officer of Joan Fabrics since 1989 and was Chairman and Chief Executive Officer of Tyng Textiles L.L.C. from 1996 to 2003. Mr. McCallum is currently Chairman of the Board of Trustees of Bentley College. |
| W. Gerald McConnell | Age 40. Mr. McConnell was elected as a director of the Company in February 2001 and has been a senior managing director of Heartland since its founding. Mr. McConnell was formerly a managing director at Deutsche Bank Alex. Brown (formerly Bankers Trust Co.) from 1997 until 1999. From 1991 until 1999, Mr. McConnell specialized in leveraged finance and financial sponsor coverage at Deutsche Bank Alex. Brown. Mr. McConnell also serves on the boards of directors of Springs Industries, Inc. ("Springs") and Trimas. |
| J. Michael Stepp | Age 59. Mr. Stepp has been a director of the Company since February 2001. Mr. Stepp is currently Vice Chairman of the Board of Directors and Chief Financial Officer of the Company. He was previously Executive Vice President and Chief Financial Officer of the Company from May 2002 through July 2002 (after serving as interim Chief Financial Officer from January 2002 through April 2002) and from April 1995 through December 1999. Mr. Stepp was a consultant to the Company and was an independent mergers and acquisitions advisor from January 2000 through February |

47

2001. Since March 2001, Mr. Stepp has been a senior managing director of Heartland but has not been an employee of Heartland since April 2002. He is also a director of Products.

**Directors Whose Terms Expire at the 2005 Annual Meeting — Class II Directors**

| | |
|---|---|
| Warren B. Rudman | Age 73. Mr. Rudman has been a director of the Company since June 1995. Mr. Rudman was a partner in the law firm of Paul, Weiss, Rifkind, Wharton & Garrison from 1993 through 2002, and since January 2003 Mr. Rudman has been of counsel to the law firm. Mr. Rudman served as a United States Senator from New Hampshire from 1980 through 1992 and as Attorney General of New Hampshire from 1970 until 1976. Mr. Rudman is also a director of the Chubb Corporation (which term will expire in April, 2004), Allied Waste, Boston Scientific, the Raytheon Company and an independent trustee of several mutual funds of the Dreyfus Corporation. |
| Cynthia L. Hess | Age 47. Ms. Hess is the owner and Chief Executive Officer of Hess Group, LLC. Prior to forming Hess Group in 2002, Ms. Hess was a senior managing director of Heartland. She was formerly Vice President of Corporate Quality for DaimlerChrysler, where she led the corporate strategy for quality improvement and facilitated quality plan execution. In her 22 years with DaimlerChrysler, Ms. Hess held various engineering, manufacturing and procurement supply positions. Ms. Hess is also a director of Metaldyne. |
| Samuel Valenti, III | Age 58. Mr. Valenti has been a director of the Company since February 2001. He is a senior managing director of Heartland, chairman of Valenti Capital LLC, has been a director of Metaldyne since January 2001, and is Chairman of the Board of Directors of Trimas. Mr. Valenti is a director of Masco Capital Corporation and has been its President since 1988. Mr. Valenti was formerly Vice President — Investments of Masco Corporation, a home improvement and building products company, from May 1974 to October 1998. |
| David C. Dauch | Age 39. Mr. Dauch has been Senior Vice President of Sales, Marketing and Manufacturing — Driveline Division of American Axle & Manufacturing since 2003, a company he joined in 1995 as Manager, Sales Administration. In 1996, he became Director of Sales, GM Full Size Truck Programs and was named Vice President of Sales and Marketing in 1998. In 2001, he became Vice President of Manufacturing — Driveline Division. From 1987 to 1995, Mr. Dauch was employed by Products where he held positions of product manager, account executive, and Director of Ford Sales and Marketing for the Automotive Carpet and Fabric Groups. |
| Marshall A. Cohen | Age 69. Mr. Cohen has been a director of the Company since April 2001. Mr. Cohen has been Counsel at Cassels Brock and Blackwell, a Canadian law firm, since October 1996. Mr. Cohen is also a director of The Toronto-Dominion Financial Group, Barrick Gold Corporation, American International Group, Inc., Lafarge Corporation N.A., The Goldfarb Corporation, Premcor Inc., |

48

Metaldyne, and Golf Town Canada Inc. Mr. Cohen serves on the Advisory Boards of the Blackstone Group and Heartland.

## Directors Whose Terms Expire at the 2006 Annual Meeting — Class III Directors

| | |
|---|---|
| Charles E. Becker | Age 56. Mr. Becker has been a director since July 2001. He was Vice Chairman of the Board from July 2001 until July 2002. For over 25 years, through 1998, Mr. Becker was the Chief Executive Officer and co-owner of Becker Group, Inc., a global automotive interior components supplier. Mr. Becker is the owner and Chairman of Becker Ventures, which was established in 1998 to invest in a variety of business ventures, including the manufacturing, real estate and service industries. Mr. Becker is also a director of Metaldyne and Trimas. |
| Robert C. Clark | Age 60. Mr. Clark has been a director of the Company since October 1994. Mr. Clark is a Harvard University Distinguished Service Professor, Harvard Law School. Mr. Clark joined Harvard Law School in 1979 after four years at Yale Law School, where he was a tenured professor, and served as Dean of the Harvard Law School from 1989 to 2003. Mr. Clark is a corporate law specialist and author of numerous texts and legal articles. Prior to his association with academia, he was in private practice with Ropes & Gray. Mr. Clark is also a director of Omnicom Group, Inc., Time Warner Inc., and a trustee of Teachers Insurance Annuity Association (TIAA). |
| David A. Stockman | Age 57. Mr. Stockman has been a director of the Company since February 2001 and has been Chairman of the Board of the Company since August 2002. Mr. Stockman is also a director of Metaldyne, Springs and Trimas. He is a senior managing director and the founder of Heartland. Prior to founding Heartland, he was a senior managing director of The Blackstone Group L.P. ("Blackstone") and had been with Blackstone since 1988. Mr. Stockman also served as the director of the Office of Management and Budget in the Reagan Administration, and represented a district in southern Michigan in the U.S. House of Representatives from 1976 to 1981. |
| Daniel P. Tredwell | Age 45. Mr. Tredwell has been a director of the Company since February 2001. Mr. Tredwell is also a director of Metaldyne, Trimas and Springs. He is a senior managing director and a co-founder of Heartland. He has two decades of leveraged financing and buyout experience. Mr. Tredwell served as a Managing Director at Chase Securities Inc. and had been with Chase Securities since 1985. |

## Arrangements Regarding Election of Directors

See Item 12, "Security Ownership of Management and Principal Stockholders — Voting" of this Report.

**EXECUTIVE OFFICERS OF THE COMPANY**

The following is a list of the names and ages, as of March 1, 2004, of the executive officers of the Company and a description of all positions and offices with the Company held by each such person and each such person's principal occupations and employment during the past five years. All executive officers hold office at the pleasure of the Company's Board of Directors.

| Name | Age | Position |
|------|-----|----------|
| David A. Stockman | 57 | Chairman of the Board and Chief Executive Officer |
| J. Michael Stepp | 59 | Vice Chairman of the Board and Chief Financial Officer |
| Wallace W. Creek | 65 | Senior Vice President-Finance |
| Millard L. King, Jr | 59 | President, Global Soft Trim |
| Robert A. Krause | 47 | Vice President and Treasurer |
| L. Gregory Tinnell | 43 | Senior Vice President, Human Resources |
| Michael G. Torakis | 47 | President, International Plastics |
| Eric J. White | 48 | President, U.S. and Mexico Plastics |

*David A. Stockman* has been a director of the Company since February 2001 and has been Chairman of the Board of the Company since August 2002. Mr. Stockman has been Chief Executive Officer of the Company since August 2003. Mr. Stockman is also a director of Metaldyne, Springs and Trimas. He is a senior managing director and the founder of Heartland. Prior to founding Heartland, he was a senior managing director of Blackstone and had been with Blackstone since 1988. Mr. Stockman also served as director of the Office of Management and Budget in the Reagan Administration, and represented a district in southern Michigan in the U.S. House of Representatives from 1976 to 1981.

*J. Michael Stepp* has been a director of the Company since February 2001. Mr. Stepp is currently Vice Chairman of the Board of Directors and Chief Financial Officer of the Company. He was previously Executive Vice President and Chief Financial Officer of the Company from May 2002 through July 2002 (after serving as interim Chief Financial Officer from January 2002 through April 2002), and from April 1995 through December 1999. Mr. Stepp was a consultant to the Company and was an independent mergers and acquisitions advisor from January 2000 through February 2001. Since March 2001, Mr. Stepp has been a senior managing director of Heartland but has not been an employee of Heartland since April 2002. He is also a director of Products.

*Wallace W. Creek* has been Senior Vice President — Finance since December 2002, and an executive officer of the Company since December 2002. Before joining the Company in 2002, Mr. Creek was corporate comptroller for General Motors. Mr. Creek is a director of Columbus McKinnon Corp.

*Millard L. King, Jr.* has been President, Global Soft Trim since August 2003 and an executive officer of the Company since March 2002. From November 2001 to March 2002, he was Executive Vice President of Global Manufacturing Operations, Carpet and Acoustics Systems. Mr. King joined the Company in 1971. Prior to November 2001, Mr. King held the positions of Senior Vice President of Operations for Automotive Knit Fabrics and Chief Operating Officer of the U.S. automotive carpet systems and of automotive knit and woven operations.

*Robert A. Krause* has been Vice President and Treasurer since October 2002, and an executive officer of the Company since December 2002. Before joining the Company, Mr. Krause was associated with American Axle & Manufacturing Holdings, Inc., where he was Vice President and Treasurer from 1999 to August 2002, and Vice President — Investor Relations from August 2002 to October 2002, Treasurer and Acting Interim Chief Financial Officer during 1999, and Treasurer from 1998 to 1999.

*L. Gregory Tinnell* has been Senior Vice President of Human Resources and an executive officer since April 2000. Previously, he was Vice President of Human Resources for the Company's southern and Mexican operations, as well as Vice President of Global Compensation & Benefits. Mr. Tinnell joined the Company in 1995. Prior to joining the Company, he served in various management positions with Sara Lee Corporation,

Nabisco Foods Group and North American Refractories Company. Mr. Tinnell serves on the National Association of Manufacturers Human Resources Steering Committee.

*Michael G. Torakis* has been President, International Plastics since August 2003 and an executive officer of the Company since March 2004. Mr. Torakis joined the Company in August 2003. Prior to joining the Company, Mr. Torakis was President of Venture Holdings Company, LLC and Chief Executive Officer of Peguform GmbH. On or about March 28, 2003, Venture Holdings Company, LLC and certain of its affiliates filed a petition for protection under the United States Bankruptcy Code. Mr. Torakis was President of Venture Holdings Company, LLC at the time of the bankruptcy filing. In addition, on or about May 28, 2002, Peguform GmbH, a subsidiary of Venture Holdings Company, LLC, filed for bankruptcy in Germany. Mr. Torakis was Chief Executive Officer of Peguform GmbH at the time of the filing.

*Eric J. White* has been President, U.S. and Mexico Plastics since August 2003 and an executive officer of the Company since August 2002. From August 2002 to August 2003, he was Executive Vice President of Global Manufacturing, Interior Trim & Cockpit Systems. Prior to August 2002, Mr. White held the positions of Vice President Operations — Plastics with responsibility for multiple plant operations, and Vice President Operations for two operations with Textron Automotive Company, Inc.

See "Executive Compensation — Employment Agreements" for a description of the Company's employment agreements with Messrs. Stepp, King, Torakis and White. Additionally, Mr. Tinnell has a written employment agreement.

Mr. Stockman does not receive any compensation for his service to the Company as Chief Executive Officer. Mr. Stockman's services are provided to the Company by Heartland pursuant to a services agreement that is more fully described in Item 13, "Certain Relationships and Related Transactions" of this Report. The assumption by Mr. Stockman of the office of Chief Executive Officer did not change the compensation due Heartland under the services agreement.

## Section 16(a) Beneficial Ownership Reporting Compliance

Section 16(a) of the Securities Exchange Act of 1934 requires the Company's officers and directors, and persons who own more than ten percent of a registered class of the Company's equity securities, to file reports of ownership and changes in ownership with the Securities and Exchange Commission (the "SEC"). Officers, directors and greater than ten percent stockholders are required by SEC regulation to furnish the Company with copies of all Section 16(a) reports they file. Based solely on review of the copies of such reports furnished to the Company during or with respect to fiscal 2003, or written representations that no Forms 5 were required, the Company believes that during the fiscal year ended December 31, 2003, all persons subject to the Section 16(a) filing requirements filed the required reports on a timely basis.

## Code of Ethics

Products has a code of ethics entitled "Collins & Aikman Products Co. Code of Business Conduct" which is applicable to all employees, consultants and contractors of Products, its subsidiaries and affiliates, including the Company. The above-referenced Code of Business Conduct is also applicable to the Company's principal executive officer, principal financial officer, principal accounting officer or controller and persons performing similar functions for the Company ("Senior Officers").

The Code of Business Conduct is available on the Company's website at www.collinsaikman.com. All amendments to the Code of Business Conduct will also be made available on the Company's website, along with all waivers of the Code of Business Conduct involving Senior Officers of the Company.

## Audit Committee Financial Expert

The Board of Directors of the Company has determined that none of the current members of the Audit Committee is an "audit committee financial expert," as the Board interprets that requirement in its business judgment. However, each member of the Audit Committee is financially literate, and each member of the Audit Committee satisfies the heightened independence requirements of Sections 303.01(B)(2)(a) and

303.01(B)(7) of the New York Stock Exchange's listing standards, to which all members of the Audit Committee are subject. In addition, the Board re-affirms its confidence in each of the members of the Audit Committee, who the Board has determined are independent under applicable rules and regulations and have considerable qualifications and extensive experience with the Company and other public and private entities, and have demonstrated unique leadership capabilities, to serve as members of the Company's Audit Committee.

**Item 11.** *Executive Compensation*

The following table sets forth information concerning the compensation for services rendered to the Company and its subsidiaries by (i) both individuals serving as the Company's Chief Executive Officer during 2003, (ii) the Company's four most highly compensated executive officers (other than the Chief Executive Officer) whose total annual salary and bonus exceeded $100,000 and who were serving as executive officers at the end of the fiscal year ended December 31, 2003 and (iii) one of the Company's former executive officers whose compensation would have been reported herein if they had been serving as executive officers of the Company at the end of the fiscal year (the individuals named in clauses (i), (ii) and (iii) being referred to herein as the "Named Executive Officers"). All compensation shown has been paid by Products or by a subsidiary of Products (although any options shown as awarded are for Common Stock of the Company). The Company does not separately compensate its executive officers for their duties as officers of the Company (except for any such options).

### Summary Compensation Table

| | | Annual Compensation | | | Securities Underlying Options(#) | All Other Compensation($) |
|---|---|---|---|---|---|---|
| Name and Principal Position | Year | Salary($) | Bonus ($) | Other Annual Compensation($)(1) | | |
| David A. Stockman | 2003 | 0 | 0 | 0 | 0 | 0 |
| Chairman and Chief | 2002 | N/A | N/A | N/A | N/A | N/A |
| Executive Officer(2) | 2001 | N/A | N/A | N/A | N/A | N/A |
| J. Michael Stepp | 2003 | 484,176 | 112,500(3) | 14,699 | 0 | 3,319(4) |
| Vice Chairman of the | 2002 | 300,000 | 262,500 | 35,897 | 440,000 | 5,047 |
| Board and Chief | 2001 | N/A | N/A | N/A | N/A | N/A |
| Financial Officer | | | | | | |
| Millard L. King, Jr. | 2003 | 341,667 | 37,500(3) | 10,780 | 0 | 2,325(6) |
| President, Global | 2002 | 250,000 | 140,873 | 11,058 | 376,321 | 2,390 |
| Soft Trim(5) | 2001 | 209,917 | 66,627 | 4,080 | 0 | 11,216 |
| Eric White | 2003 | 307,917 | 25,000(3) | 11,954 | 200,000 | 9,584(8) |
| President, US & | 2002 | 199,590 | 25,000 | 3,822 | 40,000 | 1,062 |
| Mexico Plastics(7) | 2001 | N/A | N/A | N/A | N/A | N/A |
| Michael G. Torakis | 2003 | 194,423 | 76,932 | 4,228 | 0 | 1,236(10) |
| President, International | 2002 | N/A | N/A | N/A | N/A | N/A |
| Plastics(9) | 2001 | N/A | N/A | N/A | N/A | N/A |
| Wallace W. Creek | 2003 | 256,562 | 150,000 | 10,108 | 100,000 | 1,746(12) |
| Senior Vice | 2002 | 20,833 | N/A | 1,054 | 0 | N/A |
| President-Finance(11) | 2001 | N/A | | N/A | N/A | N/A |
| Jerry L. Mosingo | 2003 | 459,677(14) | 0 | 5,963 | 210,000 | 840,211(15) |
| Former President and | 2002 | 475,833 | 0 | 9,652 | 440,000 | 2,379 |
| Chief Executive | 2001 | N/A | N/A | N/A | N/A | N/A |
| Officer(13) | | | | | | |
| Michael A. Mitchell | 2003 | 400,000 | 50,000(3) | 14,789 | 0 | 2,637(17) |
| Former President Global | 2002 | 320,833 | 50,000 | 14,477 | 360,000 | 2,165 |
| Commercial Operations(16) | 2001 | N/A | N/A | N/A | N/A | N/A |

(1) Total perquisites for each Named Executive Officer were less than the lesser of $50,000 or 10% of annual salary and bonus and, accordingly, the dollar value of such perquisites is not shown. The numbers shown for each Named Executive Officer reflect gross-ups for incremental federal and state income taxes related to such perquisites or relocation reimbursements. Perquisites for each Named Executive

Officer may, but do not necessarily, include reimbursement for any of the following expenses: car; financial planning; executive fitness; executive physicals and medical; clubs and entertainment; and personal use of Company aircraft.

(2)  Mr. Stockman became Chief Executive Officer of the Company in August 2003. He has been a director of the Company since February 2001 and Chairman of the Board of the Company since August 2002. Mr. Stockman does not receive any compensation for his services as Chief Executive Officer. Mr. Stockman's services are provided by Heartland under a services agreement. See Item 7, "Management's Discussion and Analysis — Effects of Certain Transactions with Related Parties" and Item 13, "Certain Relationships and Related Transactions" for descriptions of the services agreement between the Company and Heartland. Heartland's compensation under the services agreement did not increase as a result of Mr. Stockman becoming Chief Executive Officer of the Company.

(3)  Certain officers and key executives received a special recognition bonus in 2003. The bonus payments to Stepp, King, Mitchell and White were $112,500, $37,500, $50,000 and $25,000, respectively.

(4)  Amount for 2003 for Mr. Stepp consists of premiums in the amounts of $3,010 and $309 paid for basic term life insurance and accidental death and dismemberment ("AD&D") insurance, respectively, under group life insurance policies.

(5)  Mr. King assumed the position of President Global Soft Trim in August of 2003. Previously he was Executive Vice President Global Manufacturing Operations, Carpet & Acoustics Systems.

(6)  Amount for 2003 for Mr. King consists of premiums in the amount of $2,124 and $201 paid for basic term life insurance and AD&D insurance, respectively, under group life insurance policies.

(7)  Mr. White became President of US & Mexico Plastics in August of 2003. He formerly held the position of Executive Vice President Global Manufacturing Operations Interior Trim & Cockpit Systems.

(8)  Amount for 2003 for Mr. White consists of premiums in the amounts of $1,864 and $176 paid for basic term life insurance and AD&D insurance, respectively, under group life insurance policies and (ii) and relocation expenses of $7,544.

(9)  Mr. Torakis joined Collins & Aikman in July 2003 as President, International Plastics.

(10)  Amount for 2003 for Mr. Torakis consists of premiums in the amounts of $1,166 and $70 paid for basic term life insurance and AD&D insurance, respectively, under group life insurance policies.

(11)  Mr. Creek joined Collins & Aikman in December of 2002 as Senior Vice President of Finance.

(12)  Amount for 2003 for Mr. Creek consists of premiums in the amounts of $1,595 and $151 paid for basic term life insurance and AD&D insurance, respectively, under group life insurance policies.

(13)  In August 2003, Mr. Mosingo resigned his positions as a director and as President and Chief Executive Officer of the Company.

(14)  Amount represents Mr. Mosingo's base salary for January through his resignation date.

(15)  Amount for 2003 for Mr. Mosingo consists of premiums in the amount of $4,662 and $441 paid for basic term life insurance and AD&D, respectively, under group life insurance policies, (ii) $290,333 in salary continuation, (iii) $17,970 of his perquisite allowance (pro-rata portion for termination period), (iv) $50,000 for legal fees, and (v) a $476,805 settlement payment.

(16)  Mr. Mitchell retired from the Company effective February 29, 2004.

(17)  Amount for 2003 for Mr. Mitchell consists of premiums in the amount of $2,409 and $228 paid for basic term life insurance and AD&D insurance, respectively, under group life insurance policies.

53

## Option Grants in Last Fiscal Year

Shown below is information on grants of new stock options made during the fiscal year ended December 31, 2003 to the Named Executive Officers.

| Name | Individual Grants | | | | |
| | Number of Securities Underlying Options Granted | % of Total Options Granted to Employees in 2002 | Exercise Price ($/sh) | Expiration Date | Grant Date Present Value($)(1) |
| --- | --- | --- | --- | --- | --- |
| David A. Stockman | 0 | 0% | N/A | N/A | N/A |
| J. Michael Stepp | 0 | 0% | N/A | N/A | N/A |
| Millard L. King, Jr | 0 | 0% | N/A | N/A | N/A |
| Michael G. Torakis | 0 | 0 | N/A | N/A | N/A |
| Eric White | 200,000 | 12% | $ 8.00 | 4/7/2013 | 554,000 |
| Wallace Creek | 100,000 | 6% | $ 8.00 | 4/7/2013 | 277,000 |
| Jerry Mosingo | 210,000(2) | 12% | $ 8.00 | 4/7/2013 | 581,700 |
| Michael A. Mitchell | 0 | 0% | N/A | N/A | N/A |

(1) The fair value of each option grant was estimated using the Black-Scholes option pricing model. The assumptions used in the model were weighted average expected volatility of 77.5% weighted average, risk-free interest rate of return of 3.72%, dividend yield of 0% and expected life of seven years.

(2) 2003 option grants expired in November 2003, ninety days after Mr. Mosingo's resignation in August 2003.

## Aggregated Option Exercises in Last Fiscal Year and Fiscal Year End Option Values

Shown below is information with respect to the exercise of stock options during the last fiscal year and the year-end value of unexercised options to purchase Common Stock granted to the Named Executive Officers and held by them as of December 31, 2003.

| Name | Shares Acquired on Exercise(#) | Value Realized($) | Number of Unexercised Options at Fiscal Year-End | | Value of Unexercised In-the-Money Options at Fiscal Year-End($)(1) | |
| | | | Exercisable | Unexercisable | Exercisable | Unexercisable |
| --- | --- | --- | --- | --- | --- | --- |
| David A. Stockman | 0 | 0 | 0 | 0 | 0 | 0 |
| J. Michael Stepp | 0 | 0 | 88,000 | 352,000 | 0 | 0 |
| Millard L. King, Jr. | 0 | 0 | 98,944 | 301,056 | 0 | 0 |
| Eric White | 0 | 0 | 8,000 | 232,000 | 0 | 0 |
| Michael G. Torakis | 0 | 0 | 0 | 0 | 0 | 0 |
| Wallace Creek | 0 | 0 | 0 | 100,000 | 0 | 0 |
| Jerry L. Mosingo | 0 | 0 | 0 | 0 | 0 | 0 |
| Michael A. Mitchell | 0 | 0 | 72,000 | 288,000 | 0 | 0 |

(1) No options were in the money at fiscal year-end because the exercise price of such options exceeded the closing price of the Common Stock on the New York Stock Exchange on December 31, 2003.

## 2003 Option Cancellation/ Repricing Program

On March 24, 2003, the Company cancelled 3,559,256 outstanding, variously priced options, and replaced them with options exercisable at $8.00 per share. The Company "repriced" these options in an effort to continue their effectiveness as a component of our overall compensation strategy. The following table provides additional details regarding the 2003 repricing of options for each person who was an executive officer of the Company on March 24, 2003, or who has since become an executive officer and had options repriced on March 24, 2003.

**10-Year Option/ SAR Repricing Table**

| Name | Date | Number of Securities Underlying Options/SARs Repriced or Amended (#)(1) | Market Price of Stock at Time of Repricing or Amendment ($)(2) | Exercise Price at Time of Repricing or Amendment ($)(1)(3) | New Exercise Price ($)(2) | Length of Original Option Term Remaining at Date of Repricing or Amendment (4) |
|---|---|---|---|---|---|---|
| **Gerald E. Jones** | 03/24/03 | 6,000 | 4.26 | 10.00 | 8.00 | 07/05/05 |
| Executive Vice President | | 2,000 | | 10.00 | | 3/22/10 |
| Global Manufacturing | | 172,000 | | 10.00 | | 1/15/12 |
| Operations, Fabric | | | | | | |
| **Millard L. King, Jr.** | 03/24/03 | 2,000 | 4.26 | 10.00 | 8.00 | 01/20/09 |
| President | | 2,000 | | 10.00 | | 12/01/09 |
| Global Soft Trim | | 6,000 | | 10.00 | | 03/22/10 |
| | | 13,679 | | 9.97 | | 01/28/04 |
| | | 376,321 | | 10.00 | | 1/15/12 |
| **Dianne E. Kokkinos** | 3/24/03 | 4,000 | 4.26 | 10.00 | 8.00 | 1/15/12 |
| Senior Vice President | | | | | | |
| Global Supply Chain | | | | | | |
| Management | | | | | | |
| **Dana Leavitt** | 3/24/03 | 40,000 | 4.26 | 10.00 | 8.00 | 1/15/12 |
| Former Executive Vice President | | | | | | |
| Global Manufacturing Operations, | | | | | | |
| Interior Trim and Cockpit Systems | | | | | | |
| **Michael M. Mitchell** | 3/24/03 | 360,000 | 4.26 | 10.00 | 8.00 | 1/15/12 |
| Former President | | | | | | |
| Global Commercial Operations | | | | | | |
| **Jeffrey A. Rose** | 3/24/03 | 180,000 | 4.26 | 10.00 | 8.00 | 1/15/12 |
| Senior Vice President | | | | | | |
| Global Product Development and | | | | | | |
| Technology | | | | | | |
| **J. Michael Stepp** | 3/24/03 | 440,000 | 4.26 | 10.00 | 8.00 | 1/15/12 |
| Vice Chairman of the Board and | | | | | | |
| Chief Financial Officer | | | | | | |
| **L. Gregory Tinnell** | 3/24/03 | 4,000 | 4.26 | 10.00 | 8.00 | 7/5/05 |
| Senior Vice President | | 2,000 | | 10.00 | | 2/19/07 |
| Human Resources | | 6,000 | | 10.00 | | 8/31/09 |
| | | 8,000 | | 10.00 | | 03/22/10 |
| | | 140,000 | | 10.00 | | 1/15/12 |
| **Reed A. White** | 3/24/03 | 13,353 | 4.26 | 9.9750 | 8.00 | 1/28/04 |
| President of Collins & | | 8,000 | | 10.00 | | 3/22/10 |
| Aikman Dura Convertible | | 27,357 | | 9.9750 | | 1/28/04 |
| Systems | | 101,290 | | 10.00 | | 1/15/12 |

| Name | Date | Number of Securities Underlying Options/SARs Repriced or Amended (#)(1) | Market Price of Stock at Time of Repricing or Amendment ($)(2) | Exercise Price at Time of Repricing or Amendment ($)(1)(3) | New Exercise Price ($)(2) | Length of Original Option Term Remaining at Date of Repricing or Amendment (4) |
|---|---|---|---|---|---|---|
| **Eric White** President U.S. and Mexico Plastics | 3/24/03 | 40,000 | 4.26 | 10.00 | 8.00 | 1/15/12 |

(1) These numbers have been adjusted to reflect our 1–2.5 reverse stock split on May 28, 2002.

(2) The public offering price of the offering of our Common Stock which occurred on March 22, 2003 was used to establish the exercise price of the replacement options.

(3) These numbers are the exercise prices of the options cancelled in connection with the grant of replacement options.

(4) These are the expiration dates of both the cancelled and replacement options on March 24, 2003.

## Defined Benefit or Actuarial Plan Disclosure

*C&A Co. Plan.* Provided certain eligibility requirements are met, at the end of each calendar month, pay credits are applied to a participant's account under the Collins & Aikman Corporation Employees' Pension Account Plan (the "C&A Co. Plan") based on the participant's length of credited service and compensation (as defined) during that month. For participants age 50 or older, the monthly pay credit is based on either credited service and compensation or age and compensation, whichever results in the higher amount.

The following chart sets forth how pay credits are determined under the C&A Co. Plan:

| Eligibility Requirements | | | Percentage of Compensation Used to Determine Pay Credits | |
|---|---|---|---|---|
| Service | Years of Credited -or- | Age | Up to 1/3 of the S.S. Wage Base | Over 1/3 of the S.S. Wage Base |
| Less than 10 | | Less than 50 | 2.5% | 4.5% |
| 10 – 14 | | 50 – 54 | 3.0% | 5.5% |
| 15 – 19 | | 55 – 59 | 4.0% | 6.5% |
| 20 – 24 | | 60 – 64 | 5.0% | 8.0% |
| 25 or more | | 65 or more | 6.0% | 10.0% |

The dollar amounts that result from these percentages are added together and the total is the pay credit for the month.

In addition, interest credits are applied each month to the account balance. Participants make no contributions to the C&A Co. Plan. Employer contributions are 100% vested after five years of service or at age 65, whichever is earlier, and may vest under certain other circumstances as set forth in the C&A Co. Plan. The estimated annual benefits payable upon retirement at normal retirement age under the C&A Co. Plan for Messrs. Stepp, King, Eric White, Creek and Torakis, assuming they use their account balances to purchase a single life annuity, are $11,931, $39,681, $64,452, $2,021 and $1,264, respectively. Participants in the C&A Co. Plan have the option, however, of receiving the value of their vested account in a lump sum following termination of employment. Mr. Stockman does not participate in the C&A Co. Plan.

*C&A Co. Excess Plan.* The excess benefit plan ("SRP") of Collins & Aikman Corporation works in conjunction with the C&A Co. Plan and provides to the employee any benefit which the C&A Co. Plan would have provided except for certain legal limitations under the Employee Retirement Income Security Act of 1974 and Internal Revenue Service regulations. The pay credits and interest credits are determined as

56

described with respect to the C&A Co. Plan as if no legal limitations existed, and then this plan provides any benefit which is in excess of the benefit provided under the C&A Co. Plan. The estimated annual benefits payable upon retirement at normal retirement age under the SRP for Messrs. Stepp, King, Eric White and Creek are $37,158, $16,834, $3,795 and $897, respectively. Mr. Stockman does not participate in the SRP. Mr. Torakis did not participate in the SRP in 2003. The balances in the SRP accounts of Messrs. Mosingo and Mitchell as of December 31, 2003 were $46,365 and $42,489, respectively.

*C&A Co. SRIP.* Participation in the Collins & Aikman Corporation Supplemental Retirement Income Plan (the "C&A Co. SRIP") is solely at the discretion of the Board of Directors of Products and is extended to a select group of key executives. The plan, which may be discontinued on a prospective basis at any time, provides a participating employee with a retirement benefit at or after age 62 or between ages 55 and 61 on an actuarially reduced basis. A target benefit is first calculated for each employee based on Total Annual Compensation (final base salary plus the average of the bonuses paid for the last three fiscal years) and years of service at retirement. The benefit payable from the C&A Co. SRIP is determined as the excess of the target benefit over any pension benefits payable from Social Security and any other retirement plans sponsored by the Company. An employee does not become vested in a benefit until (i) reaching age 55 and completing 10 years of service or (ii) reaching age 62.

The following table shows, for specified compensation and years of service classifications, the hypothetical annual target benefits under the C&A Co. SRIP for employees retiring at age 65, assuming that the retiring participant elects a single life annuity.

## Pension Plan Table

| Total Annual Compensation | Years of Service | | | | | |
|---|---|---|---|---|---|---|
| | 10 | 15 | 20 | 25 | 30 | 35 |
| $ 100,000 | $ 42,000 | $ 51,000 | $ 60,000 | $ 60,000 | $ 60,000 | $ 60,000 |
| 125,000 | 52,500 | 63,750 | 75,000 | 75,000 | 75,000 | 75,000 |
| 150,000 | 63,000 | 76,500 | 90,000 | 90,000 | 90,000 | 90,000 |
| 175,000 | 73,500 | 89,250 | 105,000 | 105,000 | 105,000 | 105,000 |
| 200,000 | 84,000 | 102,000 | 120,000 | 120,000 | 120,000 | 120,000 |
| 225,000 | 94,500 | 114,750 | 135,000 | 135,000 | 135,000 | 135,000 |
| 250,000 | 105,000 | 127,500 | 150,000 | 150,000 | 150,000 | 150,000 |
| 275,000 | 115,500 | 140,250 | 165,000 | 165,000 | 165,000 | 165,000 |
| 300,000 | 126,000 | 153,000 | 180,000 | 180,000 | 180,000 | 180,000 |
| 350,000 | 147,000 | 178,500 | 210,000 | 210,000 | 210,000 | 210,000 |
| 400,000 | 168,000 | 204,000 | 240,000 | 240,000 | 240,000 | 240,000 |
| 450,000 | 189,000 | 229,500 | 270,000 | 270,000 | 270,000 | 270,000 |
| 500,000 | 210,000 | 255,000 | 300,000 | 300,000 | 300,000 | 300,000 |
| 600,000 | 252,000 | 306,000 | 360,000 | 360,000 | 360,000 | 360,000 |
| 700,000 | 294,000 | 357,000 | 420,000 | 420,000 | 420,000 | 420,000 |
| 800,000 | 336,000 | 408,000 | 480,000 | 480,000 | 480,000 | 480,000 |
| 900,000 | 378,000 | 459,000 | 540,000 | 540,000 | 540,000 | 540,000 |
| 1,000,000 | 420,000 | 510,000 | 600,000 | 600,000 | 600,000 | 600,000 |
| 1,100,000 | 462,000 | 561,000 | 660,000 | 660,000 | 660,000 | 660,000 |
| 1,200,000 | 504,000 | 612,000 | 720,000 | 720,000 | 720,000 | 720,000 |
| 1,300,000 | 546,000 | 663,000 | 780,000 | 780,000 | 780,000 | 780,000 |
| 1,400,000 | 588,000 | 714,000 | 840,000 | 840,000 | 840,000 | 840,000 |
| 1,500,000 | 630,000 | 765,000 | 900,000 | 900,000 | 900,000 | 900,000 |
| 1,600,000 | 672,000 | 816,000 | 960,000 | 960,000 | 960,000 | 960,000 |

| Total Annual Compensation | Years of Service | | | | | |
|---|---|---|---|---|---|---|
| | 10 | 15 | 20 | 25 | 30 | 35 |
| 1,700,000 | 714,000 | 867,000 | 1,020,000 | 1,020,000 | 1,020,000 | 1,020,000 |
| 1,800,000 | 756,000 | 918,000 | 1,080,000 | 1,080,000 | 1,080,000 | 1,080,000 |
| 1,900,000 | 798,000 | 969,000 | 1,140,000 | 1,140,000 | 1,140,000 | 1,140,000 |
| 2,000,000 | 840,000 | 1,020,000 | 1,200,000 | 1,200,000 | 1,200,000 | 1,200,000 |
| 2,100,000 | 882,000 | 1,071,000 | 1,260,000 | 1,260,000 | 1,260,000 | 1,260,000 |
| 2,200,000 | 924,000 | 1,122,000 | 1,320,000 | 1,320,000 | 1,320,000 | 1,320,000 |
| 2,300,000 | 966,000 | 1,173,000 | 1,380,000 | 1,380,000 | 1,380,000 | 1,380,000 |
| 2,400,000 | 1,008,000 | 1,224,000 | 1,440,000 | 1,440,000 | 1,440,000 | 1,440,000 |
| $ 2,500,000 | $ 1,050,000 | $ 1,275,000 | $ 1,500,000 | $ 1,500,000 | $ 1,500,000 | $ 1,500,000 |

All the Named Executive Officers except Messrs. Stockman and Creek participated in the C&A Co. SRIP in 2003. As of December 31, 2003, Mr. Stepp had 9 years, 0 months of plan service, and at age 65 he will have had an estimated 12 years, 0 months of plan service. As of December 31, 2003, Mr. King has had 33 years, 0 months of plan service, and at age 65, he will have had an estimated 38 years, 11 months of plan service. As of December 31, 2003, Mr. Eric White has had 2 years, 3 months of plan service, and at age 65, he will have had an estimated 18 years, 8 months of plan service. Mr. Torakis did not participate in the plan in 2003. As of December 31, 2003, Mr. Mosingo had 5 years, 0 months of plan service and was vested under the plan pursuant to the terms of his August 2003 separation agreement with the Company, described below under "Employment Agreements." As of December 31, 2003, Mr. Mitchell had two years, 3 months of plan service.

## EMPLOYMENT AGREEMENTS

*J. Michael Stepp.* In January 2004, Products entered into an employment agreement with Mr. Stepp for a period of three years subject to the terms and conditions of the agreement. The agreement provides for an initial base salary of $600,000 per year. Mr. Stepp' target bonus under the annual executive incentive compensation plan is set at 100% of his base salary. The agreement provides for employee benefits and such other fringe benefits as are available to executives of the Company, including a perquisite allowance of $30,000 grossed up for income taxes. This allowance must be used for the lease/purchase of a company automobile, automobile insurance and maintenance, country club dues, financial planning or income tax preparation. In the event Mr. Stepp's employment is terminated by Products without cause or by Mr. Stepp due to "constructive termination" prior to the expiration of the term of the agreement, Mr. Stepp shall receive (i) his base salary for 24 months based on the rate in effect immediately preceding termination date, (ii) an amount equal to the amount determined by multiplying Mr. Stepp's average actual annual bonus for the prior three years by a fraction, where the numerator is the number of whole months of service worked during the year of the when the termination occurs and the denominator is 12, and (iii) an amount equal to his target bonus for the year in which such termination occurs. He will also continue to participate in the benefit plans, programs and arrangements during the severance period (with the exception of the executive physical program, long-term disability plan, and the supplemental retirement income plan) unless comparable benefit plans, programs or arrangements are offered to Mr. Stepp through another employer during the severance period. The salary continuation is to be paid in accordance with the Company's normal pay practice and the bonus would be payable in a lump sum upon the expiration of the severance period. In such event, all outstanding stock options will immediately vest and remain exercisable until the earlier of 90 days after termination or the original expiration date of said options. The agreement also provides that all of Mr. Stepp's outstanding options immediately vest upon a "Change of Control" (as defined in the term of the agreement). In addition, the Company has agreed to credit Mr. Stepp under the Company's Supplemental Retirement Income Plan with all of his years of service that preceded his break of service, and to deem him to have satisfied vesting requirements under such plan under certain circumstances.

*Millard L. King, Jr.* In August 2003, Products entered into an employment agreement with Mr. King for a period of three years subject to the terms and conditions of the agreement. The agreement provides for an initial base salary of $450,000 per year. Mr. King's target bonus under the annual executive incentive

58

compensation plan is set at 40% of his base salary. The agreement provides for employee benefits and such other fringe benefits as are available to executives of the Company, including a perquisite allowance of $20,000 grossed up for income taxes. This allowance must be used for the lease/purchase of a company automobile, automobile insurance and maintenance, country club dues, financial planning or income tax preparation. In the event Mr. King's employment is terminated by Products without cause or by Mr. King due to "constructive termination" prior to the expiration of the term of the agreement, Mr. King shall receive his base salary for 24 months based on the rate in effect immediately preceding termination date, an amount equal to the amount determined by multiplying Mr. King's average actual, annual bonus for the prior three years by a fraction, where the numerator is the number of whole months of service worked during the year of the when the termination occurs and the denominator is 12. He will also continue to participate in the benefit plans, programs and arrangements during the severance period (with the exception of the executive physical program, long-term disability plan, and the supplemental retirement income plan) unless Mr. King is offered comparable benefits plans, programs, or arrangements with another employer during the severance period. The salary continuation is to be paid in accordance with the Company's normal pay practice and the bonus would be payable in a lump sum upon the expiration of the severance period. In such event, all outstanding stock options will immediately vest and remain exercisable until the earlier of 90 days after termination or the original expiration date of said options.

*Eric White.* In August 2003, Products entered into an employment agreement with Mr. White for a period of three years subject to the terms and conditions of the agreement. The agreement provides for an initial base salary of $400,000 per year. Mr. White's target bonus under the annual executive incentive compensation plan is set at 40% of his base salary. The agreement provides for employee benefits and such other fringe benefits as are available to executives of the Company, including a perquisite allowance of $20,000 grossed up for income taxes. This allowance must be used for the lease/purchase of a company automobile, automobile insurance and maintenance, country club dues, financial planning or income tax preparation. In the event Mr. White's employment is terminated by Products without cause or by Mr. White due to "constructive termination" prior to the expiration of the term of the agreement, Mr. White shall receive his base salary for 24 months based on the rate in effect immediately preceding termination date, an amount equal to the amount determined by multiplying Mr. White's average actual annual bonus for the prior three years by a fraction, where the numerator is the number of whole months of service worked during the year of the when the termination occurs and the denominator is 12. He will also continue to participate in the benefit plans, programs and arrangements during the severance period (with the exception of the executive physical program, long-term disability plan, and the supplemental retirement income plan) unless comparable benefit plans, programs or arrangements are offered to Mr. White through another employer during the severance period. The salary continuation is to be paid in accordance with the Company's normal pay practice and the bonus would be payable in a lump sum upon the expiration of the severance period. In such event, all outstanding stock options will immediately vest and remain exercisable until the earlier of 90 days after termination or the original expiration date of said options.

*Michael G. Torakis.* In August 2003, Products entered into an employment agreement with Mr. Torakis for a period of three years subject to the terms and conditions of the agreement. The agreement provides for an initial base salary of $450,000 per year. Mr. Torakis' target bonus under the annual executive incentive compensation plan is set at 40% of his base salary, with such bonus guaranteed for 2003 (on a proportionate basis, based on the portion of 2003 in which Mr. Torakis was employed by the Company) and 2004. The agreement provides for employee benefits and such other fringe benefits as are available to executives of the Company, including a perquisite allowance of $20,000 grossed up for income taxes. This allowance must be used for the lease/purchase of a company automobile, automobile insurance and maintenance, country club dues, financial planning or income tax preparation. In the event Mr. Torakis' employment is terminated by Products without cause or by Mr. Torakis due to "constructive termination" prior to the expiration of the term of the agreement, Mr. Torakis shall receive his base salary for 24 months based on the rate in effect immediately preceding termination date, an amount equal to the amount determined by multiplying Mr. Torakis' average actual annual bonus for the prior three years by a fraction, where the numerator is the number of whole months of service worked during the year of the when the termination occurs and the denominator is 12. He will also continue to participate in the benefit plans, programs and arrangements during

59

the severance period (with the exception of the executive physical program, long-term disability plan, and the supplemental retirement income plan) unless comparable benefit plans, programs or arrangements are offered to Mr. Torakis through another employer during the severance period. The salary continuation is to be paid in accordance with the Company's normal pay practice and the bonus would be payable in a lump sum upon the expiration of the severance period. In such event, all outstanding stock options will immediately vest and remain exercisable until the earlier of 90 days after termination or the original expiration date of said options. The Company also committed to grant Mr. Torakis options to purchase 240,000 shares of the Company's common stock.

*Jerry L. Mosingo.* In August 2003, at the time of his resignation from the Company, Mr. Mosingo entered into a separation agreement with the Company. As part of this agreement, Mr. Mosingo's pre-existing employment agreement and a separate pre-existing letter agreement with the Company were terminated. Pursuant to the August 2003 separation agreement, Mr. Mosingo received a cash payment of $400,000, a bonus settlement of $76,805 and attorney fees of $50,000 payable upon execution of the agreement. The Company agreed to pay Mr. Mosingo his salary of $750,000 per year for eighteen months from the termination date. Further, it was agreed that he will receive a perquisite allowance of $30,000 per year grossed up for income taxes during the salary continuation period and be provided with continued use of the company car and all maintenance and insurance costs associated therewith. All outstanding options immediately vested and continued to be fully exercisable for 90 days. Mr. Mosingo will continue to participate in the benefit plans, programs, and arrangement of the Employer for executive employees until the earlier of the end of the salary continuation period or eligibility to receive benefits of another employer. Collins & Aikman will pay a benefit under the C&A Co. SRIP as if Mr. Mosingo were eligible for retirement at the end of the salary continuation period with 5 years of service credit and without reduction for early commencement.

*Michael Mitchell.* Mr. Mitchell's employment relationship with Collins & Aikman ended upon his retirement from the Company in February 2004. He entered into a separation agreement with Collins & Aikman on February 29, 2004. This agreement replaced Mr. Mitchell's pre-existing employment agreement, which was terminated. He is to receive 24 months of salary continuation at a rate of $34,375 per month in addition to continuation of his perquisite allowance in the amount of $30,000 per year grossed up for income taxes. He received a $75,000 lump sum payment upon execution of the agreement and will receive a $225,000 incentive payment equal to his target bonus for services during 2003. It is payable in accordance with normal incentive plan payments. Further, all vested stock options will remain exercisable for 180 days following the termination date.

*Other Named Executives.* The Company does not have employment agreements with Messrs. Stockman or Creek.

EXHIBIT D

# PART 2

**PERFORMANCE GRAPH**

The following graph compares the percentage change in the cumulative total stockholder return on the Company's Common Stock during the period beginning on December 24, 1998 and ending on December 31, 2003 with the cumulative total return of a peer group and the Standard & Poor's 500 composite index.



### 5-YEAR CUMULATIVE TOTAL RETURN AMONG COLLINS & AIKMAN CORPORATION, S&P 500 INDEX AND PEER GROUP INDICES

| Company/Market/Index | 12/24/98 | 12/29/99 | 12/29/00 | 12/31/01 | 12/31/02 | 12/31/03 |
|---|---|---|---|---|---|---|
| Collins & Aikman Corporation(1) | 100.00 | 130.45 | 95.01 | 174.69 | 40.38 | 39.29 |
| Peer Group(2) | 100.00 | 83.82 | 62.46 | 84.46 | 67.66 | 102.53 |
| S&P 500 Index(3) | 100.00 | 121.04 | 110.02 | 96.95 | 75.52 | 97.18 |

**Notes to Table**

(1)    Collins & Aikman Corporation.*

(2)    The peer group consists of the following companies: American Axle & Manufacturing, Arvinmeritor Inc., Borg Warner Inc., Dana Corporation, Delphi Corporation, Dura Automotive Systems, Intier Automotive, Johnson Controls, Inc., Lear Corporation, Tower Automotive Inc. and Visteon Corporation.*

(3)    S&P 500 — Standard & Poor's 500 Total Return Index.*

*    As compiled by Media General Financial Services of Richmond, Virginia.

## COMPENSATION OF DIRECTORS

Under the 1994 Directors Plan, each non-employee director of the Company who is not affiliated with a major stockholder, and was not affiliated with a major stockholder at the time of his or her election to the Board of Directors, received an annual automatic grant of ten-year options for 4,000 shares of Common Stock (since reverse split of Common Stock) each November. The options have a per share exercise price equal to $8.00 and are exercisable six months and one day after the date of grant. Any options not exercisable prior to a termination of the directorship are canceled. Such non-employee directors may be granted options on the same schedule pursuant to the 2002 Stock Option Plan ("2002 Plan"). Effective September 12, 2002, members of the Audit Committee additionally receive $5,000 per meeting of the Committee. Currently, only Messrs. Clark, Rudman, Dauch and Cohen are eligible to receive future grants under the 2002 Plan. Each such director also receives a fee of $80,000 per year, payable quarterly.

## COMPENSATION COMMITTEE INTERLOCKS AND INSIDER PARTICIPATION

Since April 1, 2002, the Compensation Committee has been composed of Messrs. Stockman, Tredwell and Cohen. Neither Mr. Cohen nor Mr. Tredwell is or has been an employee of the Company or any of its subsidiaries, including Products, or is or has been separately compensated for serving as an officer of the Company or any of its subsidiaries, including Products. Mr. Stockman became Chief Executive Officer of the Company on August 2003, but does not receive any compensation for such service. (See Summary Compensation Table above and Item 13, "Certain Relationships and Related Transactions" for more information regarding compensation arrangements for Mr. Stockman's service to the Company as Chief Executive Officer.) None of the executive officers who are separately compensated for serving as executive officers (or who received options) serve on the Compensation Committee. Mr. Stockman also serves on the Compensation Committee of Metaldyne. Mr. Leuliette, a director of the Company, is Chairman, President and Chief Executive Officer of Metaldyne.

Messrs. Stockman and Tredwell are senior managing directors of Heartland. See Item 12, "Security Ownership of Management and Principal Stockholders" and Item 13, "Certain Relationships and Related Transactions" Mr. Cohen is Counsel at the Canadian law firm of Cassels Brock and Blackwell.

62

**Item 12.**     *Security Ownership of Certain Beneficial Owners and Management*

Set forth in the table below is certain information as of March 1, 2004 regarding the beneficial ownership of equity securities of the Company (including securities authorized for issuance under the Company's equity compensation plans) by (i) persons who are known to the Company to own beneficially more than five percent (5%) of the Company's voting stock, (ii) directors of the Company, (iii) the executive officers of the Company named in the Summary Compensation Table set forth in Item 11, "Executive Compensation" of this Report (and referred to herein as the "Named Executive Officers") and (iv) the directors and executive officers of the Company as a group. Unless otherwise indicated, the beneficial owner has sole voting power and sole investment power over the securities shown below.

| Title of Class | Name of Beneficial Owner | Amount and Nature of Beneficial Ownership | Percent of Class |
|---|---|---|---|
| Common Stock, par value $0.01 per share | Blackstone Capital Partners L.P. 345 Park Avenue New York, NY | 4,515,229(1) | 5.4% |
| | Charles E. Becker | 7,539,262(2) | 9.0% |
| | Robert C. Clark | 36,000(3) | * |
| | Marshall A. Cohen | 8,000(3) | * |
| | Wallace W. Creek | 200,000(4) | * |
| | David C. Dauch | 4,000(4) | * |
| | Heartland Industrial Partners, L.P. 55 Railroad Avenue Greenwich, CT | 31,272,397(5) | 37.4% |
| | Cynthia L. Hess | 0(10) | |
| | Joan Fabrics Corporation 100 Vesper Executive Park Tyngsboro, MA | 5,104,000(6) | 6.1% |
| | Millard L. King, Jr. | 400,762(7) | * |
| | Timothy D. Leuliette | 0(10) | |
| | Elkin McCallum | 5,534,000(6) | 6.6% |
| | W. Gerald McConnell | 0(10) | |
| | Jerry L. Mosingo | 0(8) | |
| | Michael A. Mitchell | 72,000(4) | * |
| | Warren B. Rudman | 32,000(3) | * |
| | J. Michael Stepp | 118,067(9)(10) | * |
| | David A. Stockman | 0(10) | |
| | Daniel P. Tredwell | 0(10) | |
| | Samuel Valenti, III | 0(10) | |
| | Eric J. White | 56,000(4) | * |
| | Michael G. Torakis | 0 (11) | * % |
| | Executive officers and directors as a Group (19 persons) | 14,020,951 | 16.8 |

---

\*     Less than one percent of shares of Common Stock outstanding.

(1)     Of these shares (i) 3,554,579 shares are held directly by Blackstone Capital Partners L.P., a Delaware limited partnership ("Blackstone Partners"), the sole general partner of which is Blackstone Management Associates L.P. ("Blackstone Associates"), (ii) 183,410 shares are held directly by Blackstone Family Investment Partnership I L.P., a Delaware limited partnership ("BFIP"), the sole general

partner of which is Blackstone Management Associates I L.L.C., (iii) 16,107 shares are held directly by Blackstone Advisory Directors Partnership L.P., a Delaware limited partnership ("BADP"), the sole general partner of which is Blackstone Associates, and (iv) 761,133 shares are held directly by Blackstone Capital Company II L.L.C., a Delaware limited liability company, all the ownership interest of which is owned directly and indirectly by Blackstone Partners, BFIP and BADP.

(2)    Such shares represent (a) 5,440,000 shares acquired by Mr. Becker as consideration for the acquisition of Becker Group L.L.C., ("Becker"), (b) 339,262 shares acquired by Mr. Becker immediately following the closing of the Becker acquisition from one of the other former Becker shareholders, (c) 160,000 shares subject to presently exercisable warrants to purchase such Common Stock at $5.00 per share acquired by Mr. Becker as consideration for the Becker acquisition and (d) 1,600,000 shares acquired by Becker Ventures LLC ("Becker Ventures") as part of the financing for the Company's acquisition of Textron Automotive Company's trim division ("TAC-Trim"). Mr. Becker is the managing member of and holds a controlling interest in Becker Ventures. Mr. Becker became a Company director upon completion of the Becker acquisition and was Vice Chairman of the Board from July 2001 until July 2002. Mr. Becker is a limited partner of Heartland and disclaims beneficial ownership of all shares held by Heartland.

(3)    Represents shares underlying options granted under the 1994 Directors Stock Option Plan (the "1994 Directors Plan") and the 2002 Plan which either are vested or will vest within 60 days unless the director ceases to be a director prior to that time.

(4)    Represents shares underlying options granted under the 2002 Plan which are vested or will vest within 60 days.

(5)    The 31,272,397 shares beneficially owned are indirectly owned by Heartland Industrial Associates L.L.C. as the general partner of each of the following limited partnerships, which hold the indicated shares directly: (a) 378,887 shares are held directly by Heartland Industrial Partners (FF), L.P., a Delaware limited partnership, (b) 528,336 shares are held directly by Heartland Industrial Partners (E1), L.P., a Delaware limited partnership, (c) 245,746 shares are held directly by Heartland Industrial Partners (K1), L.P., a Delaware limited partnership, (d) 73,719 shares are held directly by Heartland Industrial Partners (C1), L.P., a Delaware limited partnership, and (e) 30,045,709 shares are held directly by Heartland.

(6)    Of these shares (a) 5,104,000 shares are held by Joan Fabrics Corporation ("Joan Fabrics") as a part of the consideration for the sale of Joan Automotive Industries, Inc. ("Joan Automotive") to a Company subsidiary and (b) 430,000 shares are held by Mr. McCallum and his spouse. The sole stockholder of Joan Fabrics is JFC Holding Trust, in which Mr. McCallum is the trustee and has a 75% beneficial interest and his spouse, Donna McCallum, owns the balance. Mr. McCallum became a director of the Company upon the consummation of the Joan acquisition.

(7)    Of these shares, (i) 762 shares are held indirectly in the Stock Fund of the 401(k) Plan and the non-qualified Shadow Retirement Income Plan (the "SRIP") and (ii) 400,000 represent shares underlying options granted under the 2002 Plan.

(8)    All shares underlying options previously granted to Mr. Mosingo under the 2002 Plan expired in November 2003.

(9)    Of these shares, (i) 26,000 are held directly, (ii) 4,067 are held indirectly in the Stock Fund of the 401(k) Plan and the SRP, and (iii) 88,000 represent shares underlying options granted under the 2002 Plan which are vested or will vest within 60 days.

(10)   As described under (5) above, 31,272,397 shares are beneficially owned by Heartland Industrial Associates, L.L.C. Mr. Stockman is the Managing Member of Heartland Industrial Associates, L.L.C., but disclaims beneficial ownership of such shares. Messrs. Leuliette, McConnell, Stepp, Tredwell and Valenti and Ms. Hess are also members of Heartland Industrial Associates, L.L.C. and also disclaim beneficial ownership of the shares.

(11)  Excludes shares held by entities owning more than 5% of the Company's voting stock, except Joan Fabrics, which are included in the holdings of Mr. McCallum. Also excludes shares held by Mr. Mitchell, who is no longer employed by the Company as of March 1, 2004.

## VOTING

As of March 1, 2004, Heartland, Blackstone Partners, Charles E. Becker, Elkin McCallum and their affiliates (collectively, the "Investors") beneficially own or have the right to vote in the aggregate approximately 58.4% of the outstanding Common Stock. See table above and Item 13, "Certain Relationships and Related Transactions."

### SECURITIES AUTHORIZED FOR ISSUANCE UNDER EQUITY COMPENSATION PLANS

The following table indicates as of December 31, 2003, for each of our existing equity compensation plans under which any of our equity securities are authorized for issuance (including the 2002 Plan), the number of shares of our Common Stock issuable upon the exercise of outstanding options, the weighted average exercise price of such options and the number of additional shares of our Common Stock still authorized for issuance under such plans. We have no individual compensation arrangements under which any of our equity securities are authorized for issuance apart from these plans, and none of our subsidiaries or affiliates have any such plans or arrangements pursuant to which any or our equity securities authorized for issuance. All of our existing equity compensation plans have been approved by our stockholders.

| Plan Category | Number of securities to be issued upon exercise of outstanding options, warrants and rights | Weighted-average exercise price of outstanding options, warrants and rights | Number of securities remaining available for future issuance under equity compensation plans (excluding securities reflected in column (a)) |
|---|---|---|---|
| | (a) | (b) | (c) |
| **Equity compensation plans approved by security holders:** | | | |
| 1993 Plan | 77,245 | 8.0000 | 188,309 |
| 1994 Directors Plan | 64,000 | 17.1039 | 0 |
| 1994 Plan | 671,267 | 9.5016 | 743,757 |
| 2002 Plan | 4,190,811 | 8.0076 | 2,409,189 |
| **Equity compensation plans not approved by security holders** N/A | | | |
| **Total** | 5,003,323 | 8.3243 | 3,341,255 |

**Item 13.**    *Certain Relationships and Related Transactions*

*Heartland*

Heartland is a private equity firm established in 1999 for the purpose of acquiring and expanding industrial companies operating in various industrial sectors of the American manufacturing economy that are well positioned for global consolidation and growth. Three of the Company's directors, Messrs. Stockman, Tredwell and McConnell, are also employed by Heartland. Mr. Valenti is a consultant to Heartland. Messrs. Leuliette and Stepp are senior managing directors of Heartland (although they are not employees of Heartland). As of March 18, 2003, Heartland beneficially owned approximately 37% of the outstanding Common Stock.

In addition to the stockholders agreements described below, the Company is engaged in transactions with Heartland that are described in "Management's Discussion and Analysis of Financial Condition and Results of Operations — Certain Transactions with Related Parties" and in Note 19 "Related Party Transactions" of the Financial Statements included in this Report.

*Charles E. Becker*

In July 2001, the Company completed the acquisition of Becker. As a result of the Becker acquisition and a purchase of Common Stock immediately afterwards, Charles Becker became one of the Company's principal stockholders. Charles Becker became a member of the Company's Board of Directors upon closing of the Becker acquisition and was Vice Chairman of the Board from July 2001 until July 2002. In addition, Becker Ventures, an affiliate of Mr. Becker, acquired additional shares of Common Stock as part of the financings in connection with the acquisition of TAC-Trim at a price of $5.00 per share. See Item 12, "Security Ownership of Certain Beneficial Owners and Management" for a discussion of Mr. Becker's beneficial ownership of Common Stock.

In addition to the stockholders agreements described below, the Company in engaged in transactions with Mr. Becker and his affiliates that are described in "Management's Discussion and Analysis of Financial Condition and Results of Operations — Certain Transactions with Related Parties" and in Note 19 "Related Party Transactions" of the Financial Statements included in this Report.

*Elkin McCallum*

In September 2001, the Company completed the acquisition of Joan Automotive, a leading supplier of body cloth to the automotive industry, and all of the operating assets of Joan Automotive's affiliated yarn dying operation, Western Avenue Dyers, L.P. As a result of the Joan acquisition, Joan Fabrics, a company controlled by Elkin McCallum, became a principal stockholder of the Company. Upon completion of the Joan acquisition, Mr. McCallum because a member of the Company's Board of Directors. See Item 12, "Security Ownership of Certain Beneficial Owners and Management" for a discussion of Joan Fabrics' and Mr. McCallum's beneficial ownership of Common Stock.

In addition to the stockholders agreements described below, the Company is engaged in transactions with Mr. McCallum and his affiliates that are described in "Management's Discussion and Analysis of Financial Condition and Results of Operations — Certain Transactions with Related Parties" and in Note 19 "Related Party Transactions" of the Financial Statements included in this Report.

*Blackstone*

Blackstone Partners is a Delaware limited partnership formed in 1987 for the purpose of, among other things, (i) committing capital to facilitate corporate restructurings, leveraged buyouts, bridge financings and other investments and (ii) capitalizing affiliates that will engage in investment and merchant banking activities. The sole general partner of Blackstone Partners is Blackstone Associates, a Delaware limited partnership. At present, the business of Blackstone Associates consists of performing the function of, and serving as, the general partner of certain limited partnerships, including Blackstone Partners. Blackstone Management Partners L.L.C. is the general partner of Blackstone Management Partners L.P. ("Blackstone Management"), and Blackstone Associates, which is the general partner of BFIP.

## Certain Agreements and Transactions

*Blackstone/ Wasserstein/ Heartland Stockholders Agreement*

The Company is a party to a stockholders agreement (the "Initial Stockholders Agreement") with Heartland and certain of its affiliates (the "Heartland parties"), Blackstone and certain of its affiliates (the "Blackstone parties") and Wasserstein L.L.C. and certain of its affiliates (the "Wasserstein parties"). The Initial Stockholders Agreement contains (i) rights of first refusal on private sales of Common Stock by the Blackstone parties and the Wasserstein parties in favor of the Heartland parties, (ii) tag-along rights in favor of the Blackstone parties and the Wasserstein parties in the event of certain transfers of Common Stock by Heartland and (iii) for so long as Heartland has a right to designate directors, a drag-along right enabling Heartland to cause the Blackstone parties and Wasserstein parties to sell all of their Common Stock with Heartland when Heartland is selling all of its Common Stock to a third party (including by merger). The Initial Stockholders Agreement further provides that the stockholder parties thereto will vote their Common

66

Stock to ensure that seven members of the Company's board will be designated by Heartland, one by the Wasserstein parties and one by the Blackstone parties (Blackstone and Wasserstein waived their right to each name a member of the board on March 15, 2002), in each case so long as each of Heartland, the Wasserstein parties and the Blackstone parties (in each case, together with its affiliates) continue to beneficially own at least 25% of the Common Stock owned by them as of February 23, 2001. In addition, there must be at least three independent directors not otherwise affiliated with the Company, the Blackstone parties, the Wasserstein parties or Heartland. The Company's chief executive officer will also serve as a director. Certain rights inure to the benefit of, and certain obligations bind, subsequent transferees of Common Stock, but none of the rights or obligations apply to public sales, whether under Rule 144 or under a registration statement.

The Initial Stockholders Agreement also contains certain restrictions on the Company's ability to enter into transactions with Heartland and its affiliates. The Company and its subsidiaries may not enter into any such transaction or series of related transactions involving payments or other consideration in excess of $500,000 without the consent of (i) each of the Blackstone parties and the Wasserstein parties, so long as each holds at least 25% of the Common Stock held by it as of February 23, 2001, for so long as Heartland and its affiliates directly or indirectly beneficially own at least 50% of the outstanding Common Stock and (ii) a majority of the members of the board who are disinterested with respect to the particular transaction and were not designated for election by Heartland so long as Heartland and its affiliates own at least 25% of the Common Stock owned by them on the date of the Initial Stockholders Agreement. The restrictions described above will not apply to (i) an advisory fee on certain acquisitions and divestitures by the Company in an amount not exceeding 1% of the enterprise value thereof and related out-of-pocket fees and expenses, (ii) transactions involving the sale, purchase or lease of goods and services in the ordinary course of business and on an arms-length basis between the Company and portfolio companies of Heartland in an amount involving not more than $1.25 million in any transaction, and (iii) certain other transactions.

In July 2003, Wasserstein Management and its affiliates distributed all of their shares of the Company's Common Stock to the partners of WP Partners, pro-rata to their respective interests in WP Partners. As a result of this distribution, the Wasserstein parties are no longer parties to the Initial Stockholders Agreement.

### Becker/ Joan/ Heartland Stockholders Agreement

There is also a stockholders agreement (the "Becker/ Joan Stockholders Agreement") among Charles E. Becker, Michael E. McInerney and Jens Höhnel (the "Becker parties"), Joan Fabrics, JFC Holdings Trust, Mr. Elkin McCallum and Donna McCallum (the "Joan parties"), the Heartland parties and the Company. The Becker/ Joan Stockholders Agreement contains (i) rights of first refusal on private sales of Common Stock by the Becker parties and the Joan parties in favor of the Heartland parties, (ii) tag-along rights in favor of the Becker parties and the Joan parties in the event of certain transfers of Common Stock by Heartland and (iii) for so long as Heartland has a right to designate directors, a drag-along right enabling Heartland to cause the Becker parties and Joan parties to sell all of their Common Stock with Heartland when Heartland is selling all of its Common Stock to a third party (including by merger).

The Becker/ Joan Stockholders Agreement further provides that the Becker parties, the Joan parties and Heartland will each vote their Common Stock to ensure that Charles E. Becker and Elkin McCallum are each members of the Company's Board of Directors, so long as the Becker parties and the Joan parties, respectively, continue to hold shares representing 25% of the Common Stock originally acquired by them. The Becker/ Joan Stockholders Agreement also provides that the Becker parties will vote their shares in favor of the election of Heartland's designees to the Company's Board of Directors. Certain rights inure to the benefit of, and certain obligations bind, subsequent transferees of Common Stock, but none of the rights or obligations apply to public sales, whether under Rule 144 or under a registration statement.

### Additional Transactions

During 2003, the Company also engaged in various transactions with Textron, Inc. and its affiliates (formerly the beneficial owners of 6% of the Company's outstanding Common Stock). Textron, Inc. and its affiliates sold all of their remaining shares of Common Stock of the Company in open market transactions in

January 2004. See Item 7, "Management's Discussion and Analysis of Financial Condition and Results of Operations — Effects of Certain Transactions with Related Parties", and Note 19 "Related Party Transactions" of the Financial Statements included in this report for additional discussion of related party transactions.

**Item 14.**    *Principal Accounting Fees and Services*

**A.    Audit Fees**

*KPMG LLP*

On June 20, 2003, the Audit Committee of the Company's Board of Directors appointed KPMG LLP as the Company's independent accountants for the year ending December 31, 2003.

**2003 Fees:** Fees for all services provided by KPMG for the year ended December 31, 2003 were as follows:

- **Audit Fees:** Aggregate fees for professional services rendered by KPMG LLP in connection with its audit of the Company's consolidated financial statements as of and for the year ended December 31, 2003, and its limited reviews of the Company's unaudited consolidated interim financial statements as of and for the year ended December 31, 2003 and its limited reviews of the Company's unaudited consolidated interim financial statements were $1.1 million.

- **All Other Fees:** In addition to the fees described above, aggregate fees of $0.3 million (a) were billed by KPMG LLP during the year ended December 31, 2003, primarily for the following professional services (in millions):

| | |
|---|---|
| Audit-related services(b) | $0.1 |
| Income tax compliance and related tax services | $ — |
| All other products and services(c) | $0.2 |

---

(a)    0% of these fees were covered by the *de minimus* safe harbor exception from Audit Committee pre-approval set forth in Rule 2-01(c)7(ii) (C) of the Securities and Exchange Commission's Regulation S-X (17 CFR 210.2-1(c)(7)(C)).

(b)    Audit-related fees primarily include fees for audits of the Company's employee benefit plans.

(c)    ISO compliance.

**2002 Fees:** During the year ended December 31, 2002, KPMG LLP was not engaged as an independent accountant to audit either the financial statements of the Company or any of its subsidiaries, nor was it consulted regarding the application of accounting principles to any specific transaction, either completed or proposed, or the type of audit opinion that might be rendered on the Company's financial statements, or any matter that was the subject of a disagreement or reportable event.

*PricewaterhouseCoopers LLP*

PricewaterhouseCoopers LLP ("PricewaterhouseCoopers") served as the Company's independent accountants during the year ended December 31, 2002.

**2002 Fees:** Fees for all services provided by PricewaterhouseCoopers for the year ended December 31, 2002 were as follows:

- **Audit Fees:** Aggregate fees for professional services rendered by PricewaterhouseCoopers in connection with its audit of the Company's consolidated financial statements as of and for the year ended December 31, 2002 and its limited reviews of the Company's unaudited consolidated interim financial statements were $1.4 million.

• **Financial Information Systems Design and Implementation Fees:** During the year ended December 31, 2002, PricewaterhouseCoopers rendered no professional services to the Company in connection with the design and implementation of financial information systems.

• **All Other Fees:** In addition to the fees described above, aggregate fees of $5.0 million were billed by PricewaterhouseCoopers during the year ended December 31, 2002, primarily for the following professional services (in millions):

| | |
|---|---|
| Audit-related services(e) | $3.4 |
| Income tax compliance and related tax services | $1.6 |
| All other products and services | $ — |

---

(e)  Audit-related fees include fees include fees for acquisition support activities, issuance of comfort letters and audits of the Company's employee benefit plans.

(f)  These fees consist of tax consulting services and compliance services.

**B.  Audit Committee's Pre-Approval Policies for Auditor Services**

The Audit Committee's policies permit the Company's independent accountants (KPMG LLP) to provide audit-related services, tax services and non-audit services to the Company during 2003, subject to the following conditions:

(1) KPMG LLP will not be engaged to provide any services that may compromise its independence under applicable laws and regulations, including rules and regulations of the Securities and Exchange Commission, the Public Company Accounting Oversight Board, and the New York Stock Exchange;

(2) KPMG LLP and the Company will enter into engagement letters authorizing the specific audit-related tax or non-audit services and setting forth the cost of such services;

(3) The Company is authorized, without additional Audit Committee Approval, to engage KPMG LLP to provide (a) Audit-related and tax services, including due diligence and tax planning related to acquisitions where KPMG LLP does not audit the target company, to the extent that the cost of such engagement does not exceed $250,000, (b) due diligence and tax planning related to acquisitions where KPMG LLP audits the target company, to the extent the cost of such engagement does not exceed $20,000, and (c) services not otherwise covered by (a) or (b) above to the extent the cost of such engagements does not exceed $150,000; provided, however, that the aggregate amount of all such engagements under (a), (b) and (c) may not exceed $350,000 in any calendar quarter;

(4) The Chairman of the Audit Committee will be promptly notified of each engagement, and the Audit Committee will be updated quarterly on all engagements, including fees.

# PART IV

**Item 15.** *Exhibits, Financial Statement Schedules and Reports on Form 8-K*

(a)(1) Financial Statements:

|  | Page Number |
|---|---|
| Independent Auditors' Report | F-1 |
| Report of Independent Accountants | F-2 |
| Consolidated Statements of Operations for the years ended December 31, 2003, 2002 and 2001 | F-3 |
| Consolidated Balance Sheets at December 31, 2003 and 2002 | F-4 |
| Consolidated Statements of Cash Flows for the years ended December 31, 2003, 2002 and 2001 | F-5 |
| Consolidated Statements of Common Stockholders' Equity (Deficit) for the years ended December 31, 2003, 2002 and 2001 | F-6 |
| Notes to Consolidated Financial Statements | F-7 |

(a)(2) Financial Schedules:

The following financial statement schedules of Collins & Aikman Corporation for the years ended December 31, 2003, 2002, and 2001 are filed as part of this Report and should be read in conjunction with the Consolidated Financial Statements of Collins & Aikman Corporation.

|  | Page Number |
|---|---|
| Schedule I — Condensed Financial Information of Registrant | S-1 |
| Schedule II — Valuation and Qualifying Accounts | S-1 |

All other schedules, for which provision is made in the applicable accounting regulations of the Securities and Exchange Commission are omitted because they are not required, are inapplicable or the information is included in the Consolidated Financial Statements or Notes thereto.

(a)(3) Exhibits:

*Please note that in the following description of exhibits, the title of any document entered into, or filing made, prior to July 7, 1994 reflects the name of the entity, a party thereto or filing, as the case may be, at such time. Accordingly, documents and filings described below may refer to Collins & Aikman Holdings Corporation, Collins & Aikman Group, Inc. or Wickes Companies, Inc., if such documents and filings were made prior to July 7, 1994.*

| Exhibit Number | Description |
|---|---|
| 2.1 | Agreement and Plan of Merger dated May 14, 2001 by and among Collins & Aikman Corporation, Collins & Aikman Products Co., Becker Group, L.L.C., CE Becker Inc., ME McInerney Inc., J Hoehnel Inc. and the individuals party thereto as sellers is hereby incorporated by reference to Exhibit 2.1 of Collins & Aikman Corporation's Current Report on Form 8-K dated and filed July 13, 2001. |
| 2.2 | Agreement and Plan of Merger dated as of August 17, 2001 by and among Collins & Aikman Corporation, Collins & Aikman Products Co., JAII Acquisition Co., Elkin McCallum, Joan Fabrics Corporation and Joan Automotive Industries, Inc is hereby incorporated by reference to Exhibit 2.1 of Collins & Aikman Corporation's Current Report on Form 8-K dated September 21, 2001 and filed October 10, 2001. |
| 2.3 | First Amendment to Agreement and Plan of Merger by and among Collins & Aikman Corporation, Collins & Aikman Products Co., JAII Acquisition Co., Elkin McCallum, Joan Fabrics Corporation and Joan Automotive Industries, Inc dated as of September 21, 2001 is hereby incorporated by reference to Exhibit 2.2 of Collins & Aikman Corporation's Current Report on Form 8-K dated September 21, 2001 and filed October 10, 2001. |

70

| Exhibit Number | Description |
|---|---|
| 2.4 | Second Amendment to the Receivables Transfer Agreement among Collins & Aikman Products Co., Carcorp, Inc., the conduit purchasers party thereto from time to time, the committed purchasers party thereto from time to time, the funding agents party thereto from time to time and JPMorgan Chase Bank, as administrative agent, dated as of December 18, 2003 to the Receivables Transfer Agreement, dated December 20, 2001, as amended and restated as of September 24, 2002.* |
| 2.5 | Purchase Agreement dated as of August 7, 2001, as amended and restated as of November 30, 2001, by and among Textron Inc., Collins & Aikman Corporation and Collins & Aikman Products Co., including Exhibit 1 (Certificate of Designation of the 15% Series A Redeemable Preferred Stock, the 16% Series B Redeemable Preferred Stock and the 16% Series C Redeemable Preferred Stock) and Exhibit 7 (Asset Purchase Agreement dated as of August 7 by and between Textron Automotive Exteriors Inc. and JPS Automotive, Inc.), which is incorporated by reference to Collins and Aikman Corporation Current Report on Form 8-k dated December 20, 2001 and filed on January 4, 2002. The Table of Contents of the Purchase Agreement listed as Exhibit 2.4 contains a list briefly identifying the contents of all omitted schedules and exhibits. Collins & Aikman Corporation will supplementally furnish a copy of any omitted schedule or Exhibit to the Commission upon request. |
| 2.6 | Asset Purchase Agreement dated as of August 7, 2001, as amended and restated as of November 30, 2001, by and between Textron Automotive Exteriors Inc. and JPS Automotive, Inc., which is incorporated herein by reference to Exhibit 2.2 of Collins & Aikman Corporation's Current Report on Form 8-K dated December 20, 2001 and filed on January 4, 2002. |
| 2.7 | Asset Purchase Agreement dated as of August 17, 2001 by and among Collins & Aikman Products Co., Western Avenue Dyers, L.P., Elkin McCallum, Kerry McCallum, Penny Richards and Tyng Textiles LLC, which is incorporated by reference to Exhibit 2.3 to Collins & Aikman Corporation's Current Report on Form 8-K filed on October 4, 2001. |
| 2.8 | First Amendment to Asset Purchase Agreement dated as of September 21, 2001, which is incorporated by reference to Exhibit 2.4 to Collins & Aikman Corporation's Current Report on Form 8-K filed on October 4, 2001. |
| 3.1 | Restated Certificate of Incorporation of Collins & Aikman Corporation is hereby incorporated by reference to Exhibit 3.1 of Collins & Aikman Corporation's Report on Form 10-Q for the fiscal quarter ended June 26, 1999 and filed August 10, 1999. |
| 3.2 | Certificate of Amendment to the Restated Certificate of Incorporation of Collins & Aikman Corporation, which is incorporated by reference to Exhibit 3.2 of Collins & Aikman Corporation's Annual Report on Form 10-K for the fiscal year ended December 31, 2000 and filed April 2, 2001. |
| 3.3 | Certificate of Amendment of Amended and Restated Certificate of Incorporation is hereby incorporated by reference to Exhibit 3.5 of Collins & Aikman Corporation's Current Report on Form 8-K filed May 29, 2002. |
| 3.4 | By-laws of Collins & Aikman Corporation, as amended, are hereby incorporated by reference to Exhibit 3.2 of Collins & Aikman Corporation's Report on Form 10-K for the fiscal year ended January 27, 1996 and filed April 22, 1996. |
| 3.5 | Certificate of Elimination of Cumulative Exchangeable Redeemable Preferred Stock of Collins & Aikman Corporation is hereby incorporated by reference to Exhibit 3.3 of Collins & Aikman Corporation's Report on Form 10-Q for the fiscal quarter ended October 28, 1995 and filed December 8, 1995. |
| 4.1 | Specimen Stock Certificate for the Common Stock is hereby incorporated by reference to Exhibit 4.3 of Amendment No. 3 to Collins & Aikman Holdings Corporation's Registration Statement on Form S-2 (Registration No. 33-53179) filed June 21, 1994. |

71

| Exhibit Number | Description |
| --- | --- |
| 4.2 | Indenture, dated as of June 1, 1996, between Collins & Aikman Products Co., Collins & Aikman Corporation and First Union National Bank of North Carolina, as Trustee, is hereby incorporated by reference to Exhibit 4.2 of Collins & Aikman Corporation's Report on Form 10-Q for the fiscal quarter ended April 27, 1996 and filed June 11, 1996. |
| 4.3 | First Supplemental Indenture dated as of June 1, 1996, between Collins & Aikman Products Co., Collins & Aikman Corporation and First Union National Bank of North Carolina, as Trustee, is hereby incorporated by reference to Exhibit 4.3 of Collins & Aikman Corporation's Report on Form 10-Q for the fiscal quarter ended April 27, 1996 and filed June 11, 1996. |
| 4.4 | Second Supplemental Indenture, dated as of February 8, 2001, by and among Collins & Aikman Products Co., as Issuer, Collins & Aikman Corporation, as Guarantor, and First Union National Bank, as Trustee, which is incorporated by reference to Exhibit 4.11 of Collins & Aikman Corporation's Annual Report on Form 10-K for the fiscal year ended December 31, 2000 and filed April 1, 2002. |
| 4.5 | Form of Warrant is hereby incorporated by reference to Exhibit 4.1 of Collins & Aikman Corporation's Current Report on Form 8-K dated and filed July 13, 2001. |
| 4.6 | Certificate of Designation of Series A Redeemable Preferred Stock, Series B Redeemable Preferred Stock and Series C Redeemable Preferred Stock, which is incorporated herein by reference to Exhibit 4.1 of Collins & Aikman Corporation's Current Report of Form 8-K dated December 20, 2001 and filed on January 4, 2002. |
| 4.7 | Indenture dated as of December 20, 2001 by and among Collins & Aikman Products Co., as Issuer, the Guarantors parties thereto, and BNY Midwest Trust Company, as Trustee, which is incorporated herein by reference to Exhibit 4.2 of Collins & Aikman Corporation's Current Report on Form 8-K dated December 20, 2001 and filed on January 4, 2002. |
| 4.8 | Receivables Transfer Agreement dated as of December 20, 2001 by and among Carcorp, Inc., as Transferor, Collins & Aikman Products Co., individually and as Collection Agent, the persons parties thereto, as CP Conduit Purchasers, Committed Purchasers and Funding Agents and JPMorgan Chase Bank, as Administrative Agent, which is incorporated herein by reference to Exhibit 4.3 of Collins & Aikman Corporation's Current Report on Form 8-K dated December 20, 2001 and filed on January 4, 2002. |
| 4.9 | Amended and Restated Receivables Purchase Agreement dated as of December 20, 2001 among Collins & Aikman Products Co. and its wholly-owned direct and indirect subsidiaries named therein, as Sellers, and Carcorp, Inc., as Purchaser, and the other Sellers from time to time named therein, which is incorporated herein by reference to Exhibit 4.4 of Collins & Aikman Corporation's Current Report on Form 8-K dated December 20, 2001 and filed on January 4, 2002. |
| 4.10 | Credit Agreement dated as of December 20, 2001 among Collins & Aikman Products Co., as Borrower, Collins & Aikman Canada Inc., as a Canadian Borrower, Collins & Aikman Plastics, Ltd., as a Canadian Borrower, Collins & Aikman Corporation, the Lenders named therein, Deutsche Banc Alex. Brown Inc. and Merrill Lynch Capital Corporation, as Co-Documentation Agents, Credit Suisse First Boston Corporation, as Syndication Agent, JPMorgan Chase Bank, as Administrative Agent, and J.P.Morgan Bank Canada, as Canadian Administrative Agent, which is incorporated herein by reference to Exhibit 4.5 of Collins & Aikman Corporation's Current Report on Form 8-K dated December 20, 2001 and filed on January 4, 2002. |
| 4.11 | First Amendment dated as of December 13, 2002, to the Credit Agreement dated as of December 20, 2001 among Collins & Aikman Products Co., as Borrower, Collins & Aikman Canada Inc., as a Canadian Borrower, Collins & Aikman Plastics, Ltd., as a Canadian Borrower, Collins & Aikman Corporation, the Lenders named therein, Credit Suisse First Boston Corporation, as Syndication Agent, Deutsche Bank Securities Inc. (formerly known as Deutsche Banc Alex. Brown Inc.) and Merrill Lynch Capital Corporation, as Co-Documentation Agents, JPMorgan Chase Bank, as Administrative Agent, and J.P. Morgan Bank Canada, as Canadian Administrative Agent is hereby incorporated by reference to Exhibit 4.17 of Collins & Aikman Corporation's report on Form 10-K for the year ended December 31, 2002. |

| Exhibit Number | Description |
|---|---|
| 4.12 | Second Amendment dated May 2, 2003 to the Credit Agreement dated December 20, 2001 which is incorporated herein by reference to Exhibit 10.1 of Collins & Aikman Corporation's Report on Form 10-Q dated March 31, 2003 and filed on May 15, 2003. |
| 4.13 | Third Amendment dated September 23, 2003 to the Credit Agreement dated December 20, 2001 which is incorporated herein by reference to Exhibit 4.2 of Collins & Aikman Corporation's Report on Form 10-Q dated September 30, 2003 and filed on November 11, 2003. |
| 4.14 | Fourth Amendment dated October 7, 2003 to the Credit Agreement dated December 20, 2001 which is incorporated herein by reference to Exhibit 4.3 of Collins & Aikman Corporation's Report on Form 10-Q dated September 30, 2003 and filed on November 11, 2003. |
| 4.15 | Fifth Amendment dated February 13, 2004 to the Credit Agreement dated December 20, 2001.* |
| 4.16 | Guarantee and Collateral Agreement dated as of December 20, 2001 by and among Collins & Aikman Corporation, Collins & Aikman Products Co. and certain of their subsidiaries and JPMorgan Chase Bank, as Collateral Agent, which is incorporated herein by reference to Exhibit 4.6 of Collins & Aikman Corporation's Current Report on Form 8-K dated December 20, 2001 and filed on January 4, 2002. |
| 4.17 | Third Supplemental Indenture, dated as of December 20, 2001, among Collins & Aikman Products Co., Collins & Aikman Corporation, the Subsidiary Guarantors listed on the signature page thereto, and First Union National Bank (as successor in interest to First Union National Bank of North Carolina), which is incorporated herein by reference to Exhibit 4.7 of Collins & Aikman Corporation's Current Report on Form 8-K dated December 20, 2001 and filed on January 4, 2002. |
| 4.18 | Amendment and Waiver, dated August 26, 2003 to the Receivables Transfer Agreement dated December 21, 2001 which is incorporated herein by reference to Exhibit 4.1 of Collins & Aikman Corporation's Report on Form 10-Q dated September 30, 2003 and filed on November 11, 2003. |
| 4.19 | Registration Rights Agreement, dated February 23, 2001, by and among Collins & Aikman Corporation, Heartland Industrial Partners, L.P. and the other investor stockholders listed on Schedule 1 thereto, Blackstone Capital Company II, L.L.C., Blackstone Family Investment Partnership I L.P., Blackstone Advisory Directors Partnership L.P., Blackstone Capital Partners, L.P. and Wasserstein/C&A Holdings, L.L.C., incorporated by reference to Annex D to Exhibit 10.1 to Collins & Aikman Corporation's Current Report on Form 8-K dated January 12, 2001 and filed January 16, 2001. |
| 4.20 | Stockholders Agreement dated July 3, 2001, by and among Collins & Aikman Corporation, Heartland Industrial Partners, L.P. and the other Heartland Entities named therein, the Becker Stockholders party thereto and the Joan Stockholders party thereto is hereby incorporated by reference to Exhibit 10.85 of Collins & Aikman Corporation's Report on Form 10-K for the year ended December 31, 2001 and filed April 1, 2002. |
| 4.21 | Registration Rights Agreement, dated December 20, 2001, by and among Collins & Aikman Products Co., Collins & Aikman Corporation, and each of the subsidiaries listed on the signature pages thereof, and J.P. Morgan Securities Inc., Credit Suisse First Boston Corporation, Deutsche Banc Alex. Brown Inc. and Merrill Lynch, Pierce, Fenner & Smith Incorporated and the other several initial purchasers parties to the Purchase Agreement is hereby incorporated by reference to Exhibit 10.89 of Collins & Aikman Corporation's Report on Form 10-K for the year ended December 31, 2001 and filed April 1, 2002. |
| 4.22 | Registration Rights Agreement dated as of December 20, 2001 by and among Becker Ventures, LLC, Dresdner Kleinwort Capital Partners 2001 LP, Masco Capital Corporation, ML IBK Positions, Inc. and Collins & Aikman Corporation is hereby incorporated by reference to Exhibit 10.90 of Collins & Aikman Corporation's Report on Form 10-K for the year ended December 31, 2001 and filed April 1, 2002. |

| Exhibit Number | Description |
|---|---|
| 4.23 | Registration Rights Agreement, dated December 20, 2001, by and between Collins & Aikman Corporation, Textron Inc., and Textron Holdco Inc is hereby incorporated by reference to Exhibit 10.91 of Collins & Aikman Corporation's Report on Form 10-K for the year ended December 31, 2001 and filed April 1, 2002. |
| 4.24 | Preferred Stock Registration and Other Rights Agreement, dated as of December 20, 2001, by and among Collins & Aikman Products Co. and Textron Inc is hereby incorporated by reference to Exhibit 10.92 of Collins & Aikman Corporation's Report on Form 10-K for the year ended December 31, 2001 and filed April 1, 2002. |
| 10.1 | Employment Agreement, dated as of April 1, 2000, between Collins & Aikman Products Co. and an executive officer is hereby incorporated by reference to Exhibit 10.3 of Collins & Aikman Corporation's Report on Form 10-Q for the fiscal quarter ended July 1, 2000. |
| 10.2 | 1993 Employee Stock Option Plan, as amended and restated, is hereby incorporated by reference to Exhibit 10.13 of Collins & Aikman Corporation's Report on Form 10-Q for the fiscal quarter ended April 29, 1995. |
| 10.3 | 1994 Employee Stock Option Plan, as amended through February 7, 1997, is hereby incorporated by reference to Exhibit 10.12 of Collins & Aikman Corporation's Report on Form 10-Q for the fiscal quarter ended March 29, 1997. |
| 10.4 | 2000 Employee Stock Option Plan is hereby incorporated by reference to Exhibit 10.6 of Collins & Aikman Corporation's Report on Form 10-Q for the fiscal quarter ended July 1, 2000. |
| 10.5 | 1994 Directors Stock Option Plan as amended and restated is hereby incorporated by reference to Exhibit 10.15 to Collins & Aikman Corporation's Report on Form 10-K for the year ended December 26, 1998. |
| 10.6 | 1994 Employee Stock Option Plan, as amended and restated through June 3, 1999 is hereby incorporated by reference to Exhibit 10.2 of Collins & Aikman Corporation's Report on Form 10-Q for the fiscal quarter ended June 26, 1999. |
| 10.7 | Change in Control Agreement, dated March 17, 1998, between Collins & Aikman Corporation and an executive officer is hereby incorporated by reference to Exhibit 10.22 of Collins & Aikman Corporation's Report on Form 10-Q for the fiscal quarter ended March 28, 1998. |
| 10.8 | Change in Control Agreement, dated March 17, 1998, between Collins & Aikman Corporation and an executive officer is hereby incorporated by reference to Exhibit 10.29 of Collins & Aikman Corporation's Report on Form 10-K for the fiscal year ended December 25, 1999. |
| 10.9 | Change in Control Agreement, dated as of April 1, 2000, between Collins & Aikman Products Co. and an executive officer is hereby incorporated by reference to Exhibit 10.4 of Collins & Aikman Corporation's Report on Form 10-Q for the fiscal quarter ended July 1, 2000. |
| 10.10 | Stockholders Agreement, dated February 23, 2001, by and among Collins & Aikman Corporation, Heartland Industrial Partners, L.P. and other investor stockholders listed on Schedule 1 thereto, Blackstone Capital Company II, L.L.C., Blackstone Family Investment Partnership I L.P., Blackstone Capital Partners L.P., and Wasserstein/C&A Holdings, L.L.C., incorporated by reference to Annex E to Exhibit 10.1 to Collins & Aikman Corporation's Current Report on form 8-K dated January 12, 2001 and filed January 16, 2001. |
| 10.11 | Share Purchase Agreement, dated as of January 12, 2001, between Collins & Aikman Corporation and Heartland Industrial Partners, L.P., is hereby incorporated by reference to Exhibit 10.1 of Collins & Aikman Corporation's Report on Form 8-K dated January 12, 2001, incorporated by reference to Exhibit 10.1 to Collins & Aikman Corporation's Current Report on Form 8-K dated January 12, 2001 and filed January 16, 2001. |
| 10.12 | Services Agreement, dated as of February 23, 2001, by and among Collins & Aikman Corporation, Collins & Aikman Products Co. and Heartland Industrial Partners, L.P is hereby incorporated by reference to Exhibit 10.59 of Collins & Aikman Corporation's Report on Form 10-K for the year ended December 31, 2001 and filed April 1, 2002. |

74

| Exhibit Number | Description |
|---|---|
| 10.13 | Profit Participation Interest Agreement, dated as of February 23, 2001, by and among Heartland Industrial Partners, L.P. and the other investor stockholders listed on Schedule 1 thereto and each of Collins & Aikman Corporation, Blackstone Capital Company II, L.L.C. and Wasserstein/C&A Holdings, L.L.C., incorporated by reference to Annex B to Exhibit 10.1 to Collins & Aikman Corporation's Current Report on Form 8-K dated January 12, 2001 and filed January 16, 2001. |
| 10.14 | Severance Benefit Agreement dated August 9, 1999 between Collins & Aikman Corporation and an executive officer is hereby incorporated by reference to Exhibit 10.32 of Collins & Aikman Corporation's Report on Form 10-K for the fiscal year ended December 25, 1999. |
| 10.15 | Employment Agreement dated December 1, 2000 between Collins & Aikman Products Co. and an executive officer, which is incorporated by reference to Exhibit 10.75 of Collins & Aikman Corporation's Annual Report on Form 10-K for the fiscal year ended December 31, 2000. |
| 10.16 | Employment Agreement dated as of April 1, 2000, between Collins & Aikman Products Co. and an executive officer is hereby incorporated by reference to Exhibit 10.3 of Collins & Aikman Corporation's Report on Form 10-Q for the quarter ended July 1, 2000. |
| 10.17 | Service Contract between Collins & Aikman Products GmbH and an executive officer, which is incorporated by reference to Exhibit 10.5 of Collins & Aikman Corporation's Quarterly Report on Form 10-Q for the quarter ended June 30, 2001 and filed August 14, 2001. |
| 10.18 | Lease Agreement, dated as of June 29, 2001, between New King, L.L.C., as landlord, and Collins & Aikman Products Co., as tenant is hereby incorporated by reference to Exhibit 10.82 of Collins & Aikman Corporation's Report on Form 10-K for the year ended December 31, 2001 and filed April 1, 2002. |
| 10.19 | Lease Agreement, dated as of June 29, 2001, between Anchor Court, L.L.C., as landlord and Collins & Aikman Products Co., as tenant is hereby incorporated by reference to Exhibit 10.84 of Collins & Aikman Corporation's Report on Form 10-K for the year ended December 31, 2001 and filed April 1, 2002. |
| 10.20 | Registration Rights Agreement, dated July 3, 2001, by and among Collins & Aikman Corporation, Charles E. Becker, Michael E. McInerney and Jens Höhnel and, together with the Joan Investors (as defined therein) is hereby incorporated by reference to Exhibit 10.86 of Collins & Aikman Corporation's Report on Form 10-K for the year ended December 31, 2001 and filed April 1, 2002. |
| 10.21 | First Amendment to Services Agreement, dated as of August 7, 2001, among Collins & Aikman Corporation, Collins & Aikman Products Co. and Heartland Industrial Partners, L.P is hereby incorporated by reference to Exhibit 10.87 of Collins & Aikman Corporation's Report on Form 10-K for the year ended December 31, 2001 and filed April 1, 2002. |
| 10.22 | Equipment Lease, dated as of December 18, 2001, among Textron Automotive Exteriors Inc. and Textron Automotive Interiors Inc., collectively as lessee, and IAC TAX V, LLC, as lessor is hereby incorporated by reference to Exhibit 10.88 of Collins & Aikman Corporation's Report on Form 10-K for the year ended December 31, 2001 and filed April 1, 2002. |
| 10.23 | Intellimold Technology License and Support Agreement, dated as of December 20, 2001, by and between Textron, Inc. and Collins & Aikman Corporation and Collins & Aikman Products Co is hereby incorporated by reference to Exhibit 10.93 of Collins & Aikman Corporation's Report on Form 10-K for the year ended December 31, 2001 and filed April 1, 2002. |
| 10.24 | Technology License Agreement (Retained IP), dated as of December 20, 2001, by and between Textron, Inc. and Collins & Aikman Corporation and Collins & Aikman Products Co is hereby incorporated by reference to Exhibit 10.94 of Collins & Aikman Corporation's Report on Form 10-K for the year ended December 31, 2001 and filed April 1, 2002. |
| 10.25 | Technology License Agreement (Licensed-Back IP), dated as of December 20, 2001, by and between Textron, Inc. and Collins & Aikman Corporation and Collins & Aikman Products Co is hereby incorporated by reference to Exhibit 10.95 of Collins & Aikman Corporation's Report on Form 10-K for the year ended December 31, 2001 and filed April 1, 2002. |

| Exhibit Number | Description |
|---|---|
| 10.26 | Employment Agreement between Products and an officer of the Company dated as of November 1, 2001 is hereby incorporated by reference to Exhibit 10.3 of Collins & Aikman Corporation's Report on Form 10-Q for the quarter ended March 31, 2002 and filed May 15, 2002. |
| 10.27 | Employment Agreement between Products and an officer of the Company dated as of November 1, 2001 is hereby incorporated by reference to Exhibit 10.4 of Collins & Aikman Corporation's Report on Form 10-Q for the quarter ended March 31, 2002 and filed May 15, 2002. |
| 10.28 | Employment Agreement between Products and an officer of the Company dated as of December 20, 2001 is hereby incorporated by reference to Exhibit 10.5 of Collins & Aikman Corporation's Report on Form 10-Q for the quarter ended March 31, 2002 and filed May 15, 2002. |
| 10.29 | Employment Agreement between Products and an officer of the Company dated as of December 20, 2001 is hereby incorporated by reference to Exhibit 10.6 of Collins & Aikman Corporation's Report on Form 10-Q for the quarter ended March 31, 2002 and filed May 15, 2002. |
| 10.30 | Employment Agreement between Products and an officer of the Company dated as of December 20, 2001 is hereby incorporated by reference to Exhibit 10.7 of Collins & Aikman Corporation's Report on Form 10-Q for the quarter ended March 31, 2002 and filed May 15, 2002. |
| 10.31 | Separation and Consultancy Agreement dated July 31, 2002 is hereby incorporated by reference to Exhibit 10.1 to Collins & Aikman Corporation's Current report on Form 8-K filed August 2, 2002. |
| 10.32 | Severance Benefit Agreement between Collins and Aikman Corporation and an officer of the Company dated April 5, 2002 is hereby incorporated by reference to Exhibit 10.2 of Collins & Aikman Corporation's Report on Form 10-Q for the quarter ended June 30, 2002 and filed August 14, 2002. |
| 10.33 | Employment and Consulting Agreement between Collins and Aikman Corporation and an Employee dated July 2002 is hereby incorporated by reference to Exhibit 10.1 of Collins & Aikman Corporation's Report on Form 10-Q for the quarter ended September 30, 2002 and filed November 14, 2002. |
| 10.34 | Separation Agreement between Collins and Aikman Corporation and an officer of the Company dated October 2002 is hereby incorporated by reference to Exhibit 10.3 of Collins & Aikman Corporation's Report on Form 10-Q for the quarter ended September 30, 2002 and filed November 14, 2002. |
| 10.35 | Employment Agreement between Collins & Aikman Corporation and an officer of the Company dated January 25, 2004. |
| 10.36 | Amendment to Employment Agreement between Collins & Aikman Corporation and an officer of the Company dated January 25, 2004. |
| 10.37 | Separation Agreement between Collins & Aikman Corporation and an officer of the Company dated February 29, 2004. |
| 11 | Computation of Earnings Per Share.* |
| 12.1 | Computation of Ratio of Earnings to Fixed Charges.* |
| 21 | Subsidiaries of the Registrant.* |
| 23.1 | Consent of KPMG.* |
| 23.2 | Consent of PricewaterhouseCoopers.* |
| 24.1 | Powers of Attorney.* |
| 31.1 | Certification Pursuant to Section 302 of Sarbanes-Oxley Act of 2002.* |
| 31.2 | Certification Pursuant to Section 302 of Sarbanes-Oxley Act of 2002.* |

| Exhibit Number | Description |
|---|---|
| 32.1 | Certification Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 (Chapter 63, Title 18 U.S.C. 1350(a) and (b)).* |
| 99 | Voting Agreement between Blackstone Capital Partners L.P. and Wasserstein Perella Partners, L.P. is hereby incorporated by reference to Exhibit 99 of Amendment No. 4 to Collins & Aikman Holdings Corporation's Registration Statement on Form S-2 (Registration No. 33-53179) filed June 27, 1994. |

---

* Indicates document filed herewith.

(b) Reports on Form 8-K

The Company filed the following Reports on Form 8-K covering the following items:

November 13, 2003          Item 9 Regulation FD Disclosure and Item 12 Results of Operations and Financial Condition

77

## SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities and Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized, on the 16th day of March 2004.

COLLINS & AIKMAN CORPORATION

BY: /s/ DAVID A. STOCKMAN

David A. Stockman
*Chairman of the Board & Chief Executive Officer*

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the Registrant and in the capacities and on the dates indicated.

| Signature | Title | Date |
| --- | --- | --- |
| /s/ DAVID A. STOCKMAN | Chairman of the Board & Chief Executive Officer | March 16, 2004 |
| David A. Stockman | | |
| /s/ J. MICHAEL STEPP | Vice Chairman and Chief Financial Officer (Principal Financial Officer) | March 16, 2004 |
| J. Michael Stepp | | |
| * | Director | March 16, 2004 |
| Charles E. Becker | | |
| * | Director | March 16, 2004 |
| Robert C. Clark | | |
| * | Director | March 16, 2004 |
| Marshall A. Cohen | | |
| * | Director | March 16, 2004 |
| David C. Dauch | | |
| * | Director | March 16, 2004 |
| Cynthia Hess | | |
| * | Director | March 16, 2004 |
| Timothy D. Leuliette | | |
| * | Director | March 16, 2004 |
| Elkin McCallum | | |
| * | Director | March 16, 2004 |
| W. Gerald McConnell | | |
| * | Director | March 16, 2004 |
| Warren B. Rudman | | |
| * | Director | March 16, 2004 |

Daniel P. Tredwell

| | | |
|---|---|---|
| * | Director | March 16, 2004 |

Samuel Valenti

**By: /s/ JAY KNOLL

Jay Knoll

*General Counsel*

78

## INDEPENDENT AUDITORS' REPORT

The Board of Directors and Stockholders
Collins & Aikman Corporation:

We have audited the 2003 consolidated financial statements of Collins & Aikman Corporation and subsidiaries as listed in the accompanying index. These consolidated financial statements and financial statement schedules are the responsibility of the Company's management. Our responsibility is to express an opinion on these consolidated financial statements and financial statement schedules based on our audit.

We conducted our audit in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audit provides a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of Collins & Aikman Corporation and subsidiaries as of December 31, 2003, and the results of their operations and their cash flows for the year then ended, in conformity with accounting principles generally accepted in the United States of America. Also in our opinion, the related 2003 financial statement schedules, when considered in relation to the basic consolidated financial statements taken as a whole, present fairly in a material respects, the information set forth herein.

As discussed in Note 2 to the financial statements, the Company changed its method of accounting for crib supply inventories in 2003.

/s/ KPMG LLP

Detroit, Michigan
March 15, 2004

F-1

## REPORT OF INDEPENDENT ACCOUNTANTS

To the Board of Directors and Shareholders
of Collins & Aikman Corporation:

In our opinion, the consolidated balance sheet as of December 31, 2002 and the related consolidated statements of operations, cash flows and common stockholders' equity(deficit) listed in the index appearing under Item 15(a)(1) for each of the two years in the period ended December 31, 2002 present fairly, in all material respects, the financial position, results of operations and cash flows of Collins & Aikman Corporation and its subsidiaries at December 31, 2002 and for each of the two years in the period ended December 31, 2002, in conformity with accounting principles generally accepted in the United States of America. In addition, in our opinion, the financial statement schedules listed in the index appearing under Item 15(a)(2) present fairly, in all material respects, the 2002 and 2001 information set forth therein when read in conjunction with the related consolidated financial statements. These financial statements and financial statement schedules are the responsibility of the Company's management; our responsibility is to express an opinion on these financial statements based on our audits. We conducted our audits of these statements in accordance with auditing standards generally accepted in the United States of America, which require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

As discussed in Note 2 to the consolidated financial statements, effective January 1, 2002, the Company changed its method of accounting for goodwill (and other intangible assets) in accordance with the adoption of Statement of Financial Accounting Standards No. 142, "Goodwill and Other Intangible Assets".

Effective January 1, 2003, the Company reclassified the 2001 extraordinary loss on retirement of debt to other expense (income), net, upon the adoption of Statement of Financial Accounting Standards No. 145, "Rescission of FASB Statements No. 4, 44 and 64, Amendment of FASB Statement No. 13, and Technical Corrections as of April 2002".

/s/ PricewaterhouseCoopers

Detroit, Michigan
February 18, 2003

F-2

COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES

CONSOLIDATED STATEMENTS OF OPERATIONS
(in millions, except per share data)

| | | Year Ended | |
| --- | :---: | :---: | :---: |
| | December 31, 2003 | December 31, 2002 | December 31, 2001 |
| Net sales | $ 3,983.7 | $ 3,885.8 | $ 1,823.3 |
| Cost of goods sold | 3,539.5 | 3,367.7 | 1,604.5 |
| Gross profit | 444.2 | 518.1 | 218.8 |
| Selling, general and administrative expenses | 273.2 | 293.5 | 164.4 |
| Restructuring charges | 40.6 | 38.9 | 11.2 |
| Impairment of long-lived assets | 28.4 | 18.0 | 7.6 |
| Operating income | 102.0 | 167.7 | 35.6 |
| Interest expense, net of interest income of $0.7, $1.4 and $2.0 | 151.3 | 148.9 | 84.3 |
| Interest expense from subsidiary preferred stock dividends | 32.0 | — | — |
| Interest expense from subsidiary preferred stock accretion | 5.3 | — | — |
| Subsidiary preferred stock dividends | — | 30.8 | 1.5 |
| Subsidiary preferred stock accretion | — | 7.6 | 0.9 |
| Loss on sale of receivables | 7.3 | 4.2 | 10.8 |
| Other expense (income), net | (32.9) | 10.0 | 14.4 |
| Loss from continuing operations before income taxes | (61.0) | (33.8) | (76.3) |
| Income tax expense (benefit) | (1.9) | 17.5 | (21.3) |
| Loss from continuing operations before extraordinary loss and cumulative effect of a change in accounting principle | (59.1) | (51.3) | (55.0) |
| Income from discontinued operations, net of income taxes of $0.8, $6.3 and $5.7 | 1.6 | 9.5 | 8.8 |
| Loss before cumulative effect of change in accounting principle | (57.5) | (41.8) | (46.2) |
| Cumulative effect of a change in accounting principle, net of income taxes of $0 | — | (11.7) | — |
| Net loss | $ (57.5) | $ (53.5) | $ (46.2) |
| Earnings per share data: | | | |
| Net loss | $ (57.5) | $ (53.5) | $ (46.2) |
| Loss on redemption of subsidiary preferred stock | — | (36.3) | — |
| Net loss attributable to common shareholders | $ (57.5) | $ (89.8) | $ (46.2) |
| Net income (loss) per basic and diluted common share: | | | |
| Continuing operations | $ (0.71) | $ (1.15) | $ (1.42) |
| Discontinued operations | 0.02 | 0.12 | 0.23 |
| Cumulative effect of a change in accounting principle | — | (0.15) | — |
| Net loss attributable to common shareholders | $ (0.69) | $ (1.18) | $ (1.19) |
| Average common shares outstanding: | | | |
| Basic and diluted | 83.6 | 76.3 | 38.9 |

The Notes to Consolidated Financial Statements are an integral
part of these consolidated financial statements.

F-3

COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES

CONSOLIDATED BALANCE SHEETS
(in millions)

| | December 31, 2003 | | December 31, 2002 | |
|---|---|---|---|---|
| **ASSETS** | | | | |
| Current Assets: | | | | |
| Cash and cash equivalents | $ | 13.2 | $ | 81.3 |
| Accounts and other receivables, net of allowances of $9.2 and $18.6 | | 257.3 | | 373.0 |
| Inventories | | 169.4 | | 171.6 |
| Other | | 216.0 | | 177.4 |
| Total current assets | | 655.9 | | 803.3 |
| Property, plant and equipment, net | | 825.9 | | 737.8 |
| Deferred tax assets | | 178.1 | | 165.0 |
| Goodwill | | 1,363.1 | | 1,265.5 |
| Intangible assets, net | | 66.9 | | 85.3 |
| Other assets | | 101.3 | | 100.2 |
| | $ | 3,191.2 | $ | 3,157.1 |
| | | | | |
| **LIABILITIES AND COMMON STOCKHOLDERS' EQUITY** | | | | |
| Current Liabilities: | | | | |
| Short-term borrowings | $ | 16.0 | $ | 10.5 |
| Current maturities of long-term debt and capital lease obligations | | 31.5 | | 23.5 |
| Accounts payable | | 638.9 | | 595.5 |
| Accrued expenses | | 238.9 | | 299.9 |
| Total current liabilities | | 925.3 | | 929.4 |
| Long-term debt and capital lease obligations | | 1,237.7 | | 1,255.2 |
| Mandatorily redeemable preferred stock of subsidiary | | 161.2 | | — |
| Other, including pensions and post-retirement benefit obligations | | 423.4 | | 438.4 |
| Commitments and contingencies | | | | |
| Minority interest in consolidated subsidiary | | 3.3 | | 12.7 |
| Total liabilities | | 2,750.9 | | 2,635.7 |
| Mandatorily redeemable preferred stock of subsidiary | | — | | 123.9 |
| Common stock ($.01 par value, 300.0 shares authorized, 83.6 shares issued and outstanding at December 31, 2003 and 2002) | | 0.8 | | 0.8 |
| Other paid-in capital | | 1,282.3 | | 1,282.3 |
| Accumulated deficit | | (830.1) | | (772.6) |
| Accumulated other comprehensive loss | | (12.7) | | (113.0) |
| Total common stockholders' equity | | 440.3 | | 397.5 |
| | $ | 3,191.2 | $ | 3,157.1 |

The Notes to Consolidated Financial Statements are an integral
part of these consolidated financial statements.

F-4

## COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES

### CONSOLIDATED STATEMENTS OF CASH FLOWS
(in millions)

|  | Year Ended | | | | | |
|---|---|---|---|---|---|---|
|  | December 31, 2003 | | December 31, 2002 | | December 31, 2001 | |
| **OPERATING ACTIVITIES** | | | | | | |
| Net loss | $ | (57.5) | $ | (53.5) | $ | (46.2) |
| Adjustments to derive cash flow operating activities: | | | | | | |
| Impairment of goodwill | | — | | 11.7 | | — |
| Impairment of long-lived assets | | 28.4 | | 19.3 | | 7.6 |
| Deferred income tax benefit | | (8.7) | | (3.6) | | (26.0) |
| Subsidiary preferred stock requirements | | 37.3 | | 38.4 | | 2.4 |
| Depreciation | | 113.8 | | 97.0 | | 64.2 |
| Goodwill amortization | | — | | — | | 7.1 |
| Amortization of other assets | | 26.4 | | 20.0 | | 10.5 |
| Loss (gain) on sale of property, plant and equipment | | (3.5) | | 3.4 | | 8.7 |
| Decrease in accounts and other receivables | | 32.5 | | 23.7 | | 135.0 |
| Proceeds from (reduction of) participating interests in accounts receivable, net of redemptions | | 7.8 | | (13.9) | | (2.6) |
| Proceeds from non-recourse factoring facilities | | 88.5 | | — | | — |
| Decrease (increase) in inventories | | 4.6 | | (26.6) | | 53.4 |
| Increase (decrease) in accounts payable | | 32.3 | | 50.1 | | (31.9) |
| Undistributed equity in earnings of joint ventures | | — | | 5.5 | | — |
| Increase (decrease) in interest payable | | 2.8 | | (4.0) | | (4.1) |
| Changes in other assets | | (196.2) | | 62.4 | | (6.5) |
| Changes in other liabilities | | 14.4 | | (40.5) | | (34.5) |
| Net cash provided by operating activities | | 122.9 | | 189.4 | | 137.1 |
| **INVESTING ACTIVITIES** | | | | | | |
| Additions to property, plant, and other non-current assets equipment | | (175.1) | | (147.9) | | (54.5) |
| Sales of property, plant and equipment | | 18.3 | | 13.3 | | 88.1 |
| Additional investment in joint venture | | — | | (5.9) | | — |
| Payments for acquisitions and related costs, net of cash acquired | | (33.1) | | (45.6) | | (760.9) |
| Sale of business | | — | | — | | 3.5 |
| Net cash used in investing activities | | (189.9) | | (186.1) | | (723.8) |
| **FINANCING ACTIVITIES** | | | | | | |
| Issuance of long-term debt | | 13.1 | | — | | 950.0 |
| Debt issuance costs | | — | | — | | (59.4) |
| Repayment of long-term debt | | (28.9) | | (23.9) | | (383.2) |
| Repurchase of preferred stock | | — | | (100.0) | | — |
| Increase (decrease) in short-term borrowings | | 4.7 | | (16.0) | | 10.1 |
| Net borrowings (repayments) on revolving credit facilities | | 6.3 | | — | | (150.2) |
| Net proceeds from issuance of common stock | | — | | 150.6 | | 207.2 |
| Reissue of treasury stock, net | | — | | — | | 61.3 |
| Repayment of debt assumed in acquisition | | — | | (6.7) | | — |
| Net cash provided by (used in) financing activities | | (4.8) | | 4.0 | | 635.8 |
| Effect of exchange rate changes on cash | | 3.7 | | 0.1 | | 3.9 |
| Increase (decrease) in cash and cash equivalents | | (68.1) | | 7.4 | | 53.0 |
| Cash and cash equivalents at beginning of year | | 81.3 | | 73.9 | | 20.9 |
| Cash and cash equivalents at end of year | $ | 13.2 | $ | 81.3 | $ | 73.9 |
| Supplementary information: | | | | | | |
| Debt assumed in acquisition | $ | — | $ | 6.7 | $ | — |

| | | | | | | |
|---|---|---|---|---|---|---|
| Taxes paid | $ | 18.4 | $ | 12.8 | $ | 15.5 |
| Interest paid | $ | 135.4 | $ | 139.9 | $ | 76.3 |

The Notes to Consolidated Financial Statements are an integral
part of these consolidated financial statements.

F-5

## COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES

### CONSOLIDATED STATEMENTS OF COMMON STOCKHOLDERS' EQUITY (DEFICIT)
(in millions)

| | Total | Accumulated Deficit | Accumulated Other Comprehensive Income (loss)(a) | Common Stock | Other Paid-in Capital | Treasury Stock |
|---|---|---|---|---|---|---|
| **Balance at January 1, 2001** | $(154.9) | $ (636.6) | $ (42.9) | $ 0.3 | $ 585.9 | $ (61.6) |
| Comprehensive income (loss): | | | | | | |
|   Net loss | (46.2) | (46.2) | — | — | — | — |
|   Foreign currency translation adjustments | (9.0) | — | (9.0) | — | — | — |
|   Pension equity adjustment, net of tax(b) | (15.4) | — | (15.4) | — | — | — |
|     Total comprehensive loss | (70.6) | | | | | |
| Compensation expense | 1.2 | — | — | — | 1.2 | — |
| Issuance of common stock | 533.0 | — | — | 0.4 | 532.6 | — |
| Reissue of treasury stock (8.5 shares) | 61.3 | — | — | — | (0.3) | 61.6 |
| Exercise of stock options (1.1 shares) | 4.7 | — | — | — | 4.7 | — |
| **Balance at December 31, 2001** | 374.7 | (682.8) | (67.3) | 0.7 | 1,124.1 | — |
| Comprehensive income (loss): | | | | | | |
|   Net loss | (53.5) | (53.5) | — | — | — | — |
|   Foreign currency translation adjustments | 10.7 | — | 10.7 | — | — | — |
|   Pension equity adjustment, net of tax(b) | (56.4) | — | (56.4) | — | — | — |
|     Total comprehensive loss | (99.2) | | | | | |
| Loss on redemption of subsidiary preferred stock | (36.3) | (36.3) | — | — | — | — |
| Issuance of common stock | 157.2 | — | — | 0.1 | 157.1 | — |
| Exercise of stock options (0.1 shares) | 1.1 | — | — | — | 1.1 | — |
| **Balance at December 31, 2002** | 397.5 | (772.6) | (113.0) | 0.8 | 1,282.3 | — |
| Comprehensive income (loss): | | | | | | |
|   Net loss | (57.5) | (57.5) | — | — | — | — |
|   Foreign currency translation adjustment | 110.9 | — | 110.9 | — | — | — |
|   Pension equity adjustment, net of tax(b) | (10.6) | — | (10.6) | — | — | — |
|     Total comprehensive income | 42.8 | | | | | |
| **Balance at December 31, 2003** | $ 440.3 | $ (830.1) | $ (12.7) | $ 0.8 | $1,282.3 | $ — |

(a) The components of Accumulated Other Comprehensive Income (Loss) are $70.0 million of foreign currency translation adjustment and $(82.7) million of pension equity adjustment as of December 31, 2003.

(b) For 2003, 2002 and 2001, the tax effect of the pension equity adjustment is $6.0 million, $42.6 million and $3.2 million, respectively.

The Notes to Consolidated Financial Statements are an integral part
of these consolidated financial statements.

F-6

## COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

### 1. Organization

Collins & Aikman Corporation (the "Company") is a Delaware corporation, headquartered in Troy, Michigan. The Company conducts all of its operating activities through its wholly owned Collins & Aikman Products Co. ("Products") subsidiary. The Company is a global leader in design, engineering and manufacturing of automotive interior components, including instrument panels, fully assembled cockpit modules, floor and acoustic systems, automotive fabric, interior trim and convertible top systems. The Company changed the composition of its reportable segments on January 1, 2003 and further redefined the segments July 1, 2003 to reflect organizational changes and restated prior period segment data to be comparable. The Company operates through three segments: U.S. and Mexico Plastics, International Plastics and Global Soft Trim.

During February 2001, Heartland Industrial Partners, L.P. and its affiliates ("Heartland") acquired a controlling interest equal to approximately 60% of the Company through a purchase of 10 million shares of common stock from the Company and a purchase of 10.8 million shares from Blackstone Partners and WP Partners. As a result of the sale of shares, the Company received gross proceeds of $125.0 million, or approximately $94.6 million after fees and expenses associated with the transactions. The Company also received a profit participation right that it shares with Blackstone Partners and WP Partners on future common stock sales by Heartland to non-permitted transferees subject to a limit, in the case of the Company, of approximately $6.25 million. As a result of the above transactions ("Heartland Transaction"), Heartland is entitled to designate a majority of the Company's Board of Directors.

The Company completed its acquisition of Becker Group, LLC, a supplier of plastic components to the automotive industry, the automotive fabric operations of Joan Fabrics and an affiliate in July and September 2001, respectively. The acquisitions included the issuance of approximately 12 million shares of common stock with a market value of $169.3 million.

In December 2001, the Company completed its acquisition of Textron Automotive Company's ("Textron's") automotive trim division ("TAC-Trim") for $940 million. The purchase price consisted primarily of: $632.2 million in cash and assumed debt; 7.2 million shares of common stock, with a market value of $160.9 million; and preferred stock of Products with an aggregate liquidation preference of $326.4 million, valued at $146.9 million. The cash purchase price was financed through a combination of the sale of an additional 12.8 million shares of common stock, valued at $160.0 million, to Heartland and debt financing.

On December 31, 2003, Heartland owned approximately 37% of the outstanding shares; Blackstone Partners' and WP Partners' owned approximately 11%; Joan Fabrics Corp., Mr. Elkin McCallum and associates owned approximately 6%; Mr. Charles E. Becker owned approximately 9% and Textron, Inc. owned approximately 6% (which it has subsequently sold).

### 2. Summary of Significant Accounting Policies

Basis of Presentation: The consolidated financial statements include the accounts of the Company and its consolidated subsidiaries and in the opinion of management, contain all adjustments, including adjustments of a normal and recurring nature, necessary for a fair presentation of financial position and results of operations. All significant intercompany items have been eliminated in the preparation of the consolidated financial statements. Certain prior year items have been reclassified to conform to the fiscal 2003 presentation.

Investments in entities in which the Company has control are consolidated. Investments in 50% or less owned entities in which the Company has significant influence have been accounted for under the equity method. In connection with the 2001 TAC-Trim acquisition, the Company acquired a 50% interest in Textron Automotive Holdings (Italy) S.r.L., an Italian joint venture, of which Textron indirectly owned the other 50% interest. The Company accounted for this investment under the equity method for the years ended December 31, 2002 and 2001. The Company did not control the joint venture prior to December 31, 2002 but was required to provide certain administrative, technical and engineering services and to license certain

**COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

patents and other know how to the Italian joint venture. The Company recorded certain fees and reimbursement of certain expenses in providing these services and licensing these rights. In December 2002, the Company signed a letter-of-intent to purchase the remaining 50% and began consolidating the joint venture as of December 31, 2002. In January 2003, the Company acquired from Textron the remaining 50% interest in the Italian joint venture.

Reverse Stock Split: On May 28, 2002, the Company effected a one-for-2.5 reverse stock split of the Company's common stock. All shares and per share data have been adjusted retroactively for all periods presented to reflect the stock split.

Use of Estimates: The preparation of consolidated financial statements in conformity with accounting principles generally accepted in the United States of America requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the consolidated financial statements and the reported amounts of revenues and expenses during the reporting period. Management believes its assumptions and estimates are reasonable and appropriate, however actual results could differ from those estimates.

Employee Stock Options: Statement of Financial Accounting Standards ("SFAS") No. 148, "Accounting for Stock-Based Compensation — Transition and Disclosure amended SFAS No. 123, "Accounting for Stock-Based Compensation" provides alternative methods of transition for a voluntary change to the fair value based method of accounting for stock based employee compensation and amends the required disclosures. SFAS No. 123 encourages companies to adopt the fair value method for compensation expense recognition related to employee stock options. The accounting requirements of Accounting Principles Board Opinion (APB) No. 25, "Accounting for Stock Issued to Employees" use the intrinsic value method in determining compensation expense, which represents the excess of the market price of the stock over the exercise price on the measurement date. The Company has elected to continue to utilize the accounting provisions of APB No. 25 for stock options and is required to provide pro forma disclosures of net income and earnings per share had the Company adopted the fair value method for recognition purposes. The following tabular information is presented as if the Company had adopted SFAS No. 123 and restated its results: (in millions, except per share amounts).

| | Fiscal Year Ended | | |
|---|---|---|---|
| | December 31, 2003 | December 31, 2002 | December 31, 2001 |
| Net loss attributable to common shareholders: | | | |
| As reported | $ (57.5) | $ (89.8) | $ (46.2) |
| Total employee stock based compensation expense determined under fair value based method for all awards, net of tax | (4.2) | (3.4) | (2.4) |
| Pro forma, net loss | (61.7) | (93.2) | (48.6) |
| Basic and Diluted EPS: | | | |
| As reported | $ (0.69) | $ (1.18) | $ (1.19) |
| Pro forma | (0.74) | (1.22) | (1.25) |

F-8

**COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

For the above information, the fair value of each option grant was estimated on the date of grant using the Black-Scholes option pricing model with the following assumptions used for grants:

|  | 2003 | 2002 | 2001 |
|---|---|---|---|
| Weighted average expected volatility | 77.5% | 72.0% | 99.0% |
| Expected lives | 7 years | 6 years | 10 years |
| Weighted average risk free interest rate | 3.72% | 4.24%-7.32% | 4.24%-7.32% |
| Expected dividend rate | — | — | — |
| Weighted average grant date fair value of an option granted during the year | $  2.77 | $      6.71 | $      5.22 |

Earnings Per Share: Basic earnings per share is based on income attributable to common shareholders divided by the weighted average number of common shares outstanding. Diluted earnings per share is based on income attributable to common shareholders divided by the sum of the weighted average number of common shares outstanding and all potentially dilutive common shares. Potentially dilutive common shares include shares which may be issued upon the assumed exercise of employee stock options less the number of treasury shares assumed to be purchased from the proceeds, including applicable compensation expense attributable to future service see Note 16 "Common Stockholders' Equity and Earnings Per Share" for additional disclosure.

Cash and Cash Equivalents: Cash and cash equivalents include all cash balances and highly liquid investments with an original maturity of three months or less.

Accounts and Other Receivables: Accounts and other receivables consist primarily of the Company's trade receivables and the retained interest in the Receivables Facility. See Note 11 "Receivables Facility and Non-Recourse Factoring Facilities" for additional disclosure. The Company has provided an allowance against uncollectible accounts.

Inventories: Inventories are valued at the lower of cost or market, but not in excess of net realizable value. Cost is determined on the first-in, first-out basis.

Property, Plant and Equipment: Property, plant and equipment are stated at cost. Normal repairs and maintenance are expensed as incurred. Provisions for depreciation are primarily computed on a straight-line basis over the estimated useful lives as follows: 15 years for land improvements, 35 years for buildings, and 3-20 years for machinery and equipment. Leasehold improvements are amortized over the lesser of the lease term or the estimated useful lives of the improvements.

Long-Lived Assets: In August 2001, the Financial Accounting Standards Board ("FASB") issued SFAS No. 144, "Accounting for the Impairment or Disposal of Long-Lived Assets" which supersedes both SFAS No. 121, "Accounting for the Impairment of Long-Lived Assets and for Long-Lived Assets to Be Disposed Of" and the accounting and reporting provisions of APB No. 30, "Reporting the Results of Operations-Reporting the Effects of Disposal of a Segment of a Business, and Extraordinary, Unusual and Infrequently Occurring Events and Transactions", for the disposal of a segment of a business (as previously defined in that Opinion). SFAS No. 144 retains the fundamental provisions in SFAS No. 121 for recognizing and measuring impairment losses on long-lived assets held for use and long-lived assets to be disposed of by sale, while also resolving significant implementation issues associated with SFAS No. 121. For example, SFAS No. 144 provides guidance on how a long-lived asset that is used as part of a group should be evaluated for impairment, establishes criteria for when a long-lived asset is held for sale and prescribes the accounting for a long-lived asset that will be disposed of other than by sale. SFAS No. 144 retains the basic provisions of APB No. 30 on how to present discontinued operations in the income statement but broadens that presentation to include a component of an entity (rather than a segment of a business).

F-9

## COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES

### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

During 2003, the Company incurred asset impairment charges of $28.4 million of which $10.4 million related to the impairment of the Becker non-compete agreement, $7.5 million related to the initial interest acquired in an Italian joint venture, $7.8 million related to restructuring programs and $2.7 million related to other intangible assets. During 2002, the Company incurred asset impairment charges of $18.0 million recognized as part of restructuring programs (Note 15). In addition, during fiscal 2001, the Company incurred a charge of $7.6 million relating to asset impairments recognized in the Reorganization (See Note 15).

*Goodwill and Intangibles:* During the second quarter of 2002, the Company completed the implementation of SFAS 142, "Goodwill and Other Intangible Assets." Under SFAS 142, goodwill is no longer amortized. Instead, goodwill and indefinite-lived intangible assets are tested for impairment in accordance with the provisions of SFAS 142. The Company employed a discounted cash flow analysis and a market comparable approach in conducting its impairment tests. The Company completed its initial impairment test in the second quarter of 2002 and recorded an impairment loss of $11.7 million (having no tax impact), or $0.15 per average basic and diluted share relating to the UK Plastics business in the former European and Rest of World Automotive Systems segment. The impairment loss was reported as a cumulative effect of a change in accounting principle and, therefore, is accounted for as if it occurred on January 1, 2002. The Company completed its annual impairment test on November 1, 2002 indicating that the fair value of the reporting units exceeded the carrying values.

The Company's first quarter 2003 results were below the forecasts utilized in testing for the goodwill impairment for the year ended December 31, 2002. The conditions in the markets in which the Company operates continued to deteriorate and customer production schedules continued to decline, and therefore, the Company reduced its operating and financial plans for 2003. As a result, the Company initiated an impairment test (outside of the annual testing date of November 1) during the second quarter 2003. During the second quarter, the Company carefully reviewed all of its assumptions regarding revenue growth, improved operating margins and planned capital expenditures. This analysis by each reporting unit focused on new business awards, implementation of strategic business initiatives such as restructuring, material savings, plant efficiencies, revenue growth and additional product/ process technology applications. While the Company is aggressively attacking its overall cost structure, the U.S. and Mexico Plastics reporting unit had even more definitive objectives initiated after the 2003 first quarter performance on a specific plant basis. As a result of these well-defined programs, the Company, utilizing an independent outside evaluator, completed the first step of the goodwill impairment test in the second quarter of 2003 which indicated that the fair value of the reporting units exceeded the carrying values, and therefore no additional impairment testing was necessary. The Company again completed the annual impairment test as of November 1, 2003 indicating fair value of the reporting units exceeded the carrying values.

Fair value for all tests was determined based upon the discounted cash flows of the reporting units using discount rates ranging from 11.5% to 14.0% dependent on the reporting unit and a residual growth rate of 2%. The market comparable approach consisted of earnings multiples ranging from 5.2 to 6.5 times current year and forecasted Earnings Before Interest, Taxes, Depreciation and Amortization ("EBITDA") (operating income less depreciation and amortization) and a control premium on equity. Future cash flows and EBITDA are affected by future operating performance, which will be impacted by economic conditions, car builds, financial, business and other factors, many of which are beyond the Company's control. The U.S. and Mexico Plastics reporting unit can be significantly impacted by an adverse change in assumptions. Considerable judgment is often involved in making these determinations, the use of different assumptions could result in significantly different results. An approximate 50 basis point change in discount rates or an approximate 4% reduction in profit would result in a further goodwill impairment analysis as required by SFAS 142. Management believes its assumptions and estimates are reasonable and appropriate, however actual results could differ from those estimates.

COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

Pension and Postretirement Benefits Other than Pensions: Annual net periodic expense and benefit liabilities under our defined benefit plans are determined on an actuarial basis. Assumptions used in the actuarial calculations have a significant impact on plan obligations and expense. Each September, the Company reviews the actual experience compared to the more significant assumptions used and makes adjustments to the assumptions, if warranted. The healthcare trend rates are reviewed with the actuaries based upon the results of their review of claims experience. Discount rates are based upon an expected benefit payments duration analysis and the equivalent average yield rate for high-quality fixed-income investments. Pension benefits are funded through deposits with trustees and the expected long-term rate of return on fund assets is based upon actual historical returns modified for known changes in the market and any expected change in investment policy. Postretirement benefits are not funded and our policy is to pay these benefits as they become due.

Certain accounting guidance, including the guidance applicable to pensions, does not require immediate recognition of the effects of a deviation between actual and assumed experience or the revision of an estimate. This approach allows the favorable and unfavorable effects that fall within an acceptable range to be netted. Although this netting occurs outside the basic financial statements, disclosure of the net amount is disclosed as an unrecognized gain or loss in the footnotes to our financial statements. Considerable judgment is often involved in making these determinations, the use of different assumptions could result in significantly different results. Management believes its assumptions and estimates are reasonable and appropriate, however actual results could differ from those estimates.

Revenue Recognition: The Company recognizes revenue from product sales when it has shipped the goods. Products are shipped FOB shipping point using customer designated transportation companies with title passing at that time. Significant retroactive price adjustments are recognized in the period when such amounts become probable. Sales are recognized based upon the gross amount billed to a customer for those products in which the Company's customer has directed the sourcing of certain materials or components used in the manufacture of the final product. The Company generally allows its customers the right of return only in the case of defective products. The Company provides a reserve for estimated defective product costs at the time of the sale of the products.

Cost of Goods Sold and Selling, General and Administrative Costs: Cost of goods sold is comprised of direct material, direct labor and manufacturing overhead. Manufacturing overhead consists of indirect labor, depreciation, amortization and other manufacturing expenses. Selling, general and administrative costs consist of selling, research and development, engineering and administrative expenses.

Other Expense (Income), net: In 2003, other expense (income), net primarily included $32.4 million of foreign currency transaction gains offset by $3.5 million of losses related to derivatives used in the Company's hedging strategies and minority interest share of losses in a consolidated subsidiary of $5.6 million. In 2002, other expense (income), net primarily included $12.6 million of losses related to derivatives used in the Company's foreign currency hedging strategy offset by $5.9 million of foreign currency transaction gains, $5.5 million of losses related to investments in joint ventures and $1.9 million of losses from sale and leaseback transactions and minority interest share of losses of a consolidated subsidiary of $6.5 million. In 2001, other expense (income), net primarily included a $8.0 million loss on early extinguishment of debt and $7.8 million of foreign currency transaction losses offset by $5.0 million of derivatives gains and a $6.2 million gain related to a stock demutualization. The Company adopted SFAS 145 during 2003 and reclassified $8.0 million loss on the early extinguishment of debt recorded for the year ended December 31, 2001 to other expense (income), net from an extraordinary item in the amount of $5.3 million (net of income taxes of $2.7 million).

Customer Engineering and Tooling: Engineering and tooling balances represent tools, dies and other items used in the manufacturing of customer components. Amounts included in the consolidated balance sheets include Company-owned tools and costs incurred on customer-owned tools which are subject to reimbursement, pursuant to the terms of a customer contract. Company-owned tools are amortized over the

F-11

COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

tool's expected life or the life of the related vehicle program, whichever is shorter. Engineering, testing and other costs incurred in the design and development of production parts are expensed as incurred, unless the costs are reimbursable, as specified in a customer contract.

Emerging Issue Task Force ("EITF") Issue No. 99-5, "Accounting for Pre-Production Costs Related to Long-Term Supply Arrangements" requires that design and development costs for products to be sold under long-term supply arrangements be expensed as incurred and costs incurred for molds, dies and other tools that will be used in producing the products under long-term supply arrangements be capitalized and amortized over the shorter of the expected useful life of the assets or the term of the supply arrangement.

The Company had assets of approximately $6.8 million and $8.4 million recognized pursuant to agreements that provide for contractual reimbursement of pre-production design and development costs, at December 31, 2003 and 2002, respectively. The Company also has assets of $124.9 million and $77.1 million representing the costs for molds, dies and other tools, at December 31, 2003 and 2002, respectively, that are reimbursable by customers. In addition, the Company had $10.0 million and $11.0 million at December 31, 2003 and 2002, respectively, for molds, dies and other tools that the Company owns.

Derivative Financial Instruments: All derivatives are recognized on the consolidated balance sheet at fair value as required by SFAS No. 133 "Accounting for Derivative Instruments and Hedging Activities." Gains and losses on the changes in fair value of the derivatives that qualify as hedges under SFAS No. 133 are recorded on the balance sheet as a component of "Accumulated other comprehensive loss" to the extent that the hedges are effective and documented, until the underlying transactions are recognized in earnings. As of December 31, 2003 and 2002, the Company had no derivatives designated as hedges under SFAS No. 133. The Company uses derivatives to hedge economic risks even though these derivatives may not be designated as hedges in accordance with SFAS No. 133. These derivative instruments are marked to fair market value and reported on the balance sheet. Gains and losses on these instruments are reported in "Other expense (income), net" on the Consolidated Statements of Operations. The gains and losses are intended to offset economic risk of foreign currency transaction losses or gains. The Company does not enter into derivative transactions for speculative purposes.

Foreign Currency Translation: Assets and liabilities of the Company's non-U.S. businesses are translated to U.S. Dollars at end-of-period exchange rates. The effects of the translations are reported as a component of "Accumulated other comprehensive loss." Remeasurement of assets and liabilities of the Company's non-U.S. businesses that use the U.S. Dollar as functional currency are included in the Consolidated Statements of Operations as "Other expense (income), net." The Statement of Operations of the Company's non-U.S. businesses are translated to U.S. dollars at average exchange rates and are recognized as part of revenues, costs and expenses. Also included in "Other expense (income), net", are gains and losses arising from transactions denominated in a currency other than the functional currency of the business involved.

Environmental: The Company records an estimated loss when it is probable that an environmental liability has been incurred and the amount of the loss can be reasonably estimated. The Company reviews all environmental claims from time to time and adjusts the reserves accordingly. Accruals for environmental liabilities are generally included in the consolidated balance sheet as other non-current liabilities at undiscounted amounts and exclude claims for recoveries from insurance or other third parties. Accruals for insurance or other third party recoveries for environmental liabilities are recorded when it is probable that the claim will be realized.

New Accounting Pronouncements: In January 2003, the FASB issued FASB Interpretation No. ("FIN") 46, "Consolidation of Variable Interest Entities ("VIE"), an interpretation of Accounting Research Bulletin No. 51, Consolidated Financial Statements." This interpretation provides guidance on the identification of VIEs, some of which may require consolidation based on factors beyond a majority voting interest. A

F-12

**COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

VIE is defined in FIN 46 as an entity in which either the equity investors (if any) do not have a controlling financial interest or the equity investment at risk is insufficient to finance that entity's activities without receiving additional subordinated financial support from other parties. FIN 46 applies immediately to VIEs created after January 31, 2003, and in the first fiscal year or interim period beginning after December 15, 2003, to VIEs in which an enterprise holds a variable interest that it acquired before February 1, 2003. In 2003, the Company and Textron agreed to have an entity that the Company held a variable interest in restructured so it was required to be consolidated by Textron and not accounted for as a VIE. The entity was part of the Textron Leasing Transaction with the maximum potential loss related to certain equipment leases that is limited to the amount of the residual value guarantee as discussed in Note 11 "Receivables Facility and Non-Recourse Factoring Facilities." There have been no VIEs created after January 31, 2003. For the period prior to January 31, 2003, the Company has not identified any other entities that would currently qualify as a VIE.

In April 2003, the FASB issued SFAS No. 149, "Amendment of Statement 133 on Derivative Instruments and Hedging Activities." This statement amends SFAS No. 133, "Accounting for Derivative Instruments and Hedging Activities," and clarifies the accounting for derivative instruments and hedging activities. This statement is effective for contracts entered into or modified after June 30, 2003 (with exceptions) and for hedging relationships designated after June 30, 2003. SFAS No. 149 did not have a material effect on the Company's earnings or financial position.

In December 2003, the FASB issued SFAS No. 132 (Revised 2003) "Employers' Disclosures about Pensions and Other Postretirement Benefits an amendment of FASB Statements No. 87, 88, and 106." This Statement revises employers' disclosures about pension plans and other postretirement benefit plans. It does not change the measurement or recognition of those plans required by other FASB Statements. This Statement retains the disclosure requirements contained in the original SFAS No. 132, "Employers' Disclosures about Pensions and Other Postretirement Benefits," which it replaced and requires additional disclosures about the assets, obligations, cash flows and net periodic benefit cost of defined benefit pension plans and other defined benefit postretirement plans. This Statement is effective for financial statements with fiscal years ending after December 15, 2003, except for certain provisions related to foreign plans which are effective for fiscal years ending after June 15, 2004. The Company adopted the revised disclosure requirement of this Statement for all of its U.S. plans and will adopt the requirements for its foreign plans as required in 2004.

The following table highlights the sensitivity of our pension obligations and expense to changes in assumptions (in millions):

| Change in Assumption | Impact on Pension Expense | Impact on PBO |
|---|---|---|
| 25 basis point ("bp") decrease in discount rate | 1.5 | 15.6 |
| 25 bp increase in discount rate | (1.5) | (15.1) |
| 25 bp decrease in long-term return on assets | 0.8 | — |
| 25 bp increase in long-term return on assets | (0.8) | — |

Changes in Accounting Principles: In April 2002, the FASB issued SFAS No. 145, "Rescission of FASB Statements No. 4, 44, and 64, Amendment of FASB Statement No. 13, and Technical Corrections." With the rescission of SFAS No. 4 and 64, only gains and losses from extinguishments of debt that meet the criteria of APB Opinion No. 30 would be classified as extraordinary items. This statement amends SFAS No. 13, "Accounting for Leases," to eliminate the inconsistency between the required accounting for sale-leaseback transactions and the required accounting for certain lease modifications that have economic effects that are similar to sale-leaseback transactions. SFAS No. 145 also amends other existing authoritative pronouncements to make various technical corrections, clarify meanings or describe their applicability under changed conditions. SFAS No. 145 is effective for fiscal years beginning after May 15, 2002. The Company

**COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

adopted SFAS 145 and reclassified $8.0 million loss on the early extinguishment of debt recorded for the year ended December 31, 2001 to other expense (income), net from an extraordinary item in the amount of $5.3 million (net of income taxes of $2.7 million).

In June 2002, the FASB issued SFAS No. 146 "Accounting for Costs Associated with Exit or Disposal Activities." This statement nullifies EITF No. 94-3, "Liability Recognition for Certain Employee Termination Benefits and Other Costs to Exit an Activity (including Certain Costs Incurred in a Restructuring)." This statement is effective for all exit or disposal activities initiated after December 31, 2002. This statement requires that a liability for a cost associated with an exit or disposal activity be recognized when the liability is incurred rather than the date of an entity's commitment to an exit plan. The Company implemented SFAS No. 146 on January 1, 2003.

In the third quarter, the Company adopted the FASB Staff Position No. FAS 146-1 "Determining Whether a One-Time Termination Benefit Offered in Connection with an Exit or Disposal Activity Is, in Substance, an Enhancement to an Ongoing Benefit Arrangement." The effect from adopting FAS 146-1 was to defer recording $1.2 million of restructure expense to later periods. The effect on prior quarters and at December 31, 2003 for the portion of the restructuring activities deferred was not significant.

In May 2003, the FASB issued SFAS No. 150, "Accounting for Certain Financial Instruments with Characteristics of both Liabilities and Equity." SFAS No. 150 establishes standards to require issuers to classify certain financial instruments with characteristics of both liabilities and equity. This Statement is effective for financial instruments entered into or modified after May 31, 2003, and otherwise is effective at the beginning of the first interim period beginning after June 15, 2003. The Company has adopted this Statement by reclassifying the mandatorily redeemable preferred stock of subsidiary as a liability and reclassifying preferred stock dividends and accretion as interest expense effective with the quarter ending September 30, 2003.

During the second quarter 2003, the Company implemented a change in the method of accounting for holiday pay for interim periods so that such pay is accrued, and expense is recognized during the period in which the actual holiday occurs. The change in method better matches holiday expense with the period that the actual holiday occurs and the pay is earned. Previously, certain of the Company's businesses accrued holiday pay and recognized expense based upon an equal monthly amount within the fiscal year. As the prior method allocated costs within the fiscal year, there was no effect on prior years. There was no effect on the entire fiscal year as the change only affected interim periods. See Note 22 "Quarterly Financial Data" for additional information.

Additionally, during the second quarter of 2003, the Company implemented a change in the method of accounting for crib supply inventories held at plants. Crib supply inventories include small motors, replacement parts for production equipment and other miscellaneous repair parts for buildings, equipment and machinery. In the second quarter the Company implemented a perpetual crib supply inventory system and harmonized its policy to consistently account for the capitalization of crib supply inventories. The new accounting method better matches the expenditure with the period benefited, as such inventories are charged to expense when placed into service. Previously, the Company had different capitalization thresholds following the various acquisitions in late 2001 and 2002, which ranged from not capitalizing any crib supply items to capitalizing only items greater than two thousand dollars. Pro forma and the cumulative effect amounts relating to the change in accounting for crib inventories is not determinable as perpetual records of crib inventory were not maintained at all the plants prior to the application of the new method in the second quarter of 2003. For the plants that previously had no perpetual records, the effect of the change was $1.8 million after tax or $0.02 per share recorded to increase inventory and reduce cost of sales in the three months ended June 30, 2003. For the year ended December 31, 2003, the incremental effect of the adoption had an insignificant effect.

F-14

COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

3.   **Acquisitions and Goodwill**

  *a.    Acquisitions*

  On January 2, 2003, the Company acquired Delphi Corporation's plastic injection molding plant and related equipment in Logroño, Spain for $18 million. The 300,000 square foot Logroño facility includes 24 injection molding machines and one Class-A paint line.

  On January 17, 2003, the Company acquired the remaining 50% interest in an Italian automotive joint venture from Textron Inc., a related party, for $15 million, which also terminated a $28 million put-option by Textron Inc., that was exercisable in December 2004. The Company incurred fixed asset impairments of $7.5 million relating to the 50% interest owned previously.

  The Company completed its acquisitions of Textron Automotive Company's automotive trim division ("TAC-Trim") in December 2001, the automotive fabric operations of Joan Fabrics and all of the operating assets in Joan Fabric's affiliated yarn dying operation Western Avenue Dyers (collectively "Joan") in September 2001 and Becker Group, LLC ("Becker") a supplier of plastic components to the automotive industry in July 2001. The results of operations of the acquired companies are included in the Company's Consolidated Statements of Operations from the dates of acquisition.

  Appraisals for Becker and Joan were performed during 2001, and the related allocation of purchase price was completed. In the second quarter 2002, the Company's external consultants completed the valuations of all TAC-Trim acquired intangible and fixed assets. Based upon these valuations: 1) an intangible asset of $51.0 million for customer contracts was recorded based on the value of individual customer contracts — this intangible asset is being amortized over the contract's performance period, which extends through 2012; 2) the Company revised its first quarter estimate for patents and other specifically identifiable intangible assets acquired as part of the TAC-Trim purchase from $40.0 to $24.0 million (the weighted average lives increased from 7 to 10 years); and 3) in June 2002, the valuations resulted in a $30.1 million increase in fixed assets and adjustment of their useful lives. In September 2002, the Company revised its valuation resulting in a $27.7 million increase in fixed assets and adjustment of their useful lives, based upon revised information from external consultants. The allocation of the purchase price for the TAC-Trim acquisition was completed in 2002. The Becker, Joan and TAC-Trim acquisitions are intended to solidify the Company's position as a premier supplier of interior components and automotive fabrics.

  *b.    Goodwill*

  *Goodwill and Intangibles:* During the second quarter of 2002, the Company completed the implementation of SFAS 142, "Goodwill and Other Intangible Assets." Under SFAS 142, goodwill is no longer amortized. Instead, goodwill and indefinite-lived intangible assets are tested for impairment in accordance with the provisions of SFAS 142. The Company employed a discounted cash flow analysis and a market comparable approach in conducting its impairment tests. The Company completed its initial impairment test in the second quarter of 2002 and recorded an impairment loss of $11.7 million (having no tax impact), or $0.15 per average basic and diluted share relating to the UK Plastics business in the former European and Rest of World Automotive Systems segment. The impairment loss was reported as a cumulative effect of a change in accounting principle and, therefore, is accounted for as if it occurred on January 1, 2002. The Company completed its annual impairment test on November 1, 2002 indicating that the fair value of the reporting units exceeded the carrying values.

  The Company's first quarter 2003 results were below the forecasts utilized in testing for the goodwill impairment for the year ended December 31, 2002. The conditions in the markets in which the Company operates continued to deteriorate and customer production schedules continued to decline, and therefore, the Company reduced its operating and financial plans for 2003. As a result, the Company initiated an impairment test (outside of the annual testing date of November 1) during the second quarter 2003. During the second

**COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

quarter, the Company carefully reviewed all of its assumptions regarding revenue growth, improved operating margins and planned capital expenditures. This analysis by each reporting unit focused on new business awards, implementation of strategic business initiatives such as restructuring, material savings, plant efficiencies, revenue growth and additional product/ process technology applications. While the Company is aggressively attacking its overall cost structure, the U.S. and Mexico Plastics reporting unit had even more definitive objectives initiated after the 2003 first quarter performance on a specific plant basis. As a result of these well-defined programs, the Company, utilizing an independent outside evaluator, completed the first step of the goodwill impairment test in the second quarter of 2003 which indicated that the fair value of the reporting units exceeded the carrying values, and therefore no additional impairment testing was necessary. The Company again completed the annual impairment test as of November 1, 2003 indicating fair value of the reporting units exceeded the carrying values.

Fair value for all tests was determined based upon the discounted cash flows of the reporting units using discount rates ranging from 11.5% to 14.0% dependent on the reporting unit and a residual growth rate of 2%. The market comparable approach consisted of earnings multiples ranging from 5.2 to 6.5 times current year and forecasted Earnings Before Interest, Taxes, Depreciation and Amortization ("EBITDA") (operating income less depreciation and amortization) and a control premium on equity. Future cash flows and EBITDA are affected by future operating performance, which will be impacted by economic conditions, car builds, financial, business and other factors, many of which are beyond the Company's control. The U.S. and Mexico Plastics reporting unit can be significantly impacted by an adverse change in assumptions. Considerable judgment is often involved in making these determinations, the use of different assumptions could result in significantly different results. An approximate 50 basis point change in discount rates or an approximate 4% reduction in profit would result in a further goodwill impairment analysis as required by SFAS 142. Management believes its assumptions and estimates are reasonable and appropriate, however actual results could differ from those estimates.

The changes in the carrying amounts of goodwill for the year ended December 31, 2003 were primarily a result of the additional acquisition of the remaining 50% interest of an Italian joint venture and the effect of foreign currency translation.

In accordance with the provisions of SFAS No. 142, the Company did not amortize goodwill during 2002. If goodwill amortization had not been recorded during 2001, the net loss would have decreased $6.1 million to an adjusted net loss of $40.1 million. The related loss per share for fiscal 2001 would have decreased $0.14 per share resulting in adjusted loss per share of $1.05.

*c.  Intangible Assets*

The components of the Company's acquired and other amortizable intangible assets as of December 31, 2003 and 2002 were as follows (in millions):

|  | December 31, 2003 | | | December 31, 2002 | | |
| --- | --- | --- | --- | --- | --- | --- |
|  | Cost | Accumulated Amortization | Net Carrying Amount | Cost | Accumulated Amortization | Net Carrying Amount |
| Customer contracts | $51.0 | $    13.1 | $    37.9 | $ 51.0 | $    6.3 | $    44.7 |
| Patents and other | 39.2 | 10.2 | 29.0 | 31.5 | 3.5 | 28.0 |
| Non-compete agreement | — | — | — | 18.0 | 5.4 | 12.6 |
|  | $90.2 | $  23.3 | $  66.9 | $100.5 | $  15.2 | $  85.3 |

Amortization expense for intangible assets for the periods ending December 31, 2004, 2005, 2006, 2007, 2008 and thereafter will be $12.5 million, $12.6 million, $12.1 million, $9.7 million, $6.7 million and $13.3 million, respectively. See Related Party Transactions (Note 19).

F-16

## COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

4. **Inventories**

Inventory balances are summarized below (in millions):

|  | December 31, 2003 | December 31, 2002 |
|---|---|---|
| Raw materials | $ 95.0 | $ 90.3 |
| Work in process | 24.6 | 33.7 |
| Finished goods | 49.8 | 47.6 |
|  | $ 169.4 | $ 171.6 |

5. **Other Current Assets**

Other current asset balances are summarized below (in millions):

|  | December 31, 2003 | December 31, 2002 |
|---|---|---|
| Deferred tax asset | $ 25.2 | $ 25.3 |
| Reimbursable tooling and pre-production design and development | 126.5 | 83.0 |
| Other | 64.3 | 69.1 |
|  | $ 216.0 | $ 177.4 |

6. **Property, Plant and Equipment, Net**

Property, plant and equipment, net, are summarized below (in millions):

|  | December 31, 2003 | December 31, 2002 |
|---|---|---|
| Land and improvements | $ 34.5 | $ 26.1 |
| Buildings | 213.9 | 177.8 |
| Machinery and equipment | 1,076.9 | 959.6 |
| Leasehold improvements | 36.0 | 27.4 |
| Construction in progress | 119.2 | 106.2 |
|  | 1,480.5 | 1,297.1 |
| Less accumulated depreciation | (654.6) | (559.3) |
|  | $ 825.9 | $ 737.8 |

7. **Accrued Expenses**

Accrued expenses are summarized below (in millions):

|  | December 31, 2003 | December 31, 2002 |
|---|---|---|
| Payroll and employee benefits | $ 82.7 | $ 61.7 |
| Interest | 13.6 | 12.3 |
| Insurance | 23.6 | 16.5 |
| Restructuring reserves | 30.9 | 28.2 |
| Taxes payable | 0.4 | 12.0 |
| Other | 87.7 | 169.2 |

$    238.9          $    299.9

F-17

**COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

**8.   Short-Term Borrowings**

The Company utilizes uncommitted lines of credit to satisfy a portion of its short-term working capital requirements of certain of its foreign affiliates. As of December 31, 2003, the Company had lines of credit from international credit facilities of $37.1 million, of which $16.0 million was outstanding with $21.1 million available. As of December 31, 2002, the Company had unsecured lines of credit from financial institutions of $36.5 million, of which $10.5 million was outstanding with $26.0 million available. The weighted average interest rate on the outstanding borrowings at December 31, 2003 and 2002 was approximately 16.0% and 8.3%, respectively.

**9.   Long-Term Debt and Capital Lease Obligations**

Long-term debt and capital lease obligations are summarized below (in millions):

|  | December 31, 2003 | | December 31, 2002 | |
|---|---|---|---|---|
| Senior Secured Credit Facilities: | | | | |
| Tranche A Term Loan Facility | $ | 62.9 | $ | 83.8 |
| Tranche B Term Loan Facility | | 287.2 | | 293.8 |
| Revolving Credit Facility | | 6.3 | | |
| Public Debt: | | | | |
| 11 1/2% Senior Subordinated Notes, due 2006. | | 400.0 | | 400.0 |
| 10 3/4% Senior Notes, due 2011. | | 500.0 | | 500.0 |
| Other (including capital lease obligations) | | 12.8 | | 1.1 |
| Total debt | | 1,269.2 | | 1,278.7 |
| Less current maturities (including current portion of capital lease obligations) | | (31.5) | | (23.5) |
| Total Long-term debt and capital lease obligations | $ | 1,237.7 | $ | 1,255.2 |

*Senior Secured Credit Facilities*

In December 2001, in conjunction with the TAC-Trim acquisition, the Company entered into new Senior Secured Credit Facilities, which refinanced its prior bank credit facilities. The principal and interest on the prior bank credit facilities totaled $362.5 million. The cost and expenses associated with the refinancing of the prior bank credit facilities totaling $25.7 million were deferred and will be amortized over the four-year life of the term loans described below. The Company adopted SFAS 145 during 2003 and reclassified $8.0 million loss on the early extinguishment of debt to other expense (income), net from an extraordinary item in the amount of $5.3 million (net of income taxes of $2.7 million) in connection with the retirement of the prior bank credit facilities.

The Senior Secured Credit Facilities include a floating rate Revolving Facility and two floating rate Term Loan Facilities that mature on December 31, 2005. The Revolving Facility allows the Company to borrow revolving loans up to $175.0 million including Canadian dollars up to $75.0 million. The facility can be utilized for letters of credit. The Term Loan Facilities consist of a Tranche A Term Loan with an original principal balance of $100.0 million and a Tranche B Term Loan with an original principal balance of $300.0 million. As required by the credit agreement, the full amounts of the Term Loan Facilities were drawn down on the closing date. As of December 31, 2003 the Tranche A Term Loan and Tranche B Term Loan had principal balances of $62.9 million and $287.2 million, respectively. Amounts borrowed under the Term Loan Facilities that are repaid or prepaid cannot be reborrowed. The Tranche A Term Loan Facility is payable in quarterly

F-18

COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

installments that increase in amounts each year until maturity. The Tranche B Term Loan Facility is payable in quarterly installments of $0.8 million for the first three years and quarterly installments of $72.7 million during the final year. These maturities were modified as part of the fifth amendment completed in February 2004. See the proforma maturity table below.

Under the Senior Secured Credit Facilities, the interest rate on the Revolving Facility is, at the Company's option, London Inter-Bank Offer Rate ("LIBOR") plus 4.00% or the Alternate Base Rate ("ABR") plus 3.00%. The ABR is the highest of The JP Morgan Chase ("Chase's") announced prime rate, the Federal Funds Rate plus 0.5% and Chase's base certificate of deposit rate plus 1%. A per annum fee equal to the spread over the LIBOR accrues on the face amount of letters of credit. Also, there is a 1.00% commitment fee on the unused portion of the facility. The interest rates on the Canadian-dollar denominated debt is at the Company's option (the "Canadian Prime Rate") plus 3.00% or the bill of exchange rate ("Bankers' Acceptance" or "BA") denominated in Canadian dollars for one, two, three or six months plus 4.00%. The interest rate on the Tranche A Term Loan Facility is, at the Company's option, LIBOR plus 4.00% or the ABR plus 3.00%, subject to adjustment quarterly, based on performance targets. The interest rate on the Tranche B Term Loan Facility is, at the Company's option, either LIBOR plus 4.75% or ABR plus 3.75%. On any Tranche B Term Loans repaid whether voluntary or mandatory, there is a prepayment premium of 1.00%. The LIBOR rate shall not be less than 3.00% per annum. The weighted average rate of interest on the Senior Secured Credit Facilities at December 31, 2003 and 2002 was 7.60% and 6.94%, respectively.

Borrowings under the Senior Secured Credit Facility are collateralized by a first priority lien on the assets of the Company, Products and its U.S. and Canadian subsidiaries with certain exceptions including assets included in the Company's receivables facility, certain scheduled assets, and certain assets whose value relative to cost of lien perfection was deemed too low to include, as well as a pledge of stock of Products and its significant subsidiaries and certain intercompany debt and guarantees from the Company and its U.S. subsidiaries (subject to certain exceptions).

The Senior Secured Credit Facilities contain restrictive covenants including maintenance of interest coverage and leverage ratios and various other restrictive covenants that are customary for such facilities. The target levels established by these covenants limit the Company's ability to utilize availability under its liquidity facilities, including the Senior Secured Credit Facilities and are based on the Company's financial performance. At December 31, 2003, there were no funding limitations. The covenants of the Senior Secured Credit Facilities also limit investments, dividends or other distributions of capital stock, capital expenditures, the purchase of subsidiary preferred stock, the prepayment of debt other than loans under the senior facilities, liens and certain lease transactions.

In February 2004, the Company entered into the fifth amendment to the Senior Secured Credit Facilities Credit Agreement which allowed the establishment of a new $100 million Supplemental Revolving Credit Facility and the $185 million Tranche A-1 Term Loan. In connection with these new expanded facilities, $181.5 million was used to prepay existing Tranche A and Tranche B Term Loans in direct order of maturity.

In October 2003, the Company entered into amendment numbers three and four to the Senior Secured Credit Facilities Credit Agreement. The Third Amendment permitted the add-back of charges related to restructuring actions taken during the third quarter 2003 for covenant calculation purposes and increased the maximum permitted leverage ratio at September 30, 2003 to 4.50:1.00. The Fourth Amendment permitted the add-back of charges up to $11 million related to future restructuring actions for covenant calculation purposes and increased the maximum permitted leverage ratio in future quarters, including a leverage ratio of 5.00:1.00 at December 31, 2003 and decreased the minimum interest coverage ratio in future quarters, including an interest coverage ratio of 1.85:1.00 at December 31, 2003. The two financial covenants remain at the same level for the first quarter 2004 and then step-down during the year to a leverage ratio of 4.25:1.00 and an interest coverage ratio of 2.20:1.00 at December 31, 2004. In connection with the Fourth Amendment, the Company agreed to increase its applicable

F-19

COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

margin for interest rate purposes by 0.25% at times when the Company's previously reported leverage ratios exceeded 3.50:1.00 and to make adjustments to the interest coverage ratio.

Previously, in the second quarter 2003, the Company signed a second amendment to the Senior Secured Credit Facilities Credit Agreement. The principal changes were to increase the maximum permitted leverage ratio for periods following the first quarter of 2003 and to decrease the minimum permitted interest coverage ratio for periods following the first quarter of 2003. In connection with the amendment, the Company agreed that its applicable margin for interest rate purposes could be increased by up to 0.50% at times when the Company's previously reported leverage ratio exceeded 3.5:1.00. The Company paid customary fees to lenders in connection with all of the amendments.

Effective December 2002, the Company amended its Senior Credit Facilities to provide for the purchase of certain assets in Spain and Portugal as well as the remaining 50% interest in the Company's joint venture in Italy.

*Public Debt*

In December 2001, Products issued 10 3/4% Senior Notes due 2011 in a total principal amount of $500.0 million ("Notes"). The Notes were not registered under the Securities Act of 1933 and were offered only to qualified institutional buyers. In June 2002, the Company effected and registered an exchange offer of a new and identical issue of 10 3/4% Senior Notes due 2011 of Products in exchange for the outstanding Senior Notes of Products. The exchange offer raised no new proceeds for the Company and was made in accordance with contractual commitments arising from the December 2001 issuance. The cost of issuing the Notes totaling about $23.1 million was deferred and will be amortized over 10 years.

The Notes are unconditionally guaranteed on an unsecured senior basis by the parent and by each wholly owned domestic subsidiary that is a guarantor of the Bank Credit Facilities as of the issue date. This is all of the Company's wholly owned domestic subsidiaries other than its receivable and insurance subsidiaries. The debt evidenced by the Notes and Parent and Subsidiary Guarantees are unsecured senior obligations of the Company ranking senior in right of payment to all existing and future Subordinated Debt including the Existing Notes and related Guarantees and future unsecured and unsubordinated Debt. The Notes are redeemable prior to December 31, 2004 only in the event the Company receives cash proceeds from one or more equity offerings in which case the Company may at its option use all or a portion of such cash proceeds to redeem up to 35% of the principal amount of the notes. The Notes will be subject to redemption at the option of the Company, in whole or in part at any time after December 31, 2006 at a stated premium redemption price expressed as a percentage in excess of the principal amount. After December 31, 2008, the redemption price is 100%. Within 30 days of the occurrence of a change of ownership control, unless the Company has mailed a redemption notice with respect to all outstanding Notes, the Company will be required to make an offer to purchase all outstanding Notes at a purchase price equal to 101% of their principal amount. The indenture governing the notes limits the Company's ability to issue more debt, pay dividends and make distributions, repurchase stock, make investments, merge or consolidate, transfer assets, enter into transactions with affiliates and issue stock of subsidiaries. These restrictive covenants are customary for such securities and are subject to a number of exceptions.

In June 1996, Products, issued at face value $400 million principal amount of 11 1/2% Senior Subordinated Notes due 2006 which are guaranteed by the Company. The indenture governing the 11 1/2% Senior Subordinated Notes generally prohibits the Company, Products and any Restricted Subsidiary (as defined) from making certain payments and investments unless a certain financial test is satisfied and the aggregate amount of such payments and investments since the issue date is less than a specified amount. The prohibition is subject to a number of significant exceptions, including dividends to stockholders of the Company or stock repurchases not exceeding $10 million in any fiscal year or $20 million in the aggregate, dividends to stockholders of the Company or stock repurchases in the amount of the net proceeds from the sale of the

COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

Company's Imperial Wallcoverings, Inc. subsidiary ("Wallcoverings") and dividends to the Company to permit it to pay its operating and administrative expenses. The indenture also contains other restrictive covenants (including, among others, limitations on the incurrence of debt, asset dispositions and transactions with affiliates), which are customary for such securities. These covenants are also subject to a number of significant exceptions.

The Company solicited and received consent from holders of a sufficient amount of the outstanding principal of the 11 1/2% Senior Subordinated Notes allowing the Change of Control precipitated by the Heartland Transaction. A Second Supplemental Indenture dated February 8, 2001 amended the Senior Subordinated Notes indenture to reflect this and certain other changes, including allowance for the incurrence of debt in the form of the Term Loan D Facility. In connection with the TAC-Trim acquisition, the Company further amended the indenture governing these notes to make each subsidiary guarantor of the new 10 3/4% Senior Notes a guarantor of these existing notes on a senior subordinated basis.

At December 31, 2003, the scheduled annual maturities of long-term debt and capital lease obligations are as follows (in millions):

| Year Ending | |
| --- | --- |
| 2004 | $ 31.5 |
| 2005 | 333.1 |
| 2006 | 402.9 |
| 2007 | 1.7 |
| 2008 | — |
| Later years | 500.0 |
| | $ 1,269.2 |

In February 2004 the Company entered into the fifth amendment to the Senior Secured Credit Facilities Credit Agreement subsequent to year-end. The proforma scheduled annual maturities of long-term debt and capital lease obligations are as follows (in millions):

| Year Ending | |
| --- | --- |
| 2004(a) | $ 4.4 |
| 2005(a) | 360.2 |
| 2006 | 402.9 |
| 2007 | 1.7 |
| 2008 | — |
| Later years | 500.0 |
| | $ 1,269.2 |

(a)   $181.5 million of Tranche A and B loans were refinanced by Term Loan A-1 in February of 2004. An additional $3.5 million was borrowed under Term Loan A-1 during February 2004 to pay related fees and expenses of the offering. The Company will recognize approximately $1.5 million of loss on early extinguishment of debt related to the refinancing.

10.   Mandatorily Redeemable Preferred Stock of Subsidiary

In December 2001, Products issued 182,700 shares of its Series A Redeemable Preferred Stock, 123,700 shares of Series B Redeemable Preferred Stock and 20,000 shares of Series C Redeemable Preferred Stock. The Preferred Stock was recorded at fair value of $146.9 million, which was less than the liquidation value of

F-21

COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

$1,000 per share or $326.4 million. The estimated fair value was based on market prices for securities with similar terms, maturities and risk characteristics, and included a liquidation discount to reflect market conditions and was agreed to by the Company and Textron as part of the TAC-Trim purchase agreement. The difference between the initial recorded value and the liquidation value is being accreted over the 11 year terms of the securities. The 2003 and 2002 results included subsidiary preferred stock requirements calculated using the effective interest method of $37.3 million and $38.4 million, respectively. The preferred stock requirement includes both accretion and dividend costs of $5.3 million and $32.0 million, respectively for 2003 compared to $7.6 million and $30.8 million, respectively for 2002. The carrying value of the Redeemable Preferred Stock includes accretion and accrued dividends.

In June 2002, $100.0 million of proceeds from the 16 million share common stock offering was used to repurchase Series A preferred stock at a price of 75% of its liquidation preference of $133.3 million. The redeemed Series A preferred stock had a carrying value of $63.7 million. The difference between the $63.7 million in carrying value and the $100.0 million cash payment was excluded from net income and recorded as a charge to equity in the Company's accumulated deficit account. This $36.3 million equity charge is included in the computation of loss per share and is included in the net loss attributable to common shareholders.

Products is required to redeem all Series A and B Preferred Stock outstanding on January 1, 2013 and Series C Preferred Stock outstanding on February 1, 2022. The redemption price is equal to 100% of the liquidation preference plus accrued and unpaid dividends plus common equity participation for the Series C Preferred Stock. The Series A and Series B Preferred Stock are redeemable at Products' option, in whole or in part, on or after January 1, 2007 at a stated percent in excess of the liquidation preference plus accrued and unpaid dividends. The Series C Preferred Stock is not optionally redeemable. However, Products' or the holders of a majority of outstanding shares of Series C Preferred Stock, may exchange the Series C Preferred Stock for Series B Preferred Stock at any time following the second anniversary of its issuance date but prior to the third anniversary of its issuance date.

Shareholders of Series A Preferred Stock are entitled to receive dividends accruing annually on the liquidation preference at a rate of 11% for dividend periods ending on or prior to July 1, 2003, and 15% thereafter. Holders of Series B and C Preferred Stock are entitled to receive dividends accruing annually on the liquidation preference at a rate of 12% for dividend periods ending on or prior to July 1, 2003, and 16% thereafter.

Products exercised its option through January 1, 2004 and accrued the full amount of all dividends in lieu of cash payment of such dividends. Thereafter, Products may at its option elect to accrue dividends of up to 7% of the liquidation value annually on Series A Preferred Stock and up to 8% of the liquidation value on Series B and C Preferred Stock. Accrued dividends will be added to the liquidation preference of the applicable series of Preferred Stock.

Upon voluntary or involuntary liquidation, dissolution or winding-up of Products, holders of the Preferred Stock are entitled to be paid out of the assets of Products available for distribution to stockholders in the amount of $1,000 per share plus the total accrued dividends prior to any distribution to holders of equity securities which rank junior to the Preferred Stock. In addition, the holders of Series C Preferred Stock are entitled to a participation in distributions to Products common equity tied to appreciation in the value of Products common equity subsequent to the issuance date, not to exceed $2.0 million for all Series C Preferred Stock outstanding.

If Products experiences a change of ownership control, the holders of the Preferred Stock must be given the opportunity to sell to Products their Preferred Stock at 100% of the liquidation preference plus accrued and unpaid dividends, plus, in the case of Series C Preferred Stock, common equity participation. In the event that Products does not meet or exceed certain financial criteria based on interest coverage, the dividend rate

F-22

COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

applicable solely to Series A Preferred Stock will increase by 1.00% for the next full dividend period and by an additional 0.50% for each dividend period thereafter provided that the dividend rate does not exceed 20%. The provision of the certificate of designation limits Products' ability to issue more debt, pay dividends and make distributions, repurchase stock, make investments, merge or consolidate, transfer assets, enter into transactions with affiliates and issue stock of subsidiaries. These covenants are subject to a number of important exceptions.

Effective April 2004, the Company will, exercise its option to convert all 20,000 shares of the Series C Redeemable Preferred Stock to Series B Preferred Stock on an equivalent share basis. The primary difference between the Series C and Series B Preferred Stock was that Series C holders are entitled to participation in distributions of Products common equity tied to the appreciation in the value of Products common equity subsequent to the issuance date of the securities. Each Series C Preferred Stock holder will receive one share of Series B Redeemable Preferred Stock on the equivalent share basis. The conversion will have no effect on the results of operations or financial position of the Company.

## 11.  Receivables Facility and Non-Recourse Factoring Facilities

*Receivables Facility*

The Company has an agreement to sell, on an ongoing basis, the trade accounts receivable of certain business operations to a bankruptcy-remote, special purpose subsidiary ("Carcorp"), wholly owned and consolidated by the Company. The receivables subsidiary (Carcorp) will, subject to certain conditions, from time to time, sell an undivided fractional ownership interest in a pool of domestic and certain Canadian receivables, up to $250 million, to various multi-seller commercial paper conduits supported by a committed liquidity facility. Upon sale to the conduit, Carcorp will hold a subordinated retained interest in the receivables. Under the terms of the agreement, new receivables are added to the pool as collections reduce previously sold receivables. The Company expects to service, administer and collect the receivables on behalf of Carcorp and the conduit. The proceeds of sale will be less than the face amount of accounts receivable sold by an amount that approximates the purchaser's financing costs. In September 2002, the Company amended the receivables facility lengthening its term to expire in December 2004. The Company plans to renew or replace the receivables facility with other debt financings including potential borrowings under lines of credit.

As of December 31, 2003 and December 31, 2002, Carcorp, Inc.'s total receivables pool as defined under the receivables facility was $165.4 million and $253.3 million, respectively. As of December 31, 2003 the utilization of the Receivables Facility was $73.7 million and an additional $9.1 million was available, subject to limitations imposed under the Senior Secured Credit Facilities (Note 9). At December 31, 2002, utilization of the Receivables Facility was $66.0 million and an additional $93.2 million of funding was available but unutilized.

The Company estimates the fair value of its retained interest by considering two key assumptions: the payment rate, which is derived from the average life of the accounts receivable, which is less than 60 days, and the rate of expected credit losses. Based on the Company's favorable collection experience and the short-term nature of its receivables, both assumptions are highly predictable. Therefore, the Company's estimated fair value of its retained interests in the pool of eligible receivables is approximately equal to the previous cost, less the associated allowance for doubtful accounts.

The proceeds received by Carcorp from collections on receivables, after the payment of expenses and amounts due, are used to purchase new receivables. During 2003 and 2002, Carcorp had net cash collections of approximately $3.0 billion and $2.9 billion, respectively. These funds were used to purchase new receivables from the Sellers, under the Receivables Facility.

Restrictions: This receivables facility contains certain restrictions on Carcorp (including maintenance of $60.0 million net worth) and on the sellers (including limitations on liens on receivables, modifications of the terms of receivables and changes in credit and collection practices) customary for facilities of this type.

COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

The commitments under the receivables facility are subject to termination prior to their term upon the occurrence of certain events, including payment defaults, breach of covenants (including defined interest coverage and leverage ratios), bankruptcy, default by the Company in servicing the receivables and failure of the receivables to satisfy certain performance criteria.

*Non-Recourse Factoring Facilities*

The Company has entered into various agreements with international lenders to sell accounts receivables of certain international operations on a non-recourse basis. As of December 31, 2003, the Company has utilized $126.6 million from these commitments. The funding levels and commitments by the lenders are based on the eligible receivables in the Company's subsidiaries in the various countries, including subsidiaries in Belgium, Brazil, Germany, Italy, Mexico, Netherlands, Spain and Sweden. As of December 31, 2003, under the agreements, approximately $132.7 million of receivables have been sold, while the Company had retained an interest in $6.2 million on these sold receivables. The retained interest remains classified on the Company's balance sheet as trade receivables. Under the agreements, the Company usually pays a factoring fee and a discount on the daily utilization of the facility. The expenses related to these agreements are recorded in the loss on sale of receivables account on the income statement.

During 2003, the loss on the sale of the receivables totaled $7.3 million. During 2002 and 2001 the losses on sale of receivables totaled $4.2 million and $10.8 million, respectively. The 2001 loss included $5.6 million in expenses and fees to replace the prior facility. The usage fee under the facility is 1.50%. In addition, the Company is required to pay a fee of 0.50% on the unused portion of the facility and a discount. The discount on sold interests is approximately equal to the interest rate paid by the conduits to the holders of the commercial paper plus a usage fee. The discount rate at December 31, 2003 was 1.55% compared to 1.45% at December 31, 2002.

## 12.  Operating Leases

The Company has operating leases for land and buildings for periods up to twenty years and transportation, operating and administrative equipment for periods ranging from one to twelve years. The majority of these leases contain renewal provisions.

The Company has equipment lease agreements and building lease agreements with several lessors which, subject to specific approval, provide availability of funding for operating leases and sale-leasebacks as allowed in its other financing agreements. The Company has a purchase option on certain equipment at the end of the lease term based on the fair market value of the equipment or to purchase some or all of the equipment at prices determined under the agreement. The Company has classified the leases as operating leases.

At December 31, 2003, future minimum lease payments under operating leases for continuing operations are as follows (in millions):

| Year Ending | |
|---|---|
| 2004 | $  55.0 |
| 2005 | 55.0 |
| 2006 | 58.1 |
| 2007 | 54.1 |
| 2008 | 24.3 |
| Later Years | 111.4 |
| | $ 357.9 |

F-24

**COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

Rental expense of continuing operations under operating leases was $63.7 million, $57.1 million and $29.2 million, for fiscal 2003, 2002 and 2001, respectively.

During 2003, the Company received net proceeds (after fees) of approximately $10.2 million from the sale and leasebacks of real property and equipment. The total minimum lease commitments under these leases will be $16.1 million, $0.5 million relates to 2003.

During 2002, the Company received net proceeds (after fees) of approximately $14.8 million from sale and leasebacks of real property and equipment. The total minimum lease commitments under these leases will be $18.8 million, $2.6 million of which relates to both 2003 and 2002.

During 2001, Products entered into sale and leaseback transactions for certain manufacturing equipment and non-manufacturing properties. The transactions resulted in the recognition of a $4.4 million net deferred loss that is being amortized over the lease term and the recognition of an $8.7 million loss.

During 2001, the Company received net proceeds (after fees) of approximately $86.2 million from sale and leasebacks of real property and equipment, which it used to reduce outstanding debt. The aggregate lease payments associated with these leases will be $88.8 million, $12.5 million of which related to 2002. As part of the 2001 sale-leaseback transactions, Products sold and contemporaneously leased back real property from unrelated third parties and received net proceeds (after fees) of $46.4 million. Refer to Note 19 for a discussion regarding certain sale and leaseback transactions that were entered into with related parties.

### 13.  Employee Benefit Plans

#### A.  *Defined Benefit Pension and Postretirement Benefit Plans*

Subsidiaries of the Company have defined benefit pension plans covering substantially all employees who meet eligibility requirements. Plan benefits are generally based on years of service and employees' compensation during their years of employment. Funding of retirement costs for these plans complies with the minimum funding requirements specified by the Employee Retirement Income Security Act.

Subsidiaries of the Company have also provided postretirement life and health coverage for certain retirees under plans currently in effect. Many of the subsidiaries' domestic and Canadian employees may be eligible for coverage if they reach retirement age while still employed by the Company. Most of these plans are contributory. In general, future increases in costs are passed on fully to the retiree. However, future increases in costs for the Canadian divisions and limited domestic operations are shared between the Company and the retiree.

COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

The following tables provide a reconciliation of the projected benefit obligation, a reconciliation of plan assets, the funded status of the plans and amounts recognized in the Company's consolidated balance sheets at December 31, 2003 and December 31, 2002 (in millions).

| | Pension Benefits(a) Fiscal Year Ended | | Postretirement Benefits Fiscal Year Ended | |
| --- | --- | --- | --- | --- |
| | December 31, 2003 | December 31, 2002 | December 31, 2003 | December 31, 2002 |
| Measurement Date | September 30 | September 30 | September 30 | September 30 |
| **Change in benefit obligation:** | | | | |
| Benefit obligation at beginning of year | $ 384.2 | $ 372.2 | $ 93.8 | $ 151.2 |
| Service cost | 14.0 | 11.3 | 1.4 | 1.7 |
| Interest cost | 25.9 | 23.9 | 5.8 | 6.9 |
| Employee contributions | 0.6 | 0.6 | 0.9 | 0.9 |
| Amendments | 3.9 | 2.3 | 10.6 | (62.6) |
| Actuarial gain (loss) | 25.2 | 16.9 | (5.9) | 15.0 |
| Purchase Accounting | — | (26.4) | — | (12.4) |
| Settlements | (0.6) | — | — | — |
| Benefits paid | (27.8) | (19.4) | (6.4) | (6.4) |
| Currency adjustment | 16.4 | 2.0 | — | — |
| Other | 2.8 | 0.8 | — | (0.5) |
| Benefit obligation at end of year | $ 444.6 | $ 384.2 | $ 100.2 | $ 93.8 |
| **Change in plan assets:** | | | | |
| Fair value of plan assets at beginning of year | $ 303.0 | $ 338.0 | $ — | $ — |
| Actual return (loss) on plan assets | 41.4 | (34.4) | — | — |
| Employer contributions | 8.6 | 6.6 | 5.5 | 5.5 |
| Employee contributions | 0.6 | 0.6 | 0.9 | 0.9 |
| Benefits paid | (27.8) | (19.4) | (6.4) | (6.4) |
| Purchase Accounting Adjustments/ Acquisitions | — | 11.3 | — | — |
| Settlements | (0.6) | — | — | — |
| Currency adjustment | 12.5 | 0.3 | — | — |
| Fair value of plan assets at end of year | $ 337.7 | $ 303.0 | $ — | $ — |
| **Reconciliation of funded status to net amount recognized:** | | | | |
| Funded status | $ (106.9) | $ (81.2) | $ (100.2) | $ (93.8) |
| Unrecognized net loss (gain) | 140.1 | 131.7 | (9.5) | (5.0) |
| Unrecognized prior service cost (gain) | 9.4 | 5.0 | (45.6) | (63.4) |
| Net amount recognized | $ 42.6 | $ 55.5 | $ (155.3) | $ (162.2) |
| **Amounts recognized in the consolidated balance sheet consist of:** | | | | |
| Prepaid benefit cost | $ 3.3 | $ 2.1 | $ — | $ — |
| Accrued benefit liability | (101.3) | (67.6) | (155.3) | (162.2) |
| Intangible asset | 10.3 | 6.3 | — | — |
| Accumulated other comprehensive loss | 130.3 | 114.7 | — | — |
| Net amount recognized | $ 42.6 | $ 55.5 | $ (155.3) | $ (162.2) |

(a)  Employer contributions and benefits paid in the above table include only those amounts contributed directly to or paid directly from plan

F-26

COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

The accumulated benefit obligation at the end of 2003 and 2002 was $430.9 million and $372.8 million, respectively.

At the end of 2003 and 2002, the projected benefit obligation, accumulated benefit obligation and fair value of plan assets for the U.S. pension plans, pension plans outside the U.S. and pension plans with an accumulated benefit obligation in excess of plan assets, were as follows:

| End of Year | U.S. Plans | | Non-U.S. Plans | | Accumulated Benefit Obligation Exceeds the Fair Value of Plan's Assets U.S. and Non-U.S. | |
|---|---|---|---|---|---|---|
| | 2003 | 2002 | 2003 | 2002 | 2003 | 2002 |
| Projected benefit obligation | 328.8 | 297.4 | 115.8 | 86.8 | 430.6 | 374.2 |
| Accumulated benefit obligation | 327.2 | 287.8 | 103.7 | 85.0 | 420.5 | 363.9 |
| Fair value of plan assets | 248.9 | 240.3 | 88.8 | 62.7 | 321.1 | 291.1 |

The net periodic benefit cost of continuing operations for fiscal 2003, 2002 and 2001 includes the following components (in millions):

| | Pension Benefits Fiscal Year Ended | | |
|---|---|---|---|
| | December 31, 2003 | December 31, 2002 | December 31, 2001 |
| Components of net periodic benefit cost: | | | |
| Service cost | $ 14.0 | $ 11.3 | $ 6.8 |
| Interest cost | 25.9 | 23.9 | 12.7 |
| Expected return on plan assets | (27.2) | (31.6) | (14.6) |
| Amortization of prior service cost | 0.3 | 0.2 | 0.2 |
| Settlement gain | — | — | (0.1) |
| Curtailment loss (a) | — | 2.0 | — |
| Recognized net actuarial loss (b) | 9.0 | 0.6 | 0.1 |
| Net periodic benefit cost | $ 22.0 | $ 6.4 | $ 5.1 |

(a)  Curtailment loss resulted from termination of employees that were covered under a Canadian plan.

(b)  Includes $2.8 million of termination benefits for a former executive recorded as a restructuring charge in 2003.

F-27

COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

|  | Postretirement Benefits Fiscal Year Ended | | |
|  | December 31, 2003 | December 31, 2002 | December 31, 2001 |
|---|---|---|---|
| Components of net periodic benefit cost: | | | |
| Service cost | $ 1.4 | $ 1.7 | $ 1.0 |
| Interest cost | 5.8 | 6.9 | 3.8 |
| Amortization of prior service cost | (7.5) | (5.6) | (1.4) |
| Recognized net actuarial gain | (1.2) | (1.4) | (1.7) |
| Curtailment gain | — | (0.6) | — |
| Net periodic benefit cost | $ (1.5) | $ 1.0 | $ 1.7 |

Weighted average assumptions end of year used to determine benefit obligations are summarized as follows (rates are used to compute the balances as of the end of the year and the expense for the following year):

|  | Pension Benefits | | Postretirement Benefits | |
|  | 2003 | 2002 | 2003 | 2002 |
|---|---|---|---|---|
| Discount rate | 6.3% | 6.7% | 6.2% | 7.0% |
| Rate of compensation increase | 3.2% | 3.1% | N/A | N/A |

Weighted average assumptions at used to determine net periodic benefit cost are summarized as follows (rates are used to compute the balances as of the end of the year and the expense for the following year):

|  | Pension Benefits | | | Postretirement Benefits | | |
|  | 2003 | 2002 | 2001 | 2003 | 2002 | 2001 |
|---|---|---|---|---|---|---|
| Discount rate | 6.7% | 7.2% | 7.4% | 7.0% | 7.5% | 7.4% |
| Expected return on plan assets | 8.9% | 9.3% | 9.2% | N/A | N/A | N/A |
| Rate of compensation increase | 3.1% | 3.1% | 4.5% | N/A | N/A | N/A |

The discount rate is determined by using the spot rate yield on high quality corporate bonds and the duration of the liability of the company's own benefit programs. The Company reduced its discount rate from September 2002 to September 2003 to correspond to the changes in the underlying high quality bond benchmark index.

The expected long-term rate of return for the plan's total assets is based on the expected return of each of the above categories, weighted based on the target allocation for each class. Equity securities are expected to return 9% to 11% over the long-term, while debt securities are expected to return between 4% and 7%. The Investment Advisors will provide a premium to the respective market benchmark indices.

Health care costs for domestic plans: (1) Dura Convertible was assumed to increase 9.5.% during 2004; the rates were assumed to grade down by 0.5% per year to an ultimate rate of 6% and remain at that level thereafter. (2) Wickes Engineering Materials was assumed to increase 6% during 2004 and remain at that level thereafter. (3) TAC-Trim was assumed to increase 10.5% during 2004; the rates were assumed to grade down by 0.5% per year to an ultimate rate of 6% and remain at that level thereafter. Health care trend rates for Canadian Plans were assumed to increase approximately 7.5% during 2004 grading down by 0.5% per year to a constant level of 5.0% annual increase.

COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

Assumed health care cost trend rates may have a significant effect on the amounts reported for postretirement benefits. A one-percentage-point change in assumed health care cost trend rates would have the following effects (in millions):

|  | 1-Percentage-Point Increase | | 1-Percentage-Point Decrease | |
|---|---|---|---|---|
| Effect on total of service and interest cost components | $ | 0.7 | $ | (0.6) |
| Effect on postretirement benefit obligation | $ | 8.5 | $ | (7.0) |

The asset allocation for the Company's U.S. pension plans at the end of 2003 and 2002, and the target allocation for 2004, by asset category, are as follows:

| Asset Category | Target Allocation 2004 | Percentage of Plan Assets at Year End | |
|---|---|---|---|
|  |  | 2003 | 2002 |
| Equity securities | 55%-65% | 62% | 52% |
| Debt securities | 35%-45% | 37% | 42% |
| Other | 0%-5% | 2% | 6% |
| Total |  | 100% | 100% |

US Plan Assets and Investment Strategy: The plan's expected long-term rate of return on plan assets of 9% is primarily based on both historical returns and expected returns of each of the above categories, weighted based on target allocation for each class. In addition, third party data recording expected asset class returns and inflation has been considered. Investment management responsibilities of plan assets are delegated to registered investment advisers and overseen by an investment committee comprised of members of the Company's senior management. Written investment management agreements and policies set forth the goals, policies and investment management strategies of the plan with regard to permissive investments. Review of investment performance is made quarterly. In circumstances where market conditions cause asset allocation or manager diversification to deviate out of tolerance, assets are rebalanced into compliance typically within 30 days of occurrence.

*B. Defined Contribution Plans*

Subsidiaries of the Company sponsor defined contribution plans covering employees who meet eligibility requirements. Subsidiary contributions are based on formulas or are at the Company's discretion as specified in the plan documents. Contributions were $3.5 million, $6.2 million and $3.2 million in fiscal 2003, 2002 and 2001, respectively.

F-29

**COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

**14.   Discontinued Operations**

During 2003, the Company recognized $2.4 million from workers compensation claims related to discontinued operations, for which reserves were previously charged. During 2002 and 2001, the Company received proceeds of $15.8 million and $14.5 million, respectively, on environmental claims related to discontinued operations, for which reserves were previously charged. Of these amounts, $1.6 million, $9.5 million and $8.8 million were recorded as income from discontinued operations in 2003, 2002 and 2001, respectively, net of income taxes of $0.8 million, $6.3 million and $5.7 million, respectively.

During fiscal 2000, the Company settled claims for certain environmental matters related to discontinued operations for a total of $20 million. Settlement proceeds were to be paid to the Company in three installments. The first and second installments of $7.5 million and $7.5 million were received in June 2000 and June 2001, respectively with the third installment of $5.0 million received in June 2002. Of the total $20 million settlement, the Company recorded the present value of the settlement as $7.0 million of additional environmental reserves, based on its assessment of potential environmental exposures and $6.6 million, net of income taxes, as income from discontinued operations.

The Company has significant obligations related to post-retirement, casualty, environmental, asbestos, product liability, lease and other liabilities of discontinued operations. The nature of many of these contingent liabilities is such that they are difficult to quantify and uncertain in terms of amount. The Company has accrued $21.5 million for postretirement costs and $36.7 million for environmental and product liability costs.

In connection with retained operating leases of certain discontinued operations, the Company believes that future sublease rental receipts will equal or exceed future minimum lease payments and accordingly, has not recorded any liability for these leases.

**15.   Restructuring**

Activity related to the restructuring reserve is as follows (in millions):

|  | Severance Costs | Lease Commitments and Other Exit Costs | Total |
|---|---|---|---|
| Restructuring reserves: |  |  |  |
| Balance at beginning of year | $     17.5 | $      10.7 | $   28.2 |
| 2nd quarter 2003 program | 4.2 | 0.7 | 4.9 |
| 3rd quarter 2003 program | 20.4 | 6.8 | 27.2 |
| 4th quarter 2003 program | 7.6 | 1.7 | 9.3 |
| Adjustments to prior year's expenses | — | (0.8) | (0.8) |
| Total net expense | 32.2 | 8.4 | 40.6 |
| Transfers to other balance sheet accounts | (2.8) | — | (2.8) |
| Costs paid | (25.3) | (9.8) | (35.1) |
| Ending balance | $     21.6 | $       9.3 | $   30.9 |
| 3rd quarter 2003 restructuring: |  |  |  |
| Costs expected | 21.2 | 6.8 | 28.0 |
| Costs paid in period and to date | (7.8) | (3.1) | (10.9) |
| 4th quarter 2003 restructuring |  |  |  |
| Costs expected | 7.8 | 1.7 | 9.5 |
| Costs paid in period and to date | (2.8) | — | (2.8) |

**COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

During the fourth quarter 2003, the Company undertook a restructuring program to rightsize its overhead structure, reduce salaried headcount and strengthen and streamline the senior management team on a worldwide basis with the primary focus on domestic operations resulting in a restructuring charge of $9.3 million. The 2003 charge included approximately $7.6 million of severance cost and $1.7 million of costs related to the establishment of accruals for lease commitments and other exit costs. The Company restructuring plan includes severance of nearly 1,000 personnel, with approximately 100 personnel from the Company's U.S. and Mexico Plastics segment, approximately 500 from the International Plastics segment and approximately 400 from Global Soft Trim segment. Additionally, the Company recognized a $4.6 million write down of fixed assets related to U.S. and Mexico Plastics and Global Soft Trim locations.

|  | U.S. and Mexico Plastics | | International Plastics | | Global Soft Trim | | Other | Total |
|---|---|---|---|---|---|---|---|---|
| 4th Quarter 2003 Restructuring: | | | | | | | | |
| Total costs expected | $ | 0.9 | $ | 4.0 | $ | 3.6 | $ 1.0 | $ 9.5 |
| Costs incurred in period and to date | | 0.9 | | 3.8 | | 3.6 | 1.0 | 9.3 |

During the third quarter 2003, the Company undertook a restructuring program to rightsize its overhead structure, reduce salaried headcount and strengthen and streamline the senior management team on a worldwide basis with the primary focus on domestic operations resulting in a restructuring charge of $27.2 million. The 2003 charge included approximately $20.4 million of severance cost and $6.8 million of costs related to the establishment of accruals for lease commitments and other exit costs. The Company restructuring plan includes severance of nearly 1,600 personnel, with approximately 500 personnel from the Company's U.S. and Mexico Plastics segment, approximately 300 from the International Plastics segment, approximately 600 from Global Soft Trim segment and approximately 200 from the Company's corporate locations. Additionally, the Company recognized a $2.2 million write down of fixed assets related primarily to International Plastics locations.

In the third quarter, the Company adopted the FASB Staff Position No. FAS 146-1 "Determining Whether a One-Time Termination Benefit Offered in Connection with an Exit or Disposal Activity Is, in Substance, an Enhancement to an Ongoing Benefit Arrangement." The effect from adopting FAS 146-1 was to defer recording $1.2 million of restructure expense to later periods. The effect on prior quarters and December 31, 2003 for the portion of the restructuring activities deferred was not significant.

Included in the third quarter 2003 restructuring charge severance cost were charges related to the separation agreement with Jerry L. Mosingo, the former President and CEO. In August 2003, the Company's Board of Directors appointed David Stockman as CEO, in addition to retaining his position of Chairman. Under the terms of his separation agreement, Mr. Mosingo received $0.6 million in the third quarter of 2003 and will receive $0.2 million per quarter through December 31, 2004, $0.1 million for the quarter ending March 31, 2005 and other fringe and retirement benefits. The resulting third quarter 2003 restructuring charge was $5.3 million that includes the present value of future benefits of $2.8 million which is included in pension liability.

|  | U.S. and Mexico Plastics | | International Plastics | | Global Soft Trim | | Other | Total |
|---|---|---|---|---|---|---|---|---|
| 4th Quarter 2003 Restructuring: | | | | | | | | |
| Total costs expected | $ | 6.3 | $ | 5.6 | $ | 5.9 | $ 10.2 | $ 28.0 |
| Costs incurred in period and to date | | 6.3 | | 5.0 | | 5.7 | 10.2 | 27.2 |

During the second quarter 2003, the Company undertook a restructuring program to rationalize operations on a worldwide basis with the primary focus on U.S. and Mexico operations resulting in a restructuring charge of $4.9 million. The 2003 charge included approximately $4.2 million of severance cost and $0.7 million of costs related to the establishment of reserves for lease commitments and other exit costs.

F-31

COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

The Company's restructuring plan includes severance of over 500 personnel. Of the 500 personnel approximately 450 were terminated in the second quarter of 2003 with approximately 170 personnel at the Company's International Plastics segment, approximately 160 at Global Soft Trim segment and approximately 120 at the Company's corporate locations. Additionally, the Company recognized a $0.8 million write down of fixed assets related to an International Plastics location. Activity related to 2003 for this program was $4.2 million for severance costs and $0.6 million of lease commitment and other exit costs with $0.1 million of severance costs remaining to be paid.

During 2003, the Company recognized a $7.5 million write-down of fixed assets related to its 50% interest in an Italian joint venture acquired in 2001, $10.4 million impairment of the Becker non-compete agreement and $2.7 million related to other intangible assets (see Notes 3 and 19 for additional information).

Included in the 2003 charges are adjustments related to previously established accruals which did not require cash outlays of $0.8 million.

In the fourth quarter of 2002, the Company undertook a restructuring program primarily to consolidate European operations that resulted in a restructuring charge of $14.1 million. This restructuring charge included $4.0 million of severance costs, $0.8 million of costs related to other contractual obligations and $9.3 million of costs related to fixed asset impairments. The severance costs related to over 300 personnel.

In the third quarter of 2002, the Company undertook a restructuring program primarily to realign the operations in North America that resulted in a restructuring charge of $33.8 million. This restructuring charge included $23.8 million of severance costs, $1.3 million of costs related to the establishment of reserves for lease commitments and lease termination fees and $8.7 million of costs related to fixed asset impairments. The severance costs related to over 700 personnel.

Included in the third quarter 2002 restructuring charge severance costs were charges related to the separation agreement with Thomas Evans the former Chairman and CEO. In August 2002, the Company's Board of Directors appointed Jerry L. Mosingo as President, Chief Executive Officer (CEO) and Director of the Company. Under the terms of his separation agreement, Mr. Evans received $5.5 million on August 15, 2002 and will receive quarterly payments of $0.3 million through June 30, 2004. The resulting third quarter 2002 restructuring charge was $8.9 million.

In the first quarter 2002, the Company undertook a restructuring program to rationalize operations in North America and Europe resulting in a restructuring charge of $9.1 million. This restructuring included $5.5 million of severance costs and $3.6 million of costs related to the establishment of reserves for lease commitments and lease termination fees. The Company recognized severance costs for over 100 personnel primarily at the Company's North America and European headquarters. The reserve for lease commitments relates to contractual obligations for the Company's former headquarters facility, while the termination fees relate to an aircraft lease.

During 2001, the Company undertook restructuring programs to rationalize its formerly reported operations in North American, European and Specialty segments resulting in a restructuring charge aggregating $18.8 million. The charge included $11.2 million of severance costs and $7.6 million of asset impairments. The Company recognized severance costs for over 900 operating personnel at the Company's convertible tops, fabrics, carpet and acoustics locations in North America and Specialty operations. The asset impairments, primarily related to machinery and equipment located at North American, European and Specialty operations sites, are based on management's estimates of values to be realized upon disposition of the assets.

During 2001, the Company recorded a restructuring reserve in connection with the Becker acquisition aggregating $5.3 million of which $1.6 million was severance and $3.7 million for lease termination and other exit costs.

COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

**16.   Common Stockholders' Equity and Earnings Per Share**

*A.   Common Stock*

In April 2002, the Company issued 400,000 shares of common stock as part of the purchase of a lamination company wholly owned by a current director and shareholder of the Company. In June 2002, the Company issued 16 million shares of common stock for $160 million before expenses. The Company used $100 million of the $152 million in net proceeds to redeem $133 million of face value Series A Redeemable Preferred Stock and the remainder for general corporate purposes.

*B.   Stock Option Plans*

The 1994 Employee Stock Option Plan ("1994 Plan") was adopted as a successor to the 1993 Employee Stock Option Plan to facilitate awards to certain key employees and consultants. The 1994 Plan was amended in 1999 primarily to increase the number of shares available for issuance under the Plan by 1,000,000 shares. The 1994 Plan provides that no options may be granted after 10 years from the effective date of this plan. Options vest, in each case, as specified by the Company's compensation committee, generally over three years after issuance. At December 31, 2003, 1,592,214 shares were available for issuance under the 1994 Plan. The Company also adopted the 1994 Directors Stock Option Plan, which provides for the issuance of options to acquire a maximum of 240,000 shares of common stock to directors who are not part of management and are not affiliated with a major stockholder. As of December 31, 2003, 68,000 options had been granted. The Company adopted the 1997 United Kingdom Scheme, which provides for the issuance of options to key employees under the 1994 Plan. Effective January 1, 2000, the Company adopted the 2000 Employee Stock Option Plan, which provides for the issuance of up to 2,400,000 shares to key employees and consultants. At December 31, 2003, no options had been awarded under the 2000 plan. The Company adopted effective March 28, 2002, the 2002 Employee Stock Option Plan, which provides for the issuance of up to 6,600,000 shares to key employees and consultants. Under the 2002 plan 60% of the issued options vest and become exercisable in 20% increments in 2003, 2004 and 2005, accordingly, based on when the option was granted. The remaining 40% vest subject to performance targets and become exercisable during 2012 and 2013 or on an accelerated basis if performance targets are met.

The Company issued 1,723,000 options during the year and repriced 3,559,256 options that had an original average exercise price of $10.00 to an exercise price of $8.00. The weighted average exercise price was $8.87 after repricing 3,559,256 stock options in the first quarter of 2003. At December 31, 2003, options representing 3,335,122 shares of common stock were available for grants.

F-33

COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

All shareholder plans have been approved by stockholders. Stock option activity under the plans is as follows:

| | December 31, 2003 | | December 31, 2002 | | December 31, 2001 | |
|---|---|---|---|---|---|---|
| | Number of shares | Weighted Average Exercise Price | Number of shares | Weighted Average Exercise Price | Number of shares | Weighted Average Exercise Price |
| Outstanding beginning of year | 4,427,248 | $ 10.12 | 2,830,920 | $ 5.59 | 4,344,432 | $ 5.47 |
| Impact of 2002 Stock Split | — | — | (1,698,553) | | — | — |
| Adjusted Beginning Balance | 4,427,248 | 10.12 | 1,132,367 | 13.98 | 4,344,432 | 5.47 |
| Awarded | 1,723,000 | 8.00 | 5,182,929 | 10.00 | 40,000 | 5.76 |
| Cancelled | (1,140,792) | 8.55 | (1,819,634) | 10.14 | (458,090) | 7.48 |
| Exercised | — | — | (68,414) | 12.79 | (1,095,422) | 4.31 |
| Outstanding at end of year | 5,009,456 | $ 8.32 | 4,427,248 | $ 10.12 | 2,830,920 | $ 5.59 |

The following table summarizes information about stock options outstanding at December 31, 2003:

| Range of Exercise Price | Number of Shares Outstanding | Weighted Average Remaining Life | Weighted Average Exercise Price | Number of Stock Options Exercisable | Weighted Average Exercise Price |
|---|---|---|---|---|---|
| $ 8.00 — $10.00. | 4,945,456 | 9.9 | $ 8.21 | 1,354,555 | $ 8.75 |
| $10.94 — $25.00. | 64,000 | 6.7 | $ 17.10 | 64,000 | $ 17.10 |

The Company has elected to continue to utilize the accounting provisions of APB No. 25 for stock options and is required to provide pro forma disclosures of net income and earnings per share had the Company adopted the fair value method for recognition purposes. See Note 2, "Summary of Significant Accounting Policies — Employee Stock Options" for the tabular presentation as if the Company had adopted SFAS No. 123 and restated its results and for discussion related to the 2003 proforma cost related to options.

In accordance with SFAS No. 123, the 3,559,256 repriced options were revalued during 2003 to determine additional compensation cost that resulted from the difference in the fair value of the options prior to repricing and subsequent to repricing. As a result of the repricing $0.4 million of additional compensation cost, net of tax, was incurred on a proforma basis. These options have a weighted average expected life of approximately 6 years. The assumptions used in valuing the repriced options are as follows: expected volatility ranged from 77.54% to 118.309%; expected lives ranged from 1 year to 75 1/2 years; the risk free interest rate ranged from 1.2% to 3.72% in 2003; and a zero expected dividend rate.

Additionally, as a result of repricing the Company's stock options, the options are treated as variable-based awards in accordance with APB No. 25. Because these options are considered to be variable-based awards, the Company will incur future compensation expense if the stock price exceeds the $8.00 exercise price established at the time of the repricing.

C.  *Earnings Per Share*

Basic earnings per common share were computed by dividing net income (loss) by the weighted average number of shares of common stock outstanding during the year. Diluted earnings per common share were determined assuming the exercise of the stock options issued under the Company's stock option plans. There

F-34

COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

were no reconciling items between basic earnings per common share and diluted earnings per common share for 2003, 2002 and 2001.

In 2003, 2002 and 2001, potentially dilutive securities have been excluded from the diluted earnings per share calculation since their inclusion would have been antidilutive. Below is a summary of potentially dilutive securities (in millions, except weighted average exercise price):

|  | 2003 | 2002 | 2001 |
|---|---|---|---|
| Stock options | 5.0 | 4.4 | 2.8 |
| Weighted average exercise price | $ 8.32 | $ 10.12 | $5.59 |
| Warrants | 0.5 | 0.5 | 0.5 |
| Weighted average exercise price | $ 10.00 | $ 10.00 | $5.00 |

## 17. Income Taxes

The provisions for income taxes applicable to continuing operations for fiscal 2003, 2002 and 2001 are summarized as follows (in millions):

|  | Fiscal Year Ended | | |
|---|---|---|---|
|  | December 31, 2003 | December 31, 2002 | December 31, 2001 |
| Current: |  |  |  |
| Federal | $ — | $ — | $ — |
| State | 4.2 | 5.8 | 2.6 |
| Foreign | 1.5 | 15.3 | 4.8 |
|  | 5.7 | 21.1 | 7.4 |
| Deferred: |  |  |  |
| Federal | 4.9 | 19.6 | (21.7) |
| State | 1.0 | 2.1 | (1.3) |
| Foreign | (13.5) | (25.3) | (5.7) |
|  | (7.6) | (3.6) | (28.7) |
| Income tax expense (benefit) | $ (1.9) | $ 17.5 | $ (21.3) |

Domestic and foreign components of income (loss) from continuing operations before income taxes are summarized as follows (in millions):

|  | Fiscal Year Ended | | |
|---|---|---|---|
|  | December 31, 2003 | December 31, 2002 | December 31, 2001 |
| Domestic | $ 8.9 | $ 45.4 | $ (43.8) |
| Foreign | (69.9) | (79.2) | (32.5) |
|  | $ (61.0) | $ (33.8) | $ (76.3) |

COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

A reconciliation between income taxes computed at the statutory U.S. Federal rate of 35% and the provisions for income taxes applicable to continuing operations is as follows (in millions):

| | Fiscal Year Ended | | |
|---|---|---|---|
| | December 31, 2003 | December 31, 2002 | December 31, 2001 |
| Amount at statutory Federal rate | $ (21.4) | $ (11.8) | $ (26.7) |
| State taxes, net of Federal income tax | 3.2 | 5.1 | 1.0 |
| Tax differential on foreign earnings | 4.0 | (0.7) | 2.9 |
| Nontaxable interest income | (5.3) | (3.9) | — |
| Amortization of goodwill | — | — | 1.5 |
| Subsidiary preferred stock dividends and accretion | 13.1 | 13.4 | 0.8 |
| Change in valuation allowance | 10.8 | 15.9 | (1.2) |
| General business tax credits | (4.5) | (2.5) | (0.5) |
| Other | (1.8) | 2.0 | 0.9 |
| Income tax expense (benefit) | $ (1.9) | $ 17.5 | $ (21.3) |

Deferred income taxes are provided for the temporary differences between the financial reporting and tax basis of the Company's assets and liabilities. The components of the net deferred tax assets as of December 31, 2003 and 2002 were as follows (in millions):

| | December 31, 2003 | December 31, 2002 |
|---|---|---|
| Deferred tax assets: | | |
| Employee benefits, including postretirement benefits | $ 130.8 | $ 124.9 |
| Net operating loss carryforwards (NOLs) | 189.2 | 162.5 |
| General business tax credit carryforwards | 20.2 | 10.7 |
| Alternative minimum tax credit carryforwards | 8.9 | 12.2 |
| Other liabilities and reserves | 21.3 | 33.7 |
| Valuation allowance | (89.2) | (78.4) |
| Total deferred tax assets | 281.2 | 265.6 |
| Deferred tax liabilities: | | |
| Property, plant and equipment | (70.7) | (68.1) |
| Undistributed earnings of foreign subsidiaries | (7.2) | (7.2) |
| Total deferred tax liabilities | (77.9) | (75.3) |
| Net deferred tax asset | $ 203.3 | $ 190.3 |

The Company has net operating losses in its foreign jurisdictions of $92 million. These losses will begin expiring in 2005 through 2015. Additionally, the Company has foreign net operating losses of $212 million which have no expiration date.

The valuation allowance at December 31, 2003 and December 31, 2002 provides for certain deferred tax assets that in management's assessment may not be realized due to tax limitations on the use of such amounts, due to expiration prior to utilization or that relate to tax attributes that are subject to uncertainty due to the long-term nature of their realization. During fiscal 2003, the valuation allowance increased $10.8 million from fiscal 2002. This increase resulted primarily from the increase in loss carryforwards that may not be realized in future periods. The valuation allowance at December 31, 2003 includes $11.8 million related to the Textron

**COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

acquisition. If the deferred tax assets related to the $11.8 million valuation allowance become realizable, the valuation allowance offset will be to goodwill.

The above amounts have been classified in the consolidated balance sheets as follows (in millions):

|  | December 31, 2003 | December 31, 2002 |
|---|---|---|
| Deferred tax assets: |  |  |
| Current domestic and foreign, included in other current assets | $ 25.2 | $ 25.3 |
| Noncurrent domestic and foreign | 178.1 | 165.0 |
| Net deferred tax asset | $ 203.3 | $ 190.3 |

Management has reviewed the Company's operating results for recent years as well as the outlook for its continuing operations and concluded that it is more likely than not that the net deferred tax assets of $203.3 million at December 31, 2003 will be realized. Management took into consideration, among other factors, the impact of recent restructuring plans, the timing of the reversal of its temporary differences, certain tax planning strategies and the expiration dates of its NOLs. The Company's ability to generate future taxable income is dependent on numerous factors, including general economic conditions, the state of the automotive industry and other factors beyond management's control. Considerable judgement is often involved in making these determinations, the use of different assumptions could result in significantly different results.

Deferred income taxes and withholding taxes have been provided on earnings of the Company's foreign subsidiaries to the extent it is anticipated that the earnings will be remitted in the future as dividends. Deferred income taxes and withholding taxes have not been provided on the remaining undistributed earnings of foreign subsidiaries as such amounts are deemed to be permanently reinvested. The cumulative undistributed earnings as of December 31, 2003 on which the Company has not provided deferred income taxes and withholding taxes is approximately $31.9 million.

At December 31, 2003, the Company had the following tax attribute carryforwards available for U.S. Federal income tax purposes (in millions):

|  | Amount | Expiration Dates |
|---|---|---|
| Net operating losses — regular tax: |  |  |
| Preacquisition, subject to limitations | $ 103.4 | 2005-2012 |
| Subject to change in control provisions | 193.1 | 2018-2021 |
| Subject to change in control provisions | 27.1 | 2021 |
|  | $ 323.6 |  |
| Net operating losses — alternative minimum tax: |  |  |
| Preacquisition, subject to limitations | $ 67.9 | 2005-2012 |
| Subject to change in control provisions | 195.0 | 2018-2021 |
| Subject to change in control provisions | 14.3 | 2021 |
|  | $ 277.2 |  |

F-37

COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

|  | Amount | Expiration Dates |
|---|---|---|
| General business tax credits: | | |
| Preacquisition, subject to limitations | $ 10.1 | 2004-2021 |
| Subject to change in control provisions | 7.2 | 2021-2022 |
| | $ 17.3 | |
| Foreign tax credits | $ 2.9 | 2008 |
| Alternative minimum tax credits | $ 8.9 | |

As a result of the Heartland Transaction, a change in control occurred which results in annual limitations on the Company's use of its NOLs and unused tax credits. This annual limitation on the use of NOLs and tax credits depends on the value of the equity of the Company and the amount of "built-in gain" or "built-in loss" in the Company's assets at the date of the change in control. Based on the expiration dates of the NOLs and tax credits as well as anticipated levels of domestic income, management does not believe that the transaction will have a material impact on these deferred tax assets.

Future sales of common stock by the Company or its principal stockholders, or changes in the composition of its principal stockholders, could constitute a change in control that would result in additional annual limitations on the Company's use of its NOLs and unused tax credits. Management cannot predict whether such a change in control will occur.

## 18.   Risk Management and Financial Instruments

### Foreign Currency and Interest Rate Risk Management

The Company operates on a global basis and is exposed to the risk that its earnings, cash flows and stockholders' equity could be adversely impacted by fluctuations in currency exchange rates and interest rates. To manage the volatility relating to these exposures, the Company aggregates the exposures on a consolidated basis to take advantage of natural offsets. For exposures that are not offset within its operations, the Company may enter into various derivatives transactions pursuant to its risk management policies. The primary purpose of the Company's foreign currency and interest rate risk management policies and activities is to manage these risks to acceptable levels.

To manage its risks, the Company primarily utilizes forward exchange contracts and purchased options with durations of generally less than 12 months. The Company has in place forward exchange contracts and purchased options with third parties, denominated in multiple currencies, which will mature during fiscal 2004. The details are as follows:

| Derivative Type | Currency Sold | Currency Purchased | USD Equivalent of Notional Amount | Weighted Average Contract Rate (per Convention) | Unrealized Gain (Loss) |
|---|---|---|---|---|---|
| Options | CAD | USD | $   50.0 | 1.5 | $    — |

In order to manage the interest rate risk associated with our debt portfolio, the Company may enter into derivative transactions to manage its exposures to changes in global interest rates, although the Company did not have in place any interest rate derivatives in 2003 or 2002.

Gains and losses on derivatives qualifying as hedges under SFAS No. 133 "Accounting for Derivative Instruments and Hedging Activities" are recorded on the balance sheet as a component of "Accumulated

F-38

**COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

other comprehensive loss" to the extent that the hedges are effective until the underlying transactions are recognized in earnings. As of December 31, 2003, the Company had no derivatives designated as hedges under SFAS No. 133. Gains and losses from all derivatives that do not qualify as hedges under SFAS No. 133, are recorded in the income statement as required by SFAS No. 133, and the fair value is recorded in the balance sheet.

*Fair Value of Financial Instruments, Derivatives and Hedging Activities*

The estimated fair values of the Company's continuing operations financial instruments are summarized as follows (in millions):

|  | December 31, 2003 | | December 31, 2002 | |
| --- | --- | --- | --- | --- |
|  | Carrying Amount | Estimated Fair Value | Carrying Amount | Estimated Fair Value |
| Short-term debt, long-term debt and capital lease obligations | $ 1,285.2 | $ 1,244.8 | $ 1,289.2 | $ 1,200.2 |
| Mandatorily redeemable preferred stock of subsidiary | $ 161.2 | $ 161.2 | $ 123.9 | $ 123.9 |
| Forwards | $ — | $ — | $ 0.2 | $ 0.2 |
| Options | $ — | $ — | $ 0.3 | $ 0.3 |

The following methods and assumptions were used to estimate these fair values:

The fair value of the Public Debt notes are based upon quoted market prices. The fair value of the other short-term and long-term debt of the Company approximates the carrying value due to the frequent resetting of interest rates.

The fair value of the forward contracts and purchase options are based upon quoted market prices and the aggregated notional amount outstanding in U.S. dollar equivalent of $50.0 million at December 31, 2003.

Carrying amounts reported in the consolidated balance sheets for cash and cash equivalents, accounts and other receivables, accounts payable and accrued expenses approximate fair value due to the short-term nature of these instruments.

*Concentration of credit risk*

In the normal course of business, the Company provides credit to customers in the automotive industry, performs credit evaluations of these customers and maintains reserves for potential credit losses. When realized, the losses have been within the range of management's allowance for doubtful accounts.

*Other Concentrations of Risk*

The Company invests the majority of its excess cash in money market accounts and, where appropriate, diversifies the concentration of cash among financial institutions. With respect to financial institutions, the Company has diversified its selection of counterparties and has arranged master-netting agreements, where allowed by law, and the Company's policies, to minimize the risk of loss.

## 19. Related Party Transactions

**Heartland Transactions**

Heartland is a private equity firm established in 1999 for the purpose of acquiring and expanding industrial companies operating in various sectors of the North American economy that are well positioned for global consolidation and growth. The managing general partner of Heartland is Heartland Industrial

COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

Associates, L.L.C. Certain directors and officers of the Company are members of the general partner, specifically Messrs. Stockman (a Director and our Chairman and Chief Executive Officer), Stepp (a Director and our Vice Chairman and Chief Financial Officer) and Tredwell, Leuliette, McConnell and Valenti (each Directors). Other of our directors or their affiliates, specifically Messrs. Becker and McCallum, are limited partners in Heartland with interests representing less than 5% of the commitments in Heartland. Heartland has informed us that its limited partners include many financial institutions, private and government employee pension funds and corporations, among other types of investors. The Company may, in the ordinary course of business, have on a normal, customary and arms' length basis relationships with certain of Heartland's limited partners, including banking, insurance and other relationships.

The Company is a party to a Services Agreement with Heartland under which Heartland provides advisory and consulting services, including services with respect to developments in the automotive industry and supply markets, advice on financial and strategic plans and alternatives and other matters as it may reasonably request and are within Heartland's expertise. The Services Agreement terminates on the earlier of its tenth anniversary or the date upon which Heartland ceases to own Company shares equivalent to 25% of that owned by them on February 23, 2001.

Under the Services Agreement, the Company is obligated to pay to Heartland a $4.0 million annual advisory fee payable in quarterly installments and reimburse its out-of-pocket expenses related to the services it provides. The Company has also agreed to pay a fee of 1% of the total enterprise value of certain acquisitions and dispositions. During 2003, 2002 and 2001 the Company recorded total fees of $4.0 million, $5.7 million and $24.5 million, respectively.

The Services Agreement with Heartland contemplates that the Company may pay additional fees to Heartland for services rendered in connection with a range of financing transactions. In March 2004, the Company's Board of Directors, including the disinterested and independent directors of the Board, approved a fee of $1 million to Heartland for its services rendered in connection with the 2004 amendments to the Company's credit facility to add synthetic revolving and letter of credit facilities.

*Charles E. Becker Transactions*

On March 27, 2003, the Company entered into a termination agreement and release to buyout the non-compete agreement between the Company and Charles E. Becker, a member of the Company's Board of Directors and a limited partner in Heartland. The Company paid $11.3 million in April 2003 as part of the termination agreement and release. The non-compete agreement, which was entered into as part of the Becker acquisition, required the Company to make periodic payments. As a result of this transaction, the Company incurred a loss of $10.4 million, which is primarily due to the write-off of intangible assets initially recorded in conjunction with the Becker acquisition.

During 2002, the Company engaged Mr. Becker to serve as Vice Chairman and assist the Company with strategic planning activities, such as developing sales strategies, managing key customer relationships and recruiting senior management for the Company's European operations. The Company paid Mr. Becker $300,000 for such services. Mr. Becker's consulting arrangement and position as Vice Chairman ended in 2002.

The Company entered into a lease agreement with Becker Ventures L.L.C. ("Becker Ventures"), an entity controlled by Mr. Becker, for the Company's headquarters at 250 Stephenson Highway, Troy, Michigan with the effective date of the lease being January 1, 2002. In March 2002, the Company entered into lease agreements with Becker Ventures, effective January 1, 2002, for 150 Stephenson Highway and 350 Stephenson Highway, Troy, Michigan. The base rent for all three premises is $13.25 per sq. ft., subject to annual CPI adjustments. Total square footage for all three locations is approximately 286,000. The leases have

F-40

COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

20-year terms, and the Company has two five-year renewal options. The 2004 base rent for the facilities will be approximately $4.0 million. In 2004, these leases were amended to provide that the Company would assume responsibility for property management with a corresponding elimination of certain aspects of the property management fees. In addition, the Company is also party to a lease with Becker Ventures for five manufacturing facilities totaling 884,000 square feet. In 2002, the Company extended the lease term an additional ten years to expire in 2021, with the base rent for these facilities totaling $3.6 million per year.

In June 2001, Products sold and contemporaneously leased back real property located in Troy, Michigan and Plymouth, Michigan from New King, L.L.C. and Anchor Court, L.L.C., respectively, which are affiliates of Becker Ventures, for net proceeds of $15.1 million in aggregate. The initial lease term in each transaction is 20 years and each lease has two successive ten year renewal options. The basic rent for the Troy, Michigan property is $1.3 million per year, and the basic rent for the Plymouth, Michigan property is $0.5 million per year. The rental rates in each case are subject to adjustment after expiration of the initial term.

*Elkin McCallum Transactions*

In the first quarter of 2003, the Company purchased equipment from Joan Fabrics Corporation ("Joan Fabrics"), and entered into a supply agreement with Joan Fabrics to supply certain types of fabrics. Elkin McCallum, a director of the Company, controls Joan Fabrics and is a limited partner in Heartland. Under the supply agreement, the Company supplies fabric to Joan Fabrics and Joan Fabrics is responsible for all marketing, design, customer service, distribution and sales functions related to these fabrics. The Company paid Joan Fabrics $4.7 million of consideration for these transactions, a portion of which the Company has allocated to the purchased equipment (based on its appraised value) and the remainder of which it is amortizing over the five-year term of the supply agreement.

On December 31, 2002, the Company acquired an air jet texturing business from Dutton Yarns (an affiliate of Mr. McCallum) for approximately $4.2 million. The purchased assets included equipment, inventory and intellectual property. The Company had preliminarily accounted for this transaction as an acquisition of assets, but finalized its accounting during the first quarter of 2003, and recorded the transaction as a purchase of a business.

On April 12, 2002, the Company signed and closed on a merger agreement with Mr. McCallum and a lamination company wholly owned by Mr. McCallum pursuant to which the acquired company was merged into a wholly owned subsidiary of the Company. As consideration in the transaction, Mr. McCallum received 400,000 shares of Common Stock and was repaid $2.5 million in cash as reimbursement for amounts previously invested to fund the lamination company's working capital needs. Subsequent to the merger, debt owing to Mr. McCallum of $6.7 million was repaid. The Company acquired the lamination business to optimize the supply chain on certain of its fabric products and provide low cost lamination products and services to Tier-1 customers. As part of this acquisition, the Company inherited a lease pursuant to which it leases from an entity controlled by Mr. McCallum, a portion of a manufacturing facility in El Paso, Texas. The Company continues to occupy these premises pursuant to such lease.

In April 2002, the Company amended the merger agreement with Joan Automotive to clarify ownership of certain equipment listed in a schedule attached to that agreement. The original merger agreement schedule included a list of approximately 84 looms that ultimately exceeded the Company's manufacturing requirements and facility capacity. Upon determining that the excess looms would have been uneconomically expensive to relocate and store, the Company declined to take possession of 48 of these looms, which were left in place at Joan Fabrics' Hickory, North Carolina plant. The amendment clarifies that these looms are owned by Joan Fabrics.

In September 2001, the Company completed the acquisition of Joan Automotive Industries, a leading supplier of bodycloth to the automotive industry, and all of the operating assets of Joan's affiliated yarn dying

F-41

COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

operation, Western Avenue Dyers, L.P. As a result of the Joan acquisition, Joan Fabrics became a principal stockholder of the Company. Upon completion of the Joan acquisition, Mr. McCallum became a member of the Company's Board of Directors. As part of this acquisition, the Company inherited a lease pursuant to which it leases from an entity controlled by Mr. McCallum, a technical center in Lowell, Massachusetts. The operations formerly conducted in these premises have been moved to other company facilities, however, the Company remains obligated for the related lease.

In connection with the Joan acquisition, the Company entered into a Supply Agreement dated September 21, 2001 (the "Supply Agreement") with Main Street Textiles, L.P. ("Main Street"), which is controlled by Mr. McCallum, and a Transition Services Agreement dated September 21, 2001 (the "Transition Agreement") with Joan Fabrics. Under the Supply Agreement, which was mutually terminated effective as of January 1, 2004, the Company agreed to purchase all of its requirements for flat woven automotive fabric from Main Street for a five-year period beginning on the date of the Supply Agreement. The prices which the Company agreed to pay for fabric under the agreement equaled the costs of the raw materials plus an amount representing Main Street's standard labor and overhead costs incurred in manufacturing fabric for us. Under the Transition Agreement, Joan Fabrics provided Products transitional and support services for a period not to exceed twelve months in order to support the continued and uninterrupted operation of the businesses acquired by Products in the Joan acquisition. As a part of these services, pending the Company's disassembly and removal of machinery and equipment purchased from Joan Fabrics, Joan Fabrics was permitted to continue to use that machinery and equipment to manufacture for us all of our requirements for some types of knitted and woven automotive fabrics. The terms of the Company's agreement with respect to this fabric production are substantially similar to those under the Supply Agreement. Actual prices paid by the Company for fabric under the Supply Agreement and Transition Agreement were subject to the rebates described below.

In 2002 and 2003, the Company engaged in ordinary course transactions with entities controlled by Mr. McCallum for the purchase and sale of goods and services as part of ongoing business relationships. The Company recorded purchases from entities controlled by Mr. McCallum, of $17.8 million (net of $1.2 million of rebates) in 2003, and $47.3 million (net of $10.5 million of rebates) in 2002 for goods and services purchased. These rebates received from Mr. McCallum relate to knit and woven automotive fabrics provided by entities controlled by Mr. McCallum under the Supply Agreement and Transition Agreement executed in connection with the 2001 Joan acquisition, which are described above. Supplier rebates such as these are common in the automotive industry as part of ongoing price negotiations and adjustments. These rebates from Mr. McCallum totaled $14.7 million over the duration of the agreements. In addition, the Company recorded sales to entities controlled by Mr. McCallum, of $6.4 million in 2003 and $31.8 million in 2002.

The following table summarizes the balances outstanding from entities controlled by Mr. McCallum (in millions):

|  | As of December 31, | |
| --- | --- | --- |
|  | 2003 | 2002 |
| Accounts Receivable | $ 2.7 | $ 5.9 |
| Accounts Payable | $ 1.0 | $ 8.0 |

*Textron Transactions*

As discussed in Note 10 "Mandatorily Redeemable Preferred Stock of Subsidiary," and Note 12 "Operating Leases," the Company is a party to various agreements and transactions with Textron. Textron became a related party as a result of its receipt of the consideration in the 2001 TAC-Trim acquisition. In May 2002, as part of the finalization of the purchase price and related working capital adjustments of the TAC-Trim acquisition, the Company paid Textron $15.5 million in cash.

F-42

COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

Prior to the TAC-Trim acquisition, TAC-Trim entered into an $86.9 million sale and leaseback transaction (the "Textron Leasing Transaction") with two separate single purpose affiliates of Textron Financial Corporation, as lessor and purchaser, with respect to a portfolio of manufacturing equipment situated in different locations throughout the United States and Canada. In January 2003, the FASB issued FASB Interpretation No. ("FIN") 46, "Consolidation of Variable Interest Entities ("VIE"), an interpretation of Accounting Research Bulletin No. 51, "Consolidated Financial Statements" (see Note 2 "Summary of Significant Accounting Policies" for further information on FIN 46). As part of the Company's implementation of FIN 46, it determined that one of the single purpose affiliates was a VIE. The Company negotiated and agreed to have the lease restructured so it was required to be consolidated by the other party and not accounted for as a VIE. As consideration for this lease restructuring, the Company agreed to pay Textron Financial $150,000.

Payments under the Textron leasing transaction are guaranteed by Products and secured by a first perfected mortgage lien over certain real property with a value equal to $25 million. Each lease is for an initial term of three years with three one-year renewal options. At the end of the leases (including the expiration of all renewal options), there is the option of either purchasing all of the equipment for approximately $26 million or returning the equipment to the lessor. In the event the equipment is returned, arrangements will be made for the disposition of the equipment. The Company is required to guarantee a minimum value to the lessor of up to approximately $21 million upon expiration of the leases. As is customary, the documentation for the Textron leasing transaction incorporates covenants by reference, from the Company's credit facility, that may be amended or waived by the senior lenders, and also contain events of default.

As part of the TAC-Trim acquisition, the Company entered into three intellectual property license agreements with Textron. In two of these agreements, the Company licenses back to Textron certain intellectual property that was acquired in the transaction. In the third agreement, the Company licenses from Textron other intellectual property that was not acquired in the transaction. In addition, under the TAC-Trim acquisition agreement, the Company is permitted to use the "Textron" name for 18 months in exchange for payments of $13.0 million on December 15, 2002 and $6.5 million on December 15, 2003.

20.   Information About the Company's Operations

In conjunction with the 2003 restructurings, the Company changed its reportable segments to align with organization changes and senior management responsibilities. The Company's new reportable segments consist of U.S. and Mexico Plastics, International Plastics and Global Soft Trim. International Plastics includes all international plastics operations, including Canada. The U.S. and Mexico Plastics and International Plastics segments include interior trim components such as door panels, instrument panels, consoles, package trays and cargo management systems, exterior trim components such as bumper fascias and cladding and fully assembled cockpit systems and components thereof. The Global Soft Trim segment includes molded non-woven and tufted carpet, alternative molded flooring, accessory mats and acoustics systems consisting of absorbing materials, damping materials, engine compartment noise vibration and harshness systems, interior insulators, seat body cloth, insert fabric, headliner fabric, convertible roof systems, hard top retractable roof systems, tonneau covers and actuation systems. The Company changed the composition of its reportable

F-43

COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

segments on January 1, 2003 and further redefined the segments beginning July 1, 2003 and restated prior period segment data to be comparable.

The segments consist of dedicated facilities and division offices focused on the manufacturing, assembly and sequencing of the aforementioned products and systems. The other categories consist of costs not allocated to operating segments including selling, product development and administrative costs.

The Company evaluates performance based on operating profit or loss. Information about the Company's divisions is presented below (in millions):

| | Year Ended December 31, 2003 | | | | |
| | U.S. and Mexico Plastics | International Plastics | Global Soft Trim | Other(a) | Total |
|---|---|---|---|---|---|
| External revenues | $ 1,363.4 | $ 1,258.0 | $ 1,362.3 | $ — | $ 3,983.7 |
| Inter-segment revenues | 12.0 | 17.9 | 1.0 | (30.9) | — |
| Interest expense from preferred stock requirement | — | — | — | 37.3 | 37.3 |
| Depreciation and amortization | 43.6 | 39.7 | 48.7 | 8.2 | 140.2 |
| Goodwill | 761.5 | 327.2 | 274.4 | — | 1,363.1 |
| Operating income (loss) | 73.6 | (22.5) | 140.5 | (89.6) | 102.0 |
| Total assets | 1,074.6 | 845.0 | 687.0 | 584.6 | 3,191.2 |
| Capital expenditures | 45.9 | 47.4 | 75.5 | 6.3 | 175.1 |

| | Year Ended December 31, 2002 | | | | |
| | U.S. and Mexico Plastics | International Plastics | Global Soft Trim | Other(a) | Total |
|---|---|---|---|---|---|
| External revenues | $ 1,512.2 | $ 899.0 | $ 1,474.6 | $ — | $ 3,885.8 |
| Inter-segment revenues | 13.4 | 16.8 | 0.8 | (31.0) | — |
| Preferred stock requirement | — | — | — | 38.4 | 38.4 |
| Depreciation and amortization | 38.4 | 24.3 | 49.0 | 5.3 | 117.0 |
| Goodwill | 715.1 | 278.8 | 271.6 | — | 1,265.5 |
| Operating income (loss) | 113.1 | (30.1) | 161.6 | (76.9) | 167.7 |
| Total assets | 1,176.1 | 843.5 | 682.8 | 454.7 | 3,157.1 |
| Capital expenditures | 41.0 | 26.9 | 48.8 | 31.2 | 147.9 |

| | Year Ended December 31, 2001 | | | | |
| | U.S. and Mexico Plastics | International Plastics | Global Soft Trim | Other(a) | Total |
|---|---|---|---|---|---|
| External revenues | $ 208.0 | $ 263.1 | $ 1,352.2 | $ — | $ 1,823.3 |
| Inter-segment revenues | 1.9 | 6.7 | 1.4 | (10.0) | — |
| Preferred stock requirement | — | — | — | 2.4 | 2.4 |
| Depreciation and amortization | 10.8 | 12.4 | 55.9 | 2.7 | 81.8 |
| Goodwill | 949.6 | 47.1 | 257.1 | — | 1,253.8 |
| Operating income (loss) | 1.6 | (2.4) | 48.7 | (12.3) | 35.6 |
| Total assets | 866.3 | 354.6 | 826.8 | 940.2 | 2,987.9 |
| Capital expenditures | 6.5 | 2.3 | 40.9 | 4.8 | 54.5 |

F-44

**COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

---

(a)   Other includes the Company's non-operating units (See Note 14) and the effect of eliminating entries. During 2003 and 2002, certain corporate costs that were previously included at the divisional units were included in the Other category. Those costs that could be attributed to a divisional unit were allocated back to the appropriate division. Operating income (loss) for the year ended December 31, 2003 includes: $53.3 million, $74.0 million and $48.7 million of corporate costs allocated back to U.S. and Mexico Plastics, International Plastics and Global Soft Trim, respectively. Operating income (loss) for the year ended December 31, 2002 includes: $60.4 million, $35.5 million and $39.6 million of corporate costs allocated back to U.S. and Mexico Plastics, International Plastics and Global Soft Trim, respectively.

Direct and indirect sales to significant customers in excess of ten percent of consolidated net sales from continuing operations follow:

|  | Fiscal Year Ended | | |
|---|---|---|---|
|  | 2003 | 2002 | 2001 |
| DaimlerChrysler AG | 28.5% | 31.0% | 18.7% |
| General Motors Corporation | 22.4% | 23.0% | 29.0% |
| Ford Motor Company | 24.8% | 23.0% | 21.5% |

The Company recently confirmed its strategy for new business, which involves pursuing sales growth based on criteria intended to more effectively allocate the Company's resources on the most promising new business opportunities. As part of this strategy, the Company is reviewing its parts profitability for each plant and program worldwide. For example, the Company has recently concluded that a certain future business award is inconsistent with its criteria and is therefore in the process of cooperating in the transition of this award to another supplier.

At the end of the second quarter, the Company received notice from one of its customers, DaimlerChrysler Corporation, of an issue regarding the calculation methods for determining the current year valuation of price givebacks. Discussions on this issue, as well as various aspects of the broader relationship, are continuing. While the Company seeks to improve the profitability of its programs with this and all of its customers, there can be no assurance that the Company will not lose desirable programs over time. While the Company continues to believe that all of these issues will be resolved to the mutual satisfaction of the parties, there can be no assurances that such a resolution is imminent or that actions by the customer with respect to the broader relationship will not have a material adverse impact on the Company.

Information about the Company's continuing operations in different geographic areas for fiscal 2003, 2002 and 2001 is presented below (in millions):

|  | Year Ended December 31, 2003 | | Fiscal Year Ended December 31, 2002 | | Fiscal Year Ended December 31, 2001 | |
|---|---|---|---|---|---|---|
|  | Net Sales | Long-Lived Assets | Net Sales | Long-Lived Assets | Net Sales | Long-Lived Assets |
| United States | $ 2,200.4 | $ 1,472.9 | $ 2,412.0 | $ 1,445.3 | $ 1,346.0 | $ 1,545.4 |
| Canada | 464.3 | 432.3 | 488.2 | 343.4 | 168.5 | 99.0 |
| Mexico | 254.0 | 79.1 | 230.7 | 96.8 | 50.5 | 52.9 |
| Europe | 1,001.6 | 283.0 | 660.5 | 129.4 | 117.3 | 189.0 |
| Other | 63.4 | 89.9 | 94.4 | 173.9 | 141.0 | 220.6 |
| Consolidated | $ 3,983.7 | $ 2,357.2 | $ 3,885.8 | $ 2,188.8 | $ 1,823.3 | $ 2,106.9 |

Intersegment sales between geographic areas are not material. For fiscal years 2003, 2002 and 2001, export sales from the United States to foreign countries were $408.9 million, $429.5 million and $146.2 million, respectively.

COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

21.  **Commitments and Contingencies**

Except as described below, the Company and its subsidiaries are not party to any material pending legal proceedings, but is involved in ordinary routine litigation incidental to the business.

*Environmental*

The Company is subject to federal, state, local and foreign environmental, and health and safety, laws and regulations that (i) affect ongoing operations and may increase capital costs and operating expenses in order to maintain compliance with such requirements and (ii) impose liability relating to contamination at facilities, other locations such as former facilities, facilities where we have sent wastes for treatment or disposal and other properties to which the Company may be linked. Such liability may include, for example, investigation and clean-up of the contamination, personal injury and property damage caused by the contamination and damages to natural resources. Some of these liabilities may be imposed without regard to fault and may also be joint and several (which can result in a liable party being held responsible for the entire obligation, even where other parties are also liable).

Management believes that it has obtained, and is in material compliance with, those material environmental permits and approvals necessary to conduct the Company's various businesses. Environmental compliance costs for continuing businesses are accounted for as normal operating expenses or capital expenditures, except for certain costs incurred at acquired locations. Environmental compliance costs relating to conditions existing at the time of an acquisition are generally charged to reserves established in purchase accounting. The Company accrues for environmental remediation costs when such obligations are known and reasonably estimable. In the opinion of management, based on the facts presently known to it, such environmental compliance and remediation costs will not have a material effect on the Company's business, consolidated financial condition, future results of operations or cash flows.

The Company is legally or contractually responsible or alleged to be responsible for the investigation and remediation of contamination at various sites and for personal injury or property damages, if any, associated with such contamination. At some of these sites, the Company has been notified that it is a potentially responsible party ("PRP") under the federal Superfund law or similar state laws. Other sites at which the Company may be responsible for contamination may be identified in the future, including with respect to divested and acquired businesses.

The Company is currently engaged in investigating or remediating certain sites as discussed in the paragraphs below. In estimating the cost of investigation and remediation, the Company considered, among other things, its prior experience in remediating contaminated sites, remediation efforts by other parties, data released by the United States Environmental Protection Agency ("USEPA"), the professional judgment of the Company's environmental experts, outside environmental specialists and other experts and the likelihood that other identified PRPs will have the financial resources to fulfill their obligations at sites where they and the Company may be jointly and severally liable. It is difficult to estimate the total cost of investigation and remediation due to various factors including:

• incomplete information regarding particular sites and other PRPs;

• uncertainty regarding the nature and extent of environmental problems and the Company's share, if any, of liability for such problems;

• the ultimate selection among alternative approaches by governmental regulators;

F-46

COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

• the complexity and evolving nature of environmental laws, regulations and governmental directives and

• changes in cleanup standards.

The Company is a party to a Consent Decree with the State of New Hampshire to remediate a former industrial landfill known as the Cardinal Landfill in Farmington, New Hampshire. Pursuant to that Consent Decree, the Company is currently conducting a pilot test for a proposed remediation of chlorinated compound contaminants in groundwater. The Consent Decree calls for a remedy to be in place during 2004. The Company is a defendant in two lawsuits filed by a total of 91 individual plaintiffs for alleged personal injuries arising from Cardinal Landfill conditions. The Company will vigorously contest these allegations. As of December 31, 2003, the Company has accrued $13.6 million for Cardinal Landfill.

The Company is a party, as a member of a PRP workgroup, to a Consent Decree entered with the USEPA for the remediation of a former municipal landfill in Dover, New Hampshire. The town of Dover, New Hampshire is also a member of the PRP group and a party to the Consent Decree. Pursuant to the terms of the Consent Decree, the PRP group is currently engaged in the preparation of a remediation design. The Consent Decree requires that a remedy for the site be in place during 2004. As of December 31, 2003, the Company has accrued $8.7 million for Dover.

Pursuant to a Consent Decree signed with the USEPA, the Company is currently engaged in a full-scale remediation for groundwater and soil contamination at the former Stamina Mills manufacturing facility in North Smithfield, Rhode Island. Remediation activities have been ongoing since 1998. Another Consent Decree resolving the USEPA claim for past oversight costs was signed during 2003, and a payment of $7.3 million was made during the third quarter of 2003. As of December 31, 2003, the Company has accrued $6.6 million for Stamina Mills.

The Company is working with the Michigan Department of Environmental Quality ("MDEQ") to investigate and remediate soil and groundwater contamination at a former manufacturing plant in Mancelona, MI and at adjacent owned property formerly used for the treatment and disposal of plating waste. MDEQ is likely to require remediation of groundwater contamination. In addition, the Company is incurring costs in connection with the provision of alternate water supplies to residences in the area.

The current owner of one of the Company's former manufacturing plants located in Bowling Green, OH has entered into an Administrative Order on Consent with the Ohio Environmental Protection Agency ("OEPA") requiring investigation and remediation of contamination at the site. The Company is reimbursing the current owner for costs associated with ongoing groundwater monitoring and, following selection of an appropriate remedy by OEPA, will assume 90% of future remediation costs.

In the 1980's and 1990's, the California Regional Water Quality Control Board ("CRWQCB") and other state agencies ordered a predecessor of the Company to investigate and remediate soil and groundwater contamination at a former lumber treatment plant in Elmira, CA. In 1996, the Company entered into an agreement with the State of California to conduct long-term operation and maintenance of the remedy implemented at the site.

The Company has entered into an Administrative Order by Consent with the USEPA requiring investigation, delineation and removal of contamination from a vacant three acre site in Zanesville, Ohio. The delineation report has been submitted to USEPA for comment, and the Administrative Order by Consent calls for the submittal and implementation of an action plan during 2004.

In 2003, the Company signed a Consent Agreement with the State of South Carolina Department of Health and Environmental Control requiring soil and groundwater investigations at a former manufacturing facility in Cowpens, South Carolina. The Company had ceased operations at this location in 1981. Initial investigations will delineate potential groundwater contamination that has migrated under a residential area. These studies are scheduled to be completed in 2004.

F-47

COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

The Company has established accruals for certain contingent environmental liabilities and management believes such reserves comply with accounting principles generally accepted in the United States of America. The Company accrues for environmental investigatory and non-capital remediation costs when litigation has commenced or a claim or assessment has been asserted or is imminent, the likelihood of an unfavorable outcome is probable and the financial impact of such outcome is reasonably estimable. As of December 31, 2003 and 2002, total reserves for these environmental costs are approximately $51.2 million and $64.5 million, respectively.

In the opinion of management, based on information presently known to it, identified environmental costs and contingencies will not have a material effect on the Company's consolidated financial condition, future results of operations or cash flows. However, management can give no assurance that they have identified or properly assessed all potential environmental liabilities arising from the business or properties, and those of present and former subsidiaries and their corporate predecessors.

*Litigation*

The Company and its subsidiaries have lawsuits and claims pending against them and have certain guarantees outstanding which were made in the ordinary course of business.

As of December 31, 2003, the Company is party to approximately 875 pending cases alleging personal injury from exposure to asbestos containing materials used in boilers manufactured before 1966 by former operations of the Company which were sold in 1966. Asbestos-containing refractory bricks lined the boilers and, in some instances, the Company's former operations installed asbestos-containing insulation around the boilers. These pending cases do not include cases that have been dismissed or are subject to agreements to dismiss due to the inability of the plaintiffs to establish exposure to a relevant product and cases that have been settled or are subject to settlement agreements. Total settlement costs for these cases have been less than $944,800 or an average of less than $5,700 per settled case. The defense and settlement costs have been substantially covered by our primary insurance carriers under a claims handling agreement that expires in August 2006. The Company has primary, excess and umbrella insurance coverage for various periods available for asbestos-related boiler and other claims. The Company's primary carriers have agreed to cover approximately 80% of certain defense and settlement costs up to a limit of approximately $70.5 million for all claims made, subject to reservations of rights. The excess insurance coverage, which varies in availability from year to year, is approximately $600 million in aggregate for all claims made. Based on the age of the boilers, the nature of the claims and settlements made to date and the insurance coverage, management does not believe that these cases will have a material impact on the Company's financial condition, results of operations or cash flows. However, it cannot assure that the Company will not be subjected to significant additional claims in the future, that insurance will be available as expected or that unanticipated damages or settlements in the future would not exceed insurance coverage.

As previously disclosed, a purported class action was filed on March 24, 2003 in the United States District Court for the Eastern District of Michigan, against the Company, Heartland and ten current and former senior officers and/or directors of the Company, alleging violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated there under. Four similar actions were subsequently filed in the United States District Court for the Eastern District of Michigan, purportedly filed on behalf of purchasers of the common stock of the Company between August 7, 2001 and August 2, 2002, which are identical to the purported class identified in the previously disclosed lawsuit, except in one instance in which the complaint alleges a class period beginning on July 5, 2001. On August 4, 2003, the court consolidated all five pending actions and appointed lead plaintiffs for the purported class. The Company believes that the claims are without merit and intends to vigorously defend the lawsuits. The Company does not believe that the suit will have a material impact on the Company's financial condition, results of operations or cash flows.

COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

The Company is a defendant in a lawsuit involving a sales commissions arrangement inherited from a predecessor company and its partial ownership of an extinguished joint venture. In September 2003, the Oakland County Circuit Court entered a judgment by default against the Company for $4.2 million based upon an inadvertent failure to produce a small number of documents that were to be produced with thousands of other documents that were delivered in the discovery process. The Company and its counsel believes that the default judgment was improperly entered and that damages were improperly assessed, and it has filed an appeal of the judgment with the Michigan Court of Appeals. The Company intends to vigorously pursue its appeal in this matter and has posted a letter of credit in the amount of the judgment as part of the normal appeal process. While management believes it may have no liability to the plaintiff, the Company has established an appropriate reserve for this matter in an amount less than the amount of the current judgment.

The ultimate outcome of the legal proceedings to which the Company is a party will not, in the opinion of the Company's management, based on the facts presently known to it, have a material effect on the Company's consolidated financial condition, future results of operations or cash flows.

*Completion of Audit Committee Inquiry*

The Company's Audit Committee inquiry, initiated in August 2003, into certain assertions made by two former executives and related matters has been completed. The Audit Committee, aided by its independent counsel, Davis Polk & Wardwell, and by an outside accounting expert, reported its findings and recommendations to the Company's full Board of Directors. In general, the Audit Committee's inquiry extended into the following areas: (1) assertions regarding the Company's accounting for revenue and tooling, (2) a comprehensive review of related party transactions and (3) certain corporate governance procedures. The following summarizes the Committee's principal findings and recommendations:

• The Audit Committee has not become aware of any events that would necessitate a restatement of any previously issued financial statements.

• While the assertions concerning related party transactions were limited to certain transactions involving Charles Becker and Elkin McCallum and entities controlled by them, the Audit Committee reviewed all material transactions entered into between the Company and Heartland Industrial Partners, L.P., Mr. McCallum and Mr. Becker and their respective affiliates. Both Mr. Becker and Mr. McCallum are directors and significant shareholders of the Company and are, directly or indirectly, limited partners in Heartland, the Company's largest shareholder.

The Audit Committee concluded that each of these transactions had a legitimate business purpose, was negotiated fairly, and was intended to advance the interests of the Company and not to benefit the related parties at the Company's expense. The Audit Committee further concluded that, by and large, these transactions were appropriately presented to and approved by the full Board of Directors of the Company and were properly documented and adequately disclosed.

The Audit Committee concluded that certain related party matters referred to below had not been formally submitted for Board approval, and that others should have been more appropriately documented. The Audit Committee recommended that disinterested members of the Board review those matters and take whatever procedural action may be deemed appropriate. Specifically, the matters to be reviewed are (1) with respect to Mr. Becker and his affiliates: leases of two buildings adjacent to the Company's headquarters, which was already the subject of a Board-approved lease from an affiliate of Mr. Becker; an amendment reducing the rent at the Company's headquarters to the rent at these two additional buildings; and amendments of existing plant leases with an affiliate of Mr. Becker to extend the term and reduce the rent for the initial term; and (2) with respect to Mr. McCallum and his affiliates, an amendment of the previously Board-approved Joan Automotive merger agreement clarifying ownership of certain equipment listed in a schedule attached to that

F-49

**COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

agreement; and the final terms of a supply agreement contemplated at the time the Board approved a January 2003 purchase of certain fabrics equipment from an affiliate of Mr. McCallum. Subsequent to the Board's initial discussion with the Audit Committee on March 10, 2004, the Board has held a meeting and ratified all of these actions.

• The Audit Committee also recommended that the Company review its public filings to determine whether disclosure of certain aspects of the related party transactions reviewed by the Audit Committee should be enhanced and additionally, it proposed a resolution for the Board that will require pre-approval of all future related party transactions, even where pre-approval of the Board is not legally required. The resolution also reiterates procedures for ensuring proper documentation and disclosure of such transactions. Subsequent to the Board's initial discussion with the Audit Committee on March 10, 2004, the Board has adopted and approved this resolution.

As a result of the Audit Committee's recommendations, the Company has included enhanced disclosure in this Annual Report with respect to the following: (1) disclosure of the Board-approved payment of $300,000 as compensation to Mr. Becker in 2002 for his temporary service as Vice Chairman of the Company during that year; (2) an improved description of the 2003 fabrics and 2002 Dutton Yarns air-texturing operations transactions with Mr. McCallum; and (3) the dollar volume of previously disclosed ordinary course arrangements with Mr. McCallum, specifically, from transition services, supply and rebate arrangements.

The members of the Company's Audit Committee are Robert C. Clark, the former Dean of the Harvard Law School, Marshall A. Cohen, counsel at Cassels Brock and Blackwell, a Canadian law firm, and former Senator Warren B. Rudman. The accounting expert who advised the Audit Committee is Alex Arcady, a retired partner from Ernst & Young LLP, who spent the last ten years of his career in that firm's national office.

*Other Commitments*

As of December 31, 2003, the Company's continuing operations had approximately $30.3 million in outstanding capital expenditure commitments. The majority of the leased properties of the Company's previously divested businesses have been assigned to third parties. Although releases have been obtained from the lessors of certain properties, Products remains contingently liable under most of the leases. Products' future liability for these leases, in management's opinion, based on the facts presently known to it, will not have a material effect on the Company's consolidated financial condition, future results of operations or cash flows.

In November 2002, the FASB issued FIN 45, "Guarantor's Accounting and Disclosure Requirements for Guarantees, Including Indirect Guarantees of Indebtedness of Others." FIN 45 requires a guarantor to recognize, at the inception of a qualified guarantee, a liability for the fair value of the obligation undertaken in issuing the guarantee. In conjunction with divestitures and other transactions, the Company has provided indemnifications relating to legal and environmental issues, including product liability. The Company does not believe that any pending or threatened litigation or claims related to any such retained liabilities of discontinued operations are likely to result in any material loss.

F-50

**COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

22. **Quarterly Financial Data (Unaudited)**

The quarterly financial data is summarized below (in millions, except per share amounts).

|  | 2003 | | | |
|---|---|---|---|---|
|  | **First Quarter** | **Second Quarter** | **Third Quarter** | **Fourth Quarter** |
| Net sales | $ 1,035.1 | $ 1,033.5 | $ 902.2 | $ 1,012.9 |
| Gross profit | 109.4 | 124.7 | 95.5 | 114.6 |
| Income (loss) from continuing operations | (26.2) | 10.7 | (32.1) | (11.5) |
| Income (loss) before extraordinary items | (26.2) | 10.7 | (32.1) | (11.5) |
| Net income (loss) | (26.2) | 10.7 | (32.1) | (9.9) |
| Basic and diluted earnings (loss) per share: | | | | |
|   Continuing operations | (0.31) | 0.13 | (0.38) | (0.14) |
|   Discontinued operations | — | — | — | 0.02 |
|   Net income (loss) attributable to common shareholders | (0.31) | 0.13 | (0.38) | (0.12) |
| Common stock prices: | | | | |
|   High | 4.83 | 4.18 | 3.41 | 4.33 |
|   Low | 3.28 | 2.82 | 2.09 | 2.43 |

|  | 2002 | | | |
|---|---|---|---|---|
|  | **First Quarter** | **Second Quarter** | **Third Quarter** | **Fourth Quarter** |
| Net sales | $ 914.8 | $ 1,085.3 | $ 922.5 | $ 963.2 |
| Gross profit | 131.1 | 158.5 | 100.7 | 127.8 |
| Income (loss) from continuing operations | (6.7) | 3.7 | (45.2) | (3.1) |
| Income (loss) before extraordinary items | (6.7) | 3.7 | (45.2) | (3.1) |
| Net income (loss) | (18.4) | 13.2 | (45.2) | (3.1) |
| Basic and diluted earnings (loss) per share: | | | | |
|   Continuing operations | (0.10) | (0.46) | (0.54) | (0.04) |
|   Discontinued operations | — | 0.13 | — | — |
|   Cumulative effect of change in accounting principle | (0.17) | — | — | — |
|   Net loss attributable to common shareholders | (0.27) | (0.33) | (0.54) | (0.04) |
| Common stock prices: | | | | |
|   High | 25.500 | 28.375 | 9.000 | 4.450 |
|   Low | 16.750 | 9.000 | 2.810 | 2.450 |

The Company's operations are not subject to significant seasonal influences.

Changes in Accounting Principles — During the second quarter 2003, the Company implemented a change in the method of accounting for holiday pay so that such pay is accrued, and expense is recognized during the period in which the actual holiday occurs. Formerly, certain of the Company's businesses accrued holiday pay and recognized expense based upon an equal monthly amount within the fiscal year. The change in method better matches holiday expense with the period that the actual holiday occurs and the pay is earned.

As the prior method allocated costs within the fiscal year, there is no effect on prior years. There will be no effect on the entire fiscal year as the change only impacts interim periods.

F-51

COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

The effect of the change on the first quarter 2003 is as follows (in millions):

| | Quarter Ended | |
|---|---|---|
| | March 31, 2003 (As Previously Reported) | March 31, 2003 (Adjusted) |
| Net sales | $ 1,035.1 | $ 1,035.1 |
| Cost of goods sold | 928.1 | 925.7 |
| Gross profit | 107.0 | 109.4 |
| Selling, general and administrative expenses | 71.5 | 71.5 |
| Impairment of long-lived assets | 18.1 | 18.1 |
| Operating income | 17.4 | 19.8 |
| Other, net | 45.0 | 45.1 |
| Loss from continuing operations before income taxes | (27.6) | (25.3) |
| Income tax expense | 1.1 | 0.9 |
| Net loss | $ (28.7) | $ (26.2) |
| Earnings per share data: | | |
| Loss per basic and diluted common share | $ (0.34) | $ (0.31) |
| Average basic and diluted common shares outstanding | 83.6 | 83.6 |

The proforma amounts assuming the new method of accounting for holiday pay is applied retroactively to prior year periods is as follows (in millions, except per share amounts):

| | Quarter Ended March 31, 2002 | Quarter Ended June 30, 2002 | Quarter Ended September 30, 2002 | Quarter Ended December 31, 2002 |
|---|---|---|---|---|
| Net loss attributable to common shareholders | $ (17.2) | $ (22.4) | $ (44.6) | $ (5.6) |
| Net loss per common share | $ (0.26) | $ (0.32) | $ (0.53) | $ (0.07) |

Additionally, during the second quarter of 2003, the Company implemented a change in the method of accounting for crib supply inventories held at plants. Crib supply inventories include small motors, replacement parts for production equipment and other miscellaneous repair parts for buildings, equipment and machinery. The Company implemented a perpetual crib supply inventory system and harmonized its policy to consistently account for the capitalization of crib supply inventories. Formerly, the Company had different capitalization thresholds following the various acquisitions in late 2001 and 2002, which ranged from not capitalizing any crib supply items to capitalizing only items greater than two thousand dollars. The new accounting method better matches the cost with the period benefiting from the expenditure, as such inventories are charged to expense as they are placed into service and begin generating revenue. Pro forma and the cumulative effect amounts relating to the change in accounting for crib inventories is not determinable as perpetual records of crib inventory were not maintained at all the plants prior to the application of the new method in the second quarter of 2003. The effect of the change on the three months ended June 30, 2003, for the plants that had no perpetual records was to increase inventory and reduce cost of sales by $1.8 million after tax or $0.02 per share. For the year ended December 31, 2003, the incremental effect of the adoption had an insignificant effect.

23.   **Consolidating Financial Statements**

Products issued Senior Notes in a total principal amount of $500.0 million in December 2001. The Senior Notes are guaranteed by the Company and all the Company's wholly owned domestic Subsidiaries other than its receivable, insurance and charitable subsidiaries (Guarantor Subsidiaries). The following are consolidating financial statements of the Company, Products, its guarantor and non-guarantor subsidiaries:

## COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES

## SUPPLEMENTAL GUARANTOR CONDENSED CONSOLIDATING FINANCIAL STATEMENTS

### CONSOLIDATING STATEMENT OF OPERATIONS

**For the Year Ended December 31, 2003**

| | Parent | Issuer | Guarantors | Non-Guarantors | Eliminations | Consolidated Total |
|---|---|---|---|---|---|---|
| | | | | (in millions) | | |
| Net sales | $ — | $ 310.2 | $ 2,098.5 | $ 1,596.2 | $ (21.2) | $ 3,983.7 |
| Cost of goods sold | — | 207.5 | 1,850.4 | 1,502.8 | (21.2) | 3,539.5 |
| Selling, general and administrative expenses | 0.1 | 223.1 | 10.2 | 39.8 | — | 273.2 |
| Restructuring charge | — | 13.2 | 18.5 | 8.9 | — | 40.6 |
| Impairment of long-lived assets | — | 4.1 | 12.6 | 11.7 | — | 28.4 |
| **Operating income (loss)** | (0.1) | (137.7) | 206.8 | 33.0 | — | 102.0 |
| Interest expense, net | — | 21.3 | 121.2 | 8.8 | — | 151.3 |
| Interest expense from subsidiary preferred stock dividends | — | 32.0 | — | — | — | 32.0 |
| Interest expense from subsidiary preferred stock accretion | — | 5.3 | — | — | — | 5.3 |
| Intercompany interest expense (income) | — | (21.4) | (17.8) | 39.2 | — | — |
| Loss on sale of receivables | — | — | — | 7.3 | — | 7.3 |
| Other expense, net | — | (149.7) | 115.2 | 0.6 | 1.0 | (32.9) |
| **(Loss) income from continuing operations before income taxes** | (0.1) | (25.2) | (11.8) | (22.9) | (1.0) | (61.0) |
| Income tax expense (benefit) | — | (3.7) | 4.6 | (2.8) | — | (1.9) |
| **Loss from continuing operations** | (0.1) | (21.5) | (16.4) | (20.1) | (1.0) | (59.1) |
| Income from discontinued operations | — | 2.4 | (0.8) | — | — | 1.6 |
| Cumulative effect of a change in accounting principle | — | — | — | — | — | — |
| Equity in net income (loss) of subsidiaries | (57.4) | (38.3) | (27.0) | — | 122.7 | — |
| **NET INCOME (LOSS)** | $(57.5) | $ (57.4) | $ (44.2) | $ (20.1) | $ 121.7 | $ (57.5) |

**For the Year Ended December 31, 2002**

| | Parent | Issuer | Guarantors | Non-Guarantors | Eliminations | Consolidated Total |
|---|---|---|---|---|---|---|
| | | | | (in millions) | | |
| Net sales | $ — | $289.4 | $ 2,415.7 | $ 1,216.9 | $ (36.2) | $ 3,885.8 |
| Cost of goods sold | — | 181.8 | 2,110.0 | 1,112.1 | (36.2) | 3,367.7 |
| Selling, general and administrative expenses | 0.1 | 166.1 | 82.8 | 44.5 | — | 293.5 |
| Restructuring charges | — | 16.5 | 4.2 | 18.2 | — | 38.9 |
| Impairment of long-lived assets | — | — | 4.1 | 13.9 | — | 18.0 |
| **Operating income (loss)** | (0.1) | (75.0) | 214.6 | 28.2 | — | 167.7 |
| Interest expense, net | (0.1) | 15.4 | 126.2 | 7.4 | — | 148.9 |
| Intercompany interest expense (income) | (6.6) | (5.9) | (23.8) | 36.3 | — | — |
| Subsidiary preferred stock dividend | — | 30.8 | — | — | — | 30.8 |
| Subsidiary preferred stock accretion | — | 7.6 | — | — | — | 7.6 |
| Loss on sale of receivables | — | 0.6 | — | 3.6 | — | 4.2 |
| Other expense (income), net | — | (45.8) | 40.4 | 12.5 | 2.9 | 10.0 |
| **Income (loss) from continuing operations before income taxes** | 6.6 | (77.7) | 71.8 | (31.6) | (2.9) | (33.8) |
| Income tax expense (benefit) | 2.5 | (16.2) | 42.4 | (11.2) | — | 17.5 |
| **Income (loss) from continuing operations** | 4.1 | (61.5) | 29.4 | (20.4) | (2.9) | (51.3) |
| Income from discontinued operations | — | 9.5 | — | — | — | 9.5 |

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Cumulative effect of a change in accounting principle** | | — | | — | | — | (11.7) | | — | | (11.7) |
| **Equity in net income (loss) of subsidiaries** | | (57.6) | (5.6) | | (60.3) | | — | | 123.5 | | — |
| | | | | | | | | | | | |
| **NET INCOME (LOSS)** | $(53.5) | $(57.6) | $ | (30.9) | $ | (32.1) | $ | 120.6 | $ | (53.5) |

F-53

COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES

SUPPLEMENTAL GUARANTOR CONDENSED CONSOLIDATING FINANCIAL STATEMENTS

CONSOLIDATING STATEMENT OF OPERATIONS

| | | | | For the Year Ended December 31, 2001 | | |
| | Parent | Issuer | Guarantors | Non-Guarantors | Eliminations | Consolidated Total |
| --- | --- | --- | --- | --- | --- | --- |
| | | | | (in millions) | | |
| Net sales | $  — | $612.2 | $  676.4 | $  577.1 | $  (42.4) | $  1,823.3 |
| Cost of goods sold | — | 506.3 | 598.2 | 542.4 | (42.4) | 1,604.5 |
| Selling, general and administrative expenses | 0.1 | 34.9 | 81.1 | 48.3 | — | 164.4 |
| Restructuring charge | — | 4.7 | 0.2 | 6.3 | | 11.2 |
| Impairment of long-lived assets | — | 2.6 | 0.7 | 4.3 | — | 7.6 |
| **Operating income (loss)** | (0.1) | 63.7 | (3.8) | (24.2) | — | 35.6 |
| Interest expense, net | — | 45.6 | 35.9 | 2.8 | — | 84.3 |
| Intercompany interest expense (income) | — | 17.3 | (24.7) | 7.4 | — | — |
| Subsidiary preferred stock dividend | — | 1.5 | — | — | — | 1.5 |
| Subsidiary preferred stock accretion | — | 0.9 | — | — | — | 0.9 |
| Loss on sale of receivables | — | 6.1 | — | 4.7 | — | 10.8 |
| Other expense (income), net | — | 12.5 | 3.4 | 1.8 | (3.3) | 14.4 |
| **Income (loss) from continuing operations before income taxes** | (0.1) | (20.2) | (18.4) | (40.9) | 3.3 | (76.3) |
| Income tax expense (benefit) | 0.2 | (14.4) | (5.8) | (1.3) | — | (21.3) |
| **Income (loss) from continuing operations** | (0.3) | (5.8) | (12.6) | (39.6) | 3.3 | (55.0) |
| **Income from discontinued operations** | — | 8.8 | — | — | — | 8.8 |
| **Equity in net income (loss) of subsidiaries** | (45.9) | (48.9) | (33.5) | — | 128.3 | — |
| **NET INCOME (LOSS)** | $(46.2) | $(45.9) | $  (46.1) | $  (39.6) | $  131.6 | $  (46.2) |

F-54

## COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES

### SUPPLEMENTAL GUARANTOR CONDENSED CONSOLIDATING FINANCIAL STATEMENTS
### CONSOLIDATING BALANCE SHEET

| | Parent | Issuer | Guarantors | Non-Guarantors | Eliminations | Consolidated Total |
|---|---|---|---|---|---|---|
| | | | | December 31, 2003 (in millions) | | |

**ASSETS**

| | Parent | Issuer | Guarantors | Non-Guarantors | Eliminations | Consolidated Total |
|---|---|---|---|---|---|---|
| **Current Assets:** | | | | | | |
| Cash and cash equivalents | $ — | $ (71.2) | $ 78.4 | $ 6.0 | $ — | $ 13.2 |
| Accounts and other receivables, net | — | 1.1 | 34.4 | 220.4 | 1.4 | 257.3 |
| Inventories | — | 14.2 | 96.2 | 59.0 | — | 169.4 |
| Other | — | 47.8 | 109.2 | 59.0 | — | 216.0 |
| Total current assets | — | (8.1) | 318.2 | 344.4 | 1.4 | 655.9 |
| Investment in subsidiaries | 439.7 | 1,654.4 | (1.8) | — | (2,092.3) | — |
| Property, plant and equipment, net | — | 55.9 | 339.9 | 430.1 | — | 825.9 |
| Goodwill | — | — | 948.9 | 414.2 | — | 1,363.1 |
| Other assets | — | 276.0 | 15.8 | 54.5 | — | 346.3 |
| | $ 439.7 | $ 1,978.2 | $ 1,621.0 | $ 1,243.2 | $ (2,090.9) | $ 3,191.2 |

**LIABILITIES & STOCKHOLDERS' EQUITY (DEFICIT)**

| | Parent | Issuer | Guarantors | Non-Guarantors | Eliminations | Consolidated Total |
|---|---|---|---|---|---|---|
| **Current Liabilities:** | | | | | | |
| Short-term borrowings | — | — | — | 16.0 | — | 16.0 |
| Current maturities of long-term debt and capital lease obligations | — | 27.8 | 0.1 | 3.6 | — | 31.5 |
| Accounts payable | — | 46.0 | 301.4 | 291.5 | — | 638.9 |
| Accrued expenses | — | 146.9 | 2.2 | 90.4 | (0.6) | 238.9 |
| Total current liabilities | — | 220.7 | 303.7 | 401.5 | (0.6) | 925.3 |
| Long-term debt and capital lease obligations | — | 1,230.1 | — | 7.6 | — | 1,237.7 |
| Mandatorily redeemable preferred stock of subsidiary | — | 161.2 | — | — | — | 161.2 |
| Intercompany payable (receivable) | — | (317.3) | (215.7) | 533.0 | — | — |
| Other noncurrent liabilities | — | 243.8 | 74.9 | 108.0 | — | 426.7 |
| Total liabilities | — | 1,538.5 | 162.9 | 1,050.1 | (0.6) | 2,750.9 |
| Total common stockholders' equity (deficit) | 439.7 | 439.7 | 1,458.1 | 193.1 | (2,090.3) | 440.3 |
| | $ 439.7 | $ 1,978.2 | $ 1,621.0 | $ 1,243.2 | $ (2,090.9) | $ 3,191.2 |

F-55

**COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES**

**SUPPLEMENTAL GUARANTOR CONDENSED CONSOLIDATING FINANCIAL STATEMENTS**

**CONSOLIDATING BALANCE SHEET**

| | Parent | Issuer | Guarantors | Non-Guarantors | Eliminations | Consolidated Total |
|---|---|---|---|---|---|---|
| | | | | **December 31, 2002** | | |
| | | | | (in millions) | | |
| | | | **ASSETS** | | | |
| **Current Assets:** | | | | | | |
| Cash and cash equivalents | $ — | $ 0.2 | $ 0.3 | $ 80.8 | $ — | $ 81.3 |
| Accounts and other receivables, net | — | 5.0 | 40.7 | 324.4 | 2.9 | 373.0 |
| Inventories | — | 13.0 | 106.7 | 51.9 | — | 171.6 |
| Other | — | 51.4 | 75.5 | 50.5 | — | 177.4 |
| Total current assets | — | 69.6 | 223.2 | 507.6 | 2.9 | 803.3 |
| Investment in subsidiaries | 397.5 | 1,794.5 | (54.8) | — | (2,137.2) | — |
| Property, plant and equipment, net | — | 51.2 | 316.9 | 370.4 | (0.7) | 737.8 |
| Goodwill | — | — | 1,144.8 | 120.7 | — | 1,265.5 |
| Other assets | — | 212.3 | 85.8 | 52.4 | — | 350.5 |
| | $397.5 | $2,127.6 | $ 1,715.9 | $ 1,051.1 | $ (2,135.0) | $ 3,157.1 |
| **LIABILITIES & STOCKHOLDERS' EQUITY (DEFICIT)** | | | | | | |
| **Current Liabilities:** | | | | | | |
| Short-term borrowings | — | — | — | 10.5 | — | 10.5 |
| Current maturities of long-term debt | — | 22.7 | 0.1 | 0.7 | — | 23.5 |
| Accounts payable | — | 73.5 | 269.7 | 252.3 | — | 595.5 |
| Accrued expenses | — | 142.5 | 50.8 | 106.6 | — | 299.9 |
| Total current liabilities | — | 238.7 | 320.6 | 370.1 | — | 929.4 |
| Long-term debt | — | 1,255.0 | 0.1 | 0.1 | — | 1,255.2 |
| Intercompany payable (receivable) | — | (92.1) | (359.9) | 452.0 | — | — |
| Other noncurrent liabilities | — | 204.6 | 140.8 | 105.7 | — | 451.1 |
| Total liabilities | — | 1,606.2 | 101.6 | 927.9 | — | 2,635.7 |
| Mandatorily redeemable preferred stock of subsidiary | — | 123.9 | — | — | | 123.9 |
| Total common stockholders' equity (deficit) | 397.5 | 397.5 | 1,614.3 | 123.2 | (2,135.0) | 397.5 |
| | $397.5 | $2,127.6 | $ 1,715.9 | $ 1,051.1 | $ (2,135.0) | $ 3,157.1 |

## COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES

### SUPPLEMENTAL GUARANTOR CONDENSED CONSOLIDATING FINANCIAL STATEMENTS

### CONSOLIDATING STATEMENT OF CASH FLOWS

| | Parent | Issuer | Guarantors | Non-Guarantors | Eliminations | Consolidated Total |
|---|---|---|---|---|---|---|
| | | | | For the Year Ended December 31, 2003 (in millions) | | |
| **OPERATING ACTIVITIES** | | | | | | |
| Net cash provided by (used in) operating activities | $ — | $ (256.7) | $ 339.2 | $ 40.4 | $ — | $ 122.9 |
| **INVESTING ACTIVITIES** | | | | | | |
| Additions to property, plant and equipment | — | (13.8) | (84.3) | (77.0) | — | (175.1) |
| Sales of property, plant and equipment | — | — | 0.6 | 17.7 | — | 18.3 |
| Payments for acquisitions and related costs | — | — | (33.1) | — | — | (33.1) |
| Net cash provided by (used in) investing activities | — | (13.8) | (116.8) | (59.3) | — | (189.9) |
| **FINANCING ACTIVITIES** | | | | | | |
| Issuance of long-term debt and capital lease obligations | — | 1.8 | — | 11.3 | — | 13.1 |
| Repayment of long-term debt and capital lease obligations | — | (27.9) | (0.1) | (0.9) | — | (28.9) |
| Increase (decrease) in short-term borrowings | — | — | — | 4.7 | — | 4.7 |
| Net borrowings (repayments) on revolving credit facilities | — | — | — | 6.3 | — | 6.3 |
| Intercompany transfers (from) to Subsidiary | — | 225.2 | (144.2) | (81.0) | — | — |
| Net cash provided by (used in) financing activities | — | 199.1 | (144.3) | (59.6) | — | (4.8) |
| Effect of exchange rate changes on cash | — | — | — | 3.7 | — | 3.7 |
| Increase (decrease) in cash and cash equivalents | — | (71.4) | 78.1 | (74.8) | — | (68.1) |
| Cash and cash equivalents at beginning of year | — | 0.2 | 0.3 | 80.8 | — | 81.3 |
| Cash and cash equivalents at end of year | $ — | $ (71.2) | $ 78.4 | $ 6.0 | $ — | $ 13.2 |

F-57

COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES

SUPPLEMENTAL GUARANTOR CONDENSED CONSOLIDATING FINANCIAL STATEMENTS

CONSOLIDATING STATEMENT OF CASH FLOWS — (Continued)

|  | For the Year Ended December 31, 2002 | | | | | |
|  | Parent | Issuer | Guarantors | Non-Guarantors | Eliminations | Consolidated Total |
|---|---|---|---|---|---|---|
|  | | | | (in millions) | | |
| **OPERATING ACTIVITIES** | | | | | | |
| Net cash provided by (used in) operating activities | $ (0.2) | $ 24.0 | $ (271.3) | $ 436.9 | $ — | $ 189.4 |
| **INVESTING ACTIVITIES** | | | | | | |
| Additions to property, plant and equipment | — | (31.2) | (71.9) | (44.8) | — | (147.9) |
| Sales of property, plant and equipment | — | — | 13.3 | — | — | 13.3 |
| Additional investment in joint venture | — | — | — | (5.9) | — | (5.9) |
| Payment for acquisitions and related costs | — | — | (46.4) | 0.8 | — | (45.6) |
| Net cash used in investing activities | — | (31.2) | (105.0) | (49.9) | — | (186.1) |
| **FINANCING ACTIVITIES** | | | | | | |
| Repayment of long-term debt | — | (22.4) | (0.1) | (1.4) | — | (23.9) |
| Repayment of preferred stock | — | (100.0) | — | — | — | (100.0) |
| Decrease in short-term borrowings | — | — | — | (16.0) | — | (16.0) |
| Net proceeds from issuance of common stock | 150.6 | — | — | — | — | 150.6 |
| Repayment of debt assumed in acquisition | — | (6.7) | — | — | — | (6.7) |
| Intercompany transfers (from) to Subsidiary | (150.6) | 140.3 | 364.0 | (353.7) | — | — |
| Net cash provided by (used in) financing activities | — | 11.2 | 363.9 | (371.1) | — | 4.0 |
| Effect of exchange rate changes on cash | — | — | — | 0.1 | — | 0.1 |
| Increase (decrease) in cash and cash equivalents | (0.2) | 4.0 | (12.4) | 16.0 | — | 7.4 |
| Cash and cash equivalents at beginning of year | 0.2 | (3.8) | 12.7 | 64.8 | — | 73.9 |
| Cash and cash equivalents at end of year | $ — | $ 0.2 | $ 0.3 | $ 80.8 | $ — | $ 81.3 |

F-58

COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES

SUPPLEMENTAL GUARANTOR CONDENSED CONSOLIDATING FINANCIAL STATEMENTS

CONSOLIDATING STATEMENT OF CASH FLOWS

|  | | For the Year Ended December 31, 2001 | | | | |
|---|---|---|---|---|---|---|
|  | Parent | Issuer | Guarantors | Non-Guarantors | Eliminations | Consolidated Total |
|  | | | | (in millions) | | |
| **OPERATING ACTIVITIES** | | | | | | |
| Net cash provided by (used in) operating activities | $ (0.3) | $(266.6) | $ 237.6 | $ 166.4 | $ — | $ 137.1 |
| **INVESTING ACTIVITIES** | | | | | | |
| Additions to property, plant and equipment | — | (14.8) | (14.5) | (25.2) | — | (54.5) |
| Sales of property, plant and equipment | — | 62.2 | 24.0 | 1.9 | — | 88.1 |
| Payments for acquisitions and related costs | — | (760.9) | — | — | — | (760.9) |
| Sale of business | — | — | 3.5 | — | — | 3.5 |
| Net cash provided by (used in) investing activities | — | (713.5) | 13.0 | (23.3) | — | (723.8) |
| **FINANCING ACTIVITIES** | | | | | | |
| Issuance of long-term debt | — | 950.0 | — | — | — | 950.0 |
| Debt issuance costs | — | (59.4) | — | — | — | (59.4) |
| Repayment of long-term debt | — | (383.2) | — | — | — | (383.2) |
| Increase (decrease) in short-term borrowings | — | 9.7 | 2.0 | (1.6) | — | 10.1 |
| Net repayments on revolving credit facilities | — | (133.4) | — | (16.8) | — | (150.2) |
| Net proceeds from issuance of common stock | 207.2 | — | — | — | — | 207.2 |
| Reissue treasury stock, net | 61.3 | — | — | — | — | 61.3 |
| Intercompany transfers (from) to Subsidiary | (268.5) | 596.8 | (240.9) | (87.4) | — | — |
| Net cash provided by (used in) financing activities | — | 980.5 | (238.9) | (105.8) | — | 635.8 |
| Effect of exchange rate changes on cash | — | — | — | 3.9 | — | 3.9 |
| Increase (decrease) in cash and cash equivalents | (0.3) | 0.4 | 11.7 | 41.2 | — | 53.0 |
| Cash and cash equivalents at beginning of year | 0.5 | (4.2) | 1.0 | 23.6 | — | 20.9 |
| Cash and cash equivalents at end of year | $ 0.2 | $ (3.8) | $ 12.7 | $ 64.8 | $ — | $ 73.9 |

## COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES

### SCHEDULE I — CONDENSED FINANCIAL INFORMATION OF REGISTRANT

The information required under this Schedule is included in Note 23 of the Consolidated Financial Statements.

## COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES

### SCHEDULE II — VALUATION AND QUALIFYING ACCOUNTS
### For the Fiscal Years Ended December 31, 2003, December 31, 2002, and December 31, 2001

| Description | Balance At Beginning of Year | Additions Resulting from Acquisitions | Charge to Cost and Expenses | Charged to Other Accounts | Deductions | Balance at End of Year |
|---|---|---|---|---|---|---|
| | | | (in millions) | | | |
| **Fiscal Year Ended December 31, 2003:** | | | | | | |
| Allowance for doubtful accounts | $ 18.6 | $ — | $ 1.5 | $ — | $ (10.9) | $ 9.2 |
| **Fiscal Year Ended December 31, 2002:** | | | | | | |
| Allowance for doubtful accounts | $ 14.6 | $ — | $ 2.5 | $ 4.8 | $ (3.3) | $ 18.6 |
| **Fiscal Year Ended December 31, 2001:** | | | | | | |
| Allowance for doubtful accounts | $ 8.1 | $ 6.8 | $ 6.6 | $ (0.3)(a) | $ (6.6) | $ 14.6 |

(a)     Reclassifications and collection of accounts previously written off.

S-1

## Exhibit Index

| Exhibit Number | Description |
| --- | --- |
| 2.1 | Agreement and Plan of Merger dated May 14, 2001 by and among Collins & Aikman Corporation, Collins & Aikman Products Co., Becker Group, L.L.C., CE Becker Inc., ME McInerney Inc., J Hoehnel Inc. and the individuals party thereto as sellers is hereby incorporated by reference to Exhibit 2.1 of Collins & Aikman Corporation's Current Report on Form 8-K dated and filed July 13, 2001. |
| 2.2 | Agreement and Plan of Merger dated as of August 17, 2001 by and among Collins & Aikman Corporation, Collins & Aikman Products Co., JAII Acquisition Co., Elkin McCallum, Joan Fabrics Corporation and Joan Automotive Industries, Inc is hereby incorporated by reference to Exhibit 2.1 of Collins & Aikman Corporation's Current Report on Form 8-K dated September 21, 2001 and filed October 10, 2001. |
| 2.3 | First Amendment to Agreement and Plan of Merger by and among Collins & Aikman Corporation, Collins & Aikman Products Co., JAII Acquisition Co., Elkin McCallum, Joan Fabrics Corporation and Joan Automotive Industries, Inc dated as of September 21, 2001 is hereby incorporated by reference to Exhibit 2.2 of Collins & Aikman Corporation's Current Report on Form 8-K dated September 21, 2001 and filed October 10, 2001. |
| 2.4 | Second Amendment to the Receivables Transfer Agreement among Collins & Aikman Products Co., Carcorp, Inc., the conduit purchasers party thereto from time to time, the committed purchasers party thereto from time to time, the funding agents party thereto from time to time and JPMorgan Chase Bank, as administrative agent, dated as of December 18, 2003 to the Receivables Transfer Agreement, dated December 20, 2001, as amended and restated as of September 24, 2002.* |
| 2.5 | Purchase Agreement dated as of August 7, 2001, as amended and restated as of November 30, 2001, by and among Textron Inc., Collins & Aikman Corporation and Collins & Aikman Products Co., including Exhibit 1 (Certificate of Designation of the 15% Series A Redeemable Preferred Stock, the 16% Series B Redeemable Preferred Stock and the 16% Series C Redeemable Preferred Stock) and Exhibit 7 (Asset Purchase Agreement dated as of August 7 by and between Textron Automotive Exteriors Inc. and JPS Automotive, Inc.), which is incorporated by reference to Collins and Aikman Corporation Current Report on Form 8-k dated December 20, 2001 and filed on January 4, 2002. The Table of Contents of the Purchase Agreement listed as Exhibit 2.4 contains a list briefly identifying the contents of all omitted schedules and exhibits. Collins & Aikman Corporation will supplementally furnish a copy of any omitted schedule or Exhibit to the Commission upon request. |
| 2.6 | Asset Purchase Agreement dated as of August 7, 2001, as amended and restated as of November 30, 2001, by and between Textron Automotive Exteriors Inc. and JPS Automotive, Inc., which is incorporated herein by reference to Exhibit 2.2 of Collins & Aikman Corporation's Current Report on Form 8-K dated December 20, 2001 and filed on January 4, 2002. |
| 2.7 | Asset Purchase Agreement dated as of August 17, 2001 by and among Collins & Aikman Products Co., Western Avenue Dyers, L.P., Elkin McCallum, Kerry McCallum, Penny Richards and Tyng Textiles LLC, which is incorporated by reference to Exhibit 2.3 to Collins & Aikman Corporation's Current Report on Form 8-K filed on October 4, 2001. |
| 2.8 | First Amendment to Asset Purchase Agreement dated as of September 21, 2001, which is incorporated by reference to Exhibit 2.4 to Collins & Aikman Corporation's Current Report on Form 8-K filed on October 4, 2001. |
| 3.1 | Restated Certificate of Incorporation of Collins & Aikman Corporation is hereby incorporated by reference to Exhibit 3.1 of Collins & Aikman Corporation's Report on Form 10-Q for the fiscal quarter ended June 26, 1999 and filed August 10, 1999. |
| 3.2 | Certificate of Amendment to the Restated Certificate of Incorporation of Collins & Aikman Corporation, which is incorporated by reference to Exhibit 3.2 of Collins & Aikman Corporation's Annual Report on Form 10-K for the fiscal year ended December 31, 2000 and filed April 2, 2001. |

| Exhibit Number | Description |
|---|---|
| 3.3 | Certificate of Amendment of Amended and Restated Certificate of Incorporation is hereby incorporated by reference to Exhibit 3.5 of Collins & Aikman Corporation's Current Report on Form 8-K filed May 29, 2002. |
| 3.4 | By-laws of Collins & Aikman Corporation, as amended, are hereby incorporated by reference to Exhibit 3.2 of Collins & Aikman Corporation's Report on Form 10-K for the fiscal year ended January 27, 1996 and filed April 22, 1996. |
| 3.5 | Certificate of Elimination of Cumulative Exchangeable Redeemable Preferred Stock of Collins & Aikman Corporation is hereby incorporated by reference to Exhibit 3.3 of Collins & Aikman Corporation's Report on Form 10-Q for the fiscal quarter ended October 28, 1995 and filed December 8, 1995. |
| 4.1 | Specimen Stock Certificate for the Common Stock is hereby incorporated by reference to Exhibit 4.3 of Amendment No. 3 to Collins & Aikman Holdings Corporation's Registration Statement on Form S-2 (Registration No. 33-53179) filed June 21, 1994. |
| 4.2 | Indenture, dated as of June 1, 1996, between Collins & Aikman Products Co., Collins & Aikman Corporation and First Union National Bank of North Carolina, as Trustee, is hereby incorporated by reference to Exhibit 4.2 of Collins & Aikman Corporation's Report on Form 10-Q for the fiscal quarter ended April 27, 1996 and filed June 11, 1996. |
| 4.3 | First Supplemental Indenture dated as of June 1, 1996, between Collins & Aikman Products Co., Collins & Aikman Corporation and First Union National Bank of North Carolina, as Trustee, is hereby incorporated by reference to Exhibit 4.3 of Collins & Aikman Corporation's Report on Form 10-Q for the fiscal quarter ended April 27, 1996 and filed June 11, 1996. |
| 4.4 | Second Supplemental Indenture, dated as of February 8, 2001, by and among Collins & Aikman Products Co., as Issuer, Collins & Aikman Corporation, as Guarantor, and First Union National Bank, as Trustee, which is incorporated by reference to Exhibit 4.11 of Collins & Aikman Corporation's Annual Report on Form 10-K for the fiscal year ended December 31, 2000 and filed April 1, 2002. |
| 4.5 | Form of Warrant is hereby incorporated by reference to Exhibit 4.1 of Collins & Aikman Corporation's Current Report on Form 8-K dated and filed July 13, 2001. |
| 4.6 | Certificate of Designation of Series A Redeemable Preferred Stock, Series B Redeemable Preferred Stock and Series C Redeemable Preferred Stock, which is incorporated herein by reference to Exhibit 4.1 of Collins & Aikman Corporation's Current Report of Form 8-K dated December 20, 2001 and filed on January 4, 2002. |
| 4.7 | Indenture dated as of December 20, 2001 by and among Collins & Aikman Products Co., as Issuer, the Guarantors parties thereto, and BNY Midwest Trust Company, as Trustee, which is incorporated herein by reference to Exhibit 4.2 of Collins & Aikman Corporation's Current Report on Form 8-K dated December 20, 2001 and filed on January 4, 2002. |
| 4.8 | Receivables Transfer Agreement dated as of December 20, 2001 by and among Carcorp, Inc., as Transferor, Collins & Aikman Products Co., individually and as Collection Agent, the persons parties thereto, as CP Conduit Purchasers, Committed Purchasers and Funding Agents and JPMorgan Chase Bank, as Administrative Agent, which is incorporated herein by reference to Exhibit 4.3 of Collins & Aikman Corporation's Current Report on Form 8-K dated December 20, 2001 and filed on January 4, 2002. |
| 4.9 | Amended and Restated Receivables Purchase Agreement dated as of December 20, 2001 among Collins & Aikman Products Co. and its wholly-owned direct and indirect subsidiaries named therein, as Sellers, and Carcorp, Inc., as Purchaser, and the other Sellers from time to time named therein, which is incorporated herein by reference to Exhibit 4.4 of Collins & Aikman Corporation's Current Report on Form 8-K dated December 20, 2001 and filed on January 4, 2002. |

| Exhibit Number | Description |
|---|---|
| 4.10 | Credit Agreement dated as of December 20, 2001 among Collins & Aikman Products Co., as Borrower, Collins & Aikman Canada Inc., as a Canadian Borrower, Collins & Aikman Plastics, Ltd., as a Canadian Borrower, Collins & Aikman Corporation, the Lenders named therein, Deutsche Banc Alex. Brown Inc. and Merrill Lynch Capital Corporation, as Co-Documentation Agents, Credit Suisse First Boston Corporation, as Syndication Agent, JPMorgan Chase Bank, as Administrative Agent, and J.P.Morgan Bank Canada, as Canadian Administrative Agent, which is incorporated herein by reference to Exhibit 4.5 of Collins & Aikman Corporation's Current Report on Form 8-K dated December 20, 2001 and filed on January 4, 2002. |
| 4.11 | First Amendment dated as of December 13, 2002, to the Credit Agreement dated as of December 20, 2001 among Collins & Aikman Products Co., as Borrower, Collins & Aikman Canada Inc., as a Canadian Borrower, Collins & Aikman Plastics, Ltd., as a Canadian Borrower, Collins & Aikman Corporation, the Lenders named therein, Credit Suisse First Boston Corporation, as Syndication Agent, Deutsche Bank Securities Inc. (formerly known as Deutsche Banc Alex. Brown Inc.) and Merrill Lynch Capital Corporation, as Co-Documentation Agents, JPMorgan Chase Bank, as Administrative Agent, and J.P. Morgan Bank Canada, as Canadian Administrative Agent, is hereby incorporated by reference to Exhibit 4.17 of Collins & Aikman Corporation's report on Form 10-K for the year ended December 31, 2002. |
| 4.12 | Second Amendment dated May 2, 2003 to the Credit Agreement dated December 20, 2001 which is incorporated herein by reference to Exhibit 10.1 of Collins & Aikman Corporation's Report on Form 10-Q dated March 31, 2003 and filed on May 15, 2003. |
| 4.13 | Third Amendment dated September 23, 2003 to the Credit Agreement dated December 20, 2001 which is incorporated herein by reference to Exhibit 4.2 of Collins & Aikman Corporation's Report on Form 10-Q dated September 30, 2003 and filed on November 11, 2003. |
| 4.14 | Fourth Amendment dated October 7, 2003 to the Credit Agreement dated December 20, 2001 which is incorporated herein by reference to Exhibit 4.3 of Collins & Aikman Corporation's Report on Form 10-Q dated September 30, 2003 and filed on November 11, 2003. |
| 4.15 | Fifth Amendment dated February 13, 2004 to the Credit Agreement dated December 20, 2001.* |
| 4.16 | Guarantee and Collateral Agreement dated as of December 20, 2001 by and among Collins & Aikman Corporation, Collins & Aikman Products Co. and certain of their subsidiaries and JPMorgan Chase Bank, as Collateral Agent, which is incorporated herein by reference to Exhibit 4.6 of Collins & Aikman Corporation's Current Report on Form 8-K dated December 20, 2001 and filed on January 4, 2002. |
| 4.17 | Third Supplemental Indenture, dated as of December 20, 2001, among Collins & Aikman Products Co., Collins & Aikman Corporation, the Subsidiary Guarantors listed on the signature page thereto, and First Union National Bank (as successor in interest to First Union National Bank of North Carolina), which is incorporated herein by reference to Exhibit 4.7 of Collins & Aikman Corporation's Current Report on Form 8-K dated December 20, 2001 and filed on January 4, 2002. |
| 4.18 | Amendment and Waiver, dated August 26, 2003 to the Receivables Transfer Agreement dated December 21, 2001 which is incorporated herein by reference to Exhibit 4.1 of Collins & Aikman Corporation's Report on Form 10-Q dated September 30, 2003 and filed on November 11, 2003. |
| 4.19 | Registration Rights Agreement, dated February 23, 2001, by and among Collins & Aikman Corporation, Heartland Industrial Partners, L.P. and the other investor stockholders listed on Schedule 1 thereto, Blackstone Capital Company II, L.L.C., Blackstone Family Investment Partnership I L.P., Blackstone Advisory Directors Partnership L.P., Blackstone Capital Partners, L.P. and Wasserstein/C&A Holdings, L.L.C., incorporated by reference to Annex D to Exhibit 10.1 to Collins & Aikman Corporation's Current Report on Form 8-K dated January 12, 2001 and filed January 16, 2001. |

| Exhibit Number | Description |
|---|---|
| 4.20 | Stockholders Agreement dated July 3, 2001, by and among Collins & Aikman Corporation, Heartland Industrial Partners, L.P. and the other Heartland Entities named therein, the Becker Stockholders party thereto and the Joan Stockholders party thereto is hereby incorporated by reference to Exhibit 10.85 of Collins & Aikman Corporation's Report on Form 10-K for the year ended December 31, 2001 and filed April 1, 2002. |
| 4.21 | Registration Rights Agreement, dated December 20, 2001, by and among Collins & Aikman Products Co., Collins & Aikman Corporation, and each of the subsidiaries listed on the signature pages thereof, and J.P. Morgan Securities Inc., Credit Suisse First Boston Corporation, Deutsche Banc Alex. Brown Inc. and Merrill Lynch, Pierce, Fenner & Smith Incorporated and the other several initial purchasers parties to the Purchase Agreement is hereby incorporated by reference to Exhibit 10.89 of Collins & Aikman Corporation's Report on Form 10-K for the year ended December 31, 2001 and filed April 1, 2002. |
| 4.22 | Registration Rights Agreement dated as of December 20, 2001 by and among Becker Ventures, LLC, Dresdner Kleinwort Capital Partners 2001 LP, Masco Capital Corporation, ML IBK Positions, Inc. and Collins & Aikman Corporation is hereby incorporated by reference to Exhibit 10.90 of Collins & Aikman Corporation's Report on Form 10-K for the year ended December 31, 2001 and filed April 1, 2002. |
| 4.23 | Registration Rights Agreement, dated December 20, 2001, by and between Collins & Aikman Corporation, Textron Inc., and Textron Holdco Inc is hereby incorporated by reference to Exhibit 10.91 of Collins & Aikman Corporation's Report on Form 10-K for the year ended December 31, 2001 and filed April 1, 2002. |
| 4.24 | Preferred Stock Registration and Other Rights Agreement, dated as of December 20, 2001, by and among Collins & Aikman Products Co. and Textron Inc is hereby incorporated by reference to Exhibit 10.92 of Collins & Aikman Corporation's Report on Form 10-K for the year ended December 31, 2001 and filed April 1, 2002. |
| 10.1 | Employment Agreement, dated as of April 1, 2000, between Collins & Aikman Products Co. and an executive officer is hereby incorporated by reference to Exhibit 10.3 of Collins & Aikman Corporation's Report on Form 10-Q for the fiscal quarter ended July 1, 2000. |
| 10.2 | 1993 Employee Stock Option Plan, as amended and restated, is hereby incorporated by reference to Exhibit 10.13 of Collins & Aikman Corporation's Report on Form 10-Q for the fiscal quarter ended April 29, 1995. |
| 10.3 | 1994 Employee Stock Option Plan, as amended through February 7, 1997, is hereby incorporated by reference to Exhibit 10.12 of Collins & Aikman Corporation's Report on Form 10-Q for the fiscal quarter ended March 29, 1997. |
| 10.4 | 2000 Employee Stock Option Plan is hereby incorporated by reference to Exhibit 10.6 of Collins & Aikman Corporation's Report on Form 10-Q for the fiscal quarter ended July 1, 2000. |
| 10.5 | 1994 Directors Stock Option Plan as amended and restated is hereby incorporated by reference to Exhibit 10.15 to Collins & Aikman Corporation's Report on Form 10-K for the year ended December 26, 1998. |
| 10.6 | 1994 Employee Stock Option Plan, as amended and restated through June 3, 1999 is hereby incorporated by reference to Exhibit 10.2 of Collins & Aikman Corporation's Report on Form 10-Q for the fiscal quarter ended June 26, 1999. |
| 10.7 | Change in Control Agreement, dated March 17, 1998, between Collins & Aikman Corporation and an executive officer is hereby incorporated by reference to Exhibit 10.22 of Collins & Aikman Corporation's Report on Form 10-Q for the fiscal quarter ended March 28, 1998. |
| 10.8 | Change in Control Agreement, dated March 17, 1998, between Collins & Aikman Corporation and an executive officer is hereby incorporated by reference to Exhibit 10.29 of Collins & Aikman Corporation's Report on Form 10-K for the fiscal year ended December 25, 1999. |
| 10.9 | Change in Control Agreement, dated as of April 1, 2000, between Collins & Aikman Products Co. and an executive officer is hereby incorporated by reference to Exhibit 10.4 of Collins & Aikman Corporation's Report on Form 10-Q for the fiscal quarter ended July 1, 2000. |

S-5

| Exhibit Number | Description |
|---|---|
| 10.10 | Stockholders Agreement, dated February 23, 2001, by and among Collins & Aikman Corporation, Heartland Industrial Partners, L.P. and other investor stockholders listed on Schedule 1 thereto, Blackstone Capital Company II, L.L.C., Blackstone Family Investment Partnership I L.P., Blackstone Capital Partners L.P., and Wasserstein/C&A Holdings, L.L.C., incorporated by reference to Annex E to Exhibit 10.1 to Collins & Aikman Corporation's Current Report on form 8-K dated January 12, 2001 and filed January 16, 2001. |
| 10.11 | Share Purchase Agreement, dated as of January 12, 2001, between Collins & Aikman Corporation and Heartland Industrial Partners, L.P., is hereby incorporated by reference to Exhibit 10.1 of Collins & Aikman Corporation's Report on Form 8-K dated January 12, 2001, incorporated by reference to Exhibit 10.1 to Collins & Aikman Corporation's Current Report on Form 8-K dated January 12, 2001 and filed January 16, 2001. |
| 10.12 | Services Agreement, dated as of February 23, 2001, by and among Collins & Aikman Corporation, Collins & Aikman Products Co. and Heartland Industrial Partners, L.P is hereby incorporated by reference to Exhibit 10.59 of Collins & Aikman Corporation's Report on Form 10-K for the year ended December 31, 2001 and filed April 1, 2002. |
| 10.13 | Profit Participation Interest Agreement, dated as of February 23, 2001, by and among Heartland Industrial Partners, L.P. and the other investor stockholders listed on Schedule 1 thereto and each of Collins & Aikman Corporation, Blackstone Capital Company II, L.L.C. and Wasserstein/C&A Holdings, L.L.C., incorporated by reference to Annex B to Exhibit 10.1 to Collins & Aikman Corporation's Current Report on Form 8-K dated January 12, 2001 and filed January 16, 2001. |
| 10.14 | Severance Benefit Agreement dated August 9, 1999 between Collins & Aikman Corporation and an executive officer is hereby incorporated by reference to Exhibit 10.32 of Collins & Aikman Corporation's Report on Form 10-K for the fiscal year ended December 25, 1999. |
| 10.15 | Employment Agreement dated December 1, 2000 between Collins & Aikman Products Co. and an executive officer, which is incorporated by reference to Exhibit 10.75 of Collins & Aikman Corporation's Annual Report on Form 10-K for the fiscal year ended December 31, 2000. |
| 10.16 | Employment Agreement dated as of April 1, 2000, between Collins & Aikman Products Co. and an executive officer is hereby incorporated by reference to Exhibit 10.3 of Collins & Aikman Corporation's Report on Form 10-Q for the quarter ended July 1, 2000. |
| 10.17 | Service Contract between Collins & Aikman Products GmbH and an executive officer, which is incorporated by reference to Exhibit 10.5 of Collins & Aikman Corporation's Quarterly Report on Form 10-Q for the quarter ended June 30, 2001 and filed August 14, 2001. |
| 10.18 | Lease Agreement, dated as of June 29, 2001, between New King, L.L.C., as landlord, and Collins & Aikman Products Co., as tenant is hereby incorporated by reference to Exhibit 10.82 of Collins & Aikman Corporation's Report on Form 10-K for the year ended December 31, 2001 and filed April 1, 2002. |
| 10.19 | Lease Agreement, dated as of June 29, 2001, between Anchor Court, L.L.C., as landlord and Collins & Aikman Products Co., as tenant is hereby incorporated by reference to Exhibit 10.84 of Collins & Aikman Corporation's Report on Form 10-K for the year ended December 31, 2001 and filed April 1, 2002. |
| 10.20 | Registration Rights Agreement, dated July 3, 2001, by and among Collins & Aikman Corporation, Charles E. Becker, Michael E. McInerney and Jens Höhnel and, together with the Joan Investors (as defined therein) is hereby incorporated by reference to Exhibit 10.86 of Collins & Aikman Corporation's Report on Form 10-K for the year ended December 31, 2001 and filed April 1, 2002. |
| 10.21 | First Amendment to Services Agreement, dated as of August 7, 2001, among Collins & Aikman Corporation, Collins & Aikman Products Co. and Heartland Industrial Partners, L.P is hereby incorporated by reference to Exhibit 10.87 of Collins & Aikman Corporation's Report on Form 10-K for the year ended December 31, 2001 and filed April 1, 2002. |

| Exhibit Number | Description |
|---|---|
| 10.22 | Equipment Lease, dated as of December 18, 2001, among Textron Automotive Exteriors Inc. and Textron Automotive Interiors Inc., collectively as lessee, and IAC TAX V, LLC, as lessor is hereby incorporated by reference to Exhibit 10.88 of Collins & Aikman Corporation's Report on Form 10-K for the year ended December 31, 2001 and filed April 1, 2002. |
| 10.23 | Intellimold Technology License and Support Agreement, dated as of December 20, 2001, by and between Textron, Inc. and Collins & Aikman Corporation and Collins & Aikman Products Co is hereby incorporated by reference to Exhibit 10.93 of Collins & Aikman Corporation's Report on Form 10-K for the year ended December 31, 2001 and filed April 1, 2002. |
| 10.24 | Technology License Agreement (Retained IP), dated as of December 20, 2001, by and between Textron, Inc. and Collins & Aikman Corporation and Collins & Aikman Products Co is hereby incorporated by reference to Exhibit 10.94 of Collins & Aikman Corporation's Report on Form 10-K for the year ended December 31, 2001 and filed April 1, 2002. |
| 10.25 | Technology License Agreement (Licensed-Back IP), dated as of December 20, 2001, by and between Textron, Inc. and Collins & Aikman Corporation and Collins & Aikman Products Co is hereby incorporated by reference to Exhibit 10.95 of Collins & Aikman Corporation's Report on Form 10-K for the year ended December 31, 2001 and filed April 1, 2002. |
| 10.26 | Employment Agreement between Products and an officer of the Company dated as of November 1, 2001 is hereby incorporated by reference to Exhibit 10.3 of Collins & Aikman Corporation's Report on Form 10-Q for the quarter ended March 31, 2002 and filed May 15, 2002. |
| 10.27 | Employment Agreement between Products and an officer of the Company dated as of November 1, 2001 is hereby incorporated by reference to Exhibit 10.4 of Collins & Aikman Corporation's Report on Form 10-Q for the quarter ended March 31, 2002 and filed May 15, 2002. |
| 10.28 | Employment Agreement between Products and an officer of the Company dated as of December 20, 2001 is hereby incorporated by reference to Exhibit 10.5 of Collins & Aikman Corporation's Report on Form 10-Q for the quarter ended March 31, 2002 and filed May 15, 2002. |
| 10.29 | Employment Agreement between Products and an officer of the Company dated as of December 20, 2001 is hereby incorporated by reference to Exhibit 10.6 of Collins & Aikman Corporation's Report on Form 10-Q for the quarter ended March 31, 2002 and filed May 15, 2002. |
| 10.30 | Employment Agreement between Products and an officer of the Company dated as of December 20, 2001 is hereby incorporated by reference to Exhibit 10.7 of Collins & Aikman Corporation's Report on Form 10-Q for the quarter ended March 31, 2002 and filed May 15, 2002. |
| 10.31 | Separation and Consultancy Agreement dated July 31, 2002 is hereby incorporated by reference to Exhibit 10.1 to Collins & Aikman Corporation's Current report on Form 8-K filed August 2, 2002. |
| 10.32 | Severance Benefit Agreement between Collins and Aikman Corporation and an officer of the Company dated April 5, 2002 is hereby incorporated by reference to Exhibit 10.2 of Collins & Aikman Corporation's Report on Form 10-Q for the quarter ended June 30, 2002 and filed August 14, 2002. |
| 10.33 | Employment and Consulting Agreement between Collins and Aikman Corporation and an Employee dated July 2002 is hereby incorporated by reference to Exhibit 10.1 of Collins & Aikman Corporation's Report on Form 10-Q for the quarter ended September 30, 2002 and filed November 14, 2002. |
| 10.34 | Separation Agreement between Collins and Aikman Corporation and an officer of the Company dated October 2002 is hereby incorporated by reference to Exhibit 10.3 of Collins & Aikman Corporation's Report on Form 10-Q for the quarter ended September 30, 2002 and filed November 14, 2002. |

| Exhibit Number | Description |
|---|---|
| 10.35 | Employment Agreement between Collins & Aikman and an officer of the Company dated January 25, 2004.* |
| 10.36 | Amendment to Employment Agreement between Collins & Aikman Corporation and an officer of the Company dated January 25, 2004.* |
| 10.37 | Separation Agreement between Collins & Aikman Corporation and an officer of the Company dated February 29, 2004.* |
| 11 | Computation of Earnings Per Share.* |
| 12.1 | Computation of Ratio of Earnings to Fixed Charges.* |
| 21 | Subsidiaries of the Registrant.* |
| 23.1 | Consent of KPMG.* |
| 23.2 | Consent of PricewaterhouseCoopers.* |
| 24.1 | Powers of Attorney.* |
| 31.1 | Certification Pursuant to Section 302 of Sarbanes-Oxley Act of 2002.* |
| 31.2 | Certification Pursuant to Section 302 of Sarbanes-Oxley Act of 2002.* |
| 32.1 | Certification Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 (Chapter 63, Title 18 U.S.C. 1350(a) and (b)).* |
| 99 | Voting Agreement between Blackstone Capital Partners L.P. and Wasserstein Perella Partners, L.P. is hereby incorporated by reference to Exhibit 99 of Amendment No. 4 to Collins & Aikman Holdings Corporation's Registration Statement on Form S-2 (Registration No. 33-53179) filed June 27, 1994. |

\* Indicates document filed herewith.

S-8

EXHIBIT 2.4

EXECUTION COPY

SECOND AMENDMENT

SECOND AMENDMENT, dated as of December 18, 2003 (this "Amendment"), to the Receivables Transfer Agreement, dated as of December 20, 2001, as amended and restated as of September 24, 2002 (as further amended, supplemented or otherwise modified from time to time, the "Receivables Transfer Agreement"), among Collins & Aikman Products Co. ("C&A"), Carcorp, Inc. (the "Transferor"), the conduit purchasers party thereto from time to time (the "CP Conduit Purchasers"), the committed purchasers party thereto from time to time (the "Committed Purchasers": and, together with the CP Conduit Purchasers, the "Purchasers"), the funding agents party thereto from time to time (the "Funding Agents") and JPMorgan Chase Bank, as administrative agent (the "Administrative Agent").

W I T N E S S E T H :

WHEREAS, C&A, the Transferor, the Purchasers, the Funding Agents and the Administrative Agent are parties to the Receivables Transfer Agreement; and

WHEREAS, C&A and Carcorp have requested, and the Required Committed Purchasers have consented to, certain modifications as set forth herein;

NOW, THEREFORE, in consideration of the premises and of the mutual agreements herein contained, the parties hereto hereby agree as follows:

1. Defined Terms. Terms defined in the Receivables Transfer Agreement and used herein shall, unless otherwise indicated, have the meanings given to them in the Receivables Transfer Agreement.

2. Amendment to Section 2.03 of the Receivables Transfer Agreement. Paragraph (c) of Section 2.03 of the Receivables Transfer Agreement is hereby amended by deleting such paragraph in its entirety and substituting in lieu thereof the following:

"(c) Transferred Interest Held by the Committed Purchasers Prior to the Termination Date. With respect to any portion of the Transferred Interest which is owned by or transferred to a Committed Purchaser pursuant to this Agreement or an Asset Purchase Agreement prior to the Termination Date, the initial Tranche Period applicable to such portion of the Net Investment allocable thereto shall be a period of at least three (3) Business Days, and such Tranche shall be a BR Tranche. Thereafter (but prior to the Termination Date or the occurrence and continuation

of a Potential Termination Event), with respect to such portion, and with respect to any other portion of the Transferred Interest held by any Committed Purchaser, the Tranche applicable thereto shall be, at the Transferor's sole option, either a BR Tranche or a Eurodollar Tranche. Notwithstanding the foregoing, upon the occurrence of the Redwood Termination Event, and for so long as GE Capital is the only Committed Purchaser hereunder that owns any portion of the Transferred Interest or has outstanding Net Investment, the Tranche Period applicable to GE Capital's portion of the Net Investment shall be the GECC Tranche Period, and such Tranches with respect to GE Capital's Net Investment shall be GECC Tranches; provided, that if GE Capital ceases to be the only Committed Purchaser that owns a portion of the Transferred Interest or who has outstanding Net Investment, the foregoing proviso shall cease to apply and pricing for GE Capital's portion of the Net Investment shall be determined in accordance with the first two sentences of this paragraph (c). The Transferor shall give the Administrative Agent and the Funding Agents with

respect to the applicable Committed Purchasers irrevocable notice by telephone of the new Tranche Period (i) if the applicable Tranche is to be a Eurodollar Tranche, at least three (3) Business Days prior to the expiration of any then existing Tranche Period, and (ii) if the applicable Tranche is to be a BR Tranche or GECC Tranche, at least one
(1) Business Day prior to the expiration of any then existing Tranche Period. Any Tranche Period maintained by the Committed Purchasers which is outstanding on the Termination Date shall end on the Termination Date."

3. Amendment to Schedule A of the Receivables Transfer Agreement. (a) Schedule A to the Receivables Transfer Agreement is hereby amended by inserting the following defined terms in their appropriate alphabetical order:

"GECC CP Rate" shall mean (i) the latest month-end published rate for 30-day dealer commercial paper (high grade unsecured notes sold through dealers by major corporations in multiples of $1,000), which normally appears in the "Money Rates" column of The Wall Street Journal or, in the event that The Wall Street Journal ceases publication of such rate, in such other publication of general circulation as GE Capital may, from time to time, designate in writing, or (ii) if such rate is not determinable pursuant to clause (i) hereof, such rate as GE Capital may, from time to time, designate in writing.

"GECC Tranche" shall mean a Tranche as to which Discount is calculated at the GECC CP Rate plus the margin set forth in the definition of "Tranche Rate".

"GECC Tranche Period" shall mean, with respect to a GECC Tranche, each Settlement Period; provided, that on or after the Termination Date, GE Capital shall select all GECC Tranche Periods.

(b) Schedule A to the Receivables Transfer Agreement is hereby further amended by deleting the following defined terms contained therein in their entirety and substituting in lieu thereof the following:

"Tranche Period" shall mean a CP Tranche Period, a BR Tranche Period, a Eurodollar Tranche Period or a GECC Tranche Period, as applicable.

"Tranche Rate" shall mean the CP Rate, the Base Rate, the Eurodollar Rate or the GECC CP Rate, as applicable, plus, (a) in the case of the Base Rate or the Eurodollar Rate, the Applicable Margin and
(b) in the case of the GECC CP Rate, 2.25%.

4. Effectiveness. This Amendment shall become effective as of December 1, 2003 when the Administrative Agent shall have received counterparts hereof duly executed by the Transferor, C&A and the Required Committed Purchasers; provided, that if the Administrative Agent does not receive such counterparts on or prior to December 31, 2003, this Amendment shall then become effective on the date such counterparts are received.

5. Representations and Warranties. Each of the C&A and the Transferor hereby represent and warrant that each of the representations and warranties made by it in or pursuant to the Receivables Transfer Agreement shall be, after giving effect to this Amendment, true and correct in all material respects, as if made on and as of the date hereof (unless such representations and warranties are stated to relate to an earlier date, in which case such representations and warranties shall be true and correct in all material respects as of such earlier date).

6. Continuing Effect of Receivables Transfer Agreement. This Amendment shall not be construed as a waiver or consent to any further or future action on the part of C&A or the Transferor that would require a waiver or consent of the Funding Agents and the Required Committed Purchasers. Except as amended hereby, the provisions of the Receivables Transfer Agreement are and shall remain in full force and effect.

7. Counterparts. This Amendment may be executed by one or more of the parties hereto in any number of separate counterparts (which may include counterparts delivered by facsimile transmission) and all of said counterparts taken together shall be deemed to constitute one and the same instrument. Any executed counterpart delivered by facsimile transmission shall be effective as for all purposes hereof.

8. GOVERNING LAW. THIS AMENDMENT SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.

IN WITNESS WHEREOF, the parties hereto have caused this Amendment to be duly executed by their respective authorized officers as of the day and year first above written.

**CARCORP, INC., as Transferor**

By: /s/ Robert A. Krause
-----------------------------------------
Name: Robert A. Krause
Title: Vice President and Treasurer

**COLLINS & AIKMAN PRODUCTS CO., individually and as Collection Agent**

By: /s/ Robert A. Krause
-----------------------------------------
Name: Robert A. Krause
Title: Vice President and Treasurer

**JPMORGAN CHASE BANK, as**
Administrative Agent and as Committed
Purchaser

```
By: /s/ BRADLEY SCHWARTZ
    --------------------------------
    Name: BRADLEY SCHWARTZ
    Title: Managing Director
```

**CDC FINANCIAL PRODUCTS INC., as**
**Committed Purchaser**

By: _____
Name:
Title:

**THE BANK OF NOVA SCOTIA, as**
**Committed Purchaser**

By: _____
Name:
Title:

**GENERAL ELECTRIC CAPITAL**
**CORPORATION, as Committed Purchaser**

By: _____
Name:
Title: Duly Authorized Signatory

**JPMORGAN CHASE BANK, as**
Administrative Agent and as Committed
Purchaser

By: _____
Name:
Title:

**CDC FINANCIAL PRODUCTS INC., as**
**Committed Purchaser**

                    By: /s/ Kathy Lynch
                    ----------------------------------
                    Name: Kathy Lynch
                    Title: Director

**THE BANK OF NOVA SCOTIA, as**
**Committed Purchaser**

By: _____
Name:
Title:

**GENERAL ELECTRIC CAPITAL**
**CORPORATION, as Committed Purchaser**

By: _____
Name:
Title: Duly Authorized Signatory

**JPMORGAN CHASE BANK**, as
Administrative Agent and as Committed
Purchaser

By: _____
Name:
Title:

**CDC FINANCIAL PRODUCTS INC., as**
**Committed Purchaser**

By: _____
Name:
Title:

**THE BANK OF NOVA SCOTIA, as**
**Committed Purchaser**

> BY: /s/ J. A. EDWARDS
> ----------------------------------
>     Name: J. A. EDWARDS
>     Title: Managing Director

**GENERAL ELECTRIC CAPITAL**
**CORPORATION, as Committed Purchaser**

By: _____
Name:
Title: Duly Authorized Signatory

**JPMORGAN CHASE BANK,** as
Administrative Agent and as Committed
Purchaser


By: _____
Name:
Title:


**CDC FINANCIAL PRODUCTS INC.,** as
**Committed Purchaser**


By: _____
Name:
Title:


**THE BANK OF NOVA SCOTIA,** as
**Committed Purchaser**


By: _____
Name:
Title:


**GENERAL ELECTRIC CAPITAL
CORPORATION, as Committed Purchaser**


By: /s/ David A. Ernst
    ----------------------------------
    Name: David A. Ernst
    Title: Duly Authorized Signatory

EXHIBIT 4.15

EXECUTION COPY

FIFTH AMENDMENT

FIFTH AMENDMENT, dated as of February 13, 2004 (this "Amendment"), to the CREDIT AGREEMENT, dated as of December 20, 2001 (as amended prior to the date hereof, the "Existing Credit Agreement"), among COLLINS & AIKMAN PRODUCTS CO., a Delaware corporation (the "Company"), COLLINS & AIKMAN CANADA INC., a Canadian corporation, COLLINS & AIKMAN PLASTICS, LTD., a Canadian corporation, COLLINS & AIKMAN CORPORATION, a Delaware corporation ("Holdings"), the financial institutions parties thereto (the "Lenders"), CREDIT SUISSE FIRST BOSTON, as syndication agent, DEUTSCHE BANK SECURITIES INC. and MERRILL LYNCH CAPITAL CORPORATION, as co-documentation agents, JPMORGAN CHASE BANK, a New York banking corporation ("JPMorgan Chase Bank"), as administrative agent (in such capacity, the "Administrative Agent"), and JPMORGAN CHASE BANK, TORONTO BRANCH, a Foreign Bank Branch under the Bank Act (Canada), as Canadian administrative agent. This Fifth Amendment is entered into by and among the Company, Holdings, the Lenders party hereto, the Supplemental Revolving Lenders party hereto, the Tranche A-1 Term Lenders party hereto, the Administrative Agent, the Collateral Agent, the Canadian Administrative Agent and the Canadian Collateral Agent.

WHEREAS, pursuant to the Existing Credit Agreement, the Lenders have agreed to make and have made certain loans to the Borrowers;

WHEREAS, the Company has requested that the Existing Credit Agreement be modified in the manner provided for in this Amendment, and the Lenders are willing to agree to such modifications as provided for in this Amendment; and

WHEREAS, the Company has requested that the Supplemental Revolving Lenders and the Tranche A-1 Term Lenders party hereto commit to become Lenders hereto for the purpose of adding two new facilities under the Credit Agreement;

NOW, THEREFORE, the parties hereto hereby agree as follows:

1. Defined Terms. Capitalized terms used and not defined herein shall have the meanings given to them in the Amended Credit Agreement (as defined below).

2. Amendment of the Existing Credit Agreement.

(a) On the Effective Date, the Existing Credit Agreement is hereby amended to read in its entirety as set forth in Annex A hereto (the "Amended Credit Agreement"), without any further actions required for the effectiveness of such Amended Credit Agreement. On the Effective Date, the terms "Agreement," "this Agreement," "herein," "hereinafter," "hereto," "hereof" and words of similar import, as used in the Amended Credit Agreement, shall, unless the context otherwise requires, refer to the Amended Credit Agreement, and the term "Credit Agreement," as used in the other Loan Documents, shall mean the Amended Credit Agreement.

(b) All Loans and Letters of Credit outstanding under the Existing Credit Agreement on the Effective Date shall continue to be outstanding under the Amended Credit Agreement and from and after the Effective Date the terms of the Amended Credit Agreement will govern the rights of the Lenders with respect thereto.

(c) On the Effective Date, the Supplemental Revolving Lenders will provide a new $100,000,000 revolving credit facility ("Supplemental Revolving Credit Facility") to the Company

under the Amended Credit Agreement which will be available for revolving credit loans and letters of credit, as provided in the Amended Credit Agreement.

(d) On the Effective Date, the Tranche A-1 Term Lenders will make Tranche A-1 Term Loans in the aggregate principal amount of $185,000,000 to the Company under the Amended Credit Agreement, the Net Proceeds of which (which will be deemed to be $181,500,000) will be used to prepay Tranche A Term Loans and Tranche B Term Loans ratably in the direct order of maturity.

(e) On the Effective Date and after giving effect to the prepayments described in clause (d) above, Schedule 2.11 of the Existing Credit Agreement is hereby amended to read in its entirety as set forth in Annex B hereto.

(f) On the Effective Date, the Exhibits to the Existing Credit Agreement are hereby amended by adding Exhibit A-8 and Exhibit A-9 thereto as set forth in Annexes C-1 and C-2 hereto, respectively. Except as expressly provided herein, no other Exhibits or Schedules shall be deemed modified or amended by this Fifth Amendment.

3. Addition of Lenders.

(a) By its signature below, each Supplemental Revolving Lender shall become a Lender party to the Credit Agreement and the other Loan Documents with all rights, powers and obligations of a Lender thereunder and with a Supplemental Revolving Credit Linked Deposit Amount as set forth on Schedule I attached hereto.

(b) By its signature below, each Tranche A-1 Term Lender shall become a Lender party to the Credit Agreement and the other Loan Documents with all rights, powers and obligations of a Lender thereunder and with a Tranche A-1 Term Loan Commitment as set forth on Schedule II attached hereto.

4. Representations and Warranties. The Company hereby represents and warrants to the Administrative Agent and the Lenders that, as of the date hereof and after giving effect to the amendments contained herein:

(a) No Default or Event of Default has occurred and is continuing.

(b) The execution, delivery and performance by the Company of this Amendment has been duly authorized by all necessary corporate and other action and does not and will not require any registration with, consent or approval of, notice to or action by, any person (including any Governmental Authority) in order to be effective and enforceable, other than the consent of the Lenders and other parties hereto being obtained hereby. The Existing Credit Agreement as amended by this Amendment constitutes the legal, valid and binding obligation of Holdings and the Borrowers, enforceable against each in accordance with its terms, subject to applicable bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium or other laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law.

(c) The amount of Obligations permitted to be incurred by Holdings and its Subsidiaries under the covenants contained in the Subordinated Notes Indenture and Senior Unsecured Notes Indenture is sufficient to permit the Obligations (including, without limitation, the Obligations under the Revolving Credit Facility and the Supplemental Revolving Credit Facility, if fully drawn,

and in respect of the Tranche A-1 Term Loans) which may be incurred (in the case of Obligations not being incurred on the date hereof or not outstanding on the date hereof) and to be incurred or to be outstanding (in the case of Obligations outstanding on the date hereof). All such Obligations of the Company will constitute Senior Indebtedness (as defined in the Subordinated Notes Indenture), and all such Obligations of the Subsidiary Guarantor will constitute Senior Guarantor Indebtedness (as defined in the Subordinated Notes Indenture).

(d) The representations and warranties set forth in each Loan Document are true and correct in all material respects as of the date hereof, except to the extent such representations and warranties relate to an earlier date and except to the extent the matters contemplated by Section 6 hereof are permitted to occur following the Effective Date.

5. Conditions Precedent to Effectiveness. This Amendment shall become effective on the date on which each of the following conditions is satisfied (the "Effective Date"):

(a) This Amendment shall have been executed and delivered by a duly authorized officer of each of Holdings, the Borrowers, the Administrative Agent, the Required Lenders under the Existing Credit Agreement, each Supplemental Revolving Lender and each Tranche A-1 Term Lender.

(b) The Administrative Agent shall have received a certificate of the Company, dated as of the Effective Date, substantially in the form of Annex D hereto, executed by any Responsible Officer and the Secretary or any Assistant Secretary of the Company.

(c) The Administrative Agent shall have received the following executed legal opinions:

(i) the executed legal opinion of Jay Knoll, Esq., general counsel to the Company, in form and substance reasonably satisfactory to the Administrative Agent; and

(ii) the executed legal opinion of Cahill Gordon & Reindel LLP, special counsel to the Company, in form and substance reasonably satisfactory to the Administrative Agent.

Each such legal opinion shall cover such matters incident to this Amendment as the Administrative Agent may reasonably require and may be subject to such qualifications and exceptions as are customary for opinions of the type concerned.

(d) The Administrative Agent shall have received a confirmation, substantially in the form of Annex E-1 hereto, executed and delivered by Holdings, the Company and each Guarantor (other than the Canadian Guarantors) confirming their respective continuing obligations under the Guarantee and Collateral Agreement and the other U.S. Security Documents.

(e) The Canadian Administrative Agent shall have received a confirmation, substantially in the form of Annex E-2 hereto, executed and delivered by the Canadian Borrowers and each Canadian Guarantor confirming their respective continuing obligations under the Canadian Guarantee and Collateral Agreement and the other Canadian Security Documents.

(f) The Administrative Agent shall have received all fees and other amounts due and payable on or prior to the Effective Date, including, to the extent invoiced, reimbursement or payment of all reasonable out-of-pocket expenses (including reasonable fees, charges and disburse-

3

ments of counsel) required to be reimbursed or paid by any Loan Party hereunder or under any other Loan Document.

6. Mortgages and Further Assurances.

(a) To the extent not waived or extended by the Administrative Agent in its discretion, within 60 days following the Effective Date, the Company and the Canadian Borrowers shall (i) execute and deliver to the Applicable Collateral Agent such amendments or other modifications to the U.S. Mortgages and the Canadian Mortgages or such other documents as the Applicable Collateral Agent deems reasonably necessary or advisable to continue its first priority security interest (subject to Liens expressly permitted by the applicable U.S. Mortgages and the Canadian Mortgages and Section 6.04 of the Existing Credit Agreement) in the U.S. Mortgaged Properties and the Canadian Mortgaged Properties, as the case may be, and (ii) deliver bring-down title searches, local counsel legal opinions or title insurance endorsements as are reasonably requested by the Applicable Collateral Agent to confirm the continued validity of the local counsel legal opinions previously provided and title insurance policies previously issued relating to the U.S. Mortgaged Properties and the Canadian Mortgaged Properties, as modified or amended. In the event that a bring-down title search discloses a Lien not expressly permitted by the applicable U.S. Mortgages and Canadian Mortgages and Section 6.04 of the Existing Credit Agreement), the Company and the Borrowers shall within 90 days following the Effective Date (unless extended or waived by the Administrative Agent following a reasonable request by the Company) cause such Liens to be released, terminated or satisfied pursuant to documentation reasonably satisfactory to the Administrative Agent. The failure to have done the foregoing prior to the Effective Date will not constitute a breach of the Credit Agreement.

(b) Following the Effective Date, to the extent reasonably requested by the Applicable Collateral Agent as being required as a result of this Amendment, the Company shall, and shall cause the relevant Borrower or Guarantor to, provide any document (including any Uniform Commercial Code financing statement or its equivalent in the relevant Canadian jurisdiction) under the applicable Security Documents or applicable law to be filed, registered or recorded in order to create in favor of the Applicable Collateral Agent, for the benefit of the Secured Parties, a perfected Lien on the Collateral described therein, prior and superior in right to any other person (other than with respect to Liens expressly permitted by
Section 6.04 of the Existing Credit Agreement or otherwise under the Security Documents), in proper form for filing, registration or recordation. The failure to have made any such requested filings prior to the Effective Date will not constitute a breach of the Credit Agreement.

7. Expenses. The Company agrees to pay or reimburse the Administrative Agent for its reasonable out-of-pocket expenses in connection with this Amendment, including the reasonable fees, charges and disbursements of Simpson Thacher & Bartlett LLP, counsel for the Administrative Agent.

8. Governing Law; Counterparts.(a) This Amendment and the rights and obligations of the parties hereto shall be governed by, and construed and interpreted in accordance with, the laws of the State of New York.

(b) This Amendment may be executed by one or more of the parties to this Amendment on any number of separate counterparts, and all of said counterparts taken together shall be deemed to constitute one and the same instrument. This Amendment may be delivered by facsimile transmission of the relevant signature pages hereof.

4

IN WITNESS WHEREOF, the Company, the Canadian Borrowers, Holdings, the Agents, the Leaders, the Supplemental Revolving Lenders and the Tranche A-1 Term Lenders have caused this Amendment to be duly executed by their respective authorized officers as of the day and year first above written.

### COLLINS & AIKMAN PRODUCTS CO.

By: /s/ J. Michael Stepp
------------------------------------------
    Name: J. Michael Stepp
    Title: President

### COLLINS & AIKMAN CORPORATION

By: /s/ J. Michael Stepp
------------------------------------------
    Name: J. Michael Stepp
    Title: President

### COLLINS & AIKMAN CANADA INC.

By: /s/ J. Michael Stepp
------------------------------------------
    Name: J. Michael Stepp
    Title: President

### COLLINS & AIKMAN PLASTICS LTD.

By: /s/ J. Michael Stepp
------------------------------------------
    Name: J. Michael Stepp
    Title: President

By: /s/ Richard W. Duker
    --------------------------------
    Name: Richard W. Duker
    Title: Managing Director

**JPMORGAN CHASE BANK, TORONTO**
BRANCH, as Canadian Administrative Agent,
Canadian Collateral Agent and as a Lender

By: _____
                Name:
                Title:

JPMORGAN CHASE BANK, as Administrative Agent, Collateral Agent and as a Lender

By: _____ Name:

Title:

**JPMORGAN CHASE BANK, TORONTO**
BRANCH, as Canadian Administrative Agent
Canadian Collateral Agent and as a Lender

```
By: /s/ Drew McDonald
    --------------------------------
    Name: Drew McDonald
    Title: Vice President
```

FINAL COMPOSITE COPY AS AMENDED BY AMENDMENTS
NOS. 1-5

# CREDIT AGREEMENT

### Dated as of December 20, 2001

among

## COLLINS & AIKMAN PRODUCTS CO.,
as Borrower,

## COLLINS & AIKMAN CANADA INC.,
as a Canadian Borrower,

## COLLINS & AIKMAN PLASTICS, LTD.,
as a Canadian Borrower,

## COLLINS & AIKMAN CORPORATION,

## THE LENDERS NAMED HEREIN,

## DEUTSCHE BANC SECURITIES INC. and
## MERRILL LYNCH CAPITAL CORPORATION,
as Co-Documentation Agents,

## CREDIT SUISSE FIRST BOSTON,
as Syndication Agent,

## JPMORGAN CHASE BANK,
as Administrative Agent

and

## JPMORGAN CHASE BANK, TORONTO BRANCH,
as Canadian Administrative Agent

### J.P. MORGAN SECURITIES INC. and CREDIT SUISSE FIRST BOSTON,
as Joint Lead Arrangers and Joint Lead Bookrunners

and

### J.P. MORGAN SECURITIES INC. and DEUTSCHE BANK SECURITIES INC.,

as Joint Lead Arrangers and Joint Lead Bookrunners for the Supplemental Revolving Credit Facility and the Tranche A-1 Term Loans

# TABLE OF CONTENTS

| | | Page |
|---|---|---|
| ARTICLE I. DEFINITIONS | | 2 |
| SECTION 1.01. | Defined Terms | 2 |
| SECTION 1.02. | Terms Generally | 37 |
| ARTICLE II. THE CREDITS | | 37 |
| SECTION 2.01. | Loans; Commitments | 37 |
| SECTION 2.02. | Loans | 44 |
| SECTION 2.03. | Notice of Borrowings | 47 |
| SECTION 2.04. | Notes; Repayment of Loans | 48 |
| SECTION 2.05. | Fees | 49 |
| SECTION 2.06. | Interest on Loans | 50 |
| SECTION 2.07. | Default Interest | 51 |
| SECTION 2.08. | Alternate Rate of Interest | 51 |
| SECTION 2.09. | Termination and Reduction of Commitments and Total Supplemental Revolving Credit Linked Deposit Amount | 51 |
| SECTION 2.10. | Conversion and Continuation of Term Loans | 52 |
| SECTION 2.11. | Repayment of Tranche A Term, Tranche A-1 Term and Tranche B Term Borrowings | 54 |
| SECTION 2.12. | Prepayment | 54 |
| SECTION 2.13. | Reserve Requirements; Change in Circumstances | 57 |
| SECTION 2.14. | Change in Legality | 59 |
| SECTION 2.15. | Indemnity | 59 |
| SECTION 2.16. | Pro Rata Treatment | 60 |
| SECTION 2.17. | Payments | 60 |
| SECTION 2.18. | Taxes | 61 |
| SECTION 2.19. | Issuance of Letters of Credit | 64 |
| SECTION 2.20. | Participations; Unconditional Obligations | 65 |
| SECTION 2.21. | Letter of Credit Fee | 66 |
| SECTION 2.22. | Agreement To Repay Letter of Credit Disbursements | 66 |
| SECTION 2.23. | Letter of Credit Operations | 67 |
| SECTION 2.24. | Cash Collateralization | 68 |
| SECTION 2.25. | Termination and Reduction of Letter of Credit Commitment | 68 |
| SECTION 2.26. | Bankers' Acceptances | 69 |
| SECTION 2.27. | Reallocation | 71 |
| SECTION 2.28. | Permitted Indebtedness | 72 |
| ARTICLE III. REPRESENTATIONS AND WARRANTIES | | 73 |
| SECTION 3.01. | Organization, Corporate Powers | 73 |
| SECTION 3.02. | Authorization | 73 |
| SECTION 3.03. | Enforceability | 73 |
| SECTION 3.04. | Approvals | 73 |
| SECTION 3.05. | Use of Proceeds | 74 |
| SECTION 3.06. | Federal Reserve Regulations | 74 |
| SECTION 3.07. | Options for Capital Stock | 74 |
| SECTION 3.08. | Security Documents | 74 |

|  |  | Page |
|---|---|---|
| SECTION 3.09. | Financial Statements | 75 |
| SECTION 3.10. | No Material Adverse Change | 76 |
| SECTION 3.11. | Title to Properties; Possession Under Leases | 77 |
| SECTION 3.12. | Subsidiaries | 77 |
| SECTION 3.13. | Litigation; Compliance with Laws | 77 |
| SECTION 3.14. | Agreements | 78 |
| SECTION 3.15. | Investment Company Act | 78 |
| SECTION 3.16. | Public Utility Holding Company Act | 78 |
| SECTION 3.17. | Tax Returns | 78 |
| SECTION 3.18. | No Material Misstatements | 78 |
| SECTION 3.19. | Employee Benefit Plans | 79 |
| SECTION 3.20. | Labor Matters | 79 |
| SECTION 3.21. | Environmental Matters | 79 |
| SECTION 3.22. | Solvency | 80 |
| SECTION 3.23. | Absence of Certain Restrictions | 81 |
| SECTION 3.24. | No Foreign Assets Control Regulation Violation | 81 |
| SECTION 3.25. | Insurance | 81 |
| SECTION 3.26. | Certain Other Representations | 81 |
| SECTION 3.27. | Senior Debt | 82 |
| ARTICLE IV. CONDITIONS | | 82 |
| SECTION 4.01. | All Credit Events | 82 |
| SECTION 4.02. | Conditions to Effectiveness | 82 |
| ARTICLE V. AFFIRMATIVE COVENANTS | | 86 |
| SECTION 5.01. | Existence; Businesses and Properties | 87 |
| SECTION 5.02. | Insurance | 87 |
| SECTION 5.03. | Taxes | 87 |
| SECTION 5.04. | Financial Statements, Reports, Amendments, etc. | 88 |
| SECTION 5.05. | Litigation and Other Notices | 90 |
| SECTION 5.06. | ERISA | 90 |
| SECTION 5.07. | Maintaining Records; Access to Properties and Inspections | 90 |
| SECTION 5.08. | Use of Proceeds | 91 |
| SECTION 5.09. | Further Assurances | 91 |
| SECTION 5.10. | Change in Ownership | 91 |
| SECTION 5.11. | Fiscal Year; Accounting | 91 |
| SECTION 5.12. | Dividends | 91 |
| SECTION 5.13. | Interest Rate Protection | 91 |
| SECTION 5.14. | Corporate Separateness | 91 |
| SECTION 5.15. | Business of Restricted Subsidiaries | 92 |
| SECTION 5.16. | Business of Waterstone Insurance, Inc. | 92 |
| SECTION 5.17. | Collateral, etc. | 92 |
| SECTION 5.18. | Additional Collateral | 93 |
| SECTION 5.19. | Landlord Waivers | 96 |
| ARTICLE VI. NEGATIVE COVENANTS | | 96 |
| SECTION 6.01. | Indebtedness | 96 |
| SECTION 6.02. | Dividends and Distributions | 99 |
| SECTION 6.03. | Capital Expenditures | 100 |

-ii-

SECTION 6.04.    Liens................................................................................. 101
SECTION 6.05.    Priority of Loan Payments............................................................ 103
SECTION 6.06.    Sale and Lease-Back Transactions.................................................... 104
SECTION 6.07.    Investments, Loans and Advances..................................................... 104
SECTION 6.08.    Mergers, Consolidations, Sales of Assets and Acquisitions........................... 106
SECTION 6.09.    Transactions with Affiliates and Stockholders....................................... 108
SECTION 6.10.    Modification of Certain Instruments.................................................. 109
SECTION 6.11.    Amendment of Constitutive Documents; Change in Corporate Structure................... 109
SECTION 6.12.    Business of Holdings and Restricted Subsidiaries.................................... 110
SECTION 6.13.    Restrictive Agreements.............................................................. 110
SECTION 6.14.    Interest Coverage Ratio............................................................. 110
SECTION 6.15.    Leverage Ratio...................................................................... 110
SECTION 6.16.    Tax Sharing......................................................................... 111
SECTION 6.17.    Inactive Subsidiaries............................................................... 111
SECTION 6.18.    Amendments to Transaction Documents; Certain Actions under Transaction Documents... 111

ARTICLE VII. EVENTS OF DEFAULT............................................................................ 111

ARTICLE VIII. AGENTS..................................................................................... 114

ARTICLE IX. MISCELLANEOUS................................................................................ 117

SECTION 9.01.    Notices............................................................................. 117
SECTION 9.02.    Survival of Agreement............................................................... 118
SECTION 9.03.    Binding Effect...................................................................... 118
SECTION 9.04.    Successors and Assigns.............................................................. 119
SECTION 9.05.    Expenses; Indemnity................................................................. 122
SECTION 9.06.    Right of Set-off; Sharing........................................................... 124
SECTION 9.07.    Applicable Law...................................................................... 125
SECTION 9.08.    Waivers; Amendment.................................................................. 125
SECTION 9.09.    Interest Rate Limitation............................................................ 126
SECTION 9.10.    Entire Agreement.................................................................... 126
SECTION 9.11.    Waiver of Jury Trial................................................................ 126
SECTION 9.12.    Severability........................................................................ 126
SECTION 9.13.    Counterparts........................................................................ 126
SECTION 9.14.    Headings............................................................................ 127
SECTION 9.15.    Jurisdiction; Consent to Service of Process......................................... 127
SECTION 9.16.    Conversion of  Currencies........................................................... 127
SECTION 9.17.    Releases of Guarantees and Liens.................................................... 128
SECTION 9.18.    Confidentiality..................................................................... 128

Exhibits

Exhibit A-1      Revolving Credit Note
Exhibit A-2      Tranche A Term Note
Exhibit A-3      Tranche B Term Note
Exhibit A-4      Swingline Note
Exhibit A-5      Canadian Revolving Credit Note
Exhibit A-6      Additional Revolving Credit Note
Exhibit A-7      Intercompany Note
Exhibit A-8      Supplemental Revolving Credit Note
Exhibit A-9      Tranche A-1 Term Note
Exhibit B        Assignment and Acceptance
Exhibit C        Administrative Questionnaire
Exhibit D        Form of Opinion
Exhibit E        Form of Compliance Certificate
Exhibit F-1      Form of Guarantee and Collateral Agreement
Exhibit F-2      Form of Canadian Guarantee and Collateral Agreement
Exhibit G-1      Form of U.S. Mortgage
Exhibit G-2      Form of Canadian Mortgage

Schedules

1.01(A)          Applicable Margin
1.01(B)          Applicable Prepayment Percentage
1.01(C)          Additional Designated Persons
1.01(D)          Subordination Terms
1.01(E)          Mortgaged Property
1.01(F)          Specified Business
2.01             Commitments
2.11             Term Loan Amortization Schedule
2.26             Form of Bankers Acceptance
3.07             Options and Rights Regarding Holdings
                 Capital Stock
3.12(A)          Subsidiaries of Holdings
3.12(B)          Outstanding Commitments Relating to Capital Stock
3.17             Tax Matters
6.01             Existing Intercompany Indebtedness
6.04             Existing Liens
6.07             Existing Investments

-iv-

```
        CREDIT AGREEMENT, dated as of December 20,
2001, among COLLINS & AIKMAN PRODUCTS CO., a Delaware
corporation (the "Company"), COLLINS & AIKMAN CANADA
INC., a Canadian corporation ("Collins & Aikman
Canada"), COLLINS & AIKMAN PLASTICS, LTD., a Canadian
corporation ("Collins & Aikman Plastics," and
collectively with Collins & Aikman Canada, the
"Canadian Borrowers"), COLLINS & AIKMAN CORPORATION,
a Delaware corporation ("Holdings"), the financial
institutions parties hereto (as hereinafter further
defined, the "Lenders"), CREDIT SUISSE FIRST BOSTON,
as syndication agent (the "Syndication Agent"),
DEUTSCHE BANC SECURITIES INC. and MERRILL LYNCH
CAPITAL CORPORATION, as co-documentation agents (the
"Co-Documentation Agents"), JPMORGAN CHASE BANK, a
New York banking corporation ("JPMorgan Chase Bank"),
as administrative agent (in such capacity, the
"Administrative Agent"), and JPMORGAN CHASE, BANK
TORONTO BRANCH, a Canadian chartered bank ("Chase
Canada"), as Canadian administrative agent (in such
capacity, the "Canadian Administrative Agent").

    The Company, Holdings and Textron Inc., a Delaware corporation
```

("Textron"), have entered into the Purchase Agreement, dated as of August 7, 2001, as amended and restated as of November 30, 2001 (together will all the exhibits, schedules, annexes and amendments thereto and all other documents executed in connection therewith, the "Tac-Trim Purchase Agreement") pursuant to which the Company is to acquire (the "Acquisition") all the outstanding capital stock of certain Textron subsidiaries (the "Tac-Trim Subsidiaries") that comprise the automotive interior and exterior trim businesses of Textron on the Closing Date (as defined below). After giving effect to the Acquisition, the Tac-Trim Subsidiaries (other than the Brazilian Subsidiary (as defined below)) will be wholly owned subsidiaries of the Company.

In connection with the Acquisition, (a) Heartland Industrial Partners, L.P. ("Heartland"), certain of its affiliates (including investors in Heartland) and certain other investors (collectively, the "Investors") will purchase newly issued common equity (the "Investor Common Equity") of Holdings for approximately $160,000,000 in cash, of which Heartland and certain of its limited partner co-investors will provide approximately $100,000,000 and the proceeds of which will be contributed to the Company, (b) Holdings will issue to Textron 18,000,000 newly issued shares of common equity ("Seller Common Equity") of Holdings, (c) the Company will issue to Textron newly issued preferred stock ("Seller Preferred") of the Company having an original aggregate liquidation preference of $326,400,000, consisting of a Series A tranche (the "Series A Seller Preferred") with an original aggregate liquidation preference of $182,700,000, a Series B tranche with an original aggregate liquidation preference of $123,700,000 and a Series C tranche with an original aggregate liquidation preference of $20,000,000, (d) on or prior to the Closing Date and pursuant to Section 5.21 of the Tac-Trim Purchase Agreement, Textron or one of its affiliates (the "Lessor") will enter into a synthetic operating lease or other off-balance-sheet lease arrangement (the "Textron Sale/Leaseback Financing") pursuant to which certain equipment (the "Textron Sale/Leaseback Assets") included in the business conducted by the Tac-Trim Subsidiaries will be leased by the Company or its Subsidiaries on the Closing Date, and (e) on the Closing Date and pursuant to the Tac-Trim Purchase Agreement, the Company will acquire a 50% equity interest in Textron Automotive Holdings (Italy) S.r.l. (together with its subsidiaries and related assets, "Italian JV"), with Textron or its Subsidiaries retaining an equity interest in the Italian JV of not less than 40% (which has a value of approximately $18,600,000).

In connection with the Acquisition, (a) the Company has requested that the Lenders, and the Lenders have agreed to, make available the senior secured credit facilities described herein, (b) the Company will issue not less than $500,000,000 in aggregate principal amount of its senior unsecured notes (the "Senior Unsecured Notes"), and (c) the Receivables Subsidiary (as defined below) will obtain an off-balance-sheet receivables purchase facility (the "Receivables Facility") in an aggregate committed amount of $250,000,000,

# EXHIBIT D

# PART 3

of which the amount set forth in Section 4.02(c)(vii) is expected to be funded on the Closing Date (the "Receivables Facility Proceeds").

In connection with the Acquisition, (a) the existing indebtedness and capital lease obligations of the Tac-Trim Subsidiaries outstanding on the Closing Date will remain outstanding (the "Assumed Indebtedness"), (b) the Company will refinance all of its indebtedness under its credit agreement, as amended and restated as of February 23, 2001 and for which JPMorgan Chase Bank (formerly known as The Chase Manhattan Bank) acts as the administrative agent (the "Existing Credit Agreement") and (c) the Receivable Subsidiary will replace its existing receivable transfer agreement, dated as of December 27, 1999 (the transactions described in this paragraph and the immediately preceding two paragraphs, together with the Acquisition and the other transactions contemplated hereby, are collectively referred to herein as the "Transactions").

Accordingly, the Company, the Canadian Borrowers, Holdings, the Lenders, the Issuing Banks and the Agents agree as follows:

## ARTICLE I.

## DEFINITIONS

SECTION 1.01. Defined Terms. In addition to the terms defined above, as used in this Agreement the following terms shall have the meanings specified below:

"ABR Borrowing" shall mean a Borrowing comprised of ABR Loans.

"ABR Loan" shall mean any ABR Tranche A Term Loan, ABR Tranche A-1 Term Loan, ABR Tranche B Term Loan, ABR Revolving Loan, ABR Supplemental Revolving Loan or Swingline Loan.

"ABR Revolving Loan" shall mean any Revolving Loan, Additional Revolving Loan or Canadian Revolving Loan in dollars bearing interest at a rate determined by reference to the Alternate Base Rate in accordance with the provisions of Article II.

"ABR Supplemental Revolving Loan" shall mean any Supplemental Revolving Loan bearing interest at a rate determined by reference to the Alternate Base Rate in accordance with the provisions of Article II.

"ABR Tranche A Term Loan" shall mean any Tranche A Term Loan bearing interest at a rate determined by reference to the Alternate Base Rate in accordance with the provisions of Article II.

"ABR Tranche A-1 Term Loan" shall mean any Tranche A-1 Term Loan bearing interest at a rate determined by reference to the Alternate Base Rate in accordance with the provisions of Article II.

"ABR Tranche B Term Loan" shall mean any Tranche B Term Loan bearing interest at a rate determined by reference to the Alternate Base Rate in accordance with the provisions of Article II.

"Acceptance Fee" shall mean a fee payable in C$ by the applicable Canadian Borrower to the Canadian Administrative Agent for the benefit of a Canadian Lender with respect to the acceptance of a B/A, calculated on the face amount of the B/A at the rate per annum (which shall not be less than 2.75%) equal to the Applicable Margin therefor on the basis of the number of days in the applicable Contract Period (inclusive of the first day and exclusive of the last day) and a year of 365 days.

"Acquired Assets" means (a) with respect to any fiscal year, the tangible assets acquired pursuant to a Permitted Business Acquisition during such fiscal year determined at the time of the Permitted Business Acquisition in accordance with GAAP (the "Specified Amount"), provided that if such Permitted Business Acquisition is not consummated during the first quarter of such fiscal year, Acquired Assets shall be determined for purposes of this clause
(a) by multiplying the Specified Amount by (i) .75 if such Permitted Business Acquisition is consummated during the second quarter of such fiscal year, (ii) .50 if such Permitted Business Acquisition is consummated during the third quarter of such fiscal year and (iii) .25 if such Permitted Business Acquisition is consummated during the fourth quarter of such fiscal year and (b) with respect to any fiscal year thereafter, the Specified Amount.

"Additional Revolving Credit Commitments" shall have the meaning assigned such term in Section 2.27.

"Additional Revolving Credit Note" shall mean a promissory note of the Company, substantially in the form of Exhibit A-6, evidencing Additional Revolving Loans.

"Additional Revolving Lender" shall mean each Canadian Lender (or, if a Canadian Lender is a Canadian Schedule II chartered bank, the affiliate of such Lender that is a Revolving Lender).

"Additional Revolving Loans" shall mean any revolving loans made to the Company under the Additional Revolving Credit Commitments. Each Additional Revolving Loan shall be a Eurodollar Revolving Loan or an ABR Revolving Loan.

"Adjusted LIBO Rate" shall mean, with respect to any Eurodollar Borrowing for any Interest Period and for purposes of determining the Supplemental Revolving Eurodollar Rate for any Interest Period pursuant to Section 2.01(o), an interest rate per annum (rounded upwards, if necessary, to the next 1/16 of 1%) equal to the product of
(a) the greater of (i) the LIBO Rate in effect for such Interest Period and (ii) (x) 2% per annum with respect to Eurodollar Tranche A-1 Term Loans and Eurodollar Supplemental Revolving Loans and for purposes of determining the Supplemental Revolving Eurodollar Rate pursuant to

Section 2.01(o) and (y) 3% per annum otherwise and (b) Statutory Reserves. For purposes hereof, (a) if at least two offered rates for deposits in dollars for a period comparable to the applicable Interest Period appear on page 3750 (or any successor page) of the Dow Jones Telerate Screen as of 11:00 a.m., London time, on the day that is two Business Days prior to the first day of such Interest Period, the term "LIBO Rate" shall mean the arithmetic mean of all such offered rates and (b) if fewer than two such offered rates so appear on page 3750 (or any successor page) of the Dow Jones Telerate Screen, the term "LIBO Rate" shall mean the rate (rounded upwards, if necessary, to the next 1/16 of 1%) at which dollar deposits approximately equal in principal amount to JPMorgan Chase Bank's portion (or, if JPMorgan Chase Bank shall not have any portion, the portion of the Lender having the largest applicable Type of Loan) of the applicable Eurodollar Borrowing (or, in the case of a determination of the Supplemental Revolving Eurodollar Rate pursuant to Section 2.01(o), an amount reasonably determined by the Administrative Agent) and for a period comparable to the applicable Interest Period are offered to

JPMorgan Chase Bank's office in which its eurodollar operations in respect of eurodollar loans are being conducted in immediately available funds in the eurodollar market at approximately 11:00 a.m., New York time, on the day that is two Business Days prior to the first day of such Interest Period.

"Administrative Questionnaire" shall mean an Administrative Questionnaire substantially in the form of Exhibit C.

"Affiliate" shall mean, when used with respect to a specified person, another person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the person specified.

"Agency Fees" shall have the meaning assigned to such term in Section 2.05(b).

"Agents" shall mean the collective reference to the Administrative Agent, the Canadian Administrative Agent, the Syndication Agent, the Co-Documentation Agents, the Collateral Agent, and the Canadian Collateral Agent.

"Agreement" shall mean this Agreement, as in effect on the Closing Date, as amended, supplemented or otherwise modified from time to time.

"Alternate Base Rate" shall mean, for any day, a rate per annum (rounded upwards, if necessary, to the next 1/16 of 1%) equal to the greatest of (a) the Prime Rate in effect on such day, (b) the Base CD Rate in effect on such day plus 1% and (c) the Federal Funds Effective Rate in effect on such day plus 1/2 of 1%. For purposes hereof, "Prime Rate" shall mean the rate of interest per annum (which shall not be less than 4%) publicly announced from time to time by JPMorgan Chase Bank as its prime rate for dollars in effect at its principal office in New York City; each change in the Prime Rate shall be effective on the date such change is publicly announced as being effective. "Base CD Rate" shall mean the sum of (a) the product of (i) the Three-Month Secondary CD Rate and (ii) Statutory Reserves and (b) the Assessment Rate. "Three-Month Secondary CD Rate" shall mean, for any day, the secondary market rate for three-month certificates of deposit reported as being in effect on such day (or, if such day shall not be a Business Day, the next preceding Business Day) by the Board through the public information telephone line of the Federal Reserve Bank of New York (which rate will, under the current practices of the Board, be published in Federal Reserve Statistical Release H.15(519) during the week following such day), or, if such rate shall not be so reported on such day or such next preceding Business Day, the average of the secondary market quotations for three-month certificates of deposit of major money center banks in New York City received at approximately 10:00 a.m., New York City time, on such day (or, if such day shall not be a Business Day, on the next preceding Business Day) by the Administrative Agent from three New York City negotiable certificate of deposit dealers of recognized standing selected by it. "Federal Funds Effective Rate" shall mean, for any day, the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers, as published on the next succeeding Business Day by the Federal Reserve Bank of New York, or, if such rate is not so published for any day which is a Business Day, the average of the quotations for the day of such transactions received by the Administrative Agent from three Federal funds brokers of recognized standing selected by it. If for any reason the Administrative Agent shall have determined (which determination shall be conclusive absent manifest error) that it is unable to ascertain the Base CD Rate or the Federal Funds Effective Rate or both for any reason, including the inability or failure of the Administrative Agent to obtain sufficient quotations in accordance with the terms thereof, the Alternate Base Rate shall be determined without regard to clause (b) or (c), or both, of the first sentence of this definition, as appropriate, until the circumstances giving rise to such

inability no longer exist. Any change in the Alternate Base Rate due to a change in the Prime Rate, the Base CD Rate or the Federal Funds Effective Rate shall be effective on the effective date of such change in the Prime Rate, the Base CD Rate or the Federal Funds Effective Rate, respectively. For the purposes of any Canadian Revolving Credit Borrowing, Alternate Base Rate means the rate of interest per annum equal to the greater of (a) the floating annual rate of interest calculated from time to time by the Canadian Administrative Agent as the base rate which it will use to determine rates of interest on dollar Borrowings to customers in Canada and designated as its U.S. base rate and (b) the Federal Funds Effective Rate in effect on such day plus 1/2 of 1%.

"Applicable Agent" shall mean (i) the Administrative Agent with respect to the Revolving Credit Commitments, the Additional Revolving Credit Commitments, the Supplemental Revolving Credit Commitments and any Term Loans made to the Company and (ii) the Canadian Administrative Agent with respect to the Canadian Revolving Credit Commitments.

"Applicable Collateral Agent" shall mean (i) for the Lenders, with respect to the U.S. Security Documents, the Collateral Agent and (ii) for the Canadian Lenders, with respect to the Canadian Security Documents, the Canadian Collateral Agent.

"Applicable Excess Cash Flow Prepayment Percentage" shall mean initially 75% or, if the Applicable Level at any time is higher than Level III, the Excess Cash Flow Prepayment Percentage set forth in Schedule 1.01(B) opposite the Applicable Level in effect on the last day of the fiscal year to which the prepayment relates.

"Applicable Level" shall mean at any time the highest of Level I, Level II, Level III, Level IV and Level V in effect determined in accordance with Schedule 1.01(A).

"Applicable Margin" shall mean (i) with respect to Revolving Loans, Swingline Loans, Tranche A Term Loans, B/As and Canadian Prime Rate Loans, (a) for any date on or after the Closing Date to but excluding the first day after delivery of the financial statements of Holdings for the fiscal quarter of Holdings ending June 30, 2002, (x) with respect to Revolving Loans, Swingline Loans and Tranche A Term Loans which are Eurodollar Loans and B/As, 3.75% and (y) with respect to Revolving Loans, Swingline Loans and Tranche A Term Loans which are ABR Loans and Canadian Prime Rate Loans, 2.75% and (b) for any date on or after the first day after delivery of the financial statements referred to in the immediately preceding clause (a) above, the applicable margin set forth on Schedule 1.01(A) opposite the Applicable Level, in each case as of the last day of the Holdings' fiscal quarter most recently ended as of such date; (ii) with respect to Tranche B Term Loans, (a) with respect to Tranche B Term Loans which are Eurodollar Loans, 4.00% and (b) with respect to Tranche B Term Loans which are ABR Loans, 3.00%; and (iii) with respect to Supplemental Revolving Loans and Tranche A-1 Term Loans, (a) with respect to Supplemental Revolving Loans and Tranche A-1 Term Loans which are Eurodollar Loans, 4.00% and (b) with respect to Supplemental Revolving Loans and Tranche A-1 Term Loans which are ABR Loans, 3.00%. Notwithstanding the foregoing, if at any time the Leverage Ratio as of the last day of Holdings' fiscal quarter most recently ended is greater than 3.50:1.00 or 4.00:1.00, the Applicable Margin with respect to Tranche B Loans shall be increased by 0.50% and 0.75%, respectively.

"Applicable Percentage" shall mean (w) with respect to any Revolving Lender, the percentage of the aggregate Revolving Credit Commitments represented by such Revolving Lender's Revolving Credit Commitment, (x) with respect to any Additional Revolving Lender, the percentage of the aggregate Additional Revolving Credit Commitments represented by such Additional Revolving Lender's Additional Revolving Credit Commitment, (y) with respect to any Canadian Lender, the percentage of the aggregate Canadian Revolving Credit Commitments represented by

such Canadian Lender's Canadian Revolving Credit Commitment and (z) with respect to any Supplemental Revolving Lender, the percentage of the Total Supplemental Revolving Credit Linked Deposit Amount represented by such Supplemental Revolving Lender's Supplemental Revolving Credit Linked Deposit Amount.

"Assessment Rate" shall mean for any date the annual rate (rounded upwards, if necessary, to the next 1/100 of 1%) most recently estimated by the Administrative Agent as the then current net annual assessment rate that will be employed in determining amounts payable by JPMorgan Chase Bank to the Federal Deposit Insurance Corporation (or any successor) for insurance by such Corporation (or such successor) of time deposits made in dollars at JPMorgan Chase Bank's domestic offices.

"Assignment and Acceptance" shall mean an assignment and acceptance entered into by a Lender and an assignee, and accepted by the Administrative Agent, substantially in the form of Exhibit B or such other form as shall be approved by the Administrative Agent.

"Assumed Indebtedness" shall have the meaning given to such term in the recitals to this Agreement.

"Bankers' Acceptances" and "B/A" shall mean a bill of exchange denominated in C$ drawn by a Canadian Borrower and accepted by a Canadian Lender in accordance with this Agreement.

"Bankers' Acceptances Exposure" shall mean at any time the aggregate amount of Canadian Revolving Credit Borrowings which is outstanding as B/As.

"Becker Entities" shall mean Charles E. Becker (or any of his immediate family members, related family trusts, heirs and descendants), Becker Group L.L.C. and any other Affiliate of Charles E. Becker.

"Benchmark LIBO Rate" shall have the meaning assigned to such term in Section 2.01(k).

"Blackstone" shall mean Blackstone Capital Partners L.P., a Delaware limited partnership.

"Blackstone Entities" shall mean Blackstone, Blackstone Group, Blackstone Management Partners, L.P., Blackstone Management Associates, L.P. or any of their Affiliates.

"Blackstone Group" shall mean The Blackstone Group L.P., a Delaware limited partnership.

"Board" shall mean the Board of Governors of the Federal Reserve System of the United States (or any successor).

"Borrower Obligations" shall have the meaning assigned to such term in the Guarantee and Collateral Agreement.

"Borrowers" shall mean the collective reference to the Company and the Canadian Borrowers; any of them, a "Borrower".

"Borrowing" shall mean (i) a group of Loans of a

single Type made to a Borrower on a single date and as to which a single Interest Period is in effect and (ii) a group of Bankers' Acceptances purchased on a single date and as to which a single Contract Period is in effect.

"Brazilian Subsidiary" shall mean, collectively, Plascar Industria e Comerica Ltda. and its subsidiaries.

"Business Day" shall mean any day (other than a day which is a Saturday, Sunday or legal holiday in the State of New York) on which banks are open for business in New York City; provided, however, that, when used in connection with (a) Eurodollar Loan, (b) a determination of the Benchmark LIBO Rate or (c) a determination of a Supplemental Revolving Eurodollar Rate pursuant to Section 2.01(o), the term "Business Day" shall also exclude any day on which banks are not open for dealings in dollar deposits in the London interbank market; and provided, further, that when used in connection with a Canadian Revolving Loan, the term "Business Day" shall mean any day (other than a day which is a Saturday, Sunday or legal holiday in the Province of Ontario) on which banks are open for business in Toronto, Canada.

"Canadian Administrative Agent" shall mean JPMorgan Chase Bank, Toronto Branch, and its successors, as administrative agent for the Canadian Lenders.

"Canadian B/A Borrowing" shall mean a Canadian Revolving Credit Borrowing comprised of Bankers' Acceptances.

"Canadian Borrower Obligations" shall have the meaning assigned to such term in the Canadian Guarantee and Collateral Agreement.

"Canadian Borrowers" has the meaning given thereto in the recitals hereto.

"Canadian Collateral" shall mean all assets of the Loan Parties, now or hereafter acquired, upon which a Lien is intended to be created by this Agreement or any Canadian Security Document.

"Canadian Collateral Agent" shall mean JPMorgan Chase Bank, Toronto Branch, as Collateral Agent under the Canadian Guarantee and Collateral Agreement and the other Canadian Security Documents.

"Canadian dollars" and "C$" shall mean lawful currency of Canada.

"C$ Canadian Borrowing" shall mean a Borrowing denominated in C$.

"C$ Prime Rate" shall mean, on any day, the annual rate of interest (rounded upwards, if necessary, to the next 1/16 of 1%) equal to the greater of:

(a) the annual rate of interest announced from time to time by the Canadian Administrative Agent as its prime rate in effect at its principal office in Toronto on such day for determining interest rates on C$ denominated commercial loans in Canada; and

(b) the annual rate of interest equal to the sum of
(A) the CDOR Rate in effect on such date and (B) 1%.

"Canadian Guarantee and Collateral Agreement" shall mean the Canadian Guarantee and Collateral Agreement to be executed and delivered by the Canadian Borrowers and each Canadian Guarantor, substantially in the form of Exhibit F-2, as the same may be amended, supplemented or otherwise modified from time to time.

"Canadian Guarantors" shall mean Canadian Holdings, each Canadian Borrower and each Restricted Subsidiary (other than Inactive Subsidiaries) of Canadian Holdings or either Canadian Borrower and each other subsidiary of Canadian Holdings or either Canadian Borrower that becomes a party to the Canadian Guarantee and Collateral Agreement.

"Canadian Holdings" shall mean Collins & Aikman Holdings Canada Inc.

"Canadian Lenders" shall mean Lenders having Canadian Revolving Credit Commitments. Each Canadian Lender shall be a Canadian Scheduled Lender.

"Canadian Mortgaged Properties" shall mean, as of the Closing Date, the real immoveable properties listed on Schedule 1.01(E), as to which the Canadian Collateral Agent for the benefit of the Canadian Lenders shall be granted a Lien pursuant to the Canadian Mortgages and any other real or immoveable property mortgaged under a Canadian Mortgage in accordance with Section 5.18.

"Canadian Mortgages" shall mean each of the charge/mortgage of land and/or the fixed and floating charge debenture, deed of hypothec on immoveable property and the related documents, in each case made by a Canadian Borrower and/or the Canadian Guarantors in favor of, or for the benefit of, the Canadian Collateral Agent for the benefit of the Canadian Lenders, substantially in the form of Exhibit G-2 (with such changes thereto as shall be advisable under the law of the jurisdiction in which such mortgage is to be recorded), as the same may be amended, supplemented or otherwise modified from time to time.

"Canadian Obligations" shall mean the "Canadian Obligations" as defined in the Canadian Guarantee and Collateral Agreement.

"Canadian Prime Rate Borrowing" shall mean a Borrowing comprised of Canadian Prime Rate Loans.

"Canadian Prime Rate Loan" shall mean a Canadian Revolving Loan denominated in C$ which bears interest at a rate based upon the C$ Prime Rate.

"Canadian Revolving Credit Borrowing" shall mean a group of Canadian Revolving Loans made to a Canadian Borrower on a single date and as to which a single Interest Period is in effect.

"Canadian Revolving Credit Commitment" shall mean, with respect to each Lender, the commitment, if any, of such Lender to make Canadian Revolving Loans to the Canadian Borrowers hereunder as set forth in Schedule 2.01, as the same may be reduced from time to time pursuant to Section 2.09 or reduced or increased pursuant to Section 2.27. The aggregate Canadian Revolving Credit Commitments are initially $75,000,000.

"Canadian Revolving Credit Maturity Date" shall have the same meaning as the Tranche A Term Loan Maturity Date.

"Canadian Revolving Credit Note" shall mean a promissory note of a Canadian Borrower, substantially in the form of Exhibit A-5, evidencing Canadian Revolving Loans (other than Canadian B/A Borrowings).

"Canadian Revolving Loans" shall mean the revolving loans (including loans made through B/As) made to either Canadian Borrower pursuant to Section 2.01(e). Each Canadian Revolving Loan denominated in dollars shall be a Eurodollar Revolving Loan or an ABR Revolving Loan. Each Canadian Revolving Loan denominated in Canadian dollars shall be a Canadian Prime Rate Loan or a Canadian B/A Borrowing.

"Canadian Schedule II Chartered Lender" shall mean each Canadian Lender that is (i) a Schedule II chartered bank under the Bank Act (Canada) or (ii) each Canadian Lender that is listed on Schedule III of the Bank Act (Canada).

"Canadian Scheduled Lender" shall mean any person named on Schedule I to the Bank Act (Canada), Schedule II to the Bank Act (Canada) or Schedule III to the Bank Act (Canada).

"Canadian Security Documents" shall mean the collective reference to the Canadian Guarantee and Collateral Agreement, the Canadian Mortgages and all other documents, hypothecs or instruments hereafter delivered to the Canadian Collateral Agent for the benefit of the Canadian Lenders granting a Lien on any asset or assets of any person to secure the Canadian Obligations.

"Capital Expenditures" shall mean, for any person in any period, the aggregate amount of all capital expenditures of such person during such period (but not including Permitted Business Acquisitions or Investments permitted pursuant to Section 6.07(k)). For the purposes hereof, the amount of any Capital Expenditure shall not include (i) an amount equal to that portion of the proceeds received upon any sale, transfer or other disposition of assets or properties pursuant to Section 6.08 (h) or (j) which is applied to the purchase of replacement assets or properties within 12 months of the receipt thereof, (ii) expenditures that are accounted for as capital expenditures of such person and that actually are paid for by a third party (excluding Holdings or any subsidiary thereof) and for which neither Holdings nor any subsidiary thereof has provided or is required to provide, directly or indirectly, any consideration to such third party or any other person (whether before, during or after such period), (iii) the book value of any asset owned by such person prior to or during such period to the extent that such book value is included as a capital expenditure during such period as a result of such person reusing or beginning to reuse such asset during such period without a corresponding expenditure actually having been made in such period, provided that any expenditure necessary in order to permit such asset to be reused shall be included as a Capital Expenditure during the period that such expenditure actually is made or (iv) expenditures of insurance proceeds or condemnation awards received in connection with the loss, damage, destruction or condemnation of property of Holdings or its subsidiaries.

Notwithstanding the foregoing and any contrary provision herein, to the extent that the Borrowers or any Restricted Subsidiary purchases, leases or otherwise acquires assets from any person in a manner which would be subject to Section 6.08 and, but for the first parenthetical herein, would constitute a Capital Expenditure, Holdings may elect to treat the expenditure for such transaction as a Capital Expenditure and such expenditure shall be deemed to be a Capital Expenditure and shall not be subject to the restrictions of Section 6.08.

"Capital Lease Obligations" of any person shall mean the obligations of such person to pay rent or other amounts under any lease of (or other arrangement conveying the right to use) real or personal property, or a combination thereof, which obligations are required to be classified and

accounted for as capital leases on a balance sheet of such person under GAAP and, for the purposes hereof, the amount of such obligations at any time shall be the capitalized amount thereof at such time determined in accordance with GAAP.

"Cash Interest Expense" shall mean Interest Expense paid or required to be paid in cash (but excluding any amortization of debt discounts and fees included in the calculation of Interest Expense).

"CDOR Rate" shall mean, on any day, the annual rate of interest which is the rate determined as being the arithmetic average of the "BA 1 month" rate applicable to Canadian dollar bankers' acceptances displayed and identified as such on the "Reuters Screen CAD-CDOR Page" as at approximately 10:00 a.m. (Toronto time) on such day, or if such day is not a Business Day then on the immediately preceding Business Day (as adjusted by the Canadian Administrative Agent after 10:00 a.m. (Toronto time) to reflect any error in a posted rate of interest or in the posted average annual rate of interest); provided, however, if such rates do not appear on the Reuters Screen CAD-CDOR Page as contemplated, then the CDOR Rate on any day shall be calculated as the simple arithmetic average of the 30-day discount rates applicable to Canadian dollar bankers' acceptances quoted by the Canadian Revolving Lenders as of 10:00 a.m. (Toronto time) on such day, or if such day is not a Business Day, then on the immediately preceding Business Day. If fewer than three of the reference Lenders quote the aforementioned rate on the days and at the times prescribed above, the "CDOR Rate" shall be such other rate or rates as the parties may agree. The CDOR Rate shall not be less than 3% per annum.

"Certificate of Designation" shall mean the Certificate of Designation to be filed with the Secretary of State of Delaware on or before the Closing Date and governing the terms of the Seller Preferred, together with all instruments and other agreements directly related thereto, as the same may be amended, supplemented or otherwise modified from time to time in accordance with Sections 6.10 and 6.18.

A "Change in Control" shall be deemed to have occurred if (a) Holdings shall cease to directly own, beneficially and of record, free and clear of any and all Liens (other than Liens in favor of the Collateral Agent pursuant to the Guarantee and Collateral Agreement), 100% of the issued and outstanding capital stock (other than the Seller Preferred) of the Company; (b) any person or group (within the meaning of Rule 13d-5 of the Securities and Exchange Commission as in effect on the date hereof) (other than (i) any Designated Person or (ii) any combination of Designated Persons) shall own beneficially, directly or indirectly, shares representing more than 25% of the aggregate ordinary voting power represented by the issued and outstanding capital stock of Holdings at a time when Designated Persons or any combination of Designated Persons do not beneficially own shares representing at least 50% of the aggregate ordinary voting power represented by the issued and outstanding capital stock of Holdings; (c) the Continuing Directors shall cease to occupy a majority of the seats (excluding vacant seats) on the Board of Directors of Holdings; or (d) a "change of control" (however denominated) shall occur under the Senior Unsecured Notes Indenture, the Subordinated Notes Indenture, any agreement evidencing Permitted Additional Senior Unsecured Notes or Permitted Subordinated Indebtedness or a Permitted Subordinated Notes Refinancing or the Certificate of Designation. For purposes of clause (b) of this definition, the term "Designated Person" shall be deemed to include any other holder or holders of shares of Holdings having ordinary voting power if (i) any Heartland Entity, Blackstone Entity or WP Entity shall hold the irrevocable general proxy of each such holder in respect of the shares held by such holder or
(ii) such holder shall have agreed to vote to elect as directors the nominees or designees of the Heartland Entities for the Board of Directors of Holdings.

"Charges" shall have the meaning assigned to that

term in Section 9.09.

"Charitable Subsidiary" shall mean any Subsidiary that qualifies as an exempt organization under Section 501(c)(3) of the Code.

"Closing Date" shall mean the date on which the conditions set forth in Section 4.02 have been satisfied, which date shall occur on or prior to December 31, 2001.

"Code" shall mean the Internal Revenue Code of 1986, as amended from time to time.

"Collateral" shall mean all assets of the Loan Parties (other than Excluded Collateral), now or hereafter acquired, upon which a Lien is intended to be created by this Agreement or any Security Document.

"Collateral Agent" shall mean JPMorgan Chase Bank, as Collateral Agent under the Guarantee and Collateral Agreement and the U.S. Security Documents.

"Collateral Delivery Date" shall mean March 15, 2002.

"Commitment" shall mean, with respect to any Lender, such Lender's Swingline Loan Commitment, Revolving Credit Commitment, Additional Revolving Credit Commitment, Canadian Revolving Credit Commitment, and Supplemental Revolving Credit Linked Deposit Amount.

"Commitment Fee" shall have the meaning assigned to such term in Section 2.05(a).

"Company" has the meaning given thereto in the recitals hereto.

"Compliance Certificate" shall have the meaning assigned to such term in Section 5.04(c).

"Conduit Lender" shall mean any special purpose corporation organized and administered by any Lender for the purpose of making Loans otherwise required to be made by such Lender and designated by such Lender in a written instrument; provided, that the designation by any Lender of a Conduit Lender shall not relieve the designating Lender of any of its obligations to fund a Loan under this Agreement if, for any reason, its Conduit Lender fails to fund any such Loan, and the designating Lender (and not the Conduit Lender) shall have the sole right and responsibility to deliver all consents and waivers required or requested under this Agreement with respect to its Conduit Lender, and provided, further, that no Conduit Lender shall (a) be entitled to receive any greater amount pursuant to Section 2.13, 2.15, 2.18 or 9.05 than the designating Lender would have been entitled to receive in respect of the extensions of credit made by such Conduit Lender or (b) be deemed to have any Commitment.

"Confidential Information Memorandum" shall mean the Confidential Information Memorandum relating to this Agreement, dated December 2001, delivered to the Lenders prior to the Closing Date and any other Confidential Information relating to this Agreement, delivered to the Lenders and prepared in connection with syndication of this Agreement.

"Contaminants" shall mean those substances which are regulated by or form the basis of liability under any Environmental Law, including asbestos, polychlorinated biphenyls, Hazardous Materials, pollutants or solid wastes.

"Continuing Directors" shall mean the collective reference to (i) all members of the Board of Directors of Holdings who have held office continuously since the Closing Date and (ii) all members of the Board of Directors of Holdings who assumed office after the Closing Date and whose election and nomination for election by Holdings' shareholders was approved by a vote of a majority of the then Continuing Directors or nominated by a Designated Person.

"Contract Period" shall mean the term of a B/A selected by a Canadian Borrower in accordance with Section 2.26 commencing on the borrowing date, rollover date or conversion date of such B/A, as the case may be, of such B/A and expiring on a Business Day which shall be either 30 days, 60 days, 90 days or 180 days thereafter, in all cases subject to availability, provided that no Contract Period shall extend beyond the Canadian Revolving Credit Maturity Date.

"Control" shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a person, whether through the ownership of voting securities, by contract or otherwise, and "Controlling" and "Controlled" shall have meanings correlative thereto.

"Credit Agreement Creditors" shall mean the Administrative Agent, the Canadian Administrative Agent, the Issuing Banks and the Lenders.

"Current Assets" shall mean, with respect to any person at any date, the consolidated aggregate amount of all assets of such person which would be classified as current assets at such date, other than cash and cash equivalents.

"Current Liabilities" shall mean, with respect to any person at any date, the consolidated aggregate amount of all liabilities of such person (including tax and other proper accruals) which would be classified as current liabilities at such date, other than (without duplication) (i) the current portion of long-term debt,
(ii) accruals of Interest Expense (other than Interest Expense which is due and unpaid, which shall be included in determining Current Liabilities), dividends payable on the Seller Preferred (other than such dividends paid in cash, which shall be included in determining Current Liabilities) and losses or expenses on the sale of receivables to the Finance Subsidiary, (iii) Revolving Loans, Supplemental Revolving Loans, Additional Revolving Loans and Canadian Revolving Loans, classified as current, (iv) accruals of transaction costs resulting from the Transactions and (v) accruals of any costs or expenses related to severance or termination of employees accrued prior to the Closing Date.

"Default" shall mean any event or condition which upon notice, lapse of time or both would constitute an Event of Default.

"Designated Persons" shall mean any one or more of the Heartland Entities, the Blackstone Entities, the WP Entities and the persons listed on Schedule 1.01(C).

"Discount Proceeds" shall mean for any B/A, an amount (rounded to the nearest whole cent, and with one-half of one cent being rounded up) calculated on the applicable borrowing date, rollover date or conversion date, as the case may be, by multiplying:

(i) the face amount of the B/A; by

13

(ii) the quotient of one divided by the sum of one plus the product of:

1. the Discount Rate (expressed as a decimal) applicable to such B/A, and

2. a fraction, the numerator of which is the number of days in the Contract Period of the B/A (inclusive of the first day and exclusive of the last day) and the denominator of which is 365.

with such quotient being rounded up or down to the fifth decimal place and .000005 being rounded up.

"Discount Rate" shall mean, with respect to any Canadian Lender, as applicable to a B/A being purchased by such Canadian Lender on any day, the percentage discount rate (expressed to two decimal places and rounded upward, if necessary, to the nearest 0.01%) quoted by the Canadian Administrative Agent as the percentage discount rate at which the Canadian Administrative Agent would, in accordance with its normal practices, at or about 10:00 a.m., Toronto time, on such day, be prepared to purchase Bankers' Acceptances accepted by it having a face amount and term comparable to the face amount and term of such B/A. The Discount Rate shall not be less than 3% per annum.

"dollars" or "$" shall mean lawful money of the United States of America. Except as otherwise provided herein, all Loans and Letters of Credit shall be denominated in dollars and all payment obligations of the Company and the Canadian Borrowers under the Loan Documents shall be in dollars.

"$ Canadian Borrowing" shall mean a Canadian Revolving Credit Borrowing denominated in $.

"Dollar Equivalent Amount" shall mean with respect to
(i) any Canadian Revolving Loan or Letter of Credit denominated in C$ or any B/A, the equivalent amount in dollars of such Canadian Revolving Loan, Letter of Credit or B/A, as determined by the Canadian Administrative Agent using The Bank of Canada "noon rate", (ii) the amount of any Indebtedness of a Foreign Restricted Subsidiary under Section 6.01(a) or (o) denominated in a Foreign Currency on any date, the equivalent amount in dollars of such amount of Foreign Currency, as determined by the Administrative Agent using the Exchange Rate, (iii) any amount denominated in dollars, such amount in dollars and (iv) any Letter of Credit denominated in a Foreign Currency, the equivalent amount in dollars of such Letter of Credit, as determined by the Administrative Agent using the Exchange Rate.

"Domestic Restricted Subsidiary" means any Restricted Subsidiary incorporated or organized under the laws of the United States of America or any state thereof at least 90% of the capital stock of which is owned directly or indirectly by the Company (including any dual incorporated subsidiary that is treated as a Domestic Restricted Subsidiary for tax purposes).

"EBITDA" shall mean, without duplication, for any fiscal period, the sum of the amounts for such fiscal period of (i) after-tax income from continuing and discontinued operations, (ii) provision for taxes based on income, (iii) depreciation expense, (iv) total interest expense (whether shown as interest expense or as loss and expenses on sales of receivables), (v) amortization expense, (vi) other non-cash items reducing income from continuing and discontinued operations, all as determined on a consolidated basis for Holdings and its Restricted Subsidiaries in conformity with GAAP, (vii) other income and expense; (viii) the non-cash portion of non-recurring charges, (ix) all management fees and other fees paid during such period to Heartland pursuant to the Heartland

Management Agreement to the extent permitted by Section 6.09, (x) fees, charges and expenses in connection with the Transactions, (xi) non-recurring reasonable and customary fees and expenses, which are customary or consistent with past practices, of Holdings, the Borrower or any Restricted Subsidiaries related to any future issuance of capital stock, incurrence of Indebtedness or other financing transaction; (xii) to the extent reducing income from continuing and discontinued operations, cash restructuring charges and non-recurring cash integration expenses incurred in fiscal year 2002, provided that the amounts referred to in this clause (xii) shall not exceed, as applicable: (a) $25,000,000 in the aggregate for the purposes of determining the Applicable Margin or (b) $55,000,000 in the aggregate for all other purposes; (xiii) to the extent reducing income from continuing and discontinued operations, cash dividends paid on the Seller Preferred; (xiv) to the extent reducing income from continuing and discontinued operations, non-cash charges from the issuing of options to management of Holdings at below market prices; (xv) pro forma adjustments for acquisition-related savings (other than in connection with the Transactions) permitted under Regulation S-X or reasonably consistent with the purposes of Regulation S-X as determined in good faith by the Company, (xvi) to the extent reducing income from continuing and discontinued operations, costs directly related to the closing of the former corporate headquarters in Charlotte, N.C., the downsizing of the Troy, Reddich and other European operations and the out-sourcing of the Company's transportation and fulfillment department operations, provided that the amounts referred to in this clause (xvi) shall not exceed $6,000,000 in the aggregate; (xvii) for purposes of

Section 6.14 and 6.15 only, to the extent reducing income from continuing and discontinued operations for the fiscal quarter ended September 30, 2003 only, costs and charges not to exceed $20,000,000 arising from the restructuring plans announced by the Company in August 2003 and fees and expenses associated with the Third Amendment dated as of September 23, 2003 to this Agreement and (xviii) for purposes of Section 6.14 and 6.15 only, to the extent reducing income from continuing and discontinued operations for any fiscal quarter ending after September 30, 2003, costs and charges not to exceed $11,000,000 arising from the restructuring plans announced by the Company in August 2003 and fees and expenses associated with the Fourth Amendment dated as of October 7, 2003 to this Agreement; provided, however, that for purposes of calculating the Leverage Ratio under Section 6.15, EBITDA shall include, in addition, the pro forma EBITDA of any person (calculated as aforesaid but with respect to such person and its subsidiaries on a consolidated basis and after giving effect to pro forma adjustments) prior to the date it becomes a Restricted Subsidiary of Holdings or is merged into or is consolidated with Holdings or any of the Restricted Subsidiaries or that person's assets are acquired by Holdings or any of the Restricted Subsidiaries. For purposes of calculating EBITDA (i) for the fiscal quarters ending March 31, 2001, June 30, 2001 and September 30, 2001, EBITDA for such fiscal quarters shall be deemed to be $100,100,000, $132,000,000 and $73,400,000, respectively, and (ii) for the fiscal quarter ending December 31, 2001, EBITDA for such fiscal quarter shall be deemed to be the actual EBITDA for such fiscal quarter (calculated as set forth above) plus cash charges not to exceed $5,500,000.


"Environmental Claim" shall mean any written accusation, allegation, notice of violation, claim, demand, order, directive, cost recovery action or proceeding by any Governmental Authority or, if any Responsible Officer of Holdings has knowledge of it, by any person for damages, injunctive or equitable relief, personal injury (including sickness, disease or death), remedial action costs, tangible or intangible property damage, damage to the environment or natural resources, nuisance, pollution, contamination or other adverse effects on the environment, or for fines, penalties or restrictions, resulting from or based upon (i) the existence, or the continuation of the existence, of a Release (including sudden or non-sudden, accidental or non-accidental Releases) of, or exposure to, any Contaminant or odor, (ii) the presence, use, handling, transportation, storage, treatment or the disposal of Contaminants in connection with the operation of the facilities to which such Release relates or (iii) the violation or alleged violation of any Environmental Law.

"Environmental Law" shall mean any and all applicable treaties, laws, regulations, enforceable requirements, binding determinations, orders, decrees, judgments, injunctions, permits, approvals, authorizations, licenses, variances, permissions, notices or binding agreements issued, promulgated or entered by any Governmental Authority, relating to the environment, preservation or reclamation of natural resources or to the management, Release or threatened Release of Contaminants or noxious odor, including the Hazardous Materials Transportation Act, 49 U.S.C. Sections 1801 et seq., Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended by the Superfund Amendments and Reauthorization Act of 1986, 42 U.S.C. Sections 9601 et seq., Solid Waste Disposal Act, as amended by the Resource Conservation and Recovery Act of 1976 and Hazardous and Solid Waste Amendments of 1984, 42 U.S.C. Sections 6901, et seq., Federal Water Pollution Control Act, as amended by the Clean Water Act of 1977, 33 U.S.C. Sections 1251 et seq., Clean Air Act of 1970, as amended 42 U.S.C. Sections 7401 et seq., Toxic Substances Control Act of 1976, 15 U.S.C. Sections 2601 et seq., Emergency Planning and Community Right-to-Know Act of 1986, 42 U.S.C. Sections 11001 et seq., National Environmental Policy Act of 1975, 42 U.S.C. Sections 4321 et seq., Safe Drinking Water Act of 1974, as amended, 42 U.S.C. Sections 300(f) et seq., and any similar or implementing state or foreign law, and all amendments or regulations promulgated thereunder.

"Environmental Permit" shall mean any permit, approval, authorization, license, variance, or permission required from any Governmental Authority pursuant to any applicable Environmental Law.

"ERISA" shall mean the Employee Retirement Income Security Act of 1974, as the same may be amended from time to time.

"ERISA Affiliate" with respect to any person shall mean any trade or business (whether or not incorporated) that is a member of a group of which such person is a member and which is treated as a single employer under Section 414 of the Code.

"Eurodollar Borrowing" shall mean a Borrowing comprised of Eurodollar Loans.

"Eurodollar Loan" shall mean any Eurodollar Tranche A Term Loan, Eurodollar Tranche A-1 Term Loan, Eurodollar Tranche B Term Loan, Eurodollar Revolving Loan or Eurodollar Supplemental Revolving Loan.

"Eurodollar Revolving Loan" shall mean any Revolving Loan, Additional Revolving Loan or Canadian Revolving Loan in dollars bearing interest at a rate determined by reference to the Adjusted LIBO Rate in accordance with the provisions of Article 11.

"Eurodollar Supplemental Revolving Loan" shall mean any Supplemental Revolving Loan bearing interest at a rate determined by reference to the Adjusted LIBO Rate in accordance with the provisions of Article II.

"Eurodollar Tranche A Term Loan" shall mean any Tranche A Term Loan bearing interest at a rate determined by reference to the Adjusted LIBO Rate in accordance with the provisions of Article II.

"Eurodollar Tranche A-1 Term Loan" shall mean any Tranche A-1 Term Loan bearing interest at a rate determined by reference to the Adjusted LIBO Rate in accordance with the provisions of Article II.

"Eurodollar Tranche B Term Loan" shall mean any Tranche B Term Loan bearing interest at a rate determined by reference to the Adjusted LIBO Rate in accordance with the provisions of Article II.

"Event of Default" shall have the meaning assigned to such term in Article VII.

"Excess Cash Flow" shall mean for any period (i) the Net Income for such period plus (minus) (ii) the amount of depreciation, depletion, amortization of intangibles, deferred taxes, accreted and zero coupon bond interest and other noncash expenses (revenues) which, pursuant to GAAP, were deducted (added) in determining such Net Income minus (plus) (iii) additions (reductions, other than reductions attributable solely to Specified Asset Sales) to working capital for such period (i.e., the increase or decrease in Current Assets of Holdings and the Restricted Subsidiaries minus Current Liabilities of Holdings and the Restricted Subsidiaries from the beginning to the end of such period, as adjusted to exclude reductions attributable solely to Specified Asset Sales) minus (iv) the amount of Capital Expenditures for such period paid by Holdings and the Restricted Subsidiaries in cash from funds other than from the proceeds of Borrowings minus (v) the sum of (a) scheduled Loan repayments made during such period pursuant to Section 2.11, (b) optional prepayments of the Term Loans made during such period pursuant to Section 2.12(a) and (c) Revolving Loan, Additional Revolving Loan, Canadian Revolving Credit Loan and Supplemental Revolving Loan repayments made during such period that were required to be made as a result of voluntary reductions of the Revolving Credit Commitments, Additional Revolving Credit Commitments or Canadian Revolving Credit Commitments pursuant to Section 2.09(b) or of the Total Supplemental Revolving Credit Linked Deposit Amount pursuant to Section 2.09(e) minus (vi) scheduled mandatory payments of principal of Indebtedness of Holdings and the Restricted Subsidiaries other than the Loans made during such period minus (vii) fees and expenses paid in cash in connection with the Transactions to the extent not deducted in determining Net Income minus (viii) amounts paid in cash during such period pursuant to Section 8.4 of the Tac-Trim Purchase Agreement.

"Excess Supplemental Revolving Credit Linked Deposit Amount" shall mean at any time the excess, if any, of (a) the Total Supplemental Revolving Credit Linked Deposit Amount over (b) the sum of Supplemental Revolving Loans and Supplemental Revolving Letter of Credit Exposure.

"Exchange Rate" shall mean with respect to any Foreign Currency on any Business Day, the rate at which such Foreign Currency may be exchanged into dollars, as set forth in the Wall Street Journal on such Business Day. In the event that such rate does not appear in the Wall Street Journal on such Business Day, the "Exchange Rate" with respect to such Foreign Currency shall be determined by reference to such publicly available service for displaying exchange rates as may be agreed upon by the Administrative Agent and the Company or, in the absence of such agreement, such "Exchange Rate" shall instead be the Administrative Agent's spot rate of exchange in the interbank market where its foreign currency exchange operations in respect of such Foreign Currency are then being conducted, at or about 10:00 A.M., local time, at such date for the purchase of dollars with such Foreign Currency, for delivery two Business Days later; provided, that if at the time of any such determination, no such spot rate can reasonably be quoted, the Administrative Agent may use any reasonable method as it deems applicable to determine such rate, and such determination shall be conclusive absent manifest error (without prejudice to the determination of the reasonableness of such method).

"Excluded Collateral" shall mean (i) the Textron Sale/Leaseback Assets and the Textron Sale/Leaseback Mortgaged Properties to the extent such assets are leased or mortgaged

pursuant to the Textron Sale/Leaseback Financing or a Permitted Textron Sale/Leaseback Refinancing in a transaction permitted by this Agreement; (ii) the Manchester Property (but, at any time after such real property has been sold in connection with an existing sale/leaseback transaction, only for so long as such real property is subject to such sale/leaseback transaction), provided that if the Manchester Property is not sold and leasebacked in connection with such existing sale/leaseback transaction prior to June 30, 2002, the Manchester Property shall not thereafter be Excluded Collateral; (iii) until June 30, 2002, the Marshall Property, (iv) the real properties subject to, and the Canadian equipment securing, the GECC Phase II Lease (but, in each case, only for so long as such real property or equipment, as the case may be, is subject to the GECC Phase II Lease);

(v) accounts receivable, related security, collections and proceeds with respect thereto sold, or purported to be sold, pursuant to a Permitted Receivables Financing (but only for so long as such accounts receivable, related security, collections and proceeds are subject to a Permitted Receivables Financing); (vi) any assets as to which the Applicable Agent shall determine in its reasonable discretion that the costs of obtaining a security interest are excessive in relation to the value of the security to be afforded thereby; (vii) assets hereafter acquired and subject to a then existing Lien permitted under Section 6.04(a), (b) (insofar as it relates to assets subject to a Lien existing at the time of acquisition and not created in contemplation thereof), (h), (j), (n), (p), (r) and (u) (in each case to the extent the documents creating such encumbrance or applicable law prohibit such assets from becoming Collateral hereunder); (viii) all motor vehicles covered by a certificate of title or ownership; (ix) any license, contract, agreement, lease or other instrument to which any Loan Party is a party to the extent that such Loan Party is prohibited from granting a Lien in its rights thereunder under the terms of such license, contract, agreement, lease or other instrument or under applicable law (other than to the extent that any such terms would be rendered ineffective pursuant to Section 9-406 of revised Article 9 of the UCC of any relevant jurisdiction or any other applicable law and provided that any Receivable or any money or other amounts due or to become due or other right to payment under any such license, contract, agreement or other instrument shall be Collateral and shall not be Excluded Collateral); and (x) any shares in the capital of a Nova Scotia unlimited liability company, provided that such shares are pledged under a supplemental share pledge agreement in form and substance reasonably satisfactory to the Collateral Agent and the Canadian Collateral Agent.

"Executive Officer" of any corporation shall mean the president, any senior vice president or any vice president of such person.

"Existing Credit Agreement" shall have the meaning given to such term in the recitals to this Agreement.

"Facilities" shall mean the five credit facilities made available to the Company pursuant to this Agreement consisting of, respectively, the Revolving Credit Commitments (the "Revolving Credit Facility"), the Supplemental Revolving Credit Linked Deposit Amounts (including the Supplemental Revolving Loans made and the Supplemental Revolving Letters of Credit issued thereunder) (the "Supplemental Revolving Credit Facility"), the Tranche A Term Loans, the Tranche A-1 Term Loans and the Tranche B Term Loans.

"Fees" shall mean the Agency Fees, the Fronting Fees, the Commitment Fees, the Letter of Credit Fees and other fees described in Section 2.05.

"Fifth Amendment" shall mean the Fifth Amendment dated as of February 13, 2004 to this Agreement.

"Fifth Amendment Effective Date" shall mean the "Effective Date", as defined in the Fifth Amendment.

"Finance Subsidiary" shall mean Carcorp, Inc. and any other wholly owned subsidiary of the Company that is formed for the sole purpose of engaging in Permitted Receivables Financings.

"Financial Officer" of any corporation shall mean the chief financial officer, Senior Vice President-Finance and Accounting, Vice President-Finance, Controller, or Treasurer of such corporation.

"Foreign Currency" shall mean any available and freely-convertible non-dollar currency selected by the Company and approved by the Administrative Agent and, in the case of a Letter of Credit denominated in a Foreign Currency, the Issuing Bank which has agreed to issue such Letter of Credit.

"Foreign Restricted Subsidiary" shall mean any Restricted Subsidiary not organized or incorporated under the laws of the United States of America or any state thereof at least 90% of the capital stock of each class of which is owned directly or indirectly by the Company.

"Foreign Subsidiary Letter of Credit" shall mean a Letter of Credit issued to support Indebtedness of a Foreign Restricted Subsidiary incurred pursuant to Section 6.01(o), the Italian JV, except to the extent that Indebtedness has been incurred under clause (viii) of Section 6.01(c), or the Brazilian Subsidiary.

"Fronting Fees" shall have the meaning assigned to such term in Section 2.05(c).

"Funded Debt" shall mean, as applied to any person, all Indebtedness for borrowed money (including, without limitation, Capital Lease Obligations and unreimbursed drawings under letters of credit) or evidenced by a note, bond, debenture or similar instrument of that person (it being understood that all Loans shall at all times constitute "Funded Debt" for all purposes hereunder) but excluding all intercompany obligations that would be eliminated in a consolidated balance sheet of such person determined in accordance with GAAP.

"GAAP" shall mean United States generally accepted accounting principles as in effect from time to time.

"GECC Phase II Lease" shall mean that certain equipment lease to be entered into on the Closing Date by and between the Company, as lessee, and General Electric Capital Corporation, as lessor, with respect to assets to be sold by certain of the Restricted Subsidiaries to General Electric Capital Corporation.

"Governmental Authority" shall mean any international, Federal, state, regional, local or foreign court or governmental agency, authority, instrumentality or regulatory body (including the National Association of Insurance Commissioners).

"Guarantee" of or by any person shall mean (i) any obligation, contingent or otherwise, of such person guaranteeing or having the economic effect of guaranteeing any Indebtedness of any other person (the "primary obligor") in any manner, whether directly or indirectly, and including any obligation of such person, direct or indirect, (a) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness (whether arising by virtue of partnership arrangements, by agreement to keep well, to purchase assets, goods, securities or services, to take-or-pay or otherwise) or to purchase (or to advance or supply funds for the purchase of) any security for the payment of such Indebtedness, (b) to purchase property, securities or services

for the purpose of assuring the owner of such Indebtedness of the payment of such Indebtedness, (c) to maintain working capital, equity capital or other financial statement conditions or liquidity of the primary obligor so as to enable the primary obligor to pay such Indebtedness or (d) entered into for the purpose of assuring in any other manner the holders of such Indebtedness of the payment thereof or to protect such holders against loss in respect thereof (in whole or in part), or (ii) any Lien on any assets of such person securing any Indebtedness of any other person, whether or not such Indebtedness is assumed by such person; provided, however, that the term Guarantee shall not include endorsements for collection or deposit, in either case in the ordinary course of business.

"Guarantee and Collateral Agreement" shall mean the Guarantee and Collateral Agreement substantially in the form of Exhibit F-1 to be executed by Holdings, the Company and each other Guarantor, as amended and in effect from time to time.

"Guarantors" shall mean (i) with respect to the Borrower Obligations, Holdings and each Domestic Restricted Subsidiary (other than Inactive Subsidiaries) and (ii) with respect to the Canadian Borrower Obligations of each Canadian Borrower, the Canadian Guarantors.

"Hazardous Materials" shall mean all explosive or regulated radioactive materials or substances, hazardous or toxic wastes or substances, petroleum (including crude oil or any fraction thereof) or petroleum distillates, asbestos or material containing asbestos and all materials regulated pursuant to any Environmental Law, including materials listed in 49 C.F.R. Section 172.101 and hazardous substances as defined in Section 101(14) of the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended.

"Heartland" has the meaning given thereto in the recitals hereto.

"Heartland Entities" shall mean Heartland or any of its Affiliates.

"Heartland Management Agreement" shall mean the Services Agreement, dated as of February 23, 2001, as amended as of August 7, 2001, among Heartland, Holdings and the Company, as the same may be amended, supplemented or otherwise modified from time to time as permitted by Section 6.18.

"Holdings Common Stock" shall mean the Common Stock, par value $.01 per Share, of Holdings.

"Inactive Subsidiary" shall mean the Restricted Subsidiaries listed as Inactive Subsidiaries on Schedule 3.12(a) and which Restricted Subsidiaries (i) individually and in the aggregate have no material net assets and (ii) do not engage in any operating activity (other than payroll or the leasing of immaterial property).

"Indebtedness" of any person shall mean, without duplication, (a) all indebtedness of such person for borrowed money or for the deferred purchase price of property or services (other than current trade liabilities incurred in the ordinary course of business), (b) any other indebtedness of such person which is evidenced by a note, bond, debenture or similar instrument, (c) all Capital Lease Obligations of such person, (d) all obligations of such person in respect of bankers' acceptances issued or created for the account of such person, (e) all Indebtedness of others secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any Lien on any property owned or acquired by such person even though such person has not assumed or otherwise become liable for the payment thereof, (f) all obligations of such person in respect of Interest Rate Agreements which, in accordance with the definition of Interest Rate

Agreement, constitute (or would upon early termination constitute) Indebtedness and (g) all Guarantees by such person of Indebtedness of others. The Indebtedness of any person shall include the Indebtedness of any partnership in which such person is a general partner; provided that, if the sole asset of such person is its general partnership interest in such partnership, the amount of such Indebtedness shall be deemed equal to the value of such general partnership interest and the amount of any Indebtedness in respect of any Guarantee of such partnership Indebtedness shall be limited to the same extent as such Guarantee may be limited.

"Indemnitee" shall have the meaning assigned to that term in Section 9.05(b).

"Intercompany Loan" shall mean a loan made by any subsidiary of the Company to the Company or any Domestic Restricted Subsidiary or by any Restricted Subsidiary to any other Restricted Subsidiary.

"Intercompany Note" shall mean an intercompany note evidencing Indebtedness owed by the Company or any of its wholly owned subsidiaries to the Company or any of its wholly owned subsidiaries and pledged pursuant to the Security Documents in accordance with Section 6.01(c), in substantially the form of Exhibit A-7 annexed hereto.

"Interest Coverage Ratio" shall mean, for any period of four consecutive fiscal quarters, the ratio of (a) EBITDA on a consolidated basis for such period to (b) the sum of (i) Cash Interest Expense of Holdings and the Restricted Subsidiaries on a consolidated basis for such period, (ii) any dividend on the Seller Preferred paid in cash during such period and (iii) and losses on the sale of receivables to the Finance Subsidiary during such period. For purposes of calculating the total amount of clause (b) of this definition for the fiscal quarters ending June 30, 2001, September 30, 2001 and December 31, 2001, such amount for each such fiscal quarter shall be deemed to be $30,000,000.

"Interest Expense" shall mean, with respect to any person for any period, the gross interest expense of such person for such period determined on a consolidated basis in accordance with GAAP consistently applied, including (a) the amortization of debt discounts, (b) the amortization of all fees (including fees with respect to interest rate protection agreements) payable in connection with the incurrence of Indebtedness or another financing transaction (provided that one-time fees may be amortized over the expected life of such Indebtedness or financing, as determined in the reasonable good-faith judgment of the Company, whether or not such amortization is permitted by GAAP) to the extent included in interest expense and (c) the portion of any payments or accruals with respect to Capital Lease Obligations allocable to interest expense, net of all interest income for such period (except for purposes of the definition of Cash Interest Expense, in which case only interest income paid or required to be paid in cash shall be netted against cash interest expense). For purposes of the foregoing, gross interest expense shall be determined after giving effect to any net payments made or received by such person with respect to Interest Rate Agreements entered into as a hedge against interest rate exposure. Notwithstanding the foregoing, Interest Expense shall not include any loss on sales of receivables made pursuant to clause (ii) of Section 6.08(g).

"Interest Payment Date" shall mean, (i) with respect to any Eurodollar Loan (except as set forth in clause (iii) below), the last day of the Interest Period applicable to the Borrowing of which such Loan is a part and, in the case of a Eurodollar Borrowing with an Interest Period of more than three months' duration, each day that would have been an Interest Payment Date had successive Interest Periods of three months' duration been applicable to such Borrowing, and, in addition, the date of any prepayment, refinancing or conversion of such Borrowing with or to a Borrowing of a different Type, (ii) with respect to any ABR Loan (except as set forth in clause (iii) below), Canadian

Prime Rate Loan or Swingline Loan (a) the last day of each March, June, September and December and (b) the Revolving Credit Maturity Date, the Tranche A Term Loan Maturity Date, the Tranche A-1 Term Loan Maturity Date or the Tranche B Term Loan Maturity Date, as applicable and (iii) with respect to any Supplemental Revolving Loan, the first Business Day of each calendar month to occur while such Supplemental Revolving Loan is outstanding, the Revolving Credit Maturity Date and, in the case of Eurodollar Supplemental Revolving Loans, the last day of each Interest Period therefor.

"Interest Period" shall mean (a) as to any Eurodollar Borrowing, the period commencing on the date of such Borrowing or on the last day of the immediately preceding Interest Period applicable to such Borrowing, as the case may be, and ending on the numerically corresponding day (or, if there is no numerically corresponding day, on the last day) in the calendar month that is 1, 2, 3 or 6 (or, except with respect to Tranche B Loans, subject to availability (as determined by all applicable Lenders), 9 or 12) months thereafter, as the applicable Borrower may elect, (b) as to any ABR Borrowing, Canadian Prime Rate Loan or Swingline Loan, the period commencing on the date of such Borrowing or Loan or on the last day of the immediately preceding Interest Period applicable to such Borrowing or Loan, as the case may be, and ending on the earliest of (i) the next succeeding March 31, June 30, September 30 or December 31, (ii) the Revolving Credit Maturity Date, the Tranche A Term Loan Maturity Date, the Tranche A-1 Term Loan Maturity Date or the Tranche B Term Loan Maturity Date, as applicable, and (iii) the date such Borrowing is converted to a Borrowing of a different Type in accordance with Section 2.10 or 2.26, as the case may be, or repaid or prepaid in accordance with Section 2.01(d), 2.11 or 2.12 and (c) for purposes of determining the Supplemental Revolving Eurodollar Rate for purposes of Section 2.01(o)(i) initially, the period commencing on the Fifth Amendment Effective Date and ending on February 29, 2004, and (ii) thereafter, each period commencing on the first day of the next succeeding calendar month and ending on the last day of such succeeding calendar month; provided, however, that if any Interest Period would end on a day other than a Business Day, such Interest Period shall be extended to the next succeeding Business Day unless, in the case of a Eurodollar Borrowing only, such next succeeding Business Day would fall in the next calendar month, in which case such Interest Period shall end on the next preceding Business Day. Interest shall accrue from and including the first day of an Interest Period to but excluding the last day of such Interest Period.

"Interest Rate Agreement" shall mean any interest rate swap agreement, interest rate cap agreement, interest rate collar agreement, currency hedge agreement or other similar agreement or arrangement dealing with interest rates or currency exchange rates; provided that the calculation of payments for early termination shall be made on a reasonable basis in accordance with customary industry practices; provided further that all obligations to make such payments for early termination (guaranteed or unguaranteed) shall, to the extent matured, constitute Indebtedness.

"Investment Condition" shall mean with respect to any Investment or Permitted Business Acquisition that the following conditions are satisfied: (i) no Default or Event of Default has occurred or would exist after giving effect thereto; (ii) the final maturity of the Subordinated Notes is extended to December 31, 2008 or later or the Subordinated Notes are refinanced pursuant to a Permitted Subordinated Notes Refinancing; (iii) the aggregate outstanding principal amount of Term Loans does not exceed $240,000,000; and (iv) the pro forma Leverage Ratio (determined using pro forma adjustments satisfactory to the Administrative Agent) after giving effect to any such Investment or Permitted Business Acquisition is less than 2.5 to 1.0.

"Investor Common Equity" shall have the meaning given to such term in the recitals to this Agreement.

"Investors" shall have the meaning given to such term

in the recitals to this Agreement.

"Issuing Bank" shall mean, with respect to any Letter of Credit, JPMorgan Chase Bank and its Affiliates including Chase Manhattan Bank (Delaware), the Revolving Lender or Canadian Lender, as the case may be, which has agreed to issue such Letter of Credit.

"Italian JV" shall have the meaning given in the recitals hereto.

"Joan Entities" shall mean Elkin McCallum, Joan Fabrics Corporation, Western Avenue Dyers L.P., Tyng Textiles LLC and any other Affiliate of Elkin McCallum (or any of his immediate family members, related family trusts, heirs and descendants).

"Joan Fabrics" shall mean Collins & Aikman Fabrics, Inc. (formerly known as Joan Automotive Industries, Inc.), together with certain assets of Western Avenue Dyers, L.P.

"Lender Affiliate" shall mean (a) any Affiliate of any Lender, (b) any person that is administered or managed by any Lender or any Affiliate of any Lender and that is engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course of its business or
(c) with respect to any Lender which is a fund that invests in commercial loans and similar extensions of credit, any other fund that invests in commercial loans and similar extensions of credit and is managed or advised by the same investment advisor as such Lender or by an Affiliate of such Lender or investment advisor.

"Lenders" shall mean the persons identified as Lenders in this Agreement, including persons who become Lenders pursuant to Section 9.04 and Conduit Lenders (unless the context otherwise requires).

"Lessor" shall have the meaning given in the recitals hereto.

"Letter of Credit" shall mean any letter of credit issued by an Issuing Bank pursuant to Section 2.19(a) (including, without limitation, any Foreign Subsidiary Letter of Credit), consisting of Revolving Letters of Credit and Supplemental Revolving Letters of Credit.

"Letter of Credit Commitment" shall mean the collective reference to the Revolving Letter of Credit Commitment and the Supplemental Revolving Letter of Credit Commitment.

"Letter of Credit Disbursement" shall mean a payment or disbursement made by an Issuing Bank pursuant to a Letter of Credit.

"Letter of Credit Exposure" shall mean at any time the Dollar Equivalent Amount of the sum of (a) the aggregate undrawn amount of all outstanding Letters of Credit and (b) the aggregate amount of all Letter of Credit Disbursements not yet reimbursed by the Borrowers as provided in Section 2.22. Letter of Credit Exposure with respect to Letters of Credit issued for the account of the Company is "Company Letter of Credit Exposure". Letter of Credit Exposure with respect to Letters of Credit issued for the account of one or both of the Canadian Borrowers is "Canadian Borrower Letter of Credit Exposure." Letter of Credit Exposure with respect to Letters of Credit issued under the Revolving Credit Facility is "Revolving Letter of Credit Exposure." Letter of Credit Exposure with respect to Letters of Credit issued under the Supplemental Letter of Credit Facility is "Supplemental Revolving Letter of Credit Exposure."

23

"Letter of Credit Fee" shall have the meaning

assigned to such term in Section 2.21.

"Leverage Ratio" shall mean, on the last day of any fiscal quarter, the ratio of (a) Funded Debt of Holdings, the Restricted Subsidiaries and the Finance Subsidiary (including, without limitation, the aggregate net investment or equivalent amount under the Receivables Transfer Agreement) as of such date to (b) EBITDA for the period of twelve consecutive fiscal months then ended.

"Lien" shall mean, with respect to any asset, (a) any mortgage, deed of trust, lien, pledge, encumbrance, charge, hypothec or security interest in or on such asset, (b) the interest of a vendor or a lessor under any conditional sale agreement, capital lease or title retention agreement relating to such asset and (c) in the case of securities, any purchase option, call or similar right of a third party with respect to such securities.

"Loan Documents" shall mean this Agreement and the Notes, the Letters of Credit (and any instrument or document executed by any Borrower relating to any Letter of Credit) and the Security Documents.

"Loan Parties" shall mean the Company, each Canadian Borrower and each Guarantor.

"Loans" shall mean the Revolving Loans, the Supplemental Revolving Loans, the Additional Revolving Loans, the Canadian Revolving Loans, the Tranche A Term Loans, the Tranche A-1 Term Loans, the Swingline Loans and the Tranche B Term Loans.

"Manchester Property" shall mean that certain real property located at 500 West Madison, Manchester, Michigan 48158.

"Margin Stock" shall have the meaning assigned to such term under Regulation U.

"Marshall Property" shall mean that certain real property located at 905 Industrial Road, Marshall, Michigan 49068.

"Master Shareholder Agreement" shall mean the Stockholders Agreement, dated as of February 23, 2001, by and among Blackstone Capital Company II, L.L.C., the Heartland Entities party thereto and the other investors party thereto, Wasserstein/C&A Holdings, L.L.C. and Holdings, as the same may be amended, supplemented or otherwise modified from time to time as permitted by Section 6.18.

"Material Adverse Effect" shall mean (a) a materially adverse effect on the business, assets, properties, operations or financial condition of Holdings and the Restricted Subsidiaries, taken as a whole, (b) a material impairment of the ability of Holdings or any Subsidiary of Holdings to perform any of its material obligations under any Loan Document to which it is or will be a party or to consummate the Transactions or (c) an impairment of the validity or enforceability of, or material impairment of the rights, remedies or benefits available to the Credit Agreement Creditors under, any Loan Document.

"Maximum Rate" shall have the meaning assigned to such term in Section 9.09.

"Mortgaged Properties" shall mean the U.S. Mortgaged Properties and the Canadian Mortgaged Properties.

"Mortgages" shall mean the U.S. Mortgages and the

Canadian Mortgages.

"Multiemployer Plan" with respect to any person shall mean a multiemployer plan as defined in Section 4001(a)(3) of ERISA to which such person or any ERISA Affiliate of such person (other than one considered an ERISA Affiliate only pursuant to subsection (m) or (o) of Section 414 of the Code) is making or accruing an obligation to make contributions, or has within any of the preceding five plan years made or accrued an obligation to make contributions.

"Net Income" shall mean, for any fiscal period, the net income (or loss) of Holdings and its Restricted Subsidiaries and the Finance Subsidiary on a consolidated basis for such fiscal period taken as a single accounting period determined in conformity with GAAP; provided that there shall be excluded (i) the income (or loss) of any Unrestricted Subsidiary (other than the Finance Subsidiary) or any person (other than a Restricted Subsidiary) in which any other person (other than Holdings or any of the Restricted Subsidiaries) has a joint interest, but shall include the amount of dividends or other distributions (including return of capital or any other cash receipt in respect of ownership or beneficial interest) actually paid to Holdings or any of the Restricted Subsidiaries by such Unrestricted Subsidiary or such person during such period, (ii) the income (or loss) of any person accrued prior to the date it becomes a Restricted Subsidiary of Holdings or is merged into or consolidated with Holdings or any of the Restricted Subsidiaries or that person's assets are acquired by Holdings or any of the Restricted Subsidiaries, (iii) the income of any Restricted Subsidiary of Holdings to the extent that the declaration or payment of dividends or similar distributions by that Restricted Subsidiary of that income is not at the time permitted by operation of the terms of its charter or any agreement, instrument, judgment, decree, order, statute, rule or governmental regulation and (iv) after tax gains or losses attributable to Specified Asset Sales.

"Net Proceeds" shall mean with respect to any sale, transfer or other disposition (including by casualty, loss or condemnation) of any assets or properties or any other Prepayment Event (a "Proceeds Transaction") (i) the gross amount of any cash paid to or received by Holdings or any of the Restricted Subsidiaries in respect of such Proceeds Transaction (including insurance proceeds, condemnation awards and payments from time to time in respect of installment obligations, if applicable), less (ii) the amount, if any, of (a) Holdings' good faith best estimate of all taxes attributable to such Proceeds Transaction which it in good faith expects to be paid in the taxable year in which such Proceeds Transaction shall occur or in the next taxable year, (b) reasonable and customary fees, discounts, commissions, costs and other expenses (other than those payable to Holdings or any Affiliate of Holdings, except that Heartland and its Affiliates may receive fees permitted under Section 6.09 and other customary fees on terms no less favorable to Holdings or any of the Restricted Subsidiaries than would be obtained in a comparable arm's-length transaction for acting as financial advisor in connection with such Proceeds Transaction) which are incurred in connection with such Proceeds Transaction and are payable by Holdings or any of the Restricted Subsidiaries and (c) in the case of a Proceeds Transaction that is a sale, transfer or other disposition of assets or properties, proceeds required to (x) discharge Liens in respect of such assets or properties permitted by Section 6.04 or (y) to repay, or compensate for reductions in availability under, any Permitted Receivables Financing as a result thereof; provided, however, that Net Proceeds shall not include (1) any amount that otherwise would constitute Net Proceeds to the extent such amount is excluded from the definition of the term "Capital Expenditures" pursuant to clause (i) or (iv) of the second sentence thereof or (2) any amount being reserved for application as contemplated in clause (i) or (iv) of such second sentence, except that in the event any amount so reserved is not in fact so applied or contractually committed to be applied within the permitted 12-month period, such amount shall be deemed for all purposes (including the definition of Excess Cash Flow and Section 2.12(g)) to be Net Proceeds of a Proceeds Transaction received upon such Proceeds Transaction.

25

"Notes" shall mean the Tranche A Term Notes, the Tranche A-1 Term Notes, the Tranche B Term Notes, the Swingline Note, the Revolving Credit Notes, the Supplemental Revolving Credit Notes, the Additional Revolving Credit Notes and the Canadian Revolving Credit Notes.

"Obligations" shall mean all "Obligations" as that term is defined in the Guarantee and Collateral Agreement and the Canadian Obligations.

"Operating Lease" shall mean a lease which is not required to be accounted for or classified as a capital lease under GAAP. The "amount" of any Operating Lease shall be the amount that, if such Operating Lease were accounted for as a Capital Lease Obligation, would be recorded as a liability in accordance with GAAP.

"Other Taxes" shall have the meaning assigned to such term in Section 2.18.

"Overdraft Facilities" shall mean local lines of credit made available to Foreign Restricted Subsidiaries.

"PBGC" shall mean the Pension Benefit Guaranty Corporation referred to and defined in ERISA (or any such successor).

"Permitted Additional Senior Unsecured Notes" shall mean any additional unsecured senior notes of the Company or of Holdings (i) having no amortization of principal and a final scheduled maturity no earlier than November 15, 2008 and (ii) which (A) permits the Transactions contemplated by the Loan Documents, (B) does not provide for principal payments thereon prior to November 15, 2008, except upon the occurrence of a change of control, asset sale or similar event and (C) contains covenants, events of default, interest rate and other terms as are consistent with high yield senior debt securities issued in a public offering or a Rule 144A transaction. Additional Senior Unsecured Notes issued under the Senior Unsecured Notes Indenture shall constitute "Permitted Additional Senior Unsecured Notes".

"Permitted Business Acquisitions" shall mean acquisitions of all or substantially all of the assets of, or shares or other equity interests in, a person or division or line of business of a person engaged in the same business as Holdings and the Restricted Subsidiaries or in a related business if immediately after giving effect thereto: (i) no Default or Event of Default shall have occurred and be continuing, (ii) all transactions related thereto shall be consummated in accordance with applicable laws, (iii) at least 90% of the outstanding capital stock or other ownership interests of any acquired or newly formed corporation or other entity must be owned directly by the Company or a Domestic Restricted Subsidiary (it being understood that the acquisition of less than 90% of the capital stock of any corporation or other entity which is owned by a person, division or line of business acquired in a Permitted Business Acquisition shall not be prohibited by this clause) and, except as provided in Section 5.18(c), such corporation or entity shall become a Restricted Subsidiary and a Guarantor and execute a counterpart to the relevant Security Documents, and, except as provided in Section 5.18(c), all capital stock or other equity interest created or acquired and all property acquired in connection with such acquisition (other than Excluded Collateral) shall be duly and validly pledged to the Collateral Agent for the ratable benefit of the Secured Parties to the extent required by Section 5.18, and (iv) (A) Holdings shall be in compliance, on a pro forma basis, with the covenants contained in Sections 6.14 and 6.15 recomputed as at the last day of the most recently ended fiscal quarter of Holdings, and the Company shall have delivered to the Administrative Agent an officers' certificate to such effect, together with all relevant financial information for such acquired corporation, entity or assets, and (B) the acquired corporation or entity shall not be liable for any Indebtedness (except for Indebtedness permitted by Section 6.01). For purposes of Section 6,

any Restricted Subsidiary satisfying the requirements of clause (iii) above shall be deemed to be a "wholly owned subsidiary".

"Permitted Investments" shall mean:

(a) direct obligations of, or obligations the principal of and interest on which are unconditionally guaranteed by, the United States of America (or by any agency thereof to the extent such obligations are backed by the full faith and credit of the United States of America), in each case maturing within one year from the date of acquisition thereof;

(b) marketable general obligations issued by any state of the United States of America or any political subdivision of any such state or any public instrumentality thereof maturing within six months from the date of acquisition thereof and, at the time of acquisition, having one of the two highest ratings generally obtainable from either Standard & Poor's Ratings Group or Moody's Investors Service, Inc.;

(c) investments in commercial paper maturing no more than six months from the date of acquisition thereof and having, at such date of acquisition, a credit rating of A-1 or higher from Standard & Poor's Ratings Group or P-1 or higher from Moody's Investors Service, Inc.;

(d) investments in domestic and Eurodollar certificates of deposit, banker's acceptances and time deposits maturing within six months from the date of acquisition thereof issued or guaranteed by or placed with, and money market deposit accounts issued or offered by (w) any domestic office of any commercial bank organized or licensed under the laws of the United States of America or any State thereof which has a combined capital and surplus and undivided profits of not less than $500,000,000, (x) any Lender, (y) any branch of any Lender or any commercial bank organized under the laws of the United Kingdom, Canada, France or Japan having combined capital, surplus and undivided profits (less any undivided losses) of not less than $500,000,000 or (z) other than in the case of banker's acceptances, any domestic commercial bank whose deposits are guaranteed by the Federal Deposit Insurance Corporation (or any successor) and with whom deposits maintained by Holdings or any of its subsidiaries do not exceed the amount so guaranteed; and

(e) investments in money market funds or other mutual funds that invest in the types of Permitted Investments described in clauses (a) through (d) above.

"Permitted Receivables Financing" shall mean any sale by the Company or a Restricted Subsidiary of accounts receivable and related property to a Finance Subsidiary intended to be (and which shall be treated for the purposes hereof and thereof as) a true sale transaction with customary limited recourse not based upon the collectibility of the receivables sold and the corresponding sale or pledge of such accounts receivable and related property (or an interest or interests therein) by the Finance Subsidiary, in each case without any Guarantee by Holdings or any other subsidiary thereof (other than limited guaranties executed in connection with such Permitted Receivables Financing), including, without limitation, the transactions contemplated by the receivables purchase agreement and the receivables transfer agreement (the "Receivables Transfer Agreement") with respect to the Receivables Facility to be entered into on the Closing Date among the Company, individually and as collection agent, Carcorp, Inc., as transferor, and the financial institutions parties thereto, as amended from time to time, and the documents executed in connection therewith; provided, however, that the terms, conditions and structure (including the legal and organizational structure of the Finance Subsidiary and the restrictions imposed on its activities) of and the documentation incident to any such transactions (other than any amendments or other modification to the Receivables Transfer Agreement and related documents in accordance with the

terms thereof) entered into after the Closing Date must be reasonably acceptable to the Administrative Agent.

"Permitted Subordinated Indebtedness" shall mean any additional unsecured subordinated indebtedness of the Company or Holdings (i) having no amortization of principal and a scheduled final maturity no earlier than November 15, 2008 and having subordination terms at least as favorable to the Lenders in all material respects as set forth on Schedule 1.01(D) and (ii) which (A) permits the Transactions contemplated by the Loan Documents, (B) does not provide for any principal payments thereon prior to November 15, 2008, except upon the occurrence of a change of control, asset sale or similar event, in each case so long as the terms of such Permitted Subordinated Indebtedness provide that the provisions of this Agreement must be satisfied prior to any such payment and (C) contains covenants, events of default, interest rate and other terms as are consistent with high yield subordinated debt securities issued in a public offering or a Rule 144A transaction.

"Permitted Subordinated Notes Refinancing" shall mean a refinancing of the Subordinated Notes with Permitted Subordinated Indebtedness.

"Permitted Tax Payment" shall mean for any taxable year of the Company in which it joins in filing a consolidated federal income tax return with Holdings, a payment by the Company to Holdings in an amount not in excess of the amount required to be paid by the Company under the Tax Sharing Agreement, dated as of November 1, 1989, between Holdings and the Company, as in effect on the Closing Date, as amended solely to reflect the creation, acquisition or disposition of Subsidiaries of Holdings permitted hereunder and the mergers involving Holdings and the Company effected in July 1994; provided that within 20 days of receipt of such payment Holdings applies the amount thereof to satisfy such tax liability or its obligations under the Tax Sharing Agreement or to make an equity contribution or loan to the Company.

"Permitted Textron Sale/Leaseback Refinancing" shall mean a refinancing, remarketing, refunding or other replacement, in whole or in part, of the Textron Sale/Leaseback Financing provided that
(i) the only assets subject to, and which secure, such refinancing, remarketing, refunding or replacement are the assets described in clause (i) of the definition of "Excluded Collateral" and the proceeds thereof and (ii) the terms of such refinancing, remarketing, refunding or replacement are not adverse to the Lenders in any material respect, taken as a whole, provided, further, that the tenor of any such refinancing, remarketing, refunding or replacement is at least three years.

"person" shall mean any natural person, corporation, business trust, joint venture, association, company, partnership or government, or any agency or political subdivision thereof.

"Plan" with respect to any person shall mean any pension plan (other than a Multiemployer Plan) subject to the provisions of Title IV of ERISA or Section 412 of the Code which is maintained for employees of such person or any ERISA Affiliate of such person.

"Pledged Stock" shall mean all "Pledged Stock" and "Pledged Notes" as such terms are defined in the Guarantee and Collateral Agreement and "Canadian Pledged Stock" and "Canadian Pledged Notes" as such terms are defined in the Canadian Guarantee and Collateral Agreement.

"Prepayment Event" shall mean (i) any Specified Asset Sale, (ii) the incurrence by Holdings or any Restricted Subsidiary of any Indebtedness (other than Indebtedness permitted by Section 6.01 (other than clause (b)(x) thereof)), and (iii) any arrangement or transaction entered into in accordance with clause (d) or (f) of
Section 6.06, provided, however, that for purposes of Section

28

2.12(g)(i), (a) a Prepayment Event shall not be deemed to occur until the aggregate Net Proceeds from Prepayment Events consisting of Specified Asset Sales not yet applied pursuant to Section 2.12(g)(i) by reason of this proviso equals or exceeds $20,000,000, at which time a Prepayment Event shall, except as set forth in clause (b) below, be deemed to occur having Net Proceeds equal to the aggregate Net Proceeds from Prepayment Events not yet so applied, (b) with respect to Specified Asset Sales, a Prepayment Event shall be deemed to occur only with respect to that portion of the Net Proceeds thereof required to be repaid pursuant to Section 6.08(h), (j) or (k) and (c) with respect to any arrangement or transaction entered into in accordance with clause
(d) or (f) of Section 6.06, a Prepayment Event shall be deemed to occur only with respect to that portion of the Net Proceeds thereof required to be repaid pursuant to such clause.

"Primary Share Purchase Agreement" shall mean the Share Purchase Agreement, dated as of January 12, 2001, between Holdings and Heartland, as the same may be amended, supplemented or otherwise modified from time to time as permitted by Section 6.18.

"Profit Participation Agreement" shall mean the Profit Participation Agreement, dated as of February 23, 2001, among Holdings, the sellers party to the Secondary Share Purchase Agreement, the Heartland Entities party thereto and the other investors party thereto, as the same may be amended, supplemented or otherwise modified from time to time as permitted by Section 6.18.

"Purchase Money Indebtedness" shall mean Indebtedness incurred for capital expenditures, which may be secured in compliance with Section 6.04(h).

"Reallocation Notice" shall have the meaning assigned to that term in Section 2.27.

"Receivables Facility" shall have the meaning given to such term in the recitals to this Agreement.

"Receivables Facility Proceeds" shall have the meaning given to such term in the recitals to this Agreement.

"Receivables Transfer Agreement" shall have the meaning given such term in the definition of "Permitted Receivables Financing".

"Register" shall have the meaning given such term in
Section 9.04(d).

"Registration Rights Agreement" shall mean the Registration Rights Agreement, dated as of February 23, 2001, by and among Blackstone Capital Company II, L.L.C., the Heartland Entities party thereto, the other Investors party thereto, Wasserstein/C&A Holdings, L.L.C. and Holdings, as the same may be amended, supplemented or otherwise modified from time to time as permitted by Section 6.18.

"Regulation D" shall mean Regulation D of the Board as from time to time in effect and all official rulings and interpretations thereunder or thereof.

"Regulation T" shall mean Regulation T of the Board as from time to time in effect and all official rulings and interpretations thereunder or thereof.

"Regulation U" shall mean Regulation U of the Board as from time to time in effect and all official rulings and interpretations thereunder or thereof.

"Regulation X" shall mean Regulation X of the Board as from time to time in effect and all official rulings and interpretations thereunder or thereof.

"Related Fund" shall mean with respect to any Lender that is a fund that invests in bank loans and similar extensions of credit, any other fund that invests in bank loans and similar extensions of credit and that is managed by the same investment advisor as such Lender or by an Affiliate of such investment advisor.

"Release" shall mean any release, spill, emission, leaking, pumping, injection, deposit, disposal, discharge, dispersal, leaching, emanation or migration in, into, onto or through the environment (including ambient air, surface water, ground water, land surface, subsurface strata or workplace), including the movement of any Contaminant through or in the air, soil, surface water or ground water.

"Remedial Action" shall mean (i) "remedial action" as such term is defined in 42 U.S.C. Section 9601(24) and (ii) all other actions required or voluntarily undertaken to (x) clean up, remove, treat, abate or in any other way address any Contaminant in the environment or workplace, (y) prevent the Release or threat of Release, or minimize the further Release of any Contaminant so it does not migrate or endanger or threaten to endanger public health or welfare of the environment or workplace, or (z) perform studies and investigations in connection with (x) or (y) above.

"Reportable Event" shall mean any reportable event as defined in Section 4043(c) of ERISA or the regulations issued thereunder with respect to a Plan (other than a Plan maintained by an ERISA Affiliate which is considered an ERISA Affiliate only pursuant to subsection (m) or (o) of Section 414 of the Code).

"Required Lenders" shall mean, at any time, Lenders holding the Dollar Equivalent Amount of Loans (other than Swingline Loans), Letter of Credit Exposure and unused Commitments (including Excess Supplemental Revolving Credit Linked Deposit Amounts) representing at least a majority of the Dollar Equivalent Amount of the sum of the aggregate principal amount of the Loans (other than Swingline Loans) outstanding, the aggregate amount of the Letter of Credit Exposure and unused Commitments (including Excess Supplemental Revolving Credit Linked Deposit Amounts) at such time.

"Responsible Officer" of any corporation shall mean any Executive Officer or Financial Officer of such corporation and any other officer or similar official thereof responsible for the administration of the obligations of such corporation in respect of this Agreement. Unless the context otherwise requires, Responsible Officer shall mean a Responsible Officer of Holdings.

"Restricted Payments" shall have the meaning given in Section 6.02.

"Restricted Subsidiary" shall mean each Subsidiary in existence as of the Closing Date and any direct or indirect Subsidiary formed or acquired after the Closing Date, in each case, other than Unrestricted Subsidiaries.

"Revolving Credit Borrowing" shall mean a Borrowing comprised of Revolving Loans.

"Revolving Credit Commitment" shall mean, with respect to each Lender, the commitment, if any, of such Lender to make Revolving Loans to the Company hereunder as set forth in Schedule 2.01, as the same may be reduced from time to time pursuant to Section 2.09 or reduced

or increased pursuant to Section 2.27. The aggregate Revolving Credit Commitments are initially $100,000,000. The Additional Revolving Credit Commitments shall be in addition to the Revolving Credit Commitments.

"Revolving Credit Maturity Date" shall be the same date as the Tranche A Term Loan Maturity Date.

"Revolving Credit Note" shall mean a promissory note of the Company, substantially in the form of Exhibit A-1, evidencing Revolving Loans.

"Revolving Lender" shall mean any Lender with a Revolving Credit Commitment.

"Revolving Letters of Credit" shall mean Letters of Credit issued and deemed to be issued under the Revolving Credit Facility.

"Revolving Letter of Credit Commitment" shall mean $50,000,000, as the same may be reduced from time to time pursuant to Section 2.25.

"Revolving Loans" shall mean the revolving loans made to the Company pursuant to Section 2.01(c). Each Revolving Loan shall be a Eurodollar Revolving Loan or an ABR Revolving Loan.

"Secondary Share Purchase Agreement" shall mean the Share Purchase Agreement, dated as of January 12, 2001, between Heartland, and each of Blackstone Capital Company II, L.L.C., Blackstone Capital Partners, L.P., Blackstone Advisory Directors Partnership, L.P., Blackstone Family Investment Partnership I L.P. and Wasserstein/C&A Holdings, L.L.C. as the same may be amended, supplemented or otherwise modified from time to time as permitted by Section 6.18.

"Secured Parties" shall mean (a) with respect to the Obligations (as such term is defined in the Guarantee and Collateral Agreement), the U.S. Collateral and the U.S. Security Documents, the Credit Agreement Creditors and (b) with respect to the Canadian Obligations, the Canadian Collateral and the Canadian Security Documents, the Canadian Lenders and Canadian Collateral Agent.

"Securities Act" shall mean the Securities Act of 1933, as amended.

"Security Documents" shall mean the collective reference to the U.S. Security Documents and the Canadian Security Documents.

"Seller Common Equity" shall have the meaning given to such term in the recitals to this Agreement.

"Seller Preferred" shall have the meaning given to such term in the recitals to this Agreement.

"Senior Unsecured Notes" shall have the meaning given to such term in the recitals to this Agreement.

"Senior Unsecured Notes Indenture" shall mean the Indenture entered into by Holdings, the Company and certain of its subsidiaries in connection with the issuance of the Senior

Unsecured Notes, together with all instruments and other agreements entered into by Holdings, the Company or such subsidiaries in connection therewith, as the same may be amended, supplemented or otherwise modified from time to time in accordance with Sections 6.10 and 6.18.

"Significant Subsidiary" shall mean each Borrower and any Subsidiary (or, for purposes of Article VII only, any group of Subsidiaries) that at the date of any determination (i) accounts for 5% or more of the consolidated assets of Holdings or (ii) has accounted for 5% or more of the consolidated EBITDA of Holdings for each of the two consecutive periods of four fiscal quarters immediately preceding the date of determination.

"Specified Asset Sale" shall mean any sale, lease, transfer, assignment or other disposition of assets, business units or property of Holdings or any of its subsidiaries for Net Proceeds in excess of $100,000 in any transaction or series of related transactions described in paragraph (h), (j) or (k) of Section 6.08.

"Specified Business" shall mean the business described on Schedule 1.01(F).

"Statutory Reserves" shall mean a fraction (expressed as a decimal), the numerator of which is the number one and the denominator of which is the number one minus the aggregate of the maximum reserve percentages (including any marginal, special, emergency or supplemental reserves) expressed as a decimal established by the Board and any other banking authority to which the Administrative Agent is subject (a) with respect to the Base CD Rate (as such term is used in the definition of "Alternate Base Rate"), for new negotiable nonpersonal time deposits in dollars of over $100,000 with maturities approximately equal to three months, and (b) with respect to the Adjusted LIBO Rate for Eurocurrency Liabilities (as defined in Regulation D of the Board). Such reserve percentages shall include those imposed pursuant to such Regulation D. Eurodollar Loans shall be deemed to constitute Eurocurrency Liabilities and to be subject to such reserve requirements without benefit of or credit for proration, exemptions or offsets which may be available from time to time to any Lender under such Regulation D. Statutory Reserves shall be adjusted automatically on and as of the Closing Date of any change in any reserve percentage.

"Subordinated Notes" shall mean the 11--1/2% Senior Subordinated Notes due April 2006 issued by the Company pursuant to the Subordinated Notes Indenture.

"Subordinated Notes Indenture" shall mean the Indenture, dated as of June 1, 1996, among First Union Bank of North Carolina, the Company, as issuer, and Holdings and certain of its Subsidiaries, as guarantors, in connection with the issuance of the Subordinated Notes, together with all instruments and other agreements entered into by Holdings, the Company or such Subsidiaries in connection therewith, as the same has been amended, supplemented or otherwise modified as of the date hereof and as may be further amended from time to time in accordance with Sections 6.10 and 6.18.

"Subsidiary" shall mean any subsidiary of Holdings (after giving effect to the Acquisition) and from time to time thereafter.

"subsidiary" shall mean, with respect to any person (herein referred to as the "parent"), any corporation, partnership, association or other business entity (a) of which securities or other ownership interests representing more than 50% of the equity or more than 50% of the ordinary voting power or more than 50% of the general partnership interests are, at the time any determination is being made, owned, controlled or held, or (b) which is, at the time any determination is made,

32

otherwise Controlled (except Controlled pursuant to any joint venture documentation), by the parent or one or more subsidiaries of the parent or by the parent and one or more subsidiaries of the parent.

"Subsidiary Guarantor" shall mean each Subsidiary which is a Guarantor hereunder.

"Supplemental Revolving Actual Return Rate" shall have the meaning assigned to such term in Section 2.01(o).

"Supplemental Revolving Credit Borrowing" shall mean a Borrowing comprised of Supplemental Revolving Loans.

"Supplemental Revolving Credit Commitments" shall mean the obligation of the Supplemental Revolving Lenders to make deposits in their respective Supplemental Revolving Credit Linked Accounts in accordance with this Agreement and to permit such deposits to be used to fund Supplemental Revolving Loans and support Supplemental Revolving Letters of Credit as provided in this Agreement.

"Supplemental Revolving Credit Linked Account" shall mean with respect to each Supplemental Revolving Lender, the account established by the Administrative Agent at JPMorgan Chase Bank in the name of such Supplemental Revolving Lender pursuant to Section 2.01(h).

"Supplemental Revolving Credit Linked Deposit" shall mean with respect to each Supplemental Revolving Lender at any time, amounts actually on deposit in its Supplemental Revolving Credit Linked Account at such time.

"Supplemental Revolving Credit Linked Deposit Amount" shall mean with respect to each Supplemental Revolving Lender, an amount equal to the amount set forth opposite its name on Schedule I of the Fifth Amendment, or as may subsequently be set forth in the Register from time to time, as the same may be reduced from time to time pursuant to this Agreement. For the avoidance of doubt, the Supplemental Revolving Credit Linked Deposit Amount of each Supplemental Revolving Lender shall not be reduced by the making of any Supplemental Revolving Loans or reimbursement of drawings under Supplemental Revolving Letters of Credit as a result of the withdrawal of any amounts then on deposit in such Supplemental Revolving Lender's Supplemental Revolving Credit Linked Account. The aggregate Supplemental Revolving Credit Linked Deposit Amounts are initially $100,000,000.

"Supplemental Revolving Credit Note" shall mean a promissory note of the Company, substantially in the form of Exhibit A-8 evidencing a Supplemental Revolving Loan.

"Supplemental Revolving Deposit Return Date" shall mean the date that the Supplemental Revolving Credit Linked Accounts are closed pursuant to Section 2.01(j)(vi).

"Supplemental Revolving Eurodollar Rate" shall have the meaning assigned to such term in Section 2.01(o).

"Supplemental Revolving Fixed Return Rate" shall have the meaning assigned to such term in Section 2.01(o).

"Supplemental Revolving Lender" shall mean any financial institution or other investor that has a corresponding Supplemental Revolving Credit Linked Deposit Amount hereunder.

"Supplemental Revolving Letter of Credit" shall mean any Letters of Credit issued and deemed to be issued under the Supplemental Revolving Credit Facility.

"Supplemental Revolving Letter of Credit Commitment" shall mean $50,000,000, as the same may be reduced from time to time pursuant to Section 2.25.

"Supplemental Revolving Loans" shall mean the revolving loans made to the Company pursuant to Section 2.01(g). Each Supplemental Revolving Loan shall be a Eurodollar Supplemental Revolving Loan or an ABR Supplemental Revolving Loan.

"Supplemental Revolving Settlement Date" shall mean the earlier to occur of (i) the Revolving Credit Maturity Date and (ii) the date of an acceleration of payment of obligations relating to the Supplemental Revolving Credit Facility or termination of the commitment to make Supplemental Revolving Loans pursuant to Article VII.

"Swingline Lender" shall mean JPMorgan Chase Bank, in its capacity as Swingline Lender hereunder and under the other Loan Documents.

"Swingline Loan Commitment" shall mean the commitment of the Swingline Lender to make Swingline Loans as set forth in Section 2.01(d).

"Swingline Loans" shall mean the Swingline Loans made by the Swingline Lender to the Company pursuant to Section 2.01(d).

"Swingline Note" shall mean a promissory note of the Company, substantially in the form of Exhibit A-4, evidencing the Swingline Loans.

"Tac-Trim Purchase Agreement" shall have the meaning assigned to such term in the recitals to this Agreement.

"Tac-Trim Subsidiaries" shall have the meaning assigned to such term in the recitals to this Agreement.

"Taxes" shall have the meaning assigned to such term in Section 2.18.

"Term Loans" shall mean the collective reference to the Tranche A Term Loans, the Tranche A-1 Term Loans and the Tranche B Term Loans.

"Textron Entities" shall mean Textron Inc. and its controlled Affiliates.

"Textron Sale/Leaseback Assets" shall have the meaning given in the recitals hereto and, in addition, shall include any equipment exchanged for any existing Textron Sale/Leaseback Assets, provided, that the appraised value (as determined by independent appraisers) of all such equipment shall be equal to or less than the total appraised value (as determined by independent appraisers) of the Textron Sale/Leaseback Assets being exchanged, and provided, further, that, the Collateral Agent, for the benefit of the Secured Parties, shall, after giving effect to the exchange, have a perfected first priority security interest in the Textron Sale/Leaseback Assets that were exchanged.

"Textron Sale/Leaseback Financing" shall have the meaning given in the recitals hereto.

"Textron Sale/Leaseback Mortgage" shall mean each Mortgage (as defined in the Textron Sale/Leaseback Financing) delivered pursuant to the Textron Sale/Leaseback Financing or any Permitted Textron Sale/Leaseback Refinancing.

"Textron Sale/Leaseback Mortgaged Properties" shall mean each "Mortgaged Property" as defined in the applicable Textron Sale/Leaseback Mortgage and, in addition, shall include any real property exchanged for any existing Textron Sale/Leaseback Mortgaged Property, provided, that the appraised value (as determined by independent appraisers) of such real property shall be equal to or less than the appraised value (as determined by independent appraisers) of the Textron Sale/Leaseback Mortgaged Property being exchanged, and provided, further, that, after giving effect to the exchange, the Collateral Agent, for the benefit of the Secured Parties, shall have a perfected first priority security interest in the Textron Sale/Leaseback Mortgaged Property that was exchanged.

"The Becker Group" shall mean Becker Group L.L.C. and its subsidiaries.

"Total Supplemental Revolving Credit Linked Deposit Amount" shall mean, at any time, the sum of all the Supplemental Revolving Credit Linked Deposit Amounts at such time.

"Tranche A Term Borrowing" shall mean a Borrowing comprised of Tranche A Term Loans.

"Tranche A Term Loan Commitment" shall mean, with respect to each Lender, the commitment, if any, of such Lender to make a Tranche A Term Loan to the Company hereunder as set forth in Schedule 2.01. The aggregate Tranche A Term Loan Commitments are initially $100,000,000.

"Tranche A Term Loan Maturity Date" shall mean December 31, 2005.

"Tranche A Term Loan Repayment Date" shall have the meaning assigned to such term in Section 2.11.

"Tranche A Term Loans" shall mean the term loans made to the Company pursuant to Section 2.01(p). Each Tranche A Term Loan shall be a Eurodollar Tranche A Term Loan or an ABR Tranche A Term Loan.

"Tranche A Term Note" shall mean a promissory note of the Company, substantially in the form of Exhibit A-2, evidencing Tranche A Term Loans.

"Tranche A-1 Term Borrowing" shall mean a Borrowing comprised of Tranche A-1 Term Loans.

"Tranche A-1 Term Lender" shall mean each Lender with a Tranche A-1 Term Loan Commitment.

"Tranche A-1 Term Loan Commitment" shall mean, with respect to each Lender, the commitment, if any, of such Lender to make a Tranche A-1 Term Loan to the Company hereunder as set forth in Schedule II of the Fifth Amendment. The aggregate Tranche A-1 Term Loan Commitments are initially $185,000,000.

"Tranche A-1 Term Loan Maturity Date" shall mean December 31, 2005.

"Tranche A-1 Term Loans" shall mean the term loans made to the Company pursuant to Section 2.01(p). Each Tranche A-1 Term Loan shall be a Eurodollar Tranche A-1 Term Loan or an ABR Tranche A-1 Term Loan.

"Tranche A-1 Term Note" shall mean a promissory note of the Company, substantially in the form of Exhibit A-9, evidencing Tranche A-1 Term Loans.

"Tranche B Term Borrowing" shall mean a Borrowing comprised of Tranche B Term Loans.

"Tranche B Term Loan Commitment" shall mean, with respect to each Lender, the commitment, if any, of such Lender to make a Tranche B Term Loan to the Company hereunder as set forth in Schedule 2.01. The aggregate Tranche B Term Loan Commitments are initially $300,000,000.

"Tranche B Term Loan Maturity Date" shall mean shall mean December 31, 2005.

"Tranche B Term Loan Repayment Date" shall have the meaning assigned to such term in Section 2.11.

"Tranche B Term Loans" shall mean the term loans made to the Company pursuant to Section 2.01(b). Each Tranche B Term Loan shall be a Eurodollar Tranche B Term Loan or an ABR Tranche B Term Loan.

"Tranche B Term Note" shall mean a promissory note of the Company, substantially in the form of Exhibit A-3, evidencing Tranche B Term Loans.

"Transaction Documents" shall mean the Primary Share Purchase Agreement, the Secondary Share Purchase Agreement, the Master Shareholder Agreement, the Registration Rights Agreement, the Profit Participation Agreement, the Heartland Management Agreement, the Tac-Trim Purchase Agreement, the documents evidencing the Textron Sale/Leaseback Financing, the Certificate of Designation, the Senior Unsecured Notes Indenture and the Subordinated Notes Indenture.

"Transactions" shall have the meanings assigned to such term in the recitals to this Agreement.

"Type" when used in respect of any Loan or Borrowing, shall refer to the Rate by reference to which interest on such Loan or on the Loans (including Loans made through B/As) comprising such Borrowing is determined. For purposes hereof, "Rate" shall include the Adjusted LIBO Rate, the Alternate Base Rate and the C$ Prime Rate.

"UCC" shall mean the Uniform Commercial Code of New York, as in effect from time to time.

"Unrestricted Subsidiary" shall mean (i) each Finance Subsidiary, (ii) Waterstone Insurance Inc. and any other wholly owned subsidiary of the Company that is formed for the sole purpose of the business of insurance activities for Holdings and its Subsidiaries and is regulated as such by a Governmental Authority, (iii) each Charitable Subsidiary, (iv) any Subsidiary of Holdings (other than the Company) none of the capital stock or other ownership interest of which is owned by the Company or any of its Subsidiaries, provided that Holdings has notified the Administrative Agent

36

of its acquisition or creation of such Subsidiary and its ownership interest therein concurrently with such acquisition or creation and the intended purposes of such Subsidiary and (v) any Subsidiary of an Unrestricted Subsidiary. Each Unrestricted Subsidiary, other than a non-U.S. Unrestricted Subsidiary, shall have entered into the existing Tax Sharing Agreement with Holdings and the Company (or another tax sharing agreement containing terms which, in the reasonable judgment of the Administrative Agent, are customary in similar circumstances to provide an appropriate allocation of tax liabilities and benefits).

The Unrestricted Subsidiaries shall be capitalized solely from the following sources: (a) any Investment in such Unrestricted Subsidiary by any person other than Holdings and the Restricted Subsidiaries; (b) Indebtedness issued by such Unrestricted Subsidiary, or proceeds thereof; (c) capital stock of any Unrestricted Subsidiary, or proceeds thereof; (d) capital stock of Holdings issued by Holdings after the Closing Date, or proceeds thereof; (e) Investments permitted to be made in Unrestricted Subsidiaries pursuant to Section 6.07(k); and (f) with respect to any subsidiary described in clause (ii) above, contributions from the Company or any of its subsidiaries in the ordinary course of business and to the extent consistent with past practices as of the Closing Date.

Holdings will not (i) permit any Unrestricted Subsidiary to make or agree to make any Restricted Payment or other payment prohibited by Section 6.02 or pay, retire, repurchase and redeem any Indebtedness referred to in Section 6.05, in each case that could not be made directly by the Borrowers or a Restricted Subsidiary in accordance with the provisions of Section 6.02 or 6.05, as applicable, or (ii) furnish any funds to or make any investment in an Unrestricted Subsidiary or other person for purposes of enabling it to make any such Restricted Payment, other payment or payment, retirement, repurchase or redemption of indebtedness that could not be made directly by the Company or a Restricted Subsidiary in accordance with the provisions of Section 6.02 or 6.05, as applicable.

"U.S. Collateral" shall mean all assets of the Loan Parties, now or hereafter acquired, upon which a Lien is intended to be created by this Agreement or any U.S. Security Document.

"U.S. Mortgaged Properties" shall mean, as of the Closing Date, the real properties listed on Schedule 1.01(E), as to which the Collateral Agent for the benefit of the Secured Parties shall be granted a Lien pursuant to the U.S. Mortgages and any other real property which is mortgaged under a U.S. Mortgage in accordance with Section 5.18.

"U.S. Mortgages" shall mean each of the mortgages and deeds of trust made by any Loan Party in favor of, or for the benefit of, the Collateral Agent for the benefit of the Secured Parties, substantially in the form of Exhibit G-1 (with such changes thereto as shall be advisable under the law of the jurisdiction in which such mortgage or deed of trust is to be recorded or with such changes as the Collateral Agent shall reasonably deem appropriate).

"U.S. Security Documents" shall mean the collective reference to the Guarantee and Collateral Agreement, the U.S. Mortgages and all other documents, hypothecs, or instruments hereafter delivered to the Collateral Agent for the benefit of the Secured Parties granting a Lien on any asset or assets of any person to secure the Obligations (as such term is defined in the Guarantee and Collateral Agreement).

"Withdrawal Liability" shall mean liability to a Multiemployer Plan as a result of a complete or partial withdrawal from such Multiemployer Plan, as such terms are defined in Part I of Subtitle E of Title IV of ERISA.

"WP" shall mean Wasserstein Perella Partners, L.P.

"WP Entities" shall mean WP, WPMP or any of their

Affiliates.

"WPMP" shall mean Wasserstein Perella Management Partners, Inc.

SECTION 1.02. Terms Generally. The definitions in Section 1.01 shall apply equally to both the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation". All references herein to Articles, Sections, Exhibits and Schedules shall be deemed references to Articles and Sections of, and Exhibits and Schedules to, this Agreement unless the context shall otherwise require. For the purpose of clarity, neither the Company nor any Restricted Subsidiary shall be entitled or required to include in calculating EBITDA or Net Income the income (or loss) attributable to a minority interest-holder in a Restricted Subsidiary where such interest-holder is a person other than Holdings or its Subsidiaries. Except as otherwise expressly provided herein, all terms of an accounting or financial nature shall be construed in accordance with GAAP, as in effect from time to time, provided that, if the Company notifies the Administrative Agent that the Company requests an amendment to any provision hereof to eliminate the effect of any change occurring after the date hereof in GAAP or in the application thereof on the operation of such provision (or if the Administrative Agent notifies the Company that the Required Lenders request an amendment to any provision hereof for such purpose), regardless of whether any such notice is given before or after such change in GAAP or in the application thereof, then such provision shall be interpreted on the basis of GAAP as in effect and applied immediately before such change shall have become effective until such notice shall have been withdrawn or such provision amended in accordance herewith, provided, further, that if such change in GAAP would have resulted in non-compliance with Section 6.14 or 6.15 but for such notice, the Company agrees to enter into negotiations with the Administrative Agent to effectuate an amendment.

## ARTICLE II.

## THE CREDITS

SECTION 2.01. Loans; Commitments. (a) Subject to the terms and conditions and relying on the representations and warranties set forth herein, each Lender with a Tranche A Term Loan Commitment agrees, severally and not jointly, to make a Tranche A Term Loan to the Company on the Closing Date in a principal amount not to exceed its Tranche A Term Loan Commitment set forth opposite its name in Schedule 2.01. Amounts paid or prepaid in respect of Tranche A Term Loans may not be reborrowed.

(b) Subject to the terms and conditions and relying upon the representations and warranties set forth herein, each Lender with a Tranche B Term Loan Commitment agrees, severally and not jointly, to make a Tranche B Term Loan to the Company on the Closing Date in a principal amount not to exceed its Tranche B Term Loan Commitment set forth opposite its name in Schedule 2.01. Amounts paid or prepaid in respect of Tranche B Term Loans may not be reborrowed.

(c) Subject to the terms and conditions and relying upon the representations and warranties set forth herein, each Revolving Lender agrees, severally and not jointly, to make revolving credit loans to the Company (each a "Revolving Loan" and collectively, the "Revolving Loans"), at any time and from time to time on or after the Closing Date and until the earlier of the Revolving Credit Maturity Date and the termination of the Revolving Credit Commitment of such Lender in accordance with the terms hereof, in an aggregate principal amount at any time outstanding not to exceed the excess of (i) its Revolving Credit

Commitment over (ii) its Applicable Percentage of the sum of the Company Letter of Credit Exposure and Swingline Loans. Within the foregoing limits, the Company may borrow, pay or prepay and reborrow Revolving Loans on or after the Closing Date and prior to the Revolving Credit Maturity Date, subject to the terms, conditions and limitations set forth herein. As provided in Section 2.19, the Revolving Credit Commitment may be utilized for the issuance of Letters of Credit.

(d) (i) The Swingline Lender hereby agrees, subject to the limitations set forth below with respect to the maximum amount of Swingline Loans permitted to be outstanding from time to time, to make a portion of the Revolving Credit Commitments available to the Company from time to time during the period from the Closing Date through and excluding the earlier of Revolving Credit Maturity Date and the termination of the Revolving Credit Commitments in an aggregate principal amount not to exceed the Swingline Loan Commitment, by making Swingline Loans to the Company. Swingline Loans may be made notwithstanding the fact that such Swingline Loans, when aggregated with the Swingline Lender's outstanding Revolving Loans and outstanding Swingline Loans, may exceed the Swingline Lender's Revolving Credit Commitment. The Swingline Lender's commitment to make Swingline Loans to the Company pursuant to this
Section 2.01(d) is herein called its "Swingline Loan Commitment." The original amount of the Swingline Lender's Swingline Loan Commitment is $20,000,000. The Swingline Lender's Swingline Loan Commitment shall expire on the date the Revolving Credit Commitments are terminated and all Swingline Loans and all other amounts owed hereunder with respect to Swingline Loans shall be paid in full no later than that date. Amounts borrowed under this Section 2.01(d) may be repaid and reborrowed to but excluding the date of termination of the Revolving Credit Commitments; provided, however, that the Company shall repay all outstanding Swingline Loans on the last day of each fiscal quarter of the Swingline Lender.

(ii) In no event shall (a) the aggregate principal amount of Swingline Loans outstanding at any time exceed the aggregate Swingline Loan Commitment in effect at such time, (b) the aggregate principal amount of Revolving Loans and Swingline Loans outstanding at any time exceed the Revolving Credit Commitments as reduced by the aggregate Company Letter of Credit Exposure or (c) the aggregate Swingline Loan Commitment exceed at any time the aggregate Revolving Credit Commitments in effect at such time. Swingline Loans may only be made as ABR Loans.

(iii) With respect to any Swingline Loans which have not been voluntarily prepaid by the Company, the Swingline Lender (by request to the Administrative Agent) or Administrative Agent at any time may, on one Business Day's notice, require each Lender, including the Swingline Lender, and each Lender hereby agrees, subject to the provisions of this Section 2.01(d), to make a Revolving Loan (which shall be funded as an ABR Loan) in an amount equal to such Lender's Applicable Percentage of the amount of the Swingline Loans ("Refunded Swingline Loans") outstanding on the date notice is given which Swingline Lender requests the Lenders to prepay; provided that so long as no Default or Event of Default shall have occurred and be continuing, Lenders shall not be required to make such Revolving Loans if the aggregate principal amount of Swingline Loans outstanding as of any Tuesday of each week (or the first Business Day occurring after any such Tuesday if such Tuesday is not a Business Day) is less than $1,000,000.

(iv) In the case of Revolving Loans made by Lenders other than the Swingline Lender under the immediately preceding paragraph (iii), each such Lender shall make the amount of its Revolving Loan available to the Administrative Agent, in same day funds, at the office of the Administrative Agent located at 270 Park Avenue, New York, New York, not later than 1:00 P.M. (New York time) on the Business Day next succeeding the date such notice is given. The proceeds of such Revolving Loans shall be immediately delivered to the Swingline Lender (and not to the Company) and applied to repay the Refunded Swingline Loans. On the day such Revolving Loans are made, the Swingline Lender's Applicable Percentage of the Refunded Swingline Loans shall be deemed to be paid with the proceeds of a Revolving Loan made by the

Swingline Lender and such portion of Swingline Loans deemed to be so paid shall no longer be outstanding as Swingline Loans and shall be outstanding as Revolving Loans of Lenders. The Company authorizes the Administrative Agent and the Swingline Lender to charge the Company's account with Administrative Agent (up to the amount available in such account) in order to pay immediately to the Swingline Lender the amount of such Refunded Swingline Loans to the extent amounts received from Lenders, including amounts deemed to be received from the Swingline Lender, are not sufficient to repay in full such Refunded Swingline Loans. If any portion of any such amount paid (or deemed to be paid) to the Swingline Lender should be recovered by or on behalf of the Company from the Swingline Lender in bankruptcy, by assignment for the benefit of creditors or otherwise, the loss of the amount so recovered shall be ratably shared among all Lenders in the manner contemplated by Section 9.06(b). Subject to the proviso contained in the first sentence of the preceding paragraph and to the compliance by the Swingline Lender with the provisions of Section 2.01(d)(vii), each Lender's obligation to make the Revolving Loans referred to in this paragraph shall be absolute and unconditional and shall not be affected by any circumstance, including, without limitation, (i) any setoff, counterclaim, recoupment, defense or other right which such Lender may have against the Swingline Lender, the Company or any other person for any reason whatsoever;

(ii) the occurrence or continuance of an Event of Default or a Default; (iii) any adverse change in the condition (financial or otherwise) of Holdings or any of its subsidiaries; (iv) any breach of this Agreement by Holdings, the Company or any other Lender; or (v) any other circumstance, happening or event whatsoever, whether or not similar to any of the foregoing. Nothing in this Section 2.01(d) shall be deemed to relieve any Lender from its obligation to fulfill its Commitments hereunder or to prejudice any rights that the Company may have against any Lender as a result of any default by such Lender hereunder.

(v) A copy of each notice given by the Swingline Lender or the Administrative Agent pursuant to this Section 2.01(d) shall be promptly delivered by the Swingline Lender to the Administrative Agent and the Company. Upon the making of a Revolving Loan by a Lender pursuant to this Section 2.01(d), the amount so funded shall no longer be owed in respect of Swingline Loans.

(vi) If as a result of any bankruptcy or similar proceeding or for any other reason, Revolving Loans are not made pursuant to this Section 2.01 (d) sufficient to repay any amounts owed to the Swingline Lender as a result of a nonpayment of outstanding Swingline Loans, each Lender agrees to purchase, and shall be deemed to have purchased, a participation in such outstanding Swingline Loans in an amount equal to its Applicable Percentage of the unpaid amount together with accrued interest thereon. Upon one Business Day's notice from the Swingline Lender, each Lender shall deliver to the Swingline Lender an amount equal to its respective participation in same day funds at the office of the Swingline Lender in New York, New York. In order to evidence such participation each Lender agrees to enter into a participation agreement at the request of the Swingline Lender in form and substance reasonably satisfactory to all parties. In the event any Lender fails to make available to the Swingline Lender the amount of such Lender's participation as provided in this Section 2.01(d), the Swingline Lender shall be entitled to recover such amount on demand from such Lender together with interest at the customary rate set by the Swingline Lender for correction of errors among banks in New York City for one Business Day and thereafter at the Alternate Base Rate plus the Applicable Margin then in effect.

(vii) Notwithstanding anything herein to the contrary, the Swingline Lender shall not make any Swingline Loans after the occurrence and during the continuation of a Default or Event of Default of which it is aware unless the Required Lenders have consented thereto.

(e) Subject to the terms and conditions and relying upon the representations and warranties set forth herein, each Canadian Lender agrees, severally and not jointly, to make Canadian Revolving Loans to each Canadian Borrower, at any time and from time to time on or after the Closing Date and until the earlier of the Canadian Revolving Credit Maturity Date and the termination of the Canadian Revolving Credit Commitment of such Canadian Lender in accordance with the terms hereof, in an aggregate principal amount

at any time outstanding not to exceed the Dollar Equivalent Amount of the excess of (i) its Canadian Revolving Credit Commitment over (ii) its Applicable Percentage of the sum of the Canadian Borrower Letter of Credit Exposure. Within the foregoing limits, a Canadian Borrower may borrow, pay or prepay and reborrow Canadian Revolving Loans on or after the Closing Date and prior to the Canadian Revolving Credit Maturity Date, subject to the terms, conditions and limitations set forth herein.

(f) Subject to the terms and conditions and relying upon the representations and warranties set forth herein, each Additional Revolving Lender agrees, severally and not jointly, to make Additional Revolving Loans to the Company, at any time and from time to time on or after the Closing Date and until the earlier of the Revolving Credit Maturity Date and the termination of the Additional Revolving Credit Commitment of such Lender in accordance with the terms hereof as set forth in Section 2.27.

(g) Making of the Supplemental Revolving Loans. (i) Subject to the terms and conditions and relying on the representations and warranties set forth herein, each Supplemental Revolving Lender agrees, severally and not jointly with the other Supplemental Revolving Lenders, to make revolving credit loans (each a "Supplemental Revolving Loan" and collectively, the "Supplemental Revolving Loans") to the Company, at any time and from time to time during the period commencing on the Fifth Amendment Effective Date and until the Supplemental Revolving Settlement Date; provided that, after giving effect to any such Supplemental Revolving Loan (i) the aggregate outstanding principal amount of Supplemental Revolving Loans of such Supplemental Revolving Lender plus such Supplemental Revolving Lender's Applicable Percentage of the Supplemental Revolving Letter of Credit Exposure does not exceed such Supplemental Revolving Lender's Supplemental Revolving Credit Linked Deposit Amount, and (ii) the aggregate amount of the outstanding Supplemental Revolving Loans and Supplemental Revolving Letter of Credit Exposure does not exceed the Total Supplemental Revolving Credit Linked Deposit Amount, provided, however, that the aggregate Supplemental Revolving Loans will not exceed $50,000,000 at any time. Supplemental Revolving Loans made pursuant to this subsection (g) or deemed to have been made pursuant to Section 2.01(j)(ii) below may be borrowed, paid, prepaid and reborrowed in accordance with the provisions of this Agreement.

(ii) Each Supplemental Revolving Loan shall be funded by the Supplemental Revolving Lenders pro rata in accordance with their respective Applicable Percentages, solely from amounts on deposit in their respective Supplemental Revolving Credit Linked Accounts.

(iii) The Borrower shall repay all outstanding Supplemental Revolving Loans on the Supplemental Revolving Settlement Date.

(h) Establishment of Supplemental Revolving Credit Linked Accounts. On or prior to the Fifth Amendment Effective Date, the Administrative Agent shall establish a Supplemental Revolving Credit Linked Account at JPMorgan Chase Bank in the name of each Supplemental Revolving Lender. The Administrative Agent shall establish additional Supplemental Revolving Credit Linked Accounts at JPMorgan Chase Bank (subject to Article VIII) at such times and in the names of such assignee Supplemental Revolving Lenders as shall be required pursuant to Section 9.04(b). Amounts on deposit in each Supplemental Revolving Credit Linked Account shall be invested, or caused to be invested, by the Administrative Agent as set forth in paragraph (k) below, and no person (other than the Administrative Agent or any of its subagents) shall have the right to make any withdrawals from any Supplemental Revolving Credit Linked Account or exercise any other right or power with respect thereto, except as expressly provided in subsection (j) below or 9.04(b). Without limiting the generality of the foregoing, each party hereto acknowledges and agrees that no amount on deposit at any time in any Supplemental Revolving Credit Linked Account shall be the property of any of the Loan Parties, shall constitute "Collateral" under the Loan Documents, or shall otherwise be available in any manner to satisfy any Obligation of any of the Loan Parties under the Loan Documents. The Loan Parties will have no right, title or interest in or to the Supplemental Revolving Credit Linked Accounts

or the Supplemental Revolving Credit Linked Deposits. The making of the Supplemental Revolving Credit Linked Deposits, the application thereof and the arrangements with respect thereto set forth in this Agreement constitute agreements among the Administrative Agent, the Issuing Banks issuing Supplemental Revolving Letters of Credit and each Supplemental Revolving Lender with respect to the funding obligations of the Supplemented Revolving Lenders under this Agreement and do not constitute any loan or extension of credit to any Loan Party. The sole funding obligation of each Supplemental Revolving Lender in respect of the Supplemental Revolving Credit Facility shall be satisfied upon the funding of its Supplemental Revolving Credit Linked Deposit Amount. Each Supplemental Revolving Lender irrevocable and unconditionally agrees that its Supplemental Revolving Credit Linked Deposit may be applied from time to time as set forth in this Agreement. No Loan Parties shall have any responsibility or liability to the Lenders, the Agents or any other Person in respect of the establishment, maintenance, administration or misappropriation of the Supplemental Revolving Credit Linked Accounts (or any sub-accounts thereof) or with respect to the investment of amounts held therein pursuant to Section 2.01(k) or the duties and responsibilities of the Administrative Agent (or any of its sub-agents or Affiliates) with respect to the foregoing contemplated by Section 2.01(n).

(i) Deposits in Supplemental Revolving Credit Linked Accounts. The following amounts will be deposited in each Supplemental Revolving Credit Linked Account at the following times:

(i) on the Fifth Amendment Effective Date, each Supplemental Revolving Lender that is a party to this Agreement shall deposit in its Supplemental Revolving Credit Linked Account an amount in Dollars equal to such Supplemental Revolving Lender's Supplemental Revolving Credit Linked Deposit Amount. All funding obligations with respect to any Supplemental Revolving Loan and all obligations to repay the Issuing Bank with respect to any draw paid by it under any Supplemental Revolving Letter of Credit and not reimbursed by the Company, in the case of each Supplemental Revolving Lender, shall be satisfied upon such Supplemental Revolving Lender's making such deposit in its Supplemental Revolving Credit Linked Account;

(ii) on any date on which the Administrative Agent receives any payment for the account of any Supplemental Revolving Lender with respect to the principal amount of any of its Supplemental Revolving Loans (whether pursuant to Section 2.04 or 2.12 or Article VII or otherwise) prior to the Supplemental Revolving Deposit Return Date, the Administrative Agent shall deposit such amount in the Supplemental Revolving Credit Linked Account of such Supplemental Revolving Lender;

(iii) on any date on which the Administrative Agent or the Issuing Bank receives any reimbursement payment from the Company with respect to amounts withdrawn from any Supplemental Revolving Credit Linked Account to reimburse any Issuing Bank with respect to any payment made by it under any Supplemental Revolving Letter of Credit prior to the Supplemental Revolving Deposit Return Date, the Administrative Agent or the Issuing Bank shall deposit in each Supplemental Revolving Credit Linked Account the portion of such reimbursement payment to be deposited therein, in accordance with Section 2.19; and

(iv) concurrently with the effectiveness of any assignment by any Supplemental Revolving Lender of all or any portion of its Supplemental Revolving Credit Linked Deposit Amount, the Administrative Agent shall transfer into the Supplemental Revolving Credit Linked Account of the assignee Supplemental Revolving Lender the corresponding portion of the amount on deposit in the assignor's Supplemental Revolving Credit Linked Account, in accordance with Section 9.04(b).

(j) Withdrawals from and Closing of Supplemental Revolving Credit Linked Accounts. Amounts on deposit in each Supplemental Revolving Credit Linked Account shall be withdrawn and distributed (or transferred, in the case of clause (iv) below) as follows:

(i) on the date of any Borrowing of Supplemental Revolving Loans, subject to satisfaction of the conditions applicable thereto set forth in Section 4.02, the Administrative Agent shall withdraw from each Supplemental Revolving Credit Linked Account an amount equal to the relevant Supplemental Revolving Lender's Applicable Percentage of such Borrowing, and make such amount available to the Company, as contemplated by
Section 2.01(g)(ii) and in accordance with this Section 2.01;

(ii) on any date on which any Issuing Bank is to be reimbursed by the Supplemental Revolving Lenders for any payment made by such Issuing Bank with respect to a Supplemental Revolving Letter of Credit, the Administrative Agent shall withdraw from each Supplemental Revolving Credit Linked Account an amount equal to the relevant Supplemental Revolving Lender's Applicable Percentage of such unreimbursed payment, and make such amount available to the Issuing Bank, in accordance with Section 2.19;

(iii) concurrently with each optional reduction or termination of the Total Supplemental Revolving Credit Linked Deposit Amount pursuant to Section 2.09, the Administrative Agent shall withdraw from each Supplemental Revolving Credit Linked Account, and pay to the relevant Supplemental Revolving Lender, an amount equal to such Supplemental Revolving Lender's Applicable Percentage of the amount of the optional reduction of the Total Supplemental Revolving Credit Linked Deposit Amount, in accordance with the applicable Section;

(iv) concurrently with the effectiveness of any assignment by any Supplemental Revolving Lender of all or any portion of its Supplemental Revolving Credit Linked Deposit Amount, the corresponding portion of the amount on deposit in the assignor's Supplemental Revolving Credit Linked Account shall be transferred from the assignor's Supplemental Revolving Credit Linked Account to the assignee's Supplemental Revolving Credit Linked Account, in accordance with Section 9.04(b) and, if required by
Section 9.04, the Administrative Agent shall close such assignor's Supplemental Revolving Credit Linked Account;

(v) promptly following the occurrence of a Supplemental Revolving Settlement Date, the Administrative Agent shall withdraw from each Supplemental Revolving Credit Linked Account an amount equal to the applicable Supplemental Revolving Lender's Supplemental Revolving Percentage of the amount by which aggregate amounts then on deposit in the Supplemental Revolving Credit Linked Accounts exceed the Supplemental Revolving Letter of Credit Exposure and pay such amount to such Supplemental Revolving Lender; and

(vi) upon the reduction of the Total Supplemental Revolving Credit Linked Deposit Amount to $0 and the expiration or cancellation of all outstanding Supplemental Revolving Letters of Credit, the Administrative Agent shall withdraw from each Supplemental Revolving Credit Linked Account, and pay to the relevant Supplemental Revolving Lender, the aggregate amount then on deposit therein, and shall close each such Supplemental Revolving Credit Linked Account.

(k) Investment of Amounts in Supplemental Revolving Credit Linked Accounts. The Administrative Agent shall invest, or cause to be invested, the amount on deposit in the Supplemental Revolving Credit Linked Account of each Supplemental Revolving Lender so as to earn for the account of such Supplemental Revolving Lender a return thereon (the "Supplemental Revolving Credit Linked Return") for each day at a rate per annum equal to (i) the one month LIBOR rate as determined by the Administrative Agent on such day (or if such day was not a Business Day, the first Business Day immediately preceding such day) based on rates for deposits in Dollars (as set forth by Bloomberg L.P.-page BTMM or any other comparable publicly available service as may be selected by the Administrative Agent) (the "Benchmark LIBO Rate") minus (ii) 0.10% (based on a 365 or 366 day year, as the case may be). The Benchmark LIBO Rate will be reset on each Business Day. Such return will be paid by the Administrative Agent to each Supplemental Revolving Lender for any calendar month (or portion thereof) monthly in arrears on the first Business Day of the following calendar month and the Revolving Credit Maturity Date (or such earlier date on which the Supplemental Revolving Loans become due and payable pursuant to Article VII), as applicable, as well as the Supplemental Revolving Deposit Return Date. No Loan Parties shall have any obligation under or in respect of the provisions of this Section 2.01(k).

(l) Supplemental Revolving Fixed Return Rate Fee. The Borrower shall pay a fee to the Administrative Agent, for the account of each Supplemental Revolving Lender, monthly in arrears for each calendar month (or portion thereof), an amount equal to the excess of (i) the Supplemental Revolving Fixed Return Rate over (ii) the Supplemental Revolving Actual Return Rate, in each case with respect to such Supplemental Revolving Lender for such calendar month (or portion thereof) (but only if such amount constituting the difference between the amounts provided for in items (i) and (ii) above is greater than $0). Each such amount for any calendar month (or portion thereof) will be paid by the Borrower to the Administrative Agent, for the account of each Supplemental Revolving Lender, on the first Business Day of the following calendar month, on the Supplemental Revolving Settlement Date and on the Supplemental Revolving Deposit Return Date.

(m) Excess Payment. In the event that the Supplemental Revolving Actual Return Rate with respect to any Supplemental Revolving Lender for any calendar month exceeds the Supplemental Revolving Fixed Return Rate with respect to such Supplemental Revolving Lender for such calendar month, such excess amount shall be held in a separate sub-account of the Supplemental Revolving Credit Linked Account of such Supplemental Revolving Lender. Amounts on deposit in any such sub-account shall be withdrawn by the Administrative Agent and paid to the relevant Supplemental Revolving Lender in satisfaction of any amount subsequently payable by the Company to such Supplemental Revolving Lender pursuant to subsection (l) above, and the Company shall not be required to make any payment to such Supplemental Revolving Lender pursuant to subsection (l) above until the amounts on deposit in such sub-account of such Supplemental Revolving Lender shall be $0. Upon the Supplemental Revolving Settlement Date, assuming the repayment by the Borrowers of all amounts outstanding under the Supplemental Revolving Credit Facility and the termination or cash collateralization in a manner satisfactory to the Administrative Agent of any outstanding Supplemental Revolving Letter of Credit Exposure, any excess payments referred to in this Section 2.01(m) shall be returned to, and become the property of, the Company.

(n) Sub-agents. The Administrative Agent may perform any and all its duties and exercise its rights and powers contemplated by this Section 2.01 by or through one or more sub-agents appointed by it (which may include any of its Affiliates), and any such sub-agent shall be entitled to the benefit of all the provisions of Article VIII of this Agreement and Section 9.05. The parties hereto acknowledge that on or prior to the Fifth Amendment Effective Date the Administrative Agent has engaged JPMorgan Chase Institutional Services to act as its sub-agent for purposes of this Section 2.01, and that in such capacity JPMorgan Chase Institutional Services shall be entitled to the benefit of all the provisions of Article VIII of this Agreement and Section 9.05.

(o) Definitions. For purposes of this Section 2.01 (or in the case of any other provision of this Agreement that refers to any of the following terms), the following defined terms shall have the following meanings:

"Supplemental Revolving Actual Return Rate" shall mean for any calendar month (or portion thereof) referred to in subsection (l) above, with respect to any Supplemental Revolving Lender, an amount equal to (i) the aggregate amount payable to such Supplemental Revolving Lender from the Administrative Agent pursuant to Section 2.01(k) plus (ii) the aggregate amount of interest payments received by such Supplemental Revolving Lender from the Company pursuant to Section 2.06 plus (iii) the aggregate amount of letter of credit fees received by such Supplemental Revolving Lender from the Company pursuant to Section 2.21, in each case with respect to such calendar month (or portion thereof).

"Supplemental Revolving Eurodollar Rate" shall mean for any calendar month (or portion thereof) referred to in subsection (l) above with respect to which the Supplemental Revolving Eurodollar Rate is determined, the Adjusted LIBO Rate for an Interest Period of one month (or for the period beginning on the Fifth Amendment Effective Date to February 29, 2004) commencing on the first day of such calendar month (or the Fifth Amendment Effective Date) as determined by the Administrative Agent.

"Supplemental Revolving Fixed Return Rate" shall mean for any calendar month (or portion thereof) referred to in subsection (l) above, with respect to any Supplemental Revolving Lender, an amount equal to the interest that would have accrued on the Supplemental Revolving Credit Linked Deposit Amount (irrespective of the amount then on deposit in such Supplemental Revolving Lender's Supplemental Revolving Credit Linked Account) of such Supplemental Revolving Lender during such monthly period (or portion thereof) if such interest were calculated at a rate per annum equal to (i) the Supplemental Revolving Eurodollar Rate plus (ii) a rate per annum equal to the Applicable Margin for Eurodollar Supplemental Revolving Loans (on the basis of the actual number of days elapsed over a year of 360 days).

(p) Subject to the terms and conditions and relying on the representations and warranties set forth herein, each Tranche A-1 Term Lender agrees, severally and not jointly, to make a Tranche A-1 Term Loan to the Company on the Fifth Amendment Effective Date in a principal amount not to exceed its Tranche A-1 Term Loan Commitment set forth opposite its name in Schedule II of the Fifth Amendment. Amounts paid or prepaid in respect of Tranche A-1 Term Loans may not be reborrowed. The Net Proceeds thereof, which will be $181,500,000, shall be applied on the Fifth Amendment Effective Date to the prepayment of Tranche A Term Loans and Tranche B Term Loans in accordance with the Fifth Amendment.

SECTION 2.02. Loans. (a) Each Loan shall be made as part of a Borrowing consisting of Loans made by the applicable Lenders ratably in accordance with their respective Commitments; provided, however, that the failure of any Lender to make any Loan shall not in itself relieve any other Lender of its obligation to lend hereunder (it being understood, however, that no Lender shall be responsible for the failure of any other Lender to make any Loan required to be made by such other Lender). The Loans comprising each ABR Borrowing or Eurodollar Borrowing shall be in an aggregate principal amount which is an integral multiple of $1,000,000 (or, in the case of Swingline Loans, $500,000 and not less than $5,000,000 (or, in the case of Swingline Loans, $500,000) (or in the case of an ABR Borrowing, an aggregate principal amount equal to the remaining balance of the Revolving Credit Commitments). The Loans comprising each Canadian Prime Rate Borrowing or Canadian B/A Borrowing shall be in an aggregate principal amount which is an integral multiple of C$1,000,000 and not less than C$5,000,000 (or an aggregate principal amount equal to the remaining balance of the Canadian Revolving Credit Commitments); provided that the aggregate amount of any Loans comprising a Canadian B/A Borrowing shall be subject to a minimum principal amount of C$5,000,000 and shall be an integral multiple of C$1,000,000.

(b) Each Borrowing shall be comprised of ABR Loans, or (except in the case of Swingline Loans) Eurodollar Loans, as the Company may request pursuant to Section 2.03. Each Canadian Revolving Credit Borrowing shall be comprised of (i) in the case of a $ Canadian Borrowing, ABR Loans, or Eurodollar Loans, or (ii) in the case of C$ Canadian Borrowing, Canadian Prime Rate Loans or Bankers' Acceptances, as the applicable Canadian Borrower may request pursuant to Section 2.03. Each Lender may at its option fulfill its Commitment with respect to any Eurodollar Loan by causing any domestic or foreign branch or Affiliate of such Lender to make such Loan; provided that any exercise of such option shall not affect the obligation of the applicable Borrower to repay such Loan in accordance with the terms of this Agreement and the applicable Note. Borrowings of more than one Type may be outstanding at the same time; provided, however, that (except in the case of Swingline Loans) a Borrower shall not be entitled to request any Borrowing which, if made, would result in an aggregate of more than 20 separate Eurodollar Borrowings or more than six separate Canadian B/A Borrowings being outstanding hereunder at any one time. For purposes of the foregoing, Loans having different Interest Periods, regardless of whether they commence on the same date, shall be considered separate Loans.

(c) (i) Subject to paragraph (d) below, each Lender shall make a Loan to the Company in the amount of its pro rata portion, as determined pursuant to Section 2.16, of each Borrowing hereunder on the proposed date thereof by wire transfer of immediately available funds to the Administrative Agent in New York, New York, not later than 11:00 a.m., New York City time. In the case of a Borrowing under the Supplemental Revolving Credit Facility, each Supplemental Revolving Lender hereby irrevocably authorizes the Administrative Agent to make available to the Company an amount on deposit in such Supplemental Revolving Lender's Credit Linked Account equal to such Supplemental Revolving Lender's Applicable Percentage of such Borrowing (it being understood that the funding obligations of each Supplemental Revolving Lender with respect to such Borrowing shall be required to be satisfied solely by having made such amount available in its Supplemental Revolving Credit Linked Account, and the Borrower shall have no other recourse against such Supplemental Revolving Lender with respect to the satisfaction of such funding obligations if such deposit has been made). The Administrative Agent shall credit the amounts so received to the general deposit account of the Company with the Administrative Agent or, if a Borrowing shall not occur on such date because any condition precedent herein specified shall not have been met, return the amounts so received to the respective Lenders (including, in the case of Supplemental Revolving Loans, by returning such amounts to the Supplemental Revolving Credit Linked Accounts). Unless the Administrative Agent shall have received notice from a Lender prior to the date of any Borrowing that such Lender will not make available to the Administrative Agent such Lender's portion of such Borrowing, the Administrative Agent may assume that such Lender has made such portion available to the Administrative Agent on the date of such Borrowing in accordance with this paragraph (c) and the Administrative Agent may, in reliance upon such assumption, make available to the Company on such date a corresponding amount. If and to the extent that such Lender shall not have made such portion available to the Administrative Agent, such Lender and the Company severally agree to repay to the Administrative Agent forthwith on demand such corresponding amount together with interest thereon, for each day from the date such amount is made available to the Company until the date such amount is repaid by either the Company or such Lender to the Administrative Agent at (i) in the case of the Company, the interest rate applicable at the time to the Loans comprising such Borrowing and (ii) in the case of such Lender, the Federal Funds Effective Rate. If such Lender shall repay to the Administrative Agent such corresponding amount together with the applicable interest thereon, such amount shall constitute such Lender's Loan as part of such Borrowing for purposes of this Agreement and the Company's obligations under the preceding sentence shall terminate. If the Company shall repay to the Administrative Agent such corresponding amount together with the applicable interest thereon, then such amount shall not constitute a Loan hereunder and the Company shall have no further obligations hereunder in respect thereof.

(ii) Subject to paragraph (d) below, each Canadian Lender shall make a Loan to the applicable Canadian Borrower in the amount of its Applicable Percentage of each Canadian Revolving Credit

Borrowing hereunder on the proposed date thereof by wire transfer of immediately available funds to the Canadian Administrative Agent in Toronto, Canada not later than 11:00 a.m., Toronto time, and the Canadian Administrative Agent shall credit the amounts so received to the general deposit account of the applicable Canadian Borrower or, if a Canadian Revolving Credit Borrowing shall not occur on such date because any condition precedent herein specified shall not have been met, return the amounts so received to the respective Canadian Lenders. Unless the Canadian Administrative Agent shall have received notice from a Canadian Lender prior to the date of any Canadian Revolving Credit Borrowing that such Canadian Lender will not make available to the Canadian Administrative Agent such Canadian Lender's portion of such Canadian Revolving Credit Borrowing, the Canadian Administrative Agent may assume that such Canadian Lender has made such portion available to the Canadian Administrative Agent on the date of such Canadian Revolving Credit Borrowing in accordance with this paragraph (c) and the Canadian Administrative Agent may, in reliance upon such assumption, make available to the applicable Canadian Borrower on such date a corresponding amount. If and to the extent that such Canadian Lender shall not have made such portion available to the Canadian Administrative Agent, such Canadian Lender and the applicable Canadian Borrower agree to repay to the Canadian Administrative Agent forthwith on demand such corresponding amount together with interest thereon, for each day from the date such amount is made available to the applicable Canadian Borrower until the date such amount is repaid by the applicable Canadian Borrower or such Canadian Lender to the Canadian Administrative Agent at (i) in the case of the Canadian Borrowers, the interest rate applicable at the time to the Loans comprising such Canadian Revolving Credit Borrowing and (ii) in the case of such Canadian Lender, such rate determined by the Canadian Administrative Agent as the rate then in effect for dealings among Canadian banks. If such Canadian Lender shall repay to the Canadian Administrative Agent such corresponding amount together with the applicable interest thereon, such amount shall constitute such Canadian Lender's Loan as part of such Canadian Revolving Credit Borrowing for purposes of this Agreement and the applicable Canadian Borrower's obligations under the preceding sentence shall terminate. If the applicable Canadian Borrower shall repay to the Canadian Administrative Agent such corresponding amount together with the applicable interest thereon, then such amount shall not constitute a Loan hereunder and the Canadian Borrowers shall have no further obligations hereunder in respect thereof. Notwithstanding the foregoing, Canadian B/A Borrowings shall be made in accordance with the provisions of Section 2.26.

(d) Notwithstanding any other provision of this Agreement, (x) the Company shall not be entitled to request any Revolving Credit Borrowing if the Interest Period requested with respect thereto would end after the Revolving Credit Maturity Date and (y) neither Canadian Borrower shall be entitled to request any Canadian Revolving Credit Borrowing if the Interest Period or Contract Period requested with respect thereto would end after the Canadian Revolving Credit Maturity Date.

(e) Each Borrower may refinance all or any part of any Revolving Credit Borrowing, Supplemental Revolving Credit Borrowing or Canadian Revolving Credit Borrowing with a Revolving Credit Borrowing, Supplemental Revolving Credit Borrowing or Canadian Revolving Credit Borrowing, as the case may be, of the same or a different Type, subject to the conditions and limitations set forth in this Agreement. Any Revolving Credit Borrowing, Supplemental Revolving Credit Borrowing or Canadian Revolving Credit Borrowing or part thereof so refinanced shall be deemed to be repaid or prepaid in accordance with Section 2.04 or 2.12, as applicable, with the proceeds of a new Revolving Credit Borrowing, Supplemental Revolving Credit Borrowing or Canadian Revolving Credit Borrowing, as the case may be, and the proceeds of the new Revolving Credit Borrowing, Supplemental Revolving Credit Borrowing or Canadian Revolving Credit Borrowing, to the extent they do not exceed the principal amount of the Revolving Credit Borrowing, Supplemental Revolving Credit Borrowing or Canadian Revolving Credit Borrowing, as the case may be, being refinanced, shall not be paid by the applicable Lenders or Canadian Lenders, as the case may be, to the Applicable Agent, or by the Applicable Agent to the Company or the applicable Canadian Borrower, as the case may be, pursuant to paragraph (c) above.

(f) If the Applicable Agent has not received from the Company or the applicable Canadian Borrower, as the case may be, the payment required by Section 2.22(a) by 12:00 noon, New York City time, on the date on which an Issuing Bank has notified the Company or the applicable Canadian Borrower, as the case may be, and the Applicable Agent that payment of a draft presented under any Letter of Credit will be made (or such later time permitted by Section 2.22(a)), as provided in Section 2.22, the Applicable Agent will promptly notify such Issuing Bank and each Revolving Lender, Supplemental Revolving Lender or Canadian Revolving Lender, as the case may be, of the Letter of Credit Disbursement and, in the case of each such Lender, its Applicable Percentage of such Letter of Credit Disbursement. Each Revolving Lender, Supplemental Revolving Lender or Canadian Revolving Lender, as the case may be (other than the applicable Issuing Bank), will pay to the Applicable Agent, not later than 2:00 p.m., New York City time, on such date (or, if payment by the applicable Borrower is not required until after 11:00 a.m., New York City time, on such date, by 10:00 a.m. on the immediately following Business Day) such Lender's Applicable Percentage of such Letter of Credit Disbursement, which the Applicable Agent will promptly pay to such Issuing Bank. Each Supplemental Revolving Credit Lender irrevocably authorizes the Administrative Agent to make available to such Issuing Bank upon demand such Supplemental Revolving Lender's Applicable Percentage of such Letter of Credit Disbursement by withdrawing such amount from such Supplemental Revolving Lender's Supplemental Revolving Credit Linked Deposit Account (whether or not the conditions to borrowing set forth in Section 4.02 are satisfied). The Applicable Agent will promptly remit to each Revolving Lender, Supplemental Revolving Lender or Canadian Revolving Lender, as the case be, its Applicable Percentage of any amounts subsequently received by the Applicable Agent from the Company or the applicable Canadian Borrower, as the case may be, in respect of such Letter of Credit Disbursement. Such remittance to the Supplemental Revolving Lenders shall be deposited by the Administrative Agent into their Supplemental Revolving Credit Linked Accounts.

SECTION 2.03. Notice of Borrowings. (a) The Company shall give the Administrative Agent written notice (or telephone notice promptly confirmed in writing) (a) in the case of a Eurodollar Borrowing not later than 12:00 noon, New York City time, three Business Days before a proposed borrowing and (b) in the case of an ABR Borrowing, not later than 12:00 noon, New York City time, one Business Day before a proposed borrowing. Such notice shall be irrevocable and shall in each case refer to this Agreement and specify (i) whether such Borrowing will be of Term Loans, Revolving Loans, Supplemental Revolving Loan, Eurodollar Supplemental Revolving Loans, ABR Supplemental Revolving Loans or a combination thereof, (ii) the date of such Borrowing (which shall be a Business Day) and the amount of Term Loans, Revolving Loans and/or Supplemental Revolving Loans requested; and (iii) if such Borrowing is to be a Eurodollar Borrowing, the Interest Period with respect thereto. If no election as to the Type of Borrowing is specified in any such notice, then the requested Borrowing shall be an ABR Borrowing. If no Interest Period with respect to any Eurodollar Borrowing is specified in any such notice, then the Company shall be deemed to have selected an Interest Period of one month's duration. The Loans to be made on the Closing Date shall initially be ABR Loans and unless, in its sole discretion, the Administrative Agent shall otherwise agree, no such Loan may be converted into a Eurodollar Loan having an interest period in excess of one month prior to the date that is 60 days after the Closing Date. The Loans to be made on the Fifth Amendment Effective Date shall initially be ABR Loans and unless, in its sole discretion, the Administrative Agent shall otherwise agree, no such Loan may be converted into a Eurodollar Loan having an interest period in excess of one month prior to the date that is 5 Business Days after the Fifth Amendment Effective Date. If the Company shall not have given notice in accordance with this Section 2.03 of its election to refinance a Revolving Credit Borrowing prior to the end of the Interest Period in effect for such Borrowing, then the Company shall (unless such Borrowing is repaid at the end of such Interest Period) be deemed to have given notice of an election to refinance such Borrowing with an ABR Borrowing. The Administrative Agent shall promptly advise the applicable Lenders of any notice given pursuant to this Section 2.03 and of each Lender's portion of the requested Borrowing.

(b) The applicable Canadian Borrower shall give the Canadian Administrative Agent written notice (or telephone notice promptly confirmed in writing) (a) in the case of a Eurodollar Borrowing or a Canadian B/A Borrowing, not later than 12:00 noon, Toronto time, three Business Days before a proposed borrowing and (b) in the case of an ABR Borrowing or a Canadian Prime Rate Borrowing, not later than 12:00 noon, Toronto time, one Business Day before a proposed borrowing. Such notice shall be irrevocable and shall in each case refer to this Agreement and specify (i) the date of such Borrowing (which shall be a Business Day) and the amount thereof; (ii) whether such Borrowing shall be a $ Canadian Borrowing or a C$ Canadian Borrowing; (iii) if such Borrowing is to be a Eurodollar Borrowing, the Interest Period with respect thereto; and (iv) if such Borrowing is to be a Canadian B/A Borrowing, the Contract Period therefor. If no election as to the Type of Borrowing is specified in any such notice, then the requested Borrowing shall be an ABR Borrowing or a Canadian Prime Rate Borrowing, as the case may be. If no Interest Period with respect to any Eurodollar Borrowing is specified in any such notice, then the applicable Canadian Borrower shall be deemed to have selected an Interest Period of one month's duration. If no Contract Period with respect to any Canadian B/A Borrowing is specified in any such notice, then the applicable Canadian Borrower shall be deemed to have selected a Contract Period of thirty days' duration. If the applicable Canadian Borrower shall not have given notice in accordance with this Section 2.03 of its election to refinance a Canadian Revolving Credit Borrowing in dollars prior to the end of the Interest Period in effect for such Borrowing, then the applicable Canadian Borrower shall (unless such Borrowing is repaid at the end of such Interest Period) be deemed to have given notice of an election to refinance such Borrowing with an ABR Borrowing. The Canadian Administrative Agent shall promptly advise the Canadian Lenders of any notice given pursuant to this Section 2.03 and of each Canadian Lender's portion of the requested Borrowing.

SECTION 2.04. Notes; Repayment of Loans. (a) The Company hereby unconditionally promises to pay to the Administrative Agent for the account of each Lender (i) the then unpaid principal amount of each Revolving Loans, Supplemental Revolving Loan and Swingline Loan of such Lender on the Revolving Credit Maturity Date (or such earlier date on which the Revolving Loans, Supplemental Revolving Loans, Additional Revolving Loans and Swing Line Loans become due and payable pursuant to Article VII), (ii) the principal amount of the Tranche A Term Loan of such Lender, in consecutive quarterly installments, respectively, payable each March 31, June 30, September 30 and December 31 in accordance with Section 2.11 (or the then unpaid principal amount of such Tranche A Term Loan, on the date that such Tranche A Term Loan becomes due and payable pursuant to Article VII), (iii) the then unpaid principal amount of the Tranche A-1 Term Loan of such Lender on the Tranche A-1 Term Loan Maturity Date (or on the date that such Tranche A-1 Term Loan becomes due and payable pursuant to Article VII) and (iv) the principal amount of the Tranche B Term Loan of such Lender, in consecutive quarterly installments, payable on each March 31, June 30, September 30 and December 31 in accordance with Section 2.11 (or the then unpaid principal amount of such Loan, on the date that such Tranche B Term Loan becomes due and payable pursuant to Article VII). Each Canadian Borrower hereby unconditionally promises to pay to the Canadian Administrative Agent for the account of each Canadian Lender (i) the then unpaid principal amount of each Canadian B/A Borrowing at the expiration of each Contract Period, if such Borrowing is not rolled over or converted pursuant to Section 2.26 (or the then unpaid principal amount of such B/A, on the date that such B/A becomes due and payable pursuant to Article VII) or (ii) the then unpaid principal amount of each Canadian Revolving Loan of such Lender on the Canadian Revolving Credit Maturity Date (or such earlier date on which the Canadian Revolving Loans become due and payable pursuant to Article VII). Each Borrower hereby further agrees to pay interest on the unpaid principal amount of the Loans made to it from time to time outstanding from the Closing Date or the Fifth Amendment Effective Date, as the case may be, until payment in full thereof at the rates per annum, and on the dates, set forth in Section 2.06.

(b) Each Lender shall maintain in accordance with its usual practice an account or accounts evidencing indebtedness of each Borrower to such Lender resulting from each Loan of such Lender from time to time, including the amounts of principal and interest payable and paid to such Lender from time to time under this Agreement.

(c) (1) The Administrative Agent shall maintain the Register pursuant to Section 9.04(d), and a subaccount therein for each Lender in which shall be recorded (i) the amount of each Revolving Loan, Supplemental Revolving Loan, Additional Revolving Loan, Swingline Loan, Tranche A Term Loan, Tranche A-1 Term Loan and Tranche B Term Loan made hereunder, the Type thereof and each Interest Period applicable thereto, (ii) the amount of any principal or interest due and payable or to become due and payable from the Company to each Lender hereunder and (iii) both the amount of any sum received by the Administrative Agent hereunder from the Company and each Lender's share thereof.

(2) The Canadian Administrative Agent shall maintain the Register pursuant to Section 9.04(d), and a subaccount therein for each Canadian Lender in which shall be recorded (i) the amount of each Canadian Revolving Loan made hereunder, the Type thereof and each Interest Period or Contract Period applicable thereto, (ii) the amount of any principal or interest due and payable or to become due and payable from the applicable Canadian Borrower to each Canadian Lender hereunder, (iii) the face amount of all B/As accepted by the Canadian Lenders and (iv) both the amount of any sum received by the Canadian Administrative Agent hereunder from the applicable Canadian Borrower and each Canadian Lender's share thereof.

(d) The entries made in the Register and the accounts of each Lender maintained pursuant to Section 2.04(b) shall, to the extent permitted by applicable law, be prima facie evidence of the existence and amounts of the obligations of each Borrower therein recorded; provided, however, that the failure of any Lender or the Administrative Agent or the Canadian Administrative Agent to maintain the Register or any such account, or any error therein, shall not in any manner affect the obligation of any Borrower to repay (with applicable interest) the Loans made to such Borrower by such Lender in accordance with the terms of this Agreement.

(e) The Company agrees that, upon the request to the Administrative Agent by any Lender, the Company will execute and deliver to such Lender (i) a Revolving Credit Note, a Supplemental Revolving Credit Note or an Additional Revolving Credit Note, if applicable, with appropriate insertions as to date and principal amount, and/or (ii) a Tranche A Term Note with appropriate insertions as to date and principal amount, and/or (iii) a Tranche A-1 Term Note with appropriate insertions as to date and principal amount, and/or (iv) a Tranche B Term Note with appropriate insertions as to date and principal amount and/or (v) in the case of the Swingline Lender, a Swingline Note with appropriate insertions as to date and principal amount. Each Canadian Borrower agrees that, upon the request to the Canadian Administrative Agent by any Canadian Lender, such Canadian Borrower will execute and deliver to such Canadian Lender a Canadian Revolving Credit Note with appropriate insertions as to date and principal amount.

SECTION 2.05. Fees. (a) The Company agrees to pay to each Lender, through the Administrative Agent, on the last day of March, June, September and December in each year, and on the date on which the Revolving Credit Commitment and, if applicable, the Additional Revolving Credit Commitment of such Lender shall be terminated as provided herein, a commitment fee (a "U.S. Commitment Fee") of 1% (or, at any time when the Applicable Level is Level II or higher, 0.75%) per annum on the average daily unused amount of the Revolving Credit Commitment and the Additional Revolving Credit Commitment of such Lender during the preceding quarter (or shorter period ending with the Revolving Credit Maturity Date or the date on which the Revolving Credit Commitment or, if applicable, the Additional Revolving Credit Commitment of such Lender shall be terminated). The Canadian Borrowers agree to pay to each Canadian Revolving Lender, through the Canadian Administrative Agent, on the last day of March, June, September and December in each year, and on the date on which the Canadian Revolving Credit Commitment of such Lender shall be terminated as provided herein, a commitment fee in dollars (a "Canadian Commitment Fee" and, together with the U.S. Commitment Fee, the "Commitment Fees") of 1% (or, at any time when the Applicable Level is Level II or higher, 0.75%) per annum on the average daily unused amount of the Canadian Revolving Credit Commitment of such Lender during the preceding quarter (or shorter period

ending with the Canadian Revolving Credit Maturity Date or the date on which the Canadian Revolving Credit Commitment of such Lender shall be terminated). For purposes of calculating any Lender's Commitment Fees, the outstanding Swingline Loans during the period for which such Lender's Commitment Fees is calculated shall be deemed to be zero. The Commitment Fees due to each Lender shall cease to accrue on the date on which the Commitments of such Lender shall be terminated as provided herein. All Commitment Fees shall be computed on the basis of the actual number of days elapsed in a year of 365 or 366 days.

(b) The Company agrees to pay to the Administrative Agent, for its own account, at the times previously agreed, the fees (the "Agency Fees") in the amounts previously agreed to be payable to the Administrative Agent for its own account. The Canadian Borrowers agree to pay to the Canadian Administrative Agent, for its own account, at the times previously agreed the fees in the amounts previously agreed to be payable to the Canadian Administrative Agent for its own account.

(c) Each Borrower agrees to pay to each Issuing Bank, for its own account, a fronting fee for each Letter of Credit issued by such Issuing Bank for the account of such Borrower, in the amount agreed upon between such Borrower and such Issuing Bank, payable as agreed to by such Borrower and such Issuing Bank for such Letter of Credit, and negotiation, amendment, issuing, payment and other customary fees (collectively, the "Fronting Fees") in the amounts separately agreed to by such Issuing Bank and the applicable Borrower.

(d) All Fees shall be paid on the dates due, in immediately available funds, to the Applicable Agent for distribution, if and as appropriate, among the Lenders or to the applicable Issuing Banks, as the case may be. Once paid, none of the Fees shall be refundable under any circumstances.

SECTION 2.06. Interest on Loans. (a) Subject to the provisions of Section 2.07, the Loans comprising each ABR Borrowing and Swingline Loans shall bear interest (computed on the basis of the actual number of days elapsed over a year of 365 or 366 days, as the case may be, when determined by reference to the Prime Rate and over a year of 360 days at all other times) at a rate per annum equal to the Alternate Base Rate plus the Applicable Margin.

(b) Subject to the provisions of Section 2.07, the Loans comprising each Eurodollar Borrowing shall bear interest (computed on the basis of the actual number of days elapsed over a year of 360 days) at a rate per annum equal to the Adjusted LIBO Rate for the Interest Period in effect for such Borrowing plus the Applicable Margin.

(c) Subject to the provisions of Section 2.07, (i) each C$ Prime Rate Loan shall bear interest at a rate per annum equal to the C$ Prime Rate plus the Applicable Margin and (ii) each B/A shall be subject to an Acceptance Fee payable as set forth in Section 2.26.

(d) Interest on each Loan shall be payable on the Interest Payment Dates applicable to such Loan and as otherwise provided in this Agreement. The applicable Alternate Base Rate and Adjusted LIBO Rate for each Interest Period or day within an Interest Period, as the case may be, shall be determined by the Administrative Agent, and the applicable C$ Prime Rate for each Interest Period or day within an Interest Period, as the case may be, shall be determined by the Canadian Administrative Agent, and such determinations shall be conclusive absent manifest error.

(e) Except as provided herein, interest and fees hereunder shall accrue and be calculated on a daily basis on the basis of a 360-day year for actual days elapsed, except that interest calculated on the basis of the Prime Rate or the C$ Prime Rate shall be calculated on the basis of a 365-day (or 366-day, as the case may be) year for actual days elapsed. For purposes of the Interest Act (Canada) (i) whenever any interest or

fee under this Agreement with respect to credit extended thereunder, is calculated using a rate based on a year of 360 days, such rate determined pursuant to such calculation, when expressed as an annual rate, is equivalent to
(x) the applicable rate based on a year of 360 days multiplied by (y) the actual number of days in the calendar year in which the period for which such interest or fee is payable (or compounded) ends, and (z) divided by 360 and (ii) the principle of deemed reinvestment of interest does not apply to any such interest calculation under this Agreement, and (iii) the rates of interest stipulated in this Agreement are intended to be nominal rates and not effective rates or yields.

SECTION 2.07. Default Interest. If any Borrower shall default in the payment of the principal of or interest on any Loan or any other amount becoming due hereunder, by acceleration or otherwise, such Borrower shall on demand from time to time pay interest, to the extent permitted by law, on such defaulted amount up to (but not including) the date of actual payment (after as well as before judgment) at a rate per annum equal to the Alternate Base Rate or the C$ Prime Rate, as the case may be, plus the Applicable Margin plus 2% per annum.

SECTION 2.08. Alternate Rate of Interest. In the event, and on each occasion, that on the day two Business Days prior to the commencement of any Interest Period for a Eurodollar Borrowing or any Interest Period used to determine the Supplemental Revolving Eurodollar Rate or prior to the determination of a Benchmark LIBO Rate or any day the Administrative Agent shall have determined that dollar deposits in the principal amounts of the Loans comprising such Borrowing are not generally available in the interbank eurodollar market, or that the rates at which such dollar deposits are being offered will not adequately and fairly reflect the cost to any Lender of making or maintaining its Eurodollar Loan during such Interest Period, the Supplemental Revolving Eurodollar Rate for such Interest Period, the Benchmark LIBO Rate for such day or the Supplemental Revolving LIBO Rate for such day, or that reasonable means do not exist for ascertaining the Adjusted LIBO Rate or the Benchmark LIBO Rate, the Administrative Agent shall, as soon as practicable thereafter, give written or telex or telecopy notice of such determination to the Company and the applicable Lenders. In the event of any such determination,
(x) any request by a Borrower for a Eurodollar Borrowing pursuant to Section 2.03 or 2.10 shall, until the Administrative Agent shall have advised the Company and the applicable Lenders that the circumstances giving rise to such notice no longer exist, be deemed to be a request for an ABR Borrowing and (y) the Supplemental Revolving Eurodollar Rate shall be equal to a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation. Each determination by the Administrative Agent hereunder shall be conclusive absent manifest error.

SECTION 2.09. Termination and Reduction of Commitments and Total Supplemental Revolving Credit Linked Deposit Amount. (a) The Revolving Credit Commitments and the Additional Revolving Credit Commitments shall be automatically terminated on the Canadian Revolving Credit Maturity Date. The Canadian Revolving Credit Commitments shall be automatically terminated on the Canadian Revolving Credit Maturity Date. The Letter of Credit Commitment shall be automatically terminated at 5:00 p.m., New York City time, on the date that is five Business Days prior to the Revolving Credit Maturity Date. No Letters of Credit may be issued under the Canadian Revolving Credit Commitments after the Canadian Revolving Credit Maturity Date.

(b) Upon at least three Business Days' prior irrevocable written notice to the Applicable Agent, the Company or a Canadian Borrower, as the case may be, may at any time in whole permanently terminate, or from time to time in part permanently reduce, the Revolving Credit Commitments, the Additional Revolving Credit Commitments or the Canadian Revolving Credit Commitments; provided, however, that (i) each partial reduction of the Revolving Credit Commitments, the Additional Revolving Credit Commitments or the Canadian Revolving Credit Commitments shall be in an integral multiple of $1,000,000 and in a minimum principal amount of $5,000,000, (ii) the Revolving Credit Commitments shall not be reduced to an amount which is less than the Company Letter of Credit Exposure and the outstanding

Swingline Loans and Revolving Loans at such time, (iii) the Additional Revolving Credit Commitments shall not be reduced to an amount which is less than the outstanding Additional Revolving Loans at such time and (iv) the Canadian Revolving Credit Commitments shall not be reduced to an amount which is less than the Canadian Borrower Letter of Credit Exposure and the Dollar Equivalent Amount of Canadian Revolving Loans.

(c) To the extent that the program size or committed amount of the Receivables Facility exceeds $250,000,000 at any time, then the Revolving Credit Commitments and Additional Revolving Credit Commitments shall be automatically and permanently reduced by the amount of such excess.

(d) Each reduction in the Revolving Credit Commitments, the Additional Revolving Credit Commitments or the Canadian Revolving Credit Commitments, as the case may be, hereunder shall be made ratably among the applicable Lenders in accordance with their respective applicable Revolving Credit Commitments, Additional Revolving Credit Commitments or Canadian Revolving Credit Commitments. The applicable Borrowers shall pay to the Applicable Agent for the account of the applicable Lenders, on the date of each termination or reduction, the Commitment Fees on the amount of the Commitments so terminated or reduced accrued through the date of such termination or reduction.

(e) The Borrower may at any time or from time to time direct the Administrative Agent to permanently reduce the Total Supplemental Revolving Credit Linked Deposit Amount; provided that each partial reduction of the Total Supplemental Revolving Credit Linked Deposit Amount shall be in an amount that is an integral multiple of $1,000,000 and not less than $5,000,000; provided, further, that no such reduction shall be permitted if, after giving effect to such reduction, the aggregate Supplemental Revolving Loans and Supplemental Revolving Letter of Credit Exposure would exceed the Total Supplemental Revolving Credit Linked Deposit Amount as so reduced. In the event the Total Supplemental Revolving Credit Linked Deposit Amount shall be reduced as provided in the preceding sentence, the Administrative Agent will return all amounts in the Supplemental Revolving Credit Linked Accounts in excess of the reduced Total Supplemental Revolving Credit Linked Deposit Amount to the Supplemental Revolving Lenders, ratably in accordance with their Applicable Percentages.

SECTION 2.10. Conversion and Continuation of Term Loans. Each applicable Borrower shall have the right at any time upon prior irrevocable notice to the Applicable Agent (i) not later than 12:00 (noon), New York City time, one Business Day prior to conversion, to convert any Eurodollar Tranche A Term Borrowing into an ABR Tranche A Term Borrowing, to convert any Eurodollar Tranche A-1 Term Borrowing into an ABR Tranche A-1 Term Borrowing or to convert any Eurodollar Tranche B Term Borrowing into an ABR Tranche B Term Borrowing, (ii) not later than 10:00 a.m., New York City time, three Business Days prior to conversion or continuation, to convert any ABR Tranche A Term Borrowing into a Eurodollar Tranche A Term Borrowing, to convert any ABR Tranche A-1 Term Borrowing into a Eurodollar Tranche A-1 Term Borrowing or to convert any ABR Tranche B Term Borrowing into a Eurodollar Tranche B Term Borrowing, as applicable, for an additional Interest Period and (iii) not later than 10:00
a.m., New York City time, three Business Days prior to conversion, to convert the Interest Period with respect to any Eurodollar Tranche A Term Borrowing, Eurodollar Tranche A-1 Term Borrowing or Eurodollar Tranche B Term Borrowing to another permissible Interest Period, subject to the following conditions:

(a) each conversion or continuation shall be made pro rata among the applicable Lenders in accordance with the respective principal amounts of the Loans comprising the converted or continued Borrowing;

(b) if less than all the outstanding principal amount of any Borrowing shall be converted or continued, the aggregate principal amount of such Borrowing converted or continued shall be not

less than $1,000,000; provided that the aggregate principal amount of each Eurodollar Borrowing resulting from any such conversion or continuation shall not be less than $1,000,000;

(c) each conversion shall be effected by each applicable Lender by such Lender converting its applicable Loan (or portion thereof), and accrued interest on a Loan (or portion thereof) being converted shall be paid by the applicable Borrower at the time of conversion;

(d) if any Eurodollar Borrowing is converted at a time other than the end of the Interest Period applicable thereto, the applicable Borrower shall pay, upon demand, any amounts due to the applicable Lenders pursuant to Section 2.15;

(e) any portion of a Borrowing maturing or required to be repaid in less than one month may not be converted into or continued as a Eurodollar Borrowing;

(f) any portion of a Eurodollar Borrowing which cannot be converted into or continued as a Eurodollar Borrowing by reason of clause (e) above shall be automatically converted at the end of the Interest Period in effect for such Borrowing into an ABR Borrowing;

(g) no Interest Period may be selected for any Eurodollar Borrowing that would end later than a Tranche A Term Loan Repayment Date or Tranche B Term Loan Repayment Date, as applicable, occurring on or after the first day of such Interest Period if, after giving effect to such selection, the aggregate outstanding amount of (i) the Eurodollar Tranche A Term Borrowings, or the Eurodollar Tranche B Term Borrowings, as the case may be, with Interest Periods ending on or prior to such Tranche A Term Loan Repayment Date or Tranche B Term Loan Repayment Date and (ii) the ABR Tranche A Term Borrowings or ABR Tranche B Term Borrowings as the case may be, would not be at least equal to the principal amount of Tranche A Term Borrowings or Tranche B Term Borrowings, to be paid on such Tranche A Term Loan Repayment Date or Tranche B Term Loan Repayment Date;

(h) no Interest Period may be selected for any Eurodollar Borrowing that would end later than the Tranche A-1 Term Loan Maturity Date; and

(i) a Borrowing may not be converted into or continued as a Eurodollar Borrowing if a Default or an Event of Default has occurred and is continuing and the Required Lenders have determined such conversion or continuation is not appropriate.

Each notice pursuant to this Section 2.10 shall be irrevocable and shall refer to this Agreement and specify (i) the identity and amount of the Borrowing that the applicable Borrower requests be converted or continued, (ii) whether such Borrowing is to be converted to or continued as a Eurodollar Borrowing or an ABR Borrowing, (iii) if such notice requests a conversion, the date of such conversion (which shall be a Business Day) and (iv) if such Borrowing is to be converted to or continued as a Eurodollar Borrowing, the Interest Period with respect thereto. If no Interest Period is specified in any such notice with respect to any conversion to or continuation as a Eurodollar Borrowing, the applicable Borrower shall be deemed to have selected an Interest Period of one month's duration. The Applicable Agent shall promptly advise the other Lenders of any notice given pursuant to this Section 2.10 and of each Lender's portion of any converted or continued Borrowing. If the Applicable Borrower shall not have given notice in accordance with this Section 2.10 to continue any Borrowing into a subsequent Interest Period (and shall not otherwise have given notice in accordance with this Section 2.10 to convert such Borrowing), such Borrowing shall, at the end of the Interest Period applicable thereto (unless repaid pursuant to the terms hereof), automatically be continued into a new Interest Period as an ABR Borrowing.

SECTION 2.11. Repayment of Tranche A Term, Tranche A-1 Term and Tranche B Term Borrowings. (a) The Tranche A Term Borrowings shall be payable as to principal in such number of consecutive installments, payable on such dates (each a "Tranche A Term Loan Repayment Date") and in such amounts as set forth on Schedule 2.11.

(b) The Tranche B Term Borrowings shall be payable as to principal in such number of consecutive installments, payable on such dates (each a "Tranche B Loan Repayment Date") and in such amounts as set forth on Schedule 2.11.

(c) The Tranche A-1 Term Borrowings shall be payable as to principal in one installment, payable on the Tranche A-1 Term Loan Maturity Date.

(d) To the extent not previously paid, all Tranche A Term Borrowings shall be due and payable on the Tranche A Term Loan Maturity Date, all Tranche A-1 Term Borrowings shall be due and payable on the Tranche A-1 Term Loan Maturity Date and all Tranche B Term Borrowings shall be due and payable on the Tranche B Term Loan Maturity Date. Each payment of Eurodollar Tranche A Term Borrowings, Eurodollar Tranche A-1 Term Borrowings or Eurodollar Tranche B Term Borrowings repaid pursuant to this Section 2.11 shall be accompanied by accrued interest on the principal amount paid to but excluding the date of payment.

SECTION 2.12. Prepayment. (a) Each Borrower shall have the right at any time and from time to time to prepay any Borrowing (other than a Canadian B/A Borrowing), in whole or in part, upon, in the case of Eurodollar Borrowings, at least three Business Days', and in the case of ABR Borrowings and C$ Prime Rate Borrowings, at least one Business Day's, prior written notice (or telephone notice promptly confirmed by written notice) to the Administrative Agent or the Canadian Administrative Agent, as the case may be; provided, however, that each partial prepayment (other than of a Swingline Loan) of ABR Loans and of Eurodollar Loans shall be in a minimum principal amount of $5,000,000 or an integral multiple of $1,000,000 in excess thereof, each partial prepayment of C$ Prime Rate Loans shall be in a minimum principal amount of C$5,000,000 or an integral multiple of C$1,000,000 in excess thereof. Each prepayment of principal of the Term Loans pursuant to this Section 2.12(a) shall be allocated ratably among the Tranche A Term Loans, the Tranche A-1 Term Loans and the Tranche B Term Loans and shall be made in accordance with Section 2.12(i) below.

(b) On the date of any termination or reduction of the Revolving Credit Commitments pursuant to Section 2.09, the Company shall pay or prepay so much of, first, the Swingline Loans and, second, the Revolving Credit Borrowings, as shall be necessary in order that the aggregate principal amount of the Revolving Loans and Swingline Loans outstanding will not exceed the excess, if any, of (i) the aggregate Revolving Credit Commitments after giving effect to such termination or reduction over (ii) the Company Letter of Credit Exposure.

(c) On the date of any termination or reduction of the Canadian Revolving Credit Commitments pursuant to Section 2.09, the Canadian Borrowers shall pay or prepay so much of the Canadian Revolving Credit Borrowings as shall be necessary in order that the aggregate principal amount of the Canadian Revolving Loans outstanding will not exceed the excess, if any, of
(i) the aggregate Canadian Revolving Credit Commitments after giving effect to such termination or reduction over (ii) the Canadian Borrower Letter of Credit Exposure.

(d) On the date of any termination or reduction of the Additional Revolving Credit Commitments pursuant to Section 2.09 or Section 2.27, the Company shall pay or prepay so much of the Additional Revolving Credit Loans as shall be necessary in order that the aggregate principal amount of the

Additional Revolving Loans outstanding will not exceed the aggregate Additional Revolving Credit Commitments after giving effect to such termination or reduction.

(e) The Company shall prepay the Borrowings at the times and in the amounts required pursuant to Sections 2.12(g) and 2.12(h).

(f) Each Borrower's prepayment obligations under any paragraph of this Section 2.12 shall be in addition to, and shall not be discharged by the performance of, its obligations under any other such paragraph. Each notice of prepayment shall specify the prepayment date and the principal amount of each Borrowing (or portion thereof) to be prepaid, shall be irrevocable and shall commit the applicable Borrower to prepay such Borrowing by the amount stated therein on the date stated therein. All prepayments under this Section 2.12 shall be subject to Section 2.15 but otherwise without premium or penalty (other than as set forth in Section 2.12(m)). All prepayments under this Section 2.12 shall be accompanied by accrued interest on the principal amount being prepaid to the date of payment.

(g) (i) In the event and on each occasion that a Prepayment Event occurs, subject to Sections 6.08(h) and (j), the Company and any other applicable Borrower shall apply an amount equal to 100% of the Net Proceeds therefrom to prepay the Term Loans (allocated ratably among the Tranche A Term Loans, the Tranche A-1 Term Loans and the Tranche B Term Loans) in accordance with Section 2.12(i) below. Substantially simultaneously with (and in any event not later than the Business Day next following) the occurrence of a Prepayment Event, the applicable Borrower shall pay to the Applicable Agent (for application to the prepayment of Loans in accordance with this Section 2.12(g)(i)) an amount equal to 100% of the Net Proceeds from such Prepayment Event.

(ii) Upon the issuance of any Senior Unsecured Notes or Permitted Additional Senior Unsecured Notes in excess of an aggregate principal amount of $500,000,000, the Company and any other applicable Borrower shall apply an amount equal to 100% of the Net Proceeds therefrom to prepay the Tranche A Term Loans and the Tranche A-1 Term Loans in accordance with Section 2.12(i) below and to make an offer to prepay the Tranche B Term Loans at par in accordance with Section 2.12(k) below (allocated ratably among the Tranche A Term Loans, the Tranche A-1 Term Loans and the Tranche B Term Loans). Substantially simultaneously with (and in any event not later than the Business Day next following) the occurrence of such issuance, the applicable Borrower shall pay to the Applicable Agent (for application to the prepayment of Loans in accordance with this Section 2.12(g)(ii)) an amount equal to 100% of the Net Proceeds from such issuance.

(h) Not later than 90 days after the end of each fiscal year of the Company, commencing with the fiscal year ending on or about December 31, 2002, the Company and any other applicable Borrower shall pay to the Applicable Agent (for application to the prepayment of the Term Loans (allocated ratably among the Tranche A Term Loans, the Tranche A-1 Term Loans and the Tranche B Term Loans) in accordance with Section 2.12(i) below) an amount equal to the Applicable Excess Cash Flow Prepayment Percentage (as of the last day for the fiscal year for which Excess Cash Flow is calculated) of the amount of the Excess Cash Flow for such fiscal year.

(i) Each prepayment of principal of the Tranche A Term Loans or the Tranche B Term Loans pursuant to this Section 2.12 shall be applied to reduce scheduled payments of principal of the applicable Loans due under paragraph (a) or (b), as applicable, of Section 2.11 after the date of such prepayment pro rata in accordance with the remaining scheduled amount of each such payment; provided, however, that in the case of any prepayment of the Tranche A Term Loans and the Tranche B Term Loans pursuant to Section 2.12(h) or
Section 2.12(a), the principal amount of such prepayment shall be applied to reduce scheduled payments of principal due under Section 2.11 after the date of such prepayment in the chronological order of maturity. Each prepayment of principal of the Tranche A-1 Term Loans pursuant to

this Section 2.12 shall be applied to the then outstanding principal amount thereof. Notwithstanding anything in this Section 2.12 to the contrary, so long as any Tranche A Term Loans or Tranche A-1 Term Loans are outstanding, each prepayment with respect to the Tranche B Term Loans (other than any prepayment made pursuant to Section 2.12(a)) shall be applied in accordance with Section 2.12(k).

(j) In the event the amount of any prepayment required to be made above shall exceed the aggregate principal amount of the applicable outstanding ABR Loans (the amount of any such excess being called the "Excess Amount"), the Company and any other applicable Borrower shall have the right, in lieu of making such prepayment in full, to prepay all the outstanding applicable ABR Loans and to deposit an amount equal to the Excess Amount with the Collateral Agent in a cash collateral account maintained (pursuant to documentation satisfactory to the Administrative Agent) by and in the sole dominion and control of the Collateral Agent. Any amounts so deposited shall be held by the Collateral Agent as collateral for the Obligations and applied to the prepayment of the applicable Eurodollar Loans at the end of the current Interest Periods applicable thereto. On any Business Day on which (x) collected amounts remain on deposit in or to the credit of such cash collateral account after giving effect to the payments made on such day pursuant to this Section 2.12(j) and (y) the Company shall have delivered to the Collateral Agent a written request or a telephonic request (which shall be promptly confirmed in writing) that such remaining collected amounts be invested in the Permitted Investments specified in such request, the Collateral Agent shall use its reasonable efforts to invest such remaining collected amounts in such Permitted Investments; provided, however, that the Collateral Agent shall have continuous dominion and full control over any such investments (and over any interest that accrues thereon) to the same extent that it has dominion and control over such cash collateral account and no Permitted Investment shall mature after the end of the Interest Period for which it is to be applied. The Company and any other applicable Borrower shall not have the right to withdraw any amount from such cash collateral account until the applicable Eurodollar Loans and accrued interest thereon are paid in full or if a Default or Event of Default then exists or would result.

(k) The Company shall at least three Business Days prior to any expected prepayment (or offer of prepayment) pursuant to Section 2.12(g) or (h), as the case may be, notify the Applicable Agent of such prepayment (or offer of prepayment) and the approximate amount and date thereof. Upon receipt of any such notice, the Applicable Agent shall promptly provide to each Tranche B Lender a notice (each, a "Prepayment Option Notice") (i) setting forth the amount of such prepayment (or offer of prepayment) to be applied to the Tranche B Term Loans (the "Tranche B Prepayment Amount"), the estimated portion thereof that the applicable Tranche B Lender will be entitled to receive if it accepts such prepayment (or offer of prepayment) on the prepayment date (each, a "Prepayment Date"), (ii) requesting such Tranche B Lender to notify the Applicable Agent in writing, no later than the Business Day preceding the Prepayment Date, of such Tranche B Lender's acceptance or rejection (in each case, in whole and not in part) of such prepayment (or offer of prepayment) and
(iii) informing such Tranche B Lender that failure by such Tranche B Lender to reject prepayment (or offer of prepayment) in writing on or before the Business Day prior to the Prepayment Date shall be deemed an acceptance of such prepayment (or offer of prepayment). On the Prepayment Date, the Applicable Agent shall apply that portion of the Tranche B Prepayment Amount in respect of which Tranche B Lenders have accepted or been deemed to have accepted prepayment (or offer of prepayment) to the prepayment of the Tranche B Term Loans in accordance with this Section 2.12(k). The remaining amount of the Tranche B Prepayment Amount after the payments described in the immediately preceding sentence shall be allocated ratably to the then-outstanding Tranche A Term Loans and Tranche A-1 Term Loans for prepayment in accordance with Section 2.12(i).

(l) If at any time the outstanding balance of the Canadian Revolving Loans exceeds 105% of the Canadian Revolving Credit Commitments as a result of the fluctuation of currency values, the Canadian Borrowers shall immediately repay the aggregate outstanding Canadian Revolving Loans to the extent required to eliminate such excess. If any such excess remains after repayment in full of the aggregate outstanding Canadian Revolving Loans, the Canadian Borrowers shall provide cash collateral for the

Canadian Borrower Letter of Credit Exposure and Canadian B/A Borrowings in the manner set forth in Sections 2.24 and 2.26, as applicable, to the extent required to eliminate such excess.

(m) Each prepayment (whether mandatory, optional or otherwise) (other than any optional prepayment made from (a) the proceeds of any issuance of shares of Holdings' capital stock or (b) that portion of Excess Cash Flow not subject to a mandatory prepayment pursuant to Section 2.12(h)) of the Tranche B Term Loans of any Lender during any period set forth below shall be accompanied by payment of a prepayment premium on the amount prepaid (unless receipt of such prepayment premium is waived by such Lender):

| Period | Premium |
| ------ | ------- |
| Closing Date to and including first anniversary of Closing Date | 3% |
| Thereafter to and including second anniversary of Closing Date | 2% |
| Thereafter to and including third anniversary of Closing Date | 1% |

Notwithstanding the foregoing, a prepayment premium shall not be required to be paid on any prepayment made pursuant to any offer to prepay the Tranche B Term Loans made pursuant to Section 2.12(g)(ii).

SECTION 2.13. Reserve Requirements; Change in Circumstances.

(a) Notwithstanding any other provision herein, if after the Closing Date any change in applicable law or regulation or in the interpretation or administration thereof by any governmental authority (including the National Association of Insurance Commissioners) charged with the interpretation or administration thereof (whether or not having the force of law) shall change the basis of taxation of payments to any Lender or any Issuing Bank in respect of any Letter of Credit or of the principal of or interest on any Eurodollar Loan made by such Lender or the return payable to any Supplemental Revolving Credit Lender pursuant to Section 2.01 or any Fees or other amounts payable hereunder (other than changes in respect of (i) taxes imposed on the overall net income of such Lender or such Issuing Bank by the jurisdiction in which such Lender or such Issuing Bank has its principal office or by any political subdivision or taxing authority therein and (ii) any Taxes described in Section 2.18), or shall impose, modify or deem applicable any reserve, special deposit or similar requirement against assets or deposits with or for the account of or credit extended by or deposits by or, in the case of the Letters of Credit, participated in by such Lender (except any such reserve requirement which is reflected in the Adjusted LIBO Rate) or such Issuing Bank or shall impose on such Lender or such Issuing Bank or the interbank eurodollar market any other condition affecting this Agreement, any Letter of Credit (or any participation with respect thereto), the Letter of Credit Exposure, the Letter of Credit Commitment, Eurodollar Loans made by such Lender or the Supplemental Revolving Credit Linked Deposit of such Lender, and the result of any of the foregoing shall be to increase the cost to such Lender or such Issuing Bank of making or maintaining the Letter of Credit Exposure, the Letter of Credit Commitment, any Eurodollar Loan (or, in the case of such Issuing Bank, of making any payment or maintaining the Letter of Credit Commitment) or any Supplemental Revolving Credit Linked Deposit or to reduce the amount of any sum received or receivable by such Lender or such Issuing Bank hereunder or under the Notes (whether of principal, interest or otherwise) by an amount deemed by such Lender or such Issuing Bank to be material, then the Company will pay to such Lender or such Issuing Bank upon demand such additional amount or amounts as will compensate such Lender or such Issuing Bank for such additional costs incurred or reduction suffered.

(b) If any Lender or Issuing Bank shall have determined that the adoption after the Closing Date of any law, rule, regulation, official directive or guideline (whether or not having the force of law) regarding capital adequacy, or any change after the Closing Date in any of the foregoing or in the interpretation or administration of any of the foregoing by any Governmental Authority, central bank or comparable agency charged with the interpretation or administration thereof, or compliance by any Lender (or any lending office of such Lender) or Issuing Bank or any Lender's or Issuing Bank's holding company with any request or directive regarding capital adequacy (whether or not having the force of law) made or issued after the date hereof by any such authority, central bank or comparable agency, has or would have the effect of reducing the rate of return on such Lender's or Issuing Bank's capital or on the capital of such Lender's or Issuing Bank's holding company, if any, as a consequence of this Agreement or its obligations pursuant hereto to a level below that which such Lender or Issuing Bank or such Lender's or Issuing Bank's holding company would have achieved but for such adoption, change or compliance (taking into consideration such Lender's or Issuing Bank's policies and the policies of such Lender's or Issuing Bank's holding company with respect to capital adequacy) by an amount deemed by such Lender or Issuing Bank to be material, then from time to time the applicable Borrower shall pay to such Lender or Issuing Bank such additional amount or amounts as will compensate such Lender or Issuing Bank or such Lender's or Issuing Bank's holding company for any such reduction suffered.

(c) A certificate of each Lender or Issuing Bank setting forth such amount or amounts as shall be necessary to compensate such Lender or Issuing Bank or its holding company as specified in paragraph (a) or (b) above, as the case may be, shall be delivered to the applicable Borrower through the Applicable Agent and shall be conclusive absent manifest error. The Company shall pay each Lender or Issuing Bank the amount shown as due on any such certificate delivered by it within 10 days after its receipt of the same.

(d) In the event any Lender or Issuing Bank delivers a notice pursuant to paragraph (e) below, the Company may require, at the Company's expense and subject to Section 2.15, such Lender or Issuing Bank to assign, at par plus accrued interest and fees, without recourse (in accordance with Section 9.04) all its interests, rights and obligations hereunder (including, in the case of a Lender, all of its Commitment and the Loans at the time owing to it and its Notes and participations in Letters of Credit held by it and its obligations to acquire such participations and, if applicable, its Supplemental Revolving Credit Linked Account) to a financial institution specified by the Company, provided that (i) such assignment shall not conflict with or violate any law, rule or regulation or order of any court or other Governmental Authority, (ii) the applicable Borrower shall have received the written consent of the Applicable Agent, which consent shall not unreasonably be withheld, to such assignment, (iii) the Company shall have paid to the assigning Lender or Issuing Bank all monies accrued and owing hereunder to it (including pursuant to this Section) and (iv) in the case of a required assignment by an Issuing Bank, all outstanding Letters of Credit issued by such Issuing Bank shall be canceled and returned to such Issuing Bank.

(e) Promptly after any Lender or Issuing Bank has determined, in its sole judgment, that it will make a request for increased compensation pursuant to this Section, such Lender or Issuing Bank will notify the applicable Borrower thereof. Failure on the part of any Lender or Issuing Bank so to notify the applicable Borrower or to demand compensation for any increased costs or reduction in amounts received or receivable or reduction in return on capital with respect to any period shall not constitute a waiver of such Lender's or Issuing Bank's right to demand compensation with respect to such period or any other period; provided that the applicable Borrower shall not be under any obligation to compensate any Lender or Issuing Bank under Section 2.13(b) with respect to increased costs or reductions with respect to any period prior to the date that is six months prior to such request if such Lender or the Issuing Bank knew or could reasonably have been expected to be aware of the circumstances giving rise to such increased costs or reductions and of the fact that such circumstances would in fact result in such increased costs or reduction; provided, further, that, the foregoing limitation shall not apply to any increased costs or reductions arising out of the retroactive

application of any law, regulation, rule, guideline or directive as aforesaid within such six month period. The protection of this Section shall be available to each Lender and Issuing Bank regardless of any possible contention of the invalidity or inapplicability of the law, rule, regulation, guideline or other change or condition which shall have occurred or been imposed.

SECTION 2.14. Change in Legality. (a) Notwithstanding any other provision herein, if the adoption of or any change in any law or regulation or in the interpretation thereof by any Governmental Authority charged with the administration or interpretation thereof shall make it unlawful for any Lender to make or maintain any Eurodollar Loan or make or maintain any Supplemental Revolving Credit Linked Deposit or to give effect to its obligations as contemplated hereby with respect to any Eurodollar Loan or Supplemental Revolving Credit Linked Deposit, then, by written notice to the applicable Borrower and to the Applicable Agent, such Lender may:

(i) declare that Eurodollar Loans will not thereafter be made by such Lender hereunder, whereupon any request by the applicable Borrower for a Eurodollar Borrowing shall, as to such Lender only, be deemed a request for an ABR Loan unless such declaration shall be subsequently withdrawn;

(ii) require that all outstanding Eurodollar Loans made by it be converted to ABR Loans in which event all such Eurodollar Loans shall be automatically converted to ABR Loans as of the effective date of such notice as provided in paragraph (b) below; and

(iii) in the case of Supplemental Revolving Credit Linked Deposits, require that its funding obligations with respect thereto be amended or converted in a manner directed by the Administrative Agent so as to comply with law.

In the event any Lender shall exercise its rights under (i) or (ii) above, all payments and prepayments of principal which would otherwise have been applied to repay the Eurodollar Loans that would have been made by such Lender or the converted Eurodollar Loans of such Lender shall instead be applied to repay the ABR Loans made by such Lender in lieu of, or resulting from the conversion of, such Eurodollar Loans.

(b) For purposes of this Section 2.14, a notice to a Borrower by any Lender shall be effective as to each Eurodollar Loan if lawful, on the last day of the Interest Period currently applicable to such Eurodollar Loan; in all other cases such notice shall be effective on the date of receipt by such Borrower.

SECTION 2.15. Indemnity. The Company and, if applicable, the Canadian Borrowers shall severally indemnify each Lender against any loss or expense (other than taxes) which such Lender may sustain or incur as a consequence of (a) any failure by any Borrower to fulfill on the date of any Borrowing or proposed Borrowing hereunder the applicable conditions set forth in Article IV, (b) any failure by any Borrower to borrow or to refinance, convert or continue any Loan hereunder after irrevocable notice of such Borrowing, refinancing, conversion or continuation has been given pursuant to Section 2.03 or 2.10, (c) any payment, prepayment or conversion of a Eurodollar Loan required by any other provision of this Agreement or otherwise made or deemed made on a date other than the last day of the Interest Period applicable thereto, (d) any default in payment or prepayment of the principal amount of any Loan or B/A or any part thereof or interest accrued thereon, as and when due and payable (at the due date thereof, whether by scheduled maturity, acceleration, irrevocable notice of prepayment or otherwise), (e) the return of all or any portion of a Supplemental Revolving Credit Linked Deposit to such Lender on a day other than the last day of an Interest Period for which the applicable Supplemental Revolving Eurodollar Rate has been established or (f) the occurrence of any Event of Default, including, in each such case, any loss or reasonable expense sustained or incurred or to be sustained or incurred in liquidating or employing deposits from third parties acquired to effect or maintain such Loan or any part thereof as a Eurodollar Loan or B/A, as the case may be. Such loss

60

or reasonable expense shall exclude loss of margin hereunder but shall include an amount equal to the excess, if any, as reasonably determined by such Lender, of (i) its cost of obtaining the funds for the Loan being paid, prepaid, converted or not borrowed, converted or continued (assumed to be the Adjusted LIBO Rate or Discount Rate applicable thereto) or the deposit being returned for the period from the date of such payment, prepayment, conversion, return or failure to borrow, convert or continue to the last day of the Interest Period or Contract Period for such Loan (or, in the case of a failure to borrow, convert or continue, the Interest Period or Contract Period for such Loan which would have commenced on the date of such failure) over (ii) the amount of interest (as reasonably determined by such Lender) that would be realized by such Lender in reemploying the funds so paid, prepaid, converted, returned or not borrowed, converted or continued for such period or Interest Period or Contract Period, as the case may be. A certificate of any Lender setting forth any amount or amounts which such Lender is entitled to receive pursuant to this Section (and the reasons therefor) shall be delivered to the applicable Borrower through the Applicable Agent and shall be conclusive absent manifest error.

SECTION 2.16. Pro Rata Treatment. Except as required under Sections 2.12, 2.14, 2.18, 2.26 and 2.27, each Borrowing, each payment or prepayment of principal of any Borrowing, each payment of interest on the Loans, each payment of the Commitment Fees or Letter of Credit Fees, each reduction of the Revolving Credit Commitments, the Additional Revolving Credit Commitments, the Canadian Revolving Credit Commitments and the Total Supplemental Revolving Credit Linked Deposit Amount, and each refinancing of any Borrowing with, conversion of any Borrowing to or continuation of any Borrowing as a Borrowing of any Type shall be allocated (except in the case of Swingline Loans) pro rata among the Lenders in accordance with their respective Revolving Credit Commitments, Additional Revolving Credit Commitments, Canadian Revolving Credit Commitments or Supplemental Revolving Credit Linked Deposit Amounts, as the case may be, or, if applicable outstanding Loans, as the case may be. Each Lender agrees that in computing such Lender's portion of any Borrowing to be made hereunder, the Applicable Agent may, in its discretion, round each Lender's percentage of such Borrowing, computed in accordance with Section 2.01, to the next higher or lower whole dollar amount.

SECTION 2.17. Payments. (a) The Company shall make each payment without set-off or counterclaim (including principal of or interest on any Borrowing or any Fees or other amounts) required to be made by it hereunder and under any other Loan Document not later than 12:00 noon, New York City time, on the date when due in dollars to the Administrative Agent at its offices at One Chase Manhattan Plaza - 8th Floor, New York, New York, 10081, Attention of Loan Agency Services, in immediately available funds, for credit to JPMorgan Chase Bank, ABA Number 021000021, Account Number 323-5-02059. Each Canadian Borrower shall make each payment without set-off or counterclaim (including principal of or interest on any Borrowing or any Fees or other amounts) required to be made by it hereunder and under any other Loan Document not later than 12:00 noon, Toronto time, on the date when due to the Canadian Administrative Agent, at its offices at 200 Bay Street, Suite 1800, Royal Bank Plaza, South Tower, Toronto, Ontario M5J 2J2, Attention Funding Officer, in immediately available funds, for the credit of JPMorgan Chase Bank, Toronto Branch, Royal Bank of Canada, Correspondent Banking Division, Toronto, Transit #: 07172, Account Number 1000405 (if such payment is made in Canadian dollars). Such payments shall be for credit to the account of JPMorgan Chase Bank, Toronto Branch, at JPMorgan Chase Bank, New York, New York, ABA Number: 021000021, SWIFT Number: CHASUS 33, Account Number: 400929821 (if such payment is made in dollars).

(b) Whenever any payment (including principal of or interest on any Borrowing or any Fees or other amounts) hereunder or under any other Loan Document shall become due, or otherwise would occur, on a day that is not a Business Day, such payment may be made on the next succeeding Business Day (except in the case of payment of principal of a Eurodollar Borrowing if the effect of such extension would be to extend such payment into the next succeeding month, in which event such payment shall be due on the

# EXHIBIT D

# PART 4

immediately preceding Business Day), and such extension of time shall in such case be included in the computation of interest or Fees, if applicable.

(c) Each obligation of the Borrowers and the Guarantors under the Loan Documents related to any Loans or Letter of Credit denominated in dollars shall be paid in dollars. Each obligation of the Borrowers and the Guarantors related to any Loans or Letters of Credit denominated in Canadian dollars shall be paid in Canadian dollars.

SECTION 2.18. Taxes. (a) Any and all payments by each Borrower to the Administrative Agent or the Canadian Administrative Agent, as the case may be, the Issuing Banks or the Lenders hereunder or under the other Loan Documents shall be made, in accordance with Section 2.17 free and clear of and without deduction for any and all present or future taxes, levies, imposts, deductions, charges or withholdings, and all liabilities with respect thereto, excluding (i) in the case of each Lender, each Issuing Bank and the Administrative Agent, taxes that would not be imposed but for a connection between such Lender, such Issuing Bank or the Administrative Agent (as the case may be) and the jurisdiction imposing such tax, other than a connection arising solely by virtue of the activities of such Lender, such Issuing Bank or the Administrative Agent (as the case may be) pursuant to or in respect of this Agreement or under any other Loan Document, including, without limitation, entering into, lending money or extending credit pursuant to, receiving payments under, or enforcing, this Agreement or any other Loan Document, and (ii) in the case of each Lender, each Issuing Bank and the Administrative Agent, any United States withholding taxes payable with respect to payments hereunder or under the other Loan Documents under laws (including, without limitation, any statute, treaty, ruling, determination or regulation) in effect on the Initial Date (as hereinafter defined) for such Lender, such Issuing Bank or the Administrative Agent, as the case may be, but not excluding any United States withholding taxes payable solely as a result of any change in such laws occurring after the Initial Date (all such non-excluded taxes, levies, imposts, deductions, charges, withholdings and liabilities being hereinafter referred to as "Taxes"). For purposes of this Section 2.18, the term "Initial Date" shall mean (i) in the case of the Administrative Agent, any Issuing Bank or any Lender, the date on which such person became a party to this Agreement and (ii) in the case of any assignment including any assignment by a Lender or an Issuing Bank to a new lending office, the date of such assignment. If any Taxes shall be required by law to be deducted from or in respect of any sum payable hereunder or under any other Loan Document to any Lender, any Issuing Bank, the Canadian Administrative Agent or the Administrative Agent (i) the sum payable by the applicable Borrower shall be increased as may be necessary so that after making all required deductions (including deductions applicable to additional sums payable under this Section 2.18) such Lender, such Issuing Bank, the Canadian Administrative Agent or the Administrative Agent (as the case may be) receives an amount equal to the sum it would have received had no such deductions been made, (ii) the applicable Borrower shall make such deductions and (iii) the applicable Borrower shall pay the full amount deducted to the relevant taxation authority or other authority in accordance with applicable law. No Borrower shall be required to pay any amounts pursuant to clause (i) of the preceding sentence to any Lender, any Issuing Bank, the Administrative Agent or the Canadian Administrative Agent (in the case of payments to be made by the Company) not organized under the laws of the United States of America or a state thereof (or, in the case of payments to be made by the Canadian Borrowers, not organized under the laws of Canada) if such Lender, such Issuing Bank, the Canadian Administrative Agent or the Administrative Agent fails to comply with the requirements of paragraph (f) or
(g), as the case may be, and paragraph (h) of this Section 2.18.

(b) In addition, the Company agrees to pay any present or future stamp or documentary taxes or any other excise or property taxes, charges or similar levies which arise from the execution, delivery or registration of, or otherwise with respect to, this Agreement or any other Loan Document (hereinafter referred to as "Other Taxes").

(c) The Company will indemnify each Lender, each Issuing Bank, the Administrative Agent and the Canadian Administrative Agent for the full amount of Taxes and Other Taxes (including any Taxes or

Other Taxes imposed by any jurisdiction on amounts payable under this Section 2.18) paid by such Lender, such Issuing Bank or the Administrative Agent or the Canadian Administrative Agent, as the case may be, and any liability (including penalties, interest and expenses) arising therefrom or with respect thereto whether or not such Taxes or Other Taxes were correctly or legally asserted. Such indemnification shall be made within 10 days after the date any Lender, any Issuing Bank, the Canadian Administrative Agent or the Administrative Agent, as the case may be, makes written demand therefor. If a Lender, an Issuing Bank, the Administrative Agent or the Canadian Administrative Agent shall become aware that it is entitled to receive a refund or is reasonably requested by a Borrower to pursue a claim for a refund in respect of Taxes or Other Taxes, it shall promptly notify such Borrower of the availability of such refund (unless instructed to pursue a claim by such Borrower) and shall, within 30 days after receipt of a request by such Borrower, pursue or timely claim such refund at such Borrower's expense; provided that such Lender shall not be required to pursue or claim such refund if such Lender reasonably determines that the pursuit or claim of such refund will have a disadvantageous impact upon such Lender. If any Lender, any Issuing Bank, the Administrative Agent or the Canadian Administrative Agent receives a refund in respect of any Taxes or Other Taxes for which such Lender, such Issuing Bank, the Administrative Agent or the Canadian Administrative Agent has received payment from a Borrower hereunder, it shall promptly notify such Borrower of such refund and shall, within 30 days after receipt of a request by such Borrower (or promptly upon receipt, if such Borrower has requested application for such refund pursuant hereto), repay such refund (plus any interest received) to such Borrower, provided that such Borrower, upon the request of such Lender, such Issuing Bank, the Administrative Agent or the Canadian Administrative Agent, agrees to return such refund (plus any penalties, interest or other charges required to be paid) to such Lender, such Issuing Bank, the Administrative Agent or the Canadian Administrative Agent in the event such Lender, such Issuing Bank, the Administrative Agent or the Canadian Administrative Agent is required to repay such refund.

(d) Within 30 days after the date of any payment of Taxes or Other Taxes withheld by any Borrower in respect of any payment to any Lender, any Issuing Bank, the Canadian Administrative Agent or the Administrative Agent, such Borrower will furnish to the Applicable Agent, at its address referred to in Schedule 2.01, the original or a certified copy of a receipt evidencing payment thereof or a copy of the return reporting payment thereof or other evidence of such payment reasonably satisfactory to the Applicable Agent.

(e) Without prejudice to the survival of any other agreement contained herein, the agreements and obligations contained in this Section 2.18 shall survive the payment in full of principal and interest hereunder and the termination of the Commitments.

(f) In the case of any Borrowing by the Company, this paragraph (f) shall apply. Each Lender, each Issuing Bank and the Administrative Agent that is not organized under the laws of the United States of America or a state thereof agrees that at least 10 days prior to the first Interest Payment Date following the Initial Date in respect of such Issuing Bank or such Lender, it will deliver to the Company and the Administrative Agent (if appropriate) two duly completed copies of either (i) United States Internal Revenue Service Form W-8BEN or W-8ECI or successor applicable form, as the case may be, certifying in each case that the Issuing Bank or such Lender or the Administrative Agent, as the case may be, is entitled to receive payments under this Agreement and the Notes payable to it without deduction or withholding of any United States federal income taxes and backup withholding taxes or is entitled to receive such payments at a reduced rate pursuant to a treaty provision or (ii) in the case of a Lender that is not a "bank" within the meaning of Section 881(c)(3) of the Code, United States Internal Revenue Service Form W-8BEN or successor applicable form and a statement from such Lender certifying to the fact that interest payable to it hereunder (A) will not be described in Section 871(h)(3)(A) or

Section 881(c)(3)(A), (B) or (C) of the Code and (B) will not be effectively connected with a trade or business carried on in the United States by such Lender. Each Lender, each Issuing Bank and the Administrative Agent required to deliver to the Company and the Administrative Agent a Form W-8BEN or W-8ECI pursuant to the preceding sentence further undertakes to deliver to the Company and the Administrative Agent (if appropriate) two further copies of

Form W-8BEN or W-8ECI, or successor forms, or other similar manner of certification and such extensions or renewals thereof as may reasonably be requested by the Company and, in the case where a Form W-8BEN has been delivered in accordance with clause (ii) of the preceding sentence, a further statement certifying to the facts set forth in clause (B) of the preceding sentence (i) at the times reasonably requested by the Company, (ii) after the occurrence of an event requiring a change in the most recent form or statement previously delivered by it to the Company or (iii) in the case of Form W-8BEN or W-8ECI, on or before the date that any such form expires or becomes obsolete, and, in the case of Form W-8BEN or W-8ECI delivered in accordance with clause (i) of the preceding sentence, certifying that such Issuing Bank or such Lender is entitled to receive payments under this Agreement without deduction or withholding of any United States federal income taxes and backup withholding taxes or is entitled to receive such payments at a reduced rate pursuant to a treaty provision, unless such Issuing Bank or such Lender advises the Company that it is unable lawfully to provide such forms and other certifications and notifies the Company to such effect. Unless the Company and the Administrative Agent have received forms, certificates and other documents satisfactory to them indicating that payments hereunder or under or in respect of the Notes or the Letters of Credit to or for any Issuing Bank or Lender not incorporated under the laws of the United States or a state thereof are not subject to United States withholding tax or are subject to such tax at a rate reduced by an applicable tax treaty, the Company or the Administrative Agent shall withhold such taxes from such payments at the applicable statutory rate.

(g) In the event a Canadian Borrower is required to pay additional amounts pursuant to this Section 2.18, this paragraph (g) shall apply. Each Lender, each Issuing Bank and the Canadian Administrative Agent that is not incorporated within or under the laws of Canada and that is claiming such additional amounts agrees that within a reasonable period of time following the request of a Canadian Borrower, it will, to the extent it is legally entitled to a reduction in the rate of or exemption from Canadian withholding taxes, deliver to such Canadian Borrower and the Canadian Administrative Agent (if appropriate) any form or document required under the laws, regulations, official interpretations or treaties enacted by, made or entered into with Canada properly completed and duly executed by such Issuing Bank, such Lender or Canadian Administrative Agent establishing that any payments hereunder are exempt from Canadian withholding tax or subject to a reduced rate of Canadian withholding tax, as the case may be; provided that, in the sole determination of such Lender, such Issuing Bank or the Canadian Administrative Agent, such form or document shall not be otherwise disadvantageous to such Lender, such Issuing Bank or the Administrative Agent.

(h) Any Issuing Bank and any Lender claiming any additional amounts payable pursuant to this Section 2.18 shall use reasonable efforts (consistent with legal and regulatory restrictions) to file any certificate or document requested by any Borrower or to change the jurisdiction of its applicable lending office if the making of such a filing or change would avoid the need for or reduce the amount of any such additional amounts which may thereafter accrue and would not, in the sole determination of such Issuing Bank or such Lender, be otherwise disadvantageous to such Issuing Bank or such Lender. In addition, in the event any Issuing Bank or any Lender claims additional amounts payable pursuant to this Section 2.18, the affected Borrower may, at its sole expense and effort, upon notice to such Issuing Bank or such Lender and the Applicable Agent, require such Issuing Bank or such Lender to transfer and assign, without recourse (in accordance with and subject to the restrictions contained in Section 9.04), all of its interests, rights and obligations under this Agreement to an assignee that shall assume such assigned obligations (which assignee may be another Lender, if a Lender accepts such assignment); provided that (w) such assignment will result in a reduction in the claim for additional amounts under this Section 2.18, (x) such assignment shall not conflict with any law, rule or regulation or order of any court or other Governmental Authority having jurisdiction, (y) the affected Borrower shall have received the prior written consent of the Applicable Agent, which consent shall not unreasonably be withheld, and (z) the affected Borrower or such assignee shall have paid to the affected Issuing Bank or the affected Lender in immediately available funds an amount equal to the sum of the principal of and interest accrued to the date of such payment on the outstanding Letter of Credit

Disbursements or such Loans of such Issuing Bank or such Lender, respectively, plus all Fees and other amounts accrued for the account of such Issuing Bank or such Lender hereunder.

SECTION 2.19. Issuance of Letters of Credit. (a) Each Issuing Bank agrees, upon the terms and subject to the conditions herein set forth, to issue Letters of Credit (including Foreign Subsidiary Letters of Credit), in a form reasonably acceptable to the Applicable Agent and such Issuing Bank, appropriately completed, for the account of the Company or applicable Canadian Borrower, as the case may be, at any time and from time to time on and after the Closing Date (or on or after the Fifth Amendment Effective Date in the case of Supplemental Letters of Credit) until the earlier of the date five Business Days prior to the Revolving Credit Maturity Date or the Canadian Revolving Credit Maturity Date, as the case may be, and the termination of the Revolving Credit Commitments, the Canadian Revolving Credit Commitments or the Supplemental Revolving Credit Facility , as the case may be, in accordance with the terms hereof; provided, however, that any Letter of Credit shall be issued by an Issuing Bank only if, and each request by a Borrower for the issuance of any Letter of Credit shall be deemed a representation and warranty of such Borrower that, immediately following the issuance of any such Letter of Credit, (i)(w) the Letter of Credit Exposure (other than in respect of Indebtedness of the Brazilian Subsidiary and the Italian JV) under the Revolving Credit Facility shall not exceed the Revolving Letter of Credit Commitment in effect at the time, (x) the Letter of Credit Exposure in respect of Indebtedness of the Brazilian Subsidiary shall not exceed an amount equal to $30,000,000 less the amount of any Indebtedness incurred under clause (viii) of Section 6.01(c) and the Letter of Credit Exposure in respect of Indebtedness of the Italian JV shall not exceed $10,000,000, (y) the Revolving Letter of Credit Exposure shall not exceed the Revolving Credit Commitments and Canadian Revolving Credit Commitments in effect at the time and (z) the Supplemental Letter of Credit Exposure shall not exceed the Supplemental Revolving Letter of Credit Commitment in effect at the time, and (ii) the Borrowers will be in compliance with Sections 2.01(c) and (e). In determining whether the issuance of a Letter of Credit will comply with the preceding sentence, each Issuing Bank may rely conclusively on information obtained from the Administrative Agent or the Canadian Administrative Agent, as the case may be, regarding the aggregate principal amount of outstanding Revolving Loans, Canadian Revolving Loans and the aggregate Revolving Credit Commitments, Canadian Revolving Credit Commitments. Each Letter of Credit shall provide for payments of drawings in dollars or, if requested by a Canadian Borrower, Canadian dollars or, if requested by the Company, a Foreign Currency; provided, that the Letter of Credit Exposure in respect of Letters of Credit denominated in a Foreign Currency shall not exceed $20,000,000.

(b) Each Letter of Credit shall expire no later than the fifth Business Day preceding the Revolving Credit Maturity Date or the Canadian Revolving Credit Maturity Date, as the case may be, unless such Letter of Credit expires by its terms on an earlier date as described below in Section 2.19(c). Each Letter of Credit shall provide for payments of drawings in dollars or, if requested by a Canadian Borrower, Canadian dollars or, if requested by the Company, a Foreign Currency; provided, that the Letter of Credit Exposure in respect of Letters of Credit denominated in a Foreign Currency shall not exceed $20,000,000. Each Letter of Credit shall reduce availability under the Revolving Credit Commitments, the Canadian Revolving Credit Commitments or the Supplemental Revolving Credit Facility, as applicable.

(c) Each issuance of any Letter of Credit shall be made on at least three Business Days' prior written notice from the applicable Borrower to the applicable Issuing Bank and the Applicable Agent (each of which shall give prompt notice thereof to each Revolving Lender or Canadian Lender, as the case may be) specifying the date of issuance, the date on which such Letter of Credit is to expire (which shall not be later than the earlier of (i) the fifth Business Day preceding the Revolving Credit Maturity Date or the Canadian Revolving Credit Maturity Date, as the case may be, and (ii) subject to extension, two years after the date of any such Letter of Credit), the amount of such Letter of Credit, the name and address of the beneficiary of such Letter of Credit and such other information as may be necessary or desirable to complete such Letter of Credit. Such Issuing Bank will give the Applicable Agent, and the Applicable Agent shall give

each Revolving Lender, Supplemental Revolving Lender or Canadian Lender, as the case may be, prompt notice of the issuance and amount of each Letter of Credit and the expiration of each Letter of Credit.

(d) No Issuing Bank shall be required to issue a Letter of Credit unless it has agreed with the Company upon the Fronting Fees to be paid by the applicable Borrower in connection with such Letter of Credit and the form of such Letter of Credit is reasonably acceptable to such Issuing Bank.

(e) The letters of credit issued under the Existing Credit Agreement which are outstanding on the Closing Date shall be deemed to be Letters of Credit issued on the Closing Date.

(f) On the Fifth Amendment Effective Date, all Letters of Credit then outstanding will automatically, without any action on the part of any person, be deemed to be Supplemental Revolving Letters of Credit issued hereunder on the Fifth Amendment Effective Date for the account of the Company (on a joint and several basis with any other Borrower which is an account party with respect to any such Letter of Credit), if applicable, for all purposes of this Agreement and the other Loan Documents.

(g) Notwithstanding anything to the contrary in this Agreement, (i) Letters of Credit shall at all times and from time to time be deemed to be first Supplemental Revolving Letters of Credit up to but not to exceed the Supplemental Revolving Letter of Credit Commitment and thereafter be deemed to be Revolving Letters of Credit only to the extent, and in an amount by which, the aggregate amount of outstanding Letters of Credit exceeds such permitted amount of Supplemental Revolving Letters of Credit, (ii) drawings under any Letter of Credit shall be deemed to have been made first under Supplemental Revolving Letters of Credit for so long as, and to the extent that, there are any undrawn Supplemental Revolving Letters of Credit outstanding (and thereafter shall be deemed to have been made under Revolving Letters of Credit) and (iii) any Letter of Credit that expires or terminates will be deemed to be first a Revolving Letter of Credit, for so long as, and to the extent that, there are outstanding Revolving Letters of Credit immediately prior to such expiration or termination. To the extent necessary to implement the foregoing, the identification of a Letter of Credit as a Supplemental Revolving Letter of Credit or a Supplemental Revolving Letter of Credit may change from time to time and a portion of a Letter of Credit may be deemed to be a Supplemental Revolving Letter of Credit and the remainder be deemed to be a Revolving Letter of Credit.

SECTION 2.20. Participations; Unconditional Obligations. (a) By the issuance of a Letter of Credit and without any further action on the part of the applicable Issuing Bank, the Revolving Lenders, the Supplemental Revolving Lenders or Canadian Revolving Lenders in respect thereof, each Issuing Bank hereby grants to each Revolving Lender, Supplemental Revolving Lender or Canadian Revolving Lender, as the case may be, and each Revolving Lender, Canadian Revolving Lender, Supplemental Revolving Lender, as the case may be, hereby agrees to acquire from such Issuing Bank, a participation in such Letter of Credit equal to such Revolving Lender's, Canadian Revolving Lender's or Supplemental Revolving Lender's, as the case may be, Applicable Percentage of the face amount of such Letter of Credit, effective upon the issuance of such Letter of Credit. In consideration and in furtherance of the foregoing, each Revolving Lender, Supplemental Revolving Lender or Canadian Revolving Lender, as the case may be, hereby absolutely and unconditionally agrees to pay to the Applicable Agent, for the account of such Issuing Bank, in accordance with Section 2.02(f), such Revolving Lender's, Supplemental Revolving Lender's, Supplemental Revolving Lenders or Canadian Revolving Lender's, as the case may be, Applicable Percentage of each Letter of Credit Disbursement made by such Issuing Bank; provided, however, that the Revolving Lenders, Supplemental Revolving Lenders or Canadian Revolving Lenders, as the case may be, shall not be obligated to make any such payment to an Issuing Bank with respect to any wrongful payment or disbursement made as a result of the gross negligence or willful misconduct of such Issuing Bank in determining whether documents presented in connection with such Letter of Credit Disbursement conform to the requirements of the applicable Letter of Credit. In order to make payments required by the preceding sentence, each Supplemental Revolving Lender hereby irrevocably authorizes the Administrative Agent to make available to such Issuing Bank upon demand

66

at the Issuing Bank's address for notices specified herein such Supplemental Revolving Lender's Applicable Percentage of the amount of such draft, or any part thereof, that is not so reimbursed from amounts on deposit in such Supplemental Revolving Lender's Supplemental Revolving Credit Linked Account (whether or not the conditions to borrowing set forth in Section 4.02 are satisfied).

(b) Each Revolving Lender, Supplemental Revolving Lender and Canadian Revolving Lender acknowledges and agrees that its obligation to acquire participations pursuant to paragraph (a) in respect of Letters of Credit is absolute and unconditional and shall not be affected by any circumstance whatsoever, including the occurrence and continuance of an Event of Default or Default hereunder, and that each such payment shall be made without any offset, abatement, withholding or reduction whatsoever other than in the case of any wrongful payment made as a result of the gross negligence or willful misconduct of the Issuing Bank in determining whether documents presented in connection with such Letter of Credit conform to the requirements of the applicable Letter of Credit.

SECTION 2.21. Letter of Credit Fee. Each Borrower agrees to pay to the Applicable Agent for the account of the Revolving Lenders, Supplemental Revolving Lenders or Canadian Revolving Lenders, as the case may be, for each calendar quarter (or shorter period ending with the first date on which the applicable Letters of Credit Commitment shall have expired or been terminated and there shall be no outstanding Letters of Credit) a fee (the "Letter of Credit Fee") on the average daily amount of the outstanding Letters of Credit issued for the account of such Borrower at a per annum rate equal to

(i) with respect to Revolving Letters of Credit, the Applicable Margin at such time for Eurodollar Revolving Loans and (ii) with respect to Supplemental Revolving Letters of Credit, the Applicable Margin at such time for Eurodollar Supplemental Revolving Loans; provided that with respect to any Letter of Credit as to which such Borrower has failed to make a payment required by Section 2.22, interest calculated at the rate set forth in Section 2.07 from the date such payment was due through the date such payment is made shall be paid by such Borrower in lieu of the Letter of Credit Fee on the date such payment is made. The Letter of Credit Fee shall be computed on the basis of the actual number of days elapsed over a year of 360 days. The Administrative Agent or the Canadian Administrative Agent, as the case may be, agrees to disburse to each Revolving Lender, Supplemental Revolving Lender or Canadian Revolving Lender, as the case may be, its pro rata portion of such Letter of Credit Fee promptly upon receipt. With respect to Revolving Letters of Credit, the Letter of Credit Fee shall be paid in arrears on the last day of March, June, September and December of each year and on the Revolving Credit Maturity Date or Canadian Revolving Credit Maturity Date, as the case may be (or the first date on which the Revolving Letter of Credit Commitment shall have expired or been terminated and there shall be no outstanding Revolving Letters of Credit, if earlier). With respect to Supplemental Revolving Letters of Credit, the Letter of Credit Fee shall be paid in arrears on the first Business Day of each calendar month of each year and on the Revolving Credit Maturity Date (or the first date on which the Supplemental Revolving Letter of Credit Commitment shall have expired or been terminated and there shall be no outstanding Supplemental Revolving Letters of Credit, if earlier). Once paid the Letter of Credit Fee paid or payable shall not be refundable in any circumstances whatsoever, absent manifest error.

SECTION 2.22. Agreement To Repay Letter of Credit Disbursements. (a) If an Issuing Bank shall pay any draft presented under a Letter of Credit, the Borrower for whose account such Letter of Credit was issued shall pay to the Applicable Agent, on behalf of such Issuing Bank, an amount equal to the amount of such draft before 11:00 a.m., New York City time, on the Business Day on which such Issuing Bank shall have notified such Borrower that payment of such draft will be made (or such later time as is not later than one hour after such Borrower shall have received such notice or, if such Borrower shall have received such notice later than 4:00 p.m., New York City time, on any Business Day, not later than 10:00 a.m., New York City time, on the immediately following Business Day). The Applicable Agent will promptly pay any such amounts received by it to such Issuing Bank. Each Supplemental Revolving Lender authorizes each of the Administrative Agent and Issuing Bank which has received payment of a reimbursement

obligation as to which it has previously received any payments from the Supplemental Revolving Lender pursuant to Section 2.02(p) to deposit into its Supplemental Revolving Credit Linked Account its Applicable Percentage thereof.

(b) Each Borrower's obligation to repay each Issuing Bank for payments and disbursements made by such Issuing Bank under the outstanding Letters of Credit shall be absolute, unconditional and irrevocable under any and all circumstances and irrespective of:

(i) any lack of validity or enforceability of any Letter of Credit;

(ii) the existence of any claim, set-off, defense or other right which any Borrower or any other person may at any time have against the beneficiary under any Letter of Credit, any Issuing Bank, the Administrative Agent, the Canadian Administrative Agent or any Lender (other than the defense of payment in accordance with the terms of this Agreement or a defense based on the gross negligence or willful misconduct of any Issuing Bank) or any other person in connection with this Agreement or any other agreement or transaction;

(iii) any draft or other document presented under a Letter of Credit proving to be forged, fraudulent, invalid or insufficient in any respect or any statement therein being untrue or inaccurate in any respect; provided that payment by an Issuing Bank under such Letter of Credit against presentation of such draft or document shall not have constituted gross negligence or willful misconduct of such Issuing Bank;

(iv) payment by an Issuing Bank under a Letter of Credit against presentation of a draft or other document which does not comply with the terms of such Letter of Credit; provided that such payment shall not have constituted gross negligence or willful misconduct of such Issuing Bank; and

(v) any other circumstance or event whatsoever, whether or not similar to any of the foregoing; provided that such other circumstance or event shall not have been the result of gross negligence or willful misconduct of the applicable Issuing Bank.

It is understood that in making any payment under a Letter of Credit (x) each Issuing Bank's exclusive reliance on the documents presented to it under such Letter of Credit as to any and all matters set forth therein, including reliance on the amount of any draft presented under such Letter of Credit, whether or not the amount due to the beneficiary equals the amount of such draft and whether or not any document presented pursuant to such Letter of Credit proves to be insufficient in any respect, if such document on its face appears to be in order, and whether or not any other statement or any other document presented pursuant to such Letter of Credit proves to be forged or invalid or any statement therein proves to be inaccurate or untrue in any respect whatsoever and (y) any noncompliance in any immaterial respect of the documents presented under a Letter of Credit with the terms thereof shall, in each case, not be deemed willful misconduct or gross negligence of such Issuing Bank.

SECTION 2.23. Letter of Credit Operations. Each Issuing Bank shall, promptly following its receipt thereof, examine all documents purporting to represent a demand for payment under an outstanding Letter of Credit to ascertain that the same appear on their face to be in substantial conformity with the terms and conditions of such outstanding Letter of Credit. Such Issuing Bank shall (i) as promptly as possible after such demand for payment give oral notification, confirmed by telecopy, to the Applicable Agent and the applicable Borrower of such demand for payment and (ii) as promptly as possible after such Issuing Bank determines whether such demand for payment was in accordance with the terms and conditions of such outstanding Letter of Credit, give notice in the same manner to the Applicable Agent and such Borrower as to such determination and as to whether such Issuing Bank has made or will make a Letter of Credit

68

Disbursement thereunder, provided that the failure to give such notices shall not relieve any Borrower of its obligation to reimburse such Issuing Bank with respect to any such Letter of Credit Disbursement, and the Applicable Agent shall promptly give each Revolving Lender, Supplemental Revolving Lender or Canadian Revolving Lender, as the case may be, notice thereof.

SECTION 2.24. Cash Collateralization. If any Event of Default shall occur and be continuing, each Borrower shall, on the Business Day it receives notice from the Applicable Agent or the Required Lenders therefor, deposit in an account with the Applicable Agent, for the benefit of the Lenders, an amount in cash equal to its Letter of Credit Exposure as of such date. Such deposit shall be held by the Applicable Agent as collateral for the payment and performance of the Obligations. So long as such Event of Default is continuing, the Applicable Agent shall have exclusive dominion and control, including the exclusive right of withdrawal, over such account. Other than any interest earned on the investment of such deposits in Permitted Investments, which investments shall be made at the option and sole discretion of the Applicable Agent, such deposits shall not bear interest. Interest or profits, if any, on such investments shall accumulate in such account. Moneys in such account shall automatically be applied by the Applicable Agent to reimburse the applicable Issuing Bank and the Revolving Lenders, Supplemental Revolving Lenders or Canadian Lenders, as the case may be, for Letter of Credit Disbursements and, if the maturity of the Loans has been accelerated, to satisfy the Obligations. All remaining amounts on deposit shall be returned to the applicable Borrower within three Business Days after all Events of Default have been cured or waived.

SECTION 2.25. Termination and Reduction of Letter of Credit Commitment. (a) Notwithstanding any other provision hereof, in the event that any restrictions or limitations are imposed upon or determined or held to be applicable to any Issuing Bank, any Lender or any Borrower by, under or pursuant to any law or regulation (Federal, state, provincial or local) now or hereafter in effect or by reason of any interpretation thereof by any court or Governmental Authority (including any interpretation by the Comptroller of the Currency as to the applicability of 12 U.S.C. Section 84 or any substitute statute, as now or hereafter in effect, to the transactions contemplated hereby), which would prevent such Lender from legally incurring liability under or in connection with a Letter of Credit issued or to be issued pursuant hereto, then such Lender shall give prompt written notice thereof to the Applicable Agent (which shall notify the Company, each Issuing Bank and each other Revolving Lender, Supplemental Revolving Lender or Canadian Lender, as the case may be, thereof as soon as reasonably practicable), whereupon the obligation of each Issuing Bank to issue additional Letters of Credit pursuant hereto shall be reduced by the Applicable Percentage of such Lender (and, as to any Letter of Credit thereafter issued, the Applicable Percentages of the other Lenders shall be determined as though such Lender does not have a Revolving Credit Commitment, Canadian Revolving Credit Commitment or Supplemental Revolving Credit Commitment, as the case may be) until the Applicable Agent shall be advised that such event is no longer continuing or until such Lender shall have assigned its applicable Commitments pursuant to the provisions of this Agreement.

(b) The Company may permanently terminate, or from time to time in part permanently reduce, the Revolving Letter of Credit Commitment and the Supplemental Revolving Letter of Credit Commitment, in each case upon at least three Business Days' prior written or telex notice to the Administrative Agent; provided that the Revolving Letter of Credit Commitment shall not be reduced to an amount that is less than the Revolving Letter of Credit Exposure outstanding at the time and the Supplemental Revolving Letter of Credit Commitment shall not be reduced to an amount that is less than the Supplemental Revolving Letter of Credit outstanding at the time.

(c) In the event that the Revolving Credit Commitments and Canadian Revolving Credit Commitments are at any time reduced pursuant to Section 2.09 to an amount that is less than the Revolving Letter of Credit Commitment, the Revolving Letter of Credit Commitment shall be permanently reduced to an amount equal to the Revolving Credit Commitments and Canadian Revolving Credit Commitments. In the event that the Total Supplemental Revolving Credit Linked Deposit Amount is at any time reduced pursuant

to Section 2.09 to an amount that is less than the Supplemental Revolving Letter of Credit Commitment, the Supplemental Revolving Letter of Credit Commitment shall be permanently reduced to an amount equal to the Total Supplemental Revolving Credit Linked Deposit Amount.

SECTION 2.26. Bankers' Acceptances. (a) Subject to the terms and conditions of this Agreement, a Canadian Borrower may request a Canadian Revolving Credit Borrowing by presenting drafts for acceptance and purchase as B/As by the Canadian Lenders.

(b) No Contract Period with respect to a B/A shall extend beyond the Canadian Revolving Commitment Maturity Date.

(c) To facilitate availment of the Canadian Revolving Credit Borrowings by way of B/As, each Canadian Borrower hereby appoints each Canadian Lender as its attorney to sign and endorse on its behalf, in handwriting or by facsimile or mechanical signature as and when deemed necessary by such Canadian Lender, blank forms of B/As substantially in the form of Schedule 2.26. In this respect, it is each Canadian Lender's responsibility to maintain an adequate supply of blank forms of B/As for acceptance under this Agreement. The Canadian Borrowers recognize and agree that all B/As signed and/or endorsed on their behalf by a Canadian Lender shall bind such Canadian Borrower as fully and effectually as if signed in the handwriting of and duly issued by the proper signing officers of such Canadian Borrower. Each Canadian Lender is hereby authorized to issue such B/As endorsed in blank in such face amounts as may be determined by such Canadian Lender; provided that the aggregate amount thereof is equal to the aggregate amount of B/As required to be accepted and purchased by such Canadian Lender. No Canadian Lender shall be liable for any damage, loss or other claim arising by reason of any loss or improper use of any such instrument except the gross negligence or willful misconduct of the Canadian Lender or its officers, employees, agents or representatives. Each Canadian Lender shall maintain a record with respect to B/As (a) received by it from the Canadian Administrative Agent in blank hereunder, (b) voided by it for any reason, (c) accepted and purchased by it hereunder, and (d) cancelled at their respective maturities. Each Canadian Lender further agrees to retain such records in the manner and for the statutory periods provided in the various provincial or federal statutes and regulations which apply to such Canadian Lender. Each Canadian Lender agrees to provide such records to the Canadian Borrowers at the Canadian Borrowers' expense upon request. On request by or on behalf of the Canadian Borrowers, a Canadian Lender shall cancel all forms of B/A which have been pre-signed or pre-endorsed on behalf of the Canadian Borrowers and which are held by the said Canadian Lender and are not required to be issued in accordance with the Canadian Borrowers' irrevocable notice.

(d) Drafts of the Canadian Borrowers to be accepted as B/As hereunder shall be signed as set forth in this Section 2.26. Notwithstanding that any person whose signature appears on any B/A may no longer be an authorized signatory for any of the Canadian Lenders or the Canadian Borrowers at the date of issuance of a B/A, such signature shall nevertheless be valid and sufficient for all purposes as if such authority had remained in force at the time of such issuance and any such B/A so signed shall be binding on the Canadian Borrowers.

(e) Promptly following receipt of a notice of borrowing, notice of rollover or notice of conversion by way of B/As, in accordance with Section 2.03(b) or Section 2.26(h), the Canadian Administrative Agent shall so advise the Canadian Lenders and shall advise each Canadian Lender of the aggregate face amount of the B/As to be accepted by it and the applicable Contract Period (which shall be identical for all Canadian Lenders). The aggregate face amount of the B/As to be accepted by a Canadian Lender shall be an integral multiple of C$100,000 and such face amount shall be in each Canadian Lender's pro rata portion of such Canadian Revolving Credit Borrowing; provided, that the Canadian Administrative Agent may, in its sole discretion, increase or reduce any Canadian Lender's portion of such B/A to the nearest C$100,000.

(f) Upon acceptance of a B/A by a Canadian Lender, such Canadian Lender shall purchase, or arrange the purchase of, each B/A from the applicable Canadian Borrower at the Discount Rate for such Canadian Lender applicable to such B/A accepted by it and provide to the Canadian Administrative Agent the Discount Proceeds for the account of such Canadian Borrower. The Acceptance Fee payable by such Canadian Borrower to a Canadian Lender under Section 2.06 in respect of each B/A accepted by such Canadian Lender shall be set off against the Discount Proceeds payable by such Canadian Lender under this Section 2.26.

(g) Each Canadian Lender may at any time and from time to time hold, sell, rediscount or otherwise dispose of any or all B/As accepted and purchased by it.

(h) With respect to each Canadian Revolving Credit Borrowing which is outstanding hereunder by way of B/As, at or before 11:00 a.m. (Toronto time) three Business Days before the maturity date of such B/As, a Canadian Borrower shall notify the Canadian Administrative Agent at the Canadian Administrative Agent's address set forth in Section 9.01 by irrevocable telephone notice, followed by a notice of rollover on the same day, if a Canadian Borrower intends to issue B/As on such maturity date to provide for the payment of such maturing B/As. If a Canadian Borrower fails to notify the Canadian Administrative Agent of its intention to issue B/As on such maturity date, such Canadian Borrower shall provide payment to the Canadian Administrative Agent on behalf of the Canadian Lenders of an amount equal to the aggregate face amount of such B/As on the maturity date of such B/As. If a Canadian Borrower fails to make such payment, such maturing B/As shall be deemed to have been converted on their maturity date into a C$ Prime Rate Loan in an amount equal to the face amount of such B/As.

(i) Each Canadian Borrower waives presentment for payment and any other defense to payment of any amounts due to a Canadian Lender in respect of a B/A accepted and purchased by it pursuant to this Agreement which might exist solely by reason of such B/A being held, at the maturity thereof, by such Canadian Lender in its own right and each Canadian Borrower agrees not to claim any days of grace if such Canadian Lender as holder sues a Canadian Borrower on the B/A for payment of the amount payable by a Canadian Borrower thereunder. On the specified maturity date of a B/A, or such earlier date as may be required or permitted pursuant to the provisions of this Agreement, the applicable Canadian Borrower shall pay the Canadian Lender that has accepted and purchased such B/A the full face amount of such B/A and after such payment, the applicable Canadian Borrower shall have no further liability in respect of such B/A and such Canadian Lender shall be entitled to all benefits of, and be responsible for all payments due to third parties under, such B/A.

(j) If any Event of Default shall occur and be continuing and the Loans are accelerated pursuant to Article VII, each Canadian Borrower shall, on the Business Day it receives notice from the Canadian Administrative Agent, deposit in an account with the Canadian Administrative Agent, for the benefit of the Canadian Lenders, an amount in cash equal to its Bankers' Acceptances Exposure as of such date. Such deposit shall be held by the Canadian Administrative Agent as collateral for the payment and performance of the Obligations. So long as such Event of Default is continuing, the Canadian Administrative Agent shall have exclusive dominion and control, including the exclusive right of withdrawal, over such account. Other than any interest earned on the investment of such deposits in Permitted Investments, which investments shall be made at the option and sole discretion of the Canadian Administrative Agent, such deposits shall not bear interest. Interest or profits, if any, on such investments shall accumulate in such account. Moneys in such account shall automatically be applied by the Canadian Administrative Agent to reimburse the applicable Canadian Lenders for Bankers' Acceptances Exposure and, if the maturity of the Loans has been accelerated, to satisfy the Obligations. All remaining amounts on deposit shall be returned to the applicable Canadian Borrower within three Business Days after all Events of Default have been cured or waived.

(k) Each Canadian Borrower shall have the right at any time upon irrevocable notice to the Canadian Administrative Agent not later than 12:00 noon Toronto time, three Business Days prior to conversion to convert a C$ Prime Rate Loan to a Canadian B/A Borrowing, subject to the following conditions:

(a) each conversion shall be made pro rata among the applicable Canadian Lenders in accordance with the respective principal amounts of the C$ Prime Rate Loans comprising the converted Borrowing;

(b) if less than all of the outstanding principal amount of any Borrowing shall be converted, the aggregate principal amount of such Borrowing converted shall not be less than C$1,000,000;

(c) each conversion shall be effected by each applicable Canadian Lender by such Canadian Lender's converting its applicable C$ Prime Rate Loan (or a portion thereof) into a B/A, and accrued interest on any C$ Prime Rate Loan (or any portion thereof) being converted shall be paid by the applicable Canadian Borrower at the time of conversion;

(d) all Bankers' Acceptances to be issued as a result of the conversion of the C$ Prime Rate Loan shall be issued in accordance with the provisions of this Section 2.26; and

(e) C$ Prime Rate Borrowing may not be converted into a Canadian B/A Borrowing if a Default or an Event of Default has occurred and is continuing and the Canadian Administrative Agent have determined that such conversion is not appropriate.

SECTION 2.27. Reallocation. (a) The Borrowers may, from time to time, but not more than once per calendar quarter, from and after the Closing Date until the earlier of the Canadian Revolving Credit Maturity Date and the termination of the Canadian Revolving Credit Commitments, upon giving an irrevocable joint written notice (each, a "Reallocation Notice") to the Canadian Administrative Agent and the Administrative Agent at least ten (10) Business Days prior to beginning of the next following calendar quarter, temporarily reduce, in whole or in part, or increase, the Canadian Revolving Credit Commitments. Any reductions or increases in the Canadian Revolving Credit Commitments or the Additional Revolving Credit Commitments shall take effect on the first day of the next following calendar quarter. Each reduction or increase in the Canadian Revolving Credit Commitments shall result in an automatic corresponding increase or reduction in the Additional Revolving Credit Commitments; provided that the amount of the Canadian Revolving Credit Commitments shall not, at any time, (i) be reduced to an amount that is less than the Dollar Equivalent Amount of the aggregate Canadian Revolving Loans and Canadian Borrower Letter of Credit Exposure outstanding at such time or (ii) exceed the amount of the Canadian Revolving Credit Commitments as of the Closing Date, as such Canadian Revolving Credit Commitments may, from time to time, be permanently reduced or cancelled in accordance with Section 2.12 of this Agreement. The revolving credit commitments from time to time resulting from a reallocation of Canadian Revolving Credit Commitments pursuant to this Section 2.27 at any time are the "Additional Revolving Credit Commitments". Any amount of the Canadian Revolving Credit Commitments reallocated under this Section 2.27 as Additional Revolving Credit Commitments will not be available to the Canadian Borrowers, and any amount of the Additional Revolving Credit Commitments reallocated under this Section 2.27 as Canadian Revolving Credit Commitments will not be available to the Company, until and only if such amounts are reallocated back to the Canadian Revolving Credit Commitments or the Additional Revolving Credit Commitments in accordance with the terms and conditions of this
Section 2.27. Notwithstanding the foregoing, with respect to any Reallocation Notice delivered by the Borrowers during the second calendar quarter of 2003, the reductions or increases in the Canadian Revolving Credit Commitments or the Additional Revolving Credit

Commitments shall take effect on the date that is five (5) Business Days after delivery of such Reallocation Notice.

The ability of the Borrowers to reallocate the Revolving Credit Commitments and the Canadian Revolving Credit Commitments in accordance with this Section 2.27 shall be subject to the conditions that (A) the representations and warranties set forth in each Loan Document shall be true and correct in all material respects on and as of the date of such reallocation with the same effect as though made on and as of such date, except to the extent that such representations and warranties expressly relate to an earlier date and (B) at the time of and immediately following such reduction or increase, no Event of Default or Default shall have occurred and be continuing. Each Reallocation Notice shall specify the amount (expressed in dollars) of any reduction or increase in the Canadian Revolving Credit Commitments and the corresponding increase or reduction in the Additional Revolving Credit Commitments. Each reallocation requested under this Section 2.27 shall be in a minimum aggregate principal amount of $5,000,000 (or, if less, the remaining amount of the applicable Commitments) and in integral multiples of $1,000,000. Each reduction or increase in the Canadian Revolving Credit Commitments under this Section 2.27 shall be made ratably among the Canadian Lenders based on their respective Canadian Revolving Credit Commitments. Each reduction or increase in the Additional Revolving Credit Commitments under this Section 2.27 shall be made ratably among the Canadian Lenders (or, if a Canadian Lender is a Canadian Scheduled II Chartered Bank, the affiliate of such Lender that is a Revolving Lender) based on their respective Canadian Revolving Credit Commitments. The Canadian Administrative Agent or the Administrative Agent, as the case may be, shall promptly after receiving a Reallocation Notice notify each Canadian Lender or Additional Revolving Lender, as the case may be, of the amount of its Canadian Revolving Credit Commitment or Additional Revolving Credit Commitment, as the case may be, to be reallocated and the date of such reallocation.

(b) The Additional Revolving Credit Commitments shall be available to the Company in addition to the Revolving Credit Commitments. Without limitation, (i) the Company may borrow for its account under the Additional Revolving Credit Commitments to the same extent as it may utilize the Revolving Credit Commitments (subject to the same interest rate options, minimum borrowing and repayment amounts and maturities), provided that the aggregate principal amount of Additional Revolving Loans under the Additional Revolving Credit Commitments shall not exceed the Additional Revolving Credit Commitments,
(ii) only the Additional Revolving Lenders shall have a Commitment under the Additional Revolving Credit Commitments, (iii) Swingline Loans and Letters of Credit are not available under the Additional Revolving Credit Commitments, (iv) the Company will issue Additional Revolving Notes in the appropriate amounts from time to time upon request of an Additional Revolving Lender in an amount equal to the Additional Revolving Credit Commitment of such Lender, and (v) the Additional Revolving Credit Lenders shall be entitled to the same rights and subject to the same obligations with respect to the Additional Revolving Credit Commitments as are the Revolving Lenders with respect to the Revolving Credit Commitments.

SECTION 2.28. Permitted Indebtedness. The Borrowers will not request the making of any Revolving Loan or Supplemental Revolving Loan or the issuance of any Letter of Credit under this Agreement unless all payment obligations of the Loan Parties that may arise in connection with such Loan or Letter of Credit are permitted under the Senior Unsecured Notes Indenture and the Subordinated Notes Indenture. Without limitation of the foregoing, the Borrowers will at all times reserve sufficient available capacity under the Senior Unsecured Notes Indenture and the Subordinated Notes Indenture so that all Obligations related to outstanding Loans and outstanding Letters of Credit (assuming outstanding Letters of Credit are fully drawn) will be permitted thereunder and, in the case of the Subordinated Notes Indenture, will constitute Senior Indebtedness or Guarantor Senior Indebtedness, as applicable.

## ARTICLE III.

## REPRESENTATIONS AND WARRANTIES

Each of Holdings, the Canadian Borrowers and the Company represents and warrants to each of the Lenders and each Issuing Bank that:

SECTION 3.01. Organization, Corporate Powers. Each of Holdings and each Restricted Subsidiary (i) is duly organized or formed, validly existing and in good standing under the laws of the jurisdiction in which it is organized, (ii) has all requisite corporate or partnership power and authority, as applicable, and all material licenses, permits, franchises, consents and approvals, to own or lease its property and assets and to carry on its business as now conducted and as proposed to be conducted, (iii) is qualified and in good standing as a foreign entity to do business in every jurisdiction where such qualification is necessary, except where the failure so to qualify would not have a Material Adverse Effect and (iv) has the corporate or partnership power and authority, as applicable, to execute, deliver and perform each of the Loan Documents and each agreement or instrument contemplated hereby or thereby to which it is or will be a party. As of the Closing Date, none of Holdings or any Restricted Subsidiary of Holdings has any assets or business, or is a party to any material contract within the meaning of Item 6.01(b)(10) of Regulation S-K of the Securities and Exchange Commission, other than as disclosed in Holdings' most recent report on Form 10-K as filed with the Securities and Exchange Commission on April 12, 2001, or in any subsequent public filing by Holdings with the Securities and Exchange Commission made prior to the Closing Date or otherwise relating to the Transactions.

SECTION 3.02. Authorization. The execution, delivery and performance of each of the Loan Documents, the borrowings hereunder and the consummation of the Transactions, (i) have been duly authorized by all requisite corporate and, if required, stockholder action and (ii) will not (x) violate (A) any provision of law, statute, rule or regulation (including, without limitation, Regulations T, U and X) or the certificate of incorporation or by-laws (or similar governing documents) of any of Holdings and the Restricted Subsidiaries, (B) any applicable order of any court or any rule, regulation or order of any Governmental Authority or (C) any indenture, certificate of designation for preferred stock, agreement or other instrument to which any of Holdings or any Restricted Subsidiary is a party or by which any of them or any of their property is bound, (y) be in conflict with, result in a breach of or constitute (with notice or lapse of time or both) a default under any such indenture, agreement or other instrument where any such conflict, violation, breach or default referred to in clause (ii)(x) or (ii)(y) of this Section, individually or in the aggregate, would have a Material Adverse Effect or such as will be addressed by the satisfaction of the conditions to the effectiveness of this Agreement or (z) result in the creation or imposition of any Lien upon any property or assets of Holdings or any Subsidiary, except for Liens created by the Security Documents.

SECTION 3.03. Enforceability. This Agreement has been duly executed and delivered by each of Holdings and the Borrowers and constitutes, and each other Loan Document executed and delivered by any of Holdings or any other Loan Party constitutes, a legal, valid and binding obligation of such party enforceable against such party in accordance with its terms, except as enforceability may be limited by bankruptcy, insolvency, moratorium, reorganization or other similar laws affecting creditors' rights generally and except as enforceability may be limited by general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).

SECTION 3.04. Approvals. All consents and approvals of, filings and registrations with, and other actions in respect of, all Governmental Authorities required in order to make or consummate the Transactions have been obtained, given, filed or taken and are in full force and effect, other than (a) filings and other actions required pursuant to the Securities Act and the Securities Exchange Act, and filings and

other actions required pursuant to state securities or blue sky laws, in each case to the extent that such filings or other actions are not required to have been made or taken prior to the date hereof, and (b) any such consents, approvals, filings or other action, which the failure to obtain or make could not reasonably be expected to have a Material Adverse Effect.

SECTION 3.05. Use of Proceeds. The Borrowers will use the proceeds of the Loans only for the purposes set forth in Section 5.08.

SECTION 3.06. Federal Reserve Regulations. (a) None of Holdings or any Subsidiary is engaged principally, or as one of its important activities, in the business of extending credit for the purpose of purchasing or carrying Margin Stock.

(b) The making of the Loans hereunder and the use of the proceeds thereof as contemplated hereby and the other Transactions will not violate or be inconsistent with the provisions of the Regulations of the Board, including Regulations T, U and X.

SECTION 3.07. Options for Capital Stock. Except as provided in Schedule 3.07 hereto, neither Holdings nor any Subsidiary is a party to any outstanding subscriptions, options, warrants, calls, rights (including preemptive rights) or other agreements or commitments (other than stock options granted to employees, consultants or directors and directors' qualifying shares) of any nature relating to any capital stock of Holdings.

SECTION 3.08. Security Documents. (a) The Guarantee and Collateral Agreement is, and each of the other U.S. Security Documents (other than the U.S. Mortgages) are effective to create in favor of the Collateral Agent, for the benefit of the Secured Parties, a legal, valid and enforceable (except as enforceability may be limited by bankruptcy, insolvency, moratorium, reorganization or other similar laws affecting creditors' rights generally and except as enforceability may be limited by general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law)) security interest (or hypothec, if applicable) in the Collateral described therein. In the case of the Pledged Stock and Intercompany Notes described in the Guarantee and Collateral Agreement, when the Collateral Agent obtains control of stock certificates or other certificates representing such certificated Pledged Stock and Intercompany Notes (together with the appropriate stock powers or other appropriate transfer forms for such certificates executed in blank), and in the case of the other Collateral described in the Guarantee and Collateral Agreement and the other U.S. Security Documents (other than the U.S. Mortgages), when (i) financing statements, releases and other filings specified on Schedule 3 of the Guarantee and Collateral Agreement or specified in the applicable other U.S Security Documents are or have been filed and recorded, (ii) other actions specified on Schedule 3 of the Guarantee and Collateral Agreement or specified in the applicable other U.S. Security Documents are taken and (iii) all applicable filings are made in the Register of Personal and Moveable Real Rights in Quebec, the Collateral Agent shall, except as otherwise set forth in the U.S. Security Documents (other than the U.S. Mortgages) have a fully perfected Lien on, and security interest (or hypothec, if applicable) in, all right, title and interest of the Loan Parties in such Collateral, as security for the Obligations, in each case prior and superior in right to any other person (except, in the case of Collateral other than the Pledged Stock, Liens permitted by Section 6.04).

(b) Each of the U.S. Mortgages is effective to create in favor of the Collateral Agent, for the benefit of the Secured Parties, a legal, valid and enforceable (except as enforceability may be limited by bankruptcy, insolvency, moratorium, reorganization or other similar laws affecting creditors' rights generally and except as enforceability may be limited by general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law)) Lien on the Mortgaged Properties described therein and proceeds thereof, and when or if the U.S. Mortgages and related fixture filings are or have been filed in the offices specified therein, each such Mortgage shall constitute a fully perfected Lien on, and

security interest in, all right, title and interest of the Loan Parties in the U.S. Mortgaged Properties encumbered by such U.S. Mortgages, as security for the Obligations (as defined in the relevant U.S. Mortgage), in each case prior and superior in right to any other person (except Liens permitted by Section 6.04).

(c) The Canadian Guarantee and Collateral Agreement is, and each of the other Canadian Security Documents (other than the Canadian Mortgages) will upon execution and delivery thereof be, effective to create in favor of the Canadian Collateral Agent, for the benefit of the Canadian Lenders, a legal, valid and enforceable (except as enforceability may be limited by bankruptcy, insolvency, moratorium, reorganization or other similar laws affecting creditors' rights generally and except as enforceability may be limited by general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law)) security interest (or hypothec, if applicable) in the Collateral described therein. In the case of the Pledged Stock and Intercompany Notes described in the Canadian Guarantee and Collateral Agreement, when stock certificates representing such certificated Pledged Stock and Intercompany Notes (together with the appropriate stock powers or other appropriate transfer forms for such certificates executed in blank) are delivered to the Canadian Collateral Agent, and in the case of the other Collateral described in the Canadian Guarantee and Collateral Agreement and the other Canadian Security Documents (other than the Canadian Mortgages), when (i) financing statements, releases and other filings specified on Schedule 3 of the Canadian Guarantee and Collateral Agreement or specified in the applicable other Canadian Security Documents are filed and recorded, (ii) other actions specified on Schedule 3 of the Canadian Guarantee and Collateral Agreement or specified in the other applicable Canadian Security Documents are taken and (iii) all applicable filings are made in the Register of Personal and Moveable Real Rights in Quebec, the Canadian Collateral Agent shall, except as otherwise set forth in the Canadian Security Documents (other than the Canadian Mortgages), have a fully perfected Lien on, and security interest (or hypothec, if applicable) in, all right, title and interest of the Loan Parties in such Collateral, as security for the Canadian Obligations (as defined in the Canadian Guarantee and Collateral Agreement), in each case prior and superior in right to any other person (except, in the case of Collateral other than the Pledged Stock, Liens permitted by Section 6.04).

(d) Each of the Canadian Mortgages will upon delivery thereof in accordance with Section 5.17(a) be effective to create in favor of the Canadian Collateral Agent, for the benefit of the Canadian Lenders, a legal, valid and enforceable (except as enforceability may be limited by bankruptcy, insolvency, moratorium, reorganization or other similar laws affecting creditors' rights generally and except as enforceability may be limited by general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law)) Lien on the Canadian Mortgaged Properties described therein and proceeds thereof, and when the Canadian Mortgages and related fixture filings are filed in the offices specified therein, each such Canadian Mortgage shall constitute a fully perfected Lien on, and security interest (or hypothec, if applicable) in, all right, title and interest of the Loan Parties in the Canadian Mortgaged Properties encumbered by such Canadian Mortgages, as security for the Canadian Obligations (as defined in the relevant Canadian Mortgage), in each case prior and superior in right to any other person (except Liens permitted by Section 6.04).

(e) Notwithstanding the foregoing, the representations and warranties set forth in this Section 3.08 shall not be required to be made with respect to any item of property unless and until such item of property becomes Collateral under a Security Document in accordance with this Agreement.

SECTION 3.09. Financial Statements. (a) The unaudited pro forma consolidated balance sheet of Holdings and its subsidiaries as at September 30, 2001 (including the notes thereto) (the "Pro Forma Balance Sheet"), copies of which have heretofore been furnished to each Lender, has been prepared giving effect (as if such events had occurred on such date) to (i) the consummation of the Transactions, (ii) the Loans to be made, the Senior Unsecured Notes to be issued, the Receivable Facility Proceeds to be funded, the

Investor Common Equity and the Seller Preferred to be issued on the Closing Date, the Textron Sale/Leaseback Financing to be consummated on the Closing Date, and the use of proceeds thereof, (iii) the payment of fees and expenses in connection with the foregoing and (iv) acquisitions consummated by Holdings which would be required to be presented in a registration statement prepared pursuant to and in accordance with the Securities Act (including, without limitation, the acquisitions of The Becker Group and Joan Fabrics). The Pro Forma Balance Sheet has been prepared in accordance with Regulation S-X as of the date of delivery thereof, and presents fairly on a pro forma basis the estimated financial position of Holdings and its consolidated subsidiaries as at September 30, 2001 assuming that the events specified in the preceding sentence had actually occurred on such date.

(b) Holdings has heretofore furnished to each of the Lenders consolidated balance sheets and consolidated statements of income and cash flow of Holdings and its consolidated subsidiaries as at and for the fiscal years ended December 26, 1998, December 25, 1999 and December 31, 2000, certified by Arthur Andersen L.L.P., independent public accountants for Holdings and as at and for the fiscal quarters ended September 30, 2000 and September 30, 2001. Such balance sheets and statements of income and cash flows present fairly the financial condition and results of operations of Holdings and its consolidated subsidiaries on a consolidated basis as of the dates and for the periods indicated. Neither Holdings nor any of its Subsidiaries had, at the date of the most recent balance sheet referred to above, any material Guarantee, contingent liability or liability for taxes, or any long-term lease or unusual forward or long-term commitment, including, without limitation, any interest rate or foreign currency swap or exchange transaction, which is not reflected and not required to be reflected in the foregoing statements or in the notes thereto. The financial statements referred to in this Section 3.09(b) have been prepared in accordance with GAAP applied on a consistent basis.

(c) Holdings has heretofore furnished to each of the Lenders combined balance sheets and combined statements of income and cash flow of the Tac-Trim Subsidiaries and their consolidated subsidiaries as at and for the fiscal years ended January 2, 1999, January 1, 2000 and December 30, 2000, certified by Ernst & Young LLP, independent public accountants for the Tac-Trim Subsidiaries and as at and for the fiscal quarters ended September 30, 2000 and September 30, 2001. Such balance sheets and statements of income and cash flows present fairly the financial condition and results of operations of the Tac-Trim Subsidiaries and their consolidated subsidiaries on a consolidated basis as of the dates and for the periods indicated. Neither the Tac-Trim Subsidiaries nor any of their Subsidiaries had, at the date of the most recent balance sheet referred to above, any material Guarantee, contingent liability or liability for taxes, or any long-term lease or unusual forward or long-term commitment, including, without limitation, any interest rate or foreign currency swap or exchange transaction, which is not reflected and not required to be reflected in the foregoing statements or in the notes thereto. The financial statements referred to in this Section 3.09(c) have been prepared in accordance with GAAP applied on a consistent basis.

SECTION 3.10. No Material Adverse Change. (a) Except as set forth in the Confidential Information Memorandum or any public filing by Holdings with the Securities and Exchange Commission made on or prior to December 4, 2001, in each case solely with respect to the financial and operating performance of Holdings and its Subsidiaries and the Tac-Trim Subsidiaries for the period from January 1, 2001 to October 31, 2001, there has been no material adverse change in the business, properties, assets, operations, financial condition, contingent liabilities or material agreements of Holdings and its Subsidiaries, taken as a whole (after giving effect to the Acquisition), since December 31, 2000.

(b) Except as set forth in the Confidential Information Memorandum or any public filing by Holdings with the Securities and Exchange Commission made on or prior to December 4, 2001, in each case solely with respect to the financial and operating performance of Holdings and its Subsidiaries and the Tac-Trim Subsidiaries for the period from January 1, 2001 to October 31, 2001, as of the Closing Date, there has

been no material adverse change in the business, operations, and assets, financial condition, contingent liabilities or material agreements of the Tac-Trim Subsidiaries, taken as a whole, since December 31, 2000.

SECTION 3.11. Title to Properties; Possession Under Leases.

(a) Each of Holdings, the Company and the Significant Subsidiaries has good and marketable title to, or valid leasehold interests in, or easements on or other limited property interests in, all their respective material properties and assets, except for minor defects in title and limitations on property interests that do not materially interfere with their respective ability to conduct their respective business as currently conducted or to utilize such properties and assets for their intended purposes. All such material properties and assets are free and clear of Liens, other than Liens expressly permitted by Section 6.04 or in any Security Document.

(b) Each of Holdings, the Company and the Significant Subsidiaries has complied with all obligations under all material leases to which it is a party, except where the failure to comply would not have a Material Adverse Effect, and all such leases are in full force and effect, except leases in respect of which the failure to be in full force and effect would not have a Material Adverse Effect. Each of Holdings, the Company and the Significant Subsidiaries enjoys peaceful and undisturbed possession under all such material leases.

(c) Each of Holdings, the Company and the Significant Subsidiaries owns or possesses, or could obtain ownership or possession of, on terms not materially adverse to it, all patents, trademarks, service marks, trade names, copyrights, licenses and rights with respect thereto necessary for the present conduct of its business, without any known conflict with the rights of others, and free from any burdensome restrictions, except where such conflicts and restrictions would not, individually or in the aggregate, have a Material Adverse Effect.

SECTION 3.12. Subsidiaries. (a) Schedule 3.12(a) sets forth as of the Closing Date a list of all Subsidiaries of Holdings and the percentage ownership interest of Holdings therein and whether such Subsidiaries are Significant Subsidiaries.

(b) There are no outstanding subscriptions, options, warrants, calls, rights or other agreements or commitments (other than stock options granted to employees, consultants or directors and directors' qualifying shares) of any nature relating to any capital stock of any Subsidiary of Holdings, except for the Security Documents or as provided in Schedule 3.12(b).

SECTION 3.13. Litigation; Compliance with Laws. (a) There are not any actions, suits or proceedings at law or in equity or by or before any court or Governmental Authority now pending or, to the knowledge of Holdings or the Borrowers, threatened against or affecting Holdings or any of its Subsidiaries or any property or rights of Holdings or any of its subsidiaries as to which there is a reasonable possibility of an adverse determination and which

(i) if adversely determined, would, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect or (ii) involve the Loan Documents or (iii) if adversely determined would reasonably be expected to materially adversely affect the Transactions.

(b) None of Holdings or any of its Subsidiaries is in default with respect to any law, order, judgment, writ, injunction, decree, rule or regulation of any Governmental Authority where such default would reasonably be expected to have a Material Adverse Effect. The Borrowings hereunder, the use of the proceeds thereof as described in Section 5.08 and the other Transactions will not violate any applicable law or regulation or violate or be prohibited by any judgment, writ, injunction, decree or order of any court or Governmental Authority or subject Holdings or any of its subsidiaries to any civil or criminal penalty or fine.

SECTION 3.14. Agreements. (a) None of Holdings or any of its Subsidiaries is a party to any agreement or instrument or subject to any corporate restriction that has resulted or could reasonably be expected to result in a Material Adverse Effect.

(b) None of Holdings or any of its Subsidiaries is in default in any manner under any provision of any indenture or other agreement or instrument evidencing Indebtedness or any other material agreement or instrument to which it is a party or by which it or any of its properties or assets are or may be bound, in either case where such default could result in a Material Adverse Effect. After giving effect to the Transactions, no Default or Event of Default shall have occurred and be continuing.

SECTION 3.15. Investment Company Act. None of Holdings or any of its Subsidiaries is an "investment company" or a company "controlled" by an "investment company" within the meaning of the Investment Company Act of 1940, as amended.

SECTION 3.16. Public Utility Holding Company Act. None of Holdings or any of its Subsidiaries is a "holding company", or a "subsidiary company" of a "holding company", or an "affiliate" of a "holding company" or of a "subsidiary company" of a "holding company", within the meaning of the Public Utility Holding Company Act of 1935, as amended.

SECTION 3.17. Tax Returns. Each of Holdings and its Subsidiaries has filed or caused to be filed all Federal, and all material state and local, tax returns required to have been filed by it and has paid or caused to be paid all taxes shown thereon to be due and payable, and any assessments in excess of $2,000,000 in the aggregate received by it, except taxes that are being contested in accordance with Section 5.03 and taxes, assessments, charges, levies or claims in respect of property taxes for property that Holdings or one of its Subsidiaries has determined to abandon where the sole recourse for such tax, assessment, charge, levy or claim is to such property. Each of Holdings and its Subsidiaries has paid in full or made adequate provision (in accordance with GAAP) for the payment of all taxes due with respect to the periods ending on or before December 29, 2000, which taxes, if not paid or adequately provided for, would have a Material Adverse Effect. The tax returns of Holdings and its Subsidiaries have been examined by relevant Federal tax authorities for all periods through January 30, 1993, and all deficiencies asserted as a result of such examinations have been paid. Except as set forth on Schedule 3.17, as of the Closing Date, with respect to each of Holdings and its Subsidiaries, (i) no material claims are being asserted in writing with respect to any taxes, (ii) no presently effective waivers or extensions of statutes of limitation with respect to taxes have been given or requested, (iii) no tax returns are being examined by, and no written notification of intention to examine has been received from, the Internal Revenue Service or any other taxing authority and (iv) no currently pending issues have been raised in writing by the Internal Revenue Service or any other taxing authority. For purposes hereof, "taxes" shall mean any present or future tax, levy, impost, duty, charge, assessment or fee of any nature (including interest, penalties and additions thereto) that is imposed by any Governmental Authority.

SECTION 3.18. No Material Misstatements. (a) The information, reports, financial statements, exhibits and schedules furnished by or on behalf of Holdings or any of its Subsidiaries or Affiliates to the Administrative Agent or any Lender in connection with the negotiation of any Loan Document or included therein or delivered pursuant thereto, when taken as a whole, did not contain, and as they may be amended, supplemented or modified from time to time, will not contain, as of the Closing Date any material misstatement of fact and did not omit, and as they may be amended, supplemented or modified from time to time, will not omit, to state as of the Closing Date any material fact necessary to make the statements therein, in the light of the circumstances under which they were, are or will be made, not materially misleading.

(b) All financial projections concerning Holdings and its Subsidiaries that are or have been made available to the Administrative Agent or any Lender by Holdings or any of its Subsidiaries or Affiliates, unless otherwise disclosed, have been or will be prepared in good faith based upon assumptions believed by Holdings and the Company to be reasonable at the date of their delivery.

SECTION 3.19. Employee Benefit Plans. Each of Holdings and the Restricted Subsidiaries and each of their ERISA Affiliates is in compliance in all material respects with the applicable provisions of ERISA and the regulations and published interpretations thereunder except for such noncompliance which would not be expected to result in a Material Adverse Effect. No Reportable Event has occurred as to which Holdings or any of the Restricted Subsidiaries or any of their ERISA Affiliates was required to file a report with the PBGC, other than reports for which the 30 day notice requirement is waived, reports that have been filed and reports the failure of which to file would not result in a Material Adverse Effect and as of the Closing Date, the present value of all benefit liabilities under each Plan of Holdings and the Restricted Subsidiaries or any of their ERISA Affiliates (on a termination basis and based on those assumptions used to fund such Plan) did not, as of the last annual valuation report applicable thereto, exceed by more than $17,500,000 the value of the assets of such Plan on a termination basis. None of Holdings or any of the Restricted Subsidiaries or any of their ERISA Affiliates has incurred or could reasonably be expected to incur any Withdrawal Liability that could result in a Material Adverse Effect. None of Holdings or any of the Restricted Subsidiaries or any of their ERISA Affiliates has received any notification that any Multiemployer Plan is in reorganization or has been terminated within the meaning of Title IV of ERISA, and no Multiemployer Plan is reasonably expected to be in reorganization or to be terminated where such reorganization or termination has resulted or could reasonably be expected to result, through increases in the contributions required to be made to such Plan or otherwise, in a Material Adverse Effect.

SECTION 3.20. Labor Matters. There are no strikes against Holdings or any of its Subsidiaries pending, other than any strikes which, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect. The hours worked and payment made to employees of Holdings and each of its Subsidiaries have not been in violation in any material respect of the Fair Labor Standards Act or any other applicable law dealing with such matters. All material payments due from Holdings or any of its Subsidiaries, or for which any claim may be made against Holdings or any of its Subsidiaries, on account of wages and employee health and welfare insurance and other benefits have been paid or accrued as a liability on the books of Holdings or such subsidiary to the extent required by GAAP. The consummation of the Transactions will not give rise to a right of termination or right of renegotiation on the part of any union under any collective bargaining agreement to which Holdings or any of its Subsidiaries (or any predecessor) is a party or by which Holdings or any of its subsidiaries (or any predecessor) is bound, other than collective bargaining agreements which, individually or in the aggregate, are not material to Holdings and its Subsidiaries taken as a whole.

SECTION 3.21. Environmental Matters. (a) Except as disclosed in writing to each Agent, each Lender and the Issuing Bank prior to the Closing Date, which disclosed matters individually and in the aggregate are not reasonably expected by Holdings or the Company to have a Material Adverse Effect, (i) Holdings and each of its Subsidiaries has complied in all respects with all applicable Federal, state, local and other statutes, ordinances, orders, judgments, rulings and regulations relating to environmental pollution or to environmental regulation or control, except to the extent of any failure so to comply which alone and together with other such failures is not reasonably expected to result in a Material Adverse Effect; (ii) none of Holdings or any Subsidiary of Holdings has received notice of any failure so to comply which alone or together with other such failures is reasonably expected to result in a Material Adverse Effect; and (iii) none of Holdings or any of its Subsidiaries manages, transports or stores any hazardous wastes, hazardous substances, hazardous materials, toxic substances or toxic pollutants, as those terms are used in the Resource Conservation and Recovery Act, the Comprehensive Environmental Response Compensation and Liability Act, the Hazardous Materials Transportation Act, the Toxic Substance Control Act, the Clean Air Act or the

Clean Water Act, in violation of any applicable regulations promulgated pursuant thereto or of any other applicable law where such violation is reasonably likely to result, individually or together with other violations, in a Material Adverse Effect.

(b) Except with respect to matters that, individually and in the aggregate, Holdings and the Company reasonably believe would not have a Material Adverse Effect, as of the Closing Date: (i) the operations of Holdings and each of its Subsidiaries comply in all respects with all Environmental Laws and, to the knowledge of Holdings and the Borrowers after inquiry, no conditions exist (including at properties leased or subleased to third persons) which would subject Holdings or its Subsidiaries to damages, liabilities, penalties, injunctive relief or clean-up costs under any Environmental Law or which require or are reasonably likely to require any Remedial Action under any Environmental Law; (ii) each of Holdings and its Subsidiaries has obtained all Environmental Permits necessary for its operation or required by any Environmental Law, and all such Environmental Permits are in good standing, and none of Holdings or its Subsidiaries has been cited by a Governmental Authority for violating any terms or conditions of such Environmental Permits within the five-year period prior to the Closing Date; (iii) none of Holdings or its Subsidiaries is subject or a party to any Environmental Claim; (iv) with respect to present facilities and operations, none of Holdings or its Subsidiaries, or, to the knowledge of Holdings or the Borrowers, any predecessor of such persons, is subject to any outstanding written order or agreement with any Governmental Authority or private party respecting (A) any Environmental Law, (B) any Remedial Action under any Environmental Law, or (C) any Environmental Claim; (v) to the knowledge of Holdings or the Borrowers, none of the operations of any of Holdings or its Subsidiaries is the subject of any investigation by a Governmental Authority evaluating whether any Remedial Action under any Environmental Law is needed; (vi) none of Holdings or its Subsidiaries or, to the knowledge of Holdings or the Borrowers, any predecessor of such persons has filed any notice under any Environmental Law indicating past or present treatment, storage or disposal of a hazardous waste as defined under 40 C.F.R. Parts 260 through 270 (in effect as of the Closing Date) or any state equivalent, or reporting a Release of a Contaminant; (vii) to the knowledge of Holdings or the Borrowers except as permitted under any Environmental Law, none of Holdings or its Subsidiaries has experienced a Release of any Contaminant, and there has been no voluntary disposal, use, storage, recycling or treatment on, under or at any property of such person (or in tanks or other facilities thereon) of any Contaminant which, if known to be present on such property, or present in soils or groundwater, would require Remedial Action under any Environmental Law; and (viii) no Lien in favor of any Governmental Authority for (A) any liability under any Environmental Law or (B) damages arising from or costs incurred by such Governmental Authority in response to a Release of a Contaminant into the environment has been recorded with respect to any property of Holdings or any of its Subsidiaries. For purposes of this Section 3.21(b), "knowledge" means the actual knowledge of any Responsible Officer of Holdings or any Restricted Subsidiary, any officer of Holdings or any Restricted Subsidiary with responsibility for environmental compliance, or any plant or facilities manager with responsibility for overall management of such plant or facility of Holdings or any of its Subsidiaries.

(c) Each of Holdings and its Subsidiaries reasonably believes that Holdings and its Subsidiaries on a consolidated basis have made adequate provision (in accordance with GAAP) for all damages, liabilities, penalties or costs that they reasonably expect to incur in connection with any Environmental Claim or any Remedial Action existing or, to the knowledge of Holdings or the Company, reasonably anticipated as of the date of this Agreement.

SECTION 3.22. Solvency. (a) The fair salable value of the assets of the Company exceeds the amount that will be required to be paid on or in respect of the existing debts and other liabilities (including contingent liabilities) of the Company as they mature. The assets of the Company do not constitute unreasonably small capital to carry out its business as conducted or as proposed to be conducted. The Company does not intend to, or believe that it will, incur debts beyond its ability to pay such debts as they mature (taking into account the Transactions).

(b) Upon consummation of the Transactions, the fair salable value of the assets of the Company and its subsidiaries taken as a whole will exceed the amount that will be required to be paid on or in respect of the existing debts and other liabilities (including contingent liabilities) of the Company and its subsidiaries.

(c) The assets of the Company and its subsidiaries taken as a whole do not, and upon consummation of the Transactions will not, constitute unreasonably small capital for the Company and its subsidiaries to carry out their respective businesses as now conducted and as proposed to be conducted including the capital needs of the Company and its subsidiaries taking into account the particular capital requirements of the business conducted by the Company and each of its subsidiaries, and projected capital requirements and capital availability thereof.

(d) The Company does not intend to, or intend to permit any of its subsidiaries to, incur debts beyond their respective ability to pay such debts as they mature, taking into account the timing and amounts of cash to be received by the Company and each of such subsidiaries, and of amounts to be payable on or in respect of debt of the Company and each of such subsidiaries.

SECTION 3.23. Absence of Certain Restrictions. No indenture, certificate of designation for preferred stock, agreement or other instrument to which Holdings or any Restricted Subsidiary is a party will prohibit or materially restrain, or have the effect of prohibiting or materially restraining, or imposing materially adverse conditions upon, the incurrence of Indebtedness, the granting of Liens in favor of the Secured Parties, the provision of Guarantees or the payment of dividends by Subsidiaries except for restrictions (a) on the granting of Liens on assets that are encumbered by Liens permitted under clause (a), (b), (h), (j), (k), (n), (p), (r) or (u) of Section 6.04, to the extent that such restrictions apply only to the assets so encumbered and are imposed by the agreements under which such Liens were granted, (b) contained in agreements relating to Indebtedness permitted by
Section 6.01 and the Seller Preferred or (c) requiring preferred payment of dividends on the preferred shares of the Brazilian Subsidiary imposed by applicable Brazilian law, rule or regulation.

SECTION 3.24. No Foreign Assets Control Regulation Violation. None of the Transactions will result in a violation of any of the foreign assets control regulations of the United States Treasury Department, 31 C.F.R., Subtitle B, Chapter V, as amended (including the Foreign Assets Control Regulations, the Transaction Control Regulations, the Cuban Assets Control Regulations, the Foreign Funds Control Regulations, the Iranian Assets Control Regulations, the Nicaraguan Trade Control Regulations, the South African Transactions Regulations, the Libyan Sanctions Regulations, the Soviet Gold Coin Regulations, the Panamanian Transactions Regulations, the Kuwaiti Assets Control Regulations and the Iraqi Sanctions Regulations contained in said Chapter V), or any ruling issued thereunder or any enabling legislation or Presidential Executive Order granting authority therefor, nor will the proceeds of the Loans be used by the Company in a manner that would violate any thereof.

SECTION 3.25. Insurance. Each of Holdings and the Restricted Subsidiaries carries and maintains with respect to its insurable properties insurance (including self insurance) with financially sound and reputable insurers of the types, to such extent and against such risks as is customary with companies in the same or similar businesses, including fire and other risks insured against by extended coverage and public liability insurance against claims for personal injury or death or property damages occurring upon, in, about or in connection with the use of any properties owned, occupied or controlled by it.

SECTION 3.26. Certain Other Representations. All representations and warranties contained in any other Loan Document and made by any of Holdings or any of its Subsidiaries are true and correct as of the date made or deemed to have been made.

82

SECTION 3.27. Senior Debt. All payment obligations of the Company under the Loan Documents constitute Senior Indebtedness (as defined in the Subordinated Notes Indenture), and all payment obligations of Holdings and the Subsidiary Guarantors under the Loan Documents constitute Senior Guarantor Indebtedness (as defined in the Subordinated Notes Indenture). This Agreement is the Credit Agreement as defined in the Subordinated Notes Indenture.

## ARTICLE IV.

## CONDITIONS

The obligations of the Lenders to make Loans hereunder and the obligation of the Issuing Banks to issue Letters of Credit hereunder are subject to the satisfaction of the following conditions:

SECTION 4.01. All Credit Events. On the date of each Borrowing, other than a Borrowing in which Revolving Credit Loans are refinanced with new Revolving Credit Loans, Canadian Revolving Credit Loans are refinanced with new Canadian Revolving Credit Loans or Additional Revolving Credit Loans are refinanced with new Additional Revolving Credit Loans (without any increase in the aggregate principal amount of Revolving Credit Loans, Canadian Revolving Credit Loans or Additional Revolving Credit Loans, as the case may be outstanding) as contemplated by Section 2.02(e), and on the date of each issuance or renewal of a Letter of Credit:

(a) Borrowing Notice. Except in the case of the Borrowing of Tranche A-1 Term Loans on the Fifth Amendment Effective Date and the deemed issuance of Supplemental Revolving Letters of Credit, the Applicable Agent shall have received a notice of such Borrowing as required by Section 2.03, or the Applicable Agent and the applicable Issuing Bank shall have received a notice regarding the issuance or renewal of such Letter of Credit as required by Section 2.19(c), as applicable.

(b) Representations and Warranties. The representations and warranties set forth in each Loan Document shall be true and correct in all material respects on and as of the date of such Borrowing, issuance or renewal with the same effect as though made on and as of such date, except to the extent such representations and warranties expressly relate to an earlier date.

(c) No Default. At the time of and immediately after such Borrowing, issuance or renewal no Event of Default or Default shall have occurred and be continuing.

Each Borrowing and each issuance or renewal of a Letter of Credit shall be deemed to constitute a representation and warranty by the Company on the date of such Borrowing as to the matters specified in paragraphs (b) and (c) of this Section 4.01.

SECTION 4.02. Conditions to Effectiveness. On the Closing Date:

(a) Loan Documents. The Applicable Agent shall have received:

(i) this Agreement, executed and delivered by each Agent, Holdings, the Company, the Canadian Borrowers and each Lender,

(ii) the Guarantee and Collateral Agreement, executed and delivered by the Company and each Guarantor,

(iii) an Acknowledgement and Consent in the form attached to the Guarantee and Collateral Agreement, executed and delivered by each Issuer (as defined therein), if any,

that

is not a Loan Party,

(iv) the Canadian Guarantee and Collateral Agreement, executed and delivered by each Canadian Borrower and each Canadian Guarantor,

(v) an Acknowledgement and Consent in the form attached to the Canadian Guarantee and Collateral Agreement, executed and delivered by each Issuer (as defined therein), if any, that is not a Loan Party and

(vi) other Canadian Security Documents (other than the Canadian Mortgages).

(b) Fees. The Administrative Agent and the Canadian Administrative Agent shall have received all Fees and other amounts due and payable on or prior to the Closing Date, including reimbursement of any out-of-pocket expenses referred to in Section 9.05 (to the extent that notice thereof is given to the Company prior to the Closing Date).

(c) Transactions.

The following transactions shall have been consummated, in each case on terms and conditions reasonably satisfactory to the Administrative Agent:

(i) the Acquisition shall have been consummated in accordance with applicable law and the Tac-Trim Purchase Agreement;

(ii) cash consideration paid in connection with the Acquisition shall equal on the Closing Date $625,400,000;

(iii) Holdings shall have received at least $160,000,000 in cash from the issuance of the Investor Common Equity (including approximately $100,000,000 from Heartland and its co-investing limited partners), and such proceeds shall have been contributed to the Company;

(iv) Holdings shall have issued the Seller Common Equity, and the Company shall have issued the Seller Preferred, to Textron;

(v) the Company shall have received at least $500,000,000 in gross cash proceeds from the issuance of the Senior Unsecured Notes;

(vi) the Textron Sale/Leaseback Financing shall have been consummated on terms and conditions reasonably satisfactory to the Administrative Agent;

(vii) the Receivables Subsidiary shall have received at least $72,000,000 (or, if less, the amount needed to consummate the Transactions) in Receivable Facility Proceeds;

(viii) the Administrative Agent shall have received satisfactory evidence that, after giving effect to the Transactions, (A) the total Indebtedness of Holdings and its Subsidiaries will not exceed $1,447,000,000 and (B) Holdings and its Subsidiaries shall have outstanding no Indebtedness (including any receivables facility or securitization) or preferred stock other than (1) the Loans made or Letters of Credit issued on the Closing Date, (2) the Senior Unsecured Notes, (3) the Subordinated Notes, (4) the Assumed Indebtedness, (5) the Seller Preferred, and (6) other Indebtedness listed on Schedule 6.01;

84

(ix) the Administrative Agent shall have received satisfactory evidence that all other Indebtedness or preferred stock of Holdings or its Subsidiaries (other than as described in clause (viii) above) has been terminated and all amount thereunder paid in full and that arrangements shall have been made for the termination of all Liens granted in connection therewith;

(x) the Administrative Agent shall have received satisfactory evidence that the fees and expenses to be incurred in connection with the Transactions shall not exceed approximately $77,000,000;

(xi) the factoring arrangements relating to the Italian JV shall be in full force and effect.

(d) Transaction Documents. (i) The Administrative Agent shall have received copies of the executed Transaction Documents, certified by a Responsible Officer of Holdings as true and complete,
(ii) each Transaction Document shall be in full force and effect, (iii) the Transaction Documents shall be substantially in the forms provided to the Administrative Agent prior to the Closing Date and (iv) no provision of the Transaction Documents shall have been waived, amended, supplemented or otherwise modified in any material respect without approval of the Administrative Agent.

(e) Pro Forma Balance Sheet; Financial Information. The Lenders shall have received:

(i) a pro forma balance sheet of Holdings and its Subsidiaries dated the day prior to the Closing Date and prepared to give effect to the Transactions, which shall not be materially inconsistent with the forecasts previously provided to the Lenders, except for changes occurring in the ordinary course of business of Holdings and its Subsidiaries;

(ii) the audited consolidated financial statements of Holdings and its consolidated subsidiaries referred to in
Section 3.09;

(iii) unaudited interim consolidated financial statements (including related balance sheets and statements of income, shareholders equity and cash flows) of Holdings and its consolidated subsidiaries for each quarterly period of 2001 ended more than 45 days prior to the Closing Date and for each comparable quarterly period of the immediately preceding fiscal year;

(iv) audited combined income statements (including related statements of income, shareholders equity and cash flows) of the Tac-Trim Subsidiaries for the three fiscal years ended December 31, 2000 and audited combined balance sheets of the Tac-Trim Subsidiaries as at December 30, 2000 and January 1, 2000;

(v) unaudited combined financial statements (including related balance sheets and statements of income, shareholders equity and cash flows) of the Tac-Trim Subsidiaries for the nine month period ended September 30, 2001;

(vi) unaudited consolidated balance sheets and related statements of income of Holdings and balance sheet data and related income statement data of the Tac-Trim Subsidiaries in a form reasonably satisfactory to the Administrative Agent for each fiscal month of such person after the most recent fiscal quarter for which financial statements were received by the Lenders as described above through and including October 31, 2001, in each

case within 30 days of the end of each such fiscal month, and

(vii) projected quarterly operating results of Holdings and its Subsidiaries through December 31, 2002 and satisfactory support detail projected by platform and content per vehicle for the forecast period.

(f) Solvency. The Lenders shall have received a solvency certificate from the chief financial officer of Holdings, in form and substance reasonably satisfactory to the Administrative Agent, together with such other evidence reasonably requested by the Lenders, confirming the solvency of each of Holdings and its subsidiaries on a consolidated basis after giving effect to the Transactions.

(g) EBITDA. (i) The Lenders shall have received the monthly financial results of each of Holdings and the Tac-Trim Subsidiaries through October 31, 2001. The Lenders shall be satisfied that combined EBITDA (to be calculated in a manner satisfactory to the Administrative Agent) of Holdings and the Tac-Trim Subsidiaries for fiscal year 2001 will be at least $377,500,000; and

(ii) the combined EBITDA (as defined in the offering memorandum for the Senior Unsecured Notes) of Holdings and the Tac-Trim Subsidiaries for the 12 months ended September 30, 2001 shall be at least $372,000,000 (which shall include no more than $40,600,000 of adjustments not permitted by Regulation S-X as previously agreed with the Administrative Agent).

(h) Indenture Certification. The Lenders shall have received a certificate from the chief financial officer of Holdings, in form and substance reasonably satisfactory to the Administrative Agent, setting forth in reasonable detail the calculation of the amount of Indebtedness permitted to be incurred by Holdings and its Subsidiaries under the covenants contained in the Subordinated Notes Indenture and certifying that such amounts are sufficient to permit the Indebtedness under this Agreement, the Senior Unsecured Notes and other Indebtedness to be incurred or assumed in connection with the Transactions.

(i) Fees. The Lenders and the Administrative Agent shall have received all fees required to be paid, and all expenses for which invoices have been presented (including the reasonable fees and expenses of legal counsel), on or before the Closing Date. All such amounts will be paid with proceeds of Loans made on the Closing Date and will be reflected in the funding instructions given by the Company to the Administrative Agent on or before the Closing Date.

(j) Pledged Stock; Stock Powers; Pledged Notes. The Applicable Collateral Agent shall have received (i) the certificates representing the shares of capital stock pledged pursuant to the Security Documents, together with an undated stock power for each such certificate executed in blank by a duly authorized officer of the pledgor thereof and (ii) each promissory note (if any) pledged to the Applicable Collateral Agent pursuant to the Security Documents endorsed (without recourse) in blank (or accompanied by an executed transfer form in blank) by the pledgor thereof.

(k) Filings, Registrations and Recordings. The Applicable Collateral Agent shall have received each document (including any Uniform Commercial Code financing statement or its equivalent in the relevant Canadian jurisdiction) required by the Security Documents or under law or reasonably requested by the Applicable Collateral Agent to be filed, registered or recorded in order to create in favor of the Applicable Collateral Agent, for the benefit of the Secured Parties, a perfected Lien on the Collateral described therein, prior and superior in right to any other person (other than with respect to Liens expressly permitted by Section 6.04), in proper form for filing, registration or recordation including, without limitation, all acknowledgements, releases and waivers from third

parties reasonably requested by the Applicable Collateral Agent in order to confirm the priority of the Applicable Collateral Agent in the Collateral, contemplated by the applicable Security Document.

(l) Insurance. The Applicable Agent shall have received insurance certificates satisfying the requirements of Section 5.2(b) of the Guarantee and Collateral Agreement and Section 6.2(b) of the Canadian Guarantee and Collateral Agreement.

(m) Legal Opinions. The Administrative Agent shall have received the favorable written opinions of (i) Cahill Gordon & Reindel, special finance counsel, (ii) Ronald Lindsay, Esq., general counsel for Holdings and its subsidiaries, (iii) Canadian (Ontario) counsel for Holdings and its subsidiaries and (iv) Canadian (Quebec) counsel for Holdings and its subsidiaries, dated the Closing Date and addressed to the Lenders, and in form and substance satisfactory to the Administrative Agent and covering the matters set forth in Exhibit D. In addition, the Administrative Agent shall have received the favorable written opinions of such local counsel with respect to legal matters relating hereto as the Administrative Agent may reasonably have requested, in such form and to such effect as shall be satisfactory to the Lenders and to Simpson Thacher & Bartlett , special counsel for the Administrative Agent.

(n) Closing Certificate. The Applicable Agent shall have received (i) a certificate of the Secretary or Assistant Secretary of each Loan Party dated the Closing Date and certifying (A) that attached thereto is a true and complete copy of resolutions duly adopted by the Board of Directors of such entity authorizing the execution, delivery and performance of the Loan Documents to which it is a party, the granting of the Liens thereunder and, in the case of a Borrower, the borrowings hereunder, and that such resolutions have not been modified, rescinded or amended and are in full force and effect and (B) as to the incumbency and specimen signature of each officer executing any Loan Document or any other document delivered in connection herewith on behalf of such entity; (ii) a certificate of another officer as to the incumbency and specimen signature of the Secretary or Assistant Secretary executing the certificate pursuant to (i) above and (iii) such other documents as the Lenders or their counsel or Simpson Thacher & Bartlett, special counsel for the Administrative Agent, may reasonably request.

(o) No Default; Representation and Warranties. The Administrative Agent shall have received a certificate, dated the Closing Date and signed by a Financial Officer of Holdings and the Company, confirming compliance with the conditions precedent set forth in paragraphs (b) and (c) of Section 4.01.

(p) Legal Matters. All legal matters incident to this Agreement and the borrowings hereunder shall be reasonably satisfactory to the Agents and to Simpson Thacher & Bartlett, special counsel for the Administrative Agent and McMillan Binch, special counsel for the Canadian Administrative Agent.

## ARTICLE V.

## AFFIRMATIVE COVENANTS

Each of Holdings and the Borrowers covenants and agrees that from and after the Closing Date, so long as this Agreement or any Letter of Credit shall remain in effect or the principal of or interest on any Loan, any Fees or any other expenses or amounts payable under or in respect of any Loan Document or Letter of Credit shall be unpaid, unless the Required Lenders shall otherwise consent in writing, Holdings and the Borrowers will, and will cause each of the Restricted Subsidiaries to:

SECTION 5.01. Existence; Businesses and Properties. (a) Do or cause to be done all things necessary to preserve, renew and keep in full force and effect its legal existence, except as otherwise expressly permitted under
Section 6.08 and except for the liquidation or dissolution of Restricted Subsidiaries (other than Significant Subsidiaries) if the assets of such corporations to the extent they exceed estimated liabilities are acquired by a wholly owned Restricted Subsidiary in such liquidation or dissolution; provided that Subsidiaries which are Guarantors may not be liquidated into Subsidiaries that are not Guarantors and domestic Subsidiaries may not be liquidated into foreign Subsidiaries.

(b) Do or cause to be done all things necessary to obtain, preserve, renew, extend and keep in full force and effect the rights, licenses, permits, franchises, authorizations, patents, copyrights, trademarks and trade names material to the conduct of its business; comply in all material respects with all applicable laws, rules, regulations and orders of any Governmental Authority, whether now in effect or hereafter enacted; and at all times maintain and preserve all property material to the conduct of such business and keep such property in good repair, working order and condition and from time to time make, or cause to be made, all needful and proper repairs, renewals, additions, improvements and replacements thereto necessary in order that the business carried on in connection therewith, if any, may be properly conducted at all times.

(c) Without limiting the generality of the provisions of
Section 5.01(b), each of Holdings and the Borrowers shall (i)(A) undertake reasonable efforts to comply, and to cause each Subsidiary to comply, in all material respects with all Environmental Laws and any order, decree or similar requirements of any Governmental Authority concerning (1) a material violation of any Environmental Law, (2) a financial contribution by Holdings or any of its Subsidiaries under any Environmental Law or (3) a Remedial Action by or on the part of Holdings or any of its Subsidiaries under any Environmental Law and (B) undertake reasonable efforts to remedy and to cause each of its Subsidiaries to remedy, as soon as reasonably practicable, any material violation of Environmental Laws, except in any case that compliance or remedy shall not be required insofar as any failure to undertake such efforts cannot reasonably be expected by Holdings, the Canadian Borrowers or the Company to have a Material Adverse Effect, or so long as (x) the validity of the same shall be contested diligently and in good faith, (y) the subject property does not contain a material plant or other facility or shall then be in no danger of being sold, forfeited or lost pursuant to such contest and (z) reserves have been established in accordance with GAAP by Holdings or such subsidiary in connection therewith; and (ii) undertake reasonable efforts to require and to cause each of its subsidiaries to require, to the extent practicable and appropriate, that a lease for any renewing or new tenant contain terms substantially equivalent to those of clause (i) above.

SECTION 5.02. Insurance. Keep its insurable properties insured (including through self-insurance) at all times by financially sound and reputable insurers in such amounts as shall be customary for similar businesses and maintain such other insurance, of such types, to such extent and against such risks, as is customary with companies in the same or similar businesses, including insurance against fire and other risks insured against by extended coverage and public liability insurance against claims for personal injury or death or property damage occurring upon, in, about or in connection with the use of any properties owned, occupied or controlled by it; and maintain such other insurance as may be required by law.

SECTION 5.03. Taxes. Pay and discharge promptly all taxes, assessments and governmental charges or levies imposed upon it or upon its income or profits or in respect of its property, before the same shall become delinquent or in default, as well as all lawful claims for labor, materials and supplies or otherwise which, if unpaid, might give rise to a Lien upon such properties or any part thereof; provided, however, that such payment and discharge shall not be required with respect to any such tax, assessment, charge, levy or claim so long as (a) the validity or amount thereof shall be contested in good faith by appropriate proceedings and Holdings or any Restricted Subsidiary, as applicable, shall set aside on its books adequate reserves as required by GAAP with respect thereto, (b) such tax, assessment, charge, levy or claim is in respect of property taxes for property that Holdings or one of the Restricted Subsidiaries has

determined to abandon and the sole recourse for such tax, assessment, charge, levy or claim is to such property or (c) the amount of such taxes assessments, charges, levies and claims and interest and penalties thereon does not exceed $1,000,000 in the aggregate.

SECTION 5.04. Financial Statements, Reports, Amendments, etc. In the case of Holdings, furnish to the Administrative Agent for distribution to each Credit Agreement Creditor (with sufficient copies for each Credit Agreement Creditor):

(a) within 95 (or, in the case of clause (ii) below, 105) days after the end of each fiscal year consolidated balance sheets and related statements of income and cash flows, showing the consolidated financial condition of each of (i) Holdings and its Subsidiaries and (ii) unless Carcorp, Inc. and Waterstone Insurance Inc. are the only Unrestricted Subsidiaries, Holdings and the Restricted Subsidiaries, in each case as of the close of such fiscal year and the results of their operations during such year, audited in the case of clause (i) above by PricewaterhouseCoopers, LLP or other independent public accountants of recognized national standing (who shall be reasonably acceptable to the Administrative Agent) and accompanied by (1) in the case of clause (i), an opinion of such accountants (which shall not be qualified in any material respect) to the effect that such consolidated financial statements fairly present the financial condition and results of operations of Holdings and its consolidated subsidiaries and Holdings and the Restricted Subsidiaries, respectively, in accordance with GAAP and (2) a certificate of a Financial Officer certifying that such consolidated financial statements fairly present the financial condition and results of operations of Holdings and its consolidated subsidiaries and Holdings and the Restricted Subsidiaries, respectively, in accordance with GAAP consistently applied (except as disclosed in such certificate, in reasonable detail, which detail shall be reasonably acceptable to the Administrative Agent);

(b) within 50 (or, in the case of clause (ii) below, 60) days after the end of each of the first three fiscal quarters of each fiscal year, the consolidated balance sheets and related statements of income and cash flows, showing the consolidated financial condition of each of (i) Holdings and its Subsidiaries and (ii) unless Carcorp., Inc. and Waterstone Insurance Inc. are the only Unrestricted Subsidiaries, Holdings and the Restricted Subsidiaries, in each case as of the close of such fiscal quarter and the results of their operations during such fiscal quarter and the then elapsed portion of the fiscal year, together with the balance sheets and related statements of income and cash flows as of the corresponding dates and for the corresponding periods in the prior year, all certified by one of its Financial Officers as fairly presenting the consolidated financial condition and results of operations of Holdings and its consolidated subsidiaries and Holdings and the Restricted Subsidiaries, respectively, in accordance with GAAP (other than the absence of footnotes in accordance with GAAP) consistently applied (except as disclosed in such certificate in reasonable detail, which detail shall be reasonably acceptable to the Administrative Agent), subject to normal year-end audit adjustments;

(c) concurrently with any delivery of financial statements under (a) or (b) above, a certificate (a "Compliance Certificate") of the accounting firm or Financial Officer (which certificate shall be in the form of Exhibit E if delivered by a Financial Officer) opining on or certifying such statements (which certificate, when furnished by an accounting firm, may be limited to accounting matters and disclaim responsibility for legal interpretations) (i) certifying that no Default or Event of Default has occurred or, if such Default or Event of Default has occurred, specifying the nature and extent thereof and any corrective action taken or proposed to be taken with respect thereto and (ii) setting forth computations in reasonable detail (which detail shall be reasonably satisfactory to the Administrative Agent) demonstrating compliance with the covenants contained in Sections 6.14 and 6.15 showing the Applicable Level;

(d) if, as a result of any change in accounting principles and policies from those as in effect on the date of this Agreement, the consolidated financial statements of Holdings and the Subsidiaries or Holdings and the Restricted Subsidiaries, as the case may be, delivered pursuant to clauses (a) and (b) above will differ in any material respect from the consolidated financial statements that would have been delivered pursuant to such clauses had no such change in accounting principles and policies been made, then, together with the first delivery of financial statements pursuant to clauses (a) and
(b) above following such change, a schedule prepared by a Financial Officer reconciling such changes to what the financial statements would have been without such changes;

(e) promptly (and in any event within 5 days) after the same become publicly available, copies of all periodic reports and proxy statements and, to the extent requested by the Administrative Agent, any other materials filed by Holdings or any of its Subsidiaries with the Securities and Exchange Commission under the Securities Exchange Act of 1934, or any Governmental Authority succeeding to any of or all the functions of said Commission, or with any national securities exchange, or distributed to its shareholders generally, as the case may be;

(f) within 95 days after the beginning of each fiscal year, a copy of the annual income and capital expenditure budget for such fiscal year;

(g) promptly, from time to time, such other information regarding the operations, business affairs and financial condition of Holdings or any of its Restricted Subsidiaries (including, without limitation, monthly financial statements until syndication of the Facilities is completed), or compliance with the terms of any Loan Document, as any Credit Agreement Creditor, acting through the Administrative Agent, may reasonably request;

(h) promptly, a copy of any amendment or waiver of any provisions of any agreement which amendment or waiver is described in Section 6.10 or 6.11;

(i) promptly following the creation or acquisition of any Subsidiary, a certificate from a Responsible Officer, identifying such new Subsidiary and the ownership interest of Holdings and its Subsidiaries therein; and concurrently with the delivery of financial statements under (a) or (b) above, a description of the Investments in Unrestricted Subsidiaries made during the fiscal quarter ending on the date of such financial statements and the amount thereof; provided, that with respect to the Subordinated Notes owed by Carcorp, Inc. under the receivables financing facility (the "Sub Notes"), the Company shall not be required to report any changes in the outstanding principal amount of the Sub Notes, unless the aggregate outstanding principal amount of such Sub Notes exceeds $75,000,000;

(j) if requested by the Administrative Agent, within 105 days following the end of any fiscal year of any Unrestricted Subsidiary, a balance sheet and related statements of income and cash flow for such Unrestricted Subsidiary at the end of and for such fiscal year;

(k) promptly, a copy of all reports submitted in connection with any interim or special audit made by independent accountants of the books of Holdings or any of its Subsidiaries; and

(l) (i) upon receipt by Holdings or any Restricted Subsidiary of Net Proceeds of any Specified Asset Sale occurring after the Closing Date, a certificate of a Responsible Officer of the Company to the Administrative Agent setting forth the amount of the Net Proceeds which the Company and its subsidiaries expect to reinvest in replacement assets or property during the subsequent 12-month period which are not required to be applied to the repayment of the Term Loans and (ii) on the first anniversary of the receipt of such Net Proceeds, (a) a certificate of a Responsible

Officer of the Company to the Administrative Agent certifying as to the amount and use of such Net Proceeds actually reinvested in replacement assets or property during the preceding 12-month period and (b) for application in accordance with Section 2.12(g)(i), an amount equal to the remaining uninvested Net Proceeds.

SECTION 5.05. Litigation and Other Notices. Furnish to each Credit Agreement Creditor prompt written notice of the following:

(a) any Default or Event of Default, specifying the nature and extent thereof and the corrective action (if any) proposed to be taken with respect thereto;

(b) the filing or commencement of any action, suit or proceeding, whether at law or in equity or by or before any Governmental Authority, against Holdings or any Subsidiary in respect of which there is a reasonable possibility of an adverse determination and which, if adversely determined, could reasonably be expected to result in a Material Adverse Effect; and

(c) any development specific to Holdings and its Subsidiaries and not otherwise publicly disclosed known to a Responsible Officer that has resulted in, or could reasonably be anticipated to result in, a Material Adverse Effect.

SECTION 5.06. ERISA. (a) Comply in all material respects with the applicable provisions of ERISA and (b) furnish to each Credit Agreement Creditor (i) as soon as possible, and in any event within 30 days after any Responsible Officer of the Company, any Guarantor or any ERISA Affiliate of any of them knows or has reason to know that any Reportable Event has occurred that alone or together with any other Reportable Event could reasonably be expected to result in liability of the Company, any Guarantor or any of their ERISA Affiliates to the PBGC in an aggregate amount exceeding $10,000,000, a statement of a Financial Officer setting forth details as to such Reportable Event and the action proposed to be taken with respect thereto, together with a copy of the notice, if any, of such Reportable Event given to the PBGC, (ii) promptly after any Responsible Officer learns of receipt thereof, a copy of any notice the Company or any Guarantor or any of their ERISA Affiliates may receive from the PBGC relating to the intention of the PBGC to terminate any Plan or Plans (other than a Plan maintained by any of their ERISA Affiliates which is considered an ERISA Affiliate only pursuant to subsection (m) or (o) of Section 414 of the Code) or to appoint a trustee to administer any Plan or Plans, (iii) within 20 days after the due date for filing with the PBGC pursuant to Section 412(n) of the Code a notice of failure to make a required installment or other payment with respect to a Plan, a statement of a Financial Officer setting forth details as to such failure and the action proposed to be taken with respect thereto, together with a copy of such notice given to the PBGC and (iv) promptly after any Responsible Officer learns thereof and in any event within 30 days after receipt thereof by the Company, any Guarantor or any ERISA Affiliate from the sponsor of a Multiemployer Plan, a copy of each notice received by the Company, any Guarantor or such ERISA Affiliate concerning (A) the imposition of Withdrawal Liability or (B) a determination that a Multiemployer Plan is, or is expected to be, terminated or in reorganization, in each case within the meaning of Title IV of ERISA.

SECTION 5.07. Maintaining Records; Access to Properties and Inspections. Maintain all financial records in accordance with GAAP and permit any persons designated by the Administrative Agent (or, during the continuance of an Event of Default, any Lender) to visit and inspect the financial records and the properties of Holdings or any Restricted Subsidiary at reasonable times, upon reasonable notice and as often as reasonably requested and to make extracts from and copies of such financial records, and permit any persons designated by the Administrative Agent (or, during the continuance of an Event of Default, any Lender) to discuss the affairs, finances and condition of Holdings or any Restricted Subsidiary with the officers thereof and independent accountants therefor (subject to reasonable requirements of confidentiality, including requirements imposed by law or by contract).

SECTION 5.08. Use of Proceeds. (a) Use the proceeds of Supplemental Revolving Loans and Revolving Loans for general working capital purposes in the ordinary course of business.

(b) Use Letters of Credit (other than Foreign Subsidiary Letters of Credit) solely for general corporate purposes in the ordinary course of business of the applicable Borrower and its subsidiaries; and use Foreign Subsidiary Letters of Credit to support Indebtedness of Foreign Restricted Subsidiaries permitted under Section 6.01(o), the Italian JV and the Brazilian Subsidiary.

(c) Use the proceeds of the Term Loans (other than the Tranche A-1 Term Loans) to finance a portion of the Acquisition, pay related fees and expenses and refinance the Existing Credit Agreement.

(d) Use the proceeds of the Tranche A-1 Term Loans to prepay the Tranche A Term Loans and the Tranche B Term Loans in accordance with Section 2.12(a).

SECTION 5.09. Further Assurances. Subject to Sections 5.17 and 5.18, execute any and all further documents, financing statements, agreements and instruments, and take all further action (including, filing UCC financing statements (or its equivalent in Canada), mortgages, hypothecs and deeds of trust), which may be required under applicable law, or which the Applicable Collateral Agent may reasonably request, in order to effectuate the transactions contemplated by the Loan Documents, and in order to grant, preserve, protect and perfect the validity and first priority (subject to Liens permitted by Section 6.04) of the security interests created or intended to be created pursuant to this Agreement or any of the Security Documents.

SECTION 5.10. Change in Ownership. In the case of Holdings, own directly at all times, legally and beneficially, 100% of the capital stock of the Company, free of Liens except Liens in favor of the Collateral Agent; and, in the case of Company, own (a) directly at all times, legally and beneficially, 100% of the capital stock of the Finance Subsidiary free of Liens except Liens in favor of the Collateral Agent and (b) directly or indirectly at all times, legally and beneficially, 100% of the capital stock of the Canadian Borrowers free of Liens except Liens, if any, in favor of the Collateral Agent.

SECTION 5.11. Fiscal Year; Accounting. In the case of each of Holdings and its Subsidiaries, cause its respective fiscal year to end on December 31 (except that the fiscal year end may vary for any foreign subsidiary domiciled in a jurisdiction that prohibits such year end or the fiscal year end may end on the last Saturday of December for any foreign subsidiary).

SECTION 5.12. Dividends. In the case of the Company, permit its subsidiaries to pay dividends and cause such dividends to be paid to the extent required to pay the monetary Obligations.

SECTION 5.13. Interest Rate Protection. In the case of the Company, within 60 days after the Closing Date, enter into, and thereafter maintain, Interest Rate Agreements with one or more Lenders or Lender Affiliates to the extent necessary to provide that at least 40% of the aggregate principal amount of the Subordinated Notes, the Senior Unsecured Notes, and the Term Loans is subject to either a fixed interest rate or interest rate protection for a period of not less than two years, which Interest Rate Agreements shall have terms and conditions reasonably satisfactory to the Administrative Agent.

SECTION 5.14. Corporate Separateness. Cause the management, business and affairs of each of Holdings and the Subsidiaries to be conducted in such a manner so that each of Holdings and the Unrestricted Subsidiaries will be perceived as a legal entity separate and distinct from each other and the Restricted Subsidiaries.

SECTION 5.15. Business of Restricted Subsidiaries. Not permit any material portion of the business and activities of the Restricted Subsidiaries to be performed and conducted by the Unrestricted Subsidiaries.

SECTION 5.16. Business of Waterstone Insurance, Inc. Cause Waterstone Insurance, Inc. to be engaged solely in the business of insurance activities for Holdings and its Subsidiaries.

SECTION 5.17. Collateral, etc. Promptly but in no event later than the Collateral Delivery Date:

(a) Mortgages. (i) Deliver to the Applicable Collateral Agent a Mortgage with respect to each Mortgaged Property, executed and delivered by a duly authorized officer of each party thereto.

(ii) If requested by the Applicable Collateral Agent, which request shall be made (if at all) promptly after the Closing Date hereof, deliver to the Applicable Collateral Agent, and the title insurance company issuing the policy referred to in clause (iii) below (the "Title Insurance Company"), maps or plats of an as-built survey of the sites of the Mortgaged Properties certified to the Applicable Collateral Agent and the Title Insurance Company in a manner reasonably satisfactory to them, dated a date reasonably satisfactory to the Applicable Collateral Agent and the Title Insurance Company by an independent professional licensed land surveyor, which maps or plats and the surveys on which they are based shall be made in accordance with the Minimum Standard Detail Requirements for Land Title Surveys jointly established and adopted by the American Land Title Association and the American Congress on Surveying and Mapping in 1992, or in accordance with such other minimum standards as may be applicable in Canada, and, without limiting the generality of the foregoing, there shall be surveyed and shown on such maps, plats or surveys the following: (A) the locations on such sites of all the buildings, structures and other improvements and the established building setback lines; (B) the lines of streets abutting the sites and width thereof;
(C) all access and other easements appurtenant to the sites; (D) all roadways, paths, driveways, easements, encroachments and overhanging projections and similar encumbrances affecting the site, whether recorded, apparent from a physical inspection of the sites or otherwise known to the surveyor; (E) any encroachments on any adjoining property by the building structures and improvements on the sites; (F) if the site is described as being on a filed map, a legend relating the survey to said map; and (G) the flood zone designations, if any, in which the Mortgaged Properties are located.

(iii) Deliver to the Applicable Collateral Agent in respect of each Mortgaged Property a mortgagee's title insurance policy (or policies) or marked up unconditional binder for such insurance. Each such policy shall (A) be in an amount 5% greater than the greater of (i) aggregate net book value of land, building and improvements and
(ii) aggregate replacement value of land, buildings and improvements; (B) be issued at ordinary rates; (C) insure that the Mortgage insured thereby creates a valid first Lien on such Mortgaged Property free and clear of all defects and encumbrances, except those disclosed therein which are acceptable to the Applicable Collateral Agent in its reasonable discretion; (D) name the Applicable Collateral Agent for the benefit of the Lenders as the insured thereunder; (E) be in the form of ALTA Loan Policy - 1970 (Amended 10/17/70 and 10/17/84) (or equivalent policies), or such other form as the Applicable Collateral Agent may reasonably require; (F) contain such endorsements and affirmative coverage as the Applicable Collateral Agent may reasonably request to the extent available at commercially reasonable rates and (G) be issued by title companies reasonably satisfactory to the Applicable Collateral Agent (including any such title companies acting as co-insurers or reinsurers, at the option of the Applicable Collateral Agent). The Applicable Collateral Agent shall have received evidence reasonably satisfactory to it that all premiums in respect of each such policy, all charges for mortgage recording tax, and all related expenses, if any, have been paid.

(iv) If requested by the Applicable Collateral Agent, which request shall be made (if at all) promptly after receipt of the applicable surveys referred to in clause (ii) above, and only with respect to any Mortgaged Property which is located in an area designated a "flood hazard area" in any Flood Insurance Rate map published by the Federal Emergency Management Association, deliver to the Applicable Collateral Agent (A) a policy of flood insurance that
(1) covers such Mortgaged Property, (2) is written in an amount not less than the outstanding principal amount of the indebtedness secured by such Mortgage that is reasonably allocable to such real property or the maximum limit of coverage made available with respect to the particular type of property under the National Flood Insurance Act of 1968, whichever is less, and (3) has a term ending not earlier than the maturity of the Indebtedness secured by such Mortgage and (B) confirmation that the Company has received the notice required pursuant to Section 208(e) (3) of Regulation H of the Board.

(v) If requested by the Applicable Collateral Agent, which request shall be made (if at all) promptly after the Closing Date hereof, deliver to the Applicable Collateral Agent a copy of all recorded documents referred to, or listed as exceptions to title in, the title policy or policies referred to in clause (iii) above and a copy of all other material documents affecting the Mortgaged Properties.

(vi) If requested by the Applicable Collateral Agent, which request shall be made (if at all) promptly after the Closing Date hereof, deliver to the Applicable Collateral Agent an environmental audit with respect to the real properties of Holdings, each Borrower, the Canadian Borrowers, and the Restricted Subsidiaries specified by the Applicable Collateral Agent.

(b) Legal Opinions. If requested by the Applicable Collateral Agent, which request shall be made (if at all) promptly after the Closing Date hereof, deliver to the Applicable Collateral Agent the favorable written opinion of such local counsel, relating to the items described in Section 5.17(a) as the Applicable Agent or Applicable Collateral Agent may reasonably request, in such form and to such effect as shall be reasonably satisfactory to the Applicable Agent or Applicable Collateral Agent and to Simpson Thacher & Bartlett, special counsel to the Administrative Agent and Collateral Agent and McMillan Binch, special counsel to the Canadian Administrative Agent and Canadian Collateral Agent.

(c) Lien Searches. Deliver to the Applicable Collateral Agent the results of a customary Lien search done in connection with the closing of this Agreement in each of the jurisdictions where assets of the Loan Parties are located, and such search shall reveal no Liens on any of the assets of the Loan Parties except for Liens permitted by Section 6.04 or discharged on or prior to the Closing Date pursuant to documentation reasonably satisfactory to the Applicable Collateral Agent (it being understood that the Company shall be permitted to update Schedule 6.04 upon receipt of all such Lien searches in a manner satisfactory to the Lenders).

(d) Miscellaneous. Notwithstanding anything to the contrary in this Section 5.17, at the reasonable request of any Loan Party, such Loan Party shall not be required to take any action set forth in this Section 5.17 if the Administrative Agent determines in its reasonable discretion that the economic detriment and cost to the Loan Parties as a whole of taking such action would be excessive in relation to the value of the security to be afforded thereby.

SECTION 5.18. Additional Collateral. (a) With respect to any property acquired after the Closing Date by Holdings or any Restricted Subsidiary (other than (x) any property described in paragraph (b), (c), (d),
(e) or (f) below, (y) any property constituting Excluded Collateral and (z) property acquired by any Foreign Restricted Subsidiary) as to which the Collateral Agent, for the benefit of the Secured Parties, does not have a perfected Lien, promptly (but within 60 days after acquisition or any request by the Collateral Agent but in no event prior to the Collateral Delivery Date) to
(i) execute and deliver to the Collateral Agent such amendments to the Guarantee and Collateral Agreement or such other documents as the Collateral Agent

deems reasonably necessary or advisable to grant to the Collateral Agent, for the benefit of the Secured Parties, a security interest in such property and
(ii) take all actions reasonably necessary or advisable to grant to the Collateral Agent, for the benefit of the Secured Parties, a perfected first priority security interest in such property, including the filing of Uniform Commercial Code financing statements in such jurisdictions as may be required by the applicable Guarantee and Collateral Agreement or by law or as may be requested by the Collateral Agent.

(b) With respect to (A) each of the Manchester Property and the Marshall Property (to the extent such real property has not been disposed of by June 30, 2002) and (B) any fee interest in any real property having a net book value (together with all improvements thereon) of at least $500,000 acquired after the Closing Date by Holdings or any Restricted Subsidiary (other than (x) any such real property constituting Excluded Collateral and (z) real property acquired by any Foreign Restricted Subsidiary), promptly (but within 60 days after acquisition or any request by the Collateral Agent but in no event prior to the Collateral Delivery Date) or, in the case of the Manchester Property or the Marshall Property, by June 30, 2002 to (i) execute and deliver a first priority mortgage or deed of trust, as applicable, in favor of the Collateral Agent, for the benefit of the Secured Parties, covering such real property, (ii) if requested by the Collateral Agent, provide the Secured Parties with (x) title and extended coverage insurance covering such real property in an amount at least equal to the purchase price of such real property (or such other amount as shall be reasonably specified by the Collateral Agent) as well as a current ALTA survey thereof, together with a surveyor's certificate and (y) any consents or estoppels reasonably deemed necessary or advisable by the Collateral Agent in connection with such mortgage or deed of trust, each of the foregoing in form and substance reasonably satisfactory to the Collateral Agent to the extent obtainable using commercially reasonable efforts and (iii) if reasonably requested by the Collateral Agent, deliver to the Collateral Agent legal opinions relating to the matters described above, which opinions shall be in form and substance, and from counsel, reasonably satisfactory to the Collateral Agent.

(c) In addition, from time to time, Holdings and the Restricted Subsidiaries will, at their cost and expense, subject to the obtaining of any required regulatory authorizations (which Holdings and the Company agree to use their best efforts to obtain) promptly secure the Obligations by causing the following to occur: (i) promptly upon creating or acquiring any additional subsidiary, the stock of such subsidiary will (unless such subsidiary is a subsidiary of an Unrestricted Subsidiary or of a Foreign Restricted Subsidiary) be pledged pursuant to the Guarantee and Collateral Agreement, provided that no more than 65% of the capital stock of any Foreign Restricted Subsidiary shall be required to be pledged pursuant to this Section 5.18 in support of the Obligations of the Company, and (ii) such subsidiary will (unless such subsidiary is an Unrestricted Subsidiary or a Foreign Restricted Subsidiary) become a party to the Guarantee and Collateral Agreement. All such security interests and Liens will be created under the Guarantee and Collateral Agreement and other security agreements and other instruments and documents in form and substance reasonably satisfactory to the Collateral Agent.

(d) With respect to any fee interest in any property acquired after the Closing Date by any Canadian Guarantor, (other than (x) any property described in paragraph (e) or (f) below, (y) any property constituting Excluded Collateral and (z) property acquired by any non-Canadian subsidiary) as to which the Canadian Collateral Agent, for the benefit of the Canadian Lenders, does not have a perfected Lien, promptly (but within 60 days after acquisition or any request by the Canadian Collateral Agent but in no event prior to the Collateral Delivery Date) to (i) execute and deliver to the Canadian Collateral Agent such amendments to the Canadian Guarantee and Collateral Agreement or such other documents as the Canadian Collateral Agent deems reasonably necessary or advisable to grant to the Canadian Collateral Agent, for the benefit of the Canadian Lenders, a security interest in such property and (ii) take all actions reasonably necessary or advisable to grant to the Canadian Collateral Agent, for the benefit of the Canadian Lenders, a perfected first priority security interest or hypothec in such property, including, without limitation, the filing of Uniform Commercial Code financing statements (or its equivalent in Canadian jurisdiction) in such jurisdictions as

95

may be required by the Canadian Guarantee and Collateral Agreement or by law or as may be reasonably requested by the Canadian Collateral Agent.

(e) With respect to any fee interest in any real property having a net book value (together with all improvements thereon) of at least $500,000 acquired after the Closing Date by any Canadian Guarantor (other than
(x) any such real property constituting Excluded Collateral and (z) real property acquired by any non-Canadian subsidiary), promptly (but within 60 days after acquisition or any request by the Canadian Collateral Agent but in no event prior to the Collateral Delivery Date) to (i) execute and deliver a first priority mortgage or deed of trust, as applicable, in favor of the Canadian Collateral Agent, for the benefit of the Canadian Lenders, covering such real property, (ii) if requested by the Canadian Collateral Agent, provide the Canadian Lenders with (x) title and extended coverage insurance covering such real property in an amount at least equal to the purchase price of such real property (or such other amount as shall be reasonably specified by the Canadian Collateral Agent) as well as a current ALTA survey thereof or such other form as the Canadian Collateral Agent may reasonably require, together with a surveyor's certificate and (y) any consents or estoppels reasonably deemed necessary or advisable by the Canadian Collateral Agent in connection with such mortgage or deed of trust, each of the foregoing in form and substance reasonably satisfactory to the Canadian Collateral Agent to the extent obtainable using commercially reasonable efforts and (iii) if reasonably requested by the Canadian Collateral Agent, deliver to the Canadian Collateral Agent legal opinions relating to the matters described above, which opinions shall be in form and substance, and from counsel, reasonably satisfactory to the Canadian Collateral Agent.

(f) In addition, from time to time, the Canadian Guarantors will, at their cost and expense, subject to the obtaining of any required regulatory authorizations (which the Canadian Borrowers agree to use their best efforts to obtain) promptly secure the Canadian Obligations by causing the following to occur: (i) promptly upon creating or acquiring any additional subsidiary, the stock of such subsidiary will (unless such subsidiary is a subsidiary of an Unrestricted Subsidiary or of a non-Canadian subsidiary) be pledged pursuant to the Canadian Guarantee and Collateral Agreement, and (ii) such subsidiary will (unless such subsidiary is an Unrestricted Subsidiary or a non-Canadian subsidiary) become a party to the Canadian Guarantee and Collateral Agreement. All such security interests and Liens will be created under the Canadian Guarantee and Collateral Agreement and other security agreements and other instruments and documents in form and substance reasonably satisfactory to the Canadian Collateral Agent.

(g) Holdings and the Restricted Subsidiaries shall deliver or cause to be delivered to the Applicable Agent and Applicable Collateral Agent all such instruments and documents (including legal opinions and lien searches) as the Applicable Agent or Applicable Collateral Agent shall reasonably request to evidence compliance with this Section 5.18. Holdings and the Restricted Subsidiaries agree to provide such evidence as the Applicable Agent and Applicable Collateral Agent shall reasonably request as to the perfection and priority status of each such security interest and Lien.

(h) Notwithstanding anything set forth in this Section 5.18, no Loan Party will be required to grant a security interest in Excluded Collateral or in any acquired assets that are identified by the Company in writing to the Administrative Agent promptly following acquisition as assets which the Company or a Restricted Subsidiary will substantially simultaneously sell in a sale/leaseback transaction permitted by clause (a) of Section 6.06.

(i) Notwithstanding anything to the contrary in this Section 5.18, at the reasonable request of any Loan Party, such Loan Party shall not be required to take any action set forth in this Section 5.18 if the Applicable Agent determines in its reasonable discretion that the economic detriment and cost to the Loan Parties as a whole of taking such action would be excessive in relation to the value of the security to be afforded thereby.

SECTION 5.19. Landlord Waivers. Use commercially reasonable efforts (which shall not include the payment of consent fees) to deliver to the Applicable Collateral Agent a landlord waiver and consent, in form and substance reasonably satisfactory to the Applicable Collateral Agent, from each lessor (other than any Loan Party) or mortgagee of Holdings or its Subsidiaries (other than either Applicable Collateral Agent) of any property where any Collateral is located.

# ARTICLE VI.

## NEGATIVE COVENANTS

Each of Holdings and the Borrowers covenants and agrees that from and after the Closing Date, so long as this Agreement or any Letter of Credit shall remain in effect or any monetary Obligation shall be unpaid, unless the Required Lenders shall otherwise consent in writing, Holdings, and the Borrowers will not, and will not cause or permit any Restricted Subsidiary to:

SECTION 6.01. Indebtedness. Incur, create, assume or permit to exist any Indebtedness, except:

(a) (i) Indebtedness of Foreign Restricted Subsidiaries under Overdraft Facilities in an aggregate principal amount not to exceed $30,000,000; (ii) Indebtedness of the Brazilian Subsidiary under any local credit facility denominated in dollars or in Foreign Currencies in an aggregate principal amount not to exceed the Dollar Equivalent Amount of $30,000,000; (iii) Indebtedness of the Italian JV in the event it becomes a Foreign Restricted Subsidiary in accordance with the terms hereof in respect of any local credit facility in an aggregate principal amount not to exceed $10,000,000; and (iv) Indebtedness of the Company or any Restricted Subsidiary in respect of any letters of credit issued to support or any Guarantees (issued in lieu of letter of credit support) of any Indebtedness referred to in the preceding clauses (i) through (iii) to the extent that Letters of Credit are not utilized for such purposes; provided that the amount permitted under the preceding clauses (ii) and (iv) (to the extent relating to clause (ii)) shall be reduced by the amount of any Indebtedness incurred under clause (viii) of Section 6.01(c);

(b) So long as immediately after giving effect to the incurrence thereof no Default or Event of Default shall have occurred and be continuing, (x) Permitted Subordinated Indebtedness and unsecured subordinated Guarantees of such Permitted Subordinated Indebtedness by Subsidiary Guarantors but only to the extent the Net Proceeds of such Permitted Subordinated Indebtedness are applied in accordance with Section 2.12(g) (i) and (y) Senior Unsecured Notes or Permitted Additional Senior Unsecured Notes in excess of the principal amount referred to in clause (p) below and senior Guarantees of the foregoing but only to the extent that the Net Proceeds thereof are offered to be applied in accordance with Section 2.12(g)(ii);

(c) Indebtedness of (i) the Company to any subsidiary of the Company evidenced, if the principal amount of such Indebtedness owing to a Domestic Restricted Subsidiary (other than an Inactive Subsidiary, unless requested by the Administrative Agent) exceeds $10,000,000, by an Intercompany Note pledged to the Collateral Agent under the Guarantee and Collateral Agreement, (ii) any Domestic Restricted Subsidiary to the Company evidenced, if the principal amount of such Indebtedness exceeds $10,000,000, by an Intercompany Note pledged to the Collateral Agent under the Guarantee and Collateral Agreement, (iii) any Domestic Restricted Subsidiary to any other Restricted Subsidiary evidenced, if the principal amount of such Indebtedness owing to a Domestic Restricted Subsidiary (other than an Inactive Subsidiary, unless requested by the Administrative Agent) exceeds $10,000,000, by an Intercompany Note pledged to the Applicable Collateral Agent

under the applicable Security Document, (iv) any Foreign Restricted Subsidiary to the Company or to any Domestic Restricted Subsidiary incurred in the ordinary course of business for bona fide cash management purposes of the Company and its Subsidiaries, taken as a whole, in a net aggregate principal amount not at any time in excess of $250,000,000 and evidenced by one or more Intercompany Notes pledged to the Applicable Collateral Agent under the applicable Security Document if the outstanding principal amount of such Indebtedness exceeds $10,000,000 in the aggregate, (v) Holdings to the Company in an aggregate principal amount not greater than $6,000,000 at any time, (vi) Collins & Aikman Plastics, to any Domestic Restricted Subsidiary in a net aggregate amount principal amount not to exceed $35,000,000, evidenced by one or more Intercompany Notes pledged to the Collateral Agent under the Guarantee and Collateral Agreement, (vii) any Foreign Restricted Subsidiary to any other foreign Subsidiary, (viii) the Brazilian Subsidiary to the Company or to any Domestic Restricted Subsidiary (which Indebtedness may be loaned by the Company or a Domestic Restricted Subsidiary through a Foreign Restricted Subsidiary of the Company and on-loaned by such Foreign Restricted Subsidiary to the Brazilian Subsidiary) in an aggregate principal amount not at any time in excess of $30,000,000 (exclusive of capitalized interest) and evidenced by one or more of the Intercompany Notes held by the Company or a Domestic Restricted Subsidiary pledged to the Applicable Collateral Agent under the applicable Security Document if the outstanding principal amount of such Indebtedness exceeds $10,000,000 in the aggregate and (ix) any Foreign Restricted Subsidiary to the Company or to any Domestic Restricted Subsidiary representing an Investment permitted to be made as an intercompany loan by the Company and its Domestic Restricted Subsidiaries in such Foreign Restricted Subsidiary pursuant to Sections 6.07 (k), (m), (n) and (o) and the last paragraph of Section 6.07 and evidenced by one or more Intercompany Notes pledged to the Applicable Collateral Agent under the applicable Security Document if the outstanding principal amount of such Indebtedness exceeds $10,000,000 in the aggregate;

(d) Capital Lease Obligations and Purchase Money Indebtedness incurred by the Company or any other Restricted Subsidiary not in excess of $30,000,000 in the aggregate at any time outstanding prior to or within 270 days after a Capital Expenditure permitted under Section 6.03 in order to finance such Capital Expenditure, and extensions, renewals and refinancings thereof if the average life to maturity thereof is greater than or equal to the Indebtedness being refinanced (provided that such Indebtedness shall not be (A) Indebtedness of an obligor that was not an obligor with respect to the Indebtedness being extended, renewed or refinanced, (B) in a principal amount which exceeds the Indebtedness being renewed, extended or refinanced or (C) incurred, created or assumed if any Default or Event of Default has occurred and is continuing or would result therefrom);

(e) Indebtedness of the Company and its subsidiaries in the nature of Interest Rate Agreements and other interest rate and foreign currency hedging transactions entered into with respect to the Loans and other Indebtedness (it being understood that such transactions shall be entered into for business purposes and not for the purpose of speculation);

(f) Indebtedness of a Restricted Subsidiary which represents the assumption by such Restricted Subsidiary of Indebtedness of a Restricted Subsidiary in connection with the merger of such Restricted Subsidiary with or into the assuming Restricted Subsidiary or the purchase of all or substantially all the assets of such other Restricted Subsidiary;

(g) Indebtedness of the Restricted Subsidiaries in respect of performance bonds, bid bonds, appeal bonds, bankers acceptances and surety bonds provided in the ordinary course of business, and any extension, renewal or refinancing thereof to the extent not provided to secure the repayment of other Indebtedness and to the extent that the amount of refinancing Indebtedness is not greater than the amount of Indebtedness being refinanced;

98

(h) Indebtedness arising from the honoring by a bank or other financial institutions of a check, draft or similar instrument drawn against insufficient funds in the ordinary course of business; provided that such Indebtedness is extinguished within two Business Days of its incurrence;

(i) Indebtedness of a person merged or consolidated with or into, or which becomes, a Restricted Subsidiary after the Closing Date, which Indebtedness exists at the time of such acquisition, merger or consolidation (whether or not created in contemplation of such event) and such acquisition, merger or consolidation is permitted by this Agreement; provided that the aggregate principal amount of such Indebtedness shall not exceed $30,000,000 at any time outstanding;

(j) Indebtedness of the Company incurred after the Closing Date, which Indebtedness is created or incurred in connection with any Permitted Business Acquisition; provided that the aggregate principal amount of such Indebtedness shall not exceed $150,000,000 at any time outstanding;

(k) Indebtedness owed to (including obligations in respect of letters of credit for the benefit of) any person providing worker's compensation, health, disability or other employee benefits, property, casualty, liability or other insurance to Holdings or any Subsidiary, pursuant to reimbursement or indemnification obligations to such person;

(l) Indebtedness represented by the Loans, the Letters of Credit and the Guarantees thereof by the Guarantors pursuant to the Security Documents;

(m) other unsecured Indebtedness of the Company and the Canadian Borrowers in an aggregate principal amount at any time outstanding not in excess of $40,000,000 and unsecured Guarantees by the Company of any Indebtedness of the Canadian Borrowers incurred in accordance with this clause (m);

(n) other Indebtedness of the Company or any other Restricted Subsidiary in an aggregate principal amount outstanding at any time not to exceed $35,000,000 and unsecured Guarantees by the Company of any Indebtedness of any Restricted Subsidiary incurred in accordance with this clause (n);

(o) Indebtedness of Foreign Restricted Subsidiaries denominated in dollars or in Foreign Currencies in an aggregate outstanding amount at any one time, together with the fair market value of any receivables sold by a Foreign Restricted Subsidiary pursuant to Section 6.08(g)(ii) that remain uncollected, not to exceed the Dollar Equivalent Amount of $50,000,000 and unsecured Guarantees by the Company of any Indebtedness of any Foreign Restricted Subsidiary incurred in accordance with this clause (o);

(p) Indebtedness of the Company under the Senior Unsecured Notes in an aggregate principal amount not to exceed $500,000,000 and Guarantees thereof by Subsidiary Guarantors;

(q) Indebtedness of the Company under the Subordinated Notes or any Permitted Subordinated Notes Refinancing and subordinated Guarantees thereof by the Subsidiary Guarantors;

(r) Indebtedness of the Foreign Restricted Subsidiaries to the Company or any Domestic Restricted Subsidiary (i) outstanding on the date hereof and listed on Schedule 6.01 and any refinancings, refundings, renewals or extensions thereof (without increasing the principal amount thereof) and (ii) resulting from the conversion of equity owned by the Company or such Domestic Restricted Subsidiary into intercompany debt, provided that, in the case of this clause (ii), (a) no cash

payment is made in connection therewith and (b) such Indebtedness shall be evidenced by one or more Intercompany Notes pledged to the Applicable Collateral Agent under the applicable Security Document if the outstanding principal amount of such Indebtedness exceeds $10,000,000 in the aggregate; and

(s) an unsecured Guarantee by the Company or any of its Subsidiaries of lease obligations incurred by a Mexican Subsidiary of the Company in connection with a "build-to-suit" construction of an operating facility in Hermasillo, Mexico for use by such Mexican Subsidiary provided that the aggregate amount guaranteed shall not exceed $35,000,000.

SECTION 6.02. Dividends and Distributions. Declare or pay, directly or indirectly, any dividend or make any other distribution (by reduction of capital or otherwise), whether in cash, property, securities or a combination thereof, with respect to any shares of its capital stock (other than dividends and distributions on Holdings Common Stock payable solely by the issuance of additional shares of Holdings Common Stock) or directly or indirectly redeem, purchase, retire or otherwise acquire for value (or permit any Restricted Subsidiary to purchase or acquire) any shares of any class of its capital stock or any option, warrant or other right to acquire shares of such stock or set aside any cash, property, securities or combination thereof amount for any such purpose (collectively, "Restricted Payments"); provided, however, that:

(a) (i) any Subsidiary may declare and pay dividends or make other distributions to the Company or to Restricted Subsidiaries, (ii) any non-wholly owned Subsidiary may declare and pay dividends or make other distributions on a pro rata basis to all of their shareholders and (iii) to the extent required by applicable law, rule or regulation, the Brazilian Subsidiary may pay preferential dividends on its preferred shares and any other Foreign Restricted Subsidiary may make similar preferential dividends in respect of non-voting or other shares that are substantially common equivalent securities;

(b) if at the time thereof and after giving effect thereto no Default or Event of Default shall have occurred and be continuing, Holdings may pay dividends in cash on its common stock or may redeem, purchase, retire or otherwise acquire for value its common stock provided that (i) the sum of such dividends and consideration paid for such redemptions, purchases, retirements and other acquisitions after the Closing Date shall not exceed (1) $6,250,000 in any fiscal year of Holdings and (2) $25,000,000 in the aggregate and (ii) the following conditions are satisfied at the time of payment: (1) the aggregate outstanding principal amount of Term Loans does not exceed $240,000,000 and (2) the pro forma Leverage Ratio (determined using pro forma adjustments satisfactory to the Administrative Agent) after giving effect to any such payment is less than 2.5 to 1.0;

(c) the Company may pay dividends on the Seller Preferred in-kind or by accrual (at the stated rate and on the stated payment dates in the Seller Preferred) and, if at the time thereof and after giving effect thereto no Default or Event of Default shall have occurred and be continuing, the Company may pay dividends in cash on the Seller Preferred on a scheduled dividend payment date (as scheduled on the Closing Date) at a rate not to exceed 8% per annum if the following conditions are satisfied at the time of payment: (i) the aggregate outstanding principal amount of Term Loans does not exceed $240,000,000 and (ii) the pro forma Leverage Ratio (determined using pro forma adjustments satisfactory to the Administrative Agent) after giving effect to any such payment is less than 2.5 to 1.0;

(d) if at the time thereof and after giving effect thereto no Default or Event of Default shall have occurred and be continuing, Holdings may repurchase director's qualifying shares of Holdings and capital stock of Holdings and options therefor of employees and directors of Holdings

and the Restricted Subsidiaries, provided that (i) no such repurchase may be made unless Holdings is obligated to do so at the time of repurchase pursuant to contractual agreements between Holdings and the applicable officer or director and (ii) the aggregate amount paid by Holdings in connection with such repurchases at any time shall not exceed $3,000,000 plus the aggregate amount (but only to the extent such amount is simultaneously contributed by Holdings to the Company) received by Holdings from the sale or issuance of its capital stock or options therefor to officers and directors of Holdings and the Restricted Subsidiaries after the Closing Date;

(e) the Company may pay dividends or make other distributions to Holdings in amounts sufficient to allow Holdings to pay (i) Permitted Tax Payments and state and local taxes and other governmental charges, and administrative and routine expenses required to be paid by Holdings in the ordinary course of its business, (ii) the dividends, other consideration (for redemptions, purchases, retirements and other acquisitions of common stock and preferred stock) and other amounts contemplated by clause (b) above; provided that dividends paid to Holdings pursuant to this clause (ii) in order to permit Holdings to pay dividends are used by Holdings for such purpose within 20 days of the receipt of such dividends by Holdings, and (iii) the repurchase price for the capital stock and options therefor of Holdings contemplated by clause (c) above provided that such dividends pursuant to clause (iii) are used by Holdings for such purpose within 20 days of the receipt of such dividends by Holdings; provided that no dividend may be paid to Holdings pursuant to clause (ii) or (iii) if at the time of such dividend or after giving effect thereto a Default or Event of Default shall have occurred and be continuing;

(f) (i) Holdings may repay, purchase or retire any capital stock in exchange for, or out of the proceeds of, a substantially concurrent issuance of capital stock of Holdings or (ii) the Company may repay, purchase or retire any Seller Preferred (a) in exchange for, or out of the proceeds of, a substantially concurrent issuance of capital stock of Holdings or of the Company to Holdings or
(b) in exchange for an identical series of preferred stock of the Company in accordance with the requirements of the Preferred Stock Registration Rights Agreement annexed to the Tac-Trim Purchase Agreement, as in effect on the Closing Date; and

(g) (i) Investments permitted by Section 6.07 and (ii) purchases or acquisitions permitted by Section 6.08 may be consummated.

Holdings and its Subsidiaries (x) will not pay dividends on the Seller Preferred except as permitted by paragraph (c) above, (y) will not redeem, retire, defease or purchase the Seller Preferred or the Seller Common Equity except as permitted by paragraph (f) above and (z) will pay amounts payable by the Company and its Subsidiaries pursuant to Section 8.4 of the Tac-Trim Purchase Agreement only in the amounts and on the dates set forth in such Section 8.4 and the date hereof and only if no Default or Event of Default exists or would exist after giving effect thereto and will not directly or indirectly provide collateral or other consideration in respect of such amounts.

SECTION 6.03. Capital Expenditures. Permit Capital Expenditures of the Restricted Subsidiaries on a consolidated basis during any fiscal year to be greater than the amount set forth below for such fiscal year:

| Fiscal Year | Amount |
|---|---|
| 2002 | $155,000,000 |
| 2003 | $170,000,000 |
| 2004 | $150,000,000* |
| 2005 | $195,000,000 |

\* it being agreed that up to $35,000,000 of the amount, if any, of Capital Expenditures deemed to have been made in connection with the proposed "build-to-suit" construction of an operating facility referred to in Section 6.01(s) arising solely as a result of the Mexican Subsidiary's possessing title to such facility pending a sale-leaseback shall be deemed not to constitute Capital Expenditures for purposes of this Agreement.

provided, however, that (i) Restricted Subsidiaries shall be permitted to carry forward the total amount of unused permitted Capital Expenditures for any immediately preceding fiscal year (without giving effect to the amount of any unused permitted Capital Expenditures that were carried forward to such preceding fiscal year) to the immediately succeeding fiscal year so long as the aggregate Capital Expenditures do not exceed $200,000,000 in fiscal year 2003 and $250,000,000 in fiscal year 2004 and each fiscal year thereafter; (ii) Capital Expenditures may not be made by Holdings; and (iii) following the Closing Date, the amount of Capital Expenditures permitted for each fiscal year shall be increased, in the case of the first fiscal year in which an Acquired Asset is acquired, by 15%, and for each subsequent fiscal year, by 10%, of Acquired Assets (the "Acquired Assets Amount"), plus for each fiscal year commencing after any Acquired Assets Amount is added to the amount of permitted Capital Expenditures, 5% of such Acquired Assets Amount, in each case calculated on a cumulative basis.

SECTION 6.04. Liens. Create, incur, assume or permit to exist any Lien on any property or assets (including stock or other securities) now owned or hereafter acquired by it or on any income or rights in respect of any thereof, except:

(a) Liens on property or assets of the Restricted Subsidiaries existing on the Closing Date and, in the case of Liens securing Indebtedness for borrowed money, set forth in Schedule 6.04; provided that such Liens shall secure only those obligations which they secure on such date and do not subsequently apply to any other property or assets of Holdings or any Restricted Subsidiary;

(b) any Lien on any property or asset of a Restricted Subsidiary securing Indebtedness permitted by Section 6.01(i), provided that such Lien does not apply to any other property or assets of Holdings or any Restricted Subsidiary not securing such Indebtedness at the date of acquisition of such property or asset;

(c) Liens for taxes, assessments or other governmental charges or levies not yet due, or which are for less than $1,000,000 in the aggregate, or which are being contested in compliance with Section 5.03 or for property taxes for property that the Company or one of its Restricted Subsidiaries has determined to abandon if the sole recourse for such tax, assessment, charge, levy or claim is to such property;

(d) carriers', landlords', warehousemen's, mechanics', materialmen's, repairmen's, statutory liens of banks or other like Liens arising in the ordinary course of business and securing obligations which are not overdue for a period of more than 30 days or which are being contested in good faith by appropriate proceedings and in respect of which, if applicable, Holdings or the relevant Restricted Subsidiary shall have set aside on its books reserves in accordance with GAAP;

(e) pledges and deposits made in the ordinary course of business in compliance with the Federal Employers Liability Act or any other workmen's compensation, unemployment insurance and other social security laws or regulations and deposits securing liability to insurance carriers under insurance or self-insurance arrangements;

102

(f) deposits to secure the performance of bids, trade contracts (other than for Indebtedness), leases (other than Capital Lease Obligations), statutory obligations, surety and appeal bonds, performance bonds and other obligations of a like nature incurred in the ordinary course of business;

(g) zoning restrictions, easements, trackage rights, leases (other than Capital Lease Obligations), licenses, special assessments, rights-of-way, restrictions on use of real property and other similar encumbrances incurred in the ordinary course of business which, in the aggregate, are not substantial in amount and do not materially detract from the value of the property subject thereto or interfere in any material respect with the ordinary conduct of the business of any Restricted Subsidiary;

(h) any Liens securing Capital Lease Obligations permitted under Section 6.01(d) or purchase money security interests in real property, improvements thereto or equipment acquired (or, in the case of improvements, constructed) by any Restricted Subsidiary (including without limitation, the interests of vendors and lessors under conditional sale and title retention agreements); provided that
(i) such security interests secure Indebtedness permitted by Section 6.01, (ii) such security interests are incurred, and the Indebtedness secured thereby is created, within 270 days after such acquisition (or construction), (iii) the Indebtedness secured thereby does not exceed 100% of the cost of such real property, improvements or equipment at the time of such acquisition (or construction), (iv) such expenditures are Capital Expenditures permitted under Section 6.03 and (v) such security interests do not apply to any other property or assets of any Restricted Subsidiary (other than to accessions to such real property, improvements or equipment and provided that individual financings of equipment provided by a single lender may be cross-collateralized to other financings of equipment provided solely by such lender);

(i) Liens created in favor of the Applicable Collateral Agent for the benefit of the Secured Parties;

(j) Liens consisting of precautionary UCC filings arising out of operating lease transactions;

(k) any Lien on assets of a Foreign Restricted Subsidiary securing Indebtedness of such Foreign Restricted Subsidiary or any other Foreign Restricted Subsidiary permitted by Section 6.01(a) or (o);

(l) any Lien arising by operation of law pursuant to
Section 107(1) of the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. Section 9607(1), or pursuant to analogous state law, for costs or damages which are not yet due (by virtue of a written demand for payment by a Governmental Authority) or which are being contested in compliance with Section 5.03, or on property that a Restricted Subsidiary has determined to abandon if the sole recourse for such costs or damages is to such property, provided that the liability of Holdings and the Restricted Subsidiaries with respect to the matter giving rise to such Lien shall not, in the reasonable estimate of the Company (in light of all attendant circumstances, including the likelihood of contribution by third parties), exceed $10,000,000;

(m) any leases or subleases to other persons of properties or assets owned or leased by a Restricted Subsidiary;

(n) Liens consisting of interests of lessors under capital leases permitted by Section 6.01;

(o) Liens securing judgments for the payment of money in an aggregate amount not in excess of $10,000,000 (to the extent not covered by insurance) which judgments shall not be undischarged or stayed for a period of more than 30 consecutive days;

(p) the replacement, extension or renewal of any Lien permitted by clause (b) or (h) above, provided that such replacement, extension or renewal Lien shall not cover any property other than the property that was subject to such Lien prior to such replacement, extension or renewal and provided further that the Indebtedness and other obligations secured by such replacement, extension or renewal Lien are permitted by this Agreement;

(q) other Liens with respect to property or assets not constituting collateral for the Obligations with an aggregate fair market value of not more than $25,000,000 at any time;

(r) Permitted Receivables Financings;

(s) Liens on the Textron Sale/Leaseback Mortgaged Properties securing obligations under the Textron Sale/Leaseback Financing and any Permitted Textron Sale/Leaseback Refinancing;

(t) Liens securing reimbursement obligations in respect of commercial letters of credit permitted under Section 6.01 and covering the goods (or the documents of title in respect of such goods) financed by such letters of credit;

(u) Liens representing the pledge of equity interests in joint ventures to secure call options with joint venture partners and to finance such joint ventures, provided that the aggregate amount of investment in such equity interests does not exceed $25,000,000;

(v) Liens in favor of customs and revenue authorities to secure the payment of customs duties in connection with the importation of goods; and

(w) Liens on specified equipment identified on the Closing Date located in Canada with an orderly liquidation value of not more than $17,000,000 securing obligations under the GECC Phase II Lease, provided that such equipment is pledged on the Closing Date.

SECTION 6.05. Priority of Loan Payments. (a) Until the Commitments have been terminated and the Obligations have been paid in full, directly or indirectly, make any payment, retirement, repurchase, defeasance or redemption on account of the principal of any Permitted Subordinated Indebtedness, the Subordinated Notes, any Permitted Subordinated Notes Refinancing or the Senior Unsecured Notes or any Permitted Additional Senior Unsecured Notes or directly or indirectly prepay any Permitted Subordinated Indebtedness, the Subordinated Notes, any Permitted Subordinated Notes Refinancing or the Senior Unsecured Notes or any Permitted Additional Senior Unsecured Notes prior to the regularly scheduled maturity date of such Indebtedness or make any payment or prepayment of any such Indebtedness which would violate the terms of this Agreement or of such Indebtedness. Notwithstanding the foregoing the Subordinated Notes may be repaid from the proceeds of a substantially concurrent Permitted Subordinated Notes Refinancing.

(b) Until the Commitments have been terminated and the Obligations have been paid in full, repay any Funded Debt (except to the extent such repayment is prohibited by the preceding paragraph (a)) of Holdings and the Restricted Subsidiaries except:

(i) the Obligations;

(ii) payments of Funded Debt made in conformity with, or within 30 days of, the regularly scheduled maturity thereof or mandatory prepayment provisions thereof;

(iii) if no Default or Event of Default has occurred and is continuing or would result therefrom, refinancings permitted by Section 6.01;

(iv) if no Default or Event of Default has occurred and is continuing or would result therefrom, prepayments by a Restricted Subsidiary of its Funded Debt acquired in connection with a Permitted Business Acquisition; and

(v) if no Default or Event of Default has occurred and is continuing or would result therefrom, prepayments of up to $10,000,000 in the aggregate of other Funded Debt of the Restricted Subsidiaries.

(c) Refinance, prepay or otherwise retire on dates earlier than scheduled payment dates the Textron Sale/Leaseback Financing except pursuant to a concurrent Permitted Textron Sale/Leaseback Refinancing, provided that, after the first anniversary of the Closing Date, the Company or any Restricted Subsidiary may refinance, prepay or otherwise retire the Textron Sale/Leaseback Financing so long as (unless pursuant to a concurrent Permitted Textron Sale/Leaseback Refinancing) (i) such refinancing, prepayment or retirement is accretive to Holdings (i.e., after giving effect to such refinancing, prepayment or retirement and the financing thereof, if any, and taking into account other pro forma adjustments satisfactory to the Administrative Agent, the pro forma Leverage Ratio of Holdings decreases) and
(ii) the Company shall not have borrowed any Revolving Loans to effectuate such refinancing, prepayment or retirement.

SECTION 6.06. Sale and Lease-Back Transactions. Enter into any arrangement, directly or indirectly, with any person whereby Holdings or any Restricted Subsidiary shall sell or transfer any property, real or personal, used or useful in its business, whether now owned or hereafter acquired, and thereafter rent or lease such property or other property which it intends to use for substantially the same purpose or purposes as the property being sold or transferred, other than (a) such arrangements or transactions entered into substantially simultaneously (or, to the extent entered into in the ordinary course of business, within 180 days after obtaining title to such property) to finance Capital Expenditures permitted to be incurred pursuant to Section 6.03,
(b) the Textron Sale/Leaseback Financing and any Permitted Textron Sale/Leaseback Refinancing, (c) the GECC Phase II Lease, (d) such arrangements or transactions with respect to any of the real property of the Borrowers or any of the Restricted Subsidiaries located at 199 Blackhawk Road, Greenville, South Carolina and at 900 Queen Street, Ganonque, Ontario K7G 2W7 so long as the Net Proceeds thereof are used to prepay the Term Loans in accordance with Section 2.12(g)(i); (e) any such arrangements or transactions (with respect to property not constituting Collateral or, if constituting Collateral, property that remains as Collateral) solely between wholly owned Foreign Restricted Subsidiaries or solely between wholly owned Domestic Restricted Subsidiaries (other than any Domestic Restricted Subsidiaries that are not Guarantors); and
(f) such arrangements or transactions with respect to property owned by Holdings or any of its Subsidiaries on May 2, 2003 to the extent that the aggregate amount of gross proceeds received by Holdings and its Subsidiaries therefrom does not exceed $75,000,000, provided that to the extent the Net Proceeds thereof (A) do not exceed $50,000,000 in the aggregate, 50% of such Net Proceeds are used to prepay the Term Loans in accordance Section 2.12(g)(i) and (B) exceed $50,000,000 in the aggregate, 100% of such excess is used to prepay the Term Loans in accordance Section 2.12(g)(i).

SECTION 6.07. Investments, Loans and Advances. Purchase, hold or acquire any capital stock, evidences of indebtedness or other securities of, make or permit to exist any loans or advances to, or make or permit to exist any investment or any other interest in (collectively, an "Investment"), any other person, except:

105

(a) Permitted Investments and Investments that were Permitted Investments when made;

(b) Investments by Holdings in the Company, Investments by a Restricted Subsidiary in a Domestic Restricted Subsidiary and Investments by Foreign Restricted Subsidiaries in other Foreign Restricted Subsidiaries;

(c) Investments arising out of the receipt of noncash consideration for the sale of assets permitted under Section 6.08, provided that such consideration (if the stated amount or value thereof is in excess of $1,000,000) is pledged upon receipt pursuant to the applicable Security Document;

(d) intercompany loans permitted to be incurred as Indebtedness under Sections 6.01 (c) (other than clause (viii) thereof) and (r) and Guarantees permitted under Section 6.01;

(e) Investments by a wholly owned Restricted Subsidiary constituting Permitted Business Acquisitions;

(f) (i) loans and advances to employees of any Restricted Subsidiary not to exceed $300,000 at any time outstanding to any one employee and not to exceed $2,000,000 in the aggregate at any time outstanding and (ii) advances of payroll payments and expenses to employees in the ordinary course of business;

(g) accounts receivable arising and trade credit granted in the ordinary course of business and any securities received in satisfaction or partial satisfaction thereof from financially troubled account debtors to the extent reasonably necessary in order to prevent or limit loss;

(h) an Investment by the Company or any of the Restricted Subsidiaries in any Finance Subsidiary that the Company is incorporating, but only to the extent necessary to incorporate such Finance Subsidiary and acquire its capital stock and subordinated indebtedness in connection with sales of receivables, all with the minimum capitalization necessary;

(i) investments, other than investments listed in clauses (a) through (h) of this Section, existing on the Closing Date and set forth on Schedule 6.07;

(j) Investments to the extent that the consideration therefor is capital stock of Holdings and/or, in the case of a Permitted Business Acquisition, the assumption of Indebtedness not incurred or created in contemplation of the Permitted Business Acquisition to the extent such Indebtedness is permitted to be incurred under Section 6.01(i), provided that, after giving effect thereto, no Default or Event of Default under paragraph (m) of Article VII shall have occurred;

(k) other Investments, including joint ventures and Investments in Unrestricted Subsidiaries, provided that the consideration for all such Investments (whether cash or property as valued at the time of such Investment, but excluding any capital stock of Holdings or the proceeds thereof) does not exceed (net of any return representing return of capital of (but not return on) any such Investment) at any time $50,000,000 in the aggregate;

(l) Investments resulting from pledges and deposits referred to in Section 6.04(e);

(m) Investments permitted by Section 6.08(c);

(n) the acquisition by any Restricted Subsidiary of the business of Delphi Corporation and its subsidiaries conducted principally at facilities in Logrono, Spain; La Rioja, Spain; Zaragoza, Spain; and Azambuja, Portugal and related assets, provided that the purchase price for such acquisition (whether cash or property, as valued at the time of such Investment) does not exceed the equivalent of (euro)15,000,000 together with the assumed liabilities, subject to purchase price adjustments based upon the assets and/or working capital delivered at closing; and

(o) Investments in Foreign Restricted Subsidiaries to the extent necessary to meet statutory capital requirements.

None of Holdings and the Restricted Subsidiaries may make any Investment in Unrestricted Subsidiaries except as described in the definition of "Unrestricted Subsidiaries" set forth in Section 1.01. Holdings and its Subsidiaries will not make Investments in the Italian JV or any of its businesses or purchase any Capital Stock of the Italian JV (whether by the purchase of Capital Stock or assets or otherwise) after the Closing Date, except (i) Investments made pursuant to Section 6.07(k), (ii) Investments in the form of a Guarantee of (or letter of credit support for) Indebtedness of the Italian JV as permitted by
Section 6.01(a) or (iii) Investments necessary to meet the Italian JV's statutory capital requirements. Notwithstanding anything herein to the contrary, if no Default or Event of Default exists or would exist after giving effect thereto, the Company and the Restricted Subsidiaries may either (i) expend up to $23,140,000 (subject to purchase price adjustments of up to an additional $5,000,000 related to the Italian JV as provided in Section 5.20(c) in the Tac-Trim Purchase Agreement) to purchase Capital Stock of the Italian JV on a basis similar to the put/call arrangements set forth in Section 5.20 of the Tac-Trim Purchase Agreement at the times provided therein (or such earlier times as the Company may agree) if such purchase is accretive to Holdings (i.e., after giving effect to such purchase and the financing thereof, if any, and taking into account, without duplication, Indebtedness and outstanding factoring arrangements of the Italian JV and letters of credit issued for the account of or for the benefit of the Italian JV the pro forma Leverage Ratio of Holdings, calculated in a manner, and taking into account pro forma adjustments, satisfactory to the Administrative Agent, decreases) or (ii) purchase the remaining equity interests in the Italian JV not owned by them for an aggregate purchase price (whether cash or property, as valued at the time thereof, but excluding up to $10,000,000 of existing Indebtedness of the Italian JV) not to exceed $20,000,000.

SECTION 6.08. Mergers, Consolidations, Sales of Assets and Acquisitions. Merge into or consolidate with any other person, or permit any other person to merge into or consolidate with it, or sell, transfer, lease or otherwise dispose of (in one transaction or in a series of transactions) all or any part of its assets (whether now owned or hereafter acquired) or any capital stock of any subsidiary, or purchase, lease or otherwise acquire (in one transaction or a series of transactions) all or any substantial part of the assets of any other person, except that this Section 6.08 shall not prohibit:

(a) the purchase and sale of property and assets in the ordinary course of business by any Restricted Subsidiary;

(b) the Textron Sale/Leaseback Financing and a Permitted Textron Sale/Leaseback Refinancing, the GECC Phase II Lease and other sale-leasebacks permitted under Section 6.06;

(c) Permitted Business Acquisitions if the Investment Condition is satisfied or, if the Investment Condition is not satisfied, (i) Permitted Business Acquisitions that comply with the requirements of Section 6.07(j) and (ii) Permitted Business Acquisitions in an aggregate amount (valued at cost) not to exceed $50,000,000, provided that, in the case of this clause (ii), the pro forma Leverage Ratio (determined using pro forma adjustments satisfactory to the Administrative Agent) after giving effect to any such Permitted Business Acquisition is less than 3.25 to 1.0;

(d) sales, leases or transfers from one Restricted Subsidiary of the Company to the Company or to a Restricted Subsidiary or from the Company to a Domestic Restricted Subsidiary, provided that the fair market value of any assets sold, leased or transferred by a Domestic Restricted Subsidiary to a Foreign Restricted Subsidiary (net of any cash or other assets received by the Domestic Restricted Subsidiaries in exchange for any such sales, leases or transfers) shall not exceed $50,000,000 in the aggregate;

(e) sales, leases or other dispositions of inventory of the Restricted Subsidiaries determined by the Board of Directors of the Company to be no longer useful or necessary in the operation of the businesses of the Restricted Subsidiaries and sales or other dispositions of worn-out, obsolete or surplus equipment in the ordinary course of business;

(f) any Permitted Receivables Financing;

(g) (i) receivables financings constituting Indebtedness and permitted under Section 6.01(o) and (ii) sales of receivables by a Foreign Restricted Subsidiary pursuant to any factoring arrangement that would not constitute Indebtedness, provided that the fair market value of any receivables sold (other than receivables sold on a non-recourse basis on customary terms and conditions) pursuant to this clause (ii) that remain uncollected shall not exceed, together with all Indebtedness outstanding under Section 6.01(o), $50,000,000 in the aggregate;

(h) sales, leases or other dispositions of equipment or real property of the Restricted Subsidiaries determined by the Board of Directors of the Company to be no longer useful or necessary in the operation of the business of the Restricted Subsidiaries, provided that the Net Proceeds thereof in excess of $5,000,000 shall be used to prepay the Term Loans, in accordance with Section 2.12(g)(i) or used to purchase replacement assets or properties used for the same purpose as the equipment or real property disposed of within 12 months of the receipt thereof;

(i) any Restricted Subsidiary may merge with any other Restricted Subsidiary, provided that (i) at the time of and immediately after giving effect to any such merger no Default or Event of Default shall have occurred, (ii) the Company shall be the surviving corporation of any merger involving the Company, and a Canadian Borrower shall be the surviving corporation of any merger involving such Canadian Borrower and (iii) no Restricted Subsidiary organized under the laws of a jurisdiction outside the United States may merge with a Domestic Restricted Subsidiary unless the Domestic Restricted Subsidiary is the surviving corporation (except that Textron Properties, Inc. may merge with and into C&A Canada Holding Company so long as the requirements of Section 5.18(f) are satisfied);

(j) the Restricted Subsidiaries may sell or otherwise dispose of assets having a fair market value, for all such transactions, not in excess of $30,000,000, provided that (i) each such sale shall be for a consideration determined in good faith by the Board of Directors of the Company to be at least equal to the fair market value (if any) of the asset sold, (ii) the aggregate amount of all noncash consideration included in such sale proceeds may not exceed 15% of the fair market value of the aggregate amount of all such sale proceeds; provided, however, that obligations of the type referred to in clauses (a) and (b) of the definition of "Permitted Investments" (without regard to the maturity or the credit rating thereof) shall not be deemed non-cash proceeds if such obligations are promptly sold for cash and the proceeds of such sale are included in the calculation of Net Proceeds from such sale, (iii) the aggregate Net Proceeds of all such sale, and dispositions are either applied to the purchase of assets or properties used in the business of the Company and its Restricted Subsidiaries as permitted by Section 6.12 within 12 months of the receipt thereof or are applied to repay the Term Loans in

accordance with Section 2.12(g)(i) and (iv) no Default or Event of Default shall have occurred and be continuing immediately prior to or after such sale;

(k) the Restricted Subsidiaries may sell or otherwise dispose of the Specified Business in one or more transactions, provided that (i) each such sale shall be for a consideration determined in good faith by the Board of Directors of the Company to be at least equal to the fair market value (if any) of the asset sold, (ii) the aggregate amount of all noncash consideration included in such sale proceeds may not exceed 33% of the fair market value of the aggregate amount of all such sale proceeds; provided, however, that obligations of the type referred to in clauses (a) and (b) of the definition of "Permitted Investments" (without regard to the maturity or the credit rating thereof) shall not be deemed non-cash proceeds if such obligations are promptly sold for cash and the proceeds of such sale are included in the calculation of Net Proceeds from such sale, (iii) the aggregate Net Proceeds of such sale are applied as required to repay the Term Loans in accordance with Section 2.12(g) (i), (iv) each such sale shall be accretive to Holdings (i.e., after giving effect to such sale the pro forma Leverage Ratio of Holdings, calculated in a manner, and taking into account pro forma adjustments, satisfactory to the Administrative Agent, decreases) and (v) no Default or Event of Default shall have occurred and be continuing immediately prior to or after such sale;

(l) Investments permitted by Section 6.07; and

(m) Liens permitted by Section 6.04 and Restricted Payments permitted by Section 6.02.

SECTION 6.09. Transactions with Affiliates and Stockholders. Sell or transfer any property or assets to, or purchase or acquire any property or assets of, or otherwise engage in any other transactions with, any of its Affiliates (including Unrestricted Subsidiaries but excluding Restricted Subsidiaries) or any known holder of 10% or more of any class of capital stock of Holdings or any Unrestricted Subsidiary, except:

(a) transactions in the ordinary course of business that are at prices and on terms and conditions not less favorable to Holdings, the Borrowers or such Restricted Subsidiary than could be obtained on an arm's-length basis from unrelated third parties and, to the extent otherwise permitted under the Credit Agreement, issuances by Holdings of its capital stock;

(b) transactions between or among Holdings, the Borrowers and the Restricted Subsidiaries not involving any other Affiliate (to the extent not otherwise prohibited by other provisions of this Agreement);

(c) any payment permitted by Section 6.02;

(d) the Transactions and transactions with any of the Becker Entities, the Joan Entities or the Textron Entities pursuant to any documents that are in effect on the Closing Date and, for so long as the Permitted Holders are collectively the largest shareholders of Holdings, any other transactions involving the Becker Entities, the Joan Entities or the Textron Entities that are otherwise permitted under the Loan Documents;

(e) the payment, on a quarterly basis, of advisory fees to Heartland Entities in accordance with the Heartland Management Agreement, provided that the annual amount of such advisory fees shall not exceed $4,000,000;

(f) the reimbursement of Heartland Entities for their reasonable out-of-pocket expenses incurred by them in connection with the Transactions and performing management services

to Holdings, the Borrowers and the Subsidiaries, pursuant to the Heartland Management Agreement;

(g) the payment of one time fees to Heartland Entities in connection with any Permitted Business Acquisition, such fees to be payable at the time of each such acquisition and not to exceed the percentage of the aggregate consideration paid by Holdings, the Borrowers and its Restricted Subsidiaries for any such acquisition as specified in the Heartland Management Agreement, and the payment of one-time fees to Heartland Entities in connection with the Transactions as specified in the Heartland Management Agreement;

(h) payments to Heartland Entities for any financial advisory, underwriter or placement services or other investment banking activities rendered to Holdings, the Borrowers or the Restricted Subsidiaries, as set forth in the Heartland Management Agreement, or in the case of a financing transaction, if approved by the disinterested members of the Board of Directors of Holdings, in an amount not to exceed 1% of the subject amount of such financing transaction, for any financing transaction as to which the Heartland Entities provide such services; and

(i) transactions between or among the Italian JV and the Company and the Restricted Subsidiaries contemplated by the documents attached to the Tac-Trim Purchase Agreement relating to the Italian JV and any modifications or amendments thereof that are favorable to the Company and the Restricted Subsidiaries, taken as a whole;

provided, that Holdings and the Restricted Subsidiaries may not pay any fees (including advisory and other fees pursuant to the Heartland Management Agreement) to an Affiliate (including an Unrestricted Subsidiary, but excluding Restricted Subsidiaries) if after giving effect thereto a Default or Event of Default shall have occurred and is continuing, but such fees may be accrued as specified in the Heartland Management Agreement until they are permitted to be paid.

SECTION 6.10. Modification of Certain Instruments. Amend or modify any instruments, agreements or documents evidencing or related to any Permitted Subordinated Indebtedness, the Subordinated Notes, any Permitted Subordinated Notes Refinancing, the Senior Unsecured Notes, any Permitted Additional Senior Unsecured Notes, the Seller Preferred, the Textron Sale/Leaseback Financing or any Permitted Textron Sale/Leaseback Refinancing (including, without limitation, the Textron Sale/Leaseback Mortgages) or designate any Indebtedness (other than Indebtedness incurred hereunder) "Designated Senior Indebtedness" under the Subordinated Notes, any Permitted Subordinated Notes Refinancing or any Permitted Subordinated Indebtedness, unless, in the judgment of the Required Lenders, any such amendment or modification or designation does not substantially affect either the rights, security interests or priorities granted to the Credit Agreement Creditors or the Applicable Collateral Agent and is not adverse to the interests of the Credit Agreement Creditors or the rights of Holdings or its Subsidiaries (without limiting the generality of the foregoing, it is understood that any increase in interest, dividends, fees or other amounts payable in connection therewith, or any amendment that imposes additional covenants or events of default or makes more restrictive the covenants or events of default contained therein or makes more expansive the remedies set forth therein, shall require the consent of the Required Lenders). The foregoing will not restrict refinancings of the Subordinated Notes through a Permitted Subordinated Notes Refinancing or the refinancing of the Textron Sale/Leaseback Financing through a Permitted Sale/Leaseback Refinancing or the issuance of Permitted Additional Senior Unsecured Notes.

SECTION 6.11. Amendment of Constitutive Documents; Change in Corporate Structure. (i) Permit any amendment or modification to be made to the certificate of incorporation or By-laws of Holdings or of any Restricted Subsidiary if such amendment or modification is materially adverse to the interests of the Lenders, (ii) permit any Restricted Subsidiary to issue any capital stock or other equity interest to any person other than the Company or its wholly owned subsidiaries, except to joint venture partners in

connection with the creation of a joint venture or other Investment permitted by
Section 6.07, or (iii) in the case of Holdings and the Company, issue any preferred stock of such person other than the Seller Preferred, except for (x) the issuance for exchange of identical series of preferred stock of the Company in accordance with the requirements of the Preferred Stock Registration Rights Agreement annexed to the Tac-Trim Purchase Agreement, as in effect on the Closing Date, or (y) the issuance of additional shares of preferred stock of the Company in any other manner contemplated by the Certificate of Designation, including, without limitation, in satisfaction of the Earn-Out Amount provided for in the Tac-Trim Purchase Agreement.

SECTION 6.12. Business of Holdings and Restricted Subsidiaries. Engage at any time in any business or business activity other than the business currently conducted by it and business activities reasonably incidental or related thereto; provided, however, that the activities of Holdings shall be limited to (i) the ownership of the stock of the Company together with activities directly related thereto, (ii) the ownership of the stock of Unrestricted Subsidiaries described in clause (ii) of the definition of such term set forth in Section 1.01 together with activities directly related thereto, (iii) performance of its obligations under the Loan Documents, (iv) actions required by law to maintain its status as a public company or incidental to being a public company and (v) the guaranteeing of the GECC Phase II Lease, the Textron Sale/Leaseback Financing or any Permitted Textron Sale/Leaseback Refinancing.

SECTION 6.13. Restrictive Agreements. Enter into any indenture, agreement, instrument or other arrangement which, directly or indirectly, prohibits or restrains, or has the effect of prohibiting or restraining, or imposes materially adverse conditions upon, the granting of Liens in favor of the Secured Parties, the provision of Guarantees or the payment of dividends or the making of loans or advances or transfers of property or assets by Holdings or any of the Restricted Subsidiaries other than restrictions (i) on the granting of Liens on assets that are encumbered by Liens permitted under clause (a), (b), (h), (j), (k), (n), (p), (r) or (u) of Section 6.04 or (ii) contained in agreements relating to Indebtedness not in excess of $10,000,000 in the aggregate, (iii) contained in agreements relating to Indebtedness permitted by Section 6.01 or (iv) on the granting of pledges with respect to the Company's ownership interest in joint ventures contained in any joint venture documentation.

SECTION 6.14. Interest Coverage Ratio. In the case of Holdings, permit the Interest Coverage Ratio for any period of four consecutive fiscal quarters to be less than the ratio set forth below opposite the period which includes the last day of such period of consecutive fiscal quarters:

| Quarter Ending: | Ratio: |
|---|---|
| September 30, 2003 | 2.00:1.00 |
| December 31, 2003 | 1.85:1.00 |
| March 31, 2004 | 1.85:1.00 |
| June 30, 2004 | 1.85:1.00 |
| September 30, 2004 | 2.00:1.00 |
| December 31, 2004 | 2.20:1.00 |
| March 31, 2005 | 2.25:1.00 |
| June 30, 2005 – December 31, 2005 | 3.00:1.00 |

SECTION 6.15. Leverage Ratio. In the case of Holdings, permit the Leverage Ratio as of the last day of any fiscal quarter occurring during any period set forth below to be greater than the ratio set forth below for such period:

```
              Quarter Ending:                              Ratio:
          September 30, 2003                              4.50:1.00
          December 31, 2003                               5.00:1.00
          March 31, 2004                                  5.00:1.00
          June 30, 2004                                   4.75:1.00
          September 30, 2004                              4.50:1.00
          December 31, 2004                               4.25:1.00
          March 31, 2005                                  3.75:1.00
          June 30, 2005 - December 31, 2005               3.00:1.00
```

SECTION 6.16. Tax Sharing. File or consent to the filing of any consolidated income tax return with any person (other than Holdings, the Restricted Subsidiaries and Unrestricted Subsidiaries that have entered into the existing Tax Sharing Agreements).

SECTION 6.17. Inactive Subsidiaries. Permit any Inactive Subsidiary, at any time, to fail to satisfy any of the criteria set forth in the definition of Inactive Subsidiary in Section 1.01.

SECTION 6.18. Amendments to Transaction Documents; Certain Actions under Transaction Documents. Amend, supplement or otherwise modify the terms and conditions of the Transaction Documents except for any such amendment, supplement or modification that could not reasonably be expected to have a Material Adverse Effect or is not adverse to the Lenders or Holdings or its Subsidiaries. Without limitation of the foregoing, (a) the Company will not exchange any Seller Preferred for notes as contemplated by Section 8 of the Certificate of Designation or (b) make any payment in respect of, provide any collateral for or otherwise provide any consideration for the Earn Out Amount (as defined in the Tac-Trim Purchase Agreement), except through the issuance of additional shares of Seller Preferred or shares of Holdings' common stock.

## ARTICLE VII.

## EVENTS OF DEFAULT

In case of the happening of any of the following events ("Events of Default"):

(a) any representation or warranty made or deemed made in any Loan Document, or any representation, warranty, statement or information contained in any report, certificate, financial statement or other instrument furnished in connection with or pursuant to any Loan Document, shall prove to have been false or misleading in any material respect when so made, deemed made or furnished;

(b) default shall be made in the payment of any principal of any Loan when and as the same shall become due and payable, whether at the due date thereof or at a date fixed for prepayment thereof or by acceleration thereof or otherwise;

(c) default shall be made in the payment of any interest on any Loan or reimbursement of any Letter of Credit Disbursement or any Fee or any other amount (other than an amount referred to in (b) above) due under any Loan Document, when and as the same shall become due and payable, and such default shall continue unremedied for a period of five Business Days;

(d) default shall be made in the due observance or performance by Holdings or any subsidiary thereof of any covenant, condition or agreement contained in Section 2.12(e), 5.01(a), 5.05(a), 5.08, 5.10 or 5.17 or in Article VI;

(e) default shall be made in the due observance or performance by Holdings or any subsidiary thereof of any covenant, condition or agreement contained in any Loan Document (other than those specified in (b), (c) or (d) above) and such default shall continue unremedied for a period of 30 days in the case of Sections 5.01(b), 5.02, 5.09 and 5.13 and 15 days in the case of all others, in each case after notice thereof from the Administrative Agent or any Lender to the Company;

(f) Holdings, any Restricted Subsidiary or any Significant Subsidiary shall (i) fail to pay any principal or interest, regardless of amount, due in respect of Indebtedness having an aggregate principal or notional amount in excess of $10,000,000, when and as the same shall become due and payable, or (ii) fail to observe or perform any other term, covenant, condition or agreement contained in any agreements or instruments evidencing or governing any Indebtedness having an aggregate principal amount in excess of $10,000,000 if the effect of any failure referred to in this clause
(ii) is to cause, or to permit the holder or holders of such Indebtedness or a trustee on its or their behalf to cause, such Indebtedness to become due prior to its stated maturity; or a termination event or comparable event shall occur under the documents governing the Permitted Receivables Financing entitling the persons financing the receivables owned by the Finance Subsidiary (or purchasing undivided interests therein) to stop such financing or purchase of undivided interests (regardless of whether such persons declare such cessation or termination as a result of such event); or an Event of Default or Termination Event or comparable event shall occur under the Textron Sale/Leaseback Financing or a Permitted Textron Sale/Leaseback Refinancing which permits the lessor thereunder to declare all or substantially all rents thereunder to become immediately due and payable;

(g) an involuntary proceeding shall be commenced or an involuntary petition shall be filed in a court of competent jurisdiction seeking (i) relief in respect of the Company or Holdings or any Significant Subsidiary, or of a substantial part of the property or assets of the Company or Holdings or any Significant Subsidiary, under Title 11 of the United States Code, as now constituted or hereafter amended, or any other Federal or state bankruptcy, insolvency, receivership or similar law or comparable foreign law, (ii) the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for the Company or Holdings or any Significant Subsidiary or for a substantial part of the property or assets of the Company or Holdings or any Significant Subsidiary or
(iii) the winding-up or liquidation of the Company or Holdings or any Significant Subsidiary; and such proceeding or petition shall continue undismissed for 60 days or an order or decree approving or ordering any of the foregoing shall be entered;

(h) the Company or Holdings or any Significant Subsidiary shall (i) voluntarily commence any proceeding or file any petition seeking relief under Title 11 of the United States Code, as now constituted or hereafter amended, or any other Federal or state bankruptcy, insolvency, receivership or similar law or comparable foreign law, (ii) consent to the institution of, or fail to contest in a timely and appropriate manner, any proceeding or the filing of any petition described in (g) above, (iii) apply for or consent to the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for the Company or Holdings or any Significant Subsidiary or for a substantial part of the property or assets of the Company or Holdings or any Significant Subsidiary, (iv) file an answer admitting the material allegations of a petition filed against it in any such proceeding, (v) make a general assignment for the benefit of creditors, (vi) become unable, admit in writing its inability or fail generally to pay its debts as they become due or
(vii) take any action for the purpose of effecting any of the foregoing;

(i) one or more judgments for the payment of money in an aggregate amount in excess of $10,000,000 (to the extent not covered by insurance) shall be rendered against Holdings, any Restricted Subsidiary or any Significant Subsidiary or any combination thereof and the same shall remain undischarged or stayed for a period of 30 consecutive days during which execution shall not be effectively stayed, or any action shall be legally taken by a judgment creditor to levy upon assets or properties of Holdings or any Restricted Subsidiary to enforce any such judgment;

(j) a Reportable Event or Reportable Events, or a failure to make a required installment or other payment (within the meaning of Section 412(n)(1) of the Code), shall have occurred with respect to any Plan or Plans that reasonably could be expected to result in liability of the Company, any Guarantor or any of their ERISA Affiliates to the PBGC or to a Plan in an aggregate amount exceeding $5,000,000 and, within 30 days after the reporting of any such Reportable Event to the Administrative Agent or after the receipt by the Administrative Agent of the statement required pursuant to Section 5.06(b)(iii), the Administrative Agent shall have notified the Company in writing that (i) the Required Lenders have made a determination that, on the basis of such Reportable Event or Reportable Events or the failure to make a required payment, there are reasonable grounds (A) for the termination of such Plan or Plans by the PBGC, (B) for the appointment by the appropriate United States District Court of a trustee to administer such Plan or Plans or (C) for the imposition of a lien in favor of a Plan and (ii) as a result thereof an Event of Default exists hereunder; or a trustee shall be appointed by a United States District Court to administer any such Plan or Plans; or the PBGC shall institute proceedings to terminate any Plan or Plans;

(k) (i) the Company, any Guarantor or any of their ERISA Affiliates shall have been notified by the sponsor of a Multiemployer Plan that it has incurred Withdrawal Liability to such Multiemployer Plan, (ii) the Company, any Guarantor or such ERISA Affiliate does not have reasonable grounds for contesting such Withdrawal Liability or is not in fact contesting such Withdrawal Liability in a timely and appropriate manner and (iii) the amount of the Withdrawal Liability specified in such notice, when aggregated with all other amounts required to be paid to Multiemployer Plans in connection with Withdrawal Liabilities (determined as of the date or dates of such notification), exceeds $10,000,000 or requires payments exceeding $10,000,000 in any year;

(l) the Company, any Guarantor or any of their ERISA Affiliates shall have been notified by the sponsor of a Multiemployer Plan that such Multiemployer Plan is in reorganization or is being terminated, within the meaning of Title IV of ERISA, if solely as a result of such reorganization or termination the aggregate annual contributions of the Company, the Guarantors and their ERISA Affiliates to all Multiemployer Plans that are then in reorganization or have been or are being terminated have been or will be increased over the amounts required to be contributed to such Multiemployer Plans for their most recently completed plan years by an amount exceeding $10,000,000;

(m) there shall have occurred a Change in Control;

(n) (i) any Loan Document shall cease, for any reason, to be a legal, valid and binding obligation of the respective parties thereto or Holdings or any of its subsidiaries shall so assert, (ii) the guarantee contained in Section 2 of the Guarantee and Collateral Agreement or the Canadian Guarantee and Collateral Agreement shall cease, for any reason, to be in full force and effect or Holdings or any of its subsidiaries shall so assert; (iii) any security interest or Lien purported to be created by this Agreement or any Security Document and to extend to assets which are not immaterial to Holdings and its subsidiaries on a consolidated basis shall cease, for any reason (except to the extent resulting from the negligent or willful failure of the Applicable Collateral Agent to retain possession of the applicable collateral), to be, or any security interest or Lien purported to be

114

created by this Agreement or any Security Document and to extend to any assets of Holdings or its subsidiaries shall for any reason be asserted by Holdings or any of its subsidiaries not to be, a valid, first priority perfected security interest (subject to no Liens other than Liens not prohibited by any applicable provision of the Loan Documents) in such collateral (other than cash proceeds which are not identifiable proceeds); or (iii) the Obligations and the guarantees thereof pursuant to this Agreement or the Security Documents shall cease to constitute senior indebtedness under the subordination provisions of any document or instrument evidencing the Subordinated Notes, any Permitted Subordinated Notes Refinancing or any Permitted Subordinated Indebtedness or such subordination provisions shall be invalidated or otherwise cease to be a legal, valid and binding obligation of the parties thereto, enforceable in accordance with its terms; or

(o) the Finance Subsidiary shall engage in any business or activity other than the purchase of receivables from the Restricted Subsidiaries and the sale of such receivables and activities incidental thereto;

then, and in every such event (other than an event with respect to any Borrower described in paragraph (g) or (h) above), and at any time thereafter during the continuance of such event, the Administrative Agents, as the case may be, may, and at the request of the Required Lenders, shall, by notice to the Company, take either or both of the following actions, at the same or different times: (i) terminate forthwith the Commitments and the Borrower's right to request the making of a Supplemental Revolving Loan or the issuance or extension of a Supplemental Revolving Letter of Credit or an increase to the stated amount thereof and (ii) declare the Loans then outstanding to be forthwith due and payable in whole or in part, whereupon the principal of the Loans so declared to be due and payable, together with accrued interest thereon and any unpaid accrued Fees and all other liabilities of the Borrowers accrued hereunder and under any other Loan Document, shall become forthwith due and payable, without presentment, demand, protest or any other notice of any kind, all of which are hereby expressly waived by the Borrowers, anything contained herein or in any other Loan Document to the contrary notwithstanding; and in any event with respect to any Borrower or described in paragraph (g) or (h) above, the Commitments and the Borrower's right to request the making of a Supplemental Revolving Loan or the issuance or extension of a Supplemental Revolving Letter of Credit or an increase to the stated amount thereof shall automatically terminate and the principal of the Loans then outstanding, together with accrued interest thereon and any unpaid accrued Fees and all other liabilities of the Borrowers accrued hereunder and under any other Loan Document, shall automatically become due and payable, without presentment, demand, protest or any other notice of any kind, all of which are hereby expressly waived by the Borrowers, anything contained herein or in any other Loan Document to the contrary notwithstanding.

## ARTICLE VIII.

## AGENTS

In order to expedite the transactions contemplated by this Agreement, JPMorgan Chase Bank is hereby appointed to act as Administrative Agent and Collateral Agent on behalf of the Lenders and the Issuing Banks. Each of the Lenders, and each subsequent holder of any Note by its acceptance thereof, and each Issuing Bank hereby irrevocably authorizes the Administrative Agent to take such actions on behalf of such Lender or holder or the Issuing Bank, as applicable, and to exercise such powers as are specifically delegated to the Administrative Agent by the terms and provisions hereof and of the other Loan Documents, together with such actions and powers as are reasonably incidental thereto. The Administrative Agent is hereby expressly authorized by the Lenders and the Issuing Banks, without hereby limiting any implied authority, (a) to receive on behalf of the Lenders all payments of principal of and interest on the Loans and all other amounts due to the Lenders hereunder, and promptly to distribute to each Lender its proper share of

each payment so received; (b) to give notice on behalf of each of the Lenders to the Borrowers of any Event of Default specified in this Agreement of which the Administrative Agent has actual knowledge acquired in connection with its agency hereunder; (c) to distribute to each Lender and Issuing Bank copies of all notices, financial statements and other materials delivered by a Borrower pursuant to this Agreement as received by the Administrative Agent; and (d) to accept and make deposits to and withdrawals from the Supplemental Revolving Credit Linked Accounts in accordance with this Agreement. In acting as Collateral Agent, JPMorgan Chase Bank shall be entitled to the rights and benefits, and subject to the obligations, set forth for the Administrative Agent under this Article VIII, mutatis mutandis, which Article is hereby incorporated by reference, mutatis mutandis, in each of the Security Documents to which it is a party (or with respect to JPMorgan Chase Bank, Toronto Branch, each of the Canadian Security Documents to which it is a party).

Neither the Administrative Agent nor any Issuing Bank nor any of their respective affiliates, directors, officers, employees or agents shall be liable as such for any action taken or omitted by any of them except for its or his own gross negligence or willful misconduct, or be responsible for any statement, warranty or representation herein or the contents of any document delivered in connection herewith, or be required to ascertain or to make any inquiry concerning the performance or observance by any Borrower or any Guarantor of any of the terms, conditions, covenants or agreements contained in any Loan Documents. The Administrative Agent shall not be responsible to the Lenders or the holders of the Notes or the Issuing Bank for the due execution (other than by the Administrative Agent), genuineness, validity, enforceability (other than against the Administrative Agent) or effectiveness of this Agreement, the Notes or any other Loan Documents or other instruments or agreements. The Administrative Agent may deem and treat the payee of any Note as the owner thereof for all purposes hereof until it shall have received from the payee of such Note notice, given as provided herein, of the transfer thereof in compliance with Section 9.04. The Administrative Agent shall in all cases be fully protected in acting, or refraining from acting, in accordance with written instructions signed by the Required Lenders (and the Issuing Banks, with respect to Letters of Credit) and, except as otherwise specifically provided herein, such instructions and any action or inaction pursuant thereto shall be binding on all the Lenders and each subsequent holder of any Note and the Issuing Banks. The Administrative Agent shall, in the absence of knowledge to the contrary, be entitled to rely on any instrument or document believed by it in good faith to be genuine and correct and to have been signed or sent by the proper person or persons. Neither the Administrative Agent nor the Issuing Banks nor any of their respective directors, officers, employees or agents shall have any responsibility to the Borrowers on account of the failure of or delay in performance or breach by any Lender (or, in the case of the Administrative Agent, by any Issuing Bank) of any of its obligations hereunder or to any Lender (or, in the case of the Administrative Agent, to any Issuing Bank) on account of the failure of or delay in performance or breach by any other Lender or any Borrower or any Guarantor of any of their respective obligations hereunder or under any other Loan Document or in connection herewith or therewith. Each of the Administrative Agent and each Issuing Bank may execute any and all duties hereunder by or through agents or affiliates and shall be entitled to rely upon the advice of legal counsel selected by it with respect to all matters arising hereunder and shall not be liable for any action taken or suffered in good faith by it in accordance with the advice of such counsel.

The Lenders hereby acknowledge that neither the Administrative Agent nor any Issuing Bank shall be under any duty to take any discretionary action permitted to be taken by it pursuant to the provisions of this Agreement unless it shall be requested in writing to do so by the Required Lenders.

Subject to the appointment and acceptance of a successor Administrative Agent as provided below, the Administrative Agent may resign at any time by notifying the Lenders, the Issuing Bank and the Company. Upon any such resignation, the Required Lenders shall have the right to appoint a successor, with the consent of the Company (not to be unreasonably withheld). If no successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within 30 days after the retiring Administrative Agent gives notice of its resignation, then the retiring Administrative Agent may, on behalf of the Lenders, appoint a successor Administrative Agent, with the consent of the Company (not to be

unreasonably withheld), which shall be a bank with an office in New York, New York, having a combined capital and surplus of at least $500,000,000 or an Affiliate of any such bank which is also a bank. Upon the acceptance of any appointment as Administrative Agent hereunder by a successor bank, such successor shall succeed to and become vested with all the rights, powers, privileges and duties of the retiring Administrative Agent and the retiring Administrative Agent shall be discharged from its duties and obligations hereunder. After the Administrative Agent's resignation hereunder, the provisions of this Article and Section 9.05 shall continue in effect for its benefit in respect of any actions taken or omitted to be taken by it while it was acting as Administrative Agent.

Upon the effectiveness of the retirement of any Administrative Agent, the retiring Administrative Agent may, at its option (i) transfer the management of all then existing Supplemental Revolving Credit Linked Accounts to the successor Administrative Agent or (ii) close all such Supplemental Revolving Credit Linked Accounts upon the establishment of new Supplemental Revolving Credit Linked Accounts with the successor Administrative Agent (and the successor Administrative Agent shall establish such new accounts) and transfer all amounts on deposit in such Supplemental Revolving Credit Linked Accounts to such new accounts.

With respect to the Loans made by it hereunder and the Notes issued to it and the Letter of Credit participations acquired by it, each of the Administrative Agent and each Issuing Bank in its individual capacity and not as Administrative Agent or Issuing Bank, as the case may be, shall have the same rights and powers as any other Lender and may exercise the same as though it were not the Administrative Agent or an Issuing Bank, as the case may be, and the Administrative Agent and its Affiliates and each Issuing Bank and its Affiliates may accept deposits from, lend money to and generally engage in any kind of business with the Borrowers or any subsidiary or other Affiliate thereof as if it were not the Administrative Agent or an Issuing Bank, as the case may be.

Each Lender recognizes that applicable laws, rules, regulations or guidelines of Governmental Authorities may require the Administrative Agent to determine whether the transactions contemplated hereby should be classified as "highly leveraged" or assigned any similar or successor classification, and that such determination may be binding upon the other Lenders. Each Lender understands that any such determination shall be made solely by the Administrative Agent based upon such factors (which may include, without limitation, the Administrative Agent's internal policies and prevailing market practices) as the Administrative Agent shall deem relevant and agrees that the Administrative Agent shall have no liability for the consequences of any such determination.

Each Lender agrees (i) to reimburse each of the Administrative Agent and, if such Lender is a Revolving Lender, Supplemental Revolving Lender or Additional Revolving Lender, each Issuing Bank, on demand, in the amount of its pro rata share (based on its Commitments (including its Supplemental Revolving Credit Linked Deposit Amount) hereunder or its Revolving Credit Commitment, Supplemental Revolving Credit Linked Deposited Amount or Additional Revolving Credit Commitment, as the case may be, if any, in the case of reimbursement of any Issuing Bank or Swingline Lender) of any reasonable expenses incurred for the benefit of the Lenders by the Administrative Agent or, if applicable, such Issuing Bank, including counsel fees and compensation of agents and employees paid for services rendered on behalf of the Lenders, which shall not have been reimbursed by the Company and (ii) to indemnify and hold harmless each of the Administrative Agent and, if such Lender is a Revolving Lender, Supplemental Revolving Lender or Additional Revolving Lender, each Issuing Bank and the Swingline Lender and any of their respective directors, officers, employees or agents, on demand, in the amount of such pro rata share, from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever which may be imposed on, incurred by or asserted against it in its capacity as the Administrative Agent or an Issuing Bank, as the case may be, or any of them in any way relating to or arising out of this Agreement or any other Loan Document or any action taken or omitted by it

or any of them under this Agreement or any other Loan Document, to the extent the same shall not have been reimbursed by the Borrowers; provided that no Lender shall be liable to the Administrative Agent or any Issuing Bank for any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements resulting from the gross negligence or willful misconduct of the Administrative Agent or such Issuing Bank, as the case may be, or any of their directors, officers, employees or agents.

Each Lender acknowledges that it has, independently and without reliance upon the Administrative Agent, any Issuing Bank or any other Lender and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement. Each Lender also acknowledges that it will, independently and without reliance upon the Administrative Agent, any Issuing Bank or any other Lender and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement or any other Loan Document, any related agreement or any document furnished hereunder or thereunder.

Each of the Canadian Lenders hereby agrees and confirms that the provisions of this Article VIII shall apply to JPMorgan Chase Bank, Toronto Branch, as Canadian Administrative Agent and as Canadian Collateral Agent upon the same terms and subject to the same conditions as provided in this Article VIII mutatis mutandis; provided that any successor Canadian Administrative Agent or Canadian Collateral Agent shall be a bank with an office in Toronto, Canada or Montreal, Canada having a combined capital and surplus of at least $500,000,000 or an Affiliate of any such bank which is also a bank.

For the purposes of holding any security granted by any of the Loan Parties pursuant to the laws of the Province of Quebec, the Applicable Collateral Agent shall be the holder of an irrevocable power of attorney for all present and future Lenders. By executing an Assignment and Acceptance, any future Lender shall be deemed to ratify the power of attorney granted to the Applicable Collateral Agent hereunder. The Lenders and the Loan Parties agree that notwithstanding Section 32 of the Act respecting the Special Powers of Legal Persons (Quebec), the Applicable Collateral Agent may, as the person holding the power of attorney of the Lenders, acquire any debentures or other title of indebtedness secured by any hypothec granted by any of the Loan Parties to the Applicable Collateral Agent pursuant to the laws of the Province of Quebec.

Each Applicable Collateral Agent, the Administrative Agent and the Canadian Administrative Agent is authorized by the Lenders to take any action reasonably requested by the Borrowers to release any Lien on any item of property which is sold or disposed of in a transaction, or subject to a Lien, permitted by this Agreement.

None of the Co-Documentation Agents or the Syndication Agent shall have any rights or obligations under the Loan Documents in its capacity as such.

## ARTICLE IX.

## MISCELLANEOUS

SECTION 9.01. Notices. Notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed or sent by telex or telecopy, as follows:

(a) if to Holdings or to the Company, to it at 250 Stephenson Highway, Troy, Michigan 48083, Attention of Chief Financial Officer (Telecopy No. 248-824-1522) with copies to

118

**Attention of General Counsel (Telecopy No. 248-824-1882);**

(b) if to Collins & Aikman Canada, to it at 150 Collins Street, Farnham, Quebec, J2N 2R6, Canada, Attention Controller (Telecopy No. 514-293-6657) with copies to the Company, Attention of Chief Financial Officer (Telecopy No. 248-824-1522) and General Counsel (Telecopy No. 248-824-1882);

(c) if to Collins & Aikman Plastics, to it at 250 Stephenson Highway, Troy, Michigan 48083, Attention Controller (Telecopy No. 248-524-4996) with copies to the Company, Attention of Chief Financial Officer (Telecopy No. 248-824-1522) and General Counsel (Telecopy No. 248-824-1882);

(d) if to the Administrative Agent, to it at 1111 Fannin - 10th Floor, Houston, Texas 77002, Attention of Clifford Trapani (Telecopy No. 713-750-2938);

(e) if to the Canadian Administrative Agent, to it at 200 Bay Street, Suite 1800, Royal Bank Plaza, South Tower, Toronto, Ontario M5J 2J2, Attention of Amanda Vidulich and Ramona Sankar (Telecopy No. 416-981-9128);

(f) if to a Lender, to it at its address (or telecopy number) set forth on its signature page hereto or in the Assignment and Acceptance pursuant to which such Lender shall have become a party hereto.

All notices and other communications given to any party hereto in accordance with the provisions of this Agreement shall be deemed to have been given on the date of receipt if delivered by hand or overnight courier service or sent by telex or telecopy, or on the date five Business Days after dispatch by certified or registered mail if mailed, in each case delivered, sent or mailed (properly addressed) to such party as provided in this Section 9.01 or in accordance with the latest unrevoked direction from such party given in accordance with this Section 9.01.

SECTION 9.02. Survival of Agreement. All covenants, agreements, representations and warranties made by the Borrowers and the Guarantors herein and in the certificates or other instruments prepared or delivered in connection with or pursuant to this Agreement or any other Loan Document shall be considered to have been relied upon by the Lenders and shall survive the making by the Lenders of the Loans, and the execution and delivery to the Lenders of the Notes evidencing such Loans, and the issuance of the Letters of Credit, regardless of any investigation made by the Lenders or on their behalf, and shall continue in full force and effect as long as the principal of or any accrued interest on any Loan or any Fee or any other amount payable under this Agreement or any other Loan Document is outstanding and unpaid and so long as the Commitments have not been terminated. Without prejudice to the survival of any other agreements contained herein, indemnification and reimbursement obligations contained herein (including pursuant to Sections 2.13, 2.15 and 9.05) shall survive the payment in full of the principal and interest hereunder and the termination of the Commitments or this Agreement.

SECTION 9.03. Binding Effect. This Agreement shall become effective when it shall have been executed by the Borrowers, Holdings, the Administrative Agent and the Canadian Administrative Agent and when the Administrative Agent shall have received copies hereof which, when taken together, bear the signatures of each Lender, and thereafter shall be binding upon and inure to the benefit of each Borrower, Holdings, each Issuing Bank, the Administrative Agent, the Canadian Administrative Agent and each Lender and their respective successors and assigns, except that none of the Borrowers or Holdings shall have the right to assign its rights hereunder or any interest herein without the prior consent of all the Lenders.

119

SECTION 9.04. Successors and Assigns. (a) Whenever in this Agreement any of the parties hereto is referred to, such reference shall be deemed to include the successors and assigns of such party; and all covenants, promises and agreements by or on behalf of the Company, the Canadian Borrowers, Holdings, the Administrative Agent, the Canadian Administrative Agent, the Issuing Banks or the Lenders that are contained in this Agreement shall bind and inure to the benefit of their respective successors and assigns.

(b) Each Lender other than any Conduit Lender may assign to one or more assignees all or a portion of its interests, rights and obligations under this Agreement (including all or a portion of its Commitment, and the Loans at the time owing to it and the Notes and participations in Letters of Credit held by it, it being understood that Lenders shall not be required to assign pro rata amounts of their Revolving Credit Commitments, Supplemental Revolving Credit Commitments, Additional Revolving Credit Commitments, Canadian Revolving Credit Commitments, Supplemental Revolving Credit Linked Deposit Amounts, Tranche A Term Loans, Tranche A-1 Term Loans and Tranche B Term Loans; provided, however, that (i) except in the case of an assignment to a Lender or a Lender Affiliate, (v) the Company and the Administrative Agent must give their prior written consent to such assignment (which consents shall not be unreasonably withheld or delayed), (w) such assignment (unless such assignment is of all of a Lender's Loans, Letter of Credit Exposure and unused Commitments and Supplemental Revolving Credit Linked Deposit Amount) shall be in an amount of at least $1,000,000, with respect to any assignment of Supplemental Revolving Credit Linked Deposit Amounts and Tranche B Term Loans and at least $5,000,000, with respect to any assignment of Tranche A Term Loans, Tranche A-1 Term Loans or Revolving Credit Commitments, Additional Revolving Credit Commitments or Canadian Revolving Credit Commitments, unless in each case otherwise agreed to by the Company and the Administrative Agent, each in their sole discretion, (x) a Canadian Lender (or, in the case of a Canadian Schedule II chartered bank, its affiliate which is a Revolving Lender) (A) may not assign a portion of its interests under this Agreement unless, after giving effect thereto, it shall be able to comply with the reallocation described in Section 2.27 and (B) shall assign ratable portions of its Canadian Revolving Credit Commitment and Additional Revolving Credit Commitment, (y) interests under the Canadian Revolving Credit Commitments may only be assigned to Canadian Scheduled Lenders, and (z) no Lender may assign any portion of its Revolving Credit Commitment, Supplemental Revolving Credit Commitment, Additional Revolving Credit Commitment, Canadian Revolving Credit Commitment or Supplemental Revolving Credit Linked Deposit Amount to a Lender which does not have a Revolving Credit Commitment, Supplemental Revolving Credit Commitment, Additional Revolving Credit Commitment, Canadian Revolving Credit Commitment or Supplemental Revolving Credit Linked Deposit Amount, as the case may be, without the consent of the Administrative Agent, (ii) the parties to each such assignment shall execute and deliver to the Administrative Agent (which shall deliver a copy to the Canadian Administrative Agent) an Assignment and Acceptance, together with the Note or Notes subject to such assignment and, except in the case of an assignment to a Lender or a Lender Affiliate, a processing and recordation fee of $3,500 and (iii) the assignee, if it shall not be a Lender, shall deliver to the Administrative Agent an Administrative Questionnaire. Upon acceptance and recording pursuant to paragraph (e) of this Section 9.04, from and after the effective date specified in each Assignment and Acceptance, which effective date shall be at least five Business Days after the execution thereof unless agreed otherwise by the Administrative Agent (i) the assignee thereunder shall be a party hereto and, to the extent of the interest assigned by such Assignment and Acceptance, have the rights and obligations of a Lender under this Agreement and

(ii) the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Acceptance, be released from its obligations under this Agreement (and, in the case of an Assignment and Acceptance covering all or the remaining portion of an assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of Sections 2.13, 2.15, 2.18 and 9.05, as well as to any Fees accrued for its account and not yet paid). Notwithstanding the foregoing, any Conduit Lender may assign at any time to its designating Lender hereunder without the consent of the Company or the Administrative Agent any or all of the Loans it may have funded hereunder and pursuant to its designation agreement and without regard to the limitations set

forth in the first sentence of this Section 9.04(b). Without the consent of the Borrower and the Administrative Agent, the Supplemental Revolving Credit Linked Deposit of any Supplemental Revolving Lender shall not be released in connection with any assignment by such Supplemental Revolving Lender, but shall instead be purchased by the relevant assignee and continue to be held for application (to the extent not already applied) in accordance with Section 2.01 to satisfy such assignee's obligations in respect of Supplemental Revolving Loans. Each Supplemental Revolving Lender agrees that immediately prior to such assignment

(x) the Administrative Agent shall establish a new Supplemental Revolving Credit Linked Account in the name of such assignee, (y) unless otherwise consented to by the Administrative Agent, a corresponding portion of the amount on deposit in the Supplemental Revolving Credit Linked Account of the assignor Supplemental Revolving Lender shall be purchased by the assignee and shall be transferred from the assignor's Supplemental Revolving Credit Linked Account to the assignee's Supplemental Revolving Credit Linked Account and (z) if after giving effect to such assignment the aggregate amount of the Supplemental Revolving Credit Linked Account of the assignor Supplemental Revolving Lender shall be $0, the Administrative Agent shall close the Supplemental Revolving Credit Linked Account of such assignor Supplemental Revolving Lender.

(c) By executing and delivering an Assignment and Acceptance, the assigning Lender thereunder and the assignee thereunder shall be deemed to confirm to and agree with each other and the other parties hereto as follows:

(i) such assigning Lender warrants that it is the legal and beneficial owner of the interest being assigned thereby free and clear of any adverse claim and that its Commitments, and the outstanding balances of its Tranche A Term Loans, Tranche A-1 Term Loans, Tranche B Term Loans, Revolving Loans, Supplemental Revolving Loans and Supplemental Revolving Credit Linked Deposits, in each case without giving effect to assignments thereof which have not become effective, are as set forth in such Assignment and Acceptance, (ii) except as set forth in

(i) above, such assigning Lender makes no representation or warranty and assumes no responsibility with respect to any statements, warranties or representations made in or in connection with this Agreement, or the execution, legality, validity, enforceability, genuineness, sufficiency or value of this Agreement, any other Loan Document or any other instrument or document furnished pursuant hereto, or the financial condition of any Borrower or any Guarantor or the performance or observance by any Borrower or any Guarantor of any of its obligations under this Agreement, any other Loan Document or any other instrument or document furnished pursuant hereto; (iii) such assignee represents and warrants that it is legally authorized to enter into such Assignment and Acceptance; (iv) such assignee confirms that it has received copies of this Agreement, together with copies of the most recent financial statements delivered pursuant to this Agreement and such other documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into such Assignment and Acceptance; (v) such assignee will independently and without reliance upon the Administrative Agent, any Issuing Bank, such assigning Lender or any other Lender and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under this Agreement; (vi) such assignee appoints and authorizes the Administrative Agent and the Canadian Administrative Agent to take such action as agent on its behalf and to exercise such powers under this Agreement as are delegated to the Administrative Agent or the Canadian Administrative Agent, as the case may be, by the terms hereof, together with such powers as are reasonably incidental thereto; and (vii) such assignee agrees that it will perform in accordance with their terms all the obligations which by the terms of this Agreement are required to be performed by it as a Lender.

(d) Each of the Administrative Agent and the Canadian Administrative Agent shall maintain at its address referred to in Section 9.01 a copy of each Assignment and Acceptance delivered to it and a register (the "Register") for the recordation of the names and addresses of the Lenders and the Commitments of, and principal amount of the Loans owing to, and the Supplemental Revolving Credit Linked Deposit Amount of, each Lender from time to time. Each of the Administrative Agent and the Canadian Administrative Agent shall separately record the names and addresses of each Lender that holds Notes in the Register. Each of the Administrative Agent and the Canadian Administrative Agent shall also record the

121

amount of the Commitments of, and the aggregate principal amount of Loans owing to, B/As accepted and held by and the Letter of Credit Exposure of, and the Supplemental Revolving Credit Linked Deposit Amount of, such Lender in the Register. The entries in the Register shall be conclusive, in the absence of manifest error, and the Borrowers, the Administrative Agent, the Canadian Administrative Agent and the Lenders shall treat each person whose name is recorded in and the Register as the owner of the Notes, the Supplemental Revolving Credit Linked Deposit Amounts, the Commitments, the Loans and Letter of Credit Exposures recorded therein for all purposes of this Agreement. The Register shall be available for inspection by the Borrowers, the Issuing Banks and any Lender, at any reasonable time and from time to time upon reasonable prior notice. It is understood that the Canadian Administrative Agent shall be required to maintain the Register only with respect to the Canadian Revolving Credit Commitments and the Administrative Agent may, but shall not be required to, maintain the Register with respect to Canadian Revolving Credit Commitments and extensions of credit thereunder.

(e) Upon its receipt of a duly completed Assignment and Acceptance executed by an assigning Lender and an assignee together with the Note or Notes subject to such assignment, an Administrative Questionnaire completed in respect of the assignee (unless the assignee shall already be a Lender hereunder), the processing and recordation fee referred to in paragraph
(b) above and, if required, the written consent of the Company and the Administrative Agent to such assignment, the Administrative Agent or the Canadian Administrative Agent, as the case may be, shall (i) accept such Assignment and Acceptance and (ii) record the information contained therein in the Register. Within five Business Days after receipt of notice, the applicable Borrower, at its own expense, shall execute and deliver to the Administrative Agent or the Canadian Administrative Agent, as the case may be, in exchange for the surrendered Note or Notes, a new Note or Notes to the order of such assignee in a principal amount equal to the applicable Commitment assumed by it pursuant to such Assignment and Acceptance and, if the assigning Lender has retained a Commitment, a new Note to the order of such assigning Lender in a principal amount equal to the applicable Commitment retained by it. Such new Note or Notes shall be in an aggregate principal amount equal to the aggregate principal amount of such surrendered Note; such new Notes shall be dated the date of the surrendered Notes which they replace and shall otherwise be in substantially the form of Exhibit A-1, A-2, A-3, A-4, A-5, A-6, A-7, A-8 or A-9 hereto, as appropriate. Cancelled Notes shall be returned to the appropriate Borrower. Notwithstanding anything to the contrary contained herein, no assignment under

Section 9.04(b) of any rights or obligations under or in respect of the Notes or Loans evidenced by the Notes shall be effective unless and until the Administrative Agent or the Canadian Administrative Agent, as the case may be, shall have recorded such assignment in the Register. The Applicable Agent, shall record the name of the transferor, the name of the transferee, and the amount of the transfer in the Register after receipt of all documents required pursuant to this Section 9.04, including, without limitation, the Notes being assigned in connection with such transfer, and such other documents as the Applicable Agent may reasonably request.

(f) Each Lender other than any Conduit Lender may without the consent of the Borrowers, any Issuing Bank, the Canadian Administrative Agent or the Administrative Agent sell participations to one or more banks or other entities in all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitment and the Loans owing to it and the Notes and participations in Letters of Credit held by it and its Supplemental Revolving Credit Linked Account); provided, however, that (i) such Lender's obligations under this Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations, (iii) the participating banks or other entities shall be entitled to the benefit of (i) the cost protection provisions contained in Sections 2.13, 2.15, 2.18 and (ii) Section 9.06(a) to the same extent as if they were Lenders, provided, that no such participating bank or entity shall be entitled to receive any greater amount pursuant to such Sections than a Lender would have been entitled to receive in respect of the amount of the participation sold by such Lender to such participating bank or entity had no sale occurred provided, further, that the participating banks or other entities shall not be entitled to the benefits of Section 2.18 unless the applicable Borrower is notified of the participation sold to such participant and such participant agrees, for the benefit of such Borrower, to

122

comply with Sections 2.18(f) or 2.17(g), as applicable, and Section 2.18(h) as though it were a Lender, and (iv) the Borrowers, the Administrative Agent, the Canadian Administrative Agent the Issuing Banks and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement, and such Lender shall retain the sole right to enforce the obligations of the Borrowers relating to the Loans and participations in Letters of Credit and to approve any amendment, modification or waiver of any provision of this Agreement or any other Loan Document (other than amendments, modifications or waivers decreasing any fees payable hereunder or the amount of principal of or the rate at which interest is payable on the Loans, extending any final maturity date, in each case in respect of an Obligation in which the relevant participating bank or entity is participating, releasing any Collateral unless such Collateral is sold in a transaction, or subject to a Lien, permitted by this Agreement, or releasing any Guarantor from its Obligations under this Agreement or any Security Document unless all of the capital stock of such Guarantor is sold in a transaction permitted by this Agreement). Each Lender will disclose the identity of its participants to the Company and Administrative Agent or the Canadian Administrative Agent, as the case may be, if requested by the Company or the Administrative Agent.

(g) Any Lender or participant may, in connection with any assignment or participation or proposed assignment or participation pursuant to this Section 9.04, disclose to the assignee or participant or proposed assignee or participant any information relating to the Borrowers furnished to such Lender by or on behalf of the Borrowers; provided that, prior to any such disclosure, each such assignee or participant or proposed assignee or participant shall execute an agreement whereby such assignee or participant shall agree to be bound by Section 9.17.

(h) Any Lender may at any time assign and pledge all or any portion of its Loans or rights under this Agreement and the Notes issued to it to (i) a Federal Reserve Bank, and (ii) in the case of a Lender which is an investment fund, to such fund's trustee in support of its obligation to its trustee; provided that no such assignment shall release a Lender from any of its obligations hereunder.

(i) None of Holdings or the Borrowers shall assign or delegate any of its rights or duties hereunder.

(j) Each of Holdings, each Borrower, each Lender, the Canadian Administrative Agent and the Administrative Agent hereby confirms that it will not institute against a Conduit Lender or join any other person in instituting against a Conduit Lender any bankruptcy, reorganization, arrangement, insolvency or liquidation proceeding under any state bankruptcy or similar law, for one year and one day after the payment in full of the latest maturing commercial paper note issued by such Conduit Lender; provided, however, that each Lender designating any Conduit Lender hereby agrees to indemnify, save and hold harmless each other party hereto for any loss, cost, damage or expense arising out of its inability to institute such a proceeding against such Conduit Lender during such period of forbearance.

SECTION 9.05. Expenses; Indemnity. (a) The Company agrees to pay all reasonable out-of-pocket expenses incurred by the Administrative Agent and the Canadian Administrative Agent in connection with the preparation of this Agreement and the other Loan Documents, or by the Administrative Agent or the Canadian Administrative Agent in connection with the syndication of the Commitments or the administration of this Agreement, or in connection with any amendments, modifications or waivers of the provisions hereof or thereof (whether or not the transactions hereby contemplated shall be consummated) or incurred by the Administrative Agent, the Canadian Administrative Agent or any Lender in connection with the enforcement or protection of their rights in connection with this Agreement and the other Loan Documents or in connection with the Loans made or the Notes issued hereunder, including the reasonable fees, charges and disbursements of Simpson Thacher & Bartlett LLP, counsel for the Administrative Agent, and McMillan Binch, counsel to the Canadian Administrative Agent and, in connection with any such enforcement or protection, the reasonable fees, charges and disbursements of any other counsel (including the

123

reasonable allocated costs of internal counsel if a Lender elects to use internal counsel in lieu of outside counsel) for the Administrative Agent and the Canadian Administrative Agent any Issuing Bank or any Lender (but no more than one such counsel for any Lender).

(b) The Company agrees to indemnify the Administrative Agent, the Canadian Administrative Agent, each Issuing Bank, each Lender and each of their respective directors, officers, employees, agents, trustees and advisors (each such person being called an "Indemnitee") against, and to hold each Indemnitee harmless from, any and all losses, claims, damages, liabilities and related expenses, including reasonable counsel fees, charges and disbursements, incurred by or asserted against any Indemnitee arising out of, in any way connected with, or as a result of (i) the execution or delivery of this Agreement or any other Loan Document or any agreement or instrument contemplated thereby, the performance by the parties thereto of their respective obligations thereunder or the consummation of the Transactions, (ii) the use of the proceeds of the Loans or the use of any Letter of Credit or (iii) any claim, litigation, investigation or proceeding relating to any of the foregoing, whether or not any Indemnitee is a party thereto; provided that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of such Indemnitee (treating, for this purpose only, any Lender and its directors, officers, employees and agents as a single Indemnitee). Subject to and without limiting the generality of the foregoing sentence, the Company agrees to indemnify each Indemnitee against, and hold each Indemnitee harmless from, any Environmental Claim, and any and all losses, claims, damages, liabilities and related expenses, including reasonable counsel or consultant fees, charges and disbursements, incurred by or asserted against any Indemnitee (and arising out of, or in any way connected with or as a result of, any of the events described in clause (i), (ii) or (iii) of the preceding sentence) arising out of, in any way connected with, or as a result of (i) any Environmental Claim, (ii) any violation of any Environmental Law, or (iii) any act, omission, event or circumstance (including the actual, proposed or threatened, release, removal, disposition, discharge or transportation, storage, holding, existence, generation, processing, abatement, handling or presence on, into, from or under any present, past or future property of Holdings or any of its subsidiaries of any Contaminant), regardless of whether the act, omission, event or circumstance constituted a violation of Environmental Law at the time of its existence or occurrence; provided that such indemnity shall not, as to any Indemnitee, be available to the extent that such Environmental Claim is, or such, losses, claims, damages, liabilities or related expenses are, determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of such Indemnitee or any of its employers, officers, directors, employees or agents.

(c) The Company shall be entitled to assume the defense of any action for which indemnification is sought hereunder with counsel of its choice at its expense (in which case the Company shall not thereafter be responsible for the fees and expenses of any separate counsel retained by an Indemnitee except as set forth below); provided, however, that such counsel shall be reasonably satisfactory to each such Indemnitee. Notwithstanding the Company's election to assume the defense of such action, each Indemnitee shall have the right to employ separate counsel and to participate in the defense of such action, and the Company shall bear the reasonable fees, costs, and expenses of such separate counsel, if (i) the use of counsel chosen by the Company to represent such Indemnitee would present such counsel with a conflict of interest; (ii) the actual or potential defendants in, or targets of, any such action include both the Company and such Indemnitee and such Indemnitee shall have reasonably concluded that there may be legal defenses available to it that are different from or additional to those available to the Company (in which case the Company shall not have the right to assume the defense of such action or such action on behalf of such Indemnitee); (iii) the Company shall not have employed counsel reasonably satisfactory to such Indemnitee to represent it within a reasonable time after notice of the institution of such action; or (iv) the Company shall authorize such Indemnitee to employ separate counsel at the Company's expense. The Company will not be liable under this Agreement for any amount paid by an Indemnitee to settle any claims or actions if the settlement is entered into without the

124

Company's consent, which consent may not be withheld unless such settlement is unreasonable in light of such claims or actions against, and defenses available to, such Indemnitee.

(d) Holdings and the Borrowers shall not, and shall not permit any of their subsidiaries to, bring any demand, claim, cost recovery or other action they may now or hereafter have against any Indemnitee resulting from any Environmental Claim; provided that this paragraph (d) shall not, as to any Indemnitee, apply to the extent that such Environmental Claim has been determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of such Indemnitee or any of its employers, directors, officers, employees or agents.

(e) Notwithstanding anything to the contrary in this Section 9.05, this Section 9.05 shall not apply to taxes, it being understood that the Company's only obligations with respect to taxes shall arise under Sections 2.13 and 2.18 and Section 8.4 of the Guarantee and Collateral Agreement and Section 9.4 of the Canadian Guarantee and Collateral Agreement and the comparable provisions of the other Security Documents.

(f) The provisions of this Section 9.05 shall remain operative and in full force and effect regardless of the expiration of the term of this Agreement, the consummation of the transactions contemplated hereby, the repayment of any of the Obligations, the invalidity or unenforceability of any term or provision of this Agreement or any other Loan Document, or any investigation made by or on behalf of the Administrative Agent, any Issuing Bank or any Lender. All amounts due under this Section 9.05 shall be payable on written demand therefor.

SECTION 9.06. Right of Set-off; Sharing. (a) If an Event of Default shall have occurred and be continuing, each Lender (including each Issuing Bank) is hereby authorized at any time and from time to time, to the fullest extent permitted by law, to set off and apply any and all deposits (general or special, time or demand, provisional or final) at any time held and other indebtedness at any time owing by such Lender to or for the credit or the account of the Company or the Canadian Borrowers now or hereafter existing under this Agreement and other Loan Documents held by such Lender, irrespective of whether or not such Lender shall have made any demand under this Agreement or such other Loan Document and although such obligations may be unmatured. The rights of each Lender under this Section are in addition to other rights and remedies (including other rights of set-off) which such Lender may have.

(b) If any Lender (a "benefitted Lender") shall at any time receive any payment of all or part of its Loans or interest in Letters of Credit, or interest thereon, then due from a Borrower, or receive any collateral in respect thereof (whether voluntarily or involuntarily, by set-off, pursuant to events or proceedings of the nature referred to in paragraph (g) or (h) of Article VII, or otherwise), in a greater proportion than any such payment to or collateral received by any other Lender, if any, in respect of such other Lender's Loans and interests in Letters of Credit, or interest thereon, then due from such Borrower (other than as specifically contemplated by this Agreement, including, without limitation, Section 2.12), such benefitted Lender shall purchase for cash from such other Lenders a participating interest in such portion of each such other Lender's Loans and interests in Letters of Credit made to or issued for the account of such Borrower, or shall provide such other Lenders with the benefits of any such collateral, or the proceeds thereof, as shall be necessary to cause such benefitted Lender to share the excess payment or benefits of such collateral or proceeds ratably with each of such other Lenders; provided, however, that if all or any portion of such excess payment or benefits is thereafter recovered from such benefitted Lender, such purchase shall be rescinded, and the purchase price and benefits returned, to the extent of such recovery, but without interest.

123

SECTION 9.07. Applicable Law. THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF THE STATE OF NEW YORK.

SECTION 9.08. Waivers; Amendment. (a) No failure or delay of the Administrative Agent, the Canadian Administrative Agent, the Issuing Bank or any Lender in exercising any power or right hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power. The rights and remedies of the Administrative Agent, the Canadian Administrative Agent, the Issuing Banks and the Lenders hereunder and under the other Loan Documents are cumulative and are not exclusive of any rights or remedies which they would otherwise have. No waiver of any provision of this Agreement or any other Loan Document or consent to any departure by the Borrowers or any Guarantors therefrom shall in any event be effective unless the same shall be permitted by paragraph (b) below, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given. No notice or demand on the Borrowers or any Guarantors in any case shall entitle any Borrower or Guarantor to any other or further notice or demand in similar or other circumstances.

(b) Neither this Agreement nor any provision hereof may be waived, amended or modified except pursuant to an agreement or agreements in writing entered into by the Borrowers and the Required Lenders; provided, however, that no such agreement shall (i) decrease the principal amount of, or extend the final maturity of, or decrease the rate of interest on any Loan or any Letter of Credit Disbursement or amend or modify the provisions of Section 2.09(d) or 2.16 without the prior written consent of each Lender directly affected thereby; (ii) extend any Tranche A Term Loan Repayment Date or Tranche B Term Loan Repayment Date or the Tranche A-1 Term Loan Maturity Date or any other date on which principal of the Loans is due, or extend any date on which payment of interest on, or fees in respect of, any Loan or reimbursement of any Letter of Credit Disbursement is due, or extend any date on which the Supplemental Revolving Credit Linked Deposits are required to be returned in full to the Supplemental Revolving Lenders, or decrease the Supplemental Revolving Fixed Return Rate or the amount of return due to the Supplemental Revolving Lenders pursuant to Section 2.01(k), without the prior written consent of each Lender directly affected thereby; (iii) increase or extend any Commitment or Supplemental Revolving Credit Linked Deposit Amount or decrease the Commitment Fees or Letter of Credit Fees or other fees of any Lender without the prior written consent of such Lender; (iv) amend or modify the provisions of this Section or the definition of "Required Lenders", or release substantially all the Collateral from the Lien of the Security Documents or release any Guarantor from the Guarantee and Collateral Agreement unless all or substantially all of such Collateral or the capital stock of such Guarantor is sold or otherwise disposed of in a transaction permitted by this Agreement, without the prior written consent of each Lender; or (v) amend or modify the provisions of Section 2.12 to change the allocation of prepayments among the Tranche A Term Loans, the Tranche A-1 Term Loans and the Tranche B Term Loans or the manner in which prepayments of Term Loans are to be applied to remaining scheduled payments, without the prior written consent of Lenders representing at least 50% of the aggregate principal amount of (x) the Tranche A Term Loans then outstanding, if Lenders with Tranche A Term Loans are adversely affected thereby, (y) the Tranche B Term Loans then outstanding if Lenders with Tranche B Term Loans are adversely affected thereby or (z) the Tranche A-1 Term Loans then outstanding, if Lenders with Tranche A-1 Term Loans are adversely affected thereby; provided further that (a) no such agreement shall amend, modify or otherwise affect the rights or duties of the Administrative Agent, the Canadian Administrative Agent or the Issuing Banks without the prior written consent of the Administrative Agent, the Canadian Administrative Agent or the Issuing Banks acting as such at the effective date of such agreement, as the case may be, and (b) the consent of the Lenders shall not be required under this Section 9.08 with respect to the reallocations described in Section 2.27. Each Lender and each holder of a Note shall be bound by any waiver, amendment or modification authorized by this Section regardless of whether its Note shall have been marked to make reference thereto, and any consent by any

126

Lender or holder of a Note pursuant to this Section shall bind any person subsequently acquiring a Note from it, whether or not such Note shall have been so marked.

For the avoidance of doubt and notwithstanding the foregoing, this Agreement may be amended (or amended and restated) with the written consent of the Required Lenders, the Administrative Agent, Holdings and the Borrower (a) to add one or more additional credit facilities to this Agreement (including by increasing the amount of the Facilities) and to permit the extensions of credit from time to time outstanding thereunder and the accrued interest and fees in respect thereof (collectively, the "Additional Extensions of Credit") to share ratably in the benefits of this Agreement and the other Loan Documents with the Term Loans, the Supplemental Revolving Loans, the Revolving Loans and the Letters of Credit and the accrued interest and fees in respect thereof (including prepayments and commitment reductions) and (b) to include appropriately the Lenders holding such credit facilities in any determination of the Required Lenders.

SECTION 9.09. Interest Rate Limitation. Notwithstanding anything herein or in the Notes to the contrary, if at any time the applicable interest rate, together with all fees and charges which are treated as interest under applicable law (collectively the "Charges"), as provided for herein or in any other document executed in connection herewith, or otherwise contracted for, charged, received, taken or reserved by any Lender, shall exceed the maximum lawful rate (the "Maximum Rate") which may be contracted for, charged, taken, received or reserved by such Lender in accordance with applicable law, the rate of interest payable under the Note held by such Lender, together with all Charges payable to such Lender, shall be limited to the Maximum Rate, provided that such excess amount shall be paid to such Lender on the subsequent payment dates to the extent not exceeding the legal limitation.

SECTION 9.10. Entire Agreement. This Agreement, the other Loan Documents and the agreements regarding certain Fees referred to herein constitute the entire contract between the parties relative to the subject matter hereof. Any previous agreement among or representations from the parties with respect to the subject matter hereof is superseded by this Agreement and the other Loan Documents. Nothing in this Agreement or in the other Loan Documents, expressed or implied, is intended to confer upon any party other than the parties hereto and thereto any rights, remedies, obligations or liabilities under or by reason of this Agreement or the other Loan Documents.

SECTION 9.11. Waiver of Jury Trial. EACH PARTY HERETO HEREBY
WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS. EACH PARTY HERETO (a) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (b) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS, AS APPLICABLE, BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 9.11.

SECTION 9.12. Severability. In the event any one or more of the provisions contained in this Agreement or in any other Loan Document should be held invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein and therein shall not in any way be affected or impaired thereby. The parties shall endeavor in good-faith negotiations to replace the invalid, illegal or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the invalid, illegal or unenforceable provisions.

SECTION 9.13. Counterparts. This Agreement may be executed in two or more counterparts, each of which shall constitute an original but all of which when taken together shall constitute but one contract, and shall become effective as provided in Section 9.03.

SECTION 9.14. Headings. Article and Section headings and the Table of Contents used herein are for convenience of reference only, are not part of this Agreement and are not to affect the construction of, or to be taken into consideration in interpreting, this Agreement.

SECTION 9.15. Jurisdiction; Consent to Service of Process. (a) Each of the Borrowers and Holdings hereby irrevocably and unconditionally submits, for itself and its property, to the nonexclusive jurisdiction of any New York State court or Federal court of the United States of America sitting in New York City, and any appellate court from any thereof, in any action or proceeding arising out of or relating to this Agreement or the other Loan Documents, or for recognition or enforcement of any judgment, and each of the parties hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in such New York State or, to the extent permitted by law, in such Federal court. Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. Nothing in this Agreement shall affect any right that any Lender may otherwise have to bring any action or proceeding relating to this Agreement or the other Loan Documents against any Borrower or Holdings or their properties in the courts of any jurisdiction.

(b) Each of the Borrowers and Holdings hereby irrevocably and unconditionally waives, to the fullest extent they may legally and effectively do so, any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement or the other Loan Documents in any New York State or Federal court. Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

(c) Each party to this Agreement irrevocably consents to service of process in the manner provided for notices in Section 9.01. Nothing in this Agreement will affect the right of any party to this Agreement to serve process in any other manner permitted by law.

(d) Waives, to the maximum extent permitted by law, any right it may have to claim or recover in any legal action or proceeding referred to in this Section any special, exemplary, punitive or consequential damages.

SECTION 9.16. Conversion of Currencies. (a) If, for the purpose of obtaining judgment in any court, it is necessary to convert a sum due hereunder or under any other Loan Document in dollars into another currency, the parties hereto agree, to the fullest extent that they may legally and effectively do so, that the rate of exchange used shall be that at which in accordance with normal banking procedures the Administrative Agent or the Canadian Administrative Agent, as the case may be, could purchase dollars or Canadian dollars, as the case may be, with such other currency in New York, New York or Toronto, Canada, as the case may be, on the Business Day immediately preceding the day on which final judgment is given.

(b) The obligation of each Borrower in respect of any sum due to the Administrative Agent, the Canadian Administrative Agent, any Lender or any Issuing Bank hereunder or under any other Loan Document in dollars shall, to the extent permitted by applicable law, notwithstanding any judgment in a currency other than dollars, be discharged only to the extent that on the Business Day following receipt of any sum adjudged to be so due in the judgment currency the Administrative Agent, the Canadian Administrative Agent, such Lender or such Issuing Bank may in accordance with normal banking procedures purchase dollars in the amount originally due to the Administrative Agent, the Canadian Administrative Agent, such Lender or such Issuing Bank with the judgment currency. If the amount of dollars so purchased is less than the sum originally due to the Administrative Agent, the Canadian Administrative Agent, such Lender or such Issuing Bank, the applicable Borrower agrees, as a separate obligation and notwithstanding any such

128

judgment, to indemnify the Administrative Agent, the Canadian Administrative Agent, such Lender or such Issuing Bank against the resulting loss.

(c) The obligation of each Canadian Borrower in respect of any sum due to the Canadian Administrative Agent, the Administrative Agent, any Canadian Lender or any Issuing Bank hereunder or under any other Loan Document in Canadian dollars shall, to the extent permitted by applicable law, notwithstanding any judgment in a currency other than Canadian dollars, be discharged only to the extent that on the Business Day following receipt of any sum adjudged to be so due in the judgment currency the Canadian Administrative Agent, the Administrative Agent, such Canadian Lender or such Issuing Bank may in accordance with normal banking procedures purchase Canadian dollars in the amount originally due to the Canadian Administrative Agent, the Administrative Agent, such Canadian Lender or such Issuing Bank with the judgment currency. If the amount of Canadian dollars so purchased is less than the sum originally due to the Canadian Administrative Agent, the Administrative Agent, such Canadian Lender or such Issuing Bank, the Canadian Borrower agrees, as a separate obligation and notwithstanding any such judgment, to indemnify the Canadian Administrative Agent, the Administrative Agent, such Canadian Lender or such Issuing Bank against the resulting loss.

SECTION 9.17. Releases of Guarantees and Liens. (a) Notwithstanding anything to the contrary contained herein or in any other Loan Document, the Administrative Agent is hereby irrevocably authorized by each Lender (without requirement of notice to or consent of any Lender except as expressly required by Section 9.08) to take any action requested by the Company having the effect of releasing any Collateral or guarantee obligations (i) to the extent necessary to permit consummation of any transaction not prohibited by any Loan Document or that has been consented to in accordance with Section 9.08 or (ii) under the circumstances described in paragraph (b) below.

(b) At such time as the Loans, the Letter of Credit Disbursements and the other obligations under the Loan Documents (other than obligations under or in respect of Interest Rate Agreements) shall have been paid in full, the Commitments have been terminated and no Letters of Credit shall be outstanding, the Collateral shall be released from the Liens created by the Security Documents, and the Security Documents and all obligations (other than those expressly stated to survive such termination) of the Administrative Agent and each Loan Party under the Security Documents shall terminate, all without delivery of any instrument or performance of any act by any person.

SECTION 9.18. Confidentiality. Each of the Lenders, the Issuing Banks, the Administrative Agent and the Canadian Administrative Agent agrees that it shall maintain in confidence any information relating to the Borrowers furnished to it by or on behalf of any Borrower (other than information that (x) has become generally available to the public other than as a result of a disclosure by such party, (y) has been independently developed by such party without violating this Section or (z) was available to such party from a third party having, to such party's knowledge, no obligation of confidentiality to any Borrower) and shall not reveal the same other than (i) to its directors, officers, employees and, on a need to know basis, advisors and

(ii) as contemplated by Section 9.04(g), except: (a) to the extent necessary to comply with law or any legal process or the requirements of any Governmental Authority, of the National Association of Insurance Commissioners (the "NAIC") or of any securities exchange on which securities of the disclosing party or any Affiliate of the disclosing party are listed or traded, (b) as part of normal reporting or review procedures to Governmental Authorities, to the NAIC or to its parent companies or Affiliates (other than such parent companies or Affiliates that are customers, suppliers or have other material business relationships with the Company), auditors or regulators and (c) in order to enforce its rights under any Loan Document in a legal proceeding.

IN WITNESS WHEREOF, the Company, the Canadian Borrowers, Holdings, the Agents, and the Lenders have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

**COLLINS & AIKMAN PRODUCTS CO.**

by _____
                    Title:

**COLLINS & AIKMAN CORPORATION**

by _____
                    Title:

**COLLINS & AIKMAN CANADA INC.**

by _____
                    Title:

**COLLINS & AIKMAN PLASTICS, LTD.**

by _____
                    Title:

JPMORGAN CHASE BANK, as Administrative Agent, Collateral Agent and as a Lender

by _____ Title:

Address for Notices:

1111 Fannin - 10th Floor
Houston, TX 77002
Attention: Clifford Trapani
Telecopy: (713) 750-2938

JPMORGAN CHASE BANK, TORONTO
BRANCH, as Canadian Administrative Agent,
Canadian Collateral Agent and as a Lender

by _____
            Title:

by _____
            Title:


Address for Notices:
200 Bay Street, Suite 1800
Royal Bank Plaza, South Tower
Toronto, Ontario M5J 2J2
Attention: Funding Officer
Telecopy: (416) 981-9128

**CREDIT SUISSE FIRST BOSTON, as
Syndication Agent**

by _____

Title: _____

**Address for Notices:**

**CREDIT SUISSE FIRST BOSTON, CAYMAN
ISLANDS BRANCH, as a Lender**

by _____

Title: _____

**Address for Notices:**

**DEUTSCHE BANC SECURITIES INC., as**
**Co-Documentation Agent**

by _____
Title:

by _____
Title:

**Address for Notices:**

**DEUTSCHE BANK TRUST COMPANY**
AMERICAS (formerly Bankers Trust
Company), as
a Lender

by _____
Title:

**Address for Notices:**

**MERRILL LYNCH CAPITAL**
CORPORATION, as Co-Documentation
Agent and as a Lender

by _____
Title:

Address for Notices:
Carol Feeley
World Financial Center, North Tower- 27th Floor
250 Vesey Street
New York, NY 10080
Phone: (212) 449-8414
Fax: (212) 738-1649

Signature page to the Credit Agreement, dated as of December 20, 2001, among Collins & Aikman Products Co., Collins & Aikman Canada Inc., Collins & Aikman Plastics, Ltd., Collins & Aikman Corporation, the financial institutions parties thereto, the syndication agent and co-documentation agents named therein, JPMorgan Chase Bank, as administrative agent, and JPMorgan Chase Bank, Toronto Branch, as Canadian administrative agent

[Name of Lender]

by _____    Title:

**Address for Notices:**

**EXHIBIT 10.35**

## EMPLOYMENT AGREEMENT

THIS EMPLOYMENT AGREEMENT (this "Agreement") is made and entered into as of January 25, 2004, by and between COLLINS & AIKMAN CORPORATION, a Delaware corporation (the "Company"), and J. MICHAEL STEPP ("Employee").

## W I T N E S S E T H

WHEREAS, the Company wishes to retain Employee's services by providing Employee the compensation and benefits set forth in this Agreement;

WHEREAS, Employee wishes to continue his employment with the Company under the terms and conditions set forth below;

NOW, THEREFORE, in consideration of the mutual agreements contained herein, the parties agree as follows:

1. Term of Employment. The Company hereby agrees to employ Employee, and Employee hereby accepts employment, for a period of three (3) years, commencing January 1, 2003 and ending December 31, 2005, subject to the terms and conditions of this Agreement. At the end of such initial three (3) year term, unless the Company shall have given Employee thirty (30) days prior written notice of its intention to terminate this Agreement at the end of the initial term hereof, the term of this Agreement shall automatically be extended by an additional one year period. Thereafter, unless the Company shall have given Employee thirty (30) days prior written notice of its intention to terminate this Agreement at the end of the term then in effect, the term of this Agreement shall automatically be extended by an additional one year period.

2. Position of Employment. During the term of this Agreement, Employee shall be employed in the position of Vice Chairman and Chief Financial Officer of the Company and Chief Financial Officer of Collins & Aikman Products Co., a Delaware corporation ("Products") and shall perform such services for the Company and Products and their affiliates as may be assigned to him from time to time by the President and Chief Executive Officer of the Company. Employee shall devote his entire business time and attention to the affairs of the Company and Products and the performance of his duties hereunder and shall serve the Company and Products diligently and to the best of his abilities.

Nothing in this Agreement shall prohibit Employee from participating in civic or community organizations or from making passive investments using his personal assets so long as such participation and investments do not interfere with the performance of Employee's duties under this Agreement. In addition, Employee may, with the prior written approval of the Compensation Committee, serve as a member of the board of directors of any business that is not a direct or indirect competitor of the Company, Products or their affiliates.

3. Compensation.

(a) Base Salary. The Company shall pay to Employee base salary at an annual rate of not less than Six Hundred Thousand Dollars ($600,000) during the term of his employment hereunder. Such amount shall be reviewed annually by the President and Chief Executive Officer of the Company and may be increased by the President and Chief Executive Officer with the advice of the Compensation Committee.

(b) Bonus Plans. During the term of Employee's employment hereunder, Employee shall be eligible to participate in the Company's annual bonus plan, subject to the policies and procedures that the Compensation Committee has adopted or shall, in its discretion, adopt including, without limitation, policies regarding setting performance objectives, targets amounts, evaluation, and the form and timing of payments. The annual bonus target for Employee shall be One Hundred Percent (100%) of Employee's base salary.

4. Other Benefits and Perquisites. Employee shall be entitled to such fringe benefits and perquisites, and to participate in such pension, savings plan and benefit plans, as are generally made available to similarly situated executives of the Company during the term hereof, including consideration for annual stock option awards, major medical, extended medical and disability insurance, supplemental retirement income plan, group term life insurance and appropriate annual holidays, sick days, perquisite account, and vacation time, as such plans, policies and programs may exist from time to time, subject to the terms and conditions of such plans, policies and programs.

5. Reimbursement of Expenses. The Company shall reimburse Employee for all reasonable travel, entertainment and other reasonable business expenses reasonably incurred by Employee in connection with the performance of his duties hereunder, provided that Employee furnishes to the Company adequate records or other evidence respecting such expenditures. The Company shall reimburse Employee for the cost of legal counsel in connection with the review of this Agreement on Employee's behalf, provided that such reimbursement shall not exceed Five Thousand Dollars ($5,000).

6. Termination of Employment. Employee's employment under this Agreement may be terminated:

(a) by the Company upon Employee's death (which shall be referred to as a "Death Termination") or in the event of Employee's absence from work for one-hundred and twenty (120) or more work days out of any three hundred and sixty (360) day period on account of Employee's physical or mental disability (which shall be referred to as an "Inability Termination");

(b) by the Company for Cause, which means (i) fraud or misappropriation with respect to the business of the Company or intentional material damage to the property or business of the Company,
(ii) failure by Employee to perform his duties and responsibilities and to carry out his authority, (iii) malfeasance or misfeasance or breach of fiduciary duty or misrepresentation to the Company or its stockholders, (iv) failure to act in accordance with any

2

specific lawful instructions of the Board of Directors of the Company or the President and Chief Executive Officer; (v) any grossly negligent act or omission by Employee relating to the performance of his duties hereunder which the Board, in its sole discretion, determines damages the Company's reputation or future business prospects, (vi) any intentional breach of the Company's written employment policies, or (vii) any conviction of Employee of a felony (all of which shall be referred to as a "For Cause Termination"); provided, however, that Employee may, in the fourteen (14) day period following the date of any written notice of termination as a result of the occurrence of any of the events described in clauses (i) through (vi) above, provide written evidence to the Committee that such determination was based on a mistake of fact or that the circumstance giving rise to Cause has been cured in such fourteen (14) day period. If the Committee finds that the determination of Cause was based on a mistake of fact, or that the Employee has given evidence satisfactory to the Committee in its sole discretion that Cause has been cured within the fourteen (14) day period, then the notice of termination may be revoked by the Committee. If the Board or the Committee takes no action within such fourteen (14) day period, the Termination Date shall be the date set forth in the notice delivered to the Employee. The Committee may require Employee to absent himself from the premises of the Company during any such fourteen (14) day period. Failure of the Company to give notice of Cause at the first instance of an event giving rise to Cause shall not preclude Company from finding Cause in subsequent instances;

(c) by the Company at any time for any reason other than a For Cause Termination, Death Termination or Inability Termination (which shall be referred to as a "No Cause Termination");

(d) by Employee at any time for any reason other than a "Constructive Termination" (as defined below) (which shall be referred to as a "Voluntary Termination"); or

(e) by Employee within thirty (30) days after the occurrence of one or more of the following: (i) any material reduction in Employee's base salary, bonus opportunity, or health benefits, unless such reduction is being made in conjunction with an across-the-board reduction in the salaries of all similarly situated executives of the Company or (ii) a material reduction in Employee's duties and responsibilities or other breach of this Agreement by the Company, (which shall be referred to as a "Constructive Termination"); provided, however, that no event or circumstance described in clause (i) or (ii) shall give rise to a "Constructive Termination" for purposes of this Agreement unless Employee shall have given notice to the Company of Employee's determination of the occurrence of an event or circumstance described in clause (i) or (ii) and such event or circumstance shall be continuing as of the end of forty-five (45) days after the giving of such notice.

3

7. Termination Procedure.

(a) Notice of Termination. Any termination of Employee's employment by the Company or by Employee under Paragraph 6 hereof shall be communicated by written Notice of Termination to the other party hereto in accordance with Paragraph 13. For purposes of this Agreement, a "Notice of Termination" shall mean notice that indicates the specific termination provision in this Agreement relied upon and sets forth in reasonable detail the facts and circumstances providing a basis for termination of Employee's employment under the provision so indicated.

(b) Termination Date. "Termination Date" shall mean (i) if Employee's employment is terminated pursuant to Paragraph 6(a) or (b) above, the date on which a Notice of Termination is given or (ii) if Employee's employment is terminated pursuant to Paragraph 6(c), (d) or (e) above, thirty (30) days after the date on which a Notice of Termination is given.

8. Benefits Upon Termination.

(a) Termination as a Result of Death, Inability, Voluntary or For Cause Termination. If Employee's employment under this Agreement is terminated prior to the expiration of the term of this Agreement as a result of a Death Termination, an Inability Termination, a Voluntary Termination or a For Cause Termination, the Company shall pay Employee or, if applicable, Employee's estate or legal representative, (i) Employee's unpaid base salary under Paragraph 3(a) accrued to the date on which his employment terminates, (ii) any accrued but unused vacation, and (iii) all vested and accrued benefits earned by Employee under any employee benefit plans and programs sponsored by the Company in which Employee participates, subject to the terms and conditions of such plans and programs.

(b) Termination as a Result of No Cause Termination or Constructive Termination. If Employee's employment under this Agreement is terminated prior to the expiration of the term of this Agreement as a result of a No Cause Termination or a Constructive Termination, the Company shall pay and provide to Employee the following benefits:

(i) Employee's unpaid base salary accrued to the Termination Date, any accrued but unused vacation, any declared but unpaid bonus for the year preceding the Termination Date;

(ii) base salary for twenty-four (24) months, based on the rate of base salary in effect immediately preceding the Termination Date;

(iii) an amount determined by multiplying Employee's average actual, annual bonus under Section 3(b) for the prior three (3) years (or such shorter term as Employee has participated in a Company bonus program) by a fraction, the numerator of which is

4

the number of whole months of service by Employee during the year in which occurs the Termination Date and the denominator of which is twelve (12); and

(iv) continued participation in the benefit plans, programs and arrangements described in Paragraph 4 during the severance period described in Paragraph 8(b)(ii) above (other than the vacation, holiday and sick pay policies, the annual executive physical program, long-term disability plan and supplemental retirement income plan); provided, however, that participation in such benefit plans, programs and arrangements shall cease prior to the expiration of the severance period to the extent Employee has been offered or actually participates in comparable benefit plans, programs or arrangements with another employer during such period, and Employee shall report any such offer or participation to the Company.

In addition, all outstanding stock options granted to Employee under the Company's stock option plans will immediately vest upon a No Cause Termination or a Constructive Termination prior to the expiration of the term of this Agreement and will continue to be fully exercisable until the earlier of ninety (90) days after the Termination Date or the original expiration date of said options. The Company shall also cause Employee to receive all vested and accrued benefits earned by Employee under all employee benefit plans and programs sponsored by the Company in which Employee participates.

(c) Method of Payment of Severance Compensation. The amount due to Employee pursuant to Paragraph 8(b)(ii) above shall be paid on a periodic basis in accordance with the Company's normal pay practice and shall be subject to all customary withholding and tax deposit requirements. The amount due to Employee pursuant to Paragraph 8(b)(iii) above shall be paid in a lump sum upon the expiration of the severance period described in Paragraph 8(b)(ii), subject to all appropriate withholding and tax deposit requirements.

(d) Employee's entitlement in the event of termination of employment for any reason to benefits or payments under any retirement or deferred compensation plans shall be determined in accordance with and subject to the terms and conditions of such plans.

9. Covenants of Employee.

(a) Non-disparagement. Employee shall at all times refrain from taking any action or making any statements, written or oral, which are intended to or do disparage the goodwill or reputation of the Company or any of its subsidiaries or affiliates or any directors or officers thereof or which could adversely affect the morale of employees of the Company or its subsidiaries.

(b) Non-Competition. Employee shall not Compete (as hereinafter defined) with the Company or any of its subsidiaries or affiliates in any way

5

during the term of his employment with the Company and for the twenty-four (24) month period following the Termination Date (the "Restricted Period"). "Compete" means to engage in any business activity whatsoever related in any manner or fashion to any business of the Company or any of its subsidiaries or affiliates. Without limiting the generality of the foregoing, Employee shall not, during the Restricted Period, directly or indirectly (whether for compensation or otherwise), alone or as an agent, principal, partner, officer, employee, trustee, director, shareholder or in any other capacity, own, manage, operate, join, control or participate in the ownership, management, operation or control of, or furnish any capital to, or be connected in any manner with, or provide any services as an employee or consultant for, any business which Competes with the Company or any of its subsidiaries or affiliates; provided, however, that notwithstanding the foregoing, nothing contained in the Agreement shall be deemed to preclude Employee from owning not more than five percent (5%) of the publicly traded securities of any entity which Competes with the Company.

(c) Non-Solicitation. Employee covenants and agrees that he will not, during the Restricted Period, (i) solicit, employ or otherwise engage as an employee, independent contractor or otherwise, any person who is or was an employee of the Company or any of its subsidiaries or affiliates at any time during the twelve (12) month period immediately preceding Employee's Termination, (ii) induce or attempt to induce any employee of the Company or any of its subsidiaries or affiliates to terminate such employment or (iii) interfere with the relationship of the Company or any of its subsidiaries or affiliates with any person, including any person who, at any time during the twelve (12) month period immediately preceding Employee's Termination Date, was an employee, contractor, supplier or customer of the Company or any of its subsidiaries or affiliates.

(d) Confidential Information. Employee understands that in the performance of services hereunder Employee may obtain knowledge of "confidential information" (as hereinafter defined) relating to the business of the Company (or of any of its subsidiaries or affiliates). Employee shall not, without the prior written consent of the President and Chief Executive Officer of the Company, either during Employee's employment by the Company or at any time thereafter, (i) use or disclose any such confidential information outside the Company (or any of its subsidiary or affiliated companies) except as otherwise required by law, (ii) publish any article with respect thereto, (iii) except in the performance of services hereunder, remove from the premises of the Company, or aid in such removal, any such confidential information or any property or material related thereto or (iv) sell, exchange or give away or otherwise dispose of any such confidential information now or hereafter owned by the Company whether or not the same shall or may have been originated, discovered or developed by Employee. It is understood that for purposes of this Agreement the term "confidential information" shall be construed broadly to include all information or compilations of information which (i) is, or was designed to be, used in the business of the Company (or any of its subsidiaries or affiliates) or results from its (or their) research or development activities, (ii) is private or confidential in that it

6

is not generally known or available to the public and (iii) is intended to give the Company (or any of its subsidiaries or affiliates) an opportunity to obtain an advantage over competitors who do not know or use it.

(e) Return of Materials. Upon the termination of Employee's employment, Employee shall return to the Company all property of the Company in or under Employee's possession or control, including without limitation all tangible "confidential information" described in Paragraph 9(d) above. Such return shall be made at such place in Troy, Michigan as the Company shall specify and shall be made within five (5) days after Employee's Termination Date.

(f) Cooperation. During Employee's employment by the Company and thereafter, Employee shall promptly notify the Company of any threatened, pending or completed investigation, claim, action, suit or proceeding, whether civil, criminal, administrative or investigative ("Proceeding"), in which he may be involved, whether as an actual or potential party or witness or otherwise, or with respect to which he may receive requests for information, by reason of his future, present or past association with the Company or any of its subsidiaries or affiliates. Before the Termination Date and during any period for which payments are received under Section 8, Employee shall cooperate fully with the Company and its subsidiaries and affiliates in connection with any Proceeding at no expense to the Company or any of its subsidiaries or affiliates other than the reimbursement of Employee's reasonable out-of-pocket expenses. If Employee is required to assist the Company or any of its subsidiaries or affiliates with any Proceeding after the Termination Date and the completion of any continuing payments under Section 8, the Company shall pay Employee a reasonable per diem fee, in addition to any expense reimbursement, for such assistance, based on Employee's annual base salary rate immediately preceding the Termination Date. Employee shall not disclose any confidential or privileged information in connection with any Proceeding without the consent of the Company and shall give prompt notice to the Company of any request therefore.

(g) Acknowledgement Regarding Covenants. Executive acknowledges and agrees that the promises and restrictive covenants set forth in this Paragraph 9 are reasonable and necessary to protect the interests of the Company and reasonably limited in time, scope and territory. Executive acknowledges that, given his former position and the information he possesses regarding the Company and its operations, the business of the Company would be substantially and materially damaged in the event of any violation of the promises and covenants herein contained, and the Company shall be entitled (in addition to any other remedy that may be available to it) to (i) a decree or order for specific performance of any such promise or covenant and (ii) an injunction restraining the violation or threatened violation of any such promise or covenant. In addition, Employee shall immediately forfeit all rights to any payments or benefits to which he may be otherwise entitled under this Agreement in the event of a breach of any of the covenants given in this Paragraph 9. The covenants of Employee contained

7

in this Paragraph 9 shall survive the expiration of this Agreement or the termination of this Agreement by either party.

10. Release. In consideration of the compensation continuance available in certain events pursuant to this Agreement, and as a condition to the receipt of any such salary continuation and other benefits provided by this Agreement following the Termination Date, Employee shall sign a written release by which Employee shall unconditionally release and covenant not to sue the Company and its affiliates and directors, officers, employees and stockholders thereof, and release the Company and its affiliates and directors, officers, employees and stockholders from any and all claims, liabilities and obligations of any nature pertaining to termination of employment other than those explicitly provided for by this Agreement including, without limitation, any claims arising out of alleged legal restrictions on the Company's rights to terminate its employees, such as any implied contract of employment or termination contrary to public policy.

11. Governing Law; Jurisdiction. The validity, interpretation and performance of this Agreement shall be governed by the laws of Michigan, regardless of the laws that might be applied under applicable principles of conflicts of laws. Any legal proceeding filed in connection with a claim under this Agreement shall be brought in a federal or state court in Michigan, and the parties hereby submit to personal jurisdiction in those courts for such purpose.

12. Entire Agreement. This Agreement constitutes the entire agreement and understanding between the parties hereto with respect to the matters referred to herein and supersedes all prior agreements and understandings between the parties hereto with respect to the matters referred to herein.

13. Notice. Any written notice required to be given by one party to the other party hereunder shall be deemed effective if mailed by certified or registered mail:

```
            To the Company:      Collins & Aikman Products Co.
                                 250 Stephenson Highway
                                 Troy, MI  48083
                                 Attention:   Jay Knoll
                                              General Counsel

            To Employee:         J. Michael Stepp
                                 250 Stephenson Highway
                                 Troy, MI  48083
```

or such other address as may be stated in notice given under this Paragraph 13.

8

14. Severability. The invalidity, illegality or enforceability of any provision of this Agreement in any jurisdiction shall not affect the validity, legality or enforceability of the remainder of this Agreement in such jurisdiction or the validity, legality or enforceability of this Agreement or such provision in any other jurisdiction, it being the intent of the parties hereto that all rights and obligations of the parties hereto under this Agreement shall be enforceable to the fullest extent permitted by law.

15. Successors and Assigns. This Agreement shall be binding upon and inure to the benefit of the parties hereto and their personal representatives, and, in the case of the Company, its successors and assigns, and Paragraph 10 shall also inure to the benefit of the other persons and entities identified therein; provided, however, that Employee shall not, without the prior written consent of the Company, transfer, assign, convey, pledge or encumber this Agreement or any interest under this Agreement. Employee understands that the assignment of this Agreement or any benefits hereof or obligations hereunder by the Company to any of its subsidiaries or affiliates or to any purchaser of all or a substantial portion of the assets of the Company or of any affiliated company then employing Employee, and the employment of Employee by such subsidiary or affiliate or by any such purchaser or by any successor of the Company in a merger or consolidation, shall not be deemed a termination of Employee's employment for purposes of Paragraphs 6, 7 and 8 or otherwise.

16. Amendment. This Agreement may be amended or canceled only by an instrument in writing duly executed and delivered by each party to this Agreement.

17. Headings. Headings contained in this Agreement are for or convenience only and shall not limit this Agreement or affect the interpretation thereof.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first above written.

/S/ J. Michael Stepp
------------------------------------------
J. Michael Stepp

**COLLINS & AIKMAN CORPORATION**

By: /S/ David A. Stockman
------------------------------------------

Its: Chairman and Chief Executive Officer
------------------------------------------

9

EXHIBIT 10.36

# COLLINS & AIKMAN CORPORATION
## 250 STEVENSON HIGHWAY
## TROY, MI 48083

January 25, 2004

Mr. J. Michael Stepp
Vice Chairman And Chief Financial Officer Collins & Aikman
Global Headquarters
250 Stephenson Hwy.
Troy, MI 48083

## RE: AMENDMENT TO EMPLOYMENT AGREEMENT

Dear Mike:

This letter addresses certain aspects of your compensation not addressed in your Employment Agreement with Collins & Aikman Corporation (the "Company"), dated January 25, 2004, or in an existing Option Agreement. When this letter has been approved by the Compensation Committee and signed by you, it will amend your Employment Agreement, effective as of the date it is signed by a member of the Compensation Committee.

The terms of your Employment Agreement, the Supplemental Retirement Income Plan ("SRIP"), and any other plan or program generally applicable to employees or stockholders of the Company will control in the event of a conflict with the terms of this letter, except as specifically provided herein.

Commuting, Relocation, and Perquisites. The Company shall reimburse you for all reasonable expenses incurred in connection with commuting to Michigan in the performance of your duties and responsibilities under the Employment Agreement until September 30, 2003. You will have available a perquisite account of up to Thirty Thousand Dollars ($30,000) per year and an allowance of up to Twenty Five Hundred Dollars ($2,500) per year for tax and estate planning. The Company shall provide you such additional amounts as are necessary to cover any tax costs to Employee of such commuting expenses and perquisites.

Bonus Payment in the Event of a No Cause Termination or a Constructive Termination. In addition to the prorated bonus payment described in Section 8(b)(iii) of your Employment Agreement, upon the occurrence of an event giving rise to a payment under that Section 8(b), the Company shall pay you an amount equal to the target bonus for the year in which your employment terminates.

Mr. J. Michael Stepp
January 25, 2004

Page 2

Change of Control. All outstanding stock options granted to you under the Company's stock option plan will immediately vest upon a Change of Control. For purposes hereof, a "Change of Control" shall be deemed to have occurred only if Heartland Industrial Partners, L.P. and its affiliates cease to be beneficial owners of at least thirty percent (30%) of their interest in the Company as of August 1, 2003.

Supplemental Retirement Income Plan. You will be credited with all your years of service under the SRIP that preceded your break in service with the Company and an additional two years of service credit, so that, as of January 1, 2002, you had seven (7) years of vesting credit toward Retirement, as defined under Paragraph 5 of Article II of the SRIP, and seven (7) years of benefits credit for purposes of calculating the amount of any benefit under Article IV of the SRIP. In addition, if your employment is terminated for No Cause or there is a Constructive Termination, you will be deemed to have satisfied the ten (10) year vesting requirement for Retirement under Paragraph 5 of Article II of the SRIP regardless of your actual years of service, if you haven't already satisfied the vesting requirement for Retirement and you will be credited with two (2) additional years of benefits credit for purposes of Article IV of the SRIP. Furthermore, if David Stockman is not the Chief Executive Officer of Company, and you are not otherwise vested in the SRIP, then upon termination of your employment for any reason you will be deemed to have satisfied the ten (10) year vesting requirement for Retirement under Paragraph 5 of Article II of the SRIP and you will receive the additional two (2) years of benefits credit for purposes of Article IV of the SRIP that are described in the preceding sentence.

Release. You may elect, following termination of your employment, to sign a general release of claims against the Company in a form mutually acceptable to you and the Company. As provided in Section 10 of the Employment Agreement, Execution of such release is a condition to receipt of any continuing compensation or benefits under the Employment Agreement.

Covenants. The covenants contained in Sections 9(b) and 9(c) shall not be applicable in the event of a No Cause termination or a Constructive Termination of your employment, or in the event your employment terminates following the expiration of your Employment Agreement.

```
ACCEPTED AND AGREED:                    COLLINS & AIKMAN CORPORATION:


/S/ J. Michael Stepp                    /S/  David A. Stockman
----------------------------------      ----------------------------------
       J. Michael Stepp                  Compensation Committee Member


January 25, 2004                        January 25, 2004
----------------------------------      ----------------------------------
            Date                                   Date
```

EXHIBIT 10.37

## SEPARATION AGREEMENT

This Separation Agreement ("Agreement") is entered into as of this 29th day of February, 2004, among COLLINS & AIKMAN CORPORATION and any successors thereto (collectively, the "Company") and Michael A. Mitchell (the "Executive").

WHEREAS, Executive and Company, without any admission of liability, desire to settle with finality, compromise, dispose of, and release all claims, demands and causes of action Executive has or could assert against Company, whether arising out of Executive's Employment Agreement with Collins & Aikman Products Company, ("Employment Agreement"), or any agreement with a predecessor to Company, or the termination of the Employment Agreement, or the employment relationship, or the termination of the employment relationship, including the right to any notice thereof, or any condition or benefit of employment or otherwise. This Agreement is not and shall not be construed as an admission by Company of any liability, an admission against Company's interest or any violation of Company's policies or procedures.

NOW, THEREFORE, in exchange for consideration, the adequacy of which is hereby acknowledged, the Executive and the Company agree as follows:

1. Separation. The employment relationship between the Executive and the Company will terminate on February 29, 2004 (the "Termination Date"). Effective as of the Termination Date, the Executive's employment will terminate as (a) President, Global Commercial Operations and (b) all other officer, director, committee member and employee positions with the Company and its subsidiaries. Executive shall not be required to report for service after the date of this Agreement, and he shall vacate the Company's premises and return Company property by such date.

2. Payments. The Company and the Executive hereby agree that the Company shall, in exchange for the release contained herein, pay Executive:

(a) $0, less applicable taxes and withholdings, representing payment for zero (0) days of accrued and unused vacation time, payable to Executive with the March payroll;

(b) subject to Executive's compliance with Sections 5 and 6 hereof, for a period of twenty-four (24) months from the Termination Date (such twenty-four (24) month period herein referred to as the "Restricted Period") $34,375 per month (prorated in the case of the partial month period), less applicable taxes and withholding, commencing with the regularly scheduled payroll period following the expiration of the Revocation Period.

(c) $75,000 lump sum payment, less applicable taxes and withholdings, payable to Executive on the first business day following expiration of the Revocation Period (as defined in Section 11);

(d) $225,000 annual incentive payment equal to the target bonus, payable during the month of April in accordance with the normal annual incentive payment; and

(e) subject to Executive's compliance with Sections 5 and 6 hereof the benefits set forth in Schedule B, for a period of twenty-four (24) months from the Termination Date or the date Executive commences employment with any other employer.

It is further agreed that that the Executive's stock options may be exercised at any time on or prior to the date which is 180 days after the Termination Date, after which time all such options shall expire and be of no further force and effect.

3. Release. In consideration of the above, the sufficiency of which the Executive hereby acknowledges, the Executive, on behalf of the Executive and the Executive's heirs, executors and assigns hereby releases and forever discharges the Company and its members, shareholders, parents, affiliates, subsidiaries, divisions, any and all current and former directors, officers, employees, agents, and contractors and their heirs and assigns, and any and all employee pension benefit or welfare benefit plans of the Company, including current and former trustees and administrators of such employee pension benefit and welfare benefit plans, from all claims, charges, or demands, in law or in equity, whether known or unknown, which may have existed or which may now exist from the beginning of time to the date of this Agreement, including, without limitation, any claims the Executive may have arising from or relating to the Employment Agreement, any stock option, deferred compensation, or supplemental retirement agreements, Executive's employment or termination from employment with the Company, including a release of any rights or claims the Executive may have under Title VII of the Civil Rights Act of 1964, as amended, and the Civil Rights Act of 1991 (which prohibit discrimination in employment based upon race, color, sex, religion and national origin); the Americans with Disabilities Act of 1990, as amended, and the Rehabilitation Act of 1973 (which prohibit discrimination based upon disability); the Family and Medical Leave Act of 1993 (which prohibits discrimination based on requesting or taking a family or medical leave); Section 1981 of the Civil Rights Act of 1866 (which prohibits discrimination based upon race); Section 1985(3) of the Civil Rights Act of 1871 (which prohibits conspiracies to discriminate); the Employee Retirement Income Security Act of 1974,

as amended; any other federal, state or local laws against discrimination; or any other federal, state, or local statute, or common law relating to employment, wages, hours, or any other terms and conditions of employment. This includes a release by the Executive of any claims for wrongful discharge, breach of contract, torts or any other claims in any way related to the Executive's employment with or resignation or termination from the Company, including any claim under any written or oral understandings relating to employment. This release also includes a release of any claims for age discrimination under the Age Discrimination in Employment Act, as amended ("ADEA"). The ADEA requires that the Executive be advised to consult with an attorney before the Executive waives any claim under ADEA and Executive acknowledges that he has consulted with an attorney with respect to such waiver. In addition, the ADEA provides the Executive with at least 21 days to decide whether to waive claims under ADEA and seven days after the Executive signs the Agreement to revoke that waiver.

The Company releases Executive and his assigns, agents, and heirs from further obligation under the Employment Agreement and shall indemnify executive against liability for acts or omissions taken in good faith in the course of his employment to the extent permitted by law and under the Company's bylaws. This release does not release either the Executive or the Company from any obligations due to the Company or the Executive under this Agreement. This Agreement is not an admission by either the Executive or the Company of any wrongdoing or liability.

This release does not interfere with or otherwise affect Executive's right to file a charge or otherwise participate in an EEOC proceeding insofar as it is required by current EEOC regulations. However, Executive understands that Executive will assert this Agreement as an affirmative defense against any claim Executive may assert in any forum or proceeding which is in violation of the terms of this Agreement. Executive further understands and acknowledges that by signing this Agreement, he has released any right to recover monetary damages on the basis of alleged unlawful conduct by Company.

4. Acknowledgment and No Reinstatement. The Executive understands and agrees that the consideration provided for herein is more than (and in lieu of) that which the Executive would otherwise be entitled to under the Company's existing plans and policies or otherwise and that the consideration provided herein is more than sufficient to compensate him for his waiver of any and all claims under the Employment Agreement. The Executive waives any right to reinstatement or future employment with the Company following the Executive's separation from the Company on the Termination Date.

5. Non-Disparagement. The Executive agrees not to make any oral or written statements or otherwise take any action that is intended or may reasonably be expected to disparage the reputation, business, prospects or operations of the Company, its affiliates, officers, directors, stockholders or employees or any persons related to the fore going and the Company agrees that it will not, and will use all reasonable efforts to cause its affiliates, officers directors, stockholders and employees not to, make any oral or written statements or otherwise take any action that is intended or may reasonably be expected to disparage the reputation of Executive.

6. Confidentiality; Non-Competition; Etc. (a) The Executive agrees that the Executive will keep confidential all information and trade secrets of the Company or any of its subsidiaries or affiliates and will not disclose such information to any person without prior approval of the Board of Directors of the Company or use such information for any purpose. It is understood that for purposes of this Agreement the term "confidential information" is to be construed broadly to include all material nonpublic or proprietary information. The Executive shall promptly return any documents, records, data, books or materials of the Company or its subsidiaries or affiliates in his possession or control and any of his work papers containing confidential information or trade secrets of the Company or its subsidiaries or affiliates.

(b) The Executive agrees that from the date hereof through the end of the Restricted Period, the Executive shall not, directly or indirectly (whether for compensation or otherwise), as an agent, principal, partner, employee, officer, director, trustee, consultant, shareholder, or in any other capacity, own, manage, operate, join, control, directly render services for, or participate in the ownership, management or operation or control of any of the Competing Businesses (as defined below); provided, however, that notwithstanding the foregoing, nothing contained in this Agreement shall be deemed to preclude the Executive from owning not more than 2% of the publicly traded securities of any Competing Business. The "Competing Businesses" shall mean any business listed on Schedule A hereto conducted by any company listed beneath such business (and any successors to any such company with respect to such business).

(c) The Executive acknowledges that the agreements and covenants contained in this Section are essential to protect the value of the Company's and its subsidiaries' business and assets and by virtue of his employment with the Company, the Executive has obtained knowledge, contacts, know-how, training, experience and other information relating to the Company's and its subsidiaries' business operations, and there is a substantial probability that such knowledge, know-how, contacts, training, experience and information could be used to the substantial advantage of a competitor of the Company and its subsidiaries and to the Company's and its subsidiaries'

substantial detriment. Accordingly, for a period commencing on the date hereof and ending on the calendar following the last day of the Restricted Period, the Executive shall not, directly or indirectly, for himself or on behalf of or in conjunction with any person, partnership, corporation or other entity, interfere with or disrupt, or attempt to interfere with or disrupt, the relationship, contractual or otherwise, between the Company or any of its subsidiaries and any customer, client, supplier, distributor or agent of the Company or any of its subsidiaries.

(d) Executive covenants and agrees that he will not during the Restricted Period, (i) solicit, employ or otherwise engage as an employee, independent contractor or otherwise, any person who is or was an employee of the Company or any of its subsidiaries or affiliates at any time during the 24 month period immediately preceding the Termination Date, (ii) induce or attempt to induce any employee of the Company or any of its subsidiaries or affiliates to terminate such employment or (iii) interfere with the relationship of the Company or any of its subsidiaries of affiliates with any person, including any person who, at any time during the 24 month period immediately preceding the Termination Date, was an employee, contractor, supplier or customer of the Company or any of its subsidiaries or affiliates.

(e) It is the desire and intent of the parties that the provisions of this Section shall be enforced to the fullest extent permissible under the laws and public policies applied in each jurisdiction in which enforcement is sought. Accordingly, if any particular portion of this Section shall be adjudicated to be invalid or unenforceable, this Section shall be deemed amended to delete there from the portion thus adjudicated to be invalid or unenforceable, such deletion to apply only with respect to the operation of this Section in the particular jurisdiction in which such adjudication is made. The Executive agrees that he will execute any and all documents which are reasonably necessary to effectuate the provisions of this Section.

(f) If there is a breach or threatened breach by the Executive of the provisions of this Agreement, the Company or its affiliates shall be entitled, without the requirement to post a bond, to an injunction restraining the Executive from such breach. Nothing herein shall be construed as prohibiting the Company from pursuing any other remedies for such breach or threatened breach.

7. Cooperation; Reimbursement. The Executive shall, at the request of the Company, reasonably assist and cooperate with the Company in the defense and/or investigation of any third party claim or any investigation or proceeding, whether actual or threatened, including, without limitation, participating as a witness in any litigation, arbitration, hearing or other proceeding between the Company and a third party or any government body. The Company shall reimburse the Executive for all reasonable

expenses incurred by him in connection with such assistance including, without limitation, travel expenses.

8. Governing Law. This Agreement shall be governed by and construed in accordance with the laws of the State of Michigan, without reference to the principles of conflict of laws.

9. Withholding. All payments to be made hereunder shall be net of all applicable income and employment taxes required to be withheld therefrom.

10. Complete Agreement. This Agreement represents the complete agreement between the Executive and the Company concerning the subject matter in this Agreement and supersedes all prior agreements or understandings, written or oral, including the Employment Agreement and any stock option agreement. Any oral or written understandings concerning the Executive's employment are hereby terminated as of the date of such agreements as if such agreements had never been executed, including any agreements with stated effect after termination including, without limitation, the Severance Benefits Agreement, dated as of February 29, 2004, by and among the Executive and the Company. This Agreement may not be amended or modified otherwise than by a written agreement executed by the parties hereto or their respective successors and legal representatives.

11. Voluntary Agreement. This Agreement has been entered into voluntarily and not as a result of coercion, duress, or undue influence. The Executive acknowledges that the Executive has read and fully understands the terms of this Agreement and has been advised to consult with an attorney before executing this Agreement. Additionally, the Executive hereby acknowledges and waives the opportunity of at least 21 days to consider this Agreement. It is further understood that for a period of 7 days following the execution of this Agreement (the "Revocation Period"), the Executive may revoke this ---------------- Agreement, and this Agreement shall not become effective or enforceable until the Revocation Period has expired. No revocation of this Agreement by the Executive shall be effective unless the Company has received, within the Revocation Period, written notice of any revocation.

12. Successors and Assigns. The Company will require any successor or assignee, whether direct or indirect, by purchase, merger, consolidation or otherwise, of all, or substantially all, of the business and/or assets of the Company to assume and agree to perform this Agreement in the same manner and to the same extent that the Company would be required to perform it if such succession or assignment had not taken place. This Agreement shall inure to the benefit of and be binding on the Executive's personal and legal representatives, executors, administrators, successors, heirs, distributees, devisees and legatees.

The parties to this Agreement have executed this Agreement as of the day and year first written above.

**COLLINS & AIKMAN CORPORATION**

By:        /S/  David A. Stockman
          ---------------------------------------
          Name:   David A. Stockman
          Title:  Chief Executive Officer

**EXECUTIVE**

          /S/  Michael A. Mitchell
---------------------------------------------
Name:  Michael A. Mitchell

-8-

SCHEDULE A

AUTOMOTIVE FABRIC BUSINESS
Chatham Borgstena
Guilford Mills Inc.
Milliken & Company

CARPET & ACOUSTIC SYSTEMS BUSINESS
H.P. Pelzer (Automotive System)
Freudenberg NOK
Magee Carpet Inc.
Peguform
Rieter Automotive Systems
TG North America
The Woodbridge Group

OPEN ROOF SYSTEMS BUSINESS
Edscha USA Inc.
Illbruck Automotive
American Sun Roof
Webasto

INTERIOR TRIM & EXTERIOR TRIM BUSINESS
ArvinMeritor
Acsys Technologies
Decoma
Dupont Automotive
Faurecia
Findlay Industries
Foamex International Inc.
GE Plastics
Guardian Automotive
Intier Automotive Inc.
Johnson Controls Inc.
Key Plastics L.L.C.
LDM Technologies
Lear Corporation
Plastech Engineered Products Company
Venture Plastics Inc.
Ventra Group Inc.
Visteon Corporation

**SCHEDULE B**

1. Medical Coverage
2. Dental Coverage
3. Retirement Income Security Plan
4. Life Insurance
5. Accidental Death & Dismemberment Insurance
6. Perquisite Allowance
7. Cell Phone
8. Gasoline Card

EXHIBIT 11

# COLLINS & AIKMAN CORPORATION

## COMPUTATION OF EARNINGS PER SHARE IN MILLIONS, EXCEPT PER SHARE DATE

### (UNAUDITED)

|  | YEAR ENDED | |
| --- | --- | --- |
|  | DECEMBER 31, 2003 | DECEMBER 31, 2002 |
| Average common shares outstanding during the period: | | |
| Basic ...................................................... | 83.6 | 76.3 |
| Incremental shares under stock options computed under the price of issuer's stock during the period ............. | -- | -- |
| Total shares for basic EPS ................................ | 83.6 | 76.3 |
| Loss from continuing operations before extraordinary item ................................. | (59.1) | (51.3) |
| Income from discontinued operations, net of income taxes of $0.8,and $6.3 ............................... | 1.6 | 9.5 |
| Cumulative effect of a change in accounting principle, Net of income taxes of $0 ............................... | -- | (11.7) |
| Net loss ............................................... | (57.5) | (53.5) |
| Loss on redemption of  subsidiary preferred stock ........ | -- | (36.3) |
| Net loss attributable to common shareholders ............. | (57.5) | (89.8) |
| Net income (loss) per basic and diluted common share: | | |
| Continuing operations .................................... | (0.71) | (1.15) |
| Discontinued operations .................................. | 0.02 | 0.12 |
| Cumulative effect of change in accounting principle ...... | -- | (0.15) |
| Net loss attributable to common shareholders ............. | (0.69) | (1.18) |

**EXHIBIT 12.1**

Collins & Aikman Corporation and Subsidiaries
RATIO OF EARNINGS TO COMBINED FIXED CHARGES
(IN $ MILLIONS)

| | YEAR ENDING 31-Dec | |
| --- | --- | --- |
| | 2002 | 2003 |
| FIXED CHARGES | | |
|    Interest expense, net | $ 148.9 | $ 151.3 |
|    Interest income | 1.4 | 0.7 |
|     Interest expense, gross from continuing ops | 150.3 | 152.0 |
|    Capitalized interest | -- | -- |
|    Interest expense from discontinued operations | -- | -- |
|     Total interest expense, gross(*) | 150.3 | 152.0 |
|    Interest portion of rental expense | 19.0 | 32.0 |
|    Pre-tax earnings required to cover preferred stock dividends and accretion | 59.0 | 93.8 |
|    FIXED CHARGES - C&A | $ 228.3 | $ 277.8 |
|    Pre-tax income from continuing operations | $ (33.8) | $ (61.0) |
|    Minority interest in (income) loss of affiliates | -- | -- |
|    (Income) loss from equity investees | -- | -- |
|     Total | (33.8) | (61.0) |
| ADD: | | |
|    Fixed charges | 228.3 | 277.8 |
|    Distributed income of equity investees | | |
| SUBTRACT: | | |
| (A) Interest capitalized | -- | -- |
|    TOTAL EARNINGS | 194.5 | 216.8 |
|    RATIO OF EARNINGS TO FIXED CHARGES | 0.85 | 0.78 |
|    Dollar value of deficiency | (33.8) | (61.0) |

(*) - Includes amortization of debt issuance costs

**EXHIBIT 21.0**
**SUBSIDIARIES OF COLLINS & AIKMAN CORPORATION**

| COMPANY | JURISDICTION |
| --- | --- |
| Collins & Aikman Products Co. | Delaware |
| Carcorp, Inc. | Delaware |
| Collins & Aikman Accessory Mats, Inc. | Delaware |
| Collins & Aikman Automotive Mats, LLC | Delaware |
| Collins & Aikman Asset Services, Inc. | Delaware |
| CW Management Corporation (1) | Delaware |
| Hopkins Services, Inc. (2) | Minnesota |
| SAF Services Corporation (3) | Delaware |
| Collins & Aikman Automotive Exteriors, Inc. | Delaware |
| Synova Plastics, LLC (4) | Michigan |
| Collins & Aikman Automotive International, Inc. | Delaware |
| Collins & Aikman Canada Domestic Holding Company | Delaware |
| C & A Canada Holding Company | Nova Scotia |
| C & A Canada Holding Company I | Nova Scotia |
| C & A Canada Holding Company II | Nova Scotia |
| Collins & Aikman Automotive Canada Company | Nova Scotia |
| Collins & Aikman Carpet & Acoustics (MI), Inc. | Delaware |
| Collins & Aikman Carpet & Acoustics (TN), Inc. | Tennessee |
| Collins & Aikman Development Company | Delaware |
| Collins & Aikman Export Corporation | U.S. Virgin Isles |
| Collins & Aikman Fabrics, Inc. | Delaware |
| Collins & Aikman Holdings Canada Inc. | Canada |
| Collins & Aikman Canada Inc. | Ontario |
| C & A Canada International Holdings Limited(5) | Ontario |
| Collins & Aikman Luxembourg, S.A.(6) | Luxembourg |
| Collins & Aikman Interiors, Inc. | Delaware |
| Collins & Aikman Automotive Interiors, Inc. | Delaware |
| Collins & Aikman Intellimold, Inc. | Michigan |
| Riopelle Realty Limited | Ontario |
| Collins & Aikman Automotive (Asia), Inc. | Delaware |
| Collins & Aikman Automotive (Argentina), Inc. | Delaware |
| Collins & Aikman Automotive International Services, Inc. | Delaware |
| Collins & Aikman Automotive Overseas Investment, Inc. | Delaware |

| | |
|---|---|
| Collins & Aikman International Corporation | Delaware |
| Collins & Aikman Europe, Inc. | Delaware |
| Collins & Aikman (Gibraltar) Limited | Gibraltar/Delaware |
| C & A Canada International Holding Company | Nova Scotia |
| Collins & Aikman Europe S.A.(7) | Luxembourg |
| C&A (Gibraltar) | Gibraltar |
| C&A (Gibraltar) No. 2 | Gibraltar |
| Collins & Aikman Automotive Holding GmbH | Germany |
| Collins & Aikman Automotive Systems GmbH | Germany |
| Dura Convertible Systems GmbH | Germany |
| Collins & Aikman Automotive Systems Italy, S.r.l.(8) | Italy |
| Collins & Aikman  Holdings Italy S.r.l. (8) | Italy |
| Collins & Aikman Automotive Company Italia S.r.l. | Italy |
| A.P.C.O. (Advanced Plastic Company) s.r.l. | Italy |
| FAS S.p.A. | Italy |
| Collins & Aikman Automotive Trim B.V.B.A. | Belgium |
| Collins & Aikman Automotive Trim GrmbH | Germany |
| Collins & Aikman Automotive Systems S.L.(9) | Spain |
| Collins & Aikman Europe B.V. | Netherlands |
| Collins & Aikman Automotive Floormats Europe, B.V. | Netherlands |
| Collins & Aikman Holding AB | Sweden |
| Collins & Aikman Automotive Systems AB | Sweden |
| Collins & Aikman Holding B.V. | Netherlands |
| Collins & Aikman Automotive Trim B.V. | Netherlands |
| Collins & Aikman Automotive  s.r.o. | Czech Republic |
| Collins & Aikman Products GmbH (10) | Austria |
| Collins & Aikman Holdings Limited | United Kingdom |
| Collins & Aikman Automotive Fabrics Limited | United Kingdom |
| Collins & Aikman Automotive Limited | United Kingdom |
| Abex Plastic Products Limited | United Kingdom |
| Collins & Aikman Automotive Systems Limited | United Kingdom |
| Collins & Aikman Automotive Carpet Products (UK) Limited | United Kingdom |
| Manchester Kigass International Limited | United Kingdom |
| Premier Springs & Pressings Limited | United Kingdom |
| Collins & Aikman Automotive Trim Limited | United Kingdom |
| AS Collins & Aikman UK Ltd. | United Kingdom |
| Collins & Aikman Automotive UK Limited | United Kingdom |

| | |
|---|---|
| Collins & Aikman Automobile Components Manufacturing Industry and Trade Limited Company (11) | Turkey |
| Collins & Aikman Automotive Hermosillo, S.A. de C.V. (12) | Mexico |
| Collins & Aikman Holdings, S.A. de C.V. (13) | Mexico |
| Collins & Aikman Automotive Company de Mexico, S.A. de C.V. | Mexico |
| Amco de Mexico, S.A. de C.V. | Mexico |
| Collins & Aikman de Mexico, S.A. de C.V.(14) | Mexico |
| Collins & Aikman Carpet & Acoustics, S.A. de C.V. (15) | Mexico |
| Dura Convertible Systems de Mexico, S.A. de C.V.(16) | Mexico |
| Industrias Enjema, S.A. de C.V.(17) | Mexico |
| Servitop, S.A. de C.V. (18) | Mexico |
| Collins & Aikman Automotive Management Services Company Mexico S.A. de C.V.(19) | Mexico |
| Permali do Brasil Industria e ComJrcio Ltda (20) | Brazil |
| Plascar Participacoes Industriais S. A.(21) | Brazil |
| Rosario Project S. A. | Brazil |
| Collins & Aikman do Brasil Ltda (22) | Brazil |
| Collins & Aikman Plastics, Inc, | Delaware |
| ACAP, LLC (23) | |
| Becker Group, LLC | Michigan |
| Brut Plastics, Inc | Michigan |
| Engineered Plastic Products, Inc.(24) | Michigan |
| Collins & Aikman Plastics, Ltd. | Ontario |
| Collins & Aikman Properties, Inc. | Delaware |
| Comet Acoustics, Inc. | Delaware |
| Dura Convertible Systems, Inc. | Delaware |
| Amco Convertible Fabrics, Inc. | Delaware |
| Gamble Development Company | Minnesota |
| Collins & Aikman Automotive Services, LLC (25) | Delaware |
| JPS Automotive, Inc. | Delaware |
| Moduko Co., Ltd,(26) | Japan |
| Southwest Laminates, Inc. | Delaware |
| Synova Carpets, LLC(27) | North Carolina |
| Waterstone Insurance, Inc. | Vermont |
| Wickes Asset Management, Inc. | Delaware |
| Wickes Manufacturing Company | Delaware |

**NON-PROFIT CORPORATIONS**

| | |
|---|---|
| Collins & Aikman Foundation | California |
| Collins & Aikman Disaster Relief Fund, Inc. | North Carolina |

1    10% owned by Willis Corroon Corporation of North Carolina
2    10% owned by O'Brien & Gere of North America, Inc.
3    10% owned by Unicare, Inc.
4    51% owned by Jackson Plastics
5    75% owned by Collins & Aikman Plastics, Ltd. And 25% owned by
     Collins & Aikman Canada, Inc.
6    1% owned by Temmes Management Services, B.V.
7    49% owned by Collins & Aikman (Gilbraltar)Ltd; 30% owned by Collins
     & Aikman Luxembourg S.A.; 21% owned by C&A Canada International
     Holding Limited
8    25% owned by Collins & Aikman Europe, B. V.and 75% owned by Collins
     & Aikman Europe S.A.
9    .00028% owned by Collins & Aikman Holding Limited
10   .02% owned by Collins & Aikman Products Co (US)
11   .75% owned by Collins & Aikman Products Co. (US)
12   1% owned by Collins & Aikman International Corporation
13   One Share owned by Habinus Trading Co.
14   One Share owned by Collins & Aikman Accessory Mats, Inc.
15   25% owned by Collins & Aikman Products Co.
16   One share owned by Dura Convertible Systems, Inc.
17   One share(1%) owned by Collins & Aikman International Corporation
18   One share(1%) owned by Amco de Mexico, S.A. de C.V.
19   Minority interest shares owned by Collins & Aikman International
     Corporation
20   Minority interest owned by Collins & Aikman Products Co.
21   100% of voting shares owned by Permali, but 43.4% of value is
     publicly traded preferred stock

22 .5% of Collins & Aikman do Brasil Ltda. Is owned by Collins & Aikman International Corporation (US)
23 Joint Venture 47% owned by Collins & Aikman Plastics, Inc. and 53% owned by Mexican Industries
24 Joint Venture 55% (550 Class A Common Stock) owned by Gerald Edwards and 45% (450 Class B Common Stock) owned by Becker Group, LLC
25 1% owned by Wikes Assets Management, Inc
26 Joint Venture 50% owned by Valco (France)and 50% owned by Collins & Aikman Products Co.
27 Joint Venture 55% membership interest held by Henry L. Jackson, an individual and 45 % membership interest held by Collins & Aikman Products Co.

EXHIBIT 23.1

**Independent Auditors' Consent**

The Board of Directors
Collins & Aikman Corporation:

We consent to the incorporation by reference in the registration statement (No. 333-34569, No. 33-60997, No. 33-53321 and No. 33-53323) on Form S-8 of Collins & Aikman Corporation of our report dated March 15, 2004, with respect to the consolidated balance sheet of Collins & Aikman Corporation and subsidiaries as of December 31, 2003, and the related consolidated statements of operations, common stockholders' equity (deficit), and cash flows, for the year then ended, and all related financial statement schedules, which report appears in the December 31, 2003, annual report on Form 10-K of Collins & Aikman Corporation.

/s/ KPMG LLP


Detroit, Michigan
March 15, 2003

**EXHIBIT 23.2**

## CONSENT OF INDEPENDENT AUDITORS

We hereby consent to the incorporation by reference in the Registration Statement on Form S-8 (No. 333-34569, No. 33-60997, No. 33-53321 and No. 33-53323) of Collins & Aikman Corporation of our report dated February 18, 2003 relating to the financial statements and financial statement schedules, which appears in this Form 10-K.

/s/ PricewaterhouseCoopers LLP

Detroit, MI
March 15, 2004

EXHIBIT 24.1

**POWER OF ATTORNEY WITH RESPECT TO**
**ANNUAL REPORT OF COLLINS & AIKMAN CORPORATION ON**
**FORM 10-K FOR THE YEAR ENDED DECEMBER 31, 2003**

Each of the undersigned appoints each of J. Michael Stepp and Jay B. Knoll as his or her true and lawful attorney and agent to do any and all acts and things and execute any and all instruments which the attorney and agent may deem necessary or advisable in order to enable Collins & Aikman Corporation (the "Corporation") to comply with the Securities Exchange Act of 1934, and any requirements of the Securities and Exchange Commission, in connection with the Corporation's Annual Report on Form 10-K for the year ended December 31, 2003, and any and all amendments thereto, including, but not limited to, power and authority to sign his or her name (whether on behalf of the Corporation, or as a director or officer of the Corporation, or by attesting the seal of the Corporation, or otherwise) to such instruments and to such Annual Report and any amendments thereto, and to file them with the Securities and Exchange Commission. The undersigned ratifies and confirms all that any of the attorneys and agents shall do or cause to be done by virtue hereof. Any one of the attorneys and agents shall have, and may exercise, all the powers conferred by this instrument.

Each of the undersigned has signed his or her name as of March 16, 2004.

| | |
|---|---|
| /s/ Charles E. Becker | /s/ W. Gerald McConnell |
| ----------------------------- | ----------------------------- |
| Charles E. Becker | W. Gerald McConnell |
| /s/ Dean Robert C. Clark | /s/ Senator Warren B. Rudman |
| ----------------------------- | ----------------------------- |
| Dean Robert C. Clark | Senator Warren B. Rudman |
| /s/ Marshall A. Cohen | /s/ J. Michael Stepp |
| ----------------------------- | ----------------------------- |
| Marshall A. Cohen | J. Michael Stepp |
| /s/ David C. Dauch | /s/ David. A. Stockman |
| ----------------------------- | ----------------------------- |
| David C. Dauch | David. A. Stockman |
| /s/ Cynthia L. Hess | /s/ Daniel P. Tredwell |
| ----------------------------- | ----------------------------- |
| Cynthia L. Hess | Daniel P. Tredwell |
| /s/ Timothy D. Leuliette | /s/ Samuel Valenti III |
| ----------------------------- | ----------------------------- |
| Timothy D. Leuliette | Samuel Valenti III |
| /s/ Elkin McCallum | |
| ----------------------------- | |
| Elkin McCallum | |

EXHIBIT 31.1

## CERTIFICATION PURSUANT TO SECTION 302
## OF THE SARBANES-OXLEY ACT OF 2002

I, David A. Stockman, certify that:

1. I have reviewed this Annual Report on Form 10-K of Collins & Aikman Corporation;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

a. Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b. Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c. Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d. Disclosed in this annual report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonable likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal controls over financial reporting, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent functions):

a. All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b. Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting

```
        Date: March 16, 2004

                                        /s/ David A.Stockman
                                        ---------------------
                                        David A. Stockman
                        Chairman of the Board and Chief Executive Officer
```

EXHIBIT 31.2

# CERTIFICATION PURSUANT TO SECTION 302
# OF THE SARBANES-OXLEY ACT OF 2002

I, J. Michael Stepp, certify that:

1. I have reviewed this Annual Report on Form 10-K of Collins & Aikman Corporation;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

a. Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b. Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c. Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d. Disclosed in this annual report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonable likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal controls over financial reporting, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent functions):

a. All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b. Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting

```
Date:  March 16, 2004


                                        /s/ J. Michael Stepp
                                        --------------------
                                          J. Michael Stepp
                              Vice Chairman and Chief Financial Officer
                                     (Principal Financial Officer)
```

EXHIBIT 32.1

## CERTIFICATION
## ACCOMPANYING FORM 10-K REPORT
## OF COLLINS & AIKMAN CORPORATION
## PURSUANT TO SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002
(CHAPTER 63, TITLE 18 U.S.C. SUB-SECTION 1350(A) AND (B))

Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 (Chapter 63,Title 18 U.S.C. sub-sections 1350(a) and (b)), each of the undersigned hereby certifies that the Annual Report on Form 10-K for the period ended December 31, 2003 of Collins & Aikman Corporation (the "Company") fully complies with the requirements of Section 13(a) or a Section 15(d) of the Securities Exchange Act of 1934 and that the information contained in such Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

```
Dated: March 16, 2004                          /s/ David A. Stockman
                                   -------------------------------
                                            David A. Stockman
                               Chairman of the Board and Chief Executive Officer


Dated: March 16, 2004                          /s/ J. Michael Stepp
                                   -------------------------------
                                            J. Michael Stepp
                               Vice Chairman and Chief Financial Officer
```

**End of Filing**

Powered By EDGAR Online

© 2005 | EDGAR Online, Inc.

# Exhibit E

# COLLINS & AIKMAN CORP

## FORM 10-Q
### (Quarterly Report)

## Filed 11/9/2004 For Period Ending 9/30/2004

| Address | 250 STEPHENSON HWY |
| | TROY, Michigan 48083 |
| Telephone | 248-824-2500 |
| CIK | 0000846815 |
| Industry | Auto & Truck Parts |
| Sector | Consumer Cyclical |
| Fiscal Year | 12/31 |

Generated by **EDGAR Online Pro**
http://pro.edgar-online.com

**EDGAR**®
Online

Contact **EDGAR Online**
Customer Service: 203-852-5666
Corporate Sales: 212-457-8200

# UNITED STATES SECURITIES AND EXCHANGE COMMISSION
### Washington D.C. 20549

---

# Form 10-Q

(Mark One)

☑      **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the quarterly period ended September 30, 2004**

or

☐      **TRANSITION REPORT PURSUANT TO SECTION 13 or 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the transition period from     to**

**Commission file number 1-10218**

---

# Collins & Aikman Corporation

*(Exact name of registrant, as specified in its charter)*

| | |
|---|---|
| **DELAWARE** | **13-3489233** |
| *(State or other jurisdiction of incorporation or organization)* | *(IRS Employer Identification No.)* |

**250 Stephenson Highway**
**Troy, Michigan 48083**
*(Address of principal executive offices, including zip code)*

**(248) 824-2500**
*(Registrant's telephone number, including area code)*

Indicate by check mark whether the Registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the Registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.    Yes ☐     No ☑ .

Indicate by check mark whether the Registrant is an accelerated filer (as defined in Exchange Act Rule 12b-2).    Yes ☑      No ☐ .

As of October 31, 2004 the number of outstanding shares of the Registrant's common stock, $.01 par value, was 83,630,087 shares.

### WEBSITE ACCESS TO COMPANY'S REPORTS:

Collins and Aikman's internet website address is www.collinsaikman.com. The Company's annual report on Form 10-K, quarterly reports on Form 10-Q, current reports on Form 8-K, and amendment to those reports filed or furnished pursuant to Section 13(a) or 15(d) of the

Exchange Act are available free of charge through the Company's website and as soon as reasonably practicable after the reports are electronically filed with, or furnished to, the Securities and Exchange Commission.

The Company's Code of Business Conduct is available free of charge through the Company's internet website. Any amendments to the Company's Code of Business Conduct and any waivers of the Code of Business Conduct involving executive officers or directors of the Company will also be made available on the Company's internet website. Printed copies of the Company's Code of Business Conduct are also available free of charge to any shareholder upon request to: Corporate Secretary, Collins & Aikman Corporation, 250 Stephenson Highway, Troy, MI 48083.

---

## COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES

## FORM 10-Q QUARTERLY REPORT INDEX

| | | Page |
|---|---|---|
| **PART I** | **FINANCIAL INFORMATION** | |
| Item 1. | Financial Statements | 1 |
| Item 2. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 32 |
| Item 3. | Quantitative and Qualitative Disclosures About Market Risk | 45 |
| Item 4. | Controls and Procedures | 46 |
| **PART II** | **OTHER INFORMATION** | |
| Item 1. | Legal Proceedings | 47 |
| Item 6. | Exhibits and Reports on Form 8-K | 48 |
| Signature | | 50 |
| Computation of Earnings Per Share | | |
| Computation of Ratio of Earnings to Fixed Charges | | |
| Section 302 Certification | | |
| Section 302 Certification | | |
| Section 906 Certification | | |

# PART I — FINANCIAL INFORMATION

**Item 1.**  *Financial Statements*

## COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES

### CONDENSED CONSOLIDATED STATEMENTS OF OPERATIONS

| | Quarter Ended | | Nine Months Ended | |
|---|---|---|---|---|
| | September 30, 2004 | September 30, 2003 | September 30, 2004 | September 30, 2003 |
| | (Unaudited) | | | |
| | (in millions, except for per share data) | | | |
| Net sales | $864.8 | $902.2 | $2,967.5 | $2,970.8 |
| Cost of goods sold | 800.8 | 812.1 | 2,687.7 | 2,658.3 |
| Gross profit | 64.0 | 90.1 | 279.8 | 312.5 |
| Selling, general and administrative expenses | 35.2 | 57.7 | 144.7 | 193.0 |
| Restructuring charge | 9.0 | 21.9 | 28.9 | 26.8 |
| Impairment of long-lived assets | 10.3 | 2.2 | 40.7 | 21.1 |
| Operating income | 9.5 | 8.3 | 65.5 | 71.6 |
| Interest expense | 46.9 | 37.8 | 127.4 | 111.3 |
| Interest expense from subsidiary preferred stock dividends | 10.5 | 9.2 | 30.5 | 22.4 |
| Interest expense from subsidiary preferred stock accretion | 0.6 | 0.4 | 1.6 | 4.8 |
| Loss on sale of receivables | 2.4 | 1.8 | 7.2 | 4.5 |
| Loss on early extinguishment of debt | 18.8 | — | 20.3 | — |
| Other expense (income), net | (0.7) | (0.2) | 4.1 | (23.9) |
| Loss from continuing operations before income taxes | (69.0) | (40.7) | (125.6) | (47.5) |
| Income tax expense (benefit) | (13.4) | (8.6) | (17.0) | 0.1 |
| Net loss | $ (55.6) | $ (32.1) | $ (108.6) | $ (47.6) |
| Net loss per basic and diluted common share | $ (0.67) | $ (0.38) | $ (1.30) | $ (0.57) |
| Average common shares outstanding: | | | | |
| Basic and diluted | 83.6 | 83.6 | 83.6 | 83.6 |

The Notes to Consolidated Financial Statements are an integral part
of these consolidated financial statements.

1

## COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES

### CONDENSED CONSOLIDATED BALANCE SHEETS

| | September 30, 2004 | December 31, 2003 |
|---|---|---|
| | (Unaudited) | |
| | (in millions) | |

#### ASSETS

| | September 30, 2004 | December 31, 2003 |
|---|---|---|
| **Current Assets:** | | |
| Cash and cash equivalents | $ 3.5 | $ 13.2 |
| Accounts and other receivables, net of allowances of $6.4 and $9.2 | 255.1 | 257.3 |
| Inventories | 178.8 | 169.4 |
| Other | 217.1 | 212.2 |
| Total current assets | 654.5 | 652.1 |
| Property, plant and equipment, net | 806.0 | 834.1 |
| Deferred tax assets | 206.0 | 178.1 |
| Goodwill | 1,378.5 | 1,363.1 |
| Intangible assets, net | 45.7 | 66.9 |
| Other assets | 106.0 | 96.9 |
| | $3,196.7 | $3,191.2 |

#### LIABILITIES AND COMMON STOCKHOLDERS' EQUITY

| | September 30, 2004 | December 31, 2003 |
|---|---|---|
| **Current Liabilities:** | | |
| Short-term borrowings | $ 25.3 | $ 16.0 |
| Current maturities of long-term debt and capital lease obligations | 8.5 | 31.5 |
| Accounts payable | 636.3 | 638.9 |
| Accrued expenses | 225.1 | 238.9 |
| Total current liabilities | 895.2 | 925.3 |
| Long-term debt and capital lease obligations | 1,361.2 | 1,237.7 |
| Mandatorily redeemable preferred stock of subsidiary | 193.3 | 161.2 |
| Other, including pensions and postretirement benefit obligation | 404.6 | 423.4 |
| Commitments and contingencies (Note 15) | | |
| Minority interest in consolidated subsidiary | 2.3 | 3.3 |
| Total liabilities | 2,856.6 | 2,750.9 |
| Common stock ($0.01 par value, 300.0 shares authorized, 83.6 shares issued and outstanding at September 30, 2004 and December 31, 2003) | 0.8 | 0.8 |
| Other paid-in capital | 1,282.3 | 1,282.3 |
| Accumulated deficit | (938.7) | (830.1) |
| Accumulated other comprehensive loss | (4.3) | (12.7) |
| Total common stockholders' equity | 340.1 | 440.3 |
| | $3,196.7 | $3,191.2 |

The Notes to Consolidated Financial Statements are an integral part
of these consolidated financial statements.

2

**COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES**

**CONDENSED CONSOLIDATED STATEMENTS OF CASH FLOW**

| | Nine Months Ended September 30, | |
| --- | --- | --- |
| | 2004 | 2003 |
| | (Unaudited) (in millions) | |
| **OPERATING ACTIVITIES** | | |
| Net loss | $(108.6) | $ (47.6) |
| Adjustments to derive cash flow provided by (used in) operating activities: | | |
| Impairment of long lived assets | 40.7 | 21.1 |
| Deferred income tax benefit | (24.1) | (4.9) |
| Subsidiary preferred stock requirements | 32.1 | 27.2 |
| Depreciation | 101.6 | 83.7 |
| Amortization of other assets | 11.1 | 17.5 |
| Gain on curtailment of postretirement benefit plans other than pensions | (9.4) | — |
| Loss on early extinguishment of debt | 20.3 | — |
| Loss (gain) on sale of property, plant and equipment | 2.5 | (2.6) |
| Changes in assets and liabilities: | | |
| Increase (decrease) in postretirement benefit obligations | (4.6) | 6.6 |
| Decrease (increase) in net customer funded tooling | (9.0) | 7.5 |
| Decrease (increase) in accounts and other receivables | (49.0) | 22.1 |
| Proceeds from (reduction of) participating interests in accounts receivable, net of redemptions | 86.9 | (30.8) |
| Increase (decrease) in accounts receivable factored | (35.7) | 43.0 |
| Increase in inventories | (9.4) | (15.4) |
| Increase (decrease) in accounts payable | (2.6) | 9.5 |
| Increase in interest payable | 9.4 | 28.6 |
| Other, net | (61.1) | (121.5) |
| Net cash provided by (used in) operating activities | (8.9) | 44.0 |
| **INVESTING ACTIVITIES** | | |
| Additions to property, plant and equipment and other non-current assets | (151.3) | (119.9) |
| Sales of property, plant and equipment | 60.4 | 15.2 |
| Payments for acquisitions and related costs, net of cash acquired | (3.2) | (37.8) |
| Net cash used in investing activities | (94.1) | (142.5) |
| **FINANCING ACTIVITIES** | | |
| Issuance of long-term debt | 848.9 | — |
| Repayment of long-term debt and capital lease obligations | (802.6) | (22.4) |
| Payments for debt issuance costs | (15.6) | |
| Net borrowings on revolving credit facilities | 53.1 | 58.5 |
| Increase in short-term borrowings | 8.9 | 2.1 |
| Net cash provided by financing activities | 92.7 | 38.2 |
| Effect of exchange rate changes on cash | 0.6 | 1.5 |
| Net decrease in cash and cash equivalents | (9.7) | (58.8) |
| Cash and cash equivalents at beginning of period | 13.2 | 81.3 |
| Cash and cash equivalents at end of period | $   3.5 | $  22.5 |
| Supplementary information: | | |
| Taxes paid | $   7.6 | $ 18.2 |
| Interest paid | $ 106.6 | $ 73.1 |
| Capital lease obligations incurred | $   1.1 | $   1.9 |

The Notes to Consolidated Financial Statements are an integral part
of these consolidated financial statements.

**COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS (Unaudited)**

## 1. Organization

Collins & Aikman Corporation (the "Company") is a Delaware corporation, headquartered in Troy, Michigan. The Company conducts all of its operating activities through its wholly owned Collins & Aikman Products Co. ("Products") subsidiary. The Company is a global leader in design, engineering and manufacturing of automotive interior components, including instrument panels, fully assembled cockpit modules, floor and acoustic systems, automotive fabric, interior trim and convertible top systems. The Company changed the composition of its reportable segments beginning January 1, 2003 and further redefined the segments July 1, 2003 to reflect organizational changes and restated prior period segment data to be comparable. The Company operates through three segments: U.S. and Mexico Plastics, International Plastics and Global Soft Trim.

## 2. Summary of Significant Accounting Policies

### a. Basis of Presentation

The consolidated financial statements include the accounts of the Company and its consolidated subsidiaries and in the opinion of management, contain all adjustments necessary for a fair presentation of financial position and results of operations. All significant intercompany items have been eliminated in the preparation of the consolidated financial statements. Certain prior quarter and prior year items have been reclassified to conform to the current quarter and fiscal 2004 presentation. Specifically, for the third quarter and nine months ending 2004, the Company reclassified $4.2 million from cost of goods sold to selling, general and administrative expense. In addition, for the third quarter and nine months ending 2003, the Company reclassified $5.4 million and $17.1 million, respectively, in facility lease costs from selling, general, and administrative expenses to cost of goods sold. Results of operations for interim periods are not necessarily indicative of results for the full year. The accompanying consolidated financial statements and footnotes should be read in conjunction with the Company's 2003 Annual Report on Form 10-K.

### b. Stock-Based Compensation

Statement of Financial Accounting Standards ("SFAS") No. 148, "Accounting for Stock-Based Compensation — Transition and Disclosure," amended SFAS No. 123, "Accounting for Stock-Based Compensation," to provide alternative methods of transition for a voluntary change to the fair value based method of accounting for stock based employee compensation and amends the required disclosures. SFAS No. 123 encourages companies to adopt the fair value method for compensation expense recognition related to employee stock options. The accounting requirements of Accounting Principles Board Opinion ("APB") No. 25, "Accounting for Stock Issued to Employees" use the intrinsic value method in determining compensation expense, which represents the excess of the market price of the stock over the exercise price on the measurement date. The Company has elected to continue to utilize the accounting provisions of APB No. 25 for stock options and is required to provide pro forma disclosures of net income and earnings per share had the Company adopted the fair value method for recognition purposes.

In June 2004, the Compensation Committee of the Board of Directors approved a Voluntary Stock Option Exchange Program ("Program"). The Company offered option holders of grants under the 2002 Employee Stock Option Plan ("Plan") the opportunity to participate in the Program and exchange all of their existing $8.00 options for a combination of restricted stock units and stock options. The Program provided one restricted stock unit for every 50 stock options exchanged. Additionally, participants will be provided 98 options for every 100 options exchanged to be priced at the then market closing price no earlier than December 31, 2004. On June 29, 2004, 3.4 million options were exchanged, and the Company awarded 68,218 shares of restricted stock units. The restricted stock units vest in three equal annual installments on June 29, 2005, June 29, 2006 and June 29, 2007. The fair value of the restricted shares is amortized ratably over the vesting period. Compensation expense of $0.03 million was recognized in the restricted stock for the quarter ended September 30, 2004.

4

If we accounted for all stock-based compensation using the fair value recognition of SFAS No. 123 and related amendments, our net loss and basic and diluted earnings per share would have been as follows (in millions, except per share amounts):

|  | Quarter Ended | | Nine Months Ended | |
|  | September 30, 2004 | September 30, 2003 | September 30, 2004 | September 30, 2003 |
|---|---|---|---|---|
| Net loss attributable to common shareholders: | | | | |
| As reported | $(55.6) | $(32.1) | $(108.6) | $(47.6) |
| Total employee stock based compensation expense determined under fair value based method for all awards, net of tax | (0.7) | (1.5) | (2.5) | (4.4) |
| Pro forma, net loss | $(56.3) | $(33.6) | $(111.1) | $(52.0) |
| Basic and diluted EPS: | | | | |
| As reported | $(0.67) | $(0.38) | $ (1.30) | $(0.57) |
| Pro forma | $(0.67) | $(0.40) | $ (1.33) | $(0.62) |

For the above information, the fair value of each option grant was estimated on the date of grant using the Black-Scholes option pricing model with the following assumptions used for grants:

|  | September 30, 2004 | September 30, 2003 |
|---|---|---|
| Weighted average expected volatility | 81.29% | 77.50% |
| Expected lives | 7 years | 7 years |
| Weighted average risk free interest rate | 4.02% | 3.72% |
| Expected dividend rate | — | — |
| Weighted average grant date fair value of an option granted during the quarter | $ 2.77 | $ 2.77 |

All shareholder plans have been approved by stockholders. Stock option activity under the plans is as follows for the nine months ended September 30, 2004 and the year ended December 31, 2003:

|  | September 30, 2004 | | December 31, 2003 | |
|  | Number of shares | Weighted Average Exercise Price | Number of shares | Weighted Average Exercise Price |
|---|---|---|---|---|
| Outstanding beginning of year | 5,009,456 | $8.32 | 4,427,248 | $10.12 |
| Awarded | 354,000 | 8.00 | 1,723,000 | 8.00 |
| Exchanged, cancelled or expired | (5,006,256) | 8.23 | (1,140,792) | 8.55 |
| Outstanding at end of year | 357,200 | $9.72 | 5,009,456 | $ 8.32 |

During the first quarter of 2003, the Company repriced 3,559,256 options with an exercise price of $10.00 to an exercise price of $8.00. As a result of repricing the Company's stock options, the options are treated as variable-based awards in accordance with APB No. 25. Because these options are considered to be variable-based awards, the Company will incur future compensation expense if the stock price exceeds the $8.00 exercise price established at the time of the repricing. At September 30, 2004, 293,200 options subject to repricing remain outstanding.

### 3.   Acquisitions and Goodwill

#### a.      Acquisitions

During the third quarter of 2004, the Company acquired an injection molding business and a sequencing business for $3.2 million.

On January 17, 2003, the Company acquired the remaining 50% interest in an Italian automotive joint venture from Textron Inc., a related party, for $15 million, which also terminated a $28 million put-option by Textron Inc., that was exercisable in December 2004. The Company incurred fixed asset impairments of $7.5 million relating to the 50% interest owned previously.

On January 2, 2003, the Company acquired Delphi Corp's plastic injection molding plant and related equipment in Logroño, Spain for $18 million. The 300,000 square foot Logroño facility includes 24 injection molders and one Class-A paint line.

#### b.      Goodwill

In accordance with SFAS No. 142, "Goodwill and Other Intangible Assets," goodwill is no longer amortized. Instead, goodwill and indefinite-lived intangible assets are tested for impairment in accordance with the provisions of SFAS No. 142. The Company employed a discounted cash flow analysis and a market comparable approach in conducting its impairment tests. The Company completed its annual impairment test as of November 1, 2003 indicating that the fair value of the reporting units exceeded the carrying values.

Fair value for all tests was determined based upon the discounted cash flows of the reporting units using discount rates ranging from 11.5% to 14.0% dependent on the reporting unit and a residual growth rate of 2%. The market comparable approach consisted of earnings multiples ranging from 5.2 to 6.5 times current year and forecasted Earnings Before Interest, Taxes, Depreciation and Amortization ("EBITDA") (operating income plus depreciation and amortization) and a control premium on equity. Future cash flows and EBITDA are affected by future operating performance, which will be impacted by economic conditions, car builds, financial, business and other factors, many of which are beyond the Company's control. The U.S. and Mexico Plastics reporting unit can be significantly impacted by an adverse change in assumptions. Considerable judgment is often involved in making these determinations and the use of different assumptions could result in significantly different results. An approximate 50 basis point change in discount rates or an approximate 4% reduction in profit would have resulted in further goodwill impairment analysis as part of the annual impairment test conducted as of November 1, 2003 as required by SFAS No. 142. The U.S. and Mexico Plastics reporting unit achieved expected results for the first quarter of 2004 but lower than expected EBITDA for the second and third quarters. The U.S. and Mexico Plastics unit is expected to return to forecast EBITDA levels for the fourth quarter, however, the Company will closely evaluate this unit's performance for the year and its related goodwill when completing its annual impairment test as of November 1, 2004. Management believes its assumptions and estimates are reasonable and appropriate, however actual results could differ from those estimates.

#### c.      Acquired Intangible Assets

The components of the Company's acquired and other amortizable intangible assets as of September 30, 2004 and December 31, 2003 were as follows (in millions):

|  | September 30, 2004 | | | December 31, 2003 | | |
|---|---|---|---|---|---|---|
|  | Cost | Accumulated Amortization | Net Carrying Amount | Cost | Accumulated Amortization | Net Carrying Amount |
| Customer contracts | $40.0 | $18.2 | $21.8 | $51.0 | $13.1 | $37.9 |
| Patents and other | 36.9 | 13.0 | 23.9 | 39.2 | 10.2 | 29.0 |
|  | $76.9 | $31.2 | $45.7 | $90.2 | $23.3 | $66.9 |

6

As of September 30, 2004, scheduled amortization expenses for intangible assets are as follows:

|  | Amortization Expenses |
|---|---|
| Remainder of 2004 | $ 2.3 |
| 2005 | 10.3 |
| 2006 | 9.5 |
| 2007 | 7.1 |
| 2008 | 5.2 |
| 2009 and thereafter | 11.3 |

During the second quarter 2004, the Company impaired a $2.7 million Intellimold patent, a finite intangible asset that was acquired as part of the TAC-Trim acquisition. Additionally, in the second quarter 2004, the Company impaired $11.0 million of customer contracts as a result of changes in customer sourcing.

**4.  Inventories**

Inventory balances are summarized below (in millions):

|  | September 30, 2004 | December 31, 2003 |
|---|---|---|
| Raw materials | $106.9 | $ 95.0 |
| Work in process | 26.1 | 24.6 |
| Finished goods | 45.8 | 49.8 |
|  | $178.8 | $169.4 |

**5.  Customer Engineering and Tooling**

The Company had tooling assets of approximately $161.6 million and $141.7 million as of September 30, 2004 and December 31, 2003, respectively. As of September 30, 2004, $133.5 million, $7.3 million and $20.8 million were classified as current other assets, long term other assets and property, plant and equipment, respectively. As of December 31, 2003, $122.7 million, $10.8 million and $8.2 million were classified as current other assets and long term other assets and property, plant and equipment, respectively. Customer engineering and tooling balances are summarized below (in millions):

|  | September 30, 2004 | December 31, 2003 |
|---|---|---|
| Contractual reimbursement of pre-production design and development costs | $ 16.0 | $ 6.8 |
| Molds, dies and other tools reimbursable by customers | 115.9 | 124.9 |
| Molds, dies and other tools company owned | 29.7 | 10.0 |
|  | $161.6 | $141.7 |

**6.  Short-Term Borrowings**

The Company utilizes uncommitted lines of credit to satisfy a portion of its short-term working capital requirements of certain of its foreign affiliates. As of September 30, 2004, the Company had lines of credit from international credit facilities of $44.8 million, of which $25.3 million was outstanding with $19.5 million available. As of December 31, 2003, the Company had lines of credit from international credit facilities of $37.1 million, of which $16.0 million was outstanding with $21.1 million available. The weighted average interest rate on the outstanding borrowings at September 30, 2004 and December 31, 2003 was approximately 20% and 16%, respectively.

**7. Long-Term Debt and Capital Lease Obligations**

Long-term debt and capital lease obligations are summarized below (in millions):

|  | September 30, 2004 | December 31, 2003 |
|---|---|---|
| Senior Secured Credit Facilities: |  |  |
| Tranche A Term Loan Facility | $ — | $ 62.9 |
| Tranche B Term Loan Facility | — | 287.2 |
| Tranche B-1 Term Loan Facility | 400.0 | — |
| Revolving Credit Facility | 0.5 | 6.3 |
| Supplemental Revolving Credit Facility | 58.9 | — |
| Public Debt: |  |  |
| 11 1/2% Senior Subordinated Notes, due 2006. | — | 400.0 |
| 10 3/4% Senior Notes, due 2011 | 500.0 | 500.0 |
| 12 7/8% Senior Subordinated Notes, due 2012. | 400.3 | — |
| Other (including capital lease obligations) | 10.0 | 12.8 |
| Total debt | 1,369.7 | 1,269.2 |
| Less current maturities (including current portion of capital lease obligations) | (8.5) | (31.5) |
| Total long-term debt and capital lease obligations | $1,361.2 | $1,237.7 |

During the third quarter of 2004, the Company refinanced its existing Senior Secured Credit Facilities and its 11 1/2 Senior Subordinate Notes in order to extend its debt maturities and enhance financial and operating flexibility.

*Senior Secured Credit Facilities*

In February 2004, the Company entered into the fifth amendment to the Senior Secured Credit Facilities, which allowed the establishment of a new $100 million Supplemental Revolving Credit Facility and the $185 million Tranche A-1 Term Loan. In connection with these new expanded facilities, $181.5 million was used to prepay existing Tranche A and Tranche B Term Loans in direct order of maturity. The Company recognized a $1.5 million loss on early extinguishment of debt in relation to the repayments.

On September 1, 2004, the Company amended and restated its existing Senior Secured Credit Facilities, which are now comprised of a $400.0 million Tranche B-1 term loan that matures on August 31, 2011, a $170.0 million supplemental revolving credit facility that matures on August 31, 2009 and a $105.0 million revolving credit facility that also matures on August 31, 2009. In connection with the amendment and restatement of the credit facilities, proceeds from the Tranche B-1 term loan were used to repay in full the term loans outstanding and to repay, in part, revolving credit facility outstandings, in each case under the original credit agreement. Proceeds from the amended and restated supplemental revolving credit facility were used to repay, in part, revolving credit facility outstandings and to repay in full supplemental revolving credit facility outstandings, in each case under the original credit agreement. The Company recognized a $14.8 million loss on early extinguishment of debt as a result of this transaction.

The Tranche B-1 term loan has scheduled repayments of $1.0 million due each December 1, March 1, June 1 and September 1 prior to the final maturity date when the balance becomes due and payable. Borrowings under the credit facility are secured by all the assets of the Company, Products and certain of Products' subsidiaries, and are unconditionally and irrevocably guaranteed jointly and severally by the Company and substantially all of its existing and subsequently acquired or organized domestic subsidiaries (other than the Company's special purpose receivables subsidiary, captive insurance subsidiaries and charitable subsidiaries).

At September 1, 2004, interest on borrowings, at the Company's option, were either (a) adjusted LIBOR plus a 4.00% margin in the case of the Tranche B-1 term loan and supplemental revolving credit facility and a 3.00% margin in the case of the revolving credit facility or (b) the highest of (i) JPMorgan Chase Bank's prime rate, (ii) the federal funds effective rate plus 1/2 of 1.00% and (iii) the base CD rate plus 1.00% plus a 3.00% margin in the case of the Tranche B-1 term loan facility and supplemental revolving credit facility and 2.00% margin in the case of the revolving credit facility. A commitment fee on any unused commitments under the revolving credit facility equal to 0.75% per annum is payable quarterly in arrears and is subject to downward adjustment based on attaining certain performance targets. The weighted average rate of interest on the Senior Secured Credit Facilities at September 30, 2004 and December 31, 2003 was 5.79% and 7.60%, respectively.

The amended and restated credit facility requires that the Company meet certain financial tests, including, without limitation, the following tests: a maximum leverage ratio, a minimum interest coverage ratio and certain prescribed limitations on capital expenditures at levels agreed upon between Products and the agents. The amended and restated credit facility also contains covenants and restrictions, including, among others, limitations or prohibitions on declaring dividends and other distributions, redeeming and repurchasing capital stock, prepaying, redeeming and repurchasing other indebtedness, loans and investments, additional indebtedness, liens, sale-leaseback transactions, preferred stock, recapitalizations, mergers, acquisitions, asset sales and transactions with affiliates.

The amended and restated credit facility contains certain customary events of default, including, among others cross-default and cross-acceleration to other indebtedness (including the Company's receivables facility). Upon the occurrence and during the continuation of a non-bankruptcy event of default, all obligations due under the amended and restated credit facilities may be accelerated and become immediately due and payable if the Administrative Agent so directs either at its discretion or at the request of the lenders holding an aggregate of a majority of the outstanding loans and unused commitments under the amended and restated credit facilities. In addition, upon the occurrence and during the continuance of a bankruptcy event of default, all obligations under the amended and restated credit facilities shall automatically accelerate and become immediately due and payable.

*Public Debt*

On August 26, 2004, Products issued $415 million aggregate principal amount of 12 7/8% Senior Subordinated Notes due 2012 at a discount of $14.9 million, which is being amortized during the life of the debt using the effective interest method. The gross proceeds of the Notes offering, or approximately $400.1 million, were used to redeem the outstanding $400 million of 11 1/2% Senior Subordinated Notes due 2006. As a result of this transaction, Products incurred a $4.0 million loss on early extinguishment of debt.

The Notes were sold in the United States only to accredited investors pursuant to an exemption from the Securities Act of 1933, as amended, and subsequently resold to qualified institutional buyers pursuant to Rule 144A under the Securities Act and to non-U.S. persons in accordance with Regulation S under the Securities Act. The Notes have not been registered under the Securities Act and may not be offered or sold in the United States absent registration or an applicable exemption from registration requirements.

The Notes will mature on August 15, 2012 and will accrue interest at the rate of 12 7/8% per year. Interest on the notes will be payable semi-annually in arrears on each February 15 and August 15, commencing on February 15, 2005. Products may redeem some or all of the Notes at any time at 100% of the principal amount plus a make-whole premium. In addition, prior to August 15, 2007, it may redeem up to 35% of the aggregate principal amount of the Notes with the proceeds of certain equity offerings at a redemption price equal to 112.875% of the principal amount of the Notes, plus accrued and unpaid interest, if any.

If Products experiences a change of control, it may be required to offer to purchase the Notes at a purchase price equal to 101% of the principal amount, plus accrued and unpaid interest, if any.

The Notes are fully and unconditionally guaranteed on a senior subordinated unsecured basis by the Company and by each of Products' existing wholly owned domestic subsidiaries (other than its special purpose

9

receivables, insurance and charitable subsidiaries). Future domestic subsidiaries of Products may also be required to guarantee the Notes.

The Notes have been issued under an indenture with BNY Midwest Trust Company, as trustee. The indenture governing the Notes contains covenants that will limit the ability of Products and the ability of its restricted subsidiaries to, among other things: incur or guarantee additional indebtedness; pay dividends or make other distributions or repurchase or redeem its stock; make investments; sell assets; create liens; enter into agreements restricting its restricted subsidiaries' ability to pay dividends; enter into transactions with affiliates; and consolidate, merge or sell all or substantially all of its assets. If an event of default, as specified in the indenture governing the Notes, shall occur and be continuing, either the Trustee or the holders of at least 25% in aggregate principal amount of Notes may accelerate the maturity of all the Notes. The covenants, events of default and acceleration rights described in this paragraph are subject to important exceptions and qualifications, which are described in the indenture.

Under a registration rights agreement, Products and the guarantors have agreed to use their reasonable best efforts to file and cause to become effective a registration statement with respect to an offer to exchange the Notes for other senior subordinated notes issued by Products and guaranteed by the guarantors, which are registered with the SEC and which have substantially identical terms as the Notes. If Products and the guarantors are not able to affect this exchange offer, they will use their reasonable best efforts to file, and cause to become effective, a shelf registration statement relating to resales of the notes and the guarantees. Products will be obligated to pay additional interest on the notes if it does not complete this exchange offer within 270 days after the closing date.

*Other*

As of September 30, 2004, the Company believes it is in compliance with all covenants under our various obligations. The Company believes cash flow from operations, together with its revolving credit facility, receivables arrangements and sale and leaseback arrangements will provide adequate sources of liquidity for the Company to fund its operations. The Company continues to seek means to generate additional cash for debt reduction and its growth strategy. Among its potential cash generation projects, the Company seeks to further improve working capital management (including factoring of receivables) and to continue to utilize lease financings.

The Company was recently informed that certain of the accelerated payment collection programs with its larger customers will be discontinued in 2005 and that one of those customers, Ford Motor Company, intends to phase out its accelerated payment collection program from September 2004 through December 2004. At September 30, 2004, the Company had approximately $10.2 million collected under the Ford program. These programs have materially enhanced our liquidity in the past. At September 30, 2004, the Company had approximately $130.9 million collected under these arrangements, including the Ford program. The impact of the discontinuance of these programs is expected to be partially offset by a greater utilization of our existing $250 million accounts receivable securitization facility. The existing receivables facility expires on December 20, 2004, and the Company expects to have a multi-year replacement facility established before that time. The Company will also consider replacement accelerated payment programs offered on behalf of our customers or through other financial intermediaries. However, we may not be able to timely or fully replace these arrangements, and the new terms of any such program may be less advantageous than current arrangements. If the Company is unable to replace these arrangements, it could adversely affect its liquidity under its senior secured credit facilities.

**8.    Subsidiary Preferred Stock Requirements**

In connection with the TAC-Trim acquisition on December 20, 2001, Products issued to Textron Inc. preferred stock with a liquidation preference of $326.4 million and an estimated fair market value of $146.9 million. The difference between the initial recorded value and the initial liquidation preference is being accreted over the life of the stock using the effective interest method. During the third quarter of 2004, interest expense from subsidiary preferred stock accretion and dividend costs were $0.6 million and $10.5 million,

10

respectively. The third quarter of 2003 interest expense from preferred stock accretion and dividend costs was $0.4 million and $9.2 million, respectively. For the nine months ended September 30, 2004 interest expense from subsidiary preferred stock accretion and dividend costs were $1.6 million and $30.5 million, respectively. For the nine months ended September 30, 2003 interest expense from subsidiary preferred stock accretion and dividend costs were $4.8 million and $22.4 million, respectively.

Effective April 2004, all 20,000 shares of the Series C Preferred Stock, which were held by Textron Inc, were converted to Series B Preferred Stock on an equivalent share basis. The primary difference between the Series C and Series B Preferred Stock is that Series C holders were entitled to participation in distributions of Products common equity tied to the appreciation in the value of Products common equity subsequent to the issuance date of the securities. Each holder received one share of Series B Preferred Stock for each share of Series C Preferred Stock.

## 9.   Receivables Facility and Non Recourse Factoring Facilities

### Receivables Facility

As of September 30, 2004 and December 31, 2003, Carcorp, Inc.'s total receivables pool, as defined under the receivables facility, was $225.7 million and $165.4 million, respectively. As of September 30, 2004, the utilization of the Receivables Facility was $160.7 million and was fully drawn. At December 31, 2003, the utilization of the Receivables Facility was $73.7 million, and an additional $9.1 million was available, subject to limitations imposed under the Senior Secured Credit Facilities. The receivables facility expires on December 20, 2004, and the Company expects to have a replacement facility established before that time.

The Company is required to pay a fee of 0.50% on the unused portion of the facility. A discount on the sold receivables is approximately equal to the interest rate paid by the conduits to the holders of the commercial paper plus a usage fee that ranges from 1.50% to 2.25%. The discount rate at September 30, 2004 was 3.37%.

### Non-Recourse Factoring Facilities

The Company had entered into various agreements with international lenders to sell accounts receivables of certain international operations on a non-recourse basis. As of September 30, 2004, the Company has utilized $90.9 million from these commitments. The funding levels and commitments by the lenders are based on the eligible receivables in the Company's subsidiaries in the various countries, including subsidiaries in Belgium, Brazil, Czech Republic, Germany, Italy, Mexico, Netherlands, Spain and Sweden. As of September 30, 2004, under the agreements, approximately $98.1 million of receivables have been sold, while the Company had retained an interest in $7.2 million of these sold receivables. At December 31, 2003, under the agreements, approximately $132.7 million of receivables had been sold, while the Company had retained an interest in $6.1 million of these sold receivables. The retained interest remains classified on the Company's balance sheet as trade receivables. Under the agreements, the Company usually pays a factoring fee and a discount on the daily utilization of the facility. The expenses related to these agreements are recorded in loss on sale of receivables on the income statement.

For the third quarter and year-to-date ended September 30, 2004, the loss on sale of receivables under the Receivables Facility and the non-recourse factoring facilities totaled $2.4 million and $7.2 million, respectively, compared to $1.8 million and $4.5 million for the third quarter and year-to-date ended September 30, 2003, respectively.

11

## 10.    Employee Benefit Plans

The 2004 and 2003 amounts shown below reflect the defined benefit pension and other postretirement benefit expense for the three and nine months ended September 30 for each year:

| | Quarter ended September 30 | | | | Nine months ended September 30 | | | |
| | Pension Benefits | | Other Postretirement Benefits | | Pension Benefits | | Other Postretirement Benefits | |
| | 2004 | 2003 | 2004 | 2003 | 2004 | 2003 | 2004 | 2003 |
|---|---|---|---|---|---|---|---|---|
| Service cost | $ 3.8 | $ 3.5 | $ 0.2 | $ 0.3 | $ 11.4 | $ 10.5 | $ 0.8 | $ 1.0 |
| Interest cost | 6.7 | 6.5 | 1.3 | 1.4 | 20.1 | 19.5 | 4.1 | 4.3 |
| Expected return on plan assets | (7.4) | (6.8) | — | — | (22.2) | (20.4) | — | — |
| Amortization of prior service cost (gain) | 0.1 | 0.1 | (2.1) | (1.9) | 0.3 | 0.3 | (5.8) | (5.7) |
| Curtailment credits | — | — | (9.4) | — | — | — | (9.4) | — |
| Amortization of net loss/(gain) | 1.6 | 1.5 | (0.3) | (0.3) | 4.8 | 4.5 | (0.9) | (0.9) |
| Net periodic benefit cost (gain) | $ 4.8 | $ 4.8 | $(10.3) | $(0.5) | $ 14.4 | $ 14.4 | $(11.2) | $(1.3) |

The Company expects to contribute $10.9 million to its pension plans in 2004. Through the third quarter ended September 30, 2004, $8.6 million has been contributed.

The "Medicare Prescription Drug, Improvement and Modernization Act of 2003," (the "Act") reduced the net periodic postretirement benefit cost by $0.1 million and $0.2 million for the three and nine months ended September 30, 2004, respectively, including service cost, interest cost and amortization of the actuarial experience gain. The total impact of the Act on our actuarial liability was $3.0 million and is being accounted for as an actuarial gain, in accordance with guidance from the Financial Accounting Standards Board ("FASB") Staff Position 106-2 "Accounting and Disclosure Requirements Related to the Medicare Prescription Drug, Improvement and Modernization Act of 2003." As a result, the gain will be amortized as a reduction of our periodic expense and balance sheet liability over the estimated future lifetime of the active employees, depending on the plan.

On June 24, 2004, the Company announced that postretirement medical subsidies for all non-union medical plans and all postretirement life insurance (except for union and executive plans) would be eliminated effective January 1, 2006. Accordingly, these events are treated as an amendment with curtailments as appropriate for each plan. The effect of the plan amendments for the nine months ended September 30, 2004 resulted in the Company recognizing $9.4 million of curtailment credits and a $0.4 million gain in amortization of prior service costs. These gains are recognized as a $5.2 million benefit in selling, general and administrative expenses and a $4.6 million benefit in cost of goods sold. For the fourth quarter of 2004 the Company expects to recognize approximately $10.5 million in postretirement benefits, of which approximately $2.5 million ($1.8 million, net of taxes) will be classified as income from discontinued operations. Additionally, in 2005, the Company expects to recognize approximately $50.0 million in postretirement benefits, of which approximately $11.0 million ($7.0 million, net of taxes) will be classified as income from discontinued operations, relating to the effect of the plan amendments.

12

**11.  Restructuring and Impairment**

Activity related to the restructuring reserve is as follows (in millions):

| | Severance Costs | Lease Commitments and Other Exit Costs | Total |
|---|---|---|---|
| Restructuring reserves: | | | |
| Balance at beginning of year | $ 21.6 | $ 9.3 | $ 30.9 |
| 2004 Expense: | | | |
| 2nd quarter 2003 program | 0.1 | — | 0.1 |
| 3rd quarter 2003 program | 0.8 | — | 0.8 |
| 4th quarter 2003 program | 0.2 | — | 0.2 |
| 1st quarter 2004 program | 7.6 | 1.8 | 9.4 |
| 2nd quarter 2004 program | 9.1 | 1.3 | 10.4 |
| 3rd quarter 2004 program | 10.3 | 1.7 | 12.0 |
| Adjustments to prior period programs | (4.0) | — | (4.0) |
| Total net expense | 24.1 | 4.8 | 28.9 |
| Costs paid | (22.1) | (7.1) | (29.2) |
| Ending balance at September 30, 2004 | $ 23.6 | $ 7.0 | $ 30.6 |
| 3rd quarter 2003 restructuring: | | | |
| Costs expected | $ 21.2 | $ 6.8 | $ 28.0 |
| Costs paid in 2004 | 4.4 | 1.0 | 5.4 |
| Costs paid to date | 12.2 | 4.1 | 16.3 |
| 4th quarter 2003 restructuring | | | |
| Costs expected | $  6.8 | $ 1.7 | $  8.5 |
| Costs paid in 2004 | 3.0 | 1.1 | 4.1 |
| Costs paid to date | 5.8 | 1.1 | 6.9 |
| 1st quarter 2004 restructuring | | | |
| Costs expected | $  7.6 | $ 1.8 | $  9.4 |
| Costs paid in 2004 | 4.9 | 0.9 | 5.8 |
| Costs paid to date | 4.9 | 0.9 | 5.8 |
| 2nd quarter 2004 restructuring | | | |
| Costs expected | $  9.1 | $ 1.3 | $ 10.4 |
| Costs paid in 2004 | 3.7 | 0.1 | 3.8 |
| Costs paid to date | 3.7 | 0.1 | 3.8 |
| 3rd quarter 2004 restructuring | | | |
| Costs expected | $ 10.3 | $ 1.7 | $ 12.0 |
| Costs paid in 2004 | 2.0 | 0.6 | 2.6 |
| Costs paid to date | 2.0 | 0.6 | 2.6 |

13

During the third quarter 2004, the Company continued its initiative to right size its overhead structure, further reduce salaried headcount and strengthen and streamline the senior management team on a worldwide basis resulting in a restructuring charge of $12.0 million. The third quarter charge included $10.3 million of severance cost and $1.7 million of costs related to the establishment of accruals for lease commitments and other exit costs. Also included in the third quarter 2004 charges is adjustments related to previously established accruals which did not require cash outlays of $3.0 million resulting in a net charge of $9.0 million. Additionally, the Company recognized an $10.3 million write down of assets primarily related to the closing of an International Plastic location totaling $7.0 million. The $3.3 million remaining fixed asset write down was related to Global Soft Trim locations.

| | U.S. and Mexico Plastics | International Plastics | Global Soft Trim | Other | Total |
|---|---|---|---|---|---|
| 3rd Quarter 2004 Restructuring: | | | | | |
| Total costs expected | $ 1.5 | $ 5.1 | $ 3.2 | $2.2 | $12.0 |
| Costs incurred in 2004 | 1.5 | 5.1 | 3.2 | 2.2 | 12.0 |
| Costs incurred to date | 1.5 | 5.1 | 3.2 | 2.2 | 12.0 |
| Headcount Reduction | 103 | 528 | 235 | 16 | 882 |

During the second quarter 2004, the Company undertook a restructuring program to right size its overhead structure, further reduce salaried headcount and strengthen and streamline the senior management team on a worldwide basis resulting in a restructuring charge of $10.4 million. Additionally, the Company recognized a $27.4 million write down of assets related to the Company impairing $13.6 million of Intellimold assets, including a $2.7 million patent, a finite intangible asset, acquired as part of the TAC-Trim acquisition. The Company also impaired $11.0 million of customer contracts as a result of changes in customer sourcing. The $2.8 million remaining fixed asset write down was related primarily to Global Soft Trim locations.

| | U.S. and Mexico Plastics | International Plastics | Global Soft Trim | Other | Total |
|---|---|---|---|---|---|
| 2nd Quarter 2004 Restructuring: | | | | | |
| Total costs expected | $ 1.3 | $0.8 | $ 5.9 | $2.4 | $10.4 |
| Costs incurred in 2004 | 1.3 | 0.8 | 5.9 | 2.4 | 10.4 |
| Costs incurred to date | 1.3 | 0.8 | 5.9 | 2.4 | 10.4 |
| Headcount Reduction | 250 | 10 | 250 | 40 | 550 |

During the first quarter 2004, the Company undertook a restructuring program to right size its overhead structure, further reduce salaried headcount and strengthen and streamline the senior management team on a worldwide basis resulting in a restructuring charge of $9.4 million. Additionally, the Company recognized a $3.0 million write down of fixed assets related primarily to Global Soft Trim locations. The Company also incurred and recorded restructuring charges of $1.1 million for prior year programs along with an adjustment related to a previously established accrual, which did not require cash outlays of $1.0 million.

| | U.S. and Mexico Plastics | International Plastics | Global Soft Trim | Other | Total |
|---|---|---|---|---|---|
| 1st Quarter 2004 Restructuring: | | | | | |
| Total costs expected | $1.3 | $ 1.9 | $1.7 | $4.5 | $ 9.4 |
| Costs incurred in 2004 | 1.3 | 1.9 | 1.7 | 4.5 | 9.4 |
| Costs incurred to date | 1.3 | 1.9 | 1.7 | 4.5 | 9.4 |
| Headcount Reduction | 30 | 170 | 30 | 30 | 260 |

During the fourth quarter 2003, the Company undertook a restructuring program to right size its overhead structure, reduce salaried headcount and strengthen and streamline the senior management team on a worldwide basis with the primary focus on domestic operations resulting in a restructuring charge of

14

$9.3 million. Additionally, the Company recognized a $4.6 million write down of fixed assets related to U.S. and Mexico Plastics and Global Soft Trim locations.

| | U.S. and Mexico Plastics | International Plastics | Global Soft Trim | Other | Total |
|---|---|---|---|---|---|
| 4th Quarter 2003 Restructuring: | | | | | |
| Total costs expected | $ 0.9 | $ 4.0 | $ 2.6 | $1.0 | $ 8.5 |
| Costs incurred in 2004 | — | 0.2 | (1.0) | — | (0.8) |
| Costs incurred to date | 0.9 | 4.0 | 2.6 | 1.0 | 8.5 |
| Headcount Reduction | 100 | 500 | 400 | — | 1,000 |

During the third quarter 2003, the Company undertook a restructuring program to right size its overhead structure, reduce salaried headcount and strengthen and streamline the senior management team on a worldwide basis with the primary focus on domestic operations resulting in a restructuring charge of $27.2 million. Additionally, the Company recognized a $2.2 million write down of fixed assets related primarily to International Plastics locations.

Included in the third quarter 2003 restructuring charge severance cost were charges related to the separation agreement with Jerry L. Mosingo, the former President and CEO. In August 2003, the Company's Board of Directors appointed David Stockman as CEO, in addition to retaining his position of Chairman. Under the terms of his separation agreement, Mr. Mosingo received $0.6 million in the third quarter of 2003 and will receive $0.2 million per quarter through December 31, 2004 and $0.1 million for the quarter ending March 31, 2005, and other fringe and retirement benefits. The resulting third quarter 2003 restructuring charge was $5.3 million, which includes the present value of future benefits of $2.8 million, included in pension liability.

| | U.S. and Mexico Plastics | International Plastics | Global Soft Trim | Other | Total |
|---|---|---|---|---|---|
| 3rd Quarter 2003 Restructuring: | | | | | |
| Total costs expected | $ 6.3 | $ 5.6 | $ 5.9 | $10.2 | $ 28.0 |
| Costs incurred in 2004 | — | 0.6 | 0.2 | — | 0.8 |
| Costs incurred to date | 6.3 | 5.6 | 5.9 | 10.2 | 28.0 |
| Headcount Reduction | 500 | 300 | 600 | 200 | 1,600 |

During the second quarter 2003, the Company undertook a restructuring program to rationalize operations on a worldwide basis with the primary focus on U.S. and Mexico operations resulting in a restructuring charge of $4.9 million. The 2003 charge included approximately $4.2 million of severance cost and $0.7 million of costs related to the establishment of reserves for lease commitments and other exit costs. The Company's restructuring plan includes severance of over 500 personnel. Of the 500 personnel approximately 450 were terminated in the second quarter of 2003 with approximately 170 personnel at the Company's International Plastics segment, approximately 160 at Global Soft Trim segment and approximately 120 at the Company's corporate locations. Additionally, the Company recognized a $0.8 million write down of fixed assets related to an International Plastics location. Restructuring charges related to the first quarter of 2004 for this program were $0.1 million for severance costs with less than $0.1 million of severance costs remaining to be charged during 2004 and 2005.

Reserves for lease terminations costs are paid in conjunction with the remaining terms of the leases, while severance and other exit costs are generally paid within one year of the restructuring program.

During 2003, the Company recognized a $7.5 million write-down of fixed assets related to its 50% interest in an Italian joint venture acquired in 2001 and $10.4 million impairment of the Becker non-compete agreement.

15

**12.   Related Party Transactions**

*Heartland Transactions*

The Company is a party to a Services Agreement with Heartland under which Heartland provides advisory and consulting services, including services with respect to developments in the automotive industry and supply markets, advice on financial and strategic plans and alternatives and other matters as it may reasonably request and are within Heartland's expertise. The Services Agreement terminates on the earlier of its tenth anniversary or the date upon which Heartland ceases to own Company shares equivalent to 25% of that owned by them on February 23, 2001.

Under the Services Agreement, the Company is obligated to pay to Heartland a $4.0 million annual advisory fee payable in quarterly installments and reimburse its out-of-pocket expenses related to the services it provides. The Company has also agreed to pay a fee of 1% of the total enterprise value of certain acquisitions and dispositions and 1% of the gross proceeds of certain financings.

In March 2004, the Company's Board of Directors, including the disinterested and independent directors of the Board, approved a fee of $1.0 million to Heartland for its services rendered in connection with the 2004 amendments to the Company's credit facility to add a supplemental revolving credit facility.

In May 2004, the Company's Board of Directors, including the disinterested and independent directors of the Board, approved an amendment of the Services Agreement to provide for a fee of up to $5.0 million related to services rendered in connection with the notes offering and a fee of 1% of the gross proceeds of certain future financings, excluding the amendment and restatement of our senior secured credit facility. The $1.0 million fee for the February 2004 amendments to the Company's credit facility was subsequently waived when the Company completed its credit facility and notes refinancing during the third quarter of 2004, as part of which Heartland received a fee of $5.0 million.

For the quarter and nine months ended September 30, 2004, the Company recorded total fees to Heartland of $6.3 million and $8.5 million, respectively. For the quarter and nine months ended September 30, 2003, the Company recorded total fees of $1.0 million and $3.0 million, respectively.

*Charles E. Becker Transactions*

For the quarter and nine months ended September 30, 2004, the Company recorded total lease payments of $2.2 million and $6.5 million, respectively, under various lease agreements with entities controlled by Charles E. Becker, a former director of the Company. For the quarter and nine months ended September 30, 2003, the Company recorded total lease payments of $2.3 million and $6.9 million, respectively, under various lease agreements.

Mr. Becker resigned as director of the Company effective as of May 6, 2004.

*Elkin McCallum Transactions*

In 2004 and 2003, the Company engaged in ordinary course transactions with entities controlled by Elkin McCallum, a former director of the Company, for the purchase and sale of goods and services as part of ongoing business relationships. The Company recorded purchases for goods and services from entities controlled by Mr. McCallum of $0.7 million and $4.1 million for the quarter and nine months ended September 30, 2004, respectively, and $4.1 million and $15.2 million (net $1.2 million of rebates) for the quarter and nine months ended September 30, 2003, respectively, for goods and services purchased. The rebates received from Mr. McCallum relate to knit and woven automotive fabrics provided by entities controlled by Mr. McCallum under the Supply Agreement and Transition Agreement executed in connection with the 2001 Joan acquisition. Supplier rebates such as these are common in the automotive industry as part of ongoing price negotiations and adjustments. The rebates from Mr. McCallum totaled $14.7 million over the duration of the agreements. In addition, the Company recorded sales to entities controlled by Mr. McCallum of $0.6 million and $4.0 million for the quarter and nine months ended September 30, 2004, respectively, and $0.8 million and $5.3 million for the quarter and nine months ended September 30, 2003, respectively.

16

The following table summarizes the balances outstanding from entities controlled by Mr. McCallum (in millions):

|  | September 30, 2004 | December 31, 2003 |
|---|---|---|
| Accounts Receivable | $4.4 | $2.7 |
| Accounts Payable | 2.7 | 1.0 |

Mr. McCallum resigned as director of the Company effective as of May 6, 2004.

### 13. Income Taxes

The Company recognized an income tax benefit of $13.4 million and $8.6 million for the quarters ended September 30, 2004 and 2003, respectively. The Company recognized an income tax benefit of $17.0 million and an income tax expense of $0.1 million for the nine months ended September 30, 2004 and 2003, respectively. The primary reasons for the Company's effective tax rate being different from its statutory rate are non-deductible preferred stock dividends and accretion, foreign losses for which tax benefits are not recorded and state and foreign taxes that do not fluctuate directly with income, partially offset by the effect of a financing arrangement and tax credits.

### 14. Information About the Company's Operations

In conjunction with the 2003 restructurings, the Company changed its reportable segments to align with organization changes and senior management responsibilities. The Company's reportable segments consist of U.S. and Mexico Plastics, International Plastics and Global Soft Trim. International Plastics includes international plastics operations, including Canada but excluding Mexico. The U.S. and Mexico Plastics and International Plastics segments include interior trim components such as door panels, instrument panels, consoles, package trays and cargo management systems, exterior trim components such as bumper fascias and cladding and fully assembled cockpit systems and components thereof. The Global Soft Trim segment includes molded non-woven and tufted carpet, alternative molded flooring, accessory mats and acoustics systems consisting of absorbing materials, damping materials, engine compartment noise vibration and harshness systems, interior insulators, seat body cloth, insert fabric, headliner fabric, convertible roof systems, hard top retractable roof systems, tonneau covers and actuation systems. The Company changed the composition of its reportable segments beginning July 1, 2003 and restated prior period segment data to be comparable.

The Company evaluates performance based on operating profit or loss. Information about the Company's segments is presented below (in millions):

|  | Quarter Ended September 30, 2004 | | | | |
|---|---|---|---|---|---|
|  | U.S. and Mexico Plastics | International Plastics | Global Soft Trim | Other(a) | Total |
| External revenues | $261.7 | $319.6 | $283.5 | $ — | $864.8 |
| Inter-segment revenues | 8.2 | 3.3 | 1.1 | (12.6) | — |
| Interest expense from preferred stock requirement | — | — | — | 11.1 | 11.1 |
| Depreciation and amortization | 11.4 | 11.6 | 13.9 | 2.3 | 39.2 |
| Operating income (loss) | 13.8 | (8.8) | 11.9 | (7.4) | 9.5 |
| Capital expenditures | 23.6 | 29.8 | 15.4 | 0.4 | 69.2 |

17

| | Quarter Ended September 30, 2003 | | | | |
|---|---|---|---|---|---|
| | U.S. and Mexico Plastics | International Plastics | Global Soft Trim | Other(a) | Total |
| External revenues | $312.0 | $273.8 | $316.4 | $   — | $902.2 |
| Inter-segment revenues | 3.0 | 4.1 | 0.3 | (7.4) | — |
| Interest expense from preferred stock requirement | — | — | — | 9.6 | 9.6 |
| Depreciation and amortization | 10.2 | 9.3 | 11.9 | 2.2 | 33.6 |
| Operating income (loss) | 17.5 | 1.3 | 27.6 | (38.1) | 8.3 |
| Capital expenditures | 11.1 | 15.5 | 18.0 | 0.2 | 44.8 |

| | Nine Months Ended September 30, 2004 | | | | |
|---|---|---|---|---|---|
| | U.S. and Mexico Plastics | International Plastics | Global Soft Trim | Other(a) | Total |
| External revenues | $  947.6 | $1,072.8 | $947.1 | $   — | $2,967.5 |
| Inter-segment revenues | 21.7 | 10.6 | 1.5 | (33.8) | — |
| Interest expense from preferred stock requirement | — | — | — | 32.1 | 32.1 |
| Depreciation and amortization | 35.0 | 32.7 | 37.8 | 7.2 | 112.7 |
| Operating income (loss) | 38.1 | 0.9 | 73.8 | (47.3) | 65.5 |
| Capital expenditures | 50.6 | 56.8 | 40.1 | 3.8 | 151.3 |
| As of September 30: | | | | | |
| Goodwill | 757.2 | 346.9 | 274.4 | — | 1,378.5 |
| Total assets | 1,092.2 | 852.2 | 675.6 | 576.7 | 3,196.7 |

| | Nine Months Ended September 30, 2003 | | | | |
|---|---|---|---|---|---|
| | U.S. and Mexico Plastics | International Plastics | Global Soft Trim | Other(a) | Total |
| External revenues | $1,018.2 | $917.9 | $1,034.7 | $   — | $2,970.8 |
| Inter-segment revenues | 9.8 | 12.9 | 1.1 | (23.8) | — |
| Interest expense from preferred stock requirement | — | — | — | 27.2 | 27.2 |
| Depreciation and amortization | 31.6 | 28.7 | 35.0 | 5.9 | 101.2 |
| Operating income (loss) | 49.8 | (18.0) | 118.4 | (78.6) | 71.6 |
| Capital expenditures | 28.2 | 34.3 | 52.0 | 5.4 | 119.9 |
| As of September 30: | | | | | |
| Goodwill | 707.3 | 343.5 | 274.5 | — | 1,325.3 |
| Total assets | 1,049.1 | 803.6 | 697.2 | 633.1 | 3,183.0 |

(a)   Other includes the Company's non-operating units and the effect of eliminating entries. During 2004 and 2003, certain corporate costs that were previously included at the divisional units were included in the Other category. Those costs that could be attributed to a divisional unit were allocated back to the appropriate division. Operating income (loss) for the nine months ended September 30, 2004 reflects: $46.1 million, $58.1 million and $35.5 million of corporate costs allocated back to U.S. and Mexico Plastics, International Plastics and Global Soft Trim, respectively. Operating income (loss) for the nine months ended September 30, 2003 reflects: $40.8 million, $51.6 million, and $24.6 million of corporate costs allocated back to U.S. and Mexico Plastics, International Plastics and Global Soft Trim, respectively.

18

Direct and indirect sales to significant customers in excess of ten percent of consolidated net sales from continuing operations are as follows:

| | Quarter Ended | | Nine Months Ended | |
|---|---|---|---|---|
| | September 30, 2004 | September 30, 2003 | September 30, 2004 | September 30, 2003 |
| DaimlerChrysler AG | 30.1% | 28.3% | 31.5% | 29.1% |
| General Motors Corporation | 20.5% | 24.4% | 19.7% | 22.2% |
| Ford Motor Company | 24.0% | 24.1% | 26.1% | 24.7% |

## 15.  Commitments and Contingencies

Except as described below, the Company and its subsidiaries are not party to any material pending legal proceedings, but is involved in ordinary routine litigation incidental to the business.

### Environmental

The Company is subject to federal, state, local and foreign environmental, and health and safety, laws and regulations that (i) affect ongoing operations and may increase capital costs and operating expenses in order to maintain compliance with such requirements and (ii) impose liability relating to contamination at facilities, other locations such as former facilities, facilities where we have sent wastes for treatment or disposal and other properties to which the Company may be linked. Such liability may include, for example, investigation and cleanup of the contamination, personal injury and property damage caused by the contamination and damages to natural resources. Some of these liabilities may be imposed without regard to fault and may also be joint and several (which can result in a liable party being held responsible for the entire obligation, even where other parties are also liable).

Management believes that it has obtained, and is in material compliance with, those material environmental permits and approvals necessary to conduct the Company's various businesses. Environmental compliance costs for continuing businesses are accounted for as normal operating expenses or capital expenditures, except for certain costs incurred at acquired locations. Environmental compliance costs relating to conditions existing at the time of an acquisition are generally charged to reserves established in purchase accounting. The Company accrues for environmental remediation costs when such obligations are known and reasonably estimable. In the opinion of management, based on the facts presently known to it, such environmental compliance and remediation costs will not have a material effect on the Company's business, consolidated financial condition, future results of operations or cash flows.

The Company is legally or contractually responsible or alleged to be responsible for the investigation and remediation of contamination at various sites and for personal injury or property damages, if any, associated with such contamination. At some of these sites, the Company has been notified that it is a potentially responsible party ("PRP") under the federal Superfund law or similar state laws. Other sites at which the Company may be responsible for contamination may be identified in the future, including with respect to divested and acquired businesses.

The Company is currently engaged in investigating or remediating certain sites, as discussed in the paragraphs below. In estimating the cost of investigation and remediation, the Company considered, among other things, its prior experience in remediating contaminated sites, remediation efforts by other parties, data released by the United States Environmental Protection Agency ("USEPA"), the professional judgment of the Company's environmental experts, outside environmental specialists and other experts and the likelihood that other identified PRPs will have the financial resources to fulfill their obligations at sites where they and the Company may be jointly and severally liable. It is difficult to estimate the total cost of investigation and remediation due to various factors including:

• incomplete information regarding particular sites and other PRPs;

• uncertainty regarding the nature and extent of environmental problems and the Company's share, if any, of liability for such problems;

19

• the ultimate selection among alternative approaches by governmental regulators;

• the complexity and evolving nature of environmental laws, regulations and governmental directives;

• changes in cleanup standards.

The Company is a party to a Consent Decree with the State of New Hampshire to remediate a former industrial landfill known as the Cardinal Landfill in Farmington, New Hampshire. Pursuant to that Consent Decree, the Company is currently conducting a pilot test for a proposed remediation of chlorinated compound contaminants in groundwater. The Consent Decree calls for a remedy to be in place during 2005. The Company is a defendant in three lawsuits filed by a total of 91 individual plaintiffs for alleged personal injuries arising from Cardinal Landfill conditions. The Company will vigorously contest these allegations. As of September 30, 2004, the Company has accrued $11.0 million for Cardinal Landfill.

The Company is a party, as a member of a PRP workgroup, to a Consent Decree entered with the USEPA for the remediation of a former municipal landfill in Dover, New Hampshire. The town of Dover, New Hampshire is also a member of the PRP group and a party to the Consent Decree. Pursuant to the terms of the Consent Decree, the PRP group has recently completed an alternative remediation design. The USEPA and the State of New Hampshire have reviewed, provided for public comment and approved the alternative remedial design and subsequently issued an amended Record of Decision. As of September 30, 2004, the Company has accrued $8.2 million for Dover.

Pursuant to a Consent Decree signed with the USEPA, the Company is currently engaged in a full-scale remediation for groundwater and soil contamination at the former Stamina Mills manufacturing facility in North Smithfield, Rhode Island. Remediation activities have been ongoing since 1998. Another Consent Decree resolving the USEPA claim for past oversight costs was signed during 2003, and a payment of $7.3 million was made during the third quarter of 2003. As of September 30, 2004, the Company has accrued $6.4 million for Stamina Mills.

The Company is working with the Michigan Department of Environmental Quality ("MDEQ") to investigate and remediate soil and groundwater contamination at a former manufacturing plant in Mancelona, Michigan and at adjacent owned property formerly used for the treatment and disposal of plating waste. MDEQ is likely to require remediation of groundwater contamination.

The current owner of one of the Company's former manufacturing plants located in Bowling Green, Ohio has entered into an Administrative Order on Consent with the Ohio Environmental Protection Agency ("OEPA") requiring investigation and remediation of contamination at the site. The Company is reimbursing the current owner for costs associated with ongoing groundwater monitoring and, following selection of an appropriate remedy by OEPA, will assume 90% of future remediation costs.

In the 1980's and 1990's, the California Regional Water Quality Control Board ("CRWQCB") and other state agencies ordered a predecessor of the Company to investigate and remediate soil and groundwater contamination at a former lumber treatment plant in Elmira, CA. In 1996, the Company entered into an agreement with the State of California to conduct long-term operation and maintenance of the remedy implemented at the site. Currently, the Company is conducting a pilot test of an alternative treatment option that will reduce the cost and time for clean up at this site.

The Company has entered into an Administrative Order by Consent with the USEPA requiring investigation, delineation and removal of contamination from a vacant three acre site in Zanesville, Ohio. The delineation report has been submitted to USEPA for comment, and the Administrative Order by Consent calls for the submittal and implementation of an action plan during 2004. Based on ongoing investigations at the site in regards to potential lead contamination in soil and groundwater, the USEPA has requested additional studies of groundwater and site wide soil stability studies in preparation for cap installation. Initial results of these studies indicate that there is no lead contamination in groundwater. The issue of cap installation is being evaluated in light of these recent findings.

In 2003, the Company signed a Consent Agreement with the State of South Carolina Department of Health and Environmental Control requiring soil and groundwater investigations at a former manufacturing

20

facility in Cowpens, South Carolina. The Company had ceased operations at this location in 1981. Initial investigations will delineate potential groundwater contamination that has migrated under a residential area. These studies are scheduled to be completed in 2004.

The Company has established accruals for certain contingent environmental liabilities and management believes such reserves comply with accounting principles generally accepted in the United States of America. The Company accrues for environmental investigatory and non-capital remediation costs when litigation has commenced or a claim or assessment has been asserted or is imminent, the likelihood of an unfavorable outcome is probable, and the financial impact of such outcome is reasonably estimable. As of September 30, 2004 and December 31, 2003, total reserves for these environmental costs are approximately $45.7 million and $51.2 million, respectively.

In the opinion of management, based on information presently known to it, identified environmental costs and contingencies will not have a material effect on the Company's consolidated financial condition, future results of operations or cash flows. However, management can give no assurance that they have identified or properly assessed all potential environmental liabilities arising from the business or properties, and those of present and former subsidiaries and their corporate predecessors.

### Legal Proceedings

The Company and its subsidiaries have lawsuits and claims pending against them and have certain guarantees outstanding which were made in the ordinary course of business.

As of September 30, 2004, the Company was a party to approximately 1,102 pending cases alleging personal injury from exposure to asbestos containing materials used in boilers manufactured before 1966 by former operations of the Company which were sold in 1966. Asbestos-containing refractory bricks lined the boilers and, in some instances, the Company's former operations installed asbestos-containing insulation around the boilers. These pending cases do not include cases that have been dismissed or are subject to agreements to dismiss due to the inability of the plaintiffs to establish exposure to a relevant product and cases that have been settled or are subject to settlement agreements. Total settlement costs for these cases have been less than $1.3 million or an average of less than $6,250 per settled case. The defense and settlement costs have been substantially covered by the Company's primary insurance carriers under a claims handling agreement that expires in August 2006. The Company has primary, excess and umbrella insurance coverage for various periods available for asbestos-related boiler and other claims. The Company's primary carriers have agreed to cover approximately 80% of certain defense and settlement costs up to a limit of approximately $70.5 million for all claims made, subject to reservations of rights. The excess insurance coverage, which varies in availability from year to year, is approximately $615 million in aggregate for all claims made. The coverage may be impacted by matters described below. Based on the age of the boilers, the nature of the claims and settlements made to date and the insurance coverage, management does not believe that these cases will have a material impact on the Company's financial condition, results of operations or cash flows. However, the Company cannot assure that it will not be subjected to significant additional claims in the future in respect of these or other matters for which the insurance could be utilized, that insurance will be available as expected, that the matters described below may not impact the Company's coverage or that unanticipated damages or settlements in the future would not exceed insurance coverage.

In 1988, the Company divested its retail lumber and building materials business to Wickes Lumber Co. (now Wickes Inc.), which filed a voluntary petition for reorganization under Chapter 11 of the U.S. Bankruptcy Code in early 2004. As part of this divestiture, Wickes assumed responsibility for all liabilities associated with this business, including those associated with certain asbestos-related claims, and the Company agreed to give them access to its general liability insurance policies for such liabilities. These are, in several instances, the same policies referred to in the preceding paragraph. Wickes has been making claims against these policies for settlements of asbestos-related claims that it has characterized as insignificant as of late 2003 in its filings with the Securities and Exchange Commission. The Company has agreed to suspend making claims for other than defense costs to permit agreement upon a framework within the bankruptcy proceedings or otherwise for coordinating these claims as between the Company and Wickes. It is possible

21

that resolution of these issues will await confirmation of a plan of reorganization for Wickes and that an equitable portion of the insurance will be made available for Wickes asbestos or other claimants, thereby reducing the coverage available to the Company for its own claims. Based upon the information available to the Company concerning Wickes' claims history, management does not believe these matters will materially and adversely affect the Company.

A purported class action was filed on March 24, 2003 in the United States District Court for the Eastern District of Michigan, against the Company, Heartland and ten current and former senior officers and/ or directors of the Company, alleging violations of Sections 10(b) and 20 (a) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated there under. Four similar actions were subsequently filed in the United States District Court for the Eastern District of Michigan, purportedly filed on behalf of purchasers of the common stock of the Company between August 7, 2001 and August 2, 2002, which is identical to the purported class identified in the previously disclosed lawsuit, except in one instance in which the complaint alleges a class period beginning on July 5, 2001. On August 4, 2003, the court consolidated all five pending actions and appointed lead plaintiffs for the purported class. The Company believes that the claims are without merit and intends to vigorously defend the lawsuits. The Company does not believe that the suit will have a material impact on its financial condition, results of operations or cash flows.

The Company is a defendant in a lawsuit involving a sales commission arrangement inherited from a predecessor company and its partial ownership of an extinguished joint venture. In September 2003, the Oakland County Circuit Court entered a judgment by default against the company for $4.2 million based upon an inadvertent failure to produce a small number of documents that were to be produced with thousands of other documents that were delivered in the discovery process. The Company and its counsel believe that the default judgment was improperly entered and that damages were improperly assessed, and it has filed an appeal of the judgment with the Michigan Court of Appeals. The Company intends to vigorously pursue its appeal in this matter and has posted a letter of credit in the amount of the judgment as part of the normal appeal process. While management believes it has no liability to the plaintiff, the Company has established an appropriate reserve for this matter in an amount less than the amount of the current judgment.

The ultimate outcome of the legal proceedings to which the Company is a party will not, in the opinion of the Company's management, based on the facts presently known to it, have a material effect on the Company's consolidated financial condition, future results of operations or cash flows.

### Other Commitments

As of September 30, 2004, the Company's continuing operations had approximately $69.0 million in outstanding capital expenditure commitments. The majority of the leased properties of the Company's previously divested businesses have been assigned to third parties. Although releases have been obtained from the lessors of certain properties, Products remains contingently liable under most of the leases. Products' future liability for these leases, in management's opinion, based on the facts presently known to it, will not have a material effect on the Company's consolidated financial condition, future results of operations or cash flows.

22

## 16.   Other Comprehensive Loss

Total comprehensive loss for the quarter and nine months ended September 30, 2004 and September 30, 2003 are as follows (in millions):

| | Quarter Ended | | Nine Months Ended | |
|---|---|---|---|---|
| | September 30, 2004 | September 30, 2003 | September 30, 2004 | September 30, 2003 |
| Comprehensive loss: | | | | |
| Net loss | $(55.6) | $(32.1) | $(108.6) | $(47.6) |
| Other comprehensive income (loss): | | | | |
| Foreign currency translation adjustments | 20.5 | (2.0) | 8.4 | 57.5 |
| | $(35.1) | $(34.1) | $(100.2) | $ 9.9 |

## 17.   Consolidating Financial Statements

Products issued Senior Notes in a total principal amount of $500.0 million in December 2001. The Senior Notes are guaranteed by the Company and all of the Company's wholly owned domestic subsidiaries other than its receivable, insurance and charitable subsidiaries (Guarantor Subsidiaries). In conjunction with certain sale-leaseback transactions, Products has issued lease payment guarantees on behalf of certain guarantor and non-guarantor subsidiaries. Since these lease payments are guaranteed, the leases are treated as capital lease obligations in the separate financial statements of those subsidiaries, but eliminated for consolidated financial statement purposes. The following are consolidating financial statements of the Company, Products, and its guarantor and non-guarantor subsidiaries:

23

**SUPPLEMENTAL GUARANTOR CONDENSED CONSOLIDATION FINANCIAL STATEMENTS**

**CONSOLIDATING STATEMENT OF OPERATIONS**

For the Quarter Ended September 30, 2004

|  | Parent | Issuer | Guarantors | Non-Guarantors | Eliminations | Consolidated Total |
|---|---|---|---|---|---|---|
|  |  |  |  | (in millions) |  |  |
| Net sales | $ — | $ 73.7 | $413.1 | $388.2 | $(10.2) | $864.8 |
| Cost of goods sold | — | 52.5 | 393.1 | 365.4 | (10.2) | 800.8 |
| Selling, general and administrative expenses | — | 39.7 | (6.4) | 2.0 | (0.1) | 35.2 |
| Restructuring charge | — | 0.3 | 2.3 | 6.4 | — | 9.0 |
| Impairment of long-lived assets | — | — | 3.3 | 7.0 | — | 10.3 |
| Operating income (loss) | — | (18.8) | 20.8 | 7.4 | 0.1 | 9.5 |
| Interest expense, net of interest income | — | 43.7 | (0.1) | 3.8 | (0.5) | 46.9 |
| Interest expense from subsidiary preferred stock dividends | — | 10.5 | — |  |  | 10.5 |
| Interest expense from subsidiary preferred stock accretion | — | 0.6 | — | — | — | 0.6 |
| Intercompany interest | — | (2.7) | (4.5) | 7.2 | — | — |
| Loss (gain) on sale of receivables | — | (0.2) | — | 2.6 | — | 2.4 |
| Loss on early extinguishment of debt | — | 18.8 | — | — | — | 18.8 |
| Other expense (income), net | — | (1.0) | 3.2 | (2.1) | (0.8) | (0.7) |
| Income (loss) from continuing operations before income taxes | — | (88.5) | 22.2 | (4.1) | 1.4 | (69.0) |
| Income tax expense (benefit) | — | (33.5) | 9.2 | 10.9 | — | (13.4) |
| Income (loss) from continuing operations | — | (55.0) | 13.0 | (15.0) | 1.4 | (55.6) |
| Equity in net income (loss) of subsidiaries | (55.6) | (0.6) | (18.4) | — | 74.6 | — |
| Net income (loss) | $(55.6) | $(55.6) | $ (5.4) | $(15.0) | $ 76.0 | $ (55.6) |

24

**SUPPLEMENTAL GUARANTOR CONDENSED CONSOLIDATION FINANCIAL STATEMENTS**

**CONSOLIDATING STATEMENT OF OPERATIONS**

For the Quarter Ended September 30, 2003

| | Parent | Issuer | Guarantors | Non-Guarantors | Eliminations | Consolidated Total |
|---|---|---|---|---|---|---|
| | | | | (in millions) | | |
| Net sales | $ — | $ 74.3 | $388.4 | $448.4 | $(8.9) | $902.2 |
| Cost of goods sold | — | 51.9 | 342.3 | 426.8 | (8.9) | 812.1 |
| Selling, general and administrative expenses | — | 44.5 | 2.8 | 10.4 | — | 57.7 |
| Restructuring charge | — | 18.4 | 0.2 | 3.3 | — | 21.9 |
| Impairment of long-lived assets | — | 0.7 | — | 1.5 | — | 2.2 |
| Operating income (loss) | — | (41.2) | 43.1 | 6.4 | — | 8.3 |
| Interest expense, net of interest income | — | 35.6 | (0.2) | 2.4 | — | 37.8 |
| Interest expense from subsidiary preferred stock dividends | — | 9.2 | — | — | — | 9.2 |
| Interest expense from subsidiary preferred stock accretion | — | 0.4 | — | — | — | 0.4 |
| Intercompany interest | — | (4.1) | (4.2) | 8.3 | — | — |
| Loss on sale of receivables | — | — | — | 1.8 | — | 1.8 |
| Loss on early extinguishment of debt | — | — | — | — | — | — |
| Other expense (income), net | — | (2.3) | 4.5 | (2.6) | 0.2 | (0.2) |
| Income (loss) from continuing operations before income taxes | — | (80.0) | 43.0 | (3.5) | (0.2) | (40.7) |
| Income tax expense (benefit) | — | (22.7) | 19.9 | (5.8) | — | (8.6) |
| Income (loss) from continuing operations | — | (57.3) | 23.1 | 2.3 | (0.2) | (32.1) |
| Cumulative effect of change in accounting principle | — | (0.2) | — | 0.2 | — | — |
| Equity in net income (loss) of subsidiaries | (32.1) | 25.4 | (0.4) | — | 7.1 | — |
| Net income (loss) | $(32.1) | $(32.1) | $ 22.7 | $ 2.5 | $ 6.9 | $(32.1) |

25

**SUPPLEMENTAL GUARANTOR CONDENSED CONSOLIDATION FINANCIAL STATEMENTS**

**CONSOLIDATING STATEMENT OF OPERATIONS**

For the Nine Months Ended September 30, 2004

| | Parent | Issuer | Guarantors | Non-Guarantors | Eliminations | Consolidated Total |
|---|---|---|---|---|---|---|
| | | | | (in millions) | | |
| Net sales | $ — | $ 237.6 | $1,464.5 | $1,291.8 | $(26.4) | $2,967.5 |
| Cost of goods sold | — | 174.7 | 1,331.1 | 1,208.3 | (26.4) | 2,687.7 |
| Selling, general and administrative expenses | — | 160.3 | (24.9) | 1.9 | 7.4 | 144.7 |
| Restructuring charge | — | 6.0 | 6.3 | 16.6 | — | 28.9 |
| Impairment of long-lived assets | — | — | 28.6 | 12.1 | — | 40.7 |
| Operating income (loss) | — | (103.4) | 123.4 | 52.9 | (7.4) | 65.5 |
| Interest expense, net of interest income | — | 118.3 | (0.1) | 10.7 | (1.5) | 127.4 |
| Interest expense from subsidiary preferred stock dividends | — | 30.5 | — | — | | 30.5 |
| Interest expense from subsidiary preferred stock accretion | — | 1.6 | — | — | | 1.6 |
| Intercompany interest | — | (9.7) | (13.2) | 22.9 | — | — |
| Loss on sale of receivables | — | 0.1 | — | 7.1 | — | 7.2 |
| Loss on early extinguishment of debt | — | 20.3 | — | — | | 20.3 |
| Other expense (income), net | — | — | 11.3 | (6.5) | (0.7) | 4.1 |
| Income (loss) from continuing operations before income taxes | — | (264.5) | 125.4 | 18.7 | (5.2) | (125.6) |
| Income tax expense (benefit) | — | (70.8) | 47.9 | 5.9 | — | (17.0) |
| Income (loss) from continuing operations | — | (193.7) | 77.5 | 12.8 | (5.2) | (108.6) |
| Equity in net income (loss) of subsidiaries | (108.6) | 85.1 | 3.8 | — | 19.7 | — |
| Net income (loss) | $(108.6) | $(108.6) | $ 81.3 | $ 12.8 | $ 14.5 | $ (108.6) |

26

## SUPPLEMENTAL GUARANTOR CONDENSED CONSOLIDATION FINANCIAL STATEMENTS

### CONSOLIDATING STATEMENT OF OPERATIONS

**For the Nine Months Ended September 30, 2003**

| | Parent | Issuer | Guarantors | Non-Guarantors | Eliminations | Consolidated Total |
|---|---|---|---|---|---|---|
| | | | | (in millions) | | |
| Net sales | $  — | $ 237.5 | $1,585.7 | $1,167.6 | $(20.0) | $2,970.8 |
| Cost of goods sold | — | 167.7 | 1,410.5 | 1,100.1 | (20.0) | 2,658.3 |
| Selling, general and administrative expenses | 0.1 | 143.7 | 16.6 | 32.6 | — | 193.0 |
| Restructuring charge | — | 18.4 | 3.7 | 4.7 | — | 26.8 |
| Impairment of long-lived assets | — | 0.7 | 10.4 | 10.0 | — | 21.1 |
| Operating income (loss) | (0.1) | (93.0) | 144.5 | 20.2 | — | 71.6 |
| Interest expense, net of interest income | — | 106.4 | (0.2) | 5.1 | — | 111.3 |
| Interest expense from subsidiary preferred stock dividends | — | 22.4 | — | — | — | 22.4 |
| Interest expense from subsidiary preferred stock accretion | — | 4.8 | — | — | — | 4.8 |
| Intercompany interest | — | (17.8) | (13.5) | 31.3 | — | — |
| Loss on sale of receivables | — | — | — | 4.5 | — | 4.5 |
| Other expense (income), net | — | (1.8) | 16.6 | (39.8) | 1.1 | (23.9) |
| Income (loss) from continuing operations before income taxes | (0.1) | (207.0) | 141.6 | 19.1 | (1.1) | (47.5) |
| Income tax expense (benefit) | — | (55.9) | 52.1 | 3.9 | — | 0.1 |
| Income (loss) from continuing operations | (0.1) | (151.1) | 89.5 | 15.2 | (1.1) | (47.6) |
| Equity in net income (loss) of subsidiaries | (47.5) | 103.6 | (3.6) | — | (52.5) | — |
| Net income (loss) | $(47.6) | $ (47.5) | $   85.9 | $   15.2 | $(53.6) | $   (47.6) |

27

**SUPPLEMENTAL GUARANTOR CONDENSED CONSOLIDATION FINANCIAL STATEMENTS**

**CONSOLIDATING BALANCE SHEET**

|  | | As of September 30, 2004 | | | | |
|---|---|---|---|---|---|---|
|  | Parent | Issuer | Guarantors | Non-Guarantors | Eliminations | Consolidated Total |
|  | | | | (in millions) | | |
| **ASSETS** | | | | | | |
| Current Assets: | | | | | | |
| Cash and cash equivalents | $   — | $  (57.4) | $   58.9 | $    2.0 | $    — | $    3.5 |
| Accounts and other receivables, net | — | 8.0 | 55.2 | 189.6 | 2.3 | 255.1 |
| Inventories | — | 14.3 | 97.3 | 67.3 | (0.1) | 178.8 |
| Other | — | 37.7 | 113.5 | 65.9 | — | 217.1 |
| Total current assets | — | 2.6 | 324.9 | 324.8 | 2.2 | 654.5 |
| Investment in subsidiaries | 340.1 | 1,748.6 | (25.9) | — | (2,062.8) | — |
| Property, plant and equipment, net | — | 51.7 | 337.2 | 464.6 | (47.5) | 806.0 |
| Goodwill | — | — | 1,101.7 | 276.8 | — | 1,378.5 |
| Other assets | — | 277.5 | 15.8 | 64.4 | — | 357.7 |
|  | $340.1 | $2,080.4 | $1,753.7 | $1,130.6 | $(2,108.1) | $3,196.7 |
| **LIABILITIES & STOCKHOLDERS' EQUITY** | | | | | | |
| Current Liabilities: | | | | | | |
| Short-term borrowings | $   — | $    — | $    — | $   25.3 | $    — | $   25.3 |
| Current maturities of long-term debt and capital lease obligations | — | 5.1 | — | 3.4 | — | 8.5 |
| Accounts payable | — | 47.0 | 286.0 | 303.4 | (0.1) | 636.3 |
| Accrued expenses | — | 123.7 | 24.6 | 76.8 | — | 225.1 |
| Total current liabilities | — | 175.8 | 310.6 | 408.9 | (0.1) | 895.2 |
| Long-term debt and capital lease obligations | — | 1,355.9 | 5.9 | 40.8 | (41.4) | 1,361.2 |
| Mandatorily redeemable preferred stock of subsidiary | — | 193.3 | — | — | — | 193.3 |
| Intercompany payable (receivable) | — | (233.9) | (279.0) | 512.9 | — | — |
| Other, including pensions and post-retirement benefit obligation | — | 249.2 | 48.2 | 109.5 | — | 406.9 |
| Total liabilities | — | 1,740.3 | 85.7 | 1,072.1 | (41.5) | 2,856.6 |
| Total common stockholders' equity (deficit) | 340.1 | 340.1 | 1,668.0 | 58.5 | (2,066.6) | 340.1 |
|  | $340.1 | $2,080.4 | $1,753.7 | $1,130.6 | $(2,108.1) | $3,196.7 |

**SUPPLEMENTAL GUARANTOR CONDENSED CONSOLIDATION FINANCIAL STATEMENTS**

**CONSOLIDATING BALANCE SHEET**

As of December 31, 2003

|  | Parent | Issuer | Guarantors | Non-Guarantors | Eliminations | Consolidated Total |
|---|---|---|---|---|---|---|
|  |  |  | (in millions) |  |  |  |
| **ASSETS** |  |  |  |  |  |  |
| Current Assets: |  |  |  |  |  |  |
| Cash and cash equivalents | $    — | $  (71.2) | $  78.4 | $    6.0 | $    — | $   13.2 |
| Accounts and other receivables, net | — | 1.1 | 34.4 | 220.4 | 1.4 | 257.3 |
| Inventories | — | 14.2 | 96.2 | 59.0 | — | 169.4 |
| Other | — | 47.8 | 105.4 | 59.0 | — | 212.2 |
| Total current assets | — | (8.1) | 314.4 | 344.4 | 1.4 | 652.1 |
| Investment in subsidiaries | 440.3 | 1,655.0 | (1.6) | — | (2,093.7) | — |
| Property, plant and equipment, net | — | 55.9 | 348.1 | 442.8 | (12.7) | 834.1 |
| Goodwill | — | — | 948.9 | 414.2 | — | 1,363.1 |
| Other assets | — | 276.0 | 11.4 | 54.5 | — | 341.9 |
|  | $440.3 | $1,978.8 | $1,621.2 | $1,255.9 | $(2,105.0) | $3,191.2 |
| **LIABILITIES & STOCKHOLDERS' EQUITY** |  |  |  |  |  |  |
| Current Liabilities: |  |  |  |  |  |  |
| Short-term borrowings | $    — | $    — | $    — | $   16.0 | $    — | $   16.0 |
| Current maturities of long-term debt and capital lease obligations | — | 27.8 | 0.1 | 3.6 | — | 31.5 |
| Accounts payable | — | 46.0 | 301.4 | 291.5 | — | 638.9 |
| Accrued expenses | — | 146.9 | 2.2 | 90.4 | (0.6) | 238.9 |
| Total current liabilities | — | 220.7 | 303.7 | 401.5 | (0.6) | 925.3 |
| Long-term debt and capital lease obligations | — | 1,230.1 | — | 20.0 | (12.4) | 1,237.7 |
| Mandatorily redeemable preferred stock of subsidiary | — | 161.2 | — | — | — | 161.2 |
| Intercompany payable (receivable) | — | (317.3) | (215.7) | 533.0 | — | — |
| Other, including pensions and post-retirement benefit obligation | — | 243.8 | 74.9 | 108.0 | — | 426.7 |
| Total liabilities | — | 1,538.5 | 162.9 | 1,062.5 | (13.0) | 2,750.9 |
| Total common stockholders' equity (deficit) | 440.3 | 440.3 | 1,458.3 | 193.4 | (2,092.0) | 440.3 |
|  | $440.3 | $1,978.8 | $1,621.2 | $1,255.9 | $(2,105.0) | $3,191.2 |

29

**SUPPLEMENTAL GUARANTOR CONDENSED CONSOLIDATION FINANCIAL STATEMENTS**

**CONSOLIDATING STATEMENT OF CASH FLOWS**

| | Parent | Issuer | Guarantors | Non-Guarantors | Eliminations | Consolidated Total |
|---|---|---|---|---|---|---|
| | | | | (in millions) | | |
| **OPERATING ACTIVITIES** | | | | | | |
| Net cash provided by (used in) operating activities | $ — | $ 13.8 | $(43.9) | $ 21.2 | $ — | $ (8.9) |
| **INVESTING ACTIVITIES** | | | | | | |
| Additions to property, plant and equipment and other non-current assets | — | (3.3) | (62.7) | (85.3) | — | (151.3) |
| Sales of property, plant and equipment | — | — | 26.6 | 33.8 | — | 60.4 |
| Payments of acquisitions and related costs | — | — | (2.7) | (0.5) | — | (3.2) |
| Net cash used in investing activities | — | (3.3) | (38.8) | (52.0) | — | (94.1) |
| **FINANCING ACTIVITIES** | | | | | | |
| Issuance of long-term debt | — | 848.9 | — | — | — | 848.9 |
| Repayment of long-term debt | — | (799.7) | (0.1) | (2.8) | — | (802.6) |
| Payments for debt issuance costs | — | (15.6) | — | — | — | (15.6) |
| Decrease in short-term borrowings | — | — | — | 8.9 | — | 8.9 |
| Net borrowings (repayments) on revolving credit facilities | — | 53.1 | — | — | — | 53.1 |
| Intercompany transfers to (from) subsidiary | — | (83.4) | 63.3 | 20.1 | — | — |
| Net cash provided by financing activities | — | 3.3 | 63.2 | 26.2 | — | 92.7 |
| Effect of exchange rate changes on cash | — | — | — | 0.6 | — | 0.6 |
| Increase (decrease) in cash and cash equivalents | — | 13.8 | (19.5) | (4.0) | — | (9.7) |
| Cash and cash equivalents at beginning of period | — | (71.2) | 78.4 | 6.0 | — | 13.2 |
| Cash and cash equivalents at end of period | $ — | $ (57.4) | $ 58.9 | $ 2.0 | $ — | $ 3.5 |

For the Nine Months Ended September 30, 2004

30

**SUPPLEMENTAL GUARANTOR CONDENSED CONSOLIDATION FINANCIAL STATEMENTS**

## CONSOLIDATING STATEMENT OF CASH FLOWS

|  | For the Nine Months Ended September 30, 2003 | | | | | |
|---|---|---|---|---|---|---|
|  | Parent | Issuer | Guarantors | Non-Guarantors | Eliminations | Consolidated Total |
|  |  |  |  | (in millions) |  |  |
| **OPERATING ACTIVITIES** |  |  |  |  |  |  |
| Net cash provided by (used in) operating activities | $ — | $ 6.8 | $115.0 | $(77.8) | $ — | $ 44.0 |
| **INVESTING ACTIVITIES** |  |  |  |  |  |  |
| Additions to property, plant and equipment and other non-current assets | — | (11.7) | (54.9) | (53.3) | — | (119.9) |
| Sales of property, plant and equipment | — | — | 0.5 | 14.7 | — | 15.2 |
| Payments of acquisitions and related costs | — | — | (37.8) | — | — | (37.8) |
| Net cash used in investing activities | — | (11.7) | (92.2) | (38.6) | — | (142.5) |
| **FINANCING ACTIVITIES** |  |  |  |  |  |  |
| Issuance of long-term debt | — | — | — | — | — | — |
| Repayment of long-term debt | — | (21.6) | — | (0.8) | — | (22.4) |
| Decrease in short-term borrowings | — | — | — | 2.1 | — | 2.1 |
| Net borrowings (repayments) on revolving credit facilities | — | — | — | 58.5 | — | 58.5 |
| Intercompany transfers to (from) subsidiary | — | (21.4) | 26.2 | (4.8) | — | — |
| Net cash provided by (used in) financing activities | — | (43.0) | 26.2 | 55.0 | — | 38.2 |
| Effect of exchange rate changes on cash | — | — | — | 1.5 | — | 1.5 |
| Increase (decrease) in cash and cash equivalents | — | (47.9) | 49.0 | (59.9) | — | (58.8) |
| Cash and cash equivalents at beginning of period | — | 0.2 | 0.3 | 80.8 | — | 81.3 |
| Cash and cash equivalents at end of period | $ — | $(47.7) | $ 49.3 | $ 20.9 | $ — | $ 22.5 |

31

**Item 2.**    *Management's Discussion and Analysis of Financial Condition and Results of Operations*

## GENERAL

*The following discussion and analysis of our financial condition and results of operations includes statements concerning our expectations for our industry and our performance. These statements are forward-looking statements and are subject to numerous risks and uncertainties, including those highlighted elsewhere under "Cautionary Statements Concerning Forward-Looking Information and Risk Factors." Our actual results may differ materially from those contained or implied by the following discussion.*

### Introduction

The Company is a global leader in the design, engineering and manufacturing of automotive interior components, including instrument panels, fully assembled cockpit modules, floor and acoustic systems, automotive fabric and interior trim, as well as exterior trim and convertible roof systems. In reviewing the Company's results for the periods discussed, consideration should be given to the following critical events: the impact of the material acquisitions that we have made, the numerous restructuring and acquisition integration activities that we have undertaken, the material impact of general economic conditions in North America and within our industry specifically, the increasingly difficult customer and competitive environment, the capital intensive nature of our business and our high degree of leverage and liquidity and debt maturity position.

*Key Factors Impacting Our Reported Results.* Critical factors affecting our ability to succeed include the following:

- *Automotive Sales and OEM Production Levels.* In North America, the Company manufactures components for approximately 90% of all light vehicle production platforms. Sales are primarily made to North American based global OEMs, as well as Asian and European based global OEMs. The automotive supply industry in which the Company competes is cyclical and is influenced by the level of North American and Western European vehicle production. The Company's sales results are influenced heavily by the volume of OEM production of light vehicles ("builds") in the markets it serves. Industry wide NAFTA builds were down almost 1% for the quarter ended September 30, 2004 versus the same period of 2003 and were flat for the nine month comparable periods. Within NAFTA, the builds of the Big 3 OEM's were down approximately 4% and 3% for the quarter and nine month period over period, respectively. Industry wide, for Europe, third quarter and nine month builds were up 2% and 1% for 2004 compared to 2003, respectively, while builds in South America were up 30% for the third quarter and nine month period over period.

- *Our relationships with our customers.* Collins & Aikman does business with all of the world's largest vehicle manufacturers including Ford, General Motors, DaimlerChrysler, Toyota, Honda, Nissan, Volkswagen, Renault and Porsche. These relationships have typically developed over a period of many years, and have, in many cases, been enhanced by the Company's recent acquisitions, which have provided the Company with a resulting global footprint and capacity to supply a full range of interior products. In each case, there is a complex mutual dependency and cooperation between the Company and its customers necessary to ensure that vehicle programs are successful in key areas of quality, timing and cost. At the same time, customer expectations are evolving, as vehicle manufacturers continue to outsource more design and integration responsibilities to the Company and other Tier 1 suppliers. As a result, customer satisfaction, especially at critical inflexion points (such as new vehicle launches and vehicle refreshes), has become more complicated and places significant demands on the Company's resources. Also, there is an inherent tension between the Company and its customers resulting from intense competition and pricing pressures within the industry. For example, OEM customers in the automotive industry attempted to impose price decreases and givebacks. Such attempted price decreases were generally in the 2% to 4% range. Several reductions have been agreed to, and others are currently being negotiated with OEMs and pressures may increase if overall economic and industry conditions do not improve. Finally, on some vehicle programs involving component integration at the Tier 1-level, the Company is either a supplier to, or a customer of, some of its largest Tier 1 competitors, such as Delphi, Visteon and Lear. These types of arrangements are

becoming more common within the industry and add a new level of complexity to customer relationships, including the relationship with the vehicle manufacturer as the ultimate customer.

• *Our ability to secure profitable new business.* The Company actively pursues new business opportunities with its traditional customer base as well as with potential new customers. The Company seeks to distinguish itself on a variety of factors, including its global footprint, its capacity to supply a full range of interior products and its full-service capabilities (such as design, engineering, manufacturing and quality services). There is intense competition and pricing pressure on all of these opportunities. Price is typically achieved through direct negotiations with the customer, but in certain instances customers have utilized auctions or relied on benchmarking data that have included reputed world class suppliers in emerging markets. At the same time, the Company seeks to manage its cost structure through a variety of strategies, such as vertical integration initiatives that provide greater cost control opportunities. For example, since the Company is a major purchaser of raw materials like resins, it can arrange favorable supply contracts and benefit broadly from material science developments and product simplification. Additionally, the Company believes that it has the world's largest fleet of injection molding equipment for automotive products, which provides a unique ability to benefit from process improvements and best practices with respect to its plastics products on a global basis.

• *Our ability to successfully realize the benefits of our restructuring and integration initiatives.* The Company has undertaken a series of restructuring and integration initiatives to rationalize first its global manufacturing footprint and more recently its salaried workforce, including home office headcount. These activities are expected to have the following primary benefits: First, the Company has closed about 20 subscale plants and other facilities such as warehouses and consolidated activity into 80 world-class operations, which will result in a significant densification of production and resulting gains in fixed cost absorption and operating efficiencies. Second, the Company is beginning to win more "bundled" awards — with a full range of slush molded, injection molded and carpet, acoustics and fabric components on new vehicle programs. And third, the Company's salaried workforce will shrink by more than 20% from the legacy levels, while effectiveness and customer service levels will improve due to consolidation, standardization and level-loading of support infrastructure.

• *The impact of raw materials and energy costs.* The Company is a significant consumer of plastic resins and polyester and nylon fibers, which presents both a challenge and an opportunity for the Company. The challenge results from the Company's sensitivity to price movements in these raw materials (such as those related to recent short run spikes in the oil market), while the opportunity arises from the Company's ability to leverage its buying power as, in management's opinion, the largest single automotive grade resin buyer in the world. The Company has largely been able to avoid these pricing pressures due to its ability to negotiate with a variety of global suppliers and to shift volume from one supplier to another. However, it is possible that the Company may begin to see increased cost pressure if the spikes in the oil market continue. The Company's customers have historically been reluctant to provide pricing relief based on this type of raw material cost increases, as recently demonstrated in the handling of the recent near tripling of global steel prices.

• *Our liquidity and capital resources.* The Company is highly leveraged, due primarily to financing associated with recent acquisitions. Another contributing factor has been that most new business awards in the automotive industry require that suppliers advance certain costs relating to tooling and engineering and design services, which in some cases are incurred years before vehicle launch and are reimbursed over many years following vehicle launch as part of the piece price. In February 2004, the Company obtained amendments to its credit facilities that significantly loosened the principal financial covenants. The Company also obtained an additional revolving credit facility of $100 million and a new term loan in the amount of $185 million, the proceeds of which were used to pre-fund debt amortization requirements. As a result, the Company has greatly improved its financial flexibility and liquidity and has no significant amortization requirements until June 2005.

33

*Impact of Acquisitions.* Our results for the periods discussed have been impacted by several key acquisitions, which, together with related financing transactions, have substantially increased revenues and cash flow and materially altered the Company's capital and operating structure.

For example, in 2001, the Company completed three key acquisitions: (1) the acquisition of Becker Group L.L.C., a leading supplier of plastic components to the automotive industry, (2) the acquisition of Joan Automotive Fabrics, a leading supplier of body cloth to the automotive industry, and Joan's affiliated yarn dyeing operation, Western Avenue Dyers, L.P., and (3) the acquisition of Textron Automotive Company's Trim division (TAC-Trim), one of the largest suppliers of instrument panels and fully assembled cockpit modules and a major automotive plastics manufacturer of interior and exterior trim components in North America, Europe and South America. These acquisitions, together with the Company's 2002 acquisition of Southwest Laminates, a fabric lamination business, contributed approximately $2 billion of additional net sales in 2002 and drove the 113% increase in net sales from the prior year. In addition, these acquisitions were financed by varying combinations of the Company's common stock and preferred stock, warrants to purchase the Company's common stock, cash on hand and borrowings under a revolving credit facility, public issuances of debt and sales of the acquired companies' accounts receivable under the receivables facility.

The Company also completed the following acquisitions in 2002 and 2003: (1) the acquisition of Dutton Yarns' yarn texturizing business, (2) the acquisition of Delphi Corp.'s plastic injection molding plant and related equipment in Logroño, Spain, and (3) the acquisition from Textron of the remaining 50% interest of an Italian automotive joint venture. These transactions have likewise impacted the Company's financial results and capital structure, although not to the same degree as the transactions described above.

*Impact of Integration Activities and Restructuring Initiatives.* We have devoted considerable efforts beginning in 2001 to properly integrate the acquired companies. We have also implemented a series of restructuring initiatives to ensure that the resulting combined operations have the proper structure and necessary resources to perform on a profitable basis. These initiatives were directed initially at establishing a proper, global manufacturing footprint and included combining and rationalizing the Company's legacy and acquired operations in North America, Europe and South America. More recent restructuring initiatives have focused on developing an appropriate overhead structure, including strengthening and streamlining the senior management team on a worldwide basis. As a consequence of these restructuring initiatives, the Company has incurred significant restructuring and impairment charges in each of 2001, 2002, 2003 and 2004 for severance costs, plant and office closures, equipment and lease impairments, contractual obligations and other restructuring activities, which have impacted cash flow, operating income and net income. For a more detailed description of these charges, see Note 11, "Restructuring and Impairment."

*Key Indicators of Performance.* In evaluating our business, our management uses operating income as an important indicator of performance. In addition, management also considers EBITDA to be a useful proxy for measuring the cash generated by our business, and it is commonly used in the industry to analyze operating performance, liquidity and entity valuation. We define EBITDA as operating income plus depreciation and amortization. Management believes EBITDA to be a good measure of operating performance because cash generation is necessary for the Company to achieve many of the critical success factors outlined above, including investment in cost reduction activities, reducing leverage and improving liquidity. Additionally, management reviews return on invested capital, working capital changes and capital expenditures as critical financial performance metrics. Management also uses certain non-financial metrics of performance, including equipment utilization and efficiency; service, production and first time quality performance; set up and tool changeover time; employee turnover and absenteeism; and safety performance.

34

**Results of Operations**
(Dollars in millions)

*Quarter Ended September 30, 2004 versus Quarter Ended September 30, 2003*

Analysis of sales for each of our segments for the third quarter of 2004 and 2003 are as follows:

| | Quarter Ended September 30, | | | | | | |
|---|---|---|---|---|---|---|---|
| | Net Sales | | | | Composition of Dollar Change | | |
| | 2004 | 2003 | Dollar Change | % Change | Foreign Exchange Effects | Commercial Items(1) | Volume, Mix & Other(2) |
| U.S. and Mexico Plastics | $261.7 | $312.0 | $(50.3) | (16.1)% | $ — | $ (3.9) | $(46.4) |
| International Plastics | 319.6 | 273.8 | 45.8 | 16.7% | 21.2 | (3.7) | 28.3 |
| Global Soft Trim | 283.5 | 316.4 | (32.9) | (10.4)% | 4.5 | (6.5) | (30.9) |
| Other | — | — | — | — | — | — | — |
| Consolidated | $864.8 | $902.2 | $(37.4) | (4.1)% | $25.7 | $(14.1) | $(49.0) |

(1)   Commercial items include customer price increases and decreases affecting reported sales revenue.

(2)   Volume, Mix and Other is the remaining impact after excluding the effects of currency movements and commercial items

Overall sales revenue for the quarter declined primarily due to longer summer vacation shutdowns largely related to adjustments to dealer inventory levels and new model year changeover on several significant programs on which the Company was the incumbent supplier. The strengthening of the Euro, British Pound and Canadian dollar against the U.S. dollar since the third quarter of 2003 had a positive impact on our sales revenue. Several other factors decreasing third quarter revenue were competitive bidding, discontinued products and customer assembly plant production schedule adjustments on programs where the Company has significant content.

U.S. and Mexico Plastics experienced a sales decline resulting from the aforementioned items and a transfer of assembly content to an International Plastics segment location in Canada. This shift in content to Canada was part of a major new award of cockpit and sequencing business on a vehicle that launched in the first quarter of 2004.

In addition to the favorable currency gains mentioned above, International Plastics sales revenue increased due to volume growth for incremental cockpit and sequencing business. Also, a strategic initiative increased export business at our South American operations. A significant increase in third quarter volume on a major car platform in Europe also accounted for additional growth in sales revenue in the International Plastics segment.

Global Soft Trim segment sales declined primarily as a result of discontinued business. Along with the aforementioned items new model year changeovers also significantly reduced Global Soft Trim sales revenues.

35

*Gross Profit Analysis by Segment*

| | Quarter Ended September 30, | | | | | | | |
| | Gross Profit | | | | As a Percentage of Sales | | | |
| | 2004 | 2003 | Dollar Change | % Change | 2004 | 2003 | Increase (Decrease) | % Change |
|---|---|---|---|---|---|---|---|---|
| U.S. and Mexico Plastics | $14.3 | $27.3 | $(13.0) | (47.6)% | 5.5% | 8.8% | (3.3)% | (37.5)% |
| International Plastics | 18.2 | 14.3 | 3.9 | 27.3% | 5.7% | 5.2% | 0.5% | 9.6% |
| Global Soft Trim | 31.0 | 46.7 | (15.7) | (33.6)% | 10.9% | 14.8% | (3.9)% | (26.4)% |
| Other | 0.5 | 1.8 | (1.3) | (72.2)% | — | — | — | — |
| Consolidated | $64.0 | $90.1 | $(26.1) | (29.0)% | 7.4% | 10.0% | (2.6)% | (26.0)% |

Overall gross profit was impacted by the aforementioned decline in sales and higher lease costs due to the sale-leasebacks of buildings and equipment previously owned by the Company. Also, customer price reductions could not be offset by raw material cost savings to the extent previously expected due to higher costs for injection resins. Partially offsetting the decrease in gross profit was $4.6 million due to the termination of post-retirement benefits. To conform to the current year presentation, the 2003 amounts reflect a reclassification to costs of sales of $5.4 million in manufacturing facility lease costs previously recognized as selling, general and administrative expenses.

Gross profit at the U.S. and Mexico Plastics segment has decreased primarily due to the reduction in sales. Pressure in resin pricing resulted in higher material costs. These negative gross profit impacts, along with customer givebacks, were partially offset by positive influences from manufacturing efficiencies and savings from a plant closure.

The International Plastics segment's gross profit was positively impacted by the increase in their sales highlighted above, as well as material cost savings initiatives at several plants, partially offset by commercial items.

Global Soft Trim's gross profit decline was mainly due to the reduction in sales and commercial items, offset by savings realized from manufacturing efficiencies.

| | Quarter Ended September 30, | | |
| | 2004 | 2003 | Dollar Change |
|---|---|---|---|
| Selling, General and Administrative Expenses | $35.2 | $57.7 | $(22.5) |

Selling, general and administrative expenses decreased from 6.4% of sales in the third quarter 2003 to 4.1% in 2004. Contributing to the cost decrease were savings realized in connection with the salaried workforce restructuring programs and realization of the Company's cost cutting initiatives. Also impacting the decrease is the termination of post-retirement benefits, which per actuary calculations decreased selling, general and administrative expenses by $5.2 million.

*Restructuring Charges:* During the third quarter 2004, the Company continued its initiative to right size its overhead structure, further reduce salaried headcount and strengthen and streamline the senior management team on a worldwide basis resulting in a restructuring charge of $12.0 million. The 2004 third quarter charge included approximately $10.3 million of severance cost, affecting approximately 882 personnel and $1.7 million of costs related to the establishment of accruals for lease commitments and other exit costs. Offsetting the third quarter restructuring charge are adjustments to previously established accruals, not requiring cash outlays, totaling $3.0 million, resulting in a net expense of $9.0 million.

In the third quarter of 2003, the Company undertook a restructuring program to rationalize operations on a worldwide basis with the primary focus on domestic operations resulting in a restructuring charge of $21.9 million. The 2003 charge included approximately $16.8 million of severance cost and $5.1 million of costs related to the establishment of reserves for lease commitments and other exit costs.

*Impairment of Long-Lived Assets:* During the third quarter 2004, the Company recognized an $10.3 million write-down of fixed assets primarily related to the closing of an International Plastics plant totaling $7.0 million. The $3.3 million remaining fixed asset write down was related to Global Soft Trim locations.

In the third quarter 2003, the Company recognized a $2.2 million write-down of fixed assets related to an International Plastics location.

|  | Quarter Ended September 30, | | |
|---|---|---|---|
|  | 2004 | 2003 | Dollar Change |
| Operating Income | $9.5 | $8.3 | $1.2 |

The positive effect of lower selling, general and administrative costs along with a decrease in restructuring costs more than offset the decline in sales and gross profit described above. The net result was an increase in operating income of $1.2 million for the third quarter 2004 when compared to the same quarter in 2003.

|  | Quarter Ended September 30, | | |
|---|---|---|---|
|  | 2004 | 2003 | Dollar Change |
| Interest Expense | $46.9 | $37.8 | $9.1 |

The increase in interest expense is related to approximately $6.2 million of additional interest on the new Senior Subordinated Notes due 2012 as they overlapped for 41 days with the prior Senior Subordinated Notes due 2006 which were refinanced. The remainder of the increase is due to higher average debt balances period over period.

|  | Quarter Ended September 30, | | |
|---|---|---|---|
|  | 2004 | 2003 | Dollar Change |
| Loss on Sale of Receivables | $2.4 | $1.8 | $0.6 |

Throughout the normal course of business, receivables are sold to non-recourse facilities and through factoring arrangements, and a loss is recorded. The increase in loss is due to higher facility usage of existing agreements and new facilities entered into in 2004.

|  | Quarter Ended September 30, | | |
|---|---|---|---|
|  | 2004 | 2003 | Dollar Change |
| Other Expense (Income), Net | $(0.7) | $(0.2) | $(0.5) |

In the third quarter 2004, other expense (income), net included $2 million of foreign currency transaction gains, offset by minority interest share of gains of a consolidated subsidiary and losses related to derivatives used in the Company's foreign currency hedging strategy.

In the third quarter 2003, other expense (income), net primarily included $1 million of losses related to credit default swaps used in the Company's U.S. accounts receivable securitization program, offset by minority interest in a consolidated subsidiary of $2 million.

|  | Quarter Ended September 30, | | |
|---|---|---|---|
|  | 2004 | 2003 | Dollar Change |
| Income Tax Benefit | $(13.4) | $(8.6) | $(4.8) |

The primary reasons for the Company's effective tax rate being different from its statutory rate are non-deductible preferred stock interest and accretion, foreign losses for which tax benefits are not recognized and

state and foreign taxes that do not fluctuate directly with income, partially offset by the effect of intercompany financing and tax credits. Net cash taxes paid during the period were $2.3 million

*Nine Months Ended September 30, 2004 versus Nine Months Ended September 30, 2003*

Analysis of sales for each of our segments for the first nine months of 2004 and 2003 are as follows:

| | Nine Months Ended September 30, | | | | | | |
| | Net Sales | | | | Composition of Dollar Change | | |
| | 2004 | 2003 | Dollar Change | % Change | Foreign Exchange Effects | Commercial Items(1) | Volume, Mix & Other(2) |
|---|---|---|---|---|---|---|---|
| U.S. and Mexico Plastics | $ 947.6 | $1,018.2 | $(70.6) | (6.9)% | $ — | $(15.6) | $(55.0) |
| International Plastics | 1,072.8 | 917.9 | 154.9 | 16.9% | 89.8 | (10.0) | 75.1 |
| Global Soft Trim | 947.1 | 1,034.7 | (87.6) | (8.5)% | 17.9 | (16.8) | (88.7) |
| Other | — | — | — | — | — | — | — |
| Consolidated | $2,967.5 | $2,970.8 | $ (3.3) | (0.1)% | $107.7 | $(42.4) | $(68.6) |

(1)   Commercial items include customer price increases and decreases affecting reported sales revenue.

(2)   Volume, mix and Other is the remaining impact after excluding the effects of currency movements and commercial items

Total sales for the nine months ended September 30, 2004 when compared to the same 2003 period were relatively flat. New program launches and the strengthening of the Euro, British Pound and Canadian dollar against the U.S. dollar during the first nine months of 2004 compared to 2003 had a positive impact on our sales revenue. The negative volume mix change relates to elevated dealer inventory levels, competitive bidding, discontinued products and new model year changeover on several large programs on which the Company is the incumbent supplier. Finally, customer assembly plant production schedule adjustments on programs where the Company has significant content had a negative effect on sales.

U.S. and Mexico Plastics experienced a sales decline resulting from the aforementioned items and a transfer of assembly content to an International Plastics segment location in Canada. This shift in content to Canada was part of a major new award of cockpit and sequencing business on a vehicle that launched in the first quarter of 2004. Partially offsetting these decreases was new business from a major new program launch.

In addition to the favorable currency gains mentioned above, International Plastics sales revenue increased due to volume growth for incremental cockpit and sequencing business. Also, a strategic initiative increased export business at our South American operations. A 20% increase in third quarter volume on a major car platform in Europe also accounted for additional growth in sales revenue in the International Plastics segment.

Global Soft Trim segment sales declined primarily as a result of discontinued business. Along with the aforementioned items, new model year changeovers also significantly reduced Soft Trim sales revenues.

38

*Gross Profit Analysis by Segment*

| | Nine Months Ended September 30, | | | | | | | |
| | Gross Profit | | | | As a Percentage of Sales | | | |
| | 2004 | 2003 | Dollar Change | % Change | 2004 | 2003 | Increase (Decrease) | % Change |
|---|---|---|---|---|---|---|---|---|
| U.S. and Mexico Plastics | $ 78.0 | $ 94.7 | $(16.7) | (17.6)% | 8.2% | 9.3% | (1.1)% | (11.8)% |
| International Plastics | 62.8 | 35.4 | 27.4 | 77.4% | 5.9% | 3.9% | 2.0% | 51.3% |
| Global Soft Trim | 137.2 | 179.3 | (42.1) | (23.5)% | 14.5% | 17.3% | (2.8)% | (16.2)% |
| Other | 1.8 | 3.1 | (1.3) | (41.9)% | — | — | — | — |
| Consolidated | $279.8 | $312.5 | $(32.7) | (10.5)% | 9.4% | 10.5% | (1.1)% | (10.5)% |

Overall gross profit was impacted by the aforementioned decline in sales and higher lease costs from sale-leasebacks of buildings and equipment. Partially offsetting the decrease in gross profit was $4.6 million due to the termination of post-retirement benefits. To conform to the current year presentation, the 2003 amounts reflect a reclassification to cost of sales of $17.1 million in manufacturing facility lease costs previously recognized as selling, general and administrative expenses.

Gross profit at the U.S. and Mexico Plastics segment has decreased primarily due to the reduction in sales. Pressure in resin pricing resulted in higher material costs. These negative gross profit impacts, along with customer givebacks, were partially offset by positive influences from manufacturing efficiencies and savings from a plant closure.

The International Plastics segment's gross profit was positively impacted by their sales highlighted above, as well as manufacturing efficiencies and material cost savings initiatives at several plants, partially offset by commercial items.

Global Soft Trim's gross profit decline was mainly due to the reduction in sales, commercial items and material price increases, offset by savings realized from manufacturing efficiencies

| | Nine Months Ended September 30, | | |
| | 2004 | 2003 | Dollar Change |
|---|---|---|---|
| Selling, General and Administrative Expenses | $144.7 | $193.0 | $(48.3) |

Selling, general and administrative expenses decreased from 6.5% of sales in the first nine months of 2003 to 4.9% in the comparable period of 2004. Contributing to the cost decrease were savings realized in connection with the salaried workforce restructuring programs and realization of the Company's cost cutting initiatives. Also impacting the decrease is the termination of post-retirement benefits, which per actuary calculations decreased selling, general and administrative expenses by $5.2 million.

*Restructuring Charges:* During the third quarter 2004, the Company continued its initiative to right size its overhead structure, further reduce salaried headcount and strengthen and streamline the senior management team on a worldwide basis resulting in a restructuring charge of $12.0 million. The third quarter 2004 charge included $10.3 million of severance cost, affecting approximately 882 personnel and $1.7 million of costs related to the establishment of accruals for lease commitments and other exit costs. Offsetting the third quarter restructuring charge are adjustments to previously established accruals not requiring a cash outlay totaling $3.0 million, resulting in a net expense of $9.0 million.

In the second quarter 2004, the Company undertook a restructuring program to right size its overhead structure, further reduce salaried headcount and strengthen and streamline the senior management team on a worldwide basis resulting in a restructuring charge of $10.4 million. The 2004 charge included approximately $9.1 million of severance cost, affecting approximately 550 personnel and $1.3 million of costs related to the establishment of accruals for lease commitments and other exit costs.

The Company under took a restructuring program costing $9.5 million in the first quarter of 2004. The 2004 charge included $7.6 million of severance cost and $1.8 million of other exit costs and affected approximately 260 personnel. Also included in the restructuring charge are expenses related to 2003 programs of $1.1 million, offset by an adjustment related to a previously established accrual, which did not require cash outlays of $1.0 million.

During the third quarter 2003, the Company undertook a restructuring program to rationalize operations on a worldwide basis with the primary focus on domestic operations resulting in restructuring charge of $21.9 million. The 2003 charge included approximately $16.8 million of severance cost and $5.1 million of costs related to the establishment of reserves for lease commitments and other exit costs.

During the second quarter 2003, the Company undertook a restructuring program to rationalize operations on a worldwide basis with the primary focus on domestic operations resulting in a restructuring charge of $4.9 million. The 2003 charge included approximately $4.2 million of severance cost and $0.7 million of costs related to the establishment of reserves for lease commitments and other exit costs.

*Impairment of Long-Lived Assets:* During the third quarter 2004, the Company recognized an $10.3 million write-down of fixed assets primarily related to the closing of an International Plastics plant totaling $7.0 million. The $3.3 million remaining fixed asset write down was related to Global Soft Trim locations.

In the second quarter 2004, the Company recognized a $27.4 million write-down of fixed assets primarily related to the Company impairing $13.6 million of Intellimold assets, including a $2.7 million patent, a finite intangible asset, acquired as part of the TAC-Trim acquisition. Additionally, the Company impaired $11.0 million of customer contracts as a result of changes in customer sourcing. The $2.8 million remaining fixed asset write down was related primarily to Global Soft Trim locations.

During the first quarter 2004, the Company recognized a $3.0 million write-down of fixed assets as a result of the first quarter restructuring program.

Throughout the nine months ended September 30, 2003, the Company recognized a $10.7 million write-down of fixed assets, $7.7 million of which related to the initial 50% interest acquired in an Italian joint venture and $3.0 million related to an International Plastics location. The Company also recognized a $10.4 million impairment of the Becker non-compete agreement.

|  | Nine Months Ended September 30, | | |
|  | 2004 | 2003 | Dollar Change |
|---|---|---|---|
| Operating Income | $65.5 | $71.6 | $(6.1) |

The positive effect of lower selling, general and administrative costs partially offset the increase in restructuring costs and the decline in sales and gross profit described above. The net result was a decrease in operating income of $6.1 million for the nine months ended September 30, 2004 when compared to the same period in 2003.

|  | Nine Months Ended September 30, | | |
|  | 2004 | 2003 | Dollar Change |
|---|---|---|---|
| Interest Expense | $127.4 | $111.3 | $16.1 |

The increase in interest expense is related to approximately $6.2 million of additional interest on the new Senior Subordinated Notes due 2012 as they overlapped for 41 days with the prior Senior Subordinated Notes due 2006 which were refinanced. The remainder of the increase is due to higher average debt balances period over period and additional amortization of financing fees.

|  | Nine Months Ended September 30, | | |
|  | 2004 | 2003 | Dollar Change |
|---|---|---|---|
| Loss on Sale of Receivables | $7.2 | $4.5 | $2.7 |

Throughout the normal course of business, receivables are sold to non-recourse facilities and through factoring arrangements, and a loss is recorded. The increase in loss is due to higher facility usage of existing agreements and new facilities entered into in 2004.

| | Nine Months Ended September 30, | | |
| | 2004 | 2003 | Dollar Change |
| --- | --- | --- | --- |
| Other Expense (Income), Net | $4.1 | $(23.9) | $28.0 |

In the nine months ended September 30, 2004, other expense (income), net included $4 million of foreign currency transaction losses and $2 million of losses related to derivatives used in the Company's foreign currency hedging strategy, offset by minority interest share of losses of a consolidated subsidiary of $2 million.

In the nine months ended September 30, 2003, other expense (income), net primarily included $24 million of foreign currency transaction gains and minority interest share of losses of a consolidated subsidiary of $4 million primarily offset by $3 million of losses related to derivatives used in the Company's hedging strategies.

| | Nine Months Ended September 30, | | |
| | 2004 | 2003 | Dollar Change |
| --- | --- | --- | --- |
| Income Tax Expense (Benefit) | $(17.0) | $0.1 | $(17.1) |

The primary reasons for the Company's effective tax rate being different from its statutory rate are non-deductible preferred stock interest and accretion, foreign losses for which tax benefits are not recognized and state and foreign taxes that do not fluctuate directly with income, partially offset by the effect of intercompany financing and tax credits. Net cash taxes paid during the period were $7.6 million

**Liquidity and Capital Resources**

The Company and its subsidiaries had cash and cash equivalents totaling $3.5 million and $13.2 million at September 30, 2004 and December 31, 2003, respectively.

The Company's principal sources of funds are cash generated from operating activities and borrowings under its revolving credit facilities, receivables arrangements and sale leaseback arrangements. In addition, to facilitate the collection of funds from operating activities, the Company has sold receivables under its receivables facility and has also entered into accelerated payment collection programs with its larger customers. If those additional liquidity sources were to become unavailable or limited by customer concentration or credit quality or otherwise, the Company would require additional capital, access to which is not assured.

The Company believes that cash flow from operations, together with its revolving credit facilities, receivables arrangements, leasing arrangements and cash generations projects will provide adequate sources of liquidity to fund operations. The Company continues to seek means to generate additional cash for debt reduction and its growth strategy. Among its potential cash generation projects, the Company seeks to further improve working capital management (including factoring of receivables) and to continue to utilize lease financings.

Aggregate unutilized availability under the Company's financing facilities at September 30, 2004 was $182.7 million, consisting of $163.2 million under the Company's senior secured credit facilities and $19.5 million under uncommitted bank facilities in foreign locations. At September 30, 2004 the Company's receivables facility was fully drawn relative to available collateral. Limitations on the Company's availability are based on financial performance and target levels established by the covenants. At September 30, 2004, of the $182.7 million in aggregate unutilized availability under the facilities, $6.8 million would not have been

41

available due to covenant constraints. As of September 30, 2004, the Company believes it is in compliance with all covenants under our various obligations.

The Company was recently informed that certain of the accelerated payment collection programs with its larger customers will be discontinued in 2005 and that one of those customers, Ford Motor Company, intends to phase out its accelerated payment collection program from September 2004 through December 2004. At September 30, 2004, the Company had approximately $10.2 million collected under the Ford program. These programs have materially enhanced our liquidity in the past. At September 30, 2004, the Company had approximately $130.9 million collected under these arrangements, including the Ford program. The impact of the discontinuance of these programs is expected to be partially offset by a greater utilization of our existing $250 million accounts receivable securitization facility. The existing receivables facility expires on December 20, 2004, and the Company expects to have a multi-year replacement facility established before that time. The Company will also consider replacement accelerated payment programs offered on behalf of our customers or through other financial intermediaries. However, we may not be able to timely or fully replace these arrangements, and the new terms of any such program may be less advantageous than current arrangements. If the Company is unable to replace these arrangements, it could adversely affect its liquidity under its senior secured credit facilities.

### Operating Activities

Net cash used in operating activities was $8.9 million for the nine months ended September 30, 2004, compared to net cash provided by operating activities of $44.0 million for the nine months ended September 30, 2003. The 2004 decrease is primarily the result of an increase in net loss, an increase in accounts receivable and increases in other assets, offset by improvements in working capital changes, an increase in proceeds from participating interests in accounts receivable, and a decrease in accounts receivable factored.

### Investing Activities

Net cash used in investing activities was $94.1 million for the nine months ended September 30, 2004, compared to $142.5 million for the nine months ended September 30, 2003. The decrease in cash used in investing activities is primarily the result of receiving $45.2 million more of proceeds from the sale of property, plant and equipment primarily sale-leaseback transactions and a decrease of $34.6 million of business acquisition costs offset by $31.4 million more of capital expenditures.

### Financing Activities

Net cash provided by financing activities for the nine months ended September 30, 2004 was $92.7 million compared to net cash provided by financing activities for the nine months ended September 30, 2003 of $38.2 million. This increase in cash provided from financing activities is the result of $54.5 million increase in net borrowings.

In the third quarter of 2004, the Company refinanced its existing senior secured credit facilities in order to extend debt maturities and enhance financial and operating flexibility. Through a syndicate of financial institutions the Company entered into debt agreements for a 5 year $105 million revolving credit facility and a 5 year $170 million supplemental credit facility. In addition, the Company issued $415 million aggregate principal amount of 12 7/8% Senior Subordinated Notes due 2012 at a $14.7 million discount.

The Company incurred an $18.8 million loss on debt extinguishment as a result of these transactions due primarily to the write-off of existing debt issuance costs. The proceeds of the new financing were primarily used to repay outstanding borrowings under the prior Senior Subordinated Notes and pay fees and expenses related to the refinancing. The remaining proceeds were used for general corporate purposes.

During the first quarter of 2004, in conjunction with the fifth amendment to its Senior Secured Credit Facilities, the Company recognized a $1.5 million loss on early extinguishment of debt.

## Outlook

To further enhance North American automobile revenues, OEM's continue to offer incentives to increase sales volumes. However, sales for the fourth quarter of 2004 are projected to be 5%-10% lower than the prior

42

year primarily due to reduced OEM production levels and inventory adjustments on several vehicle platforms in North America and Europe.

The Company's principal uses of funds from operating activities and borrowings for the next several years are expected to fund interest and principal payments on its indebtedness, growth related working capital increases, capital expenditures, product launches and lease expenses. Consistent with the automotive supply industry, the Company continues to experience significant competitive pressure and expects to face continued downward cost pressure from vehicle manufacturers. The Company has an ongoing aggressive plan to improve the various operating performance at all of its facilities. While improvements are being made, further work remains to bring all plants to a profitable level on a continuing basis. In addition, the Company recently confirmed its strategy for new business, which involves pursuing sales growth based on criteria intended to more effectively allocate the Company's resources to the most promising new business opportunities. As part of this strategy, the Company reviewed its parts profitability for each plant and program worldwide.

Management believes cash flow from operations, together with its revolving credit facility, receivables arrangements and sale and leaseback arrangements will provide adequate sources of liquidity for the Company to fund its operations. However, the Company's sources of liquidity may be inadequate if the Company is unable to meet its operating targets, which would cause the Company to seek covenant relief from its existing lenders in the near future. In addition, matters affecting the credit quality of our significant customers could adversely impact the availability of our receivables arrangements and our liquidity. The Company continues to explore other sources of liquidity, including additional debt, but existing debt instruments may limit the Company's ability to incur additional debt, and the Company may be unable to secure equity or other financing.

We continually discuss commercial issues and broader relationship issues with our customers. While we seek to improve the profitability of our programs with our customers, there can be no assurance that we will not lose desirable programs over time. While we continue to believe that issues will be resolved to the mutual satisfaction of the parties on an ongoing basis, there can be no assurances that such a resolution will be timely obtained or, whether or not obtained, will not have a material adverse impact on us.

*Contractual Obligations*

Below is the table that identifies the Company's significant contractual obligations. Following the table is a more detailed description of these obligations.

|  | Payment due by Period | | | | |
|---|---|---|---|---|---|
|  | Total | Less than 1 Year | 1-3 Years | 4-5 Years | After 5 Years |
|  |  |  | (In millions) |  |  |
| Short-term borrowings | $    25.3 | $  25.3 | $    — | $    — | $    — |
| Long-term debt and capital lease obligations | 1,369.7 | 8.5 | 13.5 | 67.4 | 1,280.3 |
| Preferred stock(a) | 193.3 | — | — | — | 193.3 |
| Operating leases(b) | 371.2 | 27.0 | 86.1 | 76.0 | 182.1 |
| Environmental reserves | 45.7 | 2.0 | 20.4 | 9.3 | 14.0 |
| Capital expenditure commitments | 69.0 | 69.0 | — | — | — |
| Total obligations | $2,074.2 | $131.8 | $120.0 | $152.7 | $1,669.7 |

(a)  Mandatorily Redeemable Preferred Stock of Subsidiary

(b)  Includes operating leases related to restructuring charges. See Note 11, "Restructuring and Impairment." In addition to the operating lease obligations, at the end of the Textron Leasing Transaction for certain equipment leases (including the expiration of all renewal options), the Company is required to guarantee a minimum value of the equipment to the lessor of up to approximately $21 million.

43

*Capital Expenditures:* The Company incurs capital expenditures on a recurring basis for replacements and improvements. During the nine months ended September 30, 2004, the Company had approximately $151.3 million in capital expenditures for continuing operations. Capital expenditures in future years will depend upon demand for the Company's products and changes in technology.

Estimates for capital expenditures in 2004 range from approximately $175 to $185 million. A portion of capital expenditures are expected to be financed through leasing arrangements.

### *Other Commitments*

As of September 30, 2004, the Company's continuing operations had approximately $69.0 million in outstanding capital expenditure commitments. The majority of the leased properties of the Company's previously divested businesses have been assigned to third parties. Although releases have been obtained from the lessors of certain properties, Products remains contingently liable under most of the leases. Products' future liability for these leases, in management's opinion, based on the facts presently known to it, will not have a material effect on the Company's consolidated financial condition, future results of operations or cash flows.

## Safe Harbor Statement

This Report on Form 10-Q contains "forward-looking" information, as that term is defined by the federal securities laws, about our financial condition, results of operations and business. You can find many of these statements by looking for words such as "may," "will," "expect," "anticipate," "believe," "estimate," "should," "continue," "predict" and similar words used in this Form 10-Q. The forward-looking statements in this Form 10-Q are intended to be subject to the safe harbor protection provided by the federal securities laws.

These forward-looking statements are subject to numerous assumptions, risks and uncertainties (including trade relations and competition). Because the statements are subject to risks and uncertainties, actual results may differ materially from those expressed or implied by the forward-looking statements. We caution readers not to place undue reliance on the statements, which speak only as of the date of this Quarterly Report.

The cautionary statements set forth above should be considered in connection with any subsequent written or oral forward-looking statements that the Company or persons acting on its behalf may issue. The Company does not undertake any obligation to review or confirm analysts' expectations or estimates or to release publicly any revisions to any forward-looking statements to reflect events or circumstances after the date of this report or to reflect the occurrence of unanticipated events.

This Quarterly Report contains forward-looking statements within the meaning of the Private Securities Litigation Reform Act of 1995. Actual results and events may differ materially from those that are anticipated because of certain risks and uncertainties, including, but not limited to, general economic conditions in the markets in which the Company operates and industry based factors such as:

• declines in the North American, South American and European automobile and light truck builds,

• labor costs and strikes at the Company's major customers and at the Company's facilities,

• fluctuations in the production of vehicles for which we are a supplier,

• changes in the popularity of particular car models, particular interior trim packages or the loss of programs on particular vehicle models,

• dependence on significant automotive customers,

• the level of competition in the automotive supply industry and pricing pressure from automotive customers,

• risks associated with conducting business in foreign countries and

44

• fluctuation in the price of certain raw materials, including resins and other petroleum-based products, and steel.

For a discussion of certain of these and other important factors which may affect the Company's operations, products and markets, see our Annual Report on Form 10-K filed with the Securities and Exchange Commission on March 16, 2004, and our other filings with the Securities and Exchange Commission.

## Item 3.    *Quantitative and Qualitative Disclosures About Market Risk*

### Foreign Currency and Interest Rate Risk Management

The Company operates on a global basis and is exposed to the risk that its earnings, cash flows and stockholders' equity could be adversely impacted by fluctuations in currency exchange rates and interest rates. To manage the volatility relating to these exposures, the Company aggregates the exposures on a consolidated basis to take advantage of natural offsets. For exposures that are not offset within its operations, the Company may enter into various derivative transactions pursuant to its risk management policies. The primary purpose of the Company's foreign currency and interest rate risk management policies and activities is to manage these risks to acceptable levels.

To manage its risks, the Company primarily utilizes forward exchange contracts and purchased options with durations of generally less than 12 months. The Company has in place forward exchange contracts and purchased options with third parties, denominated in multiple currencies, which will mature during fiscal 2004. The details are as follows (amounts in millions, except average contract rate):

| Derivative Type | Currency Sold | Currency Purchased | USD Equivalent of Notional Amount | Weighted Average Contract Rate (per Convention) | Unrealized Gain/(Loss) |
|---|---|---|---|---|---|
| Options | CAD | USD | $50.0 | 1.50 CAD per USD | $0.1 |

In order to manage the interest rate risk associated with our debt portfolio, the Company may enter into derivative transactions to manage its exposures to changes in global interest rates, although the Company did not have in place any interest rate derivatives at September 30, 2004.

Gains and losses on derivatives qualifying as hedges under SFAS No. 133 "Accounting for Derivative Instruments and Hedging Activities" are recorded on the balance sheet as a component of "Accumulated other comprehensive loss" to the extent that the hedges are effective until the underlying transactions are recognized in earnings. As of September 30, 2004, the Company had no derivatives designated as hedges under SFAS No. 133. Gains and losses from all derivatives that do not qualify as hedges under SFAS No. 133 are recorded in the income statement as required by SFAS No. 133, and the fair value is recorded in the balance sheet.

### Concentration of Credit Risk

In the normal course of business, the Company provides credit to its customers who are concentrated in the automotive industry, performs credit evaluations of these customers and maintains reserves for potential credit losses. When realized, the losses have been within the range of management's allowance for doubtful accounts.

### Other Concentrations of Risk

The Company invests the majority of its excess cash in money market accounts and, where appropriate, diversifies the concentration of cash among financial institutions. With respect to financial institutions, the Company has diversified its selection of counterparties and has arranged master-netting agreements, where allowed by law and the Company's policies, to minimize the risk of loss.

45

**Item 4.**     *Controls and Procedures*

### a. Evaluation of disclosure controls and procedures:

We maintain disclosure controls and procedures designed to ensure that both non-financial and financial information required to be disclosed in our periodic reports is recorded, processed, summarized and reported as and when required. Based on our third quarter evaluation, our principal executive officer and principal financial officer have concluded that our disclosure controls and procedures are effective as of the end of the period covered by this report.

### b. Changes and modifications in internal controls:

We are currently undertaking a comprehensive assessment of our internal controls for financial reporting in connection with Section 404 of the Sarbanes-Oxley Act of 2002. This assessment consists of evaluating and testing applicable controls, and, as control deficiencies are identified, remediating the deficiency and then verifying the new or modified control. The scope of our assessment includes our plant and corporate operations worldwide and covers, among other things, assessments of inventory, revenue, purchasing, payroll, fixed assets, accounting and reporting cycles, information technologies general controls and business process application controls.

During the course of our evaluation, we have identified certain control deficiencies, including reviews of non-routine journal entries, account reconciliations and supporting documentation, reviews of financial data sourced from manual spreadsheets, segregation of duties, system access and user authorization, and business process application controls. Our independent auditors, KPMG LLP, previously identified certain of these items as reportable conditions in connection with the completion of their audit of our 2003 financial information. We believe that these deficiencies are primarily attributable to reduction-in-force cost reduction initiatives and residual process harmonization and personnel integration issues from prior acquisitions.

We do not believe that any of the deficiencies identified to date constitute material weaknesses in our internal controls over financial reporting. Further, while we have identified various compensating controls that mitigate the risks associated with these deficiencies, we are nevertheless implementing rigorous remediation plans to improve each of these deficiencies through new or modified controls, and we have supplemented our internal project team with the services of several outside specialists for this task.

Some of the required remediation efforts have been completed. For example, we have adopted new control procedures to catalog manual spreadsheets used as sources for financial reporting and to centralize lease contracts with related lease data to facilitate periodic reconciliations at the corporate and plant levels. We have also initiated modifications of certain existing internal controls, such as new documentation requirements of relevant business process controls — to ensure information technology applications are processing data as intended — and information technologies general controls. System access and user authorization controls are also being enhanced.

We have made our assessment of our internal controls for financial reporting a top priority and are committed to continuously refining and improving our internal control procedures. However, there can be no assurances that all control deficiencies identified and validated will be remediated before the end of our fiscal year or that the remaining unresolved control deficiencies, or control deficiencies that we may subsequently identify, will not rise to the level of material weaknesses.

46

*c. Changes in Audit Committee:*

Effective September 29, 2004, Anthony Hardwick and Richard C. Jelinek were appointed to the Board of Directors of the Company. Mr. Hardwick was also appointed to the Audit Committee of the Board of Directors, and Mr. Jelinek was also appointed to the Compensation Committee (as Chairman) and Nominating and Governance Committee of the Board of Directors.

Mr. Hardwick and Mr. Jelinek, both of whom the Board of Directors has determined are "independent", are replacing Samuel Valenti III and Cynthia L. Hess, who resigned as directors of the Company to accommodate the restructuring of the Company's board to meet the new independence requirements.

## PART II — OTHER INFORMATION

**Item 1.**   *Legal Proceedings*

The Company and its subsidiaries have lawsuits and claims pending against them and have certain guarantees outstanding, which were made in the ordinary course of business.

As of September 30, 2004, the Company was a party to approximately 1,102 pending cases alleging personal injury from exposure to asbestos containing materials used in boilers manufactured before 1966 by former operations of the Company which were sold in 1966. Asbestos-containing refractory bricks lined the boilers and, in some instances, the Company's former operations installed asbestos-containing insulation around the boilers. These pending cases do not include cases that have been dismissed or are subject to agreements to dismiss due to the inability of the plaintiffs to establish exposure to a relevant product and cases that have been settled or are subject to settlement agreements. Total settlement costs for these cases have been less than $1.3 million or an average of less than $6,250 per settled case. The defense and settlement costs have been substantially covered by the Company's primary insurance carriers under a claims handling agreement that expires in August 2006. The Company has primary, excess and umbrella insurance coverage for various periods available for asbestos-related boiler and other claims. The Company's primary carriers have agreed to cover approximately 80% of certain defense and settlement costs up to a limit of approximately $70.5 million for all claims made, subject to reservations of rights. The excess insurance coverage, which varies in availability from year to year, is approximately $615 million in aggregate for all claims made. The coverage may be impacted by matters described below. Based on the age of the boilers, the nature of the claims and settlements made to date and the insurance coverage, management does not believe that these cases will have a material impact on the Company's financial condition, results of operations or cash flows. However, the Company cannot assure that it will not be subjected to significant additional claims in the future in respect of these or other matters for which the insurance could be utilized, that insurance will be available as expected, that the matters described below may not impact the Company's coverage or that unanticipated damages or settlements in the future would not exceed insurance coverage.

In 1988, the Company divested its retail lumber and building materials business to Wickes Lumber Co. (now Wickes Inc.), which filed a voluntary petition for reorganization under Chapter 11 of the U.S. Bankruptcy Code in early 2004. As part of this divestiture, Wickes assumed responsibility for all liabilities associated with this business, including those associated with certain asbestos-related claims, and the Company agreed to give them access to its general liability insurance policies for such liabilities. These are, in several instances, the same policies referred to in the preceding paragraph. Wickes has been making claims against these policies for settlements of asbestos-related claims that it has characterized as insignificant as of late 2003 in its filings with the Securities and Exchange Commission. The Company has agreed to suspend making claims for other than defense costs to permit agreement upon a framework within the bankruptcy proceedings or otherwise for coordinating these claims as between the Company and Wickes. It is possible that resolution of these issues will await confirmation of a plan of reorganization for Wickes and that an equitable portion of the insurance will be made available for Wickes asbestos or other claimants, thereby reducing the coverage available to the Company for its own claims. Based upon the information available to the Company concerning Wickes' claims history, management does not believe these matters will materially and adversely affect the Company.

47

A purported class action was filed on March 24, 2003 in the United States District Court for the Eastern District of Michigan, against the Company, Heartland and ten current and former senior officers and/or directors of the Company, alleging violations of Sections 10(b) and 20 (a) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated there under. Four similar actions were subsequently filed in the United States District Court for the Eastern District of Michigan, purportedly filed on behalf of purchasers of the common stock of the Company between August 7, 2001 and August 2, 2002, which are identical to the purported class identified in the previously disclosed lawsuit, except in one instance in which the complaint alleges a class period beginning on July 5, 2001. On August 4, 2003, the court consolidated all five pending actions and appointed lead plaintiffs for the purported class. The Company believes that the claims are without merit and intends to vigorously defend the lawsuits. The Company does not believe that the suit will have a material impact on its financial condition, results of operations or cash flows.

The Company is a defendant in a lawsuit involving a sales commission arrangement inherited from a predecessor company and its partial ownership of an extinguished joint venture. In September 2003, the Oakland County Circuit Court entered a judgment by default against the Company for $4.2 million based upon an inadvertent failure to produce a small number of documents that were to be produced with thousands of other documents that were delivered in the discovery process. The Company and its counsel believe that the default judgment was improperly entered and that damages were improperly assessed, and it has filed an appeal of the judgment with the Michigan Court of Appeals. The Company intends to vigorously pursue its appeal in this matter and has posted a letter of credit in the amount of the judgment as part of the normal appeal process. While management believes it has no liability to the plaintiff, the Company has established an appropriate reserve for this matter in an amount less than the amount of the current judgment.

The ultimate outcome of the legal proceedings to which the Company is a party will not, in the opinion of the Company's management, based on the facts presently known to it, have a material effect on the Company's consolidated financial condition, future results of operations or cash flows.

## Item 6.  *Exhibits and Reports on Form 8-K*

### (a) Exhibits

| Exhibit Number | Description |
| --- | --- |
| 4.1 | Indenture, dated as of August 26, 2004, among Collins & Aikman Products Co., as Issuer, the Guarantors parties thereto and BNY Midwest Trust Company, as Trustee, which is incorporated herein by reference to Exhibit 99.1 of Collins & Aikman Corporation's current report on Form 8-K dated August 26, 2004 and filed on August 31, 2004. |
| 4.2 | Credit Agreement dated as of December 20, 2001, as amended and restated as of September 1, 2004, among Collins & Aikman Products Co., as Borrower, Collins & Aikman Corporation, the lenders named therein, JPMorgan Securities Inc. and Credit Suisse First Boston, as Joint Lead Arrangers, JPMorgan Securities Inc. and Deutsche Bank Securities Inc., as Joint Bookrunners for the supplemental revolving credit facility, Deutsche Bank Securities Inc., as Documentation Agent, Credit Suisse First Boston as Syndication Agent and JPMorgan Chase Bank as Administrative Agent, which is incorporated herein by reference to Exhibit 99.1 of Collins & Aikman Corporation's current report on Form 8-K dated September 1, 2004 and filed on September 7, 2004. |
| 11 | Computation of Earnings Per Share. |
| 12.1 | Computation of Ratio of Earnings to Fixed Charges. |
| 31.1 | Certification Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. |
| 31.2 | Certification Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. |
| 32.1 | Certification Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 (Chapter 63, Title 18 U.S.C. 1350(a) and (b)). |

48

**(b) Reports on Form 8-K**

The Company filed or furnished the following Reports on Form 8-K covering the following items:

| | |
|---|---|
| July 8, 2004 | Item 12 Results of Operations and Financial Condition. |
| August 2, 2004 | Item 12 Results of Operations and Financial Condition. |
| August 31, 2004 | Item 2.03 Creation of a Direct Obligation or an Obligation under an Off-Balance Sheet Arrangement of a Registrant. |
| September 7, 2004 | Item 2.03 Creation of a Direct Obligation or an Obligation under an Off-Balance Sheet Arrangement of a Registrant. |
| September 30, 2004 | Item 5.02 Departure of Directors or Principal Officers; Election of Directors; Appointment of Principal Officers. |

49

**COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES**

**SIGNATURE**

Pursuant to the requirements of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

COLLINS & AIKMAN CORPORATION

By:                                /s/ BRYCE KOTH
_____

Bryce Koth
*Chief Financial Officer*
*(Principal Financial Officer)*

Dated: November 9, 2004

50

## EXHIBIT INDEX

| Exhibit Number | Description |
|---|---|
| 4.1 | Indenture, dated as of August 26, 2004, among Collins & Aikman Products Co., as Issuer, the Guarantors party thereto and BNY Midwest Trust Company, as Trustee, which is incorporated herein by reference to Exhibit 99.1 of Collins & Aikman Corporation's current report on Form 8-K dated August 26, 2004 and filed on August 31, 2004. |
| 4.2 | Credit Agreement dated as of December 20, 2001, as amended and restated as of September 1, 2004, among Collins & Aikman Products Co., as Borrower, Collins & Aikman Corporation, the lenders named therein, JPMorgan Securities Inc. and Credit Suisse First Boston, as Joint Lead Arrangers, JPMorgan Securities Inc. and Deutsche Bank Securities Inc., as Joint Bookrunners for the supplemental revolving credit facility, Deutsche Bank Securities Inc., as Documentation Agent, Credit Suisse First Boston as Syndication Agent and JPMorgan Chase Bank as Administrative Agent, which is incorporated herein by reference to Exhibit 99.1 of Collins & Aikman Corporation's current report on Form 8-K dated September 1, 2004 and filed on September 7, 2004.. |
| 11 | Computation of Earnings Per Share. |
| 12.1 | Computation of Ratio of Earnings to Fixed Charges. |
| 31.1 | Certification Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. |
| 31.2 | Certification Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. |
| 32.1 | Certification Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 (Chapter 63, Title 18 U.S.C. 1350(a) and (b)). |

51

## EXHIBIT 11

## COLLINS & AIKMAN CORPORATION

## COMPUTATION OF EARNINGS PER SHARE IN MILLIONS, EXCEPT PER SHARE DATE

### (UNAUDITED)

| | QUARTER ENDED | |
|---|---|---|
| | SEPTEMBER 30, 2004 | SEPTEMBER 30, 2003 |
| Average common shares outstanding during the period: | | |
| Basic......................................... | 83.6 | 83.6 |
| Incremental shares under stock options computed under the price of issuer's stock during the period...... | -- | -- |
| Total shares for basic EPS........................ | 83.6 | 83.6 |
| Loss from continuing operations before extraordinary item........................................... | (55.6) | (32.1) |
| Income from discontinued operations, net of income taxes........................................... | -- | -- |
| Cumulative effect of a change in accounting principle, Net of income taxes of $0........................ | -- | -- |
| Net loss......................................... | (55.6) | (32.1) |
| Loss on redemption of subsidiary preferred stock | -- | -- |
| Net loss attributable to common shareholders...... | (55.6) | (32.1) |
| Net loss per basic and diluted common share: | | |
| Continuing operations............................ | (0.67) | (0.38) |
| Discontinued operations.......................... | -- | -- |
| Cumulative effect of change in accounting principle | -- | -- |
| Net loss attributable to common shareholders...... | (0.67) | (0.38) |

.
.

**EXHIBIT 12.1**

Collins & Aikman Corporation and Subsidiaries
RATIO OF EARNINGS TO COMBINED FIXED CHARGES
(IN $ MILLIONS)

| | NINE MONTHS ENDED SEPTEMBER 30, | |
| --- | --- | --- |
| | 2004 | 2003 |
| FIXED CHARGES | | |
| Interest expense, net | $    127.4 | $    111.3 |
| Interest income | 0.4 | 0.2 |
| Interest expense, gross from continuing ops | 128.8 | 111.5 |
| Capitalized interest | -- | -- |
| Interest expense from discontinued operations | -- | -- |
| Total interest expense, gross(*) | 67.9 | 72.3 |
| Interest portion of rental expense | 22.6 | 24.1 |
| Pre-tax earnings required to cover preferred stock dividends and accretion | 49.4 | 42.0 |
| FIXED CHARGES - C&A | $    199.8 | $    177.6 |
| Pre-tax income from continuing operations | $   (125.6) | $    (47.5) |
| Minority interest in (income) loss of affiliates | (2.1) | (4.1) |
| (Income) loss from equity investees | -- | -- |
| Total | (127.7) | (51.6) |
| ADD: | | |
| Fixed charges | 199.8 | 177.6 |
| Distributed income of equity investees | | |
| SUBTRACT: | | |
| (A) Interest capitalized | -- | -- |
| TOTAL EARNINGS | 72.1 | 126.0 |
| RATIO OF EARNINGS TO FIXED CHARGES | | |
| Dollar value of deficiency | (127.7) | (51.6) |

(*) - Includes amortization of debt issuance costs

EXHIBIT 31.1

## CERTIFICATION PURSUANT TO SECTION 302
## OF THE SARBANES-OXLEY ACT OF 2002

I, David A. Stockman, certify that:

1. I have reviewed this Report on Form 10-Q of Collins & Aikman Corporation;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

a. Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b. Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c. Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d. Disclosed in this annual report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonable likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal controls over financial reporting, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent functions):

a. All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b. Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting

```
Date: November 9, 2004                          /s/ David A. Stockman
                                                -----------------------
                                                    David A. Stockman
                                    Chairman of the Board and Chief Executive Officer
```

EXHIBIT 31.2

**CERTIFICATION PURSUANT TO SECTION 302
OF THE SARBANES-OXLEY ACT OF 2002**

I, Bryce M. Koth, certify that:

1. I have reviewed this Report on Form 10-Q of Collins & Aikman Corporation;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

a. Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b. Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c. Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d. Disclosed in this annual report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonable likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal controls over financial reporting, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent functions):

a. All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b. Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting

```
Date:  November 9, 2004


                                 /s/ Bryce M. Koth
                          ------------------------------
                                  Bryce M. Koth
                             Chief Financial Officer
                          (Principal Financial Officer)
```

EXHIBIT 32.1

**CERTIFICATION**
**ACCOMPANYING FORM 10-Q REPORT**
**OF COLLINS & AIKMAN CORPORATION**
**PURSUANT TO SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**
**(CHAPTER 63, TITLE 18 U.S.C. SUB-SECTION 1350(A) AND (B))**

Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 (Chapter 63,Title 18 U.S.C. sub-sections 1350(a) and (b)), each of the undersigned hereby certifies that the Report on Form 10-Q for the period ended September 30, 2004 of Collins & Aikman Corporation (the "Company") fully complies with the requirements of Section 13(a) or a Section 15(d) of the Securities Exchange Act of 1934 and that the information contained in such Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

```
Dated: November 9, 2004          /s/ David A. Stockman
                                 -------------------------------
                                       David A. Stockman
                       Chairman of the Board and Chief Executive Officer


Dated: November 9, 2004          /s/ Bryce M. Koth
                                 -------------------------------
                                       Bryce M. Koth
                                  Chief Financial Officer
```

**End of Filing**

Powered By EDGAR Online

© 2005 | EDGAR Online, Inc.

# Exhibit F

Collins & Aikman Ordinary Shares (CKCRQ.PK)
Daily prices (split adjusted) from May 1, 2003 to May 17, 2005
Source: Factiva

| Date | Close |
|------|-------|
| 5/1/03 | 3.99 |
| 5/2/03 | 4.02 |
| 5/5/03 | 3.87 |
| 5/6/03 | 3.68 |
| 5/7/03 | 3.66 |
| 5/8/03 | 3.62 |
| 5/9/03 | 3.63 |
| 5/12/03 | 3.57 |
| 5/13/03 | 3.50 |
| 5/14/03 | 3.80 |
| 5/15/03 | 3.20 |
| 5/16/03 | 3.20 |
| 5/19/03 | 3.23 |
| 5/20/03 | 3.18 |
| 5/21/03 | 2.90 |
| 5/22/03 | 2.88 |
| 5/23/03 | 2.83 |
| 5/27/03 | 2.96 |
| 5/28/03 | 3.05 |
| 5/29/03 | 3.02 |
| 5/30/03 | 3.12 |
| 6/2/03 | 3.19 |
| 6/3/03 | 3.19 |
| 6/4/03 | 3.15 |
| 6/5/03 | 3.00 |
| 6/6/03 | 2.90 |
| 6/9/03 | 2.86 |
| 6/10/03 | 2.82 |
| 6/11/03 | 3.02 |
| 6/12/03 | 3.18 |
| 6/13/03 | 3.04 |
| 6/16/03 | 3.09 |
| 6/17/03 | 3.18 |
| 6/18/03 | 3.17 |
| 6/19/03 | 3.12 |
| 6/20/03 | 3.10 |
| 6/23/03 | 3.02 |
| 6/24/03 | 3.01 |
| 6/25/03 | 2.92 |
| 6/26/03 | 2.98 |
| 6/27/03 | 2.96 |
| 6/30/03 | 2.95 |
| 7/1/03 | 2.99 |
| 7/2/03 | 3.00 |
| 7/3/03 | 2.96 |
| 7/7/03 | 3.11 |
| 7/8/03 | 3.20 |

Collins & Aikman Ordinary Shares (CKCRQ.PK)
Daily prices (split adjusted) from May 1, 2003 to May 17, 2005
Source: Factiva

| Date | Close |
|------|-------|
| 7/9/03 | 3.22 |
| 7/10/03 | 3.25 |
| 7/11/03 | 3.34 |
| 7/14/03 | 3.34 |
| 7/15/03 | 3.24 |
| 7/16/03 | 3.22 |
| 7/17/03 | 2.70 |
| 7/18/03 | 2.92 |
| 7/21/03 | 2.89 |
| 7/22/03 | 2.85 |
| 7/23/03 | 2.45 |
| 7/24/03 | 2.46 |
| 7/25/03 | 2.54 |
| 7/28/03 | 2.57 |
| 7/29/03 | 2.53 |
| 7/30/03 | 2.55 |
| 7/31/03 | 2.56 |
| 8/1/03 | 2.46 |
| 8/4/03 | 2.43 |
| 8/5/03 | 2.38 |
| 8/6/03 | 2.36 |
| 8/7/03 | 2.25 |
| 8/8/03 | 2.16 |
| 8/11/03 | 2.09 |
| 8/12/03 | 2.22 |
| 8/13/03 | 2.20 |
| 8/14/03 | 2.32 |
| 8/15/03 | 2.43 |
| 8/18/03 | 2.68 |
| 8/19/03 | 2.73 |
| 8/20/03 | 2.71 |
| 8/21/03 | 2.83 |
| 8/22/03 | 2.85 |
| 8/25/03 | 2.81 |
| 8/26/03 | 2.89 |
| 8/27/03 | 3.13 |
| 8/28/03 | 3.15 |
| 8/29/03 | 3.07 |
| 9/2/03 | 3.29 |
| 9/3/03 | 3.22 |
| 9/4/03 | 3.01 |
| 9/5/03 | 2.96 |
| 9/8/03 | 3.18 |
| 9/9/03 | 3.04 |
| 9/10/03 | 3.00 |
| 9/11/03 | 2.93 |
| 9/12/03 | 2.92 |

Collins & Aikman Ordinary Shares (CKCRQ.PK)
Daily prices (split adjusted) from May 1, 2003 to May 17, 2005
Source: Factiva

| Date | Close |
|------|-------|
| 9/15/03 | 2.94 |
| 9/16/03 | 2.92 |
| 9/17/03 | 2.79 |
| 9/18/03 | 2.79 |
| 9/19/03 | 3.00 |
| 9/22/03 | 3.00 |
| 9/23/03 | 2.99 |
| 9/24/03 | 2.99 |
| 9/25/03 | 2.91 |
| 9/26/03 | 3.06 |
| 9/29/03 | 3.41 |
| 9/30/03 | 3.38 |
| 10/1/03 | 3.60 |
| 10/2/03 | 3.73 |
| 10/3/03 | 2.43 |
| 10/6/03 | 2.44 |
| 10/7/03 | 2.49 |
| 10/8/03 | 2.66 |
| 10/9/03 | 2.75 |
| 10/10/03 | 3.09 |
| 10/13/03 | 3.35 |
| 10/14/03 | 3.20 |
| 10/15/03 | 3.36 |
| 10/16/03 | 3.53 |
| 10/17/03 | 3.34 |
| 10/20/03 | 3.22 |
| 10/21/03 | 3.14 |
| 10/22/03 | 2.95 |
| 10/23/03 | 2.95 |
| 10/24/03 | 2.93 |
| 10/27/03 | 3.01 |
| 10/28/03 | 3.15 |
| 10/29/03 | 3.19 |
| 10/30/03 | 3.13 |
| 10/31/03 | 3.20 |
| 11/3/03 | 3.28 |
| 11/4/03 | 3.24 |
| 11/5/03 | 3.15 |
| 11/6/03 | 2.96 |
| 11/7/03 | 2.89 |
| 11/10/03 | 2.79 |
| 11/11/03 | 2.82 |
| 11/12/03 | 2.98 |
| 11/13/03 | 3.25 |
| 11/14/03 | 3.28 |
| 11/17/03 | 3.32 |
| 11/18/03 | 3.34 |

3

Collins & Aikman Ordinary Shares (CKCRQ.PK)
Daily prices (split adjusted) from May 1, 2003 to May 17, 2005
Source: Factiva

| Date | Close |
|------|-------|
| 11/19/03 | 3.30 |
| 11/20/03 | 3.28 |
| 11/21/03 | 3.22 |
| 11/24/03 | 3.27 |
| 11/25/03 | 3.50 |
| 11/26/03 | 3.72 |
| 11/28/03 | 3.57 |
| 12/1/03 | 3.85 |
| 12/2/03 | 3.80 |
| 12/3/03 | 3.71 |
| 12/4/03 | 3.99 |
| 12/5/03 | 3.90 |
| 12/8/03 | 4.10 |
| 12/9/03 | 3.97 |
| 12/10/03 | 4.08 |
| 12/11/03 | 4.04 |
| 12/12/03 | 4.05 |
| 12/15/03 | 3.85 |
| 12/16/03 | 4.06 |
| 12/17/03 | 4.01 |
| 12/18/03 | 4.10 |
| 12/19/03 | 4.30 |
| 12/22/03 | 4.18 |
| 12/23/03 | 4.14 |
| 12/24/03 | 4.14 |
| 12/26/03 | 4.11 |
| 12/29/03 | 4.15 |
| 12/30/03 | 4.29 |
| 12/31/03 | 4.33 |
| 1/2/04 | 4.20 |
| 1/5/04 | 4.87 |
| 1/6/04 | 5.06 |
| 1/7/04 | 6.44 |
| 1/8/04 | 6.02 |
| 1/9/04 | 5.96 |
| 1/12/04 | 6.11 |
| 1/13/04 | 5.82 |
| 1/14/04 | 5.49 |
| 1/15/04 | 5.70 |
| 1/16/04 | 5.70 |
| 1/20/04 | 6.58 |
| 1/21/04 | 6.76 |
| 1/22/04 | 6.46 |
| 1/23/04 | 6.20 |
| 1/26/04 | 6.46 |
| 1/27/04 | 6.42 |
| 1/28/04 | 6.25 |

4

Collins & Aikman Ordinary Shares (CKCRQ.PK)
Daily prices (split adjusted) from May 1, 2003 to May 17, 2005
Source:  Factiva

| Date | Close |
|------|-------|
| 1/29/04 | 5.81 |
| 1/30/04 | 5.82 |
| 2/2/04 | 5.91 |
| 2/3/04 | 5.62 |
| 2/4/04 | 5.54 |
| 2/5/04 | 5.64 |
| 2/6/04 | 5.55 |
| 2/9/04 | 5.62 |
| 2/10/04 | 5.60 |
| 2/11/04 | 5.76 |
| 2/12/04 | 5.84 |
| 2/13/04 | 5.73 |
| 2/17/04 | 5.60 |
| 2/18/04 | 5.68 |
| 2/19/04 | 5.52 |
| 2/20/04 | 5.37 |
| 2/23/04 | 5.32 |
| 2/24/04 | 5.19 |
| 2/25/04 | 5.23 |
| 2/26/04 | 5.23 |
| 2/27/04 | 5.31 |
| 3/1/04 | 5.50 |
| 3/2/04 | 5.42 |
| 3/3/04 | 5.48 |
| 3/4/04 | 5.41 |
| 3/5/04 | 5.27 |
| 3/8/04 | 5.19 |
| 3/9/04 | 5.21 |
| 3/10/04 | 5.01 |
| 3/11/04 | 5.73 |
| 3/12/04 | 5.89 |
| 3/15/04 | 5.71 |
| 3/16/04 | 5.47 |
| 3/17/04 | 5.67 |
| 3/18/04 | 5.50 |
| 3/19/04 | 5.48 |
| 3/22/04 | 5.18 |
| 3/23/04 | 5.23 |
| 3/24/04 | 5.13 |
| 3/25/04 | 5.20 |
| 3/26/04 | 5.30 |
| 3/29/04 | 5.35 |
| 3/30/04 | 5.46 |
| 3/31/04 | 5.50 |
| 4/1/04 | 5.63 |
| 4/2/04 | 5.96 |
| 4/5/04 | 5.98 |

Collins & Aikman Ordinary Shares (CKCRQ.PK)
Daily prices (split adjusted) from May 1, 2003 to May 17, 2005
Source: Factiva

| Date | Close |
|------|-------|
| 4/6/04 | 5.99 |
| 4/7/04 | 6.04 |
| 4/8/04 | 5.90 |
| 4/12/04 | 6.03 |
| 4/13/04 | 5.91 |
| 4/14/04 | 5.95 |
| 4/15/04 | 5.90 |
| 4/16/04 | 5.86 |
| 4/19/04 | 5.91 |
| 4/20/04 | 5.76 |
| 4/21/04 | 6.01 |
| 4/22/04 | 6.02 |
| 4/23/04 | 6.04 |
| 4/26/04 | 6.29 |
| 4/27/04 | 6.56 |
| 4/28/04 | 6.42 |
| 4/29/04 | 6.11 |
| 4/30/04 | 6.14 |
| 5/3/04 | 6.15 |
| 5/4/04 | 5.88 |
| 5/5/04 | 5.92 |
| 5/6/04 | 5.57 |
| 5/7/04 | 5.15 |
| 5/10/04 | 5.05 |
| 5/11/04 | 5.41 |
| 5/12/04 | 5.24 |
| 5/13/04 | 5.14 |
| 5/14/04 | 5.04 |
| 5/17/04 | 4.85 |
| 5/18/04 | 5.09 |
| 5/19/04 | 5.01 |
| 5/20/04 | 5.00 |
| 5/21/04 | 4.92 |
| 5/24/04 | 5.02 |
| 5/25/04 | 5.20 |
| 5/26/04 | 5.27 |
| 5/27/04 | 5.35 |
| 5/28/04 | 5.31 |
| 6/1/04 | 5.20 |
| 6/2/04 | 5.31 |
| 6/3/04 | 5.49 |
| 6/4/04 | 5.54 |
| 6/7/04 | 5.68 |
| 6/8/04 | 5.70 |
| 6/9/04 | 5.61 |
| 6/10/04 | 5.68 |
| 6/14/04 | 5.45 |

6

Collins & Aikman Ordinary Shares (CKCRQ.PK)
Daily prices (split adjusted) from May 1, 2003 to May 17, 2005
Source: Factiva

| Date | Close |
|------|-------|
| 6/15/04 | 5.33 |
| 6/16/04 | 5.40 |
| 6/17/04 | 5.42 |
| 6/18/04 | 5.54 |
| 6/21/04 | 5.46 |
| 6/22/04 | 5.38 |
| 6/23/04 | 6.18 |
| 6/24/04 | 5.94 |
| 6/25/04 | 5.79 |
| 6/28/04 | 5.90 |
| 6/29/04 | 5.69 |
| 6/30/04 | 5.59 |
| 7/1/04 | 5.35 |
| 7/2/04 | 5.46 |
| 7/6/04 | 5.20 |
| 7/7/04 | 5.45 |
| 7/8/04 | 5.52 |
| 7/9/04 | 5.69 |
| 7/12/04 | 5.68 |
| 7/13/04 | 5.77 |
| 7/14/04 | 5.72 |
| 7/15/04 | 5.63 |
| 7/16/04 | 5.42 |
| 7/19/04 | 5.47 |
| 7/20/04 | 5.43 |
| 7/21/04 | 5.40 |
| 7/22/04 | 5.29 |
| 7/23/04 | 5.14 |
| 7/26/04 | 5.03 |
| 7/27/04 | 5.12 |
| 7/28/04 | 5.02 |
| 7/29/04 | 5.09 |
| 7/30/04 | 5.10 |
| 8/2/04 | 5.25 |
| 8/3/04 | 5.07 |
| 8/4/04 | 5.19 |
| 8/5/04 | 5.08 |
| 8/6/04 | 4.88 |
| 8/9/04 | 4.61 |
| 8/10/04 | 4.73 |
| 8/11/04 | 4.71 |
| 8/12/04 | 4.61 |
| 8/13/04 | 4.50 |
| 8/16/04 | 4.48 |
| 8/17/04 | 4.45 |
| 8/18/04 | 4.55 |
| 8/19/04 | 4.50 |

Collins & Aikman Ordinary Shares (CKCRQ.PK)
Daily prices (split adjusted) from May 1, 2003 to May 17, 2005
Source: Factiva

| Date | Close |
|------|-------|
| 8/20/04 | 4.58 |
| 8/23/04 | 4.60 |
| 8/24/04 | 4.76 |
| 8/25/04 | 4.74 |
| 8/26/04 | 4.64 |
| 8/27/04 | 4.66 |
| 8/30/04 | 4.60 |
| 8/31/04 | 4.64 |
| 9/1/04 | 4.60 |
| 9/2/04 | 4.66 |
| 9/3/04 | 4.66 |
| 9/7/04 | 4.69 |
| 9/8/04 | 4.67 |
| 9/9/04 | 4.82 |
| 9/10/04 | 4.84 |
| 9/13/04 | 4.80 |
| 9/14/04 | 4.73 |
| 9/15/04 | 4.70 |
| 9/16/04 | 4.59 |
| 9/17/04 | 4.45 |
| 9/20/04 | 4.51 |
| 9/21/04 | 4.45 |
| 9/22/04 | 4.29 |
| 9/23/04 | 4.29 |
| 9/24/04 | 4.26 |
| 9/27/04 | 4.22 |
| 9/28/04 | 4.18 |
| 9/29/04 | 4.23 |
| 9/30/04 | 4.18 |
| 10/1/04 | 4.24 |
| 10/4/04 | 4.30 |
| 10/5/04 | 4.40 |
| 10/6/04 | 4.49 |
| 10/7/04 | 4.42 |
| 10/8/04 | 4.42 |
| 10/11/04 | 4.51 |
| 10/12/04 | 4.48 |
| 10/13/04 | 4.37 |
| 10/14/04 | 4.21 |
| 10/15/04 | 4.09 |
| 10/18/04 | 3.88 |
| 10/19/04 | 3.64 |
| 10/20/04 | 3.46 |
| 10/21/04 | 3.55 |
| 10/22/04 | 3.55 |
| 10/25/04 | 3.53 |
| 10/26/04 | 3.80 |

Collins & Aikman Ordinary Shares (CKCRQ.PK)
Daily prices (split adjusted) from May 1, 2003 to May 17, 2005
Source: Factiva

| Date | Close |
|------|-------|
| 10/27/04 | 3.75 |
| 10/28/04 | 3.81 |
| 10/29/04 | 3.89 |
| 11/1/04 | 3.89 |
| 11/2/04 | 3.86 |
| 11/3/04 | 3.95 |
| 11/4/04 | 3.94 |
| 11/5/04 | 4.02 |
| 11/8/04 | 3.88 |
| 11/9/04 | 3.35 |
| 11/10/04 | 3.15 |
| 11/11/04 | 2.99 |
| 11/12/04 | 2.88 |
| 11/15/04 | 3.00 |
| 11/16/04 | 3.26 |
| 11/17/04 | 3.32 |
| 11/18/04 | 3.35 |
| 11/19/04 | 3.40 |
| 11/22/04 | 3.46 |
| 11/23/04 | 3.33 |
| 11/24/04 | 3.49 |
| 11/26/04 | 3.48 |
| 11/29/04 | 3.51 |
| 11/30/04 | 3.55 |
| 12/1/04 | 3.63 |
| 12/2/04 | 3.64 |
| 12/3/04 | 3.55 |
| 12/6/04 | 3.39 |
| 12/7/04 | 3.20 |
| 12/8/04 | 3.24 |
| 12/9/04 | 3.36 |
| 12/10/04 | 3.47 |
| 12/13/04 | 3.65 |
| 12/14/04 | 3.80 |
| 12/15/04 | 3.55 |
| 12/16/04 | 3.45 |
| 12/17/04 | 3.41 |
| 12/20/04 | 3.47 |
| 12/21/04 | 3.49 |
| 12/22/04 | 3.63 |
| 12/23/04 | 3.75 |
| 12/27/04 | 3.85 |
| 12/28/04 | 4.00 |
| 12/29/04 | 4.16 |
| 12/30/04 | 4.29 |
| 12/31/04 | 4.36 |
| 1/3/05 | 4.25 |

9

Collins & Aikman Ordinary Shares (CKCRQ.PK)
Daily prices (split adjusted) from May 1, 2003 to May 17, 2005
Source: Factiva

| Date | Close |
|------|-------|
| 1/4/05 | 4.01 |
| 1/5/05 | 3.85 |
| 1/6/05 | 3.76 |
| 1/7/05 | 4.02 |
| 1/10/05 | 4.01 |
| 1/11/05 | 3.91 |
| 1/12/05 | 3.85 |
| 1/13/05 | 3.86 |
| 1/14/05 | 3.79 |
| 1/18/05 | 3.81 |
| 1/19/05 | 3.69 |
| 1/20/05 | 3.51 |
| 1/21/05 | 3.67 |
| 1/24/05 | 3.63 |
| 1/25/05 | 3.57 |
| 1/26/05 | 3.54 |
| 1/27/05 | 3.54 |
| 1/28/05 | 3.53 |
| 1/31/05 | 3.46 |
| 2/1/05 | 3.36 |
| 2/2/05 | 3.38 |
| 2/3/05 | 3.16 |
| 2/4/05 | 2.95 |
| 2/7/05 | 3.03 |
| 2/8/05 | 3.00 |
| 2/9/05 | 2.95 |
| 2/10/05 | 2.93 |
| 2/11/05 | 2.95 |
| 2/14/05 | 2.97 |
| 2/15/05 | 2.88 |
| 2/16/05 | 2.88 |
| 2/17/05 | 2.87 |
| 2/18/05 | 2.86 |
| 2/22/05 | 2.80 |
| 2/23/05 | 2.61 |
| 2/24/05 | 2.34 |
| 2/25/05 | 2.37 |
| 2/28/05 | 1.99 |
| 3/1/05 | 1.95 |
| 3/2/05 | 1.80 |
| 3/3/05 | 1.91 |
| 3/4/05 | 1.91 |
| 3/7/05 | 1.96 |
| 3/8/05 | 2.03 |
| 3/9/05 | 2.01 |
| 3/10/05 | 1.82 |
| 3/11/05 | 1.81 |

Collins & Aikman Ordinary Shares (CKCRQ.PK)
Daily prices (split adjusted) from May 1, 2003 to May 17, 2005
Source: Factiva

| Date | Close |
|------|-------|
| 3/14/05 | 1.75 |
| 3/15/05 | 1.71 |
| 3/16/05 | 1.63 |
| 3/17/05 | 1.24 |
| 3/18/05 | 1.15 |
| 3/21/05 | 0.95 |
| 3/22/05 | 1.02 |
| 3/23/05 | 1.01 |
| 3/24/05 | 1.36 |
| 3/28/05 | 1.25 |
| 3/29/05 | 1.21 |
| 3/30/05 | 1.16 |
| 3/31/05 | 1.23 |
| 4/1/05 | 1.25 |
| 4/4/05 | 1.26 |
| 4/5/05 | 1.28 |
| 4/6/05 | 1.26 |
| 4/7/05 | 1.23 |
| 4/8/05 | 1.19 |
| 4/11/05 | 1.15 |
| 4/12/05 | 1.09 |
| 4/13/05 | 1.01 |
| 4/14/05 | 0.99 |
| 4/15/05 | 0.94 |
| 4/18/05 | 0.95 |
| 4/19/05 | 1.02 |
| 4/20/05 | 1.04 |
| 4/21/05 | 1.01 |
| 4/22/05 | 0.95 |
| 4/25/05 | 0.96 |
| 4/26/05 | 0.91 |
| 4/27/05 | 0.76 |
| 4/28/05 | 0.78 |
| 4/29/05 | 0.82 |
| 5/2/05 | 0.86 |
| 5/3/05 | 0.81 |
| 5/4/05 | 0.85 |
| 5/5/05 | 0.79 |
| 5/6/05 | 0.78 |
| 5/9/05 | 0.79 |
| 5/10/05 | 0.78 |
| 5/11/05 | 0.78 |
| 5/12/05 | 0.01 |
| 5/13/05 | 0.11 |
| 5/16/05 | 0.13 |
| 5/17/05 | 0.12 |

# Exhibit G

Dana Ordinary Shares (DCNAQ.PK)
Daily prices (split adjusted) from May 1, 2003 to March 3, 2006
Source: Factiva

| Date | Close |
|------|-------|
| 5/1/03 | 9.23 |
| 5/2/03 | 9.38 |
| 5/5/03 | 9.45 |
| 5/6/03 | 9.59 |
| 5/7/03 | 9.52 |
| 5/8/03 | 9.36 |
| 5/9/03 | 9.40 |
| 5/12/03 | 9.46 |
| 5/13/03 | 9.42 |
| 5/14/03 | 9.28 |
| 5/15/03 | 9.29 |
| 5/16/03 | 9.15 |
| 5/19/03 | 8.95 |
| 5/20/03 | 8.90 |
| 5/21/03 | 8.58 |
| 5/22/03 | 8.86 |
| 5/23/03 | 8.57 |
| 5/27/03 | 8.73 |
| 5/28/03 | 8.77 |
| 5/29/03 | 8.65 |
| 5/30/03 | 8.91 |
| 6/2/03 | 9.83 |
| 6/3/03 | 9.63 |
| 6/4/03 | 9.88 |
| 6/5/03 | 10.51 |
| 6/6/03 | 11.01 |
| 6/9/03 | 10.60 |
| 6/10/03 | 10.88 |
| 6/11/03 | 11.30 |
| 6/12/03 | 11.75 |
| 6/13/03 | 11.25 |
| 6/16/03 | 11.74 |
| 6/17/03 | 11.65 |
| 6/18/03 | 11.73 |
| 6/19/03 | 11.65 |
| 6/20/03 | 11.75 |
| 6/23/03 | 11.38 |
| 6/24/03 | 11.35 |
| 6/25/03 | 11.37 |
| 6/26/03 | 11.60 |
| 6/27/03 | 11.60 |
| 6/30/03 | 11.56 |
| 7/1/03 | 11.63 |
| 7/2/03 | 11.77 |
| 7/3/03 | 11.79 |
| 7/7/03 | 12.02 |
| 7/8/03 | 16.20 |

Dana Ordinary Shares (DCNAQ.PK)
Daily prices (split adjusted) from May 1, 2003 to March 3, 2006
Source: Factiva

| Date | Close |
|------|-------|
| 7/9/03 | 15.92 |
| 7/10/03 | 15.88 |
| 7/11/03 | 15.96 |
| 7/14/03 | 15.86 |
| 7/15/03 | 15.82 |
| 7/16/03 | 15.61 |
| 7/17/03 | 15.58 |
| 7/18/03 | 15.52 |
| 7/21/03 | 15.24 |
| 7/22/03 | 15.28 |
| 7/23/03 | 15.60 |
| 7/24/03 | 15.35 |
| 7/25/03 | 15.64 |
| 7/28/03 | 15.45 |
| 7/29/03 | 15.18 |
| 7/30/03 | 15.09 |
| 7/31/03 | 15.40 |
| 8/1/03 | 15.40 |
| 8/4/03 | 15.50 |
| 8/5/03 | 15.34 |
| 8/6/03 | 15.18 |
| 8/7/03 | 14.96 |
| 8/8/03 | 15.15 |
| 8/11/03 | 15.34 |
| 8/12/03 | 15.35 |
| 8/13/03 | 15.41 |
| 8/14/03 | 15.52 |
| 8/15/03 | 15.45 |
| 8/18/03 | 15.48 |
| 8/19/03 | 15.35 |
| 8/20/03 | 15.40 |
| 8/21/03 | 15.37 |
| 8/22/03 | 15.20 |
| 8/25/03 | 15.20 |
| 8/26/03 | 15.41 |
| 8/27/03 | 15.38 |
| 8/28/03 | 15.40 |
| 8/29/03 | 15.42 |
| 9/2/03 | 15.45 |
| 9/3/03 | 15.45 |
| 9/4/03 | 15.55 |
| 9/5/03 | 15.48 |
| 9/8/03 | 15.54 |
| 9/9/03 | 15.48 |
| 9/10/03 | 15.41 |
| 9/11/03 | 15.37 |
| 9/12/03 | 15.48 |

Dana Ordinary Shares (DCNAQ.PK)
Daily prices (split adjusted) from May 1, 2003 to March 3, 2006
Source: Factiva

| Date | Close |
| --- | --- |
| 9/15/03 | 15.62 |
| 9/16/03 | 15.59 |
| 9/17/03 | 15.60 |
| 9/18/03 | 15.72 |
| 9/19/03 | 15.73 |
| 9/22/03 | 15.65 |
| 9/23/03 | 15.90 |
| 9/24/03 | 15.50 |
| 9/25/03 | 15.65 |
| 9/26/03 | 15.50 |
| 9/29/03 | 15.52 |
| 9/30/03 | 15.43 |
| 10/1/03 | 15.45 |
| 10/2/03 | 15.35 |
| 10/3/03 | 15.59 |
| 10/6/03 | 15.55 |
| 10/7/03 | 15.70 |
| 10/8/03 | 15.59 |
| 10/9/03 | 15.78 |
| 10/10/03 | 15.73 |
| 10/13/03 | 15.67 |
| 10/14/03 | 15.72 |
| 10/15/03 | 15.64 |
| 10/16/03 | 15.84 |
| 10/17/03 | 15.89 |
| 10/20/03 | 15.79 |
| 10/21/03 | 15.79 |
| 10/22/03 | 15.70 |
| 10/23/03 | 15.70 |
| 10/24/03 | 15.90 |
| 10/27/03 | 15.89 |
| 10/28/03 | 15.84 |
| 10/29/03 | 16.00 |
| 10/30/03 | 16.14 |
| 10/31/03 | 16.28 |
| 11/3/03 | 16.59 |
| 11/4/03 | 16.60 |
| 11/5/03 | 16.53 |
| 11/6/03 | 16.55 |
| 11/7/03 | 16.33 |
| 11/10/03 | 16.34 |
| 11/11/03 | 16.15 |
| 11/12/03 | 16.70 |
| 11/13/03 | 16.72 |
| 11/14/03 | 16.65 |
| 11/17/03 | 15.24 |
| 11/18/03 | 14.81 |

Dana Ordinary Shares (DCNAQ.PK)
Daily prices (split adjusted) from May 1, 2003 to March 3, 2006
Source: Factiva

| Date | Close |
|------|-------|
| 11/19/03 | 15.04 |
| 11/20/03 | 14.98 |
| 11/21/03 | 15.00 |
| 11/24/03 | 15.23 |
| 11/25/03 | 15.70 |
| 11/26/03 | 15.98 |
| 11/28/03 | 16.17 |
| 12/1/03 | 16.38 |
| 12/2/03 | 16.23 |
| 12/3/03 | 16.72 |
| 12/4/03 | 16.64 |
| 12/5/03 | 16.30 |
| 12/8/03 | 16.64 |
| 12/9/03 | 16.73 |
| 12/10/03 | 16.60 |
| 12/11/03 | 16.94 |
| 12/12/03 | 17.04 |
| 12/15/03 | 17.06 |
| 12/16/03 | 17.05 |
| 12/17/03 | 17.15 |
| 12/18/03 | 17.86 |
| 12/19/03 | 18.04 |
| 12/22/03 | 18.25 |
| 12/23/03 | 18.25 |
| 12/24/03 | 18.22 |
| 12/26/03 | 18.20 |
| 12/29/03 | 18.30 |
| 12/30/03 | 18.40 |
| 12/31/03 | 18.35 |
| 1/2/04 | 18.05 |
| 1/5/04 | 18.62 |
| 1/6/04 | 18.97 |
| 1/7/04 | 19.19 |
| 1/8/04 | 19.49 |
| 1/9/04 | 19.50 |
| 1/12/04 | 20.48 |
| 1/13/04 | 21.01 |
| 1/14/04 | 21.31 |
| 1/15/04 | 21.37 |
| 1/16/04 | 22.04 |
| 1/20/04 | 22.07 |
| 1/21/04 | 22.53 |
| 1/22/04 | 22.67 |
| 1/23/04 | 22.56 |
| 1/26/04 | 22.95 |
| 1/27/04 | 22.70 |
| 1/28/04 | 22.41 |

Dana Ordinary Shares (DCNAQ.PK)
Daily prices (split adjusted) from May 1, 2003 to March 3, 2006
Source: Factiva

| Date | Close |
|------|-------|
| 1/29/04 | 21.81 |
| 1/30/04 | 20.80 |
| 2/2/04 | 21.26 |
| 2/3/04 | 21.57 |
| 2/4/04 | 21.52 |
| 2/5/04 | 21.40 |
| 2/6/04 | 21.63 |
| 2/9/04 | 22.43 |
| 2/10/04 | 22.90 |
| 2/11/04 | 22.31 |
| 2/12/04 | 21.89 |
| 2/13/04 | 21.30 |
| 2/17/04 | 22.19 |
| 2/18/04 | 21.98 |
| 2/19/04 | 21.76 |
| 2/20/04 | 21.41 |
| 2/23/04 | 21.13 |
| 2/24/04 | 21.02 |
| 2/25/04 | 21.38 |
| 2/26/04 | 21.15 |
| 2/27/04 | 21.39 |
| 3/1/04 | 22.15 |
| 3/2/04 | 21.71 |
| 3/3/04 | 21.49 |
| 3/4/04 | 21.39 |
| 3/5/04 | 21.89 |
| 3/8/04 | 21.37 |
| 3/9/04 | 20.32 |
| 3/10/04 | 19.88 |
| 3/11/04 | 20.05 |
| 3/12/04 | 20.16 |
| 3/15/04 | 19.66 |
| 3/16/04 | 19.47 |
| 3/17/04 | 19.79 |
| 3/18/04 | 19.75 |
| 3/19/04 | 19.08 |
| 3/22/04 | 18.42 |
| 3/23/04 | 18.21 |
| 3/24/04 | 17.65 |
| 3/25/04 | 18.40 |
| 3/26/04 | 18.61 |
| 3/29/04 | 18.95 |
| 3/30/04 | 19.43 |
| 3/31/04 | 19.86 |
| 4/1/04 | 20.44 |
| 4/2/04 | 20.92 |
| 4/5/04 | 21.25 |

Dana Ordinary Shares (DCNAQ.PK)
Daily prices (split adjusted) from May 1, 2003 to March 3, 2006
Source: Factiva

| Date | Close |
|------|-------|
| 4/6/04 | 21.31 |
| 4/7/04 | 20.85 |
| 4/8/04 | 21.12 |
| 4/12/04 | 20.80 |
| 4/13/04 | 20.30 |
| 4/14/04 | 20.40 |
| 4/15/04 | 20.75 |
| 4/16/04 | 20.97 |
| 4/19/04 | 20.75 |
| 4/20/04 | 20.25 |
| 4/21/04 | 20.80 |
| 4/22/04 | 21.51 |
| 4/23/04 | 21.60 |
| 4/26/04 | 21.37 |
| 4/27/04 | 21.90 |
| 4/28/04 | 21.20 |
| 4/29/04 | 20.81 |
| 4/30/04 | 20.16 |
| 5/3/04 | 20.31 |
| 5/4/04 | 21.00 |
| 5/5/04 | 20.89 |
| 5/6/04 | 20.24 |
| 5/7/04 | 19.26 |
| 5/10/04 | 18.51 |
| 5/11/04 | 18.88 |
| 5/12/04 | 18.62 |
| 5/13/04 | 18.90 |
| 5/14/04 | 19.07 |
| 5/17/04 | 18.54 |
| 5/18/04 | 18.46 |
| 5/19/04 | 18.60 |
| 5/20/04 | 18.10 |
| 5/21/04 | 18.10 |
| 5/24/04 | 18.11 |
| 5/25/04 | 18.19 |
| 5/26/04 | 18.59 |
| 5/27/04 | 18.90 |
| 5/28/04 | 18.65 |
| 6/1/04 | 19.05 |
| 6/2/04 | 19.22 |
| 6/3/04 | 19.03 |
| 6/4/04 | 19.56 |
| 6/7/04 | 19.98 |
| 6/8/04 | 20.13 |
| 6/9/04 | 19.71 |
| 6/10/04 | 20.54 |
| 6/14/04 | 20.13 |

Dana Ordinary Shares (DCNAQ.PK)
Daily prices (split adjusted) from May 1, 2003 to March 3, 2006
Source: Factiva

| Date | Close |
| --- | --- |
| 6/15/04 | 20.44 |
| 6/16/04 | 20.48 |
| 6/17/04 | 20.38 |
| 6/18/04 | 20.65 |
| 6/21/04 | 20.75 |
| 6/22/04 | 21.05 |
| 6/23/04 | 21.75 |
| 6/24/04 | 21.11 |
| 6/25/04 | 20.08 |
| 6/28/04 | 19.58 |
| 6/29/04 | 19.54 |
| 6/30/04 | 19.60 |
| 7/1/04 | 18.96 |
| 7/2/04 | 19.04 |
| 7/6/04 | 18.64 |
| 7/7/04 | 18.60 |
| 7/8/04 | 18.42 |
| 7/9/04 | 19.16 |
| 7/12/04 | 18.86 |
| 7/13/04 | 19.09 |
| 7/14/04 | 18.74 |
| 7/15/04 | 18.62 |
| 7/16/04 | 18.44 |
| 7/19/04 | 18.35 |
| 7/20/04 | 18.25 |
| 7/21/04 | 18.93 |
| 7/22/04 | 18.18 |
| 7/23/04 | 19.01 |
| 7/26/04 | 19.02 |
| 7/27/04 | 19.15 |
| 7/28/04 | 19.52 |
| 7/29/04 | 19.42 |
| 7/30/04 | 19.29 |
| 8/2/04 | 19.23 |
| 8/3/04 | 18.96 |
| 8/4/04 | 18.85 |
| 8/5/04 | 18.25 |
| 8/6/04 | 17.51 |
| 8/9/04 | 17.76 |
| 8/10/04 | 18.06 |
| 8/11/04 | 17.95 |
| 8/12/04 | 17.59 |
| 8/13/04 | 17.27 |
| 8/16/04 | 18.00 |
| 8/17/04 | 18.38 |
| 8/18/04 | 18.62 |
| 8/19/04 | 18.21 |

Dana Ordinary Shares (DCNAQ.PK)
Daily prices (split adjusted) from May 1, 2003 to March 3, 2006
Source: Factiva

| Date | Close |
|------|-------|
| 8/20/04 | 18.45 |
| 8/23/04 | 18.20 |
| 8/24/04 | 18.19 |
| 8/25/04 | 18.40 |
| 8/26/04 | 18.41 |
| 8/27/04 | 18.40 |
| 8/30/04 | 18.46 |
| 8/31/04 | 18.87 |
| 9/1/04 | 18.95 |
| 9/2/04 | 18.99 |
| 9/3/04 | 19.02 |
| 9/7/04 | 19.25 |
| 9/8/04 | 18.84 |
| 9/9/04 | 18.78 |
| 9/10/04 | 18.46 |
| 9/13/04 | 18.47 |
| 9/14/04 | 18.08 |
| 9/15/04 | 17.92 |
| 9/16/04 | 17.96 |
| 9/17/04 | 17.95 |
| 9/20/04 | 17.63 |
| 9/21/04 | 17.81 |
| 9/22/04 | 17.33 |
| 9/23/04 | 16.95 |
| 9/24/04 | 16.99 |
| 9/27/04 | 16.70 |
| 9/28/04 | 16.86 |
| 9/29/04 | 17.02 |
| 9/30/04 | 17.69 |
| 10/1/04 | 18.19 |
| 10/4/04 | 17.99 |
| 10/5/04 | 17.72 |
| 10/6/04 | 17.53 |
| 10/7/04 | 17.00 |
| 10/8/04 | 16.58 |
| 10/11/04 | 16.38 |
| 10/12/04 | 16.60 |
| 10/13/04 | 14.84 |
| 10/14/04 | 14.61 |
| 10/15/04 | 14.56 |
| 10/18/04 | 14.60 |
| 10/19/04 | 14.39 |
| 10/20/04 | 14.17 |
| 10/21/04 | 14.10 |
| 10/22/04 | 14.10 |
| 10/25/04 | 14.19 |
| 10/26/04 | 14.77 |

Dana Ordinary Shares (DCNAQ.PK)
Daily prices (split adjusted) from May 1, 2003 to March 3, 2006
Source: Factiva

| Date | Close |
|------|-------|
| 10/27/04 | 15.04 |
| 10/28/04 | 15.10 |
| 10/29/04 | 14.91 |
| 11/1/04 | 15.66 |
| 11/2/04 | 15.63 |
| 11/3/04 | 15.87 |
| 11/4/04 | 15.93 |
| 11/5/04 | 16.38 |
| 11/8/04 | 16.43 |
| 11/9/04 | 16.43 |
| 11/10/04 | 16.24 |
| 11/11/04 | 16.19 |
| 11/12/04 | 16.25 |
| 11/15/04 | 16.24 |
| 11/16/04 | 16.45 |
| 11/17/04 | 16.56 |
| 11/18/04 | 16.63 |
| 11/19/04 | 16.33 |
| 11/22/04 | 16.87 |
| 11/23/04 | 16.74 |
| 11/24/04 | 16.86 |
| 11/26/04 | 16.83 |
| 11/29/04 | 16.67 |
| 11/30/04 | 16.35 |
| 12/1/04 | 17.00 |
| 12/2/04 | 16.90 |
| 12/3/04 | 17.04 |
| 12/6/04 | 16.55 |
| 12/7/04 | 16.23 |
| 12/8/04 | 16.36 |
| 12/9/04 | 16.46 |
| 12/10/04 | 16.35 |
| 12/13/04 | 16.63 |
| 12/14/04 | 16.71 |
| 12/15/04 | 17.10 |
| 12/16/04 | 16.73 |
| 12/17/04 | 16.67 |
| 12/20/04 | 16.65 |
| 12/21/04 | 16.90 |
| 12/22/04 | 17.24 |
| 12/23/04 | 17.35 |
| 12/27/04 | 16.98 |
| 12/28/04 | 17.37 |
| 12/29/04 | 17.51 |
| 12/30/04 | 17.42 |
| 12/31/04 | 17.33 |
| 1/3/05 | 17.00 |

Dana Ordinary Shares (DCNAQ.PK)
Daily prices (split adjusted) from May 1, 2003 to March 3, 2006
Source: Factiva

| Date | Close |
|------|-------|
| 1/4/05 | 17.00 |
| 1/5/05 | 16.83 |
| 1/6/05 | 17.01 |
| 1/7/05 | 16.71 |
| 1/10/05 | 16.50 |
| 1/11/05 | 16.14 |
| 1/12/05 | 16.15 |
| 1/13/05 | 16.18 |
| 1/14/05 | 16.30 |
| 1/18/05 | 16.31 |
| 1/19/05 | 16.11 |
| 1/20/05 | 15.70 |
| 1/21/05 | 15.64 |
| 1/24/05 | 15.38 |
| 1/25/05 | 15.36 |
| 1/26/05 | 15.88 |
| 1/27/05 | 15.81 |
| 1/28/05 | 15.49 |
| 1/31/05 | 15.87 |
| 2/1/05 | 16.00 |
| 2/2/05 | 16.19 |
| 2/3/05 | 15.78 |
| 2/4/05 | 16.06 |
| 2/7/05 | 16.20 |
| 2/8/05 | 16.24 |
| 2/9/05 | 15.94 |
| 2/10/05 | 15.76 |
| 2/11/05 | 16.00 |
| 2/14/05 | 15.84 |
| 2/15/05 | 15.90 |
| 2/16/05 | 15.60 |
| 2/17/05 | 15.42 |
| 2/18/05 | 15.64 |
| 2/22/05 | 15.34 |
| 2/23/05 | 14.95 |
| 2/24/05 | 14.85 |
| 2/25/05 | 14.76 |
| 2/28/05 | 14.42 |
| 3/1/05 | 14.60 |
| 3/2/05 | 14.34 |
| 3/3/05 | 14.36 |
| 3/4/05 | 14.11 |
| 3/7/05 | 14.05 |
| 3/8/05 | 13.87 |
| 3/9/05 | 13.99 |
| 3/10/05 | 14.04 |
| 3/11/05 | 14.21 |

Dana Ordinary Shares (DCNAQ.PK)
Daily prices (split adjusted) from May 1, 2003 to March 3, 2006
Source: Factiva

| Date | Close |
| --- | --- |
| 3/14/05 | 14.53 |
| 3/15/05 | 14.18 |
| 3/16/05 | 14.00 |
| 3/17/05 | 13.78 |
| 3/18/05 | 13.75 |
| 3/21/05 | 13.68 |
| 3/22/05 | 13.54 |
| 3/23/05 | 13.01 |
| 3/24/05 | 13.08 |
| 3/28/05 | 12.92 |
| 3/29/05 | 12.75 |
| 3/30/05 | 12.35 |
| 3/31/05 | 12.79 |
| 4/1/05 | 12.52 |
| 4/4/05 | 12.56 |
| 4/5/05 | 12.66 |
| 4/6/05 | 12.60 |
| 4/7/05 | 12.72 |
| 4/8/05 | 12.50 |
| 4/11/05 | 12.10 |
| 4/12/05 | 11.99 |
| 4/13/05 | 11.82 |
| 4/14/05 | 11.53 |
| 4/15/05 | 10.96 |
| 4/18/05 | 11.36 |
| 4/19/05 | 11.32 |
| 4/20/05 | 11.67 |
| 4/21/05 | 12.44 |
| 4/22/05 | 12.16 |
| 4/25/05 | 12.23 |
| 4/26/05 | 11.83 |
| 4/27/05 | 11.62 |
| 4/28/05 | 11.50 |
| 4/29/05 | 11.42 |
| 5/2/05 | 11.11 |
| 5/3/05 | 11.31 |
| 5/4/05 | 12.00 |
| 5/5/05 | 11.61 |
| 5/6/05 | 11.73 |
| 5/9/05 | 11.75 |
| 5/10/05 | 11.90 |
| 5/11/05 | 11.79 |
| 5/12/05 | 11.34 |
| 5/13/05 | 11.42 |
| 5/16/05 | 11.63 |
| 5/17/05 | 11.65 |
| 5/18/05 | 12.04 |

Dana Ordinary Shares (DCNAQ,PK)
Daily prices (split adjusted) from May 1, 2003 to March 3, 2006
Source: Factiva

| Date | Close |
|------|-------|
| 5/19/05 | 12.20 |
| 5/20/05 | 12.94 |
| 5/23/05 | 12.92 |
| 5/24/05 | 12.71 |
| 5/25/05 | 12.96 |
| 5/26/05 | 12.98 |
| 5/27/05 | 13.14 |
| 5/31/05 | 13.41 |
| 6/1/05 | 13.37 |
| 6/2/05 | 13.32 |
| 6/3/05 | 13.00 |
| 6/6/05 | 13.09 |
| 6/7/05 | 13.04 |
| 6/8/05 | 14.18 |
| 6/9/05 | 14.30 |
| 6/10/05 | 14.39 |
| 6/13/05 | 14.60 |
| 6/14/05 | 14.94 |
| 6/15/05 | 14.84 |
| 6/16/05 | 14.91 |
| 6/17/05 | 15.23 |
| 6/20/05 | 14.96 |
| 6/21/05 | 14.96 |
| 6/22/05 | 14.70 |
| 6/23/05 | 14.70 |
| 6/24/05 | 14.34 |
| 6/27/05 | 13.95 |
| 6/28/05 | 14.32 |
| 6/29/05 | 14.61 |
| 6/30/05 | 14.85 |
| 7/1/05 | 15.17 |
| 7/5/05 | 15.26 |
| 7/6/05 | 15.46 |
| 7/7/05 | 15.41 |
| 7/8/05 | 16.28 |
| 7/11/05 | 16.29 |
| 7/12/05 | 16.43 |
| 7/13/05 | 16.29 |
| 7/14/05 | 16.53 |
| 7/15/05 | 16.34 |
| 7/18/05 | 16.18 |
| 7/19/05 | 16.55 |
| 7/20/05 | 16.43 |
| 7/21/05 | 15.70 |
| 7/22/05 | 15.89 |
| 7/25/05 | 15.73 |
| 7/26/05 | 15.64 |

Dana Ordinary Shares (DCNAQ.PK)
Daily prices (split adjusted) from May 1, 2003 to March 3, 2006
Source: Factiva

| Date | Close |
|------|-------|
| 7/27/05 | 15.79 |
| 7/28/05 | 15.93 |
| 7/29/05 | 15.55 |
| 8/1/05 | 15.66 |
| 8/2/05 | 15.76 |
| 8/3/05 | 15.64 |
| 8/4/05 | 15.17 |
| 8/5/05 | 14.96 |
| 8/8/05 | 15.09 |
| 8/9/05 | 15.21 |
| 8/10/05 | 14.85 |
| 8/11/05 | 14.94 |
| 8/12/05 | 14.53 |
| 8/15/05 | 14.56 |
| 8/16/05 | 14.43 |
| 8/17/05 | 14.01 |
| 8/18/05 | 13.70 |
| 8/19/05 | 13.76 |
| 8/22/05 | 13.83 |
| 8/23/05 | 13.56 |
| 8/24/05 | 13.71 |
| 8/25/05 | 13.76 |
| 8/26/05 | 13.46 |
| 8/29/05 | 13.18 |
| 8/30/05 | 13.41 |
| 8/31/05 | 13.44 |
| 9/1/05 | 13.20 |
| 9/2/05 | 13.44 |
| 9/6/05 | 13.13 |
| 9/7/05 | 13.26 |
| 9/8/05 | 13.06 |
| 9/9/05 | 12.88 |
| 9/12/05 | 12.92 |
| 9/13/05 | 12.66 |
| 9/14/05 | 12.76 |
| 9/15/05 | 9.85 |
| 9/16/05 | 9.57 |
| 9/19/05 | 9.46 |
| 9/20/05 | 8.99 |
| 9/21/05 | 9.14 |
| 9/22/05 | 9.24 |
| 9/23/05 | 9.25 |
| 9/26/05 | 9.19 |
| 9/27/05 | 9.20 |
| 9/28/05 | 9.23 |
| 9/29/05 | 9.28 |
| 9/30/05 | 9.40 |

Dana Ordinary Shares (DCNAQ.PK)
Daily prices (split adjusted) from May 1, 2003 to March 3, 2006
Source: Factiva

| Date | Close |
|------|-------|
| 10/3/05 | 9.37 |
| 10/4/05 | 9.30 |
| 10/5/05 | 9.07 |
| 10/6/05 | 8.85 |
| 10/7/05 | 9.18 |
| 10/10/05 | 6.03 |
| 10/11/05 | 5.70 |
| 10/12/05 | 5.99 |
| 10/13/05 | 6.20 |
| 10/14/05 | 6.35 |
| 10/17/05 | 7.18 |
| 10/18/05 | 6.96 |
| 10/19/05 | 7.55 |
| 10/20/05 | 7.75 |
| 10/21/05 | 7.38 |
| 10/24/05 | 7.46 |
| 10/25/05 | 7.24 |
| 10/26/05 | 7.47 |
| 10/27/05 | 7.02 |
| 10/28/05 | 7.19 |
| 10/31/05 | 7.50 |
| 11/1/05 | 7.42 |
| 11/2/05 | 7.50 |
| 11/3/05 | 7.33 |
| 11/4/05 | 7.43 |
| 11/7/05 | 7.47 |
| 11/8/05 | 7.18 |
| 11/9/05 | 6.98 |
| 11/10/05 | 6.90 |
| 11/11/05 | 7.02 |
| 11/14/05 | 6.99 |
| 11/15/05 | 6.77 |
| 11/16/05 | 6.95 |
| 11/17/05 | 7.01 |
| 11/18/05 | 7.37 |
| 11/21/05 | 7.37 |
| 11/22/05 | 7.33 |
| 11/23/05 | 7.32 |
| 11/25/05 | 7.12 |
| 11/28/05 | 6.97 |
| 11/29/05 | 6.96 |
| 11/30/05 | 6.97 |
| 12/1/05 | 6.95 |
| 12/2/05 | 6.80 |
| 12/5/05 | 6.93 |
| 12/6/05 | 6.99 |
| 12/7/05 | 6.74 |

Dana Ordinary Shares (DCNAQ.PK)
Daily prices (split adjusted) from May 1, 2003 to March 3, 2006
Source: Factiva

| Date | Close |
|------|-------|
| 12/8/05 | 6.82 |
| 12/9/05 | 7.00 |
| 12/12/05 | 6.90 |
| 12/13/05 | 6.91 |
| 12/14/05 | 7.12 |
| 12/15/05 | 6.95 |
| 12/16/05 | 6.80 |
| 12/19/05 | 6.85 |
| 12/20/05 | 6.64 |
| 12/21/05 | 6.74 |
| 12/22/05 | 6.62 |
| 12/23/05 | 6.62 |
| 12/27/05 | 6.79 |
| 12/28/05 | 6.99 |
| 12/29/05 | 7.09 |
| 12/30/05 | 7.18 |
| 1/3/06 | 7.25 |
| 1/4/06 | 7.47 |
| 1/5/06 | 7.79 |
| 1/6/06 | 7.76 |
| 1/9/06 | 7.92 |
| 1/10/06 | 7.81 |
| 1/11/06 | 7.79 |
| 1/12/06 | 7.07 |
| 1/13/06 | 6.80 |
| 1/17/06 | 5.40 |
| 1/18/06 | 4.84 |
| 1/19/06 | 4.35 |
| 1/20/06 | 4.35 |
| 1/23/06 | 4.41 |
| 1/24/06 | 4.41 |
| 1/25/06 | 4.42 |
| 1/26/06 | 4.36 |
| 1/27/06 | 4.39 |
| 1/30/06 | 4.85 |
| 1/31/06 | 4.87 |
| 2/1/06 | 5.11 |
| 2/2/06 | 4.68 |
| 2/3/06 | 4.54 |
| 2/6/06 | 4.24 |
| 2/7/06 | 4.26 |
| 2/8/06 | 4.31 |
| 2/9/06 | 4.22 |
| 2/10/06 | 4.16 |
| 2/13/06 | 4.08 |
| 2/14/06 | 4.13 |
| 2/15/06 | 3.99 |

15

Dana Ordinary Shares (DCNAQ.PK)
Daily prices (split adjusted) from May 1, 2003 to March 3, 2006
Source: Factiva

| Date | Close |
|------|-------|
| 2/16/06 | 4.09 |
| 2/17/06 | 4.23 |
| 2/21/06 | 4.03 |
| 2/22/06 | 3.89 |
| 2/23/06 | 3.15 |
| 2/24/06 | 1.51 |
| 2/27/06 | 1.78 |
| 2/28/06 | 1.76 |
| 3/1/06 | 1.85 |
| 3/2/06 | 1.04 |
| 3/3/06 | 0.66 |

# Exhibit H

Delphi Corp Common Stock (DPHIQ.PK)
Daily prices (split adjusted) from May 1, 2003 to October 10, 2005
Source: Factiva

| Date | Close |
|------|-------|
| 5/1/03 | 8.29 |
| 5/2/03 | 8.28 |
| 5/5/03 | 8.46 |
| 5/6/03 | 8.59 |
| 5/7/03 | 8.55 |
| 5/8/03 | 8.51 |
| 5/9/03 | 8.37 |
| 5/12/03 | 8.38 |
| 5/13/03 | 8.56 |
| 5/14/03 | 8.77 |
| 5/15/03 | 8.69 |
| 5/16/03 | 8.62 |
| 5/19/03 | 8.35 |
| 5/20/03 | 8.27 |
| 5/21/03 | 8.16 |
| 5/22/03 | 8.14 |
| 5/23/03 | 7.95 |
| 5/27/03 | 8.47 |
| 5/28/03 | 8.44 |
| 5/29/03 | 8.52 |
| 5/30/03 | 8.82 |
| 6/2/03 | 9.04 |
| 6/3/03 | 9.08 |
| 6/4/03 | 9.13 |
| 6/5/03 | 9.51 |
| 6/6/03 | 9.70 |
| 6/9/03 | 9.38 |
| 6/10/03 | 9.52 |
| 6/11/03 | 9.52 |
| 6/12/03 | 9.59 |
| 6/13/03 | 8.58 |
| 6/16/03 | 8.70 |
| 6/17/03 | 8.91 |
| 6/18/03 | 9.06 |
| 6/19/03 | 8.79 |
| 6/20/03 | 8.95 |
| 6/23/03 | 8.84 |
| 6/24/03 | 8.80 |
| 6/25/03 | 8.71 |
| 6/26/03 | 8.71 |
| 6/27/03 | 8.68 |
| 6/30/03 | 8.63 |
| 7/1/03 | 8.49 |
| 7/2/03 | 8.55 |
| 7/3/03 | 8.40 |
| 7/7/03 | 8.53 |
| 7/8/03 | 8.86 |

Delphi Corp Common Stock (DPHIQ.PK)
Daily prices (split adjusted) from May 1, 2003 to October 10, 2005
Source: Factiva

| Date | Close |
|------|-------|
| 7/9/03 | 8.73 |
| 7/10/03 | 8.49 |
| 7/11/03 | 8.60 |
| 7/14/03 | 8.80 |
| 7/15/03 | 8.74 |
| 7/16/03 | 8.55 |
| 7/17/03 | 8.42 |
| 7/18/03 | 8.44 |
| 7/21/03 | 8.02 |
| 7/22/03 | 8.07 |
| 7/23/03 | 8.26 |
| 7/24/03 | 8.32 |
| 7/25/03 | 8.57 |
| 7/28/03 | 8.47 |
| 7/29/03 | 8.32 |
| 7/30/03 | 8.28 |
| 7/31/03 | 8.40 |
| 8/1/03 | 8.33 |
| 8/4/03 | 8.40 |
| 8/5/03 | 8.03 |
| 8/6/03 | 8.25 |
| 8/7/03 | 8.26 |
| 8/8/03 | 8.28 |
| 8/11/03 | 8.37 |
| 8/12/03 | 8.45 |
| 8/13/03 | 8.38 |
| 8/14/03 | 8.59 |
| 8/15/03 | 8.51 |
| 8/18/03 | 8.61 |
| 8/19/03 | 8.56 |
| 8/20/03 | 8.58 |
| 8/21/03 | 8.70 |
| 8/22/03 | 8.60 |
| 8/25/03 | 8.61 |
| 8/26/03 | 8.74 |
| 8/27/03 | 8.52 |
| 8/28/03 | 8.65 |
| 8/29/03 | 9.06 |
| 9/2/03 | 9.31 |
| 9/3/03 | 9.31 |
| 9/4/03 | 9.20 |
| 9/5/03 | 9.44 |
| 9/8/03 | 9.60 |
| 9/9/03 | 9.42 |
| 9/10/03 | 9.19 |
| 9/11/03 | 9.18 |
| 9/12/03 | 9.20 |

2

Delphi Corp Common Stock (DPHIQ.PK)
Daily prices (split adjusted) from May 1, 2003 to October 10, 2005
Source: Factiva

| Date | Close |
|------|-------|
| 9/15/03 | 9.34 |
| 9/16/03 | 9.68 |
| 9/17/03 | 9.66 |
| 9/18/03 | 9.62 |
| 9/19/03 | 9.56 |
| 9/22/03 | 9.42 |
| 9/23/03 | 9.41 |
| 9/24/03 | 9.20 |
| 9/25/03 | 9.33 |
| 9/26/03 | 9.18 |
| 9/29/03 | 9.30 |
| 9/30/03 | 9.05 |
| 10/1/03 | 9.31 |
| 10/2/03 | 9.34 |
| 10/3/03 | 9.33 |
| 10/6/03 | 9.26 |
| 10/7/03 | 9.12 |
| 10/8/03 | 9.10 |
| 10/9/03 | 9.05 |
| 10/10/03 | 9.03 |
| 10/13/03 | 9.09 |
| 10/14/03 | 9.24 |
| 10/15/03 | 9.34 |
| 10/16/03 | 9.22 |
| 10/17/03 | 9.04 |
| 10/20/03 | 8.93 |
| 10/21/03 | 8.90 |
| 10/22/03 | 8.80 |
| 10/23/03 | 8.79 |
| 10/24/03 | 8.55 |
| 10/27/03 | 8.81 |
| 10/28/03 | 8.90 |
| 10/29/03 | 8.97 |
| 10/30/03 | 8.86 |
| 10/31/03 | 8.90 |
| 11/3/03 | 8.92 |
| 11/4/03 | 8.93 |
| 11/5/03 | 8.92 |
| 11/6/03 | 9.01 |
| 11/7/03 | 8.80 |
| 11/10/03 | 8.67 |
| 11/11/03 | 8.60 |
| 11/12/03 | 8.51 |
| 11/13/03 | 8.79 |
| 11/14/03 | 8.59 |
| 11/17/03 | 8.48 |
| 11/18/03 | 8.38 |

Delphi Corp Common Stock (DPHIQ.PK)
Daily prices (split adjusted) from May 1, 2003 to October 10, 2005
Source:  Factiva

| Date | Close |
|------|-------|
| 11/19/03 | 8.40 |
| 11/20/03 | 8.11 |
| 11/21/03 | 8.27 |
| 11/24/03 | 8.45 |
| 11/25/03 | 8.52 |
| 11/26/03 | 8.81 |
| 11/28/03 | 8.78 |
| 12/1/03 | 8.89 |
| 12/2/03 | 8.86 |
| 12/3/03 | 9.11 |
| 12/4/03 | 9.09 |
| 12/5/03 | 9.11 |
| 12/8/03 | 9.10 |
| 12/9/03 | 9.13 |
| 12/10/03 | 9.13 |
| 12/11/03 | 9.21 |
| 12/12/03 | 9.39 |
| 12/15/03 | 9.50 |
| 12/16/03 | 9.26 |
| 12/17/03 | 9.39 |
| 12/18/03 | 9.41 |
| 12/19/03 | 9.48 |
| 12/22/03 | 9.61 |
| 12/23/03 | 9.76 |
| 12/24/03 | 9.67 |
| 12/26/03 | 9.70 |
| 12/29/03 | 10.07 |
| 12/30/03 | 10.01 |
| 12/31/03 | 10.21 |
| 1/2/04 | 10.21 |
| 1/5/04 | 10.67 |
| 1/6/04 | 10.69 |
| 1/7/04 | 11.05 |
| 1/8/04 | 10.99 |
| 1/9/04 | 10.92 |
| 1/12/04 | 11.25 |
| 1/13/04 | 11.37 |
| 1/14/04 | 11.67 |
| 1/15/04 | 11.55 |
| 1/16/04 | 11.60 |
| 1/20/04 | 11.50 |
| 1/21/04 | 11.63 |
| 1/22/04 | 11.44 |
| 1/23/04 | 11.23 |
| 1/26/04 | 11.29 |
| 1/27/04 | 11.18 |
| 1/28/04 | 10.82 |

Delphi Corp Common Stock (DPHIQ.PK)
Daily prices (split adjusted) from May 1, 2003 to October 10, 2005
Source:  Factiva

| Date | Close |
|------|-------|
| 1/29/04 | 10.77 |
| 1/30/04 | 10.58 |
| 2/2/04 | 10.49 |
| 2/3/04 | 10.48 |
| 2/4/04 | 10.41 |
| 2/5/04 | 10.46 |
| 2/6/04 | 10.83 |
| 2/9/04 | 10.79 |
| 2/10/04 | 10.69 |
| 2/11/04 | 10.83 |
| 2/12/04 | 10.75 |
| 2/13/04 | 10.59 |
| 2/17/04 | 10.67 |
| 2/18/04 | 10.49 |
| 2/19/04 | 10.42 |
| 2/20/04 | 10.39 |
| 2/23/04 | 10.27 |
| 2/24/04 | 10.18 |
| 2/25/04 | 10.35 |
| 2/26/04 | 10.08 |
| 2/27/04 | 10.20 |
| 3/1/04 | 10.27 |
| 3/2/04 | 10.20 |
| 3/3/04 | 10.25 |
| 3/4/04 | 10.51 |
| 3/5/04 | 10.81 |
| 3/8/04 | 10.72 |
| 3/9/04 | 10.49 |
| 3/10/04 | 10.17 |
| 3/11/04 | 10.16 |
| 3/12/04 | 10.30 |
| 3/15/04 | 10.07 |
| 3/16/04 | 10.25 |
| 3/17/04 | 10.50 |
| 3/18/04 | 10.26 |
| 3/19/04 | 10.08 |
| 3/22/04 | 9.72 |
| 3/23/04 | 9.72 |
| 3/24/04 | 9.44 |
| 3/25/04 | 9.60 |
| 3/26/04 | 9.79 |
| 3/29/04 | 9.88 |
| 3/30/04 | 10.03 |
| 3/31/04 | 9.96 |
| 4/1/04 | 10.02 |
| 4/2/04 | 10.14 |
| 4/5/04 | 10.39 |

5

Delphi Corp Common Stock (DPHIQ.PK)
Daily prices (split adjusted) from May 1, 2003 to October 10, 2005
Source: Factiva

| Date | Close |
|------|-------|
| 4/6/04 | 10.64 |
| 4/7/04 | 10.32 |
| 4/8/04 | 10.16 |
| 4/12/04 | 10.25 |
| 4/13/04 | 9.92 |
| 4/14/04 | 9.74 |
| 4/15/04 | 9.83 |
| 4/16/04 | 9.80 |
| 4/19/04 | 10.16 |
| 4/20/04 | 10.38 |
| 4/21/04 | 10.33 |
| 4/22/04 | 10.56 |
| 4/23/04 | 10.58 |
| 4/26/04 | 10.58 |
| 4/27/04 | 10.54 |
| 4/28/04 | 10.23 |
| 4/29/04 | 9.99 |
| 4/30/04 | 10.20 |
| 5/3/04 | 10.45 |
| 5/4/04 | 10.26 |
| 5/5/04 | 10.22 |
| 5/6/04 | 10.10 |
| 5/7/04 | 9.99 |
| 5/10/04 | 9.96 |
| 5/11/04 | 10.06 |
| 5/12/04 | 10.03 |
| 5/13/04 | 10.00 |
| 5/14/04 | 10.01 |
| 5/17/04 | 9.88 |
| 5/18/04 | 9.99 |
| 5/19/04 | 9.92 |
| 5/20/04 | 9.63 |
| 5/21/04 | 9.83 |
| 5/24/04 | 9.98 |
| 5/25/04 | 10.16 |
| 5/26/04 | 10.25 |
| 5/27/04 | 10.30 |
| 5/28/04 | 10.19 |
| 6/1/04 | 10.30 |
| 6/2/04 | 10.37 |
| 6/3/04 | 10.39 |
| 6/4/04 | 10.44 |
| 6/7/04 | 10.51 |
| 6/8/04 | 10.61 |
| 6/9/04 | 10.66 |
| 6/10/04 | 10.80 |
| 6/14/04 | 10.65 |

Delphi Corp Common Stock (DPHIQ.PK)
Daily prices (split adjusted) from May 1, 2003 to October 10, 2005
Source: Factiva

| Date | Close |
|------|-------|
| 6/15/04 | 10.86 |
| 6/16/04 | 10.81 |
| 6/17/04 | 10.81 |
| 6/18/04 | 10.80 |
| 6/21/04 | 10.72 |
| 6/22/04 | 10.75 |
| 6/23/04 | 10.97 |
| 6/24/04 | 10.72 |
| 6/25/04 | 10.71 |
| 6/28/04 | 10.52 |
| 6/29/04 | 10.52 |
| 6/30/04 | 10.68 |
| 7/1/04 | 10.27 |
| 7/2/04 | 10.11 |
| 7/6/04 | 10.04 |
| 7/7/04 | 9.88 |
| 7/8/04 | 9.84 |
| 7/9/04 | 10.01 |
| 7/12/04 | 9.88 |
| 7/13/04 | 9.90 |
| 7/14/04 | 9.84 |
| 7/15/04 | 9.71 |
| 7/16/04 | 9.63 |
| 7/19/04 | 9.73 |
| 7/20/04 | 9.78 |
| 7/21/04 | 9.75 |
| 7/22/04 | 9.67 |
| 7/23/04 | 9.53 |
| 7/26/04 | 9.52 |
| 7/27/04 | 9.57 |
| 7/28/04 | 9.70 |
| 7/29/04 | 9.52 |
| 7/30/04 | 9.51 |
| 8/2/04 | 9.63 |
| 8/3/04 | 9.49 |
| 8/4/04 | 9.42 |
| 8/5/04 | 9.27 |
| 8/6/04 | 9.10 |
| 8/9/04 | 9.02 |
| 8/10/04 | 9.23 |
| 8/11/04 | 9.23 |
| 8/12/04 | 9.04 |
| 8/13/04 | 9.00 |
| 8/16/04 | 9.20 |
| 8/17/04 | 9.27 |
| 8/18/04 | 9.34 |
| 8/19/04 | 9.18 |

Delphi Corp Common Stock (DPHIQ.PK)
Daily prices (split adjusted) from May 1, 2003 to October 10, 2005
Source: Factiva

| Date | Close |
|------|-------|
| 8/20/04 | 9.24 |
| 8/23/04 | 9.18 |
| 8/24/04 | 9.20 |
| 8/25/04 | 9.25 |
| 8/26/04 | 9.24 |
| 8/27/04 | 9.28 |
| 8/30/04 | 9.12 |
| 8/31/04 | 9.16 |
| 9/1/04 | 9.18 |
| 9/2/04 | 9.28 |
| 9/3/04 | 9.25 |
| 9/7/04 | 9.49 |
| 9/8/04 | 9.56 |
| 9/9/04 | 9.36 |
| 9/10/04 | 9.02 |
| 9/13/04 | 9.19 |
| 9/14/04 | 9.03 |
| 9/15/04 | 8.90 |
| 9/16/04 | 8.99 |
| 9/17/04 | 9.10 |
| 9/20/04 | 8.94 |
| 9/21/04 | 9.03 |
| 9/22/04 | 9.04 |
| 9/23/04 | 9.03 |
| 9/24/04 | 9.07 |
| 9/27/04 | 9.00 |
| 9/28/04 | 9.25 |
| 9/29/04 | 9.17 |
| 9/30/04 | 9.29 |
| 10/1/04 | 9.40 |
| 10/4/04 | 9.36 |
| 10/5/04 | 9.31 |
| 10/6/04 | 8.85 |
| 10/7/04 | 8.84 |
| 10/8/04 | 8.73 |
| 10/11/04 | 8.86 |
| 10/12/04 | 8.78 |
| 10/13/04 | 8.75 |
| 10/14/04 | 8.45 |
| 10/15/04 | 8.44 |
| 10/18/04 | 8.24 |
| 10/19/04 | 8.28 |
| 10/20/04 | 8.35 |
| 10/21/04 | 8.36 |
| 10/22/04 | 8.36 |
| 10/25/04 | 8.26 |
| 10/26/04 | 8.30 |

Delphi Corp Common Stock (DPHIQ.PK)
Daily prices (split adjusted) from May 1, 2003 to October 10, 2005
Source: Factiva

| Date | Close |
|------|-------|
| 10/27/04 | 8.52 |
| 10/28/04 | 8.54 |
| 10/29/04 | 8.41 |
| 11/1/04 | 8.43 |
| 11/2/04 | 8.46 |
| 11/3/04 | 8.45 |
| 11/4/04 | 8.63 |
| 11/5/04 | 8.80 |
| 11/8/04 | 8.99 |
| 11/9/04 | 8.87 |
| 11/10/04 | 8.91 |
| 11/11/04 | 9.11 |
| 11/12/04 | 9.14 |
| 11/15/04 | 9.18 |
| 11/16/04 | 9.11 |
| 11/17/04 | 9.15 |
| 11/18/04 | 9.09 |
| 11/19/04 | 8.92 |
| 11/22/04 | 8.96 |
| 11/23/04 | 8.93 |
| 11/24/04 | 8.93 |
| 11/26/04 | 9.05 |
| 11/29/04 | 8.98 |
| 11/30/04 | 9.00 |
| 12/1/04 | 9.17 |
| 12/2/04 | 9.03 |
| 12/3/04 | 9.07 |
| 12/6/04 | 8.98 |
| 12/7/04 | 8.81 |
| 12/8/04 | 8.78 |
| 12/9/04 | 8.64 |
| 12/10/04 | 8.30 |
| 12/13/04 | 8.28 |
| 12/14/04 | 8.45 |
| 12/15/04 | 8.45 |
| 12/16/04 | 8.45 |
| 12/17/04 | 8.50 |
| 12/20/04 | 8.44 |
| 12/21/04 | 8.47 |
| 12/22/04 | 8.52 |
| 12/23/04 | 8.55 |
| 12/27/04 | 8.62 |
| 12/28/04 | 8.76 |
| 12/29/04 | 8.95 |
| 12/30/04 | 9.01 |
| 12/31/04 | 9.02 |
| 1/3/05 | 8.83 |

Delphi Corp Common Stock (DPHIQ.PK)
Daily prices (split adjusted) from May 1, 2003 to October 10, 2005
Source: Factiva

| Date | Close |
|------|-------|
| 1/4/05 | 8.55 |
| 1/5/05 | 8.40 |
| 1/6/05 | 8.44 |
| 1/7/05 | 8.32 |
| 1/10/05 | 8.22 |
| 1/11/05 | 8.09 |
| 1/12/05 | 8.12 |
| 1/13/05 | 7.99 |
| 1/14/05 | 8.00 |
| 1/18/05 | 7.97 |
| 1/19/05 | 7.94 |
| 1/20/05 | 7.81 |
| 1/21/05 | 7.64 |
| 1/24/05 | 7.58 |
| 1/25/05 | 7.50 |
| 1/26/05 | 7.60 |
| 1/27/05 | 7.57 |
| 1/28/05 | 7.50 |
| 1/31/05 | 7.59 |
| 2/1/05 | 7.52 |
| 2/2/05 | 7.63 |
| 2/3/05 | 7.45 |
| 2/4/05 | 7.63 |
| 2/7/05 | 7.55 |
| 2/8/05 | 7.50 |
| 2/9/05 | 7.41 |
| 2/10/05 | 7.30 |
| 2/11/05 | 7.26 |
| 2/14/05 | 7.13 |
| 2/15/05 | 7.13 |
| 2/16/05 | 7.09 |
| 2/17/05 | 7.08 |
| 2/18/05 | 7.06 |
| 2/22/05 | 6.92 |
| 2/23/05 | 6.90 |
| 2/24/05 | 6.87 |
| 2/25/05 | 6.89 |
| 2/28/05 | 6.87 |
| 3/1/05 | 6.89 |
| 3/2/05 | 6.46 |
| 3/3/05 | 6.37 |
| 3/4/05 | 5.46 |
| 3/7/05 | 5.15 |
| 3/8/05 | 5.01 |
| 3/9/05 | 4.89 |
| 3/10/05 | 5.07 |
| 3/11/05 | 5.12 |

Delphi Corp Common Stock (DPHIQ.PK)
Daily prices (split adjusted) from May 1, 2003 to October 10, 2005
Source: Factiva

| Date | Close |
|------|-------|
| 3/14/05 | 5.19 |
| 3/15/05 | 4.94 |
| 3/16/05 | 4.67 |
| 3/17/05 | 4.56 |
| 3/18/05 | 4.38 |
| 3/21/05 | 4.36 |
| 3/22/05 | 4.51 |
| 3/23/05 | 4.49 |
| 3/24/05 | 4.55 |
| 3/28/05 | 4.42 |
| 3/29/05 | 4.51 |
| 3/30/05 | 4.49 |
| 3/31/05 | 4.48 |
| 4/1/05 | 4.32 |
| 4/4/05 | 4.34 |
| 4/5/05 | 4.27 |
| 4/6/05 | 4.25 |
| 4/7/05 | 4.19 |
| 4/8/05 | 4.10 |
| 4/11/05 | 3.99 |
| 4/12/05 | 3.96 |
| 4/13/05 | 3.91 |
| 4/14/05 | 3.75 |
| 4/15/05 | 3.69 |
| 4/18/05 | 3.73 |
| 4/19/05 | 3.76 |
| 4/20/05 | 3.59 |
| 4/21/05 | 3.81 |
| 4/22/05 | 3.79 |
| 4/25/05 | 3.79 |
| 4/26/05 | 3.65 |
| 4/27/05 | 3.52 |
| 4/28/05 | 3.32 |
| 4/29/05 | 3.30 |
| 5/2/05 | 3.24 |
| 5/3/05 | 3.41 |
| 5/4/05 | 3.84 |
| 5/5/05 | 3.56 |
| 5/6/05 | 3.49 |
| 5/9/05 | 3.65 |
| 5/10/05 | 3.78 |
| 5/11/05 | 3.67 |
| 5/12/05 | 3.39 |
| 5/13/05 | 3.79 |
| 5/16/05 | 3.50 |
| 5/17/05 | 3.35 |
| 5/18/05 | 3.80 |

Delphi Corp Common Stock (DPHIQ.PK)
Daily prices (split adjusted) from May 1, 2003 to October 10, 2005
Source: Factiva

| Date | Close |
|------|-------|
| 5/19/05 | 4.34 |
| 5/20/05 | 4.94 |
| 5/23/05 | 4.67 |
| 5/24/05 | 4.55 |
| 5/25/05 | 4.69 |
| 5/26/05 | 4.59 |
| 5/27/05 | 4.40 |
| 5/31/05 | 4.34 |
| 6/1/05 | 4.38 |
| 6/2/05 | 4.53 |
| 6/3/05 | 4.51 |
| 6/6/05 | 4.37 |
| 6/7/05 | 4.57 |
| 6/8/05 | 4.67 |
| 6/9/05 | 4.45 |
| 6/10/05 | 4.62 |
| 6/13/05 | 4.60 |
| 6/14/05 | 5.04 |
| 6/15/05 | 5.24 |
| 6/16/05 | 5.18 |
| 6/17/05 | 5.16 |
| 6/20/05 | 5.07 |
| 6/21/05 | 5.26 |
| 6/22/05 | 5.04 |
| 6/23/05 | 4.99 |
| 6/24/05 | 4.74 |
| 6/27/05 | 4.54 |
| 6/28/05 | 4.67 |
| 6/29/05 | 4.67 |
| 6/30/05 | 4.65 |
| 7/1/05 | 4.55 |
| 7/5/05 | 4.64 |
| 7/6/05 | 4.72 |
| 7/7/05 | 4.89 |
| 7/8/05 | 5.03 |
| 7/11/05 | 5.15 |
| 7/12/05 | 5.04 |
| 7/13/05 | 5.08 |
| 7/14/05 | 5.20 |
| 7/15/05 | 5.20 |
| 7/18/05 | 5.23 |
| 7/19/05 | 5.20 |
| 7/20/05 | 5.19 |
| 7/21/05 | 5.08 |
| 7/22/05 | 5.09 |
| 7/25/05 | 5.10 |
| 7/26/05 | 5.22 |

Delphi Corp Common Stock (DPHIQ.PK)
Daily prices (split adjusted) from May 1, 2003 to October 10, 2005
Source: Factiva

| Date | Close |
|------|-------|
| 7/27/05 | 5.18 |
| 7/28/05 | 5.19 |
| 7/29/05 | 5.30 |
| 8/1/05 | 5.30 |
| 8/2/05 | 5.33 |
| 8/3/05 | 5.24 |
| 8/4/05 | 5.78 |
| 8/5/05 | 4.96 |
| 8/8/05 | 5.03 |
| 8/9/05 | 5.49 |
| 8/10/05 | 5.49 |
| 8/11/05 | 5.42 |
| 8/12/05 | 5.56 |
| 8/15/05 | 5.53 |
| 8/16/05 | 5.78 |
| 8/17/05 | 5.92 |
| 8/18/05 | 5.92 |
| 8/19/05 | 6.36 |
| 8/22/05 | 6.22 |
| 8/23/05 | 6.34 |
| 8/24/05 | 6.33 |
| 8/25/05 | 6.32 |
| 8/26/05 | 6.04 |
| 8/29/05 | 5.81 |
| 8/30/05 | 5.66 |
| 8/31/05 | 5.55 |
| 9/1/05 | 5.02 |
| 9/2/05 | 4.79 |
| 9/6/05 | 4.67 |
| 9/7/05 | 4.39 |
| 9/8/05 | 4.49 |
| 9/9/05 | 4.24 |
| 9/12/05 | 4.21 |
| 9/13/05 | 4.39 |
| 9/14/05 | 4.34 |
| 9/15/05 | 3.96 |
| 9/16/05 | 3.86 |
| 9/19/05 | 3.37 |
| 9/20/05 | 3.02 |
| 9/21/05 | 3.48 |
| 9/22/05 | 3.12 |
| 9/23/05 | 3.46 |
| 9/26/05 | 2.99 |
| 9/27/05 | 2.75 |
| 9/28/05 | 2.65 |
| 9/29/05 | 2.52 |
| 9/30/05 | 2.76 |

Delphi Corp Common Stock (DPHIQ.PK)
Daily prices (split adjusted) from May 1, 2003 to October 10, 2005
Source: Factiva

| Date | Close |
|------|-------|
| 10/3/05 | 2.80 |
| 10/4/05 | 2.78 |
| 10/5/05 | 2.50 |
| 10/6/05 | 2.20 |
| 10/7/05 | 1.12 |
| 10/10/05 | 0.33 |

# Exhibit I

Tower Automotive Ordinary (TWRAQ.PK)
Daily prices (split adjusted) from May 1, 2003 to February 2, 2005
Source: Factiva

| Date | Close |
|------|-------|
| 1-May-03 | 2.77 |
| 2-May-03 | 2.98 |
| 5-May-03 | 3.00 |
| 6-May-03 | 3.00 |
| 7-May-03 | 2.95 |
| 8-May-03 | 2.93 |
| 9-May-03 | 3.03 |
| 12-May-03 | 3.00 |
| 13-May-03 | 3.03 |
| 14-May-03 | 3.21 |
| 15-May-03 | 3.37 |
| 16-May-03 | 3.07 |
| 19-May-03 | 3.14 |
| 20-May-03 | 3.09 |
| 21-May-03 | 3.16 |
| 22-May-03 | 3.48 |
| 23-May-03 | 3.46 |
| 27-May-03 | 3.50 |
| 28-May-03 | 3.30 |
| 29-May-03 | 3.39 |
| 30-May-03 | 3.59 |
| 2-Jun-03 | 3.77 |
| 3-Jun-03 | 3.72 |
| 4-Jun-03 | 3.45 |
| 5-Jun-03 | 3.47 |
| 6-Jun-03 | 3.32 |
| 9-Jun-03 | 3.24 |
| 10-Jun-03 | 3.61 |
| 11-Jun-03 | 3.83 |
| 12-Jun-03 | 3.90 |
| 13-Jun-03 | 3.77 |
| 16-Jun-03 | 3.93 |
| 17-Jun-03 | 3.90 |
| 18-Jun-03 | 3.84 |
| 19-Jun-03 | 3.84 |
| 20-Jun-03 | 3.81 |
| 23-Jun-03 | 3.73 |
| 24-Jun-03 | 3.58 |
| 25-Jun-03 | 3.57 |
| 26-Jun-03 | 3.57 |
| 27-Jun-03 | 3.67 |
| 30-Jun-03 | 3.66 |
| 1-Jul-03 | 3.61 |
| 2-Jul-03 | 3.77 |
| 3-Jul-03 | 3.68 |
| 7-Jul-03 | 3.83 |
| 8-Jul-03 | 4.04 |

Tower Automotive Ordinary (TWRAQ.PK)
Daily prices (split adjusted) from May 1, 2003 to February 2, 2005
Source:  Factiva

| | |
|---|---|
| 9-Jul-03 | 4.20 |
| 10-Jul-03 | 4.09 |
| 11-Jul-03 | 4.00 |
| 14-Jul-03 | 4.07 |
| 15-Jul-03 | 4.20 |
| 16-Jul-03 | 4.28 |
| 17-Jul-03 | 4.20 |
| 18-Jul-03 | 4.32 |
| 21-Jul-03 | 4.09 |
| 22-Jul-03 | 4.60 |
| 23-Jul-03 | 4.68 |
| 24-Jul-03 | 4.55 |
| 25-Jul-03 | 4.52 |
| 28-Jul-03 | 4.55 |
| 29-Jul-03 | 4.57 |
| 30-Jul-03 | 4.47 |
| 31-Jul-03 | 4.54 |
| 1-Aug-03 | 4.30 |
| 4-Aug-03 | 4.25 |
| 5-Aug-03 | 4.25 |
| 6-Aug-03 | 4.05 |
| 7-Aug-03 | 3.80 |
| 8-Aug-03 | 3.90 |
| 11-Aug-03 | 3.97 |
| 12-Aug-03 | 4.04 |
| 13-Aug-03 | 3.77 |
| 14-Aug-03 | 3.82 |
| 15-Aug-03 | 3.83 |
| 18-Aug-03 | 3.95 |
| 19-Aug-03 | 4.10 |
| 20-Aug-03 | 4.10 |
| 21-Aug-03 | 4.19 |
| 22-Aug-03 | 4.22 |
| 25-Aug-03 | 4.15 |
| 26-Aug-03 | 4.14 |
| 27-Aug-03 | 4.18 |
| 28-Aug-03 | 4.14 |
| 29-Aug-03 | 4.36 |
| 2-Sep-03 | 4.55 |
| 3-Sep-03 | 4.64 |
| 4-Sep-03 | 4.65 |
| 5-Sep-03 | 4.76 |
| 8-Sep-03 | 4.90 |
| 9-Sep-03 | 4.90 |
| 10-Sep-03 | 4.52 |
| 11-Sep-03 | 4.78 |
| 12-Sep-03 | 4.72 |
| 15-Sep-03 | 4.68 |

2

Tower Automotive Ordinary (TWRAQ.PK)
Daily prices (split adjusted) from May 1, 2003 to February 2, 2005
Source: Factiva

| | |
|---|---|
| 16-Sep-03 | 4.85 |
| 17-Sep-03 | 4.99 |
| 18-Sep-03 | 5.31 |
| 19-Sep-03 | 5.34 |
| 22-Sep-03 | 5.28 |
| 23-Sep-03 | 5.37 |
| 24-Sep-03 | 5.23 |
| 25-Sep-03 | 5.05 |
| 26-Sep-03 | 4.86 |
| 29-Sep-03 | 4.67 |
| 30-Sep-03 | 4.50 |
| 1-Oct-03 | 4.74 |
| 2-Oct-03 | 4.56 |
| 3-Oct-03 | 4.70 |
| 6-Oct-03 | 4.90 |
| 7-Oct-03 | 4.71 |
| 8-Oct-03 | 4.69 |
| 9-Oct-03 | 4.75 |
| 10-Oct-03 | 4.82 |
| 13-Oct-03 | 4.95 |
| 14-Oct-03 | 5.15 |
| 15-Oct-03 | 4.43 |
| 16-Oct-03 | 4.47 |
| 17-Oct-03 | 4.42 |
| 20-Oct-03 | 4.50 |
| 21-Oct-03 | 4.45 |
| 22-Oct-03 | 4.41 |
| 23-Oct-03 | 4.02 |
| 24-Oct-03 | 3.48 |
| 27-Oct-03 | 3.36 |
| 28-Oct-03 | 3.39 |
| 29-Oct-03 | 3.29 |
| 30-Oct-03 | 3.70 |
| 31-Oct-03 | 3.98 |
| 3-Nov-03 | 3.86 |
| 4-Nov-03 | 3.78 |
| 5-Nov-03 | 3.77 |
| 6-Nov-03 | 3.96 |
| 7-Nov-03 | 3.99 |
| 10-Nov-03 | 3.93 |
| 11-Nov-03 | 3.96 |
| 12-Nov-03 | 4.25 |
| 13-Nov-03 | 4.43 |
| 14-Nov-03 | 4.44 |
| 17-Nov-03 | 4.42 |
| 18-Nov-03 | 4.43 |
| 19-Nov-03 | 4.50 |
| 20-Nov-03 | 4.46 |

3

Tower Automotive Ordinary (TWRAQ.PK)
Daily prices (split adjusted) from May 1, 2003 to February 2, 2005
Source:  Factiva

| | |
|---|---|
| 21-Nov-03 | 4.42 |
| 24-Nov-03 | 4.42 |
| 25-Nov-03 | 4.72 |
| 26-Nov-03 | 4.65 |
| 28-Nov-03 | 4.55 |
| 1-Dec-03 | 4.67 |
| 2-Dec-03 | 4.81 |
| 3-Dec-03 | 4.85 |
| 4-Dec-03 | 4.89 |
| 5-Dec-03 | 5.00 |
| 8-Dec-03 | 5.13 |
| 9-Dec-03 | 5.07 |
| 10-Dec-03 | 5.18 |
| 11-Dec-03 | 5.30 |
| 12-Dec-03 | 5.45 |
| 15-Dec-03 | 5.45 |
| 16-Dec-03 | 5.53 |
| 17-Dec-03 | 6.15 |
| 18-Dec-03 | 6.33 |
| 19-Dec-03 | 6.55 |
| 22-Dec-03 | 6.88 |
| 23-Dec-03 | 6.89 |
| 24-Dec-03 | 6.65 |
| 26-Dec-03 | 6.90 |
| 29-Dec-03 | 7.00 |
| 30-Dec-03 | 7.11 |
| 31-Dec-03 | 6.83 |
| 2-Jan-04 | 6.89 |
| 5-Jan-04 | 7.08 |
| 6-Jan-04 | 7.16 |
| 7-Jan-04 | 7.20 |
| 8-Jan-04 | 7.29 |
| 9-Jan-04 | 7.37 |
| 12-Jan-04 | 7.53 |
| 13-Jan-04 | 7.48 |
| 14-Jan-04 | 7.29 |
| 15-Jan-04 | 6.73 |
| 16-Jan-04 | 6.68 |
| 20-Jan-04 | 7.24 |
| 21-Jan-04 | 7.03 |
| 22-Jan-04 | 6.92 |
| 23-Jan-04 | 7.10 |
| 26-Jan-04 | 6.78 |
| 27-Jan-04 | 6.60 |
| 28-Jan-04 | 6.40 |
| 29-Jan-04 | 6.20 |
| 30-Jan-04 | 6.06 |
| 2-Feb-04 | 6.07 |

Tower Automotive Ordinary (TWRAQ.PK)
Daily prices (split adjusted) from May 1, 2003 to February 2, 2005
Source: Factiva

| | |
|---|---|
| 3-Feb-04 | 5.93 |
| 4-Feb-04 | 5.50 |
| 5-Feb-04 | 5.76 |
| 6-Feb-04 | 5.98 |
| 9-Feb-04 | 5.96 |
| 10-Feb-04 | 6.07 |
| 11-Feb-04 | 6.07 |
| 12-Feb-04 | 6.51 |
| 13-Feb-04 | 6.50 |
| 17-Feb-04 | 6.70 |
| 18-Feb-04 | 6.53 |
| 19-Feb-04 | 6.06 |
| 20-Feb-04 | 6.24 |
| 23-Feb-04 | 6.01 |
| 24-Feb-04 | 5.92 |
| 25-Feb-04 | 6.06 |
| 26-Feb-04 | 6.03 |
| 27-Feb-04 | 6.07 |
| 1-Mar-04 | 6.06 |
| 2-Mar-04 | 6.19 |
| 3-Mar-04 | 5.92 |
| 4-Mar-04 | 5.99 |
| 5-Mar-04 | 6.01 |
| 8-Mar-04 | 5.51 |
| 9-Mar-04 | 5.38 |
| 10-Mar-04 | 4.95 |
| 11-Mar-04 | 5.05 |
| 12-Mar-04 | 5.34 |
| 15-Mar-04 | 5.30 |
| 16-Mar-04 | 5.09 |
| 17-Mar-04 | 5.26 |
| 18-Mar-04 | 5.06 |
| 19-Mar-04 | 4.69 |
| 22-Mar-04 | 4.60 |
| 23-Mar-04 | 4.45 |
| 24-Mar-04 | 4.35 |
| 25-Mar-04 | 4.40 |
| 26-Mar-04 | 4.66 |
| 29-Mar-04 | 4.81 |
| 30-Mar-04 | 4.98 |
| 31-Mar-04 | 5.04 |
| 1-Apr-04 | 5.16 |
| 2-Apr-04 | 5.33 |
| 5-Apr-04 | 5.46 |
| 6-Apr-04 | 5.34 |
| 7-Apr-04 | 5.55 |
| 8-Apr-04 | 5.80 |
| 12-Apr-04 | 5.83 |

Tower Automotive Ordinary (TWRAQ.PK)
Daily prices (split adjusted) from May 1, 2003 to February 2, 2005
Source: Factiva

| | |
|---|---|
| 13-Apr-04 | 5.54 |
| 14-Apr-04 | 5.45 |
| 15-Apr-04 | 5.38 |
| 16-Apr-04 | 5.70 |
| 19-Apr-04 | 5.57 |
| 20-Apr-04 | 5.51 |
| 21-Apr-04 | 5.65 |
| 22-Apr-04 | 5.79 |
| 23-Apr-04 | 5.80 |
| 26-Apr-04 | 5.62 |
| 27-Apr-04 | 5.76 |
| 28-Apr-04 | 5.53 |
| 29-Apr-04 | 5.13 |
| 30-Apr-04 | 5.12 |
| 3-May-04 | 5.27 |
| 4-May-04 | 4.96 |
| 5-May-04 | 4.70 |
| 6-May-04 | 4.58 |
| 7-May-04 | 4.61 |
| 10-May-04 | 4.18 |
| 11-May-04 | 4.30 |
| 12-May-04 | 4.40 |
| 13-May-04 | 4.06 |
| 14-May-04 | 4.00 |
| 17-May-04 | 3.33 |
| 18-May-04 | 3.54 |
| 19-May-04 | 3.51 |
| 20-May-04 | 3.64 |
| 21-May-04 | 3.58 |
| 24-May-04 | 3.61 |
| 25-May-04 | 3.67 |
| 26-May-04 | 3.62 |
| 27-May-04 | 3.62 |
| 28-May-04 | 3.71 |
| 1-Jun-04 | 3.77 |
| 2-Jun-04 | 3.83 |
| 3-Jun-04 | 3.67 |
| 4-Jun-04 | 3.66 |
| 7-Jun-04 | 3.81 |
| 8-Jun-04 | 3.81 |
| 9-Jun-04 | 3.80 |
| 10-Jun-04 | 3.85 |
| 14-Jun-04 | 3.83 |
| 15-Jun-04 | 3.85 |
| 16-Jun-04 | 3.86 |
| 17-Jun-04 | 3.85 |
| 18-Jun-04 | 3.72 |
| 21-Jun-04 | 3.68 |

Tower Automotive Ordinary (TWRAQ.PK)
Daily prices (split adjusted) from May 1, 2003 to February 2, 2005
Source:  Factiva

| Date | Price |
|------|-------|
| 22-Jun-04 | 3.55 |
| 23-Jun-04 | 3.67 |
| 24-Jun-04 | 3.69 |
| 25-Jun-04 | 3.65 |
| 28-Jun-04 | 3.66 |
| 29-Jun-04 | 3.72 |
| 30-Jun-04 | 3.64 |
| 1-Jul-04 | 3.43 |
| 2-Jul-04 | 3.70 |
| 6-Jul-04 | 3.72 |
| 7-Jul-04 | 3.71 |
| 8-Jul-04 | 3.59 |
| 9-Jul-04 | 3.51 |
| 12-Jul-04 | 3.44 |
| 13-Jul-04 | 3.47 |
| 14-Jul-04 | 3.40 |
| 15-Jul-04 | 3.53 |
| 16-Jul-04 | 3.49 |
| 19-Jul-04 | 3.45 |
| 20-Jul-04 | 3.58 |
| 21-Jul-04 | 3.42 |
| 22-Jul-04 | 3.43 |
| 23-Jul-04 | 3.47 |
| 26-Jul-04 | 3.39 |
| 27-Jul-04 | 3.25 |
| 28-Jul-04 | 3.28 |
| 29-Jul-04 | 3.16 |
| 30-Jul-04 | 3.15 |
| 2-Aug-04 | 3.21 |
| 3-Aug-04 | 3.11 |
| 4-Aug-04 | 3.06 |
| 5-Aug-04 | 2.99 |
| 6-Aug-04 | 2.85 |
| 9-Aug-04 | 2.95 |
| 10-Aug-04 | 2.98 |
| 11-Aug-04 | 2.91 |
| 12-Aug-04 | 2.81 |
| 13-Aug-04 | 2.74 |
| 16-Aug-04 | 2.78 |
| 17-Aug-04 | 2.86 |
| 18-Aug-04 | 2.87 |
| 19-Aug-04 | 2.77 |
| 20-Aug-04 | 2.78 |
| 23-Aug-04 | 2.71 |
| 24-Aug-04 | 2.71 |
| 25-Aug-04 | 2.88 |
| 26-Aug-04 | 2.98 |
| 27-Aug-04 | 2.91 |

Tower Automotive Ordinary (TWRAQ.PK)
Daily prices (split adjusted) from May 1, 2003 to February 2, 2005
Source: Factiva

| | |
|---|---|
| 30-Aug-04 | 2.90 |
| 31-Aug-04 | 2.98 |
| 1-Sep-04 | 2.93 |
| 2-Sep-04 | 2.97 |
| 3-Sep-04 | 2.98 |
| 7-Sep-04 | 2.94 |
| 8-Sep-04 | 2.90 |
| 9-Sep-04 | 2.82 |
| 10-Sep-04 | 2.91 |
| 13-Sep-04 | 2.95 |
| 14-Sep-04 | 2.89 |
| 15-Sep-04 | 2.88 |
| 16-Sep-04 | 2.85 |
| 17-Sep-04 | 2.82 |
| 20-Sep-04 | 2.60 |
| 21-Sep-04 | 2.69 |
| 22-Sep-04 | 2.42 |
| 23-Sep-04 | 2.34 |
| 24-Sep-04 | 2.46 |
| 27-Sep-04 | 2.25 |
| 28-Sep-04 | 2.08 |
| 29-Sep-04 | 2.10 |
| 30-Sep-04 | 2.09 |
| 1-Oct-04 | 2.10 |
| 4-Oct-04 | 2.14 |
| 5-Oct-04 | 1.99 |
| 6-Oct-04 | 1.92 |
| 7-Oct-04 | 1.80 |
| 8-Oct-04 | 1.61 |
| 11-Oct-04 | 1.64 |
| 12-Oct-04 | 1.53 |
| 13-Oct-04 | 1.44 |
| 14-Oct-04 | 1.25 |
| 15-Oct-04 | 1.20 |
| 18-Oct-04 | 1.21 |
| 19-Oct-04 | 1.26 |
| 20-Oct-04 | 1.22 |
| 21-Oct-04 | 1.22 |
| 22-Oct-04 | 1.21 |
| 25-Oct-04 | 1.22 |
| 26-Oct-04 | 1.33 |
| 27-Oct-04 | 1.33 |
| 28-Oct-04 | 1.47 |
| 29-Oct-04 | 1.49 |
| 1-Nov-04 | 1.40 |
| 2-Nov-04 | 1.55 |
| 3-Nov-04 | 1.68 |
| 4-Nov-04 | 1.90 |

8

Tower Automotive Ordinary (TWRAQ.PK)
Daily prices (split adjusted) from May 1, 2003 to February 2, 2005
Source: Factiva

| Date | Price |
|------|------|
| 5-Nov-04 | 2.04 |
| 8-Nov-04 | 1.91 |
| 9-Nov-04 | 1.90 |
| 10-Nov-04 | 1.96 |
| 11-Nov-04 | 2.04 |
| 12-Nov-04 | 2.26 |
| 15-Nov-04 | 2.28 |
| 16-Nov-04 | 2.32 |
| 17-Nov-04 | 2.34 |
| 18-Nov-04 | 2.40 |
| 19-Nov-04 | 2.37 |
| 22-Nov-04 | 2.22 |
| 23-Nov-04 | 2.07 |
| 24-Nov-04 | 1.95 |
| 26-Nov-04 | 1.91 |
| 29-Nov-04 | 1.96 |
| 30-Nov-04 | 1.80 |
| 1-Dec-04 | 2.15 |
| 2-Dec-04 | 2.18 |
| 3-Dec-04 | 2.12 |
| 6-Dec-04 | 2.00 |
| 7-Dec-04 | 2.00 |
| 8-Dec-04 | 1.99 |
| 9-Dec-04 | 1.98 |
| 10-Dec-04 | 2.00 |
| 13-Dec-04 | 1.99 |
| 14-Dec-04 | 1.99 |
| 15-Dec-04 | 1.94 |
| 16-Dec-04 | 1.93 |
| 17-Dec-04 | 1.89 |
| 20-Dec-04 | 1.86 |
| 21-Dec-04 | 1.78 |
| 22-Dec-04 | 1.90 |
| 23-Dec-04 | 2.06 |
| 27-Dec-04 | 2.32 |
| 28-Dec-04 | 2.40 |
| 29-Dec-04 | 2.36 |
| 30-Dec-04 | 2.37 |
| 31-Dec-04 | 2.39 |
| 3-Jan-05 | 2.37 |
| 4-Jan-05 | 2.69 |
| 5-Jan-05 | 2.47 |
| 6-Jan-05 | 2.43 |
| 7-Jan-05 | 2.40 |
| 10-Jan-05 | 2.28 |
| 11-Jan-05 | 2.17 |
| 12-Jan-05 | 2.39 |
| 13-Jan-05 | 2.24 |

Tower Automotive Ordinary (TWRAQ.PK)
Daily prices (split adjusted) from May 1, 2003 to February 2, 2005
Source: Factiva

| | |
|---|---|
| 14-Jan-05 | 2.27 |
| 18-Jan-05 | 2.39 |
| 19-Jan-05 | 2.36 |
| 20-Jan-05 | 1.72 |
| 21-Jan-05 | 0.75 |
| 24-Jan-05 | 0.94 |
| 25-Jan-05 | 1.04 |
| 26-Jan-05 | 1.16 |
| 27-Jan-05 | 0.95 |
| 28-Jan-05 | 0.93 |
| 31-Jan-05 | 0.81 |
| 1-Feb-05 | 0.77 |
| 2-Feb-05 | 0.51 |

# Exhibit J

Internet Corporation (INMT#Q)
Daily prices (split adjusted) from May 1, 2003 to September 29, 2004
Source: Factiva

| Date | Close |
|------|-------|
| 5/1/03 | 3.82 |
| 5/2/03 | 3.92 |
| 5/5/03 | 3.87 |
| 5/6/03 | 3.91 |
| 5/7/03 | 3.87 |
| 5/8/03 | 3.85 |
| 5/9/03 | 3.79 |
| 5/12/03 | 3.79 |
| 5/13/03 | 3.86 |
| 5/14/03 | 3.82 |
| 5/15/03 | 3.81 |
| 5/16/03 | 3.58 |
| 5/19/03 | 3.56 |
| 5/20/03 | 3.63 |
| 5/21/03 | 3.57 |
| 5/22/03 | 3.40 |
| 5/23/03 | 3.35 |
| 5/27/03 | 3.56 |
| 5/28/03 | 3.46 |
| 5/29/03 | 3.70 |
| 5/30/03 | 3.65 |
| 6/2/03 | 3.74 |
| 6/3/03 | 3.65 |
| 6/4/03 | 3.80 |
| 6/5/03 | 3.85 |
| 6/6/03 | 3.66 |
| 6/9/03 | 3.51 |
| 6/10/03 | 3.54 |
| 6/11/03 | 3.70 |
| 6/12/03 | 3.56 |
| 6/13/03 | 3.61 |
| 6/16/03 | 3.54 |
| 6/17/03 | 3.51 |
| 6/18/03 | 3.44 |
| 6/19/03 | 3.43 |
| 6/20/03 | 3.35 |
| 6/23/03 | 3.20 |
| 6/24/03 | 3.28 |
| 6/25/03 | 3.19 |
| 6/26/03 | 3.17 |
| 6/27/03 | 3.32 |
| 6/30/03 | 3.45 |
| 7/1/03 | 3.43 |
| 7/2/03 | 3.40 |
| 7/3/03 | 3.50 |
| 7/7/03 | 3.45 |
| 7/8/03 | 3.68 |

Internet Corporation (INMT#Q)
Daily prices (split adjusted) from May 1, 2003 to September 29, 2004
Source: Factiva

| Date | Close |
|------|-------|
| 7/9/03 | 3.52 |
| 7/10/03 | 3.68 |
| 7/11/03 | 3.75 |
| 7/14/03 | 3.79 |
| 7/15/03 | 3.79 |
| 7/16/03 | 3.77 |
| 7/17/03 | 3.90 |
| 7/18/03 | 3.95 |
| 7/21/03 | 3.84 |
| 7/22/03 | 3.84 |
| 7/23/03 | 3.78 |
| 7/24/03 | 3.59 |
| 7/25/03 | 3.51 |
| 7/28/03 | 3.59 |
| 7/29/03 | 3.69 |
| 7/30/03 | 3.63 |
| 7/31/03 | 3.69 |
| 8/1/03 | 3.46 |
| 8/4/03 | 3.60 |
| 8/5/03 | 3.79 |
| 8/6/03 | 3.63 |
| 8/7/03 | 3.90 |
| 8/8/03 | 3.85 |
| 8/11/03 | 3.70 |
| 8/12/03 | 3.78 |
| 8/13/03 | 3.80 |
| 8/14/03 | 3.66 |
| 8/15/03 | 3.70 |
| 8/18/03 | 3.75 |
| 8/19/03 | 3.90 |
| 8/20/03 | 3.70 |
| 8/21/03 | 3.75 |
| 8/22/03 | 3.65 |
| 8/25/03 | 3.68 |
| 8/26/03 | 3.85 |
| 8/27/03 | 3.81 |
| 8/28/03 | 3.84 |
| 8/29/03 | 3.79 |
| 9/2/03 | 3.95 |
| 9/3/03 | 4.08 |
| 9/4/03 | 4.30 |
| 9/5/03 | 4.32 |
| 9/8/03 | 4.30 |
| 9/9/03 | 4.64 |
| 9/10/03 | 4.29 |
| 9/11/03 | 4.53 |
| 9/12/03 | 4.47 |

2

Internet Corporation (INMT#Q)
Daily prices (split adjusted) from May 1, 2003 to September 29, 2004
Source: Factiva

| Date | Close |
|------|-------|
| 9/15/03 | 4.67 |
| 9/16/03 | 4.66 |
| 9/17/03 | 4.57 |
| 9/18/03 | 4.62 |
| 9/19/03 | 4.52 |
| 9/22/03 | 4.41 |
| 9/23/03 | 4.40 |
| 9/24/03 | 4.37 |
| 9/25/03 | 4.15 |
| 9/26/03 | 4.14 |
| 9/29/03 | 4.19 |
| 9/30/03 | 4.30 |
| 10/1/03 | 4.31 |
| 10/2/03 | 4.30 |
| 10/3/03 | 4.26 |
| 10/6/03 | 4.25 |
| 10/7/03 | 4.27 |
| 10/8/03 | 4.47 |
| 10/9/03 | 4.50 |
| 10/10/03 | 4.50 |
| 10/13/03 | 4.39 |
| 10/14/03 | 4.88 |
| 10/15/03 | 5.23 |
| 10/16/03 | 4.55 |
| 10/17/03 | 4.60 |
| 10/20/03 | 4.30 |
| 10/21/03 | 4.43 |
| 10/22/03 | 4.35 |
| 10/23/03 | 4.27 |
| 10/24/03 | 4.31 |
| 10/27/03 | 4.16 |
| 10/28/03 | 4.30 |
| 10/29/03 | 4.21 |
| 10/30/03 | 4.18 |
| 10/31/03 | 4.40 |
| 11/3/03 | 4.85 |
| 11/4/03 | 4.86 |
| 11/5/03 | 4.96 |
| 11/6/03 | 4.85 |
| 11/7/03 | 4.86 |
| 11/10/03 | 4.87 |
| 11/11/03 | 4.93 |
| 11/12/03 | 4.99 |
| 11/13/03 | 4.81 |
| 11/14/03 | 4.68 |
| 11/17/03 | 4.72 |
| 11/18/03 | 4.73 |

3

Internet Corporation (INMT#Q)
Daily prices (split adjusted) from May 1, 2003 to September 29, 2004
Source: Factiva

| Date | Close |
|------|-------|
| 11/19/03 | 4.80 |
| 11/20/03 | 4.79 |
| 11/21/03 | 4.79 |
| 11/24/03 | 4.80 |
| 11/25/03 | 4.86 |
| 11/26/03 | 4.88 |
| 11/28/03 | 4.87 |
| 12/1/03 | 5.00 |
| 12/2/03 | 4.90 |
| 12/3/03 | 5.07 |
| 12/4/03 | 4.97 |
| 12/5/03 | 5.00 |
| 12/8/03 | 5.04 |
| 12/9/03 | 5.14 |
| 12/10/03 | 4.97 |
| 12/11/03 | 5.00 |
| 12/12/03 | 5.41 |
| 12/15/03 | 4.80 |
| 12/16/03 | 4.85 |
| 12/17/03 | 5.07 |
| 12/18/03 | 4.99 |
| 12/19/03 | 5.00 |
| 12/22/03 | 5.20 |
| 12/23/03 | 5.21 |
| 12/24/03 | 5.15 |
| 12/26/03 | 5.22 |
| 12/29/03 | 5.41 |
| 12/30/03 | 5.42 |
| 12/31/03 | 5.44 |
| 1/2/04 | 5.38 |
| 1/5/04 | 5.41 |
| 1/6/04 | 5.40 |
| 1/7/04 | 5.60 |
| 1/8/04 | 5.66 |
| 1/9/04 | 5.62 |
| 1/12/04 | 5.64 |
| 1/13/04 | 5.47 |
| 1/14/04 | 5.63 |
| 1/15/04 | 5.65 |
| 1/16/04 | 5.46 |
| 1/20/04 | 5.50 |
| 1/21/04 | 5.38 |
| 1/22/04 | 5.36 |
| 1/23/04 | 5.50 |
| 1/26/04 | 5.40 |
| 1/27/04 | 5.51 |
| 1/28/04 | 5.45 |

Internmet Corporation (INMT#Q)
Daily prices (split adjusted) from May 1, 2003 to September 29, 2004
Source: Factiva

| Date | Close |
|------|-------|
| 1/29/04 | 5.40 |
| 1/30/04 | 5.41 |
| 2/2/04 | 5.49 |
| 2/3/04 | 5.13 |
| 2/4/04 | 5.09 |
| 2/5/04 | 4.95 |
| 2/6/04 | 5.06 |
| 2/9/04 | 5.05 |
| 2/10/04 | 5.20 |
| 2/11/04 | 5.10 |
| 2/12/04 | 5.08 |
| 2/13/04 | 4.76 |
| 2/17/04 | 4.89 |
| 2/18/04 | 4.93 |
| 2/19/04 | 4.90 |
| 2/20/04 | 5.03 |
| 2/23/04 | 4.82 |
| 2/24/04 | 4.86 |
| 2/25/04 | 4.69 |
| 2/26/04 | 4.70 |
| 2/27/04 | 4.76 |
| 3/1/04 | 4.86 |
| 3/2/04 | 5.01 |
| 3/3/04 | 5.02 |
| 3/4/04 | 5.05 |
| 3/5/04 | 4.93 |
| 3/8/04 | 5.01 |
| 3/9/04 | 4.76 |
| 3/10/04 | 4.89 |
| 3/11/04 | 4.80 |
| 3/12/04 | 4.67 |
| 3/15/04 | 4.24 |
| 3/16/04 | 4.25 |
| 3/17/04 | 4.61 |
| 3/18/04 | 4.46 |
| 3/19/04 | 4.38 |
| 3/22/04 | 4.29 |
| 3/23/04 | 4.25 |
| 3/24/04 | 4.05 |
| 3/25/04 | 4.16 |
| 3/26/04 | 4.30 |
| 3/29/04 | 4.28 |
| 3/30/04 | 4.42 |
| 3/31/04 | 4.43 |
| 4/1/04 | 4.50 |
| 4/2/04 | 4.58 |
| 4/5/04 | 4.66 |

Internet Corporation (INMT#Q)
Daily prices (split adjusted) from May 1, 2003 to September 29, 2004
Source: Factiva

| Date | Close |
| --- | --- |
| 4/6/04 | 4.70 |
| 4/7/04 | 4.60 |
| 4/8/04 | 4.71 |
| 4/12/04 | 4.73 |
| 4/13/04 | 4.68 |
| 4/14/04 | 4.50 |
| 4/15/04 | 4.25 |
| 4/16/04 | 4.30 |
| 4/19/04 | 4.08 |
| 4/20/04 | 4.08 |
| 4/21/04 | 4.18 |
| 4/22/04 | 4.33 |
| 4/23/04 | 4.49 |
| 4/26/04 | 4.30 |
| 4/27/04 | 4.28 |
| 4/28/04 | 4.19 |
| 4/29/04 | 4.11 |
| 4/30/04 | 4.05 |
| 5/3/04 | 4.05 |
| 5/4/04 | 4.19 |
| 5/5/04 | 4.06 |
| 5/6/04 | 4.15 |
| 5/7/04 | 4.04 |
| 5/10/04 | 4.25 |
| 5/11/04 | 4.14 |
| 5/12/04 | 4.15 |
| 5/13/04 | 4.07 |
| 5/14/04 | 4.10 |
| 5/17/04 | 4.08 |
| 5/18/04 | 4.20 |
| 5/19/04 | 4.18 |
| 5/20/04 | 4.18 |
| 5/21/04 | 4.19 |
| 5/24/04 | 4.32 |
| 5/25/04 | 4.24 |
| 5/26/04 | 4.24 |
| 5/27/04 | 4.18 |
| 5/28/04 | 4.11 |
| 6/1/04 | 4.02 |
| 6/2/04 | 4.14 |
| 6/3/04 | 3.93 |
| 6/4/04 | 3.87 |
| 6/7/04 | 4.00 |
| 6/8/04 | 4.18 |
| 6/9/04 | 3.90 |
| 6/10/04 | 3.93 |
| 6/14/04 | 3.87 |

Intermet Corporation (INMT#Q)
Daily prices (split adjusted) from May 1, 2003 to September 29, 2004
Source: Factiva

| Date | Close |
|------|-------|
| 6/15/04 | 3.87 |
| 6/16/04 | 3.93 |
| 6/17/04 | 4.05 |
| 6/18/04 | 4.02 |
| 6/21/04 | 4.05 |
| 6/22/04 | 3.95 |
| 6/23/04 | 3.88 |
| 6/24/04 | 3.87 |
| 6/25/04 | 3.86 |
| 6/28/04 | 3.82 |
| 6/29/04 | 3.89 |
| 6/30/04 | 4.24 |
| 7/1/04 | 4.15 |
| 7/2/04 | 4.21 |
| 7/6/04 | 4.05 |
| 7/7/04 | 4.01 |
| 7/8/04 | 4.08 |
| 7/9/04 | 3.96 |
| 7/12/04 | 3.91 |
| 7/13/04 | 3.89 |
| 7/14/04 | 3.80 |
| 7/15/04 | 3.78 |
| 7/16/04 | 3.48 |
| 7/19/04 | 3.55 |
| 7/20/04 | 3.69 |
| 7/21/04 | 3.50 |
| 7/22/04 | 3.40 |
| 7/23/04 | 3.40 |
| 7/26/04 | 3.40 |
| 7/27/04 | 3.41 |
| 7/28/04 | 3.68 |
| 7/29/04 | 3.46 |
| 7/30/04 | 3.72 |
| 8/2/04 | 3.54 |
| 8/3/04 | 3.54 |
| 8/4/04 | 3.70 |
| 8/5/04 | 3.48 |
| 8/6/04 | 3.50 |
| 8/9/04 | 3.35 |
| 8/10/04 | 3.51 |
| 8/11/04 | 3.58 |
| 8/12/04 | 3.35 |
| 8/13/04 | 3.36 |
| 8/16/04 | 3.50 |
| 8/17/04 | 3.47 |
| 8/18/04 | 3.47 |
| 8/19/04 | 3.37 |

Internet Corporation (INMT#Q)
Daily prices (split adjusted) from May 1, 2003 to September 29, 2004
Source:  Factiva

| Date | Close |
| --- | --- |
| 8/20/04 | 3.43 |
| 8/23/04 | 3.50 |
| 8/24/04 | 3.30 |
| 8/25/04 | 3.25 |
| 8/26/04 | 3.39 |
| 8/27/04 | 3.29 |
| 8/30/04 | 3.29 |
| 8/31/04 | 3.20 |
| 9/1/04 | 3.03 |
| 9/2/04 | 2.99 |
| 9/3/04 | 2.87 |
| 9/7/04 | 2.72 |
| 9/8/04 | 2.78 |
| 9/9/04 | 2.72 |
| 9/10/04 | 2.55 |
| 9/13/04 | 2.36 |
| 9/14/04 | 2.36 |
| 9/15/04 | 2.29 |
| 9/16/04 | 2.06 |
| 9/17/04 | 2.16 |
| 9/20/04 | 0.76 |
| 9/21/04 | 0.76 |
| 9/22/04 | 0.56 |
| 9/23/04 | 0.47 |
| 9/24/04 | 0.36 |
| 9/27/04 | 0.39 |
| 9/28/04 | 0.35 |
| 9/29/04 | 0.54 |

# Exhibit K

# COLLINS & AIKMAN CORP

250 STEPHENSON HWY
TROY, MI 48083
248. 824.2500

# EX–3.(I)

**EXHIBIT 3.1**
**10–Q Filed on 08/10/1999 – Period: 06/26/1999**
File Number 001–10218



**GSI**

LIVEDGAR® Information Provided by Global Securities Information, Inc.
800.669.1154
www.gsionline.com

EXHIBIT 3.1

RESTATED CERTIFICATE OF INCORPORATION

of

COLLINS & AIKMAN CORPORATION

Under Section 245 of the General Corporation Law
of the State of Delaware

This Restated Certificate of Incorporation of Collins & Aikman Corporation (originally incorporated under the name WCI Holdings Corporation) amends and restates such corporation's Certificate of Incorporation, as amended, which was originally filed with the Secretary of State of the State of Delaware on September 21, 1988, and was duly adopted in the manner and by the vote prescribed by Section 242, in accordance with the provisions of Section 245 and Section 228 of the General Corporation Law of the State of Delaware.

FIRST: The name of the Corporation is Collins & Aikman Corporation (the "Corporation").

SECOND: The address of the registered office of the Corporation in the State of Delaware is 32 Loockerman Square, Suite L-100, in the City of Dover, County of Kent. The name of the registered agent at such registered office is The Prentice-Hall Corporation System, Inc.

THIRD: The purpose of the Corporation is to engage in any lawful act or activity for which corporations may be organized under the General Corporation Law of the State of Delaware.

FOURTH: The total number of shares of stock which the Corporation shall have authority to issue is 166,000,000, consisting of:

(a) 150,000,000 shares of Common Stock, par value $0.01 per share, which shall be designated "Common Stock". Each share of Common Stock shall be entitled to one vote per share; and

(b) 16,000,000 shares of Preferred Stock, par value $0.01 per share ("Preferred Stock"). The Board of Directors of the Corporation is hereby expressly authorized to provide for the issuance of shares of Preferred Stock in one or more series, by resolution or resolutions and by

2

filing a certificate pursuant to the applicable laws of the State of Delaware (any such certificate a "Preferred Stock Designation"), to establish from time to time the number of shares to be included in each such series, and to fix the designation, powers, preferences and rights of the shares of each series and the qualifications, limitations or restrictions thereof. Before any shares of any such series are issued, the Board of Directors shall fix, and hereby is expressly empowered to fix, the provisions of the shares thereof including, but not limited to, the following:

(1) the distinctive designation of such series, the number of shares to constitute such series and the stated value thereof if different from the par value thereof;

(2) whether the shares of such series shall have voting rights, in addition to any voting rights provided by law, and, if so, the terms of such voting rights, which may be general or limited;

(3) the dividends, if any, payable on such series, whether any such dividends shall be cumulative, and, if so, from what dates, the conditions and dates upon which such dividends shall be payable, the preference or relation which such dividends shall bear to the dividends payable on any shares of stock of any other class or any other series of this class;

(4) whether the shares of such series shall be subject to redemption by the Corporation and, if so, the times, prices and other conditions of such redemption;

(5) the amount or amounts payable upon shares of such series upon, and the rights of the holders of such series in, the voluntary or involuntary liquidation, dissolution or winding-up, or upon any distribution of the assets, of the Corporation;

(6) whether the shares of such series shall be subject to the operation of a retirement or sinking fund and, if so, the extent to and manner in which any such retirement or sinking fund shall be applied to the purchase or redemption of the shares of such series for retirement or other corporate purposes and the terms and provisions relative to the operation thereof;

3

(7) whether the shares of such series shall be convertible into, or exchangeable for, shares of stock of any other class or any other series of this class or any other securities and, if so, the price or prices or the rate or rates of conversion or exchange and the method, if any, of adjusting the same, and any other terms and conditions of conversion or exchange;

(8) the limitations and restrictions, if any, to be effective while any shares of such series are outstanding upon the payment of dividends or the making of other distributions on, and upon the purchase, redemption or other acquisition by the Corporation of, the Common Stock or shares of stock of any other class or any other series of this class;

(9) the conditions or restrictions, if any, upon the creation of indebtedness of the Corporation or upon the issue of any additional stock, including additional shares of such series or of any other series of this class or of any other class; and

(10) any other powers, preferences and relative, participating, optional and other special rights, and any qualifications, limitations and restrictions thereof.

The powers, preferences and relative, participating, optional and other special rights of each series of Preferred Stock, and the qualifications, limitations or restrictions thereof, if any, may differ from those of any nd all other series at any time outstanding. All shares of any one series of Preferred Stock shall be identical in all respects with all other shares of such series, except that shares of any one series issued at different times may differ as to the dates from which dividends thereon shall be cumulative.

\* \* \* \*

Rights, Preferences, Privileges and Restrictions
of 15-1/2% Cumulative Exchangeable Redeemable
Preferred Stock

RESOLVED that, pursuant to authority conferred upon the Board of Directors by the Certificate of Incorporation of the Company, as amended (hereinafter called the "Certificate of Incorporation"), the Board

4

of Directors hereby provides for the issuance of a series of Preferred Stock (as such term is defined in the Certificate of Incorporation) of the Company to consist of 16,000,000 shares, and fixes the powers, designation, preferences and relative, participating, optional or other rights, and the qualifications, limitations or restrictions of the shares of such series of Preferred Stock, in addition to those set forth in the Certificate of Incorporation, as follows:

1. Designation. There is hereby designated series of Preferred Stock known as the 15 1/2% Cumulative Exchangeable Redeemable Preferred Stock, par value $0.01 per share (the "Merger Preferred Stock"), consisting of 16,000,000 shares, issuable by the Company pursuant to authority granted to the Board of Directors in Article FOURTH of the Certificate of Incorporation, which authorizes the issuance of Preferred Stock having such rights and other terms as may be determined by the Board of Directors.

2. Rank. The Merger Preferred Stock shall, with respect to dividend rights and rights on liquidation, winding-up and dissolution of the Company, rank senior to the Company's Common Stock, and to all other classes and series of stock of the Company now or hereafter authorized, issued or outstanding, other than any stock of the Company ranking senior to or pari passu with the Merger Preferred Stock as to dividend rights or rights upon liquidation, winding-up or dissolution of the Company either authorized after the date hereof in compliance with paragraph 10(c)(i) or issued after the date hereof in compliance with paragraph (10)(c)(i) (the Common Stock and such other classes and series of stock collectively referred to herein as the "Junior Securities"). The Merger Preferred Stock shall be subject to the creation of such senior stock, such pari passu stock and Junior Securities to the extent not expressly prohibited by this Certificate.

3. Dividends. (a) The holders of shares of the Merger Preferred Stock shall be entitled to receive, when, as and if declared by the Board of Directors of the Company and out of the assets of the Company available for the payment of dividends

5

under the provisions of the General Corporation Law of the State of Delaware, dividends payable at the rate of $3.875 per share per annum (subject to increase as provided below). Such dividends shall be payable quarterly on the first day of February, May, August, and November in each year (each of such dates a "Dividend Payment Date") commencing with the later of (i) August 1, 1989 and (ii) the first such date after the time the merger of WCI Acquisition Corporation, a Delaware corporation, into Wickes Companies, Inc., a Delaware corporation ("Wickes"), shall become effectiv (the "Merger Effective Time"); except that if such first day is not a business day then such dividends shall be payable on the next succeeding business day. (As used herein, the term "business day" shall mean any day except a Saturday, a Sunday or a day on which banking institutions are authorized or required by law to close in the City of New York.) Dividends on each share of Merger Preferred Stock shall begin to accrue and be cumulative on outstanding shares of the Merger Preferred Stock (whether or not in any quarterly period there shall be assets of the Company legally available for the payment of such dividends) from and including the date of initial issuance of such share. The amount of any dividends "accrued" on any share of Merger Preferred Stock at any Dividend Payment Date shall be deemed to be the amount of any unpaid dividends accumulated thereon to and excluding such Dividend Payment Date, whether or not earned or declared, and the amount of dividends "accrued" on any share of Merger Preferred Stock at any date other than a Dividend Payment Date shall be calculated as the amount of any unpaid dividends accumulated to and excluding the last preceding Dividend Payment Date, whether or not earned or declared, plus an amount calculated on the basis of the annual dividend rate for the period from and including such last preceding Dividend Payment Date to and excluding the date as of which the calculation is made.

All dividends on the Merger Preferred Stock shall be computed on the basis of the number of days elapsed in a 360-day year consisting of 12 months of 30 days each. Such dividends shall

6

be paid to the holders of record of shares of the Merger Preferred Stock as they appear on the stock register of the Company on such date as shall be fixed by the Board of Directors of the Company; provided, however, that such date shall not be less than 10 days nor more than 60 days prior to the date of payment.

Dividend arrearage for any past dividend periods may be declared and paid at any time to holders of record on such date as may be fixed by the Board of Directors of the Company; provided, however, that such date shall not be less than 10 days nor more than 60 days prior to the date of payment.

(b) All dividends on the Merger Preferred Stock shall be payable in cash, except that dividend payments with respect to quarterly dividends accruing on or prior to February 1, 1995 (whenever such dividends are actually paid), may be paid in whole or in part in additional shares of the Merger Preferred Stock if the Board of Directors of the Company so directs. All such dividends paid in additional shares of Merger Preferred Stock shall be paid at a rate of 0.04 shares of Merger Preferred Stock for each $1 of such dividends not paid in cash. The issuance of Merger Preferred Stock at the prescribed rate shall constitute full payment of the portion of such dividends payable in kind. Except as described below with respect to fractional shares of Merger Preferred Stock, all dividends paid with respect to shares of the Merger Preferred Stock, whether and to the extent in cash or in kind, shall be paid pro rata to the holders entitled thereto. No interest or sum of money in lieu of interest or additional shares of Merger Preferred Stock shall be payable in respect of any accumulated unpaid dividends on the Merger Preferred Stock (whether such unpaid dividends are subsequently paid in kind or in cash).

(c) Only whole shares of Merger Preferred Stock will be issued upon the payment of dividends in kind on the Merger Preferred Stock. In lieu of the fractional portion of the aggregate number of shares of Merger Preferred Stock otherwise payable

7

to a record holder of Merger Preferred Stock at any time as dividends in kind ("Fractional Shares"), such record holder will receive a payment in cash equal to such record holder's proportionate interest in the net proceeds from the sale or sales in the open market of the aggregate of all Fractional Shares otherwise payable as a dividend. Such sale or sales shall be effected promptly after the record date fixed for determining the holders entitled to payment of the dividend.

(d) (i) Holders of shares of the Merger Preferred Stock shall be entitled to receive the dividends provided for in paragraph 3(a) in preference to and in priority over any dividends upon any of the Junior Securities.

(ii) The Company shall not (x) declare, pay or set apart funds for payment of any cash dividends on shares of Common Stock or any other shares of Junior Securities, (y) purchase, redeem or otherwise retire any Junior Securities or warrants, rights or options exercisable for shares of Junior Securities (and shall not set apart funds for such payment with respect thereto), or (z) make any distributions with respect to Junior Securities or any warrants, rights or options exercisable for any Junior Securities (except dividends or distributions on shares of Junior Securities in shares of any Junior Securities), unless (I) full cumulative dividends on the Merger Preferred Stock shall have been paid prior to, or shall be paid concurrently with, the time of such declaration, payment, setting apart, purchase, redemption, retirement or distribution for each Dividend Payment Date on or prior to such time and (II) any redemption required to have been made on or prior to such time pursuant to paragraph 4(b) and, if such time is on or after the 10th anniversary of the Merger Effective Time, the redemption of Merger Preferred Stock set forth in paragraph 4(a) shall have been made prior to, or shall be made concurrently with, such time (it being

8

understood that the failure of the Company to effect such a redemption as a result of the absence of assets legally available therefor shall not constitute compliance with this clause (II)).

(iii) Notwithstanding anything contained in this Certificate to the contrary, no dividends on shares of the Merger Preferred Stock shall be declared by the Board of Directors of the Company or paid or set apart for payment by the Company at such time as the terms and provisions of any contract or other agreement of the Company or any of its subsidiaries entered into or assumed at or prior to the Merger Effective Time, or any refinancings (including multiple refinancings) of such contracts or agreements, prohibit such declaration, payment or setting apart for payment or provide that such declaration, payment or setting apart for payment would constitute a breach thereof or a default thereunder; provided, however, that nothing contained in this Certificate shall in any way or under any circumstances be construed or deemed to require the Board of Directors of the Company to declare or the Company to set apart for payment any dividends on shares of the Merger Preferred Stock, whether or not permitted by any of such agreements. The failure of the Board of Directors of the Company to declare a dividend in reliance upon the immediately preceding sentence shall not be construed or deemed to prevent the accrual of such undeclared dividend.

(e) Subject to the foregoing provisions of this paragraph 3 and to the provisions of paragraph 9, the Board of Directors may declare, and the Company may pay, make or set apart for payment, dividends and other distributions on, and the Company may purchase, redeem or otherwise retire, any Junior Securities or any warrants, rights or options exercisable for shares of Junior Securities, and the holders of shares of Merger Preferred Stock shall not be entitled to share therein.

9

(f) If, at any time on or after the second anniversary of the Merger Effective Time, the Affiliated Common Equity Interest shall be less than $75,000,000, from and after such time the dividend rate for all outstanding Merger Preferred Stock shall be increased to $3.9375 per share per annum. "Affiliated Common Equity Interest" means from time to time the amount of the aggregate of all equity contributions to WCI Holdings II Corporation, a Delaware corporation ("Parent"), on or before such time by Blackstone Capital Partners L.P., a Delaware limited partnership, or any successor thereto ("Blackstone Partners"), Wasserstein, Perella Partners, L.P., a Delaware limited partnership, or any successor thereto ("WP Partners"), and all owners of a limited partnership interest in, or employees of Blackstone Partners or WP Partners who had co-investment rights or a similar opportunity to invest in investments made by Blackstone Partners or WP Partners at the time of their equity contribution to Parent (Blackstone Partners, WP Partners and all such persons who on or before such time shall have made such equity contributions, or any successor thereto, collectively, the "Affiliated Investors") minus any amounts received by Affiliated Investors as dividends on, redemptions of or sales of equity interests in Parent (other than sales by an Affiliated Investor to another Affiliated Investor), it being understood that payments to an Affiliated Investor of amounts characterized for this purpose by Parent (in its sole discretion and notwithstanding the characterization of such payments for any other purpose) as fees or expenses shall not constitute dividends. As used in this Certificate, a "Person" shall include any individual, corporation, partnership, joint venture, association, joint-stock company, trust, unincorporated organization or government or political subdivision thereof. The Company will by first-class mail send to each record holder a written notice of any such change in the dividend rate on the Merger Preferred Stock within 15 days of such change.

4. Scheduled Redemption. (a) Subject to the Company having funds legally available

10

therefor, the Company shall be obligated to redeem all outstanding shares of Merger Preferred Stock on the 10th anniversary of the Merger Effective Time. Such redemption of shares of Merger Preferred Stock pursuant to this paragraph 4(a) shall be at a redemption price equal to the Liquidation Preference (as defined below) per share together with accrued but unpaid dividends (whether or not declared) through the date fixed for redemption.

(b) To the extent the Company shall have funds legally available therefor, if at any time prior to the second anniversary of the Merger Effective Time, the Affiliate Common Equity Interest is less than $75,000,000, the Company will be obligated within 45 days (or the next following business day if the 45th following day is not a business day) to set apart out of funds legally available therefor, funds sufficient to redeem all shares of Merger Preferred Stock then outstanding. Such a redemption shall be at the Optional Redemption Price (as defined below) plus all accrued and unpaid dividends (whether or not declared) to the date fixed for redemption.

(c) If the funds of the Company legally available for any redemption pursuant to this paragraph 4 at the redemption date are insufficient to redeem such Merger Preferred Stock, funds to the extent legally available for the purpose will be used to redeem the number of shares of Merger Preferred Stock that legally may be redeemed. If the Company at any time shall fail to discharge any obligation to redeem shares of Merger Preferred Stock pursuant to this paragraph 4, such obligation shall be discharged as soon as the Company is able to do so.

5. Optional Redemption. All or any part of the Merger Preferred Stock may be redeemed by the Company at its election at any time and from time to time in whole or in part, by resolution of the Board of Directors, at a cash price per share equal to the sum of (i) the Optional Redemption Price plus (ii) any accrued and unpaid dividends thereon, whether or not declared, to the date fixed for the redemption; provided, however, that,

if and when any quarterly dividend shall have accrued on the Merger Preferred Stock and shall not have been paid or declared and a sufficient sum set apart for payment for any Dividend Payment Date on or prior to the date fixed for redemption, the Company may not redeem any shares of the Merger Preferred Stock unless all shares of the Merger Preferred Stock then outstanding are redeemed. The Optional Redemption Price shall equal for redemptions with a date fixed for redemption (a) that is on or prior to the first anniversary of the Merger Effective Time, 101% of the Liquidation Preference per share, (b) after the first anniversary of the Merger Effective Time to and including the second anniversary of the Merger Effective Time, 101.5% of the Liquidation Preference per share, and (c) thereafter, 102% of the Liquidation Preference per share.

6. Selection of the Merger Preferred Stock To Be Redeemed. If fewer than all the outstanding shares of the Merger Preferred Stock not previously called for redemption or exchange are to be redeemed pursuant to paragraph 5, the Board of Directors of the Company shall select the shares of the Merger Preferred Stock to be redeemed from outstanding shares not previously called for redemption by lot or pro rata as determined by the Board of Directors of the Company, in its sole discretion; provided, however, that the Board of Directors of the Company may in selecting shares for redemption choose to redeem all shares of Merger Preferred Stock held by holders of a number of such shares not to exceed 99 as may be specified by the Board of Directors (with all other shares to be redeemed, if any, so selected by lot or pro rata).

7. Notice of Redemption. At least 30 days but not more than 60 days prior to the date fixed for any redemption of shares of the Merger Preferred Stock, written notice of such redemption shall be mailed to each holder of record of shares of Merger Preferred Stock to be redeemed at the address shown on the stock transfer books of the Company or, if no such address appears or is given, at the place where the principal executive office of the Company is located; provided,

12

however, that no failure to give such notice or any defect therein or in the mailing thereof shall affect the validity of the proceedings for such redemption. Each such notice shall specify (i) the number of shares to be redeemed from such holder, (ii) the numbers of the certificates of the shares being redeemed, (iii) the date fixed for redemption, (iv) the redemption price, (v) the place or places at which payment may be obtained, (vi) the provision of this Certificate pursuant to which the shares are to be redeemed and (vii) that dividends on the shares to be redeemed shall cease to accrue on the date fixed for such redemption.

8. Status of Shares of Merger Preferred Stock upon Redemption. (a) Upon due surrender of the certificates for any shares of Merger Preferred Stock to be redeemed, such shares of Merger Preferred Stock shall be redeemed by the Company at the applicable redemption price. In case fewer than all the shares of Merger Preferred Stock represented by any such certificate are redeemed, a new certificate or certificates shall be issued representing the unredeemed shares of Merger Preferred Stock without cost to the holder thereof. Unless there shall have been a default in payment of the redemption price, from and after any date fixed for redemption, dividends on the shares of Merger Preferred Stock so called for redemption shall cease to accrue, such shares of Merger Preferred Stock shall no longer be deemed to be outstanding and shall not have the status of shares of Merger Preferred Stock and all rights of the holders thereof as stockholders of the Company (except the right to receive from the Company the redemption price without interest) shall cease with respect to such shares. From and after any date fixed for redemption, shares of the Merger Preferred Stock redeemed by the Company shall be restored to the status of authorized but unissued shares of Preferred Stock, without designation as to series until such shares are once more designated as part of a particular series by the Board of Directors of the Company.

(b) If at any time the Company shall have irrevocably deposited in trust with a trustee for the benefit of the holders of all shares of Merger

13

Preferred Stock money or direct noncallable obligations of the United States maturing as to principal and interest in such amounts and at such times as are sufficient to pay all future dividends on all shares of Merger Preferred Stock at the scheduled Dividend Payment Dates through the 10th anniversary of the Merger Effective Time (or any earlier date duly fixed for an optional redemption thereof), and the redemption price thereof, then, from and after the date on which such provision has been made, such Merger Preferred Stock shall no longer be deemed to be outstanding except for purposes of accruals of quarterly dividends and shall not have the status of shares of Merger Preferred Stock, and all rights of the holders thereof as stockholders of the Company (except the right to receive from the Company quarterly dividends and the applicable redemption price without interest) shall cease with respect to such shares. Without limiting the foregoing, any shares deemed not to be outstanding pursuant to this paragraph 8(b) shall not be subject to the provisions of paragraphs 3(f) and 4(b).

(c) All moneys so deposited with or held by such trustee which remain unclaimed by the holders of shares of Merger Preferred Stock 730 days after the date such moneys are payable to holders of shares of such Merger Preferred Stock shall be paid by such trustee to the Company, and thereafter the holders of such shares of Merger Preferred Stock shall look only to the Company for payment.

9. Liquidation, Dissolution or Winding-Up. In the event of any voluntary or involuntary liquidation, dissolution or winding-up of the Company, holders of the Merger Preferred Stock shall be entitled to be paid out of the assets of the Company available for distribution to its stockholders, whether from capital, surplus or earnings, an amount in cash equal to $25.00 per share (the "Liquidation Preference") plus any accrued and unpaid dividends to the date fixed for liquidation, dissolution or winding-up, whether or not declared, before any distribution is made on any Junior Securities, including the Common Stock.

If upon any voluntary or involuntary liquidation, dissolution or winding-up of the Company, the assets of the Company available for distribution to holders of the Merger Preferred Stock shall be insufficient to pay the holders of outstanding Merger Preferred Stock the full amounts to which they shall be entitled under this paragraph 9, the holders of the Merger Preferred Stock shall share equally and ratably in any distribution of assets of the Company in proportion to the full amount to which they would otherwise be respectively entitled. After payment of the full amount of Liquidation Preference to which they are entitled plus all accrued and unpaid dividends, whether or not declared, the holders of the Merger Preferred Stock shall not be entitled to any further participation in any distribution of assets of the Company. However, neither the voluntary sale, conveyance, exchange or transfer (for cash, shares of stock, securities or other consideration) of all or any part of the property or assets of the Company, nor the consolidation or merger or other business combination of the Company with or into any other corporation or corporations, shall be deemed to be a voluntary or involuntary liquidation, dissolution or winding-up of the Company, unless such voluntary sale, conveyance, exchange or transfer shall be in connection with a plan of liquidation, dissolution or winding-up of the Company.

10. Voting Rights. (a) The holders of shares of Merger Preferred Stock shall not be entitled to any voting rights except as expressly provided in this paragraph 10 or as otherwise provided by law.

(b) (i) If at any time or times dividends payable on the then outstanding Merger Preferred Stock shall be in arrears and unpaid in an aggregate amount equal to the amount of five consecutive quarterly dividends on the then outstanding Merger Preferred Stock, the then number of directors constituting the Board of Directors of the Company, without further action, shall be increased by two and the holders of Merger Preferred Stock shall have the exclusive right, voting separately as a class, to elect the

directors of the Company to fill such newly created directorships, the remaining directors to be elected by the other class or classes of stock entitled to vote therefor, at each meeting of stockholders held for the purpose of electing directors.

(ii) Whenever such voting right shall have vested, such right may be initially exercised at a special meeting of the holders of Merger Preferred Stock called as hereinafter provided, at any annual meeting of stockholders held for the purpose of electing directors or by the written consent of the holders of Merger Preferred Stock pursuant to Section 228 of the General Corporation Law of the State of Delaware. Such voting right shall continue until such time as all cumulative dividends on Merger Preferred Stock accrued through the latest Dividend Payment Date on or before such time shall have been paid in full, at which time such voting right of the holders of Merger Preferred Stock shall terminate, but such voting right shall again vest in the event of each and every subsequent arrearage in dividends in the requisite amount as described above.

(iii) At any time when such voting right shall have vested in the holders of Merger Preferred Stock and if such right shall not already have been initially exercised, a proper officer of the Company shall, upon the written request of any holder of record of Merger Preferred Stock then outstanding, call a special meeting of holders of Merger Preferred Stock; provided, however, no such special meeting shall be called during a period within 90 days immediately preceding the date fixed for the next annual meeting of stockholders. Such meeting shall be held at the earliest practicable date upon the notice required for annual meetings of stockholders. Any holder of Merger Preferred Stock which would be entitled to vote at such meeting shall have access to the stock books of the Company for the purpose of causing a meeting

of stockholders to be called pursuant to the provisions of this paragraph 10(b)(iii).

(iv) At any meeting at which the holders of Merger Preferred Stock shall have the right to elect directors as provided in this paragraph 10(b), the presence in person or by proxy of the holders of at least a majority of the then outstanding shares of Merger Preferred Stock shall be required and be sufficient to constitute a quorum. At any such meeting or adjournment thereof, the absence of a quorum of the holders of Merger Preferred Stock shall not prevent the election of directors other than those to be elected by the holders of Merger Preferred Stock and the absence of a quorum or quorums of the holders of capital stock entitled to elect such other directors shall not prevent the election of directors to be elected by the holders of Merger Preferred Stock.

(v) For so long as the aforesaid voting rights are vested in the holders of Merger Preferred Stock, the term of office of all directors elected by the holders of Merger Preferred Stock shall terminate upon the election of their successors by the holders of Merger Preferred Stock; provided, however, that any director who shall have been elected by holders of the Merger Preferred Stock may be removed at any time, either with or without cause, only by the affirmative vote of the holders of record of a majority of the outstanding shares of the Merger Preferred Stock at a duly called stockholders meeting. Upon any termination of such voting rights in accordance with paragraph 10(b)(ii), the term of office of all directors elected by the holders of Merger Preferred Stock shall thereupon terminate and upon such termination the number of directors constituting the Board of Directors shall, without further action, be reduced by two.

(vi) In case of any vacancy occurring among the directors so elected by holders of Merger Preferred Stock, the remaining

director who shall have been so elected may appoint a successor to hold office for the unexpired term of the director whose place shall be vacant. If both directors so elected by the holders of Merger Preferred Stock shall cease to serve as directors before their terms shall expire, the holder of Merger Preferred Stock then outstanding may, in the manner provided in paragraph 10(b)(ii), elect successors to hold office for the unexpired terms of the directors whose places shall be vacant.

(c) (i) Subject to paragraph 10(c)(ii), so long as any shares of Merger Preferred Stock are outstanding, the Company will not, without the affirmative vote, or the written consent pursuant to Section 228 of the General Corporation Law of the State of Delaware, of the holders of at least the Required Majority of the outstanding shares of Merger Preferred Stock (or such greater number as may be required by law), voting separately as a class:

(I) increase the authorized number of shares of Merger Preferred Stock or create, authorize or issue any class or series of stock of the Company (other than the shares of the Merger Preferred Stock) ranking pari passu with the Merger Preferred Stock as to dividend rights or rights upon liquidation, winding-up or dissolution of the Company;

(II) make any amendment, alteration or repeal of any of the provisions of the Certificate of Incorporation or of any certificate amendatory thereof or supplemental thereto so as to change the terms of the Merger Preferred Stock to affect adversely the rights, powers, preferences or privileges of the Merger Preferred Stock; or

(III) create, authorize or issue any class or series of stock of the Company ranking senior to the Merger Preferred

18

Stock as to dividend rights or rights upon liquidation, winding-up or dissolution of the Company.

The "Required Majority" for any action referred to in clause (II) and (III) shall be two-thirds, and for any other action referred to in this paragraph 10(c)(i) shall be a simple majority.

(ii) Notwithstanding paragraph 10(a) or paragraph 10(c)(i), holders of the Merger Preferred Stock will have no voting rights in connection with a merger or consolidation of the Company with or into Wickes, as the surviving corporation in the merger referred to above, in which the Merger Preferred Stock is converted into stock of Wickes with substantially the same terms as those set forth in this Certificate (as determined in good faith by the Board of Directors of the Company).

(d) In connection with any matter on which holders of the Merger Preferred Stock are entitled to vote including, without limitation, the election of directors as set forth in this paragraph 10 or any matter on which the holders of the Merger Preferred Stock are entitled to vote as a class or otherwise pursuant to the General Corporation Law of the State of Delaware or the provisions of the Certificate of Incorporation of the Company, each holder of the Merger Preferred Stock shall be entitled to one vote for each share of Merger Preferred Stock held by such holder.

11. Exchange Provisions. (a) On any Dividend Payment Date, the Company, at its sole option, may require the exchange of all or any part of the shares of the Merger Preferred Stock then outstanding for the Company's 15 1/2% Junior Subordinated Exchange Debentures (the "Exchange Debentures") on the notice set forth below. Holders of record of outstanding shares of the Merger Preferred Stock as they appear on the stock register of the Company at the close of business on the record date for such exchange shall be entitled to receive Exchange Debentures having a

principal amount equal to the sum of the Liquidation Preference plus any accrued and unpaid dividends, whether or not declared, on the Merger Preferred Stock to the date of such exchange in exchange for each share of Merger Preferred Stock held by them. At the time of such exchange (an "Exchange Date"), the rights of the holders of the Merger Preferred Stock then outstanding as stockholders of the Company shall cease (except for the right to receive the Exchange Debentures) and the persons entitled to receive the Exchange Debentures issuable upon exchange shall be treated for all purposes as the holders of record of such Exchange Debentures. In the event such exchange would result in the issuance of any Exchange Debenture in a principal amount which is less than $1,000 or which is not an integral multiple of $1,000 (such principal amount less than $1,000 or the difference between such principal amount and the highest integral multiple of $1,000 that is less than such principal amount, as the case may be, being hereinafter referred to as a "Fractional Principal Amount"), each holder of Merger Preferred Stock otherwise entitled to a Fractional Principal Amount shall be entitled to receive a cash payment in lieu thereof equal to such holder's proportionate interest in the net proceeds by the Company or any agent appointed for the purpose from the sale or sales on the open market of the aggregate amount of such Exchange Debentures. The person or persons entitled to receive the Exchange Debentures issuable upon exchange shall be treated for all purposes as the registered holder or holders of such Exchange Debentures as of the related Exchange Date. The Exchange Debentures will be issued under an Indenture (the "Indenture") between the Company and United States Trust Company of New York, as trustee, substantially in the form filed as an Exhibit to the Company's and Wickes' Registration Statement on Form S-4 as filed with the Securities and Exchange Commission (File No. 33-27143), as amended pursuant to the terms of the Indenture. When no Exchange Debentures are outstanding, the Indenture may be changed as may be required by law, stock exchange rules or usage, or as may otherwise be agreed to by the Company and holders of a majority of the then outstanding shares of

20

Merger Preferred Stock. The Exchange Debentures shall have the terms and benefits provided in the Indenture.

(b) If fewer than all the outstanding shares of the Merger Preferred Stock are to be exchanged, the Board of Directors of the Company shall select the shares of the Merger Preferred Stock to be exchanged from the outstanding shares by lot or pro rata as determined by the Board of Directors of the Company, in their sole discretion; provided, however, that the Board of Directors of the Company may in selecting shares to be exchanged choose to exchange all shares of the Merger Preferred Stock held by holders of a number of such shares not to exceed 100 as may be specified by the Board of Directors.

(c) At least 30 days but not more than 60 days prior to the Exchange Date, written notice of such exchange shall be mailed to each holder of record of shares of the Merger Preferred Stock to be exchanged at the address shown on the stock transfer books of the Company or, if no such address appears or is given, at the place where the principal executive office of the Company is located; provided, however, that no failure to give such notice or any defect therein or in the mailing thereof shall affect the validity of the proceedings for such exchange. Each such notice shall specify (i) the number of shares of Merger Preferred Stock to be received in the exchange from such holder, (ii) the numbers of the certificates of the shares of Merger Preferred Stock being exchanged, (iii) the principal amount of Exchange Debentures to be issued in exchange for such shares, (iv) the Exchange Date, (v) the place or places at which the shares of the MergerPreferred Stock shall be exchanged for Exchange Debentures and (vi) that dividends on the shares to be exchanged shall cease to accrue on the Exchange Date.

(d) Upon surrender of the certificates for any of the Merger Preferred Stock so exchanged, such shares of Merger Preferred Stock shall be exchanged by the Company at the required exchange rate. In case fewer than all the shares of Merger

21

Preferred Stock represented by any such certificate are exchanged, a new certificate or certificates shall be issued representing the unexchanged shares of Merger Preferred Stock without cost to the holder thereof. From and after the Exchange Date, dividends on the shares of the Merger Preferred Stock so called for exchange shall cease to accrue, such shares of Merger Preferred Stock shall no longer be deemed to be outstanding and shall not have the status of shares of Merger Preferred Stock, and all rights of the holders thereof as stockholders of the Company (except the right to receive from the Company the Exchange Debentures upon exchange and the right to receive cash payments in lieu of Fractional Principal Amounts) shall cease with respect to such shares. From and after the related Exchange Date, shares of Merger Preferred Stock exchanged for the Exchange Debentures shall be restored to the status of authorized but unissued shares of Preferred Stock, without designation as to series until such shares are once more designated as part of a particular series by the Board of Directors of the Company.

FIFTH: (a) The business of the Corporation shall be managed by or under the direction of the Board of Directors, except as may be otherwise provided by statute or by this Certificate of Incorporation. The number of directors of the Corporation shall be fixed by, or in the manner provided in, the By-laws of the Corporation; provided, however, that such number of directors shall not exceed nine. The directors of the Corporation, other than those who may be elected pursuant to any Preferred Stock Designation, shall be divided into three classes (Class I, Class II and Class III), with the term of office of one class expiring each year. Each class shall consist, as nearly as may be possible, of one-third of the total number of directors constituting the entire Board of Directors. The membership of each class initially shall be as set forth in a resolution adopted by the Board of Directors of the Corporation on or prior to June 30, 1994 (the "Effective Date"). The initial term of Class I directors shall expire at the first annual meeting of stockholders following the Effective Date; the initial term of Class II directors shall expire at the second annual meeting of stockholders following the Effective Date; and the initial term of Class III directors shall expire at the third annual meeting of

22

stockholders following the Effective Date. At each annual meeting of
stockholders, each class of directors whose term shall then expire shall be
elected to hold office for a three year term. If the number of directors is
changed, any increase or decrease shall be apportioned among the classes so as
to maintain the number of directors in each class as nearly equal as possible,
but in no case shall a decrease in the number of directors shorten the term of
any incumbent director. A director shall hold office until the annual meeting
for the year in which such director's term expires and until such director's
successor shall be elected and shall qualify, subject, however, to prior death,
resignation, retirement, disqualification or removal from office.

     (b) There shall be a nominating committee of the Board of Directors (the
"Nominating Committee") consisting of all directors serving on the Board of
Directors, excluding directors that are salaried employees of the Corporation.
The Nominating Committee shall be authorized to nominate, by a majority vote
thereof and subject only to the restrictions set forth in this paragraph (b) of
this Article FIFTH, persons for election to the Board of Directors at any annual
meeting of stockholders or at any special meeting of stockholders called for the
purpose of electing directors; provided, however, that if the Nominating
Committee does not nominate a person by majority vote with respect to any
directorship to be voted upon at such meeting and the incumbent director holding
such directorship is affiliated with Blackstone Capital Partners L.P.
("Blackstone Partners"), Wasserstein Perella Partners, L.P. ("WP Partners") or a
Transferee (as defined in Section 3.01 of that certain Voting Agreement dated as
of June 29, 1994 between Blackstone Partners and WP Partners, as the same may be
amended from time to time) of either, in lieu of any Nominating Committee
nomination, the Corporation shall place in nomination the name of the incumbent
director or a similarly affiliated person designated by the party with whom such
incumbent director is affiliated (i.e., Blackstone Partners, WP Partners or a
Transferee, as the case may be) for election to the Board of Directors at such
meeting, and the Corporation shall nominate no other person for election to such
director position. For purposes of the preceding sentence and paragraph (d) of
this Article FIFTH, a person shall be affiliated with Blackstone Partners, WP
Partners or a Transferee if such person is a general partner, limited partner,
director or officer of such entity or any affiliate of such entity or is
otherwise an "affiliate" of such entity

23

as defined in the rules and regulations under the Securities Act of 1933. Except as provided herein, the Board of Directors, or any committee thereof, shall not be authorized to nominate persons for election to the Board of Directors.

(c) Unless and except to the extent that the By-laws of the Corporation shall so require, the election of directors of the Corporation need not be by written ballot.

(d) Newly created directorships resulting from any increase in the authorized number of directors or any vacancies in the Board of Directors resulting from death, resignation, retirement, disqualification or removal from office shall be filled solely by the Nominating Committee, by a majority vote thereof, and not by the stockholders; provided, however, that if a vacancy in the Board of Directors results from the death, resignation, retirement, disqualification or removal from office of a director affiliated with (as defined in paragraph (b) of this Article FIFTH) Blackstone Partners, WP Partners or a Transferee(excluding, however, a resignation by a director affiliated with Blackstone Partners or WP Partners pursuant to Section 3.01 of the Voting Agreement referred to in paragraph (b) of this Article FIFTH), such vacancy shall automatically be filled with a similarly affiliated person designated by the party with whom such incumbent director was affiliated (i.e., Blackstone Partners, WP Partners or a Transferee, as the case may be), such affiliation being a qualification for election to such directorship. Any director elected to fill a newly created directorship or any vacancy on the Board of Directors resulting from death, resignation, retirement, disqualification or removal from office, shall hold office for the remainder of the full term of the class of directors in which the new directorship was created or the vacancy occurred and until such director's successor shall have been elected and qualified. Directors shall continue in office until others are chosen and qualified in their stead.

(e) Notwithstanding the foregoing, whenever the holders of any one or more classes or series of Preferred Stock issued by the Corporation, if any, shall have the right, voting separately by class or series, to elect directors at an annual or special meeting of stockholders, the election, term of office, filling of vacancies and other features of such directorships shall be governed by the terms of the applicable resolution or resolutions of the Board of Directors adopted pursuant to Article FOURTH.

24

(f) Any director or the entire Board of Directors of the Corporation may be removed from office only for cause and only by the affirmative vote of the holders of a majority of the shares of capital stock of the Corporation then entitled to vote in the election of such director or directors. For purposes of this paragraph and to the extent permitted by law, "cause" shall be limited to (i) action by a director involving wilful malfeasance, which conduct has a material adverse effect on the Corporation, (ii) conviction of a director of a felony or (iii) the wilful and continuous failure of a director substantially to perform such director's duties to the Corporation (including any such failure resulting from incapacity due to physical or mental illness).

(g) In furtherance and not in limitation of the powers conferred upon it by law, the Board of Directors is expressly authorized to adopt, alter, amend or repeal any provision of the By-laws of the Corporation (including, without limitation, By-laws governing the conduct of, and the matters which may properly be brought before, meetings of the stockholders and By-laws specifying the manner and extent to which prior notice shall be given of the submission of proposals to be submitted at any meeting of stockholders or of nominations of elections of directors to be held at any such meeting) by the vote of a majority of the entire Board of Directors.

(h) In addition to the powers and authorities herein or by statute expressly conferred upon it, the Board of Directors may exercise all such powers and do all such acts and things as may be exercised or done by the Corporation, subject, nevertheless, to the provisions of the laws of the State of Delaware, this Restated Certificate of Incorporation and the By-laws of the Corporation; provided, however, that no By-laws hereafter adopted by the stockholders shall invalidate any prior act of the directors which would have been valid if such By-laws had not been adopted.

SIXTH: Any action required or permitted to be taken by the stockholders of the Corporation may be effected only at a duly called annual or special meeting of such stockholders and may not be effected by consent in writing by such stockholders. Except as otherwise provided by any Preferred Stock Designation, special meetings of stockholders for any purpose or purposes may be called only by the Chairman or a Co-Chairman of the Board, if there be one, or by resolution of the Board of Directors, acting by

25

not less than a majority of the entire Board, and the power of stockholders to call a special meeting is specifically denied. No business shall be transacted and no corporate action shall be taken at a special meeting of stockholders other than that stated in the notice of such meeting.

SEVENTH: (a) In addition to any requirements of law and any other provision of this Restated Certificate of Incorporation or any resolution or resolutions of the Board of Directors adopted pursuant to Article FOURTH of this Restated Certificate of Incorporation (and notwithstanding the fact that a lesser percentage may be specified by law, this Restated Certificate of Incorporation or any such resolution or resolutions), a Business Combination (as hereinafter defined) shall require the affirmative vote of the holders of 66-2/3% or more of the combined voting power of the then outstanding shares of Voting Stock, voting together as a single class.

(b) For the purposes of this Article SEVENTH, "Business Combination" shall mean:

(1) any merger or consolidation of the Corporation (whether or not the Corporation is the surviving corporation);

(2) any sale, lease, exchange, mortgage, pledge, transfer or other disposition (in one transaction or a series of related transactions) of all or substantially all the assets of the Corporation;

(3) the adoption of any plan or proposal for the liquidation, dissolution, spinoff, splitup, splitoff, or winding up of the affairs of the Corporation (whether voluntary or involuntary); or

(4) any agreement, contract or other arrangement providing for any of the transactions described in this definition of Business Combination.

EIGHTH: To the fullest extent that the General Corporation Law of the State of Delaware as it exists on the date hereof or as it may hereafter be amended permits the limitation or elimination of the liability of directors, no director of the Corporation shall be liable to the Corporation or its stockholders for monetary damages for breach of fiduciary duty as a director. No amendment to or repeal of this Article EIGHTH shall apply to or have any effect on the liability or alleged liability of any director of the

26

Corporation for or with respect to any acts or omissions of such director occurring prior to such amendment or repeal.

NINTH: The Corporation reserves the right at any time and from time to time to amend, alter or repeal any provision contained in this Restated Certificate of Incorporation, in the manner now or hereafter prescribed by law. In addition to any requirements of law and any other provision of this Restated Certificate of Incorporation or any resolution or resolutions of the Board of Directors adopted pursuant to Article FOURTH of this Restated Certificate of Incorporation (and notwithstanding the fact that a lesser percentage may be specified by law, this Restated Certificate of Incorporation or any such resolution or resolutions), the affirmative vote of the holders of 66-2/3% or more of the combined voting power of the then outstanding shares of Voting Stock, voting together as a single class, shall be required to adopt, amend, alter or repeal any provision of this Restated Certificate of Incorporation.

IN WITNESS WHEREOF, the Corporation has caused this Restated Certificate of Incorporation to be signed in the name and on behalf of the Corporation, and attested to, by the duly elected officers of the Corporation as indicated below this 13th day of July, 1994.

COLLINS & AIKMAN CORPORATION

by        Paul W. Meeks
   ---------------------------
   Name: Paul W. Meeks
   Title: VP/Treasurer

Attest:

        Elizabeth Philipp
   ---------------------------
Name:  Elizabeth Philipp
Title: Secretary

CERTIFICATE OF AMENDMENT

OF

RESTATED CERTIFICATE OF INCORPORATION

OF

COLLINS & AIKMAN CORPORATION


     Collins & Aikman Corporation, a corporation organized and existing under the General Corporation Law of the State of Delaware (the "Corporation"), hereby certifies that the amendments set forth below to the Corporation's Restated Certificate of Incorporation were duly adopted in accordance with Section 242 of the General Corporation Law of the State of Delaware:
     FIRST:  Article FOURTH of the Restated  Certificate of  Incorporation is hereby  amended so that paragraph (b) of such Article FOURTH shall read in its entirety as follows:
     (b) 16,000,000 shares of Preferred Stock, par value $.01 per share ("Preferred Stock"). The Board of Directors is hereby expressly authorized, by resolution or resolutions, to provide, out of the unissued and undesignated shares of Preferred Stock, for the issuance of one or more series of Preferred Stock and, with respect to each such series, to fix the number of shares constituting such series and the designation of such series, the powers (if any) of the shares of such series, and the preferences and relative, participating, optional and other special rights, if any, and any qualifications, limitations or restrictions thereof, of the shares of such series. The powers, preferences and relative, participating, optional and other special rights of each series of Preferred Stock, and the qualifications,

limitations or restrictions thereof, if any, may differ from those of any and all series at any time outstanding.

SECOND:  Article FIFTH of the Restated Certificate of Incorporation is hereby amended so that paragraphs (b) and (f) of such Article FIFTH shall read in their entirety as follows:

(b) There shall be a nominating committee of the Board of Directors (the "Nominating Committee") consisting of all directors serving on the Board of Directors, excluding directors that are salaried employees of the Corporation. The Nominating Committee shall be authorized to nominate, by a majority vote thereof and subject only to the restrictions set forth in this paragraph (b) of this Article FIFTH, persons for election to the Board of Directors at any annual meeting of stockholders or at any special meeting of stockholders called for the purpose of electing directors; provided, however, that if the Nominating Committee does not nominate a person by majority vote with respect to any directorship to be voted upon at such meeting and the incumbent director holding such directorship is affiliated with Blackstone Capital Partners L.P. ("Blackstone Partners"), Wasserstein Perella Partners, L.P. ("WP Partners") or a Transferee (as defined in Section 3.01 of that certain Voting Agreement dated as of June 29, 1994 between Blackstone Partners and WP Partners, as the same may be amended from time to time) of either, in lieu of any Nominating Committee nomination, the Corporation shall place in nomination the name of the incumbent director or a similarly affiliated person designated by the party with whom such incumbent director is affiliated (i.e., Blackstone Partners, WP Partners or a Transferee, as the case may be) for election to the Board of Directors at such meeting, and the Corporation shall nominate no other person for election to such director position. For purposes of the preceding sentence and paragraphs (d) and (f) of this Article FIFTH, a person shall be affiliated with Blackstone Partners, WP Partners or a Transferee if such person is a general partner, limited partner, director, officer or employee of such entity or any affiliate of such entity or is otherwise an "affiliate" of such entity as defined in the rules and regulations under the Securities Act of 1933. Except as provided herein, the Board of Directors, or any committee

thereof, shall not be authorized to nominate persons for election to the Board of Directors.

(f) Except as set forth below, any director or the entire Board of Directors of the Corporation may be removed from office only for cause and only by the affirmative vote of the holders of a majority of the shares of capital stock of the Corporation then entitled to vote in the election of such director or directors. For purposes of this paragraph and to the extent permitted by law, "cause" shall be limited to (i) action by a director involving willful malfeasance, which conduct has a material adverse effect on the Corporation, (ii) conviction of a director of a felony or (iii) the willful and continuous failure of a director substantially to perform such director's duties to the Corporation (including any such failure resulting from incapacity due to physical or mental illness). In addition to the foregoing, if any director was at the time of his election to the Board of Directors of the Corporation affiliated with (as defined in paragraph (b) of this Article Fifth) Blackstone Partners or WP Partners, it shall be a qualification for such director to hold office that such director continue to remain affiliated with Blackstone Partners or WP Partners and upon any failure of such director to remain so affiliated, such director shall automatically be removed from office.

Dated as of August 2, 1999