UNITED STATES DISTRICT COURT
DISTRICT OF DELAWARE

| | | |
|---|---|---|
| COLLINS & AIKMAN CORPORATION and COLLINS & AIKMAN PRODUCTS CO., as Debtors in Possession, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. 07cv265-*** |
| DAVID A. STOCKMAN, J. MICHAEL STEPP, BRYCE M. KOTH, DAVID R. COSGROVE, PAUL C. BARNABA, ROBERT A. KRAUSE, JOHN A. GALANTE, CHARLES E. BECKER, ELKIN B. MCCALLUM, THOMAS E. EVANS, CYNTHIA HESS, DANIEL P. TREDWELL, W. GERALD MCCONNELL, SAMUEL VALENTI, III, HEARTLAND INDUSTRIAL PARTNERS, L.P., HEARTLAND INDUSTRIAL ASSOCIATES, L.L.C., HEARTLAND INDUSTRIAL GROUP, L.L.C., PRICEWATERHOUSECOOPERS LLP and KPMG LLP, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

## DECLARATION OF ROBERT S. SAUNDERS

I, Robert S. Saunders, hereby declare:

1.     I am a member of the Bar of this Court and of Skadden, Arps, Slate, Meagher & Flom LLP, counsel for defendants Heartland Industrial Partners, L.P., Heartland Industrial Associates, L.L.C. and Heartland Industrial Group, L.L.C. (together "Heartland") in this action.

2.     I submit this declaration in support of the motion to dismiss filed by Heartland and to transmit to the Court true and correct copies of the following documents:

Exhibit A:  Form 8-K filed by Collins & Aikman Corporation on September 30, 2004.

Exhibit B:  Relevant excerpts from Form DEF 14A, the Definitive Proxy Statement, filed by Collins & Aikman Corporation on February 13, 2001.

Exhibit C:  Relevant excerpts from Form 10-Q filed by Collins & Aikman Corporation on May 7, 2004.

Exhibit D:  Services Agreement dated as of February 23, 2001 between named parties Collins & Aikman Corporation, Collins & Aikman Products Co. and Heartland Industrial Partners, L.P. and amendments.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on September 14, 2007, in Wilmington, Delaware.

Robert S. Saunders

**EXHIBIT A**

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION

## Washington, D.C. 20549

# FORM 8-K

**CURRENT REPORT**

Pursuant to Section 13 or 15(d) of the Securities
Exchange Act of 1934

September 29, 2004
Date of Report (Date of earliest event reported)

# COLLINS & AIKMAN CORPORATION

(Exact name of registrant as specified in its charter)

| DELAWARE | 1-10218 | 13-3489233 |
|---|---|---|
| (STATE OR OTHER JURISDICTION OF INCORPORATION OR ORGANIZATION) | (COMMISSION FILE NUMBER) | (I.R.S. EMPLOYER IDENTIFICATION NO.) |

250 Stephenson Highway
Troy, Michigan 48083
(Address of principal executive offices)

(248) 824-2500

(Registrant's telephone number, including area code)

NOT APPLICABLE
(FORMER NAME OR FORMER ADDRESS, IF CHANGED SINCE LAST REPORT)

CHECK THE APPROPRIATE BOX BELOW IF THE FORM 8-K FILING IS INTENDED TO SIMULTANEOUSLY SATISFY THE FILING OBLIGATION OF THE REGISTRANT UNDER ANY OF THE FOLLOWING PROVISIONS:

[ ] Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)
[ ] Soliciting material pursuant to Rule 14a-12 under the Exchange Act

(17 CFR 240.14a-12)

[ ] Pre-commencement communication s pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))
[ ] Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

**ITEM 5.02 DEPARTURE OF DIRECTORS OR PRINCIPAL OFFICERS; ELECTION OF DIRECTORS; APPOINTMENT OF PRINCIPAL OFFICERS.**

Effective September 29, 2004, Anthony Hardwick and Richard C. Jelinek have been appointed to the Board of Directors of Collins & Aikman Corporation (the "Company"). Mr. Hardwick was also appointed to the Audit Committee of the Board of Directors, and Mr. Jelinek was also appointed to the Compensation Committee (as Chairman) and Nominating and Governance Committee of the Board of Directors.

Mr. Hardwick and Mr. Jelinek, both of whom the Board of Directors has determined are "independent", are replacing Samuel Valenti III and Cynthia L. Hess, who have resigned as directors of the company to accommodate the restructuring of the company's board to meet the new independence requirements. Mr. Valenti and Ms. Hess had been appointed to the board by Heartland Industrial Partners, L.P. in conjunction with Heartland's acquisition of 59% of the company's common stock in February 2001 and were not "independent" board members due to their affiliation with Heartland. Mr. Valenti is a Senior Managing Director of Heartland, and Ms. Hess was formerly a Senior Managing Director of Heartland.

## SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

Dated: September 30, 2004

### COLLINS & AIKMAN CORPORATION

```
By:    /s/     J. Michael Stepp
       ------------------------------------
       Name:   J. Michael Stepp
       Title:  Vice Chairman and Chief
               Financial Officer
```

**End of Filing**

Powered By EDGAR®

© 2005 | EDGAR Online, Inc.

**EXHIBIT B**

**SCHEDULE 14A INFORMATION**
**PROXY STATEMENT PURSUANT TO SECTION 14(a)**
**OF THE SECURITIES EXCHANGE ACT OF 1934**

**Filed by the Registrant [X]**

**Filed by a Party other than the Registrant [ ]**

Check the appropriate box:

[ ] Preliminary Proxy Statement
[ ] Confidential, for Use of the Commission Only (as permitted by Rule 14a-6(e)(2))
[X] Definitive Proxy Statement
[ ] Definitive Additional Materials
[ ] Soliciting Material Pursuant to Section 240.14a-11(c) or Section 240.14a-12

# COLLINS & AIKMAN CORPORATION

(Name of Registrant as Specified in Its Charter)

(Name of Person(s) Filing Proxy Statement, if other than the Registrant)

**Payment of Filing Fee (Check the appropriate box):**

[X] No fee required
[ ] Fee computed on table below per Exchange Act Rules 14a-6(i)(1) and 0-11.

Title of each class of securities to which transaction applies:

Aggregate number of securities to which transaction applies:

Per unit price or other underlying value of transaction computed pursuant to Exchange Act Rule 0-11 (set forth the amount on which the filing fee is calculated and state how it was determined):

Proposed maximum aggregate value of transaction:

Total fee paid:

[ ] Fee paid previously with preliminary materials.

[ ] Check box if any part of the fee is offset as provided by Exchange Act Rule 0-11(a)(2) and identify the filing for which the offsetting fee was paid previously. Identify the previous filing by registration statement number; or the Form or Schedule and the date of its filing.

**Amount Previously Paid:**

**Form, Schedule or Registration Statement No.:**

**Filing Party:**

**Date Filed:**

[GRAPHIC OMITTED]

Collins & Aikman Corporation
5755 New King Court
Troy, Michigan 48098

February 13, 2001

Dear Stockholder:

You are cordially invited to attend a special meeting of stockholders of Collins & Aikman Corporation to be held on March 6, 2001, at our offices at 5755 New King Court, Troy, Michigan, at 11:00 A.M., local time.

We believe that the transactions described in this Proxy Statement are exciting and positive developments for us. They involve the purchase of stock from us for $125,000,000 by a group led by Heartland Industrial Partners, L.P., a private equity fund established to invest in, build and grow industrial companies. At the same time, our current principal stockholders, affiliates of Blackstone Capital Partners, L.P. and Wasserstein Perella Partners, L.P., will also sell shares to the Heartland group, reducing their ownership of Collins & Aikman but remaining involved as substantial stockholders.

We believe that the cash infusion which we will receive in these transactions, combined with the support we expect to receive from these very significant stockholders, will help management build greater value for all the stockholders.

Blackstone and Wasserstein, which together own approximately 87% of our Common Stock, have given us an irrevocable proxy to vote their shares in favor of the proposals to come before the Special Meeting. Accordingly, approval of those proposals is assured.

You are urged to read carefully the formal notice of the meeting and the Proxy Statement which follow. After reading them, please sign, date and mail the enclosed proxy card so that your shares will be represented at the meeting. A prepaid return envelope is provided for this purpose.

We look forward to seeing you at the meeting.

Sincerely,

/s/ THOMAS E. EVANS
--------------------------
Thomas E. Evans
Chairman of the Board and
Chief Executive Officer

into a new shareholder agreement with the New Investors and the Sellers in the form filed as an exhibit to the January 16 8-K (the "New Master Shareholder Agreement") and a new registration rights agreement with the New Investors and the Sellers in the form filed as an exhibit to the January 16 8-K (the "New Registration Rights Agreement"). Upon consummation of the Transactions and conversion of the Nonvoting Stock, the New Investors, the Sellers and our other stockholders will beneficially own approximately 59.8%, 31.0% and 9.2% of the Common Stock, respectively.

The Transactions are more fully described below.

## WHAT IS THE BACKGROUND OF THE TRANSACTIONS?

In late 1998 and early 1999, we explored the possibility of combining with a strategic partner or being acquired by a strategic buyer, but we did not receive any offers or proposals that were acceptable to us. In mid-2000, the Sellers met to discuss their strategic alternatives with respect to their investment in Collins & Aikman, as well as the capital constraints facing us. The Sellers desired to achieve liquidity to retire indebtedness that was originally incurred to finance their purchase of a portion of their stock in us. The Sellers considered selling all or a portion of their shares in a public offering or a private sale at a price acceptable to them or selling a portion of their shares to an investor who was also willing to make a substantial equity investment in us to enhance our growth prospects and to maximize the value of any remaining investment the Sellers would have in us.

After discussing their objectives with respect to their investments in Collins & Aikman, the Sellers decided to contact several investment banks to solicit their opinions as to the best way for the Sellers to pursue a potential sale of all or a portion of their holdings in Collins & Aikman as well as alternatives for Collins & Aikman to raise new capital. After meeting with these banks, in August 2000, the Sellers engaged Salomon Smith Barney Inc., Wasserstein Perella & Co., Inc. and Chase Securities Inc. (the "Investment Banks") to be their exclusive financial advisors in connection with a possible transaction involving the sale, transfer or other disposition, directly or indirectly, of all or a significant portion of their holdings in Collins & Aikman. Simultaneously with the Sellers' engagement of the Investment Banks, we engaged the Investment Banks to be our financial advisors in connection with a possible transaction involving either (i) a non-public sale of Common Stock by us pursuant to an agreement entered into contemporaneously with or as part of an agreement for the sale, transfer or other disposition of our Common Stock owned by the Sellers or (ii) the transfer, sale or other disposition, by virtue of the actions of the Investment Banks or the Sellers, of all or a significant portion of our business, assets or securities, whether by way of a merger or consolidation, reorganization, recapitalization or restructuring, tender or exchange offer, negotiated purchase, leveraged buyout, partnership, collaborative venture or any other extraordinary corporate transaction involving Collins & Aikman. In light of our unsuccessful attempt to find a strategic buyer in late 1998 and early 1999, the primary targets of the sale process on behalf of the Sellers were buyout firms and equity sponsors, although the Sellers had discussions with at least one potential strategic buyer.

After contacting more than 60 potential investors and sending a confidential information memorandum to more than 25 of these investors, the Investment Banks solicited preliminary bids from several parties, all of whom were invited to participate in management presentations given by us at our headquarters in Troy, Michigan, which took place from mid-October through early November 2000, and to conduct a business and legal due diligence review of Collins & Aikman.

After the due diligence process was completed, the Investment Banks received indications of interest or offers from several interested parties. Heartland's offer emerged as the most attractive because it had the highest price and provided for a capital infusion to Collins & Aikman that we were otherwise unable to raise through a public equity offering due to market conditions. Negotiations with Heartland resulted in Heartland's increasing its bid to $5.00 per share on December 22, 2000 and agreeing to allow the Sellers (but not Collins & Aikman) to share in any profits Heartland would receive as a result of Heartland's future sales of up to 27,000,000 shares, up to a maximum of $0.35 per share (which maximum would increase by 8% annually, compounded quarterly). After consulting with certain members of our Board and our senior management, the Sellers commenced negotiations of definitive documents with Heartland.

6

Following these consultations, the Board, by unanimous written consent, established a Special Committee of disinterested directors to review, analyze, consider and pursue alternatives and responses to, and approve or disapprove, the terms of any proposed transactions relating to the proposed sale by the Sellers of a portion of their Common Stock to Heartland (and any actions by us proposed or required in connection with any such transactions) and the proposed issuance and sale by us of Common Stock to Heartland. The Special Committee consisted of Robert C. Clark and Warren B. Rudman, neither of whom has a financial interest in the Transactions.

## WHAT ACTIONS WERE TAKEN BY THE SPECIAL COMMITTEE?

Following its appointment, the Special Committee selected UBS Warburg LLC to be the financial advisor to the Special Committee and Morris, Nichols, Arsht & Tunnell to be legal counsel to the Special Committee.

The Special Committee held its first meeting by telephone on January 2, 2001. Salomon Smith Barney, financial advisor to us and the Sellers, described the process that led to Heartland's proposal to acquire 27,000,000 shares from the Sellers and 25,000,000 shares from us. Salomon Smith Barney also informed the Special Committee that one potential bidder other than Heartland remained in the process.

Our counsel then reviewed the terms of the draft share purchase agreements provided to us by Heartland. Under the proposed agreements, Heartland's purchase of 27,000,000 shares from the Sellers would close before the purchase of 25,000,000 shares from us. A delayed closing of the purchase of shares from us carried with it the risk that our sale would not be completed. It was a condition of the proposed primary share purchase agreement that our stockholders preapprove the issuance of up to 65,000,000 shares of Common Stock without further stockholder approval for purposes of the New York Stock Exchange stockholder vote requirement and that the Board waive the application of the Delaware anti-takeover statute (Section 203 of the Delaware General Corporation Law) to the acquisition of more than 15% of the our stock by Heartland. Our counsel also discussed the terms of our debt instruments that would have to be amended to permit the Heartland transaction and the provisions of the proposed primary share purchase agreement that we agree to approve any covenant changes in those debt instruments which were negotiated by Heartland. Our counsel informed the Special Committee that our debtholders and bank lenders would require consent fees for approving these amendments.

Counsel for the Special Committee reviewed the principal economic terms of the proposed share purchase agreements, including the price per share, the profit participation to be paid by Heartland to the Sellers in certain circumstances, the reimbursement of Heartland's expenses in connection with the transaction, the payment of a 1% transaction fee to Heartland (equal to approximately $13,000,000) and the payment of an annual $4,000,000 advisory fee to Heartland, representing a $2,000,000 annual increase over the annual fees currently paid to the Sellers.

After Salomon Smith Barney and our counsel left the meeting, the Special Committee, with its counsel and UBS Warburg, discussed the proposed share purchase agreements and developed a preliminary list of negotiating points, including equal profit participation with the Sellers, the reduction of fees, the elimination of the preapproval requirement for up to 65,000,000 additional common shares and protection for the public minority shareholders in future transactions with Heartland and its affiliates. The Special Committee concluded that it needed additional time and information in order to develop a negotiating position and agreed to meet later in the week.

Over the next eight days, the Special Committee and its legal and financial advisors negotiated directly with Heartland and its counsel and the Sellers and their counsel to improve the proposal. During that period, the Special Committee met telephonically five times and communicated a number of its concerns to the Sellers and Heartland. The Special Committee also learned that the second possible bidder had withdrawn. During one of the Special Committee's meetings, senior management presented its view that it was important to go forward with the Heartland transaction in order to obtain new capital and allow the Sellers to exit their investment in an orderly fashion without adversely impacting the public

7

market price for our Common Stock. Management informed the Special Committee that we would likely be in default under our debt covenants as of December 31, 2000 whether or not we proceeded with the Heartland transaction and that the cost of covenant amendments could be higher if there were no Heartland transaction.

On January 10, the Special Committee received a revised proposal from Heartland, which outlined a number of concessions that Heartland had made in its negotiations with the Special Committee and its advisors, and stated Heartland's position that it "would move on" if the revised proposal, which was stated to be its "last and best effort," was unsatisfactory to the Special Committee. Heartland's revised proposal provided for the purchase of 25,000,000 shares from us and 27,000,000 shares from the Sellers at $5.00 per share and a profit participation right of up to $0.25 per share with an annual accretion rate of 6.8% to us on an equal basis with the Sellers. Heartland also agreed to reduce its transaction fee to $12,000,000, to cap its pre-signing expenses at $500,000 and to having three independent directors on the Board, and it accepted the Special Committee's request that the Board have the right to approve any changes to our debt instruments.

The Special Committee and its counsel also negotiated a number of contractual concessions during this period, including: the elimination of Heartland's right to a majority of the Board when its ownership falls below 25% of its initial holdings; improvements in the "fiduciary out"; limitation on circumstances requiring the payment of a topping fee; a simultaneous closing for the sale of shares by us and the Sellers; a two-month increase in the time that we have to complete the transaction; limitations on those circumstances in which Heartland could terminate the transaction in the case of adverse changes; a reduction in the number of registration rights available to Heartland and the Sellers; elimination of the preapproval of the issuance of additional shares of common stock; and the elimination of a "preemptive right" on the part of Heartland and the Sellers with respect to any additional issuances of stock by us.

The Special Committee met on January 10 and discussed the revised Heartland proposal and Heartland's agreement that certain transactions between us and Heartland and its affiliates would be subject to the approval of the disinterested directors. The Special Committee agreed that the revised proposal was acceptable, but believed that the Special Committee should make one last attempt to reduce the advisory fee. At that point, representatives of Heartland joined the conference call. The Special Committee stated that the revised proposal was acceptable, but that it wished to reduce the advisory fee. In response, Heartland offered to forebear from charging its customary 1% transaction fee with respect to acquisitions and divestitures for one year following the closing of the Transactions. The Special Committee members stated that they would support the revised proposal with that modification given Heartland's commitment to grow Collins & Aikman through acquisitions. After the representatives of Heartland left the call, UBS Warburg advised the Special Committee that it was prepared to render its opinion that the $5.00 cash price per share to be received by us for the sale of 25,000,000 shares to the New Investors was fair to our public stockholders from a financial point of view. The Special Committee then voted, subject to receipt of the UBS Warburg opinion, to recommend the Transactions, as modified, to the full Board and the stockholders.

## WHAT IS THE OPINION OF THE SPECIAL COMMITTEE'S FINANCIAL ADVISOR?

At the meeting of the Board held on January 11, UBS Warburg delivered its oral opinion to the Special Committee to the effect that, as of the date of the opinion (prior to the modifications to the Transactions described on page 5) and based on and subject to the matters described in the opinion, the cash price of $5.00 per underlying share of Common Stock to be paid by the New Investors to us in the Transactions (prior to the modifications to the Transactions described on page 5) is fair, from a financial point of view, to the holders of our outstanding publicly held Common Stock. The opinion was confirmed by delivery of a written opinion dated January 11, 2001.

THE FOLLOWING SUMMARY OF THE UBS WARBURG OPINION IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE FULL TEXT OF THE OPINION. THE FULL TEXT OF THE UBS WARBURG OPINION SETS FORTH THE ASSUMPTIONS MADE, PROCEDURES FOLLOWED, MATTERS CONSIDERED AND LIMITATIONS ON THE SCOPE OF THE REVIEW UNDERTAKEN AND IS ATTACHED AS ANNEX A TO THIS PROXY STATEMENT AND INCORPORATED HEREIN BY REFERENCE. WE ENCOURAGE YOU TO READ CAREFULLY THE UBS WARBURG OPINION IN ITS ENTIRETY.

8

**EXHIBIT C**

# UNITED STATES SECURITIES AND EXCHANGE COMMISSION
### Washington D.C. 20549

---

# Form 10-Q

(Mark One)

☑ **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the quarterly period ended March 31, 2004

or

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 or 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from          to

Commission file number 1-10218

---

# Collins & Aikman Corporation
*(Exact name of registrant, as specified in its charter)*

| | |
|---|---|
| **DELAWARE** | **13-3489233** |
| *(State or other jurisdiction of incorporation or organization)* | *(IRS Employer Identification No.)* |

**250 Stephenson Highway**
**Troy, Michigan 48083**
*(Address of principal executive offices, including zip code)*

**(248) 824-2500**
*(Registrant's telephone number, including area code)*

Indicate by check mark whether the Registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the Registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.     Yes ☐          No ☑ .

Indicate by check mark whether the registrant is an accelerated filer (as defined in Exchange Act Rule 12b-2).     Yes ☑          No ☐ .

As of March 31, 2004, the number of outstanding shares of the Registrant's common stock, $.01 par value, was 83,630,087 shares.

### WEBSITE ACCESS TO COMPANY'S REPORTS:

Collins and Aikman's internet website address is www.collinsaikman.com. The Company's annual report on Form 10-K, quarterly reports on Form 10-Q, current reports on Form 8-K, and amendment to those reports filed or furnished pursuant to Section 13(a) or 15(d) of the

Exchange Act are available free of charge through the Company's website and as soon as reasonably practicable after the reports are electronically filed with, or furnished to the Securities and Exchange Commission.

The Company's Code of Business Conduct is available free of charge through the Company's internet website. Any amendments to the Company's Code of Business Conduct and any waivers of the Code of Business Conduct involving executive officers or directors of the Company will also be made available on the Company's internet website. Printed copies of the Company's Code of Business Conduct are also available free of charge to any shareholder upon request to: Corporate Secretary, Collins & Aikman Corporation, 250 Stephenson Highway, Troy, MI 48083.

## COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES

### FORM 10-Q QUARTERLY REPORT INDEX

| | | Page |
|---|---|---|
| **PART I** | **FINANCIAL INFORMATION** | |
| Item 1. | Financial Statements | 1 |
| Item 2. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 25 |
| Item 3. | Quantitative and Qualitative Disclosures About Market Risk | 33 |
| Item 4. | Controls and Procedures | 34 |
| **PART II** | **OTHER INFORMATION** | |
| Item 1. | Legal Proceedings | 35 |
| Item 6. | Exhibits and Reports on Form 8-K | 35 |
| Signature | | 36 |
| 2nd Amendment dated 3/15/04 to Agreement 02/23/01 | | |
| Computation of Earnings Per Share | | |
| Computation of Ratio of Earnings to Fixed Charges | | |
| Certification Pursuant to Section 302 | | |
| Certification Pursuant to Section 302 | | |
| Certification Pursuant to Section 906 | | |

Table of Contents

Reserves for lease terminations costs are paid in conjunction with the remaining terms of the leases, while severance and other exit costs are generally paid within one year of the restructuring program.

During 2003 the Company recognized a $7.7 million write-down of fixed assets related to its 50% interest in an Italian joint venture acquired in 2001 and $10.4 million impairment of the Becker non-compete agreement.

**12.  Related Party Transactions**

### Heartland Transactions

The Company is a party to a Services Agreement with Heartland under which Heartland provides advisory and consulting services, including services with respect to developments in the automotive industry and supply markets, advice on financial and strategic plans and alternatives and other matters as it may reasonably request and are within Heartland's expertise. The Services Agreement terminates on the earlier of its tenth anniversary or the date upon which Heartland ceases to own Company shares equivalent to 25% of that owned by them on February 23, 2001.

Under the Services Agreement, the Company is obligated to pay to Heartland a $4.0 million annual advisory fee payable in quarterly installments and reimburse its out-of-pocket expenses related to the services it provides. The Company has also agreed to pay a fee of 1% of the total enterprise value of certain acquisitions and dispositions. For the three month periods ended March 31, 2004 and 2003 the Company recorded total fees of $1.0 million for both periods, respectively.

In addition, the Services Agreement with Heartland contemplates that the Company may pay additional fees to Heartland for services rendered in connection with a range of financing transactions. In March 2004, the Company's Board of Directors, including the disinterested and independent directors of the Board, approved a fee of $1 million to Heartland for its services rendered in connection with the 2004 amendments to the Company's credit facility to add a supplemental revolving credit facility. On May 6, 2004, the Company's Board of Directors, including the disinterested and independent directors of the Board, approved an amendment of the Services Agreement to provide for a fee of up to $5.0 million related to services rendered in connection with the expected notes offering and a fee of 1% of the gross proceeds of certain future financings, excluding the amendment and restatement of our senior secured credit facility.

### Charles E. Becker Transactions

At March 31, 2004 and March 31, 2003 the Company recorded total lease payments of $2.1 million and $2.3 million, respectively under various lease agreements.

The Company has announced that Charles Becker has resigned as director of the Company effective as of May 6, 2004.

### Elkin McCallum Transactions

In 2004 and 2003, the Company engaged in ordinary course transactions with entities controlled by Mr. McCallum for the purchase and sale of goods and services as part of ongoing business relationships. The Company recorded purchases for goods and services from entities controlled by Mr. McCallum of $1.3 million for the quarter ended March 31, 2004, and $5.4 million (net of $1.2 million of rebates) for the quarter ended March 31, 2003 for goods and services purchased. The rebates received from Mr. McCallum relate to knit and woven automotive fabrics provided by entities controlled by Mr. McCallum under the Supply Agreement and Transition Agreement executed in connection with the 2001 Joan acquisition. Supplier rebates such as these are common in the automotive industry as part of ongoing price negotiations and adjustments. The rebates from Mr. McCallum totaled $14.7 million over the duration of the agreements. In addition, the Company recorded sales to entities controlled by Mr. McCallum, of $3.4 million for the quarter ended March 31, 2004 and $3.3 million for the quarter ended March 31, 2003.

12

**EXHIBIT D**

EXECUTION COPY

SERVICES AGREEMENT (this "Agreement"), dated as of February 23, 2001, among Collins & Aikman Corporation, a Delaware corporation, Collins & Aikman Products Co., a Delaware corporation (together with Collins & Aikman Corporation, the "Company"), and Heartland Industrial Partners, L.P., a Delaware limited partnership ("Heartland").

WHEREAS, Heartland, by and through itself, its affiliates and their respective officers, employees and representatives, has expertise in the areas of finance, strategy, investment and acquisitions relating to the business of the Company; and

WHEREAS, the Company desires to avail itself, for the term of this Agreement, of the expertise of Heartland in the aforesaid areas and Heartland wishes to provide the services to the Company as herein set forth;

NOW, THEREFORE, in consideration of the foregoing recitals and the covenants and conditions contained herein, the parties hereto agree as follows:

1.  **Appointment.** The Company hereby appoints Heartland to render the advisory and consulting services described in Section 2 hereof for the term of this Agreement. It is understood that the services rendered in exchange for the annual Advisory Fee referred to herein shall be construed as being extended to Collins & Aikman Products Co. and that the services rendered in exchange for the fees referred to in Section 3(c) or otherwise agreed to hereunder shall be construed as being extended to the particular entity or entities engaging in the transaction for which fees are being paid. All monetary obligations of the Company referred to herein shall nonetheless be construed as joint and several obligations of each of Collins & Aikman Corporation and Collins & Aikman Products Co.

2.  **Services.** Heartland hereby agrees that, during the term of this Agreement, it shall render to the Company, by and through itself and its officers, employees and representatives as Heartland in its sole discretion shall designate from time to time in consultation with the Company (it being understood that any representatives not associated with Heartland must be reasonably acceptable to the Company), advisory and consulting services in relation to the affairs and strategic direction of the Company and its subsidiaries, including, without limitation, (i) advice with respect to general developments in the automotive industry and the manner in which those developments may impact the Company; (ii) advice on market developments concerning the purchase and sale of automotive suppliers in its market area and other automotive industry entities identified by the Company and the manner in which those developments may impact the Company; (iii) advice on the Company's financial plans, strategic plans, and alternatives after review of such plans and alternatives with management of the Company; and (iv) advice in other business and financial areas as may be reasonably requested by the Company and which are within the expertise of Heartland. Nothing herein

-2-

shall be construed as precluding Heartland or any of its affiliates from receiving fees in addition those contemplated hereby for acquisitions and dispositions and for providing its personnel for general advice (in any such case with the requisite approvals of the Company). Additional and arrangement of financings (whether in the form of debt, equity, lease financing, public or private offerings of securities or otherwise), work-outs and other traditional and non-traditional investment banking, consultant or management services.

3.    Fees. (a) In consideration of the services contemplated by Section 2, for the term of this Agreement, the Company and its successors agree to pay to Heartland an annual fee (the "Advisory Fee") equal to (x) a fee of $404,494.38 in cash for the period from Closing Date through March 31, 2001, payable on February 23, 2001, (y) $3,000,000 in cash for the balance of calendar year 2001 and (z) $4,000,000 for each calendar year thereafter, in each case under clauses (y) and (z) payable in quarterly installments in advance on January 1, April 1, July 1 and October 1 of each year beginning March 31, 2001 through the date (the "Termination Date") which is the earlier of (x) the tenth anniversary hereof (unless extended by the Company) or (y) the date on which Heartland and its affiliates (including, without limitation, the "Heartland Entities" and their "Permitted Transferees" referred to, in each case, in the Stockholders Agreement entered into on the date hereof) hold, directly or indirectly, beneficial ownership of less than 25% of the common equity interests (including shares underlying preferred stock held by Heartland) of the Company acquired on the Closing Date, or such earlier date as the Company and Heartland shall agree. Any Advisory Fee for the last calendar year of this Agreement shall be prorated for the period of such year ending on the Termination Date. The "Closing Date" shall mean the date of the closing of the transactions contemplated by the Primary Share Purchase Agreement dated January 12, 2001 between Heartland and the Company (the "Primary SPA").

(b) Upon the Closing Date, the Company shall pay to Heartland or its designees a fee for services rendered in connection with the transactions contemplated by the Primary SPA in the amount of $12,000,000 and will reimburse Heartland and its affiliates for their reasonable out-of-pocket expenses incurred in connection with such Transactions on the basis described in the Primary SPA.

(c) In addition, commencing on February 23, 2002 and for the balance of the term of this Agreement, the Company shall pay to Heartland or its designees a transaction fee in connection with the consummation of each acquisition or divestiture by the Company or any of its subsidiaries (with respect to which Heartland provides any significant advisory services) of any business constituting a going concern or any division or line of business or separable plant or manufacturing facility or significant set of related assets in an amount equal to 1% of the aggregate total enterprise value of the business or assets being acquired or di-

-3-

vested, for Heartland's services in negotiating, analyzing, arranging and executing such acquisitions and divestitures.

(d) To the extent required by any debt financing of the Company or its subsidiaries, any fees payable hereunder shall be deferred until the earlier of (i) the liquidation or dissolution of the Company, and (ii) the time that payment of such deferred amounts is permitted under such debt financing. Any deferred fees and Out-of-Pocket Expenses shall bear interest at a rate of ten percent (10%) per annum, compounded annually, from the date deferred until paid.

4. <u>Reimbursements</u>. In addition to the fees payable pursuant to this Agreement, the Company shall pay directly or reimburse Heartland for its Out-of-Pocket Expenses. For the purposes of this Agreement, the term "<u>Out-of-Pocket Expenses</u>" shall mean the reasonable out-of-pocket costs and expenses (which, for the avoidance of doubt, shall not include any payment of salaries, bonuses or other compensation to personnel of Heartland) reasonably incurred by Heartland or its affiliates in connection with the services rendered hereunder in pursuing, or otherwise related to, the business of the Company, including, without limitation, (i) fees and disbursements of any independent professionals and organizations, including independent accountants, outside legal counsel or consultants, incurred in consultation with the Company, (ii) costs of any outside services or independent contractors such as financial printers, couriers, business publications, on-line financial services or similar services and (iii) transportation, per diem costs, word processing expenses or any similar expense not associated with its ordinary operations. All reimbursements for Out-of-Pocket Expenses shall be made promptly upon or as soon as practicable after presentation by Heartland to the Company of a written statement thereof with supporting invoices as reasonably requested by the Company.

5. <u>Indemnification</u>. The Company will indemnify and hold harmless Heartland, its affiliates and their respective partners (both general and limited), members (both managing and otherwise), officers, directors, employees, agents and representatives (each such person being an "<u>Indemnified Party</u>") from and against any and all losses, claims, damages and liabilities, whether joint or several (the "<u>Liabilities</u>"), related to, arising out of or in connection with the advisory and consulting services contemplated by this Agreement or the engagement of Heartland pursuant to, and the performance by Heartland of the services contemplated by, this Agreement, whether or not pending or threatened, whether or not an Indemnified Party is a party, whether or not resulting in any liability and whether or not such action, claim, suit, investigation or proceeding is initiated or brought by the Company; provided that if initiated or brought by the Company, such Indemnified Party shall not have been adjudged liable to the Company. The Company will reimburse any Indemnified Party for all reasonable costs and expenses (including reasonable attorneys' fees and expenses) as they are incurred in connection with investigating, preparing, pursuing, defending or assisting in the

-4-

defense of any action, claim, suit, investigation or proceeding for which the Indemnified Party would be entitled to indemnification under the terms of the previous sentence, or any action or proceeding arising therefrom, whether or not such Indemnified Party is a party thereto. The Company will not be liable under the foregoing indemnification provision with respect to any Indemnified Party, to the extent that any loss, claim, damage, liability, cost or expense is determined by a court, in a final judgment from which no further appeal may be taken, to have resulted primarily from the gross negligence, bad faith or willful misconduct of Heartland. If an Indemnified Party is reimbursed hereunder for any expenses, such reimbursement of expenses shall be promptly refunded to the Company to the extent it is finally judicially determined that the Liabilities in question resulted primarily from the gross negligence, bad faith or willful misconduct of Heartland.

The Indemnified Parties shall give prompt written notice to the Company of any pending or threatened claim or any action or proceeding arising therefrom. The failure of an Indemnified Party to so notify the Company of any such matter shall not release the Company, in whole or in part, from its obligations to indemnify hereunder except to the extent that such failure materially prejudices the ability of the Company to defend such action. If it so elects, the Company may assume the defense of such action with counsel chosen by it, and upon such assumption, the Company shall not be liable for any legal costs subsequently incurred by any Indemnified Party, unless (i) the Company has failed to provide counsel to such Indemnified Parties in a timely manner of (ii) either counsel provided by the Company or counsel to such Indemnified Parties reasonably determines that its representation of such Indemnified Parties would present it with a conflict of interest or the interests of the Company and the Indemnified Parties are materially in conflict other than by reason of those provisions, in which case the Company shall pay the reasonable fees and expenses of separate counsel for the Indemnified Parties, provided, however, that in no event shall the Company be liable for the fees and expenses of more than one counsel for the Indemnified Parties.

The Company shall not be required to make payment for any settlement affected without its prior written consent, which shall not be unreasonably withheld, and the Company shall not settle any claim against it by a third party that does not result in the unconditional release of the Indemnified Parties.

6.    _Accuracy of Information._ The Company shall furnish or cause to be furnished to Heartland such information as Heartland reasonably believes appropriate to its advisory services hereunder and to the ownership by affiliates of Heartland of equity interests of the Company (all such information so furnished being the "Information"). The Company recognizes and confirms that Heartland (i) will use and rely primarily on the Information and on information available from generally recognized public sources in performing the services contemplated by this Agreement without having independently verified the same, (ii) does not

-5-

assume responsibility for the accuracy or completeness of the Information and such other information and (iii) is entitled to rely upon the Information without independent verification.

Except as contemplated by the terms hereof or as required by applicable law, regulation or regulatory oversight or pursuant to an order entered or subpoena issued by a court of competent jurisdiction, Heartland will keep confidential all material nonpublic information provided to it by the Company pursuant to the terms hereof, and will not disclose any such Information to any third party, other than such of its employees, counsel, consultants, partners and investors, actual and potential financing sources to it or the Company and its subsidiaries and advisors as Heartland determines have a need to know. Any written material produced by Heartland for the Company or attributable to the services performed for the Company shall be the property of the Company and any and all of such materials and documents and other information supplied by the Company to Heartland in connection with this Agreement shall be promptly returned to the Company upon written request.

7.     Term.  This Agreement shall be effective as of the date hereof and shall continue until the Termination Date, provided that Section 4 shall remain in effect with respect to Out-of-Pocket Expenses incurred prior to the Termination Date.  The provisions of Sections 5 shall survive the termination of this Agreement.

8.     Permissible Activities.  Subject to applicable law, nothing herein shall in any way preclude Heartland, its affiliates or their respective partners (both general and limited), members (both managing and otherwise), officers, directors, employees, agents or representatives from engaging in any business activities or from performing services for its or their own account or for the account of others, including for companies that may be in competition with the business conducted by the Company.

9.     Miscellaneous.  (a) No amendment or waiver of any provision of this Agreement, or consent to any departure by either party hereto from any such provision, shall be effective unless the same shall be in writing and signed by all of the parties hereto.  Any amendment, waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.  The waiver by any party of any breach of this Agreement shall not operate as or be construed to be a waiver by such party of any subsequent breach.

(b)     Any notices or other communications required or permitted hereunder shall be sufficiently given if delivered personally or sent by facsimile, Federal Express, or other overnight courier, addressed as follows or to such other address of which the parties may have given notice:

-6-

If to Heartland:

> 55 Railroad Avenue
> Greenwich, CT 06830
>
> Attention: David Stockman
> Facsimile: (203) 861-2722

If to the Company:

> Collins & Aikman Corporation
> 5755 New King Court
> Troy, Michigan 48098
> Attention: Ronald T. Lindsay, General Counsel
> Facsimile: (248) 824-1882

Unless otherwise specified herein, such notices or other communications shall be deemed received (i) on the date delivered, if delivered personally or sent by facsimile, and (ii) one business day after being sent by Federal Express or other overnight courier.

(c)     This Agreement shall constitute the entire agreement between the parties with respect to the subject matter hereof, and shall supersede all previous oral and written (and all contemporaneous oral) negotiations, commitments, agreements and understandings relating hereto.

(d)     This Agreement shall be governed by, and construed and interpreted in accordance with, the laws of the State of New York. This Agreement shall inure to the benefit of, and be binding upon, Heartland, the Company and their respective successors and permitted assigns; provided that Heartland may not assign this Agreement or delegate its obligations hereunder to any person other than its affiliates without the prior written consent of the Company, which shall not be unreasonably withheld. Any assignment in violation of this Agreement shall be null and void. The provisions of Section 5 shall inure to the benefit of each Indemnified Party.

(e)     This Agreement may be executed by one or more parties to this Agreement on any number of separate counterparts, and all of said counterparts taken together shall be deemed to constitute one and the same instrument.

(f)     Any provision of this Agreement which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

S-1

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed and delivered by their duly authorized officers or agents as of the date first above written.

**HEARTLAND INDUSTRIAL PARTNERS, L.P.**
By: Heartland Industrial Associates L.L.C., its general partner

By: _____
    Name:  Daniel P. Tredwell
    Title:  Member

**COLLINS & AIKMAN CORPORATION**

By: _____
    Name:
    Title:

**COLLINS & AIKMAN PRODUCTS CO.**

By: _____
    Name:
    Title:

New Services Agreement

S-1

IN WITNESS WHEREOF, the parties have caused this Agreement to be exe-
cuted and delivered by their duly authorized officers or agents as of the date first above writ-
ten.

HEARTLAND INDUSTRIAL PARTNERS, L.P.
By: Heartland Industrial Associates L.L.C., its general
partner

By: _____
    Name:
    Title:

COLLINS & AIKMAN CORPORATION

By: _____
    Name:  Ronald T. Lindsay
    Title:  Senior Vice President

COLLINS & AIKMAN PRODUCTS CO.

By: _____
    Name:  Ronald T. Lindsay
    Title:  Senior Vice President

New Services Agreement

# FIRST AMENDMENT TO SERVICES AGREEMENT (this "First Amendment"), dated as of August 7, 2001, among Collins & Aikman Corporation, a Delaware corporation, Collins & Aikman Products Co., a Delaware corporation (together with Collins & Aikman Corporation, the "Company"), and Heartland Industrial Partners, L.P., a Delaware limited partnership ("Heartland").

WHEREAS, Heartland and the Company have entered into the Services Agreement (the "Agreement"), dated as of February 23, 2001, among Collins & Aikman Corporation, a Delaware corporation, Collins & Aikman Products Co., a Delaware corporation and Heartland Industrial Partners, L.P., a Delaware limited partnership; and

WHEREAS, the Company and Heartland desire to amend the Agreement as more fully set forth below;

NOW, THEREFORE, in consideration of the foregoing recitals and the covenants and conditions contained herein, the parties hereto agree as follows:

1.　　**Defined Terms.** Capitalized terms used in this First Amendment but not otherwise defined shall have the meanings provided in the Agreement. In addition:

"Purchase Agreement" means the Purchase Agreement, dated as of August 7, 2001 by and among Textron, Inc., a Delaware corporation, Collins & Aikman Corporation, a Delaware corporation, and Collins & Aikman Products Co., a Delaware corporation.

"Purchase Agreement Closing Date" means the Closing Date as defined in the Purchase Agreement.

2.　　**Amendment.** Sections 3(b) and 3(c) of the Agreement are hereby amended and restated in their entirety to read as follows:

"(b)　　Upon the Closing Date, the Company shall pay to Heartland or its designees a fee for services rendered in connection with the transactions contemplated by the Primary SPA in the amount of $12,000,000 and will reimburse Heartland and its affiliates for their reasonable out-of-pocket expenses incurred in connection with such transactions on the basis described in the Primary SPA. Upon the Purchase Agreement Closing Date, the Company shall pay to Heartland or its designees a fee for services rendered in connection with the transactions contemplated by the Purchase Agreement in the amount of $13,350,000 and will reimburse Heartland and its affiliates for their reasonable out-of-pocket expenses incurred in connection with such transactions.

(c)　　In addition, in connection with the consummation of each acquisition or divestiture by the Company or any of its subsidiaries of any business constituting a

-2-

going concern or any division or line of business or separable plant or manufacturing facility or significant set of related assets, with respect to which Heartland provides any significant advisory services, for Heartland's services in negotiating, analyzing, arranging and executing such acquisitions and divestitures, the Company shall pay to Heartland or its designees a transaction fee equal to 1% of the aggregate total enterprise value of the business or assets being acquired or divested; provided that (1) no such fee shall be payable for any transaction other than as set forth in clause (b) above prior to February 23, 2002 and (2) no such fee shall be payable for transactions having an aggregate total enterprise value of the business or assets being acquired or divested of less than $300 million prior to December 31, 2002.

3.    Miscellaneous.

(a)    This First Amendment and the Agreement together shall constitute the entire agreement between the parties with respect to the subject matter hereof, and shall supersede all previous oral and written (and all contemporaneous oral) negotiations, commitments, agreements and understandings relating hereto.

(b)    This First Amendment shall be governed by, and construed and interpreted in accordance with, the laws of the State of New York. This First Amendment shall inure to the benefit of, and be binding upon, Heartland, the Company and their respective successors and permitted assigns provided for in the Agreement.

This First Amendment may be executed by one or more parties to this First Amendment on any number of separate counterparts, and all of said counterparts taken together shall be deemed to constitute one and the same instrument.

[SERVICES AGREEMENT AMENDMENT]

IN WITNESS WHEREOF, the parties have caused this First Amendment to be executed and delivered by their duly authorized officers or agents as of the date first above written.

HEARTLAND INDUSTRIAL PARTNERS, L.P.

By: Heartland Industrial Associates
    L.L.C., its general partner

By: _____
    Name:
    Title:

COLLINS & AIKMAN CORPORATION

By: _____
    Name:
    Title:

COLLINS & AIKMAN PRODUCTS CO.

By: _____
    Name:
    Title:

[SERVICES AGREEMENT AMENDMENT]

IN WITNESS WHEREOF, the parties have caused this First Amendment to be
executed and delivered by their duly authorized officers or agents as of the date first above
written.

HEARTLAND INDUSTRIAL PARTNERS, L.P.

By: Heartland Industrial Associates
L.L.C., its general partner

By: _____
Name:
Title:

COLLINS & AIKMAN CORPORATION

By: _____
Name:
Title:

COLLINS & AIKMAN PRODUCTS CO.

By: _____
Name:
Title:

**SECOND AMENDMENT TO SERVICES AGREEMENT** (this "Second Amendment"), dated as of March 15, 2004, among Collins & Aikman Corporation, a Delaware corporation, Collins & Aikman Products Co., a Delaware corporation (together with Collins & Aikman Corporation, the "Company"), and Heartland Industrial Partners, L.P., a Delaware limited partnership ("Heartland").

WHEREAS, Heartland and the Company have entered into the Services Agreement (the "Agreement"), dated as of February 23, 2001, as amended, among Collins & Aikman Corporation, a Delaware corporation, Collins & Aikman Products Co., a Delaware corporation and Heartland Industrial Partners, L.P., a Delaware limited partnership; and

WHEREAS, the Company and Heartland desire to amend the Agreement as more fully set forth below;

NOW, THEREFORE, in consideration of the foregoing recitals and the covenants and conditions contained herein, the parties hereto agree as follows:

(a)     Section 3(c) of the Agreement is hereby amended by the addition of the following sentence at the end thereof as follows: "In addition, in consideration of the services performed in connection with the consummation of the Credit Linked Deposit Facility dated as of February 20, 2004 among the Company, JPMorgan Chase Bank and the other parties from time to time party thereto, the Company shall be obligated to pay to Heartland or its designees a transaction fee of $1,000,000."

(b)     Miscellaneous.

(1)     This Second Amendment and the Agreement together shall constitute the entire agreement between the parties with respect to the subject matter hereof, and shall supersede all previous oral and written (and all contemporaneous oral) negotiations, commitments, agreements and understandings relating hereto.

(2)     This Second Amendment shall be governed by, and construed and interpreted in accordance with, the laws of the State of New York. This Second Amendment shall inure to the benefit of, and be binding upon, Heartland, the Company and their respective successors and permitted assigns provided for in the Agreement.

This Second Amendment may be executed by one or more parties to this Second Amendment on any number of separate counterparts, and all of said counterparts taken together shall be deemed to constitute one and the same instrument.

-2-

IN WITNESS WHEREOF, the parties have caused this Second Amendment to be executed and delivered by their duly authorized officers or agents as of the date first above written.

HEARTLAND INDUSTRIAL PARTNERS, L.P.

By: Heartland Industrial Associates
    L.L.C., its general partner

By: _____
    Name:
    Title:

COLLINS & AIKMAN CORPORATION

By: _____
    Name:
    Title:

COLLINS & AIKMAN PRODUCTS CO.

By: _____
    Name:
    Title:

**THIRD AMENDMENT TO SERVICES AGREEMENT** (this "Third Amendment"), dated as of May 6, 2004, among Collins & Aikman Corporation, a Delaware corporation, Collins & Aikman Products Co., a Delaware corporation (together with Collins & Aikman Corporation, the "Company"), and Heartland Industrial Partners, L.P., a Delaware limited partnership ("Heartland").

WHEREAS, Heartland and the Company have entered into the Services Agreement (the "Agreement"), dated as of February 23, 2001, as amended, among Collins & Aikman Corporation, a Delaware corporation, Collins & Aikman Products Co., a Delaware corporation and Heartland Industrial Partners, L.P., a Delaware limited partnership; and

WHEREAS, the Company and Heartland desire to amend the Agreement as more fully set forth below;

NOW, THEREFORE, in consideration of the foregoing recitals and the covenants and conditions contained herein, the parties hereto agree as follows:

(a)    Section 3(c) of the Agreement is hereby amended by the addition of the following sentence at the end thereof as follows: "Further, in connection with the consummation of each financing (including capital lease financings) by the Company or any of its subsidiaries after the consummation of the Refinancing Transactions (defined below) with respect to which Heartland provides any significant advisory services, for Heartland's services in negotiating, analyzing, arranging and executing such financings, the Company shall pay to Heartland or its designees a transaction fee of 1% of the aggregate value of each such financing; provided that for transactions of substantial size, such fee may be less than 1% of the aggregate value of each such transaction, as may be agreed between the Company and Heartland. In addition, in consideration of the services performed in connection with the offering of senior notes and/or senior subordinated notes and/or the amendment and restatement of Collins & Aikman Products Co.'s senior secured credit facility (any one or more of such transactions, the "Refinancing Transactions"), the Company shall be obligated to pay to Heartland or its designees a transaction fee in the aggregate amount of $5,000,000 upon the consummation of the Refinancing Transactions."

(b)    <u>Miscellaneous</u>.

(1)    This Third Amendment and the Agreement together shall constitute the entire agreement between the parties with respect to the subject matter hereof, and shall supersede all previous oral and written (and all contemporaneous oral) negotiations, commitments, agreements and understandings relating hereto.

(2)    This Third Amendment shall be governed by, and construed and interpreted in accordance with, the laws of the State of New York. This Third Amendment shall inure to the benefit of, and be binding upon, Heartland, the Company and their respective successors and permitted assigns provided for in the Agreement.

This Third Amendment may be executed by one or more parties to this Third Amendment on any number of separate counterparts, and all of said counterparts taken together shall be deemed to constitute one and the same instrument.

1

IN WITNESS WHEREOF, the parties have caused this Third Amendment to be executed and delivered by their duly authorized officers or agents as of the date first above written.

HEARTLAND INDUSTRIAL PARTNERS, L.P.

By: Heartland Industrial Associates
L.L.C., its general partner

By: _____

Name: Daniel P. Tredwell
Title: Senior Managing Director

COLLINS & AIKMAN CORPORATION

By: _____

Name: J. Michael Stepp
Title: Vice Chairman and Chief Financial Officer

COLLINS & AIKMAN PRODUCTS CO.

By: _____

Name: J. Michael Stepp
Title: Vice Chairman and Chief Financial Officer

2