## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| COLLINS & AIKMAN CORPORATION and COLLINS & AIKMAN PRODUCTS CO., as Debtors in Possession, <br><br> Plaintiffs, <br><br> v. <br><br> DAVID A. STOCKMAN, J. MICHAEL STEPP, BRYCE M. KOTH, DAVID R. COSGROVE, PAUL C. BARNABA, ROBERT A. KRAUSE, JOHN A. GALANTE, CHARLES E. BECKER, ELKIN B. MCCALLUM, THOMAS E. EVANS, CYNTHIA HESS, DANIEL P. TREDWELL, W. GERALD MCCONNELL, SAMUEL VALENTI, III, HEARTLAND INDUSTRIAL PARTNERS, L.P., HEARTLAND INDUSTRIAL ASSOCIATES, L.L.C., HEARTLAND INDUSTRIAL GROUP, L.L.C.,. PRICEWATERHOUSECOOPERS LLP and KPMG LLP, <br><br> Defendants. | C.A. No. 07-265-*** |

## MEMORANDUM OF LAW IN SUPPORT OF PWC'S MOTION TO DISMISS

RICHARDS, LAYTON & FINGER
Robert J. Stearn, Jr. (No. 2915)
Lee E. Kaufman (No. 4877)
One Rodney Square
P.O. Box 551
Wilmington, DE 19899
(302) 651-7700

CRAVATH, SWAINE & MOORE LLP
Thomas G. Rafferty
Antony L. Ryan
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
(212) 474-1000

*Attorneys for PricewaterhouseCoopers LLP*

September 14, 2007

**Table of Contents**

Page

Table of Authorities ............................................................................................. iii

Introduction ........................................................................................................... 1

Nature and Stage of the Proceedings .................................................................... 2

Summary of Argument ........................................................................................... 2

Statement of Facts .................................................................................................. 4

Argument ................................................................................................................ 8

I.      MICHIGAN LAW GOVERNS C&A'S CLAIMS AGAINST PWC ..................... 8

II.     THE *IN PARI DELICTO* DEFENSE BARS C&A'S CLAIMS AGAINST
        PWC ........................................................................................................... 10

        A.     In Bringing These Claims, the Debtors in Possession Stand in
               C&A's Shoes. ................................................................................... 12

        B.     The Alleged Misconduct of C&A's Officers Is Imputed to C&A ........... 13

               1.     The Alleged Misconduct by C&A's Officers Occurred in
                      the Course of Their Employment ............................................. 14

               2.     The Complaint Concedes that C&A's Officers Acted for
                      the Benefit of C&A. ................................................................. 15

        C.     All the Requirements for the *In Pari Delicto* Defense Are Met. ........... 17

III.    C&A DOES NOT ALLEGE A COGNIZABLE INJURY ................................. 19

IV.     C&A'S CLAIMS AGAINST PWC ARE TIME-BARRED ................................ 22

        A.     C&A's Malpractice Claim Against PwC Is Barred in Its Entirety
               by Michigan's Two-Year Statute of Limitations. .......................... 23

               1.     Under Delaware's Borrowing Statute, C&A's Malpractice
                      Claim Is Subject to Michigan's Two-Year Statute of
                      Limitations. ............................................................................. 23

               2.     Under Michigan Law, C&A's Malpractice Claim Against
                      PwC Accrued More Than Two Years Before the
                      Bankruptcy Filing. .................................................................. 25

Page

    B.    All of C&A's Claims Against PwC Are Barred by Delaware's
         Three-Year Statute of Limitations As to the 2001 Audit............................27

V.    C&A'S CLAIMS AGAINST PWC FOR BREACH OF CONTRACT,
    FRAUD, AND AIDING AND ABETTING BREACH OF FIDUCIARY
    DUTY ARE DUPLICATIVE OF ITS MALPRACTICE CLAIM........................29

VI.    C&A'S FRAUD AND AIDING AND ABETTING CLAIMS AGAINST
    PWC MUST ALSO BE DISMISSED FOR FAILURE TO PLEAD
    FRAUD WITH PARTICULARITY.........................................................................32

Conclusion ........................................................................................................................36

**Table of Authorities**

Page(s)

**Cases**

*In re Advanta Corp. Securities Litig.*, 180 F.3d 525 (3d Cir. 1999) .................................... 34

*Allard v. Arthur Andersen & Co.*, 924 F. Supp. 488 (S.D.N.Y. 1996) ............................. 15

*Antone v. General Motors Corp.*, 473 N.E.2d 742 (N.Y. 1984) ......................................... 24

*Barnard v. Dilley*, 350 N.W.2d 887 (Mich. Ct. App. 1984) ............................................. 30-31

*Bd. of Trs. v. Grant Thornton, L.L.P.*, No. 236415, 2003 WL 1343369
(Mich. Ct. App. Mar. 11, 2003) ........................................................................................ 32

*Beck v. Deloitte & Touche*, 144 F.3d 732 (11th Cir. 1998) ............................................... 15

*Began v. Dixon*, 547 A.2d 620 (Del. Super. Ct. 1988) ...................................................... 29

*Brownell v. Garber*, 503 N.W.2d 81 (Mich. Ct. App. 1993) .................................... 3, 30-31

*In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410 (3d Cir. 1997) ..................... 6, 31

*Cerullo v. Harper Collins Publishers*, No. CIV. A. 01C-03-21-CHT,
2002 WL 243387 (Del. Super. Ct. Feb. 19, 2002) ......................................................... 24

*Chase Bank of Tex. v. Grant Thornton LLP*, No. 236237,
2003 WL 21350362 (Mich. Ct. App. June 10, 2003),
*appeal denied*, 673 N.W.2d 754 (Mich. 2003) ................................................... 3, 32, 34

*Christians v. Grant Thornton, LLP*, 733 N.W.2d 803
(Minn. Ct. App. 2007) ....................................................................................................... 20

*In re CitX Corp.*, 448 F.3d 672 (3d Cir. 2006) ........................................................... 3, 19-21

*Coleman v. PricewaterhouseCoopers, LLC*, 854 A.2d 838 (Del. 2004) ........................... 28

*Copeman Labs. Co. v. General Motors Corp.*, 36 F. Supp. 755
(E.D. Mich. 1941) ............................................................................................................. 14

*D.E. & J Ltd. P'ship v. Conaway*, 284 F. Supp. 2d 719 (E.D. Mich. 2003),
*cert. denied*, 516 U.S. 909 (1995) ................................................................................. 33

*David B. Lilly Co. v. Fisher*, 18 F.3d 1112 (3d Cir. 1994) ............................................... 23

*DiLeo v. Ernst & Young*, 901 F.2d 624 (7th Cir. 1990), *cert. denied*,
498 U.S. 941 (1990) ...................................................................................................... 33-34

iii

Page(s)

*In re Donald J. Trump Casino Sec. Litig.*, 7 F.3d 357 (3d Cir. 1993) ................................. 6

*In re Estate of Goldman*, 601 N.W.2d 126 (Mich. Ct. App. 1999) ................................... 33

*Ewing v. Beck*, 520 A.2d 653 (Del. 1987) ................................................................... 28-29

*FDIC v. Shrader & York*, 991 F.2d 216 (5th Cir. 1993), *cert. denied*,
   512 U.S. 1219 (1994) .............................................................................................. 15

*In re Fricker*, 192 B.R. 388 (Bankr. E.D. Pa. 1996) ......................................................... 23

*GSC Partners CDO Fund v. Washington*, 368 F.3d 228 (3d Cir. 2004) ...................... 4, 34

*Hammersmith v. TIG Ins. Co.*, 480 F.3d 220 (3d Cir. 2007) .............................................. 8

*Hann v. Loeb*, No. 268928, 2006 WL 2959672
   (Mich. Ct. App. Oct. 17, 2006) ............................................................................... 31

*Hartmann v. Prudential Ins. Co.*, 9 F.3d 1207 (7th Cir. 1993) ....................................... 15

*Hays & Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 885 F.2d 1149
   (3d Cir. 1989) .......................................................................................................... 12

*HealthTrio, Inc. v. Margules*, No. 06C-04-196, 2007 WL 544156
   (Del. Super. Ct. Jan. 16, 2007) ............................................................................... 31

*In re IKON Office Solutions, Inc.*, 277 F.3d 658 (3d Cir. 2002) ................................. 4, 33

*Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487 (1941) ............................................... 8

*Krieger v. Gast*, No. 4:99-CV-86, 2000 WL 288442
   (W.D. Mich. Jan. 21, 2000) ..................................................................................... 33

*Levy v. Martin*, 620 N.W.2d 292 (Mich. 2001) ............................................................... 26

*Lincoln Grain, Inc. v. Coopers & Lybrand*, 338 N.W.2d 594 (Neb. 1983) ...................... 29

*Lipper Convertibles L.P. v. PricewaterhouseCoopers LLP*,
   ___ N.E.2d ___, 2007 WL 1624759 (N.Y. June 7, 2007) ....................................... 29

*Manning v. Noa*, 76 N.W.2d 75 (Mich. 1956) .................................................................. 17

*MCA Fin. Corp. v. Grant Thornton, L.L.P.*, 687 N.W.2d 850
   (Mich. Ct. App. 2004), *appeal denied*, 693 N.W.2d 817 (Mich. 2005) ............... *passim*

*McMahon & Co. v. Donaldson, Lufkin & Jenrette Sec. Corp.*,
   727 F. Supp. 833 (S.D.N.Y. 1989) ........................................................................... 25

iv

Page(s)

*In re Mediators, Inc.*, 105 F.3d 822 (2d Cir. 1997) ............................................. 15

*Melder v. Morris*, 27 F.3d 1097 (5th Cir. 1994) ................................................. 34

*O'Melveny & Meyers v. FDIC*, 512 U.S. 79 (1994) ............................................. 13

*Official Comm. of Unsecured Creditors v. R.F. Lafferty & Co.*,
   267 F.3d 340 (3d Cir. 2001)............................................................... *passim*

*Orzel v. Scott Drug Co.*, 537 N.W.2d 208 (Mich. 1995) .......................... 11, 17-18

*Pack v. Beech Aircraft Corp.*, 132 A.2d 54 (Del. 1957)................................. 24-25

*In re Parmalat Sec. Litig.*, No. 04 MD 1653 (LAK), 2007 WL 2263893
   (S.D.N.Y. Aug. 8, 2007) ................................................................... 20

*Penner v. Seaway Hosp.*, 427 N.W.2d 584 (Mich. Ct. App. 1988) .................... 30

*PR Diamonds, Inc. v. Chandler*, 364 F.3d 671 (6th Cir. 2004) .......................... 34

*In re Rockefeller Ctr. Props., Inc. Sec. Litig.*, 311 F.3d 198 (3d Cir. 2002)........... 6

*Saudi Basic Indus. Corp. v. Mobil Yanbu Petrochem. Co.*,
   866 A.2d 1 (Del. 2005) ................................................................ 25, 27

*SmithKline Beecham Pharm. Co. v. Merck & Co.*,
   766 A.2d 442 (Del. 2000) ................................................................. 27

*Travelers Indem. Co. v. Lake*, 594 A.2d 38 (Del. 1991)................................. 2, 9

*Trenwick Am. Litig. Trust v. Ernst & Young, L.L.P.*, 906 A.2d 168
   (Del. Ch. 2006), *aff'd sub nom. Trenwick Am. Litig. Trust v. Billett*,
   No. 495, 2007 WL 2317768 (Del. Aug. 14, 2007) ............................... 20

*Ubiquitel Inc. v. Sprint Corp.*, C.A. No. 1489-N, 2005 Del. Ch. Lexis 198
   (Del. Ch. Dec. 14, 2005) ................................................................... 9

*Upjohn Co. v. N.H. Ins. Co.*, 476 N.W.2d 392 (Mich. 1991) ........................... 14

*Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*, 860 A.2d 312 (Del. 2004) ......... 27-28

*Yadlosky v. Grant Thornton, L.L.P.*, 120 F. Supp. 2d 622
   (E.D. Mich. 2000) .......................................................................... 32

Page(s)

**Statutes & Rules**

10 Del. Code § 8106 ................................................................................................. 3, 23, 27

10 Del. Code § 8121 ....................................................................................................... 3, 23

11 U.S.C. § 108 ................................................................................................................... 22

11 U.S.C. § 541(a) ............................................................................................................. 12

15 U.S.C. § 78j ................................................................................................................... 18

15 U.S.C. § 78ff ................................................................................................................. 18

17 C.F.R. § 210.1-02(d) .................................................................................................... 30

Fed. R. Civ. P. 9(b) ................................................................................................... 2, 3, 32

Fed. R. Civ. P. 12(b)(6) ............................................................................................... 2, 33

Mich. Comp. Laws § 451.501 ........................................................................................ 18

Mich. Comp. Laws § 451.809 ........................................................................................ 18

Mich. Comp. Laws § 600.2962 ...................................................................................... 13

Mich. Comp. Laws § 600.5805 ........................................................................... 23, 25, 27

Mich. Comp. Laws § 600.5807 ...................................................................................... 27

Mich. Comp. Laws § 600.5813 ...................................................................................... 27

Mich. Comp. Laws § 600.5838(1) ................................................................................. 26

**Other Authorities**

J. B. Heaton, *Deepening Insolvency*, 30 J. Corp. L. 465 (2005) ............................... 21

Restatement (Second) of Conflict of Laws § 145(2) (1971) ....................................... 9

Restatement (Second) of Conflict of Laws § 188(2) (1971) ....................................... 9

Restatement (Third) of Agency § 5.04 (2006) ............................................................ 15

Sabin Willett, *The Shallows of Deepening Insolvency*, 60 Bus. Law. 549
    (2005) ............................................................................................................................. 21

Defendant PricewaterhouseCoopers LLP ("PwC") submits this

memorandum in support of its Motion to Dismiss Plaintiffs' Complaint.

### Introduction

Plaintiffs Collins & Aikman Corporation and Collins & Aikman

Products Co. (collectively, "C&A" or the "Company") allege that before the bankruptcy

C&A's former officers and directors, led by CEO David Stockman, orchestrated a

financial fraud designed to improve C&A's reported financial results and thereby enable

the Company to continue to borrow money. In this action, C&A sues its former officers

and directors, as well as the private equity fund (Heartland) that controlled C&A and

embarked the Company on what C&A now claims was an ill-fated acquisition strategy.

The Company also presses claims against its outside auditors, PwC and KPMG LLP

("KPMG"). PwC audited C&A's financial statements for two years (2001 and 2002),

until replaced by KPMG in that capacity in 2003. C&A asserts claims against PwC for

malpractice, breach of contract, fraud, and aiding and abetting breach of fiduciary duty.

C&A seeks to recover from PwC the "deepening insolvency" that resulted in C&A's

bankruptcy.

The allegations of the Complaint, taken as true for purposes of this

motion, demonstrate that C&A's claims against PwC should be dismissed. First,

Plaintiffs claim that C&A itself committed the financial fraud alleged in the Complaint.

C&A's Complaint expressly alleges that, in the course of their employment by C&A,

Stockman and other officers of C&A engaged in fraud in a misguided attempt to benefit

the Company. The *in pari delicto* doctrine bars a plaintiff, such as C&A, from

maintaining an action based on the plaintiff's own wrongful conduct. *See* Section II

below. Second, C&A seeks to recover "deepening insolvency" damages, which are not a

cognizable corporate injury. *See* Section III below. <u>Third</u>, C&A's claims against PwC are, in any event, time-barred. C&A's malpractice claim is barred by Michigan's two-year statute of limitation, and C&A's remaining claims are barred as to the 2001 audit by Delaware's three-year statute. *See* Section IV below. <u>Fourth</u>, C&A brings an action based on alleged malpractice in which it seeks to characterize the same alleged conduct as both a contract claim as well as a variety of tort claims. Each of those separate claims is duplicative of the malpractice claim and should be dismissed for that reason alone. *See* Section V below. <u>Finally</u>, C&A's fraud-based claims (Counts Seven and Twelve) are not stated with the particularity required by Fed. R. Civ. P. 9(b) and should be dismissed. *See* Section VI below.

### Nature and Stage of the Proceedings

Plaintiffs filed their Complaint on May 17, 2007, naming as defendants several of C&A's former directors and officers, an investment fund and its affiliates, and C&A's independent auditors since the 2001 fiscal year, PwC and KPMG. PwC moves to dismiss the complaint for failure to state a claim upon which relief may be granted and for failure to plead fraud with particularity. Fed. R. Civ. P. 12(b)(6), 9(b).

### Summary of Argument

1.    Under Delaware choice-of-law rules, C&A's claims against PwC are governed by Michigan substantive law because Michigan has the most significant relationship with the allegations of the Complaint. *See Travelers Indem. Co. v. Lake*, 594 A.2d 38, 41, 46-47 (Del. 1991).

2.    C&A's claims against PwC are barred by the doctrine of *in pari delicto*. Because the Complaint alleges that the harm to C&A was caused by the actions of C&A's management, acting in the course of its employment and for C&A's benefit,

2

those actions are imputed to C&A, which may not recover for harm it is responsible for causing. *See Official Comm. of Unsecured Creditors v. R.F. Lafferty & Co.*, 267 F.3d 340, 355 (3d Cir. 2001); *MCA Fin. Corp. v. Grant Thornton, L.L.P.*, 687 N.W.2d 850 (Mich. Ct. App. 2004), *appeal denied*, 693 N.W.2d 817 (Mich. 2005).

        3.      C&A has not alleged any cognizable injury. The Third Circuit has held that "deepening insolvency" damages, which C&A seeks to recover from PwC, are not a permissible measure of damages. *See In re CitX Corp.*, 448 F.3d 672, 677 (3d Cir. 2006).

        4.      C&A's claims against PwC are barred by the applicable statute of limitations. Under Delaware's "borrowing statute" (10 Del. Code § 8121), C&A's claims are governed by the shorter of the limitations periods in Delaware and in Michigan, where the claims accrued. Accordingly, C&A's malpractice claim is barred by Michigan's two-year statute of limitations (Mich. Comp. Laws § 600.5805(6)); C&A's remaining claims are barred as to the 2001 audit by Delaware's three-year statute of limitations (10 Del. Code § 8106).

        5.      C&A's breach of contract, fraud, and aiding and abetting breach of fiduciary duty claims against PwC are merely duplications of its malpractice claim under different labels. Under Michigan law, such claims are properly dismissed. *See Chase Bank of Tex. v. Grant Thornton LLP*, No. 236237, 2003 WL 21350362, at *2 (Mich. Ct. App. June 10, 2003), *appeal denied*, 673 N.W.2d 754 (Mich. 2003); *Brownell v. Garber*, 503 N.W.2d 81, 84 (Mich. Ct. App. 1993).

        6.      C&A fails to plead its fraud and aiding and abetting breach of fiduciary duty claims in accordance with Federal Rule of Civil Procedure 9(b). The

Complaint merely alleges that PwC was negligent in its audits and that PwC desired to collect fees from C&A. Such allegations fail, as a matter of law, to meet C&A's burden of pleading scienter with particularity. *See In re IKON Office Solutions, Inc.*, 277 F.3d 658, 673 (3d Cir. 2002); *GSC Partners CDO Fund v. Washington*, 368 F.3d 228, 238 (3d Cir. 2004).

### Statement of Facts

Collins & Aikman manufactured interior components for the automobile industry. (Cmplt. ¶ 5.) In February 2001, C&A was taken over by Heartland Industrial Partners ("Heartland"), a private equity firm. (*Id.* ¶ 37.) Heartland was led by David Stockman, who joined C&A's Board of Directors in 2001, and became Chairman of the Board in 2002, and Chief Executive Officer in 2003. (*Id.* ¶ 9.) C&A's claims all arise out of the acquisition by Heartland. According to the Complaint, upon taking control, Heartland promptly caused C&A to engage in a series of major acquisitions that significantly enlarged both the company and its debt load. (*Id.* ¶ 37.)

Under Stockman's direction, C&A made three major acquisitions in 2001. In July 2001, C&A acquired Becker Group L.L.C. (*id.* ¶ 44); in September 2001, it acquired Joan Automotive Fabrics (*id.* ¶ 46); and in December 2001, it purchased Textron Automotive Company's trim division ("TAC-Trim") (*id.* ¶ 47). These acquisitions were all completed, and the increased debt connected with them had been assumed, before PwC completed its first audit engagement for C&A (of the Company's 2001 financial statements).

The Complaint refers to two types of engagements PwC performed for C&A: annual audits and quarterly reviews. First, PwC audited C&A's 2001 financial statements (for which the audit report was dated February 26, 2002) and C&A's 2002

4

financial statements (for which the audit report was dated February 18, 2003). (Cmplt. ¶¶ 84-85.)

As set forth in PwC's audit reports, C&A's management was responsible for preparing its financial statements in accordance with Generally Accepted Accounting Principles ("GAAP"). PwC's role was to express an opinion, based on its audit, on whether C&A's financial statements were "free of material misstatement". (*Id.; see also* Codification of Statements on Auditing Sandards ("AU") § 110.03.) PwC's audits were governed by Generally Accepted Auditing Standards ("GAAS"), which require an auditor to use due professional care in planning and conducting an audit, and to obtain a reasonable basis for the opinions expressed in the auditor's report. (AU § 150.02.) That reasonable basis is found by testing a sample of the entries in the financial statements. Auditors do not (and could not) review or validate every entry in their client's financial statements. "[T]he auditor is not an insurer and his or her report does not constitute a guarantee." (AU § 230.13.)

Notably, audits are not designed or intended to detect intentional fraud of the kind alleged in the Complaint. (AU § 230.12.) Auditors are entitled to rely on representations from the client's management, and do not assume that their clients are deceiving them. (AU § 230.09.) Therefore, "even a properly planned and performed audit may not detect a material misstatement resulting from fraud". (AU § 316.12.)

Second, PwC performed reviews of C&A's quarterly financial statements, as prepared by management. These quarterly reviews were far less intensive than the annual audits. As stated in the professional standards:

> "A review consists principally of performing analytical procedures and
> making inquiries of persons responsible for financial and accounting

5

> matters, and does not contemplate *(a)* tests of accounting records through inspection, observation, or confirmation; *(b)* tests of controls to evaluate their effectiveness; *(c)* obtaining corroborating evidence in response to inquiries; or *(d)* performing certain other procedures ordinarily performed in an audit." (AU § 722.07.)

*See also* SEC Release No. 6127, 18 S.E.C. Docket 384 (Sept. 20, 1979). The Complaint does not allege (nor could it) that PwC failed to comply in any way with the professional standards governing these reviews.

While the Complaint attempts to portray the financial statements that PwC audited as concealing C&A's weakness and projecting a falsely positive image of the Company (*see, e.g.*, Cmplt. ¶ 75), the statements themselves paint a starkly different picture. The audited financial statements for both 2001 and 2002, which are referred to in the Complaint (¶¶ 84-85), clearly showed a troubled company facing difficult times.[1]

C&A's 2001 financial statements, as audited by PwC, reported a loss of $46.2 million in 2001, as compared to $4.5 million in net income the previous year. (2001 Form 10-K (Ex. 1), at F-3.) In its annual report filed with the SEC, management stated that net sales from continuing operations decreased by 10.8%, "primarily driven by a decrease in North American vehicle production". (*Id.* at 17.) Management noted, "The Company was particularly adversely affected by the recession and declining consumer

---

[1] On a motion to dismiss, the court may consider documents that are either "integral to or explicitly relied upon in the complaint". *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) (citation and internal quotation omitted); *see also In re Rockefeller Ctr. Props., Inc. Sec. Litig.*, 311 F.3d 198, 205-06 (3d Cir. 2002) (same); *In re Donald J. Trump Casino Sec. Litig.*, 7 F.3d 357, 368 n.9 (3d Cir. 1993) (court may consider document "if the plaintiff's claims are based on the document"). Six documents are attached as exhibits to this motion: C&A's Forms 10-K, filed with the SEC, for 2001, 2002 and 2003; C&A's Form 8-K, filed with the SEC on June 26, 2003; and C&A's engagement letters with PwC for the 2001 and 2002 audits. Each of these documents is explicitly relied upon in C&A's Complaint (*see, e.g.*, Cmplt. ¶¶ 84-86, 137, 199), and is integral to C&A's claims.

confidence . . . ." (*Id.*) C&A's 2002 financial statements showed that negative trend

continuing, with losses increasing to $53.5 million. (2002 Form 10-K (Ex. 2), at F-3.)

Furthermore, as the Complaint concedes, PwC repeatedly warned C&A's

Board of internal control problems at C&A. As summarized in one of C&A's SEC

filings:

> "In connection with its 2001 audit, [PwC] communicated to the Audit
> Committee and to management reportable conditions in the Company's
> internal control systems . . . . Corrective actions were implemented in
> 2002. In connection with its 2002 audit, [PwC] communicated to the
> Audit Committee and to management reportable conditions in the
> Company's internal control system related to timely preparation of cash
> account reconciliations, review of non-standard journal entries, revenue
> accounting, and currency translation at foreign locations and compliance
> with established Company accounting policies and procedures."
> (Form 8-K dated June 26, 2003 (Ex. 3), *quoted in* Cmplt. ¶ 137.)

C&A's allegations that PwC "turned a blind eye" to the problems at the company (Cmplt.

¶ 137) are thus belied by the very documents quoted in the Complaint.

In early 2005, C&A experienced a liquidity crisis. (Cmplt. ¶ 62.) C&A

sought and obtained some additional financing (*id.* ¶ 70), but to no avail. On May 12,

2005, Stockman was forced to resign. (*Id.* ¶ 73.) C&A filed for bankruptcy protection

on May 17, 2005. (*Id.* ¶ 74.)

The Complaint alleges that C&A's management engaged in two forms of

wrongdoing in the course of their employment by C&A. First, the Complaint alleges that

C&A engaged in improper "rebate" transactions with some of its suppliers. (Cmplt.

¶¶ 48-58.) In some of these transactions, C&A received payments from suppliers that

would later be repaid. (*Id.* ¶¶ 49-50.) In others, C&A allegedly recognized rebates in its

accounting records before they were earned, giving the appearance that C&A's expenses

were lower than they actually were and thus that its results were better than actual. (*Id.*

¶¶ 53-58.) C&A alleges that these rebate transactions totaled $2.8 million in 2001, and

$12.8 million in 2002. (*Id.* ¶ 101.) The rebate transactions were relatively small in

comparison to C&A as a whole. They constituted less than 0.2% of C&A's cost of goods

sold in 2001 (which exceeded $1.6 billion), and less than 0.4% of C&A's cost of goods

sold in 2002 (which following the Heartland acquisitions exceeded $3.3 billion). (*See*

2001 Form 10-K (Ex. 1), at F-3; 2002 Form 10-K (Ex. 2), at F-3.)

Second, the Complaint alleges that in early 2005, as C&A suffered from a

liquidity crisis and was on the verge of collapse, management "engaged in a scheme to

defraud" its lenders by providing inaccurate financial information that would allow C&A

to borrow the additional funds needed to keep the company operating. (Cmplt. ¶¶ 62-71.)

All this activity occurred years after PwC had finished its 2002 audit for C&A and is not

alleged to be PwC's responsibility.

The Complaint makes clear that all the alleged wrongdoing by C&A's

management was undertaken in an effort to buy time for the company to continue to

operate and turn itself around. (Cmplt. ¶¶ 39-40.)

**Argument**

## I.     MICHIGAN LAW GOVERNS C&A'S CLAIMS AGAINST PWC.

All of Plaintiffs' claims against PwC—in tort and in contract—should be

governed by Michigan law, because Michigan has the most significant relationship to the

parties and the alleged wrongdoing.

A federal court exercising jurisdiction over state law claims must apply

the choice-of-law principles of the forum state. *Hammersmith v. TIG Ins. Co.*, 480 F.3d

220, 226 (3d Cir. 2007); *see also Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496

(1941). Delaware choice-of-law rules therefore apply here.

8

Delaware uses the "most significant relationship test" of the Restatement (Second) of Conflict of Laws to determine which state's law to apply for both tort and contract causes of action. *Travelers Indem. Co. v. Lake*, 594 A.2d 38, 41, 46-47 (Del. 1991). For tort actions, the Restatement provides four factors to guide which state has the most significant relationship: (1) the place where the injury occurred; (2) the place where the conduct causing the injury occurred; (3) the domicile, residence, nationality, place of incorporation and place of business of the parties; and (4) the place where the relationship, if any, between the parties is centered. Restatement (Second) of Conflict of Laws § 145(2) (1971); *see also Travelers*, 594 A.2d at 46-47. Similarly, for contract actions, the Restatement lists five factors: (1) the place of contracting; (2) the place of negotiation of the contract; (3) the place of performance; (4) the location of the subject matter of the contract; and (5) the domicile, residence, nationality, place of incorporation and place of business of the parties. *Id.* § 188(2); *see also Travelers*, 594 A.2d at 41, 46-47.

All those factors favor applying Michigan law here. C&A's allegedly false financial statements, which are the centerpiece of this action, were prepared by C&A in Michigan. C&A's "principal executive offices" were located in Troy, Michigan. (*See* 2001 Form 10-K (Ex. 1), cover page; 2002 Form 10-K (Ex. 2), cover page; 2003 Form 10-K (Ex. 4), cover page.)[2] PwC primarily performed its audit of C&A's financial statements in Michigan, at either C&A's Troy, Michigan office or PwC's Detroit,

---

[2] Although C&A is incorporated in Delaware, its principal place of business was in Michigan. *See Ubiquitel Inc. v. Sprint Corp.*, C.A. No. 1489-N, 2005 Del. Ch. Lexis 198, at *18 (Del. Ch. Dec. 14, 2005) ("a corporation's principal place of business is a more important contact than the place of incorporation").

Michigan office. As the Complaint alleges, PwC spent a considerable amount of time at C&A's corporate headquarters in Michigan, participating in face-to-face meetings with C&A employees. (Cmplt. ¶¶ 34, 81.) Moreover, PwC's Detroit, Michigan office issued the allegedly false audit reports. (*See* 2001 Form 10-K (Ex. 1), at F-1; 2002 Form 10-K (Ex. 2), at F-1.) And many of the PwC auditors who performed work on the C&A audit came from the Detroit, Michigan office, including the audit engagement partner. (*See* Cmplt. ¶ 152 (alleging "negligence by PwC's . . . Detroit office personnel").) The relationship between PwC and C&A was centered in Michigan. Indeed, the contracts governing PwC's audits of C&A's financial statements were entered into, negotiated and performed in Michigan. (*See* 2001 engagement letter (Ex. 5), at 1; 2002 engagement letter (Ex. 6), at 1.) Finally, the Complaint contains no allegations that any state other than Michigan has a relationship, let alone a significant relationship, with the parties or the allegedly wrongful conduct.

Accordingly, Michigan substantive law should apply to C&A's claims against PwC.

## II.    THE *IN PARI DELICTO* DEFENSE BARS C&A'S CLAIMS AGAINST PWC.

The Complaint alleges that C&A's officers overstated C&A's financial results in the course of their employment and for the benefit of the company, allowing C&A to conceal its true financial condition. (Cmplt. ¶¶ 39, 48-77, 90-95, 98-99.) The Complaint alleges that the officers' financial misconduct was "designed to artificially inflate the Company's reported financial results, avoid triggering debt covenants and enable Collins & Aikman to borrow additional funds". (*Id.* ¶ 40.) C&A's Complaint concedes that the purpose of the financial misconduct was to benefit C&A and that the

acts were done by those officers in the course of their employment by C&A.
Consequently, the officers' alleged fraudulent conduct is imputed to C&A and bars its
claims against PwC here.

In *Official Committee of Unsecured Creditors v. R.F. Lafferty & Co.*, 267
F.3d 340 (3d Cir. 2001), the Third Circuit held, on appeal from grant of a motion to
dismiss similar claims on behalf of a bankrupt company against its outside professionals,
that such claims were barred by the *in pari delicto* defense. The court held that once the
misconduct of top officers was imputed to the company, "the *in pari delicto* doctrine
comes into play and bars a suit". *Id.* at 355.

The principles in *Lafferty*, which was decided under Pennsylvania law,
apply equally under Michigan law. The *in pari delicto* defense, often referred to in
Michigan as the "wrongful conduct" defense, provides that "a person cannot maintain an
action, if in order to establish his cause of action, he must rely in whole or in part, on an
illegal or immoral act or transaction to which he is a party". *Orzel v. Scott Drug Co.*, 537
N.W.2d 208, 212-13 (Mich. 1995) (citation omitted). Relying on that doctrine, the
Michigan Court of Appeals recently dismissed a case with similar facts to the present
action. *MCA Fin. Corp. v. Grant Thornton, L.L.P.*, 687 N.W.2d 850 (Mich. Ct. App.
2004), *appeal denied*, 693 N.W.2d 817 (Mich. 2005).

In *MCA*, a liquidating agent of a bankrupt company sued the company's
auditors alleging, like C&A here, that the auditors failed to detect and notify the
company's board of directors that officers of the company had fraudulently
misrepresented its financial statements. *Id.* at 852. The liquidating agent further alleged
that the auditors knew, or should have known, of the fraud, and, if they had exposed the

11

fraud earlier, the company would not have gone bankrupt. *Id.* Like the officers responsible for allegedly misrepresenting C&A's financial statements, the officers in *MCA* were "acting, at least in part, out of a motivation of keeping the corporation afloat, and thus provide a benefit to the corporation[]". *Id.* at 858. The court therefore imputed the illegal conduct of those officers to the company and then to its liquidating agent, and held that the *in pari delicto* defense barred recovery. *Id.* at 851-58, 861. Likewise, the alleged illegal conduct of C&A's officers should be imputed to C&A, thereby barring its claims.

      A.    <u>In Bringing These Claims, the Debtors in Possession Stand in C&A's Shoes.</u>

      Under Section 541 of the Bankruptcy Code, a debtor's estate includes "all legal or equitable interests of the debtor in property as of the commencement" of bankruptcy. 11 U.S.C. § 541(a). Here, the Debtors in Possession bring C&A's claims against PwC—claims that are assets of the Debtors' estates under Section 541. (Cmplt. ¶¶ 6-8.)

      Accordingly, Plaintiffs here (as Debtors in Possession) are subject to all of the same defenses that Defendants would have had against C&A at the time of bankruptcy. As the Third Circuit explained in *Lafferty*, discussing Chapter 11 trustees:

> "'in actions brought by the trustee as successor to the debtor's interest under section 541, the trustee stands in the shoes of the debtor and can only assert those causes of action possessed by the debtor. [Conversely,] [t]he trustee is, of course, subject to the same defenses as could have been asserted by the defendants had the action been instituted by the debtor.'" 267 F.3d 340, 356 (3d Cir. 2001) (quoting *Hays & Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 885 F.2d 1149, 1154 (3d Cir. 1989) (alterations in original) (internal quotation omitted)).

The same is true for a debtor in possession, who under Section 1107(a) of the Bankruptcy Code "generally has all the rights and duties of a trustee". *Hays*, 885 F.2d at 1154.

Accordingly, PwC's defenses against C&A apply equally against the Debtors in Possession.

It does not matter that any recovery obtained from this action would be distributed to creditors not directly involved in the management of C&A. The *in pari delicto* defense is evaluated "without regard to whether the [Debtors in Possession are] innocent successor[s]". *Lafferty*, 267 F.3d at 357. As *MCA* explained: "[W]hile innocent investors may have been harmed, that would not change the fact that the corporation is treated as having engaged in wrongdoing and, therefore, its investors should not profit from that wrongdoing." *MCA*, 687 N.W.2d at 855-56.

Notably, under Michigan law C&A's creditors generally could not themselves bring malpractice claims against PwC. Michigan's Accountant Liability Act permits negligence actions only by an auditor's client (such as C&A) or by non-clients identified in writing as intended to benefit from the audit. Mich. Comp. Laws § 600.2962. Few, if any, of C&A's creditors would be able to meet this requirement for claims against PwC. Thus, applying the *in pari delicto* defense against C&A as Debtors in Possession is essential to prevent C&A from making an end-run around the Accountant Liability Act.

> B.    The Alleged Misconduct of C&A's Officers Is Imputed to C&A.

Imputation is determined under state law. *O'Melveny & Meyers v. FDIC*, 512 U.S. 79, 87-89 (1994); *Lafferty*, 267 F.3d at 358. Under Michigan law, "the fraudulent acts of a corporate officer may be imputed to a corporation where those acts (1) are in the course of employment and (2) are for the benefit of the corporation". *MCA*, 687 N.W.2d at 857 (citing *Lafferty*, 267 F.3d at 358). Both of those requirements are satisfied here.

13

1.    The Alleged Misconduct by C&A's Officers Occurred in the
       Course of Their Employment.

There can be no legitimate dispute that C&A's senior officers' alleged

misstatement of C&A's financial statements occurred in the course of their employment.

A corporation is bound by the acts of its officers acting within their

apparent authority. *Upjohn Co. v. N.H. Ins. Co.*, 476 N.W.2d 392, 400 (Mich. 1991).

The reason for this is that "[a] corporation can only act through its employees and,

consequently, the acts of its employees, within the scope of their employment, constitute

acts of the corporation". *Id.* (internal quotation omitted); *see also Copeman Labs. Co. v.*

*General Motors Corp.*, 36 F. Supp. 755, 762 (E.D. Mich. 1941).

Here, C&A's officers prepared the allegedly false financial statements in

the course of their employment for C&A. The Complaint alleges that the Director and

Officer Defendants were responsible for preparing C&A's financial statements. (Cmplt.

¶ 26(d)-(g).) The Complaint also quotes from PwC's audit reports, which stated each

year that C&A's "financial statements and financial statement schedules are the

responsibility of the Company's management; [PwC's] responsibility is to express an

opinion on these financial statements and financial statement schedules based on [PwC's]

audit". (*Id.* ¶¶ 84-85.)

The Complaint alleges in detail how C&A's top officers, in particular

Messrs. Stockman and Stepp, directed the misstatement of C&A's financial statements in

the course of their employment. (*See, e.g., id.* ¶¶ 48-77, 90-95, 98-99.) If those

allegations are true, C&A's CEO and CFO, who were also members of the Board of

Directors (*id.* ¶¶ 9-10), knew that the financial statements were false. Yet in C&A's

Form 10-K, filed with the SEC, Mr. Stepp, identified as "Vice Chairman and Chief

14

Financial Officer (Principal Financial Officer)", certified pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 that C&A's 2002 financial statements were "fairly present[ed] in all material respects". (2002 Form 10-K (Ex. 2), at 58.) Accordingly, the acts of senior C&A officers in allegedly falsifying C&A's financial statements clearly were done in the course of their employment.

> 2.   The Complaint Concedes that C&A's Officers Acted for the Benefit of C&A.

The *in pari delicto* defense applies as long as C&A's officers were acting for the benefit of C&A rather than solely for their own benefit. To avoid imputation, it is C&A's burden to establish this so-called "adverse interest" exception. *See MCA*, 687 N.W.2d at 858.

Michigan's formulation of the adverse interest exception is narrow: "The 'adverse interest' exception will not apply if the wrongdoers' motivation was not <u>entirely</u> for personal gain at the expense of the corporation[], but was, even in part, a misguided belief that their wrongdoing would benefit the corporation[]". *Id.* at 858 (emphasis added); *see also Allard v. Arthur Andersen & Co.*, 924 F. Supp. 488, 495 (S.D.N.Y. 1996) (applying Michigan law). This high bar to finding an adverse interest is well established in agency law. The Restatement provides that an agent's conduct is imputed unless the agent "acts adversely to the principal in a transaction or matter, intending to act <u>solely</u> for the agent's own purposes or those of another person". Restatement (Third) of Agency § 5.04 (2006); *see also Beck v. Deloitte & Touche*, 144 F.3d 732, 736 (11th Cir. 1998); *In re Mediators, Inc.*, 105 F.3d 822, 827 (2d Cir. 1997); *Hartmann v. Prudential Ins. Co.*, 9 F.3d 1207, 1210 (7th Cir. 1993); *FDIC v. Shrader & York*, 991 F.2d 216, 223 (5th Cir. 1993), *cert. denied*, 512 U.S. 1219 (1994).

15

As long as C&A senior management, when committing the alleged misconduct, was "acting, at least in part, out of a motivation of keeping the corporation[] afloat, and thus provide a benefit to the corporation[]", the adverse interest exception does not apply. *MCA*, 687 N.W.2d at 857-58. Consequently, unless C&A's officers were acting solely or entirely for their own interests, and adversely to C&A's interest, the exception does not apply, and the officers' conduct within the scope of their employment is imputed to the Company.

Here, the Complaint contains no allegation that C&A senior management acted for personal gain, much less <u>solely</u> or entirely for personal gain. Instead, the Complaint is replete with allegations of how C&A senior management's misconduct was motivated by the desire to benefit the Company. For example, the Complaint alleges:

> "Defendants employed a variety of fraudulent schemes <u>designed to artificially inflate the Company's reported financial results, avoid triggering debt covenants and enable Collins & Aikman to borrow additional funds</u>, thereby deepening its insolvency." (Cmplt. ¶ 40 (emphasis added));

> "Defendants Stockman, Stepp and others acting at their direction engaged in a series of fraudulent 'round-trip' transactions with Joan Fabrics which were <u>designed to enable Collins & Aikman to improperly increase its reported income and artificially inflate its financial results</u>." (*Id.* ¶ 48 (emphasis added));

> "Collins & Aikman's improper accounting of transactions with Defendant McCallum began in late 2001 when the Company sought $3 million from him <u>solely to increase Collins & Aikman's reported income</u> during the fourth quarter 2001." (*Id.* ¶ 90 (emphasis added)); and

> "Defendants caused Collins & Aikman to engage in a scheme <u>to inflate the Company's earnings</u> by improperly and systematically recognizing rebates tied to the future purchases of goods and services." (*Id.* ¶ 98 (emphasis added).)

As alleged in the Complaint, C&A senior management manipulated C&A's financial statements in ways that made the Company look better to outsiders than it really was in

an effort to keep C&A afloat. Accordingly, the face of the Complaint requires the imputation of the alleged misconduct of C&A's management to Plaintiffs. *See MCA*, 687 N.W.2d at 857-58, 861.

> C.    All the Requirements for the *In Pari Delicto* Defense Are Met.

The Michigan cases involving the *in pari delicto* defense articulate a number of other considerations, each of which is satisfied by the allegations of the Complaint here.

In *Orzel*, the court held that "a sufficient causal nexus must exist between the plaintiff's illegal conduct and the plaintiff's asserted damages" for the *in pari delicto* defense to apply. *Orzel*, 537 N.W.2d at 215. Thus, a plaintiff injured by falling into a hole on the premises of a church where she was playing in an illegal bingo game may still recover because the illegality of the bingo game was not an essential part of the plaintiff's case. *Id.* at 215-16 (discussing *Manning v. Noa*, 76 N.W.2d 75 (Mich. 1956)). Here, by contrast, C&A's case against PwC depends on the misconduct of C&A senior management. C&A cannot prove its case against PwC without proving that C&A management misstated the Company's financial statements. Accordingly, there is a clear causal nexus between the misconduct of C&A senior management and the recovery sought against PwC.

In the reported Michigan cases, the plaintiff's conduct was "prohibited or almost entirely prohibited under a penal or criminal statute". *Orzel*, 537 N.W.2d at 214; *see also MCA*, 687 N.W.2d at 853-54. Here, the Complaint itself alleges that C&A personnel at company headquarters engaged in "illegal acts" that PwC and KPMG did not detect. (Cmplt. ¶ 134.) Moreover, the Complaint alleges throughout that the Officer and Director Defendants engaged in a financial fraud that (if true) violated numerous

17

federal and state criminal laws. *See, e.g.*, 15 U.S.C. §§ 78j(b), 78ff; Mich. Comp. Laws §§ 451.501, 451.809. Thus, the illegal conduct requirement is met.

Moreover, based on the allegations in the Complaint, C&A cannot demonstrate that PwC's alleged wrongdoing was greater than C&A's own admitted wrongdoing. The *MCA* court observed that:

> "perhaps, plaintiffs could potentially prevail if they could show that the wrongdoers within their organizations believed, based on [the auditors'] affirmative advice, that the manner in which the transactions were structured and reported on the financial statements were proper. But plaintiffs make no such showing, nor even such an allegation."
> 687 N.W.2d at 854-55.

But here there are no allegations—nor could there be—that the fraudulent schemes "originated with" PwC or that C&A's officers believed, based on advice from PwC, that what they were doing was proper. To the contrary, the Complaint is clear that the allegedly fraudulent schemes originated with C&A senior management, particularly Messrs. Stockman and Stepp, and that C&A senior management knew that what they were doing was improper. (*See, e.g.*, Cmplt. ¶¶ 48-51.)

Application of the *in pari delicto* doctrine is therefore consistent with the public-policy reasons for the doctrine, as set forth in *Orzel* and *MCA*. Permitting recovery here would "in effect condone the wrongdoing" by "sending the message that companies can safely ignore their employees' behavior as [courts] will allow them to shift the burden to the auditors for not detecting it". *MCA*, 687 N.W.2d at 855; *see also Orzel*, 537 N.W.2d at 213.

For the foregoing reasons, the *in pari delicto* doctrine bars C&A's claims against PwC.

## III.    C&A DOES NOT ALLEGE A COGNIZABLE INJURY.

The crux of C&A's Complaint is that, faced with an increasingly competitive market and adverse business conditions, C&A senior management engaged in fraudulent schemes to misstate the Company's financial statements to conceal its true financial condition, and then used those false financial statements to acquire money by incurring additional debt, thereby deepening its insolvency. (*See, e.g.*, Cmplt. ¶¶ 39-40.) C&A seeks to recover those "deepening insolvency" damages against PwC for failing to detect the fraud committed by C&A itself. Deepening insolvency is defined as "an injury to [a debtor's] corporate property from the fraudulent expansion of corporate debt and prolongation of corporate life". *Lafferty*, 267 F.3d at 347; *see also In re CitX Corp.*, 448 F.3d 672, 677 (3d Cir. 2006). Under *CitX*, "deepening insolvency" is an impermissible measure of corporate injury. Because C&A fails to allege an injury to the Company itself and simply alleges "deepening insolvency", its Complaint should be dismissed.

In *CitX*, a bankruptcy trustee sued the corporation's outside accounting firm, asserting "deepening insolvency" damages. 448 F.3d at 677. The plaintiff argued that the accounting firm failed to notice "red flags" and uncover the company's weakened financial condition, allowing the company to issue more equity, incur more debt and extend its life, thereby resulting in additional liability in the eventual bankruptcy. *Id.* at 675-78. The Third Circuit held that "deepening insolvency" can only be used as a measure of damages where state law provides a deepening insolvency cause of action. *Id.* at 677, 680. The Court explained that *Lafferty* "never held that [deepening insolvency] was a valid theory of damages for an independent cause of action. Those statements in *Lafferty* were in the context of a deepening-insolvency <u>cause of action</u>.

They should not be interpreted to create a novel theory of damages for an independent cause of action like malpractice." *Id.* at 677 (emphasis in original).[3]

While *Lafferty* and *CitX* were decided under Pennsylvania law, other courts have concluded, consistent with *CitX* and *Lafferty*, that "deepening insolvency" is neither a permissible theory of damages nor a viable cause of action. *See, e.g., Trenwick Am. Litig. Trust v. Ernst & Young, L.L.P.*, 906 A.2d 168, 174 (Del. Ch. 2006), *aff'd sub nom. Trenwick Am. Litig. Trust v. Billett*, No. 495, 2007 WL 2317768 (Del. Aug. 14, 2007); *In re Parmalat Sec. Litig.*, No. 04 MD 1653 (LAK), 2007 WL 2263893, at *9 (S.D.N.Y. Aug. 8, 2007); *Christians v. Grant Thornton, LLP*, 733 N.W.2d 803, 812 (Minn. Ct. App. 2007). No Michigan court has authorized a "deepening insolvency" claim or "deepening insolvency" damages. The *CitX* Court observed that "nothing we said in *Lafferty* compels any extension of the doctrine beyond Pennsylvania". 448 F.3d at 680 n.11. There is no reason to believe Michigan would authorize "deepening insolvency" damages beyond what is authorized by *Lafferty* and *CitX*. Because C&A seeks damages based on a "deepening insolvency" theory, recovery is barred by *CitX*.

Even if "deepening insolvency" were a permissible theory of damages, C&A fails to allege that PwC's purported wrongdoing resulted in any cognizable harm to C&A—whether called "deepening insolvency" or any other name. *See Parmalat*, 2007 WL 2263893, at *9. The loss here was suffered by C&A's creditors, not by C&A itself.

In *CitX*, the Third Circuit held that the plaintiff—as here—failed to show a distinct injury to the corporation. 448 F.3d at 677-78. The Court explained that incurring

---

[3] The Court was careful to note that it did "not mean to imply that deepening insolvency would be a valid theory of damages for any other cause of action, such as fraud, and *Lafferty* did not so hold". 448 F.3d at 677 n.8.

additional debt does not harm a corporation. *Id.* at 677 (citing Sabin Willett, *The Shallows of Deepening Insolvency*, 60 Bus. Law. 549, 552-57 (2005)). A corporation's inability to pay its liabilities is an injury to creditors, not to the corporation. Willett, 60 Bus. Law. at 561-70. Increased liability does not in itself harm a corporation; companies can and often do benefit from taking on debt or other liabilities. For this reason, the notion that a corporation is injured in the amount of its unpayable debt is "unsupported in financial economics and inconsistent with the traditional understandings and economic functions of corporate injury". J. B. Heaton, *Deepening Insolvency*, 30 J. Corp. L. 465, 500 (2005).

Both here and in *CitX*, plaintiffs asserted that the accounting firm's opinion allowed the plaintiff company "to exist long enough for its management to incur millions more in debt". 448 F.3d at 677-78. That argument was rejected by the *CitX* court, which held that incurrence of additional liabilities did not constitute a corporate injury. *Id.*

The Third Circuit's *Lafferty* opinion—discussing damages for a fraud-based "deepening insolvency" cause of action—provides guidance as to ways in which a corporation might suffer distinct injury. These include "dissipation of corporate assets" by "prolonging an insolvent corporation's life", as well as costs of financial distress that damage the corporation's assets—"operational limitations" "brought on by unwieldy debt"; deterioration of relationships with "customers, suppliers, and employees" or decline in public confidence; and "legal and administrative costs" incurred when an insolvent company is forced into a bankruptcy that would not otherwise occur. *Lafferty*, 267 F.3d at 349-50. These are all harms to the corporation that may result from the

21

prolongation of corporate life, as opposed to the additional liability (the "deepening insolvency") itself. None is alleged here.

C&A has artfully tried to plead around this defect by alleging that it "was denied the opportunity to continue as a going concern"; suffered because the value of its "business enterprise significantly decreased"; "suffered loss of use of its money"; "incurred significant debt"; and "incurred unnecessary operating expenses". (Cmplt. ¶ 190.) Those conclusory allegations, which are contained only in the "causes of action" section of C&A's Complaint, are unavailing however. None of those alleged injuries falls within any of the types of corporate injury enumerated in *Lafferty*. 267 F.3d at 349-50. Nor does any of them represent a distinct injury to C&A, as opposed to its creditors. Moreover, the "fact" section of C&A's Complaint does not allege any facts about those injuries. Indeed, that section alleges no injury apart from "deepening insolvency"—except for the allegation that Mr. Stockman damaged C&A's relationship with General Electric Capital Corporation (*see* Cmplt. ¶ 64), which is conduct that occurred well after PwC stopped auditing C&A's financial statements, and in which PwC is not alleged to have been involved.

Accordingly, C&A's Complaint does not allege that C&A—as opposed to its creditors—suffered an injury apart from the "deepening insolvency", which *CitX* holds is unrecoverable. C&A's claims against PwC should therefore be dismissed.

## IV.    C&A'S CLAIMS AGAINST PWC ARE TIME-BARRED.

C&A filed for bankruptcy on May 17, 2005. The statute of limitations on any claims belonging to C&A is extended until two years from the bankruptcy filing, but only if the statute of limitations "has not expired before the date of the filing of the petition". 11 U.S.C. § 108(a). The extension of time cannot revive claims that were

22

already untimely at the time of the bankruptcy filing. *In re Fricker*, 192 B.R. 388, 394 (Bankr. E.D. Pa. 1996). Here, the statute of limitations on C&A's claims against PwC had already run by May 17, 2005, the date of the bankruptcy filing.

PwC issued its audit report on C&A's 2001 financial statements more than three years before C&A filed for bankruptcy, and its report on C&A's 2002 financial statements more than two years before C&A filed for bankruptcy. (Cmplt. ¶¶ 84-85.) Accordingly, C&A's malpractice claim against PwC is barred in its entirety by Michigan's two-year statute of limitations. Mich. Comp. Laws § 600.5805(6). C&A's remaining causes of action against PwC—to the extent not dismissed on other grounds— are barred with respect to the 2001 audit by Delaware's three-year statute. 10 Del. Code § 8106.

A. <u>C&A's Malpractice Claim Against PwC Is Barred in Its Entirety by Michigan's Two-Year Statute of Limitations.</u>

1. <u>Under Delaware's Borrowing Statute, C&A's Malpractice Claim Is Subject to Michigan's Two-Year Statute of Limitations.</u>

C&A's claims against PwC are all based on state law. The timeliness of C&A's claims is therefore determined by Delaware's "borrowing statute", which provides that:

> "Where a cause of action arises outside of this State, an action cannot be brought in a court of this State to enforce such cause of action after the expiration of whichever is shorter, the time limited by the law of this State, or the time limited by the law of the state or country where the cause of action arose, for bringing an action upon such cause of action. Where the cause of action originally accrued in favor of a person who at the time of such accrual was a resident of this State, the time limited by the law of this State shall apply." 10 Del. Code § 8121.

*See David B. Lilly Co. v. Fisher*, 18 F.3d 1112, 1117 (3d Cir. 1994).

Thus, the applicable statute of limitations is determined by the plaintiff's residence: if the plaintiff is a resident of Delaware at the time the cause of action accrued, then the Delaware statute of limitations applies; if the plaintiff is a non-resident, its claim is governed by the shorter of the limitations period established by Delaware or the state where the cause of action accrued.

C&A's principal place of business was in Michigan. As stated in the annual reports for C&A referred to in the Complaint (Cmplt. ¶ 75), the Company's "principal executive offices" were in Troy, Michigan. (*See, e.g.*, 2001 Form 10-K (Ex. 1), cover page; 2002 Form 10-K (Ex. 2), cover page; 2003 Form 10-K (Ex. 4), cover page.) The only contact by C&A with Delaware alleged in the Complaint is that Delaware is C&A's state of incorporation. (Cmplt. ¶ 5.)

C&A is therefore a Michigan resident for purposes of Delaware's borrowing statute. While the courts of this State "have never defined the term 'state resident' as it relates to the Delaware Borrowing Statute", *Cerullo v. Harper Collins Publishers*, No. CIV. A. 01C-03-21-CHT, 2002 WL 243387, at *3 (Del. Super. Ct. Feb. 19, 2002), Section 8121 is "almost a verbatim copy" of the New York borrowing statute. *See Pack v. Beech Aircraft Corp.*, 132 A.2d 54, 58 (Del. 1957). Accordingly, Delaware has followed New York law in interpreting the borrowing statute. *Id.*; *Cerullo*, 2002 WL 243387, at *3 ("This Court adopts the New York test as the baseline for determining Delaware residency in regards to the Delaware Borrowing Statute.").

New York courts have in turn made clear that a corporation's principal place of business determines where it "resides" for purposes of the borrowing statute. In *Antone v. General Motors Corp.*, 473 N.E.2d 742, 746 (N.Y. 1984), the New York Court

24

of Appeals held that "'resident' as used in CPLR 202 [the borrowing statute] does not have the same meaning as 'domiciliary'". A corporation is domiciled where incorporated, but resides "where it has its principal offices". *McMahon & Co. v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 727 F. Supp. 833, 834 (S.D.N.Y. 1989). Thus, a corporation incorporated in the state but with its principal place of business elsewhere is a non-resident for purposes of New York's borrowing statute. *Id.*

This rule is consistent with the purpose of Delaware's borrowing statute, which is "'designed to prevent shopping for the most favorable forum'". *Saudi Basic Indus. Corp. v. Mobil Yanbu Petrochem. Co.*, 866 A.2d 1, 16 (Del. 2005) (quoting *Pack*, 132 A.2d at 58). The borrowing statute applies "where a plaintiff brings a claim in a Delaware court that (i) arises under the law of a jurisdiction other than Delaware and (ii) is barred by that jurisdiction's statute of limitations but would not be time-barred in Delaware, which has a longer statute of limitations". *Id.* That is precisely the case here, where C&A's claims against PwC arise under Michigan law, and C&A's malpractice claim against PwC is barred in its entirety by Michigan's two year statute of limitations.

      2.    Under Michigan Law, C&A's Malpractice Claim Against PwC
              Accrued More Than Two Years Before the Bankruptcy Filing.

The statute of limitations for malpractice in Michigan is two years. Mich. Comp. Laws § 600.5805(6). C&A acknowledges that PwC's second and final audit report (on the 2002 financial statements) was dated February 18, 2003. (Cmplt. ¶ 85.) Accordingly, even if PwC's two audits are viewed together for statute-of-limitations purposes, the statute of limitations accrued on February 18, 2003, and ran on February 18, 2005, three months before the bankruptcy filing.

Michigan has enacted a "last treatment" rule, originally developed for medical malpractice cases, under which a malpractice claim "accrues at the time [the professional] discontinues serving the plaintiff in a professional . . . capacity as to the matters out of which the claim for malpractice arose". Mich. Comp. Laws § 600.5838(1); *see Levy v. Martin*, 620 N.W.2d 292 (Mich. 2001). Because C&A has expressly limited its malpractice claim against PwC to "auditing services" (Cmplt. ¶ 193), the "matters out of which the claim for malpractice arose" ended with PwC's issuance of its audit report on the 2002 financial statements, dated February 18, 2003.[4]

Accordingly, C&A's malpractice claim against PwC is time-barred in its entirety and should be dismissed.

---

[4] But even if C&A were to amend its Complaint so the "matters out of which the claim for malpractice arose" include PwC's services in reviewing C&A unaudited quarterly financial statements, the last quarterly financial statements that PwC reviewed were for the first quarter of 2003 (the quarter ending March 31, 2003). The Court should disregard C&A's erroneous allegation in Paragraph 79 of the Complaint that PwC reviewed C&A's quarterly financial statements "through the quarter ended June 30, 2003". This allegation is contradicted by C&A's own SEC filings, which are referred to in the Complaint and are also a matter of public record. (Cmplt. ¶ 75.) Those documents state that KPMG (not PwC) reviewed C&A's financial statements for the quarter ended June 30, 2003. On June 26, 2003, C&A filed with the SEC a Form 8-K (cited in Paragraph 137 of the Complaint), stating: "On June 20, 2003, the Audit Committee of the Board of Directors of Collins & Aikman Corporation (the 'Company') approved the appointment of KPMG LLP as the Company's independent accountants, and the dismissal of PricewaterhouseCoopers LLP ('PWC'), which had previously served in this capacity." (Ex. 3.) On August 15, 2003, C&A filed with the SEC on Form 12b-25 a Notification of Late Filing, stating that "the Company is filing a Form 10-Q for the quarter ended June 30, 2003, . . . without having had its financial information for such quarter reviewed by its independent auditors, KPMG LLP". C&A filed the Form 10-Q containing the financial statements for the first quarter of 2003 (the last ones reviewed by PwC) with the SEC on May 15, 2003. Thus, at the latest, the statute of limitations for malpractice under Michigan law ran on May 15, 2005, before the bankruptcy filing.

B.     All of C&A's Claims Against PwC Are Barred by Delaware's Three-Year Statute of Limitations As to the 2001 Audit.

Besides its malpractice claim, C&A asserts three other state-law claims against PwC: fraud, breach of contract, and aiding and abetting a breach of fiduciary duty. As set forth below (Part V), those claims should all be dismissed as duplicative of the malpractice claim.

They are also time-barred as they are governed by Delaware's three-year statute of limitations. Michigan has a six-year statute of limitations for fraud and breach of contract, Mich. Comp. Laws §§ 600.5807(8), 600.5813, and a three-year statute of limitations for breach of fiduciary duty, Mich. Comp. Laws § 600.5805(10). In Delaware, the three-year period of 10 Del. Code § 8106 applies to all of C&A's claims against PwC. *See Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*, 860 A.2d 312, 319 (Del. 2004). Because Delaware's borrowing statute can only shorten the applicable limitations period, *Saudi Basic Indus.*, 866 A.2d at 16-18, each of C&A's claims is barred to the extent that Delaware's three-year statute of limitations, Section 8106, has run on that claim.

For purposes of Delaware's statute of limitation, the three-year statute accrued at the time PwC issued each audit report. "[A] cause of action 'accrues' under Section 8106 at the time of the wrongful act, even if the plaintiff is ignorant of the cause of action." *Wal-Mart*, 860 A.2d at 319; *SmithKline Beecham Pharm. Co. v. Merck & Co.*, 766 A.2d 442, 450 (Del. 2000). Accordingly, Delaware's statute of limitations for all of C&A's claims on PwC's 2001 audit accrued on February 26, 2002, the date of PwC's report (Cmplt. ¶ 84), and ran on February 26, 2005, approximately three months before the bankruptcy filing.

27

The "discovery rule" applies only in exceptional circumstances, where "the injury is 'inherently unknowable and the claimant is blamelessly ignorant of the wrongful act and the injury complained of'". *Wal-Mart*, 860 A.2d at 319 (quoting *Coleman v. PricewaterhouseCoopers, LLC*, 854 A.2d 838, 842 (Del. 2004)). For example, in *Coleman*, the plaintiffs sold a business to a third party in reliance on the defendant accounting firm, which audited the third party's financial statements. The plaintiffs had no independent knowledge of the third party's financial condition, on which they relied because the purchase price was to be paid over a number of years. Under those circumstances, the discovery rule applied due to "the plaintiffs' inability to acquire by other means, information about the accounting treatment of [the third party's] financial statements upon which the plaintiffs relied". 854 A.2d at 842. Here, by contrast, Plaintiff's own financial statements are the ones at issue. C&A's Complaint alleges that the Director and Officer Defendants themselves engaged in the improper accounting transactions. (*See, e.g.*, Cmplt. ¶¶ 48-51, 63-64, 91-95, 98-99.) Based on this complaint, C&A can claim neither that its injury was "inherently unknowable" nor that it was "blamelessly ignorant of the wrongful act". *Coleman*, 856 A.2d at 842. Accordingly, the "discovery rule" cannot apply here.

Nor can C&A claim tolling under the "continuous negligence" doctrine, which in Delaware is much narrower than the "last treatment" rule prescribed by statute in Michigan. First, "continuous negligence" must be separately pleaded, *Ewing v. Beck*, 520 A.2d 653, 662 (Del. 1987), and C&A has not done so here. Second, the doctrine does not apply where the defendant's activity can be segmented into independent actions

28

producing independent harms. *Id.*; *Began v. Dixon*, 547 A.2d 620, 624 (Del. Super. Ct. 1988).

Annual audits of financial statements are inherently separable. A company produces separate financial statements for each fiscal year, and engages an auditor to perform a separate, independent audit for each year. Unlike a doctor's treatment of a medical condition persisting over years, audits are separate periodic activities. Thus, the New York Court of Appeals held recently that a series of audits does not toll the statute of limitations under a "continuing negligence" theory. *Williamson ex rel. Lipper Convertibles L.P. v. PricewaterhouseCoopers LLP*, ___ N.E.2d. ___, 2007 WL 1624759, at *5 (N.Y. June 7, 2007); *accord Lincoln Grain, Inc. v. Coopers & Lybrand*, 338 N.W.2d 594, 597-98 (Neb. 1983). The same result should apply here.

Accordingly, C&A's claims against PwC are time-barred.

## V.  C&A'S CLAIMS AGAINST PWC FOR BREACH OF CONTRACT, FRAUD, AND AIDING AND ABETTING BREACH OF FIDUCIARY DUTY ARE DUPLICATIVE OF ITS MALPRACTICE CLAIM.

The substance of C&A's Complaint against PwC lies in negligence. (*See* Cmplt. ¶¶ 89-144, 149-152.) As one would expect for a negligence action, C&A sets forth, in great detail, the professional standards PwC allegedly failed to meet. (*Id.*) C&A's express references to PwC's conduct as "negligence" (*see, e.g.*, Cmplt. ¶¶ 89, 121, 129, 134, 142, 152) reflect C&A's recognition that the facts alleged in the Complaint can support, at most, a claim of negligence. Indeed, nowhere in the body of the Complaint, before the causes of action, does C&A ever refer to PwC's conduct as anything other than negligence.

Nevertheless, in addition to Count Eight (for "negligence/malpractice"), C&A purports to bring three additional causes of action against PwC: Count Seven for

29

fraud, Count Ten for breach of contract, and Count Twelve for "aiding & abetting" (by which C&A means aiding and abetting breach of fiduciary duty). These claims are each nothing more than C&A's core malpractice claim dressed up in different legal language. Under Michigan law, where the "'contractual' duties allegedly breached by defendant are indistinguishable from the duty to render legal services in accordance with the applicable standard of care", the breach-of-contract claim is duplicative of the malpractice claim, and is properly dismissed. *See Brownell v. Garber*, 503 N.W.2d 81, 84 (Mich. Ct. App. 1993); *Penner v. Seaway Hosp.*, 427 N.W.2d 584, 587 (Mich. Ct. App. 1988); *Barnard v. Dilley*, 350 N.W.2d 887, 887-88 (Mich. Ct. App. 1984). Thus, where a malpractice claim is barred by Michigan's shorter statute of limitations (as here, *see supra* Part IV.A), a plaintiff cannot extend the time to bring suit by couching his claim as one for breach of contract. *See Barnard*, 350 N.W.2d at 888.

Here, the purported contractual duty is identical to the legal standard of care that PwC owed as a professional. In the breach-of-contract claim (Count Ten), C&A alleges that the terms of PwC's agreement with Collins & Aikman "required that PwC perform its services in accordance with generally accepted auditing standards and applicable standards promulgated by the American Institute of Certified Public Accountants" (AICPA). (Cmplt. ¶ 199.) And in the malpractice claim (Count Eight), C&A alleges that PwC "had a duty to exercise reasonable care and skill to comply with the applicable standard of care in performing its obligations to Collins & Aikman". (*Id.* ¶ 193.) Since Generally Accepted Auditing Standards (GAAS) are the professional standards applicable to audits of financial statements, *see* 17 C.F.R. § 210.1-02(d), the duties PwC is said to have breached under the two claims are indistinguishable.

30

A plaintiff may maintain a separate breach-of-contract claim against a professional only if there is a so-called "special contract", by which the professional agrees to a performance beyond that required to satisfy the relevant professional standards. *See Brownell*, 503 N.W.2d at 84; *Barnard*, 350 N.W.2d at 888; *Hann v. Loeb*, No. 268928, 2006 WL 2959672, at *2 (Mich. Ct. App. Oct. 17, 2006); *see also HealthTrio, Inc. v. Margules*, No. 06C-04-196, 2007 WL 544156, at *11 (Del. Super. Ct. Jan. 16, 2007) (applying same rule under Delaware law). Although the allegations in Paragraphs 200 and 201 of the Complaint may be C&A's attempt to plead a "special contract" between PwC and C&A, these allegations are unavailing because they are directly contradicted by the governing contracts themselves. As stated in the Complaint, "[d]uring the years 2001 and 2002, PwC and Collins & Aikman entered into services agreements". (Cmplt. ¶ 199.) These agreements—usually called "engagement letters"— are referred to in the Complaint (*see, e.g.*, Cmplt. ¶ 199) and are attached as Exhibits 5 and 6 to this motion. As documents both "integral to" and "explicitly relied upon in the complaint", they are properly considered on this motion to dismiss. *See In re Burlington Coat Factory Sec. Litig.*, 114 F.3d at 1426.

C&A alleges that PwC had a "contractual duty" to "report" (or "communicate") three kinds of matters "to the Audit Committee". (Cmplt. ¶ 200.) But the engagement letters nowhere refer to the Audit Committee, and cannot be read to impose a contractual duty on PwC to go beyond what professional standards already require in terms of communications with the Audit Committee. This is perhaps most obvious with respect to C&A's allegation that "PwC had a contractual duty to report to the Audit Committee all significant deficiencies in the design or operation of internal

31

controls". (*Id.* ¶ 200.) The engagement letters say the exact opposite—that PwC's

testing would "not be sufficient to enable [PwC] to provide assurance on the

effectiveness of internal control over financial reporting". (Ex. 5, at 2; Ex. 6, at 2.) Thus,

there was no "special contract", and C&A's claim for breach of contract should be

dismissed as duplicative.

        Michigan applies the same standard to other tort claims. "If a [plaintiff]

attempts to characterize a malpractice claim as a fraud or other type of claim, a court will

look through the labels placed on the claim and will make its determination on the basis

of the substance and not the form." *Chase Bank of Tex. v. Grant Thornton LLP*,

No. 236237, 2003 WL 21350362, at *2 (Mich. Ct. App. June 10, 2003), *appeal denied*,

673 N.W.2d 754 (Mich. 2003); *see also Bd. of Trs. v. Grant Thornton, L.L.P.*,

No. 236415, 2003 WL 1343369, at *3-4 (Mich. Ct. App. Mar. 11, 2003). C&A's fraud

and aiding and abetting breach of fiduciary duty claims are in substance the same as the

malpractice claim. (*See, e.g.*, Cmplt. ¶¶ 213-214 (pleading "failing to perform [its] duties

in compliance with GAAS" as the basis for the aiding and abetting claim against PwC).)

Accordingly, Counts Seven, Ten and Twelve should all be dismissed as to PwC as

duplicative of Count Eight.

## VI.    C&A'S FRAUD AND AIDING AND ABETTING CLAIMS AGAINST PWC MUST ALSO BE DISMISSED FOR FAILURE TO PLEAD FRAUD WITH PARTICULARITY.

        Federal Rule of Civil Procedure 9(b) requires "all averments of fraud" to

be pleaded with particularity. This heightened pleading requirement applies to common-

law fraud claims against auditors, *see Yadlosky v. Grant Thornton, L.L.P.*, 120 F. Supp.

2d 622, 635 n.1 (E.D. Mich. 2000), as well as aiding and abetting claims where the

alleged underlying breach of fiduciary duty is "grounded in fraud", *Krieger v. Gast*,

32

No. 4:99-CV-86, 2000 WL 288442, at *7 (W.D. Mich. Jan. 21, 2000). Here, C&A expressly characterizes the alleged breach of fiduciary duty by the Officer and Director Defendants as a "fraudulent scheme". (Cmplt. ¶ 165; *see also id.* ¶ 213 ("fraudulent conduct").)[5]

It is well established that an inference of scienter cannot be drawn against an auditor based merely on the misstatement of the financial statements audited. As the Third Circuit has held, "the discovery of discrete errors after subjecting an audit to piercing scrutiny post-hoc does not, standing alone, support a finding of intentional deceit or of recklessness". *In re IKON Office Solutions, Inc.*, 277 F.3d 658, 673 (3d Cir. 2002). At the pleading stage, "the complaint must set forth specific facts demonstrating 'that the accounting practices were so deficient that the audit amounted to no audit at all, or an egregious refusal to see the obvious, or to investigate the doubtful, or that the accounting judgments which were made were such that no reasonable accountant would have made the same decisions'". *D.E. & J Ltd. P'ship v. Conaway*, 284 F. Supp. 2d 719, 745 (E.D. Mich. 2003) (quoting *In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1426 (9th Cir. 1994), *cert. denied*, 516 U.S. 909 (1995)). The level of particularity required by Rule 9(b) in a case against an accounting firm is illustrated by *DiLeo v. Ernst & Young*, 901 F.2d 624, 629 (7th Cir. 1990), *cert. denied*, 498 U.S. 941 (1990):

---

[5] In addition, the aiding and abetting claim should be dismissed under Fed. R. Civ. P. 12(b)(6) for failure to state a claim because—notwithstanding C&A's wholly conclusory allegation that PwC had actual knowledge of C&A officers' alleged breaches of fiduciary duty (Cmplt. ¶ 214)—C&A has failed "to allege facts from which we might reasonably infer that [PwC] knowingly participated in [the] alleged breach of [the C&A officers'] fiduciary duty". *In re Estate of Goldman*, 601 N.W.2d 126, 129 (Mich. Ct. App. 1999).

> The complaint does not allege that [the accounting firm] had anything to gain from any fraud by Continental Bank. . . . [The accounting firm's] partners shared none of the gain from any fraud and were exposed to a large fraction of the loss. It would have been irrational for any of them to have joined cause with Continental . . . . It does not identify any of [the accounting firm's] auditors or explain what that person might have to gain from covering up Continental's wrongs." *DiLeo*, 901 F.2d at 627.

*See also Chase Bank*, 2003 WL 21350362, at *2 (applying *DiLeo* standard to Michigan common-law fraud claim against auditor).

C&A's Complaint shares these failings. It does not begin to explain what PwC would have had to gain from joining in a fraud by C&A's officers. While C&A's Complaint is filled with particularized allegations of intentional wrongdoing by C&A's former management (*see, e.g.*, Cmplt. ¶¶ 48-77), nowhere in the Complaint are there similar allegations of specific intentional wrongdoing by PwC. Instead, C&A alleges nothing more than that PwC's audits were conducted in a negligent manner. (*See, e.g.*, *id.* ¶¶ 89-144, 149-152.)

In an effort to allege scienter, C&A suggests that PwC had motive and opportunity to engage in fraudulent activity based on evidence that could be alleged of any auditor—PwC's receipt of fees from Collins & Aikman (Cmplt. ¶ 82) and its allegedly "limitless access" to C&A's business records (*id.* ¶ 134). As a matter of law, however, such allegations are insufficient to meet the requirements of Rule 9(b). An outside professional's desire to collect fees will not support a claim for fraud. *GSC Partners CDO Fund v. Washington*, 368 F.3d 228, 238 (3d Cir. 2004); *Melder v. Morris*, 27 F.3d 1097, 1104 (5th Cir. 1994); *DiLeo*, 901 F.2d at 629. Nor will an auditor's access to corporate records support a claim that the auditor knew of a fraud committed by management. *PR Diamonds, Inc. v. Chandler*, 364 F.3d 671, 695-96 (6th Cir. 2004); *In re Advanta Corp. Securities Litig.*, 180 F.3d 525, 539-40 (3d Cir. 1999).

The scant allegations C&A proffers in support of its fraud claim do more to undermine than support it.  For example, C&A contends that the existence of side letters regarding rebates provided by third parties to C&A should have served as a "red flag" to PwC.  (Cmplt. ¶¶ 126-129.)  C&A acknowledges, however, that these side letters were created for the express purpose of eliminating any suspicion on PwC's part—a fact flatly inconsistent with an inference of scienter by PwC.  (*Id.* ¶¶ 126-127.)  Indeed, C&A alleges that PwC "negligently failed to investigate or ignored this red flag" (*id.* ¶ 129), thereby confirming that C&A's claim against PwC sounds in negligence, not fraud.

Accordingly, C&A's Count Seven (for fraud) and Count Twelve (for aiding and abetting breach of fiduciary duty) should also be dismissed for failure to plead fraud with particularity.

**Conclusion**

For the foregoing reasons, PwC respectfully submits that C&A's

Complaint should be dismissed in its entirety as to PwC.

Dated:  September 14, 2007

        RICHARDS, LAYTON & FINGER

        by

        Robert J. Stearn, Jr. (No. 2915)
        Lee E. Kaufman (No. 4877)
        One Rodney Square
        P.O. Box 551
        Wilmington, DE 19899
        (302) 651-7700

        CRAVATH, SWAINE & MOORE LLP
        Thomas G. Rafferty
        Antony L. Ryan
        Worldwide Plaza
        825 Eighth Avenue
        New York, NY 10019
        (212) 474-1000

        *Attorneys for PricewaterhouseCoopers LLP*

**EXHIBIT 1**

# UNITED STATES SECURITIES AND EXCHANGE COMMISSION
## WASHINGTON, D.C. 20549

# Form 10-K

(Mark One)

☑ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d)
OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the fiscal year ended December 31, 2001**

**or**

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d)
OF THE SECURITIES EXCHANGE ACT OF 1934**

**Commission file number 1-10218**

# Collins & Aikman Corporation
*(Exact name of registrant as specified in its charter)*

| | |
|---|---|
| **Delaware** | **13-3489233** |
| *(State or other jurisdiction of incorporation or organization)* | *(I.R.S. Employer Identification Number)* |

**250 Stephenson
Troy, Michigan 48083**
*(Address of principal executive offices, including zip code)*

**Registrant's telephone number, including area code:
(248) 824-2500**

**Securities registered pursuant to Section 12(b) of the Act:**

| Title of each class | Name of each exchange on which registered |
|---|---|
| Common Stock, $.01 par value | New York Stock Exchange |

**Securities registered pursuant to Section 12(g) of the Act:
None**

Indicate by check mark whether the Registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the Registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☑  No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of Registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☑

The aggregate market value of voting stock held by non-affiliates of the Registrant was $391,879,266 as of March 20, 2002. (Treats as non-affiliates certain holders of restricted shares who have relinquished Board designation and other rights and as an affiliate a shareholder as to whom there is an issue.)

As of March 20, 2002, the number of outstanding shares of the Registrant's common stock, $.01 par value, was 167,993,798 shares.

**DOCUMENTS INCORPORATED BY REFERENCE:**

The information required by Part III (Items 10, 11, 12 and 13) is incorporated by reference to portions of the registrant's definitive Proxy Statement for the 2002 Annual Meeting of Stockholders, which will be filed within 120 days of December 31, 2001.

# COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES

## FORM 10-K ANNUAL REPORT INDEX

|  |  | Page |
|---|---|---|
| Item 1. | Business | 2 |
| Item 2. | Properties | 11 |
| Item 3. | Legal Proceedings | 11 |
| Item 4. | Submission of Matters to a Vote of Security Holders | 13 |
| Item 5. | Market for Registrant's Common Equity and Related Stockholder Matters | 13 |
| Item 6. | Selected Financial Data | 15 |
| Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 16 |
| Item 7A. | Quantitative and Qualitative Disclosures About Market Risk | 32 |
| Item 8. | Financial Statements and Supplementary Data | 33 |
| Item 9. | Changes in and Disagreements With Accountants on Accounting and Financial Disclosure | 33 |
| Item 10. | Directors and Executive Officers of the Registrant | 34 |
| Item 11. | Executive Compensation | 34 |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management | 34 |
| Item 13. | Certain Relationships and Related Transactions | 34 |
| Item 14. | Exhibits, Financial Statement Schedules and Reports on Form 8-K | 35 |

## PART I

This Report on Form 10-K contains "forward-looking" information, as that term is defined by the federal securities laws, about our financial condition, results of operations and business. You can find many of these statements by looking for words such as "may," "will," "expect," "anticipate," "believe," "estimate," "should," "continue," "predict," and similar words used in this Annual Report. The forward-looking statements in this Form 10-K are intended to be subject to the safe harbor protection provided by the federal securities laws.

These forward-looking statements are subject to numerous assumptions, risks and uncertainties (including trade relations and competition). Because the statements are subject to risks and uncertainties, actual results may differ materially from those expressed or implied by the forward-looking statements. We caution readers not to place undue reliance on the statements, which speak only as of the date of this Annual Report.

The cautionary statements set forth above should be considered in connection with any subsequent written or oral forward-looking statements that the Company or persons acting on its behalf may issue. We do not undertake any obligation to review or confirm analysts' expectations or estimates or to release publicly any revisions to any forward-looking statements to reflect events or circumstances after the date of this report or to reflect the occurrence of unanticipated events.

This Annual Report contains forward-looking statements within the meaning of the Private Securities Litigation Reform Act of 1995. Actual results and events may differ materially from those that are anticipated because of certain risks and uncertainties, including but not limited to general economic conditions in the markets in which the Company operates and industry based factors such as:

- declines in the North American, South American and European automobile and light truck builds,

- labor costs and strikes at our major customers and at our facilities,

- changes in consumer preferences,

- dependence on significant automotive customers,

- the level of competition in the automotive supply industry and pricing pressure from automotive customers and

- risks associated with conducting business in foreign countries.

In addition, factors more specific to us could cause actual results to vary materially from those anticipated in the forward-looking statements included in this report such as substantial leverage, limitations imposed by the Company's debt instruments, the Company's ability to successfully integrate acquired businesses including actions it has identified as providing cost saving opportunities, and pursue our prime contractor business strategy, the Company's customer concentration and risks associated with the formerly owned operations of the Company.

The Company's divisions may also be affected by changes in the popularity of particular vehicle models or particular interior trim packages or the loss of programs on particular vehicle models.

For a discussion of certain of these and other important factors which may affect our operations, products and markets, see "ITEM 1. BUSINESS" and "ITEM 7. MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS" and also our other filings with the Securities and Exchange Commission.

## Item 1.  *Business*

## The Company

The Company is a global leader in the design, engineering and manufacturing of automotive interior components, including instrument panels, fully assembled cockpit modules, floor and acoustic systems, automotive fabric, interior trim and convertible top systems and has the number one or two North American market share position in seven out of ten major automotive interior categories tracked by CSM Worldwide. The Company is also the largest North American supplier of convertible top systems. The Company expects the fully assembled cockpit modules market to grow significantly over the next five years and has positioned itself as a leading global supplier in this market with the recent acquisition of TAC-Trim. Sales are diversified among North American, European and South American Tier I integrators and automotive OEMs. In North

America, the Company manufactures components for approximately 90% of all light vehicle production platforms. The Company has over 25,000 employees and more than 120 plants worldwide. The Company is a Delaware corporation formed on September 21, 1988. The Company conducts all of its operating activities through its wholly owned Collins & Aikman Products Co, ("Products") subsidiary. Predecessors of Products have been in operation since 1843.

In February 2001, Heartland Industrial Partners, L.P. acquired a controlling interest in the Company. Since the investment, the Company has pursued acquisitions that have furthered a strategy of serving as a prime contractor to both Tier I integrators, which are shifting capital and emphasis away from interior components manufacturing and towards electronics and the delivery of fully integrated interior modules, and to OEMs, which continue to increase their outsourcing of complete interior manufacturing.

- On July 3, 2001, the Company acquired the Becker Group, a leading supplier of plastic components to the automotive industry.

- On September 21, 2001, the Company acquired Joan Automotive Industries, a leading supplier of bodycloth to the automotive industry, and the assets of Joan's affiliated automotive yarn dyeing operation, Western Avenue Dyers, L.P.

- On December 20, 2001, the Company acquired the Textron Automotive Company's Trim division (TAC-Trim), one of the largest suppliers of instrument panels and fully assembled cockpit modules and a major automotive plastics manufacturer of interior and exterior trim components in North America, Europe and South America.

The combination of Collins & Aikman, Becker, Joan and TAC-Trim created one of the industry's largest and most broadly based manufacturers of automotive interior components, systems and modules. The Company has the capability to supply diverse combinations of stylistically matched, functionally engineered and acoustically integrated interior trim components, systems and modules and markets interior products to customers through a single "global commercial operations" group, which supplies products from three primary categories: plastic components and cockpits, carpet and acoustics and automotive fabrics. In addition, the Company continues to market its convertible top systems through the Dura convertible group.

## Industry Trends

The Company's strategy is to capitalize on several important automotive industry trends, which are expected to drive demand for its products. These trends include:

- *Increasing OEM Demand for Modules, Systems and Complete Interiors:* To reduce costs and simplify assembly processes and design, OEMs increasingly expect their large-scale suppliers to provide fully engineered systems, pre-assembled combinations of components (systems or modules) and complete automotive interiors rather than individual components.

- *Accelerating Manufacturing Outsourcing by Tier I Total Interior Integrators:* The large total interior Tier I integrators are repositioning their assets and resources to focus on electronics design, assembly and "just-in-time" sequencing of modules, systems and complete interiors. As a result, they are seeking to divest or outsource the manufacturing of many component categories.

- *Growing Technological Content and Acoustical Performance Requirements:* The electronic and technological content of vehicles continues to expand, largely driven by demand for greater functionality and convenience. Changes to vehicle interiors, including hands-free cell phone systems, entertainment and navigational systems and voice-activated dashboard functions, are expected to require enhanced acoustical properties and increased sound field engineering relative to today's light vehicles.

- *Global Customer Requirements:* Due to the opportunity for significant cost savings, reduced product development cycle times, common global platforms and improved product quality and consistency, automotive manufacturers favor suppliers with the capability to manufacture automotive interior systems and components in multiple geographic markets.

## Corporate Strategy

The Company's goal is to become the leading manufacturer of automotive interior trim components to OEMs and Tier I integrators and to realize the integration, synergy and cost savings opportunities created by

the combination of Collins & Aikman, Becker, Joan and TAC-Trim. The following are the key elements of the strategy:

- *Provide integrated product solutions that combine interior styling, component systems and acoustical technologies*:   The ability to bundle multiple components into integrated, custom packages distinguishes the Company from its competitors and provides an opportunity to increase content per vehicle. The Company is a leader in product innovation, design and styling in all of its business lines, producing components that cover substantially all of the non-glass interior surfaces of automobiles. This breadth of product offering affords the Company a significant advantage as OEMs increasingly view the vehicle interior as a major point of differentiation and rely upon automotive suppliers for research, engineering, design and styling capabilities. By employing a cross-disciplinary approach to acoustics, surface styling and product engineering that takes advantage of product development and technological capabilities, the Company can offer integrated product solutions to its customers.

- *Capitalize on position as prime contractor to OEMs and Tier I total interior integrators:*   The Company believes that OEMs will accelerate modular and system sourcing in order to lower costs, reduce time to market and accommodate global platforms and that Tier I total interior integrators will increase the redeployment of assets and capital into the integrated design, assembly and "just in time" sequenced delivery of complete interior systems. The Company is well positioned to capitalize on these opportunities. Furthermore, the Company's products are used in approximately 90% of North American vehicle platforms and are sold to all North American OEMs, transplants such as Toyota and Honda, and major Tier I integrators. The Company is also well positioned with respect to its Tier II competitors that have comparatively narrower product lines and significantly less size, scale and technological capabilities.

- *Increase content per vehicle:*   The Company intends to take advantage of its current position to increase content per vehicle and has substantial new business awards from customers across all product categories, with the strongest growth in fully assembled cockpit modules. Projected sales growth is primarily attributable to TAC-Trim's expanded book of full cockpit programs. By increasing content per vehicle, sales are expected to increase at a rate in excess of changes in industry production rates.

- *Leverage technology to improve manufacturing efficiency:*   The Company believes it has many opportunities to improve manufacturing efficiency and cost structure by rationalizing existing operations and incorporating manufacturing "best practices," processes, procedures and technologies into its operations. For example, TAC-Trim is believed to be among the most efficient plastics suppliers in North America and Europe due to numerous proprietary manufacturing technologies, such as Invisitec™ and Intellimold™ and Envirosoft™ patented processes that allow the Company to manufacture and combine multiple products to produce complex integrated interiors products. The Company believes the application of technologies such as Intellimold™ to Becker and the Company's operations, as well as the continued roll-out of these technologies throughout TAC-Trim's operations, will significantly improve plastics manufacturing cycle times, labor costs and scrap rates.

- *Pursue cost savings opportunities arising from our acquisitions:*   The Becker, Joan and TAC-Trim acquisitions create the opportunity to realize cost savings in the first full year of operation. The Company expects to realize these savings through a number of initiatives, including purchasing savings, in-sourcing the majority of our plastics tooling and yarn dyeing requirements, consolidating research and development and engineering functions, capacity rationalization and reducing global headquarters' costs. In an effort to achieve cost savings, the Company may also elect to implement restructuring activities in future periods above and beyond activities initiated during 2001.

## Segment and Geographical Information

For a discussion of the Company's operating segments and the geographic regions in which the Company operates, refer to Item 7, "Management's Discussion and Analysis of Financial Condition and Results of Operations — Results of Operations" and to Note 20, "Information About the Company's Segments" of the financial statements included in this report.

## Products

The Company markets the majority of its products to customers through a single "global commercial operations" group, which supplies products from three primary categories including plastic components and

cockpits, carpet and acoustics and automotive fabrics. In addition, the Company markets convertible top systems through the Dura convertible group. Products include the following:

## Plastic Components and Cockpits

The Company manufactures substantially all of the components of the plastic interior trim within a vehicle, including automotive instrument panels, door panels, sidewall trim, overhead systems, headrests and armrests, cupholders, air registers and bezels, slush molded skins, pillar trim, floor console systems, instrument panel components, and fully assembled cockpit modules. This broad portfolio of plastic components and cockpits products allows the Company to offer customers modules and systems that incorporate individual components. Some major products include:

- *Instrument Panels ("IP"):* As the most structurally important plastic component in the vehicle and as the plastic substrate directly in front of the driver, the IP occupies the most important piece of "real estate" in the interior. The Company believes that it is the number one IP supplier in North America. The advanced materials we employ include Envirosoft™ castable thermoplastic materials, high performance PVC alloys, high-definition grain and texture formulation and vacuum forming. TAC-Trim has also developed the Invisitec™ invisible passenger air bag system, which provides improved appearance and craftsmanship at reduced cost.

- *Cockpits:* The Company is a leading North American and European supplier of cockpits. The complete array and breadth of our plastic component offerings has enabled the Company to become a leader in offering customers a fully assembled IP system ("cockpit") delivered on a just-in-time basis. As most of the ancillary interior trim components revolve around the IP placement, the Company believes that it will be able to penetrate effectively the customer base by offering the IP along with complementary plastic accoutrements and additional products from our other business units. We source various other parts that make up a fully assembled modular cockpit from outside suppliers (including radios, wire harnesses, cross-vehicle beams and steering columns). The Company expects that its position as a cockpit integrator will provide significant opportunities to in-source more manufactured content in the future. Through the proprietary Intelliquence™ software, finished cockpits can be delivered to the OEMs on a just-in-time basis and installed on the assembly line.

- *Door Panels:* The Company believes that it is the second largest supplier of door panels in North America. This decorative plastic interior trim component is an important element to the overall styling theme of a vehicle's interior.

- *Exteriors:* Exterior trim components include plastic molded fascia systems, bodyside cladding, signal lamps, cowl grilles and wheel flares. The Company has taken advantage of the systems trend in the exterior trim product market by producing and assembling fascia with radiator grilles, energy absorbers, trim moldings and lamps to be delivered in sequence directly to the OEMs' assembly line.

## Carpet and Acoustics

The Company evolved from a North American carpet producer to become a market leader in a broad range of automotive floor systems, luggage compartment trim, dash insulators and other acoustic products with production capabilities in both North America and Europe. While acoustical products are often combined with molded floor carpet to provide complete interior floor systems, it is useful to describe four carpet and acoustics product categories:

- *Molded Floor Systems:* Molded floor systems consist of thermoformed compression molded carpets. These carpets are provided in either a barrier or an absorptive NVH (noise, vibration and harshness) system. The barrier system includes polyethylene, barrier back, and a fiber underlay system or a foam-in-place system. Products include Tuflor™, our proprietary thermoplastic flooring product, which is rugged, durable and washable. The products in molded floor systems are highly engineered, and their manufacture requires a high degree of precision and draws on our robotics capabilities. The Company believes it is the number one producer of molded floor and acoustic systems in the North American market and manufactures molded floor systems for all of the North American and Japanese OEMs as well as a number of the European OEMs.

- *Luggage Compartment Trim:* The other major carpeted area of the vehicle is the luggage compartment, which includes one-piece molded trunk systems and assemblies, wheelhouse covers and center

pan mats, seatbacks, tireboard covers and other trunk trim products. The Company believes that it is the number two supplier of luggage compartment trim in the North American market.

- *Accessory Floormats:* The Company manufactures automotive accessory floormats by vulcanizing rubber backing to tufted carpet and also manufactures cargo mats with value-added distinctive aesthetic and practical features such as hand-sewn appearance of edges and moisture trapping construction with our patented Akro Edge® floormats. Largely due to this product differentiation, the Company has become the largest fully integrated auto floormat producer in North America.

- *Acoustical Products:* Acoustical products include interior dash insulators that insulate the passenger compartment from engine compartment noise and heat; damping materials that control noise in the floor, overhead system and sides of the vehicle; and engine compartment NVH systems. Changes to vehicle interiors, including hands-free cell phone systems, navigational systems, entertainment systems and voice-activated Internet access, will require enhanced acoustical properties and increased sound field engineering relative to today's light vehicles.

### Automotive Fabrics

The combination of the Company's existing fabrics products with Joan makes us one of the largest automotive fabrics manufacturers. The principal automotive fabrics are bodycloth (woven or knitted fabric primarily for the seats of the vehicle) and headliner (knitted fabric laminated with foam such as that on the inside roof of the vehicle). Automotive fabrics are woven or knit based on the styling and cost preference of the customer. The Company offers every major fabric variation, including dobby velours, jacquard woven velours, flat wovens, double needle-bar knits, circular knits and tricot knits.

The Company's styling capability is one of its principal strengths, and is a reason for strong sales to OEMs. With the acquisition of Joan, the production of fabrics is vertically integrated with an expandable dye house operation. Due to stringent OEM "color fastness" standards, the dyeing and color application process is a key value-added aspect of auto fabric production and contributes significantly to price-per-yard.

### Dura Convertible Top Systems

The Company is a vertically integrated full service supplier of convertible roof systems, and can design, engineer and manufacture all aspects of a convertible top including the framework, trim set, backlights, well slings, tonneau covers and power actuating system. In order to differentiate products in the marketplace, OEMs have been increasing the number of convertible models on both existing and new platforms. Management believes that this trend will continue to drive demand for convertible systems. Top-in-a-Box™, a system pioneered by Dura Convertibles, is an assembly-line-ready module containing all of the components of a convertible top that enables the OEM to install a complete convertible top system on the production line. This modular, "bolt-on" assembly significantly reduces the time and labor traditionally required to manufacture a convertible model, enabling OEMs to more profitably produce and sell convertibles. Dura Convertibles has the industry's most complete line of fabric coverings for convertible and sport utility top covers for OEMs globally. The Company maintains final assembly and trim operations near the OEMs' plants, and thereby offers customers complete just-in-time delivery and sequencing capabilities.

### Customers

Customers include both OEMs and Tier I total interior integrators, which have been increasingly divesting component manufacturing. In the past, OEMs have been typical direct customers for the Company's plastic components, cockpits, carpet and acoustic and convertible products, while Tier I total interior integrators have typically been direct customers for fabrics. The Company believes that over time, sales to Tier I total interior integrators will increase as a percentage of total sales as OEMs source increasingly larger sections of vehicle interiors to Tier I total interior integrators who in turn shift their capital and emphasis towards electronics and the delivery of fully integrated interior modules.

Through strategic acquisitions, the Company has broadened its customer base globally, with European sales representing 14% of total sales for 2001 versus 3% in 1996. DaimlerChrysler AG (including Mercedes, Chrysler, Mitsubishi and Smart), General Motors Corporation (including General Motors, Opel, Vauxhall and Saab) and Ford Motor Company (including Ford, Jaguar, Land Rover, Aston Martin and Volvo) directly

and indirectly represented approximately 18.7%, 29.0% and 21.5% of 2001 sales, respectively. These percentages are likely to change with the recent acquisition of TAC-Trim. The following is a list of customers:

| | | | |
|---|---|---|---|
| • Alpha Romeo | • General Motors | • Magna | • Renault |
| • Audi | • Honda | • Man | • Rover |
| • BMW | • Hyundai | • Mazda | • Scania |
| • CAMMI | • Intier | • Mitsubishi | • Seat |
| • DaimlerChrysler | • Isuzu | • Nissan | • Subaru |
| • Faurecia | • Jaguar | • NUMMI | • Toyota |
| • Fiat | • Johnson Controls | • Opel | • Visteon |
| • Ford | • Kia | • Porsche | • Volkswagen |
| • Freightliner | • Lear Corporation | • PSA | • Volvo |

The Company's supply relationships are typically sole-source and extend over the life of the model, which is generally four to seven years, and do not normally require the purchase by the customer of any minimum number of products. The Company receives blanket purchase orders that normally cover annual requirements for products to be supplied for a particular vehicle model which may be terminated at any time. In order to reduce reliance on any one model, the Company produces automotive interior systems and components for a broad cross-section of both new and more established models.

### Marketing, Engineering and Development

As a global leader in automotive interior components, the Company differentiates itself in the marketplace by consistently providing high quality products, outstanding customer service and program management and cost effective automotive solutions to global customers. Historically, the Company marketed individual components, modules and complete systems to customers. With the implementation of "Mega" Tier II strategy, the Company realigned marketing efforts to sell integrated product "bundles" to customers in an effort to increase growth in sales and operating income while enhancing the value-add provided to customers. Central to this marketing strategy has been the development of products that enhance both the vehicles' interior aesthetics as well as its acoustic performance. Equally important, and unlike many other Tier I or Tier II automotive suppliers, is the development of marketing and program management teams specifically focused on supporting not only OEMs, but major Tier I customers as well. These dedicated teams, consisting of automotive interior personnel who are able to meet a customer's entire interior needs, provide a single interface for our customers and help avoid duplication of our sales and engineering efforts.

Products are sold directly to customers under sales contracts that are obtained primarily through competitive bidding. These sales are originated almost entirely by sales staff. This marketing effort is augmented by design and manufacturing engineers that work closely with automotive manufacturers from the preliminary design to the manufacture and supply of automotive interior modules, systems or components. A key element employed to increase sales is to develop increasingly higher value-added products through innovations in materials construction, product design, engineering and styling. In recognition of this, in April of 2000, the Company formed the Global Product Development Division (GPDD) and also created an Advanced Sales and Program Management Group. The primary focus of the GPDD is to work closely with customer engineering personnel to develop new products, processes, innovations, etc. that are central to winning new business from customers. The Advanced Sales and Program Management Group serves as a "bridge" between the GPDD and customer focused sales groups who market the Company's products and are responsible for ensuring that customers' needs are being met.

Through sales offices in North America, South America, Europe and Asia-Pacific, our marketing personnel maintain regular contact with our various customers' engineers and purchasing agents. The Company continually seeks new business from existing customers, as well as developing relationships with new customers. The Company markets its products by maintaining strong customer relationships, developed over an 80-plus year history in the automotive industry through:

- extensive technical and product development capabilities;

- reliable just-in-time delivery of high-quality products;

- strong customer service;

- innovative new products; and

- a competitive cost structure.

The emergence of modular sourcing favors suppliers with broad manufacturing capabilities and product lines, experience with diverse materials and modular coordination. Management believes that the Company's broad base of manufacturing expertise with interior surface resins and materials and its global leadership in delivering cockpits, will favorably position the Company in the global automotive interior industry. Automotive manufacturers have increasingly looked to suppliers to assume responsibility for introducing product innovations, shortening the development cycle of new models, decreasing tooling investment and labor costs, reducing the number of costly design changes in the early phases of production and improving automotive interior acoustics, comfort and functionality. Once the Company is engaged to develop the design for the automotive interior system or component of a specific vehicle model, it is also generally engaged to supply these items when the vehicle goes into production. Substantial resources have been dedicated toward improving engineering and technical capabilities, establishing strong in-house tooling capabilities (which have been strengthened by both the Becker and TAC-Trim acquisitions) and developing advanced technology centers in the United States and in Europe. Similarly, research and development are an integral part of the sales and marketing effort. Especially noteworthy are TAC-Trim's proprietary Intellimold$^{TM}$ injection molding control process, Invisitec$^{TM}$ invisible passenger air bag door system and Envirosoft castable TPU and TPO materials.

In order to effectively develop automotive interior systems, it is necessary to have global capabilities in the engineering, research, design, development and validation of the interior components, systems and modules being produced. The Company conducts research and development at design and technology centers in Dearborn, Michigan; Dover, New Hampshire; Auburn Hills, Michigan; Plymouth, Michigan; Heidelberg, Germany and Tyngsboro, Massachusetts and at several worldwide product engineering centers. At these centers, the Company designs, develops and engineers products to comply with applicable safety standards, meet quality and durability standards, respond to environmental conditions and conform to customer aesthetic and acoustic requirements. In particular, acoustic requirements and cockpit aesthetics have become more important than ever with the advent of in-vehicle telematics. Technologically advanced acoustics testing centers are maintained in Plymouth, Michigan and Heidelberg, Germany and cockpit development centers are located in Auburn Hills and Dearborn Michigan in order to capitalize on both of these trends.

## Manufacturing

The Company focuses on combining smaller manufacturing plants into larger scale plants that have efficient layouts and the ability to absorb core fixed costs.

The Company possesses cross-disciplinary manufacturing expertise, including an ability to form and assemble multi-material combinations of hard-molded plastics, slush-molded soft skins and surfaces, carpet, fabric, foam, insulation, and other trim materials. Management believes the sophistication of the Company's carpet tufting and dying processes, the foam-in-place process for molded floors and its small-part plastic moldings and assemblies capabilities creates a competitive advantage. Recent acquisitions have added to the Company's manufacturing capabilities:

- With the Joan acquisition, the Company gained a scaleable, low-cost package automotive yarn dyeing facility thereby bringing in-house an important source of supply for the manufacture of our fabrics products.

- The acquisition of Becker, originally established as a tool shop, has supplemented existing operations with one of the industry's leading tool developers allowing the in-sourcing of a significant portion of the Company's tooling requirements. The addition of Becker's tooling expertise complemented the Company's manufacturing capabilities for carpet and acoustics products and TAC-Trim's large part injection molding process.

- The TAC-Trim acquisition added advanced process technologies such as slush-molded skinning for high-end instrument panels, thermoplastic casting, and "molded-in" color and decoration insert capability and overall manufacturing discipline and acumen. Specific product and process additions brought on by TAC-Trim include: the patented Intellimold$^{TM}$ feedback control system for injection molding control which dramatically reduces cycle times, labor costs and scrap rates; and the

proprietary Intelliquence[TM] software sequencing system which should enable product delivery on a just-in-time basis to global OEM customers. In addition, TAC-Trim significantly expands plastic manufacturing capabilities allowing the Company to provide substantially all of an automobile's interior plastic components.

## Technology and Intellectual Property

Significant resources are dedicated to research and development in order to maintain the position as a leading developer of technology innovations, some of which have been patented or are in the process of being patented, in the automotive interior industry. The Company has developed a number of patented and proprietary designs for innovative interior features, all focused on increasing value to the customer. Examples include the Company developed proprietary slimline cupholders, Caveflex[TM] (stretch woven) fabrics and the "AcT[TM] family" of acoustically tunable products.

Patents and patent applications exist in five primary areas: automotive floor mats, automotive fabric products, acoustics, plastics and convertible systems. With respect to floormats, the Company holds several U.S. and foreign patents relating to the Akro Edge® floormats. Akro Edge® floormats are the industry standard for their functional and aesthetic appeal to OEMs and their customers. With respect to automotive fabric patents, the Company has numerous patents on headliners, trunkliners and floor panels. In the acoustics area, in addition to the proprietary Comet® acoustics software, the Company is actively seeking protection of various aspects of its AcT[TM] fiber technology and various other means for improving sound deadening and sound absorption in automotive interiors. The Company has various patents and patent applications directed to cup holders, air outlet assemblies, storage systems and convertible mechanisms.

In connection with the TAC-Trim acquisition the Company acquired intellectual property rights to various products and processes including the patented Intellimold[TM] injection molding control process for use in its business. The Intellimold[TM] patents are related to methods and/or apparatus for injection molding. TAC-Trim has also developed certain skin materials and compounding solutions that provide the capability to design cost-effective materials with outstanding performance and aesthetic qualities. Examples of these materials include Envirosoft[TM] castable thermoplastic materials, high performance PVC alloys, high-definition grain and texture formulation and vacuum thermoplastic applications. TAC-Trim has also developed the Invisitec[TM] invisible passenger air bag system, which provides improved appearance and craftsmanship at reduced cost. Invisitec[TM] systems, which integrate the air bag door with the panel and top cover, have been commercialized for soft-cast and vacuum-formed panels and hard injection molded instrument panels. In total, TAC-Trim holds approximately 270 U.S. and approximately 1200 foreign active patents and has approximately 350 patents pending. The intellectual property acquired in the TAC-Trim Acquisition is subject to certain limitations on the Company's use and creates continuing obligations to Textron.

As part of the TAC-Trim acquisition, the Company entered into three intellectual property license agreements with Textron. In two of these agreements, the Company licensed back to Textron certain intellectual property that was acquired in the transaction (the "Intellimold Agreement" and the "Licensed-Back IP Agreement"). In the third agreement, the Company licensed from Textron other intellectual property that it did not acquire in the transaction (the "Retained IP Agreement"). The Company is providing general descriptions of these agreements although these descriptions do not contain all the material terms in the contracts.

- In all three agreements, the ability to use the intellectual property is limited based on whether the proposed use falls inside or outside a defined field of automotive products (the "Restricted Field").

In the Intellimold Agreement, the Company gave Textron an exclusive worldwide, perpetual, irrevocable license to use outside the Restricted Field its rights in the Intellimold process and any enhancements developed by it. Textron was also granted a royalty-free, worldwide, perpetual, irrevocable license to use the Company's rights in the Intellimold process and any enhancements developed by the Company within the Restricted Field solely in connection with its and certain affiliates' manufacturing, sales and development operations. The Intellimold Agreement also includes an exclusive royalty-free, worldwide, perpetual, irrevocable license for the Company to use within the Restricted Field any enhancements to the Intellimold process

9

developed by Textron. In the Licensed-Back IP Agreement, the Company granted Textron a non-exclusive, worldwide, royalty-free, perpetual and irrevocable license to use solely outside the Restricted Field certain intellectual property including over 50 U.S. patents on air bag related products. In the Retained IP Agreement, Textron granted to the Company a non-exclusive, worldwide, royalty-free, perpetual and irrevocable license to use solely within the Restricted Field certain intellectual property. These patents could have applicability to the automotive industry but such use is somewhat secondary to the use of such technology outside the automotive field.

As described below under the heading "Management's Discussion and Analysis of Financial Condition and Results of Operations — Liquidity — Leases", the Company leases certain equipment from Textron. When those leases terminate, if Textron and its affiliates continue to own any interest in the equipment, they will be allowed to use the equipment for certain purposes and to use related intellectual property.

## Raw Materials

Raw materials and other supplies used in our continuing operations are normally available from a variety of competing suppliers. With respect to most materials, the loss of a single or even a few suppliers would not have a material adverse effect on the Company. The Company is sensitive to price movements in its raw materials supply base and has not hedged against price fluctuations in commodity supplies, such as plastics and resins. While the Company may not be able to pass on any future raw materials price increases to customers, a significant portion of increased cost may be offset through volume purchase savings, value engineering/value analysis in conjunction with our major customers and reductions in the cost of off-quality products and processes. The Company may evaluate commodities hedging opportunities from time to time.

## Competition

The Company is a leading supplier in automotive molded carpet and acoustics, auto fabrics, convertible top systems and automotive plastics components and cockpits, within each segment. Customers rigorously evaluate suppliers on the basis of product, quality, price competitiveness, technical expertise and development capability, new product innovation, reliability and timeliness of delivery, product design capability, leanness of facilities, operational flexibility, customer service and overall management. Some competitors may have greater financial resources than the Company or a competitive advantage in the production of any given product that the Company manufactures, and there can be no assurance that the Company will be able to successfully compete in the markets for the products it currently provides.

## Joint Ventures

The Company participates in two certified minority business enterprises in the U.S. (Aguirre and Collins & Aikman Plastics, L.L.C., and Engineered Plastic Products, Inc.). These joint ventures play an important role in securing new business as automotive manufacturers continue to promote economic diversity by proactively increasing the amount of business they source to minority suppliers. These joint ventures were instrumental in our obtaining contracts with General Motors and Johnson Controls to supply them with various plastic components and systems for a number of vehicle models.

In connection with the TAC-Trim acquisition, the Company acquired a 50% interest in an Italian joint venture. Textron Automotive Holdings (Italy) S.r.L. is an Italian company that will offer interior and exterior automotive trim products to customers in Italy. Textron indirectly owns the other 50% of the Italian joint venture interests. A recent project of the Italian joint venture is to service certain cockpit needs for three new Fiat lines at a facility being built at Fiat's Cassina, Italy plant. The Company will not control the joint venture but will be required to provide certain administrative, technical and engineering services and to license certain patents and other know how to the Italian joint venture. The Company expects to receive certain fees and reimbursement of certain expenses in providing these services and licensing these rights. Refer to Item 7, "Management Discussion and Analysis of Financial Condition and Results of Operations" for additional discussion regarding a put and call arrangement that the Company entered into with respect to acquiring the remaining 50% interest in the Italian joint venture.

## Labor Matters and Employees

As of December 31, 2001, the Company's continuing operations employed approximately 25,850 persons on a full-time or full-time equivalent basis. Approximately 55% of such employees were represented by labor unions in the United States, Canada and other countries. Each facility has its own collective bargaining unit and management believes that our relations with our employees represented by labor unions and our other employees are generally good. From time to time in the ordinary course of our business, grievances are filed against the Company by employees and unions.

## Environmental Matters

A discussion of environmental matters is included in Item 3, "Legal Proceedings" and Item 7, "Management Discussion and Analysis of Financial Condition and Results of Operations" and in Note 21, "Commitments and Contingencies" of the financial statements included in this report.

## Item 2.  *Properties*

The Company has over 120 plants and facilities in North America, South America, Europe and Asia. Approximately 70% of the total square footage of these facilities is owned and the remainder is leased. Many facilities are strategically located to provide product delivery to our customers on a just-in-time basis.

### Facilities by Geographic Region

| Type of Facility | North America | South America | Europe | Asia | Total |
|---|---|---|---|---|---|
| Manufacturing | 59 | 5 | 24 | — | 88 |
| Design, Research & Development, and Technical Centers | 14 | — | 8 | — | 22 |
| Sales Branches, Offices, Other | 19 | — | 7 | 2 | 28 |
| Total(1) | 92 | 5 | 39 | 2 | 138 |

(1) Total facilities shown per the table exceeds the 120 plants and facilities indicated above because certain facilities listed in the table serve in more than one of the indicated capacities.

## Item 3.  *Legal Proceedings*

Except as described below, the Company and its subsidiaries are not party to any material pending legal proceedings, but is involved in ordinary routine litigation incidental to the business.

*Environmental:*  The Company is subject to federal, state, local and foreign environmental, and health and safety, laws and regulations that (i) affect ongoing operations and may increase capital costs and operating expenses in order to maintain compliance with such requirements and (ii) impose liability relating to contamination at facilities, and at other locations such as former facilities, facilities where we have sent wastes for treatment or disposal, and other properties to which the Company may be linked. Such liability may include, for example, investigation and clean-up of the contamination, personal injury and property damage caused by the contamination, and damages to natural resources. Some of these liabilities may be imposed without regard to fault, and may also be joint and several (which can result in a liable party being held responsible for the entire obligation, even where other parties are also liable).

Management believes that it has obtained, and is in material compliance with those material environmental permits and approvals necessary to conduct our various businesses. Environmental compliance costs for continuing businesses are accounted for as normal operating expenses or capital expenditures. Environmental compliance costs relating to conditions existing at the time of an acquisition are generally charged to reserves established in purchase accounting. The Company accrues for environmental remediation costs when such obligations are known and reasonably estimable. In the opinion of management, based on the facts presently

known to it, such environmental compliance and remediation costs will not have a material effect on the business, consolidated financial condition, future results of operations or cash flows.

The Company is legally or contractually responsible or alleged to be responsible for the investigation and remediation of contamination at various sites, and for personal injury or property damages, if any, associated with such contamination. At some of these sites the Company has been notified that it is a potentially responsible party ("PRP") under the federal Superfund law or similar state laws. The Company may be identified in other sites in the future and may be responsible for contamination, including with respect to divested and acquired businesses.

The Company is currently engaged in investigating or remediating certain sites. In estimating cost of investigation and remediation, the Company considered, among other things, prior experience in remediating contaminated sites, remediation efforts by other parties, data released by the United States Environmental Protection Agency ("USEPA"), the professional judgment of the Company's environmental experts, outside environmental specialists and other experts, and the likelihood that other identified PRPs will have the financial resources to fulfill their obligations at sites where they may be jointly and severally liable. It is difficult to estimate the total cost of investigation and remediation due to various factors including:

- incomplete information regarding particular sites and other PRPs;

- uncertainty regarding the nature and extent of environmental problems and our share, if any, of liability for such problems;

- the ultimate selection among alternative approaches by governmental regulators;

- the complexity and evolving nature of environmental laws, regulations and governmental directives; and

- changes in cleanup standards.

The Company has established reserves for environmental investigation and non-capital remediation costs. Management believes such reserves comply with generally accepted accounting principles. The Company records reserves for these environmental costs when litigation has commenced or a claim or assessment has been asserted or is imminent, the likelihood of an unfavorable outcome is probable, and the financial impact of such outcome is reasonably estimable. As of December 31, 2001, total reserves for these environmental costs are approximately $59.6 million. Approximately half of those environmental reserves are for the three sites discussed below. The balance relates to approximately 40 additional locations where the Company is participating in the investigation or remediation of the site, either directly or through financial contribution or where the company is alleged to be responsible for costs of investigation or remediation.

The Company is implementing a 1991 Administrative Order issued by USEPA concerning the remediation of soil and groundwater contamination associated with the Stamina Mills Superfund Site in North Smithfield, Rhode Island. Although the outcome of ongoing litigation with the government could reduce this expense, the environmental reserve assumes that we will have full responsibility for this matter. In addition, in March 2001 the Company received notice of a suit filed in Rhode Island state court on behalf of a person alleging medical conditions caused by exposure over a number of years, through drinking water and otherwise, to a chlorinated solvent in contaminated groundwater associated with the site. The Company filed an answer denying liability. Although management believes the Company has significant defenses, the suit is in its early stages.

The Company is also implementing a 1990 Administrative Order by Consent with the New Hampshire Department of Environmental Services (DES) concerning the investigation and remediation of the Cardinal Landfill. Among other things, the Company also paid for alternative water supplies to residences impacted by groundwater contamination associated with the landfill and investigation and, if necessary, remediation of off-site impacts from the landfill. The DES is in the process of selecting a remedy to address conditions at the landfill. Concern about conditions in the soil and groundwater at and in the vicinity of the site have prompted a lawsuit in state court, on behalf of several families that reside in a mobile home park near the landfill, against the park owner. Although the Company believes it would have significant defenses, no assurance can be given

12

that litigation will not be brought against the Company arising out of the contamination or, if so, that the matter would be resolved in a way that is not material.

As a result of the TAC-Trim acquisition, the Company is also one of 11 PRPs implementing a 1993 Consent Decree with USEPA and the State of New Hampshire concerning the remediation of soil, groundwater and sediment contamination associated with the Dover Municipal Landfill Superfund Site in Dover, New Hampshire. Under a related 1997 Administrative Order on Consent with the USEPA, the PRPs are in the process of assessing a possible alternative to the remedy previously selected for this site.

In the opinion of management, based on information presently known to it, identified environmental costs and contingencies will not have a material adverse effect on the consolidated financial condition or future results of operations. However, no assurance can be given that management has identified or properly assessed all potential environmental liability arising from the Company's business or properties, and those of present and former subsidiaries and their corporate predecessors.

During 2001, the Company received payments of $14.5 million on environmental claims related to discontinued operations. Of the $14.5 million in payments, the Company recorded $8.8 million, net of income taxes, as income from discontinued operations.

During 2000, the Company settled claims for certain other environmental matters related to discontinued operations for a total of $20.0 million. Settlement proceeds are being paid to the Company in three installments. Installments of $7.5 million were received in both 2000 and 2001. The Company anticipates receiving the final payment of $5.0 million on June 30, 2002. Of the $20.0 million settlement, the Company recorded the present value of the settlement as $7.0 million of additional reserves, based on its assessment of potential environmental exposures, and $6.6 million, net of income taxes, as income from discontinued operations.

*Other Claims:*   As of March 18, 2002, the Company is party to approximately 662 pending cases alleging personal injury from exposure to asbestos containing materials used in boilers manufactured before 1966 by former operations of the Company which were sold in 1966. Asbestos-containing refractory bricks lined the boilers and, in some instances, the Company's former operations installed asbestos-containing insulation around the boilers. These pending cases do not include cases that have been dismissed or are subject to agreements to dismiss due to the inability of the plaintiffs to establish exposure to a relevant product and cases that have been settled or are subject to settlement agreements. Total settlement costs for these cases have been less than $85,000 or an average of less than $2,500 per settled case. The defense and settlement costs have been substantially covered by our primary insurance carriers under a claims handling agreement that expires in August 2006. The Company has primary, excess and umbrella insurance coverage for various periods available for asbestos-related boiler and other claims. The Company's primary carriers have agreed to cover approximately 80% of certain defense and settlement costs up to a limit of approximately $70.5 million for all claims made, subject to reservations of rights. The excess insurance coverage, which varies in availability from year to year, is approximately $620 million in aggregate for all claims made. Based on the age of the boilers, the nature of the claims and settlements made to date, and the insurance coverage, management does not believe that these cases will have a material impact on the Company's financial condition, results of operations or cash flows. However, it cannot assure that the Company will not be subjected to significant additional claims in the future, that insurance will be available as expected or that unanticipated damages or settlements in the future would not exceed insurance coverage.

**Item 4.   *Submission of Matters to a Vote of Security Holders***

None during the fourth quarter of 2001

**Item 5.   *Market for Registrant's Common Equity and Related Stockholder Matters***

The Company's Common Stock has been traded on the New York Stock Exchange under the symbol "CKC" since July 7, 1994. At March 20, 2002, there were approximately 12,000 beneficial holders. The

following table lists the high and low closing prices for the Common Stock for the full quarterly periods during the two most recent years.

| | 2001 | | 2000 | |
|---|---|---|---|---|
| | High | Low | High | Low |
| First Quarter | 5.6875 | 3.5800 | 6.1250 | 4.5000 |
| Second Quarter | 6.2000 | 4.0500 | 7.0000 | 5.1250 |
| Third Quarter | 8.5700 | 3.9500 | 6.1250 | 4.6875 |
| Fourth Quarter | 10.3000 | 4.7600 | 4.9375 | 2.8750 |

During the first quarter of 2001, Heartland acquired a controlling interest in the Company. As part of the transaction, Heartland purchased 25 million shares of common stock (of which approximately 8.49 million shares were treasury shares) directly from the Company. Heartland is entitled to designate a majority of the Company's Board of Directors. Mr. McCallum and Mr. Becker were elected to the Board of Directors and Textron has the right to name one of the directors. Heartland has been a significant source of recent equity financing. There can be no assurances that Heartland will provide us with additional equity financing in the future. The Company also issued 79.8 million shares of common stock in relation to the acquisition of Becker Group, LLC, Joan Fabrics and Tac-Trim. See Note 3, "Acquisitions and Joint Ventures" of the financial statements included in this report.

On December 31, 2001, Heartland owned approximately 40% of the outstanding shares; Blackstone Partners and WP Partners owned approximately 15%; Joan Fabrics Corp. and Mr. Elkin McCallum and associates owned approximately 8%; Mr. Charles E. Becker approximately 11% and Textron owned approximately 11%.

Although the Company's common stock is publicly traded, the small public float of C&A common stock and registration rights granted to certain C&A stockholders, may preclude C&A from being able to issue common stock in a future public offering. Blackstone and certain of its affiliates, Wasserstein and certain of its affiliates, Heartland and certain of its affiliates, Charles E. Becker, Joan Fabrics Corporation, Textron and certain other co-investors in the TAC-Trim acquisition are entitled to demand registration rights and "piggy-back" registration rights at various times with respect to Company common stock held by them. Based on a review of Schedule 13Ds filed by the respective parties through March 20, 2002 and other information available to the Company, these parties, in the aggregate, hold approximately 160 million shares of Company common stock.

The Company has paid no dividends or made similar distributions with respect to its common stock during 2001. Any payment of future dividends and the amounts thereof will be dependent upon the Company's earnings, financial requirements and other factors deemed relevant by the Company's Board of Directors. Certain restrictive covenants contained in the agreements governing the Company's credit facilities and senior subordinated notes limit the Company's ability to make dividend and other payments. See "ITEM 7. Management's Discussion and Analysis of Financial Condition and Results of Operations — Liquidity and Capital Resources" and Note 10, "Long-Term Debt, Mandatorily Redeemable Preferred Stock and Short-Term Borrowings" of the financial statements included in this report.

## Item 6.  *Selected Financial Data*

| | Fiscal Year Ended (1) | | | | |
|---|---|---|---|---|---|
| | December 31, 2001 | December 31, 2000 | December 25, 1999 | December 26, 1998 | December 27, 1997 |
| | (in millions, except per share data) | | | | |
| **Statement of Operations Data:** | | | | | |
| Net Sales . . . . . . . . . . . . . . . . . . . . . . . . | $1,823.3 | $1,901.8 | $1,898.6 | $1,825.5 | $1,629.3 |
| Gross Margin . . . . . . . . . . . . . . . . . . . . | 218.8 | 266.6 | 284.7 | 248.2 | 233.2 |
| Selling, general and administrative expenses (excluding goodwill amortization) . . . . . . . . . . . . . . . . . . | 157.3 | 151.4 | 145.8 | 142.7 | 119.4 |
| Restructuring charge and impairment of long-lived assets (2) . . . . . . . . . . | 18.8 | — | 33.4 | — | 22.6 |
| Goodwill amortization . . . . . . . . . . . . . | 7.1 | 7.1 | 7.0 | 7.0 | 6.7 |
| Operating income . . . . . . . . . . . . . . . . | 35.6 | 108.1 | 98.5 | 98.5 | 84.5 |
| Interest expense, net(3) . . . . . . . . . . . . | 84.3 | 96.6 | 92.1 | 82.0 | 77.6 |
| Subsidiary Preferred Stock Requirements . . . . . . . . . . . . . . . . . . | 2.4 | — | — | — | — |
| Loss on sale of receivables(4) . . . . . . | 10.8 | 9.2 | 5.4 | 6.1 | 4.7 |
| Income (loss) from continuing operations before Income taxes . . . . | (68.3) | 0.8 | (1.2) | 5.2 | 2.9 |
| Income tax expense (benefit) . . . . . . . | (18.6) | 2.2 | 0.2 | 5.3 | 13.0 |
| (Loss) from continuing operations . . . | (49.7) | (1.4) | (1.4) | (.1) | (10.1) |
| Income from discontinued operations, including disposals, net of income taxes . . . . . . . . . . . . . . . . . . . . . . . . . | 8.8 | 6.6 | — | — | 166.0 |
| Income (loss) before extraordinary items and cumulative effect of a change in accounting principle . . . . | (40.9) | 5.2 | (1.4) | (.1) | 156.0 |
| Net income (loss)(5) . . . . . . . . . . . . . . | (46.2) | 4.5 | (10.2) | (3.8) | 155.2 |
| **Per Share Data:** | | | | | |
| (Loss) from continuing operations per basic and diluted share . . . . . . . | (0.51) | (0.03) | (0.02) | — | (0.15) |
| Dividends per share . . . . . . . . . . . . . . | — | — | 0.81 | — | — |
| **Balance Sheet Data (at period end):** | | | | | |
| Total assets . . . . . . . . . . . . . . . . . . . . . | $2,993.4 | $1,280.3 | $1,348.9 | $1,382.2 | $1,302.4 |
| Long-term debt, including current portion . . . . . . . . . . . . . . . . . . . . . . . | 1,301.9 | 884.0 | 912.5 | 866.0 | 772.9 |
| Common stockholders' equity (deficit) . . . . . . . . . . . . . . . . . . . . . . | 374.7 | (154.9) | (151.1) | (79.8) | (66.9) |
| **Other Data (from Continuing Operations):** | | | | | |
| Capital expenditures . . . . . . . . . . . . . . | $ 54.5 | $ 69.0 | $ 86.4 | $ 95.8 | $ 56.5 |
| Depreciation and amortization . . . . . . | 81.8 | 74.8 | 71.5 | 67.1 | 58.8 |

---

(1)  The year 2001 was a calendar year; fiscal year 2000 had 53 weeks; all other fiscal years had 52 weeks.

(2)  In 2001, the Company recorded a restructuring charge consisting of $7.6 million in asset impairments and $11.2 million primarily related to severance accruals. In 1999, the Company recorded a restructuring charge consisting of $13.4 million in asset impairments and $20.0 million primarily related to severance accruals. In 1997, the Company wrote down fixed assets by $5.1 million and reduced goodwill by $17.5 million to reflect impairments in the carrying values of certain assets and goodwill associated with two of its manufacturing facilities.

(3)  Excludes amounts allocated to discontinued operations totaling $12.5 million in 1997. No amounts were allocated to discontinued operations in 2001, 2000, 1999 and 1998.

(4)  Excludes amounts allocated to discontinued operations totaling $0.6 million in 1997. No amounts were allocated to discontinued operations in 2001, 2000, 1999 and 1998.

(5)  In 1999, the Company recorded an $8.8 million charge for the cumulative effect of a change in accounting principle related to start-up costs.

15

**Item 7.**   *Management's Discussion and Analysis of Financial Condition and Results of Operations*

**General**

The Company is a global leader in the design, engineering and manufacturing of automotive interior components, including instrument panels, fully assembled cockpit modules, floor and acoustic systems, automotive fabric, interior trim and convertible top systems. The Company has the number one or two North American market share position in seven out of ten major automotive interior categories tracked by CSM Worldwide and is also the largest North American supplier of convertible top systems. As a result of the TAC-Trim acquisition, the Company became a leading global supplier of fully assembled cockpit modules, a growing market segment. Sales are primarily made to North American and European automotive OEMs and Tier I total interior integrators. In North America, the Company manufactures components for approximately 90% of all light vehicle production platforms. The automotive supply industry in which the Company competes is cyclical and is influenced by the level of North American and European vehicle production.

The Company's net sales in 2001 were $1,823.3 million compared to $1,901.8 million in 2000. In fiscal year 2000, the Company changed its year-end to a calendar year-end. The 2000 fiscal year consisted of 53 weeks. Capitalized terms that are used in this discussion and not defined herein have the meanings assigned to such terms in the Notes to Consolidated Financial Statements.

In February 2001, Heartland acquired a controlling interest in C&A. Heartland is a private equity firm formed to focus on investments in industrial companies. As a result of the transaction, Heartland is entitled to designate a majority of the Company's Board of Directors. Heartland's strategy is to facilitate the growth of its controlled companies through acquisitions and internal growth. Since Heartland's initial investment in February 2001, the Company has aggressively pursued acquisitions in furtherance of its strategy to become a prime contractor to Tier I integrators and OEMs.

**Recent Acquisitions**

The Company completed three key acquisitions in 2001. The acquisition of Becker Group L.L.C. (Becker), a leading supplier of plastic components to the automotive industry, was completed in July 2001; the acquisition of Joan Automotive Fabrics (Joan), a leading supplier of body cloth to the automotive industry, and Joan's affiliated yarn dyeing operation, Western Avenue Dyers, L.P., in September 2001. The Becker and Joan acquisitions were financed through issuances of the Company's common stock, warrants to purchase the Company's common stock, cash on hand and borrowings under a revolving credit facility and sales of the acquired companies' accounts receivable under the receivables facility. The TAC-Trim acquisition completed in December 2001, the refinancing of the Company's then existing credit agreement and the replacement of the receivables facility were funded through the offering of $500 million in notes, the issuance of $160 million of the Company's common stock for cash, borrowings under a new senior secured credit facility and sales of receivables under a new receivables facility. The Company also issued to Textron, the seller, 18 million shares of the Company's common stock and 0.3 million shares of preferred stock with an estimated fair value at the time of the acquisition of $160.9 million and $146.8 million respectively. Commitments under the new senior secured credit facility total $575.0 million, and are comprised of $400.0 million of term loans, and a $175.0 million revolving credit facility that allows funding of up to $75.0 million for Canadian subsidiaries in Canadian dollars.

These acquisitions and financing transactions will substantially increase revenues and cash flow and have materially altered the Company's capital and operating structure. As a result of these acquisitions and financing transactions, historical results of operations are not necessarily indicative of future results and will not be comparable. Key ratios and indicators may change as a result of the acquisitions. For example, while cockpit sales are expected to comprise an increasing portion of gross revenues, cockpits generally have a lower gross margin, partially offset by lower selling, general and administrative expenses. The cockpit business is generally less asset-intensive then the Company's traditional businesses. Additionally, the integration of these three acquisitions into the Company will be challenging and the Company may not realize any or all of the cost savings or benefits that it expects.

## Results of Operations

### *2001 Compared to 2000*

*Net Sales:*  Net sales for 2001 decreased 4.1% to $1,823.3 million, down $78.5 million from 2000. Excluding the favorable impact of sales from acquired businesses during 2001 of approximately $127.2 million, net sales would have decreased 10.8%. The reduction in net sales, excluding the effect of acquisitions, was primarily driven by a decrease in North American vehicle production of 10% versus 2000. The Company was particularly adversely impacted by the recession and declining consumer confidence as well as by the recent terrorist attacks in the United States. These factors led to substantially reduced inventory levels at the Company's customers in the fourth quarter as customers sold vehicles in an uncertain and difficult economic environment. Sales for the 2001 period were also impacted by customer price reductions, and weaker Canadian and European currencies, partially offset by increased content and volume on certain North American vehicles.

Net sales for North America Automotive Interior Systems (NAAIS) during 2001 were down 2.6% to $1,145.0 million, a decrease of $30.6 million from fiscal 2000. Excluding the favorable impact of sales from the Tac-Trim and Becker acquisition during 2001 of approximately $95.8 million, net sales would have decreased 10.8%. While the decline in net sales, excluding the effect of the Becker acquisition, is consistent with North American vehicle production, we benefited from increased acoustics content on the Ford Explorer and Chrysler Minivans, and higher volumes on GM's GMT 800 Series trucks versus the prior year. These increases were more than offset by greater volume reductions on the Cadillac Deville and other GM passenger cars, and the Ford Taurus and Econoline, where the Company has significant plastics content.

Net sales for European Automotive Interior Systems (EAIS) were down $26.3 million to $258.2 million during 2001, a decrease of 9.2% from fiscal 2000. The decrease in Europe was primarily due to the negative impact caused by changes in foreign currency exchange rates and customer price reductions. In addition, certain unprofitable product lines divested in the second half of 2000 as part of the closure of the Vastra Frolunda plant in 2000 accounted for the remaining decline in 2001.

Net sales for the Specialty Automotive Products division decreased 4.9% to $420.1 million in 2001, down $21.6 million from 2000. Excluding the favorable impact of sales from the Joan acquisition during 2001 of approximately $31.4 million, net sales would have decreased 12.0%. The decrease, excluding the impact of the Joan acquisition, was due primarily to lower North American vehicle production and a reduction in headliner fabric business offset partially by increased Chrysler Sebring and Ford Thunderbird convertible volumes, as compared to fiscal 2000.

*Gross Margin:*  For 2001, gross margin was 12.0%, down from 14.0% in 2000. This decrease is primarily a result of decreased operating leverage related to lower volumes in both North America and Europe. Additionally, during 2001 gross margin was adversely impacted by the following items:

- *TAC-Trim Acquisition:*  Due to the closing of the TAC-Trim acquisition on December 20, 2001, the Company incurred eleven days of fixed costs during a normal industry shutdown period with less than $6 million in sales. This resulted in a gross margin loss for the eleven days of $4.2 million.

- *Launch Costs:*  The Company incurred launch costs during the second and third quarters of 2001 related to the Ford Thunderbird convertible program in the Company's Specialty Automotive Products division. In Europe, the Company's plastics facility in the UK experienced difficulties principally related to an outside paint supplier on the launch of the new BMW R50 (Mini) program during the second half of 2001.

- *Integration Costs:*  The Company incurred $2.5 million of costs during the fourth quarter of 2001 related to acquisition integration. The majority of these costs related to the Becker and Joan acquisitions.

- *Facility Closure Costs:*  In addition, during 2001, the Company incurred $2.5 million of costs related to the sale of the retail/commercial floormat business in North America and the shutdown of a small accessory floormat facility.

These unfavorable items as well as the impact of customer price reductions were partially offset by purchasing savings, commercial recoveries and improvements in operating performance at NAAIS and our fabrics operations.

*Selling, General and Administrative Expenses:*  Selling, general and administrative expenses for 2001 were $164.4 million, compared to $158.5 million in 2000. Relative to 2001, the comparable 2000 period included an extra week of costs due to the fiscal year change mentioned earlier. The increase is primarily due to additional costs assumed from acquisitions ($7.4 million), credits in 2000 relating to a pension related actuarial benefit and the sale of property (totaling $2.0 million) and additional expense in 2001 related to management incentive compensation plans of $3.0 million. These items more than offset the benefit in 2001 of cost reductions from earlier restructuring programs and reduced spending. As a percentage of sales, selling, general and administrative expenses were 9.0% and 8.3% for 2001 and 2000, respectively.

*Restructuring Charge:*  During 2001, the Company undertook two restructuring programs resulting in charges totaling $18.8 million. The goal of the first quarter of 2001 restructuring program (charge of $9.2 million) was to de-layer management in the North American, European and Specialty operations. The second program resulted in a fourth quarter charge of $9.6 million. The objective of this program was to downsize three facilities in North America via better utilization of manufacturing and warehouse floor space (including associated headcount reductions) and to reduce headcount in our Mexican operations. The pre-tax $18.8 million charge includes $11.2 million of severance costs and $7.6 million of asset impairment charges.

*Operating Income Highlights by Division:*  Operating income at NAAIS declined to $73.9 million for 2001 from $87.2 million for the prior year. The decline in NAAIS operating income primarily reflected the impact of lower North American production volumes as well as customer price reductions and restructuring charges, partially offset by purchasing savings and improvements in operating performance at certain carpet and acoustic facilities in the United States. The results for 2001 also included costs of $3.2 million related to the sale of the retail/commercial floormat business and the shutdown of a small accessory floormat facility. These items were somewhat offset by commercial recoveries, changes in customer pricing accruals, incremental operating income from the Becker acquisition and benefits from restructuring actions.

Operating income at EAIS declined to a loss of $22.3 million for 2001 from income of $1.1 million for 2000. The decline in EAIS operating income primarily reflected the impact of product mix and customer price reductions along with the recognition of restructuring charges. Additionally, EAIS operating performance was adversely impacted by launch costs associated with the BMW R50 (Mini) during the second half of 2001 as well as a $1.1 million loss on the sale of a small metal pressing operation in the UK in the third quarter of 2001. Benefits from earlier restructuring programs and purchasing savings reduced the negative impact of these items.

Operating income at the Specialty Automotive Products division declined to $13.0 million for 2001 from $22.8 million for 2000. The decline in Specialty Automotive Products division operating income primarily reflects expenses incurred due to the ramp-up of the Chrysler Sebring convertible in the early part of 2001, the start-up of the new Ford Thunderbird convertible in mid-year 2001 and the impact of restructuring charges. Margins, as a percentage of sales, for the fabrics business remained consistent with 2000, as better operating performance and benefits of added volume from the Joan acquisition offset the margin impact of lower net sales driven by lower industry production and reduction in headliner fabric business.

*Interest Expense:*  Interest expense for 2001 decreased $12.3 million to $84.3 million as compared to 2000. The decrease in interest expense is primarily attributed to lower average debt balances resulting from the Heartland Transaction, and lower borrowing rates in North America partially offset by increased amortization of debt issue costs resulting from the Heartland Transaction. The benefit of working capital reductions and sale and leaseback transactions also offset increased borrowings related to acquisitions.

*Loss on Sale of Receivables:*  The Company sells on a continuous basis, through its Carcorp subsidiary, an interest in a pool of accounts receivable. In connection with the sale of accounts receivables, a loss of $10.8 million was recognized during 2001, compared to a loss of $9.2 million for 2000. Included in the 2001 and 2000 losses were up-front fees related to the new accounts receivable facilities put in place during both

18

periods. In December 2001, the Company entered into a new larger facility in connection with the TAC-Trim acquisition, resulting in up-front fees of $5.6 million. During the first quarter of 2000, the Company incurred fees of $1.6 million associated with a new accounts receivable securitization replacing one that had expired. Excluding these expenses, the remaining decrease of $2.4 million, is primarily due to lower interest rates during 2001.

*Subsidiary Preferred Stock Requirements:* The Company's subsidiary, Collins & Aikman Products Co. ("C&A Products") issued to the seller preferred stock with a $326 million liquidation value and an estimated fair market value of $146.9 million in connection with the TAC-Trim acquisition. The 2001 charge represents dividends accrued of $1.5 million and accretion of discount of $0.9 million.

*Other Expense (Income):* The Company recognized other expense of $6.4 million in 2001, compared to other expense of $1.5 million in 2000. The increase in other expense resulted primarily from an $8.1 million loss on the sale and leaseback of real estate transactions completed during the second and fourth quarters of 2001, offset by a gain of $6.1 million on shares received as result of the Prudential Financial demutualization and Initial Public Offering. The remaining increase in expense is primarily due to higher foreign currency transaction losses.

*Income Taxes:* The Company recognized an income tax benefit of $18.6 million in 2001 compared to an income tax expense of $2.2 million in 2000. The overall effective tax rate for 2001 was 27.2 percent compared to 276 percent for 2000. Certain state taxes and permanent differences, that do not fluctuate with income, such as non-deductible goodwill and dividends and accretion of preferred stock impacted the effective rate by: (1) reducing the effective tax rate when a loss exists and a tax benefit is recorded, or (2) increasing the effective tax rate when we have income and tax expense is recorded.

*Discontinued Operations:* During 2001, the Company received payments on environmental claims related to discontinued operations of $14.5 million. During 2000, the Company settled claims for certain other environmental matters for $20.0 million. In fiscal 2001 and 2000, $8.8 million and $6.6 million were recorded as income from discontinued operations, respectively, net of income taxes of $5.7 million and $4.4 million, respectively.

*Extraordinary Charge:* During 2001 and 2000, the Company recognized extraordinary charges of $5.3 million and $0.7 million, respectively. Of the 2001 charge, $5.0 million represents a charge off of debt issue costs associated with our old credit facility, which was replaced by a new credit facility entered into in conjunction with the Company's TAC-Trim acquisition. In addition, during 2001 and 2000 charges were recorded in connection with the repurchase of JPS Automotive Senior Notes at prices in excess of carrying values of $0.3 million and $0.7 million, respectively.

*Net Income:* The combined effect of the foregoing resulted in a net loss of $46.2 million for 2001, compared to net income of $4.5 million in 2000.

## 2000 Compared to 1999

The Company's 2000 fiscal year consisted of 53 weeks as compared to a 52-week year in fiscal 1999. Therefore, all sales and associated costs and expenses were impacted by the longer reporting period in fiscal 2000. In a 53-week year, the Company's policy is to include the additional week in the first quarter of the year.

*Net Sales:* Net sales of $1,901.8 million for 2000 were relatively flat compared to the prior year. Net sales for the NAAIS division increased 2.1% to $1,175.6 million, up $23.9 million from 1999. The increase in sales was primarily driven by higher industry production volume as well as a favorable product mix. Net sales for the EAIS division decreased 7.1% to $284.5 million, down $21.9 million from 1999. This decrease was primarily due to the negative impact of foreign currency translation offset by slightly higher industry production volume. Net sales for the Specialty Automotive Products division were relatively flat with the prior year at $441.7 million. Production volume increases in the fabrics business were offset largely by lower convertible volumes, primarily due to a reduction in Chrysler Sebring production levels.

*Gross Margin:*   Gross margin was 14.0% in 2000, down from 15.0% in 1999. This decrease was primarily due to one-time costs related to various commercial customer recovery issues, performance issues at the Springfield operation, certain asset write-offs, lower convertible build volumes and operating issues relating to the relocation of headliner production to the Farmville facility. These decreases were partially offset by the benefits recognized from a restructuring program implemented in 1999 and 2000 and improved performance at the Manchester, Michigan plastics facility.

*Selling, General and Administrative Expenses:*   Selling, general and administrative expenses increased 3.8% to $158.6 million, up $5.8 million from 1999. The increase is primarily due to one-time costs related to the aforementioned commercial customer recovery issues and the impact of an additional week in the first quarter of fiscal 2000 partially offset by one-time pension-related actuarial benefits driven by the restructuring program and the reduction of the Company's bonus accrual. As a percentage of sales, selling, general and administrative expenses increased to 8.3% in 2000, compared to 8.0% in 1999.

*Operating Income Highlights by Division:*   Operating income for the NAAIS division decreased by 2.5% to $87.2 million, operating income for the EAIS division decreased to $1.1 million from $2.3 million and operating income for the Specialty Automotive Products division decreased by 42.4% to $22.8 million for the reasons described above.

*Restructuring Charge:*   the Company recognized a $33.4 million charge in 1999 relating to its 1999 reorganization plan.

*Interest Expense:*   Interest expense, net of interest income of $3.4 million and $2.5 million in 2000 and 1999, respectively, increased $4.6 million to $96.6 million in 2000. The increase is primarily attributed to higher average interest rates and higher average debt balances in 2000. The weighted average interest rates were 10.0% and 9.6% at December 31, 2000 and December 25, 1999, respectively.

*Loss on the Sale of Receivables:*   In connection with receivables sales, a loss of $9.2 million was recognized in 2000, compared to a loss of $5.4 million in 1999. During the first quarter of 2000, the Company entered into a new accounts receivable securitization arrangement resulting in one-time expenses for initial fees totaling $1.6 million. The remaining increase is due to higher interest rates and increased sales of eligible receivables. The prior securitization facility expired and a new facility came into effect on December 27, 1999.

*Other Expense:*   The Company recognized other expense of $1.5 million, compared to other expense of $2.2 million in 1999. The decrease is primarily due to lower option premiums resulting from a lower volume of hedging activity in 2000 offset, partially by increased foreign exchange transaction losses and higher losses from joint ventures in 2000.

*Income Taxes:*   The Company recognized income tax expense of $2.2 million in 2000, compared to income tax expense of $0.2 million in 1999. The Company's effective tax rate was 276% in 2000, compared to (22%) in 1999. The increase in the Company's effective tax rate is primarily due to the impact of prior year non-recurring tax credits, along with the effects of certain state taxes and non-deductible goodwill, which do not fluctuate with income.

*Discontinued Operations:*   In 2000, the Company settled environmental claims related to discontinued operations for a total of $20 million. Of this amount, $6.6 million was recorded as income from discontinued operations, net of income taxes of $4.4 million.

*Extraordinary Charge:*   In 2000, the Company recognized an extraordinary charge of $0.7 million, net of income taxes of $0.5 million, in connection with the repurchase of $38 million principal amount of JPS Automotive Senior Notes on the market at prices in excess of carrying values.

*Cumulative Effect of a Change in Accounting Principle:*   The Company adopted the provisions of Statement of Position No. 98-5, "Reporting on the Cost of Start-Up Activities" ("SOP 98-5") at the beginning of 1999. SOP 98-5 provides guidance on the financial reporting of start-up costs and organization costs and requires that all non-governmental entities expense the costs of start-up activities as these costs are incurred instead of being capitalized and amortized. The cumulative effect of adopting SOP 98-5 resulted in a charge of $8.8 million, net of income taxes of $5.1 million, in 1999.

*Net Income (Loss):*  The combined effect of the foregoing resulted in net income of $4.5 million in 2000, compared to a net loss of $(10.2) million in 1999, which included a restructuring charge of $33.4 million.

## Liquidity and Capital Resources

The Company and its subsidiaries had cash and cash equivalents totaling $73.9 million and $20.9 million at December 31, 2001 and December 31, 2000, respectively. The Company had $253.1 million of unutilized availability under its credit facility and the accounts receivable facility as of December 31, 2001. The total was comprised of $106.4 million under the Company's revolving credit facility (including $75.0 million available to certain Canadian subsidiaries), $118.6 under the accounts receivable facility and approximately $28.1 million under bank demand lines of credit in Canada, Austria, South America and other European locations. Availability under the revolving credit facility was reduced by outstanding letters of credit of $68.6 million as of December 31, 2001.

The Company's principal source of funds is cash generated from continuing operating activities, borrowings under credit agreement facilities, and the sale of accounts receivable under accounts receivable facilities and the issuance of common stock. The Company continues to seek means to generate additional cash for debt reduction and its growth strategy. Among other things, the Company seeks to further improve working capital management and continue to utilize a lease financing strategy.

### Operating Activities

Net cash provided by the continuing operating activities of the Company was $131.4 million for the year ended December 31, 2001, compared to $130.9 million for the year ended December 31, 2000. The increase in cash provided by operating activities is due primarily to the increase in cash generated from reductions in working capital (primarily facilitated by receivable collections at TAC-Trim and a decrease in inventory volumes), partially offset by a decrease in income from continuing operations.

### Investing Activities

During 2001, C&A Products entered into sale and leaseback transactions that generated net proceeds of $86.2 million. See the information under the heading "— Leases" for additional discussion.

As discussed above in "— Recent Acquisitions," during 2001 the Company completed several key acquisitions. Cash consideration, net of cash received and including acquisition fees, was $61.8 million for Becker, $102.0 million for Joan and $589.4 million for TAC-Trim.

Additional acquisition costs in the amount of $7.3 million resulted from purchasing the remaining 50% interest of a joint venture established in the UK to manufacture automotive interior fabrics and the acquisition of the remaining 25% interest in Collins & Aikman Carpet and Acoustics, SA. De C.V (an automotive supply operation primarily of acoustical and plastic components in Sweden, Belgium and France).

### Financing Activities

At December 31, 2001, the Company had total outstanding indebtedness of $1,301.9 million (excluding short-term borrowings and approximately $68.6 million of outstanding letters of credit) at a weighted average interest rate of 9.82% per annum. Comparatively, at December 31, 2000, the Company had total indebtedness of $884.0 million.

During 2001, Heartland, and certain other investors, acquired 57.0 million shares of common stock from the Company at a price of $5.00 per share, representing a cash investment in the Company of $285.0 million before fees and expenses. Net proceeds paid to the Company from the equity transactions were $264.3 million. A portion of the proceeds were used to pay $10.7 million in transaction related costs to obtain change in control consents, fees related to term loan facilities and other amendments to credit agreement facilities. The

remaining proceeds of $253.6 million were used to pay down a revolving credit facility and to fund part of the TAC-Trim acquisition.

During 2001, C&A Products used proceeds from an amended and restated credit facility to retire all outstanding JPS Automotive 11⅛% Senior Notes. The notes which were due June 2001, were repaid in full on March 28, 2001, at a redemption price equal to their principal amount with interest accrued to the redemption date. The Company recognized an extraordinary charge of $0.3 million in connection with this repurchase of the remaining outstanding JPS Automotive Senior Notes at prices in excess of carrying values. The amended and restated credit facility was repaid during 2001 with proceeds from various financing arrangements that the Company entered into as part of the TAC-Trim acquisition. These financing arrangements included entering into new Senior Credit Facilities and a new Receivables Facility along with the issuance of preferred stock of a subsidiary and Senior Notes due in 2011.

The new senior credit facility consists of a revolving credit facility and tranche A and tranche B term loan facilities. The revolving credit facility will provide for revolving loans and extensions of credit up to a maximum principal amount of $175.0 million. A portion of the revolving credit facility will be available to Canadian subsidiaries in Canadian dollars and a portion of the revolving credit facility will be available in the form of letters of credit. The tranche A facility is comprised of term loans in an aggregate principal amount of $100.0 million and the tranche B facility is comprised of term loans in an aggregate principal amount of $300.0 million. The revolving credit facility, the tranche A term loan and the tranche B term loan mature in December 2005. Borrowings under the new senior credit facilities will bear interest at variable rates based on a spread to the adjusted LIBOR or a base rate, at our option. At December 31, 2001 the company had $400 million in term loans outstanding under this facility.

On an ongoing basis, the Company has entered into an agreement to sell trade accounts receivable of certain business operations to a bankruptcy-remote, special purpose subsidiary, wholly owned by the Company. The Company's receivables subsidiary will, subject to certain conditions, from time to time, sell an undivided fractional ownership interest in a pool of domestic and certain Canadian receivables, up to a balance of $250 million, to bank-sponsored multi-seller commercial paper conduits under a committed facility. As of December 31, 2001, the Company had $118.6 million undrawn under the receivables facility.

New receivables will be added to the pool as collections reduce previously sold receivables. The Company expects to service, administer and collect the receivables on behalf of the receivables subsidiary and the conduits. The proceeds of sale will be less than the face amount of accounts receivable sold by an amount that approximates the purchaser's financing costs. The receivables facility has a term of 364 days, extendible for additional 364-day periods with the agreement of all parties. The new receivables facility will be an important source of ongoing liquidity to the Company. This facility could be extended on less favorable terms and if it were not extended, the Company may be unable to obtain a replacement facility or otherwise find an alternative source of funds providing it with comparable liquidity.

C&A Products issued Textron 182,700 shares of its series A redeemable preferred stock, 123,700 shares of series B redeemable preferred stock and 20,000 shares of series C redeemable preferred stock. The preferred stock was recorded at its estimated fair value of $146.9 million, which is less than the liquidation value of $1,000 per share or $326.4 million. The estimated fair value is based on market prices for securities with similar terms, maturities and risk characteristics, and includes a liquidation discount to reflect market conditions.

C&A Products also issued $500 million of 10¾% Senior Notes due in 2011 in connection with the TAC-Trim acquisition. The Company also amended the existing $400 million of 11½% senior subordinated notes due in 2006 to make each subsidiary guarantor of the Senior Notes a senior subordinated guarantor of the existing notes.

## Outlook

The Company's principal uses of funds from operating activities and borrowings for the next several years are expected to fund interest and principal payments on its indebtedness, net working capital increases, costs

22

associated with the Company's previously divested businesses, capital expenditures and lease expenses. The completion of the TAC-Trim acquisition on December 20, 2001 significantly increased debt levels and has added significant new liquidity requirements in order to launch part of TAC-Trim's projected new book of business and to finance capital expenditures at TAC-Trim. Management believes the recent inflow of capital, debt financings and related refinancings of indebtedness provide adequate sources of liquidity for the Company.

### Contractual Obligations:

Below is table that identifies the Company's significant contractual obligations. Following the table is a more detailed description of these obligations.

| | | Payment due by Period | | | |
|---|---|---|---|---|---|
| | Total | Less than 1 year | 1-3 years (in Millions) | 4-5 years | After 5 years |
| Long-Term Debt .................... | $1,301.9 | $19.5 | $ 51.4 | $731.0 | $500.0 |
| Preferred Stock* ................... | 326.4 | | | | 326.4 |
| Operating Leases ................... | 284.0 | 57.2 | 94.1 | 47.5 | 85.2 |
| Capital Expenditures ................ | 8.2 | 8.2 | | | |
| Total Obligations ................... | $1,920.5 | $84.9 | $145.5 | $778.5 | $911.6 |

\* Mandatorily Redeemable Preferred Stock of Subsidiary

### Senior Secured Credit Facilities

*General:*  As noted in the liquidity section, the Company entered into a new senior secured credit facility that allows funding in the aggregate of up to $575 million. Borrowings under the credit facility are secured by all the assets of the Company and C&A Products and certain subsidiaries of each, and are unconditionally and irrevocably guaranteed jointly and severally by the Company and each existing and subsequently acquired or organized domestic subsidiaries (other than by the Company's receivables subsidiary). Available funding under this credit facility is reduced if the program size or commitment level under the Company's new receivable facility (discussed below) exceeds $250.0 million.

*Interest Rates and Fees:*  Borrowings bear interest, at the Company's option, at either (a) adjusted LIBOR plus a 3.75% margin in the case of the revolving credit and tranche A facilities and 4.00% margin in the case of the tranche B facilities, in all cases subject to a minimum LIBOR of 3.00% or (b) the highest of (i) JPMorgan Chase Bank's prime rate, (ii) the federal funds effective rate plus 1/2 of 1.00% and (iii) the base CD rate plus 1.0%. A commitment fee on any unused commitments under the revolving portion of the credit facility equal to 1% per annum is payable quarterly in arrears and is subject to adjustment based on attaining certain performance targets.

*Covenants:*  The credit facility requires that the Company meet certain financial tests, including, without limitation, the following tests: a maximum leverage ratio, a minimum interest coverage ratio and certain prescribed limitations on capital expenditures at levels to be agreed upon between the Company and the agents. The credit facility also contains customary covenants and restrictions, including, among others, limitations or prohibitions on declaring dividends and other distributions, redeeming and repurchasing capital stock, prepaying, redeeming and repurchasing other indebtedness, loans and investments, additional indebtedness, liens, sale-leaseback transactions, preferred stock, capital expenditures, recapitalizations, mergers, acquisitions and asset sales and transactions with affiliates.

*Events of Default:*  The credit facility contains certain customary events of default, including, among others cross-default and cross-acceleration to other indebtedness (including to the receivables facility).

### 11½% Senior Subordinated Notes due 2006

C&A Products has outstanding $400 million in principal amount of 11½% senior subordinated notes due 2006. In connection with the TAC-Trim acquisition, the Company amended the indenture governing these notes to make each subsidiary guarantor of the 10¾% Senior Notes due in 2011 a guarantor of these notes on a senior subordinated basis. The indenture governing these notes contains restrictive covenants (including, among others, limitations on indebtedness, restricted payments, liens, asset dispositions, change of control and transactions with affiliates) that are customary for such securities.

### 10¾% Senior Notes due 2011

As discussed above, in connection with the TAC-Trim acquisition, Products sold $500,000,000 principal amount of 10¾% senior notes due 2011. The indenture governing these notes contains restrictive covenants (including, among others, limitations on indebtedness, restricted payments, liens, asset dispositions, change of control and transactions with affiliates) that are customary for such securities.

### Mandatorily Redeemable Preferred Stock of Subsidiary

*General:*    As discussed above, as part of the consideration paid to Textron for the TAC-Trim acquisition, C&A Products issued mandatorily redeemable preferred stock to Textron with an estimated fair market value of $146.9 million and a liquidation value of $326.4 million.

*Dividends:*    Holders of this preferred stock are entitled to receive dividends accruing on the liquidation preference thereof at a rate of 11% per annum, in respect of dividend periods ending on or prior to July 1, 2003, and 15% per annum, in respect of dividend periods ending after July 1, 2003, in the case of the series A preferred stock, 12% per annum, in respect of dividend periods ending on or prior to July 1, 2003, and 16% per annum, in respect of dividend periods ending after July 1, 2003, in the case of the series B preferred stock, 12% per annum, in respect of dividend periods ending on or prior to July 1, 2003, and 16% per annum, in respect of dividend periods ending after July 1, 2003 and in the case of the series C preferred stock, in each case payable quarterly in arrears, commencing on April 1, 2002 and accumulating from the date of issuance. C&A Products may, at its option, elect to accrue up to an amount equivalent to 7% per annum of the dividends on the series A preferred stock, an amount equivalent to 8% per annum of the dividends on the series B preferred stock and an amount equivalent to 8% per annum of the dividends on the series C preferred stock in lieu of cash payment of such dividends and, in each case, any accrued dividends will be added to the liquidation preference of the applicable series of preferred stock. Under certain circumstances, C&A Products may, at its option, at all times through and including January 1, 2004 accrue up to the full amount of all dividends on the preferred stock in lieu of cash payment of such dividends and, in each case, any accrued dividends will be added to the liquidation preference of the applicable series of preferred stock.

*Liquidation Preference:*    Upon any voluntary or involuntary liquidation, dissolution or winding-up of C&A Products, holders of the preferred stock will be entitled to be paid out of the assets of C&A Products available for distribution to stockholders in the amount of $1,000 per share plus the aggregate amount of accrued dividends prior to any distribution to any holders of equity securities which rank junior to the preferred stock. In addition, upon any voluntary or involuntary liquidation, dissolution or winding-up of C&A Products, the holders of series C preferred stock will be entitled to a participation in distributions to C&A Products' common equity tied to any appreciation in the value of C&A Products' common equity subsequent the issuance date, not to exceed an aggregate of $2 million for all series C preferred stock outstanding.

*Mandatory Redemption:*    C&A Products is required to redeem all of the series A preferred stock and series B preferred Stock outstanding on January 1, 2013 at a redemption price equal to 100% of the liquidation preference thereof, plus accrued and unpaid dividends to the date of redemption. C&A Products is also required to redeem all of the series C preferred stock outstanding on February 1, 2022 at a redemption price equal to 100% of the liquidation preference thereof, plus accrued and unpaid dividends to the date of redemption, plus common equity participation.

*Leases*

During 2001, C&A Products entered into sale and leaseback transactions for certain manufacturing equipment and non-manufacturing properties. The transactions resulted in the recognition of a $4.4 million net deferred asset that is being amortized over the lease term, and the recognition of an $8.7 million loss.

During 2001, the Company received net proceeds (after fees) of approximately $86.2 million from sale and leasebacks of real property and equipment, which it used to reduce outstanding debt. The aggregate lease expenses associated with these leases will be $88.8 million, $12.5 million of which relates to 2002. To the extent permitted by the credit facility, the Company may enter into additional similar leasing arrangements from time to time. As part of these sale-leaseback transactions, C&A Products sold and contemporaneously leased back real property from unrelated third parties, and received net proceeds (after fees) of $46.4 million.

In June 2001, the Company entered into sale-leaseback transactions with each of New King, L.L.C. ("New King") and Anchor Court, L.L.C. ("Anchor Court"), which are affiliates of Becker Ventures LLC. Becker Ventures is controlled by Charles Becker, a Company director. See the information under the heading "— Other Information — Effect of Transactions with Related Parties."

In connection with these sale-leaseback transactions, C&A Products sold and contemporaneously leased back real property located in Troy, Michigan and Plymouth, Michigan from New King and Anchor Court, respectively, for net proceeds of $15.1 million in aggregate. The initial lease term in each transaction is 20 years and each lease has two successive ten year renewal options. The basic rent for the Troy, Michigan property is $1.3 million per year, and the basic rent for the Plymouth, Michigan property is $.5 million per year. The rental rates in each case are subject to adjustment after expiration of the initial term.

Prior to the TAC Trim acquisition, TAC-Trim entered into an $86.9 million sale and leaseback transaction (the "Textron Leasing Transaction") with two separate single purpose affiliates of Textron Financial Corporation, as lessor and purchaser, with respect to a portfolio of manufacturing equipment situated in different locations throughout the United States and Canada. Payments under the Textron leasing transaction are guaranteed by C&A Products and secured by a first perfected mortgage lien over certain real property with a value equal to $25 million. Each lease is for an initial term of three years with three one-year renewal options. As is customary, the documentation for the Textron leasing transaction incorporates covenants by reference, from the Company's credit facility, that may be amended or waived by the senior lenders, and also contain events of default. See the information under the heading "— Other Information — Effect of Transactions with Related Parties."

The Company also has other equipment lease agreements with several lessors that, subject to specific approval, provide availability of funding for operating leases and sale and leasebacks as allowed in its other financing agreements.

Refer to Note 12, "Leases" of the financial statements included in this report for information regarding future minimum lease payments.

*Capital Expenditures*

The Company makes capital expenditures on a recurring basis for replacements and improvements. During 2001, the Company had approximately $54.5 million in capital expenditures for continuing operations. Capital expenditures will materially increase with the expanded book of business in 2002 and in future years will depend upon demand for our products and changes in technology. Estimates for capital expenditures in 2002 range from approximately $130 to $150 million. A portion of capital expenditures may be financed through leasing arrangements.

### Sources of Liquidity

The table below identifies the Company's significant sources of liquidity:

| | Maximum Amount Available | Less than 1 year | 1-3 years | 4-5 years | After 5 years |
|---|---|---|---|---|---|
| | | | **Availability Expiration Per Period** | | |
| | | | (in millions) | | |
| Receivable Facility . . . . . . . . . . . . . . . . . . | $250.0 | $250.0 | $— | $— | $— |
| Revolving Credit Facility(1) . . . . . . . . . . | 175.0 | — | — | 175.0 | — |
| Lines of Credit. . . . . . . . . . . . . . . . . . . . . . | 55.0 | 55.0 | — | — | — |
| Total Available  . . . . . . . . . . . . . . . . . . . . . | $480.0 | $305.0 | $— | $175.0 | $— |

(1) At December 31, 2001, $68.6 million of outstanding letters of credit reduce the maximum amount available under the Revolving Credit Facility.

### Receivables Facility

*General:*   As discussed above, in connection with the TAC-Trim acquisition, the Company entered into an agreement to sell, on an ongoing basis, the trade accounts receivable of certain business operations to a bankruptcy-remote, special purpose subsidiary, wholly owned and consolidated by the Company. The receivables subsidiary (Carcorp) will, subject to certain conditions, from time to time, sell an undivided fractional ownership interest in a pool of domestic and certain Canadian receivables, up to $250 million, to various multi-seller commercial paper conduits supported by a committed liquidity facility. Upon sale to the conduit, Carcorp will hold a subordinated retained interest in the receivables. Under the terms of the agreement, new receivables are added to the pool as collections reduce previously sold receivables. The Company expects to service, administer and collect the receivables on behalf of Carcorp and the conduit. The proceeds of sale will be less than the face amount of accounts receivable sold by an amount that approximates the purchaser's financing costs. The term of the receivables facility will initially be 364 days, and may be extended for additional 364-day periods with the agreement of all parties.

*Restrictions:*   This receivables facility contains certain restrictions on Carcorp (including maintenance of $60.0 million net worth) and on the sellers (including limitations on liens on receivables, modifications of the terms of receivables, and changes in credit and collection practices) customary for facilities of this type. The commitments under the receivables facility are subject to termination prior to their term upon the occurrence of certain events, including payment defaults, breach of covenants, including defined interest coverage and leverage ratios, bankruptcy, default by the Company in servicing the receivables and failure of the receivables to satisfy certain performance criteria.

### Commercial Commitments

Following is a discussion of significant commercial commitments of the Company.

*Letters of Credit:*   The Company acquired a 50% interest in an unconsolidated Italian joint venture as part of the TAC-Trim acquisition. The Italian joint venture will incur indebtedness in connection with its ongoing capital expenditure program to service three new vehicle lines of Fiat at Fiat's Cassina plant and other planned capital expenditures. The Company agreed to initially issue letters of credit of up to $10.0 million to support this debt. If such letters of credit are drawn, there can be no assurance that this Italian joint venture will have sufficient assets to reimburse the Company.

*Put and Call Arrangement:*   The Company entered into a put and call arrangement with respect to the 50% interest in the Italian joint venture. The arrangement permits Textron to require the Company to purchase Textron's interests in the joint venture for an aggregate of approximately $23.1 million, subject to an increase by $5.0 million under certain circumstances, after the third anniversary of closing. Additionally, the arrangement permits the Company to require Textron to sell its interests in the joint venture to the Company

for fair market value following the third anniversary of the closing. The Company cannot be sure that it will have adequate liquidity to satisfy any put, or exercise any call, of the Textron interest.

In addition, the Company's credit facility may restrict such further acquisition or any further financing of the joint venture. While the Company will be permitted, and required, to provide certain guarantees and letters of credit support, it may not be permitted to further finance the joint venture and this may adversely affect the value of the interests which the Company could be required to purchase at a fixed price in the future.

*Contingent Consideration and Purchase Price Adjustments:* Under the TAC-Trim acquisition agreement, the purchase price paid by the Company is subject to adjustment based upon working capital and debt levels and the seller is entitled to a return of any cash left in the business at closing and reimbursement of certain capital expenditures made by it after September 30, 2001. These payments may be considerable and are presently subject to review under the terms of the acquisition agreement. Becker Ventures holds 4.0 million shares of the Company which were acquired as part of the financing for the TAC-Trim acquisition. Mr. Becker is the managing member of Becker Ventures and holds a controlling interest in Becker Ventures.

As part of the TAC-Trim acquisition agreement, the Company may be obligated to make additional aggregate payments to Textron of \$15 million to \$125 million in the event that the Company's cumulative EBITDA (which is defined in the purchase agreement to adjust for the expected effect of acquisitions after the closing of the TAC-Trim acquisition and the related financings) for the five year period ending December 31, 2006 is between \$2,908 million and \$4,691 million.

If the Company's material debt instruments prohibit this payment, then it will be entitled to issue additional preferred stock having terms equivalent to the series B preferred stock, except that it will be required to mandatorily redeem such preferred stock at its liquidation preference, with accrued and unpaid dividends, at such time as, and to the extent that, it is permitted to do so under our material debt instruments. In addition, under the TAC-Trim acquisition agreement, the Company is permitted to use the "Textron" name for 18 months in exchange for payments of \$13.0 million on December 15, 2002 and \$6.5 million on December 15, 2003.

## Other Information

### Effects of Certain Transactions with Related Parties

#### Heartland Transactions

The Company is a party to a services agreement with Heartland under which Heartland provides it with advisory and consulting services, including services with respect to developments in the automotive industry and supply markets, advice on financial and strategic plans and alternatives and other matters as it may reasonably request and are within Heartland's expertise. The services agreement terminates on the earlier of its 10th anniversary or the date upon which Heartland ceases to own Company shares equivalent to 25% of that owned by them on February 23, 2001.

Under the services agreement, the Company is obligated to pay to Heartland a \$4.0 million annual advisory fee on a quarterly basis and to reimburse its out-of-pocket expenses related to the services it provides. The Company has also agreed to pay a fee of 1% of the total enterprise value of certain acquisitions and dispositions. In connection with Heartland's initial investment in the Company on February 23, 2001, it paid Heartland a fee of \$12.0 million and reimbursed it for its reasonable out-of-pocket expenses incurred in connection with its initial investment. A fee of \$12.5 million was paid by the company to Heartland as a result of its advisory services in connection with the TAC-Trim acquisition.

#### Charles E. Becker Transactions

In July 2001, the Company completed the acquisition of Becker. As a result of the Becker acquisition and a purchase of Company common stock immediately afterwards, Charles Becker became one of the Company's principal stockholders. Charles Becker became Vice Chairman and a member of the Company's Board of

Directors upon closing of the Becker acquisition. The Company agreed to make $18.0 million in non-compete payments over five years to Mr. Becker at the time of the acquisition. In addition, Becker Ventures, an affiliate of Mr. Becker, acquired additional shares of Company common stock as part of the financings in connection with the TAC-Trim acquisition at a price of $5.00 per share.

As discussed above under "—Leases," the Company is a party to certain sale-leaseback transactions with certain affiliates of Becker Ventures LLC, an entity that is controlled by Charles Becker, a director of the Company. The purpose of these sale-leaseback transactions was to reduce the Company's outstanding debt. The Company believes that the terms of the sale-leaseback transactions with Becker Ventures are on terms substantially similar to those which could have been negotiated in arms-length transactions of the same type. These sale-leaseback transactions were authorized by the independent members of the Company's board of directors.

### Elkin McCallum Transactions

In September 2001, the Company completed the acquisition of Joan Automotive Industries, a leading supplier of bodycloth to the automotive industry, and all of the operating assets of Joan's affiliated yarn dying operation, Western Avenue Dyers, L.P. As a result of the Joan acquisition, Joan Fabrics Corp., a company controlled by Elkin McCallum, became a principal stockholder of the Company. Upon completion of the Joan acquisition, Mr. McCallum became a member of the Company's Board of Directors.

In connection with the Joan acquisition, the Company entered into a Supply Agreement dated September 21, 2001 (the "Supply Agreement") with Main Street Textiles, L.P. ("Main Street"). Main Street is controlled by Elkin McCallum, a director of the Company. Under the Supply Agreement, the Company agreed to purchase all of its requirements for flat woven automotive fabric from Main Street for a five year period beginning on the date of the Supply Agreement. The prices which the Company will pay for fabric under the agreement will equal the costs of the raw materials plus an amount which represents Main Street's standard labor and overhead costs incurred in manufacturing fabric for us. During the term of the Supply Agreement, Main Street is prohibited from manufacturing automotive fabric products for third parties without the Company's prior consent but may sell seconds and close-out items in bona fide transactions. The Supply Agreement is also terminable by mutual written consent, upon the occurrence of certain events of bankruptcy, the appointment of a receiver or trustee, an assignment for the benefit of creditors, or in the event of a material breach. In addition, either party may terminate the Supply Agreement upon 270 days prior notice to the other party in the event that the parties are unable to agree on the pricing of fabric covered by the Supply Agreement.

The Company is also a party to a Transition Services Agreement dated September 21, 2001 with Joan Fabrics Corporation ("Joan Fabrics"), another company controlled by Mr. McCallum. Under this agreement Joan Fabrics will provide C&A Products with transitional and support services for a period not to exceed twelve months in order to support the continued and uninterrupted operation of the businesses acquired by C&A Products in the Joan acquisition. As a part of these services, pending the Company's disassembly and removal of machinery and equipment that we purchased from Joan Fabrics, Joan Fabrics will use that machinery and equipment to manufacture for us all of our requirements for some types of knitted and woven automotive fabrics. The terms of the Company's agreement with respect to this fabric production are substantially similar to those under the Supply Agreement.

Mr. McCallum became a related party as a result of the Joan acquisition. The terms of the Supply Agreement and the Transition Agreement were reached through arms-length negotiations prior to Mr. McCallum becoming a related party.

### Textron Transactions

As discussed above under "—Leases," "Business — Technology and Intellectual Property," "Business — Joint Ventures" and "—Put and Call Arrangement" the Company is a party to various agreements and transactions with Textron. Textron became a related party as a result of its receipt of the consideration in the TAC-Trim acquisition.

## Discontinued Operations

Net cash flows from discontinued operations in 2001 were $12.2 million, representing recoveries, net of cash outflows. However, the Company has significant obligations related to post-retirement, casualty, environmental, product liability, lease and other liabilities of discontinued operations. The nature of many of these contingent liabilities is such that they are difficult to quantify and uncertain in terms of amount. The company has accrued $10.0 million for casualty reserves, $38.9 million for post retirement costs and $40.7 million for environmental and product liability costs. Based upon the information available to management and the Company's experience to date, the Company believes that these liabilities will not have a material effect on our financial condition, results of operations or cash flows. In addition, the Company has primary, excess and umbrella insurance coverage for various periods that the Company expects to cover certain of these liabilities. However, there can be no assurances that contingent liabilities will not arise or that known contingent liabilities or related claims will not exceed the Company's expectations or that insurance will be available to cover these liabilities. Because the cash requirements of the Company's operations are substantially a function of these contingencies, it is possible that actual net cash requirements could differ materially from the Company's estimates.

## Recent and Future Reorganization Plans

In 1999 a reorganization was undertaken to reduce costs, improve operating efficiencies throughout the operations and to more effectively respond to the OEMs' demand for complete interior trim systems and more sophisticated components. In general, the reorganization involved, among other things; the reorganization of Company's operating segments, the closure or sale of various facilities, and the termination of approximately 1,000 employees.

Upon final completion of the 1999 reorganization plan, as modified in 2000, the Company recognized a pre-tax restructuring charge of $33.4 million, including $13.4 million of asset impairments, $15.0 million of severance costs and $5.0 million related to the termination of sales commission contracts.

During the first quarter of 2001, the Company undertook a restructuring program resulting in a charge of $9.2 million. The goal of this restructuring program is to further de-layer management in the North American, European and Specialty operations. The pre-tax $9.2 million charge includes $8.4 million of severance costs and $0.8 million of asset impairments.

During the fourth quarter of 2001, the Company incurred charges totaling $9.6 million including $2.8 million of severance costs and $6.8 million for the write-off of long-lived assets. The Company may elect to implement additional restructuring activities as opportunities to achieve cost savings arise in future periods.

## Equity Financing

Heartland has been a significant source of recent equity financing. There can be no assurances that Heartland will provide additional equity financing in the future. Although the Company's common stock is publicly traded, the small public float of Company common stock and registration rights granted to certain Company stockholders may preclude the Company from being able to issue common stock in a future public offering.

## Stock Repurchase Plan

At December 31, 2001, approximately $1.0 million remained authorized by the Company's Board of Directors to repurchase shares of the Company's common stock at management's discretion. The Company believes it has sufficient liquidity under its existing credit arrangements to effect the repurchase program. The Company made no repurchases during the fiscal 2001 compared to share repurchases of approximately $.5 million for fiscal 2000.

## Accounting Policies

The preparation of consolidated financial statements in conformity with accounting principles generally accepted in the United States of America requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the consolidated financial statements and the reported amounts of revenues and expenses during the reporting period. Considerable judgment is often involved in making these determinations, and therefore, actual results could differ from those estimates.

*Goodwill Impairment Testing:*  In June 2001, the FASB approved SFAS No. 142, "Goodwill and Other Intangible Assets" effective for fiscal years beginning after December 15, 2001. Under SFAS No. 142, goodwill will no longer be amortized. Amortization of goodwill resulting from business combinations initiated prior to July 1, 2001, will cease as of January 1, 2002, and beginning July 1, 2001, goodwill resulting from business combinations initiated after June 30, 2001 was not amortized. Beginning in 2002, all goodwill and intangible assets will be tested at least annually for impairment in accordance with the provisions of SFAS No. 142. The Company continues to review the provisions of SFAS No. 142, but cannot determine the complete impact of the standard until such time as it can complete the first-step of a two-step impairment test. The first-step will be performed by June 30, 2002. If an impairment loss were identified as a result of these tests, it would be reported as a cumulative effect of a change in accounting principle.

*Realization of Deferred Tax Assets:*  Assessing the need for and amount of a valuation allowance for deferred tax assets requires significant judgment. The fact that a benefit may be expected for a portion but not all of a deferred tax asset increases the judgmental complexity. Future realization of deferred tax assets ultimately depends on the existence of sufficient taxable income of the appropriate character in either the carryback or carryforward period under the tax law.

During 2001, Heartland acquired approximately 60 percent of the outstanding shares of the Company. This constituted a "change in control" that results in annual limitations on the Company's use of its NOLs and unused tax credits. This annual limitation on the use of NOLs and tax credits depends on the value of the equity of the Company and the amount of "built-in gain" or "built-in loss" in the Company's assets at the date of the "change in control". Based on the expiration dates of the NOLs and tax credits as well as anticipated levels of domestic income, management does not believe that the transaction will have a material impact on these deferred tax assets. Management has reviewed the Company's operating results for recent years as well as the outlook for its continuing operations and concluded that it is more likely than not that the net deferred tax assets of $141.7 million at December 31, 2001 will be realized.

Management took into consideration, among other factors, the expected impact of current year acquisitions, the impact of recent restructuring plans, and the infusion of cash from Heartland. These factors along with the timing of the reversal of its temporary differences, certain tax planning strategies and the expiration date of its NOLs were also considered in reaching this conclusion. The Company's ability to generate future taxable income is dependent on numerous factors, including general economic conditions, the state of the automotive industry and other factors beyond management's control. Therefore, there can be no assurance that the Company will meet its expectation of future taxable income.

*Environmental Contingencies:*  The Company is subject to federal, state, local and foreign environmental, and health and safety, laws and regulations that (i) affect ongoing operations and may increase capital costs and operating expenses in order to maintain compliance with such requirements and (ii) impose liability relating to contamination at facilities, and at other locations such as former facilities, facilities where the Company has sent wastes for treatment or disposal, and other properties to which the Company may be linked. Such liability may include, for example, investigation and clean-up of the contamination, personal injury and property damage caused by the contamination, and damages to natural resources. Some of these liabilities may be imposed without regard to fault, and may also be joint and several (which can result in a liable party being held responsible for the entire obligation, even where other parties are also liable).

Management believes that it has obtained, and is in material compliance with, those material environmental permits and approvals necessary to conduct the Company's various businesses. Environmental

compliance costs for continuing businesses are accounted for as normal operating expenses or capital expenditures, except for certain costs incurred at acquired locations. Environmental compliance costs relating to conditions existing at the time of an acquisition are generally charged to reserves established in purchase accounting. The Company accrues for environmental remediation costs when such obligations are known and reasonably estimable. In the opinion of management, based on the facts presently known to it, such environmental compliance and remediation costs will not have a material adverse effect on the Company's business, consolidated financial condition or future results of operations.

The Company is legally or contractually responsible or alleged to be responsible for the investigation and remediation of contamination at various sites, and for personal injury or property damages, if any, associated with such contamination. At some of these sites the Company has been notified that it is a potentially responsible party ("PRP") under the federal Superfund law or similar state laws. Other sites at which we may be responsible for contamination may be identified in the future, including with respect to divested and acquired businesses.

The Company is currently engaged in investigating or remediating certain sites. In estimating the cost of investigation and remediation, the Company has considered, among other things, prior experience in remediating contaminated sites, remediation efforts by other parties, data released by the United States Environmental Protection Agency ("USEPA"), the professional judgment of the Company's environmental experts, outside environmental specialists and other experts, and the likelihood that other identified PRPs will have the financial resources to fulfill their obligations at sites where they and the Company may be jointly and severally liable. It is difficult to estimate the total cost of investigation and remediation due to various factors including:

- incomplete information regarding particular sites and other PRPs;

- uncertainty regarding the nature and extent of environmental problems and the Company's share, if any, of liability for such problems;

- the ultimate selection among alternative approaches by governmental regulators;

- the complexity and evolving nature of environmental laws, regulations and governmental directives; and

- changes in cleanup standards.

The Company has established accruals for certain contingent environmental liabilities and management believes such reserves comply with generally accepted accounting principles. The Company records reserves for environmental investigatory and non-capital remediation costs when litigation has commenced or a claim or assessment has been asserted or is imminent, the likelihood of an unfavorable outcome is probable, and the financial impact of such outcome is reasonably estimable. As of December 31, 2001, total reserves for those contingent environmental liabilities are approximately $59.6 million.

In the opinion of management, based on information presently known to it, identified environmental costs and contingencies will not have a material adverse effect on our consolidated financial condition, future results of operations or cash flows. However, we can give no assurance that we have identified or properly assessed all potential environmental liability arising from our business or properties, and those of our present and former subsidiaries and their corporate predecessors.

*Allowance for uncollectible accounts:*  The allowance for uncollectibles provides for losses believed to be inherent within the company's "Accounts and Other Receivables," (primarily trade receivables and the retained interest in the receivables facility). Management evaluates both the creditworthiness of specific customers and the overall probability of losses based upon an analysis of the overall aging of receivables, past collection trends and general economic conditions. Management believes, based on its review, that the allowance for uncollectibles is adequate to cover potential losses. Actual results may vary as a result of unforeseen economic events and the impact those events could have on our customers.

*Valuation of Mandatorily Redeemable Preferred Stock of Subsidiary:*   The Company issued preferred stock as part of the consideration given to Textron in the TAC-Trim acquisition. The preferred stock is recorded at fair value, which is less than the liquidation value of $1,000 per share or $326.4 million. Since the preferred stock is not publicly traded the use of an estimated fair value was required. The Company estimated the fair value to be $146.9 million based on market prices for securities with similar terms, maturities and risk characteristics, and included a liquidation discount to reflect market conditions. The difference between the initial recorded value and the initial liquidation preference will be accreted over the life of the stock.

### Item 7A. *Quantitative and Qualitative Disclosures About Market Risk*

### Risk Management

The Company is exposed to market risk from changes in interest rates and foreign exchange rates. To mitigate the risk from these interest rate and foreign currency exchange rate fluctuations, the Company enters into various hedging transactions that have been authorized pursuant to policies and procedures. The Company does not use derivative financial instruments for trading purposes.

### Interest Rate Exposure

The Company's exposure to market risk for changes in interest rates relates primarily to the Company's variable rate debt obligations. While the Company has used interest rate swaps and other interest rate protection agreements to modify its exposure to interest rate movements and to reduce borrowing rates, no such agreements were in place at December 31, 2001.

The tables below provide information about the Company's derivative financial instruments and other financial instruments that are sensitive to changes in interest rates, including debt obligations. The table presents principal cash flows and related interest rates by expected maturity dates for the Company's debt obligations. The instrument's actual cash flows are denominated in U.S. dollars (dollar amounts in millions).

| | Expected Maturity Date | | | | | | | Fair Value December 31, 2001 |
|---|---|---|---|---|---|---|---|---|
| | 2002 | 2003 | 2004 | 2005 | 2006 | Thereafter | Total | |
| | | | | | (in millions) | | | |
| Debt: | | | | | | | | |
| Fixed rate ($US) . . . . . . . . . . | — | — | — | — | 400.0 | 500.0 | 900.0 | 830.5 |
| Average interest rate . . . . . . | — | — | — | — | 11.5% | 10.75% | | |
| Variable rate ($US) . . . . . . . . | 18.0 | 23.0 | 28.0 | 331.0 | — | — | 400.0 | 400.0 |
| Average interest rate . . . . . . . . | (A) | (A) | (A) | (A) | — | — | (A) | |

(A)  Borrowings bear interest at variable rates based on a spread to the adjusted LIBOR rate or, at the Company's option, a base rate. The Company is sensitive to interest rate changes and based upon amounts outstanding at December 31, 2001, a 0.5% increase in the weighted average interest rate (6.9% at December 31, 2001) would increase interest costs by approximately $2.0 million annually.

### Currency Rate Exposure

The Company is subject to currency rate exposure primarily related to foreign currency purchase and sale transactions and intercompany and third party loans. The primary purpose of the Company's foreign currency hedging activities is to protect against the volatility associated with these foreign currency exposures. The Company primarily utilizes forward exchange contracts and purchased options with durations of generally less than 12 months.

At December 31, 2001, the Company had outstanding the following foreign currency forward and option contract amounts (amounts in millions, except average contract rate):

| Currency (Pay) | Currency (Receive) | Contract Amount | Weighted Average Contract Rate Per Convention | Unrealized Gain (loss) |
|---|---|---|---|---|
| Euro .................... | GBP | $ 27.7 | 0.62202 GBP per EUR | 0.3 |
| GBP .................... | Euro | $ 15.4 | 0.61071 GBP per EUR | |
| GBP .................... | USD | $113.1 | 1.44536 USD per GBP | (0.5) |
| USD .................... | GBP | $ 13.0 | 1.43382 USD per GBP | 0.2 |
| Euro .................... | USD | $ 40.1 | 0.89524 USD per Euro | 0.3 |
| USD .................... | Euro | $   1.5 | 0.89799 USD per Euro | |
| CAD .................... | USD | $400.7 | 1.59286 CAD per USD | 2.1 |
| USD .................... | CAD | $ 21.1 | 1.57137 CAD per USD | (0.3) |
| SEK .................... | GBP | $ 38.3 | 15.69660 SEK per GBP | (1.1) |
| GBP .................... | SEK | $   4.1 | 15.31879 SEK per GBP | |
| SEK .................... | USD | $   1.7 | 10.73600 SEK per USD | |
| SEK .................... | Euro | $   0.9 | 9.74950 SEK per EUR | |
| MXN .................... | USD | $   2.8 | 9.85200 MXN per USD | (0.2) |

These amounts include option contracts with an aggregate notional amount of $122.2 million outstanding at December 31, 2001 with a weighted average strike price of $1.62 CAD per USD. For additional information on hedging activity see "Note 5. — Notes to Consolidated Financial Statements."

The information presented does not fully reflect the net foreign exchange rate exposure of the Company because it does not include the intercompany funding arrangements denominated in foreign currencies and the foreign currency-denominated cash flows from anticipated sales and purchases. Management believes that the foreign currency exposure relating to these items would substantially offset the exposure discussed above.

On January 1, 2001, eleven of the fifteen member countries of the European Union adopted the Euro as their common currency. The conversion did not have a material adverse effect on the Company's consolidated financial position or results of operations.

### Item 8.   *Financial Statements and Supplementary Data*

See the Consolidated Financial Statements of Collins & Aikman Corporation and subsidiaries included herein and listed on the Index to Financial Statements set forth in Item 14 (a) of this Form 10-K report.

### Item 9.   *Changes in and Disagreements with Accountants on Accounting and Financial Disclosure*

On April 10, 2001, the Company notified Arthur Andersen LLP that it was changing its independent accountants to PricewaterhouseCoopers LLP for the fiscal year ending December 31, 2001. The Audit Committee of the Board of Directors and the Board of Directors of the Company approved the decision to replace Arthur Andersen LLP. The Company's Annual Report on Form 10-K for the fiscal year ended December 31, 2000 was filed on April 2, 2001. It included financial statements covering each of the past two fiscal years ended December 31, 2000 and December 25, 1999, accompanied by the report of Arthur Andersen LLP. Such report did not include any adverse opinion or disclaimer of opinion, or any qualification as to audit scope or accounting principles.

During the fiscal years ended December 31, 2000 and December 25, 1999 there were no disagreements with Arthur Andersen LLP on any matter of accounting principles or practices, financial statement disclosure or audit scope. During this period, there were also no disagreements which, if not resolved to the satisfaction of Arthur Andersen LLP, would have caused them to make reference to the subject matter of such disagreement in their reports on the financial statements for such years.

During the fiscal years ended December 31, 2000 and December 31, 1999, PricewaterhouseCoopers LLP had not been engaged as an independent accountant to audit either the financial statements of the Company or any of its subsidiaries, nor had it been consulted regarding the application of the Company's accounting principles to a specified transaction, either completed or proposed, or the type of audit opinion that might be rendered on the Company's financial statements.

As a result of its 1999 audit, Arthur Andersen LLP reported material weaknesses in the Company's internal control systems. The identified conditions specifically related to four of the Company's foreign locations, most of which were recently acquired. These weaknesses were primarily attributable to the effects of implementing a new computer system as part of the Company's acquisition integration strategy and Year 2000 compliance efforts. Issues at these locations primarily related to the detail records supporting the general ledger and staff training needs. As a result, in 2000, the Company committed significant resources to addressing the issues, including the re-implementation of certain systems, implementing an internal audit function and replacing controllers at three of the four locations. The Company made significant progress in addressing these issues; however, Arthur Andersen LLP continued to report material weaknesses following its 2000 audit because two of these four foreign locations were assessed as continuing to have similar material weaknesses as in 1999. Improvement efforts at these locations were hampered by personnel turnover and continuing acquisition integration efforts.

Arthur Andersen LLP did not modify its report on the Company's 1999 and 2000 audited financial statements as a consequence of these material weaknesses.

The Company is continuing its efforts to address these matters and believes that it has corrected all these matters during 2001.

## PART III

### Item 10.  *Directors and Executive Officers of the Registrant*

There is incorporated herein by reference the information required by this Item in the Company's definitive proxy statement for the 2002 Annual Meeting of Stockholders which will be filed with the Securities and Exchange Commission no later than 120 days after the close of the year ended December 31, 2001.

### Item 11.  *Executive Compensation*

There is incorporated herein by reference the information required by this Item in the Company's definitive proxy statement for the 2002 Annual Meeting of Stockholders which will be filed with the Securities and Exchange Commission no later than 120 days after the close of the year ended December 31, 2001.

### Item 12.  *Security Ownership of Certain Beneficial Owners and Management*

There is incorporated herein by reference the information required by this Item in the Company's definitive proxy statement for the 2002 Annual Meeting of Stockholders which will be filed with the Securities and Exchange Commission no later than 120 days after the close of the year ended December 31, 2001.

### Item 13.  *Certain Relationships and Related Transactions*

There is incorporated herein by reference the information required by this Item in the Company's definitive proxy statement for the 2002 Annual Meeting of Stockholders which will be filed with the Securities and Exchange Commission no later than 120 days after the close of the year ended December 31, 2001.

# PART IV

## Item 14.  *Exhibits, Financial Statement Schedules and Reports on Form 8-K*

### (a)(1)  Financial Statements:

| | Page Number |
|---|---|
| Report of Independent Accountants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | F-1 |
| Report of Independent Public Accountants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | F-2 |
| Consolidated Statements of Operations for the fiscal years ended December 31, 2001, December 31, 2000 and December 25, 1999 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | F-3 |
| Consolidated Balance Sheets at December 31, 2001 and December 31, 2000 . . . . . . . . | F-4 |
| Consolidated Statements of Cash Flows for the fiscal years ended December 31, 2001, December 31, 2000 and December 25, 1999 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | F-5 |
| Consolidated Statements of Common Stockholders' Equity (Deficit) for the fiscal years ended December 31, 2001, December 31, 2000 and December 25, 1999 . . . . . . . . . . . | F-6 |
| Notes to Consolidated Financial Statements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | F-7 |

### (a)(2)  Financial Schedules:

The following financial statement schedules of Collins & Aikman Corporation for the fiscal years ended December 31, 2001, December 31, 2000, and December 25, 1999 are filed as part of this Report and should be read in conjunction with the Consolidated Financial Statements of Collins & Aikman Corporation.

| | Page Number |
|---|---|
| Schedule I — Condensed Financial Information of the Registrant . . . . . . . . . . . . . . . . . . . | S-1 |
| Schedule II — Valuation and Qualifying Accounts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | S-1 |

All other schedules, for which provision is made in the applicable accounting regulations of the Securities and Exchange Commission are omitted because they are not required, are inapplicable, or the information is included in the Consolidated Financial Statements or Notes thereto.

### (a) (3)  Exhibits:

Please note that in the following description of exhibits, the title of any document entered into, or filing made, prior to July 7, 1994 reflects the name of the entity, a party thereto or filing, as the case may be, at such time. Accordingly, documents and filings described below may refer to Collins & Aikman Holdings Corporation, Collins & Aikman Group, Inc. or Wickes Companies, Inc., if such documents and filings were made prior to July 7, 1994.

| Exhibit Number | Description |
|---|---|
| 2.1 | Agreement and Plan of Merger dated May 14, 2001 by and among Collins & Aikman Corporation, Collins & Aikman Products Co., Becker Group, L.L.C., CE Becker Inc., ME McInerney Inc., J Hoehnel Inc. and the individuals party thereto as sellers is hereby incorporated by reference to Exhibit 2.1 of Collins & Aikman Corporation's Current Report on Form 8-K dated July 13, 2001. |
| 2.2 | Agreement and Plan of Merger dated as of August 17, 2001 by and among Collins & Aikman Corporation, Collins & Aikman Products Co., JAII Acquisition Co., Elkin McCallum, Joan Fabrics Corporation and Joan Automotive Industries, Inc is hereby incorporated by reference to Exhibit 2.1 of Collins & Aikman Corporation's Current Report on Form 8-K dated September 21, 2001. |

| Exhibit Number | Description |
|---|---|
| 2.3 | First Amendment to Agreement and Plan of Merger by and among Collins & Aikman Corporation, Collins & Aikman Products Co., JAII Acquisition Co., Elkin McCallum, Joan Fabrics Corporation and Joan Automotive Industries, Inc dated as of September 21, 2001 is hereby incorporated by reference to Exhibit 2.2 of Collins & Aikman Corporation's Current Report on Form 8-K dated September 21, 2001. |
| 2.4 | Purchase Agreement dated as of August 7, 2001, as amended and restated as of November 30, 2001, by and among Textron Inc., Collins & Aikman Corporation and Collins & Aikman Products Co., including Exhibit 1 (Certificate of Designation of the 15% Series A Redeemable Preferred Stock, the 16% Series B Redeemable Preferred Stock and the 16% Series C Redeemable Preferred Stock) and Exhibit 7 (Asset Purchase Agreement dated as of August 7 by and between Textron Automotive Exteriors Inc. and JPS Automotive, Inc.), which is incorporated by reference to Collins and Aikman Corporation Current Report on Form 8-k dated December 20, 2001 and filed on January 4, 2002. The Table of Contents of the Purchase Agreement listed as Exhibit 2.4 contains a list briefly identifying the contents of all omitted schedules and exhibits. Collins & Aikman Corporation will supplementally furnish a copy of any omitted schedule or Exhibit to the Commission upon request. |
| 2.5 | Asset Purchase Agreement dated as of August 7, 2001, as amended and restated as of November 30, 2001, by and between Textron Automotive Exteriors Inc. and JPS Automotive, Inc., which is incorporated herein by reference to Exhibit 2.2 of Collins & Aikman Corporation's Current Report on Form 8-K dated December 20, 2001 and filed on January 4, 2002. |
| 2.6 | Asset Purchase Agreement dated as of August 17, 2001 by and among Collins & Aikman Products Co., Western Avenue Dyers, L.P., Elkin McCallum, Kerry McCallum, Penny Richards and Tyng Textiles LLC, which is incorporated by reference to Exhibit 2.3 to Collins & Aikman Corporation's Current Report on Form 8-K filed on October 4, 2001. |
| 2.7 | First Amendment to Asset Purchase Agreement dated as of September 21, 2001, which is incorporated by reference to Exhibit 2.4 to Collins & Aikman Corporation's Current Report on Form 8-K filed on October 4, 2001. |
| 3.1 | Restated Certificate of Incorporation of Collins & Aikman Corporation is hereby incorporated by reference to Exhibit 3.1 of Collins & Aikman Corporation's Report on Form 10-Q for the fiscal quarter ended June 26, 1999. |
| 3.2 | Certificate of Amendment to the Restated Certificate of Incorporation of Collins & Aikman Corporation, which is incorporated by reference to Exhibit 3.2 of Collins & Aikman Corporation's Annual Report on Form 10-K for the fiscal year ended December 31, 2000. |
| 3.3 | By-laws of Collins & Aikman Corporation, as amended, are hereby incorporated by reference to Exhibit 3.2 of Collins & Aikman Corporation's Report on Form 10-K for the fiscal year ended January 27, 1996. |
| 3.4 | Certificate of Elimination of Cumulative Exchangeable Redeemable Preferred Stock of Collins & Aikman Corporation is hereby incorporated by reference to Exhibit 3.3 of Collins & Aikman Corporation's Report on Form 10-Q for the fiscal quarter ended October 28, 1995. |
| 4.1 | Specimen Stock Certificate for the Common Stock is hereby incorporated by reference to Exhibit 4.3 of Amendment No. 3 to Collins & Aikman Holdings Corporation's Registration Statement on Form S-2 (Registration No. 33-53179) filed June 21, 1994. |
| 4.2 | Indenture, dated as of June 1, 1996, between Collins & Aikman Products Co., Collins & Aikman Corporation and First Union National Bank of North Carolina, as Trustee, is hereby incorporated by reference to Exhibit 4.2 of Collins & Aikman Corporation's Report on Form 10-Q for the fiscal quarter ended April 27, 1996. |
| 4.3 | First Supplemental Indenture dated as of June 1, 1996, between Collins & Aikman Products Co., Collins & Aikman Corporation and First Union National Bank of North Carolina, as Trustee, is hereby incorporated by reference to Exhibit 4.3 of Collins & Aikman Corporation's Report on Form 10-Q for the fiscal quarter ended April 27, 1996. |

| Exhibit Number | Description |
|---|---|
| 4.4 | Waiver dated as of October 27, 1998 under the Credit Agreement dated as of May 28, 1998, among Collins & Aikman Products Co., Collins & Aikman Canada, Inc. and Collins & Aikman Plastics, Ltd., as Canadian Borrowers, Collins & Aikman Corporation, as Guarantor, the Lender Parties thereto, Bank of America, N.T.S.A., as Documentation Agent, The Chase Manhattan Bank, as Administrative Agent, and The Chase Manhattan Bank of Canada, as Canadian Administrative Agent is hereby incorporated by reference to Exhibit 4.5 of Collins & Aikman Corporation's Report on Form 10-Q for the fiscal quarter ended September 26, 1998. |
| 4.5 | Waiver dated as of December 22, 1998 under the Credit Agreement dated as of May 28, 1998, among Collins & Aikman Products Co., Collins & Aikman Canada, Inc. and Collins & Aikman Corporation, as Guarantor, the Lender Parties thereto, Bank of America, N.T.S.A., as Documentation Agent, The Chase Manhattan Bank, as Administrative Agent, and The Chase Manhattan Bank of Canada, as Canadian Administrative Agent is hereby incorporated by reference to Exhibit 4.6 of Collins & Aikman Corporation's Report on Form 10-K for the year ended December 26, 1998. |
| 4.6 | Amendment and Waiver dated as of March 8, 1999, among Collins & Aikman Products Co., Collins & Aikman Canada, Inc., Collins & Aikman Plastics Ltd., Collins & Aikman Corporation, as Guarantor, the Lender Parties thereto, Bank of America N.T.S.A., as Documentation Agent, The Chase Manhattan Bank, as Administrative Agent, and The Chase Manhattan Bank of Canada, as Canadian Administrative Agent is hereby incorporated by reference to Exhibit 4.7 of Collins & Aikman Corporation's Report on Form 10-K for the year ended December 26, 1998. |
| 4.7 | Tranche C Term Loan Supplement dated as of May 12, 1999 to the Credit Agreement dated as of May 28, 1998 among Collins & Aikman Products Co., Collins & Aikman Canada, Inc., Collins & Aikman Plastics, Ltd., Collins & Aikman Corporation, the Financial Institutions parties thereto, Bank of America N.T.S.A., as Documentation Agent, The Chase Manhattan Bank, as Administrative Agent, and The Chase Manhattan Bank of Canada, as Canadian Administrative Agent is hereby incorporated by reference to Exhibit 4.1 of Collins & Aikman Corporation's Report on Form 10-Q for the fiscal quarter ended June 26, 1999. |
| 4.8 | Indenture dated as of June 28, 1994, between JPS Automotive Products Corp., as Issuer, JPS Automotive L.P., as Guarantor and Shawmut Bank Connecticut, N.A., as Trustee, is hereby incorporated by reference to Exhibit 4.2 of JPS Automotive Corp.'s Registration Statement on Form S-1, Registration No. 33-75510. |
| 4.9 | First Supplemental Indenture, dated as of October 5, 1994, between JPS Automotive Products Corp. and JPS Automotive L.P., as Co-Obligors, and Shawmut Bank Connecticut, N.A., as Trustee is hereby incorporated by reference to Exhibit 4.48A of JPS Automotive L.P.'s and JPS Automotive Products Corp.'s Report on Form 10-Q for the fiscal quarter ended October 2, 1994. |
| 4.10 | Second Supplemental Indenture, dated as of February 8, 2001, by and among Collins & Aikman Products Co., as Issuer, Collins & Aikman Corporation, as Guarantor, and First Union National Bank, as Trustee, which is incorporated by reference to Exhibit 4.11 of Collins & Aikman Corporation's Annual Report on Form 10-K for the fiscal year ended December 31, 2000. |
| 4.11 | Form of Warrant is hereby incorporated by reference to Exhibit 4.1 of Collins & Aikman Corporation's Current Report on Form 8-K dated July 13, 2001. |
| 4.12 | Certificate of Designation of Series A Redeemable Preferred Stock, Series B Redeemable Preferred Stock and Series C Redeemable Preferred Stock, which is incorporated herein by reference to Exhibit 4.1 of Collins & Aikman Corporation's Current Report of Form 8-K dated December 20, 2001 and filed on January 4, 2002. |
| 4.13 | Indenture dated as of December 20, 2001 by and among Collins & Aikman Products Co., as Issuer, the Guarantors parties thereto, and BNY Midwest Trust Company, as Trustee, which is incorporated herein by reference to Exhibit 4.2 of Collins & Aikman Corporation's Current Report on Form 8-K dated December 20, 2001 and filed on January 4, 2002. |

| Exhibit Number | Description |
|---|---|
| 4.14 | Receivables Transfer Agreement dated as of December 20, 2001 by and among Carcorp, Inc., as Transferor, Collins & Aikman Products Co., individually and as Collection Agent, the persons parties thereto, as CP Conduit Purchasers, Committed Purchasers and Funding Agents and JPMorgan Chase Bank, as Administrative Agent, which is incorporated herein by reference to Exhibit 4.3 of Collins & Aikman Corporation's Current Report on Form 8-K dated December 20, 2001 and filed on January 4, 2002. |
| 4.15 | Amended and Restated Receivables Purchase Agreement dated as of December 20, 2001 among Collins & Aikman Products Co. and its wholly-owned direct and indirect subsidiaries named therein, as Sellers, and Carcorp, Inc., as Purchaser, and the other Sellers from time to time named therein, which is incorporated herein by reference to Exhibit 4.4 of Collins & Aikman Corporation's Current Report on Form 8-K dated December 20, 2001 and filed on January 4, 2002. |
| 4.16 | Credit Agreement dated as of December 20, 2001 among Collins & Aikman Products Co., as Borrower, Collins & Aikman Canada Inc., as a Canadian Borrower, Collins & Aikman Plastics, Ltd., as a Canadian Borrower, Collins & Aikman Corporation, the Lenders named therein, Deutsche Banc Alex. Brown Inc. and Merrill Lynch Capital Corporation, as Co-Documentation Agents, Credit Suisse First Boston Corporation, as Syndication Agent, JPMorgan Chase Bank, as Administrative Agent, and J.P.Morgan Bank Canada, as Canadian Administrative Agent, which is incorporated herein by reference to Exhibit 4.5 of Collins & Aikman Corporation's Current Report on Form 8-K dated December 20, 2001 and filed on January 4, 2002. |
| 4.17 | Guarantee and Collateral Agreement dated as of December 20, 2001 by and among Collins & Aikman Corporation, Collins & Aikman Products Co. and certain of their subsidiaries and JPMorgan Chase Bank, as Collateral Agent, which is incorporated herein by reference to Exhibit 4.6 of Collins & Aikman Corporation's Current Report on Form 8-K dated December 20, 2001 and filed on January 4, 2002. |
| 4.18 | Third Supplemental Indenture, dated as of December 20, 2001, among Collins & Aikman Products Co., Collins & Aikman Corporation, the Subsidiary Guarantors listed on the signature page thereto, and First Union National Bank (as successor in interest to First Union National Bank of North Carolina), which is incorporated herein by reference to Exhibit 4.7 of Collins & Aikman Corporation's Current Report on Form 8-K dated December 20, 2001 and filed on January 4, 2002. |
| 10.1 | Stockholders Agreement, dated February 23, 2001, by and among Collins & Aikman Corporation, Heartland Industrial Partners, L.P. and other investor stockholders listed on Schedule 1 thereto, Blackstone Capital Company II, L.L.C., Blackstone Family Investment Partnership I L.P., Blackstone Advisory Directors Partnership L.P., Blackstone Capital Partners L.P., and Wasserstein/C&A Holdings, L.L.C., incorporated by reference to Annex E to Exhibit 10.1 to Collins & Aikman Corporation's Current Report on Form 8-K dated January 12, 2001. |
| 10.2 | Employment Agreement dated as of July 18, 1990 between Wickes Companies, Inc. and an executive officer is hereby incorporated by reference to Exhibit 10.3 of Wickes Companies, Inc.'s Report on Form 10-K for the fiscal year ended January 26, 1991.* |
| 10.3 | Employment Agreement dated as of July 22, 1992 between Collins & Aikman Corporation and an executive officer is hereby incorporated by reference to Exhibit 10.7 of Collins & Aikman Holdings Corporation's Report on Form 10-K for the fiscal year ended January 30, 1993.* |
| 10.4 | First Amendment to Employment Agreement dated as of February 24, 1994 between Collins & Aikman Corporation and an executive officer is hereby incorporated by reference to Exhibit 10.7 of Collins & Aikman Holdings Corporation's Registration Statement on Form S-2 (Registration No. 33-53179) filed April 19, 1994.* |
| 10.5 | Second Amendment, dated as of October 3, 1996, to the Employment Agreement, dated as of July 22, 1992, as amended, between Collins & Aikman Products Co. and an executive officer is hereby incorporated by reference to Exhibit 10.26 of Collins & Aikman Corporation's Report on Form 10-Q for the fiscal quarter ended October 26, 1996.* |

| Exhibit Number | Description |
|---|---|
| 10.6 | Third Amendment dated as of August 1, 1997, to the Employment Agreement dated as of July 22, 1992, as amended, between the Corporation and an executive officer is hereby incorporated by reference to Exhibit 10.35 of Collins & Aikman Corporation's Report on Form 10-Q for the fiscal quarter ended September 27, 1997.* |
| 10.7 | Letter Agreement dated March 23, 1999 with an executive officer is hereby incorporated by reference to Exhibit 10.7 of Collins & Aikman Corporation's Report on Form 10-K for the fiscal year ended December 26, 1998.* |
| 10.8 | Amended and Restated Employment Agreement dated as of January 20, 1999 between Collins & Aikman Products Co. and an executive officer is hereby incorporated by reference to Collins & Aikman Corporation's Report on Form 10-K for the fiscal year ended December 26, 1998.* |
| 10.9 | Employment Agreement dated as of January 20, 1999 between Collins & Aikman Products Co. and an executive officer is hereby incorporated by reference to Exhibit 10.9 of Collins & Aikman Corporation's Form 10-K for the fiscal year ended December 26, 1998.* |
| 10.10 | Employment Agreement dated as of April 22, 1999 between Collins & Aikman Corporation and an executive officer is hereby incorporated by reference to Exhibit 10.10 of Collins & Aikman Corporation's Report on Form 10-Q for the fiscal quarter ended March 27, 1999.* |
| 10.11 | Employment Agreement, dated as of March 29, 2000, between Collins & Aikman Products Co. and an executive officer is hereby incorporated by reference to Exhibit 10.1 of Collins & Aikman Corporation's Report on Form 10-Q for the fiscal quarter ended April 1, 2000.* |
| 10.12 | Employment Agreement, dated as of April 1, 2000, between Collins & Aikman Products Co. and an executive officer is hereby incorporated by reference to Exhibit 10.3 of Collins & Aikman Corporation's Report on Form 10-Q for the fiscal quarter ended July 1, 2000.* |
| 10.13 | Employment Agreement, dated as of August 1, 2000, between Collins & Aikman Products Co. and an executive officer is hereby incorporated by reference to Exhibit 10.6 of Collins & Aikman Corporation's Report on Form 10-Q for the fiscal quarter ended September 30, 2000.* |
| 10.14 | Employment Agreement, dated as of August 1, 2000, between Collins & Aikman Products Co. and an executive officer is hereby incorporated by reference to Exhibit 10.8 of Collins & Aikman Corporation's Report on Form 10-Q for the fiscal quarter ended September 30, 2000.* |
| 10.15 | Letter agreement, dated as of May 12, 1999, with an executive officer is hereby incorporated by Exhibit 10.2 of Collins & Aikman Corporation's Report on Form 10-Q for the fiscal quarter ended June 26, 1999.* |
| 10.16 | Letter agreement, dated as of April 7, 2000, between Collins & Aikman Corporation and an executive officer is hereby incorporated by reference to Exhibit 10.12 of Collins & Aikman Corporation's Report on Form 10-Q for the fiscal quarter ended September 30, 2000.* |
| 10.17 | Letter agreement, dated as of July 13, 2000, between Collins & Aikman Corporation and an executive officer is hereby incorporated by reference to Exhibit 10.11 of Collins & Aikman Corporation's Report on Form 10-Q for the fiscal quarter ended September 30, 2000.* |
| 10.18 | Service contract between Collins & Aikman Products GmbH and an executive officer is hereby incorporated by reference to Exhibit 10.5 of Collins & Aikman Corporation's Report on Form 10-Q for the fiscal quarter ended September 30, 2000. |
| 10.19 | Settlement Agreement dated as of April 27, 2000, between Collins & Aikman Products Co. and an executive officer is hereby incorporated by reference to Exhibit 10.10 of Collins & Aikman Corporation's Report on Form 10-Q for the fiscal quarter ended September 30, 2000. |
| 10.20 | Collins & Aikman Corporation 1998 Executive Incentive Compensation Plan is hereby incorporated by reference to Exhibit 10.10 of Collins & Aikman Corporation's Report on Form 10-K for the fiscal year ended December 26, 1998.* |
| 10.21 | Collins & Aikman Products Co. 2000 Executive Incentive Compensation Plan is hereby incorporated by reference to Exhibit 10.5 of Collins & Aikman Corporation's Report on Form 10-Q for the fiscal quarter ended July 1, 2000. |

| Exhibit Number | Description |
|---|---|
| 10.22 | Collins & Aikman Corporation Supplemental Retirement Income Plan is hereby incorporated by reference to Exhibit 10.23 of Amendment No. 5 to Collins & Aikman Holdings Corporation's Registration Statement on Form S-2 (Registration No. 33-53179) filed July 6, 1994.* |
| 10.23 | Amendment to Collins & Aikman Corporation Supplemental Retirement Income Plan is hereby incorporated by reference to Exhibit 10.12 of the Collins & Aikman Corporation's Report on Form 10-K for the fiscal year ended December 26, 1998.* |
| 10.24 | 1993 Employee Stock Option Plan, as amended and restated, is hereby incorporated by reference to Exhibit 10.13 of Collins & Aikman Corporation's Report on Form 10-Q for the fiscal quarter ended April 29, 1995.* |
| 10.25 | 1994 Employee Stock Option Plan, as amended through February 7, 1997, is hereby incorporated by reference to Exhibit 10.12 of Collins & Aikman Corporation's Report on Form 10-Q for the fiscal quarter ended March 29, 1997.* |
| 10.26 | 2000 Employee Stock Option Plan is hereby incorporated by reference to Exhibit 10.6 of Collins & Aikman Corporation's Report on Form 10-Q for the fiscal quarter ended July 1, 2000. |
| 10.27 | 1994 Directors Stock Option Plan as amended and restated is hereby incorporated by reference to Exhibit 10.15 to Collins & Aikman Corporation's Report on Form 10-K for the year ended December 26, 1998.* |
| 10.28 | Excess Benefit Plan of Collins & Aikman Corporation is hereby incorporated by reference to Exhibit 10.25 of Collins & Aikman Corporation's Report on Form 10-K for the fiscal year ended January 28, 1995.* |
| 10.29 | 1994 Employee Stock Option Plan, as amended and restated through June 3, 1999 is hereby incorporated by reference to Exhibit 10.2 of Collins & Aikman Corporation's Report on Form 10-Q for the fiscal quarter ended June 26, 1999. |
| 10.30 | Change in Control Agreement, dated March 17, 1998, between Collins & Aikman Corporation and an executive officer is hereby incorporated by reference to Exhibit 10.17 of Collins & Aikman Corporation's Report on Form 10-K for the fiscal year ended December 27, 1997.* |
| 10.31 | Change in Control Agreement, dated March 17, 1998, between Collins & Aikman Corporation and an executive officer is hereby incorporated by reference to Exhibit 10.18 of Collins & Aikman Corporation's Report on Form 10-K for the fiscal year ended December 27, 1997.* |
| 10.32 | Change in Control Agreement, dated March 17, 1998, between Collins & Aikman Corporation and an executive officer is hereby incorporated by reference to Exhibit 10.19 of Collins & Aikman Corporation's Report on Form 10-K for the fiscal year ended December 27, 1997.* |
| 10.33 | Change in Control Agreement, dated March 17, 1998, between Collins & Aikman Corporation and an executive officer is hereby incorporated by reference to Exhibit 10.20 of Collins & Aikman Corporation's Report on Form 10-K for the fiscal year ended December 27, 1997.* |
| 10.34 | Change in Control Agreement, dated March 17, 1998, between Collins & Aikman Corporation and an executive officer is hereby incorporated by reference to Exhibit 10.22 of Collins & Aikman Corporation's report on Form 10-Q for the fiscal quarter ended March 28, 1998.* |
| 10.35 | Change in Control Agreement, dated August 9, 1999, between Collins & Aikman Corporation and an executive officer is hereby incorporated by reference to Exhibit 10.25 of Collins & Aikman Corporation's Report on Form 10-K for the fiscal year ended December 25, 1999.* |
| 10.36 | Change in Control Agreement, dated March 17, 1998, between Collins & Aikman Corporation and an executive officer is hereby incorporated by reference to Exhibit 10.26 of Collins & Aikman Corporation's Report on Form 10-K for the fiscal year ended December 25, 1999.* |
| 10.37 | Change in Control Agreement, dated March 17, 1998, between Collins & Aikman Corporation and an executive officer is hereby incorporated by reference to Exhibit 10.27 of Collins & Aikman Corporation's Report on Form 10-K for the fiscal year ended December 25, 1999.* |
| 10.38 | Change in Control Agreement, dated July 26, 1999, between Collins & Aikman Corporation and an executive officer is hereby incorporated by reference to Exhibit 10.28 of Collins & Aikman Corporation's Report on Form 10-K for the fiscal year ended December 25, 1999.* |

| Exhibit Number | Description |
|---|---|
| 10.39 | Change in Control Agreement, dated March 17, 1998, between Collins & Aikman Corporation and an executive officer is hereby incorporated by reference to Exhibit 10.29 of Collins & Aikman Corporation's Report on Form 10-K for the fiscal year ended December 25, 1999.* |
| 10.40 | Change in Control Agreement, dated as of April, 2000, between Collins & Aikman Corporation and an executive officer is hereby incorporated by reference to Exhibit 10.2 of Collins & Aikman Corporation's Report on Form 10-Q for the fiscal quarter ended July 1, 2000.* |
| 10.41 | Change in Control Agreement, dated as of April 1, 2000, between Collins & Aikman Products Co. and an executive officer is hereby incorporated by reference to Exhibit 10.4 of Collins & Aikman Corporation's Report on Form 10-Q for the fiscal quarter ended July 1, 2000.* |
| 10.42 | Change in Control Agreement, dated as of August 1, 2000, between Collins & Aikman Corporation and an executive officer is hereby incorporated by reference to Exhibit 10.7 of Collins & Aikman Corporation's Report on Form 10-Q for the fiscal quarter ended September 30, 2000.* |
| 10.43 | Change in Control Agreement, dated as of August 1, 2000, between Collins & Aikman Corporation and an executive officer is hereby incorporated by reference to Exhibit 10.9 of Collins & Aikman Corporation's Report on Form 10-Q for the fiscal quarter ended September 30, 2000.* |
| 10.44 | Lease, executed as of the 1st day of June 1987, between Dura Corporation and Dura Acquisition Corp. is hereby incorporated by reference to Exhibit 10.24 of Amendment No. 5 to Collins & Aikman Holdings Corporation's Registration Statement on Form S-2 (Registration No. 33-53179) filed July 6, 1994. |
| 10.45 | Master Equipment Lease Agreement dated as of September 30, 1994, between NationsBanc Leasing Corporation of North Carolina and Collins & Aikman Products Co. is hereby incorporated by reference to Exhibit 10.27 of Collins & Aikman Corporation's Report on Form 10-Q for the fiscal quarter ended October 29, 1994. |
| 10.46 | Equity Purchase Agreement by and among JPSGP, Inc., Foamex-JPS Automotive L.P. and Collins & Aikman Products Co. dated August 28, 1996 is hereby incorporated by reference to Exhibit 2.1 of Collins & Aikman Corporation's Report on Form 10-Q for the fiscal quarter ended July 27, 1996. |
| 10.47 | Amendment No. 1 to Equity Purchase Agreement by and among JPSGP, Inc., Foamex-JPS Automotive L.P., Foamex International Inc. and Collins & Aikman Products Co. dated as of December 11, 1996 is hereby incorporated by reference to Exhibit 2.2 of Collins & Aikman Corporation's Current Report on Form 8-K dated December 10, 1996. |
| 10.48 | Equity Purchase Agreement by and among Seiren U.S.A. Corporation, Seiren Automotive Textile Corporation, Seiren Co., Ltd. and Collins & Aikman Products Co. dated December 11, 1996, is hereby incorporated by reference to Exhibit 2.3 of Collins & Aikman Corporation's Current Report on Form 8-K dated December 10, 1996. |
| 10.49 | Acquisition Agreement between Perstorp A.B. and Collins & Aikman Products Co. dated December 11, 1996 is hereby incorporated by reference to Exhibit 2.4 of Collins & Aikman Corporation's Current Report on Form 8-K dated December 10, 1996. |
| 10.50 | Agreement among Perstorp A.B., Perstorp GmbH, Perstorp Biotec A.B. and Collins & Aikman Products Co. dated December 11, 1996 is hereby incorporated by reference to Exhibit 2.5 of Collins & Aikman Corporation's current report on Form 8-K dated December 10, 1996. |
| 10.51 | Settlement and Amendment Agreement dated as of December 16, 1997 by and among Collins & Aikman Products Co., Perstorp A.B., Perstorp GmbH, Collins & Aikman Holding A.B., Collins & Aikman Automotive Systems GmbH, Collins & Aikman Automotive Systems N.V., Collins & Aikman Automotive Systems A.B. and Perstorp Components GmbH and related Letter Amendment Agreement is hereby incorporated by reference to Exhibit 10.38 of Collins & Aikman Corporation's Report or Form 10-Q for the fiscal quarter ended September 26, 1998. |

| Exhibit Number | Description |
|---|---|
| 10.52 | Acquisition Agreement dated as of December 9, 1996 among Collins & Aikman Products Co., Collins & Aikman Floor Coverings Group, Inc., Collins & Aikman Floor Coverings, Inc., CAF Holdings, Inc., and CAF Acquisition Corp. is hereby incorporated by reference to Exhibit 2.7 of Collins & Aikman Corporation's Current Report on Form 8-K dated December 10, 1996. |
| 10.53 | Mastercraft Group Acquisition Agreement dated as of April 25, 1997 among Collins & Aikman Products Co., Joan Fabrics Corporation and MC Group Acquisition Company L.L.C., is hereby incorporated by reference to Exhibit 2.1 of Collins & Aikman Corporation's Report on Form 10-Q for the fiscal quarter ended March 29, 1997. |
| 10.54 | Asset Purchase Agreement dated as of June 30, 1997 by and between JPS Automotive L.P. and Safety Components International, Inc. is hereby incorporated by reference to Exhibit 2.1 of JPS Automotive L.P.'s and JPS Automotive Products Corp.'s Current Report on Form 8-K dated July 24, 1997. |
| 10.55 | Closing Agreement dated July 24, 1997 between JPS Automotive L.P., Safety Components International, Inc. and Safety Components Fabric Technologies, Inc. is hereby incorporated by reference to Exhibit 2.2 of JPS Automotive L.P.'s and JPS Automotive Products Corp.'s Current Report on Form 8-K dated July 24, 1997. |
| 10.56 | Amended and Restated Acquisition Agreement dated as of November 4, 1997 and amended and restated as of March 9, 1998, among Collins & Aikman Products Co., Imperial Wallcoverings Inc. and BDPI Holdings Corporation is hereby incorporated by reference to Exhibit 2.4 of Collins & Aikman Corporation's Report on Form 10-K for the fiscal year ended December 27, 1997. |
| 10.57 | Share Purchase Agreement, dated as of January 12, 2001, between Collins & Aikman Corporation and Heartland Industrial Partners, L.P., is hereby incorporated by reference to Exhibit 10.1 of Collins & Aikman Corporation's Report on Form 8-K dated January 12, 2001., incorporated by reference to Exhibit 10.1 to Collins & Aikman Corporation's Current Report on Form 8-K dated January 12, 2001. |
| 10.58 | Registration Rights Agreement, dated February 23, 2001, by and among Collins & Aikman Corporation, Heartland Industrial Partners, L.P. and the other investor stockholders listed on Schedule 1 thereto, Blackstone Capital Company II, L.L.C., Blackstone Family Investment Partnership I L.P., Blackstone Advisory Directors Partnership L.P., Blackstone Capital Partners, L.P. and Wasserstein/C&A Holdings, L.L.C., incorporated by reference to Annex D to Exhibit 10.1 to Collins & Aikman Corporation's Current Report on Form 8-K dated January 12, 2001. |
| 10.59 | Services Agreement, dated as of February 23, 2001, by and among Collins & Aikman Corporation, Collins & Aikman Products Co. and Heartland Industrial Partners, L.P. |
| 10.60 | Profit Participation Interest Agreement, dated as of February 23, 2001, by and among Heartland Industrial Partners, L.P. and the other investor stockholders listed on Schedule 1 thereto and each of Collins & Aikman Corporation, Blackstone Capital Company II, L.L.C. and Wasserstein/C&A Holdings, L.L.C., incorporated by reference to Annex B to Exhibit 10.1 to Collins & Aikman Corporation's Current Report on Form 8-K dated January 12, 2001. |
| 10.61 | Employment Agreement dated October 1, 1999 between Collins & Aikman Products Co. and an executive officer is hereby incorporated by reference to Exhibit 10.30 of Collins & Aikman Corporation's Report on Form 10-K for the fiscal year ended December 25, 1999. |
| 10.62 | Severance Benefit Agreement dated July 26, 1999 between Collins & Aikman Corporation and an executive officer is hereby incorporated by reference to Exhibit 10.31 of Collins & Aikman Corporation's Report on Form 10-K for the fiscal year ended December 25, 1999.* |
| 10.63 | Severance Benefit Agreement dated August 9, 1999 between Collins & Aikman Corporation and an executive officer is hereby incorporated by reference to Exhibit 10.32 of Collins & Aikman Corporation's Report on Form 10-K for the fiscal year ended December 25, 1999.* |
| 10.64 | Letter agreement dated December 17, 1999 between Collins & Aikman Corporation and an executive officer is hereby incorporated by reference to Exhibit 10.33 of Collins & Aikman Corporation's Report on Form 10-K for the fiscal year ended December 25, 1999.* |

| Exhibit Number | Description |
|---|---|
| 10.65 | Employment Agreement dated December 1, 2000 between Collins & Aikman Products Co. and an executive officer, which is incorporated by reference to Exhibit 10.75 of Collins & Aikman Corporation's Annual Report on Form 10-K for the fiscal year ended December 31, 2000.* |
| 10.66 | Separation Agreement dated as of March 12, 2001 between Collins & Aikman Products Co. and an executive officer, which is incorporated by reference to Exhibit 10.1 to the Company's Quarterly Report on Form 10-Q for the quarter ended March 31, 2001.* |
| 10.67 | Employment Agreement dated as of March 29, 2000 between Collins & Aikman Products Co. and an executive officer is hereby incorporated by reference to Exhibit 10.1 of Collins & Aikman Corporation's Report on Form 10-Q for the quarter ended April 1, 2000.* |
| 10.68 | Change in control agreement dated as of April 2000, between Collins & Aikman Corporation and an executive officer is hereby incorporated by reference to Exhibit 10.2 of Collins & Aikman Corporation's Report on Form 10-Q for the quarter ended July 1, 2000.* |
| 10.69 | Employment agreement dated as of April 1, 2000, between Collins & Aikman Products Co. and an executive officer is hereby incorporated by reference to Exhibit 10.3 of Collins & Aikman Corporation's Report on Form 10-Q for the quarter ended July 1, 2000.* |
| 10.70 | Change in control agreement dated as of April 1, 2000, between Collins & Aikman Products Co. and an executive officer is hereby incorporated by reference to Exhibit 10.4 of Collins & Aikman Corporation's Report on Form 10-Q for the quarter ended July 1, 2000.* |
| 10.71 | Service contract between Collins & Aikman Products GmbH and an executive officer, which is incorporated by reference to Exhibit 10.5 of Collins & Aikman Corporation's Quarterly Report on Form 10-Q for the quarter ended June 30, 2001.* |
| 10.72 | Employment agreement dated as of August 1, 2000, between Collins & Aikman Products Co. and an executive officer, which is incorporated by reference to Exhibit 10.6 of Collins & Aikman Corporation's  Quarterly Report on Form 10-Q for the quarter ended June 30, 2001.* |
| 10.73 | Change in control agreement dated as of August 1, 2000, between Collins & Aikman Corporation and an executive officer, which is incorporated by reference to Exhibit 10.7 of Collins & Aikman Corporation's Quarterly Report on Form 10-Q for the quarter ended June 30, 2001.* |
| 10.74 | Employment agreement dated as of August 1, 2000, between Collins & Aikman Products Co. and an executive officer, which is incorporated by reference to Exhibit 10.8 of Collins & Aikman Corporation's Quarterly Report on Form 10-Q for the quarter ended June 30, 2001.* |
| 10.75 | Change in control agreement dated as of August 1, 2000, between Collins & Aikman Corporation and an executive officer, which is incorporated by reference to Exhibit 10.9 of Collins & Aikman Corporation's Quarterly Report on Form 10-Q for the quarter ended June 30, 2001.* |
| 10.76 | Settlement agreement dated as of April 27, 2000, between Collins & Aikman Products Co. and an executive officer, which is incorporated by reference to Exhibit 10.10 of Collins & Aikman Corporation's Quarterly Report on Form 10-Q for the quarter ended June 30, 2001.* |
| 10.77 | Letter agreement dated as of July 13, 2000, between Collins & Aikman Corporation and an executive officer, which is incorporated by reference to Exhibit 10.11 of Collins & Aikman Corporation's Quarterly Report on Form 10-Q for the quarter ended June 30, 2001.* |
| 10.78 | Letter agreement dated as of April 7, 2000, between Collins & Aikman Corporation and an executive officer, which is incorporated by reference to Exhibit 10.12 of Collins & Aikman Corporation's Quarterly Report on Form 10-Q for the quarter ended June 30, 2001.* |
| 10.79 | Collins & Aikman Products Co. 2000 Executive Incentive Compensation Plan is hereby incorporated by reference to Exhibit 10.5 of Collins & Aikman Corporation's Report on Form 10-Q for the quarter ended July 1, 2000.* |
| 10.80 | 2000 Employee Stock Option Plan is hereby incorporated by reference to Exhibit 10.6 of Collins & Aikman Corporation's Report on Form 10-Q for the quarter ended July 1, 2000.* |
| 10.81 | Agreement of Sale and Purchase, dated as of June 22, 2001, by and among Collins & Aikman Products Co. and New King, L.L.C. |

| Exhibit Number | Description |
|---|---|
| 10.82 | Lease Agreement, dated as of June 29, 2001, between New King, L.L.C., as landlord, and Collins & Aikman Products Co., as tenant. |
| 10.83 | Agreement of Sale and Purchase, dated as of June 22, 2001, by and among Collins & Aikman Products Co. and Anchor Court, L.L.C. |
| 10.84 | Lease Agreement, dated as of June 29, 2001, between Anchor Court, L.L.C., as landlord and Collins & Aikman Products Co., as tenant. |
| 10.85 | Stockholders Agreement dated July 3, 2001, by and among Collins & Aikman Corporation, Heartland Industrial Partners, L.P. and the other Heartland Entities named therein, the Becker Stockholders party thereto and the Joan Stockholders party thereto. |
| 10.86 | Registration Rights Agreement, dated July 3, 2001, by and among Collins & Aikman Corporation, Charles E. Becker, Michael E. McInerney and Jens Höhnel and, together with the Joan Investors (as defined therein). |
| 10.87 | First Amendment to Services Agreement, dated as of August 7, 2001, among Collins & Aikman Corporation, Collins & Aikman Products Co. and Heartland Industrial Partners, L.P. |
| 10.88 | Equipment Lease, dated as of December 18, 2001, among Textron Automotive Exteriors Inc. and Textron Automotive Interiors Inc., collectively as lessee, and IAC TAX V, LLC, as lessor. |
| 10.89 | Registration Rights Agreement, dated December 20, 2001, by and among Collins & Aikman Products Co., Collins & Aikman Corporation, and each of the subsidiaries listed on the signature pages thereof, and J.P. Morgan Securities Inc., Credit Suisse First Boston Corporation, Deutsche Banc Alex. Brown Inc. and Merrill Lynch, Pierce, Fenner & Smith Incorporated and the other several initial purchasers parties to the Purchase Agreement. |
| 10.90 | Registration Rights Agreement dated as of December 20, 2001 by and among Becker Ventures, LLC, Dresdner Kleinwort Capital Partners 2001 LP, Masco Capital Corporation, ML IBK Positions, Inc. and Collins & Aikman Corporation. |
| 10.91 | Registration Rights Agreement, dated December 20, 2001, by and between Collins & Aikman Corporation, Textron Inc., and Textron Holdco Inc. |
| 10.92 | Preferred Stock Registration and Other Rights Agreement, dated as of December 20, 2001, by and among Collins & Aikman Products Co. and Textron Inc. |
| 10.93 | Intellimold Technology License and Support Agreement, dated as of December 20, 2001, by and between Textron, Inc. and Collins & Aikman Corporation and Collins & Aikman Products Co. |
| 10.94 | Technology License Agreement (Retained IP), dated as of December 20, 2001, by and between Textron, Inc. and Collins & Aikman Corporation and Collins & Aikman Products Co. |
| 10.95 | Technology License Agreement (Licensed-Back IP), dated as of December 20, 2001, by and between Textron, Inc. and Collins & Aikman Corporation and Collins & Aikman Products Co. |
| 21 | Subsidiaries of the Registrant. |
| 23.1 | Consent of PricewaterhouseCoopers LLP. |
| 23.2 | Consent of Arthur Andersen LLP. |
| 99 | Voting Agreement between Blackstone Capital Partners L.P. and Wasserstein Perella Partners, L.P. is hereby incorporated by reference to Exhibit 99 of Amendment No. 4 to Collins & Aikman Holdings Corporation's Registration Statement on Form S-2 (Registration No. 33-53179) filed June 27, 1994. |

* Management contract or compensatory plan or arrangement required to be filed as an exhibit to this Form pursuant to Item 14 (c) of this report.

Copies of any exhibits may be obtained by stockholders upon written request to Investor Relations accompanied by a check in the amount of $5.00 payable to Collins & Aikman Corporation to cover processing and mailing costs.

**(b)  Reports on Form 8-K**

The Company filed the following Reports on Form 8-K covering the following items:

| | | |
|---|---|---|
| December 4, 2001 | — | Item 9 (Regulation FD Disclosure) |
| January 4, 2002 | — | Item 2 (Acquisition or Disposition of Assets) and Item 7 (Exhibits) |
| January 14, 2002 | — | Item 2 (Acquisition or Disposition of Assets) and Item 7 (Financial Statements of Business Acquired, Pro Forma Financial Information and Exhibits) Audited financial statements are presented for the years ended December 31, 2000, January 1, 2000 and January 2, 1999. Unaudited financial statements are presented for the nine months ended September 29, 2001 and September 30, 2000.* |

---

*  This Report was filed on Form 8-K/A in accordance with Item 7(a)(4) and item 7(b)(2) of Form 8-K.

## SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities and Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized, on the 28th day of March 2001.

COLLINS & AIKMAN CORPORATION

By:      /s/   THOMAS E. EVANS

Thomas E. Evans
*Chairman of the Board of Directors*

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the Registrant and in the capacities and on the dates indicated.

| Signature | Title | Date |
| --- | --- | --- |
| /s/   THOMAS E. EVANS<br>Thomas E. Evans | Chairman of the Board of Directors and Chief Executive Officer (Principal Executive Officer) | March 28, 2002 |
| /s/   J. MICHAEL STEPP<br>J. Michael Stepp | Interim Chief Financial Officer and Director (Principal Financial and Accounting Officer) | March 28, 2002 |
| /s/   CHARLES E. BECKER<br>Charles E. Becker | Vice Chairman of the Board of Directors | March 28, 2002 |
| /s/   ROBERT C. CLARK<br>Robert C. Clark | Director | March 28, 2002 |
| /s/   MARSHALL A. COHEN<br>Marshall A. Cohen | Director | March 28, 2002 |
| /s/   CYNTHIA HESS<br>Cynthia Hess | Director | March 28, 2002 |
| /s/   TIMOTHY D. LEULIETTE<br>Timothy D. Leuliette | Director | March 28, 2002 |
| /s/   ELKIN MCCALLUM<br>Elkin McCallum | Director | March 28, 2002 |
| /s/   W. GERALD MCCONNELL<br>W. Gerald McConnell | Director | March 28, 2002 |
| /s/   WARREN B. RUDMAN<br>Warren B. Rudman | Director | March 28, 2002 |
| /s/   DAVID A. STOCKMAN<br>David A. Stockman | Director | March 28, 2002 |
| /s/   DANIEL P. TREDWELL<br>Daniel P. Tredwell | Director | March 28, 2002 |
| /s/   SAMUEL VALENTI<br>Samuel Valenti | Director | March 28, 2002 |

46

## REPORT OF INDEPENDENT ACCOUNTANTS

To the Board of Directors and Shareholders
of Collins & Aikman Corporation:

In our opinion, the 2001 consolidated financial statements listed in the index appearing under Item 14(a)(1) present fairly, in all material respects, the financial position of Collins & Aikman Corporation and its subsidiaries at December 31, 2001, and the results of their operations and their cash flows for the year then ended in conformity with accounting principles generally accepted in the United States of America. In addition, in our opinion, the financial statement schedules listed in the index appearing under Item 14(a)(2) present fairly, in all material respects, the information set forth therein when read in conjunction with the related consolidated financial statements. These financial statements and financial statement schedules are the responsibility of the Company's management; our responsibility is to express an opinion on these financial statements and financial statement schedules based on our audit. We conducted our audit of these statements in accordance with auditing standards generally accepted in the United States of America, which require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation. We believe that our audit provides a reasonable basis for our opinion.

PRICEWATERHOUSECOOPERS LLP

Detroit, Michigan
February 21, 2002

## REPORT OF INDEPENDENT PUBLIC ACCOUNTANTS

To Collins & Aikman Corporation:

We have audited the accompanying consolidated balance sheet of Collins & Aikman Corporation (a Delaware Corporation) and subsidiaries as of December 31, 2000 and the related consolidated statements of operations, cash flows, and common stockholders' deficit for each of the two fiscal years in the period ended December 31, 2000, as listed in the index appearing under Item 14(a)(1). These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audits in accordance with auditing standards generally accepted in the United States. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the financial statements referred to above present fairly, in all material respects, the financial position of Collins & Aikman Corporation and subsidiaries as of December 31, 2000 and the results of their operations and their cash flows for each of the two fiscal years in the period ended December 31, 2000, in conformity with accounting principles generally accepted in the United States.

Our audit was made for the purpose of forming an opinion on the basic financial statements taken as a whole. The schedule listed in the index appearing under item 14(a)(2) is presented for purposes of complying with the Securities and Exchange Commission's rules and is not part of the basic financial statements. This schedule has been subjected to the auditing procedures applied in the audit of the basic financial statements and, in our opinion, fairly states in all material respects the financial data required to be set forth therein in relation to the basic financial statements taken as a whole.

ARTHUR ANDERSEN LLP

Charlotte, North Carolina,
February 14, 2001 (except with respect to the matter discussed in Note 24,
as to which the date is March 28, 2002)

**COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES**

**CONSOLIDATED STATEMENTS OF OPERATIONS**
**(in millions, except per share data)**

|  | Year Ended | | |
|  | December 31, 2001 | December 31, 2000 | December 25, 1999 |
|---|---|---|---|
| Net sales | $1,823.3 | $1,901.8 | $1,898.6 |
| Cost of goods sold | 1,604.5 | 1,635.2 | 1,613.9 |
| Gross profit | 218.8 | 266.6 | 284.7 |
| Selling, general and administrative expenses | 164.4 | 158.5 | 152.8 |
| Restructuring charge and impairment of long-lived assets | 18.8 | — | 33.4 |
| Operating income | 35.6 | 108.1 | 98.5 |
| Interest expense, net of interest income of $2.0, $3.4 and $2.5 | 84.3 | 96.6 | 92.1 |
| Loss on sale of receivables | 10.8 | 9.2 | 5.4 |
| Subsidiary preferred stock requirements | 2.4 | — | — |
| Other expense, net | 6.4 | 1.5 | 2.2 |
| Income (loss) from continuing operations before income taxes | (68.3) | 0.8 | (1.2) |
| Income tax (benefit) expense | (18.6) | 2.2 | 0.2 |
| Loss from continuing operations before extraordinary loss and cumulative effect of a change in accounting principle | (49.7) | (1.4) | (1.4) |
| Income from discontinued operations, net of income taxes of $5.7 and $4.4 | 8.8 | 6.6 | — |
| Income (loss) before extraordinary loss and cumulative effect of change in accounting principle | (40.9) | 5.2 | (1.4) |
| Extraordinary loss on retirement of debt, net of income taxes of $2.7 and $0.5 | (5.3) | (0.7) | — |
| Cumulative effect of a change in accounting principle, net of income taxes of $5.1 | — | — | (8.8) |
| Net income (loss) | $ (46.2) | $ 4.5 | $ (10.2) |
| Net income (loss) per basic and diluted common share: | | | |
| Continuing operations | $ (0.51) | $ (0.03) | $ (0.02) |
| Discontinued operations | 0.09 | 0.11 | — |
| Extraordinary loss | (0.05) | (0.01) | — |
| Cumulative effect of a change in accounting principle | — | — | (0.14) |
| Net income (loss) | $ (0.47) | $ 0.07 | $ (0.16) |
| Average common shares outstanding: | | | |
| Basic and Diluted | 97.2 | 61.9 | 62.0 |

The Notes to Consolidated Financial Statements are an integral part
of these consolidated financial statements.

F-3

**COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES**

**CONSOLIDATED BALANCE SHEETS**
**(in millions, except par value)**

| | December 31, 2001 | December 31, 2000 |
|---|---|---|
| **ASSETS** | | |
| Current Assets: | | |
| Cash and cash equivalents . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ 73.9 | $ 20.9 |
| Accounts and other receivables, net of allowances of $14.6 and $8.1 . . . . . . . | 406.1 | 196.5 |
| Inventories . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 132.6 | 131.7 |
| Other . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 131.9 | 75.9 |
| Total current assets . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 744.5 | 425.0 |
| Property, plant and equipment, net . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 618.1 | 434.1 |
| Deferred tax assets . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 136.5 | 97.3 |
| Goodwill, net . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1,253.8 | 245.5 |
| Investment in joint ventures . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 23.0 | 4.8 |
| Other assets . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 217.5 | 73.6 |
| | $2,993.4 | $1,280.3 |
| **LIABILITIES AND COMMON STOCKHOLDERS' EQUITY (DEFICIT)** | | |
| Current Liabilities: | | |
| Short-term borrowings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ 35.7 | $ 3.8 |
| Current maturities of long-term debt . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 19.5 | 84.3 |
| Accounts payable . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 468.7 | 178.5 |
| Accrued expenses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 245.2 | 123.1 |
| Total current liabilities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 769.1 | 389.7 |
| Long-term debt . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1,282.4 | 799.7 |
| Other, including post-retirement benefit obligations . . . . . . . . . . . . . . . . . . . | 404.3 | 245.8 |
| Commitments and contingencies . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | |
| Minority interest in consolidated subsidiary . . . . . . . . . . . . . . . . . . . . . . . . | 15.2 | — |
| Mandatorily redeemable preferred stock of subsidiary . . . . . . . . . . . . . . . . . . | 147.7 | — |
| Common stock ($.01 par value, 300.0 shares authorized, 168.0 shares issued and outstanding at December 31, 2001 and 150.0 shares authorized, 70.5 shares issued and 62.0 shares outstanding at December 31, 2000) . . . . . . . . . | 1.7 | 0.7 |
| Other paid-in capital . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1,123.1 | 585.5 |
| Accumulated deficit . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (682.8) | (636.6) |
| Accumulated other comprehensive loss . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (67.3) | (42.9) |
| Treasury stock, at cost, 8.5 shares at December 31, 2000 . . . . . . . . . . . . . . . . | — | (61.6) |
| Total common stockholders' equity (deficit) . . . . . . . . . . . . . . . . . . . | $ 374.7 | $ (154.9) |
| | $2,993.4 | $1,280.3 |

The Notes to Consolidated Financial Statements are an integral part
of these consolidated financial statements.

## COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES

### CONSOLIDATED STATEMENTS OF CASH FLOWS
#### (in millions)

| | Year Ended | | |
| --- | --- | --- | --- |
| | December 31, 2001 | December 31, 2000 | December 25, 1999 |
| **OPERATING ACTIVITIES** | | | |
| Loss from continuing operations . . . . . . . . . . . . . . . . . . . . . . . . | $ (49.7) | $ (1.4) | $ (1.4) |
| Adjustments to derive cash flow from continuing operating activities: | | | |
| Impairment of long-lived assets . . . . . . . . . . . . . . . . . . . . | 7.6 | — | 13.4 |
| Deferred income tax expense . . . . . . . . . . . . . . . . . . . . . . | (26.0) | (10.0) | (6.8) |
| Subsidiary preferred stock requirements . . . . . . . . . . . . . | 2.4 | — | — |
| Depreciation and leasehold amortization . . . . . . . . . . . . . | 64.2 | 59.1 | 58.2 |
| Goodwill amortization . . . . . . . . . . . . . . . . . . . . . . . . . . . | 7.1 | 7.1 | 7.0 |
| Amortization of other assets . . . . . . . . . . . . . . . . . . . . . . | 10.5 | 8.5 | 6.2 |
| Loss (gain) on sale of property, plant and equipment . . . | 8.7 | (1.0) | (0.3) |
| Decrease in accounts and other receivables. . . . . . . . . . . | 135.0 | 78.2 | 1.8 |
| Decrease in inventories . . . . . . . . . . . . . . . . . . . . . . . . . . | 53.4 | 0.9 | 20.2 |
| Increase (decrease) in interest payable . . . . . . . . . . . . . . | (4.1) | 3.4 | 0.9 |
| Increase (decrease) in accounts payable . . . . . . . . . . . . . | (31.9) | (20.0) | 28.7 |
| Other, net . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (45.8) | 6.1 | (27.8) |
| Net cash provided by continuing operating activities . . . . | 131.4 | 130.9 | 100.1 |
| Net cash provided by (used in) discontinued operations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 12.2 | 0.4 | (16.8) |
| **INVESTING ACTIVITIES** | | | |
| Additions to property, plant and equipment . . . . . . . . . . | (54.5) | (69.0) | (86.4) |
| Sales of property, plant and equipment . . . . . . . . . . . . . . | 88.1 | 5.6 | 10.1 |
| Acquisitions of businesses, net of cash acquired . . . . . . . | (760.9) | — | (0.4) |
| Sale of business . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 3.5 | — | — |
| Other, net . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | — | — | (0.8) |
| Net cash used in investing activities . . . . . . . . . . . . . . . | (723.8) | (63.4) | (77.5) |
| **FINANCING ACTIVITIES** | | | |
| Issuance of long-term debt . . . . . . . . . . . . . . . . . . . . . . . . | 950.0 | — | 100.0 |
| Proceeds from (reduction of) participating interests in accounts receivable, net of redemptions . . . . . . . . . . . . . . | (2.6) | (34.0) | 2.0 |
| Cost of debt issuance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (59.4) | — | (2.4) |
| Repayment of long-term debt . . . . . . . . . . . . . . . . . . . . . . . | (383.2) | (66.6) | (20.6) |
| Increase (decrease) in short-term borrowings. . . . . . . . . . . | 10.1 | 0.2 | (7.4) |
| Net borrowings (repayments) on revolving credit facilities . . . | (150.2) | 39.0 | (35.3) |
| Net proceeds from issuance of common stock . . . . . . . . . . | 207.2 | — | — |
| Reissue (purchase) treasury stock, net . . . . . . . . . . . . . . . . | 61.3 | 0.4 | (1.7) |
| Dividends paid . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | — | — | (50.2) |
| Net cash provided by (used in) financing activities . . . | 633.2 | (61.0) | (15.6) |
| Increase (decrease) in cash and cash equivalents . . . . . . . | 53.0 | 6.9 | (9.8) |
| Cash and cash equivalents at beginning of year . . . . . . . . | 20.9 | 14.0 | 23.8 |
| Cash and cash equivalents at end of year . . . . . . . . . . . . | $ 73.9 | $ 20.9 | $ 14.0 |

The Notes to Consolidated Financial Statements are an integral part
of these consolidated financial statements.

## COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES

### CONSOLIDATED STATEMENTS OF COMMON STOCKHOLDERS' EQUITY (DEFICIT)
#### (in millions)

| | Current Year Comprehensive Income (Loss) | Total | Accumulated Deficit | Accumulated Other Comprehensive Loss(a) | Common Stock | Other Paid-in Capital | Treasury Stock |
|---|---|---|---|---|---|---|---|
| **Balance at December 26, 1998** | | $ (79.7) | $(580.7) | $(23.5) | $0.7 | $ 585.5 | $(61.7) |
| Comprehensive income: | | | | | | | |
| Net loss | $(10.2) | (10.2) | (10.2) | — | — | — | — |
| Other comprehensive income, net of tax: | | | | | | | |
| Foreign currency translation adjustments | (10.6) | (10.6) | — | (10.6) | — | — | — |
| Pension equity adjustment | 0.8 | 0.8 | — | 0.8 | — | — | — |
| | $(20.0) | | | | | | |
| Compensation expense | | 0.5 | — | — | — | 0.5 | — |
| Dividends | | (50.2) | (50.2) | — | — | — | — |
| Purchase of treasury stock (3.7 shares) | | (2.1) | — | — | — | — | (2.1) |
| Exercise of stock options (0.1 shares) | | 0.4 | — | — | — | (0.5) | 0.9 |
| **Balance at December 25, 1999** | | (151.1) | (641.1) | (33.3) | 0.7 | 585.5 | (62.9) |
| Comprehensive income: | | | | | | | |
| Net Income | $ 4.5 | 4.5 | 4.5 | | | | |
| Other comprehensive income, net of tax: | | | | | | | |
| Foreign currency translation adjustments | (10.4) | (10.4) | — | (10.4) | — | — | — |
| Pension equity adjustment | 0.8 | 0.8 | — | 0.8 | — | — | — |
| | $ (5.1) | | | | | | |
| Compensation expense | | 0.9 | — | — | — | 0.9 | — |
| Purchase of treasury stock (0.4 shares) | | (0.5) | — | — | — | — | (0.5) |
| Exercise of stock options (0.2 shares) | | 0.9 | — | — | — | (0.9) | 1.8 |
| **Balance at December 31, 2000** | | $(154.9) | $(636.6) | $(42.9) | $0.7 | $ 585.5 | $(61.6) |
| Comprehensive income: | | | | | | | |
| Net loss | $(46.2) | (46.2) | (46.2) | | | | |
| Other comprehensive income: | | | | | | | |
| Foreign currency translation adjustments | (9.0) | (9.0) | — | (9.0) | — | — | — |
| Pension equity adjustment, net of tax | (15.4) | (15.4) | — | (15.4) | — | — | — |
| | $(70.6) | | | | | | |
| Compensation expense | | 1.2 | — | — | — | 1.2 | — |
| Issue of common stock | | 533.0 | — | — | 1.0 | 532.0 | — |
| Reissue of treasury stock (8.5 shares) | | 61.3 | — | — | — | (0.3) | 61.6 |
| Exercise of stock options (1.1 shares) | | 4.7 | — | — | — | 4.7 | — |
| **Balance at December 31, 2001** | | $ 374.7 | $(682.8) | $(67.3) | $1.7 | $1,123.1 | $ — |

(a) The components of Accumulated Other Comprehensive Loss are $51.7 million of foreign currency translation adjustment and $15.6 million of pension equity adjustment as of December 31, 2001.

The Notes to Consolidated Financial Statements are an integral part
of these consolidated financial statements.

COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

## 1.  Organization

Collins & Aikman Corporation (the "Company") is a Delaware corporation, headquartered in Troy, Michigan. The Company conducts all of its operating activities through its wholly owned Collins & Aikman Products Co. ("Products") subsidiary. The Company is a global leader in design, engineering and manufacturing of automotive interior components, including instrument panels, fully assembled cockpit modules, floor and acoustic systems, automotive fabric, interior trim and convertible top systems. The Company operates through three divisions: North American Automotive Interior Systems, European Automotive Interior Systems and Specialty Automotive Products.

As of December 31, 2000, Blackstone Capital Partners L.P. and its affiliates ("Blackstone Partners") and Wasserstein Perella Partners L.P. and its affiliates ("WP Partners") collectively owned approximately 87% of the common stock of the Company.

During February 2001, Heartland Industrial Partners, L.P. and its affiliates ("Heartland") acquired a controlling interest equal to approximately 60% of the Company through a purchase of 25 million shares of common stock from the Company and a purchase of 27 million shares from Blackstone Partners and WP Partners. As a result of the sale of shares, the Company received gross proceeds of $125.0 million, or approximately $94.6 million after fees and expenses associated with the transactions. The Company also received a profit participation right on certain future common stock sales by Heartland. As a result of the above transactions ("Heartland Transaction"), Heartland is entitled to designate a majority of the Company's Board of Directors (Note 3).

The Company completed its acquisition of Becker Group, LLC, a supplier of plastic components to the automotive industry and the automotive fabric operations of Joan Fabrics and an affiliate in July and September 2001, respectively. The acquisitions included the issuance of approximately 30 million shares of common stock with a market value of $169.3 million (Note 3).

In December 2001, the Company completed it acquisition of Textron Automotive Company's ("Textron's") automotive trim division ("TAC-Trim") for $940 million. The purchase price consisted primarily of: $632.2 million in cash and assumed debt; 18 million shares of common stock, with a market value of $160.9 million; and preferred stock of Products with an aggregate liquidation preference of $326.4 million, valued at $146.9 million. The cash purchase price was financed through a combination of the sale of an additional 32 million shares of common stock, valued at $160.0 million, to Heartland and debt financing (Note 3).

As a result of the above transactions, the Company's total shares outstanding increased from approximately 62 million shares to approximately 168 million shares. On December 31, 2001, Heartland owned approximately 40% of the outstanding shares; Blackstone Partners' and WP Partners' owned approximately 15%; Joan Fabrics Corp., Mr. Elkin McCallum and associates owned approximately 8%; Mr. Charles E. Becker and Textron, Inc. each owned approximately 11% (Note 3).

## 2.  Summary of Significant Accounting Policies

Basis of Presentation — The consolidated financial statements include the accounts of the Company and its consolidated subsidiaries. Investments in entities in which the Company has control are consolidated. Investments in 50% or less owned entities in which the Company has significant influence have been accounted for under the equity method. All significant intercompany items have been eliminated in the preparation of the consolidated financial statements. Certain prior year items have been reclassified to conform with the fiscal 2001 presentation.

Use of Estimates — The preparation of consolidated financial statements in conformity with generally accepted accounting principles requires management to make estimates and assumptions that affect the

**COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the consolidated financial statements and the reported amounts of revenues and expenses during the reporting period. Actual results could differ from those estimates.

Fiscal Year — During fiscal 2000, the Company changed its fiscal year-end to a calendar year-end. The 2000 fiscal year consisted of 53 weeks, which ended on December 31, 2000 whereas fiscal 1999, which ended on December 25, 1999 had 52 weeks.

Earnings Per Share — Basic earnings per share is based on income available to common shareholders divided by the weighted average number of common shares outstanding. Diluted earnings per share is based on income available to common shareholders divided by the sum of the weighted average number of common shares outstanding and all potentially dilutive common shares. Potentially dilutive common shares include shares which may be issued upon the assumed exercise of employee stock options less the number of treasury shares assumed to be purchased from the proceeds, including applicable compensation expense (Note 23).

Cash and Cash Equivalents — Cash and cash equivalents include all cash balances and highly liquid investments with an original maturity of three months or less.

Accounts and Other Receivables — Accounts and other receivables consist primarily of the Company's trade receivables and the retained interest in the Receivables Facility (See Note 11). The Company has provided an allowance against uncollectible accounts.

Inventories — Inventories are valued at the lower of cost or market, but not in excess of net realizable value. Cost is determined on the first-in, first-out basis.

Property, Plant and Equipment — Property, plant and equipment are stated at cost. Normal repairs and maintenance are expensed as incurred. Provisions for depreciation are primarily computed on a straight-line basis over the estimated useful lives as follows: 10-20 years for land improvements, 20-40 years for buildings, and 3-11 years for machinery and equipment. Leasehold improvements are amortized over the lesser of the lease term or the estimated useful lives of the improvements.

Long-Lived Assets — Statement of Financial Accounting Standards ("SFAS") No. 121, "Accounting for the Impairment of Long-Lived Assets and for Long-Lived Assets to be Disposed Of", establishes accounting standards for the impairment of long-lived assets, certain identifiable intangibles, and goodwill related to those assets to be held and used and for long-lived assets and certain identifiable intangibles to be disposed of. SFAS No. 121 requires that long-lived assets and certain identifiable intangibles to be held and used by an entity be reviewed for impairment whenever events or changes in circumstances indicate that the carrying amount of an asset may not be recoverable, and that certain long-lived assets and identifiable intangibles to be disposed of be reported at the lower of carrying amount or fair value less cost to sell. During 2001, the Company incurred asset impairment charges of $7.6 million recognized as part of restructuring programs (Note 15). In addition, during fiscal 1999, the Company incurred a charge of $13.4 million relating to asset impairments recognized in the Reorganization (See Note 15).

Goodwill and Intangibles — Goodwill, representing the excess of purchase price over the fair value of net assets of the acquired entities, obtained prior to June 30, 2001 is being amortized on a straight-line basis over a period of forty years. Amortization of goodwill applicable to continuing operations was $7.1 million for the year ended December 31, 2001 and $7.1 million for fiscal 2000 and $7.0 million for fiscal 1999. Accumulated amortization at December 31, 2001 and December 30, 2000 was $35.7 million and $32.0 million, respectively. The carrying value of goodwill is reviewed periodically based on the non-discounted cash flows and pretax income of the entities acquired over the remaining amortization periods. The Company believes that no adjustment for impairment is required for the $1.3 billion of goodwill at December 31, 2001. In accordance with SFAS No. 142, "Goodwill and Other Intangible Assets," goodwill in the amount of $1.0 billion acquired subsequent to June 30, 2001 is not being amortized (Note 3). Beginning in 2002, as required by SFAS

F-8

**COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

No. 142, goodwill will no longer be amortized, but will be subject to annual impairment tests. Other intangible assets that do not have an indefinite life will continue to be amortized over their useful lives.

*Revenue Recognition* — The Company recognizes revenue from product sales when it has shipped the goods. The Company generally allows its customers the right of return only in the case of defective products. The Company provides a reserve for estimated defective product costs at the time of the sale of the products.

*Customer Engineering and Tooling* — Engineering and tooling balances represent tools, dies and other items used in the manufacture of customer components. Amounts included in the consolidated balance sheets include Company-owned tools and costs incurred on customer-owned tools which are subject to reimbursement, pursuant to the terms of a customer contract. Company-owned tools balances are amortized over the tool's expected life or the life of the related vehicle program, whichever is shorter. Engineering, testing and other costs incurred in the design and development of production parts are expensed as incurred, unless the costs are reimbursable, as specified in a customer contract.

Emerging Issue Task Force EITF Issue No. 99-5, "Accounting for Pre-Production Costs Related to Long-Term Supply Arrangements" (EITF No. 99-5) requires that design and development costs for products to be sold under long-term supply arrangements be expensed as incurred, and costs incurred for molds, dies and other tools that will be used in producing the products under long-term supply arrangements be capitalized and amortized over the shorter of the expected useful life of the assets or the term of the supply arrangement. The Company adopted the provisions of EITF No. 99-5 on a prospective basis on December 26, 1999. At December 31, 2001, the Company had assets of approximately $22.7 million recognized pursuant to agreements that provide for contractual reimbursement of pre-production design and development costs, approximately $90.2 million (of which substantially all is reimbursable) for molds, dies and other tools that are customer-owned and approximately $9.1 million for molds, dies and other tools that the Company owns.

*Derivative Financial Instruments* — The Company utilizes derivative financial instruments to manage risk associated with foreign exchange rate volatility. Currently, most of the Company's derivative transactions do not utilize the hedge provisions of SFAS No. 133, "Accounting for Derivative Instruments and Hedging Activities". The Company uses derivatives to hedge economic risks even though these derivatives may not qualify for hedge accounting in accordance with SFAS No. 133. Accordingly, these derivative instruments are marked to fair market value and reported on the balance sheet. Gains and losses on these instruments are reported in "Other Income" on the Consolidated Statements of Operations. From a risk management perspective, these gains and losses are intended to offset foreign currency transaction losses or gains. The Company also has several credit default swaps, with a notional amount of 175 million. The purpose of entering these swaps is to reduce a potential loss in liquidity (provided by the Company's Receivable Facility) that would result from the downgrading of an obligor (Note 11). The fair value of these instruments was approximately $3.1 million as of December 31, 2001. These instruments do not qualify for hedge accounting under SFAS No. 133 and are marked to market with gains and losses reported in "Other Income" on the Consolidated Statement of Operations. Corporate policy prescribes the range of allowable risk management activity. The Company does not enter into derivative transactions for speculative purposes. Refer to Note 5. "Foreign Currency Protection Programs" for additional discussion.

*Foreign Currency* — Foreign currency activity is reported in accordance with SFAS No. 52, "Foreign Currency Translation". SFAS No. 52 generally provides that the assets and liabilities of foreign operations be translated at the current exchange rates as of the end of the accounting period and that revenues and expenses be translated using average exchange rates. The resulting translation adjustments arising from foreign currency translations are accumulated as a component of other comprehensive income.

Gains and losses resulting from foreign currency transactions are recognized in other income (expense). The Company recognized a loss from foreign currency transactions of $2.8 million for the year ended December 31, 2001, a loss of $0.4 million in fiscal 2000 and a gain of $0.5 million in fiscal 1999.

**COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

*Environmental —* The Company records an estimated loss when it is probable that an environmental liability has been incurred and the amount of the loss can be reasonably estimated. The Company also considers estimates of certain reasonably possible environmental liabilities in determining the aggregate amount of environmental reserves. The Company reviews all environmental claims from time to time and adjusts the reserves accordingly. Accruals for environmental liabilities are generally included in the consolidated balance sheet as other non-current liabilities at undiscounted amounts and exclude claims for recoveries from insurance or other third parties. Accruals for insurance or other third party recoveries for environmental liabilities are recorded when it is probable that the claim will be realized.

*Newly Issued Accounting Standards —* In August 2001, the FASB issued SFAS No. 144, "Accounting for the Impairment or Disposal of Long-Lived Assets" effective for fiscal years beginning after December 15, 2001. The provisions of SFAS 144 are to be applied prospectively and have no impact on the accompanying financial statements. SFAS No. 144, supercedes SFAS No. 121 "Accounting for the Impairment of Long-Lived Assets and for Long-Lived Assets to Be Disposed Of" and the provisions of APB Opinion No. 30, " Reporting the Results of Operations — Reporting the Effects of Disposal of a Segment of a Business," for the disposal of segments of a business. SFAS No. 144 requires that one accounting model be used for long-lived assets to be disposed of by sale and extends the use of this accounting to discontinued operations. Long-lived assets will be measured at the lower of carrying amount or fair value less cost to sell, regardless of whether it is reported in continuing or discontinued operations. Additionally, SFAS No. 144 broadens the reporting of discontinued operations to include certain disposal transactions that were not included in previous standards.

In June 2001, the FASB approved SFAS No. 141, "Business Combinations" and SFAS No. 142, "Goodwill and Other Intangible Assets" effective for fiscal years beginning after December 15, 2001. SFAS No. 141 requires that the purchase method of accounting be used for all business combinations initiated after June 30, 2001. Under SFAS No. 142, amortization of goodwill, including goodwill recorded in past business combinations, will discontinue upon adoption of this standard. In addition, goodwill recorded as a result of business combinations completed during the six-month period ending December 31, 2001 will not be amortized. All goodwill and intangible assets will be tested for impairment in accordance with the provisions of SFAS No. 142. The Company is currently reviewing the provisions of SFAS No. 141 and 142 and assessing the impact of adoption. The Company cannot determine the complete impact of SFAS 142 until such time as it can complete the first-step of a two-step impairment test. The Company is gathering information to prepare the first-step of the impairment test and expects to complete this step by June 30, 2002. If an impairment loss were identified as a result of these tests, it would be reported as a cumulative effect of a change in accounting principle. In accordance with the provisions of SFAS No. 142 the Company is not amortizing any of the goodwill associated with its acquisitions made subsequent to June 30, 2001 (Note 3).

In September 2000, the Financial Accounting Standards Board ("FASB") issued SFAS No. 140, "Accounting for Transfers and Servicing of Financial Assets and Extinguishments of Liabilities", which replaced SFAS No. 125, also titled "Accounting for Transfers and Servicing of Financial Assets and Extinguishments of Liabilities". SFAS No. 140 provides accounting and reporting standards for transfers and servicing of financial assets and extinguishments of liabilities. Those standards are based on consistent application of a financial-components approach that focuses on control. After a transfer of financial assets, an entity recognizes the financial and servicing assets it controls and the liabilities it has incurred, derecognizes financial assets when control has been surrendered, and derecognizes liabilities when extinguished. SFAS No. 140 became effective for recognition and reclassification of collateral and for disclosures relating to securitization transactions and collateral for fiscal years ending after December 15, 2000 (See Note 11) and for transfers and servicing of financial assets and extinguishments of liabilities occurring after March 31, 2001.

In June 1998, the FASB issued SFAS No. 133 which established accounting and reporting standards requiring that every derivative instrument (including certain derivative instruments embedded in other contracts) be recorded in the balance sheet as either an asset or liability measured at its fair value. SFAS

COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

No. 133 requires that changes in the derivative's fair value be recognized currently in earnings unless specific hedge accounting criteria are met. Special accounting for qualifying hedges allows a derivative's gains and losses to offset related results on the hedged item in the income statement, and requires that a company formally document, designate, and assess the effectiveness of transactions that receive hedge accounting. In June 1999, the FASB issued SFAS No. 137, "Accounting for Derivative Instruments and Hedging Activities — Deferral of the Effective Date of FASB Statement No. 133, an Amendment of FASB Statement No. 133". Under SFAS No. 137, SFAS No. 133 was made effective for fiscal years beginning after June 15, 2000. In June 2000, the FASB issued SFAS No. 138, "Accounting for Certain Derivative Instruments and Certain Hedging Activities — An Amendment of FASB Statement No. 133," which provides additional guidance for certain derivative instruments and hedging activities addressed in SFAS No. 133. SFAS No. 138 must be adopted concurrently with the adoption of SFAS No. 133.

SFAS No. 133 and SFAS 138 were effective for the Company as of January 1, 2001. Adoption of these new accounting standards had no material effect on net income, other comprehensive income, assets and liabilities.

### 3.   Acquisitions and Joint Ventures

In December 2001, the Company completed its acquisition of Textron Automotive Company's automotive trim division ("TAC-Trim"). TAC-Trim is a leading supplier of fully-integrated cockpits and a major automotive plastics manufacturer in North America, Europe, and South America for instrument panels, interior trim and exterior components. The purchase price consisted primarily of: $632.2 million in cash (net of cash received and assumed debt); 18 million shares of common stock, with a market value of $160.9 million; and preferred stock of Products with an aggregate liquidation preference of $326.4 million, valued at $146.9 million. The cash purchase price was financed through a combination of the sale of an additional 32 million shares of common stock, valued at $160.0 million, to Heartland and debt financing. As part of the Textron purchase agreement, the Company may be obligated to make additional payments of up to $125.0 million to Textron based on cumulative cash flow performance for the five year period ended December 31, 2006. If the then existing debt instruments prohibit these additional payments, then the Company is entitled to issue additional mandatorily redeemable preferred stock of its subsidiary.

In September 2001, the Company completed its acquisition of the automotive fabric operations of Joan Fabrics, a leading supplier of bodycloth to the automotive industry, and all of the operating assets in Joan Fabric's affiliated yarn dying operation, Western Avenue Dyers (collectively "Joan"). Consideration included $102.0 million in cash, including acquisition fees, and 12.76 million shares of the Company's common stock, valued at $90.2 million.

In July 2001, the Company completed its acquisition of Becker Group, LLC ("Becker"), a supplier of plastic components to the automotive industry. Consideration included $61.8 million in cash, including acquisition fees, $18.0 million in non-compete agreements (to be paid out over 5 years), 17.0 million shares of the Company's common stock, valued at $79.1 million, and warrants to purchase 500,000 shares of the Company's common stock at an exercise price of $5.00 per share, valued at $0.7 million.

During the first quarter of 2001, the Company purchased the remaining 50% from Courtaulds Textiles (Holdings) Limited ("Courtaulds") for $3.8 million, net of cash acquired. In December 1997, the Company had entered into a 50% joint venture with Courtaulds to manufacture automotive interior fabrics in the United Kingdom.

Also during the first quarter of 2001, the Company acquired the remaining 25% of the Collins & Aikman Carpet and Acoustics, S.A. de C.V. joint venture and related intangible assets for $3.5 million. As part of the 1996 acquisition of Perstorp, the Company acquired the initial 75% of Collins & Aikman Carpet and Acoustics, S.A. de C.V. joint venture.

**COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

The results of operations of the acquired companies are included in the Company's consolidated statements of operations from the dates of acquisition.

The acquisitions were accounted for under the purchase method of accounting. In accordance with SFAS No. 142, goodwill recorded as a result of business combinations completed during the six-month period ending December 31, 2001 was not amortized. Beginning in 2002, all goodwill and intangible assets will be tested for impairment in accordance with the provisions of SFAS No. 142. Under SFAS No. 142, amortization of goodwill, including goodwill recorded in past business combinations, will discontinue upon adoption of this standard. For acquisitions completed prior to July 1, 2001, the excess of the purchase price for each acquisition over the estimated fair value of the tangible and identifiable intangible net assets acquired was being amortized over a period of 40 years on a straight-line basis.

The following unaudited pro forma summary presents information as if the acquisition of TAC-trim, Joan and Becker became effective at the beginning of the respective periods noted in the table below. The acquisitions have been accounted for using the purchase method. The allocation of the purchase price is preliminary and may be revised upon the completion of our appraisals. Appraisals are in progress for TAC-Trim. Appraisals for Becker and Joan were preformed during 2001. For the Becker and Joan acquisitions, the Company recorded approximately $286.3 million as goodwill. These acquisitions are intended to solidify the Company's position as a "Mega Tier 2" supplier of interior components and automotive fabrics.

The unaudited pro forma information does not reflect any benefits from synergies that might be achieved from combining operations and does not reflect the actual results that would have occurred nor is it necessarily indicative of future results of operations of the combined companies. Included in the proforma amounts are charges related to the acquired subsidiaries; $11.4 million and $21.7 million of restructuring charges at December 31, 2001 and 2000, respectively; a $42.6 million loss on a sale-leaseback transaction at December 31, 2001; and a $59.1 million charge for a cumulative effect of a change in accounting principle (net of tax) at December 31, 2000. The unaudited pro forma amounts include adjustments that are based upon available information and various assumptions that the Company believes are reasonable.

|  | Year Ended | |
|---|---|---|
|  | 2001 (52 weeks) | 2000 (53 weeks) |
|  | (in millions, except for per share data) | |
| Net sales ................................................. | $3,485.2 | $4,030.4 |
| Restructuring charges ..................................... | $ 30.2 | $ 21.7 |
| Income (loss) from continuing operations ................... | $ (126.8) | $ (1.3) |
| Income (loss) before extraordinary charge .................. | $ (118.0) | $ 5.3 |
| Net income (loss) ......................................... | $ (118.3) | $ (54.5) |
| Net income (loss) per basic and diluted common share ....... | $ (0.70) | $ (0.33) |

**COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

Following is the preliminary opening condensed balance sheet of the three significant acquisitions made during 2001:

| | Becker | Joan | TAC-Trim |
|---|---|---|---|
| | | (in millions) | |
| Assets | | | |
| Current Assets | $ 53.6 | $ 40.2 | $335.0 |
| Goodwill | 130.5 | 155.8 | 730.3 |
| Other Assets | 21.9 | 14.4 | 387.6 |
| Liabilities | | | |
| Current Liabilities | 67.7 | 18.2 | 432.1 |
| Other Liabilities | 14.7 | — | 80.8 |
| Cash Paid, net of cash received | 61.8 | 102.0 | 596.6 |
| Common Stock, Preferred Stock and Warrants | 79.8 | 90.2 | 307.8 |
| Assumed Debt and Other Consideration | 18.0 | — | 35.6 |
| Total Consideration | $159.6 | $192.2 | 940.0 |

**4. Change in Accounting Principle**

In April 1998, the AICPA issued SOP 98-5, "Reporting on the Costs of Start-up Activities". SOP 98-5 provides guidance on the financial reporting of start-up costs and organization costs and requires that all non-governmental entities expense the costs of start-up activities as these costs are incurred instead of being capitalized and amortized. The Company adopted SOP 98-5 on December 27, 1998. The initial impact of adopting SOP 98-5 resulted in a charge of approximately $8.8 million, net of income taxes of $5.1 million, which has been reflected as a cumulative effect of a change in accounting principle in the accompanying consolidated statement of operations for the fiscal year ended December 25, 1999.

**5. Foreign Currency Protection Programs**

The primary purpose of the Company's foreign currency risk management activities is to protect against the volatility associated with intercompany funding arrangements, third party loans and foreign currency purchase and sale transactions. The Company primarily utilizes forward exchange contracts and purchased options with durations of generally less than 12 months.

The Company has in place forward exchange contracts, with third parties, denominated in multiple currencies which will mature during fiscal 2002. These forward contracts, which in notional terms aggregated a U.S. dollar equivalent of $558.2 million at December 31, 2001, are to manage the currency volatility associated with intercompany funding arrangements, third party loans and foreign currency purchase and sales transactions.

During fiscal 2001, 2000 and 1999, the Company purchased option contracts giving the Company the right to purchase U.S. dollars for use by its Canadian operations. During 2000 and 1999, the premiums associated with these contracts were amortized over the contracts' terms which were one year or less. Beginning January 1, 2001, the contracts are marked to fair market value and recorded on the balance sheet, per the requirements of SFAS No. 133. The total notional amount purchased over these three fiscal years was $114.2 million with associated premiums of $1.5 million. At December 31, 2001, the notional amount outstanding was $30.7 million.

In addition, during 2001, the Company purchased option contracts giving the Company the right to sell Canadian dollars received by its U.S. operations. The contracts are marked to fair market value and recorded on the balance sheet, per the requirements of SFAS No. 133. The total notional amount purchased was $28.7 million with associated premiums of $0.3 million. At December 31, 2001, the notional amount outstanding was $6.8 million.

COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

During 2001, in order to comply with the provisions of the Receivables Facility, the Company purchased a series of option contracts, each of which gave Carcorp Inc., a wholly-owned bankruptcy remote subsidiary of the Company (See Note 11), the right to sell a total of $360.0 million Canadian dollars in exchange for U.S. dollars. The option contracts are marked to fair market value and recorded on the balance sheet, per the requirements of SFAS No. 133. The total U.S. dollar notional amount purchased to comply with the Receivables Facility was $226.0 million, with associated net premiums of $1.1 million. The total notional amount outstanding at December 31, 2001 was $84.7 million.

### 6. Inventories

Inventory balances are summarized below (in millions):

| | December 31, 2001 | December 31, 2000 |
|---|---|---|
| Raw materials | $ 73.8 | $ 80.8 |
| Work in process | 25.6 | 28.5 |
| Finished goods | 33.2 | 22.4 |
| | $132.6 | $131.7 |

### 7. Other Current Assets

Other current asset balances are summarized below (in millions):

| | December 31, 2001 | December 31, 2000 |
|---|---|---|
| Deferred tax asset | $ 25.3 | $19.1 |
| Reimbursable tooling | 53.7 | 27.7 |
| Other | 52.9 | 29.1 |
| | $131.9 | $75.9 |

### 8. Property, Plant and Equipment, Net

Property, plant and equipment, net, are summarized below (in millions):

| | December 31, 2001 | December 31, 2000 |
|---|---|---|
| Land and improvements | $ 25.5 | $ 18.7 |
| Buildings | 168.8 | 155.0 |
| Machinery and equipment | 828.8 | 549.7 |
| Leasehold improvements | 11.7 | 18.8 |
| Construction in progress | 45.0 | 35.1 |
| | 1,079.8 | 777.3 |
| Less accumulated depreciation and amortization | (461.7) | (343.2) |
| | $ 618.1 | $ 434.1 |

**COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

**9. Accrued Expenses**

Accrued expenses are summarized below (in millions):

| | December 31, 2001 | December 31, 2000 |
|---|---|---|
| Payroll and employee benefits | $ 48.4 | $ 26.9 |
| Interest | 14.8 | 17.0 |
| Insurance | 39.0 | 17.2 |
| Restructuring reserves | 13.5 | 2.5 |
| Other | 129.5 | 59.5 |
| | $245.2 | $123.1 |

**10. Long-Term Debt, Mandatorily Redeemable Preferred Stock and Short-Term Borrowings**

**a. Long-term Debt**

Long-term debt is summarized below (in millions):

| | December 31, 2001 | December 31, 2000 |
|---|---|---|
| Senior Credit Facilities: | | |
| Tranche A Term Loan Facility | $ 100.0 | $ — |
| Tranche B Term Loan Facility | 300.0 | — |
| Revolving Credit Facility | — | — |
| Bank Credit Facilities: | | |
| Term Loan A Facility | — | 66.3 |
| Term Loan B Facility | — | 118.0 |
| Term Loan C Facility | — | 96.0 |
| Revolving Credit Facility, including $17.3 million by the Canadian borrowers at December 31, 2000. | — | 150.2 |
| Public Debt: | | |
| 11$\frac{1}{2}$% Senior Subordinated Notes, due 2006 | 400.0 | 400.0 |
| 10$\frac{3}{4}$% Senior Notes, due 2011 | 500.0 | — |
| JPS Automotive 11$\frac{1}{8}$% Senior Notes, including premiums of $— and $0.3 million | — | 48.3 |
| Other | 1.9 | 5.2 |
| Total debt | 1,301.9 | 884.0 |
| Less current maturities | (19.5) | (84.3) |
| | $1,282.4 | $799.7 |

**Bank Credit Facilities**

In December 2001, in conjunction with the TAC-Trim acquisition, the Company entered into new Senior Credit Facilities, which refinanced its Bank Credit Facilities. The principal and interest on the Bank Credit Facilities totaled $362.5 million. The cost and expenses associated with the refinancing of the bank credit facilities totaling $25.7 million were deferred and will be amortized over the four-year life of the term loans

## COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES

### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

described below. In addition, the Company incurred a $5.0 million, net of tax, extraordinary charge in connection with the retirement of the old Bank Credit Facilities.

The new Senior Credit Facilities include a floating rate Revolving Facility and two new floating rate Term Loan Facilities that mature on December 31, 2005. The Revolving Facility allows the Company to borrow revolving loans up to $175.0 million including Canadian dollars up to $75.0 million. The facility can be utilized for letters of credit. The Term Loan Facilities consist of a Tranche A Term Loan with a principal balance of $100.0 million and a Tranche B Term Loan with a principal balance of $300.0 million. As required by the credit agreement, the full amounts of the Term Loan Facilities were drawn down on the closing date. Amounts borrowed under the Term Loan Facilities that are repaid or prepaid cannot be reborrowed. The Tranche A Term Loan Facility is payable in quarterly installments that increase in amounts each year until maturity. The Tranche B Term Loan Facility is payable in quarterly installments of $0.8 million for the first three years and quarterly installments of $72.7 million during the final year.

Under the new Senior Credit Facilities, the interest rate on the Revolving Facility is, at the Company's option, London Inter-Bank Offer Rate ("LIBOR") plus 3.75% or the Alternate Base Rate ("ABR") plus 2.75%. The ABR is the highest of The JP Morgan Chase ("Chase's") announced prime rate, the Federal Funds Rate plus 0.5% and Chase's base certificate of deposit rate plus 1%. A per annum fee equal to the spread over the LIBOR plus a fronting fee of 0.25% accrue on the face amount of letters of credit. Also, there is a 1.00% commitment fee on the unused portion of the facility. The interest rates on the Canadian-dollar denominated debt is at the Company's option (the "Canadian Prime Rate") plus 3.75% or the bill of exchange rate ("Bankers' Acceptance" or "BA") denominated in Canadian dollars for one, two, three or six months plus 2.75%. The interest rate on the Tranche A Term Loan Facility is, at the Company's option, LIBOR plus 3.75% or the ABR plus 2.75%. The interest rates and commitment fees on the Revolving Facility and the Tranche A Term Loan Facility are subject to adjustment quarterly starting six months after the closing date based on performance targets. The interest rate on the Tranche B Term Loan Facility is, at our option, either LIBOR plus 4.00% or ABR plus 3.00%. On any Tranche B Term Loans repaid whether voluntary or mandatory there is a prepayment premium of 3.00% the first year, 2.00% the second year and 1.00% the third year. The Company may elect interest periods of 1, 2, 3, or 6 months (or 9 or 12 months, if available) for LIBOR borrowings. LIBOR shall not be less than 3.00% per annum. At December 31, 2001, LIBOR for 1, 3 and 6 months were 1.87%, 1.88% and 1.98%, respectively. The weighted average rate of interest on the new Senior Credit Facilities at December 31, 2001 was 7.67%.

In May 1998, Products entered into Bank Credit Facilities ("old Bank Credit Facilities") consisting of a senior secured Revolving Credit Facility and Term Loan Facilities. The Revolving Credit Facility allowed borrowings in an aggregate principal amount of up to $250.0 million, terminating on December 31, 2003, of which $60.0 million (or the equivalent thereof in Canadian dollars) was available to two of the Company's Canadian subsidiaries ("the Canadian Borrowers") and of which up to $50.0 million was available as a letter of credit facility (the "Revolving Credit Facility", and together with the Term Loan Facilities, the "Credit Agreement Facilities"). The Term Loan Facilities consisted of a Term Loan A Facility in the amount of $100 million payable in quarterly installments until final maturity on December 31, 2003 and a Term Loan B Facility in the amount of $125 million payable in quarterly installments until final maturity on June 30, 2005. In addition, the Term Loan Facilities included a provision for a Term Loan C Facility of up to $150 million. In May 1999, the Company closed on the Term Loan C Facility in the principal amount of $100 million. The Term Loan C Facility was payable in quarterly installments through final maturity on December 31, 2005. The Company used approximately $44 million of the proceeds from the Term Loan C Facility to pay a special dividend to shareholders on May 28, 1999 (See Note 16). The remaining proceeds were used to repay amounts outstanding on the Revolving Credit Facility and for general corporate purposes.

Effective February 2001, the Company amended and restated the Credit Agreement Facilities and received waivers of the interest coverage and leverage ratio covenants for the period ending December 31,

**COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

2000. The Company also received commitments from its lenders for a Term Loan D Facility in the amount of $50 million maturing January 2006, which was used to retire the outstanding JPS Automotive 11⅛% Senior Notes due 2001. The primary purpose of the amendments was to allow the change of control precipitated by the Heartland Transaction and to provide for the Term Loan D Facility.

In March 2001, the proceeds from the Term Loan D Facility were used to retire all outstanding JPS Automotive 11⅛% Senior Notes due June 2001. The Company recognized an extraordinary charge of $0.3 million in connection with this repurchase of the remaining outstanding JPS Automotive Senior Notes at prices in excess of carrying values.

The old Bank Credit Facilities were guaranteed by the Company and its U.S. subsidiaries (subject to certain exceptions). As a part of the amendment and restatement effective February 23, 2001, the Company provided collateral additional to the previous pledge of stock of Products and its significant subsidiaries and certain intercompany debt and guarantees from the Company and its U.S. subsidiaries (subject to certain exceptions). This additional collateral consisted of a first priority lien on the assets of the Company, Products and its U.S. and Canadian subsidiaries with certain exceptions including assets included in the Company's receivables facility, certain scheduled assets, and certain assets whose value relative to cost of lien perfection was deemed too low to include. Guarantees and security requirements of the new Senior Credit Facility are substantially the same as the old bank credit facilities as amended and restated except that they are extended to subsequently acquired or organized domestic subsidiaries.

The new Senior Credit Facilities and the old Credit Facilities contain restrictive covenants including maintenance of interest coverage and leverage ratios and various other restrictive covenants that are customary for such facilities. The covenants of the new Senior Credit Facilities limit investments, dividends or other distributions of capital stock, capital expenditures, the purchase of Preferred Stock of subsidiary, the prepayment of debt other than loans under the senior credit facilities, liens and certain lease transactions. Should the Company sell assets or incur debt over $20.0 million proceeds must be used to pre-pay the term loans in an amount based on excess cash flow as measured by the leverage ratio performance. The covenants permit the payment of dividends on the Preferred Stock not to exceed 8% per annum unless at least 50% of the Senior Secured Term Loan Facilities are repaid or the proforma total Leverage Ratio is less than 2.5 to 1. The covenants limit acquisitions including further investment in the Italian joint venture, Holdings (Italy) S.r.L. to $23.0 million subject to a purchase price adjustment up to $5.0 million provided that after the expenditure no default has occurred. The covenants require that the interest coverage ratio for any period of four consecutive fiscal quarters be less than 2.25 to 1.00 on September 30,2002 increasing each quarter to 3.25 to 1.00 on December 31, 2005 and that the leverage ratio be no greater than 4.50 to 1.00 on September 30, 2002 decreasing each quarter to 3.00 to 1.00 on December 31, 2005.

The interest rates under the old Bank Credit Facilities were at variable rates based determined similar to the new Senior Credit Facilities. The weighted average rate of interest on the old Bank Credit Facilities at December 31, 2000 was 9.05%.

*Public Debt*

In December 2001, the C&A Products issued 10¾% Senior Subordinated Notes due 2011 in a total principal amount of $500.0 million. The Notes were not registered under the securities act of 1933 and were offered only to qualified institutional buyers. The Company used the net proceeds from the offering together with the proceeds from other financing to consummate the TAC-Trim acquisition, repay all principal, interest, fees and other amounts outstanding under the old Bank Credit Facilities, replace the Company's existing Receivables Facility and pay related fees and expenses. The cost of issuing the notes totaling about $23.1 million was deferred and will be amortized over 10 years.

**COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

The notes are unconditionally guaranteed on an unsecured senior basis by the parent and by each wholly owned domestic subsidiary that is a guarantor of the Bank Credit Facilities as of the issue date. This is all of the Company's wholly owned domestic subsidiaries other than its receivable and insurance subsidiaries. The Debt evidenced by the Notes and Parent and Subsidiary Guarantees are unsecured senior obligations of the Company ranking senior in right of payment to all existing and future Subordinated Debt including the Existing Notes and related Guarantees and future unsecured and unsubordinated Debt. The Notes are redeemable prior to December 31, 2004 only in the event the Company receives cash proceeds from one or more equity offerings in which case the Company may at its option use all or a portion of such cash proceeds to redeem up to 35% of the principal amount of the notes. The Notes will be subject to redemption at the option of the Company, in whole or in part at any time after December 31, 2006 at a stated premium redemption price expressed as a percentage in excess of the principal amount. After December 31, 2008, the redemption price is 100%. Within 30 days of the occurrence of a change of ownership control, unless the Company has mailed a redemption notice with respect to all outstanding Notes, the Company will be required to make an offer to purchase all outstanding Notes at a purchase price equal to 101% of their principal amount. The indenture governing the notes limits the Company's ability to issue more debt, pay dividends and make distributions, repurchase stock, make investments, merge or consolidate, transfer assets, enter into transactions with affiliates and issue stock of subsidiaries. These restrictive covenants are customary for such securities and are subject to a number of exceptions.

In June 1996, Products, issued at face value $400 million principal amount of $11\frac{1}{2}$% Senior Subordinated Notes due 2006 which are guaranteed by the Company. The indenture governing the $11\frac{1}{2}$% Senior Subordinated Notes generally prohibits the Company, Products and any Restricted Subsidiary (as defined) from making certain payments and investments unless a certain financial test is satisfied and the aggregate amount of such payments and investments since the issue date is less than a specified amount. The prohibition is subject to a number of significant exceptions, including dividends to stockholders of the Company or stock repurchases not exceeding $10 million in any fiscal year or $20 million in the aggregate, dividends to stockholders of the Company or stock repurchases in the amount of the net proceeds from the sale of the Company's Imperial Wallcoverings, Inc. subsidiary ("Wallcoverings") and dividends to the Company to permit it to pay its operating and administrative expenses. The indenture also contains other restrictive covenants (including, among others, limitations on the incurrence of debt, asset dispositions and transactions with affiliates), which are customary for such securities. These covenants are also subject to a number of significant exceptions.

The Company solicited and received consent from holders of a sufficient amount of the outstanding principal of the $11\frac{1}{2}$% Senior Subordinated Notes allowing the Change of Control precipitated by the Heartland Transaction. A Second Supplemental Indenture dated February 8, 2001 amended the Senior Subordinated Notes indenture to reflect this and certain other changes, including allowance for the incurrence of debt in the form of the Term Loan D Facility. In connection with the TAC-Trim acquisition, we further amended the indenture governing these notes to make each subsidiary guarantor of the new $10\frac{3}{4}$% Senior Notes a guarantor of these existing notes on a senior subordinated basis.

As of August 1998, the JPS Automotive acquisition date, $180 million principal amount of JPS Automotive $11\frac{1}{8}$% Senior Notes due 2001 (the "JPS Automotive Senior Notes") was outstanding. Of this amount, $68 million were purchased by the Company in the open market and subsequently contributed to or repurchased by JPS Automotive. The remaining $112 million face value of JPS Automotive Senior Notes were recorded at a market value of $117.2 million on the date of the acquisition. Through subsequent retirements of the JPS Automotive Senior Notes, the Company reduced the outstanding face value to $48.0 million at December 31, 2000. In March 2001, the Company retired the remaining JPS Automotive Senior Notes with proceeds from the Term Loan D Facility described above. The Company recognized an extraordinary charge of $0.3 million in connection with the retirement of the notes at prices in excess of carrying values.

**COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

At December 31, 2001, the scheduled annual maturities of long-term debt are as follows (in millions):

| Year Ending | |
|---|---:|
| 2002 | $   19.5 |
| 2003 | 23.4 |
| 2004 | 28.0 |
| 2005 | 331.0 |
| 2006 | 400.0 |
| Later years | 500.0 |
| | $1,301.9 |

Total interest paid by the Company on all debt was $76.3 million, $94.8 million and $91.9 million for 2001, 2000 and 1999, respectively.

### b.  *Mandatorily Redeemable Preferred Stock of Subsidiary*

As part of the consideration paid to Textron for the TAC-Trim acquisition, Products issued to Textron 182,700 shares of its Series A Redeemable Preferred Stock, 123,700 shares of Series B Redeemable Preferred Stock and 20,000 shares of Series C Redeemable Preferred Stock. The Preferred Stock is recorded at fair value, which is less than the liquidation value of $1,000 per share or $326.4 million. The estimated fair value of $146.9 million is based on market prices for securities with similar terms, maturities and risk characteristics, and includes a liquidation discount to reflect market conditions. The difference between the initial recorded value and the initial liquidation preference will be accreted over the life of the stock.

Products is required to redeem all Series A and B Preferred Stock outstanding on January 1, 2013 and Series C Preferred Stock outstanding on February 1, 2022. The redemption price is equal to 100% of the liquidation preference plus accrued and unpaid dividends plus common equity participation for the Series C Preferred Stock. The Series A and Series B Preferred Stock are redeemable at Products' option, in whole or in part, on or after January 1, 2007 at a stated percent in excess of the liquidation preference plus accrued and unpaid dividends. The Series C Preferred stock is not optionally redeemable. However, at Products' option or the holders of a majority of outstanding shares of Series C Preferred Stock, the Series C Preferred Stock is exchangeable for Series B Preferred Stock at any time following the second anniversary of its issuance date but prior to the third anniversary of its issuance date.

Shareholders of Series A Preferred Stock are entitled to receive dividends accruing annually on the liquidation preference at a rate of 11% for dividend periods ending on or prior to July 1, 2003, and 15% thereafter. Holders of Series B and C Preferred Stock are entitled to receive dividends accruing annually on the liquidation preference at a rate of 12% for dividend periods ending on or prior to July 1, 2003, and 16% thereafter.

Products may at its option through January 1, 2004 accrue up to the full amount of all dividends in lieu of cash payment of such dividends. Thereafter, Products may at its option elect to accrue dividends of up to 7% of the liquidation value annually on Series A Preferred Stock and up to 8% of the liquidation value on Series B and C Preferred Stock. Accrued dividends will be added to the liquidation preference of the applicable series of Preferred Stock.

Upon voluntary or involuntary liquidation, dissolution or winding-up of Products, holders of the Preferred Stock are entitled to be paid out of the assets of Products available for distribution to stockholders in the amount of $1,000 per share plus the total accrued dividends prior to any distribution to holders of equity securities which ranks junior to the Preferred Stock. In addition, the holders of Series C Preferred Stock are entitled to a participation in distributions to Products common equity tied to appreciation in the value of

COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

Products common equity subsequent to the issuance date, not to exceed $2.0 million for all Series C Preferred Stock outstanding.

If Products experiences a change of ownership control, the holders of the Preferred Stock must be given the opportunity to sell to Products their Preferred Stock at 100% of the liquidation preference plus accrued and unpaid dividends, plus, in the case of Series C Preferred Stock, common equity participation. In the event that Products does not meet or exceed certain financial criteria based on interest coverage, the dividend rate applicable solely to Series A Preferred Stock will increase by 1.00% for the next full dividend period and by an additional 0.50% for each dividend period thereafter provided that the dividend rate does not exceed 20%. The provision of the certificate of designation limits Products ability to issue more debt, pay dividends and make distributions, repurchase stock, make investments, merge or consolidate, transfer assets, enter into transactions with affiliates and issue stock of subsidiaries. These covenants are subject to a number of important exceptions.

The 2001 results included dividends and accretion calculated using the effective interest method that totaled $2.4 million.

### c.  Short-Term Borrowings

At December 31, 2001, short-term borrowings was primarily comprised of borrowings at a newly acquired subsidiary and carried a fixed interest rate of approximately 23%.

### 11.  Receivables Facility

In December 2001, as part of the refinancing completed in connection with the TAC-Trim acquisition, C&A Products entered into a new receivables facility (the "New Receivables Facility") and repaid the outstanding balance of $128.7 million of the Company's previous receivables facility (the "Old Receivables Facility") entered into in December 1999, which was not renewed. The Receivables Facility utilizes funding provided by commercial paper conduits. Carcorp, Inc., a wholly owned, bankruptcy-remote subsidiary of Products ("Carcorp") purchases virtually all trade receivables generated by Products and certain of its subsidiaries (the "Sellers") in the United States and Canada, transferring rights to collections on those receivables to the conduits. The conduits in turn issue commercial paper, which is collateralized by those rights. The New Receivables Facility has a 364-day term expiring December 2002. The Old Receivables Facility had 364-day terms, renewable annually for up to five years.

The total funding available to the Company on a revolving basis under the New Receivables facility was increased to $250.0 million compared to $171.6 million under the Old Receivables Facility. The funding available under both facilities depends primarily on the amount of receivables generated by the Sellers from sales, the rate of collection on those receivables and other characteristics of those receivables that affect their eligibility (such as the bankruptcy or downgrading below investment grade of the obligor, delinquency and excessive concentration). The Company retains the receivables collection responsibility.

In December 2001, the Company funded $79.9 million through the New Receivables Facility. The Company had $118.6 million available but unutilized at December 31, 2001. At December 31, 2000, the Old Receivables Facility was fully utilized at $82.5 million. The discount on sold interests is equal to the interest rate paid by the conduits to the holders of the commercial paper plus a usage fee. The discount rate at December 31, 2001, was 3.53% compared to 7.40% at December 31, 2000. Under the New Receivables Facility the usage fee was increased to 1.50% from 0.75% under the Old Receivables Facility. In addition, the Company pays a fee on the unused portion of the facility. Under the New Receivables Facility that fee was increased from .25% to .50%. During 2001, the loss on the sale of the receivables totaled $10.8 million. Included in the loss were fees and expenses of replacing the Old Receivables Facility totaling $5.6 million. During 2000 and 1999 the losses on the sale of receivables totaled $9.2 million and $5.4 million, respectively. The 2000 loss included $1.6 million in expenses and fees to replace the prior facility.

**COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

As of December 31, 2001 and 2000, the conduits collectively had invested $79.9 million and $82.5 million, respectively, to purchase an undivided senior interest (net of settlements in transit) in the receivables pool. Accordingly, such receivables were not reflected in the Company's financial statements as of those dates. As of December 31, 2001 and 2000, Carcorp's total receivables pool was $334.6 million and $174.9 million, respectively. When the Company sells receivables to Carcorp, it retains a subordinated interest in the receivables sold. The Company estimates the fair value of its retained interest by considering two key assumptions: the payment rate, which is derived from the average life of the accounts receivable, which is less than 60 days, and the rate of expected credit losses. Based on the Company's favorable collection experience and the short-term nature of its receivables, both assumptions are highly predictable. Therefore, the Company's estimated fair value of its retained interests in the pool of eligible receivables is approximately equal to the previous cost, less the associated allowance for doubtful accounts.

The proceeds received by Carcorp from collections on receivables, after the payment of expenses and amounts due, are used to purchase new receivables from the Sellers. During 2001 and 2000, Carcorp had net cash collections of approximately $1.6 billion and $1.5 billion, respectively. These funds were used to purchase new receivables from the Sellers, under the Old Receivables Facility.

The New Receivables Facility contains certain other restrictions on Carcorp (including maintenance of $60.0 million of net worth) and on the Sellers (including limitations on liens on receivables, modifications of the terms of receivables, and change in credit and collection practices) customary for facilities of this type. The commitments under the New Receivables Facility are subject to termination prior to their term upon the occurrence of certain events, including payment defaults, breach of covenants, including defined interest coverage and leverage ratios, bankruptcy, default by Products in servicing the receivables and failure of the receivables to satisfy certain performance criteria.

## 12. Leases

The Company is the lessee under various long-term operating leases for land and buildings for periods up to twenty years. The majority of these leases contain renewal provisions. In addition, the Company leases transportation, operating and administrative equipment for periods ranging from one to twelve years.

The Company has equipment lease agreements and building lease agreements with several lessors which, subject to specific approval, provide availability of funding for operating leases and sale-leasebacks as allowed in its other financing agreements. The Company has a purchase option on certain equipment at the end of the lease term based on the fair market value of the equipment and has additional options to cause the sale of some or all of the equipment or to purchase some or all of the equipment at prices determined under the agreement. The Company has classified the leases as operating.

At December 31, 2001, future minimum lease payments under operating leases for continuing operations are as follows (in millions):

| Year Ending | |
|---|---|
| 2002 | $ 57.2 |
| 2003 | 50.3 |
| 2004 | 43.8 |
| 2005 | 25.0 |
| 2006 | 22.5 |
| Later Years | 85.2 |
| | $284.0 |

**COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

Rental expense of continuing operations under operating leases was $29.2 million, $20.8 million, and $21.5 million for fiscal 2001, 2000 and 1999, respectively. Obligations under capital leases are not significant.

During 2001, C&A Products entered into sale and leaseback transactions for certain manufacturing equipment and non-manufacturing properties. The transactions resulted in the recognition of a $4.4 million net deferred asset that is being amortized over the lease term, and the recognition of an $8.7 million loss.

During 2001, the Company received net proceeds (after fees) of approximately $86.2 million from sale and leasebacks of real property and equipment, which it used to reduce outstanding debt. The aggregate lease expenses associated with these leases will be $88.8 million, $12.5 million of which relates to 2002. To the extent permitted by the credit facility, the Company may enter into additional similar leasing arrangements from time to time. As part of these sale-leaseback transactions, C&A Products sold and contemporaneously leased back real property from unrelated third parties, and received net proceeds (after fees) of $46.4 million. Refer to Note 19 for a discussion regarding certain sale and leaseback transactions that were entered into with related parties.

### 13. Employee Benefit Plans

#### a. Defined Benefit Pension and Postretirement Benefit Plans

Subsidiaries of the Company have defined benefit pension plans covering substantially all employees who meet eligibility requirements. Plan benefits are generally based on years of service and employees' compensation during their years of employment. Funding of retirement costs for these plans complies with the minimum funding requirements specified by the Employee Retirement Income Security Act. Assets of the pension plans are invested primarily in equity and fixed income securities.

Subsidiaries of the Company have also provided postretirement life and health coverage for certain retirees under plans currently in effect. Many of the subsidiaries' domestic and Canadian employees may be eligible for coverage if they reach retirement age while still employed by the Company. Most of these plans are contributory. In general, future increases in costs are passed on fully to the retiree. However, future increases in costs for the Canadian divisions and limited domestic operations are shared between the Company and the retiree.

During fiscal year 2000, the Company recognized a net $1.0 million curtailment gain related to a reduction in employees participating in the Collins & Aikman Corporation Supplemental Retirement Income Plan, a plan whose participation is limited to a select group of key executives. The gain has been reflected in selling, general and administrative expenses in the accompanying statements of operations for the year ended December 31, 2000.

**COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

The following tables provide a reconciliation of the projected benefit obligation, a reconciliation of plan assets, the funded status of the plans, and amounts recognized in the Company's consolidated balance sheets at December 31, 2001 and December 31, 2000 (in millions).

|  | Pension Benefits Fiscal Year Ended | | Postretirement Benefits Fiscal Year Ended | |
|---|---|---|---|---|
|  | December 31, 2001 | December 31, 2000 | December 31, 2001 | December 31, 2000 |
| **Change in benefit obligation:** | | | | |
| Benefit obligation at beginning of year | $175.0 | $170.5 | $ 52.6 | $ 57.5 |
| Service cost | 6.8 | 6.7 | 1.0 | .9 |
| Interest cost | 12.7 | 12.8 | 3.8 | 3.6 |
| Employee contributions | — | — | .9 | .9 |
| Amendments | 1.4 | .4 | — | — |
| Actuarial gain | 2.3 | (.5) | (1.3) | (5.3) |
| Benefits paid | (14.1) | (11.6) | (4.7) | (4.7) |
| Currency adjustment | (1.7) | (3.3) | (.5) | (.3) |
| Benefit obligation at end of year | $182.4 | $175.0 | $ 51.8 | $ 52.6 |
| **Change in plan assets:** | | | | |
| Fair value of plan assets at beginning of year | $164.2 | $159.3 | $ — | $ — |
| Actual return on plan assets | (24.1) | 15.1 | — | — |
| Employer contributions | 4.3 | 4.2 | 3.8 | 3.8 |
| Employee contributions | — | — | .9 | .9 |
| Benefits paid | (14.1) | (11.6) | (4.7) | (4.7) |
| Currency adjustment | (1.6) | (2.8) | — | — |
| Fair value of plan assets at end of year | $128.7 | $164.2 | $ — | $ — |
| **Reconciliation of funded status to net amount recognized:** | | | | |
| Funded status | $(53.7) | $(10.8) | $ (51.8) | $(52.6) |
| Unrecognized net loss (gain) | 48.1 | 7.0 | (21.5) | (22.0) |
| Unrecognized prior service cost (gain) | 4.4 | 3.3 | (6.4) | (7.8) |
| Net amount recognized | $ (1.2) | $ (.5) | $ (79.7) | $(82.4) |

The table above does not reflect the results of the TAC-Trim acquisition as the Company is still completing purchase accounting for the acquisition. The amounts included in the balance sheet reflect the preliminary value assigned to the TAC-Trim assets and obligations.

| Amounts recognized in the consolidated balance sheet consist of: | | | | |
|---|---|---|---|---|
| Prepaid benefit cost | $ 18.7 | $ 14.6 | $ — | $ — |
| Accrued benefit liability | (25.6) | (17.0) | (179.1) | (82.4) |
| Intangible asset | 5.8 | 1.5 | — | — |
| Accumulated other comprehensive loss | 19.0 | .4 | — | — |
| Net amount recognized | $ 17.9 | $ (.5) | $(179.1) | $(82.4) |

**COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

The projected benefit obligation, accumulated benefit obligation and fair value of plan assets for the pension plans with accumulated benefit obligations in excess of plan assets were $175.2 million, $165.9 million and $121.7 million, respectively, as of December 31, 2001 and $21.8 million, $20.1 million and $4.2 million, respectively, as of December 31, 2000.

The net periodic benefit cost of continuing operations for fiscal 2001, 2000, and 1999 includes the following components (in millions):

| | Pension Benefits Fiscal Year Ended | | |
| | December 31, 2001 | December 31, 2000 | December 25, 1999 |
|---|---|---|---|
| Components of net periodic benefit cost: | | | |
| Service cost | $ 6.8 | $ 6.7 | $ 9.1 |
| Interest cost | 12.7 | 12.8 | 11.0 |
| Expected return on plan assets | (14.6) | (14.6) | (12.4) |
| Amortization of prior service cost | .2 | .1 | — |
| Settlement loss (gain) | (.1) | — | — |
| Curtailment gain | — | (1.0) | — |
| Recognized net actuarial loss | .1 | .1 | .7 |
| Net periodic benefit cost | $ 5.1 | $ 4.1 | $ 8.4 |

| | Postretirement Benefits Fiscal Year Ended | | |
| | December 31, 2001 | December 31, 2000 | December 25, 1999 |
|---|---|---|---|
| Components of net periodic benefit cost: | | | |
| Service cost | $ 1.0 | $ .9 | $ 1.5 |
| Interest cost | 3.8 | 3.6 | 4.3 |
| Amortization of prior service cost | (1.4) | (1.4) | (1.4) |
| Recognized net actuarial gain | (1.7) | (2.0) | (.9) |
| Net periodic benefit cost | $ 1.7 | $1.1 | $ 3.5 |

Weighted average fiscal year-end assumptions are summarized as follows:

| | Pension Benefits | | Postretirement Benefits | |
| | 2001 | 2000 | 2001 | 2000 |
|---|---|---|---|---|
| Discount rate | 7.2% | 7.4% | 7.5% | 7.6% |
| Expected return on plan assets | 9.0% | 9.0% | N/A | N/A |
| Rate of compensation increase | 3.1% | 4.5% | N/A | N/A |

Health care costs for domestic plans: (1) Dura Convertible was assumed to increase 11% during 2002; the rates were assumed to grade down by 0.5% per year to an ultimate rate of 6% and remain at that level thereafter. (2) Wickes Engineering Materials was assumed to increase 6% during 2002 and remain at that level thereafter. (3) TAC-Trim was assumed to increase 12% during 2002; the rates were assumed to grade down by 0.5% per year to an ultimate rate of 6% and remain at that level thereafter. Health care trend rates for Canadian Plans were assumed to increase approximately 8.5% during 2002 grading down by 0.5% per year to a constant level of 5% annual increase.

**COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

Assumed health care cost trend rates may have a significant effect on the amounts reported for postretirement benefits. A one-percentage-point change in assumed health care cost trend rates would have the following effects:

| | 1-Percentage-Point Increase | 1-Percentage-Point Decrease |
|---|---|---|
| Effect on total of service and interest cost components............. | $  .4 | $   (.3) |
| Effect on postretirement benefit obligation ........................ | $20.1 | $(16.2) |

**b.  *Defined Contribution Plans***

Subsidiaries of the Company sponsor defined contribution plans covering employees who meet eligibility requirements. Subsidiary contributions are based on formulas or are at the Company's discretion as specified in the plan documents. Contributions relating to continuing operations were $3.2 million, $4.0 million and $3.0 million in fiscal 2001, 2000 and 1999, respectively.

**14.  Discontinued Operations**

During fiscal 2000, the Company settled claims for certain environmental matters related to discontinued operations for a total of $20 million. Settlement proceeds will be paid to the Company in three installments. The first and second installments of $7.5 million and $7.5 million were received in June 2000 and June 2001, respectively with the third installment of $5.0 million to be received in June 2002. Of the total $20 million settlement, the Company recorded the present value of the settlement as $7.0 million of additional environmental reserves, based on its assessment of potential environmental exposures, and $6.6 million, net of income taxes, as income from discontinued operations.

The Company has significant obligations related to post-retirement, casualty, environmental, product liability, lease and other liabilities of discontinued operations. The nature of many of these contingent liabilities is such that they are difficult to quantify and uncertain in terms of amount. The company has accrued $10.0 million for casualty reserves, $38.9 million for post retirement costs and $40.7 million for environmental and product liability costs.

In connection with retained operating leases of certain discontinued operations, the Company believes that future sublease rental receipts will equal or exceed future minimum lease payments and accordingly has not recorded any liability for these leases.

**15.  Restructuring**

In the fourth quarter 2001, the Company undertook a restructuring program to rationalize operations in North American, European and Specialty operations resulting in a restructuring charge of $9.6 million. The charge included $2.8 million of severance costs and $6.8 million of asset impairments. The Company recognized severance costs for over 200 operating personnel at the Company's convertible tops, fabrics, carpet and acoustics locations in North America and Specialty operations. The asset impairments, primarily related to machinery and equipment located at North American, European and Specialty operations sites, are based on management's estimates of values to be realized upon disposition of the assets. The activity related to severance costs for the fourth quarter 2001 restructuring program is as follows (in millions):

| | Original Reserve | Cash Payments | Remaining Reserve |
|---|---|---|---|
| Anticipated severance benefits............................... | $2.8 | $0.7 | $2.1 |

During the first quarter of 2001, the Company undertook a restructuring program resulting in a charge of $9.2 million. The goal of the restructuring was to further de-layer management in North America, European

**COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

and Specialty operations. The pre-tax $9.2 million charge included $8.4 million of severance costs and $0.8 million of asset impairments. The Company recognized severance costs for over 700 operating personnel at the Company's convertible tops, fabrics, accessory floormats, plastics, carpet and acoustics locations in North America and the Company's plastics, accessory floormats, carpet and acoustics operations in Europe. The Company also recognized severance costs for management and administrative personnel at its World Headquarters, North American Automotive Interior Systems division and European Automotive Interior Systems division. The asset impairments, primarily related to machinery and equipment located at the site, are based on management's estimates of values to be realized upon disposition of the assets. The activity related to severance costs for 2001 restructuring program is as follows (in millions):

|  | Original Reserve | Cash Payments | Remaining Reserve |
|---|---|---|---|
| Anticipated severance benefits............................... | $8.4 | $(6.9) | $1.5 |

In fiscal 1999, the Company announced a comprehensive plan (the "Reorganization") to reorganize its global automotive carpet, acoustics, plastics and accessory floormats businesses. The Company undertook the Reorganization to reduce costs and improve operating efficiencies throughout the Company's operations and to more effectively respond to the OEMs' demand for complete interior trim systems and more sophisticated components. Upon final completion of the Reorganization plan, the Company recognized a pre-tax restructuring charge of $33.4 million, including $13.4 million of asset impairments, $15.0 million of severance costs and $5.0 million related to the termination of sales commission contracts at the Company's North American plastics operations. The 1999 Reorganization included the closure of three facilities. The Homer, Michigan plastics facility was closed in August 1999 and its operations were relocated to an existing plastics facility. The Cramerton, North Carolina fabrics facility was sold in September 1999 and the relocation of its operations to another fabrics facility was completed in fiscal 2000. The acoustics facility in Vastra Frolunda, Sweden, was closed in September 2000 and its operations were relocated to other facilities in Europe. The Company recognized $13.4 million in asset impairments, primarily relating to buildings, machinery and equipment located at these three sites. In addition to these closures, the Company recognized severance costs for operating personnel at the Company's plastics operations in the United Kingdom and the Company's fabrics, convertibles and accessory floormats operations in North America. The Company also recognized severance costs for management and administrative personnel at the Company's former North Carolina headquarters and North American Automotive Interior Systems division.

During fiscal 2000, certain modifications were made to the Reorganization, which changed the original estimates. Severance costs for individuals and payments for the termination of sales commission arrangements originally contemplated in the Reorganization were approximately $3.1 million lower than the original estimates. The reduction consisted of $2.0 million of severance benefits and $1.1 million of payments for termination of sales commission arrangements. However, during fiscal 2000, there were additional personnel terminations made as the Company continued to reshape its management team. The Company estimates indicate that the adjustment to reduce the original restructuring provision approximates the provision required for the additional personnel terminated in fiscal 2000. As of December 31, 2000, the Company's Reorganization efforts, as modified, were substantially complete and approximately 1,000 employees had been terminated.

**COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

The components of the reserves for the Reorganization restructuring charges are as follows (in millions):

|  | Original Reserve | Changes in Reserve | Remaining Reserve |
|---|---|---|---|
| Anticipated severance benefits............................ | $15.0 | $(15.0) | $ — |
| Anticipated payments related to the termination of sales commission arrangements .............................. | 5.0 | (3.6) | 1.4 |
|  | $20.0 | $(18.6) | $1.4 |

### 16.   Common Stockholders' Equity

#### *Dividends*

On February 10, 1999, the Company declared a special dividend of approximately $6.2 million, representing $0.10 per share on all outstanding shares of common stock held by stockholders of record as of the close of business on February 22, 1999. The dividend was paid on March 1, 1999. On May 13, 1999, the Company declared another special dividend relating to the distribution of the proceeds from the sale of Wallcoverings of approximately $44.0 million, representing $0.71 per share on all outstanding shares of common stock held by stockholders of record as of the close of business on May 20, 1999. The dividend was paid on May 28, 1999.

#### *Stock Option Plans*

The 1994 Employee Stock Option Plan ("1994 Plan") was adopted as a successor to the 1993 Employee Stock Option Plan to facilitate awards to certain key employees and consultants. The 1994 Plan was amended in 1999 primarily to increase the number of shares available for issuance under the Plan from 2,980,534 to 3,980,534. The 1994 Plan provides that no options may be granted after 10 years from the effective date of this plan. Options vest, in each case, as specified by the Company's compensation committee, generally over three years after issuance. At December 31, 2001, options representing 1,272,718 shares of common stock were available for grants.

The Company also adopted the 1994 Directors Stock Option Plan, which provides for the issuance of options to acquire a maximum of 600,000 shares of common stock to directors who are not part of management and are not affiliated with a major stockholder. As of December 31, 2001, 170,000 options had been granted.

The Company adopted the 1997 United Kingdom Scheme, which provides for the issuance of options to key employees under the 1994 Plan. As of December 31, 2001, 32,474 options had been granted.

**COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

Stock option activity under the plans is as follows:

| | December 31, 2001 | | December 31, 2000 | | December 25, 1999 | |
|---|---|---|---|---|---|---|
| | Number of shares | Weighted Average Exercise Price | Number of shares | Weighted Average Exercise Price | Number of shares | Weighted Average Exercise Price |
| Outstanding beginning of year | 4,344,432 | $5.47 | 4,720,955 | $5.70 | 3,141,195 | $6.23 |
| Awarded | 40,000 | 5.76 | 827,500 | 5.65 | 2,024,000 | 5.19 |
| Cancelled | (458,090) | 7.48 | (983,732) | 7.07 | (337,000) | 8.10 |
| Exercised | (1,095,422) | 4.31 | (220,291) | 3.99 | (107,240) | 3.99 |
| Outstanding at end of year | 2,830,920 | 5.59 | 4,344,432 | $5.47 | 4,720,955 | $5.70 |

The following table summarizes information about stock options outstanding at December 31, 2001:

| Range of Exercise Price | Number of Shares Outstanding | Weighted Average Remaining Life | Weighted Average Exercise Price |
|---|---|---|---|
| $3.99 — $4.43 | 267,071 | 2.9 | 4.07 |
| $5.00 — $6.00 | 1,925,000 | 7.6 | 5.19 |
| $6.01 — $11.75 | 638,849 | 6.4 | 7.41 |

SFAS No. 123, "Accounting for Stock-Based Compensation", encourages companies to adopt the fair value method for compensation expense recognition related to employee stock options. The accounting requirements of Accounting Principles Board Opinion No. 25 ("APB No. 25") use the intrinsic value method in determining compensation expense, which represents the excess of the market price of the stock over the exercise price on the measurement date. The Company has elected to continue to utilize the accounting provisions of APB No. 25 for stock options, and is required to provide pro forma disclosures of net income and earnings per share had the Company adopted the fair value method for recognition purposes. The following information is presented as if the Company had adopted SFAS No. 123 and restated its results (in millions, except per share amounts):

| | Fiscal Year Ended | | |
|---|---|---|---|
| | December 31, 2001 | December 31, 2000 | December 25, 1999 |
| Net income (loss): | | | |
| As reported | $(46.2) | $ 4.5 | $(10.2) |
| Pro forma | (48.6) | 2.1 | (12.4) |
| Basic and Diluted EPS: | | | |
| As reported | $(0.47) | $ 0.07 | $(0.16) |
| Pro forma | (0.50) | 0.03 | (0.20) |

For the above information, the fair value of each option grant was estimated on the date of grant using the Black-Scholes option pricing model with the following assumptions used for grants in fiscal 2001, 2000 and 1999: expected volatility was 99%, 53% and 84% in 2001, 2000 and 1999, respectively; expected lives of 10 years, which equals the lives of the grants; a risk free interest rate ranging from 4.24% to 7.32% and a zero expected dividend rate. The weighted average grant-date fair value of an option granted during fiscal 2001, 2000 and 1999 was $5.22, $4.11 and $4.50, respectively.

**COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

Because the SFAS No. 123 method of accounting has not been applied to options granted prior to January 28, 1995, the above pro forma amounts may not be representative of the compensation costs to be expected in future years.

**17.  Income Taxes**

The provisions for income taxes applicable to continuing operations for fiscal 2001, 2000 and 1999 are summarized as follows (in millions):

| | Fiscal Year Ended | | |
|---|---|---|---|
| | December 31, 2001 | December 31, 2000 | December 25, 1999 |
| Current: | | | |
| Federal | $  — | $  — | $  — |
| State | 2.6 | 1.5 | 2.1 |
| Foreign | 4.8 | 10.7 | 4.9 |
| | 7.4 | 12.2 | 7.0 |
| Deferred: | | | |
| Federal | (19.0) | (3.5) | (6.3) |
| State | (1.3) | (0.2) | (0.5) |
| Foreign | (5.7) | (6.3) | — |
| | (26.0) | (10.0) | (6.8) |
| Income tax expense | $(18.6) | $  2.2 | $  0.2 |

Domestic and foreign components of income (loss) from continuing operations before income taxes are summarized as follows (in millions):

| | Fiscal Year Ended | | |
|---|---|---|---|
| | December 31, 2001 | December 31, 2000 | December 25, 1999 |
| Domestic | $(35.8) | $(11.9) | $(16.6) |
| Foreign | (32.5) | 12.7 | 15.4 |
| | $(68.3) | $  0.8 | $  (1.2) |

**COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

A reconciliation between income taxes computed at the statutory U.S. Federal rate of 35% and the provisions for income taxes applicable to continuing operations is as follows (in millions):

|  | Fiscal Year Ended | | |
|---|---|---|---|
|  | December 31, 2001 | December 31, 2000 | December 25, 1999 |
| Amount at statutory Federal rate . . . . . . . . . . . . . . . . . . . | $(23.9) | $ 0.3 | $(0.4) |
| State taxes, net of Federal income tax . . . . . . . . . . . . . . | 0.9 | 0.8 | 1.0 |
| Tax differential on foreign earnings . . . . . . . . . . . . . . . . | 2.9 | (0.3) | (0.8) |
| Amortization of goodwill . . . . . . . . . . . . . . . . . . . . . . . . . . | 1.5 | 1.5 | 1.5 |
| Preferred stock dividend . . . . . . . . . . . . . . . . . . . . . . . . . . | 0.8 | — | — |
| Change in valuation allowance . . . . . . . . . . . . . . . . . . . . . | (1.2) | 0.4 | 0.3 |
| General business tax credits . . . . . . . . . . . . . . . . . . . . . . . | (0.5) | (1.1) | (2.0) |
| Other . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 0.9 | 0.6 | 0.6 |
| Income tax expense . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $(18.6) | $ 2.2 | $ 0.2 |

Deferred income taxes are provided for the temporary differences between the financial reporting and tax basis of the Company's assets and liabilities. The components of the net deferred tax assets as of December 31, 2001 and 2000 were as follows (in millions):

|  | December 31, 2001 | December 31, 2000 |
|---|---|---|
| **Deferred tax assets:** | | |
| Employee benefits, including postretirement benefits . . . . . . . . . . . . . | $ 78.5 | $ 37.9 |
| Net operating loss carryforwards (NOLs) . . . . . . . . . . . . . . . . . . . . . . | 134.6 | 116.2 |
| General business tax credits carryforwards . . . . . . . . . . . . . . . . . . . . | 11.4 | 10.0 |
| Alternative minimum tax credit carryforwards . . . . . . . . . . . . . . . . . . | 12.2 | 12.2 |
| Other liabilities and reserves . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 36.1 | 41.1 |
| Valuation allowance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (49.2) | (57.1) |
| Total deferred tax assets . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 223.6 | 160.3 |
| **Deferred tax liabilities:** | | |
| Property, plant and equipment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (74.7) | (55.4) |
| Undistributed earnings of foreign subsidiaries . . . . . . . . . . . . . . . . . . | (7.2) | (7.2) |
| Total deferred tax liabilities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (81.9) | (62.6) |
| Net deferred tax asset . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $141.7 | $ 97.7 |

The valuation allowance at December 31, 2001 and December 31, 2000 provides for certain deferred tax assets that in management's assessment may not be realized due to tax limitations on the use of such amounts, due to expiration prior to utilization or that relate to tax attributes that are subject to uncertainty due to the long-term nature of their realization. During fiscal 2001, the valuation allowance decreased $7.9 million from fiscal 2000. This decrease resulted primarily from the future expectation of increased pretax income due to current year acquisitions. During fiscal 2000, the valuation allowance increased $5.0 million from fiscal 1999. This increase resulted primarily from the increase in tax credit and loss carryforwards that may not be realized in future periods.

**COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

The above amounts have been classified in the consolidated balance sheets as follows (in millions):

|  | December 31, 2001 | December 31, 2000 |
|---|---|---|
| Deferred tax assets (liabilities): | | |
| Current domestic and foreign, included in other current assets . . . . | $ 25.3 | $19.1 |
| Current foreign, included in accrued expenses . . . . . . . . . . . . . . . . . | (2.1) | (2.6) |
| Noncurrent domestic and foreign . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 136.5 | 97.3 |
| Noncurrent foreign, included in other noncurrent liabilities . . . . . . . | (18.0) | (16.1) |
|  | $141.7 | $97.7 |

Management has reviewed the Company's operating results for recent years as well as the outlook for its continuing operations and concluded that it is more likely than not that the net deferred tax assets of $141.7 million at December 31, 2001 will be realized. Management took into consideration, among other factors, the expected impact of current year acquisitions, the impact of recent restructuring plans, and the infusion of cash from Heartland. These factors along with the timing of the reversal of its temporary differences, certain tax planning strategies and the expiration date of its NOLs were also considered in reaching this conclusion. The Company's ability to generate future taxable income is dependent on numerous factors, including general economic conditions, the state of the automotive industry and other factors beyond management's control. Therefore, there can be no assurance that the Company will meet its expectation of future taxable income.

Deferred income taxes and withholding taxes have been provided on earnings of the Company's foreign subsidiaries to the extent it is anticipated that the earnings will be remitted in the future as dividends. Deferred income taxes and withholding taxes have not been provided on the remaining undistributed earnings of foreign subsidiaries as such amounts are deemed to be permanently reinvested. The cumulative undistributed earnings as of December 31, 2001 on which the Company has not provided deferred income taxes and withholding taxes is approximately $317.0 million.

**COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

At December 31, 2001, the Company had the following tax attribute carryforwards available for U.S. Federal income tax purposes (in millions):

| | Amount | Expiration Dates |
|---|---|---|
| **Net operating losses — regular tax:** | | |
| Preacquisition, subject to limitations | $ 4.7 | 2002-2009 |
| Subject to change in control provisions | 11.7 | 2002-2007 |
| Subject to change in control provisions | 103.2 | 2008-2012 |
| Subject to change in control provisions | 199.6 | 2018-2021 |
| Unrestricted | 23.8 | 2021 |
| | $343.0 | |
| **Net operating losses — alternative minimum tax:** | | |
| Preacquisition, subject to limitations | $ 2.6 | 2002-2009 |
| Subject to change in control provisions | 10.6 | 2002-2007 |
| Subject to change in control provisions | 69.7 | 2008-2012 |
| Subject to change in control provisions | 205.7 | 2018-2021 |
| Unrestricted | 20.3 | 2021 |
| | $308.9 | |
| **General business tax credits:** | | |
| Preacquisition, subject to limitations | $ .6 | 2002-2003 |
| Subject to change in control provisions | 9.0 | 2004-2021 |
| Unrestricted | .2 | 2021 |
| | $ 9.8 | |
| **Alternative minimum tax credits** | $ 12.2 | |

As a result of the Heartland Transaction, a change in control occurred which results in annual limitations on the Company's use of its NOLs and unused tax credits. This annual limitation on the use of NOLs and tax credits depends on the value of the equity of the Company and the amount of "built-in gain" or "built-in loss" in the Company's assets at the date of the change in control. Based on the expiration dates of the NOLs and tax credits as well as anticipated levels of domestic income, management does not believe that the transaction will have a material impact on these deferred tax assets.

Future sales of common stock by the Company or its principal stockholders, or changes in the composition of its principal stockholders, could constitute a change in control that would result in additional annual limitations on the Company's use of its NOLs and unused tax credits. Management cannot predict whether such a change in control will occur.

Income taxes paid, net of refunds received, were $15.5 million, $4.8 million and $3.0 million for fiscal 2001, 2000 and 1999, respectively.

COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

### 18.   Disclosures About Fair Value of Financial Instruments

The estimated fair values of the Company's continuing operations financial instruments are summarized as follows (in millions):

| | December 31, 2001 | | December 31, 2000 | |
|---|---|---|---|---|
| | Carrying Amount | Estimated Fair Value | Carrying Amount | Estimated Fair Value |
| Long-term debt . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $1,301.9 | $1,232.4 | $884.0 | $812.1 |
| Mandatorily redeemable preferred stock of subsidiary . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ 147.7 | $ 147.7 | $ — | $ — |

The following methods and assumptions were used to estimate these fair values:

Short-Term and Long-Term Debt — The fair value of the Senior Subordinated Notes is based upon quoted market price. The fair value of the other long-term debt of the Company including the Preferred stock, along with the Company's and short-term debt approximates the carrying value.

Carrying amounts reported in the consolidated balance sheets for cash and cash equivalents, accounts and other receivables, accounts payable and accrued expenses approximate fair value due to the short-term nature of these instruments.

Fair value estimates are made at a specific point in time, based on relevant market information about the financial instruments. These estimates are subjective in nature and involve uncertainties and matters of significant judgement and therefore, cannot be determined with precision. Changes in assumptions could significantly affect these estimates.

### 19.   Related Party Transactions

During the first quarter of 2001, Heartland acquired a controlling interest equal to approximately 60% of the Company through a purchase of 25 million shares of common stock from the Company and a purchase of 27 million shares from Blackstone Partners and WP Partners. In the sale, the Company received gross proceeds of $125.0 million, or approximately $95.0 million after fees and expenses associated with the transactions. The purchase price also gave the Company a profit participation right on certain future common stock sales by Heartland. As a result of the transaction, Heartland is entitled to designate a majority of the Company's Board of Directors. Prior to the transaction, as of December 31, 2000, Blackstone Partners and WP Partners collectively owned approximately 87% of the Common Stock of the Company. In connection with the Heartland Transaction, the Company paid Heartland a transaction fee of $12.0 million and paid WP Partners an investment banking fee of $2.0 million.

During the first quarter of 2001, the Amended and Restated Stockholders' Agreement was terminated and a new, 10 year Services Agreement was entered into between the Company, Products and Heartland. Under this Services Agreement, the Company will pay Heartland an annual advisory fee of $4.0 million. The Services Agreement also provides for the Company to pay a 1% transaction fee on certain acquisitions and divestitures commencing on or after February 23, 2002. Under the former Amended and Restated Stockholders' Agreement among the Company, Products, Blackstone Partners and WP Partners, the Company paid each of Blackstone Partners and WP Partners, or their respective affiliates, an annual monitoring fee of $1.0 million.

In December 2001, Heartland, and certain co-investors that include a director of the Company, purchased an additional 32 million shares of common stock at a price of $5.00 per share, as part of the financing for the TAC-Trim acquisition. The average closing price of the stock three days before and three day after the definitive agreement announcement date was $8.94. Additionally, the Company paid Heartland transaction fees of $12.5 million in connection with the TAC-Trim acquisition. The Company also reimbursed

## COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES

### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

Heartland for $1.5 million of expenses that Heartland incurred in relation to the Becker acquisition. (See Note 3)

As part of the TAC-Trim acquisition, the Company entered into three intellectual property license agreements with Textron. In two of these agreements, the Company licenses back to Textron certain intellectual property that was acquired in the transaction. In the third agreement, the Company licenses from Textron other intellectual property that was not acquire in the transaction

Prior to the TAC-Trim acquisition, TAC-Trim entered into an $86.9 million sale and leaseback transaction (the "Textron Leasing Transaction") with two separate single purpose affiliates of Textron Financial Corporation, as lessor and purchaser, with respect to a portfolio of manufacturing equipment situated in different locations throughout the United States and Canada. Payments under the Textron Leasing Transaction are guaranteed by Products and secured by a first perfected mortgage lien over certain real property with a value equal to $25 million. Each Lease is for an initial term of three (3) years with three one (1) year renewal options. As is customary, the documentation for the Textron Leasing Transaction incorporates covenants by reference, from the new Senior Credit Facility, that may be amended or waived by the senior lenders, and also contain events of default.

During 2001, the Company entered into sale and leaseback transactions for certain non-manufacturing properties with entities that are controlled by one of the Company's current directors and shareholders. In connection with these sale-leaseback transactions, Products sold and contemporaneously leased back real property located in Troy, Michigan and Plymouth, Michigan for net proceeds of $15.1 million in aggregate. The initial lease term in each transaction is 20 years and each lease has two successive ten year renewal options. The basic rent for the Troy, Michigan property is $1.3 million per year, and the basic rent for the Plymouth, Michigan property is $0.5 million per year. The rental rates in each case are subject to adjustment after expiration of the initial term.

Additionally, in connection with the Joan acquisition, the Company entered into a Supply Agreement and a Transition Service Agreement with entities controlled by the former owner of Joan who is currently a director and shareholder of the Company. Under the Supply Agreement, the Company has agreed to purchase all of its requirements for flat woven automotive fabric from the controlled entities for a five-year period beginning on the date of the Supply Agreement. The prices for fabric under the agreement will equal the costs of the raw materials plus an amount that represents the entities' standard labor and overhead costs incurred in manufacturing fabric. Under Transition Service Agreement an entity controlled by the director will provide Products with transitional and support services for a period not to exceed twelve months in order to support the continued and uninterrupted operation of the businesses acquired by Products in the Joan acquisition. As a part of these services, pending disassembly and removal of machinery and equipment purchased as part of the acquisition, the controlled entity will use that machinery and equipment to manufacture all of the Company's requirements for some types of knitted and woven automotive fabrics.

On December 31, 2001, Heartland owned approximately 40% of the outstanding shares of the Company; Blackstone Partners' and WP Partners' owned approximately 15%; Joan Fabrics Corp., Mr. Elkin McCallum and associates owned approximately 8%; Mr. Charles E. Becker and Textron, Inc. each owned approximately 11%.

### 20.  Information About the Company's Operations

On February 10, 1999, the Company announced the Reorganization, a comprehensive plan to reorganize its global automotive carpet, acoustics, plastics and accessory floormats businesses into two divisions: North American Automotive Interior Systems, headquartered in the Detroit metropolitan area, and European Automotive Interior Systems, headquartered in Germany. As part of the Reorganization, the Company also established the Specialty Automotive Products division, which includes the Company's automotive fabrics and

**COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

Dura Convertible Systems businesses. North American Automotive Interior Systems and European Automotive Interior Systems include the following product groups: molded floor carpet, luggage compartment trim, acoustical products, accessory floormats and plastic-based interior systems. The Specialty Automotive Products division includes automotive fabrics and convertible top systems. The three divisions also produce other automotive and non-automotive products.

The accounting policies of the divisions are the same as those described in the Summary of Significant Accounting Policies (See Note 2). The Company evaluates performance based on profit or loss from operations before interest expense, foreign exchange gains and losses, loss on sale of receivables, other income and expense and income taxes.

Information about the Company's divisions is presented below (in millions):

| | Year Ended December 31, 2001 | | | | |
|---|---|---|---|---|---|
| | North American Automotive Interior Systems | European Automotive Interior Systems | Specialty Automotive Products | Other(a) | Total |
| External revenues . . . . . . . . . . | 1,145.0 | 258.2 | 420.1 | | 1,823.3 |
| Inter-segment revenues . . . . . . | 12.0 | 30.2 | 0.2 | (42.4) | — |
| Depreciation, amortization and subsidiary preferred stock requirements . . . . . . . . . . . . . | 46.4 | 21.4 | 14.6 | 1.8 | 84.2 |
| Operating income (loss) . . . . . | 73.9 | (22.3) | 13.0 | (29.0) | 35.6 |
| Total assets . . . . . . . . . . . . . . . | 1,899.1 | 308.2 | 452.2 | 333.9 | 2,993.4 |
| Capital expenditures . . . . . . . . . | 27.9 | 12.1 | 12.2 | 2.3 | 54.5 |

| | Fiscal Year Ended December 31, 2000 | | | | |
|---|---|---|---|---|---|
| | North American Automotive Interior Systems | European Automotive Interior Systems | Specialty Automotive Products | Other(a) | Total |
| External revenues . . . . . . . . . . | $1,175.6 | $284.5 | $441.7 | $ — | $1,901.8 |
| Inter-segment revenues . . . . . | 22.3 | 34.7 | 33.8 | (90.8) | — |
| Depreciation and amortization . . . . . . . . . . . . . | 43.2 | 16.6 | 13.5 | 1.4 | 74.7 |
| Operating income (loss) . . . . | 87.2 | 1.1 | 22.8 | (3.0) | 108.1 |
| Total assets . . . . . . . . . . . . . . . | 696.8 | 228.6 | 234.6 | 120.3 | 1,280.3 |
| Capital expenditures . . . . . . . . | 34.3 | 18.3 | 15.6 | 0.8 | 69.0 |

| | Fiscal Year Ended December 25, 1999 | | | | |
|---|---|---|---|---|---|
| | North American Automotive Interior Systems | European Automotive Interior Systems | Specialty Automotive Products | Other(a) | Total |
| External revenues . . . . . . . . . . | $1,151.7 | $306.4 | $440.5 | $ — | $1,898.6 |
| Inter-segment revenues . . . . . | 85.2 | 27.4 | 16.7 | (129.3) | — |
| Depreciation and amortization . . . . . . . . . . . | 38.6 | 17.2 | 14.8 | 0.8 | 71.4 |
| Operating income (loss) . . . . | 89.3 | 2.3 | 39.6 | (32.7) | 98.5 |
| Total assets . . . . . . . . . . . . . . . | 799.0 | 241.6 | 234.7 | 73.6 | 1,348.9 |
| Capital expenditures . . . . . . . . | 45.7 | 23.5 | 12.7 | 4.5 | 86.4 |

(a) Other includes the Company's discontinued operations (See Note 14), non-operating units, the effect of eliminating entries and restructuring charges (See Note 15).

**COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

Sales by product groups follow (in millions):

| | Fiscal Year Ended | | |
| --- | --- | --- | --- |
| | December 31, 2001 | December 31, 2000 | December 25 1999 |
| Molded floor carpet | $  476.6 | $  458.2 | $  468.0 |
| Luggage compartment trim | 61.4 | 71.0 | 90.6 |
| Acoustical products | 222.9 | 231.4 | 209.8 |
| Accessory floormats | 148.7 | 160.4 | 165.9 |
| Plastic-based interior trim systems | 403.6 | 452.1 | 435.4 |
| Automotive fabrics | 278.5 | 290.5 | 269.5 |
| Convertible top systems | 118.4 | 105.2 | 118.9 |
| Other | 113.2 | 133.0 | 140.5 |
| Total | $1,823.3 | $1,901.8 | $1,898.6 |

The Company performs periodic credit evaluations of its customers' financial condition. Although the Company does not generally require collateral, it does require cash payments in advance when the assessment of credit risk associated with a customer is substantially higher than normal. Receivables generally are due within 45 days, and credit losses have consistently been within management's expectations and are provided for in the consolidated financial statements.

Direct and indirect sales to significant customers in excess of ten percent of consolidated net sales from continuing operations follow:

| | Fiscal Year Ended | | |
| --- | --- | --- | --- |
| | 2001 | 2000 | 1999 |
| General Motors Corporation | 29.0% | 31.4% | 31.5% |
| Ford Motor Company | 21.5% | 20.6% | 20.4% |
| DaimlerChrysler AG | 18.7% | 16.8% | 18.9% |

Information about the Company's continuing operations in different geographic areas for fiscal 2001, 2000 and 1999 is presented below (in millions):

| | Year Ended December 31, 2001 | | Fiscal Year Ended December 31, 2000 | | Fiscal Year Ended December 25, 1999 | |
| --- | --- | --- | --- | --- | --- | --- |
| | Net Sales | Long-Lived Assets | Net Sales | Long-Lived Assets | Net Sales | Long-Lived Assets |
| United States | $1,346.0 | $1,548.0 | $1,123.6 | $518.5 | $1,092.6 | $550.8 |
| Canada | 168.5 | 101.9 | 407.6 | 85.1 | 398.4 | 87.7 |
| Mexico | 50.5 | 52.9 | 86.1 | 26.2 | 101.2 | 20.3 |
| United Kingdom | 117.3 | 71.8 | 117.2 | 54.3 | 121.7 | 64.3 |
| Other (a) | 141.0 | 337.8 | 167.3 | 73.9 | 184.7 | 74.2 |
| Consolidated | $1,823.3 | $2,112.4 | $1,901.8 | $758.0 | $1,898.6 | $797.3 |

(a) Other includes South America, Asia and Europe including Sweden, Spain, Belgium, Germany, Austria, France, the Netherlands and the Czech Republic.

Intersegment sales between geographic areas are not material. For fiscal years 2001, 2000 and 1999, export sales from the United States to foreign countries were $146.2 million, $87.2 million and $84.7 million, respectively.

COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

### 21. Commitments and Contingencies

*Environmental*

The Company is subject to federal, state, local and foreign environmental, and health and safety, laws and regulations that (i) affect ongoing operations and may increase capital costs and operating expenses in order to maintain compliance with such requirements and (ii) impose liability relating to contamination at facilities, and at other locations such as former facilities, facilities where we have sent wastes for treatment or disposal, and other properties to which the Company may be linked. Such liability may include, for example, investigation and clean-up of the contamination, personal injury and property damage caused by the contamination, and damages to natural resources. Some of these liabilities may be imposed without regard to fault, and may also be joint and several (which can result in a liable party being held responsible for the entire obligation, even where other parties are also liable).

Management believes that it has obtained, and is in material compliance with, those material environmental permits and approvals necessary to conduct our various businesses. Environmental compliance costs for continuing businesses are accounted for as normal operating expenses or capital expenditures, except for certain costs incurred at acquired locations. Environmental compliance costs relating to conditions existing at the time of an acquisition are generally charged to reserves established in purchase accounting. The Company accrues for environmental remediation costs when such obligations are known and reasonably estimable. In the opinion of management, based on the facts presently known to it, such environmental compliance and remediation costs will not have a material effect on our business, consolidated financial condition, future results of operations or cash flows.

We are legally or contractually responsible or alleged to be responsible for the investigation and remediation of contamination at various sites, and for personal injury or property damages, if any, associated with such contamination. At some of these sites we have been notified that we are a potentially responsible party ("PRP") under the federal Superfund law or similar state laws. Other sites at which we may be responsible for contamination may be identified in the future, including with respect to divested and acquired businesses.

We are currently engaged in investigating or remediating certain sites. In estimating our cost of investigation and remediation, we have considered, among other things, our prior experience in remediating contaminated sites, remediation efforts by other parties, data released by the United States Environmental Protection Agency ("USEPA"), the professional judgment of our environmental experts, outside environmental specialists and other experts, and the likelihood that other identified PRPs will have the financial resources to fulfill their obligations at sites where they and we may be jointly and severally liable. It is difficult to estimate the total cost of investigation and remediation due to various factors including: incomplete information regarding particular sites and other PRPs; uncertainty regarding the nature and extent of environmental problems and our share, if any, of liability for such problems; the ultimate selection among alternative approaches by governmental regulators; the complexity and evolving nature of environmental laws, regulations and governmental directives; and changes in cleanup standards.

The Company has established accounting reserves for certain contingent environmental liabilities and management believes such reserves comply with generally accepted accounting principles. The Company records reserves for environmental investigatory and non-capital remediation costs when litigation has commenced or a claim or assessment has been asserted or is imminent, the likelihood of an unfavorable outcome is probable, and the financial impact of such outcome is reasonably estimable. As of December 31, 2001, total reserves for those contingent environmental liabilities are approximately $59.6 million.

In the opinion of management, based on information presently known to it, identified environmental costs and contingencies will not have a material effect on our consolidated financial condition, future results of operations or cash flows. However, we can give no assurance that we have identified or properly assessed all

**COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

potential environmental liability arising from our business or properties, and those of our present and former subsidiaries and their corporate predecessors.

### *Litigation*

The Company and its subsidiaries have lawsuits and claims pending against them and have certain guarantees outstanding which were made in the ordinary course of business.

The ultimate outcome of the legal proceedings to which the Company is a party will not, in the opinion of the Company's management based on the facts presently known to it, have a material effect on the Company's consolidated financial condition, future results of operations or cash flows.

### *Other Commitments*

As of December 31, 2001, the Company's continuing operations had approximately $8.2 million in outstanding capital expenditure commitments. The majority of the leased properties of the Company's previously divested businesses have been assigned to third parties. Although releases have been obtained from the lessors of certain properties, C&A Products remains contingently liable under most of the leases. C&A Products' future liability for these leases, in management's opinion, based on the facts presently known to it, will not have a material effect on the Company's consolidated financial condition, future results of operations or cash flows.

### 22. Quarterly Financial Data (Unaudited)

The quarterly financial data is summarized below (in millions, except per share amounts).

| | 2001 | | | |
|---|---|---|---|---|
| | First Quarter | Second Quarter | Third Quarter | Fourth Quarter |
| Net sales | $ 453.1 | $ 457.6 | $ 430.5 | $ 482.1 |
| Gross margin | 58.8 | 64.3 | 53.4 | 42.3 |
| Income (loss) from continuing operations | (7.1) | 1.8 | (13.8) | (30.6) |
| Income (loss) before extraordinary operations | (7.1) | 9.2 | (12.4) | (30.6) |
| Net income (loss) | (7.4) | 9.2 | (12.4) | (35.6) |
| Basic and diluted earnings (loss) per share | (.10) | .11 | (.12) | (.29) |
| Common stock prices: | | | | |
| High | 5.6875 | 6.2000 | 8.5700 | 10.3000 |
| Low | 3.5800 | 4.0500 | 3.9500 | 4.7600 |

COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

| | 2000 | | | |
|---|---|---|---|---|
| | First Quarter | Second Quarter | Third Quarter | Fourth Quarter |
| Net sales | $ 534.8 | $ 507.2 | $ 423.0 | $ 436.8 |
| Gross margin | 83.7 | 84.1 | 53.2 | 45.6 |
| Income (loss) from continuing operations | 7.0 | 11.1 | (4.1) | (15.4) |
| Income (loss) before extraordinary operations | 7.0 | 17.7 | (4.1) | (15.4) |
| Net income (loss) | 7.0 | 17.7 | (4.8) | (15.4) |
| Basic and diluted earnings (loss) per share | .11 | .29 | (.08) | (.25) |
| Common stock prices: | | | | |
|    High | 6.1250 | 7.0000 | 6.1250 | 4.9375 |
|    Low | 4.5000 | 5.1250 | 4.6875 | 2.8750 |

The Company's operations are not subject to significant seasonal influences.

### 23.  Earnings Per Share

The Company adopted SFAS No. 128, "Earnings Per Share," in December 1997. Basic earnings per common share were computed by dividing net income (loss) by the weighted average number of shares of common stock outstanding during the year. Diluted earnings per common share were determined assuming the exercise of the stock options issued under the Company's stock option plans (See Note 16). There were no reconciling items between basic earnings per common share and diluted earnings per common share for 2001, 2000 and 1999.

In 2001, 2000 and 1999, potentially dilutive securities have been excluded from the diluted earnings per share calculation since their inclusion would have been antidilutive. At December 31, 2001, the Company's potentially dilutive securities included 2.8 million stock options with a weighted average exercise price of $5.59 and 0.5 million warrants with an exercise price of $5.00. At December 31, 2000 and December 25, 1999, the Company's potentially dilutive securities included 4.3 million and 4.7 million stock options, respectively, with weighted average exercise prices of $5.47 and $5.70, respectively.

### 24.  Consolidating Financial Statements

Products issued 10¾% Senior Subordinated Notes due 2011 in a total principal amount of $500.0 million in December 2001. These notes are guaranteed by certain subsidiaries of the Company (Guarantor Subsidiaries). The Guarantor Subsidiaries also guaranteed the Company's previously existing old Bank Credit Facilities (as defined in Note 10).

### COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES

### SUPPLEMENTAL GUARANTOR CONDENSED CONSOLIDATING FINANCIAL STATEMENTS

### CONSOLIDATING STATEMENT OF INCOME

| | | | | For the Year Ended December 31, 2001 | | |
| --- | --- | --- | --- | --- | --- | --- |
| | Parent | Issuer | Guarantors | Non-Guarantors (in millions) | Eliminations | Consolidated Total |
| **Operating Income** | | | | | | |
| Net sales . . . . . . . . . . . . . . . . . . . . . . . | $ — | $612.2 | $676.4 | $577.1 | $ (42.4) | $1,823.3 |
| Cost of goods sold . . . . . . . . . . . . . | — | 506.3 | 598.2 | 542.4 | (42.4) | 1,604.5 |
| Selling, general & administrative expenses . . . . . . . . . . . . . . . . . . . . . . | 0.1 | 34.9 | 81.1 | 48.3 | — | 164.4 |
| Restructuring charge and impairment of long-lived assets . . . . . . . . . . . . . . . . | — | 7.3 | .9 | 10.6 | — | 18.8 |
| **Operating income (loss)** . . . . . . . . . . . . . | (0.1) | 63.7 | (3.8) | (24.2) | — | 35.6 |
| Interest expense, net . . . . . . . . . . . . . . . . | — | 45.6 | 35.9 | 2.8 | — | 84.3 |
| Intercompany interest expense (income) | — | 17.3 | (24.7) | 7.4 | — | — |
| Loss on sale of receivables. . . . . . . . . . . . | — | 6.1 | — | 4.7 | — | 10.8 |
| Subsidiaries preferred stock requirements . . . . . . . . . . . . . . . . . . . | — | 2.4 | — | — | — | 2.4 |
| Other expense (income), net . . . . . . . . . . | — | 5.0 | 2.9 | 1.8 | (3.3) | 6.4 |
| **Income (loss) from continuing operations before income taxes** . . . . . . . . . . . . . . . . | (0.1) | (12.7) | (17.9) | (40.9) | 3.3 | (68.3) |
| Income tax expense (benefit) . . . . . . . . . | 0.2 | (11.9) | (5.6) | (1.3) | — | (18.6) |
| **Income (loss) from continuing operations** . . . . . . . . . . . . . . . . . . . . . . | (0.3) | (.8) | (12.3) | (39.6) | 3.3 | (49.7) |
| **Discontinued operations income** . . . . . . . . . . | — | (8.8) | 0.3 | — | — | (8.8) |
| **Extraordinary loss** . . . . . . . . . . . . . . . . . | — | 5.0 | 0.3 | — | — | 5.3 |
| **Equity in net (income) loss of subsidiaries** . . . . . . . . . . . . . . . . . . . . . . | 45.9 | 48.9 | 33.5 | — | (128.3) | — |
| **NET INCOME (LOSS)** . . . . . . . . . . . . . . . . | $(46.2) | $(45.9) | $(46.1) | $(39.6) | $ 131.6 | $ (46.2) |

| | | | | For the Year Ended December 31, 2000 | | |
| --- | --- | --- | --- | --- | --- | --- |
| | Parent | Issuer | Guarantors | Non-Guarantors (in millions) | Eliminations | Consolidated Total |
| **Operating Income** | | | | | | |
| Net sales . . . . . . . . . . . . . . . . . . . . . . . | $ — | $547.7 | $619.6 | $815.4 | $ (80.9) | $1,901.8 |
| Cost of goods sold . . . . . . . . . . . . . | — | 464.4 | 554.1 | 697.6 | (80.9) | 1,635.2 |
| Selling, general & administrative expenses . . . . . . . . . . . . . . . . . . . . . . | 0.1 | 36.0 | 53.5 | 68.9 | — | 158.5 |
| **Operating income (loss)** . . . . . . . . . . . . . | (0.1) | 47.3 | 12.0 | 48.9 | — | 108.1 |
| Interest expense (income) . . . . . . . . . . . . | (0.1) | 86.8 | 7.4 | 2.5 | — | 96.6 |
| Intercompany interest expense (income) . . | — | 19.9 | (16.2) | (3.7) | — | — |
| Loss on sale of receivables. . . . . . . . . . . . | — | 1.6 | — | 7.6 | — | 9.2 |
| Other expense (income), net . . . . . . . . . . | — | 2.1 | (13.6) | 9.9 | 3.1 | 1.5 |
| **Income (loss) from continuing operations before income taxes** . . . . . . . . . . . . . . . . | — | (63.1) | 34.4 | 32.6 | (3.1) | 0.8 |
| Income tax expense (benefit) . . . . . . . . . | — | (24.1) | 15.3 | 12.2 | (1.2) | 2.2 |
| **Income (loss) from continuing operations** . . . | — | (39.0) | 19.1 | 20.4 | (1.9) | (1.4) |
| **Discontinued operations income** . . . . . . . . . . | — | (6.6) | — | — | — | (6.6) |
| **Extraordinary loss** . . . . . . . . . . . . . . . . . | — | — | 0.7 | — | — | 0.7 |
| **Equity in net (income) loss of subsidiaries** . . . . . . . . . . . . . . . . . . . . . . | (4.5) | 36.9 | (9.2) | — | 50.6 | — |
| **NET INCOME (LOSS)** . . . . . . . . . . . . . . . . | $ 4.5 | $ 4.5 | $ 27.6 | $ 20.4 | $ (52.5) | $ 4.5 |

COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES

SUPPLEMENTAL GUARANTOR CONDENSED CONSOLIDATING FINANCIAL STATEMENTS

CONSOLIDATING STATEMENT OF INCOME

| | | | | For the Year Ended December 25, 1999 | | |
| | Parent | Issuer | Guarantors | Non-Guarantors | Eliminations | Consolidated Total |
|---|---|---|---|---|---|---|
| | | | | (in millions) | | |
| **Operating Income** | | | | | | |
| Net sales . . . . . . . . . . . . . . . . . . . . | $ — | $547.7 | $616.9 | $837.8 | $(103.8) | $1,898.6 |
| Cost of goods sold . . . . . . . . . . . . . | — | 447.3 | 555.6 | 714.8 | (103.8) | 1,613.9 |
| Selling, general & administrative expenses . . . . . . . . . . . . . . . . . . | 0.5 | 53.6 | 38.7 | 60.0 | — | 152.8 |
| Restructuring charge and impairment of long-lived assets . . | — | 6.9 | 16.4 | 10.1 | — | 33.4 |
| **Operating income (loss)** . . . . . . . . | (0.5) | 39.9 | 6.2 | 52.9 | — | 98.5 |
| Interest expense (income) . . . . . . | (0.1) | 79.5 | 8.8 | 3.9 | — | 92.1 |
| Intercompany interest expense (income) . . . . . . . . . . . . . . . . . . | — | 22.1 | (15.4) | (6.7) | — | — |
| Loss on sale of receivables . . . . . . | — | — | — | 5.4 | — | 5.4 |
| Other expense, (income) net . . . . | — | 7.5 | (19.3) | 7.3 | 6.7 | 2.2 |
| **Income (loss) from continuing operations before income taxes** . . . . | (0.4) | (69.2) | 32.1 | 43.0 | (6.7) | (1.2) |
| Income tax expense (benefit) . . . . . | — | (26.2) | 13.6 | 15.4 | (2.6) | 0.2 |
| **Income (loss) from continuing operations** . . . . . . . . . . . . . . . . . . | (0.4) | (43.0) | 18.5 | 27.6 | (4.1) | (1.4) |
| **Cumulative effect of accounting change** . . . . . . . . . . . . . . . . . . . . . | — | 2.4 | 4.0 | 2.4 | — | 8.8 |
| **Equity in net (income)loss of subsidiaries** . . . . . . . . . . . . . . . . . . | 9.8 | (35.6) | (6.1) | — | 31.9 | — |
| **NET INCOME (LOSS)** . . . . . . . . | $(10.2) | $ (9.8) | $ 20.6 | $ 25.2 | $ (36.0) | $ (10.2) |

**COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES**

**SUPPLEMENTAL GUARANTOR CONDENSED CONSOLIDATING FINANCIAL STATEMENTS**

**CONSOLIDATING BALANCE SHEET**

| | Parent | Issuer | Guarantors | Non-Guarantors | Eliminations | Consolidated Total |
|---|---|---|---|---|---|---|
| | | | | **For the Year Ended December 31, 2001** | | |
| | | | | (in millions) | | |
| **ASSETS** | | | | | | |
| Current Assets | | | | | | |
| Cash and cash equivalents . . . | $  0.2 | $  (3.8) | $  12.7 | $ 64.8 | $   — | $  73.9 |
| Accounts and other receivables, net . . . . . . . . . . | — | 8.7 | 140.6 | 250.9 | 5.9 | 406.1 |
| Inventories . . . . . . . . . . . . . . . | — | 37.6 | 55.7 | 39.3 | — | 132.6 |
| Other . . . . . . . . . . . . . . . . . . . | — | 8.6 | 71.4 | 51.9 | — | 131.9 |
| Total current assets . . . . . . . . . . | 0.2 | 51.1 | 280.4 | 406.9 | 5.9 | 744.5 |
| Investment in subsidiaries . . . . . | 374.5 | 1,784.9 | 396.5 | — | (2,555.9) | — |
| Property, plant and equipment, net . . . . . . . . . . . . . . . . . . . . . . | — | 69.4 | 254.7 | 294.0 | — | 618.1 |
| Goodwill, net . . . . . . . . . . . . . . . | — | 23.7 | 1,101.3 | 133.0 | (4.2) | 1,253.8 |
| Other assets . . . . . . . . . . . . . . . | — | 195.9 | 106.6 | 74.5 | — | 377.0 |
| | 374.5 | 2,073.9 | 1,859.1 | 501.5 | (2,560.1) | 2,248.9 |
| | $ 374.7 | $2,125.0 | $2,139.5 | $908.4 | $(2,554.2) | $2,993.4 |
| **LIABILITIES & STOCKHOLDERS' EQUITY (DEFICIT)** | | | | | | |
| Current Liabilities | | | | | | |
| Short-term borrowings . . . . . . | — | 10.1 | 0.1 | 25.5 | — | 35.7 |
| Current portion of long-term debt . . . . . . . . . . . . . . . . . . . | — | 18.0 | (0.1) | 1.6 | — | 19.5 |
| Accounts payable . . . . . . . . . | — | 100.2 | 247.5 | 121.0 | — | 468.7 |
| Accrued expenses . . . . . . . . . | — | 71.4 | 83.7 | 90.1 | — | 245.2 |
| Total current liabilities . . . . . . . . | — | 199.7 | 331.2 | 238.2 | — | 769.1 |
| Long-term debt . . . . . . . . . . . . . . | — | 1,282.0 | (0.3) | 0.7 | — | 1,282.4 |
| Intercompany payable (receivable) . . . . . . . . . . . . . . . | — | (102.4) | 4.1 | 98.3 | — | — |
| Other noncurrent liabilities . . . . | — | 223.5 | 137.4 | 58.6 | — | 419.5 |
| Mandatorily redeemable preferred stock of subsidiary . . . . . . . . . . . . . . . . . | — | 147.7 | — | — | — | 147.7 |
| | — | 1,550.8 | 141.2 | 157.6 | — | 1,849.6 |
| Stockholders equity . . . . . . . . . . | $ 374.7 | $  374.5 | $1,667.1 | $512.6 | $(2,554.2) | $  374.7 |
| | $ 374.7 | $2,125.0 | $2,139.5 | $908.4 | $(2,554.2) | $2,993.4 |

**COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES**

**SUPPLEMENTAL GUARANTOR CONDENSED CONSOLIDATING FINANCIAL STATEMENTS**

**CONSOLIDATING BALANCE SHEET**

| | Parent | Issuer | Guarantors | Non-Guarantors | Eliminations | Consolidated Total |
|---|---|---|---|---|---|---|
| | | | | (in millions) | | |
| **ASSETS** | | | | | | |
| Current Assets | | | | | | |
| Cash and cash equivalents...... | $ 0.5 | $ (4.2) | $ 1.0 | $ 23.6 | $ — | $ 20.9 |
| Accounts and other Receivables, net ........................ | — | 7.8 | 30.9 | 155.2 | 2.6 | 196.5 |
| Inventories.................... | — | 39.6 | 49.5 | 42.6 | — | 131.7 |
| Other ........................ | — | 20.4 | 14.4 | 41.1 | — | 75.9 |
| Total current assets ............. | 0.5 | 63.6 | 95.8 | 262.5 | 2.6 | 425.0 |
| Investment in subsidiaries ........ | (152.9) | 831.7 | 297.4 | — | (976.2) | — |
| Property, plant and equipment, net ........................ | — | 94.4 | 152.7 | 187.7 | (0.7) | 434.1 |
| Goodwill, net ................... | — | — | 111.5 | 138.2 | (4.2) | 245.5 |
| Other assets ................... | — | 122.4 | 20.7 | 32.6 | — | 175.7 |
| | (152.9) | 1,048.5 | 582.3 | 358.5 | (981.1) | 855.3 |
| | $(152.4) | $1,112.1 | $ 678.1 | $621.0 | $(978.5) | $1,280.3 |

**LIABILITIES & STOCKHOLDERS' EQUITY (DEFICIT)**

| | | | | | | |
|---|---|---|---|---|---|---|
| Current Liabilities | | | | | | |
| Short-term borrowings ......... | — | 0.4 | — | 3.4 | — | 3.8 |
| Current portion of long-term debt ....................... | — | 35.6 | 48.3 | 0.4 | — | 84.3 |
| Accounts payable .............. | — | 52.4 | 42.0 | 84.1 | — | 178.5 |
| Accrued expenses .............. | — | 58.7 | 13.3 | 51.1 | — | 123.1 |
| Total current liabilities........... | — | 147.1 | 103.6 | 139.0 | — | 389.7 |
| Long-term debt.................. | — | 781.7 | — | 18.0 | — | 799.7 |
| Intercompany payable (receivable) .. | — | 234.6 | (245.9) | 11.3 | — | — |
| Other noncurrent liabilities ....... | 2.6 | 101.6 | 96.1 | 45.5 | — | 245.8 |
| | 2.6 | 1,117.9 | (149.8) | 74.8 | | 1,045.5 |
| Stockholders equity (deficit) ..... | $(155.0) | $ (152.9) | $ 724.3 | $407.2 | $(978.5) | $ (154.9) |
| | $(152.4) | $1,112.1 | $ 678.1 | $621.0 | $(978.5) | $1,280.3 |

COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES

SUPPLEMENTAL GUARANTOR CONDENSED CONSOLIDATING FINANCIAL STATEMENTS

CONSOLIDATING STATEMENT OF CASH FLOWS

| | For the Year Ended December 31, 2001 | | | | | |
|---|---|---|---|---|---|---|
| | Parent | Issuer | Guarantors | Non-Guarantors | Eliminations | Consolidated Total |
| | | | | (in millions) | | |
| **OPERATING ACTIVITIES** | | | | | | |
| Net cash provided by continuing operating activities . . . . . . . . . . . . | $ (0.3) | $(266.6) | $ 237.6 | $160.7 | $— | $ 131.4 |
| Net cash provided by discontinued operations . . . . . . . . . . . . . . . . . . . . . | — | — | — | 12.2 | — | 12.2 |
| **INVESTING ACTIVITIES** | | | | | | |
| Additions to property, plant and equipment . . . . . . . . . . . . . . . . . . . | — | (14.8) | (14.5) | (25.2) | — | (54.5) |
| Sales of property, plant and equipment . . . . . . . . . . . . . . . . . . . . | — | 62.2 | 24.0 | 1.9 | — | 88.1 |
| Acquisitions of businesses, net of cash acquired . . . . . . . . . . . . . . . . . . | — | (760.9) | — | — | — | (760.9) |
| Sale of business . . . . . . . . . . . . . . . . . . | — | — | 3.5 | — | — | 3.5 |
| Net cash provided by (used in) investing activities . . . . . . . . . | — | (713.5) | 13.0 | (23.3) | — | (723.8) |
| **FINANCING ACTIVITIES** | | | | | | |
| Issuance of long-term debt . . . . . . . . | — | 950.0 | — | — | — | 950.0 |
| Proceeds from (reduction of) participating interests in account receivable, net of redemptions . . . . | — | — | — | (2.6) | — | (2.6) |
| Cost of debt issuance . . . . . . . . . . . . . | — | (59.4) | — | — | — | (59.4) |
| Repayment of long-term debt . . . . . . | — | (383.2) | | | — | (383.2) |
| Increase (decrease) in short-term borrowings . . . . . . . . . . . . . . . . . . . | — | 9.7 | 2.0 | (1.6) | — | 10.1 |
| Net borrowings (repayments) on revolving credit facilities . . . . . . . . | — | (133.4) | — | (16.8) | — | (150.2) |
| Net proceeds from issuance of common stock . . . . . . . . . . . . . . . . . | 207.2 | — | — | — | — | 207.2 |
| Reissue (purchase) treasury stock, net . . . . . . . . . . . . . . . . . . . . . . . . . . | 61.3 | — | — | — | — | 61.3 |
| Intercompany transfers to (from) subsidiary . . . . . . . . . . . . . . . . . . . . | (268.5) | 596.8 | (240.9) | (87.4) | — | — |
| Net cash provided by (used in) financing activities . . . . . . . . . | — | 980.5 | (238.9) | (108.4) | — | 633.2 |
| Increase (decrease) in cash and cash equivalents . . . . . . . . . . . . . . . . . . . . | (0.3) | 0.4 | 11.7 | 41.2 | — | 53.0 |
| Cash and cash equivalents at beginning of year . . . . . . . . . . . . . . . . . . . . . . . | 0.5 | (4.2) | 1.0 | 23.6 | — | 20.9 |
| Cash and cash equivalents at end of year . . . . . . . . . . . . . . . . . . . . . . . . . . | $ 0.2 | $ (3.8) | $ 12.7 | $ 64.8 | $— | $ 73.9 |

COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES

SUPPLEMENTAL GUARANTOR CONDENSED CONSOLIDATING FINANCIAL STATEMENTS

CONSOLIDATING STATEMENT OF CASH FLOWS — (Continued)

| | Parent | Issuer | Guarantors | Non-Guarantors (in millions) | Eliminations | Consolidated Total |
|---|---|---|---|---|---|---|
| **OPERATING ACTIVITIES** | | | | | | |
| Net cash provided by continuing operating activities . . . . . . . . . . | $ 0.4 | $ 13.2 | $ 6.7 | $110.6 | $— | $130.9 |
| Net cash provided by discontinued operations . . . . . . . . . . . . . . . . | — | — | 0.4 | — | — | 0.4 |
| **INVESTING ACTIVITIES** | | | | | | |
| Additions to property, plant and equipment . . . . . . . . . . . . . . . . . | — | (20.9) | (13.9) | (34.2) | — | (69.0) |
| Sales of property, plant and equipment . . . . . . . . . . . . . . . . . | — | 5.6 | — | — | — | 5.6 |
| Net cash used in investing activities . . . . . . . . . . . . . . . . | — | (15.3) | (13.9) | (34.2) | — | (63.4) |
| **FINANCING ACTIVITIES** | | | | | | |
| Proceeds from (reduction of) participating interests in account receivable, net of redemptions . . | — | — | — | (34.0) | — | (34.0) |
| Repayment of long-term debt . . . . . | — | (27.5) | (38.1) | (1.0) | — | (66.6) |
| Increase (decrease) in short-term borrowings . . . . . . . . . . . . . . . . . | — | — | — | 0.2 | — | 0.2 |
| Net borrowings (repayments) on revolving credit facilities . . . . . . | — | 64.9 | — | (25.9) | — | 39.0 |
| Reissue (purchase) treasury stock, net . . . . . . . . . . . . . . . . . . . . . . . | 0.4 | — | — | — | — | 0.4 |
| Intercompany transfers to (from) subsidiary . . . . . . . . . . . . . . . . . . . | (0.4) | (37.8) | 43.7 | (5.5) | — | — |
| Net cash provided by (used in) financing activities . . . . | — | (.4) | 5.6 | (66.2) | — | (61.0) |
| Increase (decrease) in cash and cash equivalents . . . . . . . . . . . . . . | 0.4 | (2.5) | (1.2) | 10.2 | — | 6.9 |
| Cash and cash equivalents at beginning of year . . . . . . . . . . . . . . | 0.1 | (1.7) | 2.2 | 13.4 | — | 14.0 |
| Cash and cash equivalents at end of year . . . . . . . . . . . . . . . . . . . . . . . | $ 0.5 | $ (4.2) | $ 1.0 | $ 23.6 | $— | $ 20.9 |

F-45

**COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES**

**SUPPLEMENTAL GUARANTOR CONDENSED CONSOLIDATING FINANCIAL STATEMENTS**

**CONSOLIDATING STATEMENT OF CASH FLOWS**

| | For the Year Ended December 25, 1999 | | | | | |
|---|---|---|---|---|---|---|
| | Parent | Issuer | Guarantors | Non-Guarantors | Eliminations | Consolidated Total |
| | | | | (in millions) | | |
| **OPERATING ACTIVITIES** | | | | | | |
| Net cash provided by continuing operating activities............ | $  0.1 | $ 151.2 | $ 152.8 | $(204.0) | $— | $100.1 |
| Net cash provided by discontinued operations ................. | — | (9.8) | (7.0) | — | — | (16.8) |
| **INVESTING ACTIVITIES** | | | | | | |
| Additions to property, plant and equipment................. | — | (32.1) | (16.6) | (37.7) | — | (86.4) |
| Sales of property, plant and equipment................... | — | 4.6 | 5.5 | — | — | 10.1 |
| Acquisitions of businesses, net of cash acquired ............... | — | (0.4) | — | — | — | (0.4) |
| Other, net.................... | — | (0.8) | — | — | — | (0.8) |
| Net cash used in investing activities ................ | — | (28.7) | (11.1) | (37.7) | — | (77.5) |
| **FINANCING ACTIVITIES** | | | | | | |
| Issuance of long-term debt....... | — | 100.0 | — | — | — | 100.0 |
| Cost of debt issuance ........... | — | (2.4) | — | — | — | (2.4) |
| Proceeds from (reduction of) participating interests in account receivable, net of redemptions .. | — | — | — | 2.0 | — | 2.0 |
| Repayment of long-term debt .... | — | (19.4) | — | (1.2) | — | (20.6) |
| Increase (decrease) in short-term borrowings ................. | — | (0.4) | — | (7.0) | — | (7.4) |
| Net borrowings (repayments) on revolving credit facilities....... | — | (18.4) | (16.9) | — | — | (35.3) |
| Reissue (purchase) treasury stock, net........................ | (1.7) | — | — | — | — | (1.7) |
| Dividends paid ................. | (50.2) | — | — | — | — | (50.2) |
| Dividends paid from (by) subsidiary .............. | 50.2 | (50.2) | — | — | — | — |
| Intercompany transfers to (from) subsidiary ................... | 1.6 | (118.2) | (116.4) | 233.0 | — | — |
| Net cash provided by (used in) financing activities .... | (0.1) | (109.0) | (133.3) | 226.8 | — | (15.6) |
| Increase (decrease) in cash and cash equivalents ................. | — | 3.7 | 1.4 | (14.9) | — | (9.8) |
| Cash and cash equivalents at beginning of year............... | 0.1 | (5.4) | 0.8 | 28.3 | — | 23.8 |
| Cash and cash equivalents at end of year.......................... | $  0.1 | $  (1.7) | $  2.2 | $  13.4 | $— | $ 14.0 |

**COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES**

**SCHEDULE I — CONDENSED FINANCIAL INFORMATION OF REGISTRANT**

The information required under this Schedule is included in Note 24 to the Notes to the Consolidated Financial Statements.

**COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES**

**SCHEDULE II — VALUATION AND QUALIFYING ACCOUNTS**

**For the Fiscal Years Ended December 31, 2001, December 31, 2000 and December 25, 1999**

| Description | Balance at Beginning of Year | Additions Resulting from Acquisitions | Charge to Cost and Expenses | Charged to Other Accounts | Deductions | Balance at End of Year |
|---|---|---|---|---|---|---|
| | | | | (in millions) | | |
| **Fiscal Year Ended December 31, 2001:** | | | | | | |
| Allowance for doubtful accounts . . . . . . | $ 8.1 | $6.8 | $ 6.6 | $ (.3) (a) | $ (6.6) | $14.6 |
| Restructuring reserves. . . . . . . . . . . . . . | $ 2.5 | $ | $16.2 | $ | $ | $18.7 |
| **Fiscal Year Ended December 31, 2000:** | | | | | | |
| Allowance for doubtful accounts . . . . . . | $ 8.5 | $ — | $ 6.6 | $ (.9) (a) | $ (6.1) (b) | $ 8.1 |
| Restructuring reserves. . . . . . . . . . . . . . | $13.5 | $ — | $ — | $ — | $(11.0) (c) | $ 2.5 |
| **Fiscal Year Ended December 25, 1999:** | | | | | | |
| Allowance for doubtful accounts . . . . . . | $ 7.2 | $ — | $ 2.4 | $ 1.2 (a) | $ (2.3) (b) | $ 8.5 |
| Restructuring reserves. . . . . . . . . . . . . . | $ 1.9 | $ — | $20.0 | $ — | $ (8.4) (c) | $13.5 |

(a) Reclassifications and collection of accounts previously written off.

(b) Reclassifications to other accounts, uncollectible amounts written off, and the elimination of amounts included in the allowance due from Enjema which was considered as a component of the Company's purchase cost for the remaining 50% interest in Enjema.

(c) Spending against the established reserves. See Note 15 to the Notes to Consolidated Financial Statement.

## EXHIBIT INDEX

| Exhibit Number | Description |
|---|---|
| 2.1 | Agreement and Plan of Merger dated May 14, 2001 by and among Collins & Aikman Corporation, Collins & Aikman Products Co., Becker Group, L.L.C., CE Becker Inc., ME McInerney Inc., J Hoehnel Inc. and the individuals party thereto as sellers is hereby incorporated by reference to Exhibit 2.1 of Collins & Aikman Corporation's Current Report on Form 8-K dated July 13, 2001. |
| 2.2 | Agreement and Plan of Merger dated as of August 17, 2001 by and among Collins & Aikman Corporation, Collins & Aikman Products Co., JAII Acquisition Co., Elkin McCallum, Joan Fabrics Corporation and Joan Automotive Industries, Inc is hereby incorporated by reference to Exhibit 2.1 of Collins & Aikman Corporation's Current Report on Form 8-K dated September 21, 2001. |
| 2.3 | First Amendment to Agreement and Plan of Merger by and among Collins & Aikman Corporation, Collins & Aikman Products Co., JAII Acquisition Co., Elkin McCallum, Joan Fabrics Corporation and Joan Automotive Industries, Inc dated as of September 21, 2001 is hereby incorporated by reference to Exhibit 2.2 of Collins & Aikman Corporation's Current Report on Form 8-K dated September 21, 2001. |
| 2.4 | Purchase Agreement dated as of August 7, 2001, as amended and restated as of November 30, 2001, by and among Textron Inc., Collins & Aikman Corporation and Collins & Aikman Products Co., including Exhibit 1 (Certificate of Designation of the 15% Series A Redeemable Preferred Stock, the 16% Series B Redeemable Preferred Stock and the 16% Series C Redeemable Preferred Stock) and Exhibit 7 (Asset Purchase Agreement dated as of August 7 by and between Textron Automotive Exteriors Inc. and JPS Automotive, Inc.), which is incorporated by reference to Collins & Aikman Corporation's Current Report on Form 8-K dated December 20, 2001 and filed on January 4, 2002. The Table of Contents of the Purchase Agreement listed as Exhibit 2.4 contains a list briefly identifying the contents of all omitted schedules and exhibits. Collins & Aikman Corporation will supplementally furnish a copy of any omitted schedule or Exhibit to the Commission upon request. |
| 2.5 | Asset Purchase Agreement dated as of August 7, 2001, as amended and restated as of November 30, 2001, by and between Textron Automotive Exteriors Inc. and JPS Automotive, Inc., which is incorporated herein by reference to Exhibit 2.2 of Collins & Aikman Corporation's Current Report on Form 8-K dated December 20, 2001 and filed on January 4, 2002. |
| 2.6 | Asset Purchase Agreement dated as of August 17, 2001 by and among Collins & Aikman Products Co., Western Avenue Dyers, L.P., Elkin McCallum, Kerry McCallum, Penny Richards and Tyng Textiles LLC, which is incorporated by reference to Exhibit 2.3 to Collins & Aikman Corporation Current Report on Form 8-K filed on October 4, 2001. |
| 2.7 | First Amendment to Asset Purchase Agreement dated as of September 21, 2001, which is incorporated by reference to Exhibit 2.4 to Collins & Aikman Corporation Current Report on Form 8-K filed on October 4, 2001. |
| 3.1 | Restated Certificate of Incorporation of Collins & Aikman Corporation is hereby incorporated by reference to Exhibit 3.1 of Collins & Aikman Corporation's Report on Form 10-Q for the fiscal quarter ended June 26, 1999. |
| 3.2 | Certificate of Amendment to the Restated Certificate of Incorporation of Collins & Aikman Corporation, which is incorporated by reference to Exhibit 3.2 of Collins & Aikman Corporation's Annual Report on Form 10-K for the fiscal year ended December 31, 2000. |
| 3.3 | By-laws of Collins & Aikman Corporation, as amended, are hereby incorporated by reference to Exhibit 3.2 of Collins & Aikman Corporation's Report on Form 10-K for the fiscal year ended January 27, 1996. |
| 3.4 | Certificate of Elimination of Cumulative Exchangeable Redeemable Preferred Stock of Collins & Aikman Corporation is hereby incorporated by reference to Exhibit 3.3 of Collins & Aikman Corporation's Report on Form 10-Q for the fiscal quarter ended October 28, 1995. |

| Exhibit Number | Description |
|---|---|
| 4.1 | Specimen Stock Certificate for the Common Stock is hereby incorporated by reference to Exhibit 4.3 of Amendment No. 3 to Collins & Aikman Holdings Corporation's Registration Statement on Form S-2 (Registration No. 33-53179) filed June 21, 1994. |
| 4.2 | Indenture, dated as of June 1, 1996, between Collins & Aikman Products Co., Collins & Aikman Corporation and First Union National Bank of North Carolina, as Trustee, is hereby incorporated by reference to Exhibit 4.2 of Collins & Aikman Corporation's Report on Form 10-Q for the fiscal quarter ended April 27, 1996. |
| 4.3 | First Supplemental Indenture dated as of June 1, 1996, between Collins & Aikman Products Co., Collins & Aikman Corporation and First Union National Bank of North Carolina, as Trustee, is hereby incorporated by reference to Exhibit 4.3 of Collins & Aikman Corporation's Report on Form 10-Q for the fiscal quarter ended April 27, 1996. |
| 4.4 | Waiver dated as of October 27, 1998 under the Credit Agreement dated as of May 28, 1998, among Collins & Aikman Products Co., Collins & Aikman Canada, Inc. and Collins & Aikman Plastics, Ltd., as Canadian Borrowers, Collins & Aikman Corporation, as Guarantor, the Lender Parties thereto, Bank of America, N.T.S.A., as Documentation Agent, The Chase Manhattan Bank, as Administrative Agent, and The Chase Manhattan Bank of Canada, as Canadian Administrative Agent is hereby incorporated by reference to Exhibit 4.5 of Collins & Aikman Corporation's Report on Form 10-Q for the fiscal quarter ended September 26, 1998. |
| 4.5 | Waiver dated as of December 22, 1998 under the Credit Agreement dated as of May 28, 1998, among Collins & Aikman Products Co., Collins & Aikman Canada, Inc. and Collins & Aikman Corporation, as Guarantor, the Lender Parties thereto, Bank of America, N.T.S.A., as Documentation Agent, The Chase Manhattan Bank, as Administrative Agent, and The Chase Manhattan Bank of Canada, as Canadian Administrative Agent is hereby incorporated by reference to Exhibit 4.6 of Collins & Aikman Corporation's Report on Form 10-K for the year ended December 26, 1998. |
| 4.6 | Amendment and Waiver dated as of March 8, 1999, among Collins & Aikman Products Co., Collins & Aikman Canada, Inc., Collins & Aikman Plastics Ltd., Collins & Aikman Corporation, as Guarantor, the Lender Parties thereto, Bank of America N.T.S.A., as Documentation Agent, The Chase Manhattan Bank, as Administrative Agent, and The Chase Manhattan Bank of Canada, as Canadian Administrative Agent is hereby incorporated by reference to Exhibit 4.7 of Collins & Aikman Corporation's Report on Form 10-K for the year ended December 26, 1998. |
| 4.7 | Tranche C Term Loan Supplement dated as of May 12, 1999 to the Credit Agreement dated as of May 28, 1998 among Collins & Aikman Products Co., Collins & Aikman Canada, Inc., Collins & Aikman Plastics, Ltd., Collins & Aikman Corporation, the Financial Institutions parties thereto, Bank of America N.T.S.A., as Documentation Agent, The Chase Manhattan Bank, as Administrative Agent, and The Chase Manhattan Bank of Canada, as Canadian Administrative Agent is hereby incorporated by reference to Exhibit 4.1 of Collins & Aikman Corporation's Report on Form 10-Q for the fiscal quarter ended June 26, 1999. |
| 4.8 | Indenture dated as of June 28, 1994, between JPS Automotive Products Corp., as Issuer, JPS Automotive L.P., as Guarantor and Shawmut Bank Connecticut, N.A., as Trustee, is hereby incorporated by reference to Exhibit 4.2 of JPS Automotive Corp.'s Registration Statement on Form S-1, Registration No. 33-75510. |
| 4.9 | First Supplemental Indenture, dated as of October 5, 1994, between JPS Automotive Products Corp. and JPS Automotive L.P., as Co-Obligors, and Shawmut Bank Connecticut, N.A., as Trustee is hereby incorporated by reference to Exhibit 4.48A of JPS Automotive L.P.'s and JPS Automotive Products Corp.'s Report on Form 10-Q for the fiscal quarter ended October 2, 1994. |
| 4.10 | Second Supplemental Indenture, dated as of February 8, 2001, by and among Collins & Aikman Products Co., as Issuer, Collins & Aikman Corporation, as Guarantor, and First Union National Bank, as Trustee, which is incorporated by reference to Exhibit 4.11 of Collins & Aikman Corporation's Annual Report on Form 10-K for the fiscal year ended December 31, 2000. |
| 4.11 | Form of Warrant is hereby incorporated by reference to Exhibit 4.1 of Collins & Aikman Corporation's Current Report on Form 8-K dated July 13, 2001. |

| Exhibit Number | Description |
|---|---|

4.12    Certificate of Designation of Series A Redeemable Preferred Stock, Series B Redeemable Preferred Stock and Series C Redeemable Preferred Stock, which is incorporated herein by reference to Exhibit 4.1 of Collins & Aikman Corporation's Current Report on Form 8-K dated December 20, 2001 and filed on January 4, 2002.

4.13    Indenture dated as of December 20, 2001 by and among Collins & Aikman Products Co., as Issuer, the Guarantors parties thereto and BNY Midwest Trust Company, as Trustee, which is incorporated herein by reference to Exhibit 4.2 of Collins & Aikman Corporation's Current Report on Form 8-K dated December 20, 2001 and filed on January 4, 2002.

4.14    Receivables Transfer Agreement dated as of December 20, 2001 by and among Carcorp, Inc., as Transferor, Collins & Aikman Products Co., individually and as Collection Agent, the persons parties thereto, as CP Conduit Purchasers, Committed Purchasers and Funding Agents and JPMorgan Chase Bank, as Administrative Agent, which is incorporated herein by reference to Exhibit 4.3 of Collins & Aikman Corporation's Current Report on Form 8-K dated December 20, 2001 and filed on January 4, 2002.

4.15    Amended and Restated Receivables Purchase Agreement dated as of December 20, 2001 among Collins & Aikman Products Co. and its wholly-owned direct and indirect subsidiaries named therein, as Sellers, and Carcorp, Inc., as Purchaser, and the other Sellers from time to time named therein, which is incorporated herein by reference to Exhibit 4.4 of Collins & Aikman Corporation's Current Report on Form 8-K dated December 20, 2001 and filed on January 4, 2002.

4.16    Credit Agreement dated as of December 20, 2001 among Collins & Aikman Products Co., as Borrower, Collins & Aikman Canada Inc., as a Canadian Borrower, Collins & Aikman Plastics, Ltd., as a Canadian Borrower, Collins & Aikman Corporation, the Lenders named therein, Deutsche Banc Alex. Brown Inc. and Merrill Lynch Capital Corporation, as Co-Documentation Agents, Credit Suisse First Boston Corporation, as Syndication Agent, JPMorgan Chase Bank, as Administrative Agent, and J.P.Morgan Bank Canada, as Canadian Administrative Agent, which is incorporated herein by reference to Exhibit 4.5 of Collins & Aikman Corporation's Current Report on Form 8-K dated December 20, 2001 and filed on January 4, 2002.

4.17    Guarantee and Collateral Agreement dated as of December 20, 2001 by and among Collins & Aikman Corporation, Collins & Aikman Products Co. and certain of their subsidiaries and JPMorgan Chase Bank, as Collateral Agent, which is incorporated herein by reference to Exhibit 4.6 of Collins & Aikman Corporation's Current Report on Form 8-K dated December 20, 2001 and filed on January 4, 2002.

4.18    Third Supplemental Indenture, dated as of December 20, 2001, among Collins & Aikman Products Co., Collins & Aikman Corporation, the Subsidiary Guarantors listed on the signature page thereto, and First Union National Bank (as successor in interest to First Union National Bank of North Carolina), which is incorporated herein by reference to Exhibit 4.7 of Collins & Aikman Corporation's Current Report on Form 8-K dated December 20, 2001 and filed on January 4, 2002.

10.1    Stockholders Agreement, dated February 23, 2001, by and among Collins & Aikman Corporation, Heartland Industrial Partners, L.P. and other investor stockholders listed on Schedule 1 thereto, Blackstone Capital Company II, L.L.C., Blackstone Family Investment Partnership I L.P., Blackstone Advisory Directors Partnership L.P., Blackstone Capital Partners L.P., and Wasserstein/C&A Holdings, L.L.C., incorporated by reference to Annex E to Exhibit 10.1 to Collins & Aikman Corporation's Current Report on Form 8-K dated January 12, 2001.

10.2    Employment Agreement dated as of July 18, 1990 between Wickes Companies, Inc. and an executive officer is hereby incorporated by reference to Exhibit 10.3 of Wickes Companies, Inc.'s Report on Form 10-K for the fiscal year ended January 26, 1991.*

10.3    Employment Agreement dated as of July 22, 1992 between Collins & Aikman Corporation and an executive officer is hereby incorporated by reference to Exhibit 10.7 of Collins & Aikman Holdings Corporation's Report on Form 10-K for the fiscal year ended January 30, 1993.*

| Exhibit Number | Description |
|---|---|
| 10.4 | First Amendment to Employment Agreement dated as of February 24, 1994 between Collins & Aikman Corporation and an executive officer is hereby incorporated by reference to Exhibit 10.7 of Collins & Aikman Holdings Corporation's Registration Statement on Form S-2 (Registration No. 33-53179) filed April 19, 1994.* |
| 10.5 | Second Amendment, dated as of October 3, 1996, to the Employment Agreement, dated as of July 22, 1992, as amended, between Collins & Aikman Products Co. and an executive officer is hereby incorporated by reference to Exhibit 10.26 of Collins & Aikman Corporation's Report on Form 10-Q for the fiscal quarter ended October 26, 1996.* |
| 10.6 | Third Amendment dated as of August 1, 1997, to the Employment Agreement dated as of July 22, 1992, as amended, between the Corporation and an executive officer is hereby incorporated by reference to Exhibit 10.35 of Collins & Aikman Corporation's Report on Form 10-Q for the fiscal quarter ended September 27, 1997.* |
| 10.7 | Letter Agreement dated March 23, 1999 with an executive officer is hereby incorporated by reference to Exhibit 10.7 of Collins & Aikman Corporation's Report on Form 10-K for the fiscal year ended December 26, 1998.* |
| 10.8 | Amended and Restated Employment Agreement dated as of January 20, 1999 between Collins & Aikman Products Co. and an executive officer is hereby incorporated by reference to Collins & Aikman Corporation's Report on Form 10-K for the fiscal year ended December 26, 1998.* |
| 10.9 | Employment Agreement dated as of January 20, 1999 between Collins & Aikman Products Co. and an executive officer is hereby incorporated by reference to Exhibit 10.9 of Collins & Aikman Corporation's Form 10-K for the fiscal year ended December 26, 1998.* |
| 10.10 | Employment Agreement dated as of April 22, 1999 between Collins & Aikman Corporation and an executive officer is hereby incorporated by reference to Exhibit 10.10 of Collins & Aikman Corporation's Report on Form 10-Q for the fiscal quarter ended March 27, 1999.* |
| 10.11 | Employment Agreement, dated as of March 29, 2000, between Collins & Aikman Products Co. and an executive officer is hereby incorporated by reference to Exhibit 10.1 of Collins & Aikman Corporation's Report on Form 10-Q for the fiscal quarter ended April 1, 2000.* |
| 10.12 | Employment Agreement, dated as of April 1, 2000, between Collins & Aikman Products Co. and an executive officer is hereby incorporated by reference to Exhibit 10.3 of Collins & Aikman Corporation's Report on Form 10-Q for the fiscal quarter ended July 1, 2000.* |
| 10.13 | Employment Agreement, dated as of August 1, 2000, between Collins & Aikman Products Co. and an executive officer is hereby incorporated by reference to Exhibit 10.6 of Collins & Aikman Corporation's Report on Form 10-Q for the fiscal quarter ended September 30, 2000.* |
| 10.14 | Employment Agreement, dated as of August 1, 2000, between Collins & Aikman Products Co. and an executive officer is hereby incorporated by reference to Exhibit 10.8 of Collins & Aikman Corporation's Report on Form 10-Q for the fiscal quarter ended September 30, 2000.* |
| 10.15 | Letter agreement, dated as of May 12, 1999, with an executive officer is hereby incorporated by reference to Exhibit 10.2 of Collins & Aikman Corporation's Report on Form 10-Q for the fiscal quarter ended June 26, 1999.* |
| 10.16 | Letter agreement, dated as of April 7, 2000, between Collins & Aikman Corporation and an executive officer is hereby incorporated by reference to Exhibit 10.12 of Collins & Aikman Corporation's Report on Form 10-Q for the fiscal quarter ended September 30, 2000.* |
| 10.17 | Letter agreement, dated as of July 13, 2000, between Collins & Aikman Corporation and an executive officer is hereby incorporated by reference to Exhibit 10.11 of Collins & Aikman Corporation's Report on Form 10-Q for the fiscal quarter ended September 30, 2000.* |
| 10.18 | Service contract between Collins & Aikman Products GmbH and an executive officer is hereby incorporated by reference to Exhibit 10.5 of Collins & Aikman Corporation's Report on Form 10-Q for the fiscal quarter ended September 30, 2000. |
| 10.19 | Settlement Agreement dated as of April 27, 2000, between Collins & Aikman Products Co. and an executive officer is hereby incorporated by reference to Exhibit 10.10 of Collins & Aikman Corporation's Report on Form 10-Q for the fiscal quarter ended September 30, 2000. |

| Exhibit Number | Description |
|---|---|
| 10.20 | Collins & Aikman Corporation 1998 Executive Incentive Compensation Plan is hereby incorporated by reference to Exhibit 10.10 of Collins & Aikman Corporation's Report on Form 10-K for the fiscal year ended December 26, 1998.* |
| 10.21 | Collins & Aikman Products Co. 2000 Executive Incentive Compensation Plan is hereby incorporated by reference to Exhibit 10.5 of Collins & Aikman Corporation's Report on Form 10-Q for the fiscal quarter ended July 1, 2000. |
| 10.22 | Collins & Aikman Corporation Supplemental Retirement Income Plan is hereby incorporated by reference to Exhibit 10.23 of Amendment No. 5 to Collins & Aikman Holdings Corporation's Registration Statement on Form S-2 (Registration No. 33-53179) filed July 6, 1994.* |
| 10.23 | Amendment to Collins & Aikman Corporation Supplemental Retirement Income Plan is hereby incorporated by reference to Exhibit 10.12 of the Collins & Aikman Corporation's Report on Form 10-K for the fiscal year ended December 26, 1998.* |
| 10.24 | 1993 Employee Stock Option Plan, as amended and restated, is hereby incorporated by reference to Exhibit 10.13 of Collins & Aikman Corporation's Report on Form 10-Q for the fiscal quarter ended April 29, 1995.* |
| 10.25 | 1994 Employee Stock Option Plan, as amended through February 7, 1997, is hereby incorporated by reference to Exhibit 10.12 of Collins & Aikman Corporation's Report on Form 10-Q for the fiscal quarter ended March 29, 1997.* |
| 10.26 | 2000 Employee Stock Option Plan is hereby incorporated by reference to Exhibit 10.6 of Collins & Aikman Corporation's Report on Form 10-Q for the fiscal quarter ended July 1, 2000. |
| 10.27 | 1994 Directors Stock Option Plan as amended and restated is hereby incorporated by reference to Exhibit 10.15 to Collins & Aikman Corporation's Report on Form 10-K for the year ended December 26, 1998.* |
| 10.28 | Excess Benefit Plan of Collins & Aikman Corporation is hereby incorporated by reference to Exhibit 10.25 of Collins & Aikman Corporation's Report on Form 10-K for the fiscal year ended January 28, 1995.* |
| 10.29 | 1994 Employee Stock Option Plan, as amended and restated through June 3, 1999 is hereby incorporated by reference to Exhibit 10.2 of Collins & Aikman Corporation's Report on Form 10-Q for the fiscal quarter ended June 26, 1999 |
| 10.30 | Change in Control Agreement, dated March 17, 1998, between Collins & Aikman Corporation and an executive officer is hereby incorporated by reference to Exhibit 10.17 of Collins & Aikman Corporation's Report on Form 10-K for the fiscal year ended December 27, 1997.* |
| 10.31 | Change in Control Agreement, dated March 17, 1998, between Collins & Aikman Corporation and an executive officer is hereby incorporated by reference to Exhibit 10.18 of Collins & Aikman Corporation's Report on Form 10-K for the fiscal year ended December 27, 1997.* |
| 10.32 | Change in Control Agreement, dated March 17, 1998, between Collins & Aikman Corporation and an executive officer is hereby incorporated by reference to Exhibit 10.19 of Collins & Aikman Corporation's Report on Form 10-K for the fiscal year ended December 27, 1997.* |
| 10.33 | Change in Control Agreement, dated March 17, 1998, between Collins & Aikman Corporation and an executive officer is hereby incorporated by reference to Exhibit 10.20 of Collins & Aikman Corporation's Report on Form 10-K for the fiscal year ended December 27, 1997.* |
| 10.34 | Change in Control Agreement, dated March 17, 1998, between Collins & Aikman Corporation and an executive officer is hereby incorporated by reference to Exhibit 10.22 of Collins & Aikman Corporation's report on Form 10-Q for the fiscal quarter ended March 28, 1998.* |
| 10.35 | Change in Control Agreement, dated August 9, 1999, between Collins & Aikman Corporation and an executive officer is hereby incorporated by reference to Exhibit 10.25 of Collins & Aikman Corporation's Report on Form 10-K for the fiscal year ended December 25, 1999.* |
| 10.36 | Change in Control Agreement, dated March 17, 1998, between Collins & Aikman Corporation and an executive officer is hereby incorporated by reference to Exhibit 10.26 of Collins & Aikman Corporation's Report on Form 10-K for the fiscal year ended December 25, 1999.* |

| Exhibit Number | Description |
|---|---|
| 10.37 | Change in Control Agreement, dated March 17, 1998, between Collins & Aikman Corporation and an executive officer is hereby incorporated by reference to Exhibit 10.27 of Collins & Aikman Corporation's Report on Form 10-K for the fiscal year ended December 25, 1999.* |
| 10.38 | Change in Control Agreement, dated July 26, 1999, between Collins & Aikman Corporation and an executive officer is hereby incorporated by reference to Exhibit 10.28 of Collins & Aikman Corporation's Report on Form 10-K for the fiscal year ended December 25, 1999.* |
| 10.39 | Change in Control Agreement, dated March 17, 1998, between Collins & Aikman Corporation and an executive officer is hereby incorporated by reference to Exhibit 10.29 of Collins & Aikman Corporation's Report on Form 10-K for the fiscal year ended December 25, 1999.* |
| 10.40 | Change in Control Agreement, dated as of April, 2000, between Collins & Aikman Corporation and an executive officer is hereby incorporated by reference to Exhibit 10.2 of Collins & Aikman Corporation's Report on Form 10-Q for the fiscal quarter ended July 1, 2000.* |
| 10.41 | Change in Control Agreement, dated as of April 1, 2000, between Collins & Aikman Products Co. and an executive officer is hereby incorporated by reference to Exhibit 10.4 of Collins & Aikman Corporation's Report on Form 10-Q for the fiscal quarter ended July 1, 2000.* |
| 10.42 | Change in Control Agreement, dated as of August 1, 2000, between Collins & Aikman Corporation and an executive officer is hereby incorporated by reference to Exhibit 10.7 of Collins & Aikman Corporation's Report on Form 10-Q for the fiscal quarter ended September 30, 2000.* |
| 10.43 | Change in Control Agreement, dated as of August 1, 2000, between Collins & Aikman Corporation and an executive officer is hereby incorporated by reference to Exhibit 10.9 of Collins & Aikman Corporation's Report on Form 10-Q for the fiscal quarter ended September 30, 2000.* |
| 10.44 | Lease, executed as of the 1st day of June 1987, between Dura Corporation and Dura Acquisition Corp. is hereby incorporated by reference to Exhibit 10.24 of Amendment No. 5 to Collins & Aikman Holdings Corporation's Registration Statement on Form S-2 (Registration No. 33-53179) filed July 6, 1994. |
| 10.45 | Master Equipment Lease Agreement dated as of September 30, 1994, between NationsBanc Leasing Corporation of North Carolina and Collins & Aikman Products Co. is hereby incorporated by reference to Exhibit 10.27 of Collins & Aikman Corporation's Report on Form 10-Q for the fiscal quarter ended October 29, 1994. |
| 10.46 | Equity Purchase Agreement by and among JPSGP, Inc., Foamex-JPS Automotive L.P. and Collins & Aikman Products Co. dated August 28, 1996 is hereby incorporated by reference to Exhibit 2.1 of Collins & Aikman Corporation's Report on Form 10-Q for the fiscal quarter ended July 27, 1996. |
| 10.47 | Amendment No. 1 to Equity Purchase Agreement by and among JPSGP, Inc., Foamex-JPS Automotive L.P., Foamex International Inc. and Collins & Aikman Products Co. dated as of December 11, 1996 is hereby incorporated by reference to Exhibit 2.2 of Collins & Aikman Corporation's Current Report on Form 8-K dated December 10, 1996. |
| 10.48 | Equity Purchase Agreement by and among Seiren U.S.A. Corporation, Seiren Automotive Textile Corporation, Seiren Co., Ltd. and Collins & Aikman Products Co. dated December 11, 1996, is hereby incorporated by reference to Exhibit 2.3 of Collins & Aikman Corporation's Current Report on Form 8-K dated December 10, 1996. |
| 10.49 | Acquisition Agreement between Perstorp A.B. and Collins & Aikman Products Co. dated December 11, 1996 is hereby incorporated by reference to Exhibit 2.4 of Collins & Aikman Corporation's Current Report on Form 8-K dated December 10, 1996. |
| 10.50 | Agreement among Perstorp A.B., Perstorp GmbH, Perstorp Biotec A.B. and Collins & Aikman Products Co. dated December 11, 1996 is hereby incorporated by reference to Exhibit 2.5 of Collins & Aikman Corporation's current report on Form 8-K dated December 10, 1996. |

| Exhibit Number | Description |
|---|---|
| 10.51 | Settlement and Amendment Agreement dated as of December 16, 1997 by and among Collins & Aikman Products Co., Perstorp A.B., Perstorp GmbH, Collins & Aikman Holding A.B., Collins & Aikman Automotive Systems GmbH, Collins & Aikman Automotive Systems N.V., Collins & Aikman Automotive Systems A.B. and Perstorp Components GmbH and related Letter Amendment Agreement is hereby incorporated by reference to Exhibit 10.38 of Collins & Aikman Corporation's Report or Form 10-Q for the fiscal quarter ended September 26, 1998. |
| 10.52 | Acquisition Agreement dated as of December 9, 1996 among Collins & Aikman Products Co., Collins & Aikman Floor Coverings Group, Inc., Collins & Aikman Floor Coverings, Inc., CAF Holdings, Inc., and CAF Acquisition Corp. is hereby incorporated by reference to Exhibit 2.7 of Collins & Aikman Corporation's Current Report on Form 8-K dated December 10, 1996. |
| 10.53 | Mastercraft Group Acquisition Agreement dated as of April 25, 1997 among Collins & Aikman Products Co., Joan Fabrics Corporation and MC Group Acquisition Company L.L.C., is hereby incorporated by reference to Exhibit 2.1 of Collins & Aikman Corporation's Report on Form 10-Q for the fiscal quarter ended March 29, 1997. |
| 10.54 | Asset Purchase Agreement dated as of June 30, 1997 by and between JPS Automotive L.P. and Safety Components International, Inc. is hereby incorporated by reference to Exhibit 2.1 of JPS Automotive L.P.'s and JPS Automotive Products Corp.'s Current Report on Form 8-K dated July 24, 1997. |
| 10.55 | Closing Agreement dated July 24, 1997 between JPS Automotive L.P., Safety Components International, Inc. and Safety Components Fabric Technologies, Inc. is hereby incorporated by reference to Exhibit 2.2 of JPS Automotive L.P.'s and JPS Automotive Products Corp.'s Current Report on Form 8-K dated July 24, 1997. |
| 10.56 | Amended and Restated Acquisition Agreement dated as of November 4, 1997 and amended and restated as of March 9, 1998, among Collins & Aikman Products Co., Imperial Wallcoverings Inc. and BDPI Holdings Corporation is hereby incorporated by reference to Exhibit 2.4 of Collins & Aikman Corporation's Report on Form 10-K for the fiscal year ended December 27, 1997. |
| 10.57 | Share Purchase Agreement, dated as of January 12, 2001, between Collins & Aikman Corporation and Heartland Industrial Partners, L.P., is hereby incorporated by reference to Exhibit 10.1 of Collins & Aikman Corporation's Report on Form 8-K dated January 12, 2001., incorporated by reference to Exhibit 10.1 to Collins & Aikman Corporation's Current Report on Form 8-K dated January 12, 2001. |
| 10.58 | Registration Rights Agreement, dated February 23, 2001, by and among Collins & Aikman Corporation, Heartland Industrial Partners, L.P. and the other investor stockholders listed on Schedule 1 thereto, Blackstone Capital Company II, L.L.C., Blackstone Family Investment Partnership I L.P., Blackstone Advisory Directors Partnership L.P., Blackstone Capital Partners, L.P. and Wasserstein/C&A Holdings, L.L.C., incorporated by reference to Annex D to Exhibit 10.1 to Collins & Aikman Corporation's Current Report on Form 8-K dated January 12, 2001. |
| 10.59 | Services Agreement, dated as of February 23, 2001, by and among Collins & Aikman Corporation, Collins & Aikman Products Co. and Heartland Industrial Partners, L.P. |
| 10.60 | Profit Participation Interest Agreement, dated as of February 23, 2001, by and among Heartland Industrial Partners, L.P. and the other investor stockholders listed on Schedule 1 thereto and each of Collins & Aikman Corporation, Blackstone Capital Company II, L.L.C. and Wasserstein/C&A Holdings, L.L.C., incorporated by reference to Annex B to Exhibit 10.1 to Collins & Aikman Corporation's Current Report on Form 8-K dated January 12, 2001. |
| 10.61 | Employment Agreement dated October 1, 1999 between Collins & Aikman Products Co. and an executive officer is hereby incorporated by reference to Exhibit 10.30 of Collins & Aikman Corporation's Report on Form 10-K for the fiscal year ended December 25, 1999. |
| 10.62 | Severance Benefit Agreement dated July 26, 1999 between Collins & Aikman Corporation and an executive officer is hereby incorporated by reference to Exhibit 10.31 of Collins & Aikman Corporation's Report on Form 10-K for the fiscal year ended December 25, 1999.* |

| Exhibit Number | Description |
|---|---|
| 10.63 | Severance Benefit Agreement dated August 9, 1999 between Collins & Aikman Corporation and an executive officer is hereby incorporated by reference to Exhibit 10.32 of Collins & Aikman Corporation's Report on Form 10-K for the fiscal year ended December 25, 1999.* |
| 10.64 | Letter agreement dated December 17, 1999 between Collins & Aikman Corporation and an executive officer is hereby incorporated by reference to Exhibit 10.33 of Collins & Aikman Corporation's Report on Form 10-K for the fiscal year ended December 25, 1999.* |
| 10.65 | Employment Agreement dated December 1, 2000 between Collins & Aikman Products Co. and an executive officer, which is incorporated by reference to Exhibit 10.75 of Collins & Aikman Corporation's Annual Report on Form 10-K for the fiscal year ended December 31, 2000.* |
| 10.66 | Separation Agreement dated as of March 12, 2001 between Collins & Aikman Products Co. and an executive officer, which is incorporated by reference to Exhibit 10.1 to Collins & Aikman Corporation's Quarterly Report on Form 10-Q for the quarter ended March 31, 2001.* |
| 10.67 | Employment Agreement dated as of March 29, 2000 between Collins & Aikman Products Co. and an executive officer is hereby incorporated by reference to Exhibit 10.1 of Collins & Aikman Corporation's Report on Form 10-Q for the quarter ended April 1, 2000.* |
| 10.68 | Change in control agreement dated as of April 2000, between Collins & Aikman Corporation and an executive officer is hereby incorporated by reference to Exhibit 10.2 of Collins & Aikman Corporation's Report on Form 10-Q for the quarter ended July 1, 2000.* |
| 10.69 | Employment agreement dated as of April 1, 2000, between Collins & Aikman Products Co. and an executive officer is hereby incorporated by reference to Exhibit 10.3 of Collins & Aikman Corporation's Report on Form 10-Q for the quarter ended July 1, 2000.* |
| 10.70 | Change in control agreement dated as of April 1, 2000, between Collins & Aikman Products Co. and an executive officer is hereby incorporated by reference to Exhibit 10.4 of Collins & Aikman Corporation's Report on Form 10-Q for the quarter ended July 1, 2000.* |
| 10.71 | Service contract between Collins & Aikman Products GmbH and an executive officer, which is incorporated by reference to Exhibit 10.5 of Collins & Aikman Corporation's Quarterly Report on Form 10-Q for the quarter ended June 30, 2001.* |
| 10.72 | Employment agreement dated as of August 1, 2000, between Collins & Aikman Products Co. and an executive officer, which is incorporated by reference to Exhibit 10.6 of Collins & Aikman Corporation's Quarterly Report on Form 10-Q for the quarter ended June 30, 2001.* |
| 10.73 | Change in control agreement dated as of August 1, 2000, between Collins & Aikman Corporation and an executive officer, which is incorporated by reference to Exhibit 10.7 of Collins & Aikman Corporation's Quarterly Report on Form 10-Q for the quarter ended June 30, 2001.* |
| 10.74 | Employment agreement dated as of August 1, 2000, between Collins & Aikman Products Co. and an executive officer, which is incorporated by reference to Exhibit 10.8 of Collins & Aikman Corporation's Quarterly Report on Form 10-Q for the quarter ended June 30, 2001.* |
| 10.75 | Change in control agreement dated as of August 1, 2000, between Collins & Aikman Corporation and an executive officer, which is incorporated by reference to Exhibit 10.9 of Collins & Aikman Corporation's Quarterly Report on Form 10-Q for the quarter ended June 30, 2001.* |
| 10.76 | Settlement agreement dated as of April 27, 2000, between Collins & Aikman Products Co. and an executive officer, which is incorporated by reference to Exhibit 10.10 of Collins & Aikman Corporation's Quarterly Report on Form 10-Q for the quarter ended June 30, 2001.* |
| 10.77 | Letter agreement dated as of July 13, 2000, between Collins & Aikman Corporation and an executive officer, which is incorporated by reference to Exhibit 10.11 of Collins & Aikman Corporation's Quarterly Report on Form 10-Q for the quarter ended June 30, 2001.* |
| 10.78 | Letter agreement dated as of April 7, 2000, between Collins & Aikman Corporation and an executive officer, which is incorporated by reference to Exhibit 10.12 of Collins & Aikman Corporation's Quarterly Report on Form 10-Q for the quarter ended June 30, 2001.* |
| 10.79 | Collins & Aikman Products Co. 2000 Executive Incentive Compensation Plan is hereby incorporated by reference to Exhibit 10.5 of Collins & Aikman Corporation's Report on Form 10-Q for the quarter ended July 1, 2000.* |

| Exhibit Number | Description |
|---|---|
| 10.80 | 2000 Employee Stock Option Plan is hereby incorporated by reference to Exhibit 10.6 of Collins & Aikman Corporation's Report on Form 10-Q for the quarter ended July 1, 2000.* |
| 10.81 | Agreement of Sale and Purchase, dated as of June 22, 2001, by and among Collins & Aikman Products Co. and New King, L.L.C. |
| 10.82 | Lease Agreement, dated as of June 29, 2001, between New King, L.L.C., as landlord, and Collins & Aikman Products Co., as tenant. |
| 10.83 | Agreement of Sale and Purchase, dated as of June 22, 2001, by and among Collins & Aikman Products Co. and Anchor Court, L.L.C. |
| 10.84 | Lease Agreement, dated as of June 29, 2001, between Anchor Court, L.L.C., as landlord and Collins & Aikman Products Co., as tenant. |
| 10.85 | Stockholders Agreement dated July 3, 2001, by and among Collins & Aikman Corporation, Heartland Industrial Partners, L.P. and the other Heartland Entities named therein, the Becker Stockholders party thereto and the Joan Stockholders party thereto. |
| 10.86 | Registration Rights Agreement, dated July 3, 2001, by and among Collins & Aikman Corporation, Charles E. Becker, Michael E. McInerney and Jens Höhnel and, together with the Joan Investors (as defined therein). |
| 10.87 | First Amendment to Services Agreement, dated as of August 7, 2001, among Collins & Aikman Corporation, Collins & Aikman Products Co. and Heartland Industrial Partners, L.P. |
| 10.88 | Equipment Lease, dated as of December 18, 2001, among Textron Automotive Exteriors Inc. and Textron Automotive Interiors Inc., collectively as lessee, and IAC TAX V, LLC, as lessor. |
| 10.89 | Registration Rights Agreement, dated December 20, 2001, by and among Collins & Aikman Products Co., Collins & Aikman Corporation, and each of the subsidiaries listed on the signature pages thereof, and J.P. Morgan Securities Inc., Credit Suisse First Boston Corporation, Deutsche Banc Alex. Brown Inc. and Merrill Lynch, Pierce, Fenner & Smith Incorporated and the other several initial purchasers parties to the Purchase Agreement. |
| 10.90 | Registration Rights Agreement dated as of December 20, 2001 by and among Becker Ventures, LLC, Dresdner Kleinwort Capital Partners 2001 LP, Masco Capital Corporation, ML IBK Positions, Inc. and Collins & Aikman Corporation. |
| 10.91 | Registration Rights Agreement, dated December 20, 2001, by and between Collins & Aikman Corporation, Textron Inc., and Textron Holdco Inc. |
| 10.92 | Preferred Stock Registration and Other Rights Agreement, dated as of December 20, 2001, by and among Collins & Aikman Products Co. and Textron Inc. |
| 10.93 | Intellimold Technology License and Support Agreement, dated as of December 20, 2001, by and between Textron, Inc. and Collins & Aikman Corporation and Collins & Aikman Products Co. |
| 10.94 | Technology License Agreement (Retained IP), dated as of December 20, 2001, by and between Textron, Inc. and Collins & Aikman Corporation and Collins & Aikman Products Co. |
| 10.95 | Technology License Agreement (Licensed-Back IP), dated as of December 20, 2001, by and between Textron, Inc. and Collins & Aikman Corporation and Collins & Aikman Products Co. |
| 21 | Subsidiaries of the Registrant. |
| 23.1 | Consent of PricewaterhouseCoopers LLP. |
| 23.2 | Consent of Arthur Andersen LLP. |
| 99 | Voting Agreement between Blackstone Capital Partners L.P. and Wasserstein Perella Partners, L.P. is hereby incorporated by reference to Exhibit 99 of Amendment No. 4 to Collins & Aikman Holdings Corporation's Registration Statement on Form S-2 (Registration No. 33-53179) filed June 27, 1994. |

---

* Management contract or compensatory plan or arrangement required to be filed as an exhibit to this Form pursuant to Item 14 (c) of this report.

**EXHIBIT 2**

# UNITED STATES SECURITIES AND EXCHANGE COMMISSION
## WASHINGTON, D.C. 20549

# Form 10-K

(Mark One)

☑ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the fiscal year ended December 31, 2002**

or

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**Commission file number 1-10218**

# Collins & Aikman Corporation

*(Exact name of registrant as specified in its charter)*

**Delaware**
*(State or other jurisdiction of incorporation or organization)*

**13-3489233**
*(I.R.S. Employer Identification Number)*

**250 Stephenson Highway
Troy, Michigan 48083**
*(Address of principal executive offices, including zip code)*

**Registrant's telephone number, including area code:
(248) 824-2500**

**Securities registered pursuant to Section 12(b) of the Act:**

| Title of each class | Name of each exchange on which registered |
|---|---|
| Common Stock, $.01 par value | New York Stock Exchange |

**Securities registered pursuant to Section 12(g) of the Act:
None**

Indicate by check mark whether the Registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the Registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☑  No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of Registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☑

Indicate by check mark whether the registrant is an accelerated filer (as defined in Exchange Act Rule 12b-2). Yes ☑  No ☐.

The aggregate market value of voting stock held by non-affiliates of the Registrant was $168,443,079 as of March 18, 2003.

As of February 28, 2003, the number of outstanding shares of the Registrant's common stock, $.01 par value, was 83,630,087 shares.

## DOCUMENTS INCORPORATED BY REFERENCE:

The information required by Part III (Items 10, 11, 12 and 13) is incorporated by reference to portions of the registrant's definitive Proxy Statement for the 2002 Annual Meeting of Stockholders, which will be filed within 120 days of December 31, 2002.

## WEBSITE ACCESS TO COMPANY'S REPORTS:

Collins and Aikman's internet website address is www.collinsaikman.com. The Company's annual report on Form 10-K, quarterly reports on Form 10-Q, current reports on Form 8-K, and amendment to those reports filed or furnished pursuant to Section 13(a) or 15(d) of the Exchange Act are available free of charge through the Company's website and as soon as reasonably practicable after the reports are electronically filed with, or furnished to the Securities and Exchange Commission.

# COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES

## FORM 10-K ANNUAL REPORT INDEX

|  |  | Page |
|---|---|---|
| Item 1. | Business | 7 |
| Item 2. | Properties | 16 |
| Item 3. | Legal Proceedings | 16 |
| Item 4. | Submission of Matters to a Vote of Security Holders | 19 |
| Item 5. | Market for Registrant's Common Equity and Related Stockholder Matters | 19 |
| Item 6. | Selected Financial Data | 20 |
| Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 21 |
| Item 7A. | Quantitative and Qualitative Disclosures About Market Risk | 40 |
| Item 8. | Financial Statements and Supplementary Data | 41 |
| Item 9. | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | 41 |
| Item 10. | Directors and Executive Officers of the Registrant | 42 |
| Item 11. | Executive Compensation | 42 |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management | 42 |
| Item 13. | Certain Relationships and Related Transactions | 42 |
| Item 14. | Controls and Procedures | 42 |
| Item 15. | Exhibits, Financial Statement Schedules and Reports on Form 8-K | 44 |

# PART I

This Report on Form 10-K contains "forward-looking" information, as that term is defined by the federal securities laws, about our financial condition, results of operations and business. You can find many of these statements by looking for words such as "may," "will," "expect," "anticipate," "believe," "estimate," "should," "continue," "predict," and similar words used in this Annual Report. The forward-looking statements in this Form 10-K are intended to be subject to the safe harbor protection provided by the federal securities laws.

These forward-looking statements are subject to numerous assumptions, risks and uncertainties (including trade relations and competition). Because the statements are subject to risks and uncertainties, actual results may differ materially from those expressed or implied by the forward-looking statements. We caution readers not to place undue reliance on the statements, which speak only as of the date of this Annual Report.

The cautionary statements set forth above should be considered in connection with any subsequent written or oral forward-looking statements that Collins and Aikman, Corporation (the Company) or persons acting on its behalf may issue. The Company does not undertake any obligation to review or confirm analysts' expectations or estimates or to release publicly any revisions to any forward-looking statements to reflect events or circumstances after the date of this report or to reflect the occurrence of unanticipated events.

This Annual Report contains forward-looking statements within the meaning of the Private Securities Litigation Reform Act of 1995. Actual results and events may differ materially from those that are anticipated because of certain risks and uncertainties, including but not limited to general economic conditions in the markets in which the Company operates and industry based factors such as:

*Demand in the automotive industry is significantly dependent on the U.S. and the global economies and the Company's business and profitability are exposed to current and future uncertainties.*

The Company's financial performance depends, in large part, on conditions in the global automotive markets and, generally, on the U.S. and global economies. Demand in the automotive industry fluctuates in response to overall economic conditions and is particularly sensitive to changes in interest rate levels, consumer confidence and fuel costs. The threat or act of terrorism and war, the recession and other recent developments adversely affected consumer confidence throughout the U.S. and much of the world and exacerbated the uncertainty in the Company's markets. The future impact on us is difficult to predict. We would be harmed by any sustained weakness in demand or continued downturn in the economy.

The Company's sales are impacted by retail inventory levels and production schedules. In 2002, Original Equipment Manufacturer (OEM) customers continued to significantly reduce their production and inventory levels due to the uncertain economic environment. In the current environment, it is extremely difficult to predict future production rates and inventory levels and the sustainability of any recovery.

*The base of customers which the Company serves is concentrated, and the loss of business from a major customer or the discontinuation of particular vehicle models could reduce the Company's sales and harm the Company's profitability.*

Because of the relative importance of a few large customers and the high degree of concentration of OEMs in the automotive industry, the Company's business is exposed to a high degree of risk related to customer concentration. DaimlerChrysler AG, General Motors Corporation and Ford Motor Company and their respective affiliates were the Company's three largest customers and they directly or indirectly accounted for approximately 31%, 23% and 23% of the Company's 2002 net sales, respectively. A loss of significant business from, or adverse performance by, any of these customers would be harmful to the Company's profitability. Although the Company receives purchase orders from most of the Company's customers, these purchase orders typically provide for the supply of a customer's annual requirements for a particular model or assembly plant, renewable on a year-to-year basis, rather than for the purchase of a specific quantity of products. It is difficult to accurately predict the level of new production for 2003 car sales. The loss of business with respect to significant vehicle models could have a material adverse effect.

In addition, there is substantial and continuing pressure from automotive manufacturers to reduce costs, including costs associated with outside suppliers like Collins and Aikman. For example, OEM customers in the automotive industry attempted to impose price decreases and givebacks throughout 2002. Such attempted price decreases were generally in the 3% to 8% range. Several reductions have been agreed to, and others are currently being negotiated with OEMs and pressures may increase if overall economic and industry conditions do not improve. It is difficult for the Company to offset downward pricing pressures through alternative, less costly sources of raw materials. In addition, throughout 2002, the Company has experienced pricing pressure from its suppliers. The Company cannot assure that it will not be materially and adversely affected by substantial and continuing pricing pressures.

*The prices that the Company can charge some of the Company's customers are predetermined and the Company bears the risk of costs in excess of its estimates.*

Sales contracts with some of the Company's customers require it to provide its products at predetermined prices. In some cases, these prices decline over the course of the contract. The costs that the Company incurs in fulfilling these contracts may vary substantially from its initial estimates. Unanticipated cost increases may occur as a result of several factors, including increases in the costs of labor, components or materials. In some cases, the Company may be permitted to pass on cost increases associated with specific materials to its customers. Cost overruns that the Company cannot pass on to its customers could have a material adverse effect.

*The Company may not be able to successfully integrate the Company's acquired operations or realize the intended benefits of the Company's acquisitions.*

The Company's future operations and cash flow will depend largely upon its ability to integrate acquisitions, achieve the strategic operating objectives for these acquisitions and realize significant synergies and cost savings as a result. Acquisitions since January 2001 account for 50 of the Company's 115 plants and facilities and approximately 50% of the Company's approximately 25,000 employees. The Textron Automotive Company's Trim division (TAC-Trim) acquisition in 2001 individually accounted for 41 of the Company's plants and facilities and approximately 12,000 of the Company's employees located across seven different countries, including two countries where the Company did not previously operate. The Company has not previously undertaken an integration process as large or complex as the integration plans required by these recent acquisitions collectively or by the TAC-Trim acquisition individually. In order to succeed, the Company will need to realize projected synergies and cost savings on a timely basis, consolidate information technologies, capitalize on the Company's increased purchasing power, effectively control the progress of the Company's integration process and associated costs, consolidate the Company's program management, research and development and engineering operations; capitalize on the Company's prime contractor strategy and the opportunities afforded by the Company's broader products offering; and maintain strong relationships with Tier I integrators and OEMs.

To the extent the Company has misjudged the nature and extent of industry trends or its competition, it may have difficulty in achieving its operating and strategic objectives. In addition, the Company's integration activities will place substantial demands on its management, operational resources and financial and internal control systems. The Company's future operating results will depend upon the Company's ability to implement and improve its operating and financial controls and to combine, train and manage the Company's employee base. There is a risk that the diversion of management attention, particularly in a difficult operating environment, will affect sales and the attention that management can devote to this and other operational, financial and strategic issues. In addition, in some of the Company's past non-U.S. acquisitions, the Company has encountered integration and systems difficulties typical of foreign transactions, which have given rise to material weaknesses that had to be subsequently corrected. The Company cannot assure you that it will not encounter similar difficulties going forward. All statements concerning the benefits, cost savings and synergies the Company expects to realize from its acquisitions are forward-looking statements.

3

*The Company may pursue additional acquisitions that further the Company's current strategies.*

The Company may selectively identify and acquire other businesses with complementary products, manufacturing capabilities or geographic markets and the Company expects to continually evaluate such opportunities. The Company cannot assure you that any business acquired will be successfully integrated with other operations or prove to be complementary in the manner expected or profitable. The Company could incur further indebtedness in connection with the Company's acquisition strategy and increase the Company's leverage. Acquisitions outside of North America may present unique difficulties and increase the Company's exposure to the risks attendant to international operations. The process of integrating acquired companies and operations into the Company's existing operations may result in unforeseen operating difficulties and may require significant financial resources that would otherwise be available for the ongoing development or expansion of existing operations.

*The Company may incur unanticipated contingent liabilities as a result of acquisitions and may experience unanticipated liabilities associated with former discontinued operations.*

The Company may incur unforeseen environmental, tax, pension, litigation or other liabilities in connection with the Company's recent or future acquisitions or the Company may underestimate the known liabilities. If such liabilities materialize or are greater than the Company estimates, they could have a material adverse effect on us. In addition, the Company has significant responsibilities related to some of its formerly owned businesses, or discontinued operations, such as those relating to post-retirement, casualty, environmental, product liability, lease and other matters. Based upon the information presently available and the Company's insurance coverage, the Company does not believe that any of these liabilities will have a material adverse effect upon the Company's financial condition or results of operations, however, the Company could be incorrect in its assumptions and the extent of those contingent liabilities of which the Company is aware may exceed its expectations and there may be other such liabilities of which the Company presently has no knowledge.

*If the Company is unable to meet future capital requirements, the Company's competitive position may be adversely affected.*

In securing new business, the Company is typically required to expend significant amounts of capital for engineering, development, tooling and other costs. Generally, the Company seeks to recoup these costs through pricing over time, but the Company may be unsuccessful due to competitive pressures and other market constraints or if a customer ceases production of a particular vehicle. While the Company believes that it will be able to fund capital expenditures through cash flow from operations, borrowings under the Company's credit facilities and sales of receivables under the Company's receivables facility, there can be no assurance that it will have adequate funds to make all the necessary capital expenditures or that the amount of future capital expenditures will not be materially in excess of its anticipated expenditures.

*Recent trends among the Company's customers will increase competitive pressures in the Company's businesses.*

In recent years, the competitive environment among suppliers to the vehicle manufacturers in the automotive industry has changed significantly as these manufacturers have sought to outsource more vehicular components, modules and systems and to use on-line auctions in order to obtain further price reductions. In addition, these sectors have experienced substantial consolidation as OEMs have sought to lower costs, improve quality and increasingly purchase complete systems and modules rather than separate components. This consolidation has caused, and its continuation will continue to amplify, the pricing pressures outlined above in the discussion of the concentration of the Company's customers. The Company's competitive strategy will be to position ourselves as the prime contractor of choice to both Tier I integrators and OEM assembly plants by supplying a full spectrum of integrated interior trim components. This strategy presents the risk that some of the Company's customers may be in competition with the Company as well. Furthermore, the trend toward consolidation among automotive parts suppliers is resulting in a smaller number of large suppliers like us who benefit from purchasing and distribution economies of scale. The Company may be

4

unable to achieve the cost savings and operational improvements expected from the Company's prime contractor business strategy, which could harm its ability to compete favorably in the future with other larger, consolidated companies.

*The Company's strategy may not succeed if anticipated outsourcing fails to occur due to union considerations.*

Because of the economic benefits inherent in outsourcing to suppliers and the costs associated with reversing a decision to purchase automotive interior systems and components from an outside supplier, automotive manufacturers' commitments to purchasing automotive interior systems and components from outside suppliers, particularly on a just-in-time basis, are contemplated to increase. However, under the contracts currently in effect in the United States and Canada between each of Ford, General Motors and DaimlerChrysler and the United Auto Workers ("UAW") and the Canadian Auto Workers ("CAW"), in order for any of such automotive manufacturers to obtain from external sources components that it currently produces, it must first notify the UAW or the CAW of such intention. If the UAW or the CAW objects to the proposed outsourcing, some agreement will have to be reached between the UAW or the CAW and the automotive manufacturer. Factors that will normally be taken into account by the UAW, the CAW and the automotive manufacturer include whether the proposed new supplier is technologically more advanced than the automotive manufacturer, whether the new supplier is unionized, whether cost benefits exist, and whether the automotive manufacturer will be able to reassign union members whose jobs are being displaced to other jobs within the same factories.

*The Company's products are subject to changing technology, which could place us at a competitive disadvantage relative to alternative products introduced by competitors.*

The Company believes that its customers rigorously evaluate their suppliers on the basis of product quality, price competitiveness, technical expertise and development capability, new product innovation, reliability and timeliness of delivery, product design capability, manufacturing expertise, operational flexibility, customer service and overall management. The Company's success will depend on its ability to continue to meet customers' changing specifications with respect to these criteria. The Company may, therefore, require significant ongoing and recurring additional capital expenditures and investment in research and development, manufacturing and other areas to remain competitive.

*The Company may be subject to work stoppages at its facilities or those of its principal customers, which could seriously impact the profitability of the Company's business.*

As of December 31, 2002, approximately 57% of the Company's global work force was unionized. If the Company's unionized workers were to engage in a strike, work stoppage or other slowdown in the future, the Company could experience a significant disruption of the Company's operations, which could have a material adverse effect on us. Many OEMs and their suppliers have unionized work forces. Work stoppages or slowdowns experienced by OEMs or their suppliers could result in slowdowns or closures of assembly plants where the Company's products are included in assembled vehicles. Furthermore, organizations responsible for shipping the Company's customers' products may be impacted by occasional strikes staged by the unions representing transportation employees. Any interruption in the delivery of the Company's customers' products would reduce demand for the Company's products.

*A growing portion of the Company's revenue may be derived from international sources, which exposes us to additional uncertainty.*

A significant portion of the Company's 2002 sales were derived from shipments to destinations outside of the United States and Canada. As part of the Company's business strategy, the Company intends to expand the Company's international operations and customer base. Sales outside of the U.S. and Canada, particularly sales to emerging markets, are subject to other various risks, including: governmental embargoes or foreign trade restrictions such as antidumping duties; changes in U.S. and foreign governmental regulations; tariffs; fuel duties; other trade barriers; political, economic and social instability; and foreign exchange risk. In

5

addition, there are tax inefficiencies in repatriating funds from non-U.S. subsidiaries. To the extent such repatriation is necessary for us to meet the Company's debt service or other obligations, this will adversely affect us. International operations are frequently conducted through joint venture arrangements that can materially limit the Company's operational and financial control of the business.

*The Company may incur material losses and costs as a result of product liability and warranty claims that may be brought against us.*

The Company faces an inherent business risk of exposure to product liability claims in the event that the use of its current and formerly manufactured or sold products results, or is alleged to result, in bodily injury and/or property damage. The Company may experience material product liability losses in the future or incur significant costs to defend such claims. The Company's product liability insurance coverage will be inadequate for any liabilities that may ultimately be incurred or may be unavailable on acceptable terms in the future. In addition, if any of the Company's products are or are alleged to be defective, the Company may be required to participate in a government-required or OEM-instituted recall involving such products. Each vehicle manufacturer has its own policy regarding product recalls and other product liability actions relating to its suppliers.

In addition, as suppliers become more integrally involved in the vehicle design process and assume more of the vehicle assembly functions, vehicle manufacturers are increasingly looking to their suppliers for contribution when faced with product liability claims. A successful claim brought against us in excess of the Company's available insurance coverage or a requirement to participate in a product recall may have a material adverse effect.

In the ordinary course of the Company's business, contractual disputes over warranties can arise. In the past five years or more, the Company has not been required to make any material payments in respect of warranty claims. In most cases, financial responsibility for warranty costs are contractually retained by the Company's customer so long as the customers' specifications are met, but the Company may nonetheless be subjected to requests for cost sharing or pricing adjustments as a part of the Company's commercial relationship with the customer.

*The Company's business may be materially and adversely affected by compliance obligations and liabilities under environmental laws and regulations.*

The Company is subject to federal, state, local and foreign environmental, and health and safety, laws and regulations that affect ongoing operations and may increase capital costs and operating expenses in order to maintain compliance with such requirements; and impose liability relating to contamination at the Company's facilities, and at other locations such as former facilities, facilities where the Company has sent wastes for treatment or disposal, and other properties to which the Company (or a company or business for which the Company is responsible) are linked. See Footnote 21 "Commitments and Contingencies — Environmental".

*The Company may not be able to manage its business as it might otherwise due to its high degree of leverage.*

The Company has indebtedness that is substantial in relation to the Company's stockholders' equity and cash flow. At December 31, 2002, the Company had $1,289.2 million of outstanding total debt and short-term borrowings. The Company's percentage of total debt and outstanding preferred stock of its subsidiary, Products ("Products Preferred Stock") to total capitalization was 78% at December 31, 2002. The degree to which the Company is leveraged will have important consequences, including the following:

- the Company's ability to obtain additional financing in the future for working capital, capital expenditures, acquisitions, business development efforts or general corporate purposes may be impaired;

- a substantial portion of the Company's cash flow from operations will be dedicated to the payment of interest and principal on the Company's indebtedness, dividends on Products Preferred Stock, and capital and operating lease expense, thereby reducing the funds available to us for other purposes;

- the Company's operations are restricted by the Company's debt instruments and the terms of the Products Preferred Stock, which contain material financial and operating covenants, and those restrictions will limit, among other things, the Company's ability to borrow money in the future for working capital, capital expenditures, acquisitions or other purposes;

- indebtedness under the Company's senior credit facilities and the financing cost associated with its receivables facility will be at variable rates of interest, which makes it vulnerable to increases in interest rates;

- the Company's leverage may place us at a competitive disadvantage as compared with the Company's less leveraged competitors and the Company's leverage will make it more vulnerable in the event of a downturn in general economic conditions or in any of the Company's businesses; and

- the Company's flexibility in planning for, or reacting to, changes in its business and the automotive industry may be limited.

The Company's ability to service or refinance, when required, the Products Preferred Stock and the Company's debt, lease and other obligations will depend principally upon the Company's future operating performance, which will be affected by prevailing economic conditions and financial, business and other factors, many of which are beyond the Company's control.

In addition, factors more specific to us could cause actual results to vary materially from those anticipated in the forward-looking statements included in this report such as substantial leverage, limitations imposed by the Company's debt instruments, the Company's ability to successfully integrate acquired businesses including actions it has identified as providing cost saving opportunities, and pursue our prime contractor business strategy, the Company's customer concentration and risks associated with the formerly owned operations of the Company.

The Company's divisions may also be affected by changes in the popularity of particular vehicle models or particular interior trim packages or the loss of programs on particular vehicle models.

For a discussion of certain of these and other important factors which may affect our operations, products and markets, see "Item 1. — Business" and "Item 7. — Management's Discussion and Analysis of Financial Condition and Results of Operations" and also our other filings with the Securities and Exchange Commission.

## Item 1.  *Business*

### The Company

The Company is a global leader in the design, engineering and manufacturing of automotive interior components, including instrument panels, fully assembled cockpit modules, floor and acoustic systems, automotive fabric, interior trim and convertible top systems and has the number one or two North American market share position in seven out of ten major automotive interior categories tracked by CSM Worldwide. The Company is also the largest North American supplier of convertible top systems. The Company expects the fully assembled cockpit modules market to grow significantly over the next five years and has positioned itself as a leading global supplier in this market. Sales are diversified among all North American OEMs, transplants such as Toyota, Honda and Nissan and major Tier I integrators. In North America, the Company manufactures components for approximately 90% of all light vehicle production. The Company has approximately 25,000 employees and more than 115 plants and facilities worldwide. The Company is a Delaware corporation formed on September 21, 1988. The Company conducts all of its operating activities through its wholly owned subsidiary Collins & Aikman Products Co. ("Products"). Predecessors of Products have been in operation since 1843.

In February 2001, Heartland Industrial Partners, L.P. acquired a controlling interest in the Company. Since the investment, the Company has pursued acquisitions that have furthered a strategy of serving as a prime contractor to both Tier I integrators, which are shifting capital and emphasis away from interior components manufacturing and towards electronics and the delivery of fully integrated interior modules, and to OEMs, which continue to increase their outsourcing of complete interior manufacturing. Significant acquisitions include:

- On July 3, 2001, the Company acquired the Becker Group, a leading supplier of plastic components to the automotive industry.

- On September 21, 2001, the Company acquired Joan Automotive Industries, a leading supplier of bodycloth to the automotive industry, and the assets of Joan's affiliated automotive yarn dyeing operation, Western Avenue Dyers, L.P.

- On December 20, 2001, the Company acquired TAC-Trim, one of the largest suppliers of instrument panels and fully assembled cockpit modules and a major automotive plastics manufacturer of interior and exterior trim components in North America, Europe and South America.

- On January 2, 2003, the Company acquired Delphi Corp.'s plastic injection molding plant and related equipment in Logroño, Spain.

- On January 17, 2003, the Company acquired from Textron the remaining 50% interest in Textron Automotive Holdings (Italy) S.r.L., a joint venture that was formed as part of the TAC-Trim acquisition. The joint venture includes four facilities producing interior and exterior automotive trim components for strategic global customers in the region.

Collins & Aikman through its recent acquisitions has created one of the industry's largest and most broadly based manufacturers of automotive interior components, systems and modules. The Company has the capability to supply diverse combinations of stylistically matched, functionally engineered and acoustically integrated interior trim components, systems and modules and markets interior products to customers through a single "global commercial operations" group, which supplies products from three primary categories: plastic components and cockpits, carpet and acoustics and automotive fabrics. In addition, the Company continues to market its convertible top systems through the Dura convertible group.

## Industry Trends

The Company's strategy is to capitalize on several important automotive industry trends, which are expected to drive demand for its products. These trends include:

- *Increasing OEM Demand for Modules, Systems and Complete Interiors.*   To reduce costs and simplify assembly processes and design, OEMs increasingly expect their large-scale suppliers to provide fully engineered systems, pre-assembled combinations of components (systems or modules) and complete automotive interiors rather than individual components. OEMs also continue to increase their need for multiple products on any given assembly line, further driving the need for suppliers to be able to handle extreme complexity.

- *Accelerating Manufacturing Outsourcing by Tier I Total Interior Integrators.*   The large total interior Tier I integrators are repositioning their assets and resources to focus on electronics design, assembly and "just-in-time" sequencing of modules, systems and complete interiors. As a result, they are seeking to divest or outsource the manufacturing of many component categories.

- *Growing Technological Content and Acoustical Performance Requirements.*   The electronic and technological content of vehicles continues to expand, largely driven by demand for greater functionality and convenience. Changes to vehicle interiors, including hands-free cell phone systems, entertainment and navigational systems and voice-activated dashboard functions, are expected to require enhanced acoustical properties and increased sound field engineering relative to today's light vehicles.

8

- *Global Customer Requirements.* Due to the opportunity for significant cost savings, reduced product development cycle times, common global platforms and improved product quality and consistency, automotive manufacturers favor suppliers with the capability to manufacture automotive interior systems and components in multiple geographic markets.

## Corporate Strategy

The Company's goal is to become the leading manufacturer of automotive interior trim components to OEMs and Tier I integrators and to realize the integration, synergy and cost savings opportunities created by the combination of Collins & Aikman and its 2001 acquisitions. The Company intends to leverage its product development, patented new materials, continuous enhanced manufacturing capability, an unwavering dedication to lean, error proofing and APQP (Advanced Product Quality Planning) launch readiness systems to meet customers' demands. The following are the key elements of the strategy:

- *Provide integrated product solutions that combine interior styling, component systems and acoustical technologies.* The ability to bundle multiple components into integrated, custom packages distinguishes the Company from its competitors and provides an opportunity to increase content per vehicle. The Company is a leader in product innovation, design and styling in all of its business areas, producing components that cover substantially all of the non-glass interior surfaces of automobiles. This breadth of product offering affords the Company a significant advantage as OEMs increasingly view the vehicle interior as a major point of differentiation and rely upon automotive suppliers for research, engineering, design and styling capabilities. By employing a cross-disciplinary approach to acoustics, surface styling and product engineering that takes advantage of product development and technological capabilities, the Company can offer integrated product solutions to its customers.

- *Capitalize on position as prime contractor to OEMs and Tier I total interior integrators.* The Company believes that OEMs will accelerate modular and system sourcing in order to lower costs, reduce time to market and accommodate global platforms and that Tier I total interior integrators will increase the redeployment of assets and capital into the integrated design, assembly and "just in time" sequenced delivery of complete interior systems. The Company is well positioned to capitalize on these opportunities. Furthermore, the Company's products are used in approximately 90% of all North American light vehicle platforms and are sold to all North American OEMs, transplants such as Toyota, Nissan and Honda, and major Tier I integrators. The Company is also well positioned with respect to its Tier II competitors that have comparatively narrower product lines and significantly less size, scale and technological capabilities.

- *Increase content per vehicle.* The Company intends to take advantage of its current position to increase content per vehicle and has substantial new business awards from customers across all product categories, with the strongest growth in fully assembled cockpit modules. Projected sales growth is primarily attributable to TAC-Trim's expanded book of full cockpit programs. By increasing content per vehicle, sales are expected to increase at a rate in excess of changes in industry production rates.

- *Leverage technology to improve manufacturing efficiency.* The Company believes it has many opportunities to improve manufacturing efficiency and cost structure by rationalizing existing operations and incorporating manufacturing "best practices," processes, procedures and technologies into its operations. For example, TAC-Trim is believed to be among the most efficient plastics suppliers in North America and Europe due to numerous proprietary manufacturing technologies, such as Invisitec™ and Intellimold™ and Envirosoft™ patented processes that allow the Company to manufacture and combine multiple products to produce complex integrated interiors products. The Company believes the application of technologies such as Intellimold™ to the Company's other operations, as well as the continued roll-out of these technologies throughout TAC-Trim's operations, will significantly improve plastics manufacturing cycle times, labor costs and scrap rates.

- *Pursue cost savings opportunities.* The Becker, Joan and TAC-Trim acquisitions created cost savings in the first full year of operation. The Company expects to continue to realize additional savings through a number of initiatives, including purchasing savings, in-sourcing the majority of our plastics

tooling and yarn dyeing requirements, consolidating research and development and engineering functions, capacity rationalization and reducing global headquarters' costs. In an effort to achieve cost savings, the Company may also elect to implement restructuring activities in future periods above and beyond activities initiated during 2002.

## Segment and Geographical Information

For a discussion of the Company's operating segments and the geographic regions in which the Company operates, refer to Item 7 MD&A — "Results of Operations" and to Footnote 20 — "Information About the Company's Operations."

## Products

The Company markets the majority of its products to customers through a single "global commercial operations" group, which supplies products from four primary categories: plastic components and cockpits, carpet and acoustics, automotive fabrics, and convertible top systems.

## Plastic Components and Cockpits

The Company manufactures substantially all of the components of the plastic interior trim within a vehicle, including automotive instrument panels, door panels, sidewall trim, overhead systems, headrests and armrests, cupholders, air registers and bezels, slush molded skins, pillar trim, floor console systems, instrument panel components, and fully assembled cockpit modules. This broad portfolio of plastic components and cockpits products allows the Company to offer customers modules and systems that incorporate individual components. Some major products include:

- *Instrument Panels ("IP"):* As the most structurally important plastic component in the vehicle and as the plastic substrate directly in front of the driver, the IP occupies the most important piece of "real estate" in the interior. The Company believes that it is the number one IP supplier in North America. The advanced materials the Company employs include Envirosoft™ castable thermoplastic materials, high performance PVC alloys, high-definition grain and texture formulation and vacuum forming. The Company also has the proprietary Invisitec™ invisible passenger air bag system, which provides improved appearance and craftsmanship at reduced cost.

- *Cockpits:* The Company is a leading North American and European supplier of cockpits. The complete array and breadth of its plastic component offerings has enabled the Company to become a leader in offering customers a fully assembled IP system ("cockpit") delivered on a just-in-time basis. As most of the ancillary interior trim components revolve around the IP placement, the Company believes that it will be able to penetrate effectively the customer base by offering the IP along with complementary plastic accoutrements and additional products from its other business units. The Company sources various other parts that make up a fully assembled modular cockpit from outside suppliers (including radios, wire harnesses, cross-vehicle beams and steering columns). The Company expects that its position as a cockpit integrator will provide significant opportunities to in-source more manufactured content in the future. Through the proprietary Intelliquence™ software, finished cockpits can be delivered to the OEMs on a just-in-time basis and installed on the assembly line.

- *Door Panels:* The Company believes that it is the second largest supplier of door panels in North America. This decorative plastic interior trim component is an important element to the overall styling theme of a vehicle's interior.

- *Exteriors:* Exterior trim components include plastic molded fascia systems, bodyside cladding, signal lamps, cowl grilles and wheel flares. The Company has taken advantage of the systems trend in the exterior trim product market by producing and assembling fascia with radiator grilles, energy absorbers, trim moldings and lamps to be delivered in sequence directly to the OEMs' assembly line.

## Carpet and Acoustics

The Company evolved from a North American carpet producer to become a market leader in a broad range of automotive floor systems, luggage compartment trim, dash insulators and other acoustic products with production capabilities in both North America and Europe. While acoustical products are often combined with molded floor carpet to provide complete interior floor systems, it is useful to describe four carpet and acoustics product categories:

- *Molded Floor Systems:*  Molded floor systems consist of thermoformed compression molded carpets. These carpets are provided in either a barrier or an absorptive NVH (noise, vibration and harshness) system. The barrier system includes polyethylene, barrier back, and a fiber underlay system or a foam-in-place system. Products include Tuflor™, the Company's proprietary thermoplastic flooring product, which is rugged, durable and washable. The products in molded floor systems are highly engineered, and their manufacture requires a high degree of precision and draws on the Company's robotics capabilities. The Company believes it is the number one producer of molded floor and acoustic systems in the North American market and manufactures molded floor systems for all of the North American and Japanese OEMs as well as a number of the European OEMs.

- *Luggage Compartment Trim:*  The other major carpeted area of the vehicle is the luggage compartment, which includes one-piece molded trunk systems and assemblies, wheelhouse covers and center pan mats, seatbacks, tireboard covers and other trunk trim products. The Company believes that it is the number two supplier of luggage compartment trim in the North American market.

- *Accessory Floormats:*  The Company manufactures automotive accessory floormats by vulcanizing rubber backing to tufted carpet and also manufactures cargo mats with value-added distinctive aesthetic and practical features such as hand-sewn appearance of edges and moisture trapping construction with our patented Akro Edge® floormats. Largely due to this product differentiation, the Company has become the largest fully integrated auto floormat producer in North America.

- *Acoustical Products:*  Acoustical products include interior dash insulators that insulate the passenger compartment from engine compartment noise and heat; damping materials that control noise in the floor, overhead system and sides of the vehicle; and engine compartment NVH systems. Changes to vehicle interiors, including hands-free cell phone systems, navigational systems, entertainment systems and voice-activated Internet access, will require enhanced acoustical properties and increased sound field engineering relative to today's light vehicles.

## Automotive Fabrics

The Company is positioned as the market leader in the North American automotive fabrics market, with the 2001 acquisition and the completed integration of Joan Fabrics automotive business. The principal automotive products include body cloth (woven or knitted fabrics for seating surfaces and other interior applications) and headliner fabric. The Company is able to offer virtually every major weave/knit technology currently available in the marketplace including dobby velours, jacquard velours, flat wovens, double-needlebar knits, circular knits and tricot knits. This allows the Company to effectively serve changing customer styling and cost directives.

In addition, Joan and other acquisitions have allowed the Company to increase its backward and forward integration levels by adding yarn dye and fabric lamination operations. This additional value-add manufacturing and improved control of the supply chain have contributed to improved operational efficiencies and manufacturing performance.

## Dura Convertible Top Systems

Dura Convertible Systems (DCS) is the only vertically integrated full service supplier of convertible roof systems, which designs, engineers and manufactures all aspects of a convertible top including the framework, trim set, backlights, well slings, tonneau covers and power actuating system. Recently, in order to differentiate products in the marketplace, OEMs have been increasing the number of convertible and open roof derivative

11

vehicles on both existing and new platforms. The Company's management believes that this trend will continue to drive demand for convertibles and other innovative open roof systems. DCS is well positioned to secure additional business based upon demonstrated new innovative roof system concepts.

Top-in-a-Box™, a system pioneered by DCS, is an assembly-line-ready module containing all of the components of a convertible top that enables the OEM to install a complete convertible top system on the production line. This modular, "bolt-on" assembly significantly reduces the time and labor traditionally required to manufacture a convertible model, enabling OEMs to more profitably produce and sell convertibles. DCS has the industry's most complete line of fabric coverings for convertible and sport utility top covers for OEMs globally. The Company maintains final assembly and trim operations near the OEMs' plants, and thereby offers customers complete just-in-time delivery and sequencing capabilities.

## Customers

Customers include OEMs and Tier I total interior integrators, both of which have been increasingly divesting component manufacturing. OEMs have been typical direct customers for the Company's plastic components, cockpits, carpet and acoustic and convertible products, while Tier I total interior integrators have typically been direct customers for fabrics and carpet and acoustics.

Through strategic acquisitions, the Company has broadened its customer base globally, with European and South American sales representing 19% of total sales for 2002 versus 14% in 2001. DaimlerChrysler AG (including Mercedes, Chrysler, Mitsubishi and Smart), General Motors Corporation (including General Motors, Opel, Vauxhall and Saab) and Ford Motor Company (including Ford, Jaguar, Land Rover, Aston Martin and Volvo) directly and indirectly represented approximately 31%, 23% and 23% of 2002 sales, respectively. The following is a list of customers:

- Alpha Romeo
- Audi
- BMW
- CAMMI
- DaimlerChrysler
- Faurecia
- Fiat
- Ford
- Freightliner
- General Motors
- Honda
- Intier
- Isuzu
- Jaguar
- Johnson Controls
- Lear Corporation
- Magna
- MAN
- Mazda
- Mitsubishi
- Nissan
- NUMMI
- Opel
- Porsche
- PSA
- Renault
- Rover
- Scania
- Seat
- Subaru
- Toyota
- Visteon
- Volkswagen
- Volvo

The Company's supply relationships are typically sole-source and extend over the life of the model, which is generally four to seven years, and do not normally require the purchase by the customer of any minimum number of products. The Company receives blanket purchase orders that normally cover annual requirements for products to be supplied for a particular vehicle model which may be terminated at any time. In order to reduce reliance on any one model, the Company produces automotive interior and exterior systems and components for a broad cross-section of both new and more established models.

## Marketing, Engineering and Development

As a global leader in automotive interior and exterior components, the Company differentiates itself in the marketplace by consistently providing high quality products, outstanding customer service and program management, and cost effective automotive solutions to global customers. Historically, the Company marketed individual components, modules and complete systems to customers. The Company has realigned marketing efforts to sell integrated product "bundles" to customers in an effort to increase growth in sales and operating income while enhancing the value-add provided to customers. Central to this marketing strategy has been the development of products that enhance both the vehicles' interior aesthetics as well as its acoustic performance. Equally important, and unlike many other Tier I or Tier II automotive suppliers, is the development of marketing and program management teams specifically focused on supporting not only OEMs, but major Tier I customers as well. These dedicated teams, consisting of experienced automotive personnel

12

who are able to meet a customer's entire needs, provide a single interface for our customers and help avoid duplication of our sales and engineering efforts.

Products are sold directly to customers under sales contracts that are obtained primarily through competitive bidding. These sales are originated almost entirely by sales staff. This marketing effort is augmented by design and manufacturing engineers that work closely with automotive manufacturers from the preliminary design to the manufacture and supply of automotive modules, systems or components. A key element employed to increase sales is to develop increasingly higher value-added products through innovations in materials construction, product design, engineering and styling. The primary focus of the Global Product Development Division (GPDD), therefore, is to work closely with customer engineering personnel to develop new products, processes, innovations, etc. that are central to winning new business from customers. The Advanced Sales and Program Management Group serves as a "bridge" between the GPDD and customer focused sales groups who market the Company's products and are responsible for ensuring that customers' needs are being met.

Through sales offices in North America, South America, Europe and Asia-Pacific, the Company's marketing personnel maintain regular contact with their various customers' engineers and purchasing agents. The Company continually seeks new business from existing customers, as well as developing relationships with new customers. The Company markets its products by maintaining strong customer relationships, developed over an 80-plus year history in the automotive industry through:

- extensive technical and product development capabilities;

- reliable just-in-time delivery of high-quality products;

- strong customer service;

- innovative new products; and

- a competitive cost structure.

The emergence of modular sourcing favors suppliers with broad manufacturing capabilities and product lines, experience with diverse materials and modular coordination. Management believes that the Company's broad base of manufacturing expertise with interior surface resins and materials and its global leadership in delivering cockpits, favorably positions the Company in the global automotive interior industry. Automotive manufacturers have increasingly looked to suppliers to assume responsibility for introducing product innovations, shortening the development cycle of new models, decreasing tooling investment and labor costs, reducing the number of costly design changes in the early phases of production and improving automotive interior acoustics, comfort and functionality. Once the Company is engaged to develop the design for the automotive interior system or component of a specific vehicle model, it is also generally engaged to supply these items when the vehicle goes into production. Substantial resources have been dedicated toward improving engineering and technical capabilities, establishing strong in-house tooling capabilities and developing advanced technology centers in the United States and in Europe. Similarly, research and development are an integral part of the sales and marketing effort. Especially noteworthy are the Company's proprietary Intellimold™ injection molding control process, Invisitec™ invisible passenger air bag door system and Envirosoft castable TPU (Thermal Plastic Polyurethane) and TPO (Thermal Plastic Olefin) materials.

In order to effectively develop automotive interior systems, it is necessary to have global capabilities in the engineering, research, design, development and validation of the interior components, systems and modules being produced. The Company conducts research and development at design and technology centers in Dearborn, Michigan; Dover, New Hampshire; Auburn Hills, Michigan; Plymouth, Michigan; Heidelberg, Germany and Tyngsboro, Massachusetts and at several worldwide product engineering centers. At these centers, the Company designs, develops and engineers products to comply with applicable safety standards, meet quality and durability standards, respond to environmental conditions and conform to customer aesthetic and acoustic requirements. In particular, acoustic requirements and cockpit aesthetics have become more important than ever with the advent of in-vehicle telematics. Technologically advanced acoustics testing

13

centers are maintained in Plymouth, Michigan and Heidelberg, Germany and cockpit development centers are located in Auburn Hills and Dearborn, Michigan in order to capitalize on both of these trends.

## Manufacturing

The Company focuses on combining smaller manufacturing plants into larger scale plants that have efficient layouts and the ability to reduce fixed costs.

The Company possesses cross-disciplinary manufacturing expertise, including an ability to form and assemble multi-material combinations of hard-molded plastics, slush-molded soft skins and surfaces, carpet, fabric, foam, insulation, and other trim materials as well as stamping, welding, machining and painting of metals and cutting and sewing of fabric components. Management believes the sophistication of the Company's carpet tufting and dying processes, the foam-in-place process for molded floors and its small-part plastic moldings and assemblies capabilities creates a competitive advantage.

With the Joan acquisition, the Company gained a scaleable, low-cost package automotive yarn dyeing facility thereby bringing in-house an important source of supply for the manufacture of our fabrics products.

The acquisition of Becker, originally established as a tool shop, has supplemented existing operations with one of the industry's leading tool developers allowing the in-sourcing of a significant portion of the Company's tooling requirements. The addition of Becker's tooling expertise complemented the Company's manufacturing capabilities for carpet and acoustics products and TAC-Trim's large part injection molding process.

The TAC-Trim acquisition added advanced process technologies such as slush-molded skinning for high-end instrument panels, thermoplastic casting, and "molded-in" color and decoration insert capability and overall manufacturing discipline and acumen. Specific product and process additions brought on by TAC-Trim include: the patented Intellimold™ feedback control system for injection molding control which dramatically reduces cycle times, labor costs and scrap rates; and the proprietary Intelliquence™ software sequencing system which should enable product delivery on a just-in-time basis to global OEM customers. In addition, TAC-Trim significantly expands plastic manufacturing capabilities allowing the Company to provide substantially all of an automobile's interior plastic components.

## Technology and Intellectual Property

Significant resources are dedicated to research and development in order to maintain the position as a leading developer of technology innovations, some of which have been patented or are in the process of being patented, in the automotive interior industry. The Company has developed a number of patented and proprietary designs for innovative interior features, all focused on increasing value to the customer. Examples include the Company developed proprietary slimline cupholders, Cavelflex™ (stretch woven) fabrics and the "AcT™ family" of acoustically tunable products.

Patents and patent applications exist in five primary areas: automotive floor mats, automotive fabric products, acoustics, interiors and convertible systems. With respect to floormats, the Company holds several U.S. and foreign patents relating to the Akro Edge® floormats. Akro Edge® floormats are the industry standard for their functional and aesthetic appeal to OEMs and their customers. With respect to automotive fabric patents, the Company has numerous patents on headliners, trunkliners and floor panels. In the acoustics area, in addition to the proprietary Comet® acoustics software, the Company is actively seeking protection of various aspects of its AcT™ fiber technology and various other means for improving sound deadening and sound absorption in automotive interiors. The Company has various patents and patent applications directed to cup holders, air outlet assemblies, storage systems and convertible mechanisms. The Company owns the patents relating to Intellimold™ injection molding control process for use in its business. The Intellimold™ patents are related to methods and/or apparatus for injection molding. The Company also holds technology relating to certain skin materials and compounding solutions that provide the capability to design cost-effective materials with outstanding performance and aesthetic qualities. Examples of these materials include Envirosoft™ castable thermoplastic materials, high performance PVC alloys, high-definition grain and texture formulation and vacuum thermoplastic applications. The Company also holds technology relating to the

14

Invisitec™ invisible passenger air bag system, which provides improved appearance and craftsmanship at reduced cost. Invisitec™ systems, which integrate the air bag door with the panel and top cover, have been commercialized for soft-cast and vacuum-formed panels and hard injection molded instrument panels. In total, the Company holds approximately 370 U.S. and approximately 1,400 foreign active patents and has approximately 325 patents pending. The intellectual property acquired in the TAC-Trim Acquisition is subject to certain limitations on the Company's use and creates continuing obligations to Textron.

As part of the TAC-Trim acquisition, the Company entered into three intellectual property license agreements with Textron. In two of these agreements, the Company licensed back to Textron certain intellectual property that was acquired in the transaction (the "Intellimold Agreement" and the "Licensed-Back IP Agreement"). In the third agreement, the Company licensed from Textron other intellectual property that it did not acquire in the transaction (the "Retained IP Agreement"). The Company is providing general descriptions of these agreements although these descriptions do not contain all the material terms in the contracts. In all three agreements, the ability to use the intellectual property is limited based on whether the proposed use falls inside or outside a defined field of automotive products (the "Restricted Field").

In the Intellimold Agreement, the Company gave Textron an exclusive worldwide, perpetual, irrevocable license to use outside the Restricted Field its rights in the Intellimold process and any enhancements developed by it. Textron was also granted a royalty-free, worldwide, perpetual, irrevocable license to use the Company's rights in the Intellimold process and any enhancements developed by the Company within the Restricted Field solely in connection with its and certain affiliates' manufacturing, sales and development operations. The Intellimold Agreement also includes an exclusive royalty-free, worldwide, perpetual, irrevocable license for the Company to use within the Restricted Field any enhancements to the Intellimold process developed by Textron. In the Licensed-Back IP Agreement, the Company granted Textron a non-exclusive, worldwide, royalty-free, perpetual and irrevocable license to use solely outside the Restricted Field certain intellectual property including over 50 U.S. patents on air bag related products. In the Retained IP Agreement, Textron granted to the Company a non-exclusive, worldwide, royalty-free, perpetual and irrevocable license to use solely within the Restricted Field certain intellectual property. These patents could have applicability to the automotive industry but such use is somewhat secondary to the use of such technology outside the automotive field.

As described below under the heading "Management's Discussion and Analysis of Financial Condition and Results of Operations — Liquidity — Leases", the Company leases certain equipment from Textron. When those leases terminate, if Textron and its affiliates continue to own any interest in the equipment, they will be allowed to use the equipment for certain purposes and to use related intellectual property.

## Raw Materials

Raw materials and other supplies used in our continuing operations are normally available from a variety of competing suppliers. With respect to most materials, the loss of a single or even a few suppliers would not have a material adverse effect on the Company. The Company is sensitive to price movements in its raw materials supply base and has not hedged against price fluctuations in commodity supplies, such as plastics and resins. While the Company may not be able to pass on any future raw materials price increases to customers, a significant portion of increased cost may be offset through volume purchase savings, value engineering/value analysis in conjunction with our major customers and reductions in the cost of off-quality products and processes. The Company may evaluate commodities hedging opportunities from time to time.

## Competition

The Company is a leading supplier in automotive molded carpet and acoustics, auto fabrics, convertible top systems and automotive plastics components and cockpits, within each segment. Customers rigorously evaluate suppliers on the basis of product, quality, price competitiveness, technical expertise and development capability, new product innovation, reliability and timeliness of delivery, product design capability, leanness of facilities, operational flexibility, customer service and overall management. Some competitors may have greater financial resources than the Company or a competitive advantage in the production of any given

15

product that the Company manufactures, and there can be no assurance that the Company will be able to successfully compete in the markets for the products it currently provides.

### Joint Ventures

In January 2003, the Company acquired from Textron the remaining 50% interest in Textron Automotive Holdings (Italy) S.r.L., a joint venture that was formed as part of the TAC-Trim acquisition. Refer to Item 7. "Management's Discussion and Analysis of Financial Condition and Results of Operations" for additional discussion regarding this acquisition of the remaining 50% interest in the Italian joint venture.

### Labor Matters and Employees

As of December 31, 2002, the Company's continuing operations employed approximately 25,000 persons on a full-time or full-time equivalent basis. Approximately 57% of such employees were represented by labor unions in the United States, Canada and other countries. Each facility with represented employees has its own collective bargaining unit and management believes that its relations with employees represented by labor unions and other employees are generally good. From time to time in the ordinary course of our business, grievances are filed against the Company by employees and unions.

### Environmental Matters

A discussion of environmental matters is included in Item 3. "Legal Proceedings" and Item 7. "Management's Discussion and Analysis of Financial Condition and Results of Operations" and in Note 21 "Commitments and Contingencies" of this report.

### Item 2.   *Properties*

The Company has over 115 plants and facilities in North America, South America, Europe and Asia. Approximately 60% of the over 14 million total square footage of these facilities is owned and the remainder is leased. Many facilities are strategically located to provide product delivery to our customers on a just-in-time basis.

**Facilities by Geographic Region**

| Type of Facility | North America | South America | Europe | Asia | Total |
|---|---|---|---|---|---|
| Manufacturing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 52 | 4 | 29 | — | 85 |
| Design, Research & Development, and Technical Centers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 19 | — | 7 | — | 26 |
| Sales Branches, Offices, Other . . . . . . . . . . . . . . . . . . . | 13 | — | 5 | 2 | 20 |
| Total(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 84 | 4 | 41 | 2 | N/A |

(1) Total facilities shown per the table exceeds the 115 plants and facilities indicated above because certain facilities listed in the table serve in more than one of the indicated capacities.

### Item 3.   *Legal Proceedings*

Except as described below, the Company and its subsidiaries are not party to any material pending legal proceedings, but is involved in ordinary routine litigation incidental to the business.

*Environmental:*   The Company is subject to federal, state, local and foreign environmental, and health and safety, laws and regulations that (i) affect ongoing operations and may increase capital costs and operating expenses in order to maintain compliance with such requirements and (ii) impose liability relating to contamination at facilities, and at other locations such as former facilities, facilities where we have sent wastes for treatment or disposal, and other properties to which the Company may be linked. Such liability may include, for example, investigation and clean-up of the contamination, personal injury and property damage

caused by the contamination, and damages to natural resources. Some of these liabilities may be imposed without regard to fault, and may also be joint and several (which can result in a liable party being held responsible for the entire obligation, even where other parties are also liable).

Management believes that it has obtained, and is in material compliance with those material environmental permits and approvals necessary to conduct its various businesses. Environmental compliance costs for continuing businesses are accounted for as normal operating expenses or capital expenditures, except for certain costs incurred at acquired locations. Environmental compliance costs relating to conditions existing at the time of an acquisition are generally charged to reserves established in purchase accounting. The Company accrues for environmental remediation costs when such obligations are known and reasonably estimable. In the opinion of management, based on the facts presently known to it, such environmental compliance and remediation costs will not have a material effect on the business, consolidated financial condition, future results of operations or cash flows.

The Company is legally or contractually responsible or alleged to be responsible for the investigation and remediation of contamination at various sites, and for personal injury or property damages, if any, associated with such contamination. At some of these sites the Company has been notified that it is a potentially responsible party ("PRP") under the federal Superfund law or similar state laws. Other sites at which the Company may be responsible for contamination may be identified in the future, including with respect to divested and acquired businesses.

The Company is currently engaged in investigating or remediating certain sites as discussed in the paragraphs below. In estimating the cost of investigation and remediation, the Company considered, among other things, its prior experience in remediating contaminated sites, remediation efforts by other parties, data released by the United States Environmental Protection Agency ("USEPA"), the professional judgment of the Company's environmental experts, outside environmental specialists and other experts, and the likelihood that other identified PRPs will have the financial resources to fulfill their obligations at sites where they and the Company may be jointly and severally liable. It is difficult to estimate the total cost of investigation and remediation due to various factors including: incomplete information regarding particular sites and other PRPs; uncertainty regarding the nature and extent of environmental problems and the Company's share, if any, of liability for such problems; the ultimate selection among alternative approaches by governmental regulators; the complexity and evolving nature of environmental laws, regulations and governmental directives; and changes in cleanup standards.

The Company has established accruals for certain contingent environmental liabilities. The Company accrues for environmental investigatory and non-capital remediation costs when litigation has commenced or a claim or assessment has been asserted or is imminent, the likelihood of an unfavorable outcome is probable, and the financial impact of such outcome is reasonably estimable. As of December 31, 2002 and 2001, total reserves for those contingent environmental liabilities are approximately $64.5 million and $59.6 million, respectively.

The Company is a party to a Consent Decree with the State of New Hampshire to remediate a former industrial landfill known as the Cardinal Landfill in Farmington, New Hampshire. Pursuant to that Consent Decree, the Company is currently conducting a pilot test for a proposed remediation of chlorinated compound contaminants in groundwater. The Consent Decree calls for a remedy to be in place by 2004. The Company is a defendant in two lawsuits filed by a total of 91 individual plaintiffs for alleged personal injuries arising from Cardinal Landfill conditions. The Company will vigorously contest these allegations. As of December 31, 2002, the Company has accrued $15.7 million for Cardinal Landfill.

The Company is a party, as a member of a PRP workgroup, to a Consent Decree entered with the USEPA for the remediation of a former municipal landfill in Dover, New Hampshire. The town of Dover, New Hampshire is also a member of the PRP group and a party to the Consent Decree. Pursuant to the terms of the Consent Decree, the PRP group is currently engaged in the preparation of a remediation design. The Consent Decree requires that a remedy for the site be in place by 2004. As of December 31, 2002, the Company has accrued $9.6 million for Dover.

17

Pursuant to a Consent Decree signed with the USEPA, the Company is currently engaged in a full-scale remediation for groundwater and soil contamination at the former Stamina Mills manufacturing facility in North Smithfield, Rhode Island. Remediation activities have been ongoing since 1998. The Company is also in negotiation with the USEPA regarding a claim for past oversight costs. A resolution of this matter is anticipated in 2003. As of December 31, 2002, the Company has accrued $14.1 million for Stamina Mills.

The Company is working with the Michigan Department of Environmental Quality (MDEQ) to investigate and remediate soil and groundwater contamination at a former manufacturing plant in Mancelona, MI and at adjacent owned property formerly used for the treatment and disposal of plating waste. MDEQ is likely to require remediation of groundwater. In addition, the Company is incurring costs in connection with the provision of alternate water supplies to residences in the area.

The current owner of one of the Company's former manufacturing plants located in Bowling Green, OH has entered into an Administrative Order on Consent with the Ohio Environmental Protection Agency (OEPA) requiring investigation and remediation of contamination at the site. The Company is reimbursing the current owner for costs associated with ongoing groundwater monitoring and, following selection of an appropriate remedy by OEPA, will assume 90% of future remediation costs.

In the 1980's and 1990's, the California Regional Water Quality Control Board (CRWQCB) and other state agencies ordered a predecessor of the Company to investigate and remediate soil and groundwater contamination at a former lumber treatment plant in Elmira, Ca. In 1996, the Company entered into an agreement with the State of California to conduct long-term operation and maintenance of the remedy implemented at the site.

In the opinion of management, based on information presently known to it, identified environmental costs and contingencies will not have a material effect on the Company's consolidated financial condition, future results of operations or cash flows. However, we can give no assurance that we have identified or properly assessed all potential environmental liability arising from the Company's business or properties, and those of the Company's present and former subsidiaries and their corporate predecessors.

During 2002, the Company received proceeds of $15.8 million on environmental claims related to discontinued operations. Of this amount, $9.5 million was recorded as income from discontinued operations, net of income taxes.

During 2001, the Company received proceeds of $14.5 million on environmental claims related to discontinued operations. Of this amount $8.8 million was recorded as income from discontinued operations, net of income taxes.

*Other Claims:*  As of December 31, 2002, the Company is party to approximately 780 pending cases alleging personal injury from exposure to asbestos containing materials used in boilers manufactured before 1966 by former operations of the Company which were sold in 1966. Asbestos-containing refractory bricks lined the boilers and, in some instances, the Company's former operations installed asbestos-containing insulation around the boilers. These pending cases do not include cases that have been dismissed or are subject to agreements to dismiss due to the inability of the plaintiffs to establish exposure to a relevant product and cases that have been settled or are subject to settlement agreements. Total settlement costs for these cases have been less than $617,750 or an average of less than $10,127 per settled case. The defense and settlement costs have been substantially covered by our primary insurance carriers under a claims handling agreement that expires in August 2006. The Company has primary, excess and umbrella insurance coverage for various periods available for asbestos-related boiler and other claims. The Company's primary carriers have agreed to cover approximately 80% of certain defense and settlement costs up to a limit of approximately $70.5 million for all claims made, subject to reservations of rights. The excess insurance coverage, which varies in availability from year to year, is approximately $620 million in aggregate for all claims made. Based on the age of the boilers, the nature of the claims and settlements made to date, and the insurance coverage, management does not believe that these cases will have a material impact on the Company's financial condition, results of operations or cash flows. However, it cannot assure that the Company will not be subjected to significant

18

additional claims in the future, that insurance will be available as expected or that unanticipated damages or settlements in the future would not exceed insurance coverage.

A purported class action was filed on March 24, 2003 in the United States District Court for the Eastern District of Michigan (No. 03 CV 71173). The action was purportedly filed on behalf of purchasers of the common stock of the Company between August 7, 2001 and August 2, 2002 against the Company, Heartland Industrial Partners, L.P. and ten senior officers and/or directors of the Company. The complaint alleges that the defendants violated Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, and Rule 10b-5 promulgated thereunder, by issuing a series of materially false and misleading statements pertaining to, among other things, the anticipated benefits of the TAC-Trim acquisition. The Company believes that the claims are without merit and intends to vigorously defend the lawsuit. The Company does not believe that the suit will have a material impact on the Company's financial condition, results of operations or cash flow.

### Item 4.   *Submission of Matters to a Vote of Security Holders*

None during the fourth quarter of 2002.

### Item 5.   *Market for Registrant's Common Equity and Related Stockholder Matters*

The Company's Common Stock has been traded on the New York Stock Exchange under the symbol "CKC" since July 7, 1994. At March 18, 2003, there were approximately 120 holders of record. The following table lists the high and low closing prices for the Common Stock for the full quarterly periods during the two most recent years.

|  | 2002 | | 2001 | |
|---|---|---|---|---|
|  | High | Low | High | Low |
| First Quarter | 25.500(1) | 16.750(1) | 14.218(1) | 8.950(1) |
| Second Quarter | 28.375(1) | 9.000(1) | 15.500(1) | 10.125(1) |
| Third Quarter | 9.000 | 2.810 | 21.425(1) | 9.875(1) |
| Fourth Quarter | 4.450 | 2.450 | 25.750(1) | 11.900(1) |

(1)  Adjusted for May 28, 2002 2.5 to 1 reverse stock split.

On December 31, 2002, Heartland owned approximately 36% of the outstanding shares; Blackstone Partners and WP Partners owned approximately 11%; Joan Fabrics Corp. and Mr. Elkin McCallum and associates owned approximately 7%; Mr. Charles E. Becker and Textron each owned approximately 9%.

The Company has paid no dividends or made similar distributions with respect to its common stock during 2002 or 2001. Any payment of future dividends and the amounts thereof will be dependent upon the Company's earnings, financial requirements and other factors deemed relevant by the Company's Board of Directors. Certain restrictive covenants contained in the agreements governing the Company's credit facilities and senior subordinated notes limit the Company's ability to make dividend and other payments. See ITEM 7. "Management's Discussion and Analysis of Financial Condition and Results of Operations — Liquidity and Capital Resources" and Note 9 to the Consolidated Financial Statements.

**Item 6.   *Selected Financial Data***

| | Year Ended(1) | | | | |
|---|---|---|---|---|---|
| | December 31, 2002 | December 31, 2001 | December 31, 2000 | December 25, 1999 | December 26, 1998 |
| | (in millions, except per share data) | | | | |
| **Statement of Operations Data:** | | | | | |
| Net sales .......................... | $3,885.8 | $1,823.3 | $1,901.8 | $1,898.6 | $1,825.5 |
| Gross profit ....................... | 518.1 | 218.8 | 266.6 | 284.7 | 248.2 |
| Selling, general and administrative expenses........................ | 293.5 | 157.3 | 151.4 | 145.8 | 142.7 |
| Restructuring charge and impairment of long-lived assets(2) ........... | 56.9 | 18.8 | — | 33.4 | — |
| Goodwill amortization ............. | — | 7.1 | 7.1 | 7.0 | 7.0 |
| Operating income ................. | 167.7 | 35.6 | 108.1 | 98.5 | 98.5 |
| Interest expense, net............... | 148.9 | 84.3 | 96.6 | 92.1 | 82.0 |
| Subsidiary preferred stock requirements .................... | 38.4 | 2.4 | — | — | — |
| Loss on sale of receivables ......... | 4.2 | 10.8 | 9.2 | 5.4 | 6.1 |
| Income (loss) from continuing operations before income taxes .... | (33.8) | (68.3) | 0.8 | (1.2) | 5.2 |
| Income tax expense (benefit) ....... | 17.5 | (18.6) | 2.2 | 0.2 | 5.3 |
| (Loss) from continuing operations ... | (51.3) | (49.7) | (1.4) | (1.4) | (0.1) |
| Income from discontinued operations, including disposals, net of income taxes ........................... | 9.5 | 8.8 | 6.6 | — | — |
| Income (loss) before extraordinary items and cumulative effect of a change in accounting principle .... | (41.8) | (40.9) | 5.2 | (1.4) | (0.1) |
| Net income (loss)(3) ............. | (53.5) | (46.2) | 4.5 | (10.2) | (3.8) |
| **Per Share Data(4):** | | | | | |
| (Loss) from continuing operations per basic and diluted share ....... | (1.15) | (1.28) | (0.06) | (0.05) | — |
| Dividends per share ............... | — | — | — | 0.32 | — |
| **Balance Sheet Data (at period end):** | | | | | |
| Total assets ....................... | $3,157.1 | $2,987.9 | $1,280.3 | $1,348.9 | $1,382.2 |
| Long-term debt, including current portion ......................... | 1,278.7 | 1,302.5 | 884.0 | 912.5 | 866.0 |
| Mandatorily redeemable preferred stock of subsidiary .............. | 123.9 | 149.3 | — | — | — |
| Common stockholders' equity (deficit) ........................ | 397.5 | 374.7 | (154.9) | (151.1) | (79.8) |
| **Other Data:** | | | | | |
| Capital expenditures............... | $ 147.9 | $ 54.5 | $ 69.0 | $ 86.4 | $ 95.8 |
| Depreciation and amortization ...... | 117.0 | 81.8 | 74.8 | 71.5 | 67.1 |

(1) The years 2002 & 2001 were calendar years; fiscal year 2000 had 53 weeks; all other fiscal years had 52 weeks.

(2) In 2002, the Company recorded a $56.9 million restructuring charge consisting of $18.0 million in asset impairments and $33.2 million primarily related to severance accruals and $5.7 million primarily related to other contractual obligations. In 2001, the Company recorded a restructuring charge consisting of $7.6 million in asset impairments and $11.2 million primarily related to severance accruals. In 1999, the Company recorded a restructuring charge consisting of $13.4 million in asset impairments and $20.0 million primarily related to severance accruals.

(3) In 2002, the Company recorded an $11.7 million charge for the cumulative effect of a change in accounting principle related to an impairment loss. In 1999, the Company recorded an $8.8 million charge for the cumulative effect of a change in accounting principle related to start-up costs.

(4) On May 28, 2002, the Company effected a one-for-2.5 reverse stock split of the Company's common stock. All shares and per share data have been adjusted retroactively for all periods presented to reflect the stock split.

## Item 7.  *Management's Discussion and Analysis of Financial Condition and Results of Operations*

**General**

The Company is a global leader in the design, engineering and manufacturing of automotive interior components, including instrument panels, fully assembled cockpit modules, floor and acoustic systems, automotive fabric, interior trim and convertible top systems. The Company has the number one or two North American market share position in seven out of ten major automotive interior categories tracked by CSM Worldwide and is also the largest North American supplier of convertible top systems. Also, the Company is a leading global supplier of fully assembled cockpit modules, a growing market segment.

Sales are primarily made to North American and European automotive OEMs and Tier I total interior integrators. In North America, the Company manufactures components for approximately 90% of all light vehicle production platforms. The automotive supply industry in which the Company competes is cyclical and is influenced by the level of North American and European vehicle production.

The Company's net sales in 2002 were $3,885.8 million compared to $1,823.3 million in 2001. Capitalized terms that are used in this discussion and not defined herein have the meanings assigned to such terms in the Notes to Consolidated Financial Statements.

Investors can obtain free access to the Company's filings with the Securities and Exchange Commission by accessing the Company's website at http://www.collinsaikman.com/investor/docs.html.

**Results of Operations**

*2002 Compared to 2001*

*Net Sales:*  Net sales for 2002 increased 113.1% to $3,885.8 million up $2,062.5 million from 2001. The increase in net sales was primarily driven by the acquisitions of TAC-Trim, Becker, Joan and Southwest Laminates (SWL), which contributed approximately $2,090 million. Sales for 2002 increased approximately $400.6 million or 11.5% over pro forma 2001 sales of $3,485.2 million. New programs, increased content, a higher North American build rate and the 2002 acquisition of SWL drove this sales increase. In North America the build rate increased about 6.0%. Pro forma 2001 sales are based on previous filings with the SEC and include TAC-Trim, Becker and Joan for the full year.

Excluding the impact of the acquisitions, net sales decreased 1.5% from last year. The decrease is due primarily to $31 million of discontinued non-automotive and low margin business and $42 million of customer price reductions offset by a $35 million increase in new business and a $10 million strengthening of foreign currencies.

Net sales for the North American Automotive Interior Systems division (NAAIS) increased $1,515.2 million to $2,613.4 million from 2001. Excluding the impact of the TAC-Trim and Becker acquisitions totaling approximately $1,526 million, net sales for NAAIS decreased 1.0%. This reduction is primarily due to $15 million of discontinued non-automotive mat business, a $29 million decline in plastics sales (of which $12 million was due to shutdowns of customer assembly plants), $17 million of customer price reductions and $3 million attributable to the weaker Canadian currency. These decreases were offset by a $55 million increase in Carpet and Acoustic volumes due to higher North American car builds when compared to the prior year.

Net sales for the European and Rest of World Automotive Interior Systems division (Europe and ROW), which includes South America, increased 177.5% to $718.0 million from 2001. Without the benefit of TAC-Trim sales totaling approximately $460 million, sales were essentially unchanged. Sales were impacted primarily by approximately $9 million of reduced production volume, $4 million of customer price reductions and $1 million of discontinued low margin business offset by a $13 million impact from the strengthening of European currencies.

Net sales for the Specialty Automotive Products division increased 18.9% to $554.4 million compared to 2001. Excluding the acquisition of Joan and SWL, which contributed approximately $103 million to net sales,

21

sales decreased 3.3%. The decline is primarily due to $15 million of customer price reductions and $14 million of discontinued low margin business. These decreases were partially offset by approximately $18 million related to increased production volumes.

*Gross Profit:* For 2002, gross profit increased to 13.3% from 12.0% in 2001. The combined gross profit of the NAAIS and of the Specialty Automotive Products divisions increased from 13.2% to 15.7%. The increases at these divisions resulted from approximately $62 million in manufacturing efficiencies and purchasing savings, partially offset by $32 million of customer price reductions net of commercial recoveries and rebates and $11 million of product launch and plant consolidation cost. The increase at these divisions was offset by a decline in the gross profit of Europe and ROW from 4.4% to 2.7%. This Europe and ROW decline was due primarily to a change in sales mix resulting in higher sales of its lower margin cockpit assembly business and operating inefficiencies.

*Selling, General and Administrative Expenses:* Selling, general and administrative expenses for 2002 were $293.5 million compared to $164.4 million in 2001. The increase is due to the additional costs assumed from the acquisitions offset by $6.1 million of goodwill amortization expensed in 2001. Due to the elimination of duplicate efforts, reduced headcount and reduced discretionary spending, selling, general and administrative expenses as a percentage of sales declined from 9.0% in 2001 to 7.6% in 2002.

*Restructuring Charge:* During 2002, the Company undertook three restructuring programs resulting in charges totaling $56.9 million. The goal of the first restructuring program that resulted in a charge of $9.1 million in the first quarter was to de-layer management in the North American, European and Specialty operations. The objective of the second program that resulted in a charge of $33.8 million in the third quarter was to realign the operations in North America. Included in the third quarter restructuring charge was $8.9 million related to the separation agreement with Thomas Evans, the former Chairman and CEO. The third program resulted in a charge of $14.1 million in the fourth quarter. The objective of this program was to consolidate plant operations in Europe and to further de-layer management in North America. The pre-tax fourth quarter charge includes $4.8 million of severance cost and cost related to other contractual obligations and $9.3 million of asset impairment charges. The 2002 restructuring programs resulted in the separation of over 1,100 personnel.

During 2001, the Company undertook two restructuring programs resulting in charges totaling $18.8 million. The goal of the first quarter 2001 restructuring program which, resulted in a charge of $9.2 million, was to de-layer management in the North American, European and Specialty operations. The second program resulted in a fourth quarter charge of $9.6 million. The objective of this program was to downsize three facilities in North America via better utilization of manufacturing and warehouse floor space (including associated headcount reductions) and to reduce headcount in our Mexican operations. The $18.8 million charge includes $11.2 million of severance costs and $7.6 million of asset impairment charges.

*Operating Income Highlights by Division:* The NAAIS results reflect a $42.4 million improvement in operating performance at the Carpet & Acoustics business. The improvement was primarily attributable to approximately $13 million of sales growth resulting from an increase in light vehicle build and $44 million of manufacturing improvements and purchasing savings, offset by $12 million of customer price reductions and $6 million of restructuring cost. After considering the approximate $141 million impact of acquisitions, the Plastic & Cockpit business operating income declined. The decline was driven by a $8 million decrease in sales volumes and resulting inefficiencies associated primarily with certain GM models, $11 million of product launch and plant consolidation costs, $2 million related to the decline in plastic sales due to the shutdown of customer assembly plants and $6 million of customer price reductions. These decreases were offset by $10 million of purchasing and spending savings and reductions in administrative expenses.

The Europe and ROW operating performance was adversely impacted by approximately $30 million loss related to locations acquired in 2001, $17 million of customer price reductions and operating inefficiencies including $10 million of launch costs associated with the BMW Mini program. These reductions were offset by $8 million of new business, spending and purchase savings and savings related to restructuring plans.

Specialty Automotive Products operating income increased $37.8 million primarily the result of $32 million of improved manufacturing performance, purchasing savings, reductions in administrative expense and savings related to restructuring plans, $4 million due to increased build volumes, and approximately $19 million from the impact of the acquisitions. These increases were partially offset by $14 million of customer price reductions.

*Interest Expense:*    Net interest expense increased $64.6 million to $148.9 million for 2002. The increase in interest expense is primarily attributed to higher average debt balances and increased amortization of debt issue costs resulting from the TAC-Trim acquisition, partially offset by the benefit of working capital reductions.

*Loss on Sale of Receivables:*    The Company has the ability to sell, through its Carcorp subsidiary, interests in a pool of accounts receivable. In connection with the receivable sales, a loss of $4.2 million was recognized during 2002, compared to a loss of $10.8 million for 2001. In December 2001, the Company entered into a new larger receivable facility in connection with the TAC-Trim acquisition, resulting in up-front fees of $5.6 million.

*Subsidiary Preferred Stock Accretion and Dividend:*    In connection with the TAC-Trim acquisition on December 20, 2001, Products issued to Textron preferred stock with a liquidation preference of $326.4 million and an estimated fair market value of $146.9 million. In June 2002, Products repurchased $133.3 million of liquidation preference Series A preferred stock that was initially valued at $56.8 million, along with accrued dividends of $6.9 million. The difference between the initial recorded value and the initial liquidation preference will be accreted over the life of the stock using the effective interest method. The 2002 preferred stock accretion and dividend costs were $7.6 million and $30.8 million. The 2001 preferred stock accretion and dividend costs were $0.9 million and $1.5 million.

*Other expense, net:*    In 2002, other expenses, net primarily included $12.6 million of losses related to derivatives used in the Company's foreign currency hedging strategy, $5.5 million of losses related to investments in joint ventures and $1.9 million of losses from sale and leaseback transactions offset by $5.9 million of foreign currency transaction gains and minority interest share of losses of a consolidated subsidiary of $6.5 million.

In 2001, "other expenses, net" primarily included $7.8 million of foreign currency transaction losses and $8.2 million of losses from sale and leaseback transactions offset by $5.0 million of derivatives gains and a $6.2 million gain related to a stock demutualization.

*Income Taxes:*    The Company recognized an income tax expense of $17.5 million for 2002 compared to an income tax benefit of $18.6 million in 2001. Net cash taxes paid during the period were $12.8 million. The primary reasons for the Company's relatively high effective tax rate are non-deductible preferred stock dividends and accretion, foreign losses for which tax benefits are not recorded and certain taxes that do not fluctuate directly with income.

*Discontinued Operations:*    During 2002 and 2001, the Company received payment on environmental claims related to discontinued operations, for which reserves were previously charged, and received proceeds of $15.8 million and $14.5 million, respectively. Of these amounts, $9.5 million and $8.8 million were recorded as income from discontinued operations in 2002 and 2001, respectively, net of income taxes of $6.3 million and $5.7 million, respectively.

*Extraordinary Charge:*    During 2001, the Company recognized extraordinary charges of $5.3 million of which $5.0 million represents a write-off of debt issue costs associated with our old credit facility, which was replaced by a new credit facility entered into in conjunction with the Company's TAC-Trim acquisition. Also, during 2001 charges were recorded in connection with the repurchase of JPS Automotive Senior Notes at prices in excess of carrying values of $0.3 million.

*Cumulative Effect of Change in Accounting Principle:*    During 2002, the Company completed its implementation of SFAS 142, Goodwill and Other Intangible Assets. Under SFAS 142 goodwill and indefinite-lived assets are no longer amortized but are tested for impairment. In accordance with SFAS 142,

23

the Company employed a discounted cash flow analysis in conducting its impairment test. As a result of the test, the Company recorded an impairment loss of $11.7 million relating to the UK Plastics business in the European and ROW segment.

*Net Loss:*   The combined effect of the foregoing resulted in net loss of $53.5 million for 2002, compared to net loss of $46.2 million in 2001.

*Net (Loss) Available to Common Shareholders:*   In June 2002, $100.0 million of proceeds from a 16 million share common stock offering was used to repurchase Series A preferred stock at a price of 75% of its liquidation preference of $133.3 million. The redeemed Series A preferred stock had a carrying value of $63.7 million. In accordance with generally accepted accounting principles, the difference between the $63.7 million in carrying value and the $100.0 million cash payment was excluded from net income and recorded directly to equity in the Company's accumulated deficit account. Although this $36.3 million equity charge is excluded from net income, the charge is included in the computation of earnings/(loss) per share and is included in the net loss available to common shareholders.

### 2001 Compared to 2000

*Net Sales:*   Net sales for 2001 decreased 4.1% to $1,823.3 million, down $78.5 million from 2000. Excluding the favorable impact of sales from acquired businesses during 2001 of approximately $127.2 million, net sales would have decreased 10.8%. The reduction in net sales, excluding the effect of acquisitions, was primarily driven by a decrease in North American vehicle production of 10% or $135.0 million versus 2000. The Company was particularly adversely impacted by the recession and declining consumer confidence as well as by terrorist attacks in the United States. These factors led to substantially reduced inventory levels at the Company's customers in the fourth quarter as customers sold vehicles in an uncertain and difficult economic environment. Sales for the 2001 period were also impacted by customer price reductions of $30.0 million, and weaker Canadian and European currencies of $24.0 million, and a reduction in headliner fabrics business of $20.0 million.

Net sales for NAAIS during 2001 were down 1.9% to $1,098.2 million, a decrease of $21.2 million from fiscal 2000. Excluding the favorable impact of sales from the Tac-Trim and Becker acquisition during 2001 of approximately $95.2 million, net sales would have decreased 10.4%. The decline in net sales, excluding the effect of the Becker acquisition, was primarily driven by a decrease in North American vehicle production of $100.0 million and customer price reductions of $24.0 million.

Net sales for Europe and ROW were down $25.8 million to $258.7 million during 2001, a decrease of 9.1% from fiscal 2000. The decrease in Europe was primarily due to the negative impact caused by changes in foreign currency exchange rates of $16.0 million and customer price reductions of $6.0 million.

Net sales for the Specialty Automotive Products division decreased 6.3% to $466.4 million in 2001, down $31.5 million from 2000. Excluding the favorable impact of sales from the Joan acquisition during 2001 of approximately $31.4 million, net sales would have decreased 12.6%. The decrease, excluding the impact of the Joan acquisition, was due primarily to lower North American vehicle production ($35.0 million) and a reduction in headliner fabric business ($20.0 million).

*Gross Profit:*   For 2001, gross profit was 12.0%, down from 14.0% in 2000. This decrease was primarily a result of decreased operating leverage related to lower volumes in both North America and Europe. Additionally, during 2001 gross profit was adversely impacted by the following items:

- *TAC-Trim Acquisition:*   Due to the closing of the TAC-Trim acquisition on December 20, 2001, the Company incurred eleven days of fixed costs during a normal industry shutdown period with less than $6 million in sales. This resulted in a gross margin loss for the eleven days of $4.2 million.

- *Launch Costs:*   The Company incurred launch costs during the second and third quarters of 2001 related to the Ford Thunderbird convertible program in the Company's Specialty Automotive Products division. In Europe, the Company's plastics facility in the UK experienced difficulties principally

related to an outside paint supplier on the launch of the new BMW R50 (Mini) program during the second half of 2001.

- *Integration Costs:*  The Company incurred $2.5 million of costs during the fourth quarter of 2001 related to acquisition integration. The majority of these costs related to the Becker and Joan acquisitions.

- *Facility Closure Costs:*  In addition, during 2001, we incurred $2.5 million of costs related to the sale of the retail/commercial floormat business in North America and the shutdown of a small accessory floormat facility.

- These unfavorable items were exacerbated by various customer price reductions of approximately $40.0 million but were partially offset by commercial recoveries of $6.9 million and improvements in operating performance at NAAIS of $10.3 million and at the fabrics operations of $5.5 million.

*Selling, General and Administrative Expenses:*  Selling, general and administrative expenses for 2001 were $164.4 million, compared to $158.5 million in 2000. Relative to 2001, the comparable 2000 period included an extra week of costs due to the fiscal year change mentioned earlier. The increase is primarily due to additional costs assumed from acquisitions of $7.4 million, credits in 2000 relating to a pension related actuarial benefit and the sale of property totaling $2.0 million and additional expense in 2001 related to management incentive compensation plans of $3.0 million. These items more than offset the benefit in 2001 of cost reductions from earlier restructuring programs and reduced spending. As a percentage of sales, selling, general and administrative expenses were 9.0% and 8.3% for 2001 and 2000, respectively.

*Restructuring Charge:*  During 2001, the Company undertook two restructuring programs resulting in charges totaling $18.8 million. The goal of the first quarter of 2001 restructuring program charge of $9.2 million was to delayer management in the North American, European and Specialty operations. The second program resulted in a fourth quarter charge of $9.6 million. The objective of this program was to downsize three facilities in North America via better utilization of manufacturing and warehouse floor space (including associated headcount reductions) and to reduce headcount in our Mexican operations. The pre tax $18.8 million charge includes $11.2 million of severance costs and $7.6 million of asset impairment charges.

*Operating Income Highlights by Division:*  Operating income at NAAIS declined to $68.7 million for 2001 from $88.0 million for the prior year. The decline in NAAIS operating income primarily reflected the impact of lower North American production volumes of $8.7 million as well as restructuring charges of $8.2 million which were offset by improvements in operating performance of $10.3 million. The results for 2001 also included costs of $3.2 million related to the sale of the retail/commercial floormat business and the shutdown of a small accessory floormat facility.

Operating income at Europe and ROW declined to a loss of $24.9 million for 2001 from income of $0.6 million for 2000. The decline in operating income primarily reflected the impact of product mix and customer price reductions along with the recognition of restructuring charges. Additionally, Europe and ROW operating performance was adversely impacted by launch costs associated with the BMW R50 (Mini) during the second half of 2001 as well as a $1.1 million loss on the sale of a small metal pressing operation in the UK in the third quarter of 2001. Benefits from earlier restructuring programs and purchasing savings reduced the negative impact of these items.

Operating income at the Specialty Automotive Products division declined to $10.6 million for 2001 from $19.5 million for 2000. The decline in Specialty Automotive Products division operating income primarily reflects expenses incurred due to the ramp up of the Chrysler Sebring convertible in the early part of 2001 of $6.1 million, the start up of the new Ford Thunderbird convertible in mid-year 2001 of $1.5 million and the impact of restructuring charges of $1.7 million. Margins, as a percentage of sales, for the fabrics business remained consistent with 2000, as better operating performance and benefits of added volume from the Joan acquisition offset the margin impact of lower net sales driven by lower industry production and reduction in headliner fabric business.

*Interest Expense:*   Interest expense for 2001 decreased $12.3 million to $84.3 million as compared to 2000. The decrease in interest expense is primarily attributed to lower average debt balances resulting from the Heartland Transaction, and lower borrowing rates in North America partially offset by increased amortization of debt issue costs resulting from the Heartland Transaction. The benefit of working capital reductions and sale and leaseback transactions also offset increased borrowings related to acquisitions.

*Loss on Sale of Receivables:*   The Company has the ability to sell, through its Carcorp subsidiary, interests in a pool of accounts receivable. In connection with the receivable sales, a loss of $10.8 million was recognized during 2001, compared to a loss of $9.2 million for 2000. Included in the 2001 and 2000 losses were up-front fees related to the new accounts receivable facilities put in place during both periods. In December 2001, the Company entered into a new larger facility in connection with the TAC-Trim acquisition, resulting in up-front fees of $5.6 million. During the first quarter of 2000, the Company incurred fees of $1.6 million associated with a new accounts receivable securitization replacing one that had expired. Excluding these expenses, the remaining decrease of $2.4 million, is primarily due to lower interest rates during 2001.

*Subsidiary Preferred Stock Accretion and Dividends:*   In connection with the TAC-Trim acquisition on December 20, 2001, Products issued to Textron preferred stock with a liquidation preference of $326.4 million and an estimated fair market value of $146.9 million. The 2001 charge represents dividends accrued of $1.5 million and accretion of discount of $0.9 million.

*Other Expense, net:*   The Company recognized other expense of $6.4 million in 2001, compared to other expense of $1.5 million in 2000. The increase in other expense resulted primarily from an $8.1 million loss on the sale and leaseback of real estate transactions completed during the second and fourth quarters of 2001, offset by a gain of $6.2 million on shares received as result of a stock demutualization and initial public offering. The remaining increase in expense is primarily due to higher foreign currency transaction losses.

*Income Taxes:*   The Company recognized an income tax benefit of $18.6 million in 2001 compared to an income tax expense of $2.2 million in 2000. The overall effective tax rate for 2001 was 27.2 percent compared to 276 percent for 2000. Certain state taxes and permanent differences, that do not fluctuate with income, such as non-deductible goodwill and dividends and accretion of preferred stock impacted the effective rate by: (1) reducing the effective tax rate when a loss exists and a tax benefit is recorded, or (2) increasing the effective tax rate when we have income and tax expense is recorded.

*Discontinued Operations:*   During 2001, the Company received payments on environmental claims related to discontinued operations of $14.5 million. During 2000, the Company settled claims for certain other environmental matters for $20.0 million. In fiscal 2001 and 2000, $8.8 million and $6.6 million were recorded as income from discontinued operations respectively, net of income taxes of $5.7 million and $4.4 million, respectively.

*Extraordinary Charge:*   During 2001 and 2000, the Company recognized extraordinary charges of $5.3 million and $0.7 million, respectively. Of the 2001 charge, $5.0 million represents a write-off of debt issue costs associated with our old credit facility, which was replaced by a new credit facility entered into in conjunction with the Company's TAC-Trim acquisition. In addition, during 2001 and 2000 charges were recorded in connection with the repurchase of JPS Automotive Senior Notes at prices in excess of carrying values of $0.3 million and $0.7 million, respectively.

*Net Income:*   The combined effect of the foregoing resulted in a net loss of $46.2 million for 2001, compared to net income of $4.5 million in 2000.

## Liquidity and Capital Resources

The Company and its subsidiaries had cash and cash equivalents totaling $81.3 million and $73.9 million at December 31, 2002 and December 31, 2001, respectively. Additionally, the Company had $248.7 million of unutilized availability under its credit arrangements and receivables facility as of December 31, 2002. The total was comprised of $93.2 million under the Company's receivables facility, $129.5 million under the Company's revolving credit facility, approximately $26.0 million under uncommitted bank facilities in Canada

and other foreign locations. Availability under the revolving credit facility was reduced by outstanding letters of credit of $45.5 million as of December 31, 2002.

The Company's principal sources of funds are cash generated from operating activities and borrowings under credit facilities. In addition, to facilitate the collection of funds from operating activities, the Company has sold receivables under its receivables facility and has also entered into an accelerated payment collection program with two of its larger customers. During 2002, the Company issued common stock, although such issuances are not likely to be a consistent source of financing in the near-term. The Company continues to seek means to generate additional cash for debt reduction and its growth strategy. Among other things, the Company seeks to further improve working capital management and continue to utilize a lease financing strategy.

### *Operating Activities*

Net cash provided by the continuing operating activities of the Company was $189.5 million for the year ended December 31, 2002, compared to $141.0 million for the year ended December 31, 2001. The 2002 increase is primarily the result of a decrease in working capital attributable to increases in accounts payable from the timing of payments.

### *Investing Activities*

Net cash used in investing activities of the Company was $186.1 million for 2002, compared to net cash used of $723.8 million for 2001. The decrease in cash used in investing activities is primarily the result of the Company spending $715.3 million less in the payment of acquisition costs for acquiring businesses and receiving $74.8 million less in proceeds from the sale of property, plant and equipment. The decreased use of cash was offset by a $93.4 million increase in capital expenditures which were the result of the larger size of the Company in 2002 due to acquisitions, and an additional investment in a joint venture of $5.9 million in 2002.

### *Financing Activities*

Net cash provided from financing activities for 2002 was $4.0 million compared to net cash from financing activities for the 2001 of $635.8 million. This decrease in cash provided from financing activities is the result of $100.0 million used for the repurchase of preferred stock, $413.9 million decrease in net borrowings, and $117.9 million decrease in proceeds from the issuance of stock.

At December 31, 2002, the Company had total outstanding indebtedness of $1,278.7 million (excluding short-term borrowings and approximately $45.5 million of outstanding letters of credit) at a weighted average interest rate of 9.9% per annum. Comparatively, at December 31, 2001, the Company had total indebtedness of $1,302.5 million.

During 2001, Heartland, and certain other investors, acquired 22.8 million shares of common stock from the Company at a price of $12.50 per share, representing a cash investment in the Company of $285.0 million before fees and expenses. Net proceeds paid to the Company from the equity transactions were $264.3 million. A portion of the proceeds were used to pay $10.7 million in transaction related costs to obtain; change in control consents, fees related to term loan facilities, and other amendments to credit agreement facilities. The remaining proceeds of $253.6 million were used to pay down a revolving credit facility and to fund part of the TAC-Trim acquisition.

During 2001, Products used proceeds from an amended and restated credit facility to retire all outstanding JPS Automotive 11⅛% Senior Notes. The notes which were due June 2001, were repaid in full on March 28, 2001, at a redemption price equal to their principal amount with interest accrued to the redemption date. The Company recognized an extraordinary charge of $0.3 million in connection with this repurchase of the remaining outstanding JPS Automotive Senior Notes at prices in excess of carrying values. Borrowings under prior bank facilities were repaid during 2001 with proceeds from various financing arrangements that the

Company entered into as part of the TAC-Trim acquisition. These financing arrangements included entering into a new senior secured credit facility and a new receivables facility along with the issuance of preferred stock of a subsidiary and senior notes due in 2011.

The senior secured credit facility consists of a revolving credit facility and tranche A and tranche B term loan facilities. The revolving credit facility provides for revolving loans and extensions of credit up to a maximum principal amount of $175.0 million. A portion of the revolving credit facility will be available to Canadian subsidiaries in Canadian dollars and a portion of the revolving credit facility will be available in the form of letters of credit. The revolving credit facility, the tranche A term loan and the tranche B term loan mature in December 2005. Borrowings under the senior credit facilities bear interest at variable rates based on a spread to the adjusted LIBOR or a base rate, at the Company's option. The Company had $377.6 million and $400.0 million in term loans outstanding under this facility at December 31, 2002 and 2001, respectively.

On an ongoing basis, the Company has entered into an agreement to sell trade accounts receivable of certain business operations to a bankruptcy-remote, special purpose subsidiary, wholly owned by the Company. The Company's receivables subsidiary will, subject to certain conditions, from time to time, sell an undivided fractional ownership interest in a pool of domestic and certain Canadian receivables, up to a balance of $250 million, to bank-sponsored multi-seller commercial paper conduits under a committed facility. As of December 31, 2002, the Company had $93.2 million undrawn under the receivables facility.

New receivables will be added to the pool as collections reduce previously sold receivables. The Company expects to service, administer and collect the receivables on behalf of the receivables subsidiary and the conduits. The proceeds of sale will be less than the face amount of accounts receivable sold by an amount that approximates the purchaser's financing costs. In September 2002, the Company amended the receivables facility lengthening its term to expire in December 2004. The receivables facility is an important source of ongoing liquidity to the Company.

In December 2001, Products issued 182,700 shares of its Series A Redeemable Preferred Stock, 123,700 shares of Series B Redeemable Preferred Stock and 20,000 shares of Series C Redeemable Preferred Stock. The Preferred Stock was recorded at estimated fair value of $146.9, which was less than the liquidation value of $1,000 per share or $326.4 million. The estimated fair value was based on market prices for securities with similar terms, maturities and risk characteristics, and included a liquidation discount to reflect market conditions and was agreed to by the Company and Textron as part of the TAC-Trim purchase agreement. The difference between the initial recorded value and the liquidation value is being accreted over the 11 year terms of the securities. The results for 2002 and 2001, included subsidiary preferred stock requirements calculated using the effective interest method of $38.4 million and $2.4 million, respectively. The preferred stock requirement includes both accretion and dividend costs of $7.6 million and $30.8 million, respectively, for 2002 and $0.9 million and $1.5 million, respectively, for 2001. The carrying value of the Redeemable Preferred Stock includes accretion and accrued dividends.

Products issued $500 million of $10\frac{3}{4}$% Senior Notes due in 2011 in connection with the TAC-Trim acquisition. The Company also amended the existing $400 million of $11\frac{1}{2}$% senior subordinated notes due in 2006 to make each subsidiary guarantor of the Senior Notes a senior subordinated guarantor of the existing notes.

The following table sets forth the ratings as of December 31, 2002 for securities issued by the Company and its subsidiaries:

|  | Standard & Poors | Moody's |
|---|---|---|
| Public Debt: |  |  |
| $11\frac{1}{2}$% Senior Subordinated Note, due 2006 ......................... | B | B2 |
| $10\frac{3}{4}$% Senior Notes, due 2011 ..................................... | B | B1 |

## Outlook

To further enhance North American automotive revenues, OEMs and transplants are continuing to offer incentives in 2003 that should enable production schedules to remain consistent with 2002 levels. The European market is expected to remain relatively soft, and that market has the potential for continuing declines in production compared to the prior year's levels. However, the Company remains cautiously optimistic that North American vehicle production will remain stable for 2003 as inventory levels at the OEM's appear to be at higher levels than in comparable periods.

The Company's principal uses of funds from operating activities and borrowings for the next several years are expected to fund interest and principal payments on its indebtedness, growth related working capital increases, costs associated with the Company's previously divested businesses, capital expenditures and lease expense. In addition, selective acquisitions to expand our geographic and customer presence continue to be explored. The completion of the TAC-Trim acquisition on December 20, 2001 significantly increased the debt levels and has required significant additional liquidity in order to launch part of the projected new book of business and to finance capital expenditures related to those operations. Management expects that the majority of additional liquidity requirements will be funded from cash generated from operating the acquired companies. These new capital requirements will relate primarily to tooling and advanced engineering and development. While the Company ultimately expects to be entitled to receive these amounts from customers, it will need to finance these requirements to achieve its revenue goals. Otherwise, much of the increased capital expenditures relate to the Company's larger size and are expected to be serviced by the larger cash flow base. Management believes cash flow from operations will provide adequate sources of liquidity for the Company and could, if necessary, be supplemented with additional proceeds from financing activities. However, the Company's sources of liquidity may be inadequate if it is unable to successfully integrate acquired businesses in accordance with its expectations, economic conditions worsen, or the Company is unable to meet financial or operating covenants as a result of the foregoing. The Company continues to explore other sources of liquidity, including additional debt, but existing debt instruments may limit the Company's ability to incur additional debt, and the Company may be unable to secure equity or other financings. The Company also believes it could obtain favorable modifications related to existing debt instruments and related covenants.

### Contractual Obligations

Below is the table that identifies the Company's significant contractual obligations. Following the table is a more detailed description of these obligations.

| | Payment due by Period | | | | |
|---|---|---|---|---|---|
| | Total | Less than 1 year | 1-3 years (in millions) | 4-5 years | After 5 Years |
| Long-term debt and capital lease obligations ...................... | $1,278.7 | $ 23.5 | $355.2 | $400.0 | $500.0 |
| Preferred stock*..................... | 123.9 | — | — | — | 123.9 |
| Short-term borrowings .............. | 10.5 | 10.5 | — | — | — |
| Operating leases ................... | 346.9 | 50.0 | 95.4 | 68.3 | 133.2 |
| Capital expenditures ................ | 36.2 | 36.2 | — | — | — |
| Total obligations ................... | $1,796.2 | $120.2 | $450.6 | $468.3 | $757.1 |

* Mandatorily Redeemable Preferred Stock of Subsidiary

### Senior Secured Credit Facilities

*General:* The Company's senior secured credit facility allowed funding in the aggregate of up to $553 million at December 31, 2002. Borrowings under the credit facility are secured by all the assets of the

Company and Products and certain of its subsidiaries, and are unconditionally and irrevocably guaranteed jointly and severally by the Company and each existing and subsequently acquired or organized domestic subsidiaries (other than by the Company's receivables subsidiary). Available funding under this credit facility is reduced if the program size or commitment level under the Company's receivable facility (discussed below) exceeds $250.0 million.

*Interest Rates and Fees:*    Borrowings bear interest, at the Company's option, at either (a) adjusted LIBOR plus a 3.75% margin in the case of the revolving credit and tranche A term loan facilities and 4.00% margin in the case of the tranche B term loan facilities, in all cases subject to a minimum LIBOR of 3.00% or (b) the highest of (i) JPMorgan Chase Bank's prime rate, (ii) the federal funds effective rate plus 1/2 of 1.00% and (iii) the base CD rate plus 1.00%. A commitment fee on any unused commitments under the revolving portion of the credit facility equal to 1.00% per annum is payable quarterly in arrears and is subject to adjustment based on attaining certain performance targets.

*Covenants:*    The credit facility requires that the Company meet certain financial tests, including, without limitation, the following tests: a maximum leverage ratio, a minimum interest coverage ratio and certain prescribed limitations on capital expenditures at levels to be agreed upon between the Company and the agents. The credit facility also contains covenants and restrictions, including, among others, limitations or prohibitions on declaring dividends and other distributions, redeeming and repurchasing capital stock, prepaying, redeeming and repurchasing other indebtedness, loans and investments, additional indebtedness, liens, sale-leaseback transactions, preferred stock, capital expenditures, recapitalizations, mergers, acquisitions and asset sales and transactions with affiliates.

*Events of Default:*    The credit facility contains certain customary events of default, including, among others cross-default and cross-acceleration to other indebtedness (including the receivables facility).

### 11¹⁄₂% Senior Subordinated Notes due 2006

Products has outstanding $400 million in principal amount of 11¹⁄₂% Senior Subordinated Notes due 2006. In connection with the TAC-Trim acquisition, the Company amended the indenture governing these notes to make each subsidiary guarantor of the 10³⁄₄% Senior Notes due in 2011 a guarantor of these notes on a senior subordinated basis. The indenture governing these notes contains restrictive covenants (including, among others, limitations on indebtedness, restricted payments, liens, asset dispositions, change of control and transactions with affiliates) that are customary for such securities.

### 10³⁄₄% Senior Notes due 2011

As discussed above, in connection with the TAC-Trim acquisition, Products sold $500 million principal amount of 10³⁄₄% senior notes due 2011. The indenture governing these notes contains restrictive covenants (including, among others, limitations on indebtedness, restricted payments, liens, asset dispositions, change of control and transactions with affiliates) that are customary for such securities.

### Mandatorily Redeemable Preferred Stock of Subsidiary

*General:*    As discussed above, as part of the consideration paid to Textron for the TAC-Trim acquisition, Products issued mandatorily redeemable preferred stock to Textron with an estimated fair market value of $146.9 million and a liquidation value of $326.4 million.

*Dividends:*    Holders of this preferred stock are entitled to receive dividends accruing on the liquidation preference thereof at a rate of 11% per annum, in respect of dividend periods ending on or prior to July 1, 2003, and 15% per annum, in respect of dividend periods ending after July 1, 2003, in the case of the Series A Preferred Stock, 12% per annum, in respect of dividend periods ending on or prior to July 1, 2003, and 16% per annum, in respect of dividend periods ending after July 1, 2003, in the case of the Series B Preferred Stock, 12% per annum, in respect of dividend periods ending on or prior to July 1, 2003, and 16% per annum, in respect of dividend periods ending after July 1, 2003 and in the case of the Series C Preferred Stock, in each case payable quarterly in arrears, commencing on April 1, 2002 and accumulating from the date of issuance.

Products may, at its option, elect to accrue up to an amount equivalent to 7% per annum of the dividends on the Series A Preferred Stock, an amount equivalent to 8% per annum of the dividends on the Series B Preferred Stock and an amount equivalent to 8% per annum of the dividends on the Series C Preferred Stock in lieu of cash payment of such dividends and, in each case, any accrued dividends will be added to the liquidation preference of the applicable series of preferred stock. Products may at its option through January 1, 2004 accrue up to the full amount of all dividends in lieu of cash payment of such dividends. Thereafter, Products may at its option elect to accrue dividends of up to 7% of the liquidation value annually on Series A Preferred Stock and up to 8% of the liquidation value on Series B and C Preferred Stock. Accrued dividends will be added to the liquidation preference of the applicable series of Preferred Stock.

*Repurchase:*   In June 2002, $100.0 million of proceeds from the 16 million share common stock offering was used to repurchase preferred stock from Textron at a price of 75% of its liquidation preference of 133.0 million. The redeemed Series A Preferred Stock had a carrying value of $63.7 million.

*Liquidation Preference:*   Upon any voluntary or involuntary liquidation, dissolution or winding-up of Products, holders of the preferred stock will be entitled to be paid out of the assets of Products available for distribution to stockholders in the amount of $1,000 per share plus the aggregate amount of accrued dividends prior to any distribution to any holders of equity securities which rank junior to the preferred stock. In addition, upon any voluntary or involuntary liquidation, dissolution or winding-up of Products, the holders of Series C Preferred Stock will be entitled to a participation in distributions to Products' common equity tied to any appreciation in the value of Products' common equity subsequent the issuance date, not to exceed an aggregate of $2 million for all Series C Preferred Stock outstanding.

*Mandatory Redemption:*   Products is required to redeem all of the Series A Preferred Stock and Series B Preferred Stock outstanding on January 1, 2013 at a redemption price equal to 100% of the liquidation preference thereof, plus accrued and unpaid dividends to the date of redemption. Products is also required to redeem all of the series C preferred stock outstanding on February 1, 2022 at a redemption price equal to 100% of the liquidation preference thereof, plus accrued and unpaid dividends to the date of redemption, plus common equity participation.

### *Operating Leases*

During 2002, the Company received net proceeds (after fees) of approximately $14.8 million from sale and leasebacks of real property and equipment. The aggregate lease expenses associated with these leases will be $18.8 million, $2.6 million of which relates to 2003.

During 2001, Products entered into sale and leaseback transactions for certain manufacturing equipment and non-manufacturing properties. The transactions resulted in the recognition of a $4.4 million net deferred asset that is being amortized over the lease term, and the recognition of an $8.7 million loss.

During 2001, the Company received net proceeds (after fees) of approximately $86.2 million from sale and leasebacks of real property and equipment, which it used to reduce outstanding debt. The aggregate lease expenses associated with these leases will be $88.8 million, $12.5 million of which relates to 2002. To the extent permitted by the credit facility, the Company may enter into additional similar leasing arrangements from time to time. As part of these sale-leaseback transactions, Products sold and contemporaneously leased back real property from unrelated third parties, and received net proceeds (after fees) of $46.4 million.

In June 2001, the Company entered into sale-leaseback transactions with each of New King, L.L.C. ("New King") and Anchor Court, L.L.C. ("Anchor Court"), which are affiliates of Becker Ventures LLC. Becker Ventures is controlled by Charles Becker, a Company director. See the information under the heading "— Other Information — Effect of Transactions with Related Parties."

In connection with these sale-leaseback transactions, Products sold and contemporaneously leased back real property located in Troy, Michigan and Plymouth, Michigan from New King and Anchor Court, respectively, for net proceeds of $15.1 million in aggregate. The initial lease term in each transaction is 20 years and each lease has two successive ten year renewal options. The basic rent for the Troy, Michigan

31

property is $1.3 million per year, and the basic rent for the Plymouth, Michigan property is $0.5 million per year. The rental rates in each case are subject to adjustment after expiration of the initial term.

Prior to the TAC Trim acquisition, TAC-Trim entered into an $86.9 million sale and leaseback transaction (the "Textron Leasing Transaction") with two separate single purpose affiliates of Textron Financial Corporation, as lessor and purchaser, with respect to a portfolio of manufacturing equipment situated in different locations throughout the United States and Canada. Payments under the Textron leasing transaction are guaranteed by Products and secured by a first perfected mortgage lien over certain real property with a value equal to $25 million. Each lease is for an initial term of three years with three one-year renewal options. As is customary, the documentation for the Textron leasing transaction incorporates covenants by reference, from the Company's credit facility, that may be amended or waived by the senior lenders, and also contain events of default. See the information under the heading "— Other Information — Effect of Transactions with Related Parties."

The Company also has other equipment lease agreements with several lessors that, subject to specific approval, provide availability of funding for operating leases and sale and leasebacks as allowed in its other financing agreements.

Refer to Note 12, "Operating Leases" of the financial statements included in this report for information regarding future minimum lease payments.

### Capital Expenditures

The Company makes capital expenditures on a recurring basis for replacements and improvements. During 2002, the Company had approximately $148 million in capital expenditures for continuing operations. Capital expenditures will materially increase with the expanded book of business in 2003, and in future years will depend upon demand for the Company's products and changes in technology. Estimates for capital expenditures in 2003 range from approximately $145 to $165 million. A portion of capital expenditures may be financed through leasing arrangements.

### Sources of Liquidity

The table below identifies the Company's significant sources of liquidity:

|  | December 31, 2002 | Availability Expiration Per Period | | | |
|  | Maximum Amount Available | Less than 1 Year | 1-3 Years | 4-5 Years | After 5 years |
| --- | --- | --- | --- | --- | --- |
|  |  | (in millions) | | | |
| Receivable Facility(1) ............... | $ 93.2 | $ — | $ 93.2 | $— | $— |
| Revolving Credit Facility(2) .......... | 129.5 | — | 129.5 | — | — |
| Short-term borrowings(3)............. | 26.0 | 26.0 | — | — | — |
| Total Available...................... | $248.7 | $26.0 | $222.7 | $— | $— |

(1) Total commitment under the facility is $250.0 million.

(2) At December 31, 2002, $45.5 million of outstanding letters of credit reduced the maximum amount available under the Revolving Credit Facility.

(3) Borrowings outstanding in addition to the amount available were $10.5 million.

### Receivables Facility

*General:*   The Company has an agreement to sell, on an ongoing basis, the trade accounts receivable of certain business operations to a bankruptcy-remote, special purpose subsidiary, wholly owned and consolidated by the Company. The receivables subsidiary (Carcorp) will, subject to certain conditions, from time to time, sell an undivided fractional ownership interest in a pool of domestic and certain Canadian receivables, up to

$250 million, to various multi-seller commercial paper conduits supported by a committed liquidity facility. Upon sale to the conduit, Carcorp will hold a subordinated retained interest in the receivables. Under the terms of the agreement, new receivables are added to the pool as collections reduce previously sold receivables. The Company expects to service, administer and collect the receivables on behalf of Carcorp and the conduit. The proceeds of sale will be less than the face amount of accounts receivable sold by an amount that approximates the purchaser's financing costs. In September 2002, the Company amended the receivables facility lengthening its term to expire in December 2004.

*Restrictions:*   This receivables facility contains certain restrictions on Carcorp (including maintenance of $60.0 million net worth) and on the sellers (including limitations on liens on receivables, modifications of the terms of receivables, and changes in credit and collection practices) customary for facilities of this type. The commitments under the receivables facility are subject to termination prior to their term upon the occurrence of certain events, including payment defaults, breach of covenants, including defined interest coverage and leverage ratios, bankruptcy, default by the Company in servicing the receivables and failure of the receivables to satisfy certain performance criteria.

### Commercial Commitments

*Put and Call Arrangement:*   The Company entered into a put and call arrangement with respect to the acquisition of the initial 50% interest in the Italian joint venture. In January 2003, the Company acquired the remaining 50% interest in the Italian joint venture for $15 million, which also terminated the put call arrangement. The arrangement, that was exercisable in December 2004, permitted Textron to require the Company to purchase Textron's interests in the joint venture for an aggregate of approximately $28 million.

### Stock Options

As a result of repricing the Company's stock options during 2002, the repriced options were treated as variable-based awards in accordance with APB No. 25. Subsequent to December 31, 2002, the Company approved the repricing of approximately 3.6 million options with exercise prices of $10.00 to a new exercise price of $8.00. Since these options are considered to be variable-based awards, the Company will incur future compensation expense if the stock price exceeds the $8.00 exercise price to be established by repricing.

## Other Information

## Effects of Certain Transactions with Related Parties

### Heartland Transactions

The Company is a party to a services agreement with Heartland under which Heartland provides it with advisory and consulting services, including services with respect to developments in the automotive industry and supply markets, advice on financial and strategic plans and alternatives and other matters as it may reasonably request and are within Heartland's expertise. The services agreement terminates on the earlier of its 10th anniversary or the date upon which Heartland ceases to own Company shares equivalent to 25% of that owned by them on February 23, 2001.

Under the services agreement, the Company is obligated to pay to Heartland a $4.0 million annual advisory fee on a quarterly basis and to reimburse its out-of-pocket expenses related to the services it provides. The Company has also agreed to pay a fee of 1% of the total enterprise value of certain acquisitions and dispositions.

### Charles E. Becker Transactions

Subsequent to December 31, 2002, the Company entered into a letter of intent with Charles E. Becker, a member of the Company's Board of Directors, to buyout the non-compete agreement effective in early 2003. The non-compete agreement was entered into as part of the Becker acquisition. The Company will make a one-time payment to Mr. Becker of $11.3 million thereby terminating its remaining obligation of approximately $12.6 million and eliminate Mr. Becker's obligation not to compete. As a result of this transaction the

Company expects to record a loss of approximately $10 million, which is primarily due to the resulting write-off of the intangible assets initially recorded in conjunction with the Becker acquisition.

In July 2001, the Company completed the acquisition of Becker. As a result of the Becker acquisition and a purchase of Company common stock immediately afterwards, Charles Becker became one of the Company's principal stockholders. Charles Becker became Vice Chairman and a member of the Company's Board of Directors upon closing of the Becker acquisition. The Company agreed to make $18.0 million in non-compete payments over five years to Mr. Becker at the time of the acquisition.

The Company entered into a lease agreement with Becker Ventures, an entity controlled by one of the Company's current directors and shareholders, for the Company's headquarters at 250 Stephenson Highway, Troy, Michigan with the effective date of the lease being January 1, 2002. In March, 2002, the Company entered into lease agreements with Becker Ventures, effective January 1, 2002, for 150 Stephenson Highway and 350 Stephenson Highway, Troy, Michigan. The base rent for all three premises is $13.25 per sq. ft. Total square footage for all three locations is approximately 286,000. The leases have 20-year terms, and the Company has two five-year renewal options. The 2003 cost for the facilities will be approximately $3.8 million. For the years ended December 31, 2002 and 2001, the Company recorded a total cost of $17.1 million and $2.1 million, respectively, for rental expenses with related parties. In addition, the Company is also party to a lease with Becker Ventures for five manufacturing facilities totaling 884,000 square feet. In 2002, the Company extended the lease term an additional ten years to expire in 2021, with the base rent for these facilities totaling $3.6 million per year.

As discussed above under "— Operating Leases," the Company is a party to certain sale-leaseback transactions with certain affiliates of Becker Ventures LLC, an entity that is controlled by Charles Becker, a director of the Company. The purpose of these sale-leaseback transactions was to reduce the Company's outstanding debt. The Company believes that the terms of the sale-leaseback transactions with Becker Ventures are on terms substantially similar to those which could have been negotiated in arms-length transactions of the same type. These sale-leaseback transactions were authorized by the independent members of the Company's board of directors.

### *Elkin McCallum Transactions*

In January 2003, the Company purchased equipment required to support an anticipated increase in the production of furniture fabrics from Joan Fabrics for $4.7 million. The Company also expects to spend another $4.7 million to outside vendors to prepare existing facilities to accommodate new furniture fabrics business. The Company also anticipates that it will enter into a supply agreement with Joan Fabrics in early 2003 to supply furniture fabrics. Elkin McCallum, a director of the Company, controls Joan Fabrics. Joan Fabrics would be responsible for all marketing, design, customer service and distribution functions and will also assume marketing responsibility for the Company's existing furniture fabrics business.

On December 31, 2002, the Company acquired certain assets from Dutton Yarns (an affiliate of Mr. McCallum) for approximately $4.2 million. These assets are used by the Company to texture yarn. As part of the transaction, Dutton Yarns has agreed to provide the Company transition services through December 31, 2003.

On April 12, 2002, the Company signed and closed on a merger agreement with Mr. McCallum (a current director and shareholder of the Company) and a lamination company wholly owned by Mr. McCallum pursuant to which the acquired company was merged into a wholly owned subsidiary of the Company. As consideration in the transaction, Mr. McCallum received 400,000 shares of Common Stock and was repaid $2.5 million in cash as reimbursement for amounts invested to fund the company's working capital needs. Subsequent to the merger, debt owing to Mr. McCallum of $6.7 million was repaid. The Company acquired the lamination business to optimize the supply chain on certain of its fabric products and provide low cost lamination products and services to Tier-1 customers.

In September 2001, the Company completed the acquisition of Joan Automotive Industries, a leading supplier of bodycloth to the automotive industry, and all of the operating assets of Joan's affiliated yarn dying operation, Western Avenue Dyers, L.P. As a result of the Joan acquisition, Joan Fabrics Corp., a company controlled by Elkin McCallum, became a principal stockholder of the Company. Upon completion of the Joan acquisition, Mr. McCallum became a member of the Company's Board of Directors.

In connection with the Joan acquisition, the Company entered into a Supply Agreement dated September 21, 2001 (the "Supply Agreement") with Main Street Textiles, L.P. ("Main Street"). Main Street is controlled by Elkin McCallum, a director of the Company. Under the Supply Agreement, the Company agreed to purchase all of its requirements for flat woven automotive fabric from Main Street for a five year period beginning on the date of the Supply Agreement. The prices which the Company will pay for fabric under the agreement will equal the costs of the raw materials plus an amount which represents Main Street's standard labor and overhead costs incurred in manufacturing fabric for us. During the term of the Supply Agreement, Main Street is prohibited from manufacturing automotive fabric products for third parties without the Company's prior consent but may sell seconds and close-out items in bona fide transactions. The Supply Agreement is also terminable by mutual written consent, upon the occurrence of certain events of bankruptcy, the appointment of a receiver or trustee, an assignment for the benefit of creditors, or in the event of a material breach. In addition, either party may terminate the Supply Agreement upon 270 days prior notice to the other party in the event that the parties are unable to agree on the pricing of fabric covered by the Supply Agreement.

The Company is also a party to a Transition Services Agreement dated September 21, 2001 with Joan Fabrics Corporation ("Joan Fabrics"), another company controlled by Mr. McCallum. Under this agreement Joan Fabrics will provide Products with transitional and support services for a period not to exceed twelve months in order to support the continued and uninterrupted operation of the businesses acquired by Products in the Joan acquisition. As a part of these services, pending the Company's disassembly and removal of machinery and equipment that we purchased from Joan Fabrics, Joan Fabrics will use that machinery and equipment to manufacture for us all of our requirements for some types of knitted and woven automotive fabrics. The terms of the Company's agreement with respect to this fabric production are substantially similar to those under the Supply Agreement.

Mr. McCallum became a related party as a result of the Joan acquisition. The terms of the Supply Agreement and the Transition Agreement were reached through arms-length negotiations prior to Mr. McCallum becoming a related party.

### *Textron Transactions*

As discussed above under "— Operating Leases and Mandatorily Redeemable Preferred Stock of Subsidiary," "Business — Technology and Intellectual Property," "Business — Joint Ventures" and "— Put and Call Arrangement" the Company is a party to various agreements and transactions with Textron. Textron became a related party as a result of its receipt of the consideration in the TAC-Trim acquisition.

### Discontinued Operations

Proceeds from discontinued operations in 2002 were $15.8 million, representing recoveries, net of cash outflows. However, the Company has significant obligations related to post-retirement, casualty, environmental, product liability, lease and other liabilities of discontinued operations. The nature of many of these contingent liabilities is such that they are difficult to quantify and uncertain in terms of amount. The company has accrued $23.0 million for post retirement costs and $53.4 million for environmental and product liability costs. Based upon the information available to management and the Company's experience to date, the Company believes that these liabilities will not have a material effect on its financial condition, results of operations or cash flows. In addition, the Company has primary, excess and umbrella insurance coverage for various periods that the Company expects to cover certain of these liabilities. However, there can be no assurances that contingent liabilities will not arise or that known contingent liabilities or related claims will not exceed the Company's expectations or that insurance will be available to cover these liabilities. Because the

cash requirements of the Company's operations are substantially a function of these contingencies, it is possible that actual net cash requirements could differ materially from the Company's estimates.

## Recent and Future Reorganization Plans

During the fourth quarter of 2002, the Company undertook a restructuring program primarily to realign the operations in Europe that resulted in a restructuring charge of $14.1 million. This restructuring charge included $4.0 million of severance costs, $0.8 million of costs related to the establishment of reserves for lease commitments and lease termination fees, and $9.3 million of costs related to fixed asset impairments. The severance costs related to over 300 personnel.

During the third quarter of 2002, the Company undertook a restructuring program primarily to realign the operations in North America that resulted in a restructuring charge of $33.8 million. This restructuring charge included $23.8 million of severance costs, $1.3 million of costs related to the establishment of reserves for lease commitments and lease termination fees, and $8.7 million of costs related to fixed asset impairments. The severance costs related to over 700 personnel.

Included in the third quarter 2002 restructuring charge severance costs was $8.9 million related to the separation agreement with Thomas Evans, the former Chairman and Chief Executive Officer (CEO). In August 2002, the Company's Board of Directors appointed Jerry L. Mosingo as President, CEO and Director of the Company. Under the terms of his separation agreement, Mr. Evans received $5.5 million on August 15, and will receive quarterly payments of $0.3 million through June 30, 2004.

During the first quarter of 2002, the Company undertook a restructuring program to rationalize operations in North America, Europe and Specialty operations that resulted in a restructuring charge of $9.1 million. This restructuring included $5.5 million of cash severance costs and $3.6 million of costs related to the establishment of reserves for lease commitments and lease termination fees. The Company incurred severance costs for over 100 personnel primarily at the Company's North America and European headquarters and additional reductions at its Specialty operations. The reserve for lease commitments relates to contractual obligations for the Company's former headquarters facility, while the termination fees relate to an aircraft lease on an aircraft that the company discontinued using. The Company relocated its headquarters to its current location in order to optimize and consolidate corporate operations.

During the first quarter of 2001, the Company undertook a restructuring program resulting in a charge of $9.2 million. The goal of this restructuring program was to further de-layer management in the North American, European and Specialty operations. The pre-tax $9.2 million charge includes $8.4 million of severance costs and $0.8 million of asset impairments.

During the fourth quarter of 2001, the Company incurred charges totaling $9.6 million including $2.8 million of severance costs and $6.8 million for the write-off of long-lived assets.

The company is continually evaluating the business and may elect to implement additional restructuring activities as opportunities to achieve cost savings arise in future periods.

## Stock Repurchase Plan

At December 31, 2002, approximately $1.0 million remained authorized by the Company's Board of Directors to repurchase shares of the Company's common stock at management's discretion. The Company believes it has sufficient liquidity under its existing credit arrangements to effect the repurchase program. The Company made no repurchases for the years ended 2002 and 2001.

## Accounting Policies

The preparation of consolidated financial statements in conformity with accounting principles generally accepted in the United States of America requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of

the consolidated financial statements and the reported amounts of revenues and expenses during the reporting period. Considerable judgment is often involved in making these determinations, the use of different assumptions could result in significantly different results. Management believes its assumptions and estimates are reasonable and appropriate, however actual results could differ from those estimates.

*Goodwill Impairment Testing:*  During the second quarter of 2002, the Company completed the implementation of SFAS 142, "Goodwill and Other Intangible Assets". Under SFAS 142, goodwill is no longer amortized. Instead, goodwill and indefinite-lived intangible assets are tested for impairment in accordance with the provisions of SFAS 142. The Company employed a discounted cash flow analysis and a market comparable approach in conducting its impairment tests. The Company completed its initial impairment test in the second quarter of 2002 and recorded an impairment loss of $11.7 million (having no tax impact), or $0.15 per average basic and diluted share relating to the UK Plastics business in the European and Rest of World Automotive Systems segment. The impairment loss was reported as a cumulative effect of a change in accounting principle and, therefore, is accounted for as if it occurred on January 1, 2002. The Company completed this test again as of November 1, which indicated that the fair value of the reporting units exceeded the carrying values. Fair value was determined based upon the discounted cash flows of the reporting units using discount rates ranging from 11.5% to 14.0% dependant on the reporting unit and a residual growth rate of 2%. The market comparable approach consisted of an earnings multiple of 5 times forecasted EBITDA (operating income less — interest, taxes, depreciation and amortization) and a control premium on equity. Future cash flows and EBITDA are affected by future operating performance, which will be impacted by economic conditions, car builds, financial, business and other factors, many of which are beyond the Companies control. The North American Plastics reporting unit can be significantly impacted by an adverse change in assumptions.

*Realization of Deferred Tax Assets:*  Assessing the need for and amount of a valuation allowance for deferred tax assets requires significant judgment. The fact that a benefit may be expected for a portion but not all of a deferred tax asset increases the judgmental complexity. Future realization of deferred tax assets ultimately depends on the existence of sufficient taxable income of the appropriate character in either the carryback or carryforward period under the tax law.

During 2001, Heartland acquired approximately 60 percent of the outstanding shares of the Company. This constituted a "change in control" that results in annual limitations on the Company's use of its NOLs and unused tax credits. This annual limitation on the use of NOLs and tax credits depends on the value of the equity of the Company and the amount of "built-in gain" or "built-in loss" in the Company's assets at the date of the "change in control". Based on the expiration dates of the NOLs and tax credits as well as anticipated levels of domestic income, management does not believe that the transaction will have a material impact on these deferred tax assets. Management has reviewed the Company's operating results for recent years as well as the outlook for its continuing operations and concluded that it is more likely than not that the net deferred tax assets of $190 million at December 31, 2002 will be realized.

Management took into consideration, among other factors, the expected impact of acquisitions, the impact of recent restructuring plans, and the infusion of cash from Heartland. These factors along with the timing of the reversal of its temporary differences, certain tax planning strategies and the expiration date of its NOLs were also considered in reaching this conclusion. The Company's ability to generate future taxable income is dependent on numerous factors, including general economic conditions, the state of the automotive industry and other factors beyond management's control. Therefore, there can be no assurance that the Company will meet its expectation of future taxable income.

*Pension and Postretirement Benefits Other than Pensions:*  Annual net periodic expense and benefit liabilities under our defined benefit plans are determined on an actuarial basis. Assumptions used in the actuarial calculations have a significant impact on plan obligations and expense. Each September, the Company reviews the actual experience compared to the more significant assumptions used and make adjustments to the assumptions, if warranted. The healthcare trend rates are reviewed with the actuaries based upon the results of their review of claims experience. Discount rates are based upon an expected benefit payments duration analysis and the equivalent average yield rate for high-quality fixed-income investments.

Pension benefits are funded through deposits with trustees and the expected long-term rate of return on fund assets is based upon actual historical returns modified for known changes in the market and any expected change in investment policy. Postretirement benefits are not funded and our policy is to pay these benefits as they become due.

Certain accounting guidance, including the guidance applicable to pensions, does not require immediate recognition of the effects of a deviation between actual and assumed experience or the revision of an estimate. This approach allows the favorable and unfavorable effects that fall within an acceptable range to be netted. Although this netting occurs outside the basic financial statements, disclosure of the net amount is disclosed as an unrecognized gain or loss in the footnotes to our financial statements. The Company expects to incur approximately $19 million of pension expense in 2003. See Note 13 "Employee Benefit Plans" for additional discussion for the impact on income.

*Environmental Contingencies:*   The Company is subject to federal, state, local and foreign environmental, and health and safety, laws and regulations that (i) affect ongoing operations and may increase capital costs and operating expenses in order to maintain compliance with such requirements and (ii) impose liability relating to contamination at facilities, and at other locations such as former facilities, facilities where the Company has sent wastes for treatment or disposal, and other properties to which the Company may be linked. Such liability may include, for example, investigation and clean-up of the contamination, personal injury and property damage caused by the contamination, and damages to natural resources. Some of these liabilities may be imposed without regard to fault, and may also be joint and several (which can result in a liable party being held responsible for the entire obligation, even where other parties are also liable).

Management believes that it has obtained, and is in material compliance with, those material environmental permits and approvals necessary to conduct the Company's various businesses. Environmental compliance costs for continuing businesses are accounted for as normal operating expenses or capital expenditures, except for certain costs incurred at acquired locations. Environmental compliance costs relating to conditions existing at the time of an acquisition are generally charged to reserves established in purchase accounting. The Company accrues for environmental remediation costs when such obligations are known and reasonably estimable. In the opinion of management, based on the facts presently known to it, such environmental compliance and remediation costs will not have a material adverse effect on the Company's business, consolidated financial condition or future results of operations.

The Company is legally or contractually responsible or alleged to be responsible for the investigation and remediation of contamination at various sites, and for personal injury or property damages, if any, associated with such contamination. At some of these sites the Company has been notified that it is a potentially responsible party ("PRP") under the federal Superfund law or similar state laws. Other sites at which we may be responsible for contamination may be identified in the future, including with respect to divested and acquired businesses.

The Company is currently engaged in investigating or remediating certain sites as discussed below. In estimating the cost of investigation and remediation, the Company has considered, among other things, prior experience in remediating contaminated sites, remediation efforts by other parties, data released by the United States Environmental Protection Agency ("USEPA"), the professional judgment of the Company's environmental experts, outside environmental specialists and other experts, and the likelihood that other identified PRPs will have the financial resources to fulfill their obligations at sites where they and the Company may be jointly and severally liable. It is difficult to estimate the total cost of investigation and remediation due to various factors including:

- incomplete information regarding particular sites and other PRPs;

- uncertainty regarding the nature and extent of environmental problems and the Company's share, if any, of liability for such problems;

- the ultimate selection among alternative approaches by governmental regulators;

- the complexity and evolving nature of environmental laws, regulations and governmental directives; and

- changes in cleanup standards.

The Company is a party to a Consent Decree with the State of New Hampshire to remediate a former industrial landfill known as the Cardinal Landfill in Farmington, New Hampshire. Pursuant to that Consent Decree, the Company is currently conducting a pilot test for a proposed remediation of chlorinated compound contaminants in groundwater. The Consent Decree calls for a remedy to be in place by 2004. The Company is a defendant in two lawsuits filed by a total of 91 individual plaintiffs for alleged personal injuries arising from Cardinal Landfill conditions. The Company will vigorously contest these allegations. As of December 31, 2002, the Company has accrued $15.7 million for Cardinal Landfill.

The Company is a party, as a member of a PRP workgroup, to a Consent Decree entered with the USEPA for the remediation of a former municipal landfill in Dover, New Hampshire. The town of Dover, New Hampshire is also a member of the PRP group and a party to the Consent Decree. Pursuant to the terms of the Consent Decree, the PRP group is currently engaged in the preparation of a remediation design. The Consent Decree requires that a remedy for the site be in place by 2004. As of December 31, 2002, the Company has accrued $9.6 million for Dover.

Pursuant to a Consent Decree signed with the USEPA, the Company is currently engaged in a full-scale remediation for groundwater and soil contamination at the former Stamina Mills manufacturing facility in North Smithfield, Rhode Island. Remediation activities have been ongoing since 1998. The Company is also in negotiation with the USEPA regarding a claim for past oversight costs. A resolution of this matter is anticipated in 2003. As of December 31, 2002, the Company has accrued $14.1 million for Stamina Mills.

The Company is working with the Michigan Department of Environmental Quality (MDEQ) to investigate and remediate soil and groundwater contamination at a former manufacturing plant in Mancelona, MI and at adjacent owned property formerly used for the treatment and disposal of plating waste. MDEQ is likely to require remediation of groundwater. In addition, the Company is incurring costs in connection with the provision of alternate water supplies to residences in the area.

The current owner of one of the Company's former manufacturing plants located in Bowling Green, OH has entered into an Administrative Order on Consent with the Ohio Environmental Protection Agency (OEPA) requiring investigation and remediation of contamination at the site. The Company is reimbursing the current owner for costs associated with ongoing groundwater monitoring and, following selection of an appropriate remedy by OEPA, will assume 90% of future remediation costs.

In the 1980's and 1990's, the California Regional Water Quality Control Board (CRWQCB) and other state agencies ordered a predecessor of the Company to investigate and remediate soil and groundwater contamination at a former lumber treatment plant in Elmira, CA. In 1996, the Company entered into an agreement with the State of California to conduct long-term operation and maintenance of the remedy implemented at the site.

The Company has established accruals for certain contingent environmental liabilities and management believes such reserves comply with generally accepted accounting principles. The Company records reserves for environmental investigatory and non-capital remediation costs when litigation has commenced or a claim or assessment has been asserted or is imminent, the likelihood of an unfavorable outcome is probable, and the financial impact of such outcome is reasonably estimable. As of December 31, 2002 and 2001, total reserves for those contingent environmental liabilities are approximately $64.5 million and $59.6 million, respectively.

In the opinion of management, based on information presently known to it, identified environmental costs and contingencies will not have a material adverse effect on our consolidated financial condition, future results of operations or cash flows. However, we can give no assurance that we have identified or properly assessed all potential environmental liability arising from our business or properties, and those of our present and former subsidiaries and their corporate predecessors.

39

*Allowance for uncollectible accounts:*  The allowance for uncollectibles provides for losses believed to be inherent within the company's "Accounts and Other Receivables," (primarily trade receivables and the retained interest in the receivables facility). Management evaluates both the creditworthiness of specific customers and the overall probability of losses based upon an analysis of the overall aging of receivables, past collection trends and general economic conditions. Management believes, based on its review, that the allowance for uncollectibles is adequate to cover potential losses. Actual results may vary as a result of unforeseen economic events and the impact those events could have on our customers.

*Valuation of Mandatorily Redeemable Preferred Stock of Subsidiary:*  The Company issued preferred stock as part of the consideration given to Textron in the TAC-Trim acquisition. The preferred stock is recorded at fair value, which is less than the liquidation value of $1,000 per share or $326.4 million. Since the preferred stock is not publicly traded the use of an estimated fair value was required. The Company estimated the fair value to be $146.9 million based on market prices for securities with similar terms, maturities and risk characteristics, and included a liquidation discount to reflect market conditions. The difference between the initial recorded value and the initial liquidation preference will be accreted over the life of the stock.

## Item 7A.  *Quantitative and Qualitative Disclosures About Market Risk*

### Market Risk Sensitivity

In the normal course of business, the Company is exposed to market risk associated with fluctuations in foreign exchange rates and interest rates. The Company manages these risks through the use of derivative financial instruments in accordance with management's guidelines. The Company enters into all hedging transactions for periods consistent with the underlying exposures. We do not enter into derivative instruments for trading purposes.

### Foreign Currency

Operating results may be impacted by the Company buying, selling and financing in currencies other than the functional currency of our operating companies ("transactional exposure"). The Company mitigates this risk by entering into foreign currency forward, swap and option contracts. The foreign currency contracts are executed with banks that the Company believes are creditworthy.

The Company's most significant foreign currency transactional exposures relate to Mexico, Canada and the European Monetary Union. As of December 31, 2002, foreign currency contracts representing $97.4 million of notional amount were outstanding with maturities of less than one year. The fair value of these foreign exchange contracts as of December 31, 2002 was approximately $468,000. The table below provides a summary of the foreign exchange contracts that are outstanding as of December 31, 2002. The instrument's actual cash flows are denominated in U.S. dollars (dollar amounts in millions).

| Derivative Type | Currency Sold | Currency Purchased | USD Equivalent of Notional Amount | Weighted Average Contract Rate (per Convention) | Unrealized Gain/(Loss) |
|---|---|---|---|---|---|
| Forwards . . . . . . . | GBP | EUR | $ 3.4 | 0.6176 GBP per EUR | $0.2 |
| Forwards . . . . . . . | CAD | USD | 2.0 | 1.5853 CAD per USD | 0.0 |
| Spot . . . . . . . . . . | USD | EUR | 18.0 | 1.0478 USD per EUR | — |
| Options . . . . . . . . | CAD | USD | 74.0 | 1.6420 CAD per USD | 0.3 |
| | | | $97.4 | | $0.5 |

In addition to the transactional exposures, our operating results are impacted by the translation of our foreign operating income into U.S. dollars ("translation exposure"). We do not enter into foreign currency contracts to mitigate this exposure.

## Interest Rate

As of December 31, 2002 approximately 70% of the Company's borrowings were on a fixed rate basis. The remainder of the Company's borrowings were on a variable rate basis and sensitive to changes in interest rates. While the Company has used interest rate swaps and other interest rate protection agreements to modify its exposure to interest rate movements and to reduce borrowing rates, no such agreements were in place at December 31, 2002. Because approximately $378 million of the Company's borrowings were subject to a minimum LIBOR floor of 3.0%, a 0.5% unfavorable increase in interest rates would not materially impact pre-tax earnings and cash flow.

## Item 8.   *Financial Statements and Supplementary Data*

See the Consolidated Financial Statements of Collins & Aikman Corporation and subsidiaries included herein and listed on the Index to Financial Statements set forth in Item 15 (a) of this Form 10-K report.

## Item 9.   *Changes in and Disagreements with Accountants on Accounting and Financial Disclosure*

On April 10, 2001, the Company notified Arthur Andersen LLP that it was changing its independent accountants to PricewaterhouseCoopers LLP for the fiscal year ending December 31, 2001. The Audit Committee of the Board of Directors and the Board of Directors of the Company approved the decision to replace Arthur Andersen LLP. The Company's Annual Report on Form 10-K for the fiscal year ended December 31, 2000 was filed on April 2, 2001. It included financial statements as of December 31, 2000 and December 25, 1999 and for each of the three periods ended December 2000, 1999 and 1998, accompanied by the report of Arthur Andersen LLP. Such report did not include any adverse opinion or disclaimer of opinion, or any qualification as to audit scope or accounting principles.

During the fiscal years ended December 31, 2000 and December 25, 1999, there were no disagreements with Arthur Andersen LLP on any matter of accounting principles or practices, financial statement disclosure or audit scope. During this period, there were also no disagreements which, if not resolved to the satisfaction of Arthur Andersen LLP, would have caused them to make reference to the subject matter of such disagreement in their reports on the financial statements for such years.

During the fiscal year ended December 31, 2000, PricewaterhouseCoopers LLP had not been engaged as an independent accountant to audit either the financial statements of the Company or any of its subsidiaries, nor had it been consulted regarding the application of our accounting principles to a specified transaction, either completed or proposed, or the type of audit opinion that might be rendered on our financial statements.

As a result of its 1999 audit, Arthur Andersen LLP reported material weaknesses in the Company's internal control systems. The identified conditions specifically related to four of our foreign locations, most of which were acquired in 2001. These weaknesses were primarily attributable to the effects of implementing a new computer system as part of our acquisition integration strategy and Year 2000 compliance efforts. Issues at these locations primarily related to the detail records supporting the general ledger and staff training needs. As a result, in 2000, the Company committed significant resources to addressing the issues, including the re-implementation of certain systems, implementing an internal audit function and replacing controllers at three of the four locations. The Company made significant progress in addressing these issues; however, Arthur Andersen LLP continued to report material weaknesses following its 2000 audit because two of these four foreign locations were assessed as continuing to have similar material weaknesses as in 1999. Improvement efforts at these locations were hampered by personnel turnover and continuing acquisition integration efforts.

Arthur Andersen LLP did not modify its report on the Company's 1999 and 2000 audited financial statements as a consequence of these material weaknesses. The Company is continuing its efforts to address these matters and believes that it corrected all these matters during 2001.

# PART III

### Item 10.  *Directors and Executive Officers of the Registrant*

There is incorporated herein by reference the information required by this Item in the Company's definitive proxy statement for the 2003 Annual Meeting of Stockholders which will be filed with the Securities and Exchange Commission no later than 120 days after the close of the year ended December 31, 2002.

### Item 11.  *Executive Compensation*

There is incorporated herein by reference the information required by this Item in the Company's definitive proxy statement for the 2003 Annual Meeting of Stockholders which will be filed with the Securities and Exchange Commission no later than 120 days after the close of the year ended December 31, 2002.

### Item 12.  *Security Ownership of Certain Beneficial Owners and Management*

There is incorporated herein by reference the information required by this Item in the Company's definitive proxy statement for the 2003 Annual Meeting of Stockholders which will be filed with the Securities and Exchange Commission no later than 120 days after the close of the year ended December 31, 2002.

### Item 13.  *Certain Relationships and Related Transactions*

There is incorporated herein by reference the information required by this Item in the Company's definitive proxy statement for the 2003 Annual Meeting of Stockholders which will be filed with the Securities and Exchange Commission no later than 120 days after the close of the year ended December 31, 2002.

### Item 14.  *Controls and Procedures*

#### a.  Evaluation of disclosure controls and procedures:

Within 90 days prior to the filing date of this report, the Company's Chief Executive Officer and the Company's Chief Financial Officer "the Certifying Officers" evaluated the effectiveness of the design and operation of the Company's "disclosure controls and procedures" (as defined in the Securities Exchange Act of 1934). Based on that evaluation, the Certifying Officers have concluded that the Company's disclosure controls and procedures are effective to ensure that information required to be disclosed by the Company in the reports that it files and submits under the Exchange Act is recorded, processed, summarized and reported as and when required, and are effective to ensure that such information is accumulated and communicated to the Company's management, including its Certifying Officers, as appropriate to allow timely decisions regarding required disclosure. In addition, the Certifying Officers also disclosed to the Company's auditors and the audit committee of the board of directors all significant deficiencies in the design or operation of internal controls that could adversely affect the Company's ability to record, process, summarize and report financial data. A summary of the key items disclosed and the changes in internal controls resulting from corrective actions are discussed below.

#### b.  Changes in internal controls:

An evaluation of internal controls was conducted for the year ended December 31, 2002. The following paragraphs detail management's significant areas of focus to further enhance internal controls:

- The Company has implemented certain enhancements, or is in the process of enhancing, internal controls relating to data quality and process efficiency with respect to its current consolidation system and preparation of consolidated financial statements. Recent actions relate to improving the systematic roll-up of both financial and non-financial information that is reported in the Company's financial reports filed with the Securities & Exchange Commission. These actions have primarily focused on improving; (1) the entity structure utilized by the consolidation tool, (2) the collection and compilation of financial and non-financial data, and (3) the ability to identify and eliminate intercompany transactions and balances in a more efficient manner. The Company is currently making

these changes to its existing consolidation system and is in the process of implementing a new consolidation system. As part of the new system implementation process, the Company is examining additional means to improve its internal controls. The Company is also enhancing its procedures with respect to ensuring timely and adequate review of non-standard journal entries and account reconciliations, and adherence to existing corporate accounting policies and accounting principles generally accepted in the United States of America.

- Further, the Company is implementing controls to ensure that financial and non-financial information that is generated by accounting or other company functions is adequately reviewed prior to being recorded in the Company's books of record. As disclosed in Note 22 "Quarterly Financial Data," an error in the mathematical computation of foreign currency exchange gains was discovered and was reflected as a prior period adjustment in the third quarter 2002 financial statements. The error was detected as the result of a change in the individuals responsible for computing and reviewing the foreign currency exchange gain/loss. The Company is implementing new controls that are designed to improve the existing approval and authorization processes.

Other than the above, there were no significant changes in the Company's internal controls or in other factors that could significantly affect internal controls subsequent to the date of the most recently completed evaluation. The Company also intends to refine its internal control procedures on an ongoing basis as deemed appropriate with a view towards making improvements.

## PART IV

**Item 15.   *Exhibits, Financial Statement Schedules and Reports on Form 8-K***

(a)(1)   Financial Statements:

|  | Page Number |
|---|---|
| Report of Independent Accountants | F-1 |
| Report of Independent Public Accountants | F-2 |
| Consolidated Statements of Operations for the years ended December 31, 2002, December 31, 2001 and fiscal year ended December 31, 2000 | F-3 |
| Consolidated Balance Sheets at December 31, 2002 and December 31, 2001 | F-4 |
| Consolidated Statements of Cash Flows for the years ended December 31, 2002, December 31, 2001 and fiscal year ended December 31, 2000 | F-5 |
| Consolidated Statements of Common Stockholders' Equity (Deficit) for the years ended December 31, 2002, December 31, 2001 and fiscal year ended December 31, 2000 | F-6 |
| Notes to Consolidated Financial Statements | F-7 |

(a)(2)   Financial Schedules:

The following financial statement schedules of Collins & Aikman Corporation for the year ended December 31, 2002, December 31, 2001, and the fiscal year ended December 31, 2000 are filed as part of this Report and should be read in conjunction with the Consolidated Financial Statements of Collins & Aikman Corporation.

|  | Page Number |
|---|---|
| Schedule I — Condensed Financial Information of the Registrant | S-1 |
| Schedule II — Valuation and Qualifying Accounts | S-1 |

All other schedules, for which provision is made in the applicable accounting regulations of the Securities and Exchange Commission are omitted because they are not required, are inapplicable, or the information is included in the Consolidated Financial Statements or Notes thereto.

(a)(3)   Exhibits:

*Please note that in the following description of exhibits, the title of any document entered into, or filing made, prior to July 7, 1994 reflects the name of the entity, a party thereto or filing, as the case may be, at such time. Accordingly, documents and filings described below may refer to Collins & Aikman Holdings Corporation, Collins & Aikman Group, Inc. or Wickes Companies, Inc., if such documents and filings were made prior to July 7, 1994.*

| Exhibit Number | Description |
|---|---|
| 2.1 | Agreement and Plan of Merger dated May 14, 2001 by and among Collins & Aikman Corporation, Collins & Aikman Products Co., Becker Group, L.L.C., CE Becker Inc., ME McInerney Inc., J Hoehnel Inc. and the individuals party thereto as sellers is hereby incorporated by reference to Exhibit 2.1 of Collins & Aikman Corporation's Current Report on Form 8-K dated July 13, 2001. |
| 2.2 | Agreement and Plan of Merger dated as of August 17, 2001 by and among Collins & Aikman Corporation, Collins & Aikman Products Co., JAII Acquisition Co., Elkin McCallum, Joan Fabrics Corporation and Joan Automotive Industries, Inc is hereby incorporated by reference to Exhibit 2.1 of Collins & Aikman Corporation's Current Report on Form 8-K dated September 21, 2001. |

| Exhibit Number | Description |
|---|---|
| 2.3 | First Amendment to Agreement and Plan of Merger by and among Collins & Aikman Corporation, Collins & Aikman Products Co., JAII Acquisition Co., Elkin McCallum, Joan Fabrics Corporation and Joan Automotive Industries, Inc dated as of September 21, 2001 is hereby incorporated by reference to Exhibit 2.2 of Collins & Aikman Corporation's Current Report on Form 8-K dated September 21, 2001. |
| 2.4 | Purchase Agreement dated as of August 7, 2001, as amended and restated as of November 30, 2001, by and among Textron Inc., Collins & Aikman Corporation and Collins & Aikman Products Co., including Exhibit 1 (Certificate of Designation of the 15% Series A Redeemable Preferred Stock, the 16% Series B Redeemable Preferred Stock and the 16% Series C Redeemable Preferred Stock) and Exhibit 7 (Asset Purchase Agreement dated as of August 7 by and between Textron Automotive Exteriors Inc. and JPS Automotive, Inc.), which is incorporated by reference to Collins and Aikman Corporation Current Report on Form 8-k dated December 20, 2001 and filed on January 4, 2002. The Table of Contents of the Purchase Agreement listed as Exhibit 2.4 contains a list briefly identifying the contents of all omitted schedules and exhibits. Collins & Aikman Corporation will supplementally furnish a copy of any omitted schedule or Exhibit to the Commission upon request. |
| 2.5 | Asset Purchase Agreement dated as of August 7, 2001, as amended and restated as of November 30, 2001, by and between Textron Automotive Exteriors Inc. and JPS Automotive, Inc., which is incorporated herein by reference to Exhibit 2.2 of Collins & Aikman Corporation's Current Report on Form 8-K dated December 20, 2001 and filed on January 4, 2002. |
| 2.6 | Asset Purchase Agreement dated as of August 17, 2001 by and among Collins & Aikman Products Co., Western Avenue Dyers, L.P., Elkin McCallum, Kerry McCallum, Penny Richards and Tyng Textiles LLC, which is incorporated by reference to Exhibit 2.3 to Collins & Aikman Corporation's Current Report on Form 8-K filed on October 4, 2001. |
| 2.7 | First Amendment to Asset Purchase Agreement dated as of September 21, 2001, which is incorporated by reference to Exhibit 2.4 to Collins & Aikman Corporation's Current Report on Form 8-K filed on October 4, 2001. |
| 3.1 | Restated Certificate of Incorporation of Collins & Aikman Corporation is hereby incorporated by reference to Exhibit 3.1 of Collins & Aikman Corporation's Report on Form 10-Q for the fiscal quarter ended June 26, 1999. |
| 3.2 | Certificate of Amendment to the Restated Certificate of Incorporation of Collins & Aikman Corporation, which is incorporated by reference to Exhibit 3.2 of Collins & Aikman Corporation's Annual Report on Form 10-K for the fiscal year ended December 31, 2000. |
| 3.3 | Certificate of Amendment of Amended and Restated Certificate of Incorporation is hereby incorporated by reference to Exhibit 3.5 of Collins & Aikman Corporation's Current Report on Form 8-K filed May 29, 2002. |
| 3.4 | By-laws of Collins & Aikman Corporation, as amended, are hereby incorporated by reference to Exhibit 3.2 of Collins & Aikman Corporation's Report on Form 10-K for the fiscal year ended January 27, 1996. |
| 3.5 | Certificate of Elimination of Cumulative Exchangeable Redeemable Preferred Stock of Collins & Aikman Corporation is hereby incorporated by reference to Exhibit 3.3 of Collins & Aikman Corporation's Report on Form 10-Q for the fiscal quarter ended October 28, 1995. |
| 4.1 | Specimen Stock Certificate for the Common Stock is hereby incorporated by reference to Exhibit 4.3 of Amendment No. 3 to Collins & Aikman Holdings Corporation's Registration Statement on Form S-2 (Registration No. 33-53179) filed June 21, 1994. |
| 4.2 | Indenture, dated as of June 1, 1996, between Collins & Aikman Products Co., Collins & Aikman Corporation and First Union National Bank of North Carolina, as Trustee, is hereby incorporated by reference to Exhibit 4.2 of Collins & Aikman Corporation's Report on Form 10-Q for the fiscal quarter ended April 27, 1996. |

| Exhibit Number | Description |
|---|---|
| 4.3 | First Supplemental Indenture dated as of June 1, 1996, between Collins & Aikman Products Co., Collins & Aikman Corporation and First Union National Bank of North Carolina, as Trustee, is hereby incorporated by reference to Exhibit 4.3 of Collins & Aikman Corporation's Report on Form 10-Q for the fiscal quarter ended April 27, 1996. |
| 4.4 | Waiver dated as of October 27, 1998 under the Credit Agreement dated as of May 28, 1998, among Collins & Aikman Products Co., Collins & Aikman Canada, Inc. and Collins & Aikman Plastics, Ltd., as Canadian Borrowers, Collins & Aikman Corporation, as Guarantor, the Lender Parties thereto, Bank of America, N.T.S.A., as Documentation Agent, The Chase Manhattan Bank, as Administrative Agent, and The Chase Manhattan Bank of Canada, as Canadian Administrative Agent is hereby incorporated by reference to Exhibit 4.5 of Collins & Aikman Corporation's Report on Form 10-Q for the fiscal quarter ended September 26, 1998. |
| 4.5 | Waiver dated as of December 22, 1998 under the Credit Agreement dated as of May 28, 1998, among Collins & Aikman Products Co., Collins & Aikman Canada, Inc. and Collins & Aikman Corporation, as Guarantor, the Lender Parties thereto, Bank of America, N.T.S.A., as Documentation Agent, The Chase Manhattan Bank, as Administrative Agent, and The Chase Manhattan Bank of Canada, as Canadian Administrative Agent is hereby incorporated by reference to Exhibit 4.6 of Collins & Aikman Corporation's Report on Form 10-K for the year ended December 26, 1998. |
| 4.6 | Amendment and Waiver dated as of March 8, 1999, among Collins & Aikman Products Co., Collins & Aikman Canada, Inc., Collins & Aikman Plastics Ltd., Collins & Aikman Corporation, as Guarantor, the Lender Parties thereto, Bank of America N.T.S.A., as Documentation Agent, The Chase Manhattan Bank, as Administrative Agent, and The Chase Manhattan Bank of Canada, as Canadian Administrative Agent is hereby incorporated by reference to Exhibit 4.7 of Collins & Aikman Corporation's Report on Form 10-K for the year ended December 26, 1998. |
| 4.7 | Tranche C Term Loan Supplement dated as of May 12, 1999 to the Credit Agreement dated as of May 28, 1998 among Collins & Aikman Products Co., Collins & Aikman Canada, Inc., Collins & Aikman Plastics, Ltd., Collins & Aikman Corporation, the Financial Institutions parties thereto, Bank of America N.T.S.A., as Documentation Agent, The Chase Manhattan Bank, as Administrative Agent, and The Chase Manhattan Bank of Canada, as Canadian Administrative Agent is hereby incorporated by reference to Exhibit 4.1 of Collins & Aikman Corporation's Report on Form 10-Q for the fiscal quarter ended June 26, 1999. |
| 4.8 | Indenture dated as of June 28, 1994, between JPS Automotive Products Corp., as Issuer, JPS Automotive L.P., as Guarantor and Shawmut Bank Connecticut, N.A., as Trustee, is hereby incorporated by reference to Exhibit 4.2 of JPS Automotive Corp.'s Registration Statement on Form S-1, Registration No. 33-75510. |
| 4.9 | First Supplemental Indenture, dated as of October 5, 1994, between JPS Automotive Products Corp. and JPS Automotive L.P., as Co-Obligors, and Shawmut Bank Connecticut, N.A., as Trustee is hereby incorporated by reference to Exhibit 4.48A of JPS Automotive L.P.'s and JPS Automotive Products Corp.'s Report on Form 10-Q for the fiscal quarter ended October 2, 1994. |
| 4.10 | Second Supplemental Indenture, dated as of February 8, 2001, by and among Collins & Aikman Products Co., as Issuer, Collins & Aikman Corporation, as Guarantor, and First Union National Bank, as Trustee, which is incorporated by reference to Exhibit 4.11 of Collins & Aikman Corporation's Annual Report on Form 10-K for the fiscal year ended December 31, 2000. |
| 4.11 | Form of Warrant is hereby incorporated by reference to Exhibit 4.1 of Collins & Aikman Corporation's Current Report on Form 8-K dated July 13, 2001. |
| 4.12 | Certificate of Designation of Series A Redeemable Preferred Stock, Series B Redeemable Preferred Stock and Series C Redeemable Preferred Stock, which is incorporated herein by reference to Exhibit 4.1 of Collins & Aikman Corporation's Current Report of Form 8-K dated December 20, 2001 and filed on January 4, 2002. |

| Exhibit Number | Description |
|---|---|
| 4.13 | Indenture dated as of December 20, 2001 by and among Collins & Aikman Products Co., as Issuer, the Guarantors parties thereto, and BNY Midwest Trust Company, as Trustee, which is incorporated herein by reference to Exhibit 4.2 of Collins & Aikman Corporation's Current Report on Form 8-K dated December 20, 2001 and filed on January 4, 2002. |
| 4.14 | Receivables Transfer Agreement dated as of December 20, 2001 by and among Carcorp, Inc., as Transferor, Collins & Aikman Products Co., individually and as Collection Agent, the persons parties thereto, as CP Conduit Purchasers, Committed Purchasers and Funding Agents and JPMorgan Chase Bank, as Administrative Agent, which is incorporated herein by reference to Exhibit 4.3 of Collins & Aikman Corporation's Current Report on Form 8-K dated December 20, 2001 and filed on January 4, 2002. |
| 4.15 | Amended and Restated Receivables Purchase Agreement dated as of December 20, 2001 among Collins & Aikman Products Co. and its wholly-owned direct and indirect subsidiaries named therein, as Sellers, and Carcorp, Inc., as Purchaser, and the other Sellers from time to time named therein, which is incorporated herein by reference to Exhibit 4.4 of Collins & Aikman Corporation's Current Report on Form 8-K dated December 20, 2001 and filed on January 4, 2002. |
| 4.16 | Credit Agreement dated as of December 20, 2001 among Collins & Aikman Products Co., as Borrower, Collins & Aikman Canada Inc., as a Canadian Borrower, Collins & Aikman Plastics, Ltd., as a Canadian Borrower, Collins & Aikman Corporation, the Lenders named therein, Deutsche Banc Alex. Brown Inc. and Merrill Lynch Capital Corporation, as Co-Documentation Agents, Credit Suisse First Boston Corporation, as Syndication Agent, JPMorgan Chase Bank, as Administrative Agent, and J.P.Morgan Bank Canada, as Canadian Administrative Agent, which is incorporated herein by reference to Exhibit 4.5 of Collins & Aikman Corporation's Current Report on Form 8-K dated December 20, 2001 and filed on January 4, 2002. |
| 4.17 | First Amendment dated as of December 13, 2002, to the Credit Agreement dated as of December 20, 2001 among Collins & Aikman Products Co., as Borrower, Collins & Aikman Canada Inc., as a Canadian Borrower, Collins & Aikman Plastics, Ltd., as a Canadian Borrower, Collins & Aikman Corporation, the Lenders named therein, Credit Suisse First Boston Corporation, as Syndication Agent, Deutsche Bank Securities Inc. (formerly known as Deutsche Banc Alex. Brown Inc.) and Merrill Lynch Capital Corporation, as Co-Documentation Agents, JPMorgan Chase Bank, as Administrative Agent, and J.P. Morgan Bank Canada, as Canadian Administrative Agent.* |
| 4.18 | Guarantee and Collateral Agreement dated as of December 20, 2001 by and among Collins & Aikman Corporation, Collins & Aikman Products Co. and certain of their subsidiaries and JPMorgan Chase Bank, as Collateral Agent, which is incorporated herein by reference to Exhibit 4.6 of Collins & Aikman Corporation's Current Report on Form 8-K dated December 20, 2001 and filed on January 4, 2002. |
| 4.19 | Third Supplemental Indenture, dated as of December 20, 2001, among Collins & Aikman Products Co., Collins & Aikman Corporation, the Subsidiary Guarantors listed on the signature page thereto, and First Union National Bank (as successor in interest to First Union National Bank of North Carolina), which is incorporated herein by reference to Exhibit 4.7 of Collins & Aikman Corporation's Current Report on Form 8-K dated December 20, 2001 and filed on January 4, 2002. |
| 10.1 | Stockholders Agreement, dated February 23, 2001, by and among Collins & Aikman Corporation, Heartland Industrial Partners, L.P. and other investor stockholders listed on Schedule 1 thereto, Blackstone Capital Company II, L.L.C., Blackstone Family Investment Partnership I L.P., Blackstone Advisory Directors Partnership L.P., Blackstone Capital Partners L.P., and Wasserstein/C&A Holdings, L.L.C., incorporated by reference to Annex E to Exhibit 10.1 to Collins & Aikman Corporation's Current Report on Form 8-K dated January 12, 2001. |
| 10.2 | Employment Agreement dated as of July 18, 1990 between Wickes Companies, Inc. and an executive officer is hereby incorporated by reference to Exhibit 10.3 of Wickes Companies, Inc.'s Report on Form 10-K for the fiscal year ended January 26, 1991. |

| Exhibit Number | Description |
|---|---|
| 10.3 | Employment Agreement dated as of July 22, 1992 between Collins & Aikman Corporation and an executive officer is hereby incorporated by reference to Exhibit 10.7 of Collins & Aikman Holdings Corporation's Report on Form 10-K for the fiscal year ended January 30, 1993. |
| 10.4 | First Amendment to Employment Agreement dated as of February 24, 1994 between Collins & Aikman Corporation and an executive officer is hereby incorporated by reference to Exhibit 10.7 of Collins & Aikman Holdings Corporation's Registration Statement on Form S-2 (Registration No. 33-53179) filed April 19, 1994. |
| 10.5 | Second Amendment, dated as of October 3, 1996, to the Employment Agreement, dated as of July 22, 1992, as amended, between Collins & Aikman Products Co. and an executive officer is hereby incorporated by reference to Exhibit 10.26 of Collins & Aikman Corporation's Report on Form 10-Q for the fiscal quarter ended October 26, 1996. |
| 10.6 | Third Amendment dated as of August 1, 1997, to the Employment Agreement dated as of July 22, 1992, as amended, between the Corporation and an executive officer is hereby incorporated by reference to Exhibit 10.35 of Collins & Aikman Corporation's Report on Form 10-Q for the fiscal quarter ended September 27, 1997. |
| 10.7 | Letter Agreement dated March 23, 1999 with an executive officer is hereby incorporated by reference to Exhibit 10.7 of Collins & Aikman Corporation's Report on Form 10-K for the fiscal year ended December 26, 1998. |
| 10.8 | Amended and Restated Employment Agreement dated as of January 20, 1999 between Collins & Aikman Products Co. and an executive officer is hereby incorporated by reference to Collins & Aikman Corporation's Report on Form 10-K for the fiscal year ended December 26, 1998. |
| 10.9 | Employment Agreement dated as of January 20, 1999 between Collins & Aikman Products Co. and an executive officer is hereby incorporated by reference to Exhibit 10.9 of Collins & Aikman Corporation's Report on Form 10-K for the fiscal year ended December 26, 1998. |
| 10.10 | Employment Agreement dated as of April 22, 1999 between Collins & Aikman Corporation and an executive officer is hereby incorporated by reference to Exhibit 10.10 of Collins & Aikman Corporation's Report on Form 10-Q for the fiscal quarter ended March 27, 1999. |
| 10.11 | Employment Agreement, dated as of March 29, 2000, between Collins & Aikman Products Co. and an executive officer is hereby incorporated by reference to Exhibit 10.1 of Collins & Aikman Corporation's Report on Form 10-Q for the fiscal quarter ended April 1, 2000. |
| 10.12 | Employment Agreement, dated as of April 1, 2000, between Collins & Aikman Products Co. and an executive officer is hereby incorporated by reference to Exhibit 10.3 of Collins & Aikman Corporation's Report on Form 10-Q for the fiscal quarter ended July 1, 2000. |
| 10.13 | Employment Agreement, dated as of August 1, 2000, between Collins & Aikman Products Co. and an executive officer is hereby incorporated by reference to Exhibit 10.6 of Collins & Aikman Corporation's Report on Form 10-Q for the fiscal quarter ended September 30, 2000. |
| 10.14 | Employment Agreement, dated as of August 1, 2000, between Collins & Aikman Products Co. and an executive officer is hereby incorporated by reference to Exhibit 10.8 of Collins & Aikman Corporation's Report on Form 10-Q for the fiscal quarter ended September 30, 2000. |
| 10.15 | Letter agreement, dated as of May 12, 1999, with an executive officer is hereby incorporated by reference to Exhibit 10.2 of Collins & Aikman Corporation's Report on Form 10-Q for the fiscal quarter ended June 26, 1999. |
| 10.16 | Letter agreement, dated as of April 7, 2000, between Collins & Aikman Corporation and an executive officer is hereby incorporated by reference to Exhibit 10.12 of Collins & Aikman Corporation's Report on Form 10-Q for the fiscal quarter ended September 30, 2000. |
| 10.17 | Letter agreement, dated as of July 13, 2000, between Collins & Aikman Corporation and an executive officer is hereby incorporated by reference to Exhibit 10.11 of Collins & Aikman Corporation's Report on Form 10-Q for the fiscal quarter ended September 30, 2000. |

| Exhibit Number | Description |
|---|---|
| 10.18 | Service contract between Collins & Aikman Products GmbH and an executive officer is hereby incorporated by reference to Exhibit 10.5 of Collins & Aikman Corporation's Report on Form 10-Q for the fiscal quarter ended September 30, 2000. |
| 10.19 | Settlement Agreement dated as of April 27, 2000, between Collins & Aikman Products Co. and an executive officer is hereby incorporated by reference to Exhibit 10.10 of Collins & Aikman Corporation's Report on Form 10-Q for the fiscal quarter ended September 30, 2000. |
| 10.20 | Collins & Aikman Corporation 1998 Executive Incentive Compensation Plan is hereby incorporated by reference to Exhibit 10.10 of Collins & Aikman Corporation's Report on Form 10-K for the fiscal year ended December 26, 1998. |
| 10.21 | Collins & Aikman Products Co. 2000 Executive Incentive Compensation Plan is hereby incorporated by reference to Exhibit 10.5 of Collins & Aikman Corporation's Report on Form 10-Q for the fiscal quarter ended July 1, 2000. |
| 10.22 | Collins & Aikman Corporation Supplemental Retirement Income Plan is hereby incorporated by reference to Exhibit 10.23 of Amendment No. 5 to Collins & Aikman Holdings Corporation's Registration Statement on Form S-2 (Registration No. 33-53179) filed July 6, 1994. |
| 10.23 | Amendment to Collins & Aikman Corporation Supplemental Retirement Income Plan is hereby incorporated by reference to Exhibit 10.12 of the Collins & Aikman Corporation's Report on Form 10-K for the fiscal year ended December 26, 1998. |
| 10.24 | 1993 Employee Stock Option Plan, as amended and restated, is hereby incorporated by reference to Exhibit 10.13 of Collins & Aikman Corporation's Report on Form 10-Q for the fiscal quarter ended April 29, 1995. |
| 10.25 | 1994 Employee Stock Option Plan, as amended through February 7, 1997, is hereby incorporated by reference to Exhibit 10.12 of Collins & Aikman Corporation's Report on Form 10-Q for the fiscal quarter ended March 29, 1997. |
| 10.26 | 2000 Employee Stock Option Plan is hereby incorporated by reference to Exhibit 10.6 of Collins & Aikman Corporation's Report on Form 10-Q for the fiscal quarter ended July 1, 2000. |
| 10.27 | 1994 Directors Stock Option Plan as amended and restated is hereby incorporated by reference to Exhibit 10.15 to Collins & Aikman Corporation's Report on Form 10-K for the year ended December 26, 1998. |
| 10.28 | Excess Benefit Plan of Collins & Aikman Corporation is hereby incorporated by reference to Exhibit 10.25 of Collins & Aikman Corporation's Report on Form 10-K for the fiscal year ended January 28, 1995. |
| 10.29 | 1994 Employee Stock Option Plan, as amended and restated through June 3, 1999 is hereby incorporated by reference to Exhibit 10.2 of Collins & Aikman Corporation's Report on Form 10-Q for the fiscal quarter ended June 26, 1999. |
| 10.30 | Change in Control Agreement, dated March 17, 1998, between Collins & Aikman Corporation and an executive officer is hereby incorporated by reference to Exhibit 10.17 of Collins & Aikman Corporation's Report on Form 10-K for the fiscal year ended December 27, 1997. |
| 10.31 | Change in Control Agreement, dated March 17, 1998, between Collins & Aikman Corporation and an executive officer is hereby incorporated by reference to Exhibit 10.18 of Collins & Aikman Corporation's Report on Form 10-K for the fiscal year ended December 27, 1997. |
| 10.32 | Change in Control Agreement, dated March 17, 1998, between Collins & Aikman Corporation and an executive officer is hereby incorporated by reference to Exhibit 10.19 of Collins & Aikman Corporation's Report on Form 10-K for the fiscal year ended December 27, 1997. |
| 10.33 | Change in Control Agreement, dated March 17, 1998, between Collins & Aikman Corporation and an executive officer is hereby incorporated by reference to Exhibit 10.20 of Collins & Aikman Corporation's Report on Form 10-K for the fiscal year ended December 27, 1997. |
| 10.34 | Change in Control Agreement, dated March 17, 1998, between Collins & Aikman Corporation and an executive officer is hereby incorporated by reference to Exhibit 10.22 of Collins & Aikman Corporation's Report on Form 10-Q for the fiscal quarter ended March 28, 1998. |

| Exhibit Number | Description |
|---|---|
| 10.35 | Change in Control Agreement, dated August 9, 1999, between Collins & Aikman Corporation and an executive officer is hereby incorporated by reference to Exhibit 10.25 of Collins & Aikman Corporation's Report on Form 10-K for the fiscal year ended December 25, 1999. |
| 10.36 | Change in Control Agreement, dated March 17, 1998, between Collins & Aikman Corporation and an executive officer is hereby incorporated by reference to Exhibit 10.26 of Collins & Aikman Corporation's Report on Form 10-K for the fiscal year ended December 25, 1999. |
| 10.37 | Change in Control Agreement, dated March 17, 1998, between Collins & Aikman Corporation and an executive officer is hereby incorporated by reference to Exhibit 10.27 of Collins & Aikman Corporation's Report on Form 10-K for the fiscal year ended December 25, 1999. |
| 10.38 | Change in Control Agreement, dated July 26, 1999, between Collins & Aikman Corporation and an executive officer is hereby incorporated by reference to Exhibit 10.28 of Collins & Aikman Corporation's Report on Form 10-K for the fiscal year ended December 25, 1999. |
| 10.39 | Change in Control Agreement, dated March 17, 1998, between Collins & Aikman Corporation and an executive officer is hereby incorporated by reference to Exhibit 10.29 of Collins & Aikman Corporation's Report on Form 10-K for the fiscal year ended December 25, 1999. |
| 10.40 | Change in Control Agreement, dated as of April, 2000, between Collins & Aikman Corporation and an executive officer is hereby incorporated by reference to Exhibit 10.2 of Collins & Aikman Corporation's Report on Form 10-Q for the fiscal quarter ended July 1, 2000. |
| 10.41 | Change in Control Agreement, dated as of April 1, 2000, between Collins & Aikman Products Co. and an executive officer is hereby incorporated by reference to Exhibit 10.4 of Collins & Aikman Corporation's Report on Form 10-Q for the fiscal quarter ended July 1, 2000. |
| 10.42 | Change in Control Agreement, dated as of August 1, 2000, between Collins & Aikman Corporation and an executive officer is hereby incorporated by reference to Exhibit 10.7 of Collins & Aikman Corporation's Report on Form 10-Q for the fiscal quarter ended September 30, 2000. |
| 10.43 | Change in Control Agreement, dated as of August 1, 2000, between Collins & Aikman Corporation and an executive officer is hereby incorporated by reference to Exhibit 10.9 of Collins & Aikman Corporation's Report on Form 10-Q for the fiscal quarter ended September 30, 2000. |
| 10.44 | Lease, executed as of the 1st day of June 1987, between Dura Corporation and Dura Acquisition Corp. is hereby incorporated by reference to Exhibit 10.24 of Amendment No. 5 to Collins & Aikman Holdings Corporation's Registration Statement on Form S-2 (Registration No. 33-53179) filed July 6, 1994. |
| 10.45 | Master Equipment Lease Agreement dated as of September 30, 1994, between NationsBanc Leasing Corporation of North Carolina and Collins & Aikman Products Co. is hereby incorporated by reference to Exhibit 10.27 of Collins & Aikman Corporation's Report on Form 10-Q for the fiscal quarter ended October 29, 1994. |
| 10.46 | Equity Purchase Agreement by and among JPSGP, Inc., Foamex-JPS Automotive L.P. and Collins & Aikman Products Co. dated August 28, 1996 is hereby incorporated by reference to Exhibit 2.1 of Collins & Aikman Corporation's Report on Form 10-Q for the fiscal quarter ended July 27, 1996. |
| 10.47 | Amendment No. 1 to Equity Purchase Agreement by and among JPSGP, Inc., Foamex-JPS Automotive L.P., Foamex International Inc. and Collins & Aikman Products Co. dated as of December 11, 1996 is hereby incorporated by reference to Exhibit 2.2 of Collins & Aikman Corporation's Current Report on Form 8-K dated December 10, 1996. |
| 10.48 | Equity Purchase Agreement by and among Seiren U.S.A. Corporation, Seiren Automotive Textile Corporation, Seiren Co., Ltd. and Collins & Aikman Products Co. dated December 11, 1996, is hereby incorporated by reference to Exhibit 2.3 of Collins & Aikman Corporation's Current Report on Form 8-K dated December 10, 1996. |
| 10.49 | Acquisition Agreement between Perstorp A.B. and Collins & Aikman Products Co. dated December 11, 1996 is hereby incorporated by reference to Exhibit 2.4 of Collins & Aikman Corporation's Current Report on Form 8-K dated December 10, 1996. |

| Exhibit Number | Description |
|---|---|

10.50    Agreement among Perstorp A.B., Perstorp GmbH, Perstorp Biotec A.B. and Collins & Aikman Products Co. dated December 11, 1996 is hereby incorporated by reference to Exhibit 2.5 of Collins & Aikman Corporation's Current Report on Form 8-K dated December 10, 1996.

10.51    Settlement and Amendment Agreement dated as of December 16, 1997 by and among Collins & Aikman Products Co., Perstorp A.B., Perstorp GmbH, Collins & Aikman Holding A.B., Collins & Aikman Automotive Systems GmbH, Collins & Aikman Automotive Systems N.V., Collins & Aikman Automotive Systems A.B. and Perstorp Components GmbH and related Letter Amendment Agreement is hereby incorporated by reference to Exhibit 10.38 of Collins & Aikman Corporation's Report or Form 10-Q for the fiscal quarter ended September 26, 1998.

10.52    Acquisition Agreement dated as of December 9, 1996 among Collins & Aikman Products Co., Collins & Aikman Floor Coverings Group, Inc., Collins & Aikman Floor Coverings, Inc., CAF Holdings, Inc. and CAF Acquisition Corp. is hereby incorporated by reference to Exhibit 2.7 of Collins & Aikman Corporation's Current Report on Form 8-K dated December 10, 1996.

10.53    Mastercraft Group Acquisition Agreement dated as of April 25, 1997 among Collins & Aikman Products Co., Joan Fabrics Corporation and MC Group Acquisition Company L.L.C., is hereby incorporated by reference to Exhibit 2.1 of Collins & Aikman Corporation's Report on Form 10-Q for the fiscal quarter ended March 29, 1997.

10.54    Asset Purchase Agreement dated as of June 30, 1997 by and between JPS Automotive L.P. and Safety Components International, Inc. is hereby incorporated by reference to Exhibit 2.1 of JPS Automotive L.P.'s and JPS Automotive Products Corp.'s Current Report on Form 8-K dated July 24, 1997.

10.55    Closing Agreement dated July 24, 1997 between JPS Automotive L.P., Safety Components International, Inc. and Safety Components Fabric Technologies, Inc. is hereby incorporated by reference to Exhibit 2.2 of JPS Automotive L.P.'s and JPS Automotive Products Corp.'s Current Report on Form 8-K dated July 24, 1997.

10.56    Amended and Restated Acquisition Agreement dated as of November 4, 1997 and amended and restated as of March 9, 1998, among Collins & Aikman Products Co., Imperial Wallcoverings Inc. and BDPI Holdings Corporation is hereby incorporated by reference to Exhibit 2.4 of Collins & Aikman Corporation's Report on Form 10-K for the fiscal year ended December 27, 1997.

10.57    Share Purchase Agreement, dated as of January 12, 2001, between Collins & Aikman Corporation and Heartland Industrial Partners, L.P., is hereby incorporated by reference to Exhibit 10.1 of Collins & Aikman Corporation's Report on Form 8-K dated January 12, 2001., incorporated by reference to Exhibit 10.1 to Collins & Aikman Corporation's Current Report on Form 8-K dated January 12, 2001.

10.58    Registration Rights Agreement, dated February 23, 2001, by and among Collins & Aikman Corporation, Heartland Industrial Partners, L.P. and the other investor stockholders listed on Schedule 1 thereto, Blackstone Capital Company II, L.L.C., Blackstone Family Investment Partnership I L.P., Blackstone Advisory Directors Partnership L.P., Blackstone Capital Partners, L.P. and Wasserstein/C&A Holdings, L.L.C., incorporated by reference to Annex D to Exhibit 10.1 to Collins & Aikman Corporation's Current Report on Form 8-K dated January 12, 2001.

10.59    Services Agreement, dated as of February 23, 2001, by and among Collins & Aikman Corporation, Collins & Aikman Products Co. and Heartland Industrial Partners, L.P is hereby incorporated by reference to Exhibit 10.59 of Collins & Aikman Corporation's Report on Form 10-K for the year ended December 31, 2001.

10.60    Profit Participation Interest Agreement, dated as of February 23, 2001, by and among Heartland Industrial Partners, L.P. and the other investor stockholders listed on Schedule 1 thereto and each of Collins & Aikman Corporation, Blackstone Capital Company II, L.L.C. and Wasserstein/C&A Holdings, L.L.C., incorporated by reference to Annex B to Exhibit 10.1 to Collins & Aikman Corporation's Current Report on Form 8-K dated January 12, 2001.

| Exhibit Number | Description |
|---|---|
| 10.61 | Employment Agreement dated October 1, 1999 between Collins & Aikman Products Co. and an executive officer is hereby incorporated by reference to Exhibit 10.30 of Collins & Aikman Corporation's Report on Form 10-K for the fiscal year ended December 25, 1999. |
| 10.62 | Severance Benefit Agreement dated July 26, 1999 between Collins & Aikman Corporation and an executive officer is hereby incorporated by reference to Exhibit 10.31 of Collins & Aikman Corporation's Report on Form 10-K for the fiscal year ended December 25, 1999. |
| 10.63 | Severance Benefit Agreement dated August 9, 1999 between Collins & Aikman Corporation and an executive officer is hereby incorporated by reference to Exhibit 10.32 of Collins & Aikman Corporation's Report on Form 10-K for the fiscal year ended December 25, 1999. |
| 10.64 | Letter Agreement dated December 17, 1999 between Collins & Aikman Corporation and an executive officer is hereby incorporated by reference to Exhibit 10.33 of Collins & Aikman Corporation's Report on Form 10-K for the fiscal year ended December 25, 1999. |
| 10.65 | Employment Agreement dated December 1, 2000 between Collins & Aikman Products Co. and an executive officer, which is incorporated by reference to Exhibit 10.75 of Collins & Aikman Corporation's Annual Report on Form 10-K for the fiscal year ended December 31, 2000. |
| 10.66 | Separation Agreement dated as of March 12, 2001 between Collins & Aikman Products Co. and an executive officer, which is incorporated by reference to Exhibit 10.1 to the Company's Quarterly Report on Form 10-Q for the quarter ended March 31, 2001. |
| 10.67 | Employment Agreement dated as of March 29, 2000 between Collins & Aikman Products Co. and an executive officer is hereby incorporated by reference to Exhibit 10.1 of Collins & Aikman Corporation's Report on Form 10-Q for the quarter ended April 1, 2000. |
| 10.68 | Change in Control Agreement dated as of April 2000, between Collins & Aikman Corporation and an executive officer is hereby incorporated by reference to Exhibit 10.2 of Collins & Aikman Corporation's Report on Form 10-Q for the quarter ended July 1, 2000. |
| 10.69 | Employment Agreement dated as of April 1, 2000, between Collins & Aikman Products Co. and an executive officer is hereby incorporated by reference to Exhibit 10.3 of Collins & Aikman Corporation's Report on Form 10-Q for the quarter ended July 1, 2000. |
| 10.70 | Change in Control Agreement dated as of April 1, 2000, between Collins & Aikman Products Co. and an executive officer is hereby incorporated by reference to Exhibit 10.4 of Collins & Aikman Corporation's Report on Form 10-Q for the quarter ended July 1, 2000. |
| 10.71 | Service Contract between Collins & Aikman Products GmbH and an executive officer, which is incorporated by reference to Exhibit 10.5 of Collins & Aikman Corporation's Quarterly Report on Form 10-Q for the quarter ended June 30, 2001. |
| 10.72 | Employment Agreement dated as of August 1, 2000, between Collins & Aikman Products Co. and an executive officer, which is incorporated by reference to Exhibit 10.6 of Collins & Aikman Corporation's Quarterly Report on Form 10-Q for the quarter ended June 30, 2001. |
| 10.73 | Change in Control Agreement dated as of August 1, 2000, between Collins & Aikman Corporation and an executive officer, which is incorporated by reference to Exhibit 10.7 of Collins & Aikman Corporation's Quarterly Report on Form 10-Q for the quarter ended June 30, 2001. |
| 10.74 | Employment Agreement dated as of August 1, 2000, between Collins & Aikman Products Co. and an executive officer, which is incorporated by reference to Exhibit 10.8 of Collins & Aikman Corporation's Quarterly Report on Form 10-Q for the quarter ended June 30, 2001. |
| 10.75 | Change in Control Agreement dated as of August 1, 2000, between Collins & Aikman Corporation and an executive officer, which is incorporated by reference to Exhibit 10.9 of Collins & Aikman Corporation's Quarterly Report on Form 10-Q for the quarter ended June 30, 2001. |
| 10.76 | Settlement Agreement dated as of April 27, 2000, between Collins & Aikman Products Co. and an executive officer, which is incorporated by reference to Exhibit 10.10 of Collins & Aikman Corporation's Quarterly Report on Form 10-Q for the quarter ended June 30, 2001. |

| Exhibit Number | Description |
|---|---|
| 10.77 | Letter Agreement dated as of July 13, 2000, between Collins & Aikman Corporation and an executive officer, which is incorporated by reference to Exhibit 10.11 of Collins & Aikman Corporation's Quarterly Report on Form 10-Q for the quarter ended June 30, 2001. |
| 10.78 | Letter Agreement dated as of April 7, 2000, between Collins & Aikman Corporation and an executive officer, which is incorporated by reference to Exhibit 10.12 of Collins & Aikman Corporation's Quarterly Report on Form 10-Q for the quarter ended June 30, 2001. |
| 10.79 | Collins & Aikman Products Co. 2000 Executive Incentive Compensation Plan is hereby incorporated by reference to Exhibit 10.5 of Collins & Aikman Corporation's Report on Form 10-Q for the quarter ended July 1, 2000. |
| 10.80 | Agreement of Sale and Purchase, dated as of June 22, 2001, by and among Collins & Aikman Products Co. and New King, L.L.C is hereby incorporated by reference to Exhibit 10.81 of Collins & Aikman Corporation's Report on Form 10-K for the year ended December 31, 2001. |
| 10.81 | Lease Agreement, dated as of June 29, 2001, between New King, L.L.C., as landlord, and Collins & Aikman Products Co., as tenant is hereby incorporated by reference to Exhibit 10.82 of Collins & Aikman Corporation's Report on Form 10-K for the year ended December 31, 2001. |
| 10.82 | Agreement of Sale and Purchase, dated as of June 22, 2001, by and among Collins & Aikman Products Co. and Anchor Court, L.L.C is hereby incorporated by reference to Exhibit 10.83 of Collins & Aikman Corporation's Report on Form 10-K for the year ended December 31, 2001. |
| 10.83 | Lease Agreement, dated as of June 29, 2001, between Anchor Court, L.L.C., as landlord and Collins & Aikman Products Co., as tenant is hereby incorporated by reference to Exhibit 10.84 of Collins & Aikman Corporation's Report on Form 10-K for the year ended December 31, 2001. |
| 10.84 | Stockholders Agreement dated July 3, 2001, by and among Collins & Aikman Corporation, Heartland Industrial Partners, L.P. and the other Heartland Entities named therein, the Becker Stockholders party thereto and the Joan Stockholders party thereto is hereby incorporated by reference to Exhibit 10.85 of Collins & Aikman Corporation's Report on Form 10-K for the year ended December 31, 2001. |
| 10.85 | Registration Rights Agreement, dated July 3, 2001, by and among Collins & Aikman Corporation, Charles E. Becker, Michael E. McInerney and Jens Höhnel and, together with the Joan Investors (as defined therein) is hereby incorporated by reference to Exhibit 10.86 of Collins & Aikman Corporation's Report on Form 10-K for the year ended December 31, 2001. |
| 10.86 | First Amendment to Services Agreement, dated as of August 7, 2001, among Collins & Aikman Corporation, Collins & Aikman Products Co. and Heartland Industrial Partners, L.P is hereby incorporated by reference to Exhibit 10.87 of Collins & Aikman Corporation's Report on Form 10-K for the year ended December 31, 2001. |
| 10.87 | Equipment Lease, dated as of December 18, 2001, among Textron Automotive Exteriors Inc. and Textron Automotive Interiors Inc., collectively as lessee, and IAC TAX V, LLC, as lessor is hereby incorporated by reference to Exhibit 10.88 of Collins & Aikman Corporation's Report on Form 10-K for the year ended December 31, 2001. |
| 10.88 | Registration Rights Agreement, dated December 20, 2001, by and among Collins & Aikman Products Co., Collins & Aikman Corporation, and each of the subsidiaries listed on the signature pages thereof, and J.P. Morgan Securities Inc., Credit Suisse First Boston Corporation, Deutsche Banc Alex. Brown Inc. and Merrill Lynch, Pierce, Fenner & Smith Incorporated and the other several initial purchasers parties to the Purchase Agreement is hereby incorporated by reference to Exhibit 10.89 of Collins & Aikman Corporation's Report on Form 10-K for the year ended December 31, 2001. |
| 10.89 | Registration Rights Agreement dated as of December 20, 2001 by and among Becker Ventures, LLC, Dresdner Kleinwort Capital Partners 2001 LP, Masco Capital Corporation, ML IBK Positions, Inc. and Collins & Aikman Corporation is hereby incorporated by reference to Exhibit 10.90 of Collins & Aikman Corporation's Report on Form 10-K for the year ended December 31, 2001. |

| Exhibit Number | Description |
|---|---|
| 10.90 | Registration Rights Agreement, dated December 20, 2001, by and between Collins & Aikman Corporation, Textron Inc., and Textron Holdco Inc is hereby incorporated by reference to Exhibit 10.91 of Collins & Aikman Corporation's Report on Form 10-K for the year ended December 31, 2001. |
| 10.91 | Preferred Stock Registration and Other Rights Agreement, dated as of December 20, 2001, by and among Collins & Aikman Products Co. and Textron Inc is hereby incorporated by reference to Exhibit 10.92 of Collins & Aikman Corporation's Report on Form 10-K for the year ended December 31, 2001. |
| 10.92 | Intellimold Technology License and Support Agreement, dated as of December 20, 2001, by and between Textron, Inc. and Collins & Aikman Corporation and Collins & Aikman Products Co is hereby incorporated by reference to Exhibit 10.93 of Collins & Aikman Corporation's Report on Form 10-K for the year ended December 31, 2001. |
| 10.93 | Technology License Agreement (Retained IP), dated as of December 20, 2001, by and between Textron, Inc. and Collins & Aikman Corporation and Collins & Aikman Products Co is hereby incorporated by reference to Exhibit 10.94 of Collins & Aikman Corporation's Report on Form 10-K for the year ended December 31, 2001. |
| 10.94 | Technology License Agreement (Licensed-Back IP), dated as of December 20, 2001, by and between Textron, Inc. and Collins & Aikman Corporation and Collins & Aikman Products Co is hereby incorporated by reference to Exhibit 10.95 of Collins & Aikman Corporation's Report on Form 10-K for the year ended December 31, 2001. |
| 10.95 | Severance Agreement between Collins & Aikman Automotive Holding GmbH and an executive officer of the Company dated as of March 6, 2002 is hereby incorporated by reference to Exhibit 10.1 of Collins & Aikman Corporation's Report on Form 10-Q for the quarter ended March 31, 2002. |
| 10.96 | Separation Agreement and General Release between Products and an executive officer of the Company dated as of March 5, 2002 is hereby incorporated by reference to Exhibit 10.2 of Collins & Aikman Corporation's Report on Form 10-Q for the quarter ended March 31, 2002. |
| 10.97 | Employment Agreement between Products and an officer of the Company dated as of November 1, 2001 is hereby incorporated by reference to Exhibit 10.3 of Collins & Aikman Corporation's Report on Form 10-Q for the quarter ended March 31, 2002. |
| 10.98 | Employment Agreement between Products and an officer of the Company dated as of November 1, 2001 is hereby incorporated by reference to Exhibit 10.4 of Collins & Aikman Corporation's Report on Form 10-Q for the quarter ended March 31, 2002. |
| 10.99 | Employment Agreement between Products and an officer of the Company dated as of December 20, 2001 is hereby incorporated by reference to Exhibit 10.5 of Collins & Aikman Corporation's Report on Form 10-Q for the quarter ended March 31, 2002. |
| 10.100 | Employment Agreement between Products and an officer of the Company dated as of December 20, 2001 is hereby incorporated by reference to Exhibit 10.6 of Collins & Aikman Corporation's Report on Form 10-Q for the quarter ended March 31, 2002. |
| 10.101 | Employment Agreement between Products and an officer of the Company dated as of December 20, 2001 is hereby incorporated by reference to Exhibit 10.7 of Collins & Aikman Corporation's Report on Form 10-Q for the quarter ended March 31, 2002. |
| 10.102 | Separation and Consultancy Agreement dated July 31, 2002 is hereby incorporated by reference to Exhibit 10.1 to Collins & Aikman Corporation's Current report on Form 8-K filed August 2, 2002. |
| 10.103 | Severance Benefit Agreement between Collins and Aikman Corporation and an officer of the Company dated April 5, 2002 is hereby incorporated by reference to Exhibit 10.2 of Collins & Aikman Corporation's Report on Form 10-Q for the quarter ended June 30, 2002. |
| 10.104 | Employment and Consulting Agreement between Collins and Aikman Corporation and an Employee dated July 2002 is hereby incorporated by reference to Exhibit 10.1 of Collins & Aikman Corporation's Report on Form 10-Q for the quarter ended September 30, 2002. |

| Exhibit Number | Description |
|---|---|
| 10.105 | Separation Agreement between Collins and Aikman Corporation and an officer of the Company dated September 2002 is hereby incorporated by reference to Exhibit 10.2 of Collins & Aikman Corporation's Report on Form 10-Q for the quarter ended September 30, 2002. |
| 10.106 | Separation Agreement between Collins and Aikman Corporation and an officer of the Company dated October 2002 is hereby incorporated by reference to Exhibit 10.3 of Collins & Aikman Corporation's Report on Form 10-Q for the quarter ended September 30, 2002. |
| 11 | Computation of Earnings Per Share.* |
| 12.1 | Computation of Ratio of Earnings to Fixed Charges.* |
| 21 | Subsidiaries of the Registrant.* |
| 23.1 | Consent of PricewaterhouseCoopers LLP.* |
| 24.1 | Powers of Attorney.* |
| 99 | Voting Agreement between Blackstone Capital Partners L.P. and Wasserstein Perella Partners, L.P. is hereby incorporated by reference to Exhibit 99 of Amendment No. 4 to Collins & Aikman Holdings Corporation's Registration Statement on Form S-2 (Registration No. 33-53179) filed June 27, 1994. |
| 99.1 | Certification Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 (Chapter 63, Title 18 U.S.C. 1350(a) and (b)).* |

* Indicates document filed herewith.

**(b) Reports on Form 8-K**

The Company filed the following Reports on Form 8-K covering the following items:

November 21, 2002    Item 5 (Other Events)
February 21, 2002    Item 9 Regulation FD Disclosure

## SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities and Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized, on the 24th day of March 2003.

COLLINS & AIKMAN CORPORATION

BY:      /s/   JERRY L. MOSINGO
_____

Jerry L. Mosingo
*President & Chief Executive Officer*

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the Registrant and in the capacities and on the dates indicated.

| Signature | Title | Date |
|---|---|---|
| /s/   JERRY L. MOSINGO | President & Chief Executive Officer | March 24, 2003 |
| Jerry L. Mosingo | | |
| * | Vice Chairman and Chief Financial Officer (Principal Financial Officer) | March 24, 2003 |
| J. Michael Stepp | | |
| * | Chairman of the Board of Directors | March 24, 2003 |
| David A. Stockman | | |
| * | Director | March 24, 2003 |
| Charles E. Becker | | |
| * | Director | March 24, 2003 |
| Robert C. Clark | | |
| * | Director | March 24, 2003 |
| Marshall A. Cohen | | |
| * | Director | March 24, 2003 |
| David C. Dauch | | |
| * | Director | March 24, 2003 |
| Cynthia Hess | | |
| * | Director | March 24, 2003 |
| Timothy D. Leuliette | | |
| * | Director | March 24, 2003 |
| Elkin McCallum | | |
| * | Director | March 24, 2003 |
| W. Gerald McConnell | | |
| * | Director | March 24, 2003 |
| Warren B. Rudman | | |
| * | Director | March 24, 2003 |
| Daniel P. Tredwell | | |
| * | Director | March 24, 2003 |
| Samuel Valenti | | |

*By:   /s/   JERRY L. MOSINGO
_____

Jerry L. Mosingo
*Attorney-in-Fact*

56

**CERTIFICATION PURSUANT TO SECTION 302
OF THE SARBANES-OXLEY ACT OF 2002**

I, Jerry L. Mosingo, certify that:

1. I have reviewed this annual report on Form 10-K of Collins & Aikman Corporation;

2. Based on my knowledge, this annual report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this annual report;

3. Based on my knowledge, the financial statements, and other financial information included in this annual report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this annual report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-14 and 15d-14) for the registrant and we have:

    a. Designed such disclosure controls and procedures to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this annual report is being prepared;

    b. Evaluated the effectiveness of the registrant's disclosure controls and procedures as of a date within 90 days prior to the filing date of this annual report (the "Evaluation Date"); and

    c. Presented in this annual report our conclusions about the effectiveness of the disclosure controls and procedures based on our evaluation as of the Evaluation Date;

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation, to the registrant's auditors and the audit committee of registrant's board of directors:

    a. All significant deficiencies in the design or operation of internal controls which could adversely affect the registrant's ability to record, process, summarize and report financial data and have identified for the registrant's auditors any material weaknesses in internal controls; and

    b. Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal controls; and

6. The registrant's other certifying officer and I have indicated in this annual report whether or not there were significant changes in internal controls or in other factors that could significantly affect internal controls subsequent to the date of our most recent evaluation, including any corrective actions with regard to significant and material weaknesses.

Date: March 24, 2003

_____
    /s/  JERRY L. MOSINGO
Jerry L. Mosingo
*President & Chief Executive Officer*

57

**CERTIFICATION PURSUANT TO SECTION 302
OF THE SARBANES-OXLEY ACT OF 2002**

I, J. Michael Stepp, certify that:

1. I have reviewed this annual report on Form 10-K of Collins & Aikman Corporation;

2. Based on my knowledge, this annual report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this annual report;

3. Based on my knowledge, the financial statements, and other financial information included in this annual report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this annual report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-14 and 15d-14) for the registrant and we have:

    a. Designed such disclosure controls and procedures to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this annual report is being prepared;

    b. Evaluated the effectiveness of the registrant's disclosure controls and procedures as of a date within 90 days prior to the filing date of this annual report (the "Evaluation Date"); and

    c. Presented in this annual report our conclusions about the effectiveness of the disclosure controls and procedures based on our evaluation as of the Evaluation Date;

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation, to the registrant's auditors and the audit committee of registrant's board of directors:

    a. All significant deficiencies in the design or operation of internal controls which could adversely affect the registrant's ability to record, process, summarize and report financial data and have identified for the registrant's auditors any material weaknesses in internal controls; and

    b. Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal controls; and

6. The registrant's other certifying officer and I have indicated in this annual report whether or not there were significant changes in internal controls or in other factors that could significantly affect internal controls subsequent to the date of our most recent evaluation, including any corrective actions with regard to significant and material weaknesses.

Date: March 24, 2003

    /s/   J. MICHAEL STEPP
_____
J. Michael Stepp
*Vice Chairman and Chief Financial Officer*
*(Principal Financial Officer)*

58

## REPORT OF INDEPENDENT ACCOUNTANTS

To the Board of Directors and Shareholders
of Collins & Aikman Corporation:

In our opinion, the 2002 and 2001 consolidated financial statements listed in the index appearing under Item 15(a)(1) present fairly, in all material respects, the financial position of Collins & Aikman Corporation and its subsidiaries at December 31, 2002 and 2001, and the results of their operations and their cash flows for the years then ended in conformity with accounting principles generally accepted in the United States of America. In addition, in our opinion, the financial statement schedules listed in the index appearing under Item 15(a)(2) present fairly, in all material respects, the 2002 and 2001 information set forth therein when read in conjunction with the related consolidated financial statements. These financial statements and financial statement schedules are the responsibility of the Company's management; our responsibility is to express an opinion on these financial statements and financial statement schedules based on our audits. We conducted our audits of these statements in accordance with auditing standards generally accepted in the United States of America, which require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion. The financial statements of Collins & Aikman Corporation as of December 31, 2000, and for the year then ended, were audited by other independent accountants who have ceased operations. Those independent accountants expressed an unqualified opinion on those financial statements in their report dated February 14, 2001 (except with respect to the matter discussed in Note 24 (which in the current report on Form 10-K is Note 23), as to which the date is March 28, 2002).

As discussed in Note 2 to the consolidated financial statements, effective January 1, 2002, the Company changed its method of accounting for goodwill in accordance with the adoption of Statement of Financial Accounting Standards No. 142, "Goodwill and Other Intangible Assets".

/s/ PRICEWATERHOUSECOOPERS LLP

Detroit, Michigan
February 18, 2003

F-1

**The following report is a copy of a report previously issued by Arthur Andersen LLP, which has ceased operations, and has not been reissued by Arthur Andersen LLP. Note 24 referenced below is Note 23 and Item 14(a)(2) referenced below is Item 15(a)(2) in the current report on Form 10-K.**

### REPORT OF INDEPENDENT PUBLIC ACCOUNTANTS

To Collins & Aikman Corporation:

We have audited the accompanying consolidated balance sheet of Collins & Aikman Corporation (a Delaware Corporation) and subsidiaries as of December 31, 2000 and the related consolidated statements of operations, cash flows, and common stockholders' deficit for each of the two fiscal years in the period ended December 31, 2000, as listed in the index appearing under Item 15(a)(1). These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audits in accordance with auditing standards generally accepted in the United States. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the financial statements referred to above present fairly, in all material respects, the financial position of Collins & Aikman Corporation and subsidiaries as of December 31, 2000 and the results of their operations and their cash flows for each of the two fiscal years in the period ended December 31, 2000, in conformity with accounting principles generally accepted in the United States.

Our audit was made for the purpose of forming an opinion on the basic financial statements taken as a whole. The schedule listed in the index appearing under item 14(a)(2) is presented for purposes of complying with the Securities and Exchange Commission's rules and is not part of the basic financial statements. This schedule has been subjected to the auditing procedures applied in the audit of the basic financial statements and, in our opinion, fairly states in all material respects the financial data required to be set forth therein in relation to the basic financial statements taken as a whole.

/s/ ARTHUR ANDERSEN LLP

Charlotte, North Carolina,
February 14, 2001 (except with respect to the matter discussed in Note 24,
as to which the date is March 28, 2002)

COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES

CONSOLIDATED STATEMENTS OF OPERATIONS

(in millions, except per share data)

| | Year Ended | | |
|---|---|---|---|
| | December 31, 2002 | December 31, 2001 | December 31, 2000 |
| Net sales | $3,885.8 | $1,823.3 | $1,901.8 |
| Cost of goods sold | 3,367.7 | 1,604.5 | 1,635.2 |
| Gross profit | 518.1 | 218.8 | 266.6 |
| Selling, general and administrative expenses | 293.5 | 164.4 | 158.5 |
| Restructuring charge and impairment of long-lived assets | 56.9 | 18.8 | — |
| Operating income | 167.7 | 35.6 | 108.1 |
| Interest expense, net of interest income of $1.4, $2.0 and $3.4 | 148.9 | 84.3 | 96.6 |
| Loss on sale of receivables | 4.2 | 10.8 | 9.2 |
| Subsidiary preferred stock dividends | 30.8 | 1.5 | — |
| Subsidiary preferred stock accretion | 7.6 | 0.9 | — |
| Other expense, net | 10.0 | 6.4 | 1.5 |
| Income (loss) from continuing operations before income taxes | (33.8) | (68.3) | 0.8 |
| Income tax (benefit) expense | 17.5 | (18.6) | 2.2 |
| Loss from continuing operations before extraordinary loss and cumulative effect of a change in accounting principle | (51.3) | (49.7) | (1.4) |
| Income from discontinued operations, net of income taxes of $6.3, $5.7 and $4.4 | 9.5 | 8.8 | 6.6 |
| Income (loss) before extraordinary loss and cumulative effect of change in accounting principle | (41.8) | (40.9) | 5.2 |
| Extraordinary loss on retirement of debt, net of income taxes of $2.7 and $0.5 | — | (5.3) | (0.7) |
| Cumulative effect of a change in accounting principle, net of income taxes of $0 | (11.7) | — | — |
| Net income (loss) | $ (53.5) | $ (46.2) | $ 4.5 |
| Earnings per share data: | | | |
| Net income (loss) | $ (53.5) | $ (46.2) | $ 4.5 |
| Loss on redemption of subsidiary preferred stock | (36.3) | — | — |
| Net income (loss) available to common shareholders | $ (89.8) | $ (46.2) | $ 4.5 |
| Net income (loss) per basic and diluted common share: | | | |
| Continuing operations | $ (1.15) | $ (1.28) | $ (0.06) |
| Discontinued operations | 0.12 | 0.23 | 0.27 |
| Extraordinary loss | — | (0.14) | (0.03) |
| Cumulative effect of a change in accounting principle | (0.15) | — | — |
| Net income (loss) available to common shareholders | $ (1.18) | $ (1.19) | $ 0.18 |
| Average common shares outstanding: | | | |
| Basic and diluted | 76.3 | 38.9 | 24.8 |

The Notes to Consolidated Financial Statements are an integral
part of these consolidated financial statements.

## COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES

### CONSOLIDATED BALANCE SHEETS
### (in millions)

| | December 31, 2002 | December 31, 2001 |
|---|---|---|
| **ASSETS** | | |
| Current Assets: | | |
| Cash and cash equivalents | $ 81.3 | $ 73.9 |
| Accounts and other receivables, net of allowances of $18.6 and $14.6. | 373.0 | 406.1 |
| Inventories | 171.6 | 132.6 |
| Other | 177.4 | 131.9 |
| Total current assets | 803.3 | 744.5 |
| Property, plant and equipment, net | 737.8 | 612.6 |
| Deferred tax assets | 165.0 | 136.5 |
| Goodwill | 1,265.5 | 1,253.8 |
| Intangible assets, net | 85.3 | 23.6 |
| Other assets | 100.2 | 216.9 |
| | $3,157.1 | $2,987.9 |
| **LIABILITIES AND COMMON STOCKHOLDERS' EQUITY** | | |
| Current Liabilities: | | |
| Short-term borrowings | $ 10.5 | $ 25.6 |
| Current maturities of long-term debt | 23.5 | 19.9 |
| Accounts payable | 580.5 | 468.7 |
| Accrued expenses | 314.9 | 249.4 |
| Total current liabilities | 929.4 | 763.6 |
| Long-term debt and capital lease obligations | 1,255.2 | 1,282.6 |
| Other, including pensions and post-retirement benefit obligations | 438.4 | 402.5 |
| Commitments and contingencies | | |
| Minority interest in consolidated subsidiary | 12.7 | 15.2 |
| Mandatorily redeemable preferred stock of subsidiary | 123.9 | 149.3 |
| Common stock ($.01 par value, 300.0 shares authorized, 83.6 shares issued and outstanding at December 31, 2002 and 300.0 shares authorized, 67.2 shares issued and outstanding at December 31, 2001) | 0.8 | 0.7 |
| Other paid-in capital | 1,282.3 | 1,124.1 |
| Accumulated deficit | (772.6) | (682.8) |
| Accumulated other comprehensive loss | (113.0) | (67.3) |
| Total common stockholders' equity | $ 397.5 | $ 374.7 |
| | $3,157.1 | $2,987.9 |

The Notes to Consolidated Financial Statements are an integral
part of these consolidated financial statements.

F-4

### COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES

### CONSOLIDATED STATEMENTS OF CASH FLOWS
#### (in millions)

| | Year Ended | | |
| --- | --- | --- | --- |
| | December 31, 2002 | December 31, 2001 | December 31, 2000 |
| **OPERATING ACTIVITIES** | | | |
| Net income (loss) | $ (53.5) | $ (46.2) | $ 4.5 |
| Adjustments to derive cash flow operating activities: | | | |
| Impairment of goodwill | 11.7 | — | — |
| Impairment of long-lived assets | 19.3 | 7.6 | — |
| Deferred income tax expense (benefit) | (3.6) | (26.0) | (10.0) |
| Subsidiary preferred stock requirements | 38.4 | 2.4 | — |
| Depreciation | 97.0 | 64.2 | 59.1 |
| Goodwill amortization | — | 7.1 | 7.1 |
| Amortization of other assets | 20.0 | 10.5 | 8.5 |
| Loss (gain) on sale of property, plant and equipment | 3.4 | 8.7 | (1.0) |
| Decrease in accounts and other receivables | 23.7 | 135.0 | 78.2 |
| Proceeds from (reduction of) participating interests in accounts receivable, net of redemptions | (13.9) | (2.6) | (34.0) |
| Decrease (increase) in inventories | (26.6) | 53.4 | 0.9 |
| Increase (decrease) in accounts payable | 35.1 | (31.9) | (20.0) |
| Undistributed equity in earnings of joint ventures | 5.5 | — | — |
| Increase (decrease) in interest payable | (4.0) | (4.1) | 3.4 |
| Changes in other assets | 62.4 | (6.5) | 24.5 |
| Changes in other liabilities | (25.4) | (30.6) | (23.9) |
| Net cash provided by operating activities | 189.5 | 141.0 | 97.3 |
| **INVESTING ACTIVITIES** | | | |
| Additions to property, plant and equipment | (147.9) | (54.5) | (69.0) |
| Sales of property, plant and equipment | 13.3 | 88.1 | 5.6 |
| Additional investment in joint venture | (5.9) | — | — |
| Acquisitions of businesses, net of cash acquired | (6.8) | (760.9) | — |
| Payment of acquisition costs | (38.8) | — | — |
| Sale of business | — | 3.5 | — |
| Net cash used in investing activities | (186.1) | (723.8) | (63.4) |
| **FINANCING ACTIVITIES** | | | |
| Issuance of long-term debt | — | 950.0 | — |
| Debt issuance costs | — | (59.4) | — |
| Repayment of long-term debt | (23.9) | (383.2) | (66.6) |
| Repurchase of preferred stock | (100.0) | — | — |
| Increase (decrease) in short-term borrowings | (16.0) | 10.1 | 0.2 |
| Net borrowings (repayments) on revolving credit facilities | — | (150.2) | 39.0 |
| Net proceeds from issuance of common stock | 150.6 | 207.2 | — |
| Reissue of treasury stock, net | — | 61.3 | 0.4 |
| Repayment of debt assumed in acquisition | (6.7) | — | — |
| Net cash provided by (used in) financing activities | 4.0 | 635.8 | (27.0) |
| Increase in cash and cash equivalents | 7.4 | 53.0 | 6.9 |
| Cash and cash equivalents at beginning of year | 73.9 | 20.9 | 14.0 |
| Cash and cash equivalents at end of year | $ 81.3 | $ 73.9 | $ 20.9 |
| Supplementary information: | | | |
| Debt assumed in acquisition | $ 6.7 | $ — | $ — |
| Taxes paid | $ 12.8 | $ 15.5 | $ 4.8 |
| Interest paid | $ 139.9 | $ 76.3 | $ 94.8 |

The Notes to Consolidated Financial Statements are an integral
part of these consolidated financial statements.

F-5

## COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES

## CONSOLIDATED STATEMENTS OF COMMON STOCKHOLDERS' EQUITY (DEFICIT)
### (in millions)

| | Current Year Comprehensive Income (Loss) | Total | Accumulated Deficit | Accumulated Other Comprehensive Loss(a) | Common Stock | Other Paid-in Capital | Treasury Stock |
|---|---|---|---|---|---|---|---|
| **Balance at December 25, 1999** | | $(151.1) | $(641.1) | $ (33.3) | $0.3 | $ 585.9 | $(62.9) |
| Comprehensive income: | | | | | | | |
| Net Income | $ 4.5 | 4.5 | 4.5 | — | — | — | — |
| Other comprehensive income, net of tax: | | | | | | | |
| Foreign currency translation adjustments | (10.4) | (10.4) | — | (10.4) | — | — | — |
| Pension equity adjustment(b) | 0.8 | 0.8 | — | 0.8 | — | — | — |
| | $ (5.1) | | | | | | |
| Compensation expense | | 0.9 | — | — | — | 0.9 | — |
| Purchase of treasury stock (0.4 shares) | | (0.5) | — | — | — | — | (0.5) |
| Exercise of stock options (0.2 shares) | | 0.9 | — | — | — | (0.9) | 1.8 |
| **Balance at December 31, 2000** | | (154.9) | (636.6) | (42.9) | 0.3 | 585.9 | (61.6) |
| Comprehensive income: | | | | | | | |
| Net loss | $(46.2) | (46.2) | (46.2) | — | — | — | — |
| Other comprehensive income: | | | | | | | |
| Foreign currency translation adjustments | (9.0) | (9.0) | — | (9.0) | — | — | — |
| Pension equity adjustment, net of tax(b) | (15.4) | (15.4) | — | (15.4) | — | — | — |
| | $(70.6) | | | | | | |
| Compensation expense | | 1.2 | — | — | — | 1.2 | — |
| Issuance of common stock | | 533.0 | — | — | 0.4 | 532.6 | — |
| Reissue of treasury stock (8.5 shares) | | 61.3 | — | — | — | (0.3) | 61.6 |
| Exercise of stock options (1.1 shares) | | 4.7 | — | — | — | 4.7 | — |
| **Balance at December 31, 2001** | | 374.7 | (682.8) | (67.3) | 0.7 | 1,124.1 | — |
| Comprehensive income: | | | | | | | |
| Net loss | $(53.5) | (53.5) | (53.5) | — | — | — | — |
| Other comprehensive income: | | | | | | | |
| Foreign currency translation adjustments | 10.7 | 10.7 | — | 10.7 | — | — | — |
| Pension equity adjustment, net of tax(b) | (56.4) | (56.4) | — | (56.4) | — | — | — |
| | $(99.2) | | | | | | |
| Loss on redemption of subsidiary preferred stock | | (36.3) | (36.3) | — | — | — | — |
| Issuance of common stock | | 157.2 | — | — | 0.1 | 157.1 | — |
| Exercise of stock options (0.1 shares) | | 1.1 | — | — | — | 1.1 | — |
| **Balance at December 31, 2002** | | $ 397.5 | $(772.6) | $(113.0) | $0.8 | $1,282.3 | $ — |

(a) The components of Accumulated Other Comprehensive Loss are $40.9 million of foreign currency translation adjustment and $72.1 million of pension equity adjustment as of December 31, 2002.

(b) For 2002, 2001 and 2000 the tax effect of the pension equity adjustment is $42.6 million, $3.2 million, and $0.4 million, respectively.

The Notes to Consolidated Financial Statements are an integral part of these consolidated financial statements.

COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

## 1. Organization

Collins & Aikman Corporation (the "Company") is a Delaware corporation, headquartered in Troy, Michigan. The Company conducts all of its operating activities through its wholly owned Collins & Aikman Products Co. ("Products") subsidiary. The Company is a global leader in design, engineering and manufacturing of automotive interior components, including instrument panels, fully assembled cockpit modules, floor and acoustic systems, automotive fabric, interior trim and convertible top systems. The Company operates through three divisions: North American Automotive Interior Systems, European and Rest of World Automotive Interior Systems and Specialty Automotive Products.

During February 2001, Heartland Industrial Partners, L.P. and its affiliates ("Heartland") acquired a controlling interest equal to approximately 60% of the Company through a purchase of 25 million shares of common stock from the Company and a purchase of 27 million shares from Blackstone Partners and WP Partners. As a result of the sale of shares, the Company received gross proceeds of $125.0 million, or approximately $94.6 million after fees and expenses associated with the transactions. The Company also received a profit participation right that it shares with Blackstone Partners and WP Partners on future common stock sales by Heartland to non-permitted transferees subject to a limit, in the case of the Company, of approximately $6.25 million. As a result of the above transactions ("Heartland Transaction"), Heartland is entitled to designate a majority of the Company's Board of Directors.

The Company completed its acquisition of Becker Group, LLC, a supplier of plastic components to the automotive industry and the automotive fabric operations of Joan Fabrics and an affiliate in July and September 2001, respectively. The acquisitions included the issuance of approximately 30 million shares of common stock with a market value of $169.3 million.

In December 2001, the Company completed its acquisition of Textron Automotive Company's ("Textron's") automotive trim division ("TAC-Trim") for $940 million. The purchase price consisted primarily of: $632.2 million in cash and assumed debt; 18 million shares of common stock, with a market value of $160.9 million; and preferred stock of Products with an aggregate liquidation preference of $326.4 million, valued at $146.9 million. The cash purchase price was financed through a combination of the sale of an additional 12.8 million shares of common stock, valued at $160.0 million, to Heartland and debt financing.

On December 31, 2002, Heartland owned approximately 36% of the outstanding shares; Blackstone Partners' and WP Partners' owned approximately 11%; Joan Fabrics Corp., Mr. Elkin McCallum and associates owned approximately 7%; Mr. Charles E. Becker and Textron, Inc. each owned approximately 9%.

## 2. Summary of Significant Accounting Policies

Basis of Presentation:   The consolidated financial statements include the accounts of the Company and its consolidated subsidiaries and in the opinion of management, contain all adjustments, including adjustments of a normal and recurring nature, necessary for a fair presentation of financial position and results of operations. All significant intercompany items have been eliminated in the preparation of the consolidated financial statements. Certain prior year items have been reclassified to conform with the fiscal 2002 presentation.

Investments in entities in which the Company has control are consolidated. Investments in 50% or less owned entities in which the Company has significant influence have been accounted for under the equity method. In connection with the 2001 TAC-Trim acquisition, the Company acquired a 50% interest in Textron Automotive Holdings (Italy) S.r.L., an Italian joint venture, of which Textron indirectly owned the other 50% interest. The Company accounted for this investment under the equity method, the Company did not control the joint venture prior to December 31, 2002 but was required to provide certain administrative, technical and engineering services and to license certain patents and other know how to the Italian joint venture. The Company recorded certain fees and reimbursement of certain expenses in providing these services and

**COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

licensing these rights. In December 2002, the Company signed a letter-of-intent to purchase the remaining 50% and began consolidating the joint venture as of December 31, 2002. In January 2003, the Company acquired from Textron the remaining 50% interest in the Italian joint venture.

**Reverse Stock Split:**   On May 28, 2002, the Company effected a one-for-2.5 reverse stock split of the Company's common stock. All shares and per share data have been adjusted retroactively for all periods presented to reflect the stock split.

**Use of Estimates:**   The preparation of consolidated financial statements in conformity with generally accepted accounting principles requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the consolidated financial statements and the reported amounts of revenues and expenses during the reporting period. Management believes its assumptions and estimates are reasonable and appropriate, however actual results could differ from those estimates.

**Fiscal Year:**   During fiscal 2000, the Company changed its fiscal year-end to a calendar year-end. The 2000 fiscal year-end consisted of 53 weeks, which ended on December 31, 2000.

**Employee Stock Options:**   SFAS No. 148, "Accounting for Stock-Based Compensation — Transition and Disclosure amended SFAS No. 123, "Accounting for Stock-Based Compensation" to provide alternative methods of transition for a voluntary change to the fair value based method of accounting for stock based employee compensation and amended the required disclosures. SFAS No. 123 encourages companies to adopt the fair value method for compensation expense recognition related to employee stock options. The accounting requirements of Accounting Principles Board Opinion (APB) No. 25 use the intrinsic value method in determining compensation expense, which represents the excess of the market price of the stock over the exercise price on the measurement date. The Company has elected to continue to utilize the accounting provisions of APB No. 25 for stock options, and is required to provide pro forma disclosures of net income and earnings per share had the Company adopted the fair value method for recognition purposes. The following tabular information is presented as if the Company had adopted SFAS No. 123 and restated its results: (in millions, except per share amounts).

|  | Fiscal Year Ended | | |
|---|---|---|---|
|  | December 31, 2002 | December 31, 2001 | December 31, 2000 |
| Net income (loss) available to shareholders: |  |  |  |
|    As reported . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $(89.8) | $(46.2) | $ 4.5 |
| Total employee stock based compensation expense determined under fair value based method for all awards, net of tax . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (3.4) | (2.4) | (2.4) |
|    Pro forma, net income (loss) . . . . . . . . . . . . . . . . . . | (93.2) | (48.6) | 2.1 |
| Basic and Diluted EPS(a): |  |  |  |
|    As reported . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $(1.18) | $(1.19) | $0.18 |
|    Pro forma . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (1.22) | (1.25) | 0.08 |

(a)  Adjusted to reflect the impact of the reverse stock split.

**Earnings Per Share:**   Basic earnings per share is based on income available to common shareholders divided by the weighted average number of common shares outstanding. Diluted earnings per share is based on income available to common shareholders divided by the sum of the weighted average number of common shares outstanding and all potentially dilutive common shares. Potentially dilutive common shares include

**COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

shares which may be issued upon the assumed exercise of employee stock options less the number of treasury shares assumed to be purchased from the proceeds, including applicable compensation expense (Note 16).

Cash and Cash Equivalents:   Cash and cash equivalents include all cash balances and highly liquid investments with an original maturity of three months or less.

Accounts and Other Receivables:   Accounts and other receivables consist primarily of the Company's trade receivables and the retained interest in the Receivables Facility (See Note 11). The Company has provided an allowance against uncollectible accounts.

Inventories:   Inventories are valued at the lower of cost or market, but not in excess of net realizable value. Cost is determined on the first-in, first-out basis.

Property, Plant and Equipment:   Property, plant and equipment are stated at cost. Normal repairs and maintenance are expensed as incurred. Provisions for depreciation are primarily computed on a straight-line basis over the estimated useful lives as follows: 10-20 years for land improvements, 20-40 years for buildings, and 3-11 years for machinery and equipment. Leasehold improvements are amortized over the lesser of the lease term or the estimated useful lives of the improvements.

Long-Lived Assets:   Statement of Financial Accounting Standards ("SFAS") No. 121, "Accounting for the Impairment of Long-Lived Assets and for Long-Lived Assets to be Disposed of", established accounting standards for the impairment of long-lived assets, certain identifiable intangibles, and goodwill related to those assets to be held and used and for long-lived assets and certain identifiable intangibles to be disposed. SFAS No. 121 requires that long-lived assets and certain identifiable intangibles to be held and used by an entity be reviewed for impairment whenever events or changes in circumstances indicate that the carrying amount of an asset may not be recoverable, and that certain long-lived assets and identifiable intangibles to be disposed of be reported at the lower of carrying amount or fair value less cost to sell. In August 2001, this statement was superseded by the issuance of SFAS No. 144, "Accounting for the Impairment or Disposal of Long-Lived Assets." The statement retains the previously existing accounting requirements related to the recognition and measurement of the impairment of long-lived assets to be held and used while expanding the measurement requirements of long-lived assets to be disposed of by sale to include discontinued operations. It also expands the previously existing reporting requirements for discontinued operations to include a component of an entity that either has been disposed of or is classified as held for sale. The Company implemented SFAS No. 144 on January 1, 2002. This statement did not have a material impact on the Company's consolidated financial position or results of operations. During 2002, the Company incurred asset impairment charges of $18.0 million recognized as part of restructuring programs (Note 15). In addition, during fiscal 2001, the Company incurred a charge of $7.6 million relating to asset impairments recognized in the Reorganization (See Note 15).

Goodwill and Intangibles:   During the second quarter of 2002, the Company completed the implementation of SFAS 142, "Goodwill and Other Intangible Assets". Under SFAS 142, goodwill is no longer amortized. Instead, goodwill and indefinite-lived intangible assets are tested for impairment in accordance with the provisions of SFAS 142. The Company employed a discounted cash flow analysis and a market comparable approach in conducting its impairment tests. The Company completed its initial impairment test in the second quarter of 2002 and recorded an impairment loss of $11.7 million (having no tax impact), or $0.15 per average basic and diluted share relating to the UK Plastics business in the European and Rest of World Automotive Systems segment. The impairment loss was reported as a cumulative effect of a change in accounting principle and, therefore, is accounted for as if it occurred on January 1, 2002. The Company completed this test again as of November 1, which indicated that the fair value of the reporting units exceeded the carrying values. Fair value was determined based upon the discounted cash flows of the reporting units using discount rates ranging from 11.5% to 14.0% dependant on the reporting unit and a residual growth rate of 2%. The market comparable approach consisted of an earnings multiple of 5 times forecasted EBITDA (operating income less — interest, taxes, depreciation and amortization) and a control premium on equity.

**COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

Future cash flows and EBITDA are affected by future operating performance, which will be impacted by economic conditions, car builds, financial, business and other factors, many of which are beyond the Company's control. The North American Plastics reporting unit can be significantly impacted by an adverse change in assumptions. Considerable judgment is often involved in making these determinations, the use of different assumptions could result in significantly different results. Management believes its assumptions and estimates are reasonable and appropriate, however actual results could differ from those estimates.

Pension and Postretirement Benefits Other than Pensions:   Annual net periodic expense and benefit liabilities under our defined benefit plans are determined on an actuarial basis. Assumptions used in the actuarial calculations have a significant impact on plan obligations and expense. Each September, the Company reviews the actual experience compared to the more significant assumptions used and make adjustments to the assumptions, if warranted. The healthcare trend rates are reviewed with the actuaries based upon the results of their review of claims experience. Discount rates are based upon an expected benefit payments duration analysis and the equivalent average yield rate for high-quality fixed-income investments. Pension benefits are funded through deposits with trustees and the expected long-term rate of return on fund assets is based upon actual historical returns modified for known changes in the market and any expected change in investment policy. Postretirement benefits are not funded and our policy is to pay these benefits as they become due.

Certain accounting guidance, including the guidance applicable to pensions, does not require immediate recognition of the effects of a deviation between actual and assumed experience or the revision of an estimate. This approach allows the favorable and unfavorable effects that fall within an acceptable range to be netted. Although this netting occurs outside the basic financial statements, disclosure of the net amount is disclosed as an unrecognized gain or loss in the footnotes to our financial statements. Considerable judgment is often involved in making these determinations, the use of different assumptions could result in significantly different results. Management believes its assumptions and estimates are reasonable and appropriate, however actual results could differ from those estimates.

Revenue Recognition:   The Company recognizes revenue from product sales when it has shipped the goods. Products are shipped FOB supplier using customer designated transportation companies with title passing at that time. The Company generally allows its customers the right of return only in the case of defective products. The Company provides a reserve for estimated defective product costs at the time of the sale of the products.

Cost of Goods Sold and Selling, General and Administrative Costs:   Cost of goods sold is comprised of direct material, direct labor and manufacturing overhead. Manufacturing overhead consists of indirect labor, depreciation, amortization and other manufacturing expenses. Selling, general and administrative costs consist of selling, research and development, engineering and administrative expenses.

Other Expense, net:   In 2002, "other expenses, net" primarily included $12.6 million of losses related to derivatives used in the Company's foreign currency hedging strategy, $5.5 million of losses related to investments in joint ventures and $1.9 million of losses from sale and leaseback transactions offset by $5.9 million of foreign currency transaction gains and minority interest share of losses of a consolidated subsidiary of $6.5 million. In 2001, "other expenses, net" primarily included $7.8 million of foreign currency transaction losses and $8.2 million of losses from sale and leaseback transactions offset by $5.0 million of derivatives gains and $6.2 million related to a stock demutualization. In 2000, "other expenses, net" included primarily a $1.0 million derivative loss.

Customer Engineering and Tooling:   Engineering and tooling balances represent tools, dies and other items used in the manufacture of customer components. Amounts included in the consolidated balance sheets include Company-owned tools and costs incurred on customer-owned tools which are subject to reimbursement, pursuant to the terms of a customer contract. Company-owned tools balances are amortized over the

F-10

**COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

tool's expected life or the life of the related vehicle program, whichever is shorter. Engineering, testing and other costs incurred in the design and development of production parts are expensed as incurred, unless the costs are reimbursable, as specified in a customer contract.

Emerging Issue Task Force EITF Issue No. 99-5, "Accounting for Pre-Production Costs Related to Long-Term Supply Arrangements" (EITF No. 99-5) requires that design and development costs for products to be sold under long-term supply arrangements be expensed as incurred, and costs incurred for molds, dies and other tools that will be used in producing the products under long-term supply arrangements be capitalized and amortized over the shorter of the expected useful life of the assets or the term of the supply arrangement. The Company adopted the provisions of EITF No. 99-5 on a prospective basis on December 26, 1999.

The Company had assets of approximately $8.4 million and $22.7 million recognized pursuant to agreements that provide for contractual reimbursement of pre-production design and development costs, at December 31, 2002 and 2001, respectively. The Company also capitalized $77.1 million and $90.2 million in costs for molds, dies and other tools, at December 31, 2002 and 2001, respectively, that are reimbursable by customers. In addition, the Company had $11.0 million and $9.1 million at December 31, 2002 and 2001, respectively, for molds, dies and other tools that the Company owns.

Derivative Financial Instruments:  All derivatives are recognized on the consolidated balance sheet at fair value as required by SFAS 133 "Accounting for Derivative Instruments and Hedging Activities". Gains and losses on the changes in fair value of the derivatives that qualify as hedges under SFAS No. 133, are recorded on the Balance Sheet as a component of "Other comprehensive income" to the extent that the hedges are effective and documented, until the underlying transactions are recognized in earnings. As of December 31, 2002, the Company had no derivatives designated as hedges under SFAS No. 133. The Company uses derivatives to hedge economic risks even though these derivatives may not be designated as hedges in accordance with SFAS No. 133. These derivative instruments are marked to fair market value and reported on the balance sheet. Gains and losses on these instruments are reported in "Other Income" or "Other Expense" on the Consolidated Statements of Operations. The gains and losses are intended to offset economic risk of foreign currency transaction losses or gains. The Company does not enter into derivative transactions for speculative purposes.

Foreign Currency Translation:  Assets and liabilities of the Company's non-U.S. businesses generally are translated to U.S. Dollars at end-of-period exchange rates. The effects of the translations are reported as a component of "Other comprehensive income." Remeasurement of assets and liabilities of the Company's non-U.S. businesses that use the U.S. Dollar as functional currency are included in the Consolidated Statements of Operations as "Other income" or "Other expense". The Statement of Operations of the Company's non-U.S. businesses are translated to U.S. dollars at average exchange rates and are recognized as part of revenues, costs and expenses. Also included in "Other income" or "Other expense", are gains and losses arising from transactions denominated in a currency other than the functional currency of the business involved. Gains and losses resulting from foreign currency transactions are recognized in "Other income" or "Other expense".

Environmental:  The Company records an estimated loss when it is probable that an environmental liability has been incurred and the amount of the loss can be reasonably estimated. The Company also considers estimates of certain reasonably possible environmental liabilities in determining the aggregate amount of environmental reserves. The Company reviews all environmental claims from time to time and adjusts the reserves accordingly. Accruals for environmental liabilities are generally included in the consolidated balance sheet as other non-current liabilities at undiscounted amounts and exclude claims for recoveries from insurance or other third parties. Accruals for insurance or other third party recoveries for environmental liabilities are recorded when it is probable that the claim will be realized.

**COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

*New Accounting Pronouncements:*   In June 2002, the FASB issued SFAS No. 146 "Accounting for Costs Associated with Exit or Disposal Activities." This statement nullifies Emerging Issues Task Force (EITF) Issue No. 94-3, "Liability Recognition for Certain Employee Termination Benefits and Other Costs to Exit an Activity (including Certain Costs Incurred in a Restructuring)." This statement requires that a liability for a cost associated with an exit or disposal activity be recognized when the liability is incurred rather than the date of an entity's commitment to an exit plan. The Company is required to implement SFAS No. 146 on January 1, 2003. Management has not determined the impact, if any, that this statement will have on its consolidated financial position or results of operations.

In November 2002, the FASB issued FASB Interpretation (FIN) No. 45, "Guarantor's Accounting and Disclosure Requirements for Guarantees, Including Indirect Guarantees of Indebtedness of Others." FIN No. 45 requires a guarantor to recognize, at the inception of a qualified guarantee, a liability for the fair value of the obligation undertaken in issuing the guarantee. The Company is currently reviewing these recognition and measurement provisions, which are effective on a prospective basis for qualified guarantees issued or modified after December 31, 2002, to determine whether they will have a material impact on its consolidated financial statements. The disclosure requirements of FIN No. 45, which are effective for this quarter, are presented in the following paragraph.

In conjunction with divestitures and other transactions, the Company has provided indemnifications relating to legal and environmental issues, including products. The Company does not believe that any pending or threatened litigation or claims related to any such retained liabilities of discontinued operations are likely to result in any material loss.

In January 2003, the FASB issued FASB Interpretation No. 46 (FIN 46), "Consolidation of Variable Interest Entities, an interpretation of Accounting Research Bulletin No. 51, Consolidated Financial Statements." This interpretation provides guidance on the identification of variable interest entities, some of which may require consolidation based on factors beyond a majority voting interest. A variable interest entity is defined in FIN 46 as an entity in which either the equity investors (if any) do not have a controlling financial interest or the equity investment at risk is insufficient to finance that entity's activities without receiving additional subordinated financial support from other parties. FIN 46 applies immediately to variable interest entities created after January 31, 2003, and in the first fiscal year or interim period beginning after June 15, 2003, to variable interest entities in which an enterprise holds a variable interest that it acquired before February 1, 2003. The company is currently unaware of any entities that exist that would qualify as a variable interest entity.

**3.  Acquisitions and Goodwill**

*a.  Acquisitions*

The Company completed its acquisitions of Textron Automotive Company's automotive trim division ("TAC-Trim") in December 2001, the automotive fabric operations of Joan Fabrics and all of the operating assets in Joan Fabric's affiliated yarn dying operation Western Avenue Dyers (collectively "Joan") in September 2001, and Becker Group, LLC ("Becker") a supplier of plastic components to the automotive industry in July 2001. The results of operations of the acquired companies are included in the Company's consolidated statements of operations from the dates of acquisition.

Appraisals for Becker and Joan were performed during 2001 and the related allocation of purchase price was completed. In the second quarter 2002, the Company's external consultants completed the valuations of all TAC-Trim acquired intangible and fixed assets. Based upon these valuations: 1) an intangible asset of $51.0 million for customer contracts was recorded based on the value of individual customer contracts — this intangible asset is being amortized over the contract's performance period, which extends through 2012; 2) the Company revised its first quarter estimate for patents and other specifically identifiable intangible assets

**COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

acquired as part of the TAC-Trim purchase from $40.0 to $24.0 million (the weighted average lives increased from 7 to 10 years); and 3) in June 2002, the valuations resulted in a $30.1 million increase in fixed assets and adjustment of their useful lives. In September 2002, the Company revised its valuation resulting in a $27.7 million increase in fixed assets and adjustment of their useful lives, based upon revised information from external consultants. The allocation of the purchase price for the TAC-Trim acquisition was completed in 2002. The Becker, Joan and TAC-Trim acquisitions are intended to solidify the Company's position as a premier supplier of interior components and automotive fabrics.

*b.  Goodwill*

During the second quarter of 2002, the Company completed the implementation of SFAS 142, "Goodwill and Other Intangible Assets". Under SFAS 142, goodwill is no longer amortized. Instead, goodwill and indefinite-lived intangible assets are tested for impairment in accordance with the provisions of SFAS 142. In accordance with its impairment policy, the Company employed a discounted cash flow analysis in conducting its impairment tests. As required, the Company completed its initial impairment test for goodwill recorded as of December 31, 2001, in the second quarter 2002 and recorded an impairment loss of $11.7 million (having no tax impact), or $0.15 per average basic and diluted share relating to the UK Plastics business in the European and Rest of World Automotive Interior Systems segment. The impairment loss was reported as a cumulative effect of a change in accounting principle and, therefore, was accounted for as if it occurred on January 1, 2002. In addition, as required under SFAS 142 the Company subsequently completed an annual impairment test of goodwill and recorded no additional impairment.

In accordance with the provisions of SFAS 142, the Company did not amortize goodwill during 2002. If goodwill amortization had not been recorded during 2001, net loss would have decreased $6.1 million to an adjusted net loss of $40.1 million. The related loss per share for fiscal 2001 would have decreased $0.14 per share resulting in adjusted loss per share of $1.05. If goodwill amortization had not been recorded during 2000, net income would have increased $6.1 million to an adjusted net income of $10.6 million. The related income per share for fiscal 2000 would have increased $0.25 per share resulting in adjusted income per share of $0.43.

The changes in the carrying amounts of goodwill for the year ended December 31, 2002 were as follows (in millions):

| | North American Automotive Interior Systems | European and Rest of World Automotive Interior Systems | Specialty Automotive Products | Total |
|---|---|---|---|---|
| Balance as of December 31, 2001 . . . . . . | $1,037.4 | $ 23.3 | $193.1 | $1,253.8 |
| Goodwill acquired during the period . . | — | — | 11.0 | 11.0 |
| FAS 142 Impairment . . . . . . . . . . . . . . | — | (11.7) | — | (11.7) |
| Purchase accounting adjustments, related to fixed assets and intangibles . . . . . . . . . . . . . . . . . . . . | (75.0) | — | — | (75.0) |
| Other adjustments, net(A) . . . . . . . . . . | 79.0 | 3.5 | 4.9 | 87.4 |
| Balance as of December 31, 2002 . . . . . | $1,041.4 | $ 15.1 | $209.0 | $1,265.5 |

(A) Includes effect of foreign currency translation.

**COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

*c.  Intangible Assets*

The components of the Company's acquired and other amortizable intangible assets as of December 31, 2002 were as follows (in millions):

|  | Cost | Accumulated Amortization | Net Carrying Amount |
|---|---|---|---|
| Customer contracts ................................... | $ 51.0 | $ 6.3 | $44.7 |
| Patents and other ..................................... | 31.5 | 3.5 | 28.0 |
| Non-compete agreement ............................. | 18.0 | 5.4 | 12.6 |
|  | $100.5 | $15.2 | $85.3 |

Amortization expense for intangible assets for the periods ending December 31, 2003, 2004, 2005, 2006, and thereafter will be $14.1, $15.5, $15.6, $13.1, and $27.1, respectively.

**4.  Inventories**

Inventory balances are summarized below (in millions):

|  | December 31, 2002 | December 31, 2001 |
|---|---|---|
| Raw materials .............................................. | $ 90.3 | $ 73.8 |
| Work in process ........................................... | 33.7 | 25.6 |
| Finished goods ............................................ | 47.6 | 33.2 |
|  | $171.6 | $132.6 |

**5.  Other Current Assets**

Other current asset balances are summarized below (in millions):

|  | December 31, 2002 | December 31, 2001 |
|---|---|---|
| Deferred tax asset .......................................... | $ 25.3 | $ 25.3 |
| Reimbursable tooling and preproduction design and development .... | 83.0 | 53.7 |
| Other ...................................................... | 69.1 | 52.9 |
|  | $177.4 | $131.9 |

**COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

### 6. Property, Plant and Equipment, Net

Property, plant and equipment, net, are summarized below (in millions):

|  | December 31, 2002 | December 31, 2001 |
|---|---|---|
| Land and improvements | $ 26.1 | $ 25.5 |
| Buildings | 177.8 | 168.8 |
| Machinery and equipment | 959.6 | 823.3 |
| Leasehold improvements | 27.4 | 11.7 |
| Construction in progress | 106.2 | 45.0 |
|  | 1,297.1 | 1,074.3 |
| Less accumulated depreciation | (559.3) | (461.7) |
|  | $ 737.8 | $ 612.6 |

### 7. Accrued Expenses

Accrued expenses are summarized below (in millions):

|  | December 31, 2002 | December 31, 2001 |
|---|---|---|
| Payroll and employee benefits | $ 52.9 | $ 48.4 |
| Interest | 10.8 | 14.8 |
| Insurance | 16.9 | 39.0 |
| Restructuring reserves | 28.2 | 8.0 |
| Taxes payable | 12.0 | 4.6 |
| Other | 194.1 | 134.6 |
|  | $314.9 | $249.4 |

### 8. Short-Term Borrowings

The Company utilizes uncommitted lines of credit to satisfy a portion of its short-term working capital requirements of certain of its foreign affiliates. As of December 31, 2002, the Company had unsecured lines of credit from financial institutions of $36.5 million, of which $10.5 million was outstanding with $26.0 million available. The weighted average interest rate on the outstanding borrowings at December 31, 2002 was approximately 8.3%.

**COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

## 9.   Long-Term Debt and Capital Lease Obligations

Long-term debt and capital lease obligations are summarized below (in millions):

|  | December 31, 2002 | December 31, 2001 |
|---|---|---|
| Senior Secured Credit Facilities: |  |  |
| Tranche A Term Loan Facility | $   83.8 | $   100.0 |
| Tranche B Term Loan Facility | 293.8 | 300.0 |
| Revolving Credit Facility | — | — |
| Public Debt: |  |  |
| 11½% Senior Subordinated Notes, due 2006 | 400.0 | 400.0 |
| 10¾% Senior Notes, due 2011 | 500.0 | 500.0 |
| Other (including capital lease obligations) | 1.1 | 2.5 |
| Total debt | 1,278.7 | 1,302.5 |
| Less current maturities (including current portion of capital lease obligations) | (23.5) | (19.9) |
| Total Long-term debt and capital lease obligations | $1,255.2 | $1,282.6 |

### *Senior Secured Credit Facilities*

In December 2001, in conjunction with the TAC-Trim acquisition, the Company entered into new Senior Secured Credit Facilities, which refinanced its prior bank credit facilities. The principal and interest on the prior bank credit facilities totaled $362.5 million. The cost and expenses associated with the refinancing of the prior bank credit facilities totaling $25.7 million were deferred and will be amortized over the four-year life of the term loans described below. In addition, the Company incurred a $5.0 million, net of tax, extraordinary charge in connection with the retirement of the prior bank credit facilities.

The Senior Secured Credit Facilities include a floating rate Revolving Facility and two floating rate Term Loan Facilities that mature on December 31, 2005. The Revolving Facility allows the Company to borrow revolving loans up to $175.0 million including Canadian dollars up to $75.0 million. The facility can be utilized for letters of credit. The Term Loan Facilities consist of a Tranche A Term Loan with an original principal balance of $100.0 million and a Tranche B Term Loan with an original principal balance of $300.0 million. As required by the credit agreement, the full amounts of the Term Loan Facilities were drawn down on the closing date. As of December 31, 2002 the Tranche A Term Loan and Tranche B Term Loan had principal balances of $83.8 million and $293.8 million, respectively. Amounts borrowed under the Term Loan Facilities that are repaid or prepaid cannot be reborrowed. The Tranche A Term Loan Facility is payable in quarterly installments that increase in amounts each year until maturity. The Tranche B Term Loan Facility is payable in quarterly installments of $0.8 million for the first three years and quarterly installments of $72.7 million during the final year.

Under the Senior Secured Credit Facilities, the interest rate on the Revolving Facility is, at the Company's option, London Inter-Bank Offer Rate ("LIBOR") plus 3.75% or the Alternate Base Rate ("ABR") plus 2.75%. The ABR is the highest of The JP Morgan Chase ("Chase's") announced prime rate, the Federal Funds Rate plus 0.5% and Chase's base certificate of deposit rate plus 1%. A per annum fee equal to the spread over the LIBOR accrue on the face amount of letters of credit. Also, there is a 1.00% commitment fee on the unused portion of the facility. The interest rates on the Canadian-dollar denominated debt is at the Company's option (the "Canadian Prime Rate") plus 3.75% or the bill of exchange rate ("Bankers' Acceptance" or "BA") denominated in Canadian dollars for one, two, three or six months plus

**COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

2.75%. The interest rate on the Tranche A Term Loan Facility is, at the Company's option, LIBOR plus 3.75% or the ABR plus 2.75%, subject to adjustment quarterly, based on performance targets. The interest rate on the Tranche B Term Loan Facility is, at the Company's option, either LIBOR plus 4.00% or ABR plus 3.00%. On any Tranche B Term Loans repaid whether voluntary or mandatory, there is a prepayment premium of 3.00% the first year, 2.00% the second year and 1.00% the third year. The LIBOR rate shall not be less than 3.00% per annum. The weighted average rate of interest on the Senior Secured Credit Facilities at December 31, 2002 and 2001 was 6.94% and 7.67%, respectively.

Borrowings under the Senior Secured Credit Facility are secured by a first priority lien on the assets of the Company, Products and its U.S. and Canadian subsidiaries with certain exceptions including assets included in the Company's receivables facility, certain scheduled assets, and certain assets whose value relative to cost of lien perfection was deemed too low to include, as well as a pledge of stock of Products and its significant subsidiaries and certain intercompany debt and guarantees from the Company and its U.S. subsidiaries (subject to certain exceptions).

The Senior Secured Credit Facilities contain restrictive covenants including maintenance of interest coverage and leverage ratios and various other restrictive covenants that are customary for such facilities. The covenants of the Senior Credit Facilities limit investments, dividends or other distributions of capital stock, capital expenditures, the purchase of Preferred Stock of subsidiary, the prepayment of debt other than loans under the senior credit facilities, liens and certain lease transactions. Should the Company sell assets or incur debt over $20.0 million, proceeds must be used to pre-pay the term loans in an amount based on excess cash flow as measured by the leverage ratio performance. The covenants permit the payment of dividends on the Preferred Stock not to exceed 8% per annum unless at least 50% of the Senior Secured Term Loan Facilities are repaid or the proforma total Leverage Ratio is less than 2.5 to 1. The covenants require; that the interest coverage ratio be less than 2.35 to 1.00 for the quarter ended December 31, 2002, increasing each quarter with an ultimate ratio of 3.25 to 1.00 on December 31, 2005, and that the leverage ratio be no greater than 4.25 to 1.00 on December 31, 2002 decreasing each quarter with an ultimate ratio of 3.00 to 1.00 on December 31, 2005. The Company's sources of liquidity may be inadequate if it is unable to successfully integrate acquired businesses in accordance with its expectations, economic conditions worsen, or the Company is unable to meet financial or operating covenants as a result of the foregoing. The Company continues to explore other sources of liquidity, including additional debt, but existing debt instruments may limit the Company's ability to incur additional debt, and the Company may be unable to secure equity or other financings. The Company also believes it could obtain favorable modifications related to existing debt instruments and related covenants.

Effective December 2002, the Company amended its Senior Credit Facilities to provide for the purchase of certain assets in Spain and Portugal as well as the remaining 50% interest in the Company's joint venture in Italy.

### *Public Debt*

In December 2001, Products issued 10³⁄₄% Senior Notes due 2011 in a total principal amount of $500.0 million. The notes were not registered under the Securities Act of 1933 and were offered only to qualified institutional buyers. In June 2002, the Company effected and registered an exchange offer of a new and identical issue of 10³⁄₄% Senior Notes due 2011 of Products in exchange for the outstanding Senior Notes of Products. The exchange offer raised no new proceeds for the Company and was made in accordance with contractual commitments arising from the December 2001 issuance. The cost of issuing the notes totaling about $23.1 million was deferred and will be amortized over 10 years.

The notes are unconditionally guaranteed on an unsecured senior basis by the parent and by each wholly owned domestic subsidiary that is a guarantor of the Bank Credit Facilities as of the issue date. This is all of the Company's wholly owned domestic subsidiaries other than its receivable and insurance subsidiaries. The Debt evidenced by the Notes and Parent and Subsidiary Guarantees are unsecured senior obligations of the

## COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

Company ranking senior in right of payment to all existing and future Subordinated Debt including the Existing Notes and related Guarantees and future unsecured and unsubordinated Debt. The Notes are redeemable prior to December 31, 2004 only in the event the Company receives cash proceeds from one or more equity offerings in which case the Company may at its option use all or a portion of such cash proceeds to redeem up to 35% of the principal amount of the notes. The Notes will be subject to redemption at the option of the Company, in whole or in part at any time after December 31, 2006 at a stated premium redemption price expressed as a percentage in excess of the principal amount. After December 31, 2008, the redemption price is 100%. Within 30 days of the occurrence of a change of ownership control, unless the Company has mailed a redemption notice with respect to all outstanding Notes, the Company will be required to make an offer to purchase all outstanding Notes at a purchase price equal to 101% of their principal amount. The indenture governing the notes limits the Company's ability to issue more debt, pay dividends and make distributions, repurchase stock, make investments, merge or consolidate, transfer assets, enter into transactions with affiliates and issue stock of subsidiaries. These restrictive covenants are customary for such securities and are subject to a number of exceptions.

In June 1996, Products, issued at face value $400 million principal amount of $11\frac{1}{2}$% Senior Subordinated Notes due 2006 which are guaranteed by the Company. The indenture governing the $11\frac{1}{2}$% Senior Subordinated Notes generally prohibits the Company, Products and any Restricted Subsidiary (as defined) from making certain payments and investments unless a certain financial test is satisfied and the aggregate amount of such payments and investments since the issue date is less than a specified amount. The prohibition is subject to a number of significant exceptions, including dividends to stockholders of the Company or stock repurchases not exceeding $10 million in any fiscal year or $20 million in the aggregate, dividends to stockholders of the Company or stock repurchases in the amount of the net proceeds from the sale of the Company's Imperial Wallcoverings, Inc. subsidiary ("Wallcoverings") and dividends to the Company to permit it to pay its operating and administrative expenses. The indenture also contains other restrictive covenants (including, among others, limitations on the incurrence of debt, asset dispositions and transactions with affiliates), which are customary for such securities. These covenants are also subject to a number of significant exceptions.

The Company solicited and received consent from holders of a sufficient amount of the outstanding principal of the $11\frac{1}{2}$% Senior Subordinated Notes allowing the Change of Control precipitated by the Heartland Transaction. A Second Supplemental Indenture dated February 8, 2001 amended the Senior Subordinated Notes indenture to reflect this and certain other changes, including allowance for the incurrence of debt in the form of the Term Loan D Facility. In connection with the TAC-Trim acquisition, the Company further amended the indenture governing these notes to make each subsidiary guarantor of the new $10\frac{3}{4}$% Senior Notes a guarantor of these existing notes on a senior subordinated basis.

At December 31, 2002, the scheduled annual maturities of long-term debt and capital lease obligations are as follows (in millions):

| Year Ending | |
|---|---:|
| 2003 | $    23.5 |
| 2004 | 27.8 |
| 2005 | 327.4 |
| 2006 | 400.0 |
| 2007 | — |
| Later years | 500.0 |
| | $1,278.7 |

Total interest paid by the Company on all debt was $139.9 million, $76.3 million, and $94.8 million for 2002, 2001, and 2000, respectively.

**COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

**10.  Mandatorily Redeemable Preferred Stock of Subsidiary**

In December 2001, Products issued 182,700 shares of its Series A Redeemable Preferred Stock, 123,700 shares of Series B Redeemable Preferred Stock and 20,000 shares of Series C Redeemable Preferred Stock. The Preferred Stock was recorded at fair value of $146.9 million, which was less than the liquidation value of $1,000 per share or $326.4 million. The estimated fair value was based on market prices for securities with similar terms, maturities and risk characteristics, and included a liquidation discount to reflect market conditions and was agreed to by the Company and Textron as part of the TAC-Trim purchase agreement. The difference between the initial recorded value and the liquidation value is being accreted over the 11 year terms of the securities. The 2002 and 2001 results included subsidiary preferred stock requirements calculated using the effective interest method of $38.4 million and $2.4 million, respectively. The preferred stock requirement includes both accretion and dividend costs of $7.6 million and $30.8 million, respectively for 2002 compared to $0.9 million and $1.5 million, respectively for 2001. The carrying value of the Redeemable Preferred Stock includes accretion and accrued dividends.

In June 2002, $100.0 million of proceeds from the 16 million share common stock offering was used to repurchase Series A preferred stock at a price of 75% of its liquidation preference of $133.3 million. The redeemed Series A preferred stock had a carrying value of $63.7 million. In accordance with generally accepted accounting principles, the difference between the $63.7 million in carrying value and the $100.0 million cash payment was excluded from net income and recorded as a charge to equity in the Company's accumulated deficit account. This $36.3 million equity charge is included in the computation of earnings / (loss) per share and is included in the net loss available to common shareholders.

Products is required to redeem all Series A and B Preferred Stock outstanding on January 1, 2013 and Series C Preferred Stock outstanding on February 1, 2022. The redemption price is equal to 100% of the liquidation preference plus accrued and unpaid dividends plus common equity participation for the Series C Preferred Stock. The Series A and Series B Preferred Stock are redeemable at Products' option, in whole or in part, on or after January 1, 2007 at a stated percent in excess of the liquidation preference plus accrued and unpaid dividends. The Series C Preferred stock is not optionally redeemable. However, at Products' option or the holders of a majority of outstanding shares of Series C Preferred Stock, the Series C Preferred Stock is exchangeable for Series B Preferred Stock at any time following the second anniversary of its issuance date but prior to the third anniversary of its issuance date.

Shareholders of Series A Preferred Stock are entitled to receive dividends accruing annually on the liquidation preference at a rate of 11% for dividend periods ending on or prior to July 1, 2003, and 15% thereafter. Holders of Series B and C Preferred Stock are entitled to receive dividends accruing annually on the liquidation preference at a rate of 12% for dividend periods ending on or prior to July 1, 2003, and 16% thereafter.

Products may at its option through January 1, 2004 accrue up to the full amount of all dividends in lieu of cash payment of such dividends. Thereafter, Products may at its option elect to accrue dividends of up to 7% of the liquidation value annually on Series A Preferred Stock and up to 8% of the liquidation value on Series B and C Preferred Stock. Accrued dividends will be added to the liquidation preference of the applicable series of Preferred Stock. The Company uses the effective interest method in calculating accretion.

Upon voluntary or involuntary liquidation, dissolution or winding-up of Products, holders of the Preferred Stock are entitled to be paid out of the assets of Products available for distribution to stockholders in the amount of $1,000 per share plus the total accrued dividends prior to any distribution to holders of equity securities which ranks junior to the Preferred Stock. In addition, the holders of Series C Preferred Stock are entitled to a participation in distributions to Products common equity tied to appreciation in the value of Products common equity subsequent to the issuance date, not to exceed $2.0 million for all Series C Preferred Stock outstanding.

**COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

If Products experiences a change of ownership control, the holders of the Preferred Stock must be given the opportunity to sell to Products their Preferred Stock at 100% of the liquidation preference plus accrued and unpaid dividends, plus, in the case of Series C Preferred Stock, common equity participation. In the event that Products does not meet or exceed certain financial criteria based on interest coverage, the dividend rate applicable solely to Series A Preferred Stock will increase by 1.00% for the next full dividend period and by an additional 0.50% for each dividend period thereafter provided that the dividend rate does not exceed 20%. The provision of the certificate of designation limits Products ability to issue more debt, pay dividends and make distributions, repurchase stock, make investments, merge or consolidate, transfer assets, enter into transactions with affiliates and issue stock of subsidiaries. These covenants are subject to a number of important exceptions.

### 11.  Receivables Facility

The Company has an agreement to sell, on an ongoing basis, the trade accounts receivable of certain business operations to a bankruptcy-remote, special purpose subsidiary, wholly owned and consolidated by the Company. The receivables subsidiary (Carcorp) will, subject to certain conditions, from time to time, sell an undivided fractional ownership interest in a pool of domestic and certain Canadian receivables, up to $250 million, to various multi-seller commercial paper conduits supported by a committed liquidity facility. Upon sale to the conduit, Carcorp will hold a subordinated retained interest in the receivables. Under the terms of the agreement, new receivables are added to the pool as collections reduce previously sold receivables. The Company expects to service, administer and collect the receivables on behalf of Carcorp and the conduit. The proceeds of sale will be less than the face amount of accounts receivable sold by an amount that approximates the purchaser's financing costs. In September 2002, the Company amended the receivables facility lengthening its term to expire in December 2004.

Restrictions:  This receivables facility contains certain restrictions on Carcorp (including maintenance of $60.0 million net worth) and on the sellers (including limitations on liens on receivables, modifications of the terms of receivables, and changes in credit and collection practices) customary for facilities of this type. The commitments under the receivables facility are subject to termination prior to their term upon the occurrence of certain events, including payment defaults, breach of covenants, including defined interest coverage and leverage ratios, bankruptcy, default by the Company in servicing the receivables and failure of the receivables to satisfy certain performance criteria.

As of December 31, 2002 and 2001, Carcorp's total receivables pool was $253.3 million and $334.6 million, respectively. When the Company sells receivables to Carcorp, it retains a subordinated interest in the receivables sold. As of December 31, 2002, the utilization of the Receivables Facility was $66.0 million but there was approximately $93.2 million of available but unutilized funding. At December 31, 2001, utilization of the Receivables Facility was $79.9 million and an additional $118.6 million of funding was available but unutilized.

During 2002, the loss on the sale of the receivables totaled $4.2 million. During 2001 and 2000 the losses on the sale of receivables totaled $10.8 million and $9.2 million, respectively. The 2001 and 2000 loss included $5.6 million and $1.6 million in expenses and fees to replace the prior facility. The usage fee under the facility is 1.50%. In addition, the Company is required to pay a fee of 0.50% on the unused portion of the facility and a discount. The discount on sold interests is approximately equal to the interest rate paid by the conduits to the holders of the commercial paper plus a usage fee. The discount rate at December 31, 2002 was 1.45% compared to 3.53% at December 31, 2001.

In December 2001, as part of the refinancing completed in connection with the TAC-Trim acquisition, Products entered into a new receivables facility and repaid the outstanding balance of $128.7 million of the Company's previous receivables facility entered into in December 1999, which was not renewed. The maximum funding available to the Company on a revolving basis under the Old Receivables Facility was $171.6 million.

COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

The Company estimates the fair value of its retained interest by considering two key assumptions: the payment rate, which is derived from the average life of the accounts receivable, which is less than 60 days, and the rate of expected credit losses. Based on the Company's favorable collection experience and the short-term nature of its receivables, both assumptions are highly predictable. Therefore, the Company's estimated fair value of its retained interests in the pool of eligible receivables is approximately equal to the previous cost, less the associated allowance for doubtful accounts.

The proceeds received by Carcorp from collections on receivables, after the payment of expenses and amounts due, are used to purchase new receivables from the Sellers. During 2002 and 2001, Carcorp had net cash collections of approximately $2.9 billion and $1.6 billion, respectively. These funds were used to purchase new receivables from the Sellers, under the Receivables Facility.

## 12. Operating Leases

The Company has operating leases for land and buildings for periods up to twenty years and transportation, operating and administrative equipment for periods ranging from one to twelve years. The majority of these leases contain renewal provisions.

The Company has equipment lease agreements and building lease agreements with several lessors which, subject to specific approval, provide availability of funding for operating leases and sale-leasebacks as allowed in its other financing agreements. The Company has a purchase option on certain equipment at the end of the lease term based on the fair market value of the equipment or to purchase some or all of the equipment at prices determined under the agreement. The Company has classified the leases as operating.

At December 31, 2002, future minimum lease payments under operating leases for continuing operations are as follows (in millions):

| Year Ending | |
| --- | --- |
| 2003 | $ 50.0 |
| 2004 | 57.3 |
| 2005 | 38.1 |
| 2006 | 34.7 |
| 2007 | 33.6 |
| Later Years | 133.2 |
| | $346.9 |

Rental expense of continuing operations under operating leases was $57.1 million, $29.2 million, and $20.8 million, for fiscal 2002, 2001, and 2000, respectively.

During 2002, the Company received net proceeds (after fees) of approximately $14.8 million from sale and leasebacks of real property and equipment. The aggregate lease expenses associated with these leases will be $18.8 million, $2.6 million of which relates to 2003.

During 2001, Products entered into sale and leaseback transactions for certain manufacturing equipment and non-manufacturing properties. The transactions resulted in the recognition of a $4.4 million net deferred asset that is being amortized over the lease term, and the recognition of an $8.7 million loss.

During 2001, the Company received net proceeds (after fees) of approximately $86.2 million from sale and leasebacks of real property and equipment, which it used to reduce outstanding debt. The aggregate lease expenses associated with these leases will be $88.8 million, $12.5 million of which related to 2002. To the extent permitted by the credit facility, the Company may enter into additional similar leasing arrangements

**COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

from time to time. As part of these sale-leaseback transactions, Products sold and contemporaneously leased back real property from unrelated third parties, and received net proceeds (after fees) of $46.4 million. Refer to Note 19 for a discussion regarding certain sale and leaseback transactions that were entered into with related parties.

**13. Employee Benefit Plans**

*A. Defined Benefit Pension and Postretirement Benefit Plans*

Subsidiaries of the Company have defined benefit pension plans covering substantially all employees who meet eligibility requirements. Plan benefits are generally based on years of service and employees' compensation during their years of employment. Funding of retirement costs for these plans complies with the minimum funding requirements specified by the Employee Retirement Income Security Act. Assets of the pension plans are invested primarily in equity and fixed income securities.

Subsidiaries of the Company have also provided postretirement life and health coverage for certain retirees under plans currently in effect. Many of the subsidiaries' domestic and Canadian employees may be eligible for coverage if they reach retirement age while still employed by the Company. Most of these plans are contributory. In general, future increases in costs are passed on fully to the retiree. However, future increases in costs for the Canadian divisions and limited domestic operations are shared between the Company and the retiree.

**COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

The following tables provide a reconciliation of the projected benefit obligation, a reconciliation of plan assets, the funded status of the plans, and amounts recognized in the Company's consolidated balance sheets at December 31, 2002 and December 31, 2001 (in millions).

| | Pension Benefits Fiscal Year Ended | | Postretirement Benefits Fiscal Year Ended | |
| --- | --- | --- | --- | --- |
| | December 31, 2002 | December 31, 2001 | December 31, 2002 | December 31, 2001 |
| Measurement Date...................... | September 30 | September 30 | September 30 | September 30 |
| **Change in benefit obligation:** | | | | |
| Benefit obligation at beginning of year ... | $372.2 | $175.0 | $ 151.2 | $ 52.6 |
| Service cost............................ | 11.3 | 6.8 | 1.7 | 1.0 |
| Interest cost ......................... | 23.9 | 12.7 | 6.9 | 3.8 |
| Employee contributions ................. | 0.6 | — | 0.9 | 0.9 |
| Amendments........................... | 2.3 | 1.0 | (62.6) | — |
| Actuarial gain ........................ | 16.9 | 2.3 | 15.0 | (1.3) |
| Purchase Accounting Adjustments/ Acquisitions......................... | (26.4) | 190.2 | (12.4) | 99.4 |
| Benefits paid ......................... | (19.4) | (14.1) | (6.4) | (4.7) |
| Currency adjustment ................... | 2.0 | (1.7) | — | (0.5) |
| Other ................................ | 0.8 | — | (0.5) | — |
| Benefit obligation at end of year..... | $384.2 | $372.2 | $ 93.8 | $ 151.2 |
| **Change in plan assets:** | | | | |
| Fair value of plan assets at beginning of year ............................ | $338.0 | $164.2 | $ — | $ — |
| Actual return on plan assets ............ | (34.4) | (24.1) | — | — |
| Employer contributions ................. | 6.6 | 4.3 | 5.5 | 3.8 |
| Employee contributions ................. | 0.6 | — | 0.9 | 0.9 |
| Benefits paid ......................... | (19.4) | (14.1) | (6.4) | (4.7) |
| Purchase Accounting Adjustments/ Acquisitions......................... | 11.3 | 209.3 | — | — |
| Currency adjustment ................... | 0.3 | (1.6) | — | — |
| Fair value of plan assets at end of year ........................... | $303.0 | $338.0 | $ — | $ — |
| **Reconciliation of funded status to net amount recognized:** | | | | |
| Funded status ......................... | $(81.2) | $(34.2) | $ (93.8) | $(151.2) |
| Unrecognized net loss (gain) ........... | 131.7 | 48.1 | (5.0) | (21.5) |
| Unrecognized prior service cost (gain) ... | 5.0 | 4.0 | (63.4) | (6.4) |
| Net amount recognized ............ | $ 55.5 | $ 17.9 | $(162.2) | $(179.1) |

**COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

|  | Pension Benefits Fiscal Year Ended | | Postretirement Benefits Fiscal Year Ended | |
|  | December 31, 2002 | December 31, 2001 | December 31, 2002 | December 31, 2001 |
|---|---|---|---|---|
| Amounts recognized in the consolidated balance sheet consist of: | | | | |
| Prepaid benefit cost . . . . . . . . . . . . . . . . . . . | $ 2.1 | $ 18.7 | $ — | $ — |
| Accrued benefit liability . . . . . . . . . . . . . . . | (67.6) | (25.6) | (162.2) | (179.1) |
| Intangible asset . . . . . . . . . . . . . . . . . . . . . . . | 6.3 | 5.8 | — | — |
| Accumulated other comprehensive loss . . . | 114.7 | 19.0 | — | — |
| Net amount recognized . . . . . . . . . . . . | $ 55.5 | $ 17.9 | $(162.2) | $(179.1) |

The projected benefit obligation, accumulated benefit obligation and fair value of plan assets for the pension plans with accumulated benefit obligations in excess of plan assets were $374.2 million, $363.9 million and $291.1 million, respectively, as of December 31, 2002 and $175.2 million, $165.9 million and $121.7 million, respectively, as of December 31, 2001.

The net periodic benefit cost of continuing operations for fiscal 2002, 2001, and 2000 includes the following components (in millions):

|  | Pension Benefits Fiscal Year Ended | | |
|  | December 31, 2002 | December 31, 2001 | December 31, 2000 |
|---|---|---|---|
| Components of net periodic benefit cost: | | | |
| Service cost . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ 11.3 | $ 6.8 | $ 6.7 |
| Interest cost . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 23.9 | 12.7 | 12.8 |
| Expected return on plan assets . . . . . . . . . . . . . . . . . . | (31.6) | (14.6) | (14.6) |
| Amortization of prior service cost . . . . . . . . . . . . . . . | 0.2 | 0.2 | 0.1 |
| Settlement loss (gain) . . . . . . . . . . . . . . . . . . . . . . . . . . | — | (0.1) | — |
| Curtailment loss (gain) (A) . . . . . . . . . . . . . . . . . . . . | 2.0 | — | (1.0) |
| Recognized net actuarial loss . . . . . . . . . . . . . . . . . . . | 0.6 | 0.1 | 0.1 |
| Net periodic benefit cost . . . . . . . . . . . . . . . . . . . . . . | $ 6.4 | $ 5.1 | $ 4.1 |

(A)  Curtailment loss resulted from termination of employees that were covered under a Canadian plan.

|  | Postretirement Benefits Fiscal Year Ended | | |
|  | December 31, 2002 | December 31, 2001 | December 31, 2000 |
|---|---|---|---|
| Components of net periodic benefit cost: | | | |
| Service cost . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ 1.7 | $ 1.0 | $ 0.9 |
| Interest cost . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 6.9 | 3.8 | 3.6 |
| Amortization of prior service cost . . . . . . . . . . . . . . . | (5.6) | (1.4) | (1.4) |
| Recognized net actuarial gain . . . . . . . . . . . . . . . . . . . | (1.4) | (1.7) | (2.0) |
| Curtailment loss (gain) . . . . . . . . . . . . . . . . . . . . . . . . . | (0.6) | — | — |
| Net periodic benefit cost . . . . . . . . . . . . . . . . . . . . . . | $ 1.0 | $ 1.7 | $ 1.1 |

**COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

Weighted average fiscal year-end assumptions are summarized as follows(a):

|  | Pension Benefits | | Postretirement Benefits | |
|---|---|---|---|---|
|  | 2002 | 2001 | 2002 | 2001 |
| Discount rate .......................................... | 6.7% | 7.2% | 7.0% | 7.5% |
| Expected return on plan assets ........................... | 8.5% | 9.3% | N/A | N/A |
| Rate of compensation increase ........................... | 3.1% | 3.1% | N/A | N/A |

(a) These rates are used to compute the balances as of the end of the year and the expense for the following year.

Health care costs for domestic plans: (1) Dura Convertible was assumed to increase 10.5% during 2003; the rates were assumed to grade down by 0.5% per year to an ultimate rate of 6% and remain at that level thereafter. (2) Wickes Engineering Materials was assumed to increase 6% during 2003 and remain at that level thereafter. (3) TAC-Trim was assumed to increase 11.5% during 2003; the rates were assumed to grade down by 0.5% per year to an ultimate rate of 6% and remain at that level thereafter. Health care trend rates for Canadian Plans were assumed to increase approximately 8% during 2003 grading down by 0.5% per year to a constant level of 5% annual increase.

Assumed health care cost trend rates may have a significant effect on the amounts reported for postretirement benefits. A one-percentage-point change in assumed health care cost trend rates would have the following effects:

|  | 1-Percentage-Point Increase | 1-Percentage-Point Decrease |
|---|---|---|
| Effect on total of service and interest cost components............. | $0.4 | $(0.3) |
| Effect on postretirement benefit obligation ....................... | $4.8 | $(4.1) |

**B.   *Defined Contribution Plans***

Subsidiaries of the Company sponsor defined contribution plans covering employees who meet eligibility requirements. Subsidiary contributions are based on formulas or are at the Company's discretion as specified in the plan documents. Contributions were $6.2 million, $3.2 million, and $4.0 million in fiscal 2002, 2001, and 2000, respectively.

**14.   Discontinued Operations**

During the second quarters of 2002 and 2001, the Company received proceeds of $15.8 million and $12.2 million, respectively, on environmental claims related to discontinued operations, for which reserves were previously charged. Of these amounts, $9.5 million and $7.4 million were recorded as income from discontinued operations in the second quarter of 2002 and 2001, respectively, net of income taxes of $6.3 million and $4.8 million, respectively.

In addition, during the third quarter of 2001, the Company received payment of $2.3 million on environmental claims related to discontinued operations. Of this amount $1.4 million, net of taxes of $0.9 million, was recorded as income from discontinued operations in the quarter ended September 30, 2001.

During fiscal 2000, the Company settled claims for certain environmental matters related to discontinued operations for a total of $20 million. Settlement proceeds will be paid to the Company in three installments. The first and second installments of $7.5 million and $7.5 million were received in June 2000 and June 2001, respectively with the third installment of $5.0 million received in June 2002. Of the total $20 million settlement, the Company recorded the present value of the settlement as $7.0 million of additional

**COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

environmental reserves, based on its assessment of potential environmental exposures, and $6.6 million, net of income taxes, as income from discontinued operations.

The Company has significant obligations related to post-retirement, casualty, environmental, product liability, lease and other liabilities of discontinued operations. The nature of many of these contingent liabilities is such that they are difficult to quantify and uncertain in terms of amount. The company has accrued $23.0 million for postretirement costs and $53.4 million for environmental and product liability costs.

In connection with retained operating leases of certain discontinued operations, the Company believes that future sublease rental receipts will equal or exceed future minimum lease payments and accordingly has not recorded any liability for these leases.

**15.  Restructuring**

In the fourth quarter of 2002, the Company undertook a restructuring program primarily to European operations that resulted in a restructuring charge of $14.1 million. This restructuring charge included $4.0 million of severance costs, $0.8 million of costs related to other contractual obligations, and $9.3 million of costs related to fixed asset impairments. The severance costs related to over 300 personnel.

In the third quarter of 2002, the Company undertook a restructuring program primarily to realign the operations in North America that resulted in a restructuring charge of $33.8 million. This restructuring charge included $23.8 million of severance costs, $1.3 million of costs related to the establishment of reserves for lease commitments and lease termination fees, and $8.7 million of costs related to fixed asset impairments. The severance costs related to over 700 personnel.

Included in the third quarter 2002 restructuring charge severance costs was $8.9 million related to the separation agreement with Thomas Evans the former Chairman and CEO. In August 2002, the Company's Board of Directors appointed Jerry L. Mosingo as President, Chief Executive Officer (CEO) and Director of the Company. Mr. Mosingo replaced Thomas E. Evans, the Company's previous Chairman and CEO, as CEO. Under the terms of his separation agreement, Mr. Evans received $5.5 million on August 15, and will receive quarterly payments of $0.3 million through June 30, 2004.

In the first quarter of 2002, the Company undertook a restructuring program to rationalize operations in North America, Europe and Specialty operations that resulted in a restructuring charge of $9.1 million. This restructuring included $5.5 million of cash severance costs and $3.6 million of costs related to the establishment of reserves for lease commitments and lease termination fees. The Company incurred severance costs for over 100 personnel primarily at the Company's North America and European headquarters and additional reductions at its Specialty operations. The reserve for lease commitments relates to contractual obligations for the Company's former headquarters facility, while the termination fees relate to an aircraft lease on an aircraft that the company is no longer using. The Company relocated its headquarters to its new resource center in order to optimize and consolidate corporate operations.

In 2002, the Company also reserved for restructuring costs incurred as a result of acquisitions. The balance reserved totaled $15.2 million for lease costs and employee severance costs.

During 2001, the Company undertook restructuring programs to rationalize operations in North American, European and Specialty operations resulting in a restructuring charge aggregating $18.8 million. The charge included $11.2 million of severance costs and $7.6 million of asset impairments. The Company recognized severance costs for over 900 operating personnel at the Company's convertible tops, fabrics, carpet and acoustics locations in North America and Specialty operations. The asset impairments, primarily related to machinery and equipment located at North American, European and Specialty operations sites, are based on management's estimates of values to be realized upon disposition of the assets.

**COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

In addition, the Company recorded a restructuring reserve in connection with the Becker acquisition aggregating $5.3 million of which $1.6 million was severance and $3.7 million for lease termination and other exit costs. Following is the rollforward of the restructuring accruals for 2002 (in millions):

| Description | Beginning of Year | Additions Resulting from Acquisitions(a) | Charged to Cost and Expenses | Charged (credited) to Other Accounts(b) | Deductions(c) | End of Year |
|---|---|---|---|---|---|---|
| Restructuring Reserves in the balance sheet for: | | | | | | |
| 2002 . . . . . . . . . . . . . . . . . . . . | $8.0 | $15.2 | $56.9 | $(18.0) | $(33.9) | $28.2 |

(a) Restructuring costs for acquired companies.

(b) Asset impairments

(c) Deductions, primarily representing cash utilized.

Of the $28.2 million remaining reserve, $7.8 million relates to long-term leases expiring through 2004 and $20.4 million related to severance costs of which $18.7 million will be paid in 2003.

## 16. Common Stockholders' Equity and Earnings Per Share

### A. Common Stock

In April 2002, the Company issued 400,000 shares of common stock as part of the purchase of a lamination company wholly owned by a current director and shareholder of the Company. In June, the Company issued 16 million shares of common stock for $160 million before expenses. The Company used $100 million of the $152 million in net proceeds to redeem $133 million of face value Series A Redeemable Preferred Stock and the remainder for general corporate purposes.

### B. Stock Option Plans

The 1994 Employee Stock Option Plan ("1994 Plan") was adopted as a successor to the 1993 Employee Stock Option Plan to facilitate awards to certain key employees and consultants. The 1994 Plan was amended in 1999 primarily to increase the number of shares available for issuance under the Plan from 2,980,534 to 3,980,534. The 1994 Plan provides that no options may be granted after 10 years from the effective date of this plan. Options vest, in each case, as specified by the Company's compensation committee, generally over three years after issuance. The Company also adopted the 1994 Directors Stock Option Plan, which provides for the issuance of options to acquire a maximum of 600,000 shares of common stock to directors who are not part of management and are not affiliated with a major stockholder. As of December 31, 2002, 170,000 options had been granted. The Company adopted the 1997 United Kingdom Scheme, which provides for the issuance of options to key employees under the 1994 Plan. The Company adopted the 2000 Employee Stock Option Plan, effective January 1, 2000, which provided for the issuance of up to 6,000,000 shares to key employees and consultants. The Company adopted the 2002 Employee Stock Option Plan, effective January 1, 2002, which provided for the issuance of up to 6,600,000 shares to key employees and consultants. Under the 2002 plan 60% of the issued options vest and become exercisable in 20% increments on January 1, 2003, January 1, 2004 and January 1, 2005. The remaining 40% vest subject to performance targets and become exercisable on January 1, 2012 or on an accelerated basis if performance targets are met.

The Company issued 5,182,929 options during the year and repriced 854,000 options that had an original average exercise price of $14.05 to an exercise price of $10.00. The impact of the reverse stock split reduced the beginning balance by 1,698,553 shares. At December 31, 2002, options representing 3,921,330 shares of common stock were available for grants.

**COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

Stock option activity under the plans is as follows:

| | December 31, 2002 | | December 31, 2001 | | December 31, 2000 | |
|---|---|---|---|---|---|---|
| | Number of shares | Weighted Average Exercise Price | Number of shares | Weighted Average Exercise Price | Number of shares | Weighted Average Exercise Price |
| Outstanding beginning of year . . . . . . . . . . . | 2,830,920 | $ 5.59 | 4,344,432 | $5.47 | 4,720,955 | $5.70 |
| Impact of 2002 Stock Split . . . . . . . . . . . . . | (1,698,553) | | — | — | — | — |
| Adjusted Beginning Balance . . . . . . . . . | 1,132,367 | 13.98 | — | — | — | — |
| Awarded . . . . . . . . . . . . | 5,182,929 | 10.00 | 40,000 | 5.76 | 827,500 | 5.65 |
| Cancelled . . . . . . . . . . . | (1,819,634) | 10.14 | (458,090) | 7.48 | (983,732) | 7.07 |
| Exercised . . . . . . . . . . . | (68,414) | 12.79 | (1,095,422) | 4.31 | (220,291) | 3.99 |
| Outstanding at end of year . . . . . . . . . . . . . . | 4,427,248 | $10.12 | 2,830,920 | $5.59 | 4,344,432 | $5.47 |

(a) Weighted average exercise price is $10.86 after repricing 854,000 stock options.

The following table summarizes information about stock options outstanding at December 31, 2002:

| Range of Exercise Price | Number of Shares Outstanding | Weighted Average Remaining Life | Weighted Average Exercise Price |
|---|---|---|---|
| $ 9.98 — $12.60 . . . . . . . . . . . . . . . . . . . . . . | 4,363,248 | 8.7 | $10.01 |
| $10.92 — $25.00 . . . . . . . . . . . . . . . . . . . . . . | 64,000 | 9.1 | $17.10 |

SFAS No. 148, "Accounting for Stock-Based Compensation — Transition and Disclosure" amended SFAS No. 123, "Accounting for Stock-Based Compensation" to provide alternative methods of transition for a voluntary change to the fair value based method of accounting for stock based employee compensation and amended the required disclosures. SFAS No. 123 encourages companies to adopt the fair value method for compensation expense recognition related to employee stock options. The accounting requirements of APB No. 25 use the intrinsic value method in determining compensation expense, which represents the excess of the market price of the stock over the exercise price on the measurement date. The Company has elected to continue to utilize the accounting provisions of APB No. 25 for stock options, and is required to provide pro forma disclosures of net income and earnings per share had the Company adopted the fair value method for recognition purposes. See Note 2, "Summary of Significant Accounting Policies — Employee Stock Options" for the tabular presentation as if the Company had adopted SFAS No. 123 and restated its results.

For the above information, the fair value of each option grant was estimated on the date of grant using the Black-Scholes option pricing model with the following assumptions used for grants in fiscal 2002, 2001, and 2000: weighted average expected volatility was 72%, 99%, and 53%; expected lives of 6 years, 10 years and 10 years in 2002, 2001 and 2000, respectively; a weighted average risk free interest rate of 4.72% in 2002 and ranging from 4.24% to 7.32% in 2001 and 2002 and a zero expected dividend rate. The weighted average grant-date fair value of an option granted during fiscal 2002, 2001, and 2000 was $6.71, $5.22, and $4.11, respectively.

In accordance with SFAS No. 123, the 854,000 repriced options were revalued during 2002 to determine additional compensation cost that resulted from the difference in the fair value of the options prior to repricing and subsequent to repricing. As a result of the repricing $336,000 of additional compensation cost, net of tax, was incurred on a proforma basis. These options have a weighted average expected life of approximately

**COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

4 years. The assumptions used in valuing the repriced options are as follows: expected volatility ranged from 74% to 109%; expected lives ranged from 1 year to 5$\frac{1}{2}$ years; the risk free interest rate ranged from 2.14% to 4.40% in 2002; and a zero expected dividend rate. Refer to Note 2, "Summary of Significant Accounting Policies — Employee Stock Options" for discussion related to the 2002 proforma cost related to options.

Additionally, as a result of repricing the Company's stock options, the options are treated as variable-based awards in accordance with APB No. 25. Since these options are considered to be variable-based awards, the Company will incur future compensation expense if the stock price exceeds the $10 exercise price established by repricing.

*C.  Earnings Per Share*

The Company adopted SFAS No. 128, "Earnings Per Share," in December 1997. Basic earnings per common share were computed by dividing net income (loss) by the weighted average number of shares of common stock outstanding during the year. Diluted earnings per common share were determined assuming the exercise of the stock options issued under the Company's stock option plans. There were no reconciling items between basic earnings per common share and diluted earnings per common share for 2002, 2001, and 2000.

In 2002, 2001, and 2000, potentially dilutive securities have been excluded from the diluted earnings per share calculation since their inclusion would have been antidilutive. At December 31, 2002, the Company's potentially dilutive securities included 4.4 million stock options with a weighted average exercise price of $10.12 and 0.5 million warrants with an exercise price of $10.00. At December 31, 2001, the Company's potentially dilutive securities included 2.8 million stock options, respectively, with weighted average exercise prices of $5.59 and 0.5 million warrants with an exercise price of $5.00. At December 31, 2000, the Company's potentially dilutive securities included 4.3 million stock options with weighted average exercise prices of $5.47.

**COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

**17.  Income Taxes**

The provisions for income taxes applicable to continuing operations for fiscal 2002, 2001, and 2000 are summarized as follows (in millions):

|  | Fiscal Year Ended | | |
|---|---|---|---|
|  | December 31, 2002 | December 31, 2001 | December 31, 2000 |
| Current: | | | |
| Federal | $ — | $ — | $ — |
| State | 5.8 | 2.6 | 1.5 |
| Foreign | 15.3 | 4.8 | 10.7 |
|  | 21.1 | 7.4 | 12.2 |
| Deferred: | | | |
| Federal | 19.6 | (19.0) | (3.5) |
| State | 2.1 | (1.3) | (0.2) |
| Foreign | (25.3) | (5.7) | (6.3) |
|  | (3.6) | (26.0) | (10.0) |
| Income tax expense (benefit) | $ 17.5 | $(18.6) | $  2.2 |

Domestic and foreign components of income (loss) from continuing operations before income taxes are summarized as follows (in millions):

|  | Fiscal Year Ended | | |
|---|---|---|---|
|  | December 31, 2002 | December 31, 2001 | December 31, 2000 |
| Domestic | $ 45.4 | $(35.8) | $(11.9) |
| Foreign | (79.2) | (32.5) | 12.7 |
|  | $(33.8) | $(68.3) | $  0.8 |

A reconciliation between income taxes computed at the statutory U.S. Federal rate of 35% and the provisions for income taxes applicable to continuing operations is as follows (in millions):

|  | Fiscal Year Ended | | |
|---|---|---|---|
|  | December 31, 2002 | December 31, 2001 | December 31, 2000 |
| Amount at statutory Federal rate | $(11.8) | $(23.9) | $ 0.3 |
| State taxes, net of Federal income tax | 5.1 | 0.9 | 0.8 |
| Tax differential on foreign earnings | (0.7) | 2.9 | (0.3) |
| Nontaxable interest income | (3.9) | — | — |
| Amortization of goodwill | — | 1.5 | 1.5 |
| Subsidiary preferred stock dividends and accretion | 13.4 | 0.8 | — |
| Change in valuation allowance | 15.9 | (1.2) | 0.4 |
| General business tax credits | (1.5) | (0.5) | (1.1) |
| Other | 1.0 | 0.9 | 0.6 |
| Income tax expense | $ 17.5 | $(18.6) | $ 2.2 |

**COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

Deferred income taxes are provided for the temporary differences between the financial reporting and tax basis of the Company's assets and liabilities. The components of the net deferred tax assets as of December 31, 2002 and 2001 were as follows (in millions):

|  | December 31, 2002 | December 31, 2001 |
|---|---|---|
| Deferred tax assets: | | |
| Employee benefits, including postretirement benefits . . . . . . . . . . . . . | $124.9 | $ 78.5 |
| Net operating loss carryforwards (NOLs) . . . . . . . . . . . . . . . . . . . . . . | 162.5 | 134.6 |
| General business tax credit carryforwards . . . . . . . . . . . . . . . . . . . . . . | 10.7 | 11.4 |
| Alternative minimum tax credit carryforwards . . . . . . . . . . . . . . . . . . | 12.2 | 12.2 |
| Other liabilities and reserves . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 33.7 | 36.1 |
| Valuation allowance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (78.4) | (49.2) |
| Total deferred tax assets . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 265.6 | 223.6 |
| Deferred tax liabilities: | | |
| Property, plant and equipment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (68.1) | (74.7) |
| Undistributed earnings of foreign subsidiaries . . . . . . . . . . . . . . . . . . | (7.2) | (7.2) |
| Total deferred tax liabilities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (75.3) | (81.9) |
| Net deferred tax asset . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $190.3 | $141.7 |

The company has net operating losses in its foreign jurisdictions of $76 million. These losses will begin expiring in 2003 through 2011. Additionally, the company has foreign net operating losses of $244 million which have no expiration date.

The valuation allowance at December 31, 2002 and December 31, 2001 provides for certain deferred tax assets that in management's assessment may not be realized due to tax limitations on the use of such amounts, due to expiration prior to utilization or that relate to tax attributes that are subject to uncertainty due to the long-term nature of their realization. During 2002, the valuation allowance increased $29.2 million from 2001. This increase resulted primarily from $19.8 million for current year net operating losses and $3.9 million release of valuation allowances.

The above amounts have been classified in the consolidated balance sheets as follows (in millions):

|  | December 31, 2002 | December 31, 2001 |
|---|---|---|
| Deferred tax assets (liabilities): | | |
| Current domestic and foreign, included in other current assets . . . . | $ 25.3 | $ 25.3 |
| Current foreign, included in accrued expenses . . . . . . . . . . . . . . . . . . | — | (2.1) |
| Noncurrent domestic and foreign . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 165.0 | 136.5 |
| Noncurrent foreign, included in other noncurrent liabilities . . . . . . . | — | (18.0) |
|  | $190.3 | $141.7 |

Management has reviewed the Company's operating results for recent years as well as the outlook for its continuing operations and concluded that it is more likely than not that the net deferred tax assets of $190.3 million at December 31, 2002 will be realized. Management took into consideration, among other factors, the expected impact of current year acquisitions, the impact of recent restructuring plans, and the infusion of cash from Heartland. These factors along with the timing of the reversal of its temporary differences, certain tax planning strategies and the expiration date of its NOLs were also considered in

**COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

reaching this conclusion. The Company's ability to generate future taxable income is dependent on numerous factors, including general economic conditions, the state of the automotive industry and other factors beyond management's control. Therefore, there can be no assurance that the Company will meet its expectation of future taxable income.

Deferred income taxes and withholding taxes have been provided on earnings of the Company's foreign subsidiaries to the extent it is anticipated that the earnings will be remitted in the future as dividends. Deferred income taxes and withholding taxes have not been provided on the remaining undistributed earnings of foreign subsidiaries as such amounts are deemed to be permanently reinvested. The cumulative undistributed earnings as of December 31, 2002 on which the Company has not provided deferred income taxes and withholding taxes is approximately $101.8 million.

At December 31, 2002, the Company had the following tax attribute carryforwards available for U.S. Federal income tax purposes (in millions):

| | Amount | Expiration Dates |
|---|---|---|
| **Net operating losses — regular tax:** | | |
| Preacquisition, subject to limitations | $ 2.8 | 2005-2009 |
| Subject to change in control provisions | 82.6 | 2008-2012 |
| Subject to change in control provisions | 200.2 | 2018-2021 |
| | $285.6 | |
| **Net operating losses — alternative minimum tax:** | | |
| Preacquisition, subject to limitations | $ 1.4 | 2005-2009 |
| Subject to change in control provisions | 48.5 | 2008-2012 |
| Subject to change in control provisions | 206.8 | 2018-2021 |
| | $256.7 | |
| **General business tax credits:** | | |
| Preacquisition, subject to limitations | $ 0.6 | 2003 |
| Subject to change in control provisions | 10.1 | 2004-2021 |
| | $ 10.7 | |
| **Alternative minimum tax credits** | $ 12.2 | |

As a result of the Heartland Transaction, a change in control occurred which results in annual limitations on the Company's use of its NOLs and unused tax credits. This annual limitation on the use of NOLs and tax credits depends on the value of the equity of the Company and the amount of "built-in gain" or "built-in loss" in the Company's assets at the date of the change in control. Based on the expiration dates of the NOLs and tax credits as well as anticipated levels of domestic income, management does not believe that the transaction will have a material impact on these deferred tax assets.

Future sales of common stock by the Company or its principal stockholders, or changes in the composition of its principal stockholders, could constitute a change in control that would result in additional annual limitations on the Company's use of its NOLs and unused tax credits. Management cannot predict whether such a change in control will occur.

Income taxes paid, net of refunds received, were $12.8 million, $15.5 million, and $4.8 million for fiscal 2002, 2001, and 2000, respectively.

**COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

### 18. Risk Management and Financial Instruments

#### *Foreign Currency and Interest Rate Risk Management*

The company operates on a global basis and is exposed to the risk that its earnings, cash flows and stockholders' equity could be adversely impacted by fluctuations in currency exchange rates and interest rates. To manage the volatility relating to these exposures, the Company aggregates the exposures on a consolidated basis to take advantage of natural offsets. For exposures that are not offset within its operations, the Company may enter into various derivatives transactions pursuant to the its risk management policies. The primary purpose of the Company's foreign currency and interest rate risk management policies and activities is to manage these risks to acceptable levels.

To manage its risks, the Company primarily utilizes forward exchange contracts and purchased options with durations of generally less than 12 months. The Company has in place forward exchange contracts and purchased options with third parties, denominated in multiple currencies, which will mature during fiscal 2003. The details are as follows:

| Derivative Type | Currency Sold | Currency Purchased | USD Equivalent of Notional Amount | Weighted Average Contract Rate (per Convention) | Unrealized Gain/(Loss) |
|---|---|---|---|---|---|
| Forwards . . . . . . . | GBP | EUR | $ 3.4 | 0.6176 GBP per EUR | $0.2 |
| Forwards . . . . . . . | CAD | USD | 2.0 | 1.5853 CAD per USD | — |
| Spot . . . . . . . . . | USD | EUR | 18.0 | 1.0478 USD per EUR | — |
| Options . . . . . . . . | CAD | USD | 74.0 | 1.6420 CAD per USD | 0.3 |
| | | | $97.4 | | $0.5 |

In order to manage the interest rate risk associated with our debt portfolio, the Company may enter into derivative transactions to manage its exposures to changes in global interest rates, although the Company did not have in place any interest rate derivatives in 2001 or 2002.

Gains and losses on derivatives qualifying as hedges under SFAS No. 133 "Accounting for Derivative Instruments and Hedging Activities", are recorded on the balance sheet as a component of "Other comprehensive income" to the extent that the hedges are effective until the underlying transactions are recognized in earnings. As of December 31, 2002, the Company had no derivatives designated as hedges under SFAS No. 133. Gains and losses from all derivatives that do not qualify as hedges under SFAS No. 133, are recorded in the income statement as required by SFAS No. 133 and the fair value is recorded in the balance sheet.

**COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

*Fair Value of Financial Instruments, Derivatives and Hedging Activities*

The estimated fair values of the Company's continuing operations financial instruments are summarized as follows (in millions):

| | December 31, 2002 | | December 31, 2001 | |
| --- | --- | --- | --- | --- |
| | Carrying Amount | Estimated Fair Value | Carrying Amount | Estimated Fair Value |
| Short-term debt, long-term debt and capital lease obligations | $1,289.2 | $1,200.2 | $1,328.1 | $1,258.6 |
| Mandatorily redeemable preferred stock of subsidiary | $ 123.9 | $ 123.9 | $ 149.3 | $ 149.3 |
| Forwards | $ 0.2 | $ 0.2 | $ 0.6 | $ 0.6 |
| Options | $ 0.3 | $ 0.3 | $ 1.6 | $ 1.6 |

The following methods and assumptions were used to estimate these fair values:

The fair value of the Public Debt notes are based upon quoted market prices. The fair value of the other short-term and long-term debt of the Company approximates the carrying value due to the frequent resetting of interest rates.

The fair value of the forward contracts and purchase options are based upon quoted market prices and the aggregated notional amount outstanding in U.S. dollar equivalent of $97.4 million at December 31, 2002.

Carrying amounts reported in the consolidated balance sheets for cash and cash equivalents, accounts and other receivables, accounts payable and accrued expenses approximate fair value due to the short-term nature of these instruments.

*Concentration of credit risk*

In the normal course of business, the Company provides credit to customers in the automotive industry, performs credit evaluations of these customers and maintains reserves for potential credit losses. When realized, the losses have been within the range of management's allowance for doubtful accounts.

*Other Concentrations of Risk*

The Company invests the majority of its excess cash in money market accounts, where appropriate, diversifies the concentration of cash among financial institutions. With respect to financial institutions, the company has diversified its selection of counterparties and has arranged master-netting agreements, where allowed by law and the Company's policies, to minimize the risk of loss.

**19.  Related Party Transactions**

On December 31, 2002, the Company acquired certain assets from Dutton Yarns (an affiliate of Mr. McCallum) for approximately $4.2 million. These assets are used by the Company to texture yarn. As part of the transaction, Dutton Yarns has agreed to provide the Company transition services through December 31, 2003.

In January 2003, the Company purchased equipment required to support an anticipated increase in the production of Furniture Fabrics from Joan Fabrics for $4.7 million. Elkin McCallum, a director of the Company, controls Joan Fabrics.

The Company entered into a lease agreement with Becker Ventures, an entity controlled by one of the Company's current directors and shareholders, for the Company's headquarters at 250 Stephenson Highway,

**COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

Troy, Michigan with the effective date of the lease being January 1, 2002. In March, 2002, the Company entered into lease agreements with Becker Ventures, effective January 1, 2002, for 150 Stephenson Highway and 350 Stephenson Highway, Troy, Michigan. The base rent for all three premises is $13.25 per sq. ft. Total square footage for all three locations is approximately 286,000. The leases have 20-year terms, and the Company has two five-year renewal options. The 2003 cost for the facilities will be approximately $3.8 million. For the years ended December 31, 2002 and 2001, the Company recorded a total cost of $17.1 million and $2.1 million, for rental expenses with related parties. In addition, the Company is also party to a lease with Becker Ventures for five manufacturing facilities totaling 884,000 square feet. In 2002, the Company extended the lease term an additional ten years to expire in 2021, with the base rent for these facilities totaling $3.6 million per year.

On April 12, 2002, the Company signed and closed on a merger agreement with Mr. McCallum (a current director and shareholder of the Company) and a lamination company wholly owned by Mr. McCallum pursuant to which the acquired company was merged into a wholly owned subsidiary of the Company. As consideration in the transaction, Mr. McCallum received 400,000 shares of Common Stock and was repaid $2.5 million in cash as reimbursement for amounts invested to fund the company's working capital needs. Subsequent to the merger, debt owing to Mr. McCallum of $6.7 million was repaid. The Company acquired the lamination business to optimize the supply chain on certain of its fabric products and provide low cost lamination products and services to Tier-1 customers.

In June 2002, the Company repurchased Series A preferred stock from Textron at a price of 75% of its liquidation preference of 133.3 million, which had a carrying value of $63.7 million (see Note 10). In addition, in May 2002, the Company and Textron finalized the purchase price and related working capital adjustments of TAC-Trim and paid Textron $15.5 million in cash.

During the first quarter of 2001, Heartland acquired a controlling interest equal to approximately 60% of the Company through a purchase of 25 million shares of common stock from the Company and a purchase of 27 million shares from Blackstone Partners and WP Partners. In the sale, the Company received gross proceeds of $125.0 million, or approximately $95.0 million after fees and expenses associated with the transactions. The purchase price also gave the Company a profit participation right on certain future common stock sales by Heartland. As a result of the transaction, Heartland is entitled to designate a majority of the Company's Board of Directors. Prior to the transaction, as of December 31, 2000, Blackstone Partners and WP Partners collectively owned approximately 87% of the Common Stock of the Company. In connection with the Heartland transaction, the Company paid Heartland a transaction fee of $12.0 million and paid WP Partners an investment banking fee of $2.0 million.

During the first quarter of 2001, the Amended and Restated Stockholders' Agreement was terminated and a new, 10 year Services Agreement was entered into between the Company, Products and Heartland. Under this Services Agreement, the Company will pay Heartland an annual advisory fee of $4.0 million. The Services Agreement also provides for the Company to pay a 1% transaction fee on certain acquisitions and divestitures commencing on or after February 23, 2002. Under the former Amended and Restated Stock-holders' Agreement among the Company, Products, Blackstone Partners and WP Partners, the Company paid each of Blackstone Partners and WP Partners, or their respective affiliates, an annual monitoring fee of $1.0 million.

In December 2001, Heartland, and certain co-investors that include a director of the Company, purchased an additional 12.8 million shares of common stock at a price of $12.50 per share, as part of the financing for the TAC-Trim acquisition. The average closing price of the stock three days before and three day after the definitive agreement announcement date was $22.35. Additionally, the Company paid Heartland transaction fees of $12.5 million in connection with the TAC-Trim acquisition. The Company also reimbursed Heartland for $1.5 million of expenses that Heartland incurred on behalf of the Company in relation to the Becker acquisition.

**COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

As part of the TAC-Trim acquisition, the Company entered into three intellectual property license agreements with Textron. In two of these agreements, the Company licenses back to Textron certain intellectual property that was acquired in the transaction. In the third agreement, the Company licenses from Textron other intellectual property that was not acquired in the transaction. In addition, under the TAC-Trim acquisition agreement, the Company is permitted to use the "Textron" name for 18 months in exchange for payments of $13.0 million on December 15, 2002 and $6.5 million on December 15, 2003.

Prior to the TAC-Trim acquisition, TAC-Trim entered into an $86.9 million sale and leaseback transaction (the "Textron Leasing Transaction") with two separate single purpose affiliates of Textron Financial Corporation, as lessor and purchaser, with respect to a portfolio of manufacturing equipment situated in different locations throughout the United States and Canada. Payments under the Textron Leasing Transaction are guaranteed by Products and secured by a first perfected mortgage lien over certain real property with a value equal to $25 million. Each lease is for an initial term of three (3) years with three one (1) year renewal options. As is customary, the documentation for the Textron Leasing Transaction incorporates covenants by reference, from the Senior Secured Credit Facility, that may be amended or waived by the senior lenders, and also contain events of default.

During 2001, the Company entered into sale and leaseback transactions for certain non-manufacturing properties with entities that are controlled by one of the Company's current directors and shareholders. In connection with these sale-leaseback transactions, Products sold and contemporaneously leased back real property located in Troy, Michigan and Plymouth, Michigan for net proceeds of $15.1 million in aggregate. The initial lease term in each transaction is 20 years and each lease has two successive ten year renewal options. The basic rent for the Troy, Michigan property is $1.3 million per year, and the basic rent for the Plymouth, Michigan property is $0.5 million per year. The rental rates in each case are subject to adjustment after expiration of the initial term.

Additionally, in connection with the Joan acquisition, the Company entered into a Supply Agreement and a Transition Service Agreement with entities controlled by the former owner of Joan who is currently a director and shareholder of the Company. Under the Supply Agreement, the Company has agreed to purchase all of its requirements for flat woven automotive fabric from the controlled entities for a five-year period beginning on the date of the Supply Agreement. The prices for fabric under the agreement will equal the costs of the raw materials plus an amount that represents the entities' standard labor and overhead costs incurred in manufacturing fabric. Under Transition Service Agreement an entity controlled by the director will provide Products with transitional and support services for a period not to exceed twelve months in order to support the continued and uninterrupted operation of the businesses acquired by Products in the Joan acquisition. As a part of these services, pending disassembly and removal of machinery and equipment purchased as part of the acquisition, the controlled entity will use that machinery and equipment to manufacture all of the Company's requirements for some types of knitted and woven automotive fabrics.

On December 31, 2002, Heartland owned approximately 36% of the outstanding shares of the Company; Blackstone Partners' and WP Partners' owned approximately 11%; Joan Fabrics Corp., Mr. Elkin McCallum and associates owned approximately 7%; Mr. Charles E. Becker and Textron, Inc. each owned approximately 9%.

## 20.  Information About the Company's Operations

The Company primarily supplies automotive interior systems — textile and plastic products, acoustics and convertible top systems to the global automotive industry.

North American Automotive Interior Systems (NAAIS) and European and Rest of World Automotive Interior Systems (Europe and ROW) include the following product groups: molded floor carpet, luggage compartment trim, acoustical products, accessory floormats and plastic-based interior trim modules, systems

**COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

and components. The Specialty Automotive Products (Specialty) division includes automotive fabrics and convertible top systems. The three divisions also produce other automotive and non-automotive products.

The Company evaluates performance based on operating profit or loss. Information about the Company's divisions is presented below (in millions):

| | Year Ended December 31, 2002 | | | | |
| --- | --- | --- | --- | --- | --- |
| | North American Automotive Interior Systems | European and Rest of World Automotive Interior Systems | Specialty Automotive Products | Other(A) | Total |
| External revenues . . . . . . . . . . . . . . . | $2,613.4 | $718.0 | $554.4 | $   — | $3,885.8 |
| Inter-segment revenues . . . . . . . . . . | 15.8 | 193.5 | 41.8 | (251.1) | — |
| Preferred Stock Requirement . . . . . | 38.4 | — | — | — | 38.4 |
| Depreciation and amortization . . . . | 65.3 | 30.1 | 16.9 | 4.7 | 117.0 |
| Operating income (loss) . . . . . . . . . | 236.0 | (59.8) | 48.4 | (56.9) | 167.7 |
| Total assets . . . . . . . . . . . . . . . . . . . . | 1,872.2 | 553.9 | 449.6 | 281.4 | 3,157.1 |
| Capital expenditures . . . . . . . . . . . . . | 85.5 | 24.0 | 12.2 | 26.2 | 147.9 |

| | Year Ended December 31, 2001 | | | | |
| --- | --- | --- | --- | --- | --- |
| | North American Automotive Interior Systems | European and Rest of World Automotive Interior Systems | Specialty Automotive Products | Other(A) | Total |
| External revenues . . . . . . . . . . . . . . . | $1,098.2 | $258.7 | $466.4 | $   — | $1,823.3 |
| Inter-segment revenues . . . . . . . . . . | 12.0 | 30.2 | 0.2 | (42.4) | — |
| Preferred Stock Requirement . . . . . | 2.4 | — | — | — | 2.4 |
| Depreciation and amortization . . . . | 40.6 | 21.4 | 17.9 | 1.9 | 81.8 |
| Operating income (loss) . . . . . . . . . | 68.7 | (24.9) | 10.6 | (18.8) | 35.6 |
| Total assets . . . . . . . . . . . . . . . . . . . . | 1,861.3 | 308.2 | 484.5 | 333.9 | 2,987.9 |
| Capital expenditures . . . . . . . . . . . . . | 25.6 | 12.1 | 14.5 | 2.3 | 54.5 |

| | Year Ended December 31, 2000 | | | | |
| --- | --- | --- | --- | --- | --- |
| | North American Automotive Interior Systems | European and Rest of World Automotive Interior Systems | Specialty Automotive Products | Other(A) | Total |
| External revenues . . . . . . . . . . . . . . . | $1,119.4 | $284.5 | $497.9 | $   — | $1,901.8 |
| Inter-segment revenues . . . . . . . . . . | 22.1 | 34.7 | 34.0 | (90.8) | — |
| Preferred Stock Requirement . . . . . | — | — | — | — | — |
| Depreciation and amortization . . . . | 41.3 | 16.6 | 15.4 | 1.4 | 74.7 |
| Operating income (loss) . . . . . . . . . | 88.0 | 0.6 | 19.5 | — | 108.1 |
| Total assets . . . . . . . . . . . . . . . . . . . . | 664.3 | 228.6 | 267.1 | 120.3 | 1,280.3 |
| Capital expenditures . . . . . . . . . . . . . | 31.5 | 18.3 | 18.4 | 0.8 | 69.0 |

(A) Other includes the Company's non-operating units (See Note 14), the effect of eliminating entries and restructuring charges (See Note 15). During 2002, certain costs that were previously included at the divisional units were included as non-operating costs. In order for the information to be comparable, all non-operating costs have been allocated back to the segments based on sales and assets. For 2002, $134.6 million, $9.4 million and $29.7 million of costs were allocated back to NAAIS, Europe and ROW and Specialty, respectively.

**COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

Sales by product groups follow (in millions):

|  | Fiscal Year Ended | | |
|---|---|---|---|
|  | December 31, 2002 | December 31, 2001 | December 31, 2000 |
| Plastic-based interior and exterior trim systems . . . . . . . | $2,328.6 | $ 403.6 | $ 452.1 |
| Molded floor carpet . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 481.6 | 476.6 | 458.2 |
| Automotive fabrics . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 377.0 | 278.5 | 290.5 |
| Acoustical products . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 266.8 | 222.9 | 231.4 |
| Accessory floormats . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 156.2 | 148.7 | 160.4 |
| Convertible top systems . . . . . . . . . . . . . . . . . . . . . . . . | 129.3 | 118.4 | 105.2 |
| Luggage compartment trim . . . . . . . . . . . . . . . . . . . . . . | 70.1 | 61.4 | 71.0 |
| Other . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 76.2 | 113.2 | 133.0 |
| Total . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $3,885.8 | $1,823.3 | $1,901.8 |

Direct and indirect sales to significant customers in excess of ten percent of consolidated net sales from continuing operations follow:

|  | Fiscal Year Ended | | |
|---|---|---|---|
|  | 2002 | 2001 | 2000 |
| DaimlerChrysler AG . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 31.0% | 18.7% | 16.8% |
| General Motors Corporation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 23.0% | 29.0% | 31.4% |
| Ford Motor Company . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 23.0% | 21.5% | 20.6% |

Information about the Company's continuing operations in different geographic areas for fiscal 2002, 2001, and 2000 is presented below (in millions):

|  | Year Ended December 31, 2002 | | Fiscal Year Ended December 31, 2001 | | Fiscal Year Ended December 31, 2000 | |
|---|---|---|---|---|---|---|
|  | Net Sales | Long-Lived Assets | Net Sales | Long-Lived Assets | Net Sales | Long-Lived Assets |
| United States . . . . . . . . . | $2,412.0 | $1,445.3 | $1,346.0 | $1,548.0 | $1,123.6 | $518.5 |
| Canada . . . . . . . . . . . . . . | 488.2 | 343.4 | 168.5 | 101.9 | 407.6 | 85.1 |
| Mexico . . . . . . . . . . . . . . | 230.7 | 96.8 | 50.5 | 52.9 | 86.1 | 26.2 |
| United Kingdom . . . . . . . | 660.5 | 63.2 | 117.3 | 71.8 | 117.2 | 54.3 |
| Other . . . . . . . . . . . . . . . | 94.4 | 240.1 | 141.0 | 337.8 | 167.3 | 73.9 |
| Consolidated . . . . . . . . . . | $3,885.8 | $2,188.8 | $1,823.3 | $2,112.4 | $1,901.8 | $758.0 |

Intersegment sales between geographic areas are not material. For fiscal years 2002, 2001, and 2000, export sales from the United States to foreign countries were $429.5 million, $146.2 million, and $87.2 million, respectively.

COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

**21. Commitments and Contingencies**

*Environmental*

The Company is subject to federal, state, local and foreign environmental, and health and safety, laws and regulations that (i) affect ongoing operations and may increase capital costs and operating expenses in order to maintain compliance with such requirements and (ii) impose liability relating to contamination at facilities, and at other locations such as former facilities, facilities where we have sent wastes for treatment or disposal, and other properties to which the Company may be linked. Such liability may include, for example, investigation and clean-up of the contamination, personal injury and property damage caused by the contamination, and damages to natural resources. Some of these liabilities may be imposed without regard to fault, and may also be joint and several (which can result in a liable party being held responsible for the entire obligation, even where other parties are also liable).

Management believes that it has obtained, and is in material compliance with, those material environmental permits and approvals necessary to conduct the Company's various businesses. Environmental compliance costs for continuing businesses are accounted for as normal operating expenses or capital expenditures, except for certain costs incurred at acquired locations. Environmental compliance costs relating to conditions existing at the time of an acquisition are generally charged to reserves established in purchase accounting. The Company accrues for environmental remediation costs when such obligations are known and reasonably estimable. In the opinion of management, based on the facts presently known to it, such environmental compliance and remediation costs will not have a material effect on the Company's business, consolidated financial condition, future results of operations or cash flows.

The Company is legally or contractually responsible or alleged to be responsible for the investigation and remediation of contamination at various sites, and for personal injury or property damages, if any, associated with such contamination. At some of these sites the Company has been notified that it is a potentially responsible party ("PRP") under the federal Superfund law or similar state laws. Other sites at which the Company may be responsible for contamination may be identified in the future, including with respect to divested and acquired businesses.

The Company is currently engaged in investigating or remediating certain sites as discussed in the paragraphs below. In estimating the cost of investigation and remediation, the Company considered, among other things, its prior experience in remediating contaminated sites, remediation efforts by other parties, data released by the United States Environmental Protection Agency ("USEPA"), the professional judgment of the Company's environmental experts, outside environmental specialists and other experts, and the likelihood that other identified PRPs will have the financial resources to fulfill their obligations at sites where they and the Company may be jointly and severally liable. It is difficult to estimate the total cost of investigation and remediation due to various factors including: incomplete information regarding particular sites and other PRPs; uncertainty regarding the nature and extent of environmental problems and the Company's share, if any, of liability for such problems; the ultimate selection among alternative approaches by governmental regulators; the complexity and evolving nature of environmental laws, regulations and governmental directives; and changes in cleanup standards.

The Company is a party to a Consent Decree with the State of New Hampshire to remediate a former industrial landfill known as the Cardinal Landfill in Farmington, New Hampshire. Pursuant to that Consent Decree, the Company is currently conducting a pilot test for a proposed remediation of chlorinated compound contaminants in groundwater. The Consent Decree calls for a remedy to be in place by 2004. The Company is a defendant in two lawsuits filed by a total of 91 individual plaintiffs for alleged personal injuries arising from Cardinal Landfill conditions. The Company will vigorously contest these allegations. As of December 31, 2002, the Company has accrued $15.7 million for Cardinal Landfill.

**COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

The Company is a party, as a member of a PRP workgroup, to a Consent Decree entered with the USEPA for the remediation of a former municipal landfill in Dover, New Hampshire. The town of Dover, New Hampshire is also a member of the PRP group and a party to the Consent Decree. Pursuant to the terms of the Consent Decree, the PRP group is currently engaged in the preparation of a remediation design. The Consent Decree requires that a remedy for the site be in place by 2004. As of December 31, 2002, the Company has accrued $9.6 million for Dover.

Pursuant to a Consent Decree signed with the USEPA, the Company is currently engaged in a full-scale remediation for groundwater and soil contamination at the former Stamina Mills manufacturing facility in North Smithfield, Rhode Island. Remediation activities have been ongoing since 1998. The Company is also in negotiation with the USEPA regarding a claim for past oversight costs. A resolution of this matter is anticipated in 2003. As of December 31, 2002, the Company has accrued $14.1 million for Stamina Mills.

The Company is working with the Michigan Department of Environmental Quality (MDEQ) to investigate and remediate soil and groundwater contamination at a former manufacturing plant in Mancelona, MI and at adjacent owned property formerly used for the treatment and disposal of plating waste. MDEQ is likely to require remediation of groundwater. In addition, the Company is incurring costs in connection with the provision of alternate water supplies to residences in the area.

The current owner of one of the Company's former manufacturing plants located in Bowling Green, OH has entered into an Administrative Order on Consent with the Ohio Environmental Protection Agency (OEPA) requiring investigation and remediation of contamination at the site. The Company is reimbursing the current owner for costs associated with ongoing groundwater monitoring and, following selection of an appropriate remedy by OEPA, will assume 90% of future remediation costs.

In the 1980's and 1990's, the California Regional Water Quality Control Board (CRWQCB) and other state agencies ordered a predecessor of the Company to investigate and remediate soil and groundwater contamination at a former lumber treatment plant in Elmira, CA. In 1996, the Company entered into an agreement with the State of California to conduct long-term operation and maintenance of the remedy implemented at the site.

The Company has established accruals for certain contingent environmental liabilities and management believes such reserves comply with generally accepted accounting principles. The Company accrues for environmental investigatory and non-capital remediation costs when litigation has commenced or a claim or assessment has been asserted or is imminent, the likelihood of an unfavorable outcome is probable, and the financial impact of such outcome is reasonably estimable. As of December 31, 2002 and 2001, total reserves for these environmental costs are approximately $64.5 million and $59.6 million, respectively.

In the opinion of management, based on information presently known to it, identified environmental costs and contingencies will not have a material effect on the Company's consolidated financial condition, future results of operations or cash flows. However, we can give no assurance that we have identified or properly assessed all potential environmental liabilities arising from our business or properties, and those of our present and former subsidiaries and their corporate predecessors.

### *Litigation*

The Company and its subsidiaries have lawsuits and claims pending against them and have certain guarantees outstanding which were made in the ordinary course of business.

The ultimate outcome of the legal proceedings to which the Company is a party will not, in the opinion of the Company's management based on the facts presently known to it, have a material effect on the Company's consolidated financial condition, future results of operations or cash flows.

**COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

*Other Commitments*

As of December 31, 2002, the Company's continuing operations had approximately $36.2 million in outstanding capital expenditure commitments. The majority of the leased properties of the Company's previously divested businesses have been assigned to third parties. Although releases have been obtained from the lessors of certain properties, Products remains contingently liable under most of the leases. Products' future liability for these leases, in management's opinion, based on the facts presently known to it, will not have a material effect on the Company's consolidated financial condition, future results of operations or cash flows.

Refer to Note 2, "New Accounting Pronouncements" regarding certain indemnifications and guarantees as required by FIN No. 45.

COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

### 22. Quarterly Financial Data (Unaudited)

The quarterly financial data is summarized below (in millions, except per share amounts).

| | 2002 | | | |
|---|---|---|---|---|
| | First Quarter | Second Quarter | Third Quarter | Fourth Quarter |
| Net sales | $ 914.8 | $1,085.3 | $ 922.5 | $963.2 |
| Gross profit | 131.1 | 158.5 | 100.7 | 127.8 |
| Income (loss) from continuing operations | (6.7) | 3.7 | (45.2) | (3.1) |
| Income (loss) before extraordinary items | (6.7) | 3.7 | (45.2) | (3.1) |
| Net income (loss) | (18.4) | 13.2 | (45.2) | (3.1) |
| Basic and diluted earnings (loss) per share Continuing operations | (0.11) | (0.46) | (0.54) | (0.04) |
| Discontinued operations | — | 0.12 | — | — |
| Cumulative effect of change in accounting principle | (0.17) | — | — | — |
| Extraordinary loss | — | — | — | — |
| Net income available to common shareholders | (0.27) | (0.33) | (0.54) | (0.04) |
| Common stock prices: | | | | |
| High | 25.500 | 28.375 | 9.000 | 4.450 |
| Low | 16.750 | 9.000 | 2.810 | 2.450 |

| | 2001 | | | |
|---|---|---|---|---|
| | First Quarter | Second Quarter | Third Quarter | Fourth Quarter |
| Net sales | $ 453.1 | $ 457.6 | $ 430.5 | $ 482.1 |
| Gross profit | 58.8 | 64.3 | 53.4 | 42.3 |
| Income (loss) from continuing operations | (7.1) | 1.8 | (13.8) | (30.6) |
| Income (loss) before extraordinary items | (7.1) | 9.2 | (12.4) | (30.6) |
| Net income (loss) | (7.4) | 9.2 | (12.4) | (35.6) |
| Basic and diluted earnings (loss) per share | | | | |
| Continuing operations | (0.26) | 0.05 | (0.32) | (0.62) |
| Discontinued operations | — | 0.21 | 0.03 | — |
| Cumulative effect of change in accounting principle | — | — | — | — |
| Extraordinary loss | — | — | — | (0.10) |
| Net income available to common shareholders | (0.26) | 0.26 | (0.29) | (0.72) |
| Common stock prices: | | | | |
| High | 14.218 | 15.500 | 21.425 | 25.750 |
| Low | 8.950 | 10.125 | 9.875 | 11.900 |

The Company's operations are not subject to significant seasonal influences.

Impact of Prior Period Adjustment — During the Company's review of its financial information, an error in the mathematical computation of foreign currency exchange gains was discovered. The third quarter 2002

**COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

financial statements reflect the correction of the error as a prior period adjustment. The impact of the adjustment on the prior period financial statements follows:

| | Three Months Ended | | | | Six Months Ended | |
|---|---|---|---|---|---|---|
| | March 31, 2002 (As Reported) | March 31, 2002 (Adjusted) | June 30, 2002 (As Reported) | June 30, 2002 (Adjusted) | June 30, 2002 (As Reported) | June 30, 2002 (Adjusted) |
| | (in millions, except per share data) | | | | | |
| Net sales | $914.8 | $914.8 | $1,085.3 | $1,085.3 | $2,000.1 | $2,000.1 |
| Cost of goods sold | 783.7 | 783.7 | 926.8 | 926.8 | 1,710.5 | 1,710.5 |
| Gross profit | 131.1 | 131.1 | 158.5 | 158.5 | 289.6 | 289.6 |
| Selling, general and administrative expenses | 67.6 | 67.6 | 77.0 | 77.0 | 144.6 | 144.6 |
| Restructuring charges and impairment of long lived assets | 9.1 | 9.1 | — | — | 9.1 | 9.1 |
| Operating income | 54.4 | 54.4 | 81.5 | 81.5 | 135.9 | 135.9 |
| Other, net | 55.9 | 54.2 | 51.8 | 57.0 | 107.7 | 111.2 |
| Income (loss) from continuing operations before income taxes | (1.5) | 0.2 | 29.7 | 24.5 | 28.2 | 24.7 |
| Income tax expense | 5.9 | 6.9 | 23.2 | 20.8 | 29.1 | 27.7 |
| Income (loss) from continuing operations before extraordinary items | (7.4) | (6.7) | 6.5 | 3.7 | (0.9) | (3.0) |
| Income from discontinued operations, net of income taxes | — | — | 9.5 | 9.5 | 9.5 | 9.5 |
| Cumulative effect of change in accounting principle, net of income taxes(A) | (11.7) | (11.7) | — | — | (11.7) | (11.7) |
| Net income (loss) | $(19.1) | (18.4) | 16.0 | 13.2 | (3.1) | (5.2) |
| Earnings per share data: | | | | | | |
| Net income (loss) | $(19.1) | (18.4) | 16.0 | 13.2 | (3.1) | (5.2) |
| Loss on redemption of subsidiary preferred stock | — | — | (36.3) | (36.3) | (36.3) | (36.3) |
| Net (loss) available to common shareholders | $(19.1) | $(18.4) | $ (20.3) | $ (23.1) | $ (39.4) | $ (41.5) |
| Net (loss) per basic and diluted common share | $(0.28) | $(0.27) | $ (0.29) | $ (0.33) | $ (0.57) | $ (0.60) |
| Average basic and diluted common shares outstanding: | 67.2 | 67.2 | 70.4 | 70.4 | 68.8 | 68.8 |

| | March 31, 2002 (As Reported) | March 31, 2002 (Adjusted) | | | June 30, 2002 (As Reported) | June 30, 2002 (Adjusted) |
|---|---|---|---|---|---|---|
| Accumulated deficit(A) | $(701.9) | $(701.2) | | | $(722.1) | $(724.2) |

(A) Includes effect of $11.7 million (having no tax impact) cumulative effect of change in accounting principle recorded in June 2002, and accounted for as if it occurred on January 1, 2002.

F-43

**COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

**23.  Consolidating Financial Statements**

Products issued Senior Notes in a total principal amount of $500.0 million in December 2001. The Senior Notes are guaranteed by the Company and all the Company's wholly owned domestic Subsidiaries other than its receivable, insurance and charitable subsidiaries (Guarantor Subsidiaries). The following are consolidating financial statements of the Company, Products, its guarantor and non-guarantor subsidiaries:

COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES

SUPPLEMENTAL GUARANTOR CONDENSED CONSOLIDATING FINANCIAL STATEMENTS

CONSOLIDATING STATEMENT OF INCOME

| | For the Year Ended December 31, 2002 | | | | | |
|---|---|---|---|---|---|---|
| | Parent | Issuer | Guarantors | Non-Guarantors | Eliminations | Consolidated Total |
| | | | | (in millions) | | |
| Net sales | $ — | $289.4 | $2,415.7 | $1,216.9 | $(36.2) | $3,885.8 |
| Cost of goods sold | — | 181.8 | 2,110.0 | 1,112.1 | (36.2) | 3,367.7 |
| Selling, general and administrative expenses | 0.1 | 166.1 | 82.8 | 44.5 | — | 293.5 |
| Restructuring charges and impairment of long-lived assets | — | 16.5 | 8.3 | 32.1 | — | 56.9 |
| Operating income (loss) | (0.1) | (75.0) | 214.6 | 28.2 | — | 167.7 |
| Interest expense, net | (0.1) | 15.4 | 126.2 | 7.4 | — | 148.9 |
| Intercompany interest (income) expense | (6.6) | (5.9) | (23.8) | 36.3 | — | — |
| Loss on sale of receivables | — | 0.6 | — | 3.6 | — | 4.2 |
| Subsidiary preferred stock dividend | — | 30.8 | — | — | — | 30.8 |
| Subsidiary preferred stock accretion | — | 7.6 | — | — | — | 7.6 |
| Other expense, net | — | (45.8) | 40.4 | 12.5 | 2.9 | 10.0 |
| Income (loss) from continuing operations before income taxes | 6.6 | (77.7) | 71.8 | (31.6) | (2.9) | (33.8) |
| Income tax (benefit) expense | 2.5 | (16.2) | 42.4 | (11.2) | — | 17.5 |
| Income (loss) from continuing operations | 4.1 | (61.5) | 29.4 | (20.4) | (2.9) | (51.3) |
| Income from discontinued operations | — | 9.5 | — | — | — | 9.5 |
| Cumulative effect of a change in accounting principle | — | — | — | (11.7) | — | (11.7) |
| Equity in net (loss) income of subsidiaries | (57.6) | (5.6) | (60.3) | — | 123.5 | — |
| NET INCOME (LOSS) | $(53.5) | $(57.6) | $ (30.9) | $ (32.1) | $120.6 | $ (53.5) |

| | For the Year Ended December 31, 2001 | | | | | |
|---|---|---|---|---|---|---|
| | Parent | Issuer | Guarantors | Non-Guarantors | Eliminations | Consolidated Total |
| | | | | (in millions) | | |
| Net sales | $ — | $612.2 | $676.4 | $577.1 | $(42.4) | $1,823.3 |
| Cost of goods sold | — | 506.3 | 598.2 | 542.4 | (42.4) | 1,604.5 |
| Selling, general and administrative expenses | 0.1 | 34.9 | 81.1 | 48.3 | — | 164.4 |
| Restructuring charges and impairment of long-lived assets | — | 7.3 | 0.9 | 10.6 | — | 18.8 |
| Operating income (loss) | (0.1) | 63.7 | (3.8) | (24.2) | — | 35.6 |
| Interest expense, net | — | 45.6 | 35.9 | 2.8 | — | 84.3 |
| Intercompany interest (income) expense | — | 17.3 | (24.7) | 7.4 | — | — |
| Loss on sale of receivables | — | 6.1 | — | 4.7 | — | 10.8 |
| Subsidiary preferred stock dividend | — | 1.5 | — | — | — | 1.5 |
| Subsidiary preferred stock accretion | — | 0.9 | — | — | — | 0.9 |
| Other expense, net | — | 5.0 | 2.9 | 1.8 | (3.3) | 6.4 |
| Income (loss) from continuing operations before income taxes | (0.1) | (12.7) | (17.9) | (40.9) | 3.3 | (68.3) |
| Income tax (benefit) expense | 0.2 | (11.9) | (5.6) | (1.3) | — | (18.6) |
| Income (loss) from continuing operations | (0.3) | (0.8) | (12.3) | (39.6) | 3.3 | (49.7) |
| Income from discontinued operations | — | 8.8 | — | — | — | 8.8 |
| Extraordinary loss on retirement of debt | — | (5.0) | (0.3) | — | — | (5.3) |
| Equity in net (loss) income of subsidiaries | (45.9) | (48.9) | (33.5) | — | 128.3 | — |
| NET INCOME (LOSS) | $(46.2) | $(45.9) | $(46.1) | $(39.6) | $131.6 | $ (46.2) |

F-45

COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES

SUPPLEMENTAL GUARANTOR CONDENSED CONSOLIDATING FINANCIAL STATEMENTS

CONSOLIDATING STATEMENT OF INCOME

| | | | | For the Year Ended December 31, 2000 | | |
| --- | --- | --- | --- | --- | --- | --- |
| | Parent | Issuer | Guarantors | Non-Guarantors | Eliminations | Total Consolidated |
| | | | | (in millions) | | |
| Net sales | $  — | $547.7 | $619.6 | $815.4 | $  (80.9) | $1,901.8 |
| Cost of goods sold | — | 464.4 | 554.1 | 697.6 | (80.9) | 1,635.2 |
| Selling, general and administrative expenses | 0.1 | 36.0 | 53.5 | 68.9 | — | 158.5 |
| Operating income (loss) | (0.1) | 47.3 | 12.0 | 48.9 | — | 108.1 |
| Interest expense, net | (0.1) | 86.8 | 7.4 | 2.5 | — | 96.6 |
| Intercompany interest (income) expense | — | 19.9 | (16.2) | (3.7) | — | — |
| Loss on sale of receivables | — | 1.6 | — | 7.6 | — | 9.2 |
| Other expense, net | — | 2.1 | (13.6) | 9.9 | 3.1 | 1.5 |
| Income (loss) from continuing operations before income taxes | — | (63.1) | 34.4 | 32.6 | (3.1) | 0.8 |
| Income tax (benefit) expense | — | (24.1) | 15.3 | 12.2 | (1.2) | 2.2 |
| Income (loss) from continuing operations | — | (39.0) | 19.1 | 20.4 | (1.9) | (1.4) |
| Income from discontinued operations | — | 6.6 | — | — | — | 6.6 |
| Extraordinary loss on retirement of debt | — | — | (0.7) | — | — | (0.7) |
| Equity in net income (loss) of subsidiaries | 4.5 | 36.9 | 9.2 | — | (50.6) | — |
| NET INCOME (LOSS) | $ 4.5 | $   4.5 | $ 27.6 | $ 20.4 | $  (52.5) | $   4.5 |

F-46

COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES

SUPPLEMENTAL GUARANTOR CONDENSED CONSOLIDATING FINANCIAL STATEMENTS

CONSOLIDATING BALANCE SHEET

| | Parent | Issuer | Guarantors | Non-Guarantors | Eliminations | Consolidated Total |
|---|---|---|---|---|---|---|
| | | | | For the Year Ended December 31, 2002 | | |
| | | | | (in millions) | | |
| **ASSETS** | | | | | | |
| Current Assets: | | | | | | |
| Cash and cash equivalents .... | $  — | $   0.2 | $   0.3 | $  80.8 | $   — | $  81.3 |
| Accounts and other receivables, net ........... | — | 5.0 | 40.7 | 324.4 | 2.9 | 373.0 |
| Inventories ................. | — | 13.0 | 106.7 | 51.9 | — | 171.6 |
| Other ..................... | — | 51.4 | 75.5 | 50.5 | — | 177.4 |
| Total current assets ........... | — | 69.6 | 223.2 | 507.6 | 2.9 | 803.3 |
| Investment in subsidiaries ...... | 397.5 | 1,794.5 | (54.8) | — | (2,137.2) | — |
| Property, plant and equipment, net ........................ | — | 51.2 | 316.9 | 370.4 | (0.7) | 737.8 |
| Goodwill ..................... | — | — | 1,144.8 | 120.7 | — | 1,265.5 |
| Other assets ................. | — | 212.3 | 85.8 | 52.4 | — | 350.5 |
| | $397.5 | $2,127.6 | $1,715.9 | $1,051.1 | $(2,135.0) | $3,157.1 |
| **LIABILITIES & STOCKHOLDERS' EQUITY (DEFICIT)** | | | | | | |
| Current Liabilities: | | | | | | |
| Short-term borrowings ....... | — | — | — | 10.5 | — | 10.5 |
| Current maturities of long-term debt ................ | — | 22.7 | 0.1 | 0.7 | — | 23.5 |
| Accounts payable ........... | — | 58.5 | 269.7 | 252.3 | — | 580.5 |
| Accrued expenses ........... | — | 157.5 | 50.8 | 106.6 | — | 314.9 |
| Total current liabilities ........ | — | 238.7 | 320.6 | 370.1 | — | 929.4 |
| Long-term debt ............... | — | 1,255.0 | 0.1 | 0.1 | — | 1,255.2 |
| Intercompany payable (receivable) ................ | — | (92.1) | (359.9) | 452.0 | — | — |
| Other noncurrent liabilities ..... | — | 204.6 | 140.8 | 105.7 | — | 451.1 |
| Mandatorily redeemable preferred stock of subsidiary .. | — | 123.9 | — | — | — | 123.9 |
| Total common stockholders' equity (deficit) ............. | $397.5 | $  397.5 | $1,614.3 | $  123.2 | $(2,135.0) | $  397.5 |
| | $397.5 | $2,127.6 | $1,715.9 | $1,051.1 | $(2,135.0) | $3,157.1 |

F-47

COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES

SUPPLEMENTAL GUARANTOR CONDENSED CONSOLIDATING FINANCIAL STATEMENTS

CONSOLIDATING BALANCE SHEET

| | For the Year Ended December 31, 2001 | | | | | |
|---|---|---|---|---|---|---|
| | Parent | Issuer | Guarantors | Non-Guarantors | Eliminations | Consolidated Total |
| | | | | (in millions) | | |
| **ASSETS** | | | | | | |
| Current Assets | | | | | | |
| Cash and cash equivalents ....... | $ 0.2 | $ (3.8) | $ 12.7 | $ 64.8 | $ — | $ 73.9 |
| Accounts and other receivables, net ......................... | — | 8.7 | 140.6 | 250.9 | 5.9 | 406.1 |
| Inventories .................... | — | 37.6 | 55.7 | 39.3 | — | 132.6 |
| Other ........................ | — | 8.6 | 71.4 | 51.9 | — | 131.9 |
| Total current assets ............... | 0.2 | 51.1 | 280.4 | 406.9 | 5.9 | 744.5 |
| Investment in subsidiaries ......... | 374.5 | 1,784.9 | 396.5 | — | (2,555.9) | — |
| Property, plant and equipment, net .. | — | 63.9 | 254.7 | 294.0 | — | 612.6 |
| Goodwill ....................... | — | 23.7 | 1,101.3 | 133.0 | (4.2) | 1,253.8 |
| Other assets .................... | — | 195.9 | 106.6 | 74.5 | — | 377.0 |
| | 374.5 | 2,068.4 | 1,859.1 | 501.5 | (2,560.1) | 2,243.4 |
| | $374.7 | $2,119.5 | $2,139.5 | $908.4 | $(2,554.2) | $2,987.9 |
| **LIABILITIES & STOCKHOLDERS' EQUITY (DEFICIT)** | | | | | | |
| Current Liabilities: | | | | | | |
| Short-term borrowings .......... | — | — | 0.1 | 25.5 | — | 25.6 |
| Current maturities of long-term debt ........................ | — | 18.0 | 0.3 | 1.6 | — | 19.9 |
| Accounts payable ............... | — | 100.2 | 247.5 | 121.0 | — | 468.7 |
| Accrued expenses ............... | — | 76.0 | 83.3 | 90.1 | — | 249.4 |
| Total current liabilities ............ | — | 194.2 | 331.2 | 238.2 | — | 763.6 |
| Long-term debt .................. | — | 1,282.0 | (0.1) | 0.7 | — | 1,282.6 |
| Intercompany payable (receivable) .. | — | (102.4) | 4.1 | 98.3 | — | — |
| Other noncurrent liabilities ......... | — | 221.9 | 137.2 | 58.6 | — | 417.7 |
| Mandatorily redeemable preferred stock of subsidiary .............. | — | 149.3 | — | — | — | 149.3 |
| | — | 1,550.8 | 141.2 | 157.6 | | 1,849.6 |
| Total common stockholders' equity (deficit) ....................... | $374.7 | $ 374.5 | $1,667.1 | $512.6 | $(2,554.2) | $ 374.7 |
| | $374.7 | $2,119.5 | $2,139.5 | $908.4 | $(2,554.2) | $2,987.9 |

## COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES

## SUPPLEMENTAL GUARANTOR CONDENSED CONSOLIDATING FINANCIAL STATEMENTS

## CONSOLIDATING STATEMENT OF CASH FLOWS

| | For the Year Ended December 31, 2002 | | | | | |
|---|---|---|---|---|---|---|
| | Parent | Issuer | Guarantors | Non-Guarantors (in millions) | Eliminations | Consolidated Total |
| **OPERATING ACTIVITIES** | | | | | | |
| Net cash provided by (used in) operating activities . . . . . . . . . . . . | $ (0.2) | $ 24.0 | $(271.3) | $ 437.0 | $— | $ 189.5 |
| **INVESTING ACTIVITIES** | | | | | | |
| Additions to property, plant and equipment . . . . . . . . . . . . . . . . . . . . | — | (31.2) | (71.9) | (44.8) | — | (147.9) |
| Sales of property, plant and equipment . . . . . . . . . . . . . . . . . . . . | — | — | 13.3 | — | — | 13.3 |
| Additional investment in joint venture . . . . . . . . . . . . . . . . . . . . . . | — | — | — | (5.9) | — | (5.9) |
| Acquisitions of businesses, net of cash acquired . . . . . . . . . . . . . . . . | — | — | (6.8) | — | — | (6.8) |
| Payment of acquisition costs . . . . . . . | — | — | (38.8) | — | — | (38.8) |
| Net cash provided by (used in) investing activities . . . . . . . . . | — | (31.2) | (104.2) | (50.7) | — | (186.1) |
| **FINANCING ACTIVITIES** | | | | | | |
| Repayment of long-term debt . . . . . . | — | (22.4) | (0.1) | (1.4) | — | (23.9) |
| Increase (decrease) in short-term borrowings . . . . . . . . . . . . . . . . . . . | — | — | — | (16.0) | — | (16.0) |
| Net proceeds from issuance of common stock . . . . . . . . . . . . . . . | 150.6 | — | — | — | — | 150.6 |
| Repayment of preferred stock . . . . . . | — | (100.0) | — | — | — | (100.0) |
| Repayment of debt assumed in acquisition . . . . . . . . . . . . . . . . . . . | — | (6.7) | — | — | — | (6.7) |
| Intercompany transfers (from) to Subsidiary . . . . . . . . . . . . . . . . . . . . | (150.6) | 140.3 | 364.0 | (353.7) | — | — |
| Net cash provided by (used in) financing activities . . . . . . . . . | — | 11.2 | 363.9 | (371.1) | — | 4.0 |
| Increase (decrease) in cash and cash equivalents . . . . . . . . . . . . . . . . . . . | (0.2) | 4.0 | (11.6) | 15.2 | — | 7.4 |
| Cash and cash equivalents at beginning of year . . . . . . . . . . . . . . . | 0.2 | (3.8) | 12.7 | 64.8 | — | 73.9 |
| Cash and cash equivalents at end of year . . . . . . . . . . . . . . . . . . . . . . . | $ — | $ 0.2 | $ 1.1 | $ 80.0 | $— | $ 81.3 |

F-49

COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES

SUPPLEMENTAL GUARANTOR CONDENSED CONSOLIDATING FINANCIAL STATEMENTS

CONSOLIDATING STATEMENT OF CASH FLOWS — (Continued)

| | For the Year Ended December 31, 2001 | | | | | |
| | Parent | Issuer | Guarantors | Non-Guarantors | Eliminations | Consolidated Total |
| | | | | (in millions) | | |
| **OPERATING ACTIVITIES** | | | | | | |
| Net cash provided by (used in) operating activities . . . . . . . . . . . . . | $ (0.3) | $(266.6) | $ 237.6 | $ 170.3 | $— | $ 141.0 |
| **INVESTING ACTIVITIES** | | | | | | |
| Additions to property, plant and equipment . . . . . . . . . . . . . . . . . . . . . | — | (14.8) | (14.5) | (25.2) | — | (54.5) |
| Sales of property, plant and equipment . . . . . . . . . . . . . . . . . . . . . | — | 62.2 | 24.0 | 1.9 | — | 88.1 |
| Acquisitions of businesses, net of cash acquired . . . . . . . . . . . . . . . . . | — | (760.9) | — | — | — | (760.9) |
| Sale of business . . . . . . . . . . . . . . . . . . | — | — | 3.5 | — | — | 3.5 |
| Net cash provided by (used in) investing activities . . . . . . . . . | — | (713.5) | 13.0 | (23.3) | — | (723.8) |
| **FINANCING ACTIVITIES** | | | | | | |
| Issuance of long-term debt . . . . . . . . | — | 950.0 | — | — | — | 950.0 |
| Debt issuance costs . . . . . . . . . . . . . . | — | (59.4) | — | — | — | (59.4) |
| Repayment of long-term debt . . . . . . | — | (383.2) | — | — | — | (383.2) |
| Increase (decrease) in short-term borrowings . . . . . . . . . . . . . . . . . . . . | — | 9.7 | 2.0 | (1.6) | — | 10.1 |
| Net borrowings (repayments) on revolving credit facilities . . . . . . . . | — | (133.4) | — | (16.8) | — | (150.2) |
| Net proceeds from issuance of common stock . . . . . . . . . . . . . . . . | 207.2 | — | — | — | — | 207.2 |
| Reissue (purchase) treasury stock, net . . . . . . . . . . . . . . . . . . . . . . . . . | 61.3 | — | — | — | — | 61.3 |
| Intercompany transfers (from) to Subsidiary . . . . . . . . . . . . . . . . . . . . | (268.5) | 596.8 | (240.9) | (87.4) | — | — |
| Net cash provided by (used in) financing activities . . . . . . . . . | — | 980.5 | (238.9) | (105.8) | — | 635.8 |
| Increase (decrease) in cash and cash equivalents . . . . . . . . . . . . . . . . . . . . | (0.3) | 0.4 | 11.7 | 41.2 | — | 53.0 |
| Cash and cash equivalents at beginning of year . . . . . . . . . . . . . . . . | 0.5 | (4.2) | 1.0 | 23.6 | — | 20.9 |
| Cash and cash equivalents at end of year . . . . . . . . . . . . . . . . . . . . . . . . | $ 0.2 | $ (3.8) | $ 12.7 | $ 64.8 | $— | $ 73.9 |

F-50

**COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES**

**SUPPLEMENTAL GUARANTOR CONDENSED CONSOLIDATING FINANCIAL STATEMENTS**

**CONSOLIDATING STATEMENT OF CASH FLOWS**

| | For the Year Ended December 31, 2000 | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | Parent | Issuer | Guarantors | Non-Guarantors | Eliminations | Consolidated Total |
| | | | | (in millions) | | |
| **OPERATING ACTIVITIES** | | | | | | |
| Net cash provided by operating activities . . . . . . . . . . . . . . . . . . . . . . | $ 0.4 | $ 13.2 | $ 7.1 | $ 76.6 | $— | $ 97.3 |
| **INVESTING ACTIVITIES** | | | | | | |
| Additions to property, plant and equipment. . . . . . . . . . . . . . . . . . . . . | — | (20.9) | (13.9) | (34.2) | — | (69.0) |
| Sales of property, plant and equipment. . . . . . . . . . . . . . . . . . . . . | — | 5.6 | — | — | — | 5.6 |
| Net cash used in investing activities . . . . . . . . . . . . . . . . . . . . | — | (15.3) | (13.9) | (34.2) | — | (63.4) |
| **FINANCING ACTIVITIES** | | | | | | |
| Repayment of long-term debt . . . . . . | — | (27.5) | (38.1) | (1.0) | — | (66.6) |
| Increase (decrease) in short-term borrowings . . . . . . . . . . . . . . . . . . | — | — | — | 0.2 | — | 0.2 |
| Net borrowings (repayments) on revolving credit facilities . . . . . . . . | — | 64.9 | — | (25.9) | — | 39.0 |
| Reissue (purchase) treasury stock, net . . . . . . . . . . . . . . . . . . . . . . . . | 0.4 | — | — | — | — | 0.4 |
| Intercompany transfers to (from) subsidiary . . . . . . . . . . . . . . . . . . . | (0.4) | (37.8) | 43.7 | (5.5) | — | — |
| Net cash provided by (used in) financing activities . . . . . . . . . . . | — | (0.4) | 5.6 | (32.2) | — | (27.0) |
| Increase (decrease) in cash and cash equivalents . . . . . . . . . . . . . . . . . . | 0.4 | (2.5) | (1.2) | 10.2 | — | 6.9 |
| Cash and cash equivalents at beginning of year . . . . . . . . . . . . . . . . . . . . | 0.1 | (1.7) | 2.2 | 13.4 | — | 14.0 |
| Cash and cash equivalents at end of year . . . . . . . . . . . . . . . . . . . . . . . | $ 0.5 | $ (4.2) | $ 1.0 | $ 23.6 | $— | $ 20.9 |

F-51

**COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES**

**SCHEDULE I — CONDENSED FINANCIAL INFORMATION OF REGISTRANT**

The information required under this Schedule is included in Note 23 of the Consolidated Financial Statements.

**COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES**

**SCHEDULE II — VALUATION AND QUALIFYING ACCOUNTS**
**For the Fiscal Years Ended December 31, 2002, December 31, 2001, and December 31, 2000**

| Description | Balance At Beginning of Year | Additions Resulting from Acquisitions | Charge to Cost And Expenses | Charged to Other Accounts | Deductions | Balance at End of Year |
|---|---|---|---|---|---|---|
| | | | | (in millions) | | |
| **Fiscal Year Ended December 31, 2002:** | | | | | | |
| Allowance for doubtful accounts . . . . . . | $14.6 | $ — | $2.5 | $ 4.8 | $(3.3) | $18.6 |
| **Fiscal Year Ended December 31, 2001:** | | | | | | |
| Allowance for doubtful accounts . . . . . . | $ 8.1 | $6.8 | $6.6 | $(0.3) (a) | $(6.6) | $14.6 |
| **Fiscal Year Ended December 31, 2000:** | | | | | | |
| Allowance for doubtful accounts . . . . . . | $ 8.5 | $ — | $6.6 | $(0.9) (a) | $(6.1) (b) | $ 8.1 |

(a) Reclassifications and collection of accounts previously written off.

(b) Reclassifications to other accounts, uncollectible amounts written off, and the elimination of amounts included in the allowance due from Enjema which was considered as a component of the Company's purchase cost for the remaining 50% interest in Enjema.

## Exhibit Index

| Exhibit Number | Description |
|---|---|
| 2.1 | Agreement and Plan of Merger dated May 14, 2001 by and among Collins & Aikman Corporation, Collins & Aikman Products Co., Becker Group, L.L.C., CE Becker Inc., ME McInerney Inc., J Hoehnel Inc. and the individuals party thereto as sellers is hereby incorporated by reference to Exhibit 2.1 of Collins & Aikman Corporation's Current Report on Form 8-K dated July 13, 2001. |
| 2.2 | Agreement and Plan of Merger dated as of August 17, 2001 by and among Collins & Aikman Corporation, Collins & Aikman Products Co., JAII Acquisition Co., Elkin McCallum, Joan Fabrics Corporation and Joan Automotive Industries, Inc is hereby incorporated by reference to Exhibit 2.1 of Collins & Aikman Corporation's Current Report on Form 8-K dated September 21, 2001. |
| 2.3 | First Amendment to Agreement and Plan of Merger by and among Collins & Aikman Corporation, Collins & Aikman Products Co., JAII Acquisition Co., Elkin McCallum, Joan Fabrics Corporation and Joan Automotive Industries, Inc dated as of September 21, 2001 is hereby incorporated by reference to Exhibit 2.2 of Collins & Aikman Corporation's Current Report on Form 8-K dated September 21, 2001. |
| 2.4 | Purchase Agreement dated as of August 7, 2001, as amended and restated as of November 30, 2001, by and among Textron Inc., Collins & Aikman Corporation and Collins & Aikman Products Co., including Exhibit 1 (Certificate of Designation of the 15% Series A Redeemable Preferred Stock, the 16% Series B Redeemable Preferred Stock and the 16% Series C Redeemable Preferred Stock) and Exhibit 7 (Asset Purchase Agreement dated as of August 7 by and between Textron Automotive Exteriors Inc. and JPS Automotive, Inc.), which is incorporated by reference to Collins and Aikman Corporation Current Report on Form 8-k dated December 20, 2001 and filed on January 4, 2002. The Table of Contents of the Purchase Agreement listed as Exhibit 2.4 contains a list briefly identifying the contents of all omitted schedules and exhibits. Collins & Aikman Corporation will supplementally furnish a copy of any omitted schedule or Exhibit to the Commission upon request. |
| 2.5 | Asset Purchase Agreement dated as of August 7, 2001, as amended and restated as of November 30, 2001, by and between Textron Automotive Exteriors Inc. and JPS Automotive, Inc., which is incorporated herein by reference to Exhibit 2.2 of Collins & Aikman Corporation's Current Report on Form 8-K dated December 20, 2001 and filed on January 4, 2002. |
| 2.6 | Asset Purchase Agreement dated as of August 17, 2001 by and among Collins & Aikman Products Co., Western Avenue Dyers, L.P., Elkin McCallum, Kerry McCallum, Penny Richards and Tyng Textiles LLC, which is incorporated by reference to Exhibit 2.3 to Collins & Aikman Corporation's Current Report on Form 8-K filed on October 4, 2001. |
| 2.7 | First Amendment to Asset Purchase Agreement dated as of September 21, 2001, which is incorporated by reference to Exhibit 2.4 to Collins & Aikman Corporation's Current Report on Form 8-K filed on October 4, 2001. |
| 3.1 | Restated Certificate of Incorporation of Collins & Aikman Corporation is hereby incorporated by reference to Exhibit 3.1 of Collins & Aikman Corporation's Report on Form 10-Q for the fiscal quarter ended June 26, 1999. |
| 3.2 | Certificate of Amendment to the Restated Certificate of Incorporation of Collins & Aikman Corporation, which is incorporated by reference to Exhibit 3.2 of Collins & Aikman Corporation's Annual Report on Form 10-K for the fiscal year ended December 31, 2000. |
| 3.3 | Certificate of Amendment of Amended and Restated Certificate of Incorporation is hereby incorporated by reference to Exhibit 3.5 of Collins & Aikman Corporation's Current Report on Form 8-K filed May 29, 2002. |
| 3.4 | By-laws of Collins & Aikman Corporation, as amended, are hereby incorporated by reference to Exhibit 3.2 of Collins & Aikman Corporation's Report on Form 10-K for the fiscal year ended January 27, 1996. |

| Exhibit Number | Description |
|---|---|
| 3.5 | Certificate of Elimination of Cumulative Exchangeable Redeemable Preferred Stock of Collins & Aikman Corporation is hereby incorporated by reference to Exhibit 3.3 of Collins & Aikman Corporation's Report on Form 10-Q for the fiscal quarter ended October 28, 1995. |
| 4.1 | Specimen Stock Certificate for the Common Stock is hereby incorporated by reference to Exhibit 4.3 of Amendment No. 3 to Collins & Aikman Holdings Corporation's Registration Statement on Form S-2 (Registration No. 33-53179) filed June 21, 1994. |
| 4.2 | Indenture, dated as of June 1, 1996, between Collins & Aikman Products Co., Collins & Aikman Corporation and First Union National Bank of North Carolina, as Trustee, is hereby incorporated by reference to Exhibit 4.2 of Collins & Aikman Corporation's Report on Form 10-Q for the fiscal quarter ended April 27, 1996. |
| 4.3 | First Supplemental Indenture dated as of June 1, 1996, between Collins & Aikman Products Co., Collins & Aikman Corporation and First Union National Bank of North Carolina, as Trustee, is hereby incorporated by reference to Exhibit 4.3 of Collins & Aikman Corporation's Report on Form 10-Q for the fiscal quarter ended April 27, 1996. |
| 4.4 | Waiver dated as of October 27, 1998 under the Credit Agreement dated as of May 28, 1998, among Collins & Aikman Products Co., Collins & Aikman Canada, Inc. and Collins & Aikman Plastics, Ltd., as Canadian Borrowers, Collins & Aikman Corporation, as Guarantor, the Lender Parties thereto, Bank of America, N.T.S.A., as Documentation Agent, The Chase Manhattan Bank, as Administrative Agent, and The Chase Manhattan Bank of Canada, as Canadian Administrative Agent is hereby incorporated by reference to Exhibit 4.5 of Collins & Aikman Corporation's Report on Form 10-Q for the fiscal quarter ended September 26, 1998. |
| 4.5 | Waiver dated as of December 22, 1998 under the Credit Agreement dated as of May 28, 1998, among Collins & Aikman Products Co., Collins & Aikman Canada, Inc. and Collins & Aikman Corporation, as Guarantor, the Lender Parties thereto, Bank of America, N.T.S.A., as Documentation Agent, The Chase Manhattan Bank, as Administrative Agent, and The Chase Manhattan Bank of Canada, as Canadian Administrative Agent is hereby incorporated by reference to Exhibit 4.6 of Collins & Aikman Corporation's Report on Form 10-K for the year ended December 26, 1998. |
| 4.6 | Amendment and Waiver dated as of March 8, 1999, among Collins & Aikman Products Co., Collins & Aikman Canada, Inc., Collins & Aikman Plastics Ltd., Collins & Aikman Corporation, as Guarantor, the Lender Parties thereto, Bank of America N.T.S.A., as Documentation Agent, The Chase Manhattan Bank, as Administrative Agent, and The Chase Manhattan Bank of Canada, as Canadian Administrative Agent is hereby incorporated by reference to Exhibit 4.7 of Collins & Aikman Corporation's Report on Form 10-K for the year ended December 26, 1998. |
| 4.7 | Tranche C Term Loan Supplement dated as of May 12, 1999 to the Credit Agreement dated as of May 28, 1998 among Collins & Aikman Products Co., Collins & Aikman Canada, Inc., Collins & Aikman Plastics, Ltd., Collins & Aikman Corporation, the Financial Institutions parties thereto, Bank of America N.T.S.A., as Documentation Agent, The Chase Manhattan Bank, as Administrative Agent, and The Chase Manhattan Bank of Canada, as Canadian Administrative Agent is hereby incorporated by reference to Exhibit 4.1 of Collins & Aikman Corporation's Report on Form 10-Q for the fiscal quarter ended June 26, 1999. |
| 4.8 | Indenture dated as of June 28, 1994, between JPS Automotive Products Corp., as Issuer, JPS Automotive L.P., as Guarantor and Shawmut Bank Connecticut, N.A., as Trustee, is hereby incorporated by reference to Exhibit 4.2 of JPS Automotive Corp.'s Registration Statement on Form S-1, Registration No. 33-75510. |
| 4.9 | First Supplemental Indenture, dated as of October 5, 1994, between JPS Automotive Products Corp. and JPS Automotive L.P., as Co-Obligors, and Shawmut Bank Connecticut, N.A., as Trustee is hereby incorporated by reference to Exhibit 4.48A of JPS Automotive L.P.'s and JPS Automotive Products Corp.'s Report on Form 10-Q for the fiscal quarter ended October 2, 1994. |

| Exhibit Number | Description |
|---|---|
| 4.10 | Second Supplemental Indenture, dated as of February 8, 2001, by and among Collins & Aikman Products Co., as Issuer, Collins & Aikman Corporation, as Guarantor, and First Union National Bank, as Trustee, which is incorporated by reference to Exhibit 4.11 of Collins & Aikman Corporation's Annual Report on Form 10-K for the fiscal year ended December 31, 2000. |
| 4.11 | Form of Warrant is hereby incorporated by reference to Exhibit 4.1 of Collins & Aikman Corporation's Current Report on Form 8-K dated July 13, 2001. |
| 4.12 | Certificate of Designation of Series A Redeemable Preferred Stock, Series B Redeemable Preferred Stock and Series C Redeemable Preferred Stock, which is incorporated herein by reference to Exhibit 4.1 of Collins & Aikman Corporation's Current Report of Form 8-K dated December 20, 2001 and filed on January 4, 2002. |
| 4.13 | Indenture dated as of December 20, 2001 by and among Collins & Aikman Products Co., as Issuer, the Guarantors parties thereto, and BNY Midwest Trust Company, as Trustee, which is incorporated herein by reference to Exhibit 4.2 of Collins & Aikman Corporation's Current Report on Form 8-K dated December 20, 2001 and filed on January 4, 2002. |
| 4.14 | Receivables Transfer Agreement dated as of December 20, 2001 by and among Carcorp, Inc., as Transferor, Collins & Aikman Products Co., individually and as Collection Agent, the persons parties thereto, as CP Conduit Purchasers, Committed Purchasers and Funding Agents and JPMorgan Chase Bank, as Administrative Agent, which is incorporated herein by reference to Exhibit 4.3 of Collins & Aikman Corporation's Current Report on Form 8-K dated December 20, 2001 and filed on January 4, 2002. |
| 4.15 | Amended and Restated Receivables Purchase Agreement dated as of December 20, 2001 among Collins & Aikman Products Co. and its wholly-owned direct and indirect subsidiaries named therein, as Sellers, and Carcorp, Inc., as Purchaser, and the other Sellers from time to time named therein, which is incorporated herein by reference to Exhibit 4.4 of Collins & Aikman Corporation's Current Report on Form 8-K dated December 20, 2001 and filed on January 4, 2002. |
| 4.16 | Credit Agreement dated as of December 20, 2001 among Collins & Aikman Products Co., as Borrower, Collins & Aikman Canada Inc., as a Canadian Borrower, Collins & Aikman Plastics, Ltd., as a Canadian Borrower, Collins & Aikman Corporation, the Lenders named therein, Deutsche Banc Alex. Brown Inc. and Merrill Lynch Capital Corporation, as Co-Documentation Agents, Credit Suisse First Boston Corporation, as Syndication Agent, JPMorgan Chase Bank, as Administrative Agent, and J.P.Morgan Bank Canada, as Canadian Administrative Agent, which is incorporated herein by reference to Exhibit 4.5 of Collins & Aikman Corporation's Current Report on Form 8-K dated December 20, 2001 and filed on January 4, 2002. |
| 4.17 | First Amendment dated as of December 13, 2002, to the Credit Agreement dated as of December 20, 2001 among Collins & Aikman Products Co., as Borrower, Collins & Aikman Canada Inc., as a Canadian Borrower, Collins & Aikman Plastics, Ltd., as a Canadian Borrower, Collins & Aikman Corporation, the Lenders named therein, Credit Suisse First Boston Corporation, as Syndication Agent, Deutsche Bank Securities Inc. (formerly known as Deutsche Banc Alex. Brown Inc.) and Merrill Lynch Capital Corporation, as Co-Documentation Agents, JPMorgan Chase Bank, as Administrative Agent, and J.P. Morgan Bank Canada, as Canadian Administrative Agent.* |
| 4.18 | Guarantee and Collateral Agreement dated as of December 20, 2001 by and among Collins & Aikman Corporation, Collins & Aikman Products Co. and certain of their subsidiaries and JPMorgan Chase Bank, as Collateral Agent, which is incorporated herein by reference to Exhibit 4.6 of Collins & Aikman Corporation's Current Report on Form 8-K dated December 20, 2001 and filed on January 4, 2002. |
| 4.19 | Third Supplemental Indenture, dated as of December 20, 2001, among Collins & Aikman Products Co., Collins & Aikman Corporation, the Subsidiary Guarantors listed on the signature page thereto, and First Union National Bank (as successor in interest to First Union National Bank of North Carolina), which is incorporated herein by reference to Exhibit 4.7 of Collins & Aikman Corporation's Current Report on Form 8-K dated December 20, 2001 and filed on January 4, 2002. |

| Exhibit Number | Description |
|---|---|
| 10.1 | Stockholders Agreement, dated February 23, 2001, by and among Collins & Aikman Corporation, Heartland Industrial Partners, L.P. and other investor stockholders listed on Schedule 1 thereto, Blackstone Capital Company II, L.L.C., Blackstone Family Investment Partnership I L.P., Blackstone Advisory Directors Partnership L.P., Blackstone Capital Partners L.P., and Wasserstein/C&A Holdings, L.L.C., incorporated by reference to Annex E to Exhibit 10.1 to Collins & Aikman Corporation's Current Report on Form 8-K dated January 12, 2001. |
| 10.2 | Employment Agreement dated as of July 18, 1990 between Wickes Companies, Inc. and an executive officer is hereby incorporated by reference to Exhibit 10.3 of Wickes Companies, Inc.'s Report on Form 10-K for the fiscal year ended January 26, 1991. |
| 10.3 | Employment Agreement dated as of July 22, 1992 between Collins & Aikman Corporation and an executive officer is hereby incorporated by reference to Exhibit 10.7 of Collins & Aikman Holdings Corporation's Report on Form 10-K for the fiscal year ended January 30, 1993. |
| 10.4 | First Amendment to Employment Agreement dated as of February 24, 1994 between Collins & Aikman Corporation and an executive officer is hereby incorporated by reference to Exhibit 10.7 of Collins & Aikman Holdings Corporation's Registration Statement on Form S-2 (Registration No. 33-53179) filed April 19, 1994. |
| 10.5 | Second Amendment, dated as of October 3, 1996, to the Employment Agreement, dated as of July 22, 1992, as amended, between Collins & Aikman Products Co. and an executive officer is hereby incorporated by reference to Exhibit 10.26 of Collins & Aikman Corporation's Report on Form 10-Q for the fiscal quarter ended October 26, 1996. |
| 10.6 | Third Amendment dated as of August 1, 1997, to the Employment Agreement dated as of July 22, 1992, as amended, between the Corporation and an executive officer is hereby incorporated by reference to Exhibit 10.35 of Collins & Aikman Corporation's Report on Form 10-Q for the fiscal quarter ended September 27, 1997. |
| 10.7 | Letter Agreement dated March 23, 1999 with an executive officer is hereby incorporated by reference to Exhibit 10.7 of Collins & Aikman Corporation's Report on Form 10-K for the fiscal year ended December 26, 1998. |
| 10.8 | Amended and Restated Employment Agreement dated as of January 20, 1999 between Collins & Aikman Products Co. and an executive officer is hereby incorporated by reference to Collins & Aikman Corporation's Report on Form 10-K for the fiscal year ended December 26, 1998. |
| 10.9 | Employment Agreement dated as of January 20, 1999 between Collins & Aikman Products Co. and an executive officer is hereby incorporated by reference to Exhibit 10.9 of Collins & Aikman Corporation's Form 10-K for the fiscal year ended December 26, 1998. |
| 10.10 | Employment Agreement dated as of April 22, 1999 between Collins & Aikman Corporation and an executive officer is hereby incorporated by reference to Exhibit 10.10 of Collins & Aikman Corporation's Report on Form 10-Q for the fiscal quarter ended March 27, 1999. |
| 10.11 | Employment Agreement, dated as of March 29, 2000, between Collins & Aikman Products Co. and an executive officer is hereby incorporated by reference to Exhibit 10.1 of Collins & Aikman Corporation's Report on Form 10-Q for the fiscal quarter ended April 1, 2000. |
| 10.12 | Employment Agreement, dated as of April 1, 2000, between Collins & Aikman Products Co. and an executive officer is hereby incorporated by reference to Exhibit 10.3 of Collins & Aikman Corporation's Report on Form 10-Q for the fiscal quarter ended July 1, 2000. |
| 10.13 | Employment Agreement, dated as of August 1, 2000, between Collins & Aikman Products Co. and an executive officer is hereby incorporated by reference to Exhibit 10.6 of Collins & Aikman Corporation's Report on Form 10-Q for the fiscal quarter ended September 30, 2000. |
| 10.14 | Employment Agreement, dated as of August 1, 2000, between Collins & Aikman Products Co. and an executive officer is hereby incorporated by reference to Exhibit 10.8 of Collins & Aikman Corporation's Report on Form 10-Q for the fiscal quarter ended September 30, 2000. |

| Exhibit Number | Description |
|---|---|
| 10.15 | Letter agreement, dated as of May 12, 1999, with an executive officer is hereby incorporated by reference to Exhibit 10.2 of Collins & Aikman Corporation's Report on Form 10-Q for the fiscal quarter ended June 26, 1999. |
| 10.16 | Letter agreement, dated as of April 7, 2000, between Collins & Aikman Corporation and an executive officer is hereby incorporated by reference to Exhibit 10.12 of Collins & Aikman Corporation's Report on Form 10-Q for the fiscal quarter ended September 30, 2000. |
| 10.17 | Letter agreement, dated as of July 13, 2000, between Collins & Aikman Corporation and an executive officer is hereby incorporated by reference to Exhibit 10.11 of Collins & Aikman Corporation's Report on Form 10-Q for the fiscal quarter ended September 30, 2000. |
| 10.18 | Service contract between Collins & Aikman Products GmbH and an executive officer is hereby incorporated by reference to Exhibit 10.5 of Collins & Aikman Corporation's Report on Form 10-Q for the fiscal quarter ended September 30, 2000. |
| 10.19 | Settlement Agreement dated as of April 27, 2000, between Collins & Aikman Products Co. and an executive officer is hereby incorporated by reference to Exhibit 10.10 of Collins & Aikman Corporation's Report on Form 10-Q for the fiscal quarter ended September 30, 2000. |
| 10.20 | Collins & Aikman Corporation 1998 Executive Incentive Compensation Plan is hereby incorporated by reference to Exhibit 10.10 of Collins & Aikman Corporation's Report on Form 10-K for the fiscal year ended December 26, 1998. |
| 10.21 | Collins & Aikman Products Co. 2000 Executive Incentive Compensation Plan is hereby incorporated by reference to Exhibit 10.5 of Collins & Aikman Corporation's Report on Form 10-Q for the fiscal quarter ended July 1, 2000. |
| 10.22 | Collins & Aikman Corporation Supplemental Retirement Income Plan is hereby incorporated by reference to Exhibit 10.23 of Amendment No. 5 to Collins & Aikman Holdings Corporation's Registration Statement on Form S-2 (Registration No. 33-53179) filed July 6, 1994. |
| 10.23 | Amendment to Collins & Aikman Corporation Supplemental Retirement Income Plan is hereby incorporated by reference to Exhibit 10.12 of the Collins & Aikman Corporation's Report on Form 10-K for the fiscal year ended December 26, 1998. |
| 10.24 | 1993 Employee Stock Option Plan, as amended and restated, is hereby incorporated by reference to Exhibit 10.13 of Collins & Aikman Corporation's Report on Form 10-Q for the fiscal quarter ended April 29, 1995. |
| 10.25 | 1994 Employee Stock Option Plan, as amended through February 7, 1997, is hereby incorporated by reference to Exhibit 10.12 of Collins & Aikman Corporation's Report on Form 10-Q for the fiscal quarter ended March 29, 1997. |
| 10.26 | 2000 Employee Stock Option Plan is hereby incorporated by reference to Exhibit 10.6 of Collins & Aikman Corporation's Report on Form 10-Q for the fiscal quarter ended July 1, 2000. |
| 10.27 | 1994 Directors Stock Option Plan as amended and restated is hereby incorporated by reference to Exhibit 10.15 to Collins & Aikman Corporation's Report on Form 10-K for the year ended December 26, 1998. |
| 10.28 | Excess Benefit Plan of Collins & Aikman Corporation is hereby incorporated by reference to Exhibit 10.25 of Collins & Aikman Corporation's Report on Form 10-K for the fiscal year ended January 28, 1995. |
| 10.29 | 1994 Employee Stock Option Plan, as amended and restated through June 3, 1999 is hereby incorporated by reference to Exhibit 10.2 of Collins & Aikman Corporation's Report on Form 10-Q for the fiscal quarter ended June 26, 1999. |
| 10.30 | Change in Control Agreement, dated March 17, 1998, between Collins & Aikman Corporation and an executive officer is hereby incorporated by reference to Exhibit 10.17 of Collins & Aikman Corporation's Report on Form 10-K for the fiscal year ended December 27, 1997. |
| 10.31 | Change in Control Agreement, dated March 17, 1998, between Collins & Aikman Corporation and an executive officer is hereby incorporated by reference to Exhibit 10.18 of Collins & Aikman Corporation's Report on Form 10-K for the fiscal year ended December 27, 1997. |

| Exhibit Number | Description |
|---|---|
| 10.32 | Change in Control Agreement, dated March 17, 1998, between Collins & Aikman Corporation and an executive officer is hereby incorporated by reference to Exhibit 10.19 of Collins & Aikman Corporation's Report on Form 10-K for the fiscal year ended December 27, 1997. |
| 10.33 | Change in Control Agreement, dated March 17, 1998, between Collins & Aikman Corporation and an executive officer is hereby incorporated by reference to Exhibit 10.20 of Collins & Aikman Corporation's Report on Form 10-K for the fiscal year ended December 27, 1997. |
| 10.34 | Change in Control Agreement, dated March 17, 1998, between Collins & Aikman Corporation and an executive officer is hereby incorporated by reference to Exhibit 10.22 of Collins & Aikman Corporation's Report on Form 10-Q for the fiscal quarter ended March 28, 1998. |
| 10.35 | Change in Control Agreement, dated August 9, 1999, between Collins & Aikman Corporation and an executive officer is hereby incorporated by reference to Exhibit 10.25 of Collins & Aikman Corporation's Report on Form 10-K for the fiscal year ended December 25, 1999. |
| 10.36 | Change in Control Agreement, dated March 17, 1998, between Collins & Aikman Corporation and an executive officer is hereby incorporated by reference to Exhibit 10.26 of Collins & Aikman Corporation's Report on Form 10-K for the fiscal year ended December 25, 1999. |
| 10.37 | Change in Control Agreement, dated March 17, 1998, between Collins & Aikman Corporation and an executive officer is hereby incorporated by reference to Exhibit 10.27 of Collins & Aikman Corporation's Report on Form 10-K for the fiscal year ended December 25, 1999. |
| 10.38 | Change in Control Agreement, dated July 26, 1999, between Collins & Aikman Corporation and an executive officer is hereby incorporated by reference to Exhibit 10.28 of Collins & Aikman Corporation's Report on Form 10-K for the fiscal year ended December 25, 1999. |
| 10.39 | Change in Control Agreement, dated March 17, 1998, between Collins & Aikman Corporation and an executive officer is hereby incorporated by reference to Exhibit 10.29 of Collins & Aikman Corporation's Report on Form 10-K for the fiscal year ended December 25, 1999. |
| 10.40 | Change in Control Agreement, dated as of April, 2000, between Collins & Aikman Corporation and an executive officer is hereby incorporated by reference to Exhibit 10.2 of Collins & Aikman Corporation's Report on Form 10-Q for the fiscal quarter ended July 1, 2000. |
| 10.41 | Change in Control Agreement, dated as of April 1, 2000, between Collins & Aikman Products Co. and an executive officer is hereby incorporated by reference to Exhibit 10.4 of Collins & Aikman Corporation's Report on Form 10-Q for the fiscal quarter ended July 1, 2000. |
| 10.42 | Change in Control Agreement, dated as of August 1, 2000, between Collins & Aikman Corporation and an executive officer is hereby incorporated by reference to Exhibit 10.7 of Collins & Aikman Corporation's Report on Form 10-Q for the fiscal quarter ended September 30, 2000. |
| 10.43 | Change in Control Agreement, dated as of August 1, 2000, between Collins & Aikman Corporation and an executive officer is hereby incorporated by reference to Exhibit 10.9 of Collins & Aikman Corporation's Report on Form 10-Q for the fiscal quarter ended September 30, 2000. |
| 10.44 | Lease, executed as of the 1st day of June 1987, between Dura Corporation and Dura Acquisition Corp. is hereby incorporated by reference to Exhibit 10.24 of Amendment No. 5 to Collins & Aikman Holdings Corporation's Registration Statement on Form S-2 (Registration No. 33-53179) filed July 6, 1994. |
| 10.45 | Master Equipment Lease Agreement dated as of September 30, 1994, between NationsBanc Leasing Corporation of North Carolina and Collins & Aikman Products Co. is hereby incorporated by reference to Exhibit 10.27 of Collins & Aikman Corporation's Report on Form 10-Q for the fiscal quarter ended October 29, 1994. |
| 10.46 | Equity Purchase Agreement by and among JPSGP, Inc., Foamex-JPS Automotive L.P. and Collins & Aikman Products Co. dated August 28, 1996 is hereby incorporated by reference to Exhibit 2.1 of Collins & Aikman Corporation's Report on Form 10-Q for the fiscal quarter ended July 27, 1996. |

| Exhibit Number | Description |
|---|---|
| 10.47 | Amendment No. 1 to Equity Purchase Agreement by and among JPSGP, Inc., Foamex-JPS Automotive L.P., Foamex International Inc. and Collins & Aikman Products Co. dated as of December 11, 1996 is hereby incorporated by reference to Exhibit 2.2 of Collins & Aikman Corporation's Current Report on Form 8-K dated December 10, 1996. |
| 10.48 | Equity Purchase Agreement by and among Seiren U.S.A. Corporation, Seiren Automotive Textile Corporation, Seiren Co., Ltd. and Collins & Aikman Products Co. dated December 11, 1996, is hereby incorporated by reference to Exhibit 2.3 of Collins & Aikman Corporation's Current Report on Form 8-K dated December 10, 1996. |
| 10.49 | Acquisition Agreement between Perstorp A.B. and Collins & Aikman Products Co. dated December 11, 1996 is hereby incorporated by reference to Exhibit 2.4 of Collins & Aikman Corporation's Current Report on Form 8-K dated December 10, 1996. |
| 10.50 | Agreement among Perstorp A.B., Perstorp GmbH, Perstorp Biotec A.B. and Collins & Aikman Products Co. dated December 11, 1996 is hereby incorporated by reference to Exhibit 2.5 of Collins & Aikman Corporation's Current Report on Form 8-K dated December 10, 1996. |
| 10.51 | Settlement and Amendment Agreement dated as of December 16, 1997 by and among Collins & Aikman Products Co., Perstorp A.B., Perstorp GmbH, Collins & Aikman Holding A.B., Collins & Aikman Automotive Systems GmbH, Collins & Aikman Automotive Systems N.V., Collins & Aikman Automotive Systems A.B. and Perstorp Components GmbH and related Letter Amendment Agreement is hereby incorporated by reference to Exhibit 10.38 of Collins & Aikman Corporation's Report or Form 10-Q for the fiscal quarter ended September 26, 1998. |
| 10.52 | Acquisition Agreement dated as of December 9, 1996 among Collins & Aikman Products Co., Collins & Aikman Floor Coverings Group, Inc., Collins & Aikman Floor Coverings, Inc., CAF Holdings, Inc. and CAF Acquisition Corp. is hereby incorporated by reference to Exhibit 2.7 of Collins & Aikman Corporation's Current Report on Form 8-K dated December 10, 1996. |
| 10.53 | Mastercraft Group Acquisition Agreement dated as of April 25, 1997 among Collins & Aikman Products Co., Joan Fabrics Corporation and MC Group Acquisition Company L.L.C., is hereby incorporated by reference to Exhibit 2.1 of Collins & Aikman Corporation's Report on Form 10-Q for the fiscal quarter ended March 29, 1997. |
| 10.54 | Asset Purchase Agreement dated as of June 30, 1997 by and between JPS Automotive L.P. and Safety Components International, Inc. is hereby incorporated by reference to Exhibit 2.1 of JPS Automotive L.P.'s and JPS Automotive Products Corp.'s Current Report on Form 8-K dated July 24, 1997. |
| 10.55 | Closing Agreement dated July 24, 1997 between JPS Automotive L.P., Safety Components International, Inc. and Safety Components Fabric Technologies, Inc. is hereby incorporated by reference to Exhibit 2.2 of JPS Automotive L.P.'s and JPS Automotive Products Corp.'s Current Report on Form 8-K dated July 24, 1997. |
| 10.56 | Amended and Restated Acquisition Agreement dated as of November 4, 1997 and amended and restated as of March 9, 1998, among Collins & Aikman Products Co., Imperial Wallcoverings Inc. and BDPI Holdings Corporation is hereby incorporated by reference to Exhibit 2.4 of Collins & Aikman Corporation's Report on Form 10-K for the fiscal year ended December 27, 1997. |
| 10.57 | Share Purchase Agreement, dated as of January 12, 2001, between Collins & Aikman Corporation and Heartland Industrial Partners, L.P., is hereby incorporated by reference to Exhibit 10.1 of Collins & Aikman Corporation's Report on Form 8-K dated January 12, 2001., incorporated by reference to Exhibit 10.1 to Collins & Aikman Corporation's Current Report on Form 8-K dated January 12, 2001. |

| Exhibit Number | Description |
|---|---|

10.58    Registration Rights Agreement, dated February 23, 2001, by and among Collins & Aikman Corporation, Heartland Industrial Partners, L.P. and the other investor stockholders listed on Schedule 1 thereto, Blackstone Capital Company II, L.L.C., Blackstone Family Investment Partnership I L.P., Blackstone Advisory Directors Partnership L.P., Blackstone Capital Partners, L.P. and Wasserstein/C&A Holdings, L.L.C., incorporated by reference to Annex D to Exhibit 10.1 to Collins & Aikman Corporation's Current Report on Form 8-K dated January 12, 2001.

10.59    Services Agreement, dated as of February 23, 2001, by and among Collins & Aikman Corporation, Collins & Aikman Products Co. and Heartland Industrial Partners, L.P is hereby incorporated by reference to Exhibit 10.59 of Collins & Aikman Corporation's Report on Form 10-K for the year ended December 31, 2001.

10.60    Profit Participation Interest Agreement, dated as of February 23, 2001, by and among Heartland Industrial Partners, L.P. and the other investor stockholders listed on Schedule 1 thereto and each of Collins & Aikman Corporation, Blackstone Capital Company II, L.L.C. and Wasserstein/C&A Holdings, L.L.C., incorporated by reference to Annex B to Exhibit 10.1 to Collins & Aikman Corporation's Current Report on Form 8-K dated January 12, 2001.

10.61    Employment Agreement dated October 1, 1999 between Collins & Aikman Products Co. and an executive officer is hereby incorporated by reference to Exhibit 10.30 of Collins & Aikman Corporation's Report on Form 10-K for the fiscal year ended December 25, 1999.

10.62    Severance Benefit Agreement dated July 26, 1999 between Collins & Aikman Corporation and an executive officer is hereby incorporated by reference to Exhibit 10.31 of Collins & Aikman Corporation's Report on Form 10-K for the fiscal year ended December 25, 1999.

10.63    Severance Benefit Agreement dated August 9, 1999 between Collins & Aikman Corporation and an executive officer is hereby incorporated by reference to Exhibit 10.32 of Collins & Aikman Corporation's Report on Form 10-K for the fiscal year ended December 25, 1999.

10.64    Letter Agreement dated December 17, 1999 between Collins & Aikman Corporation and an executive officer is hereby incorporated by reference to Exhibit 10.33 of Collins & Aikman Corporation's Report on Form 10-K for the fiscal year ended December 25, 1999.

10.65    Employment Agreement dated December 1, 2000 between Collins & Aikman Products Co. and an executive officer, which is incorporated by reference to Exhibit 10.75 of Collins & Aikman Corporation's Annual Report on Form 10-K for the fiscal year ended December 31, 2000.

10.66    Separation Agreement dated as of March 12, 2001 between Collins & Aikman Products Co. and an executive officer, which is incorporated by reference to Exhibit 10.1 to the Company's Quarterly Report on Form 10-Q for the quarter ended March 31, 2001.

10.67    Employment Agreement dated as of March 29, 2000 between Collins & Aikman Products Co. and an executive officer is hereby incorporated by reference to Exhibit 10.1 of Collins & Aikman Corporation's Report on Form 10-Q for the quarter ended April 1, 2000.

10.68    Change in Control Agreement dated as of April 2000, between Collins & Aikman Corporation and an executive officer is hereby incorporated by reference to Exhibit 10.2 of Collins & Aikman Corporation's Report on Form 10-Q for the quarter ended July 1, 2000.

10.69    Employment Agreement dated as of April 1, 2000, between Collins & Aikman Products Co. and an executive officer is hereby incorporated by reference to Exhibit 10.3 of Collins & Aikman Corporation's Report on Form 10-Q for the quarter ended July 1, 2000.

10.70    Change in Control Agreement dated as of April 1, 2000, between Collins & Aikman Products Co. and an executive officer is hereby incorporated by reference to Exhibit 10.4 of Collins & Aikman Corporation's Report on Form 10-Q for the quarter ended July 1, 2000.

10.71    Service Contract between Collins & Aikman Products GmbH and an executive officer, which is incorporated by reference to Exhibit 10.5 of Collins & Aikman Corporation's Quarterly Report on Form 10-Q for the quarter ended June 30, 2001.

10.72    Employment Agreement dated as of August 1, 2000, between Collins & Aikman Products Co. and an executive officer, which is incorporated by reference to Exhibit 10.6 of Collins & Aikman Corporation's Quarterly Report on Form 10-Q for the quarter ended June 30, 2001.

| Exhibit Number | Description |
|---|---|
| 10.73 | Change in Control Agreement dated as of August 1, 2000, between Collins & Aikman Corporation and an executive officer, which is incorporated by reference to Exhibit 10.7 of Collins & Aikman Corporation's Quarterly Report on Form 10-Q for the quarter ended June 30, 2001. |
| 10.74 | Employment Agreement dated as of August 1, 2000, between Collins & Aikman Products Co. and an executive officer, which is incorporated by reference to Exhibit 10.8 of Collins & Aikman Corporation's Quarterly Report on Form 10-Q for the quarter ended June 30, 2001. |
| 10.75 | Change in Control Agreement dated as of August 1, 2000, between Collins & Aikman Corporation and an executive officer, which is incorporated by reference to Exhibit 10.9 of Collins & Aikman Corporation's Quarterly Report on Form 10-Q for the quarter ended June 30, 2001. |
| 10.76 | Settlement Agreement dated as of April 27, 2000, between Collins & Aikman Products Co. and an executive officer, which is incorporated by reference to Exhibit 10.10 of Collins & Aikman Corporation's Quarterly Report on Form 10-Q for the quarter ended June 30, 2001. |
| 10.77 | Letter Agreement dated as of July 13, 2000, between Collins & Aikman Corporation and an executive officer, which is incorporated by reference to Exhibit 10.11 of Collins & Aikman Corporation's Quarterly Report on Form 10-Q for the quarter ended June 30, 2001. |
| 10.78 | Letter Agreement dated as of April 7, 2000, between Collins & Aikman Corporation and an executive officer, which is incorporated by reference to Exhibit 10.12 of Collins & Aikman Corporation's Quarterly Report on Form 10-Q for the quarter ended June 30, 2001. |
| 10.79 | Collins & Aikman Products Co. 2000 Executive Incentive Compensation Plan is hereby incorporated by reference to Exhibit 10.5 of Collins & Aikman Corporation's Report on Form 10-Q for the quarter ended July 1, 2000. |
| 10.80 | Agreement of Sale and Purchase, dated as of June 22, 2001, by and among Collins & Aikman Products Co. and New King, L.L.C is hereby incorporated by reference to Exhibit 10.81 of Collins & Aikman Corporation's Report on Form 10-K for the year ended December 31, 2001. |
| 10.81 | Lease Agreement, dated as of June 29, 2001, between New King, L.L.C., as landlord, and Collins & Aikman Products Co., as tenant is hereby incorporated by reference to Exhibit 10.82 of Collins & Aikman Corporation's Report on Form 10-K for the year ended December 31, 2001. |
| 10.82 | Agreement of Sale and Purchase, dated as of June 22, 2001, by and among Collins & Aikman Products Co. and Anchor Court, L.L.C is hereby incorporated by reference to Exhibit 10.83 of Collins & Aikman Corporation's Report on Form 10-K for the year ended December 31, 2001. |
| 10.83 | Lease Agreement, dated as of June 29, 2001, between Anchor Court, L.L.C., as landlord and Collins & Aikman Products Co., as tenant is hereby incorporated by reference to Exhibit 10.84 of Collins & Aikman Corporation's Report on Form 10-K for the year ended December 31, 2001. |
| 10.84 | Stockholders Agreement dated July 3, 2001, by and among Collins & Aikman Corporation, Heartland Industrial Partners, L.P. and the other Heartland Entities named therein, the Becker Stockholders party thereto and the Joan Stockholders party thereto is hereby incorporated by reference to Exhibit 10.85 of Collins & Aikman Corporation's Report on Form 10-K for the year ended December 31, 2001. |
| 10.85 | Registration Rights Agreement, dated July 3, 2001, by and among Collins & Aikman Corporation, Charles E. Becker, Michael E. McInerney and Jens Höhnel and, together with the Joan Investors (as defined therein) is hereby incorporated by reference to Exhibit 10.86 of Collins & Aikman Corporation's Report on Form 10-K for the year ended December 31, 2001. |
| 10.86 | First Amendment to Services Agreement, dated as of August 7, 2001, among Collins & Aikman Corporation, Collins & Aikman Products Co. and Heartland Industrial Partners, L.P is hereby incorporated by reference to Exhibit 10.87 of Collins & Aikman Corporation's Report on Form 10-K for the year ended December 31, 2001. |

| Exhibit Number | Description |
|---|---|
| 10.87 | Equipment Lease, dated as of December 18, 2001, among Textron Automotive Exteriors Inc. and Textron Automotive Interiors Inc., collectively as lessee, and IAC TAX V, LLC, as lessor is hereby incorporated by reference to Exhibit 10.88 of Collins & Aikman Corporation's Report on Form 10-K for the year ended December 31, 2001. |
| 10.88 | Registration Rights Agreement, dated December 20, 2001, by and among Collins & Aikman Products Co., Collins & Aikman Corporation, and each of the subsidiaries listed on the signature pages thereof, and J.P. Morgan Securities Inc., Credit Suisse First Boston Corporation, Deutsche Banc Alex. Brown Inc. and Merrill Lynch, Pierce, Fenner & Smith Incorporated and the other several initial purchasers parties to the Purchase Agreement is hereby incorporated by reference to Exhibit 10.89 of Collins & Aikman Corporation's Report on Form 10-K for the year ended December 31, 2001. |
| 10.89 | Registration Rights Agreement dated as of December 20, 2001 by and among Becker Ventures, LLC, Dresdner Kleinwort Capital Partners 2001 LP, Masco Capital Corporation, ML IBK Positions, Inc. and Collins & Aikman Corporation is hereby incorporated by reference to Exhibit 10.90 of Collins & Aikman Corporation's Report on Form 10-K for the year ended December 31, 2001. |
| 10.90 | Registration Rights Agreement, dated December 20, 2001, by and between Collins & Aikman Corporation, Textron Inc., and Textron Holdco Inc is hereby incorporated by reference to Exhibit 10.91 of Collins & Aikman Corporation's Report on Form 10-K for the year ended December 31, 2001. |
| 10.91 | Preferred Stock Registration and Other Rights Agreement, dated as of December 20, 2001, by and among Collins & Aikman Products Co. and Textron Inc is hereby incorporated by reference to Exhibit 10.92 of Collins & Aikman Corporation's Report on Form 10-K for the year ended December 31, 2001. |
| 10.92 | Intellimold Technology License and Support Agreement, dated as of December 20, 2001, by and between Textron, Inc. and Collins & Aikman Corporation and Collins & Aikman Products Co is hereby incorporated by reference to Exhibit 10.93 of Collins & Aikman Corporation's Report on Form 10-K for the year ended December 31, 2001. |
| 10.93 | Technology License Agreement (Retained IP), dated as of December 20, 2001, by and between Textron, Inc. and Collins & Aikman Corporation and Collins & Aikman Products Co is hereby incorporated by reference to Exhibit 10.94 of Collins & Aikman Corporation's Report on Form 10-K for the year ended December 31, 2001. |
| 10.94 | Technology License Agreement (Licensed-Back IP), dated as of December 20, 2001, by and between Textron, Inc. and Collins & Aikman Corporation and Collins & Aikman Products Co is hereby incorporated by reference to Exhibit 10.95 of Collins & Aikman Corporation's Report on Form 10-K for the year ended December 31, 2001. |
| 10.95 | Severance Agreement between Collins & Aikman Automotive Holding GmbH and an executive officer of the Company dated as of March 6, 2002 is hereby incorporated by reference to Exhibit 10.1 of Collins & Aikman Corporation's Report on Form 10-Q for the quarter ended March 31, 2002. |
| 10.96 | Separation Agreement and General Release between Products and an executive officer of the Company dated as of March 5, 2002 is hereby incorporated by reference to Exhibit 10.2 of Collins & Aikman Corporation's Report on Form 10-Q for the quarter ended March 31, 2002. |
| 10.97 | Employment Agreement between Products and an officer of the Company dated as of November 1, 2001 is hereby incorporated by reference to Exhibit 10.3 of Collins & Aikman Corporation's Report on Form 10-Q for the quarter ended March 31, 2002. |
| 10.98 | Employment Agreement between Products and an officer of the Company dated as of November 1, 2001 is hereby incorporated by reference to Exhibit 10.4 of Collins & Aikman Corporation's Report on Form 10-Q for the quarter ended March 31, 2002. |
| 10.99 | Employment Agreement between Products and an officer of the Company dated as of December 20, 2001 is hereby incorporated by reference to Exhibit 10.5 of Collins & Aikman Corporation's Report on Form 10-Q for the quarter ended March 31, 2002. |

| Exhibit Number | Description |
|---|---|
| 10.100 | Employment Agreement between Products and an officer of the Company dated as of December 20, 2001 is hereby incorporated by reference to Exhibit 10.6 of Collins & Aikman Corporation's Report on Form 10-Q for the quarter ended March 31, 2002. |
| 10.101 | Employment Agreement between Products and an officer of the Company dated as of December 20, 2001 is hereby incorporated by reference to Exhibit 10.7 of Collins & Aikman Corporation's Report on Form 10-Q for the quarter ended March 31, 2002. |
| 10.102 | Separation and Consultancy Agreement dated July 31, 2002 is hereby incorporated by reference to Exhibit 10.1 to Collins & Aikman Corporation's Current report on Form 8-K filed August 2, 2002. |
| 10.103 | Severance Benefit Agreement between Collins and Aikman Corporation and an officer of the Company dated April 5, 2002 is hereby incorporated by reference to Exhibit 10.2 of Collins & Aikman Corporation's Report on Form 10-Q for the quarter ended June 30, 2002. |
| 10.104 | Employment and Consulting Agreement between Collins and Aikman Corporation and an Employee dated July 2002 is hereby incorporated by reference to Exhibit 10.1 of Collins & Aikman Corporation's Report on Form 10-Q for the quarter ended September 30, 2002. |
| 10.105 | Separation Agreement between Collins and Aikman Corporation and an officer of the Company dated September 2002 is hereby incorporated by reference to Exhibit 10.2 of Collins & Aikman Corporation's Report on Form 10-Q for the quarter ended September 30, 2002. |
| 10.106 | Separation Agreement between Collins and Aikman Corporation and an officer of the Company dated October 2002 is hereby incorporated by reference to Exhibit 10.3 of Collins & Aikman Corporation's Report on Form 10-Q for the quarter ended September 30, 2002. |
| 11 | Computation of Earnings Per Share.* |
| 12.1 | Computation of Ratio of Earnings to Fixed Charges.* |
| 21 | Subsidiaries of the Registrant.* |
| 23.1 | Consent of PricewaterhouseCoopers LLP.* |
| 24.1 | Powers of Attorney.* |
| 99 | Voting Agreement between Blackstone Capital Partners L.P. and Wasserstein Perella Partners, L.P. is hereby incorporated by reference to Exhibit 99 of Amendment No. 4 to Collins & Aikman Holdings Corporation's Registration Statement on Form S-2 (Registration No. 33-53179) filed June 27, 1994. |
| 99.1 | Certification Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 (Chapter 63, Title 18 U.S.C. 1350(a) and (b)).* |

———————————

* Indicates document filed herewith.

# EXHIBIT 3

# COLLINS & AIKMAN CORP

250 STEPHENSON HWY
TROY, MI 48083
248. 824.2500

## 8–K

**CHANGES IN REGISTRANT'S CERTIFYING ACCOUNTANT**
**Filed on 06/26/2003 – Period: 06/20/2003**
File Number 001–10218



**LIVEDGAR**[®] Information Provided by Global Securities Information, Inc.
800.669.1154
www.gsionline.com

===============================================================================

SECURITIES AND EXCHANGE COMMISSION

Washington, D.C. 20549
_____

FORM 8-K

Current Report

Pursuant to Section 13 or 15(d) of the Securities
Exchange Act of 1934

June 20, 2003
Date of Report (Date of earliest event reported)

COLLINS & AIKMAN CORPORATION

(Exact name of registrant as specified in its charter)

| Delaware | 1-10218 | 13-3489233 |
|---|---|---|
| (State or other jurisdiction of incorporation or organization) | (Commission file number) | (I.R.S. Employer Identification No.) |

250 Stephenson Highway
Troy, Michigan 48083
(Address of principal executive offices)
(248) 824-2500

(Registrant's telephone number, including area
code)
Not Applicable
(Former name or former address, if changed since last report)

===============================================================================

Item 4.  Changes in Registrant's Certifying Accountant.

On June 20, 2003, the Audit Committee of the Board of Directors of Collins & Aikman Corporation (the "Company") approved the appointment of KPMG LLP as the Company's independent accountants, and the dismissal of PricewaterhouseCoopers LLP ("PWC"), which had previously served in this capacity.

During the years ended December 31, 2002 and 2001 and through June 20, 2003, KPMG LLP has not been engaged as an independent accountant to audit either the financial statements of the Company or any of its subsidiaries, nor has it been consulted regarding the application of accounting principles to any specified transaction, either completed or proposed, or the type of audit opinion that might be rendered on the Company's financial statements, or any matter that was the subject of a disagreement or reportable event.

PricewaterhouseCoopers LLP communicated in its February 2003 report to the Audit Committee that disagreements with respect to potential changes in measurement date and asset valuation methods for the Company's pension plans were resolved. In connection with its 2003 budgeting process, the Company had engaged an actuarial consultant to develop and evaluate prospective alternatives

for its pension measurement date and asset valuation methods. These alternatives were reviewed with PricewaterhouseCoopers LLP in order to obtain their views on the appropriate accounting measurement dates and valuation methodologies. After full discussion with PricewaterhouseCoopers LLP, the Company's senior officers and PricewaterhouseCoopers LLP agreed to continue employing in 2003 the pension valuation and measurement methodologies the Company had employed in 2002. There were no other disagreements with PricewaterhouseCoopers LLP during the years ended December 31, 2002 and 2001 and through the date of this report on any matter of accounting principles or practices, financial statement disclosure, or auditing scope or procedure which, if not resolved to the satisfaction of PricewaterhouseCoopers LLP, would have caused it to make reference to the subject matter of such disagreement in their reports on the financial statements for the year.

The reports of PricewaterhouseCoopers LLP on the financial statements for the years ended December 31, 2002 and 2001, did not include any adverse opinion or disclaimer of opinion, or any qualification or modification as to uncertainty, audit scope or accounting principles.

During the years ended December 31, 2002 and 2001 and through June 20, 2003, PricewaterhouseCoopers LLP reported no material weaknesses in the Company's internal control systems and there were no other reportable events as defined in Regulation S-K Item 304(a)(i)(v) other than those described in the next paragraph.

In connection with its 2001 audit, PricewaterhouseCoopers LLP communicated to the Audit Committee and to management reportable conditions in the Company's internal control systems, attributable primarily to integration issues from an acquisition completed during the third quarter of 2001, personnel turnover at the corporate and plant level and failure of two manufacturing facilities to follow Company procedures related to account reconciliations. Corrective actions were implemented in 2002. In connection with its 2002 audit, PricewaterhouseCoopers LLP communicated to the Audit Committee and to management reportable conditions in the Company's internal control system related to timely preparation of cash account reconciliations, review of non-standard journal entries, revenue accounting and currency translation at foreign locations and compliance with established Company accounting policies and procedures. These conditions were attributable primarily to computer systems, process harmonization and personnel integration issues from the December 20, 2001, TAC-Trim acquisition. Corrective actions have been developed and are being implemented to eliminate or reduce to an acceptable level the financial reporting risks associated with the conditions noted. PricewaterhouseCoopers LLP is not in a position to comment on the adequacy of these corrective actions. The Company believes that it will correct all these conditions during 2003. PricewaterhouseCoopers LLP did not modify its report on the Company's 2001 and 2002 audited financial statements as a consequence of these reportable conditions. The Company has authorized PricewaterhouseCoopers LLP to respond fully to any inquiries by KPMG LLP.

The Company has requested that PricewaterhouseCoopers LLP furnish it with a letter addressed to the Securities and Exchange Commission stating whether or not it agrees with the above statements. A copy of such letter, dated June 24, 2003, is filed as an Exhibit to this Form 8-K.

The Company intends to continue its engagement of Deloitte & Touche to provide internal audit services.

Item 7. Exhibits.

    (c) Exhibits. The following exhibit is filed herewith:

Exhibit No.      Description

16           Letter from PricewaterhouseCoopers LLP to the Securities
and Exchange Commission dated June 24, 2003

SIGNATURES


Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

Dated:  June 26, 2003


                         COLLINS & AIKMAN CORPORATION



                         By:   /s/ J. Michael Stepp
                               ---------------------------------
                               Name:    J. Michael Stepp
                               Title:   Vice Chairman and
                                        Chief Financial Officer

EXHIBIT INDEX

# COLLINS & AIKMAN CORP

250 STEPHENSON HWY
TROY, MI 48083
248. 824.2500

# EX–16

**LETTER**
**8–K Filed on 06/26/2003 – Period: 06/20/2003**
File Number 001–10218



[Letterhead of PricewaterhouseCoopers LLP]

June 24, 2003

Securities and Exchange Commission
450 Fifth Street, N.W.
Washington, D.C. 20549

Commissioners:

We have read the statements made by Collins & Aikman Corporation (copy
attached), which we understand will be filed with the Commission, pursuant to
Item 4 of Form 8-K, as part of the Company's Form 8-K report dated June 20,
2003. We agree with the statements concerning our Firm in such Form 8-K.

Very truly yours,


/s/ PricewaterhouseCoopers LLP
-------------------------------------
PricewaterhouseCoopers LLP

# EXHIBIT 4

# UNITED STATES SECURITIES AND EXCHANGE COMMISSION
## WASHINGTON, D.C. 20549

# Form 10-K

(Mark One)

☑ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d)
OF THE SECURITIES EXCHANGE ACT OF 1934**
**For the fiscal year ended December 31, 2003**

or

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d)
OF THE SECURITIES EXCHANGE ACT OF 1934**

**Commission file number 1-10218**

# Collins & Aikman Corporation

*(Exact name of registrant as specified in its charter)*

| **Delaware** | **13-3489233** |
|---|---|
| *(State or other jurisdiction of incorporation or organization)* | *(I.R.S. Employer Identification Number)* |

**250 Stephenson Highway
Troy, Michigan 48083**
*(Address of principal executive offices, including zip code)*

**Registrant's telephone number, including area code:
(248) 824-2500**

**Securities registered pursuant to Section 12(b) of the Act:**

| Title of each class | Name of each exchange on which registered |
|---|---|
| Common Stock, $.01 par value | New York Stock Exchange |

**Securities registered pursuant to Section 12(g) of the Act:
None**

Indicate by check mark whether the Registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the Registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☐ No ☑

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of Registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☑

Indicate by check mark whether the registrant is an accelerated filer (as defined in Exchange Act Rule 12b-2). Yes ☑ No ☐.

The aggregate market value of voting stock held by non-affiliates of the Registrant was $168,794,241 as of March 1, 2004.

As of February 26, 2004, the number of outstanding shares of the Registrant's common stock, $.01 par value, was 83,630,087 shares.

## WEBSITE ACCESS TO COMPANY'S REPORTS:

Collins & Aikman's internet website address is www.collinsaikman.com. The Company's annual report on Form 10-K, quarterly reports on Form 10-Q, current reports on Form 8-K and amendment to those reports filed or furnished pursuant to Section 13(a) or 15(d) of the Exchange Act are available free of charge through the Company's website and as soon as reasonably practicable after the reports are electronically filed with, or furnished to the Securities and Exchange Commission.

The Company's Code of Business Conduct is available free of charge through the Company's internet website. Any amendments to the Company's Code of Business Conduct and any waivers of the Code of Business Conduct involving executive officers or directors of the Company will also be made available on the Company's internet website. Printed copies of the Company's Code of Business Conduct are also available free of charge to any shareholder upon request to: Corporate Secretary, Collins & Aikman Corporation, 250 Stephenson Highway, Troy, MI 48083.

COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES

FORM 10-K ANNUAL REPORT INDEX

Page

PART I

| | | |
|---|---|---|
| Item 1. | Business | 8 |
| Item 2. | Properties | 16 |
| Item 3. | Legal Proceedings | 17 |
| Item 4. | Submission of Matters to a Vote of Security Holders | 17 |

PART II

| | | |
|---|---|---|
| Item 5. | Market for Registrant's Common Equity and Related Stockholder Matters | 17 |
| Item 6. | Selected Financial Data | 18 |
| Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 19 |
| Item 7A. | Quantitative and Qualitative Disclosures About Market Risk | 44 |
| Item 8. | Financial Statements and Supplementary Data | 44 |
| Item 9. | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | 45 |
| Item 9A. | Controls and Procedures | 46 |

PART III

| | | |
|---|---|---|
| Item 10. | Directors and Executive Officers of the Registrant | 47 |
| Item 11. | Executive Compensation | 52 |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management | 63 |
| Item 13. | Certain Relationships and Related Transactions | 65 |
| Item 14. | Principal Accounting Fees and Services | 68 |

PART IV

| | | |
|---|---|---|
| Item 15. | Exhibits, Financial Statement Schedules and Reports on Form 8-K | 70 |

## PART I

**Cautionary Statements Regarding Forward-Looking Information and Risk Factors**

This Report on Form 10-K contains "forward-looking" information, as that term is defined by the federal securities laws, about our financial condition, results of operations and business. You can find many of these statements by looking for words such as "may," "will," "expect," "anticipate," "believe," "estimate," "should," "continue," "predict" and similar words used in this Annual Report. The forward-looking statements in this Form 10-K are intended to be subject to the safe harbor protection provided by the federal securities laws.

These forward-looking statements are subject to numerous assumptions, risks and uncertainties (including trade relations and competition). Because the statements are subject to risks and uncertainties, actual results may differ materially from those expressed or implied by the forward-looking statements. We caution readers not to place undue reliance on the statements, which speak only as of the date of this Annual Report.

The cautionary statements set forth above should be considered in connection with any subsequent written or oral forward-looking statements that Collins & Aikman Corporation (the "Company") or persons acting on its behalf may issue. The Company does not undertake any obligation to review or confirm analysts' expectations or estimates or to release publicly any revisions to any forward-looking statements to reflect events or circumstances after the date of this report or to reflect the occurrence of unanticipated events.

This Report on Form 10-K contains forward-looking statements within the meaning of the Private Securities Litigation Reform Act of 1995. Actual results and events may differ materially from those that are anticipated because of certain risks and uncertainties, including but not limited to general economic conditions in the markets in which the Company operates and industry based factors such as:

*Demand in the automotive industry is significantly dependent on the U.S. and the global economies and the Company's business and profitability are exposed to current and future uncertainties.*

The Company's financial performance depends, in large part, on conditions in the global automotive markets and, generally, on the U.S. and global economies. Demand in the automotive industry fluctuates in response to overall economic conditions and is particularly sensitive to changes in interest rate levels, consumer confidence and fuel costs. The threat or act of terrorism and war, the recession and other recent developments adversely affected consumer confidence throughout the U.S. and much of the world and exacerbated the uncertainty in the Company's markets. The future impact on us is difficult to predict. We would be harmed by any sustained weakness in demand or continued downturn in the economy.

The Company's sales are impacted by retail inventory levels and production schedules. In 2003, Original Equipment Manufacturer ("OEM") customers continued to significantly reduce their production and inventory levels due to the uncertain economic environment. In the current environment, it is extremely difficult to predict future production rates and inventory levels and the sustainability of any recovery.

*The base of customers which the Company serves is concentrated, and the loss of business from a major customer or the discontinuation of particular vehicle models could reduce the Company's sales and harm the Company's profitability.*

Because of the relative importance of a few large customers and the high degree of concentration of OEMs in the automotive industry, the Company's business is exposed to a high degree of risk related to customer concentration. DaimlerChrysler AG, General Motors Corporation and Ford Motor Company and their respective affiliates were the Company's three largest customers, and they directly or indirectly accounted for approximately 28%, 22% and 25% of the Company's 2003 net sales, respectively. A loss of significant business from, or adverse performance by, any of these customers would be harmful to the Company's profitability. Although the Company receives purchase orders from most of the Company's customers, these purchase orders typically provide for the supply of a customer's annual requirements for a particular model or assembly plant, renewable on a year-to-year basis, rather than for the purchase of a

2

specific quantity of products. It is difficult to accurately predict the level of new production for 2004 car sales. The loss of business with respect to significant vehicle models could have a material adverse effect.

In addition, there is substantial and continuing pressure from automotive manufacturers to reduce costs, including costs associated with outside suppliers like Collins & Aikman. For example, OEM customers in the automotive industry attempted to impose price decreases and givebacks throughout 2003. Such attempted price decreases were generally in the 2% to 4% range. Several reductions have been agreed to, and others are currently being negotiated with OEMs and pressures may increase if overall economic and industry conditions do not improve. It is difficult for the Company to offset downward pricing pressures through alternative, less costly sources of raw materials. In addition, throughout 2003, the Company has experienced pricing pressure from its suppliers. The Company cannot assure you that it will not be materially and adversely affected by substantial and continuing pricing pressures.

*The prices that the Company can charge some of the Company's customers are predetermined, and the Company bears the risk of costs in excess of its estimates.*

Sales contracts with some of the Company's customers require it to provide its products at predetermined prices. In some cases, these prices decline over the course of the contract. The costs that the Company incurs in fulfilling these contracts may vary substantially from its initial estimates. Unanticipated cost increases may occur as a result of several factors, including increases in the costs of labor, components or materials. In some cases, the Company may be permitted to pass on cost increases associated with specific materials to its customers. Cost overruns that the Company cannot pass on to its customers could have a material adverse effect.

*The Company may not be able to successfully integrate the Company's acquired operations or realize the intended benefits of the Company's acquisitions.*

The Company's future operations and cash flow will depend largely upon its ability to integrate acquisitions, achieve the strategic operating objectives for these acquisitions and realize significant synergies and cost savings as a result. Acquisitions since January 2001 account for 48 of the Company's current 102 plants and facilities and approximately 58% of the Company's approximately 23,900 employees. The Textron Automotive Company's Trim division ("TAC-Trim") acquisition in 2001, at that time, individually accounted for 41 of the Company's plants and facilities and approximately 12,000 of the Company's employees located across seven different countries, including two countries where the Company did not previously operate. The Company has not previously undertaken an integration process as large or complex as the integration plans required by these recent acquisitions collectively or by the TAC-Trim acquisition individually. In order to succeed, the Company will need to realize projected synergies and cost savings on a timely basis, consolidate information technologies, capitalize on the Company's increased purchasing power, effectively control the progress of the Company's integration process and associated costs, consolidate the Company's program management, research and development and engineering operations, capitalize on the Company's prime contractor strategy and the opportunities afforded by the Company's broader products offering and maintain strong relationships with Tier I integrators and OEMs.

To the extent the Company has misjudged the nature and extent of industry trends or its competition, it may have difficulty in achieving its operating and strategic objectives. In addition, the Company's integration activities will place substantial demands on its management, operational resources and financial and internal control systems. The Company's future operating results will depend upon the Company's ability to implement and improve its operating and financial controls and to combine, train and manage the Company's employee base. There is a risk that the diversion of management attention, particularly in a difficult operating environment, will affect sales and the attention that management can devote to this and other operational, financial and strategic issues. In addition, in some of the Company's past non-U.S. acquisitions, the Company has encountered integration and systems difficulties typical of foreign transactions, which have given rise to material weaknesses that had to be subsequently corrected. The Company cannot assure you that it will not encounter similar difficulties going forward. All statements concerning the benefits, cost savings and synergies the Company expects to realize from its acquisitions are forward-looking statements.

3

*The Company may pursue additional acquisitions that further the Company's current strategies.*

The Company may selectively identify and acquire other businesses with complementary products, manufacturing capabilities or geographic markets, and the Company expects to continually evaluate such opportunities. The Company cannot assure you that any business acquired will be successfully integrated with other operations or prove to be complementary in the manner expected or be profitable. The Company could incur further indebtedness in connection with the Company's acquisition strategy and increase the Company's leverage. Acquisitions outside of North America may present unique difficulties and increase the Company's exposure to the risks attendant to international operations. The process of integrating acquired companies and operations into the Company's existing operations may result in unforeseen operating difficulties and may require significant financial resources that would otherwise be available for the ongoing development or expansion of existing operations.

*The Company may incur unanticipated contingent liabilities as a result of acquisitions and may experience unanticipated liabilities associated with former discontinued operations.*

The Company might incur unforeseen environmental, tax, pension, litigation or other liabilities in connection with the Company's recent or future acquisitions, or the Company might underestimate the known liabilities. If such liabilities materialize or are greater than the Company estimates, they could have a material adverse effect on us. In addition, the Company has significant responsibilities related to some of its formerly owned businesses, or discontinued operations, such as those relating to post-retirement, casualty, environmental, product liability, lease and other matters. Based upon the information presently available and the Company's insurance coverage, the Company does not believe that any of these liabilities will have a material adverse effect upon the Company's financial condition or results of operations, however, the Company might be incorrect in its assumptions; and the extent of those contingent liabilities of which the Company is aware could exceed its expectations. In addition, there may be other such liabilities of which the Company presently has no knowledge.

*If the Company is unable to meet future capital requirements, the Company's competitive position may be adversely affected.*

In securing new business, the Company typically is required to expend significant amounts of capital for engineering, development, tooling and other costs. Generally, the Company seeks to recoup these costs through pricing over time, but the Company may be unsuccessful due to competitive pressures and other market constraints or if a customer ceases production of a particular vehicle. While the Company believes that it will be able to fund capital expenditures through cash flow from operations, borrowings under the Company's credit facilities, sale and leaseback agreements and sales of receivables including sales under the Company's receivables facility and factoring arrangements, there can be no assurance that it will have adequate funds to make all the necessary capital expenditures or that the amount of future capital expenditures will not be materially in excess of its anticipated expenditures.

*Recent trends among the Company's customers will increase competitive pressures in the Company's businesses.*

In recent years, the competitive environment among suppliers to the vehicle manufacturers in the automotive industry has changed significantly as these manufacturers have sought to outsource more vehicular components, modules and systems and to use on-line auctions in order to obtain further price reductions. In addition, these sectors have experienced substantial consolidation as OEMs have sought to lower costs, improve quality and increasingly purchase complete systems and modules rather than separate components. This consolidation has caused, and its continuation will continue to amplify, the pricing pressures outlined above in the discussion of the concentration of the Company's customers. The Company's competitive strategy will be to position itself as the prime contractor of choice to both Tier I integrators and OEM assembly plants by supplying a full spectrum of integrated interior trim components. This strategy presents the risk that some of the Company's customers may be in competition with the Company as well. Furthermore, the trend toward consolidation among automotive parts suppliers is resulting in a smaller number of large

4

suppliers like us who benefit from purchasing and distribution economies of scale. The Company may be unable to achieve the cost savings and operational improvements expected from the Company's prime contractor business strategy, which could harm its ability to compete favorably in the future with other larger, consolidated companies.

*The Company's strategy may not succeed if anticipated outsourcing fails to occur due to union considerations.*

Because of the economic benefits inherent in outsourcing to suppliers and the costs associated with reversing a decision to purchase automotive interior systems and components from an outside supplier, automotive manufacturers' commitments to purchasing automotive interior systems and components from outside suppliers, particularly on a just-in-time basis, are contemplated to increase. However, under the contracts presently in effect in the United States and Canada between each of Ford, General Motors and DaimlerChrysler and the United Auto Workers ("UAW") and the Canadian Auto Workers ("CAW"), in order for any of such automotive manufacturers to obtain from external sources components that it currently produces, it must first notify the UAW or the CAW of such intention. If the UAW or the CAW objects to the proposed outsourcing, some agreement will have to be reached between the UAW or the CAW and the automotive manufacturer. Factors that will normally be taken into account by the UAW, the CAW and the automotive manufacturer include whether the proposed new supplier is technologically more advanced than the automotive manufacturer, whether the new supplier is unionized, whether cost benefits exist and whether the automotive manufacturer will be able to reassign union members whose jobs are being displaced to other jobs within the same factories.

*The Company's products are subject to changing technology, which could place us at a competitive disadvantage relative to alternative products introduced by competitors.*

The Company believes that its customers rigorously evaluate their suppliers on the basis of product quality, price competitiveness, technical expertise and development capability, new product innovation, reliability and timeliness of delivery, product design capability, manufacturing expertise, operational flexibility, customer service and overall management. The Company's success will depend on its ability to continue to meet customers' changing specifications with respect to these criteria. The Company may, therefore, require significant ongoing and recurring additional capital expenditures and investment in research and development, manufacturing and other areas to remain competitive.

*The Company may be subject to work stoppages at its facilities or those of its principal customers, which could seriously impact the profitability of the Company's business.*

As of December 31, 2003, approximately 62% of the Company's global work force was unionized. If the Company's unionized workers were to engage in a strike, work stoppage or other slowdown in the future, the Company could experience a significant disruption of the Company's operations, which could have a material adverse effect on us. Many OEMs and their suppliers have unionized work forces. Work stoppages or slowdowns experienced by OEMs or their suppliers could result in slowdowns or closures of assembly plants where the Company's products are included in assembled vehicles. Furthermore, organizations responsible for shipping the Company's customers' products may be impacted by occasional strikes staged by the unions representing transportation employees. Any interruption in the delivery of the Company's customers' products would reduce demand for the Company's products.

*A growing portion of the Company's revenue may be derived from international sources, which exposes us to additional uncertainty.*

A significant portion of the Company's 2003 sales was derived from shipments to destinations outside of the United States and Canada. As part of the Company's business strategy, the Company intends to expand the Company's international operations and customer base. Sales outside of the U.S. and Canada, particularly sales to emerging markets, are subject to other various risks, including: governmental embargoes or foreign trade restrictions such as antidumping duties; changes in U.S. and foreign governmental regulations; tariffs;

5

fuel duties; other trade barriers; political, economic and social instability and foreign exchange risk. In addition, there are tax inefficiencies in repatriating funds from non-U.S. subsidiaries. To the extent such repatriation is necessary for us to meet the Company's debt service or other obligations, this will adversely affect us. International operations frequently are conducted through joint venture arrangements that can materially limit the Company's operational and financial control of the business.

*The Company may incur material losses and costs as a result of product liability and warranty claims that may be brought against us.*

The Company faces an inherent business risk of exposure to product liability claims in the event that the use of its current and formerly manufactured or sold products results, or is alleged to result, in bodily injury and/or property damage. The Company may experience material product liability losses in the future or incur significant costs to defend such claims. The Company's product liability insurance coverage will be inadequate for any liabilities that may ultimately be incurred or may be unavailable on acceptable terms in the future. In addition, if any of the Company's products are or are alleged to be defective, the Company may be required to participate in a government-required or OEM-instituted recall involving such products. Each vehicle manufacturer has its own policy regarding product recalls and other product liability actions relating to its suppliers.

In addition, as suppliers become more integrally involved in the vehicle design process and assume more of the vehicle assembly functions, vehicle manufacturers are increasingly looking to their suppliers for contribution when faced with product liability claims. A successful claim brought against us in excess of the Company's available insurance coverage or a requirement to participate in a product recall may have a material adverse effect.

In the ordinary course of the Company's business, contractual disputes over warranties can arise. In the past five years or more, the Company has not been required to make any material payments in respect of warranty claims. In most cases, financial responsibility for warranty costs are contractually retained by the Company's customer so long as the customers' specifications are met, but the Company may nonetheless be subjected to requests for cost sharing or pricing adjustments as a part of the Company's commercial relationship with the customer.

*The Company's business may be materially and adversely affected by compliance obligations and liabilities under environmental laws and regulations.*

The Company is subject to federal, state, local and foreign environmental, and health and safety, laws and regulations that affect ongoing operations and may increase capital costs and operating expenses in order to maintain compliance with such requirements and impose liability relating to contamination at the Company's facilities, other locations such as former facilities, facilities where the Company has sent wastes for treatment or disposal and other properties to which the Company (or a company or business for which the Company is responsible) are linked. See Note 21 "Commitments and Contingencies — Environmental."

*The Company may not be able to manage its business as it might otherwise due to its high degree of leverage.*

The Company has indebtedness that is substantial in relation to the Company's stockholders' equity and cash flow. At December 31, 2003, the Company had $1,285.2 million of outstanding total debt and short-term borrowings. The Company's percentage of total debt and outstanding preferred stock of its subsidiary, Collins & Aikman Products Co. ("Products") ("Products Preferred Stock") to total capitalization was 76.7% at December 31, 2003. The degree to which the Company is leveraged will have important consequences, including the following:

- the Company's ability to obtain additional financing in the future for working capital, capital expenditures, acquisitions, business development efforts or general corporate purposes may be impaired;

6

- a substantial portion of the Company's cash flow from operations will be dedicated to the payment of interest and principal on the Company's indebtedness, dividends on Products Preferred Stock and capital and operating lease expense, thereby reducing the funds available to us for other purposes

- the Company's operations are restricted by the Company's debt instruments and the terms of the Products Preferred Stock, which contain material financial and operating covenants, and those restrictions will limit, among other things, the Company's ability to borrow money in the future for working capital, capital expenditures, acquisitions or other purposes;

- indebtedness under the Company's senior credit facilities and the financing cost associated with its receivables facility will be at variable rates of interest, which makes it subject to increases in interest rates;

- the Company's leverage may place us at a competitive disadvantage as compared with the Company's less leveraged competitors, and the Company's leverage will make it more vulnerable in the event of a downturn in general economic conditions or in any of the Company's businesses; and

- the Company's flexibility in planning for, or reacting to, changes in its business and the automotive industry may be limited.

The Company has significant debt obligations maturing in 2005 and 2006. The Company's ability to service or refinance, when required, the Products Preferred Stock and the Company's debt, lease and other obligations will depend principally upon the Company's future operating performance, which will be affected by prevailing economic conditions and financial, business and other factors, many of which are beyond the Company's control.

In addition, factors more specific to us could cause actual results to vary materially from those anticipated in the forward-looking statements included in this report such as substantial leverage, limitations imposed by the Company's debt instruments, the Company's ability to successfully integrate acquired businesses including actions it has identified as providing cost saving opportunities and pursuing our prime contractor business strategy, the Company's customer concentration and risks associated with the formerly owned operations of the Company.

The Company's divisions may also be affected by changes in the popularity of particular vehicle models or particular interior trim packages or the loss of programs on particular vehicle models.

For a discussion of certain of these and other important factors which may affect our operations, products and markets, see "Item 1. — Business" and "Item 7. — Management's Discussion and Analysis of Financial Condition and Results of Operations" and also our other filings with the Securities and Exchange Commission.

## Completion of Audit Committee Inquiry

The Company's Audit Committee inquiry, initiated in August 2003, into certain assertions made by two former executives and related matters has been completed. The Audit Committee, aided by its independent counsel, Davis Polk & Wardwell, and by an outside accounting expert, reported its findings and recommendations to the Company's full Board of Directors. In general, the Audit Committee's inquiry extended into the following areas: (1) assertions regarding the Company's accounting for revenue and tooling, (2) a comprehensive review of related party transactions and (3) certain corporate governance procedures. The following summarizes the Committee's principal findings and recommendations:

- The Audit Committee has not become aware of any events that would necessitate a restatement of any previously issued financial statements.

- While the assertions concerning related party transactions were limited to certain transactions involving Charles Becker and Elkin McCallum and entities controlled by them, the Audit Committee reviewed all material transactions entered into between the Company and Heartland Industrial Partners, L.P., Mr. McCallum and Mr. Becker and their respective affiliates. Both Mr. Becker and Mr. McCallum are

7

directors and significant shareholders of the Company and are, directly or indirectly, limited partners in Heartland, the Company's largest shareholder.

The Audit Committee concluded that each of these transactions had a legitimate business purpose, was negotiated fairly, and was intended to advance the interests of the Company and not to benefit the related parties at the Company's expense. The Audit Committee further concluded that, by and large, these transactions were appropriately presented to and approved by the full Board of Directors of the Company and were properly documented and adequately disclosed.

The Audit Committee concluded that certain related party matters referred to below had not been formally submitted for Board approval, and that others should have been more appropriately documented. The Audit Committee recommended that disinterested members of the Board review those matters and take whatever procedural action may be deemed appropriate. Specifically, the matters to be reviewed are (1) with respect to Mr. Becker and his affiliates: leases of two buildings adjacent to the Company's headquarters, which was already the subject of a Board-approved lease from an affiliate of Mr. Becker; an amendment reducing the rent at the Company's headquarters to the rent at these two additional buildings; and amendments of existing plant leases with an affiliate of Mr. Becker to extend the term and reduce the rent for the initial term; and (2) with respect to Mr. McCallum and his affiliates, an amendment of the previously Board-approved Joan Automotive merger agreement clarifying ownership of certain equipment listed in a schedule attached to that agreement; and the final terms of a supply agreement contemplated at the time the Board approved a January 2003 purchase of certain fabrics equipment from an affiliate of Mr. McCallum. Subsequent to the Board's initial discussion with the Audit Committee on March 10, 2004, the Board has held a meeting and ratified all of these actions.

• The Audit Committee also recommended that the Company review its public filings to determine whether disclosure of certain aspects of the related party transactions reviewed by the Audit Committee should be enhanced and additionally, it proposed a resolution for the Board that will require pre-approval of all future related party transactions, even where pre-approval of the Board is not legally required. The resolution also reiterates procedures for ensuring proper documentation and disclosure of such transactions. Subsequent to the Board's initial discussion with the Audit Committee on March 10, 2004, the Board has adopted and approved this resolution.

As a result of the Audit Committee's recommendations, the Company has included enhanced disclosure in this Annual Report with respect to the following: (1) disclosure of the Board-approved payment of $300,000 as compensation to Mr. Becker in 2002 for his temporary service as Vice Chairman of the Company during that year; (2) an improved description of the 2003 fabrics and 2002 Dutton Yarns air-texturing operations transactions with Mr. McCallum; and (3) the dollar volume of previously disclosed ordinary course arrangements with Mr. McCallum, specifically, from transition services, supply and rebate arrangements.

The members of the Company's Audit Committee are Robert C. Clark, the former Dean of the Harvard Law School, Marshall A. Cohen, counsel at Cassels Brock and Blackwell, a Canadian law firm, and former Senator Warren B. Rudman. The accounting expert who advised the Audit Committee is Alex Arcady, a retired partner from Ernst & Young LLP, who spent the last ten years of his career in that firm's national office.

### Item 1.  *Business*

### THE COMPANY

The Company is a global leader in the design, engineering and manufacturing of automotive interior components, including: instrument panels, fully assembled cockpit modules, floor and acoustic systems, automotive fabric, and interior trim, as well as exterior trim and convertible roof systems. In North America, the Company manufactures components for approximately 90% of all light vehicle production platforms. Sales are primarily made to North American based global OEMs, as well as Asian and European based global OEMs. The automotive supply industry in which the Company competes is cyclical and is influenced by the level of North American and European vehicle production. The Company has approximately 23,900

employees and 102 plants and facilities worldwide. The Company is a Delaware corporation formed on September 21, 1988. The Company conducts all of its operating activities through its wholly owned subsidiary Collins & Aikman Products Co. ("Products"). Predecessors of Products have been in operation since 1843.

Collins & Aikman is one of the industry's largest and most broadly based manufacturers of automotive interior components, systems and modules. The Company has the capability to supply diverse combinations of stylistically matched, functionally engineered and acoustically integrated interior trim components, systems and modules and markets interior products to customers through customer business units, which supplies products from three primary categories: plastic components and cockpits, carpet and acoustics, automotive fabrics and convertible roof systems.

## INDUSTRY TRENDS

The Company's strategy is to capitalize on several important automotive industry trends, which are expected to drive demand for its products. These trends include:

- *Increasing OEM Demand for Modules, Systems and Complete Interiors.* To reduce costs and simplify assembly processes and design, OEMs increasingly expect their large-scale suppliers to provide fully engineered systems, pre-assembled combinations of components (systems or modules) and complete automotive interiors rather than individual components. OEMs also continue to increase their need for multiple products on any given assembly line, further driving the need for suppliers to be able to handle extreme complexity.

- *Growing Technological Content and Acoustical Performance Requirements.* The electronic and technological content of vehicles continues to expand, largely driven by demand for greater functionality and convenience. Changes to vehicle interiors, including hands-free cell phone systems, entertainment and navigational systems and voice-activated dashboard functions, are expected to require enhanced acoustical properties and increased sound field engineering relative to today's light vehicles.

- *Global Customer Requirements.* Due to the opportunity for significant cost savings, reduced product development cycle times, common global platforms and improved product quality and consistency, automotive manufacturers favor suppliers with the capability to manufacture automotive interior systems and components in multiple geographic markets.

## CORPORATE STRATEGY

The Company's goal is to become the leading manufacturer of automotive interior trim components to OEMs and Tier I integrators and to realize the integration, synergy and cost savings opportunities created by the combination of its portfolio of products. The Company intends to leverage its product development, patented new materials, continuous enhanced manufacturing capability, an unwavering dedication to lean manufacturing, error proofing and APQP (Advanced Product Quality Planning) launch readiness systems to meet customers' demands. The following are the key elements of the strategy:

- *Provide integrated product solutions that combine interior styling, component systems and acoustical technologies.* The ability to bundle multiple components into integrated, custom packages distinguishes the Company from its competitors and provides an opportunity to increase content per vehicle. The Company is a leader in product innovation, design and styling in all of its business lines, producing components that cover substantially all of the non-glass interior surfaces of automobiles. This breadth of product offering affords the Company a significant advantage as OEMs increasingly view the vehicle interior as a major point of differentiation and rely upon automotive suppliers for research, engineering, design and styling capabilities. By employing a cross-disciplinary approach to acoustics, surface styling and product engineering that takes advantage of product development and technological capabilities, the Company can offer integrated product solutions to its customers.

- *Capitalize on position as full service provider to OEMs and Tier I total interior integrators.* The Company believes that OEMs will accelerate modular and system sourcing in order to lower costs, reduce time to market and accommodate global platforms and "just in time" sequenced delivery of

9

complete interior systems. The Company is well positioned to capitalize on these opportunities. Furthermore, the Company's products are used in approximately 90% of all North American light vehicle platforms and are sold to all North American OEMs, transplants such as Toyota, Nissan and Honda and major Tier I integrators. The Company is also well positioned with respect to its Tier II competitors that have comparatively narrower product lines and significantly less size, scale and technological capabilities.

- *Increase content per vehicle.* The Company intends to take advantage of its current position to increase content per vehicle and has substantial new business awards from customers across all product categories, with the strongest growth in fully assembled cockpit modules. Projected sales growth is primarily attributable to its expanded book of full cockpit programs. By increasing content per vehicle, sales are expected to increase at a rate in excess of changes in industry production rates.

- *Leverage technology to improve manufacturing efficiency.* The Company believes it has many opportunities to improve manufacturing efficiency and cost structure by rationalizing existing operations and incorporating manufacturing "best practices," processes, procedures and technologies into its operations. For example, the Company is believed to be among the most efficient plastics suppliers in North America and Europe due to numerous proprietary manufacturing technologies, such as Invisitec™ and Envirosoft™ patented processes that allow the Company to manufacture and combine multiple products to produce complex integrated interiors products. The Company believes the application of technologies to the Company's other operations, as well as the continued roll-out of these technologies throughout the Company's operations, will significantly improve plastics manufacturing cycle times, labor costs and scrap rates.

- *Pursue cost savings opportunities.* The Company expects to continue to realize savings through a number of initiatives, including purchasing savings, in-sourcing the majority of our plastics tooling and yarn dyeing requirements, consolidating research and development and engineering functions, capacity rationalization and reducing global headquarters' costs. While the Company believes that the majority of restructuring activities have already been undertaken, in an effort to achieve cost savings, the Company may also elect to implement restructuring activities in future periods above and beyond activities initiated during 2003.

## SEGMENT AND GEOGRAPHICAL INFORMATION

The Company changed the composition of its reportable segments on January 1, 2003 and further redefined the segments July 1, 2003 to reflect organizational changes and restated prior period segment data to be comparable. The Company operates through three segments: U.S. and Mexico Plastics, International Plastics and Global Soft Trim. For a discussion of the Company's operating segments and the geographic regions in which the Company operates, refer to Item 7 Management's Discussion and Analysis of Financial Condition and Results of Operations — "Results of Operations" and to Footnote 20 — "Information About the Company's Operations."

## PRODUCTS

The Company markets the majority of its products to customers through customer business units, which manage products from two primary categories: plastic components and cockpits, and soft trim which include: carpet and acoustics, automotive fabrics and convertible roof systems.

### Plastic Components and Cockpits

The U.S. and Mexico Plastics and International Plastics segments include interior trim components such as door panels, instrument panels, consoles, package trays and cargo management systems, exterior trim components such as bumper fascias and cladding and fully assembled cockpit systems and components

10

thereof. This broad portfolio of plastic components and cockpits products allows the Company to offer customers modules and systems that incorporate individual components. Some major products include:

- *Instrument Panels ("IP"):* As the most structurally important plastic component in the vehicle and as the plastic substrate directly in front of the driver, the IP occupies the most important piece of "real estate" in the interior. The Company believes that it is the number one IP supplier in North America. The advanced materials the Company employs include Envirosoft™ castable thermoplastic materials, high performance PVC alloys, high-definition grain and texture formulation and vacuum forming. The Company also has the proprietary Invisitec™ invisible passenger air bag system, which provides improved appearance and craftsmanship at reduced cost.

- *Cockpits:* The Company is a leading North American and European supplier of cockpits. The complete array and breadth of its plastic component offerings has enabled the Company to become a leader in offering customers a fully assembled IP system ("cockpit") delivered on a just-in-time basis. As most of the ancillary interior trim components revolve around the IP placement, the Company believes that it will be able to penetrate effectively the customer base by offering the IP along with complementary plastic accoutrements and additional products from its other business units. The Company sources various other parts that make up a fully assembled modular cockpit from outside suppliers (including radios, wire harnesses, cross-vehicle beams and steering columns). The Company expects that its position as a cockpit integrator will provide significant opportunities to in-source more manufactured content in the future. Through the proprietary Intelliquence™ software, finished cockpits can be delivered to the OEMs on a just-in-time basis and installed on the assembly line.

- *Door Panels:* The Company believes that it is the second largest supplier of door panels in North America. This decorative plastic interior trim component is an important element to the overall styling theme of a vehicle's interior.

- *Exteriors:* Exterior trim components include plastic molded fascia systems, bodyside cladding, signal lamps, cowl grilles and wheel flares. The Company has taken advantage of the systems trend in the exterior trim product market by producing and assembling fascia with radiator grilles, energy absorbers, trim moldings and lamps to be delivered in sequence directly to the OEMs' assembly line.

**Soft Trim**

The Soft Trim segment includes the Company's global carpet and acoustics products, global automotive fabrics products and global convertible roof systems. Some of the major products of each group include:

**Carpet and Acoustics**

Carpet and acoustics products includes molded non-woven and tufted carpet, alternative molded flooring, accessory mats and acoustics systems consisting of absorbing materials, damping materials, engine compartment noise vibration and harshness systems and interior insulators. The Company evolved from a North American carpet producer to become a market leader in a broad range of automotive floor systems, luggage compartment trim, dash insulators and other acoustic products with production capabilities in both North America and Europe. While acoustical products are often combined with molded floor carpet to provide complete interior floor systems, it is useful to describe four carpet and acoustics product categories:

- *Molded Floor Systems:* Molded floor systems consist of thermoformed compression molded carpets. These carpets are provided in either a barrier or an absorptive NVH (noise, vibration and harshness) system. The barrier system includes polyethylene, barrier back, and a fiber underlay system or a foam-in-place system. Products include Tuflor™, the Company's proprietary thermoplastic flooring product, which is rugged, durable and washable. The products in molded floor systems are highly engineered, and their manufacture requires a high degree of precision and draws on the Company's robotics capabilities. The Company believes it is the number one producer of molded floor and acoustic systems in the North American market and manufactures molded floor systems for all of the North American and Japanese OEMs as well as a number of the European OEMs.

11

- *Luggage Compartment Trim:*  The other major carpeted area of the vehicle is the luggage compartment, which includes one-piece molded trunk systems and assemblies, wheelhouse covers and center pan mats, seatbacks, tireboard covers and other trunk trim products. The Company believes that it is the number two supplier of luggage compartment trim in the North American market.

- *Accessory Floormats:*  The Company manufactures automotive accessory floormats by vulcanizing rubber backing to tufted carpet and also manufactures cargo mats with value-added distinctive aesthetic and practical features such as hand-sewn appearance of edges and moisture trapping construction with our patented Akro Edge® floormats. Largely due to this product differentiation, the Company has become the largest fully integrated auto floormat producer in North America.

- *Acoustical Products:*  Acoustical products include interior dash insulators that insulate the passenger compartment from engine compartment noise and heat; damping materials that control noise in the floor, overhead system and sides of the vehicle; and engine compartment NVH systems. Changes to vehicle interiors, including hands-free cell phone systems, navigational systems, entertainment systems and voice-activated Internet access, will require enhanced acoustical properties and increased sound field engineering relative to today's light vehicles.

**Automotive Fabrics**

The Company is positioned as the market leader in the North American automotive fabrics market. The principal automotive products include body cloth (woven or knitted fabrics for seating surfaces and other interior applications) and headliner fabric. The Company is able to offer virtually every major weave/knit technology currently available in the marketplace including dobby velours, jacquard velours, flat wovens, double-needlebar knits, circular knits and tricot knits. This allows the Company to effectively serve changing customer styling and cost directives.

Strategic acquisitions have allowed the Company to increase its backward and forward integration levels by adding yarn dyeing and fabric lamination operations. This additional value-add manufacturing and improved control of the supply chain have contributed to improved operational efficiencies and manufacturing performance.

**Convertible Roof Systems**

The Company is the only vertically integrated full service supplier of convertible roof systems, which designs, engineers and manufactures all aspects of a convertible top including the framework, trim set, backlights, well slings, tonneau covers and power actuating system. Recently, in order to differentiate products in the marketplace, OEMs have been increasing the number of convertible and open roof derivative vehicles on both existing and new platforms. The Company's management believes that this trend will continue to drive demand for convertibles and other innovative open roof systems. The Company is well positioned to secure additional business based upon demonstrated new innovative roof system concepts.

Top-in-a-Box™, a system pioneered by the Company, is an assembly-line-ready module containing all of the components of a convertible top that enables the OEM to install a complete convertible top system on the production line. This modular, "bolt-on" assembly significantly reduces the time and labor traditionally required to manufacture a convertible model, enabling OEMs to more profitably produce and sell convertibles. The Company has the industry's most complete line of fabric coverings for convertible and sport utility top covers for OEMs globally. The Company maintains final assembly and trim operations near the OEMs' plants, and thereby offers customers complete just-in-time delivery and sequencing capabilities.

<u>**CUSTOMERS**</u>

Customers include OEMs and Tier I total interior integrators, both of which have been increasingly divesting component manufacturing. OEMs have typically been direct customers for the Company's plastic components and cockpits, and soft trim products, while Tier I total interior integrators have typically been direct customers for fabrics and carpet and acoustics products.

12

Through strategic acquisitions, the Company has broadened its customer base globally, with European and South American sales representing 27% of total sales for 2003 versus 19% in 2002. DaimlerChrylser AG (including Mercedes, Chrysler, Mitsubishi and Smart), General Motors Corporation (including General Motors, Opel, Vauxhall and Saab) and Ford Motor Company (including Ford, Jaguar, Land Rover, Aston Martin and Volvo) directly and indirectly represented approximately 28%, 22% and 25% of 2003 sales, respectively. The following is a list of primary customers:

- Alfa Romeo
- Audi
- BMW
- CAMMI
- DaimlerChrysler
- Faurecia
- Fiat
- Ford
- Freightliner

- General Motors
- Honda
- Intier
- Isuzu
- Jaguar
- Johnson Controls
- Land Rover
- Lear Corporation
- Magna

- MAN
- Mazda
- Mitsubishi
- Nissan
- NUMMI
- Opel
- Porsche
- PSA
- Renault

- MG Rover
- Saab
- Scania
- Seat
- Subaru
- Toyota
- Visteon
- Volkswagen
- Volvo

The Company's supply relationships are typically sole-source and extend over the life of the model, which is generally four to seven years, and do not normally require the purchase by the customer of any minimum number of products. The Company receives blanket purchase orders that normally cover annual requirements for products to be supplied for a particular vehicle model which may be terminated at any time. In order to reduce reliance on any one model, the Company produces automotive interior and exterior systems and components for a broad cross-section of both new and more established models.

## MARKETING, ENGINEERING AND DEVELOPMENT

As a global leader in automotive interior and exterior components, the Company differentiates itself in the marketplace by consistently providing high quality products, outstanding customer service and program management and cost effective automotive solutions to global customers. Historically, the Company marketed individual components, modules and complete systems to customers. The Company has realigned marketing efforts to sell integrated product "bundles" to customers in an effort to increase growth in sales and operating income while enhancing the value-add provided to customers. Central to this marketing strategy has been the development of products that enhance both the vehicles' interior aesthetics as well as its acoustic performance.

Products are sold directly to customers under sales contracts that are obtained primarily through competitive bidding. These sales are originated almost entirely by sales staff. This marketing effort is augmented by design and manufacturing engineers that work closely with automotive manufacturers from the preliminary design to the manufacture and supply of automotive modules, systems or components. A key element employed to increase sales is to develop increasingly higher value-added products through innovations in materials construction, product design, engineering and styling. The primary focus of the Design Engineering and Technology, therefore, is to work closely with customer engineering personnel to develop new products, processes, innovations, etc. that are central to winning new business from customers.

Through sales offices in North America, South America, Europe and Asia-Pacific, the Company's marketing personnel maintain regular contact with their various customers' engineers and purchasing agents. The Company continually seeks new business from existing customers, as well as developing relationships with new customers. The Company markets its products by maintaining strong customer relationships, developed over an 80-plus year history in the automotive industry through:

- extensive technical and product development capabilities;

- reliable just-in-time delivery of high-quality products;

- strong customer service;

- innovative new products; and

- a competitive cost structure.

13

The emergence of modular sourcing favors suppliers with broad manufacturing capabilities and product lines, experience with diverse materials and modular coordination. Management believes that the Company's broad base of manufacturing expertise with interior surface resins and materials and its global leadership in delivering cockpits, favorably positions the Company in the global automotive interior industry. Automotive manufacturers have increasingly looked to suppliers to assume responsibility for introducing product innovations, shortening the development cycle of new models, decreasing tooling investment and labor costs, reducing the number of costly design changes in the early phases of production and improving automotive interior acoustics, comfort and functionality. Once the Company is engaged to develop the design for the automotive interior system or component of a specific vehicle model, it is also generally engaged to supply these items when the vehicle goes into production. Substantial resources have been dedicated toward improving engineering and technical capabilities, establishing strong in-house tooling capabilities and developing advanced technology centers in the United States and in Europe. Similarly, research and development are an integral part of the sales and marketing effort. Especially noteworthy are the Company's proprietary Invisitec[TM] invisible passenger air bag door system and Envirosoft castable TPU (Thermalplastic Polyurethane) and TPO (Thermalplastic Olefin) materials.

In order to effectively develop automotive interior systems, it is necessary to have global capabilities in the engineering, research, design, development and validation of the interior components, systems and modules being produced. The Company conducts research and development at design and technology centers in Dearborn, Michigan; Dover, New Hampshire; Troy, Michigan and Plymouth, Michigan; Heidelberg, Germany and Tyngsboro, Massachusetts and at several worldwide product engineering centers. At these centers, the Company designs, develops and engineers products to comply with applicable safety standards, meet quality and durability standards, respond to environmental conditions and conform to customer aesthetic and acoustic requirements. In particular, acoustic requirements and cockpit aesthetics have become more important than ever with the advent of in-vehicle telematics.

Technologically advanced acoustics testing centers are maintained in Plymouth, Michigan and Heidelberg, Germany and cockpit development centers are located in Troy and Dearborn, Michigan in order to capitalize on both of these trends.

## MANUFACTURING

The Company focuses on combining smaller manufacturing plants into larger scale plants that have efficient layouts and the ability to reduce fixed costs.

The Company possesses cross-disciplinary manufacturing expertise, including an ability to form and assemble multi-material combinations of hard-molded plastics, slush-molded soft skins and surfaces, carpet, fabric, foam, insulation and other trim materials as well as stamping, welding, machining and painting of metals and cutting and sewing of fabric components. Management believes the sophistication of the Company's carpet tufting and dyeing processes, the foam-in-place process for molded floors and its small-part plastic moldings and assemblies capabilities create a competitive advantage.

The Company also possesses a scaleable, low-cost package automotive yarn dyeing capability that provides an important source of supply for the manufacture of our fabrics products.

The Company possesses advanced process technologies such as slush-molded skinning for high-end instrument panels, thermoplastic casting, and "molded-in" color and decoration insert capability and overall manufacturing discipline and acumen. Specific product and processes include the proprietary Intelliquence[TM] software sequencing system which should enable product delivery on a just-in-time basis to global OEM customers.

Through its extensive in-house tooling resources, the Company has the ability to in-source a significant amount of its tooling requirements for manufacturing carpet, acoustic, and injection molded components.

14

## TECHNOLOGY AND INTELLECTUAL PROPERTY

Significant resources are dedicated to research and development in order to maintain the position as a leading developer of technology innovations, some of which have been patented or are in the process of being patented, in the automotive interior industry. The Company has developed a number of patented and proprietary designs for innovative interior features, all focused on increasing value to the customer. Examples include the Company developed proprietary slimline cupholders, Cavelflex™ (stretch woven) fabrics and the AcT™ family of acoustically tunable products.

Patents and patent applications exist in five primary areas: automotive floor mats, automotive fabric products, acoustics, interiors and convertible systems. With respect to floormats, the Company holds several U.S. and foreign patents relating to the Akro Edge® floormats. Akro Edge® floormats are the industry standard for their functional and aesthetic appeal to OEMs and their customers. With respect to automotive fabric patents, the Company has numerous patents on headliners, trunkliners and floor panels. In the acoustics area, in addition to the proprietary Fused Fiber™ technology, the Company is actively seeking protection of various aspects of its AcT™ fiber technology and various other means for improving sound deadening and sound absorption in automotive interiors. The Company has various patents and patent applications directed to cup holders, air outlet assemblies, storage systems and convertible mechanisms. The Company owns the patents relating to Intellimold™ injection molding control process for use in its business. The Intellimold™ patents are related to methods and/or apparatus for injection molding. The Company also holds technology relating to certain skin materials and compounding solutions that provide the capability to design cost-effective materials with outstanding performance and aesthetic qualities. Examples of these materials include Envirosoft™ castable thermoplastic materials, high performance PVC alloys, high-definition grain and texture formulation and vacuum thermoplastic applications. Additionally, a new patented process, TACII™ has been developed in concert with the castable Envirosoft™ materials. The Company also holds technology relating to the Invisitec™ invisible passenger air bag system, which provides improved appearance and craftsmanship at reduced cost. Invisitec™ systems, which integrate the air bag door with the panel and top cover, have been commercialized for soft-cast and vacuum-formed panels and hard injection molded instrument panels. In total, the Company holds approximately 390 U.S. and approximately 1,500 foreign active patents and has approximately 300 patents pending. The intellectual property acquired in the TAC-Trim Acquisition is subject to certain limitations on the Company's use and creates continuing obligations to Textron.

As part of the TAC-Trim acquisition, the Company entered into three intellectual property license agreements with Textron. In two of these agreements, the Company licensed back to Textron certain intellectual property that was acquired in the transaction (the "Intellimold Agreement" and the "Licensed-Back IP Agreement"). In the third agreement, the Company licensed from Textron other intellectual property that it did not acquire in the transaction (the "Retained IP Agreement"). The Company is providing general descriptions of these agreements although these descriptions do not contain all the material terms in the contracts. In all three agreements, the ability to use the intellectual property is limited based on whether the proposed use falls inside or outside a defined field of automotive products (the "Restricted Field").

In the Intellimold Agreement, the Company gave Textron an exclusive worldwide, perpetual, irrevocable license to use outside the Restricted Field its rights in the Intellimold process and any enhancements developed by it. Textron was also granted a royalty-free, worldwide, perpetual, irrevocable license to use the Company's rights in the Intellimold process and any enhancements developed by the Company within the Restricted Field solely in connection with its and certain affiliates' manufacturing, sales and development operations. The Intellimold Agreement also includes an exclusive royalty-free, worldwide, perpetual, irrevocable license for the Company to use within the Restricted Field any enhancements to the Intellimold process developed by Textron. In the Licensed-Back IP Agreement, the Company granted Textron a non-exclusive, worldwide, royalty-free, perpetual and irrevocable license to use solely outside the Restricted Field certain intellectual property including over 77 U.S. patents on air bag related products. In the Retained IP Agreement, Textron granted to the Company a non-exclusive, worldwide, royalty-free, perpetual and irrevocable license to use solely within the Restricted Field certain intellectual property. These patents could have applicability to the automotive industry, but such use is somewhat secondary to the use of such technology outside the automotive field.

15

As described below under the heading "Management's Discussion and Analysis of Financial Condition and Results of Operations — Other Information — Off-Balance Sheet Arrangements", the Company leases certain equipment from Textron. When those leases terminate, if Textron and its affiliates continue to own any interest in the equipment, they will be allowed to use the equipment for certain purposes and to use related intellectual property.

## RAW MATERIALS

Raw materials and other supplies used in our continuing operations are normally available from a variety of competing suppliers. With respect to most materials, the loss of a single or even a few suppliers would not have a material adverse effect on the Company. The Company is sensitive to price movements in its raw materials supply base and has not hedged against price fluctuations in commodity supplies, such as plastics and resins. While the Company may not be able to pass on any future raw materials price increases to customers, a significant portion of increased cost may be offset through volume purchase savings, value engineering/value analysis in conjunction with our major customers and reductions in the cost of off-quality products and processes. The Company may evaluate commodities hedging opportunities from time to time.

## COMPETITION

The Company is a leading supplier in automotive molded carpet and acoustics, auto fabrics, convertible top systems and automotive plastics components and cockpits. Customers rigorously evaluate suppliers on the basis of product, quality, price competitiveness, technical expertise and development capability, new product innovation, reliability and timeliness of delivery, product design capability, leanness of facilities, operational flexibility, customer service and overall management. Some competitors may have greater financial resources than the Company or a competitive advantage in the production of any given product that the Company manufactures, and there can be no assurance that the Company will be able to successfully compete in the markets for the products it currently provides.

## JOINT VENTURES

The Company forms joint ventures in order to facilitate the exchange of technical information, gain entry into new markets and expand product offerings to its customer base. The Company's investment in unconsolidated joint ventures totaled $2.5 million at December 31, 2003. In January 2003, the Company acquired from Textron the remaining 50% interest in Textron Automotive Holdings (Italy) S.r.L., a joint venture that was formed as part of the TAC-Trim acquisition. Refer to Item 7. "Management's Discussion and Analysis of Financial Condition and Results of Operations" for additional discussion regarding this acquisition of the remaining 50% interest in the Italian joint venture.

## LABOR MATTERS AND EMPLOYEES

As of December 31, 2003, the Company's continuing operations employed approximately 23,900 persons on a full-time or full-time equivalent basis. Approximately 62% of such employees were represented by labor unions in the United States, Canada and other countries. Each facility with represented employees has its own collective bargaining unit and management believes that its relations with employees represented by labor unions and other employees are generally good. From time to time in the ordinary course of our business, grievances are filed against the Company by employees and unions.

## ENVIRONMENTAL MATTERS

A discussion of environmental matters is included in Item 7. "Management's Discussion and Analysis of Financial Condition and Results of Operations" and in Note 21 "Commitments and Contingencies" of this report.

### Item 2. *Properties*

The Company has 102 plants and facilities in North America, South America, Europe and Asia. Approximately 45% of the over 12 million total square footage of these facilities is owned, and the remainder is

leased. Many facilities are strategically located to provide product delivery to our customers on a just-in-time basis.

### Facilities by Geographic Region

| Type of Facility | North America | South America | Europe | Asia | Total |
|---|---|---|---|---|---|
| Manufacturing | 51 | 3 | 27 | — | 81 |
| Design, Research & Development, and Technical Centers | 12 | — | 6 | — | 18 |
| Sales Branches, Offices, Other | 12 | — | 3 | 1 | 16 |
| Total(1) | 75 | 3 | 36 | 1 | 115 |

(1) Total facilities shown per the table exceeds the 102 plants and facilities indicated above because certain facilities listed in the table serve in more than one of the indicated capacities.

### Item 3.  *Legal Proceedings*

A discussion of environmental matters and litigation is included in Note 21 "Commitments and Contingencies" of this report.

### Item 4.  *Submission of Matters to a Vote of Security Holders*

None during the fourth quarter of 2003.

### Supplemental Disclosure. Executive Officers of the Registrant

Information regarding the Company's executive officers is included in "Directors and Executive Officers of the Registrant — Executive Officers of the Company."

### PART II

### Item 5.  *Market for Registrant's Common Equity and Related Stockholder Matters*

The Company's Common Stock has been traded on the New York Stock Exchange under the symbol "CKC" since July 7, 1994. At March 1, 2004, there were approximately 120 holders of record. The following table lists the high and low closing prices for the Common Stock for the full quarterly periods during the two most recent years.

| | 2003 | | 2002 | |
|---|---|---|---|---|
| | High | Low | High | Low |
| First Quarter | 4.83 | 3.28 | 25.500 | 16.750 |
| Second Quarter | 4.18 | 2.82 | 28.375 | 9.000 |
| Third Quarter | 3.41 | 2.09 | 9.000 | 2.810 |
| Fourth Quarter | 4.33 | 2.43 | 4.450 | 2.450 |

As of December 31, 2003, Heartland Industrial Partners, L.P. ("Heartland") owned approximately 37% of the outstanding shares; Blackstone Capital Partners LP owned approximately 5%; Joan Fabrics Corp., Mr. Elkin McCallum and affiliates owned approximately 6%; Mr. Charles E. Becker owned approximately 9% and Textron, Inc. owned approximately 6% (Which it has subsequently sold). See Item 7, "Management's Discussion and Analysis of Financial Condition and Results of Operations — Effects of Certain Transaction with Related Parties" for further information about these parties.

The Company has paid no dividends or made similar distributions with respect to its common stock during 2003 or 2002. Any payment of future dividends and the amounts thereof will be dependent upon the Company's earnings, financial requirements and other factors deemed relevant by the Company's Board of Directors. Certain restrictive covenants contained in the agreements governing the Company's credit facilities and senior subordinated notes limit the Company's ability to make dividend and other payments. See Item 7,

"Management's Discussion and Analysis of Financial Condition and Results of Operations — Liquidity and Capital Resources" and Note 9, "Long-Term Debt and Capital Lease Obligations" of this report.

Item 6. *Selected Financial Data*

| | Year Ended(1) | | | | |
| | December 31, 2003 | December 31, 2002 | December 31, 2001 | December 31, 2000 | December 25, 1999 |
|---|---|---|---|---|---|
| | (In millions, except per share data) | | | | |
| **Statement of Operations Data:** | | | | | |
| Net sales ........................... | $3,983.7 | $3,885.8 | $1,823.3 | $1,901.8 | $1,898.6 |
| Gross profit ........................ | 444.2 | 518.1 | 218.8 | 266.6 | 284.7 |
| Selling, general and administrative expenses (excluding goodwill amortization) ...................... | 273.2 | 293.5 | 157.3 | 151.4 | 145.8 |
| Restructuring charge and impairment of long-lived assets(2) ................ | 69.0 | 56.9 | 18.8 | — | 33.4 |
| Goodwill amortization ................ | — | — | 7.1 | 7.1 | 7.0 |
| Operating income ................... | 102.0 | 167.7 | 35.6 | 108.1 | 98.5 |
| Interest expense, net ................ | 151.3 | 148.9 | 84.3 | 96.6 | 92.1 |
| Interest expense from subsidiary preferred stock requirements ........ | 37.3 | — | — | — | — |
| Subsidiary preferred stock requirements | — | 38.4 | 2.4 | — | — |
| Loss on sale of receivables ........... | 7.3 | 4.2 | 10.8 | 9.2 | 5.4 |
| Income (loss) from continuing operations before income taxes ...... | (61.0) | (33.8) | (76.3) | 0.8 | (1.2) |
| Income tax expense (benefit) ......... | (1.9) | 17.5 | (21.3) | 2.2 | 0.2 |
| Loss from continuing operations ....... | (59.1) | (51.3) | (55.0) | (1.4) | (1.4) |
| Income from discontinued operations, including disposals, net of income taxes ........................... | 1.6 | 9.5 | 8.8 | 6.6 | — |
| Income (loss) before cumulative effect of a change in accounting principle... | (57.5) | (41.8) | (46.2) | 5.2 | (1.4) |
| Net income (loss)(3) ................ | (57.5) | (53.5) | (46.2) | 4.5 | (10.2) |
| **Per Share Data:** | | | | | |
| Loss from continuing operations per basic and diluted share ............. | (0.71) | (1.15) | (1.42) | (0.06) | (0.05) |
| Dividends per share ................. | — | — | — | — | 0.32 |
| **Balance Sheet Data (at period end):** | | | | | |
| Total assets ....................... | $3,191.2 | $3,157.1 | $2,987.9 | $1,280.3 | $1,348.9 |
| Long-term debt, including current portion ......................... | 1,269.2 | 1,278.7 | 1,302.5 | 884.0 | 912.5 |
| Mandatorily redeemable preferred stock of subsidiary .................... | 161.2 | 123.9 | 149.3 | — | — |
| Common stockholders' equity (deficit) | 440.3 | 397.5 | 374.7 | (154.9) | (151.1) |
| **Other Data:** | | | | | |
| Capital expenditures ................ | $ 175.1 | $ 147.9 | $ 54.5 | $ 69.0 | $ 86.4 |
| Depreciation and amortization ........ | 140.2 | 117.0 | 81.8 | 74.8 | 71.5 |

(1) The years 2003, 2002 and 2001 were calendar years; fiscal year 2000 had 53 weeks; fiscal year 1999 had 52 weeks.

(2) In 2003, the Company recorded $69.0 million in charges consisting of restructuring of $32.2 million in severance costs; $9.2 million in costs associated with global rationalization and other exit related costs and $28.4 million in asset impairments. Included in the 2003 charges are adjustments related to previously established accruals which did not require cash outlays of $0.8 million. In 2002, the Company recorded a $56.9 million restructuring charge consisting of $18.0 million in asset impairments and $33.2 million primarily related to severance accruals and $5.7 million primarily related to other contractual obligations. In 2001, the Company recorded a restructuring charge consisting of $7.6 million in asset impairments and $11.2 million primarily related to severance accruals. In 1999, the Company recorded a restructuring charge consisting of $13.4 million in asset impairments and $20.0 million primarily related to severance accruals.

18

(3) In 2002, the Company recorded an $11.7 million charge for the cumulative effect of a change in accounting principle related to an impairment loss. In 1999, the Company recorded an $8.8 million charge for the cumulative effect of a change in accounting principle related to start-up costs.

## Item 7.  *Management's Discussion and Analysis of Financial Condition and Results of Operations*

### GENERAL

*The following discussion and analysis of our financial condition and results of operations includes statements concerning our expectations for our industry and our performance. These statements are forward-looking statements and are subject to numerous risks and uncertainties, including those highlighted elsewhere under "Cautionary Statements Concerning Forward-Looking Information and Risk Factors." Our actual results may differ materially from those contained or implied by the following discussion.*

### Introduction

The Company is a global leader in the design, engineering and manufacturing of automotive interior components, including instrument panels, fully assembled cockpit modules, floor and acoustic systems, automotive fabric and interior trim, as well as exterior trim and convertible roof systems. In reviewing the Company's results for the periods discussed, consideration should be given to the following critical events: the impact of the material acquisitions that we have made, the numerous restructuring and acquisition integration activities that we have undertaken, the material impact of general economic conditions in North America and within our industry specifically, the increasingly difficult customer and competitive environment, the capital intensive nature of our business and our high degree of leverage and liquidity and debt maturity position.

*Key Factors Impacting Our Reported Results.*   Critical factors affecting our ability to succeed include the following:

- *Automotive Sales and OEM Production Levels.*   In North America, the Company manufactures components for approximately 90% of all light vehicle production platforms. Sales are primarily made to North American based global OEMs, as well as Asian and European based global OEMs. The automotive supply industry in which the Company competes is cyclical and is influenced by the level of North American and Western European vehicle production. The Company's sales results are influenced heavily by the volume of OEM production of light vehicles ("builds") in the markets it serves. U.S. retail automotive sales were down 1.1% in 2003 versus 2002 and down 1.8% in 2002 versus 2001. Industry wide North American Free Trade Agreement ("NAFTA") builds were down 3.0% in 2003 versus 2002 and up 5.7% in 2002 versus 2001. Within NAFTA, the builds of the Big 3 OEM's were down 5.7% in 2003 versus 2002, and up 5.9% in 2002 versus 2001. In Western Europe, builds were down nearly 0.5% in 2003 versus 2002 and down 1.4% in 2002 versus 2001. In South America, builds were down 0.5% in 2003 versus 2002 and down 8.0% in 2002 versus 2001.

- *Our relationships with our customers.*   Collins & Aikman does business with all of the world's largest vehicle manufacturers including Ford, General Motors, DaimlerChrysler, Toyota, Honda, Nissan, Volkswagen, Renault and Porsche. These relationships have typically developed over a period of many years, and have, in many cases, been enhanced by the Company's recent acquisitions, which has provided the Company with a resulting global footprint and capacity to supply a full range of interior products. In each case, there is a complex mutual dependency and cooperation between the Company and its customers necessary to ensure that vehicle programs are successful in key areas of quality, timing and cost. At the same time, customer expectations are evolving, as vehicle manufacturers continue to outsource more design and integration responsibilities to the Company and other Tier 1 suppliers. As a result, customer satisfaction, especially at critical inflexion points (such as new vehicle launches and vehicle refreshes), has become more complicated and places significant demands on the Company's resources. Also, there is an inherent tension between the Company and its customers resulting from intense competition and pricing pressures within the industry. For example, OEM customers in the automotive industry attempted to impose price decreases and givebacks throughout 2003. Such attempted price decreases were generally in the 2% to 4% range. Several reductions have

been agreed to, and others are currently being negotiated with OEMs and pressures may increase if overall economic and industry conditions do not improve. Finally, on some vehicle programs involving component integration at the Tier 1-level, the Company is either a supplier to, or a customer of, some of its largest Tier 1 competitors, such as Delphi, Visteon and Lear. These types of arrangements are becoming more common within the industry, and add a new level of complexity to customer relationships, including the relationship with the vehicle manufacturer as the ultimate customer.

- *Our ability to secure profitable new business.*   The Company actively pursues new business opportunities with its traditional customer base as well as with potential new customers. The Company seeks to distinguish itself on a variety of factors, including its global footprint, its capacity to supply a full range of interior products and its full-service capabilities (such as design, engineering, manufacturing and quality services). There is intense competition and pricing pressure on all of these opportunities. Price is typically achieved through direct negotiations with the customer, but in certain instances customers have utilized auctions or relied on benchmarking data that have included reputed world class suppliers in emerging markets. At the same time, the Company seeks to manage its cost structure through a variety of strategies, such as vertical integration initiatives that provide greater cost control opportunities. For example, since the Company is a major purchaser of raw materials like resins, it can arrange favorable supply contracts and benefit broadly from material science developments and product simplification. Additionally, the Company believes that it has the world's largest fleet of injection molding equipment for automotive products, which provides a unique ability to benefit from process improvements and best practices with respect to its plastics products on a global basis.

- *Our ability to successfully realize the benefits of our restructuring and integration initiatives.*   The Company has undertaken a series of restructuring and integration initiatives to rationalize first its global manufacturing footprint and more recently its salaried workforce, including home office headcount. These activities are expected to have the following primary benefits: First, the Company has closed about 20 subscale plants and other facilities such as warehouses and consolidated activity into 80 world-class operations, which will result in a significant densification of production and resulting gains in fixed cost absorption and operating efficiencies. Second, the Company is beginning to win more "bundled" awards — with a full range of slush molded, injection molded and carpet, acoustics and fabric components on new vehicle programs. And third, the Company's salaried workforce will shrink by more than 20% from the legacy levels, while effectiveness and customer service levels will improve due to consolidation, standardization and level-loading of support infrastructure.

- *The impact of raw materials and energy costs.*   The Company is a significant consumer of resin and nylon feedstocks, which presents both a challenge and an opportunity for the Company. The challenge results from the Company's sensitivity to price movements in these raw materials (such as those related to recent short run spikes in the oil market), while the opportunity arises from the Company's ability to leverage its buying power as, in management's opinion, the largest single automotive grade resin buyer in the world. The Company has largely been able to avoid these pricing pressures due to its ability to negotiate with a variety of global suppliers, and to shift volume from one supplier to another. However, it is possible that the Company may begin to see increased cost pressure if the spikes in the oil market continue. The Company's customers have historically been reluctant to provide pricing relief based on this type of raw material cost increases, as recently demonstrated in the handling of the recent near tripling of global steel prices.

- *Our liquidity and capital resources.*   The Company is highly leveraged, due primarily to financing associated with recent acquisitions. Another contributing factor has been that most new business awards in the automotive industry require that suppliers advance certain costs relating to tooling and engineering and design services, which in some cases are incurred years before vehicle launch and are reimbursed over many years following vehicle launch as part of the piece price. In February 2004, the Company obtained amendments to its credit facilities that significantly loosened the principal financial covenants. The Company also obtained an additional revolving credit facility of $100 million and a new term loan in the amount of $185 million, the proceeds of which were used to pre-fund debt

20

amortization requirements. As a result, the Company has greatly improved its financial flexibility and liquidity and has no significant amortization requirements until June 2005.

*Impact of Acquisitions.* Our results for the periods discussed have been impacted by several key acquisitions, which, together with related financing transactions, have substantially increased revenues and cash flow and materially altered the Company's capital and operating structure.

For example, in 2001, the Company completed three key acquisitions: (1) the acquisition of Becker Group L.L.C., a leading supplier of plastic components to the automotive industry, (2) the acquisition of Joan Automotive Fabrics, a leading supplier of body cloth to the automotive industry, and Joan's affiliated yarn dyeing operation, Western Avenue Dyers, L.P., and (3) the acquisition of Textron Automotive Company's Trim division (TAC-Trim), one of the largest suppliers of instrument panels and fully assembled cockpit modules and a major automotive plastics manufacturer of interior and exterior trim components in North America, Europe and South America. These acquisitions, together with the Company's 2002 acquisition of Southwest Laminates, a fabric lamination business, contributed approximately $2,090 million of additional net sales in 2002 and drove the 113% increase in net sales from the prior year. In addition, these acquisitions were financed by varying combinations of the Company's common stock and preferred stock, warrants to purchase the Company's common stock, cash on hand and borrowings under a revolving credit facility, public issuances of debt, and sales of the acquired companies' accounts receivable under the receivables facility.

The Company also completed the following acquisitions in 2002 and 2003: (1) the acquisition of Dutton Yarns' yarn texturizing business, (2) the acquisition of Delphi Corp.'s plastic injection molding plant and related equipment in Logroño, Spain, and (3) the acquisition from Textron of the remaining 50% interest of an Italian automotive joint venture. These transactions have likewise impacted the Company's financial results and capital structure, although not to the same degree as the transactions described above.

*Impact of Integration Activities and Restructuring Initiatives.* We have devoted considerable efforts throughout 2001, 2002 and 2003 to properly integrate the acquired companies. We have also implemented a series of restructuring initiatives to ensure that the resulting combined operations have the proper structure and necessary resources to perform on a profitable basis. These initiatives were directed initially at establishing a proper, global manufacturing footprint and included combining and rationalizing the Company's legacy and acquired operations in North America, Europe and South America. More recent restructuring initiatives have focused on developing an appropriate overhead structure, including strengthening and streamlining the senior management team on a worldwide basis. As a consequence of these restructuring initiatives, the Company has incurred significant restructuring and impairment charges in each of 2001, 2002 and 2003 for severance costs, plant and office closures, equipment and lease impairments, contractual obligations and other restructuring activities, which have impacted cash flow, operating income and net income. For a more detailed description of these charges, see footnote 15, "Results of Operations".

*Key Indicators of Performance.* In evaluating our business, our management uses operating income as an important indicator of performance. In addition management also considers EBITDA to be a useful proxy for measuring the cash generated by our business, and it is commonly used in the industry to analyze operating performance, liquidity and entity valuation. We define EBITDA as operating income plus depreciation and amortization. Management believes EBITDA to be a good measure of operating performance because cash generation is necessary for the Company to achieve many of the critical success factors outlined above, including investment in cost reduction activities, reducing leverage and improving liquidity. Additionally, management reviews return on invested capital, working capital changes and capital expenditures as critical financial performance metrics. Management also uses certain non-financial metrics of performance, including equipment utilization and efficiency; service, production and first time quality performance; set up and tool changeover time; employee turnover and absenteeism; and safety performance.

## SEGMENT INFORMATION

The following table summarizes financial information for our operating segments:

| | Year Ended December 31, 2003 | | | | |
|---|---|---|---|---|---|
| | U.S. and Mexico Plastics | International Plastics | Global Soft Trim | Other | Total |
| Net sales . . . . . . . . . . . . . . . . | $1,363.4 | $1,258.0 | $1,362.3 | $    — | $3,983.7 |
| Gross profit . . . . . . . . . . . . . | 137.7 | 58.8 | 238.9 | 8.8 | 444.2 |
| Operating income (loss) . . . | 73.6 | (22.5) | 140.5 | (89.6) | 102.0 |

| | Year Ended December 31, 2002 | | | | |
|---|---|---|---|---|---|
| | U.S. and Mexico Plastics | International Plastics | Global Soft Trim | Other | Total |
| Net sales . . . . . . . . . . . . . . . . | $1,512.2 | $899.0 | $1,474.6 | $    — | $3,885.8 |
| Gross profit . . . . . . . . . . . . . | 179.9 | 48.2 | 274.6 | 15.4 | 518.1 |
| Operating income (loss) . . . | 113.1 | (30.1) | 161.6 | (76.9) | 167.7 |

| | Year Ended December 31, 2001 | | | | |
|---|---|---|---|---|---|
| | U.S. and Mexico Plastics | International Plastics | Global Soft Trim | Other | Total |
| Net sales . . . . . . . . . . . . . . . . | $208.0 | $263.1 | $1,352.2 | $    — | $1,823.3 |
| Gross profit . . . . . . . . . . . . . | 15.2 | 15.9 | 187.6 | 0.1 | 218.8 |
| Operating income (loss) . . . | 1.6 | (2.4) | 48.7 | (12.3) | 35.6 |

Capitalized terms that are used in this discussion and not defined herein have the meanings assigned to such terms in the Notes to Consolidated Financial Statements.

Investors can obtain free access to the Company's filings with the Securities and Exchange Commission by accessing the Company's website at http://www.collinsaikman.com/investor/docs.html.

## RESULTS OF OPERATIONS

### 2003 Compared to 2002

*Net Sales:* Net sales for 2003 increased 2.5% or $97.9 million to $3,983.7 million from 2002. The increase in net sales was primarily driven by approximately $225 million from acquisitions, primarily from the remainder of an Italian joint venture from Textron Inc. and a manufacturing operation in Logroño, Spain, and $163 million as a result of strengthening European and Canadian currencies offset by weakening South American currencies. Without the benefit of the above acquisitions, net sales decreased 3.3%, consistent with industry trends. Excluding an $84 million reduction due to the termination of an agreement with a Tier 1 customer, net new business volume increased $17 million. Offsetting the increase was a $23 million loss from the May 2003 tornado that shutdown production at a customer assembly plant, a $20 million loss due to plant closures and other factors, including less continuing business of existing programs of $125 million and commercial items (includes pricing and contractual arrangements) of $46 million.

Net sales for the U.S. and Mexico Plastics segment decreased $148.8 million to $1,363.4 million from 2002. The decline was primarily due to a $84 million reduction due to the termination of an agreement with a Tier 1 customer, a $23 million loss from the May 2003 tornado that shutdown production at a customer assembly plant and other factors, including reduced production volume of approximately $14 million and commercial items (includes pricing and contractual arrangements) of $21 million. Contributing to the reduced production volume was an extended period of re-tooling for a new program launch at a customer assembly plant.

Net sales for the International Plastics segment increased $359.0 million to $1,258.0 million from 2002. The increase in net sales was primarily driven by approximately $214 million from acquisitions in Italy and Spain and $130 million as a result of strengthening European and Canadian currencies offset by weakening South American currencies. The increase was also due to net new business of $110 million, offset by a

22

decrease in continuing business of existing programs of $86 million and commercial items (includes pricing and contractual arrangements) of $6 million. Contributing to the reduced continuing business of existing programs was an extended period of re-tooling for new program launches at customer assembly plants in Canada, customer directed content changes in Europe and less content placed in vehicles in South America due to their poor economic situation.

Net sales for the Global Soft Trim segment decreased $112.3 million to $1,362.3 million from 2002. Included in 2003 net sales was approximately $10 million from small acquisitions and $34 million in exchange gains from strengthening Canadian and European currencies. The decrease primarily resulted from the reduced impacts of business volume of $78 million, $20 million due to plant closures and other factors, including a decrease in continuing business of existing programs of $39 million and commercial items of $18 million. Contributing to the reduced continuing business of existing programs was the overall decrease in automotive builds and lower cost products going into vehicles in comparison to the prior year.

*Gross Profit:*  Gross profit for 2003 was $444.2 million, down $73.9 million from 2002. Gross margin for 2003 was 11.2% compared to 13.3% in 2002. Overall margins were impacted by a third and fourth quarter improvement at the 12 problem plants identified in the first half of 2003. The remainder of the impact is discussed as follows. The U.S. and Mexico Plastics segment had a decline in gross profit which was primarily attributed to an increase in the mix of the cockpit modules that carry a lower overall margin due to high purchased component content and commercial items of $21 million. Offsetting these decreases was $34 million from improved material and manufacturing efficiencies. The Global Soft Trim segment also contributed to the decline in gross profit primarily due to the mix of components, as well as commercial items of $28 million. The International Plastics segment's gross profit increased due to a $44 million improvement in material and manufacturing efficiencies offset by a decrease from volume and mix and $8 million in commercial items.

*Selling, General and Administrative Expenses:*  Selling, general and administrative expenses for 2003 decreased $20.3 million to $273.2 million compared to $293.5 million in 2002. As a percentage of sales, selling, general and administrative expenses decreased from 7.6% for 2002 to 6.9% in 2003. Contributing to the cost decrease were savings realized in connection with the salaried workforce restructuring and the previously announced European restructuring programs and rationalization of selling, general and administrative functions. Offsetting these decreases were higher net engineering and design related costs for significant new program awards of $66 million, a $19 million increase from the prior year.

*Restructuring and Impairment of Long-Lived Assets Charges:*  During 2003, the Company undertook three restructuring programs resulting in a $40.6 million charge. The goal of the first restructuring program, which resulted in a $4.9 million charge in the second quarter, was to rationalize operations on a worldwide basis with the primary focus on domestic operations. The charge included approximately $4.2 million of severance cost and $0.7 million of costs related to the establishment of reserves for lease commitments and other exit costs. The goal of the second restructuring program, which resulted in a $21.9 million charge in the third quarter and a $5.3 million charge in the fourth quarter, was to take actions aimed principally at rightsizing its support operations. The restructuring charge included approximately $20.4 million of severance costs and $6.8 million of costs related to the establishment of reserves for lease commitments and other exit costs. Included in the third quarter restructuring charge was $5.3 million related to the separation agreement with Jerry L. Mosingo, the former President and CEO. The goal of the third restructuring program, which resulted in a $9.3 million charge in the fourth quarter, was to rightsize the Company's overhead structure, reduce salaried headcount and strengthen and streamline the senior management team on a worldwide basis with the primary focus on domestic operations. The restructuring charge included approximately $7.6 million of severance costs and $1.7 million of costs related to the establishment of reserves for lease commitments and other exit costs. The 2003 restructuring programs affected nearly 3,100 personnel. Included in the 2003 charges are adjustments related to previously established accruals which did not require cash outlays of $0.8 million.

In addition, the Company recognized $28.4 million in asset impairment charges in 2003. Of the $28.4 million, $10.4 million related to the impairment of the Becker non-compete agreement, $7.5 million

23

related to the initial interest acquired in an Italian joint venture, $7.8 million related to the above restructuring programs and $2.7 million related to other intangible assets.

During 2002, the Company undertook three restructuring programs resulting in $38.9 million in restructuring charges and $18.0 million in related impairment charges. The goal of the first restructuring program that resulted in a charge of $9.1 million in the first quarter was to de-layer management in the North American and European operations. The objective of the second program that resulted in a $25.1 million restructuring charge and $8.7 million impairment charge in the third quarter was to realign the operations in North America. Included in the third quarter restructuring charge was $8.9 million related to the separation agreement with Thomas Evans, the former Chairman and CEO. The third program resulted in a restructuring charge of $4.8 million and impairment charge of $9.3 million in the fourth quarter. The objective of this program was to consolidate plant operations in Europe and to further de-layer management in North America. The 2002 restructuring programs resulted in the separation of over 1,100 personnel.

*Operating Income:* Operating income for 2003 decreased $65.7 million to $102.0 million compared to 2002. The decrease was primarily due to the problem plants identified in the first six months of 2003, higher net engineering and design related costs for significant new program awards of $19 million, the impact of sales mix of $58 million and commercial items (includes pricing and contractual arrangements) of $58 million, offset by material and manufacturing efficiencies of $96 million. Also, contributing to the decline was a $9.4 million increase in restructuring and impairment charges.

Operating income at the U.S. and Mexico Plastics segment declined $39.5 million primarily as a result of the problem plants identified in the first six months of 2003, higher net engineering and design related costs for significant new program awards, the impact of sales mix and commercial items (includes pricing and contractual arrangements) of $21 million. Offsetting these decreases were manufacturing efficiencies of $30 million. Included in 2003 operating income are $9.4 million in restructuring and $12.3 million in impairment charges compared to $0.8 million in restructuring and $1.2 million in impairment charges in 2002.

Operating loss at the International Plastics segment decreased $7.6 million. The reduction was primarily a result of material and manufacturing efficiencies of $43 million, offset by an increase in restructuring and impairment charges and the impact of sales mix of $37 million. Included in 2003 operating income are $8.9 million in restructuring and $9.2 million in impairment charges compared to $8.5 million of restructuring and $2.6 million in impairment charges in 2002.

The Global Soft Trim operating income decreased $21.1 million primarily as a result of sales mix of $13 million and commercial items (includes pricing and contractual arrangements) of $28 million. This decrease was partially offset by an improvement in material and manufacturing efficiencies of $19 million. Also offsetting the decrease was a reduced amount of restructuring and impairment charges from 2002 to 2003. Included in 2003 operating income are $10.7 million in restructuring and $3.6 million in impairment charges compared to $11.2 million in restructuring and $14.2 million in impairment charges in 2002.

*Interest Expense, Net:* Net interest expense from debt instruments increased $2.4 million to $151.3 million for 2003. The increase is primarily due to higher average borrowing levels during the year.

*Subsidiary Preferred Stock Requirements:* In connection with the TAC-Trim acquisition on December 20, 2001, Products issued to Textron Inc. preferred stock with a liquidation preference of $326.4 million and an estimated fair market value of $146.9 million. In June 2002, Products repurchased $133.3 million of liquidation preference Series A preferred stock that was initially valued at $56.8 million, along with accrued dividends of $6.9 million. The difference between the initial recorded value and the initial liquidation preference is being accreted over the life of the stock using the effective interest method. During 2003, interest expense from subsidiary preferred stock accretion and dividend costs were $5.3 million and $32.0 million, respectively. The 2002 preferred stock accretion and dividend costs were $7.6 million and $30.8 million, respectively.

Effective April 2004, the Company will, exercise its option to convert all 20,000 shares of the Series C Redeemable Preferred Stock to Series B Preferred Stock on an equivalent share basis. The primary difference between the Series C and Series B Preferred Stock was that Series C holders are entitled to participation in

24

distributions of Products common equity tied to the appreciation in the value of Products common equity subsequent to the issuance date of the securities. Each Series C Preferred Stock holder will receive one share of Series B Redeemable Preferred Stock on the equivalent share basis.

*Loss on Sale of Receivables:* In connection with the receivables sold to non-recourse facilities and through factoring arrangements, a loss of $7.3 million was recognized during 2003, compared to a loss of $4.2 million in 2002. The increase is due to new non-recourse factoring arrangements entered into during 2003.

*Other Expense (Income), Net:* In 2003, other expense (income), net primarily included $32.4 million of foreign currency transaction gains offset by $3.5 million of losses related to derivatives used in the Company's hedging strategies and the minority interest share of gains in a consolidated subsidiary of $5.6 million.

For 2002, other expense (income), net related primarily to $12.6 million of losses related to derivatives used in the Company's foreign currency hedging strategy reduced by $5.9 million of foreign currency transaction gains, $5.5 million of losses from an investment in a joint venture, $1.9 million of losses from sale and leaseback transactions and the minority interest share of losses of a consolidated subsidiary of $6.5 million.

*Income Taxes:* The Company recognized an income tax benefit of $1.9 million for 2003 compared to an income tax expense of $17.5 million in 2002. Net cash taxes paid during 2003 were $18.4 million. The primary reasons for the Company's effective tax rate being different from its statutory rate are non-deductible preferred stock dividends and accretion, foreign losses for which tax benefits are not recorded and state taxes that do not fluctuate directly with income, partially offset by the effect of a financing arrangement and a tax credit.

*Income from Discontinued Operations:* During 2003, the Company recognized $2.4 million from workers compensation claims related to discontinued operations, for which reserves were previously charged. Of these amounts, $1.6 million was recorded as income from discontinued operations, net of income taxes of $0.8 million.

During the second quarter 2002, the Company received proceeds of $15.8 million on environmental claims previously expensed related to discontinued operations. Of these amounts, $9.5 million was recorded as income from discontinued operations in the second quarter of 2002, net of income taxes of $6.3 million.

*Change in Accounting Principle:* During 2003, the Company implemented a change in the method of accounting for holiday pay so that such pay is accrued, and expense is recognized during the period for which the actual holiday occurs. Formerly, certain of the Company's businesses accrued holiday pay and recognized expense based upon an equal monthly amount within the fiscal year. The change in method better matches holiday expense with the period that the actual holiday occurs and the pay is earned. As the prior method allocated costs within the fiscal year, there is no effect on prior years. There was no effect on the entire fiscal year as the change only impacted interim periods.

Additionally, during 2003, the Company implemented a change in the method of accounting for crib supply inventories held at plants. Crib supply inventories include small motors, replacement parts for production equipment and other miscellaneous repair parts for building equipment and machinery. The Company implemented a perpetual crib supply inventory system and harmonized its policy to consistently account for the capitalization of crib supply inventories. Formerly, the Company had different capitalization thresholds following the various acquisitions in late 2001 and 2002, which ranged from not capitalizing any crib supply items to capitalizing only items greater than two thousand dollars. The new accounting method better matches the cost with the period benefiting from the expenditure, as such, inventories are charged to expense as they are placed into service and begin generating revenue. Pro forma and the cumulative effect amounts relating to the change in accounting for crib inventories is not determinable as perpetual records of crib inventory were not maintained at all the plants prior to the application of the new method in the second quarter of 2003. For the plants that previously had no perpetual records, the effect of the change was $1.8 million after tax or $0.02 per share recorded to increase inventory and reduce cost of sales in the three months ended June 30, 2003. For the year ended December 31, 2003, the incremental effect of the adoption had an insignificant effect.

During 2002, the Company completed its implementation of Statement of Financial Accounting Standards ("SFAS") No. 142, "Goodwill and Other Intangible Assets." Under SFAS No. 142, goodwill and indefinite-lived assets are no longer amortized but are tested for impairment. In accordance with SFAS No. 142, the Company employed a discounted cash flow analysis in conducting its impairment test. As a result of the test, the Company recorded an impairment loss of $11.7 million relating to the UK Plastics business in the International Plastics segment.

*Net Loss Attributable to Common Shareholders:*  In June 2002, $100.0 million of proceeds from a 16 million share common stock offering was used to repurchase Series A preferred stock at a price of 75% of its liquidation preference of $133.3 million. The redeemed Series A preferred stock had a carrying value of $63.7 million. In accordance with generally accepted accounting principles, the difference between the $63.7 million in carrying value and the $100.0 million cash payment was excluded from net income and recorded directly to equity in the Company's accumulated deficit account. Although this $36.3 million equity charge is excluded from net income, the charge is included in the computation of earnings (loss) per share and is included in the net loss attributable to common shareholders.

### 2002 Compared to 2001

*Net Sales:*  Net sales for 2002 increased 113.1% to $3,885.8 million up $2,062.5 million from 2001. The increase in net sales was primarily driven by the acquisitions of TAC-Trim, Becker, Joan and Southwest Laminates (SWL), which contributed approximately $2,090 million. Sales for 2002 increased approximately $400.6 million or 11.5% over pro forma 2001 sales of $3,485.2 million. New programs, increased content, a higher North American build rate and the 2002 acquisition of SWL drove this sales increase. In North America the build rate increased about 6.0%. Pro forma 2001 sales are based on previous filings with the Securities and Exchange Commission and include TAC-Trim, Becker and Joan for the full year.

Excluding the impact of the acquisitions, net sales decreased 1.5% from 2001. The decrease is due primarily to $31 million of discontinued non-automotive and low margin business and $42 million of commercial items offset by a $35 million increase in new business and a $10 million strengthening of foreign currencies.

Net sales for the U.S. and Mexico Plastics segment increased $1,304.2 million to $1,512.2 million from 2001. Excluding the impact of the TAC-Trim and Becker acquisitions totaling approximately $1,317 million, net sales for U.S. and Mexico Plastics decreased 6.3%. This reduction is primarily due to shutdowns of customer assembly plants.

Net sales for the International Plastics segment increased 241.7% to $899.0 million from 2001. Without the benefit of TAC-Trim sales totaling approximately $669 million, sales decreased 12.5%. The decrease was primarily due to customer price reductions.

Net sales for the Global Soft Trim segment increased 9.1% to $1,474.6 million compared to 2001. Excluding the acquisition of Joan and SWL, which contributed approximately $103 million to net sales, sales increased 1.4%. The increase is primarily due to increased production volumes and impact from continuing business, as well as a $10 million impact from strengthening European currencies, offset by the weaker Canadian currency and commercial items.

*Gross Profit:*  For 2002, gross profit increased to 13.3% from 12.0% in 2001. Excluding the favorable impact on gross profit from the Tac-Trim and Becker acquisitions, the increase in gross profit was mainly attributable to the Global Soft Trim segment. The Global Soft Trim segment's increase resulted from approximately $65 million in material and manufacturing efficiencies, partially offset by $31 million of commercial items and rebates and $10 million of product launch and plant consolidation cost.

*Selling, General and Administrative Expenses:*  Selling, general and administrative expenses for 2002 were $293.5 million compared to $164.4 million in 2001. The increase is due to the additional costs assumed from the acquisitions offset by $6.1 million of goodwill amortization expensed in 2001. Due to the elimination of duplicate efforts, reduced headcount and reduced discretionary spending, selling, general and administrative expenses as a percentage of sales declined from 9.0% in 2001 to 7.6% in 2002.

*Restructuring and Impairment of Long-Lived Assets Charges:* During 2002, the Company undertook three restructuring programs resulting in $38.9 million in restructuring charges and $18.0 million in related impairment charges. The goal of the first restructuring program that resulted in a charge of $9.1 million in the first quarter was to de-layer management in the North American and European operations. The objective of the second program that resulted in a $25.1 million restructuring charge and $8.7 million impairment charge in the third quarter was to realign the operations in North America. Included in the third quarter restructuring charge was $8.9 million related to the separation agreement with Thomas Evans, the former Chairman and CEO. The third program resulted in a restructuring charge of $4.8 million and impairment charge of $9.3 million in the fourth quarter. The objective of this program was to consolidate plant operations in Europe and to further de-layer management in North America. The 2002 restructuring programs resulted in the separation of over 1,100 personnel

During 2001, the Company undertook two restructuring programs resulting in charges totaling $18.8 million. The goal of the first quarter 2001 restructuring program which, resulted in a charge of $9.2 million, was to de-layer management in the North American and European operations. The second program resulted in a fourth quarter charge of $9.6 million. The objective of this program was to downsize three facilities in North America via better utilization of manufacturing and warehouse floor space (including associated headcount reductions) and to reduce headcount in our Mexican operations. The $18.8 million charge includes $11.2 million of severance and other exit costs and $7.6 million of asset impairment charges.

*Operating Income:* Operating income increased $132.1 million from 2001. The majority of the increase was due to the acquisitions. However, material and manufacturing efficiencies also contributed to the increase, partially offset by commercial items, product launch and plant consolidations costs and an increase in restructuring charges.

The U.S. and Mexico Plastics segment results reflect a $111.5 million improvement in operating performance. After considering the approximate $111 million impact of acquisitions, the U.S. and Mexico Plastics business operating income remained unchanged. Negative effects on operating income included a decrease in sales volumes and resulting inefficiencies associated primarily with certain GM models, $11 million of product launch and plant consolidation costs, $2 million related to the decline in plastic sales due to the shutdown of customer assembly plants and commercial items. These decreases were offset by purchasing and spending savings and reductions in administrative expenses.

The International Plastics operating performance was adversely impacted by commercial items and operating inefficiencies, as well as $11 million due to restructuring charges. These reductions were offset by spending and purchase savings.

Global Soft Trim operating income increased $112.9 million primarily the result of $70 million of improved material and manufacturing efficiencies, $17 million of sales growth resulting from an increase in light vehicle build, $8 million of reductions in administrative expense, and approximately $19 million from the impact of the acquisitions. These increases were partially offset by $30 million of commercial items and $10 million of operating inefficiencies due to launch costs associated with the BMW Mini program.

*Interest Expense, Net:* Net interest expense increased $64.6 million to $148.9 million for 2002. The increase in interest expense is primarily attributed to higher average debt balances and increased amortization of debt issue costs resulting from the TAC-Trim acquisition, partially offset by the benefit of working capital reductions.

*Subsidiary Preferred Stock Requirements:* In connection with the TAC-Trim acquisition on December 20, 2001, Products issued to Textron preferred stock with a liquidation preference of $326.4 million and an estimated fair market value of $146.9 million. In June 2002, Products repurchased $133.3 million of liquidation preference Series A preferred stock that was initially valued at $56.8 million, along with accrued dividends of $6.9 million. The difference between the initial recorded value and the initial liquidation preference will be accreted over the life of the stock using the effective interest method. The 2002 preferred stock accretion and dividend costs were $7.6 million and $30.8 million, respectively. The 2001 preferred stock accretion and dividend costs were $0.9 million and $1.5 million, respectively.

27

*Loss on Sale of Receivables:*  The Company has the ability to sell, through its Carcorp subsidiary, interests in a pool of accounts receivable. In connection with the receivable sales, a loss of $4.2 million was recognized during 2002, compared to a loss of $10.8 million for 2001. In December 2001, the Company entered into a new larger receivable facility in connection with the TAC-Trim acquisition, resulting in up-front fees of $5.6 million.

*Other Expense (Income), Net:*  In 2002, other expense (income), net primarily included $12.6 million of losses related to derivatives used in the Company's foreign currency hedging strategy offset by $5.9 million of foreign currency transaction gains, $5.5 million of losses related to investments in joint ventures, $1.9 million of losses from sale and leaseback transactions and the minority interest share of losses of a consolidated subsidiary of $6.5 million.

In 2001, other expense (income), net primarily included a $8.0 million loss on early extinguishment of debt and $7.8 million of foreign currency transaction losses offset by $5.0 million of derivatives gains and a $6.2 million gain related to a stock demutualization. The Company adopted SFAS 145 during 2003 and reclassified $8.0 million loss on the early extinguishment of debt recorded for the year ended December 31, 2001 to other expense (income), net from an extraordinary item in the amount of $5.3 million (net of income taxes of $2.7 million).

*Income Taxes:*  The Company recognized an income tax expense of $17.5 million for 2002 compared to an income tax benefit of $21.3 million in 2001. Net cash taxes paid during the period were $12.8 million. The primary reasons for the Company's relatively high effective tax rate are non-deductible preferred stock dividends and accretion, foreign losses for which tax benefits are not allowed and certain taxes that do not fluctuate directly with income.

*Discontinued Operations:*  During 2002 and 2001, the Company received payment on environmental claims related to discontinued operations, for which reserves were previously charged, and received proceeds of $15.8 million and $14.5 million, respectively. Of these amounts, $9.5 million and $8.8 million were recorded as income from discontinued operations in 2002 and 2001, respectively, net of income taxes of $6.3 million and $5.7 million, respectively.

*Cumulative Effect of Change in Accounting Principle:*  During 2002, the Company completed its implementation of SFAS 142, Goodwill and Other Intangible Assets. Under SFAS 142 goodwill and indefinite-lived assets are no longer amortized but are tested for impairment. In accordance with SFAS 142, the Company employed a discounted cash flow analysis in conducting its impairment test. As a result of the test, the Company recorded an impairment loss of $11.7 million relating to the UK Plastics business in the International Plastics segment.

*Net Loss Attributable to Common Shareholders:*  In June 2002, $100.0 million of proceeds from a 16 million share common stock offering was used to repurchase Series A preferred stock at a price of 75% of its liquidation preference of $133.3 million. The redeemed Series A preferred stock had a carrying value of $63.7 million. In accordance with generally accepted accounting principles, the difference between the $63.7 million in carrying value and the $100.0 million cash payment was excluded from net income and recorded directly to equity in the Company's accumulated deficit account. Although this $36.3 million equity charge is excluded from net income, the charge is included in the computation of earnings (loss) per share and is included in the net loss attributable to common shareholders.

## LIQUIDITY AND CAPITAL RESOURCES

The Company and its subsidiaries had cash and cash equivalents totaling $13.2 million and $81.3 million at December 31, 2003 and December 31, 2002, respectively. The Company's ability to utilize availability under its various credit arrangements and receivables facility is limited, in accordance with covenants established under the senior secured credit facility. However, at December 31, 2003, there were no restrictions and the Company had $149.7 million in aggregate of unutilized availability.

The total availability at December 31, 2003 was comprised of $9.1 million under the Company's receivables facility, $119.5 million under the Company's revolving credit facility and approximately $21.1 million under

uncommitted bank facilities in foreign locations. The numbers indicated above under the revolving credit facility were further reduced by outstanding letters of credit of $49.2 million as of December 31, 2003. Funding limitations are based on the Company's financial performance and target levels established by the covenants. At December 31, 2003, there were no funding limitations.

In October 2003, the Company entered into third and fourth amendments to the Senior Secured Credit Facilities Credit Agreement. The principal changes resulting from these amendments were to permit the add-back of certain restructuring charges for covenant calculation purposes, to increase the maximum permitted leverage ratio for periods beginning with the third quarter of 2003 and make adjustments to the interest coverage ratio. Previously, in the second quarter, the Company executed a second amendment to the senior secured credit agreement. The principal changes were modifications of certain covenants, including an increase in the maximum permitted leverage covenant and a decrease in the minimum interest coverage ratio. The amendment is effective for periods following the first quarter 2003. Other modifications were made to the credit agreement and are detailed in Note 7 "Long-Term Debt and Capital Lease Obligations" as well as in the copy of the amendments, which are filed as an exhibit to this Form 10-K.

In February 2004, the Company entered into the fifth amendment to the Senior Secured Credit Facilities Credit Agreement which allowed the establishment of a new $100 million supplemental Revolving Credit Facility and the $185 million Tranche A-1 Term Loan. In connection with these new expanded facilities, $181.5 million was used to prepay existing Tranche A and Tranche B Term Loans in direct order of maturity.

The Company's principal sources of funds are cash generated from operating activities and borrowings under its revolving credit facilities, receivables arrangements and sales leaseback arrangements. In addition, to facilitate the collection of funds from operating activities, the Company has sold receivables under its receivables facility and has also entered into an accelerated payment collection program with two of its larger customers. If those additional liquidity sources were to become unavailable or limited by customer concentration or credit quality or otherwise, the Company would require additional capital, access to which is not assured. During 2002, the Company issued common stock, although such issuances are not likely to be a source of financing in the near-term. The Company continues to seek means to generate additional cash for debt reduction and its growth strategy. Among its potential cash generation projects, the Company seeks to further improve working capital management (including factoring of receivables) and to continue to utilize lease financings.

*Operating Activities*

Net cash provided by the continuing operating activities of the Company was $122.9 million for the year ended December 31, 2003, compared to $189.4 million for the year ended December 31, 2002. The 2003 decrease is primarily the result of increases in other asset balances, offset by increases in proceeds from non-recourse factoring facilities, increases in proceeds from participating interests in accounts receivable, reductions in accrued expenses and other liabilities, decreases in inventories and other positive working capital changes.

*Investing Activities*

Net cash used in investing activities of the Company was $189.9 million for 2003, compared to net cash used of $186.1 million for 2002. The increased use of cash was primarily the result of a $27.2 million increase in capital expenditures. The increased use of cash was offset by the Company spending $12.5 million less in the payment of acquisition costs for acquiring businesses, spending $5.9 million less on investments in joint ventures and receiving $5.0 million more in proceeds from the sale of property, plant and equipment.

*Financing Activities*

Net cash used from financing activities for 2003 was $4.8 million compared to net cash provided from financing activities for 2002 of $4.0 million. This increase in cash used from financing activities is the result of $150.6 million decrease in proceeds from the issuance of stock offset by $100.0 million used for the repurchase of preferred stock in 2002 and a $41.8 million decrease in cash used for net borrowings.

At December 31, 2003, the Company had total outstanding indebtedness of $1,285.2 million at a weighted average interest rate of 10.1% per annum. Comparatively, at December 31, 2002, the Company had total indebtedness of $1,289.2 million.

During 2001, Heartland, and certain other investors, acquired 22.8 million shares of common stock from the Company at a price of $12.50 per share, representing a cash investment in the Company of $285.0 million before fees and expenses. Net proceeds paid to the Company from the equity transactions were $264.3 million. A portion of the proceeds were used to pay $10.7 million in transaction related costs, including change in control consents, fees related to term loan facilities, and other amendments to credit agreement facilities. The remaining proceeds of $253.6 million were used to pay down a revolving credit facility and to fund part of the TAC-Trim acquisition.

The senior secured credit facility consists of a revolving credit facility and tranche A and tranche B term loan facilities. The revolving credit facility provides for revolving loans and extensions of credit up to a maximum principal amount of $175.0 million. A portion of the revolving credit facility will be available to Canadian subsidiaries in Canadian dollars and a portion of the revolving credit facility will be available in the form of letters of credit. The revolving credit facility, the tranche A term loan and the tranche B term loan mature in December 2005. Borrowings under the senior credit facilities bear interest at variable rates based on a spread to the adjusted LIBOR or a base rate, at the Company's option. The Company had $350.1 million and $377.6 million in term loans outstanding under this facility at December 31, 2003 and 2002, respectively. See discussion on additional changes in February 2004 on Senior Secured Credit Facilities discussion under "Liquidity and Capital Resources" section previously.

On an ongoing basis, the Company has entered into an agreement to sell trade accounts receivable of certain business operations to a bankruptcy-remote, special purpose subsidiary, wholly owned by the Company. The Company's receivables subsidiary will, subject to certain conditions, from time to time, sell an undivided fractional ownership interest in a pool of domestic and certain Canadian receivables, up to a balance of $250 million, to bank-sponsored multi-seller commercial paper conduits under a committed facility. As of December 31, 2003, the Company had $73.7 million outstanding and $9.1 million undrawn under the receivables facility. As of December 31, 2002, utilization of the receivables facility was $66.0 million and an additional $93.2 million of funding was available but unutilized.

New receivables will be added to the pool as collections reduce previously sold receivables. The Company expects to service, administer and collect the receivables on behalf of the receivables subsidiary and the conduits. The proceeds of sale will be less than the face amount of accounts receivable sold by an amount that approximates the purchaser's financing costs. In September 2002, the Company amended the receivables facility lengthening its term to expire in December 2004. The receivables facility is an important source of ongoing liquidity to the Company.

In December 2001, Products issued 182,700 shares of its Series A Redeemable Preferred Stock, 123,700 shares of Series B Redeemable Preferred Stock and 20,000 shares of Series C Redeemable Preferred Stock. The Preferred Stock was recorded at estimated fair value of $146.9 million, which was less than the liquidation value of $1,000 per share or $326.4 million. The estimated fair value was based on market prices for securities with similar terms, maturities and risk characteristics, and included a liquidation discount to reflect market conditions and was agreed to by the Company and Textron as part of the TAC-Trim purchase agreement. The difference between the initial recorded value and the liquidation value is being accreted over the 11 year terms of the securities. The results for 2003 and 2002 included subsidiary preferred stock requirements calculated using the effective interest method of $37.3 million and $38.4 million, respectively. The preferred stock requirement includes both accretion and dividend costs of $5.3 million and $32.0 million, respectively, for 2003 and $7.6 million and $30.8 million, respectively, for 2002. The carrying value of the Redeemable Preferred Stock includes accretion and accrued dividends.

Products issued $500 million of 10¼% Senior Notes due in 2011 in connection with the TAC-Trim acquisition. The Company also amended the existing $400 million of 11½% senior subordinated notes due in 2006 to make each subsidiary guarantor of the Senior Notes a senior subordinated guarantor of the existing notes.

The following table sets forth the ratings as of December 31, 2003 for securities issued by the Company and its subsidiaries:

| | Standard & Poors | Moody's |
|---|---|---|
| Public Debt: | | |
| 11½% Senior Subordinated Notes, due 2006 ........................ | B— | B3 |
| 10¾% Senior Notes, due 2011 ................................... | B— | B2 |

## OUTLOOK

To further enhance North American automotive revenues, OEMs and transplants are continuing to offer incentives in 2004 that should enable production schedules to remain consistent with 2003 levels. The European market is expected to remain relatively soft, and that market has the potential for continuing declines in production compared to prior year levels. However, the Company remains cautiously optimistic that 2004 North American vehicle production and inventory levels will remain consistent with 2003 levels.

The Company's principal uses of funds from operating activities and borrowings for the next several years are expected to fund interest and principal payments on its indebtedness, growth related working capital increases, capital expenditures, product launches and lease expense. Consistent with the automotive supply industry, the Company continues to experience significant competitive pressure and expects to face continued downward cost pressure from vehicle manufacturers. The Company has an ongoing aggressive plan to improve the various operating performance at all of its facilities. While improvements are being made, further work remains to have all plants profitable on a continuing basis. In addition, the Company recently confirmed its strategy for new business, which involves pursuing sales growth based on criteria intended to more effectively allocate the Company's resources to the most promising new business opportunities. As part of this strategy, the Company reviewed its parts profitability for each plant and program worldwide. As a result, the Company concluded that a certain future business award is inconsistent with its criteria and is therefore in the process of cooperating in the transition of this award to another supplier.

Management believes cash flow from operations, together with its revolving credit facility, receivables arrangements, and sale and leaseback arrangements will provide adequate sources of liquidity for the Company to fund its operations. However, the Company's sources of liquidity may be inadequate if economic conditions worsen or if the Company is unable to meet financial or operating covenants as a result of the foregoing, and the Company will need to seek financing to refinance maturing debt. In addition, matters affecting the credit quality of our significant customers could adversely impact the availability of our receivables arrangements and our liquidity. The Company continues to explore other sources of liquidity, including additional debt, but existing debt instruments may limit the Company's ability to incur additional debt, and the Company may be unable to secure equity or other financing.

At the end of the second quarter, the Company received notice from one of its customers, Daimler-Chrysler Corporation, of an issue regarding the calculation methods for determining the current year valuation of price givebacks. Discussions on this issue, as well as various aspects of the broader relationship, are continuing. While the Company seeks to improve the profitability of its programs with this and all of its customers, there can be no assurance that the Company will not lose desirable programs over time. While the Company continues to believe that all of these issues will be resolved to the mutual satisfaction of the parties, there can be no assurances that such a resolution is imminent or that actions by the customer with respect to the broader relationship will not have a material adverse impact on the Company.

*Contractual Obligations*

Below is the table that identifies the Company's significant contractual obligations. Following the table is a more detailed description of these obligations.

| | Total | Less than 1 Year | 1-3 Years | 4-5 Years | After 5 Years |
|---|---|---|---|---|---|
| | | | **Payment due by Period** | | |
| | | | (In millions) | | |
| Short-term borrowings .............. | $   16.0 | $  16.0 | $    — | $   — | $    — |
| Long-term debt and capital lease obligations ..................... | 1,269.2 | 31.5 | 736.0 | 1.7 | 500.0 |
| Preferred stock(a) ................. | 161.2 | — | — | | 161.2 |
| Operating leases(b) ................ | 357.9 | 55.0 | 113.1 | 78.4 | 111.4 |
| Environmental reserves .............. | 51.2 | 7.6 | 21.5 | 8.5 | 13.6 |
| Capital expenditures ................ | 30.3 | 30.3 | — | — | — |
| Total obligations ................... | $1,885.8 | $140.4 | $870.6 | $88.6 | $786.2 |

(a) Mandatorily Redeemable Preferred Stock of Subsidiary
(b) Includes operating leases related to restructuring charges. See Note 15, "Restructuring." In addition to the operating lease obligations, at the end of the Textron Leasing Transaction for certain equipment leases (including the expiration of all renewal options), the Company is required to guarantee a minimum value of the equipment to the lessor of up to approximately $21 million.

*Senior Secured Credit Facilities*

*General:* The Company's senior secured credit facility allowed funding in the aggregate of up to $525.0 million at December 31, 2003. Borrowings under the credit facility are secured by all the assets of the Company and Products and certain of its subsidiaries, and are unconditionally and irrevocably guaranteed jointly and severally by the Company and each existing and subsequently acquired or organized domestic subsidiaries (other than by the Company's receivables subsidiary). Available funding under this credit facility is reduced if the program size or commitment level under the Company's receivable facility (discussed below) exceeds $250.0 million.

*Interest Rates and Fees:* At December 31, 2003, borrowings bear interest, at the Company's option, at either (a) adjusted LIBOR plus a 4.00% margin in the case of the revolving credit and tranche A term loan facilities and 4.75% margin in the case of the tranche B term loan facility, in all cases subject to a minimum LIBOR of 3.00% or (b) the highest of (i) JPMorgan Chase Bank's prime rate, (ii) the federal funds effective rate plus 1/2 of 1.00% and (iii) the base CD rate plus 1.00% plus a 3.00% margin in the case of the revolving credit and tranche A term loan facilities and 3.75% margin in the case of the tranche B term loan facility. A commitment fee on any unused commitments under the revolving portion of the credit facility equal to 1.00% per annum is payable quarterly in arrears and is subject to adjustment based on attaining certain performance targets.

In February 2004, the Company entered into the fifth amendment to the Senior Secured Credit Facilities Credit Agreement which allowed the establishment of a new $100 million Supplemental Revolving Credit Facility and the $185 million Tranche A-1 Term Loan. In connection with these new facilities, $181.5 million was used to prepay existing Tranch A and Tranch B Term Loans in direct order of maturity. Applicable interest rates on the new facilities are, at the Company's option, either (a) adjusted LIBOR plus a 4.00% margin, subject to a minimum LIBOR of 2.00%, or (b) the highest of (i) JPMorgan Chase Bank's prime rate, (ii) the federal funds effective rate plus 1/2 of 1.00% and (iii) the base CD rate plus 1.00% plus 3.00% margin. There are no commitment fees on these new facilities.

*Covenants:* The credit facility requires that the Company meet certain financial tests, including, without limitation, the following tests: a maximum leverage ratio, a minimum interest coverage ratio and certain

prescribed limitations on capital expenditures at levels to be agreed upon between the Company and the agents. The credit facility also contains covenants and restrictions, including, among others, limitations or prohibitions on declaring dividends and other distributions, redeeming and repurchasing capital stock, prepaying, redeeming and repurchasing other indebtedness, loans and investments, additional indebtedness, liens, sale-leaseback transactions, preferred stock, capital expenditures, recapitalizations, mergers, acquisitions, asset sales and transactions with affiliates.

*Events of Default:*  The credit facility contains certain customary events of default, including, among others cross-default and cross-acceleration to other indebtedness (including the receivables facility).

### 11½% Senior Subordinated Notes due 2006 and 10¾% Senior Notes due 2011

Products has outstanding $400 million in principal amount of 11½% Senior Subordinated Notes due 2006. The Company and substantially all domestic subsidiaries of Products have guaranteed these notes on a senior subordinated basis. The indenture governing these notes contains restrictive covenants (including, among others, limitations on indebtedness, restricted payments, liens, asset dispositions, change of control and transactions with affiliates) that are customary for such securities.

Products has issued $500 million principal amount of 10¾% senior notes due 2011. The Company and substantially all domestic subsidiaries of Products have guaranteed these notes on an unsecured senior basis. The indenture governing these notes contains restrictive covenants (including, among others, limitations on indebtedness, restricted payments, liens, asset dispositions, change of control and transactions with affiliates) that are customary for such securities.

### Mandatorily Redeemable Preferred Stock of Subsidiary

*General:*  As part of the consideration paid to Textron for the TAC-Trim acquisition, Products issued mandatorily redeemable preferred stock to Textron with an estimated fair market value of $146.9 million and a liquidation value of $326.4 million.

*Dividends:*  Holders of this preferred stock are entitled to receive dividends accruing as detailed in the table that follows:

| Dividend Periods Ending | Series A Preferred Stock | Series B Preferred Stock | Series C Preferred Stock |
|---|---|---|---|
| On or prior to July 1, 2003 .................. | 11% | 12% | 12% |
| After July 1, 2003 .......................... | 15% | 16% | 16% |

In each case the dividends are payable quarterly in arrears, commencing on April 1, 2002 and accumulating from the date of issuance. Products may, at its option, elect to accrue up to an amount equivalent to 7% per annum of the dividends on the Series A Preferred Stock, an amount equivalent to 8% per annum of the dividends on the Series B Preferred Stock and an amount equivalent to 8% per annum of the dividends on the Series C Preferred Stock in lieu of cash payment of such dividends and, in each case, any accrued dividends will be added to the liquidation preference of the applicable series of preferred stock. Products may at its option through January 1, 2004 accrue up to the full amount of all dividends in lieu of cash payment of such dividends. Thereafter, Products may at its option elect to accrue dividends of up to 7% of the liquidation value annually on Series A Preferred Stock and up to 8% of the liquidation value on Series B and C Preferred Stock. Accrued dividends will be added to the liquidation preference of the applicable series of Preferred Stock.

*Repurchase:*  In June 2002, $100.0 million of proceeds from the 16 million share common stock offering was used to repurchase preferred stock from Textron at a price of 75% of its liquidation preference of 133.0 million. The redeemed Series A Preferred Stock had a carrying value of $63.7 million.

*Liquidation Preference:*  Upon any voluntary or involuntary liquidation, dissolution or winding-up of Products, holders of the preferred stock will be entitled to be paid out of the assets of Products available for distribution to stockholders in the amount of $1,000 per share plus the aggregate amount of accrued dividends prior to any distribution to any holders of equity securities which rank junior to the preferred stock. In

addition, upon any voluntary or involuntary liquidation, dissolution or winding-up of Products, the holders of Series C Preferred Stock will be entitled to a participation in distributions to Products' common equity tied to any appreciation in the value of Products' common equity subsequent the issuance date, not to exceed an aggregate of $2 million for all Series C Preferred Stock outstanding.

*Mandatory Redemption:* Products is required to redeem all of the Series A Preferred Stock and Series B Preferred Stock outstanding on January 1, 2013 at a redemption price equal to 100% of the liquidation preference thereof, plus accrued and unpaid dividends to the date of redemption. Products is also required to redeem all of the series C preferred stock outstanding on February 1, 2022 at a redemption price equal to 100% of the liquidation preference thereof, plus accrued and unpaid dividends to the date of redemption, plus common equity participation.

### Operating Leases

During 2003, the Company received net proceeds (after fees) of approximately $10.2 million from the sale and leasebacks of real property and equipment. The total minimum lease commitments under these leases will be $16.1 million, $0.5 million relates to 2003.

During 2002, the Company received net proceeds (after fees) of approximately $14.8 million from sale and leasebacks of real property and equipment. The total minimum lease commitments under these leases will be $18.8 million, $2.6 million of which relates to both 2003 and 2002.

During 2001, Products entered into sale and leaseback transactions for certain manufacturing equipment and non-manufacturing properties. The transactions resulted in the recognition of a $4.4 million net deferred loss that is being amortized over the lease term, and the recognition of an $8.7 million loss.

During 2001, the Company received net proceeds (after fees) of approximately $86.2 million from sale and leasebacks of real property and equipment, which it used to reduce outstanding debt. The aggregate lease expenses associated with these leases will be $88.8 million, $12.5 million of which relates to 2002. As part of these sale-leaseback transactions, Products sold and contemporaneously leased back real property from unrelated third parties, and received net proceeds (after fees) of $46.4 million.

The Company also has other equipment lease agreements with several lessors that, subject to specific approval, provide availability of funding for operating leases and sale and leasebacks as allowed in its other financing agreements. To the extent permitted by the credit facility, the Company may enter into additional similar leasing arrangements from time to time.

See "— Other Information — Effects of Certain Transactions with Related Parties" for additional information. Refer to Note 12, "Operating Leases" of the financial statements included in this report for information regarding future minimum lease payments.

### Capital Expenditures

The Company incurs capital expenditures on a recurring basis for replacements and improvements. During 2003, the Company had approximately $175.1 million in capital expenditures for continuing operations. Capital expenditures will materially increase with the expanded book of business in 2004, and in future years will depend upon demand for the Company's products and changes in technology. Estimates for capital expenditures in 2004 range from approximately $145 to $155 million. A portion of capital expenditures may be financed through leasing arrangements.

*Sources of Liquidity*

The table below identifies the Company's significant sources of liquidity:

| | December 31, 2003 | Availability Expiration Per Period | | | |
|---|---|---|---|---|---|
| | Maximum Amount Available | Less than 1 Year | 1-3 Years | 4-5 Years | After 5 Years |
| | | (In millions) | | | |
| Receivable Facility(1) | $  9.1 | $  9.1 | $  — | $  — | $— |
| Revolving Credit Facility(2) | 119.5 | — | 119.5 | — | — |
| Short-term borrowings | 21.1 | 21.1 | — | — | — |
| Total Available | $149.7 | $ 30.2 | $119.5 | $  — | $— |

(1) Total commitment under the facility is $250 million.

(2) At December 31, 2003, $49.2 million of outstanding letters of credit reduced the maximum amount available under the Revolving Credit Facility.

The proforma table below identifies the Company's significant sources of liquidity adjusted to reflect the supplemental revolving credit facility:

| | December 31, 2003 | Availability Expiration Per Period | | | |
|---|---|---|---|---|---|
| | Maximum Amount Available | Less than 1 Year | 1-3 Years | 4-5 Years | After 5 Years |
| | | (In millions) | | | |
| Receivable Facility(1) | $  9.1 | $  9.1 | $  — | $  — | $— |
| Revolving Credit Facility(2) | 168.7 | — | 168.7 | — | — |
| Supplemental Revolving Credit Facility(3) | 50.8 | — | 50.8 | — | — |
| Short-term borrowings | 21.1 | 21.1 | — | — | — |
| Total Available | $249.7 | $ 30.2 | $219.5 | $  — | $— |

(1) Total commitment under the facility is $250 million.

(2) Subsequent to entering into the Supplemental Revolving Credit Facility there were no outstanding letters of credit reducing the maximum amount available under the Revolving Credit Facility.

(3) The $100 million Supplemental Revolving Credit Facility allows for up to $50 million of cash advances and up to $50 million for letters of credit. At December 31, 2003, $50 million was available for cash advances and $0.8 million for additional letters of credit, after adjusting for the transfer of $49.2 million of outstanding letters of credit transferred from the Revolving Credit Facility.

*Receivables Facility*

*General:* The Company has an agreement to sell, on an ongoing basis, the trade accounts receivable of certain business operations to a bankruptcy-remote, special purpose subsidiary, wholly owned and consolidated by the Company. The receivables subsidiary (Carcorp) will, subject to certain conditions, from time to time, sell an undivided fractional ownership interest in a pool of domestic and certain Canadian receivables, up to $250 million, to various multi-seller commercial paper conduits supported by a committed liquidity facility. Upon sale to the conduit, Carcorp will hold a subordinated retained interest in the receivables. Under the terms of the agreement, new receivables are added to the pool as collections reduce previously sold receivables. The Company expects to service, administer and collect the receivables on behalf of Carcorp and the conduit. The proceeds of sale will be less than the face amount of accounts receivable sold by an amount

that approximates the purchaser's financing costs. In September 2002, the Company amended the receivables facility lengthening its term to expire in December 2004.

*Restrictions:*   This receivables facility contains certain restrictions on Carcorp (including maintenance of $60.0 million net worth) and on the sellers (including limitations on liens on receivables, modifications of the terms of receivables, and changes in credit and collection practices) which are customary for facilities of this type. The commitments under the receivables facility are subject to termination prior to their term upon the occurrence of certain events, including payment defaults, breach of covenants, including defined interest coverage and leverage ratios, bankruptcy, default by the Company in servicing the receivables and failure of the receivables to satisfy certain performance criteria.

### Commercial Commitments

*Put and Call Arrangement:*   The Company previously entered into a put and call arrangement with respect to the acquisition of the initial 50% interest in the Italian joint venture. In January 2003, the Company acquired the remaining 50% interest in the Italian joint venture for $15 million, which also terminated the put and call arrangement. The arrangement, which was exercisable in December 2004, permitted Textron to require the Company to purchase Textron's interests in the joint venture for an aggregate of approximately $28 million.

### Stock Options

As a result of repricing the Company's stock options during 2002, the repriced options were treated as variable-based awards in accordance with APB No. 25. Subsequent to December 31, 2002, the Company approved the repricing of approximately 3.6 million options with an exercise price of $10.00 to a new exercise price of $8.00. Because these options are considered to be variable-based awards, the Company will incur future compensation expense if the stock price exceeds the new exercise price of $8.00.

## OTHER INFORMATION

### Off-balance Sheet Arrangements

Prior to the TAC Trim acquisition, TAC-Trim entered into an $86.9 million sale and leaseback transaction (the "Textron Leasing Transaction") with two separate single purpose affiliates of Textron Financial Corporation, as lessor and purchaser, with respect to a portfolio of manufacturing equipment situated in different locations throughout the United States and Canada. Payments under the Textron leasing transaction are guaranteed by Products and secured by a first perfected mortgage lien over certain real property with a value equal to $25 million. At the end of the Textron Leasing Transaction for certain equipment leases (including the expiration of all renewal options), the Company is required to guarantee a minimum value of the equipment to the lessor of up to approximately $21 million. Each lease is for an initial term of three years with three one-year renewal options. See "— Other Information — Effects of Certain Transactions with Related Parties" for additional information.

In November 2002, the Financial Accounting Standards Board ("FASB") issued FIN 45, "Guarantor's Accounting and Disclosure Requirements for Guarantees, Including Indirect Guarantees of Indebtedness of Others." FIN 45 requires a guarantor to recognize, at the inception of a qualified guarantee, a liability for the fair value of the obligation undertaken in issuing the guarantee. In conjunction with divestitures and other transactions, the Company has provided indemnifications relating to legal and environmental issues, including product liability. The Company does not believe that any pending or threatened litigation or claims related to any such retained liabilities of discontinued operations are likely to result in any material loss.

### Certain Transactions with Related Parties

#### Heartland Transactions

Heartland is a private equity firm established in 1999 for the purpose of acquiring and expanding industrial companies operating in various sectors of the North American economy that are well positioned for

global consolidation and growth. The managing general partner of Heartland is Heartland Industrial Associates, L.L.C. Certain directors and officers of the Company are members of the general partner, specifically Messrs. Stockman (a Director and our Chairman and Chief Executive Officer), Stepp (a Director and our Vice Chairman and Chief Financial Officer) and Tredwell, Leuliette, McConnell and Valenti (each Directors). Other of our directors or their affiliates, specifically Messrs. Becker and McCallum, are limited partners in Heartland with interests representing less than 5% of the commitments in Heartland. Heartland has informed us that its limited partners include many financial institutions, private and government employee pension funds and corporations, among other types of investors. The Company may, in the ordinary course of business, have on a normal, customary and arms' length basis relationships with certain of Heartland's limited partners, including banking, insurance and other relationships.

The Company is a party to a Services Agreement with Heartland under which Heartland provides advisory and consulting services, including services with respect to developments in the automotive industry and supply markets, advice on financial and strategic plans and alternatives and other matters as it may reasonably request and are within Heartland's expertise. The Services Agreement terminates on the earlier of its tenth anniversary or the date upon which Heartland ceases to own Company shares equivalent to 25% of that owned by them on February 23, 2001.

Under the Services Agreement, the Company is obligated to pay to Heartland a $4.0 million annual advisory fee payable in quarterly installments and reimburse its out-of-pocket expenses related to the services it provides. The Company has also agreed to pay a fee of 1% of the total enterprise value of certain acquisitions and dispositions. During 2003, 2002 and 2001 the Company recorded total fees of $4.0 million, $5.7 million and $24.5 million, respectively.

The Services Agreement with Heartland contemplates that the Company may pay additional fees to Heartland for services rendered in connection with a range of financing transactions. In March 2004, the Company's Board of Directors, including the disinterested and independent directors of the Board, approved a fee of $1 million to Heartland for its services rendered in connection with the 2004 amendments to the Company's credit facility to add synthetic revolving and letter of credit facilities.

### Charles E. Becker Transactions

On March 27, 2003, the Company entered into a termination agreement and release to buyout the non-compete agreement between the Company and Charles E. Becker, a member of the Company's Board of Directors and a limited partner in Heartland. The Company paid $11.3 million in April 2003 as part of the termination agreement and release. The non-compete agreement, which was entered into as part of the Becker acquisition, required the Company to make periodic payments. As a result of this transaction, the Company incurred a loss of $10.4 million, which is primarily due to the write-off of intangible assets initially recorded in conjunction with the Becker acquisition.

During 2002, the Company engaged Mr. Becker to serve as Vice Chairman and assist the Company with strategic planning activities, such as developing sales strategies, managing key customer relationships and recruiting senior management for the Company's European operations. The Company paid Mr. Becker $300,000 for such services. Mr. Becker's consulting arrangement and position as Vice Chairman ended in 2002.

The Company entered into a lease agreement with Becker Ventures L.L.C. ("Becker Ventures"), an entity controlled by Mr. Becker, for the Company's headquarters at 250 Stephenson Highway, Troy, Michigan with the effective date of the lease being January 1, 2002. In March 2002, the Company entered into lease agreements with Becker Ventures, effective January 1, 2002, for 150 Stephenson Highway and 350 Stephenson Highway, Troy, Michigan. The base rent for all three premises is $13.25 per sq. ft., subject to annual CPI adjustments. Total square footage for all three locations is approximately 286,000. The leases have 20-year terms, and the Company has two five-year renewal options. The 2004 base rent for the facilities will be approximately $4.0 million. In 2004, these leases were amended to provide that the Company would assume responsibility for property management with a corresponding elimination of certain aspects of the property management fees. In addition, the Company is also party to a lease with Becker Ventures for five

manufacturing facilities totaling 884,000 square feet. In 2002, the Company extended the lease term an additional ten years to expire in 2021, with the base rent for these facilities totaling $3.6 million per year.

In June 2001, Products sold and contemporaneously leased back real property located in Troy, Michigan and Plymouth, Michigan from New King, L.L.C. and Anchor Court, L.L.C., respectively, which are affiliates of Becker Ventures, for net proceeds of $15.1 million in aggregate. The initial lease term in each transaction is 20 years and each lease has two successive ten year renewal options. The basic rent for the Troy, Michigan property is $1.3 million per year, and the basic rent for the Plymouth, Michigan property is $0.5 million per year. The rental rates in each case are subject to adjustment after expiration of the initial term.

### Elkin McCallum Transactions

In the first quarter of 2003, the Company purchased equipment from Joan Fabrics Corporation ("Joan Fabrics"), and entered into a supply agreement with Joan Fabrics to supply certain types of fabrics. Elkin McCallum, a director of the Company, controls Joan Fabrics and is a limited partner in Heartland. Under the supply agreement, the Company supplies fabric to Joan Fabrics and Joan Fabrics is responsible for all marketing, design, customer service, distribution and sales functions related to these fabrics. The Company paid Joan Fabrics $4.7 million of consideration for these transactions, a portion of which the Company has allocated to the purchased equipment (based on its appraised value) and the remainder of which it is amortizing over the five-year term of the supply agreement.

On December 31, 2002, the Company acquired an air jet texturing business from Dutton Yarns (an affiliate of Mr. McCallum) for approximately $4.2 million. The purchased assets included equipment, inventory and intellectual property. The Company had preliminarily accounted for this transaction as an acquisition of assets, but finalized its accounting during the first quarter of 2003, and recorded the transaction as a purchase of a business.

On April 12, 2002, the Company signed and closed on a merger agreement with Mr. McCallum and a lamination company wholly owned by Mr. McCallum pursuant to which the acquired company was merged into a wholly owned subsidiary of the Company. As consideration in the transaction, Mr. McCallum received 400,000 shares of Common Stock and was repaid $2.5 million in cash as reimbursement for amounts previously invested to fund the lamination company's working capital needs. Subsequent to the merger, debt owing to Mr. McCallum of $6.7 million was repaid. The Company acquired the lamination business to optimize the supply chain on certain of its fabric products and provide low cost lamination products and services to Tier-1 customers. As part of this acquisition, the Company inherited a lease pursuant to which it leases from an entity controlled by Mr. McCallum, a portion of a manufacturing facility in El Paso, Texas. The Company continues to occupy these premises pursuant to such lease.

In April 2002, the Company amended the merger agreement with Joan Automotive to clarify ownership of certain equipment listed in a schedule attached to that agreement. The original merger agreement schedule included a list of approximately 84 looms that ultimately exceeded the Company's manufacturing requirements and facility capacity. Upon determining that the excess looms would have been uneconomically expensive to relocate and store, the Company declined to take possession of 48 of these looms, which were left in place at Joan Fabrics' Hickory, North Carolina plant. The amendment clarifies that these looms are owned by Joan Fabrics.

In September 2001, the Company completed the acquisition of Joan Automotive Industries, a leading supplier of bodycloth to the automotive industry, and all of the operating assets of Joan's affiliated yarn dying operation, Western Avenue Dyers, L.P. As a result of the Joan acquisition, Joan Fabrics became a principal stockholder of the Company. Upon completion of the Joan acquisition, Mr. McCallum became a member of the Company's Board of Directors. As part of this acquisition, the Company inherited a lease pursuant to which it leases from an entity controlled by Mr. McCallum, a technical center in Lowell, Massachusetts. The operations formerly conducted in these premises have been moved to other company facilities, however the Company remains obligated for the related lease.

In connection with the Joan acquisition, the Company entered into a Supply Agreement dated September 21, 2001 (the "Supply Agreement") with Main Street Textiles, L.P. ("Main Street"), which is controlled by Mr. McCallum, and a Transition Services Agreement dated September 21, 2001 (the "Transition Agreement") with Joan Fabrics. Under the Supply Agreement, which was mutually terminated effective as of January 1, 2004, the Company agreed to purchase all of its requirements for flat woven automotive fabric from Main Street for a five-year period beginning on the date of the Supply Agreement. The prices which the Company agreed to pay for fabric under the agreement equaled the costs of the raw materials plus an amount representing Main Street's standard labor and overhead costs incurred in manufacturing fabric for us. Under the Transition Agreement, Joan Fabrics provided Products transitional and support services for a period not to exceed twelve months in order to support the continued and uninterrupted operation of the businesses acquired by Products in the Joan acquisition. As a part of these services, pending the Company's disassembly and removal of machinery and equipment purchased from Joan Fabrics, Joan Fabrics was permitted to continue to use that machinery and equipment to manufacture for us all of our requirements for some types of knitted and woven automotive fabrics. The terms of the Company's agreement with respect to this fabric production are substantially similar to those under the Supply Agreement. Actual prices paid by the Company for fabric under the Supply Agreement and Transition Agreement were subject to the rebates described below.

In 2002 and 2003, the Company engaged in ordinary course transactions with entities controlled by Mr. McCallum for the purchase and sale of goods and services as part of ongoing business relationships. The Company recorded purchases from entities controlled by Mr. McCallum, of $17.8 million (net of $1.2 million of rebates) in 2003, and $47.3 million (net of $10.5 million of rebates) in 2002 for goods and services purchased. These rebates received from Mr. McCallum relate to knit and woven automotive fabrics provided by entities controlled by Mr. McCallum under the Supply Agreement and Transition Agreement executed in connection with the 2001 Joan acquisition, which are described above. Supplier rebates such as these are common in the automotive industry as part of ongoing price negotiations and adjustments. These rebates from Mr. McCallum totaled $14.7 million over the duration of the agreements. In addition, the Company recorded sales to entities controlled by Mr. McCallum, of $6.4 million in 2003 and $31.8 million in 2002.

The following table summarizes the balances outstanding from entities controlled by Mr. McCallum (in millions):

|  | As of December 31, | |
| --- | --- | --- |
|  | 2003 | 2002 |
| Accounts Receivable | $2.7 | $5.9 |
| Accounts Payable | $1.0 | $8.0 |

### Textron Transactions

As discussed above under "— Mandatorily Redeemable Preferred Stock of Subsidiary," Item 1 "Business — Technology and Intellectual Property," Item 1 "Business — Joint Ventures" and "— Commercial Commitments — Put and Call Arrangement" the Company is a party to various agreements and transactions with Textron. Textron became a related party as a result of its receipt of the consideration in the 2001 TAC-Trim acquisition. In May 2002, as part of the finalization of the purchase price and related working capital adjustments of the TAC-Trim acquisition, the Company paid Textron $15.5 million in cash.

Prior to the TAC-Trim acquisition, TAC-Trim entered into an $86.9 million sale and leaseback transaction (the "Textron Leasing Transaction") with two separate single purpose affiliates of Textron Financial Corporation, as lessor and purchaser, with respect to a portfolio of manufacturing equipment situated in different locations throughout the United States and Canada. In January 2003, the FASB issued FASB Interpretation No. ("FIN") 46, "Consolidation of Variable Interest Entities ("VIE"), an interpretation of Accounting Research Bulletin No. 51, "Consolidated Financial Statements" (see Note 2 "Summary of Significant Accounting Policies" for further information on FIN 46). As part of the Company's implementation of FIN 46,

39

it determined that one of the single purpose affiliates was a VIE. The Company and Textron agreed to have the lease restructured so it was required to be consolidated by one party and not accounted for as a VIE. As consideration for this lease restructuring, the Company agreed to pay Textron Financial $150,000.

Payments under the Textron leasing transaction are guaranteed by Products and secured by a first perfected mortgage lien over certain real property with a value equal to $25 million. Each lease is for an initial term of three years with three one-year renewal options. At the end of the leases (including the expiration of all renewal options), there is the option of either purchasing all of the equipment for approximately $26 million or returning the equipment to the lessor. In the event the equipment is returned, arrangements will be made for the disposition of the equipment. The Company is required to guarantee a minimum value to the lessor of up to approximately $21 million upon expiration of the leases. As is customary, the documentation for the Textron leasing transaction incorporates covenants by reference, from the Company's credit facility, that may be amended or waived by the senior lenders, and also contain events of default.

As part of the TAC-Trim acquisition, the Company entered into three intellectual property license agreements with Textron. In two of these agreements, the Company licenses back to Textron certain intellectual property that was acquired in the transaction. In the third agreement, the Company licenses from Textron other intellectual property that was not acquired in the transaction. In addition, under the TAC-Trim acquisition agreement, the Company is permitted to use the "Textron" name for 18 months in exchange for payments of $13.0 million on December 15, 2002 and $6.5 million on December 15, 2003.

## Discontinued Operations

The Company recognized in 2003 $2.4 million from discontinued operations and $15.8 million of proceeds, respectively, representing recoveries, net of cash outflows. However, the Company has significant obligations related to post-retirement, casualty, environmental, product liability, lease and other liabilities of discontinued operations. The nature of many of these contingent liabilities is such that they are difficult to quantify and uncertain in terms of amount. The Company has accrued $21.5 million for post retirement costs and $36.7 million for environmental and product liability costs. Based upon the information available to management and the Company's experience to date, the Company believes that these liabilities will not have a material effect on its financial condition, results of operations or cash flows. In addition, the Company has primary, excess and umbrella insurance coverage for various periods that the Company expects to cover certain of these liabilities. However, there can be no assurances that contingent liabilities will not arise or that known contingent liabilities or related claims will not exceed the Company's expectations or that insurance will be available to cover these liabilities. Because the cash requirements of the Company's operations are substantially a function of these contingencies, it is possible that actual net cash requirements could differ materially from the Company's estimates.

## Recent and Future Reorganization Plans

The Company has been restructuring its operations in order to rightsize its overhead structure, reduce salaried headcount and strengthen and streamline the senior management team on a worldwide basis. While the Company believes that the majority of restructuring activities have already been undertaken, the Company is continually evaluating the business and may elect to implement additional restructuring activities as opportunities to achieve cost savings arise in future periods. Refer to "Results of Operations" above and Note 15 "Restructuring" for additional information.

## Stock Repurchase Plan

At December 31, 2003, approximately $1.0 million remained authorized by the Company's Board of Directors to repurchase shares of the Company's common stock at management's discretion. The Company believes it has sufficient liquidity under its existing credit arrangements to effect the repurchase program. The Company made no repurchases for the years ended 2003 and 2002.

**Critical Accounting Estimates**

A summary of the Company's accounting policies is described in Note 2, "Summary of Significant Accounting Policies", of the consolidated financial statements. Critical accounting policies are those that are most important to the portrayal of the Company's financial condition and results. The preparation of consolidated financial statements in conformity with accounting principles generally accepted in the United States of America requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the consolidated financial statements and the reported amounts of revenues and expenses during the reporting period. Considerable judgment is often involved in making these determinations, the use of different assumptions could result in significantly different results. Management believes its assumptions and estimates are reasonable and appropriate, however actual results could differ from those estimates. Certain of the Company's more critical accounting estimates are described below.

*Goodwill and Intangibles:* During the second quarter of 2002, the Company completed the implementation of SFAS 142, "Goodwill and Other Intangible Assets." Under SFAS 142, goodwill is no longer amortized. Instead, goodwill and indefinite-lived intangible assets are tested for impairment in accordance with the provisions of SFAS 142. The Company employed a discounted cash flow analysis and a market comparable approach in conducting its impairment tests. The Company completed its initial impairment test in the second quarter of 2002 and recorded an impairment loss of $11.7 million (having no tax impact), or $0.15 per average basic and diluted share relating to the UK Plastics business in the former European and Rest of World Automotive Systems segment. The impairment loss was reported as a cumulative effect of a change in accounting principle and, therefore, is accounted for as if it occurred on January 1, 2002. The Company completed its annual impairment test on November 1, 2002 indicating that the fair value of the reporting units exceeded the carrying values.

The Company's first quarter 2003 results were below the forecasts utilized in testing for the goodwill impairment for the year ended December 31, 2002. The conditions in the markets in which the Company operates continued to deteriorate and customer production schedules continued to decline, and therefore, the Company reduced its operating and financial plans for 2003. As a result, the Company initiated an impairment test (outside of the annual testing date of November 1) during the second quarter 2003. During the second quarter, the Company carefully reviewed all of its assumptions regarding revenue growth, improved operating margins and planned capital expenditures. This analysis by each reporting unit focused on new business awards, implementation of strategic business initiatives such as restructuring, material savings, plant efficiencies, revenue growth and additional product/process technology applications. While the Company is aggressively attacking its overall cost structure, the U.S. and Mexico Plastics reporting unit had even more definitive objectives initiated after the 2003 first quarter performance on a specific plant basis. As a result of these well-defined programs, the Company, utilizing an independent outside evaluator, completed the first step of the goodwill impairment test in the second quarter of 2003 which indicated that the fair value of the reporting units exceeded the carrying values, and therefore no additional impairment testing was necessary. The Company again, completed the annual impairment test as of November 1, 2003 indicating fair value of the reporting units exceeded the carrying values.

Fair value for all tests was determined based upon the discounted cash flows of the reporting units using discount rates ranging from 11.5% to 14.0% dependent on the reporting unit and a residual growth rate of 2%. The market comparable approach consisted of earnings multiples ranging from 5.2 to 6.5 times current year and forecasted Earnings Before Interest, Taxes, Depreciation and Amortization ("EBITDA") (operating income less depreciation and amortization) and a control premium on equity. Future cash flows and EBITDA are affected by future operating performance, which will be impacted by economic conditions, car builds, financial, business and other factors, many of which are beyond the Company's control. The U.S. and Mexico Plastics reporting unit can be significantly impacted by an adverse change in assumptions. Considerable judgment is often involved in making these determinations, the use of different assumptions could result in significantly different results. An approximate 50 basis point change in discount rates or an approximate 4% reduction in profit would result in a further goodwill impairment analysis as required by SFAS 142.

Management believes its assumptions and estimates are reasonable and appropriate, however actual results could differ from those estimates.

*Realization of Deferred Tax Assets:* Assessing the need for and amount of a valuation allowance for deferred tax assets requires significant judgment. The fact that a benefit may be expected for a portion but not all of a deferred tax asset increases the judgmental complexity. Future realization of deferred tax assets ultimately depends on the existence of sufficient taxable income of the appropriate character in either the carryback or carryforward period under the tax law.

During 2001, Heartland acquired approximately 60 percent of the outstanding shares of the Company. This constituted a "change in control" that results in annual limitations on the Company's use of its Net Operating Loss ("NOLs") and unused tax credits. This annual limitation on the use of NOLs and tax credits depends on the value of the equity of the Company and the amount of "built-in gain" or "built-in loss" in the Company's assets at the date of the "change in control." Based on the expiration dates of the NOLs and tax credits, as well as anticipated levels of domestic income, management does not believe that the transaction will have a material impact on these deferred tax assets. Management has reviewed the Company's operating results for recent years as well as the outlook for its continuing operations and concluded that it is more likely than not that the net deferred tax assets of $203.3 million at December 31, 2003 will be realized.

Management took into consideration, among other factors, the impact of recent restructuring plans, the timing of the reversal of its temporary differences, certain tax planning strategies and the expiration date of its NOLs. The Company's ability to generate future taxable income is dependent on numerous factors, including general economic conditions, the state of the automotive industry and other factors beyond management's control. Therefore, there can be no assurance that the Company will meet its expectation of future taxable income.

*Pension and Postretirement Benefits Other than Pensions:* Annual net periodic expense and benefit liabilities under our defined benefit plans are determined on an actuarial basis. Assumptions used in the actuarial calculations have a significant impact on plan obligations and expense. Each September, the Company reviews the actual experience compared to the more significant assumptions used and makes adjustments to the assumptions, if warranted. The healthcare trend rates are reviewed with the actuaries based upon the results of their review of claims experience. Discount rates are based upon an expected benefit payments duration analysis and the equivalent average yield rate for high-quality fixed-income investments. Pension benefits are funded through deposits with trustees and the expected long-term rate of return on fund assets is based upon actual historical returns modified for known changes in the market and any expected change in investment policy. Postretirement benefits are not funded and our policy is to pay these benefits as they become due.

The following table highlights the sensitivity of our pension obligations and expense to changes in assumptions (in millions):

| Change in Assumption | Impact on Pension Expense | Impact on PBO |
| --- | --- | --- |
| 25 basis point ("bp") decrease in discount rate .................... | 1.5 | 15.6 |
| 25 bp increase in discount rate ................................. | (1.5) | (15.1) |
| 25 bp decrease in long-term return on assets ..................... | 0.8 | — |
| 25 bp increase in long-term return on assets ..................... | (0.8) | — |

Certain accounting guidance, including the guidance applicable to pensions, does not require immediate recognition of the effects of a deviation between actual and assumed experience or the revision of an estimate. This approach allows the favorable and unfavorable effects that fall within an acceptable range to be netted. Although this netting occurs outside the basic financial statements, disclosure of the net amount is disclosed as an unrecognized gain or loss in the footnotes to our financial statements. The Company expects to incur approximately $18.8 million of pension expense in 2004. See Note 13 "Employee Benefit Plans" for additional discussion.

*Environmental Contingencies:*    The Company is subject to federal, state, local and foreign environmental, and health and safety, laws and regulations that (i) affect ongoing operations and may increase capital costs and operating expenses in order to maintain compliance with such requirements and (ii) impose liability relating to contamination at facilities, and at other locations such as former facilities, facilities where the Company has sent wastes for treatment or disposal, and other properties to which the Company may be linked. Such liability may include, for example, investigation and clean-up of the contamination, personal injury and property damage caused by the contamination, and damages to natural resources. Some of these liabilities may be imposed without regard to fault, and may also be joint and several (which can result in a liable party being held responsible for the entire obligation, even where other parties are also liable).

Management believes that it has obtained, and is in material compliance with, those material environmental permits and approvals necessary to conduct the Company's various businesses. Environmental compliance costs for continuing businesses are accounted for as normal operating expenses or capital expenditures, except for certain costs incurred at acquired locations. Environmental compliance costs relating to conditions existing at the time of an acquisition are generally charged to reserves established in purchase accounting. The Company accrues for environmental remediation costs when such obligations are known and reasonably estimable. In the opinion of management, based on the facts presently known to it, such environmental compliance and remediation costs will not have a material adverse effect on the Company's business, consolidated financial condition or future results of operations.

The Company is legally or contractually responsible or alleged to be responsible for the investigation and remediation of contamination at various sites, and for personal injury or property damages, if any, associated with such contamination. At some of these sites the Company has been notified that it is a potentially responsible party ("PRP") under the federal Superfund law or similar state laws. Other sites at which we may be responsible for contamination may be identified in the future, including with respect to divested and acquired businesses.

The Company is currently engaged in investigating or remediating certain sites as discussed below. In estimating the cost of investigation and remediation, the Company has considered, among other things, prior experience in remediating contaminated sites, remediation efforts by other parties, data released by the United States Environmental Protection Agency ("USEPA"), the professional judgment of the Company's environmental experts, outside environmental specialists and other experts, and the likelihood that other identified PRPs will have the financial resources to fulfill their obligations at sites where they and the Company may be jointly and severally liable. It is difficult to estimate the total cost of investigation and remediation due to various factors including:

- incomplete information regarding particular sites and other PRPs;

- uncertainty regarding the nature and extent of environmental problems and the Company's share, if any, of liability for such problems;

- the ultimate selection among alternative approaches by governmental regulators;

- the complexity and evolving nature of environmental laws, regulations and governmental directives; and

- changes in cleanup standards.

Revenue Recognition:    The Company recognizes revenue from product sales when it has shipped the goods. Products are shipped FOB shipping point using customer designated transportation companies with title passing at that time. Significant retroactive price adjustments are recognized in the period when such amounts become probable. Sales are recognized based upon the gross amount billed to a customer for those products in which the Company's customer has directed the sourcing of certain materials or components used in the manufacture of the final product. The Company generally allows its customers the right of return only in the case of defective products. The Company provides a reserve for estimated defective product costs at the time of the sale of the products.

43

*Allowance for uncollectible accounts:*  The allowance for uncollectible accounts provides for losses believed to be inherent within the Company's "Accounts and Other Receivables," (primarily trade receivables and the retained interest in the receivables facility). Management evaluates both the creditworthiness of specific customers and the overall probability of losses based upon an analysis of the overall aging of receivables, past collection trends and general economic conditions. Management believes, based on its review, that the allowance for uncollectible accounts is adequate to cover potential losses. Actual results may vary as a result of unforeseen economic events and the impact those events could have on our customers.

### Item 7A.  *Quantitative and Qualitative Disclosures About Market Risk*

### MARKET RISK SENSITIVITY

In the normal course of business, the Company is exposed to market risk associated with fluctuations in foreign exchange rates and interest rates. The Company manages these risks through the use of derivative financial instruments in accordance with management's guidelines. The Company enters into all hedging transactions for periods consistent with the underlying exposures. We do not enter into derivative instruments for speculative or trading purposes.

### Foreign Currency

Operating results may be impacted by the Company buying, selling and financing in currencies other than the functional currency of our operating companies ("transactional exposure"). The Company mitigates this risk by entering into foreign currency forward, swap and option contracts. The foreign currency contracts are executed with banks that the Company believes are creditworthy.

The Company's most significant foreign currency transactional exposures relate to Mexico, Canada and the European Monetary Union. As of December 31, 2003, foreign currency contracts representing $50 million of notional amount were outstanding with maturities of less than one year. The fair value of these foreign exchange contracts as of December 31, 2003 was approximately $44 thousand. The table below provides a summary of the foreign exchange contracts that are outstanding as of December 31, 2003. The instrument's actual cash flows are denominated in U.S. dollars (dollar amounts in millions).

| Derivative Type | Currency Sold | Currency Purchased | USD Equivalent of Notional Amount | Weighted Average Contract Rate (per Convention) | Unrealized Gain/(Loss) |
|---|---|---|---|---|---|
| Options | CAD | USD | $50.0 | 1.5 | $ — |

In addition to the transactional exposures, our operating results are impacted by the translation of our foreign operating income into U.S. dollars ("translation exposure"). We do not enter into foreign currency contracts to mitigate this exposure.

### Interest Rate

As of December 31, 2003 approximately 71% of the Company's borrowings were on a fixed rate basis. The remainder of the Company's borrowings were on a variable rate basis and sensitive to changes in interest rates. While the Company has used interest rate swaps and other interest rate protection agreements to modify its exposure to interest rate movements and to reduce borrowing rates, no such agreements were in place at December 31, 2003. Because approximately $356.4 million of the Company's borrowings were subject to a minimum LIBOR floor of 3.00%, a 1.00% unfavorable increase in interest rates would not materially impact pre-tax earnings and cash flow.

### Item 8.  *Financial Statements and Supplementary Data*

See the Consolidated Financial Statements of Collins & Aikman Corporation and subsidiaries included herein and listed on the Index to Financial Statements set forth in Item 15 (a) of this Form 10-K report.

**Item 9.**  *Changes in and Disagreements with Accountants on Accounting and Financial Disclosure*

On June 20, 2003, the Audit Committee of the Board of Directors of Collins & Aikman Corporation approved the appointment of KPMG LLP as the Company's independent accountants for the year ending December 31, 2003 and the dismissal of PricewaterhouseCoopers LLP ("PwC"), which had previously served in this capacity.

During the years ended December 31, 2002 and 2001 and through June 20, 2003, KPMG LLP had not been engaged as an independent accountant to audit either the financial statements of the Company or any of its subsidiaries, nor had it been consulted regarding the application of accounting principles to any specified transaction, either completed or proposed, or the type of audit opinion that might be rendered on the Company's financial statements, or any matter that was the subject of a disagreement or reportable event.

PwC communicated in its February 2003 report to the Audit Committee that disagreements with respect to potential changes in measurement date and asset valuation methods for the Company's pension plans were resolved. In connection with its 2003 budgeting process, the Company had engaged an actuarial consultant to develop and evaluate prospective alternatives for its pension measurement date and asset valuation methods. These alternatives were reviewed with PwC in order to obtain their views on the appropriate accounting measurement dates and valuation methodologies. After full discussion with PwC, the Company's senior officers and PwC agreed to continue employing in 2003 the pension valuation and measurement methodologies the Company had employed in 2002. There were no other disagreements with PwC during the years ended December 31, 2002 and 2001 on any matter of accounting principles or practices, financial statement disclosure, or auditing scope or procedure which, if not resolved to the satisfaction of PwC, would have caused it to make reference to the subject matter of such disagreement in their reports on the financial statements for the year.

The reports of PwC on the financial statements for the years ended December 31, 2002 and 2001, did not include any adverse opinion or disclaimer of opinion, or any qualification or modification as to uncertainty, audit scope or accounting principles.

During the years ended December 31, 2002 and 2001 and through June 20, 2003, PwC reported no material weaknesses in the Company's internal control systems and there were no other reportable events as defined in Regulation S-K Item 304(a)(1)(v), other than those described in the next paragraph.

In connection with its 2001 audit, PwC communicated to the Audit Committee and to management reportable conditions in the Company's internal control systems, attributable primarily to integration issues from an acquisition completed during the third quarter of 2001, personnel turnover at the corporate and plant level and failure of two manufacturing facilities to follow Company procedures related to account reconciliations. Corrective actions were implemented in 2002. In connection with its 2002 audit, PwC communicated to the Audit Committee and to management reportable conditions in the Company's internal control system related to timely preparation of cash account reconciliations, review of non-standard journal entries, revenue accounting and currency translation at foreign locations and compliance with established Company accounting policies and procedures. These conditions were attributable primarily to computer systems, process harmonization and personnel integration issues from the December 20, 2001, TAC-Trim acquisition. Corrective actions have been developed and are being implemented to eliminate or reduce to an acceptable level the financial reporting risks associated with the conditions noted. PwC is not in a position to comment on the adequacy of these corrective actions. The Company believes that it has corrected all these conditions during 2003. PwC did not modify its report on the Company's 2001 and 2002 audited financial statements as a consequence of these reportable conditions.

The Company requested that PwC furnish it with a letter addressed to the Securities and Exchange Commission stating whether or not it agrees with the above statements. A copy of such letter, dated June 24, 2003, is filed as an Exhibit on Form 8-K filed with the Securities and Exchange Commission on June 26, 2003.

**Item 9A.**  *Controls and Procedures*

a. Evaluation of disclosure controls and procedures:

As of the end of the period covered by this report, the Company's Chief Executive Officer and the Company's Chief Financial Officer, "the Certifying Officers," evaluated the effectiveness of the design and operation of the Company's "disclosure controls and procedures" (as defined in the Securities Exchange Act of 1934). Based on that evaluation, the Certifying Officers have concluded that the Company's disclosure controls and procedures are effective to ensure that information required to be disclosed by the Company in the reports that it files and submits under the Exchange Act is recorded, processed, summarized and reported as and when required, and are effective to ensure that such information is accumulated and communicated to the Company's management, including its Certifying Officers, as appropriate to allow timely decisions regarding required disclosure. In addition, the Certifying Officers also disclosed to the Company's auditors and the audit committee of the Board of Directors all significant deficiencies in the design or operation of internal controls that could adversely affect the Company's ability to record, process, summarize and report financial data. A summary of the key items disclosed and the changes in internal controls resulting from corrective actions are discussed below.

b. Changes in internal controls:

An evaluation of internal controls was conducted for the year ended December 31, 2003. The following paragraphs detail management's significant areas of focus to further enhance internal controls:

- The Company has implemented certain enhancements, or is in the process of enhancing, internal controls relating to data quality and process efficiency with respect to its current consolidation system and preparation of consolidated financial statements. Recent actions relate to improving the systematic roll-up of both financial and non-financial information that is reported in the Company's financial reports filed with the Securities & Exchange Commission. These actions have primarily focused on improving: (1) the entity structure utilized by the consolidation tool, (2) the collection and compilation of financial and non-financial data and (3) the ability to identify and eliminate intercompany transactions and balances in a more efficient manner. The Company is currently making these changes to its existing consolidation system and is in the process of implementing a new consolidation system. As part of the new system implementation process, the Company is examining additional means to improve its internal controls. The Company is also enhancing its procedures with respect to ensuring timely and adequate review of non-standard journal entries and account reconciliations and adherence to existing corporate accounting policies and accounting principles generally accepted in the United States of America.

Other than the above, there were no significant changes in the Company's internal controls or in other factors that could significantly affect internal controls. The Company also intends to refine its internal control procedures on an ongoing basis as deemed appropriate with a view towards making improvements.

# PART III

## Item 10.  *Directors and Executive Officers of the Registrant*

The Restated Certificate of Incorporation of the Company provides that the Board of Directors of the Company is divided into three classes serving staggered three-year terms. Set forth below, as of March 1, 2004, are the name, age and principal occupation or employment during the last five years of each of the current directors of the Company. None of the directors is related to any executive officer or other director of the Company by blood, marriage or adoption. The affiliations between the Company and Heartland, Blackstone Partners, Charles E. Becker, Becker Ventures, Elkin McCallum, Joan Fabrics and Textron (as such terms are defined herein) are set forth under Item 12, "Security Ownership of Certain Beneficial Owners and Management" and Item 13, "Certain Relationships and Related Transactions."

**Directors Whose Terms Expire at the 2004 Annual Meeting — Class I Directors**

| | |
|---|---|
| Timothy D. Leuliette | Age 54. Mr. Leuliette was elected as a director of the Company in February 2001 and has been a director of Metaldyne Corporation ("Metaldyne") since November 2000 and a director of Trimas Corporation ("Trimas") since 2002. He is currently Chairman, President and Chief Executive Officer of Metaldyne. He is a senior managing director and one of the co-founders of Heartland. Prior to joining Heartland, Mr. Leuliette joined the Penske Corporation as President and Chief Operating Officer in 1996. From 1991 to 1996 Mr. Leuliette served as President and Chief Executive Officer of ITT Automotive, an automotive company. He also serves on a number of corporate and charitable boards, and served as chairman of the Board of Directors of The Federal Reserve Bank of Chicago, Detroit Branch. |
| Elkin McCallum | Age 60. Mr. McCallum was elected as a director of the Company in September 2001. Mr. McCallum has been the Chairman of the Board and Chief Executive Officer of Joan Fabrics since 1989 and was Chairman and Chief Executive Officer of Tyng Textiles L.L.C. from 1996 to 2003. Mr. McCallum is currently Chairman of the Board of Trustees of Bentley College. |
| W. Gerald McConnell | Age 40. Mr. McConnell was elected as a director of the Company in February 2001 and has been a senior managing director of Heartland since its founding. Mr. McConnell was formerly a managing director at Deutsche Bank Alex. Brown (formerly Bankers Trust Co.) from 1997 until 1999. From 1991 until 1999, Mr. McConnell specialized in leveraged finance and financial sponsor coverage at Deutsche Bank Alex. Brown. Mr. McConnell also serves on the boards of directors of Springs Industries, Inc. ("Springs") and Trimas. |
| J. Michael Stepp | Age 59. Mr. Stepp has been a director of the Company since February 2001. Mr. Stepp is currently Vice Chairman of the Board of Directors and Chief Financial Officer of the Company. He was previously Executive Vice President and Chief Financial Officer of the Company from May 2002 through July 2002 (after serving as interim Chief Financial Officer from January 2002 through April 2002) and from April 1995 through December 1999. Mr. Stepp was a consultant to the Company and was an independent mergers and acquisitions advisor from January 2000 through February |

2001. Since March 2001, Mr. Stepp has been a senior managing director of Heartland but has not been an employee of Heartland since April 2002. He is also a director of Products.

**Directors Whose Terms Expire at the 2005 Annual Meeting — Class II Directors**

Warren B. Rudman

Age 73. Mr. Rudman has been a director of the Company since June 1995. Mr. Rudman was a partner in the law firm of Paul, Weiss, Rifkind, Wharton & Garrison from 1993 through 2002, and since January 2003 Mr. Rudman has been of counsel to the law firm. Mr. Rudman served as a United States Senator from New Hampshire from 1980 through 1992 and as Attorney General of New Hampshire from 1970 until 1976. Mr. Rudman is also a director of the Chubb Corporation (which term will expire in April, 2004), Allied Waste, Boston Scientific, the Raytheon Company and an independent trustee of several mutual funds of the Dreyfus Corporation.

Cynthia L. Hess

Age 47. Ms. Hess is the owner and Chief Executive Officer of Hess Group, LLC. Prior to forming Hess Group in 2002, Ms. Hess was a senior managing director of Heartland. She was formerly Vice President of Corporate Quality for DaimlerChrysler, where she led the corporate strategy for quality improvement and facilitated quality plan execution. In her 22 years with DaimlerChrysler, Ms. Hess held various engineering, manufacturing and procurement supply positions. Ms. Hess is also a director of Metaldyne.

Samuel Valenti, III

Age 58. Mr. Valenti has been a director of the Company since February 2001. He is a senior managing director of Heartland, chairman of Valenti Capital LLC, has been a director of Metaldyne since January 2001, and is Chairman of the Board of Directors of Trimas. Mr. Valenti is a director of Masco Capital Corporation and has been its President since 1988. Mr. Valenti was formerly Vice President — Investments of Masco Corporation, a home improvement and building products company, from May 1974 to October 1998.

David C. Dauch

Age 39. Mr. Dauch has been Senior Vice President of Sales, Marketing and Manufacturing — Driveline Division of American Axle & Manufacturing since 2003, a company he joined in 1995 as Manager, Sales Administration. In 1996, he became Director of Sales, GM Full Size Truck Programs and was named Vice President of Sales and Marketing in 1998. In 2001, he became Vice President of Manufacturing — Driveline Division. From 1987 to 1995, Mr. Dauch was employed by Products where he held positions of product manager, account executive, and Director of Ford Sales and Marketing for the Automotive Carpet and Fabric Groups.

Marshall A. Cohen

Age 69. Mr. Cohen has been a director of the Company since April 2001. Mr. Cohen has been Counsel at Cassels Brock and Blackwell, a Canadian law firm, since October 1996. Mr. Cohen is also a director of The Toronto-Dominion Financial Group, Barrick Gold Corporation, American International Group, Inc., Lafarge Corporation N.A., The Goldfarb Corporation, Premcor Inc.,

48

Metaldyne, and Golf Town Canada Inc. Mr. Cohen serves on the Advisory Boards of the Blackstone Group and Heartland.

**Directors Whose Terms Expire at the 2006 Annual Meeting — Class III Directors**

Charles E. Becker

Age 56. Mr. Becker has been a director since July 2001. He was Vice Chairman of the Board from July 2001 until July 2002. For over 25 years, through 1998, Mr. Becker was the Chief Executive Officer and co-owner of Becker Group, Inc., a global automotive interior components supplier. Mr. Becker is the owner and Chairman of Becker Ventures, which was established in 1998 to invest in a variety of business ventures, including the manufacturing, real estate and service industries. Mr. Becker is also a director of Metaldyne and Trimas.

Robert C. Clark

Age 60. Mr. Clark has been a director of the Company since October 1994. Mr. Clark is a Harvard University Distinguished Service Professor, Harvard Law School. Mr. Clark joined Harvard Law School in 1979 after four years at Yale Law School, where he was a tenured professor, and served as Dean of the Harvard Law School from 1989 to 2003. Mr. Clark is a corporate law specialist and author of numerous texts and legal articles. Prior to his association with academia, he was in private practice with Ropes & Gray. Mr. Clark is also a director of Omnicom Group, Inc., Time Warner Inc., and a trustee of Teachers Insurance Annuity Association (TIAA).

David A. Stockman

Age 57. Mr. Stockman has been a director of the Company since February 2001 and has been Chairman of the Board of the Company since August 2002. Mr. Stockman is also a director of Metaldyne, Springs and Trimas. He is a senior managing director and the founder of Heartland. Prior to founding Heartland, he was a senior managing director of The Blackstone Group L.P. ("Blackstone") and had been with Blackstone since 1988. Mr. Stockman also served as the director of the Office of Management and Budget in the Reagan Administration, and represented a district in southern Michigan in the U.S. House of Representatives from 1976 to 1981.

Daniel P. Tredwell

Age 45. Mr. Tredwell has been a director of the Company since February 2001. Mr. Tredwell is also a director of Metaldyne, Trimas and Springs. He is a senior managing director and a co-founder of Heartland. He has two decades of leveraged financing and buyout experience. Mr. Tredwell served as a Managing Director at Chase Securities Inc. and had been with Chase Securities since 1985.

**Arrangements Regarding Election of Directors**

See Item 12, "Security Ownership of Management and Principal Stockholders — Voting" of this Report.

## EXECUTIVE OFFICERS OF THE COMPANY

The following is a list of the names and ages, as of March 1, 2004, of the executive officers of the Company and a description of all positions and offices with the Company held by each such person and each such person's principal occupations and employment during the past five years. All executive officers hold office at the pleasure of the Company's Board of Directors.

| Name | Age | Position |
|------|-----|----------|
| David A. Stockman . . . . . . . . | 57 | Chairman of the Board and Chief Executive Officer |
| J. Michael Stepp . . . . . . . . . . | 59 | Vice Chairman of the Board and Chief Financial Officer |
| Wallace W. Creek . . . . . . . . . | 65 | Senior Vice President-Finance |
| Millard L. King, Jr . . . . . . . . | 59 | President, Global Soft Trim |
| Robert A. Krause. . . . . . . . . . | 47 | Vice President and Treasurer |
| L. Gregory Tinnell . . . . . . . . . | 43 | Senior Vice President, Human Resources |
| Michael G. Torakis . . . . . . . . | 47 | President, International Plastics |
| Eric J. White . . . . . . . . . . . . . | 48 | President, U.S. and Mexico Plastics |

*David A. Stockman* has been a director of the Company since February 2001 and has been Chairman of the Board of the Company since August 2002. Mr. Stockman has been Chief Executive Officer of the Company since August 2003. Mr. Stockman is also a director of Metaldyne, Springs and Trimas. He is a senior managing director and the founder of Heartland. Prior to founding Heartland, he was a senior managing director of Blackstone and had been with Blackstone since 1988. Mr. Stockman also served as director of the Office of Management and Budget in the Reagan Administration, and represented a district in southern Michigan in the U.S. House of Representatives from 1976 to 1981.

*J. Michael Stepp* has been a director of the Company since February 2001. Mr. Stepp is currently Vice Chairman of the Board of Directors and Chief Financial Officer of the Company. He was previously Executive Vice President and Chief Financial Officer of the Company from May 2002 through July 2002 (after serving as interim Chief Financial Officer from January 2002 through April 2002), and from April 1995 through December 1999. Mr. Stepp was a consultant to the Company and was an independent mergers and acquisitions advisor from January 2000 through February 2001. Since March 2001, Mr. Stepp has been a senior managing director of Heartland but has not been an employee of Heartland since April 2002. He is also a director of Products.

*Wallace W. Creek* has been Senior Vice President — Finance since December 2002, and an executive officer of the Company since December 2002. Before joining the Company in 2002, Mr. Creek was corporate comptroller for General Motors. Mr. Creek is a director of Columbus McKinnon Corp.

*Millard L. King, Jr.* has been President, Global Soft Trim since August 2003 and an executive officer of the Company since March 2002. From November 2001 to March 2002, he was Executive Vice President of Global Manufacturing Operations, Carpet and Acoustics Systems. Mr. King joined the Company in 1971. Prior to November 2001, Mr. King held the positions of Senior Vice President of Operations for Automotive Knit Fabrics and Chief Operating Officer of the U.S. automotive carpet systems and of automotive knit and woven operations.

*Robert A. Krause* has been Vice President and Treasurer since October 2002, and an executive officer of the Company since December 2002. Before joining the Company, Mr. Krause was associated with American Axle & Manufacturing Holdings, Inc., where he was Vice President and Treasurer from 1999 to August 2002, and Vice President — Investor Relations from August 2002 to October 2002, Treasurer and Acting Interim Chief Financial Officer during 1999, and Treasurer from 1998 to 1999.

*L. Gregory Tinnell* has been Senior Vice President of Human Resources and an executive officer since April 2000. Previously, he was Vice President of Human Resources for the Company's southern and Mexican operations, as well as Vice President of Global Compensation & Benefits. Mr. Tinnell joined the Company in 1995. Prior to joining the Company, he served in various management positions with Sara Lee Corporation,

Nabisco Foods Group and North American Refractories Company. Mr. Tinnell serves on the National Association of Manufacturers Human Resources Steering Committee.

*Michael G. Torakis* has been President, International Plastics since August 2003 and an executive officer of the Company since March 2004. Mr. Torakis joined the Company in August 2003. Prior to joining the Company, Mr. Torakis was President of Venture Holdings Company, LLC and Chief Executive Officer of Peguform GmbH. On or about March 28, 2003, Venture Holdings Company, LLC and certain of its affiliates filed a petition for protection under the United States Bankruptcy Code. Mr. Torakis was President of Venture Holdings Company, LLC at the time of the bankruptcy filing. In addition, on or about May 28, 2002, Peguform GmbH, a subsidiary of Venture Holdings Company, LLC, filed for bankruptcy in Germany. Mr. Torakis was Chief Executive Officer of Peguform GmbH at the time of the filing.

*Eric J. White* has been President, U.S. and Mexico Plastics since August 2003 and an executive officer of the Company since August 2002. From August 2002 to August 2003, he was Executive Vice President of Global Manufacturing, Interior Trim & Cockpit Systems. Prior to August 2002, Mr. White held the positions of Vice President Operations — Plastics with responsibility for multiple plant operations, and Vice President Operations for two operations with Textron Automotive Company, Inc.

See "Executive Compensation — Employment Agreements" for a description of the Company's employment agreements with Messrs. Stepp, King, Torakis and White. Additionally, Mr. Tinnell has a written employment agreement.

Mr. Stockman does not receive any compensation for his service to the Company as Chief Executive Officer. Mr. Stockman's services are provided to the Company by Heartland pursuant to a services agreement that is more fully described in Item 13, "Certain Relationships and Related Transactions" of this Report. The assumption by Mr. Stockman of the office of Chief Executive Officer did not change the compensation due Heartland under the services agreement.

### Section 16(a) Beneficial Ownership Reporting Compliance

Section 16(a) of the Securities Exchange Act of 1934 requires the Company's officers and directors, and persons who own more than ten percent of a registered class of the Company's equity securities, to file reports of ownership and changes in ownership with the Securities and Exchange Commission (the "SEC"). Officers, directors and greater than ten percent stockholders are required by SEC regulation to furnish the Company with copies of all Section 16(a) reports they file. Based solely on review of the copies of such reports furnished to the Company during or with respect to fiscal 2003, or written representations that no Forms 5 were required, the Company believes that during the fiscal year ended December 31, 2003, all persons subject to the Section 16(a) filing requirements filed the required reports on a timely basis.

### Code of Ethics

Products has a code of ethics entitled "Collins & Aikman Products Co. Code of Business Conduct" which is applicable to all employees, consultants and contractors of Products, its subsidiaries and affiliates, including the Company. The above-referenced Code of Business Conduct is also applicable to the Company's principal executive officer, principal financial officer, principal accounting officer or controller and persons performing similar functions for the Company ("Senior Officers").

The Code of Business Conduct is available on the Company's website at www.collinsaikman.com. All amendments to the Code of Business Conduct will also be made available on the Company's website, along with all waivers of the Code of Business Conduct involving Senior Officers of the Company.

### Audit Committee Financial Expert

The Board of Directors of the Company has determined that none of the current members of the Audit Committee is an "audit committee financial expert," as the Board interprets that requirement in its business judgment. However, each member of the Audit Committee is financially literate, and each member of the Audit Committee satisfies the heightened independence requirements of Sections 303.01(B)(2)(a) and

303.01(B)(7) of the New York Stock Exchange's listing standards, to which all members of the Audit Committee are subject. In addition, the Board re-affirms its confidence in each of the members of the Audit Committee, who the Board has determined are independent under applicable rules and regulations and have considerable qualifications and extensive experience with the Company and other public and private entities, and have demonstrated unique leadership capabilities, to serve as members of the Company's Audit Committee.

### Item 11.  *Executive Compensation*

The following table sets forth information concerning the compensation for services rendered to the Company and its subsidiaries by (i) both individuals serving as the Company's Chief Executive Officer during 2003, (ii) the Company's four most highly compensated executive officers (other than the Chief Executive Officer) whose total annual salary and bonus exceeded $100,000 and who were serving as executive officers at the end of the fiscal year ended December 31, 2003 and (iii) one of the Company's former executive officers whose compensation would have been reported herein if they had been serving as executive officers of the Company at the end of the fiscal year (the individuals named in clauses (i), (ii) and (iii) being referred to herein as the "Named Executive Officers"). All compensation shown has been paid by Products or by a subsidiary of Products (although any options shown as awarded are for Common Stock of the Company). The Company does not separately compensate its executive officers for their duties as officers of the Company (except for any such options).

### Summary Compensation Table

| Name and Principal Position | Year | Salary($) | Bonus ($) | Other Annual Compensation($)(1) | Securities Underlying Options(#) | All Other Compensation($) |
|---|---|---|---|---|---|---|
| David A. Stockman ........... | 2003 | 0 | 0 | 0 | 0 | 0 |
| Chairman and Chief | 2002 | N/A | N/A | N/A | N/A | N/A |
| Executive Officer(2) | 2001 | N/A | N/A | N/A | N/A | N/A |
| J. Michael Stepp.............. | 2003 | 484,176 | 112,500(3) | 14,699 | 0 | 3,319(4) |
| Vice Chairman of the | 2002 | 300,000 | 262,500 | 35,897 | 440,000 | 5,047 |
| Board and Chief | 2001 | N/A | N/A | N/A | N/A | N/A |
| Financial Officer | | | | | | |
| Millard L. King, Jr. ........... | 2003 | 341,667 | 37,500(3) | 10,780 | 0 | 2,325(6) |
| President, Global | 2002 | 250,000 | 140,873 | 11,058 | 376,321 | 2,390 |
| Soft Trim(5) | 2001 | 209,917 | 66,627 | 4,080 | 0 | 11,216 |
| Eric White.................... | 2003 | 307,917 | 25,000(3) | 11,954 | 200,000 | 9,584(8) |
| President, US & | 2002 | 199,590 | 25,000 | 3,822 | 40,000 | 1,062 |
| Mexico Plastics(7) | 2001 | N/A | N/A | N/A | N/A | N/A |
| Michael G. Torakis ........... | 2003 | 194,423 | 76,932 | 4,228 | 0 | 1,236(10) |
| President, International | 2002 | N/A | N/A | N/A | N/A | N/A |
| Plastics(9) | 2001 | N/A | N/A | N/A | N/A | N/A |
| Wallace W. Creek ............. | 2003 | 256,562 | 150,000 | 10,108 | 100,000 | 1,746(12) |
| Senior Vice | 2002 | 20,833 | N/A | 1,054 | 0 | 0 |
| President-Finance(11) | 2001 | N/A | N/A | N/A | N/A | N/A |
| Jerry L. Mosingo .............. | 2003 | 459,677(14) | 0 | 5,963 | 210,000 | 840,211(15) |
| Former President and | 2002 | 475,833 | 0 | 9,652 | 440,000 | 2,379 |
| Chief Executive | 2001 | N/A | N/A | N/A | N/A | N/A |
| Officer(13) | | | | | | |
| Michael A. Mitchell............ | 2003 | 400,000 | 50,000(3) | 14,789 | 0 | 2,637(17) |
| Former President Global | 2002 | 320,833 | 50,000 | 14,477 | 360,000 | 2,165 |
| Commercial Operations(16) | 2001 | N/A | N/A | N/A | N/A | N/A |

(1)  Total perquisites for each Named Executive Officer were less than the lesser of $50,000 or 10% of annual salary and bonus and, accordingly, the dollar value of such perquisites is not shown. The numbers shown for each Named Executive Officer reflect gross-ups for incremental federal and state income taxes related to such perquisites or relocation reimbursements. Perquisites for each Named Executive

Officer may, but do not necessarily, include reimbursement for any of the following expenses: car; financial planning; executive fitness; executive physicals and medical; clubs and entertainment; and personal use of Company aircraft.

(2) Mr. Stockman became Chief Executive Officer of the Company in August 2003. He has been a director of the Company since February 2001 and Chairman of the Board of the Company since August 2002. Mr. Stockman does not receive any compensation for his services as Chief Executive Officer. Mr. Stockman's services are provided by Heartland under a services agreement. See Item 7, "Management's Discussion and Analysis — Effects of Certain Transactions with Related Parties" and Item 13, "Certain Relationships and Related Transactions" for descriptions of the services agreement between the Company and Heartland. Heartland's compensation under the services agreement did not increase as a result of Mr. Stockman becoming Chief Executive Officer of the Company.

(3) Certain officers and key executives received a special recognition bonus in 2003. The bonus payments to Stepp, King, Mitchell and White were $112,500, $37,500, $50,000 and $25,000, respectively.

(4) Amount for 2003 for Mr. Stepp consists of premiums in the amounts of $3,010 and $309 paid for basic term life insurance and accidental death and dismemberment ("AD&D") insurance, respectively, under group life insurance policies.

(5) Mr. King assumed the position of President Global Soft Trim in August of 2003. Previously he was Executive Vice President Global Manufacturing Operations, Carpet & Acoustics Systems.

(6) Amount for 2003 for Mr. King consists of premiums in the amount of $2,124 and $201 paid for basic term life insurance and AD&D insurance, respectively, under group life insurance policies.

(7) Mr. White became President of US & Mexico Plastics in August of 2003. He formerly held the position of Executive Vice President Global Manufacturing Operations Interior Trim & Cockpit Systems.

(8) Amount for 2003 for Mr. White consists of premiums in the amounts of $1,864 and $176 paid for basic term life insurance and AD&D insurance, respectively, under group life insurance policies and (ii) and relocation expenses of $7,544.

(9) Mr. Torakis joined Collins & Aikman in July 2003 as President, International Plastics.

(10) Amount for 2003 for Mr. Torakis consists of premiums in the amounts of $1,166 and $70 paid for basic term life insurance and AD&D insurance, respectively, under group life insurance policies.

(11) Mr. Creek joined Collins & Aikman in December of 2002 as Senior Vice President of Finance.

(12) Amount for 2003 for Mr. Creek consists of premiums in the amounts of $1,595 and $151 paid for basic term life insurance and AD&D insurance, respectively, under group life insurance policies.

(13) In August 2003, Mr. Mosingo resigned his positions as a director and as President and Chief Executive Officer of the Company.

(14) Amount represents Mr. Mosingo's base salary for January through his resignation date.

(15) Amount for 2003 for Mr. Mosingo consists of premiums in the amount of $4,662 and $441 paid for basic term life insurance and AD&D, respectively, under group life insurance policies, (ii) $290,333 in salary continuation, (iii) $17,970 of his perquisite allowance (pro-rata portion for termination period), (iv) $50,000 for legal fees, and (v) a $476,805 settlement payment.

(16) Mr. Mitchell retired from the Company effective February 29, 2004.

(17) Amount for 2003 for Mr. Mitchell consists of premiums in the amount of $2,409 and $228 paid for basic term life insurance and AD&D insurance, respectively, under group life insurance policies.

53

## Option Grants in Last Fiscal Year

Shown below is information on grants of new stock options made during the fiscal year ended December 31, 2003 to the Named Executive Officers.

| Name | Individual Grants | | | | |
| | Number of Securities Underlying Options Granted | % of Total Options Granted to Employees in 2002 | Exercise Price ($/sh) | Expiration Date | Grant Date Present Value($)(1) |
|---|---|---|---|---|---|
| David A. Stockman . . . . . | 0 | 0% | N/A | N/A | N/A |
| J. Michael Stepp . . . . . . . | 0 | 0% | N/A | N/A | N/A |
| Millard L. King, Jr . . . . . | 0 | 0% | N/A | N/A | N/A |
| Michael G. Torakis . . . . . | 0 | 0 | N/A | N/A | N/A |
| Eric White . . . . . . . . . . . . | 200,000 | 12% | $8.00 | 4/7/2013 | 554,000 |
| Wallace Creek . . . . . . . . . | 100,000 | 6% | $8.00 | 4/7/2013 | 277,000 |
| Jerry Mosingo . . . . . . . . . | 210,000(2) | 12% | $8.00 | 4/7/2013 | 581,700 |
| Michael A. Mitchell . . . . | 0 | 0% | N/A | N/A | N/A |

(1) The fair value of each option grant was estimated using the Black-Scholes option pricing model. The assumptions used in the model were weighted average expected volatility of 77.5% weighted average, risk-free interest rate of return of 3.72%, dividend yield of 0% and expected life of seven years.

(2) 2003 option grants expired in November 2003, ninety days after Mr. Mosingo's resignation in August 2003.

## Aggregated Option Exercises in Last Fiscal Year and Fiscal Year End Option Values

Shown below is information with respect to the exercise of stock options during the last fiscal year and the year-end value of unexercised options to purchase Common Stock granted to the Named Executive Officers and held by them as of December 31, 2003.

| Name | Shares Acquired on Exercise(#) | Value Realized($) | Number of Unexercised Options at Fiscal Year-End | | Value of Unexercised In-the-Money Options at Fiscal Year-End($)(1) | |
| | | | Exercisable | Unexercisable | Exercisable | Unexercisable |
|---|---|---|---|---|---|---|
| David A. Stockman . . . . . . . . . . | 0 | 0 | 0 | 0 | 0 | 0 |
| J. Michael Stepp . . . . . . . . . . . . | 0 | 0 | 88,000 | 352,000 | 0 | 0 |
| Millard L. King, Jr. . . . . . . . . . . | 0 | 0 | 98,944 | 301,056 | 0 | 0 |
| Eric White . . . . . . . . . . . . . . . . . | 0 | 0 | 8,000 | 232,000 | 0 | 0 |
| Michael G. Torakis . . . . . . . . . . | 0 | 0 | 0 | 0 | 0 | 0 |
| Wallace Creek . . . . . . . . . . . . . . | 0 | 0 | 0 | 100,000 | 0 | 0 |
| Jerry L. Mosingo . . . . . . . . . . . . | 0 | 0 | 0 | 0 | 0 | 0 |
| Michael A. Mitchell . . . . . . . . . | 0 | 0 | 72,000 | 288,000 | 0 | 0 |

(1) No options were in the money at fiscal year-end because the exercise price of such options exceeded the closing price of the Common Stock on the New York Stock Exchange on December 31, 2003.

## 2003 Option Cancellation/Repricing Program

On March 24, 2003, the Company cancelled 3,559,256 outstanding, variously priced options, and replaced them with options exercisable at $8.00 per share. The Company "repriced" these options in an effort to continue their effectiveness as a component of our overall compensation strategy. The following table provides additional details regarding the 2003 repricing of options for each person who was an executive officer of the Company on March 24, 2003, or who has since become an executive officer and had options repriced on March 24, 2003.

54

**10-Year Option/SAR Repricing Table**

| Name | Date | Number of Securities Underlying Options/SARs Repriced or Amended (#)(1) | Market Price of Stock at Time of Repricing or Amendment ($)(2) | Exercise Price at Time of Repricing or Amendment ($)(1)(3) | New Exercise Price ($)(2) | Length of Original Option Term Remaining at Date of Repricing or Amendment (4) |
|---|---|---|---|---|---|---|
| **Gerald E. Jones** | 03/24/03 | 6,000 | 4.26 | 10.00 | 8.00 | 07/05/05 |
| Executive Vice President | | 2,000 | | 10.00 | | 3/22/10 |
| Global Manufacturing | | 172,000 | | 10.00 | | 1/15/12 |
| Operations, Fabric | | | | | | |
| **Millard L. King, Jr.** | 03/24/03 | 2,000 | 4.26 | 10.00 | 8.00 | 01/20/09 |
| President | | 2,000 | | 10.00 | | 12/01/09 |
| Global Soft Trim | | 6,000 | | 10.00 | | 03/22/10 |
| | | 13,679 | | 9.97 | | 01/28/04 |
| | | 376,321 | | 10.00 | | 1/15/12 |
| **Dianne E. Kokkinos** | 3/24/03 | 4,000 | 4.26 | 10.00 | 8.00 | 1/15/12 |
| Senior Vice President | | | | | | |
| Global Supply Chain | | | | | | |
| Management | | | | | | |
| **Dana Leavitt** | 3/24/03 | 40,000 | 4.26 | 10.00 | 8.00 | 1/15/12 |
| Former Executive Vice President | | | | | | |
| Global Manufacturing | | | | | | |
| Operations, Interior Trim | | | | | | |
| and Cockpit Systems | | | | | | |
| **Michael M. Mitchell** | 3/24/03 | 360,000 | 4.26 | 10.00 | 8.00 | 1/15/12 |
| Former President | | | | | | |
| Global Commercial | | | | | | |
| Operations | | | | | | |
| **Jeffrey A. Rose** | 3/24/03 | 180,000 | 4.26 | 10.00 | 8.00 | 1/15/12 |
| Senior Vice President | | | | | | |
| Global Product | | | | | | |
| Development and | | | | | | |
| Technology | | | | | | |
| **J. Michael Stepp** | 3/24/03 | 440,000 | 4.26 | 10.00 | 8.00 | 1/15/12 |
| Vice Chairman of the | | | | | | |
| Board and Chief Financial | | | | | | |
| Officer | | | | | | |
| **L. Gregory Tinnell** | 3/24/03 | 4,000 | 4.26 | 10.00 | 8.00 | 7/5/05 |
| Senior Vice President | | 2,000 | | 10.00 | | 2/19/07 |
| Human Resources | | 6,000 | | 10.00 | | 8/31/09 |
| | | 8,000 | | 10.00 | | 03/22/10 |
| | | 140,000 | | 10.00 | | 1/15/12 |
| **Reed A. White** | 3/24/03 | 13,353 | 4.26 | 9.9750 | 8.00 | 1/28/04 |
| President of Collins & | | 8,000 | | 10.00 | | 3/22/10 |
| Aikman Dura Convertible | | 27,357 | | 9.9750 | | 1/28/04 |
| Systems | | 101,290 | | 10.00 | | 1/15/12 |

55

| Name | Date | Number of Securities Underlying Options/SARs Repriced or Amended (#) (1) | Market Price of Stock at Time of Repricing or Amendment ($) (2) | Exercise Price at Time of Repricing or Amendment ($) (1) (3) | New Exercise Price ($) (2) | Length of Original Option Term Remaining at Date of Repricing or Amendment (4) |
|---|---|---|---|---|---|---|
| Eric White<br>President<br>U.S. and Mexico Plastics | 3/24/03 | 40,000 | 4.26 | 10.00 | 8.00 | 1/15/12 |

(1) These numbers have been adjusted to reflect our 1–2.5 reverse stock split on May 28, 2002.

(2) The public offering price of the offering of our Common Stock which occurred on March 22, 2003 was used to establish the exercise price of the replacement options.

(3) These numbers are the exercise prices of the options cancelled in connection with the grant of replacement options.

(4) These are the expiration dates of both the cancelled and replacement options on March 24, 2003.

## Defined Benefit or Actuarial Plan Disclosure

*C&A Co. Plan.*   Provided certain eligibility requirements are met, at the end of each calendar month, pay credits are applied to a participant's account under the Collins & Aikman Corporation Employees' Pension Account Plan (the "C&A Co. Plan") based on the participant's length of credited service and compensation (as defined) during that month. For participants age 50 or older, the monthly pay credit is based on either credited service and compensation or age and compensation, whichever results in the higher amount.

The following chart sets forth how pay credits are determined under the C&A Co. Plan:

| Eligibility Requirements | | | Percentage of Compensation Used to Determine Pay Credits | |
|---|---|---|---|---|
| Years of Credited Service | -or- | Age | Up to ⅓ of the S.S. Wage Base | Over ⅓ of the S.S. Wage Base |
| Less than 10 | | Less than 50 | 2.5% | 4.5% |
| 10 – 14 | | 50 – 54 | 3.0% | 5.5% |
| 15 – 19 | | 55 – 59 | 4.0% | 6.5% |
| 20 – 24 | | 60 – 64 | 5.0% | 8.0% |
| 25 or more | | 65 or more | 6.0% | 10.0% |

The dollar amounts that result from these percentages are added together and the total is the pay credit for the month.

In addition, interest credits are applied each month to the account balance. Participants make no contributions to the C&A Co. Plan. Employer contributions are 100% vested after five years of service or at age 65, whichever is earlier, and may vest under certain other circumstances as set forth in the C&A Co. Plan. The estimated annual benefits payable upon retirement at normal retirement age under the C&A Co. Plan for Messrs. Stepp, King, Eric White, Creek and Torakis, assuming they use their account balances to purchase a single life annuity, are $11,931, $39,681, $64,452, $2,021 and $1,264, respectively. Participants in the C&A Co. Plan have the option, however, of receiving the value of their vested account in a lump sum following termination of employment. Mr. Stockman does not participate in the C&A Co. Plan.

*C&A Co. Excess Plan.*   The excess benefit plan ("SRP") of Collins & Aikman Corporation works in conjunction with the C&A Co. Plan and provides to the employee any benefit which the C&A Co. Plan would have provided except for certain legal limitations under the Employee Retirement Income Security Act of 1974 and Internal Revenue Service regulations. The pay credits and interest credits are determined as

56

described with respect to the C&A Co. Plan as if no legal limitations existed, and then this plan provides any benefit which is in excess of the benefit provided under the C&A Co. Plan. The estimated annual benefits payable upon retirement at normal retirement age under the SRP for Messrs. Stepp, King, Eric White and Creek are $37,158, $16,834, $3,795 and $897, respectively. Mr. Stockman does not participate in the SRP. Mr. Torakis did not participate in the SRP in 2003. The balances in the SRP accounts of Messrs. Mosingo and Mitchell as of December 31, 2003 were $46,365 and $42,489, respectively.

*C&A Co. SRIP.*  Participation in the Collins & Aikman Corporation Supplemental Retirement Income Plan (the "C&A Co. SRIP") is solely at the discretion of the Board of Directors of Products and is extended to a select group of key executives. The plan, which may be discontinued on a prospective basis at any time, provides a participating employee with a retirement benefit at or after age 62 or between ages 55 and 61 on an actuarially reduced basis. A target benefit is first calculated for each employee based on Total Annual Compensation (final base salary plus the average of the bonuses paid for the last three fiscal years) and years of service at retirement. The benefit payable from the C&A Co. SRIP is determined as the excess of the target benefit over any pension benefits payable from Social Security and any other retirement plans sponsored by the Company. An employee does not become vested in a benefit until (i) reaching age 55 and completing 10 years of service or (ii) reaching age 62.

The following table shows, for specified compensation and years of service classifications, the hypothetical annual target benefits under the C&A Co. SRIP for employees retiring at age 65, assuming that the retiring participant elects a single life annuity.

### Pension Plan Table

| Total Annual Compensation | Years of Service | | | | | |
|---|---|---|---|---|---|---|
| | 10 | 15 | 20 | 25 | 30 | 35 |
| $ 100,000 | $ 42,000 | $ 51,000 | $ 60,000 | $ 60,000 | $ 60,000 | $ 60,000 |
| 125,000 | 52,500 | 63,750 | 75,000 | 75,000 | 75,000 | 75,000 |
| 150,000 | 63,000 | 76,500 | 90,000 | 90,000 | 90,000 | 90,000 |
| 175,000 | 73,500 | 89,250 | 105,000 | 105,000 | 105,000 | 105,000 |
| 200,000 | 84,000 | 102,000 | 120,000 | 120,000 | 120,000 | 120,000 |
| 225,000 | 94,500 | 114,750 | 135,000 | 135,000 | 135,000 | 135,000 |
| 250,000 | 105,000 | 127,500 | 150,000 | 150,000 | 150,000 | 150,000 |
| 275,000 | 115,500 | 140,250 | 165,000 | 165,000 | 165,000 | 165,000 |
| 300,000 | 126,000 | 153,000 | 180,000 | 180,000 | 180,000 | 180,000 |
| 350,000 | 147,000 | 178,500 | 210,000 | 210,000 | 210,000 | 210,000 |
| 400,000 | 168,000 | 204,000 | 240,000 | 240,000 | 240,000 | 240,000 |
| 450,000 | 189,000 | 229,500 | 270,000 | 270,000 | 270,000 | 270,000 |
| 500,000 | 210,000 | 255,000 | 300,000 | 300,000 | 300,000 | 300,000 |
| 600,000 | 252,000 | 306,000 | 360,000 | 360,000 | 360,000 | 360,000 |
| 700,000 | 294,000 | 357,000 | 420,000 | 420,000 | 420,000 | 420,000 |
| 800,000 | 336,000 | 408,000 | 480,000 | 480,000 | 480,000 | 480,000 |
| 900,000 | 378,000 | 459,000 | 540,000 | 540,000 | 540,000 | 540,000 |
| 1,000,000 | 420,000 | 510,000 | 600,000 | 600,000 | 600,000 | 600,000 |
| 1,100,000 | 462,000 | 561,000 | 660,000 | 660,000 | 660,000 | 660,000 |
| 1,200,000 | 504,000 | 612,000 | 720,000 | 720,000 | 720,000 | 720,000 |
| 1,300,000 | 546,000 | 663,000 | 780,000 | 780,000 | 780,000 | 780,000 |
| 1,400,000 | 588,000 | 714,000 | 840,000 | 840,000 | 840,000 | 840,000 |
| 1,500,000 | 630,000 | 765,000 | 900,000 | 900,000 | 900,000 | 900,000 |
| 1,600,000 | 672,000 | 816,000 | 960,000 | 960,000 | 960,000 | 960,000 |

57

| Total Annual | Years of Service | | | | | |
|---|---|---|---|---|---|---|
| Compensation | 10 | 15 | 20 | 25 | 30 | 35 |
| 1,700,000 | 714,000 | 867,000 | 1,020,000 | 1,020,000 | 1,020,000 | 1,020,000 |
| 1,800,000 | 756,000 | 918,000 | 1,080,000 | 1,080,000 | 1,080,000 | 1,080,000 |
| 1,900,000 | 798,000 | 969,000 | 1,140,000 | 1,140,000 | 1,140,000 | 1,140,000 |
| 2,000,000 | 840,000 | 1,020,000 | 1,200,000 | 1,200,000 | 1,200,000 | 1,200,000 |
| 2,100,000 | 882,000 | 1,071,000 | 1,260,000 | 1,260,000 | 1,260,000 | 1,260,000 |
| 2,200,000 | 924,000 | 1,122,000 | 1,320,000 | 1,320,000 | 1,320,000 | 1,320,000 |
| 2,300,000 | 966,000 | 1,173,000 | 1,380,000 | 1,380,000 | 1,380,000 | 1,380,000 |
| 2,400,000 | 1,008,000 | 1,224,000 | 1,440,000 | 1,440,000 | 1,440,000 | 1,440,000 |
| $2,500,000 | $1,050,000 | $1,275,000 | $1,500,000 | $1,500,000 | $1,500,000 | $1,500,000 |

All the Named Executive Officers except Messrs. Stockman and Creek participated in the C&A Co. SRIP in 2003. As of December 31, 2003, Mr. Stepp had 9 years, 0 months of plan service, and at age 65 he will have had an estimated 12 years, 0 months of plan service. As of December 31, 2003, Mr. King has had 33 years, 0 months of plan service, and at age 65, he will have had an estimated 38 years, 11 months of plan service. As of December 31, 2003, Mr. Eric White has had 2 years, 3 months of plan service, and at age 65, he will have had an estimated 18 years, 8 months of plan service. Mr. Torakis did not participate in the plan in 2003. As of December 31, 2003, Mr. Mosingo had 5 years, 0 months of plan service and was vested under the plan pursuant to the terms of his August 2003 separation agreement with the Company, described below under "Employment Agreements." As of December 31, 2003, Mr. Mitchell had two years, 3 months of plan service.

## EMPLOYMENT AGREEMENTS

*J. Michael Stepp.* In January 2004, Products entered into an employment agreement with Mr. Stepp for a period of three years subject to the terms and conditions of the agreement. The agreement provides for an initial base salary of $600,000 per year. Mr. Stepp' target bonus under the annual executive incentive compensation plan is set at 100% of his base salary. The agreement provides for employee benefits and such other fringe benefits as are available to executives of the Company, including a perquisite allowance of $30,000 grossed up for income taxes. This allowance must be used for the lease/purchase of a company automobile, automobile insurance and maintenance, country club dues, financial planning or income tax preparation. In the event Mr. Stepp's employment is terminated by Products without cause or by Mr. Stepp due to "constructive termination" prior to the expiration of the term of the agreement, Mr. Stepp shall receive (i) his base salary for 24 months based on the rate in effect immediately preceding termination date, (ii) an amount equal to the amount determined by multiplying Mr. Stepp's average actual annual bonus for the prior three years by a fraction, where the numerator is the number of whole months of service worked during the year of the when the termination occurs and the denominator is 12, and (iii) an amount equal to his target bonus for the year in which such termination occurs. He will also continue to participate in the benefit plans, programs and arrangements during the severance period (with the exception of the executive physical program, long-term disability plan, and the supplemental retirement income plan) unless comparable benefit plans, programs or arrangements are offered to Mr. Stepp through another employer during the severance period. The salary continuation is to be paid in accordance with the Company's normal pay practice and the bonus would be payable in a lump sum upon the expiration of the severance period. In such event, all outstanding stock options will immediately vest and remain exercisable until the earlier of 90 days after termination or the original expiration date of said options. The agreement also provides that all of Mr. Stepp's outstanding options immediately vest upon a "Change of Control" (as defined in the agreement). In addition, the Company has agreed to credit Mr. Stepp under the Company's Supplemental Retirement Income Plan with all of his years of service that preceded his break of service, and to deem him to have satisfied vesting requirements under such plan under certain circumstances.

*Millard L. King, Jr.* In August 2003, Products entered into an employment agreement with Mr. King for a period of three years subject to the terms and conditions of the agreement. The agreement provides for an initial base salary of $450,000 per year. Mr. King's target bonus under the annual executive incentive

compensation plan is set at 40% of his base salary. The agreement provides for employee benefits and such other fringe benefits as are available to executives of the Company, including a perquisite allowance of $20,000 grossed up for income taxes. This allowance must be used for the lease/purchase of a company automobile, automobile insurance and maintenance, country club dues, financial planning or income tax preparation. In the event Mr. King's employment is terminated by Products without cause or by Mr. King due to "constructive termination" prior to the expiration of the term of the agreement, Mr. King shall receive his base salary for 24 months based on the rate in effect immediately preceding termination date, an amount equal to the amount determined by multiplying Mr. King's average actual, annual bonus for the prior three years by a fraction, where the numerator is the number of whole months of service worked during the year of the when the termination occurs and the denominator is 12. He will also continue to participate in the benefit plans, programs and arrangements during the severance period (with the exception of the executive physical program, long-term disability plan, and the supplemental retirement income plan) unless Mr. King is offered comparable benefits plans, programs, or arrangements with another employer during the severance period. The salary continuation is to be paid in accordance with the Company's normal pay practice and the bonus would be payable in a lump sum upon the expiration of the severance period. In such event, all outstanding stock options will immediately vest and remain exercisable until the earlier of 90 days after termination or the original expiration date of said options.

*Eric White.* In August 2003, Products entered into an employment agreement with Mr. White for a period of three years subject to the terms and conditions of the agreement. The agreement provides for an initial base salary of $400,000 per year. Mr. White's target bonus under the annual executive incentive compensation plan is set at 40% of his base salary. The agreement provides for employee benefits and such other fringe benefits as are available to executives of the Company, including a perquisite allowance of $20,000 grossed up for income taxes. This allowance must be used for the lease/purchase of a company automobile, automobile insurance and maintenance, country club dues, financial planning or income tax preparation. In the event Mr. White's employment is terminated by Products without cause or by Mr. White due to "constructive termination" prior to the expiration of the term of the agreement, Mr. White shall receive his base salary for 24 months based on the rate in effect immediately preceding termination date, an amount equal to the amount determined by multiplying Mr. White's average actual annual bonus for the prior three years by a fraction, where the numerator is the number of whole months of service worked during the year of the when the termination occurs and the denominator is 12. He will also continue to participate in the benefit plans, programs and arrangements during the severance period (with the exception of the executive physical program, long-term disability plan, and the supplemental retirement income plan) unless comparable benefit plans, programs or arrangements are offered to Mr. White through another employer during the severance period. The salary continuation is to be paid in accordance with the Company's normal pay practice and the bonus would be payable in a lump sum upon the expiration of the severance period. In such event, all outstanding stock options will immediately vest and remain exercisable until the earlier of 90 days after termination or the original expiration date of said options.

*Michael G. Torakis.* In August 2003, Products entered into an employment agreement with Mr. Torakis for a period of three years subject to the terms and conditions of the agreement. The agreement provides for an initial base salary of $450,000 per year. Mr. Torakis' target bonus under the annual executive incentive compensation plan is set at 40% of his base salary, with such bonus guaranteed for 2003 (on a proportionate basis, based on the portion of 2003 in which Mr. Torakis was employed by the Company) and 2004. The agreement provides for employee benefits and such other fringe benefits as are available to executives of the Company, including a perquisite allowance of $20,000 grossed up for income taxes. This allowance must be used for the lease/purchase of a company automobile, automobile insurance and maintenance, country club dues, financial planning or income tax preparation. In the event Mr. Torakis' employment is terminated by Products without cause or by Mr. Torakis due to "constructive termination" prior to the expiration of the term of the agreement, Mr. Torakis shall receive his base salary for 24 months based on the rate in effect immediately preceding termination date, an amount equal to the amount determined by multiplying Mr. Torakis' average actual annual bonus for the prior three years by a fraction, where the numerator is the number of whole months of service worked during the year of the when the termination occurs and the denominator is 12. He will also continue to participate in the benefit plans, programs and arrangements during

59

the severance period (with the exception of the executive physical program, long-term disability plan, and the supplemental retirement income plan) unless comparable benefit plans, programs or arrangements are offered to Mr. Torakis through another employer during the severance period. The salary continuation is to be paid in accordance with the Company's normal pay practice and the bonus would be payable in a lump sum upon the expiration of the severance period. In such event, all outstanding stock options will immediately vest and remain exercisable until the earlier of 90 days after termination or the original expiration date of said options. The Company also committed to grant Mr. Torakis options to purchase 240,000 shares of the Company's common stock.

*Jerry L. Mosingo.* In August 2003, at the time of his resignation from the Company, Mr. Mosingo entered into a separation agreement with the Company. As part of this agreement, Mr. Mosingo's pre-existing employment agreement and a separate pre-existing letter agreement with the Company were terminated. Pursuant to the August 2003 separation agreement, Mr. Mosingo received a cash payment of $400,000, a bonus settlement of $76,805 and attorney fees of $50,000 payable upon execution of the agreement. The Company agreed to pay Mr. Mosingo his salary of $750,000 per year for eighteen months from the termination date. Further, it was agreed that he will receive a perquisite allowance of $30,000 per year grossed up for income taxes during the salary continuation period and be provided with continued use of the company car and all maintenance and insurance costs associated therewith. All outstanding options immediately vested and continued to be fully exercisable for 90 days. Mr. Mosingo will continue to participate in the benefit plans, programs, and arrangement of the Employer for executive employees until the earlier of the end of the salary continuation period or eligibility to receive benefits of another employer. Collins & Aikman will pay a benefit under the C&A Co. SRIP as if Mr. Mosingo were eligible for retirement at the end of the salary continuation period with 5 years of service credit and without reduction for early commencement.

*Michael Mitchell.* Mr. Mitchell's employment relationship with Collins & Aikman ended upon his retirement from the Company in February 2004. He entered into a separation agreement with Collins & Aikman on February 29, 2004. This agreement replaced Mr. Mitchell's pre-existing employment agreement, which was terminated. He is to receive 24 months of salary continuation at a rate of $34,375 per month in addition to continuation of his perquisite allowance in the amount of $30,000 per year grossed up for income taxes. He received a $75,000 lump sum payment upon execution of the agreement and will receive a $225,000 incentive payment equal to his target bonus for services during 2003. It is payable in accordance with normal incentive plan payments. Further, all vested stock options will remain exercisable for 180 days following the termination date.

*Other Named Executives.* The Company does not have employment agreements with Messrs. Stockman or Creek.

## PERFORMANCE GRAPH

The following graph compares the percentage change in the cumulative total stockholder return on the Company's Common Stock during the period beginning on December 24, 1998 and ending on December 31, 2003 with the cumulative total return of a peer group and the Standard & Poor's 500 composite index.

### 5-YEAR CUMULATIVE TOTAL RETURN AMONG COLLINS & AIKMAN CORPORATION, S&P 500 INDEX AND PEER GROUP INDICES



| Company/Market/Index | 12/24/98 | 12/29/99 | 12/29/00 | 12/31/01 | 12/31/02 | 12/31/03 |
|---|---|---|---|---|---|---|
| Collins & Aikman Corporation(1) .... | 100.00 | 130.45 | 95.01 | 174.69 | 40.38 | 39.29 |
| Peer Group(2)........ | 100.00 | 83.82 | 62.46 | 84.46 | 67.66 | 102.53 |
| S&P 500 Index(3) ... | 100.00 | 121.04 | 110.02 | 96.95 | 75.52 | 97.18 |

Notes to Table

(1) Collins & Aikman Corporation.*

(2) The peer group consists of the following companies: American Axle & Manufacturing, Arvinmeritor Inc., Borg Warner Inc., Dana Corporation, Delphi Corporation, Dura Automotive Systems, Intier Automotive, Johnson Controls, Inc., Lear Corporation, Tower Automotive Inc. and Visteon Corporation.*

(3) S&P 500 — Standard & Poor's 500 Total Return Index.*

   *  As compiled by Media General Financial Services of Richmond, Virginia.

## COMPENSATION OF DIRECTORS

Under the 1994 Directors Plan, each non-employee director of the Company who is not affiliated with a major stockholder, and was not affiliated with a major stockholder at the time of his or her election to the Board of Directors, received an annual automatic grant of ten-year options for 4,000 shares of Common Stock (since reverse split of Common Stock) each November. The options have a per share exercise price equal to $8.00 and are exercisable six months and one day after the date of grant. Any options not exercisable prior to a termination of the directorship are canceled. Such non-employee directors may be granted options on the same schedule pursuant to the 2002 Stock Option Plan ("2002 Plan"). Effective September 12, 2002, members of the Audit Committee additionally receive $5,000 per meeting of the Committee. Currently, only Messrs. Clark, Rudman, Dauch and Cohen are eligible to receive future grants under the 2002 Plan. Each such director also receives a fee of $80,000 per year, payable quarterly.

## COMPENSATION COMMITTEE INTERLOCKS AND INSIDER PARTICIPATION

Since April 1, 2002, the Compensation Committee has been composed of Messrs. Stockman, Tredwell and Cohen. Neither Mr. Cohen nor Mr. Tredwell is or has been an employee of the Company or any of its subsidiaries, including Products, or is or has been separately compensated for serving as an officer of the Company or any of its subsidiaries, including Products. Mr. Stockman became Chief Executive Officer of the Company on August 2003, but does not receive any compensation for such service. (See Summary Compensation Table above and Item 13, "Certain Relationships and Related Transactions" for more information regarding compensation arrangements for Mr. Stockman's service to the Company as Chief Executive Officer.) None of the executive officers who are separately compensated for serving as executive officers (or who received options) serve on the Compensation Committee. Mr. Stockman also serves on the Compensation Committee of Metaldyne. Mr. Leuliette, a director of the Company, is Chairman, President and Chief Executive Officer of Metaldyne.

Messrs. Stockman and Tredwell are senior managing directors of Heartland. See Item 12, "Security Ownership of Management and Principal Stockholders" and Item 13, "Certain Relationships and Related Transactions" Mr. Cohen is Counsel at the Canadian law firm of Cassels Brock and Blackwell.

**Item 12.** *Security Ownership of Certain Beneficial Owners and Management*

Set forth in the table below is certain information as of March 1, 2004 regarding the beneficial ownership of equity securities of the Company (including securities authorized for issuance under the Company's equity compensation plans) by (i) persons who are known to the Company to own beneficially more than five percent (5%) of the Company's voting stock, (ii) directors of the Company, (iii) the executive officers of the Company named in the Summary Compensation Table set forth in Item 11, "Executive Compensation" of this Report (and referred to herein as the "Named Executive Officers") and (iv) the directors and executive officers of the Company as a group. Unless otherwise indicated, the beneficial owner has sole voting power and sole investment power over the securities shown below.

| Title of Class | Name of Beneficial Owner | Amount and Nature of Beneficial Ownership | Percent of Class |
|---|---|---|---|
| Common Stock, par value $0.01 per share | Blackstone Capital Partners L.P. 345 Park Avenue New York, NY | 4,515,229(1) | 5.4% |
| | Charles E. Becker | 7,539,262(2) | 9.0% |
| | Robert C. Clark | 36,000(3) | * |
| | Marshall A. Cohen | 8,000(3) | * |
| | Wallace W. Creek | 200,000(4) | * |
| | David C. Dauch | 4,000(4) | * |
| | Heartland Industrial Partners, L.P. 55 Railroad Avenue Greenwich, CT | 31,272,397(5) | 37.4% |
| | Cynthia L. Hess | 0(10) | |
| | Joan Fabrics Corporation 100 Vesper Executive Park Tyngsboro, MA | 5,104,000(6) | 6.1% |
| | Millard L. King, Jr. | 400,762(7) | * |
| | Timothy D. Leuliette | 0(10) | |
| | Elkin McCallum | 5,534,000(6) | 6.6% |
| | W. Gerald McConnell | 0(10) | |
| | Jerry L. Mosingo | 0(8) | |
| | Michael A. Mitchell | 72,000(4) | * |
| | Warren B. Rudman | 32,000(3) | * |
| | J. Michael Stepp | 118,067(9)(10) | * |
| | David A. Stockman | 0(10) | |
| | Daniel P. Tredwell | 0(10) | |
| | Samuel Valenti, III | 0(10) | |
| | Eric J. White | 56,000(4) | * |
| | Michael G. Torakis | 0 | * |
| | Executive officers and directors as a Group (19 persons) | 14,020,951(11) | 16.8% |

\* Less than one percent of shares of Common Stock outstanding.

(1) Of these shares (i) 3,554,579 shares are held directly by Blackstone Capital Partners L.P., a Delaware limited partnership ("Blackstone Partners"), the sole general partner of which is Blackstone Management Associates L.P. ("Blackstone Associates"), (ii) 183,410 shares are held directly by Blackstone Family Investment Partnership I L.P., a Delaware limited partnership ("BFIP"), the sole general

partner of which is Blackstone Management Associates I L.L.C., (iii) 16,107 shares are held directly by Blackstone Advisory Directors Partnership L.P., a Delaware limited partnership ("BADP"), the sole general partner of which is Blackstone Associates, and (iv) 761,133 shares are held directly by Blackstone Capital Company II L.L.C., a Delaware limited liability company, all the ownership interest of which is owned directly and indirectly by Blackstone Partners, BFIP and BADP.

(2) Such shares represent (a) 5,440,000 shares acquired by Mr. Becker as consideration for the acquisition of Becker Group L.L.C., ("Becker"), (b) 339,262 shares acquired by Mr. Becker immediately following the closing of the Becker acquisition from one of the other former Becker shareholders, (c) 160,000 shares subject to presently exercisable warrants to purchase such Common Stock at $5.00 per share acquired by Mr. Becker as consideration for the Becker acquisition and (d) 1,600,000 shares acquired by Becker Ventures LLC ("Becker Ventures") as part of the financing for the Company's acquisition of Textron Automotive Company's trim division ("TAC-Trim"). Mr. Becker is the managing member of and holds a controlling interest in Becker Ventures. Mr. Becker became a Company director upon completion of the Becker acquisition and was Vice Chairman of the Board from July 2001 until July 2002. Mr. Becker is a limited partner of Heartland and disclaims beneficial ownership of all shares held by Heartland.

(3) Represents shares underlying options granted under the 1994 Directors Stock Option Plan (the "1994 Directors Plan") and the 2002 Plan which either are vested or will vest within 60 days unless the director ceases to be a director prior to that time.

(4) Represents shares underlying options granted under the 2002 Plan which are vested or will vest within 60 days.

(5) The 31,272,397 shares beneficially owned are indirectly owned by Heartland Industrial Associates L.L.C. as the general partner of each of the following limited partnerships, which hold the indicated shares directly: (a) 378,887 shares are held directly by Heartland Industrial Partners (FF), L.P., a Delaware limited partnership, (b) 528,336 shares are held directly by Heartland Industrial Partners (E1), L.P., a Delaware limited partnership, (c) 245,746 shares are held directly by Heartland Industrial Partners (K1), L.P., a Delaware limited partnership, (d) 73,719 shares are held directly by Heartland Industrial Partners (C1), L.P., a Delaware limited partnership, and (e) 30,045,709 shares are held directly by Heartland.

(6) Of these shares (a) 5,104,000 shares are held by Joan Fabrics Corporation ("Joan Fabrics") as a part of the consideration for the sale of Joan Automotive Industries, Inc. ("Joan Automotive") to a Company subsidiary and (b) 430,000 shares are held by Mr. McCallum and his spouse. The sole stockholder of Joan Fabrics is JFC Holding Trust, in which Mr. McCallum is the trustee and has a 75% beneficial interest and his spouse, Donna McCallum, owns the balance. Mr. McCallum became a director of the Company upon the consummation of the Joan acquisition.

(7) Of these shares, (i) 762 shares are held indirectly in the Stock Fund of the 401(k) Plan and the non-qualified Shadow Retirement Income Plan (the "SRIP") and (ii) 400,000 represent shares underlying options granted under the 2002 Plan.

(8) All shares underlying options previously granted to Mr. Mosingo under the 2002 Plan expired in November 2003.

(9) Of these shares, (i) 26,000 are held directly, (ii) 4,067 are held indirectly in the Stock Fund of the 401(k) Plan and the SRP, and (iii) 88,000 represent shares underlying options granted under the 2002 Plan which are vested or will vest within 60 days.

(10) As described under (5) above, 31,272,397 shares are beneficially owned by Heartland Industrial Associates, L.L.C. Mr. Stockman is the Managing Member of Heartland Industrial Associates, L.L.C., but disclaims beneficial ownership of such shares. Messrs. Leuliette, McConnell, Stepp, Tredwell and Valenti and Ms. Hess are also members of Heartland Industrial Associates, L.L.C. and also disclaim beneficial ownership of the shares.

(11) Excludes shares held by entities owning more than 5% of the Company's voting stock, except Joan Fabrics, which are included in the holdings of Mr. McCallum. Also excludes shares held by Mr. Mitchell, who is no longer employed by the Company as of March 1, 2004.

## VOTING

As of March 1, 2004, Heartland, Blackstone Partners, Charles E. Becker, Elkin McCallum and their affiliates (collectively, the "Investors") beneficially own or have the right to vote in the aggregate approximately 58.4% of the outstanding Common Stock. See table above and Item 13, "Certain Relationships and Related Transactions."

## SECURITIES AUTHORIZED FOR ISSUANCE UNDER EQUITY COMPENSATION PLANS

The following table indicates as of December 31, 2003, for each of our existing equity compensation plans under which any of our equity securities are authorized for issuance (including the 2002 Plan), the number of shares of our Common Stock issuable upon the exercise of outstanding options, the weighted average exercise price of such options and the number of additional shares of our Common Stock still authorized for issuance under such plans. We have no individual compensation arrangements under which any of our equity securities are authorized for issuance apart from these plans, and none of our subsidiaries or affiliates have any such plans or arrangements pursuant to which any or our equity securities authorized for issuance. All of our existing equity compensation plans have been approved by our stockholders.

| Plan Category | Number of securities to be issued upon exercise of outstanding options, warrants and rights | Weighted-average exercise price of outstanding options, warrants and rights | Number of securities remaining available for future issuance under equity compensation plans (excluding securities reflected in column (a)) |
|---|---|---|---|
| | (a) | (b) | (c) |
| **Equity compensation plans approved by security holders:** | | | |
| 1993 Plan . . . . . . . . . . . . . . . . . . | 77,245 | 8.0000 | 188,309 |
| 1994 Directors Plan . . . . . . . . . . . | 64,000 | 17.1039 | 0 |
| 1994 Plan . . . . . . . . . . . . . . . . . . | 671,267 | 9.5016 | 743,757 |
| 2002 Plan . . . . . . . . . . . . . . . . . . | 4,190,811 | 8.0076 | 2,409,189 |
| **Equity compensation plans not approved by security holders** | | | |
| N/A . . . . . . . . . . . . . . . . . . . . . | | | |
| **Total** . . . . . . . . . . . . . . . . . . | 5,003,323 | 8.3243 | 3,341,255 |

## Item 13.  *Certain Relationships and Related Transactions*

### *Heartland*

Heartland is a private equity firm established in 1999 for the purpose of acquiring and expanding industrial companies operating in various industrial sectors of the American manufacturing economy that are well positioned for global consolidation and growth. Three of the Company's directors, Messrs. Stockman, Tredwell and McConnell, are also employed by Heartland. Mr. Valenti is a consultant to Heartland. Messrs. Leuliette and Stepp are senior managing directors of Heartland (although they are not employees of Heartland). As of March 18, 2003, Heartland beneficially owned approximately 37% of the outstanding Common Stock.

In addition to the stockholders agreements described below, the Company is engaged in transactions with Heartland that are described in "Management's Discussion and Analysis of Financial Condition and Results of Operations — Certain Transactions with Related Parties" and in Note 19 "Related Party Transactions" of the Financial Statements included in this Report.

*Charles E. Becker*

In July 2001, the Company completed the acquisition of Becker. As a result of the Becker acquisition and a purchase of Common Stock immediately afterwards, Charles Becker became one of the Company's principal stockholders. Charles Becker became a member of the Company's Board of Directors upon closing of the Becker acquisition and was Vice Chairman of the Board from July 2001 until July 2002. In addition, Becker Ventures, an affiliate of Mr. Becker, acquired additional shares of Common Stock as part of the financings in connection with the acquisition of TAC-Trim at a price of $5.00 per share. See Item 12, "Security Ownership of Certain Beneficial Owners and Management" for a discussion of Mr. Becker's beneficial ownership of Common Stock.

In addition to the stockholders agreements described below, the Company in engaged in transactions with Mr. Becker and his affiliates that are described in "Management's Discussion and Analysis of Financial Condition and Results of Operations — Certain Transactions with Related Parties" and in Note 19 "Related Party Transactions" of the Financial Statements included in this Report.

*Elkin McCallum*

In September 2001, the Company completed the acquisition of Joan Automotive, a leading supplier of body cloth to the automotive industry, and all of the operating assets of Joan Automotive's affiliated yarn dying operation, Western Avenue Dyers, L.P. As a result of the Joan acquisition, Joan Fabrics, a company controlled by Elkin McCallum, became a principal stockholder of the Company. Upon completion of the Joan acquisition, Mr. McCallum because a member of the Company's Board of Directors. See Item 12, "Security Ownership of Certain Beneficial Owners and Management" for a discussion of Joan Fabrics' and Mr. McCallum's beneficial ownership of Common Stock.

In addition to the stockholders agreements described below, the Company is engaged in transactions with Mr. McCallum and his affiliates that are described in "Management's Discussion and Analysis of Financial Condition and Results of Operations — Certain Transactions with Related Parties" and in Note 19 "Related Party Transactions" of the Financial Statements included in this Report.

*Blackstone*

Blackstone Partners is a Delaware limited partnership formed in 1987 for the purpose of, among other things, (i) committing capital to facilitate corporate restructurings, leveraged buyouts, bridge financings and other investments and (ii) capitalizing affiliates that will engage in investment and merchant banking activities. The sole general partner of Blackstone Partners is Blackstone Associates, a Delaware limited partnership. At present, the business of Blackstone Associates consists of performing the function of, and serving as, the general partner of certain limited partnerships, including Blackstone Partners. Blackstone Management Partners L.L.C. is the general partner of Blackstone Management Partners L.P. ("Blackstone Management"), and Blackstone Associates, which is the general partner of BFIP.

**Certain Agreements and Transactions**

*Blackstone/Wasserstein/Heartland Stockholders Agreement*

The Company is a party to a stockholders agreement (the "Initial Stockholders Agreement") with Heartland and certain of its affiliates (the "Heartland parties"), Blackstone and certain of its affiliates (the "Blackstone parties") and Wasserstein L.L.C. and certain of its affiliates (the "Wasserstein parties"). The Initial Stockholders Agreement contains (i) rights of first refusal on private sales of Common Stock by the Blackstone parties and the Wasserstein parties in favor of the Heartland parties, (ii) tag-along rights in favor of the Blackstone parties and the Wasserstein parties in the event of certain transfers of Common Stock by Heartland and (iii) for so long as Heartland has a right to designate directors, a drag-along right enabling Heartland to cause the Blackstone parties and Wasserstein parties to sell all of their Common Stock with Heartland when Heartland is selling all of its Common Stock to a third party (including by merger). The Initial Stockholders Agreement further provides that the stockholder parties thereto will vote their Common

66

Stock to ensure that seven members of the Company's board will be designated by Heartland, one by the Wasserstein parties and one by the Blackstone parties (Blackstone and Wasserstein waived their right to each name a member of the board on March 15, 2002), in each case so long as each of Heartland, the Wasserstein parties and the Blackstone parties (in each case, together with its affiliates) continue to beneficially own at least 25% of the Common Stock owned by them as of February 23, 2001. In addition, there must be at least three independent directors not otherwise affiliated with the Company, the Blackstone parties, the Wasserstein parties or Heartland. The Company's chief executive officer will also serve as a director. Certain rights inure to the benefit of, and certain obligations bind, subsequent transferees of Common Stock, but none of the rights or obligations apply to public sales, whether under Rule 144 or under a registration statement.

The Initial Stockholders Agreement also contains certain restrictions on the Company's ability to enter into transactions with Heartland and its affiliates. The Company and its subsidiaries may not enter into any such transaction or series of related transactions involving payments or other consideration in excess of $500,000 without the consent of (i) each of the Blackstone parties and the Wasserstein parties, so long as each holds at least 25% of the Common Stock held by it as of February 23, 2001, for so long as Heartland and its affiliates directly or indirectly beneficially own at least 50% of the outstanding Common Stock and (ii) a majority of the members of the board who are disinterested with respect to the particular transaction and were not designated for election by Heartland so long as Heartland and its affiliates own at least 25% of the Common Stock owned by them on the date of the Initial Stockholders Agreement. The restrictions described above will not apply to (i) an advisory fee on certain acquisitions and divestitures by the Company in an amount not exceeding 1% of the enterprise value thereof and related out-of-pocket fees and expenses, (ii) transactions involving the sale, purchase or lease of goods and services in the ordinary course of business and on an arms-length basis between the Company and portfolio companies of Heartland in an amount involving not more than $1.25 million in any transaction, and (iii) certain other transactions.

In July 2003, Wasserstein Management and its affiliates distributed all of their shares of the Company's Common Stock to the partners of WP Partners, pro-rata to their respective interests in WP Partners. As a result of this distribution, the Wasserstein parties are no longer parties to the Initial Stockholders Agreement.

### Becker/Joan/Heartland Stockholders Agreement

There is also a stockholders agreement (the "Becker/Joan Stockholders Agreement") among Charles E. Becker, Michael E. McInerney and Jens Höhnel (the "Becker parties"), Joan Fabrics, JFC Holdings Trust, Mr. Elkin McCallum and Donna McCallum (the "Joan parties"), the Heartland parties and the Company. The Becker/Joan Stockholders Agreement contains (i) rights of first refusal on private sales of Common Stock by the Becker parties and the Joan parties in favor of the Heartland parties, (ii) tag-along rights in favor of the Becker parties and the Joan parties in the event of certain transfers of Common Stock by Heartland and (iii) for so long as Heartland has a right to designate directors, a drag-along right enabling Heartland to cause the Becker parties and Joan parties to sell all of their Common Stock with Heartland when Heartland is selling all of its Common Stock to a third party (including by merger).

The Becker/Joan Stockholders Agreement further provides that the Becker parties, the Joan parties and Heartland will each vote their Common Stock to ensure that Charles E. Becker and Elkin McCallum are each members of the Company's Board of Directors, so long as the Becker parties and the Joan parties, respectively, continue to hold shares representing 25% of the Common Stock originally acquired by them. The Becker/Joan Stockholders Agreement also provides that the Becker parties will vote their shares in favor of the election of Heartland's designees to the Company's Board of Directors. Certain rights inure to the benefit of, and certain obligations bind, subsequent transferees of Common Stock, but none of the rights or obligations apply to public sales, whether under Rule 144 or under a registration statement.

### Additional Transactions

During 2003, the Company also engaged in various transactions with Textron, Inc. and its affiliates (formerly the beneficial owners of 6% of the Company's outstanding Common Stock). Textron, Inc. and its affiliates sold all of their remaining shares of Common Stock of the Company in open market transactions in

January 2004. See Item 7, "Management's Discussion and Analysis of Financial Condition and Results of Operations — Effects of Certain Transactions with Related Parties", and Note 19 "Related Party Transactions" of the Financial Statements included in this report for additional discussion of related party transactions.

**Item 14.  *Principal Accounting Fees and Services***

**A.  Audit Fees**

*KPMG LLP*

On June 20, 2003, the Audit Committee of the Company's Board of Directors appointed KPMG LLP as the Company's independent accountants for the year ending December 31, 2003.

**2003 Fees:**  Fees for all services provided by KPMG for the year ended December 31, 2003 were as follows:

- **Audit Fees:**  Aggregate fees for professional services rendered by KPMG LLP in connection with its audit of the Company's consolidated financial statements as of and for the year ended December 31, 2003, and its limited reviews of the Company's unaudited consolidated interim financial statements as of and for the year ended December 31, 2003 and its limited reviews of the Company's unaudited consolidated interim financial statements were $1.1 million.

- **All Other Fees:**  In addition to the fees described above, aggregate fees of $0.3 million (a) were billed by KPMG LLP during the year ended December 31, 2003, primarily for the following professional services (in millions):

| | |
|---|---|
| Audit-related services(b) ................................................... | $0.1 |
| Income tax compliance and related tax services ........................... | $ — |
| All other products and services(c) ........................................ | $0.2 |

(a) 0% of these fees were covered by the *de minimus* safe harbor exception from Audit Committee pre-approval set forth in Rule 2-01(c)7(ii)(C) of the Securities and Exchange Commission's Regulation S-X (17 CFR 210.2-1(c)(7)(C)).

(b) Audit-related fees primarily include fees for audits of the Company's employee benefit plans.

(c) ISO compliance.

**2002 Fees:**  During the year ended December 31, 2002, KPMG LLP was not engaged as an independent accountant to audit either the financial statements of the Company or any of its subsidiaries, nor was it consulted regarding the application of accounting principles to any specific transaction, either completed or proposed, or the type of audit opinion that might be rendered on the Company's financial statements, or any matter that was the subject of a disagreement or reportable event.

*PricewaterhouseCoopers LLP*

PricewaterhouseCoopers LLP ("PricewaterhouseCoopers") served as the Company's independent accountants during the year ended December 31, 2002.

**2002 Fees:**  Fees for all services provided by PricewaterhouseCoopers for the year ended December 31, 2002 were as follows:

- **Audit Fees:**  Aggregate fees for professional services rendered by PricewaterhouseCoopers in connection with its audit of the Company's consolidated financial statements as of and for the year ended December 31, 2002 and its limited reviews of the Company's unaudited consolidated interim financial statements were $1.4 million.

- **Financial Information Systems Design and Implementation Fees:** . During the year ended December 31, 2002, PricewaterhouseCoopers rendered no professional services to the Company in connection with the design and implementation of financial information systems.

- **All Other Fees:**   In addition to the fees described above, aggregate fees of $5.0 million were billed by PricewaterhouseCoopers during the year ended December 31, 2002, primarily for the following professional services (in millions):

| | |
|---|---|
| Audit-related services (e) | $3.4 |
| Income tax compliance and related tax services | $1.6 |
| All other products and services | $ — |

(e)  Audit-related fees include fees include fees for acquisition support activities, issuance of comfort letters and audits of the Company's employee benefit plans.

(f)  These fees consist of tax consulting services and compliance services.

**B.   Audit Committee's Pre-Approval Policies for Auditor Services**

The Audit Committee's policies permit the Company's independent accountants (KPMG LLP) to provide audit-related services, tax services and non-audit services to the Company during 2003, subject to the following conditions:

(1) KPMG LLP will not be engaged to provide any services that may compromise its independence under applicable laws and regulations, including rules and regulations of the Securities and Exchange Commission, the Public Company Accounting Oversight Board, and the New York Stock Exchange;

(2) KPMG LLP and the Company will enter into engagement letters authorizing the specific audit-related tax or non-audit services and setting forth the cost of such services;

(3) The Company is authorized, without additional Audit Committee Approval, to engage KPMG LLP to provide (a) Audit-related and tax services, including due diligence and tax planning related to acquisitions where KPMG LLP does not audit the target company, to the extent that the cost of such engagement does not exceed $250,000, (b) due diligence and tax planning related to acquisitions where KPMG LLP audits the target company, to the extent the cost of such engagement does not exceed $20,000, and (c) services not otherwise covered by (a) or (b) above to the extent the cost of such engagements does not exceed $150,000; provided, however, that the aggregate amount of all such engagements under (a), (b) and (c) may not exceed $350,000 in any calendar quarter;

(4) The Chairman of the Audit Committee will be promptly notified of each engagement, and the Audit Committee will be updated quarterly on all engagements, including fees.

PART IV

**Item 15.** *Exhibits, Financial Statement Schedules and Reports on Form 8-K*

(a)(1)  Financial Statements:

| | Page Number |
|---|---|
| Independent Auditors' Report | F-1 |
| Report of Independent Accountants | F-2 |
| Consolidated Statements of Operations for the years ended December 31, 2003, 2002 and 2001 | F-3 |
| Consolidated Balance Sheets at December 31, 2003 and 2002 | F-4 |
| Consolidated Statements of Cash Flows for the years ended December 31, 2003, 2002 and 2001 | F-5 |
| Consolidated Statements of Common Stockholders' Equity (Deficit) for the years ended December 31, 2003, 2002 and 2001 | F-6 |
| Notes to Consolidated Financial Statements | F-7 |

(a)(2)  Financial Schedules:

The following financial statement schedules of Collins & Aikman Corporation for the years ended December 31, 2003, 2002, and 2001 are filed as part of this Report and should be read in conjunction with the Consolidated Financial Statements of Collins & Aikman Corporation.

| | Page Number |
|---|---|
| Schedule I — Condensed Financial Information of Registrant | S-1 |
| Schedule II — Valuation and Qualifying Accounts | S-1 |

All other schedules, for which provision is made in the applicable accounting regulations of the Securities and Exchange Commission are omitted because they are not required, are inapplicable or the information is included in the Consolidated Financial Statements or Notes thereto.

(a)(3)  Exhibits:

*Please note that in the following description of exhibits, the title of any document entered into, or filing made, prior to July 7, 1994 reflects the name of the entity, a party thereto or filing, as the case may be, at such time. Accordingly, documents and filings described below may refer to Collins & Aikman Holdings Corporation, Collins & Aikman Group, Inc. or Wickes Companies, Inc., if such documents and filings were made prior to July 7, 1994.*

| Exhibit Number | Description |
|---|---|
| 2.1 | Agreement and Plan of Merger dated May 14, 2001 by and among Collins & Aikman Corporation, Collins & Aikman Products Co., Becker Group, L.L.C., CE Becker Inc., ME McInerney Inc., J Hoehnel Inc. and the individuals party thereto as sellers is hereby incorporated by reference to Exhibit 2.1 of Collins & Aikman Corporation's Current Report on Form 8-K dated and filed July 13, 2001. |
| 2.2 | Agreement and Plan of Merger dated as of August 17, 2001 by and among Collins & Aikman Corporation, Collins & Aikman Products Co., JAII Acquisition Co., Elkin McCallum, Joan Fabrics Corporation and Joan Automotive Industries, Inc is hereby incorporated by reference to Exhibit 2.1 of Collins & Aikman Corporation's Current Report on Form 8-K dated September 21, 2001 and filed October 10, 2001. |
| 2.3 | First Amendment to Agreement and Plan of Merger by and among Collins & Aikman Corporation, Collins & Aikman Products Co., JAII Acquisition Co., Elkin McCallum, Joan Fabrics Corporation and Joan Automotive Industries, Inc dated as of September 21, 2001 is hereby incorporated by reference to Exhibit 2.2 of Collins & Aikman Corporation's Current Report on Form 8-K dated September 21, 2001 and filed October 10, 2001. |

| Exhibit Number | Description |
|---|---|
| 2.4 | Second Amendment to the Receivables Transfer Agreement among Collins & Aikman Products Co., Carcorp, Inc., the conduit purchasers party thereto from time to time, the committed purchasers party thereto from time to time, the funding agents party thereto from time to time and JPMorgan Chase Bank, as administrative agent, dated as of December 18, 2003 to the Receivables Transfer Agreement, dated December 20, 2001, as amended and restated as of September 24, 2002.* |
| 2.5 | Purchase Agreement dated as of August 7, 2001, as amended and restated as of November 30, 2001, by and among Textron Inc., Collins & Aikman Corporation and Collins & Aikman Products Co., including Exhibit 1 (Certificate of Designation of the 15% Series A Redeemable Preferred Stock, the 16% Series B Redeemable Preferred Stock and the 16% Series C Redeemable Preferred Stock) and Exhibit 7 (Asset Purchase Agreement dated as of August 7 by and between Textron Automotive Exteriors Inc. and JPS Automotive, Inc.), which is incorporated by reference to Collins and Aikman Corporation Current Report on Form 8-k dated December 20, 2001 and filed on January 4, 2002. The Table of Contents of the Purchase Agreement listed as Exhibit 2.4 contains a list briefly identifying the contents of all omitted schedules and exhibits. Collins & Aikman Corporation will supplementally furnish a copy of any omitted schedule or Exhibit to the Commission upon request. |
| 2.6 | Asset Purchase Agreement dated as of August 7, 2001, as amended and restated as of November 30, 2001, by and between Textron Automotive Exteriors Inc. and JPS Automotive, Inc., which is incorporated herein by reference to Exhibit 2.2 of Collins & Aikman Corporation's Current Report on Form 8-K dated December 20, 2001 and filed on January 4, 2002. |
| 2.7 | Asset Purchase Agreement dated as of August 17, 2001 by and among Collins & Aikman Products Co., Western Avenue Dyers, L.P., Elkin McCallum, Kerry McCallum, Penny Richards and Tyng Textiles LLC, which is incorporated by reference to Exhibit 2.3 to Collins & Aikman Corporation's Current Report on Form 8-K filed on October 4, 2001. |
| 2.8 | First Amendment to Asset Purchase Agreement dated as of September 21, 2001, which is incorporated by reference to Exhibit 2.4 to Collins & Aikman Corporation's Current Report on Form 8-K filed on October 4, 2001. |
| 3.1 | Restated Certificate of Incorporation of Collins & Aikman Corporation is hereby incorporated by reference to Exhibit 3.1 of Collins & Aikman Corporation's Report on Form 10-Q for the fiscal quarter ended June 26, 1999 and filed August 10, 1999. |
| 3.2 | Certificate of Amendment to the Restated Certificate of Incorporation of Collins & Aikman Corporation, which is incorporated by reference to Exhibit 3.2 of Collins & Aikman Corporation's Annual Report on Form 10-K for the fiscal year ended December 31, 2000 and filed April 2, 2001. |
| 3.3 | Certificate of Amendment of Amended and Restated Certificate of Incorporation is hereby incorporated by reference to Exhibit 3.5 of Collins & Aikman Corporation's Current Report on Form 8-K filed May 29, 2002. |
| 3.4 | By-laws of Collins & Aikman Corporation, as amended, are hereby incorporated by reference to Exhibit 3.2 of Collins & Aikman Corporation's Report on Form 10-K for the fiscal year ended January 27, 1996 and filed April 22, 1996. |
| 3.5 | Certificate of Elimination of Cumulative Exchangeable Redeemable Preferred Stock of Collins & Aikman Corporation is hereby incorporated by reference to Exhibit 3.3 of Collins & Aikman Corporation's Report on Form 10-Q for the fiscal quarter ended October 28, 1995 and filed December 8, 1995. |
| 4.1 | Specimen Stock Certificate for the Common Stock is hereby incorporated by reference to Exhibit 4.3 of Amendment No. 3 to Collins & Aikman Holdings Corporation's Registration Statement on Form S-2 (Registration No. 33-53179) filed June 21, 1994. |

| Exhibit Number | Description |
|---|---|
| 4.2 | Indenture, dated as of June 1, 1996, between Collins & Aikman Products Co., Collins & Aikman Corporation and First Union National Bank of North Carolina, as Trustee, is hereby incorporated by reference to Exhibit 4.2 of Collins & Aikman Corporation's Report on Form 10-Q for the fiscal quarter ended April 27, 1996 and filed June 11, 1996. |
| 4.3 | First Supplemental Indenture dated as of June 1, 1996, between Collins & Aikman Products Co., Collins & Aikman Corporation and First Union National Bank of North Carolina, as Trustee, is hereby incorporated by reference to Exhibit 4.3 of Collins & Aikman Corporation's Report on Form 10-Q for the fiscal quarter ended April 27, 1996 and filed June 11, 1996. |
| 4.4 | Second Supplemental Indenture, dated as of February 8, 2001, by and among Collins & Aikman Products Co., as Issuer, Collins & Aikman Corporation, as Guarantor, and First Union National Bank, as Trustee, which is incorporated by reference to Exhibit 4.11 of Collins & Aikman Corporation's Annual Report on Form 10-K for the fiscal year ended December 31, 2000 and filed April 1, 2002. |
| 4.5 | Form of Warrant is hereby incorporated by reference to Exhibit 4.1 of Collins & Aikman Corporation's Current Report on Form 8-K dated and filed July 13, 2001. |
| 4.6 | Certificate of Designation of Series A Redeemable Preferred Stock, Series B Redeemable Preferred Stock and Series C Redeemable Preferred Stock, which is incorporated herein by reference to Exhibit 4.1 of Collins & Aikman Corporation's Current Report of Form 8-K dated December 20, 2001 and filed on January 4, 2002. |
| 4.7 | Indenture dated as of December 20, 2001 by and among Collins & Aikman Products Co., as Issuer, the Guarantors parties thereto, and BNY Midwest Trust Company, as Trustee, which is incorporated herein by reference to Exhibit 4.2 of Collins & Aikman Corporation's Current Report on Form 8-K dated December 20, 2001 and filed on January 4, 2002. |
| 4.8 | Receivables Transfer Agreement dated as of December 20, 2001 by and among Carcorp, Inc., as Transferor, Collins & Aikman Products Co., individually and as Collection Agent, the persons parties thereto, as CP Conduit Purchasers, Committed Purchasers and Funding Agents and JPMorgan Chase Bank, as Administrative Agent, which is incorporated herein by reference to Exhibit 4.3 of Collins & Aikman Corporation's Current Report on Form 8-K dated December 20, 2001 and filed on January 4, 2002. |
| 4.9 | Amended and Restated Receivables Purchase Agreement dated as of December 20, 2001 among Collins & Aikman Products Co. and its wholly-owned direct and indirect subsidiaries named therein, as Sellers, and Carcorp, Inc., as Purchaser, and the other Sellers from time to time named therein, which is incorporated herein by reference to Exhibit 4.4 of Collins & Aikman Corporation's Current Report on Form 8-K dated December 20, 2001 and filed on January 4, 2002. |
| 4.10 | Credit Agreement dated as of December 20, 2001 among Collins & Aikman Products Co., as Borrower, Collins & Aikman Canada Inc., as a Canadian Borrower, Collins & Aikman Plastics, Ltd., as a Canadian Borrower, Collins & Aikman Corporation, the Lenders named therein, Deutsche Banc Alex. Brown Inc. and Merrill Lynch Capital Corporation, as Co-Documentation Agents, Credit Suisse First Boston Corporation, as Syndication Agent, JPMorgan Chase Bank, as Administrative Agent, and J.P.Morgan Bank Canada, as Canadian Administrative Agent, which is incorporated herein by reference to Exhibit 4.5 of Collins & Aikman Corporation's Current Report on Form 8-K dated December 20, 2001 and filed on January 4, 2002. |
| 4.11 | First Amendment dated as of December 13, 2002, to the Credit Agreement dated as of December 20, 2001 among Collins & Aikman Products Co., as Borrower, Collins & Aikman Canada Inc., as a Canadian Borrower, Collins & Aikman Plastics, Ltd., as a Canadian Borrower, Collins & Aikman Corporation, the Lenders named therein, Credit Suisse First Boston Corporation, as Syndication Agent, Deutsche Bank Securities Inc. (formerly known as Deutsche Banc Alex. Brown Inc.) and Merrill Lynch Capital Corporation, as Co-Documentation Agents, JPMorgan Chase Bank, as Administrative Agent, and J.P. Morgan Bank Canada, as Canadian Administrative Agent is hereby incorporated by reference to Exhibit 4.17 of Collins & Aikman Corporation's report on Form 10-K for the year ended December 31, 2002. |

| Exhibit Number | Description |
|---|---|
| 4.12 | Second Amendment dated May 2, 2003 to the Credit Agreement dated December 20, 2001 which is incorporated herein by reference to Exhibit 10.1 of Collins & Aikman Corporation's Report on Form 10-Q dated March 31, 2003 and filed on May 15, 2003. |
| 4.13 | Third Amendment dated September 23, 2003 to the Credit Agreement dated December 20, 2001 which is incorporated herein by reference to Exhibit 4.2 of Collins & Aikman Corporation's Report on Form 10-Q dated September 30, 2003 and filed on November 11, 2003. |
| 4.14 | Fourth Amendment dated October 7, 2003 to the Credit Agreement dated December 20, 2001 which is incorporated herein by reference to Exhibit 4.3 of Collins & Aikman Corporation's Report on Form 10-Q dated September 30, 2003 and filed on November 11, 2003. |
| 4.15 | Fifth Amendment dated February 13, 2004 to the Credit Agreement dated December 20, 2001.* |
| 4.16 | Guarantee and Collateral Agreement dated as of December 20, 2001 by and among Collins & Aikman Corporation, Collins & Aikman Products Co. and certain of their subsidiaries and JPMorgan Chase Bank, as Collateral Agent, which is incorporated herein by reference to Exhibit 4.6 of Collins & Aikman Corporation's Current Report on Form 8-K dated December 20, 2001 and filed on January 4, 2002. |
| 4.17 | Third Supplemental Indenture, dated as of December 20, 2001, among Collins & Aikman Products Co., Collins & Aikman Corporation, the Subsidiary Guarantors listed on the signature page thereto, and First Union National Bank (as successor in interest to First Union National Bank of North Carolina), which is incorporated herein by reference to Exhibit 4.7 of Collins & Aikman Corporation's Current Report on Form 8-K dated December 20, 2001 and filed on January 4, 2002. |
| 4.18 | Amendment and Waiver, dated August 26, 2003 to the Receivables Transfer Agreement dated December 21, 2001 which is incorporated herein by reference to Exhibit 4.1 of Collins & Aikman Corporation's Report on Form 10-Q dated September 30, 2003 and filed on November 11, 2003. |
| 4.19 | Registration Rights Agreement, dated February 23, 2001, by and among Collins & Aikman Corporation, Heartland Industrial Partners, L.P. and the other investor stockholders listed on Schedule 1 thereto, Blackstone Capital Company II, L.L.C., Blackstone Family Investment Partnership I L.P., Blackstone Advisory Directors Partnership L.P., Blackstone Capital Partners, L.P. and Wasserstein/C&A Holdings, L.L.C., incorporated by reference to Annex D to Exhibit 10.1 to Collins & Aikman Corporation's Current Report on Form 8-K dated January 12, 2001 and filed January 16, 2001. |
| 4.20 | Stockholders Agreement dated July 3, 2001, by and among Collins & Aikman Corporation, Heartland Industrial Partners, L.P. and the other Heartland Entities named therein, the Becker Stockholders party thereto and the Joan Stockholders party thereto is hereby incorporated by reference to Exhibit 10.85 of Collins & Aikman Corporation's Report on Form 10-K for the year ended December 31, 2001 and filed April 1, 2002. |
| 4.21 | Registration Rights Agreement, dated December 20, 2001, by and among Collins & Aikman Products Co., Collins & Aikman Corporation, and each of the subsidiaries listed on the signature pages thereof, and J.P. Morgan Securities Inc., Credit Suisse First Boston Corporation, Deutsche Banc Alex. Brown Inc. and Merrill Lynch, Pierce, Fenner & Smith Incorporated and the other several initial purchasers parties to the Purchase Agreement is hereby incorporated by reference to Exhibit 10.89 of Collins & Aikman Corporation's Report on Form 10-K for the year ended December 31, 2001 and filed April 1, 2002. |
| 4.22 | Registration Rights Agreement dated as of December 20, 2001 by and among Becker Ventures, LLC, Dresdner Kleinwort Capital Partners 2001 LP, Masco Capital Corporation, ML 1BK Positions, Inc. and Collins & Aikman Corporation is hereby incorporated by reference to Exhibit 10.90 of Collins & Aikman Corporation's Report on Form 10-K for the year ended December 31, 2001 and filed April 1, 2002. |

| **Exhibit Number** | **Description** |
|---|---|
| 4.23 | Registration Rights Agreement, dated December 20, 2001, by and between Collins & Aikman Corporation, Textron Inc., and Textron Holdco Inc is hereby incorporated by reference to Exhibit 10.91 of Collins & Aikman Corporation's Report on Form 10-K for the year ended December 31, 2001 and filed April 1, 2002. |
| 4.24 | Preferred Stock Registration and Other Rights Agreement, dated as of December 20, 2001, by and among Collins & Aikman Products Co. and Textron Inc is hereby incorporated by reference to Exhibit 10.92 of Collins & Aikman Corporation's Report on Form 10-K for the year ended December 31, 2001 and filed April 1, 2002. |
| 10.1 | Employment Agreement, dated as of April 1, 2000, between Collins & Aikman Products Co. and an executive officer is hereby incorporated by reference to Exhibit 10.3 of Collins & Aikman Corporation's Report on Form 10-Q for the fiscal quarter ended July 1, 2000. |
| 10.2 | 1993 Employee Stock Option Plan, as amended and restated, is hereby incorporated by reference to Exhibit 10.13 of Collins & Aikman Corporation's Report on Form 10-Q for the fiscal quarter ended April 29, 1995. |
| 10.3 | 1994 Employee Stock Option Plan, as amended through February 7, 1997, is hereby incorporated by reference to Exhibit 10.12 of Collins & Aikman Corporation's Report on Form 10-Q for the fiscal quarter ended March 29, 1997. |
| 10.4 | 2000 Employee Stock Option Plan is hereby incorporated by reference to Exhibit 10.6 of Collins & Aikman Corporation's Report on Form 10-Q for the fiscal quarter ended July 1, 2000. |
| 10.5 | 1994 Directors Stock Option Plan as amended and restated is hereby incorporated by reference to Exhibit 10.15 to Collins & Aikman Corporation's Report on Form 10-K for the year ended December 26, 1998. |
| 10.6 | 1994 Employee Stock Option Plan, as amended and restated through June 3, 1999 is hereby incorporated by reference to Exhibit 10.2 of Collins & Aikman Corporation's Report on Form 10-Q for the fiscal quarter ended June 26, 1999. |
| 10.7 | Change in Control Agreement, dated March 17, 1998, between Collins & Aikman Corporation and an executive officer is hereby incorporated by reference to Exhibit 10.22 of Collins & Aikman Corporation's Report on Form 10-Q for the fiscal quarter ended March 28, 1998. |
| 10.8 | Change in Control Agreement, dated March 17, 1998, between Collins & Aikman Corporation and an executive officer is hereby incorporated by reference to Exhibit 10.29 of Collins & Aikman Corporation's Report on Form 10-K for the fiscal year ended December 25, 1999. |
| 10.9 | Change in Control Agreement, dated as of April 1, 2000, between Collins & Aikman Products Co. and an executive officer is hereby incorporated by reference to Exhibit 10.4 of Collins & Aikman Corporation's Report on Form 10-Q for the fiscal quarter ended July 1, 2000. |
| 10.10 | Stockholders Agreement, dated February 23, 2001, by and among Collins & Aikman Corporation, Heartland Industrial Partners, L.P. and other investor stockholders listed on Schedule 1 thereto, Blackstone Capital Company II, L.L.C., Blackstone Family Investment Partnership I L.P., Blackstone Capital Partners L.P., and Wasserstein/C&A Holdings, L.L.C., incorporated by reference to Annex E to Exhibit 10.1 of Collins & Aikman Corporation's Current Report on form 8-K dated January 12, 2001 and filed January 16, 2001. |
| 10.11 | Share Purchase Agreement, dated as of January 12, 2001, between Collins & Aikman Corporation and Heartland Industrial Partners, L.P., is hereby incorporated by reference to Exhibit 10.1 of Collins & Aikman Corporation's Report on Form 8-K dated January 12, 2001, incorporated by reference to Exhibit 10.1 to Collins & Aikman Corporation's Current Report on Form 8-K dated January 12, 2001 and filed January 16, 2001. |
| 10.12 | Services Agreement, dated as of February 23, 2001, by and among Collins & Aikman Corporation, Collins & Aikman Products Co. and Heartland Industrial Partners, L.P is hereby incorporated by reference to Exhibit 10.59 of Collins & Aikman Corporation's Report on Form 10-K for the year ended December 31, 2001 and filed April 1, 2002. |

| Exhibit Number | Description |
|---|---|
| 10.13 | Profit Participation Interest Agreement, dated as of February 23, 2001, by and among Heartland Industrial Partners, L.P. and the other investor stockholders listed on Schedule 1 thereto and each of Collins & Aikman Corporation, Blackstone Capital Company II, L.L.C. and Wasserstein/C&A Holdings, L.L.C., incorporated by reference to Annex B to Exhibit 10.1 to Collins & Aikman Corporation's Current Report on Form 8-K dated January 12, 2001 and filed January 16, 2001. |
| 10.14 | Severance Benefit Agreement dated August 9, 1999 between Collins & Aikman Corporation and an executive officer is hereby incorporated by reference to Exhibit 10.32 of Collins & Aikman Corporation's Report on Form 10-K for the fiscal year ended December 25, 1999. |
| 10.15 | Employment Agreement dated December 1, 2000 between Collins & Aikman Products Co. and an executive officer, which is incorporated by reference to Exhibit 10.75 of Collins & Aikman Corporation's Annual Report on Form 10-K for the fiscal year ended December 31, 2000. |
| 10.16 | Employment Agreement dated as of April 1, 2000, between Collins & Aikman Products Co. and an executive officer is hereby incorporated by reference to Exhibit 10.3 of Collins & Aikman Corporation's Report on Form 10-Q for the quarter ended July 1, 2000. |
| 10.17 | Service Contract between Collins & Aikman Products GmbH and an executive officer, which is incorporated by reference to Exhibit 10.5 of Collins & Aikman Corporation's Quarterly Report on Form 10-Q for the quarter ended June 30, 2001 and filed August 14, 2001. |
| 10.18 | Lease Agreement, dated as of June 29, 2001, between New King, L.L.C., as landlord, and Collins & Aikman Products Co., as tenant is hereby incorporated by reference to Exhibit 10.82 of Collins & Aikman Corporation's Report on Form 10-K for the year ended December 31, 2001 and filed April 1, 2002. |
| 10.19 | Lease Agreement, dated as of June 29, 2001, between Anchor Court, L.L.C., as landlord and Collins & Aikman Products Co., as tenant is hereby incorporated by reference to Exhibit 10.84 of Collins & Aikman Corporation's Report on Form 10-K for the year ended December 31, 2001 and filed April 1, 2002. |
| 10.20 | Registration Rights Agreement, dated July 3, 2001, by and among Collins & Aikman Corporation, Charles E. Becker, Michael E. McInerney and Jens Höhnel and, together with the Joan Investors (as defined therein) is hereby incorporated by reference to Exhibit 10.86 of Collins & Aikman Corporation's Report on Form 10-K for the year ended December 31, 2001 and filed April 1, 2002. |
| 10.21 | First Amendment to Services Agreement, dated as of August 7, 2001, among Collins & Aikman Corporation, Collins & Aikman Products Co. and Heartland Industrial Partners, L.P is hereby incorporated by reference to Exhibit 10.87 of Collins & Aikman Corporation's Report on Form 10-K for the year ended December 31, 2001 and filed April 1, 2002. |
| 10.22 | Equipment Lease, dated as of December 18, 2001, among Textron Automotive Exteriors Inc. and Textron Automotive Interiors Inc., collectively as lessee, and IAC TAX V, LLC, as lessor is hereby incorporated by reference to Exhibit 10.88 of Collins & Aikman Corporation's Report on Form 10-K for the year ended December 31, 2001 and filed April 1, 2002. |
| 10.23 | Intellimold Technology License and Support Agreement, dated as of December 20, 2001, by and between Textron, Inc. and Collins & Aikman Corporation and Collins & Aikman Products Co is hereby incorporated by reference to Exhibit 10.93 of Collins & Aikman Corporation's Report on Form 10-K for the year ended December 31, 2001 and filed April 1, 2002. |
| 10.24 | Technology License Agreement (Retained IP), dated as of December 20, 2001, by and between Textron, Inc. and Collins & Aikman Corporation and Collins & Aikman Products Co is hereby incorporated by reference to Exhibit 10.94 of Collins & Aikman Corporation's Report on Form 10-K for the year ended December 31, 2001 and filed April 1, 2002. |
| 10.25 | Technology License Agreement (Licensed-Back IP), dated as of December 20, 2001, by and between Textron, Inc. and Collins & Aikman Corporation and Collins & Aikman Products Co is hereby incorporated by reference to Exhibit 10.95 of Collins & Aikman Corporation's Report on Form 10-K for the year ended December 31, 2001 and filed April 1, 2002. |

| Exhibit Number | Description |
|---|---|
| 10.26 | Employment Agreement between Products and an officer of the Company dated as of November 1, 2001 is hereby incorporated by reference to Exhibit 10.3 of Collins & Aikman Corporation's Report on Form 10-Q for the quarter ended March 31, 2002 and filed May 15, 2002. |
| 10.27 | Employment Agreement between Products and an officer of the Company dated as of November 1, 2001 is hereby incorporated by reference to Exhibit 10.4 of Collins & Aikman Corporation's Report on Form 10-Q for the quarter ended March 31, 2002 and filed May 15, 2002. |
| 10.28 | Employment Agreement between Products and an officer of the Company dated as of December 20, 2001 is hereby incorporated by reference to Exhibit 10.5 of Collins & Aikman Corporation's Report on Form 10-Q for the quarter ended March 31, 2002 and filed May 15, 2002. |
| 10.29 | Employment Agreement between Products and an officer of the Company dated as of December 20, 2001 is hereby incorporated by reference to Exhibit 10.6 of Collins & Aikman Corporation's Report on Form 10-Q for the quarter ended March 31, 2002 and filed May 15, 2002. |
| 10.30 | Employment Agreement between Products and an officer of the Company dated as of December 20, 2001 is hereby incorporated by reference to Exhibit 10.7 of Collins & Aikman Corporation's Report on Form 10-Q for the quarter ended March 31, 2002 and filed May 15, 2002. |
| 10.31 | Separation and Consultancy Agreement dated July 31, 2002 is hereby incorporated by reference to Exhibit 10.1 to Collins & Aikman Corporation's Current report on Form 8-K filed August 2, 2002. |
| 10.32 | Severance Benefit Agreement between Collins and Aikman Corporation and an officer of the Company dated April 5, 2002 is hereby incorporated by reference to Exhibit 10.2 of Collins & Aikman Corporation's Report on Form 10-Q for the quarter ended June 30, 2002 and filed August 14, 2002. |
| 10.33 | Employment and Consulting Agreement between Collins and Aikman Corporation and an Employee dated July 2002 is hereby incorporated by reference to Exhibit 10.1 of Collins & Aikman Corporation's Report on Form 10-Q for the quarter ended September 30, 2002 and filed November 14, 2002. |
| 10.34 | Separation Agreement between Collins and Aikman Corporation and an officer of the Company dated October 2002 is hereby incorporated by reference to Exhibit 10.3 of Collins & Aikman Corporation's Report on Form 10-Q for the quarter ended September 30, 2002 and filed November 14, 2002. |
| 10.35 | Employment Agreement between Collins & Aikman Corporation and an officer of the Company dated January 25, 2004. |
| 10.36 | Amendment to Employment Agreement between Collins & Aikman Corporation and an officer of the Company dated January 25, 2004. |
| 10.37 | Separation Agreement between Collins & Aikman Corporation and an officer of the Company dated February 29, 2004. |
| 11 | Computation of Earnings Per Share.* |
| 12.1 | Computation of Ratio of Earnings to Fixed Charges.* |
| 21 | Subsidiaries of the Registrant.* |
| 23.1 | Consent of KPMG.* |
| 23.2 | Consent of PricewaterhouseCoopers.* |
| 24.1 | Powers of Attorney.* |
| 31.1 | Certification Pursuant to Section 302 of Sarbanes-Oxley Act of 2002.* |
| 31.2 | Certification Pursuant to Section 302 of Sarbanes-Oxley Act of 2002.* |

| Exhibit Number | Description |
|---|---|
| 32.1 | Certification Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 (Chapter 63, Title 18 U.S.C. 1350(a) and (b)).* |
| 99 | Voting Agreement between Blackstone Capital Partners L.P. and Wasserstein Perella Partners, L.P. is hereby incorporated by reference to Exhibit 99 of Amendment No. 4 to Collins & Aikman Holdings Corporation's Registration Statement on Form S-2 (Registration No. 33-53179) filed June 27, 1994. |

\* Indicates document filed herewith.

  (b) Reports on Form 8-K

The Company filed the following Reports on Form 8-K covering the following items:

November 13, 2003    Item 9 Regulation FD Disclosure and Item 12 Results of Operations and Financial Condition

77

## SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities and Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized, on the 16th day of March 2004.

COLLINS & AIKMAN CORPORATION

BY:      /s/   DAVID A. STOCKMAN

David A. Stockman
*Chairman of the Board & Chief Executive Officer*

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the Registrant and in the capacities and on the dates indicated.

| Signature | Title | Date |
|---|---|---|
| /s/   DAVID A. STOCKMAN<br>David A. Stockman | Chairman of the Board & Chief Executive Officer | March 16, 2004 |
| /s/   J. MICHAEL STEPP<br>J. Michael Stepp | Vice Chairman and Chief Financial Officer (Principal Financial Officer) | March 16, 2004 |
| *<br>Charles E. Becker | Director | March 16, 2004 |
| *<br>Robert C. Clark | Director | March 16, 2004 |
| *<br>Marshall A. Cohen | Director | March 16, 2004 |
| *<br>David C. Dauch | Director | March 16, 2004 |
| *<br>Cynthia Hess | Director | March 16, 2004 |
| *<br>Timothy D. Leuliette | Director | March 16, 2004 |
| *<br>Elkin McCallum | Director | March 16, 2004 |
| *<br>W. Gerald McConnell | Director | March 16, 2004 |
| *<br>Warren B. Rudman | Director | March 16, 2004 |
| *<br>Daniel P. Tredwell | Director | March 16, 2004 |
| *<br>Samuel Valenti | Director | March 16, 2004 |

*By:      /s/   JAY KNOLL

Jay Knoll
*General Counsel*

78

## INDEPENDENT AUDITORS' REPORT

The Board of Directors and Stockholders
Collins & Aikman Corporation:

We have audited the 2003 consolidated financial statements of Collins & Aikman Corporation and subsidiaries as listed in the accompanying index. These consolidated financial statements and financial statement schedules are the responsibility of the Company's management. Our responsibility is to express an opinion on these consolidated financial statements and financial statement schedules based on our audit.

We conducted our audit in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audit provides a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of Collins & Aikman Corporation and subsidiaries as of December 31, 2003, and the results of their operations and their cash flows for the year then ended, in conformity with accounting principles generally accepted in the United States of America. Also in our opinion, the related 2003 financial statement schedules, when considered in relation to the basic consolidated financial statements taken as a whole, present fairly in a material respects, the information set forth herein.

As discussed in Note 2 to the financial statements, the Company changed its method of accounting for crib supply inventories in 2003.

/s/ KPMG LLP

Detroit, Michigan
March 15, 2004

## REPORT OF INDEPENDENT ACCOUNTANTS

To the Board of Directors and Shareholders
of Collins & Aikman Corporation:

In our opinion, the consolidated balance sheet as of December 31, 2002 and the related consolidated statements of operations, cash flows and common stockholders' equity (deficit) listed in the index appearing under Item 15(a)(1) for each of the two years in the period ended December 31, 2002 present fairly, in all material respects, the financial position, results of operations and cash flows of Collins & Aikman Corporation and its subsidiaries at December 31, 2002 and for each of the two years in the period ended December 31, 2002, in conformity with accounting principles generally accepted in the United States of America. In addition, in our opinion, the financial statement schedules listed in the index appearing under Item 15(a)(2) present fairly, in all material respects, the 2002 and 2001 information set forth therein when read in conjunction with the related consolidated financial statements. These financial statements and financial statement schedules are the responsibility of the Company's management; our responsibility is to express an opinion on these financial statements based on our audits. We conducted our audits of these statements in accordance with auditing standards generally accepted in the United States of America, which require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

As discussed in Note 2 to the consolidated financial statements, effective January 1, 2002, the Company changed its method of accounting for goodwill (and other intangible assets) in accordance with the adoption of Statement of Financial Accounting Standards No. 142, "Goodwill and Other Intangible Assets".

Effective January 1, 2003, the Company reclassified the 2001 extraordinary loss on retirement of debt to other expense (income), net, upon the adoption of Statement of Financial Accounting Standards No. 145, "Rescission of FASB Statements No. 4, 44 and 64, Amendment of FASB Statement No. 13, and Technical Corrections as of April 2002".

/s/ PricewaterhouseCoopers

Detroit, Michigan
February 18, 2003

F-2

COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES

CONSOLIDATED STATEMENTS OF OPERATIONS
(in millions, except per share data)

| | Year Ended | | |
|---|---|---|---|
| | December 31, 2003 | December 31, 2002 | December 31, 2001 |
| Net sales | $3,983.7 | $3,885.8 | $1,823.3 |
| Cost of goods sold | 3,539.5 | 3,367.7 | 1,604.5 |
| Gross profit | 444.2 | 518.1 | 218.8 |
| Selling, general and administrative expenses | 273.2 | 293.5 | 164.4 |
| Restructuring charges | 40.6 | 38.9 | 11.2 |
| Impairment of long-lived assets | 28.4 | 18.0 | 7.6 |
| Operating income | 102.0 | 167.7 | 35.6 |
| Interest expense, net of interest income of $0.7, $1.4 and $2.0 | 151.3 | 148.9 | 84.3 |
| Interest expense from subsidiary preferred stock dividends | 32.0 | — | — |
| Interest expense from subsidiary preferred stock accretion | 5.3 | — | — |
| Subsidiary preferred stock dividends | — | 30.8 | 1.5 |
| Subsidiary preferred stock accretion | — | 7.6 | 0.9 |
| Loss on sale of receivables | 7.3 | 4.2 | 10.8 |
| Other expense (income), net | (32.9) | 10.0 | 14.4 |
| Loss from continuing operations before income taxes | (61.0) | (33.8) | (76.3) |
| Income tax expense (benefit) | (1.9) | 17.5 | (21.3) |
| Loss from continuing operations before extraordinary loss and cumulative effect of a change in accounting principle | (59.1) | (51.3) | (55.0) |
| Income from discontinued operations, net of income taxes of $0.8, $6.3 and $5.7 | 1.6 | 9.5 | 8.8 |
| Loss before cumulative effect of change in accounting principle | (57.5) | (41.8) | (46.2) |
| Cumulative effect of a change in accounting principle, net of income taxes of $0 | — | (11.7) | — |
| Net loss | $ (57.5) | $ (53.5) | $ (46.2) |
| Earnings per share data: | | | |
| Net loss | $ (57.5) | $ (53.5) | $ (46.2) |
| Loss on redemption of subsidiary preferred stock | — | (36.3) | — |
| Net loss attributable to common shareholders | $ (57.5) | $ (89.8) | $ (46.2) |
| Net income (loss) per basic and diluted common share: | | | |
| Continuing operations | $ (0.71) | $ (1.15) | $ (1.42) |
| Discontinued operations | 0.02 | 0.12 | 0.23 |
| Cumulative effect of a change in accounting principle | — | (0.15) | — |
| Net loss attributable to common shareholders | $ (0.69) | $ (1.18) | $ (1.19) |
| Average common shares outstanding: | | | |
| Basic and diluted | 83.6 | 76.3 | 38.9 |

The Notes to Consolidated Financial Statements are an integral
part of these consolidated financial statements.

F-3

COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES

CONSOLIDATED BALANCE SHEETS

(in millions)

| | December 31, 2003 | December 31, 2002 |
|---|---|---|
| **ASSETS** | | |
| Current Assets: | | |
| Cash and cash equivalents | $    13.2 | $    81.3 |
| Accounts and other receivables, net of allowances of $9.2 and $18.6 | 257.3 | 373.0 |
| Inventories | 169.4 | 171.6 |
| Other | 216.0 | 177.4 |
| Total current assets | 655.9 | 803.3 |
| Property, plant and equipment, net | 825.9 | 737.8 |
| Deferred tax assets | 178.1 | 165.0 |
| Goodwill | 1,363.1 | 1,265.5 |
| Intangible assets, net | 66.9 | 85.3 |
| Other assets | 101.3 | 100.2 |
| | $3,191.2 | $3,157.1 |
| **LIABILITIES AND COMMON STOCKHOLDERS' EQUITY** | | |
| Current Liabilities: | | |
| Short-term borrowings | $    16.0 | $    10.5 |
| Current maturities of long-term debt and capital lease obligations | 31.5 | 23.5 |
| Accounts payable | 638.9 | 595.5 |
| Accrued expenses | 238.9 | 299.9 |
| Total current liabilities | 925.3 | 929.4 |
| Long-term debt and capital lease obligations | 1,237.7 | 1,255.2 |
| Mandatorily redeemable preferred stock of subsidiary | 161.2 | — |
| Other, including pensions and post-retirement benefit obligations | 423.4 | 438.4 |
| Commitments and contingencies | | |
| Minority interest in consolidated subsidiary | 3.3 | 12.7 |
| Total liabilities | 2,750.9 | 2,635.7 |
| Mandatorily redeemable preferred stock of subsidiary | — | 123.9 |
| Common stock ($.01 par value, 300.0 shares authorized, 83.6 shares issued and outstanding at December 31, 2003 and 2002) | 0.8 | 0.8 |
| Other paid-in capital | 1,282.3 | 1,282.3 |
| Accumulated deficit | (830.1) | (772.6) |
| Accumulated other comprehensive loss | (12.7) | (113.0) |
| Total common stockholders' equity | 440.3 | 397.5 |
| | $3,191.2 | $3,157.1 |

The Notes to Consolidated Financial Statements are an integral
part of these consolidated financial statements.

F-4

COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES

CONSOLIDATED STATEMENTS OF CASH FLOWS
(in millions)

| | Year Ended | | |
|---|---|---|---|
| | December 31, 2003 | December 31, 2002 | December 31, 2001 |
| OPERATING ACTIVITIES | | | |
| Net loss | $ (57.5) | $ (53.5) | $ (46.2) |
| Adjustments to derive cash flow operating activities: | | | |
| Impairment of goodwill | — | 11.7 | — |
| Impairment of long-lived assets | 28.4 | 19.3 | 7.6 |
| Deferred income tax benefit | (8.7) | (3.6) | (26.0) |
| Subsidiary preferred stock requirements | 37.3 | 38.4 | 2.4 |
| Depreciation | 113.8 | 97.0 | 64.2 |
| Goodwill amortization | — | — | 7.1 |
| Amortization of other assets | 26.4 | 20.0 | 10.5 |
| Loss (gain) on sale of property, plant and equipment | (3.5) | 3.4 | 8.7 |
| Decrease in accounts and other receivables | 32.5 | 23.7 | 135.0 |
| Proceeds from (reduction of) participating interests in accounts receivable, net of redemptions | 7.8 | (13.9) | (2.6) |
| Proceeds from non-recourse factoring facilities | 88.5 | — | — |
| Decrease (increase) in inventories | 4.6 | (26.6) | 53.4 |
| Increase (decrease) in accounts payable | 32.3 | 50.1 | (31.9) |
| Undistributed equity in earnings of joint ventures | — | 5.5 | — |
| Increase (decrease) in interest payable | 2.8 | (4.0) | (4.1) |
| Changes in other assets | (196.2) | 62.4 | (6.5) |
| Changes in other liabilities | 14.4 | (40.5) | (34.5) |
| Net cash provided by operating activities | 122.9 | 189.4 | 137.1 |
| INVESTING ACTIVITIES | | | |
| Additions to property, plant, and other non-current assets equipment | (175.1) | (147.9) | (54.5) |
| Sales of property, plant and equipment | 18.3 | 13.3 | 88.1 |
| Additional investment in joint venture | — | (5.9) | — |
| Payments for acquisitions and related costs, net of cash acquired | (33.1) | (45.6) | (760.9) |
| Sale of business | — | — | 3.5 |
| Net cash used in investing activities | (189.9) | (186.1) | (723.8) |
| FINANCING ACTIVITIES | | | |
| Issuance of long-term debt | 13.1 | — | 950.0 |
| Debt issuance costs | — | — | (59.4) |
| Repayment of long-term debt | (28.9) | (23.9) | (383.2) |
| Repurchase of preferred stock | — | (100.0) | — |
| Increase (decrease) in short-term borrowings | 4.7 | (16.0) | 10.1 |
| Net borrowings (repayments) on revolving credit facilities | 6.3 | — | (150.2) |
| Net proceeds from issuance of common stock | — | 150.6 | 207.2 |
| Reissue of treasury stock, net | — | — | 61.3 |
| Repayment of debt assumed in acquisition | — | (6.7) | — |
| Net cash provided by (used in) financing activities | (4.8) | 4.0 | 635.8 |
| Effect of exchange rate changes on cash | 3.7 | 0.1 | 3.9 |
| Increase (decrease) in cash and cash equivalents | (68.1) | 7.4 | 53.0 |
| Cash and cash equivalents at beginning of year | 81.3 | 73.9 | 20.9 |
| Cash and cash equivalents at end of year | $ 13.2 | $ 81.3 | $ 73.9 |
| Supplementary information: | | | |
| Debt assumed in acquisition | $ — | $ 6.7 | $ — |
| Taxes paid | $ 18.4 | $ 12.8 | $ 15.5 |
| Interest paid | $ 135.4 | $ 139.9 | $ 76.3 |

The Notes to Consolidated Financial Statements are an integral
part of these consolidated financial statements.

F-5

COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES

CONSOLIDATED STATEMENTS OF COMMON STOCKHOLDERS' EQUITY (DEFICIT)

(in millions)

| | Total | Accumulated Deficit | Accumulated Other Comprehensive Income (loss)(a) | Common Stock | Other Paid-in Capital | Treasury Stock |
|---|---|---|---|---|---|---|
| **Balance at January 1, 2001** | $(154.9) | $(636.6) | $ (42.9) | $0.3 | $ 585.9 | $(61.6) |
| Comprehensive income (loss): | | | | | | |
| Net loss | (46.2) | (46.2) | — | — | — | — |
| Foreign currency translation adjustments | (9.0) | — | (9.0) | — | — | — |
| Pension equity adjustment, net of tax(b) | (15.4) | — | (15.4) | — | — | — |
| Total comprehensive loss | (70.6) | | | | | |
| Compensation expense | 1.2 | — | — | — | 1.2 | — |
| Issuance of common stock | 533.0 | — | — | 0.4 | 532.6 | — |
| Reissue of treasury stock (8.5 shares) | 61.3 | — | — | — | (0.3) | 61.6 |
| Exercise of stock options (1.1 shares) | 4.7 | — | — | — | 4.7 | — |
| **Balance at December 31, 2001** | 374.7 | (682.8) | (67.3) | 0.7 | 1,124.1 | — |
| Comprehensive income (loss): | | | | | | |
| Net loss | (53.5) | (53.5) | — | — | — | — |
| Foreign currency translation adjustments | 10.7 | — | 10.7 | — | — | — |
| Pension equity adjustment, net of tax(b) | (56.4) | — | (56.4) | — | — | — |
| Total comprehensive loss | (99.2) | | | | | |
| Loss on redemption of subsidiary preferred stock | (36.3) | (36.3) | — | — | — | — |
| Issuance of common stock | 157.2 | — | — | 0.1 | 157.1 | — |
| Exercise of stock options (0.1 shares) | 1.1 | — | — | — | 1.1 | — |
| **Balance at December 31, 2002** | 397.5 | (772.6) | (113.0) | 0.8 | 1,282.3 | — |
| Comprehensive income (loss): | | | | | | |
| Net loss | (57.5) | (57.5) | — | — | — | — |
| Foreign currency translation adjustment | 110.9 | — | 110.9 | — | — | — |
| Pension equity adjustment, net of tax(b) | (10.6) | — | (10.6) | — | — | — |
| Total comprehensive income | 42.8 | | | | | |
| **Balance at December 31, 2003** | $ 440.3 | $(830.1) | $ (12.7) | $0.8 | $1,282.3 | $ — |

(a) The components of Accumulated Other Comprehensive Income (Loss) are $70.0 million of foreign currency translation adjustment and $(82.7) million of pension equity adjustment as of December 31, 2003.

(b) For 2003, 2002 and 2001, the tax effect of the pension equity adjustment is $6.0 million, $42.6 million and $3.2 million, respectively.

The Notes to Consolidated Financial Statements are an integral part
of these consolidated financial statements.

COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

## 1. Organization

Collins & Aikman Corporation (the "Company") is a Delaware corporation, headquartered in Troy, Michigan. The Company conducts all of its operating activities through its wholly owned Collins & Aikman Products Co. ("Products") subsidiary. The Company is a global leader in design, engineering and manufacturing of automotive interior components, including instrument panels, fully assembled cockpit modules, floor and acoustic systems, automotive fabric, interior trim and convertible top systems. The Company changed the composition of its reportable segments on January 1, 2003 and further redefined the segments July 1, 2003 to reflect organizational changes and restated prior period segment data to be comparable. The Company operates through three segments: U.S. and Mexico Plastics, International Plastics and Global Soft Trim.

During February 2001, Heartland Industrial Partners, L.P. and its affiliates ("Heartland") acquired a controlling interest equal to approximately 60% of the Company through a purchase of 10 million shares of common stock from the Company and a purchase of 10.8 million shares from Blackstone Partners and WP Partners. As a result of the sale of shares, the Company received gross proceeds of $125.0 million, or approximately $94.6 million after fees and expenses associated with the transactions. The Company also received a profit participation right that it shares with Blackstone Partners and WP Partners on future common stock sales by Heartland to non-permitted transferees subject to a limit, in the case of the Company, of approximately $6.25 million. As a result of the above transactions ("Heartland Transaction"), Heartland is entitled to designate a majority of the Company's Board of Directors.

The Company completed its acquisition of Becker Group, LLC, a supplier of plastic components to the automotive industry, the automotive fabric operations of Joan Fabrics and an affiliate in July and September 2001, respectively. The acquisitions included the issuance of approximately 12 million shares of common stock with a market value of $169.3 million.

In December 2001, the Company completed its acquisition of Textron Automotive Company's ("Textron's") automotive trim division ("TAC-Trim") for $940 million. The purchase price consisted primarily of: $632.2 million in cash and assumed debt; 7.2 million shares of common stock, with a market value of $160.9 million; and preferred stock of Products with an aggregate liquidation preference of $326.4 million, valued at $146.9 million. The cash purchase price was financed through a combination of the sale of an additional 12.8 million shares of common stock, valued at $160.0 million, to Heartland and debt financing.

On December 31, 2003, Heartland owned approximately 37% of the outstanding shares; Blackstone Partners' and WP Partners' owned approximately 11%; Joan Fabrics Corp., Mr. Elkin McCallum and associates owned approximately 6%; Mr. Charles E. Becker owned approximately 9% and Textron, Inc. owned approximately 6% (which it has subsequently sold).

## 2. Summary of Significant Accounting Policies

Basis of Presentation:  The consolidated financial statements include the accounts of the Company and its consolidated subsidiaries and in the opinion of management, contain all adjustments, including adjustments of a normal and recurring nature, necessary for a fair presentation of financial position and results of operations. All significant intercompany items have been eliminated in the preparation of the consolidated financial statements. Certain prior year items have been reclassified to conform to the fiscal 2003 presentation.

Investments in entities in which the Company has control are consolidated. Investments in 50% or less owned entities in which the Company has significant influence have been accounted for under the equity method. In connection with the 2001 TAC-Trim acquisition, the Company acquired a 50% interest in Textron Automotive Holdings (Italy) S.r.L., an Italian joint venture, of which Textron indirectly owned the other 50% interest. The Company accounted for this investment under the equity method for the years ended December 31, 2002 and 2001. The Company did not control the joint venture prior to December 31, 2002 but was required to provide certain administrative, technical and engineering services and to license certain

**COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

patents and other know how to the Italian joint venture. The Company recorded certain fees and reimbursement of certain expenses in providing these services and licensing these rights. In December 2002, the Company signed a letter-of-intent to purchase the remaining 50% and began consolidating the joint venture as of December 31, 2002. In January 2003, the Company acquired from Textron the remaining 50% interest in the Italian joint venture.

Reverse Stock Split: On May 28, 2002, the Company effected a one-for-2.5 reverse stock split of the Company's common stock. All shares and per share data have been adjusted retroactively for all periods presented to reflect the stock split.

Use of Estimates: The preparation of consolidated financial statements in conformity with accounting principles generally accepted in the United States of America requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the consolidated financial statements and the reported amounts of revenues and expenses during the reporting period. Management believes its assumptions and estimates are reasonable and appropriate, however actual results could differ from those estimates.

Employee Stock Options: Statement of Financial Accounting Standards ("SFAS") No. 148, "Accounting for Stock-Based Compensation — Transition and Disclosure amended SFAS No. 123, "Accounting for Stock-Based Compensation" provides alternative methods of transition for a voluntary change to the fair value based method of accounting for stock based employee compensation and amends the required disclosures. SFAS No. 123 encourages companies to adopt the fair value method for compensation expense recognition related to employee stock options. The accounting requirements of Accounting Principles Board Opinion (APB) No. 25, "Accounting for Stock Issued to Employees" use the intrinsic value method in determining compensation expense, which represents the excess of the market price of the stock over the exercise price on the measurement date. The Company has elected to continue to utilize the accounting provisions of APB No. 25 for stock options and is required to provide pro forma disclosures of net income and earnings per share had the Company adopted the fair value method for recognition purposes. The following tabular information is presented as if the Company had adopted SFAS No. 123 and restated its results: (in millions, except per share amounts).

| | Fiscal Year Ended | | |
| --- | --- | --- | --- |
| | December 31, 2003 | December 31, 2002 | December 31, 2001 |
| Net loss attributable to common shareholders: | | | |
| As reported . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $(57.5) | $(89.8) | $(46.2) |
| Total employee stock based compensation expense determined under fair value based method for all awards, net of tax . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (4.2) | (3.4) | (2.4) |
| Pro forma, net loss . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (61.7) | (93.2) | (48.6) |
| Basic and Diluted EPS: | | | |
| As reported . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $(0.69) | $(1.18) | $(1.19) |
| Pro forma . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (0.74) | (1.22) | (1.25) |

F-8

COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

For the above information, the fair value of each option grant was estimated on the date of grant using the Black-Scholes option pricing model with the following assumptions used for grants:

|  | 2003 | 2002 | 2001 |
|---|---|---|---|
| Weighted average expected volatility | 77.5% | 72.0% | 99.0% |
| Expected lives | 7 years | 6 years | 10 years |
| Weighted average risk free interest rate | 3.72% | 4.24%-7.32% | 4.24%-7.32% |
| Expected dividend rate | — | — | — |
| Weighted average grant date fair value of an option granted during the year | $   2.77 | $      6.71 | $      5.22 |

Earnings Per Share:  Basic earnings per share is based on income attributable to common shareholders divided by the weighted average number of common shares outstanding. Diluted earnings per share is based on income attributable to common shareholders divided by the sum of the weighted average number of common shares outstanding and all potentially dilutive common shares. Potentially dilutive common shares include shares which may be issued upon the assumed exercise of employee stock options less the number of treasury shares assumed to be purchased from the proceeds, including applicable compensation expense attributable to future service see Note 16 "Common Stockholders' Equity and Earnings Per Share" for additional disclosure.

Cash and Cash Equivalents:  Cash and cash equivalents include all cash balances and highly liquid investments with an original maturity of three months or less.

Accounts and Other Receivables:  Accounts and other receivables consist primarily of the Company's trade receivables and the retained interest in the Receivables Facility. See Note 11 "Receivables Facility and Non-Recourse Factoring Facilities" for additional disclosure. The Company has provided an allowance against uncollectible accounts.

Inventories:  Inventories are valued at the lower of cost or market, but not in excess of net realizable value. Cost is determined on the first-in, first-out basis.

Property, Plant and Equipment:  Property, plant and equipment are stated at cost. Normal repairs and maintenance are expensed as incurred. Provisions for depreciation are primarily computed on a straight-line basis over the estimated useful lives as follows: 15 years for land improvements, 35 years for buildings, and 3-20 years for machinery and equipment. Leasehold improvements are amortized over the lesser of the lease term or the estimated useful lives of the improvements.

Long-Lived Assets:  In August 2001, the Financial Accounting Standards Board ("FASB") issued SFAS No. 144, "Accounting for the Impairment or Disposal of Long-Lived Assets" which supersedes both SFAS No. 121, "Accounting for the Impairment of Long-Lived Assets and for Long-Lived Assets to Be Disposed Of" and the accounting and reporting provisions of APB No. 30, "Reporting the Results of Operations-Reporting the Effects of Disposal of a Segment of a Business, and Extraordinary, Unusual and Infrequently Occurring Events and Transactions", for the disposal of a segment of a business (as previously defined in that Opinion). SFAS No. 144 retains the fundamental provisions in SFAS No. 121 for recognizing and measuring impairment losses on long-lived assets held for use and long-lived assets to be disposed of by sale, while also resolving significant implementation issues associated with SFAS No. 121. For example, SFAS No. 144 provides guidance on how a long-lived asset that is used as part of a group should be evaluated for impairment, establishes criteria for when a long-lived asset is held for sale and prescribes the accounting for a long-lived asset that will be disposed of other than by sale. SFAS No. 144 retains the basic provisions of APB No. 30 on how to present discontinued operations in the income statement but broadens that presentation to include a component of an entity (rather than a segment of a business).

COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

During 2003, the Company incurred asset impairment charges of $28.4 million of which $10.4 million related to the impairment of the Becker non-compete agreement, $7.5 million related to the initial interest acquired in an Italian joint venture, $7.8 million related to restructuring programs and $2.7 million related to other intangible assets. During 2002, the Company incurred asset impairment charges of $18.0 million recognized as part of restructuring programs (Note 15). In addition, during fiscal 2001, the Company incurred a charge of $7.6 million relating to asset impairments recognized in the Reorganization (See Note 15).

*Goodwill and Intangibles:*   During the second quarter of 2002, the Company completed the implementation of SFAS 142, "Goodwill and Other Intangible Assets." Under SFAS 142, goodwill is no longer amortized. Instead, goodwill and indefinite-lived intangible assets are tested for impairment in accordance with the provisions of SFAS 142. The Company employed a discounted cash flow analysis and a market comparable approach in conducting its impairment tests. The Company completed its initial impairment test in the second quarter of 2002 and recorded an impairment loss of $11.7 million (having no tax impact), or $0.15 per average basic and diluted share relating to the UK Plastics business in the former European and Rest of World Automotive Systems segment. The impairment loss was reported as a cumulative effect of a change in accounting principle and, therefore, is accounted for as if it occurred on January 1, 2002. The Company completed its annual impairment test on November 1, 2002 indicating that the fair value of the reporting units exceeded the carrying values.

The Company's first quarter 2003 results were below the forecasts utilized in testing for the goodwill impairment for the year ended December 31, 2002. The conditions in the markets in which the Company operates continued to deteriorate and customer production schedules continued to decline, and therefore, the Company reduced its operating and financial plans for 2003. As a result, the Company initiated an impairment test (outside of the annual testing date of November 1) during the second quarter 2003. During the second quarter, the Company carefully reviewed all of its assumptions regarding revenue growth, improved operating margins and planned capital expenditures. This analysis by each reporting unit focused on new business awards, implementation of strategic business initiatives such as restructuring, material savings, plant efficiencies, revenue growth and additional product/process technology applications. While the Company is aggressively attacking its overall cost structure, the U.S. and Mexico Plastics reporting unit had even more definitive objectives initiated after the 2003 first quarter performance on a specific plant basis. As a result of these well-defined programs, the Company, utilizing an independent outside evaluator, completed the first step of the goodwill impairment test in the second quarter of 2003 which indicated that the fair value of the reporting units exceeded the carrying values, and therefore no additional impairment testing was necessary. The Company again completed the annual impairment test as of November 1, 2003 indicating fair value of the reporting units exceeded the carrying values.

Fair value for all tests was determined based upon the discounted cash flows of the reporting units using discount rates ranging from 11.5% to 14.0% dependent on the reporting unit and a residual growth rate of 2%. The market comparable approach consisted of earnings multiples ranging from 5.2 to 6.5 times current year and forecasted Earnings Before Interest, Taxes, Depreciation and Amortization ("EBITDA") (operating income less depreciation and amortization) and a control premium on equity. Future cash flows and EBITDA are affected by future operating performance, which will be impacted by economic conditions, car builds, financial, business and other factors, many of which are beyond the Company's control. The U.S. and Mexico Plastics reporting unit can be significantly impacted by an adverse change in assumptions. Considerable judgment is often involved in making these determinations, the use of different assumptions could result in significantly different results. An approximate 50 basis point change in discount rates or an approximate 4% reduction in profit would result in a further goodwill impairment analysis as required by SFAS 142. Management believes its assumptions and estimates are reasonable and appropriate, however actual results could differ from those estimates.

COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

Pension and Postretirement Benefits Other than Pensions:  Annual net periodic expense and benefit liabilities under our defined benefit plans are determined on an actuarial basis. Assumptions used in the actuarial calculations have a significant impact on plan obligations and expense. Each September, the Company reviews the actual experience compared to the more significant assumptions used and makes adjustments to the assumptions, if warranted. The healthcare trend rates are reviewed with the actuaries based upon the results of their review of claims experience. Discount rates are based upon an expected benefit payments duration analysis and the equivalent average yield rate for high-quality fixed-income investments. Pension benefits are funded through deposits with trustees and the expected long-term rate of return on fund assets is based upon actual historical returns modified for known changes in the market and any expected change in investment policy. Postretirement benefits are not funded and our policy is to pay these benefits as they become due.

Certain accounting guidance, including the guidance applicable to pensions, does not require immediate recognition of the effects of a deviation between actual and assumed experience or the revision of an estimate. This approach allows the favorable and unfavorable effects that fall within an acceptable range to be netted. Although this netting occurs outside the basic financial statements, disclosure of the net amount is disclosed as an unrecognized gain or loss in the footnotes to our financial statements. Considerable judgment is often involved in making these determinations, the use of different assumptions could result in significantly different results. Management believes its assumptions and estimates are reasonable and appropriate, however actual results could differ from those estimates.

Revenue Recognition:  The Company recognizes revenue from product sales when it has shipped the goods. Products are shipped FOB shipping point using customer designated transportation companies with title passing at that time. Significant retroactive price adjustments are recognized in the period when such amounts become probable. Sales are recognized based upon the gross amount billed to a customer for those products in which the Company's customer has directed the sourcing of certain materials or components used in the manufacture of the final product. The Company generally allows its customers the right of return only in the case of defective products. The Company provides a reserve for estimated defective product costs at the time of the sale of the products.

Cost of Goods Sold and Selling, General and Administrative Costs:  Cost of goods sold is comprised of direct material, direct labor and manufacturing overhead. Manufacturing overhead consists of indirect labor, depreciation, amortization and other manufacturing expenses. Selling, general and administrative costs consist of selling, research and development, engineering and administrative expenses.

Other Expense (Income), net:  In 2003, other expense (income), net primarily included $32.4 million of foreign currency transaction gains offset by $3.5 million of losses related to derivatives used in the Company's hedging strategies and minority interest share of losses in a consolidated subsidiary of $5.6 million. In 2002, other expense (income), net primarily included $12.6 million of losses related to derivatives used in the Company's foreign currency hedging strategy offset by $5.9 million of foreign currency transaction gains, $5.5 million of losses related to investments in joint ventures and $1.9 million of losses from sale and leaseback transactions and minority interest share of losses of a consolidated subsidiary of $6.5 million. In 2001, other expense (income), net primarily included a $8.0 million loss on early extinguishment of debt and $7.8 million of foreign currency transaction losses offset by $5.0 million of derivatives gains and a $6.2 million gain related to a stock demutualization. The Company adopted SFAS 145 during 2003 and reclassified $8.0 million loss on the early extinguishment of debt recorded for the year ended December 31, 2001 to other expense (income), net from an extraordinary item in the amount of $5.3 million (net of income taxes of $2.7 million).

Customer Engineering and Tooling:  Engineering and tooling balances represent tools, dies and other items used in the manufacturing of customer components. Amounts included in the consolidated balance sheets include Company-owned tools and costs incurred on customer-owned tools which are subject to reimbursement, pursuant to the terms of a customer contract. Company-owned tools are amortized over the

COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

tool's expected life or the life of the related vehicle program, whichever is shorter. Engineering, testing and other costs incurred in the design and development of production parts are expensed as incurred, unless the costs are reimbursable, as specified in a customer contract.

Emerging Issue Task Force ("EITF") Issue No. 99-5, "Accounting for Pre-Production Costs Related to Long-Term Supply Arrangements" requires that design and development costs for products to be sold under long-term supply arrangements be expensed as incurred and costs incurred for molds, dies and other tools that will be used in producing the products under long-term supply arrangements be capitalized and amortized over the shorter of the expected useful life of the assets or the term of the supply arrangement.

The Company had assets of approximately $6.8 million and $8.4 million recognized pursuant to agreements that provide for contractual reimbursement of pre-production design and development costs, at December 31, 2003 and 2002, respectively. The Company also has assets of $124.9 million and $77.1 million representing the costs for molds, dies and other tools, at December 31, 2003 and 2002, respectively, that are reimbursable by customers. In addition, the Company had $10.0 million and $11.0 million at December 31, 2003 and 2002, respectively, for molds, dies and other tools that the Company owns.

Derivative Financial Instruments:  All derivatives are recognized on the consolidated balance sheet at fair value as required by SFAS No. 133 "Accounting for Derivative Instruments and Hedging Activities." Gains and losses on the changes in fair value of the derivatives that qualify as hedges under SFAS No. 133 are recorded on the balance sheet as a component of "Accumulated other comprehensive loss" to the extent that the hedges are effective and documented, until the underlying transactions are recognized in earnings. As of December 31, 2003 and 2002, the Company had no derivatives designated as hedges under SFAS No. 133. The Company uses derivatives to hedge economic risks even though these derivatives may not be designated as hedges in accordance with SFAS No. 133. These derivative instruments are marked to fair market value and reported on the balance sheet. Gains and losses on these instruments are reported in "Other expense (income), net" on the Consolidated Statements of Operations. The gains and losses are intended to offset economic risk of foreign currency transaction losses or gains. The Company does not enter into derivative transactions for speculative purposes.

Foreign Currency Translation:  Assets and liabilities of the Company's non-U.S. businesses are translated to U.S. Dollars at end-of-period exchange rates. The effects of the translations are reported as a component of "Accumulated other comprehensive loss." Remeasurement of assets and liabilities of the Company's non-U.S. businesses that use the U.S. Dollar as functional currency are included in the Consolidated Statements of Operations as "Other expense (income), net." The Statement of Operations of the Company's non-U.S. businesses are translated to U.S. dollars at average exchange rates and are recognized as part of revenues, costs and expenses. Also included in "Other expense (income), net", are gains and losses arising from transactions denominated in a currency other than the functional currency of the business involved.

Environmental:  The Company records an estimated loss when it is probable that an environmental liability has been incurred and the amount of the loss can be reasonably estimated. The Company reviews all environmental claims from time to time and adjusts the reserves accordingly. Accruals for environmental liabilities are generally included in the consolidated balance sheet as other non-current liabilities at undiscounted amounts and exclude claims for recoveries from insurance or other third parties. Accruals for insurance or other third party recoveries for environmental liabilities are recorded when it is probable that the claim will be realized.

New Accounting Pronouncements:  In January 2003, the FASB issued FASB Interpretation No. ("FIN") 46, "Consolidation of Variable Interest Entities ("VIE"), an interpretation of Accounting Research Bulletin No. 51, Consolidated Financial Statements." This interpretation provides guidance on the identification of VIEs, some of which may require consolidation based on factors beyond a majority voting interest. A

**COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

VIE is defined in FIN 46 as an entity in which either the equity investors (if any) do not have a controlling financial interest or the equity investment at risk is insufficient to finance that entity's activities without receiving additional subordinated financial support from other parties. FIN 46 applies immediately to VIEs created after January 31, 2003, and in the first fiscal year or interim period beginning after December 15, 2003, to VIEs in which an enterprise holds a variable interest that it acquired before February 1, 2003. In 2003, the Company and Textron agreed to have an entity that the Company held a variable interest in restructured so it was required to be consolidated by Textron and not accounted for as a VIE. The entity was part of the Textron Leasing Transaction with the maximum potential loss related to certain equipment leases that is limited to the amount of the residual value guarantee as discussed in Note 11 "Receivables Facility and Non-Recourse Factoring Facilities." There have been no VIEs created after January 31, 2003. For the period prior to January 31, 2003, the Company has not identified any other entities that would currently qualify as a VIE.

In April 2003, the FASB issued SFAS No. 149, "Amendment of Statement 133 on Derivative Instruments and Hedging Activities." This statement amends SFAS No. 133, "Accounting for Derivative Instruments and Hedging Activities," and clarifies the accounting for derivative instruments and hedging activities. This statement is effective for contracts entered into or modified after June 30, 2003 (with exceptions) and for hedging relationships designated after June 30, 2003. SFAS No. 149 did not have a material effect on the Company's earnings or financial position.

In December 2003, the FASB issued SFAS No. 132 (Revised 2003) "Employers' Disclosures about Pensions and Other Postretirement Benefits an amendment of FASB Statements No. 87, 88, and 106." This Statement revises employers' disclosures about pension plans and other postretirement benefit plans. It does not change the measurement or recognition of those plans required by other FASB Statements. This Statement retains the disclosure requirements contained in the original SFAS No. 132, "Employers' Disclosures about Pensions and Other Postretirement Benefits," which it replaced and requires additional disclosures about the assets, obligations, cash flows and net periodic benefit cost of defined benefit pension plans and other defined benefit postretirement plans. This Statement is effective for financial statements with fiscal years ending after December 15, 2003, except for certain provisions related to foreign plans which are effective for fiscal years ending after June 15, 2004. The Company adopted the revised disclosure requirement of this Statement for all of its U.S. plans and will adopt the requirements for its foreign plans as required in 2004.

The following table highlights the sensitivity of our pension obligations and expense to changes in assumptions (in millions):

| Change in Assumption | Impact on Pension Expense | Impact on PBO |
|---|---|---|
| 25 basis point ("bp") decrease in discount rate .................... | 1.5 | 15.6 |
| 25 bp increase in discount rate ................................... | (1.5) | (15.1) |
| 25 bp decrease in long-term return on assets ..................... | 0.8 | — |
| 25 bp increase in long-term return on assets ..................... | (0.8) | — |

Changes in Accounting Principles:   In April 2002, the FASB issued SFAS No. 145, "Rescission of FASB Statements No. 4, 44, and 64, Amendment of FASB Statement No. 13, and Technical Corrections." With the rescission of SFAS No. 4 and 64, only gains and losses from extinguishments of debt that meet the criteria of APB Opinion No. 30 would be classified as extraordinary items. This statement amends SFAS No. 13, "Accounting for Leases," to eliminate the inconsistency between the required accounting for sale-leaseback transactions and the required accounting for certain lease modifications that have economic effects that are similar to sale-leaseback transactions. SFAS No. 145 also amends other existing authoritative pronouncements to make various technical corrections, clarify meanings or describe their applicability under changed conditions. SFAS No. 145 is effective for fiscal years beginning after May 15, 2002. The Company

COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

adopted SFAS 145 and reclassified $8.0 million loss on the early extinguishment of debt recorded for the year ended December 31, 2001 to other expense (income), net from an extraordinary item in the amount of $5.3 million (net of income taxes of $2.7 million).

In June 2002, the FASB issued SFAS No. 146 "Accounting for Costs Associated with Exit or Disposal Activities." This statement nullifies EITF No. 94-3, "Liability Recognition for Certain Employee Termination Benefits and Other Costs to Exit an Activity (including Certain Costs Incurred in a Restructuring)." This statement is effective for all exit or disposal activities initiated after December 31, 2002. This statement requires that a liability for a cost associated with an exit or disposal activity be recognized when the liability is incurred rather than the date of an entity's commitment to an exit plan. The Company implemented SFAS No. 146 on January 1, 2003.

In the third quarter, the Company adopted the FASB Staff Position No. FAS 146-1 "Determining Whether a One-Time Termination Benefit Offered in Connection with an Exit or Disposal Activity Is, in Substance, an Enhancement to an Ongoing Benefit Arrangement." The effect from adopting FAS 146-1 was to defer recording $1.2 million of restructure expense to later periods. The effect on prior quarters and at December 31, 2003 for the portion of the restructuring activities deferred was not significant.

In May 2003, the FASB issued SFAS No. 150, "Accounting for Certain Financial Instruments with Characteristics of both Liabilities and Equity." SFAS No. 150 establishes standards to require issuers to classify certain financial instruments with characteristics of both liabilities and equity. This Statement is effective for financial instruments entered into or modified after May 31, 2003, and otherwise is effective at the beginning of the first interim period beginning after June 15, 2003. The Company has adopted this Statement by reclassifying the mandatorily redeemable preferred stock of subsidiary as a liability and reclassifying preferred stock dividends and accretion as interest expense effective with the quarter ending September 30, 2003.

During the second quarter 2003, the Company implemented a change in the method of accounting for holiday pay for interim periods so that such pay is accrued, and expense is recognized during the period in which the actual holiday occurs. The change in method better matches holiday expense with the period that the actual holiday occurs and the pay is earned. Previously, certain of the Company's businesses accrued holiday pay and recognized expense based upon an equal monthly amount within the fiscal year. As the prior method allocated costs within the fiscal year, there was no effect on prior years. There was no effect on the entire fiscal year as the change only affected interim periods. See Note 22 "Quarterly Financial Data" for additional information.

Additionally, during the second quarter of 2003, the Company implemented a change in the method of accounting for crib supply inventories held at plants. Crib supply inventories include small motors, replacement parts for production equipment and other miscellaneous repair parts for buildings, equipment and machinery. In the second quarter the Company implemented a perpetual crib supply inventory system and harmonized its policy to consistently account for the capitalization of crib supply inventories. The new accounting method better matches the expenditure with the period benefited, as such inventories are charged to expense when placed into service. Previously, the Company had different capitalization thresholds following the various acquisitions in late 2001 and 2002, which ranged from not capitalizing any crib supply items to capitalizing only items greater than two thousand dollars. Pro forma and the cumulative effect amounts relating to the change in accounting for crib inventories is not determinable as perpetual records of crib inventory were not maintained at all the plants prior to the application of the new method in the second quarter of 2003. For the plants that previously had no perpetual records, the effect of the change was $1.8 million after tax or $0.02 per share recorded to increase inventory and reduce cost of sales in the three months ended June 30, 2003. For the year ended December 31, 2003, the incremental effect of the adoption had an insignificant effect.

COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

### 3. Acquisitions and Goodwill

#### a. *Acquisitions*

On January 2, 2003, the Company acquired Delphi Corporation's plastic injection molding plant and related equipment in Logroño, Spain for $18 million. The 300,000 square foot Logroño facility includes 24 injection molding machines and one Class-A paint line.

On January 17, 2003, the Company acquired the remaining 50% interest in an Italian automotive joint venture from Textron Inc., a related party, for $15 million, which also terminated a $28 million put-option by Textron Inc., that was exercisable in December 2004. The Company incurred fixed asset impairments of $7.5 million relating to the 50% interest owned previously.

The Company completed its acquisitions of Textron Automotive Company's automotive trim division ("TAC-Trim") in December 2001, the automotive fabric operations of Joan Fabrics and all of the operating assets in Joan Fabric's affiliated yarn dying operation Western Avenue Dyers (collectively "Joan") in September 2001 and Becker Group, LLC ("Becker") a supplier of plastic components to the automotive industry in July 2001. The results of operations of the acquired companies are included in the Company's Consolidated Statements of Operations from the dates of acquisition.

Appraisals for Becker and Joan were performed during 2001, and the related allocation of purchase price was completed. In the second quarter 2002, the Company's external consultants completed the valuations of all TAC-Trim acquired intangible and fixed assets. Based upon these valuations: 1) an intangible asset of $51.0 million for customer contracts was recorded based on the value of individual customer contracts — this intangible asset is being amortized over the contract's performance period, which extends through 2012; 2) the Company revised its first quarter estimate for patents and other specifically identifiable intangible assets acquired as part of the TAC-Trim purchase from $40.0 to $24.0 million (the weighted average lives increased from 7 to 10 years); and 3) in June 2002, the valuations resulted in a $30.1 million increase in fixed assets and adjustment of their useful lives. In September 2002, the Company revised its valuation resulting in a $27.7 million increase in fixed assets and adjustment of their useful lives, based upon revised information from external consultants. The allocation of the purchase price for the TAC-Trim acquisition was completed in 2002. The Becker, Joan and TAC-Trim acquisitions are intended to solidify the Company's position as a premier supplier of interior components and automotive fabrics.

#### b. *Goodwill*

*Goodwill and Intangibles:*  During the second quarter of 2002, the Company completed the implementation of SFAS 142, "Goodwill and Other Intangible Assets." Under SFAS 142, goodwill is no longer amortized. Instead, goodwill and indefinite-lived intangible assets are tested for impairment in accordance with the provisions of SFAS 142. The Company employed a discounted cash flow analysis and a market comparable approach in conducting its impairment tests. The Company completed its initial impairment test in the second quarter of 2002 and recorded an impairment loss of $11.7 million (having no tax impact), or $0.15 per average basic and diluted share relating to the UK Plastics business in the former European and Rest of World Automotive Systems segment. The impairment loss was reported as a cumulative effect of a change in accounting principle and, therefore, is accounted for as if it occurred on January 1, 2002. The Company completed its annual impairment test on November 1, 2002 indicating that the fair value of the reporting units exceeded the carrying values.

The Company's first quarter 2003 results were below the forecasts utilized in testing for the goodwill impairment for the year ended December 31, 2002. The conditions in the markets in which the Company operates continued to deteriorate and customer production schedules continued to decline, and therefore, the Company reduced its operating and financial plans for 2003. As a result, the Company initiated an impairment test (outside of the annual testing date of November 1) during the second quarter 2003. During the second

COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

quarter, the Company carefully reviewed all of its assumptions regarding revenue growth, improved operating margins and planned capital expenditures. This analysis by each reporting unit focused on new business awards, implementation of strategic business initiatives such as restructuring, material savings, plant efficiencies, revenue growth and additional product/process technology applications. While the Company is aggressively attacking its overall cost structure, the U.S. and Mexico Plastics reporting unit had even more definitive objectives initiated after the 2003 first quarter performance on a specific plant basis. As a result of these well-defined programs, the Company, utilizing an independent outside evaluator, completed the first step of the goodwill impairment test in the second quarter of 2003 which indicated that the fair value of the reporting units exceeded the carrying values, and therefore no additional impairment testing was necessary. The Company again completed the annual impairment test as of November 1, 2003 indicating fair value of the reporting units exceeded the carrying values.

Fair value for all tests was determined based upon the discounted cash flows of the reporting units using discount rates ranging from 11.5% to 14.0% dependent on the reporting unit and a residual growth rate of 2%. The market comparable approach consisted of earnings multiples ranging from 5.2 to 6.5 times current year and forecasted Earnings Before Interest, Taxes, Depreciation and Amortization ("EBITDA") (operating income less depreciation and amortization) and a control premium on equity. Future cash flows and EBITDA are affected by future operating performance, which will be impacted by economic conditions, car builds, financial, business and other factors, many of which are beyond the Company's control. The U.S. and Mexico Plastics reporting unit can be significantly impacted by an adverse change in assumptions. Considerable judgment is often involved in making these determinations, the use of different assumptions could result in significantly different results. An approximate 50 basis point change in discount rates or an approximate 4% reduction in profit would result in a further goodwill impairment analysis as required by SFAS 142. Management believes its assumptions and estimates are reasonable and appropriate, however actual results could differ from those estimates.

The changes in the carrying amounts of goodwill for the year ended December 31, 2003 were primarily a result of the additional acquisition of the remaining 50% interest of an Italian joint venture and the effect of foreign currency translation.

In accordance with the provisions of SFAS No. 142, the Company did not amortize goodwill during 2002. If goodwill amortization had not been recorded during 2001, the net loss would have decreased $6.1 million to an adjusted net loss of $40.1 million. The related loss per share for fiscal 2001 would have decreased $0.14 per share resulting in adjusted loss per share of $1.05.

### c. Intangible Assets

The components of the Company's acquired and other amortizable intangible assets as of December 31, 2003 and 2002 were as follows (in millions):

| | December 31, 2003 | | | December 31, 2002 | | |
|---|---|---|---|---|---|---|
| | Cost | Accumulated Amortization | Net Carrying Amount | Cost | Accumulated Amortization | Net Carrying Amount |
| Customer contracts ... | $51.0 | $13.1 | $37.9 | $ 51.0 | $ 6.3 | $44.7 |
| Patents and other ..... | 39.2 | 10.2 | 29.0 | 31.5 | 3.5 | 28.0 |
| Non-compete agreement ......... | — | — | — | 18.0 | 5.4 | 12.6 |
| | $90.2 | $23.3 | $66.9 | $100.5 | $15.2 | $85.3 |

Amortization expense for intangible assets for the periods ending December 31, 2004, 2005, 2006, 2007, 2008 and thereafter will be $12.5 million, $12.6 million, $12.1 million, $9.7 million, $6.7 million and $13.3 million, respectively. See Related Party Transactions (Note 19).

COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

4. **Inventories**

Inventory balances are summarized below (in millions):

|  | December 31, 2003 | December 31, 2002 |
|---|---|---|
| Raw materials | $ 95.0 | $ 90.3 |
| Work in process | 24.6 | 33.7 |
| Finished goods | 49.8 | 47.6 |
|  | $169.4 | $171.6 |

5. **Other Current Assets**

Other current asset balances are summarized below (in millions):

|  | December 31, 2003 | December 31, 2002 |
|---|---|---|
| Deferred tax asset | $ 25.2 | $ 25.3 |
| Reimbursable tooling and pre-production design and development | 126.5 | 83.0 |
| Other | 64.3 | 69.1 |
|  | $216.0 | $177.4 |

6. **Property, Plant and Equipment, Net**

Property, plant and equipment, net, are summarized below (in millions):

|  | December 31, 2003 | December 31, 2002 |
|---|---|---|
| Land and improvements | $ 34.5 | $ 26.1 |
| Buildings | 213.9 | 177.8 |
| Machinery and equipment | 1,076.9 | 959.6 |
| Leasehold improvements | 36.0 | 27.4 |
| Construction in progress | 119.2 | 106.2 |
|  | 1,480.5 | 1,297.1 |
| Less accumulated depreciation | (654.6) | (559.3) |
|  | $ 825.9 | $ 737.8 |

7. **Accrued Expenses**

Accrued expenses are summarized below (in millions):

|  | December 31, 2003 | December 31, 2002 |
|---|---|---|
| Payroll and employee benefits | $ 82.7 | $ 61.7 |
| Interest | 13.6 | 12.3 |
| Insurance | 23.6 | 16.5 |
| Restructuring reserves | 30.9 | 28.2 |
| Taxes payable | 0.4 | 12.0 |
| Other | 87.7 | 169.2 |
|  | $238.9 | $299.9 |

F-17

COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

## 8. Short-Term Borrowings

The Company utilizes uncommitted lines of credit to satisfy a portion of its short-term working capital requirements of certain of its foreign affiliates. As of December 31, 2003, the Company had lines of credit from international credit facilities of $37.1 million, of which $16.0 million was outstanding with $21.1 million available. As of December 31, 2002, the Company had unsecured lines of credit from financial institutions of $36.5 million, of which $10.5 million was outstanding with $26.0 million available. The weighted average interest rate on the outstanding borrowings at December 31, 2003 and 2002 was approximately 16.0% and 8.3%, respectively.

## 9. Long-Term Debt and Capital Lease Obligations

Long-term debt and capital lease obligations are summarized below (in millions):

| | December 31, 2003 | December 31, 2002 |
|---|---|---|
| Senior Secured Credit Facilities: | | |
| Tranche A Term Loan Facility | $    62.9 | $    83.8 |
| Tranche B Term Loan Facility | 287.2 | 293.8 |
| Revolving Credit Facility | 6.3 | — |
| Public Debt: | | |
| 11½% Senior Subordinated Notes, due 2006. | 400.0 | 400.0 |
| 10¾% Senior Notes, due 2011 | 500.0 | 500.0 |
| Other (including capital lease obligations) | 12.8 | 1.1 |
| Total debt | 1,269.2 | 1,278.7 |
| Less current maturities (including current portion of capital lease obligations) | (31.5) | (23.5) |
| Total Long-term debt and capital lease obligations | $1,237.7 | $1,255.2 |

### Senior Secured Credit Facilities

In December 2001, in conjunction with the TAC-Trim acquisition, the Company entered into new Senior Secured Credit Facilities, which refinanced its prior bank credit facilities. The principal and interest on the prior bank credit facilities totaled $362.5 million. The cost and expenses associated with the refinancing of the prior bank credit facilities totaling $25.7 million were deferred and will be amortized over the four-year life of the term loans described below. The Company adopted SFAS 145 during 2003 and reclassified $8.0 million loss on the early extinguishment of debt to other expense (income), net from an extraordinary item in the amount of $5.3 million (net of income taxes of $2.7 million) in connection with the retirement of the prior bank credit facilities.

The Senior Secured Credit Facilities include a floating rate Revolving Facility and two floating rate Term Loan Facilities that mature on December 31, 2005. The Revolving Facility allows the Company to borrow revolving loans up to $175.0 million including Canadian dollars up to $75.0 million. The facility can be utilized for letters of credit. The Term Loan Facilities consist of a Tranche A Term Loan with an original principal balance of $100.0 million and a Tranche B Term Loan with an original principal balance of $300.0 million. As required by the credit agreement, the full amounts of the Term Loan Facilities were drawn down on the closing date. As of December 31, 2003 the Tranche A Term Loan and Tranche B Term Loan had principal balances of $62.9 million and $287.2 million, respectively. Amounts borrowed under the Term Loan Facilities that are repaid or prepaid cannot be reborrowed. The Tranche A Term Loan Facility is payable in quarterly

COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

installments that increase in amounts each year until maturity. The Tranche B Term Loan Facility is payable in quarterly installments of $0.8 million for the first three years and quarterly installments of $72.7 million during the final year. These maturities were modified as part of the fifth amendment completed in February 2004. See the proforma maturity table below.

Under the Senior Secured Credit Facilities, the interest rate on the Revolving Facility is, at the Company's option, London Inter-Bank Offer Rate ("LIBOR") plus 4.00% or the Alternate Base Rate ("ABR") plus 3.00%. The ABR is the highest of The JP Morgan Chase ("Chase's") announced prime rate, the Federal Funds Rate plus 0.5% and Chase's base certificate of deposit rate plus 1%. A per annum fee equal to the spread over the LIBOR accrues on the face amount of letters of credit. Also, there is a 1.00% commitment fee on the unused portion of the facility. The interest rates on the Canadian-dollar denominated debt is at the Company's option (the "Canadian Prime Rate") plus 3.00% or the bill of exchange rate ("Bankers' Acceptance" or "BA") denominated in Canadian dollars for one, two, three or six months plus 4.00%. The interest rate on the Tranche A Term Loan Facility is, at the Company's option, LIBOR plus 4.00% or the ABR plus 3.00%, subject to adjustment quarterly, based on performance targets. The interest rate on the Tranche B Term Loan Facility is, at the Company's option, either LIBOR plus 4.75% or ABR plus 3.75%. On any Tranche B Term Loans repaid whether voluntary or mandatory, there is a prepayment premium of 1.00%. The LIBOR rate shall not be less than 3.00% per annum. The weighted average rate of interest on the Senior Secured Credit Facilities at December 31, 2003 and 2002 was 7.60% and 6.94%, respectively.

Borrowings under the Senior Secured Credit Facility are collateralized by a first priority lien on the assets of the Company, Products and its U.S. and Canadian subsidiaries with certain exceptions including assets included in the Company's receivables facility, certain scheduled assets, and certain assets whose value relative to cost of lien perfection was deemed too low to include, as well as a pledge of stock of Products and its significant subsidiaries and certain intercompany debt and guarantees from the Company and its U.S. subsidiaries (subject to certain exceptions).

The Senior Secured Credit Facilities contain restrictive covenants including maintenance of interest coverage and leverage ratios and various other restrictive covenants that are customary for such facilities. The target levels established by these covenants limit the Company's ability to utilize availability under its liquidity facilities, including the Senior Secured Credit Facilities and are based on the Company's financial performance. At December 31, 2003, there were no funding limitations. The covenants of the Senior Secured Credit Facilities also limit investments, dividends or other distributions of capital stock, capital expenditures, the purchase of subsidiary preferred stock, the prepayment of debt other than loans under the senior facilities, liens and certain lease transactions.

In February 2004, the Company entered into the fifth amendment to the Senior Secured Credit Facilities Credit Agreement which allowed the establishment of a new $100 million Supplemental Revolving Credit Facility and the $185 million Tranche A-1 Term Loan. In connection with these new expanded facilities, $181.5 million was used to prepay existing Tranche A and Tranche B Term Loans in direct order of maturity.

In October 2003, the Company entered into amendment numbers three and four to the Senior Secured Credit Facilities Credit Agreement. The Third Amendment permitted the add-back of charges related to restructuring actions taken during the third quarter 2003 for covenant calculation purposes and increased the maximum permitted leverage ratio at September 30, 2003 to 4.50:1.00. The Fourth Amendment permitted the add-back of charges up to $11 million related to future restructuring actions for covenant calculation purposes and increased the maximum permitted leverage ratio in future quarters, including a leverage ratio of 5.00:1.00 at December 31, 2003 and decreased the minimum interest coverage ratio in future quarters, including an interest coverage ratio of 1.85:1.00 at December 31, 2003. The two financial covenants remain at the same level for the first quarter 2004 and then step-down during the year to a leverage ratio of 4.25:1.00 and an interest coverage ratio of 2.20:1.00 at December 31, 2004. In connection with the Fourth Amendment, the Company agreed to increase its applicable

COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

margin for interest rate purposes by 0.25% at times when the Company's previously reported leverage ratios exceeded 3.50:1.00 and to make adjustments to the interest coverage ratio.

Previously, in the second quarter 2003, the Company signed a second amendment to the Senior Secured Credit Facilities Credit Agreement. The principal changes were to increase the maximum permitted leverage ratio for periods following the first quarter of 2003 and to decrease the minimum permitted interest coverage ratio for periods following the first quarter of 2003. In connection with the amendment, the Company agreed that its applicable margin for interest rate purposes could be increased by up to 0.50% at times when the Company's previously reported leverage ratio exceeded 3.5:1.00. The Company paid customary fees to lenders in connection with all of the amendments.

Effective December 2002, the Company amended its Senior Credit Facilities to provide for the purchase of certain assets in Spain and Portugal as well as the remaining 50% interest in the Company's joint venture in Italy.

*Public Debt*

In December 2001, Products issued 10¾% Senior Notes due 2011 in a total principal amount of $500.0 million ("Notes"). The Notes were not registered under the Securities Act of 1933 and were offered only to qualified institutional buyers. In June 2002, the Company effected and registered an exchange offer of a new and identical issue of 10¾% Senior Notes due 2011 of Products in exchange for the outstanding Senior Notes of Products. The exchange offer raised no new proceeds for the Company and was made in accordance with contractual commitments arising from the December 2001 issuance. The cost of issuing the Notes totaling about $23.1 million was deferred and will be amortized over 10 years.

The Notes are unconditionally guaranteed on an unsecured senior basis by the parent and by each wholly owned domestic subsidiary that is a guarantor of the Bank Credit Facilities as of the issue date. This is all of the Company's wholly owned domestic subsidiaries other than its receivable and insurance subsidiaries. The debt evidenced by the Notes and Parent and Subsidiary Guarantees are unsecured senior obligations of the Company ranking senior in right of payment to all existing and future Subordinated Debt including the Existing Notes and related Guarantees and future unsecured and unsubordinated Debt. The Notes are redeemable prior to December 31, 2004 only in the event the Company receives cash proceeds from one or more equity offerings in which case the Company may at its option use all or a portion of such cash proceeds to redeem up to 35% of the principal amount of the notes. The Notes will be subject to redemption at the option of the Company, in whole or in part at any time after December 31, 2006 at a stated premium redemption price expressed as a percentage in excess of the principal amount. After December 31, 2008, the redemption price is 100%. Within 30 days of the occurrence of a change of ownership control, unless the Company has mailed a redemption notice with respect to all outstanding Notes, the Company will be required to make an offer to purchase all outstanding Notes at a purchase price equal to 101% of their principal amount. The indenture governing the notes limits the Company's ability to issue more debt, pay dividends and make distributions, repurchase stock, make investments, merge or consolidate, transfer assets, enter into transactions with affiliates and issue stock of subsidiaries. These restrictive covenants are customary for such securities and are subject to a number of exceptions.

In June 1996, Products, issued at face value $400 million principal amount of 11½% Senior Subordinated Notes due 2006 which are guaranteed by the Company. The indenture governing the 11½% Senior Subordinated Notes generally prohibits the Company, Products and any Restricted Subsidiary (as defined) from making certain payments and investments unless a certain financial test is satisfied and the aggregate amount of such payments and investments since the issue date is less than a specified amount. The prohibition is subject to a number of significant exceptions, including dividends to stockholders of the Company or stock repurchases not exceeding $10 million in any fiscal year or $20 million in the aggregate, dividends to stockholders of the Company or stock repurchases in the amount of the net proceeds from the sale of the

COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

Company's Imperial Wallcoverings, Inc. subsidiary ("Wallcoverings") and dividends to the Company to permit it to pay its operating and administrative expenses. The indenture also contains other restrictive covenants (including, among others, limitations on the incurrence of debt, asset dispositions and transactions with affiliates), which are customary for such securities. These covenants are also subject to a number of significant exceptions.

The Company solicited and received consent from holders of a sufficient amount of the outstanding principal of the 11½% Senior Subordinated Notes allowing the Change of Control precipitated by the Heartland Transaction. A Second Supplemental Indenture dated February 8, 2001 amended the Senior Subordinated Notes indenture to reflect this and certain other changes, including allowance for the incurrence of debt in the form of the Term Loan D Facility. In connection with the TAC-Trim acquisition, the Company further amended the indenture governing these notes to make each subsidiary guarantor of the new 10¾% Senior Notes a guarantor of these existing notes on a senior subordinated basis.

At December 31, 2003, the scheduled annual maturities of long-term debt and capital lease obligations are as follows (in millions):

**Year Ending**

| | |
|---|---:|
| 2004 | $    31.5 |
| 2005 | 333.1 |
| 2006 | 402.9 |
| 2007 | 1.7 |
| 2008 | — |
| Later years | 500.0 |
| | $1,269.2 |

In February 2004 the Company entered into the fifth amendment to the Senior Secured Credit Facilities Credit Agreement subsequent to year-end. The proforma scheduled annual maturities of long-term debt and capital lease obligations are as follows (in millions):

**Year Ending**

| | |
|---|---:|
| 2004(a) | $     4.4 |
| 2005(a) | 360.2 |
| 2006 | 402.9 |
| 2007 | 1.7 |
| 2008 | — |
| Later years | 500.0 |
| | $1,269.2 |

(a) $181.5 million of Tranche A and B loans were refinanced by Term Loan A-1 in February of 2004. An additional $3.5 million was borrowed under Term Loan A-1 during February 2004 to pay related fees and expenses of the offering. The Company will recognize approximately $1.5 million of loss on early extinguishment of debt related to the refinancing.

**10.  Mandatorily Redeemable Preferred Stock of Subsidiary**

In December 2001, Products issued 182,700 shares of its Series A Redeemable Preferred Stock, 123,700 shares of Series B Redeemable Preferred Stock and 20,000 shares of Series C Redeemable Preferred Stock. The Preferred Stock was recorded at fair value of $146.9 million, which was less than the liquidation value of

COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

$1,000 per share or $326.4 million. The estimated fair value was based on market prices for securities with similar terms, maturities and risk characteristics, and included a liquidation discount to reflect market conditions and was agreed to by the Company and Textron as part of the TAC-Trim purchase agreement. The difference between the initial recorded value and the liquidation value is being accreted over the 11 year terms of the securities. The 2003 and 2002 results included subsidiary preferred stock requirements calculated using the effective interest method of $37.3 million and $38.4 million, respectively. The preferred stock requirement includes both accretion and dividend costs of $5.3 million and $32.0 million, respectively for 2003 compared to $7.6 million and $30.8 million, respectively for 2002. The carrying value of the Redeemable Preferred Stock includes accretion and accrued dividends.

In June 2002, $100.0 million of proceeds from the 16 million share common stock offering was used to repurchase Series A preferred stock at a price of 75% of its liquidation preference of $133.3 million. The redeemed Series A preferred stock had a carrying value of $63.7 million. The difference between the $63.7 million in carrying value and the $100.0 million cash payment was excluded from net income and recorded as a charge to equity in the Company's accumulated deficit account. This $36.3 million equity charge is included in the computation of loss per share and is included in the net loss attributable to common shareholders.

Products is required to redeem all Series A and B Preferred Stock outstanding on January 1, 2013 and Series C Preferred Stock outstanding on February 1, 2022. The redemption price is equal to 100% of the liquidation preference plus accrued and unpaid dividends plus common equity participation for the Series C Preferred Stock. The Series A and Series B Preferred Stock are redeemable at Products' option, in whole or in part, on or after January 1, 2007 at a stated percent in excess of the liquidation preference plus accrued and unpaid dividends. The Series C Preferred Stock is not optionally redeemable. However, Products' or the holders of a majority of outstanding shares of Series C Preferred Stock, may exchange the Series C Preferred Stock for Series B Preferred Stock at any time following the second anniversary of its issuance date but prior to the third anniversary of its issuance date.

Shareholders of Series A Preferred Stock are entitled to receive dividends accruing annually on the liquidation preference at a rate of 11% for dividend periods ending on or prior to July 1, 2003, and 15% thereafter. Holders of Series B and C Preferred Stock are entitled to receive dividends accruing annually on the liquidation preference at a rate of 12% for dividend periods ending on or prior to July 1, 2003, and 16% thereafter.

Products exercised its option through January 1, 2004 and accrued the full amount of all dividends in lieu of cash payment of such dividends. Thereafter, Products may at its option elect to accrue dividends of up to 7% of the liquidation value annually on Series A Preferred Stock and up to 8% of the liquidation value on Series B and C Preferred Stock. Accrued dividends will be added to the liquidation preference of the applicable series of Preferred Stock.

Upon voluntary or involuntary liquidation, dissolution or winding-up of Products, holders of the Preferred Stock are entitled to be paid out of the assets of Products available for distribution to stockholders in the amount of $1,000 per share plus the total accrued dividends prior to any distribution to holders of equity securities which rank junior to the Preferred Stock. In addition, the holders of Series C Preferred Stock are entitled to a participation in distributions to Products common equity tied to appreciation in the value of Products common equity subsequent to the issuance date, not to exceed $2.0 million for all Series C Preferred Stock outstanding.

If Products experiences a change of ownership control, the holders of the Preferred Stock must be given the opportunity to sell to Products their Preferred Stock at 100% of the liquidation preference plus accrued and unpaid dividends, plus, in the case of Series C Preferred Stock, common equity participation. In the event that Products does not meet or exceed certain financial criteria based on interest coverage, the dividend rate

COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

applicable solely to Series A Preferred Stock will increase by 1.00% for the next full dividend period and by an additional 0.50% for each dividend period thereafter provided that the dividend rate does not exceed 20%. The provision of the certificate of designation limits Products' ability to issue more debt, pay dividends and make distributions, repurchase stock, make investments, merge or consolidate, transfer assets, enter into transactions with affiliates and issue stock of subsidiaries. These covenants are subject to a number of important exceptions.

Effective April 2004, the Company will, exercise its option to convert all 20,000 shares of the Series C Redeemable Preferred Stock to Series B Preferred Stock on an equivalent share basis. The primary difference between the Series C and Series B Preferred Stock was that Series C holders are entitled to participation in distributions of Products common equity tied to the appreciation in the value of Products common equity subsequent to the issuance date of the securities. Each Series C Preferred Stock holder will receive one share of Series B Redeemable Preferred Stock on the equivalent share basis. The conversion will have no effect on the results of operations or financial position of the Company.

### 11. Receivables Facility and Non-Recourse Factoring Facilities

#### Receivables Facility

The Company has an agreement to sell, on an ongoing basis, the trade accounts receivable of certain business operations to a bankruptcy-remote, special purpose subsidiary ("Carcorp"), wholly owned and consolidated by the Company. The receivables subsidiary (Carcorp) will, subject to certain conditions, from time to time, sell an undivided fractional ownership interest in a pool of domestic and certain Canadian receivables, up to $250 million, to various multi-seller commercial paper conduits supported by a committed liquidity facility. Upon sale to the conduit, Carcorp will hold a subordinated retained interest in the receivables. Under the terms of the agreement, new receivables are added to the pool as collections reduce previously sold receivables. The Company expects to service, administer and collect the receivables on behalf of Carcorp and the conduit. The proceeds of sale will be less than the face amount of accounts receivable sold by an amount that approximates the purchaser's financing costs. In September 2002, the Company amended the receivables facility lengthening its term to expire in December 2004. The Company plans to renew or replace the receivables facility with other debt financings including potential borrowings under lines of credit.

As of December 31, 2003 and December 31, 2002, Carcorp, Inc.'s total receivables pool as defined under the receivables facility was $165.4 million and $253.3 million, respectively. As of December 31, 2003 the utilization of the Receivables Facility was $73.7 million and an additional $9.1 million was available, subject to limitations imposed under the Senior Secured Credit Facilities (Note 9). At December 31, 2002, utilization of the Receivables Facility was $66.0 million and an additional $93.2 million of funding was available but unutilized.

The Company estimates the fair value of its retained interest by considering two key assumptions: the payment rate, which is derived from the average life of the accounts receivable, which is less than 60 days, and the rate of expected credit losses. Based on the Company's favorable collection experience and the short-term nature of its receivables, both assumptions are highly predictable. Therefore, the Company's estimated fair value of its retained interests in the pool of eligible receivables is approximately equal to the previous cost, less the associated allowance for doubtful accounts.

The proceeds received by Carcorp from collections on receivables, after the payment of expenses and amounts due, are used to purchase new receivables. During 2003 and 2002, Carcorp had net cash collections of approximately $3.0 billion and $2.9 billion, respectively. These funds were used to purchase new receivables from the Sellers, under the Receivables Facility.

Restrictions: This receivables facility contains certain restrictions on Carcorp (including maintenance of $60.0 million net worth) and on the sellers (including limitations on liens on receivables, modifications of the terms of receivables and changes in credit and collection practices) customary for facilities of this type.

COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

The commitments under the receivables facility are subject to termination prior to their term upon the occurrence of certain events, including payment defaults, breach of covenants (including defined interest coverage and leverage ratios), bankruptcy, default by the Company in servicing the receivables and failure of the receivables to satisfy certain performance criteria.

### Non-Recourse Factoring Facilities

The Company has entered into various agreements with international lenders to sell accounts receivables of certain international operations on a non-recourse basis. As of December 31, 2003, the Company has utilized $126.6 million from these commitments. The funding levels and commitments by the lenders are based on the eligible receivables in the Company's subsidiaries in the various countries, including subsidiaries in Belgium, Brazil, Germany, Italy, Mexico, Netherlands, Spain and Sweden. As of December 31, 2003, under the agreements, approximately $132.7 million of receivables have been sold, while the Company had retained an interest in $6.2 million on these sold receivables. The retained interest remains classified on the Company's balance sheet as trade receivables. Under the agreements, the Company usually pays a factoring fee and a discount on the daily utilization of the facility. The expenses related to these agreements are recorded in the loss on sale of receivables account on the income statement.

During 2003, the loss on the sale of the receivables totaled $7.3 million. During 2002 and 2001 the losses on the sale of receivables totaled $4.2 million and $10.8 million, respectively. The 2001 loss included $5.6 million in expenses and fees to replace the prior facility. The usage fee under the facility is 1.50%. In addition, the Company is required to pay a fee of 0.50% on the unused portion of the facility and a discount. The discount on sold interests is approximately equal to the interest rate paid by the conduits to the holders of the commercial paper plus a usage fee. The discount rate at December 31, 2003 was 1.55% compared to 1.45% at December 31, 2002.

### 12. Operating Leases

The Company has operating leases for land and buildings for periods up to twenty years and transportation, operating and administrative equipment for periods ranging from one to twelve years. The majority of these leases contain renewal provisions.

The Company has equipment lease agreements and building lease agreements with several lessors which, subject to specific approval, provide availability of funding for operating leases and sale-leasebacks as allowed in its other financing agreements. The Company has a purchase option on certain equipment at the end of the lease term based on the fair market value of the equipment or to purchase some or all of the equipment at prices determined under the agreement. The Company has classified the leases as operating leases.

At December 31, 2003, future minimum lease payments under operating leases for continuing operations are as follows (in millions):

| Year Ending | |
| --- | --- |
| 2004 | $ 55.0 |
| 2005 | 55.0 |
| 2006 | 58.1 |
| 2007 | 54.1 |
| 2008 | 24.3 |
| Later Years | 111.4 |
| | $357.9 |

F-24

COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

Rental expense of continuing operations under operating leases was $63.7 million, $57.1 million and $29.2 million, for fiscal 2003, 2002 and 2001, respectively.

During 2003, the Company received net proceeds (after fees) of approximately $10.2 million from the sale and leasebacks of real property and equipment. The total minimum lease commitments under these leases will be $16.1 million, $0.5 million relates to 2003.

During 2002, the Company received net proceeds (after fees) of approximately $14.8 million from sale and leasebacks of real property and equipment. The total minimum lease commitments under these leases will be $18.8 million, $2.6 million of which relates to both 2003 and 2002.

During 2001, Products entered into sale and leaseback transactions for certain manufacturing equipment and non-manufacturing properties. The transactions resulted in the recognition of a $4.4 million net deferred loss that is being amortized over the lease term and the recognition of an $8.7 million loss.

During 2001, the Company received net proceeds (after fees) of approximately $86.2 million from sale and leasebacks of real property and equipment, which it used to reduce outstanding debt. The aggregate lease payments associated with these leases will be $88.8 million, $12.5 million of which related to 2002. As part of the 2001 sale-leaseback transactions, Products sold and contemporaneously leased back real property from unrelated third parties and received net proceeds (after fees) of $46.4 million. Refer to Note 19 for a discussion regarding certain sale and leaseback transactions that were entered into with related parties.

13. **Employee Benefit Plans**

*A. Defined Benefit Pension and Postretirement Benefit Plans*

Subsidiaries of the Company have defined benefit pension plans covering substantially all employees who meet eligibility requirements. Plan benefits are generally based on years of service and employees' compensation during their years of employment. Funding of retirement costs for these plans complies with the minimum funding requirements specified by the Employee Retirement Income Security Act.

Subsidiaries of the Company have also provided postretirement life and health coverage for certain retirees under plans currently in effect. Many of the subsidiaries' domestic and Canadian employees may be eligible for coverage if they reach retirement age while still employed by the Company. Most of these plans are contributory. In general, future increases in costs are passed on fully to the retiree. However, future increases in costs for the Canadian divisions and limited domestic operations are shared between the Company and the retiree.

COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

The following tables provide a reconciliation of the projected benefit obligation, a reconciliation of plan assets, the funded status of the plans and amounts recognized in the Company's consolidated balance sheets at December 31, 2003 and December 31, 2002 (in millions).

| | Pension Benefits(a) Fiscal Year Ended | | Postretirement Benefits Fiscal Year Ended | |
| --- | --- | --- | --- | --- |
| | December 31, 2003 | December 31, 2002 | December 31, 2003 | December 31, 2002 |
| Measurement Date | September 30 | September 30 | September 30 | September 30 |
| Change in benefit obligation: | | | | |
| Benefit obligation at beginning of year | $ 384.2 | $372.2 | $ 93.8 | $ 151.2 |
| Service cost | 14.0 | 11.3 | 1.4 | 1.7 |
| Interest cost | 25.9 | 23.9 | 5.8 | 6.9 |
| Employee contributions | 0.6 | 0.6 | 0.9 | 0.9 |
| Amendments | 3.9 | 2.3 | 10.6 | (62.6) |
| Actuarial gain (loss) | 25.2 | 16.9 | (5.9) | 15.0 |
| Purchase Accounting | — | (26.4) | — | (12.4) |
| Settlements | (0.6) | — | — | — |
| Benefits paid | (27.8) | (19.4) | (6.4) | (6.4) |
| Currency adjustment | 16.4 | 2.0 | — | — |
| Other | 2.8 | 0.8 | — | (0.5) |
| Benefit obligation at end of year | $ 444.6 | $384.2 | $ 100.2 | $ 93.8 |
| Change in plan assets: | | | | |
| Fair value of plan assets at beginning of year | $ 303.0 | $338.0 | $ — | $ — |
| Actual return (loss) on plan assets | 41.4 | (34.4) | — | — |
| Employer contributions | 8.6 | 6.6 | 5.5 | 5.5 |
| Employee contributions | 0.6 | 0.6 | 0.9 | 0.9 |
| Benefits paid | (27.8) | (19.4) | (6.4) | (6.4) |
| Purchase Accounting Adjustments/ Acquisitions | — | 11.3 | — | — |
| Settlements | (0.6) | — | — | — |
| Currency adjustment | 12.5 | 0.3 | — | — |
| Fair value of plan assets at end of year | $ 337.7 | $303.0 | $ — | $ — |
| Reconciliation of funded status to net amount recognized: | | | | |
| Funded status | $(106.9) | $(81.2) | $(100.2) | $ (93.8) |
| Unrecognized net loss (gain) | 140.1 | 131.7 | (9.5) | (5.0) |
| Unrecognized prior service cost (gain) | 9.4 | 5.0 | (45.6) | (63.4) |
| Net amount recognized | $ 42.6 | $ 55.5 | $(155.3) | $(162.2) |
| Amounts recognized in the consolidated balance sheet consist of: | | | | |
| Prepaid benefit cost | $ 3.3 | $ 2.1 | $ — | $ — |
| Accrued benefit liability | (101.3) | (67.6) | (155.3) | (162.2) |
| Intangible asset | 10.3 | 6.3 | — | — |
| Accumulated other comprehensive loss | 130.3 | 114.7 | — | — |
| Net amount recognized | $ 42.6 | $ 55.5 | $(155.3) | $(162.2) |

(a) Employer contributions and benefits paid in the above table include only those amounts contributed directly to or paid directly from plan assets.

COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

The accumulated benefit obligation at the end of 2003 and 2002 was $430.9 million and $372.8 million, respectively.

At the end of 2003 and 2002, the projected benefit obligation, accumulated benefit obligation and fair value of plan assets for the U.S. pension plans, pension plans outside the U.S. and pension plans with an accumulated benefit obligation in excess of plan assets, were as follows:

| End of Year | U.S. Plans | | Non-U.S. Plans | | Accumulated Benefit Obligation Exceeds the Fair Value of Plan's Assets U.S. and Non-U.S. | |
| --- | --- | --- | --- | --- | --- | --- |
| | 2003 | 2002 | 2003 | 2002 | 2003 | 2002 |
| Projected benefit obligation | 328.8 | 297.4 | 115.8 | 86.8 | 430.6 | 374.2 |
| Accumulated benefit obligation | 327.2 | 287.8 | 103.7 | 85.0 | 420.5 | 363.9 |
| Fair value of plan assets | 248.9 | 240.3 | 88.8 | 62.7 | 321.1 | 291.1 |

The net periodic benefit cost of continuing operations for fiscal 2003, 2002 and 2001 includes the following components (in millions):

| | Pension Benefits Fiscal Year Ended | | |
| --- | --- | --- | --- |
| | December 31, 2003 | December 31, 2002 | December 31, 2001 |
| Components of net periodic benefit cost: | | | |
| Service cost | $ 14.0 | $ 11.3 | $  6.8 |
| Interest cost | 25.9 | 23.9 | 12.7 |
| Expected return on plan assets | (27.2) | (31.6) | (14.6) |
| Amortization of prior service cost | 0.3 | 0.2 | 0.2 |
| Settlement gain | — | — | (0.1) |
| Curtailment loss (a) | — | 2.0 | — |
| Recognized net actuarial loss (b) | 9.0 | 0.6 | 0.1 |
| Net periodic benefit cost | $ 22.0 | $  6.4 | $  5.1 |

(a) Curtailment loss resulted from termination of employees that were covered under a Canadian plan.

(b) Includes $2.8 million of termination benefits for a former executive recorded as a restructuring charge in 2003.

F-27

COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

| | Postretirement Benefits Fiscal Year Ended | | |
|---|---|---|---|
| | December 31, 2003 | December 31, 2002 | December 31, 2001 |
| Components of net periodic benefit cost: | | | |
| Service cost | $ 1.4 | $ 1.7 | $ 1.0 |
| Interest cost | 5.8 | 6.9 | 3.8 |
| Amortization of prior service cost | (7.5) | (5.6) | (1.4) |
| Recognized net actuarial gain | (1.2) | (1.4) | (1.7) |
| Curtailment gain | — | (0.6) | — |
| Net periodic benefit cost | $(1.5) | $ 1.0 | $ 1.7 |

Weighted average assumptions end of year used to determine benefit obligations are summarized as follows (rates are used to compute the balances as of the end of the year and the expense for the following year):

| | Pension Benefits | | Postretirement Benefits | |
|---|---|---|---|---|
| | 2003 | 2002 | 2003 | 2002 |
| Discount rate | 6.3% | 6.7% | 6.2% | 7.0% |
| Rate of compensation increase | 3.2% | 3.1% | N/A | N/A |

Weighted average assumptions at used to determine net periodic benefit cost are summarized as follows (rates are used to compute the balances as of the end of the year and the expense for the following year):

| | Pension Benefits | | | Postretirement Benefits | | |
|---|---|---|---|---|---|---|
| | 2003 | 2002 | 2001 | 2003 | 2002 | 2001 |
| Discount rate | 6.7% | 7.2% | 7.4% | 7.0% | 7.5% | 7.4% |
| Expected return on plan assets | 8.9% | 9.3% | 9.2% | N/A | N/A | N/A |
| Rate of compensation increase | 3.1% | 3.1% | 4.5% | N/A | N/A | N/A |

The discount rate is determined by using the spot rate yield on high quality corporate bonds and the duration of the liability of the company's own benefit programs. The Company reduced its discount rate from September 2002 to September 2003 to correspond to the changes in the underlying high quality bond benchmark index.

The expected long-term rate of return for the plan's total assets is based on the expected return of each of the above categories, weighted based on the target allocation for each class. Equity securities are expected to return 9% to 11% over the long-term, while debt securities are expected to return between 4% and 7%. The Investment Advisors will provide a premium to the respective market benchmark indices.

Health care costs for domestic plans: (1) Dura Convertible was assumed to increase 9.5.% during 2004; the rates were assumed to grade down by 0.5% per year to an ultimate rate of 6% and remain at that level thereafter. (2) Wickes Engineering Materials was assumed to increase 6% during 2004 and remain at that level thereafter. (3) TAC-Trim was assumed to increase 10.5% during 2004; the rates were assumed to grade down by 0.5% per year to an ultimate rate of 6% and remain at that level thereafter. Health care trend rates for Canadian Plans were assumed to increase approximately 7.5% during 2004 grading down by 0.5% per year to a constant level of 5.0% annual increase.

COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

Assumed health care cost trend rates may have a significant effect on the amounts reported for postretirement benefits. A one-percentage-point change in assumed health care cost trend rates would have the following effects (in millions):

|  | 1-Percentage-Point Increase | 1-Percentage-Point Decrease |
|---|---|---|
| Effect on total of service and interest cost components............ | $0.7 | $(0.6) |
| Effect on postretirement benefit obligation ...................... | $8.5 | $(7.0) |

The asset allocation for the Company's U.S. pension plans at the end of 2003 and 2002, and the target allocation for 2004, by asset category, are as follows:

| Asset Category | Target Allocation 2004 | Percentage of Plan Assets at Year End 2003 | 2002 |
|---|---|---|---|
| Equity securities........................................ | 55%-65% | 62% | 52% |
| Debt securities ......................................... | 35%-45% | 37% | 42% |
| Other.................................................. | 0%-5% | 2% | 6% |
| Total ................................................. |  | 100% | 100% |

US Plan Assets and Investment Strategy:   The plan's expected long-term rate of return on plan assets of 9% is primarily based on both historical returns and expected returns of each of the above categories, weighted based on target allocation for each class. In addition, third party data recording expected asset class returns and inflation has been considered. Investment management responsibilities of plan assets are delegated to registered investment advisers and overseen by an investment committee comprised of members of the Company's senior management. Written investment management agreements and policies set forth the goals, policies and investment management strategies of the plan with regard to permissive investments. Review of investment performance is made quarterly. In circumstances where market conditions cause asset allocation or manager diversification to deviate out of tolerance, assets are rebalanced into compliance typically within 30 days of occurrence.

### B.  *Defined Contribution Plans*

Subsidiaries of the Company sponsor defined contribution plans covering employees who meet eligibility requirements. Subsidiary contributions are based on formulas or are at the Company's discretion as specified in the plan documents. Contributions were $3.5 million, $6.2 million and $3.2 million in fiscal 2003, 2002 and 2001, respectively.

COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

**14. Discontinued Operations**

During 2003, the Company recognized $2.4 million from workers compensation claims related to discontinued operations, for which reserves were previously charged. During 2002 and 2001, the Company received proceeds of $15.8 million and $14.5 million, respectively, on environmental claims related to discontinued operations, for which reserves were previously charged. Of these amounts, $1.6 million, $9.5 million and $8.8 million were recorded as income from discontinued operations in 2003, 2002 and 2001, respectively, net of income taxes of $0.8 million, $6.3 million and $5.7 million, respectively.

During fiscal 2000, the Company settled claims for certain environmental matters related to discontinued operations for a total of $20 million. Settlement proceeds were to be paid to the Company in three installments. The first and second installments of $7.5 million and $7.5 million were received in June 2000 and June 2001, respectively with the third installment of $5.0 million received in June 2002. Of the total $20 million settlement, the Company recorded the present value of the settlement as $7.0 million of additional environmental reserves, based on its assessment of potential environmental exposures and $6.6 million, net of income taxes, as income from discontinued operations.

The Company has significant obligations related to post-retirement, casualty, environmental, asbestos, product liability, lease and other liabilities of discontinued operations. The nature of many of these contingent liabilities is such that they are difficult to quantify and uncertain in terms of amount. The Company has accrued $21.5 million for postretirement costs and $36.7 million for environmental and product liability costs.

In connection with retained operating leases of certain discontinued operations, the Company believes that future sublease rental receipts will equal or exceed future minimum lease payments and accordingly, has not recorded any liability for these leases.

**15. Restructuring**

Activity related to the restructuring reserve is as follows (in millions):

|  | Severance Costs | Lease Commitments and Other Exit Costs | Total |
|---|---|---|---|
| Restructuring reserves: |  |  |  |
| Balance at beginning of year | $17.5 | $10.7 | $28.2 |
| 2nd quarter 2003 program | 4.2 | 0.7 | 4.9 |
| 3rd quarter 2003 program | 20.4 | 6.8 | 27.2 |
| 4th quarter 2003 program | 7.6 | 1.7 | 9.3 |
| Adjustments to prior year's expenses | — | (0.8) | (0.8) |
| Total net expense | 32.2 | 8.4 | 40.6 |
| Transfers to other balance sheet accounts | (2.8) | — | (2.8) |
| Costs paid | (25.3) | (9.8) | (35.1) |
| Ending balance | $21.6 | $ 9.3 | $30.9 |
| 3rd quarter 2003 restructuring: |  |  |  |
| Costs expected | 21.2 | 6.8 | 28.0 |
| Costs paid in period and to date | (7.8) | (3.1) | (10.9) |
| 4th quarter 2003 restructuring |  |  |  |
| Costs expected | 7.8 | 1.7 | 9.5 |
| Costs paid in period and to date | (2.8) | — | (2.8) |

COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

During the fourth quarter 2003, the Company undertook a restructuring program to rightsize its overhead structure, reduce salaried headcount and strengthen and streamline the senior management team on a worldwide basis with the primary focus on domestic operations resulting in a restructuring charge of $9.3 million. The 2003 charge included approximately $7.6 million of severance cost and $1.7 million of costs related to the establishment of accruals for lease commitments and other exit costs. The Company restructuring plan includes severance of nearly 1,000 personnel, with approximately 100 personnel from the Company's U.S. and Mexico Plastics segment, approximately 500 from the International Plastics segment and approximately 400 from Global Soft Trim segment. Additionally, the Company recognized a $4.6 million write down of fixed assets related to U.S. and Mexico Plastics and Global Soft Trim locations.

| | U.S. and Mexico Plastics | International Plastics | Global Soft Trim | Other | Total |
|---|---|---|---|---|---|
| 4th Quarter 2003 Restructuring: | | | | | |
| Total costs expected ............. | $0.9 | $4.0 | $3.6 | $1.0 | $9.5 |
| Costs incurred in period and to date | 0.9 | 3.8 | 3.6 | 1.0 | 9.3 |

During the third quarter 2003, the Company undertook a restructuring program to rightsize its overhead structure, reduce salaried headcount and strengthen and streamline the senior management team on a worldwide basis with the primary focus on domestic operations resulting in a restructuring charge of $27.2 million. The 2003 charge included approximately $20.4 million of severance cost and $6.8 million of costs related to the establishment of accruals for lease commitments and other exit costs. The Company restructuring plan includes severance of nearly 1,600 personnel, with approximately 500 personnel from the Company's U.S. and Mexico Plastics segment, approximately 300 from the International Plastics segment, approximately 600 from Global Soft Trim segment and approximately 200 from the Company's corporate locations. Additionally, the Company recognized a $2.2 million write down of fixed assets related primarily to International Plastics locations.

In the third quarter, the Company adopted the FASB Staff Position No. FAS 146-1 "Determining Whether a One-Time Termination Benefit Offered in Connection with an Exit or Disposal Activity Is, in Substance, an Enhancement to an Ongoing Benefit Arrangement." The effect from adopting FAS 146-1 was to defer recording $1.2 million of restructure expense to later periods. The effect on prior quarters and December 31, 2003 for the portion of the restructuring activities deferred was not significant.

Included in the third quarter 2003 restructuring charge severance cost were charges related to the separation agreement with Jerry L. Mosingo, the former President and CEO. In August 2003, the Company's Board of Directors appointed David Stockman as CEO, in addition to retaining his position of Chairman. Under the terms of his separation agreement, Mr. Mosingo received $0.6 million in the third quarter of 2003 and will receive $0.2 million per quarter through December 31, 2004, $0.1 million for the quarter ending March 31, 2005 and other fringe and retirement benefits. The resulting third quarter 2003 restructuring charge was $5.3 million that includes the present value of future benefits of $2.8 million which is included in pension liability.

| | U.S. and Mexico Plastics | International Plastics | Global Soft Trim | Other | Total |
|---|---|---|---|---|---|
| 4th Quarter 2003 Restructuring: | | | | | |
| Total costs expected ................ | $6.3 | $5.6 | $5.9 | $10.2 | $28.0 |
| Costs incurred in period and to date .. | 6.3 | 5.0 | 5.7 | 10.2 | 27.2 |

During the second quarter 2003, the Company undertook a restructuring program to rationalize operations on a worldwide basis with the primary focus on U.S. and Mexico operations resulting in a restructuring charge of $4.9 million. The 2003 charge included approximately $4.2 million of severance cost and $0.7 million of costs related to the establishment of reserves for lease commitments and other exit costs.

COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

The Company's restructuring plan includes severance of over 500 personnel. Of the 500 personnel approximately 450 were terminated in the second quarter of 2003 with approximately 170 personnel at the Company's International Plastics segment, approximately 160 at Global Soft Trim segment and approximately 120 at the Company's corporate locations. Additionally, the Company recognized a $0.8 million write down of fixed assets related to an International Plastics location. Activity related to 2003 for this program was $4.2 million for severance costs and $0.6 million of lease commitment and other exit costs with $0.1 million of severance costs remaining to be paid.

During 2003, the Company recognized a $7.5 million write-down of fixed assets related to its 50% interest in an Italian joint venture acquired in 2001, $10.4 million impairment of the Becker non-compete agreement and $2.7 million related to other intangible assets (see Notes 3 and 19 for additional information).

Included in the 2003 charges are adjustments related to previously established accruals which did not require cash outlays of $0.8 million.

In the fourth quarter of 2002, the Company undertook a restructuring program primarily to consolidate European operations that resulted in a restructuring charge of $14.1 million. This restructuring charge included $4.0 million of severance costs, $0.8 million of costs related to other contractual obligations and $9.3 million of costs related to fixed asset impairments. The severance costs related to over 300 personnel.

In the third quarter of 2002, the Company undertook a restructuring program primarily to realign the operations in North America that resulted in a restructuring charge of $33.8 million. This restructuring charge included $23.8 million of severance costs, $1.3 million of costs related to the establishment of reserves for lease commitments and lease termination fees and $8.7 million of costs related to fixed asset impairments. The severance costs related to over 700 personnel.

Included in the third quarter 2002 restructuring charge severance costs were charges related to the separation agreement with Thomas Evans the former Chairman and CEO. In August 2002, the Company's Board of Directors appointed Jerry L. Mosingo as President, Chief Executive Officer (CEO) and Director of the Company. Under the terms of his separation agreement, Mr. Evans received $5.5 million on August 15, 2002 and will receive quarterly payments of $0.3 million through June 30, 2004. The resulting third quarter 2002 restructuring charge was $8.9 million.

In the first quarter 2002, the Company undertook a restructuring program to rationalize operations in North America and Europe resulting in a restructuring charge of $9.1 million. This restructuring included $5.5 million of severance costs and $3.6 million of costs related to the establishment of reserves for lease commitments and lease termination fees. The Company recognized severance costs for over 100 personnel primarily at the Company's North America and European headquarters. The reserve for lease commitments relates to contractual obligations for the Company's former headquarters facility, while the termination fees relate to an aircraft lease.

During 2001, the Company undertook restructuring programs to rationalize its formerly reported operations in North American, European and Specialty segments resulting in a restructuring charge aggregating $18.8 million. The charge included $11.2 million of severance costs and $7.6 million of asset impairments. The Company recognized severance costs for over 900 operating personnel at the Company's convertible tops, fabrics, carpet and acoustics locations in North America and Specialty operations. The asset impairments, primarily related to machinery and equipment located at North American, European and Specialty operations sites, are based on management's estimates of values to be realized upon disposition of the assets.

During 2001, the Company recorded a restructuring reserve in connection with the Becker acquisition aggregating $5.3 million of which $1.6 million was severance and $3.7 million for lease termination and other exit costs.

COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

**16. Common Stockholders' Equity and Earnings Per Share**

*A. Common Stock*

In April 2002, the Company issued 400,000 shares of common stock as part of the purchase of a lamination company wholly owned by a current director and shareholder of the Company. In June 2002, the Company issued 16 million shares of common stock for $160 million before expenses. The Company used $100 million of the $152 million in net proceeds to redeem $133 million of face value Series A Redeemable Preferred Stock and the remainder for general corporate purposes.

*B. Stock Option Plans*

The 1994 Employee Stock Option Plan ("1994 Plan") was adopted as a successor to the 1993 Employee Stock Option Plan to facilitate awards to certain key employees and consultants. The 1994 Plan was amended in 1999 primarily to increase the number of shares available for issuance under the Plan by 1,000,000 shares. The 1994 Plan provides that no options may be granted after 10 years from the effective date of this plan. Options vest, in each case, as specified by the Company's compensation committee, generally over three years after issuance. At December 31, 2003, 1,592,214 shares were available for issuance under the 1994 Plan. The Company also adopted the 1994 Directors Stock Option Plan, which provides for the issuance of options to acquire a maximum of 240,000 shares of common stock to directors who are not part of management and are not affiliated with a major stockholder. As of December 31, 2003, 68,000 options had been granted. The Company adopted the 1997 United Kingdom Scheme, which provides for the issuance of options to key employees under the 1994 Plan. Effective January 1, 2000, the Company adopted the 2000 Employee Stock Option Plan, which provides for the issuance of up to 2,400,000 shares to key employees and consultants. At December 31, 2003, no options had been awarded under the 2000 plan. The Company adopted effective March 28, 2002, the 2002 Employee Stock Option Plan, which provides for the issuance of up to 6,600,000 shares to key employees and consultants. Under the 2002 plan 60% of the issued options vest and become exercisable in 20% increments in 2003, 2004 and 2005, accordingly, based on when the option was granted. The remaining 40% vest subject to performance targets and become exercisable during 2012 and 2013 or on an accelerated basis if performance targets are met.

The Company issued 1,723,000 options during the year and repriced 3,559,256 options that had an original average exercise price of $10.00 to an exercise price of $8.00. The weighted average exercise price was $8.87 after repricing 3,559,256 stock options in the first quarter of 2003. At December 31, 2003, options representing 3,335,122 shares of common stock were available for grants.

COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

All shareholder plans have been approved by stockholders. Stock option activity under the plans is as follows:

| | December 31, 2003 | | December 31, 2002 | | December 31, 2001 | |
|---|---|---|---|---|---|---|
| | Number of shares | Weighted Average Exercise Price | Number of shares | Weighted Average Exercise Price | Number of shares | Weighted Average Exercise Price |
| Outstanding beginning of year . . . . . . . . . . | 4,427,248 | $10.12 | 2,830,920 | $ 5.59 | 4,344,432 | $5.47 |
| Impact of 2002 Stock Split . . . . . . . . . . . . . | — | — | (1,698,553) | — | — | — |
| Adjusted Beginning Balance . . . . . . . . | 4,427,248 | 10.12 | 1,132,367 | 13.98 | 4,344,432 | 5.47 |
| Awarded . . . . . . . . . . . . | 1,723,000 | 8.00 | 5,182,929 | 10.00 | 40,000 | 5.76 |
| Cancelled . . . . . . . . . . | (1,140,792) | 8.55 | (1,819,634) | 10.14 | (458,090) | 7.48 |
| Exercised . . . . . . . . . . | — | — | (68,414) | 12.79 | (1,095,422) | 4.31 |
| Outstanding at end of year . . . . . . . . . . . . . | 5,009,456 | $ 8.32 | 4,427,248 | $10.12 | 2,830,920 | $5.59 |

The following table summarizes information about stock options outstanding at December 31, 2003:

| Range of Exercise Price | Number of Shares Outstanding | Weighted Average Remaining Life | Weighted Average Exercise Price | Number of Stock Options Exercisable | Weighted Average Exercise Price |
|---|---|---|---|---|---|
| $ 8.00 — $10.00 . . . . . | 4,945,456 | 9.9 | $ 8.21 | 1,354,555 | $ 8.75 |
| $10.94 — $25.00 . . . . . | 64,000 | 6.7 | $17.10 | 64,000 | $ 17.10 |

The Company has elected to continue to utilize the accounting provisions of APB No. 25 for stock options and is required to provide pro forma disclosures of net income and earnings per share had the Company adopted the fair value method for recognition purposes. See Note 2, "Summary of Significant Accounting Policies — Employee Stock Options" for the tabular presentation as if the Company had adopted SFAS No. 123 and restated its results and for discussion related to the 2003 proforma cost related to options.

In accordance with SFAS No. 123, 3,559,256 repriced options were revalued during 2003 to determine additional compensation cost that resulted from the difference in the fair value of the options prior to repricing and subsequent to repricing. As a result of the repricing $0.4 million of additional compensation cost, net of tax, was incurred on a proforma basis. These options have a weighted average expected life of approximately 6 years. The assumptions used in valuing the repriced options are as follows: expected volatility ranged from 77.54% to 118.309%; expected lives ranged from 1 year to 75$\frac{1}{2}$ years; the risk free interest rate ranged from 1.2% to 3.72% in 2003; and a zero expected dividend rate.

Additionally, as a result of repricing the Company's stock options, the options are treated as variable-based awards in accordance with APB No. 25. Because these options are considered to be variable-based awards, the Company will incur future compensation expense if the stock price exceeds the $8.00 exercise price established at the time of the repricing.

*C. Earnings Per Share*

Basic earnings per common share were computed by dividing net income (loss) by the weighted average number of shares of common stock outstanding during the year. Diluted earnings per common share were determined assuming the exercise of the stock options issued under the Company's stock option plans. There

COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

were no reconciling items between basic earnings per common share and diluted earnings per common share for 2003, 2002 and 2001.

In 2003, 2002 and 2001, potentially dilutive securities have been excluded from the diluted earnings per share calculation since their inclusion would have been antidilutive. Below is a summary of potentially dilutive securities (in millions, except weighted average exercise price):

|  | 2003 | 2002 | 2001 |
|---|---|---|---|
| Stock options | 5.0 | 4.4 | 2.8 |
| Weighted average exercise price | $ 8.32 | $10.12 | $5.59 |
| Warrants | 0.5 | 0.5 | 0.5 |
| Weighted average exercise price | $10.00 | $10.00 | $5.00 |

### 17. Income Taxes

The provisions for income taxes applicable to continuing operations for fiscal 2003, 2002 and 2001 are summarized as follows (in millions):

|  | Fiscal Year Ended | | |
|---|---|---|---|
|  | December 31, 2003 | December 31, 2002 | December 31, 2001 |
| Current: |  |  |  |
| Federal | $ — | $ — | $ — |
| State | 4.2 | 5.8 | 2.6 |
| Foreign | 1.5 | 15.3 | 4.8 |
|  | 5.7 | 21.1 | 7.4 |
| Deferred: |  |  |  |
| Federal | 4.9 | 19.6 | (21.7) |
| State | 1.0 | 2.1 | (1.3) |
| Foreign | (13.5) | (25.3) | (5.7) |
|  | (7.6) | (3.6) | (28.7) |
| Income tax expense (benefit) | $ (1.9) | $ 17.5 | $(21.3) |

Domestic and foreign components of income (loss) from continuing operations before income taxes are summarized as follows (in millions):

|  | Fiscal Year Ended | | |
|---|---|---|---|
|  | December 31, 2003 | December 31, 2002 | December 31, 2001 |
| Domestic | $ 8.9 | $ 45.4 | $(43.8) |
| Foreign | (69.9) | (79.2) | (32.5) |
|  | $(61.0) | $(33.8) | $(76.3) |

COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

A reconciliation between income taxes computed at the statutory U.S. Federal rate of 35% and the provisions for income taxes applicable to continuing operations is as follows (in millions):

|  | Fiscal Year Ended | | |
|  | December 31, 2003 | December 31, 2002 | December 31, 2001 |
| --- | --- | --- | --- |
| Amount at statutory Federal rate | $(21.4) | $(11.8) | $(26.7) |
| State taxes, net of Federal income tax | 3.2 | 5.1 | 1.0 |
| Tax differential on foreign earnings | 4.0 | (0.7) | 2.9 |
| Nontaxable interest income | (5.3) | (3.9) | — |
| Amortization of goodwill | — | — | 1.5 |
| Subsidiary preferred stock dividends and accretion | 13.1 | 13.4 | 0.8 |
| Change in valuation allowance | 10.8 | 15.9 | (1.2) |
| General business tax credits | (4.5) | (2.5) | (0.5) |
| Other | (1.8) | 2.0 | 0.9 |
| Income tax expense (benefit) | $ (1.9) | $ 17.5 | $(21.3) |

Deferred income taxes are provided for the temporary differences between the financial reporting and tax basis of the Company's assets and liabilities. The components of the net deferred tax assets as of December 31, 2003 and 2002 were as follows (in millions):

|  | December 31, 2003 | December 31, 2002 |
| --- | --- | --- |
| Deferred tax assets: |  |  |
| Employee benefits, including postretirement benefits | $130.8 | $124.9 |
| Net operating loss carryforwards (NOLs) | 189.2 | 162.5 |
| General business tax credit carryforwards | 20.2 | 10.7 |
| Alternative minimum tax credit carryforwards | 8.9 | 12.2 |
| Other liabilities and reserves | 21.3 | 33.7 |
| Valuation allowance | (89.2) | (78.4) |
| Total deferred tax assets | 281.2 | 265.6 |
| Deferred tax liabilities: |  |  |
| Property, plant and equipment | (70.7) | (68.1) |
| Undistributed earnings of foreign subsidiaries | (7.2) | (7.2) |
| Total deferred tax liabilities | (77.9) | (75.3) |
| Net deferred tax asset | $203.3 | $190.3 |

The Company has net operating losses in its foreign jurisdictions of $92 million. These losses will begin expiring in 2005 through 2015. Additionally, the Company has foreign net operating losses of $212 million which have no expiration date.

The valuation allowance at December 31, 2003 and December 31, 2002 provides for certain deferred tax assets that in management's assessment may not be realized due to tax limitations on the use of such amounts, due to expiration prior to utilization or that relate to tax attributes that are subject to uncertainty due to the long-term nature of their realization. During fiscal 2003, the valuation allowance increased $10.8 million from fiscal 2002. This increase resulted primarily from the increase in loss carryforwards that may not be realized in future periods. The valuation allowance at December 31, 2003 includes $11.8 million related to the Textron

COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

acquisition. If the deferred tax assets related to the $11.8 million valuation allowance become realizable, the valuation allowance offset will be to goodwill.

The above amounts have been classified in the consolidated balance sheets as follows (in millions):

|  | December 31, 2003 | December 31, 2002 |
| --- | --- | --- |
| Deferred tax assets: | | |
| Current domestic and foreign, included in other current assets .... | $ 25.2 | $ 25.3 |
| Noncurrent domestic and foreign ............................ | 178.1 | 165.0 |
| Net deferred tax asset .................................... | $203.3 | $190.3 |

Management has reviewed the Company's operating results for recent years as well as the outlook for its continuing operations and concluded that it is more likely than not that the net deferred tax assets of $203.3 million at December 31, 2003 will be realized. Management took into consideration, among other factors, the impact of recent restructuring plans, the timing of the reversal of its temporary differences, certain tax planning strategies and the expiration dates of its NOLs. The Company's ability to generate future taxable income is dependent on numerous factors, including general economic conditions, the state of the automotive industry and other factors beyond management's control. Considerable judgement is often involved in making these determinations, the use of different assumptions could result in significantly different results.

Deferred income taxes and withholding taxes have been provided on earnings of the Company's foreign subsidiaries to the extent it is anticipated that the earnings will be remitted in the future as dividends. Deferred income taxes and withholding taxes have not been provided on the remaining undistributed earnings of foreign subsidiaries as such amounts are deemed to be permanently reinvested. The cumulative undistributed earnings as of December 31, 2003 on which the Company has not provided deferred income taxes and withholding taxes is approximately $31.9 million.

At December 31, 2003, the Company had the following tax attribute carryforwards available for U.S. Federal income tax purposes (in millions):

|  | Amount | Expiration Dates |
| --- | --- | --- |
| Net operating losses — regular tax: | | |
| Preacquisition, subject to limitations ............................ | $103.4 | 2005-2012 |
| Subject to change in control provisions.......................... | 193.1 | 2018-2021 |
| Subject to change in control provisions.......................... | 27.1 | 2021 |
|  | $323.6 | |
| Net operating losses — alternative minimum tax: | | |
| Preacquisition, subject to limitations ............................ | $ 67.9 | 2005-2012 |
| Subject to change in control provisions.......................... | 195.0 | 2018-2021 |
| Subject to change in control provisions.......................... | 14.3 | 2021 |
|  | $277.2 | |

F-37

COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

| | Amount | Expiration Dates |
|---|---|---|
| General business tax credits: | | |
| Preacquisition, subject to limitations | $ 10.1 | 2004-2021 |
| Subject to change in control provisions | 7.2 | 2021-2022 |
| | $ 17.3 | |
| Foreign tax credits | $ 2.9 | 2008 |
| Alternative minimum tax credits | $ 8.9 | |

As a result of the Heartland Transaction, a change in control occurred which results in annual limitations on the Company's use of its NOLs and unused tax credits. This annual limitation on the use of NOLs and tax credits depends on the value of the equity of the Company and the amount of "built-in gain" or "built-in loss" in the Company's assets at the date of the change in control. Based on the expiration dates of the NOLs and tax credits as well as anticipated levels of domestic income, management does not believe that the transaction will have a material impact on these deferred tax assets.

Future sales of common stock by the Company or its principal stockholders, or changes in the composition of its principal stockholders, could constitute a change in control that would result in additional annual limitations on the Company's use of its NOLs and unused tax credits. Management cannot predict whether such a change in control will occur.

## 18. Risk Management and Financial Instruments

### Foreign Currency and Interest Rate Risk Management

The Company operates on a global basis and is exposed to the risk that its earnings, cash flows and stockholders' equity could be adversely impacted by fluctuations in currency exchange rates and interest rates. To manage the volatility relating to these exposures, the Company aggregates the exposures on a consolidated basis to take advantage of natural offsets. For exposures that are not offset within its operations, the Company may enter into various derivatives transactions pursuant to its risk management policies. The primary purpose of the Company's foreign currency and interest rate risk management policies and activities is to manage these risks to acceptable levels.

To manage its risks, the Company primarily utilizes forward exchange contracts and purchased options with durations of generally less than 12 months. The Company has in place forward exchange contracts and purchased options with third parties, denominated in multiple currencies, which will mature during fiscal 2004. The details are as follows:

| Derivative Type | Currency Sold | Currency Purchased | USD Equivalent of Notional Amount | Weighted Average Contract Rate (per Convention) | Unrealized Gain (Loss) |
|---|---|---|---|---|---|
| Options | CAD | USD | $50.0 | 1.5 | $— |

In order to manage the interest rate risk associated with our debt portfolio, the Company may enter into derivative transactions to manage its exposures to changes in global interest rates, although the Company did not have in place any interest rate derivatives in 2003 or 2002.

Gains and losses on derivatives qualifying as hedges under SFAS No. 133 "Accounting for Derivative Instruments and Hedging Activities" are recorded on the balance sheet as a component of "Accumulated

COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

other comprehensive loss" to the extent that the hedges are effective until the underlying transactions are recognized in earnings. As of December 31, 2003, the Company had no derivatives designated as hedges under SFAS No. 133. Gains and losses from all derivatives that do not qualify as hedges under SFAS No. 133, are recorded in the income statement as required by SFAS No. 133, and the fair value is recorded in the balance sheet.

*Fair Value of Financial Instruments, Derivatives and Hedging Activities*

The estimated fair values of the Company's continuing operations financial instruments are summarized as follows (in millions):

| | December 31, 2003 | | December 31, 2002 | |
| --- | --- | --- | --- | --- |
| | Carrying Amount | Estimated Fair Value | Carrying Amount | Estimated Fair Value |
| Short-term debt, long-term debt and capital lease obligations | $1,285.2 | $1,244.8 | $1,289.2 | $1,200.2 |
| Mandatorily redeemable preferred stock of subsidiary | $ 161.2 | $ 161.2 | $ 123.9 | $ 123.9 |
| Forwards | $ — | $ — | $ 0.2 | $ 0.2 |
| Options | $ — | $ — | $ 0.3 | $ 0.3 |

The following methods and assumptions were used to estimate these fair values:

The fair value of the Public Debt notes are based upon quoted market prices. The fair value of the other short-term and long-term debt of the Company approximates the carrying value due to the frequent resetting of interest rates.

The fair value of the forward contracts and purchase options are based upon quoted market prices and the aggregated notional amount outstanding in U.S. dollar equivalent of $50.0 million at December 31, 2003.

Carrying amounts reported in the consolidated balance sheets for cash and cash equivalents, accounts and other receivables, accounts payable and accrued expenses approximate fair value due to the short-term nature of these instruments.

*Concentration of credit risk*

In the normal course of business, the Company provides credit to customers in the automotive industry, performs credit evaluations of these customers and maintains reserves for potential credit losses. When realized, the losses have been within the range of management's allowance for doubtful accounts.

*Other Concentrations of Risk*

The Company invests the majority of its excess cash in money market accounts and, where appropriate, diversifies the concentration of cash among financial institutions. With respect to financial institutions, the Company has diversified its selection of counterparties and has arranged master-netting agreements, where allowed by law, and the Company's policies, to minimize the risk of loss.

**19.  Related Party Transactions**

**Heartland Transactions**

Heartland is a private equity firm established in 1999 for the purpose of acquiring and expanding industrial companies operating in various sectors of the North American economy that are well positioned for global consolidation and growth. The managing general partner of Heartland is Heartland Industrial

COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

Associates, L.L.C. Certain directors and officers of the Company are members of the general partner, specifically Messrs. Stockman (a Director and our Chairman and Chief Executive Officer), Stepp (a Director and our Vice Chairman and Chief Financial Officer) and Tredwell, Leuliette, McConnell and Valenti (each Directors). Other of our directors or their affiliates, specifically Messrs. Becker and McCallum, are limited partners in Heartland with interests representing less than 5% of the commitments in Heartland. Heartland has informed us that its limited partners include many financial institutions, private and government employee pension funds and corporations, among other types of investors. The Company may, in the ordinary course of business, have on a normal, customary and arms' length basis relationships with certain of Heartland's limited partners, including banking, insurance and other relationships.

The Company is a party to a Services Agreement with Heartland under which Heartland provides advisory and consulting services, including services with respect to developments in the automotive industry and supply markets, advice on financial and strategic plans and alternatives and other matters as it may reasonably request and are within Heartland's expertise. The Services Agreement terminates on the earlier of its tenth anniversary or the date upon which Heartland ceases to own Company shares equivalent to 25% of that owned by them on February 23, 2001.

Under the Services Agreement, the Company is obligated to pay to Heartland a $4.0 million annual advisory fee payable in quarterly installments and reimburse its out-of-pocket expenses related to the services it provides. The Company has also agreed to pay a fee of 1% of the total enterprise value of certain acquisitions and dispositions. During 2003, 2002 and 2001 the Company recorded total fees of $4.0 million, $5.7 million and $24.5 million, respectively.

The Services Agreement with Heartland contemplates that the Company may pay additional fees to Heartland for services rendered in connection with a range of financing transactions. In March 2004, the Company's Board of Directors, including the disinterested and independent directors of the Board, approved a fee of $1 million to Heartland for its services rendered in connection with the 2004 amendments to the Company's credit facility to add synthetic revolving and letter of credit facilities.

*Charles E. Becker Transactions*

On March 27, 2003, the Company entered into a termination agreement and release to buyout the non-compete agreement between the Company and Charles E. Becker, a member of the Company's Board of Directors and a limited partner in Heartland. The Company paid $11.3 million in April 2003 as part of the termination agreement and release. The non-compete agreement, which was entered into as part of the Becker acquisition, required the Company to make periodic payments. As a result of this transaction, the Company incurred a loss of $10.4 million, which is primarily due to the write-off of intangible assets initially recorded in conjunction with the Becker acquisition.

During 2002, the Company engaged Mr. Becker to serve as Vice Chairman and assist the Company with strategic planning activities, such as developing sales strategies, managing key customer relationships and recruiting senior management for the Company's European operations. The Company paid Mr. Becker $300,000 for such services. Mr. Becker's consulting arrangement and position as Vice Chairman ended in 2002.

The Company entered into a lease agreement with Becker Ventures L.L.C. ("Becker Ventures"), an entity controlled by Mr. Becker, for the Company's headquarters at 250 Stephenson Highway, Troy, Michigan with the effective date of the lease being January 1, 2002. In March 2002, the Company entered into lease agreements with Becker Ventures, effective January 1, 2002, for 150 Stephenson Highway and 350 Stephenson Highway, Troy, Michigan. The base rent for all three premises is $13.25 per sq. ft., subject to annual CPI adjustments. Total square footage for all three locations is approximately 286,000. The leases have

COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

20-year terms, and the Company has two five-year renewal options. The 2004 base rent for the facilities will be approximately $4.0 million. In 2004, these leases were amended to provide that the Company would assume responsibility for property management with a corresponding elimination of certain aspects of the property management fees. In addition, the Company is also party to a lease with Becker Ventures for five manufacturing facilities totaling 884,000 square feet. In 2002, the Company extended the lease term an additional ten years to expire in 2021, with the base rent for these facilities totaling $3.6 million per year.

In June 2001, Products sold and contemporaneously leased back real property located in Troy, Michigan and Plymouth, Michigan from New King, L.L.C. and Anchor Court, L.L.C., respectively, which are affiliates of Becker Ventures, for net proceeds of $15.1 million in aggregate. The initial lease term in each transaction is 20 years and each lease has two successive ten year renewal options. The basic rent for the Troy, Michigan property is $1.3 million per year, and the basic rent for the Plymouth, Michigan property is $0.5 million per year. The rental rates in each case are subject to adjustment after expiration of the initial term.

### Elkin McCallum Transactions

In the first quarter of 2003, the Company purchased equipment from Joan Fabrics Corporation ("Joan Fabrics"), and entered into a supply agreement with Joan Fabrics to supply certain types of fabrics. Elkin McCallum, a director of the Company, controls Joan Fabrics and is a limited partner in Heartland. Under the supply agreement, the Company supplies fabric to Joan Fabrics and Joan Fabrics is responsible for all marketing, design, customer service, distribution and sales functions related to these fabrics. The Company paid Joan Fabrics $4.7 million of consideration for these transactions, a portion of which the Company has allocated to the purchased equipment (based on its appraised value) and the remainder of which it is amortizing over the five-year term of the supply agreement.

On December 31, 2002, the Company acquired an air jet texturing business from Dutton Yarns (an affiliate of Mr. McCallum) for approximately $4.2 million. The purchased assets included equipment, inventory and intellectual property. The Company had preliminarily accounted for this transaction as an acquisition of assets, but finalized its accounting during the first quarter of 2003, and recorded the transaction as a purchase of a business.

On April 12, 2002, the Company signed and closed on a merger agreement with Mr. McCallum and a lamination company wholly owned by Mr. McCallum pursuant to which the acquired company was merged into a wholly owned subsidiary of the Company. As consideration in the transaction, Mr. McCallum received 400,000 shares of Common Stock and was repaid $2.5 million in cash as reimbursement for amounts previously invested to fund the lamination company's working capital needs. Subsequent to the merger, debt owing to Mr. McCallum of $6.7 million was repaid. The Company acquired the lamination business to optimize the supply chain on certain of its fabric products and provide low cost lamination products and services to Tier-1 customers. As part of this acquisition, the Company inherited a lease pursuant to which it leases from an entity controlled by Mr. McCallum, a portion of a manufacturing facility in El Paso, Texas. The Company continues to occupy these premises pursuant to such lease.

In April 2002, the Company amended the merger agreement with Joan Automotive to clarify ownership of certain equipment listed in a schedule attached to that agreement. The original merger agreement schedule included a list of approximately 84 looms that ultimately exceeded the Company's manufacturing requirements and facility capacity. Upon determining that the excess looms would have been uneconomically expensive to relocate and store, the Company declined to take possession of 48 of these looms, which were left in place at Joan Fabrics' Hickory, North Carolina plant. The amendment clarifies that these looms are owned by Joan Fabrics.

In September 2001, the Company completed the acquisition of Joan Automotive Industries, a leading supplier of bodycloth to the automotive industry, and all of the operating assets of Joan's affiliated yarn dying

COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

operation, Western Avenue Dyers, L.P. As a result of the Joan acquisition, Joan Fabrics became a principal stockholder of the Company. Upon completion of the Joan acquisition, Mr. McCallum became a member of the Company's Board of Directors. As part of this acquisition, the Company inherited a lease pursuant to which it leases from an entity controlled by Mr. McCallum, a technical center in Lowell, Massachusetts. The operations formerly conducted in these premises have been moved to other company facilities, however, the Company remains obligated for the related lease.

In connection with the Joan acquisition, the Company entered into a Supply Agreement dated September 21, 2001 (the "Supply Agreement") with Main Street Textiles, L.P. ("Main Street"), which is controlled by Mr. McCallum, and a Transition Services Agreement dated September 21, 2001 (the "Transition Agreement") with Joan Fabrics. Under the Supply Agreement, which was mutually terminated effective as of January 1, 2004, the Company agreed to purchase all of its requirements for flat woven automotive fabric from Main Street for a five-year period beginning on the date of the Supply Agreement. The prices which the Company agreed to pay for fabric under the agreement equaled the costs of the raw materials plus an amount representing Main Street's standard labor and overhead costs incurred in manufacturing fabric for us. Under the Transition Agreement, Joan Fabrics provided Products transitional and support services for a period not to exceed twelve months in order to support the continued and uninterrupted operation of the businesses acquired by Products in the Joan acquisition. As a part of these services, pending the Company's disassembly and removal of machinery and equipment purchased from Joan Fabrics, Joan Fabrics was permitted to continue to use that machinery and equipment to manufacture for us all of our requirements for some types of knitted and woven automotive fabrics. The terms of the Company's agreement with respect to this fabric production are substantially similar to those under the Supply Agreement. Actual prices paid by the Company for fabric under the Supply Agreement and Transition Agreement were subject to the rebates described below.

In 2002 and 2003, the Company engaged in ordinary course transactions with entities controlled by Mr. McCallum for the purchase and sale of goods and services as part of ongoing business relationships. The Company recorded purchases from entities controlled by Mr. McCallum, of $17.8 million (net of $1.2 million of rebates) in 2003, and $47.3 million (net of $10.5 million of rebates) in 2002 for goods and services purchased. These rebates received from Mr. McCallum relate to knit and woven automotive fabrics provided by entities controlled by Mr. McCallum under the Supply Agreement and Transition Agreement executed in connection with the 2001 Joan acquisition, which are described above. Supplier rebates such as these are common in the automotive industry as part of ongoing price negotiations and adjustments. These rebates from Mr. McCallum totaled $14.7 million over the duration of the agreements. In addition, the Company recorded sales to entities controlled by Mr. McCallum, of $6.4 million in 2003 and $31.8 million in 2002.

The following table summarizes the balances outstanding from entities controlled by Mr. McCallum (in millions):

|  | As of December 31, | |
|  | 2003 | 2002 |
| --- | --- | --- |
| Accounts Receivable | $2.7 | $5.9 |
| Accounts Payable | $1.0 | $8.0 |

*Textron Transactions*

As discussed in Note 10 "Mandatorily Redeemable Preferred Stock of Subsidiary," and Note 12 "Operating Leases," the Company is a party to various agreements and transactions with Textron. Textron became a related party as a result of its receipt of the consideration in the 2001 TAC-Trim acquisition. In May 2002, as part of the finalization of the purchase price and related working capital adjustments of the TAC-Trim acquisition, the Company paid Textron $15.5 million in cash.

COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

Prior to the TAC-Trim acquisition, TAC-Trim entered into an $86.9 million sale and leaseback transaction (the "Textron Leasing Transaction") with two separate single purpose affiliates of Textron Financial Corporation, as lessor and purchaser, with respect to a portfolio of manufacturing equipment situated in different locations throughout the United States and Canada. In January 2003, the FASB issued FASB Interpretation No. ("FIN") 46, "Consolidation of Variable Interest Entities ("VIE"), an interpretation of Accounting Research Bulletin No. 51, "Consolidated Financial Statements" (see Note 2 "Summary of Significant Accounting Policies" for further information on FIN 46). As part of the Company's implementation of FIN 46, it determined that one of the single purpose affiliates was a VIE. The Company negotiated and agreed to have the lease restructured so it was required to be consolidated by the other party and not accounted for as a VIE. As consideration for this lease restructuring, the Company agreed to pay Textron Financial $150,000.

Payments under the Textron leasing transaction are guaranteed by Products and secured by a first perfected mortgage lien over certain real property with a value equal to $25 million. Each lease is for an initial term of three years with three one-year renewal options. At the end of the leases (including the expiration of all renewal options), there is the option of either purchasing all of the equipment for approximately $26 million or returning the equipment to the lessor. In the event the equipment is returned, arrangements will be made for the disposition of the equipment. The Company is required to guarantee a minimum value to the lessor of up to approximately $21 million upon expiration of the leases. As is customary, the documentation for the Textron leasing transaction incorporates covenants by reference, from the Company's credit facility, that may be amended or waived by the senior lenders, and also contain events of default.

As part of the TAC-Trim acquisition, the Company entered into three intellectual property license agreements with Textron. In two of these agreements, the Company licenses back to Textron certain intellectual property that was acquired in the transaction. In the third agreement, the Company licenses from Textron other intellectual property that was not acquired in the transaction. In addition, under the TAC-Trim acquisition agreement, the Company is permitted to use the "Textron" name for 18 months in exchange for payments of $13.0 million on December 15, 2002 and $6.5 million on December 15, 2003.

20.  **Information About the Company's Operations**

In conjunction with the 2003 restructurings, the Company changed its reportable segments to align with organization changes and senior management responsibilities. The Company's new reportable segments consist of U.S. and Mexico Plastics, International Plastics and Global Soft Trim. International Plastics includes all international plastics operations, including Canada. The U.S. and Mexico Plastics and International Plastics segments include interior trim components such as door panels, instrument panels, consoles, package trays and cargo management systems, exterior trim components such as bumper fascias and cladding and fully assembled cockpit systems and components thereof. The Global Soft Trim segment includes molded non-woven and tufted carpet, alternative molded flooring, accessory mats and acoustics systems consisting of absorbing materials, damping materials, engine compartment noise vibration and harshness systems, interior insulators, seat body cloth, insert fabric, headliner fabric, convertible roof systems, hard top retractable roof systems, tonneau covers and actuation systems. The Company changed the composition of its reportable

COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

segments on January 1, 2003 and further redefined the segments beginning July 1, 2003 and restated prior period segment data to be comparable.

The segments consist of dedicated facilities and division offices focused on the manufacturing, assembly and sequencing of the aforementioned products and systems. The other categories consist of costs not allocated to operating segments including selling, product development and administrative costs.

The Company evaluates performance based on operating profit or loss. Information about the Company's divisions is presented below (in millions):

| | Year Ended December 31, 2003 | | | | |
|---|---|---|---|---|---|
| | U.S. and Mexico Plastics | International Plastics | Global Soft Trim | Other(a) | Total |
| External revenues . . . . . . . . . . . . | $1,363.4 | $1,258.0 | $1,362.3 | $ — | $3,983.7 |
| Inter-segment revenues . . . . . . . | 12.0 | 17.9 | 1.0 | (30.9) | — |
| Interest expense from preferred stock requirement . . . . . . . . . . | — | — | — | 37.3 | 37.3 |
| Depreciation and amortization | 43.6 | 39.7 | 48.7 | 8.2 | 140.2 |
| Goodwill . . . . . . . . . . . . . . . . . . . | 761.5 | 327.2 | 274.4 | — | 1,363.1 |
| Operating income (loss) . . . . . . | 73.6 | (22.5) | 140.5 | (89.6) | 102.0 |
| Total assets . . . . . . . . . . . . . . . . . | 1,074.6 | 845.0 | 687.0 | 584.6 | 3,191.2 |
| Capital expenditures . . . . . . . . . | 45.9 | 47.4 | 75.5 | 6.3 | 175.1 |

| | Year Ended December 31, 2002 | | | | |
|---|---|---|---|---|---|
| | U.S. and Mexico Plastics | International Plastics | Global Soft Trim | Other(a) | Total |
| External revenues . . . . . . . . . . . . | $1,512.2 | $ 899.0 | $1,474.6 | $ — | $3,885.8 |
| Inter-segment revenues . . . . . . . | 13.4 | 16.8 | 0.8 | (31.0) | — |
| Preferred stock requirement . . . | — | — | — | 38.4 | 38.4 |
| Depreciation and amortization | 38.4 | 24.3 | 49.0 | 5.3 | 117.0 |
| Goodwill . . . . . . . . . . . . . . . . . . . | 715.1 | 278.8 | 271.6 | — | 1,265.5 |
| Operating income (loss) . . . . . . | 113.1 | (30.1) | 161.6 | (76.9) | 167.7 |
| Total assets . . . . . . . . . . . . . . . . . | 1,176.1 | 843.5 | 682.8 | 454.7 | 3,157.1 |
| Capital expenditures . . . . . . . . . | 41.0 | 26.9 | 48.8 | 31.2 | 147.9 |

| | Year Ended December 31, 2001 | | | | |
|---|---|---|---|---|---|
| | U.S. and Mexico Plastics | International Plastics | Global Soft Trim | Other(a) | Total |
| External revenues . . . . . . . . . . . . | $ 208.0 | $ 263.1 | $1,352.2 | $ — | $1,823.3 |
| Inter-segment revenues . . . . . . . | 1.9 | 6.7 | 1.4 | (10.0) | — |
| Preferred stock requirement . . . | — | — | — | 2.4 | 2.4 |
| Depreciation and amortization | 10.8 | 12.4 | 55.9 | 2.7 | 81.8 |
| Goodwill . . . . . . . . . . . . . . . . . . . | 949.6 | 47.1 | 257.1 | — | 1,253.8 |
| Operating income (loss) . . . . . . | 1.6 | (2.4) | 48.7 | (12.3) | 35.6 |
| Total assets . . . . . . . . . . . . . . . . . | 866.3 | 354.6 | 826.8 | 940.2 | 2,987.9 |
| Capital expenditures . . . . . . . . . | 6.5 | 2.3 | 40.9 | 4.8 | 54.5 |

COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

(a) Other includes the Company's non-operating units (See Note 14) and the effect of eliminating entries. During 2003 and 2002, certain corporate costs that were previously included at the divisional units were included in the Other category. Those costs that could be attributed to a divisional unit were allocated back to the appropriate division. Operating income (loss) for the year ended December 31, 2003 includes: $53.3 million, $74.0 million and $48.7 million of corporate costs allocated back to U.S. and Mexico Plastics, International Plastics and Global Soft Trim, respectively. Operating income (loss) for the year ended December 31, 2002 includes: $60.4 million, $35.5 million and $39.6 million of corporate costs allocated back to U.S. and Mexico Plastics, International Plastics and Global Soft Trim, respectively.

Direct and indirect sales to significant customers in excess of ten percent of consolidated net sales from continuing operations follow:

|  | Fiscal Year Ended | | |
|  | 2003 | 2002 | 2001 |
|---|---|---|---|
| DaimlerChrysler AG | 28.5% | 31.0% | 18.7% |
| General Motors Corporation | 22.4% | 23.0% | 29.0% |
| Ford Motor Company | 24.8% | 23.0% | 21.5% |

The Company recently confirmed its strategy for new business, which involves pursuing sales growth based on criteria intended to more effectively allocate the Company's resources on the most promising new business opportunities. As part of this strategy, the Company is reviewing its parts profitability for each plant and program worldwide. For example, the Company has recently concluded that a certain future business award is inconsistent with its criteria and is therefore in the process of cooperating in the transition of this award to another supplier.

At the end of the second quarter, the Company received notice from one of its customers, Daimler-Chrysler Corporation, of an issue regarding the calculation methods for determining the current year valuation of price givebacks. Discussions on this issue, as well as various aspects of the broader relationship, are continuing. While the Company seeks to improve the profitability of its programs with this and all of its customers, there can be no assurance that the Company will not lose desirable programs over time. While the Company continues to believe that all of these issues will be resolved to the mutual satisfaction of the parties, there can be no assurances that such a resolution is imminent or that actions by the customer with respect to the broader relationship will not have a material adverse impact on the Company.

Information about the Company's continuing operations in different geographic areas for fiscal 2003, 2002 and 2001 is presented below (in millions):

|  | Year Ended December 31, 2003 | | Fiscal Year Ended December 31, 2002 | | Fiscal Year Ended December 31, 2001 | |
|  | Net Sales | Long-Lived Assets | Net Sales | Long-Lived Assets | Net Sales | Long-Lived Assets |
|---|---|---|---|---|---|---|
| United States | $2,200.4 | $1,472.9 | $2,412.0 | $1,445.3 | $1,346.0 | $1,545.4 |
| Canada | 464.3 | 432.3 | 488.2 | 343.4 | 168.5 | 99.0 |
| Mexico | 254.0 | 79.1 | 230.7 | 96.8 | 50.5 | 52.9 |
| Europe | 1,001.6 | 283.0 | 660.5 | 129.4 | 117.3 | 189.0 |
| Other | 63.4 | 89.9 | 94.4 | 173.9 | 141.0 | 220.6 |
| Consolidated | $3,983.7 | $2,357.2 | $3,885.8 | $2,188.8 | $1,823.3 | $2,106.9 |

Intersegment sales between geographic areas are not material. For fiscal years 2003, 2002 and 2001, export sales from the United States to foreign countries were $408.9 million, $429.5 million and $146.2 million, respectively.

F-45

COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

### 21.  Commitments and Contingencies

Except as described below, the Company and its subsidiaries are not party to any material pending legal proceedings, but is involved in ordinary routine litigation incidental to the business.

#### *Environmental*

The Company is subject to federal, state, local and foreign environmental, and health and safety, laws and regulations that (i) affect ongoing operations and may increase capital costs and operating expenses in order to maintain compliance with such requirements and (ii) impose liability relating to contamination at facilities, other locations such as former facilities, facilities where we have sent wastes for treatment or disposal and other properties to which the Company may be linked. Such liability may include, for example, investigation and clean-up of the contamination, personal injury and property damage caused by the contamination and damages to natural resources. Some of these liabilities may be imposed without regard to fault and may also be joint and several (which can result in a liable party being held responsible for the entire obligation, even where other parties are also liable).

Management believes that it has obtained, and is in material compliance with, those material environmental permits and approvals necessary to conduct the Company's various businesses. Environmental compliance costs for continuing businesses are accounted for as normal operating expenses or capital expenditures, except for certain costs incurred at acquired locations. Environmental compliance costs relating to conditions existing at the time of an acquisition are generally charged to reserves established in purchase accounting. The Company accrues for environmental remediation costs when such obligations are known and reasonably estimable. In the opinion of management, based on the facts presently known to it, such environmental compliance and remediation costs will not have a material effect on the Company's business, consolidated financial condition, future results of operations or cash flows.

The Company is legally or contractually responsible or alleged to be responsible for the investigation and remediation of contamination at various sites and for personal injury or property damages, if any, associated with such contamination. At some of these sites, the Company has been notified that it is a potentially responsible party ("PRP") under the federal Superfund law or similar state laws. Other sites at which the Company may be responsible for contamination may be identified in the future, including with respect to divested and acquired businesses.

The Company is currently engaged in investigating or remediating certain sites as discussed in the paragraphs below. In estimating the cost of investigation and remediation, the Company considered, among other things, its prior experience in remediating contaminated sites, remediation efforts by other parties, data released by the United States Environmental Protection Agency ("USEPA"), the professional judgment of the Company's environmental experts, outside environmental specialists and other experts and the likelihood that other identified PRPs will have the financial resources to fulfill their obligations at sites where they and the Company may be jointly and severally liable. It is difficult to estimate the total cost of investigation and remediation due to various factors including:

- incomplete information regarding particular sites and other PRPs;

- uncertainty regarding the nature and extent of environmental problems and the Company's share, if any, of liability for such problems;

- the ultimate selection among alternative approaches by governmental regulators;

COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

- the complexity and evolving nature of environmental laws, regulations and governmental directives and
- changes in cleanup standards.

The Company is a party to a Consent Decree with the State of New Hampshire to remediate a former industrial landfill known as the Cardinal Landfill in Farmington, New Hampshire. Pursuant to that Consent Decree, the Company is currently conducting a pilot test for a proposed remediation of chlorinated compound contaminants in groundwater. The Consent Decree calls for a remedy to be in place during 2004. The Company is a defendant in two lawsuits filed by a total of 91 individual plaintiffs for alleged personal injuries arising from Cardinal Landfill conditions. The Company will vigorously contest these allegations. As of December 31, 2003, the Company has accrued $13.6 million for Cardinal Landfill.

The Company is a party, as a member of a PRP workgroup, to a Consent Decree entered with the USEPA for the remediation of a former municipal landfill in Dover, New Hampshire. The town of Dover, New Hampshire is also a member of the PRP group and a party to the Consent Decree. Pursuant to the terms of the Consent Decree, the PRP group is currently engaged in the preparation of a remediation design. The Consent Decree requires that a remedy for the site be in place during 2004. As of December 31, 2003, the Company has accrued $8.7 million for Dover.

Pursuant to a Consent Decree signed with the USEPA, the Company is currently engaged in a full-scale remediation for groundwater and soil contamination at the former Stamina Mills manufacturing facility in North Smithfield, Rhode Island. Remediation activities have been ongoing since 1998. Another Consent Decree resolving the USEPA claim for past oversight costs was signed during 2003, and a payment of $7.3 million was made during the third quarter of 2003. As of December 31, 2003, the Company has accrued $6.6 million for Stamina Mills.

The Company is working with the Michigan Department of Environmental Quality ("MDEQ") to investigate and remediate soil and groundwater contamination at a former manufacturing plant in Mancelona, MI and at adjacent owned property formerly used for the treatment and disposal of plating waste. MDEQ is likely to require remediation of groundwater contamination. In addition, the Company is incurring costs in connection with the provision of alternate water supplies to residences in the area.

The current owner of one of the Company's former manufacturing plants located in Bowling Green, OH has entered into an Administrative Order on Consent with the Ohio Environmental Protection Agency ("OEPA") requiring investigation and remediation of contamination at the site. The Company is reimbursing the current owner for costs associated with ongoing groundwater monitoring and, following selection of an appropriate remedy by OEPA, will assume 90% of future remediation costs.

In the 1980's and 1990's, the California Regional Water Quality Control Board ("CRWQCB") and other state agencies ordered a predecessor of the Company to investigate and remediate soil and groundwater contamination at a former lumber treatment plant in Elmira, CA. In 1996, the Company entered into an agreement with the State of California to conduct long-term operation and maintenance of the remedy implemented at the site.

The Company has entered into an Administrative Order by Consent with the USEPA requiring investigation, delineation and removal of contamination from a vacant three acre site in Zanesville, Ohio. The delineation report has been submitted to USEPA for comment, and the Administrative Order by Consent calls for the submittal and implementation of an action plan during 2004.

In 2003, the Company signed a Consent Agreement with the State of South Carolina Department of Health and Environmental Control requiring soil and groundwater investigations at a former manufacturing facility in Cowpens, South Carolina. The Company had ceased operations at this location in 1981. Initial investigations will delineate potential groundwater contamination that has migrated under a residential area. These studies are scheduled to be completed in 2004.

COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

The Company has established accruals for certain contingent environmental liabilities and management believes such reserves comply with accounting principles generally accepted in the United States of America. The Company accrues for environmental investigatory and non-capital remediation costs when litigation has commenced or a claim or assessment has been asserted or is imminent, the likelihood of an unfavorable outcome is probable and the financial impact of such outcome is reasonably estimable. As of December 31, 2003 and 2002, total reserves for these environmental costs are approximately $51.2 million and $64.5 million, respectively.

In the opinion of management, based on information presently known to it, identified environmental costs and contingencies will not have a material effect on the Company's consolidated financial condition, future results of operations or cash flows. However, management can give no assurance that they have identified or properly assessed all potential environmental liabilities arising from the business or properties, and those of present and former subsidiaries and their corporate predecessors.

*Litigation*

The Company and its subsidiaries have lawsuits and claims pending against them and have certain guarantees outstanding which were made in the ordinary course of business.

As of December 31, 2003, the Company is party to approximately 875 pending cases alleging personal injury from exposure to asbestos containing materials used in boilers manufactured before 1966 by former operations of the Company which were sold in 1966. Asbestos-containing refractory bricks lined the boilers and, in some instances, the Company's former operations installed asbestos-containing insulation around the boilers. These pending cases do not include cases that have been dismissed or are subject to agreements to dismiss due to the inability of the plaintiffs to establish exposure to a relevant product and cases that have been settled or are subject to settlement agreements. Total settlement costs for these cases have been less than $944,800 or an average of less than $5,700 per settled case. The defense and settlement costs have been substantially covered by our primary insurance carriers under a claims handling agreement that expires in August 2006. The Company has primary, excess and umbrella insurance coverage for various periods available for asbestos-related boiler and other claims. The Company's primary carriers have agreed to cover approximately 80% of certain defense and settlement costs up to a limit of approximately $70.5 million for all claims made, subject to reservations of rights. The excess insurance coverage, which varies in availability from year to year, is approximately $600 million in aggregate for all claims made. Based on the age of the boilers, the nature of the claims and settlements made to date and the insurance coverage, management does not believe that these cases will have a material impact on the Company's financial condition, results of operations or cash flows. However, it cannot assure that the Company will not be subjected to significant additional claims in the future, that insurance will be available as expected or that unanticipated damages or settlements in the future would not exceed insurance coverage.

As previously disclosed, a purported class action was filed on March 24, 2003 in the United States District Court for the Eastern District of Michigan, against the Company, Heartland and ten current and former senior officers and/or directors of the Company, alleging violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated there under. Four similar actions were subsequently filed in the United States District Court for the Eastern District of Michigan, purportedly filed on behalf of purchasers of the common stock of the Company between August 7, 2001 and August 2, 2002, which are identical to the purported class identified in the previously disclosed lawsuit, except in one instance in which the complaint alleges a class period beginning on July 5, 2001. On August 4, 2003, the court consolidated all five pending actions and appointed lead plaintiffs for the purported class. The Company believes that the claims are without merit and intends to vigorously defend the lawsuits. The Company does not believe that the suit will have a material impact on the Company's financial condition, results of operations or cash flows.

COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

The Company is a defendant in a lawsuit involving a sales commissions arrangement inherited from a predecessor company and its partial ownership of an extinguished joint venture. In September 2003, the Oakland County Circuit Court entered a judgment by default against the Company for $4.2 million based upon an inadvertent failure to produce a small number of documents that were to be produced with thousands of other documents that were delivered in the discovery process. The Company and its counsel believes that the default judgment was improperly entered and that damages were improperly assessed, and it has filed an appeal of the judgment with the Michigan Court of Appeals. The Company intends to vigorously pursue its appeal in this matter and has posted a letter of credit in the amount of the judgment as part of the normal appeal process. While management believes it may have no liability to the plaintiff, the Company has established an appropriate reserve for this matter in an amount less than the amount of the current judgment.

The ultimate outcome of the legal proceedings to which the Company is a party will not, in the opinion of the Company's management, based on the facts presently known to it, have a material effect on the Company's consolidated financial condition, future results of operations or cash flows.

### Completion of Audit Committee Inquiry

The Company's Audit Committee inquiry, initiated in August 2003, into certain assertions made by two former executives and related matters has been completed. The Audit Committee, aided by its independent counsel, Davis Polk & Wardwell, and by an outside accounting expert, reported its findings and recommendations to the Company's full Board of Directors. In general, the Audit Committee's inquiry extended into the following areas: (1) assertions regarding the Company's accounting for revenue and tooling, (2) a comprehensive review of related party transactions and (3) certain corporate governance procedures. The following summarizes the Committee's principal findings and recommendations:

- The Audit Committee has not become aware of any events that would necessitate a restatement of any previously issued financial statements.

- While the assertions concerning related party transactions were limited to certain transactions involving Charles Becker and Elkin McCallum and entities controlled by them, the Audit Committee reviewed all material transactions entered into between the Company and Heartland Industrial Partners, L.P., Mr. McCallum and Mr. Becker and their respective affiliates. Both Mr. Becker and Mr. McCallum are directors and significant shareholders of the Company and are, directly or indirectly, limited partners in Heartland, the Company's largest shareholder.

  The Audit Committee concluded that each of these transactions had a legitimate business purpose, was negotiated fairly, and was intended to advance the interests of the Company and not to benefit the related parties at the Company's expense. The Audit Committee further concluded that, by and large, these transactions were appropriately presented to and approved by the full Board of Directors of the Company and were properly documented and adequately disclosed.

  The Audit Committee concluded that certain related party matters referred to below had not been formally submitted for Board approval, and that others should have been more appropriately documented. The Audit Committee recommended that disinterested members of the Board review those matters and take whatever procedural action may be deemed appropriate. Specifically, the matters to be reviewed are (1) with respect to Mr. Becker and his affiliates: leases of two buildings adjacent to the Company's headquarters, which was already the subject of a Board-approved lease from an affiliate of Mr. Becker; an amendment reducing the rent at the Company's headquarters to the rent at these two additional buildings; and amendments of existing plant leases with an affiliate of Mr. Becker to extend the term and reduce the rent for the initial term; and (2) with respect to Mr. McCallum and his affiliates, an amendment of the previously Board-approved Joan Automotive merger agreement clarifying ownership of certain equipment listed in a schedule attached to that

COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

agreement; and the final terms of a supply agreement contemplated at the time the Board approved a January 2003 purchase of certain fabrics equipment from an affiliate of Mr. McCallum. Subsequent to the Board's initial discussion with the Audit Committee on March 10, 2004, the Board has held a meeting and ratified all of these actions.

- The Audit Committee also recommended that the Company review its public filings to determine whether disclosure of certain aspects of the related party transactions reviewed by the Audit Committee should be enhanced and additionally, it proposed a resolution for the Board that will require pre-approval of all future related party transactions, even where pre-approval of the Board is not legally required. The resolution also reiterates procedures for ensuring proper documentation and disclosure of such transactions. Subsequent to the Board's initial discussion with the Audit Committee on March 10, 2004, the Board has adopted and approved this resolution.

As a result of the Audit Committee's recommendations, the Company has included enhanced disclosure in this Annual Report with respect to the following: (1) disclosure of the Board-approved payment of $300,000 as compensation to Mr. Becker in 2002 for his temporary service as Vice Chairman of the Company during that year; (2) an improved description of the 2003 fabrics and 2002 Dutton Yarns air-texturing operations transactions with Mr. McCallum; and (3) the dollar volume of previously disclosed ordinary course arrangements with Mr. McCallum, specifically, from transition services, supply and rebate arrangements.

The members of the Company's Audit Committee are Robert C. Clark, the former Dean of the Harvard Law School, Marshall A. Cohen, counsel at Cassels Brock and Blackwell, a Canadian law firm, and former Senator Warren B. Rudman. The accounting expert who advised the Audit Committee is Alex Arcady, a retired partner from Ernst & Young LLP, who spent the last ten years of his career in that firm's national office.

*Other Commitments*

As of December 31, 2003, the Company's continuing operations had approximately $30.3 million in outstanding capital expenditure commitments. The majority of the leased properties of the Company's previously divested businesses have been assigned to third parties. Although releases have been obtained from the lessors of certain properties, Products remains contingently liable under most of the leases. Products' future liability for these leases, in management's opinion, based on the facts presently known to it, will not have a material effect on the Company's consolidated financial condition, future results of operations or cash flows.

In November 2002, the FASB issued FIN 45, "Guarantor's Accounting and Disclosure Requirements for Guarantees, Including Indirect Guarantees of Indebtedness of Others." FIN 45 requires a guarantor to recognize, at the inception of a qualified guarantee, a liability for the fair value of the obligation undertaken in issuing the guarantee. In conjunction with divestitures and other transactions, the Company has provided indemnifications relating to legal and environmental issues, including product liability. The Company does not believe that any pending or threatened litigation or claims related to any such retained liabilities of discontinued operations are likely to result in any material loss.

COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

22. **Quarterly Financial Data (Unaudited)**

The quarterly financial data is summarized below (in millions, except per share amounts).

| | 2003 | | | |
|---|---|---|---|---|
| | First Quarter | Second Quarter | Third Quarter | Fourth Quarter |
| Net sales | $1,035.1 | $1,033.5 | $902.2 | $1,012.9 |
| Gross profit | 109.4 | 124.7 | 95.5 | 114.6 |
| Income (loss) from continuing operations | (26.2) | 10.7 | (32.1) | (11.5) |
| Income (loss) before extraordinary items | (26.2) | 10.7 | (32.1) | (11.5) |
| Net income (loss) | (26.2) | 10.7 | (32.1) | (9.9) |
| Basic and diluted earnings (loss) per share: | | | | |
|   Continuing operations | (0.31) | 0.13 | (0.38) | (0.14) |
|   Discontinued operations | — | — | — | 0.02 |
|   Net income (loss) attributable to common shareholders | (0.31) | 0.13 | (0.38) | (0.12) |
| Common stock prices: | | | | |
|   High | 4.83 | 4.18 | 3.41 | 4.33 |
|   Low | 3.28 | 2.82 | 2.09 | 2.43 |

| | 2002 | | | |
|---|---|---|---|---|
| | First Quarter | Second Quarter | Third Quarter | Fourth Quarter |
| Net sales | $914.8 | $1,085.3 | $922.5 | $963.2 |
| Gross profit | 131.1 | 158.5 | 100.7 | 127.8 |
| Income (loss) from continuing operations | (6.7) | 3.7 | (45.2) | (3.1) |
| Income (loss) before extraordinary items | (6.7) | 3.7 | (45.2) | (3.1) |
| Net income (loss) | (18.4) | 13.2 | (45.2) | (3.1) |
| Basic and diluted earnings (loss) per share: | | | | |
|   Continuing operations | (0.10) | (0.46) | (0.54) | (0.04) |
|   Discontinued operations | — | 0.13 | — | — |
|   Cumulative effect of change in accounting principle | (0.17) | — | — | — |
|   Net loss attributable to common shareholders | (0.27) | (0.33) | (0.54) | (0.04) |
| Common stock prices: | | | | |
|   High | 25.500 | 28.375 | 9.000 | 4.450 |
|   Low | 16.750 | 9.000 | 2.810 | 2.450 |

The Company's operations are not subject to significant seasonal influences.

Changes in Accounting Principles — During the second quarter 2003, the Company implemented a change in the method of accounting for holiday pay so that such pay is accrued, and expense is recognized during the period in which the actual holiday occurs. Formerly, certain of the Company's businesses accrued holiday pay and recognized expense based upon an equal monthly amount within the fiscal year. The change in method better matches holiday expense with the period that the actual holiday occurs and the pay is earned.

As the prior method allocated costs within the fiscal year, there is no effect on prior years. There will be no effect on the entire fiscal year as the change only impacts interim periods.

COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

The effect of the change on the first quarter 2003 is as follows (in millions):

|  | Quarter Ended | |
|---|---|---|
|  | March 31, 2003 (As Previously Reported) | March 31, 2003 (Adjusted) |
| Net sales | $1,035.1 | $1,035.1 |
| Cost of goods sold | 928.1 | 925.7 |
| Gross profit | 107.0 | 109.4 |
| Selling, general and administrative expenses | 71.5 | 71.5 |
| Impairment of long-lived assets | 18.1 | 18.1 |
| Operating income | 17.4 | 19.8 |
| Other, net | 45.0 | 45.1 |
| Loss from continuing operations before income taxes | (27.6) | (25.3) |
| Income tax expense | 1.1 | 0.9 |
| Net loss | $ (28.7) | $ (26.2) |
| Earnings per share data: | | |
| Loss per basic and diluted common share | $ (0.34) | $ (0.31) |
| Average basic and diluted common shares outstanding | 83.6 | 83.6 |

The proforma amounts assuming the new method of accounting for holiday pay is applied retroactively to prior year periods is as follows (in millions, except per share amounts):

|  | Quarter Ended March 31, 2002 | Quarter Ended June 30, 2002 | Quarter Ended September 30, 2002 | Quarter Ended December 31, 2002 |
|---|---|---|---|---|
| Net loss attributable to common shareholders | $(17.2) | $(22.4) | $(44.6) | $ (5.6) |
| Net loss per common share | $(0.26) | $(0.32) | $(0.53) | $(0.07) |

Additionally, during the second quarter of 2003, the Company implemented a change in the method of accounting for crib supply inventories held at plants. Crib supply inventories include small motors, replacement parts for production equipment and other miscellaneous repair parts for buildings, equipment and machinery. The Company implemented a perpetual crib supply inventory system and harmonized its policy to consistently account for the capitalization of crib supply inventories. Formerly, the Company had different capitalization thresholds following the various acquisitions in late 2001 and 2002, which ranged from not capitalizing any crib supply items to capitalizing only items greater than two thousand dollars. The new accounting method better matches the cost with the period benefiting from the expenditure, as such inventories are charged to expense as they are placed into service and begin generating revenue. Pro forma and the cumulative effect amounts relating to the change in accounting for crib inventories is not determinable as perpetual records of crib inventory were not maintained at all the plants prior to the application of the new method in the second quarter of 2003. The effect of the change on the three months ended June 30, 2003, for the plants that had no perpetual records was to increase inventory and reduce cost of sales by $1.8 million after tax or $0.02 per share. For the year ended December 31, 2003, the incremental effect of the adoption had an insignificant effect.

### 23. Consolidating Financial Statements

Products issued Senior Notes in a total principal amount of $500.0 million in December 2001. The Senior Notes are guaranteed by the Company and all the Company's wholly owned domestic Subsidiaries other than its receivable, insurance and charitable subsidiaries (Guarantor Subsidiaries). The following are consolidating financial statements of the Company, Products, its guarantor and non-guarantor subsidiaries:

COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES

SUPPLEMENTAL GUARANTOR CONDENSED CONSOLIDATING FINANCIAL STATEMENTS

CONSOLIDATING STATEMENT OF OPERATIONS

| | Parent | Issuer | Guarantors | Non-Guarantors | Eliminations | Consolidated Total |
|---|---|---|---|---|---|---|
| | For the Year Ended December 31, 2003 | | | | | |
| | | | (in millions) | | | |
| Net sales | $ — | $310.2 | $2,098.5 | $1,596.2 | $(21.2) | $3,983.7 |
| Cost of goods sold | — | 207.5 | 1,850.4 | 1,502.8 | (21.2) | 3,539.5 |
| Selling, general and administrative expenses | 0.1 | 223.1 | 10.2 | 39.8 | — | 273.2 |
| Restructuring charge | — | 13.2 | 18.5 | 8.9 | — | 40.6 |
| Impairment of long-lived assets | — | 4.1 | 12.6 | 11.7 | — | 28.4 |
| Operating income (loss) | (0.1) | (137.7) | 206.8 | 33.0 | — | 102.0 |
| Interest expense, net | — | 21.3 | 121.2 | 8.8 | — | 151.3 |
| Interest expense from subsidiary preferred stock dividends | — | 32.0 | — | — | — | 32.0 |
| Interest expense from subsidiary preferred stock accretion | — | 5.3 | — | — | — | 5.3 |
| Intercompany interest expense (income) | — | (21.4) | (17.8) | 39.2 | — | — |
| Loss on sale of receivables | — | — | — | 7.3 | — | 7.3 |
| Other expense, net | — | (149.7) | 115.2 | 0.6 | 1.0 | (32.9) |
| (Loss) income from continuing operations before income taxes | (0.1) | (25.2) | (11.8) | (22.9) | (1.0) | (61.0) |
| Income tax expense (benefit) | — | (3.7) | 4.6 | (2.8) | — | (1.9) |
| Loss from continuing operations | (0.1) | (21.5) | (16.4) | (20.1) | (1.0) | (59.1) |
| Income from discontinued operations | — | 2.4 | (0.8) | — | — | 1.6 |
| Cumulative effect of a change in accounting principle | — | — | — | — | — | — |
| Equity in net income (loss) of subsidiaries | (57.4) | (38.3) | (27.0) | — | 122.7 | — |
| NET INCOME (LOSS) | $(57.5) | $(57.4) | $ (44.2) | $ (20.1) | $121.7 | $ (57.5) |

| | Parent | Issuer | Guarantors | Non-Guarantors | Eliminations | Consolidated Total |
|---|---|---|---|---|---|---|
| | For the Year Ended December 31, 2002 | | | | | |
| | | | (in millions) | | | |
| Net sales | $ — | $289.4 | $2,415.7 | $1,216.9 | $(36.2) | $3,885.8 |
| Cost of goods sold | — | 181.8 | 2,110.0 | 1,112.1 | (36.2) | 3,367.7 |
| Selling, general and administrative expenses | 0.1 | 166.1 | 82.8 | 44.5 | — | 293.5 |
| Restructuring charges | — | 16.5 | 4.2 | 18.2 | — | 38.9 |
| Impairment of long-lived assets | — | — | 4.1 | 13.9 | — | 18.0 |
| Operating income (loss) | (0.1) | (75.0) | 214.6 | 28.2 | — | 167.7 |
| Interest expense, net | (0.1) | 15.4 | 126.2 | 7.4 | — | 148.9 |
| Intercompany interest expense (income) | (6.6) | (5.9) | (23.8) | 36.3 | — | — |
| Subsidiary preferred stock dividend | — | 30.8 | — | — | — | 30.8 |
| Subsidiary preferred stock accretion | — | 7.6 | — | — | — | 7.6 |
| Loss on sale of receivables | — | 0.6 | — | 3.6 | — | 4.2 |
| Other expense (income), net | — | (45.8) | 40.4 | 12.5 | 2.9 | 10.0 |
| Income (loss) from continuing operations before income taxes | 6.6 | (77.7) | 71.8 | (31.6) | (2.9) | (33.8) |
| Income tax expense (benefit) | 2.5 | (16.2) | 42.4 | (11.2) | — | 17.5 |
| Income (loss) from continuing operations | 4.1 | (61.5) | 29.4 | (20.4) | (2.9) | (51.3) |
| Income from discontinued operations | — | 9.5 | — | — | — | 9.5 |
| Cumulative effect of a change in accounting principle | — | — | — | (11.7) | — | (11.7) |
| Equity in net income (loss) of subsidiaries | (57.6) | (5.6) | (60.3) | — | 123.5 | — |
| NET INCOME (LOSS) | $(53.5) | $(57.6) | $ (30.9) | $ (32.1) | $120.6 | $ (53.5) |

## COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES

### SUPPLEMENTAL GUARANTOR CONDENSED CONSOLIDATING FINANCIAL STATEMENTS

### CONSOLIDATING STATEMENT OF OPERATIONS

| | For the Year Ended December 31, 2001 | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | Parent | Issuer | Guarantors | Non-Guarantors | Eliminations | Consolidated Total |
| | | | | (in millions) | | |
| Net sales | $ — | $612.2 | $676.4 | $577.1 | $(42.4) | $1,823.3 |
| Cost of goods sold | — | 506.3 | 598.2 | 542.4 | (42.4) | 1,604.5 |
| Selling, general and administrative expenses | 0.1 | 34.9 | 81.1 | 48.3 | — | 164.4 |
| Restructuring charge | | 4.7 | 0.2 | 6.3 | | 11.2 |
| Impairment of long-lived assets | — | 2.6 | 0.7 | 4.3 | — | 7.6 |
| Operating income (loss) | (0.1) | 63.7 | (3.8) | (24.2) | — | 35.6 |
| Interest expense, net | — | 45.6 | 35.9 | 2.8 | — | 84.3 |
| Intercompany interest expense (income) | — | 17.3 | (24.7) | 7.4 | — | — |
| Subsidiary preferred stock dividend | — | 1.5 | — | — | — | 1.5 |
| Subsidiary preferred stock accretion | — | 0.9 | — | — | — | 0.9 |
| Loss on sale of receivables | — | 6.1 | — | 4.7 | — | 10.8 |
| Other expense (income), net | — | 12.5 | 3.4 | 1.8 | (3.3) | 14.4 |
| Income (loss) from continuing operations before income taxes | (0.1) | (20.2) | (18.4) | (40.9) | 3.3 | (76.3) |
| Income tax expense (benefit) | 0.2 | (14.4) | (5.8) | (1.3) | — | (21.3) |
| Income (loss) from continuing operations | (0.3) | (5.8) | (12.6) | (39.6) | 3.3 | (55.0) |
| Income from discontinued operations | — | 8.8 | — | — | — | 8.8 |
| Equity in net income (loss) of subsidiaries | (45.9) | (48.9) | (33.5) | — | 128.3 | — |
| NET INCOME (LOSS) | $(46.2) | $(45.9) | $(46.1) | $(39.6) | $131.6 | $ (46.2) |

COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES

SUPPLEMENTAL GUARANTOR CONDENSED CONSOLIDATING FINANCIAL STATEMENTS
CONSOLIDATING BALANCE SHEET

|  | December 31, 2003 | | | | | |
|---|---|---|---|---|---|---|
|  | Parent | Issuer | Guarantors | Non-Guarantors | Eliminations | Consolidated Total |
|  | | | | (in millions) | | |
| **ASSETS** | | | | | | |
| Current Assets: | | | | | | |
| Cash and cash equivalents .... | $ — | $ (71.2) | $ 78.4 | $ 6.0 | $ — | $ 13.2 |
| Accounts and other receivables, net .......... | — | 1.1 | 34.4 | 220.4 | 1.4 | 257.3 |
| Inventories ................. | — | 14.2 | 96.2 | 59.0 | — | 169.4 |
| Other ..................... | — | 47.8 | 109.2 | 59.0 | — | 216.0 |
| Total current assets ........... | — | (8.1) | 318.2 | 344.4 | 1.4 | 655.9 |
| Investment in subsidiaries ...... | 439.7 | 1,654.4 | (1.8) | — | (2,092.3) | — |
| Property, plant and equipment, net ........................ | — | 55.9 | 339.9 | 430.1 | — | 825.9 |
| Goodwill ..................... | — | — | 948.9 | 414.2 | — | 1,363.1 |
| Other assets ................. | — | 276.0 | 15.8 | 54.5 | — | 346.3 |
|  | $439.7 | $1,978.2 | $1,621.0 | $1,243.2 | $(2,090.9) | $3,191.2 |
| **LIABILITIES & STOCKHOLDERS' EQUITY (DEFICIT)** | | | | | | |
| Current Liabilities: | | | | | | |
| Short-term borrowings ....... | — | — | — | 16.0 | — | 16.0 |
| Current maturities of long-term debt and capital lease obligations ............... | — | 27.8 | 0.1 | 3.6 | — | 31.5 |
| Accounts payable ........... | — | 46.0 | 301.4 | 291.5 | — | 638.9 |
| Accrued expenses ........... | — | 146.9 | 2.2 | 90.4 | (0.6) | 238.9 |
| Total current liabilities ......... | — | 220.7 | 303.7 | 401.5 | (0.6) | 925.3 |
| Long-term debt and capital lease obligations ................. | — | 1,230.1 | — | 7.6 | — | 1,237.7 |
| Mandatorily redeemable preferred stock of subsidiary .. | — | 161.2 | — | — | — | 161.2 |
| Intercompany payable (receivable) ................. | — | (317.3) | (215.7) | 533.0 | — | — |
| Other noncurrent liabilities ..... | — | 243.8 | 74.9 | 108.0 | — | 426.7 |
| Total liabilities ................ | — | 1,538.5 | 162.9 | 1,050.1 | (0.6) | 2,750.9 |
| Total common stockholders' equity (deficit) ............. | 439.7 | 439.7 | 1,458.1 | 193.1 | (2,090.3) | 440.3 |
|  | $439.7 | $1,978.2 | $1,621.0 | $1,243.2 | $(2,090.9) | $3,191.2 |

COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES

SUPPLEMENTAL GUARANTOR CONDENSED CONSOLIDATING FINANCIAL STATEMENTS

CONSOLIDATING BALANCE SHEET

| | Parent | Issuer | Guarantors | Non-Guarantors | Eliminations | Consolidated Total |
|---|---|---|---|---|---|---|
| | | | | December 31, 2002 (in millions) | | |

### ASSETS

| | Parent | Issuer | Guarantors | Non-Guarantors | Eliminations | Consolidated Total |
|---|---|---|---|---|---|---|
| Current Assets: | | | | | | |
| Cash and cash equivalents .... | $  — | $   0.2 | $   0.3 | $  80.8 | $  — | $  81.3 |
| Accounts and other receivables, net ........... | — | 5.0 | 40.7 | 324.4 | 2.9 | 373.0 |
| Inventories ................. | — | 13.0 | 106.7 | 51.9 | — | 171.6 |
| Other ..................... | — | 51.4 | 75.5 | 50.5 | — | 177.4 |
| Total current assets ........... | — | 69.6 | 223.2 | 507.6 | 2.9 | 803.3 |
| Investment in subsidiaries ...... | 397.5 | 1,794.5 | (54.8) | — | (2,137.2) | — |
| Property, plant and equipment, net........................ | — | 51.2 | 316.9 | 370.4 | (0.7) | 737.8 |
| Goodwill...................... | — | — | 1,144.8 | 120.7 | — | 1,265.5 |
| Other assets ................. | — | 212.3 | 85.8 | 52.4 | — | 350.5 |
| | $397.5 | $2,127.6 | $1,715.9 | $1,051.1 | $(2,135.0) | $3,157.1 |

### LIABILITIES & STOCKHOLDERS' EQUITY (DEFICIT)

| | Parent | Issuer | Guarantors | Non-Guarantors | Eliminations | Consolidated Total |
|---|---|---|---|---|---|---|
| Current Liabilities: | | | | | | |
| Short-term borrowings ....... | — | — | — | 10.5 | — | 10.5 |
| Current maturities of long-term debt ................ | — | 22.7 | 0.1 | 0.7 | — | 23.5 |
| Accounts payable ........... | — | 73.5 | 269.7 | 252.3 | — | 595.5 |
| Accrued expenses ........... | — | 142.5 | 50.8 | 106.6 | — | 299.9 |
| Total current liabilities ......... | — | 238.7 | 320.6 | 370.1 | — | 929.4 |
| Long-term debt ............... | — | 1,255.0 | 0.1 | 0.1 | — | 1,255.2 |
| Intercompany payable (receivable) ................ | — | (92.1) | (359.9) | 452.0 | — | — |
| Other noncurrent liabilities ..... | — | 204.6 | 140.8 | 105.7 | — | 451.1 |
| Total liabilities................ | — | 1,606.2 | 101.6 | 927.9 | — | 2,635.7 |
| Mandatorily redeemable preferred stock of subsidiary .. | — | 123.9 | — | — | — | 123.9 |
| Total common stockholders' equity (deficit) ............. | 397.5 | 397.5 | 1,614.3 | 123.2 | (2,135.0) | 397.5 |
| | $397.5 | $2,127.6 | $1,715.9 | $1,051.1 | $(2,135.0) | $3,157.1 |

COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES

SUPPLEMENTAL GUARANTOR CONDENSED CONSOLIDATING FINANCIAL STATEMENTS

CONSOLIDATING STATEMENT OF CASH FLOWS

| | For the Year Ended December 31, 2003 | | | | | |
| | Parent | Issuer | Guarantors | Non-Guarantors | Eliminations | Consolidated Total |
|---|---|---|---|---|---|---|
| | | | | (in millions) | | |
| **OPERATING ACTIVITIES** | | | | | | |
| Net cash provided by (used in) operating activities . . . . . . . . . . . . . | $ — | $(256.7) | $ 339.2 | $ 40.4 | $— | $ 122.9 |
| **INVESTING ACTIVITIES** | | | | | | |
| Additions to property, plant and equipment . . . . . . . . . . . . . . . . . . . . | — | (13.8) | (84.3) | (77.0) | — | (175.1) |
| Sales of property, plant and equipment . . . . . . . . . . . . . . . . . . . . | — | — | 0.6 | 17.7 | — | 18.3 |
| Payments for acquisitions and related costs . . . . . . . . . . . . . . . . . . | — | — | (33.1) | — | — | (33.1) |
| Net cash provided by (used in) investing activities . . . . . . . . | — | (13.8) | (116.8) | (59.3) | — | (189.9) |
| **FINANCING ACTIVITIES** | | | | | | |
| Issuance of long-term debt and capital lease obligations . . . . . . . . . | — | 1.8 | — | 11.3 | — | 13.1 |
| Repayment of long-term debt and capital lease obligations . . . . . . . . | — | (27.9) | (0.1) | (0.9) | — | (28.9) |
| Increase (decrease) in short-term borrowings . . . . . . . . . . . . . . . . . . . | — | — | — | 4.7 | — | 4.7 |
| Net borrowings (repayments) on revolving credit facilities . . . . . . . . | — | — | — | 6.3 | — | 6.3 |
| Intercompany transfers (from) to Subsidiary . . . . . . . . . . . . . . . . . . . | — | 225.2 | (144.2) | (81.0) | — | — |
| Net cash provided by (used in) financing activities . . . . . . . . . | — | 199.1 | (144.3) | (59.6) | — | (4.8) |
| Effect of exchange rate changes on cash . . . . . . . . . . . . . . . . . | — | — | — | 3.7 | — | 3.7 |
| Increase (decrease) in cash and cash equivalents . . . . . . . . . . . . . . . . . . . . | — | (71.4) | 78.1 | (74.8) | — | (68.1) |
| Cash and cash equivalents at beginning of year . . . . . . . . . . . . . . . | — | 0.2 | 0.3 | 80.8 | — | 81.3 |
| Cash and cash equivalents at end of year . . . . . . . . . . . . . . . . . . . . . . | $ — | $ (71.2) | $ 78.4 | $ 6.0 | $— | $ 13.2 |

F-57

COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES

SUPPLEMENTAL GUARANTOR CONDENSED CONSOLIDATING FINANCIAL STATEMENTS

CONSOLIDATING STATEMENT OF CASH FLOWS — (Continued)

| | For the Year Ended December 31, 2002 | | | | | |
|---|---|---|---|---|---|---|
| | Parent | Issuer | Guarantors | Non-Guarantors | Eliminations | Consolidated Total |
| | | | (in millions) | | | |
| **OPERATING ACTIVITIES** | | | | | | |
| Net cash provided by (used in) operating activities ............. | $ (0.2) | $ 24.0 | $(271.3) | $ 436.9 | $— | $ 189.4 |
| **INVESTING ACTIVITIES** | | | | | | |
| Additions to property, plant and equipment .................... | — | (31.2) | (71.9) | (44.8) | — | (147.9) |
| Sales of property, plant and equipment .................... | — | — | 13.3 | — | — | 13.3 |
| Additional investment in joint venture........................ | — | — | — | (5.9) | — | (5.9) |
| Payment for acquisitions and related costs........................... | — | — | (46.4) | 0.8 | — | (45.6) |
| Net cash used in investing activities ................. | — | (31.2) | (105.0) | (49.9) | — | (186.1) |
| **FINANCING ACTIVITIES** | | | | | | |
| Repayment of long-term debt ...... | — | (22.4) | (0.1) | (1.4) | — | (23.9) |
| Repayment of preferred stock ...... | — | (100.0) | — | — | — | (100.0) |
| Decrease in short-term borrowings.. | — | — | — | (16.0) | — | (16.0) |
| Net proceeds from issuance of common stock ............... | 150.6 | — | — | — | — | 150.6 |
| Repayment of debt assumed in acquisition .................... | — | (6.7) | — | — | — | (6.7) |
| Intercompany transfers (from) to Subsidiary .................... | (150.6) | 140.3 | 364.0 | (353.7) | — | — |
| Net cash provided by (used in) financing activities ......... | — | 11.2 | 363.9 | (371.1) | — | 4.0 |
| Effect of exchange rate changes on cash ................. | — | — | — | 0.1 | — | 0.1 |
| Increase (decrease) in cash and cash equivalents ..................... | (0.2) | 4.0 | (12.4) | 16.0 | — | 7.4 |
| Cash and cash equivalents at beginning of year ................ | 0.2 | (3.8) | 12.7 | 64.8 | — | 73.9 |
| Cash and cash equivalents at end of year .......................... | $ — | $ 0.2 | $ 0.3 | $ 80.8 | $— | $ 81.3 |

COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES

SUPPLEMENTAL GUARANTOR CONDENSED CONSOLIDATING FINANCIAL STATEMENTS

CONSOLIDATING STATEMENT OF CASH FLOWS

| | Parent | Issuer | Guarantors | Non-Guarantors | Eliminations | Consolidated Total |
|---|---|---|---|---|---|---|
| | | | | (in millions) | | |
| **OPERATING ACTIVITIES** | | | | | | |
| Net cash provided by (used in) operating activities . . . . . . . . . . . . | $ (0.3) | $(266.6) | $ 237.6 | $ 166.4 | $— | $ 137.1 |
| **INVESTING ACTIVITIES** | | | | | | |
| Additions to property, plant and equipment . . . . . . . . . . . . . . . . . . . | — | (14.8) | (14.5) | (25.2) | — | (54.5) |
| Sales of property, plant and equipment . . . . . . . . . . . . . . . . . . . | — | 62.2 | 24.0 | 1.9 | — | 88.1 |
| Payments for acquisitions and related costs . . . . . . . . . . . . . . . . . | — | (760.9) | — | — | — | (760.9) |
| Sale of business . . . . . . . . . . . . . . . . . | — | — | 3.5 | — | — | 3.5 |
| Net cash provided by (used in) investing activities . . . . . . . . . . . | — | (713.5) | 13.0 | (23.3) | — | (723.8) |
| **FINANCING ACTIVITIES** | | | | | | |
| Issuance of long-term debt . . . . . . . . | — | 950.0 | — | — | — | 950.0 |
| Debt issuance costs . . . . . . . . . . . . . . | — | (59.4) | — | — | — | (59.4) |
| Repayment of long-term debt . . . . . . | — | (383.2) | — | — | — | (383.2) |
| Increase (decrease) in short-term borrowings . . . . . . . . . . . . . . . . . . . | — | 9.7 | 2.0 | (1.6) | — | 10.1 |
| Net repayments on revolving credit facilities . . . . . . . . . . . . . . . . . . . . | — | (133.4) | — | (16.8) | — | (150.2) |
| Net proceeds from issuance of common stock . . . . . . . . . . . . . . . | 207.2 | — | — | — | — | 207.2 |
| Reissue treasury stock, net . . . . . . . . | 61.3 | — | — | — | — | 61.3 |
| Intercompany transfers (from) to Subsidiary . . . . . . . . . . . . . . . . . . . . | (268.5) | 596.8 | (240.9) | (87.4) | — | — |
| Net cash provided by (used in) financing activities . . . . . . . . . . . | — | 980.5 | (238.9) | (105.8) | — | 635.8 |
| Effect of exchange rate changes on cash . . . . . . . . . . . . . . . . . . . . | — | — | — | 3.9 | — | 3.9 |
| Increase (decrease) in cash and cash equivalents . . . . . . . . . . . . . . . . . . . . | (0.3) | 0.4 | 11.7 | 41.2 | — | 53.0 |
| Cash and cash equivalents at beginning of year . . . . . . . . . . . . . . . | 0.5 | (4.2) | 1.0 | 23.6 | — | 20.9 |
| Cash and cash equivalents at end of year . . . . . . . . . . . . . . . . . . . . . . . . | $ 0.2 | $ (3.8) | $ 12.7 | $ 64.8 | $— | $ 73.9 |

COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES

SCHEDULE I — CONDENSED FINANCIAL INFORMATION OF REGISTRANT

The information required under this Schedule is included in Note 23 of the Consolidated Financial Statements.

COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES

SCHEDULE II — VALUATION AND QUALIFYING ACCOUNTS
For the Fiscal Years Ended December 31, 2003, December 31, 2002, and December 31, 2001

| Description | Balance At Beginning of Year | Additions Resulting from Acquisitions | Charge to Cost and Expenses | Charged to Other Accounts | Deductions | Balance at End of Year |
|---|---|---|---|---|---|---|
| | | | | (in millions) | | |
| **Fiscal Year Ended December 31, 2003:** | | | | | | |
| Allowance for doubtful accounts . . . . . . | $18.6 | $ — | $1.5 | $  — | $(10.9) | $ 9.2 |
| **Fiscal Year Ended December 31, 2002:** | | | | | | |
| Allowance for doubtful accounts . . . . . . | $14.6 | $ — | $2.5 | $ 4.8 | $  (3.3) | $18.6 |
| **Fiscal Year Ended December 31, 2001:** | | | | | | |
| Allowance for doubtful accounts . . . . . . | $ 8.1 | $6.8 | $6.6 | $(0.3) (a) | $  (6.6) | $14.6 |

(a) Reclassifications and collection of accounts previously written off.

## Exhibit Index

| Exhibit Number | Description |
| --- | --- |

2.1   Agreement and Plan of Merger dated May 14, 2001 by and among Collins & Aikman Corporation, Collins & Aikman Products Co., Becker Group, L.L.C., CE Becker Inc., ME McInerney Inc., J Hoehnel Inc. and the individuals party thereto as sellers is hereby incorporated by reference to Exhibit 2.1 of Collins & Aikman Corporation's Current Report on Form 8-K dated and filed July 13, 2001.

2.2   Agreement and Plan of Merger dated as of August 17, 2001 by and among Collins & Aikman Corporation, Collins & Aikman Products Co., JAII Acquisition Co., Elkin McCallum, Joan Fabrics Corporation and Joan Automotive Industries, Inc is hereby incorporated by reference to Exhibit 2.1 of Collins & Aikman Corporation's Current Report on Form 8-K dated September 21, 2001 and filed October 10, 2001.

2.3   First Amendment to Agreement and Plan of Merger by and among Collins & Aikman Corporation, Collins & Aikman Products Co., JAII Acquisition Co., Elkin McCallum, Joan Fabrics Corporation and Joan Automotive Industries, Inc dated as of September 21, 2001 is hereby incorporated by reference to Exhibit 2.2 of Collins & Aikman Corporation's Current Report on Form 8-K dated September 21, 2001 and filed October 10, 2001.

2.4   Second Amendment to the Receivables Transfer Agreement among Collins & Aikman Products Co., Carcorp, Inc., the conduit purchasers party thereto from time to time, the committed purchasers party thereto from time to time, the funding agents party thereto from time to time and JPMorgan Chase Bank, as administrative agent, dated as of December 18, 2003 to the Receivables Transfer Agreement, dated December 20, 2001, as amended and restated as of September 24, 2002.*

2.5   Purchase Agreement dated as of August 7, 2001, as amended and restated as of November 30, 2001, by and among Textron Inc., Collins & Aikman Corporation and Collins & Aikman Products Co., including Exhibit 1 (Certificate of Designation of the 15% Series A Redeemable Preferred Stock, the 16% Series B Redeemable Preferred Stock and the 16% Series C Redeemable Preferred Stock) and Exhibit 7 (Asset Purchase Agreement dated as of August 7 by and between Textron Automotive Exteriors Inc. and JPS Automotive, Inc.), which is incorporated by reference to Collins and Aikman Corporation Current Report on Form 8-k dated December 20, 2001 and filed on January 4, 2002. The Table of Contents of the Purchase Agreement listed as Exhibit 2.4 contains a list briefly identifying the contents of all omitted schedules and exhibits. Collins & Aikman Corporation will supplementally furnish a copy of any omitted schedule or Exhibit to the Commission upon request.

2.6   Asset Purchase Agreement dated as of August 7, 2001, as amended and restated as of November 30, 2001, by and between Textron Automotive Exteriors Inc. and JPS Automotive, Inc., which is incorporated herein by reference to Exhibit 2.2 of Collins & Aikman Corporation's Current Report on Form 8-K dated December 20, 2001 and filed on January 4, 2002.

2.7   Asset Purchase Agreement dated as of August 17, 2001 by and among Collins & Aikman Products Co., Western Avenue Dyers, L.P., Elkin McCallum, Kerry McCallum, Penny Richards and Tyng Textiles LLC, which is incorporated by reference to Exhibit 2.3 to Collins & Aikman Corporation's Current Report on Form 8-K filed on October 4, 2001.

2.8   First Amendment to Asset Purchase Agreement dated as of September 21, 2001, which is incorporated by reference to Exhibit 2.4 to Collins & Aikman Corporation's Current Report on Form 8-K filed on October 4, 2001.

3.1   Restated Certificate of Incorporation of Collins & Aikman Corporation is hereby incorporated by reference to Exhibit 3.1 of Collins & Aikman Corporation's Report on Form 10-Q for the fiscal quarter ended June 26, 1999 and filed August 10, 1999.

3.2   Certificate of Amendment to the Restated Certificate of Incorporation of Collins & Aikman Corporation, which is incorporated by reference to Exhibit 3.2 of Collins & Aikman Corporation's Annual Report on Form 10-K for the fiscal year ended December 31, 2000 and filed April 2, 2001.

| Exhibit Number | Description |
|---|---|
| 3.3 | Certificate of Amendment of Amended and Restated Certificate of Incorporation is hereby incorporated by reference to Exhibit 3.5 of Collins & Aikman Corporation's Current Report on Form 8-K filed May 29, 2002. |
| 3.4 | By-laws of Collins & Aikman Corporation, as amended, are hereby incorporated by reference to Exhibit 3.2 of Collins & Aikman Corporation's Report on Form 10-K for the fiscal year ended January 27, 1996 and filed April 22, 1996. |
| 3.5 | Certificate of Elimination of Cumulative Exchangeable Redeemable Preferred Stock of Collins & Aikman Corporation is hereby incorporated by reference to Exhibit 3.3 of Collins & Aikman Corporation's Report on Form 10-Q for the fiscal quarter ended October 28, 1995 and filed December 8, 1995. |
| 4.1 | Specimen Stock Certificate for the Common Stock is hereby incorporated by reference to Exhibit 4.3 of Amendment No. 3 to Collins & Aikman Holdings Corporation's Registration Statement on Form S-2 (Registration No. 33-53179) filed June 21, 1994. |
| 4.2 | Indenture, dated as of June 1, 1996, between Collins & Aikman Products Co., Collins & Aikman Corporation and First Union National Bank of North Carolina, as Trustee, is hereby incorporated by reference to Exhibit 4.2 of Collins & Aikman Corporation's Report on Form 10-Q for the fiscal quarter ended April 27, 1996 and filed June 11, 1996. |
| 4.3 | First Supplemental Indenture dated as of June 1, 1996, between Collins & Aikman Products Co., Collins & Aikman Corporation and First Union National Bank of North Carolina, as Trustee, is hereby incorporated by reference to Exhibit 4.3 of Collins & Aikman Corporation's Report on Form 10-Q for the fiscal quarter ended April 27, 1996 and filed June 11, 1996. |
| 4.4 | Second Supplemental Indenture, dated as of February 8, 2001, by and among Collins & Aikman Products Co., as Issuer, Collins & Aikman Corporation, as Guarantor, and First Union National Bank, as Trustee, which is incorporated by reference to Exhibit 4.11 of Collins & Aikman Corporation's Annual Report on Form 10-K for the fiscal year ended December 31, 2000 and filed April 1, 2002. |
| 4.5 | Form of Warrant is hereby incorporated by reference to Exhibit 4.1 of Collins & Aikman Corporation's Current Report on Form 8-K dated and filed July 13, 2001. |
| 4.6 | Certificate of Designation of Series A Redeemable Preferred Stock, Series B Redeemable Preferred Stock and Series C Redeemable Preferred Stock, which is incorporated herein by reference to Exhibit 4.1 of Collins & Aikman Corporation's Current Report of Form 8-K dated December 20, 2001 and filed on January 4, 2002. |
| 4.7 | Indenture dated as of December 20, 2001 by and among Collins & Aikman Products Co., as Issuer, the Guarantors parties thereto, and BNY Midwest Trust Company, as Trustee, which is incorporated herein by reference to Exhibit 4.2 of Collins & Aikman Corporation's Current Report on Form 8-K dated December 20, 2001 and filed on January 4, 2002. |
| 4.8 | Receivables Transfer Agreement dated as of December 20, 2001 by and among Carcorp, Inc., as Transferor, Collins & Aikman Products Co., individually and as Collection Agent, the persons parties thereto, as CP Conduit Purchasers, Committed Purchasers and Funding Agents and JPMorgan Chase Bank, as Administrative Agent, which is incorporated herein by reference to Exhibit 4.3 of Collins & Aikman Corporation's Current Report on Form 8-K dated December 20, 2001 and filed on January 4, 2002. |
| 4.9 | Amended and Restated Receivables Purchase Agreement dated as of December 20, 2001 among Collins & Aikman Products Co. and its wholly-owned direct and indirect subsidiaries named therein, as Sellers, and Carcorp, Inc., as Purchaser, and the other Sellers from time to time named therein, which is incorporated herein by reference to Exhibit 4.4 of Collins & Aikman Corporation's Current Report on Form 8-K dated December 20, 2001 and filed on January 4, 2002. |

| Exhibit Number | Description |
|---|---|
| 4.10 | Credit Agreement dated as of December 20, 2001 among Collins & Aikman Products Co., as Borrower, Collins & Aikman Canada Inc., as a Canadian Borrower, Collins & Aikman Plastics, Ltd., as a Canadian Borrower, Collins & Aikman Corporation, the Lenders named therein, Deutsche Banc Alex. Brown Inc. and Merrill Lynch Capital Corporation, as Co-Documentation Agents, Credit Suisse First Boston Corporation, as Syndication Agent, JPMorgan Chase Bank, as Administrative Agent, and J.P.Morgan Bank Canada, as Canadian Administrative Agent, which is incorporated herein by reference to Exhibit 4.5 of Collins & Aikman Corporation's Current Report on Form 8-K dated December 20, 2001 and filed on January 4, 2002. |
| 4.11 | First Amendment dated as of December 13, 2002, to the Credit Agreement dated as of December 20, 2001 among Collins & Aikman Products Co., as Borrower, Collins & Aikman Canada Inc., as a Canadian Borrower, Collins & Aikman Plastics, Ltd., as a Canadian Borrower, Collins & Aikman Corporation, the Lenders named therein, Credit Suisse First Boston Corporation, as Syndication Agent, Deutsche Bank Securities Inc. (formerly known as Deutsche Banc Alex. Brown Inc.) and Merrill Lynch Capital Corporation, as Co-Documentation Agents, JPMorgan Chase Bank, as Administrative Agent, and J.P. Morgan Bank Canada, as Canadian Administrative Agent is hereby incorporated by reference to Exhibit 4.17 of Collins & Aikman Corporation's report on Form 10-K for the year ended December 31, 2002. |
| 4.12 | Second Amendment dated May 2, 2003 to the Credit Agreement dated December 20, 2001 which is incorporated herein by reference to Exhibit 10.1 of Collins & Aikman Corporation's Report on Form 10-Q dated March 31, 2003 and filed on May 15, 2003. |
| 4.13 | Third Amendment dated September 23, 2003 to the Credit Agreement dated December 20, 2001 which is incorporated herein by reference to Exhibit 4.2 of Collins & Aikman Corporation's Report on Form 10-Q dated September 30, 2003 and filed on November 11, 2003. |
| 4.14 | Fourth Amendment dated October 7, 2003 to the Credit Agreement dated December 20, 2001 which is incorporated herein by reference to Exhibit 4.3 of Collins & Aikman Corporation's Report on Form 10-Q dated September 30, 2003 and filed on November 11, 2003. |
| 4.15 | Fifth Amendment dated February 13, 2004 to the Credit Agreement dated December 20, 2001.* |
| 4.16 | Guarantee and Collateral Agreement dated as of December 20, 2001 by and among Collins & Aikman Corporation, Collins & Aikman Products Co. and certain of their subsidiaries and JPMorgan Chase Bank, as Collateral Agent, which is incorporated herein by reference to Exhibit 4.6 of Collins & Aikman Corporation's Current Report on Form 8-K dated December 20, 2001 and filed on January 4, 2002. |
| 4.17 | Third Supplemental Indenture, dated as of December 20, 2001, among Collins & Aikman Products Co., Collins & Aikman Corporation, the Subsidiary Guarantors listed on the signature page thereto, and First Union National Bank (as successor in interest to First Union National Bank of North Carolina), which is incorporated herein by reference to Exhibit 4.7 of Collins & Aikman Corporation's Current Report on Form 8-K dated December 20, 2001 and filed on January 4, 2002. |
| 4.18 | Amendment and Waiver, dated August 26, 2003 to the Receivables Transfer Agreement dated December 21, 2001 which is incorporated herein by reference to Exhibit 4.1 of Collins & Aikman Corporation's Report on Form 10-Q dated September 30, 2003 and filed on November 11, 2003. |
| 4.19 | Registration Rights Agreement, dated February 23, 2001, by and among Collins & Aikman Corporation, Heartland Industrial Partners, L.P. and the other investor stockholders listed on Schedule 1 thereto, Blackstone Capital Company II, L.L.C., Blackstone Family Investment Partnership I L.P., Blackstone Advisory Directors Partnership L.P., Blackstone Capital Partners, L.P. and Wasserstein/C&A Holdings, L.L.C., incorporated by reference to Annex D to Exhibit 10.1 to Collins & Aikman Corporation's Current Report on Form 8-K dated January 12, 2001 and filed January 16, 2001. |

| Exhibit Number | Description |
|---|---|
| 4.20 | Stockholders Agreement dated July 3, 2001, by and among Collins & Aikman Corporation, Heartland Industrial Partners, L.P. and the other Heartland Entities named therein, the Becker Stockholders party thereto and the Joan Stockholders party thereto is hereby incorporated by reference to Exhibit 10.85 of Collins & Aikman Corporation's Report on Form 10-K for the year ended December 31, 2001 and filed April 1, 2002. |
| 4.21 | Registration Rights Agreement, dated December 20, 2001, by and among Collins & Aikman Products Co., Collins & Aikman Corporation, and each of the subsidiaries listed on the signature pages thereof, and J.P. Morgan Securities Inc., Credit Suisse First Boston Corporation, Deutsche Banc Alex. Brown Inc. and Merrill Lynch, Pierce, Fenner & Smith Incorporated and the other several initial purchasers parties to the Purchase Agreement is hereby incorporated by reference to Exhibit 10.89 of Collins & Aikman Corporation's Report on Form 10-K for the year ended December 31, 2001 and filed April 1, 2002. |
| 4.22 | Registration Rights Agreement dated as of December 20, 2001 by and among Becker Ventures, LLC, Dresdner Kleinwort Capital Partners 2001 LP, Masco Capital Corporation, ML IBK Positions, Inc. and Collins & Aikman Corporation is hereby incorporated by reference to Exhibit 10.90 of Collins & Aikman Corporation's Report on Form 10-K for the year ended December 31, 2001 and filed April 1, 2002. |
| 4.23 | Registration Rights Agreement, dated December 20, 2001, by and between Collins & Aikman Corporation, Textron Inc., and Textron Holdco Inc is hereby incorporated by reference to Exhibit 10.91 of Collins & Aikman Corporation's Report on Form 10-K for the year ended December 31, 2001 and filed April 1, 2002. |
| 4.24 | Preferred Stock Registration and Other Rights Agreement, dated as of December 20, 2001, by and among Collins & Aikman Products Co. and Textron Inc is hereby incorporated by reference to Exhibit 10.92 of Collins & Aikman Corporation's Report on Form 10-K for the year ended December 31, 2001 and filed April 1, 2002. |
| 10.1 | Employment Agreement, dated as of April 1, 2000, between Collins & Aikman Products Co. and an executive officer is hereby incorporated by reference to Exhibit 10.3 of Collins & Aikman Corporation's Report on Form 10-Q for the fiscal quarter ended July 1, 2000. |
| 10.2 | 1993 Employee Stock Option Plan, as amended and restated, is hereby incorporated by reference to Exhibit 10.13 of Collins & Aikman Corporation's Report on Form 10-Q for the fiscal quarter ended April 29, 1995. |
| 10.3 | 1994 Employee Stock Option Plan, as amended through February 7, 1997, is hereby incorporated by reference to Exhibit 10.12 of Collins & Aikman Corporation's Report on Form 10-Q for the fiscal quarter ended March 29, 1997. |
| 10.4 | 2000 Employee Stock Option Plan is hereby incorporated by reference to Exhibit 10.6 of Collins & Aikman Corporation's Report on Form 10-Q for the fiscal quarter ended July 1, 2000. |
| 10.5 | 1994 Directors Stock Option Plan as amended and restated is hereby incorporated by reference to Exhibit 10.15 to Collins & Aikman Corporation's Report on Form 10-K for the year ended December 26, 1998. |
| 10.6 | 1994 Employee Stock Option Plan, as amended and restated through June 3, 1999 is hereby incorporated by reference to Exhibit 10.2 of Collins & Aikman Corporation's Report on Form 10-Q for the fiscal quarter ended June 26, 1999. |
| 10.7 | Change in Control Agreement, dated March 17, 1998, between Collins & Aikman Corporation and an executive officer is hereby incorporated by reference to Exhibit 10.22 of Collins & Aikman Corporation's Report on Form 10-Q for the fiscal quarter ended March 28, 1998. |
| 10.8 | Change in Control Agreement, dated March 17, 1998, between Collins & Aikman Corporation and an executive officer is hereby incorporated by reference to Exhibit 10.29 of Collins & Aikman Corporation's Report on Form 10-K for the fiscal year ended December 25, 1999. |
| 10.9 | Change in Control Agreement, dated as of April 1, 2000, between Collins & Aikman Products Co. and an executive officer is hereby incorporated by reference to Exhibit 10.4 of Collins & Aikman Corporation's Report on Form 10-Q for the fiscal quarter ended July 1, 2000. |

| **Exhibit Number** | **Description** |
|---|---|
| 10.10 | Stockholders Agreement, dated February 23, 2001, by and among Collins & Aikman Corporation, Heartland Industrial Partners, L.P. and other investor stockholders listed on Schedule 1 thereto, Blackstone Capital Company II, L.L.C., Blackstone Family Investment Partnership I L.P., Blackstone Capital Partners L.P., and Wasserstein/C&A Holdings, L.L.C., incorporated by reference to Annex E to Exhibit 10.1 to Collins & Aikman Corporation's Current Report on form 8-K dated January 12, 2001 and filed January 16, 2001. |
| 10.11 | Share Purchase Agreement, dated as of January 12, 2001, between Collins & Aikman Corporation and Heartland Industrial Partners, L.P., is hereby incorporated by reference to Exhibit 10.1 of Collins & Aikman Corporation's Report on Form 8-K dated January 12, 2001, incorporated by reference to Exhibit 10.1 to Collins & Aikman Corporation's Current Report on Form 8-K dated January 12, 2001 and filed January 16, 2001. |
| 10.12 | Services Agreement, dated as of February 23, 2001, by and among Collins & Aikman Corporation, Collins & Aikman Products Co. and Heartland Industrial Partners, L.P is hereby incorporated by reference to Exhibit 10.59 of Collins & Aikman Corporation's Report on Form 10-K for the year ended December 31, 2001 and filed April 1, 2002. |
| 10.13 | Profit Participation Interest Agreement, dated as of February 23, 2001, by and among Heartland Industrial Partners, L.P. and the other investor stockholders listed on Schedule 1 thereto and each of Collins & Aikman Corporation, Blackstone Capital Company II, L.L.C. and Wasserstein/C&A Holdings, L.L.C., incorporated by reference to Annex B to Exhibit 10.1 to Collins & Aikman Corporation's Current Report on Form 8-K dated January 12, 2001 and filed January 16, 2001. |
| 10.14 | Severance Benefit Agreement dated August 9, 1999 between Collins & Aikman Corporation and an executive officer is hereby incorporated by reference to Exhibit 10.32 of Collins & Aikman Corporation's Report on Form 10-K for the fiscal year ended December 25, 1999. |
| 10.15 | Employment Agreement dated December 1, 2000 between Collins & Aikman Products Co. and an executive officer, which is incorporated by reference to Exhibit 10.75 of Collins & Aikman Corporation's Annual Report on Form 10-K for the fiscal year ended December 31, 2000. |
| 10.16 | Employment Agreement dated as of April 1, 2000, between Collins & Aikman Products Co. and an executive officer is hereby incorporated by reference to Exhibit 10.3 of Collins & Aikman Corporation's Report on Form 10-Q for the quarter ended July 1, 2000. |
| 10.17 | Service Contract between Collins & Aikman Products GmbH and an executive officer, which is incorporated by reference to Exhibit 10.5 of Collins & Aikman Corporation's Quarterly Report on Form 10-Q for the quarter ended June 30, 2001 and filed August 14, 2001. |
| 10.18 | Lease Agreement, dated as of June 29, 2001, between New King, L.L.C., as landlord, and Collins & Aikman Products Co., as tenant is hereby incorporated by reference to Exhibit 10.82 of Collins & Aikman Corporation's Report on Form 10-K for the year ended December 31, 2001 and filed April 1, 2002. |
| 10.19 | Lease Agreement, dated as of June 29, 2001, between Anchor Court, L.L.C., as landlord and Collins & Aikman Products Co., as tenant is hereby incorporated by reference to Exhibit 10.84 of Collins & Aikman Corporation's Report on Form 10-K for the year ended December 31, 2001 and filed April 1, 2002. |
| 10.20 | Registration Rights Agreement, dated July 3, 2001, by and among Collins & Aikman Corporation, Charles E. Becker, Michael E. McInerney and Jens Höhnel and, together with the Joan Investors (as defined therein) is hereby incorporated by reference to Exhibit 10.86 of Collins & Aikman Corporation's Report on Form 10-K for the year ended December 31, 2001 and filed April 1, 2002. |
| 10.21 | First Amendment to Services Agreement, dated as of August 7, 2001, among Collins & Aikman Corporation, Collins & Aikman Products Co. and Heartland Industrial Partners, L.P is hereby incorporated by reference to Exhibit 10.87 of Collins & Aikman Corporation's Report on Form 10-K for the year ended December 31, 2001 and filed April 1, 2002. |

| Exhibit Number | Description |
|---|---|
| 10.22 | Equipment Lease, dated as of December 18, 2001, among Textron Automotive Exteriors Inc. and Textron Automotive Interiors Inc., collectively as lessee, and IAC TAX V, LLC, as lessor is hereby incorporated by reference to Exhibit 10.88 of Collins & Aikman Corporation's Report on Form 10-K for the year ended December 31, 2001 and filed April 1, 2002. |
| 10.23 | Intellimold Technology License and Support Agreement, dated as of December 20, 2001, by and between Textron, Inc. and Collins & Aikman Corporation and Collins & Aikman Products Co is hereby incorporated by reference to Exhibit 10.93 of Collins & Aikman Corporation's Report on Form 10-K for the year ended December 31, 2001 and filed April 1, 2002. |
| 10.24 | Technology License Agreement (Retained IP), dated as of December 20, 2001, by and between Textron, Inc. and Collins & Aikman Corporation and Collins & Aikman Products Co is hereby incorporated by reference to Exhibit 10.94 of Collins & Aikman Corporation's Report on Form 10-K for the year ended December 31, 2001 and filed April 1, 2002. |
| 10.25 | Technology License Agreement (Licensed-Back IP), dated as of December 20, 2001, by and between Textron, Inc. and Collins & Aikman Corporation and Collins & Aikman Products Co is hereby incorporated by reference to Exhibit 10.95 of Collins & Aikman Corporation's Report on Form 10-K for the year ended December 31, 2001 and filed April 1, 2002. |
| 10.26 | Employment Agreement between Products and an officer of the Company dated as of November 1, 2001 is hereby incorporated by reference to Exhibit 10.3 of Collins & Aikman Corporation's Report on Form 10-Q for the quarter ended March 31, 2002 and filed May 15, 2002. |
| 10.27 | Employment Agreement between Products and an officer of the Company dated as of November 1, 2001 is hereby incorporated by reference to Exhibit 10.4 of Collins & Aikman Corporation's Report on Form 10-Q for the quarter ended March 31, 2002 and filed May 15, 2002. |
| 10.28 | Employment Agreement between Products and an officer of the Company dated as of December 20, 2001 is hereby incorporated by reference to Exhibit 10.5 of Collins & Aikman Corporation's Report on Form 10-Q for the quarter ended March 31, 2002 and filed May 15, 2002. |
| 10.29 | Employment Agreement between Products and an officer of the Company dated as of December 20, 2001 is hereby incorporated by reference to Exhibit 10.6 of Collins & Aikman Corporation's Report on Form 10-Q for the quarter ended March 31, 2002 and filed May 15, 2002. |
| 10.30 | Employment Agreement between Products and an officer of the Company dated as of December 20, 2001 is hereby incorporated by reference to Exhibit 10.7 of Collins & Aikman Corporation's Report on Form 10-Q for the quarter ended March 31, 2002 and filed May 15, 2002. |
| 10.31 | Separation and Consultancy Agreement dated July 31, 2002 is hereby incorporated by reference to Exhibit 10.1 to Collins & Aikman Corporation's Current report on Form 8-K filed August 2, 2002. |
| 10.32 | Severance Benefit Agreement between Collins and Aikman Corporation and an officer of the Company dated April 5, 2002 is hereby incorporated by reference to Exhibit 10.2 of Collins & Aikman Corporation's Report on Form 10-Q for the quarter ended June 30, 2002 and filed August 14, 2002. |
| 10.33 | Employment and Consulting Agreement between Collins and Aikman Corporation and an Employee dated July 2002 is hereby incorporated by reference to Exhibit 10.1 of Collins & Aikman Corporation's Report on Form 10-Q for the quarter ended September 30, 2002 and filed November 14, 2002. |
| 10.34 | Separation Agreement between Collins and Aikman Corporation and an officer of the Company dated October 2002 is hereby incorporated by reference to Exhibit 10.3 of Collins & Aikman Corporation's Report on Form 10-Q for the quarter ended September 30, 2002 and filed November 14, 2002. |

| Exhibit Number | Description |
|---|---|
| 10.35 | Employment Agreement between Collins & Aikman and an officer of the Company dated January 25, 2004.* |
| 10.36 | Amendment to Employment Agreement between Collins & Aikman Corporation and an officer of the Company dated January 25, 2004.* |
| 10.37 | Separation Agreement between Collins & Aikman Corporation and an officer of the Company dated February 29, 2004.* |
| 11 | Computation of Earnings Per Share.* |
| 12.1 | Computation of Ratio of Earnings to Fixed Charges.* |
| 21 | Subsidiaries of the Registrant.* |
| 23.1 | Consent of KPMG.* |
| 23.2 | Consent of PricewaterhouseCoopers.* |
| 24.1 | Powers of Attorney.* |
| 31.1 | Certification Pursuant to Section 302 of Sarbanes-Oxley Act of 2002.* |
| 31.2 | Certification Pursuant to Section 302 of Sarbanes-Oxley Act of 2002.* |
| 32.1 | Certification Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 (Chapter 63, Title 18 U.S.C. 1350(a) and (b)).* |
| 99 | Voting Agreement between Blackstone Capital Partners L.P. and Wasserstein Perella Partners, L.P. is hereby incorporated by reference to Exhibit 99 of Amendment No. 4 to Collins & Aikman Holdings Corporation's Registration Statement on Form S-2 (Registration No. 33-53179) filed June 27, 1994. |

* Indicates document filed herewith.

**EXHIBIT 5**

# PRICEWATERHOUSECOOPERS 🄮

PricewaterhouseCoopers LLP
400 Renaissance Center
Detroit MI 48243-1507
Telephone (313) 394 6000
Facsimile (313) 394 6555

April 26, 2001

Rajesh K. Shah
Executive Vice President and Chief Financial Officer
Collins & Aikman Corporation
5755 New King Court
Troy, MI 48098

Dear Rajesh:

The purpose of this letter is to confirm our understanding of the terms of our engagement as independent accountants of Collins and Aikman Corporation (the "Company").

Services and related report(s)

We will audit the consolidated financial statements of the Company at December 31, 2001 and for the year then ending to be included in the Company's annual report of Form 10-K to be filed with the Securities & Exchange Commission. Upon completion of our audit, we will provide you with our audit report on the financial statements referred to above. If, for any reasons caused by you or relating to the affairs of the Company, we are unable to complete the audit, we may decline to issue a report as a result of this engagement.

In conjunction with the annual audit, we will perform reviews of the Company's unaudited consolidated quarterly financial statements and related data for each of the first three quarters in the year ending December 31, 2001, before the Form 10-Q is filed. These reviews will be conducted in accordance with standards established by the American Institute of Certified Public Accountants, which are substantially less in scope than audits. Accordingly, a review may not reveal material modifications necessary to make the quarterly financial information conform with generally accepted accounting principles. We will communicate to you for your consideration any matters that come to our attention as a result of the review that we believe may require material modifications to the quarterly financial information to make it conform with generally accepted accounting principles. You have notified us that it is not necessary for us to issue review reports in writing to you on the results of our quarterly procedures. If, for any reasons caused by you or relating to your affairs, we are unable to complete our review, we will notify you.

## Our responsibilities and limitations

The objective of an audit is the expression of an opinion on the financial statements. We will be responsible for performing the audit in accordance with generally accepted auditing standards. These standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. The audit will include examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation.

We will consider the Company's internal control over financial reporting solely for the purpose of determining the nature, timing and extent of auditing procedures necessary for expressing our opinion on the financial statements. This consideration will not be sufficient to enable us to provide assurance on the effectiveness of internal control over financial reporting. However, any significant deficiencies relating to internal control over financial reporting identified during our audit will be communicated to you.

We will design our audit to obtain reasonable, but not absolute, assurance of detecting errors or fraud that would have a material effect on the financial statements as well as other illegal acts having a direct and material effect on financial statement amounts. Our audit will not include a detailed audit of transactions, such as would be necessary to disclose errors or fraud that did not cause a material misstatement of the financial statements. It is important to recognize that there are inherent limitations in the auditing process. Audits are based on the concept of selective testing of the data underlying the financial statements, which involves judgment regarding the areas to be tested and the nature, timing, extent and results of the tests to be performed. Audits are, therefore, subject to the limitation that material errors or fraud or other illegal acts having a direct and material financial statement impact, if they exist, may not be detected. Because of the characteristics of fraud, particularly those involving concealment through collusion and falsified documentation (including forgery), an audit designed and executed in accordance with generally accepted auditing standards may not detect a material fraud. Further, while effective internal control reduces the likelihood that errors, fraud or other illegal acts will occur and remain undetected, it does not eliminate that possibility. For these reasons we cannot ensure that errors, fraud or other illegal acts, if present, will be detected. However, we will communicate to you, as appropriate, any illegal act, material errors, or evidence that fraud may exist identified during our audit.

Our audit is intended for the benefit of the Company. The audit will not be planned or conducted in contemplation of reliance by any third party or with respect to any specific transaction. Therefore, items of possible interest to a third party will not be specifically addressed and matters may exist that would be assessed differently by a third party, possibly in connection with a specific transaction.

<u>Management's responsibilities</u>

The financial statements and information referred to above are the responsibility of the management of the Company.  In this regard, management is responsible for properly recording transactions in the accounting records and for establishing and maintaining internal control sufficient to permit the preparation of financial statements and information in conformity with generally accepted accounting principles.  Management is responsible for adjusting the financial statements to correct material misstatements and for affirming to us that the effects of any uncorrected misstatements aggregated by us during the current engagement and pertaining to the year ending December 31, 2001 are immaterial, both individually and in the aggregate, to the financial statements taken as a whole.  Management also is responsible for identifying and ensuring that the Company complies with the laws and regulations applicable to its activities.

Management is responsible for making available to us, on a timely basis, all of the Company's original accounting records and related information and company personnel to whom we may direct inquiries.  As required by generally accepted auditing standards, we will make specific inquiries of management and others about the representations embodied in the financial statements and information and the effectiveness of internal control over financial reporting.  Generally accepted auditing standards also require that we obtain written representations covering audited financial statements from certain members of management.  The results of our audit tests, the responses to our inquiries and the written representations comprise the evidential matter we intend to rely upon in forming our opinion on the financial statements.  Similarly, the results of our analytical procedures, the responses to our inquiries and the written representations obtained comprise the basis for our review on the unaudited quarterly financial information.

To assist us in planning the audit of the financial statements, you will authorize your previous auditors, Arthur Andersen LLP, to allow us to review their working papers and to respond fully to our inquiries.

<u>Other documents</u>

Generally accepted auditing standards require that we read any annual report that contains our audit report.  The purpose of this procedure is to consider whether other information in the annual report, including the manner of its presentation, is materially inconsistent with information appearing in the financial statements.  We assume no obligation to perform procedures to corroborate such other information as part of our audit.

With regard to electronic filings, such as in connection with the SEC's Electronic Data Gathering, Analysis, and Retrieval ("EDGAR") system, you agree that, before filing any document in electronic format with the SEC with which we are associated, you will advise us of the proposed filing on a timely basis.  We will provide you with a signed copy of our report(s) and consent(s).  These manually signed documents will serve to authorize the use of our name prior to any electronic transmission by you.  For our files, you will provide us with a complete copy of the document as accepted by EDGAR.

The Company may wish to include our report on these financial statements in a registration statement proposed to be filed under the Securities Act of 1933 or in some other securities offering. You agree that the aforementioned audit report, or reference to our Firm, will not be included in any such offering without our prior permission or consent. Any agreement to perform work in connection with an offering, including an agreement to provide permission or consent, will be a separate engagement.

Agreement not to demand jury trial

In the unlikely event that differences concerning our services or fees should arise that are not resolved by mutual agreement, to facilitate judicial resolution and save time and expense of both parties, the Company and PricewaterhouseCoopers LLP agree not to demand a trial by jury in any action, proceeding or counterclaim arising out of or relating to our services and fees for this engagement.

Timing and fees

Completion of our work is subject to, among other things, 1) appropriate cooperation from the Company's personnel, including timely preparation of necessary schedules, 2) timely responses to our inquiries, and 3) timely communication of all significant accounting and financial reporting matters. When and if for any reason the Company is unable to provide such schedules, information and assistance, PricewaterhouseCoopers LLP and the Company will mutually revise the fee to reflect additional services, if any, required of us to complete the audit.

As stated in our proposal letter to you dated March 5, 2001, we agree to conduct this audit for $550,000, exclusive of reasonable and necessary out-of-pocket expenses. This fee takes into account the agreed-upon level of preparation and assistance from company personnel; we will advise management on a timely basis should this not be provided or should any other circumstances arise which may cause actual time to significantly exceed that amount. This fee also includes the Statutory audits of the foreign locations identified in Exhibit I. Additional fees for the Statutory audits of entities included in Exhibit II will be agreed separately.

Invoices rendered are due and payable upon receipt.

Other matters

Any additional services that you may request and we agree to provide may be the subject of separate written agreements. As indicated in the March 5, 2001 proposal letter, fees for such additional assignments and special projects will be determined on a project-by-project basis, with fees varying between 50% and 80% of our standard billing rates depending on the nature of the services involved.

In the event we are requested or authorized by you or required by government regulation, subpoena, or other legal process to produce our working papers or our personnel as witnesses

with respect to our engagement for you, you will, so long as we are not a party to the proceeding in which the information is sought, reimburse us for our professional time and expenses, as well as the fees and expenses of our counsel, incurred in responding to such a request.

The Company agrees that it will not, directly or indirectly, agree to assign or transfer any claim against PricewaterhouseCoopers LLP arising out of this engagement to anyone.

This engagement letter reflects the entire agreement between us relating to the services covered by this letter.  It replaces and supersedes any previous proposals, correspondence and understandings, whether written or oral.  The agreements of the Company and PricewaterhouseCoopers LLP contained in this engagement letter shall survive the completion or termination of this engagement.

\*    \*    \*    \*    \*

If you have any questions, please call David Breen at (313) 394-6559.  If the services outlined herein are in accordance with your requirements and if the above terms are acceptable to you, please have one copy of this letter signed in the space provided below and return it to us.

Very truly yours,

*PricewaterhouseCoopers LLP*

The services and terms as set forth in this letter are agreed to.

**Collins & Aikman Corporation**

By: _____
     Rajesh K. Shah

_____
Executive Vice President and Chief Financial
Officer

May 30, 2001
_____
(Date)

6

EXHIBIT I
**Collins & Aikman Corporation**
**Statutory Audits Included in Original Fee Proposal**
**Year Ended December 31, 2001**

**Mexican Statutory Audits**

1. Collins & Aikman de Mexico
2. Amco de Mexico
3. Dura Convertible Systems de Mexico
4. Collins & Aikman Carpet & Acoustics

**European Statutory Audits**

**UK**
1. Collins & Aikman Holding Ltd (No. 03254988)-Trading
2. Collins & Aikman Plasics Ltd. (No. 00774837)-Trading

**Germany**
- Collins & Aikman Automotive Systems GmbH

**Belgium**
- Collins & Aikman Automotive Systems N.V.

**Sweden**
- Collins & Aikman Automotive Systems AB

**The Netherlands**
- Collins & Aikman Automotive Floormats Europe B.V.

<u>EXHIBIT II</u>
**Collins & Aikman Corporation**
**Statutory Audits To Be Quoted Separately**
**Year Ended December 31, 2001**

## <u>Mexican Statutory Audits</u>

1. Industrias Enjema, S.A. de C.V.
2. Servitrim S.A. de C.V.
3. Servitop S.A. de C.V.

## <u>European Statutory Audits</u>

**UK**
1. Collins & Aikman Automotive Systems Ltd. (No. 01527308)-Non-Trading
2. Collins & Aikman Carpet Products Ltd. (No. 03155925)-Non-Trading
3. Collins & Aikman Fabrics Ltd. (No. 3446844)-Trading
4. Premier Springs & Pressings Ltd. (No. 1912304)-Non-Trading
5. Abex Plastics Products Ltd. (No. 1245597)-Non-Trading
6. Manchester Kigass Inter. Ltd. (No. 3315195)- Non-Trading

**Spain**
- Collins & Aikman Automotive Systems S.A.

**Sweden**
- Collins & Aikman Holding AB

**Austria**
- Collins & Aikman Austria

**EXHIBIT 6**

# PRICEWATERHOUSECOOPERS 🏢

PricewaterhouseCoopers LLP
400 Renaissance Center
Detroit MI 48243-1507
Telephone (313) 394 6000
Facsimile   (313) 394 6555

August 30, 2002 (as revised November 26, 2002)

J. Michael Stepp
Vice Chairman and Chief Financial Officer
Collins & Aikman Corporation
250 Stephenson Highway
Troy, MI  48083

Dear Mr. Stepp:

The purpose of this letter is to confirm our understanding of the terms of our engagement as independent accountants of Collins & Aikman Corporation (the "Company").

<u>Services and related report</u>

We will audit the consolidated financial statements of the Company at December 31, 2002 and for the year then ending.  Upon completion of our audit, we will provide you with our audit report on the financial statements referred to above.  If, for any reasons caused by you or relating to the affairs of the Company, we are unable to complete the audit, we may decline to issue a report as a result of this engagement.

In conjunction with the annual audit, we will perform reviews of the Company's unaudited consolidated quarterly financial statements and related data for each of the first three quarters in the year ending December 31, 2002, before the Form 10-Q is filed.  These reviews will be conducted in accordance with standards established by the American Institute of Certified Public Accountants, which are substantially less in scope than audits.  Accordingly, a review may not reveal material modifications necessary to make the quarterly financial information conform with generally accepted accounting principles.  We will communicate to you for your consideration any matters that come to our attention as a result of the review that we believe may require material modifications to the quarterly financial information to make it conform with generally accepted accounting principles.  You have notified us that it is not necessary for us to issue review reports in writing to you on the results of our quarterly procedures.  If, for any reasons caused by you or relating to your affairs, we are unable to complete our review, we will notify you.

# PRICEWATERHOUSECOOPERS 🅿

Our responsibilities and limitations

The objective of an audit is the expression of an opinion on the financial statements. We will be responsible for performing the audit in accordance with generally accepted auditing standards. These standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. The audit will include examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation.

We will consider the Company's internal control over financial reporting solely for the purpose of determining the nature, timing and extent of auditing procedures necessary for expressing our opinion on the financial statements. This consideration will not be sufficient to enable us to provide assurance on the effectiveness of internal control over financial reporting. However, any significant deficiencies relating to internal control over financial reporting identified during our audit will be communicated to you.

We will design our audit to obtain reasonable, but not absolute, assurance of detecting errors or fraud that would have a material effect on the financial statements as well as other illegal acts having a direct and material effect on financial statement amounts. Our audit will not include a detailed audit of transactions, such as would be necessary to disclose errors or fraud that did not cause a material misstatement of the financial statements. It is important to recognize that there are inherent limitations in the auditing process. Audits are based on the concept of selective testing of the data underlying the financial statements, which involves judgment regarding the areas to be tested and the nature, timing, extent and results of the tests to be performed. Audits are, therefore, subject to the limitation that material errors or fraud or other illegal acts having a direct and material financial statement impact, if they exist, may not be detected. Because of the characteristics of fraud, particularly those involving concealment through collusion and falsified documentation (including forgery), an audit designed and executed in accordance with generally accepted auditing standards may not detect a material fraud. Further, while effective internal control reduces the likelihood that errors, fraud or other illegal acts will occur and remain undetected, it does not eliminate that possibility. For these reasons we cannot ensure that errors, fraud or other illegal acts, if present, will be detected. However, we will communicate to you, as appropriate, any illegal act, material errors, or evidence that fraud may exist identified during our audit.

The audit will not be planned or conducted in contemplation of reliance by any third party or with respect to any specific transaction. Therefore, items of possible interest to a third party will not be specifically addressed and matters may exist that would be assessed differently by a third party, possibly in connection with a specific transaction.



## Management's responsibilities

The financial statements and information referred to above are the responsibility of the management of the Company. In this regard, management is responsible for properly recording transactions in the accounting records and for establishing and maintaining internal control sufficient to permit the preparation of financial statements and information in conformity with generally accepted accounting principles. Management is responsible for adjusting the financial statements to correct material misstatements and for affirming to us that the effects of any uncorrected misstatements aggregated by us during the current engagement and pertaining to the year ending December 31, 2002 are immaterial, both individually and in the aggregate, to the financial statements taken as a whole. Management also is responsible for identifying and ensuring that the Company complies with the laws and regulations applicable to its activities.

Management is responsible for making available to us, on a timely basis, all of the Company's original accounting records and related information and company personnel to whom we may direct inquiries. As required by generally accepted auditing standards, we will make specific inquiries of management and others about the representations embodied in the financial statements and information and the effectiveness of internal control over financial reporting. Generally accepted auditing standards also require that we obtain written representations covering audited financial statements from certain members of management. The results of our audit tests, the responses to our inquiries and the written representations comprise the evidential matter we intend to rely upon in forming our opinion on the financial statements. Similarly, the results of our analytical procedures, the responses to our inquiries and the written representations obtained comprise the basis for our review on the unaudited quarterly financial information.

## Other documents

Generally accepted auditing standards require that we read any annual report that contains our audit report. The purpose of this procedure is to consider whether other information in the annual report, including the manner of its presentation, is materially inconsistent with information appearing in the financial statements. We assume no obligation to perform procedures to corroborate such other information as part of our audit.

With regard to electronic filings, such as in connection with the SEC's Electronic Data Gathering, Analysis, and Retrieval ("EDGAR") system, you agree that, before filing any document in electronic format with the SEC with which we are associated, you will advise us of the proposed filing on a timely basis. We will provide you with a signed copy of our report(s) and consent(s). These manually signed documents will serve to authorize the use of our name prior to any electronic transmission by you. For our files, you will provide us with a complete copy of the document as accepted by EDGAR.

# PRICEWATERHOUSE COOPERS 🅿️

The Company may wish to include our report on these financial statements in a registration statement proposed to be filed under the Securities Act of 1933 or in some other securities offering. You agree that the aforementioned audit report, or reference to our Firm, will not be included in any such offering without our prior permission or consent. Any agreement to perform work in connection with an offering, including an agreement to provide permission or consent, will be a separate engagement.

Agreement not to demand jury trial

In the unlikely event that differences concerning our services or fees should arise that are not resolved by mutual agreement, to facilitate judicial resolution and save time and expense of both parties, the Company and PricewaterhouseCoopers LLP agree not to demand a trial by jury in any action, proceeding or counterclaim arising out of or relating to our services and fees for this engagement.

Timing and fees

Completion of our work is subject to, among other things, 1) appropriate cooperation from the Company's personnel, including timely preparation of necessary schedules, 2) timely responses to our inquiries, and 3) timely communication of all significant accounting and financial reporting matters. To conduct our audits of North American manufacturing locations and shared service operations, we will request that schedules be prepared in advance of our audit to support certain financial amounts. We will agree the timing of our procedures and the schedules to be prepared with the respective operational controllers at least four weeks prior to our visit.

We estimate our fees for this audit engagement will be $1,300,000, inclusive of out-of-pocket expenses, subject to the terms and conditions above. We will perform the 2002 statutory audit of the consolidated foreign entities detailed in Attachment A. This excludes any audit procedures for the Italian joint venture, statutory or otherwise. Our foreign affiliates will invoice the foreign operations of the Company in local currency (including local VAT, if applicable) according to a fee schedule that will be provided to you at a later date. PricewaterhouseCoopers Detroit will invoice you for the remainder according to the following schedule:

| | |
|---|---|
| October 15, 2002 | $150,000 |
| November 30, 2002 | $150,000 |
| December 31, 2002 | $150,000 |
| January 31, 2003 | Balance |

4

# PRICEWATERHOUSECOOPERS

## Other matters

Our fees for research and consultation on accounting matters will be agreed with you in advance. Other services that you may request and we agree to provide will be the subject of separate written agreements.

In the event we are requested or authorized by you or required by government regulation, subpoena, or other legal process to produce our working papers or our personnel as witnesses with respect to our engagement for you, you will, so long as we are not a party to the proceeding in which the information is sought, reimburse us for our professional time and expenses, as well as the fees and expenses of our counsel, incurred in responding to such a request.

The Company agrees that it will not, directly or indirectly, agree to assign or transfer any claim against PricewaterhouseCoopers LLP arising out of this engagement to anyone.

This engagement letter reflects the entire agreement between us relating to the services covered by this letter. It replaces and supersedes any previous proposals, correspondence and understandings, whether written or oral. The agreements of the Company and PricewaterhouseCoopers LLP contained in this engagement letter shall survive the completion or termination of this engagement.

\*    \*    \*    \*    \*

If you have any questions, please call David J. Breen at 313-394-6559 or Michael R. Desmet at (313) 394-6411. If the services outlined herein are in accordance with your requirements and if the above terms are acceptable to you, please have one copy of this letter signed in the space provided below and return it to us.

Very truly yours,

*PricewaterhouseCoopers LLP*

cc:
James Murawski

# PRICEWATERHOUSECOOPERS

The services and terms as set forth in this letter are agreed to.

Collins & Aikman Corporation

By: _____

J. Michael Stepp, Vice Chairman and Chief
Financial Officer

_____
(Date)

6

# Collins & Aikman Corporation
# 2002 Global fee allocation

**Attachment A**

| Country | Entity | Local currency | U.S. Dollars |
|---|---|---|---|
| Mexico | Dura Convertible Systems de Mexico | | |
| Mexico | Amco de Mexico | 161,990 | $ 16,342 |
| Mexico | Servitrim S.A de C.V. | 106,029 | 10,696 |
| Mexico | Servitop S.A. de C.V. | 44,500 | 4,489 |
| Mexico | Collins & Aikman Holdings S.A de. C.V. | 44,500 | 4,489 |
| Mexico | Collins & Aikman de Mexico | 68,000 | 6,860 |
| Mexico | Collins & Aikman Carpet & Acoustics | 360,000 | 36,317 |
| Mexico | Industrias Enjema, S.A. de C.V. | 94,800 | 9,563 |
| Mexico | Textron Automotive Company de Mexico | 43,000 | 4,338 |
| Mexico | Textron Automotive Mgt Services Company Mexico | 292,427 | 29,500 |
| Mexico | Aiktron S.A. de CV | 79,302 | 8,000 |
| Mexico | Textron S.A. de CV | 69,389 | 7,000 |
| Mexico | Textron Executive Services | 19,826 | 2,000 |
| Mexico | Textron Automotive Mgt Services Company de Cuatitlan | 9,913 | 1,000 |
| Brazil | Plascar participacoes Industrais S.A. | 9,913 | 1,000 |
| UK | Collins & Aikman Automotive Interior Systems Europe Ltd | 356,493 | 117,500 |
| UK | Collins & Aikman Fabrics Ltd. | 55,000 | 85,261 |
| UK | Collins & Aikman Holding Ltd | 20,100 | 31,159 |
| UK | Collins & Aikman Automotive Systems Ltd. | 2,500 | 3,876 |
| UK | Collins & Aikman Carpet Products Ltd. | 1,250 | 1,938 |
| UK | Premier Springs & Pressings Ltd. | 1,250 | 1,938 |
| UK | Abex Plastics Products Ltd. | 1,250 | 1,938 |
| UK | Manchester Kigass Inter. Ltd. | 1,250 | 1,938 |
| UK | Textron Automotive, Ltd. UK | 1,250 | 1,938 |
| UK | AS Textron | 27,000 | 41,855 |
| UK | Textron Automotive MIP | 12,000 | 18,602 |
| Sweden | Collins & Aikman Automotive Systems AB | 2,000 | 3,100 |
| Sweden | Collins & Aikman Holding AB | 480,000 | 51,072 |
| Belgium | Collins & Aikman Automotive Systems N.V. | 25,000 | 2,660 |
| Belgium | Textron Automotive Belgium BVBA (Genk) | 2,500 | 2,461 |
| Netherlands | Collins & Aikman Automotive Floormats Europe BV | 45,725 | 45,012 |
| Netherlands | Collins & Aikman Europe BV | 14,222 | 14,000 |
| Netherlands | Textron Automotive B.V. - Born | 5,000 | 4,922 |
| Germany | Collins & Aikman Automotive Systems GmbH | 53,000 | 52,173 |
| Germany | Textron Automotive Germany GmbH | 44,000 | 43,314 |
| Austria | Collins & Aikman Austria | 40,000 | 39,376 |
| Spain | Collins & Aikman Automotive Systems S.A. | 12,480 | 12,285 |
| USA | Collins & Aikman Corporation | 19,775 | 19,467 |
| | | | 560,622 |
| | | | $ 1,300,000 |

**$ per unit of Local Currency @ June 30**

| | |
|---|---|
| Sterling Pound | 1.550 |
| Mexico Peso | 0.101 |
| Brazilian Real | 0.330 |
| European Euro | 0.984 |
| Swedish Krona | 0.106 |

## CERTIFICATE OF SERVICE

I, Lee E. Kaufman, hereby certify that on this 14th day of September, 2007, I caused a

copy of the ***Memorandum of Law in Support of PWC's Motion to Dismiss*** to be electronically

filed with the Clerk of Court using CM/ECF, which will send notifications of such filing to the

following:

| Joseph A. Rosenthal<br>Carmella P. Keener<br>Rosenthal, Monhait & Goddess, P.A.<br>919 N. Market Street, Suite 1401<br>P. O. Box 1070<br>Wilmington, DE 19899<br>(Counsel to Plaintiffs) |
| --- |
| Thomas P. Preston<br>Blank Rome LLP<br>Chase Manhattan Centre<br>1201 Market Street<br>Suite 800<br>Wilmington, DE 19801<br>(Counsel to Defendants Koth & Krause) |
| Thomas G. Macauley<br>Zuckerman Spaeder LLP<br>919 Market Street, Suite 1705<br>P. O. Box 1028<br>Wilmington, DE 19899<br>(Counsel to Defendant Barnaba) |
| Christian D. Wright<br>Andrew A. Lundgren<br>Young, Conaway, Stargatt & Taylor, LLP<br>The Brandywine Building<br>1000 West Street, 17th Street<br>P. O. Box 391<br>Wilmington, DE 19899-0391<br>(Counsel to Defendant Evans) |

Peter B. Ladig
Stephen B. Brauerman
The Bayard Firm
222 Delaware Avenue
Suite 900
P. O. Box 25130
Wilmington, DE 19899
(Counsel to Defendant Stockman)

Vernon R. Proctor
Proctor Heyman LLP
1116 West Street
Wilmington, DE 19801
(Counsel to Defendant Cosgrove)

James L. Holzman
J. Clayton Athey
Prickett Jones & Elliott, P.A.
1310 King Street
P. O. Box 1328
Wilmington, DE 19899
(Counsel to Defendant Becker)

Michael J. Maimone
Joseph B. Cicero
Edwards Angell Palmer & Dodge LLP
919 North Market Street
Suite 1500
Wilmington, DE 19801
(Counsel to Defendant KPMG LLP)

Stephen L. Ascher
Jenner & Block
919 Third Avenue
New York, NY 10022-3908
(Counsel to Defendant Becker)

-2-

I hereby certify that on this 14th day of September, 2007, I caused a copy of the *Memorandum of Law in Support of PWC's Motion to Dismiss* to be served in the manner indicated upon the following:

| |
|---|
| ***Via Hand Delivery***<br>Robert S. Saunders<br>Skadden, Arps, Slate, Meagher & Flom LLP<br>One Rodney Square<br>P. O. Box 636<br>Wilmington, DE 19899<br>(Counsel to Defendants Heartland, Tredwell,<br>McConnell & Valenti) |
| ***Via Fed Ex***<br>Gandolfo V. DiBlasi<br>Stacey R. Friedman<br>Sullivan & Cromwell LLP<br>125 Broad Street<br>New York, NY 10004<br>(Counsel to Defendant Stepp) |
| ***Via Fed Ex***<br>Lynn Brimer<br>Strobl & Sharp, P.C.<br>300 East Long Lake Road<br>Suite 200<br>Bloomfield Hills, MI 48304-2376<br>(Counsel to Defendant Hess) |
| ***Via Fed Ex***<br>Samuel H. Rudman<br>David A. Rosenfeld<br>Lerach Coughlin Stoia Geller Rudman &<br>Robbins LLP<br>58 South Service Road<br>Suite 200<br>Melville, NY 11747<br>(Counsel to Plaintiffs) |

*Via Fed Ex*
Michael Joseph
Joseph O. Click
Blank Rome LLP
600 New Hampshire Avenue, NW
Washington, D.C. 20037
(Counsel to Defendants Koth & Krause)

*Via Fed Ex*
Carl S. Kravitz
Zuckerman Spaeder LLP
1800 M Street, N.W.
Washington, D.C. 20036
(Counsel to Defendant Barnaba)

*Via Fed Ex*
Richard A. Spehr
Joseph DeSimone
Mayer Brown
1675 Broadway
New York, NY 10019-5820
(Counsel to Defendant Evans)

*Via Fed Ex*
Andrew B. Weisman
Michael L. Taylor
Wilmer Cutler Pickering Hale and Dorr LLP
1875 Pennsylvania Avenue, NW
Washington, D.C. 20006
(Counsel to Defendant Stockman)

*Via Fed Ex*
Craig A. Stewart
Ken L. Hashimoto
Arnold & Porter LLP
399 Park Avenue
New York, NY 10022
(Counsel to Defendant Cosgrove)

*Via Fed Ex*
Stephen L. Ascher
Jenner & Block
919 Third Avenue
New York, NY 10022-3908
(Counsel to Defendant Becker)

RLF1-3201126-1

| |
|---|
| *Via Fed Ex*<br>Christopher Harris<br>Seth L. Friedman<br>Latham & Watkins LLP<br>885 Third Avenue<br>New York, NY 10022<br>(Counsel to Defendant KPMG LLP) |
| *Via Fed Ex*<br>Richard M. Strassberg<br>Jeffrey A. Simes<br>Goodwin Procter LLP<br>599 Lexington Avenue<br>New York, NY 10022<br>(Counsel to Defendant McCallum) |
| *Via Fed Ex*<br>Jonathan J. Lerner<br>Lee Haber Kuck<br>Skadden, Arps, Slate, Meagher & Flom LLP<br>Four Time Square<br>New York, NY 10036<br>(Counsel to Defendants Heartland, Tredwell,<br>McConnell & Valenti) |
| *Via Fed Ex*<br>Michael Shapiro<br>Gerald Griffin<br>Carter Ledyard & Milburn LLP<br>2 Wall Street<br>New York, NY 10005<br>(Counsel to Defendant Galante) |

Lee E. Kaufman (DE No. 4877)
Richards, Layton & Finger, P.A.
920 North King Street
P. O. Box 551
Wilmington, Delaware 19899
Phone:  302-651-7700
Fax:  302-651-7701
E-mail:  kaufman@rlf.com