IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

COLLINS & AIKMAN CORPORATION, ET AL.          Case No. 07 Civ. 0265

vs.

DAVID A. STOCKMAN, ET AL.

**COMPENDIUM OF UNREPORTED DECISIONS CITED IN
THE OPENING BRIEF IN SUPPORT OF
DEFENDANT KPMG, LLP'S MOTION TO DISMISS**

OF COUNSEL:

Christopher Harris
Seth L. Friedman
Latham & Watkins LLP
885 Third Avenue
New York, NY 10022
Phone: (212) 906-1200

DATED: September 14, 2007

EDWARDS ANGELL PALMER & DODGE LLP
Michael J. Maimone (#3592)
Paul D. Brown (#3903)
919 North Market Street, 15th Floor
Wilmington, DE  19801
Phone: (302) 777-7770
Fax: (302) 777-7263

# INDEX

**Cases**                                                                                    **TAB**

*Begier v. Price Waterhouse,*
    1992 WL 236175 (E.D. Pa. Sept. 14, 1992) .......................................................................1

*Cambridge Biotech Corp. v. Deloitte & Touche,*
    1997 WL 42516 (Mass. Super. Ct. Jan. 28, 1997) ............................................................ 2

*Chase Bank of Texas v. Grant Thornton, L.L.P.,*
    2003 WL 21350362 (Mich. Ct. App. June 10, 2003)....................................................... 3

*Johnson v. Metabolife International, Inc.,*
    2002 WL 32494514 (N.D. Tex. Oct. 23, 2002)................................................................. 4

*Krieger v. Gast,*
    2000 WL 288442 (W.D. Mich. Jan. 21, 2000)................................................................. 5

*In re Marsh & McLennan Cos. Inc., Securities Litigation,*
    2006 WL 2057194 (S.D.N.Y. July 20, 2006)................................................................... 6

*Official Comm. of Unsecured Creditors of Allegheny Health, Educ. & Res.*
*Found v. Pricewaterhouse Coopers, LLP,*
    2007 U.S. Dist. LEXIS 3331 (W.D. Pa. Jan. 17, 2007) ........................................................ 7

*Official Comm. of Unsecured Creditors of Corell Steel v. Fishbein & Co., P.C.,*
    1992 WL 196768 (E.D. Pa. Aug. 10, 1992) ........................................................................ 8

*In re Parmalat Sec. Litigation,*
    __ F. Supp. 2d __, 2007 WL 2263893 (S.D.N.Y. Aug. 8, 2007) ......................................... 9

*Pew v. Cardarelli,*
    No. 03-742, 2005 U.S. Dist. LEXIS 40018 (N.D.N.Y. Mar. 17, 2005), *aff'd,*
    164 Fed. Appx. 31 (2d Cir. N.Y. 2006)............................................................................ 10

*Pilot Industrial, Inc. v. Grant Thornton, LLP,*
    2006 WL 2033996 (Mich. Ct. App. July 20, 2006)........................................................... 11

*In re Refco, Inc. Securities Litigation,*
    2007 WL 1280649 (S.D.N.Y. Apr. 30, 2007) .................................................................. 12

*Robins v. Garg,*
    __ N.W.2d __, 2007 WL 2164870 (Mich. Ct. App. July 26, 2007).................................... 13

*Scalici v. Bank One, NA*,
    2005 WL 2291732 (Mich. Ct. App. Sept. 20, 2005) ........................................................... 14

*Shivers v. McMartin, Wasek & Assoc., Inc.*,
    2005 WL 1959480 (Mich. Ct. App. Aug. 16, 2005) ........................................................... 15

*In re Williams Securities Litigation*,
    __ F. Supp. 2d__, 2007 WL 2007987 (N.D. Okla. July 6, 2007)........................................ 16

*Wojcik v. William J McNish & McNish's Sporting Goods & Trophies Inc.*,
    2006 WL 2061499 (Mich. Ct. App. July 25, 2006)............................................................ 17

_510587_1.DOC

## CERTIFICATE OF SERVICE

I, Michael J. Maimone, Esquire, hereby certify that on September 14, 2007, I

caused to be electronically filed a true and correct copy of the foregoing document with the Clerk

of the Court using CM/ECF, which will send notification that such filing is available for

reviewing and downloading to the following counsel of record:

Joseph A. Rosenthal, Esquire.
Carmella P. Keener
Rosenthal, Monhait & Goddess, P.A.
919 N. Market Street
P.O. Box 1070
Wilmington, DE 19899

*/s/ Michael J. Maimone*
Michael J. Maimone (#3592)
Paul D. Brown (#3903)
Edwards Angell Palmer & Dodge LLP
Wilmington, DE  19801
(302) 777-7770
mmaimone@eapdlaw.com

1

Westlaw.

Not Reported in F.Supp.    Page 1

Not Reported in F.Supp., 1992 WL 236175 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.)**

**H**

Begier v. Price Waterhouse
E.D.Pa.,1992.
Only the Westlaw citation is currently available.
    United States District Court, E.D. Pennsylvania.
Harry P. BEGIER, Jr., Trustee in Bankruptcy of
    AIA Industries, Inc. and American International
    Airways, Inc.
        v.
    PRICE WATERHOUSE.
    **Civ. A. No. 87-6096.**

Sept. 14, 1992.

David S. Fishbone, Ciardi, Fishbone & Di Donato,
Phila., Pa., Michael H. Kaliner, Jackson & Sullivan,
Fairless Hills, Pa., Gloria M. Satriale, Philadelphia,
Pa., for plaintiff.
Patricia L. Freeland, John G. Harkins, Jr., Pepper,
Hamilton & Scheetz, Philadelphia, Pa., for
defendant.

MEMORANDUM AND ORDER
DITTER, Senior District Judge.
**\*1** Plaintiff, Harry Begier, is AIA Industries, Inc.'s,
trustee in bankruptcy. In this action, Mr. Begier
originally alleged breach of contract, negligence, a
claim under 11 U.S.C. § 544, and claims under
section 10(b) and 13(b)(2) of the Securities and
Exchange Act of 1934 against Price Waterhouse
(PW), AIA's accounting firm. As a result of a
series of rulings, only a portion of Mr. Begier's
contract claim remains. Citing a breach of
contract, he seeks the return of professional fees
which AIA paid to PW for audits performed in
1982 and 1983.

PW has moved for summary judgment on this final
issue, and I will grant its motion.

In 1981, Gayle Moneyhan and Arthur Toll formed
AIA Industries, Inc., and its wholly owned
subsidiary, American International Airways, Inc., to
provide charter airline service to casinos in Atlantic
City, New Jersey. AIA quickly grew to be the
fourth largest scheduled carrier flying from
Philadelphia, Pennsylvania, but the expansion
proved unsuccessful. AIA recorded large losses,
there were accusations of fraud, and in July, 1984,
the airline filed for bankruptcy.

PW's work included auditing AIA's November 30,
1982, and November 30, 1983, financial statements.
Mr. Begier claims PW did not follow generally
accepted accounting standards, failed to uncover
various material facts, failed to present an accurate
depiction of AIA's financial health, and therefore
breached its contract with AIA.

PW claims the reporting arrangements were
governed by contracts which required AIA's
management to provide accurate and truthful
information concerning AIA and its finances. PW
contends AIA's management provided false and
misleading information as part of a massive fraud to
inflate AIA's value and obfuscate the company's
true financial position. Based on this assertion,
PW constructs three defenses to the contract
allegations.

First, PW claims AIA contracted to provide, to the
best of AIA's knowledge, accurate accounting
figures and therefore breached by intentionally
providing false and misleading financial
information. Second, PW claims AIA deliberately
interfered with PW's ability to do a full and fair
audit. PW argues AIA should not benefit from its
own obstruction. Third, PW claims the
misrepresentations fraudulently induced PW to
perform the auditing work.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                    Page 2

**Not Reported in F.Supp., 1992 WL 236175 (E.D.Pa.)**
**(Cite as: Not Reported in F.Supp.)**

Since this is PW's motion for summary judgment, I must view all of the facts in a light most favorable to Mr. Begier. Summary judgment is appropriate if there is no genuine issue of material fact and PW is entitled to prevail as a matter of law. In this case, PW has met its burden.

*A. The Management Representation Letters.*

Prior to each audit, the parties memorialized their agreement in an engagement letter.[FN1] Each letter provided PW would perform the audits in accordance with generally accepted accounting standards (GAAS).

When performing an audit in accordance with GAAS, an auditor must obtain certain written statements from the audited company's management. In these statements, the audited company's management must acknowledge its responsibility to present the company's financial statements fairly, and it must affirm the truthfulness of the information it provides to the auditor during the examination. *See AICPA Professional Standards,* AU § 333.01 (June 1982). If the auditor does not receive these materials, or if he cannot satisfy any of the other GAAS requirements, he may not express an unqualified opinion concerning the company's financial statements, and he must explain why. *See Id.* at §§ 333.10-333.13.

*2 AIA's top managers provided the company's affirmation in several management representation letters. Arthur Toll (AIA's chairman), Bruce Edmondson (vice president), George Phelan (vice president and treasurer), and Allan Marmon (vice president and corporate counsel) prepared the first letter for the November 30, 1982, audit on March 16, 1983. Among other things, it said:
1. We acknowledge management's responsibility for the fair presentation in the financial statements of financial position, results of operations and changes in financial position in conformity with generally accepted accounting principles.
2. [A]ll financial and accounting records and related data have been made available to you. We are not aware of any accounts, transactions or material agreements not fairly described and properly recorded in the financial and accounting records underlying the financial statements.
3. We are not aware of (a) any irregularities involving management or employees who have significant roles in the system of internal accounting control, or any irregularities involving other employees that could have a material effect on the financial statements....
5. The receivables ... at November 30, 1982 represent bona fide claims against debtors for sales or other charges arising on or before that date....
9. The financial statements and appended notes include all disclosures necessary for a fair presentation of the financial position and results of operations of the company in accordance with generally accepted accounting principles, and disclosures otherwise required to be included therein by the laws and regulations to which the company is subject....
10. No matters or occurrences have come to our attention up to the date of this letter which would materially affect the financial statements and related disclosures of the period ended November 30, 1982 or, although not affecting such financial statements or disclosures, have caused or are likely to cause any material change, adverse or otherwise, in the financial position or results of operations of the company. We have no plans or intentions that may materially affect the carrying value or classification of assets and liabilities.
11. We have carefully reviewed a draft of the consolidated financial statements for the period ended November 30, 1982, in addition to the related consolidated statements and are in agreement herewith.
12. Deferred operating costs ... at November 30, 1982, are recoverable from future operations and relate to aircraft training and preparation for operations, initial marketing, advertising, incremental operating costs, and other start-up costs connected with CAB certification commencement of scheduled operations.

AIA also prepared management representation letters for the first audit on May 31, 1983, and on the 18th, 21st, and 28th of July, 1983. For the second audit, AIA prepared management representation letters on February 27, 1984, March

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                    Page 3

Not Reported in F.Supp., 1992 WL 236175 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.)**

21, 1984, and the 2nd and 9th of May, 1984. These letters were not as lengthy or detailed, but they provided similar assurances.[FN2]

**\*3** All of PW's arguments flow from the premise that AIA's management representation letters were deliberately false and misleading. The first question, then, is whether the uncontested record supports this assertion. There can be no question it does.

Even the most cursory glance at the uncontested facts reveals the management letters were riddled with misrepresentations and false statements. AIA's top management clearly prepared and signed these letters at the same time it was orchestrating a complex web of fraudulent transactions and other financial misdealings.

ITG, Inc., was an air charter services broker. The company was a major creditor of AIA, and ultimately became AIA's exclusive charter agent. Before the first management representation letter on March 16, 1983, Arthur Toll and Bruce Edmondson conceived and began orchestrating fraudulent deals between AIA and ITG. These transactions substantially inflated AIA's trade accounts receivables and other accounts receivables. The dealings included a series of short term loans (including one for $160,000) that AIA treated as income and used to fund its negative cash flow and to meet payroll obligations. AIA also began adding false invoices to its books before March 16, 1983. These entries recorded non-existent flights, undelivered services, and services at inflated rates. AIA's management also recorded penalties to ITG for flights when no penalty was warranted.

In  addition to the ITG transactions, AIA's management began a series of fraudulent payments to Steve Homick, a building contractor, and other entities before the March 16, 1983, management representation letter. In a related case, Mr. Begier has already admitted Messrs. Toll, Phelan, and Edmondson either made these payments or had direct knowledge of them, and Mr. Phelan testified at his deposition that Mr. Toll directed him to draft the checks to Mr. Homick.

This illicit activity began before the November 30, 1982, management representation letter. It continued through and beyond the last letter of May 9, 1984. There were more short term loans from ITG (eventually totalling over $1 million), and more fraudulent invoices, payments, and accounting entries. AIA even faked the purchase of two airplane engines to raise over $2 million to pay off ITG receivables. In this scheme, AIA procured money to buy and reported that it actually bought two jet engines even though it had only leased them. AIA put the engines on its books as assets and used the purchase money to balance its receivables.

All of this activity directly controverts the first letter's affirmations.

As I wrote when I granted summary judgment for PW on Mr. Begier's negligence claim, "the record plainly shows AIA's management, directors, and owners were intimately acquainted with all of the fraud and illicit dealings that occurred." In this way, there can be no doubt that AIA's management deliberately provided false and misleading information to PW.

*B. The Contract Claim.*

**\*4** Given that the management representation letters were deliberately false and misleading, the issue turns to whether these materials created a breach, a deliberate attempt to thwart PW's efforts, or a fraudulent inducement.

PW's engagement letter for each audit specifically stated PW would perform its audit of AIA's financial statements in accordance with GAAS. In addition, AIA's first management representation letter for each audit reported it presented AIA's financial figures in accordance with GAAS. Under the circumstances, one can only conclude the parties intended auditing in accordance with GAAS to be a material provision of their contract. The contract obligated AIA to present its financial position to PW fairly before PW could begin its work. AIA clearly failed to do so. In fact, the uncontested record indicates AIA's top management deliberately presented false and misleading financial information

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                              Page 4

**Not Reported in F.Supp., 1992 WL 236175 (E.D.Pa.)**
**(Cite as: Not Reported in F.Supp.)**

to PW. After all, the very men who were falsifying the books at AIA signed the letters to PW. As a result, AIA breached the agreement, and any performance failure by PW is excused. *See Ott v. Buehler Lumber Co.,* 541 A.2d 1143, 1145 (Pa.Super.1988); *Restatement (Second) of Contracts* § 245 (1979). *See also Cenco Inc. v. Seidman & Seidman,* 686 F.2d 449, 453 (7th Cir.1982).

Similarly, AIA's behavior excused PW from performing a proper audit because AIA deliberately interfered with PW's efforts. *See Craig Coal Mining Co. v. Romani,* 513 A.2d 437, 440 (Pa.Super 1986) ("Manifestly, a plaintiff cannot prevail in an action for non-performance of a contract if he alone is responsible for the non-performance."); *Restatement (Second) of Contracts* § 245 (1979). In addition, the uncontested evidence shows AIA's promise to present its financial figures fairly to PW was material to the contract. The uncontested evidence further shows that PW relied on the promise when entering the contract, and that AIA never intended to make good on the promise. For this reason, PW prevails on its fraudulent inducement argument. *See First Federation Savings & Loan Association v. Reggie,* 546 A.2d 62, 66 (Pa.Super 1988) ("The recipient of misrepresentation may avoid a contract by showing that the misrepresentation was material." ).

*C. Mr. Begier's Response.*

Mr. Begier does not contest the facts concerning the fraud at AIA, and he does not dispute any of the facts concerning the contracts. He simply argues the record does not demonstrate AIA hindered PW's ability to do a proper audit by presenting the fraudulent management representation letters. Yet, even if I accepted his argument, his brief has not even contested the breach and fraudulent inducement arguments. Consequently, Mr. Begier has failed to raise an issue of material fact that precludes summary judgment.

PW has presented undisputed facts that demonstrate AIA's management representation letters were deliberately false and misleading. PW has produced similar proof that the GAAS requirements were a material part of the parties' contracts. PW's defenses are therefore valid, and it is entitled to judgment as a matter of law on the remaining portion of Mr. Begier's contract claim. I will grant summary judgment in favor of PW and against Mr. Begier.

**\*5** An order follows.

AND NOW, this 14th day of September, 1992, it is hereby ordered that:

1. The motion of defendant, Price Waterhouse, for summary judgment on the remainder of trustee's contract claim against Price Waterhouse is granted.

2. On Count I, summary judgment is entered in favor of Price Waterhouse and against Harry P. Begier, Jr., Trustee in Bankruptcy of AIA Industries, Inc., and American International Airways, Inc.

> FN1. There were two engagement letters for the November 30, 1982, audit. The first was dated October 21, 1982, and a modified version was dated November 4, 1982. The engagement letter for the November 30, 1983, audit was dated November 28, 1983.

> FN2. Messrs. Toll and Edmondson signed all of the letters. Allan Marmon only signed the first letter.

E.D.Pa.,1992.
Begier v. Price Waterhouse
Not Reported in F.Supp., 1992 WL 236175 (E.D.Pa.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**2**

Westlaw.

Not Reported in N.E.2d                                                                                           Page 1

Not Reported in N.E.2d, 6 Mass.L.Rptr. 367, 1997 WL 42516 (Mass.Super.)
**(Cite as: Not Reported in N.E.2d)**

**C**
Cambridge Biotech Corp. v. Deliotte & Touche
Mass.Super.,1997.

Superior Court of Massachusetts.
CAMBRIDGE BIOTECH CORP., Plaintiff,
v.
DELIOTTE & TOUCHE, Defendant.
**Civ. A. No. 96-1480-A.**

Jan. 28, 1997.

*MEMORANDUM OF DECISION and ORDER ON*
*DEFENDANT'S MOTION TO DISMISS*
*COMPLAINT*
FREMONTSMITH.
**\*1** This action alleges that plaintiff's own
accountants, defendant Deliotte & Touche, LLP
(Deliotte), provided deficient audits to the company
in 1991 and 1992 which resulted in plaintiff's
bankruptcy. Defendant has moved to dismiss the
complaint on statute of limitations and other
grounds. For the reasons stated below, defendant's
motion is *denied.*

### BACKGROUND

Plaintiff Cambridge Biotech Corporation contracted
with defendant Deloitte & Touche for independent
auditor services for fiscal years 1991 and 1992.
Defendant conducted the audits and rendered a "
Report of Independent Accounts" ("Report") for
each year, which plaintiff included in its Form 10-K
and filed with the United States Securities and
Exchange Commission ("SEC"). The 1991 Report
was dated March 6, 1992 and the 1992 Report was
dated March 19, 1993. Each year plaintiff filed the
10-K forms, with the Report, with the SEC by
March 31 of the same year.

On March 19, 1996, plaintiff filed this complaint
alleging that defendant failed to conduct its audit in

accordance with Generally Accepted Auditing
Standards (GAAS) and Generally Accepted
Accounting Principles (GAAP), resulting in revenue
overstatement for 1991 and 1992. Plaintiff's
complaint alleges negligence (Count I) and breach
of contract (Count II) for each of the reports.
Plaintiff claims damages due to loss of credibility
and reputation, resulting in harm to its business
which forced it to file for bankruptcy.

Defendant moves to dismiss the complaint on
several grounds. First, defendant claims that with
respect to the 1992 audit plaintiff's claims are
barred by the applicable three year statute of
limitations under G.L. c. 260 § 4, for actions of tort
or contract for malpractice. Defendant further
argues that because plaintiff's counsel did not apply
for nor receive permission from the Bankruptcy
Court to represent plaintiff in this action pursuant to
11 U.S.C. § 327(a), the complaint was a "nullity"
even with respect to the 1992 audit, so that any
claims in that regard are now time barred as well.

Defendant further contends that, even if not time
barred, plaintiff's negligence claim fails to state a
claim and that the contract count also fails to state a
claim and is, in any event, duplicative of plaintiff's
malpractice cause of action, which sounds in tort.
Defendant also argues that plaintiff's participation
in defendant's alleged fraud bars it from pursuing
this action, and, finally, that plaintiff's complaint
should be dismissed because there is a prior
pending claim by the company's stockholders, who
are the "real party in interest," involving the same
facts and issues.[FN1]

> FN1. Plaintiff assigned 90% of any
> recovery in this action to a class of its
> stockholders who are suing defendant in
> Federal District Court in New York.

For the reasons stated below, the motion to dismiss
is denied.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.E.2d, 6 Mass.L.Rptr. 367, 1997 WL 42516 (Mass.Super.)
**(Cite as: Not Reported in N.E.2d)**

### DISCUSSION

When evaluating the sufficiency of a complaint pursuant to Mass.R.Civ.P. 12(b)(6), the court must accept as true the well pleaded factual allegations of the complaint, as well as any inference which can be drawn therefrom in the plaintiff's favor. *Eyal v. Helen Broadcasting Corp.,* 411 Mass. 426, 429 (1991) and cases cited.

### I.

*Timeliness of Plaintiff's Action*

1.*Timeliness of Plaintiff's Claims Arising from the 1991 Report*

**\*2** On their face, plaintiff's claims arising from the 1991 Report, filed in March of 1992, appear to be time-barred.[FN2] However, plaintiff argues that the three year statute of limitations for malpractice actions, G.L. c. 260 § 4, was tolled pursuant to the continuous representation doctrine.

> FN2. Plaintiff's claims arising from the 1992 audit are not, on their face, time barred as the 1992 audit Report was filed no later than March 31, 1993, whereas plaintiff's complaint was filed on March 19, 1996.

The continuing representation doctrine arose in the context of medical malpractice and has since been expanded to other professions, including attorneys and, in two jurisdictions, accountants. *Cuccolo v. Lipsky, Goodkin & Co.,* 826 F.Supp. 763, 768 (S.D.N.Y.1993). The essence of the doctrine is that "when the course of treatment which includes the wrongful acts or omissions has run continuously and is related to the same original condition or complaint, the accrual comes only at the end of the treatment ... The continuous treatment we mean, however, is treatment for the same or related illnesses or injuries, continuing after the alleged acts or malpractice, not mere continuity of a general

physician-patient relationship." *F.D.I.C. v. Deloitte & Touche,* 834 F.Supp. 1129, 1148-1149 (E.D.Ark.1992) (citing *Borgia v. New York,* 12 N.Y.2d 151 (1962)).

As with medical and legal professionals, " [c]ontinuous representation tolls the statute of limitations until an accountant stops rendering professional services to his or her client on a particular matter ... The mere recurrence of professional services does not constitute continuous representation where the later services performed were not related to the original service." *Cuccolo,* at 768. Allegations of annual audits, without reference to the same or related problems for which "treatment" was sought, will not support application of the continuous representation doctrine: "[if the doctrine applied in such a case,] it almost certainly would apply in every case involving an accountant that had performed audits for a client in consecutive years. That result is unacceptable, nor is it called for by the doctrine described in *Borgia.*" *F.D.I.C.,* at 1149.

The Supreme Judicial Court has expanded the doctrine of continuous representation to the legal malpractice field, *Murphy v. Smith,* 411 Mass. 133, 137 (1991), but it has not yet applied it to accountants.

It is true that applying the doctrine in a case where nothing more than consecutive annual audits were involved would mean that any and all yearly audits would amount to continuous treatment, rendering the three year statute of limitations of Chapter 260, § 4, virtually meaningless whenever a defendant accountant had performed consecutive year audits. As the court in *F.D.I.C.* stated: "[t]he mere possibility of continuous treatment, which can be imagined but which has not been alleged, is not enough...." *Id.,* at 1151.

Here, however, the complaint alleges that Deloitte's audit letter for the 1992 audit stated that "In our opinion, based on our audits and the report of the other auditors, such consolidated financial statements present fairly, in all material respects, the financial position of Cambridge Biotech Corp. and subsidiaries as of December 31, 1991 and 1992,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.E.2d, 6 Mass.L.Rptr. 367, 1997 WL 42516 (Mass.Super.)
**(Cite as: Not Reported in N.E.2d)**

and the results of their operations and their cash flows for each of the three years in the period ended December 31, 1992 in conformity with generally accepted accounting principles."

**\*3** Accordingly, as the 1992 audit letter itself indicated, a related continuous representation since 1991 was involved, there is a disputed issue of material fact for the jury whether continuous representation can be proved in this case. In these circumstances, the Appellate Courts of the Commonwealth should be provided with a full record on which to decide whether the doctrine of continuous representation, if found as a factual matter to exist, should be applied to accountants in Massachusetts. Accordingly, the defendant's motion to dismiss the complaint, insofar as the 1991 audit is concerned, is denied.[FN3]

> FN3. A motion to dismiss pursuant to Mass.R.Civ.P. 12(b)(6) is a appropriate vehicle to raise a statute of limitations defense. *Epstein v. Seigal,* 396 Mass. 278, 279 (1985). And, plaintiff has the burden of proving facts that would take the case outside the impact of the statute of limitations. *Franklin v. Albert,* 381 Mass. 611, 619 (1980). Here, however, it does not appear beyond doubt that the plaintiff can prove no set of facts in support of his [continuous representation argument] to surmount defendant's statute of limitations defense. Cf. *Nader v. Citron,* 372 Mass. 96, 98 (1977).

### 2. Effect of Debtor's Failure to Seek Bankruptcy Court Approval of Counsel

Defendant contends that, even with respect to the 1992 audit, the suit was late-filed because it was not authorized by the bankruptcy court when filed in March, 1996.

Pursuant to 11 U.S.C. § 327(a) a bankruptcy court must approve the trustee's employment of professionals to represent or assist in carrying out Chapter 11 duties.[FN4] The trustee's application to the court must set out facts enabling the court to

make a conflict of interest or adverse interest determination regarding the professional and the estate.[FN5]

> FN4. Section 327(a) provides, in pertinent part, "the trustee, with the court's approval, may employ ... attorneys ... that do not hold or represent an interest adverse to the estate, and that are disinterested persons, to represent or assist the trustee in carrying out the trustees duties under this title."

> FN5. Bankruptcy Rule 2014 provides, in pertinent part, "[a]n order approving the employment of attorneys ... pursuant to § 327 ... shall be made only on application of the trustee or committee ... The application shall state the specific facts showing the necessity for the employment, the name of the person to be employed, the reasons for the selection, the professional serviced to be rendered, any proposed arrangement for compensation, and, to the best of the applicant's knowledge, all of the person's connections with the debtor, creditors, any other party in interest, their respective attorneys and accountants, the United States trustee, or any person employed in the office of the United States trustee. The application shall be accompanied by a verified statement of the person to be employed setting forth the person's connections [to the same parties listed above]."

The recognized sanction for non-compliance with section 327(a) and Rule 2014, however, is not dismissal, but denial of attorneys' fees. With one exception, all of the cases involving issues of representation without prior bankruptcy court approval have discussed the effect on attorneys' fees rather than any effect on the validity of the complaint. See, e.g., *In Re Atkins,* 69 F.3d 970, 973 (9th Cir.1995) ("[i]n bankruptcy proceedings, professionals who perform services for a debtor in possession cannot recover fees for services rendered to the estate unless those services have been previously authorized by a court order," citing

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.E.2d                                                     Page 4

Not Reported in N.E.2d, 6 Mass.L.Rptr. 367, 1997 WL 42516 (Mass.Super.)
**(Cite as: Not Reported in N.E.2d)**

section 327(a) and Rule 2014); *In Re Kendavis Industries Int., Inc.,* 91 B.R. 742, 748 (N.D.Tex.1988) ("where an attorney for a debtor is found to be interested, disallowance of attorney fees is appropriate ... [i]f an attorney holds an undisclosed adverse interest, a court is empowered to deny all compensation").

While a bankruptcy, moreover, stays any action against the bankrupt, it does not prohibit a suit by a bankrupt in possession. Thus, in *In Re Interwest Business Equipment, Inc.,* 23 F.3d 311, 318 (10th Cir.1994), the court held that the Bankruptcy Code and Rules may not limit an attorney's choice of whom to work for: "[the code and rules] do not provide authority for the court to prohibit a professional from working for any client it chooses. Thus, there can be no question of the court either permitting or prohibiting unapproved representation. Instead, any professional not obtaining approval is simply considered a volunteer if it seeks payment from the estate." Recently, courts have mitigated even this sanction, allowing retroactive attorneys' fees for unauthorized services which were later authorized. See, e.g., *In Re Atkins,* 69 F.3d, at 973 ("bankruptcy courts in this circuit possess the equitable power to approve retroactively a professional's valuable but unauthorized services" ).[FN6]

> FN6. See also Stephen R. Grensky, *The Problem Presented By Professionals Who Fail To Obtain Prior Court Approval Of Their Employment Or Nunc Pro Tunc Est Bunc,* 62 Am.Bankr.L.J. 185 (1988), describing the purpose of Section 327(a) and Rule 2014 as overseeing the employment of professionals to prevent "vounteerism," and criticizing courts that award fees to unauthorized professionals on equitable grounds.

*4 The court is aware of only one case wherein a motion to dismiss was filed on the ground of unauthorized bankruptcy representation, and that motion was denied. In *In Re Chocklett,* 274 F.Supp. 821, 822 (W.D.Va.1967), the court held that a suit filed by the trustee's attorney was not

subject to dismissal merely because the attorney did not comply with the appointment provision,[FN7] the court finding that "the appointment of counsel to represent the estate in the absence of a verified petition should not withdraw counsel's authority to file a valid suit against the petitioner." *Id.,* at 824, citing *Widett v. D'Andria,* 241 F.2d 680 (1st Cir.1957) (where the court had noted that the only cases litigated under Order 44 dealt with attorneys' fees and that none of them addressed "the question of the authority of counsel to act for a trustee, receiver or debtor in possession when not appointed by the court as the Order requires." *Id.,* at 682).
The court held that the sanction of denial of attorneys' fees provided for in the Order was " adequate to effectuate its purpose ... We see no point in adding lack of authority to file notice of appeal to the sanction stated in the Order." *Id.,* at 683.[FN8]

> FN7. The attorney in *In Re Chocklett* 274 F.Supp. at 824, was appointed pursuant to General Order in Bankruptcy No. 44, a predecessor to Section 327(a) and Rule 2014, the purpose of which was to "protect the estate by insuring employment of competent counsel who have no adverse interest ..."*Id.*While counsel did seek and obtain the appointment, he did not submit a verified petition, as required by the Order.

> FN8. While General Order 44 explicitly provided that the court may deny attorneys' fees where appropriate, and Section 327(a) does not, 11 U.S.C. § 328(a) provides that the court may modify the terms and conditions of employment, including fees, at the conclusion of employment if "such terms and conditions prove to have been improvident in light of developments not capable of being anticipated at the time of the fixing of such terms and conditions." Therefore, Section 327(a) and Rule 2014, viewed in the context of the overall statutory scheme and purpose, as well as relevant case law, serve the same purpose as General Order 44, i.e., to control the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.E.2d, 6 Mass.L.Rptr. 367, 1997 WL 42516 (Mass.Super.)
**(Cite as: Not Reported in N.E.2d)**

debtor's employment and compensation of professionals in the interest of the estate. There is nothing to suggest that any broader sanctions are authorized. *See also* Grensky, *supra,* n. 4, at 193 ("section 327(a) and B.R.2014(a) are not significantly different than General Order 44 which they replaced ...").

Accordingly, defendant's argument that this Court should dismiss plaintiff's complaint, even as it relates to the 1992 audit, as a "nullity," because plaintiff's counsel allegedly did not receive timely court permission, is unavailing.

## II. *The Negligence Count*

Defendant claims that plaintiff fails to state a claim for negligence in that plaintiff fails to specify facts to support the duty, breach, and causation elements of negligence. Defendant also asserts that plaintiff's failure to specify which specific Generally Accepted Auditing Standards ("GAAS") defendant allegedly violated is grounds for dismissal of plaintiff's complaint. Plaintiff argues that such specificity of pleading is unnecessary, but offers to amend its complaint pursuant to Mass.R.Civ.P. 15(a) if the court finds plaintiff must plead detailed GAAS violations.

In Massachusetts it has been held that a complaint for accountant malpractice must allege "with clarity and certainty specific facts concerning (1) the negligent acts or omissions of the defendants; (2) the content of the auditors' reports and certificates; (3) the work which the defendants had agreed to do, had stated that they had done or omitted, and had actually done; (4) the extent to which the defendants' representations were qualified, contained disclaimers, or were expressed as opinions; (5) the generally accepted principles of accounting which the defendants were alleged to have violated; and (6) the facts misrepresented and what the plaintiffs allege the defendants knew, or (after reasonable investigation) should have known, concerning them." *Blank v. Katz,* 350 Mass. 779 (1966). *See also* 3 Mass.Jur. § 30.117, at 101 (1992).

Under this standard, plaintiff's complaint is deficient. Plaintiff's conclusory allegations notwithstanding, plaintiff fails to specify facts concerning defendant's alleged negligent acts or omissions, specific GAAS violations, and what facts defendant knew or should have known concerning plaintiff.

**\*5** Although Rule 8(a)'s notice pleading requirements, effective in 1974, after the *Blank* case, may be argued to have required less in the way of "specific facts" in the complaint than did *Blank,* that case is still good law and is generally cited as the standard. *See,* e.g., *Massachusetts Jurisprudence* and *Mottla's Proof of Cases.* Accordingly, defendant's motion to dismiss the complaint for lack of specificity is allowed, but with leave to amend within thirty days.

## III. *The Contract Count*

Defendant claims that plaintiff fails to state a claim for breach of contract because the complaint does not allege that plaintiff performed its duties under the contract. However, plaintiff's complaint, though not detailed, satisfies the pleading requirements for a breach of contract action. *U.S. Funding, Inc. v. Bank of Boston,* 28 Mass.App.Ct. 404, 406 (1990) (complaint "does not show beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief," citing *Nader v. Citron,* 372 Mass. 96, 98 104-105 (1977)).

Defendant also argues that the court should dismiss the contract count because it is duplicative of the tort count, citing cases from other states holding that accountant malpractice actions have their "true basis" in negligence, not contract. For example, in *F.D.I.C. v. Clark,* 978 F.2d 1541, 1551-1552 (10th. Cir.1992), the court held that the trial court properly treated attorney malpractice claims as "one hybrid tort claim for malpractice [sounding in negligence]" for purposes of Colorado's proportional liability statute. Similarly, in *F.D.I.C. v. Regier Carr & Monroe,* 996 F.2d 222, 224 (10 Cir.1993) the court held that, for statute of limitations purposes, an accountant malpractice

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.E.2d                                                                    Page 6

Not Reported in N.E.2d, 6 Mass.L.Rptr. 367, 1997 WL 42516 (Mass.Super.)
**(Cite as: Not Reported in N.E.2d)**

action sounded in tort, not contract, where the contract contained nothing beyond the ordinary standard of care applicable to accountants, i.e., GAAP.[FN9]

> FN9. Defendant also points out that the Massachusetts General Court has seen fit to give a contract action for accountant malpractice a three year statute of limitations, G.L. c. 260, § 4, the same as for tort actions, G.L. c. 260, § 2A.

The SJC, however, has held that, in the analogous context of legal malpractice, "the plaintiff's complaint need not ... label the action as an action of contract or as an action of tort ... Under our traditional practice, a plaintiff may elect to bring either an action of contract or an action of tort in such a case, but he need not choose between the two labels." *Hendrickson v. Sears* 365 Mass. 83, 86 (1974). The Court also noted that the traditional view of legal malpractice is that "the gist of the action, regardless of its form, is the attorney's breach of contract." *Id.,* at 86. See also *Brown v. Gerstein,* 17 Mass.App.Ct. 558, 572 (1984) (the attorney client relationship is essentially contractual in nature).

Accordingly, defendant's motion to dismiss the contract count is denied.

#### IV. *Plaintiff's Participation in Alleged GAAP violations*

Defendant further contends, that in view of plaintiff's counsel's own admission that plaintiff provided defendant with false financial statements (made in his capacity as counsel for the stockholder class in its suit against plaintiff), plaintiff's own wrongdoing is a bar to the suit, citing *Cenco, Inc. v. Seidman & Seidman,* 686 F.2d 449, 454-456 (7th Cir.1982) (a "wrongdoing corporation may not sue its independent auditor in negligence or contract for failing to discover and expose the very fraud the corporation itself perpetrated through its preparation of false financial statements.").

*6 However, *Cenco* did not involve a motion to dismiss, but involved jury instructions advising that "a participant in a fraud cannot also be a victim entitled to recover damages" (holding that such an instruction was "proper in the circumstances.") *Id.* Similarly here, such facts, if undisputed, or if proven at trial, may constitute a bar for purposes of summary judgment, directed verdict, or jury instructions and a special jury question, but are not germane to a motion to dismiss.

#### V. *Prior Pending New York Class Action*

Finally, defendant argues that plaintiff's complaint should be dismissed because there is a pending class action in Federal District Court against defendant concerning the same events alleging violations of federal securities laws. Defendant claims that the stockholder class in that action is the real party in interest here because plaintiff in this action assigned 90% of any recovery in this action to the class. Therefore, claims defendant, since all of the claims asserted in this action could have been filed in district court in New York, this action should be dismissed as a matter of issue preclusion, citing *Caspian Investments, Ltd. v. Vicom Holdings, Ltd.,* 770 F.Supp 880, 884 (S.D.N.Y.1991).

Here, however, the parties are not the same in the two actions. As stated in *Caspian Investments,*" comity requires that the parties and issues in both cases must be sufficiently similar that doctrine of res judicata would apply." *Id.,* at 884, citing *Herbstein v. Bruetman,* 743 F.Supp. 184, 188 (S.D.N.Y.1990). Nor can there be any *res judicata,* in any event, until one or another of the actions is litigated to final judgment.

#### ORDER

For the reasons stated above, defendant's motion to dismiss is *denied,* except that plaintiff is ordered to file an amended complaint within thirty days after receipt of this order setting forth with specificity the matters specified in *Blank v. Katz,* 12, *supra.*

Mass.Super.,1997.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.E.2d                                                    Page 7

Not Reported in N.E.2d, 6 Mass.L.Rptr. 367, 1997 WL 42516 (Mass.Super.)
**(Cite as: Not Reported in N.E.2d)**

Cambridge Biotech Corp. v. Deliotte & Touche
Not Reported in N.E.2d, 6 Mass.L.Rptr. 367, 1997
WL 42516 (Mass.Super.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**3**

Westlaw.

Not Reported in N.W.2d                                                                                                     Page 1

Not Reported in N.W.2d, 2003 WL 21350362 (Mich.App.)
**(Cite as: Not Reported in N.W.2d)**

**H**
Chase Bank of Texas, N.A. v. Grant Thornton LLP
Mich.App.,2003.
Only the Westlaw citation is currently available.
UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.
Court of Appeals of Michigan.
**CHASE** BANK OF TEXAS, N.A., Residential
Funding Corporation, Bank One Texas, N.A., The
Bank of New York, and Lasalle Bank, N.A.,
Plaintiffs-Appellants,
v.
**GRANT** THORNTON LLP and Doeren Mayhew
& Company, P.C., Defendants-Appellees.
**No. 236237.**

June 10, 2003.

Before: CAVANAGH, P.J., and GAGE and
ZAHRA, JJ.

[UNPUBLISHED]
PER CURIAM.
**\*1** Plaintiffs State Bank of Texas, N.A. (also
referred to as Chase Bank), Residential Funding
Corporation, Bank One Texas, N.A., The Bank of
New York, and LaSalle Bank, N.A., appeal by right
from an order granting summary disposition to
defendants Grant Thornton, LLP, and Doeren
Mayhew & Co., PC, pursuant to MCR 2.116(C)(8).
We affirm.

I. Facts and Procedure

Plaintiffs bring this action for fraud and aiding and
abetting fraud against the accountants for plaintiffs'
borrower, Mortgage Company of America (MCA),
to recover money that was lost by plaintiffs when
MCA became bankrupt. MCA was in the business
of originating, selling and servicing mortgages.
Plaintiffs entered into an ongoing business
relationship with MCA commencing in October

1997, when plaintiffs loaned funds to MCA and
various MCA-related entities pursuant to "
warehouse" loan funding agreements. The loans
were pledged with the intent that the loan proceeds
would finance MCA's mortgage banking operations.
Defendants, two accounting firms, jointly conducted
annual audits of MCA and five of MCA's related
entities, for the fiscal years between 1993 and 1998.
Defendants' final audit of MCA's related entities
was on January 31, 1998, and no audit reports or
opinions were issued regarding MCA after January
1998. In early 1999, MCA and its related entities
collapsed, became bankrupt, and defaulted on
outstanding obligations to plaintiffs and other
creditors. Plaintiffs suffered substantial financial
loss upon MCA's collapse.

Plaintiffs' amended complaint alleges that plaintiffs'
loss was caused by defendants' willful or reckless
misrepresentation of the actual financial condition
of MCA in their audit reports between 1993 and
1998, thereby fraudulently inducing plaintiffs to
loan millions of dollars to MCA. Defendants filed a
motion for summary disposition of plaintiffs'
amended complaint, claiming that plaintiffs failed to
state a cause of action pursuant to MCR 2.116(C)(8)
and MCR 2.112(B)(1). The trial court granted
summary disposition in favor of defendants.

II. Analysis

On appeal, plaintiffs argue they properly pleaded
their claim for fraud with sufficient specificity. We
disagree.

This Court reviews de novo the trial court's ruling
on a motion for summary disposition pursuant to
MCR 2.116(C)(8).*Beaudrie v. Henderson,* 465
Mich. 124, 129;631 NW2d 308 (2001). Motions
brought under MCR 2.116(C)(8) test the legal
sufficiency of the claim with regard to the pleadings
alone. *Id.* All well-pleaded facts are accepted as true
and are construed in a light most favorable to the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.W.2d                                                                Page 2

Not Reported in N.W.2d, 2003 WL 21350362 (Mich.App.)
**(Cite as: Not Reported in N.W.2d)**

nonmoving party. *Butler v. Ramco-Gershenson, Inc,* 214 Mich.App 521, 534;542 NW2d 912 (1995)." Summary disposition under MCR 2.116(C)(8) is proper when the claim is so clearly unenforceable as a matter of law that no factual development could establish the claim and justify recovery."*Corley v. Detroit Bd of Ed,* 246 Mich.App 15, 18;632 NW2d 147 (2001), lv held in abeyance 654 NW2d 329 (2002), quoting *Smith v. Stolberg,* 231 Mich.App 256, 258;586 NW2d 103 (1998). Mere conclusions unsupported by allegations of fact will not suffice to state a cause of action under MCR 2.116(C)(8). *Butler, supra* at 534.Under MCR 2.112(B)(1), "[i]n allegations of fraud or mistake, the circumstances constituting fraud ... must be stated with particularity."

**\*2** The elements of a fraud claim are well settled: (1) That defendant made a material representation; (2) that it was false; (3) that when he made it he knew that it was false, or made it recklessly, without any knowledge of its truth and as a positive assertion; (4) that he made it with the intention that it should be acted upon by plaintiff; (5) that plaintiff acted in reliance upon it; and (6) that he thereby suffered injury. [*Kassab v Michigan Basic Prop Ins Ass'n,* 441 Mich. 433, 442;491 NW2d 545 (1992), citing *Hi-Way Motor Co v. Int'l Harvester Co,* 398 Mich. 330, 336;247 NW2d 813 (1976), quoting *Candler v. Heigho,* 208 Mich. 115, 121;175 NW 141 (1919).]

In *DiLeo v. Ernst & Young,* 901 F.2d 624, 627 (CA 7, 1990), the Seventh Circuit Court of Appeals stated the following regarding a claim of fraud under FRCP 9(b), the federal counterpart to MCR 2.112(B)(1):

[FRCP] 9(b) requires the plaintiff to state 'with particularity' any 'circumstances constituting fraud.' Although states of mind may be pleaded generally, the 'circumstances' must be pleaded in detail. This means the who, what when, where, and how: the first paragraph of any newspaper story.

These same pleading requirements exist under MCR 2.112(B)(1).

The amended complaint in the present case does not plead fraud with the requisite specificity, and instead pleads general conclusory statements alleging that defendants misrepresented MCA's financial condition. For example, the amended complaint fails to sufficiently set forth specific facts showing that defendants knew the financial representations were false or that they intended to make plaintiff rely on the representations. As noted in *DiLeo, supra* at 629:

The complaint does not allege that [the accountants] had anything to gain from any fraud by Continental Bank.... [The accountants'] partners shared none of the gain from any fraud and were exposed to a large fraction of the loss. It would have been irrational for any of them to have joined cause with Continental.... The complaint does not come close. It does not identify any of [the accountants'] auditors or explain what that person might have to gain from covering up Continental's wrongs.... What the [plaintiffs] needed to show, if not that [the accountants] had something to gain from deceit, was at least that [the accountants] knew that particular loans had gone bad and could not be collected.

Similarly, in the present case, plaintiffs offered merely the "conclusory" statements that defendants fraudulently misrepresented the financial position of MCA with the intent that plaintiffs would rely on the misrepresentations.

Moreover, the substance of plaintiffs' allegations is negligence rather than fraud. "If a [litigant] attempts to characterize a malpractice claim as a fraud or other type of claim, a court will look through the labels placed on the claim and will make its determination on the basis of the substance and not the form."*Brownell v. Garber,* 199 Mich.App 519, 532-533;503 NW2d 81 (1993). It is the substance of the claim, which must be scrutinized. *US Fidelity & Guar Co v. Citizens Ins Co of America,* 201 Mich.App 491, 494;506 NW2d 527 (1993). The amended complaint in the present case refers to defendants' "unqualified opinions" regarding MCA's audited financial statements, and it states that if defendants had properly followed GAAS and GAAP, the audited financial statements would have revealed MCA's fraudulent conduct. The amended complaint actually specifies the accounting standards that defendants allegedly failed to meet

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.W.2d                                                                    Page 3

Not Reported in N.W.2d, 2003 WL 21350362 (Mich.App.)
**(Cite as: Not Reported in N.W.2d)**

under GAAP and GAAS. Thus, the substance of the claim in the present case is negligence, not fraud. We view plaintiffs' focus on defendants' representations regarding the quality and standard of their work as an attempt to depict a negligence claim as a fraud claim.

**\*3** As a claim for professional negligence, the Michigan Accountant Liability Act, M.C.L. § 600.2962, which limits defendants' liability to three possible situations, specifically barred plaintiffs' suit. Under subsection (a) of the act, liability may be imposed if the claimant is the accountant's client; under (b), liability may be imposed if the action is grounded upon "fraud or an intentional misrepresentation"; and under (c), liability may be imposed where the accountant was "informed in writing by the client at the time of the engagement that a primary intent of the client was for the professional public accounting services to benefit or influence the person bringing the action for damages."In the present case, plaintiffs were never defendants' clients, and plaintiffs did not allege the existence of a writing sufficient to meet the requirements of the act, thus liability cannot be imposed on defendants under subsections (a) and (c). Because this is an action for professional negligence, and not fraud, liability also cannot be imposed on defendants in the present case under subsection (b) of the act.

This case is analogous to *Yadlosky v. Grant Thornton,* 120 F Supp 2d 622 (ED Mich, 2000), where the court dismissed a negligent misrepresentation claim brought by a non-client against defendants arising out of the same group of audits involved in the present case. The federal district court found that there was no basis for liability under Michigan's Accountant Liability Act. In *Yadlosky,* the plaintiff, an investor who purchased securities from MCA, alleged that he was deceived into the purchases by "false and misleading" financial statements prepared by the defendant accounting firms; that if the accountants had performed their duties in accordance with GAAS, MCA's financial problems would have been disclosed to the investors; and the plaintiff, having relied upon these statements in making his investment decision, would not have lost his

investment. Under a FRCP 12(b)(6) motion for failure to state a claim upon which relief can be granted, the court rejected the plaintiffs' arguments and found that they were barred by the act. *Yadloski, supra* at 634-635.

Likewise, in the present case, plaintiffs made similar allegations in the amended complaint, and claimed that a proper audit by defendants, following the standards set forth under GAAS and GAAP, would have revealed MCA's fraudulent activities to plaintiffs, and thus, plaintiffs would not have decided to loan funds to MCA, and would not have suffered any damages. Just as in *Yadlosky,* in the present case, plaintiffs' claim is barred by the act. In short, plaintiffs have not alleged fraud with the requisite particularity, and their claim appears to be a claim for professional negligence, and not fraud. Thus, defendants are protected under the Michigan Accountant Liability Act, M.C.L. § 600.2962. Accordingly, the trial court did not err in dismissing plaintiffs' claim under MCR 2.116(C)(8).[FN1]

> FN1. Although the trial court did not address the possibility that the fraud claim was actually a claim for negligence, it properly dismissed plaintiffs' claim. Where the right result is reached for the wrong reason, reversal is improper. *Hilgendorf v St John Hosp & Medical Ctr Corp,* 245 Mich.App 670, 685 n 8;630 NW2d 356 (2001); *Detroit v. Presti,* 240 Mich.App 208, 214;610 NW2d 261 (2000).

**\*4** Next, plaintiffs argue that defendants have " substantially assisted" MCA in its perpetration of fraud, and have therefore aided and abetted MCA's fraudulent conduct. We disagree. An essential element of a claim for aiding and abetting fraud is that the defendant provides "substantial assistance" to the fraudulent scheme. Restatement Torts, 2d, § 876(b). Under *Dileo, supra* at 628, the alleged abettor is required to have the same degree of scienter as the person committing the actual fraud. As previously discussed, plaintiffs have failed to demonstrate that defendants had or should have had any knowledge that MCA was engaged in fraudulent activity. We note that our analysis with

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.W.2d, 2003 WL 21350362 (Mich.App.)
**(Cite as: Not Reported in N.W.2d)**

regard to the "fraud" claim applies equally to the "aiding and abetting fraud" claim.

Plaintiffs also argue that the trial court erred in granting summary disposition pursuant to MCR 2.116(C)(8) on the grounds that "[p]laintiffs have presented no evidence that [d]efendants made any material representations that resulted in a loss to [p]laintiffs."Plaintiffs assert that evidence does not need to be presented in response to a motion under MCR 2.116(C)(8), because as stated in*Singerman v. Muni Serv Bureau, Inc,* 455 Mich. 135, 139;565 NW2d 383 (1997), "[a] motion for summary disposition brought under MCR 2 .116(C)(8) tests the legal sufficiency of a claim and is tested on the pleadings alone. All factual allegations must be taken as pleaded, as well as any reasonable inferences that may be drawn therefrom."However, plaintiffs rely only on the trial court's use of the word "evidence" in its oral ruling. Although the trial court used the word "evidence," a review of the record reveals that the trial court did in fact apply the correct standard for deciding a motion for summary disposition, and on the correct elements required for stating a claim of fraud. The use of the word "evidence" by the trial court was actually in reference to the lack of factual allegations to support the fraud claim in the amended complaint.

Finally, plaintiffs add that the trial court erred in ruling that plaintiffs were required to allege a contractual relationship in the amended complaint, because a fraud claim does not require privity of contract. However, examination of the record reveals the learned trial judge was not referring to plaintiffs' complaint. The trial court was also ruling on a second motion to dismiss brought in a related case that arose out of the same audits that were performed by the same defendants in the present case. Both cases were dismissed on the same day as a result of a single ruling from the trial court. The second matter included a claim for negligent misrepresentation, which does require privity of contract. Therefore, the trial court's mention of the absence of a contractual relationship between the parties was not directed at plaintiffs in the present case.[FN2]

FN2. This Court recently affirmed the trial court's dismissal of the claims asserted against defendants in this related case. See *Bd of Trustees et al v Grant Thornton, LLP and Doeren Mayhew, PC,* unpublished opinion per curiam of the Court of Appeals, issued March 11, 2003 (Docket No. 236415).

Affirmed.

Mich.App.,2003.
Chase Bank of Texas, N.A. v. Grant Thornton LLP
Not Reported in N.W.2d, 2003 WL 21350362 (Mich.App.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**4**

Westlaw.

Not Reported in F.Supp.2d

Page 1

Not Reported in F.Supp.2d, 2002 WL 32494514 (N.D.Tex.)
**(Cite as: Not Reported in F.Supp.2d)**

**C**
Johnson v. Metabolife Intern., Inc.
N.D.Tex.,2002.
Only the Westlaw citation is currently available.
United States District Court,N.D. Texas, Dallas
Division.
Brenda JOHNSON, Plaintiff,
v.
METABOLIFE INTERNATIONAL, INC.,
Defendant.
**No. Civ.A.3:01-CV-2082-G.**

Oct. 23, 2002.

Edward Blizzard, Blizzard McCarthy & Nabers,
Houston, TX, C. L. Mike Schmidt, Law Office of C
L Mike Schmidt, Dallas, TX, for Plaintiff.
Baxter W. Banowsky, Banowsky Betz & Levine,
Dallas, TX, for Defendants.

FISH, Chief J.
*1 Before the court is the motion of the defendant
Metabolife International, Inc. ("Metabolife") to
strike and/or dismiss, pursuant to FED. R. CIV. P.
9(b), 12(b)(6), and 12(e), the state law claim of
deceit and fraud brought by the plaintiff Brenda
Johnson ("Johnson"). Also before the court is
Johnson's motion for leave to amend her complaint.
For the following reasons, Metabolife's motion is
granted and Johnson's motion is denied.

I.

This is a personal injury case. Metabolife, a
corporation with its principal place of business in
the state of California, Notice of Removal at 3, is
engaged in the business of marketing and selling
weight loss supplements, including a product known
as "Metabolife 356" ("M-356"), to the general
public. Defendant's Third Amended Answer and
Affirmative Defenses ("Defendant's Third Amended

Answer") ¶¶ 6-7. Metabolife markets its products
throughout the nation, including Texas. *See*
Defendant's Third Amended Answer ¶¶ 4, 7.
Johnson is an individual domiciliary and resident of
the state of Texas. Plaintiff's Original Petition ("
Complaint") ¶ 2, *attached to* Notice of Removal as
Tab 2 of Exhibit A. Johnson brought her claim
initially in the District Court of Dallas County,
101st Judicial District, on May 30, 2001.
Metabolife then removed the case to this court
pursuant to 28 U.S.C. § 1441(a).*See* Notice of
Removal. The crux of the case is Johnson's
allegation that she suffered serious injuries
following her consumption of M-356. *See*
Complaint ¶ 11.

On October 5, 2001, Johnson filed her first
amended complaint, which added a state law cause
of action for "deceit and fraud." *See* Plaintiff's First
Amended Original Petition ("First Amended
Complaint") ¶¶ 15-21, *attached to* Notice of
Removal as Tab 22 of Exhibit A. The factual
allegations in that claim, however, failed to state
with particularity the circumstances constituting
fraud, which is required by FED. R. CIV. P. 9(b) of
any claim of fraud.[FN1]Consequently, on March 5,
2002, this court granted Metabolife's motion for a
more definite statement, pursuant to FED. R. CIV.
P. 12(e), and ordered Johnson to replead her deceit
and fraud claim. *See* Order, March 5, 2002. In
response, Johnson filed her second amended
complaint on July 5, 2002.

> FN1. The deceit and fraud claim in the
> first amended complaint merely stated that:
> Defendant made material representations
> to the general public and potential users of
> [M-356] such as Plaintiff, that [M-356]
> was thoroughly tested and proven safe.
> Plaintiff reasonably relied on such
> representations in deciding to use [M-356]
> and, but for such representations of safety,
> she would not have used [M-356]. At the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2002 WL 32494514 (N.D.Tex.)
**(Cite as: Not Reported in F.Supp.2d)**

Page 2

time the representations were made, they were false, and Defendant knew they were false. Defendant also failed to represent to Plaintiff that [M-356] could cause serious health problems including neurologic injury, seizure, heart failure and sudden death. This omission was material and induced Plaintiff to use [M-356] ... This omission by Defendant was material and intentional and it had the desired effect-to induce the continued use by Plaintiff and millions of others.

First Amended Complaint ¶¶ 16-21 (paragraph numbers omitted from text).

On August 12, 2002, Metabolife filed the instant motion to strike and/or dismiss, pursuant to FED. R. CIV. P. 9(b), 12(b)(6), and 12(e), the deceit and fraud cause of action in Johnson's second amended complaint. *See* Defendant's Motion to Strike/and or [sic] Dismiss ("Defendant's Motion") at 6. Specifically, Metabolife requests that the court strike paragraphs 15-21 of Johnson's second amended complaint and/or dismiss her deceit and fraud claim in its entirety. *Id.* Johnson responded on September 6, 2002 by filing a motion for leave to further amend her complaint. *See* Plaintiff's Motion for Leave of Court to Amend Plaintiff's Complaint ( "Plaintiff's Motion").[FN2] Metabolife opposes the motion for leave to further amend. Defendant's Response to Plaintiff's Motion to Amend Pleadings ( "Defendant's Response") at 1. The court now addresses both Metabolife's motion to strike and/or dismiss and Johnson's motion for leave to amend.

FN2. Johnson has appended a copy of her proposed third amended complaint to her motion for leave to amend. *See* Plaintiff's Third Amended Complaint ("Third Amended Complaint"), *attached to* Plaintiff's Motion as Exhibit A.

II.

*1. Defendant's Motion to Strike and/or Dismiss*

*a. The Legal Standard*

**\*2** Federal Rule of Civil Procedure 12(b)(6) authorizes dismissal of a complaint for "failure to state a claim upon which relief can be granted." However, a motion under Rule 12(b)(6) should be granted only if it appears beyond doubt that the plaintiff could prove no set of facts in support of her claim that would entitle her to relief. *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *Leffall v. Dallas Independent School District,* 28 F.3d 521, 524 (5th Cir.1994); see also *Kaiser Aluminum & Chemical Sales, Inc. v. Avondale Shipyards, Inc.,* 677 F.2d 1045, 1050 (5th Cir.1982), *cert. denied,*459 U.S. 1105, 103 S.Ct. 729, 74 L.Ed.2d 953 (1983). In determining whether dismissal should be granted, the court must accept all well-pleaded facts as true and view them in the light most favorable to the plaintiff. See *Capital Parks, Inc. v. Southeastern Advertising and Sales System, Inc.,* 30 F.3d 627, 629 (5th Cir.1994); *Norman v. Apache Corporation,* 19 F.3d 1017, 1021 (5th Cir.1994); *Chrissy F. by Medley v. Mississippi Department of Public Welfare,* 925 F.2d 844, 846 (5th Cir.1991).

Under Federal Rule of Civil Procedure 9(b), a plaintiff must state with particularity the circumstances constituting a claim of fraud. *See* FED. R. CIV. P. 9(b); see also *Tuchman v. DSC Communications Corporation,* 14 F.3d 1061, 1067 (5th Cir.1994); *Guidry v. Bank of LaPlace,* 954 F.2d 278, 288 (5th Cir.1992). Although Rule 9(b) permits the plaintiff to allege generally the defendant's intent to commit fraud, a mere allegation that the defendant had the requisite intent will not satisfy Rule 9(b). See *Melder v. Morris,* 27 F.3d 1097, 1102 (5th Cir.1994); *Tuchman,* 14 F.3d at 1068. To adequately plead fraudulent intent, the plaintiff must set forth specific facts that support an inference of fraud. *Tuchman,* 14 F.3d at 1068.

What constitutes particularity "will necessarily differ with the facts of each case."*Guidry,* 954 F.2d at 288. Generally, this circuit has interpreted Rule 9(b) as requiring the plaintiff to include specific details of the time, place, contents, and nature of the activities which form the basis of the allegedly fraudulent conduct, as well as the speaker's identity and what was obtained thereby. See *Williams v. WMX Technologies, Inc.,* 112 F.3d 175, 177 (5th

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2002 WL 32494514 (N.D.Tex.)
**(Cite as: Not Reported in F.Supp.2d)**

Cir.), *cert. denied,* 522 U.S. 966, 118 S.Ct. 412, 139 L.Ed.2d 315 (1997); *Tel-Phonic Services, Inc. v. TBS International, Inc.,* 975 F.2d 1134, 1139 (5th Cir.1992); see also 5 CHARLES A. WRIGHT & ARTHUR MILLER, FEDERAL PRACTICE AND PROCEDURE § 1297 (2d edition 1990). "Anything less fails to provide defendants with adequate notice of the nature and grounds of the claim." *Hart v. Bayer Corporation,* 199 F.3d 239, 248 (5th Cir.2000) (citing *Tuchman,* 14 F.3d at 1067). Dismissal of a fraud claim for failure to plead the claim with particularity under Rule 9(b) is treated as a dismissal for failure to state a claim under Rule 12(b)(6). See *Lovelace v. Software Spectrum, Inc.,* 78 F.3d 1015, 1017 (5th Cir.1996); *Shushany v. Allwaste, Inc.,* 992 F.2d 517, 520 (5th Cir.1993); *Guidry,* 954 F.2d at 281.

### b. *Johnson's Deceit and Fraud Claim*

*\*3* Johnson filed her current live pleading, the second amended complaint, on July 5, 2002. This pleading was filed after the court granted Metabolife's motion for a more definite statement, pursuant to FED. R. CIV. P. 12(e), and ordered Johnson to replead her claim for deceit and fraud with the specificity required by FED. R. CIV. P. 9(b). In the instant motion to strike and/or dismiss, Metabolife argues that Johnson's second amended complaint again fails to meet the minimum pleading requirements for a claim of fraud under Rule 9(b). The court agrees with this assertion.

Johnson took four months to file her second amended complaint.[FN3] A careful review of that complaint, however, reveals that the only change of any significance made to the deceit and fraud claim was the addition of language to paragraph number 16. In the first amended complaint, paragraph 16 stated that:

> FN3. The court granted Metabolife's motion for more definite statement on March 5, 2002, and, as mentioned, Johnson did not file her second amended complaint until July 5, 2002. *See* Docket Sheet.

Defendant made material representations to the general public and to potential users of [M-356] such as Plaintiff, that [M-356] was thoroughly tested and proven safe.
First Amended Complaint ¶ 16. Plaintiff amended this paragraph in the second amended complaint to assert that:
Defendant made material representations to the general public and to potential users of [M-356] such as Plaintiff, *through billboard, television and other media advertisements,* that [M-356] was *an all-natural product and safe to use.*

Plaintiff's Second Amended Original Petition (" Second Amended Complaint") ¶ 16 (italicized words indicate new language).

However, even with the additional language alleging that Metabolife made material representations "through billboard, television and other media advertisements, that [M-356] was an all-natural product and safe to use," Johnson's claim for deceit and fraud falls well short of the specificity required for a claim of fraud. "At a minimum, Rule 9(b) requires that [Johnson] specify the particulars of 'time, place, and contents of the [allegedly] false representations." ' *Williams,* 112 F.3d at 179 (quoting *Tuchman,* 14 F.3d at 1068). Johnson's repled deceit and fraud claim identifies neither the time nor the place of these alleged misrepresentations. In fact, Johnson flatly admits that she cannot "remember the location of the billboard or the precise date and time the advertising was on the [television] or radio." Plaintiff's Response to Defendant's Motion to Strike and/or Dismiss ("Plaintiff's Response") ¶ 3. Nor does she allege the specific contents, context, or speaker of these advertisements. Johnson has also failed to present any facts to support an inference of Metabolife's alleged fraudulent intent. Finally, Johnson does not adequately show how any alleged statements on behalf of Metabolife were actually fraudulent. Thus, the deceit and fraud claim in Johnson's second amended complaint lacks sufficient particularity to comply with Rule 9(b).

Johnson responds to these deficiencies by simply arguing that "[n]o one could be expected to remember those details," Plaintiff's Response ¶ 3,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                 Page 4

Not Reported in F.Supp.2d, 2002 WL 32494514 (N.D.Tex.)
**(Cite as: Not Reported in F.Supp.2d)**

and by pointing her finger at Metabolife, whom she alleges failed to provide adequate information concerning the missing details of where, when and what, which she sought through written discovery. *Id.* The court acknowledges that Rule 9(b) imposes a more onerous standard for pleading fraud, one which is significantly more difficult to satisfy than the usual standard of FED. R. CIV. P. 8(a). However, as the Fifth Circuit has stated:

*4 [T]he requirement for particularity in pleading fraud does not lend itself to refinement, and it need not in order to make sense. Directly put, the who, what, when, and where must be laid out *before* access to the discovery process is granted ... We remind that this bite of Rule 9(b) was part of the pleading revolution of 1938. In short, we apply the rule with force, without apology.

*Williams,* 112 F.3d at 178 (italics in original).

Johnson alone must "specify the statements contended to be fraudulent, identify the speaker, state when and where the statements were made, and explain why the statements were fraudulent" in order to satisfy the minimum requirements of Rule 9(b).*Id.* at 177 (adopting the standards of *Mills v. Polar Molecular Corporation,* 12 F.3d 1170, 1175 (2d. Cir.1993)). Metabolife has no duty to assist Johnson in her attempt to plead deceit and fraud. Nevertheless, the record reflects that Metabolife actually provided Johnson with some materials concerning Metabolife's advertising of M-356. Plaintiff's Response ¶ 3; Defendant's Reply to Plaintiff's Response to Defendant's Motion to Strike and/or Dismiss ("Defendant's Reply") at 3-4. Even with the benefit of these materials, however, Johnson has been unable to plead her claim of fraud with the particularity required by Rule 9(b). Consequently, this court must dismiss Johnson's deceit and fraud claim, pursuant to FED. R. CIV. P. 12(b)(6), for failure to state a claim upon which relief can be granted.[FN4] See *Lovelace,* 78 F.3d at 1017.

> FN4. Concluding that Johnson's deceit and fraud claim should be dismissed under FED. R. CIV. P. 12(b)(6), the court finds it unnecessary to address Metabolife's

alternative request to strike paragraphs 15-21 of the deceit and fraud claim pursuant to FED. R. CIV. P. 12(e).

### 2. *Plaintiff's Motion for Leave to Amend*

On September 6, 2002, Johnson requested yet another bite at the apple by filing a motion for leave to amend her complaint for the third time. Johnson filed this motion following Metabolife's motion to strike and/or dismiss.[FN5] Importantly, Johnson has provided a copy of the proposed third amended complaint, which allows the court to determine whether the proposed changes are detailed enough to comply with Rule 9(b). For the reasons discussed below, the court finds that Johnson has again failed to plead her claim of fraud with the requisite specificity and, therefore, denies her motion for leave to amend.

> FN5. Johnson filed the motion for leave to amend contemporaneously with her response to Metabolife's motion to strike and/or dismiss.

Under Federal Rule of Civil Procedure 15(a), leave to amend should be "freely given when justice so requires."This and the other federal rules "reject the approach that pleading is a game of skill in which one misstep by counsel may be decisive to the outcome and accept the principle that the purpose of pleading is to facilitate a proper decision on the merits."*Conley,* 355 U.S. at 48. The Fifth Circuit has repeatedly held that Rule 15(a) evinces a liberal amendment policy. See, *e.g., Lowrey v. Texas A & M University System,* 117 F.3d 242, 245 (5th Cir.1997); *Nance v. Gulf Oil Corporation,* 817 F.2d 1176, 1180 (5th Cir.1987); *Youmans v. Simon,* 791 F.2d 341, 348 (5th Cir.1986). That liberal amendment policy, however, does not require the federal courts to engage in "futile gestures." *DeLoach v. Woodley,* 405 F.2d 496, 497 (5th Cir.1968); see also *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962) (amendment of pleading need not be allowed if amendment would be futile). Thus, "[w]here a complaint, as amended, would be subject to dismissal, leave to amend need not be granted."

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                Page 5

Not Reported in F.Supp.2d, 2002 WL 32494514 (N.D.Tex.)
**(Cite as: Not Reported in F.Supp.2d)**

*DeLoach,* 405 F.2d at 497. Finally, "the circumstances and terms upon which leave is to be ' freely given' is committed to the informed, careful judgment and discretion of the Trial Judge as he superintends the development of a cause toward its ultimate disposition."*Lone Star Motor Import, Inc. v. Citroen Cars Corporation,* 288 F.2d 69, 75 (5th Cir.1961).

**\*5** In the instant case, Johnson seeks to augment her deceit and fraud claim in an attempt to comply with FED. R. CIV. P. 9(b). In addition to the information provided in the second amended complaint, Johnson now proposes a complaint that avers:
Plaintiff began taking the drug in late 1998. Before she bought the product, she saw billboards advertising the product as being "all natural". She also saw television advertising and heard radio advertising which indicated that the product was safe because it was all natural. When she first purchased a bottle of [M-356] pills, the label on the bottle said that the pills contained natural herbs that were independently laboratory tested for safety. Plaintiff reasonably relied upon such representations that the product was all natural and safe in deciding to use [M-356] to her detriment and, but for such representations of safety, she would not have used [M-356]. At the time the representations were made, the Defendant had received hundreds of reports from users of its products indicating that the product could cause serious health problems and therefore, it knew that the representations of safety were false.

Third Amended Complaint ¶¶ 16-18 (paragraph numbers omitted from text).

Unfortunately, while Johnson's proposed third amended complaint provides more detail as to the nature of Metabolife's allegedly deceitful and fraudulent activities, the proposed amendment still lacks the particularity required by Rule 9(b). As previously discussed, a claim of fraud must include specific details as to the time, place, contents, and nature of the activities which form the basis of the allegedly fraudulent conduct. See *Tel-Phonic Services,* 975 F.2d at 1139. Moreover, even though a plaintiff may allege additional facts in support of a claim of fraud, it is the quality, not the quantity, of

those facts which is significant under Rule (9)(b). As the Fifth Circuit has stated, "[a] complaint can be long-winded, even prolix, without pleading with particularity.... [S]uch a garrulous style is not an uncommon mask for an absence of detail."*Williams,* 112 F.3d at 178. Here, each of Johnson's new allegations misses the mark.

First, while Johnson now alleges that "[b]efore she bought the product, she saw billboards advertising the product as being 'all natural,' " she fails to state where she saw these billboards, the content of the billboards, or even how the statement of "all natural " is fraudulent. *See* Plaintiff's Third Amended Complaint ¶ 16. In addition, a claim of fraud requires a more specific statement of time than to simply allege "before she bought the product." Second, Johnson also alleges that she "saw television advertising and heard radio advertising which indicated that the product was safe because it was all natural." *Id.* Nevertheless, Johnson continues to admit that she is unable remember any of the dates or times when she saw these advertisements on the television or heard them on the radio. Plaintiff's Motion ¶ 2. And again, she fails to allege the specific contents, context, or speaker of these advertisements. This is insufficient to state a claim of fraud with the particularity required by Rule 9(b). Third, Johnson now alleges that she purchased a bottle of M-356, which on its label "said that the pills contained natural herbs that were independently laboratory tested for safety." Third Amended Complaint ¶ 16. However, she never alleges that M-356 is not "all natural" or that it was not "independently laboratory tested for safety." Johnson also fails to allege any specific statement located on the label of the M-356 bottles, other than the assertion that the pills were "all natural" and "independently laboratory tested for safety." *Id.* Finally, Johnson's third amended complaint contains absolutely no statement of where or when Metabolife received the "hundreds of reports from users of its products," how these reports should have put Metabolife on notice that M-356 might cause serious health problems, or how such reports might indicate the fraudulent intent of Metabolife. See *id.* ¶ 18.Thus, as with her previous complaint, Johnson's proposed third amended complaint lacks sufficient detail to satisfy the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2002 WL 32494514 (N.D.Tex.)
**(Cite as: Not Reported in F.Supp.2d)**

requirements of Rule 9(b).

**\*6** Johnson again blames any inadequacies in her amended pleading on Metabolife's failure to produce information though discovery. Plaintiff's Motion ¶ 2. However, as discussed above, the heightened pleading requirements of Rule 9(b) must be granted. *Williams,* 112 F.3d at 178. Consequently, while Johnson's proposed third amended complaint may have designated Metabolife as the "who" responsible for the alleged deceit and fraud, she has again failed to provide sufficient facts concerning the "what, where, when, and how" required by FED. R. CIV. P. 9(b). See *id.* This court, therefore, will not engage in the futile gesture of allowing Johnson to substitute one insufficiently-pled claim for another. Accordingly, Johnson's motion for leave to amend her complaint is denied.

### III.

For the reasons discussed above, Metabolife's motion to dismiss Johnson's claim for deceit and fraud in her second amended complaint is GRANTED. Additionally, because Johnson's proposed third amended complaint fails to cure the deficiencies in her deceit and fraud claim, Johnson's motion for leave to amend her second amended complaint is DENIED.

SO ORDERED.

N.D.Tex.,2002.
Johnson v. Metabolife Intern., Inc.
Not Reported in F.Supp.2d, 2002 WL 32494514 (N.D.Tex.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**5**

Westlaw.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2000 WL 288442 (W.D.Mich.)
**(Cite as: Not Reported in F.Supp.2d)**

▷
Krieger v. Gast
W.D.Mich.,2000.
Only the Westlaw citation is currently available.
United States District Court, W.D. Michigan,
Southern Division.
Mark A. KRIEGER, Plaintiff,
v.
Warren E. GAST, et al., Defendants.
**No. 4:99-CV-86.**

Jan. 21, 2000.

Thomas A. Baird, White, Przybylowicz, Schneider
& Baird, PC, Okemos, MI, Ingham, Charles R.
Watkins, Robert J. Emanuel, Susman & Watkins,
Chicago, IL, for Mark A. Krieger, individually and
on behalf of all others similarly situated, pltf.
Jon R. Muth, Miller, Johnson, Snell & Cummiskey,
Grand Rapids, MI, Kent, Anne N. DePrez, Barnes
& Thornburg, Indianapolis, IN, for Warren E. Gast,
deft.
Jon R. Muth, Anne N. DePrez, (See above), for
William E. Johnson, deft.
Jon R. Muth, Anne N. DePrez, (See above), for
Kevin C. Gast, deft.
Jon R. Muth, Anne N. DePrez, (See above), for Jay
Van Den Berg, deft.
Jon R. Muth, (See above), for Marcella Schalon,
deft.
Jon R. Muth, Anne N. DePrez, (See above), for
Allan Westmaas, deft.
Kevin Abraham Rynbrandt, Varnum, Riddering,
Schmidt & Howlett LLP, Grand Rapids, MI, Kent,
Kevin J. O'Brien, Butler, Rubin, Saltarelli & Boyd,
Chicago, IL, for Gast Manufacturing Corporation,
deft.
Jon R. Muth, Anne N. DePrez, (See above), for
McDonald & Company Securities, Incorporated,
deft.
Jon R. Muth, Anne N. DePrez, (See above), for
McDonald & Company Investments, Inc., deft.

QUIST, J.
*1 In accordance with the Opinion filed on this date,

IT IS HEREBY ORDERED that the Amended
Motion Of The McDonald Companies And The
Director Defendants To Dismiss Complaint (docket
no. 15) is GRANTED IN PART AND DENIED IN
PART. The motion is granted with respect to all
Counts against Defendants McDonald & Company
Securities, Inc. and McDonald & Company
Investments, Inc., and those defendants are hereby
DISMISSED from this case. The motion is denied
with respect to all Counts against the Director
Defendants (Warren E. Gast, William E. Johnson,
Kevin C. Gast, Jay Van Den Berg, and Allan
Westmaas) with the exception of Count V against
Defendants William E. Johnson, Kevin C. Gast, Jay
Van Den Berg, and Allan Westmaas, which is
DISMISSED against those defendants. However,
Defendant Warren E. Gast may renew the motion
on Count V in the event that Plaintiff fails to amend
his complaint as set forth below.

IT IS FURTHER ORDERED that the Motion Of
Defendant Gast Manufacturing Corporation To
Dismiss Complaint (docket no. 6) is GRANTED IN
PART AND DENIED IN PART. The motion is
granted with respect to Count II and denied as to all
other Counts. However, Defendant may renew its
motion on Count V-negligent misrepresentation-in
the event that Plaintiff fails to amend his complaint
as set forth below.

IT IS FURTHER ORDERED that within fourteen
(14) days of this date, Plaintiff shall file an
amended complaint specifically alleging that he
attended the August 21, 1996, shareholders
meeting, heard the statements allegedly made by
Defendant Warren Gast, and relied on them, if that
is in fact what occurred. Plaintiff's failure to file an
amended complaint within that time shall result in
dismissal of Count V.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 2

Not Reported in F.Supp.2d, 2000 WL 288442 (W.D.Mich.)
**(Cite as: Not Reported in F.Supp.2d)**

Plaintiff, Mark A. Krieger ("Krieger"), on behalf of a putative class, filed the instant action against Defendants, Gast Manufacturing Corporation ("GMC"), Warren E. Gast, William E. Johnson, Kevin C. Gast, Jay Van Den Berg, Allan Westmaas, McDonald & Company Securities, Inc. ("McDonald & Co."), and McDonald & Company Investments, Inc. ("McDonald Investments" and together with McDonald & Co. the "McDonald Companies"), alleging state law claims for breach of fiduciary duty (Count I), aiding and abetting/inducement and conspiracy to commit a breach of fiduciary duty (Count II), common law fraud (Counts III and IV), negligent misrepresentation (Count V), conspiracy (Count VI), and unjust enrichment (Count VII).[FN1] Krieger's claims arise out of an August 1996 merger in which the GMC minority shareholders were "squeezed out," as well as certain post-merger transactions. More specifically, Krieger alleges that the merger and other transactions were part of a plan by the directors and major shareholders of GMC to appropriate for themselves part of the value of Krieger's and the other minority shareholders' stock. Presently before the Court are GMC's motion to dismiss and the McDonald Companies' and the Director Defendants' motion to dismiss.

> FN1. Krieger also sued Marcella Schalon and Gast Investment Corporation. Those defendants have since been dismissed pursuant to stipulation of the parties.

*Facts and Procedural History*

**\*2** GMC is a Michigan corporation engaged in the business of manufacturing and selling compressors, pumps, blowers, and related items. Prior to September 1996, Krieger owned 500 shares of GMC Class A common stock. During the period of time relevant to Krieger's claims, Defendants Warren E. Gast, William E. Johnson, Kevin C. Gast, Jay Van Den Berg, and Allan Westmaas (collectively referred to as the "Inside Group") were officers and/or directors of GMC and, along with others, owned approximately 82% of the outstanding shares of GMC Class A and Class B

common stock and 73% of the outstanding shares of GMC preferred stock.

Krieger alleges that in 1994, Warren Gast, the president, chief executive officer, secretary, and chairman of the board of GMC, decided to liquidate his holdings in GMC by either taking GMC public through an initial public offering ("IPO") or selling GMC to a third party. (*See* Compl. ¶ 33(b).) In order to facilitate the IPO or sale of GMC, the Inside Group met with various investment bankers, and in or about August 1995, GMC retained Defendant McDonald & Co. as its investment banker. (*Seeid.*)McDonald & Co. then introduced the Inside Group to RDV Corporation ("RDV").

According to Krieger, in a series of meetings held sometime in late 1995 or early 1996, the Inside Group, McDonald & Co., and RDV formulated a plan, dubbed by Krieger as the "Wrongful Plan," to enable the Inside Group, McDonald & Co., and RDV to profit at the expense of the minority shareholders. Krieger alleges that under this plan, the Inside Group and RDV, which was to purchase an interest in GMC, would increase the value of their shares by appropriating part of the value of the minority shareholders' shares through a "squeeze out" at an unfairly low price and thereby gain the ability to realize substantial profits through a subsequent IPO or sale of GMC. Krieger also claims that McDonald & Co. would share in the profits through "success" or finders fees paid by GMC. (*Seeid.* ¶¶ 33(e), 34, 38.)

The Wrongful Plan was implemented in July 1996, when the Inside Group and other GMC officials formed a shell corporation called Gast Investment Corporation ("GIC"), into which they transferred all the GMC common and preferred shares that they owned or controlled, which amounted to 82% of the common stock and 73 % of the preferred stock. On August 8, 1996, the Inside Group caused GMC and GIC to enter into an Agreement and Plan of Merger merging GIC into GMC and leaving GMC as the surviving corporation (the "Merger"). The terms of the agreement provided that all GMC stock owned by minority shareholders would be converted into the right to receive $140 per share for common stock and $10 per share for preferred stock.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 3

Not Reported in F.Supp.2d, 2000 WL 288442 (W.D.Mich.)
**(Cite as: Not Reported in F.Supp.2d)**

On August 9, 1996, a notice of a special shareholders meeting (the "Notice") signed by Warren Gast was sent to GMC shareholders. The Notice stated that a meeting would be held on August 21, 1996, to approve the Merger. The Notice also informed the shareholders that GIC would vote its shares in favor of the Merger, that GIC's vote would ensure that the Merger would occur, and that the minority shareholders' shares would be converted into the right to receive $140 and $10 cash, respectively, for common and preferred shares. (*Seeid.* ¶¶ 39-42.)In addition, the Notice stated that after the Merger the continuing shareholders (who included the Inside Group and others with interests in GIC) would sell to GMC 325,533 shares of GMC stock at $140 per share for an approximate total price of $45.5 million. (*Seeid.* ¶ 45(a).)

**\*3** The Merger was approved at the August 21, 1996, shareholders' meeting. Krieger and the other minority shareholders were paid the amounts specified in the Notice for their shares and did not exercise their appraisal rights under Michigan law. *See*M.C.L. §§ 450.1762, 1772-73. Following the Merger, the Inside Group sold 325,533 of their shares to GMC, and RDV and its affiliates purchased from GMC a 49% interest for $4.2 million plus a loan of $4.2 million, as described in the Notice.[FN2]In May of 1997, nine months after the Merger, GMC entered into negotiations with IDEX Corporation ("IDEX") for the sale of GMC. In January 1998, the continuing shareholders sold GMC to IDEX and received in excess of $300 per share, or over twice the amount the minority shareholders received for their shares. (*Seeid.* ¶ 51.)Krieger claims that GMC common stock was worth $300 per share on August 21, 1996, and that Defendants either knew or should have been aware of that fact. Krieger further claims that Defendants prevented the minority shareholders from discovering that fact by dissuading them from exercising their statutory appraisal rights by means of misleading statements or omissions in the Notice.

     FN2. Krieger also alleges that a reverse stock split occurred, although he does not allege the terms of the split, i.e., one for

two.

Krieger initially filed suit against Defendants and others on May 22, 1998, in the United States District Court for the Northern District of Illinois. In that case, Krieger alleged violations of the Securities Exchange Act of 1934 and various state law claims. The district court dismissed Krieger's federal securities law claims under Fed.R.Civ.P. 12(b)(6) for failure to state a claim and dismissed his state law claims pursuant to 28 U.S.C. § 1367(c). *SeeKrieger v. Gast,* No. 98 C 3182, 1998 U.S. Dist. LEXIS 15422, at *21 (N.D.Ill. Sept. 22, 1998) (mem.op.). Krieger then filed a new action in state court in Cook County, Illinois, asserting state law claims. The Illinois state court dismissed that case because it did not have personal jurisdiction over several of the defendants. Krieger filed the instant action in Michigan asserting state law claims under Michigan law.

*Standards for Review*

An action may be dismissed if the complaint fails to state a claim upon which relief can be granted. Fed.R.Civ.P. 12(b)(6). The moving party has the burden of proving that no claim exists. Although a complaint is to be liberally construed, it is still necessary that the complaint contain more than bare assertions of legal conclusions. *SeeAllard v. Weitzman (In re DeLorean Motor Co.),* 991 F.2d 1236, 1240 (6th Cir.1993) (citing *Schied v. Fanny Farmer Candy Shops, Inc.,* 859 F.2d 434, 436 (6th Cir.1988)). All factual allegations in the complaint must be presumed to be true, and reasonable inferences must be made in favor of the non-moving party. *See* 2A James W. Moore, *Moore's Federal Practice,* ¶ 12.34[1][b] (3d ed.1997). The Court need not, however, accept unwarranted factual inferences. *SeeMorgan v. Church's Fried Chicken,* 829 F.2d 10, 12 (6th Cir.1987). Dismissal is proper "only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations."*Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 2232 (1984) (citing *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 101-02 (1957)).

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                            Page 4

Not Reported in F.Supp.2d, 2000 WL 288442 (W.D.Mich.)
**(Cite as: Not Reported in F.Supp.2d)**

*4 In addition to moving for dismissal under Rule 12(b)(6), the Inside Group and the McDonald Companies contend that with the exception of Count V, Krieger's complaint must be dismissed because it fails to comply with Fed.R.Civ.P. 9(b). Under that rule, "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity," although circumstances regarding state of mind "may be averred generally." Fed.R.Civ.P. 9(b)."The purpose of Rule 9(b) is to provide fair notice to the defendant so as to allow him to prepare an informed pleading responsive to the specific allegations of fraud ."*Advocacy Org. for Patients & Providers v. Auto Club Ins. Ass'n,* 176 F.3d 315, 322 (6th Cir.1999) (citing *Michaels Bldg. Co. v. Ameritrust Co., N.A.,* 848 F.2d 674, 679 (6th Cir.1988)). In addition, Rule 9(b) serves to protect a defendant's reputation by precluding unfounded allegations of fraud and to reduce the number of strike suits and fishing expeditions. *SeeGuidry v. Bank of LaPlace,* 954 F.2d 278, 288 (5th Cir.1992) (stating that " [t]his higher [pleading] standard stems from the obvious concerns that general, unsubstantiated charges of fraud can do damage to a defendant's reputation"); *Arazie v. Mullane,* 2 F.3d 1456, 1465 (7th Cir.1993) (noting that burden of the heightened pleading standard is to prevent "strike suits brought by disgruntled investors").

The Sixth Circuit has adopted a liberal approach to the application of Rule 9(b).*SeeCoffey v. Foamex L.P.,* 2 F.3d 157, 161-62 (6th Cir.1993). To satisfy the requirements of the rule, a plaintiff must " ' allege the time, place, and content of the alleged misrepresentation on which he or she relied; the fraudulent scheme; the fraudulent intent of the defendants; and the injury resulting from the fraud." ' *Id.* at 161-62 (quoting (*Ballan v. Upjohn Co.,* 814 F.Supp. 1375, 1385 (W.D.Mich.1992)); *see also Vild v. Visconsi,* 956 F.2d 560, 567 (6th Cir.1992). A plaintiff's allegations must satisfy Rule 9(b)'s particularity requirement with regard to each element of the claim of fraud and with regard to each defendant against whom fraud is alleged. *See Picard Chem. Inc. Profit Sharing Plan v. Perrigo Co.,* 940 F.Supp. 1101, 1114 (W.D.Mich.1996).

In *Michaels Building,* the court held that the particularity requirement under Rule 9(b) must be " read in harmony" with the policy of Rule 8 of requiring only a "short and plain statement of the claim" in pleadings.*Michaels Bldg.,* 848 F.2d at 679 . The court observed that although a plaintiff is required to plead with greater specificity when fraud is alleged in the complaint, courts should not be "too exacting" and should "not demand clairvoyance from pleaders" in determining whether the requirements of Rule 9(b) have been met. *Id.* at 681.Thus, so long as the plaintiff's allegations inform the defendant of the circumstances constituting the fraud with enough specificity to permit the defendant to respond to and defend the claim, the complaint should not be dismissed. *Seeid.* at 680.This is especially true where facts relating to the plaintiff's claim are within the defendant's knowledge or control. *Seeid.*

*Discussion*

I. Inside Group's and McDonald Companies'
Motion To Dismiss

A. Compliance with Rule 9(b)

*5 The Inside Group's and McDonald Companies' first argument is that all counts of Krieger's complaint, except Count V for negligent misrepresentation, must be dismissed because those claims fail to comply with Fed.R.Civ.P. 9(b). Although Krieger alleges fraud claims only in Counts III and IV, the Inside Group asserts that Rule 9(b)'s requirements apply to the other claims as well because they are based upon allegations of fraud perpetrated as part of the Wrongful Plan. Therefore, as an initial matter, the Court must decide whether Rule 9(b)'s requirements apply only to those claims expressly pled as fraud or whether they extend to other non-fraud claims.

By its own terms, Rule 9(b) is limited to claims of fraud or mistake. While the language of the rule appears to preclude its application to other types of claims, courts have applied the more stringent pleading requirements of Rule 9(b) to claims

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                 Page 5

Not Reported in F.Supp.2d, 2000 WL 288442 (W.D.Mich.)
**(Cite as: Not Reported in F.Supp.2d)**

denominated as something other than fraud, such as breach of fiduciary duty, where such claims are grounded in allegations of intentional wrongdoing. *See, e.g.,Torchetti v. International Bus. Machs. Corp.,* 986 F.Supp. 49, 51 (D.Mass.1997) (holding that breach of fiduciary duty claims asserted under the Employee Retirement Income Security Act of 1974 "stemming from fraud" were subject to Rule 9(b)); *Burt v. Danforth,* 742 F.Supp. 1043, 1051 (E.D.Mo.1990) (concluding in shareholder derivative action that "although plaintiff's claims are formally cast in terms of breach of fiduciary duty, the pleading requirements of Rule 9(b) are no less applicable to plaintiff's allegations of intentional wrongdoing").

As the cases cited by the parties demonstrate, a divergence of opinion exists among the courts with regard to whether Rule 9(b) may be applied to claims other than fraud. Krieger relies on a recent decision by the Eighth Circuit, *Carlon v. Thaman* ( *In re NationsMart Corp. Sec. Litig.*), 130 F.3d 309 (8th Cir.1997), in support of his contention that Rule 9(b) does not apply to claims other than fraud. In *NationsMart,* the Eighth Circuit held that the district court erred in dismissing the plaintiffs' claim under § 11 of the Securities Act because the plaintiffs were not alleging fraud in the context of their § 11 claim, and even if the plaintiffs were alleging that the defendants engaged in fraudulent conduct under § 11, application of Rule 9(b) to the claim would simply mean that the fraud allegations would be disregarded since a § 11 claim may be premised upon innocent or negligent misrepresentations. *SeeNationsMart,* 130 F.3d at 314-15. The court bolstered its conclusion that dismissal was not required under Rule 9(b) by noting that the plaintiffs had expressly disclaimed any claim of fraud in their § 11 count. *Seeid.* at 315.Krieger contends that this Court should follow the reasoning in *NationsMart,* especially because Krieger expressly disavowed any allegations of fraud in his breach of fiduciary duty claims.

**\*6** Defendants rely on several cases which applied Rule 9(b) to claims not requiring proof of fraudulent intent based on the rationale that the claims included allegations of fraud which triggered the application of Rule 9(b). In one such case,

*Anderson v. Clow* (*In re Stac Elecs. Sec. Litig.*), 89 F.3d 1399 (9th Cir.1996), the Ninth Circuit held that Rule 9(b) applied to the plaintiff's claim under § 11 of the Securities Act, even though the plaintiff, as in this case, expressly disclaimed any allegations of fraud in its § 11 claim, because the claim was grounded in fraud. *SeeIn re Stac Elecs. Sec. Litig.,* 89 F.3d at 1404-05 & 1405 n. 2. The court reasoned: Rule 9(b) serves to give defendants adequate notice to allow them to defend against the charge and to deter the filing of complaints "as a pretext for the discovery of unknown wrongs," to protect professionals from the harm that comes from being subject to fraud charges, and to "prohibit [ ] plaintiff [s] from unilaterally imposing upon the court, the parties and society enormous social and economic costs absent some factual basis."Because the same policy considerations apply to Section 11 claims sounding in fraud, we hold that persons making such claims must state with particularity the circumstances constituting the alleged fraud.

*Id.* at 1405 (citation omitted) (alterations in original) (quoting *Semegen v. Weidner,* 780 F.2d 727, 731 (9th Cir.1985)). Several other circuits have adopted the same reasoning with respect to claims under the Securities Act that are not based on fraud. *SeeMelder v. Morris,* 27 F.3d 1097, 1100 n. 6 (5th Cir.1994); *Shapiro v. UJB Fin. Corp.,* 964 F.2d 272, 288 (3d Cir.1992); *Sears v. Likens,* 912 F.2d 889, 892-93 (7th Cir.1990). The First Circuit in *Shaw v. Digital Equipment Corp.,* 82 F.3d 1194 (1st Cir.1996), a case cited by Krieger, noted that Rule 9(b) would have applied to claims not requiring proof of fraud if they were based upon allegations amounting to a "unified course of fraudulent conduct...." *Shaw,* 82 F.3d at 1223. However, the court found that Rule 9(b) was inapplicable to the plaintiff's claims because the " complaint avoid[ed] grounding its Section 11 and 12(2) claims on any allegations of fraud."*Id.*

Although the Sixth Circuit has not addressed the issue, this Court concludes that the cases holding that Rule 9(b) applies to non-fraud claims " grounded in fraud" reach the proper result. In this regard, the Court agrees with the court's analysis in *Taam Associates, Inc. v. Housecall Medical Resources, Inc.,* No. 1:96-CV-2214A-JEC, 1998

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                              Page 6

Not Reported in F.Supp.2d, 2000 WL 288442 (W.D.Mich.)
**(Cite as: Not Reported in F.Supp.2d)**

U.S. Dist. LEXIS 22372 (N.D.Ga. Mar. 30, 1998). In that case, the court reasoned that Rule 9(b) should transcend the label affixed to a claim by a plaintiff because "[a] mere allegation, or 'averment, ' of [fraud] could still serve to injure a defendant's reputation, regardless of whether such allegation is necessary to establish liability under the cause of action."*Taam Assoc.,* 1998 U.S. Dist. LEXIS 22372, at *40. Thus, where fraud is alleged, the claim should be tested under Rule 9(b)'s requirements even if the claim may be established without proof of fraud. *See* *id.* at *40-41 (citing *Shapiro,* 964 F.2d at 288).[FN3]

> FN3. The Court also agrees with the *Taam Associates* court's conclusion that application of Rule 9(b) to non-fraud claims grounded in fraud does not run afoul of the Supreme Court's decision in *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit,* 507 U.S. 163, 113 S.Ct. 1160 (1993), in which the Court held that Rule 9(b) is limited only to the claims enumerated in the rule, i.e., fraud and mistake. *See* *Leatherman,* 507 U.S. at 168, 113 S.Ct. at 1163. The *Leatherman* holding did not address instances where fraud forms the basis for a non-fraud claim, and this Court finds no reason to conclude that *Leatherman* precludes the application of Rule 9(b) in such circumstances.

**\*7** Having concluded that Rule 9(b) applies to non-fraud claims grounded in fraud, the Court must determine whether claims other than the fraud claims alleged in Counts III and IV are based upon allegations of fraud. The Court determines, based upon its review of the complaint, that Counts I and II, which allege claims for breach of fiduciary duty and aiding and abetting breach of fiduciary duty, are subject to Rule 9(b) even though Krieger has expressly disclaimed any allegations of fraud. The crux of the allegations in those counts, which specifically reference the Wrongful Plan, is that the Inside Defendants dissuaded Krieger and the minority shareholders from exercising their appraisal rights by misleading them about the true

value of their GMC stock. (*See* Compl. ¶¶ 62,63, 68, 70.) Moreover, according to Krieger's own allegations, the Wrongful Plan was steeped in fraud. Likewise, the Court finds that Krieger's conspiracy claim in Count VI is grounded in fraud and subject to Rule 9(b).[FN4] In particular, the complaint alleges that Defendants were "parties to an agreement, the Wrongful Plan, the purpose of which was unlawful, to defraud" Krieger. (Compl. ¶ 94.) In contrast to the other claims, the Court finds that Krieger's unjust enrichment claim alleged in Count VII is not subject to Rule 9(b) because fraud is not required to establish the claim and Krieger did not include any allegations of fraud in that claim.

> FN4. As with breach of fiduciary duty claims, several courts have also held that Rule 9(b) applies to civil conspiracy claims where the conspiracy is linked to fraud. *See* *Hayduk v. Lanna,* 775 F.2d 441, 443 (1st Cir.1985); *Heinrich v. Sweet,* 49 F.Supp.2d 27, 45 (D.Mass.1999); *Cohabaco Cigar Co. v. United States Tobacco Co.,* No. 98 C 1580, 1998 WL 773696, at *6 (N.D.Ill.1998) (mem.op.).

### 1. Inside Group

The Court first determines whether the complaint satisfies Rule 9(b) with respect to the allegations against the Inside Group (Warren Gast, Kevin Gast, Johnson, Westmaas, and Van Den Berg). Based upon its review of the allegations against those defendants, the Court concludes that, in general, Krieger has sufficiently complied with Rule 9(b) to avoid dismissal. The complaint outlines the details and purpose of the alleged fraudulent scheme, namely, that the Inside Group adopted a plan to maximize their profit from a planned sale or IPO of GMC by causing GMC to merge with GIC and squeeze Krieger and the other minority shareholders out at an unfairly low price. (*See* Compl. ¶¶ 33(e), 34.) The complaint further alleges that in order to accomplish the Wrongful Plan, the Inside Group drafted and sent to the minority shareholders the misleading Notice, which was intended to cause the minority shareholders to accept the amount offered for their shares and forego their right to an

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 7

Not Reported in F.Supp.2d, 2000 WL 288442 (W.D.Mich.)
**(Cite as: Not Reported in F.Supp.2d)**

appraisal that would have revealed that the real value of their GMC shares was substantially in excess of the price offered in the merger. (*Seeid.* ¶ ¶ 36, 39, 40.) Moreover, the complaint alleges in sufficient detail the time, place, and content of the alleged misrepresentations or omissions. In contrast to many complex securities cases where plaintiffs allege a host of misrepresentations and omissions by various defendants at different times and places, the misrepresentations and omissions that allegedly occurred in this case, with the exception of two allegedly misleading statements made by Warren Gast at the August 21, 1996, shareholders meeting, are limited to the statements made in or the information omitted from the Notice sent to the shareholders by Warren Gast on August 9, 1996. [FN5]

> FN5. Having reviewed the alleged misrepresentations set forth in paragraphs 40 through 45 of the complaint, the Court has some doubt about whether some or possibly all of those statements can be considered false or misleading in light of information disclosed in the Notice, which explains the details of the merger, and the subsequent occurrence of all of the events described in the Notice. However, because the Inside Group Defendants have not challenged the sufficiency of those allegations under Rule 12(b)(6), the Court need not address whether those allegations suffice to support a fraud claim. *See Midwest Commerce Bank Ins. Co. v. Elkhart City Ctr.,* 4 F.3d 521, 523 (7th Cir.1993) (stating that "Rule 9(b) does not require that the complaint explain the plaintiff's theory of the case, but only that it state the misrepresentation, omission, or other action or inaction that the plaintiff claims was fraudulent. The plaintiff's theory of the case is tested by a motion to dismiss for failure to state a claim ...." (citations omitted)).

**\*8** The Inside Group's primary contention is that the complaint fails to comply with Rule 9(b) because it does not allege any specific conduct by Van Den Berg and the other Inside Group defendants, other than Warren Gast, who prepared and signed the notice, apart from conclusory allegations that they " controlled and directed the actions complained of,"" caused the misleading Notice to be mailed" to Krieger, and "intentionally misstated and omitted material facts from the notice and other documents related to the Merger."Krieger responds that his allegations against Van Den Berg and the other Inside Group Defendants are sufficient because they show that as directors, those Defendants authorized and consented to the Notice and saw it before it was sent out. In addition, Krieger contends that he is entitled to rely on the "group published information" presumption because the Notice was sent out as part of a corporate group decision-making process.

The Court agrees with Defendants that Krieger has not alleged any specific conduct by Van Den Berg, Kevin Gast, Westmaas, and Johnson. Thus, because the Notice is central to Krieger's fraud claim, Krieger can meet Rule 9(b) with respect to the Inside Group defendants other than Warren Gast only if the "group published information" presumption applies in this case. Under that presumption, "[i]dentifying the individual sources of statements is unnecessary when the fraud allegations arise from misstatements or omissions in group-published documents such as annual reports, which presumably involve collective actions of corporate directors or officers."*Schwartz v. Celestial Seasonings, Inc.,* 124 F.3d 1246, 1254 (10th Cir.1997); *see alsoBerry v. Valence Tech., Inc.,* 175 F.3d 699, 706 (9th Cir.1999). The "group published information" or "group pleading doctrine, " as it is also called, has been applied in securities cases to various types of corporate communications and reports, including prospectuses, SEC filings, registrations, and other documents intended for dissemination to the public. *SeeBenedict v. Cooperstock,* 23 F.Supp.2d 754, 763 (E.D.Mich.1998) (mem.op.).

The Inside Group Defendants appear to concede that the presumption applies to Defendants Johnson and Westmaas, who were also officers of GMC. They contend that the presumption is inapplicable to Defendants Van Den Berg and Kevin Gast, who were outside directors. They assert that the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2000 WL 288442 (W.D.Mich.)
**(Cite as: Not Reported in F.Supp.2d)**

presumption does not apply to Van Den Berg and Kevin Gast because Krieger failed to allege that Van Den Berg and Kevin Gast either participated in the day-to-day operations of GMC or had a special relationship with GMC.[FN6] Many courts, particularly those in the Ninth Circuit, have limited the application of the presumption to outside directors to instances where the "outside director either participated in the day-to-day corporate activities, or had a special relationship with the corporation, such as participation in preparing or communicating group information at particular times."*Decker v. Glenfed, Inc. (In re Glenfed, Inc. Sec. Litig.),* 60 F.3d 591, 593 (9th Cir.1995). The justification for requiring plaintiffs to allege more specific involvement by outside directors in the preparation and dissemination of allegedly misleading materials is that outside directors are not employees of the company with ongoing responsibilities and are thus less connected to the company's day-to-day affairs. *SeeIn re Syntex Corp. Sec. Litig.,* 855 F.Supp. 1086, 1100 (N.D.Cal.1994) ; *Haltman v. Aura Sys., Inc.,* 844 F.Supp. 544, 548-49 (C.D.Cal.1993).

> FN6. The Inside Group Defendants do not dispute that the "group published information" doctrine applies to the inside directors, Johnson and Westmaas.

**\*9** The Inside Defendants are correct that Krieger has not specifically alleged that Van Den Berg and Kevin Gast either participated in GMC's day-to-day affairs or had a special relationship with GMC. However, the Court finds that the "group published information" presumption may be applied in this case even in the absence of such allegations. Typically, the presumption is applied in securities fraud cases where the misleading statements tend to occur in prospectuses, financial reports, and other documents prepared under the direction of corporate officers with intimate knowledge of the matters contained in those documents. Because outside directors lack "operational involvement," their "boardroom titles" alone are insufficient to warrant the presumption. *Syntex Corp.,* 855 F.Supp. at 1100. The difference in this case is that unlike prospectuses, financial statements, and reports, the

Notice involved a merger-a matter requiring approval by the board in the first instance as well as notice by the board to the shareholders regarding approval of the Merger.[FN7]*See*M.C.L.A. § 450.1703a. Because the Merger was a matter in which the board was intimately involved, the Court concludes that Krieger may rely on the "group published information" presumption to satisfy Rule 9(b) with respect to the Inside Group Defendants other than Warren Gast. However, because the presumption applies only to written documents, it encompasses statements or omissions in the Notice but does not apply to the oral statements which Krieger alleges Warren Gast made at the shareholders meeting. *(See* Compl. ¶¶ 46(h), 47.)

> FN7. In fact, the Notice states that it was sent "By Order of the Board of Directors" and the proxy statement indicates that it was sent "by the Company's Board of Directors...." (Notice at 3, Compl. Ex. A.)

The Court does conclude, however, that the complaint fails to satisfy Rule 9(b) in two respects. First, in paragraphs 76 and 82, Krieger alleges that the Inside Group intentionally misstated and omitted material facts from the Notice and "other documents related to the Merger," but does not identify what the "other documents" are. Second, Krieger alleges that he relied on the Notice but fails to allege that he relied on the alleged statements by Warren Gast at the shareholders meeting. Therefore, Krieger must amend his complaint to sufficiently identify the "other documents" and to allege reliance upon Warren Gast's statements if he did in fact rely on them.

### 2. McDonald Companies

The McDonald Companies also contend that the complaint fails to comply with Rule 9(b). The Court agrees with Defendants that the complaint lacks the required specificity in the allegations against McDonald Investments. The complaint alleges nothing more than McDonald Investments is the parent of McDonald & Co., is a citizen of Ohio, and "received the fruits of the fraud committed by

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                        Page 9

Not Reported in F.Supp.2d, 2000 WL 288442 (W.D.Mich.)
**(Cite as: Not Reported in F.Supp.2d)**

McDonald & Co. and the other defendants."(Compl. ¶¶ 4, 18.) These allegations are insufficient because Krieger has not alleged any acts or conduct by McDonald Investments to support any of his claims against that defendant, even under the more generous pleading requirements of Rule 8.

**\*10** The Court also agrees with Defendants that the complaint fails to comply with Rule 9(b) with respect to the claims against McDonald & Co. for fraud under Count IV. The complaint fails to allege any conduct by McDonald & Co. which constitutes fraud, and Krieger may not rely on the "group published information" presumption to meet Rule 9(b) with respect to this defendant. Although a plaintiff should normally be given the opportunity to amend in the face of a Rule 9(b) challenge, the Court finds that further amendment would be futile, as Krieger has already had several opportunities to develop his claims against the McDonald Companies and he has not demonstrated that amendment would cure the deficiencies in his complaint.

### B. Failure to Plead Scienter

#### 1. The Inside Group

The Inside Group contends that Counts II, III, IV, and VI must be dismissed because Krieger's allegations not only fail to demonstrate intent, but also suggest that the members of the Inside Group acted irrationally. More specifically, the Inside Group contends that if Krieger's premise is true, i.e., that shares of GMC stock were actually worth $300 at the time the Merger was approved, then the Inside Group gave up millions of dollars when they sold 325,533 shares of their stock to GMC for $140 per share-the same amount paid to Krieger and the minority shareholders-and when GMC sold a 49% interest to RDV for $140 per share.[FN8]The Inside Group asserts that because "[n]o rational person would give such discounts, let alone enter into a complicated conspiracy to do so," (Inside Group Defs.' Br. at 8), Krieger's own allegations dispel any reasonable inference of fraudulent intent.

FN8. Using Krieger's numbers, the Inside Group asserts that they lost over $52 million on the sale of their stock to GMC (($300 per share x 325,533 shares)-($140 x 325,533)) and over $30.3 million when GMC sold the 49% interest to RDV for $140 per share (($300 per share x 387,074 total Inside Group shares)-($45.6 million paid to Inside Group)) x 49%-$4.2 million paid by RDV) when they could have had $116 million without going through the Merger and other transactions. The Inside Group asserts that because "[n]o rational person would give such discounts, let alone enter into a complicated conspiracy to do so," (Inside Group's Br. at 8), Krieger's own allegations dispel any reasonable inference of fraudulent intent.

Krieger responds that the Inside Group's argument misconstrues the complaint because Krieger is not alleging that the Inside Group sold their GMC shares on the same terms as the minority shareholders. Rather, Krieger contends that the sale by the Inside Group was a sham because the Inside Group actually sold their shares for $140 *plus* an ownership interest in the new GMC entity. With respect to the RDV transaction, Krieger asserts that RDV actually paid $8.4 million for its shares because the $4.2 million loan was really just more equity and the RDV transaction included elements of value beyond the $8.4 million equity infusion/loan. In addition, Krieger contends that RDV's purchase of a 49% interest in post-merger GMC for $8.4 million is proof that the stock was worth more than $140 because all of GMC's shares had allegedly been redeemed for full value and GMC was worthless. This last argument ignores the fact, as set forth in the Notice, that GMC did not redeem 61,743 of the Inside Defendants' GMC shares. (*See*Notice at 12, Compl. Ex. A.) Based upon the $140 per share, GMC would have still been worth approximately 8.6 million dollars after the redemption, an amount which corresponds closely to the price paid by RDV for its 49% interest.[FN9]

FN9. At $140 per share, 61,643 shares

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 10

Not Reported in F.Supp.2d, 2000 WL 288442 (W.D.Mich.)
**(Cite as: Not Reported in F.Supp.2d)**

equals approximately $8.6 million. A 49% share of the company would thus equal roughly $4.2 million.

While the Inside Group's argument seems persuasive, for purposes of a Rule 12(b)(6) motion, the Court finds that Krieger's allegations are not so incredible as to negate any inference of scienter on the part of the Inside Group. A plaintiff may show fraudulent intent "either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness."*Shields v. Citytrust Bancorp, Inc.,* 25 F.3d 1124, 1128 (2d Cir.1994). Krieger's allegations fall more into the former means of proof rather than the latter. Those facts essentially show that the Inside Group desired to maximize their profits on an eventual sale of GMC stock by offering the minority shareholders less than fair value for their stock. Krieger's complaint includes at least a few allegations supporting an inference of fraud, namely, the failure to disclose the plan to sell GMC to a third party following the Merger and the failure to disclose the existence of a GMC valuation performed by DeLoitte & Touche. As described by the court in *Sealy Mattress Co. of New Jersey, Inc. v. Sealy, Inc.,* 532 A.2d 1324 (Del. Ch.1987), it was incumbent on the Inside Defendants to make full disclosure to the minority shareholders:

*11 As fiduciaries seeking to "cash out" the minority stockholders of a Delaware corporation in a non-arm's length merger, the defendants had a duty to be entirely and scrupulously fair to the plaintiffs in all respects. The majority stockholder was obliged not to time or structure the transaction, or to manipulate the corporation's values, so as to permit or facilitate the forced elimination of the minority stockholders at an unfair price. The corporation's directors were obliged to make an informed, deliberate judgment, in good faith, that the merger terms, including the price, were fair and that the merger would not become a vehicle for economic oppression. And finally, the directors (and the majority stockholder, to the extent that it involved itself in such matters) were obliged to disclose with entire candor all material facts concerning the merger, so that the minority

stockholders would be able to make an informed decision as to whether to accept the merger price or to seek judicial remedies such as appraisal, an injunction, or a post merger damage action.

*Sealy Mattress Co.,* 532 A.2d at 1335 (citation omitted); *see alsoThompson v. Walker,* 253 Mich. 126, 135, 234 N.W. 144, 147 (1931).

Krieger's allegations in this case are similar to those in *Lydon v. Estate of Winston,* 715 F.Supp. 600 (S.D.N.Y.1989) (mem.op.). In *Lydon,* the plaintiff, a minority shareholder in Winston Network, Inc. (" WNI"), alleged that the majority shareholders violated the federal securities laws in connection with a squeeze-out merger between WNI and a corporation formed by the majority shareholders for the purpose of acquiring WNI. Seventeen months after the merger, the majority shareholder group sold WNI for a substantial profit even though, according to the plaintiffs, no business developments or changes had occurred. *SeeLydon,* 715 F.Supp. at 601. The plaintiff alleged that the majority shareholder group failed to disclose that it planned to resell WNI at a higher price but did not allege that the group had a specific buyer in mind or that it had engaged in any level of purchase negotiations. The court rejected the plaintiff's contention that the post-merger sale alone was sufficient to infer fraudulent intent because the plaintiff failed to allege the price of the shares at the time of the merger or that the majority shareholder group had made any efforts prior to the merger to determine whether WNI could be sold. *Seeid.*The court also found that "[e]ven if the fact of such a plan is an actionable omission, there are no factual allegations that support an inference that the alleged plan to find a buyer in the future had been formulated prior to the merger."Without such allegations, the court concluded that the plaintiff failed to establish fraud under the federal securities laws.[FN10]*Seeid.* at 602.

> FN10. As an alternate basis for dismissal, the court held that the plaintiff failed to state a claim under the Supreme Court's holding in *Santa Fe Industries, Inc. v. Green,* 430 U.S. 462, 97 S.Ct. 1292 (1977).

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                Page 11

Not Reported in F.Supp.2d, 2000 WL 288442 (W.D.Mich.)
**(Cite as: Not Reported in F.Supp.2d)**

In addition to the fact that Krieger alleges common law fraud rather than fraud under the securities laws, this case differs from *Lydon* because Krieger has alleged that the Merger was part of the Inside Group's plan to sell GMC for a profit after cashing out the minority shareholders. Furthermore, Krieger alleges that prior to the Merger, the Inside Group actually hired an investment banker and examined the options for maximizing its investment in GMC, including a possible sale to a third party. While the Inside Group's argument may ultimately support a Rule 56 motion, the Court finds that at this juncture Krieger's allegations are sufficient to proceed against the Inside Group.[FN11]

> FN11. The parties have devoted substantial time to debating whether the redemption of the continuing shareholders' shares reduced the value of GMC. The Court does not find the issue to be determinative of the motion."When a corporation redeems stock, the stock it receives is offset by a corresponding liability. The value of the corporation is reduced by the amount of the liability, and there is no change in the value of the remaining shares."*Smith v. Smith,* 197 W. Va. 505, 510, 475 S.E.2d 881, 886 (1996). However, the value of the remaining shares may increase if fair market value was not paid for the redeemed shares. *See id.*Thus, if Krieger is correct that the minority shareholders received less than fair market value, the continuing shareholders' shares would have actually increased in value as alleged.

### 2. The McDonald Companies

**\*12** The Court agrees with the McDonald Companies that the complaint fails to establish scienter in the claims against the McDonald Companies. The only allegations made by Krieger that might even arguably support an inference of scienter is that McDonald & Co. was paid a " success fee" and other compensation for its role in structuring the Merger and other transactions and that its fees were dependent upon the success of the

transactions at issue. However, an allegation that a defendant received a fee which, by itself, was legitimate is insufficient to support an inference of scienter. *SeeAdvocacy Org.,* 176 F.3d at 324 (stating that "[t]he mere possibility that an otherwise lawful payment system could be used to defraud does not create a inference of fraud sufficient to withstand a 12(b)(6) motion"); *Melder v. Morris,* 27 F.3d 1097, 1104 (5th Cir.1994) (holding that the plaintiff's allegation that the underwriters received substantial fees in connection with securities offerings failed to support an inference of scienter). Because Krieger has failed to allege that the McDonald Companies knowingly participated in the alleged fraud, the Court finds that the fraud claim under Count IV must be dismissed, as well as the aiding and abetting/inducement and conspiracy to commit breach of fiduciary duty claim and conspiracy claim in Counts II and VI, because those claims require at least some degree of knowing participation, which is not supported by the allegations in the complaint. *SeeEstate of Goldman v. National Bank of Detroit,* 236 Mich.App. 517, 523, 601 N.W.2d 126, 129 (1999) (per curiam) (concluding that the petitioners failed to allege facts to support a reasonable inference that the respondent knowingly participated in the alleged breach of fiduciary duty); *Veriden v. McLeod,* 180 Mich. 182, 191, 146 N.W. 619, 622 (1914) (stating that a plaintiff alleging civil conspiracy must prove joint assent of the minds of two or more persons); *Cousineau v. Ford Motor Co.,* 140 Mich.App.19, 32, 363 N.W.2d 721, 728 (1985) (noting requirement of a "tacit understanding" among conspirators) (citing William L. Prosser, *Handbook on the Law of Torts,* § 46, at 292 (4th ed.1971)); *cf.In re North Dakota Personal Injury Asbestos Litig. No. 1,* 737 F.Supp. 1087, 1096 n. 4 (D.N.D.1990) (stating that "[w]here an alleged civil conspiracy is grounded in deceit or fraud, the court must be vigilant in the requirement of scienter).

### C. Count II

The Inside Group Defendants and the McDonald Company Defendants contend that Count II, titled " Aiding and Abetting/Inducement and Conspiracy to

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                          Page 12

Not Reported in F.Supp.2d, 2000 WL 288442 (W.D.Mich.)
**(Cite as: Not Reported in F.Supp.2d)**

Commit a Breach of Fiduciary Duty and/or Abuse of Confidential Relationship Against All Defendants " must be dismissed because: (1) Krieger did not allege that the interest of any fiduciary was antagonistic to Krieger's interest; and (2) Krieger did not allege knowing participation by the McDonald Companies. Krieger's claim is essentially one for knowing participation in a fiduciary's breach of duty.

*13 The Michigan Court of Appeals recently addressed a claim based upon participation in the breach of a fiduciary duty in *Estate of Goldman.*In that case, the petitioner alleged that the respondent bank assisted the trustee of a marital trust in improperly distributing the assets of the trust to the surviving spouse for the purpose of creating a new trust. While not expressly recognizing an action for participation in a fiduciary's breach of his fiduciary duty, the court acknowledged that the claim was consistent with prior Michigan cases, including *L.A. Young Spring & Wire Corp. v. Falls,* 307 Mich. 69, 11 N.W.2d 329 (1943) (en banc), which held that a defendant was liable for profits he received as a willing and active participant in a conspiracy to defraud General Motors. *SeeEstate of Goldman,* 236 Mich.App. at 522-23, 601 N.W.2d at 128-29 (discussing *L.A. Young* ). The *Estate of Goldman* court noted the *L.A. Young* court's quotation of the following passage from *Irving Trust Co. v. Deutsch,* 73 F.2d 121 (2d Cir.1934): "one who knowingly joins a fiduciary in an enterprise where the personal interest of the latter is or may be antagonistic to his trust becomes jointly and severally liable with him for the profits of the enterprise."*Irving Trust,* 73 F.2d at 125. The *Estate of Goldman* court affirmed the dismissal of the petitioners' claim because it found that the petitioners' allegations did not show that the bank took affirmative steps to assist the fiduciary in violating his duties to the beneficiaries or that the bank profited from the breach. *SeeEstate of Goldman,* 236 Mich.App. at 523, 601 N.W.2d at 129.

The Inside Group contends that Krieger has failed to state a claim because his allegations are inconsistent with any inference that their interests were antagonistic to Krieger's interests. This argument incorporates the Inside Group's argument

that scienter cannot be inferred from Krieger's allegations because those allegations establish that the Inside Group sold their stock for the same price Krieger received for his stock. In other words, the Inside Group contends that because they did not receive more than Krieger received, their interests were congruent with, and not opposed to, Krieger's interest.

As discussed above, while this argument does have merit on its surface, Krieger has alleged sufficient facts from which it may be inferred that the Inside Group intentionally failed to disclose information relating to the value of GMC at the time of the Merger and the purpose of the Merger. If Krieger is correct in his assertion that the value of GMC shares was much higher than $140 at the time of the Merger and the Inside Defendants were aware of that fact, the Inside Group's interest would certainly be antagonistic to those of Krieger and the minority shareholders to the extent that they received less than fair market value for their stock because the continuing shareholders would have reaped the benefit of the difference. Therefore, the Court will not dismiss Count II against the Inside Defendants at this stage.

*14 The McDonald Companies contend that Count II should be dismissed against them because the allegations do not establish that they profited from the transaction. One of the reasons given by the *Estate of Goldman* court for its conclusion that the petitioners failed to allege knowing participation was that the respondent bank did not profit from the breach of fiduciary duty. *SeeEstate of Goldman,* 236 Mich.App. at 523, 601 N.W.2d at 129. The McDonald Companies acknowledge that McDonald & Company received fees as a result of the Merger and other transactions but contend that such fees are insufficient to constitute knowing participation in a breach of fiduciary duty. In support of their position, the McDonald Companies rely on the *Irving Trust* case cited in *Estate of Goldman* and *L.A. Young.*In *Irving Trust,* the bankruptcy trustee for Acoustic Products Company sued various directors of the company based upon their alleged appropriation of a corporate opportunity to acquire shares of stock in a company controlled by W.R. Reynolds & Co. ("Reynolds").*SeeIrving Trust,* 73

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2000 WL 288442 (W.D.Mich.)
**(Cite as: Not Reported in F.Supp.2d)**

Page 13

F.2d at 122-23. The trustee sued Reynolds on the theory that it knowingly participated with the directors in breaching their fiduciary duties. The court found that Reynolds "was not obligated to ... investigate scrupulously the intracorporate affairs of Acoustic" and concluded that Reynolds could not be held liable for participating in the breach " [s]ince it received no benefit from the transaction aside from completing the sale of the stock...."*Id.* at 125.

Here, Krieger has not alleged that McDonald & Co. received any benefits from the alleged breach of fiduciary duty apart from its receipt of investment fees. Krieger has only alleged that McDonald & Co. received investment fees that were incident to the transactions. Because Krieger has not alleged that McDonald & Co. received any benefit beyond its fees, the Court finds that Count II fails to state a claim against the McDonald Companies.

### D. Count V

Count V alleges a claim for negligent misrepresentation. A negligent or innocent misrepresentation claim "eliminates the elements of scienter and intention that the misrepresentation be acted upon, [but] it preserves the requirements of affirmative representation, reliance, and causation." *Dix v. American Bankers Life Assurance Co. of Florida,* 141 Mich.App. 650, 659, 367 N.W.2d 896, 900-01 (1985) (per curiam) (citing *United States Fidelity & Guar. Co. v. Black,* 412 Mich. 99, 116-19, 313 N.W.2d 77, 83-85 (1981)), *aff'd in part, rev'd on other grounds,*429 Mich. 410, 415 N.W.2d 206 (1987). Krieger asserts that his claim is based upon the misrepresentations and omissions in the Notice and the misrepresentations made by Warren Gast at the shareholders meeting.

The Court finds that Krieger has failed to state a claim against the McDonald Companies for negligent misrepresentation for two reasons. First, the allegations do not show that the McDonald Companies owed a duty to Krieger or the minority shareholders. *SeeOhio Farmers Ins. Co. v. Shamie,* 235 Mich.App. 417, 426, 597 N.W.2d 553, 558 (1999) (finding the plaintiff's allegations that the

defendants had a duty to exercise due care to the plaintiff were sufficient to support a negligent misrepresentation claim); *Boumelhem v. Bic Corp.,* 211 Mich.App. 175, 185, 535 N.W.2d 574, 579 (1995) (stating that the defendant had no duty to warn the plaintiff of the dangerous character of its lighters). Second, the complaint contains no allegation stating that the McDonald Companies made any sort of affirmative misrepresentation to Krieger.

**\*15** Krieger has also failed to state a claim against Defendants Westmaas, Kevin Gast, Johnson, and Van Den Berg. Krieger's claim against these Defendants depends entirely upon misrepresentations or omissions in the Notice. However, a negligent misrepresentation claim may not be based upon an omission. *SeePlatsis v. E.F. Hutton & Co.,* 946 F.2d 38, 41 (6th Cir.1991) (stating that the requirement of a false representation "can be satisfied only by an affirmative misstatement, not by an omission") (applying Michigan law). Thus, Krieger cannot rely upon the omissions set forth in his complaint to support his claim. The Court also finds that the statements set forth in paragraphs 44 and 45 of the complaint do not constitute misrepresentations of fact because those statements reflect opinions or describe events which were "anticipated to occur after the Merger," (*see*Notice at 11, Compl. Ex. A), and which in fact occurred. Therefore, Count V will be dismissed as to those Defendants.

Finally, Krieger may not rely on the statements Warren Gast allegedly made at the shareholders meeting because he did not allege that he actually attended the meeting and heard those statements and he did not allege that he relied on the statements. Because Krieger is required to prove both reliance and causation, he also fails to state a claim against Warren Gast. However, the Court will grant Krieger leave to file an amended complaint to include specific allegations showing reliance and causation.

### E. Count VII

Defendants contend that Krieger's unjust

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                     Page 14

Not Reported in F.Supp.2d, 2000 WL 288442 (W.D.Mich.)
(Cite as: Not Reported in F.Supp.2d)

enrichment claim in Count VII must be dismissed because Krieger did not allege that they were enriched by the Wrongful Plan. To establish his claim, Krieger is required to show that Defendants received a benefit from him. *See Dumas v. Auto Club Ins. Ass'n,* 437 Mich. 521, 546, 473 N .W.2d 652, 663 (1991). The Court agrees with Defendants that Krieger has not alleged that the McDonald Companies received a benefit from him. The allegations in the complaint show that the only thing that the McDonald Companies received was their fee-which Krieger did not pay. On the other hand, the Court finds that Krieger's allegations are sufficient to show that the Inside Group received a benefit from Krieger and the minority shareholders. Assuming that Krieger can sustain his allegations with evidence and show that the Inside Group was aware that GMC's stock was worth more than $300 at the time the Notice was sent out, he will be able to show that the Inside Group received a benefit, namely, the difference between the fair market value of the stock and the $140 per share paid to Krieger and the minority shareholders. Therefore, the claim will be dismissed against the McDonald Companies but not against the Inside Group.

## II. GMC's Motion to Dismiss

GMC has moved for dismissal of all claims. The Court will discuss each claim separately.

### A. Count II

GMC first contends that Krieger's claim of knowing participation in breach of fiduciary duty alleged in Count II fails to state a claim against GMC because the complaint fails to allege that GMC did anything to aid or abet the Inside Defendants in breaching their fiduciary duties. Although Krieger protests that he refers to GMC as a wrongdoer throughout the complaint, those allegations, including those under Count II and elsewhere in the complaint, are at best, conclusory, and fail to identify any specific participation by GMC in the alleged breach of fiduciary duty. Therefore, Count II will be dismissed against GMC.

### B. Count VI

*16 GMC next contends that the conspiracy claim in Count VI must be dismissed because GMC, as a corporation, cannot conspire with its own officers and directors under the intra-corporate conspiracy doctrine. Generally, "there can be no conspiracy between a corporation and its directors if the directors are acting on behalf of the corporation." *Blair v. Checker Cab Co.,* 219 Mich.App. 667, 674, 558 N.W.2d 439, 442 (1996). However, an exception to this rule exists "where the directors have an independent personal stake in a particular action and, therefore, are actually acting on their own behalf." *Id.* at 674-75, 558 N.W.2d at 442.

Construing all inferences in Krieger's favor, the Court finds that Krieger has sufficiently alleged that the director defendants had a personal stake in the outcome of the Wrongful Plan because they personally stood to benefit from its success in the form of an increase in the value of their shares. Although GMC contends that Krieger does not differentiate between the gain sought by GMC and the gain sought by the directors, GMC has cited no case law imposing an obligation upon Krieger to do so. Instead, the cases establish that so long as the allegations in the complaint show that the agents of the corporation had a personal stake, the intra-corporate conspiracy doctrine will not bar a conspiracy claim against a corporate defendant. *See Brever v. Rockwell Int'l Corp.,* 40 F.3d 1119, 1127 (10th Cir.1994); *Blair,* 219 Mich.App. at 675-76, 558 N.W.2d at 443. Thus, Count VI states a claim against GMC.

### C. Count V

GMC contends that Krieger's negligent misrepresentation claim must be dismissed because Krieger did not allege that GMC owed a duty of care to supply correct information. Citing *Radol v. Thomas,* 772 F.2d 244 (6th Cir.1985), GMC correctly notes that a corporation has no fiduciary duty to its shareholders. *See Radol,* 772 F.2d at 258. GMC contends that because it did not have any fiduciary duty to Krieger, his negligent misrepresentation claim must fail.[FN12]

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2000 WL 288442 (W.D.Mich.)
**(Cite as: Not Reported in F.Supp.2d)**

> FN12. The Court rejects GMC's reliance on the economic loss doctrine. That doctrine has been applied by Michigan courts only in cases involving the sale of goods under the Uniform Commercial Code. *SeeNeibarger v. Universal Coops., Inc.,* 439 Mich. 512, 515-21, 486 N.W.2d 612, 613-15 (1992). In addition, the Uniform Commercial Code specifically excludes "investment securities" from the definition of "goods." *See*M.C.L. § 440.2105(1).

Krieger does not contend that GMC owed him a fiduciary duty. Krieger cites *Molecular Technology Corp. v. Valentine,* 925 F.2d 910 (6th Cir.1991) as support for his assertion that he may maintain a negligent misrepresentation claims against GMC without regard to whether GMC owed him a fiduciary duty. In *Molecular Technology,* the Sixth Circuit found that under Michigan law, a special relationship, such as privity, need not exist in order for a defendant to owe a duty of care to provide accurate information to a third party. *SeeMolecular Tech.,* 925 F.2d at 915-16. Rather, the court held that a defendant owes a duty to "all those ... who defendant knows will rely on the information *and* to third parties who defendant should reasonably foresee will rely on the information."*Id.* at 916 (italics in original). The court relied on *Williams v. Polgar,* 391 Mich. 6, 215 N.W.2d 149 (1974) (en banc) in support of its position. In *Polgar,* the Michigan Supreme Court held that the existence of a duty does not depend on privity. *SeeWilliams,* 391 Mich. at 9-10, 18, 215 N.W.2d at 150, 154. The *Polgar* court extended liability, specifically to an abstractor who prepared an erroneous abstract of title, beyond those known to be relying on the abstract to those persons the abstractor could reasonably foresee as relying on the accuracy of the abstract. *Seeid.* at 157, 215 N.W.2d at 157.

*\*17* Applying *Polgar* and *Molecular Technology* to the instant case, the Court finds that Krieger has alleged sufficient facts to establish that GMC had a duty to ensure Krieger received accurate information about the Merger and other transactions. The facts in the complaint show that the board of directors approved the Merger and,

acting through Warren Gast, prepared and sent the Notice to the shareholders explaining the details of the Merger. At the time the Notice was sent out, the directors knew that it would be received and read by a defined group of individuals-the GMC shareholders. Thus, Krieger was within the group of persons that the directors knew would rely on the Notice. Although GMC contends that Krieger has not alleged any facts showing that GMC performed any act that created a duty, GMC's duty arises because the directors were acting on behalf of GMC when they prepared and sent the Notice. Thus, Krieger has alleged sufficient facts to support a finding that GMC owed a duty to furnish accurate information. As noted above, however, Krieger may not rely on the Notice to establish his claim because the representations in the Notice were not false and omissions cannot support a claim for negligent misrepresentation. Thus, the only statements left are those allegedly made by Warren Gast at the shareholders meeting.

### D. Count III

GMC, like the Inside Group, contends that Krieger's fraud claim must be dismissed because the allegations negate any inference of intent to defraud. GMC's argument tracks the argument made by the Inside Group, namely, that if the stock was actually worth in excess of $300 per share at the time of the Merger, the Inside Group Defendants' sale of their stock and the sale of a 49% interest to RDV at $140 per share was totally irrational and contrary to the Inside Defendants' economic interests. As discussed above, the Court concludes that Krieger has alleged sufficient facts to raise the possibility that Defendants intentionally failed to disclose material information which may have been material to Krieger's decision whether to exercise his appraisal rights. Therefore, the Court will not dismiss the fraud claim at this stage.

### E. Count VII

Finally, GMC argues that Krieger's claim for unjust enrichment must be dismissed because Krieger does not allege that GMC received a benefit from

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2000 WL 288442 (W.D.Mich.)
**(Cite as: Not Reported in F.Supp.2d)**

Page 16

Krieger. However, if Krieger's allegation that he was paid less than the true value of his stock is true, then GMC will have received a benefit from Krieger, i.e., Krieger's stock at less than true value. Therefore, the Court will deny the motion with respect to Count VII.

### III. Request For Leave To Amend

Krieger has requested leave to amend his complaint in the event that the Court finds that dismissal is appropriate. While leave to amend should generally be granted, the Court declines to grant Krieger leave to amend his complaint with regard to the dismissed claims against the McDonald Companies and the dismissed claims against GMC because Krieger has had several opportunities to correct any deficiencies in his complaint and has not demonstrated how further amendment will save the dismissed claims. However, the Court will order Krieger to file an amended complaint to allege that he attended the shareholders meeting, heard the alleged statements by Warren Gast, and relied on them.

### Conclusion

*18 For the foregoing reasons, the Court will grant in part and deny in part the Inside Group's and the McDonald Companies' motion to dismiss. The Court will deny the motion with regard to the Inside Group on all counts except Count V against Defendants William E. Johnson, Kevin C. Gast, Jay Van Den Berg, and Allan Westmaas. The Court will allow Defendant Warren Gast to renew the motion again with respect to Count V in the event that Krieger fails to allege that he heard and relied on the statements allegedly made by Warren Gast at the shareholders meeting. The motion will be granted on all claims against the McDonald Companies. The Court will also grant in part and deny in part GMC's motion. Count II will be dismissed and the motion will be denied with regard to all other Counts. GMC will also be given the opportunity to renew its motion to dismiss Count V in the event Krieger fails to amend his complaint as required by the Court.

W.D.Mich.,2000.
Krieger v. Gast
Not Reported in F.Supp.2d, 2000 WL 288442 (W.D.Mich.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**6**

Westlaw.

--- F.Supp.2d ----

--- F.Supp.2d ----, 2006 WL 2057194 (S.D.N.Y.)
**(Cite as: --- F.Supp.2d ----)**

▷

In re Marsh & McLennan Companies, Inc.
Securities Litigation
S.D.N.Y.,2006.
Only the Westlaw citation is currently available.
United States District Court,S.D. New York.
In re MARSH & MCLENNAN COMPANIES,
INC. SECURITIES LITIGATION.
**No. MDL NO. 1744, 04 Civ. 8144(SWK).**

July 20, 2006.

KRAM, J.
*1 THIS DOCUMENT RELATES TO: ALL
ACTIONS

*TABLE OF*
*CONT*
*ENTS.*
I.                     1
INTROD
UCTION.
II.                    2
BACKG
ROUND.
A. The                 2
Parties.
B. The                 5
Factual
Allegations.
C. The                 14
Legal
Claims.
III.                   17
LEGAL
STAND
ARDS
FOR
DISM
ISSAL.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----                                                    Page 2

--- F.Supp.2d ----, 2006 WL 2057194 (S.D.N.Y.)
**(Cite as: --- F.Supp.2d ----)**

A. Motion to Dismiss Pursuant to Rule 12(b)(6).                       17

B. Pleading under Federal Rules of Civil Procedure 8 and 9(b), and the PSLRA.    19

IV. DISCUSSION.                                                       20

A. Section 10(b) and Rule 10b-5 Claims.                              20

1. Liability for Misstatements and Omissions.                        21

i. The Alleged Misrepresentations.                                   22

a. Materiality.                                                      22

b. The Duty to Disclose.                                             24

(1) MMC's Reported Earnings.                                         26

(2) MMC's Risk Disclosures                                           30

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----                                                    Page 3

--- F.Supp.2d ----, 2006 WL 2057194 (S.D.N.Y.)
**(Cite as: --- F.Supp.2d ----)**

| | |
|---|---|
| (3) MMC's Contingent Loss Reserves. | 32 |
| (4) The Magnitude of Contingent Commissions and Their Materiality to MMC's Earnings. | 34 |
| (5) Statements Pertaining to MMC's Business Practices. | 37 |
| (6) Fraudulent Accounting. | 45 |
| c. Misstatements Attributable to Defendants. | 48 |
| ii. Scienter. | 54 |
| a. MMC and Marsh. | 55 |
| b. The Individual Defendants. | 61 |
| (1) The Senior Management Defendants. | 63 |

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----

Page 4

--- F.Supp.2d ----, 2006 WL 2057194 (S.D.N.Y.)
**(Cite as: --- F.Supp.2d ----)**

(2) The Audit Committee Defendants. ... 70

c. D & T. ... 75

iii. Reliance. ... 78

iv. Loss Causation. ... 79

2. Market Manipulation. ... 80

B. Section 11 Claims. ... 81

C. Section 18 Claims. ... 86

D. Control Person Claims: Section 15 and Section 20(a). ... 87

E. State Law Claims. ... 91

1. Common Law Fraud and Deceit. ... 91

2. Negligent Misrepresentation. ... 92

3. State Securities Laws. ... 93

V. CONCLUSION. ... 94

I. INTRODUCTION

On October 14, 2004, New York State Attorney General Eliot Spitzer (the "NYAG") filed a civil complaint in New York State Supreme Court

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----                                                                      Page 5

--- F.Supp.2d ----, 2006 WL 2057194 (S.D.N.Y.)
**(Cite as: --- F.Supp.2d ----)**

against Marsh & Mclennan Companies, Inc. ("MMC " or the "Company") alleging that the Company " steered unsuspecting clients to insurers with whom it had lucrative payoff agreements, and that the firm solicited rigged bids for insurance contracts."Press Release, Office of New York State Attorney General Eliot Spitzer, Investigation Reveals Widespread Corruption in Insurance Industry (Oct. 14, 2004), *available at* http://www.oag.state.ny.us/pr ess/2004/oct/oct14a_04.html. The following day, the first of approximately a dozen class action securities complaints was filed in federal court. Each complaint alleges that MMC, its subsidiary, Marsh Inc. ("Marsh"), its auditor, Deloitte & Touch LLP ("D & T"), and nearly two dozen directors and officers of MMC and Marsh are liable for numerous violations of the federal securities laws and assorted state laws. [FN1]

**\*2** Upon plaintiffs' motions, the Court consolidated these complaints and appointed The Public Employees' Retirement System of Ohio, State Teachers' Retirement System of Ohio, Ohio Bureau of Workers' Compensation, and the State of New Jersey, Department of Treasury, Division of Investment as co-lead plaintiffs ("Plaintiffs"). Plaintiffs filed the Consolidated Class Action Amended Complaint shortly thereafter (the " Complaint"). In eight separate filings, the defendants now move to dismiss the Complaint in its entirety for failure to state a claim upon which relief can be granted, pursuant to Federal Rule of Civil Procedure 12(b)(6), and failure to plead fraud with particularity, pursuant to Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act of 1995 ("PSLRA"). For the reasons stated below, the motion is granted in part and denied in part.

## II. BACKGROUND

### A. The Parties

This lawsuit has been brought as a class action on behalf of all persons that, between and including October 14, 1999 and October 13, 2004 (the "Class

Period"), purchased or otherwise acquired securities issued by MMC (the "Class"). The co-lead plaintiffs are large, institutional investors with billions of dollars in assets and tens of millions of dollars of estimated losses. Plaintiffs allege that the members of the Class collectively lost "nearly $12 billion in market capitalization."(Compl.¶ 27.) In addition, Plaintiffs bring claims under state law on behalf of a subclass of state and municipal pension plans that purchased MMC securities during the Class Period (the "Pension Fund Subclass").

Plaintiffs name both corporate and individual defendants. MMC and Marsh are the primary corporate defendants. MMC is a public company providing professional services in the fields of risk and insurance, investment management, and consulting and human resources. Marsh, MMC's principal subsidiary, provides risk and insurance services to clients. The Marsh subsidiary is wholly owned by MMC, generating approximately 60% of the parent corporation's revenues. (Compl.¶ 118.) Plaintiffs also name MMC's independent auditing firm, D & T, which audited MMC's financial statements throughout the Class Period.

Plaintiffs name twenty individual defendants, most of them former or current directors and officers of MMC and Marsh: Jeffrey Greenberg, former Chief Executive Officer ("CEO") and Chairman of MMC ( "Greenberg"); Mathis Cabiallavetta, former Vice Chairman of MMC ("Cabiallavetta"); Roger E. Egan, former President and Chief Operating Officer of Marsh ("Egan"); Lewis W. Bernard, a director of MMC ("Bernard"); Peter Coster, former President of Mercer and a former director of MMC ("Coster" ); Robert Erburu, a director of MMC ("Erburu"); Lawrence Lasser, former President and CEO of Putnam and a former director of MMC ("Lasser"); Oscar Fanjul, a director of MMC ("Fanjul"); Ray J. Groves, former Chairman and CEO of Marsh and a director of MMC ("Groves"); Stephen R. Hardis, a director of MMC ("Hardis"); Gwendolyn S. King, a director of MMC ("King"); Right Honorable Lord Ian Bruce Lang of Monkton, a director of MMC (" Lang"); David A. Olsen, a director of MMC ("Olsen "); Robert J. Rapport, MMC's Vice President, Chief Accounting Officer, and Controller during the Class Period ("Rapport"); Morton O. Schapiro, a director

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----

--- F.Supp.2d ----, 2006 WL 2057194 (S.D.N.Y.)
**(Cite as: --- F.Supp.2d ----)**

of MMC ("Schapiro"); Adele Simmons, a director of MMC ("Simmons"); John T. Sinnott, former Chairman and CEO of Marsh and a former director of MMC ("Sinnott"); A.J.C. Smith, a former director of MMC, and the pre-Class Period Chairman and CEO of MMC ("Smith"); Sandra S. Wijnberg, a senior Vice President and Chief Financial Officer of MMC ("Wijnberg"); and Michael Bischoff, a senior Vice President and head of Investor Relations during the Class Period (" Bischoff").[FN2]

**\*3** For pleading purposes, Plaintiffs commonly refer to the individual defendants by reference to various group aliases. The following groups are referenced in the Complaint: (1) Defendants Greenberg, Cabiallavetta, Groves, Smith, Sinnott, Egan, Wijnberg, and Rapport (the "Senior Management Defendants"); (2) Defendants Fanjul, Hardis, King, Lang, Olsen, Schapiro, and Simmons (the "Audit Committee Defendants"); and (3) Defendants Greenberg, Wijnberg, Rapport, Cabiallavetta, Fanjul, Groves, Hardis, King, Lang, Olsen, Simmons, Sinnott, Smith, and Schapiro (the " Individual Section 11 Defendants"). The corporate and individual defendants will be referred to collectively as "Defendants."

### B. The Factual Allegations

Plaintiffs' principal material allegations are summarized below. This summary takes as true Plaintiffs' allegations and factual assertions, but in no way constitutes factual findings by the Court.

The global insurance marketplace consists of four primary entities: (1) insurance companies that provide insurance; (2) clients in need of various types of liability and casualty insurance; (3) risk managers who evaluate clients' loss exposure and advise them on the type of insurance needed; and (4) brokers that match clients with insurance providers on the basis of the clients' needs and the nuances of the insurance marketplace. MMC is the world's largest insurance broker, providing risk and insurance brokerage services to a predominately corporate clientele worldwide. (Compl.¶¶ 112-18.) Throughout the Class Period, MMC

marketed itself as a client-focused brokerage, emphasizing its establishment of a "level playing field" for insurance providers, "completeness" in its disclosure of bids to clients, and commitment to " bidding integrity" between insurers. (Compl.¶ 122.)

Clients pay brokers a commission for locating the best insurer for their needs. (Compl.¶ 117.) In addition, many brokers, including MMC, receive additional, "contingent commissions" directly from insurance companies, pursuant to "placement service agreements" ("PSAs") and "market service agreements" ("MSAs"). These contingent commissions are typically based on an insurance company's book of business with the broker, renewal rates, and the profitability of the business placed by the broker. Because brokers have a fiduciary duty to serve their client's best interests, contingent commission agreements collected from insurance providers present them with a direct conflict of interest. Accordingly, state insurance agencies, such as the New York State Insurance Department ("NYSID"), have established guidelines to regulate brokers' disclosure of the contingent commissions they receive from insurance companies. Though contingent commission agreements have always existed within the insurance industry, MMC pioneered the manipulation of such agreements to drive increasingly higher revenues. (Compl.¶¶ 123-30.)

MMC's manipulation of contingent commission agreements was exemplified by the formation of Marsh's "Global Broking" division, which was formed in order to control business placement and maximize the Company's receipt of contingent commissions. By centralizing the negotiation of contingent commission agreements in one department, MMC enhanced its ability to steer business to those insurance providers that paid the Company the highest contingent commissions and used the Company's size as leverage to force insurance companies to pay greater contingent commissions in exchange for MMC's placement of business. MMC management mandated that all negotiation of contingent commission agreements be routed through Global Broking. (Compl.¶¶ 131-40.)

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----                                                                    Page 7

--- F.Supp.2d ----, 2006 WL 2057194 (S.D.N.Y.)
(Cite as: --- F.Supp.2d ----)

*4 A central part of MMC's business plan throughout the Class Period was to raise the Company's revenues by promoting the interests of the insurance providers with which it had contingent commission agreements. By steering business to the insurance providers offering the most lucrative contingent commissions, MMC collected higher fees. For example, one PSA between MMC and insurance provider American Insurance Group, Corp. ("AIG") provided MMC with a bonus of 1% of all renewal premiums if clients renewed with AIG at rate of 85% or higher. MMC would receive greater percentage bonuses based on higher renewal rates, e.g., a 2% bonus for a 90% rate or a 3% bonus for a 95% rate. Global Broking and Company executives emphasized the importance of PSAs and MSAs to employees and directed brokers to steer clients to insurers paying the highest contingent commissions. (Compl.¶¶ 141-56.)

MMC employed a variety of techniques to steer clients to specific insurance providers. For instance, MMC began rating insurance companies based on how advantageous their contingent commission agreements were to the Company, rather than on the quality of the insurer's services or the price competitiveness of its policies. These ratings were compiled into tiering reports, which were then used by Global Broking executives to ensure that Marsh focused its broking business on the insurance companies with which it had the most favorable contingent commission agreements. (Compl.¶¶ 157-61.) In addition to rating carriers based on how lucrative the contingent commission contracts were for MMC, the Company also instituted a " pay-to-play" system through which Marsh would refuse to place business with a provider unless it entered a contingent commission agreement. (Compl.¶¶ 162-69.) Internally, Marsh encouraged its employees to place contracts with friendly insurance carriers by praising and promoting employees who placed business with those providers that had entered into the most favorable contingent commission agreements with MMC. (Compl.¶¶ 170-78.)

MMC even engineered a system of bid-rigging, steering business to preferred insurers in order to maximize the Company's contingent commission

revenues. In one example of bid manipulation, Marsh created three types of quotes, known as "A," "B," and "C" quotes. When an insurance provider's existing coverage of a MMC client was up for renewal, Marsh would solicit an "A" quote from that provider, informing the provider of the target premium and policy terms for the quote. If the incumbent provider agreed to bid the "A" quote, it would keep the business, regardless of whether it was capable of providing more favorable terms. Marsh would then create the appearance of a competitive bidding process by soliciting higher, "B " or "C" quotes from competing insurance providers. By agreeing to provide less favorable quotes to Marsh, the other providers would receive assurances that they would be protected by the Company when they were the incumbent provider. (Compl.¶¶ 179-215, 226-31.)

*5 MMC's disclosure of its contingent commission agreements was subject to regulation by the NYSID. Under a NYSID regulatory order promulgated in 1998, known as Circular Letter 22, brokers were required to disclose to their clients the existence and amount of contingent commissions and the reasons for such payments. (Compl.¶¶ 126, 232.) MMC's disclosure to clients, however, was often misleading. (Compl.¶ 244.)

The reticence with which MMC revealed the nature of its contingent commissions was compounded by its insufficient disclosure of the importance of contingent commissions to MMC's revenues. Under an agreement entered into with the Risk and Insurance Management Society ("RIMS"), MMC was required to provide its clients with a calculation (called an "average contingency factor" or "ACF") that reflected the amount that MMC received from contingent commissions, in comparison to all premiums placed by MMC in a given year. (Compl. ¶¶ 126, 242-43.) Under the agreement, however, MMC often provided its clients with "technically accurate, but potentially misleading" responses to relevant inquiries. (Compl.¶ 244.)

MMC's financial statements during the Class Period reveal that the nature of contingent commissions was insufficiently disclosed to investors as well, touting the provision of services for contingent

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----

--- F.Supp.2d ----, 2006 WL 2057194 (S.D.N.Y.)
(Cite as: --- F.Supp.2d ----)

Page 8

commissions, rather than revealing that contingent commissions were in fact kick-backs for improper steering agreements. The following explanation of contingent commissions in MMC's 2003 Annual Report is illustrative:
Market services revenue is derived from agreements Marsh has with most of its principal insurance markets. Under these agreements, Marsh is paid for services provided to the market, including: access to a global distribution network that fosters revenue generation and operating efficiencies; intellectual capital in the form of new products, solutions and general information on emerging developments in the insurance marketplace; the development and provision of technology systems and services that create efficiencies in doing business; and a wide range of administrative services. Payments under market service agreements are based upon such factors as the overall volume, growth, and in limited cases profitability, of the total business placed by Marsh with a given insurer.

(Compl.¶ 575.) Similar descriptions of contingent commissions are contained in MMC's SEC filings throughout the class period. (Compl.¶¶ 232-41.)

MMC's improprieties during the Class Period were not limited to Marsh's insurance business, but were widespread throughout the Company. Mercer, MMC's consulting and human resources subsidiary, entered into secretive arrangements with employee benefit vendors and insurers which provided it with incentives to steer its clients to the vendors and insurers that gave it the most lucrative kickbacks. (Compl.¶¶ 251, 254-63.) Putnam, MMC's mutual fund business, engaged in illicit market-timing and late-trading activities for the benefit of favored investors at the expense of the rest of its clients. As a result of these activities, Putnam paid $111 million to settle regulatory actions against it. (Compl.¶¶ 252, 275-76.) Additionally, Trident, an investment partnership between MMC and its senior officers and directors, is currently under investigation by the SEC with respect to the propriety of potentially conflict-ridden related-party transactions. (Compl.¶¶ 253, 277-83.)

*6 On October 14, 2004, the NYAG filed a civil complaint against MMC and Marsh, alleging that

the Company was engaged in improper steering and bid-rigging activities. Additionally, the NYAG announced that two of AIG's employees had pleaded guilty to criminal charges in connection with their dealings with MMC. MMC immediately issued a press release announcing that it took the NYAG's allegations seriously and had been cooperating with the NYAG investigation since it began in the spring. Nevertheless, the share price of MMC common stock dropped from $46.13 to $34.85 that same day. (Compl.¶¶ 284-88.) The following day, MMC announced its suspension of MSAs and the resignation of Marsh's CEO, Defendant Groves. The share price of MMC common stock further dropped from its October 14 close to $29.20. (Compl.¶¶ 289-93.)

On October 18, 2004, MMC issued a press release regarding the effect of MSAs on MMC revenue, indicating that MMC collected $845 million in MSA revenue in 2003, representing 12% of MMC's $6.9 billion risk and insurance services revenue and 7% of the Company's $11.6 billion total revenue. (Compl.¶ 294.) In the following months, the Company announced the resignation of Defendants Greenberg and Egan, ethical reforms pertaining to its insurance brokerage transactions, the restructuring of the MMC Board of Directors, and the creation of an $850 million restitution fund to settle the NYAG's civil complaint. (Compl.¶¶ 301-14.) Also during this time, various MMC employees faced criminal liability in New York, and the Company was subjected to additional regulatory action outside that state. (Compl.¶¶ 316-18.)

Over the course of approximately one-hundred pages and three-hundred paragraphs of the Complaint, Plaintiffs allege that Defendants made public statements misstating MMC's financial results, omitting material facts, and misrepresenting the Company's business practices. (Compl.¶¶ 323-646.) The alleged misstatements and omissions fall into seven general categories: (1) MMC misstated its earnings by failing to disclose that contingent commission revenues were derived from improper steering and bid manipulation; (2) MMC misstated its earnings by failing to reserve for contingent losses from its steering and bid

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----                                          Page 9

--- F.Supp.2d ----, 2006 WL 2057194 (S.D.N.Y.)
**(Cite as: --- F.Supp.2d ----)**

manipulation; (3) MMC failed to disclose the magnitude of contingent commissions and their materiality to the Company's revenue; (4) MMC failed to disclose the risks that contingent commissions might be discontinued or that MMC would face litigation or regulatory action; (5) MMC misrepresented the true nature of the services provided in exchange for contingent commissions; (6) MMC made material misrepresentations regarding its commitment to clients and adherence to ethical practices; and (7) MMC falsely represented that Marsh's clients were fully apprised of contingent commissions. In addition, Plaintiffs allege that MMC engaged in fraudulent accounting by failing to comply with GAAP and SEC regulations, thus MMC is liable for issuing, and D & T is liable for certifying, MMC's misleading financial statements. (Compl.¶¶ 647-746.) Without exception, Plaintiffs' allegations of securities fraud derive from the steering and bid manipulation scheme.

### C. The Legal Claims

**\*7** Count I alleges that Defendants MMC, Marsh, D & T, Greenberg, Cabiallavetta, Egan, Fanjul, Groves, Hardis, King, Lang, Olsen, Rapport, Schapiro, Simmons, Sinnott, Smith, and Wijnberg made materially misleading statements and omissions throughout the class period and engaged in a scheme to manipulate the market for MMC securities in violation of Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 promulgated thereunder.

Count II alleges that Defendants MMC, Marsh, Greenberg, Cabiallavetta, Egan, Fanjul, Groves, Hardis, King, Lang, Olsen, Rapport, Schapiro, Simmons, Sinnott, Smith, and Wijnberg controlled primary violators of the securities laws in violation of Section 20(a) of the Exchange Act.

Count III alleges that Defendants MMC, D & T, Greenberg, Cabiallavetta, Fanjul, Groves, Hardis, King, Lang, Olsen, Rapport, Schapiro, Simmons, Sinnott, Smith, Wijnberg, Bernard, Coster, Erburu, and Lasser are liable for materially untrue statements and omissions contained in MMC's

February 13, 2003 prospectus supplement, filed in connection with its 4.850% bond offering under an earlier registration statement, in violation of Section 11 of the Securities Act of 1933 ("Securities Act"). FN3

Count IV alleges that Defendants Greenberg, Cabiallavetta, Fanjul, Groves, Hardis, King, Lang, Olsen, Schapiro, Simmons, Sinnott, Smith, Bernard, Coster, Erburu, and Lasser controlled primary violators of Section 11 of the Securities Act, in violation of Section 15 of the Securities Act.FN4

Count V alleges that Defendants MMC, D & T, Greenberg, Cabiallavetta, Fanjul, Groves, Hardis, King, Lang, Olsen, Rapport, Schapiro, Simmons, Sinnott, Smith, Wijnberg, Bernard, Coster, Erburu, and Lasser are liable for materially false or misleading statements or omissions contained in MMC's Exchange Act filings, in violation of Section 18 of the Exchange Act.FN5

Count VI alleges that Defendants MMC, D & T, Greenberg, Cabiallavetta, Egan, Fanjul, Groves, Hardis, King, Lang, Olsen, Rapport, Schapiro, Simmons, Sinnott, Smith, and Wijnberg are liable to the Pension Fund Subclass for common law fraud and deceit.

Count VII alleges that Defendants MMC, Greenberg, Cabiallavetta, Egan, Fanjul, Groves, Hardis, King, Lang, Olsen, Rapport, Schapiro, Simmons, Sinnott, Smith, Wijnberg, Bernard, Coster, Erburu, and Lasser are liable to the Pension Fund Subclass for negligent misrepresentation.

Count VIII alleges that Defendants MMC, D & T, Greenberg, Cabiallavetta, Egan, Fanjul, Groves, Hardis, King, Lang, Olsen, Rapport, Schapiro, Simmons, Sinnott, Smith, Wijnberg, Bernard, Coster, Erburu, and Lasser are liable to the Pension Fund Subclass for violations of state securities laws.

Defendants have filed eight separate motions to dismiss the Complaint for failure to state a claim upon which relief can be granted and failure to plead with particularity. The moving papers of the Defendants will be referred to by the following aliases: (1) Defendants MMC, Marsh, Cabiallavetta,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----                                                              Page 10

--- F.Supp.2d ----, 2006 WL 2057194 (S.D.N.Y.)
**(Cite as: --- F.Supp.2d ----)**

Coster, Rapport, Smith, Wijnberg, and Bischoff ("Corporate"); (2) Defendant Greenberg ("Greenberg"); (3) Defendant Egan ("Egan"); (4) Defendants Bernard, Erburu, Fanjul, Hardis, King, Lang, Olsen, Schapiro, and Simmons ("Independent Directors"); (5) Defendant Lasser ("Lasser"); (6) Defendant Groves ("Groves"); (7) Defendant Sinnott ("Sinnott"); (8) Defendant D & T ("D & T").

### III. LEGAL STANDARDS FOR DISMISSAL

#### A. Motion to Dismiss Pursuant to Rule 12(b)(6)

**\*8** Under Federal Rule of Civil Procedure 12(b)(6), "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."*Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957), *cited in Shah v. Meeker,* 435 F.3d 244, 246 (2d Cir.2006). The role of the court is "merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof."*Levitt v. Bear Stearns & Co.,* 340 F.3d 94, 101 (2d Cir.2003) (internal citations omitted). Accordingly, courts should not dismiss a claim unless, "after accepting all the allegations in the Complaint as true and drawing all reasonable inferences in [the plaintiffs'] favor, the Complaint fails to allege any set of facts that would entitle [them] to relief." *Caiola v. Citibank, N.A.,* 295 F.3d 312, 321 (2d Cir.2002).

In considering a motion to dismiss, the "court must limit itself to facts stated in the complaint or in documents attached to the complaint as exhibits or incorporated in the complaint by reference."*Kramer v. Time Warner Inc.,* 937 F.2d 767, 773 (2d Cir.1991); *see alsoSan Leandro Emergency Medical Group Profit Sharing Plan v. Philip Morris Cos.,* 75 F.3d 801, 808-09 (2d Cir.1996) (holding that documents "integral" to the complaint are properly considered on a motion to dismiss). In addition, "[o]n a motion to dismiss a securities action, a district court may consider documents required to be publicly filed with the S.E.C. that bear on the adequacy of disclosure."*City of Sterling

*Heights Police and Fire Ret. Sys. v. Abbey Nat'l, PLC,* 423 F.Supp.2d 348, 355 (S.D.N.Y.2006) (citing *Kramer,* 937 F.2d at 773-74). Accordingly, the Court considers the allegations of the Complaint, documents incorporated therein, and any "publicly filed documents appended to" Defendants' motions to dismiss. *Id.* (citation omitted).

#### B. Pleading under Federal Rules of Civil Procedure 8 and 9(b), and the PSLRA

While the rules of pleading in federal court generally require only "a short and plain statement" of the plaintiff's claim for relief, Fed. R. Civ. Proc. 8 , averments of fraud must be "stated with particularity." Fed. R. Civ. Proc. 9(b). The PSLRA has expanded on Rule 9(b)'s pleading requirements in the context of securities fraud allegations. "That statute insists that securities fraud complaints ' specify' each misleading statement; that they set forth the facts 'on which [a] belief' that a statement is misleading was 'formed'; and that they 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." ' *Dura Pharm., Inc. v. Broudo,* 544 U.S. 336, 345, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005) (quoting 15 U.S.C. §§ 78u-4(b)(1), (2)).

The Second Circuit evaluates a securities complaint's compliance with Rule 9(b) and the PSLRA by means of a common formulation. "A complaint must: (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent."*Stevelman v. Alias Research Inc.,* 174 F.3d 79, 84 (2d Cir.1999) (internal quotation marks and citations omitted). Failure to plead with the requisite particularity is a ground for dismissal.

#### IV. DISCUSSION

#### A. Section 10(b) and Rule 10b-5 Claims

**\*9** Count I of the Complaint alleges violations of

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----                                      Page 11

--- F.Supp.2d ----, 2006 WL 2057194 (S.D.N.Y.)
**(Cite as: --- F.Supp.2d ----)**

Section 10(b) of the Exchange Act and Rule 10b-5. Section 10(b) prohibits conduct "involving manipulation or deception, manipulation being practices ... that are intended to mislead investors by artificially affecting market activity, and deception being misrepresentation, or nondisclosure intended to deceive."*Ganino v. Citizens Utils. Co.,* 228 F.3d 154, 161 (2d Cir.2000) (quoting *Field v. Trump,* 850 F.2d 938, 946-47 (2d Cir.1988)). Rule 10b-5 uses similar language to describe the unlawful behavior proscribed by Section 10(b), making it illegal,
(a) To employ any device, scheme, or artifice to defraud,
(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,
in connection with the purchase or sale of any security.

17 C.F.R § 240.10b-5.

Plaintiffs allege that Defendants deceived investors by making various misstatements and omissions during the Class Period in violation of Rule 10b-5(b), and, in less detail, that Defendants are liable for their scheme to manipulate the market for MMC securities in violation of Rule 10b-5(a) & (c).

### 1. Liability for Misstatements and Omissions

Plaintiffs claim that Defendants made misstatements and omissions concerning MMC's allegedly improper collection of contingent commissions and the nature of the Company's business practices. A claim for relief under the deception branch of Section 10(b) and Rule 10b-5 may only be sustained where plaintiffs allege that the defendants "(1) made misstatements or omissions of material fact; (2) with scienter; (3) in connection with the purchase or sale of securities; (4) upon which plaintiffs relied; and (5) that plaintiffs' reliance was the proximate cause of their injury."*Lentell v.*

*Merrill Lynch & Co.,* 396 F.3d 161, 172 (2d Cir.2005) (quoting *In re IBM Sec. Litig.,* 163 F.3d 102, 106 (2d Cir.1998)). Plaintiffs are required to adequately allege each of these elements-material misrepresentations, scienter, connection, reliance, and loss causation-in order to sustain a claim.

Defendants move to dismiss the Rule 10b-5(b) claims on the grounds that Plaintiffs fail to plead (1) any actionable misrepresentations, (2) facts supporting a strong inference of scienter, (3) reliance, or (4) loss causation.

### i. The Alleged Misrepresentations

The allegations of the Complaint focus predominantly on MMC's collection of contingent commissions. Plaintiffs do not allege that contingent commissions are per se illegal, nor that contingent commissions constitute fictional revenue, only that MMC maximized contingent commission revenues by engaging in improper behavior (i.e ., steering and bid manipulation) and then misled the investing public by making affirmative misstatements and failing to disclose this behavior. Defendants argue that Plaintiffs allege mere corporate mismanagement, which there is no duty to disclose, and that they fail to state any materially misleading statements.

### a. Materiality

**\*10** "At the pleading stage, a plaintiff satisfies the materiality requirement of Rule 10b-5 by alleging a statement or omission that a reasonable investor would have considered significant in making investment decisions."*Ganino,* 228 F.3d at 161 (citations omitted). The Second Circuit has " consistently rejected a formulaic approach to assessing the materiality of an alleged misrepresentation," but has advised that, "when presented with a Rule 12(b)(6) motion, 'a complaint may not properly be dismissed ... on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----

--- F.Supp.2d ----, 2006 WL 2057194 (S.D.N.Y.)
(Cite as: --- F.Supp.2d ----)

Page 12

importance." ' *Id.* at 162 (quoting *Goldman v. Belden,* 754 F.2d 1059, 1067 (2d Cir.1985)). In the context of alleged omissions, "there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Basic Inc. v. Levinson,* 485 U.S. 224, 231, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988) (citing *TSC Indus., Inc. v. Northway, Inc.,* 426 U.S. 438, 449, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976)).

Plaintiffs argue that Defendants' failure to disclose the alleged misconduct at Marsh constitutes a material omission. The Complaint alleges that contingent commissions comprised more than 16% of MMC's risk and insurance revenues, and over 50% of the Company's total profits, by 2003. (Compl.¶ 104.) Further, Plaintiffs allege that MMC claimed to be a client-focused company and that it derived the majority of its revenue from its provision of risk and insurance services to its clients. (Compl.¶¶ 3, 102.) Despite MMC's representations and the importance of its provision of client services to the Company's revenues, the steering and bid manipulation at Marsh was widespread. This contention is supported by specific factual allegations of systemic steering within Marsh's Global Broking division and MMC's abrupt elimination of all such agreements immediately after the NYAG complaint was filed. (Compl.¶¶ 226, 26.)

Taking the allegations of the Complaint as true, the Court finds that Plaintiffs have sufficiently alleged the materiality of the undisclosed misconduct to MMC's bottom line. A rational jury could conclude that a reasonable investor would find it significant that MMC was generating substantial earnings from its improper business practices and jeopardizing the client relationships central to its largest business segment by placing insurance business with the insurance providers offering MMC the highest commissions, rather than those providers offering the insurance packages best suited to the clients' needs. The Complaint sufficiently alleges the nondisclosure of material information.

### b. The Duty to Disclose

Simply alleging the nondisclosure of material information, however, is insufficient to state an actionable misrepresentation absent a duty to disclose. "As the Supreme Court has made clear[,] ... the concepts of materiality and duty to disclose are different ."*Glazer v. Formica Corp.,* 964 F.2d 149, 156 (2d Cir.1992) (citations omitted); *see alsoIn re Time Warner Inc. Sec. Litig.,* 9 F.3d 259, 267 (2d Cir.1993)."When an allegation of fraud is based upon nondisclosure, there can be no fraud absent a duty to speak."*Chiarella v. United States,* 445 U.S. 222, 235, 100 S.Ct. 1108, 63 L.Ed.2d 348 (1980). This "duty to speak" arises in only limited situations.

*11 Of course, specific statutes and regulations create affirmative duties to disclose information, but another duty arises more generally. "When a corporation does make a disclosure-whether it be voluntary or required-there is a duty to make it complete and accurate."*Roeder v. Alpha Indus., Inc.,* 814 F.2d 22, 26 (1st Cir.1987), *cited inGlazer,* 964 F.2d at 157. In other words, corporations have a duty to disclose all facts necessary to ensure the completeness and accuracy of their public statements. Thus, with respect to allegations of corporate mismanagement, disclosure is required where "a failure to disclose facts that amount to mismanagement may render other statements misleading."*In re NTL Inc. Sec. Litig.,* 347 F.Supp.2d 15, 27 (S.D.N.Y.2004); *see alsoIn re JP Morgan Chase Sec. Litig.,* 363 F.Supp.2d 595, 617 (S.D.N.Y.2005); *In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.,* 324 F.Supp.2d 474, 494 n. 11 (S.D.N.Y.2004).

The same proposition holds true for allegations of uncharged criminal conduct. Though courts have held that the securities laws do not impose a duty to disclose uncharged criminal conduct, *seeUnited States v. Matthews,* 787 F.2d 38, 49 (2d Cir.1986); *In re Citigroup, Inc. Sec. Litig.,* 330 F.Supp.2d 367, 377 (S.D.N.Y.2004), corporations are obligated to disclose facts necessary to ensure that their statements are not misleading. This duty applies to the disclosure of criminal conduct to the same extent it applies to the disclosure of any other

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----

Page 13

--- F.Supp.2d ----, 2006 WL 2057194 (S.D.N.Y.)
**(Cite as: --- F.Supp.2d ----)**

material information. *SeeMenkes v. Stolt-Nielsen S.A.,* No. 3:03CV409(DJS), 2005 WL 3050970, at *7 (D.Conn. Nov.10, 2005); *In re Par Pharm., Inc. Sec. Litig.,* 733 F.Supp. 668, 675 (S.D.N.Y.1990).

In light of these principles, the key considerations of the Court's inquiry are whether (a) the alleged omissions, even if grounded in corporate mismanagement or criminal conduct, are sufficiently connected to Defendants' existing disclosures to make those public statements misleading, or (b) the Defendants failed to disclose material information required by specific regulations and statutes. Each of the alleged misrepresentations must be analyzed with these considerations in mind.

### (1) MMC's Reported Earnings

Because the securities laws do not impose a general duty to disclose corporate mismanagement or uncharged criminal conduct, the allegation that MMC misstated its earnings merely by failing to disclose the misconduct at its Marsh subsidiary is not actionable. Plaintiffs do not allege that MMC failed to fully and accurately report the Company's income from contingent commissions. There is no allegation that MMC misstated the amount of revenue received from specific transactions or that it reported phantom or untimely profits. Absent an allegation that MMC reported income that it did not actually receive, the allegation that a corporation properly reported income that is alleged to have been, in part, improperly obtained is insufficient to impose Section 10(b) liability. *SeeIn reSofamor Danek Group, Inc.,* 123 F.3d 394, 401 & n. 3 (6th Cir.1997) ("It is clear that a violation of federal securities laws cannot be premised upon a company's disclosure of accurate historical data."); *Greenstone v. Cambex Corp.,* 777 F.Supp. 88, 91 (D.Mass.1991) (dismissing securities claim because the plaintiff did "not allege that the revenues actually received by Cambex differed from those reported to the SEC," but argued "instead that the reports would have been more accurate and complete if the defendants had revealed their improper activities because such activities allegedly influenced the financial success of Cambex"), *aff'd*

975 F.2d 22 (1st Cir.1992).

**\*12** A court in this District recently considered the motion to dismiss of a company that was sued after investors learned that a significant portion of its revenues were derived from illegal practices. *SeeIn re Van der Moolen Holding N.V. Sec. Litig.,* 405 F.Supp.2d 388, 392 (S.D.N.Y.2005). The court held that statements which "put the sources of [the defendant's] revenue at issue" were sufficient to give rise to Section 10(b) liability because the company failed to disclose the role of improper conduct in generating that revenue.*Id.* at 401.This proposition is reasonable, as statements falsely attributing the company's success to factors other than the improper conduct may be regarded as misleading by virtue of what is not disclosed. However, *In re Van der Moolen* may be interpreted to hold that the statements which put the sources of revenue at issue triggered a general duty to disclose, thereby rendering all of the company's statements of its revenue figures misleading. *Id.* at 413-27 (including revenue figures and financial statements in an appendix of alleged false and misleading statements). According to this theory of liability, a single misstatement regarding a company's revenues could conceivably create liability for the company's revenue disclosures throughout the Class Period.

This Court is of the opinion that a company's misleading statements about the sources of its revenue do not make the company's statements of the revenue figures misleading; rather, liability is limited to the misleading statements themselves. If actual revenues derived from improper conduct were a sufficient basis of Section 10(b) liability, then the statement of those revenues should be actionable without requiring that plaintiffs point to a statement putting the source of those revenues at issue. As noted above, however, the isolated statement of actual revenues allegedly generated by improper activities does not create Section 10(b) liability. *SeeIn re Sofamor Danek Group,* 123 F.3d at 401.

Holding that accurate revenue figures are misstated by virtue of a company's misleading statements about the business practices generating that revenue, while withholding liability for revenue

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----

Page 14

--- F.Supp.2d ----, 2006 WL 2057194 (S.D.N.Y.)
(Cite as: --- F.Supp.2d ----)

figures unaccompanied by misleading statements would lead to inequitable results. Imagine that Company A and Company B each engage in improper business practices, but properly report their revenue from those activities. Company A, which states its revenue without issuing misleading companion statements that put the sources of the revenue at issue, would be sheltered from liability. Meanwhile Company B, which issues misleading statements regarding its revenue, would be liable not only for those misleading statements, but for the misstatement of its revenue figures as well. The only difference between the actions of these companies is the existence of misleading statements putting the sources of their revenues at issue. Therein lies the deception; thus, liability properly attaches solely to the misleading statements. *See In re Par Pharm.*, 733 F.Supp. at 678 (limiting liability to statements in which the subject matter of the statement is sufficiently connected to the undisclosed misconduct); *Menkes*, 2005 WL 3050970, at *7-8 (same). Consequently, Plaintiffs' allegation that MMC misstated its earnings by failing to disclose the existence of steering and bid manipulation is insufficient to state a claim under Section 10(b).

### (2) MMC's Risk Disclosures

*13 Plaintiffs also allege that MMC failed to disclose the risk that contingent commissions might be discontinued or that the Company would be subject to litigation, regulatory action, or other penalties. Nearly identical allegations were held insufficient to state a claim in *In re Citigroup.* The reasoning of that case applies equally here.

With respect to a company's failure to disclose impending litigation, there is no requirement "to make disclosures predicting such litigation," absent an allegation that the litigation "was substantially certain to occur during the relevant period." *In re Citigroup*, 330 F.Supp.2d at 377; *see also In re Par Pharm.*, 733 F.Supp. at 678; *Ballan v. Wilfred American Educ. Corp.*, 720 F.Supp. 241, 248 (E.D.N.Y.1989). Plaintiffs do not adequately allege that MMC was likely to be subjected to litigation-during the Class Period for the

misconduct alleged in the Complaint. Furthermore, once the NYAG investigation began in the spring of 2004, MMC disclosed its existence in the relevant SEC filings and discussed the changing regulatory environment in the media. (Compl. ¶¶ 608, 620, 637.)

As for the allegation that Defendants failed to disclose the risk that contingent commitments might be discontinued, Plaintiffs fail to allege that MMC made any "projections or future predictions in the challenged documents" that it would continue to collect contingent commissions. *In re Citigroup*, 330 F.Supp.2d at 378. Nor did Defendants have "a duty to speculate about the effects of discovery of the [steering] scheme on the company's future prospects ." *Id.* (citing *In re Par Pharm.*, 773 F.Supp. at 678); *see also In re Par Pharm.*, 773 F.Supp. at 678 (defendants were "not obligated to speculate as to the myriad of consequences, ranging from minor setbacks to complete ruin, that might have befallen the company if the [unlawful] scheme was discovered, disclosed or terminated"). Defendants can not be held liable for failing to make similarly speculative disclosures regarding the possibility that its contingent commission revenues may some day be discontinued.

Plaintiffs essentially allege that Defendants had a duty to disclose the existence of improper business practices prior to any indication that those practices were under scrutiny. Such a general duty to disclose corporate mismanagement or uncharged criminal conduct has been rejected. Furthermore, to the extent that Defendants were aware of the shifting regulatory landscape and the potential effects on the collection of contingent commissions, Defendants' public disclosures were adequate.

### (3) MMC's Contingent Loss Reserves

In an attempt to tie Marsh's undisclosed misconduct to a specific regulatory disclosure requirement, Plaintiffs allege that MMC misstated its earnings during the Class Period by failing to reserve for contingent losses stemming from Marsh's improper steering and bid manipulation. (*See, e.g.,* Compl. ¶¶ 324-25, 331-32, 333-34.) The duty to reserve for

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----                                          Page 15

--- F.Supp.2d ----, 2006 WL 2057194 (S.D.N.Y.)
**(Cite as: --- F.Supp.2d ----)**

contingent losses arises under the Financial Accounting Standards Board's Statement No. 5 (" FASB No. 5"):

**\*14** An estimated loss from a loss contingency ... shall be accrued by a charge to income if *both* of the following conditions are met:

a. Information available prior to issuance of the financial statements indicates that it is probable that an asset had been impaired or a liability had been incurred at the date of the financial statements. It is implicit in this condition that it must be probable that one or more future events will occur confirming the fact of the loss.

b. The amount of the loss can be reasonably estimated.

*Id.* ¶ 8. Plaintiffs fail to properly allege that MMC violated either the accrual or reporting duty imposed by FASB No. 5.

MMC eventually incurred a loss in the form of an $850 million restitution fund established pursuant to the settlement of the NYAG lawsuit, which was filed after the close of the Class Period and settled after the Company installed a new management structure. The investigation leading to the lawsuit did not begin until spring 2004, and the existence of the investigation was disclosed in all of MMC's SEC filings subsequent to its commencement. (Compl.¶¶ 608, 637.)

Considering the longstanding industry practice of collecting contingent commissions, the lack of regulatory scrutiny during the Class Period, and the turnover in management prior to the settlement, the Complaint does not adequately allege that MMC should have reported a *probability* of litigation losses with respect to their collection of contingent commissions. *See* FASB No. 5, ¶ 36 (instructing corporations analyzing the application of FASB No. 5 to consider various factors such as "the progress of the case," "the experience of the enterprise in similar cases, the experience of other enterprises, and any decision of the enterprise's management as to how the enterprise intends to respond to the lawsuit"). Even if MMC had a duty to disclose the existence of an unasserted claim, the Company's quarterly disclosures of the NYAG investigation were adequate. (Compl.¶¶ 608, 637.)

Furthermore, the allegations of the Complaint are insufficient to explain how MMC could have reasonably estimated and accrued the loss amount at the time the financial statements were issued or at any time prior to settlement negotiations. *SeeIn re K-Tel Int'l, Inc. Sec. Litig.,* 300 F.3d 881, 893 (8th Cir.2002) (dismissing complaint under FASB No. 5 because the plaintiffs failed "to provide any basis for the allegations or sources for the amounts, other than *later financial disclosure* made by [the defendant]") (emphasis added). Accordingly, the allegations of the Complaint are insufficient to state a Section 10(b) claim that MMC breached its duty to reserve for contingent losses.

### (4) The Magnitude of Contingent Commissions and Their Materiality to MMC's Earnings

Plaintiffs cite a number of general regulatory provisions to support their argument that MMC had a duty to distinguish its contingent commission revenue from the rest of its risk and insurance services revenue because of its magnitude and materiality to MMC's earnings. Yet Plaintiffs fail to identify any specific accounting standard or other authority requiring that a corporation's financial statements separately report a particular type of its subsidiary's revenue. Without exception, the rules invoked by plaintiffs are either beyond the scope of the misconduct alleged in the Complaint or insufficient to establish liability under Section 10(b).

**\*15** Contingent commissions were a consistent source of income prior to and throughout the Class Period. They did not constitute an "unusual or infrequent" revenue source, nor are there sufficient allegations that MMC should have expected that revenue source to change in some way that would require its disclosure under Regulation S-K, Item 303. Nevertheless, even if the Complaint's allegations were sufficient to establish a violation of that regulation, the violation alone would be insufficient to establish Defendants' liability under Section 10(b) and Rule 10b-5. *SeeOran v. Stafford,* 226 F.3d 275, 288 (3d Cir.2000) (holding that "a violation of SK-303's reporting requirements does not automatically give rise to a material omission under Rule 10b-5" because the materiality standards

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----

--- F.Supp.2d ----, 2006 WL 2057194 (S.D.N.Y.)
**(Cite as: --- F.Supp.2d ----)**

of the regulation and the rule differ substantially).

Similarly, the revenue recognition requirements of SEC Staff Accounting Bulletin No. 101 do not demand that MMC separately identify contingent commission revenue apart from the rest of its risk and insurance services revenue. *See* SEC Staff Accounting Bulletin No. 101, 64 Fed.Reg. 68936 (1999). Nor do Plaintiffs allege that MMC failed to recognize its contingent commission revenue. The Plaintiffs fail to explain how an SEC Bulletin concerned with the timing of revenue recognition in financial statements implicates MMC's duty to account for its risk and insurance services revenue any differently than it did throughout the Class Period.

Plaintiffs also rely on SEC Staff Accounting Bulletin No. 99 ("SAB No. 99") for the proposition that MMC had a duty to disclose the materiality of contingent commissions to MMC's earnings. This reliance is misplaced. SAB No. 99 advises that quantity is not dispositive when determining whether a misstatement or omission of an item in a financial statement is material. *See* SEC Staff Accounting Bulletin No. 99, 64 Fed.Reg. 45150 (1999). As discussed above, however, MMC's failure to disclose the existence of the alleged misconduct did not amount to a misstatement of its earnings, and, regardless of how contingent commission revenue might have been obtained, Plaintiffs do not allege that MMC omitted such revenue from its financial reports. Nor do Plaintiffs present authority establishing that SAB No. 99 creates a line-item disclosure requirement. Plaintiffs may not avoid their obligation to allege an actionable misstatement simply by arguing that a misstatement follows from materiality.

Absent some indication that a directly relevant regulatory disclosure requirement was violated and specific allegations of how the requirement was violated, Plaintiffs can not state a claim under Section 10(b) for MMC's alleged failure to disclose the magnitude of contingent commissions and their materiality to earnings. *See Iron Workers Local 16 Pension Fund v. Hilb Rogal & Hobbs Co.,* --- F.Supp.2d ----, No. Civ.A. 1:05-735, 2006 WL 1117814, at *10 (E.D.Va. Apr.24, 2006)

(dismissing a similar claim because plaintiffs " failed to establish that Defendants had a duty to disclose non-standard commissions on a line item basis").

### (5) Statements Pertaining to MMC's Business Practices

**\*16** Although the allegations regarding MMC's earnings figures, risk disclosures, and regulatory violations fail to plead actionable omissions, certain statements regarding MMC's business practices are adequately connected to the nondisclosure of steering and bid manipulation to state a claim under Section 10(b). Plaintiffs allege several distinct categories of statements pertinent to MMC's business practices: (1) disclosures regarding the nature of the services provided in exchange for contingent commissions; (2) disclosures about MMC's commitment to clients and adherence to ethical practices; and (3) disclosures that Marsh's clients were fully apprised of contingent commissions. Certain statements within these categories are materially misleading by virtue of the undisclosed steering and bid manipulation employed by Marsh to maximize the Company's contingent commissions.

MMC's 2003 10-K describes the source of contingent commission revenues as follows:
Under these agreements, Marsh is paid for services provided to the markets, including: access to a global distribution network that fosters revenue generation and operating efficiencies; intellectual capital in the form of new products, solutions and general information on emerging developments in the insurance marketplace; the development and provision of technology systems and services that create efficiencies in doing business; and a wide range of administrative services. Payments under market service agreements are based upon such factors as the overall volume, growth, and in limited cases profitability, of the total business placed by Marsh with a given insurer.

(Compl.¶ 575.) [FN6]The truthfulness of this and similar statements describing the services provided for contingent commissions is brought into question

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----                                                                    Page 17

--- F.Supp.2d ----, 2006 WL 2057194 (S.D.N.Y.)
**(Cite as: --- F.Supp.2d ----)**

by Plaintiffs' allegations that MMC actually received contingent commissions as kickbacks for steering business to the companies with which it had contingent commission agreements. (Compl.¶¶ 232-41.) These statements put the source of contingent commission revenues at issue without disclosing information necessary to explain the true nature of the business practices employed to enhance those revenues.

Defendants argue that these allegations are not pleaded with sufficient particularity. Yet Plaintiffs state precisely which entities made the statements and the context of those statements: MMC made the misleading statements in the Company's Annual Reports and its 10-K filings from 2000 to 2003. Plaintiffs also explain why these statements were misleading: because MMC collected the commissions in return for steering business to insurance providers, rather than for the general market services that they purported to provide. This level of specificity is sufficient to allege an actionable misrepresentation.[FN7]

MMC also argues that it "performed services that benefited both insurers and insureds," thus the statements regarding the services provided for contingent commissions are not false. (Corporate Reply Br. 19.) However, taking as true Plaintiffs' allegations that contingent commissions were collected in exchange for the provision of steering and bid manipulation, Plaintiffs have properly alleged that MMC's disclosures concealed the true nature of its collection of contingent commissions, thus violated Section 10(b).*See In re JP Morgan Chase,* 363 F.Supp.2d at 618 (allegation that defendants made "misrepresentations and omissions that concealed the nature of the transactions the bank had conducted .... is precisely the type of deception that Section 10(b) prohibits"). The Court will not dismiss the Complaint merely because MMC contests a factual allegation that, if true, would be actionable. MMC will have the opportunity to rebut Plaintiffs' contentions at trial or on summary judgment, but factual disputes are not properly decided at this stage of the proceedings.

*17 Even if the Court credited Defendants' assertion that MMC truly did provide general market services

in return for contingent commissions, the Complaint sufficiently alleges that contingent commissions and the services for which they were received could not be accurately described without reference to the widespread steering and bid manipulation employed to enhance those revenues. This argument is supported by ample allegations of the elaborate steering schemes utilized at Marsh and their centrality to Marsh's collection of contingent commissions. (Compl.¶¶ 141-225.) In short, this category of misrepresentations is pleaded with sufficient specificity to conclude that MMC's descriptions of the services provided for contingent commissions materially misled investors about the nature of the Company's contingent commission revenues.

Plaintiffs also allege that MMC misrepresented its commitment to clients and adherence to ethical practices throughout the Class Period. Certain misrepresentations alleged in this category, such as those regarding MMC's "culture of excellence," its " independence of thought and objective advice," and the Company's "dedicat[ion] to client service" and " commit[tment] to building value for shareholders" amount to no more than puffery. (Compl.¶¶ 543, 347, 417.) Broad, general statements such as these are insufficient to state a claim for securities fraud. *SeeLasker v. New York State Elec. & Gas Corp.,* 85 F.3d 55, 59 (2d Cir.1996) (per curiam); *In re JP Morgan Chase,* 363 F.Supp.2d at 633.

Certain related statements, however, are sufficiently connected to the allegations of steering and pleaded with adequate particularity to withstand a motion to dismiss. MMC made a number of statements regarding the criteria brokers consider when placing insurance business for the Company's clients. These representations are directly contradicted by the Complaint's allegations of steering and bid manipulation. For instance, an April 2001 press release asserted that "[i]n a market where insurance rates are rising and coverage is more difficult to obtain, Marsh provides value to clients by developing *the most cost-effective responses* to the risks they face."(Compl. ¶ 409 (emphasis added).) In addition, MMC repeatedly stated that the Company created insurance programs for its clients "that vary according to the risk profiles,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----                                                                    Page 18

--- F.Supp.2d ----, 2006 WL 2057194 (S.D.N.Y.)
**(Cite as: --- F.Supp.2d ----)**

requirements and preferences of clients."(Compl.¶ ¶ 452, 462, 489, 506, 573.) Defendants Groves and Egan's comments in the 2003 Annual Report also speak directly to the reasons for the Company's successful insurance placement: "We reach across markets to tap into risk capital wherever it exists, *seeking the best terms, conditions, and prices.*Our brokers' knowledge of the interests of insurers for different types of risk and their relationships with senior underwriters are *an advantage for clients* as well as underwriters."(Compl. ¶ 584 (emphasis added).) [FN8]

**\*18** Each of these statements refers to the method by which Marsh makes insurance placements, asserting that Marsh tailors insurance packages for its clients according to the clients' coverage requirements and financial needs. Plaintiffs specifically allege that these statements were made materially misleading by MMC's failure to disclose that it directed clients to insurers to maximize the Company's revenues under contingent commission agreements, rather than to serve the clients' best interests or obtain the most cost-effective coverage options. (Compl.¶ 8.) These allegations are sufficient to plead actionable misrepresentations. *Cf. In re Sotheby's Holdings, Inc. Sec. Litig.*, No. 00 Civ. 1041(DLC), 2000 WL 1234601, at \*4 (S.D.N.Y. Aug.31, 2000) (statements about "intense " competition could be misleading where Sotheby's had eliminated price competition with its primary competitor).

Finally, Plaintiffs allege that Defendants falsely represented that MMC's clients were fully apprised of contingent commissions. Many statements within this category are not actionable. For instance, Plaintiffs do not adequately plead the falsity of certain vague statements, such as a Marsh spokeswoman's statement that "Marsh has made considerable effort to ensure its clients are well informed about [contingent commission] agreements " and Sinnott's statement that "brokers are fine-tuning their transparency as their role becomes increasingly important."(Compl.¶¶ 343, 616.) To support their argument that MMC's disclosures were misleading, Plaintiffs rely in large part on the DPW Report issued by MMC's legal counsel in January 2005. (Compl.¶ 315.) Yet that Report states that

MMC's contingent commission disclosures were " performed pursuant to the protocol" established by the RIMS agreement and merely that they were sometimes "technically accurate, but potentially misleading." (Compl. ¶ 244.) In this context, statements that Marsh made "efforts" with respect to its disclosure obligations or that unspecified brokers were "fine-tuning" their transparency cannot be said to be false. In addition, the latter statement was made by Sinnott, who was no longer employed by Marsh and was speaking in reference to the insurance industry generally.

Certain statements made towards the end of the Class Period, however, have been adequately pleaded. Shortly after the NYAG had begun its investigation of MMC, Defendant Egan is quoted as stating that "Marsh has led the industry in terms of disclosure, and we think we will continue to lead the industry in terms of disclosure."(Compl.¶ 629.) [FN9]Defendant Egan also asserted that MMC " continued to disclose to clients when they ask as much information as they need to know about these agreements."(Compl.¶ 631.) In light of the timing of these comments and the facts underlying Plaintiffs' allegations that "Marsh actively sought to prevent its clients from discovering how [ ] contingent commissions were obtained" (Compl.¶ 242-49), the materially misleading nature of these statements is also pleaded with sufficient specificity.

**\*19** In sum, certain statements regarding MMC's business practices-in particular the services provided for contingent commissions, the criteria considered when placing client insurance business, and the disclosure of contingent commissions to clients-have been alleged with sufficient particularity to plead actionable misrepresentations. The rest of the alleged false and misleading statements are too attenuated from the alleged misconduct to create liability under Section 10(b).

### (6) Fraudulent Accounting

Defendants supplement their lengthy allegations of misrepresentations with forty pages of allegations that MMC engaged in fraudulent accounting throughout the Class Period. (Compl.¶¶

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----                                              Page 19

--- F.Supp.2d ----, 2006 WL 2057194 (S.D.N.Y.)
(Cite as: --- F.Supp.2d ----)

647-747.) The allegations underlying this fraudulent accounting theory, however, are a carbon copy of the alleged misrepresentations that the Court addressed above. *See supra* Parts IV.A.1.i.b(1)-(5). [FN10] Plaintiffs simply attempt to cast these same allegations as evidence of fraudulent accounting by alleging that the failure to disclose the existence of steering and bid manipulation was in violation of Generally Accepted Accounting Practices ("GAAP"). Despite over one-hundred paragraphs of allegations, Plaintiffs fail to sufficiently plead a violation of GAAP or the existence of accounting fraud.

Plaintiffs attempt to prove violations of GAAP by reference to various SEC Releases, Accounting Principle Board Opinions, and FASB Statements of Financial Accounting Concepts. (Compl.¶¶ 649-63.) The gravamen of these allegations is that MMC engaged in accounting fraud, violating GAAP, by failing to present a true representation of the Company's operations. Notably missing are specific examples of fraudulent accounting practices utilized by MMC, citations to GAAP provisions prohibiting MMC's accounting practices, or reference to any cases finding violations of GAAP on the basis of actions similar to those alleged by Plaintiffs. On the contrary, Plaintiffs cite regulatory language describing management's general duty to provide a clear picture of the corporation's financial condition from the perspective of management. While Plaintiffs have adequately alleged the existence of statements regarding MMC's business practices that were made misleading by the failure to disclose internal misconduct, Plaintiffs fail to allege facts indicating that MMC's financial statements misstated the Company's financial condition throughout the Class Period.

Plaintiffs' argument stretches the definition of accounting fraud to its breaking point, as none of the hallmarks of accounting fraud are present here. For example, there was no restatement of earnings or external investigation of MMC's accounting practices. Plaintiffs do not allege that MMC harbored non-existent assets on its books, made undisclosed payments, improperly recognized revenue, or engaged in sham transactions creating

the illusion of revenue. In fact, none of the legal authorities Plaintiffs present to support their allegations of fraudulent accounting are factually similar to the allegations of the Complaint. *See, e.g., In re Royal Dutch/Shell Transp. Sec. Litig.,* 380 F.Supp.2d 509, 515-16 (D.N.J.2005) (overstating natural resource reserves and future cash flows); *In re WorldCom, Inc. Sec. Litig.,* 352 F.Supp.2d 472, 477 (S.D.N.Y.2005) (illegally capitalizing expenses); *In re AOL Time Warner, Inc. Sec. and " ERISA" Litig.,* 381 F.Supp.2d 192, 216 (S.D.N.Y.2004) (improperly reporting revenue from sham transactions); *In re Global Crossing, Ltd. Sec. Litig.,* 322 F.Supp.2d 319, 325-326 (S.D.N.Y.2004) (reporting revenues from purchases while amortizing off-setting costs; reporting income from revenue-neutral swap transactions); *In re Cendant Corp. Sec. Litig. .,* 109 F.Supp.2d 235, 241 (D.N.J.2000) (manipulating reserves; irregular revenue recognition practices; improperly accounting for lost revenues).

*20 On the contrary, Plaintiffs allege that MMC brokered agreements between clients and insurance providers and received payments from both the clients and the providers. It is undisputed that payments from both parties were recognized and reported, and that the simple practice of collecting contingent commissions was legal. Indeed, even after the NYAG investigation, MMC announced that it "intend[ed] to collect market services revenue earned prior to October 1, 2004."MMC Annual Report (Form 10-K), at 28 (March 8, 2005). The allegation that Marsh engaged in improper business practices to maximize contingent commission revenue rather than acting in the best interests of its clients has little to do with the financial accounting of that revenue. MMC's alleged nondisclosure of improper steering activities violates Section 10(b) to the extent that MMC made misleading statements regarding the source of that revenue or the business practices employed to generate that revenue, but the accurate reporting of that revenue does not amount to accounting fraud.

c. Misstatements Attributable to Defendants

Although Plaintiffs adequately allege certain

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----                                                                          Page 20

--- F.Supp.2d ----, 2006 WL 2057194 (S.D.N.Y.)
**(Cite as: --- F.Supp.2d ----)**

misrepresentations, the Complaint does not allege personal statements by every defendant nor can the allegations of group-published misstatements be attributed to every defendant listed in the Complaint. Most significantly, D & T argues that Plaintiffs' attempt to hold it responsible for MMC's statements violates the prohibition on secondary liability. In addition, several individual defendants argue that group pleading was abolished by the PSLRA, thus Plaintiffs may not attribute the Company's public statements to individual defendants that did not personally make misleading statements.

Plaintiffs concede that "D & T's liability in this case is based upon the falsity of its audit opinions."(Pls.' Opp. to D & T 12.) As noted above, however, Plaintiffs fail to state a claim for accounting fraud. In the absence of adequate allegations that MMC engaged in fraudulent accounting that would render the certification of MMC's financial statements false, Plaintiffs may not premise D & T's liability on its audit opinions. Accordingly, the allegations of D & T's allegedly false audit opinions fail to state a claim against D & T under Section 10(b).

Plaintiffs also attempt to predicate D & T's liability on statements in the unaudited sections of MMC's SEC filings. To the extent that certain statements in the unaudited portions of MMC's 10-K filings are misleading, *see supra* Part IV.A.1.i.b(5), those statements are not attributable to the Company's auditor. D & T's audit opinions were explicitly limited to the financial statements included in MMC's annual 10-K filings. (Compl.¶¶ 694-98.) 10-K filings are comprised of various components, including audited financial statements, the audit opinions themselves, and unaudited sections such as annual reports and management's discussion and analysis. Misrepresentations in these unaudited sections are not attributable to D & T. *See In re The Warnaco Group, Inc. Sec. Litig.,* 388 F.Supp.2d 307, 314 (S.D.N.Y.2005) ("liability may not generally attach to a public auditor for unaudited public statements the company made") (citing *Wright v. Ernst & Young LLP,* 152 F.3d 169, 175 (2d Cir.1998)); *In re Philip Servs. Corp. Sec. Litig.,* 383 F.Supp.2d 463, 472 n. 5 (S.D.N.Y.2004) (auditor "can be held liable under Section 10(b)

only for its own misrepresentations concerning [the defendant's] financial statements").

**\*21** Even assuming that liability could attach to accountants for unaudited statements, Plaintiffs fail to allege that D & T participated in the preparation of those statements at a level "sufficient for primary liability under § 10(b)."*In re The Warnaco Group,* 388 F.Supp.2d at 314 (comparing the insufficient examination and review of statements in that case to the material assistance and creation of statements present in *In re Global Crossing,* 322 F.Supp.2d at 333-34).[FN11] Because the allegations are insufficient to attach primary liability to D & T, the Section 10(b) count against that company is dismissed.

Defendants' argument that group pleading is no longer permissible under the PSLRA is rejected. As several courts, including this one, have recently noted, "[t]he majority rule in this district is that the group pleading doctrine has survived the PSLRA." *In re Van der Moolen,* 405 F.Supp.2d at 399;*see also In re BISYS Sec. Litig.,* 397 F.Supp.2d 430, 438-40 (S.D.N.Y.2005) (providing a thorough explanation for the continued viability of the group pleading doctrine following the PSLRA); *In re AOL Time Warner,* 381 F.Supp.2d at 220. Group pleading allows the court to presume that statements in certain group-published documents (i.e. registration statements, annual reports, prospectuses) are the collective work of certain individuals. *In re AOL Time Warner,* 381 F.Supp.2d at 220. However, "[a] plaintiff may invoke the group pleading doctrine against a defendant only if the plaintiff has alleged facts indicating that the defendant was a corporate insider or affiliate with direct involvement in the daily affairs of the company."*In re BISYS,* 397 F.Supp.2d at 440 (citation omitted).

The Independent Directors argue that they had insufficient control over MMC to be held liable under the group pleading doctrine. Plaintiffs fail to allege with particularity that the Independent Directors were sufficiently involved in the day-to-day operations of MMC or drafting of company statements to attribute statements in unsigned documents to the Independent Directors.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*See* *JHW Greentree Capital, L.P.,* No. 05 Civ. 2985 HB, 2005 WL 3008452, at \*6 (S.D.N.Y. Nov.10, 2005). Accordingly, allegations against the Independent Directors that are grounded on unsigned documents are dismissed against those defendants. Yet Plaintiffs allege that all of the defendants on MMC's board of directors, including the Independent Directors, signed SEC Filings containing misleading statements. (*See, e.g.,* Compl. ¶¶ 489, 560, 573.) The statements in those signed documents are properly attributed to the Independent Directors. *See* *JHW Greentree Capital,* 2005 WL 3008452, at \*6; *In re JWP Inc. Sec. Litig.,* 928 F.Supp. 1239, 1256 (S.D.N.Y.1996). Consequently, Plaintiffs need not rely on group pleading to attribute actionable misrepresentations to the Independent Directors.

On the other hand, Plaintiffs do not allege that Defendant Egan signed any of the SEC filings that contain misleading statements. Egan argues that the group pleading doctrine does not extend to individuals in his position, officers of a subsidiary to a parent company that is responsible for making public statements. However, courts in this District have recognized that subsidiaries may be held responsible for the statements of their parent companies that are uniquely within the subsidiary's knowledge and control. *See* *In re LaBranche Sec. Litig.,* 405 F.Supp.2d 333, 351 (S.D.N.Y.2005); *In re Van der Moolen,* 405 F.Supp.2d at 403. This is the flip side of the coin that excuses D & T from liability for MMC's misstatements because of the auditor's lack of control over unaudited sections of MMC's 10-K Filings. *Compare* *In re Warnaco,* 388 F.Supp.2d at 314 (failing to find liability where auditor merely "examined and reviewed" the direct violator's statements), *with* *In re Global Crossing,* 322 F.Supp.2d at 333-34 (finding liability where plaintiffs alleged that auditors "prepared, directed or controlled," "helped created," and "materially assisted" the preparation of a direct violator's false statements).

\*22 Here, Plaintiffs allege that the Senior Management Defendants of both MMC and Marsh " participated in drafting, preparation and/or approval " of misstatements, and that they "control[led] the context of the various SEC filings" containing

misstatements. (Compl.¶¶ 70-71.) These allegations are sufficient to attribute misstatements to Marsh and the Senior Management Defendants, such as Egan, who did not sign the SEC filings. In addition, the Court has already determined that certain statements made by Egan regarding Marsh's insurance placements and client disclosures were sufficiently pleaded to allege actionable misrepresentations. On account of both classes of statements, Plaintiffs have adequately alleged that Egan made false and misleading statements.

### ii. Scienter

The PSLRA mandates that plaintiffs alleging securities fraud "state with particularity facts giving rise to a strong inference that the defendant[s] acted with the required state of mind."15 U.S.C. § 78u-4(b)(2). The requisite state of mind in an action under Section 10(b) and Rule 10b-5 is "an intent to deceive, manipulate, or defraud."*Kalnit v. Eichler,* 264 F.3d 131, 138 (2d Cir.2001) (internal quotation marks and citation omitted). The Second Circuit has indicated that plaintiffs may establish this intent " either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness."*Id.* (internal quotation marks and citations omitted). With one exception,[FN12] the parties' moving papers are wholly concerned with the latter method of establishing scienter.

To establish strong circumstantial evidence of scienter, a plaintiff must allege facts showing " conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendants or so obvious that the defendant must have been aware of it."*In re Carter-Wallace, Inc., Sec. Litig.,* 220 F.3d 36, 39 (2d Cir.2000) (citation omitted). This high standard may be met where plaintiffs allege that defendants (1) "engaged in deliberately illegal behavior;" (2) " knew facts or had access to information suggesting that their public statements were not accurate;" or (3) "failed to check information they had a duty to monitor."*Novak v. Kasaks,* 216 F.3d 300, 311 (2d

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----                                                                Page 22

--- F.Supp.2d ----, 2006 WL 2057194 (S.D.N.Y.)
(Cite as: --- F.Supp.2d ----)

Cir.2000) (citations omitted). Even so, "the strength of the circumstantial allegations must be correspondingly greater" than allegations of motive and opportunity. *Kalnit*, 264 F.3d at 142 (citation omitted).

### a. MMC and Marsh

A corporate defendant's scienter is necessarily derived from its employees. *See Suez Equity Investors, L.P. v. Toronto-Dominion Bank,* 250 F.3d 87, 101 (2d Cir.2001). While there is no simple formula for how senior an employee must be in order to serve as a proxy for corporate scienter, courts have readily attributed the scienter of management-level employees to corporate defendants. *See e.g., In re BISYS,* 397 F.Supp.2d at 442-43 (inferring a corporation's scienter from the intentional misbehavior of its regional vice president and vice president of corporate finance); *In re JP Morgan,* 363 F.Supp.2d at 627 (attributing the knowledge of a vice chairman, vice president, and managing director to the corporate defendant).

**\*23** Defendants concede that a corporation's scienter may be inferred from its employees, but argue that plaintiffs must allege that an employee with scienter was also responsible for an underlying misstatement. Yet Defendants point to no controlling authority for this position. In fact, courts in this District have recently emphasized that there is no requirement "that the same individual who made an alleged misstatement on behalf of a corporation personally possessed the required scienter." *In re JP Morgan,* 363 F.Supp.2d at 627; *see also In re BISYS,* 397 F.Supp.2d at 443, 449.

The Court is in accord with this position. Confining the pool of employees from which a corporation's scienter may be inferred to those that made an underlying misstatement, as Defendants suggest, is unduly limiting. This requirement forecloses liability in situations where institutional fraud is readily perceivable but plaintiffs have yet to match a culpable employee with a public misstatement. *Cf. Press v. Chem. Inv. Servs. Corp.,* 166 F.3d 529, 538 (2d Cir.1999) (unduly stringent pleading requirements "would make virtually impossible a

plaintiff's ability to plead scienter in a financial transaction involving a corporation, institution, bank or the like that did not involve specifically greedy comments from an authorized corporate individual"). Imposing this limitation at the pleading stage would doom the long-recognized concept of primary entity liability to irrelevancy, effectively limiting the liability of corporate defendants to secondary liability under Section 20(a).

Plaintiffs interpret the pleading standards for corporate scienter even more liberally than *In re JP Morgan* and *In re BISYS,* arguing that corporate scienter may be properly alleged from the corporation's collective knowledge, without evidence of any particular employee's scienter. *See, e.g., In re Worldcom,* 352 F.Supp.2d at 497; *In re Dynex Capital, Inc. Sec. Litig.,* No. 05 Civ. 1897(HB), 2006 WL 314524, at \*9-10 (S.D.N.Y. Feb.10, 2006). In fact, Judge Baer recently certified this very question for interlocutory appeal. *See In re Dynex Capital, Inc. Sec. Litig .,* No. 05 Civ. 1897(HB), 2006 WL 1517580 (S.D.N.Y. June 2, 2006). The Court supports the proposition stated in those cases, as the collective knowledge doctrine serves an important function in situations where widespread corporate fraud cannot be connected to individual defendants at the pleading stage. Here, however, Marsh and MMC's scienter is just as easily inferred from the conscious misbehavior and recklessness of particular management-level employees identified in the Complaint as it is from the collective knowledge of the corporate entities.

Plaintiffs allege that MMC and Marsh had notice of the potential conflicts of interest posed by contingent commission agreements and the need for oversight of that business practice. (Compl.¶ 125.) Nevertheless, the Company's employees are alleged to have been widely engaged in the improper collection of contingent commissions. For instance, Plaintiffs allege that The DPW Report revealed " widespread instances" of bid manipulation at Marsh during the Class Period (Compl.¶¶ 226-29, 762), and several management-level employees have pleaded guilty to criminal charges for their involvement in bid-rigging at the Company. (Compl. ¶¶ 230-31, 316, 318.) Further, confidential

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----                                                                    Page 23

--- F.Supp.2d ----, 2006 WL 2057194 (S.D.N.Y.)
(Cite as: --- F.Supp.2d ----)

witnesses assert that contingent commission agreements were centralized within Marsh's Global Broking division to maximize the collection of those revenues (Compl.¶¶ 131-41), that employees openly discussed steering at company meetings (Compl.¶¶ 144-46), and that managers encouraged steering in company emails. (Compl.¶ ¶ 147-48, 160.) [FN13]

**\*24** The Complaint also alleges that Marsh managers personally directed the steering of insurance business to insurance providers with which the Company had the most lucrative contingent commission agreements. Marsh's Executive Director of Marketing in the Global Broking division is alleged to have demanded that insurance providers help Marsh manipulate bids by providing the Company with above-market "B" quotes. (Compl.¶ 769.) Further, Plaintiffs allege that Global Broking prepared a "Tiering Report," which classified insurance companies by the value of their contingent commission agreements with Marsh. This report was then distributed to senior executives and Managing Directors instructed their subordinates that the report would provide "clear direction on who [we] are steering business to and who we are steering business from."(Compl.¶ 772.) The Complaint specifically alleges that at least two senior executives at Marsh-Christopher Treanor, the head of the Global Broking division (Compl.¶¶ 145-46, 305), and Robert J. Stearns, a Senior Vice President (Compl.¶ 309)-were directly involved in, or aware of, Marsh's steering practices throughout the Class Period. These allegations are more than adequate to raise an inference of conscious misbehavior or recklessness.

Defendants rely on the Second Circuit's opinion in *Chill v. Gen. Elec. Co.,* 101 F.3d 263 (2d Cir.1996), to argue that MMC, as Marsh's parent corporation, cannot be responsible for the misconduct at its subsidiary. In *Chill,* the court declined to hold the General Electric Company ("GE") responsible for the fraudulent acts of a single employee at Kidder, Peabody & Co., Inc., which was one of twenty-four subsidiaries of GE Capital Services, itself one of twelve GE subsidiaries. *Id.* at 264-65, 271.Chill affirmed that parent corporations may not be held liable for reliance on their subsidiaries' internal

controls.*Id.* at 271.Plaintiffs, however, allege more than MMC's mere reliance on Marsh's financial controls; they allege MMC's awareness, reckless disregard, and complicity in the misbehavior at Marsh and a breakdown in MMC's own internal controls.

Unlike *Chill,* the Complaint does not simply allege that MMC published faulty financial results derived from its subsidiary's accounting practices, but that MMC issued misleading statements regarding the Company's business practices in the insurance industry after being put on notice of the conflicts of interest inherent in the receipt of contingent commissions. Further, that Marsh is the largest and most prominent of MMC's businesses, generating approximately sixty percent of the Company's revenues, undermines MMC's attempt to detach itself from its subsidiary. (Compl.¶¶ 11, 99.) The factual allegations underlying MMC's integration with Marsh demonstrate the parent company's familiarity with the subsidiary's operations and, ultimately, its misconduct. The Complaint alleges that MMC employees attended meetings of the Global Broking division in which steering was discussed. (Compl.¶ 84.) In addition, Defendant Greenberg, CEO of MMC, is alleged to have described the collection of contingent commissions as a "part of [MMC's] business model." (Compl.¶ 20.) When attempting to calm the investment community's anxiety following the announcement of the NYAG investigation, Greenberg explained that MMC was "knowledgeable about how our business works, what our model is." (Compl.¶ 627.)

**\*25** In sum, Plaintiffs allege that both MMC and Marsh actively oversaw a "business model based on unsustainable and improper business practices." (Compl.¶ 9.) There are sufficient allegations regarding the pervasiveness of the fraud, the conscious misbehavior of particular corporate employees, and the complicity of the corporate entities to find that MMC was aware of or recklessly disregarded the intentional misconduct at Marsh. Consequently, the allegations of the Complaint sufficiently plead the scienter of both corporate defendants.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----                                                    Page 24

--- F.Supp.2d ----, 2006 WL 2057194 (S.D.N.Y.)
**(Cite as: --- F.Supp.2d ----)**

#### b. The Individual Defendants

Scienter of the individual defendants-directors and officers of MMC, and officers of Marsh-is not so easily alleged. Courts in this District have recognized that, by themselves, general allegations regarding the magnitude of the fraud or the organizational role of a defendant are insufficient to raise a strong inference of a defendant's scienter. *See In re Worldcom, Inc. Sec. Litig.,* 294 F.Supp.2d 392, 418 (S.D.N.Y.2003); *In re LaBranche,* 405 F.Supp.2d at 361;*In re AOL Time Warner,* 381 F.Supp.2d at 222 n. 30. Rather, "securities fraud claims typically have sufficed to state a claim based on recklessness when they have specifically alleged defendants' knowledge of facts or access to information contradicting their public statements." *Novak,* 216 F.3d at 308.

Thus, the Second Circuit's recent scienter jurisprudence has consistently found the requisite inference of scienter where defendants have been exposed to information contrary to their public statements. *SeeCosmas v. Hassett,* 886 F.2d 8, 10, 13 (2d Cir.1989) (defendants' knowledge that their company derived a significant portion of its revenues from Chinese imports, coupled with the existence of public information regarding Chinese import restrictions, gave rise to a strong inference of scienter); *Novak,* 216 F.3d at 304, 311 (in light of particularized allegations that the defendants had access to documents directly relevant to the subject of their misstatements, the court reasoned that the defendants knowingly made the misstatements); *Rothman v. Gregor,* 220 F.3d 81, 91-92 (2d Cir.2000) (defendants who failed to expense irrecoverable royalty advances must have known that they would not recoup the cost of the advances during the class period because they sued to recover those advances).

These Second Circuit cases uniformly rely on allegations that specific contradictory information was available to the defendants at the same time they made their misleading statements. *See also Shields v. Citytrust Bancorp, Inc.,* 25 F.3d 1124, 1129 (2d Cir.1994) (plaintiff failed to plead scienter where the plaintiff did "not allege that the company's disclosures were incompatible with what

the most current reserve reports showed at the time the disclosures were made"). The Complaint must allege equally compelling information available to the individual defendants at the time of their public statements in order to plead their scienter.

#### (1) The Senior Management Defendants

**\*26** Plaintiffs attempt to establish the Senior Management Defendants' scienter with several general allegations that they attribute to these defendants as a group. However, neither alone, nor collectively, are these general allegations sufficient to raise the strong inference of scienter required by the PSLRA.

Many of Plaintiffs' general allegations have a common flaw. Plaintiffs rarely distinguish between Defendants' knowledge of contingent commissions and knowledge of the misconduct intended to maximize those commissions. Where the Complaint does include specific allegations regarding misconduct, it alleges that certain managers and brokers at Marsh were involved in the misconduct, formulated the business strategies, and were privy to conversations in which steering and bid manipulation were discussed. But Plaintiffs fail to connect the misconduct or knowledge of the misconduct to any of the individual named defendants. Simply arguing that specific high level employees must have known what was taking place at Marsh because certain subordinate employees were later implicated in the fraud is insufficient to give rise to the strong inference of scienter required to state a claim under Section 10(b).

Nor do the problems at other MMC subsidiaries provide a strong inference of recklessness with regard to misconduct at Marsh, a wholly separate subsidiary. *Cf.In re Worldcom,* 294 F.Supp.2d at 418 (particularized allegations of misconduct at one office were "too far removed from the fraud underlying the false statements in the SEC filings to put [the] defendants on notice of those frauds"). Insider trading scandals at Putnam, MMC's investment management business, and the SEC investigation into conflicts of interest at Mercer, MMC's consulting and human resources subsidiary,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----                                                                Page 24

--- F.Supp.2d ----, 2006 WL 2057194 (S.D.N.Y.)
**(Cite as: --- F.Supp.2d ----)**

### b. The Individual Defendants

Scienter of the individual defendants-directors and officers of MMC, and officers of Marsh-is not so easily alleged. Courts in this District have recognized that, by themselves, general allegations regarding the magnitude of the fraud or the organizational role of a defendant are insufficient to raise a strong inference of a defendant's scienter. *See In re Worldcom, Inc. Sec. Litig.,* 294 F.Supp.2d 392, 418 (S.D.N.Y.2003); *In re LaBranche,* 405 F.Supp.2d at 361;*In re AOL Time Warner,* 381 F.Supp.2d at 222 n. 30. Rather, "securities fraud claims typically have sufficed to state a claim based on recklessness when they have specifically alleged defendants' knowledge of facts or access to information contradicting their public statements." *Novak,* 216 F.3d at 308.

Thus, the Second Circuit's recent scienter jurisprudence has consistently found the requisite inference of scienter where defendants have been exposed to information contrary to their public statements. *SeeCosmas v. Hassett,* 886 F.2d 8, 10, 13 (2d Cir.1989) (defendants' knowledge that their company derived a significant portion of its revenues from Chinese imports, coupled with the existence of public information regarding Chinese import restrictions, gave rise to a strong inference of scienter); *Novak,* 216 F.3d at 304, 311 (in light of particularized allegations that the defendants had access to documents directly relevant to the subject of their misstatements, the court reasoned that the defendants knowingly made the misstatements); *Rothman v. Gregor,* 220 F.3d 81, 91-92 (2d Cir.2000) (defendants who failed to expense irrecoverable royalty advances must have known that they would not recoup the cost of the advances during the class period because they sued to recover those advances).

These Second Circuit cases uniformly rely on allegations that specific contradictory information was available to the defendants at the same time they made their misleading statements. *See also Shields v. Citytrust Bancorp, Inc.,* 25 F.3d 1124, 1129 (2d Cir.1994) (plaintiff failed to plead scienter where the plaintiff did "not allege that the company's disclosures were incompatible with what

the most current reserve reports showed at the time the disclosures were made"). The Complaint must allege equally compelling information available to the individual defendants at the time of their public statements in order to plead their scienter.

### (1) The Senior Management Defendants

**\*26** Plaintiffs attempt to establish the Senior Management Defendants' scienter with several general allegations that they attribute to these defendants as a group. However, neither alone, nor collectively, are these general allegations sufficient to raise the strong inference of scienter required by the PSLRA.

Many of Plaintiffs' general allegations have a common flaw. Plaintiffs rarely distinguish between Defendants' knowledge of contingent commissions and knowledge of the misconduct intended to maximize those commissions. Where the Complaint does include specific allegations regarding misconduct, it alleges that certain managers and brokers at Marsh were involved in the misconduct, formulated the business strategies, and were privy to conversations in which steering and bid manipulation were discussed. But Plaintiffs fail to connect the misconduct or knowledge of the misconduct to any of the individual named defendants. Simply arguing that specific high level employees must have known what was taking place at Marsh because certain subordinate employees were later implicated in the fraud is insufficient to give rise to the strong inference of scienter required to state a claim under Section 10(b).

Nor do the problems at other MMC subsidiaries provide a strong inference of recklessness with regard to misconduct at Marsh, a wholly separate subsidiary. *Cf.In re Worldcom,* 294 F.Supp.2d at 418 (particularized allegations of misconduct at one office were "too far removed from the fraud underlying the false statements in the SEC filings to put [the] defendants on notice of those frauds"). Insider trading scandals at Putnam, MMC's investment management business, and the SEC investigation into conflicts of interest at Mercer, MMC's consulting and human resources subsidiary,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----

Page 25

--- F.Supp.2d ----, 2006 WL 2057194 (S.D.N.Y.)
(Cite as: --- F.Supp.2d ----)

may provide some evidence that the MMC directors should have been more proactive about the potential for misconduct in the Company's other business divisions, but are insufficient on their own to put MMC directors or Marsh officers on notice of steering and bid-rigging at Marsh.[FN14]

Plaintiffs also allege that the evolving disclosure language regarding contingent commissions in MMC's 10-K filings and Annual Reports is evidence of the Senior Management Defendants' scienter. Yet the language regarding the services supplied for contingent commissions is consistent, if increasingly more ornate, after being introduced in the 2000 10-K.[FN15]The mere existence of allegedly misleading language in a group-published document does not compel a conclusion that all of the signatories were aware that it was misleading. *See Citigroup,* 330 F.Supp.2d at 381-82. To hold otherwise would allow plaintiffs to plead the scienter of whole classes of defendants solely by alleging a misstatement.

Other general allegations, such as that the Senior Management Defendants concealed their improper activities (Compl.¶¶ 780-85) or actively made false disclosures regarding their fiduciary duties (Compl.¶ 809), are similarly insufficient. Plaintiffs adequately allege that certain non-defendant employees engaged in misconduct and that the existence of improper conduct within the Company made certain public disclosures false. But Plaintiffs can not use this information to allege the Senior Management Defendants' scienter without adequate factual allegations that *those* defendants *engaged* in misconduct or *knew* that their disclosures were false. These types of conclusory allegations beg the question.

**\*27** Ultimately, while some of the Complaint's general allegations (e.g., the magnitude of the fraud, the awareness of similar misconduct at other MMC subsidiaries), provide some evidence of the Senior Management Defendant's scienter, the general allegations are insufficient to raise a strong inference of their scienter. Even collectively, these general allegations are weaker than the collective allegations that have supported a strong inference of scienter in the cases cited by Plaintiffs. *See, e.g., In*

*re Cosmas,* 886 F.2d at 10, 13 (relying on allegations that defendants made statements contrary to publicly available information); *In re Atlas Air,* 324 F.Supp.2d at 492 (noting that senior managers had access to reports detailing the poor inventory situation underlying the company's fraudulent accounting).

Plaintiffs supplement their general allegations with limited individual allegations of each Senior Management Defendant's scienter. For many of the Senior Management Defendants, these particularized allegations are limited to allegations of the individual defendant's position at the Company,[FN16] general awareness of contingent commissions, access to corporate information, responsibility for the financial accounting process, and signing of public documents. As noted above, these types of allegations may provide some evidence of scienter, but are insufficient to raise a strong inference of scienter absent allegations that they were exposed to contemporaneous information contradicting their public statements. *Seesupra* Part IV.A.1 .ii.b. Consequently, the specific allegations against defendants Smith, Groves, Sinnott, Wijnberg, Rapport, and Cabialavetta are insufficient to raise a strong inference of scienter.

Plaintiffs provide additional specific allegations for Defendants Greenberg and Egan. For instance, Plaintiffs correlate the increased importance of Marsh's Global Broking division with Greenberg's ascension as the CEO of MMC. (Compl.¶¶ 766, 770.) However, the increased prominence of the Global Broking division and centralization of contingent commissions therein do not raise a strong inference of scienter. There are no particularized allegations that Greenberg personally helped formulate steering policy or that he had direct access to reports or presentations explaining such strategies. On the contrary, Plaintiffs allege that Greenberg attended some Global Broking meetings in which contingent commissions were discussed and that improper steering was discussed at some of the division's other meetings. (Compl. ¶ ¶ 812, 145-46 .) Notably absent are allegations that Greenberg attended the meetings in which steering was discussed. Nor do allegations that Greenberg attended meetings in which contingent

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----

Page 26

--- F.Supp.2d ----, 2006 WL 2057194 (S.D.N.Y.)
(Cite as: --- F.Supp.2d ----)

commissions were discussed generally raise an inference that steering was discussed in those meetings.

Similarly, allegations that a former Marsh employee "openly criticized Global Broking for not necessarily fulfilling its fiduciary duties,""publicly spoke about his concerns with Global Broking" at a 2002 conference, and "voiced these concerns directly to Defendant Egan" during the Class Period are insufficient to give rise to a strong inference of Egan's awareness or reckless disregard of steering and bid manipulation. (Compl.¶¶ 793-94.) The Complaint does not particularize what "concerns" were raised, whether steering was addressed, or how these "concerns" would have put Egan or any of the other defendants on notice of the specific misconduct alleged in the Complaint. The Complaint is laden with allegations that misconduct was occurring at Marsh, particularly in the Global Broking division, but devoid of specific allegations that evidence of this misconduct was brought to the attention of the individual named defendants during the Class Period.

**\*28** The only allegation that tips the scales in favor of any of the Senior Management Defendants' scienter is the announcement of the NYAG investigation. Plaintiffs do not allege specifically when the NYAG investigation was announced, but it was first disclosed in MMC's 1st quarter 10-Q. The NYAG complaint was then filed and the suit was settled for $850 million within a year of the commencement of the investigation. Meanwhile, the DPW Report commissioned by Defendants following the filing of the NYAG lawsuit revealed widespread instances of steering at the Company. (Compl.¶ 226.) Added to the allegations that, after the investigation's announcement, Greenberg and Egan personally made misstatements and aggressively supported the Company's business practices, the existence of the NYAG investigation and the rapid discovery of widespread misconduct at Marsh shortly thereafter constitute strong circumstantial evidence that those defendants either knew or were reckless in not learning of the fraudulent business practices at Marsh. *SeeIn re Van der Moolen,* 405 F.Supp.2d at 408-09. Accordingly, a strong inference of scienter arises

upon Greenberg and Egan's awareness of the NYAG investigation.

As set forth above, Plaintiffs have adequately alleged scienter for the misleading statements made by Greenberg and Egan after the publication of the 2004 1st Quarter 10-Q on May 10, 2004 until the end of the Class Period. The Section 10(b) and 10b-5 claims against the remainder of the Senior Management Defendants are dismissed for failure to plead scienter with particularity.

(2) The Audit Committee Defendants

Plaintiffs attempt to plead the scienter of the Audit Committee Defendants through a series of "red flags " that were allegedly ignored by those defendants. Red flag allegations are commonly used to plead the scienter of auditors and audit committees in the context of a company's fraudulent accounting. *See, e.g.,In re Philip Servs.,* 383 F.Supp.2d at 475;*In re Worldcom,* 294 F.Supp.2d at 418. Although the Court has rejected Plaintiffs' allegations of fraudulent accounting here, there is no reason why the red flags pleading paradigm may not be employed in the context of misrepresentations stemming from internal misconduct. *See, e.g.,In re Van der Moolen,* 405 F.Supp.2d at 406.

Merely labeling allegations as red flags, however, is insufficient to make those allegations relevant to a defendant's scienter. Rather, plaintiffs must plead " facts which come to a defendant's attention that would place a reasonable party in defendant's position on notice that the audited company was engaged in wrongdoing to the detriment of its investors."*In re Worldcom,* 346 F.Supp.2d 628, 672 (S.D.N.Y.2004) (internal quotation marks and citation omitted); *see alsoIn re Leslie Fay Cos. Sec. Litig.,* 871 F.Supp. 686, 699 (S.D.N.Y.1995) (red flags must "be clearly evident to any auditor performing its duties"). Although the Audit Committee Defendants rebut many of the red flag allegations here, courts must keep in mind that a defendant "cannot secure dismissal by cherry-picking only those allegations susceptible to rebuttal and disregarding the remainder."*In re Philip Servs.,* 383 F.Supp.2d at 476. Indeed, "

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----                                                              Page 27

--- F.Supp.2d ----, 2006 WL 2057194 (S.D.N.Y.)
(Cite as: --- F.Supp.2d ----)

multiple allegations of 'red flags,' considered in the aggregate, [may] support an inference of fraudulent intent adequate to survive a motion to dismiss."*Id.* at 475.

**\*29** Nevertheless, courts have been hesitant to find a strong inference of audit committee members' scienter in cases providing general allegations of circumstantial evidence. *See, e.g.,In re Worldcom,* 294 F.Supp.2d at 418. Even in *In re Atlas Air,* where the scienter of several corporate officers was adequately pleaded on the basis of the magnitude of the company's restatement of its earnings, improper financial reporting of the company's core operations, and a series of statements by confidential witnesses indicating that senior management was aware of the specific conditions underlying the fraudulent accounting alleged therein, the court dismissed the claim against the single named audit committee member because the plaintiffs failed to plead "that the audit committee was given information that should have alerted [the defendant] to the fact that the company's financials were false."324 F.Supp.2d at 497. Plaintiffs' allegations are similarly deficient here.

Many of the alleged red flags overlap with Plaintiffs' arguments for the Senior Management Defendants' scienter, and contain the same defects as those allegations. However, the Complaint also includes a number of distinct red flags that allegedly put the Audit Committee Defendants on notice: (1) conflicts of interest inherent in contingent commission agreements; (2) Circular Letter 22; (3) the RIMS agreement; (4) failure to disclose the materiality of contingent commissions; (5) the lack of costs associated with contingent commissions; (6) the existence of related-party transactions with insurance providers AIG and ACE; and (7) the ranking and promotion of employees involved in steering.

The first three of these red flags are primarily relevant to the alleged misrepresentations about the Company's misleading client disclosure protocol. However, none of the misrepresentations regarding MMC's disclosure to its clients are attributable to the Audit Committee Defendants. Nor is the Audit Committee Defendants' awareness of regulations

and agreements related to brokers' disclosure responsibilities sufficient to allege scienter for the misstatements (regarding the nature of services provided for contingent commissions and the nature of client insurance placements) that are appropriately attributed to these defendants.

Further, Plaintiffs concede that defendants adhered to the disclosure protocol created by the RIMS Agreement, and only allege that the calculations performed pursuant to the protocol could be viewed as inaccurate or misleading. (Compl ¶ 244.) The fact that Defendants adhered to the regulatory agreement, even if that agreement ultimately failed its goal, undermines Plaintiffs' argument that the Audit Committee Defendants breached their duty to monitor regulatory compliance.

To the extent that the Audit Committee had a duty to monitor regulatory and legal compliance, Plaintiffs have not alleged information that reached the Audit Committee and that they either knew about or were reckless in ignoring. *SeeIn re Atlas Air,* 324 F.Supp.2d at 497. Simply stating that a defendant had a duty to monitor is insufficient to raise a strong inference of scienter without allegations of what information was reasonably available to them or how they were reckless in their duties.

**\*30** Other red flags, such as the failure to disclose the magnitude of contingent commissions and the ranking and promotion of employees involved in steering, are also insufficient to put the Audit Committee Defendants on notice of misconduct at Marsh. Regarding the former of these red flags, the Court has already ascertained that the Company did not have a specific line-item duty to disclose the magnitude of contingent commissions in MMC's financial statements. *Seesupra* Part IV.A.1.i.b(4). Accordingly, the alleged failure to disclose does not give rise to an inference of the Audit Committee Defendants' scienter. With respect to the latter red flag, the Plaintiffs do not allege that the Audit Committee Defendants were even involved in the promotion and ranking of employees, let alone that they were aware that any of the individuals being promoted or ranked were involved in steering or that promotion and ranking were based on

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

participation in steering activities.

Nor are the related-party transactions between MMC and underwriters AIG and ACE, where Defendant Greenberg's father and brother worked, a sufficient red flag to give rise to the Audit Committee Defendants' recklessness. Plaintiffs do not allege that MMC interacted with AIG and ACE any differently than with the other underwriters from which it received contingent commissions. There are no facts alleged to show that closer scrutiny of those transactions would have put any of the defendants on notice of the misconduct at Marsh.

In short, Plaintiffs' allegations of red flags are insufficient to establish the scienter of the Audit Committee Defendants. The Section 10(b) and Rule 10b-5 claims against those defendants are dismissed.

### c. D & T

The standard for pleading auditor scienter is demanding. The scienter of an auditor must " approximate an actual intent to aid in the fraud being perpetrated by the audited company." *Rothman,* 220 F.3d at 98 (quoting *Decker v. Massey-Ferguson, Ltd.,* 681 F.2d 111, 120-21 (2d Cir.1982)). Therefore, a plaintiff must prove that " [t]he accounting practices were so deficient that the audit amounted to no audit at all, or an egregious refusal to see the obvious, or to investigate the doubtful, or that the accounting judgments which were made were such that no reasonable accountant would have made the same decisions if confronted with the same facts ."*S.E.C. v. Price Waterhouse,* 797 F.Supp. 1217, 1240 (S.D.N.Y.1992) (internal quotation marks and citations omitted). Although Plaintiffs have failed to adequately plead their theory of fraudulent accounting or allege any actionable misrepresentations by D & T, *seesupra* Part IV.A.1.i.b(6) & c, Plaintiffs' failure to allege scienter is an alternate ground for dismissal against the auditor.

Plaintiffs argue that D & T's receipt of consulting fees during the time that it served as MMC's auditor, coupled with the inferences created by the Complaint's red flag allegations, creates a strong

inference of scienter. Although an auditor's receipt of consulting fees inordinately disproportionate to its auditing fees may give rise to a proper inference of motive, *seeIn re Global Crossing,* 322 F.Supp.2d at 346 (finding an inference of motive where an auditor received consulting fees nearly six times greater than its auditing fees), allegations of payment for services rendered are generally inadequate. *SeeIn re JP Morgan,* 363 F.Supp.2d at 621 ("Generalized allegations of intent to maintain lucrative business relationships and to establish new ones do not set forth a motive for scienter purposes." ). Here, D & T's receipt of consulting fees approximately equal to its auditing fees (Compl.¶ 690) is insufficient to raise a strong inference of motive.

**\*31** The red flags that allegedly put D & T on notice of the fraud are mostly derivative of the allegations against the Audit Committee Defendants, and are even less compelling in the context of D & T's scienter. In addition to their red flag allegations, Plaintiffs argue that D & T was reckless in failing to recognize that MMC was receiving contingent commissions as kickbacks for steering services, rather than in return for the services described in MMC's Annual Reports and 10-K filings. But Plaintiffs do not allege facts demonstrating how MMC's financial statements failed to account for the receipt of contingent commissions or the overhead costs that MMC purported to assign to them. Even if MMC was using the description of services as a smokescreen for its receipt of allegedly "pure profit" contingent commissions, the Plaintiffs do not allege that these generic services (e.g., new product development, access to the global insurance market, new technology, and administrative services) were not covered in other sections of MMC's balance sheet. These general discussions in MMC's Annual Reports and 10-K filings, even if they ultimately prove to be false, are insufficient to demonstrate D & T's recklessness.

Finally, with respect to the RIMS agreement and Circular Letter 22, MMC's regulatory obligations did not create a duty for D & T to monitor the Company's compliance. Nor does the Complaint allege facts that would have put the auditor on

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----                                                              Page 29

--- F.Supp.2d ----, 2006 WL 2057194 (S.D.N.Y.)
**(Cite as: --- F.Supp.2d ----)**

notice that MMC was not complying with the Company's regulatory disclosure requirements. Attempting to make the auditor responsible for its client's off-balance sheet misconduct extends the accountant's responsibility beyond the scope of the auditing relationship.

The Complaint fails to allege adequate circumstantial evidence that D & T was reckless in failing to uncover the internal misconduct at MMC. The Section 10(b) and Rule 10b-5 claim against D & T is dismissed for this further reason.

### iii. Reliance

Defendant Egan contests Plaintiffs' allegations of reliance. Reliance, or transaction causation, " requires only an allegation that 'but for the claimed misrepresentations or omissions, the plaintiff would not have entered into the detrimental securities transaction." ' *Lentell*, 396 F.3d at 172 (quoting *Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc.* 343 F.3d 189, 197 (2d Cir.2003)).

Although the Complaint properly alleges reliance with its fraud on the market allegations (Compl.¶¶ 828-36), Egan argues that Plaintiffs fail to allege the purchase or sale of a security after Egan's first direct statement in March of 2004. The Class, however, alleges purchases throughout the Class Period, which extends until October 14, 2004. These allegations are sufficient. The Court is not aware of any case requiring a class to provide proof of purchase for every day of the Class Period at the pleading stage, and will not require such a showing here.

### iv. Loss Causation

**\*32** Defendants also challenge Plaintiffs' allegations of loss causation. The Supreme Court recently clarified the pleading requirements for loss causation in the context of alleged violations of Section 10(b). To properly plead loss causation, plaintiffs must provide "the defendants with notice of what the relevant economic loss might be [and] what the causal connection might be between the

loss and the [alleged] misrepresentation."*Dura Pharm.*, 544 U.S. at 347. Plaintiffs readily meet this standard.

Defendants argue that the market was aware of the magnitude of contingent commission revenues before MMC's stock price dropped. The magnitude of revenues, however, is not the sole misrepresentation alleged in the Complaint. Here, Plaintiffs allege that MMC's stock price fell significantly after it was revealed that MMC had been misrepresenting its business practices, particularly the nature of services provided for contingent commissions and the criteria for Marsh's insurance placement services. Plaintiffs allege that upon the filing of the NYAG complaint, in which contingent commission revenues were alleged to be the result of improper business practices, MMC's stock price lost a third of its value in two days. That is all that is required at this stage. *SeeLentell*, 396 F.3d at 173 (explaining that the plaintiff must allege "that the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security"). Loss causation is properly pleaded.

### 2. Market Manipulation

In addition to their claim that Defendants made misrepresentations during the Class Period, Plaintiffs briefly allege that Defendants violated Rule 10b-5(a) and (c).[FN17] Because the Court has already found MMC and Marsh liable of false and misleading statements, it need not consider whether they are also liable under the prohibition on fraudulent schemes and acts. *SeeIn re Alstom SA*, 406 F.Supp.2d 433, 475 (S.D.N.Y.2005). Indeed, Plaintiffs fail to argue scheme liability in their primary opposition memorandum. Plaintiffs only elaborate on that theory in their opposition to the Independent Directors' motion to dismiss. (Pls.' Opp. to Independent Directors 23.)

The allegations of the Complaint attempt to connect the individual defendants to the fraud almost exclusively by allegations of misrepresentations or omissions. The closest Plaintiffs come to alleging that the individual defendants, primarily MMC

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----                                                    Page 30

--- F.Supp.2d ----, 2006 WL 2057194 (S.D.N.Y.)
**(Cite as: --- F.Supp.2d ----)**

directors, engaged in any acts or schemes to mislead investors is to argue that those defendants "helped perpetuate" the systemic fraud at Marsh. (Pls.' Opp. to Independent Directors 23.) However, the Complaint does not include sufficient particularized allegations of the individual defendants' active participation in a scheme to manipulate MMC securities. Rather, the Complaint relies on allegations that the individual defendants made, or allowed to be made, false or misleading statements despite their awareness or reckless disregard of the misconduct at Marsh. This is insufficient to state a claim for scheme liability on behalf of any of the individual defendants. *SeeIn re JHW Greentree Capital,* 2005 WL 3008452, at \*7 n. 11.

### B. Section 11 Claims

**\*33** Plaintiffs allege that MMC, D & T, and the Individual Section 11 Defendants are liable for false or misleading statements contained in Exchange Act documents incorporated by reference into MMC's February 13, 2003 prospectus supplement. Defendants raise three defenses to this charge: (1) Plaintiffs do not have standing to state a Section 11 claim; (2) Section 11 liability may not attach to a prospectus supplement; and (3) Plaintiffs fail to allege Defendants' scienter.

The pleading requirement for Section 11 standing is satisfied by "general allegations that plaintiff purchased 'pursuant to' or traceable to [a] false registration statement."*In re Global Crossing, Ltd. Sec. Litig.,* 313 F.Supp.2d 189, 208 (S.D.N.Y.2003) (citations omitted). Here, Plaintiffs have done precisely that, alleging that "Lead Plaintiffs and other members of the Class acquired the securities in [MMC]'s 4.850% debt offering pursuant to the Registration Statement/Prospectus." (Compl.¶ 859.) Nothing more is required at this stage of pleading.

Next, Defendants argue that a prospectus supplement may not serve as the basis of Section 11 liability. The language of Section 11 creates liability for false or misleading statements "in any part of the registration statement."15 U.S.C. § 77k(a). Here, the February 13, 2003 prospectus

supplement updated the Company's 1998 shelf registration filed pursuant to Form S-3. Under the provisions of a shelf registration, issuers may omit certain information from the registration statement and original prospectus, and update them at a later date. *See* Harold S. Bloomenthal, Securities Law Handbook § 6:32 (2006). The prospectus supplement here did exactly that, setting the amount and type of securities that would be issued and explicitly incorporating by reference several Exchange Act filings, including the Annual Report on Form 10-K for the year ended December 31, 2001, to update pertinent company information. (Holton Decl. Ex. R.)

Defendants argue that the SEC's recently adopted Securities Offering Reform ("SOR"), which explicitly recognized prospectus supplements as part of a registration statement for Section 11 liability, indicates that there was no liability for prospectus supplements prior to the SOR's December 1, 2005 effective date. But this argument is rebutted by language in the SOR asserting that, at least since 1998, the SEC believed that "prospectus statements and the information contained in them are subject to liability under Section 11."Securities Offering Reform, 70 Fed.Reg. 44,722, 44,771 n. 445 (Aug. 3, 2005) (to be codified at 17 C.F.R. pts. 200, 228, 229, 230, 239, 240, 243, 249 & 274). The SEC's position appears to have been recognized by several courts in this District, which have held that Section 11 claims were properly derived from misstatements incorporated into prospectus supplements. *See, e.g.,In re Atlas Air,* 324 F.Supp.2d at 502;*Nanopierce Techs. v. Southridge Capital Mgmt. LLC,* No. 02 Civ. 0767(LBS), 2003 WL 22882137, at \*4 (S.D.N.Y. Dec.4, 2003). Accordingly, the February 13, 2003 prospectus supplement, and the Exchange Act filings it expressly incorporates, may serve as a basis for Section 11 liability.

**\*34** Defendants also argue that the Complaint fails to meet the pleading requirements of Rule 9(b). The Second Circuit, in *Rombach v. Chang,* 355 F.3d 164 (2d Cir.2004), established "that the heightened pleading standard of Rule 9(b) applies to Section 11 and Section 12(a)(2) claims insofar as the claims are premised on allegations of fraud."*Id.* at 171.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----, 2006 WL 2057194 (S.D.N.Y.)
**(Cite as: --- F.Supp.2d ----)**

Rule 9(b) applies even where plaintiffs deny that their claims sound in fraud, so long as "the wording and imputations of the complaint are classically associated with fraud."*Id.* at 172.

Here, Plaintiffs clearly allege fraud. The exact phrases held to be indicative of fraud allegations in *Rombach,* "that the Registration Statement was ' inaccurate *and* misleading;' that it contained ' *untrue* statements of material facts," ' *id.,* are repeated verbatim in the Complaint. (Compl.¶ 856.) In fact, prior to the statement of the Section 11 count, the entire Complaint sounds in fraud. Plaintiffs cannot "repeat and reallege each and every allegation contained" in the Complaint (Compl.¶ 853), and then attempt to disclaim those allegations in the very next paragraph by stating, " [a]ll of the preceding allegations of fraud or fraudulent conduct and/or motive are specifically excluded" from the Section 11 count. (Compl.¶ 854.)

In requiring heightened pleading for Section 11 claims sounding in fraud, *Rombach* emphasized the reputational interests Rule 9(b) seeks to protect. 355 F.3d at 171. Allowing plaintiffs to allege fraud over nine-hundred paragraphs and then withdraw those claims for eight paragraphs in order to state a Section 11 claim eviscerates Rule 9(b)'s mandate to "safeguard a defendant's reputation from improvident charges of wrongdoing."*Id.* (citing *O'Brien v. Nat'l Property Analysts Partners,* 936 F.2d 674, 676 (2d Cir.1991)). Plaintiffs must either provide sufficient allegations of the defendants' fraudulent intent, or withdraw allegations of fraud against certain defendants and allege those defendants' negligence.

Because the heightened pleading requirements of Rule 9(b) apply, Plaintiffs must adequately plead that MMC and the Individual Section 11 Defendants were reckless when the misleading statements incorporated into the February 13, 2003 Prospectus Supplement were made. As indicated above, *seesupra* Part IV.A.1.ii, Plaintiffs have only pleaded that MMC and Marsh were reckless at the time the Prospectus Supplement was filed. Because Marsh did not sign the registration statement or the Exchange Act filings incorporated therein, Count III

is sustained as to MMC and dismissed against the remaining Individual Section 11 Defendants and D & T.[FN18]

C. Section 18 Claims

Section 18 provides an alternative to Section 10(b) for plaintiffs seeking to hold defendants liable for Exchange Act filings containing materially false or misleading statements. Unlike Section 10(b)'s relaxed standard for pleading reliance, however, Section 18 requires that plaintiffs allege actual reliance on specific statements in covered Exchange Act filings. *See*15 U.S.C. § 78r(a); *Heit v. Weitzen,* 402 F.2d 909, 916 (2d Cir.1968) ("Reliance on the actual 10K report is an essential prerequisite for a Section 18 action and constructive reliance is not sufficient.").

**\*35** Here, Plaintiffs allege, "[i]n connection with the purchase of the Company's securities, Lead Plaintiffs and all other members of the Class, and/or their respective agents, specifically read and relied upon" MMC's Exchange Act filings, "including statements regarding the Company's financial condition and revenue figures."(Compl.¶ 871.) The Court, however, has concluded that statements regarding MMC's finances were not misleading. *See supra* Part IV.A.1.i.b(1)-(4) & (6). Plaintiffs do not properly allege that they made purchases or sales of securities in reliance upon the narrow class of alleged misstatements that are actionable. Therefore, as pleaded, Plaintiffs' reliance allegations are insufficient. Pursuant to the language of Section 18, Plaintiffs must allege that they personally read specific actionable misstatements in MMC filings covered by Section 18, and then purchased or sold securities in reliance on those misstatements. 15 U.S.C. § 78r. As Plaintiffs fail to make this pleading, the Section 18 claim is dismissed against all defendants.

D. Control Person Claims: Section 15 and Section 20(a)

Both Section 20(a) of the Exchange Act and Section 15 of the Securities Act create secondary liability

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

for persons who control primary violators of the provisions of those Acts. Courts in this District routinely examine Section 15 claims under the standard applied to Section 20(a) claims. *See DeMaria v. Andersen,* 153 F.Supp.2d 300, 314 (S.D.N.Y.2001), *aff'd* 318 F.3d 170 (2d Cir.2003); *In re Am. Bank Note Holographics, Inc. Sec. Litig.,* 93 F.Supp.2d 424, 441 (S.D.N.Y.2000). On the face of each statute, Section 20(a) and Section 15 have entirely different mens rea requirements: Section 20(a) provides a good faith defense, while Section 15 liability attaches on the basis of mere negligence. As such, it initially seems counterintuitive to use the same framework to consider the two provisions. Yet, in this case, Plaintiffs' Section 11 claims are premised on allegations of fraud. *See supra* Part IV.B. It follows from *Rombach's* heightened pleading requirements for Section 11 violations sounding in fraud that the pleading requirements for the corresponding control person claim are also greater. As such, analysis of the two types of control person claims will proceed in parallel.

To establish a prima facie case of a control person claim, Plaintiffs must allege: (1) an underlying primary violation; (2) the defendant's control over the primary violator; and (3) the defendant's culpable participation in the primary violation. *See Boguslavsky v. Kaplan,* 159 F.3d 715, 720 (2d Cir.1998) (citing *SEC v. First Jersey Sec., Inc.,* 101 F.3d 1450, 1472 (2d Cir.1996)). As discussed above, *see supra* Parts IV.A.1 & B, Plaintiffs adequately plead primary violations of Section 11 by MMC, and Section 10(b) by MMC, Marsh, and, for a limited period, Greenberg and Egan. Accordingly, the focus is on Defendants' control and culpable participation of these primary violators.

**\*36** The Second Circuit has only briefly addressed the control and culpable participation prongs, and without distinguishing between its analyses of those two distinct prongs. *See Suez Equity Investors,* 250 F.3d at 101-02; *First Jersey,* 101 F.3d at 1472-73. Courts in this District, however, have generally found that control is adequately alleged with a " short, plain statement that gives the defendant fair notice of the claim that the defendant was a control person and the ground on which it rests its assertion."

*In re Worldcom,* 294 F.Supp.2d at 415-16 (citing *Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 512, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002)). The Section 15 defendants include various officers and directors of MMC, while the Section 20(a) defendants include officers and directors of both MMC and Marsh. Only Defendants Egan, Sinnott, and the Independent Directors contest Plaintiffs' allegations of control. As will soon be discussed, Plaintiffs fail to adequately plead the culpable participation of Sinnott or the Independent Directors, thus the Court will only address control with respect to Egan.

Plaintiffs allege that Egan was the Chief Operating Officer of primary violator Marsh during a substantial portion of the Class Period, the supervisor of employees that were directly involved in bid-rigging, and an active participant in the framework for staff performance evaluations, which allegedly took steering into account. (Compl.¶ 819.) These allegations of daily operational control over Marsh are more than adequate to establish Egan's control for Section 20(a).

The standard of pleading required for culpable participation has been the subject of great debate in this District. One of the more comprehensive discussions in recent years may be found in *In re Livent, Inc. Noteholders Sec. Litig.,* 151 F.Supp.2d 371 (S.D.N.Y.2001), in which Judge Marrero surveyed the diverging positions in this District regarding both the existence of the culpable participation prong and the pleading standard required for its satisfaction. *Id.* at 413-18; *see also In re Alstom SA,* 406 F.Supp.2d at 490-92 (Marrero, J.). Judge Marrero ultimately held that plaintiffs must, at a minimum, plead recklessness in the same sense required by Section 10(b). *See In re Livent,* 151 F.Supp.2d at 417. This Court has followed a similar approach in recent years, *see, e.g., In re AOL Time Warner,* 381 F.Supp.2d at 235, and in the absence of Second Circuit precedent to the contrary, will continue along that course.

Accordingly, per the Court's discussion of scienter above, *see supra* Part IV.A.1.ii, only MMC, Marsh, Greenberg, and Egan may be considered culpable participants in the fraud for purposes of Section 20(a). As each of these Section 20(a) defendants

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----                                        Page 33

--- F.Supp.2d ----, 2006 WL 2057194 (S.D.N.Y.)
**(Cite as: --- F.Supp.2d ----)**

also had control over primary violators, the Section 20(a) claims are adequately pleaded against them. With respect to the Section 15 claim, the Plaintiffs have not raised a strong inference of scienter for any of the named Section 15 defendants at the time the relevant registration statement was filed. Accordingly, the Section 15 claim is dismissed against all defendants.

### E. State Law Claims

**\*37** In addition to their federal securities claims, Plaintiffs assert a handful of state law claims on behalf of the Pension Fund Subclass. As an initial matter, the Court will exercise supplemental jurisdiction over the state law claims. The Plaintiffs have stated valid federal claims, and there is insufficient confusion of issues to persuade the Court to decline jurisdiction of the remaining claims. Specific defenses to each of the state law claims are discussed below.[FN19]

### 1. Common Law Fraud and Deceit

Despite some similarities between common law fraud and Rule 10b-5 claims, the two actions maintain meaningful distinctions. Pertinent to the instant action, a plaintiff alleging common law fraud may not rely on the fraud on the market presumption, but must demonstrate actual reliance on the alleged misrepresentations. See *Banque Arabe Et Internationale D'Investissement v. Maryland Nat'l Bank,* 850 F.Supp. 1199, 1221 (S.D.N.Y.1994) *aff'd* 57 F.3d 146 (2d Cir.1995); *Kaufman v. i-Stat Corp.,* 165 N.J. 94, 97-98, 754 A.2d 1188, 1189 (N.J.2000); *In Re Donahue Sec., Inc.,* No. 01-0127, 2004 Bankr.LEXIS 1955, at \*17 (Bankr.S.D.Ohio Nov. 23, 2004). As discussed in the context of Plaintiffs' Section 18 claims, *see supra* Part IV.C, the Complaint fails to adequately allege actual reliance on any of the narrow class of misrepresentations sustained by this Opinion. Accordingly, Plaintiffs' common law fraud claims are dismissed against all Defendants.

### 2. Negligent Misrepresentation

Negligent misrepresentation claims must be pleaded with particularity pursuant to Rule 9(b). *AIG Global Sec. Lending Corp. v. Banc of America Sec. LLC,* 254 F.Supp.2d 373, 389 (S.D.N.Y.2003). As such, Plaintiffs must particularly allege the elements of their negligent misrepresentation claim in compliance with the specific requirements of state law.

For instance, a New Jersey claim for negligent misrepresentation requires that a plaintiff allege actual reliance. *Kaufman,* 754 A.2d at 1195 (establishing that the element of reliance is identical for negligent misrepresentation and common law fraud). Similarly, Ohio state law requires that a plaintiff plead actual reliance on an affirmative false statement. See *Davis v. DCB Fin. Corp.,* 259 F.Supp.2d 664, 672 (S.D.Ohio 2003); *Flanagan Lieberman Hoffman & Swaim v. Transamerica Life and Annuity Co.,* 228 F.Supp.2d 830, 851 (S.D.Ohio 2002) (requiring that a plaintiff plead reliance on "an affirmative false statement" because "a claim for negligent misrepresentation does not apply to omissions"). Plaintiffs' failure to properly plead reliance has already been established in connection with their Section 18 claim. *See supra* Part IV.C. Therefore, Plaintiffs' negligent misrepresentation claims are dismissed for their failure to properly plead reliance in accordance with the specific standards of these jurisdictions.

Further, under New York law, negligent misrepresentation claims made in connection with the purchase or sale of securities are preempted by the Martin Act, N.Y. Gen. Bus. Law §§ 352 et seq. See *Pro Bono Invs., Inc. v. Gerry,* No. 03 Civ. 4347, 2005 WL 2429787, at \*16 (S.D.N.Y. Sept. 30, 2005) (discussing and rejecting the opinions dissenting from the majority position regarding Martin Act preemption of negligent misrepresentation claims); *Granite Partners, L.P. v. Bear, Stearns & Co.,* 17 F.Supp.2d 275, 291-92 (S.D.N.Y.1998). Consequently, Plaintiffs' negligent misrepresentation claim is dismissed in its entirety.

### 3. State Securities Laws

**\*38** Finally, Count VIII alleges violations of state

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----                                    Page 34

--- F.Supp.2d ----, 2006 WL 2057194 (S.D.N.Y.)
(Cite as: --- F.Supp.2d ----)

securities laws. Regardless of the state law applied, Plaintiffs' claims are defective. In New York, Plaintiffs' claims are once again barred by the Martin Act, which omits a private right of action for the violation of New York state securities laws. *CPC Int'l Inc. v. McKesson Corp.,* 70 N.Y.2d 268, 275-76, 519 N.Y.S.2d 804, 514 N.E.2d 116 (N.Y.1987). Meanwhile, in Ohio, securities plaintiffs must allege their reliance on false representations. *Nickels v. Koehler Mgmt. Corp.,* 541 F.2d 611, 617 (6th Cir.1976). The Court has already noted the Complaint's defects in this capacity. *Seesupra* Part IV.C. Finally, although New Jersey's Uniform Securities Law, N.J. Stat. Ann. §§ 49:3-47 et seq., does not require reliance, it "requires privity in securities-fraud actions and thus will not allow [Plaintiffs] to reach the issuer of [their] shares or its officers."*Kaufman,* 754 A.2d at 1197 (citing N.J. Stat. Ann. §§ 49:3-71). Consequently, Plaintiffs are unable to establish privity, and their state securities law claims must be dismissed under New Jersey law as well . [FN20]

### V. CONCLUSION

As set forth above, Defendants' motions to dismiss are granted in part and denied in part. The Section 10(b) and 20(a) claims are dismissed against all Defendants with the exception of MMC, Marsh, Greenberg and Egan, while the Section 11 claim is dismissed against all Defendants with the exception of MMC. The remaining claims are dismissed against all Defendants.

As several of Plaintiffs' claims have been sustained and others merely suffer from pleading deficiencies, Plaintiffs may submit to the Court, no later than August 18, 2006, a proposed Second Amended Complaint. The Second Amended Complaint shall be accompanied by a Memorandum of Law indicating how the defects in the Complaint have been cured. Thereafter, the Court will either grant leave to amend, or enter an Order dismissing the still defective portions of the Complaint with prejudice.

SO ORDERED.

FN1. Plaintiffs name both parent corporation Marsh & Mclennan Companies, Inc. and its wholly owned subsidiary, Marsh, Inc., as defendants. For clarity, these entities will be referred to as MMC and Marsh, respectively. Because the Complaint often refers to the parent and its subsidiary collectively, the Court attempted to distinguish between the two in the context of the specific allegations of the Complaint. Where the Court was unable to determine which entity a specific allegation referred to, the two entities are collectively referred to as MMC. Upon amending their Complaint, Plaintiffs are ordered to appropriately distinguish between the two entities wherever feasible. For instance, Plaintiffs commonly refer to the Global Broking division as being a segment of the collective Company, when it is clearly a division of the Marsh subsidiary. On amendment, the division is to be properly identified.

FN2. Plaintiffs premise Defendant Bischoff's liability on a single statement allegedly made by Bischoff during the Class Period. (Compl.¶ 629.) In his motion to dismiss, Defendant Egan takes responsibility for the statement falsely attributed to Bischoff. (Egan Mot. to Dismiss 9 & n. 11.) The Court credits this affirmation by Egan and dismisses all claims against Bischoff. Consequently, Bischoff is omitted from the following discussion.

FN3. The Complaint alleges that a previously unidentified Defendant "Davis" is liable on Counts III, IV, and V. (Compl.270, 272, 274.) As Defendant Davis is not identified elsewhere in the Complaint or referred to in any of Plaintiffs' opposition briefs, the allegations against Davis are not pleaded with sufficient particularity, thus all claims against that defendant are dismissed. Further, the Complaint omits Defendants Rapport and Wijnberg from the list of

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----, 2006 WL 2057194 (S.D.N.Y.)
(Cite as: --- F.Supp.2d ----)

Defendants liable on Count III, yet includes those defendants in its list of Individual Section 11 Defendants. ( Compare Compl. ¶ 73, with Compl. 270.) Reading the Complaint in the light most favorable to the plaintiffs, the Court will assume that Plaintiffs intended to allege that Defendants Rapport and Wijnberg are liable on Count III. This and other errors identified in the following footnotes are to be corrected on amendment of the Complaint if Plaintiffs wish to replead their claims against these defendants.

FN4. The Complaint lists Defendant Groves as liable on Count IV, while Plaintiffs' opposition briefs specifically omit Groves from the list of defendants liable on Count IV. (Compl. 272; Pls.' Omnibus Opposition 23.) As Count IV is dismissed against all individual defendants, seeinfra Part IV.D, the discrepancy is irrelevant to this Opinion.

FN5. The Complaint alleges that MMC is liable on Counts V, VI, VII, and VIII, while Plaintiffs' opposition brief ambiguously omit the corporate defendant from these counts. (Pls.' Omnibus Opposition 23-24.) Reading the Complaint in the light most favorable to the plaintiffs, the Court will assume that Plaintiffs intended to state a claim against MMC for Counts V, VI, VII, and VIII.

FN6. Similar descriptions are contained in MMC's 2000, 2001, and 2002 10-Ks and its 2002 and 2003 Annual Reports. (Compl. ¶¶ 391, 438, 491, 508, 587.) However, Plaintiffs do not adequately explain how MMC's description of contingent commissions in the 1999 10-K is misleading. That statement focuses solely on the calculation of contingent commissions, asserting that they are based on "the overall volume of business placed by the broker with [an] insurer, the aggregate commissions paid by the insurer during specific periods, or the loss

performance to the insurer of that business. "(Compl.¶ 349.) This description of how contingent commissions are calculated is not substantially different from what Plaintiffs allege. Plaintiffs argue that MMC's later disclosures are misleading because the services allegedly provided in return for contingent commissions were nonexistent, concealing the fact that the commissions were "kickbacks" for steering business. This rationale does not apply to the description of contingent commissions in the 1999 10-K.

FN7. Of course, Rule 9(b) and the PSLRA also require that plaintiffs plead a strong inference of fraudulent intent. The Court discusses the scienter requirement below. Seeinfra Part IV.A.1.ii.

FN8. Similar representations regarding Marsh's purportedly cost-effective, client-focused insurance placement are scattered throughout the Complaint. (See Compl. ¶¶ 476, 502, 577, 618, 620, 624.)

FN9. Although Plaintiffs attribute this statement to Defendant Bischoff, Defendant Egan has taken responsibility for the statement. (Egan Mot. to Dismiss 9 n. 11.) Seesupra note 2.

FN10. Although the statements in the unaudited sections of Marsh's 10-K filings regarding the services provided for contingent commissions plead actionable misstatements, Plaintiffs do not adequately allege that these misstatements are evidence that MMC engaged in fraudulent accounting. The Complaint is devoid of allegations that MMC's financial statements misreported the collection of contingent commissions or the existence of expenses associated with MMC's purported market services.

FN11. Plaintiffs' argument that D & T breached its obligation to ensure the " overall accuracy" of unaudited documents

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
Page 36

--- F.Supp.2d ----, 2006 WL 2057194 (S.D.N.Y.)
**(Cite as: --- F.Supp.2d ----)**

in MMC's SEC filings is similarly unpersuasive. (Pls.' Opp. to D & T 15.) The provision on which Plaintiffs rely specifically notes that "the auditor has *no obligation* to perform any procedures to corroborate other information contained in a document," but that the auditor "should read the other information and consider whether such information is ... materially inconsistent with information ... appearing in the financial statements."AU § 550.04 (emphasis added). Plaintiffs do not allege that any of the statements in the unaudited portions of MMC's 10-K filings were materially inconsistent with any specific parts of MMC's audited financial statements. Further, even if Plaintiffs had sufficiently pleaded a violation of this provision, *Wright* specifically prohibits Section 10(b) liability for accountants absent an affirmative misstatement.

FN12. D & T briefly address Plaintiffs' allegations of motive and opportunity. *See infra* Part IV.A.1.ii.c.

FN13. Defendants contest the Complaint's reliance on the statements of confidential witnesses. While not all of the allegations based on confidential witness statements here are pleaded with particularity (e.g., allegations of vague "complaints made to Marsh's senior management" (Compl. ¶¶ 79, 92)), others, especially concerning general communication within the Global Broking division about steering (*see, e.g.,* Compl. ¶¶ 81, 84), provide "a sufficient general description of the personal sources of the plaintiffs' beliefs" to be considered at the pleading stage. *Novak,* 216 F.3d at 314.

FN14. Although the allegations of misconduct at MMC's other subsidiaries do not establish the individual defendants' scienter, the allegations of misconduct at those subsidiaries is not so irrelevant, duplicative, or prejudicial that it need be stricken from the Complaint. In fact, as

pleaded, the fraud at Mercer bears some resemblance to the fraud that allegedly took place at Marsh. *SeeIn re Royal Ahold N.V. Sec. & ERISA Litig.,* 351 F.Supp.2d 334, 398-99 (D.Md.2004) (denying motion to strike allegations about similar fraudulent schemes at the parent company's other subsidiaries). In addition, joined with the Complaint's other scienter allegations, the fraud at Mercer and Putnam bears on Defendants' awareness or reckless disregard of a breakdown in MMC's internal controls. It should be noted, however, that the decision to allow these allegations neither undermines the need for Plaintiffs to provide sufficient allegations of Defendants' scienter with respect to the fraud at Marsh, nor does it bear on the scope of discovery that should be allowed with respect to these allegations, any limits that may be placed on such discovery, or any limiting instructions that would be required at trial.

FN15. In MMC's 10-K filings and Annual Reports from 2000 to 2003, the Company represents that it received contingent commissions in return for various market services. Though the language used to describe these services differs, MMC consistently refers to new product development, access to the global insurance market, new technology, and administrative services.

FN16. See *supra* Part II.A for a description of each Senior Management Defendant's position at the Company.

FN17. As noted above, *seesupra* Part IV.A, Rule 10b-5(a) & (c) codifies prohibition of the following activities: "(a) To employ any device, scheme, or artifice to defraud;" or "(c) To engage in any act, practice, or course of business, which operates or would operate as a fraud or deceit upon any person."17 C.F.R. § 40.10b-5.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----                                                                    Page 37

--- F.Supp.2d ----, 2006 WL 2057194 (S.D.N.Y.)
**(Cite as: --- F.Supp.2d ----)**

FN18. Plaintiffs argue that *In re Atlas Air* sufficiently distinguishes *Rombach,* and is sufficiently analogous to this case, to militate against dismissal. *In re Atlas Air,* however, merely recognized that Section 11 claims could be stated against defendants for whom scienter was not adequately pleaded if the plaintiffs " remov[ed] their allegations of scienter with respect to" those defendants. 324 F.Supp.2d at 503. Here, given the Complaint's pervasive allegations of fraud against over a dozen Individual Section 11 Defendants (Compl.¶¶ 748, 827), the Court will require Plaintiffs to choose between allegations of fraud or negligence when amending their Complaint, rather than to make that choice for them. *SeeLone Star Ladies Inv. Club v. Schlotzsky's, Inc.,* 238 F.3d 363, 368-69 (5th Cir.2001), *cited inRombach,* 355 F.3d at 176.

The Section 11 claim against D & T is dismissed for the additional reason that Plaintiffs fail to state any actionable misrepresentations in the 2001 10-K that may be attributed to that defendant. Consequently, Plaintiffs may not adequately replead the Section 11 claim against D & T simply by dropping its allegations of the auditor's fraudulent intent.

FN19. Because many of the asserted state law claims have pleading requirements and elements similar to the federal securities claims, the discussion of these claims will be brief. Where applicable, citations are provided for Ohio, New Jersey, and New York, the respective residencies of Co-Lead Plaintiffs and MMC.

FN20. Plaintiffs assert that their purchase of securities from the February 13, 2003 bond offering properly establishes their privity with MMC. As Defendants note, however, a firm commitment underwriting, as was utilized here (*See* Holton Decl. Ex. R at S-5), does not create privity between an issuer and its investors. *SeeAkerman v.*

*Oryx Comms., Inc.,* 810 F.2d 336, 344 (2d Cir.1987). This is for the simple reason that investors do not acquire title directly from the issuer, but from the underwriters who have purchased the securities for sale to investors.*Id.*

S.D.N.Y.,2006.
In re Marsh & McLennan Companies, Inc. Securities Litigation
--- F.Supp.2d ----, 2006 WL 2057194 (S.D.N.Y.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

7

Westlaw.

Slip Copy                                                                    Page 1

Slip Copy, 2007 WL 141059 (W.D.Pa.)
**(Cite as: Slip Copy)**

▷

**Official** Committee of Unsecured Creditors of
**Allegheny** Health, Educ. and Research Foundation
v. Pricewaterhouse Coopers, LLP
W.D.Pa.,2007.
Only the Westlaw citation is currently available.
United States District Court,W.D. Pennsylvania.
The **OFFICIAL** COMMITTEE OF UNSECURED
CREDITORS OF **ALLEGHENY** HEALTH,
EDUCATION AND RESEARCH FOUNDATION,
Plaintiff,
v.
PRICEWATERHOUSE COOPERS, LLP,
Defendant.
**No. 2:00cv684.**

Jan. 17, 2007.

David S. Torborg, Jones Day, Washington, DC,
Douglas A. Campbell, Stanley E. Levine, Campbell
& Levine, James M. Jones, John G. Unice, Jones
Day, Pittsburgh, PA, John Kevin Cogan, Jones Day,
Columbus, OH, Richard B. Whitney, Jones, Day,
Reavis & Pogue, Cleveland, OH, for Plaintiff.
Francis P. Barron, Cravath, Swaine & Moore, New
York, NY, Joseph F. McDonough, Robert D.
Finkel, Manion, McDonough & Lucas, Anthony P.
Picadio, Picadio, McCall, Miller & Norton, Joseph
P. Pohl, III, Mary J. Hackett, Reed Smith,
Pittsburgh, PA, for Defendant.
Laura E. Ellsworth, Jones Day, Pittsburgh, PA.

DAVID STEWART CERCONE, United States
District Judge.

*1 In July of 1998, the Allegheny Health, Education
& Research Foundation ("AHERF") and certain of
its affiliates filed for bankruptcy. AHERF was a
nonprofit Pennsylvania corporation which was one
of the largest nonprofit, integrated healthcare

systems in the country. Prior to the bankruptcy,
Coopers & Lybrand, L.L.P.("CL") audited the
financial statements of AHERF and its affiliates or
their predecessors. PricewaterhouseCoopers, L.L.P.
("PwC"), the successor to CL, was formed in July
of 1998 from the merger of Price Waterhouse
L.L.P. and CL.

Plaintiff, the Official Committee of Unsecured
Creditors of AHERF (the "Committee") filed this
action on behalf of the AHERF estates against PwC
alleging professional negligence, breach of contract,
and aiding and abetting breaches of fiduciary duty
committed by certain members of AHERF's
management. These claims by the Committee are
based upon CL's audits of AHERF's financial
statements for the fiscal years 1996 and 1997 [FN1].
PwC has filed a motion for summary judgment, the
Committee has responded and, after argument in
open court, the motion is now before the Court.

> FN1. These fiscal years ended on June 30,
> 1996 and June 30, 1997, respectively.
> Amended Complaint ¶ 31.

PwC is a limited liability partnership that provides
accounting and auditing services. PwC's Statement
of Undisputed Material Facts ("PwC's SUMF") ¶
1. PwC has an office in Pittsburgh. *Id.* AHERF was
a nonprofit Pennsylvania corporation, which, prior
to filing bankruptcy, operated as the parent
company for a number of affiliates in the greater
Pittsburgh and Philadelphia areas. PwC's SUMF ¶
¶ 3 & 4.

On July 21, 1998, AHERF filed for bankruptcy
under Chapter 11 of the Bankruptcy Code. PwC's
SUMF ¶ 5. On that same day, the following
AHERF affiliates also filed for bankruptcy: (1)
Allegheny University Hospitals, East ("AUH-East")
[FN2]; (2) Allegheny University Medical Practices ("

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                        Page 2

Slip Copy, 2007 WL 141059 (W.D.Pa.)
**(Cite as: Slip Copy)**

AUMP") [FN3]; (3) Allegheny Hospitals, Centennial ("AH-Centennial") [FN4]; and (4) Allegheny University of the Health Sciences ("AUHS") [FN5] (collectively, including AHERF, "Debtors").*Id.* AHERF affiliates that did not file bankruptcy include: (1) Allegheny General Hospital ("AGH"); (2) Allegheny University Medical Centers ("AUMC") [FN6]; and (3) Allegheny Hospitals, New Jersey(" AH-NJ")(collectively the "Non-Debtor Affiliates"). PwC's SUMF ¶ 11. The Committee was appointed to represent the creditors of the Debtor and is comprised of: MBIA Insurance Co.; PNC Bank; the Bank of New York, as trustee for the Centennial bondholders; Aetna U .S. Healthcare, Inc.; and Coventry Corporation. PwC's SUMF ¶ 6.

> FN2. AUH-East operated five hospitals in the Philadelphia area: (1) Allegheny University Hospitals, MCP (formerly known as the Medical College of Pennsylvania Hospital); (2) Allegheny University Hospitals, Hahnemann (formerly known as Hahnemann University Hospital); (3) Allegheny University Hospitals, Bucks County; (4) Allegheny University Hospitals, Elkins Park; and (5) St. Christopher's Hospital for Children. PwC's SUMF ¶ 7.

> FN3. AUMP owned and managed a number of physician practices in the greater Pittsburgh and Philadelphia areas. PwC's SUMF ¶ 8.

> FN4. AH-Centennial operated four hospitals in Philadelphia: (1) The Graduate Hospital; (2) City Avenue Hospital; (3) Parkview Hospital; and (4) Mt. Sinai Hospital, which closed in October of 1997. PwC's SUMF ¶ 9. The Centennial hospitals were part of the Graduate Health System, Inc. ("GHS") until October 31, 1996, at which point the three GHS subsidiaries that owned them were merged into SDN, Inc. Committee's Statement of Undisputed Material Facts ("Comm's SUMF") ¶ 17. On May 1, 1997, SDN, Inc. Changed its name to AH-Centennial.

> *Id.*

> FN5. AUHS was an accredited university in Philadelphia that owned and operated the MCP-Hahnemann School of Medicine. PwC's SUMF ¶ 10.

> FN6. AUMC operated the following community hospitals in the Pittsburgh area: (1) Forbes Regional Hospital; (2) Forbes Metropolitan Hospital; (3) Forbes Nursing Center; (4) Forbes Hospice; (5) Allegheny Valley Hospital; and (6) Canonsburg General Hospital. PwC's SUMF ¶ 13.

Certain AHERF affiliates were members of obligated groups, on whose behalf state and local authorities issued municipal bonds. PwC's SUMF ¶ 18. As of June 30, 1996, AHERF had two obligated groups, the Allegheny General Hospital Obligated Group ("AGHOG") and the Delaware Valley Obligated Group ("DVOG"). PwC's SUMF ¶ 19. The DVOG included Debtors AUH-East and AUHS. PwC's SUMF ¶ 20. The DVOG bonds were issued in June of 1996, and all the bonds were either insured by MBIA, Inc., or secured by a stand-by letter of credit from PNC Bank. *Id.*

**\*2** As of June 30, 1997, AHERF had five obligated groups: AGHOG; DVOG; the AUMC Obligated Group; the AG-Centennial Obligated Group; and AH-NJ Obligated Group. PwC's SUMF ¶ 21. The AUMC, the AG-Centennial, and AH-NJ Obligated Groups comprised affiliates that joined the AHERF system in the 1997 fiscal year and remained liable on bonds issued prior to their affiliation with AHERF. *Id.* All the bonds for the AHERF obligated groups were issued prior to June 30, 1996. PwC's SUMF ¶ 22.

Sherif S. Abdelhak ("Abdelhak") was AHERF's President and Chief Executive Officer ("CEO") from 1986 until June 5, 1998. PwC's SUMF ¶ 23. As CEO, Abdelhak had overall executive responsibility for AHERF and its affiliates. *Id.* Abdelhak was also a member of the Boards of Trustees of AHERF, AUHS, AUH-East, AH-Centennial, AUMP, AGH and AUMC. *Id.* David W. McConnell ("McConnell") served as

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2007 WL 141059 (W.D.Pa.)
**(Cite as: Slip Copy)**

Executive Vice President and Chief Financial Officer ("CFO") of AHERF from November of 1991 until June of 1998. PwC's SUMF ¶ 24. McConnell also served as the Treasurer of AUHS, AH-Centennial and AUMC, and as Assistant Treasurer of AUH-East and AGH. Id. McConnell reported to Abdelhak. PwC's SUMF ¶ 32.

The Committee contends that in the late 1980's, Abdelhak, McConnell and others among the AHERF System's senior management ("senior management"), acting in concert with AHERF's Trustees, adopted the view that in order to prosper in a changing market for healthcare institutions, AHERF must grow by acquisition of hospitals, educational institutions, research facilities and medical practices. Amended Complaint ¶ 15. The theory underlying such growth was in part that healthcare providers needed to achieve economies of scale and an assured supply of patient revenue through the acquisition of geographically-proximate hospitals and physician practices. Id. The Committee avers that AHERF pursued this " economies of scale" strategy though a series of ill-advised and unjustifiable acquisitions, beginning in 1988 and continuing through the decade of the 1990's. Id. Further, AHERF never took the steps necessary to implement its "synergistic" strategy, as it failed to perform the proper due diligence, cut overhead costs or develop and employ the operational infrastructure essential to achieving the promised "economies of scale." Id.

The Committee directs this Court to various examples of AHERF's failed business strategies during the above-mentioned time period. In 1988, AHERF acquired MPC, which operated a medical school and associated hospital in Philadelphia. Amended Complaint ¶ 16. At the time of the acquisition, the Committee contends that MCP was in serious financial distress, and agreed to the acquisition only after AHERF pledged a capital infusion of $40-60 million into MCP over a five year period. Id.

Through the 1990's, senior management acting with the knowledge of and in concert with certain AHERF Trustees, continued to pursue similar acquisitions of failing institutions. Amended

Complaint ¶ 18. In 1991, AHERF acquired the United Health System ("United"), which operated St. Christopher's Hospital for Children in Philadelphia and three suburban hospitals. Amended Complaint ¶ 19. At that time, the Committee contends that the three hospitals were struggling financially, and United was headed for bankruptcy. Id. AHERF's Board approved the acquisition of the four hospitals. Amended Complaint ¶ 20. In so doing, AHERF assumed the hospitals' $137 million in long term debt. Id. Two years later, AHERF acquired Hahnemann University Medical School and its associated medical center, Hahnemann University Hospital. Amended Complaint ¶ 21.

*3 In 1996, despite "already straining under the load of its debt-ridden and failing acquisitions," AHERF negotiated a plan to acquire six more hospitals in the Philadelphia area that were owned by the Graduate Health System ("GHS"). Amended Complaint ¶ 22. The Committee contends that the GHS hospitals were already losing millions of dollars every month. Amended Complaint ¶ 23. While pursuing the GHS hospitals, AHERF also acquired five hospitals in the Greater Pittsburgh market including four hospitals that made up the Forbes Health System and Allegheny Valley Hospital. Amended Complaint ¶ 26. The acquisition of the GHS and Pittsburgh area hospitals added $282 million of under-secured bond debt to the AHERF System's consolidated balance sheet. Amended Complaint ¶¶ 25 & 26. The Committee also avers that AHERF, in the latter half of the 1990's, purchased the practices of hundreds of primary care physicians practicing in the Philadelphia and Pittsburgh markets which produced "staggering losses" to the AHERF System. Amended Complaint ¶ 21.

CL was retained by AHERF to audit AHERF's consolidated financial statement for the fiscal year 1996, and to audit the separate financial statements of AGHOG, DVOG and the Allegheny Integrated Health Group. PwC's SUMF ¶ 64. CL was also retained by AHERF to audit AHERF's consolidated financial statement for the fiscal year 1997, but not the separate financial statements of the obligated group affiliates. Id. CL was required to conduct the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                           Page 4

Slip Copy, 2007 WL 141059 (W.D.Pa.)
**(Cite as: Slip Copy)**

audits in accordance with generally accepted accounting standards ("GAAS") and other professional standards. Comm's SUMF ¶ 63.

The 1996 and 1997 engagement letters executed by CL and AHERF with regard to the audits provided, *inter alia:*
*REPRESENTATION FROM MANAGEMENT*
At the conclusion of the audits, AHERF management will provide to [CL] a representation letter for each respective report that ... will confirm management's responsibility for the preparation of the financial statements in conformity with generally accepted accounting principles, the availability of financial records and related data, the completeness and availability of all minutes of the Board and Committee meetings, management's responsibility for the entity's compliance with laws and regulations, the identification and disclosure to the auditor of all laws and regulations that have a direct and material effect on the determination of financial statement amounts and, to the best of their knowledge and belief, the absence of irregularities involving management or those employees who have significant roles in the control structure.

PwC's SUMF ¶ 66; PwC's Appendix at Tabs 51 & 52.

The Committee contends that CL violated numerous core auditing standards which caused AHERF's statements of operations and balance sheets for fiscal years 1996 and 1997 to be materially misstated. Comm's SUMF ¶¶ 256 & 257. Specifically, the Committee claims that AHERF's audited statement of operations overstated net income by more than $90 million in 1996 and by more than $150 million in 1997, turning positive net income into losses of approximately $80 million in 1996 and $130 million in 1997. Comm's SUMF ¶ 257. Further, AHERF's balance sheet overstated un restricted net assets by more than $80 million in 1996 and more than $240 million in 1997. *Id.*

**\*4** PwC, however, contends that AHERF management knowingly misstated AHERF's financial statements in both 1996 and 1997, alleging that McConnell directed the improper accounting entries, and Abdelhak was aware of the

misstatements. PwC's SUMF ¶¶ 31-35. Moreover, the Committee admits that the financial statements of AHERF and its affiliates for the fiscal years 1996 and 1997 were "materially misstated." Amended Complaint ¶ 36. It is further alleged that AHERF maintained internal schedules that showed two (2) sets of financial results, side by side: one side with the results provided to CL and reported externally; and the other side showing the actual financial results. PwC's SUMF ¶ 113. These internal schedules showing different sets of financial results were provided to McConnell and Abdelhak by the AHERF financial department. PwC's SUMF ¶ 114. Members of AHERF management who were certified public accountants were required by AICPA standards to be candid and forthcoming with CL. PwC's SUMF ¶ 68. Members of AHERF's management who were CPAs included: Stephen Spargo [FN7] ("Spargo"), Senior Vice President, Corporate Support Services for AHERF; Albert Adamczak [FN8] ("Adamczak"), Senior Director of Finance at AGH; and Daniel Cancelmi. PwC's SUMF ¶¶ 29, 39 & 68; Comm's SUMF ¶ 68. Spargo and Adamczak reported to McConnell. PwC's SUMF ¶ 32.

> FN7. Spargo was responsible for overseeing AHERF's consolidated accounting functions and interacting with AHERF's outside auditors from CL. PwC's SUMF ¶ 31.

> FN8. Adamczak's responsibilities included directing the accounting for AHERF and its western affiliates and interacting with AHERF's outside auditors from CL. PwC's SUMF ¶ 31.

CL, however, presented "clean opinions" of AHERF's audited financial statements for both fiscal-year 1996 and fiscal-year 1997, stating that the financial statements "present[ed] fairly, in all material respects, the consolidated financial position " of AHERF as of June 30, 1996 for fiscal-year 1996, and as of June 30, 1997 for fiscal-year 1997. Comm's SUMF ¶ 316. If, as part of its fiscal-year 1996 or 1997 audits, CL had accurately reported AHERF's financial condition and disclosed that the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

financial statements presented for audit were materially or intentionally misstated, or had it shared concerns over the competence and integrity of AHERF's financial management, the Committee contends that AHERF's Board of Directors (the " Board"), Audit Committee, and/or the "innocent, unaware and misinformed Trustees" would have acted to remedy AHERF's financial distress, which was nearly a decade in the making, and prevented AHERF's July 1998 bankruptcy. Comm's SUMF ¶ 146; Amended Complaint ¶ 41.

The audited financial statements failed to inform the Board that additional expansion activities could threaten AHERF's financial viability or that AHERF was in fact in financial distress. Comm's SUMF ¶ 318. Moreover, the Committee contends that CL's negligence allowed the financial deterioration of AHERF to continue into insolvency, and prevented the timely implementation of measures to reverse the decline of AHERF's financial condition. Amended Complaint ¶¶ 47 & 48. The Committee contends that AHERF was damaged by CL to the " full extent of [the] insolvency, which amount is in excess of $1 billion."Amended Complaint ¶ 49.

**5** Pursuant to FED. R. CIV. P 56(c), summary judgment shall be granted when there are no genuine issues of material fact in dispute and the movant is entitled to judgment as a matter of law. To support denial of summary judgment, an issue of fact in dispute must be both genuine and material, *i.e.,* one upon which a reasonable fact finder could base a verdict for the non-moving party and one which is essential to establishing the claim. *Anderson v. Liberty Lobby,* 477 U.S. 242, 248 (1986). When considering a motion for summary judgment, the court is not permitted to weigh the evidence or to make credibility determinations, but is limited to deciding whether there are any disputed issues and, if there are, whether they are both genuine and material. *Id.* The court's consideration of the facts must be in the light most favorable to the party opposing summary judgment and all reasonable inferences from the facts must be drawn in favor of that party as well. *Whiteland Woods,*

*L.P. v. Township of West Whiteland,* 193 F.3d 177, 180 (3d Cir.1999), *Tigg Corp. v. Dow Corning Corp.,* 822 F.2d 358, 361 (3d Cir.1987).

When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). In the language of the Rule, the nonmoving party must come forward with "specific facts showing that there is a genuine issue for trial."FED. R. CIV. P 56(e). Further, the nonmoving party cannot rely on unsupported assertions, conclusory allegations, or mere suspicions in attempting to survive a summary judgment motion. *Williams v. Borough of W. Chester,* 891 F.2d 458, 460 (3d Cir.1989) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986) ). The non-moving party must respond "by pointing to sufficient cognizable evidence to create material issues of fact concerning every element as to which the non-moving party will bear the burden of proof at trial."*Simpson v. Kay Jewelers, Div. Of Sterling, Inc.,* 142 F.3d 639, 643 n. 3 (3d Cir.1998), *quoting Fuentes v. Perskie,* 32 F.3d 759, 762 n. 1 (3d Cir.1994).

PwC contends that it is entitled to summary judgment on the Committee's claims based upon the following:
1. The Court of Appeals for the Third Circuit in *In re CitX Corp.,* 448 F.3d 672 (3d Cir.2006), found that a deepening insolvency theory of damages in invalid for a malpractice action, and that a claim of negligence cannot sustain a cause of action for deepening insolvency. Because the Committee seeks to recover damages that are similar to a deepening insolvency measure of damages which are precluded under *CitX,* PwC is entitled to summary judgment;
2. Senior management of AHERF, acting in the course of their employment, materially misstated AHERF's financial statements to its auditor, CL. Standing in the shoes of AHERF, the Committee was *in pari delicto* with CL, and their claims are barred;

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                          Page 6

Slip Copy, 2007 WL 141059 (W.D.Pa.)
**(Cite as: Slip Copy)**

*6  3. AHERF interfered with CL's audits by withholding material information, as well by providing CL with misleading information;

4. The Committee's sole contention of causation, which rests on the assertion that AHERF's Board, or its creditors, would have taken action to avoid bankruptcy if CL had done a proper audit, is entirely speculative;

5. CL did not audit Centennial or any of the Graduate hospitals, and therefore owed no duty to Centennial;

6. The Committee's breach of contract claim is duplicative of its professional negligence claims; and

7. The Committee's claim for aiding and abetting breach of fiduciary duty is not a recognized cause of action in Pennsylvania.

In its oral argument before the Court, PwC indicated that its strongest argument for summary judgment was based upon the Third Circuit's opinion in *CitX.*Because of this perceived importance, the Court has analyzed the parties contentions below. However, because this Court finds that the wrongdoing of AHERF's senior management must be imputed to AHERF, and that the doctrine of *in pari delicto* applies to bar the Committee's claims, the remaining arguments in favor of summary judgment need not be addressed at this time.

A. *Effect of In re CitX Corp.*

In *CitX*, an insolvent internet company involved in an illegal Ponzi scheme used its financial statements, compiled by its accounting firm, to attract investors. *In re CitX Corp.*, 448 F.3d at 674. The company spent the investors' money and incurred millions more in debt, then filed for bankruptcy. *Id.* The trustee in bankruptcy filed an action against the accounting firm responsible for compiling [FN9] the financial statements alleging, among other things, malpractice and "deepening insolvency." *Id.* In affirming the district court's grant of summary judgment to the accountants, the Third Circuit found that the trustee's evidence was insufficient show both harm and causation, based

largely upon a "sham" affidavit given by the debtor's Chief Operating Officer. In its analysis, the court stated that deepening insolvency was not "a valid theory of damages for an independent cause of action."*In re CitX Corp.*, 448 F.3d at 677. The court also concluded that "a claim of negligence cannot sustain a deepening [ ] insolvency cause of action." *Id.* at 681.

> FN9. Though it has no effect upon the Court's analysis in this instance, it should be noted that in the instant action, CL was engaged to audit the financial statements of AHERF, not to merely compile such information. The principal difference between the two is the degree and amount of responsibility undertaken by the accountant. In both types of engagements the accountant agrees to prepare financial statements. In an audited engagement, the accountant assumes responsibility for the accuracy of the figures appearing thereon. In effect, he warrants the reliability of the report which he prepares. In an unaudited engagement, the accountant does not warrant and is not responsible for the ultimate accuracy of the report if the figures supplied by the client are erroneous. *See Robert Wooler Co. v. Fid. Bank,* 479 A.2d 1027, 1030 (Pa.Super.1984).

PwC argues here that because the Committee seeks to recover damages that are similar to a deepening insolvency measure of damages precluded by *CitX,* PwC is entitled to summary judgment. The Court, however, finds that PwC's argument fails because: (1) the Committee has not claimed a cause of action based upon a deepening insolvency theory; (2) PwC did not move for summary judgment on the grounds that the Committee failed to offer sufficient proof of harm or damages [FN10]; and, (3) under a narrow reading of *CitX,* the damages alleged by the Committee in this action are not precluded.

> FN10. It must be noted that, in a separate motion, PwC did seek to exclude certain

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                            Page 7

Slip Copy, 2007 WL 141059 (W.D.Pa.)
**(Cite as: Slip Copy)**

damage testimony proffered by the Committee's expert. Though this Court has serious concerns regarding the Committee's measure of damages, the issue of harm to AHERF and the proper measure of damages, if any, shall be left for another day.

In determining whether deepening insolvency was a viable theory of damages for negligence, in light of its opinion in *Official Comm. of Unsecured Creditors v. R.F. Lafferty & Co.,* 267 F.3d 340 (3d Cir.2001), the Third Circuit stated:
*7 in predicting Pennsylvania law, [we defined " deepening insolvency"] as "an injury to [a debtor's] corporate property from the fraudulent expansion of corporate debt and prolongation of corporate life." *Lafferty,* 267 F.3d at 347. In that opinion, we concluded that deepening insolvency was a valid Pennsylvania cause of action. *Id.* at 344. Although we [described] deepening insolvency as a "type of injury," *id.* at 347, and a "theory of injury," *id.* at 349, we never held that it was a valid theory of damages for an independent cause of action. Those statements in *Lafferty* were in the context of a deepening-insolvency cause of action. They should not be interpreted to create a novel theory of damages for an independent cause of action like malpractice.

*In re CitX Corp.,* 448 F.3d at 677. Notwithstanding the court's finding that "[t]he deepening of a firm's insolvency is not an independent form of corporate damage," it further stated "[w]here an independent cause of action gives a firm a remedy for the increase in its liabilities, the decrease in fair asset value, or its lost profits, then the firm may recover, without reference to the incidental impact upon the solvency calculation."*In re Citx Corp.,* 448 F.3d at 678 (quoting Sabin Willett, The Shallows of Deepening Insolvency, 60 BUS. LAW. 549, 575 (2005)).

In the instant action, the Committee alleges " independent caus[es] of action" in the form of professional negligence, breach of contract, and aiding and abetting breach of fiduciary duty, which, if viable, give AHERF a "remedy for the increase in its liabilities, the decrease in fair asset value, or its

lost profits."Therefore, PwC is not entitled to summary judgment based upon the holding in *CitX.*

### B. *Equitable Doctrine of In Pari Delicto*

It is undisputed that the Committee stands in the shoes of the bankruptcy trustee and is authorized to prosecute any claims or causes of action that the debtor, AHERF, has against CL. *See* Opinion, Ziegler, J., January 28, 2002 at p. 6. Understanding the dynamics of the action then, the Committee essentially claims that AHERF followed a fatally flawed business plan for nearly a decade [FN11], resulting in its "woeful and deteriorating" financial condition, and despite the fact AHERF knowingly supplied its independent auditors with materially misleading financial statements for the fiscal years 1996 and 1997, the auditors failed to save AHERF from its internally orchestrated, and Board approved, demise.

> FN11.  Over  such  period,  AHERF's long-term debt increased from $70 million in 1987 to approximately $1.1 billion in 1997. Amended Complaint ¶ 29.

PwC argues that the Committee's claims are barred as a matter of law because the Committee, standing in the shoes of AHERF, was *in pari delicto* with the defendant. The common law doctrine of *in pari delicto,* literally meaning "in equal fault," provides that a plaintiff may not assert a claim against a defendant if the plaintiff bears fault for the claim. *See Pinter v. Dahl,* 486 U.S. 622, 632 (1988); *Official Comm. of Unsecured Creditors v. R.F. Lafferty & Co.,* 267 F.3d 340, 354 (3d Cir.2001) (citing *Feld and Sons, Inc. v. Pechner, Dorfman, Wolfee, Rounick and Cabot,* 458 A.2d 545, 548-549 (Pa.Super.1983). It is derived from the maxim *in pari delicto potior est conditio defendentis* meaning: "in a case of equal or mutual fault ... the position of the defending party ... is the better one." *Bateman Eichler, Hill Richards, Inc. v. Berner,* 472 U.S. 299, 306 (1985) (quoting Black's Law Dictionary 711 (5th ed.1979)). Therefore, the defense is "limited to situations where the plaintiff bore at least substantially equal responsibility for

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                          Page 8

Slip Copy, 2007 WL 141059 (W.D.Pa.)
**(Cite as: Slip Copy)**

his injury, and where the parties' culpability arose out of the same illegal act."*Pinter v. Dahl,* 486 U.S. at 632. Under both Pennsylvania and federal law, *in pari delicto* is a doctrine of equity. *Lafferty,* 267 F.3d at 354;*Peyton v. Margiotti,* 156 A.2d 865, 868 (Pa.1959).

**\*8** In *Lafferty,* the Third Circuit found that the analysis of the *in pari delicto* doctrine was the same under various causes of action, and determined that a court may speak of one doctrine though it may involve a number of different defenses depending on whether a contract, tort, or other claim is asserted. *See Lafferty,* 267 F .3d at 354-355. In so finding, the court quoted the Seventh Circuit Court of Appeals in *Cenco, Inc. v. Seidman & Seidman,* 686 F.2d 449 (7th Cir.1982) in which Judge Posner stated:

... the question [is] whether Seidman was entitled to use the wrongdoing of Cenco's managers as a defense against the charges of breach of contract, negligence, and fraud [which] when committed by auditors, are a single form of wrongdoing under different names.... Because these theories of auditors' misconduct are so alike, the defenses based on misconduct of the audited firm or its employees are also alike, though verbalized differently. A breach of contract is excused if the promisee's hindrance or failure to cooperate prevented the promisor from performing the contract. The corresponding defense in the case of negligence is, of course, contributory negligence.... [And, in the fraud context, a] participant in a fraud cannot also be a victim entitled to recover damages, for he cannot have relied on the truth of the fraudulent representations, and such reliance is an essential element in a case of fraud.

*Cenco, Inc. v. Seidman & Seidman,* 686 F.2d at 453-554 (citation omitted). Therefore, if the conduct of AHERF's management can be imputed FN12 to AHERF, and therefore, to the Committee, then the *in pari delicto* doctrine may bar the entire suit. *See Lafferty,* 267 F.3d at 355.

> FN12. Imputation refers to the attribution of one person's wrongdoing to another person. *Lafferty,* 267 F.3d at 355.

We look to state law to ascertain when wrongful conduct should be imputed to a corporation. *See O'Melveny & Myers v. FDIC,* 512 U.S. 79, 84 (1994)(holding, in the FDIC receivership context, that, without an "explicit federal statutory provision" or special federal interest, state law "governs the imputation of knowledge to corporate victims of alleged negligence"). PwC seeks to impute the conduct of AHERF's senior management, including *inter alia* Abdelhak, McConnell, Spargo and Adamczak,FN13 who knowingly misstated AHERF's financial statements in both 1996 and 1997. PwC's SUMF ¶¶ 29-35. Moreover, despite representations to the contrary, AHERF knew at the time the financial statements were presented to CL that the statements were materially false. PwC's SUMF ¶¶ 33-34. Spargo and Adamczak also testified that McConnell directed the improper accounting entries, and that Abdelhak was aware of the entries. PwC's SUMF ¶ 35.

> FN13. Both Spargo and Adamczak had job responsibilities which included the preparation of AHERF's financial statements and interacting with AHERF's auditors at CL. PwC's SUMF ¶ 31.

In applying the law of imputation in *Lafferty,* the Third Circuit applied a two-part test under which the fraud of an officer is imputed to a corporation when the officer commits the fraud (1) in the course of his employment, and (2) for the benefit of the corporation. *Lafferty,* 267 F.3d at 358-359 (citing *Rochez Bros., Inc. v. Rhoades,* 527 F.2d 880, 884 (3d Cir.1975). The Third Circuit in *Rochez Bros.* further stated "[t]his is true even if the officer's conduct was unauthorized, effected for his own benefit but clothed with apparent authority of the corporation, or contrary to instructions. The underlying reason is that a corporation can speak and act only through its agents and so must be accountable for any acts committed by one of its agents within his actual or apparent scope of authority and while transacting corporate business." *Rochez Bros., Inc. v. Rhoades,* 527 F.2d at 884FN14 .

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                    Page 9

Slip Copy, 2007 WL 141059 (W.D.Pa.)
(Cite as: Slip Copy)

FN14. It should be noted that *Rochez* was decided before *O'Melveny & Myers v. FDIC,* which held that the issue of imputation is determined by state law, and while the *Rochez* court did not rely upon Pennsylvania case law for its summary of agency law, the court's summary was certainly consistent with Pennsylvania agency law.

**\*9** The record clearly establishes, and the Committee does not contest, that the senior management of AHERF were acting in the course of their employment when the materially false financial statements for the fiscal years 1996 and 1997 were prepared and presented to CL for audit. The first prong of the imputation test, therefore, is satisfied.

Under the second prong of the imputation test, regarding whether the conduct of AHERF's management was committed for the benefit of the corporation, the conduct will not be imputed if the officers' interests were adverse to the corporation and "not for the benefit of the corporation."*Lafferty,* 267 F.3d at 359,*see also Solomon v. Gibson,* 615 A.2d 367 (Pa.Super.1992). This is known as the " adverse interest exception."

PwC argues that the conduct of AHERF management must be imputed to AHERF because there is no evidence that AHERF's interests were totally abandoned, and that Abdelhak and McConnell acted entirely for their own benefit. The Committee, however, contends that inquiry into the application of the adverse interest is fact intensive, and is properly a question for the jury. Further, the Committee argues that PwC's assertion that the adverse interest exception applies only if Abdelhak and McConnell acted "entirely" in their own interest, and "totally abandoned" the interests of AHERF is not the proper standard under Pennsylvania law. Citing *In re Phar-Mor, Inc. Securities Litigation,* 900 F.Supp. 784 (W.D.Pa.1995), the Committee argues that summary judgment is improper here because a trier of fact could reasonably conclude that Abdelhak and McConnell acted, not with the intent to benefit AHERF, but to preserve their own "employment,

salaries, emoluments and reputations ..." *See In re Phar-Mor, Inc. Securities Litigation,* 900 F.Supp. at 786-787.

The Third Circuit's rulings in *Lafferty* do not aid the Court in resolving the issue. *Lafferty* arose out of the bankruptcy of two lease financing companies that were allegedly involved in a "Ponzi" scheme. The Official Committee of Unsecured Creditors brought suit on behalf of the debtor corporations against, *inter alia,* the corporations' counsel, accountant, and underwriters (one of which was Lafferty), claiming that these third parties had fraudulently induced the corporations to issue debt securities, thereby deepening their insolvency and forcing them into bankruptcy. The District Court held that the suit against the third parties was barred by the doctrine of *in pari delicto.*In affirming the dismissal of the lawsuit, the Third Circuit had no need to apply the adverse interest exception to imputation as it relied upon an exception to the exception, known as the "sole actor [FN15]" exception.*Lafferty,* 267 F.3d at 359. The exception states that:

FN15. PwC also argues that the sole actor exception is applicable here as well. Because the Court finds that the adverse interest exception does not bar imputation in this instance, there is no need to address the argument.

If an agent is the sole representative of a principal, then that agent's fraudulent conduct is imputable to the principal regardless of whether the agent's conduct was adverse to the principal's interests. The rationale for this rule is that the sole agent has no one to whom he can impart his knowledge, or from whom he can conceal it, and that the corporation must bear the responsibility for allowing an agent to act without accountability.
**\*10** *Id.*

After a careful examination of applicable Pennsylvania law, as well as a review of similar cases in other circuits, the Court finds that the Committee's adverse interest argument fails. It has been long held under Pennsylvania law that a

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                    Page 10

Slip Copy, 2007 WL 141059 (W.D.Pa.)
**(Cite as: Slip Copy)**

corporation or principal, is liable for the acts of its agents, officers or directors only when the agent, officer or director is acting within the express or implied or apparent scope of his authority or employment, or where the principal, with full knowledge of the material facts, ratifies the unauthorized acts. *Todd v. Skelly,* 120 A.2d 906, 909 (Pa.1956) (citations omitted). However, where the
agent acts in his own interest which is antagonistic to that of his principal, or commits a fraud for **his own benefit** in a matter which is beyond the scope of his actual or apparent authority or employment, the principal **who has received no benefit** therefrom will not be liable for the agent's tortious act.

*Id.* (Emphasis added).

Because the misrepresentations made by AHERF management in the financial statements occurred within the scope of their employment and authority, the adverse interest exception prevents imputation only if AHERF "received no benefit" from the improper conduct of its managers and directors. Consistent with the law of Pennsylvania, Judge Ziegler specifically stated in *Phar-Mor* that "[a] corporation is not imputed with the 'knowledge of an agent in a transaction in which the agent secretly is acting adversely to the [corporation] and **entirely** for his own or another's purposes.' " *In re Phar-Mor, Inc. Securities Litigation,* 900 F.Supp. at 786 (citations omitted) (quoting RESTATEMENT (SECOND) OF AGENCY § 282(1)(1957) )(emphasis added).

The focus, therefore, is not whether Abdelhak, McConnell and other senior management responsible for the ill-fated financial statements benefitted in some way, or whether such benefits outweighed the benefits to AHERF, but the question is a relatively simple one-whether **any** benefit accrued to AHERF. The Court finds the rationale advanced by the Court of Appeals for the First Circuit in the factually similar *Baena v. KPMG LLP,* 453 F.3d 1 (1st Cir.2006) to be both applicable and persuasive here.

In *Baena,* a Belgian company with headquarters in

Massachusetts, took on massive new debt in connection with the acquisitions of two U.S. companies. *Baena v. KPMG LLP,* 453 at 3. It was later discovered that the company had greatly overstated its revenues and profits,[FN16] and certain top officers and directors were ultimately implicated in the apparent fraud. *Id.* The company filed for bankruptcy, and the bankruptcy court approved a plan of liquidation, giving authority to prosecute claims on behalf of the company to the trustee. *Id.* The trustee brought an action [FN17] against the accountants, charging that the accounting firms, as claimed by the Committee in the instant action, knowingly tolerated patently improper accounting practices by the company in order to retain a lucrative client. *Id.* at 4. The district court held that *in pari dilecto* barred the claim, and dismissed the action pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. *Id.*

> FN16. The accounting devices allegedly employed by the company in overstating the revenues and profits included recording revenue from contracts not yet executed, booking revenue in a lump sum where the amount should have been amortized across several years, and recording revenue from clients who did not exist or who had not made payments or commitments that could properly be recorded. *Id.* at 3.

> FN17. The complaint set forth a claim for unfair or deceptive trade practices under Massachusetts state law, Mass. Gen. Laws ch. 93A §§ 1-11 (2002), and two (2) tort violations, aiding and abetting the breach of a fiduciary duty and accounting malpractice. *Id.* The district court dismissed the two tort claims as barred by the statute of limitations and no appeal was taken as to those claims. The only claim pertinent to the appeal was the unfair trade practice claim. *Id.*

**\*11** Similar to the arguments made by the Committee, the trustee in *Baena* argued on appeal that the "adverse interest" exception prevented

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2007 WL 141059 (W.D.Pa.)
**(Cite as: Slip Copy)**

application of the imputation doctrine, and that the doctrine should not apply where "innocent decision-makers" could have prevented the harm. *Id.* at 7. Applying the law of Massachusetts, the First Circuit found that imputation may be avoided where the wrongdoing was done primarily for personal benefit of the officer and was in fact "adverse" to the interest of the company, *e.g.* if the salesman uses the company car in a bank robbery, the company is not normally liable. *Id.* (citing PROSSER AND KEETON ON TORTS § 70, at 503-505 (5th ed.1984)). In this case, however, the approval and oversight of the financial statements was a function of management, was carried out on the company's behalf, and therefore, was enough to attribute management's conduct to the company. *Baena v. KPMG LLP,* 453 F.3d at 7,*see also* RESTATEMENT (SECOND) OF AGENCY § 257 (1958); *Lafferty,* 267 F.3d at 358-59;*Askanase v. Fatjo,* 130 F.3d 657, 666 (5th Cir.1997).

The First Circuit specifically found that "[a] fraud by top management to overstate earnings, and so facilitate stock sales or acquisitions, is not in the long-term interest of the company; but, like price-fixing, it profits the company in the first instance and the company is still civilly and criminally liable .... [n]or does it matter that the implicated managers also may have seen benefits to themselves-that alone does not make their interests adverse."*Baena v. KPMG LLP,* 453 F.3d at 7-8;*see, e.g., Beck v. Deloitte & Touche,* 144 F.3d 732, 736 (11th Cir.1998)(finding adverse interest exception inapplicable because accountant's malpractice brought plaintiff some short-term benefit. "Florida law requires that a corporate officer's interest be entirely adverse for the exception to apply (*i.e.,* his actions must neither be intended to benefit the corporation nor actually cause short- or long-term benefit to the corporation)); *FDIC v. Shrader & York,* 991 F.2d 216, 223-24 (5th Cir.1993), *cert. denied,*512 U.S. 1219 (1994)(an agent's knowledge falls within the adverse interest exception only if the agent acts "entirely for his own or another's purposes ... the knowledge is imputed in a case of ' joint' interests even though the agent's primary interest is inimical to that of the principal); *see also* RESTATEMENT (SECOND) OF AGENCY § 282(1). Affirming the district court's decision to

dismiss the action, the First Circuit held that nothing in the complaint suggested that senior management was acting solely out of self-interest or otherwise attempting primarily to benefit anyone other than the company through their behavior. *Id.* at 7-8.

Notably, the *Baena* case was resolved on a motion to dismiss despite the trustee's contention that the adverse interest exception was an issue of fact not proper for resolution at such an early stage of the litigation. Here, the Committee also vehemently argues that the adverse interest exception is an issue of fact that must be resolved by a jury. The Court certainly agrees that in the thousands of pages submitted by the parties in support of their positions, there are many factual issues that are disputed. Regarding the issues related to the imputation issue, however, it is clear to this Court that AHERF management was acting within the scope of their employment in submitting the financial statements and that such misconduct enabled further acquisitions that, in the short term, was a benefit to AHERF.

**\*12** The Committee admits that in both fiscal-years 1996 and 1997, AHERF managers directed accounting entries that caused the financial statements to be "materially misstated." Amended Complaint ¶ 36. Further, the Committee admits that AHERF maintained internal schedules that showed two (2) sets of financial results, side by side: one side with the results provided to CL and reported externally; and the other side showing the actual financial results. PwC's SUMF ¶ 113; Comm's SUMF ¶¶ 113, 229. These internal schedules showing different sets of financial results were provided to McConnell and Abdelhak by the AHERF financial department. PwC's SUMF ¶ 114; Comm's SUMF ¶ 114. Moreover, there is no dispute that the AHERF managers and directors were acting within the scope of their employment in the preparation of the offending financial statements. The question, therefore, is whether AHERF management acted solely for their own personal interests, AHERF deriving no benefit from the misconduct.

The Court agrees with PwC that there is no

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2007 WL 141059 (W.D.Pa.)
**(Cite as: Slip Copy)**

evidence in the record showing that AHERF's interests were totally abandoned, and that Abdelhak and McConnell acted entirely for their own benefit. Futher, the record is replete with testimony that, had certain AHERF trustees and/or members of AHERF's Audit Committee been aware that the 1996 and 1997 financial statements materially misstated AHERF's financial conditions, they would have taken immediate action including changing AHERF's business strategy by ceasing all further hospital and physician-practice acquisitions. *See, e.g.* Comm's SUMF ¶¶ 147-152(citing to depositions of AHERF trustees and/or members of AHERF's Audit Committee). Clearly, if during the periods relevant to the misstated financial statements, AHERF made acquisitions of other hospitals, physician practices and/or educational facilities, then over the immediate short term AHERF did indeed benefit. The benefits to AHERF from such acquisitions include an increase of its assets and the addition of income streams.

It is undisputed that in August of 1996, AHERF acquired six (6) hospitals in the Philadelphia area that were owned by the Graduate Health System (" GHS"). Amended Complaint ¶ 22; Report of R. Bruce Den Uyl, Comm. Appendix, Tab 3, p. 4 (hereinafter ("Den Uyl Report"). In the same time period, AHERF also acquired five hospitals in the Greater Pittsburgh market including four hospitals that made up the Forbes Health System and Allegheny Valley Hospital. Amended Complaint ¶ 26; Den Uyl Report, p. 6. On July 1, 1997, AHERF purchased Canonsburg Hospital. Den Uyl Report, p. 6. Further, in the latter half of the 1990's, AHERF purchased the practices of "hundreds" of primary care physicians in the Pittsburgh and Philadelphia markets. Amended Complaint ¶ 27. Specifically, AHERF purchased the primary physician practices organized under Allegheny University Medical Practices, formerly known as Allegheny Integrated Health Group. Den Uyl Report, p. 6-7. AHERF's largest acquisition of physician practices became effective in April of 1997, when it acquired the practices of more than one hundred (100) physicians including approximately eighty (80) primary care physicians of the Penn Group Medical Associates. Den Uyl Report, p. 7. Management's scheme to misrepresent the financial condition of

the company in this instance permitted AHERF to grow as a company, which was a benefit to AHERF. *See In re Rent-Way Secs. Litig.,* 209 F.Supp.2d 493, 522 (W.D.Pa.2002).

**\*13** Further, the Committee's contention that imputation is improper where the jury could infer that management acted to preserve their own " employment, salaries, emoluments and reputations ... " is illogical as it would discharge corporations from liability for the misdeeds of its officers or directors in almost every instance. That members of AHERF management may have seen benefits to themselves here, does not by itself render their interests adverse.[FN18] As further evidence of self-interest, the Committee asserts that on the "eve of bankruptcy" certain senior executives, including Abdelhak and McConnell, withdrew nearly $6 million in benefits held in a KESOP executive-benefit program, even though some portion of those benefits had not yet vested and even though funding the KESOP program would endanger AHERF's ability to meet payroll. Comm's SUMF ¶ 38. This alleged misconduct, however, occurred more than one (1) year after the conclusion of AHERF's 1997 fiscal year, and has no relevance to whether management's motive for misstating the financial statements for the 1996 and 1997 fiscal years was entirely for personal interests.

> FN18. The adverse interest exception might apply under circumstances in which the corporate officers loot the corporation of all its assets, thereby depriving the corporation of any benefit from the fraud perpetrated against innocent investors. *See Baena v. KPMG LLP,* 453 F.3d at 7-8; *Alberts v. Tuft (In re Greater Southeast Cmty. Hosp. Corp.),* 2006 Bankr.LEXIS 2419, 111-110 (Bankr.D.D.C.2006). There is no evidence of such circumstances here.

Based on the above, the Court finds there are no facts in dispute that warrant application of the adverse interest exception to bar imputation. There is also no dispute that AHERF's senior management team created the fraudulent financial statements, and therefore, was a primary wrong-doer. CL's

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2007 WL 141059 (W.D.Pa.)
**(Cite as: Slip Copy)**

alleged misdeeds are based, *inter alia,* upon its failure to detect the material misstatements in the financial statements and advise AHERF of the accounting violations and the actual financial condition of the company. AHERF bears at least substantially equal responsibility for the injury it seeks to remedy, and barring an equitable determination to the contrary, the *in pari delicto* doctrine bars AHERF's, and thus the Committee's, claims against PwC.

The Committee argues that two (2) equitable factors preclude application of the *in pari delicto* doctrine: (1) CL's improper conduct; and (2) the presence the AHERF Board members who were innocent, independent actors who could have stopped the wrongdoing had CL conducted proper audits. The Committee's first contention is without merit. The *in pari delicto* doctrine contemplates "mutual fault" on the part of both plaintiff and defendant. *See Bateman Eichler, Hill Richards, Inc. v. Berner,* 472 U.S. at 306. As previously stated, the application of the doctrine is "limited to situations where the plaintiff bore at least substantially equal responsibility for his injury, and where the parties' culpability arose out of the same illegal act."*Pinter v. Dahl,* 486 U.S. at 632. In both *Lafferty* and *Baena v. KPMG,* the courts applied the *in pari delicto* doctrine to bar the claims of the plaintiffs notwithstanding the assumptions made by the courts that the defendant professionals were complicit in the alleged corporate wrong-doing. *See Lafferty,* 267 F.3d at 345;*Baena v. KPMG LLP,* 453 F.3d at 4 .

**\*14** The Court is also not moved by the Committee's argument regarding the "innocent and independent" Board members who could have, if so informed, stopped the wrong-doing and reversed a decade of mismanagement. This type of innocent and independent "decision-maker" limitation has been adopted by some courts to bar *in pari delicto* defenses against a bankruptcy trustee seeking to recover against outside professionals. *See e.g. In re Sharp Int'l Corp.,* 278 B.R. 28, 36 (Bankr.E.D.N.Y.2002); *Wechsler v. Squadron, Ellenoff, Plesent & Sheinfeld, L.L.P.,* 212 B.R. 34, 36 (S.D.N.Y.1997). The Court was unable to find support for the innocent decision-maker limitation

to imputation and/or *in pari delicto* in either Pennsylvania or Third Circuit decisions. Moreover, this limitation clearly deviates from traditional agency doctrine, as well as Pennsylvania agency law. Indeed, the Pennsylvania Supreme Court has long held a corporate principal liable "for the frauds, deceits, concealments, misrepresentations, torts, negligences and other malfeasances and misfeasances of [its] agent committed within the scope of his employment even though the principal did not authorize, justify, participate in or know of such conduct or even if he forbade the acts or disapproved of them, as long as they occurred within the agent's scope of employment."*Aiello v. Ed Saxe Real Estate, Inc.,* 499 A.2d 282, 287 (Pa.1985)(citing *Bachman v. Monte,* 326 Pa. 289, 192 A. 485 (1937); *Freedman v. Providence Washington Ins. Co.,* 182 Pa. 64, 37 A. 909 (1897); *DeTurck v. Matz,* 180 Pa. 347, 36 A. 861 (1897); *McNeile v. Cridland,* 168 Pa. 16, 31 A. 939 (1895); *Independent Bldg. & Loan Assn. v. Real Estate Title Ins. & Trust Co.,* 156 Pa. 181, 27 A. 62 (1893) ; *Griswold v. Gebbie,* 126 Pa. 353, 17 A. 673 (1889) ; *Brooke v. New York, L.E. & W.R.R.,* 108 Pa. 529, 1 A. 206 (1885); *Erie City Iron Works v. Barber and Co.,* 106 Pa. 125 (1884); *Custar v. Titusville Gas & Water Co.,* 63 Pa. 381 (1869); *Shelhamer v. Thomas,* 7 Serg. & R 106 (1821); *Phoenix Insurance Co. v. Pratt,* 2 Binn. 308 (1810)). A company president, therefore, who engages in price-fixing leaves his corporation liable even if the board of directors, had it known, would have stopped him. *E.g. Am. Soc'y of Mech. Eng'rs, Inc. v. Hydrolevel Corp.,* 456 U.S. 556, 570-74 (1982) (finding principal was subject to civil liability under the antitrust laws for acts of its agents performed with apparent authority).

By the Committee's own admission, the AHERF Board members during the relevant period were themselves CEOs, CFOs and members of Boards of the leading and largest Pennsylvania-based corporations. Brief of Committee, pp. 18-19. Yet these Board members allowed AHERF to pursue a business strategy, proffered by AHERF senior management and certain Trustees acting in concert, that implemented a series of ill-advised and unjustifiable acquisitions beginning in 1988 and continuing through the decade of the 1990's.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2007 WL 141059 (W.D.Pa.)
**(Cite as: Slip Copy)**

Amended Complaint ¶¶ 15-18. Specifically, in January of 1991, the Board approved the acquisition of four (4) hospitals making up the United Health System ("United") knowing that three of the hospitals were struggling financially and that United was headed toward bankruptcy. Amended Complaint ¶¶ 15-18. In August of 1996, during the time period relevant to the misstated financial documents, the Board approved a plan to acquire six GHS hospitals despite clear indication these hospitals were losing millions of dollars every month. Amended Complaint ¶¶ 22 & 23. The Committee admits that the financial distress of the GHS hospitals was "widely reported by the media." Amended Complaint ¶ 22. During this same time period, the Board approved the acquisition of five hospitals in the Greater Pittsburgh market including four hospitals that made up the Forbes Health System and Allegheny Valley Hospital. Amended Complaint ¶ 26. The acquisition of the GHS and Pittsburgh area hospitals added $282 million of under-secured bond debt to the AHERF System's consolidated balance sheet. Amended Complaint ¶¶ 25 & 26. There was no outcry from the innocent and independent Board members or Trustees. Moreover, during this period of acquisition and expansion, and with the approval of AHERF's Board, AHERF's debt increased from approximately $70 million in 1987 to approximately $1 .1 billion in 1997. *See* Amended Complaint ¶ 29.

**\*15** Despite the averments of the Committee regarding the decade long business strategy consisting of ill-conceived, ill-advised mergers and acquisitions, and despite the intentional accounting misstatements by AHERF management, the Committee lays AHERF's entire bankruptcy at the feet of its outside auditors. The very harm allegedly suffered at the hands of PwC, however, presupposes the Board approved business strategy, as well as the imputable wrongdoing of AHERF's management. The Court, therefore, finds no equitable bar to either the imputation of the misdeeds of AHERF management to AHERF or to the application of the doctrine of *in pari delicto.*

The Court finds no material issue of fact that excepts the wrongdoing of AHERF's senior management from imputation to AHERF. The Court further finds no factual or equitable bar to application of the doctrine of *in pari delicto* which shall bar all the Committee's claims in this matter. PwC's motion for summary judgment shall be granted. An appropriate order will follow.

W.D.Pa.,2007.
Official Committee of Unsecured Creditors of Allegheny Health, Educ. and Research Foundation v. Pricewaterhouse Coopers, LLP
Slip Copy, 2007 WL 141059 (W.D.Pa.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**8**

Westlaw.

Not Reported in F.Supp.                                          Page 1

Not Reported in F.Supp., 1992 WL 196768 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.)**

**H**
Official Committee of Unsecured Creditors of
Corell Steel on Behalf of Corell Steel v. Fishbein
and Co., P.C.
E.D.Pa.,1992.
Only the Westlaw citation is currently available.
United States District Court, E.D. Pennsylvania.
The **OFFICIAL** COMMITTEE OF UNSECURED
CREDITORS OF CORELL STEEL on Behalf of
CORELL STEEL
v.
**FISHBEIN** AND COMPANY, P.C., et al.
**Civ. A. No. 91-4919.**

Aug. 10, 1992.

Martin J. Weis, Ralph J. Kelly, Dilworth, Paxson,
Kalish & Kauffman, Philadelphia, Pa., for The
Official Unsecured Creditors' Committee.
Jacqueline H. Canter, Philip B. Toran, Jay S.
Rothman, Marshall, Dennehey, Warner, Coleman
and Goggin, Philadelphia, Pa., for defendants.
Ralph J. Kelly, Dilworth, Paxson, Kalish &
Kauffman, Philadelphia, Pa., Douglas H. Weiss,
Marlton, N.J., for Corell Steel Company.

LOUIS H. POLLAK, Senior District Judge.
*1 Plaintiff, The Official Committee of Unsecured
Creditors of Corell Steel ("Committee"), has filed
this accountant malpractice action on behalf of
Corell Steel ("Corell"), against defendants, Fishbein
and Company, P.C., and its partners ("Fishbein"),
alleging that Fishbein's performance of audits for
Corell in 1986 and 1987 led to the dissipation of
Corell's assets and, ultimately, its insolvency.
Presently before the court is Defendants' Motion to
Dismiss plaintiff's complaint.

Defendants' motion asserts the following grounds
for dismissal of the complaint: (1) plaintiff lacks
standing to pursue this action; (2) plaintiff's claims
are barred by the applicable statutes of limitations;

(3) plaintiff has failed to state an adequate claim for
breach of contract; (4) plaintiff's claims sounding
in fraud have not been pled with the requisite level
of specificity; and (5) plaintiff has failed to allege
breach of any duty owed to it by defendants.

A.

Defendants argue that plaintiff lacks standing to
bring this action. This suit was initiated in the
Bankruptcy Court of the Eastern District of
Pennsylvania, ostensibly on Corell's behalf, after
that court granted plaintiff leave, by order dated
April 11, 1991, to bring an adversary proceeding
against defendants, Plaintiff's Complaint at ¶ 4,
and to employ the law firm of Dilworth, Paxson,
Kalish & Kauffman as special counsel to prosecute
this claim. Defendants contend that plaintiff may
not bring the case because it is unable to
demonstrate that the debtor has unjustifiably failed
to pursue its claims itself against defendants.
Defendants argue that the bankruptcy court's order
of April 11, 1991 authorizing initiation of the suit is
not determinative of the standing question, and
recommend dismissal of the action or remand to the
bankruptcy court for "determination as to whether
the debtor unjustifiably refused to bring an action
against Fishbein, and accordingly as to whether the
Unsecured Creditors Committee has standing to
bring this action, as well as whether such an
adversary proceeding would ultimately benefit the
debtor's estate and hence the creditors." [FN1]
Defendants' Motion to Dismiss at 24.

Defendants' argument is without merit. In either of
two approaches used by courts in this circuit,
plaintiff has standing to bring this suit on behalf of
Corell.

One approach used by Third Circuit courts has been
to permit a creditors committee to maintain an
action, in its own right or on behalf of a debtor,
depending on the circumstance, upon "only a

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.

Not Reported in F.Supp., 1992 WL 196768 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.)**

showing that a Committee's cause has merit and that the [debtor-in-possession] refused to sue ... as opposed to requiring a Committee to make any further showing of extenuating circumstances." *In re Nicolet, Inc.,* 80 B.R. 733, 737-38 (E.D.Pa.1987) . *See also Coral Petroleum, Inc. v. Banque Paribas-London,* 797 F.2d 1351, 1362-63 (5th Cir.1986) (to bring suit on behalf of unwilling debtor in possession, committee of unsecured creditors need only show that the claim has merit and that the debtor in possession refused to sue; no further showing is necessary). *Cf. In re McKeesport Steel Castings Co.,* 799 F.2d 91, 94 (3d Cir.1986) (individual creditors may act in lieu of trustee when debtor in possession refuses to act and creditors have a colorable claim).

**\*2** In *Nicolet,* the bankruptcy court entertained a motion by an unsecured creditor's committee to file a legal action on behalf of the debtor to recover payments made out of the debtor's estate. The court surveyed various holdings of the Third Circuit Court of Appeals, which has not directly addressed the question of creditors' standing to sue in such circumstances, and concluded that:
[W]e infer that the Court would utilize a functional approach in the analogous instant situation and determine that a Committee could maintain an action on behalf of a [debtor-in-possession] as long as the claim had any merit and the [debtor] was, for any reason at all or for no reason, failing to maintain the action in prompt fashion.

[W]e do not think that the reasons why a [debtor] has failed to proceed are really very important, or that a Committee must undertake to prove the existence of any such reason to be allowed to proceed with an action in its own name on the [debtor's] behalf. Rather, we believe that, upon proving the potential merit of its case and the [debtor's] failure to proceed, the Committee should be allowed to proceed on its own without establishing anything further.

*Nicolet,* 80 B.R. at 738, 739. I will follow the approach outlined in *Nicolet.*[FN2]

Plaintiff has made the requisite showing to proceed with this complaint. The bankruptcy court's order of April 11, 1991 granting plaintiff leave to bring this adversary proceeding and authorizing the retention of special counsel to prosecute this action, specifically contained the court's finding that good cause had been shown to maintain the suit. Bankruptcy Court Order of April 11, 1991, No. 89-20656. While not determinative, the bankruptcy court's acknowledgment of good cause certainly encourages a finding that plaintiff's claims are potentially meritorious. In addition, personal review of the plaintiff's complaint and applicable law demonstrates that plaintiff has stated colorable claims, pleading in detail defendants' alleged misconduct and Corell's injuries supposedly suffered as a result. As will be discussed in the remainder of this memorandum, the Committee has stated claims for which they are possibly entitled to relief.[FN3]

Second, plaintiff points out that, as of the time the bankruptcy court granted it leave to file this action, the debtor had been in bankruptcy for nearly two years [FN4] but had not pursued these claims. This seems sufficient proof of the second element of the standing formula, that the debtor, "for any reason at all or for no reason, [is] failing to maintain the action in prompt fashion." *See Nicolet,* 80 B.R. at 738. Thus, absent superseding events in the bankruptcy court, such as the debtor itself bringing an action against defendants, *see id.* 739-40, the Committee may pursue its claims of accountant malpractice on Corell's behalf.

Even if plaintiff could not at this stage make a showing sufficient under the *Nicolet* standard, the Committee may establish standing in yet another way. Where the debtor's legal claims arose prior to the filing of bankruptcy, as is the case in this instance, the claims become part of the debtor's estate under 11 U.S.C. § 541. It is well established that a committee of unsecured creditors may pursue these claims on behalf of the debtor or trustee upon a showing that the bankruptcy court has appointed the committee to enforce the debtor's claims and that the committee is a representative of the estate. *Committee of Unsecured Creditors v Doemling,* 127 B.R. 945, 949 (W.D.Pa.1991) (citing *In re*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.

Page 3

**Not Reported in F.Supp., 1992 WL 196768 (E.D.Pa.)**
**(Cite as: Not Reported in F.Supp.)**

*Amarex, Inc.,* 96 B.R. 330, 334 (W.D.Okla.1989). A committee is a representative of an estate if a " ' successful recovery by the appointed representative would benefit the debtor's estate and particularly the unsecured creditors.' " *Doemling,* 127 B.R. at 950 (quoting *In re Sweetwater,* 884 F.2d 1323, 1327 (10th Cir.1989)); *see also Amarex,* 96 B.R. at 334; *In re Kroh Bros. Development Co.,* 100 B.R. 487, 499-500 (Bkrtcy.W.D.Mo.1989); *In re Tennessee Wheel & Rubber Co.,* 64 B.R. 721, 725-26 (Bkrtcy.M.D.Tenn.1987). Whether a committee is a representative of an estate is determined on a case-by-case basis. *Doemling,* 127 B.R. at 949-950.

**\*3** Under *Doemling,* plaintiff has standing to bring suit on behalf of Corell. As noted above, the bankruptcy court appointed the Committee for the purpose of bringing suit against defendants, satisfying the first condition of *Doemling.* Moreover, the Committee is acting as representative of the estate since success in the suit will increase the assets of the debtor's estate and benefit the unsecured creditors.

### B.

Defendants contend that the applicable statutes of limitations bar all but one count of plaintiff's complaint. They argue that, under Pennsylvania law, a four-year period applies to plaintiff's breach of contract claim (Count I), and that a two-year period applies to plaintiff's causes of action for negligent misrepresentation (Count II), negligence (Count III), breach of fiduciary duty (Count IV), and fraudulent misrepresentation (Count V). Defendants further argue that, in cases involving alleged reliance on an accountant's report, the statute of limitations begins to run upon plaintiff's receipt of the accountant's report, such that the periods in this case commenced to run on receipt of Fishbein's 1986 audit on December 5, 1986, and on receipt of Fishbein's 1987 audit on December 9, 1987. Since plaintiff filed its complaint April 23, 1991, defendants calculate that plaintiff is time-barred from asserting all counts of its complaint save the Count I claim of breach of contract based upon the 1987 audit.

Defendants' calculation fails to take into account Corell's state of bankruptcy and the slight latitude the law gives bankrupt businesses in bringing their claims. Section 108(a) of the Bankruptcy Code provides:

If applicable nonbankruptcy law, an order entered in a nonbankruptcy proceeding, or an agreement fixes a period within which the debtor may commence an action, and such period has not expired before the date of the filing of the petition, the trustee may commence such action only before the later of-

(1) the end of such period, including any suspension of such period occurring on or after the commencement of the case; or

(2) two years after the order for relief.

11 U.S.C. § 108(a). Corell filed its Chapter 11 Petition on *April 24, 1989.* Pursuant to section 108(a), any causes of action that were not time-barred as of April 24, 1989 could be filed by the later of the running of the statute of limitations or April 24, 1991, two years after the order for relief was entered in the bankruptcy court.[FN5] Because plaintiff's complaint was filed in the bankruptcy court on April 23, 1991, within the two-year extension period prescribed by section 108(a)(2), plaintiff need only establish that the statutes of limitations on each count had not run as of April 24, 1989.[FN6]

#### 1. *Breach of contract*

Plaintiff disputes defendants' contention that the Pennsylvania statute of limitations for breach of contract in an accountant malpractice action is four years; it argues instead that the applicable period is six years. Whether the applicable statute of limitations is four or six years is of no consequence given the applicability of § 108. Even assuming the statute of limitations commenced to run on the breach of contract claim on the day Corell received the audits, the breach of contract claims based on either the 1986 audit or the 1987 were not time-barred as of April 24, 1989 under either the four- or six-year statute of limitation periods.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                    Page 4

Not Reported in F.Supp., 1992 WL 196768 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.)**

2. *Negligent Misrepresentation, Negligence, Breach of Fiduciary Duty, and Fraudulent Misrepresentation*

a. Claims based on the 1987 Audit

**\*4** The parties agree that the applicable statute of limitations for the tort claims in counts II through V is two years. The earliest date the statute of limitations on the 1987 audit could have commenced to run was December 9, 1987, the day Corell received the audit. Thus none of the tort claims associated with the 1987 audit had expired by April 24, 1989.

b. Claims based on the 1986 Audit

Defendants argue that the statute of limitations with respect to the claims arising out of the 1986 audit began to run the day the plaintiff received the accountant's report, December 5, 1986. Plaintiff responds that the statute of limitations does not begin to run until Corell discovered the tortious conduct. Plaintiff is correct. Under Pennsylvania's well established equitable discovery rule, the statute of limitations does not begin to run until the injured party "knew or using reasonable diligence should have known of the claim." *Vernau v. Vic's Market, Inc.,* 896 F.2d 43, 45-46 (3rd Cir.1990). *See also School District of the Borough of Aliquippa v. Maryland Casualty Company,* 587 A.2d 765 (Pa.Super.1991) (plaintiffs had two years from time they learned of injury to determine whether accountants were negligent).

In applying the discovery rule, the court must determine when Corell learned or, using reasonable diligence should have learned, of the injury to the company. In *Urland v. Merrell-Dow Pharmaceuticals, Inc.,,* 822 F.2d 1268, 1273 (3rd Cir.1987), the court defined "reasonable diligence" as follows:
There are very few facts which diligence cannot discover, but there must be some reason to awaken inquiry and direct diligence in the channel in which it would be successful.

Arguably, there was reason to awaken Corell's inquiry as to defendants' alleged injury to the company prior to April 24, 1987 such that the tort claims would have expired prior to April 24, 1989.
In its complaint plaintiff states:
during the 1986 fiscal year, Corell was experiencing certain conditions and events which when considered in the aggregate indicated that there could be substantial doubt about Corell's ability to continue as a going concern for a reasonable period of time, [including a substantial drop in sales, a meager net profit, a cash flow problem, and a decrease in working capital.]

Plaintiff's Complaint at ¶ 43. Receiving a rosy audit on December 5, 1986, in light of these serious indicators might "awaken inquiry." *Urland,* 822 F.2d at 1273. Plaintiff also notes that the 1987 fiscal year indicators were even more foreboding. Id. at ¶ 49. Such poor business after a glowing audit might also alert Corell of some accounting problems.

However, poor sales or financial difficulties may not implicate one's accountant so much as the current financial conditions. "Financial problems do not necessarily suggest accounting fraud," *Gruber v. Price Waterhouse,* 697 F.Supp. 859, 865 (E.D.Pa.1988) (quoting *Mosesian v. Peat, Marwick, Mitchell & Co.,* 727 F.2d 873, 878 (9th Cir.), *cert. denied,*469 U.S. 932 (1984). Further development of the facts through discovery is called for to determine when Corell knew or, using reasonable diligence should have known, of Fishbein's fraudulent conduct toward them.

C.

**\*5** Defendants claim that, aside from being time-barred, count I fails to state a claim for breach of contract. Plaintiff claims that Fishbein entered into a contract with Corell in which Fishbein agreed to perform auditing and accounting services in accordance with both generally accepted auditing standards ("GAAS") and generally accepted accounting principles ("GAAP"). Plaintiff's Complaint at ¶ 27. In failing to comply with various elements of GAAS and GAAP, defendants

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                                   Page 5

Not Reported in F.Supp., 1992 WL 196768 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.)**

allegedly breached their contract with Corell. *Id.* at ¶¶ 56-61.

GAAS represents auditing standards approved and adopted by the membership of the American Institute of Certified Public Accountants (AICPA), AU § 150.02, and GAAP "encompasses the conventions, rules, and procedures necessary to define accepted accounting practice at a particular time," AICPA, AU § 411.02. In essence, GAAS and GAAP delineate due professional care owed by accountants to their clients as stated by the accounting community.

Failure to perform a service with the requisite level of professional care typically constitutes a claim of negligence, not breach of contract. *See, e.g. Yosuf v. U.S.,* 642 F.Supp. 415, 426-27 (M.D.Pa.1986) (physician who fails to provide services with reasonable skill and diligence subject to malpractice suit sounding in tort); *Hoyer v. Frazee,* 470 A.2d 990, 992-93 (Pa.Super.1984) (standard of care in an attorney malpractice case is whether attorney has exercised ordinary skill and knowledge). That is, an accountant's failure to perform an audit in accordance with GAAS and GAAP classically precipitates a claim for negligence, not breach of contract. *See Robert Wooler Co. v. Fidelity Bank,* 479 A.2d 1027, 1032 (Pa.Super.1984) (where accounting firm violated duty of care owed to client, it could be found liable for plaintiff's losses if accountant's negligence was a substantial factor in causing the loss).

Plaintiff argues, though, that Fishbein had not merely a general duty, but a *contractual obligation* to perform up to a certain standard. Plaintiff's argument is problematic in two respects, though. First, it is not clear under basic contract law that Corell's agreement with Fishbein, even as characterized by plaintiff, creates a cause of action in contract. Second, even if the agreement does create a cause of action in contract, plaintiff has failed properly to state a claim of breach of contract in accordance with Pennsylvania law. Both weaknesses in plaintiff's pleading derive from the basic inadequacy in the claim: count I sounds in negligence, not contract.

According to Corpus Juris Secundum (C.J.S.):
an action in contract is for the breach of a duty arising out of a contract either express or implied, while an action in tort is for a breach of duty imposed by law, which arises from an obligation created by a relation, ordinarily unconnected with a contract, but may arise either independently of any contract or by virtue of contract relations.

**\*6** 1A C.J.S. *Actions* § 85 (1985). The source of the duty determines the appropriate cause of action. [FN7] *Id.*

Although Fishbein contracted to act in accordance with GAAP and GAAS, the contract is not the source of Fishbein's duty to act with professional care. Rather, Fishbein's duty to act in compliance with GAAS and GAAP arises by law. Fishbein's agreement to work in accordance with GAAS and GAAP represents no more than its recognition of a legal duty to provide services with the ordinary skill and knowledge required by both Pennsylvania law and AICPA rules.

Under Pennsylvania law, accountants who contract to provide services must "use such skill in the performance of their agreement as reasonably prudent, skillful accountants would use under the circumstances." *Wooler,* 479 A.2d at 1031 (quoting *O'Neill v. Atlas Automobile Finance Corp.,* 11 A.2d 782, 786 (Pa.Super.1940)). In addition, Rules 202 and 203 of the Rules of Conduct of the Code of Professional Ethics of the AICPA require accountants to comply with GAAS and GAAP in the performance of their professional services. Fishbein's duty to act in accordance with GAAS and GAAP existed notwithstanding the contract with Corell, suggesting count I more properly lies in tort than in contract.

Even if Fishbein's duty arose by contract, plaintiff has failed to plead a claim in breach of contract under Pennsylvania law standards. In an effort to prevent plaintiffs from circumventing the two-year limitation on tort actions by pleading claims as breaches of contract, Pennsylvania courts have established different pleading requirements for the breach of contract and tort causes of action. In *Sherman Industries, Inc. v. Goldhammer,* 683

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Page 7 of 12

Not Reported in F.Supp.                                                                    Page 6

Not Reported in F.Supp., 1992 WL 196768 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.)**

F.Supp. 502, 506 (E.D.Pa.1988), the court explained:

[I]n order to distinguish a contract malpractice claim from a tort claim, the plaintiff claiming under a contract theory must raise an issue as to whether it specifically instructed the defendant to perform a task that the defendant failed to perform, or as to whether the defendant made a specific promise upon which plaintiff reasonably relied to its detriment.

*See also Hoyer,* 470 A.2d at 992-993 (since complaint did not aver breach of specific provision of contract, complaint did not state a breach of contract claim, but rather a negligence claim). A plaintiff need only allege breach of a general duty of care to properly plead malpractice based in tort. *Sherman Industries, Inc.,* 683 F.Supp. at 506.

As defendants properly note, plaintiff has failed to specify a breach of a specific promise or instruction as required under *Sherman.* Instead, the Committee broadly alleges that defendants " fraudulently, recklessly, negligently" failed to do a number of things required under GAAP and GAAS. Plaintiff's Complaint at ¶¶ 56-61. Not only is plaintiff's language in the form of a prototypical negligence claim (such that the claim literally sounds in tort), but none of the averments refers to a breach of a specific contract provision. An agreement to act with the legally required level of care cannot constitute a specific contractual promise. Otherwise, claims in tort and in breach of contract, at least within the context of service contracts, would be indistinguishable. Plaintiff's true complaint is not that Fishbein failed to perform the contract-for the financial statements were delivered-but that Fishbein performed the contract without the requisite level of care.

**\*7** Plaintiff argues that *Sherman* and *Hoyer* have no bearing on this case since they involve attorney malpractice claims and not accountant malpractice. This distinction is unconvincing. Plaintiff gives neither reasoning nor Pennsylvania law in support of the assertion that malpractice claims against attorneys based in contract should be pled differently than similar claims against accountants. More likely, the manner of asserting malpractice claims against attorneys and accountants is comparable given the quite analogous relationships of attorney-client and accountant-client. In both cases, the client has sought professional advice, and expects in return service performed with skill, knowledge, and confidentiality.

Moreover, *Sherman* has a broader application than simply attorney malpractice. While the case specifically concerns attorney malpractice, as plaintiff notes, the pleading standards articulated by the court make no reference to attorneys, but state quite universally the different pleading requirements for contract and tort claims. The similarity of the accountant-client and attorney-client relationships, together with the nonexclusive language used by the court in *Sherman,* demonstrate that the standards outlined in *Sherman* have significant bearing upon this case.

As opposed to *Sherman* and *Hoyer,* plaintiff argues that two other cases are controlling in the present circumstances: *Foster v. Peat Marwick Main & Co.,* 587 A.2d 382 (1991) and *Baehr v. Touche-Ross & Co.,* 62 B.R. 793 (E.D.Pa.1986).[FN8] Neither of the cases provides guidance for this case.

*Foster* and *Baehr* do involve breach of contract claims against accountants for failure to provide services in accordance with GAAP and GAAS. However, neither case directly addresses the issue of whether the breach of contract claim is sufficiently stated. The courts' silence on the sufficiency of the breach of contract claims in the absence of direct challenges thereto [FN9] ought not be read as an affirmation of the sufficiency of the pleading. The opinions in *Foster* and *Baehr* provide no information on how the claims were formulated. The cases, therefore, can hardly serve as a guide for how breach of contract claims may be adequately pled in accountant malpractice cases.

In sum, plaintiff has failed to state a cause of action in breach of contract. The true nature of Corell's complaint lies in tort, involving a breach of duty arising in law, not contract. Moreover, the broad averments in the complaint do not satisfy Pennsylvania law pleading requirements for breach of contract. As the very same negligence claim is

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                    Page 7

Not Reported in F.Supp., 1992 WL 196768 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.)**

pled in count III, incorporating the allegations listed in count I paragraphs 34 through 55, dismissal of count I will be granted.[FN10]

### D.

Defendants also move to dismiss plaintiff's fraud allegations raised throughout the complaint and count V sounding in fraudulent misrepresentation. Defendants tender two arguments. First, they contend that the Committee failed to plead fraud with the particularity required under Fed.R.Civ.P. 9(b). Second, defendants assert that even if the claims are sufficiently pled pursuant to Rule 9(b), the Committee has failed to allege scienter, one of the elements of fraud. Neither argument withstands scrutiny.

**\*8** Rule 9(b) reads:
In all averments of fraud and mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge and other condition of mind of a person may be averred generally.

With respect to motions to dismiss under Rule 9(b), the Third Circuit has stated that "focusing exclusively on its 'particularity' language is 'too narrow an approach and fails to take account of the simplicity and flexibility contemplated by the rules.' " *Christidis v. First Pennsylvania Mortg. Trust,* 717 F.2d 96, 100 (3rd Cir.1983) (quoting 5 C. Wright & A. Miller Federal Practice and Procedure § 1298, at 407 (1968)). The purpose of Rule 9(b) is to give defendants notice of the "precise misconduct with which they are charged and to safeguard defendants against spurious charges of immoral and fraudulent behavior." *Seville Industrial Machinery Corp. v. Southmost Machinery Corp.,* 742 F.2d 786, 791 (3rd Cir.1984) *, cert. denied,* 469 U.S. 1211 (1985).

In a case with substantially similar facts, *In re U.S. Healthcare, Inc. Securities Litigation,* 122 F.R.D. 467 (E.D.Pa.1988), the court found that the plaintiffs had sufficiently pled a fraud claim against defendant accountants where plaintiffs "identified numerous accounting and auditing standards which,

they allege, were not followed by [their accountants,] ... identified the financial statements which they allege were materially false and ... particularly identified the allegedly misleading portion of the documents." [FN11] Likewise, in *In re Fiddler's Woods Bondholders Litigation,* 102 F.R.D. 291-294 (E.D.Pa.1984), the court ruled that plaintiffs had sufficiently pled a fraud claim against the defending accounting firm where the plaintiff identified the "established principles" defendant supposedly violated. *See also Christidis,* 717 F.2d at 100 (plaintiffs did not aver fraud with sufficient particularity since they failed to disclose how defendants knowingly departed from accounting standards).

In view of the standard for pleading with specificity outlined in *In re U.S. Healthcare, In re Fiddler's Woods,* and *Christidis,* the Committee has pled its fraud claims with sufficient particularity. In paragraph 59, (a) through (t), the Committee identifies the specific accounting and auditing standards allegedly violated by Fishbein.[FN12] Plaintiff is also quite specific as to which financial statements it alleges were materially false and how these statements were fraudulent. Plaintiff's Complaint at ¶¶ 37-55.[FN13] The averments in the complaint are sufficiently particular within the contemplation of Rule 9(b): the complaint provides Fishbein adequate notice of its alleged misconduct and protects them from frivolous allegations of fraud.

Defendants also argue that the fraud claims must be dismissed because plaintiff has failed to plead scienter, one of the five elements of fraud.[FN14] " [F]raud can take many forms ..., whether by direct falsehood or innuendo." *Delahanty v. First Pennsylvania Bank, N.A.,* 464 A.2d 1243, 1251 (Pa.Super.1983). As such, it is not always necessary, let alone possible, to demonstrate specific intent. Under Pennsylvania law, a showing of gross negligence or recklessness is sufficient to plead scienter in fraud claims. *Rosen and Co. Inc. v. Seidman,* 48 D. & C. 3d 411, 421 (1988).

**\*9** In *Rosen,* the court held that "either gross negligence or reckless misstatements would support a finding of fraud, even without a finding of specific

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                    Page 8

Not Reported in F.Supp., 1992 WL 196768 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.)**

intent to deceive." *Rosen,* 48 D. & C. 3d at 421 (citing *Ultramares Corp. v. Touche,* 174 N.E. 441 (1931)). Similarly, in *Delahanty,* the court stated: "It is well settled that fraud is proved when it is shown that the false representation was made knowingly, or in conscious disregard of the truth, or *recklessly without caring whether it be true or false.* " *Delahanty,* 464 A.2d at 1252 (citing *Warren Balderston Co. v. Integrity Trust Co.,* 170 A. 282 (1934)) (emphasis added).

The Committee's complaint has certainly alleged gross negligence and/or recklessness on the part of Fishbein. Plaintiff does not simply assert " Fishbein's conduct was fraudulent," as defendants suggest. Rather, the Committee alleges numerous misrepresentations and omissions by Fishbein which, if proved, would constitute recklessness or gross negligence. The Committee's allegations of fraud and fraudulent misrepresentation are sufficiently pled and dismissal of the claims will be denied.

### E.

Finally, defendants argue that all of the Committee's tort claims against Fishbein must be dismissed because Fishbein owed no duty of care to the Committee. Further, defendants contend that Fishbein did not owe a fiduciary duty to either Corell or the Committee, and therefore, count IV of plaintiff's complaint alleging breach of a fiduciary duty should be dismissed. Neither argument has merit.

As discussed in Part A, the Committee has properly instituted this suit "on behalf of Corell." Since the Committee is acting "on behalf of Corell," the Committee has stepped into the shoes of the company and thus may assert any claims accrued by Corell, including Fishbein's breach of duty toward the company.[FN15] Fishbein certainly owed a duty of care to Corell, the client. Plaintiff's claims will not be dismissed on these grounds.

Concerning defendants' fiduciary duty toward Corell or the Committee, defendants correctly note that it is generally established that an accountant is

not necessarily in a fiduciary relationship with a client. *See, e.g. Stainton v. Tarantino,* 637 F.Supp. 1051, 1066 (E.D.Pa.1986); *Rubin v. Katz,* 347 F.Supp. 322, 324 (E.D.Pa.1972). However, a fiduciary relationship may be shown where the plaintiff can prove that the "accounting services and confidential advice ... provided them gave rise to a confidential relationship." *Stainton,* 637 F.Supp. at 1066.

The court in *Stainton* explains that a confidential relationship arises "only if parties surrender substantial control over some part of their business affairs." *Id.* In more recent years, courts have stated a somewhat different, though similar, definition of fiduciary relationships. The court in *Antinoph v. Laverell Reynolds Securities, Inc.,* 703 F.Supp. 1185, 1188 (E.D.Pa.1989), describes a fiduciary relationship as follows:
**\*10** a fiduciary relationship 'arises whenever a trust, continuous or temporary, is specially reposed in the skill or integrity of another, or the property, or pecuniary interest, in the whole or in a part ... is placed in the charge of another.'.. [I]n addition ... the defendant must also have accepted the fiduciary relationship (quoting *Consolidated Oil and Gas, Inc. v. Ryan,* 250 F.Supp. 600, 604 (W.D.Ark.1966) , *aff'd,*368 F.2d 177 (8th Cir.1966).

Whether Corell yielded "substantial control," *Stainton,* 637 F.Supp. at 1066, to Fishbein, or whether Corell placed its business "in the charge of, " *Antinoph,* 703 F.Supp. at 1188, Fishbein is not completely clear from the complaint. Nor do we know if Fishbein accepted the fiduciary relationship.

The standard for determining the sufficiency of a complaint is quite liberal, though. A complaint should only be dismissed where "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 102 (1957). *See also D.P. Enterprises, Inc. v. Bucks County Community College,* 725 F.2d 943, 944 (3rd Cir.1985) (claim should be dismissed only if no relief could be granted under any set of facts which could be proved). Further development of the facts through discovery may offer some

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                          Page 9

Not Reported in F.Supp., 1992 WL 196768 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.)**

substantiation of the claim that a fiduciary relationship did exist between Corell and Fishbein, and transitively between Fishbein and the Committee, or may conclusively demonstrate the contrary. Accordingly, dismissal of count IV on its face, in advance of such further factual development, would be premature.

For the foregoing reasons, defendants' motion to dismiss will be granted in part and denied in part. The Defendants' Motion to Dismiss will be granted with respect to striking count I for failure to state a breach of contract claim. Defendants' Motion to Dismiss will be denied in all other respects.

Upon consideration of defendants motion to dismiss, for the reasons given in the accompanying memorandum, it is hereby ORDERED and DIRECTED that:

(1) Defendants' motion to dismiss count I for failure to state a claim is GRANTED, and count I is dismissed; and

(2) In all other respects, defendants' motion to dismiss is DENIED.

> FN1. In a motion to stay these proceedings, filed simultaneously with this Motion to Dismiss, defendants urged this court to stay this litigation until the bankruptcy court determines whether plaintiff's authority to prosecute this claim should be excluded from a plan of reorganization approved by that court for the debtor. In a separate memorandum, I denied the motion to stay on a finding that plaintiff's ability to fund this litigation by leave of the bankruptcy court was a matter independent of the merits of this case. I will not revisit in this memorandum defendants' arguments on that issue made

under the guise of a motion to dismiss rather than a motion to stay. However, I note that in concluding that this action need not await a finding by the bankruptcy court that this litigation would ultimately benefit the debtor's estate, I made no judgment as to whether plaintiff met the applicable standing test to prosecute this case on the debtor's behalf.

> FN2. Defendants argue that an unsecured creditors committee lacks standing to sue on behalf of a debtor in possession unless the committee can show that the debtor *unjustifiably* refused to bring suit. Defendants' Motion to Dismiss at 21-26 (citing *STN Enterprises, Inc. v. Noyes*, 779 F.2d 901, 904 (2d Cir.1985). I am persuaded by Bankruptcy Judge Scholl's conclusion in *Nicolet* that the Third Circuit would be more likely to employ a less exacting standard than that used by the Second Circuit.

> FN3. Defendants argue in their Reply Brief that plaintiff must "prove" the potential merit of their claim to some court before plaintiff has standing. Defendants seem to suggest that plaintiff lacks standing unless it can show now they will ultimately prevail. A potentially meritorious claim is not the same as a meritorious claim-and a motion to dismiss is not the same as a motion for summary judgment.

> FN4. Corell initiated its Chapter 11 proceeding on April 24, 1989.

> FN5. The "order for relief" was issued on the date debtor filed for bankruptcy, not on the date the bankruptcy court authorized the Committee to proceed on behalf of Corell. According to 2 *Collier on Bankruptcy* ¶ 102.7 (15th Ed.1992), "In a voluntary case the filing of the petition under section 301 commences the voluntary case and is itself entry of the order for relief from which time periods are to be measured." Corell's bankruptcy

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.

Not Reported in F.Supp., 1992 WL 196768 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.)**

was such a voluntary case. *See also Jackson v. Security Finance Group,* 42 B.R. 76, 84 (Bkrtcy.D.C.1984) (§ 108(a) allows commencement of suit within two years from date bankruptcy petition filed, as long as statute of limitations has not run by the date of filing); *Ellenberg v. Dekalb County Georgia,* 23 B.R. 384, 391 (Bkrtcy.N.D.Ga.1982) (in voluntary bankruptcy case, date of filing of petition is considered the date relief ordered under § 108(a)).

FN6. In holding that the tolling provision of § 108(a) is applicable to plaintiff's causes of action, I reject defendants' arguments, advanced in their Reply Memorandum, that the Committee may not invoke the benefits of § 108. Defendants state that "no court has gone as far as to permit a creditors committee to invoke § 108 even when suing derivatively on behalf of the debtor.... In the case *sub judice,* the Committee is not acting as a collection agent of the debtor. Rather, an agreement was entered into between the debtor and the Unsecured Creditor's Committee whereby the debtor assigned its rights to any claim over and against Fishbein." Reply of Defendant, Fishbein & Company to Plaintiff's Response to Defendant's Motion to Dismiss ("Reply Brief") at 2-3.
In support of this position, defendants cite *Motor Carrier Audit and Collection Company v. Light Products, Inc.,* 113 B.R. 424 (N.D.Ill.1989). There, the court determined that "a mere purchaser or assignee" of the debtor's rights could not be the beneficiary of the § 108 tolling provision where the complaint did not allege that the action was brought on the trustee's behalf. The court explained, though, that if the plaintiff can show that it is an agent of the trustee, as opposed to an assignee, the plaintiff is entitled to the benefits of § 108. *Motor Carrier,* 113 B.R. at 426.
The Committee is not an assignee, as

defendants contend. Rather, the Committee is acting on behalf of Corell, the debtor-in-possession. *See* Plaintiff's Complaint at ¶ 2. In a Chapter 11 case, a debtor-in-possession has the powers and duties of a trustee. 11 U.S.C. § 1107(a). The Committee, therefore, both because it is standing in the shoes of Corell in bringing these claims and because it is " acting on behalf of or as an agent for the trustee," *Motor Carrier,* 113 B.R. at 426, is entitled to invoke the statutory protections of § 108.

FN7. Of course, there are occasions where an action may be brought in both contract and tort. *See Sherman Industries, Inc. v. Goldhammer,* 683 F.Supp. 502, 506 (E.D.Pa.1988) (noting that malpractice actions may be raised in both tort and in contract where the defendant pleads each claim properly).

FN8. Plaintiff also refers to *Robert Wooler Co. v. Fidelity Bank,* 479 A.2d 1027 (1984) . *Wooler* is inapposite, however. The case does not even involve a breach of contract claim, but rather upholds a finding of accountant liability for tortious malpractice.

FN9. The contract claims were challenged on different grounds. In *Foster,* defendant contended plaintiff brought the breach of contract claim on behalf of too wide a group. *Foster,* 587 A.2d at 384-85. And in *Baehr,* defendants challenged the breach of contract claim by arguing that plaintiff was not a real party of interest and that defendants' conduct did not cause plaintiff's loss. *Baehr,* 62 B.R. at 796.

FN10. Since count I will be dismissed, defendants' argument that plaintiff is not entitled to consequential damages for the alleged breach of contract is no longer relevant.

FN11. Defendants rely on Second Circuit

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.

Not Reported in F.Supp., 1992 WL 196768 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.)**

law in citing the standard for pleading with specificity. Third Circuit courts have rejected Second Circuit case law on Rule 9(b) as too stringent. *In re U.S. Healthcare, Inc. Securities Litigation,* 122 F.R.D. at 470 (citing *Recchion v. Westinghouse Electric Corp.,* 606 F.Supp. 889, 894 (W.D.Pa.1985)).

FN12. In four averments, (p) through (s), plaintiff does not indicate a specific accounting standard breached by defendants. However, the language of the four averments, particularly in the context of the eleven other allegations that do refer to standards, adequately notifies Fishbein of the misconduct with which it is charged, thereby defeating a Rule 9(b) motion. *See In re Fiddler's Woods,* 102 F.R.D. at 294 (while not clear that plaintiffs' alleged violation was of "established" principles, Rule 9(b) motion failed since allegations specific enough to give defendant notice of the claims against it and to prevent frivolous claims).

FN13. For example, plaintiff lists seven very specific problems with Fishbein's performance of the 1987 audit, including failure "to discover and deduct from the inventory certain inventory on hand but held on consignment for third parties," and failure "to make sufficient inquiry and provide allowance for scrap and/or obsolete inventory." Plaintiff's Complaint at ¶ 47.

FN14. Under Pennsylvania law, the five elements of fraud include: (1) false representation of an existing fact, (2) materiality of the misrepresentation, (3) scienter, (4) reliance, and (5) damage to the person relying thereon. *Rosen and Co., Inc. v. Seidman,* 48 D. & C. 3d 411, 415-16 (1988).

FN15. Moreover, as mentioned in Part A, the Committee is entitled to raise Corell's claims as the appointed representative of

the estate. *See Doemling,* 127 B.R. at 948 (committee of unsecured creditors could bring tort claim against defendant where committee appointed by court and committee representative of estate).

Under 11 U.S.C. § 541, the property of the debtor's estate includes the debtor's legal or equitable causes of action. In that Corell's cause of action against Fishbein arose prior to the filing for bankruptcy, Corell's cause of action is part of the estate.

E.D.Pa.,1992.
Official Committee of Unsecured Creditors of Corell Steel on Behalf of Corell Steel v. Fishbein and Co., P.C.
Not Reported in F.Supp., 1992 WL 196768 (E.D.Pa.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**9**



2007 WL 2263893
--- F.Supp.2d ----, 2007 WL 2263893 (S.D.N.Y.)
**(Cite as: 2007 WL 2263893 (S.D.N.Y.))**

Page 1

**H**
Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
In re PARMALAT SECURITIES LITIGATION.
This document relates to: 06 Civ. 0383, 06 Civ. 3109.
**No. 04 MD 1653(LAK).**

Aug. 8, 2007.

**Background:** Actions were brought on behalf of the successors of two bankrupt subsidiaries against a number of banks and accounting firms for allegedly helping to conceal parent's true financial condition, thus causing the subsidiaries to incur debt in reliance on misrepresentations of parent's financial health. Defendants filed motions to dismiss.

**Holdings:** The District Court, Kaplan, J., held that:

(1) subsidiaries of insolvent parent corporation could not seek damages for their wrongful incurrence of debt in reliance on misrepresentations of parent's financial health by defendant banks and accounting firms, and

(2) claims were not stated against defendants for the looting of subsidiary's proceeds of sale-leaseback transaction by parent's corrupt insiders.

Motions granted.

[1] Accountants  11

11Ak11 Most Cited Cases
Subsidiaries of insolvent parent corporation could not seek damages under New York law for their wrongful incurrence of debt in reliance on misrepresentations of parent's financial health by defendant banks and accounting firms since subsidiaries failed to allege that such misrepresentations caused injury by inducing them to delay filing for bankruptcy; insofar as subsidiaries claimed that they were induced to delay in liquidating, they failed to allege harm to themselves, and any harm to subsidiaries due to delay in filing for reorganization was purely speculative.

[1] Banks and Banking  100

52k100 Most Cited Cases
Subsidiaries of insolvent parent corporation could not seek damages under New York law for their wrongful incurrence of debt in reliance on misrepresentations of parent's financial health by defendant banks and accounting firms since subsidiaries failed to allege that such misrepresentations caused injury by inducing them to delay filing for bankruptcy; insofar as subsidiaries claimed that they were induced to delay in liquidating, they failed to allege harm to themselves, and any harm to subsidiaries due to delay in filing for reorganization was purely speculative.

[2] Corporations 460

101k460 Most Cited Cases
Looting of the proceeds of a loan to company can constitute an actionable injury to the company under New York law.

[3] Accountants 9

11Ak9 Most Cited Cases
Absent allegations that any of insolvent parent corporation's banks and accounting firms had any connection to financially dependent subsidiaries or even knew about, assisted, or otherwise participated in one subsidiary's loan in the form of a sale-leaseback transaction, let alone the looting of the proceeds by parent's corrupt insiders, subsidiaries' losses were not a foreseeable result of banks' and accounting firms' alleged schemes to hide parent's financial condition so as to give rise to claims under New York law for aiding and abetting breach of fiduciary duty and fraud by parent's insiders, and for participating in a civil conspiracy to conceal parent's financial condition.

[3] Banks and Banking 100

52k100 Most Cited Cases
Absent allegations that any of insolvent parent

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2007 WL 2263893                                                        Page 2
--- F.Supp.2d ----, 2007 WL 2263893 (S.D.N.Y.)
**(Cite as: 2007 WL 2263893 (S.D.N.Y.))**

corporation's banks and accounting firms had any connection to financially dependent subsidiaries or even knew about, assisted, or otherwise participated in one subsidiary's loan in the form of a sale-leaseback transaction, let alone the looting of the proceeds by parent's corrupt insiders, subsidiaries' losses were not a foreseeable result of banks' and accounting firms' alleged schemes to hide parent's financial condition so as to give rise to claims under New York law for aiding and abetting breach of fiduciary duty and fraud by parent's insiders, and for participating in a civil conspiracy to conceal parent's financial condition.

**[3] Conspiracy**  9
91k9 Most Cited Cases
Absent allegations that any of insolvent parent corporation's banks and accounting firms had any connection to financially dependent subsidiaries or even knew about, assisted, or otherwise participated in one subsidiary's loan in the form of a sale-leaseback transaction, let alone the looting of the proceeds by parent's corrupt insiders, subsidiaries' losses were not a foreseeable result of banks' and accounting firms' alleged schemes to hide parent's financial condition so as to give rise to claims under New York law for aiding and abetting breach of fiduciary duty and fraud by parent's insiders, and for participating in a civil conspiracy to conceal parent's financial condition.

**[4] Federal Civil Procedure**  636
170Ak636 Most Cited Cases
Subsidiaries of insolvent parent corporation failed to plead fraud with particularity where they did not adequately allege auditor's actual or imputed knowledge that parent's insiders were committing fraud, and that it was reasonably foreseeable to auditor that its conduct in appraising subsidiary's assets for purposes of sale-leaseback transaction would result in the looting of subsidiary's assets by parent's corrupt insiders; therefore, lack of allegation that auditor proximately caused the proceeds of sale-leaseback transaction to be looted precluded subsidiaries from stating claims against the auditor under New York law for aiding and abetting breach of fiduciary duty and fraud by parent's insiders, and for participating in a civil conspiracy to conceal parent's financial condition. Fed.Rules Civ.Proc.Rule 9(b), 28 U.S.C.A.

**[5] Federal Civil Procedure** 636
170Ak636 Most Cited Cases
For purposes of satisfying requirement for pleading fraud with particularity, strong inference of a defendant's knowledge of fraud may arise where the complaint sufficiently alleges that the defendant (1) benefited in a concrete and personal way from the purported fraud, (2) engaged in deliberately illegal behavior, (3) knew facts or had access to information suggesting that fraud was being committed, or (4) failed to check information it had a duty to monitor. Fed.Rules Civ.Proc.Rule 9(b), 28 U.S.C.A.

**[6] Principal and Agent** 1
308k1 Most Cited Cases
An agency relationship exists under New York law when there is agreement between the principal and the agent that the agent will act for the principal and the principal retains a degree of control over the agent.

**[7] Corporations** 1.5(3)
101k1.5(3) Most Cited Cases
Under New York law, directors and officers holding positions with a parent and its subsidiary can "change hats" to represent the two corporations separately, despite their common ownership; courts generally presume that the directors are wearing their "subsidiary hats" and not their "parent hats" when acting for the subsidiary.

**[8] Corporations** 1.5(1)
101k1.5(1) Most Cited Cases
Fact that one corporation finances some of the operations of another does not necessarily establish an agency relationship under New York law.

**[9] Corporations** 1.5(3)
101k1.5(3) Most Cited Cases
Alleging that a company requested a representative of its parent organization to resolve its business dispute with a sister company is insufficient to allege that it controlled the parent organization so as to give rise to agency relationship under New York law.

**[10] Joint Adventures** 7

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2007 WL 2263893                                                                                          Page 3
--- F.Supp.2d ----, 2007 WL 2263893 (S.D.N.Y.)
(Cite as: 2007 WL 2263893 (S.D.N.Y.))

224k7 Most Cited Cases
Under New York law, knowledge of a joint adventurer is imputed to its co-adventurers.

**[11] Joint Adventures** 🔑 1.2(7)
224k1.2(7) Most Cited Cases
Under New York law, one of the essential features of a joint venture is an agreement among the parties to share profits and losses from the undertaking.

**[12] Joint Adventures** 🔑 1.2(8)
224k1.2(8) Most Cited Cases
Allegation that each member accounting firm had the power to, and did, control the nature, amount, and flow of information to other member firms regarding affiliated companies under audit did not give rise to inference of joint control so as to support finding of joint venture under New York law; rather, allegation suggested that firms did not have control over one another's work, but instead acted as individual entities working on discrete projects.

Leo R. Beus, Adam C. Anderson, Beus Gilbert PLLC, Herbert P. Minkel, Jr., Esq., for Plaintiffs.

Daniel F. Kolb, Sharon Katz, Davis Polk & Wardwell, for Defendants Deloitte & Touche USA LLP and Deloitte & Touche LLP.

Richard A. Martin, E. Joshua Rosenkranz, Erik S. Groothuis, Mark A. Picard, Heller Ehrman LLP, for Defendant Deloitte & Touche S.p.A.

Michael J. Dell, Michael S. Oberman, Timothy P. Harkness, Kramer Levin Naftalis & Frankel LLP, for Defendant Deloitte Touche Tohmatsu.

Bruce R. Braun, Linda T. Coberly, Winston & Strawn LLP, Margaret Maxwell Zagel, Ronald P. Gould, Grant Thornton LLP, for Defendant Grant Thornton LLP.

James L. Bernard, Katherine I. Puzone, Michele S. Carino, Marisa Brahms, Stroock & Stroock & Lavan LLP, for Defendant Grant Thornton International.

A. Robert Pietrzak, Thomas McC. Souther, Daniel A. McLaughlin, Joseph B. Tompkins, Jr., Alan C. Geolot, Mark P. Guerrera, Sidley Austin LLP, for Defendants Bank of America Corp., Bank of America, N.A., Bank of America National Trust & Savings Association, Banc of America Securities LLC, Banc of America Securities Ltd., and Bank of

America International Ltd.

Michael S. Feldberg, Todd S. Fishman, Lanier Saperstein, Laura Martin, Allen & Overy LLP, for Defendants Credit Suisse, Credit Suisse International, and Credit Suisse Securities (Europe) Ltd.

Dennis E. Glazer, Nancy B. Ludmerer, Elliot Moskowitz, Antoinette G. Ellison, Davis Polk & Wardwell, for Defendant Banca Nazionale del Lavoro S.p.A.

Michael C. Lambert, Richard A. Bertocci, Andreas Seuffert, Gilmartin, Poster & Shafto LLP, for Defendant Banca Intesa S.p.A.

**OPINION**

KAPLAN, District Judge.

*1 International dairy conglomerate Parmalat S.p.A. and its affiliates ("Parmalat") collapsed in scandal and filed for bankruptcy in Italy in late 2003. These actions are brought on behalf of the successors of two bankrupt Parmalat subsidiaries against a number of banks and accounting firms principally for helping conceal Parmalat's true financial condition, thus causing the subsidiaries to incur debt in reliance on misrepresentations of Parmalat's financial health. Before the Court are defendants' motions to dismiss the second amended complaints in both actions.

*Facts*

The complaints in these two actions are substantially the same. The only relevant differences are that the complaint in *Smith v. Bank of America* [FN1] names Banca Intesa as a defendant and asserts a cause of action against certain other defendants for aiding and abetting a fraudulent conveyance, while the complaint in *Pappas v. Bank of America* [FN2] does not. Accordingly, the following allegations are drawn from both complaints unless otherwise indicated.

*I. The Parties*

*A. Plaintiffs*

Parmalat USA Corp. ("Parmalat USA") was a wholly owned subsidiary of Parmalat. It had no operations or employees of its own, but was the sole owner of Farmland Dairies LLC ("Farmland"), which was in the business of processing, selling, and distributing dairy products in the United States. [FN3] According to the complaints, both Parmalat USA and Farmland (the "Companies") were insolvent

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2007 WL 2263893                                                                                          Page 4
--- F.Supp.2d ----, 2007 WL 2263893 (S.D.N.Y.)
**(Cite as: 2007 WL 2263893 (S.D.N.Y.))**

and completely financially dependent on Parmalat. [FN4]

The Companies filed for bankruptcy in this district on February 24, 2004, following Parmalat's collapse. [FN5] On March 10, 2004, the bankruptcy court confirmed a liquidation plan for Parmalat USA and a modified reorganization plan for Farmland. Plaintiff G. Peter Pappas was appointed the administrator of Parmalat USA's Plan of Liquidation. Plaintiff Gerald K. Smith was appointed the litigation trustee of Farmland Dairies LLC Litigation Trust. [FN6]

*B. Defendants*

*1. The Deloitte Defendants*

Deloitte Touche Tohmatsu ("DTT") is a Swiss association headquartered in New York and the umbrella firm for the international accounting enterprise commonly known as "Deloitte." [FN7]

Deloitte & Touche USA LLP and its subsidiary, Deloitte & Touche LLP (collectively, "Deloitte USA") are Delaware limited liability partnerships. Together they constitute the United States member firm of the Deloitte organization. [FN8] Deloitte USA audited Parmalat USA's financial statements from 1999 to 2002. [FN9]

Deloitte & Touche, S.p.A. ("Deloitte Italy") is an Italian limited liability entity and the Italian member firm of DTT. [FN10] It audited Parmalat's consolidated financial statements from 1999 to 2002. [FN11]

*2. The Grant Thornton Defendants*

Grant Thornton International ("GTI") is an Illinois corporation headquartered in London and the umbrella organization for Grant Thornton entities throughout the world. Grant Thornton LLP ("GT USA") is an Illinois limited liability partnership and the United States member firm of GTI. Grant Thornton S.p.A. ("GT Italy") is an Italian limited liability entity and the Italian member firm of GTI. [FN12] GT Italy audited the financial statements of Parmalat's off-shore subsidiary, Bonlat Financing Ltd. ("Bonlat") from 1999 to 2002. [FN13]

*3. The Bank of America Defendants*

**\*2** Bank of America Corp. ("BA Corp.") is a Delaware corporation and the parent of Bank of America, N.A. ("BANA"), a national banking association based in North Carolina and successor of Bank of America National Trust & Savings Association ("BANTSA"). Banc of America Securities Ltd. ("BAS Ltd.") is a United Kingdom limited liability investment bank and BANA's wholly owned subsidiary. Its predecessor was Bank of America International Ltd. (BAI). Banc of America Securities LLC ("BAS LLC"), also a subsidiary of BA Corp., is a Delaware limited liability investment bank and brokerage firm based in North Carolina. [FN14]

*4. The Credit Suisse Defendants*

While the complaints are not entirely clear, it appears that there are three Credit Suisse defendants.

Credit Suisse Group ("CSG") is a Swiss global financial services company with a branch office in New York City. According to the complaints, an entity called Credit Suisse First Boston ("CSFB") was its wholly owned subsidiary and investment banking and asset management arm until 2005 when it merged with Credit Suisse ("CS"), which the complaints describe as CSG's private banking division. The complaints appear to name CS as a defendant. If, in fact, that was the intention and if, as plaintiffs suggest, CS is an unincorporated division of CSG, CSG would be a defendant. The Court notes, however, that CSG's Report on Form 6-K for August 2007 describes CS as a wholly-owned subsidiary. In addition, counsel for the Credit Suisse defendants have appeared on behalf of CS rather than CSG. In consequence, the Court concludes that the plaintiffs sued CS, not CSG. In view of the outcome of these motions, however, any uncertainty ultimately is immaterial.

The other two Credit Suisse defendants are Credit Suisse First Boston International ("CSFBI"), a London-based bank, and Credit Suisse Securities (Europe) Limited ("CSSEL"), a London-based broker-dealer. [FN15]

*5. Banca Nazionale*

Banca Nazionale del Lavoro S.p.A. ("BNL") is an Italian banking conglomerate. It has branches in the United States, including New York and Chicago, and describes itself as one of the world's 100 largest banks. BNL's subsidiary, Ifitalia S.p.A. ("Ifitalia"), is an Italian bank and factoring company. [FN16]

*6. Banca Intesa*

Smith's complaint names also Banca Intesa ("Intesa"), one of Italy's largest banking companies, which provides a variety of commercial banking services. [FN17] Its subsidiary, Nextra Investment Management SGT ("Nextra"), serves as Intesa's asset management and investment banking arm. [FN18]

## II. The Alleged Wrongdoing

The complaints are long, rambling, repetitious, and disorganized. [FN19] Their gist, however, can be summed up as follows.

Plaintiffs allege that the Companies were insolvent and completely financially dependent on Parmalat at all relevant times. [FN20] For example, the notes to Parmalat USA's consolidated financial statements for 2002 stated that the company's ability to maintain its then-current debt arrangement, obtain additional financing from third-party lenders, and continue as a going concern was dependent on Parmalat's ability to guarantee Parmalat USA's debt to third parties and Parmalat's forbearance from calling debts owed to it by Parmalat USA. [FN21]

*3 Because of this dependence on Parmalat, plaintiffs claim, certain "innocent decision makers" at the Companies relied on representations that Parmalat was financially healthy in (1) causing Parmalat USA to incur more than $20 million in debt guaranteed by Parmalat, [FN22] and (2) causing Farmland to take out a loan in the form of a sale-leaseback transaction, whereby it transferred its dairy processing plants and equipment to a third party and leased them back under leases guaranteed by Parmalat. [FN23]

Plaintiffs allege, however, that Parmalat in fact was in financial ruin when the Companies entered into these transactions. Certain of Parmalat's officers, directors, and other employees allegedly had looted the company for years and fraudulently concealed the company's true financial condition in its financial statements. [FN24] Plaintiffs allege that the Companies therefore incurred debt that they were unable to repay once Parmalat collapsed in 2003, thus deepening their insolvency. In addition, the proceeds of the sale-leaseback transaction allegedly were looted by Parmalat insiders. [FN25]

According to plaintiffs, the innocent decision makers would have prevented the Companies from incurring these liabilities in the first instance, reported the fraudulent acts being committed by Parmalat's insiders, and filed for bankruptcy at an earlier date if they had known the truth about Parmalat's financial condition. [FN26]

Defendants are charged principally with assisting the Parmalat fraud or otherwise with being complicit in a scheme to hide Parmalat's financial condition. The allegations of defendants' wrongdoing may be divided into three categories.

### A. Misleading Parmalat Financial Statements

The first includes claims that Deloitte Italy and GT Italy helped Parmalat insiders misrepresent Parmalat's financial condition in financial statements. They allegedly did so by (1) failing to reveal in their audit reports that Bonlat was booking fictitious sales to boost Parmalat's reported revenues, and that Bonlat's sole purported asset, a $4.9 billion bank account, did not exist, [FN27] (2) participating in a scheme with Parmalat's insiders to reclassify improperly "Parmalat's growing debts to third parties as obligations owed by one Parmalat entity to another," [FN28] and (3) deliberately preventing DTT's Maltese member firm ("Deloitte Malta"), which audited Bonlat's parent, Parmalat Capital Finance ("PCF"), from receiving Bonlat's audited financial statements for the years 2001 and 2002, thus preventing Deloitte Malta from completing its audit work on PCF's 2002 financial statements and blowing the whistle on the Bonlat fraud. [FN29]

The complaints allege that Deloitte Italy further assisted the fraud by (4) certifying Parmalat's 2002 financial statements without having received certification of PCF's financial statements for that year, [FN30] (5) failing to reveal in its audit reports that reimbursement credits issued by Parmalat to its subsidiaries, which the subsidiaries booked as reductions in costs and expenses, were uncollectible, [FN31] and (6) failing to ensure that a $26.5 million write-down of Parmalat USA's goodwill in 2002 "flowed through" to Parmalat's financial statements. [FN32]

### B. Fraudulent Transactions

*4 The second category of allegations includes claims that certain defendants engaged in transactions that permitted Parmalat insiders to misrepresent the company's financial health.

Plaintiffs allege that the Bank of America and Credit Suisse Defendants structured or otherwise participated in fraudulent transactions designed to conceal Parmalat's debt, [FN33] and that BNL and

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2007 WL 2263893                                                                                   Page 6
--- F.Supp.2d ----, 2007 WL 2263893 (S.D.N.Y.)
**(Cite as: 2007 WL 2263893 (S.D.N.Y.))**

Ifitalia repeatedly paid Parmalat cash in exchange for assignment of receivables that both parties knew were bad, thus permitting Parmalat to record as assets what essentially were loans from BNL. [FN34] These allegations are substantially similar to those described in the Court's earlier opinions in related matters, [FN35] familiarity with which is assumed, and need not be recounted here.

In addition, Smith alleges that Intesa assisted Parmalat's insiders in fraudulently securing financing through the use of a company called Wishaw Trading S.p.A. ("Wishaw"). [FN36] Although Smith does not so allege, he implies that Parmalat or its employees somehow controlled Wishaw. [FN37] According to Smith, Parmalat insiders "used" Wishaw to manufacture fictitious promissory notes, purportedly representing trade debt owed to Intesa, which Intesa then endorsed and sold to third parties, thus acting as a "broker/banker of fraudulently obtained loans." The purpose of the transaction, Smith claims, was to raise money to "prop up Parmalat's ailing Brazilian operations and to improperly funnel money to" Parmalat's corrupt insiders. [FN38]

Smith alleges also that in June 2003, Nextra purchased an entire 300 million bond issue of Parmalat Finance Corporation B.V., which it resold within a few months for a substantial profit, despite knowing of Parmalat's "disastrous financial condition." According to Smith, this transaction "artificially propped up Parmalat and concealed Parmalat's true financial condition." [FN39]

*C. Deloitte USA*

The third category of allegations involves claims arising from the conduct of Deloitte USA.

*1. Auditing Services*
Plaintiffs claim that Deloitte USA misled innocent insiders at the Companies by issuing unqualified audit opinions of Parmalat USA's financial statements for the years 1999 to 2002.

*a. Reimbursement Credits*
They allege that Parmalat USA had booked millions of dollars worth of "reimbursement credits" issued by Parmalat between 1999 and 2002. [FN40] The credits had been booked as reductions in costs and expenses and therefore increased Parmalat USA's reported net income and assets. [FN41] Plaintiffs claim, however, that the credits in fact were "uncollectible." [FN42] They allege that Deloitte USA violated generally accepted auditing standards

("GAAS") by failing to obtain sufficient audit evidence that the credits were genuine despite "red flags" that should have cued it into the fact that they were phony. [FN43]

In particular, plaintiffs claim that when Deloitte USA conducted a "successor audit" of Parmalat USA in 1999, it discovered that the company had not collected on similar reimbursement credits issued from 1995 to 1998. [FN44] They allege also that when Deloitte USA "sought confirmation from [Parmalat and Deloitte Italy] of the calculations and nature of the reimbursement credits" and "questioned why the reimbursement credits were accounted for as reimbursement of expenses as opposed to a capital contribution from [Parmalat]," it "did not receive the confirmations and information it requested" because Parmalat and Deloitte Italy "repeatedly refused to provide such audit evidence." [FN45] Plaintiffs allege further that Carlo Zucchinali of Deloitte Italy sent a January 18, 2000 email to James Pickette, Deloitte USA's audit manager, describing the reimbursement credits as "loss absorptions," or "contributions--income for the receiving company--from other Parmalat companies to cover losses." [FN46]

*5 According to plaintiffs, Deloitte USA knew or should have known that the reimbursement credits were uncollectible and that Parmalat USA's financial condition was overstated in its financial statements. It therefore acted improperly in failing to qualify its audit opinions. [FN47]

*b. Going Concern Qualifications*
Plaintiffs claim that Deloitte USA failed to issue going concern qualifications in its audit opinions. Because Parmalat USA was financially dependent on Parmalat, they allege, Deloitte USA was required by GAAS either to obtain evidence that Parmalat in fact intended to give, and was capable of giving, continued financial support to Parmalat USA, or to reveal in its audit opinions that there was substantial doubt about the company's ability to continue as a going concern. [FN48] Plaintiffs claim that Deloitte USA failed to do either.

In connection with its audits of Parmalat USA for the years 1999 to 2001, Deloitte USA allegedly sought only representations from Parmalat's managers than Parmalat would continue to support Parmalat USA. Plaintiffs claim that this was insufficient under GAAS. [FN49]

On May 8, 2003, in connection with Parmalat USA's

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2007 WL 2263893                                                                                                    Page 7
--- F.Supp.2d ----, 2007 WL 2263893 (S.D.N.Y.)
**(Cite as: 2007 WL 2263893 (S.D.N.Y.))**

2002 audit, Astrid Potts of Deloitte USA allegedly "sought from [Deloitte Italy] and Parmalat-SpA details of the *actual audit evidence*--not just the representation from Parmalat-SpA's management that had become the norm--that [Deloitte Italy] was relying upon to confirm Parmalat-SpA would not call loans to Parmalat-USA due during 2003 and that Parmalat-SpA had the ability to continue to provide financial support to Parmalat-USA." [FN50] According to plaintiffs, "Lelio Bigogno of [Deloitte Italy] responded that same day to Potts, refusing to provide the requested audit evidence: 'I do not believe that out consideration on the capability of Finanziaria *to support or on whatsoever information about our* audit procedures should be shared with you [*sic* ]." [FN51]

Plaintiffs claim that Bigogno's response to Potts should have signaled to Deloitte USA that there was serious doubt about Parmalat's ability and intention to continue supporting the Companies. Nevertheless, plaintiffs allege, Deloitte USA improperly issued an unqualified audit opinion of Parmalat USA's 2002 financial statements. [FN52]

*c. Overstatement of Goodwill*
The complaints allege also that Deloitte USA failed to reveal that Parmalat USA's goodwill was overstated in financial statements.

According to plaintiffs, "[f]or the years 2000 and 2001, the goodwill reported on the balance sheet of Parmalat-USA constituted approximately half or more of Parmalat-USA's total reported assets" and that "[r]eported goodwill and other intangible assets totaled approximately $202 million at the end of fiscal year 2000 and $198 million at the end of fiscal year 2001." [FN53] Plaintiffs allege that "the results of the underlying operations of Parmalat-USA and its subsidiaries did not justify" the reported values. [FN54]

*6 When it became clear that the company's goodwill was overstated, Deloitte USA and Parmalat USA reduced reported goodwill by $26.5 million. Plaintiffs contend that "even this write-down was not sufficient." [FN55] They allege that Deloitte USA knew or should have known that Parmalat USA's goodwill was misstated, and that had it conducted its audits in accordance with GAAS, it would have revealed this in its audit opinions. [FN56]

*2. The Sale-Leaseback Transaction*
The remaining allegations against Deloitte USA arise from a 2003 transaction between Farmland and

General Electric Capital Corporation ("GECC").

*a. The Proposed Deal*
The complaints allege that, in late 2002, Parmalat's corrupt insiders "desperately needed increasing amounts of cash in order to fund their fraudulent scheme." Parmalat hired Citigroup Global Markets ("CGM") to locate an investor to provide financing using Farmland's assets as security. [FN57] GCM found GECC.

GECC and Parmalat initially contemplated that GECC would lend $200 million to Farmland in the form of a sale-leaseback transaction--Farmland would transfer its dairy processing plants and equipment to GECC in exchange for $200 million in cash and then lease the assets back. It allegedly "was understood that the financing would be upstreamed to Parmalat-SpA and that Parmalat-SpA was the ultimate creditor." Parmalat therefore would guarantee the leases. [FN58] The transaction later was restructured and divided into two tranches, the first of which was $100 million and the second $94 million. [FN59]

GECC required that it be provided with Parmalat USA's audited financial statements for the years 2000 and 2001. During the winter of 2002 and the spring of 2003, Deloitte USA provided GECC with the requested documents. Plaintiffs allege that "GECC also received Parmalat-USA's unaudited financial statements for 2002." [FN60]

GECC required also that Farmland's dairy processing equipment be appraised. This was in part because GECC required "the outstanding loan amount to be over-collateralized at all times by at least 30% (i.e., 1.3 times)." GECC therefore required Farmland's assets to be worth at least $252.2 million, or 130 percent of $194 million. [FN61]

*b. The Deloitte USA-Deloitte Italy Dispute*
Plaintiffs allege that, in September 2002, CGM "requested" that GECC use Deloitte USA as the appraiser of Farmland's assets. [FN62] When Adolfo Mamoli of Deloitte Italy found out about this, he objected vigorously, claiming that the appraisal assignment necessarily would compromise Deloitte USA's independence with respect to its audits of Parmalat USA. That is, Mamoli complained that if Deloitte USA served both as an appraiser of Farmland's assets and as auditor of Parmalat USA, it ultimately would have to audit a transaction, the value of which would have been based upon its own appraisal. Plaintiffs allege that Mamoli voiced his

2007 WL 2263893                                                                          Page 8
--- F.Supp.2d ----, 2007 WL 2263893 (S.D.N.Y.)
**(Cite as: 2007 WL 2263893 (S.D.N.Y.))**

objection repeatedly between September 5, 2002 and January 16, 2003. [FN63]

*7 Charles Horstmann, DTT's global director of ethics and independence, "was responsible for mediating disputes between [Deloitte] member firms, including those arising out of the Parmalat account." Horstmann, "on behalf of DTT and at the request of [Deloitte USA]," allegedly intervened in the dispute between Deloitte USA and Deloitte Italy. [FN64] Plaintiffs allege that Horstmann was able to "persuade Mamoli to withdraw his objection" "[a]fter a long series of e-mails, telephone conversations, and at least one face-to-face meeting." Mamoli allegedly withdrew his objection "even though the substance of that objection was not resolved." [FN65]

### c. The Appraisal

Sometime in March 2003, "GECC executed a letter agreement with [Deloitte USA] dated February 21, 2003, whereby [Deloitte USA] agreed to appraise" the property that would be subject to the sale-leaseback transaction. [FN66]

On April 30, 2003, Deloitte USA issued an appraisal report. According to plaintiffs, the report inflated the appraisal value of Farmland's assets. It allegedly reported an appraisal value of $252.5 million--more than enough to meet GECC's collateralization requirements for a $194 million transaction--even though an appraisal performed in 1999 by Daley-Hodkin Appraisal Corporation ("DHAC") valued Farmland's assets at about $35 million. Plaintiffs contend that Deloitte USA's appraisal report "provided no explanation or justification for an over seven-fold increase in the value of Farmland's assets in four years, despite Farmland having reported substantial operating losses over the same period." [FN67]

Plaintiffs allege that the overvaluation stemmed from the fact that Deloitte USA "ignored two of the three basic approaches to valuation[, t]he Cost Approach and the Market Comparable Approach," and instead applied only the "Discounted Cash Flow Approach." [FN68] Moreover, plaintiffs allege, in applying the discounted cash flow approach, Deloitte USA relied on "calculated" instead of actual values for Farmland's 2001 and 2002 earnings before income taxes, depreciation, and amortization ("EBITDA"). Deloitte USA allegedly stated in its appraisal report that Farmland's EBITDA for 2002 was unavailable, and therefore projected the company's 2003 EBITDA value and then "calculated" EBITDA values for previous years "by reducing the 2003 projections by

2.5% per year." Plaintiffs claim that Deloitte USA did this despite knowing Farmland's actual EBITDA values for 2002. According to plaintiffs, Deloitte USA's "calculated" EBITDA values "far exceeded" the actual values. [FN69]

### d. The Aftermath

On the same day that Deloitte USA issued its appraisal report, Farmland transferred its dairy processing plants and equipment to GECC for $100 million. It agreed to make periodic lease payments totaling $50 million plus interest and costs and a residual payment of $50 million at the end of the lease term. [FN70] Although plaintiffs do not so allege, the complaints imply that this $100 million transaction represented only the first tranche of sale-leaseback transaction.

*8 In February 2004, Farmland was unable to make its lease payments. Moreover, as Parmalat already had been declared insolvent in Italy, Parmalat "failed to honor its obligations under its guarantee given to GECC." [FN71]

Plaintiffs claim that the sale-leaseback transaction would not have gone forward if Farmland's assets had been valued properly. They claim that a proper appraisal would have revealed not only that the transaction was not sufficiently collateralized to meet GECC's requirements, but also that there were substantial doubts about the Companies' abilities to continue as going concerns. [FN72] Hence, plaintiffs contend that Farmland would not have incurred a liability on which it ultimately defaulted when Parmalat collapsed if Deloitte USA had acted properly. [FN73]

The complaints allege also that, after Farmland entered into the sale-leaseback transaction and received the $100 million from GECC, Parmalat's insiders "looted the cash by causing Farmland to ultimately divert $20 million to Parmalat's Canadian operations and $80 million to Parmalat" itself. [FN74]

### III. Causes of Action

Plaintiffs assert causes of action against all defendants for aiding and abetting breach of fiduciary duty [FN75] and fraud [FN76] by the Parmalat insiders, as well as for participating in a civil conspiracy to conceal Parmalat's financial condition. [FN77] They allege also violations by the Bank of America and Deloitte Defendants of the federal and New Jersey Racketeer Influenced and Corrupt

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Organizations Acts ("RICO") [FN78] based on alleged predicate acts of mail and wire fraud. [FN79] In connection with the auditing services Deloitte USA provided to the Companies, plaintiffs sue the Deloitte Defendants for fraud, [FN80] negligent misrepresentation, [FN81] and professional malpractice. [FN82] Finally, Smith asserts a claim against the Bank of America, Deloitte, and Grant Thornton Defendants for aiding and abetting a fraudulent transfer of Farmland's assets. [FN83]

The Deloitte, Bank of America, and Credit Suisse Defendants, as well GTI, GT USA, and BNL move to dismiss the claims against them in both complaints. In addition, Intesa moves to dismiss the claims against it in Smith's complaint.

*Discussion*

*I. Standard*

In deciding a motion to dismiss, the Court ordinarily accepts as true all well-pleaded factual allegations and draws all reasonable inferences in the plaintiff's favor. [FN84] Until recently, it frequently was said that dismissal is inappropriate "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." [FN85] This standard, however, has been supplanted. Now, in order "[t]o survive dismissal, the plaintiff must provide the grounds upon which his claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.' " [FN86]

In addition, Federal Rule of Civil Procedure 9(b) requires allegations of fraud and breach of fiduciary duty consisting of fraud by a fiduciary to be stated with particularity. [FN87] While the rule allows general averments of intent, knowledge, and other mental conditions, it nevertheless requires a plaintiff to allege facts that give rise to a "strong inference" of the defendant's culpable state of mind. [FN88] This may be done by alleging facts that the defendant had both motive and opportunity to commit or assist fraud, or facts that constitute strong circumstantial evidence of the defendant's conscious misbehavior or recklessness. [FN89]

*II. Choice of Law*

*\*9 Plaintiffs argue that New Jersey law applies to all of their claims. Some defendants resist this; others do not. However, the parties point to no conflict between the law of the forum and that of any other state with respect to the issues necessary to dispose of these

motions. Accordingly, the Court applies New York law. [FN90]

*III. Injury*

[1] The complaints allege two kinds of injury to the Companies. First, plaintiffs contend that defendants' improper actions misled innocent decision makers at the Companies about Parmalat's financial health. Believing, incorrectly, that Parmalat could provide the Companies with continuing financial support and guarantee its loans, the innocent decision makers caused the already-insolvent Companies to incur debt they were unable to pay, thus deepening their insolvency. Second, plaintiffs claim that the $100 million GECC paid to Farmland as part of the sale-leaseback transaction was looted by Parmalat's corrupt insiders.

*A. Deepened Insolvency*

The parties devote a great deal of space to arguing whether courts recognize "deepened insolvency" damages or "deepening insolvency" causes of action. But this ultimately is beside the point, as plaintiffs have failed adequately to allege that the Companies were injured when they allegedly were induced to incur debt, whatever the claimed injury should be labeled.

*1. Debt and Insolvency*

Plaintiffs assume that the mere act of incurring debt when a company already is insolvent--that is, when its liabilities are greater than the value of its assets [FN91] or when it is unable to repay its existing debt [FN92]-- necessarily deepens the company's insolvency. This is not the case.

When, for example, a company borrows cash and receives the full amount of the loan, it receives an asset that directly offsets the newly incurred liability on its balance sheet. In other words, the company "expand[s] debt in *precise* proportion--dollar-for-dollar proportion--to the expansion of assets in the form of new cash." [FN93] The difference between the company's assets and liabilities therefore remains the same. Its ability to pay its debts as they become due is no worse; indeed, it may be better. The company's insolvency is no greater than before. [FN94]

The Ninth Circuit recognized this in *Rochelle v. Marine Midland Grace Trust Co. of New York.* [FN95] Rochelle, the trustee of a bankrupt company, Sunset, sued directors, officers, and auditors for

2007 WL 2263893                                                                                    Page 10
--- F.Supp.2d ----, 2007 WL 2263893 (S.D.N.Y.)
(Cite as: 2007 WL 2263893 (S.D.N.Y.))

mismanaging, looting, and otherwise breaching duties owed to the company. He asserted claims under the federal securities laws, arguing that Sunset was injured when the defendants misrepresented the company's financial health in order to secure loans that the company actually was unable to pay, thus deepening Sunset's insolvency. The court noted, however, that because Sunset received the full amount of the loans, it suffered no loss on the loan transactions in question. The court thus observed that Rochelle's theory was that Sunset's injury was caused not by the incurrence of debt, but rather by management's subsequent squandering of the loan proceeds. This, the court concluded, amounted to a claim of corporate mismanagement, and was not actionable under the securities laws. [FN96]

*10 The point is that a company's insolvency is not deepened simply by the incurrence of new debt where the company suffers no loss on the loan transaction. [FN97] The insolvency is deepened when, for example, the proceeds of the loan are squandered or assets otherwise are looted. [FN98] It is at that point that the gap between liabilities and assets widens and the ability to service outstanding debt is impaired.

The Companies are not alleged to have suffered any loss on the loan transactions in question. Accordingly, it would be misleading to refer to any injury the Companies may have suffered by incurring debt as "deepened insolvency." This is not to say, however, that the Companies necessarily suffered no injury at all. [FN99]

### 2. Debt and Injury
In *Official Committee of Unsecured Creditors v. R.F. Lafferty & Co., Inc.,* [FN100] the successors of two bankrupt corporations alleged that the corporations had been induced fraudulently to incur debt that they were unable to pay, thereby forcing them into bankruptcy. Although the Third Circuit framed the issue as whether Pennsylvania recognizes a cause of action for "deepening insolvency," [FN101] it addressed the underlying question--whether the corporations could have suffered any injury as a result of the alleged fraud. The court wrote:
"Even when a corporation is insolvent, its corporate property may have value. The fraudulent and concealed incurrence of debt can damage that value in several ways. For example, to the extent that bankruptcy is not already a certainty, the incurrence of debt can force an insolvent corporation into bankruptcy, thus inflicting legal and administrative costs on the corporation. When

brought on by unwieldy debt, bankruptcy also creates operational limitations which hurt a corporation's ability to run its business in a profitable manner. Aside from causing actual bankruptcy, deepening insolvency can undermine a corporation's relationships with its customers, suppliers, and employees. The very threat of bankruptcy, brought about through fraudulent debt, can shake the confidence of parties dealing with the corporation, calling into question its ability to perform, thereby damaging the corporation's assets, the value of which often depends on the performance of other parties. In addition, prolonging an insolvent corporation's life through bad debt may simply cause the dissipation of corporate assets.
"These harms can be averted, and the value within an insolvent corporation salvaged, if the corporation is dissolved in a timely manner, rather than kept afloat with spurious debt." [FN102]

Plaintiffs do not claim that defendants' actions ultimately drove the Companies into bankruptcy. Indeed, they allege that the Companies already were insolvent by 1999 and would have filed for bankruptcy even sooner than they did had Parmalat's true financial condition been revealed. Nor do plaintiffs allege that the Companies' incurrence of new debt harmed their business relationships, reputations, or otherwise hindered their operations. The complaints instead appear to draw on *Lafferty's* final theory of damages--that "prolonging [the Companies'] life through bad debt ... cause[d] the dissipation of corporate assets." [FN103]

*11 Plaintiffs allege that innocent decision makers at the Companies would have sought "an orderly reorganization or liquidation of [the Companies] at a much earlier date, thus preserving assets," [FN104] had Parmalat's insolvency been revealed. In other words, plaintiffs claim that the Companies were injured in that they were induced to delay filing for bankruptcy.

#### a. Delayed Liquidation
Although plaintiffs assume that delayed liquidation and delayed reorganization would have injured the Companies equally, there is a critical difference. If the Companies were insolvent by 1999 and liquidation was inevitable, then they had nothing to lose simply by continuing to operate, even if that would have meant the continued depletion of their assets. As one commentator writes,
"In a liquidation, assets will be sold and the proceeds distributed to creditors. [In cases where]

2007 WL 2263893                                                                    Page 11
--- F.Supp.2d ----, 2007 WL 2263893 (S.D.N.Y.)
(Cite as: 2007 WL 2263893 (S.D.N.Y.))

liquidation is inevitable ... [the harm caused by delayed bankruptcy filing is a] harm to the beneficiaries of that liquidation-- the creditors. The corporation is no more one of them than the deceased is a beneficiary at the reading of his own will. If asset liquidation is the inevitable best case, the corporation is defunct. Delay does not hinder its ability to purchase raw material, operate its factories, sell widgets, collect receivables, make payroll, or sponsor the Mite A hockey team. All of those attributes of corporate life are gone, and once again we are adding insult only to death." [FN105] Accordingly, insofar as plaintiffs claim that the Companies were induced to delay in liquidating, they have failed to allege harm to the Companies themselves. And they of course lack standing to recoup damages suffered by others, such as the Companies' creditors. [FN106]

### b. Delayed Reorganization
However, insofar as plaintiffs claim that the Companies were injured because they were induced to delay filing for reorganization, the conclusion may be different.

### (1) Parmalat USA
Parmalat USA currently is in liquidation. If, however, Parmalat USA, at some point prior to February 2004, might have filed for reorganization and continued operating under bankruptcy protection instead of simply liquidating, it arguably missed the opportunity to fight for survival under bankruptcy protection. Its successor in interest then might have a case if he could establish that defendants' actions caused the company to miss that opportunity.

The complaints allege few facts concerning Parmalat USA's financial condition prior to February 2004. They allege that Parmalat USA's financial statements for the years 2000 to 2002 reported that the company's insolvency--the amount by which liabilities exceeded assets--increased from about $40 million to about $47.5 million. [FN107] This hardly establishes, however, that reorganization and continued operation would have been a viable option had the company filed for bankruptcy sooner than it did. The allegations, if proven, would leave a fact finder to speculate not only as to whether Parmalat USA would have filed for bankruptcy sooner, [FN108] but also as to whether the trustees would have sought reorganization as opposed to liquidation, and whether a plan for reorganization would have been approved. This is too much. Plaintiffs have not supplied factual allegations sufficient to raise a right to relief above the speculative level.

### (2) Farmland
*12 Farmland is in a slightly different boat, as it filed for reorganization, and a plan was approved. It therefore was not deprived of the opportunity to fight for survival under bankruptcy protection. Nevertheless, it perhaps could be argued that Farmland was injured because it emerged from bankruptcy with a lower enterprise value than it otherwise would have as result of being induced to delay reorganization.

The viability of this theory is not free from doubt. [FN109] Regardless, plaintiffs do not allege that Farmland operated at a loss or that its assets diminished in value simply as a result of the company's continued operations. [FN110] The allegations therefore do not support the conclusion that earlier rather than later bankruptcy would have stemmed any additional losses or left the company with more assets.

Even if plaintiffs had alleged that Farmland's assets were depleted merely by continued operations, the allegations still would fail. It is too speculative to conclude that an earlier reorganization would have left Farmland, as opposed to some other interested party, better off. Bankruptcy reorganization is an inherently flexible process, as a bankruptcy court has broad equitable powers to craft a reorganization plan. In exercising those powers, a court must consider the interests of a number of relevant parties, including not only the debtor, but also its creditors. [FN111] Given this flexibility--and the paucity of allegations concerning Farmland's financial condition before February 2004--it is difficult, perhaps impossible, to say what a hypothetical reorganization plan might have looked like had Farmland filed for bankruptcy protection at some unspecified earlier date. Even assuming that Farmland's estate would have been more valuable if bankruptcy protection had been sought earlier, it is far from clear that any of this additional value necessarily or probably would have been left to Farmland, as opposed to distributed to its creditors or other interested parties. Hence, too much speculation is required to conclude that Farmland itself would have benefitted from earlier bankruptcy protection. Accordingly, even if the complaints contained allegations supporting this theory of injury, they would not raise plaintiffs' right to relief beyond the speculative level.

* * *

In sum, while the incurrence of debt by itself cannot deepen a company's insolvency, the Court is not

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2007 WL 2263893                                                                              Page 12
--- F.Supp.2d ----, 2007 WL 2263893 (S.D.N.Y.)
**(Cite as: 2007 WL 2263893 (S.D.N.Y.))**

prepared to conclude that it never can cause injury to an insolvent company. But plaintiffs nevertheless have failed to allege that it caused injury to the Companies in this case. Accordingly, plaintiffs' claims must be dismissed insofar as they seek damages for the Companies' wrongful incurrence of debt.

*B. Looting*

[2] This does not dispose of all of plaintiffs' claims, however. The complaints allege that Farmland acquired $100 million as part of the sale-leaseback transaction, and that this money subsequently was looted when Parmalat insiders diverted the funds to other Parmalat entities. As the foregoing analysis indicates, the looting of the proceeds of a loan can constitute an injury to a company. [FN112] Even assuming the truth of plaintiffs' allegations, however, the question whether the complaints adequately allege that defendants' actions caused the Companies' injuries would remain.

*IV. Causation*

*13 Plaintiffs cannot succeed on any of their claims unless they establish that defendants' conduct caused the Companies' losses. It is not sufficient that they show "but for" causation. They must prove also that defendants' actions were the proximate cause of the Companies' losses. [FN113]

*A. Defendants Other Than Deloitte USA*

In *Bloor v. Carro, Spanbock, Londin, Rodman & Fass,* [FN114] the trustee of a bankrupt company alleged a massive scheme in which the company's officers and controlling stockholders mismanaged the firm and looted corporate funds. The trustee sued, among others, a law firm in connection with its preparation of the company's SEC filings and other documents, which allegedly misrepresented the company's financial condition. The trustee claimed that these misrepresentations allowed the company to raise large amounts of capital, which ultimately was looted as part of the ongoing fraud at the company. The Second Circuit held, however, that this was insufficient to plead loss causation under the securities laws, as it amounted merely to a claim of "but for" causation. The company's alleged losses, the court held, were caused by theft or mismanagement of corporate funds, not the raising of the funds that occurred with the defendant's help. [FN115]

[3] Plaintiffs allege that Parmalat's true financial

condition would have been revealed had defendants acted properly and that either the innocent decision makers at the Companies or GECC would not have allowed the sale-leaseback transaction to go forward. They do not allege, however, that any of the defendants, with the exception of Deloitte USA, had any connection to the Companies or even knew about, assisted, or otherwise participated in the sale-leaseback transaction, let alone the looting of the proceeds. Absent such allegations, the Court fails to see how the Companies' losses were a foreseeable result of these defendants' alleged schemes to hide Parmalat's financial condition. As in *Bloor*, plaintiffs perhaps allege that "but for" defendants' actions, the Companies would not have acquired the money that ultimately was looted. But they fail to allege that these defendants could have foreseen not only that the sale-leaseback transaction would have taken place, but also that the proceeds would have been squandered.

Plaintiffs cite the Court's decision in a related case brought by Dr. Enrico Bondi, the Italian representative of Parmalat's bankrupt estate. [FN116] Dr. Bondi, like plaintiffs here, sued the Bank of America Defendants and others for structuring fraudulent transactions that concealed Parmalat's mounting losses. The Court held that Dr. Bondi adequately pleaded proximate cause where he alleged that the defendants' "material omissions lulled Parmalat's innocent insiders into a false sense of security in the health of the Company" and that "the innocent insiders relied on the mirage" in failing to investigate further and thus failing to discover and halt the fraud. [FN117]

*14 Dr. Bondi's case, however, involved a substantially shorter chain of causation than plaintiffs allege here. It is reasonably foreseeable that misrepresenting a company's financial condition, and thus hiding from its innocent managers that the company is being driven into the ground, will cause the company harm. But it is significantly less foreseeable that doing so will cause a subsidiary with which the defendant has no contact to enter into a transaction of which the defendant has no knowledge and that the subsidiary subsequently will be injured when the proceeds are upstreamed to the parent and looted by its corrupt insiders. In other words, even assuming plaintiffs adequately have alleged that defendants helped perpetuate the Parmalat fraud, they have not alleged that it was foreseeable that the assets of one of Parmalat's subsidiaries would get swept into that scheme and looted and that the Companies thus would be injured.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2007 WL 2263893                                                                    Page 13
--- F.Supp.2d ----, 2007 WL 2263893 (S.D.N.Y.)
**(Cite as: 2007 WL 2263893 (S.D.N.Y.))**

Accordingly, plaintiffs have failed to plead proximate cause as to defendants other than Deloitte USA.

*B. Deloitte USA*

[4] Deloitte USA is in a unique position because it audited the Companies and appraised Farmland's assets for purposes of the sale-leaseback transaction. The question, however, is whether these connections made it reasonably foreseeable to Deloitte USA that causing Farmland to enter into the sale-leaseback transaction would result in the looting of the proceeds.

The district court in the *Bloor* case held that neither auditors who overstated the victim company's financial condition in audit reports nor appraisers who overvalued its assets were liable when the money raised as a result of these misrepresentations eventually was looted by the company's management. "While it was arguably foreseeable that, as a result of [the defendants' actions], securities issued and sold by [the company] would command a higher price than their true value, thus injuring purchasers and providing excessive funds to the corporation, it was not reasonably foreseeable that inside management of [the company] would embezzle the funds so received for their personal use." [FN118]

Plaintiffs argue that this case is different because Deloitte USA knew that the proceeds of the sale-leaseback transaction would be upstreamed to Parmalat and that Parmalat was being looted by corrupt insiders. It therefore could have foreseen that if Farmland entered into the sale-leaseback transaction, the proceeds would be swept up into the Parmalat fraud. The question thus becomes whether plaintiffs adequately have alleged Deloitte USA's knowledge of the Parmalat fraud.

*1. Direct Knowledge*

To the extent that plaintiffs rely on allegations that Deloitte USA in fact knew that the proceeds would move upstream to Parmalat and that the corrupt insiders were looting that entity, Rule 9(b) applies, as they allege in substance Deloitte USA's culpable participation in the insiders' fraud. [FN119]

[5] As noted, Rule 9(b) requires a plaintiff to allege facts raising a strong inference of the defendant's knowledge. The inference may arise where the complaint sufficiently alleges that the defendant (1) benefitted in a concrete and personal way from the

purported fraud, (2) engaged in deliberately illegal behavior, (3) knew facts or had access to information suggesting that fraud was being committed, or (4) failed to check information it had a duty to monitor. [FN120]

**\*15** The complaints contain no allegations that Deloitte USA stood to receive any benefit from the Parmalat fraud. Rather, they allege that Deloitte USA engaged in deliberately fraudulent behavior by overstating Farmland's assets in its appraisal report, and that it improperly failed to investigate numerous "red flags" indicating that something was amiss at Parmalat. In other words, plaintiffs do not claim that Deloitte USA had motive and opportunity to perpetuate the Parmalat fraud, but that it consciously or recklessly misbehaved.

*a. Fraudulent Appraisal*

Plaintiffs argue that Deloitte USA's fraudulent intent can be inferred from the fact that it ignored certain valuation methods and relied on projected instead of actual earnings to arrive at an appraisal value of Farmland's assets that inexplicably was seven times greater than the value reported by DHAC four years earlier. They contend also that the inference is strengthened by the fact that Deloitte USA improperly served as both Parmalat USA's auditor and the appraiser for the sale-leaseback transaction. The argument has superficial appeal. But greater scrutiny reveals that it is not as strong as it appears at first blush.

*(1) DHAC's 1999 Appraisal*

First, it simply is not the case that Deloitte USA failed to explain why it reported a higher value than DHAC. Unlike DHAC's appraisal, which considered only Farmland's property in Wallington, New Jersey, [FN121] Deloitte USA's appraisal considered this property as well as property in Atlanta, Brooklyn, Grand Rapids, and Decatur, Alabama. [FN122] In addition, Deloitte USA's appraisal report explained that there had been a "major investment" in the Wallington facility in "the past few years" and that other equipment had been installed there "recently." [FN123]

This of course does not establish, nor may the Court conclude on a motion to dismiss, that Deloitte USA provided accurate appraisal values in its report. But it substantially undercuts any inference of Deloitte USA's fraudulent intent based on the fact that its appraisal values were higher than DHAC's.

*(2) Valuation Approaches*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Second, contrary to plaintiffs' allegations, Deloitte USA's appraisal report did not "ignore" the cost and market comparable approaches to valuation. [FN124] Rather, it considered these approaches, but concluded that the discounted cash flow approach was the most appropriate for valuing Farmland's assets. [FN125] It stated in the report that the cost approach was not viable because there was a dearth of information "regarding the composition of the components" of Farmland's property. [FN126] Moreover, it stated that the market comparable approach was disadvantageous because comparisons to similar properties--the backbone of that approach--necessarily are imperfect. Deloitte USA nevertheless provided a valuation based on the market comparable approach and indicated that it "considered the indication of value from this approach in assessing the reasonableness of the indication of value from [its] primary approach, the discounted cash flow approach." [FN127]

*16 Plaintiffs do not explain why this was improper. Indeed, DHAC's appraisal report--which plaintiffs assume was accurate--also considered various approaches before concluding that one approach was appropriate for valuing certain properties while other approaches were more useful for valuing other properties. [FN128] Plaintiffs fail also to explain how or why using other valuation methods besides the discounted cash flow approach would have produced better or more accurate appraisal values. Accordingly, allegations that Deloitte USA ignored certain valuation methods do not raise a strong inference of fraudulent intent.

### (3) "Calculated" EBITDA Values
Third, the allegations that Deloitte USA improperly used "calculated" EBITDA values for the years 2001 and 2002 in employing the discounted cash flow approach are belied by Deloitte USA's appraisal report.

According to the report, Deloitte USA projected 2003 EBITDA values and then reduced them by 2.5 percent per year to arrive at 2001 and 2002 values in employing the market comparable approach, not the discounted cash flow approach. The report states that this was done in order to make Farmland's EBITDA values consistent with those of "guideline companies" to which Farmland was compared for purposes of the market comparable approach, and for which actual 2002 EBITDA values were unavailable. [FN129] But as noted, Deloitte USA stated in the appraisal report that the market comparable approach was not as appropriate for valuing Farmland's assets as the

discounted cash flow approach. In employing the discounted cash flow approach, the report stated, Deloitte USA used historical revenue and other information for 2001 and 2002. It did not "calculate" EBITDA values the way it did for purposes of the market comparable approach. In fact, the report does not state that Deloitte USA considered EBITDA values, "calculated" or otherwise, in applying the discounted cash flow approach. [FN130]

In light of this, the complaints must be interpreted as alleging that Deloitte USA's statements about the data it used for purposes of employing the discounted cash flow approach were false. But the complaints allege no facts raising an inference, let alone a strong inference, that this was the case. A bald allegation that Deloitte USA said one thing and did another is too conclusory to satisfy Rule 9(b).

### (4) Failure to Maintain Independence
Finally, an auditor's violation of an ethical duty of independence by itself does not give rise to a strong inference of fraud. It may bolster other facts that tend to demonstrate fraud. [FN131] Generally, however, an auditor's decision to take on non-audit work that threatens to compromise its duty of independence gives rise to a strong inference of culpable intent only when it is shown that the auditor had a "direct stake" in the alleged fraud. [FN132]

Plaintiffs do not allege that Deloitte USA stood to benefit from aiding the Parmalat fraud or that it had anything to gain from appraising Farmland's assets other than ordinary appraisal fees. The mere expectation of ordinary fees is not a sufficient motive to raise a strong inference of culpable intent. [FN133]

*17 Moreover, it is of more than passing interest that it was CGM--an entity that is not alleged to have had anything to do with the Parmalat fraud-- that "requested" that Deloitte USA conduct the appraisal for GECC. Had Parmalat or some other allegedly culpable entity done so, this perhaps would have taken plaintiffs closer to raising the inference that Deloitte USA's supposed violation of its duty of independence was motivated by fraudulent intent. But that is not what the complaints allege.

Accordingly, none of plaintiffs' allegations of improper appraisal methods raises a strong inference of Deloitte USA's knowledge of the Parmalat fraud.

### b. Improper Auditing Practices
Plaintiffs next contend that culpable knowledge can

2007 WL 2263893                                                                    Page 15
--- F.Supp.2d ----, 2007 WL 2263893 (S.D.N.Y.)
**(Cite as: 2007 WL 2263893 (S.D.N.Y.))**

be inferred from Deloitte USA's allegedly improper audits of Parmalat USA.

Allegations that an auditor failed to follow GAAS or other auditing procedures do not alone support a claim of fraud. [FN134] "Only where such allegations are coupled with evidence of 'corresponding fraudulent intent,' might they be sufficient." [FN135] Accordingly, the issue is not whether plaintiffs have alleged GAAS violations, but whether they have alleged facts indicating that those violations were motivated by or indicative or products of fraudulent intent.

The complaints allege that Deloitte USA encountered obvious signs that something was amiss at Parmalat, but failed to investigate and blow the whistle. Plaintiffs therefore rely on a theory of recklessness to show fraudulent intent. [FN136] The Second Circuit defines reckless conduct as conduct that is "highly unreasonable" and represents "an extreme departure from the standards of ordinary care ... to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." [FN137] "[A]n egregious refusal to see the obvious, or to investigate the doubtful, may in some cases give rise to an inference of ... recklessness." [FN138]

### (1) Reimbursement Credits

Plaintiffs argue that it should have been obvious to Deloitte USA that something improper was going on at Parmalat because it knew that Parmalat's reimbursement credits were bogus. They contend that Deloitte USA knew this because it conducted a successor audit of Parmalat USA in 1999 and discovered that Parmalat USA had not collected on any of the credits it had received from 1995 to 1998. This is unavailing.

The complaints do not allege why Parmalat's failure to pay past credits within a few years necessarily or probably should have indicated that it never would pay them. They do not allege, for example, that Parmalat had promised to the pay reimbursement credits within a certain time frame or that its consistent practice prior to 1995 had been to pay reimbursement credits more quickly. Accordingly, it cannot be said that Parmalat's failure to pay past reimbursement credits within a four-year span should have signaled to Deloitte USA that its credits were a sham altogether, let alone that Parmalat's insiders were engaged in a fraudulent scheme to loot the company.

*18 Plaintiffs contend also that Deloitte USA should have known something was amiss at Parmalat when Deloitte Italy and Parmalat refused to provide it with "confirmation ... of the calculations and nature ... [and] accounting treatment" of the reimbursement credits. [FN139] If Parmalat and Deloitte Italy were evasive in providing information material to Parmalat USA's audit and Deloitte USA failed to follow up, this perhaps would go some way towards raising an inference of recklessness. [FN140] But plaintiffs' allegations nevertheless are insufficient.

The complaints do not explain what it means to receive "confirmation" of the "calculations and nature" of reimbursement credits, or what a response to a request for such "confirmation" would look like. The most reasonable interpretation that the Court can supply, bearing in mind that it must construe the pleadings in the light most favorable to plaintiffs, is that Deloitte USA sought confirmation that Parmalat USA had booked the proper amount of credits and that it had accounted for them properly by booking them as reimbursement of expenses as opposed to a capital contribution from Parmalat. Plaintiffs do not explain, however, how Deloitte Italy's or Parmalat's failure to answer these questions would have indicated to Deloitte USA that Parmalat never would pay the reimbursement credits or that Parmalat's insiders were committing fraud.

Plaintiffs do not allege that Parmalat or Deloitte Italy failed to confirm that Parmalat would pay the credits or that it had the financial means to do so. Had Parmalat or Deloitte Italy been evasive in answering *these* questions, perhaps this would have made the fact that Parmalat was concealing financial difficulties sufficiently obvious to Deloitte USA to support an inference of conscious recklessness. But that is not what plaintiffs allege.

The allegations imply that Deloitte USA acted improperly in failing to ask these questions. This, however, amounts at best to a claim that Deloitte USA violated auditing standards or that it was negligent, perhaps even grossly so. But it does not raise the inference that Deloitte USA recklessly disregarded a substantial possibility that Parmalat was being looted. [FN141]

### (2) Going Concern Qualifications

The allegations regarding going concern qualifications fail to raise an inference of culpable knowledge as well.

Plaintiffs allege that, in connection with Parmalat

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2007 WL 2263893
--- F.Supp.2d ----, 2007 WL 2263893 (S.D.N.Y.)
(Cite as: 2007 WL 2263893 (S.D.N.Y.))

Page 16

USA's audit for the years 1999 to 2001, Deloitte USA improperly relied on management representations instead of "actual audit evidence" that Parmalat intended to provide continuing financial support to the Companies. But GAAS, AU Section 333.02, provides that "representations from management are part of the evidential matter the independent auditor" must obtain. [FN142] Moreover, AU Section 333.11 provides that

"if the independent auditor performs an audit of the financial statements of a subsidiary but does not audit those of the parent company, he or she may want to obtain representations from management of the parent company concerning matters that may affect the subsidiary, such as related-party transactions *or the parent company's intention to provide continuing financial support to the subsidiary.*" [FN143]

**\*19** Plaintiffs claim that this does not get Deloitte USA off the hook because AU Section 333.02 permits an auditor to use management representations as a supplement to other audit evidence, not as "a substitute for the application of those auditing procedures necessary to afford a reasonable basis for an opinion regarding the financial statements under audit." [FN144] Plaintiffs fail to allege, however, what else beside management representations would qualify as "actual audit evidence" of Parmalat's future intent to continue supporting the Companies and therefore why management representations alone were insufficient. In any event, even if there were some other audit evidence that Deloitte USA failed to obtain, plaintiffs' allegations would amount only to a claim that Deloitte USA violated GAAS, which is not enough to raise an inference of culpable knowledge. [FN145]

The only allegations that bring plaintiffs close to raising a sufficient inference of recklessness are the claims that Bigogno of Deloitte Italy refused to honor Potts' request for audit evidence in connection with Parmalat USA's 2002 audit. As noted, allegations that Deloitte Italy or Parmalat refused to provide necessary audit information to Deloitte USA may be sufficient to satisfy Rule 9(b). The Court need not decide the issue, however. Even assuming that the Bigogno-Potts exchange is sufficient to raise a strong inference of Deloitte USA's culpable knowledge, this would not help plaintiffs on the proximate cause issue.

The Bigogno-Potts exchange allegedly occurred on May 8, 2003. This, however, was after Deloitte USA's audits of Parmalat USA for the years 1999 to

2001 and its April 30, 2003 appraisal of Farmland's assets. The only alleged conduct of Deloitte USA that occurred after May 8, 2003, was its 2002 audit of Parmalat USA. But plaintiffs do not allege that GECC or any other party relied on audited financial statements for 2002 in deciding whether the sale-leaseback transaction should go forward. They allege only that GECC required Parmalat USA's audited financial statements for the years 2000 and 2001, and that it received *unaudited* financial statements for 2002. Accordingly, it cannot be said that the Bigogno-Potts exchange made it reasonably foreseeable that Deloitte USA's actions, at the time they were taken, would lead to the looting of the proceeds of the sale-leaseback transaction.

*(3) Overstatement of Goodwill*
Finally, allegations that Deloitte USA failed to reveal that Parmalat USA's goodwill was overstated in financial statements fail to raise a strong inference of fraudulent intent.

According to plaintiffs, Parmalat USA reported that its goodwill was approximately $202 million at the end of fiscal year 2000 and $198 million at the end of fiscal year 2001. This constituted approximately half of Parmalat USA's total reported assets in those years. Plaintiffs do not explain, however, what is improper or misleading about these values. They simply claim that "the results of the underlying operations of Parmalat-USA and its subsidiaries did not justify" the reported values. In addition, they allege that even though Parmalat USA reduced the company's reported goodwill by $26.5 million in 2002, "this write-down was not sufficient." [FN146] Allegations that reported goodwill values were "unjustified" or that a reduction in values was "insufficient" are conclusions. They are not facts constituting strong circumstantial evidence of conscious misbehavior or recklessness.

**\*20** Plaintiffs contend also that "Deloitte recklessly did not require that [the 2002 write-down of goodwill] flow through to the consolidated financial statements of Parmalat-SpA." [FN147] The vague reference to "Deloitte" fails to indicate that Deloitte USA, which audited only Parmalat USA and apparently had no direct connection to Parmalat, was responsible for ensuring that information "flow through" to Parmalat's financial statements. Indeed, plaintiffs state elsewhere in the pleadings that this was the responsibility of Deloitte Italy. [FN148] The allegation therefore fails to raise a strong inference of Deloitte USA's fraudulent intent.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*2. Imputed Knowledge*

The fact that plaintiffs have failed to allege conduct by Deloitte USA itself that would give rise to an inference of culpable knowledge is not the end of the story. The complaints allege that Deloitte Italy was involved intimately in the Parmalat fraud and that its knowledge of wrongdoing, if any, should be imputed to Deloitte USA.

*a. Agency*

Plaintiffs' first theory is that Deloitte Italy was DTT's agent, and that DTT in turn was Deloitte USA's agent. [FN149] As will become clear, however, even assuming plaintiffs adequately have alleged Deloitte Italy's knowledge of the Parmalat fraud and its agency relationship with DTT, they have not alleged adequately that DTT was Deloitte USA's agent.

[6] As the Court previously has explained,

"An agency relationship exists under New York law when there is agreement between the principal and the agent that the agent will act for the principal and the principal retains a degree of control over the agent. The element of control often is deemed the essential characteristic of the principal-agent relationship. To bind a principal, an agent must have authority, whether apparent, actual or implied. Actual authority arises from a principal's direct manifestations to the agent. It may be express or implied, but in either case it exists only where the agent may reasonably infer from the words or conduct of the principal that the principal has consented to the agent's performance of a particular act." [FN150]

*(1) Common Officers and Directors*

[7] Plaintiffs' allege first that eleven of twenty-six members of DTT's board of directors were partners of Deloitte USA, and that DTT and Deloitte USA shared a chief executive officer and a chief financial officer. [FN151] But the fact that two corporations share officers and directors does not establish by itself that one corporation is the agent of the other. It is a "well established principle [of corporate law] that directors and officers holding positions with a parent and its subsidiary can and do 'change hats' to represent the two corporations separately, despite their common ownership." [FN152] "[C]ourts generally presume 'that the directors are wearing their 'subsidiary hats' and not their 'parent hats' when acting for the subsidiary.' " [FN153] Plaintiffs offer no allegations to overcome this presumption. [FN154]

**\*21** Moreover, the overlap of DTT's management

with that of Deloitte USA is equally consistent with the inference that DTT controlled Deloitte USA as it is with the inference that Deloitte USA controlled DTT. Indeed, plaintiffs allege that "DTT exercised authority and control over the various Deloitte member firms engaged in Parmalat audits." [FN155] Deloitte USA cannot be said to have controlled DTT if, as is alleged, DTT was in control of Deloitte USA. [FN156]

*(2) Deloitte USA's Financial Support of other Deloitte Entities*

Plaintiffs next allege that Deloitte USA paid the salaries and benefits of ten to forty percent of DTT's employees, "financially subsidized Deloitte's global integration process for the less profitable member firms such as [Deloitte Italy]," and provided funding to pay for claims brought against Deloitte member firms when their liability insurance did not provide complete coverage. [FN157]

[8] The fact that one corporation finances some of the operations of another does not necessarily establish an agency relationship. The provision of financing does not in every circumstance establish the ability to control the way the beneficiary corporation performs its work. And where it does-- perhaps because the financing corporation can threaten to cut off future support--it does not necessarily entail the beneficiary's power to act on the financing corporation's behalf. [FN158] The allegations regarding Deloitte USA's role in the Deloitte organization suggest at most that Deloitte USA was a particularly profitable Deloitte member firm and that DTT--the umbrella entity allegedly capable of controlling the Deloitte member firms-- therefore used the proceeds from Deloitte USA's operations to fund the operations of itself and certain other member firms. The allegations by themselves do not support the inference that Deloitte USA controlled the manner of DTT's performance, or that DTT acted on its behalf.

*(3) Dispute Between Deloitte USA and Deloitte Italy*

Finally, plaintiffs allege that when Mamoli of Deloitte Italy objected to the idea of Deloitte USA appraising Farmland's assets while simultaneously serving as Parmalat USA's auditor, Deloitte USA "secure[d] the intervention of" DTT's Horstmann to "persuade" Mamoli to withdraw his objection. [FN159] According to plaintiffs, this demonstrates that Deloitte USA controlled DTT. [FN160]

[9] This is unavailing. Alleging that a company requested a representative of its parent organization

2007 WL 2263893                                                                                                        Page 18
--- F.Supp.2d ----, 2007 WL 2263893 (S.D.N.Y.)
(Cite as: 2007 WL 2263893 (S.D.N.Y.))

to resolve its business dispute with a sister company is far from alleging that it controlled the parent organization. Plaintiffs do not allege, for example, that anyone at Deloitte USA ordered--or had the authority to order--Horstmann to intervene, let alone to resolve the dispute the way he did. Rather, they allege that it was Horstmann's job to resolve disputes between Deloitte member firms and that even though it was Deloitte USA that requested his help, Horstmann was acting on behalf of DTT when he intervened. Accordingly, apart from the conclusory and therefore insufficient allegation that Deloitte USA was "dominant over DTT," and "impose [d] its will" on Deloitte Italy, [FN161] plaintiffs do not allege anything about DTT's involvement in the dispute that would support the conclusion that Deloitte USA controlled DTT.

*b. Joint Venture*

**\*22** [10] Plaintiffs' second theory of imputed knowledge is that all of the Deloitte entities were engaged in a joint venture. Knowledge of a joint adventurer is imputed to its co-adventurers. [FN162]

"A joint venture is a special combination of two or more persons where in some specific venture a profit is jointly sought. The indicia of the existence of a joint venture are: (i) acts manifesting the intent of the parties to be associated as joint venturers; (ii) mutual contribution to the joint undertaking through a combination of property, financial resources, effort, skill or knowledge; (iii) a measure of joint proprietorship and control over the enterprise; and (iv) a provision for the sharing of profits and losses. The ultimate inquiry is whether the parties have so joined their property, interests, skills and risks that for the purpose of the particular adventure their respective contributions have become as one and the commingled property and interests of the parties have thereby been made subject to each of the associates on the trust and inducement that each would act for their joint benefit." [FN163]

Plaintiffs' theory essentially is that the Deloitte member firms were joint adventurers in auditing Parmalat's financial statements, as each provided auditing services under the Deloitte aegis to different Parmalat entities according to the same auditing standards and shared in the profits and fees generated by the Parmalat account. [FN164] The Court previously rejected just such a theory, holding that "allegations that several firms worked on specific Parmalat-related assets together and that they all followed the same auditing standards" did not give rise to an inference that the firms had mutual control

over each other and the purported enterprise. [FN165] In other words, it failed to indicate that each firm's individual work on a particular Parmalat project had "become as one" with the work of its sister firms.

Plaintiffs attempt to distinguish this case by arguing that the alleged joint venture here was not the *auditing* of Parmalat, but the *certification* of its financial statements. [FN166] They claim that each member firm had the ability to withhold certification of a Parmalat subsidiary's financial statements, and therefore the *de facto* power to ensure that Parmalat's consolidated financial statements did not receive certification or an unqualified opinion.

[11] This is unavailing. One of the essential features of a joint venture is an agreement among the parties to share profits and losses from the undertaking. The Deloitte firms, however, presumably did not earn profits or suffer losses in connection with their certification of Parmalat's financial statements, but in connection with their provision of auditing services to various Parmalat entities. That is, they presumably received payment regardless of whether they issued certifications or qualified their audit reports. Plaintiffs allege no facts to rebut this presumption. [FN167] Hence, it cannot be said that the Deloitte entities engaged in a joint venture, the sole object of which was to ensure that Parmalat's consolidated financial statements were certified.

**\*23** [12] Plaintiffs claim also that there was joint control in this case because each member firm "had the power to, and did, control the nature, amount, and flow of information to other Deloitte member firms regarding the Parmalat entity, subsidiary, or affiliate under audit." [FN168] But this cuts the other way. It suggests that the firms did *not* have control over one another's work, but instead acted as individual entities working on discrete projects. If there were a free flow of information and each firm had unfettered access to information concerning a sister firm's project, then perhaps one could infer that the work of all the Deloitte firms had "become as one." The complaints, however, allege the opposite.

\* \* \*

In the last analysis, the Court is not persuaded that plaintiffs have alleged that DTT was Deloitte USA's agent, or that the Deloitte member firms were engaged in a joint venture. Any knowledge Deloitte Italy and DTT might have had of the Parmalat fraud therefore cannot be imputed to Deloitte USA. [FN169]

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2007 WL 2263893                                                              Page 19
--- F.Supp.2d ----, 2007 WL 2263893 (S.D.N.Y.)
**(Cite as: 2007 WL 2263893 (S.D.N.Y.))**

As plaintiffs have failed adequately to allege Deloitte USA's knowledge that Parmalat's insiders were committing fraud, they have failed to allege that it was reasonably foreseeable to Deloitte USA that its conduct eventually would result in the looting of Farmland's assets. Contrary to plaintiffs' assertions, this case is indistinguishable from *Bloor.* Plaintiffs allege at most that Deloitte USA caused the sale-leaseback transaction to occur. But they do not allege adequately that Deloitte USA proximately caused the proceeds of that transaction to be looted. Accordingly, plaintiffs have failed to plead proximate cause for purposes of their claims against Deloitte USA.

*Conclusion*

The motions of Deloitte USA, DTT, Deloitte Italy, GTI, GT USA, the Bank of America Defendants, the Credit Suisse Defendants, and BNL to dismiss the second amended complaints of Smith [FN170] and Pappas [FN171] are granted in their entirety. The motion of Banca Intesa to dismiss Smith's second amended complaint [FN172] is granted in its entirety as well.

SO ORDERED.

FN1. 06 Civ. 0383.

FN2. 06 Civ. 3109.

FN3. *Pappas v. Bank of Am. Corp.,* 06 Civ. 3109, docket item 6 (second amended complaint), ¶¶ 1-2 [hereinafter, *Pappas SAC*]; *Smith v. Bank of Am. Corp.,* 06 Civ. 0383, docket item 157 (second amended complaint), ¶¶ 1-2 [hereinafter, *Smith SAC*].
For purposes of this Opinion, the Court will cite to "*Pappas SAC*" where the complaints are duplicative, as parallel citations would be cumbersome. It cites to "*Smith SAC*" when referencing allegations found only in that complaint.

FN4. *See Pappas* SAC ¶¶ 102-108.

FN5. *Id.* ¶ 3.

FN6. *Id.* ¶ 11; *Smith* SAC ¶ 11.

FN7. *Pappas* SAC ¶ 42.

FN8. *Id.* ¶¶ 43-44.

FN9. *Id.* ¶ 71.

FN10. *Id.* ¶ 45.

FN11. *Id.* ¶ 161.
DTT, Deloitte USA, and Deloitte Italy are referred to collectively herein as the "Deloitte Defendants."

FN12. *Id.* ¶¶ 35-37.

FN13. *Id.* ¶ 311.
GTI, GT USA, and GT Italy are referred to collectively herein as the "Grant Thornton Defendants."

FN14. *Id.* ¶¶ 13-22.
BA Corp., BANA, BANTSA, BAS Ltd., BAS LLC, and BAI are referred to collectively herein as the "Bank of America Defendants."

FN15. *Id.* ¶¶ 29-32.
CS, CSFBI, and CSSEL are referred to collectively herein as the "Credit Suisse Defendants."

FN16. *Id.* ¶ 34. Ifitalia is not named as a defendant.

FN17. *Smith SAC* ¶¶ 37-38.

FN18. *Id.* ¶¶ 503, 506. Nextra is not named as a defendant.

FN19. For example, Smith's second amended complaint is 156 pages and 617 numbered paragraphs. While this is a substantial improvement over the first amended complaint, which was 342 pages long and contained 1309 numbered paragraphs, it still is unnecessarily long. In addition, where allegations concerning a particular topic could have been placed in a single section, plaintiffs instead have spread them among numerous, disparate sections, leaving it to the Court to consolidate relevant allegations to get a coherent picture of the alleged wrongdoing and the relationships among the parties. *See, e.g.,* ¶¶ 47-56, 266-315 (describing Deloitte Defendants and their relationships to one another); *id.* ¶¶ 215-223, 322-343 (alleging wrongdoing related to Bonlat).

2007 WL 2263893                                                              Page 20
--- F.Supp.2d ----, 2007 WL 2263893 (S.D.N.Y.)
**(Cite as: 2007 WL 2263893 (S.D.N.Y.))**

Moreover, the complaints often lump defendants together, making it unclear which particular defendants are the subject of certain allegations and forcing the Court, where possible, to rely on context to understand plaintiffs' precise meaning. *See, e.g., id.* ¶ 171 (referring to "Deloitte" generally without specifying particular Deloitte entity).

FN20. *See Pappas* SAC ¶¶ 102-108, 156.

FN21. *Id.* ¶ 106.

FN22. *Id.* ¶¶ 150-156.

FN23. *Id.* ¶¶ 7, 224.

FN24. *E.g., id.* ¶ 4.

FN25. *Id.* ¶¶ 6-8.

FN26. *See, e.g., id.* ¶ 159.

FN27. *Id.* ¶¶ 195-202; 310-328.

FN28. *Id.* ¶ 183.

FN29. *Id.* ¶¶ 207-215.

FN30. *Id.* ¶ 215.

FN31. *Id.* ¶¶ 186-190, 193.

FN32. *Id.* ¶ 191.

FN33. *See generally id.* ¶ ¶ 359-437 (allegations against the Bank of America Defendants), 440-454 (allegations against the Credit Suisse Defendants).

FN34. *See generally id.* ¶¶ 455-474.

FN35. *See In re Parmalat Sec. Litig.,* 412 F.Supp.2d 392, 396-399 (S.D.N.Y.2006) (describing allegations against the Bank of America Defendants); *In re Parmalat Securities Litigation,* 376 F.Supp.2d 472, 489-90 (S.D.N.Y.2005) (describing allegations against the Credit Suisse Defendants); *id. at* 488-89 (describing allegations against BNL and Ifitalia).

FN36. *Smith* SAC ¶ 489.

FN37. Pleadings in related cases allege that Wishaw is a Uruguayan shell entity controlled by the Tanzi family, the same family that founded and controlled Parmalat. *See In re Parmalat Sec. Litig.,* 383 F.Supp.2d 587, 591 (S.D.N.Y.2005). Smith states as much in his memorandum in opposition to Intesa's motion to dismiss. *See* Smith Mem. Opp'n Intesa Mot. Dismiss 1.

FN38. *Smith* SAC ¶¶ 489-501.

FN39. *Id.* ¶ 502.

FN40. *Pappas* SAC ¶ 83.

FN41. *Id.* ¶¶ 77, 85.

FN42. *Id.* ¶ 97.

FN43. *Id.* ¶¶ 89-94.

FN44. *Id.* ¶¶ 76-82.

FN45. *Id.* ¶¶ 93-99.

FN46. *Id.* ¶ 97.

FN47. *Id.* ¶ 99.

FN48. *Id.* ¶¶ 100-109.

FN49. *Id.* ¶¶ 110-115.

FN50. *Id.* ¶ 116 (emphasis in original).

FN51. *Id.* ¶ 117 (emphasis and [*sic*] in original).

FN52. *Id.* ¶¶ 118-120.

FN53. *Id.* ¶ 129.

FN54. *Id.* ¶ 130.

FN55. *Id.* As noted, plaintiffs allege also that "Deloitte" failed to ensure that this write-down "flow[ed] through" to Parmalat's consolidated financial statements. *Id.* ¶ 131. They do not specify to which Deloitte entity they refer in making this allegation. But plaintiffs suggest elsewhere in the pleadings that it was Deloitte Italy that was responsible for ensuring that adjustments to the Companies' financial statements "flowed

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2007 WL 2263893                                                                                    Page 21
--- F.Supp.2d ----, 2007 WL 2263893 (S.D.N.Y.)
(Cite as: 2007 WL 2263893 (S.D.N.Y.))

through" to Parmalat's financial statements. *See id.* ¶ 191.

FN56. *Id.* ¶ 132.

FN57. *Id.* ¶ 223.

FN58. *Id.* ¶ 224.

FN59. *Id.* ¶ 240.

FN60. *Id.* ¶¶ 225-226.

FN61. *Id.* ¶¶ 240-241.

FN62. *Id.* ¶ 227.

FN63. *Id.* ¶¶ 228-229.

FN64. *Id.* ¶¶ 268-269.

FN65. *Id.* ¶¶ 230-232.

FN66. *Id.* ¶ 233. Plaintiffs allege that Deloitte USA then attempted to resolve the independence issue raised by Mamoli by establishing a "Chinese Wall" between the team responsible for appraising Farmland and the team that audited Parmalat USA. According to plaintiffs, however, the wall was "porous," and in any event imposed a scope limitation on Deloitte USA's audit of Parmalat USA in violation of GAAS. *Id.* ¶ 235.

FN67. *Id.* ¶¶ 238-243.

FN68. *Id.* ¶¶ 244-245.

FN69. *Id.* ¶¶ 245-247.

FN70. *Id.* ¶ 7.

FN71. *Id.* ¶ 253.

FN72. *See id.* ¶¶ 245 (alleging that Deloitte USA overvalued Farmland's assets in order to make sure that GECC's collateralization requirement was met), 248 (proper appraisal would have called into question "the viability of Parmalat-USA and its subsidiaries as going concerns").

FN73. *Id.* ¶ 65.

FN74. *Id.* ¶ 7.

FN75. *Pappas* SAC Count I; *Smith* SAC Count I.

FN76. *Pappas* SAC Count II; *Smith* SAC Count III.

FN77. *Pappas* SAC Count VI; *Smith* SAC Count VII.

FN78. 18 U.S.C. § 1961 *et seq.*; N.J.S. 2c:41-1 *et seq.*

FN79. *Pappas* SAC Count VII; *Smith* SAC Count VIII.

FN80. *Pappas* SAC Count III; *Smith* SAC Count IV.

FN81. *Pappas* SAC Count IV; *Smith* SAC Count V.

FN82. *Pappas* SAC Count V; *Smith* SAC Count VI.

FN83. *Smith* SAC Count II.
The Court has jurisdiction pursuant to 28 U.S.C. § 1334.

FN84. *Levy v. Southbrook Int'l Invs., Ltd.,* 263 F.3d 10, 14 (2d Cir.2001), *cert. denied,* 535 U.S. 1054, 122 S.Ct. 1911, 152 L.Ed.2d 821 (2002).

FN85. *Cohen v. Koenig,* 25 F.3d 1168, 1172 (2d Cir.1994) (quoting *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)).

FN86. *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,* 493 F.3d 87, ----, 2007 WL 1989336, *5 (2d Cir.2007) (quoting *Bell Atl. Corp. v. Twombly,* --- U.S. ----, ----, 127 S.Ct. 1955, 1965, 167 L.Ed.2d 929 (2007)); *see also Iqbal v. Hasty,* 490 F.3d 143, 157-58 (2d Cir.2007) (discussing breadth of *Bell Atl.* holding and declining to limit it solely to the antitrust context).

FN87. Fed.R.Civ.P. 9(b); *Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt. LLC.,* 479 F.Supp.2d 349, 359-60 (S.D.N.Y.2007).

FN88. *See, e.g., Fraternity Fund,* 479

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

F.Supp.2d at 360, 367; *see also Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, --- U.S. ----, ----, 127 S.Ct. 2499, 2510, 168 L.Ed.2d 179 (2007) (plaintiff must allege facts that give rise to "strong inference" of fraudulent intent, which means inference "must be cogent and compelling, thus strong in light of other explanations").

FN89. *E.g., Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt. LLC*, 376 F.Supp.2d 385, 404 (S.D.N.Y.2005) (quoting *Acito v. IMCERA Group*, 47 F.3d 47, 52 (2d Cir.1995) (quoting *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir.1994))).

FN90. *See, e.g., Antaeus Enters., Inc. v. SD-Barn Real Estate, L.L.C.*, 480 F.Supp.2d 734, 740 (S.D.N.Y.2007) (law of forum applies if no conflict is shown to exist (citing *Faulkner v. Nat'l Geographic Soc.*, 452 F.Supp.2d 369, 375 n. 25 (S.D.N.Y.2006); *Carroll v. LeBoeuf, Lamb, Green & MacRae, L.L.P.*, 392 F.Supp.2d 621, 625 n. 21 (S.D.N.Y.2005))); *In re Parmalat Sec. Litig.*, 479 F.Supp.2d 332, 342 n. 56 (S.D.N.Y.2007).

FN91. *See* 11 U.S.C. § 101(32)(A) (a corporation is insolvent when "the sum of [the] entity's debts is greater than all of [the] entity's property, at a fair valuation"); Sabin Willett, *The Shallows of Deepening Insolvency*, 60 BUS. LAW. 549, 552 (2005) [hereinafter, "*Shallows*"] (describing "balance sheet insolvency" as the condition where liabilities are greater than the value of assets).

FN92. *See, e.g.*, OXFORD ENGLISH DICTIONARY, "Insolvent" ("Unable to pay one's debts or discharge one's liabilities; bankrupt.") (*available at* http://dictionary.oed.com/cgi/entry/5011811 7?single=1 & query-type=word & queryword =insolvent & first=1 & max--to--show=10) (last visited July 31, 2007); *see also* BLACK'S LAW DICTIONARY (8th ed.2004), "Insolvent" ("having liabilities that exceed the value of assets; having stopped paying debts in the ordinary course of business or being unable to pay them as they fall due"); *Shallows*, 60 BUS. LAW. at 552 (describing "cash-flow insolvency"--"where

a company intends or believes that it will incur debts that would be beyond its ability to pay as those debts mature"--and "low capital insolvency"--"where a company engages in a business or transaction that its capital is simply too small to protect against the risk of future setbacks").

FN93. *Shallows*, 60 BUS. LAW. at 555.

FN94. From the point of view of creditors, the company's insolvency in some circumstances may become *shallower* as a result of its incurrence of new debt. *See Shallows*, 60 BUS. LAW. at 552-53.

FN95. 535 F.2d 523 (9th Cir.1976).

FN96. *See id.* at 528-29; *see also In re Investors Funding Corp. of New York Sec. Litig.*, 523 F.Supp. 533, 539 (S.D.N.Y.1980) ("Since [company] received more than fair value in exchange for its debentures and other securities, it was not damaged until the proceeds from such sales were subsequently misused.")

FN97. *See Rubin v. Mfrs. Hanover Trust Co.*, 661 F.2d 979, 991 (2d Cir.1981) (construing statute limiting when bankruptcy trustee can set aside obligation incurred by debtor and concluding that "if the debtor receives property or discharges or secures an antecedent debt that is substantially equivalent in value to the property given or obligation incurred by him in exchange, then the transaction has not significantly affected his estate and his creditors have no cause to complain"); *cf. In re CitX Corp., Inc.*, 448 F.3d 672, 677 (3d Cir.2006) (use of fraudulent financial statements to raise $1 million in capital from investors did not deepen insolvency, but in fact made it shallower).

FN98. *See Investors Funding Corp.*, 523 F.Supp. at 539; *see also In re Global Serv. Group, LLC*, 316 B.R. 451, 461 (Bankr.S.D.N.Y.2004) (allegations that management prolonged the life of an insolvent corporation that continues to incur debt, without more--such as an allegation that management subsequently misappropriated the funds received--does not state a claim for relief); *see also CitX*,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2007 WL 2263893                                                                                          Page 23
--- F.Supp.2d ----, 2007 WL 2263893 (S.D.N.Y.)
(Cite as: 2007 WL 2263893 (S.D.N.Y.))

448 F.3d at 677 (increase in insolvency does not occur when there is a capital infusion, but when the cash subsequently is looted or squandered).

FN99. Cf. *In re Parmalat Sec. Litig.*, 383 F.Supp.2d 587, 601-02 (S.D.N.Y.2005) (declining to recognize deepening insolvency cause of action under North Carolina law where injuries plaintiff complained of were equally compensable under more traditional tort theories, such as breach of fiduciary duty).

FN100. 267 F.3d 340 (3d Cir.2001).

FN101. As the court stated in a subsequent case,

"[a]lthough [in *Lafferty* ] we did describe deepening insolvency as a 'type' of injury,' and a 'theory of injury,' we never held that it was a valid theory of damages for an independent cause of action. Those statements in *Lafferty* were in the context of a deepening-insolvency *cause of action*. They should not be interpreted to create a novel theory of damages for an independent cause of action like malpractice." *CitX*, 448 F.3d at 677 (citations omitted; emphasis in original).

FN102. *Lafferty*, 267 F.3d at 349-50 (citations omitted); *see generally* J.B. Heaton, *Deepening Insolvency*, 30 J. Corp. L. 465 (Spring 2005) (wrongly incurred debt may cause a company injury in the form of "costs of financial distress"--such as the administrative costs of bankruptcy, or a decline in assets and profits as a result of damaged reputation--but company is not harmed by amount of wrongfully incurred debt). *But see Shallows*, 60 Bus. Law at 564-67 (critiquing *Lafferty's* reasoning).

FN103. *Id.* at 350.

FN104. *Pappas* SAC ¶ 159.

FN105. *Shallows*, 60 BUS. LAW. at 566.

FN106. E.g., *In re Parmalat Sec. Litig.*, 383 F.Supp.2d 587, 594 (S.D.N.Y.2005) (citing cases).

FN107. *Pappas* SAC ¶ 103.

FN108. Simply because a company is insolvent does not mean it necessarily will file for bankruptcy. *Global Serv. Group*, 316 B.R. at 460 (unlike some jurisdictions, American law does not require company's management to file for bankruptcy, but leaves the decision up to proper business judgment).

FN109. *See Shallows*, 60 BUS. LAW. at 567-68 (discussing theory and potential problems).

FN110. Plaintiffs do allege that Farmland's assets were depleted when they were up-streamed to Parmalat and subsequently looted. Allegations that the Companies were injured by corporate looting are dealt with more fully below. The present question, however, is not whether earlier bankruptcy would have prevented intervening factors, such as the Parmalat fraud, from affecting Farmland. Rather, it is whether the mere continuation of Farmland's operations outside of bankruptcy left the company worse off-- that is, whether the mere incurrence of debt, separate and apart from what happened to the loan proceeds, caused injury to the company.

As noted, plaintiffs allege that the consolidated financial statements of "Parmalat USA and its subsidiaries" revealed that Parmalat USA's insolvency increased by about $7.5 million between 2000 and 2002, *Pappas* SAC ¶ 103, during which period Parmalat USA incurred more debt, *id.* ¶ 151. This may suggest that Parmalat USA's assets were losing value. The reference to "Parmalat USA and its subsidiaries" however is quite vague and does not specify Farmland in particular. The allegations therefore do not indicate whether the assets of Farmland itself were losing value.

FN111. *See, e.g., Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380, 389, 113 S.Ct. 1489, 123 L.Ed.2d 74 (1993) ("In overseeing [the Chapter 11 reorganization] process, the bankruptcy courts are necessarily entrusted with broad equitable powers to balance the interests of the affected parties, guided by the overriding goal of ensuring the success of the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

reorganization."); *N.L.R.B. v. Bildisco,* 465 U.S. 513, 525, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984) (noting that flexibility and equity are "built into" Chapter 11).

FN112. As indicated above, *this* deepens a corporation's insolvency, as it leaves the corporation not only with a new liability but also fewer assets. It therefore might be appropriate to identify the injury caused by the looting of loan proceeds as "deepened insolvency." But the Court sees little reason to do so. The traditional name--looted assets--is sufficient.

FN113. *See, e.g., Fraternity Fund,* 479 F.Supp.2d at 370-71 (aiding and abetting fraud and breach of fiduciary duty); *First Capital Asset Mgmt., Inc. v. Brickellbush, Inc.,* 218 F.Supp.2d 369, 379 (S.D.N.Y.2002) (federal RICO); *Duane Jones Co. v. Burke,* 306 N.Y. 172, 190-91, 117 N.E.2d 237, 246 (1954) (civil conspiracy); *Kristina Denise Enters., Inc. v. Arnold,* 41 A.D.3d 788, 838 N.Y.S.2d 667, 667 (2d Dep't 2007) (accounting malpractice); *Gerber Trade Finance, Inc. v. Skwiersky, Alpert & Bressler, LLP,* 12 A.D.3d 286, 286, 786 N.Y.S.2d 9, 10 (1st Dep't 2004) (negligent misrepresentation); *Laub v. Faessel,* 297 A.D.2d 28, 30- 31, 745 N.Y.S.2d 534, 536 (1st Dep't 2002) (fraud, negligent misrepresentation, and breach of fiduciary duty (citing cases)); *Interchange State Bank v. Veglia,* 286 N.J.Super. 164, 178, 668 A.2d 465, 472 (1995) (New Jersey RICO).

FN114. 754 F.2d 57 (2d Cir.1985).

FN115. *Id.* at 61-62 ("Any damage sustained by IFC, the only cognizable plaintiff here, occurred later, after the securities transactions were completed, when the proceeds of those transactions were allegedly funneled into unwise investments or diverted to the personal use of the Danskers.... [T]he failure of the corporation to use proceeds wisely or the theft of corporate funds by officers was hardly a reasonably foreseeable result, let alone the direct result, of any of Carro Spanbock's alleged actions.").
Although *Bloor* involved securities fraud claims and thus invoked the concepts of "transaction causation" and "loss causation," *see id.* at 61, the decision hinged on the plaintiff's inability to show loss causation, *see id.* at 61-62, which the Second Circuit has held embodies the traditional notion of proximate cause, *see AUSA Life Ins. Co. v. Ernst and Young,* 206 F.3d 202, 209 (2d Cir.2000) ("Loss causation is causation in the traditional 'proximate cause' sense-the allegedly unlawful conduct caused the economic harm." (citing *Schlick v. Penn-Dixie Cement Corp.,* 507 F.2d 374, 380 (2d Cir.1974))); *accord Laub,* 297 A.D.2d at 31, 745 N.Y.S.2d at 536 ("Loss causation is the fundamental core of the common-law concept of proximate cause." (citing authority)).

FN116. *Parmalat,* 412 F.Supp.2d 392.

FN117. *Id.* at 403-04.

FN118. *See In re Investors Funding Corp. of New York Sec. Litig.,* 566 F.Supp. 193 (S.D.N.Y.1983) (appraisers) (citing *In re Investors Funding Corp. of New York Sec. Litig.,* 523 F.Supp. 533, 540 (S.D.N.Y.1980) (auditors)), *aff'd sub nom., Bloor,* 754 F.2d 57.

FN119. *Cf. First Nationwide Bank v. Gelt Funding Corp.,* 27 F.3d 763, 770-772 (2d Cir.1994) (requiring party to allege loss causation with particularity where claims were premised on fraud).

FN120. *See Fraternity Fund,* 376 F.Supp.2d at 404 (quoting *Novak v. Kasaks,* 216 F.3d 300, 311 (2d Cir.2000)).

FN121. *See* Toscano Decl. Ex. C [hereinafter, "DHAC Appraisal Report"] at 1, 4-5, 18-22.

FN122. *See id.* Ex. B [hereinafter, "Deloitte USA Appraisal Report"] at 13-18, cover letter.

FN123. *Id.* at 14.
Plaintiffs relied on both the DHAC and Deloitte USA appraisal reports in making their allegations. *See, e.g., Pappas* SAC ¶ 243. The Court therefore may consider these documents at the pleadings stage. *E.g., Chambers v. Time Warner, Inc.,* 282 F.3d

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

147, 152-53 (2d Cir.2002). It may do so, however, only to conclude that certain statements were made therein, not to assess the truth of the matters asserted. *E.g., Loveman v. Lauder,* 484 F.Supp.2d 259, 268 n. 48 (S.D.N.Y.2007).

FN124. According to Deloitte USA's appraisal report, the cost approach "considers the value of facilities in terms of the investment in current labor and materials required to assemble facilities possessing comparable utility to the facilities subject to the appraisal." The market comparable approach "is based upon the observation of actual market transactions between buyers and sellers to establish a value ... through the identification of market transactions involving similar assets." The discounted cash flow approach "measures the present worth of the expected future economic benefits in the form of cash flows associated with asset ownership." Deloitte USA Appraisal Report 21-22.
To put it more colloquially, the cost approach establishes how much it would cost to replace a piece of property, the market comparable approach establishes how much a potential purchaser would pay for the property, and the discounted cash flow approach establishes the present value of future income expected to be generated by the property.

FN125. *Id.* at 25-42.

FN126. *Id.* at 25.

FN127. *Id.* at 31

FN128. *See* DHAC Appraisal Report 54-55.

FN129. Deloitte USA Appraisal Report 30.

FN130. *Id.* at 31-41.

FN131. *See, e.g., In re Stone & Webster, Inc., Sec. Litig.,* 414 F.3d 187, 215 (1st Cir.2005) (Leval, J., sitting by designation) (allegations that auditor had motivation to overlook client's concealment of losses in order to maintain lucrative accounting business may bolster inference of *scienter,* but not enough by itself to give rise to strong inference).

FN132. *See In re Royal Ahold N.V. Sec. & ERISA Litig.,* 351 F.Supp.2d 334, 390-91 (D.Md.2004) (citing *In re MicroStrategy Inc. Sec. Litig.,* 115 F.Supp.2d 620, 635-637 (E.D.Va.2000) (strong inference of fraudulent intent raised where auditor had direct stake in maintaining false appearance of client company's financial health because it agreed to sell company products governed by contract that required long-term commitment from the company, and therefore made it less likely that purchasers would enter into contracts unless there was "clear assurance of the Company's financial health")).

FN133. *See, e.g., In re Oxford Health Plans, Inc. Sec. Litig.,* 51 F.Supp.2d 290, 294 (S.D.N.Y.1999) ("generalized economic interests" such as "receipt of compensation and the maintenance of a profitable professional business relationship" does not give rise to strong inference of *scienter* (citing cases)); *accord Stone & Webster,* 414 F.3d at 215 ("[A]bsent truly extraordinary circumstances, an auditor's motivation to continue a profitable business relationship is not sufficient by itself to support a strong inference of scienter.").

FN134. *Novak,* 216 F.3d at 309 (citing *Stevelman v. Alias Research Inc.,* 174 F.3d 79, 84 (2d Cir.1999); *Chill v. General Elec. Co.,* 101 F.3d 263, 270 (2d Cir.1996)).

FN135. *Id.* (quoting *Chill,* 101 F.3d at 270).

FN136. Rule 9(b) can be satisfied by allegations of "conscious recklessness--i.e., a state of mind approximating actual intent, and not merely a heightened form of negligence--or actual intent." *Id.* (quoting *Novak v. Kasaks,* 997 F.Supp. 425 (S.D.N.Y.1998)) (quotations omitted).

FN137. *Id.* (quoting *Rolf v. Blyth, Eastman Dillon & Co., Inc.,* 570 F.2d 38, 47 (2d Cir.1978) (quoting *Sanders v. John Nuveen & Co.,* 554 F.2d 790, 793 (7th Cir.1977) (ellipsis in original))).

FN138. *Id.* (quoting *Chill,* 101 F.3d at 269 (quoting *Goldman v. McMahan, Brafman, Morgan & Co.,* 706 F.Supp. 256, 259

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2007 WL 2263893                                                      Page 26
--- F.Supp.2d ----, 2007 WL 2263893 (S.D.N.Y.)
(Cite as: 2007 WL 2263893 (S.D.N.Y.))

(S.D.N.Y.1989) (ellipsis in original))).

FN139. *Pappas* SAC ¶ 93.

FN140. *See, e.g., SEC. v. McNulty,* 137 F.3d 732, 741 (2d Cir.1998) (pleadings sufficient where defendant allegedly included false statements in SEC filings despite "the obviously evasive and suspicious statements made to him" by the corporate officials upon whom he was relying for this information and despite outside counsel's recommendation that these statements not be included).

FN141. *Cf. Ziemba v. Cascade Int'l, Inc.,* 256 F.3d 1194, 1210-11 (11th Cir.2001) (failure of subsidiary's auditor to investigate warning signs that parent might not be able to give subsidiary the capital infusion it needed to survive and therefore to issue going concern qualifications raised inference of gross negligence but not fraud).
Plaintiffs contend also that Zucchinali of Deloitte Italy told Pickette of Deloitte USA in a January 18, 2000 email that the reimbursement credits were part of a program referred to as "loss absorptions," meaning they were "contributions--income for the receiving company--from other Parmalat companies to cover losses." *Pappas* SAC ¶ 97. While use of the phrases "loss absorption" and "to cover losses" perhaps was suspicious, Zucchinali's email reasonably can be read as an innocent explanation that the reimbursement credits were promises to pay Parmalat subsidiaries for losses sustained or expenses borne on behalf of the parent company. The fact that Pickette received the January 18 email therefore does not raise a strong inference that Deloitte USA knew the reimbursement credits were part of a fraudulent scheme.

FN142. American Institute of Certified Public Accountants, Codification of Statements on Accounting Standards, AU § 333.02 [hereinafter, "AICPA"]. *See Pappas* SAC ¶ 75 (equating AICPA with GAAS). Plaintiffs relied on this document in making their allegations. *See, e.g., id.* ¶¶ 75, 89-91. The Court therefore may consider it on these motions. *E.g., Chambers,* 282 F.3d at 152-53.

FN143. AICPA AU § 333.11 (emphasis added).

FN144. *Id.* AU § 333.02.

FN145. Plaintiffs point also to AU Section 333.14, which provides that "[i]f the auditor is precluded from performing procedures he or she considers necessary in the circumstances with respect to a matter that is material to the financial statements, even though management has given representations concerning the matter, there is a limitation on the scope of the audit, and the auditor should qualify his or her opinion or disclaim an opinion." *Id.* AU § 333.14. But plaintiffs do not allege that Deloitte USA was precluded from performing auditing procedures in connection with its audits for the years 1999 to 2001. Plaintiffs perhaps allege that Deloitte USA was precluded from performing auditing procedures in connection with its 2002 audit because of Bigogno's refusal to provide audit evidence to Potts. This allegation is addressed in the text.

FN146. *Pappas* SAC ¶¶ 130-131.

FN147. *Id.* ¶ 131.

FN148. *Id.* ¶ 191.

FN149. It is possible to interpret the complaints as alleging an *alter ego* theory, despite their express references to agency law. The difference is immaterial, however. At least one court has held that the test for determining the existence of an agency relationship is the same as the test for determining whether two related corporations, such as a parent and a subsidiary, are *alter egos. See Kashfi v. Phibro-Salomon, Inc.,* 628 F.Supp. 727, 735 (S.D.N.Y.1986) (citing *Fidenas A.G. v. Honeywell, Inc.,* 501 F.Supp. 1029, 1037 (S.D.N.Y.1980)). *But see Royal Indus. Ltd. v. Kraft Foods, Inc.,* 926 F.Supp. 407, 413 (S.D.N.Y.1996) ("If ... an agency arrangement is alleged, then the plaintiff should not have to also allege domination and intent to defraud for the claim to survive."). In any event, both tests requiring a showing of control, *Parmalat,* 375 F.Supp.2d at 290-292, which plaintiffs have

2007 WL 2263893
--- F.Supp.2d ----, 2007 WL 2263893 (S.D.N.Y.)
(Cite as: 2007 WL 2263893 (S.D.N.Y.))

Page 27

failed adequately to allege.

FN150. *Parmalat,* 375 F.Supp.2d at 290 (citing authority) (citations and quotations omitted).

FN151. *Pappas* SAC ¶ 273.

FN152. *United States v. Bestfoods,* 524 U.S. 51, 69-70, 118 S.Ct. 1876, 141 L.Ed.2d 43 (1998) (quoting *Lusk v. Foxmeyer Health Corp.,* 129 F.3d 773, 779 (5th Cir.1997) (alteration in original); citing *Fisser v. Int'l Bank,* 282 F.2d 231, 238 (2d Cir.1960)).

FN153. *Id.* (quoting P. BLUMBERG, LAW OF CORPORATE GROUPS: PROCEDURAL PROBLEMS IN THE LAW OF PARENT AND SUBSIDIARY CORPORATIONS § 1.02.1, p. 12 (1983); citing *United States v. Jon-T Chemicals, Inc.,* 768 F.2d 686, 691 (5th Cir.1985), *cert. denied,* 475 U.S. 1014, 106 S.Ct. 1194, 89 L.Ed.2d 309 (1986)).

FN154. *See id.* (fact that parent and subsidiary shared officers and directors not enough to hold parent vicariously liable under Comprehensive Environmental Response, Compensation and Liability Act).

FN155. *Pappas* SAC ¶ 266; *see also id.* ¶¶ 254-271 (alleging DTT's control over Deloitte firms).

FN156. *In re Parmalat Sec. Litig.,* 377 F.Supp.2d 390, 406 (S.D.N.Y.2005).

FN157. *Pappas* SAC ¶¶ 273-275.

FN158. *See Itel Containers Int'l Corp. v. Atlanttrafik Exp. Serv. Ltd.,* 909 F.2d 698, 702-03 (2d Cir.1990) (no agency relationship established where one company provided financing to another, but beneficiary "was meant to, and did, operate independently").

FN159. *Pappas* SAC ¶ 228-231.

FN160. *Id.* ¶ 276.

FN161. *Id.*

FN162. *See Mallis v. Bankers Trust Co.,* 717

F.2d 683, 689 n. 9 (2d Cir.1983) (citing cases).

FN163. *Decker, Decker & Assocs., Inc. v. Ass'n of Nat'l Advertisers, Inc.,* 15 Misc.3d 1117, ----, 839 N.Y.S.2d 432, 2007 WL 1053881, *5 (2007)* (citing authority) (citations and quotations omitted). Plaintiffs argue that New Jersey law differs from New York law in that it does not require a showing of intent to establish the existence of a joint venture. This is incorrect. *See, e.g., Ginsberg v. Bistricer, No. C-113- 98 2007 WL 987169, *11 (N.J.Super.App.Div. Apr. 4, 2007)* ("In determining whether a joint venture was formed, the court's primary consideration is the intention of the parties."); *Sullivan v. Jefferson, Jefferson & Vaida,* 167 N.J.Super. 282, 290, 400 A.2d 836, 840 (1979) ("[T]he basic criterion of a joint venture ... [is] the voluntary agreement of the parties to form a relationship with the intent to create a joint venture."). In any event, as will become clear, plaintiffs have failed to allege the joint control element of a joint venture. The intent of the Deloitte entities therefore is beside the point.

FN164. *See Pappas* SAC ¶¶ 284-303.

FN165. *Parmalat,* 421 F.Supp.2d at 717-18 (applying Illinois law and quoting *Parmalat,* 377 F.Supp.2d 390, 407).

FN166. *See Pappas* SAC ¶ 280.

FN167. *See id.* ¶ 288 (alleging that Deloitte firms shared in the "profits and losses in their overall *audits* " (emphasis added)).

FN168. *Id.* ¶ 300.

FN169. As noted, plaintiffs' allegations arguably are more consistent with the conclusion that Deloitte USA was DTT's agent, rather than *vice versa.* This does not help plaintiffs, however, "as an agent generally is not liable for the acts of co-agents." *In re Parmalat Sec. Litig.,* 421 F.Supp.2d 703, 707 (S.D.N.Y.2006).

FN170. 04 MD 1653 docket items 703, 686, 689, 696, 695, 702, 713, 693; 06 Civ. 0383 docket items 185, 168, 171, 176, 175, 182,

2007 WL 2263893                                                        Page 28
--- F.Supp.2d ----, 2007 WL 2263893 (S.D.N.Y.)
**(Cite as: 2007 WL 2263893 (S.D.N.Y.))**

      195, 174.

      <u>FN171.</u> 04 MD 1653 docket items 721, 1276, 722, 734, 733, 743, 727, 738; 06 Civ. 3109 docket items 9, 10, 13, 27, 25, 39, 20, 32.

      <u>FN172.</u> 04 MD 1653 docket item 709; 06 Civ. 0383 docket item 189.

--- F.Supp.2d ----, 2007 WL 2263893 (S.D.N.Y.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**10**

Westlaw

Not Reported in F.Supp.2d                                                    Page 1

Not Reported in F.Supp.2d, 2005 WL 3817472 (N.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

**H**
Pew v. Cardarelli
N.D.N.Y.,2005.
Only the Westlaw citation is currently available.
    United States District Court,N.D. New York.
    John PEW, Jr., Barbara E. Pew, Harold Pew,
    Donna Pew, II. Nancy Hann, Julia Hudasky,
Kathleen Prickett, Miriam V. Pricket, on behalf of
    themselves and all others similarly situated,
                    Plaintiffs,
                        v.
    Donald P. CARDARELLI, Peter J. O'Neill and
    Price Waterhousecoopers LLP, Defendants.
            No. 5:03-CV-742 (NAM).

                March 17, 2005.

Mackenzie, Hughes Law Firm, Kenneth E.
Ackerman, David M. Garber, Syracuse, New York
and Wechsler Harwood LLP, Robert I. Harwood,
William R. Weinstein, Joshua D. Glatter, New
York, New York and Dilworth Paxson LLP, Stuart
Savett,    James    J.    Rodgers,    Philadelphia,
Pennsylvania and Dilworth Paxson LLP, Harold G.
Cohen, Cherry Hill, New Jersey, for Plaintiffs, of
counsel.
Wilmer, Cutler Law Firm, Charles E. Davidow,
Washington, D.C. and Hiscock, Barclay Law Firm,
Douglas J. Nash, John P. Langan, Syracuse, New
York, for Defendants Donald P. Cardarelli and
Peter J. O'Neill.
Hancock, Estabrook Law Firm, Daniel B. Berman,
Syracuse, New York and Orrick, Herrington Law
Firm, Diana L. Weiss, New York, New York, for
Defendant Pricewaterhouse Coopers LLP.

    MEMORANDUM-DECISION AND ORDER
MORDUE, J.

            INTRODUCTION

*1 Defendants move to dismiss the amended
complaint in this action, commenced May 13, 2003,
to recover damages allegedly stemming from
defendants' violations of federal securities law and
state law in the sale of subordinated Money Market
Certificates ("Certificates") offered by Agway, an
agricultural cooperative. Plaintiffs, who sue on
behalf of a putative class defined as all persons who
acquired Certificates during the class period, claim
that defendants made false and misleading
statements in the applicable Registration
Statements, Annual Reports, Quarterly Reports and
Current Reports during the relevant period, in
violation of section 11 of the Securities Act (15
U.S.C. § 77k) and section 349 of New York
General Business Law. Defendant Donald P.
Cardarelli, then Agway's Chief Executive Officer,
and defendant Peter J. O'Neill, then Agway's Senior
Vice President, Finance and Control, signed
allegedly false and misleading Registration
Statements and other public filings during the class
period. Defendant PricewaterhouseCoopers LLP ("
Pricewaterhouse"), an accounting firm, audited
Agway's financial statements and issued allegedly
false and misleading audit reports which, with the
knowledge and express consent of Pricewaterhouse,
were incorporated into and made part of Agway's
Registration Statements and Annual Reports filed
with the Securities and Exchange Commission ("
SEC") during the class period. For the reasons
stated herein, the Court dismisses the federal causes
of action, that is, claims one, two and three, with
prejudice. It dismisses without prejudice claim four,
the state law cause of action.

            GENERAL BACKGROUND

Since the 1960's, Agway was a large agricultural
supply and marketing cooperative engaged
primarily in providing agriculture-related products
and services. Membership in the cooperative was
open to owners and operators of working farms and
their immediate family members, and the purchase
of at least one share of Agway stock for $25 was
required. In its annual report and other distributions

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2005 WL 3817472 (N.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

to its members, Agway represented that it was " honest and ethical" in its business dealings and that it viewed itself as "the steward [ ]" of the organization's resources and as "accountable for their use."

Agway traditionally financed much of its working capital with proceeds from the sales of Certificates, fixed-interest debt instruments subordinated to Agway's other debt. Plaintiffs purchased Certificates during the period from November 1, 2000, through November 3, 2001, pursuant to the 1998 Registration Statement (filed August 31, 1998, effective September 21, 1998) and the 2001 Registration Statement (filed April 30, 2001, effective July 9, 2001). Agway's public filings, beginning in 1999 and continuing through September 2002, disclosed that Agway had substantial financial difficulties; that by June 2000 it had a negative cash flow and had begun selling assets in an effort to restructure; that it was relying on the debt markets as a primary source of financing; that it was compelled to enter into increasingly restrictive loan covenants in order to obtain credit; and that, as disclosed in its Annual Reports filed in June 2000 and June 2001, it had repeatedly breached the loan covenants, resulting in even more burdensome requirements in exchange for waivers of the breaches.

**\*2** On March 6, 2002, Agway announced a temporary suspension of sales of Certificates; it never resumed selling them. On June 17, 2002, Agway announced the suspension of its practice of repurchasing Certificates prior to maturity. Agway's turnaround efforts failed and on September 30, 2002, it announced its intention to file a petition for reorganization under Chapter 11 of the Bankruptcy Code. It filed the petition in October 2002.

### AMENDED COMPLAINT

In their amended complaint, plaintiffs state that they bring the action as a class action pursuant to Fed.R.Civ.P. 23(a) and (b)(3) on behalf of all persons who acquired Certificates between September 21, 2000, and September 21, 2002, and were injured thereby. Plaintiffs aver that questions

of law and fact common to the class include whether defendants violated federal securities laws and/or New York General Business Law § 349, whether the Registration Statements contained false and misleading statements, and whether defendants were negligent in omitting and/or misrepresenting material facts in the public filings. Plaintiffs assert that the controversy is best adjudicated as a class action because they believe there are thousands of class members, because joinder of all class members is impracticable and because it is impracticable for class members to sue individually.

Plaintiffs claim that defendants made numerous false and misleading statements in the following SEC filings relevant to the Certificates issued to and purchased by the class: the 1998 and 2001 Registration Statements (Forms S-3), which incorporated by reference all pertinent annual, quarterly and current reports, and which included by consent the Pricewaterhouse unqualified audit reports for the relevant fiscal years ending in June 1999, 2000 and 2001; the 2000 and 2001 Annual Reports (Forms 10-K), which included by consent the Pricewaterhouse unqualified audit reports; the five Quarterly Reports (Forms 10-Q) for the quarters ending September 2000, December 2000, March 2001 and December 2001; and the two Current Reports (Forms 8-K) dated March 1, 2001 and March 31, 2001. All of these documents were signed either by O'Neill alone or by O'Neill and Cardarelli.

More particularly, in paragraph 88 of the amended complaint, plaintiffs claim that statements in the Registration Statements and incorporated SEC filings were false and misleading because they either concealed or failed to disclose that:
(i) the only substantial liquid source of funds available to discharge the hundreds of millions of dollars of Money Market Certificates maturing during the Class Period and thereafter was "other peoples' money" derived from the sale of the new Money Market Certificates; (ii) because substantially all of Agway's most valuable assets were either pledged to senior debt or otherwise unavailable in connection with maturity obligations, the sale of Agway's presently available assets would be insufficient to fully satisfy its payment

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2005 WL 3817472 (N.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

to its members, Agway represented that it was " honest and ethical" in its business dealings and that it viewed itself as "the steward [ ]" of the organization's resources and as "accountable for their use."

Agway traditionally financed much of its working capital with proceeds from the sales of Certificates, fixed-interest debt instruments subordinated to Agway's other debt. Plaintiffs purchased Certificates during the period from November 1, 2000, through November 3, 2001, pursuant to the 1998 Registration Statement (filed August 31, 1998, effective September 21, 1998) and the 2001 Registration Statement (filed April 30, 2001, effective July 9, 2001). Agway's public filings, beginning in 1999 and continuing through September 2002, disclosed that Agway had substantial financial difficulties; that by June 2000 it had a negative cash flow and had begun selling assets in an effort to restructure; that it was relying on the debt markets as a primary source of financing; that it was compelled to enter into increasingly restrictive loan covenants in order to obtain credit; and that, as disclosed in its Annual Reports filed in June 2000 and June 2001, it had repeatedly breached the loan covenants, resulting in even more burdensome requirements in exchange for waivers of the breaches.

**\*2** On March 6, 2002, Agway announced a temporary suspension of sales of Certificates; it never resumed selling them. On June 17, 2002, Agway announced the suspension of its practice of repurchasing Certificates prior to maturity. Agway's turnaround efforts failed and on September 30, 2002, it announced its intention to file a petition for reorganization under Chapter 11 of the Bankruptcy Code. It filed the petition in October 2002.

### AMENDED COMPLAINT

In their amended complaint, plaintiffs state that they bring the action as a class action pursuant to Fed.R.Civ.P. 23(a) and (b)(3) on behalf of all persons who acquired Certificates between September 21, 2000, and September 21, 2002, and were injured thereby. Plaintiffs aver that questions

of law and fact common to the class include whether defendants violated federal securities laws and/or New York General Business Law § 349, whether the Registration Statements contained false and misleading statements, and whether defendants were negligent in omitting and/or misrepresenting material facts in the public filings. Plaintiffs assert that the controversy is best adjudicated as a class action because they believe there are thousands of class members, because joinder of all class members is impracticable and because it is impracticable for class members to sue individually.

Plaintiffs claim that defendants made numerous false and misleading statements in the following SEC filings relevant to the Certificates issued to and purchased by the class: the 1998 and 2001 Registration Statements (Forms S-3), which incorporated by reference all pertinent annual, quarterly and current reports, and which included by consent the Pricewaterhouse unqualified audit reports for the relevant fiscal years ending in June 1999, 2000 and 2001; the 2000 and 2001 Annual Reports (Forms 10-K), which included by consent the Pricewaterhouse unqualified audit reports; the five Quarterly Reports (Forms 10-Q) for the quarters ending September 2000, December 2000, March 2001 and December 2001; and the two Current Reports (Forms 8-K) dated March 1, 2001 and March 31, 2001. All of these documents were signed either by O'Neill alone or by O'Neill and Cardarelli.

More particularly, in paragraph 88 of the amended complaint, plaintiffs claim that statements in the Registration Statements and incorporated SEC filings were false and misleading because they either concealed or failed to disclose that:
(i) the only substantial liquid source of funds available to discharge the hundreds of millions of dollars of Money Market Certificates maturing during the Class Period and thereafter was "other peoples' money" derived from the sale of the new Money Market Certificates; (ii) because substantially all of Agway's most valuable assets were either pledged to senior debt or otherwise unavailable in connection with maturity obligations, the sale of Agway's presently available assets would be insufficient to fully satisfy its payment

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 3
Not Reported in F.Supp.2d, 2005 WL 3817472 (N.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

obligations with respect to the currently maturing Money Market Certificates, let alone newly sold Certificates; (iii) the potential proceeds from substantially dismantling all of Agway's remaining businesses (the antithesis of a "going concern") were only a fraction of the Money Market Certificates outstanding and maturing in the future; (iv) Agway's inability to satisfy its obligations concerning the maturing Money Market Certificates from the results of its operations created serious doubt as to whether Agway could continue as a "going concern," and the imminent risk of default; and (v) therefore, at the time of purchase, the newly issued Money Market Certificates were worth, at most, only a small fraction of the face amount that Agway collected from plaintiffs and the Class.

**\*3** Based on these allegations, the amended complaint states four causes of action. Claim one is against Pricewaterhouse for violating section 11 of the Securities Act, 15 U.S.C. § 77k, by issuing unqualified audit reports which were incorporated into the Registration Statements, which were misleading and untrue, and which omitted and failed adequately to disclose material facts. Claim Two avers that the individual defendants violated section 11 in that they caused Certificates to be sold to plaintiffs and the class pursuant to the misleading Registration Statements. Claim Three asserts that, as controlling persons under section 15 of the Securities Act, 15 U.S.C. § 77o, the individual defendants are liable for Agway's wrongful conduct. The fourth claim alleges that all defendants engaged in materially deceptive acts or practices in the conduct of business, trade or commerce in violation of section 349 of New York General Business Law.

Plaintiffs claim that at the time they acquired the Certificates, neither plaintiffs nor any class member knew or by the exercise of reasonable care could have known of the facts concerning the inaccurate and misleading statements and omissions alleged. They further claim that the action is timely under section 13 of the Securities Act, 15 U.S.C. § 77m, because it was brought within one year after they discovered the untrue statements. The amended complaint seeks class certification, a declaration that defendants have violated federal and New York laws, money damages and an award of attorneys fees and expenses.

## THE MOTION

Defendants, in moving to dismiss the amended complaint, argue that it fails to state a claim because defendants properly disclosed the existing facts; that plaintiffs' section 11 claims fail under the Second Circuit's "bespeaks caution" doctrine and the "safe harbor" doctrine; that the section 11 claims are time-barred; that plaintiffs' reliance on defendants' failure to issue a "going concern" qualification lacks merit; and that the claim under section 349 of New York General Business Law lacks merit.

## APPLICABLE LAW

### Motion to dismiss complaint

In addressing defendants' motion to dismiss the complaint under Fed.R.Civ.P. 12(b)(6), the Court reads the complaint generously, accepting the truth of and drawing all reasonable inferences from all well-pleaded factual allegations. *See Mills v. Polar Molecular Corp.,* 12 F.3d 1170, 1174 (2d Cir.1993). Dismissal is proper only if it appears beyond doubt that plaintiffs can prove no set of facts which would entitle them to relief. *See Valmonte v. Bane,* 18 F.3d 992, 998 (2d Cir.1994).

For purposes of a motion to dismiss, a complaint in a securities case is deemed to include "any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference, as well as public disclosure documents required by law to be, and that have been, filed with the SEC, and documents that the plaintiffs either possessed or knew about and upon which they relied in bringing the suit."*Rothman v. Gregor,* 220 F.3d 81, 88 (2d Cir.2000) (citations omitted).

### Section 11

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2005 WL 3817472 (N.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

**\*4** Defendants contend that the amended complaint fails to state a claim because the public filings properly disclose the existing material facts. Section 11(a) of the Securities Act of 1933 imposes liability for a Registration Statement that "contain[s] an untrue statement of a material fact or omit[s] to state a material fact ... necessary to make the statements therein not misleading."15 U.S.C. § 77k(a). The test for whether a statement is materially misleading within the meaning of section 11 is not whether particular statements, taken separately, were literally true, but whether defendants' representations, taken together and in context, would have misled a reasonable investor about the nature of the investment. *See Rombach v. Chang,* 355 F.3d 164, 178, n. 11 (2d Cir.2004); *Olkey v. Hyperion 1999 Term Trust, Inc.,* 98 F.3d 2, 5 (2d Cir.1996). Those who may be liable include anyone who signed the registration statement and any accountant who has with his consent been named as having prepared or certified any part of the registration statement, *see*15 U.S.C. § 77k(a)(1), (4), as well as every person "who, by or through stock ownership, agency or otherwise ... controls any persons liable" under section 11. 15 U.S.C. § 77o.

"Bespeaks caution" doctrine and safe harbor provision

Defendants contend that the Registration Statements and related SEC filings in question are protected by both the "bespeaks caution" doctrine and the safe harbor provision of the Private Securities Litigation Reform Act ("PSLRA"). Under the bespeaks caution doctrine, a defendant may not be liable for misrepresentations in an offering if the alleged misrepresentations were sufficiently balanced by cautionary language such that no reasonable investor would be misled about the nature and risk of the offered security. *See Halperin v. eBanker USA.com, Inc.,* 295 F.3d 352, 357 (2d Cir.2002). The doctrine applies to forward-looking, prospective representations and not to material omissions or misstatements of historical fact. *See P. Stolz Family Partnership L.P. v. Daum,* 355 F.3d 92, 96-97 (2d Cir.2004). As explained by the Second Circuit: "The cautionary language

associated with the 'bespeaks caution' doctrine is aimed at warning investors that bad things may come to pass-in dealing with the contingent or unforeseen future. Historical or present fact-knowledge within the grasp of the offeror-is a different matter. Such facts exist and are known; they are not unforeseen or contingent."*Id.* at 97. Thus, "[c]autionary words about future risk cannot insulate from liability the failure to disclose that the risk has transpired."*Rombach,* 355 F.3d at 173.

In applying the bespeaks caution doctrine, the Court's task is not to inquire whether isolated statements within a document were true, but rather " whether defendants' representations or omissions, considered together and in context, would affect the total mix of information and thereby mislead a reasonable investor regarding the nature of the securities offered."*Halperin,* 295 F.3d at 357. The Court thus examines the cautionary language in the context of the representations to determine whether the language warns of the specific contingency that lies at the heart of the alleged misrepresentation. *See P. Stoltz,* 355 F.3d at 97.

**\*5** In the PSLRA, the safe-harbor provision states, in part, that an issuer of securities "shall not be liable with respect to any forward-looking statement ... if and to the extent that-(A) the forward-looking statement is (i) identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement; or (ii) immaterial[.]"15 U.S.C. §§ 77z-2(a), (c)(1)(A).

Limitations period

Defendants further argue that the amended complaint is time-barred because all material facts bearing on plaintiffs' claims were disclosed more than a year prior to the commencement of the action. Section 13 of the Securities Act provides that section 11 actions must be brought "within one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence[.]"15 U.S.C. § 77m. It has been stated that a plaintiff

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

is held to the constructive notice-or "inquiry notice" -standard set forth in section 13 "where the circumstances are such to suggest to a person of ordinary intelligence the probability that he has been defrauded."*In re Ames Dep't Stores, Inc. Note Litig.,* 991 F.2d 968, 979 (2d Cir.1993) (citation omitted). Stated otherwise, section 13 requires the plaintiff to bring suit within one year after "the plaintiff obtains actual knowledge of the facts giving rise to the action or notice of the facts, which in the exercise of reasonable diligence, would have led to actual knowledge."*Kahn v. Kohlberg, Kravis, Roberts & Co.,* 970 F.2d 1030, 1042 (2d Cir.1992).

### DISCUSSION

#### Failure to state a claim under section 11

In considering whether it appears beyond doubt, based on the complaint and the SEC filings, that plaintiffs can prove no set of facts which would entitle them to relief, the Court first reviews the amended complaint to identify the alleged misstatements or omissions. Upon thorough review of the amended complaint, the Court finds no allegations that defendants misstated or omitted specific financial data. Rather, plaintiffs point to factual disclosures which are in themselves undisputedly accurate, but complain that, taken together and in context, they would have been misleading to a reasonable investor because defendants either concealed or failed to disclose the following:
(i) the only substantial liquid source of funds available to discharge the hundreds of millions of dollars of Money Market Certificates maturing during the Class Period and thereafter was "other peoples' money" derived from the sale of the new Money Market Certificates; (ii) because substantially all of Agway's most valuable assets were either pledged to senior debt or otherwise unavailable in connection with maturity obligations, the sale of Agway's presently available assets would be insufficient to fully satisfy the Company's payment obligations with respect to the currently maturing Money Market Certificates, let alone newly sold Certificates; (iii) the potential proceeds

from substantially dismantling all of Agway's remaining businesses (the antithesis of a "going concern") were only a fraction of the Money Market Certificates outstanding and maturing in the future; (iv) Agway's inability to satisfy its obligations concerning the maturing Money Market Certificates from the results of its operations created serious doubt as to whether Agway could continue as a "going concern" and the imminent risk of default; and (v) therefore, at the time of purchase, the newly issued Money Market Certificates were worth, at most, only a small fraction of the face amount that Agway collected from plaintiffs and the Class.

\*6 Amended complaint, ¶ 88.

For example, plaintiffs point to Agway's guarantee of the Certificates and state that it was misleading because it concealed the fact that the guarantee was subject to substantial present likelihood of default and therefore essentially worthless for the reasons stated in paragraph 88. Likewise, they urge that the Registration Statements misleadingly represented the amounts of interest payable by the Certificates, because default was "imminent and inevitable" and therefore, any interest actually paid was just a limited advance return of capital. They further take issue with the Registration Statements' provisions regarding the company's repurchase practice; plaintiffs argue that these were misleading because Agway had "no reasonably foreseeable possibility of discharging its mandatory maturity obligations from operations" and default was imminent and inevitable. Plaintiffs further complain that the subordination disclosures and other disclosures of risk factors in the Registration Statements were misleading because Agway's available assets were insufficient to satisfy the company's obligations with respect to currently maturing Certificates, and Agway's default, insolvency and bankruptcy were imminent and inevitable, not just possible. And plaintiffs contend that the statements regarding redemptions of Certificates prior to maturity were misleading because Agway had no reasonable possibility of discharging its obligations to redeem even the mature Certificates and default was imminent and inevitable.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2005 WL 3817472 (N.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

In addressing the large amount of material relevant to the question of whether, based on the amended complaint and the public filings, it appears beyond doubt that plaintiffs can prove no set of facts which would entitle them to relief, the Court finds it useful to examine each of the five points set forth in paragraph 88. These five points are the foundation of plaintiffs' argument that, while not actually inaccurate, the financial data set forth in the public filings would have misled a reasonable investor.

First is the question of whether defendants concealed or failed to disclose that "the only substantial liquid source of funds available to discharge the hundreds of millions of dollars of Money Market Certificates maturing during the Class Period and thereafter was 'other peoples' money' derived from the sale of the new Money Market Certificates." The Court notes that this point concerns Agway's future prospects for discharging its obligations on the Certificates in the upcoming months and years. The Court agrees with defendants that Agway disclosed the relevant presently-existing facts as to its available sources of funds, its use of borrowing and/or proceeds from the sale of new Certificates to redeem outstanding Certificates, and the possibility that it might be required to abandon its past practice of repurchasing Certificates presented prior to maturity. In particular, these disclosures were made prior to and contemporaneous with the first purchase of Certificates by plaintiffs on November 1, 2000. For example, the 1998 Registration Statement stated that proceeds from the sale of Certificates would be used to redeem outstanding Certificates; that, in the event of bankruptcy, Agway's assets would be available to pay obligations under the Certificates only after all senior debt had been paid; that there may not be sufficient assets remaining to pay amounts due on any or all of the outstanding Certificates; and that as of August 26, 1998, there was outstanding senior debt of over $19 million.

**\*7** Agway's 1999 Annual Report stated that in October 1999, $58 million of Certificates issued by AFC would mature. It further stated that Agway " expects to refinance this debt either through a new issue of subordinated debt, through short-term bank borrowings, or a combination of both."

Similarly, Agway's 2000 Annual Report, filed September 21, 2000, for the fiscal year ending June 24, 2000, stated that in October 2000 over $50 million of Certificates would mature and that Agway "expects to refinance this debt either through a new issue of subordinated debt, through cash from operations, through sales of discontinued assets, through short-term bank borrowings, or a combination thereof."That cash from operations would not likely be sufficient to meet Agway's obligations on the maturing Certificates was clear from disclosures in the 2000 Annual Report such as the following: total current liabilities were about $587 million; total current assets were almost $570 million (including only $29 million in cash); there was a net loss of $9 million; and there was a net cash flow from continuing operations of negative $38 million. Agway's other expected resources for meeting this obligation, as stated in the report, included "short-term bank borrowings"; however, Agway clearly had serious credit problems. For example, Agway disclosed that its earnings level as of June 2000 was not adequate to support its borrowing level, that it had violated the loan covenants imposed by its lenders, that it was in negotiations for new credit facilities, and that "there [was] no assurance that the Company [would] achieve the desired levels of financing[.]" It further disclosed that the demands of its lenders might cause it to cease the practice of repurchasing the Certificates prior to maturity. Agway's only other expected resources for refinancing the maturing Certificates as stated in the report were sales of discontinued assets and/or a new issue of subordinated debt, that is, a new issue of Certificates. The 2000 Annual Report reported "net assets of discontinued operations," obviously a finite resource, as about $34 million. In other words, the reported facts concerning resources for repurchasing Certificates demonstrate the probability that proceeds from the sales of new Certificates (i.e., "other people's money") would be a substantial source of funds used to discharge the hundreds of millions of dollars of Certificates maturing during the class period and thereafter. Less than six weeks after this report was filed, plaintiffs made their first purchase of Certificates.

In subsequent Annual Reports and other filings,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                      Page 7

Not Reported in F.Supp.2d, 2005 WL 3817472 (N.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

Agway continued to report information relevant to its resources for repurchasing Certificates, including the amount of currently maturing Certificates, the amount of cash on hand and working capital available, its declining financial picture, its efforts to restructure and their effects, its deteriorating credit situation, and its worsening ratio of assets to liabilities. It also specifically addressed the impact of these factors on its ability to repurchase Certificates prior to maturity. For example, in its 2001 Annual Report Agway disclosed that certain of its credit agreements were "designed in part to allow and enable [it] to continue its past practice of repurchasing, at face value, certain subordinated debt and preferred stock when presented for repurchase prior to maturity."

*8 The 2001 Registration Statement (filed April 30, 2001, effective July 9, 2001) disclosed that proceeds from the sale of securities would be used for general corporate purposes, which may include the repayment of debt and that, in the event of bankruptcy, the company's assets would be available to pay obligations under the Certificates only after all senior debt had been paid. It explained that in certain circumstances the restrictions imposed by its credit agreement prevented it from repurchasing or repaying principal of the subordinated debt, that it was not obligated to repurchase Certificates, and that it might stop or suspend the repurchase practice at any time. And it disclosed that as of March 24, 2001, there was outstanding senior debt of over $84 million.

To conclude with respect to the first material misstatement and omission of fact alleged in paragraph 88, the Court finds that as a matter of law Agway disclosed the presently-existing facts material to the question of the sources of funds available to discharge the Certificates maturing during the Class Period and thereafter; that is, it disclosed its financial situation and the fact that it was redeeming Certificates using credit and the proceeds from the sale of new Certificates. Moreover, Agway included significant cautionary statements with respect to this subject.[FN1] The Court finds nothing in the filings which renders the disclosures misleading with respect to the first point.

FN1. The Court will discuss cautionary statements in greater detail hereinafter.

The second alleged material misstatement and omission of fact upon which plaintiffs rely is that " because substantially all of Agway's most valuable assets were either pledged to senior debt or otherwise unavailable in connection with maturity obligations, the sale of Agway's presently available assets would be insufficient to fully satisfy the Company's payment obligations with respect to the currently maturing Money Market Certificates, let alone newly sold Certificates."

A reading of the relevant SEC filings demonstrates that throughout the period in question, defendants disclosed in detail the value of the company's assets, the amount of senior debt, the amount of assets " pledged to senior debt," the amount of assets " otherwise unavailable," the amount of the company's obligations with respect to maturing Certificates, and its resources for repurchasing Certificates. Indeed, plaintiffs do not claim otherwise, nor do plaintiffs question the accuracy of the disclosures themselves. Essentially, the " omission" of which plaintiffs complain is defendants' omission to predict the future. Particularly in view of the cautionary language discussed hereinafter, this argument lacks merit. *See generally Jackson National Life Ins. Co. v. Merrill Lynch & Co.,* 32 F.3d 697, 702-03 (2d Cir.1994).

The third alleged "material misstatement and omission of fact" upon which plaintiffs rely is that " the potential proceeds from substantially dismantling all of Agway's remaining businesses were only a fraction of the amount of Money Market Certificates newly sold and outstanding and maturing in the future."The Court concludes that, as with the first two alleged misstatements and omissions, Agway disclosed extensive relevant data, including data bearing on the assets and liabilities of each separate business within the company. Again, plaintiffs do not allege that the data was inaccurate or that any specific fact or figure was omitted, nor do they allege that defendants withheld or incorrectly reported any information concerning any existing offers for Agway's businesses. Nor was the information misleading in any manner. The

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                      Page 8

Not Reported in F.Supp.2d, 2005 WL 3817472 (N.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

Court agrees with defendants that this alleged misstatement and omission of fact "is, on its face, clearly a prediction: it speculates as to the price at which existing businesses might, in the future, be sold."

**\*9** The fourth alleged material misstatement and omission of fact is: "Agway's inability to satisfy its obligations concerning the maturing Money Market Certificates from the results of its operations and available assets created serious doubt as to whether Agway could continue as a 'going concern' and the imminent risk of default."Plaintiffs assert that Pricewaterhouse's audits of Agway's financial statements for the periods ending June 2000 and June 2001 should have included a "going concern" qualification, that is, a statement that there was substantial doubt as to Agway's ability to continue as a going concern for another twelve months. A going concern statement is defined by auditing standards 341.02 and 341.04 issued by the Auditing Standards Board of the American Institute of Certified Public Accountants as follows:
The auditor has a responsibility to evaluate whether there is substantial doubt about the entity's ability to continue as a going concern for a reasonable period of time, not to exceed one year beyond the date of the financial statements being audited (hereinafter referred to as a reasonable period of time)....
The auditor is not responsible for predicting future conditions or events. The fact that the entity may cease to exist as a going concern subsequent to receiving a report from the auditor that does not refer to substantial doubt, even within one year following the date of the financial statements, does not, in itself, indicate inadequate performance by the auditor. Accordingly, the absence of reference to substantial doubt in an auditor's report should not be viewed as providing assurance as to an entity's ability to continue as a going concern.

Inasmuch as Agway did continue as a going concern until October 2002, well over a year after the 2001 Annual Report and the 2001 Registration Statement, Pricewaterhouse's failure to include such a qualification cannot have constituted a material omission or misrepresentation. *See, e.g., In re Integrated Resources Real Est., Ltd,* 815 F.Supp.

620, 670 (S.D.N.Y.1993); *Schick v. Ernst & Young,* 808 F.Supp. 1097, 1102-03 (S.D.N.Y.1992). Moreover, in view of the extensive factual disclosures and cautionary statements, the absence of a going concern qualification did not render the Annual Reports or Registration Statements misleading. *See In re Integrated,* 815 F.Supp. at 670 . The Court notes also that the auditing standards state that "the absence of reference to substantial doubt in an auditor's report should not be viewed as providing assurance as to an entity's ability to continue as a going concern."

The fifth alleged material misstatement and omission of fact is: "therefore, at the time of purchase, the newly issued Money Market Certificates were worth, at most, only a fraction of the face amount that Agway collected from plaintiffs and the Class."This alleged "fact" is not a fact at all, but rather a conclusion; it does not in itself constitute a false or misleading material statement or omission of fact. Indeed, on page 34 of their Memorandum of Law (Dkt. No. 24), plaintiffs treat this fifth alleged material misstatement/omission not as a fact but rather as a " risk," that is, a consequence of Agway's financial circumstances. In this respect, plaintiffs contend that "no investor was told of the most pertinent risk facing plaintiffs and the Class-that the lack of a real market and independent underwriting, combined with assets comprising only a fraction of Agway's obligations under the outstanding and newly sold Money Market Certificates, meant the Certificates could be and were worth only a fraction of their face value being charged by Agway."This conclusion regarding value is based on facts which, as discussed above, were disclosed and were not false or misleading.

*The bespeaks caution doctrine and the safe harbor provision*

**\*10** In considering the cautionary language and forward-looking statements in the filings as factors relevant to whether a reasonable investor could have been misled, the Court notes again that the allegedly undisclosed risk was that Agway would be unable to meet its obligations on plaintiffs'

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2005 WL 3817472 (N.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

Certificates, or, as plaintiffs put it, that the Certificates were worth only a fraction of their face value. Defendants argue that the public filings disclosed the risks presented by the investments, including the consequences if Agway entered bankruptcy, and that therefore defendants are protected by the bespeaks caution doctrine. Defendants further argue that the company's forward-looking statements regarding its expectations and beliefs are not misleading and fall within the safe harbor afforded by the PSLRA. As will be discussed below, the Court agrees on both points and concludes that no reasonable investor could have been misled into thinking that the risk that materialized and resulted in his loss did not actually exist. *See Halperin,* 295 F.3d at 359.

The Court first considers the application of the bespeaks caution doctrine. As stated, under this doctrine, a defendant may not be liable for forward-looking, prospective misrepresentations in an offering if the alleged misrepresentations were sufficiently balanced by cautionary language such that no reasonable investor would be misled about the nature and risk of the offered security. *See P. Stolz,* 355 F.3d at 96-97;*Halperin,* 295 F.3d at 357. Accordingly, the Court examines the cautionary language in the overall context of the public filings to determine whether it warns of the specific risk as to which plaintiffs claim to have been misled. *See P. Stolz,* 355 F.3d at 97.

Both the 1998 and the 2001 Registration Statements disclosed that the securities were unsecured obligations, that they were subordinated to all of the company's senior debt, and that there were no specific assets to which holders of the securities could look for repayment. Both Registration Statements disclosed that if Agway's assets were distributed as a result of bankruptcy, liquidation or reorganization, Agway might not have enough assets to pay investors the amounts owed to them under the securities. Further, both Registration Statements stated that the securities were not underwritten, that there was no market for the securities, that Agway did not intend to create or encourage a trading mechanism for the securities, and that it was highly unlikely that any secondary trading market would develop. Both disclosed the

risk that Agway's financial condition could be directly affected by factors affecting the agricultural economy. And both stated that Agway's concentration of customers in the Northeast region may affect its overall credit risk because the repayment of Agway's receivables may be affected by inherent risks associated with the economic environment of the region, the impact of regional weather on the conditions of crops and the impact on the agricultural economy. Further, the 2001 Registration Statement stated that if Agway were unable to compete successfully with its competitors, it would likely result in the loss of customers which could have a significant negative impact on its financial condition and results of operations.

*11 In its Annual Report filed September 16, 1999, for the fiscal year ending June 30, 1999, Agway reported a 96% decline in earnings and disclosed that it had breached certain of its covenants on its short-term bank financing. Agway's lenders agreed to waive these breaches in exchange for Agway's agreement to further restrictive covenants in its credit agreements.

Agway's Annual Report for the fiscal year ending June 24, 2000, reported over $9 million in net losses and negative cash flow of almost $38 million. Agway again breached its loan covenants and again obtained waivers by agreeing to even more burdensome restrictions. These waivers, however, were effective only through December 2000. Agway disclosed that "the revised borrowing limits and financial covenants are expected to continue to be restrictive through December 2000, and, given the historical volatility of Agway's operating results, may be violated in ensuing months."Agway also reported that it was attempting to negotiate new credit facilities with its lenders in order to meet its ongoing needs, but that "there [was] no assurance that the Company [would] achieve the desired level of financing, and the terms of such financing, as ultimately negotiated, [could not] be determined at [that] time."It further stated that "the terms or conditions of the lines of credit discussed above, as ultimately negotiated, may cause [Agway] to limit or cease its past practices with regard to the repurchase of subordinated debt."

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                Page 10

Not Reported in F.Supp.2d, 2005 WL 3817472 (N.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

Thereafter, Agway reported that it was selling assets in an effort to restructure its business and return to profitability. The Current Report filed August 3, 2000, disclosed the sale of six of Agway's pipeline terminal storage facilities; the Current Report filed August 15, 2000, disclosed the sale of Agway's consumer wholesale dealer business; and the Current Report filed December 14, 2000, reported its plan to "realign the Agricultural segment of Agway's business in an effort to convert that segment's historic operating losses to profits by fiscal 2003."

On or about November 1, 2000 (the date of plaintiffs' first purchases), Agway filed a supplemental prospectus amending its offering to extend maturity dates. Agway continued to report declining financial performance, defaults under its loan covenants, the imposition of more restrictive covenants and the existence of ongoing negotiations to obtain waivers of its debt covenants. The Quarterly Report of September 23, 2000, disclosed a $20 million decrease in net cash for the quarter; the December 23, 2000 Quarterly Report disclosed that "negotiations for new credit facilities have not been completed; therefore, there is no assurance that the Company will achieve the desired levels of financing"; the Current Report filed March 1, 2001, stated that "failure to obtain the adequate level of financing could have a material adverse impact on Agway.... [N]egotiations for new credit facilities have not been completed; therefore, there is no assurance that the Company will achieve the desired levels of financing"; the Current Report dated March 30, 2001, disclosed that Agway had refinanced its lines of credit through the establishment of a new senior debt facility, which contained a number of requirements and restrictions; the Quarterly Report of March 24, 2001, and Current Report filed August 20, 2001, reported that Agway was in violation of its debt covenants and was negotiating waivers and amendments.

**\*12** Throughout this period Agway continued to report losses and working capital deficits. The Annual Report for the fiscal year ended June 30, 2001, filed September 18, 2001, disclosed the renegotiated loan covenants and the restrictive

terms of credit, as well as almost $9 million losses, a $19 million decline in net cash and an increase in Agway's working capital deficit by $34 million over the prior year. It also disclosed additional violations of the company's loan covenants, efforts to sell its retail store distribution system, and sales of discontinued operations. It further reported that its lenders had required it to collateralize additional assets and to restrict repurchases of subordinated debt and preferred stock. And it warned that it might stop or suspend the repurchase of Certificates or that it might be required to do so.

To summarize, reports of presently existing negative financial circumstances were accompanied by cautionary language regarding forward-looking risks, including the disclosures that if Agway's assets were distributed as a result of bankruptcy, Agway might not have enough assets to pay investors the amounts owed to them under the securities; that it was highly unlikely that any secondary trading market for the Certificates would develop; that Agway's financial condition could be directly affected by factors affecting the agricultural economy; that Agway's concentration of customers in the Northeast region may affect its overall credit risk; that if Agway were unable to compete successfully with its competitors, it would likely result in the loss of customers which could have a significant negative impact on its financial condition and results of operations; that the financial covenants may be violated in ensuing months; that there was no assurance that Agway would achieve the desired level of financing; that the terms or conditions of credit as ultimately negotiated may cause Agway to limit or cease its past practices with regard to the repurchase of subordinated debt; and that failure to obtain the adequate level of financing could have a material adverse impact on Agway.

The above disclosures directly bear on the risk of which plaintiffs now complain, that is, the risk that-due to the subordinated status of the Certificates and Agway's accelerating financial deterioration, particularly its credit problems-Agway would be unable to meet its obligations on plaintiffs' Certificates. It is undisputed that the disclosures of then-existing facts

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2005 WL 3817472 (N.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

were accurate. The Court concludes that, as a matter of law, no reasonable investor, reading the cautionary statements in context, could have been misled about the future risks inherent in the investment. *See, e.g., Halperin,* 295 F.3d at 357, 359; *Olkey,* 98 F.3d at 9.

The Court now turns to the safe harbor provision of the PSLRA, which protects an issuer of securities from liability with respect to any forward-looking statement not contained within financial statements [FN2] if and to the extent that the forward-looking statement is "identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward looking statement[.]"15 U.S.C. § 77z-2(c)(1)(A)(i). In their amended complaint, in particular paragraphs 96 and 98, plaintiffs set forth allegedly misleading statements in the 2000 and 2001 Annual Reports concerning Agway's ability to meet its financing needs, as follows:

> FN2. PSLRA does not apply to disclosures contained within financial statements. 15 U.S.C. § 77z-2(b)(2)(A).

**\*13** - Agway finances its operations and the operations of all its business and subsidiaries through Agway Financial Corporation (AFC). External sources of short-term financing for Agway and all its other continuing operations include revolving credit lines, letters of credit, and a commercial paper program[.]
- Agway expects to continue to have appropriate and adequate financing to meet its ongoing needs.
- Adequate collateral existed throughout 2000 to permit AFC to borrow amounts to meet the ongoing needs of Agway and is expected to do so.
- Management believes that adequate collateral exists and will continue to exist so that Agway senior debt financing is, and will continue to be, adequate to meet ongoing needs of Agway.
- In October 2000, $50,700[,000] of money market certificates issued by AFC will mature. Agway expects to refinance this debt either through a new issue of subordinated debt, through cash from

operations, through sales of discontinued assets, through short-term bank borrowings, or a combination thereof.

Paragraph 100 of the amended complaint refers to similar statements in the quarterly reports.

Except for the first statement, which is a statement of existing fact which is not alleged to be incorrect, these are all statements of general optimism concerning Agway's future ability to obtain financing. Indeed, as defendants point out, "in a sense the entire Amended Complaint is directed at forward looking statements, consisting of Agway's purported failure to inform investors that it 'had no reasonably foreseeable possibility' of meeting its obligations and that 'default was imminent and inevitable.' "

The Court rejects plaintiffs' contention that these statements are not "identified" as forward-looking statements. Both the 2000 and 2001 Annual Reports include express cautionary provisions to the effect that words such as "believe" and "expect" identify forward-looking statements. In any event, the terms "believe" and "expect" cannot reasonably be interpreted otherwise. Further, the statements complained of are accompanied by extensive information bearing on Agway's future prospects for obtaining financing. And, as has already been discussed in connection with the bespeaks caution doctrine, the filings are replete with "meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the statements."

The Court further rejects plaintiffs' contention that the safe harbor provision does not apply because the person making the statements and/or authorizing them actually knew they were false when made. Plaintiffs correctly state that "[c]autionary words about future risk cannot insulate from liability the failure to disclose that the risk has transpired." *Rombach,* 355 F.3d at 173. Here, however, the filings accurately stated the existing problems and the future risks. The risks of which plaintiffs complain had not yet transpired during the period in issue. Indeed, Agway continued to operate its business and pursue its turnaround efforts for

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2005 WL 3817472 (N.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

almost two years after plaintiffs' first purchases on November 1, 2000, and for almost a year after the last purchases by plaintiffs on November 3, 2001.

### Section 11-conclusion

**\*14** The Court concludes that, taken together and in context, defendants' representations would not have led a reasonable investor to believe that the risk which materialized and resulted in plaintiffs' losses did not exist. Accordingly, plaintiffs have failed to state a claim under section 11.

### Limitations period

As noted, section 13 imposes a duty of inquiry which requires a plaintiff to bring suit within one year after obtaining "actual knowledge of the facts giving rise to the action or notice of the facts, which in the exercise of reasonable diligence, would have led to actual knowledge."*Kahn v. Kohlberg, Kravis, Roberts & Co.,* 970 F.2d 1030, 1042 (2d Cir.1992). A duty to inquire arises where "the circumstances are such as to suggest to a person of ordinary intelligence the probability that he has been defrauded."*In re Ames,* 991 F.2d at 979.

Defendants contend that plaintiffs were on inquiry notice of "the adverse developments on which their claim is based more than a year before the commencement of this litigation."They point out that Agway had made the following disclosures more than one year before this lawsuit was commenced, that is, prior to May 13, 2002: that Agway was relying on bank borrowing (and, until March 6, 2002, the sales of new Certificates) to provide funding with which to redeem maturing Certificates; that its poor performance had repeatedly placed it in breach of the loan covenants upon which that borrowing was predicated; that it was unable to complete negotiations for a new credit line and thereafter was able to obtain credit only under extremely onerous terms; that it had negative cash flow from continuing operations; that it had a cash balance of zero at the end of fiscal 2001 and 2002; that it had suffered net losses in 2000 and 2001; and that it was attempting to sell

assets in an effort to restructure its business and return to profitability.

The Court concludes that no later than the Current Report filed March 6, 2002, plaintiffs were made aware of the factual circumstances bearing on Agway's financial situation, its repeated losses, its efforts to restructure, the risk that those efforts might fail, and the risks inherent in the Certificates' status as subordinated unsecured debt. As the Second Circuit stated in *Jackson,* 32 F.3d at 702-03, the disclosures "provided actual notice of potential insolvency, much less inquiry notice sufficient to trigger the duty to timely investigate and file the complaint."Plaintiffs cannot claim that they lacked notice of the company's potential insolvency when the company's public disclosures warned of the very contingency about which plaintiffs now complain. *See id.* at 703.

Plaintiffs argue that the negative financial information that actually was disclosed "focuses almost exclusively on the bank line of credit and results of operations, and does not specifically discuss and is not directly relevant to the Certificates and their true, economically illusory, Ponzi scheme-like nature."While in certain circumstances, disclosures of losses and other negative financial data may not necessarily put a plaintiff on inquiry notice for limitations purposes as a matter of law, *see. e.g., In re Ames,* 991 F.2d at 980-81, here, matters such as the credit arrangements and the results of operations bear directly on the cause of plaintiffs' losses, *viz.,* the company's inability to meet its obligations on the Certificates.

**\*15** Plaintiffs also point out that defendants identify no revelation or materially new and different piece of information disclosed more than one year prior to May 13, 2003, that would constitute a "red flag" or "storm warning." There is, however, no requirement that there be a particular "red flag" or "storm warning" in order to trigger inquiry notice; in any event, the public filings as of March 2002 were replete with "storm warnings" and amply disclosed Agway's financial situation, its gradual deterioration, and the potential impact on plaintiffs' Certificates so as to place plaintiffs on inquiry

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2005 WL 3817472 (N.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

Page 13

notice.

Plaintiffs claim that they were not able to discern the possibility of material misstatements and omissions until the May 15, 2002 Quarterly Report in which Agway for the first time treated Telmark and the insurance subsidiary, which Agway was attempting to sell, as discontinued operations. Plaintiffs argue:
[I]n the financial statements, for the first time, the minimal assets of Agway were separated from the discontinued operations of Telmark and the insurance subsidiary, foreshadowing the reality that defendants had previously been able to conceal-that Agway itself had virtually no remaining assets and no operating income by which to discharge its obligations and its "guarantee" with respect to the more than $420 million of Money Market Certificates outstanding at that date, and that the only possible source to meet those obligations was its "ability"-now on hold-to sell new Money Market Certificates in furtherance of its now unraveling Ponzi scheme.

Again, plaintiffs do not claim that any of the figures or events set forth in any of the filings were inaccurate.

There is no merit to the implication that Agway concealed its financial problems by misleadingly reporting its financial data in combination with that of Telmark's leasing operation and the insurance subsidiary. Beginning with the 1998 Registration Statement and in all the SEC filings thereafter, Agway disclosed sufficient information to enable the reader to evaluate the operations and assets of Telmark and the insurance subsidiary separately from those of the company as a whole and from other operations. Indeed, it appears in the Annual Report for the fiscal year ending June 24, 2000, that Telmark's leasing operation contributed significantly to the company's overall assets and income. The report separately reported Telmark's increased revenues, its lease receivables, its credit facilities, its growing lease portfolio, and its compliance with all covenants in its borrowing arrangements. It also disclosed Agway's net loss, its decrease in net earnings, its violations of financial covenants with its lenders, its restructured and restrictive borrowing arrangements and its plan to discontinue its retail services business. The 2000 Annual Report separately reported subordinated debt and sources of financing of Agway, AFC and Telmark. In reporting assets, it separately reported leases receivable, both current and long term.[FN3]

> FN3. For example, the 2000 Annual Report showed almost $570 million in total current assets, including only $29 million in cash. Of these current assets, over $152 million was attributed to leases receivable.

*16 Significantly, the 2001 Annual Report disclosed that on September 14, 2001, Agway pledged its membership interest in Telmark as additional collateral to secure Agway's obligations under its credit agreement with lenders, thus giving lenders the option to foreclose on Agway's membership interest in Telmark in the event Agway defaulted on its obligations under the credit agreement. Again, the Annual Report disclosed sufficient information to enable the reader to evaluate the operations and assets of Telmark and the insurance subsidiary separately from those of the company as a whole and from other operations.

The Court has reviewed the SEC filings and concludes as a matter of law that, more than a year prior to the commencement of this action, plaintiffs were on inquiry notice-if not actual notice-of the risk of which they now complain, that is, Agway's deteriorating condition and the risk that Agway would be unable to meet its obligations on the Certificates. Accordingly, plaintiffs' federal claims are time-barred under section 13.

### Claims against Pricewaterhouse

For the same reasons, the amended complaint also fails to state a claim against Pricewaterhouse.

### CONCLUSION

Reading the amended complaint and public filings

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 14

Not Reported in F.Supp.2d, 2005 WL 3817472 (N.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

generously, accepting the truth of and drawing all reasonable inferences from all well-pleaded factual allegations, the Court concludes that no reasonable investor could have been misled into thinking that the risk that materialized and resulted in plaintiffs' claimed losses did not actually exist. Thus, it appears beyond doubt that plaintiffs can prove no set of facts which would entitle them to relief on their section 11 claims. Moreover, based on the public filings, the Court concludes as a matter of law that plaintiffs' federal claims are time-barred under section 13 because, more than a year prior to the commencement of this action, plaintiffs were on inquiry notice-if not actual notice-of the risk of which they now complain, that is, the risk that Agway would be unable to meet its obligations on the Certificates. Accordingly, plaintiffs' federal claims are dismissed with prejudice.

The Court in its discretion declines to exercise jurisdiction over plaintiffs' state law claim under New York General Business Law section 349 and it is dismissed without prejudice.

Despite the fact that plaintiffs' federal claims lack merit as a matter of law, the Court finds that plaintiffs' claims were not so untenable as a matter of law as to constitute a frivolous legal position for purposes of Rule 11 sanctions. Nor did they constitute the type of abuse of the adversary system that Rule 11 was designed to guard against. Accordingly, the Court does not award sanctions under Fed.R.Civ.P. 11.

It is therefore

ORDERED that defendants' motion to dismiss the amended complaint is granted; and it is further

ORDERED that claims one, two and three of the amended complaint are dismissed with prejudice; and it is further

*17 ORDERED that claim four of the amended complaint is dismissed without prejudice.

IT IS SO ORDERED.

N.D.N.Y.,2005.

Pew v. Cardarelli
Not Reported in F.Supp.2d, 2005 WL 3817472 (N.D.N.Y.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

11

Westlaw.

Not Reported in N.W.2d                                                              Page 1

Not Reported in N.W.2d, 2006 WL 2033996 (Mich.App.)
**(Cite as: Not Reported in N.W.2d)**

**H**
**Pilot** Industries, Inc. v. **Grant** Thornton, LLP
Mich.App.,2006.
Only the Westlaw citation is currently available.
UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.
Court of Appeals of Michigan.
**PILOT** INDUSTRIES, INC., Plaintiff-Appellant,
andRobert A. Davis, Frederick W. Woodward, and
M. Lawrence Parker, Plaintiffs,
v.
**GRANT** THORNTON, LLP and Russell G.
Wieman, Defendants-Appellees.
**Docket No. 258689.**

July 20, 2006.

Washtenaw Circuit Court; LC No. 01-001355-NM.

Before: DONOFRIO, P.J., and O'CONNELL and
SERVITTO, JJ.

[UNPUBLISHED]
PER CURIAM.
*1 Plaintiff Pilot Industries, Inc. (Pilot), appeals as
of right from the trial court's finding of no cause of
action following a bench trial. We affirm. This case
arose when Grant Thornton, LLP (Thornton), while
auditing Pilot for fiscal year 2000, found an error in
Pilot's 1999 financial documents that Thornton had
missed in its 1999 audit.

Although Pilot argues that the trial court committed
legal error by misapplying the legal standard, Pilot's
proposed standard would inappropriately hold
defendant strictly liable for any material
misrepresentations in Pilot's 1999 financial
statements. This is not the standard. "Accountants,
like physicians and lawyers, owe a duty to perform
their services with that degree of skill and
competence reasonably expected of persons in their
profession in the community."*FDIC v.
Schoenberger,* 781 F Supp 1155, 1157 (ED La

1992). An auditor's certification does not usually
guarantee that the audit's results are flawless, but
represents that the audit complied with professional
standards. See *Id.*In Michigan, a public accountant
is not liable to a client unless the accountant's acts
or omissions are negligent. MCL 600.2962(A).
Therefore, the existence of errors or misstatements
in the audit report does not automatically justify
legal relief, and the trial court correctly held
Thornton to the professional-negligence standard. [FN1]

> FN1. We note that if errors automatically
> led to liability, then the law would
> discourage accountants from responsibly
> revisiting, revising, and, when necessary,
> repudiating their earlier audits.

Pilot next claims the trial court clearly erred when it
found that Pilot failed to prove by a preponderance
of the evidence that Thornton breached its standard
of care. We disagree. "This Court reviews a trial
court's findings of fact in a bench trial for clear
error and reviews de novo its conclusions of law."
*Ambs v. Kalamazoo Co Rd Comm,* 255 Mich.App
637, 651;662 NW2d 424 (2003)."A finding is
clearly erroneous where, although there is evidence
to support the finding, the reviewing court on the
entire record is left with the definite and firm
conviction that a mistake has been made."*Id.* at 652.
This case revolved around Thornton's confirmation
of an $6.7 million account receivable as an internal
account between Pilot and a subsidiary (which
would have no real effect on Pilot's overall financial
picture) and an unrealized, outside account (which
would leave Pilot without real funds). The trial
court heard evidence that Pilot's management
verified that the account was offset by a $6.5
million account payable, which accorded with
Thornton's expectations and with the subsidiary's
previously audited financial statements. The trial
court heard competing expert testimony regarding
whether Thornton sufficiently tested these figures to

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.W.2d, 2006 WL 2033996 (Mich.App.)
**(Cite as: Not Reported in N.W.2d)**

verify competently the averments of Pilot's management. Ultimately, the trial court held that Pilot conformed to the standard of care, and we defer to the trial court's superior ability to observe the witnesses and weigh their credibility and the importance of their testimony. *Zeeland Farm Services, Inc v. JBL Enterprises, Inc,* 219 Mich.App 190, 195;555 NW2d 733 (1996). Because this case came down to a closely drawn question whether Thornton should have done more to root out apparently substantiated misrepresentations by Pilot's management, we cannot confidently say that the trial court misinterpreted the facts.

**\*2** However, according to Pilot, the trial court erred when it found that Thornton reasonably relied on the unsupported categorization of the $6.7 million dollar account as an essentially internal debt. Pilot correctly argues that auditors are supposed to evaluate the validity and reliability of internal financial statements. *Ameriwood Industries Int'l Corp v Arthur Andersen,* 961 F Supp 1078, 1090 (WD Mich, 1997). It is the duty of an auditor to independently analyze a company's books as a " watchdog" on behalf of a company's creditors, stockholders, and the investing public at large. *Comm'r of Insurance v. Albino,* 225 Mich.App 547, 565-566;572 NW2d 21 (1997). Therefore, the " discovery of negligent misrepresentations is an anticipated purpose of the audit...."*Ameriwood, supra.*Nevertheless, Pilot mischaracterizes the trial court's findings. The trial court did not find that Pilot's misstatements automatically exonerated Thornton from investigating the accounts, but that the misunderstanding and misrepresentations suggested that no problem existed, making it harder to detect. The trial court heard testimony that Pilot's mischaracterization of the $6.7 million account was tested, but that the tests Thornton used failed to reveal any problem. In other words, the trial court concluded that everybody, including Pilot's internal accountants, failed to detect the problem, which was evidence that the problem was not as easily detectable as Pilot alleged. Because the trial court did not misinterpret the purpose behind the audit or give conclusive weight to the misrepresentations of Pilot's management, Pilot has failed to demonstrate any error requiring reversal.

Affirmed.

Mich.App.,2006.
Pilot Industries, Inc. v. Grant Thornton, LLP
Not Reported in N.W.2d, 2006 WL 2033996 (Mich.App.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**12**

Westlaw.

--- F.Supp.2d ----                                                                     Page 1

--- F.Supp.2d ----, 2007 WL 1280649 (S.D.N.Y.), Fed. Sec. L. Rep. P 94,312
(Cite as: --- F.Supp.2d ----)

▷
In re **Refco**, Inc. Securities Litigation
S.D.N.Y.,2007.

United States District Court,S.D. New York.
In re REFCO, INC. SECURITIES LITIGATION
No. 05 Civ. 8626(GEL).

April 30, 2007.

John P. Coffey, Max W. Berger, Salvatore J. Graziano, John C. Browne, and Jeremy P. Robinson , Bernstein Litowitz Berger & Grossman LLP, New York, New York, and Stuart M. Grant, James J. Sabella, Megan D. McIntyre, Jeff A. Almeida, Christine M. Mackintosh, and Jill Agro, Grant & Eisenhofer P.A., New York, New York and Wilmington, Delaware, for Lead Plaintiffs Pacific Investment Management Company, LLC and RH Capital LLC and the Prospective Class.
Robert B. McCaw, Lori A. Martin, John V.H. Pierce , and Dawn M. Wilson, Wilmer Cutler Pickering Hale and Dorr LLP, New York, New York, for the " 144A" or "Bond Underwriter" Defendants.
Jeffrey T. Golenbock and Adam C. Silverstein, Golenbock Eiseman Assor Bell & Peskoe LLP, New York, New York, for Defendants Phillip R. Bennett, Refco Group Holdings Inc., and Phillip R. Bennett Three Year Annuity Trust.
Bruce R. Braun, Bradley E. Lerman, Linda T. Coberly, and David Mollón, Winston & Strawn LLP, New York, New York and Chicago, Illinois, and Margaret Maxwell Zegel and Tracy W. Berry, Grant Thornton LLP, Chicago, Illinois, for Defendant Grant Thornton LLP.
Michael T. Hannafan, Blake T. Hannafan, and Nicholas A. Pavich, Hannafan & Hannafan, Ltd., Chicago, Illinois, and Norman Eisen and Melinda Sarafa, Zuckerman Spaeder LLP, New York, New York, for Defendant Tone Grant.
Helen B. Kim and Marc D. Powers, Baker & Hostetler LLP, New York, New York and Los Angeles, California, and Richard E. Nathan, Nathan

Law Office, Los Angeles, California, for Defendant Dennis A. Kleina.
Stuart L. Shapiro, Matthew J. Sava, and Yoram J. Miller, Shapiro Forman Allen Sava & McPherson LLP, New York, New York, for Defendants Joseph J. Murphy and Gerald M. Sherer.
Ivan Kline, Stuart I. Friedman, and Elizabeth D. Meacham, Friedman & Wittenstein, New York, New York, for Defendant William M. Sexton.
Holly K. Kulka, Heller Ehrman LLP, New York, New York, for Defendant Philip Silverman.
Greg A. Danilow and Paul Dutka (Seth Goodchild and Joshua S. Amsel, on the brief), Weil, Gotshal & Manges LLP, New York, New York, for the "THL" and "Audit Committee" Defendants.
Barbara Moses and Rachel Korenblat, Morvillo, Abramowitz, Grand, Iason, Anello & Bohrer, P.C., New York, New York, for Defendant Robert Trosten.

OPINION AND ORDER
LYNCH, J.
**\*1** Various defendants in this large securities class action arising from the collapse of Refco Inc. and its affiliated companies ("Refco") move for dismissal or partial dismissal of the First Amended Complaint as to them. This opinion addresses ten motions to dismiss by twenty-eight defendants, many of whom raise overlapping arguments. Accordingly, to avoid an unduly duplicative and lengthy opinion, the movants' legal arguments will be grouped together. Detailed discussions of relevant factual allegations will be reserved for the legal analyses that require them, and the initial discussion of background facts will accordingly be brief.

BACKGROUND

I. *The Allegations*

A. The Alleged Fraudulent Scheme

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----, 2007 WL 1280649 (S.D.N.Y.), Fed. Sec. L. Rep. P 94,312
**(Cite as: --- F.Supp.2d ----)**

Refco was a provider of brokerage and clearing services in the international derivatives, currency and futures markets.[FN1]Part of Refco's business model involved giving loans to its trading clients, which the clients then used to leverage larger trades. (Compl.¶¶ 2, 87, 382.) At a certain point, Refco began making loans without adequately assessing the customers' credit-worthiness or their trading activities. These risky loans began to backfire in 1997 and 1998, when several global financial crises caused Refco and a number of its largest customers to suffer massive trading losses. (Compl.¶¶ 31, 383-97.) The loans were now "uncollectible receivables" that would never be paid. (P. Mem.8.)

Rather than disclose these uncollectible receivables to the public and Refco's investors, Refco's management allegedly devised a scheme to hide them. First, they transferred the loans onto the books of Refco Group Holdings, Inc. ("RGHI"), an entity owned and controlled by defendant Phillip R. Bennett, Refco's president, CEO, and Chairman (Compl.¶ 32) and Tone Grant, Bennett's predecessor as CEO (*id.* ¶ 41). As a result, RGHI owed hundreds of millions of dollars to Refco. In order to hide RGHI's obligation to Refco, the complaint alleges, a series of fraudulent transactions were arranged by which the RGHI receivable was made to disappear from Refco's books.

The transactions all worked in essentially the same way. First, Refco Capital (a Refco subsidiary) would make loans to a third party.[FN2]This money was transferred into accounts in the third party's name at Refco. (Compl.¶¶ 417-18.) The third party would then loan an equivalent amount to RGHI; the loan agreements between the third party and Refco Capital required that the money be used only for that purpose.[FN3](*Id.* ¶ 411.)These loans to RGHI were guaranteed by Refco itself; Bennett-on behalf of Refco as guarantor-signed the loan agreement between the third party and RGHI. (Compl.¶¶ 415-18.) RGHI then used the loan from the third party to pay down the money it owed to Refco for the uncollectible receivables. (Compl. ¶ 416.) Thus, Refco Capital was loaning money to RGHI for use in temporarily paying off its debt to Refco. This series of transactions would take place a few days before the end of the relevant financial period, and would be undone within two weeks. (Compl.¶ 409).

*2 The loans in question were substantially greater than Refco's reported net income. A February 2005 loan, for example, was for $595 million, 337% of Refco's reported net income for the relevant fiscal year. (Compl.¶ 560.) A February 2004 loan was for $970 million, 518% of Refco's reported net income for the relevant fiscal year. (*Id.*) If compared to quarterly income, of course, the size of the loans is even more dramatic: a November 2004 loan for $545 million was the equivalent of 3,045% of Refco's reported net income for that quarter. (*Id.*)[FN4]

Thus, Refco Capital was loaning enormous sums of money to the third party while Refco guaranteed an equivalent loan from the third party to RGHI. Meanwhile, Refco Capital-not RGHI-paid to the third party the interest purportedly owed by RGHI. (*Id.* ¶ 563.)The transactions took place in substantially the same form over the course of six years.

None of these transactions was disclosed to the public in the filings discussed below. Thus, in effect, Refco was loaning money to itself, through third parties, to hide its dismal financial situation from the public and its investors.

### B. The Relevant Transactions

The various transactions at issue in this case took place while the fraudulent scheme above was ongoing.

#### 1. *The Rule 144A Bonds and the Exxon Capital Exchange*

In June 2004, Refco issued $600 million of 9% Senior Subordinated Notes due in 2012. These bonds were sold to the defendants referred to by plaintiffs as the "Bond Underwriter Defendants," who call themselves the "144A Defendants." These defendants then immediately resold the bonds to institutional buyers, including some of the plaintiffs.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----                                                                                          Page 3

--- F.Supp.2d ----, 2007 WL 1280649 (S.D.N.Y.), Fed. Sec. L. Rep. P 94,312
**(Cite as: --- F.Supp.2d ----)**

(*See* Compl. ¶¶ 94-95, 100-08.) The bonds were unregistered pursuant to Securities and Exchange Commission ("SEC") Rule 144A, 17 C.F.R. § 230.144A, which exempts private placements to qualified institutional buyers from the registration requirements of the Securities Act, and were thus issued pursuant to an offering memorandum rather than a registration statement. (Compl.¶¶ 105-108.) Plaintiffs allege that this offering memorandum contained various false statements concerning Refco's financial performance and viability. (*Id.* ¶¶ 109-143.)The unregistered bond offering was marketed to institutional investors at a nationwide road show in July 2004 (the "Road Show ").

Plaintiffs argue that this unregistered bond offering was the first step in a single plan of financing. The second step in this putative plan came when Refco issued registered bonds, which holders of the Rule 144A Bonds acquired by exchanging their Rule 144A bonds for registered bonds in a transaction known as an *"Exxon Capital* exchange."

The registered bond offering was made pursuant to a Form S-4 Registration Statement (Wilson Decl. Ex. C) (the "Bond Registration Statement"), which was filed with the SEC on October 12, 2004, and became effective on the day the registered bonds were issued, April 13, 2005. The registration statement was not yet effective at the time of the Rule 144A offering. (Compl.¶¶ 149-50.) Plaintiffs allege that this statement, too, contained various false statements of material fact. (*Id.* ¶¶ 153-65.)

### 2. *The August 2005 IPO*

**\*3** In August 2005, Refco conducted a successful initial public offering ("IPO"), underwritten by fifteen banks including the three banks that served as underwriters for the Rule 144A offering. (*See* P. Mem. 14 n. 8). In the IPO, Refco sold approximately 20% of its shares to plaintiff RH Capital and other members of the putative class. (Compl.¶ 166.) The IPO was conducted pursuant to a Form S-1 registration statement dated April 8, 2005, Form S-1/A registration statements dated

May 27, July 1, July 20, July 25, August 8, and August 10, 2005, and a Form 424B1 prospectus dated August 10, 2005. (*Id.* ¶ 168.)Again, plaintiffs allege that these filings contained false statements of material fact. (*Id.* ¶¶ 172-98.)

### 3. *The October 2005 Press Release and Refco's Collapse*

On October 10, 2005, Refco issued a press release announcing that it had discovered an "undisclosed affiliate transaction." (*Id.* ¶ 199.)The press release disclosed the existence of a $340 million receivable owed to the company by "an entity controlled by Phillip R. Bennett" (that is, RGHI), and indicated that Bennett had repaid the receivable in cash as of October 10. It suggested that the receivable represented RGHI's assumption of a debt owed by a third party to Refco, which "may have been uncollectible." (*Id.*) Because this receivable had not been disclosed in the previously-filed financial statements, the press release concluded that these statements "should no longer be relied upon."(*Id.* ¶ 200.)Refco's stock price dropped 45% in a single day. (*Id.* ¶ 202.)Plaintiffs allege, however, that this press release did not disclose the full extent of Refco's troubles, because it downplayed the impact that the disclosure would have on Refco's business. ( *Id.* ¶¶ 202-03.)An investigation by the SEC was immediately commenced, and on October 12, 2005, Bennett was arrested as a flight risk. (*Id.* ¶¶ 205-06.)Refco's stock price continued to decline sharply until the New York Stock Exchange (" NYSE") halted trading of Refco shares on October 13, 2005. (*Id.* ¶ 208.)On October 17, 2005, Refco announced that it was filing for bankruptcy. (*Id.* ¶ 209.)

This litigation was initiated on October 11, 2005. In an order dated February 8, 2006 (Doc. # 63), the Court appointed RH Capital Associates LLC ("RH Capital") and Pacific Investment Management Company LLC ("PIMCO") as lead plaintiffs pursuant to 15 U.S.C. § 78u-4(a)(3)(B) and 15 U.S.C. § 77z-1(a)(3). A consolidated class action complaint was filed on April 3, 2006, and the First Amended Consolidated Class Action Complaint (Doc. # 86) (the "complaint") was filed on May 5,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----, 2007 WL 1280649 (S.D.N.Y.), Fed. Sec. L. Rep. P 94,312
**(Cite as: --- F.Supp.2d ----)**

2006. Papers relating to the ten motions to dismiss now pending were submitted between July and November of 2006, and the motions are now fully briefed. Before discussing the substance of these motions, a brief introduction to the various movants is appropriate.

### C. The Movants

**\*4** There are ten separate motions to dismiss pending, several of which are filed on behalf of more than one defendant. This section briefly identifies the movant or group of movants behind each of the ten motions.

#### 1. *Phillip R. Bennett, RGHI, and the Bennett Trust*

Defendant Phillip R. Bennett was the President, Chief Executive Officer and Chairman of Refco until he was forced to resign in October 2005. (Compl.¶ 32.) Bennett held his interests in Refco both directly and through RGHI and the Phillip R. Bennett Three Year Annuity Trust (the "Bennett Trust"), both of which he controlled. (*Id.* ¶¶ 26-28.)

#### 2. *Tone Grant*

Tone Grant was the President of Refco Group before Bennett was promoted to that position in September 1998, at which time Grant ended his employment with Refco. Grant continued to own 50% of RGHI, which in turn owned approximately 43% of Refco Group, until the August 2004 bond offering. (*Id.* ¶ 23.) To avoid confusion with defendant Grant Thornton, this opinion will refer to Tone Grant by his full name.

#### 3. *William Sexton*

William Sexton was Executive Vice President and Chief Operating Officer ("COO") of Refco Group beginning in August 2004. He briefly served as CEO of Refco after Bennett's resignation. (*Id.* ¶ 34.)

#### 4. *Joseph J. Murphy and Gerald M. Sherer*

Joseph Murphy was an Executive Vice President for global marketing at Refco beginning in 1999. Plaintiffs also allege that he served as an officer of certain Refco subsidiaries, but these do not include Refco Capital or RGHI, the subsidiaries most directly involved in the allegedly fraudulent transactions.(*Id.* ¶ 36.)

Gerald Sherer was Chief Financial Officer ("CFO") and an Executive Vice President of Refco Group beginning in January 2005. (*Id.* ¶ 33.)

#### 5. *Robert Trosten*

Robert Trosten was Sherer's predecessor as CFO of Refco Group. He served in that capacity from 2001 to October 2004. (*Id.* ¶ 40.)

#### 6. *Philip Silverman*

Philip Silverman was secretary of several Refco entities, including RGHI, and was Controller of Refco Group during 2004 and 2005. (*Id.* ¶ 37.)

#### 7. *Dennis Klejna*

Dennis Klejna was an Executive Vice President and General Counsel of Refco Group from 1999 until the company's collapse. (*Id.* ¶ 38.)

#### 8. *The THL and Audit Committee Defendants*

The "THL Partners Defendants" [FN5] and the "THL Individual Defendants" [FN6] (together, the "THL Defendants") are entities and individuals affiliated with Thomas H. Lee Partners, L.P., a private equity firm that invested $507 million in Refco prior to its collapse. In June 2004, the THL Defendants helped Refco with a leveraged buyout, in which the THL Defendants acquired a 57% equity stake in Refco. The remaining 43% was held by RGHI, which, in turn, was owned by Bennett. This gave the THL Defendants a dominant position on Refco's board of

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----                                                                    Page 5

--- F.Supp.2d ----, 2007 WL 1280649 (S.D.N.Y.), Fed. Sec. L. Rep. P 94,312
(Cite as: --- F.Supp.2d ----)

directors and a controlling interest in Refco's stock.

**\*5** The Audit Committee Defendants [FN7] are three former Refco outside directors who were members of Refco's audit committee.

### 9. Grant Thornton LLP

Grant Thornton LLP was Refco's outside auditor. It is the subject of two claims under the Securities Act involving the October 2004 Bond Registration Statement, and one claim under Section 10(b) of the Exchange Act. Each of the three claims arises from the audit reports Grant Thornton prepared on Refco's year-end financial statements beginning in the year 2003.

### 10. The Bond Underwriter Defendants

Defendants Credit Suisse Securities (USA) LLC (" Credit Suisse"), Banc of America Securities LLC (" BAS"), and Deutsche Bank Securities Inc. (" Deutsche Bank") refer to themselves as the "144A Defendants," while plaintiffs refer to them as the " Bond Underwriter Defendants." (P. Mem.53-54.) These banks were the underwriters for the Rule 144A private placement of Refco bonds. This opinion will refer to them as the "Bond Underwriter Defendants."

### DISCUSSION

The complaint makes claims under both the Securities Act of 1933 and the Securities Exchange Act of 1934. While few defendants move to dismiss all the claims against them, many defendants move to dismiss some, and many of their arguments overlap. There are several overarching issues raised: (1) whether there can be liability under Securities Act §§ 11 and 12 for involvement in the Rule 144A private placement of unregistered bonds; (2) the sufficiency of allegations of control-person liability under Securities Act § 15 based on the Bond Registration Statement; (3) whether the Exchange Act § 10(b) and Rule 10b-5 claims are adequately pled with respect to scienter and specific

allegations of misrepresentation; (4) whether plaintiffs have adequately alleged their Exchange Act claims against Grant Thornton, Refco's auditor; (5) whether plaintiffs have adequately stated a claim for control-person liability under the Exchange Act; and (6) whether the insider-trading allegations against a few of the defendants are adequate.

### I. Standards for Motions to Dismiss

On a motion to dismiss, the allegations in the Complaint are accepted as true, and all reasonable inferences drawn in favor of the plaintiffs. *Grandon v. Merrill Lynch & Co.,* 147 F.3d 184, 188 (2d Cir.1998). The Court's task is "not to weigh the evidence that might be presented at trial but merely to determine whether the complaint itself is legally sufficient."*Goldman v. Belden,* 754 F.2d 1059, 1067 (2d Cir.1985). Therefore, motions to dismiss should only be granted if it appears that the plaintiffs can prove no set of facts in support of their claim that would entitle them to relief. *Ryder Energy Distrib. Corp. v. Merrill Lynch Commodities, Inc.,* 748 F.2d 774, 779 (2d Cir.1984).

In deciding motions to dismiss, the Court may consider documents that are referenced in the Complaint, documents that the plaintiffs relied on in bringing suit and that either are in the plaintiffs' possession or that the plaintiffs knew of when bringing suit, or matters of which judicial notice may be taken. *Chambers v. Time Warner, Inc.,* 282 F.3d 147, 153 (2d Cir.2002)."[W]hen a plaintiff chooses not to attach to the complaint or incorporate by reference a document upon which it relies and which is integral to the complaint, the court may nonetheless take the document into consideration in deciding the ... motion to dismiss, without converting the proceeding to one for summary judgment."*Int'l Audiotext Network, Inc. v. AT & T Co.,* 62 F.3d 69, 72 (2d Cir.1995) (internal citation and quotation marks omitted). Thus, for purposes of a motion to dismiss, a court may consider:
**\*6** any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference, as well as public disclosure documents required by law to be, and that have been, filed with

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----

Page 6

--- F.Supp.2d ----, 2007 WL 1280649 (S.D.N.Y.), Fed. Sec. L. Rep. P 94,312
**(Cite as: --- F.Supp.2d ----)**

the SEC, and documents that the plaintiffs either possessed or knew about and upon which they relied in bringing the suit.

*Rothman v. Gregor,* 220 F.3d 81, 88-89 (2d Cir.2000) (internal citations omitted).

## II. *Claims Under Sections 11 and 12 of the Securities Act*

Several defendants move to dismiss Counts One and Three of the Amended Complaint, which involve §§ 12 and 11 of the Securities Act, respectively. Essentially, § 12 creates liability for misstatements in registration statements for public offerings, 15 U.S.C. § 77*l*, while § 11 creates liability for misstatements in prospectuses. 15 U.S.C. § 77k.

The first set of transactions on which the relevant claims are based was the private placement offering of $600 million in Senior Subordinated Notes. (*See* Confidential Offering Circular, July 22, 2004, Wilson Decl. Ex. B. (the "Offering Memorandum" ).) As discussed above, the notes were unregistered pursuant to SEC Rule 144A, 17 C.F.R. § 230.144A, which exempts private placements to qualified institutional buyers from the registration requirements of the Securities Act. *See*15 U.S.C. § 77d(2) (exempting from registration requirements " transactions by an issuer not involving any public offering"); *seealsoIn re Livent, Inc. Noteholders Secs. Litig.,* 151 F.Supp.2d 371, 431 (S.D.N.Y.2001). Among the purchasers of unregistered bonds in this offering were plaintiffs PIMCO and PIMCO High Yield Fund. The Bond Underwriter Defendants acted as lead initial purchasers-that is, underwriters-for this issue.

The second set of transactions was the public offering of registered bonds pursuant to a Form S-4 Registration Statement (Wilson Decl. Ex. C) (the " Bond Registration Statement"). In this offering, Refco allowed holders of unregistered bonds to exchange their bonds for registered bonds in a transaction known as an *"Exxon Capital* exchange." (Compl.¶ 149.) *SeeExxon Capital Holding Corp.,* SEC No-Action Letter (May 13, 1988). The Bond Underwriter Defendants are not identified as underwriters in the Bond Registration Statement, and claim not to have been involved in this transaction in any fashion whatsoever.

### A. Claims Arising From the Rule 144A Offering and the Subsequent Public Offering

Count One of the Complaint makes claims under § 12(a)(2) of the Securities Act based on alleged misstatements in the Rule 144A Offering Memorandum. This count is challenged by a group of defendants that includes the Bond Underwriter Defendants and several defendants whom plaintiffs claim "solicited the [plaintiffs'] purchases of the 144A Bonds." (Compl.¶ 275.) [FN8]This group of defendants argues that § 12(a)(2) does not apply to private offering memoranda.

The Bond Underwriter Defendants also move to dismiss Count Three of the complaint, which makes claims under § 11 of the Securities Act based on the Bond Registration Statement, on the grounds that their involvement in Refco's collapse was limited to underwriting the June 2004 private placement of bonds pursuant to Rule 144A, and that this private placement is not a "public offering" subject to the terms of the Act.

*7 Plaintiffs make three arguments in defense of their claims arising from the Rule 144A offering: first, that the Rule 144A offering itself is covered by § 12(a)(2); second, alternatively, that the Rule 144A offering should be treated as part of a two-step transaction which, viewed as a whole, falls within the coverage of § 12(a)(2) or § 11; and third, that the Bond Underwriter Defendants were directly involved with the creation of the Bond Registration Statement and are therefore subject to liability under § 11 even if the Rule 144A offering is not covered.

### 1. *The Rule 144A Offering Cannot Give Rise to Liability Under § 12(a)(2)*

Section 12(a)(2) of the Securities Act extends liability to any person who

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----                                                                    Page 7

--- F.Supp.2d ----, 2007 WL 1280649 (S.D.N.Y.), Fed. Sec. L. Rep. P 94,312
(Cite as: --- F.Supp.2d ----)

offers or sells a security ... by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements ... not misleading.

15 U.S.C.A. § 77*l* (a)(2). Thus, if the Offering Memorandum or some other relevant document does not qualify as a "prospectus or oral communication" within the meaning of the statute, then plaintiffs' § 12(a)(2) claims based on the Rule 144A offering must be dismissed.

The Supreme Court held in *Gustafson v. Alloyd Co., Inc.,* 513 U.S. 561, 115 S.Ct. 1061, 131 L.Ed.2d 1 (1995), that the work "prospectus" refers to "documents related to public offerings by an issuer or its controlling shareholders," that is, documents that "*must* include the information contained in registration statement."*Id.* at 569 (emphasis added; internal quotation marks omitted). The phrase "oral communication," the Court explained, refers only to oral communications relating to a prospectus, and therefore does not change the analysis. *Id.* at 567-68. Thus, § 12(a)(2) liability "cannot attach unless there is an obligation to distribute the prospectus in the first place."*Id.* at 571.

The Second Circuit further clarified this rule in *Yung v. Lee,* 432 F.3d 142 (2d Cir.2005), holding that § 12(a)(2) does not apply to the distribution of a prospectus prepared in connection with a public offering to a purchaser in a private transaction. *Id.* at 149.Even where the defendants' marketing efforts in connection with the private transaction relied heavily upon the same prospectus used in a public offering, there was no liability because defendants were not obligated to distribute the prospectus in connection with that transaction. *Id.* Under *Yung,* therefore, the issue is whether the defendants in this case were obligated to distribute a prospectus in connection with the Rule 144A transaction at issue.

Rule 144A specifically provides that securities sold in compliance with its provisions "shall be deemed not to have been offered to the public."17 C.F.R. § 230.144A(c). Plaintiffs rely heavily on the fact that the Rule 144A Offering Memorandum included the same information that would later be included in the

Bond Registration Statement, but the test is whether there was any requirement that that information be included in the Offering Memorandum. *See Gustafson,* 513 U.S. at 569. Plaintiffs point to no such requirement.

*8 The complaint explicitly acknowledges that "the Bonds were exempt-from-registration pursuant to Rule 144A."(Compl.¶ 273.) To concede that an issuance is properly exempted from registration under Rule 144A is to concede that the issuance complies with the conditions of the rule, and securities issued in compliance with the conditions of the rule "shall be deemed not to have been offered to the public." 17 C.F.C. § 230.144A(c).[FN9] In other words, exemption from registration and non-public status are necessary consequences of compliance with the conditions of Rule 144A. If the Rule 144A bonds were exempt from registration because they complied with Rule 144A, they were non-public by definition.[FN10]District courts in the Second Circuit have consistently dismissed § 12(a)(2) claims based on Rule 144A offerings on the grounds that "offerings under Rule 144A are by definition non-public, and offering memoranda distributed in connection with such offerings cannot give rise to Section 12(a)(2) liability."*Am. High-Income Trust v. Alliedsignal,* 329 F.Supp.2d 534, 543 (S.D.N.Y.2004); *seealsoAIG Global Secs. Lending Corp. v. Banc of Am. Secs. LLC,* 254 F.Supp.2d 373, 388-389 (S.D.N.Y.2003).

Plaintiffs assert that the SEC "has made clear that its promulgation of Rule 144A was not intended to limit the reach of § 12(a)(2), and that it believes § 12(a)(2) *should* apply to Rule 144A/Exxon Capital exchange transactions" (P. Mem. 47 (emphasis in original)), conveying the impression that the SEC agrees with their legal analysis. However, although the SEC would be "in sympathy on policy grounds" with a finding of § 12(a)(2) liability, it believes that "the more likely reading of *Gustafson...* is that ... the Supreme Court would not have deemed the offering memorandum in the Rule 144A offering to be a prospectus."(Letter of Aug. 9, 2001, from David M. Becker, General Counsel of the SEC, to the U.S. Dist. Ct. for the Dist. of S.C., *In re Safety-Kleen Bondholders Litig.,* No. 3:00-1145-17, Coffey Dec. Ex. 1, at 3.) This Court agrees with the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----, 2007 WL 1280649 (S.D.N.Y.), Fed. Sec. L. Rep. P 94,312
(Cite as: --- F.Supp.2d ----)

SEC and with prior courts in this district that under current law a Rule 144A offering does not give rise to liability under § 12(a)(2).

Plaintiffs rely on the pre-*Gustafson* case of *Hill York Corp. v. Am. Int'l Franchises, Inc.* 448 F.2d 680 (5th Cir.1971), for the proposition that "the question of public offering is one of fact and must depend upon the circumstances of each case."*Id.* at 687.It is true that a few post-*Gustafson* cases in other districts have applied this reasoning to find that a § 12(a)(2) claim based on a Rule 144A offering could survive a motion to dismiss. *See,e.g., In re Enron Corp. Secs., Derivative & ERISA Litig.,* 310 F.Supp.2d 819, 859-866 (S.D.Tex.2004). As noted above, however, courts in the Southern District of New York have repeatedly declined to follow this reasoning. Even if it were followed, nothing in the alleged facts of this case suggests that the Rule 144A offering was public.

*9 Plaintiffs assert that "the Rule 144A Bonds were offered to a subset of the investing public" (P. Mem.44), but this is disingenuous. In a broad sense, any private transaction involves "a subset of the investing public"-every investor is a "subset" of the investing public just as every citizen is a subset of the general public. The Offering Memorandum by its terms, however, required the terms of the offer not to be made public, and made clear that the offering was "personal to the offeree ... and [did] not constitute an offer to any other person or to the public generally."(Offering Memorandum, Wilson Decl. Ex. B., at ii.) The Offering Memorandum also provided that the notes were not registered with the SEC (*id.* at ii-iii), which, for the reasons discussed above, clearly implies that they are non-public under Rule 144A. *SeeIn re Worldcom, Inc. Secs. Litig.,* 294 F.Supp.2d 431, 454 (S.D.N.Y.2003) ( " *WorldCom I*" ) (relying on similar language to hold that "[t]he fact that the [offering in question] was a private placement is clear from its face"). Nothing in the complaint suggests that the Rule 144A offering was directed at the general investing public. "[N]o matter how the plaintiff might word the claim, the document involved cannot be ' silkenized' into a § 12[ (a) ](2) 'prospectus'." *Glamorgan Coal Corp. v. Ratner's Group PLC,* No. 93 Civ. 7581, 1995 WL 406167, at *3 (S.D.N.Y.

July 10, 1995). In short, plaintiffs have offered no persuasive reason why the Rule 144A offering should be treated as public within the meaning of § 12(a)(2).

*2. The Rule 144A Offering and the* Exxon Capital *Exchange Do Not Constitute a Single Transaction Covered By § 12(a)(2) or § 11*

Plaintiffs argue that even if the Rule 144A offering itself is not covered by § 12(a)(2), it should be treated as part of a single, two-step transaction that is covered by that provision. They argue that an initial purchaser or underwriter that prepares an offering memorandum for a private placement of notes is liable under § 12 when the issuer of the notes later exchanges them for registered bonds in an *Exxon Capital* exchange. In other words, plaintiffs contend that the entire two-step process (the initial offering of unregistered bonds, followed by the *Exxon Capital* exchange) was a single " public offering." They make the same argument with respect to § 11 of the Securities Act, 15 U.S.C. 77k.

District courts have rejected similar efforts to subject Rule 144A transactions to § 12(a)(2) liability by treating them as part of larger transactions. *SeeAm. High-Income Trust,* 329 F.Supp.2d at 543;*In re Interbank Funding Corp. Secs. Litig.,* 329 F.Supp.2d 84, 94-95 (D.D.C.2004). "The process by which an issuer offers bonds through a private placement under Rule 144A of the Securities Act, and subsequently offers to exchange the Rule 144A notes for registered securities-an " ' Exxon Capital exchange offer'-is typical of high-yield debt issuance."*Am. High-Income Trust,* 329 F.Supp. at 541. Therefore, to treat the two transactions as part of a single plan "would render Rule 144A ineffective for a very substantial number of securities transactions, and defeat the capital market financing objectives the Rule 144A exemption was designed to achieve."*Livent,* 151 F.Supp.2d at 431-32 (addressing a similar integration argument in a § 11 context). If an *Exxon Capital* exchange brought unregistered bonds within the scope of § 11 or § 12, qualified institutional buyers who participated in the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----

--- F.Supp.2d ----, 2007 WL 1280649 (S.D.N.Y.), Fed. Sec. L. Rep. P 94,312
(Cite as: --- F.Supp.2d ----)

Page 9

exchange would be considered underwriters under the Securities Act and would be required to file their own registration statement, which would significantly undermine Rule 144A's goal of promoting liquidity in secondary securities markets. *Id.* at 431.

**\*10** The SEC, like courts in this district, has taken the position that no liability under § 12(a)(2) arises in a two-step transaction of this kind. Letter from Jacob H. Stillman, Solicitor, Office of the General Counsel of the SEC, to the U.S. Dist. Ct. for the N. Dist. of Ala., dated Nov. 28, 2006, *In re HealthSouth Secs. Litig.*, No. CV-03-BE-1500-S (Letter from Robert B. McCaw to the Court, dated Dec. 1, 2006, Ex. A), at 8-11. As the SEC noted, the concept of "integration" on which the plaintiffs' theory is premised is a specific doctrine in securities law by which courts determine whether multiple securities transactions should be considered part of the same offering for purposes of determining whether exemptions from the registration requirements apply. To apply it to the facts of this case would be "to apply 'integration' in an entirely novel manner which stands the concept on its head," because "[t]he Commission, and securities market participants, recognize the two steps to be separate transactions."*Id.* at 11.Indeed, as the SEC noted, the qualified institutional buyers certainly relied on that understanding when they decided to become involved in the Rule 144A transaction. *Id.*

Plaintiffs allege that the Offering Memorandum was used as the foundation for preparing the Bond Registration Statement, that the two documents were substantially similar in content, and that the parties preparing the Offering Memorandum knew and understood that they were preparing statements that would also be included in the Bond Registration Statement. (Compl.¶ 153.) Two transactions do not become one, however, simply because they involve the same statements. Plaintiffs have failed to show that the two transactions were one for purposes of § 12(a)(2). Thus, Count One of the complaint, which makes claims under § 12(a)(2) based on the Rule 144A offering, must be dismissed.

Count Three of the complaint makes claims against various defendants-including the Bond Underwriter Defendants [FN11]-pursuant to Section of 11 of the Securities Act, 15 U.S.C. § 77k. Count Three is based on alleged misstatements in the Bond Registration Statement, not the Rule 144A Offering Memorandum. Section 11 imposes liability for material misrepresentations in a registration statement, and by its terms applies only to registered offerings.[FN12] Plaintiffs argue, however, that the Bond Underwriter Defendants may be liable under § 11 for misstatements in the Rule 144A Offering Memorandum because the unregistered and registered offerings should be treated as one transaction for purposes of § 11. The arguments against plaintiffs' integration theory discussed above apply with equal force to plaintiffs' § 11 claims, and so the Rule 144A offering and the subsequent public offering will not be treated as one integrated transaction for purposes of § 11. *SeeLivent*, 151 F.Supp.2d at 431-32.

### 3. The Bond Underwriter Defendants Are Not Liable Under § 11 For Their Involvement in the Preparation of the Bond Registration Statement

**\*11** The only remaining question with respect to liability under §§ 11 and 12 is whether the Bond Underwriter Defendants are subject to § 11 liability for direct involvement in the creation of the Bond Registration Statement. The Bond Underwriter Defendants move to dismiss Count Three as against them on the grounds that their involvement was limited to the Rule 144A offering. In order to be liable under § 11 for misstatements in the Bond Registration Statement, the defendants must qualify as "underwriters" within the meaning of § 11(a)(5). [FN13] The term "underwriter" is defined by the Securities Act as:

any person who has purchased from an issuer with a view to, or offers or sells for an issuer in connection with, the distribution of any security, or participates or has a direct or indirect participation in any such undertaking, or participates or has a participation in the direct or indirect underwriting of any such undertaking; but such term shall not include a person whose interest is limited to a commission from an underwriter or dealer not in excess of the usual and customary distributors' or sellers' commission.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----, 2007 WL 1280649 (S.D.N.Y.), Fed. Sec. L. Rep. P 94,312
(Cite as: --- F.Supp.2d ----)

15 U.S.C.A. § 77b(11).

In this case, plaintiffs allege "upon information and belief" that the Bond Underwriter Defendants " participated in the preparation of the Bond Registration Statement."(Compl.¶¶ 153, 307.) [FN14] This conclusory allegation of participation in the preparation of the statement includes no detail whatsoever; plaintiffs make no specific allegations as to the extent of this participation or what actual actions the defendants took.

The term "underwriter" in the Securities Act has been broadly interpreted. Thus, the Seventh Circuit has held that it includes "a party retained solely to make minimum interest rate recommendations and participate in the preparation of a registration statement but which does not purchase or sell securities, solicit orders, take part in the actual distribution, assume any risk of sale of the securities or do other things commonly associated with an underwriter's role."*Harden v. Raffensperger, Hughes & Co., Inc.,* 65 F.3d 1392, 1396 (7th Cir.1995). "Underwriter" is not, however, a term of unlimited applicability that includes anyone associated with a given transaction. "It is crucial to the definition of 'underwriter' that any underwriter must participate in the distribution of a security." *McFarland v. Memorex Corp.,* 493 F.Supp. 631, 644 (D.C.Cal.1980). Thus, parties have been found not to meet the definition where there was "no allegation ... that the [the parties] purchased any [of the relevant] securities with a view to distribution or that they offered or sold any security on behalf of [the issuer]."*Id.*"[U]nderwriters are subjected to liability because they hold themselves out as professionals who are able to evaluate the financial condition of the issuer."*Id.* at 646.This is precisely what the Underwriting Defendants did *not* do with respect to the public offering in this case. Plaintiffs have alleged no facts suggesting the Bond Underwriter Defendants held themselves out in any respect as to the public offering; on the contrary, any role they may have played in that offering was never publicly acknowledged. Nor do any of the allegations in the Amended Complaint suggest that the Bond Underwriter Defendants bore any risk with respect to that transaction. "An underwriter buys securities directly or indirectly from the issuer and resells them to the public, or he performs some act (or acts) that facilitates the issuer's distribution. He participates in the transmission process between the issuer and the public."*Ingenito v. Bermec Corp.,* 441 F.Supp. 525, 536 (S.D.N.Y.1977).

**\*12** Because the plaintiffs have failed to make any specific allegations of "participation" of the kind that would qualify the Bond Underwriter Defendants as underwriters of the public offering, the plaintiffs' conclusory allegation that they " participated" in the creation of a registration statement, read in isolation, would likely be insufficient to survive a motion to dismiss." Conclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to [defeat] a motion to dismiss."*Smith v. Local 819 I.B.T. Pension Plan,* 291 F.3d 236, 240 (2d Cir.2002) (internal citation omitted). Even if this bare allegation could suffice in some circumstances, it does not here, because in the context of the entire complaint it is clear that the word "participated" refers entirely to defendants' participation in the Rule 144A offering-not to actual participation in the creation of the Bond Registration Statement.[FN15]

Plaintiffs state that the Bond Underwriter Defendants were "paid as underwriters and ... performed the functions of underwriters in connection with the Bond Offering-including contacting potential investors, organizing road shows, preparing the offering documents, and conducting a 'due diligence' investigation."(P. Mem.54.) Despite plaintiffs' artful use of the phrase "Bond Offering" to describe both the Rule 144A offering and the subsequent public offering, it is clear from the Amended Complaint that all of these actions took place in the context of the Bond Underwriter Defendants' work on the Rule 144A offering, not the subsequent public offering. (Compl. ¶¶ 107, 144, 147-48, 153.) Plaintiffs' memorandum of law clarifies that the "indirect participation" alleged (P. Mem.55) includes the Bond Underwriter Defendants' participation in the Road Show in July 2004 during which the Rule 144A bonds were marketed to investors.[FN16] Plaintiffs' theory is that because the Rule 144A bonds by their terms anticipated the possibility of an exchange for registered bonds, the Bond

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----                                                        Page 11

--- F.Supp.2d ----, 2007 WL 1280649 (S.D.N.Y.), Fed. Sec. L. Rep. P 94,312
(Cite as: --- F.Supp.2d ----)

Underwriter Defendants by soliciting purchasers for the Rule 144A bonds in fact "solicited [investors] to participate in both steps of the Bond Offering."(P. Mem.54.) Once plaintiffs' theory that the "two-step process" was in fact a single transaction is rejected, therefore, plaintiffs' claim of "indirect participation" (P. Mem.55) in this context becomes irrelevant. The alleged "indirect participation" also includes the actual underwriting of the Rule 144A offering, with the knowledge that the bonds would later be exchanged for registered bonds (P. Mem.54-55), an argument that also necessarily fails once the plaintiffs' single-transaction theory is rejected.

Of course, a court reviewing a motion to dismiss is required to draw all inferences in favor of the non-moving party. Here, however, the single sentence alleging that the Bond Underwriter Defendants participated in the public offering presents a legal conclusion, not a factual allegation, and must be read in the context of the factual allegations to which it refers. "Conclusory allegations, unwarranted deductions of facts or legal conclusions masquerading as facts will not prevent dismissal of Section 11 claims."*In re Merrill Lynch & Co., Inc. Research Reports Secs. Litig.,* 272 F.Supp.2d 243, 253 (S.D.N.Y.2003) (internal citations, alterations and quotation marks omitted). Plaintiffs have in fact failed to allege any specific role whatsoever in the underwriting of the public offering; their only relevant allegation is simply a reproduction of the statutory requirement of "direct or indirect participation," 15 U.S.C. § 77b(11), and in context even that allegation pertains to matters that do not give rise to § 11 liability. Accordingly, the Bond Underwriter Defendants' motion to dismiss Count Three as to them will be granted.

### B. Motions to Dismiss the § 11 Claims For Failure to Allege Fraud With Sufficient Particularity

**\*13** Defendants Silverman, Klejna, Bennett, and Grant Thornton [FN17] argue that the claims relating to § 11 of the Securities Act (Compl.¶¶ 299-132, 313-328) sound in fraud, and are therefore subject to a higher pleading standard. (Silverman Mem. 22-24; Klejna Mem. 30-33; Bennett Mem. 19-21; [FN18] Grant Thornton Mem. 15-18.) This argument

is without merit.

Rule 9(b) of the Federal Rules of Civil Procedure provides that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity."To meet the requirements of Rule 9(b), a complaint must " (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent."*Mills v. Polar Molecular Corp.,* 12 F.3d 1170, 1175 (2d Cir.1993).

The Second Circuit has acknowledged that "fraud is not an element or a requisite to a claim under Section 11," and that "a plaintiff need allege no more than negligence to proceed under Section 11." *Rombach v. Chang,* 355 F.3d 164, 171 (2d Cir.2004). Accordingly, Rule 9(b)'s standards apply to Section 11 claims only "insofar as the claims are premised on allegations of fraud."*Id.* Applying this analysis, however, the court found implications of fraud in language that closely tracked the language of Section 11 itself:

Plaintiffs assert that their Section 11 claims "do[ ] not sound in fraud" but the wording and imputations of the complaint are classically associated with fraud: that the Registration statement was " inaccurate *and* misleading;", that it contained " *untrue* statements of material facts;" and that " materially *false* and *misleading* written statements" were issued.

*Rombach,* 355 F.3d at 171 (emphasis in original). This passage presents something of a conundrum, because applied literally, it would seem to require applying a 9(b) standard to all claims under § 11. Section 11 applies when "any part of the registration statement ... contained an *untrue statement of a material fact* or omitted to state a *material fact* required to be stated therein or necessary to make the statements therein not misleading."15 U.S.C.A. § 77k(a) (emphasis added). *SeeJohnson v. NYFIX, Inc.,* 399 F.Supp.2d 105, 122 (D.Conn.2005).[FN19] Fraud, of course, implies more than falsity, and the mere fact that a statement is misleading (as are all false statements, whether intentionally, negligently or innocently made) does

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----, 2007 WL 1280649 (S.D.N.Y.), Fed. Sec. L. Rep. P 94,312
(Cite as: --- F.Supp.2d ----)

not make it fraudulent.

It is clear that the Second Circuit did not intend *Rombach* as an instruction that all § 11 pleadings should be subjected to the Rule 9(b) standard. *See Rombach,* 355 F.3d at 178 (finding that § 11 claims against certain defendants sounded in negligence, not fraud). Nor can the Second Circuit have intended that all allegations directly reproducing the language of § 11 be subject to Rule 9(b); as *Rombach* acknowledges, violations of § 11 claims do not necessarily involve fraud. 355 F.3d at 171. Therefore, the court's conclusion that the particular language in *Rombach* was indicative of fraud should be read in the context of the pleadings at issue in that case, in which the plaintiffs "[did] not assert any claim of negligence on the part of the Individual Defendants, nor [did] they specify any basis for such a claim."*Rombach v. Chang,* No. 00 Civ. 0958, 2002 WL 1396986, at *4 (E.D.N.Y. June 7, 2002).*Rombach* necessarily requires a case-by-case analysis of particular pleadings to determine whether "the gravamen of the complaint is plainly fraud."355 F.3d at 172, quoting *In re Stac Elecs. Secs. Litig.,* 89 F.3d 1399, 1405 n. 2 (9th Cir.1996). In this case, the gravamen of the § 11 claims is plainly *not* fraud.

*14 The complaint in this case is carefully structured so as to draw a clear distinction between negligence and fraud claims. The Securities Act claims are found in the first half of the complaint (¶ ¶ 86-379); the Exchange Act allegations, which include allegations of fraud by some-but not all-of the defendants named in the Securities Act claims, are found in the second half of the complaint (¶¶ 381-720). This careful division makes it easy to distinguish between the two, and the substance of the allegations keeps the distinction as clear as does the complaint's structure. The relevant factual allegations are contained in a section called " Defendants' Negligence" (Compl.¶ ¶ 249-258), which alleges exactly that.

The Securities Act section of the complaint alleges various untrue or misleading statements in the Offering Memorandum, the Bond Registration Statement, and the IPO Registration Statement. As to the defendants' intent, however, these claims are carefully couched in the language of negligence. For example, plaintiffs allege that Refco's corporate officers and auditors "did not conduct a reasonable investigation of the statements contained in the Offering Memorandum and the Bond Registration Statement, and did not possess reasonable grounds for believing that the statements in those documents were true and not misleading."(Compl.¶ 252.) Defendants have pointed to no allegations in the Securities Act section of the complaint that contain even a hint of fraud.

As Silverman notes (Silverman Mem. ¶ 24), the complaint certainly accuses Refco of concealing uncollectible receivables. (Compl.¶ 199.) Indeed, it is clear that plaintiffs believe that Refco and various persons associated with it, including most, if not all, of the defendants, were engaged in a massive fraud. This fact, however, does not take away plaintiffs' right to plead in the alternative that defendants violated provisions requiring only negligence. *SeeRombach,* 355 F.3d at 171 ("The same course of conduct that would support a Rule 10b-5 claim may as well support a Section 11 claim or a claim under Section 12(a)(2)." ).

Of course, "[p]laintiffs cannot evade the Rule 9(b) strictures by summarily disclaiming any reliance on a theory of fraud or recklessness."*In re JP Morgan Chase Secs. Litig.,* 363 F.Supp.2d 595, 635 (S.D.N.Y.2005). Thus, the language at the beginning of each Securities Act claim disclaiming any intent to allege fraud is by itself insufficient to protect those claims from Rule 9(b)'s stringent requirements.[FN20]In this case, however, plaintiffs have done more than disclaim fraud; they have specifically pled alternate theories of fraud and negligence. As the Third Circuit held in a similar case,

plaintiffs ... do not merely disavow already-pled allegations of fraud in connection with their Section 11 and Section 12(a)(2) claims, leaving the court to sift through those allegations in search of some lesser included claim of strict liability. Rather, both plaintiffs have expressly pled negligence in connection with their Section 11 and 12(a)(2) claims. We regard this difference in pleading as dispositive.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----, 2007 WL 1280649 (S.D.N.Y.), Fed. Sec. L. Rep. P 94,312
(Cite as: --- F.Supp.2d ----)

**\*15** *In re Suprema Specialties, Inc. Secs. Litig.,* 438 F.3d 256, 272 (3d Cir.2006) (internal citations, alterations, and quotation marks omitted). Defendants do not argue that the complaint is insufficiently specific if Rule 9(b)'s standards are not applied. Accordingly, the motions by defendants Silverman, Klejna, Bennett, and Grant Thornton to dismiss the § 11 claims (Count Three) and the control-person claims based on underlying § 11 violations (Count Four) for failure to satisfy Rule 9(b)'s standards will be denied.

### C. Whether Unregistered Bondholders Have Standing to Make § 11 Claims Based on the Bond Registration Statement

Several defendants move to dismiss the § 11 claims as to those plaintiffs who acquired the Registered Bonds by exchanging unregistered Rule 144A bonds for them. (*See* Sexton Mem. 23-26, Klejna Mem. 33-35, THL/Audit Comm. Mem. 22, and Grant Thornton Mem. 20-23; response at P. Mem. 58-62.) This argument applies to the § 11 claims made on behalf of plaintiffs who purchased unregistered bonds and then traded them for registered bonds in the *Exxon Capital* exchange, but does not reach the claims of those plaintiffs who acquired registered bonds on the open market.

The defendants frame the argument in several different ways, all of which are based on the idea that the Bond Registration Statement had nothing to do with the unregistered bondholders' decision to exchange their unregistered bonds for registered bonds. Thus, Grant Thornton frames the question as one of what statements are material under § 11, arguing that "any positive or negative news contained in the registration statement would have impacted the bondholder's holdings regardless of whether he exchanged his stock."(Grant Thornton Memo 21.) Sexton argues these plaintiffs have no standing (Sexton Mem. 23-23) and that they "lack the required causation nexus with the Registration Statement" (Sexton Reply 14).[FN21] Klejna, who is not being sued for any role in the unregistered bond offering, argues that it would be unfair to hold him responsible for an investment decision by plaintiffs in which he had no involvement. (Klejna Reply 14.)

The questions of standing, reliance, materiality, and causation are related, because "materiality is intimately bound up with the concept of reliance," and "[r]eliance, in turn, is linked to causation."*In re McKesson HBOC, Inc. Secs. Litig.,* 126 F.Supp.2d 1248, 1260 (N.D.Cal.2000). Put another way, a misstatement is material if an investor acted in reliance upon it and was thereby caused to suffer damages.

The parties argue at some length about whether it is appropriate to impose a reliance requirement on § 11 claims. Although the caselaw is not entirely clear as to the circumstances in which reliance can be relevant to a § 11 claim, the better reading of § 11 seems to be that it "creates a presumption that 'any person acquiring such security' was legally harmed by the defective registration statement."*APA Excelsior III L.P. v. Premiere Techs., Inc.,* 476 F.3d 1261, 1271 (11th Cir.2007)."To say that reliance is 'presumed' is simply not the same thing as saying that reliance is 'irrelevant.' "*Id.* at 1272.*Butsee Westinghouse Elec. Corp. v. '21' Int'l Holdings, Inc.,* 821 F.Supp. 212, 218 (S.D.N.Y.1993) ("Reliance is not a factor in a § 11 action, and thus impossibility of reliance can be no bar to a § 11 claim. As long as a plaintiff can show that the particular securities he purchased were registered by means of a materially false registration statement, he has a claim under § 11."(internal citations omitted).) Whether framed as a question of materiality or reliance, it seems clear as a matter of law and logic that plaintiffs should be entitled to no recovery when it can be established with certainty that they were not harmed in any way by the relevant misrepresentations.

**\*16** Defendants offer at least two different reasons to think that reliance was impossible in the present case, that is, that any misstatements in the Bond Registration Statement were immaterial as to plaintiff unregistered bondholders. The first contention is that the unregistered bondholders' relevant investment decision was already made at the time they purchased the unregistered bonds. As Sexton puts it, "[p]laintiffs' investment decision could not have possibly been affected or 'impelled' by the registration statements because their investment commitment to Refco was made when

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----                                                                     Page 14

--- F.Supp.2d ----, 2007 WL 1280649 (S.D.N.Y.), Fed. Sec. L. Rep. P 94,312
**(Cite as: --- F.Supp.2d ----)**

they purchased the Rule 144A Bonds prior to the issuance of the registration statement."(Letter from Stuart I. Friedman to the Court, dated Mar. 1, 2007; *see* Sexton Mem. 24-25.) In other words, " [c]ompletion of the mandated exchange was the performance of a ministerial act."(Klejna Mem. 34.) FN22

In a case to which defendants seek to analogize this one, the Eleventh Circuit concluded that where plaintiffs had made a binding and irrevocable commitment to purchase the relevant investments prior to the issuance of the registration statement, there could be no liability under § 11. *APA Excelsior,* 476 F.3d 1261, 1275-76. Section 11's presumption of reliance is rebutted, in other words, where the plaintiffs were irrevocably committed to purchase the securities before the registration statement issued, because "[t]o hold otherwise would mean that an impossible fact will be presumed in Plaintiffs' favor."*Id.* at 1273. Defendants argue that plaintiffs' claims similarly should be dismissed on the grounds that the unregistered bondholders, like the parties in *APA Excelsior,* were irrevocably committed to the *Exxon Capital* exchange when they purchased the unregistered bonds.

At this stage of the litigation, however, it cannot be said with certainty that "the plaintiffs lacked the power or authority to back out" of the *Exxon Capital* exchange. *Pell v. Weinstein,* 759 F.Supp. 1107, 1114 (M.D.Pa.1991). It is true that, according to the complaint, the unregistered bondholders would not have bought the unregistered bonds without the understanding that they would be exchanged for Registered Bonds. (Compl.¶ 104.) Furthermore, the complaint alleges that the *Exxon Capital* exchange was *"mandated"* by the Offering Memorandum and the underwriting contracts." (Compl. ¶ 100 (emphasis added).) In context, however, it is clear that it was the *issuers* of the bonds, not the purchasers, who were obligated under this arrangement. Plaintiffs allege that the " co-issuers" of the bonds "undertook to use their best efforts to offer the Registered Bonds in exchange for the 144A Bonds."(Compl.¶ 103.) An undertaking on the offeror's side does not oblige the offeree to accept.

Nothing in the plaintiffs' allegations suggests that plaintiffs were irrevocably committed to the *Exxon Capital* exchange. Indeed, plaintiffs contend that " unless and until they affirmatively exchanged the bonds ... the Rule 144A bondholders retained the option of rejecting the exchange offer and keeping their registered bonds."(Letter from Stuart M. Grant to the Court, dated Mar. 12, 2007.) Defendants have pointed to no language in the relevant documents suggesting otherwise. Defendants point out that the unregistered bondholders allegedly decided to buy the unregistered bonds specifically because they understood that the bonds would be exchanged for registered bonds. Alleging that plaintiffs had made a decision, however, is not the same as alleging that they had entered into a commitment. Although plaintiffs certainly intended to exchange their 144A bonds for registered bonds, there is at least a question of fact as to whether the Bond Registration Statement could have had any impact on their decision to participate in the *Exxon Capital* exchange.

*17 As a question of irrevocable commitment, therefore, defendants' arguments are unpersuasive. There are other ways to frame the issue, however. Plaintiffs argue that "a jury could find ... that there is a substantial likelihood that a reasonable investor would consider that information [in the Registration Statement] important when deciding whether to *purchase the [144A Bonds] and exchange them* for Registered Bonds."(P. Mem. 61 (emphasis added).) Plaintiffs' phrasing assumes that the unregistered and registered bond offerings may be treated as a single transaction, a theory that has already been rejected for the reasons discussed above. It is therefore necessary to ask what the unregistered bondholders-already owners of non-tradeable Refco bonds-could have done differently had the Bond Registration Statement been fully candid about Refco's alleged foul deeds and dreadful prospects. Under this line of inquiry, it is not an irrevocable commitment that rebuts the presumption of reliance, but rather the fact that plaintiffs had no other options.

"[W]hen presented with a Rule 12(b)(6) motion, a complaint may not properly be dismissed ... on the ground that the alleged misstatements or omissions

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----                                                          Page 15

--- F.Supp.2d ----, 2007 WL 1280649 (S.D.N.Y.), Fed. Sec. L. Rep. P 94,312
**(Cite as: --- F.Supp.2d ----)**

*15*

are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance."*Goldman v. Belden,* 754 F.2d 1059, 1067 (2d Cir.1985).[FN23] The Second Circuit has held that where "the omitted information would not have made a reasonable shareholder any less likely to favor the objected-to transaction, ... such an omission, material or not, could not have caused the injury for which damages are sought."*Minzer v. Keegan,* 218 F.3d 144 (2d Cir.2000). Applying this materiality analysis to a case where plaintiffs' only options were to trade their preferred stock for common stock, or to redeem it at a price substantially below the market price, the Fifth Circuit held that there could be no liability for misrepresentations because "respondents d [id] not indicate how they might have acted differently had they had prior notice" of the true facts behind the misrepresentations. *Dwoskin v. Rollins, Inc.,* 634 F.2d 285, 291 n. 4 (5th Cir.1980).*SeealsoElfenbein v. Am. Fin. Corp.,* 487 F.Supp. 619, 627 (S.D.N.Y.1980).

The same principle applies here, because plaintiffs have not alleged that unregistered bondholders would have been any less likely to go through with the *Exxon Capital* exchange had the Bond Registration Statement been accurate. Plaintiffs have not alleged that the unregistered bonds differed in any respect from the registered bonds for which they were exchanged, except that the registered bonds were freely tradeable. Had the plaintiffs known the true state of Refco's affairs, they would have had no reason to avoid making make their holdings tradeable; on the contrary, they would have had every reason to rid themselves of the bonds as soon as possible. Plaintiffs have failed to allege that the omitted information would have made a reasonable shareholder any less likely to favor the *Exxon Capital* exchange. They have therefore failed to show that any omissions or misrepresentations were material. Accordingly, Counts Three and Four will be dismissed as to any plaintiffs who obtained registered bonds in the *Exxon Capital* exchange.

**III. *Control-Person Liability Under Securities Act §***

### A. Standards for Control-Person Liability

*\*18* To make out a claim for control-person liability under section 15 of the Securities Act, plaintiffs must allege "(a) a primary violation by a controlled person, and (b) control by the defendant of the primary violator."*In re Global Crossing, Ltd. Secs. Litig.,* No. 02 Civ. 910, 2005 WL 2990646, at *7 (S.D.N.Y. Nov. 7, 2005) ("*Global Crossing III*"). Control entails " 'the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise.'" *SEC v. First Jersey Secs., Inc.,* 101 F.3d 1450, 1472-73 (2d Cir.1996), quoting 17 C.F.R. § 240.12b-2. To prevail on a § 15 claim, "[a] plaintiff is required to prove actual control, not merely control person status."*In re IPO Secs. Litig.,* 241 F.Supp.2d 281, 352 (S.D.N.Y.2003) (emphasis omitted).

### B. Control Person Liability for the Rule 144A Offering Memorandum

As an initial matter, the dismissal of Count One, the count pertaining to the Rule 144A Offering Memorandum, necessarily requires the dismissal of Count Two, which pertains to control-person liability for the statements made in the Rule 144A Offering Memorandum. As noted above, control-person liability exists only where there is a primary violation, and so the conclusion that misstatements in the Offering Memorandum cannot give rise to liability requires the further conclusion that those misstatements cannot give rise to control-person liability. Accordingly, Count Two will be dismissed in its entirety.

### C. Control Person Liability for the Bond Registration Statement and the IPO Registration Statement

Count Four of the complaint alleges control-person liability for misstatements in the Bond Registration Statement. Counts Six and Eight allege

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----                                                                                    Page 16

--- F.Supp.2d ----, 2007 WL 1280649 (S.D.N.Y.), Fed. Sec. L. Rep. P 94,312
(Cite as: --- F.Supp.2d ----)

control-person liability for misstatements in the August 2005 IPO Registration Statement and prospectus. There is no dispute that misstatements in these documents would constitute a primary violation of the Securities Act; therefore, the sole issue with respect to Counts Four, Six and Eight is whether the plaintiffs have adequately alleged that the defendants named in these counts exercised control over Refco at the time the statements became effective.

As this Court found in an earlier case, allegations of control under Section 15 are subject only to notice-pleading requirements, and accordingly survive motions to dismiss "as long as it is at least plausible that plaintiff could develop some set of facts that would pass muster."*In re Global Crossing III,* 2005 WL 2990646, at *8. Thus, the Court in that case concluded that even though the facts alleged in the complaint, taken alone, were insufficient to constitute control, the case did not fit "into that narrow category of cases in which it is ' implausible' or mere 'unlikely speculation' that plaintiffs can develop a record that would support a finding of control, especially given the decidedly fact-based nature of the control inquiry."*Id.* (internal citations and quotation marks omitted). [FN24]

**\*19** Under these standards, defendants' arguments for dismissal are unpersuasive. Defendant Bennett moves to dismiss the Section 15 allegations against defendants RGHI and the Bennett Trust, noting that this Court has previously held that mere minority ownership is insufficient to constitute control under Section 15. *See Global Crossing III,* 2005 WL 2990646, at *8. However, the Court held in the same case that such allegations were sufficient to survive a motion to dismiss, because it was not implausible that plaintiffs could develop a record that could support a finding of control. Bennett also argues that RGHI and the Bennett Trust cannot be liable under a control theory because the complaint alleges that they were controlled by him. (Bennett Mem. 15.) As a matter of logic, however, it makes little sense to say that controlling entities should escape liability on the grounds that other entities in turn controlled them. The issue is whether the entity has "the power to direct or cause the direction of

the management and policies of a person,"*First Jersey,* 191 F.3d at 1472-73, not whether that power is exercised at the direction of another. In fact, " [t]he 'control person' provisions were included in the federal securities laws to 'prevent people and entities from using 'dummies' to do the things that they were forbidden to do by the securities laws.'" *In re Flag Telecom Holdings, Ltd. Secs. Litig.,* 352 F.Supp.2d 429 (S.D.N.Y.2005) (internal citations and quotation marks omitted).[FN25]

Defendant Klejna argues that the mere signing of the Bond Registration Statement is insufficient to support control liability. Klejna notes the principle that one purpose of control liability is to prevent powerful individuals or entities from arranging for " dummies" to sign in their stead, and contends that this principle militates against finding control as to the actual signatories. (Klejna Mem. 25-26.) However, "[t]he very fact that a director is required to sign these critical documents charges the director with power over the documents and represents to the corporation, its shareholders, and the public that the corporation's director has performed her role with sufficient diligence that she is willing and able to stand behind the information contained in those documents."*WorldCom I,* 294 F.Supp.2d at 420. "It does comport with common sense to presume that a person who signs his name to a report has some measure of control over those who write the report." *Jacobs v. Coopers & Lybrand, L.L.P.,* No. 97 Civ. 3374, 1999 WL 101772, at *18 (S.D.N.Y. Mar.1, 1999). Thus, signature on an SEC filing containing the misrepresentations that are the subject of a claim is suggestive of control. In any event, the complaint goes on to allege that Klejna's position as Executive Vice President and General Counsel gave him some degree of control over Refco, and that he was directly involved in its day-to-day operations, including financial reporting and accounting. (Compl.¶¶ 321, 350, 678, 697.) That suffices as an allegation of control.

**\*20** Sexton argues that the allegations of control against him with respect to the IPO Registration statement must be dismissed because they are based "solely upon Sexton's status as an officer of Refco Group."(Sexton Mem. 22.) "However, where ... the corporate officers are a narrowly defined group

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----, 2007 WL 1280649 (S.D.N.Y.), Fed. Sec. L. Rep. P 94,312
**(Cite as: --- F.Supp.2d ----)**

charged with the day-to-day operations of a public corporation, it is reasonable to presume that these officers had the power to control or influence the particular transactions giving rise to the securities violations."*Maywalt v. Parker & Parsley Petroleum Co.,* 808 F.Supp. 1037, 1054 (S.D.N.Y.1992) (internal citations and quotation marks omitted). Moreover, the complaint specifically alleges that Sexton "prepared and approved" the IPO Registration Statement. (Compl.¶ 34.) This is sufficient for purposes of a motion to dismiss.

Murphy argues that the Section 15 allegations against him should be dismissed (Murphy/Sherer Mem. 31-25), but he signed the Bond Registration Statement (Compl.¶ 36), which is a sufficient basis for control liability, and allegedly "prepared and approved" the IPO Registration Statement. (*Id.*) Moreover, as an Executive Vice President of Refco and President of various Refco subsidiaries, Murphy's role was central enough to make it plausible that the plaintiffs will be able to develop sufficient evidence to show control.

Silverman argues that mere allegations of officer status are insufficient to establish control. (Silverman Mem. 7.) He also argues that he was not, as alleged, the Controller of Refco in 2004 and 2005, and that the extensive alleged involvement of other defendants in the road show and other corporate activities somehow demonstrates that he was not deeply involved in these events. (*Id.* at 7-11.)Of course, arguments pertaining to the truth of the allegations and the weight of the evidence have no place in a motion to dismiss. The complaint alleges that Silverman signed the Bond Registration Statement (Compl.¶ 37), and that he prepared and approved it, and that he was deeply involved with Refco's day-to-day activities. (*Id.* ¶ 388.)This is enough to support the allegations of control.

The Audit Committee Defendants argue that the allegations of control against them are inadequate. (THL/Audit Comm. Mem. 36-38.) The complaint, however, alleges that these defendants were responsible for overseeing Refco's financial reporting, accounting, and internal controls, and coordinating outside audits. (Compl.¶¶ 322, 268.) As another court in this district found in a

similar case,

the audit committee was clearly the body charged with the specific responsibility of overseeing [the company's accounting and financial reporting and, therefore, with keeping [the company] on the straight and narrow. A reasonable jury could find that the audit committee's recommendations would carry sufficient weight ... that the audit committee had the practical ability to direct [the company's] accounting policies. The audit committee defendants need not, of course, have actually exercised that authority to be held liable as control persons.

**\*21** *In re JWP Inc. Secs. Litig.,* 928 F.Supp. 1239, 1260 (S.D.N.Y.1996).

The THL Individual Defendants also challenge the allegations in Count Four, arguing that those allegations are based merely on their status, rather than actual control. (THL/Audit Comm. Mem. 38-40.) The complaint alleges that THL Partners acquired a 57% stake in Refco prior to the issuance of the Bond Registration Statement, and that each of the THL Individual Defendants was a control person of THL Partners. (Compl.¶¶ 48-52.) " Control over a primary violator may be established by showing that the defendant possessed 'the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise.'"*First Jersey,* 101 F.3d at 1472-73, quoting 17 C.F.R. § 240.12b-2. Moreover, the complaint alleges that the THL Individual Defendants were at all relevant times directors of Refco, and that they "prepared and approved" the Bond Registration Statement. Thus, it is not implausible that plaintiffs could develop a record that could support a finding of control as to the THL Individual Defendants.

In short, the movants have failed to offer any convincing arguments for the dismissal of the Section 15 claims under the Securities Act, with the exception of the claims in Count Two. Accordingly, their motions to dismiss Counts Four, Six and Eight will be denied.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----                                                                      Page 18

--- F.Supp.2d ----, 2007 WL 1280649 (S.D.N.Y.), Fed. Sec. L. Rep. P 94,312
(Cite as: --- F.Supp.2d ----)

### IV. *Exchange Act § 10(b) and Rule 10b-5 Allegations Against the Officer and Audit Committee Defendants*

Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), provides that it shall be unlawful "[t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors."Pursuant to this authority, the SEC issued Rule 10b-5, 17 C.F.R. § 240.10b-5, which makes it unlawful "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading."

The defendants subject to § 10(b) claims make a variety of challenges, which fall into two basic groups. First, some defendants argue that the plaintiffs have failed to sufficiently allege that they made material false statements. Second, various defendants argue that the plaintiffs have failed to sufficiently allege that any false statements were made with scienter. Accordingly, this section discusses first the issue of material false statements, and then the question of scienter. The Exchange Act allegations against Grant Thornton, Refco's auditor, are discussed separately in a subsequent section.

#### A. Material False Statements

**\*22** To state a claim under Section 10(b), "a plaintiff must plead that the defendant, in connection with the purchase or sale of securities, made a materially false statement or omitted a material fact, with scienter, and that the plaintiff's reliance on the defendant's action caused injury to the plaintiff."*Lawrence v. Cohn,* 325 F.3d 141, 147 (2d Cir.2003), quoting *Ganino v. Citizens Utils. Co.,* 228 F.3d 154, 161 (2d Cir.2000). A statement or omission is material if it "would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available."*TSC Industries Inc. v. Northway, Inc.,* 426 U.S. 438, 449, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976).

The PSLRA and Rule 9(b) of the Federal Rules of Civil Procedure impose particularity requirements on Section 10(b) complaints, mandating that they " (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Stevelman v. Alias Research, Inc.,* 174 F.3d 79, 84 (2d Cir.1999) (citations and internal quotation marks omitted); *see*15 U.S.C.A. § 78u-4(b)(1) (PSLRA requirements for pleading misrepresentation).

The movants in this case do not dispute that the complaint adequately identifies the fraudulent statements, where and when they were made, and why they were fraudulent. Instead, their challenges all pertain to the identity of the speaker, and fall into two basic groups. First, some defendants argue that the complaint inappropriately groups them together, failing to tie them individually to the allegedly fraudulent statements. Second, some defendants argue that they cannot be implicated in the making of the allegedly fraudulent statements because of the timing of those statements.[FN26]

#### 1. *Challenges Pertaining to Group Pleading (The Officer Defendants)*

"[A] defendant must actually make a false or misleading statement in order to be held liable under Section 10(b). Anything short of such conduct is merely aiding and abetting, and no matter how substantial that aid may be, it is not enough to trigger liability under Section 10(b)." *Wright v. Ernst & Young LLP,* 152 F.3d 169, 175 (2d Cir.1998) (internal quotation marks and alterations omitted)."[W]hen fraud is alleged against multiple defendants, a plaintiff must set forth separately the acts complained of by each defendant. A complaint may not simply clump defendants together in vague allegations to meet the pleading requirements of Rule 9(b)."*Rich v. Maidstone Fin., Inc.,* 98 Civ. 2569, 2001 WL

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----, 2007 WL 1280649 (S.D.N.Y.), Fed. Sec. L. Rep. P 94,312
(Cite as: --- F.Supp.2d ----)

286757, at *6 (S.D.N.Y. Mar.23, 2001). Under the doctrine of group pleading, however, plaintiffs can " circumvent the general pleading rule that fraudulent statements must be linked directly to the party accused of the fraudulent intent" by "rely[ing] on a presumption that statements in prospectuses, registration statements, annual reports, press releases, or group-published information, are the collective work of those individuals with direct involvement in the everyday business of the company."*In re BISYS Sec. Litig.,* 397 F.Supp.2d 430, 438 (S.D.N.Y.2005), quoting *In re NTL Secs. Litig.,* 347 F.Supp.2d 15, 22 n. 26 (S.D.N.Y.2004).

**\*23** Alleging direct involvement in the company's everyday business is critical to support the presumption. Thus, allegations that a defendant was simply "an affiliate and contracted to perform work" or even that it "own[ed] and control[led]" the identified speaker will be insufficient. *In re Parmalat Secs. Litig.,* No. 05 Civ. 4015, 479 F.Supp.2d 332, 2007 WL 869012, at *4 (S.D.N.Y. Mar.23, 2007).

As defendants point out, some courts have held that the PSLRA implicitly abrogated or abolished the group pleading doctrine. In *Southland Secs. Corp. v. INSpire Ins. Solutions Inc.,* 365 F.3d 353 (5th Cir.2004), the Fifth Circuit concluded that the group pleading doctrine "cannot withstand the PSLRA's specific requirement that the untrue statements or omissions be set forth with particularity as to 'the defendant' and that scienter be pleaded with regard to 'each act or omission' sufficient to give 'rise to a strong inference that the defendant acted with the required state of mind."*Id.* at 364-65, quoting 15 U.S.C. § 78u-4(b).

As the Fifth Circuit acknowledged, however, the PSLRA "does not explicitly abolish the doctrine."*Id.* at 365.Nor is there any apparent contradiction between the idea that each defendant's role must be pled with particularity and the fact that corporate officers may work as a group to produce particular document. Therefore, this Court joins the majority of district courts in this district and others in holding that the group pleading doctrine is "alive and well." In re BISYS Secs. Litig., 397 F.Supp.2d 430, 439 (S.D.N.Y.2005); *see*id. at 439 n. 42

(collecting cases).

Defendants Murphy, Klejna and Silverman argue that the complaint fails to tie them to the alleged fraudulent statements with enough specificity. (Sherer/Murphy Mem. 13-14; Klejna Mem. 8-13; Silverman Mem. 15-16.) The Complaint alleges, however, that each of these three officers "prepared and approved" the allegedly fraudulent documents. (Compl.¶¶ 36, 37, 38). Moreoever, the Complaint alleges that each of these three defendants "was a corporate insider or affiliate with direct involvement in the daily affairs of the company." *BISYS,* 397 F.Supp.2d at 440-441. (*See* Compl. ¶¶ 36, 37, 38). These allegations of their involvement in the creation of the alleged misstatements is sufficient to survive the motions to dismiss.

Similarly, the Audit Committee Defendants contend that the plaintiffs have alleged "no special relationship with the corporation" or "access to information more akin to a corporate insider." (THL/Audit Comm. Mem. 24 n. 15.) "Allegations of membership on an Audit Committee may, in certain circumstances, provide a basis for liability under the group pleading doctrine."*In re Alstom SA,* 406 F.Supp.2d 433, 449 (S.D.N.Y.2005) (*"Alstom I "* ). Plaintiffs allege that the Audit Committee Defendants served on the Audit Committee from at least October 12, 2004, when they approved the Bond Registration Statement, through the time of Refco's bankruptcy (Compl.¶¶ 42-45), and that they had extensive access to Refco's internal information, were responsible for overseeing the integrity of Refco's financial statements, and approved those financial statements for all relevant periods. (Compl. ¶¶ 42-45, 268; *see* P. Mem. 93-94.) These allegations are sufficient under the group pleading doctrine. *See*In re Adelphia Commc'ns Corp. Secs. and Deriv. Litig.,* 398 F.Supp.2d 244, 250 (S.D.N.Y.2005) (applying group pleading doctrine to members of the board with equity interest and "access to information concerning the company's day-to-day business").

*2. Challenges Based on the Timing of the False Statements (Trosten and Sherer)*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----, 2007 WL 1280649 (S.D.N.Y.), Fed. Sec. L. Rep. P 94,312
**(Cite as: --- F.Supp.2d ----)**

**\*24** Trosten, Refco's former CFO, argues that plaintiffs have failed to identify any material misrepresentations made by Trosten within the class period, defined by the complaint as August 5, 2004, to October 17, 2005. (Compl. at 1.) (Trosten Mem. 16-17; *see* P. Mem. 94-95). He makes two arguments: first, that he resigned on October 4, 2004, eight days before the filing of the Bond Registration Statement, and that he is therefore not liable for any misrepresentations in that document; and second, that any misstatements in the Offering Memorandum or road show are irrelevant because they happened in July 2004 (Compl.¶¶ 105, 144), prior to the start of the Class Period on August 5.

Plaintiffs contend that Trosten "is subject to liability for his false statements at the Road Shows at in the Offering Memorandum."(P. Mem.95.) These transactions are not, however, asserted as a basis for liability in the complaint. The section of the complaint that deals with the "False and Misleading Statements" on which Exchange Act liability is based describes in detail three sets of statements (the May 2005 press release and Form 8-K, the 2005 year-end press release and 2005 Form 10-K, and the First Quarter 2006 press release and associated filings) (Compl.¶¶ 526-551), and references the Bond Registration Statement and the IPO Registration Statement (Compl.¶ 525), but makes no mention of misstatements in the Bond Offering Memorandum or at the Road Show. Moreover, Count Nine of the complaint alleges that misstatements were made "throughout the Class Period." (Compl.¶ 639.) Thus, plaintiffs cannot now argue that the earlier statements should be the basis of liability.

Even if pre-class-period statements were alleged as a basis for liability in the complaint, they would not survive the motion to dismiss. The Second Circuit has held that "[a] defendant ... is liable only for those statements made during the class period."*In re IBM Secs. Litig.,* 163 F.3d 102, 107 (2d Cir.1998). Although pre-class-period statements can be relevant for showing whether defendants had knowledge that their later statements were false, *In re Scholastic Corp. Secs. Litig.,* 252 F.3d 63, 72 (2d Cir.2001), those statements cannot themselves give rise to liability.[FN27]

As to whether Trosten may be held liable for misstatements in the Bond Registration Statement, which was filed after his departure from Refco, the general rule is of course that "a defendant must actually make a false or misleading statement in order to be held liable under Section 10(b). Anything short of such conduct is merely aiding and abetting, and no matter how substantial that aid may be, it is not enough to trigger liability under Section 10(b)."*Wright,* 152 F.3d at 175 (internal quotation marks and alterations omitted). Trosten did not himself make the misstatements in the Bond Registration Statement, and he can therefore be held liable only if he falls within the group pleading doctrine, which is an exception to this general requirement.

**\*25** "Alleging direct involvement in the company's everyday business is critical to support the presumption."*Parmalat,* 2007 WL 869012 at \*4. The Complaint does not allege that Trosten remained involved in Refco's everyday business after his departure (Compl.¶ 40), and therefore fails to satisfy the requirements of the doctrine. Nor does the complaint allege that Trosten prepared or approved the Bond Registration Statement; the only factual predicate offered for Trosten's liability for misstatements in the Bond Registration Statement is that he knew that the statements in the Offering Memorandum would be repeated in the Bond Registration Statement. (P. Mem.95.) This argument, however, would give rise to liability far beyond the scope allowed by the group pleading doctrine, because it would give rise to liability in any case where a misstatement is regularly or predictably repeated for anyone involved in prior iterations of the statement.

The group pleading doctrine is a presumption that certain statements are "the collective work of those individuals with direct involvement in the everyday business of the company."*BISYS,* 397 F.Supp.2d at 438. It is a doctrine of attribution, not of complicity, and therefore does not give rise to liability for later statements by a defendant's former associates. *See Lattanzio v. Deloitte & Touche LLP,* 476 F.3d 147, 153 (2d Cir.2007) (as to an accountant, plaintiff must allege a misstatement that is attributed to the defendant "at the time of its dissemination," and

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----                                                                    Page 21

--- F.Supp.2d ----, 2007 WL 1280649 (S.D.N.Y.), Fed. Sec. L. Rep. P 94,312
**(Cite as: --- F.Supp.2d ----)**

cannot rely on alleged assistance in the drafting or compilation of a filing). Accordingly, the Exchange Act claims against Trosten must be dismissed.

Sherer also makes an argument based on the timing of the relevant statements. He contends that he is not responsible for statements Refco made before January 2005, when Sherer began working at Refco. (Sherer/Murphy Mem. 13-14.) Plaintiffs' memo clarifies that they do not seek to hold him responsible for statements made prior to that time. (P. Mem.94.) Although the substantive counts of the complaint do not specifically indicate that Sherer is not subject to claims for misstatements before this point (*see* Compl. ¶¶ 638-645), the Court accepts that any claims against Sherer arising from misstatements before January 2005 have now been abandoned. Accordingly, Sherer's motion to dismiss such claims against him will be denied as moot.

B. Scienter

The Officer Defendants and the Audit Committee Defendants argue that the Exchange Act counts against them must be dismissed for failure to satisfy the scienter element of an Exchange Act claim. (*See* Sexton Mem. 9-17; Silverman Mem. 16-22; Klejna Mem. 13-24; Sherer/Murphy Mem. 16-31; *see* P. Mem. 105-112).[FN28]

The state of mind that must be alleged in an action under section 10(b) and Rule 10b-5 is " 'an intent to deceive, manipulate or defraud.' "*Ganino,* 228 F.3d at 168, quoting *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 193 n. 12, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). To state a claim for securities fraud, the PSLRA requires that plaintiffs "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."15 U.S.C. § 78u-4(b)(2).*SeeNovak v. Kasaks,* 216 F.3d 300, 310 (2d Cir.2000) (noting that the PSLRA "did not change the basic pleading standard for scienter in this circuit.").

*26 To satisfy this requirement, "a complaint may (1) allege facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness, or (2) allege facts to show that defendants had both

motive and opportunity to commit fraud."*Rothman,* 220 F.3d at 90. Conscious misbehavior or recklessness may be inferred where the complaint sufficiently alleges that the defendants: (1) " benefitted in a concrete and personal way from the purported fraud"; (2) "engaged in deliberately illegal behavior"; (3) "knew facts or had access to information suggesting that their public statements were not accurate"; or (4) "failed to check information they had a duty to monitor."*Novak,* 216 F.3d at 311 (internal citations omitted). As to motive and opportunity, "[m]otives that are generally possessed by most corporate directors and officers do not suffice; instead, plaintiffs must assert a concrete and personal benefit to the individual defendants resulting from the fraud."*Kalnit v. Eichler,* 264 F.3d 131, 139 (2d Cir.2001).

The group pleading doctrine "has no effect on the PSLRA's scienter requirement. It merely gives plaintiffs the benefit of a presumption that certain kinds of statements were made by certain kinds of defendants. It does not permit plaintiffs to presume the state of mind of those defendants at the time the alleged misstatements were made."*BISYS,* 397 F.Supp.2d at 440.

*1. The Officer Defendants' Motive and Opportunity to Commit Fraud*

Silverman, Sexton, Klejna, Sherer, and Murphy contend that plaintiffs have failed to adequately allege their motive and opportunity to commit fraud.

To establish an adequate motive to commit securities fraud, plaintiffs must allege a motive that is concrete and personal to the defendant charged with making the misstatement or omission. *Kalnit,* 264 F.3d at 139. This must be more than "a generalized motive, one which could be imputed to any publicly-owned, for-profit endeavor."*Chill v. Gen. Elec. Co.,* 101 F.3d 268 (2d Cir.1996)." Motives that are generally possessed by most corporate directors and officers do not suffice." *Kalnit,* 264 F.3d at 139. The desire for the corporation to appear profitable, the desire to keep stock prices high, and even the desire to keep stock prices high in order to increase officer

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----, 2007 WL 1280649 (S.D.N.Y.), Fed. Sec. L. Rep. P 94,312
(Cite as: --- F.Supp.2d ----)

compensation, are insufficient because they are " common to all corporate executives and, thus, too generalized to demonstrate scienter."*Id.* Similarly, " [t]o allege a motive sufficient to support the inference [of scienter], a plaintiff must do more than merely charge that executives aim to prolong the benefits of the positions they hold."*Shields v. Citytrust Bancorp, Inc.,* 25 F.3d 1124, 1130 (2d Cir.1994).

Of course, the desire to keep stock prices high or to increase one's own compensation are often the actual motive for corporate fraud, but "[i]f scienter could be pleaded on that basis alone, virtually every company in the United States that experiences a downturn in stock price could be forced to defend securities fraud actions."*Acito v. IMCERA Group, Inc.,* 47 F.3d 47, 54 (2d Cir.1995)."[T]he 'not commonly shared' limitation on motive inhibits some plaintiffs who have been genuinely defrauded from obtaining a remedy,"*JP Morgan Chase,* 363 F.Supp.2d at 619, but the mere desire to increase officer compensation or stock prices does not give rise to a "strong inference" of fraudulent intent because such desires are omnipresent, and can as easily be a sign of simple ambition or run-of-the-mill greed as of fraud. *Cf.id.* at 618 n. 14 (discussing whether plaintiffs must plead facts that exclude other inferences that are equally plausible to scienter).

*\*27* To show motive in this case, plaintiffs allege that the officers of Refco in the year leading up to the IPO "stripped close to $1 billion from the Company" in a variety of ways. (Compl.¶ 582.) The first wave of the "frenzy," according to plaintiffs, began in June 2004 with the THL Partner Defendants' purchase of a 57% stake in Refco from RGHI. Plaintiffs allege that Murphy, Sexton, and Klejna received large sums of money-from $6.5 million to $13.7 million-from this buyout pursuant to a "Company-endorsed profit-sharing agreement liquidated by [RGHI]." Plaintiffs also allege that the defendants received certain "unusually large" grants of common stock, without indicating when these grants took place, other than saying they were "[i]n the lead-up to the IPO."(Compl.¶ 585.) Motive, however, entails "concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged,"*Shields,* 25 F.3d at 1130, and plaintiffs do not explain how these first floods of money relate to the alleged fraud.

Plaintiffs also rely on a number of more general benefits that would accrue from the IPO. For example, the IPO would allow the defendants to create a public trading market that would allow the defendants to sell their stock for huge profit or use it as collateral for personal loans (Compl.¶ 588), and would create a capital infusion that would increase the book value of all Refco shares, including the shares the defendants retained.[FN29]( *Id.*) Moreover, plaintiffs allege that the officer defendants received-again, at an unspecified time-" huge" grants of restricted stock units ("RSUs"). Fifty percent of these grants would vest in four years, while fifty percent were conditional on the company's performance. (Compl.¶ 591.) The officers also were entitled to bonuses conditioned on company performance. (Compl.¶ 593.) It is not necessary to decide whether these incentives, in the aggregate, would have given the defendants a sufficient motive to commit fraud, because another allegation relating to the defendants' motive is enough to suffice.

The IPO underwriting agreement provided for a so-called "green shoe" option providing that in the event the IPO was oversubscribed, the underwriters would be authorized to sell more shares than originally provided for at the offering price. (Compl. ¶ 168.) The proceeds of any such sale would be distributed directly to the shareholders of record before the IPO-including the officer defendants and the THL Partner Defendants. (*Id.* ¶ 587.)Thus, "by creating sufficient demand for Refco stock at the time of the IPO, these Defendants received an extra cash payment from the sale of shares dedicated to cover the oversubscription."(*Id.*) The IPO was indeed oversubscribed, and the defendants received payments ranging from Sherer's $349,800 to Klejna's $201,135. (*Id.* ¶ 587.)

"[M]otive is adequately pleaded where the plaintiffs allege that the defendants sold their own shares while at the same time misrepresenting corporate performance in order to inflate stock prices." *Marcus v. Frome,* 329 F.Supp.2d 464, 473

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----                                                                                                    Page 23

--- F.Supp.2d ----, 2007 WL 1280649 (S.D.N.Y.), Fed. Sec. L. Rep. P 94,312
(Cite as: --- F.Supp.2d ----)

(S.D.N.Y.2004). The Second Circuit has held that motive is adequately alleged where the defendants who made false statements inflating the value of shares "sold tens of thousands of shares during the period that the allegedly defrauded customers were purchasing them."*Shields,* 25 F.3d at 1131. According to the complaint, the officers had a direct financial interest in the IPO. By fraudulently concealing the uncollectible receivables, they could drive up demand for Refco shares, which would result in purchases of shares from which defendants would be directly compensated. This is a concrete benefit directly flowing from the alleged fraud, and is accordingly sufficient to give rise to a strong inference of motive.

**\*28** Several defendants point out that they purchased stock in the IPO, which, they argue, is inconsistent with the motive to commit fraud. They cite *In re Regeneron Pharmaceuticals, Inc. Securities Litigation,* No. 03 Civ. 3111, 2005 WL 225288 (S.D.N.Y. Feb. 1, 2005), in which the court stated that "[i]t is well settled that ... the purchase of additional company shares during the class period-is inconsistent with an intent to commit fraud."*Id.* at \*22. *Regeneron,* however, dealt with alleged misstatements by corporate officers about the effectiveness of a new drug marketed by their company.[FN30] Purchasing shares in the company is indeed inconsistent with a belief that the drug's effectiveness has been fraudulently overstated, because that fact will inevitably become known; one does not buy seats on a sinking ship. In this case, however, the facts alleged in the complaint do not make clear that the defendants knew the ship was sinking. The defendants might have believed that the uncollectible receivables held by RGHI could be hidden indefinitely or at some point permanently disposed of (for example, by RGHI actually paying Refco for them), and that Refco's stock would accordingly continue to rise.

Murphy and Sexton make a similar argument, relying on *In re Health Management Systems, Inc. Securities Litigation,* No. 97 Civ. 1865, 1998 WL 283286 (S.D.N.Y. June 1, 1998), which held that the fact that defendants actually purchased shares " undermines plaintiff's claim that defendants delayed notifying the public so that they could sell their

stock at a huge profit."*Id.* at \*6. Again, the case is not analogous; nothing about defendants' purchase of shares in the IPO is inconsistent with their alleged efforts to inflate the demand for Refco stock. The defendants in *Health Management* allegedly planned to profit by selling shares; the fact that they purchased shares thus directly rebutted plaintiffs' theory. The scheme in this case did not depend upon defendants' selling their shares.

Defendants are free to argue to a finder of fact that their actions were inconsistent with an intent to commit fraud. It might be possible to argue, for example, that plaintiffs' allegations are implausible because Refco would have been seen as too risky an investment by anyone who knew of the scheme. However, despite the demands of Rule 9(b) and the PSLRA, this is, after all, a motion to dismiss, and arguments such as these are inappropriate at this stage. Plaintiffs have adequately alleged that the officer defendants stood to profit in a direct, personal, and concrete way from the alleged fraud.

As to opportunity, the defendants' arguments are easily dispensed with. They argue that plaintiffs' allegation that each defendant prepared and approved the relevant misstatement are insufficient to establish opportunity to commit fraud. (*See,e.g.,* Sexton Mem. 16.) They do not explain, however, why these allegations do not suffice. Opportunity entails "the means and likely prospect of achieving concrete benefits by the means alleged."*Shields,* 25 F.3d at 1130. The defendants' involvement in the preparation of the statements at issue was of course the "means and likely prospect" of fraudulently inflating demand for Refco shares. They were corporate officers of Refco with the power to approve those statements, and cannot seriously dispute that "[s]uch senior executives have the opportunity to commit fraud."*Am. Bank Note Holographics,* 93 F.Supp.2d at 444. Thus, plaintiffs have adequately alleged that Silverman, Sexton, Klejna, Sherer, and Murphy had sufficient motive and opportunity to give rise to a "strong inference," 15 U.S.C. § 78u-4(b)(2), of scienter.

*2. The Officer Defendants' Knowledge or Recklessness*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----, 2007 WL 1280649 (S.D.N.Y.), Fed. Sec. L. Rep. P 94,312
(Cite as: --- F.Supp.2d ----)

**\*29** Although the finding that motive and opportunity have been adequately alleged is sufficient to dispose of the argument that plaintiffs have not adequately alleged scienter as to these defendants, the issue of the officer defendants' knowledge or recklessness will be addressed because it is relevant to the discussion of control-person liability in a later section of this opinion.

To support an inference of recklessness, plaintiffs must allege facts showing that the defendants' conduct was "highly unreasonable, representing an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it."*Rothman,* 220 F.3d at 90. Recklessness is adequately alleged when, inter alia, a plaintiff "specifically alleges defendants' knowledge of facts or access to information contradicting their public statements."*In re eSpeed, Inc. Secs. Litig.,* 457 F.Supp.2d 266, 282 (S.D.N.Y.2006).

Sexton, Silverman, Klejna, Sherer, and Murphy argue that the plaintiffs have failed to adequately allege facts giving rise to a strong inference that they acted with the requisite state of mind, that is, knowledge or recklessness. They contend that plaintiffs' allegations fail because they have not pointed to specific pieces of information to which defendants had access that would have alerted them to the wrongdoing in progress, noting that " conclusory allegations that a corporate officer had ' access' to information that contradicted the alleged misstatements are insufficient to raise a strong inference of recklessness."*Kinsey v. Cendant Corp.,* No. 04 Civ.0582, 2005 WL 1907678, at \*5 (S.D.N.Y. Aug. 10, 2005).

Aside from defendants' role in the corporation, the complaint's allegations of recklessness focus primarily on the allegedly fraudulent transactions themselves, in particular their size, their timing and recurrent nature, and their obvious lack of business purpose. The transactions were certainly large, and their timing, recurrent nature, and obvious lack of business purpose would certainly have been suspicious to anyone who became aware of them.

Plaintiffs also rely on the allegation that Refco had a history of similar violations, which they claim " should have alerted the Inside Defendants and Grant Thornton to the risk of financial manipulation." (Compl.¶ 576.) This history allegedly included at least 140 citations from the CFTC for violations including filing false trading reports and inadequate record-keeping-"the worst record in the industry."( *Id.*) "Refco's culture of rule-breaking and repeated legal troubles should have, and but for their recklessness would have, alerted Grant Thornton and the Inside Defendants (who, unlike outside investors, had unfettered access to Refco's managers, books, and records) to Refco's fraudulent financial reporting."(*Id.* ¶ 576.)Specifically, plaintiffs allege that Refco had earlier been implicated in CFTC and SEC enforcement actions where Refco was accused of improperly shifting client funds between related party accounts and paying off its own debt, actions similar to the scheme at issue here. (*Id.* ¶¶ 577, 578, 579.)This history, they contend, was essentially a roadmap to discovery of the fraud, had anyone cared to look into it.

**\*30** The red flags on which plaintiffs rely are glaringly suggestive of fraud, but only to those who were or should have been aware of them. While a red flag need not "reveal to a defendant all aspects of a given fraud,"*In re Van der Moolen Holding N.V. Secs. Litig.,* 405 F.Supp.2d 388, 406 (S.D.N.Y.2005), plaintiffs must allege that "facts which come to a defendant's attention would place a reasonable party in defendant's position on notice of wrongdoing."*Id.* In this case, there was certainly a monster under the bed; the question is whether anyone had a reason to look there.

"[S]cienter cannot be inferred solely from the fact that, due to the defendants' board membership or executive managerial position, they had access to the company's internal documentation as well as any adverse information."*In re Winstar Commc'ns,* No. 01 Civ. 3014, 2006 WL 473885, at \*7 (S.D.N.Y. Feb.27, 2006). The inquiry into whether corporate officers should have known of facts indicating the falsity of public statements is a fact-specific one; scienter may be found where there are "specific allegations of various reasonably available facts, or

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----                                                                    Page 25

--- F.Supp.2d ----, 2007 WL 1280649 (S.D.N.Y.), Fed. Sec. L. Rep. P 94,312
(Cite as: --- F.Supp.2d ----)

'red flags,' that should have put the officers on notice" that the public statements were false. *Goplen v. 51job. Inc.,* 453 F.Supp.2d 759, 774-775 (S.D.N.Y.2006).

Where the parent corporation is allegedly put on notice of the true underlying facts, scienter can be established, *see Alstom,* 454 F.Supp.2d 187, 199 (S.D.N.Y.2006) (*"Alstom II"* ) (finding scienter where the parent corporation "had been directly alerted at its highest corporate levels as to this potentially adverse issue"). But "[f]raud cannot be inferred simply because [a parent company's officers] might have been more curious or concerned about the activity at [its subsidiary]." *Chill,* 101 F.3d at 270. "[I]ntentional misconduct or recklessness cannot be presumed from a parent's reliance on its subsidiary's internal controls."*Id.* at 271 (internal citations and quotation marks omitted).

During the relevant time period, each of the moving defendants was an Executive Vice President of Refco, but none is alleged to have been an officer of Refco Capital or (with the exception of Silverman) RGHI. (Compl.¶¶ 33-38.) Silverman was Controller and Secretary of Refco. Sherer, who joined Refco in January 2005, was CFO from that time through Refco's collapse; Sexton was COO; Klejna was General Counsel; and Murphy was in charge of global marketing.(*Id.*) As to these officers, plaintiffs allege essentially that the ongoing fraud was so large and conspicuous, so poorly hidden, and so consistent with prior violations that the officer defendants must have been aware of it. They contend that the defendants' "positions in ... the Company, and their concomitant access to inside information, also raise a strong inference that [they] knew or recklessly disregarded the truth about the transactions discussed above. The Officer Defendants were responsible for the Company's operations and played a critical role in its management."(Compl.¶ 565.) Thus, they contend, the defendants' "access to, and obligation to monitor, all the underlying facts and circumstances of these transactions raises a strong inference of scienter."(*Id.*)

*31 The allegations against some of the defendants are stronger than others. Silverman's alleged role in

Refco and related parties raises a strong inference of knowledge or recklessness. Whether or not his duties as Secretary and Controller of Refco included monitoring related-party transactions involving subsidiaries like Refco Capital-a question not addressed in the complaint-Silverman was Secretary of RGHI (Compl.¶ 37), the entity most deeply implicated in the fraudulent transactions. Plaintiffs also point out that Silverman was asked by the Board of Refco to resign at the same time as Bennett and Maggio. (*Id.*) This fact at least suggests that the Board-which was in a position to know-believed he was in a position to have learned of the fraud. Moreover, Silverman allegedly signed an agreement by which BAWAG, which allegedly served as one of the third-party intermediaries for the fraudulent loans, obtained in 2004 an undisclosed equity interest in Refco. (Compl.¶ 269(a).) This could be read to suggest that he was not only involved with the day-to-day operations of RGHI, but in particular in dealings with the third party that facilitated the fraud. While a reasonable fact-finder might certainly conclude that Silverman was not conscious or reckless with respect to the fraud, these allegations at least give rise to a "strong inference" sufficient to allow plaintiffs to go forward with discovery as to Silverman.

The allegations as to Murphy and Sexton, on the other hand, are inadequate. Plaintiffs never explain, for example, what business Murphy, Refco's vice president for global marketing, would have had reviewing the books of Refco Capital or RGHI. Sexton, who was Refco's COO (and, briefly, CEO), no doubt had more responsibility for Refco's operations, but plaintiffs make no allegations whatsoever concerning the relationship between Refco Capital, the subsidiary, and Refco, the entity for which Sexton worked. The complaint states that Refco Capital Markets Ltd. "is a Bermuda-based Refco subsidiary that traded over-the-counter derivatives in a largely unregulated market" (Compl. ¶ 25),[FN31] but whether the two entities were entirely separate or effectively one, and whether Refco's officers had any involvement whatsoever in the operations of Refco Capital, is left entirely to the imagination.[FN32]Thus, the complaint gives no basis on which to conclude that Sexton or Murphy should have been familiar with any transactions

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----                                                                          Page 26

--- F.Supp.2d ----, 2007 WL 1280649 (S.D.N.Y.), Fed. Sec. L. Rep. P 94,312
**(Cite as: --- F.Supp.2d ----)**

originating with that company.

Nor do plaintiffs allege any reason to think that Sexton or Murphy should have been aware of the activities of RGHI. Plaintiffs more than amply allege that all defendants had a basis for knowing RGHI "was a related party controlled by Refco's President and CEO."(¶ 566.) This can hardly be questioned; as Klejna notes, the relationship between Refco and RGHI was disclosed in the IPO Registration Statement and the Bond Registration Statement. (Compl.¶ 99.) Plaintiffs do not, however, allege that Sexton-or, indeed, any of the corporate officers moving for dismissal, with the exception of Silverman-was involved in RGHI's day-to-day operations, much less the relevant transactions. See In re NYSE Specialists Secs. Litig., 405 F.Supp.2d 281, 314 (S.D.N.Y.2005) (holding that plaintiffs had failed to allege scienter where there were no allegations that corporate parent " recklessly disregarded" red flags that should have put it on notice of subsidiary's fraudulent scheme). It is not clear that Sexton's responsibilities as COO would have involved oversight of transactions such as the ones at issue, or monitoring Refco's financial situation. Nor do plaintiffs allege any reason why Sexton or Murphy should have known that Bennett had signed for Refco as a guarantor for the relevant loans.

**\*32** The only aspect of the fraudulent transactions that would presumably have appeared on Refco's own books was the last step, in which RGHI used the loan from the third party to pay down the money it owed to Refco for the uncollectible receivables. (Compl.¶ 416.) A Refco officer reviewing Refco's books might have seen RGHI temporarily paying off "at least a portion of the receivable owed."FN33( Id.) The complaint does not specify, however, whether this payment against the RGHI receivable appeared in any reports or statements routinely reviewed by officers such as Sexton. The other stages in the transactions would apparently not have been reflected in Refco's books at all. As noted above, the complaint does not allege that the fraudulent transactions began at Refco itself; instead, the money came from Refco Capital, a subsidiary with which the Officer Defendants are not alleged to have been involved.FN34Indeed, in

the plaintiffs' chart summarizing the form of these transactions, no arrow representing a loan or a debt originates from Refco itself. (Id. ¶ 517.)Nothing in the complaint supports the strong inference that Murphy or Sexton had responsibility for monitoring those books.

Plaintiffs' allegations of a history of similar violations by Refco is relevant insofar as it would have made the red flags brighter, but again, unless this history required a defendant to make further investigations that would have uncovered the fraud, the history would not make visible red flags otherwise outside defendants' range of vision. Nor does it matter that an employee at Refco allegedly discovered the fraud after working there for only two months (Compl.¶ 608), because the complaint never identifies this employee's position, or the responsibilities pursuant to which he or she discovered the fraud. No doubt there were some employees at Refco whose positions put them into close contact with the massive fraud, but absent an allegation that puts defendants themselves into such contact, that fact cannot defeat a motion to dismiss. Nor does the suspiciously large severance payment allegedly made to Trosten (¶ 575) raise an inference of scienter as to the individual defendants, because the complaint fails to specify which of them, if any, were or should have been aware of it. ( Id.)

Plaintiffs's allegations as to Sherer and Klejna are more specific. Sherer, the CFO, was responsibility for Refco's financial well-being, and the regular appearance and disappearance of a large RGHI receivable at the end of Refco's financial period's was a glaring red flag. Moreover, the fraudulent transactions were allegedly orchestrated by one or more attorneys at an unnamed law firm. (Compl.¶ ¶ 403-05.) The plaintiffs allege that Sherer, as CFO, and Klejna, as General Counsel, were responsible for receiving and authorizing the payment of bills from this firm that "described the legal work performed ... in connection with documenting the transactions."(Compl.¶ 595.) It is of course possible that Bennett orchestrated the legal work without the help or knowledge of the corporate officers responsible for supervising the law firm, but the allegation that Sherer and Klejna

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----

--- F.Supp.2d ----, 2007 WL 1280649 (S.D.N.Y.), Fed. Sec. L. Rep. P 94,312
(Cite as: --- F.Supp.2d ----)

Page 27

stood between Bennett and the law firm in the relevant chain of command supports a strong inference that they were aware of the work being done. The size of the transactions, their recurrent nature, and their obvious lack of business purpose may not themselves be sufficient to support an inference of scienter, but together with the allegations concerning the roles and responsibilities of Silverman, Sherer, and Klejna, they suffice.

**\*33** Thus, plaintiffs have adequately alleged recklessness as to Silverman, Sherer and Klejna, but not as to Sexton and Murphy. Because motive and opportunity have been adequately alleged as to all five of these defendants, however, a strong inference of scienter has been raised as to each, and their motions to dismiss for failure to allege scienter will be denied.

### 3. *The Audit Committee Defendants' Recklessness*

The Audit Committee Defendants also argue that plaintiffs have failed to adequately allege scienter as to them. (THL/Audit Comm. Mem. 25-34; *see* P. Mem. 105-113.) Although the allegations of recklessness as to the Audit Committee Defendants are insufficient to give rise to a strong inference of fraud, the allegations of motive and opportunity are enough to survive a motion to dismiss.

As to recklessness, "courts have been hesitant to find a strong inference of audit committee members' scienter in cases providing general allegations of circumstantial evidence."*In re Marsh & McLennan Cos., Inc. Secs. Litig.,* No. 04 Civ. 8144, 2006 WL 2057194, at \*29 (S.D.N.Y. July 20, 2006). Reckless conduct in a § 10(b) claim "represents an extreme departure from the standards of ordinary care ... to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it."*Chill,* 101 F.3d at 269. " [J]ust because a defendant is a director and member of the company's audit committee does not lead automatically to an inference that the person acted with conscious disregard of a known risk as opposed to with gross negligence or even negligence."*Jacobs,* 1999 WL 101772, at \*16.

Plaintiffs allege in detail the responsibilities for internal procedures and oversight that went with membership in the Audit Committee. (Compl.¶¶ 599-601.) Specifically, the Audit Committee's duties allegedly included oversight of Refco's accounting and internal control policies and procedures and of the internal controls themselves; assessment and management of the company's exposure to risk; management of internal audit projects; and meetings with inside and outside counsel to review legal and regulatory matters, including any matters that might have a material impact on Refco's financial statements; and reviewing and discussing with management " material financial arrangements of the Company which do not appear on the financial statements of the Company."*(Id.* ¶ 601.)The complaint also alleges that Audit Committee Defendant O'Kelley, the chairman of the Committee, was qualified as an independent "audit committee financial expert" as defined by the SEC, which required extensive experience and expertise on his part. (*Id.* ¶ 602.)

Mere membership in a committee with oversight responsibilities, however, is not enough to give rise to an inference of recklessness. "[C]ourts have routinely rejected the attempt to plead scienter based on allegations that because of defendants' board membership and/or their executive managerial positions, they had access to information concerning the company's adverse financial outlook."*Health Mgmt. Sys.,* No. 97 Civ. 1865, 1998 WL 283286, at \*6 (S.D.N.Y. June 1, 1998). It is not enough to allege "that the Audit Committee had a duty to monitor regulatory and legal compliance"; rather, plaintiff must identify " information that reached the Audit Committee and that they either knew about or were reckless in ignoring."*Marsh & McLennan,* 2006 WL 2057194, at \*29. "Simply stating that a defendant had a duty to monitor is insufficient to raise a strong inference of scienter without allegations of what information was reasonably available to them or how they were reckless in their duties."*Id.*

**\*34** As to the specific information revealing fraud that the Audit Committee Defendants Plaintiffs knew or should have known of, plaintiffs can point only to certain "significant deficiencies" in Refco's

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----, 2007 WL 1280649 (S.D.N.Y.), Fed. Sec. L. Rep. P 94,312
(Cite as: --- F.Supp.2d ----)

audit procedures which were brought to the Committee's attention by Refco's auditor in February 25, 2005. (Compl.¶¶ 603-07.) These deficiencies were: (1) a need to increase the resources of Refco's finance department, "to be able to prepare financial statements that are fully compliant with all SEC reporting guidelines on a timely basis"(*id.* ¶ 603), and (2) a "lack of formalized procedures for closing [the Company's] books"(*id.*(alterations in original)). The IPO Registration Statement defined "significant deficiency" as "a deficiency that results in more than a remote likelihood that a misstatement of financial statements that is more than inconsequential will not be prevented or detected."(*Id.*) Plaintiffs allege that these deficiencies "should have alerted [the Audit Committee Defendants] that there was a significant risk of fraudulent activity at t he Company."(*Id.* ¶ 604.)They also allege that the deficiencies "created an environment where it was easy for Bennett, Maggio and others to fraudulently manipulate Refco's financial statements."(*Id.*)

Plaintiffs do not explain how correction of these deficiencies would have resulted in discovery of the fraud. Nor is it obvious that it would have; more resources for the finance department or more formalized procedures might have necessitated more care on the part of the perpetrators, but plaintiffs do not explain what aspects of the fraud would have been revealed by a strengthening of procedure or an influx of resources to the finance department. Alleging that the defendants should have prospectively tightened controls is not the same as alleging that they should have investigated specific red flags that would have led them to the fraud. Plaintiffs have essentially claimed that the Audit Committee's negligence made it too easy to commit fraud at Refco, but even if true, this is not the same as alleging that they knew or should have known of the fraud.

Allegations that an audit committee failed to take steps to prevent fraud may suffice where plaintiffs identify specific actions that the committee-members should have taken that would have prevented the fraud. *Livent,* 78 F.Supp.2d at 221 ("[I]f the Outside Directors were aware that the Company's management information systems were

capable of manipulating the accounts without leaving a paper trail, and failed, despite this awareness, to take steps to insure that such manipulations were not being performed, including a review of the work of D & T, this might constitute recklessness sufficient to infer scienter."); *JWP,* 928 F.Supp. at 1257 (denying summary judgment where a reasonable factfinder could conclude that " the audit committee defendants were aware of a laundry list of dubious accounting practices that should have caused them to investigate and to uncover the massive fraud at JWP."). However, where plaintiffs fail to describe the chain of events by which defendants should have discovered or averted the fraud, the allegations do not give rise to an inference of scienter. *In re WorldCom, Inc., Secs. Litig.,* No. 02 Civ. 3288, 2003 WL 23174761, at *5 (S.D.N.Y. Dec. 3, 2003) *("WorldCom II")* (" even if the Lead Plaintiff had sufficiently alleged a breach of a well-defined duty to communicate, it has not alleged that Internal Audit would have reported to the Audit Committee in the Fall of 2001 that it had uncovered information indicative of fraud or wrongdoing, or even information requiring further investigation."); *Marsh & McLennan,* 2006 WL 2057194, at *30 ("There are no facts alleged to show that closer scrutiny of those transactions would have put any of the defendants on notice of the misconduct.").

**\*35** Here, as in *WorldCom II,* the Amended Complaint describes what the Audit Committee Defendants might have learned if they had done a better job or if they had been more aggressive or diligent. Section 10(b), however, does not impose liability for negligence or impose obligations ex post facto. There is simply no adequate basis to infer from the allegations in the Amended Complaint that the Audit Committee Defendants themselves were aware or must have been aware of the accounting fraud.

*WorldCom II,* 2003 WL 23174761, at *5. "The Amended Complaint's allegations reveal at most an Audit Committee that ... was anemic in its oversight function. The allegation that a defendant generally failed to perform a job well, however, is not a substitute for the particularized pleading that a defendant knowingly or recklessly engaged in fraud.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----, 2007 WL 1280649 (S.D.N.Y.), Fed. Sec. L. Rep. P 94,312
(Cite as: --- F.Supp.2d ----)

"*Id.* at *6.

Similarly, plaintiffs' allegation that an unidentified employee caught the fraud after only two months of employment at Refco (Compl.¶ 608) does nothing to help identify the information from which the Audit Committee knew or should have known of the fraud in progress, because plaintiffs fail to identify the information from which this employee identified the fraud. If the employee was reviewing the same information as the Audit Committee Defendants, the allegation could be relevant, but plaintiffs do not even suggest that this was the case.[FN35]In short, plaintiffs have failed to adequately allege that the Audit Committee Defendants were so reckless as to give rise to an inference of scienter.

### 4. *The Audit Committee Defendants' Motive and Opportunity*

Some of the alleged motives alleged as to the officer defendants discussed above are also alleged as to the Audit Committee Defendants, in particular the grants of Refco common stock (Compl.¶ 585), but the Audit Committee Defendants are not alleged to have benefitted from the "green shoe" option that supported the inference of motive as to the corporate officers discussed above. (Compl.¶ 587.) The only other motive allegation against these defendants is that each of the three received 20,000 restricted stock units ("RSUs") in advance of the IPO. They were the only board members to receive these grants. (Compl.¶ 592.) The RSUs would become worthless were the fraud exposed. (*Id.* ¶¶ 591-92.)

In general, an "unparticularized interest in executive compensation tied to stock price performance is not a sufficient motive for fraud."*Geiger,* 933 F.Supp. at 1190. In this case, however, the allegation that no other directors received grants of RSUs makes those grants sufficiently unusual to support the required inference of motive. *Cf.WorldCom I,* 294 F.Supp.2d at 412 (to determine whether insider sales were unusual, "the court may consider whether other directors also sold or held their shares during the relevant period"). It could be inferred from the fact that grants were made directly to the Audit

Committee-and only to the Audit Committee-that the RSU grants were part of a quid pro quo in exchange for the Committee's overlooking the fraudulent transactions, or a specifically tailored incentive for them to overlook the transactions, or both. Because only these boardmembers received the RSUs, this allegation is not "common to all," boardmembers, *Kalnit,* 264 F.3d at 139, and is sufficient to support an inference of motive. Thus, the Audit Committee Defendants' motion to dismiss for failure to allege scienter will be denied. [FN36]

### V. *Exchange Act Claims Against Grant Thornton*

#### A. The Exchange Act Allegations Against Grant Thornton

*36 Plaintiffs allege that Grant Thornton made false statements in its unqualified audit reports for the fiscal years 2003, 2004 and 2005, which were included in the Company's fiscal year 2005 Annual Report. (Compl.¶¶ 54, 532.) In these reports, plaintiffs allege that Grant Thornton falsely stated (1) that its audits conformed with Generally Accepted Auditing Standards ("GAAS"), [FN37] and (2) that it had concluded that Refco's financial statements were presented in accordance with Generally Accepted Accounting Principles ("GAAP").[FN38] (Compl.¶¶ 306, 336, 532.) Grant Thornton makes several arguments in support of its motion to dismiss these claims. First, it argues that plaintiffs have failed to identify the material misstatements at issue with sufficient particularity. Second, it argues that plaintiffs cannot show loss causation as to certain losses. Third, it argues that plaintiffs have failed to allege facts giving rise to a strong inference of scienter on its part. Each of these arguments is without merit.

#### B. Material Misstatements by Grant Thornton

Grant Thornton argues that plaintiffs' Exchange Act claims against it should be dismissed for failure to comply with Rule 9(b)'s particularity requirements, in that the plaintiffs have failed to allege with specificity the material misstatements on which

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----                                                                          Page 30

--- F.Supp.2d ----, 2007 WL 1280649 (S.D.N.Y.), Fed. Sec. L. Rep. P 94,312
**(Cite as: --- F.Supp.2d ----)**

their claims are based. (Grant Thornton Mem. 15-17; *see* P. Mem. 87-89). There is no question that plaintiffs have pointed with adequate specificity to the statements alleged to be false; as noted above, plaintiffs allege that in Grant Thornton's audit reports for the fiscal years 2003, 2004 and 2005, which were included in the Company's fiscal year 2005 Annual Report, Grant Thornton falsely stated (1) that its audits conformed with GAAS and (2) that it had concluded that Refco's financial statements were presented in accordance with GAAP. Rather, Grant Thornton's contention is that plaintiffs have failed to explain why those statements were false.

As to the failure of Grant Thornton's audits to conform with GAAS, plaintiffs allege that over the years that Grant Thornton served as Refco's auditor, it made only one attempt to confirm that one of the massive loan transactions that took place at the end of each reporting period was an actual loan, and that Grant Thornton made no effort to determine whether this was in fact an arm's-length transaction. (Compl.¶¶ 232, 239, 554-67.) Plaintiffs also allege that Grant Thornton failed to detect the massive fraud (*id.* ¶¶ 227; 237-238) and to remain properly independent (¶ 228). As to the failure of Refco's financial statements to conform with GAAP, plaintiffs allege that the statements failed to disclose significant related-party transactions (*Id.* ¶¶ 215-19) and that Refco was a guarantor of those transactions (*id.* ¶ 221), and that the statements violated general principles of GAAP requiring that financial statements contain a thorough and complete report of relevant information.(*Id.* ¶¶ 224-25.)[FN39]

**\*37** These allegations are sufficiently particular to survive the motion to dismiss, because they give Grant Thornton more than ample notice of the ways in which its unqualified audit reports allegedly misrepresented the propriety of its auditing practices and Refco's accounting practices. Grant Thornton argues that these alleged problems with its audits would not constitute a violation of the relevant standards, but "[a]lthough the question of whether GAAP has been violated might appear to be a legal determination, the element of what is ' generally accepted' makes this difficult to decide as

a matter of law."*In re Global Crossing, Ltd. Secs. Litig.,* 322 F.Supp.2d 319, 339 (S.D.N.Y.2004) ( " *Global Crossing I* " ). At the motion to dismiss stage, the plaintiffs' assertion that certain practices were not generally accepted "must be taken as true." *Id.* at 339.Therefore, Grant Thornton's argument that the complaint puts it "in the impossible position of trying to divine Plaintiffs' allegations" (Grant Thornton Mem. 17) is without merit.

### C. Loss Causation As To Grant Thornton

Grant Thornton argues that plaintiffs' claims against it-both the § 11 claims and the § 10 claims-must be dismissed because plaintiffs have not adequately alleged loss causation as to losses suffered after October 10, 2005, the date of the initial press release disclosing the hidden uncollectible receivables and disavowing the financial statements.

Grant Thornton argues that the October 10, 2005, disclosure of the related-party loan to RGHI and announcement that Refco's prior financial statements could not be relied upon (Compl.¶ 620) "removed from the marketplace the only alleged misinformation that could possibly have been attributed to the audit firm."(Grant Thornton Reply 8.) It contends that after the October 10 disclosure, " the marketplace was on notice that the financial statements could not be relied upon, so investors necessarily would have known that the audit opinion concerning those financial statements could not be relied upon either."(*Id.* at 8-9.)Conceding that Refco's stock continued to decline after this disclosure, Grant Thornton contends that the later decline was due to the liquidity problems following the "mass exodus" of Refco's customers and Bennett's arrest. (*Id.*) Therefore, it argues, any misstatements in its audit reports were not the cause of losses suffered after the October 10 disclosures.

Grant Thornton is free to make such arguments to the factfinder, but it seems more than plausible to argue, as plaintiffs do, that the exodus of Refco's customers was due, in part, to the allegedly false statements by Grant Thornton and the other defendants. (Compl.¶ 621.) Plaintiffs' allegations could support an inference "that foreseeability links

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----, 2007 WL 1280649 (S.D.N.Y.), Fed. Sec. L. Rep. P 94,312
(Cite as: --- F.Supp.2d ----)

the omitted information and the ultimate injury in this case, in contrast to cases where external and unforeseeable factors such as market crashes were the direct cause of a plaintiff's loss."*Castellano v. Young & Rubicam, Inc.,* 257 F.3d 171, 190 (2d Cir.2001). Accordingly, Grant Thornton's argument regarding loss causation is without merit.[FN40]

### D. Grant Thornton's Recklessness

**\*38** Grant Thornton argues that plaintiffs have failed to adequately allege that any false statements in its audit reports were made knowingly or recklessly, or that it had motive and opportunity to commit the fraud. (Grant Thornton Mem. 5-15; *see* P. Mem. 97-104). Because the plaintiffs have adequately alleged facts giving rise to a strong inference of recklessness, it is unnecessary to reach the question of motive.

"The standard for pleading auditor scienter is demanding."*Marsh & McLennan,* 2006 WL 2057194, at \*30. For an accountant to be found to have acted recklessly during an audit, its alleged misconduct must "approximate an actual intent to aid in the fraud being perpetrated by the audited company."*Rothman,* 220 F.3d at 98 (citation and internal quotation marks omitted). This standard requires more than "a failure to follow GAAP." *Vladimir v. Deloitte & Touche LLP,* 95 Civ. 10319, 1997 WL 151330, at \*3 (S.D.N.Y. Mar.31, 1997). Plaintiffs must prove that "[t]he accounting practices were so deficient that the audit amounted to no audit at all, or an egregious refusal to see the obvious, or to investigate the doubtful, or that the accounting judgments which were made were such that no reasonable accountant would have made the same decisions if confronted with the same facts." *S.E.C. v. Price Waterhouse,* 797 F.Supp. 1217, 1240 (S.D.N.Y.1992) (internal quotation marks and citations omitted). Because "[i]t is elementary that, on a motion to dismiss, the Complaint must be read as a whole,"*Yoder v. Orthomolecular Nutrition Inst., Inc.,* 751 F.2d 555, 562 (2d Cir.1985), the red flags must be viewed in the aggregate; defendants " cannot secure dismissal by cherry-picking only those allegations susceptible to rebuttal and disregarding the remainder."*In re Philip Svcs. Corp.

*Secs. Litig.,* 383 F.Supp.2d 463, 476 (S.D.N.Y.2004).

As noted above, the claims against Grant Thornton are premised on its alleged false statements about its own auditing practices and Refco's accounting practices. Plaintiffs' memorandum focuses on the red flags that allegedly should have alerted Grant Thornton to the fraud; apparently, their argument is that from the scale and obviousness of the fraud, it can be inferred either (1) that Grant Thornton actually knew of the fraud, in which case of course its certifications were false; or (2) that Grant Thornton didn't know of the fraud, which could only happen as a result of audit procedures that were (contrary to the claims in their reports) so substandard that the auditors would have to have known they were sub-standard.

To demonstrate Grant Thornton's recklessness, plaintiffs rely on many of the same allegations made against the officer defendants. They note the " suspicious timing, recurrent pattern and unusual nature of the related-party transactions" (P. Mem.97) and the large size of the sham loans in comparison to Refco's net income. (*Id.*) Some of these red flags are not alleged to have been known by Grant Thornton; for example, plaintiffs do not allege that Grant Thornton knew the transactions were being routed back to Refco-related entities after they were loaned to third parties, or that Grant Thornton knew that Refco Capital was paying interest on the fraudulent loans.[FN41]As discussed above, however, the complaint supports an inference that the appearance and disappearance of large receivables at the end of financial reporting periods was reflected in Refco's books, and large transactions near the end of financial reporting periods can be a significant red flag. *In re Winstar Commc'ns,* No. 01 Civ. 3014, 2006 WL 473885, at \*11 (S.D.N.Y. Feb.27, 2006).

**\*39** As to these large transactions, plaintiffs note that Grant Thornton only arranged for one confirmation request for the related-party transactions. In Fall 2004, Refco Capital sent a confirmation request to the third party known as " Customer X," asking that they confirm certain information to Grant Thornton. (Compl.¶ 554.)

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

The Statement of Account attached to the confirmation request showed that Refco (by which plaintiffs presumably mean Refco Capital) had loaned $325,000,000 to Customer X on February 25, 2002, three days prior to the end of Refco's fiscal year. (Compl.¶ 556.) Customer X confirmed this information and sent it, along with a Statement of Account, to Grant Thornton. Grant Thornton did not ask for any further information. Nor did Grant Thornton send confirmation requests in fiscal years 2003, 2004, or 2005. (Compl.¶ 559.)

Plaintiffs do not explain what would have been learned if such requests had been sent, and of course Refco was in the business of making loans, some of them presumably falling close to the end of its fiscal year. Absent an allegation that Grant Thornton knew or discovered that the loan would be routed back to RGHI, the failure to send more confirmation requests is not direct evidence of a refusal to see the obvious. In the context of the other allegations of scienter as to Grant Thornton, however, the firm's apparent lack of interest in large receivables that briefly disappeared from Refco's books at the moment when they would have been reportable forms an important part of the broader picture.

Plaintiffs also contend that the fraud was " documented in plain terms in numerous documents maintained at the Company."(P. Mem.100.) The complaint does allege that numerous such documents existed. (Compl.¶ 400) For example, plaintiffs claim that the unnamed law firm facilitating the transaction drew up agreements and other transaction documents with the third parties through which the money passed, including a guarantee letter from Refco Group. (*Id.* ¶ 405.)" The documentation for each of these transactions was created by the Law Firm."(*Id.* ¶ 406.)Many of the documents, such as the loan agreement pursuant to which Refco Capital loaned money to Customer X, were between Refco Capital or RGHI and the third party. (*Id.* ¶¶ 409, 412.)Bennett signed guarantee agreements for some of these loans on behalf of Refco. (*Id.* ¶ 425.)[FN42]

Of course, it could turn out that the documents relating to these loans, guarantees, and other

transactions were kept carefully hidden in the files of third parties to which Grant Thornton had no access. Given the size of the transactions, the fact that at least some of Refco's officers were allegedly involved in orchestrating it, and the volume of documentation allegedly created, however, this allegation-together with the others-contributes to a strong inference of scienter on Grant Thornton's part. Accordingly, Grant Thornton's argument that the plaintiffs have failed to allege scienter is without merit, as are its other challenges to the Exchange Act claims.

### VI. *Control-Person Liability Under Exchange Act § 20(a)*

*40 Most of the moving defendants argue that the control-person liability claims against them under § 20(a) of the Exchange Act must be dismissed. Under § 20(a):
Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a).

To make out a prima facie case under § 20(a) of the Exchange Act, a plaintiff "must show a primary violation by the controlled person and control of the primary violator by the targeted defendant, and show that the controlling person was in some meaningful sense a culpable participant in the fraud perpetrated by the controlled person."*First Jersey,* 101 F.3d at 1472. Defendants do not argue that plaintiffs have failed to allege a primary violation.

Section 20(a) and Section 15 are parallel provisions, and their "terms are interpreted in the same manner."*Global Crossing I,* 322 F.Supp.2d at 349. Accordingly, the challenges to the allegations of control by defendants Bennett, RGHI, the Bennett Trust, Sexton, Murphy, Silverman, the Audit Committee Defendants, and the THL

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----                                                                      Page 33

--- F.Supp.2d ----, 2007 WL 1280649 (S.D.N.Y.), Fed. Sec. L. Rep. P 94,312
(Cite as: --- F.Supp.2d ----)

Individual Defendants are without merit, for the reasons discussed above in the context of liability under § 15 of the Securities Act. The only remaining issue for these defendants is therefore whether plaintiffs have adequately alleged culpable participation in the fraud.

Unlike § 15, § 20(a) requires that the plaintiff must also "allege culpable participation 'in some meaningful sense' by the controlling person in the fraud."[FN43]*Id.,* quoting *Burstyn v. Worldwide Xceed Group, Inc.,* No. 01 Civ. 1125, 2002 WL 31191741, at *7 (S.D.N.Y. Sept. 30, 2002). Although "control" may be pleaded in accordance with Rule 8(a)'s notice-pleading standard, *seeIn re Parmalat Secs. Litig.,* 383 F.Supp.2d 616, 627 & n. 53 (S.D.N.Y.2005), a heightened pleading requirement applies to the "culpable participation" element; the plaintiff "must plead with particularity facts giving rise to a strong inference that the controlling person knew or should have known that the primary violator, over whom that person had control, was engaging in fraudulent conduct."*Id.* (internal quotation marks omitted); *seeGlobal Crossing III,* 2005 WL 2990646, at *7.

### A. Bennett and the Bennett Entities

Bennett argues that certain counts should be dismissed because he cannot be both primarily liable as a direct violator of the Acts and secondarily liable as a "controlling person." (Bennett Mem. 12-14.) It is true that dicta in *Kalnit v. Eichler,* 85 F.Supp.2d 232 (S.D.N.Y.1999), suggest that where a "plaintiff alleges that [defendants] had knowledge of the misrepresentations and omissions ... the [defendants] could not be control persons."*Id.* at 246.Other courts, however, have consistently held that "[a]lthough a defendant ultimately may not be held liable as both a primary violator and a controlling person, [pleading] such alternative theories of liability [is] permissible."*Parmalat,* 375 F.Supp.2d at 310. Bennett's argument is with Rule 8(e)(2) of the Federal Rules of Civil Procedure, which allows alternate pleading and provides that " [a] party may also state as many separate claims or defenses as the party has regardless of consistency."

*41 RGHI and the Bennett Trust also move for dismissal of the § 20(a) counts against them. They argue that the complaint fails to allege that they controlled Refco-an argument rejected in the context of the Securities Act § 15 discussion above-and that the plaintiffs have failed to allege culpable participation. Inexplicably, they contend that "[p]laintiffs do not allege that RGHI and the Trust played any role in the alleged fraudulent scheme."(Bennett Mem. 18.) On the contrary, plaintiffs' theory of the fraud centers around the claim that RGHI was the hiding place for Refco's uncollectible receivables. Moreover, the complaint alleges that Bennett, the primary actor in the fraud, controlled RGHI and the Trust, which in turn controlled Refco. (Compl.¶ 261.) Thus, Bennett's control of Refco was exercised through the shell entities, and those entities were the means by which he exercised his power to orchestrate the fraudulent scheme. In essence, the complaint alleges that the shell entities that controlled Refco *were* Bennett. This is enough to give rise to a strong inference of culpable participation.

### B. Sexton, Klejna, Murphy, Sherer, Silverman, and the Audit Committee Defendants

Section 20(a)'s culpable participation requirement is similar to the scienter requirement of Section 10(b); plaintiffs must "plead with particularity facts giving rise to a strong inference that the controlling person knew or should have known that the primary violator, over whom that person had control, was engaging in fraudulent conduct."*In re Global Crossing, Ltd. Secs. Litig.,* 471 F.Supp.2d 338, 351 (S.D.N.Y.2006) (*"Global Crossing IV"* ) (internal citations, alterations and quotation marks omitted); *butseeAlstom I,* 406 F.Supp.2d at 490 (noting that " [d]isagreement exists within the Second Circuit ... as to precisely what conduct, beyond negligence, [culpable participation] entails."). Thus, the conclusion above that plaintiffs have sufficiently plead scienter as to defendants Silverman, Sexton, Klejna, Sherer [FN44] and Murphy, thus requires the conclusion that plaintiffs have shown culpable participation as to those defendants.

As discussed above, plaintiffs' scienter allegations

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----, 2007 WL 1280649 (S.D.N.Y.), Fed. Sec. L. Rep. P 94,312
**(Cite as: --- F.Supp.2d ----)**

give rise to a sufficiently strong inference that defendants Sexton and Murphy had motive and opportunity to commit fraud, but not that they acted with knowledge or recklessness. The same is true of the Audit Committee Defendants. Courts in this district have reached different conclusions as to whether allegations of motive to commit fraud suffice to support an allegation of culpable participation where there are insufficient allegations to support an inference of knowledge or recklessness. *Compare In re Flag Telecom Holdings, Ltd. Secs. Litig.,* 308 F.Supp.2d 249, 273 (S.D.N.Y.2004) ("[I]f a plaintiff pleads facts establishing that the control person had motive and opportunity to commit fraud, plaintiff has pled ' culpable participation.' ") *with In re Independent Energy Holdings PLC Secs. Litig.,* 154 F.Supp.2d 741, 771-72 & n. 23 (S.D.N.Y.2001) ("Plaintiffs have failed to cite a single case where the culpable participation prong has been satisfied solely based on allegations of the controlling person's financial motive.").

**\*42** It makes little sense, however, to hold that the same facts are sufficient to support a claim for primary liability but insufficient to support a claim for control liability. If alleged facts raise a strong inference that a defendant acted with scienter as to a particular misstatement, those facts must necessarily raise a strong inference that the defendant's participation as a control person was culpable. Accordingly, culpable participation has been adequately alleged even as to those defendants as to whom motive and opportunity, but not recklessness, have been adequately alleged. The motions to dismiss the § 20(a) claims against Silverman, Sexton, Klejna, Sherer, Murphy, and the Audit Committee Defendants will be denied.

### C. Tone Grant

Defendant Tone Grant's challenge to the allegations of control-person liability against him (Tone Grant Mem. 17-22) is meritless. Grant was allegedly the co-owner of RGHI with Bennett, and RGHI was the central mechanism in the alleged fraud. Bennett and Grant were the only two owners of RGHI, the corporate entity through which all of the allegedly

fraudulent transactions passed. (Compl.¶¶ 41, 517-18.) Aside from serving as a holding company for Bennett's and Grant's interests in Refco, RGHI had no other business, so plaintiffs' allegation that almost four billion dollars in fraudulent loans passed through RGHI is more than sufficient to raise an inference of recklessness as to Grant. (*Id.* ¶ 515.)

### D. Trosten

Trosten, like the other officer defendants, challenges the allegations of control-person liability against him. (Trosten Mem. 22-24.) Plaintiffs' § 20(a) claims against Trosten rely on their scienter allegations, as do their claims against the other officer defendants. Because of the conclusion above that the § 10(b) claims against Trosten must be dismissed because none of the relevant misstatements can be attributed to him, this opinion has yet to consider the scienter allegations against Trosten, and so he must be treated separately from the other officer defendants.

Plaintiffs rely on their allegations of scienter against Trosten (P. Mem.104, 120) for their allegations of culpable participation against him. Plaintiffs have clearly alleged not only that Trosten was reckless in failing to discovery the fraud, but that he actually knew about it. For example, plaintiffs allege that Trosten and Bennett agreed with RGHI and BAWAG to unwind specific fraudulent transactions (Compl.¶¶ 489, 494) and that Trosten was the person BAWAG contacted to confirm the terms of the loans. (*Id.*) There can be no question that plaintiffs have raised a strong inference that Trosten had the requisite scienter. However, a claim under § 20(a) requires culpable *participation*-that is, actual involvement in the making of the fraudulent statements by the putatively controlled entity. Put another way, a claim under § 20(a) requires that the defendant have "actual control over the transaction in question." *Ross v. Bolton,* No. 83 Civ. 8244, 1989 WL 80428 (S.D.N.Y. Apr.4, 1989) (internal citation and quotation marks omitted). Thus, for the same reasons that Trosten escapes primary liability for the alleged misstatements, plaintiffs' § 20(a) claims against him must also be dismissed.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----                                                                         Page 35

--- F.Supp.2d ----, 2007 WL 1280649 (S.D.N.Y.), Fed. Sec. L. Rep. P 94,312
**(Cite as: --- F.Supp.2d ----)**

E. The THL Partner and Individual Defendants

**\*43** The THL Partner and Individual Defendants move for dismissal of the § 20(a) claims against them, arguing that both the allegations of control and the allegations of culpable participation against them are insufficient as a matter of law. (THL/Audit Comm. Memo 40-46.) The arguments as to control are rejected for the reasons discussed above in the context of these defendants' challenges to the allegations of control under § 15 of the Securities Act.

As to the allegations of culpable participation by the THL Defendants, plaintiffs' allegations of recklessness are too thin to survive the motion to dismiss, but their allegations of motive and opportunity will suffice for reasons previously discussed. Plaintiffs allege that the THL Individual Defendants were members of Refco's Board of Directors, and that they were "deeply involved in the day-to-day management of Refco."(Compl.¶ 264.) They allege that the THL Partner Defendants " dominated Refco's Board of Directors," controlling half of its Board, and that after the LBO these defendants had the ability to control all aspects of Refco's business. (*Id.* ¶ 263.)They also allege that defendant THL Managers V, LLC ("THL Managers "), of which defendant Thomas H. Lee Partners is the managing member, entered an agreement with Refco under which THL Managers was retained to advise Refco in connection with virtually all aspects of Refco's affairs. (*Id.*) Plaintiffs argue that the " unfettered access" afforded by this role, combined with the red flags discussed above in the context of the recklessness allegations against the other defendants, supports an inference of culpable participation as to the THL Defendants. However, plaintiffs have made no allegations whatsoever as to how the THL Defendants' "unfettered access" would have led them across particular documents in which the red flags would have been apparent, and these allegations must therefore fail for the same reason the allegations against some of the officer defendants failed: there is no allegation supporting a "strong inference" that the defendants were actually aware of the red flags in question.

Plaintiffs also allege that the THL Defendants had "

unusual and significant motives" for committing fraud. The THL Defendants, like the officer defendants discussed above, were shareholders of record before the IPO, and therefore stood to profit personally and directly from any oversubscription of shares pursuant to the so-called "green shoe" option. For the reasons discussed above, this allegation is sufficient to support an inference of motive as to these defendants, and their motion to dismiss the § 20(a) claims against them must accordingly be denied.

VII. *Insider Trading Claims Under Exchange Act § 20A*

Section 20A of the Exchange Act provides:
Any person who violates any provision of this chapter or the rules or regulations thereunder by purchasing or selling a security while in possession of material, nonpublic information shall be liable in an action in any court of competent jurisdiction to any person who, contemporaneously with the purchase or sale of securities that is the subject of such violation, has purchased (where such violation is based on a sale of securities) or sold (where such violation is based on a purchase of securities) securities of the same class.

**\*44** 15 U.S.C. § 78t-1.

Bennett argues that the complaint's allegations of insider trading under § 20A of the Exchange Act are insufficient because they fail to allege with particularity that Bennett's trading was contemporaneous with the plaintiffs'. (Bennett Mem. 21-23.) *SeeWilson v. Comtech Telecommc'ns Corp.,* 648 F.2d 88, 94-95 (2d Cir.1981) ("Any duty of disclosure is owed only to those investors trading contemporaneously with the insider"). Bennett is alleged to have sold at least 5.375 million shares in the IPO, which commenced on August 10, 2005. (Compl.¶¶ 166, 710.) Plaintiffs are alleged to have purchased shares in the same IPO. (Compl. ¶ 362.) Bennett makes no attempt to explain how these events, which took place on the same day, could be any more contemporaneous. His argument is without merit.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----, 2007 WL 1280649 (S.D.N.Y.), Fed. Sec. L. Rep. P 94,312
(Cite as: --- F.Supp.2d ----)

Defendants THL Funds and Thomas H. Lee Investors Limited Partnership-two of the THL Defendants-also challenge the § 20A allegations against them.[FN45] (THL/Audit Comm. Mem. 46-47; *see* P. Mem. 127-129.) They argue that a § 20A claim for insider trading can only be based on predicate liability under § 10(b)-not predicate liability under § 20(a)'s control-person provisions.

Not all violations of the Exchange Act can serve as predicate violations for purposes of § 20A; the predicate violation must be an act of insider trading. [FN46] Section 20A liability is limited to "[a]ny person who violates any provision of this chapter or the rules or regulations thereunder *by* purchasing or selling a security while in possession of material, nonpublic information."(emphasis added)."The reference to 'this chapter' [in § 20A] is to the '34 [Exchange] Act, and the language of the statute is thus quite plain that to state a claim under § 20A, a plaintiff must plead a predicate violation of the '34 Act or its rules and regulations."*Jackson Nat. Life Ins. Co. v. Merrill Lynch & Co., Inc.,* 32 F.3d 697, 703 (2d Cir.1994).

The terms of § 20A do not limit its coverage to violators of § 10(b); rather, the required "predicate violation" may be of any section of the Exchange Act, provided the violation was effected *"by purchasing or selling a security* while in possession of material, nonpublic information" (emphasis added). That is, there can only be § 20A liability if the predicate violation of the Exchange Act was an act of insider trading. Section 20A "creates a private right of action to enforce the existing prohibition on insider trading under § 10(b) caselaw, and does not create a new definition of insider trading."*DeMarco v. Robertson Stephens Inc.,* 318 F.Supp.2d 110, 126 (S.D.N.Y.2004)."The language of § 20A makes clear that ... Congress sought to alter the remedies available in insider trading cases, and only in insider trading cases." *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson,* 501 U.S. 350, 362, 111 S.Ct. 2773, 115 L.Ed.2d 321 (1991); *seeJackson Nat. Life Ins. Co.,* 32 F.3d at 703 ("Congress added § 20A ... to remedy the very specific problems inherent in prosecuting insider trading cases").

*45 The question raised by defendants' motion, then, is whether control-person violations of § 20(a) can constitute insider trading, that is, "violat[ing] any provision of this chapter or the rules or regulations thereunder by purchasing or selling a security while in possession of material, nonpublic information" under § 20A. Put differently, the question is whether § 20A creates a private right of action against those who control acts of insider trading, as well as the primary violators who directly engage in them. There is little precedent on this issue; the parties have identified no case directly addressing the question of whether § 20A liability may be premised on a § 20(a) violation, and the Court has found none.[FN47]

Section § 20(a) provides liability for any person who "controls any person liable under any provision of this chapter or of any rule or regulation thereunder,"15 U.S.C. § 78t(a). It further provides that a control person is liable "jointly and severally with and *to the same extent as* such controlled person, unless the controlling person acted in good faith and did not directly or indirectly induce the acts or acts constituting the violation of cause of action."15 U.S.C. § 78t(a) (emphasis added). The emphasized language clearly provides that liability against a control person is coterminous with liability against the person controlled. If so, the private right of action created by § 20A should extend to the controller.

This reading is consistent with the statute's language and purpose. Section 20A provides liability for insider-trading violations of "any provision of this chapter or the rules or regulations thereunder."15 U.S.C. § 78t-1. If § 10(b) were the only provision that could serve as the basis for liability, Congress could have simply identified § 10(b) and the rules enforcing it as the basis for liability. Moreover, control person liability involves more than mere vicarious responsibility for another's wrongdoing; it extends to those who culpably participate in the primary violation, and it would be strange to create a private right of action against the primary violator but not those who culpably participate in the primary violation as controlling persons through the vehicle of persons or entities that they control. Defendants have produced no authority or rationale

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----, 2007 WL 1280649 (S.D.N.Y.), Fed. Sec. L. Rep. P 94,312
(Cite as: --- F.Supp.2d ----)

for the proposition that § 20A liability cannot be predicated on a control-person insider trading violation. Accordingly, their argument is rejected, and their motion to dismiss the § 20A claims against them will be denied.

## CONCLUSION

For the foregoing reasons, it is hereby ORDERED that the motions to dismiss by the "144A" or "Bond Underwriter" Defendants (Doc. # 257) and Robert Trosten (Doc. # 282) are granted. The motions to dismiss by Phillip R. Bennett, et al. (Doc. # 260), Grant Thornton LLP (Doc. # 265), William Sexton (Doc. # 266), Phillip Silverman (Docs.268, 294), Dennis Klejna (Doc. # 273), the THL and Audit Committee Defendants (Doc. # 277), Joseph J. Murphy and Gerald M. Sherer (Doc. # 279), and Tone Grant (Doc. # 303), are granted in part and denied in part.

**\*46** Counts One and Two of the First Amended Complaint are dismissed in their entirety, and Count Three is dismissed as against the Bond Underwriter Defendants. Counts Three and Four are dismissed as to those plaintiffs who traded their unregistered Rule 144A bonds for registered bonds in the *Exxon Capital* exchange. All claims against defendant Robert Trosten are also dismissed. The motions to dismiss are in all other respects denied.

SO ORDERED.

FN1. The name "Refco," as used throughout this opinion, refers to Refco Inc., the publicly traded company formed pursuant to the August 2005 initial public offering ("IPO") described below, as well as to Refco Group Ltd., LLC, the company through which Refco's business was primarily conducted prior to the IPO. (Compl.¶¶ 20-21.)

FN2. It appears from the complaint that most or all of the loans at issue originated from Refco Capital, a subsidiary, not from Refco itself. (Compl.¶¶ 403, 405.)

Although the Complaint in various places uses "Refco" and "Refco Capital" interchangeably, it is clear in context that Refco Capital was the source of the loans. For example, paragraph 409 of the complaint clearly uses "Refco" to refer to " Refco Capital," as is apparent from the allegation that the loan agreement was signed by David Weaver, the Chief Administrative Officer at Refco Capital.

FN3. The third parties were compensated for this service by the interest on their loans to RGHI, which was greater than the interest they were charged by Refco Capital. (Compl.¶ 413.) The payments of interest, however, were made by Refco Capital, not RGHI. (*Id.* ¶ 418.)

FN4. Plaintiffs argue that loans for sums in excess of Refco's net earnings were unusual (Compl.¶ 562), but do not provide information about other loans with which to compare the fraudulent loans. Defendants point out that the loans represented less than 1% of Refco's alleged assets during the Class Period. (*Seeid.* ¶¶ 177, 515).

FN5. The "THL Partners Defendants" are Thomas H. Lee Partners, L.P., Thomas H. Lee Equity Fund V, L.P., Thomas H. Lee Parallel Fund V, L.P., Thomas H. Lee Equity (Cayman) Fund V. L.P., THL Equity Advisors V, LLC, Thomas H. Lee Investors Limited Partnership, and The 1997 Thomas H. Lee Nominee Trust.

FN6. The "THL Individual Defendants" are Thomas H. Lee, David V. Harkins, Scott L. Jaeckel and Scott A. Schoen.

FN7. The "Audit Committee Defendants" are Ronald L. O'Kelley, Leo R. Breitman and Nathan Gantcher.

FN8. Specifically, the defendants who make this argument are Bennett (Bennett Mem. 9-12), Trosten (Trosten Mem. 8-14),

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----                                                                                         Page 38

--- F.Supp.2d ----, 2007 WL 1280649 (S.D.N.Y.), Fed. Sec. L. Rep. P 94,312
(Cite as: --- F.Supp.2d ----)

and the THL Partners Defendants (THL/Audit Comm. Mem. 11-20). Murphy makes the same argument in the context of contesting control-person liability (Sherer/Murphy Mem. 34-35), as does Silverman (Silverman Mem. 13-14).

FN9. Plaintiffs note that the full text of Rule 144A provides that securities sold pursuant to its terms "shall be deemed not to have been offered to the public *within the meaning of section 4(3)(A) of the [Securities] Act,"*17 C.F.R. § 230.144A(c) (emphasis added), and argue that it would therefore be inappropriate to deem Rule 144A offerings non-public for purposes of § 12(a)(2). The regulation's language hardly suggests, however, that an offering that is private by its terms, and by federal regulation for purposes of one provision of the act, should be considered public for purposes of another provision. Indeed, *Gustafson* itself was based on the premise that the Securities Act "is to be interpreted as a symmetrical and coherent regulatory scheme, one in which the operative words have a consistent meaning throughout." *Gustafson,* 513 U.S. at 569.

FN10. Plaintiffs argue that § 12 liability does not depend upon whether an offering was registered. See*Gustafson,* 513 U.S. at 579 (noting that dealings may violate § 12 "even though they are not related to the *fact* of registration) (emphasis in original) (internal quotation marks omitted)). This is true, but irrelevant. If the bonds were entitled to an *exemption* from registration under Rule 144A, they were also entitled to be deemed non-public.

FN11. Specifically, Count Three names defendants Bennett, Murphy, Lee, Sexton, Silverman, Maggio, Klejna, the THL Individual Defendants, the Audit Committee Defendants, Refco Futures, Westminster-Refco, Lind-Waldock, Grant Thornton, and the Bond Underwriter Defendants. (Compl.¶ 300.)

FN12. Of course, there are no registration statements for offerings of unregistered bonds.

FN13. Section 11(a) lists five categories of defendants who may be held liable under its provisions. The first four categories are those who are named in or sign the registration statement, or who are partners or directors of the issuer. 15 U.S.C. § 77k(a)(1)-(4). Thus, only the remaining category, "underwriter[s]," is potentially applicable here.

FN14. It appears that plaintiffs do not rely upon this allegation as a basis to maintain Count One, which does not explicitly rely on this allegation; nor does plaintiffs' memorandum of law rely on this claim in opposing the Bond Underwriter Defendants' motion to dismiss the § 12(a)(2) claims against them. Presumably this is because plaintiffs' § 12(a)(2) claim involves misstatements in the Rule 144A Offering Memorandum, rather than the Bond Registration Statement for the subsequent public offering.

FN15. Of course, if the Court has misconstrued the complaint and the plaintiffs intended to allege some other participation in the creation of the Bond Registration Statement, plaintiffs can seek leave to file an amended complaint explaining the participation on which they rely.

FN16. The relevant factual allegation here is that "[t]he Offering Memorandum [for the Rule 144A bonds], which described and provided for the entire two-step process by which the Bonds were transmitted into the market ... was used ... to solicit [plaintiffs] not only to participate in the first step of the offering, but also to participate in the second step."(Compl.¶ 106.)

FN17. Grant Thornton does not argue that

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----, 2007 WL 1280649 (S.D.N.Y.), Fed. Sec. L. Rep. P 94,312
(Cite as: --- F.Supp.2d ----)

the § 11 claims are insufficient if Rule 9's standards do not apply.

FN18. Bennett makes this argument as a challenge to the claims of control-person liability against RGHI and the Bennett Trust. (Bennett Mem. 19-21.)

FN19.*Johnson* noted that "the terms of section 11 require *any* plaintiff to establish that a registration statement 'contained an untrue statement of material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading,' " but applied a Rule 9(b) standard because the allegations referred to "materially false and misleading statements." 399 F.Supp.2d at 122.

FN20. Each Securities Act claim begins with this careful sentence: "Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein, except allegations that the Defendants made the untrue statements of material facts and omissions intentionally or recklessly."(Compl.¶¶ 270, 284, 299, 313, 329, 342, 361, 369.)

FN21. Relatedly, Klejna argues that unregistered bondholders cannot " 'trace' their [securities] to the allegedly defective registration statement."*DeMaria v. Andersen*, 318 F.3d 170, 176 (2d Cir.2003) . (*See* Klejna Mem. 34.) *SeealsoGuenther v. Cooper Life Sciences, Inc.*, 759 F.Supp. 1437, 1439 (N.D.Cal.1990). ("[T]o have standing under section 11, plaintiffs must establish that they purchased shares either (1) directly in the public offering for which the misleading registration statement was filed or (2) traceable to that public offering. ") The Second Circuit held in *Barnes v. Osofsky*, 373 F.2d 269, 271-73 (2d Cir.1967), that § 11's private right of action was available only to plaintiffs who had purchased the securities in question directly from the issuer. *Id.* at 272-73.In

other words, § 11's coverage is available only to those who acquired a security issued pursuant to the registration statement, not to those who purchased other similar securities already on the market at the time the registration statement was issued. In this case, plaintiffs did purchase the securities issues pursuant to the registration, so the " traceability" requirement is not directly implicated here.

FN22. This version of the argument relies on the so-called "commitment theory" of securities law, which originally developed in the context of statute of limitations questions as the proposition that "the time of a 'purchase or sale' of securities within the meaning of Rule 10b-5 is to be determined as the time when the parties to the transaction are committed to one another."*Radiation Dynamics, Inc. v. Goldmuntz*, 464 F.2d 876, 891 (2d Cir.1972). Thus, in any case where a contract requires subsequent payments, those payments are do not affect the statute of limitations, because "once plaintiff has committed itself to the transaction, the claim accrues and thus the statute begins to run."*Kahn v. Kohlberg, Kravis, Roberts & Co.*, 970 F.2d 1030, 1040 (2d Cir.1992). This concept was subsequently expanded to other areas of securities and contracts law as the principle that "[o]nce the decision is made and the parties are irrevocably committed to the transaction, there is little justification for penalizing alleged omissions or misstatements which occur thereafter and which have no effect on the decision."*SEC v. Nat'l Student Mktg. Corp.*, 457 F.Supp. 682, 703 (D.D.C.1978). Defendants contend that it would be similarly pointless to penalize them for statements made after the plaintiffs' decision to invest in the relevant bonds was already made.

FN23.*Goldman* was analyzing materiality for purposes of the Exchange Act, but the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----

--- F.Supp.2d ----, 2007 WL 1280649 (S.D.N.Y.), Fed. Sec. L. Rep. P 94,312
**(Cite as: --- F.Supp.2d ----)**

materiality analysis is the same in both the Securities Act and Exchange Act contexts. *Kronfeld v. Trans World Airlines, Inc.,* 832 F.2d 726, 731 (2d Cir.1987).

FN24. Sexton contends that "culpable participation" is an element of a claim under Section 15. (Sexton Mem. 21.) It is not. *In re Global Crossing, Ltd., Secs. Litig.,* No. 02 Civ. 910, 2005 WL 1907005, at *11 (S.D.N.Y. Aug. 8, 2005)(*"Global Crossing II"* );see*In re Vivendi Universal, S.A.,* 381 F.Supp.2d 158, 188 (S.D.N.Y.2003) ("the apparent majority of judges in the Southern District ... have determined that culpable participation is not an element of § 15").

FN25. Bennett also argues that the pleading standard of Rule 9(b) should apply to the Section 15 allegations, because "allegations of fraud permeate the Complaint."(Bennett Mem. 21.) This argument is no more meritorious as applied to Section 15 than it was when applied to Section 11.

FN26. Grant Thornton, the outside auditor, also challenges the specificity of the allegations tying it to the allegedly fraudulent statements. These arguments are addressed in Section V of this opinion.

FN27. Plaintiffs' arguments against this rule are not unpersuasive. A class period is delimited in order to identify the individuals who claim membership in the class, not to identify the conduct that injured them, as is clear in context when the Complaint identifies the plaintiffs as those "who purchased or acquired [relevant securities] between August 5, 2004 and October 17, 2005 (the "Class Period")."(*Id.*)Indeed, this is why it is called the "*Class* Period," not the " Liability Period." Thus, it might logically be concluded that "[t]he fact that the proposed class period begins after the first of the alleged misstatements does not make

those earlier statements irrelevant or not actionable."*Zelman v. JDS Uniphase Corp.,* 376 F.Supp.2d 956, 966 (N.D.Cal.2005). However, as noted above, the Second Circuit has spoken clearly on this question, and this Court is bound by its conclusion.

FN28. Although Trosten is among these defendants (see Trosten Mem. 17-22), his arguments need not be addressed in light of the conclusion that plaintiffs have failed to identify him with relevant misstatements.

FN29. Plaintiffs also allege that the IPO would result in a "huge one-time 'special dividend' payment that would ... line the pockets of these corporate insiders." (Compl.¶ 588.) It is not clear what this refers to; presumably, it is a reference to the "green shoe" option, as plaintiffs have not alleged any other special dividend from the IPO.

FN30. The same is true of *In re Symbol Techologies Class Action Litigation,* 950 F.Supp. 1237, 1245 (E.D.N.Y.1997) (" Plaintiffs do not allege a motive to commit fraud. This is not surprising, since the company and defendant Amato, as well as two high-ranking financial officers, purchased shares of Symbol stock during the class period"), on which *Regeneron* relied; *Symbol* dealt with allegedly false projections of future performance that would have been shortly disproved. Klejna also cites *In re Sina Corp. Securities Litigation,* No. 05 Civ. 2154, 2006 WL 2742048 (S.D.N.Y. Sept. 26, 2006), in which the court noted that "If the Individual Defendants indeed failed to disclose certain facts in order to personally profit from inside information, one would reasonably expect that they would hold fewer shares of stock before the anticipated plunge in the stock's price than they held the year before."*Id.* at *12. It is not clear from the allegations in this case that the defendants anticipated a plunge.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----, 2007 WL 1280649 (S.D.N.Y.), Fed. Sec. L. Rep. P 94,312
(Cite as: --- F.Supp.2d ----)

FN31. Although it has no effect on the outcome of the present motion, it should be noted that Klejna asserts that there are in fact two separate entities that might be referred to as "Refco Capital": Refco Capital Markets Ltd., and Refco Capital LLC. (Klejna Mem. 21 n. 12.)

FN32. The complaint does make clear that the loan agreements between Refco Capital and the third party were signed by David Weaver, the Chief Administrative Officer at Refco Capital (¶ 409), rather than by any of the moving defendants.

FN33. It appears that the scheme was designed not to pay off all of Refco's uncollectible receivables, but merely to pay them down. (See Compl. ¶ 240.)

FN34. As discussed above, the complaint in places uses the word "Refco" to refer to Refco Capital. Thus, as to the transactions for which BAWAG served as intermediary, the complaint frequently states that the money originated with "Refco," a term which the complaint defines to include Refco itself "and all of its predecessors and affiliates," (Compl. Ex. 1. at viii), but does not explain whether this term is used to denote Refco or Refco Capital. In at least one place, it is clear that where the portions of the complaint dealing with BAWAG loans . refer to money originating from "Refco," they mean money originating with "Refco Capital Markets," not Refco itself (Compl. ¶ 500). The complaint nowhere alleges otherwise with respect to the other BAWAG transactions. (Id. ¶¶ 472-501.)Moreover, the complaint elsewhere states broadly that "[t]he funds used in the circular transactions originated with Refco Capital."(Id. ¶ 569.)In transactions with other third parties, too, Refco Capital was the source of the money. (Id. ¶ 505.)

FN35. If plaintiffs can plead that the

unidentified employee learned of the fraud by reviewing information known to the Audit Committee, they can of course seek leave to amend their complaint to allege that.

FN36. The Audit Committee Defendants do not dispute that they had the opportunity to engage in fraud.

FN37. The Complaint defines GAAS as the auditing standards issued or adopted by the Public Company Accounting Oversight Board ("PCAOB") established by the Sarbanes-Oxley Act of 2002, together with the auditing standards issued by the American Institute of Certified Public Accountants ("AICPA"). (Compl. ¶ 206 (mis-numbered paragraph on page 94, between ¶¶ 225 and 226); id. ¶ 226.)

FN38. The Complaint defines GAAP as:
those principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practices at a particular time. GAAP principles are the official standards accepted by the SEC and promulgated in part by the American Institute of Certified Public Accountants (" AICPA"). GAAP consists of a hierarchy of authoritative literature. The highest authority is comprised of Financial Accounting Standards Board ("FASB") Statements of Financial Accounting Statements ("SFAS"), followed by FASB Interpretations ("FIN"), Accounting Principles Board Opinions ("APB Opinion "), and AICPA Accounting Research Bulletins ("ARB"). GAAP provides other authoritative pronouncements including, among others, the FASB Concept Statements ("FASCON").
(Compl.¶ 212.)

FN39. Allegations that an auditor " prepared, directed or controlled," "helped create" or "materially assisted in" preparing false statements are sufficient to

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----, 2007 WL 1280649 (S.D.N.Y.), Fed. Sec. L. Rep. P 94,312
(Cite as: --- F.Supp.2d ----)

give rise to liability. *Global Crossing I,* 322 F.Supp.2d at 334. In this case, however, the false statements for which Grant Thornton is allegedly liable are not Refco's statements, but Grant Thornton's audits themselves.

FN40. Grant Thornton also argues that allegations in the criminal indictment against Bennett, along with allegations in the complaint in this case, suggest that "a central purpose of the scheme was to hide the truth from Grant Thornton."(Grant Thornton Mem. 14.) This argument, of course, has no place in a motion to dismiss.

FN41. Plaintiffs allege that Grant Thornton "recklessly failed to discover" that Refco Capital was paying the interest. (Compl.¶ 563.)

FN42. Plaintiffs also rely on internal statements of RGHI's accounts at Refco, which allegedly contained line-items reflecting the circular flow of funds between RGHI and BAWAG. (Compl.¶ 567.) In at least one case, a transfer from BAWAG to RGHI was followed a short time later by a transfer of slightly more money from RGHI back to BAWAG. In other words, it would have been apparent to a reviewer of these records that BAWAG had loaned RGHI a large sum of money. There is nothing obviously suspicious about this, however; the relevant parties were in the business of making loans and investments, and the circular transactions were suspicious because they involved money being loaned from one Refco-related party through BAWAG *to another Refco-related party* -something that plaintiffs do not allege that RGHI's account statements reflected.
As to one circular transaction involving BAWAG,, the complaint alleges that after RGHI received the loan from BAWAG, RGHI unwound the transaction by sending the money back to "Refco" (again, this seems to refer to Refco Capital)-without

using BAWAG as an intermediary. The complaint specifically notes that in this case, the line-item representing the return of money to Refco is *not* identified in RGHI's records; the relevant line-item is marked only "transfer." (¶ 567(b).) In other words, the relevant records contain a transfer from BAWAG to RGHI, followed by an unspecified "transfer." For this transaction, then, it would not even have been apparent to a reviewer of records that the transfer was a loan from BAWAG to RGHI.

FN43. The holding that § 20(a) requires culpable participation, while § 15 does not, may seem to contradict the observation that the terms of the two provisions are substantially identical and "are interpreted in the same manner."*Global Crossing I,* 322 F.Supp.2d at 349. There is, however, one respect in which the terms of the control-person provisions differ. Section 15 provides that there shall be no liability where "the controlling person had no *knowledge of or reasonable ground to believe* in the existence of the facts by reason of which the liability of the controlled person is alleged to exist."15 U.S.C.A. § 77o (emphasis added). Section 20(a), on the other hand, gives rise to no liability where "the controlling person acted in *good faith* and did not directly or indirectly induce the act or acts constituting the violation or cause of action. "15 U.S.C.A. § 78t (a) (emphasis added). Thus, an allegation of negligence does not state a violation of § 20(a) if the negligence was in good faith; the same is not true of § 15. It is in part from this language requiring a lack of "good faith" that the Second Circuit inferred that § 20(a) was "obviously [intended] to impose liability only on those directors ... who are in some meaningful sense culpable participants in the fraud perpetrated by controlled persons."*Lanza v. Drexel & Co.,* 479 F.2d 1277, 1299 (2d Cir.1973).

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----                                                                    Page 43

--- F.Supp.2d ----, 2007 WL 1280649 (S.D.N.Y.), Fed. Sec. L. Rep. P 94,312
(Cite as: --- F.Supp.2d ----)

FN44. Sherer does not challenge plaintiffs' allegations that he controlled Refco, only whether plaintiffs have sufficiently pled that he was a culpable participant. (Sherer Mem. 36.)

FN45. The defendants argue that no predicate violation has been alleged, because the underlying § 20(a) control-person claims fail as a matter of law. This argument is rejected for the reasons discussed on the context of § 20(a) control-person liability above; plaintiffs have adequately alleged a § 20(a) claim against the THL Defendants. Defendants also argue that the complaint " fails to contain any specific factual allegations that these defendants knowingly possessed material non-public information when they sold their shares in the IPO."(THL/Audit Comm. Mem. 47.) The THL Defendants themselves in a related case have alleged that they conducted an extensive review of Refco's financial information. Complaint, *Thomas H. Lee Equity Fund V., L.P., et al v. Phillip R. Bennett, et al.,* No. 05 Civ. 9608 (S.D.N.Y. Nov. 14, 2005) (Coffey Decl. Ex. D), at ¶¶ 21-22, referenced at Compl. ¶¶ 119, 572. A claim for insider trading "does not require ... that a causal connection exist between the knowing possession of the information and the trade, that is, it does not require that the defendant 'use' the information when trading."*In re Oxford Health Plans, Inc.,* 187 F.R.D. 133, 143 (S.D.N.Y.1999). Defendants object to plaintiffs' reliance on this document, but it is appropriate at the motion to dismiss stage to rely on "any statements or documents incorporated in [the complaint] by reference, as well as ... documents that the plaintiffs either possessed or knew about and upon which they relied in bringing the suit."*Rothman,* 220 F.3d at 88-89 (internal citations omitted). Thus, plaintiffs have adequately alleged that the THL Defendants knowingly possessed material nonpublic information.

FN46. Acts of insider trading fall with § 10(b)'s prohibition of the use of "any manipulative or deceptive device or contrivance" in the purchase or sale of securities, 15 U.S.C. § 78j(b).*See*17 C.F.R. § 240.10b-5. Insider trading qualifies as a " manipulative or deceptive device or contrivance" giving rise to liability under § 10(b) because insider trading involves the insiders taking unfair advantage of the uninformed stockholders with whom they have "a relationship of trust and confidence."*United States v. O'Hagan,* 521 U.S. 642, 652, 117 S.Ct. 2199, 138 L.Ed.2d 724 (1997), quoting *Chiarella v. United States,* 445 U.S. 222, 228, 100 S.Ct. 1108, 63 L.Ed.2d 348 (1980).

FN47.*SeeMakor Issues & Rights, Ltd. v. Tellabs, Inc.,* 437 F.3d 588, 605 (7th Cir.2006) ("Whether § 20(a) control-person liability standing alone can serve as the "separate underlying violation" required for § 20A insider trading is an open question of law and raises an important issue of statutory interpretation that should not be decided in a vacuum. No party in this litigation has provided more than cursory briefing of this issue, and therefore we take no position on its resolution, leaving it for further factual and legal development during the course of the litigation.").

S.D.N.Y.,2007.
In re Refco, Inc. Securities Litigation
--- F.Supp.2d ----, 2007 WL 1280649 (S.D.N.Y.), Fed. Sec. L. Rep. P 94,312

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**13**

Westlaw.

--- N.W.2d ----                                                                        Page 1

--- N.W.2d ----, 2007 WL 2164870 (Mich.App.)
**(Cite as: --- N.W.2d ----)**

**H**
**Robins v. Garg**
Mich.App.,2007.
Only the Westlaw citation is currently available.
Court of Appeals of Michigan.
Michael **ROBINS**, Personal Representative of the
Estate of Ilene **Robins**, Deceased,
Plaintiff-Appellant,
v.
Tilak **GARG** (ON REMAND), Defendant-Appellee.
**Docket No. 256169.**

July 26, 2007.

Oakland Circuit Court; LC No.2002-041909-NH.

Before: COOPER, P.J., and FORT HOOD and
BORRELLO, JJ.
BORRELLO, J.
Plaintiff Michael Robins, the personal
representative of the estate of decedent Ilene
Robins, appeals as of right the trial court's order
granting summary disposition in favor of defendant.
Previously, in a published opinion, we reversed the
trial court's grant of summary disposition in favor of
defendant and remanded. *Robins v. Garg,* 270
Mich. 519;716 NW2d 318 (2006). In lieu of
granting leave to appeal, our Supreme Court
vacated our opinion and remanded for
reconsideration in light of *Woodard v. Custer,* 476
Mich. 545;719 NW2d 842 (2006).*Robins v. Garg,*
--- Mich. ----;731 NW2d 408 (2007). On remand,
we again reverse and remand.

Defendant Dr. Tilak Garg, M.D., a general
practitioner, operated a walk-in clinic in Keego
Harbor, Michigan. He began seeing Ilene Robins as
a patient in January 1986. At that time, Dr. Garg
noted that Robins was at risk for heart disease
because she had the following risk factors: a family
history of heart disease, high cholesterol, and a
history of smoking (although Robins told Dr. Garg
during her first appointment that she had just quit

smoking). Dr. Garg did not refer Robins to a
cardiologist in 1986, but he did order her to
undergo a stress test, an electrocardiogram (EKG),
and blood tests to determine, among other things,
her cholesterol level. Dr. Garg diagnosed Robins
with asthma in 1987. He did not order another stress
test at this time. According to Dr. Garg's deposition,
by 1987, Robins visited Dr. Garg's clinic as needed
to get prescription refills, and she was usually in a
hurry to get her prescriptions refilled and leave.
This pattern apparently continued for a number of
years.

In 1998, Dr. Garg checked Robins's cholesterol
level for the first time since 1986. The test revealed
that Robins's cholesterol level was still high. Dr.
Garg advised Robins to follow a low-cholesterol
diet and to return for more testing, which was
performed in July 1998. Dr. Garg asserted that in
1998, he referred Robins to a cardiologist (although
this referral was not documented in Robins's
medical chart) and prescribed Lipitor to control her
cholesterol level. According to Dr. Garg, he
planned to refill Robins's prescription for Lipitor in
October 1998, but did not do so because Robins
informed him that she had not taken the medication.
Instead of Lipitor, Dr. Garg prescribed Zocor for
Robins to control her cholesterol level. On at least
two occasions in 1999, Robins returned to Dr. Garg
to have prescriptions refilled, but she never asked
for refills of her cholesterol medication, and her
medical chart indicated that she was "[n]ot taking
cholesterol medicine" and that she did "not want to
take it." Dr. Garg did not order or perform any
other testing for Robins's heart or cholesterol
problems from that date forward, despite the fact
that Robins continued to seek treatment from Dr.
Garg for various ailments.

On June 1, 2001, Robins came to Dr. Garg's clinic
because she was experiencing pain in her chest and
back. She stated that she had experienced the same
pain once the day before and once a week before.
Dr. Garg testified that Robins complained of severe

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- N.W.2d ----, 2007 WL 2164870 (Mich.App.)
**(Cite as: --- N.W.2d ----)**

pain and that he and an office assistant took her to the EKG room. Dr. Garg testified that he told the receptionist to call an ambulance because Robins's pain was so severe. Before the ambulance arrived, however, Robins went into cardiac arrest as Dr. Garg was connecting the EKG leads. She stopped breathing, and she had no pulse. Dr. Garg performed CPR until the ambulance arrived, but his efforts to revive her were unsuccessful, and Robins died at the hospital.

Plaintiff filed a medical malpractice lawsuit against Dr. Garg and attached to his complaint the affidavit of Dr. Marvin Werlinsky, D.O., a licensed family practitioner in Florida. Dr. Werlinsky is board certified in family practice by the American College of Osteopathic Family Physicians. Defendant moved to strike Dr. Werlinsky as plaintiff's expert on the standard of care, arguing that Dr. Werlinsky was not a general practice physician like defendant and that he was not familiar with the standard of care in the geographical area where Dr. Garg practices medicine. The trial court agreed and struck Dr. Werlinsky as plaintiff's standard of care expert. Defendant then moved for summary disposition, arguing that because Dr. Werlinsky had signed plaintiff's affidavit of merit and was unqualified to do so, plaintiff's claim was not filed within the period of limitations and that plaintiff could not prove causation. The trial court granted defendant's motion for summary disposition on the grounds of both causation and the statute of limitations.

Plaintiff first argues that the trial court erred in striking his standard of care expert, Dr. Werlinsky, under MCL 600.2912a(1)(a). We review a trial court's decision regarding the qualification of an expert for an abuse of discretion. *Tate v. Detroit Receiving Hosp.,* 249 Mich.App 212, 215;642 NW2d 346 (2002).MCL 600.2912a(1)(a) provides that a plaintiff must show that

[t]he defendant, if a general practitioner, failed to provide the plaintiff the recognized standard of acceptable professional practice or care in the community in which the defendant practices or in a similar community, and that as a proximate result of the defendant failing to provide that standard, the plaintiff suffered an injury.

"An expert familiar with the standard of care in a community may testify concerning the standard of care in that community, although he has not practiced in the community."*Bahr v. Harper-Grace Hosps,* 448 Mich. 135, 141;528 NW2d 170 (1995). Additionally, the statute does not require a nonlocal expert "to contact physicians in one area to determine the applicable standard of care in that community or to determine whether that community is similar to another community."*Turbin v. Graesser (On Remand* ), 214 Mich.App 215, 219;542 NW2d 607 (1995).

In this case, Dr. Werlinsky testified in his deposition that his practice was located in Palm Beach County, Florida. Defendant's clinic was located in Oakland County, Michigan. However, plaintiff submitted evidence to the trial court that Oakland County and Palm Beach County were similar in population size and had a similar number of hospitals and family practice physicians. Dr. Werlinsky testified that he interacted with general practitioners from throughout the country and believed that the way he practiced medicine was similar to the way a physician practiced medicine in Michigan. Because plaintiff presented evidence that Dr. Werlinsky was familiar with the standard of care for an area similar to where defendant practiced, *Bahr, supra* at 142, and because Dr. Werlinsky testified that he practiced medicine similarly to the way it was practiced in Michigan, Dr. Werlinsky was qualified to give testimony under MCL 600.2912a(1)(a). Thus, the trial court abused its discretion in ruling that Dr. Werlinsky was not qualified under MCL 600.2912a(1)(a).

Plaintiff next argues that the trial court erred in concluding that his affidavit of merit failed to comply with MCL 600.2169 because Dr. Werlinsky was not qualified to give expert testimony against Dr. Garg.[FN1]We agree.

> FN1. This is the only issue that is affected by the Supreme Court's remand in this case. With the exception of this issue, the opinion is, with the exception of minor changes, unchanged from our first opinion in this case.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

In a medical malpractice action, the plaintiff's expert's qualifications must match the qualifications of the defendant. MCL 600.2169(1); *Decker v. Flood,* 248 Mich.App 75, 85;638 NW2d 163 (2001).MCL 600.2169 provides, in relevant part:

(1) In an action alleging medical malpractice, a person shall not give expert testimony on the appropriate standard of practice or care unless the person is licensed as a health professional in this state or another state and meets the following criteria:

(a) If the party against whom or on whose behalf the testimony is offered is a specialist, specializes at the time of the occurrence that is the basis for the action in the same specialty as the party against whom or on whose behalf the testimony is offered. However, if the party against whom or on whose behalf the testimony is offered is a specialist who is board certified, the expert witness must be a specialist who is board certified in that specialty.

(b) Subject to subdivision (c), during the year immediately preceding the date of the occurrence that is the basis for the claim or action, devoted a majority of his or her professional time to either or both of the following:

(*i* ) The active clinical practice of the same health profession in which the party against whom or on whose behalf the testimony is offered is licensed and, if that party is a specialist, the active clinical practice of that specialty.

(*ii* ) The instruction of students in an accredited health professional school or accredited residency or clinical research program in the same health profession in which the party against whom or on whose behalf the testimony is offered is licensed and, if that party is a specialist, an accredited health professional school or accredited residency or clinical research program in the same specialty.

(c) If the party against whom or on whose behalf the testimony is offered is a general practitioner, the expert witness, during the year immediately preceding the date of the occurrence that is the basis for the claim or action, devoted a majority of his or her professional time to either or both of the following:

(*i* ) Active clinical practice as a general practitioner.

(*ii* ) Instruction of students in an accredited health professional school or accredited residency or clinical research program in the same health profession in which the party against whom or on whose behalf the testimony is offered is licensed.

In *Woodard, supra,* our Supreme Court broadly interpreted the term specialist in MCL 600.2169. According to *Woodard's* definition of a specialist, any physician who can potentially become board certified in a branch of medicine or surgery is a specialist, and a physician does not have to be board certified to be a specialist. *Woodard, supra* at 561.Despite the broad definition of a specialist as that term is defined in *Woodard,* defendant Dr. Garg does not qualify as a specialist. It is undisputed that Dr. Garg is a general practitioner. The American Board of Medical Specialties does not offer board certification for general practitioners. Dr Garg is therefore not board certified in general practice and could never potentially become board certified in general practice. Because general practice is not an area of practice in which a medical doctor can potentially become board certified, a medical doctor practicing general medicine is not a specialist under *Woodard.* [FN2]*Id.* Therefore, MCL 600.2169(1)(c) applies to this case. MCL 600.2169(1)(c) requires that if the defendant in a medical malpractice action is a general practitioner, the expert offering standard of care testimony against the defendant must have devoted a majority of the expert's professional time in the year preceding the date of the alleged malpractice to active clinical practice as a general practitioner or the instruction of students as a general practitioner.

> FN2. We observe, however, that the American Board of Medical Specialties does offer board certification in family practice. Therefore, unlike a medical doctor engaged in general practice, a medical doctor could become a specialist in family practice. Although defendant's business card refers to his practice as a family practice, he stated in his deposition that he would characterize his practice as general practice and that he did not "do family medicine."

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- N.W.2d ----                                                                 Page 4

--- N.W.2d ----, 2007 WL 2164870 (Mich.App.)
**(Cite as: --- N.W.2d ----)**

Defendant is an M.D. who is a general practitioner, and Dr. Werlinsky is a D.O. who is a board certified family practitioner. The definition of a "general practitioner" is " 'a medical practitioner whose practice is not limited to any specific branch of medicine." ' *Decker, supra* at 83, quoting *Random House Webster's College Dictionary* (1997). " Family practice" is defined as "medical specialization in general practice that requires additional training and leads to board certification." *Random House Webster's College Dictionary* (2001). We find that Dr. Werlinsky's practice fits under the definition of "general practice." Dr. Werlinsky testified that he does not limit his practice to a specific branch of medicine. Defendant's own standard of care expert, who was a family practitioner, testified in his deposition that there is a "large overlap" between family practice and general practice. Additionally, while defendant denied engaging in family practice in his deposition, he refers to his practice as a family practice on his business card. The practice of a family practitioner and a general practitioner are alike in that neither practice is limited to a specific branch of medicine. See *Decker, supra* at 83.For purposes of satisfying the requirements of MCL 600.2169, therefore, we hold that an expert who is a board certified family practitioner is qualified under MCL 600.2169(1)(c) to testify against a defendant doctor who is a general practitioner, as long as MCL 600.2169(1)(c)(i) or (ii) is also satisfied.[FN3] Accordingly, because Dr. Werlinsky was engaged in the general practice medicine, as a family practitioner, for the year preceding the date of the alleged malpractice, we conclude that he was qualified under MCL 600.2169(1)(c), and that plaintiff's affidavit of merit complied with MCL 600.2912d(1).

> FN3. However, we observe that the analysis changes if the expert witness is a general practitioner and the defendant is a doctor who is board certified in family medicine. The reason for this is that under *Woodard,* the defendant would be a specialist in family medicine. Therefore, MCL 600.2169(1)(a), not MCL 600.2169(1)(c), would apply. Under MCL

600.2169(1)(a), the defendant, as a board certified family practitioner, would be a specialist in family practice under *Woodard;* therefore, the expert must also be board certified in family medicine. A medical doctor who is a general practitioner therefore would not be qualified to testify against a board certified family practitioner under MCL 600.2169(1)(a).

Because plaintiff's affidavit of merit was compliant with the statute and both the affidavit and plaintiff's complaint were filed before the expiration of the period of limitations, the trial court erred in granting summary disposition in favor of defendant on the grounds that the period of limitations had expired. Additionally, because we conclude that plaintiff's affidavit of merit was proper, there is no need to address plaintiff's remaining arguments regarding the statute of limitations.

Plaintiff next argues that the trial court erred in granting summary disposition because plaintiff could not show causation. We agree with plaintiff that the trial court erred in granting summary disposition. Because there are genuine issues of material fact regarding the cause of the decedent's death, summary disposition was improper.

This Court reviews de novo a trial court's ruling on a motion for summary disposition. *Maskery v. Univ. of Michigan Bd of Regents,* 468 Mich. 609, 613;664 NW2d 165 (2003). A motion for summary disposition brought under MCR 2.116(C)(10) tests the factual support for a claim. *Dressel v. Ameribank,* 468 Mich. 557, 561;664 NW2d 151 (2003). In ruling on a motion for summary disposition under MCR 2.116(C)(10), the trial court may consider the pleadings, affidavits, depositions, admissions, and other admissible evidence submitted by the parties in the light most favorable to the nonmoving party. If the evidence does not establish a genuine issue of material fact, the moving party is entitled to a judgment as a matter of law. *Maiden v. Rozwood,* 461 Mich. 109, 120;597 NW2d 817 (1999).

"In an action alleging medical malpractice, the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- N.W.2d ----                                                                Page 5

--- N.W.2d ----, 2007 WL 2164870 (Mich.App.)
**(Cite as: --- N.W.2d ----)**

plaintiff has the burden of proving that he or she suffered an injury that more probably than not was proximately caused by the negligence of the defendant or defendants."MCL 600.2912a(2). " Proximate cause" is a term of art that encompasses both cause in fact and legal cause. *Craig v. Oakwood Hosp.,* 471 Mich. 67, 86;684 NW2d 296 (2004)."Generally, an act or omission is a cause in fact of an injury only if the injury could not have occurred without (or 'but for') that act or omission. "*Id.* at 87.Cause in fact may be established by circumstantial evidence, but the circumstantial evidence must not be speculative and must support a reasonable inference of causation. *Wiley v. Henry Ford Cottage Hosp.,* 257 Mich.App 488, 496;668 NW2d 402 (2003)." 'All that is necessary is that the proof amount to a reasonable likelihood of probability rather than a possibility. The evidence need not negate all other possible causes, but such evidence must exclude other reasonable hypotheses with a fair amount of certainty.' " *Skinner v. Square D Co.,* 445 Mich. 153, 166;516 NW2d 475 (1994), quoting 57A Am Jur 2d, Negligence, § 461, p 442. Summary disposition is not appropriate when the plaintiff offers evidence that shows "that it is more likely than not that, but for defendant's conduct, a different result would have obtained." *Dykes v. William Beaumont Hosp,* 246 Mich.App 471, 479 n 7;633 NW2d 440 (2001).

We conclude that there were genuine issues of material fact on the question of causation and that the trial court erred in granting defendant summary disposition on this ground. Although the medical examiner testified in his deposition that he believed the cause of the decedent's death was asthma with a contributing cause of a myocardial infarction, plaintiff presented expert testimony that the decedent's cause of death was a myocardial infarction. Defendant argues that plaintiff cannot establish causation because plaintiff's expert's theory of causation contradicts the findings of the medical examiner. However, the facts presented in this case are distinguishable from those considered by this Court in reaching its opinion in *Badalamenti v. William Beaumont Hospital-Troy,* 237 Mich.App 278;602 NW2d 854 (1999). In *Badalamenti,* this Court opined "that an expert's opinion is objectionable where it is based on assumptions that

are not in accord with the established facts."*Id.* at 286.The expert in *Badalamenti* based his opinion that the plaintiff was in cardiogenic shock only on his "skepticism" of an echocardiogram performed by another doctor. *Id.* at 287.In this case, plaintiff's expert testified that he did not disagree with the medical examiner's objective findings, but he disagreed with the medical examiner's interpretation of the findings given, in part, the decedent's clinical presentation. Although plaintiff's expert disagreed with the medical examiner regarding the decedent's cause of death, this disagreement does not contradict any established fact. Further, contrary to the findings of the trial court, plaintiff's expert's opinion was not impermissibly speculative. Thus, plaintiff's expert created a question of fact regarding whether plaintiff's heart condition caused her death. [FN4]Because the determination of questions of fact are the sole responsibility of the trier of fact, the trial court erred in granting summary disposition for defendant.

> FN4. This expert's testimony and that of plaintiff's standard of care expert also created questions of fact regarding whether defendant breached the standard of care and whether this breach caused the decedent harm.

We reverse the trial courts grant of summary disposition to defendant and remand for proceedings consistent with this opinion. We do not retain jurisdiction.

Mich.App.,2007.
Robins v. Garg
--- N.W.2d ----, 2007 WL 2164870 (Mich.App.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**14**

Westlaw.

Not Reported in N.W.2d, 2005 WL 2291732 (Mich.App.)
**(Cite as: Not Reported in N.W.2d)**

▷
Scalici v. Bank One, NA
Mich.App.,2005.
Only the Westlaw citation is currently available.
UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.
Court of Appeals of Michigan.
Paolo **SCALICI** and Victoria **Scalici**,
Plaintiffs-Appellants,
v.
**BANKONE**, NA and Amy Okoroafo,
Defendants-Appellees.
Theodore FORMAN, Thomas Fowler, Rodney
McGrain, Juanita Mcgrain, James A. Ropicky,
Susan **Scalici**, Bradley Wildberg, Kristan Wildberg,
Bruce Ollman, and Susan Ollman,
Plaintiffs-Appellants,
v.
**BANKONE**, NA and Amy Okoroafo,
Defendants-Appellees.
Terry PALAZZOLO, Jessee Bays, and Gary
Middleton, Plaintiffs-Appellants,
v.
**BANKONE**, NA and Amy Okoroafo,
Defendants-Appellees.
**No. 254632, 254633, 254634.**

Sept. 20, 2005.

Before: SMOLENSKI, P.J., and MURPHY and
DAVIS, JJ.

[UNPUBLISHED]
PER CURIAM.
**\*1** In these consolidated appeals, plaintiffs appeal
as of right the trial court's dismissal of their claims
with prejudice for failure to state a claim on which
relief could be granted. MCR 2.116(C)(8). We
affirm.

I. Facts and Procedural History

Plaintiffs' claims against defendants arose out of
their participation in an investment scheme with
Daniel Broucek, who was doing business under the
name of Pupler Distributing Company (Pupler).
Pursuant to the investment scheme, plaintiffs would
lend money to Pupler in exchange for a promissory
note and a post-dated check. Under the terms of the
promissory note, plaintiffs would receive the
principal amount of the loan along with a "financing
fee" on the maturity date of the loan. The checks
issued with the promissory notes were written for
the full amount of the principal plus the "financing
fee" and were post-dated to the maturity date of the
loan. The post-dated checks were drawn on Pupler's
account with defendant Bank One, NA (Bank One).
By November of 2002, Pupler's account with Bank
One was frozen and, after Broucek entered
involuntary bankruptcy, plaintiffs were left holding
worthless promissory notes and checks.

In February of 2003, plaintiffs filed their respective
suits against defendants. Plaintiffs claimed they
would not have "invested" with Pupler had it not
been for the misrepresentations of Bank One's
employees, including primarily the representations
of defendant Amy Okoroafo, who was the banking
center manager for one of Bank One's branches.
Based on the alleged misrepresentations and other
theories, plaintiffs argued defendants should be
liable for the losses plaintiffs sustained as a result of
investing in Pupler. In each case, Bank One
responded by filing a motion for a more definite
statement wherein it asked the court to require
plaintiffs to attach copies of the notes and checks
upon which plaintiffs based their claims, as required
by MCR 2.113(F)(1). After plaintiffs filed amended
complaints with copies of the promissory notes and,
in some cases, copies of the checks attached, Bank
One filed a motion for summary disposition under
MCR 2.116(C)(8).[FN1] In these motions, Bank One
argued plaintiffs' claims were based on losses
sustained after their criminally usurious loans
became uncollectible and, therefore, the claims
were unenforceable under Michigan's wrongful

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.W.2d, 2005 WL 2291732 (Mich.App.)
**(Cite as: Not Reported in N.W.2d)**

conduct rule. On July 10, 2003, the trial court held a joint hearing on this issue.[FN2] The trial court agreed that plaintiffs' claims were barred by the wrongful conduct rule and granted summary disposition in favor of defendants under MCR 2.116(C)(8). Plaintiffs then appealed as of right.

> FN1. In each case, Okoroafo filed a motion under MCR 2.116(C)(8), which relied upon Bank One's law and arguments.

> FN2. While the three cases were not consolidated until this appeal, see *Scalici v. Bank One,* unpublished order of the Court of Appeals, entered May 10, 2004 (Docket No 254632), all three were assigned to the same trial court and were handled jointly for judicial efficiency.

## II. Standards of Review

This Court reviews de novo the resolution of a summary disposition motion.*Corley v. Detroit Bd of Ed,* 470 Mich. 274, 277;681 NW2d 342 (2004). A motion under MCR 2.116(C)(8) tests the legal sufficiency of the complaint on the basis of the pleadings alone. *Id.;*MCR 2.116(G)(5). All well-pleaded factual allegations in support of the claim are accepted as true and construed in the light most favorable to the nonmoving party. *Adair v. Michigan,* 470 Mich. 105, 119;680 NW2d 386 (2004)."A motion under MCR 2.116(C)(8) may be granted only where the claims alleged are 'so clearly unenforceable as a matter of law that no factual development could possibly justify recovery. " ' *Maiden v. Rozwood,* 461 Mich. 109, 119;597 NW2d 817 (1999), quoting *Wade v. Dep't of Corrections,* 439 Mich. 158, 162;483 NW2d 26 (1992).

**\*2** This Court also reviews de novo the proper interpretation of a statute.*Macomb Co Prosecutor v. Murphy,* 464 Mich. 149, 157;627 NW2d 247 (2001) . This Court begins the interpretation of a statute by examining the language of the statute itself. *Id.* at 158.If the language is not ambiguous, the court shall not construe it, but rather will enforce it as written. *Id.* Where ambiguity exists, "this Court seeks to

effectuate the Legislature's intent through a reasonable construction, considering the purpose of the statute and the object sought to be accomplished. "*Id.* Furthermore, an act must be construed as a " whole to harmonize provisions and carry out the purpose of the Legislature."*Id.*

## III. Analysis

As a preliminary matter, we note that the wrongful conduct rule does not attack plaintiffs' prima facie cases, but rather seeks to foreclose plaintiffs from proceeding for reasons unrelated to their prima facie cases. For this reason, the wrongful conduct rule is properly understood to be an affirmative defense. *Campbell v. St John Hosp,* 434 Mich. 608, 615-616;455 NW2d 695 (1990). Normally, the defendant has the burden of establishing the existence of an affirmative defense. *Nationwide Mut Ins Co v. Quality Builders, Inc,* 192 Mich.App 643, 646;482 NW2d 474 (1992). However, where a complaint shows on its face that relief is barred by an affirmative defense, the trial court may dismiss the complaint for failing to state a claim on which relief can be granted. See *Rauch v. Day and Night Mfg Corp,* 576 F.2d 697, 702 (CA 6, 1978); see also, e.g., *Glazier v. Lee,* 171 Mich.App 216;429 NW2d 857 (1988) (granting summary disposition under MCR 2.116(C)(8) based on the wrongful conduct rule). In the present case, the promissory notes, which are the basis of plaintiffs' losses, were attached to their respective amended complaints and became part of the pleadings. See MCR 2.113(F)(2) . Consequently, the trial court could properly consider whether the wrongful conduct rule barred plaintiffs' claims when ruling on defendants' motions for summary disposition under MCR 2.116(C)(8). However, the relevant inquiry remains whether any factual development under the facts pleaded by plaintiffs could possibly justify recovery. *Maiden, supra* at 119.

### A. The Wrongful Conduct Rule

Under Michigan's wrongful conduct rule, a plaintiff's claim will be barred if it is based, in whole or in part, on the plaintiff's own illegal

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.W.2d, 2005 WL 2291732 (Mich.App.)
**(Cite as: Not Reported in N.W.2d)**

conduct.*Orzel v. Scott Drug Co,* 449 Mich. 550, 558;537 NW2d 208 (1995). This is true even where the defendant has participated equally in the illegal activity. *Id.* at 559.In *Manning v. Bishop of Marquette,* 345 Mich. 130, 133;76 NW2d 75 (1956) , our Supreme Court succinctly stated the rule: "Our doors are open to both the virtuous and the villainous. We do not, however, lend our aid to the furtherance of an unlawful project, nor do we decide, as between 2 scoundrels, who cheated whom the more."The Court in *Orzel* noted that the rationale behind the wrongful conduct rule is rooted in public policy considerations. *Orzel, supra* at 559.The Court explained,

*\*3* If courts chose to regularly give their aid under such circumstances, several unacceptable consequences would result. First, by making relief potentially available for wrongdoers, courts in effect would condone and encourage illegal conduct. Second, some wrongdoers would be able to receive a profit or compensation as a result of their illegal acts. Third, and related to the two previously mentioned results, the public would view the legal system as a mockery of justice. Fourth, and finally, wrongdoers would be able to shift much of the responsibility for their illegal acts to other parties. [*Id.* at 559-560 (citations omitted).]

However, the Court in *Orzel* also noted that the wrongful conduct rule is a general rule and that there are limitations and exceptions to its application.*Id.* at 561.

There are two limitations on the application of the wrongful conduct rule. First, the plaintiff's conduct must be mostly or entirely prohibited by a penal or criminal statute and must constitute sufficiently serious misconduct to warrant application of the wrongful conduct rule. *Id.* at 561.Where the plaintiff's conduct amounts to a violation of a safety statute, that violation will not be sufficient to bar his or her claim. *Id.* Second, "a sufficient causal nexus must exist between the plaintiff's illegal conduct and the plaintiff's asserted damages."*Id.* at 564.

In addition to these limitations, there are two exceptions that will preclude application of the wrongful conduct rule to bar a plaintiff's claims: the differing degrees of culpability exception and the

statutory basis for recovery exception. Under the first exception, where the "plaintiff has engaged in serious illegal conduct and the illegal conduct has proximately caused the plaintiff's injuries, a plaintiff may still seek recovery against the defendant if the defendant's culpability is greater than the plaintiff's culpability for the injuries...."*Id.* at 569.The second exception applies where the plaintiff alleges the defendant violated a statute, which, either explicitly or implicitly, allows the plaintiff to recover for injuries suffered as a result of the violation. *Id.* at 570.

B. The Application of the Wrongful Conduct Rule

Plaintiffs first argue that the trial court erred by granting summary disposition under MCR 2.116(C)(8) based on the wrongful conduct rule where facts could be developed that would demonstrate that the criminal usury statute, MCL 438.41, did not prohibit their conduct. Specifically, plaintiffs state, because the promissory notes did not mention an interest rate, but rather referred to a " financing fee" and because they thought they were dealing with a corporation, they could not be found to have knowingly charged simple interest in excess of 25% per year without being authorized or permitted by law to do so. Consequently, plaintiffs contend, the first requirement for application of the wrongful conduct rule could not be met. We disagree.

*\*4* Under MCL 438.41,
[a] person is guilty of criminal usury when, not being authorized or permitted by law to do so, he knowingly charges, takes or receives any money or other property as interest on the loan or forbearance of any money or other property, at a rate exceeding 25% at simple interest per annum or the equivalent rate for a longer or shorter period. Any person guilty of criminal usury may be imprisoned for a term not to exceed 5 years or fined not more than $10,000.00, or both.

Hence, according to its plain language, a person is guilty of violating MCL 438.41 when they charge, take or receive money or other property as interest on a loan, while knowing that the interest charged,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.W.2d                                                                          Page 4

Not Reported in N.W.2d, 2005 WL 2291732 (Mich.App.)
**(Cite as: Not Reported in N.W.2d)**

taken or received exceeded a simple interest rate of 25% per year.

In the present case, plaintiffs claim they were unaware that the "financing fee" referenced in the promissory notes attached to their amended complaints, constituted interest and, therefore, did not knowingly charge, take or receive simple interest in excess of 25% per year. We find this argument to be disingenuous. According to plain usage, a "fee" is "a sum charged or paid, as for professional services or for a privilege."*Random House Webster's College Dictionary* (1992). Likewise, "financing" is the "act of obtaining or furnishing funds for a purchase or enterprise."*Id.* Hence, in the context of these promissory notes, which clearly involve the lending of money,[FN3] the "financing fee" is a sum charged by the lender (i.e.plaintiffs) for the furnishing of funds to the borrower (i.e.Pupler). This is synonymous with the charging of interest on a loan. See *id.*(defining the word "interest" as "a sum paid or charged for the use of money or for borrowing money."). Furthermore, many of the promissory notes have a notation at the bottom that clearly identifies the portion of the payment that constitutes the repayment of principal and the portion that constitutes the payment of interest. Finally, while the notes do not directly state the applicable annual percentage rate, the fact that the rate of return invariably exceeded an annual rate of 25% was self-evident from the amounts listed on the notes. [FN4] Consequently, the promissory notes attached to the pleadings clearly indicate that plaintiffs knowingly charged, took or received interest on a loan at a rate exceeding 25% at simple interest per annum contrary to MCL 438.41.

> FN3. While plaintiffs repeatedly refer to these transactions as "investments", the promissory notes clearly state that Pupler will be in default if it fails to pay the principal and "financing fee" upon the maturity of the note. The use of the word principal contemplates the repayment of a loan.
>
> FN4. By way of example, in a note

executed on October 28, 2002, Pupler promised to pay plaintiff Susan Scalici $880,000 on November 14, 2002. The note identified $80,000 of the payment as the "financing fee." Hence, on its face the note purports to pay a 10% return on the principal amount over a loan period of 17 days. No reasonable person could be unaware that a 10% return over a period of 17 days amounted to an annual rate of return in excess of 25%.

Plaintiffs also state that they were unaware that Pupler was not a valid corporate entity when the notes were executed. Plaintiffs argue that, because they believed Pupler was a corporate entity and corporations are permitted by MCL 450.1275 to agree in writing to rates of interest in excess of the legal rate, the notes did not violate MCL 438.41. We disagree.

MCL 450.1275, which is part of the Business Corporation Act, MCL 450.1101*et seq,* states:
A domestic or foreign corporation, whether or not formed at the request of a lender or in furtherance of a business enterprise, may by agreement in writing, and not otherwise, agree to pay a rate of interest in excess of the legal rate and the defense of usury shall be prohibited.

**\*5** Under the plain meaning of this statute, one of the powers possessed by corporations is the power to agree to pay a rate of interest in excess of the legal rate. However, while the statute permits corporations to agree to pay potentially usurious interest, nothing within this language necessarily absolves the corporation's lenders of criminal liability under MCL 438.41. Furthermore, this grant of power is consistent with MCL 438.61, which creates exceptions to the usury statutes for loans made to a business entities. Under MCL 438.61(2), a limited class of lenders, such as banks, may lawfully charge a business entity any rate of interest, notwithstanding both the civil and criminal usury statutes.[FN5] Conversely, while MCL 438.61(3) does allow persons other than those identified in MCL 438.61(2) to charge a business entity an interest rate in excess of the civil usury statutes, it also provides that the interest rate

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.W.2d                                                    Page 5

Not Reported in N.W.2d, 2005 WL 2291732 (Mich.App.)
**(Cite as: Not Reported in N.W.2d)**

charged may not exceed the criminal usury limits. Thus, while corporations do have the power to agree to pay a rate in excess of the legal rate, only certain classes of lenders may actually charge a rate in excess of the rate provided by MCL 438.41 without incurring criminal liability. The provision for continued criminal liability under MCL 438.61(3) for persons who charge business entities an interest rate in violation of MCL 438.41 directly contradicts plaintiffs' contention that MCL 450.1275 removes plaintiffs' loans from operation of the criminal usury laws. Consequently, the trial court properly determined that plaintiffs violated MCL 438.41 and that this violation warranted application of the wrongful conduct rule.

> FN5. The civil usury statutes are MCL 438.31 and MCL 438.32. The criminal usury statutes are MCL 438.41 and MCL 438.42.

Plaintiffs next argue there was an insufficient causal nexus between the charging of interest in excess of 25% and their losses to warrant application of the wrongful conduct rule. Specifically, plaintiffs contend that their losses were incurred because Pupler was a bad investment and not because of the rate of interest charged. We disagree.

In order to bar a plaintiff from recovery under the wrongful conduct rule, the injury suffered " 'must be traceable to his own breach of the law and the breach must be an integral and essential part of his case." ' *Manning, supra* at 136, quoting *Meador v. Hotel Grover,* 193 Miss 392, 405, 406;9 So2d 782 (1942). In the present case, plaintiffs' losses directly resulted from their inability to collect the sums due on the promissory notes received from Pupler. While plaintiffs claim the notes are merely evidence of their "investment" in Pupler and that the actual losses were sustained because Pupler was not a sound investment, the reality is plaintiffs' entire case arises out of their decision to lend Pupler money, which loans Pupler was unable to repay. Indeed, plaintiffs cannot even establish their losses without the notes. In addition, plaintiffs' attempt to minimize the role the usurious interest rate played in the investment scheme by emphasizing the role of

Bank One's employees in convincing plaintiffs to loan the money to Pupler is unconvincing. Even accepting that Bank One's employees influenced plaintiffs' decisions to loan money to Pupler, a significant factor in any decision to loan money will be the rate of return. Given the staggeringly high rate of return for most of the notes, one can reasonably conclude that the rate of return was a significant motivational factor for plaintiffs. As the trial court aptly noted, "-a lot of money can be made if you're willing to trip over a few penal statutes along the way." Hence, we conclude that plaintiffs' claims are directly and causally related to their decision to engage in usurious lending. Therefore, there is a sufficient causal nexus between plaintiffs' illegal conduct and the losses suffered to warrant application of the wrongful conduct rule.

*6 Because it is clear from plaintiffs' pleadings that their losses are causally linked to their engagement in serious misconduct prohibited by a penal or criminal statute, the trial court properly concluded that the wrongful conduct rule applied to their claims.

C. The Exceptions to the Wrongful Conduct Rule

Plaintiffs next argue that, even if a penal or criminal statute prohibited their conduct and there were a causal connection between that conduct and their losses, their claims should not be barred because both exceptions to the wrongful conduct rule apply. Specifically, plaintiffs claim defendants' conduct is more culpable than their own and recovery is explicitly or implicitly permitted by statute. We disagree.

In discussing the nature of the culpability exception to the application of the wrongful conduct rule, the Court in *Orzel* noted that a plaintiff might still seek recovery against the defendant if the defendant's culpability is greater than the plaintiff's culpability for the injuries. *Orzel, supra* at 569.However, the Court explained that such cases arise when the plaintiff has acted under circumstances of oppression, imposition, hardship, undue influence, or great inequality of condition or age. *Id.* In interpreting this language, the Court in *Stopera v.*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.W.2d, 2005 WL 2291732 (Mich.App.)
**(Cite as: Not Reported in N.W.2d)**

*DiMarco,* 218 Mich.App 565, 571-572 n 5;554 NW2d 379 (1996) stated,

As we stressed in the preceding paragraph, this case involves a defendant who was significantly more culpable than the plaintiff. We consider this necessary for application of the culpability exception. In its discussion of the applicability of the exception, the *Orzel* Court listed only situations where a defendant was egregiously more at fault than a plaintiff, *Orzel, supra* at 569, without suggesting that a slight difference in the degree of culpability would be sufficient for its application. Further, to apply the culpability exception in cases where a defendant is only slightly more blameworthy would likely eviscerate the wrongful conduct rule entirely; presumably, a plaintiff will almost always be able to argue that, if the allegations of a complaint are proved, a defendant's misconduct will be shown to be at least somewhat greater than the plaintiff's....

Hence, in order for plaintiffs to assert this exception, defendants must be significantly more culpable than plaintiffs for the losses suffered by plaintiffs.

In the present case, plaintiffs cannot demonstrate that defendants' actions make them more culpable than plaintiffs, let alone significantly more culpable. First, as the trial court noted, plaintiffs pleaded that defendants' conduct was tortious whereas plaintiffs' conduct was clearly felonious. In addition, defendants' culpability is limited to their role in convincing defendants to participate in the Pupler investment scheme. However, the final decisions to enter into usurious loan agreements with Pupler and continue to reinvest with Pupler, were made by the individual plaintiffs. Therefore, while plaintiffs might be able to develop facts that demonstrate defendants' culpability, and may even be able to demonstrate that defendants were equally culpable, we conclude that there are no factual developments which could lead to the conclusion that defendants were significantly more culpable than plaintiffs. Therefore, the trial court properly rejected this exception to the application of the wrongful conduct rule.

**\*7** Plaintiffs next argue that there is a statutory basis

for recovery from defendants. Plaintiffs contend that, because MCL 438.32 prevents a usurious lender from recovering usurious interest charges, it must necessarily permit the recovery of the principal. Hence, MCL 438.32 implicitly permits recovery against defendants. We disagree.

In order for the statutory basis exception to apply, plaintiffs must allege defendants violated a statute, which, either explicitly or implicitly, allows them to recover for injuries suffered as a result of defendants' violation.*Orzel, supra* at 570.Yet plaintiffs have not pleaded that defendants violated a statute, which either explicitly or implicitly, permits them to recover their loan losses from defendants. Indeed, plaintiffs' argument relies solely on their own violations of the usury statutes to implicitly find authority for recovery of their losses. Even if reliance on their own violation of a statute were sufficient, because MCL 438.32 seeks to punish lenders who violate the civil usury law, we cannot conclude that the statutory purpose of MCL 438.32 was to protect the usurious lender's principal. See *Orzel, supra* at 571.Therefore, the statutory basis exception does not apply to plaintiffs' claims.

### D. Motion to Amend

Finally, plaintiffs argue that the trial court should have given them leave to amend their respective complaints to plead facts, which would establish the existence of greater culpability on the part of defendants. We decline to address this issue because it was not raised in the statement of the questions presented, *People v. Miller,* 238 Mich.App 168, 172;604 NW2d 781 (1999), and was inadequately briefed and, therefore, abandoned on appeal, *People v. Van Tubbergen,* 249 Mich.App 354, 365;642 NW2d 368 (2002). Furthermore, as noted above, we have determined that no factual development could establish that defendants were significantly more culpable for plaintiffs' losses than plaintiffs. Therefore, leave to amend would have been futile and was properly denied. *Hakari v. Ski Brule, Inc,* 230 Mich.App 352, 355;584 NW2d 345 (1998).

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.W.2d                                                                                Page 7

Not Reported in N.W.2d, 2005 WL 2291732 (Mich.App.)
**(Cite as: Not Reported in N.W.2d)**

### IV. Conclusion

The trial court properly determined plaintiffs'
claims against defendants, as pleaded, were based
on losses proximately caused by plaintiffs' own
criminal conduct and, therefore, were subject to the
wrongful conduct rule. In addition, the trial court
correctly determined that neither exception to the
wrongful conduct rule applied to plaintiffs' claims.
Consequently, the trial court did not err when it
dismissed plaintiffs' claims for failing to state a
claim on which relief can be granted.

Affirmed.

Mich.App.,2005.
Scalici v. Bank One, NA
Not Reported in N.W.2d, 2005 WL 2291732
(Mich.App.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**15**



Not Reported in N.W.2d

Not Reported in N.W.2d, 2005 WL 1959480 (Mich.App.)
**(Cite as: Not Reported in N.W.2d)**

Page 1

Shivers v. McMartin, Wasek and Associates, Inc.
Mich.App.,2005.
Only the Westlaw citation is currently available.
UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.
Court of Appeals of Michigan.
William **SHIVERS**, Plaintiff-Appellant,
v.
**MCMARTIN**, WASEK AND ASSOCIATES,
INC., Defendant-Appellee.
No. 251569.

Aug. 16, 2005.

Before: METER, P.J., and BANDSTRA and
BORRELLO, JJ.

[UNPUBLISHED]
PER CURIAM.
*1 Plaintiff appeals as of right from an order
granting defendant's motion for summary
disposition under MCR 2.116(C)(8). We affirm.

Plaintiff's first argues that the trial court erred in
granting summary disposition with respect to Count
I of the complaint. We disagree.

A trial court's ruling with regard to a motion for
summary disposition is reviewed de novo.
*Taxpayers of Michigan Against Casinos v State of
Michigan,* 471 Mich. 306, 317;685 NW2d 221
(2004). "A motion under MCR 2.116(C)(8) tests the
legal sufficiency of a claim[.]"*Mable Cleary Trust
v. Edward-Marlah Muzyl Trust,* 262 Mich.App 485,
491;686 NW2d 770 (2004). "Granting a motion
pursuant to MCR 2.116(C)(8) is proper when the
opposing party has failed to state a claim on which
relief can be granted, the claim is clearly
unenforceable as a matter of law, and no factual
development could support recovery. When
reviewing such a motion, only the pleadings are
considered; no documentary evidence may be

examined."*Id.* Factual allegations in support of the
claim are accepted as true and construed in the light
most favorable to the nonmoving party. *Adair v.
State,* 470 Mich. 105, 119;680 NW2d 386 (2004).
However, mere "[c]onclusory statements,
unsupported by factual allegations, are insufficient
to state a cause of action."*Churella v Pioneer State
Mutual Ins Co,* 258 Mich.App 260, 272;671 NW2d
125 (2003).

Count I of plaintiff's amended complaint alleged
that defendant violated its duties to the insured to
fairly and honestly service and adjust their property
loss claims. Plaintiff asserted that defendant
breached its duties by way of the following:
a. Misrepresentation of the terms and conditions of
property insurance contracts by advising the
insureds the market value was the actual cash value
within the meaning of the insurance policy.
b. Making payment to the insureds based on market
value rather than the coinsurance formula as set
forth in the insurance policies.
c. Misrepresenting the applicable Michigan Public
Acts covering file loss monies to be disbursed to the
municipal governments and the amounts forwarded
to such governmental units.
d. Misrepresenting that repairs or demolition must
be completed in order to recover the repair or
demolition costs up to the maximum amount of
coverage where the loss exceeds the amount of
coverage contrary to the Michigan Public Acts in
such case so made and provided.
e. Whether Defendant's conduct is subject to
liability under common law principles of
fraud/negligent misrepresentation.

Count I of plaintiff's amended complaint also
asserted that defendant actively concealed material
facts and misled consumers into believing that they
were receiving the actual benefits afforded by their
policies. Plaintiff asserted that "consumers relied on
the representations of the defendant to their
damages."Although plaintiff's amended complaint

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.W.2d, 2005 WL 1959480 (Mich.App.)
**(Cite as: Not Reported in N.W.2d)**

does not identify the precise legal theory underlying Count I, both parties described the claim as sounding in fraud/misrepresentation.

*2  To establish a claim of fraudulent misrepresentation, a plaintiff must show that: (1) the defendant made a material representation; (2) the representation was false; (3) when the defendant made the representation, the defendant knew that it was false, or made it recklessly, without knowledge of its truth as a positive assertion; (4) the defendant made the representation with the intention that the plaintiff would act upon it; (5) the plaintiff acted in reliance upon it; and (6) the plaintiff suffered damage. [*Bergen v. Baker,* 264 Mich.App 376;691 NW2d 770 (2004) (internal citations and quotations omitted).]

In addition to being based on false assertions, fraud may also be committed by suppression of facts and suppression of the truth. *Hord v Environmental Research Institute of Michigan,* 463 Mich. 399, 412; 617 NW2d 543 (2000).

To the extent that plaintiff's amended complaint presents a fraudulent misrepresentation or silent fraud theory, whether defendant owed plaintiff a duty to adjust his claim fairly and honestly-as argued by plaintiff-is irrelevant, because duty is not one of the elements of fraudulent misrepresentation. See *Mable Cleary Trust, supra* at 499-500.At any rate, plaintiff failed to state a claim for fraudulent misrepresentation or silent fraud. Indeed, although plaintiff asserted that "consumers relied on the representations of the defendant to their damages," he did not support this assertion with any factual allegations of reliance or damages. Mere conclusory statements, unsupported by factual allegations, are insufficient to state a cause of action. *Churella, supra* at 272.

Additionally, even when viewed in the light most favorable to the nonmoving party, plaintiff's pleadings indicate that he did not act in reliance on the alleged misrepresentations. Plaintiff's amended complaint states:
17. Plaintiff, as a result of Defendant's Acts as set forth herein above instituted a civil action as against his insurer Auto Owners Insurance Company for

recovery of the benefits due and owing him as a result of the file [sic] loss to his home located at 2215 Chippewa, Flint, Michigan.
18. That Plaintiff had to enlist the services of Attorney Douglas M. Philpott to process said suit in the Genesee Count Circuit Court, which concluded by a case evaluation award.

Plaintiff's pleadings indicate that he did not act in reliance on defendant's alleged misrepresentations, but rather rejected defendant's alleged misrepresentations, filed suit against Auto Owners Insurance Company to recover benefits, and accepted the case evaluation award.

It is possible that Count I of the complaint was based on negligent misrepresentation. To establish a claim of negligent misrepresentation, a plaintiff must prove that he " 'justifiably relied to his detriment on information prepared without reasonable care by one who owed the relying party a duty of care." ' *Mable Cleary Trust, supra* at 502, quoting *Law Offices of Lawrence J Stockler, PC v Rose,* 174 Mich.App 14, 30;436 NW2d 70 (1989). Even assuming, without deciding, that the tort of negligent misrepresentation applies to insurance adjusters, we hold that plaintiff failed to state a claim for negligent misrepresentation because plaintiff failed to allege that he "justifiably relied to his detriment on information prepared without reasonable care by one who owed the relying party a duty of care." *Mable Cleary Trust, supra* at 502.Indeed, as discussed above, plaintiff's pleadings do not sufficiently allege reliance and indicate that plaintiff did *not* justifiably rely to his detriment on the information prepared by defendant. Summary disposition was appropriate.

*3  Although the trial court granted summary disposition on different grounds than those asserted here, the trial court's decision granting summary disposition will be affirmed because the right result was reached. *Pro-Staffers, Inc v. Premier Mfg Support Servs,* 252 Mich.App 318, 322;651 NW2d 811 (2002).

Plaintiff next argues that the trial court erred in dismissing his claim based on MCL 445.911, a provision of the Michigan Uniform Consumer

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.W.2d                                                                           Page 3

Not Reported in N.W.2d, 2005 WL 1959480 (Mich.App.)
**(Cite as: Not Reported in N.W.2d)**

Protection Act (MCPA), MCL 445.901*et seq.* We disagree.

Even assuming that 2000 PA 432-which removed the ability of a plaintiff to bring a private cause of action under MCL 445.911 for misconduct made unlawful by Chapter 20 of the Insurance Code-should not be applied retroactively to bar plaintiff's claim, the claim nonetheless fails. Indeed, MCL 445.911(2) states that "[e]xcept in a class action, a person who *suffers loss* as a result of a violation of this act may bring an action to recover actual damages or $250.00, whichever is greater, together with reasonable attorneys' fees" (emphasis added). The pleadings in this case simply do not adequately allege a loss on the part of plaintiff that resulted from defendant's conduct. The complaint, in fact, indicates that plaintiff *refused to accept* the information set forth (in an allegedly unfair, deceptive, or unconscionable manner) by defendants and eventually accepted a case evaluation award in the lawsuit against Auto Owners Insurance Company. Under the circumstances, we conclude that plaintiff failed to establish a valid MCPA claim. We therefore affirm the trial court's grant of summary disposition, albeit on alternative grounds. *Pro-Staffers, supra* at 322.

Given our disposition of this case, we need not address the additional argument raised by plaintiff on appeal.

Affirmed.

Mich.App.,2005.
Shivers v. McMartin, Wasek and Associates, Inc.
Not Reported in N.W.2d, 2005 WL 1959480 (Mich.App.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# 16
# Part 1 of 3

Westlaw.

496 F.Supp.2d 1195                                                              Page 1

496 F.Supp.2d 1195
**(Cite as: 496 F.Supp.2d 1195)**

**H**
In re Williams Securities Litigation
N.D.Okla.,2007.

United States District Court,N.D. Oklahoma.
In re WILLIAMS SECURITIES LITIGATION.
This Document Pertains To: WCG Subclass.
**Nos. 02-cv-072-SPF-FHM, 02-cv-077-SPF-FHM,
02-cv-078-SPF-FHM, 02-cv-080-SPF-FHM,
02-cv-081-SPF-FHM, 02-cv-083-SPF-FHM,
02-cv-093-SPF-FHM, 02-cv-095-SPF-FHM,
02-cv-097-SPF-FHM, 02-cv-107-SPF-FHM,
02-cv-113-SPF-FHM, 02-cv-120-SPF-FHM,
02-cv-124-SPF-FHM, 02-cv-130-SPF-FHM,
02-cv-132-SPF-FHM, 02-cv-135-SPF-FHM,
02-cv-139-SPF-FHM, 02-cv-161-SPF-FHM,
02-cv-162-SPF-FHM, 02-cv-184-SPF-FHM,
02-cv-189-SPF-FHM, 02-cv-190-SPF-FHM,
02-cv-204-SPF-FHM, 02-cv-205-SPF-FHM,
02-cv-206-SPF-FHM, 02-cv-218-SPF-FHM,
02-cv-231-SPF-FHM, 02-cv-235-SPF-FHM,
02-cv-303-SPF-FHM, 02-cv-319-SPF-FHM.**

July 6, 2007.

**Background:** Buyers of securities issued by corporation engaged in fiber optic cable business brought securities fraud class action suit against corporation and its auditor under § 10(b), claiming failure to disclose undervaluation of key assets. Defendants moved for summary judgment.

**Holdings:** The District Court, Friot, J., held that:

(1) proposed expert testimony from witness who was not certified public accountant (CPA), regarding asset valuation, would be rejected due to witness' lack of experience in specific area and unreliability of methodology;

(2) inadmissibility of underlying testimony precluded admission of CPA's testimony that assets valuation was impermissibly understated;

(3) CPA testimony was inadmissible due to failure to make showing that fraud remained major factor in declining stock price of over class period;

(4) in absence of expert testimony, investors were unable to satisfy causality and damages requirements for § 10(b) action;

(5) assuming causality and damages requirements were satisfied, there were fact issues precluding summary judgment that § 10(b) was not violated; and

(6) auditor was not liable for violating § 10(b).

Judgment for defendants.

See, also, 2006 WL 2869537.
West Headnotes
**[1] Evidence 157 ⚖➔555.2**

157 Evidence
  157XII Opinion Evidence
    157XII(D) Examination of Experts
      157k555 Basis of Opinion
        157k555.2  k.  Necessity  and
Sufficiency. Most Cited Cases
To make the assessment of proposed expert testimony reliability, required by evidence rules and *Daubert* decision, a court having found that the expert possesses the requisite expertise, if expertise was challenged, and having determined that the proposed expert testimony fits the issues in the case, must determine whether the expert's conclusions are the product of (1) application of that expertise using recognized and supportable methodologies, (2) on the basis of adequate data which is (3) rationally tied to the opinions which purport to be based on that data. Fed.Rules Evid.Rules 104, 702, 28 U.S.C.A.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

496 F.Supp.2d 1195                                                                                        Page 2

496 F.Supp.2d 1195
**(Cite as: 496 F.Supp.2d 1195)**

**[2] Evidence 157 ☞555.4(5)**

157 Evidence
    157XII Opinion Evidence
        157XII(D) Examination of Experts
            157k555 Basis of Opinion
                157k555.4 Sources of Data
                    157k555.4(5) k.  Opinions of Others.
Most Cited Cases
Certified public accountant (CPA), retained by class
action plaintiffs in § 10(b) securities fraud suit to
give opinion whether sued corporation's financial
statements were prepared in accordance with
generally applicable accounting principles (GAAP),
and that CPA adhered to applicable professional
standards, could rely in part on work of expert who
was not CPA, as to whether one of corporation's
assets had been impaired. Securities Exchange Act
of 1934, § 10(b), 15 U.S.C.A. § 78j(b).

**[3] Evidence 157 ☞540**

157 Evidence
    157XII Opinion Evidence
        157XII(C) Competency of Experts
            157k540 k. Conduct of Business, Custom,
or Usage. Most Cited Cases
Expert, qualified to make general discounted cash
flow analysis, lacked specific industry knowledge
and experience to satisfy *Daubert* and federal
evidence rule requirements for providing analysis of
impairment of fiber optic cable assets, for use in
claim that corporation submitted knowingly false
financial statements, in violation of § 10(b).
Securities Exchange Act of 1934, § 10(b), 15
U.S.C.A. § 78j(b); Fed.Rules Evid.Rule 702, 28
U.S.C.A.

**[4] Evidence 157 ☞555.2**

157 Evidence
    157XII Opinion Evidence
        157XII(D) Examination of Experts
            157k555 Basis of Opinion
                157k555.2    k.    Necessity    and
Sufficiency. Most Cited Cases
Expert's proposed analysis of asset impairment was
inadmissible due to unreliability, in suit alleging
that corporation providing fiber optic networks

misrepresented its financial condition in violation of
§ 10(b); analysis did not take into account
corporation's financial plan, and did not consider
treatment of entire class of fiber optics when
concentrating on one type. Securities Exchange Act
of 1934, § 10(b), 15 U.S.C.A. § 78j(b); Fed.Rules
Evid.Rule 702, 28 U.C.C.A.

**[5] Evidence 157 ☞540**

157 Evidence
    157XII Opinion Evidence
        157XII(C) Competency of Experts
            157k540 k. Conduct of Business, Custom,
or Usage. Most Cited Cases
Certified public accountant (CPA) was qualified to
give expert testimony that corporation, alleged to
have committed securities fraud in violation of §
10(b), was in violation of covenant, in loan
agreement, that it maintain specified earnings
before interest, taxes, depreciation and amortization
(EBITDA), despite claim that determination
required interpretation of contract that was outside
of CPA's expertise. Securities Exchange Act of
1934, § 10(b), 15 U.S.C.A. § 78j(b); Fed.Rules
Evid.Rule 702, 28 U.S.C.A.

**[6] Evidence 157 ☞555.2**

157 Evidence
    157XII Opinion Evidence
        157XII(D) Examination of Experts
            157k555 Basis of Opinion
                157k555.2     k.     Necessity     and
Sufficiency. Most Cited Cases
Exclusion for unreliability, under federal evidence
rule and *Daubert* decision, of underlying expert
testimony that certain assets of corporation engaged
in fiber optic cable business were impaired,
precluded certified public accountant (CPA) from
giving expert testimony, in § 10(b) securities fraud
action, that corporation failed to write down assets
in question when preparing financial statements,
committing securities fraud in violation of § 10(b).
Securities Exchange Act of 1934, § 10(b), 15
U.S.C.A. § 78j(b); Fed.Rules Evid.Rule 702, 28
U.S.C.A.

**[7] Evidence 157 ☞555.5**

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

496 F.Supp.2d 1195                                                    Page 3

496 F.Supp.2d 1195
(Cite as: 496 F.Supp.2d 1195)

157 Evidence
   157XII Opinion Evidence
      157XII(D) Examination of Experts
         157k555 Basis of Opinion
            157k555.5 k. Cause and Effect. Most Cited Cases
Proposed expert testimony, in § 10(b) securities fraud class action against corporation supplying fiber optic cable, as to losses allegedly sustained by investors due to nondisclosure of need to write down value of major assets, was inadmissible due to failure to make showing that fraud was continuing to be major factor causing prices of stock to be higher than they otherwise would have been throughout the class period, during which there was sharp general decline in value of stock and bonds, and failure to adequately consider downward pricing pressure caused by industry difficulties and meltdown of telecommunications securities market. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b); Fed.Rules Evid.Rule 702, 28 U.S.C.A.

**[8] Evidence 157 ☞555.9**

157 Evidence
   157XII Opinion Evidence
      157XII(D) Examination of Experts
         157k555 Basis of Opinion
            157k555.9 k. Damages. Most Cited Cases
Expert testimony regarding damages from stock investments was inadmissible, in securities fraud class action suit claiming that supplier of communications cable violated § 10(b) by failing to disclose need to write down value of critical assets, when market had already taken into account supplier's problems with cables as of date of first disclosure by supplier, so that problem was already reflected in price at time of alleged first disclosure, and first class action suit was filed on day of disclosure. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b); Fed.Rules Evid.Rule 702, 28 U.S.C.A.

**[9] Evidence 157 ☞555.9**

157 Evidence
   157XII Opinion Evidence

157XII(D) Examination of Experts
   157k555 Basis of Opinion
      157k555.9 k. Damages. Most Cited Cases
Expert testimony regarding damages from corporate notes investments was inadmissible, in securities fraud class action suit claiming that supplier of communications cable violated § 10(b) by failing to disclose need to write down value of critical assets, when expert had conducted no event study, analyzing factors other than fraud that could have affected price of notes. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b); Fed.Rules Evid.Rule 702, 28 U.S.C.A.

**[10] Securities Regulation 349B ☞60.47**

349B Securities Regulation
   349BI Federal Regulation
      349BI(C) Trading and Markets
         349BI(C)7 Fraud and Manipulation
            349Bk60.43 Grounds of and Defenses to Liability
            349Bk60.47 k. Causation; Existence of Injury. Most Cited Cases

**Securities Regulation 349B ☞60.61**

349B Securities Regulation
   349BI Federal Regulation
      349BI(C) Trading and Markets
         349BI(C)7 Fraud and Manipulation
            349Bk60.60 Evidence
            349Bk60.61 k. In General; Admissibility. Most Cited Cases
Determination that supporting expert testimony was inadmissible, under standards imposed by *Daubert* decision and federal procedure rule, precluded satisfaction of loss causation and damages requirements for stating claim that corporation supplying fiberoptic cable committed securities fraud, in violation of § 10(b), when it did not disclose need to write down value of critical assets. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b).

**[11] Securities Regulation 349B ☞60.28(13)**

349B Securities Regulation

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

496 F.Supp.2d 1195

496 F.Supp.2d 1195
(Cite as: 496 F.Supp.2d 1195)

Page 4

349BI Federal Regulation
   349BI(C) Trading and Markets
     349BI(C)7 Fraud and Manipulation
      349Bk60.17 Manipulative, Deceptive
or Fraudulent Conduct
        349Bk60.28 Nondisclosure; Insider
Trading
        349Bk60.28(10) Matters to Be
Disclosed
        349Bk60.28(13) k. Particular
Matters. Most Cited Cases
There was no § 10(b) securities fraud liability when
corporation providing fiber optic cable failed to
disclose that certain of its employees received
shares or options to purchase shares in initial public
offerings (IPOs) of companies that were
corporation's strategic partners, when nondisclosure
occurred before beginning of class period.
Securities Exchange Act of 1934, § 10(b), 15
U.S.C.A. § 78j(b).

**[12] Federal Civil Procedure 170A ☞2511**

170A Federal Civil Procedure
   170AXVII Judgment
     170AXVII(C) Summary Judgment
      170AXVII(C)2 Particular Cases
        170Ak2511 k. Securities Cases in
General. Most Cited Cases
Material issues of fact, as to whether spokespersons
of corporation distributing to its shareholders shares
of subsidiary corporation carrying on fiber optic
cable business knew statements regarding benefits
to come from separating business were false,
precluded summary judgment that statements did
not constitute securities fraud under § 10(b).
Securities Exchange Act of 1934, § 10(b), 15
U.S.C.A. § 78j(b).

**[13] Federal Civil Procedure 170A ☞2511**

170A Federal Civil Procedure
   170AXVII Judgment
     170AXVII(C) Summary Judgment
      170AXVII(C)2 Particular Cases
        170Ak2511 k. Securities Cases in
General. Most Cited Cases
Material issues of fact, as to whether claims of
technology advancements were misleading, rather

than constituting nonactionable puffing, precluded
summary judgment that corporation supplying fiber
optic cable committed securities fraud in violation
of § 10(b). Securities Exchange Act of 1934, §
10(b), 15 U.S.C.A. § 78j(b).

**[14] Federal Civil Procedure 170A ☞2511**

170A Federal Civil Procedure
   170AXVII Judgment
     170AXVII(C) Summary Judgment
      170AXVII(C)2 Particular Cases
        170Ak2511 k. Securities Cases in
General. Most Cited Cases
Material issues of fact, as to whether spokespersons
knew statements they were making about increased
industry demand for fiber optic bandwidth, position
of corporation supplying cable to achieve goals,
success in attracting new customers, and funding
strategy were not true, precluded summary
judgment that they did not commit securities fraud
under § 10(b). Securities Exchange Act of 1934, §
10(b), 15 U.S.C.A. § 78j(b).

**[15] Federal Civil Procedure 170A ☞840**

170A Federal Civil Procedure
   170AVII Pleadings and Motions
     170AVII(E) Amendments
      170Ak839 Complaint
        170Ak840 k. Time for Amendment.
Most Cited Cases
Investors bringing § 10(b) securities fraud class
action claim against corporation, alleging wrongful
nondisclosure of overvalued assets used in its fiber
optic cable business, could amend complaint, at
summary judgment stage, after discovery had
closed, to allege that spokespersons' assertions that
separation of cable business from other businesses
would be beneficial were false, even though specific
comments were not included in original complaint;
comments in question were similar to others that
were included, and corporation was not prejudiced
by being required to defend against them.
Securities Exchange Act of 1934, § 10(b), 15
U.S.C.A. § 78j(b); Fed.Rule Civ.Proc.Rule 15(a),
28 U.S.C.A.

**[16] Federal Civil Procedure 170A ☞2511**

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

496 F.Supp.2d 1195                                                                    Page 5

496 F.Supp.2d 1195
(Cite as: 496 F.Supp.2d 1195)

170A Federal Civil Procedure
   170AXVII Judgment
      170AXVII(C) Summary Judgment
         170AXVII(C)2 Particular Cases
            170Ak2511 k. Securities Cases in
General. Most Cited Cases
Material issues of fact, as to whether defendants
knew or recklessly disregarded falsity of statements
made by corporation engaged in fiber optic cable
business, regarding spin off of business using
overvalued assets, quality of its network, and
financial expectations of cable business, precluded
summary judgment on securities fraud claim under §
10(b). Securities Exchange Act of 1934, § 10(b),
15 U.S.C.A. § 78j(b).

**[17] Federal Civil Procedure 170A ☞2511**

170A Federal Civil Procedure
   170AXVII Judgment
      170AXVII(C) Summary Judgment
         170AXVII(C)2 Particular Cases
            170Ak2511 k. Securities Cases in
General. Most Cited Cases
Material issues of fact, as to whether corporation
failed to disclose it was in violation of its debt
covenants, and its auditor failed to ascertain and
report violation, precluded summary judgment that
corporation and auditor committed securities fraud
under § 10(b). Securities Exchange Act of 1934, §
10(b), 15 U.S.C.A. § 78j(b).

**[18] Securities Regulation 349B ☞60.30**

349B Securities Regulation
   349BI Federal Regulation
      349BI(C) Trading and Markets
         349BI(C)7 Fraud and Manipulation
            349Bk60.17 Manipulative, Deceptive
or Fraudulent Conduct
               349Bk60.30 k. Conduct of
Accountants, Attorneys or Other Professionals.
Most Cited Cases
Auditor, sued for securities fraud under § 10(b) in
connection with its audit of corporation selling fiber
optic cable, was not required to modify audit
opinion language to indicate doubt as to whether
corporation could continue as going concern, when
corporation continued as going concern for one year

following audit report. Securities Exchange Act of
1934, § 10(b), 15 U.S.C.A. § 78j(b).

**[19] Securities Regulation 349B ☞60.45(3)**

349B Securities Regulation
   349BI Federal Regulation
      349BI(C) Trading and Markets
         349BI(C)7 Fraud and Manipulation
             349Bk60.43 Grounds of and Defenses
to Liability
               349Bk60.45 Scienter, Intent,
Knowledge, Negligence or Recklessness
                  349Bk60.45(3) k. Accountants,
Attorneys, Underwriters and Brokers. Most Cited
Cases
In order to establish scienter of accountants, in §
10(b) securities fraud case, based on recklessness,
there must be showing that accounting practices
were so deficient that audit amounted to no audit at
all, or an egregious refusal to see the obvious, or to
investigate the doubtful, or that accounting
judgments which were made were such that no
reasonable accountant would have made same
decisions if confronted with same facts. Securities
Exchange Act of 1934, § 10(b), 15 U.S.C.A. §
78j(b).

**[20] Securities Regulation 349B ☞60.45(3)**

349B Securities Regulation
   349BI Federal Regulation
      349BI(C) Trading and Markets
         349BI(C)7 Fraud and Manipulation
             349Bk60.43 Grounds of and Defenses
to Liability
               349Bk60.45 Scienter, Intent,
Knowledge, Negligence or Recklessness
                  349Bk60.45(3) k. Accountants,
Attorneys, Underwriters and Brokers. Most Cited
Cases
Scienter requirement for securities fraud case, under
§ 10(b), was not satisfied in suit alleging that
accountants auditing supplier of fiber optic
improperly certified financial statements, when
there was mere disagreement between accountants
as to proper treatment, or at most negligence on part
of accountant, and accountant's work did not begin
to approach "no audit at all" standard for finding of

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

496 F.Supp.2d 1195
**(Cite as: 496 F.Supp.2d 1195)**

scienter. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b).

*1199 Behram Viraf Parekh, Yourman Alexander & Parekh, Leigh A. Parker, Weiss & Yourman, Brian Barry, Jill Levine, Brian Barry Law Office, Los Angeles, CA, Dael Cohen, Jared Specthrie, Joshua H. Vinik, Kent A. Bronson, Matthew A. Kupillas, Samuel H. Rudman, U. Seth Ottensoser, Jared Specthrie, Milberg Weiss LLP, Emily C. Komlossy, Lynda J. Grant, Labaton Sucharow & Rudoff LLP, Eric James Belfi, Marvin Lawrence Frank, Murray Frank & Sailer LLP, Fred Taylor Isquith, Gregory Mark Nespole, Jeffrey G. Smith, Michael Jaffe, Wolf Haldenstein Adler Freeman & Herz, Samuel Kenneth Rosen, Harwood Feffer LLP, New York City, James Rouse Hicks, Ronald Joseph Saffa, Morrel Saffa Craige Hicks Barnhart & Brunton, William Walker O'Connor, Norman Wohlgemuth Chandler & Dowdell, Gerald Joseph Lovoi, Tulsa, OK, Cari Campen Laufenberg, Laurie Bernice Ashton, Keller Rohrback LLP, Phoenix, AZ, George Patrick O'Hara, Sr, Whitten Nelson McGuire Terry & Roselius, Oklahoma City, OK, Michael I. Behn, Behn & Wyetzner Chartered, William Woods Thomas, Futterman & Howard Chtd., Chicago, IL, Andrew Michael Schatz, Schatz & Nobel PC, Hartford, CT, John G. Emerson, Jr., Emerson Poynter LLP, Little Rock, AR, David B. Kahn, David B. Kahn & Associates Ltd, Northfield, IL, Jerold B. Hoffman, Hoffman & Edelson LLC, Doylestown, PA, Michael Burrage, Burrage Law Firm, Durant, OK, for Plaintiffs.

Jeremy J. Brandon, John Turner, Jonathan Bridges, William C. Carmody, Susman Godfrey LLP, Dallas, TX, for Plaintiffs/Movants.

Charles Robert Burton, IV, R. Thomas Seymour, Seymour Law Firm, Tulsa, OK, for Plaintiffs/Intervenor Plaintiff/Movants.

Samuel Philips Sporn, Schoengold Sporn Laitmain & Lometti PC, New York City, for Intervenor Plaintiff/Movants.

Alex Anton Goldberg, Williams Companies Inc, Graydon Dean Luthey, Jr., Stephanie Ann Horton, Sarah Jane Gillett, Hall Estill Hardwick Gable Golden & Nelson, Gerald Lee Jackson, James L. Kincaid, Michael James Gibbens, Victor Eric Morgan, Christopher Benton Woods, Susan E.

Huntsman, Michael Robert Pacewicz, Crowe & Dunlevy, Frederic Dorwart, John Daniel Clayman, Fred Dorwart Lawyers, Tulsa, OK, Darren L. McCarty, Crews Shepherd & McCarty LLP, Ralph I. Miller, Vance L. Beagles, Yolanda Cornejo Garcia, Weil Gotshal & Manges LLP, Dallas, TX, Ethan D. Dettmer, Gibson Dunn & Crutcher, Peter Allen Wald, Latham & Watkins LLP, San Francisco, CA, Joseph Peter Busch, III, Meryl L. Young, *1200 Wayne W. Smith, Gibson Dunn & Crutcher LLP, Irvine, CA, Sally A. Berens, Timothy K. Roake, Gibson Dunn & Crutcher LLP, Palo Alto, CA, Patrick Michael Ryan, Phillip Gardner Whaley, Grant M. Lucky, Ryan Whaley Coldiron and Shandy PC, Mary H. (Molly) Tolbert, Charles B. Goodwin, Mack Jay Morgan, III, Crowe & Dunlevy, Timothy James Bomhoff, McAfee & Taft, Brooks Allen Richardson, Jay Patrick Walters, Warren Franklin Bickford, IV, John Barnes Heatly, Fellers Snider Blankenship Bailey & Tippens, Oklahoma City, OK, Charles W. Cox, Ethan J. Brown, Jamie Lynne Wine, Jill M. Ray, Miles N. Ruthberg, Latham & Watkins, Los Angeles, CA, Christopher Harris, Robert J. Malionek, Latham & Watkins, Israel Dahan, Jonathan M. Hoff, Cadwalader Wickersham & Taft, New York City, Paul V. Konovalov, Latham & Watkins, Costa Mesa, CA, for Defendants.

Sheila Miller Bradley, Tony Michael Graham, Graham & Freeman PLLC, Tulsa, OK, for Intervenor.

Scott Alan Graham, Seymour Law Firm, Charles Greenough, Reuben Davis, Boone Smith Davis Hurst & Dickman, Scott Anthony Troy, Tulsa, OK, Stuart L. Berman, Schiffrin & Barroway LLP, Radnor, PA, William Bernard Federman, Federman & Sherwood, Joe Earl Edwards, Joel W. Harmon, Thomas Pitchlynn Howell, IV, Day Edwards Propester & Christensen, John E. Barbush, PC, Oklahoma City, OK, Michael T. Fantini, Berger & Montague PC, Philadelphia, PA, Gregory J. Myers, Lockridge Grindal Nauen PLLP, Minneapolis, MN, Edward Frank Siegel, Siegel & Associates, Cleveland, OH, for Movants.

FRIOT, District Judge.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

496 F.Supp.2d 1195                                                    Page 7

496 F.Supp.2d 1195
**(Cite as: 496 F.Supp.2d 1195)**

Table of
Contents

| | | | |
|---|---|---|---|
| I. | Introduction. | | .1201 |
| | A. | Preliminary matters. | .1201 |
| | B. | The Daubert and summary judgment record. | .1204 |
| II. | Factual Background. | | .1204 |
| III. | Procedural History. | | .1227 |
| IV. | Summary of the claims of the WCG Subclass. | | .1229 |

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

496 F.Supp.2d 1195
**(Cite as: 496 F.Supp.2d 1195)**

|   |   |   |   |
|---|---|---|---|
| A. | Rule 10(b) and Rule 10b-5 Claims -Basic Elements. | .1229 | |
| B. | Section 20(a) Claims -Basic Elements. | .1229 | |
| V. | The Daubert Motions. | .1230 | |
| A. | The general framework for Daubert analysis in this case. | .1230 | |
| B. | Qualifications. | .1232 | |
| C. | Reliability. | .1233 | |
| D. | The Daubert challenges with respect to Messrs. Mathis and Mintzer. | .1235 | |

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

496 F.Supp.2d 1195                                                          Page 9

496 F.Supp.2d 1195
**(Cite as: 496 F.Supp.2d 1195)**

|   |   |   |   |
|---|---|---|---|
| 1. | The division of labor between Messrs. Mathis and Mintzer with respect to FAS 121 impairment analysis. | .1238 | |
| 2. | The experts' methodology vs. the methodology the accountants were required to employ in their audit-related work. | .1239 | |
| 3. | Daubert analysis-proposed expert testimony of H. Sean Mathis. | .1242 | |
| | a. | Qualifications. | .1242 |
| | b. | Reliability. | .1245 |

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

496 F.Supp.2d 1195                                                                Page 10

496 F.Supp.2d 1195
**(Cite as: 496 F.Supp.2d 1195)**

|   |   |   |   |   |
|---|---|---|---|---|
| 4. | Daubert analysis-proposed expert testimony of Andrew M. Mintzer. | .1248 | | |
| | a. | Qualifications. | .1249 | |
| | b. | Reliability. | .1249 | |
| E. | Daubert analysis-proposed expert testimony of Dr. Blaine Nye. | .1252 | | |
| 1. | Dr. Nye's three damage scenarios. | .1253 | | |
| | a. | Scenario 1. | .1253 | |
| | | (i) | General description of Scenario 1. | .1253 |
| | | (ii) | Corrective disclosures-Scenario 1. | .1256 |

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

496 F.Supp.2d 1195                                                      Page 11

496 F.Supp.2d 1195
**(Cite as: 496 F.Supp.2d 1195)**

| | | | |
|---|---|---|---|
| b. | Scenario 2. | .1258 | |
| c. | Alternative Scenario 2. | .1260 | |
| 2. | Qualifications. | .1261 | |
| 3. | Reliability. | .1261 | |
| a. | The loss causation requirement. | .1262 | |
| | (i) | Loss causation-basic rules. | .1262 |
| | (ii) | Loss causation-limits of the doctrine. | .1264 |
| | (iii) | Loss causation-materialization of the risk. | .1265 |
| b. | The Daubert challenge as to Dr. Nye's Scenario 1 (common stock). | .1266 | |

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

496 F.Supp.2d 1195
**(Cite as: 496 F.Supp.2d 1195)**

c.  The Daubert challenge as to Dr. Nye's Scenario 2 (common stock).  .1267

    (i)  Corrective disclosures on or after January 29, 2002.  .1267

    (ii) The constant percentage inflation approach.  .1269

d.  The Daubert challenge as to Dr. Nye's Alternative Scenario 2 (common stock).  .1270

e.  The Daubert challenge with respect to the notes.  .1271

VI.  The Motions for Summary Judgment.  .1275

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

496 F.Supp.2d 1195                                                          Page 13

496 F.Supp.2d 1195
**(Cite as: 496 F.Supp.2d 1195)**

| A. | The Williams Companies, Inc. and Keith E. Bailey's Motion for Partial Summary Judgment on Alleged Misstatements and Omissions Made Before WCG's Spin-Off from Williams. | .1276 |
|----|-------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------|-------|
| B. | Motion of the Williams Companies, Inc. and Keith E. Bailey for Partial Summary Judgment on Alleged Misstatements or Omissions Made After WCG's Spin-Off from Williams. | .1283 |
| C. | Defendant Ernst & Young LLP's Motion for Summary Judgment. | .1285 |

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

496 F.Supp.2d 1195

Page 14

496 F.Supp.2d 1195
**(Cite as: 496 F.Supp.2d 1195)**

| | | | |
|---|---|---|---|
| | 1. | Material misstatements or omissions. | .1286 |
| | 2. | Scienter as to E & Y. | .1288 |
| D. | | WCG Defendants' Motion for Summary Judgment. | .1290 |
| | 1. | WCG's contentions. | .1290 |
| | 2. | Plaintiffs' response to WCG's motion. | .1292 |
| VII. | Conclusion. | | .1295 |

**\*1201 I.** *Introduction.*

A. *Preliminary matters.* These thirty consolidated securities fraud actions involve two subclasses of plaintiffs. One of the subclasses (the WMB Subclass) consists of purchasers of securities issued by Williams Companies, Inc. The other subclass (the WCG Subclass) consists of purchasers of common stock and notes issued by Williams Communications Group, Inc. The claims of the WMB Subclass have been settled. The remaining claims, asserted by the WCG Subclass, are traceable to the rise and fall of Williams Communications Group, Inc., and arise under §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 and Rule 10b-5, promulgated thereunder. *See, generally, In re Williams Securities Litigation,* 339 F.Supp.2d 1206 (N.D.Okla.2003).

Investors who bought WCG [FN1] stock during the class period bought into an industry meltdown of historic proportions. The defendants maintain, correctly, that the \*1202 plaintiffs are not entitled to insurance against improvident investment choices.

The plaintiffs, having convincingly demonstrated that the views expressed privately by members of senior management of WMB and WCG belied their rosy public statements about WCG's prospects, maintain, correctly, that they are entitled to present their claims to a jury if they can make a threshold showing of triable issues with respect to the contested elements of their securities fraud claims.

The task now before the court is to determine whether plaintiffs have marshaled record evidence and expert testimony sufficient to survive (i) the defendants' Daubert challenges to the proposed testimony of plaintiffs' expert witnesses, and (ii) the defendants' related motions for summary judgment.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

496 F.Supp.2d 1195                                                    Page 15

496 F.Supp.2d 1195
(Cite as: 496 F.Supp.2d 1195)

FN1. In this Memorandum Opinion, The Williams Companies, Inc. is referred to as WMB. WMB and defendant Keith E. Bailey are referred to as the WMB defendants. Williams Communications Group, Inc. is referred to as WCG. The defendants (Howard E. Janzen et al.) who are former officers or directors of WCG are referred to as the WCG defendants. The defendant Ernst & Young LLP is referred to as E & Y.

The following motions are before the court:

Motion of Defendant Ernst & Young LLP for Summary Judgment, filed April 14, 2006 (doc. no. 1027);

Motion of The Williams Companies, Inc. and Keith E. Bailey for Partial Summary Judgment on Alleged Misstatements or Omissions Made *After* WCG's Spin-off from Williams, filed April 14, 2006 (doc. no. 1050);

The Williams Companies, Inc. and Keith E. Bailey's Motion for Partial Summary Judgment on Alleged Misstatements and Omissions Made *Before* WCG's Spin-off from Williams, filed April 14, 2006 (doc. no. 1060);

WCG Defendants' Motion for Summary Judgment, filed April 14, 2006 (doc. no. 1092);

WCG Defendants' Motion to Exclude the Report and Testimony of Plaintiffs' Expert Blaine F. Nye, filed April 14, 2006 (doc. no. 1103);

Defendant Ernst & Young's Motion to Exclude the Testimony and Report of Plaintiffs' Expert Blaine F. Nye, filed May 16, 2006 (doc. no. 1297);

Motion of The Williams Companies, Inc. and Keith E. Bailey to Exclude Testimony of Plaintiffs' Proposed Expert Witness Blaine F. Nye (doc. no. 1316), and Joinder in WCG Defendants' Motion to Exclude the Report and Testimony of Plaintiffs' Expert Blaine F. Nye (doc. no. 1317), filed May 18, 2006;

Defendant Ernst & Young LLP's Motion to Exclude H. Sean Mathis's Testimony and Evidence Under the Standards Established in Daubert and Kumho Tire, filed August 4, 2006 (doc. no. 1433);

Defendant Ernst & Young LLP's Motion to Exclude Portions of the Testimony and Report of Plaintiffs' Expert Andrew Mintzer Under the Standards Established in Daubert and Kumho Tire, filed August 4, 2006 (doc. no. 1436);

WCG Individual Defendants' Motion to Exclude Portions of Andrew Mintzer's Expert Testimony and Report, filed August 4, 2006 (doc. no. 1437);

Motion of The Williams Companies, Inc. and Keith E. Bailey to Exclude Portions of the Testimony and Report of Plaintiffs' Expert Andrew Mintzer, filed August 4, 2006 (doc. no. 1445);

Defendant Ernst & Young LLP's Joinder in WCG Defendants' Motion to Exclude the Report and Testimony of Plaintiffs' Expert Rick Lawrence, filed August 4, 2006 (doc. no. 1447);

WCG Plaintiffs' Motion to Exclude the Reports and Testimony of Defendants' Expert Eric P. Evans, filed August 4, 2006 (doc. no. 1448);

WCG Plaintiffs' Motion to Exclude the Reports and Testimony of Defendants' Expert William W. Holder, filed August 4, 2006 (doc. no. 1450);

*1203 WCG Individual Defendants' Motion to Exclude the Report and Testimony of Plaintiffs' Expert H. Sean Mathis, filed August 4, 2006 (doc. no. 1451);

Joinder of The Williams Defendants to Motions and Supporting Briefs Filed by Ernst & Young LLP and the WCG Individual Defendants, filed August 4, 2006 (doc. no. 1453);

WCG Plaintiffs' Motion to Exclude the Reports and Testimony of Defendants' Expert Thomas J. Mangold, filed August 4, 2006 (doc. no. 1455);

WCG Defendants' Motion to Exclude Certain Portions of the Report and Testimony of Plaintiffs' Expert Rick Lawrence, filed August 4, 2006 (doc. no. 1456);

WCG Plaintiffs' Motion to Exclude the Reports and Testimony of Defendants' Expert Paul A. Gompers, filed August 4, 2006 (doc. no. 1457);

Joinder of The Williams Defendants to Reply Briefs Filed by Ernst & Young LLP and The WCG Individual Defendants, filed September 8, 2006 (doc. no. 1529);

Defendant Ernst & Young LLP's Motion in Limine to Exclude Evidence and Argument Relating to the Audit Quality Review Program, filed November 7, 2006 (doc. no. 1561);

Defendant Ernst & Young LLP's Motion in Limine to Exclude Evidence and Argument Relating to Dismissed, Abandoned and Unpled Claims, filed November 7, 2006 (doc. no. 1563);

Defendant Ernst & Young LLP, WCG Defendants,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

496 F.Supp.2d 1195

Page 16

496 F.Supp.2d 1195
**(Cite as: 496 F.Supp.2d 1195)**

and Williams Defendants' Motion in Limine to Exclude Certain Irrelevant or Overly Prejudicial Evidence, filed November 7, 2006 (doc. no. 1566);

Defendant Ernst & Young's Motion in Limine to Exclude Plaintiffs' Use of Trading Models to Estimate Aggregate Damages, filed November 7, 2006 (doc. no. 1567);

WCG Defendants' Motion in Limine to Exclude References to Executive Loan Forgiveness, Key Employee Retention Program, filed November 7, 2006 (doc. no. 1569);

Motion in Limine No. 1 of The Williams Companies and Keith E. Bailey to Exclude Improper Expert Testimony, filed November 7, 2006 (doc. no. 1570);

Motion in Limine No. 2 of The Williams Companies, Inc., Keith E. Bailey and Ernst & Young LLP to Exclude Evidence or Reference to " Corrective Disclosures" on Dates Where the Stock Price Did Not Move in a Statistically Significant Fashion, filed November 7, 2006 (doc. no. 1571);

Motion in Limine No. 3 of The Williams Companies, Inc., Keith E. Bailey and Ernst & Young LLP to Preclude Evidence or Argument Regarding The Williams Companies, Inc.'s Financial Statements, filed November 7, 2006 (doc. no. 1575);

Motion in Limine No. 4 of The Williams Companies, Inc., Keith E. Bailey and Ernst & Young LLP to Preclude Evidence or Argument Regarding Alleged Uses of the Word "Junk" to Describe WCG, filed November 7, 2006 (doc. no. 1577);

Motion in Limine of the WCG Defendants and Ernst & Young LLP to Exclude References to Directed Shares Transactions and Related Issues, filed November 7, 2006 (doc. no. 1578);

Motion in Limine of the WCG Defendants and Ernst & Young to Exclude Plaintiffs' Inadmissible Lay Witness Testimony, filed November 7, 2006 (doc. no. 1583);

The WCG Subclass's Amended Omnibus Motion in Limine, filed November 7, 2006 (doc. no. 1585); and

***1204** Joinder of The Williams Defendants to Motions and Supporting Materials Filed by Ernst & Young LLP and the WCG Individual Defendants, filed November 10, 2006 (doc. no. 1590).

### B. *The Daubert and summary judgment record.*

The Daubert motions, briefs, exhibits and appendices consist of 119 filings, totaling more than 13,750 pages. The summary judgment motions, briefs, exhibits and appendices consist of 93 filings, totaling more than 22,900 pages. The briefs which are before the court with respect to these motions demonstrate outstanding advocacy. They have met the court's highest expectations.

As will be seen, with respect to the Daubert motions, the court's attention has primarily been addressed to the defendants' challenges to the proposed expert testimony of Messrs. H. Sean Mathis and Andrew M. Mintzer and Dr. Blaine F. Nye.

### II. *Factual Background.*

For summary judgment purposes, the court views the facts and draws reasonable inferences from those facts in a light most favorable to the non-moving party. *Piercy v. Maketa,* 480 F.3d 1192, 1197 (10th Cir.2007). The following facts are either undisputed or viewed in a light most favorable to plaintiffs.

Following the breakup of AT & T in the early 1980's, WMB, an energy company, developed a strategy to run fiber-optic cables through some of its decommissioned pipelines, planning, under the original strategy, to provide services solely to other communications providers. After WMB secured adequate assurances of demand for its service, it authorized the initial $26 million build. WMB formed a subsidiary called Williams Telecommunications Company ("WilTel I") in 1985, which eventually built a nationwide digital fiber-optic network, consisting of approximately 9,700 route miles. Bailey Aff., ¶ 8-11; Ex. 1 at EY-WCG-00-000005, Caroline L. Marshall Declaration ("CM Decl.").

In 1995, WMB sold the WilTel I network business to LDDS Communications (thereafter WorldCom, Inc.) for approximately $2.5 billion. The sale included the nationwide fiber-optic network,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

496 F.Supp.2d 1195                                                                                    Page 17

496 F.Supp.2d 1195
**(Cite as: 496 F.Supp.2d 1195)**

together with the associated relationships with consumers and business and carrier customers. WMB excluded from the sale an approximately 9,700 route-mile single fiber network, comprised of a single fiber-optic strand and associated equipment along the original nationwide network, as well as WilTel I's telecommunications equipment distribution business, and Vyvx Services, a provider of multimedia fiber transmission for the broadcast industry. WMB agreed with LDDS that it would not reenter the telecommunications business for three years. WMB incorporated the WilTel I businesses that it did not sell, including Vyvx Services, under the name of WilTel Technology Ventures, Inc. That name later changed to Williams Communications Group, Inc. in 1997. Bailey Aff., ¶¶ 11, 12; Ex. 1 at EY-WCG-00-000005, CM Decl.

The NASDAQ U.S. Telecommunications Index (" Telecom Index") began the 1997 year at 215.71. Ex. 10 at 45, Joint Appendix of WCG Defendants (" JA"). By the end of 1997, the Telecom Index had increased to 306.60, an increase of 42%. *Id.* at 41.

In January 1998, the non-compete agreement with LDDS Communications expired and WMB reentered the network communications market through WCG. The objective of WCG was to own or lease, operate and extend a nationwide fiber-optic network and to provide services exclusively to communications service providers. **\*1205** Bailey Aff., ¶ 13; Ex. 1 at EY-WCG-00-000005, EY-WCG-00-000007, CM Decl.

Prior to 2001, WCG had four business units: Network, Broadband Media, Solutions and Strategic Investments. The Network unit offered Internet, data, voice and video services, as well as rights of use of dark fiber (fiber that WCG installed but for which it did not provide communications transmission services), on WCG's fiber-optic network. The Broadband Media unit provided worldwide transmission of live and non-live media content through integrated fiber-optic, satellite and teleport services. The Solutions unit provided professional and maintenance services and distributed communications equipment from leading

vendors for the voice and data communications needs of businesses of all sizes, as well as for governmental, educational and non-profit institutions. Through the Strategic Investments unit, WCG invested strategically in communications businesses which WCG believed would increase revenue opportunities for the Network and other business units. Ex. 30 at LB 066319, Ex. 88 at WMB.00003044, Kent A. Bronson Declaration (" KB Decl.").

In a February 11, 1998 press release, WMB announced that it was "accelerating the expansion of its national fiber-optic network with plans for a $2.7 billion investment in a 32,000-mile system by year-end 2001." According to the press release, " [t]he network is projected to reach nearly 22,000 miles by year-end 1999-doubling its current size. It will stretch to more than 25,000 miles by year-end 2000 and some 32,000 by the end of 2001. " *See,* Ex. 2, CM Decl.

In 1998, WCG established an Asset Defeasance Program ("ADP"), in the form of an operating lease agreement covering a portion of the fiber-optic network, with a group of financial institutions. The total estimated cost of the network assets to be covered by the lease agreement was $750 million. The lease term included an interim term, during which the covered network assets were to be constructed, and a base term. The interim and base terms were expected to total five years, and, if renewed, could total seven years. WCG had an option to purchase the covered network assets during the lease term. WMB provided a residual value guarantee equal to a maximum of 89.9% of the transaction. Ex. 12 at 143, JA. Under a subsequent agreement, if WCG exercised its option to purchase the covered network assets during the lease term, WMB was obligated to fund the purchase price of the ADP assets in exchange for debt or equity from WCG. Ex. 60 at WTL 0282528, CM Decl.

By the end of 1998, the Telecom Index closed at 500.91, an increase of 63% during the course of the year. Ex. 10 at 36, JA.

On February 9, 1999, WCG and SBC

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

496 F.Supp.2d 1195                                                          Page 18

496 F.Supp.2d 1195
**(Cite as: 496 F.Supp.2d 1195)**

Communications, Inc. entered into a 20-year business relationship in which each agreed to be the other's preferred provider of network services. Ex. 1 at EY-WCG-00-000022, Ex. 60 at WTL 0282526, CM Decl.

Two days later, in a February 11, 1999 press release, WCG announced a "$4.7 billion expanded and accelerated construction plan that nearly doubles its original $2.7 billion financial commitment and advances its target network completion date by a full year." According to the press release, WCG planned "to finish its 32,000-mile network in 2000." "Under the ' turbo-charged plan,' " WCG's "current 19,000-mile network will expand to 26,000 miles by year-end and to 32,000 miles in 2000, ultimately connecting 125 cities." The press release quoted defendant, Howard Janzen, WCG's president and chief executive officer, as stating " '[t]he funds to support this "turbo-charged" plan will **\*1206** come from a variety of sources ... [t]hese include [WCG's] planned initial public offering, a related high-yield bond offering, a separate equity investment by SBC Communications, revenue from fiber transactions and network services, and the additional traffic we will generate by completing the network more rapidly.' " Ex. 2, Robert J. Malionek Declaration (" RM Decl.")

In September 1999, WCG established a $1.05 billion credit facility with a group of banks. Bank of America was the administrative agent. The credit facility consisted of $525 million seven-year senior multi-draw amortizing term loan facility and a $525 million six-year senior reducing revolving credit facility. WCG could borrow under the term loan facility during a one-year period beginning on the credit facility's commencement date and could borrow under the revolving credit facility throughout the six-year term. WCG's credit agreement included a minimum EBITDA (earnings before interest, taxes, depreciation and amortization) covenant and a Total Leverage Ratio covenant. Under the credit facility, E & Y, WMB and WCG's outside auditor, was required to provide to WCG's board of directors and Bank of America an annual debt covenant compliance report stating whether E & Y had obtained any knowledge of a

default during its annual audit. Ex. 1 at EY-WCG-00-000080, CM Decl.; Ex. 62, KB Decl.

WCG, then a wholly owned subsidiary of WMB, received capital contributions and interest-bearing advances from WMB in order to fund its operations. In September 1999, previous non-capital borrowings from WMB were converted into a seven-year note bearing interest at an annual rate based upon WCG's credit rating. Although the intercompany note ranked equal with the credit facility note, WMB agreed that the intercompany note would be subordinated to the rights of the credit facility lenders in any bankruptcy, insolvency, liquidation or dissolution of WCG and in the event of default under the credit facility. Ex. 1 at EY-WCG-00-000079, CM Decl.

To raise funds for operations, including network construction, WCG conducted an initial public offering ("IPO") in October, 1999. The IPO offered for sale 29,600,000 shares of Class A common stock. The underwriters for the IPO exercised their options and purchased 4,440,000 additional shares to cover over-allotments. In separate private placements, SBC Communications, Intel Corporation and Telefonos de Mexico, S.A. de C.V., respectively acquired 20,226,812, 9,225,093 and 4,612,546 shares of WCG's Class A common stock.[FN2] The financing effort also included the issuance of high yield notes in addition to the equity. The total amount raised from the IPO, private placement and high yield notes was approximately $3.4 billion. Ex. 1at EY-WCG-00-000005, CM Decl.; Ex. 12 at 4,6, JA; Ex. 1 at WCG 00650, KB Decl.

> FN2. WMB owned 100% of WCG's Class B common stock. Through its ownership of Class B common stock, WMB retained an approximate 85% economic interest and an approximate 98% voting interest in WCG. WCG continued to be included in WMB's consolidated financial statements. Ex. 1 at EY-WCG-00-000005, CM Decl.; Ex. 2 at WMB.00064220, KB Decl.

Following the IPO, shares of WCG stock began to

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

496 F.Supp.2d 1195

496 F.Supp.2d 1195
**(Cite as: 496 F.Supp.2d 1195)**

Page 19

trade on the New York Stock Exchange. Shares of WCG closed on October 1, 1999, the first day of trading, at $28.06 per share. Ex. 11 at 1, JA. The Telecom Index closed on October 1, 1999 at 616.80, representing growth of 23% from the end of 1998. Ex. 10 at 32, JA.

WMB and WCG anticipated that the amount raised from the IPO would be sufficient to fund completion of WCG's network**1207** buildout and other capital requirements and enable WCG to generate a positive cash flow without the need for further outside financing. Bailey Aff., ¶ 14; Ex. 1 at WCG 001650, Ex. 2 at WMB.00064219, KB Decl. However, six months later, WCG internally updated its capital expenditure plans to show that capital expenditures in 2000-2001 would be more than $1 billion higher than WCG's internal forecast for that time period at year-end 1999. Ex. 4 at WTL 0090117, Ex. 5 at 35-38, KB Decl.

In a memorandum dated January 24, 2000, John Williamson ("Williamson"), E & Y's engagement partner for the YE 2000 audit of WCG, set forth his reasons for designating WCG as a "close monitoring engagement." One such reason was:
With the IPO in October 1999, the management of WCG will be under significant pressure to manage operating results to those included in the forecasts presented in connection with the Initial Public Offering process. The company has historically experienced significant net losses.... The expectation is that losses in and of themselves are not a significant issue to WCG's investors so long as WCG is able to meet the expectations included in the IPO model.

Ex. 9 at EY-WMB-E-01302453, CM Decl.[FN3]

> FN3. WCG was ultimately identified as a " close-monitoring client." According to an E & Y December 31, 2000 memorandum, this status was "[d]ue to the significance of losses, liquidity concerns, rapid expansion of operations, rate of change in [WCG] and industry, accounts receivable collection problems at Solutions and the presence of material weakness in the prior

year." Ex. 54 at EY-WCG-00-002254, CM Decl.

In his memorandum, Williamson also noted a "key area" for partner review being "[i]mpairment analysis on assets or investments identified as having impairment indicators-WCG." Ex. 9 at EY-WMB-E-01302454, CM Decl.

WCG's Financial Outlook for February 2000, distributed to defendant, Keith E. Bailey ("Bailey"), WMB's chief executive officer and then chairman of WCG's board of directors, as well as to other WMB executives, stated, as to WCG's network business unit: "[R]evenues continue to fall short of plan due to service delivery and provisioning issues. " Ex. 4 at WTL 0090087, KB Decl. It also stated that "Network capital spending expected to be above plan due to carryover spending projects from 1999." Ex. 4 at WTL 0090088, KB Decl.

WCG's Financial Outlook for March 2000, distributed to Bailey and other WMB executives, stated: "Network quarterly revenue of $130MM is 14% below plan due to service delivery and provisioning problems. We expect these issues to continue throughout 2000 resulting in significantly lower EBITDA targets." Ex. 38 at WTL 0027923, KB Decl. It also said: "We expect [capital] spending to exceed plan by year-end due to the additional carryover spending from 1999 and the authorization of new projects." Ex. 38 at WTL 0027924, KB Decl.

The price of WCG's stock generally climbed from October 1, 1999 until March 7, 2000, when it reached $61.81 per share, the highest level at which WCG's common shares would ever trade. Ex. 11 at 3, JA. The Telecom Index also continued to rise during this period, closing at 1170.64 on March 7, 2000. Ex. 10 at 30, JA. The Telecom Index reached its own zenith of 1248.06 on March 10, 2000, three days after WCG's stock peaked. *Id.*

During and after WCG's IPO process, WMB considered a spin-off of WCG, to make it an independent company. Bailey Aff. ¶ 15. In a letter dated March 7, 2000, Lehman Brothers, an investment banking firm, at the request of WMB,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

496 F.Supp.2d 1195                                                                    Page 20

496 F.Supp.2d 1195
(Cite as: 496 F.Supp.2d 1195)

provided its *1208 view, from a financial and debt capital markets perspective, "of a distribution to public stockholders of all of the Class B common stock in [WCG]." Ex. 24 at LB101808, KB Decl. Lehman Brothers understood that "[the] transaction would be effected via a pro rata distribution of the Class B common stock of [WCG] to the stockholders of [WMB] and would constitute 100 percent of the Class B common shares outstanding" and that it "would result in two unaffiliated publicly held companies." *Id.* Lehman Brothers also understood "[the] letter [would] be used in connection with a request for ruling that [WMB had] filed with the Internal Revenue Service concerning the Federal income tax consequences of the Distribution." Ex. 24 at LB 101809, KB Decl.

As reported in the letter, Lehman Brothers viewed " the Distribution [to] provide [WMB] with the optimal capital structure to achieve its business objectives." Ex. 24 at LB 101809, KB Decl. In arriving at its view, Lehman Brothers stated:
Prior to the Offerings [WCG's IPO, private placement and high yield notes], [WMB] had been under ratings pressure due to funding its own aggressive business plan while simultaneously funding WCG's business plan. The Offerings were necessary for [WMB] to fund [WCG's] business plan through 2000 and retain its investment grade rating. From a credit ratings perspective, [WMB] and [WCG] are now considered separate credits by the credit rating agencies due to the non-recourse nature of the Notes Offerings [high yield Notes].
However, [WMB] continues to carry the burden of having funded [WCG] prior to the Offerings.... WMB continues to fully consolidate [WCG's] $2.0 billion of debt.... And, since WMB owns a substantial portion of [WCG], we believe [WMB's] lenders do not fully appreciate the separation of the higher risk profile [WCG] business from the lower risk energy businesses. *The result is that [WMB's] balance sheet, while currently investment grade, is stretched with limited future debt capacity.*

\* \* \* \* \* \*

[WMB] needs to retain, and possibly improve, its credit rating to continue to be competitive among its industry peers.

\* \* \* \* \* \*

The continued deterioration of [WMB's] credit quality would affect its cost of financing, ability to compete among its peers and ultimately execute on its business objectives. *The Distribution would incrementally reduce [WMB's] current balance sheet pressure, increase [WMB's] future financing capacity and provide the opportunity to improve its competitive profile.*

Ex. 24 at LB 101813, KB Decl. (emphasis added).

On April 11, 2000, defendant, Howard Janzen (" Janzen"), WCG's chief executive officer, sent an e-mail to defendant, Scott Schubert ("Schubert"), WCG's chief financial officer, stating "We need to get a solid handle on capital spending...." Ex. 6, KB Decl. On that day, Janzen also issued a memorandum announcing a policy "prohibit[ing] future participation by WCG employees in directed share programs ["friends and family stock"] offered by other companies that do business, or are likely to do business, with [WCG]." Ex. 77, Sarah Jane Gillett Declaration ("SJG Decl."). WCG had previously allowed its employees to receive directed shares or friends and family stock in the IPO's of companies with which WCG had invested and had strategic alliances. One such company was Sycamore Networks. Shortly before the Janzen memorandum, *Fortune* magazine had published an article discussing the sale of friends and family *1209 stock to defendant Matthew Bross ("Bross"), WCG's chief technology officer, from Sycamore Networks. The article reported that Bross had been given the opportunity to buy Sycamore Networks' stock at the IPO price of $38 per share, which he could immediately sell in the open market for a substantial profit. The article reported that Sycamore Networks' stock commenced trading on opening day at $270 per share and that the value of Bross' stock surged to $1 million dollars. Bross and a group of employees under him had specifically recruited Sycamore Networks to develop products that WCG wanted to deploy on its network.[FN4] Approximately seven months before the IPO, WCG had announced that it would buy $400 million of Sycamore Networks products for its network. After WCG decided to award a contract to Sycamore Networks, the company offered the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

496 F.Supp.2d 1195                                                                                              Page 21

496 F.Supp.2d 1195
**(Cite as: 496 F.Supp.2d 1195)**

friends and family stock to Bross. The *Fortune* magazine article noted that while the offering of friends and family stock was not illegal, it might not be "100% ethically sound." Ex. LLLLL, SJG Decl.

> FN4. Bross was overseer of WCG's "technology farm system." Bross and a group of employees under him would scout out technology talent across the country to develop products that WCG wanted to employ on its network. Bross worked with established companies but also recruited start-up companies like Sycamore Networks to develop products. Ex. 69 at 17-18, 27-30, SJG Decl. In addition to Sycamore Networks, Bross received directed shares, or friends and family stock, in other start-up companies. He also received seats on the board of directors and advisory boards of start-up companies under arrangements that included awards of stock or options. Ex. LLLLL, Ex. MMMMM, SJG Decl.

On May 18, 2000, WCG obtained approval from WMB for another $1 billion of capital expenditures on "transport, switching and colocation facilities and equipment." Ex. 7 at WMB.00429828, KB Decl. The minutes of the WMB's May board of directors meeting stated that Janzen "discussed results for the first quarter and issues that had caused revenues to fall short of plan, including challenges associated with service delivery, SBC's delay in obtaining Section 271 relief from the Federal Communications Commission,[FN5] and the fact that [the] Solutions [unit] suffered a revenue decline in the first quarter." Ex. 7 at WMB.00429827.

> FN5. Section 271 of the 1996 Telecommunications Act sets forth certain requirements that regional Bell operating companies must satisfy "before they can be approved by the Federal Communications Commission to enter [the various state] long distance markets." Ex. 3 at 22, n. 57, RM Decl., Ex. 1 at EY-WCG-00-000028,

CM Decl.

Following the May board meeting, Bailey wrote to Janzen:
I think it is probably *an exercise in understatement to observe that both boards were very uncomfortable with the rate which we are driving spending at [WCG] and had a concern that we not overreach either from a capital or organizational perspective ....* I think with the clear view on the part of the Board[ ] that we need to move further away from the brink in terms of credit rating and the willingness to sell common equity to do it we would be well advised to push that lever hard this year assuming the markets don't tank in the next few months....*Given the number of folks who heard the Williams Board view that it is inevitable that we will need to separate the companies ... it is unlikely that will remain a secret.*

Ex. 9, KB Decl. (emphasis added).

A June 2000 Network Business Review report for May 2000 results for WCG showed a negative revenue variance of $127.7 million and noted: "Unfavorable revenues caused by service delivery concerns." Ex. 40 at WTL 0206653, KB Decl.

**\*1210** In a June 21, 2000 e-mail to Janzen and others, Bailey suggested that WCG seek immediate board approval for the issuance of WCG equity. Ex. 10, KB Decl. However, in order to maintain tax consolidation benefits, WMB placed limits on the amount of additional equity that WCG could issue to fund its still-growing capital requirements. Ex. 11, KB Decl.

On June 26, 2000, WCG issued a press release announcing that WCG's board of directors had "approved expenditure of nearly $1 billion over the next several years to build data centers, expand its network colocation facilities and to scale up its Internet Protocal (IP) network." Ex. 12, KB Decl. WCG also held a conference call to discuss the new initiatives and expenditures. During the call, Schubert, the CFO, also discussed certain revenue delays related to service delivery problems and SBC Communications-related delays. Ex. 13 at TWC-018449, KB Decl.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

496 F.Supp.2d 1195                                                                 Page 22

496 F.Supp.2d 1195
**(Cite as: 496 F.Supp.2d 1195)**

The market reacted unfavorably to WCG's announcement of additional capital expenditures and deferred revenue expectations, and the price of WCG's common stock fell 14% in response to the news. Ex. 14 at ¶ 32, KB Decl.

On June 27, 2000, Bailey sent an e-mail to Janzen and others which stated:
Obviously with the negative reaction of the market to the conference call and the down grading of our near term financial expectations [for WCG] we are getting a lot of calls and will need to do a fair amount of handholding with unhappy investors at both levels....*Our "bet" is approaching $7 billion with the announced spend and right now the market is beginning to think we are going to spend into the future without any sense of the need to be profitable.*
    Some of the stronger than expected reaction is due to the fact that the market tone has changed dramatically.

In another e-mail to Janzen later that day, Bailey stated:
I would hope with the next several days we are able to sell the merits of the investments and to talk back down some of the over reaction that has taken place but my experience tells me that until you string a few quarters together that fully meet the market expectations for performance without any more downward adjustments you will be selling into a very skeptical marketplace. It is also clear that the $1 billion of equity is out of reach within the tax consolidation limits today and you may need to back off of capital spending just to manage that dynamic as a practical matter.

Ex. 15, KB Decl. (emphasis added).

In an e-mail exchange on July 7, 2000, Janzen and Bailey agreed to delay any WCG equity offering to fund WCG's increased capital needs after Bailey noted that "[WCG's] stock is weak and I am concerned filing into a weak and declining stock price sends the wrong message to the market about our confidence in the future." *See,* Ex. 16, KB Decl.

By July 12, 2000, WCG projected spending a total

of $5.4 billion on WCG's network in 2000-2001, compared to the $1.9 billion projected for the same time period at the time of WCG's IPO. Ex. 17, KB Decl.

On July 13, 2000, Bailey sent an e-mail to the WMB board of directors in which he explained that following the June 27, 2000 conference call, WCG's stock had gone into "something of a funk" and "the bad news far outweighs the good." He also explained that WCG had developed a "credibility problem," "impair[ing] WCG's ability to raise capital at least in the short term" and that WCG " [was] adjusting [its] appetite for capital to meet that reduced capacity." *See,* Ex. 23, KB Decl. In that e-mail, Bailey noted "the pressure on the [WMB] *1211 balance sheet which comes from funding [WCG's] needs and trying to respond to the opportunities in the energy business." *Id.* Bailey, clearly beginning to chafe under what he felt to be a hair shirt in the form of WCG, stated that the upcoming WMB board meeting would be designed to answer "one question," whether WCG should be spun off from WMB. *Id.*Bailey further stated:
I think the decision [of whether to stay the course] would be relatively easy if we come away with a very high confidence level regarding [WCG's] ability to deliver that [revenue] ramp within the capital it identified in May. *The more that promise is deferred and the less confidence you have in it the more difcult the decision to stay the course, particularly given the robust real time performance and expansion opportunities in the energy area.*

*Id.* (emphasis added).

Between March 7, 2000 and July 21, 2000, the price of WCG's stock declined by more than 50%, closing on July 21, 2000 at $29.38 per share. Ex. 11 at 5, JA. From March 10, 2000 to July 21, 2000, Telecom Index declined 28% to 904.71. Ex. 10 at 28, JA.

On July 22, 2000, Lehman Brothers made a presentation to the WMB board of directors about the current structure of WMB and WCG, maintaining status quo, separation alternatives and recapitalization. Ex. 184, KB Decl. According to Lehman Brothers, maintaining the status quo "could

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

496 F.Supp.2d 1195

496 F.Supp.2d 1195
(Cite as: 496 F.Supp.2d 1195)

have negative implications for WMB's ratings."
Ex. 184 at WMB.00264690, KB Decl.

On July 24, 2000, the first day of the class period in the case at bar, WMB issued a press release stating that the WMB board of directors had "authorized management to pursue a course of action that, if successful and approved by the board, would lead to the complete separation of [WMB and WCG]." The press release quoted Bailey as stating about the spin off:

We believe these steps [leading to a separation of WMB and WCG] are *the best way to ensure that both our energy and communications businesses have the efficient and effective access to the capital necessary to pursue the substantial growth that each enjoys* .... Obviously, the ability to do that is consistent with the best long-term interest of our shareholders.

Ex. 27, KB Decl.

WCG's stock price dropped slightly following this announcement, declining 2.98% on July 24, 2000 to close at $28.50. Ex. 11 at 5, JA. On that day, the Telecom Index closed at 873.96. Ex. 10 at 28, JA.

On July 27, 2000, WCG issued a press release announcing financial results for the second quarter of 2000. In the press release, Janzen was quoted as stating: "We have continued to see a dramatic ramp-up in overall industry demand for bandwidth." Consolidated Amended Class Action Complaint (" Complaint"), ¶ 61.

In a conference call the next day, July 28, 2000, Bailey remarked:

As stated in the press release, we believe this course of action, if successful, *is the best way to assure that every part of our company can enjoy optimal growth as a result of the opportunities that are available to us* and that continue to become available to us and *it enables us to fund those opportunities in an efficient and an effective way.*

Ex. 28 at 1-2, KB Decl. (emphasis added).

On August 8, 2000, WMB announced that it had received approval from the IRS for a proposed

tax-free distribution of WCG to shareholders. Ex. 33 at EY-WCG-DF-001565, KB Decl.

*1212 WCG completed the sale of $1 billion of high yield bonds on August 3, 2000. In a September 11, 2000 memorandum to the WMB board of directors, Janzen stated: "Although the bond offering raised more capital than originally forecast, we are still approximately $800 million under-funded through the end of 2001.[W] e are planning to return to the capital markets with a $250 million convertible preferred stock offering in a private placement transaction by mid-September.... We expect to bridge the remainder of the cash shortfall through a combination of asset sales, dark fiber sales and utilization of the bank credit facility as well as further debt and equity offerings." Ex. 44 at WTL 0077116, KB Decl. However, he also stated: "we anticipate a need to request additional capital to offset cost overruns associated with the core network build out." He anticipated " advancing a request for capital at the November [WMB board of directors] meeting." *Id.*

Approximately $240.5 million in preferred stock was issued in a private placement in September, 2000. In that month, WCG also drew $525 million under its credit facility. Ex. 7, Robert Malionek Declaration ("RM Decl."), Ex. 1 at EY-WCG-00-000080, CM Decl.

In September of 2000, E & Y conducted a meeting to discuss WCG's audit for 2000. One of the overall goals of E & Y for the audit, noted by Williamson, was "[a]t separation [of WCG and WMB], there should be no thoughts about switching audit firms." Ex. 13 at EY-WCG-DOC2-004108, CM Decl. Shortly before the September meeting, Williamson had sent an e-mail to the E & Y engagement team detailing discussions he had had with Schubert. He had questioned Schubert about "key areas to focus on to ensure [that E & Y] continue[s] as [auditor] of [WCG] post spin-off" and relayed those areas to the team. Williamson further wrote:

Regarding areas to focus over the next 6 months [Schubert] commented on the following: [WCG] will do something with ... [the] Solutions [unit] and we need to make sure we are not a roadblock to

496 F.Supp.2d 1195                                                                                        Page 24

496 F.Supp.2d 1195
(Cite as: 496 F.Supp.2d 1195)

whatever they do. I asked him what this might mean, but he did not have further clarification other than to be ready, whatever they do.

Ex. 15 at EY-WCG-DOC2-000071, CM Decl.

On September 20, 2000, Bailey sent two e-mails to Janzen on the subject of WCG's capital. In the first e-mail, Bailey stated:
With the latest pressure on stock price I think it is fair to say [you] are out of capital capacity.... I don't think you have any choice at this point other than going on a rigid, essential need only capital diet while you restore capital capacity through operating performance and selling non core assets like [the] Solutions [unit] and ATL and some of the technology investments. My hope is that we can turn things around in a couple of quarters of good performance but the market is clearly running away from us....

Ex. 35, KB Decl.

In the second e-mail, Bailey observed:
For whatever reason, the market has lost confidence in the company and the cost of funds has spiraled upwards.... I suspect our Board would be amazed if we told them we were on a capital diet at WCG.

Ex. 34, KB Decl.

On September 22, 2000, Bailey instructed John Bumgarner ("Bumgarner"), who served as a senior officer for both WMB and WCG, to prepare a report for WMB showing that WCG has:
a point of view in advance of our priorities and what we would do to ensure the funding for the highest of those under *1213 the most difficult scenarios *as post spin the ultimate safety blanket of [WMB] financial backstops will no longer be available* .... Obviously the current view of the next year has a funding gap. It also shows a number of possible ways to close that gap, but, at today['s] stock price and credit market condition, *I believe only those that involve the sale of existing assets would be practical answers and that is not entirely within our control* .... The bottom line is we need to know before a funding crisis hits what gives first and how much flexibility we have in delaying

capital to manage around the need....

Ex. 45, KB Decl. (emphasis added).

Bumgarner took responsibility for preparing the report, internally referred to as the "White Paper." Although Boston Consulting Group, an outside consulting firm, ostensibly authored the White Paper, the details of the White Paper were principally the work product of WCG's network finance team of Mardi De Verges, T.J. Gallagher and Bill Cornog, with Bumgarner acting as editor in chief. The White Paper was presented to the WMB board of directors at its November 16, 2000 meeting.

A September 2000 Financial Outlook for WCG discussed a "Negative 3Q operating EBITDA variance from plan driven primarily by 34% shortfall in data revenues due to provisioning issues and higher than anticipated credits/billing adjustments...." Ex. 46 at WTL 0094619, KB Decl.

In an October 9, 200 e-mail from defendant Bob McCoy ("McCoy"), WMB vice president of law, to Jack McCarthy ("McCarthy"), WMB's chief financial officer (and copied to WMB and WCG executives), McCoy revealed his concerns about the proposed spinoff:
[T]he capital market landscape has changed dramatically since the [WMB] board started examining separation as a strategy. What was possible for WCG on a stand alone basis last spring and early summer may not be possible today.

Ex. 36, KB Decl.

In an October 12, 2000 e-mail to Bailey, Janzen stated: "Our $500 million gap has grown because of decline of our strategic investments and the network cost overrun (which isn't known yet outside the company)." He also stated that analysts " believe[d] this gap is a major issue for [WCG]." Ex. 47, KB Decl.

On October 25, 2000, Bailey, during a WMB conference call with analysts to discuss WMB's and WCG's financial results for the third quarter of 2000, stated that WCG expected to achieve

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

496 F.Supp.2d 1195                                              Page 25

496 F.Supp.2d 1195
(Cite as: 496 F.Supp.2d 1195)

EBITDA positive numbers by the end of 2001 and that WCG was *"pre-funded for their capital needs in this time of more unsettled capital markets, to carry them to that point of EBITDA positive."* Ex. 53 at WMB.00227224, KB Decl. (emphasis added). At his deposition, Bailey admitted that as he told investors WCG was prefunded, WMB had not yet put in place a plan to fill WCG's funding gap. Ex 3 at 130-131, 134, 144-46, KB Decl.

On the same day, October 25, WCG issued a press release announcing its financial results for third quarter of 2000. Bross was quoted as stating:
Through our unique Technology Farm System, [WCG] continues to test and deploy leading-edge optical technologies that split the spectrum of light to increase capacity and improve quality of service...
. By combining these emerging technology [sic] with our industry-leading ability to expand and provision customer demand for recurring capacity, [WCG] is executing on its stated strategy*1214 to drive network utilization and accelerate the decline in unit costs.

Complaint, ¶ 62.

In a November 8, 2000 e-mail to Bailey and others, Schubert stated: "We have worked hard to eliminate the $700MM gap through a combination of capital reductions, capital deferral, cost reductions and additional dark fiber sales.
Practical side however is that we have set in motion a series of events, all of which need to occur, in order to just be able to say that we are prefunded [for] 12 months." Ex. 56, KB Decl.

In a November 12, 2000 e-mail to Bailey and others, Schubert wrote:
To WCG, the capital markets are closed and should be expected to remain that way. Our accessing the debt markets will be very costly.... Several of the banks in our commercial facility have stated they want out. They indicated that they only got in due to the insistence of WMB, as part of their energy relationship and have no desire to hold telecom paper.

Ex. 79, KB Decl.

As has been noted, the White Paper was presented to the WMB board at its November 16, 2000 meeting.[FN6] The White Paper contained an Executive Summary which included the following observations:

> FN6. In July of 2000, Bailey told Janzen he wanted a:
> very straightforward graphic presentation that shows expected NPV of our overall financial commitment to WCG with the original Turbocharge plan as the base case and then our current case ... and we need to answer the question as to what our current assessment is of the economics of the money we have now exposed.
> The White Paper indicated that the net present value of WMB's and WCG's spending on the network was negative $4.7 billion if no further capital was invested and prices continued to fall. Ex. 62, KB Decl.

[To] date the near-term returns on the investment have fallen short of the original expectations.
Much lower prices than expected have hurt margin realization. Higher volumes at these lower prices have driven up total costs and consumed much more of the network than anticipated at the time of approval of the original and turbo plans. Without any further capital expenditure beyond that originally envisioned, the cash generating potential of the existing lit network is much lower than originally expected.
More broadly, there has been a "train wreck" in the telecommunications industry in 2000. Beginning in the spring of this year and accelerating this fall, the equity and fixed income security prices of all sectors of the industry are down considerably. The falling prices have and will prevent many players from reaching operations that are cash flow positive. Many investors have lost confidence, and an industry credit crunch has ensued. Many smaller players are bankrupting, and many larger players are fundamentally and immediately shifting their strategies.

Ex. 62 at WMB.00400436, KB Decl.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

496 F.Supp.2d 1195                                                                Page 26

496 F.Supp.2d 1195
**(Cite as: 496 F.Supp.2d 1195)**

The White Paper identified WCG's repeated failures to meet its previous forecasts and attributed those " disappointments" to increased demand and falling prices:
[F]inancial performance has significantly missed expectations. The October 1999 IPO projection showed the Network achieving positive EBITDA from operations by 2Q 2000 with $29M for the total year. The latest forecast projects EBITDA turning positive by 4Q2001 with a negative $204M in 2000.
Perhaps more importantly, the same factors driving this year's financial performance also directly and negatively **\*1215** impact the cash producing potential of the existing investment.

* * * * * *

The assumptions about market development differed from actual experience on two main dimensions:
• Demand greatly exceeded expectations
• Prices fell much more quickly than expected
The reality of these two factors has driven the differences between the planned and actual performance.

Ex. 62 at WMB.00400439-40.

As a result of these adverse circumstances, the White Paper described the situation then facing telecommunications industry companies as a "doom loop":
Of course, WCG is not the only company to be impacted by the unexpected demand and low prices. This dynamic has been a result of super-heated and irrational capital markets, low barriers-to-entry for small and niche players, and a misunderstanding by many players and analysts around what is a successful and sustainable business model.
In short, companies have been on a "capital treadmill." A market with easy capital resulted in a host of new players entering the market and building out networks. In order to generate revenue quickly, many players cut prices to fill their networks. To continue and expand these builds, additional capital was required.... [T]his quickly became a treadmill, but one that has ultimately proved unsustainable. In fact, the treadmill has turned into a "doom loop" for many of these

companies.

* * * * * *

With the evolution from the treadmill to the doom loop, the bottom has dropped out of the equity and debt markets. Beginning in March 2000, technology stocks have plummeted. Since September 1st, the market has in particular begun punishing telecom stocks, with virtually all players across the value chain experiencing dramatic losses in valuations. Fiber players, networks, and hardware vendors have all been hurt.

* * * * * *

Creditors are also beginning to seriously question the ability of companies to meet their obligations.

* * * * * *

As a result, capital markets have become much more difficult to access for telecommunications companies.

Ex. 62 at WMB.00400444-46, KB Decl.

The White Paper offered some optimism for WCG's future position within the troubled telecom industry:
"WCG is [ ] one of the best-positioned players to take advantage of a market recovery." But it specifically tempered any future expectations for WCG with a comment that the timing of any improvements could not be predicted and that, accordingly, concerns remained:
Of course, no one knows exactly how the competitive environment will shift or how prices will react.

* * * * * *

Of course, there is a possibility that all will not go according to plan in 2001. There is potential for better than expected results but also the risk of a below plan outcome. Chief concerns include:
Prices continue to decline at 1999/2000 pace
• Service delivery issues prevent meeting planned volumes because of:
-vendor problems,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

496 F.Supp.2d 1195                                                                                              Page 27

496 F.Supp.2d 1195
**(Cite as: 496 F.Supp.2d 1195)**

-customer issues,
-internal issues
• Capital markets for telecom do not reopen
**\*1216** • Alternative sources of funds are not
available.

Ex. 62 at WMB.00400436, WMB.00400453, KB
Decl.

Any expressions of positive expectations for WCG
in White Paper assumed that WCG would perform
in accordance with its latest projections.
Employees within WCG responsible for the
projections testified that they were not certain that
the projections had been fully developed or that
WCG would be viable as a stand-alone company
after the spin-off. Ex. 71 at 638, 141-145, Ex. 72,
Ex. 70 at 130-133, 137-140, 221-222; Ex. 41 at
475-478.

The White Paper was also distributed to the WCG
board of directors and was described in the
November 20, 2000 board minutes. E & Y's
working papers for the 2000 audit stated that all
board minutes were reviewed. Ex. 6 at 181-184,
CM Decl.; Ex. 35 at WTL 0324757, CM Decl.;
Ex. 36 at EY-WCG-00-001433,
EY-WCG-00-001437.

In addition to receiving the White Paper, the WMB
board of directors also received a November 16,
2000 report from Lehman Brothers. The Lehman
Brothers report stated that the energy markets were "
strong" while the "equity, high yield and bank
markets [were] currently closed" for WCG. Ex. 81
at WCG 023252. Lehman Brothers noted that
WCG's leverage ratios were "double its peers" and
that WCG's bank covenants were "at risk." It also
noted that WCG was "4 months funded before
financings or asset sales" and "3.4B of new funds
[were] required to fund plan through 1 Q02."Ex. 81
at 023254.

On November 16, 2000, WMB issued a press
release which announced that the WMB board of
directors had authorized management to continue to
pursue a tax-free spin-off of WCG. The press
release quoted Bailey as stating:
This important step continues a process that we

believe remains in the best long-term interests of
our shareholders. Our energy and communications
businesses have tremendous opportunities before
them. *Creating the most effective and efficient
access to capital will help fuel that growth, and we
believe that can best be achieved by creating two
independent businesses.*

Ex. 84, KB Decl.

On that day, WCG also issued a press release
touting the WMB board's authorization to continue
the pursuit of the tax-free spin-off of WCG. This
release stated, in pertinent part, that "WCG is
superbly positioned to achieve our goals...."
Complaint, ¶ 65.

On November 28, 2000, WCG issued a press
release announcing that "its 33,000 mile network is
on schedule for year-end completion, with 31,000
miles installed and 27,500 lit." Ex. C, SJG Decl.

On December 6, 2000, at a WCG officers' meeting,
a slide was presented demonstrating that WCG was
"Not Delivering on the 2000 Financial
Commitments" with "Revenues off by 24%;" "
Gross Margin off 125%;" "EBITDA lower by more
than $200 million;" and "Capital up by 45%." Ex.
50 at WCG-HJ-E000010747, KB Decl.

An internal Lehman Brothers document dated
December 11, 2000 stated:
*The primary business purpose for the [spin-off] is to
relieve WMB of the financing requirements from
WCG and enable it to effectively pursue acquisition
opportunities in its energy business ....* The
proposed capital plans of both WMB and WCG
would continue to strain WMB's balance sheet and
jeopardize its investment grade credit ratings,
having a detrimental effect on its ability to execute
its business objectives. Ultimately, the [spin-off]
will improve WMB's competitive profile by
reducing **\*1217** WMB's balance sheet pressure and
increasing its future financing capacity.

Ex. 30 at LB 066320, KB Decl.

In a December 15, 2000 e-mail to Bailey, Janzen
stated:

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

496 F.Supp.2d 1195                                                                    Page 28

496 F.Supp.2d 1195
(Cite as: 496 F.Supp.2d 1195)

Our immediate crisis is largely a product of the market heading away from us and no doubt we are in for a battle where survival is by no means certain.

\* \* \* \* \* \*

To listen to Jack [McCarthy] talk about working with Bankers on other alternatives to *heave the junk called WCG overboard* as fast as possible is [ ] depressing.

Ex. 29, KB Decl. (emphasis added).

In a December 21, 2000 memorandum to Janzen, Bumgarner wrote:
One could go through every AFE [Authorization for Expenditure] or Board presentation or the 1999 IPO model or the 2000 Bond sale model and discover the same economic busts in forecasts and assumptions. *At no time has network come close to making FINANCIAL estimate-either long-term or short-term.*
Focusing on more than just Voice, the overall company's IPO model of October 1999 called for a year 2000 EBITDA of positive $56MM, and the latest estimate for the year is minus $279MM excluding Tech farm sales (a plus $277MM). If you look at just Network, the IPO model called for Year 2000 EBITDA of plus $29MM and produced minus $178MM (excluding Tech Farm and Power Tel).

\* \* \* \* \* \*

In my opinion, the above financial results leave little room for the argument about the following conclusions:
1. Our WCG management group has little to no financial credibility left in the financial markets.
2. Our Voice strategy ... so far ... is a huge failure and when these revenues of $636MM in 2001 are added to Solutions[,] [unit] revenues $1,421 MM in 2001 represent 66% of total revenues ... on which we are breakeven or losing money.

\* \* \* \* \* \*

In addition, Bumgarner stated:

1. Our capital spending process is still not functioning, i.e.,
(a) $500mm in overruns
(b) low to no economies on $5.7 bil of spend
(c) over counting; miscounting year 2001 capital requests numbers that were later worked out with BCG in October/November.
Has anyone seen the assumptions used in the projected spending for next year? Are they consistent with current reality? Are they consistent with each project? I, for one, have little confidence, and January 1 is ten days away.

Ex. 52, KB Decl. (emphasis added).

In a December, 2000 memo from Deborah Stanford, of E & Y, to Debbie Fleming, of WMB, regarding the potential spin-off, E & Y noted:
We understand that losses in [WCG] hampered [WMB's] ability to secure debt financing, and that this endangered [WMB's] ability to grow its business. The market began to punish [WMB's] stock for this inability to grow the business.... A spin-off of [WCG] was attractive in that it offered a way to segregate the profitable pipeline business from the communications business and in so doing, better position the pipeline business for debt financing.

Ex. 11 at EY-WCG/DF-001564, CM Decl.

By the end of 2000, the price of WCG's stock declined to $11.75 per share. Ex. 11 at 7, JA. The Telecom Index closed on **\*1218** December 29, 2000 at 463.44. Ex. 10 at 26, JA.

On January 26, 2001, at the request of WMB, Lehman Brothers issued another letter relating to the spin-off. In the letter, Lehman Brothers set forth its view regarding certain "Restructuring Transactions" which WMB and WCG had identified to be accomplished in addition to the spin-off. One of the identified transactions, which was to occur before the spin-off, would involve the transfer of a $975 million intercompany note (and other assets) from WMB to WCG in exchange for WCG's common stock, certain intangible assets, and WCG's release of certain claims. Lehman Brothers commented that it viewed the identified transactions

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

496 F.Supp.2d 1195

496 F.Supp.2d 1195
(Cite as: 496 F.Supp.2d 1195)

as necessary to permit WMB to proceed with the spin-off and to enable WMB to achieve its business purpose for the spin off, which according to Lehman Brothers was "to enable [WMB] to increase its borrowing capacity." Ex. 2 at WMB.00064217, KB Decl. Lehman Brothers specifically stated that *"Maintenance of [WMB's] investment grade credit [was] a business necessity in order [WMB] to participate in the highest growth and highest margin areas of its business equity market and trading."* Ex. 2 at WMB.00064220, KB Decl. (emphasis added). It further concluded that "in order to reposition itself to successfully compete with its peers, [WMB] must definitively separate itself from [WCG] by effecting the [spin-off]." Ex. 2 at WMB.00064228.

In an internal memorandum in January of 2001, E & Y set forth Lehman Brothers' argument for spin-off of WCG from WMB:
The major argument (in a nutshell) was that the two divisions cannot achieve their goals by remaining combined. In order for WCG to grow it must have capital investment. Looking at it separately, it currently does not have an investment grade credit rating. In contrast [WMB's] Energy division currently has this type of rating. The Energy division sees its growth in the trading [sic] natural gas and electricity. To do so it must keep its investment grade rating. This means that it cannot finance [WCG's] growth without sacrificing [WMB's] investment grade rating and therefore its[ ] growth.

Ex. 12 at EY-WCG/DF-001557, CM Decl.

It also noted that in May 2000:
Telecommunications and dot. com stock prices dropped sharply, followed by a downward spiral in debt markets as well. Analysts described the market for telecommunications stock and debt as a " train wreck."

Ex. 12 at EY-WCG/DF-001564, CM Decl.

On January 29, 2001, WCG announced that it had reached an agreement with Platinum Equity, LLC to sell the U.S., Mexican and Canadian operations of the Solutions unit. Ex. 87, KB Decl.

In January of 2001, senior WMB executives, including Bailey, participated in a "roadshow" in connection with an anticipated WMB equity offering. During the roadshow, Bailey and other WMB executives met in various cities with current and prospective investors and analysts and described the spin-off of WCG as something that " Better enables each company to execute its respective business plan"; "Optimizes access to capital"; "Facilitates pursuit of growth opportunities "; and "Creates a 'Win-Win' " for "WMB and WCG shareholders." Ex. 85 at ML 070978; Ex. 3 at 377-382, KB Decl.

On February 5, 2001, WCG announced earnings for the fourth quarter of 2000. Ex. 87, KB Decl. According to the press release, WCG "expects to be EBITDA-positive on operational basis by the end of 2001...."*Id.*The press release also portrayed WCG's business as continuing to be *1219 strong, as " Janzen cited [WCG's] success in both attracting new customers and meeting growing demand from established customers as proof of its broadband-enablement strategy and leadership in delivery of data, voice, Internet and media services." *Id.*

On February 15, 2001, *TheStreet.com* reported on the statements made by WCG at a Wall Street analysts' conference. Schubert was quoted as stating: "We believe we are on a clear path to profitability.... We have a sound funding strategy in place." Complaint, ¶ 68.

On February 26, 2001, WMB contributed the $975 million intercompany note and other assets in exchange for 24.3 million newly issued WCG shares. Ex. 1 at EY-WCG-00-000004, EY-WCG-00-000092, CM Decl.

In March 2001, WCG issued $1.4 billion in structured notes. WMB provided indirect credit support for the notes through a commitment to issue its preferred stock in the event of default under the notes. Ex. D at 10, SJG Decl.

In a letter dated March 9, 2001, WMB advised E & Y that WMB had announced a plan that may result in WCG being spun off and that "[w]hile WCG is a

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

496 F.Supp.2d 1195                                                                Page 30

496 F.Supp.2d 1195
**(Cite as: 496 F.Supp.2d 1195)**

subsidiary of [WMB], WMB will ensure that WCG has funding for its operations and financing needs." Ex. 8, RM Decl. WMB also advised that "[WMB] will not spin off WCG to [WMB] shareholders unless management believes WCG possess sufficient liquidity through internal cash flows and external financing to enable it to fund its obligations through December 21, 2001." *Id.*

On March 12, 2001, WCG filed with the SEC its Form 10-K for the year-ended December 31, 2000, including financial statements purportedly presenting WCG's 2000 financial statements in accordance with Generally Accepted Accounting Principles. Ex. 88, KB Decl. In the Report of Independent Auditors at page F-15 of WCG's 2000 10-K, E & Y stated that "We conducted our audits in accordance with auditing standards generally accepted in the United States" and that, in its opinion, "the financial statements ... present fairly, in all material respects, the consolidated financial position of [WCG] at December 31, 2000 ... in conformity with accounting principles generally accepted in the United States." *Id.*

The Form 10-K did not report material impairments of long-lived assets as of December 31, 2000. Ex. 88, KB Decl. The February 5, 2001 press release announcing fourth quarter earnings did not announce the recording of material impairments of long-lived assets as of December 31, 2000. Ex. 87, KB Decl.

E & Y's work papers for the YE 2000 WCG audit totaled 17,000 pages. However, only two sentences were included regarding network impairment. Specifically, E & Y noted that "We did not identify any impairment indicators w/f/r [waive further review]." It also noted that "Since the majority of in-service assets have been added within the past 2 years as the construction of the network has been underway, we determined that there are no impairment indicators which would warrant a write-down of PP & E [Property, Plant and Equipment]." Ex. 18 at EY-WCG-AWS-00-165, EY-WCG-AWS-00-164, RM Decl.

An E & Y internal quality control review performed

on E & Y's 2000 audit of WCG shortly after it issued its audit opinion on WCG's 2000 financial statements stated:
Network and dark-fourth quarter market changes, overall decline in market cap to book value, and potential technological changes. *Could have considered impairment issues in 2000.* Client has not yet defined specific indicators of impairment. **\*1220** This issue will be addressed this year.

Ex. 56 at EY-WCG/DF-007293, CM Decl. (emphasis added).

E & Y audited WCG's debt covenant calculations and concluded that at YE 2000 it had no reason to believe that WCG was in violation of its debt covenants, as defined by the credit agreement. Ex. 2, Ex. 6, Dan Neale Declaration "DN Decl". WCG was required to maintain a Leverage Ratio of no more than 18:1 as of December 31, 2000. According to WCG's Debt Compliance Certificate for year-end 2000, approved by E & Y, WCG's Leverage Ratio was 17.07. Ex. 36 at EY-WCG-00-001532, CM Decl. WCG was also required to comply with a minimum annual 2000 EBITDA covenant of $120 million. According to WCG's Debt Compliance Certificate, WCG's EBITDA was $160 million. Ex. 36 at EY-WCG-00-001532-33, CM Decl.

E & Y considered whether WCG would continue as a going concern for 12 months beyond the date of the financial statements and concluded that there was no substantial doubt about WCG's ability to continue as a going concern. Ex. 11, p. 92, ll. 15-25, Christopher R. Harris Declaration ("CH Decl.").

WMB paid E & Y $25.8 million for work performed in 2000. Of that amount, $4.4 million was for the annual audit. Ex. 16 at LP-WCG-010105, CM Decl.

Janzen, in a press release dated March 15, 2001, announcing the private placement of $1.4 billion in structured notes, was quoted as stating: "Closing this transaction enhances our overall liquidity and positions us well in anticipation of the proposed spinoff." Complaint, ¶ 73.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

496 F.Supp.2d 1195                                                    Page 31

496 F.Supp.2d 1195
**(Cite as: 496 F.Supp.2d 1195)**

In a March 17, 2001 e-mail to Schubert and defendant, Howard Kalika, a Vice President of WCG, regarding WCG's viability, Lehman Brothers stated that "we believe we can give the viability opinion, *but have serious concerns for your funding position going forward.*" Lehman Brothers advised that it had said the same to McCarthy, WMB's CFO. Ex. 96, KB Decl. (emphasis added).
In an e-mail to Bailey and others that same day, McCarthy wrote: "Lehman is now marginally comfortable with [WCG's] 'financial visibility'.... They are struggling with ... what will happen in the near term to the share price of WCG. They can see as much as 50% decline following the spin due to their review of WMB shareholders who would be likely to sell and also their view that the market for WCG is weak at this time." Ex. 95, KB Decl.

In a March 20, 2001 e-mail from Schubert to Janzen, Schubert stated:
[T]he note offering is struggling to get up to the full $1.4 b and we had to reduce the b traunche bank offering to $300 mm from $500 mm. These items plus the fall in tech farm values and the ATL sale deferral is putting pressure on the Lehman viability opinion.

Ex. 98, KB Decl.

Despite WMB's credit support for the $1.4 billion structured notes, Lehman Brothers and CSFB, as joint bookrunners for the offering, were unable to sell off the final $200 million in notes, a point they worked to keep secret, as indicated by a March 22, 2001 e-mail from Spencer Cutter of Lehman Brothers to Kenny Gunderman, also of Lehman Brothers:
[T]he fact that Lehman and CSFB will be left holding bonds is TOP SECRET-though the company is aware of it, if other firms or investors catch wind that we are sitting on $200 million-it will be BAD.

Ex. 99, KB Decl.

On March 30, 2001, Lehman Brothers made a presentation to the WMB board of directors about the spin-off, discussing *1221 WCG's performance in comparison to its peers in the

telecommunications industry. It outlined the key business risks faced by WCG, including customer concentration risk, industry risk with market conditions deteriorating, market risk of supply and demand and WCG's ability to perform in accordance with its business plan. Lehman Brothers stated that WCG was adequately capitalized and forward funded for 15 months. However, it disclosed that WCG's peers were forward funded for 18 to 24 months. Lehman Brothers discussed the key financial risks related to the spin-off, including the fact that WCG's business plan was not fully funded for 18 months, its balance sheet was highly leveraged and that WCG would have a strong need to access equity capital markets to de-leverage the balance sheet and fund its business plan. It revealed that WCG would need $450 million for 18 months' funding and $1.5 billion to be fully funded. It further observed that the equity capital markets were closed for WCG's peer group and that the market was not likely to open before 4Q 2001. Ex.102, WMB.00550045, Ex.101, WMB/WC. 00047022, WMB/WC.00047023, WMB/WC.00047024, WMB/WC.00047033, WMB/WC.00047035, KB Decl.

Lehman Brothers' actual opinion letter to WMB in connection with the spin-off of WCG neither " opined whether [WCG was] going to survive after the spin-off" nor stated "whether or not WCG [was] going to be a viable stand-alone company after the spin-off." Ex. 83 at 68-71; Ex. 67, CM Decl. Lehman Brothers opined only that the spin-off " [would] not materially impair the ability of [WCG] to fund in the future, from external sources or through internally generated funds, its currently anticipated operating and capital requirements as currently projected in the financial forecasts prepared by the management of [WCG]." Ex. 67 at WMB/WC.00047066, CM Decl.

In its opinion letter, Lehman Brothers also informed WMB and its board of directors that:
With respect to the financial forecasts of [WCG], upon advice of managements of [WMB] and [WCG], *we have assumed that such forecasts have been reasonably prepared on a basis reflecting the best currently available estimates and judgments of*

496 F.Supp.2d 1195                                                                Page 32

496 F.Supp.2d 1195
**(Cite as: 496 F.Supp.2d 1195)**

*the management of [WCG] as to the future financial performance of [WCG] and that [WCG] will perform in accordance with such forecasts.*

Ex. 67 at WMB/WC.00047065, CM Decl. (emphasis added).

On March 30, 2001, WMB issued a press release announcing that WMB had approved the spin-off of WCG. In the press release, Bailey was quoted as stating:
Today's decision brings to a conclusion an effort that began last summer. That is when our board began analysis of whether separating [WMB] and [WCG] *would best enable each to reach its full potential and to most efficiently access capital markets* .... With sufficient capital in hand to meet its needs well into 2002 and its next-generation network completed and open for business, we believe [WCG] is poised to deliver on its great potential.

Ex. 92 at LB 066355, KB Decl.

On that day, WCG issued a press release about the spin-off. Janzen was quoted as stating:
"[T]his spinoff is the natural evolution of a business strategy begun in 1998, when we re-entered the telecommunications space.... The spinoff gives [WCG] the best opportunity to strengthen its industry leadership and the ability to attract investors who value the vast potential of broadband."

CAC, ¶ 75.

In a letter dated April 10, 2001 to a U.S. Treasury Department official, McCarthy **\*1222** stated: "The objective of the [spin-off] is to maintain [WMB's] credit rating and increase its borrowing capacity so that it can efficiently fund the capital needs of its growing business." Ex. 188, KB Decl.

In April, 2001, senior WMB executives also participated in a roadshow in connection with the spin-off. Ex. 93, Ex. 94, KB Decl. During the roadshow, the executives described the spin-off as something that "Better enables each company to execute its business plan"; "Optimizes access to

capital"; "Facilitates pursuit of growth opportunities" and "Creates a 'Win-Win' for WMB and WCG shareholders." Ex. 94 at WCG-HJ-E000015845, KB Decl.

On April 18, 2001, Winstar Communications, a significant customer of WCG, announced that it had filed for protection under Chapter 11 of the Bankruptcy Code. WCG had entered into an agreement with Winstar Communications in 1998 for a 25-year indefeasible right to use of approximately 2% of the wireless local capacity of Winstar Communications. Ex. D, at 12, SJG Decl.; Ex. 49 at EY-WCG-01-005034, CM Decl.

On April 23, 2001, WMB spun off WCG. WMB distributed approximately 400 million shares, or 95 percent of WCG common stock held by WMB, to WMB shareholders in a tax-free distribution. Following the distribution, WMB retained approximately 5% of WCG's common stock. As a result of the spin, WCG's business was completely separated from WMB. Bailey resigned as chairman of WCG's board of directors. Ex. D, SJG Decl.; Bailey Aff. ¶ 33.

On April 26, 2001, during WMB's first quarter 2001 analyst conference call, Bailey stated the following regarding WCG:
We also have been pleased with the way the [WCG] stock has traded since the spin. While we obviously were disappointed that the combination of the market conditions in that sector and the overhang of the shares that came onto the market as a result of our dividend put continued pressure on that stock, it appears that the market pretty fully discounted it, it's found a hard bottom and because their financing is in place and their performance we believe is good and will continue to be good, we think that there's significant upside in that stock as well[,] as soon as it reaches a new ownership equilibrium.

Ex. 115 at WMB.00032222, KB Decl.

Shortly after the spin-off, The Blackstone Group began working with WCG to restructure its balance sheet or find an investor to infuse more capital into WCG. On or about April 30, 2001, Bumgarner

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

496 F.Supp.2d 1195                                                           Page 33

496 F.Supp.2d 1195
(Cite as: 496 F.Supp.2d 1195)

requested certain WCG employees "to evaluate the potential of repurchasing up to $1 billion of WCG bonds," which were then trading at a steep discount. Ex. 118, Ex. 119, KB Decl.

On May 17, 2001, during a WMB shareholder meeting, Bailey commented as follows:
[W]e were ultimately successful, and in a way that we believe best assures the long-term health and prosperity of both companies.... [WCG] is strongly positioned for success. Its core network asset is in place. It has demonstrated history of technical performance. And, it has the financial resources in place to enable it to deliver on the promise of a very bright future.

Ex. 116 at WMSE005813519, KB Decl.

On June 17, 2001, Janzen forwarded to Bumgarner an e-mail written by T.J. Gallagher announcing a freeze on capital spending. Ex. 120, KB Decl. In late June 2001, WCG announced that it would lay off up to 10% of its work force. Ex. 74 at EY-WCG-01-006032, CM Decl.

In a July 18, 2001 Preliminary Restructuring Proposal, The Blackstone Group outlined two proposed restructuring transactions,*1223 both of which contemplated purchase by SBC of WCG's notes on the open market and SBC's tender of the notes to WCG in exchange for prepayment of services and additional new securities. Ex. 121, KB Decl. In its July proposal, The Blackstone Group stated:
[WCG's] liquidity position seems viable in the very short term, but WCG will need future funding to meet its business plan. [WCG] will need to (i) undergo a restructuring to alleviate cash flow until it can reach cash flow neutral, and/or (ii) raise further capital from an investor to fund future cash funding needs. *[WCG] should not use cash to repurchase debt because it will adversely affect future liquidity and hinder achieving business plan.*

Ex. 121 at WTL 0023210, KB Decl. (emphasis added).

At a special meeting on July 30, 2001, WCG's board of directors authorized WCG's officers to

proceed with evaluation of, and initial steps to implement, a proposal to restructure [WCG's] balance sheet by acquiring [WCG's] outstanding high-yield bonds. Ex. 126, KB Decl.

In July and August of 2001, WCG approached SBC for financial assistance but SBC decided against making any investment. Ex. 123 at WTL 0250417, KB Decl. An August 23, 2001 presentation to the WCG board of directors stated:
From a financial standpoint we realize the cash generated from our business plan is insufficient to service our debt. The action we are recommending is to buy back $1.5-2 B of our bonds in their discounted condition to reduce debt payments.
The presentation further stated:
WCG is very close to falling into a chasm of the red "danger" zone-we are hampered by a weak financial structure and disappointing operational performance.

Ex. 124 at WTL 0093794, 0093745, KB Decl.

After unsuccessful attempts to get help to buy back its notes on the open market, WCG set up a subsidiary, CG Investments, to purchase its notes. WCG elected to go forward with the repurchase of the notes despite advice that the banks would view it "as contrary to the spirit, if not the language, of the credit agreement."Ex. 126 at WTL 0023330, Ex. 127, KB Decl., Ex. 23, Ex. 24, MK Decl.

In October 2001, WCG prepared for discussions with lending banks about debt covenants for 2002 and beyond. It informed Bank of America, the administrative agent of the lending banks, of its use of cash to repurchase the notes. Ex. 60 at WTL 0282531, CM Decl. On October 12, 2001, counsel for WCG's lending banks advised WCG of concerns that the bond repurchases violated WCG's credit agreement. Ex. 128, KB Decl.

At the beginning of a meeting with lending banks on October 19, 2001, WCG received a letter from Bank of America informing it that WCG's buy-back of the publicly-traded notes violated certain provisions of the credit agreement and that the administrative agent was reserving all of its rights under the credit agreement, including termination. The letter acknowledged that WCG disputed the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

496 F.Supp.2d 1195                                                    Page 34

496 F.Supp.2d 1195
**(Cite as: 496 F.Supp.2d 1195)**

validity of Bank of America's position. Ex. 60 at WTL 0282531; Ex. 129, KB Decl. During the meeting, WCG presented an overview of its current business plan. It indicated that its strong cash position eliminated the need to raise new capital by year-end 2001 under one of its covenants and also suggested covenant revisions for the next year and thereafter. Ex. 60 at WTL 0282531.

During the October 19 meeting, WCG agreed to allow PricewaterhouseCoopers LLP ("PWC"), on behalf of the lending banks, to perform an evaluation of WCG's *1224 business plan. It was agreed that the review would be completed by January 15, 2002, and that WCG would not continue the bond buy-back program until completion of the review. Ex. 60 at WTL 0282532; Ex. 130, KB Decl.

On October 31, 2001, WCG announced in a press release that it had "amended the company's bank credit facility covenant that required the company to raise additional capital by the end of [2001]."
Before the amendment, WCG had to raise additional debt and equity in the amount of $225 million by December 1, 2001. Under the amendment, which had been agreed to by the lending banks the day before, October 30, 2001, WCG was not required to raise any additional capital until July 1, 2003. Ex. 25, MK Decl.; Ex. 60 at WTL 0282532, CM Decl. WCG's press release also revealed WCG's buy back of " approximately 18.3% of its outstanding publicly traded senior notes at a total cost of about 43 cents per dollar of face value." It also quoted Schubert as stating:
As the company continues to optimize its capital structure and position itself for long-term success, we will be working jointly with our bank group to perform a more comprehensive review of the existing credit agreement.... This review will ensure that the existing credit agreement remains consistent with our current capital structure, our reduced capital expenditure requirements and the overall market environment. During this review period, which may require 60-90 days to compete, the company will not make any additional cash purchases of its publicly traded debt.

Ex. 25, KM Decl.

In an October 31, 2001 e-mail to Janzen, Bailey stated:
I gave a fire breathing endorsement of WCG and the strategy that underpinned it (a bandwidth machine-low cost-high quality) during our analysts meetings yesterday.

Ex. 117, KB Decl.

After his fire breathing endorsement and at a time when he possessed undisclosed adverse information about WCG, Bailey (without any public reporting or disclosure) sold nearly 400,000 shares of WCG stock, for a profit of approximately $500,000. Ex. 138 at WMDC007752, Ex. 141, Ex. 142, KB Decl.

In November 2001, PWC began its review of WCG. During November and December of 2001, WCG began to explore other restructuring alternatives. Ex. 60 at WTL 0282532, CM Decl.

In the third and fourth quarters of 2001, WCG took impairment charges on excess network equipment. Specifically, WCG took charges of $150 million in the third quarter and $186 million in the fourth quarter on excess equipment. Ex. 11 at EY-WCG-01-003946, RM Decl. In the third quarter of 2001, WCG wrote down 100% of its $35 million in Sycamore Networks equipment on hand. Ex. 167, Ex. 71 at 353-56, KB Decl.

By the end of 2001, WCG's stock declined to $2.35 per share. Ex. 11 at 12, JA. At that point, WCG's stock had lost 96% of its value since its high on March 7, 2000 and 92% of its value since the beginning of the class period on July 24, 2000.
The Telecom Index closed on December 31, 2001 at 236.63. Ex. 10 at 21, JA. This was down 81 % from its high on March 10, 2000 and 73% from the beginning of the class period.

On January 11, 2002, WCG presented its business plan to the lending banks. At the meeting, it was indicated that, as a prerequisite to amendment of the covenants, WCG should restructure all of its debt.
The meeting concluded with an agreement to extend the negotiation period until January*1225 24,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

496 F.Supp.2d 1195                                                                Page 35

496 F.Supp.2d 1195
**(Cite as: 496 F.Supp.2d 1195)**

2002. The negotiation period was subsequently extended to February 28, 2002. WCG was required to develop a comprehensive plan for the financial restructuring and de-leveraging of its balance sheet. Ex. 60 at WTL 0282533, CM Decl.

On January 23, 2002, PWC formally reported to WCG's bank group that it was uncertain whether WCG would achieve the cash flows projected in its business plan as WCG was forecasting "very aggressive growth rates in revenue drivers" and " projecting huge increases in its market share in all major products." Ex. 132, KB Decl.

On January 28, 2002, Global Crossing, a competitor of WCG, filed for Chapter 11 bankruptcy protection. Ex. 60 at WTL 0282534, CM Decl.

On January 28, 2002, WCG's stock closed at $1.63 per share. Ex. 11 at 64, JA. At that time, WCG's stock had lost 97% of its value since March 7, 2000 and 94% of its value since the outset of the class period. On that day, the Telecom Index closed at 217.06, a decline of 83% from its high on March 10, 2000 and of 75% since the outset of the class period. Ex. 10 at 21, JA.

Because the credit facility provided for an interest rate that was reset on a periodic basis, WCG, on January 28, 2002, issued an interest rate reset request. The request required the reaffirmation of certain representations and warranties in the credit facility. In response to the request, Bank of America informed WCG that due to negative developments in the telecommunications industry, WCG may have been in default of its representations and warranties. On January 29, 2002, the Bank of America sent WCG a reservation of rights letter concerning the possible default. Ex. 60 at WTL 0282533, CM Decl.

WMB, in a January 29, 2002 press release, announced that "Today's planned release of complete unaudited 2001 earnings has been delayed pending an internal assessment of [WMB's] contingent obligations related to [WCG]."*See,* Ex. 14, JA. On the same day, WCG issued a press release stating that "the assessment WMB is undertaking has no direct impact on WCG's

operations, WCG's financial performance or the contingent guarantees WMB provided in support of WCG's $750 million network lease agreement (ADP facility) and the $1.4 billion of WCG senior notes issued in March of 2001." *See,* Ex. 15, JA.

On the same day, January 29, the first of the present class actions was filed by the Milberg, Weiss law firm on behalf of these plaintiffs. (*Cali, et al. v. Williams Companies, Inc, et* al No. 02-CV-072, N.D. Okla., Doc. No 1.) The January 29 Cali complaint is discussed in more detail later in this memorandum.

The price of WCG's stock closed on January 29, 2002 at $1.34 per share, down 11.6% (net of market and industry effects) from the previous day's closing price. Ex. 11, JA; Ex. 1 at ¶ 88, MK Decl. The weighted average price of WCG's notes fell 8.6% on January 29, 2002 and fell an additional 13.9% on the following day. Ex. 1 at ¶ 91, MK Decl.

On January 29, 2002, another WCG competitor, Level 3 Communications, Inc., announced that it was taking a $3.2 billion impairment charge for its long-lived assets. Ex. 15, MK Decl.

On February 1, 2002, shares of WCG's stock closed at $1.42, down 98% from the stock's high on March 7, 2000 and 95% from the outset of the class period. Ex. 11 at 12, JA.

On the next trading day, February 4, 2002, WCG issued a press release announcing that its preliminary fourth quarter results did not include " any impairment related to [WCG's] long-lived assets "*1226 and that bankruptcy announcements by other telecom companies and impairment charges taken by competitors had "resulted in a continuing analysis of this assessment." *See,* Ex. 16, JA. WCG also announced that "On January 29, the banks, through their administrative agent, had informed [WCG] that, in their view, the Company may be in default under its credit agreement, and have reserved their rights accordingly." According to the press release, "The possible default relates to the fact that, due to recent negative developments in the telecommunications industry, the banks are questioning whether the Company can confirm the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

496 F.Supp.2d 1195                                                    Page 36

496 F.Supp.2d 1195
**(Cite as: 496 F.Supp.2d 1195)**

representations and warranties included in the credit agreement.... The banks have also reserved their right to claim that the purchase by [WCG] of certain of its redeemable notes in 2001 previously reported by the Company may violate the credit agreement." WCG announced that it had agreed to submit to the banks by February 25, 2002, "a comprehensive plan for restructuring and de-leveraging its balance sheet. " In developing this plan, it was "considering various possible restructuring alternatives" but that " successful execution of the options currently envisioned does not include seeking bankruptcy protection or the substantial dilution of equity security holders." *See,* Ex. 16, JA.

In response to the February 4, 2002 press release, WCG's stock fell by 22.8% (net of market and industry effects); trading volume was 26.0 shares, 3.9 times the average post-spin off daily volume. The stock closed at $1.00. On the following day, WCG's stock price declined another 11.6%. WCG notes fell by an average of 23.6% on February 4, 2002 in response to WCG's announcement. Ex. 1 at ¶ 94, MK Decl.

On February 13, 2002, WCG held a conference call with analysts. During this call Schubert said:

To re-summarize, last week WCG agreed to submit a comprehensive plan for restructuring and de-levering the balance sheet to our bank group by February 23. We continue to work with our financial and legal advisors on the development of this plan. Our previously stated goal remains. That is to successfully execute a plan without needing to seek bankruptcy court protection or requiring substantial dilution of our current equity shareholders.

However, based on the number of questions we have received, I must remind everyone that the ultimate outcome will be influenced by stakeholders outside of the company. As a result we cannot ensure success regarding our stated goal.

Ex. 17 at 2-3, JA.

Shares of WCG closed on February 12, 2002 at $.067, down $.01 from the previous day's close. Ex. 11 at 12, JA.

At the same time WCG was negotiating with its lending banks, it was in discussions with WMB and SBC, seeking substantial cash infusions. These discussions ultimately proved to be unsuccessful and ended in late February 2002. Ex. 63 at EY-WCG-01-000514, CM Decl.

On February 25, 2002, WCG issued a press release which announced that "The company, along with its bank group, is pursuing a comprehensive resolution to restructure its balance sheet" and "discussions are being expanded to include multiple restructuring options." According to WCG, "As part of evaluating the expanded options, the company is considering the potential benefits of a negotiated Chapter 11 reorganization process." *See,* Ex. 18, JA.

In response to the February 25, 2002 press release, WCG's stock price fell by 61.6% (net of industry and market effects). Ex. 1 at ¶ 95, MK Decl. The price of WCG's stock closed at $0.22 per share. *1227 Ex. 11 at 13, JA. The next day, February 26, Moody's lowered its credit ratings for WCG, and WCG's stock price was down another 16.2% (net of industry and market effects) on that day. Ex. 1 at ¶ 95, MK Decl. The WCG notes declined by 16.6% and 15.8% on February 25 and February 26, 2002, respectively. Ex. 1 at ¶ 96, MK Decl.

On March 5, 2002, WCG and the bank group agreed to extend the negotiating period to March 27, 2002. Ex. 60 at WTL 0282535, CM Decl.

On March 8, 2002, WCG exercised its option to purchase the ADP assets in accordance with the terms of the ADP. Under a prior agreement, WMB was obligated to fund the purchase price of the ADP assets in exchange for debt or equity from WCG. Ex. 60 at WTL 0282536, CM Decl.

By March 28, 2002, the price of WCG's stock had declined further, to close at $0.14 per share. Ex. 11 at 13, JA. The Telecom Index closed on March 28, 2002 at 173.76, a decline of 86% from its high on March 10, 2000 and 80% from the outset of the class period. Ex. 10 at 20, JA.

On April 1, 2002, WCG filed its Form 10-K for the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

496 F.Supp.2d 1195

496 F.Supp.2d 1195
(Cite as: 496 F.Supp.2d 1195)

year 2001. Ex. 19, JA. This filing disclosed that WCG had taken a total of $2.9 billion in impairment charges with respect to long-lived assets. *Id.* at F-11, F-12.It further stated that " Among the [restructuring] options is reorganization under Chapter 11 of the U.S. Bankruptcy Code."Ex. 19 at V-3, JA. E & Y included a "going concern" statement in its opinion, based on the potential for default claimed by WCG's creditors:

The accompanying financial statements have been prepared assuming that [WCG] will continue as a going concern. As more fully described in Note 1, certain of the Company's creditors have informed WCG that in their view WCG may be in default under the terms of its credit facility. This condition raises substantial doubt about the Company's ability to continue as a going concern. The financial statements do not include any adjustments to reflect the possible future effects on the recoverability and classification of assets or the amounts and classification of liabilities that may result from the outcome of this uncertainty.

E & Y did not issue an annual debt covenant compliance report for YE 2001. E & Y's issuance of the going concern explanatory paragraph constituted an event of default under WCG's credit agreement. Ex. 12, RM Decl.

The price of WCG's stock on April 1, 2002 closed at $0.13 per share. Ex. 11 at 13, JA.

On April 22, 2002, the price of WCG's stock closed at $0.17 per share. Ex. 11 at 13, JA. This was down 99% from the March 7, 2002 high and down 99.4% from the outset of the class period.

After the market close on April 22, 2002, WCG filed for Chapter 11 bankruptcy protection. Ex. 20, JA. The next trading day, April 23, 2002, WCG's stock price fell by 67.3% (net of industry and market effects). Ex. 1 at ¶ 98, MK Decl. The price of WCG's stock closed at $0.06, representing a total class period decline of 99.8%. Ex. 11 at 13, JA. Trading volume in WCG common stock on April 23, 2002 was 46.8 million shares, 7.1 times the daily average trading volume for WCG stock during the period following WCG's spin-off from WMB. The average price of WCG notes was down

17.6% on April 23, 2002. Ex. 1 at ¶ 98, MK Decl. The Telecom Index closed on April 23, 2002, at 148.94. Ex. 10 at 20, JA. At that point, the Telecom Index had declined approximately 83% from its high on March 10, 2000.

### III. *Procedural History*

Beginning on January 29, 2002, the date of WMB's press release announcing the **\*1228** delay of the release of the 2001 earnings pending an internal assessment of WMB's contingent obligations related to WCG, thirty separate class actions were filed in this judicial district against WMB and other defendants. By orders dated April 15, 2002 and June 21, 2002, the actions were consolidated and by order dated July 15, 2002, the consolidated action was styled, *In re Williams Securities Litigation,* Case No. 02-CV-72-F(M), Lead Case.[FN7]In the June 21, 2002 order, the court bifurcated the consolidated action in the two subclasses of plaintiffs: (i) the WMB Subclass and (ii) the WCG Subclass.[FN8] On July 8, 2002, the court appointed Alex Meruelo ("Meruelo") as lead plaintiff of the WCG Subclass. The 143-page Consolidated Amended Class Action Complaint was filed by lead plaintiff on behalf of the WCG Subclass on September 27, 2002. The Consolidated Amended Class Action Complaint alleged claims against (i) all defendants under § 10(b) of the Exchange Act, 15 U.S.C. § 78(b), and SEC Rule 10(b) promulgated thereunder, 17 C.F.R. § 240.10b-5, and (ii) the individual defendants and WMB as controlling persons under § 20(a) of the Exchange Act, 15 U.S.C. § 78t(a). More specifically, the amended complaint alleged that during the class period, as a result of defendants' materially false and misleading statements, members of the WCG Subclass purchased or acquired WCG equity and debt securities at prices that were artificially inflated. Motions to dismiss the complaint were filed by the WCG defendants and E & Y on November 25, 2002. By order dated December 12, 2003, the motion of the WCG defendants was denied and the motion of E & Y was granted in part and denied in part. *See, In re Williams Securities Litigation,* 339 F.Supp.2d at 1242.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

496 F.Supp.2d 1195                                                    Page 38

496 F.Supp.2d 1195
**(Cite as: 496 F.Supp.2d 1195)**

FN7. The consolidated action was originally assigned to Judge Sven Erik Holmes. The matter was reassigned to Judge Terence C. Kern on March 15, 2005. Subsequently, on November 3, 2005, the action was reassigned to the undersigned.

FN8. As previously stated, the claims of the WMB Subclass plaintiffs have been settled. A stipulation of settlement was executed on August 28, 2006. The court granted preliminary approval of the settlement and granted certification of the settlement class for settlement purposes on October 5, 2006. The court granted final approval of the settlement on February 9, 2007. Judgment was entered on February 12, 2007.

On January 12, 2005, Meruelo filed a motion to certify the WCG Subclass and to appoint himself and Norman Kirkendoll ("Kirkendoll") as representatives of the WCG Subclass. As previously noted, on November 11, 2005, the case was reassigned to the undersigned.

In an order dated June 12, 2006, this court certified the WCG Subclass and designated Mereulo and Kirkendoll as representatives for the WCG Subclass. Pursuant to the court's June 12, 2006 order and a subsequent order of August 8, 2006, the WCG Subclass consists of all persons who purchased or otherwise acquired the securities of WCG between July 24, 2000 and April 22, 2002, inclusive (the class period), and who were damaged thereby.[FN9]

FN9. Excluded from the subclass are defendants, officers and directors of WCG and/or any of its subsidiaries, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which defendants have or have had a controlling interest; holders of an Allowed Claim in Class 5 or 6 under WCG's Second Amended Joint Chapter 11 Plan of Reorganization, acting

in such capacity; and WCG common stock in the April 2001 spin-off of WCG from The Williams Companies, Inc. ("WMB") with respect to the WCG common stock they received as a result of the spin-off.

On August 16, 2006, the court entered an order approving the Notice of Pendency **\*1229** of Class Action, Summary Notice and Notice Dissemination Program. In that order, the court specifically ordered that all members of the WCG Subclass " who do not timely request exclusion from the Class by October 18, 2006 ... will be bound by any judgment or determination of the Court affecting the Class."

On October 31, 2006 and November 1, 2006, the court heard arguments on Daubert and summary judgment motions. Shortly thereafter, on November 14, 2006, the court entered an order staying proceedings in this case as related to the WCG Subclass pending the entry of an order on the Daubert and summary judgment motions.

### IV. *Summary of the claims of the WCG Subclass*

The WCG Subclass plaintiffs allege that the WMB defendants and WCG defendants made materially false and misleading statements or omitted to disclose material facts as to the reasons for the April 2001 spin-off and as to WCG's financial condition and operating results both before and after the April 2001 spin-off.

The WCG Subclass alleges that E & Y issued a clean audit opinion that falsely stated that WCG's financial statements for YE 2000 complied with generally accepted accounting principles. It also alleges that E & Y's audit opinion falsely stated that the audit complied with generally accepted auditing principles. Specifically, the WCG Subclass contends that WCG's network assets and other fixed assets were materially impaired under Statement of Financial Accounting Standards No. 121 (FAS 121) in 2000 and that WCG failed to disclose these impairments in the financial statements. Additionally, the WCG Subclass alleges that WCG improperly recognized revenue on certain

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

496 F.Supp.2d 1195

496 F.Supp.2d 1195
**(Cite as: 496 F.Supp.2d 1195)**

indefeasible right of use ("IRU") fiber transactions. It also contends that WCG failed to disclose debt covenant violations. The WCG Subclass contends that E & Y knew or recklessly disregarded facts showing that the assets were impaired, that WCG improperly recognized revenue with respect to the IRU transaction, and that WCG had violated its debt covenants. The WCG Subclass further alleges that E & Y failed to disclose "going concern" doubts in the audit report even though E & Y knew or recklessly disregarded facts showing that there was substantial doubt about WCG's ability to continue as a going concern.

### A. *Rule 10(b) and Rule 10b-5 Claims-Basic Elements.*

Section 10(b) of the Exchange Act forbids (1) the " use or employ [ment] ... of any ... deceptive device," (2) "in connection with the purchase or sale of any security," and (3) "in contravention of" the SEC " rules and regulations." 15 U.S.C. § 78j(b). SEC Rule 10(b)-5 forbids, among other things, the making of any "untrue statement of material fact" or the omission of any material fact "necessary in order to make the statements made ... not misleading." 17 C.F.R. § 240.10b-5. In cases involving publicly traded securities and purchases or sales in public securities markets, the basic elements of a securities fraud claim under § 10(b) and Rule 10b-5 include: (1) a material misrepresentation (or omission); (2) scienter, *i.e.,* a wrongful state of mind; (3) a connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation, *i.e.* a causal connection between the material misrepresentation and the loss. *Dura Pharmaceuticals, Inc. v. Broudo,* 544 U.S. 336, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005).

### B. *Section 20(a) Claims-Basic Elements.*

Under § 20(a) of the Exchange Act, "[e]very person who, directly or indirectly, controls any person liable" under Section **\*1230** 10(b) and Rule 10(b)-5 "shall also be liable jointly severally with and to the same extent as such controlled person is liable...."

15 U.S.C. § 78t. The basic elements of a control person liability claim under § 20(a) are (1) a primary violation of the securities laws and (2) " control" over the primary violator by the alleged controlling person. *City of Philadelphia v. Fleming Companies, Inc.,* 264 F.3d 1245, 1270-71 (10th Cir.2001) (citing *Maher v. Durango Metals, Inc.,* 144 F.3d 1302 (10th Cir.1998)).

### V. *The Daubert Motions.*

### A. *The general framework for Daubert analysis in this case.*

The basic principles which govern the resolution of a challenge to the admissibility of proposed expert testimony are nearly rote, but bear repeating with an eye to the context of the issues now before the court. Those principles are discussed in broad terms at this point. Further, more specific, discussion and analysis will be found later in this memorandum opinion.

The Supreme Court's decisions in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) and *Kumho Tire Company, Ltd. v. Carmichael,* 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999) establish a "gatekeeper" function for trial judges under Rule 702, Fed.R.Evid. *See also, Goebel v. Denver and Rio Grande Western R. Co.,* 215 F.3d 1083 at 1087 (10th Cir.2000)(*Goebel I* ). The gatekeeper function "requires the judge to assess the reasoning and methodology underlying the expert's opinion, and determine whether it is scientifically valid and applicable to a particular set of facts." *Id.*

The question of *how* to perform its gatekeeping function is a discretionary matter for the trial court. The court may conduct a hearing, it may perform its gatekeeping obligation by ruling on a motion in limine or on an objection at trial, or even by ruling on a post-trial motion. *Id.* When faced with a Daubert objection to proposed expert testimony, the court must adequately demonstrate by specific findings on the record that it has performed its duty

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

496 F.Supp.2d 1195                                                                 Page 40

496 F.Supp.2d 1195
(Cite as: 496 F.Supp.2d 1195)

as gatekeeper. *Goebel I,* 215 F.3d at 1088. The Court of Appeals has left no room for doubt on this point, *e.g., Dodge v. Cotter Corp.,* 328 F.3d 1212, 1227 (10th Cir.2003), *cert. denied,*540 U.S. 1003, 124 S.Ct. 533, 157 L.Ed.2d 408 (2003) ("Again, we lack specific, detailed findings about [the expert's] reasoning or the reliability of his methodology in arriving at his conclusions.").

When the proposed testimony of an expert is challenged under *Daubert* and its progeny, Rule 104 of the Federal Rules of Evidence applies to the court's consideration and determination of the issues raised by the Daubert challenge. *Daubert,* at 592, n. 10, 113 S.Ct. 2786. Rule 104(a) casts upon the proponent of the testimony the burden of establishing the admissibility of the testimony by a preponderance of the evidence. *Id. See also, Ralston v. Smith & Nephew Richards, Inc.,* 275 F.3d 965, 970, n. 4 (10th Cir.2001) and the Advisory Committee notes to the 2000 Amendment to Rule 702 ("[T]he admissibility of all expert testimony is governed by the principles of Rule 104(a). Under that Rule, the proponent has the burden of establishing that the pertinent admissibility requirements are met by a preponderance of the evidence."). It is in that light, and with that burden [FN10] in mind, *1231 that the court considers the pending Daubert motions.

> FN10. The proponent's burden may not be an evidentiary burden in the strict sense, but it is clear that, under Rule 104(a), it falls to the proponent to establish, and not to the opponent to refute, the admissibility of the evidence proffered by the proponent. *See, e.g., United States v. Cherry,* 217 F.3d 811, 815 (10th Cir.2000) and *United States v. Metropolitan Enterprises, Inc.,* 728 F.2d 444, 448-49 (10th Cir.1984).

Even though the court may delve deeply into the minutiae of the proposed expert's opinions while conducting the Daubert analysis, the court must always remain mindful that its focus "must be solely on principles and methodology, not on the conclusions that they generate,"*Daubert,* 509 U.S.

at 595, 113 S.Ct. 2786, except that a Daubert challenge may succeed if the court "conclude [s] that there is simply too great an analytical gap between the data and the opinion proffered," *General Elec. Co. v. Joiner,* 522 U.S. 136, 146, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997). Thus, the ultimate objective of *Daubert* scrutiny is to ascertain whether the proffered expert testimony is " not only relevant, but reliable," *Daubert,* 509 U.S. at 589, 113 S.Ct. 2786.

An essential component of the relevance evaluation is the determination of whether the proposed expert testimony fits the issues in the case. In assessing " fit," as the Supreme court called it, the court must determine whether the "expert testimony proffered in the case is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute. " *Daubert,* 509 U.S. at 591, 113 S.Ct. 2786 [internal quotation marks omitted].

As explained by the Court of Appeals:
[I]n fulfilling its *Daubert* obligations a trial court must also conduct a further inquiry into whether proposed testimony is sufficiently "relevant to the task at hand." *Daubert,* 509 U.S. at 597, 113 S.Ct. 2786, 125 L.Ed.2d 469. Relevant evidence "means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed.R.Evid. 401. The Supreme Court has described the consideration of relevant evidence as one of "fit." *Daubert,* 509 U.S. at 591, 113 S.Ct. 2786, 125 L.Ed.2d 469. A trial court must look at the logical relationship between the evidence proffered and the material issue that evidence is supposed to support to determine if it advances the purpose of aiding the trier of fact. Even if an expert's proffered evidence is scientifically valid and follows appropriately reliable methodologies, it might not have sufficient bearing on the issue at hand to warrant a determination that it has relevant " fit."

*Bitler v. A.O. Smith Corp.,* 400 F.3d 1227, 1234 (10th Cir.2004)*cert. denied sub nom. WHITE-RODGERS v. BITLER,* 546 U.S. 926, 126 S.Ct. 395, 163 L.Ed.2d 274 (2005).

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

496 F.Supp.2d 1195                                                        Page 41

496 F.Supp.2d 1195
**(Cite as: 496 F.Supp.2d 1195)**

In *Kumho,* the Court elaborated upon the Daubert gatekeeping function as applied to proposed expert testimony outside of the realm of classical scientific testimony. The Court emphasized that even where the proposed expert testimony is not scientific, in the classical sense, the trial judge is nevertheless required to ascertain whether the expert "employs in the courtroom the same level of *intellectual rigor* that characterizes the practice of an expert in the relevant field." *Kumho,* 526 U.S. at 152, 119 S.Ct. 1167 (emphasis added).

It is clear that, in our circuit, the Daubert gatekeeping function is undertaken by means of a two-step analysis. *Ralston,* 275 F.3d 965 at 969. *First,* the court must determine whether the proposed expert is qualified. This requires an assessment of his "knowledge, skill, experience, training or education." *See*Rule 702 and *Ralston* at 969. *Secondly,* if the proposed expert is determined to be sufficiently qualified, the court must determine whether his opinions are "reliable" in the sense required by **\*1232** *Daubert* and *Kumho. Ralston,* 275 F.3d 965 at 969.

### B. *Qualifications.*

In *Gardner v. General Motors Corporation,* 507 F.2d 525 (10th Cir.1974), our Court of Appeals noted that a proposed expert "should not be required to satisfy an overly narrow test of his own qualifications." *Id.* at 528. This self-evident admonition should be read in light of subsequent post-*Daubert* decisions.

The decision in *Ralston,* 275 F.3d 965, provides a good starting point, because that decision turned entirely on the expert's qualifications. Plaintiff asserted that the warnings accompanying an implanted orthopedic nail were inadequate. *Id.* at 967-68. The Court of Appeals affirmed the trial court's exclusion of the testimony of plaintiff's expert, a board-certified orthopedic surgeon who was also an associate professor of medicine at the University of Kansas Medical School. The expert's *general* credentials were clearly as good as could reasonably be expected, but she had done no research "specifically looking at this nail," *id.* at

969, and had not drafted a warning for a surgical device. *Id.* Her general credentials, though seeming ly impressive as general credentials, were not good enough: "[M]erely possessing a medical degree is not sufficient to permit a physician to testify concerning any medical-related issue." *Id.* at 970. The board-certified orthopedic surgeon's "reliance upon general principles and concepts" did not suffice. *Id.* Accordingly, her proposed testimony about the adequacy of the warning was not within the "reasonable confines" of her expertise. *Id.* If her proposed expert testimony had been within those "reasonable confines," her lack of specialization would have gone to the weight, not the admissibility, of her proposed expert testimony. *Id.See also,* as to specialization, *Broadcort Capital Corp. v. Summa Medical Corp.,* 972 F.2d 1183, 1194-95 (10th Cir.1992) (affirming trial court determination that an attorney with "some education and training in the field" was not qualified "as an expert in the securities area").

In this case, as is discussed in Part V(D) and (E), below, the Daubert challenge, and the resultant Daubert scrutiny, focuses on some unusually specific and discrete matters which plaintiffs' experts propose to address in their testimony-and on the interrelationships between the conclusions of those experts. Consequently, it should be borne in mind that "[t]he issue with regard to expert testimony is not the qualifications of a witness in the abstract, but whether those qualifications provide a foundation for a witness to answer a specific question." *Berry v. City of Detroit,* 25 F.3d 1342, 1351 (6th Cir.1994), *cert. denied,*513 U.S. 1111, 115 S.Ct. 902, 130 L.Ed.2d 786 (1995). *See also, Wheeling Pittsburgh Steel Corp. v. Beelman River Terminals, Inc.,* 254 F.3d 706, 715 (8th Cir.2001) ("To begin with, we agree with the district court that Dr. Curtis ... easily qualifies as an expert under Federal Rule of Evidence 702. The real question is, what is he an expert about?") and *Westfed Holdings, Inc. v. United States,* 55 Fed. Cl. 544, 571 (2003), *rev'd in part on other grounds,*407 F.3d 1352 (Fed.Cir.2005). Thus, on the issue of expert qualifications, *Ralston* and like cases establish that the qualifications of the proposed expert are to be assessed only after the specific matters he proposes to address have been identified.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

496 F.Supp.2d 1195

496 F.Supp.2d 1195
(Cite as: 496 F.Supp.2d 1195)

Page 42

The controlling Tenth Circuit cases, exemplified by *Ralston,* establish that the expert's qualifications must be both (i) adequate in a general, qualitative sense (*i.e.,*"knowledge, skill, experience, training or education" as required by Rule 702) and (ii) specific to the matters he proposes to address as an expert.[FN11]

> FN11. Plaintiffs have cited an unpublished Tenth Circuit decision, *Tingey v. Radionics,* 2006 WL 2258872 (10th Cir. Aug. 8, 2006) for the proposition that disputes as to the strength of the expert's credentials or as to his methodology "go to the weight, not the admissibility" of his testimony. Doc. No. 1498 at 4 (quoting *Tingey* at \*17). The Tenth Circuit's unpublished decision says exactly that, without elaboration other than to cite and quote from a Second Circuit decision, *Zuchowicz v. United States,* 140 F.3d 381 (2 ndCir.1998). It is unsurprising that *Tingey* cites *Zuchowicz,* from the Second Circuit, because the relevant passage from *Zuchowicz,* as quoted in *Tingey,* would be difficult to support with the Tenth Circuit's published decisions applying *Daubert* and its progeny. The unvarnished declaration that disputes as to credentials and methodology go to weight rather than admissibility is irreconcilable with scores of Tenth Circuit decisions, to say nothing of *Daubert, Kumho, Joiner* and *Weisgram.*

#### *1233 C. *Reliability.*

Under Rule 702, an expert with the necessary qualifications in the relevant field may give expert testimony if (i) the testimony is based upon sufficient facts or data, (ii) the testimony is the product of reliable principles and methods, and (iii) the witness has applied the principles and methods reliably to the facts of the case. Rule 702, Fed.R.Evid. *See, generally, Goebel v. Denver and Rio Grande Western R. Co.,* 346 F.3d 987, 991 (10th Cir.2003) ( *Goebel II* ).

The evaluation for reliability cannot be permitted to

evolve into an assessment of the ultimate persuasiveness of the proffered expert testimony. Faced with a Daubert challenge, expert testimony must meet "exacting standards of reliability," *Weisgram v. Marley Company,* 528 U.S. 440, 455, 120 S.Ct. 1011, 145 L.Ed.2d 958 (2000), but those exacting standards are still applied within a well-defined framework, because *Daubert* scrutiny is neither a substitute for jury resolution of contested issues fairly presented by conflicting testimony from qualified experts nor a grant of uncabined discretion to district judges to reject expert testimony that rubs them the wrong way. " Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert,* at 596, 113 S.Ct. 2786.

Thus, the court's "focus generally should not be upon the precise conclusions reached by the expert, but on the methodology employed in reaching those conclusions." *Bitler,* 400 F.3d at 1233. As explained by Judge Becker for the Third Circuit, a challenge to proposed expert testimony "does not mean that plaintiffs have to prove their case twice-they do not have to demonstrate to the judge by a preponderance of the evidence that the assessments of their experts are correct, they only have to demonstrate by a preponderance of evidence that their opinions are reliable." *In re Paoli R.R. Yard PCB Litigation,* 35 F.3d 717, 744 (3rd Cir.1994), *cert. denied sub nom. General Elec. Co. v. Ingram,* 513 U.S. 1190, 115 S.Ct. 1253, 131 L.Ed.2d 134 (1995). The reliability standard is "lower than the merits standard of correctness." *Id.* Thus, the trial court's determination of "reliability," in the Daubert sense, is not a determination as to whether the expert's proposed testimony is substantively correct-determinations of that kind would stretch most judges beyond their competence in most cases. [FN12]

> FN12. The relative competence of the trial judge and the expert is not a concern to the Supreme Court: "Of course, neither the difficulty of the task nor any comparative

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# 16
# Part 2 of 3

496 F.Supp.2d 1195                                                                                                  Page 43

496 F.Supp.2d 1195
(Cite as: 496 F.Supp.2d 1195)

lack of expertise can excuse the judge from exercising the 'gatekeeper' duties that the Federal Rules of Evidence impose...." *Joiner,* 522 U.S. at 148, 118 S.Ct. 512.

The reliability determination must be made regardless of the subject of the proposed expert testimony:
**\*1234** We conclude that *Daubert's* general principles apply to the expert matters described in Rule 702. The Rule, in respect to all such matters, "establishes a standard of evidentiary reliability." 509 U.S. at 590, 113 S.Ct. 2786, 125 L.Ed.2d 469. It "requires a valid ... connection to the pertinent inquiry as a precondition to admissibility." *Id.,* at 592, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469. And where such testimony's factual basis, data, principles, methods, or their application are called sufficiently into question, see Part III, *infra,* the trial judge must determine whether the testimony has "a reliable basis in the knowledge and experience of [the relevant] discipline." 509 U.S. at 592, 113 S.Ct. 2786, 125 L.Ed.2d 469.

*Kumho,* 526 U.S. at 149, 119 S.Ct. 1167.

*Daubert,* of course, involved a proffer of expert testimony in a classical scientific discipline-epidemiology. Bearing that context in mind, it is nevertheless appropriate to review the non-exclusive list of five factors which were provided by the *Daubert* court to guide trial court determinations of reliability. The Court said that the trial judge should (1) assess whether the expert's technique or theory can be or has been tested-that is, whether the expert's theory can be challenged in some objective sense, or whether it is instead simply a subjective, conclusory approach that cannot reasonably be assessed for reliability, (2) determine whether the technique or theory has been subject to peer review and publication, (3) evaluate the known or potential rate of error of the technique or theory when applied, (4) ascertain the existence and maintenance of standards and controls and, (5) determine whether the technique or theory has been generally accepted in the scientific community. *See,*509 U.S. at 590-94, 113 S.Ct. 2786.

*Kumho* made it clear that the gatekeeper function

applies even where the proposed expert testimony is outside the realm of science in the classical sense. *Kumho* involved a proffer of engineering testimony in a product liability case. The *Kumho* decision makes it clear that, although the ultimate task of the trial judge, as gatekeeper, remains the same, the factors which were included in the nonexclusive list in Daubert are to be used only to the extent that they are logically applicable. *See Kumho,* 526 U.S. at 149, 119 S.Ct. 1167. Thus, for instance, it has been noted that the factors mentioned by the Court in Daubert do not neatly apply to expert testimony from a sociologist, *Tyus v. Urban Search Management,* 102 F.3d 256 (7th Cir.1996), and that lack of peer review or publication is not dispositive where the expert's opinion is supported by "widely accepted scientific knowledge." *Kannankeril v. Terminix International, Inc.,* 128 F.3d 802, 809 (3rd Cir.1997). Moreover, as noted by the Advisory Committee in commenting on the 2000 amendments to Rule 702, courts both before and after *Daubert* have found other factors relevant in determining whether expert testimony is sufficiently reliable to be considered by the jury. Those additional factors which may be relevant depending on the circumstances include (1) whether the expert proposes to testify about matters growing naturally and directly out of his research, independent of the litigation, or whether he has developed his opinion expressly for the purpose of testifying, (2) whether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion, (3) whether the expert has adequately accounted for obvious alternative explanations, (4) whether the expert is being as careful as he would be in his regular professional work outside his paid litigation consulting, and (5) whether the field of expertise claimed by the expert is known to reach reliable results for the **\*1235** type of opinion the expert would give. *See,* Advisory Committee notes to 2002 amendments, and cases there cited.

[1] In sum, to make the Daubert assessment of reliability, the court-having found that the expert possesses the requisite expertise (if challenged), and having determined that the proposed expert testimony fits the issues in the case-must determine whether the expert's conclusions are the product of (i) application of that expertise using recognized

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

496 F.Supp.2d 1195

496 F.Supp.2d 1195
(Cite as: 496 F.Supp.2d 1195)

Page 44

and supportable methodologies, (ii) on the basis of adequate data which is (iii) rationally tied to the opinions which purport to be based on that data.

"Under *Daubert,* any step that renders the analysis unreliable ... renders the expert's testimony inadmissible. This is true whether the step completely changes a reliable methodology or merely misapplies that methodology." *Goebel II,* 346 F.3d at 992 (citations and internal quotations omitted); *Mitchell v. Gencorp Inc.,* 165 F.3d 778, 782 (10th Cir.1999). If the challenged expert testimony is crucial to the proponent's case, the result of a successful Daubert challenge may be entry of judgment as a matter of law. *Joiner,* 522 U.S. at 142-43, 118 S.Ct. 512; *cf. Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* --- U.S. ----, 127 S.Ct. 2499, 2511 n. 8, 168 L.Ed.2d 179 (2007); *Weisgram,* 528 U.S. at 453, 120 S.Ct. 1011. *See, e.g., Truck Ins. Exchange v. MagneTek, Inc.,* 360 F.3d 1206, 1213 (10th Cir.2004); *Ralston,* 275 F.3d at 974. Although the standard of appellate review is no more stringent where the trial court's exclusion of expert testimony is outcome-determinative, *Joiner,* 522 U.S. at 142, 118 S.Ct. 512, it certainly would be-and is here-natural to proceed with great caution where the court's rulings may be dispositive with respect to all or major portions of the case before it.

## D. *The Daubert challenges with respect to Messrs. Mathis and Mintzer.*

Plaintiffs' counsel retained H. Sean Mathis and Andrew M. Mintzer as two of their experts in this case. Mr. Mathis is a Managing Director in Miller Mathis & Co., an investment banking firm which was founded by Mr. Mathis and another principal. Mathis Rpt. at 2. Mr. Mintzer is a Certified Public Accountant. The qualifications of Messrs. Mathis and Mintzer are discussed in more detail in parts 3(a) and 4(a), below.

The scope of Mr. Mathis's engagement as an expert in this case has been described in various ways, but it is clear that his work in this case relates entirely to an impairment analysis of WCG's dark fiber and spare conduit assets under Statement of Financial

Accounting Standards No. 121 (FAS 121), a statement of accounting standards which was promulgated by the Financial Accounting Standards Board in 1995. The joint efforts of Messrs. Mathis and Mintzer with respect to FAS 121 provided a major portion of the basis for Mr. Mintzer's opinion that the financial statements of WCG as of December 31, 2000 and for the first three quarters of 2001 were not presented in conformity with generally accepted accounting principles (GAAP [FN13]). Mintzer Rpt., ¶¶ 86-171, 269-*1236 280. As is discussed in more detail below, in situations to which it applies, FAS 121 generally governs accounting for the impairment of long-lived assets. (FAS 121 has been superseded, but is the only impairment-related Statement of Financial Accounting Standards which is relevant to this case.)

> FN13. Generally accepted accounting principles "are the conventions, rules, and procedures that define accepted accounting practices." *United States v. Arthur Young & Co.,* 465 U.S. 805, 811, n. 7, 104 S.Ct. 1495, 79 L.Ed.2d 826 (1984). The Supreme Court has also observed that: " Far from a single-source accounting rulebook, GAAP 'encompasses the conventions, rules, and procedures that define accepted accounting practice at a particular point in time.' Kay & Searfoss [R. Kay & D. Searfoss, Handbook of Accounting and Auditing, ch. 5, p. 7 (2d ed.1989) ], ch. 5, at 7 (1994 Update). GAAP changes and, even at any one point, is often indeterminate. '[T]he determination that a particular accounting principle is generally accepted may be difficult because no single source exists for all principles.' *Ibid.* There are 19 different GAAP sources, any number of which might present conflicting treatments of a particular accounting question. *Id.,* ch. 5 at 6-7. When such conflicts arise, the accountant is directed to consult an elaborate hierarchy of GAAP sources to determine which treatment to follow." *Shalala v. Guernsey Memorial Hosp.,* 514

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

496 F.Supp.2d 1195
**(Cite as: 496 F.Supp.2d 1195)**

U.S. 87, 101, 115 S.Ct. 1232, 131 L.Ed.2d
106 (1995).

Mr. Mintzer's work as an expert in this case covers
more ground than Mr. Mathis's work (and thus, Mr.
Mintzer's work involves matters in addition to
application of FAS 121), but Mr. Mintzer's work is,
in several significant respects, dependent on Mr.
Mathis's work, and Dr. Nye's work is, in turn,
predicated in part on the work of Messrs. Mathis
and Mintzer.

As Mr. Mintzer wrote in his report, he was engaged
in this case to render an opinion as to:
a. Whether or not the financial statements of
Williams Communications Group, Inc. (WCG)
were prepared in accordance with applicable
Generally    Accepted    Accounting    Principles
(GAAP), and
b. Whether or not Ernst & Young LLP (E & Y)
adhered to applicable professional standards in the
performance of its audits of the fiscal 2000 financial
statements of WCG.

Mintzer Rpt. at 5 (footnote omitted).

As a prerequisite to analysis of the Daubert
challenges to the expert testimony of Messrs.
Mathis and Mintzer, it is necessary, as discussed in
Part V(B) and (C), above, to identify the specific
matters they propose to address in their expert
testimony. That, in turn, requires at least a general
familiarity with FAS 121.

FAS 121 "establishes accounting standards for the
impairment of long-lived assets, certain identifiable
intangibles, and goodwill related to those assets to
be held and used and for long-lived assets and
certain identifiable intangibles to be disposed of."
FAS 121, p. 4.[FN14] As relevant to the issues in this
case, and ignoring numerous details for the moment,
FAS 121 essentially requires entities that report
their financial condition on the basis of GAAP to
review for, recognize, measure and report losses
resulting from drops in the value of assets within the
scope of the statement "whenever events or changes
in circumstances indicate that the carrying amount
of an asset may not be recoverable." *Id.* Under FAS
121, and asset is said to be "impaired" if application

of FAS 121 indicates that the asset is not worth the
value at which it is carried on the books of the
company. *Id.* at 6."FAS 121 anticipates and
requires that managers, like the defendants, exercise
considerable business judgment in performing an
impairment review." *In re: Serologicals Sec
Litigation,* 2003 WL 24033694 at *14 (N.D.Ga.
Feb. 20, 2003). *See also,* involving FAS 121, *In re
K-tel International, Inc. Securities Litigation,* 300
F.3d 881 (8th Cir.2002); *Amalgamated Bank v.
Coca-Cola Co.,* 2006 WL 2818973 (N.D.Ga. Sept.
29, 2006); ***1237***Rosen v. Textron, Inc.,* 321
F.Supp.2d 308 (D.R.I.2004) and *Cutsforth v.
Renschler,* 235 F.Supp.2d 1216 (M.D.Fla.2002).

> FN14. The copy of FAS 121 to which the
> court refers, ex. 1 to Doc No. 1451, is a
> copy of the Financial Accounting
> Standards Board's official print of the
> now-superseded document, and it is that
> version which is cited in this memorandum
> opinion. Another source is http: //www.
> fasb. org/ st/ summary/ stsum 121. shtml.
> (Last visited June 7, 2007.)

The determination as to whether an impairment loss
must be recorded pursuant to FAS 121 involves
three steps:
*Step One: Review* long-lived assets for impairment
whenever events or changes in circumstances (*i.e.,* a
trigger) indicate that the carrying amount of an asset
may not be recoverable.
*Step Two: Estimate* the future cash flows expected
to result from the use of the asset and its eventual
disposition (undiscounted and without interest
charges). Impairment loss is to be recognized if
this amount is less than the carrying amount of the
asset.
*Step Three: Measure* the amount of the impairment
loss as the amount by which the carrying amount of
the asset exceeds its fair value (determining fair
value on the basis of market price, or, in the
absence of a market price, on the basis of such
measures as discounted future cash flows).

FAS 121 at ¶¶ 4-17, pp. 6-9.[FN15]

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

496 F.Supp.2d 1195                                                Page 46

496 F.Supp.2d 1195
(Cite as: 496 F.Supp.2d 1195)

> FN15. The FAS 121 procedure differs somewhat as applied to assets which management intends to dispose of. Those assets are to be reported at the lower of carrying amount or fair value less cost to sell. *Id.* at 8, ¶ 15. The resultant gain or loss is a component of income from continuing operations. *Id.* at 9, ¶ 18.

The short version of a description of the scope of the respective assignments of Messrs. Mathis and Mintzer with respect to FAS 121 analysis is that Mr. Mintzer performed Step 1 and Mr. Mathis performed Step 2 and Step 3 of the FAS 121 analysis. Doc. No. 1498 (Plaintiffs) at 5; Doc. No. 1499 (Plaintiffs) at 5.[FN16] That much is undisputed. Thus, Mr. Mathis's description of his engagement is that he was retained to:

> FN16. The pending Daubert and summary judgment motions involve 212 docketed documents. For the sake of brevity, they will generally be cited only by docket number and filing party, *e.g.* Plaintiffs or the WMB defendants or the WCG defendants or E & Y.

perform an impairment analysis, consistent with Financial Accounting Standards No. 121[sic] ("FAS 121"), of (i) the excess dark fiber and spare conduit assets of WCG as of December 31, 2000, which is one year prior to the impairment analysis conducted by the Company as of December 31, 2001 ... and (ii) the excess dark fiber and spare conduit assets held by the Asset Defeasance Program ("ADP") as of December 31, 2000.
Mathis Rpt. at 2.

As has been noted, closer analysis of the allocation of work as between Mr. Mathis and Mr. Mintzer is required, but that analysis should be undertaken in light of the gist of the Daubert challenges advanced by the defendants.

The WCG defendants argue that Mr. Mathis is "not qualified to testify as an expert regarding application of FAS 121" and that "numerous and substantial flaws in Mathis's methodology render

his opinions wholly unreliable." Doc. No. 1451 (WCG defendants) at 2. Similarly, E & Y asserts that Mr. Mathis is not qualified to conduct an impairment analysis under FAS 121 because "he lacks the required experience and accounting knowledge." Doc. No. 1433(E & Y) at 1. E & Y also asserts that Mr. Mathis's methodology is fatally deficient because his FAS 121 analysis "actually contradicts FAS 121" and uses a method that "is not allowed under FAS 121." *Id.* at 2. The defendants seek to exclude Mr. Mathis's proposed expert testimony *in toto.*

The Daubert challenges as to Mr. Mintzer are narrower. The defendants seek to **\*1238** exclude everything Mr. Mintzer has to say about FAS 121, but not everything he has to say on other subjects.
E & Y seeks to exclude Mr. Mintzer's opinions that WCG should have taken an impairment charge as of December 31, 2000 as to (i) the fiber network and (ii) the equipment inventory.[FN17] Doc. No. 1436(E & Y) at 1. E & Y argues that Mr. Mintzer lacks sufficient knowledge and experience with respect to application of FAS 121, that his reliance on the work of Mr. Mathis as to impairment of the fiber network is fatal to his own opinion as to impairment, and that Mr. Mintzer's opinion that WCG should have taken an impairment charge with respect to unspecified equipment inventory as of December 31, 2000 is fatally nonspecific and unreliable. *Id.* at 1-2.

> FN17. Under the court's order on E & Y's Motion to Dismiss Consolidated Amended Class Action Complaint (motion at Doc. No. 198), plaintiffs' claims against E & Y were dismissed to the extent that they were premised on WCG's 10-Q filings, press releases and other public statements not made by E & Y. *In re Williams Securities Litigation,* 339 F.Supp.2d at 1239.

The WCG defendants seek to exclude Mr. Mintzer's opinions as to violation of debt covenants and as to whether FAS 121 Step 1 triggering events occurred in *2001.* Doc. No. 1437 (WCG defendants) at 3. Those defendants assert that Mr. Mintzer's opinion as to violation of the debt covenants is inadmissible

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

496 F.Supp.2d 1195                                                                 Page 47

496 F.Supp.2d 1195
**(Cite as: 496 F.Supp.2d 1195)**

because it lies outside his area of expertise. *Id.* at 4. The challenge to Mr. Mintzer's opinion as to FAS 121 triggering events in 2001 is premised on arguments as to methodology, not as to qualifications. *Id.* at 7. The WCG defendants also adopt E & Y's motion as to Mr. Mintzer. *Id.*

The WMB defendants attack only the opinions expressed in the last four paragraphs of Mr. Mintzer's 305-paragraph report, those being the paragraphs in which Mr. Mintzer opines that the financial statements of Williams Companies, Inc. were misstated as a result of WCG's failure to write down its assets under FAS 121. Doc. No. 1446-1 (WMB defendants) at 1. The challenge is based on the substance of, and the support for, the opinions, rather than on Mr. Mintzer's qualifications. *Id.* at 4-14. (The WMB defendants also adopt the motions of E & Y and the WCG defendants as to Mr. Mintzer. *Id.* at 6, n. 3.)

### 1. *The division of labor between Messrs. Mathis and Mintzer with respect to FAS 121 impairment analysis.*

Viewing the Daubert challenges to the proposed expert testimony of Messrs. Mathis and Mintzer with respect to application of FAS 121 in light of the complexity of the accounting issues as to which they opine, in light of the reliance Mr. Mintzer necessarily places on Mr. Mathis's work, and in light of the bases for the defendants' challenges to the opinions of the two experts, closer analysis of the division of labor between the two experts with respect to application of FAS 121 is required. The determination of the existence of an impairment loss under FAS 121 as of (or at any time after) December 31, 2000 plainly required (whether made contemporaneously or by Messrs. Mathis and Minter as retained experts) several separately identifiable analyses and judgments. The following is a non-exhaustive summary of the analyses and judgments which application of FAS 121 entailed and of the division of labor between Messrs. Mathis and Mintzer with respect to those tasks:

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

496 F.Supp.2d 1195                                                                                          Page 48

496 F.Supp.2d 1195
**(Cite as: 496 F.Supp.2d 1195)**

*STEP 1*
FAS 121, ¶
¶ 4, 5
Determine
whether
impairment
indicators
exist.

Identify          Mintzer
triggers of
impairment
analysis.
FAS 121, ¶
¶ 4, 5

*STEP 2*
FAS 121, ¶
6
Determine
whether an
impairment
must be
recognized.
("
undisc
ounted
future cash
flows" vs. "
carrying
amount")

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

496 F.Supp.2d 1195                                                              Page 49

496 F.Supp.2d 1195
**(Cite as: 496 F.Supp.2d 1195)**

| | | |
|---|---|---|
| Estimate undiscounted future cash flow from asset and its disposition and compare to carrying amount of the asset. FAS 121, ¶ 6 | Mathis | |
| 2.1 | Classify assets for grouping purposes. FAS 121, ¶¶ 8, 98 | Mathis |
| 2.2 | Determine amount of "excess" darkfiber. FAS 121, ¶ 8 | Mathis |
| | 2.2(a) Determine extent of reliance on management's grouping. FAS 121, ¶ 98 | Mathis |
| | 2.2(b) Determine number of fiber strands to be retained. | Mathis |

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

496 F.Supp.2d 1195                                                      Page 50

496 F.Supp.2d 1195
**(Cite as: 496 F.Supp.2d 1195)**

|      |                                                                                 |        |
|------|---------------------------------------------------------------------------------|--------|
|      | 2.2(c) Determine extent of reliance on manage ment's budgets and projec tions. FAS 121, ¶ 142 | Mathis |
| 2.3  | Identify " reasonable and suppor table assum ptions" re: expected future cash flows from excess dark fiber FAS 121, ¶ 9 | Mathis |
|      | 2.3(a) Estimate future prices- market factors.                                  | Mathis |
|      | 2.3(b) Estimate future prices-te chnology factors.                              | Mathis |
|      | 2.3(c) Estimate future bandwi dthvol umes-m arket factors.                      | Mathis |

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

496 F.Supp.2d 1195                                                        Page 51

496 F.Supp.2d 1195
**(Cite as: 496 F.Supp.2d 1195)**

| | |
|---|---|
| 2.3(d) Determine number of years (i.e. useful life) for which " future cash flows [are] expected to be generated by [the] asset." FAS 121, ¶ ¶ 6, 9 | Mathis |
| 2.4 Determine "likelihood of possible outcomes" re: estimate of future cash flow. FAS 121, ¶ 9 | Mathis |
| *STEP 3* FAS 121, ¶ 7 Determine amount of impairment loss to be recognized. | |
| 3.1 Determine "the fair value of the asset." FAS 121, ¶ 7 | Mathis |

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

| | |
|---|---|
| 3.1(a) Select dark fiber valuation approach. FAS 121, ¶ 7 | Mathis |
| 3.1(b) Select appropriate discount rate [if discounted cash flow approach is used]. FAS 121, ¶ 7 | Mathis |

| | |
|---|---|
| Ancillary steps: Judgment as to qualifications of Mathis to perform Steps 2 and 3 | Mintzer |

**\*1239** *2. The experts' methodology vs. the methodology the accountants were required to employ in their audit-related work.*

[2] One more matter should be addressed before applying the Daubert and Rule 702 standards to the challenges to the proposed expert testimony of Messrs. Mathis and Mintzer. As has been noted, Mr. Mintzer is a Certified Public Accountant. Mr. Mathis is not. E & Y asserts, in essence, that in evaluating Mr. Mintzer's work as a retained expert in this case, the court should apply the standards that would have governed Mr. Mintzer's work (both substantively and with respect to methodology) if he were performing the audit of the financial statements of WMB and WCG in the first instance.

Thus, in support of its criticism of Mr. Mintzer's reliance on Mr. Mathis's performance of Steps 2 and 3 of the FAS 121 impairment analysis, E & Y argues that Auditing Standard 336 precluded Mr. Mintzer from adopting or otherwise relying on Mr. Mathis's work. Doc. No. 1436(E & Y) at 11; Doc. No. 1525(E & Y) at 7. In response, plaintiffs argue that "Mintzer, of course, was not conducting an audit. He was evaluating and opining on the methodologies employed by WCG and its auditors related to WCG's 2000 audit. Thus, GAAS [FN18] does not define the standard to which he is held and AU 336 is not relevant to this case. The applicable standard for his opinion is Fed.R.Evid. 703." Doc. **\*1240** No. 1499 (Plaintiffs) at 6. Plaintiffs assert, instead, that the relevant professional standard is the Statement on Standards for Consulting Services, published by the American Institute of Certified

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

496 F.Supp.2d 1195                                                              Page 53

496 F.Supp.2d 1195
**(Cite as: 496 F.Supp.2d 1195)**

Public Accountants (AICPA). *Id.* at 7 (citing "
SSCS § 100.06"). In reply, E & Y argues that "
Plaintiffs also are wrong that SSCS § 100.06
applies because Mintzer was hired only as a '
consultant.' Perhaps what Mintzer is doing *for
plaintiffs* qualifies as 'consulting,' but what he is
purporting to do *for the jury* is step into the shoes of
an auditor and accountant performing a FAS 121
analysis." Doc. No. 1525 at 10 (citation omitted).

> FN18. "GAAS" stands for generally
> accepted auditing standards. "GAAS
> include 10 broadly phrased standards and
> general principles that guide the audit
> function. They are classified as general
> standards, standards of fieldwork, and ...
> standards of reporting. More specific
> guidance may be found in the Statements
> on Auditing Standards (SAS), which are
> periodic interpretations of the standards
> issued by the Auditing Standards Board
> (ASB) of the American Institute of
> Certified Public Accountants (AICPA).
> See AICPA, *Codification of Statements on
> Auditing Standards* (AU) §§ 110-901
> (2005)." *Deephaven Private Placement
> Trading, Ltd. v. Grant Thornton & Co.,*
> 454 F.3d 1168, 1170 (10th Cir.2006).

The court rejects E & Y's contention that the GAAP
and GAAS standards that governed its audit work
apply, of their own force, to Mr. Mintzer's work as a
retained expert. His work as a retained expert (and
hence the court's evaluation of his work under
*Daubert* ) certainly must be informed by the
relevant GAAP and GAAS standards. But *Daubert*
and Rules 702 and 703, as well as the relevant
standards governing the public accounting
profession, lead the court to the conclusion that Mr.
Mintzer's work is not to be judged by wholesale
application of the standards that would have
governed his work (both methods and substantive
principles) had he performed the WMB and WCG
audits himself.

As a beginning point, the court will examine how
the public accounting profession characterizes and
defines Mr. Mintzer's engagement as a retained

expert in this case. The AICPA's standards and
related interpretive materials provide valuable
guidance.

The AICPA distinguishes between what it calls "
attest services" and other types of service. "For
years, attest services generally were limited to
expressing a positive opinion on historical financial
statements on the basis of an audit in accordance
with generally accepted auditing standards (GAAS).
" AICPA Professional Standards: *Statements on
Standards for Attestation Engagements,* as amended
(AICPA, 2001). Attest services now include
services other than traditional audits, *id.,* but the
common characteristic of all attest engagements is
that the practitioner is attesting to, or providing
assurance on, subject matter that is the
responsibility of another party. Jane M. Mancino
and Charles E. Landes, *A New Look at the
Attestation Standards,* Journal of Accountancy, vol.
192, no. 1 (AICPA July 2001).[FN19] *See also, In
re Computer Learning Centers, Inc.,* 285 B.R. 191,
215 (Bkrtcy.E.D.Va.2002). Attest services are the
gold standard; expert opinions in litigation are
more like base metal: "An expert opinion is not an
attest opinion as the term is used in reference to a
set or specified elements of financial statements.
On rare occasions, though, an expert opinion may
relate to an examination of a financial presentation
or to a judgment on whether financial statements are
presented in accordance with generally accepted
accounting principles (GAAP)." Peter B. Frank
and Michael Wagner, *Providing Litigation Services,*
Consulting Services Practice Aid 93-1, at ¶
70/110.03 (AICPA 1993).

> FN19. Available online at ht tp:// www.
> aicpa. org/ PUBS/ jofa/ jul 2001/ mancino.
> htm (last visited January 23, 2007).

Frank and Wagner go on to comment that: "In
general, litigation services engagements are
considered to be a form of consulting services as
defined by the AICPA. Therefore, the Statements
on Standards for Consulting Services (SSCS) must
be followed in a litigation services engagement." *Id.*
at 70/130.18.As a consulting service:
[Litigation work] excludes three general categories

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

of services subject to AICPA **\*1241** Technical Standards. These standards are Statements on Auditing Standards (SASs), Statements on Standards for Attestation Engagements (SSAEs), or Statements on Standards for Accounting and Review Services (SSARSs). The excluded services may be performed in conjunction with consulting services, but only the consulting services are subject to the SSCS.

Peter B. Frank, Michael Wagner and Roman L. Weil, *Litigation Services Handbook: The Role of the Accountant as Expert Witness,* at 3 (John Wiley & Sons, Inc.1993 supp.) (hereinafter: *Handbook* ).

Because of the sharp differentiation between attest services and consulting engagements (of which litigation services are one variety), the AICPA cautions that:
When the practitioner determines that an attest service is to be provided as part of a consulting service engagement, the practitioner should inform the client of the relevant differences between the two types of services and obtain concurrence that the attest service is to be performed in accordance with the appropriate professional requirements. The practitioner should take such actions *because the professional requirements for an attest service differ from those for a consulting service engagement.*

AICPA Professional Standards: *Statements on Standards for Attestation Engagements,* as amended, § 101, ¶ 110 (AICPA, 2001) (emphasis added).

In the case at bar, plaintiffs do not claim that Mr. Mintzer performed an audit conforming to GAAS. He was not required by *Daubert* (or Rules 702 and 703) to do that. This court agrees with the court in *United States v. Forbes,* 2006 WL 2792883 (D.Conn. Sept. 28, 2006) that an accountant may testify with respect to GAAS or GAAP violations on the basis of work done in compliance with the AICPA's standards for consulting work. In *Forbes,* the court rejected the defendant's assertion that the expert's proposed testimony was:
deficient because he did not follow generally accepted auditing standards (GAAS) in formulating

his opinions. [The expert] did not need to perform an audit in accordance with GAAS or attest to the accuracy under generally accepted auditing [sic] principles (GAAP) of CUC's and Cendant's financial statements in order to give his expert opinion that those financial statements violated GAAP.... He also did not need to use GAAS to identify the fraudulent accounting practices or to explain how they violated GAAP and inflated those earnings. [The expert's] work on this case is governed by the consulting standards of the American Institute of Certified Public Accountants ( "AICPA"), and his testimony complied with those standards. Contrary to Forbes's contention, this does not mean that [the expert] did not employ the same level of intellectual rigor that characterizes the practice of an expert in his field.

*Id.* at *1.

As has been noted, E & Y's primary complaint as to Mr. Mintzer's asserted failure to comply with GAAS in his work as an expert in this case is that Mr. Mintzer's use of, and reliance on, the FAS 121 Step 2 and Step 3 conclusions of Mr. Mathis violated Auditing Standard 336. Pointing out that Messrs. Mathis and Mintzer have never even spoken with each other (Mathis deposition at 89), E & Y argues, in effect, that the asserted AU 336 violation, without more, requires rejection of Mr. Mintzer's proposed expert testimony. Doc. No. 1436(E & Y) at 11; Doc. No. 1525(E & Y) at 7. [FN20] Although the relationship between **\*1242** Mr. Mathis's work and that of Mr. Mintzer deserves, and will get, more detailed treatment later in this memorandum, the court, relying on the legal and accounting authorities set forth above, rejects E & Y's *per se* argument as to the impermissibility of Mr. Mintzer's reliance on Mr. Mathis's work.[FN21]

> FN20. E & Y also cites the Tenth Circuit's decision in *TK-7 Corp. v. Barbouti,* 993 F.2d 722 (10th Cir.1993), for the proposition that the validity of the work of one expert may not be uncritically assumed by another expert if that assumption forms a necessary part component of his expert testimony. E & Y's reliance on that case

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

496 F.Supp.2d 1195                                                          Page 55

496 F.Supp.2d 1195
(Cite as: 496 F.Supp.2d 1195)

is misplaced. In *TK-7,* the expert whose work was incorporated by another expert did not testify at trial. He was apparently not listed as an expert and his financial projections (the validity of which was assumed by the expert whose trial testimony was rejected) were not subject to testing and challenge in the usual ways.

In the case at bar, Mr. Mathis is a testifying expert. His work has, of course, been subjected to the entire range of attacks permitted by the rules.

FN21. On the subject of independence and objectivity, a CPA working on a litigation engagement has some latitude: "As a consultant, the CPA may resolve doubt in favor of the client, as long as the position can be supported." *Handbook, supra,* at 7. That, as a practical matter, is a fair characterization of the approach of most expert witnesses. In contrast, in an attest engagement, the requirement of stiff-necked independence prevails over other considerations: "Independence in mental attitude presumes an undeviating concern for an unbiased conclusion about the subject matter or an assertion no matter what the subject matter or the assertion may be." *Statements on Standards for Attestation Engagements,* as amended, § 101, ¶ 37 (AICPA, 2001). Thus, an auditor must "be without bias" and apply " a judicial impartiality." AICPA Professional Standards: *Independence,* AU § 220.0 (AICPA 1972). Some expert witnesses would clear that bar; most (regardless of credentials) would not.

*3. Daubert analysis-proposed expert testimony of H. Sean Mathis.*

*a. Qualifications.*

Mr. Mathis's qualifications must be assessed in light of the demands of his specific undertaking in this case. See the discussion in Part V(B) and (C), above.

[3] The FAS 121 Step 2 and Step 3 analysis undertaken by Mr. Mathis represents the entirety of his expert work in this case, and forms an indispensable component of a significant portion of the expert work of Mr. Mintzer. Mathis Rpt. at 2-4; Mintzer Rpt., ¶¶ 150-52, p. 52-53.[FN22]

> FN22. The nature and extent of Mr. Mintzer's reliance on Mr. Mathis is discussed in greater detail in Part V(D)(4)(b), below.

Without repeating all of the task descriptions summarized in the chart in Part V(D)(1), above, Mr. Mathis's FAS 121 Step 2 and Step 3 analysis plainly required, on the basis of an understanding of the then-relatively new (but rapidly expanding) [FN23] fiber optic data transmission business (augmented by an understanding of competing data transmission technologies): judgments as to classification and grouping [FN24] of fiber optic assets and related equipment assets (with related judgments as to the present and future physical and commercial interrelationship between lit and dark fiber assets), judgments (on a retrospective as well as prospective basis) as to the extent and effect of increases in industry-wide capacity, judgments as to future retention of core fiber and associated assets (with related judgments as to the impact of existing and foreseeable technology improvements [FN25] on capacity), judgments as to present and future domestic **\*1243** and international demand for internet, data, voice and video data transmission services and for rights of use of dark fiber, judgments as to the effect of market and technology factors on prices for data transmission services (and rights of use), as well as the costs of providing those services, judgments as to the remaining physical and technological useful life of the dark fiber assets, and judgments as to appropriate discount rates, as affected by both micro- and macro economic factors. FN26

> FN23. *See, e.g.,* WCG Form 10-K Annual Report for year ended December 31, 2000, at 2-4, 13.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

496 F.Supp.2d 1195

496 F.Supp.2d 1195
(Cite as: 496 F.Supp.2d 1195)

Page 56

FN24. Asset grouping is described in FAS 121 as requiring "significant management judgment within certain parameters." FAS 121, ¶ 98, p. 31.

FN25. *E.g.,* fiber improvements such as Enhanced LEAF and TruWave products, transmission developments such as dense wave division multiplexing, and connectivity developments such as optically meshed SONET.

FN26. This partial listing is based on the text of FAS 121 and the record evidence as to the nature of WCG's business and of WCG's operating assets. This listing is substantially confirmed by the deposition testimony of Mr. Mathis. Mathis deposition at 326-32.

The qualifications that Mr. Mathis brought to this undertaking are summarized as follows: Mr. Mathis is a Managing Director in Miller Mathis & Co., an investment banking firm. He was graduated from Allegheny College with a Bachelor of Arts degree and from the Wharton Graduate School of Business with a Master of Business Administration degree. To put it mildly, he has substantial experience in the business world. His career history is summarized in Appendix B to his report.

Mr. Mathis asserts, and there is no reason to doubt, that he has substantial experience in discounted cash flow analysis. This is significant because, depending on the circumstances, a discounted cash flow analysis is a permissible valuation technique under FAS 121, Step 3. FAS 121, ¶ 7. In this respect, it is noteworthy that plaintiffs define Mr. Mathis's task in this case narrowly and then assert that he was qualified to perform that narrowly-defined task. Although plaintiffs acknowledge that they "retained Mathis to evaluate Step 2 and Step 3 of the impairment analysis," Doc. No. 1498 (Plaintiffs) at 4, they favor a more limited description of what he actually did: they say that he was called upon to "opine on financial valuations based on cash flow analyses, an area well-within his expertise." *Id.* at 2. He has performed numerous " valuations based on discounted cash flow analyses,"

for which reason "he is entirely qualified to perform a discounted cash flow analysis in this case." *Id.* at 3.

Bearing in mind that Mr. Mathis, and Mr. Mathis alone, is on the hook for FAS 121 Steps 2 and 3 in this case, it is clear that his engagement to perform the Step 2 and 3 analyses necessarily entailed judgments (whether they are characterized as accounting judgments, business judgments, or financial judgments, or some combination of the three) substantially more complex and industry-specific than is suggested by the description of his task as, essentially, a discounted cash flow analysis. The FAS 121 Step 2 and Step 3 analyses in this case required numerous quantitative (see the chart in Part V(D)(1), above) inputs which, by their nature, could only be the product of qualitative judgments resulting from the application of industry-specific knowledge, augmented by professional experience in selecting and evaluating the relevant data and then pushing the masses of data through the FAS 121 analytical process.

Viewing the matter in this light, it is evident that Mr. Mathis's qualifications for his specific tasks in this case must be viewed both in light of his considerable business experience and in light of the credentials and experience that he does not possess.

Mr. Mathis is neither a certified public accountant nor "an accountant" nor an "auditor." Mathis Dep. 38, 45. That, in itself, is dispositive of nothing, but it is relevant. He has never performed a FAS 121 analysis. *Id.* at 46. This case is "the only time" he has ever been asked to render an opinion as to impairment of *1244 assets under FAS 121. *Id.* at 53. By his own description, he is "not a telecom expert." *Id.* at 60. He did not avail himself of the assistance of his firm's telecom expert. *Id.* Though he sat, "from the late '90s to the early 2000s" on the board of a wireless paging company (Arch Communications), he recalls no specific experience "working for or on behalf of a company that has a fiber network." *Id.* at 58-60.

The disjunctive language of Rule 702 makes it clear that experience can substitute for formal credentials.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

496 F.Supp.2d 1195                                                                    Page 57

496 F.Supp.2d 1195
**(Cite as: 496 F.Supp.2d 1195)**

*E.g., LifeWise Master Funding v. Telebank,* 374 F.3d 917, 928 (10th Cir.2004). But regardless of the mix of formal credentials and experience that is proffered as establishing the requisite "qualifications" under the rule, those qualifications must be *specific* as well as *general.* See the discussion in Part V(B), above. In this case, as a practical matter, the requirement of *specific* qualifications means that, for the FAS 121 Step 2 and Step 3 work for which Mr. Mathis undertook sole responsibility in plaintiffs' lineup of experts, Mr. Mathis necessarily had to have *industry*-specific qualifications: "The real question is, what is he an expert about?" *Wheeling Pittsburgh Steel Corp.* 254 F.3d at 715.

The court concludes with no difficulty that, had Mr. Mathis been a member of a team of specialists collaborating on an FAS 121 analysis of WCG's dark fiber and related assets, he would have had much to offer with respect to those aspects of FAS 121 Step 3 that would have included a discounted cash flow analysis (if that valuation method were selected). It is equally clear, however, that the numerous financial, accounting and business judgments (correctly referred to by E & Y and the WCG defendants as "industry-dependent judgments," Doc. No. 1523 [E & Y and WCG] at 8) that are antecedent to a Step 3 discounted cash flow analysis are no more "within the reasonable confines of [Mr. Mathis's] subject area" than were the board-certified orthopedic surgeon's criticisms of the warnings accompanying the orthopedic nail in *Ralston. Ralston,* 275 F.3d at 970 (quoting *Compton v. Subaru of America, Inc.,* 82 F.3d 1513, 1520 (10th Cir.1996)). It should be noted, moreover, that the opinions expounded by Mr. Mathis as to FAS 121 Steps 2 and 3 are not undergirded by the work of Mr. Mintzer: "For purposes of evaluating Step 2 and Step 3 of the FAS 121 impairment calculation, I am relying on another expert retained by Plaintiffs with specialized knowledge and skills in the field of business valuation, Mr. Sean Mathis of the firm Miller Mathis. I am relying on Mr. Mathis in a similar fashion that an auditor relies on a specialist in the conduct of an audit." Mintzer Rpt., ¶ 150, p. 52.[FN27] Although this is more relevant to an analysis of Mr. Mintzer's work than to that of Mr. Mathis, it is also worthy of note that Mr. Mathis's

qualifications cannot be bolstered by any claim that he was selected by Mr. Mintzer. Mr. Mintzer did not select Mr. Mathis, and had never worked with or even heard of him before they both were hired by plaintiffs' counsel in this case. Mintzer deposition **\*1245** at 283. Mr. Mintzer undertook no investigation of Mr. Mathis other than to look for publicly available "negative citations." *Id.* at 284.

> FN27. In paragraph 151 of his report, at p. 52, Mr. Mintzer refers to Mr. Mathis's grouping judgment and then proceeds, in paragraph 152, to say: "*Thus* it is my opinion that the decision by Plaintiff's valuation expert, Mr. Mathis, to separately evaluate excess dark fibers based on grouping fibers according to WCG's business plan is in conformity with FAS 121." *Id.* (emphasis added). This declaration by Mr. Mintzer on the critical issue of asset grouping is not supported by any proffer of any analysis on his part. For that reason, whether this declaration is dismissed as constituting a notable example of "ipse dixit," *Joiner,* 522 U.S. at 146, 118 S.Ct. 512, or as an expression by a retained expert without benefit of any semblance of compliance with Rule 26(a)(2)(B), it is clear that it must be disregarded.

The short of the matter is that Mr. Mathis, though clearly possessing the *general* qualifications required to perform a discounted cash flow analysis, does not possess the industry-specific expertise necessary to make the numerous judgments which had to be made in order to generate the inputs for a discounted cash flow analysis as applied to the dark fiber and related assets of WCG as of December 31, 2000. His expert opinions as to the outcome of a FAS 121 Step 2 and Step 3 analysis as applied to those assets in this case, are, accordingly, inadmissible under Rule 702 and *Daubert.*

### b. *Reliability.*

[4] The defendants attack the reliability of Mr.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

496 F.Supp.2d 1195                                                                                    Page 58

496 F.Supp.2d 1195
**(Cite as: 496 F.Supp.2d 1195)**

Mathis's proposed expert testimony on several bases. Defendants assert that, in performing his FAS 121 analysis, Mr. Mathis improperly disregarded WCG's business plans. They also assert that Mr. Mathis's approach to asset grouping was fatally flawed in several respects. Because the court has determined that Mr. Mathis lacks the qualifications necessary to give the expert testimony he proposes to give, it would be sufficient to leave it at that, and forego analysis of any of the challenges to the reliability of that testimony. The court has determined, however, that it is appropriate to address two aspects of the challenge to the reliability of Mr. Mathis's conclusions.

*Methodology: Disregard for management's budgets and projections.* In considering a Daubert motion, it is usually important for the court to determine whether the methodology employed by an expert "is generally accepted in the relevant [professional] community," *Kumho,* 526 U.S. at 151, 119 S.Ct. 1167, because a retained expert's adherence to an established and recognized methodology (if there is one) is important under Daubert and its progeny. *See, e.g., 103 Investors I, L.P. v. Square D Co.,* 470 F.3d 985 (10th Cir.2006).

Paragraph 142 of FAS 121 states that "information necessary to perform the recoverability test is generally available from budgets and projections used by management in the decision-making process." As will be seen, Mr. Mathis acknowledged that, in performing his FAS 121 analysis, he disregarded WCG's business plan. As a matter of methodology under paragraph 142, management's business plans clearly ought not to be rejected out of hand: those business plans may ultimately, for some reason, be disregarded, but the auditor who takes it upon himself to reject them plainly should have a reasoned basis for doing so. Likewise, in this litigation context, the expert is one step removed from making professional auditing judgments in the first instance-his task is to provide expert testimony in aid of a determination of whether the others who came before him made judgments which were fraudulent or otherwise actionable.

As to whether he took management's business plans

into account in reaching his judgments under FAS 121, Mr. Mathis testified as follows:
Q. Did you try to conduct your analysis to be consistent with WCG's business plan as of 12-31-2000?
A. FAS 121 does not mention business plan [FN28] anywhere. We wanted our analysis to be consistent with 121, and business plan is not mentioned, so business plan to us was irrelevant.

> FN28. Lest there be any doubt, Mr. Mathis agreed that "budgets and projections" would be part of a business plan: "Q: Would you call their budgets and projections part of their business plan? A: I would think they would be." *Id.* at 104.

*1246 Q. The company's business plan at 12-31-2000 was irrelevant to your analysis?
A. In terms of doing the FAS 121 analysis, yes.
Q. So you have no opinion whatsoever as to whether your analysis was consistent with the company's business plan as of 12-31-2000; is that right?
MR. VINIK: I object to the form.
A. Our analysis is independent of any business plan.

Mathis deposition at 102-03.

Mr. Mathis reinforced this point when he testified that "we did not conduct our analysis with regard to their business plan, as consistent with FAS 121." *Id.* at 104. Otherwise stated: "We did not, consistent with FAS 121, consider the company's business plan." *Id.* at 105. Later in his deposition, when pressed on a related point, Mr. Mathis reminded counsel, somewhat petulantly, that: "I told you, I don't use company information." *Id.* at 264.

In response to defendants' arguments on this point, plaintiffs argue, first (and correctly) that: "Nothing in Paragraph 142 requires that budgets and projections used by management should be taken at face value, or that they should be the sole source of information relied on in an impairment analysis." Doc. No. 1498 at 9. Plaintiffs also point out that

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

496 F.Supp.2d 1195                                                                                           Page 59

496 F.Supp.2d 1195
**(Cite as: 496 F.Supp.2d 1195)**

Mr. Mathis testified as follows: "So would we look at management's projections? The answer is we looked at some of management's projections." Mathis deposition at 113. The problem is that plaintiffs point to nothing in Mr. Mathis's report or testimony reflecting consideration, analysis and reasoned rejection of management's budgets and projections relevant to an FAS 121 impairment analysis. A fair reading of his testimony reliably indicates that Mr. Mathis made an *a priori* decision not to take management's business plan into account.

Under Rule 702, it behooves the retained expert to use "reliable principles and methods." Alteration of an established methodology is a "step that renders the analysis unreliable [and] renders the expert's testimony inadmissible." *Goebel II,* 346 F.3d at 992. *See also, Mitchell v. Gencorp Inc.,* 165 F.3d at 782. In the case at bar, the parties and the court have, in FAS 121, guidance as to methodology of a quality and definitiveness that could only be aspired to in most of the areas in which expert witnesses ply their trade. Where, as here, the document that is the lodestar of the expert's endeavor spells out the method to be employed, the expert must either use that methodology or demonstrate that he has a reasoned basis for choosing to ignore it.[FN29] Mr. Mathis has done neither. In this very noticeable respect, his work was not "rooted in the principles and methodology of accountancy." *Securities and Exchange Comm'n v. Lipson,* 46 F.Supp.2d 758, 764 (N.D.Ill.1998).

> FN29. *See, generally,* Sofia Adroru and Alan Ratliff, *Kicking the Tires after Kumho: the Bottom Line on Admitting Financial Expert Testimony,* 37 Hous. L.Rev. 431, 492 (2000). "[T]he focus of the court's acceptance inquiry under *Daubert* is (1) whether the subject issue is specifically addressed by GAAP or other formal accounting guidance and, if not, whether there is their formal, informal, or court approved guidance that is analogous; (2) what particular authority or guidance controls; (3) whether the expert consulted or relied upon the controlling guidance;

and (4) whether the expert applied the guidance. A 'no' answer to (1) will likely cause exclusion of the testimony. There may be uncertainties in connection with (2) that the court will have to weigh under the circumstances. Concerning (3) and (4), to pass the acceptance test, the presumptive answers should be 'yes,' although the court should consider whether the facts and circumstances of a given case might justify deviation from those standards."

**\*1247** *Accounting for alternative explanations re: asset grouping: treatment of the network as a single asset.* One of the factors to be considered by the court is "[w]hether the expert has adequately accounted for obvious alternative explanations." Rule 702, Fed.R.Evid., Adv. Committee note to 2000 Amendments.

Asset grouping is central to the validity of Mr. Mathis's FAS 121 impairment analysis. The dispute as to network asset grouping for purposes of FAS 121 impairment analysis is, essentially, a dispute as to whether a year-end 2000 impairment analysis, if one had been performed, should have treated the entire fiber optic network as the relevant asset, or whether the dark fiber assets should have been separated out for impairment analysis, as was done by Mr. Mathis. Treatment of the fiber network as a unified asset for year-end 2000 impairment analysis is an "obvious alternative explanation" vis-a-vis the approach taken by Mr. Mathis. Mr. Mathis was invited-and declined-to express an opinion criticizing WCG's failure to perform an impairment analysis on the network as a whole as of year-end 2000. He disclaimed an opinion as to whether it would have been inappropriate to perform an analysis on the basis of that asset grouping. Mathis deposition at 43-45. He expressed his opinion that he thought the group of assets he selected "was the correct group of assets." *Id.* at 44. Thus, although it may well be that the reason Mr. Mathis performed an impairment analysis of only the dark fiber assets is that he "was asked [by plaintiffs counsel] to do an impairment analysis of the dark fiber assets,"*id.* at 20, he did assert that his conclusion as to grouping of assets was an expression of *his* analytical

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

496 F.Supp.2d 1195

496 F.Supp.2d 1195
(Cite as: 496 F.Supp.2d 1195)

Page 60

conclusion. *Id.* at 44. For that reason, it is especially noteworthy that Mr. Mathis expressly disclaims an opinion that it would have been *inappropriate* under FAS 121 to have performed an analysis of WCG's network as a whole as of year end 2000. *Id.* at 43-45.[FN30] Moreover, this is not an issue that was handed off by Mr. Mathis to Mr. Mintzer-Mr. Mintzer's proposed expert testimony does not close this gap. It is clear from Mr. Mintzer's report (¶¶ 147, et seq.) that, in expressing *his* opinion that WCG improperly failed to record an impairment charge at year end 2000, he relies entirely on Mr. Mathis as to FAS 121 Step 2 and Step 3. Otherwise stated, Mr. Mintzer's proposed expert testimony provides no independent analysis or expression of opinion on the issue of grouping of assets under FAS 121 for purposes of the year-end 2000 financial statements. Thus, on the issue of whether it would have been inappropriate for WCG to have treated the fiber network as a single asset for FAS 121 purposes as of year end 2000, Mr. Mintzer clearly does not pick up where Mr. Mathis left off-and, as has been noted, Mr. Mathis stops short of opining that it would have been inappropriate under FAS 121 to have performed an analysis of *1248 WCG's network as a whole as of year end 2000.

> FN30. Although, as noted, Mr. Mathis did assert that he formed an opinion that it would be appropriate for him to perform an impairment analysis on the dark fiber assets (Mathis deposition at 44), a fair reading of his report leaves one with the distinct impression that, from the very outset, his task, as he perceived it, was to perform an impairment analysis *only* on the dark fiber assets. *See, e.g.,* Mathis Rpt. at 3 (task was to conduct "an impairment analysis of WCG's excess dark fiber and spare conduit assets"), 10 (analysis was "of WCG's excess dark fiber and spare conduits"), 11 (Step 1 was to determine the "book value of WCG's excess dark fiber"). However, that matter need not be resolved in this memorandum, because it is plainly apparent that, in any event, Mr. Mathis disclaims an opinion as

to whether it would have been inappropriate for a year-end 2000 impairment analysis to have treated the fiber network as a unified asset.

It bears repeating that Messrs. Mathis and Mintzer, as retained experts, are not doing "first instance" auditing in this case. Especially where professional judgment is involved (and, as has been seen, the performance of an FAS 121 impairment analysis is a process that is shot through with judgment calls [FN31]), an expert's opinion as to how *he* would have performed a task is of limited relevance at best unless he has given a reasoned explanation of why the most obvious alternative (in this case, treatment of the fiber network as a unified asset) is inappropriate and should consequently be rejected. Mr. Mathis's selected approach to asset grouping does not, in and of itself, undermine an antipodal approach. In this context, the expert who goes no further than to select and defend his preferred approach leaves the job, at best, half done.

> FN31. *See, In re BellSouth Corp. Securities Litigation,* 355 F.Supp.2d 1350, 1376 (N.D.Ga.2005); *Serologicals,* 2003 WL 24033694 at *14; *Cutsforth,* 235 F.Supp.2d at 1260.

Plaintiffs have not carried their burden of establishing that the proposed expert testimony of Mr. Mathis is the product of reliable principles and methods, reliably applied to the facts of this case. It will be excluded.

#### 4. *Daubert analysis-proposed expert testimony of Andrew M. Mintzer.*

[5] Various portions, but not all portions, of Mr. Mintzer's proposed expert testimony have been challenged by the defendants. Mr. Mintzer's opinion testimony is summarized in paragraph 67 of his report. The following table, adapted from Mr. Mintzer's paragraph 67, shows the matters as to which Mr. Mintzer opines and identifies the defendants attacking those opinions.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

496 F.Supp.2d 1195                                                                    Page 61

496 F.Supp.2d 1195
**(Cite as: 496 F.Supp.2d 1195)**

| Mintzer ¶ | Opinions stated in Mr. Mintzer's report, per descriptions in ¶ 67 of Mintzer report ***WCG's 2000 Fiscal Year Financial Statements*** | Motion by: |
|---|---|---|
| 68 | WCG's December 31, 2000 financial statements were materially false and misleading as they were not presented in conformity with GAAP. | (See below) |
| 69-85 | E & Y failed to perform the 2000 audit of WCG while being independent. | no motion |

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

496 F.Supp.2d 1195
**(Cite as: 496 F.Supp.2d 1195)**

| 86-171 | Impairment of NetworkAssets-WCG's network was impaired, yet it failed to record an impairment charge, thereby overstating its assets by approximately $800 million and it failed to disclose that the dark fiber assets subject to its ADP were impaired by approximately $100 million. | E & Y |

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

496 F.Supp.2d 1195
**(Cite as: 496 F.Supp.2d 1195)**

| 172-223 | Debt Covenant Violations-WCG was, in reality, in violation of its debt covenants, thereby exposing its debt to being called by the lenders. | WCG |
|---|---|---|
| 224-268 | Going Concern Uncertainties-There was significant uncertainty about WCG's ability to continue as a going concern, yet E & Y failed to disclose the "going concern" doubts in its auditreport. | no motion |

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

496 F.Supp.2d 1195

496 F.Supp.2d 1195
**(Cite as: 496 F.Supp.2d 1195)**

Page 64

| 269-280 | Equipment Impairment-WCG's equipment inventory was impaired, yet it failed to record an impairment charge, thereby overstating its assets. | E & Y |
| 281-294 | E & Y ignored clearly evident Fraud Risk Factors and did not exercise Professiona lSkept icism. | no motion |
| 295-301 | WCG published quarterly financial statements at March 31, 2001, June 30, 2001 andSep tember 30, 2001 which were materially misstated and not in conformity with GAAP. | WCG |

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

496 F.Supp.2d 1195    Page 65

496 F.Supp.2d 1195
(Cite as: 496 F.Supp.2d 1195)

| | *[WMB]'s Financial statements (Referred to by Mintzer as TWC)* | |
|---|---|---|
| 302 | [WMB] failed to record its share of WCG's impairment charges, as of December 31, 2000 and March 31, 2001, while WCG was its subsidiary. | WMB |
| 303-305 | [WMB] failed to record in its June 30 and September 30, 2001 financial statements a contingent liability for its guarantees of certain the WCGtrans actions. | WMB |

**\*1249 a.** *Qualifications.*

Mr. Mintzer's expertise is attacked by the WCG defendants and by E & Y. *See,* Doc. No. 1437 at 4-6 and Doc. No. 1436 at 8-9. The WCG defendants attack Mr. Mintzer's expertise only as to his opinion that WCG was in violation of the EBITDA-related provisions of its debt covenants. E & Y attacks Mr. Mintzer's qualifications only as to his opinion on network impairment. Because the court's exclusion of Mr. Mathis's opinion testimony on that subject is fatal to the admissibility of Mr. Mintzer's opinion testimony on the same subject, the court need not address E & Y's attack on Mr.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

496 F.Supp.2d 1195                                                                                      Page 66

496 F.Supp.2d 1195
(Cite as: 496 F.Supp.2d 1195)

Mintzer's qualifications.

As to Mr. Mintzer's qualification to give expert
testimony with respect to debt covenant violations,
the WCG defendants argue that:
EBITDA is a non-GAAP term which is defined on a
case-by-case basis by contracting parties. Here, the
Credit Agreement provides the controlling
definition of EBITDA. Thus, Mintzer's
fundamental opinion-that certain revenues were
improperly included in the calculation of
EBITDA-depends not on his analysis of the
requirements of GAAP, but on a legal interpretation
of the Credit Agreement, i.e. the intent of the
contract between WCG and its Bank Group.
Mintzer, a CPA, can offer no expertise, special or
otherwise, regarding the intent of the parties to a
contract. Nor can he seek to opine on the
interpretation of a unique, contractual non-GAAP
term, substituting his intent for that of the parties
themselves.

Doc. No. 1437 at 5.

The WCG defendants conclude by asserting that:
Mintzer's opinion relating to debt covenants is not
founded upon any expertise in accounting,
generally, or GAAP, specifically, but rather his
personal lay interpretation of the parties' intent
regarding a contractually negotiated EBITDA
definition. It is not, therefore, proper expert
testimony and should be excluded.

*Id.* at 6.

The court disagrees. Although EBITDA was a
term which was contractually defined between
WCG and its lenders, the beginning point for
calculation of EBITDA was GAAP net income.
*See,* Exh. 5916 and EY-WCG-00-001534-1537.
The adjustments to GAAP net income, to calculate
EBITDA, consist of items which can be expected to
be well-understood by a Certified Public
Accountant with Mr. Mintzer's experience.
Judgment is involved (especially with respect to the
adjustment for "non-cash extraordinary or
non-recurring charges"), but the requisite judgment
is accounting judgment, not legal judgment. The
fact that the EBITDA calculation required the

auditor to read, understand and apply contractual
terms did not take the EBITDA calculation outside
of the realm in which CPA's with Mr. Mintzer's
experience commonly work. Auditors read and
apply contractual documents all the time. In a
complex business organization like WCG, the
calculation of EBITDA could certainly be a
complex task, but it was, at base, an accounting
task, as is amply demonstrated by the relevant
portion of Mr. Mintzer's report (¶¶ 172-223).
The court concludes that Mr. Mintzer was
well-qualified to render his opinion as to debt
covenant violations.

b. *Reliability.*

[6] *Paragraphs 86-171 and 269-280: Impairment.*
Mr. Mintzer's opinions as to impairment under FAS
121 are wholly dependent on the excluded expert
testimony of Mr. Mathis as to FAS 121 Steps 2 and
3. "Under *Daubert,* any step that renders ***1250** the
analysis unreliable renders the expert's testimony
inadmissible." *Goebel II,* 346 F.3d at 992. *See
also, J.B. Hunt Transport, Inc. v. General Motors
Corp.,* 243 F.3d 441, 444 (8th Cir.2001) (excluding
expert testimony that is "inextricably linked" to the
excluded testimony of another expert).[FN32]
Moreover, as to equipment impairment (to be
distinguished from network impairment), Mr.
Mintzer has not, either himself or in tandem with
Mr. Mathis, undertaken any semblance of an FAS
121 impairment analysis. Mintzer Rpt., ¶ 277;
Mintzer deposition at 302-03. That alone suffices
to preclude testimony from Mr. Mintzer as to
equipment impairment, because the expert must tie
the relevant principles "reliably to the facts of the
case." Rule 702, Fed.R.Evid.; *Goebel II,* 346 F.3d
at 991.

> FN32. As plaintiffs' counsel acknowledged
> at argument: "It is absolutely correct, as
> defendants point out, if Mr. Mathis can't
> get through the gate, Mr. Mintzer's reliance
> on him is inappropriate." Hrg. transcript,
> Oct. 31, 2006 at 131.

*Paragraphs 172-223: Debt covenant violations.*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

496 F.Supp.2d 1195
**(Cite as: 496 F.Supp.2d 1195)**

Aside from the WCG defendants' unsuccessful challenge to Mr. Mintzer's qualifications to opine as to debt covenant violations, there is no Daubert challenge to Mr. Mintzer's proposed opinion testimony with respect to violations of debt covenants. That testimony will accordingly not be excluded under *Daubert* and Rule 702.

*Paragraphs 295-301: March, June and September, 2001 financial statements.* Mr. Mintzer opines that, aside from the FAS 121 triggering events that were evident at year end 2000, additional triggering events were evident in 2001. Mintzer Rpt., ¶ 296. He proceeds to describe those events, then concludes that: "The financial statements of WCG included in its Forms 10Q at March 31, 2001, June 30, 2001 and September 30, 2001 were not prepared in accordance with GAAP as a result of the GAAP violations discussed above; specifically WCG's failure to disclose the network impairment charge." *Id.* at ¶ 301.

The WCG defendants point out that Mr. Mintzer has not performed an FAS 121 Step 1 trigger analysis for any date after year end 2000. (It is also clear from Mr. Mathis's report that his FAS 121 analysis stops at year end 2000. Mathis Rpt. at 2-4.) Consequently, the WCG defendants argue, in essence, that Mr. Mintzer's comments about triggering events in 2001 are apropos of nothing and should be excluded because they are irrelevant and confusing. Doc. No. 1437 at 7. In response, plaintiffs assert (claiming that Mr. Mintzer "clarified " the matter in his deposition testimony) that all Mr. Mintzer really meant to do in paragraphs 295-301 was to provide additional evidence "to support and amplify his opinion that an impairment was necessary at YE 2000." Doc. No. 1499 at 11.

Aside from the fact that this temporizing explanation squarely contradicts the opinion proffered in paragraph 301 of Mr. Mintzer's report ( *viz.* that WCG's March, June and September, 2001 financial statements were not prepared in accordance with GAAP "as a result of the GAAP violations discussed above"), the opinions set forth in paragraphs 295-301, as explained and clarified, must be excluded.

First, taking plaintiffs at their word that the expert testimony embodied in paragraphs 295-301 is merely intended to generally support, or amplify, Mr. Mintzer's proposed testimony that an impairment charge should have been taken at year end 2000, the court has determined that Mr. Mintzer's opinion about impairment at year end 2000 must be excluded. Paragraphs 295-301 are, on that basis, irrelevant.

**\*1251** Second, testimony about additional triggering events in 2001, as set forth in paragraphs 295-301, is inadmissible because there is no showing, or even a claim, that plaintiffs' experts have performed an FAS 121 analysis for any date after year end 2000. Gratuitous testimony about asserted FAS 121 triggering events in 2001 would be confusing and prejudicial, especially when considered in light of the fact that criticism of the defendants' failure to report network impairment as of year end 2000 (even if otherwise admissible) cannot be supported on the basis of facts which were unavailable to the defendants at the time the relevant auditing judgments were made.

*Paragraph 302: WMB's year end 2000 and March, 2001 financial statements.* Paragraph 302 of Mr. Mintzer's report states as follows:
During fiscal year 2000 and the first quarter of fiscal year ended December 31, 2001, WCG was a subsidiary of [WMB]. The financial results of WCG were included in the consolidated financial statements of [WMB]. Under GAAP [WMB] consolidated WCG's financial position and results of operations in its financial statements. As a result of the unrecorded impairment charges described previously, [WMB's] financial statements for the periods ended December 31, 2000 and March 31, 2001 are materially misstated.

The "unrecorded impairment charges" referred to in this paragraph are the year end 2000 impairment charges as to which plaintiffs' proposed expert testimony has been excluded. Consequently, if for no reason other than that, the opinion testimony embodied in paragraph 302 must be excluded. Aside from that, Mr. Mintzer provides no materiality analysis to support his opinion that

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

496 F.Supp.2d 1195

496 F.Supp.2d 1195
(Cite as: 496 F.Supp.2d 1195)

Page 68

WMB's statements were materially misstated.[FN33] This violates the expert report requirements of Rule 26(a)(2)(B), Fed.R.Civ.P., which requires that the report of a retained expert disclose "the basis and reasons" for all of his opinions, as well as "the data or other information considered" by the expert and precludes a showing by plaintiffs, consonant with their burden under Rule 104(a), Fed.R.Evid. (see, *Ralston,* 275 F.3d at 970, n. 4), that this proposed opinion testimony passes muster under Rule 702 and *Daubert* and its progeny.

> FN33. The absence of a materiality analysis from Mr. Mintzer's report is not a mere oversight. His conclusion as to materiality is not documented anywhere. Mintzer deposition at 375-76.

*Paragraphs 303-305: WMB's failure to record a contingent liability.* In the final numbered paragraphs of his report, paragraphs 303-305, Mr. Mintzer opines that WMB should have recorded a charge on its June and September, 2001 financial statements [FN34] for its contingent liability as a guarantor of more than $1 billion in WCG debt.

> FN34. It is not necessary, in this memorandum, to address the relevance of WMB's post-spin off financial statements to the claims of the holders of WCG securities.

Paragraphs 303-305, which are presented by Mr. Mintzer under their own heading, represent a discrete piece of analysis and opinion by Mr. Mintzer. His contention as to WMB's obligation to take a charge related to its contingent liability on WCG's debt is a conclusion which is, both as an accounting matter and as a legal matter, distinct from his opinions about WCG's financial statements and about WMB's failure to take impairment charges relating to WCG's assets.

In its Daubert motion, WMB provides arguments, at least facially well supported, as to why this opinion should be excluded. Doc. No. 1446 at 9-13. In their 13-page response to the WMB's Daubert

motion **\*1252** with respect to Mr. Mintzer, plaintiffs did not respond at all to WMB's challenge to paragraphs 303-305 of Mr. Mintzer's report. The burden of establishing the admissibility of Mr. Mintzer's proposed expert testimony rests with the plaintiffs. *Ralston,* 275 F.3d at 970, n. 4; *Mitchell,* 165 F.3d at 781. This portion of Mr. Mintzer's proposed expert testimony will be excluded because plaintiffs have made no attempt to demonstrate its admissibility.

### E. Daubert analysis-proposed expert testimony of Dr. Blaine Nye.

Blaine F. Nye, Ph.D., was retained on behalf of plaintiffs to "provide expert opinions in this class action on the issues of market efficiency, loss causation, materiality, and the damages incurred by purchasers of" WCG common stock and unsecured notes. Nye Rpt., ¶ 3. Ignoring the voluminous exhibits to his report for the moment, the substantive portion of Dr. Nye's 107-page Rule 26(a)(2)(B) report includes sections addressing causation, analysis of common stock damages, analysis of WCG notes damages and market efficiency. His report is dated February 3, 2006, nine months after the Supreme Court's decision in *Dura.*

A significant portion (¶¶ 24-104) of Dr. Nye's report consists of a meticulous summary, mostly unflattering to WMB and WCG managers, contrasting WMB's and WCG's increasingly pessimistic internal discussions with their consistently rosy public pronouncements between mid-2000 and late 2001 (and even into early 2002). This portion of Dr. Nye's report is relevant and essentially accurate. It contains little information not documented elsewhere in the record.

A major premise underlying Dr. Nye's opinions in this case is the assumption that senior management of WMB and WCG, as well as E & Y, misrepresented WCG's financial condition and prospects, specifically including assumptions (i) that WCG should have taken a charge in excess of $750 million, not later than year-end 2000, for impairment of long-lived assets and inventory (*i.e.,*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

496 F.Supp.2d 1195                                                                    Page 69

496 F.Supp.2d 1195
**(Cite as: 496 F.Supp.2d 1195)**

the asset impairment addressed by the excluded testimony of Messrs. Mathis and Mintzer), (ii) that the asset impairment should have been publicly disclosed "no later than in early 2001," and (iii) that if the impairment had been recognized and disclosed on a timely basis, investors would likely have understood that WCG would not be able to generate revenue sufficient to pay its debts. Nye Rpt., ¶ 6(d)-(e). Dr. Nye thus assumed the correctness of the work of Messrs. Mathis and Mintzer-including assumptions that "they [WCG] weren't making any money, they couldn't fund their business plan, they couldn't raise any more money; therefore, they had no basis for projecting any value to their equity." Nye deposition at 169-70. Dr. Nye also assumed "that as of that day, [July 23, 2000, the day before the class period began] that WCG either knew or should have known that it had zero expected value for its equity, zero projected value for its equity." Nye deposition at 272. *See also, id.* at p. 168 (on July 24, 2000, "the value of the equity was zero. Zero. And [the stock] was priced at 28.50."), and p. 186 (on July 24, 2000, " the company knew the value of the equity was zero" ). Thus, in Scenario 1 (his preferred damage scenario), Dr. Nye concluded that on day one of the class period, July 24, 2000, when the stock closed at $28.50 per share, that price consisted of $27.94 (98%) by way of fraud-related price inflation and 56 cents of actual value. Nye Rpt., Exh. 3A.[FN35]

> FN35. Dr. Nye also testified that "I have no information about" whether the stock was inflated on July 23, 2000 or on any prior day. Nye deposition at 189.

The defendants' Daubert challenges to Dr. Nye's proposed expert testimony encompass**\*1253** matters other than the issue of loss causation. The WCG defendants challenge Dr. Nye's opinions with respect to materiality. The WMB defendants challenge Dr. Nye's opinions with respect to his aggregate damages trading model and with respect to market efficiency. However, all defendants challenge Dr. Nye's methodologies with respect to loss causation and the closely related issues as to identification of compensable losses. For present purposes, it is not necessary to address the

defendants' challenges other than those relating to loss causation and identification of compensable losses. These latter issues are thoroughly developed in the briefs, they lend themselves to analysis under a well-developed body of law, and they affect all of plaintiffs' claims.[FN36]

> FN36. Because Dr. Nye's proposed expert testimony presupposes the validity of the conclusions reached in the excluded testimony of Messrs. Mathis and Mintzer, the court's analysis of the challenges to the admissibility of Dr. Nye's testimony perhaps needs to go no further than to state the obvious conclusion that Dr. Nye's testimony is inadmissible simply because the testimony of Messrs. Mathis and Mintzer does not survive Daubert scrutiny.
>
> However, the issues as to Dr. Nye's testimony which are addressed in this portion of this memorandum go to the heart of plaintiffs' case and are throughly developed in the briefs. For that reason, and in the interest of minimizing the possibility of shuttling between this court and the Court of Appeals, the court will address Dr. Nye's proposed expert testimony independently of its disposition of the challenges to the testimony of Messrs. Mathis and Mintzer.

1. *Dr. Nye's three damage scenarios.*

a. *Scenario 1.*

(i) *General description of Scenario 1.*

As described by Dr. Nye, he calculated plaintiffs' damages under three scenarios, consisting of Scenario 1, Scenario 2, and an alternative version of Scenario 2. He described his first scenario as follows:

*Scenario 1:* Inflation in the prices of WCG stock and WCG Notes is measured as the difference between the price paid and the true value of each security as measured by the settle-out price for the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

496 F.Supp.2d 1195                                                                                                    Page 70

496 F.Supp.2d 1195
**(Cite as: 496 F.Supp.2d 1195)**

relevant security after announcement of WCG's bankruptcy filing on April 23,[FN37] 2002, adjusted for intervening market and industry movements. I have been asked to commence damage calculations at several potential starting dates, *i.e.,* July 24, 2000, November 16, 2000, February 5, 2001, March 13, 2001, and April 24, 2001. Damages are calculated as price inflation at purchase less price inflation at sale.

> FN37. The date of the bankruptcy filing was April 22, 2002. *See, In re Williams Communications Group, et al.,* BK-02-11957, Bankr.S.D.N.Y.

Nye Rpt., ¶ 7.

The class period in this case begins on July 24, 2000, the day WMB issued a press release announcing the spin off of WCG and extolling the benefits of the spin off strategy. The class period ends on April 22, 2002, the day of the bankruptcy filing. Under all three scenarios, damages are available to class members who purchased WCG common stock or notes at any time during the class period.[FN38] Scenario 1, which benefits all class members without regard to whether or when they sold their WCG securities,[FN39] posits that there was "leakage" of the "relevant truth" during *1254 the class period and that "the leakage of WCG's true financial condition and prospects during the Class Period revealed the risks that had been concealed by the prior misrepresentations...." Nye Rpt., ¶¶ 109, 110. Plaintiffs assert that corrective information "slowly leaked into the market during the Class Period, through various sources of information" (Doc. No. 1376 at 7; Doc. No. 1378 at 1), gradually removing the fraud premium from the price of a share of the stock.

> FN38. Apparently for analytical and illustrative purposes, Dr. Nye used a total of five starting dates: July 24, 2000, November 16, 2000, February 5, 2001, March 13, 2001 and April 24, 2001. Nye Rpt., ¶ 7.

> FN39. As is discussed below, one of the main differences between Scenario 1 and Scenario 2 is that, under Scenario 2, no recovery is available to any class member who sold before January 29, 2002.

As has been noted, Dr. Nye concludes in Scenario 1 that fraud accounted for ninety-eight percent of the value of a common share of WCG on July 24, 2000 ($27.94 of the $28.50 closing price). Otherwise stated, during the 21-month class period in which the per-share price of WCG stock declined from $28.50 to six cents, the "true" value of the stock, exclusive of the fraud premium, was "*56 cents going down to 6 cents*." Nye deposition at 278 (emphasis added). Dr. Nye's starting point to arrive at that conclusion was the per-share closing price (just under six cents) on the trading day following WCG's bankruptcy filing-April 23, 2002. To determine the "true value" of WCG's common stock, Dr. Nye took WCG's six-cent closing price on April 23, 2002 "and incorporated the movements of the market and industry on each day [FN40] from April 23, 2002, back to each starting date, such that WCG's common stock's expected value on those dates would have been $0.56 [July 24, 2000], $0.33 [Nov. 16, 2000], $0.28 [Feb. 5, 2001], $0.19 [March 13, 2001], and $0.17 [April 24, 2001], respectively" in the absence of the fraud-related inflation of the per-share price. Nye Rpt., ¶ 108.
This, in Scenario 1, is described by Dr. Nye as the "predicted price of WCG stock *absent the alleged fraud.*" *Id.* (emphasis added). Thus, short of the very end of the class period, Dr. Nye attributes virtually all of the market value of WCG common stock to fraud. Under Scenario 1, the amount of the damage per share is the amount of the calculated fraud-related inflation per share.[FN41] *Id.*

> FN40. Dr. Nye started with the "daily return" on the share price. Nye Rpt., ¶ 881, n. 118. The daily return is the percentage change from the previous day (whether positive or negative). The "residual return" is the portion of the daily return remaining after removal of "market and industry effects." *Id.* The residual return thus reflects "the effect of new,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

496 F.Supp.2d 1195                                                        Page 71

496 F.Supp.2d 1195
**(Cite as: 496 F.Supp.2d 1195)**

> unexpected, company-specific information on share price." *Id.*

> FN41. Dr. Nye recognizes that his damage calculations are subject to the 90-day lookback provision of PSLRA, 15 U.S.C. § 78u-4(e). *See, e.g.,* Nye Rpt., ¶ 108. For discussion purposes, this adjustment, which is not in controversy, is disregarded (unless otherwise noted) in this memorandum.

For purposes of evaluating the defendants' Daubert challenge to Dr. Nye's Scenario 1, it is important to bear in mind the price trends for WCG stock and for telecommunications stocks generally during the class period. The following graph shows the changes in the per-share price of WCG's common stock before and during the class period: [FN42]

> FN42. The two graphs (WCG closing prices and Nasdaq telecommunications index) which follow appear in Doc. No. 1103 (WCG Daubert motion, p. 26). Their accuracy has not been challenged by plaintiffs.

> **\*1255**

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

496 F.Supp.2d 1195                                                                Page 72

496 F.Supp.2d 1195
(Cite as: 496 F.Supp.2d 1195)



During the same period, the trajectory of the share prices for the companies represented in the Nasdaq telecommunications index was remarkably similar:

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

496 F.Supp.2d 1195                                                                                        Page 73

496 F.Supp.2d 1195
**(Cite as: 496 F.Supp.2d 1195)**



It bears repeating that Dr. Nye attributes 56 cents of the decline in WCG's stock from $28.50 to six cents during the class period to industry-wide difficulties and other non-fraud effects.

**\*1256** (ii) *Corrective disclosures-Scenario 1.*

*Dr. Nye's positions as to timing of corrective disclosures.* As is discussed below, the applicable law requires a securities fraud plaintiff in a "fraud on the market" case to identify compensable losses by separating the compensable fraud-related losses from losses attributable to general economic conditions, broad market trends, industry-specific stresses, management incompetence, bad luck and other non-fraud factors. As compared to Scenario 2, which posits that there were no corrective disclosures until the first of four major disclosures that occurred over the eleven week period preceding WCG's bankruptcy filing in April, 2002,

Dr. Nye's Scenario 1 proceeds on the basis that corrective disclosures, which had the effect of draining the fraud premium out of the stock price, " gradually came out over the Class Period" (approximately 21 months). Nye deposition, p. 264. *See also, id.* at p. 53 ("Throughout that period different things came out to the market and the inflation went down."). As will be discussed in Parts (E)(3)(a) and (b), below, because Dr. Nye's Scenario 1 is premised on leakage of the truth throughout the class period (thus enabling class members who sold throughout the class period to recover under Scenario 1, unlike Scenario 2), the viability of Scenario 1 depends on whether Dr. Nye has identified corrective disclosures (or, as discussed below, "materialization of the risk") occurring during the relatively long interval which was within the class period but before the final denouement of WCG in 2002.

As has been noted, Scenario 1, asserting (or presupposing) gradual leakage of the relevant truth throughout the class period, is Dr. Nye's (and

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

496 F.Supp.2d 1195                                                                Page 74

496 F.Supp.2d 1195
**(Cite as: 496 F.Supp.2d 1195)**

plaintiffs') preferred damage scenario. The development of Scenario 2, in contrast, was plainly driven by concerns as to whether corrective disclosures, cognizable under *Dura* and its progeny, occurred before the final few months preceding the bankruptcy filing in April, 2002.[FN43] Dr. Nye's report is in some respects at odds with his deposition testimony with respect to the timing of corrective disclosures. Dr. Nye's deposition testimony favors the gradual leakage theory more than his report does.

> FN43. As plaintiffs' counsel candidly acknowledged at argument: "[Mr. Turner:] And I will acknowledge, Your Honor, up front, that there are tensions between some interpretations of Dura and Dr. Nye's Scenario 1." Hrg. transcript, Nov. 1, 2006 at 232.

Building on the work of Messrs. Mathis and Mintzer (postulating the creation of the fraud premium by failure to disclose asset impairment), Dr. Nye's focus, in all of his scenarios, is on the subsequent draining of that premium from the value of WCG's securities. Dr. Nye's report concisely summarized his (and plaintiffs') inflation/deflation prototype as follows:

Thus, the misrepresentations and omissions in defendants' disclosures to investors regarding its true financial condition could and did have an effect on WCG stock price and served to inflate the price of WCG stock throughout the Class Period. The corrective disclosures *later in the Class period* caused the WCG stock price to decline.

Nye Rpt., ¶ 26 (emphasis added).

Later in his report, although stating that "the truth about WCG's financial performance and prospects had begun to leak into the market during the Class Period," Dr. Nye cites January 29, 2002 as the date of the first "specific partial corrective disclosure." *Id.* ¶ 86.

Given the ambiguities in Dr. Nye's report, as to the timing of corrective disclosures, it is not surprising that at his deposition, Dr. Nye was pressed as to the

dates of the corrective disclosures that would *1257 have removed the fraud-related inflation from the per-share price of WCG's common stock. He asserted that corrective disclosures occurred *each day* during the class period. Nye deposition, p. 51 ( "Q: And on what days were there corrective disclosures under Scenario 1? A: Scenario 1, every day. In other words, the whole thing is a manipulated period."); p. 279 ("Q: [W]hat are the dates of corrective disclosure for Scenario 1 and where can I find them in your report? A: As far as I'm concerned, I've answered it. Q: What are the days? A: All of them."). When pressed to describe some association between misstatements and corrective disclosures, Dr. Nye responded by broadening the concept of corrective disclosure to encompass essentially anything negative about the prospects of the company:

Q. Is it your view, sir, that it's one big scheme and it's-and it's hard to separate-separate out the various parts?

Mr. Graziano: Objection, vague.

A. I think that there is one big overlying theme, and that's they never had a projected way to make any money on this business. As that comes out to all these details, that's what happens.

Q. (By Mr. Busch) But you haven't attempted to determine which corrective disclosure goes with which particular misrepresentation, have you?

A. The representation?

Q. You've listed lots-

A. *I haven't sorted anything out in the components. That was all basically revelation of the initial problem.*

Q. So you haven't attempted to tie particular misrepresentations to particular corrective disclosures; is that true?

A. Well, the initial misrepresentation is they can make money and pay off their debt. All these disclosures are linked directly to that. They're just basically eventually telling the market they can't pay their bills. They're not going to make any money.

*Id.* at 135-36 (emphasis added).

Dr. Nye's approach to corrective disclosures raises the question of whether the "leakage" into the market, destroying the value of a share of WCG stock, consisted of actual corrective disclosures

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

496 F.Supp.2d 1195                                                      Page 75

496 F.Supp.2d 1195
**(Cite as: 496 F.Supp.2d 1195)**

which drained off a fraud premium, or was, instead, leakage of the gradual realization of the increasingly grim prospects for the telecommunications sector as a whole. Responding to defendants' contentions as to the merits of the leakage theory, the plaintiffs argued, citing paragraphs 28-104 of his report, that "Dr. Nye identifies numerous examples of corrective information that leaked into the market during the Class Period." Doc. No. 1376 at 7. Plaintiffs also asserted that Dr. Nye's massive (more than 1300-page) compendium of news articles, reports and SEC filings would reveal "numerous instances of leakage of corrective information concerning WCG's true financial condition, providing the basis for Dr. Nye's opinion that the market ultimately learned the truth about WCG that was previously concealed by defendants." *Id.* at 8. The compendium was Exhibit 13 to Dr. Nye's report, but, due to its size, it was not filed.

The seventy-six paragraphs of Dr. Nye's report cited by plaintiffs as identifying corrective disclosures (which, by definition, would have to consist of negative information) reflect, with almost no exceptions before late 2001, a continuous litany of upbeat announcements by WCG management. For that reason, the court, being concerned about a possible divergence of views as to what would constitute a corrective disclosure, directed plaintiffs to file Dr. Nye's compendium, as they had offered (Doc. No. 1376, p. 8) to do. The order directed that:
The filing of the copy of Exhibit 13 [the compendium] shall be accompanied by *1258 the filing of a statement over the signature of counsel for plaintiffs, citing the pages of Exhibit 13 (by Bates number) which plaintiffs assert represent or reflect "corrective information that leaked into the market during the Class Period" (*see,* Doc. No. 1376 at 7), but before January 29, 2002.

Doc. No. 1650, filed March 14, 2007.

Plaintiffs filed the compendium and the statement required by the court. Doc. Nos. 1652-54 (March 21, 2007). The items designated by plaintiffs within the compendium consist predominantly of news that was generally applicable to the telecommunications industry as a whole, or, if specific to WCG, consist mostly of comments about industry-wide conditions affecting WCG. The pre-January, 2002 compendium items designated by plaintiffs which were most pointedly negative [FN44] were not cited by Dr. Nye in his report, likely because, although negative, they were not discernibly corrective.[FN45]

> FN44. Specifically, a Moody's Investor Service Release on March 14, 2001 (WGC-NYE13-524), and Knight Ridder Articles on March 13, 2001 (*id.* at 577), April 4, 2001 (*id.* at 592), June 5, 2001 (*id.* at 762) and August 29, 2001 (*id.* at 972).

> FN45. As has been discussed, Dr. Nye took a more expansive view of what constituted a corrective disclosure when he gave his deposition,

The earliest impairment-related disclosure cited by Dr. Nye in his report is the November 1, 2001 disclosure of a $150 million write down of inventory. Nye Rpt., ¶ 83. On October 31, WCG stock closed at $1.67. Before November 1, it had lost 94 percent of the value it had at the beginning of the class period. By November 19, the per-share closing price had risen to $3.00. In terms of corrective disclosures with associated movements in the per-share price of WCG's common stock, the record is as uninformative now as it was after Dr. Nye gave his deposition.

Using a starting date of July 24, 2000, the first day of the class period, Dr. Nye calculates that, under Scenario 1, $1.96 billion would be recoverable with respect to WCG stock and $940 million would be recoverable with respect to WCG notes.

### b. *Scenario 2.*

Dr. Nye described his second scenario as follows:
*Scenario 2:* Damages incurred by purchasers of WCG stock and WCG Notes are calculated based on the percentage inflation in the security as measured by the Company-specific percentage

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

496 F.Supp.2d 1195

496 F.Supp.2d 1195
**(Cite as: 496 F.Supp.2d 1195)**

returns (*i.e.,* net of market and industry effects) in the security's value upon the disclosures of information allegedly withheld from the market, on January 29, 2002, February 4, 2002, February 25, 2002 and April 23, 2002. Selling damages are limited to those shares purchased in the Class Period and held through one or more of these dates. The same five starting dates are used for this scenario as for Scenario 1, *i.e.,* July 24, 2000, November 16, 2000, February 5, 2001, March 13, 2001, and April 24, 2001.

Nye Rpt., ¶ 7.

The Scenario 2 starting dates and corrective disclosure dates are illustrated as follows (not to scale):

*1259

| Starting Dates – 2000 and 2001 | | | | | Corrective Disclosure Dates – 2002 | | | |
|---|---|---|---|---|---|---|---|---|
| | | | | | 1/29 | 2/4 | 2/25 | 4/23 |
| 7/24/00 | | | | | | | | |
| | 11/16/00 | | | | | | | |
| | | 2/5/01 | | | | | | |
| | | | 3/13/01 | | | | | |
| | | | | 4/24/01 | | | | |

The four corrective disclosure dates are key to Dr. Nye's Scenario 2, because, in Scenario 2, Dr. Nye is "measuring share price inflation by the effect of specific disclosures on January 29, 2002, February 4, 2002, February 25, 2002 and April 23, 2002." Nye Rpt., ¶ 116. The operation of Scenario 2 in and after January, 2002 is graphically illustrated below. The data for the graph are from Exhibit 3B to Dr. Nye's report.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

496 F.Supp.2d 1195                                                                 Page 77

496 F.Supp.2d 1195
(Cite as: 496 F.Supp.2d 1195)



As can be seen, Dr. Nye's data show that WCG stock comes into 2002 at a price above $2.00 per share, consisting almost entirely of the postulated fraud premium. At the beginning of January, 2002, the fraud-related inflation is 90.8 percent of the per-share price. Exh. 3B, p. 8. As the graph shows, that inflation percentage remains constant until January 29, the date of the first of the four corrective disclosures. The inflation percentage drops slightly on January 29, and slightly more on February 4, followed by a substantial drop on February 25, finally plummeting to zero on April 23.

Under this second scenario, damages are recoverable only by security holders who bought during the class period and held the security at least until January 29, 2002. Security holders who sold on or before January 28 would get no recovery. Nye deposition at 113, 275. The price decline that occurred before January 29, 2002 is "not a claimable loss." [FN46] *Id.* at *1260 114. Dr. Nye acknowledged that he could give no "economic or

logical reason" why a shareholder who sold on January 29 would have a claim and a shareholder who sold on January 28 would not have a claim, *id.* at 115, explaining that Scenario 2 "was produced to meet some sort of legal definition of damages." *Id.* at 124. Dr. Nye acknowledged that, in the causation section of his report, he has "not tied those four things [the disclosures on the four corrective disclosure dates] specifically to allege[d] misrepresentations." *Id.* at 140.

FN46. Likewise, damages are not available under Scenario 2 with respect to shares that were both bought and sold between any two consecutive dates of the four disclosure dates. Nye Rpt., ¶ 120.

Dr. Nye used a "constant percentage inflation" approach in Scenario 2. Nye Rpt., ¶ 111. His use of this approach is noteworthy when viewed in light of the fact that, in Scenario 2, the corrective disclosures occur in a relatively compressed time period at the end of a relatively long class period-a

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

496 F.Supp.2d 1195                                                                    Page 78

496 F.Supp.2d 1195
**(Cite as: 496 F.Supp.2d 1195)**

class period in which the stock lost almost all of its value before the first corrective disclosure date. The most prominent effect of Dr. Nye's use of the constant percentage inflation method in Scenario 2 is that the declines in per-share value, beginning on the first corrective disclosure date, are cast back, on a percentage basis, to the beginning of the class period. The result, as is discussed further in Part V(E)(3)(c), below, is that a small loss in share value (on or after January 29) in dollar terms translates into a large dollar recovery per share for shares bought early in the class period-a recovery in dollars per share that is attributable mostly to share price declines that occurred *before* the first corrective disclosure.

### c. Alternative Scenario 2.

Correctly anticipating some of the defendants' challenges, Dr. Nye proffers, but does not endorse, a constant dollar alternative to the constant percentage approach of his second scenario, as applied to common stock (but not as applied to the notes).[FN47] This alternative version of Scenario 2 quantifies damages on the basis of the dollar decline (rather than the percentage decline) in per-share prices associated with each of the four dates in early 2002 on which plaintiffs assert that corrective disclosures occurred, described by plaintiffs as "the four specific corrective disclosure events at the end of the Class Period." Doc. No. 1378 at 10. Dr. Nye explains this alternative version of Scenario 2 as follows:

> FN47. Plaintiffs' counsel likewise do not endorse Alternative Scenario 2. They state that it is offered for use "in the event that the Court or the Tenth Circuit adopts the view that the constant percentage approach is improper as a matter of law." Doc. No. 1376 at 22.

I expect defendants to argue that a constant dollar (as opposed to constant percentage) approach should be used to calculate damages in this case, as I have observed in many other cases. I do not endorse the use of the constant dollar methodology

given the fact pattern in this case. However, at the request of plaintiffs' counsel, I have calculated damages incurred by purchasers of WCG common stock based on the dollar amount of inflation in the security as measured by the company-specific dollar declines in the security's value upon the disclosures of information allegedly withheld from the market, on January 29, 2002, February 4, 2002, February 25, 2002 and April 23, 2002. The same five starting dates are used for this scenario as for Scenarios 1 and 2, *i.e.,* July 24, 2000, November 16, 2000, February 5, 2001, March 13, 2001, and April 24, 2001. Selling damages are to be calculated based on the same eligibility requirements for selling damages in Scenario 2. (Note that the constant dollar methodology does not cause any selling damages *1261 during a period of like inflation, as the inflation at purchase and inflation at sale are the same on each day within each period between disclosures.) Also, because the drop in the prices of WCG Notes used to calculate price inflation in the WCG Notes as a percentage of face value is equivalent to the dollar amount, per $100 of face value, there is no alternative calculation under Scenario 2 for the WCG Notes.

Nye Rpt., ¶ 7. n. 6.

The constant dollar approach of Alternative Scenario 2 yields results that differ materially from the results which would obtain under Scenario 2, as is shown by a comparison of the graph in Part V(E)(1)(b), above (illustrating the operation of Scenario 2), with the following graph, which illustrates the operation of Alternative Scenario 2:

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

496 F.Supp.2d 1195
**(Cite as: 496 F.Supp.2d 1195)**



Data from Ex. 3B Alt. to Nye Rpt.

As is discussed below, with respect to the matters which the court finds to be dispositive in this memorandum, there are no differences between Scenario 2 and Alternative Scenario 2.

### 2. *Qualifications.*

The defendants do not challenge Dr. Nye's qualifications.

### 3. *Reliability.*

To be admissible, expert testimony must be both relevant and reliable. *Daubert,* 509 U.S. at 589, 113 S.Ct. 2786. Relevance depends in part on whether the proposed expert testimony fits the issues in the case. *Id.* at 591, 113 S.Ct. 2786; *Bitler,* 400 F.3d at 1234. In many cases, such as medical malpractice actions, the substantive legal framework in which expert testimony is offered is painted with a relatively broad brush. Determination of the admissibility of expert testimony in those cases seldom requires extensive consideration and application of substantive legal principles. This case is different. In this case, determination of the admissibility of Dr. Nye's proposed testimony as to loss causation and damages is governed as much by substantive legal principles as it is by principles of **\*1262** economics and finance.[FN48] In the case at bar, the two sets of principles are tightly intertwined. For that reason, the court's resolution of the Daubert challenges to Dr. Nye's proposed expert testimony begins with an analysis of the relevant substantive legal principles.

FN48. This is not an uncommon circumstance. *See, e.g.,* Federal Judicial

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

496 F.Supp.2d 1195

496 F.Supp.2d 1195
(Cite as: 496 F.Supp.2d 1195)

Page 80

Center, *Reference Manual on Scientific Evidence* at 22 (2d ed. 2000) ("[S]ome opinions have held that the 'fit' prong of the *Daubert* test and the helpfulness standard of Rule 702 require courts to exclude a plaintiff's expert testimony that does not satisfy the plaintiff's substantive burden of proof on an issue.") Citing *Daubert v. Merrell Dow. Pharmaceuticals, Inc.,* 43 F.3d 1311 (9th Cir.1995)(*Daubert* on remand).

### a. *The loss causation requirement.*

#### (i) *Loss causation-basic rules.*

*Dura Pharmaceuticals, Inc. v. Broudo,* 544 U.S. 336, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005), came to the Supreme Court as a pleading case-the issue being what a securities fraud plaintiff who would proceed on a fraud on the market theory must allege with respect to loss causation in order to survive a motion to dismiss. In deciding the pleading issue, the Court explicitly, and unsurprisingly, expounded on what a securities fraud plaintiff must *prove* with respect to loss causation. For that reason, even with a pinched reading, the decision in *Dura* provides definitive guidance beyond the pleading stage.

In *Dura,* the Court of Appeals had held that the complaint adequately alleged securities fraud where it averred simply that the plaintiff paid a fraudulently inflated price for the security. The Supreme Court unanimously held that the Court of Appeals was "wrong, both in respect to what a plaintiff must prove and in respect to what the plaintiffs' complaint here must allege." *Id.* at 338, 125 S.Ct. 1627. The Court began its analysis by noting that, in a case alleging fraud in connection with the purchase or sale of publicly traded securities, plaintiff must show, among other things: (i) transaction causation, (ii) economic loss and (iii) loss causation. *Id.* at 341-42, 125 S.Ct. 1627. Of significance in the case at bar is the court's statement that, normally, in fraud on the market cases, "an inflated purchase price will not itself constitute *or proximately cause* the relevant

economic loss." *Id.* at 342, 125 S.Ct. 1627 (emphasis added). The Court elaborated as follows:
For one thing, as a matter of pure logic, at the moment the transaction takes place, the plaintiff has suffered no loss; the inflated purchase payment is offset by ownership of a share that *at that instant* possesses equivalent value. Moreover, the logical link between the inflated share purchase price and any later economic loss is not invariably strong. Shares are normally purchased with an eye toward a later sale. But if, say, the purchaser sells the shares quickly before the relevant truth begins to leak out, the misrepresentation will not have led to any loss.
If the purchaser sells later after the truth makes its way into the marketplace, an initially inflated purchase price *might* mean a later loss. But that is far from inevitably so. When the purchaser subsequently resells such shares, even at a lower price, that lower price may reflect, not the earlier misrepresentation, but changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events, which taken separately or together account for some or all of that lower price.

*Id.* at 342-43, 125 S.Ct. 1627 (emphasis in original).

Having articulated the substantive requirement of proof, the Court then addressed how a securities fraud plaintiff must deal with this requirement at the pleading stage. As a pleading matter, the Court's formulation was not demanding: the Court said simply that "[it] should not prove burdensome for a plaintiff who has **\*1263** suffered an economic loss to provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind." *Id.* at 347, 125 S.Ct. 1627. This relaxed approach to pleading loss causation does not, of course, undermine the Court's conclusion that loss causation, the "causal connection between the material misrepresentation and the loss,"*id.* at 342, 125 S.Ct. 1627, is to be established, in a fraud on the market case, by showing that the disclosure of " the relevant truth" resulted in a loss attributable to " the earlier misrepresentation." *Id.* at 342-43, 125 S.Ct. 1627.

The lower courts have applied *Dura* with varying degrees of stringency-variations that appear to be

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

496 F.Supp.2d 1195                                                                    Page 81

496 F.Supp.2d 1195
(Cite as: 496 F.Supp.2d 1195)

largely attributable to the fact that *Dura* has been applied in a variety of procedural contexts, including motions to dismiss, class certification, settlement approval, Daubert motions, summary judgment and trial. In resolving the Daubert challenges to Dr. Nye's proposed expert testimony, this court applies the law of loss causation, as articulated in *Dura* and in the lower courts, to Dr. Nye's three scenarios. In so doing, the court focuses principally on: (i) the extent to which Dr. Nye's methodology complies with loss causation doctrine as established in *Dura* and relevant lower court decisions, (ii) the adequacy of the factual basis for Dr. Nye's application of the methodology underlying his three scenarios, and (iii) the adequacy of his identification of loss-causing corrective disclosures.

As a prerequisite to that analysis, further examination of the lower courts' treatment of loss causation is necessary. As has been seen, *Dura*, settling a conflict among the circuits, established that loss causation, as defined by the Court, must be shown-pleaded and proven-by a securities fraud plaintiff. Cases from lower courts are equally informative in establishing how that can, and cannot, be accomplished.

Securities fraud claims begin with material misstatements or omissions. *Id.* at 341, 125 S.Ct. 1627. The actionable conduct may be a misleadingly favorable representation, or it may be a statement that is deceptive because it suggests that nothing is amiss when something is indeed materially amiss, or it may consist simply of silence, accompanied by scienter, as to a material matter. In the case at bar, the alleged fraud consisted predominantly of the defendants' alleged failure to disclose that major assets (the fiber network and related equipment) were worth far less than was shown in WCG's's financial statements, a determination which would have required the reporting of a very large impairment loss as a charge against income under FAS 121. That, in brief, is the *inflation* side of the securities fraud equation in this case. The cases relevant to analysis of Dr. Nye's work deal with the other side of the equation: loss causation.

Three months before the Supreme Court handed down its decision in *Dura*, the Second Circuit addressed loss causation in *Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161 (2nd Cir.2005), *cert. denied,*546 U.S. 935, 126 S.Ct. 421, 163 L.Ed.2d 321 (2005), an illuminating decision that is entirely congruent with *Dura*.[FN49]The court in *Lentell* concluded, albeit as a pleading matter, that a plaintiff had not adequately alleged loss causation where "[t]here is no allegation that the market reacted negatively to corrective disclosure regarding the falsity of" the defendant's misstatements "and no allegation that [the defendant] misstated or omitted risks that did lead to the loss." *Id.* at 175.[FN50] *See also,* *1264*In re Acterna Corp. Securities Litigation*, 378 F.Supp2d 561, 587 (D.Md.2005). In a case (such as the case at bar) that presupposes an efficient market, as fraud-on-the-market cases must do, *see, Basic Inc. v. Levinson*, 485 U.S. 224, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988), the showing of causation which must be made in order to avoid "transform[ing] a private securities action into a partial downside insurance policy,"*Dura*, 544 U.S. at 347-48, 125 S.Ct. 1627, is a showing that the fraud premium was removed from the price of the stock by way of the efficient market's reaction to a corrective disclosure that was responsive to the misstatement or omission that created the fraud premium in the first instance. Or, as it was concisely put by Judge Scheindlin (who has probably written at least as much as any other judge on loss causation issues): loss causation requires "a false or misleading statement, which caused an artificial inflation of the stock, followed by a dissipation of that inflation after corrective disclosures were made." *In re GeoPharma Securities Litigation*, 399 F.Supp.2d 432, 453 (S.D.N.Y.2005). Thus, if "the logical link between the inflated share purchase price and any later economic loss,"*Dura*, 544 U.S. at 342, 125 S.Ct. 1627, is to be shown, the showing is ordinarily made by demonstrating "that the plaintiff suffered an economic loss *fairly attributable to the public airing of the alleged fraud, i.e.,* a significant price decline immediately following the announcement that reveals the fraud to the public." *D.E. & J. Ltd. P'shp. v. Conaway*, 284 F.Supp.2d 719, 748-49 (E.D.Mich.2003) (emphasis added), *aff'd,*133

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

496 F.Supp.2d 1195
**(Cite as: 496 F.Supp.2d 1195)**

Fed.Appx. 994 (6th Cir.2005) (unpublished). For that reason, if "plaintiffs' expert does detail [ed] event studies supporting a finding that [the stock] reacted to the *entire bundle* of negative information . .. this reaction suggests only market efficiency, not loss causation, for there is no evidence linking the *culpable* disclosure to the stock-price movement." *Oscar Private Equity Investments v. Allegiance Telecom, Inc.,* 487 F.3d 261, 270 (5th Cir.2007) (emphasis in original).

> FN49. The Supreme Court denied certiorari in *Lentell* in October, 2005, 546 U.S. 935, 126 S.Ct. 421, without vacating and remanding for reconsideration on light of Dura, which had been decided the preceding April.

> FN50. *But see, In re Motorola Securities Litigation,* 2007 WL 487738 (N.D.Ill. Feb. 8, 2007), which rejects the *Lentell* approach as not consistent with Seventh Circuit case law. The February, 2007 *Motorola* decision (casting the burden on the defendant, on motion for summary judgment, to negate loss causation as a matter of law, *id.* at *44) appears to have been undermined by the Seventh Circuit's decision two months later in *Ray v. Citigroup Global Markets, Inc.,* 482 F.3d 991 (7th Cir.2007), affirming summary judgment for the defendants where plaintiffs failed to establish loss causation.

As has been seen, during the class period, the price of WCG's common stock fell amidst an "entire bundle of negative information" that largely obliterated the value of publicly traded securities throughout the telecommunications sector. "Of course, if the loss was caused by an intervening event, like a general fall in the price of Internet stocks, the chain of causation will not have been established." *Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc.,* 343 F.3d 189, 197 (2nd Cir.2003). So where there is both an industry-wide debacle (*e.g.,*"a marketwide phenomenon causing comparable losses to other investors,"*Lentell,* 396 F.3d at 174) accompanied by an abundant flow of

bad news, unrelated to the fraud, about both the industry and the company in question, the non-fraud "contributing forces must be isolated and removed. This is often done, as it was here, with the help of an expert witness." *Robbins v. Koger Properties, Inc.,* 116 F.3d 1441, 1447, n. 5 (11th Cir.1997) (rendering judgment as a matter of law for defendant accounting firm).

> (ii) *Loss causation-limits of the doctrine.*

It has been observed, and this court readily concludes, that:
**\*1265** *Dura* did not set forth any requirements as to who may serve as the source of the [corrective] information, nor is there any requirement that the disclosure take a particular form or be of a particular quality. Thus, it is the inherent veracity of the information that is of paramount concern in *Dura.*It is the exposure of the falsity of the fraudulent representation that is the critical component of loss causation.

*In re Winstar Communications,* 2006 WL 473885 at *14 (S.D.N.Y. Feb. 27, 2006). *See also, In re eSpeed, Inc. Securities Litigation,* 2006 WL 880045 at * 18 (S.D.N.Y. April 3, 2006) (There is "no requirement that corrective disclosures emanate from the company itself, so long as the truth is disclosed in some fashion."). Nor, as a matter of common sense, is there any requirement that "an alleged corrective disclosure must be the linguistic mirror image of the alleged fraud." *In re Bristol-Myers Squibb Securities Litigation,* 2005 WL 2007004 at *20 (D.N.J. Aug. 17, 2005).

Moreover, to establish loss causation (which may, for some analytical purposes, be distinguished from quantifying recoverable damages), "the plaintiff need not show that the defendant's act was the sole and exclusive cause of the injury he has suffered; he need only show that it was substantial, *i.e.,* a significant contributing cause." *Robbins,* 116 F.3d 1441, 1447. Even so, "a plaintiff will be allowed to recover only damages actually caused by the misrepresentation." *Id.* at 1447, n. 4.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# 16
# Part 3 of 3

496 F.Supp.2d 1195                                                                                    Page 83

496 F.Supp.2d 1195
(Cite as: 496 F.Supp.2d 1195)

### (iii) *Loss causation-materialization of the risk.*

The Court in *Dura* pointedly noted that the complaint in that case did not assert that the "share price fell significantly after the truth became known, "544 U.S. at 347, 125 S.Ct. 1627. Although this statement can fairly be read as indicating that a reasonably recognizable corrective disclosure is required in a fraud on the market case, the WCG plaintiffs contend that loss causation is present where the concealed risk simply "materialized" in the form of unfavorable developments that caused the market to drive the share price down-a proposition aptly articulated by plaintiffs' counsel at argument as "a revelation of the truth via materialization of the risk that was concealed. No one ever announced it, no one ever went on the public air waves and said, you know, here is the truth, but the truth was, nonetheless, made evident by virtue of materialization of exactly the risk that had been concealed by the misrepresentations." Hrg. transcript, Nov. 1, 2006 at 235. Cases, including *Lentell*, addressing loss causation in the form of materialization of the risk are collected and analyzed in *Glover v. DeLuca,* 2006 WL 2850448 at *33-37 (W.D.Pa. Sept. 29, 2006), where the court describes the concept as "an alternate way of pleading loss causation." *Id.* at *38. *See also, Lentell*, 396 F.3d at 172-74; *In re AOL Time Warner, Inc. Securities Litigation,* 2007 WL 1789013 at *8 (S.D.N.Y. June 20, 2007) (Loss causation pleaded "by allegations that a defendant's misstatements or omissions concealed a risk that later materialized to cause the plaintiff's loss."); *In re Teco Energy, Inc., Securities Litigation,* 2006 WL 2884960 at *6 (M.D.Fla.2006); *Leykin v. AT & T Corp.,* 423 F.Supp.2d 229 at 240, 245-46 (S.D.N.Y.2006); and *In re GeoPharma Securities Litigation,* 399 F.Supp.2d at 444 (S.D.N.Y.2005).

The concept of materialization of the risk, at its apogee, is method of proof of loss causation, not an excuse for lack of evidence of loss causation. To the extent that plaintiffs assert, as may be inferred from the above-quoted statement at argument, that " materialization of the risk" is a cognizable approach to loss causation where the "relevant truth" gradually leaks out and the effects of the relevant truth *1266 (*e.g.*, facts which expose the fraud or

are at least indicative of the fraud) cannot be differentiated from bad news unrelated to the fraud, the court concludes that plaintiffs' reliance on materialization of the risk is misplaced. *See, Glover,* 2006 WL 2850448 at *33-34. The suggestion that a fraud premium can be drained off by materialization of the risk (as distinguished from one or more identifiable corrective disclosures) provides no warrant for dispensing with *Dura's* requirement that plaintiff prove a "causal connection between the material misrepresentation and the loss." 544 U.S. at 342, 125 S.Ct. 1627. Although *Dura* did not address the concept of materialization of the risk as a substitute for corrective disclosure (and, it may be noted, did not even use the term "corrective disclosure"), the Court, in *Dura,* did recognize the concept that there will be cases in which "the relevant truth begins to leak out." *Id.Dura's* causation requirement would be entirely undermined if, in the context of an overall implosion of shareholders' equity in the relevant industry, a plaintiff could exempt himself from the obligation to separate the effects of fraud-related inflation from the effects of non-fraud risks by asserting simply that he is the victim of materialization of a fraudulently-concealed risk. Thus, if plaintiff asserts that the fraud surfaced " through disclosure of another event," he "must provide proof that the market recognized a relationship between the event disclosed and the fraud." *McKowan Lowe & Co., Ltd. v. Jasmine, Ltd.,* 2005 WL 1541062 at *8 (D.N.J. June 30, 2005).

### b. *The Daubert challenge as to Dr. Nye's Scenario 1 (common stock).*

[7] Dr. Nye's Scenario 1 collides directly with loss causation doctrine and is accordingly rejected. Dr. Nye does not even purport, in Scenario 1, to have removed the effects of "[n]onfraud company-specific information." Nye deposition at 210. Nor has he identified any corrective disclosures before January 29, 2002 other than to insist, meaninglessly, that corrective disclosures occurred "every day." Nye deposition at 51 (discussed in Part V(E)(1)(a)(ii), above). Thus, remarkably, he has not identified either fraud or

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Page 84

496 F.Supp.2d 1195
**(Cite as: 496 F.Supp.2d 1195)**

non-fraud related news (much less parsed the effects of the two) for the class period through January 28, 2002, *id.,* even though he acknowledges, as he must, that "The market provides a measure of inflation on dates on which the company's misrepresentations and omissions are revealed, in the decline in value of the stock related to the company-specific return attributable to those omissions and misrepresentations." Nye Rpt., ¶ 111.

The court accordingly concludes that Dr. Nye's Scenario 1 methodology is deficient in that his conclusions with respect to loss causation and damages are not supported by identification of any corrective disclosures or "materialization of the risk" cognizable under *Dura* and its progeny. He fails to differentiate between losses rooted in causes cognizable under loss causation doctrine, on one hand, and, on the other hand, losses attributable to industry-specific stresses, the meltdown in the telecommunications sector, and other negative developments unrelated to the alleged fraud. The consequence of this failure is that Dr. Nye's Scenario 1, viewed as charitably as the record will permit, does not establish loss causation at all, much less enable "a factfinder to ascribe some rough proportion of the whole loss to [the] misstatements." *Lattanzio v. Deloitte & Touche LLP,* 476 F.3d 147, 158 (2nd Cir.2007).

The Court's opinion in *Dura* leaves no room for doubt that even where a securities fraud plaintiff proceeds on a "leakage" theory of corrective disclosure, he must still establish that the lower price reflects the fraud-related inflation and not *1267 "changed economic circumstances, changed investor expectations, new-industry-specific facts, conditions or other events, which taken separately or together account for some or all of that lower price." *Dura,* 544 U.S. at 342-43, 125 S.Ct. 1627. As a practical matter, Dr. Nye *assumes* leakage of the relevant truth. He identifies no such leakage before January 29. His Scenario 1 methodology is neither "relevant" nor "reliable." *See, Daubert,* 509 U.S. at 589, 113 S.Ct. 2786. In securities litigation, non-fraud causes of a loss in value are "obvious alternative explanations," Rule 702, Fed.R.Evid., Advisory Committee notes to 2002

amendments. Because Dr. Nye fails to address the obvious alternative explanations as required by the law of loss causation, his Scenario 1 will be excluded.

### c. *The Daubert challenge as to Dr. Nye's Scenario 2 (common stock).*

[8] Scenario 2 is described in detail in Part V(E)(1)(b), above. The Daubert motions will be granted as to Dr. Nye's Scenario 2 for two reasons. First, Dr. Nye has not demonstrated an adequate factual basis for his assertion of loss causation on the basis of corrective disclosures which are claimed to have occurred on or after January 29, 2002. Secondly, Scenario 2, premised on a "constant percentage inflation" approach, Nye Rpt., ¶ 111, impermissibly seeks recovery of losses as to which loss causation has not been, and cannot be, established.

### (i) *Corrective disclosures on or after January 29, 2002.*

As has been noted, Dr. Nye has testified that Scenario 2 "was produced to meet some sort of legal definition of damages." Nye deposition at 124. One of the essential features of Scenario 2 is that it is based on the premise that, as plaintiffs' counsel put it, "the first public corrective disclosure" occurred on January 29, 2002. Hrg. transcript, Nov. 1, 2006 at 230. As Dr. Nye puts it, these are "certain corrective disclosures later in the Class Period and at the end of the Class Period." Nye Rpt., ¶ 25.

Under Scenario 2, no recovery is available to an investor who sold his securities before January 29, 2002. Thus, an investor who bought at $28.50 per share on the first day of the class period and sold his shares at the January 28, 2002 closing price of $1.63, would not, under Scenario 2, recover any of the drop from $28.50 to $1.63. If he sold on the next day, his per-share recovery, due to the fraud, would be $24.40. Dr. Nye acknowledged that he could give no "economic or logical reason" why a shareholder who sold on January 29 would have a

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

496 F.Supp.2d 1195
**(Cite as: 496 F.Supp.2d 1195)**

claim and a shareholder who sold on January 28 would not. Nye deposition at 115.

Plaintiffs and Dr. Nye assert, for purposes of Scenario 2, that the first corrective disclosure, on January 29, 2002, consisted of the revelatory effect of *WMB's* announcement "that it was delaying the reporting of its fourth quarter and 2001 year-end financial statements while it re-evaluated the status of certain contingent liabilities it had with respect to WCG." Nye Rpt. at ¶ 86. In the relevant passage of his report, Dr. Nye discusses the import of this revelation without mentioning that, on the same day, January 29, the first of the present class actions was filed by the Milberg, Weiss law firm on behalf of these plaintiffs (*Cali, et al. v. Williams Companies, Inc, et al* No. 02-CV-072, N.D. Okla., Doc. No 1. Herein: Cali Complaint). The Cali Complaint was accompanied by certification from the named plaintiffs, seeking to proceed as representatives of the putative class, dated January 23, 2002. Doc. No. 1, pp. 68-71. The January 23, 2002 certifications declared, among other **\*1268** things, that the named plaintiffs had reviewed the complaint.

In terms of negative things that might be said about WCG, its history and its prospects, the Cali Complaint, read together with the Milberg, Weiss press release of the same date, leaves very little to the imagination. The 67-page Cali Complaint can speak for itself, but it provides a detailed compendium of two important categories of matters that were "knowable" before the day the complaint was filed: (i) negative information about WCG that was demonstrably "in the market" during the class period and (ii) misstatements, the falsity of which was known on the basis of publicly available information, before Scenario 2's first corrective disclosure date-January 29, 2002. It is, for that reason, worthy of note that the Cali Complaint alleges that:
-During the class period, a huge oversupply of fiber-optic capacity was created and that "over the objection of defendants," market analysts warned of the oversupply. ¶ 26.
-Defendants consistently, and falsely, denied that WCG had been adversely affected by "the glut of over-supply." ¶ 28.

-The defendants "engineered" the spin-off of WCG so that WMB could rid itself of WCG "before investors came to realize the true impaired condition of WCG." ¶ 29.
-The defendants made false statements about the true reason for the spin-off, which was to "dump WCG" before WMB would have to take a massive charge related to the ownership of WCG. ¶ 38.
-The spin-off was designed to "avoid a massive write-down as WCG's stock price was decimated as its impaired condition slowly became known to investors." ¶ 30.
-The press releases touting the spin-off were false and misleading because WCG was "experiencing declining demand for bandwidth such that its revenue projections were lacking in a reasonable basis," and because they falsely created the impression that WCG would be able to fund its operations with internally-generated cash or by issuing more debt. ¶ 36(i), (iii).
-At the time the spin-off was executed, there was no disclosure of "the true risks which resulted from guaranteeing WCG's debt as a result of the undisclosed, impaired condition of WCG." ¶ 77.
-In mid-2001, WMB failed to make "adjustments to its balance sheet to account for the WCG loan guarantees, and the fact that now WCG faced a substantial likelihood of a default." ¶ 91.
-A registration statement filed in June, 2001 misleadingly failed to disclose that "as a result of the impaired operational and financial condition of WCG that WMB has a substantial undisclosed risk of loss." ¶ 99(ii).
-In August, 2001, an analyst opined that "there is a high probability that they [WCG] are going to have difficulty surviving in their present form." ¶ 104.
-On October 1, 2001, WCG misleadingly announced that "[w]e continue to execute on our financing plan." ¶ 108.

The Milberg Weiss January 29 press release, Doc. 1297, Ex. 4, concisely summarized the Cali Complaint, including the allegations about impairment of WCG's assets and the misstatements which concealed the likelihood that WCG would default on its debt.

Regardless of what might have been said before

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

496 F.Supp.2d 1195                                                    Page 86

496 F.Supp.2d 1195
**(Cite as: 496 F.Supp.2d 1195)**

January 29, Dr. Nye's testimony and report make three things clear: First, that by the end of the day on January 29, a reasonable investor could not but **\*1269** conclude that there was an overwhelming likelihood that WCG had run out its string: "WCG was not making any money; that it couldn't fund its business plan; that it couldn't get any more capital to fund its business plan and, therefore, the projected value of its equity was virtually nil." Nye deposition at 118 (discussing January 29 press release). Second: that Dr. Nye's Scenario 2 is premised on his assertion that "the 'relevant truth' is that WCG likely would not be able to repay its debt as scheduled and, therefore, its assets likely would not provide a return to its equity investors." Nye Rpt., ¶ 109. And third: that the efficient market, in which "the market price reflects all publicly available information," Nye deposition at 39, knew what Milberg Weiss knew when it wrote the Cali Complaint. *Id.* at 38-40.[FN51] Moreover, although Dr. Nye's deposition testimony (pp. 122-23) qualifies this statement, he opined in his report that the movement in WCG's share price on January 29, 2002 was not significant [FN52] in light of declines in "the market" and "the industry" on that day. Nye Rpt., ¶ 88.[FN53]

> FN51. The court thus agrees with E & Y that "It is disingenuous for Plaintiffs to now argue that the truth had not been disclosed until January 29 (or worse yet, April 23), when Plaintiffs used the same publicly available information to file this lawsuit relating to the same issues (which given its lengthy and detailed treatment simply could not have been prepared after the announcement) on the same day."Doc. No. 1393 at 8.

> FN52. *Cf., In re Acterna Corp. Securities Litigation,* 378 F.Supp.2d 561, 588 (D.Md.2005) ("[T]he price declined only one penny (or 3%), to $.32, on the day Acterna announced its goodwill impairment, October 30, 2002.")

> FN53. It is noteworthy that Dr. Nye *opines,* presumably on the basis of his regression

analysis as to the common stock, that, on the four corrective disclosure dates in 2002, WCG stock "declined in amounts in excess of market and industry effects" Nye Rpt., ¶ 104, but he only *assumes* (" Plaintiffs allege") that these partial disclosures "revealed the risks that had been concealed by the prior misrepresentations and omissions." *Id.,* ¶ 121. In his words, he "h[as] not tied those four things specifically to allege[d] misrepresentations." Nye deposition at 140. Under *Dura,* a "causal connection between the material misrepresentation and the loss,"544 U.S. at 342, 125 S.Ct. 1627, cannot be shown simply by pointing to company-related bad news (called " firm-specific facts" by Justice Breyer, *id.* at 343, 125 S.Ct. 1627) if that bad news is not tied to the fraud. *Cf., D.E. & J. Ltd. P'shp. v. Conaway,* 133 Fed.Appx. 994, 1000-01 (6th Cir.2005) ("But the observation that a stock price dropped on a particular day, whether as a result of a bankruptcy or not, is not the same as an allegation that a defendant's fraud caused the loss.").

The record undermines any assertion-crucial to Dr. Nye's Scenario 2-that any material, new, company-specific and fraud-related information became available to the efficient market on January 29, 2002 or on the three subsequent corrective disclosure dates proposed by plaintiffs.

*(ii) The constant percentage inflation approach.*

As has been noted, under Dr. Nye's Scenario 2, an investor who sold on January 28, 2002 gets no recovery, while an investor who sold on January 29 recovers for all of his loss of per-share value *for the entire class period* (nearly $25 per share for an investor who bought at the beginning of the class period) even though the price of the stock had already declined 94 percent, to $1.60 before (as postulated in Scenario 2) "the relevant truth" emerged. *Dura,* 544 U.S. at 342, 125 S.Ct. 1627. The drop from January 28 to January 29 was 29

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

496 F.Supp.2d 1195
**(Cite as: 496 F.Supp.2d 1195)**

cents.

A loss in value occurring before the first corrective disclosure "cannot be considered causally related to [defendant's] fraudulent accounting methods because before the **\*1270** revelations began in August, 1998, the true nature of [defendant's] financial condition had not yet been disclosed." *In re Daou Systems, Inc. Securities Litigation,* 411 F.3d 1006, 1027 (9th Cir.2005). *See also, In re Redback Networks, Inc., Securities Litigation,* 2007 WL 963958 at \*6 (N.D.Cal. March 30, 2007) (" [T]he stock price began to fall in June 2001 when the 'truth' began coming out. However, at that time the stock *already had fallen to less than $12 per share.* Based on Plaintiffs' own allegations, the fall from $150 to $12 cannot be attributed to the alleged fraud."(emphasis in original)). Where, as in the case at bar, the value of a common share is driven down to the penny stock range by forces unrelated to revelation of the fraud (as must be assumed for purposes of Dr. Nye's Scenario 2, Nye Rpt., ¶ 86), the application of the constant percentage inflation approach would give the equity investor the "partial downside insurance policy" which *Dura* counsels that the securities law should not provide. 544 U.S. at 348, 125 S.Ct. 1627.[FN54]

> FN54. The court can conceive of a case, involving a short class period, in which the constant percentage inflation approach would at least clear the Daubert hurdle, leaving the final determination of the merits of the matter to be resolved by the finder of fact. But, given the tortured history of WCG's securities in the 18 months before the first asserted corrective disclosure January 29, 2002, this is not that case.

Dr. Nye's Scenario 2 does not satisfy the requirements of Rule 702 and *Daubert* and its progeny, and will accordingly be excluded.

*d. The Daubert challenge as to Dr. Nye's Alternative Scenario 2 (common stock).*

Anticipating objections to the constant percentage inflation approach which the court has rejected, Dr. Nye developed a "constant dollar" variation of Scenario 2. As is discussed in more detail in Part V(E)(1)(c), above, this version of Scenario 2 quantifies damages on the basis of the dollar decline (rather than the percentage decline) in per-share prices on the four corrective disclosure dates in early 2002. This modification eliminates the defendants' objection to use of the constant percentage inflation approach.

Pointing out that Dr. Nye himself insists that Alternative Scenario 2 is inappropriate " economically and logically," Nye deposition at 227, defendants argue that Alternative Scenario 2 should be rejected out of hand. The court does not agree. Alternative Scenario 2 represents nothing more than a mathematical variation on Scenario 2, designed to conform plaintiffs' trial presentation to the law as the court may find it to be. The reason for which Alternative Scenario 2 was developed is clear, and the basis on which plaintiffs and Dr. Nye assert that they ought not to be subjected to the limitations of Alternative Scenario 2 is equally clear. Dr. Nye's disagreement with Alternative Scenario 2 is no more disqualifying than would be an accountant's preparation of two alternative lost profit scenarios (and disagreement with one of them) for a plaintiff seeking to recover lost profits.

Although Dr. Nye's disagreement with Alternative Scenario 2's constant dollar approach is not fatal to its admissibility, Alternative Scenario 2 is identical to Scenario 2 in that it is not supported by a showing of material, new, company-specific and fraud-related information that became available to the efficient market on January 29, 2002 or on the three subsequent corrective disclosure dates proposed by plaintiffs. Alternative Scenario 2 will, for that reason, be excluded.

**\*1271** *e. The Daubert challenge with respect to the notes.*

[9] Dr. Nye's work with respect to the notes is in some ways similar to, and in some ways different from, his work with respect to the common stock.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

496 F.Supp.2d 1195
**(Cite as: 496 F.Supp.2d 1195)**

The Daubert challenges with respect to Dr. Nye's proposed expert testimony relating to the notes may be resolved by examining his opinions as to the notes, the bases for those opinions, and the matters that are not disclosed by his analysis.

Dr. Nye's report points out that the weighted average price of the WCG notes was 97.8 percent of face value at the beginning of the class period and 16 percent of face value after the bankruptcy filing. Nye Rpt., ¶ 23. He concludes that:
[T]he price of the WCG Notes reacted to news about the Company and to changes in WCG's perceived financial condition. Thus, the misrepresentations and omissions in defendants' disclosures to investors regarding its true financial condition could and did have an effect on the WCG Notes' prices and served to inflate the prices of the WCG Notes during the Class Period. The corrective disclosures later in the Class Period caused the WCG Notes' prices to decline.

Nye Rpt., ¶ 27.

Later in his report, Dr. Nye elaborates on this point:
As with WCG stock, WCG Notes prices responded to information about the declining fortunes at WCG. Thus, the alleged fraud, including the failure to timely write down the value of certain assets, directly caused the inflated prices of the WCG Notes throughout the Class Period. News of WCG's true financial condition in 2001 and 2002 caused the prices of WCG Notes to decline and, consequently, caused investors who purchased WCG Notes during the Class Period to incur losses.

*Id.,* ¶ 101.

Dr. Nye's Scenarios 1 and 2, analyzed as to the common stock in Part V(E)(3)(b)-(d), above, are turned out in slightly different livery as applied to the notes. Dr. Nye's Scenario 1 assigns to the notes, *on every day of the class period,* "true values" equal to the market value of the notes when WCG filed for bankruptcy. *Id.,* ¶ 138(a). He then posits that "[t]he price inflation is equal to the difference between the actual price and the true value." *Id.* Lest there be any confusion: Dr. Nye's Scenario 1 makes no pretense of differentiating between fraud

and non-fraud losses in value, as was made clear at his deposition: "Q: So, if I understand, then, under Scenario 1, no other fact would be significant other than the price of the notes in terms of damages? A: That's how you calculate it, right." Nye deposition at 233. By way of example, because Dr. Nye's Scenario 1 does not separate fraud from non-fraud losses, defendants are chargeable, under Scenario 1, with the entire drop in the value of the notes that occurred on the first trading day after September 11, 2001. *Id.* at 234; Doc. No. 1092, Ex. 4(E) (p. 11) to Ex. 2. They are thus impermissibly held to account for "the entire bundle of negative information,"*Oscar Private Equity Investments,* 487 F.3d 261, 270 (5th Cir.2007), with no identification of any "causal connection between the material misrepresentation and the loss,"*Dura,* at 342, 125 S.Ct. 1627.

In Scenario 2, as to the notes as with the stock, an investor who sold on January 28 (by which time the notes had fallen to about 40 percent of face value) has no recovery. *Id.,* ¶ 139. Scenario 2 uses the same four corrective disclosure dates (January 29, February 5 and 25, and April 23). Dr. Nye explains the operation of Scenario 2,[FN55] as applied to the notes, as follows:

> FN55. As to the notes, there is no equivalent of Alternate Scenario 2 which Dr. Nye developed with respect to the stock, "because the drop in the prices of WCG Notes used to calculate price inflation in the WCG Notes as a percentage of face value is equivalent to the dollar amount, per $100 of face value." *Id.,* ¶ 7, n. 6.

**\*1272** From the start of the damages period (July 24, 2000, November 16, 2000, February 5, 2001, March 12, 2001, or April 23, 2001) through January 28, 2002, inclusive, the price inflation in the WCG Notes is a constant value and is equal to the sum of the drops in the prices of each of the WCG Notes from the four days used to measure the price inflation. From January 29, 2002 through February 4, 2002, inclusive, the price inflation is equal to the sum of the drops on February 5, February 25, and

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

496 F.Supp.2d 1195
**(Cite as: 496 F.Supp.2d 1195)**

April 23, 2002. From February 5 through February 24, 2002, inclusive, the price inflation is equal to the sum of the drops on February 25 and April 23, 2002. From February 25 through April 23, 2002, inclusive, the price inflation is equal to the drop on April 23, 2002.
*Id.,* ¶ 138(b).

Dr. Nye calculates Scenario 2 damages as the sum of the price declines on the four disclosure dates in early 2002 [FN56] (as applicable, depending on the date of sale), and assumes that the sum of all four drops would have been reflected in the prices of the notes on day one of the class period. *Id.,* ¶¶ 10, 138(b), 139. With respect to his Scenario 2 approach as applied to the notes, Dr. Nye performed no regression analysis,[FN57] or even an analysis of statistical significance, to differentiate fraud-related effects from forces unrelated to the fraud, Nye deposition at 147-50, 235, all of which is acknowledged by plaintiffs in their briefs. Doc. No. 1376 at 23; 1378 at 13-14. He does, however, claim to have performed an event study with respect to the notes under Scenario 2. *Id.* at 231. This deserves some discussion.

> FN56. Subject to PSLRA's 90-day lookback requirement. See note 41, above.

> FN57. "Multiple regression analysis is a statistical tool for understanding the relationship between two or more variables [such as fraud- and non-fraud related effects on the price of a security]. Multiple regression involves a variable to be explained-called the dependent variable-and additional explanatory variables that are thought to produce or be associated with changes in the dependent variable." Federal Judicial Center, *Reference Manual on Scientific Evidence* at 181 (2d ed.2000).

An event study is a statistical regression analysis that examines the effect of an event on a dependent variable, such as a corporation's stock price. This approach assumes that the price and value of the

security move together except during days when disclosures of company-specific information influence the price of the stock. The analyst then looks at the days when the stock moves differently than anticipated solely based upon market and industry factors-so-called days of "abnormal returns." The analyst then determines whether those abnormal returns are due to fraud or non-fraud related factors.... [E]vent study methodology has been used by financial economists as a tool to measure the effect on market prices from all types of new information relevant to a company's equity valuation.
*In re Enron Corp. Securities Litigation,* 2006 WL 4381143 at \*54 (S.D.Tex. June 5, 2006) (quoting from Jay W. Eisenhofer, Geoffrey C. Jarvis, and James R. Banko, *Securities Fraud, Stock Price Valuation, and Loss Causation: Toward A Corporate Finance-Based Theory of Loss Causation,* 59 Bus. Law. 1419, 1425-26 (August 2004)).

An event study can play a pivotal role in a securities fraud case: "Because of the need to distinguish between the fraud-related\*1273 and non-fraud related influences of [sic] the stock's price behavior, a number of courts have rejected or refused to admit into evidence damages reports or testimony by damages experts in securities cases which fail to include event studies or something similar." *In re Imperial Credit Industries, Inc. Securities Litigation,* 252 F.Supp.2d 1005, 1015 (C.D.Cal.2003) (collecting cases; citation and quotation marks omitted). *See also, Gordon Partners v. Blumenthal,* 2007 WL 1438753 at \* 1 (S.D.N.Y. May 16, 2007); *Partners v. Blumenthal,* 2007 WL 431864 at \*13 (S.D.N.Y. Feb. 9, 2007) and *Carpe v. Aquila, Inc.,* 2005 WL 1138833 at \*3-4 (W.D. Mo. March 23, 2005). "Event study" is thus "a term of art in the relevant economic literature that refers to a regression analysis that examines the effect of an event on some dependent variable, such as a corporation's stock price." *RMED International, Inc. v. Sloan's Supermarkets, Inc.,* 2000 WL 310352 at \*6 (S.D.N.Y. March 23, 2000).

The obvious purpose of an event study, in the present context, is to isolate fraud-related effects so

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.


496 F.Supp.2d 1195

496 F.Supp.2d 1195
**(Cite as: 496 F.Supp.2d 1195)**

that the finder of fact may determine "what the causal connection might be between [the notes' loss of value] and the misrepresentation." *Dura,* at 347, 125 S.Ct. 1627. When questioned at his deposition about his failure to perform an event study to support his Scenario 2 [FN58] with respect to the notes, Dr. Nye responded that: "Under Scenario 2, I looked at the change in the price of the bonds on the date information was released. That's an event study." Nye deposition at 231. This declaration cannot be reconciled with any accepted definition of an event study, or with the fact that, as E & Y put it, Dr. Nye "does not do any independent analysis to determine whether the Notes price movements on these four dates were statistically significant based on the price movements or in any way causally linked to disclosure of the fraud," Doc. No. 1297 at 14-15. Thus, Dr. Nye's lame assertion notwithstanding, it is clear that he did not conduct an event study in any sense in which that term is used in his profession. If his version of an event study for Scenario 2 is to be thought of at all as an " event study" then it is a "step [which] completely changes a reliable methodology,"*Mitchell,* 165 F.3d 778 at 782, (quoting *In re Paoli R.R. Yard PCB Litigation,* 35 F.3d 717, 745 (3d Cir.1994)), because what he calls an event study does not even purport to differentiate between forces related to the fraud and those not related to the fraud.

> FN58. It should be borne in mind that the absence of an event study is immaterial with respect to Scenario 1, because, with respect to that scenario, Dr. Nye does not claim to have identified, much less analyzed, the effect of "[n]onfraud company-specific information." Nye deposition at 210. Under Scenario 1, " every decrease in inflation is damage." *Id.*

In response to defendants' assertions as to the deficiencies in Dr. Nye's work as to the notes, plaintiffs argue, somewhat contradictorily, that (i) " Dr. Nye's event study for the Notes reasonably parallels his event study for WCG common stock," Doc. No. 1378 at 13, (ii) he did not "perform a separate, independent regression analysis for the Notes" because to have done so would only have

increased damages, *id.,* and (iii) defendants fail to point out how an event study could have been performed as to the notes. Doc. No. 1376 at 23. The court will address these responses in turn.

Plaintiffs support their argument that Dr. Nye's event study for the notes paralleled his event study for the common stock by pointing out that, just as was the case with the stock, there were, indeed, negative price movements for the notes on the *1274 four disclosure dates posited by Scenario 2, and that these movements were among the largest movements in the entire class period. Doc. No. 1378 at 14. This echoes that Dr. Nye's testimony that he looked at the prices and found that the prices went down, Nye deposition at 231, which is essentially the same as an accountant, in a lost profits case, excusing his failure to measure lost net profits by arguing that, after all, he did calculate lost gross receipts. Dr. Nye simply did not perform an event study with respect to the notes, and no assertion that "yes, he found that note prices dropped on the disclosure dates" can change that fact.

The second argument, that performing a regression analysis *(e.g.,* at a component of an event study) would have been unnecessary because a regression analysis would only have increased damages, has two premises. Plaintiffs and Dr. Nye argue, first, that the only non-company specific information that would have been factored out by an event study as to the notes would have been the steady decline in interest rates during the relevant period, and, secondly, that adjusting for the decline in interest rates would only have increased damages. As to the contention that prevailing interest rates would have been the only exogenous influence on the price of the notes, Dr. Nye's testimony is contradictory. At one point, Dr. Nye suggested that bond (note) prices are influenced only by interest rates and default risk, which is company-specific. *Id.* at 147-48. Later, he testified that "the market" can affect default risk, *id.* at 231, which would lead inexorably to the conclusion that those influences must be factored out. However, there is no need to consider whether Dr. Nye's explanation is undermined by the seemingly common-sense proposition that the default risk component of note

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

496 F.Supp.2d 1195                                                    Page 91

496 F.Supp.2d 1195
**(Cite as: 496 F.Supp.2d 1195)**

values certainly could be affected by a perception that an industry-wide meltdown is in progress. The reason is that, even as to news affecting perceptions of *company-specific* default risk (*i.e.,* assuming that there *were* no exogenous factors other than the trend in interest rates), Dr. Nye did nothing to differentiate between fraud-related bad news and bad news unrelated to the fraud.

As to plaintiffs' third argument, questioning whether an event study *could* have been performed as to the notes, the court notes that this contention is apparently bottomed on the problematic proposition that note prices would not have been found to have been affected by non-company specific influences other than interest rates. Doc. No. 1376 at 23-24. There is no need, however, to resolve that issue, nor is there any need to determine whether plaintiffs' view of the matter is undercut by a very cogent showing that an event study could have been performed as to the notes. Doc. No. 1297, Ex. 7 (Affidavit of David Tabak, Ph.D.). The reason is that it does not fall to the defendants, in support of their Daubert challenge, to prescribe a method by which plaintiffs and Dr. Nye either might or must carry their burden of establishing the admissibility of Dr. Nye's proposed expert testimony as to loss causation. What is required is an event study "or something similar." *Imperial Credit,* 252 F.Supp.2d at 1015.[FN59] This court assays, within the confines of *Daubert* and Rule 702, the methodology the expert chose to use, *Bitler,* 400 F.3d at 1233; it need not select the appropriate *1275 methodology. "Thus, Judge Peck did not say that summary judgment was appropriate because plaintiffs had not submitted an event study. He said that it was appropriate because plaintiffs had submitted *no evidence* on the issue of loss causation." *Gordon Partners,* 2007 WL 1438753 at *2 (emphasis in original). Because he did *nothing* to differentiate between fraud and non-fraud effects on note prices, it is not necessary to determine what methodology would have sufficed if Dr. Nye had done *something.*

> FN59. There is no single template for event studies. *See, generally,* A.Craig MacKinlay, Event *Studies in Economics and Finance,* XXXV Journal of Economic

Literature 13 (1997). "In the majority of applications, the focus [of an event study] is the effect of an event on the price of a particular class of securities of the firm, most often common equity.... However, event studies can be applied using debt securities with little modification." *Id.* at 13.

Viewing Dr. Nye's proposed expert testimony as to the notes in light of the combined demands of *Daubert* and *Dura,* it is plain that he expounds conclusions that are greater than the sum of their factual and analytical parts. "[T]here is simply too great an analytical gap between the data and the opinion proffered,"*Joiner,* 522 U.S. 136 at 146, 118 S.Ct. 512, 139 L.Ed.2d 508. His work with respect to the notes does not address, in any manner that lends itself to reasoned analysis, the question of " what the causal connection might be between [the notes' loss of value] and the misrepresentation." *Dura,* at 347, 125 S.Ct. 1627. Having offered no analysis that differentiates between the effects of fraud-related and non-fraud news and events, Dr. Nye's declaration that corrective disclosures caused the notes' prices to decline represents, at best, an opinion "connected to existing data only by the *ipse dixit* of the expert." *Joiner,* 522 U.S. at 146, 118 S.Ct. 512.

---

All of Dr. Nye's causation-related opinions, including his damage scenarios, have been analyzed to determine whether they square with the law of loss causation, applied through the prism of *Daubert* and Rule 702. Dr. Nye's proposed opinion testimony does not square with the law of loss causation, principally because his approaches to causation fail to differentiate, by means sufficient to pass muster under *Daubert,* between losses attributable to fraud and losses attributable to other forces that caused the historic debacle in the telecommunications industry. Implicit in Dr. Nye's work is the supposition that virtually none of the market value of WCG's stock at the beginning of the class period (or at any time until the telecom chickens had all come home to roost) was

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

496 F.Supp.2d 1195                                                                                            Page 92

496 F.Supp.2d 1195
(Cite as: 496 F.Supp.2d 1195)

attributable to inflated investor expectations for the telecom industry as a whole-and the concomitant proposition that virtually none of the decline in the value of the stock is attributable to the industry-wide debacle.

The defendants' Daubert motions with respect to the proposed opinion testimony of Dr. Blaine F. Nye are **GRANTED** with respect to his opinions as to loss causation and his damage scenarios, both as to the common stock and as to the notes. This partial granting of the Daubert motions with respect to Dr. Nye, in combination with the granting of the Daubert motions as to Messrs. Mathis and Mintzer, is, as set forth in part VI, below, dispositive of all of the claims asserted by the plaintiffs in the WCG class action. Accordingly, the court does not reach, and denies as moot,[FN60] the defendants' Daubert motions as to Dr. Nye, to the extent that they challenge his proposed expert testimony as to matters other than loss causation and his damage scenarios.

> FN60. *Cf., Carpe,* 2005 WL 1138833 at *2, n. 6 ("Because the Court is able to reach its decision on other grounds, the Court takes no position on these alleged deficiencies with Mr. Marek's expert report.")

### VI. *The Motions for Summary Judgment.*

[10] The court's rulings on the Daubert motions will, as discussed below, result**\*1276** in summary judgment in favor of *all* defendants on the WCG Subclass plaintiffs' claims because plaintiffs cannot establish the elements of loss causation and damages. The defendants' motions for summary judgment and partial summary judgment raise other issues. They have been fully briefed and argued. As has been noted, the briefs and exhibits supporting and opposing the motions run to nearly 23,000 pages. The motions thus present live issues that are ripe for determination by the court even though the court could, in its discretion, proceed no further than to render summary judgment on the basis of its resolution of the Daubert motions. Accordingly, having thoroughly reviewed the briefs

and the voluminous record, and for substantially the same reasons as have been discussed in note 36, above (as to the court's consideration of the Daubert motions with respect to Dr. Nye), the court will proceed to address the other issues raised by the WMB defendants' motion for partial summary judgment, E & Y's motion for summary judgment, and the WCG Defendants' motion for summary judgment.

### A. *The Williams Companies, Inc. and Keith E. Bailey's Motion for Partial Summary Judgment on Alleged Misstatements and Omissions Made Before WCG's Spin-Off from Williams.*

The WMB defendants move for partial summary judgment as to the WCG Subclass plaintiffs' claims relating to alleged misstatements or omissions made before the spin-off of WCG from WMB on April 23, 2001. The WMB defendants assert that plaintiffs cannot establish the requisite elements of materiality or scienter in support of their claims.

[11] Initially, the WMB defendants challenge plaintiffs' claims which focus on WCG's purported failure to disclose that certain of its employees, including defendant Matthew Bross, had received "directed" or "friends and family" shares and options to purchase shares in the initial public offerings of certain companies that were WCG's strategic partners. WMB defendants assert that the alleged omissions occurred before the class period began. Because liability can be imposed only for statements or omissions made during the class period, the WMB defendants contend the alleged pre-class period omissions are not actionable as a matter of law. In addition, they contend that the alleged omissions are immaterial as a matter of law because they related to matters that were publicly known. The WMB defendants contend that the details of the "directed" or "friends and family" shares programs were publicly disclosed and thoroughly discussed in the national press, such as *Fortune* magazine, before the beginning of the class period. Moreover, WCG, in response to that publicity, adopted a policy in April of 2000 specifically prohibiting the WCG employees from engaging in such transactions. In light of these

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

496 F.Supp.2d 1195                                                                Page 93

496 F.Supp.2d 1195
**(Cite as: 496 F.Supp.2d 1195)**

facts, the WMB defendants argue that plaintiffs cannot establish the materiality element of their claims based upon alleged omissions relating to the "directed" or "friends and family" shares and options to purchase shares.

The WMB defendants challenge the plaintiffs' contention that pre-class period events resulted in the purchase of inferior equipment by WCG from companies (such as Sycamore Networks) which had to be written off during the class period. The WMB defendants contend that the equipment was of superior quality and is still functioning on the network, arguing that the only identified problem with the equipment was WCG's inability to get the equipment delivered when it was needed.

*1277 In response, plaintiffs do not dispute that certain of the "friends and family" transactions were adversely reported in the press, and that, consequently, WCG sought to restrict the ability of its employees to engage in such transactions prior to the class period. Doc. No. 1225 (plaintiffs) at 54. Rather, plaintiffs argue that the evidence relating to the transactions is relevant to their claim that defendants, in violation of GAAP, failed to take any inventory write-downs for excess or impaired equipment that was acquired in transactions associated with employee "friends and family" benefits until late in the class period, significantly after WCG had placed restrictions on employee participation in the "friends and family" programs. Plaintiffs contend that what the WMB defendants seek, in effect, is an order *in limine* precluding plaintiffs from offering any evidence regarding these transactions.

Plaintiffs have conceded in their briefing that information relating to the "directed" or "friends and family" programs was publicly disclosed prior to the start of the class period. Accordingly, the court concludes that plaintiffs cannot establish [FN61] the element of materiality as to their claims based upon alleged omissions involving the "directed" or "friends and family" programs. *See, e.g., Baron v. Smith,* 380 F.3d 49, 57 (1st Cir.2004) ("It is not a material omission to fail to point out information of which the market is already aware."); *Smith v. Circuit City Stores, Inc.,* 286 F.Supp.2d 707,

721-22 (E.D.Va.2003) (an omitted fact is immaterial as a matter of law where "the relevant information was already publicly available" at the time of the purported omission). Therefore, the court concludes that the WMB defendants are entitled to summary judgment on those claims.[FN62]

> FN61. Of course, plaintiffs need not actually "show" or "prove" or "establish" anything to defeat the summary judgment motions. They must merely demonstrate the existence of a genuine issue of material fact. Although this order sometimes uses the quoted terms because they are used in the case law, the court has consistently judged plaintiffs' claims by the lesser standard which is appropriate at this stage. *Goodwin v. General Motors Corporation,* 275 F.3d 1005, 1011 at n. 7 (10th Cir.2002).

> FN62. The court notes that during oral argument on the WMB defendants' motion, defendants' counsel represented to the court that plaintiffs' counsel had advised defendants' counsel that plaintiffs were not going to pursue an omissions claim against the WMB defendants based on the "directed" or "friends and family" transactions. Plaintiffs' counsel, during his presentation, did not contradict that representation.

At this stage of the proceedings, the court need not determine the admissibility of any evidence relating to the "directed" or "friends and family" share transactions. The court, however, would note that during oral argument on the motion, defendants' counsel stated that based upon representations of plaintiffs' counsel, plaintiffs would not have an expert to address the issue of impairment of network equipment or inventory (not to be confused with impairment of dark fiber) and that they did not plan to pursue a claim related to impairment of network equipment or inventory. Moreover, as previously discussed, the court has specifically determined that Mr. Mintzer's testimony as to the equipment impairment is inadmissible under

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

496 F.Supp.2d 1195
**(Cite as: 496 F.Supp.2d 1195)**

*Daubert.* Plaintiffs cannot, without expert testimony, establish their claims relating to any alleged misstatement in the financial statements of WCG at year-end 2000 dealing with impairment of network equipment or inventory. This issue will receive more attention in the court's ruling on E & Y's summary judgment motion. The evidence as to the "friends and family" transactions would likely be highly potent at a jury *1278 trial and quite properly so. Those transactions strongly suggest, at a minimum, flaccid ethical standards among members of WCG's senior management. However, at this juncture, the admissibility of that decidedly unflattering evidence need not be determined.

[12] The WMB defendants next challenge plaintiffs' claims as to alleged misstatements about the reasons for the spin-off which were made in the press releases of July 24, 2000,[FN63] November 16, 2000 [FN64] and March 30, 2001.[FN65] The WMB defendants assert that the alleged misstatements are not actionable as a matter of law because they can only be classified as statements of "corporate optimism" or "mere puffing." Such statements, the WMB defendants maintain, are typically forward-looking statements or are generalized statements of optimism that are not capable of objective verification. The WMB defendants argue that vague, optimistic statements are not actionable because they are not statements relied upon by reasonable investors when making investment decisions. Mustering just a bit of chutzpah, or admirable modesty, or both, they argue in essence that public pronouncements about WMB's subjective motives for the spin-off would not be relied upon by reasonable investors in making their decisions to buy or sell stock. Asserting that the alleged misstatements are immaterial as a matter of law, the WMB defendants contend that partial summary judgment should be entered as to plaintiffs' claims based on those statements.

FN63. The July 24, 2000 WMB press release quoted Bailey as stating:
We believe these steps [leading to the separation of WMB from WCG] are *the best way to ensure that both our energy and communications businesses have the*

*efficient and effective access to the capital necessary to pursue the substantial growth opportunities that each enjoys...* Obviously, the ability to do that is consistent with the *best long-term interest of our shareholders.*
Ex. 27, KB Decl. (emphasis added).

FN64. The November 16, 2000 WMB press release quoted Bailey as stating:
This important step continues a process that we believe remains in the best long-term interests of our shareholders ... *Our energy and communications businesses have tremendous opportunities before them. Creating the most effective and efficient access to capital will help fuel that growth, and we believe that can best be achieved by creating two independent businesses.*
Ex. 84, KB. Decl. (emphasis added).

FN65. The March 30, 2001 WCG press release quoted Janzen as stating:
[T]his spinoff is the natural evolution of a business strategy begun in 1998, when we re-entered the telecommunications space ... The spinoff gives [WCG] the best opportunity to strengthen its industry leadership and the ability to attract investors who value the vast potential of broadband.
Complaint, ¶ 75.

In response, plaintiffs contend that the court should not dismiss the claims based on the asserted misstatements because the court, per the Honorable Sven Erik Holmes, has ruled (in the order addressing defendants' motions to dismiss the Complaint) that "statements concerning the reasons for WCG's spin-off, WCG's business condition and prospects, and WCG's capitalization" should not be dismissed as immaterial. *In re Williams Securities Litigation,* 339 F.Supp.2d at 1224-1233. Plaintiffs argue that Judge Holmes' ruling is the law of this case and that, in any event, the challenged statements concern facts that defendants, themselves, recognized as critical. Plaintiffs contend that defendants' own act of repeatedly

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

496 F.Supp.2d 1195                                                    Page 95

496 F.Supp.2d 1195
**(Cite as: 496 F.Supp.2d 1195)**

making the statements about the reasons for WCG's spin-off, about WCG's condition and prospects, and about WCG's capitalization, increased the likelihood that investors would have found those matters to be important, with the *1279 natural result that they would have relied upon the statements in making their investment decisions. Plaintiffs also assert that the alleged misstatements should not be dismissed because there are issues of fact as to the materiality of the misstatements.

Only "material" false or misleading statements or omissions are actionable under § 10(b). 17 C.F.R. § 240.10b-5(b). " '[A] statement or omission is only material if a reasonable investor would consider it important in determining whether to buy or sell stock,' and if it would have 'significantly altered the total mix of information available' to current and potential investors." *Fleming Companies, Inc.,* 264 F.3d at 1267-68 (quoting *Grossman v. Novell, Inc.,* 120 F.3d 1112, 1119 (10th Cir.1997)). Materiality is a mixed question of law and fact. *TSC Indus., Inc. v. Northway, Inc.,* 426 U.S. 438, 450, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976). The question of materiality can be resolved as a matter of law only when the information is so obviously unimportant to an investor that reasonable minds cannot differ on the question of materiality. *Connett v. Justus Enterprises of Kansas, Inc.,* 68 F.3d 382, 384 (10th Cir.1995); *Manavazian v. Atec Group, Inc.,* 160 F.Supp.2d 468, 478 (E.D.N.Y.2001) ("Dismissal due to immateriality is not warranted unless the misstatement or omission is so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance.") (quotations omitted). Forward-looking statements can be material. *Grossman,* 120 F.3d at 1120, n. 6. A statement as to beliefs or opinions may be actionable if the statement is known by the speaker at the time it is expressed to be untrue or to have no reasonable basis in fact. *Id.*

The court finds it unnecessary to address the issue of whether the previous ruling on the issue of materiality must be left untouched as the law of the case. Reviewing the summary judgment record in a light most favorable to plaintiffs, the court is convinced that summary judgment is not

appropriate on the issue of the materiality of the challenged statements. The plaintiffs have proffered sufficient evidence to raise a triable issue of fact as to the falsity of the statements. They have also presented evidence sufficient, by a significant margin, to raise an issue of fact as to whether the alleged statements, at the time they were made, were known to Bailey or Janzen to be untrue or without reasonable basis in fact and thus the product of sheer duplicity on the part of those executives. *Grossman,* 120 F.3d at 1120, n. 6. The court accordingly concludes that reasonable minds could differ on the materiality question. Therefore, the court concludes that partial summary judgment is not appropriate as to the issue of materiality on the challenged misstatements relating to the reasons for the spin-off.

[13] The WMB defendants next challenge alleged misstatements as to the quality of WCG's network and technology, as made in the October 25, 2000 press release.FN66 To the extent that plaintiffs rely upon the "friends and family" transactions to support their claim, the WMB defendants' arguments in response are those that have been previously discussed in this *1280 memorandum. As to plaintiffs' remaining arguments as to the falsity of the statements,FN67 the WMB defendants contend that plaintiffs' contentions have not been borne out in discovery and that the facts relied upon by plaintiffs do not contradict the statements. The WMB defendants also contend that the statements in the press release are classic examples of "vague corporate optimism" routinely held to be immaterial and that the statements, by their nature, would not be relied upon by investors in making investment decisions.

> FN66. The October 25, 2000 WCG press release quoted Bross as stating:
> Through our unique Technology Farm System, [WCG] continues to test and deploy leading-edge optical technologies that split the spectrum of light to increase capacity and improve quality of service ... By combining these emerging technology [sic] with our industry-leading ability to expand and provision customer demand for

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

496 F.Supp.2d 1195                                              Page 96

496 F.Supp.2d 1195
(Cite as: 496 F.Supp.2d 1195)

recurring capacity, [WCG] is executing on its stated strategy to drive network utilization and accelerate the decline in unit costs.
Complaint, ¶ 62.

FN67. Described by defendants (paraphrasing the Complaint) as follows: That (1) WCG had pared down its budget for equipment, maintenance and upgrades for the year 2001; (2) WCG eliminated its allocation of funds to a "remote access project," which would have made problems on the network easier to detect; (3) WCG did not have or maintain route diversity; and (4) WCG had difficulty meeting the needs of some of its customers. *See,* Doc. No. 1061(WMB) at 23.

The court concludes that partial summary judgment is not appropriate as to the alleged false and misleading statements relating to the October 25, 2000 press release. The summary judgment record, viewed in a light most favorable to plaintiffs, is sufficient to raise triable issues as to whether these statements are actionable under § 10(b) and Rule 10b-5.

[14] The WMB defendants further challenge plaintiffs' claims predicated on the alleged misstatements about WCG's financial results and expectations, as made in the July 27, 2000 press release,[FN68] the November 16, 2000 press release, [FN69] the February 5, 2001 press release,[FN70] the February 15, 2001 *The Street.com* Report [FN71] and the March 15, 2001 press release.[FN72] The WMB defendants contend that the statements constitute mere corporate puffing incapable of objective verification. In addition, the WMB defendants contend that the forward-looking, optimistic statements were accompanied by cautionary statements regarding the risks of WCG's business and are inactionable as a matter of law under the " bespeaks caution" doctrine.

FN68. The July 27, 2000 WCG press release quoted Janzen as stating: "We

have continued to see a dramatic ramp-up in overall industry demand for bandwidth." Complaint, ¶ 61.

FN69. The November 16, 2000 WCG press release stated: "WCG is superbly positioned to achieve our goals." Complaint, ¶ 65.

FN70. The February 5, 2001 WCG press release stated: "[WCG] expects to be EBITDA-positive on an operational basis by the end of 2001...." In the press release, Janzen also cited:
[WCG's] success in both attracting new customers and meeting growing demand from established customers as proof of its broadband-enablement strategy and leadership in delivery of data, voice, Internet and media services.
Complaint, ¶ 67.

FN71. The February 15, 2001 *The Street.com* Report quoted Schubert as stating: "We believe we are on a clear path to profitability ... We have a sound funding strategy in place." Complaint, ¶ 68.

FN72. The March 15, 2001 WCG press release quoted Janzen as stating: "Closing [the $1.4 billion structured notes] transaction enhances our overall liquidity and positions us well in anticipation of the proposed spinoff." Complaint, ¶ 73.

The court disagrees. The record is clearly adequate to raise triable issues as to the materiality of the challenged statements; most prominently the issue of whether the speakers, at the time the statements were made, knew or had very good reason to know that the statements were untrue or had no reasonable basis in fact. *Grossman,* 120 F.3d at 1120 n. 6. In light of the evidence in the record, the court also concludes that partial summary judgment is not appropriate based on the **\*1281** "bespeaks caution" doctrine. *Gabriel Capital, L.P. v. NatWest Finance, Inc.,* 122 F.Supp.2d 407, 419 (S.D.N.Y.2000) ( "The 'bespeaks doctrine,' [ ]

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

496 F.Supp.2d 1195

496 F.Supp.2d 1195
(Cite as: 496 F.Supp.2d 1195)

Page 97

does not apply where a defendant knew that its statement was false when made.").

[15] The WMB defendants also contend, in their reply brief, that the plaintiffs, in responding to the WMB defendants' motion, have referred to statements not previously pled in the Complaint. The WMB defendants assert that plaintiffs seek, belatedly, to rely on the statements made by Bailey as to the reasons for the spin-off in the July 28, 2000 conference call,[FN73] the statements made by Bailey about WCG's funding situation during the October 25, 2000 conference call,[FN74] the statements made by Bailey and other officers on the reasons for the spin-off during the January 2001 road show, [FN75] the statements by Bailey about the reasons of the spin-off in the March 30, 2001 press release [FN76] and the statements made by certain WMB executives as to the reasons for the spin-off during the April 2001 road show.[FN77] The WMB defendants contend that plaintiffs should not be permitted to amend their complaint at the summary judgment stage, after discovery has closed, and that plaintiffs have offered no justification for their delay. Defendants maintain that most of the new allegations are based on public statements that have always been accessible. Defendants contend that they will be seriously prejudiced if plaintiffs are permitted to amend, arguing, among other things, that they have been denied their opportunity to challenge the sufficiency of the allegations by way of a motion to dismiss. The WMB defendants also assert that even if the plaintiffs are granted leave to amend, the new allegations nevertheless fail as a matter of law because plaintiffs cannot show falsity, materiality and scienter.

FN73. In the July 28, 2000 conference call, Bailey stated:
As stated in the press release, we believe this course of action, if successful, is *the best way to assure that every part of our company can enjoy the optimal growth as a result of the opportunities that are available to us* and that continue to become available to us and *it enables us to fund those opportunities in an efficient and an effective way.*

Ex. 28 at 1-2, KB Decl. (emphasis added).

FN74. In the October 25, 2000 conference call, Bailey stated that WCG was " pre-funded for their capital needs in this time of more unsettled capital markets, to carry them to that point of EBITDA positive." Ex. 53 at WMB.00227224, KB Decl.

FN75. During the January 2001 roadshow, Bailey and other senior WMB executives described the spin-off of WCG as something that: "Better enables each company to execute its respective business plan;" "Optimizes access to capital;" " Facilitates pursuit of growth opportunities" and "Creates a 'Win-Win' for WMB and WCG shareholders." Ex. 85 at ML 070978, KB Decl.

FN76. In the March 30, 2001 press release, Bailey stated that the separation of WMB and WCG "would best enable each to reach its full potential and to most efficiently access capital markets...." Ex. 92 at LB 066355, KB Decl.

FN77. During the April 2001 roadshow, senior WMB executives described the spin-off as something that "Better enables each company to execute its respective business plan;" "Optimizes access to capital;" "Facilitates pursuit of growth opportunities;" and "Creates a 'Win-Win' for WMB and WCG shareholders." Ex. 94 at WCG-HJ-E000015845.

Although the WMB defendants are correct that the cited statements are not specifically pleaded in the Complaint, the court concludes that plaintiffs should be permitted to rely upon them.[FN78] *See,* Rule 15(a), Fed.R.Civ.P. (leave to amend "shall be freely given when justice so requires."). The alleged misstatements are similar to *1282 those previously pled, which survived dismissal. No new discovery is required to address these additional matters. The defenses to these allegations, at least in the present procedural context, are the same as

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

496 F.Supp.2d 1195                                          Page 98

496 F.Supp.2d 1195
(Cite as: 496 F.Supp.2d 1195)

those raised as to other matters which have been pleaded. The court specifically rejects defendants' bare, conclusory statement that they will suffer substantial prejudice if plaintiffs are allowed to rely upon these alleged misstatements.[FN79] As to the merits of the new allegations, the court concludes that there is sufficient evidence in the record to survive a challenge under Rule 56 on the issues of falsity, materiality and scienter.

> FN78. The new allegations would be required to be included in any final pretrial order.

> FN79. The court specifically finds no prejudice as to the July 28, 2000 conference call allegations. In motion briefing, the WMB defendants recognize that plaintiffs have made such allegations: "Plaintiffs claim that the statements made by Keith Bailey regarding the reasons for the spin-off were false and misleading, citing quotes ... during the July 28, 2000 Williams Earnings Call...."*See,* Doc. No. 1061(WMB) at 34.

[16] The WMB defendants also contend that they are entitled to partial summary judgment on plaintiffs' § 10(b) and Rule 10b-5 claims relating to the alleged misstatements as to the reasons for WCG's spin-off, WCG's network quality and WCG's financial results and expectations because plaintiffs do not have sufficient evidence that the WMB defendants acted with the requisite scienter.
The WMB defendants argue that plaintiffs have produced no competent evidence that defendants knew that the purported misstatements were false or misleading when made or that they made the statements recklessly. They further argue that plaintiffs have no significant "motive and opportunity" evidence.

The scienter element in a securities fraud case requires "a mental state embracing intent to deceive, manipulate, or defraud." *Fleming Cos.,* 264 F.3d at 1258 (quotations omitted). It includes "knowing or intentional conduct" and "recklessness," which is "conduct that it is an extreme departure

from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *Id.*"One of the classic fact patterns giving rise to a strong inference of scienter is that defendants published statements when they knew facts or had access to information suggesting that their public statements were materially inaccurate." *Florida State Bd. of Admin. v. Green Tree Financial Corp.,* 270 F.3d 645, 665 (8th Cir.2001) (citing *Novak v. Kasaks,* 216 F.3d 300, 311 (2nd Cir.), *cert. denied,* 531 U.S. 1012, 121 S.Ct. 567, 148 L.Ed.2d 486 (2000)); *see also, Fleming Cos.,* 264 F.3d at 1260-61(in case of omissions, scienter proved by knowledge of the omitted fact plus knowledge that the omission is likely to mislead investors).
Evidence of motive and opportunity may also be relevant to the issue of scienter. *Fleming Cos.,* 264 F.3d at 1263. Furthermore, the scienter of senior controlling officers of a corporation may be attributed to the corporation itself to establish liability under § 10(b) and Rule 10b-5 when those senior officials act within the scope of their apparent authority. *Adams v. Kinder-Morgan, Inc.,* 340 F.3d 1083, 1106 (10th Cir.2003).

Reviewing the summary judgment record and the inferences reasonably drawn therefrom in the light most favorable to plaintiffs, the court concludes that genuine issues of fact exist as to the scienter element as challenged by the WMB defendants.
The evidence before the court shows that defendants knew facts or had access to non-public information contradicting the challenged public statements. Moreover, there is evidence in the record, easily sufficient to raise an issue of fact, **\*1283** that defendants knew of undisclosed material facts and that failure to reveal such facts would likely mislead investors. The court is persuaded that this evidence, if credited by the trier of fact, would establish recklessness as defined by relevant case law. The court also concludes that evidence in the record, viewed favorably to plaintiffs, raises an issue of fact as to defendants' motive and opportunity to commit the alleged fraud. The court therefore concludes that, for summary judgment purposes, a sufficient showing of scienter has been made as to the claims relating to the WMB

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

496 F.Supp.2d 1195
**(Cite as: 496 F.Supp.2d 1195)**

defendants' statements about the reasons for the spin-off, WCG's network quality and WCG's financial results and expectations. [FN80]

> FN80. The court notes that several of the challenged statements are not made by Bailey. Rather, they are made by Bross, Janzen, Schubert and WCG. Plaintiffs have alleged a § 20(a) claim against the WMB defendants. For the WMB defendants to be held liable under § 20(a), the plaintiffs need not show that the WMB defendants were actual or culpable participants in the primary violation. *Adams*, 340 F.3d at 1109 ("[W]e have expressly rejected those decisions that may be read to require a plaintiff to show the defendant actually or culpably participated in the primary violation ... Section 20 of the Exchange Act contains no requirement that plaintiffs must prove a control person's state of mind.") (internal quotations omitted).

The WMB defendants further contend that the plaintiffs' assertion of scienter, as to the claimed GAAP violations, fail as a matter of law. Specifically, the WMB defendants attack plaintiffs' contentions (i) that WCG violated GAAP in that impairment charges should have been taken earlier as to WCG's inventory, international assets and Winstar assets, as well as the dark fiber and conduit assets, and (ii) that WCG improperly booked revenues in connection with purported dark fiber "swaps" which in reality had no business purpose. At oral argument on the motion, the WMB defendants' counsel represented to the court, without contradiction from plaintiffs' counsel, that plaintiffs were not pursuing the issues relating to Winstar assets and the fiber swaps. On the basis of this representation (among others made at oral argument), taken together with the court's exclusion of the proposed expert testimony of Mr. Mintzer, there are several aspects of plaintiffs' GAAP-related claims that would not ultimately be submitted to a jury as this matter now stands. But, as to the scienter element [FN81] of the GAAP claims against the WMB defendants, there are genuine issues of fact which preclude summary judgment. [FN82]

> FN81. Again, the court notes that plaintiffs have alleged a § 20(a) claim as to the accounting fraud allegations. Under Tenth Circuit law, plaintiffs need not show that the WMB defendants actually or culpably participated in the primary violation to hold defendants liable under § 20(a). *Adams*, 340 F.3d at 1109.

> FN82. The court notes that in footnote 11 of their brief in support of their motion for partial summary judgment, the WMB defendants specifically join in E & Y's motion for summary judgment challenging the alleged GAAP violations.

*B. Motion of the Williams Companies, Inc. and Keith E. Bailey for Partial Summary Judgment on Alleged Misstatements or Omissions Made After WCG's Spin-Off from Williams*

The WMB defendants move for partial summary judgment as to the WCG Subclass plaintiffs' claims relating to alleged misstatements or omissions made by WCG or its officers and directors after the spin-off of WCG from WMB on April 23, 2001. [FN83] The WMB defendants argue that they cannot *1284 be held liable under § 20(a) for these alleged post-spin-off misrepresentations and omissions and that, in any event, plaintiffs have no evidence to show that the WMB defendants conspired with unspecified persons at WCG, or that they were "control persons" of WCG after the spin-off. Arguing that Supreme Court and Tenth Circuit law plainly establish that third parties such as the WMB defendants cannot be held liable for alleged misrepresentations and omissions made by WCG after the spin-off, the WMB defendants contend that partial summary judgment is appropriate.

> FN83. Plaintiffs, according to defendants, seek to proceed on the basis of at least 28 statements made by WCG or its management after the spin-off.

In response, plaintiffs concede that the WMB defendants did not control WCG after the spin-off

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

496 F.Supp.2d 1195
**(Cite as: 496 F.Supp.2d 1195)**

and agree that those defendants cannot have any § 20(a) control person liability for WCG's primary violations after the spin-off. They also do not challenge any of the WMB defendants' arguments relating to the alleged conspiracy. The court therefore concludes that partial summary judgment is appropriate on plaintiffs' § 20(a) claims as to alleged misrepresentations and omissions made by WCG or its officers and directors after the spin-off of WCG from WMB on April 23, 2001 and as to any claims relating to the alleged conspiracy.

However, plaintiffs do argue that Bailey (as distinguished from WCG) made three additional false and misleading statements after the spin-off. These false and misleading statements were made, plaintiffs contend, in the April 26, 2001 conference call,[FN84] the May 17, 2001 WMB shareholder meeting [FN85] and the October 31, 2001 e-mail to Janzen. The WMB defendants protest that none of these alleged false and misleading statements were pleaded in the Complaint and that plaintiffs should not be allowed, at this stage, to proceed on the basis of these allegations.

> FN84. During the April 26, 2001 conference call, Bailey stated:
> [B]ecause their financing is in place and their performance we believe is good and will continue to be good, we think that there's significant upside in that stock as well as soon as it reaches a new ownership equilibrium.
> Ex. 115 at WMB. 00032222, KB Decl. (emphasis added).

> FN85. During the May 17, 2001 shareholder meeting, Bailey stated:
> [W]e were ultimately successful, and in a way that we believe best assures the long-term health and prosperity of both companies.... [WCG] is strongly positioned for success. Its core network asset is in place. It has a demonstrated history of technical leadership. It has been and should be the standard-setter in operational performance. And, *it has the financial resources in place* to enable it to

deliver on the promise of a very bright future.
Ex. 116 at WMSE005813519, KB Decl. (emphasis added).

As to the allegations relating to the April 26, 2001 conference call and the May 17, 2001 WMB shareholder meeting, the court disagrees with the defendants. The alleged false and misleading statements relating to WCG's financing and reasons for the spin-off are similar to those previously pled, which survived a motion to dismiss. The court again rejects the WMB defendants' bare, conclusory statements of prejudice. The court also concludes that plaintiffs have demonstrated triable issues of fact as to materiality and scienter with respect to these allegations. However, plaintiffs will not be permitted to proceed on the basis of the October 31, 2001 e-mail. In that e-mail to Janzen, Bailey stated: "I gave a fire breathing endorsement of WCG and the strategy that underpinned it (a bandwidth machine-low cost/high quality) during our analysts meetings yesterday." Ex. 117, KB Decl. There is no evidence in the record as to the actual statement made by Bailey to the analysts. The actionability of the statement*1285 to the analysts, for that reason, defies analysis. Consequently, it would be futile to allow plaintiffs to rely on this allegation and to include it in any pretrial order because it would not survive a test of its legal sufficiency. *See, Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962) (court need not grant leave to amend if amendment would be futile).[FN86]

> FN86. As to the "fire breathing endorsement" statement made by Bailey to Janzen, the court notes that defendants cannot be held liable for a private statement. *See, Basic, Inc. v. Levinson,* 485 U.S. 224, 247, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988) (a plaintiff using the fraud on the market theory must point to " public material misrepresentations"). It should be borne in mind, though, that, with the present disposition of this case, the court has no occasion to address the evidentiary admissibility of Bailey's

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

496 F.Supp.2d 1195                                              Page 101

496 F.Supp.2d 1195
(Cite as: 496 F.Supp.2d 1195)

statement to Janzen about his fire breathing endorsement. That is a matter entirely distinct from the substantive actionability of this private comment. If this case were ever to go to trial, there is more than a passing likelihood that Bailey would be required to eat his fire.

Plaintiffs also contend that the WMB defendants made false and misleading statements post-spin-off as a result of their failure to take any WCG-related charges on WMB's own books until January 29, 2002.[FN87] In response, defendants argue that plaintiffs lack standing to complain about WMB's accounting and that WMB did disclose its contingent liabilities relating to WCG in November of 2001-as plaintiffs' accounting expert, Mr. Mintzer, suggested should have been done. The WMB defendants also point out that the disclosure, when made, had no negative effect on WCG's stock price, indicating that the disclosure was immaterial. Summary judgment is not specifically sought as to this claim and will not be granted, because there are triable issues of materiality and scienter.[FN88] The standing issue is more complex and has not been adequately briefed. It will receive no further attention at this stage.

> FN87. As previously discussed, Mr. Mintzer opined that WMB should have recorded a charge on its June and September 2001 financial statements for its contingent liability as guarantor of more than $1 billion in WCG debt.

> FN88. The court has excluded Mr. Mintzer's proposed expert testimony relating to WMB's failure to record a contingent liability. *See,* Part V(D)(4)(b), above (discussing paragraphs 303-305 of Mr. Mintzer's report). It therefore appears that plaintiffs may not have sufficient evidence to establish that any misrepresentation or omission occurred. The court, however, declines to address that matter *sua sponte.*

### C. Defendant Ernst & Young LLP's Motion for

#### *Summary Judgment.*

E & Y moves for summary judgment on the WCG Subclass plaintiffs' § 10(b) and Rule 10b-5 claim, relating to E & Y's March 12, 2001 audit opinion on WCG's year-end 2000 financial statements. In the challenged audit opinion, E & Y stated that the audit was "conducted in accordance with [GAAS]," and that "the financial statements ... present fairly, in all material respects" WCG's financial position. E & Y asserts that plaintiffs cannot establish that there was a materially false statement because the evidence does not establish that the audit was not conducted in accordance with GAAS and that WCG's financial statements violated GAAP. In addition, E & Y contends that plaintiffs cannot prevail because the evidence fails to show that E & Y acted with the requisite scienter. Specifically, E & Y argues that the evidence fails to show that its auditing practices were so deficient that the audit amounted to "no audit at all" or that "no reasonable accountant would have made the same decisions if confronted with the same facts."

#### *1286 1. Material misstatements or omissions.

Plaintiffs allege that WCG violated GAAP in its financial statements by: (i) "improperly failing to record required write-downs for impairment on the value of WCG's excess fiber and conduit of approximately $1.9 billion;" and (ii) "improperly failing to record required write-downs for impairment in the value of WCG's excessive inventory on a timely basis of approximately $336 million." [FN89] Complaint ¶ 157. As previously discussed, FAS 121, which, during the periods relevant in the case at bar, governed accounting for the impairment of long-lived assets, requires a three-step analysis before a company takes an impairment charge. E & Y argues that plaintiffs cannot demonstrate that any of the three sequential steps in the FAS 121 analysis at year-end 2000 indicated that an impairment charge was required, contending that plaintiffs cannot prove that (i) there were impairment indicators or triggering events as of December 31, 2000; (ii) a cash flow analysis conducted on WCG's network would have shown an impairment; or (iii) a material charge would have

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

496 F.Supp.2d 1195                                                        Page 102

496 F.Supp.2d 1195
(Cite as: 496 F.Supp.2d 1195)

resulted. On this basis, E & Y maintains that plaintiffs cannot establish that either the network or the network equipment were materially impaired at year-end 2000-hence no GAAP violation occurred and there was not a material misstatement. The court agrees.

> FN89. In the Complaint, plaintiffs also allege that WCG violated GAAP regarding the treatment of WCG's 2000 broadband transactions, WCG's international equity investments and fiber assets and WCG's Winstar assets. During oral argument on the motion, E & Y's counsel represented that plaintiffs' counsel had conceded plaintiffs' claim as to these allegations and such representation was not contradicted by plaintiffs. It appears from the court's review of the record that plaintiffs have no material facts to support such allegations, and thus, no genuine issue of fact exists as to whether WCG fairly presented its financial statements in these areas and as to whether E & Y's auditing of these areas complied with GAAS. The court concludes that E & Y is entitled to summary judgment as to plaintiffs' claim relating to these allegations.

The court has excluded the report and testimony of plaintiffs' expert, H. Sean Mathis, and has excluded the report and testimony of plaintiffs' expert Andrew M. Mintzer as to the impairment issues. Without this testimony, plaintiffs cannot establish a genuine issue of fact as to whether WCG failed all three steps of the impairment analysis and that, consequently, a material impairment existed as to WCG's network and network equipment at year-end 2000. For that reason, plaintiffs cannot establish that WCG violated GAAP by failing to record impairments in the year-end 2000 financial statements. Plaintiffs are accordingly unable to establish the essential element of material misrepresentation or omission in support of their claim of impairment under FAS 121.

Because plaintiffs cannot show that WCG's year-end 2000 financial statements were inaccurate

with respect to application of FAS 121, the court concludes, with respect to impairment, that plaintiffs also cannot succeed on their claim that E & Y made a material misstatement in reporting that it had performed its audit in accordance with GAAS. To succeed on this issue, plaintiffs must show a "material" misrepresentation or omission. *Dura*, 544 U.S. at 341, 125 S.Ct. 1627. However, an auditor's statement that it conducted an audit in compliance with GAAS, even if untrue, is not "material" if the company's financial statements do not materially violate GAAP because "it is difficult to imagine how a reasonable investor could conclude," under those circumstances, that the purported misstatement of the auditor "significantly altered the total mix of information available." *See,* **\*1287***New Jersey and its Div. of Investment v. Sprint Corp.,* 314 F.Supp.2d 1119,1147 (D.Kan.2004).

[17] Plaintiffs also allege that at year-end 2000 WCG was in violation of its debt covenants and failed-thus violating GAAP-to disclose the violations in its financial statements. They also allege that E & Y failed to modify its report as to the debt covenant violations, in violation of GAAS. The debt covenants required WCG to satisfy several financial measurements, including the Total Leverage Ratio (of no more than 18) and the Minimum EBITDA (of $120 million). Plaintiffs contend that WCG met its Total Leverage Ratio (calculated to be 17.07) by resorting to four improper items, which if properly accounted for, would have caused the ratio to exceed 18.[FN90] They also argue that WCG satisfied its EBITDA requirement by using two improper items, which, if excluded, would have caused WCG to miss the EBITDA mark by about $60 million. [FN91]

> FN90. These items are:
> 1. The Solutions unit's bad debt expense of $30 million (excluded from EBITDA).
> 2. Cash of $70 million received on the sale of XOXO securities (included in EBITDA for covenant purposes).
> 3. Known accounting error which net to a $4.5 million decrease to the income reported in WCG's income statement

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

496 F.Supp.2d 1195
**(Cite as: 496 F.Supp.2d 1195)**

(excluded from EBITDA for covenant purposes).
4. Special adjustments to GAAP net income of $5.8 million made only for purposes of computing debt covenant compliance.
Ex. 8, para. 182, p. 60, CM Decl.

FN91. These two items are:
1. The Solutions unit's bad debt expense of $30 million (excluded from EBITDA for covenant purposes).
2. Cash of $70 million received on the sale of the XOXO securities (included in EBITDA for covenant purposes).
Ex. 8, para. 220, p. 72, CM Decl.

The court has not excluded Mr. Mintzer's proposed expert testimony with respect to WCG's violations of the debt covenants. Paragraphs 172 through 223 of Mr. Mintzer's expert report specifically discuss the debt covenant violation asserted by plaintiffs. Ex. 8, CM Decl. Based upon the report and the other evidence in the summary judgment record, viewed in a light most favorable to plaintiffs, the court concludes that genuine issues of fact do exist as to whether WCG failed to disclose that it was in violation of its debt covenants and as to whether E & Y failed to ascertain and report the asserted violation. Summary judgment must therefore be denied as to the element of material misrepresentation with respect to the alleged debt covenant violations.

[18] Plaintiffs also contend that E & Y failed to modify its audit opinion language, thus departing from GAAS, to indicate that there was substantial doubt that WCG could continue as a "going concern" for twelve months beyond December 31, 2000. According to AU § 341, one of AICPA's professional standards, E & Y, in conducting an audit of WCG's financial statements in accordance with GAAS, was required to evaluate whether there was substantial doubt as to WCG's ability to continue as a going concern for a reasonable period of time, not to exceed one year from the date of the financial statements. Ex. 61 at AU § 341.01 and AU § 341.02, CM Decl. Continuation of an entity as a going concern is assumed in the absence of

significant information to the contrary. Information that significantly contradicts that assumption relates to the entity's inability to continue to meet its obligations as they become due without substantial disposition of assets outside of the ordinary course of business, restructuring of debt, externally forced revisions of its operations, or similar actions. *Id.* at AU § 341.01. Plaintiffs contend that the evidence establishes the existence of factors clearly indicating that substantial doubt existed about WCG's ability to continue**\*1288** as a going concern as of December 31, 2000. These factors, plaintiffs argue, portended that WCG would have needed to restructure its debt, dispose of assets and restructure its operations in order to meet its obligations in 2001. In support of this claim, plaintiffs point out that less than seven days after the April, 2001 spin-off, WCG began working with The Blackstone Group to look at strategies to restructure its balance sheet. Less than two months later, in June of 2001, WCG attempted a capital spending freeze to control expenditures and announced a 10 percent lay off of its work force. Subsequently, in August of 2001, WCG bought back some of its long term debt in an attempt to restructure its balance sheet. Plaintiffs contend that these attempts at restructuring, shortly after the spin-off, show that WCG was not a going concern as defined by GAAS as of year-end 2000.

E & Y contends that during the audit, it reviewed WCG's liquidity position, considered WCG's specific characteristics within the telecom industry and obtained a management representation letter from WMB confirming its financial support of WCG. As a result of this review and based upon its professional judgment, it concluded that there was no substantial doubt about WCG's ability to continue as a going concern for twelve months beyond December 31, 2000. Based upon the evidence in the record, including WMB's assurance of funding for WCG in 2001 as long as the spin-off did not occur, and Lehman Brothers' opinion that if the spin-off occurred it would not materially impair WCG's ability to fund its future capital needs, E & Y contends that plaintiffs' claim that there was substantial doubt about WCG's ability to continue as a going concern as of year-end 2000 is untenable. In addition, E & Y argues that plaintiffs' going

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

496 F.Supp.2d 1195                                                    Page 104

496 F.Supp.2d 1195
**(Cite as: 496 F.Supp.2d 1195)**

concern argument is undermined by the indisputable fact that WCG did indeed continue as a going concern beyond December 31, 2001.

E & Y also challenges plaintiffs' argument that WCG's "restructuring," which occurred months after the audit, shows substantial doubt that WCG was a going concern, contending that there is no evidence in the record to show that, to stay in business, WCG was forced to sell assets to meet its obligations as they became due.

The court concludes that plaintiffs have not presented evidence sufficient under the minimal Rule 56 standard to show a material misrepresentation or omission by E & Y as to WCG's status as a going concern. There is no dispute that WCG did continue as a going concern past December 31, 2001. For that reason, E & Y's failure to include a going concern qualification cannot constitute a "material" misrepresentation or omission. *See, Pew v. Cardarelli,* 2005 WL 3817472, *9 (N.D.N.Y. March 17, 2005) (citing *In re Integrated Resources Real Estate, Ltd. Partnerships Securities Litigation,* 815 F.Supp. 620, 670 (S.D.N.Y.1993) and *Schick v. Ernst & Young,* 808 F.Supp. 1097, 1102-03 (S.D.N.Y.1992) ). Moreover, as did the court in Pew, the court notes that the AICPA's professional standards specifically state that "the absence of reference to substantial doubt in an auditor's report should not be viewed as providing assurance as to an entity's ability to continue as a going concern." *Id.; see also,* Ex. 61 at AU § 341.04, CM Decl. Consequently, the court concludes that plaintiffs cannot establish a material misrepresentation or omission as to WCG's ability to continue as a going concern as of year-end 2000.

### 2. Scienter as to E & Y.

The court has concluded that as to as to the material misrepresentation or omission element of plaintiffs' § 10(b) and Rule 10b-5 claim against E & Y, genuine issues of fact exist only with respect to the alleged debt covenant violations. E & Y **\*1289** also moves for summary judgment on the basis that plaintiffs cannot establish the scienter element of

their claim.

[19] Although recklessness can satisfy the requirement of scienter in a securities fraud action against an accountant, "recklessness," for purposes of a securities fraud claim against an outside auditor, has persuasively been defined as:
highly unreasonable [conduct], involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it. That standard requires more than a misapplication of accounting principles. [Plaintiffs] must prove that the accounting practices were so deficient that the audit amounted to no audit at all, or "an egregious refusal to see the obvious, or to investigate the doubtful," or that the accounting judgments which were made were such that no reasonable accountant would have made the same decisions if confronted with the same facts.

*Sprint Corp.,* 314 F.Supp.2d at 1148 (quoting *S.E.C. v. Price Waterhouse,* 797 F.Supp. 1217, 1240 (S.D.N.Y.1992)).

[20] Applying that standard and viewing the evidence most favorably to the plaintiffs, the court concludes that plaintiffs cannot meet this exacting standard as to the alleged debt covenant violations. Although plaintiffs have shown that another accountant, Mr. Mintzer, would have handled the matter differently and reached different audit conclusions, they have not shown that E & Y's accounting practices were so deficient that the audit amounted to no audit at all or that the accounting judgments made were such that no reasonable accountant would have made the same decision if confronted with the same facts. Moreover, they have not shown an egregious refusal by E & Y to see the obvious or to investigate the doubtful. At best, plaintiffs have shown negligence by E & Y-not reckless conduct. Recklessness, however, is "a mental state apart from negligence and [is] akin to conscious disregard." *In re Comshare Inc. Securities Litigation,* 183 F.3d 542, 550 (6th Cir.1999); *see also, In re Cardinal Health Inc. Securities Litigations,* 426 F.Supp.2d 688,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

496 F.Supp.2d 1195                                                                    Page 105

496 F.Supp.2d 1195
**(Cite as: 496 F.Supp.2d 1195)**

(S.D.Ohio 2006) ("Recklessness on the part of an independent auditor entails a mental state so culpable that it approximate[s] an actual intent to aid in the fraud being perpetrated by the audited company.") (internal quotations and citations omitted).

GAAP and GAAS violations, standing alone, are not sufficient to establish scienter. *Zucker v. Sasaki,* 963 F.Supp. 301, 307 (S.D.N.Y.1997). The GAAP or GAAS violations must be coupled with evidence that the violations were the result of the auditor's *fraudulent intent to mislead investors. Fleming Cos.,* 264 F.3d at 1261. The court's careful review of the substantial summary judgment record in this case convinces the court that plaintiffs cannot make the required showing as to E & Y. Plaintiffs' proffered evidence that E & Y lacked independence is insufficient to raise a genuine issue of fact as to scienter. The mere fact that E & Y had an interest in continued employment by WCG after the spin-off and to continue to receive substantial auditing fees is likewise not sufficient. *Sprint Corp.,* 314 F.Supp.2d at 1148, n. 26. Accordingly, because plaintiffs have failed to show by competent evidence that E & Y acted with scienter as to the alleged debt covenant violations, the court concludes that summary judgment is appropriate.

The court further concludes that even if plaintiffs could establish material misrepresentations or omissions as to the impairment of WCG's network and network *1290 equipment and as to WCG's ability to continue as a going concern as of year-end 2000, plaintiffs have failed to raise genuine issues of fact as to whether E & Y's treatment of those matters was reckless. The summary judgment record in this case does not establish that E & Y's audit amounted, effectively, to no audit at all. The plaintiffs' primary argument is that because only two sentences in the 17,000 pages of work papers mention the FAS 121 impairment analysis, E & Y's year-end 200 audit amounted to "no audit at all." The evidence clearly shows that E & Y evaluated whether FAS 121 impairment indicators existed and concluded that they did not. E & Y documented this conclusion in the work papers. Plaintiffs' contentions on this point boil down to an argument with E & Y's professional judgment as to FAS 121

impairment indicators. But plaintiffs have not made a showing, sufficient for summary judgment purposes, that "no reasonable accountant would have made the same decisions" E & Y made. Moreover, the summary judgment record shows that none of WCG's competitors took a network or equipment impairment charge at year-end 2000. This substantially undercuts plaintiffs' contention that E & Y reached a conclusion that no reasonable accountant would have reached. Furthermore, as to scienter with respect to the going concern qualification, at least one court has held that scienter is not demonstrated as to status as a going concern when the company survives for twelve months. *See, Fidel v. Farley,* 2001 U.S. Dist. LEXIS 9461, at *32, n. 21 (W.D. Ky. June 27, 2001). Accordingly, the court concludes that E & Y is entitled to summary judgment as to the scienter element.

### D. *WCG Defendants' Motion for Summary Judgment.*

#### 1. *WCG's contentions.*

The WCG defendants move for summary judgment on the ground that the WCG Subclass plaintiffs cannot, as a matter of law, establish loss causation, an element of their § 10(b) and Rule 10b-5 claims. Defendants argue that under the Supreme Court's decision in Dura, plaintiffs must show that their claimed losses were caused by the revelation of the fraud to the market ("the corrective disclosure") and not by "changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events...." *Dura,* 544 U.S. at 342-43, 125 S.Ct. 1627. The WCG defendants contend that plaintiffs cannot show that their losses were caused by the fraud. Defendants contend that the Complaint (not to be confused with Dr. Nye's report) alleges only two corrective disclosures as to WCG common stock and none as to WCG's notes.[FN92]

> FN92. Because the Complaint fails to give any idea of plaintiffs' losses in regard to

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

496 F.Supp.2d 1195                                                                          Page 106

496 F.Supp.2d 1195
**(Cite as: 496 F.Supp.2d 1195)**

the notes and the causal connection of the losses, defendants contend that plaintiffs cannot establish loss causation with regard to the notes.

The earliest of the two disclosures alleged in the Complaint was February 25, 2002, the date WCG announced in a press release that it was considering bankruptcy as an option to restructure its debt. Defendants contend, however, that this announcement was not a corrective disclosure-pointing out that WCG had warned the investing public in its February 4, 2002 press release, as well as in a February 13, 2002 earnings conference call, that bankruptcy might be an option. In addition, defendants assert that by the time the February 25th announcement was made, WCG's stock had lost more than 98 percent of its value from the beginning of the class period. Indeed, the price of WCG's *1291 stock had declined from $28.50 to $0.51 per share. Because the value of the WCG stock had fallen so far before the announcement, defendants contend that the market clearly knew WCG was in dire financial straits. Thus, defendants maintain that there was nothing corrective, at least in a causal sense, about the February 25th announcement.

Defendants also argue that even if WCG's announcement could be treated as a corrective disclosure, a price decline of only an additional one percent (based on its price on the first day of the class period) after the per-share price had fallen more than 98 percent, taken together with the fact that the Telecom Index had declined more than 81 percent during the same period, precludes any finding of loss causation.

Defendants also assert that the second disclosure pleaded in the Complaint, WCG's actual bankruptcy filing on April 22, 2002, likewise cannot be treated as a corrective disclosure for loss causation purposes. Defendants point out that WCG disclosed on February 4, 2002, February 13, 2002, February 25, 2002 and April 1, 2002, that bankruptcy was a possibility. Defendants also contend that WCG had not fraudulently claimed to the investing public that it would not file for bankruptcy. Consequently, defendants contend that

while the bankruptcy filing disclosed negative news, it cannot be said to have disclosed corrective news.

Defendants also point out that before the bankruptcy announcement, the price of WCG's stock was $0.17 per share-representing a decline of 99.4 percent from the first day of the class period, substantially tracking the overall decline in the value of securities in the telecommunications sector.

The WCG defendants further argue that plaintiffs cannot salvage their case through evidence offered by their damages and loss causation expert, Dr. Nye. First, defendants contend that Dr. Nye's opinion testimony is inadmissible under *Daubert.* Defendants next argue that Dr. Nye's theory of loss causation, "leakage" or gradual disclosure of the " relevant truth" as to WCG's financial condition throughout the class period, runs contrary to the allegations of the Complaint. Defendants insist that plaintiffs should be held to the theory of loss causation stated in their amended pleading (that WCG's financial condition was concealed from the investing public until February 25, 2002). Because plaintiffs did not seek leave to plead any "leakage" theory of loss causation, defendants contend that they should not be permitted to rely on the "leakage" theory to support their case at this juncture. Defendants also contend that the "leakage" theory collides with the holding in *Dura.* On this point, defendants argue that while courts have allowed plaintiffs to establish loss causation by showing that the truth leaked out through a series of partial corrective disclosures, the courts have not excused plaintiffs from identifying those disclosures. Nor, say the defendants, are the plaintiffs excused from showing statistically significant market reactions to the leaked truth. Defendants argue that Dr. Nye has presented no evidence or analysis showing any corrective disclosures prior to January 29, 2002. Because Dr. Nye's "leakage" opinion does not identify the emergence of corrective information on an identifiable date, with an associated drop in the price of the stock, defendants contend that plaintiffs cannot establish loss causation by way of Dr. Nye's " leakage" opinion.

Defendants acknowledge that in his report, Dr. Nye has identified four specific partial corrective

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

496 F.Supp.2d 1195                                                                          Page 107

496 F.Supp.2d 1195
**(Cite as: 496 F.Supp.2d 1195)**

disclosure dates. Dr. Nye proffers corrective disclosures on January 29, February 4, February 25, and April 22, 2002. But defendants argue that the identified disclosures do not constitute **\*1292** corrective disclosures. The defendants' arguments as to the February 25 and April 22 announcements are summarized above. As to the January 29, 2002 disclosure (WMB's announcement that it was delaying the fourth quarter and 2001 year-end financial statements while it re-evaluated the status of its contingent liabilities relating to WCG), defendants assert that the disclosure did not directly expose any fraud by WCG and that if an announcement does not directly expose the fraud, the plaintiffs' expert may not be permitted to speculate, without evidence, that the market recognized a relationship between the announcement and the fraud. Defendants assert that Dr. Nye's work has not shown, on any acceptable basis, that the market recognized a relationship between WMB's announcement and WCG's alleged concealment of its "true" financial condition, thus precluding any attempt, through Dr. Nye or otherwise, to speculate that the market recognized a relationship between the announcement and fraud. Defendants also contend that Dr. Nye's own economic analysis refutes any claim that the January 29, 2002 announcement operated as a corrective disclosure, pointing out that his event study shows that the price decline following the announcement was not statistically significant, and concluding that in the absence of a statistically significant price decline following the corrective disclosure, there can be no loss causation.

As to the February 4, 2002 disclosure (WCG's announcement that the bank group had informed WCG that it may be in default under its credit facility and that WCG was performing a review of possible impairment of long-lived assets), defendants assert that, at best, the disclosure was in part corrective and in part merely negative and that Dr. Nye has wholly failed to differentiate between the effects of the two categories of information, thus precluding the use of Dr. Nye's proposed testimony on this point to support loss causation. Doc. No. 1092 (WCG defendants) at 33.

Aside from their contentions as to loss causation,

the WCG defendants move for summary judgment on the basis of a related (but not identical) contention that plaintiffs cannot establish either the fact of their damages or the means of calculating their damages, both of which failures are fatal to plaintiffs' securities fraud claims, asserting that Dr. Nye's three proposed damage scenarios (Scenario 1, Scenario 2 and Alternative Scenario 2) are so inadequate as to render them useless. Defendants argue that each of the scenarios would permit plaintiffs to recover losses which either preceded disclosure of the alleged fraud or were the result of market factors unrelated to the alleged fraud, or both. Because plaintiffs are unable to either prove the fact of damages or present a reliable method for calculating legally cognizable damages, defendants contend that they are entitled to summary judgment.

### 2. *Plaintiffs' response to WCG's motion.*

Plaintiffs argue that the "leakage" theory is not inconsistent with the allegations of the Complaint. They contend that their amended pleading contains numerous examples of the market's gradual realization of WCG's poor financial condition during the class period, as well as defendants' efforts to rebut the market's realization. The allegations, plaintiffs maintain, provide sufficient notice of plaintiffs' assertion that negative information concerning WCG slowly leaked into the marketplace, gradually revealing WCG's true financial condition and gradually dissipating the artificial inflation in WCG's stock price. Plaintiffs also suggest that even if the leakage theory has not been pleaded, the court should **\*1293** consider the issue at this stage by treating it as an amendment to their pleading.

Aside from pleading issues, plaintiffs also contend that the leakage theory is consistent with *Dura.* Plaintiffs assert that in the *Dura* opinion, the Supreme Court explained that a loss may be caused if the purchaser sells after "the relevant truth begins to leak out,"*Dura,* 544 U.S. at 342, 125 S.Ct. 1627, thus recognizing that some cases may involve a gradual, fraud-related stock price decline. Plaintiffs contend that their leakage theory in this case is not precluded simply because they cannot

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

specifically identify each piece of corrective information that leaked out into the market during the class period. It is noteworthy, and telling, that they assert that *any* information that allowed investors to understand WCG's true financial condition and prospects for success is "leakage of the relevant truth." Doc. No. 1210 (plaintiffs) at 23. They maintain that the very nature of the leakage theory makes it impossible to identify each and every piece of information that revealed the true state of WCG's financial condition because a statistical analysis of WCG's stock price movements will not necessarily identify the "bits and pieces" of corrective information which cause the stock price to imperceptibly but inexorably decline to its true value. They contend, in substance, that it should be sufficient for them to show that by the end of the class period, the market knew the truth about WCG's previously-misrepresented financial condition and prospects for success.

Plaintiffs also contend that they have shown, with Dr. Nye's Scenario 2 and Alternative Scenario 2, that the truth about WCG's financial condition and its prospects for success was revealed to the investing public, at the very least, through the four specific corrective disclosures on January 29, 2002, February 4, 2002, February 25, 2002 and April 22, 2002 and that their assertion of the January 29 and February 4 disclosures is not inconsistent with the allegations of the Complaint.

Plaintiffs contend that the January 29, 2002 announcement (about WMB's assessment of its contingent liabilities) was a corrective disclosure because that announcement partially revealed believable negative information in the possession of WMB, previously concealed, about WCG's financial condition and prospects for success. Plaintiffs also challenge defendants' argument that the disclosure was not corrective because the resulting stock price movement was not statistically significant, arguing that defendants' argument is based on an incorrect interpretation of "statical significance" and its meaning in relation to the materiality of a stock price drop.

Plaintiffs contend that the February 4, 2002 disclosure was a corrective disclosure because it revealed to the market material risks that had been fraudulently concealed, specifically (i) that WCG had been overloaded with debt and would be unable to service that debt while maintaining its business plan and (ii) that WCG's long-lived assets were materially impaired. Plaintiffs argue that it was not necessary for Dr. Nye to separate corrective bad news from garden-variety bad news on February 4 as long as some portion of WCG's stock price drop on that day was caused by investors' reaction to the fraud-related information.

Next, plaintiffs argue that the February 25, 2002 announcement was a corrective disclosure because it disclosed the substantial likelihood that WCG would not be able to survive as a viable standalone entity after the spin-off, which had previously been concealed by defendants. Noting that bankruptcy is always a possibility for any corporation, plaintiffs contend that prior to February 25, 2002, the market was **1294** not made aware that it was "highly likely" that WCG would be forced to declare bankruptcy, Doc. No. 1210, at 33, pointing out that one of the defendants' experts (Dr. Tabak) admitted that the February 25, 2002 announcement revealed to investors a heightened risk of WCG's bankruptcy.

As to the final disclosure date, plaintiffs argue that the bankruptcy filing on April 22, 2002 was a corrective disclosure because it finally revealed the truth, previously undisclosed, as to the "magnitude" of the likelihood that WCG would be forced to declare bankruptcy. Plaintiffs maintain that the bankruptcy filing can constitute a corrective disclosure because the defendants' prior misrepresentation had concealed that it was foreseeable that a company would declare bankruptcy in the near future, pointing out again that Dr. Tabak acknowledged in deposition that if plaintiffs' allegations concerning defendants' awareness of the likelihood of bankruptcy were proven, loss causation is associated with the April 22nd bankruptcy filing.

Finally, plaintiffs contend that their damage theories are legally and economically sound, at least for summary judgment purposes. They contend that Dr. Nye's proposed expert testimony on the related issues of loss causation and damages satisfies

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

496 F.Supp.2d 1195                                                                    Page 109

496 F.Supp.2d 1195
**(Cite as: 496 F.Supp.2d 1195)**

*Daubert* and *Kumho*. Pointing out that the Court, in *Dura*, did not address the measure of damages in a securities fraud case, plaintiffs argue that the traditional method, the out-of-pocket rule,[FN93] is still the law and that their case passes muster under the out-of-pocket rule, both as to the common stock and as to the notes.

> FN93. The out-of-pocket measure of damages is " 'the difference between the fair value of all that the [plaintiff] received and the fair value of what he would have received had there been no fraudulent conduct.' "*Randall v. Loftsgaarden,* 478 U.S. 647, 661-62, 106 S.Ct. 3143, 92 L.Ed.2d 525 (1986) (quoting *Affiliated Ute Citizens v. United States,* 406 U.S. 128, 155, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972) ).

The court need not determine whether Dr. Nye's leakage theory is fatally inconsistent with the Complaint. The court has concluded, in Part V(E) of this memorandum, that Dr. Nye's causation-related opinions, including his damage scenarios, do not square with the law of loss causation, applied through the prism of *Daubert* and Rule 702. The court has granted defendants' *Daubert* motions with respect to Dr. Nye's proposed expert testimony with respect to loss causation and his damage scenarios. That discussion and analysis need not be repeated here. Loss causation is an essential element of plaintiffs' § 10(b) and Rule 10b-5 claim and is an issue on which plaintiffs have the burden of proof at trial. *Dura,* 544 U.S. at 342, 125 S.Ct. 1627; *Gordon Partners v. Blumenthal,* 2007 WL 1438753, at *2. Confronted with defendants' motions, plaintiffs are obliged to come forward with evidence which, if credited, would be sufficient to support a finding in their favor on the issue of loss causation. *Gordon Partners,* 2007 WL 1438753 at *2.

The court has carefully reviewed the summary judgment record for competent evidence, aside from the excluded expert testimony, to support such a finding. Having done so, the court concludes that plaintiffs have failed to present evidence sufficient

to raise a triable issue as to loss causation. The plaintiffs have not made a showing, sufficient for summary judgment purposes, that defendants' alleged misrepresentations or omissions were the cause of plaintiffs' actual losses. *Dura,* 544 U.S. at 342, 125 S.Ct. 1627 (defining loss causation as a " causal connection between the material misrepresentation and the loss"). "[A]n inflated purchase price will not itself **\*1295** constitute or proximately cause the relevant economic loss." *Dura,* 544 U.S. at 342, 125 S.Ct. 1627. With or without Dr. Nye's proposed expert testimony, the summary judgment record provides no basis upon which a finder of fact could reasonably determine, consistent with loss causation doctrine established by *Dura* and its progeny, that plaintiffs' claimed losses were caused by defendants' alleged misrepresentations or omissions and not by " changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events...."*Dura,* 544 U.S. at 342-43, 125 S.Ct. 1627. Having failed to provide admissible expert or lay evidence sufficient to raise a genuine issue of fact as to the causal nexus between defendants' misrepresentations or omissions and plaintiffs' alleged losses, the court concludes that all defendants are entitled to summary judgment on the issue of loss causation. FN94

> FN94. The court notes that E & Y, in its opening brief for summary judgment, incorporated the WCG defendants' arguments as to causation and damages. Although the WMB defendants did not specifically adopt or join in the WCG defendants' motion, the court still concludes that summary judgment is appropriate as to plaintiffs' claims for the reasons now and hereinafter stated.

"Economic loss," in the words of the Court in *Dura,* 544 U.S. at 342, 125 S.Ct. 1627 (citing 15 U.S.C. § 78u-4(b)(4)), is an essential element of these plaintiffs' securities fraud claim. Plaintiffs asserting claims under § 1 0(b) and Rule 10b-5 case generally rely on expert testimony to establish the fact of damages and the recoverable amount of

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

496 F.Supp.2d 1195
**(Cite as: 496 F.Supp.2d 1195)**

damages. *Sowell v. Butcher & Singer, Inc.,* 926 F.2d 289, 301 (3d Cir.1991). The court has excluded Dr. Nye's expert testimony as to each of his damage scenarios. The conclusion follows that plaintiffs cannot satisfy their burden of establishing the fact of damages and the means of calculating damages. Summary judgment should consequently be granted in favor of all defendants on the issue of damages. *Carpe,* 2005 WL 1138833 at *8 (granting summary judgment in defendants' favor as to plaintiffs' § 10(b) and Rule 10b-5 claims based upon a failure to establish the fact of damages and the means of calculating damages).

Because summary judgment is appropriate on the issues of loss causation and damages, plaintiffs cannot establish the essential elements of their § 10(b) and Rule 10b-5 claim and therefore cannot prevail on their claims against any of the defendants. This conclusion is fatal to plaintiffs' § 20(a) claim. As has been discussed, the basic elements of a control person liability claim under § 20(a) are (i) a primary violation of the securities laws and (ii) "control" over the primary violator by the alleged controlling person. *Fleming Companies,* 264 F.3d at 1270-71. Because plaintiffs are unable to establish their § 10(b) and Rule 10b-5 claim, they cannot establish the first element of their § 20(a) claim. The court therefore concludes that summary judgment is appropriate on the § 20(a) claim against the defendants. *Id.* at 1271 (§ 20(a) claim properly dismissed upon dismissal of § 10(b) and Rule 10b-5 claim).

## VII. *Conclusion.*

Based upon the foregoing, the court **ORDERS** as follows:
1. Defendant Ernst & Young LLP's Motion to Exclude H. Sean Mathis' Testimony & Evidence Under the Standards Established in Daubert & Kumho Tire, filed August 4, 2006 (doc. no. 1433), is **GRANTED.**
2. WCG Defendants' Motion to Exclude the Report and Testimony of Plaintiffs' Expert H. Sean Mathis, *1296 filed August 4, 2006 (doc. no. 1451), is **GRANTED.**
3. Defendant Ernst & Young LLP's Motion to

Exclude Portions of the Testimony & Report of Plaintiffs' Expert Andrew Mintzer Under the Standards Established in Daubert & Kumho Tire, filed August 4, 2006 (doc. no. 1436), is **GRANTED.**
4. WCG Individual Defendants' Motion to Exclude Portions of Andrew Mintzer's Expert Testimony and Report, filed August 4, 2006 (doc. no. 1437), is **GRANTED IN PART AND DENIED IN PART.**
5. The Williams Companies, Inc. and Keith E. Bailey's Motion to Exclude Portions of the Testimony and Report of Plaintiffs' Expert Andrew Mintzer, filed August 4, 2006 (doc. no. 1445), is **GRANTED.**
6. The Williams Defendants' Joinder to Motions and Supporting Briefs filed by Ernst & Young, LLP and the WCG Individual Defendants, filed August 4, 2006 (doc. no. 1453), to the extent defendants seek to join the motions, briefs and declarations relating to the exclusion of the reports and testimony of experts H. Sean Mathis and Andrew Mintzer, is **GRANTED.**
7. The Williams Defendants' Joinder to Reply Briefs filed by Ernst & Young LLP and the WCG Individual Defendants, filed September 8, 2006 (doc. no. 1529), to the extent defendants seek to join the reply briefs relating to the exclusion of the reports and testimony of experts H. Sean Mathis and Andrew Mintzer, is **GRANTED.**
8. WCG Defendants' Motion to Exclude the Report and Testimony of Plaintiffs' Expert Blaine F. Nye, filed April 14, 2006 (doc. no. 1103), to the extent defendants seek to exclude the report and testimony of Dr. Nye regarding loss causation and damage scenarios, is **GRANTED.** In all other respects, the motion is **DENIED as MOOT.**
9. Defendant Ernst & Young LLP's Motion to Exclude the Testimony and Report of Plaintiffs' Expert Blaine F. Nye, filed May 16, 2006 (doc. no. 1297), to the extent defendant seeks to exclude the testimony and report of Dr. Nye regarding loss causation and damage scenarios, is **GRANTED.** In all other respects, the motion is **DENIED as MOOT.**
10. The Williams Companies, Inc. and Keith E. Bailey's Motion to Exclude Testimony of Plaintiffs' Expert Blaine F. Nye, filed May 18, 2006 (doc. no. 1316), to the extent defendants seek to exclude the testimony of Dr. Nye regarding loss causation and

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

496 F.Supp.2d 1195                                               Page 111

496 F.Supp.2d 1195
**(Cite as: 496 F.Supp.2d 1195)**

damage scenarios, is **GRANTED.** In all other respects, the motion is **DENIED as MOOT.**

11. The Williams Companies, Inc. and Keith E. Bailey's Joinder in WCG Defendants' Motion to Exclude the Report and Testimony of Plaintiffs' Expert Blaine F. Nye, filed May 18, 2006 (doc. no. 1317), is also **GRANTED.**

12. Defendant Ernst & Young LLP's Motion for Summary Judgment, filed April 14, 2006 (doc. no. 1027), is **GRANTED.**

13. The Williams Companies, Inc. and Keith E. Bailey's Motion for Partial Summary Judgment on Alleged Misstatements or Omissions Made *After* WCG's Spin-Off from Williams, filed April 14, 2006 (doc. no. 1050), is **GRANTED in part and DENIED in part.**

14. The Williams Companies, Inc. and Keith E. Bailey's Motion for Partial *1297 Summary Judgment on Alleged Misstatements and Omissions Made *Before* WCG's Spin-Off from Williams, filed April 14, 2006 (doc. no. 1060), is **GRANTED in part and DENIED in part.**

15. WCG Defendants' Motion for Summary Judgment, filed April 14, 2006 (doc. no. 1092), is **GRANTED.**

In light of the court's rulings on the motions listed above, the court also **ORDERS** as follows:

1. Defendant Ernst & Young LLP's Joinder in WCG Defendants' Motion to Exclude the Report and Testimony of Plaintiffs' Expert Rick Lawrence, filed August 4, 2006 (doc. no. 1447), is **DENIED as MOOT.**

2. WCG Plaintiffs' Motion to Exclude the Reports and Testimony of Defendants' Expert Eric P. Evans, filed August 4, 2006 (doc. no. 1448), is **DENIED as MOOT.**

3. WCG Plaintiffs' Motion to Exclude the Reports and Testimony of Defendants' Expert William W. Holder, filed August 4, 2006 (doc. no. 1450), is **DENIED as MOOT.**

4. The Williams Defendants' Joinder to Motions and Supporting Briefs filed by Ernst & Young LLP and the WCG Individual Defendants, filed August 4, 2006 (doc. no. 1453), to the extent defendants seek to join the motions and briefs relating to the exclusion of the report and testimony of expert Rick Lawrence, is **DENIED as MOOT.**

5. WCG Plaintiffs' Motion to Exclude the Reports and Testimony of Defendants' Expert Thomas J. Mangold, filed August 4, 2006 (doc. no. 1455), is **DENIED as MOOT.**

6. WCG Defendants' Motion to Exclude Certain Portions of the Report and Testimony of Plaintiffs' Expert Rick Lawrence, filed August 4, 2006 (doc. no. 1456), is **DENIED as MOOT.**

7. WCG Plaintiffs' Motion to Exclude the Reports and Testimony of Defendants' Expert Paul A. Gompers, filed August 4, 2006 (doc. no. 1457), is **DENIED as MOOT.**

8. The Williams Defendants' Joinder to Reply Briefs filed by Ernst & Young LLP and the WCG Individual Defendants, filed September 8, 2006 (doc. no. 1529), to the extent defendants seek to join the reply briefs relating to the exclusion of the report and testimony of expert Rick Lawrence, is **DENIED as MOOT.**

9. Defendant Ernst & Young LLP's Motion in Limine to Exclude Evidence and Argument Relating to the Audit Quality Review Program, filed November 7, 2006 (doc. no. 1561), is **DENIED as MOOT.**

10. Defendant Ernst & Young LLP's Motion in Limine to Exclude Evidence and Argument Relating to Dismissed, Abandoned & Unpled Claims, filed November 7, 2006 (doc. no. 1563), is **DENIED as MOOT.**

11. Defendant Ernst & Young LLP, WCG Defendants and Williams Defendants' Motion in Limine to Exclude Certain Irrelevant or Overly Prejudicial Evidence, filed November 7, 2006 (doc. no. 1566), is **DENIED as MOOT.**

12. Defendant Ernst & Young LLP's Motion in Limine to Exclude Plaintiffs' Use of Trading Models to Estimate Aggregate Damages, filed November 7, 2006 (doc. no. 1567), is **DENIED as MOOT.**

13. WCG Defendants' Motion in Limine to Exclude References to Executive Loan Forgiveness, Key *1298 Employee Retention Program, filed November 7, 2006 (doc. no. 1569), is **DENIED as MOOT.**

14. The Williams Companies, Inc. and Keith E. Bailey's Motion in Limine No. 1 to Exclude Improper Expert Testimony, filed November 7, 2006 (doc. no. 1570), is **DENIED as MOOT.**

15. The Williams Companies, Inc., Keith E. Bailey

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

496 F.Supp.2d 1195
**(Cite as: 496 F.Supp.2d 1195)**

and Ernst & Young LLP's Motion in Limine No. 2 to Exclude Evidence or Reference to "Corrective Disclosures" on Dates Where the Stock Price Did Not Move in a Statistically Significant Fashion, filed November 7, 2006 (doc. no. 1571), is **DENIED as MOOT.**

16. The Williams Companies, Inc., Keith Bailey and Ernst & Young LLP's Motion in Limine No. 3 to Preclude Evidence or Argument Regarding The Williams Companies, Inc.'s Financial Statements, filed November 7, 2006 (doc. no. 1575), is **DENIED as MOOT.**

17. The Williams Companies, Inc., Keith Bailey and Ernst & Young LLP's Motion in Limine No. 4 to Preclude Evidence or Argument Regarding Alleged Uses of the Word "Junk" to Describe WCG, filed November 7, 2006 (doc. no. 1577), is **DENIED as MOOT.**

18. WCG Defendants and Ernst & Young LLP's Motion in Limine to Exclude References to Directed Shares Transactions and Related Issues, filed November 7, 2006 (doc. no. 1578), is **DENIED as MOOT.**

19. WCG Defendants and Ernst and Young LLP's Motion in Limine to Exclude Plaintiffs' Inadmissible Lay Witness Testimony, filed November 7, 2006 (doc. no. 1583), is **DENIED as MOOT.**

20. WCG Subclass' Amended Omnibus Motion in Limine, filed November 7, 2006 (doc. no. 1585), is **DENIED as MOOT.**

21. The Joinder of the Williams Defendants to Motions and Supporting Materials Filed by Ernst & Young LLP and the WCG Individual Defendants, filed November 10, 2006 (doc. no. 1590), is **DENIED as MOOT.**

Judgment shall enter forthwith. The court **DIRECTS** the clerk of the court to enter this order and the judgment in the following cases which were consolidated with this case:

| 02-cv-000 | *Weisz v.* |
| 77-SP | *Williams* |
| F-FHM | *Co., Inc.,* |
| | *et al.* |

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

496 F.Supp.2d 1195                                                    Page 113

496 F.Supp.2d 1195
**(Cite as: 496 F.Supp.2d 1195)**

| | |
|---|---|
| 02-cv-000 78-SP F-FHM | *Matcovsky, et al. v. Williams Compa nies, et al.* |
| 02-cv-000 80-SP F-FHM | *Hansbro v. Williams Compa nies, et al.* |
| 02-cv-000 81-SP F-FHM | *Rovner v. Williams Co., Inc., et al.* |
| 02-cv-000 83-SP F-FHM | *Clavin v. Williams Co., Inc., et al.* |
| 02-cv-000 93-SP F-FHM | *Berger, et al. v. Williams Co., Inc., et al.* |
| 02-cv-000 95-SP F-FHM | *BC Invest. Club v. Williams Co., Inc., et al.* |
| 02-cv-000 97-SP F-FHM | *Kosseff, et al. v. Williams Co., Inc., et al.* |
| 02-cv-001 07-SP F-FHM | *Cohen v. Williams Co., Inc., et al.* |
| 02-cv-001 13-SP F-FHM | *Shook v. Williams Co., Inc., et al.* |
| 02-cv-001 20-SP F-FHM | *Goldstein v. Williams Compa nies, et al.* |
| 02-cv-001 24-SP F-FHM | *Armezzani, et al. v. Williams Compa nies, et al.* |

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

496 F.Supp.2d 1195

496 F.Supp.2d 1195
**(Cite as: 496 F.Supp.2d 1195)**

| | |
|---|---|
| 02-cv-001 30-SP F-FHM | *Cottrell v. Williams Co., Inc., et al.* |
| 02-cv-001 32-SP F-FHM | *Market Street Sec. v. Williams Co., Inc., et al.* |
| 02-cv-001 35-SP F-FHM | *Querci v. Williams Co., Inc., et al.* |
| 02-cv-001 39-SP F-FHM | *Ackerman v. Williams Co., Inc., et al.* |
| 02-cv-001 61-SP F-FHM | *Sheniak v. Williams Co., Inc., et al.* |
| 02-cv-001 62-SP F-FHM | *Miller v. Williams Co., Inc., et al.* |
| 02-cv-001 84-SP F-FHM | *Omar v. Williams Co., Inc., et al.* |
| 02-cv-001 89-SP F-FHM | *Wilkinson v. Williams Co., Inc., et al.* |
| 02-cv-001 90-SP F-FHM | *Jordan, et al. v. Williams Co., Inc., et al.* |
| 02-cv-002 04-SP F-FHM | *Harman v. Williams Co., Inc., et al.* |

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

496 F.Supp.2d 1195

496 F.Supp.2d 1195
**(Cite as: 496 F.Supp.2d 1195)**

| | |
|---|---|
| 02-cv-002 05-SP F-FHM | *Teamster Local 854 Pension Fund, et al. v. Williams Co. Inc., et al.* |
| 02-cv-002 06-SP F-FHM | *Katz v. Bailey, et al.* |
| 02-cv-002 18-SP F-FHM | *Watkins v. v. Williams Co., Inc., et al.* |
| 02-cv-002 31-SP F-FHM | *Vaughan v. Williams Co., Inc., et al.* |
| 02-cv-002 35-SP F-FHM | *Cohen, et al. v. Williams Co., Inc., et al.* |
| 02-cv-003 03-SP F-FHM | *Local 710 Pension Fund, et. al. v. Williams Co., Inc., et al.* |
| 02-cv-003 19-SP F-FHM | *Hoffman, et al. v. Williams Co., Inc., et al.* |

N.D.Okla.,2007.
In re Williams Securities Litigation
496 F.Supp.2d 1195

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**17**

Westlaw.

Not Reported in N.W.2d                                                        Page 1

Not Reported in N.W.2d, 2006 WL 2061499 (Mich.App.)
**(Cite as: Not Reported in N.W.2d)**

**H**
**Wojcik** v. **McNish**
Mich.App.,2006.
Only the Westlaw citation is currently available.
UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.
Court of Appeals of Michigan.
Mark **WOJCIK** and Marjorie **Wojcik**,
Plaintiffs/Counter-Defendants-Appellants,
v.
William J **MCNISH** and **McNish's** Sporting Goods
& Trophies Inc, Defendants/
Counter-Plaintiffs-Appellees.
**Docket No. 267005.**

July 25, 2006.

Oakland Circuit Court; LC No.2003-052644.

Before: KELLY, PJ, and MARKEY and METER,
JJ.

[UNPUBLISHED]
PER CURIAM.
*1 In 1982, Mark Wojcik ("plaintiff" or "Wojcik")
[FN1] and William J. McNish ("defendant" or "
McNish") formed the defendant McNish Sporting
Goods and Trophies, Inc. (the "company" or the "
corporation"). The business relationship between
plaintiff and defendant soured after defendant, the
majority stockholder in the company, insisted that
his son-in-law, Christian Beaudoin ("Beaudoin"),
participate in the business. Plaintiff claims that
elevating Beaudoin to company management forced
him to resign as day-to-day manager of the
company, and that subsequently, defendants refused
to buy his stock contrary to the parties' agreement to
form the corporation. The trial court granted
defendants' motion for summary disposition.
Plaintiffs appeal by right. We affirm in part, reverse
in part, and remand for further proceedings.

FN1. The singular "plaintiff" refers only to
plaintiff Mark Wojcik unless otherwise
specified. The factual and legal bases of
plaintiff Marjorie Wojcik's claims are so
inadequately briefed that they are deemed
abandoned. *Prince v. MacDonald,* 237
Mich.App 186, 197;602 NW2d 834 (1999).

I

Plaintiffs originally filed an eight-count complaint,
which grew to nine counts in plaintiffs' first
amended complaint. Plaintiffs alleged defendants
breached fiduciary duties, engaged in actionable
oppressive conduct under MCL 450.1489, breached
employment contracts and a stock purchase
agreement, wrongfully terminated or constructively
discharged plaintiff, discriminated because of age,
and owed money damages in a corporate "derivative
" claim. Plaintiffs also sought declaratory and
injunctive. After discovery was completed,
defendants moved for summary disposition.
Plaintiffs filed a response brief and also moved for
summary disposition. The trial court heard
arguments of counsel at the conclusion of which the
trial court took the matter under advisement. The
trial court issued its opinion and order granting
defendants' motion for summary disposition on
January 31, 2005.

The court ruled that plaintiffs' minority oppression
claim failed because it lacked evidentiary support
that defendants engaged in "a continuing course of
conduct or a significant action or series of actions
that substantially interferes with the interests of a
shareholder as a shareholder."MCL 450.1489. The
court granted defendants summary disposition on
plaintiff's age discrimination claim because plaintiff
had not established that he had suffered an adverse
employment action. The court determined that at
best plaintiff had established only nepotism, which
was not actionable under either state or federal law.

Regarding plaintiff's contract claims, the court ruled

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.W.2d, 2006 WL 2061499 (Mich.App.)
**(Cite as: Not Reported in N.W.2d)**

without further explanation, "that no questions of fact exist and Defendants' motion as to claims relating to the written agreement is granted."The trial court opined with respect to the stock purchase agreement, "that there is no evidence that the parties ever reached an agreement on the essential terms and even if such an agreement existed, Wojcik repudiated it when he stated that he would not abide by the agreement without a guaranty from McNish." Thus, the court concluded that because plaintiff repudiated the agreement, defendants were entitled to treat the agreement as terminated.

**\*2** After the trial court issued its ruling, plaintiffs believed that some counts remained viable. Subsequently, after further motions and briefing, the trial court issued a second opinion and order, clarifying that it had dismissed all of plaintiffs' claims, and that only defendants' counterclaims remained. Plaintiffs appeal by right.

### II

We review de novo a trial court's decision to grant or deny summary disposition. *Maiden v. Rozwood,* 461 Mich. 109, 118;597 NW2d 817 (1999). A party's motion brought under MCR 2.116(C)(10) tests the factual sufficiency of a claim and must be supported by affidavits, depositions, admissions, or other documentary evidence. *Id.* at 120.The trial court must view the substantively admissible evidence submitted at the time of the motion in the light most favorable to the party opposing the motion to determine if a party is entitled to judgment as a matter of law. *Id.* at 118, 120.If the moving party fulfills its initial burden, the party opposing the motion then must demonstrate with evidentiary materials that a genuine and material issue of disputed fact exists, and may not rest upon mere allegations or denials in the pleadings. MCR 2.116(G)(4); *Quinto v. Cross & Peters Co,* 451 Mich. 358, 362;547 NW2d 314 (1996). A trial court properly grants summary disposition when no genuine issue regarding any material fact exists and the moving party is entitled to judgment as a matter of law. *West v. Gen Motors Corp,* 469 Mich. 177, 183;665 NW2d 468 (2003)."A genuine issue of material fact exists when the record, giving the

benefit of reasonable doubt to the opposing party, leaves open an issue upon which reasonable minds might differ."*Id.*

We review questions of law de novo. *Bertrand v. Mackinac Island,* 256 Mich.App 13, 28;662 NW2d 77 (2003). Accordingly, this Court reviews de novo the interpretation and application of a statute. *Eggleston v Bio-Medical Applications of Detroit, Inc,* 468 Mich. 29, 32;658 NW2d 132 (2003). Further, both the questions of whether contract language is ambiguous and the proper interpretation of a contract are questions of law, which we review de novo. *Klapp v United Ins Group Agency, Inc,* 468 Mich. 459, 463;663 NW2d 447 (2003).

### III

Plaintiff argues that the trial court erred by dismissing his claim that McNish, as majority stockowner, breached his fiduciary duty to both the corporation and plaintiff, a minority stockholder, because material questions of fact remain regarding this claim. We disagree.

In *Production Finishing Corp v. Shields,* 158 Mich.App 479, 486;405 NW2d 171 (1987), this Court citing elemental rules of agency observed: "It is beyond dispute that in Michigan, directors and officers of corporations are fiduciaries who owe a strict duty of good faith to the corporation which they serve."Applying common-law agency principles, " '[a] fiduciary owes a duty of good faith to his principal and is not permitted to act for himself at his principal's expense during the course of his agency." ' *The Meyer and Anna Prentis Family Foundation, Inc v Barbara Ann Karmanos Cancer Institute,* 266 Mich.App 39, 49;698 NW2d 900 (2005), quoting *Central Cartage v. Fewless,* 232 Mich.App 517, 524;591 NW2d 422 (1998).

**\*3** Here, all of the alleged breaches of fiduciary duty by defendant relate to the appointment of Beaudoin as an officer and manager of the company. In essence, plaintiff claims that Beaudoin's promotion would ultimately lead to the financial ruin of the company and consequent depreciation in the value of the company's stock.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Plaintiff cites *Salvador v. Connor,* 87 Mich.App 664;276 NW2d 458 (1978), in support of his position. But, in that case the plaintiff alleged the defendants hired relatives for managerial positions where they "performed few, if any, services of value for the corporation," and the defendants otherwise fraudulently diverted corporate money for the defendants own benefit. In contrast, plaintiff alleges that Beaudoin was simply not capable of managing the company, not that McNish was diverting corporate assets to his own use. When a party fails to cite any supporting legal authority for its position, the issue is deemed abandoned. *Prince v. MacDonald,* 237 Mich.App 186, 197;602 NW2d 834 (1999).

Moreover, plaintiffs' claim of harm to the corporation is based on speculation about the company's performance in the future. After a change in management, company revenues may decrease for any number of reasons, including a general downturn in economic conditions, economic health of clients, loss of key personnel, change in accounting practices, or increased competition. Indeed, plaintiff acknowledged that after his departure from the company, the company would face a difficult transition. In addition, plaintiff testified that after leaving the company he started working for the company's competitors. In sum, plaintiff's claim regarding breach of fiduciary duty must fail because it is based on speculation regarding future profitability of the corporation. The causal relationship between the alleged breach of duty and the alleged harm is too speculative to be sustained. See, e.g., in another context, *Skinner v. Square D Co,* 445 Mich. 153, 164;516 NW2d 475 (1994) ("To be adequate, a plaintiff's circumstantial proof must facilitate reasonable inferences of causation, not mere speculation.").

Moreover, McNish's decisions are shielded by the business judgment rule, under which courts are reluctant to interfere with the discretion vested in the directors and officers of the corporation to manage its affairs. *In re Estate of Butterfield,* 418 Mich. 241, 255;341 NW2d 453 (1983); See, also, *Dodge v. Ford Motor Co,* 204 Mich. 459, 500;170 NW 668 (1919), quoting 2 Cook on Corporations (7th Ed.), § 545: " 'The discretion of the directors

will not be interfered with by the courts, unless there has been bad faith, wilful neglect, or abuse of discretion." '

Plaintiffs have not alleged, nor did they present any evidence to the trial court that McNish engaged in bad faith, willful neglect, or abuse of discretion. Plaintiff conceded in his deposition that he could not believe McNish would ever do anything to intentionally harm the company. Further, the company had not adopted an anti-nepotism policy; relatives of both plaintiff and defendant had worked for the company in the past. Indeed, if a change in corporate management or nepotism in a close corporation could serve as a basis for a claim of bad faith, willful neglect, or abuse of discretion, the courts would be flooded with litigation. In sum, because plaintiff did not allege or present any evidence of bad faith, willful neglect, or abuse of discretion, the trial court properly dismissed plaintiff's claim for breach of fiduciary duties.

IV

**\*4** Next, plaintiffs argue that the trial court erred by granting summary disposition on their claim under MCL 450.1489. We disagree. Plaintiffs failed to produce evidence to create a material question of fact that defendants engaged in "willfully unfair and oppressive conduct" through a "continuing course of conduct or a significant action or series of actions" that substantially interfered with plaintiff's interests as a shareholder. So, the trial court properly granted defendants' motion for summary disposition on this claim.

This Court has held that MCL 450.1489, § 489 of the Michigan Business Corporation Act (MBCA) creates a cause of action to which the residual six-year limitation period of MCL 600.5813 applies. *Estes v Idea Engineering & Fabricating, Inc,* 250 Mich.App 270, 285-286;649 NW2d 84 (2002). The *Estes* conflict panel did not address, however, what conduct could be actionable under § 489. But this Court considered that question in *Franchino v. Franchino,* 263 Mich.App 172;687 NW2d 620 (2004), a case involving a close corporation similar to this case. In *Franchino,* the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.W.2d                                                          Page 4

Not Reported in N.W.2d, 2006 WL 2061499 (Mich.App.)
**(Cite as: Not Reported in N.W.2d)**

plaintiff was a 31% shareholder, director, and an employee of the corporation. The defendant was a 69% shareholder, director, and the plaintiff's father. The plaintiff sought relief under § 489 after the defendant fired him and orchestrated the plaintiff's removal as a director of the corporation.*Franchino, supra* at 176-178.The plaintiff alleged that the defendant engaged in "willfully unfair and oppressive conduct" under § 489"by terminating [the] plaintiff's employment in violation of the employment contract, removing [the] plaintiff from the board of directors, and amending the bylaws of the corporation."*Franchino, supra* at 178.This Court affirmed the trial court's grant of summary disposition in favor of the defendant, opining that § 489

neither explicitly protects minority shareholders' interests as employees or directors, nor is it silent on the issue. Rather, the Legislature amended the statute to explicitly state that minority shareholders could bring suit for oppression only for conduct that "substantially interferes with the interests of the shareholder *as a shareholder.*"MCL 450.1489(3) (emphasis added). To construe the statute in a way that allows plaintiff to sue for oppression of his interests as an employee and director would ignore the Legislature's decision to insert the phrase "as a shareholder" and render the phrase nugatory, which is contrary to a fundamental rule of statutory construction. Accordingly, we hold that the trial court correctly concluded that MCL 450.1489(3) does not allow shareholders to recover for harm suffered in their capacity as employees or board members.[FN2][*Franchino, supra* at 185-186 (citations omitted).]

> FN2. We note that the Legislature has amended this subsection to add: "Willfully unfair and oppressive conduct may include the termination of employment or limitations on employment benefits to the extent that the actions interfere with distributions or other shareholder interests disproportionately as to the affected shareholder."2006 PA 68, effective March 20, 2006.

Thus, the *Franchino* Court held that § 489"only gives rise to a cause of action in cases where a minority shareholder suffered oppression in his capacity as a shareholder"*Franchino, supra* at 189.The trial court properly granted summary disposition to the defendant because "employment and board membership are not generally listed among rights that automatically accrue to shareholders."*Id.* at 184.The Court noted that shareholder's rights "are typically considered to include voting at shareholder's meetings, electing directors, adopting bylaws, amending charters, examining the corporate books, and receiving corporate dividends."*Id.,* citing 12 Fletcher Cyclopedia Corporations, ch 58, § 5717, p 22. Under the MBCA, the principal rights of shareholders in an ordinary business corporation " are to have a certificate of stock in proper form, to attend and vote at corporate meetings, and to take part in the election of directors." 9 MLP Corporations, § 191 (citations omitted). In general, corporate actions requiring a shareholder vote are " authorized by a majority of the votes cast by the holders of shares entitled to vote on the action, unless a greater vote is required in the articles of incorporation."MCL 450.1441(2).

**\*5** In this case, plaintiff has not offered evidentiary support for his claim that defendants engaged in "a continuing course of conduct or a significant action or series of actions that substantially interfere[d]" with him as a shareholder to participate at shareholder meetings, or to access corporate books and records. Plaintiff's claims regarding breach of an employment contract and breach of a stock purchase agreement are not interests of plaintiff as a shareholder, and therefore, are not protected by § 489.*Franchino, supra* at 185-186, 189.Absent fraud or other unlawful conduct, which interferes with plaintiff's right to vote at pertinent shareholders meetings, plaintiff has no cause of action under § 489 to contest selection of personnel to serve as officers to manage the company by the majority of the shareholders. Thus, plaintiff has no cause of action under § 489 to contest the appointment of Beaudoin as an officer and manager of the company simply because plaintiff believes Beaudoin is not qualified for the position.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.W.2d                                                                    Page 5

Not Reported in N.W.2d, 2006 WL 2061499 (Mich.App.)
**(Cite as: Not Reported in N.W.2d)**

Furthermore, we reject plaintiff's claim that the appointment of Beaudoin indirectly affected his interests as a shareholder because the company will be less profitable than it otherwise could become. Undoubtedly, a shareholder has an interest in having his investment become as profitable as possible. See *Thompson v. Walker,* 253 Mich. 126, 134-135;234 NW 144 (1931) (the officers and directors of a corporation have a fiduciary duty to manage the corporation so "as to produce to each stockholder the best possible return for his investment"), and *Dodge, supra* at 507 ("A business corporation is organized and carried on primarily for the profit of the stockholders."). For the reasons discussed already, plaintiff's claim is inherently speculative. To be actionable under § 489, defendants' conduct must be "illegal, fraudulent, or *willfully* unfair and oppressive."MCL 450.1489(1) (emphasis added). This is defined by the statute to be "a continuing course of conduct or a significant action or series of actions that substantially interferes with the interests of the shareholder as a shareholder."MCL 450.1489(3). The statute places the focus on the actions of the majority, not the reasonable expectation of the shareholders to profits. See *Franchino, supra* at 188.Thus, to be actionable under § 489, the conduct of the majority must have been intended to cause the purported oppressive result. Here, plaintiff only testified that McNish would not listen to his warnings regarding Beaudoin's capabilities. Plaintiff, produced no evidence that McNish acted intentionally to harm the company, testifying "it would be hard for me to believe that because he has a large regard for money and damaging the corporation would damage his worth...."

In sum, plaintiffs failed to create a material question of fact that defendants engaged in "illegal, fraudulent, or willfully unfair and oppressive" conduct, or a "continuing course of conduct or a significant action or series of actions" that substantially interfered with plaintiff's interests as a shareholder. MCL 450.1489. Therefore, the trial court properly granted defendants' motion for summary disposition on this claim. *Franchino, supra* at 181.

V.

A. Plaintiff Mark Wojcik's Employment Contract Claims

**\*6** We find that plaintiff's claim for breach of a written contract for lifetime employment as manager of the company is without merit. We also find without merit plaintiff's claim that because of oral promises, his position as manager was subject to termination only on just cause.

This issue presents a question of contract interpretation. The main goal of a court when interpreting a contract is to ascertain and enforce the parties' intent. *Quality Products & Concepts Co v Nagel Precision, Inc,* 469 Mich. 362, 375;666 NW2d 251 (2003). A court must first look to the contract's language and accord that language its plain meaning. *Wilkie v. Auto-Owners Ins Co,* 469 Mich. 41, 61;664 NW2d 776 (2003). Also, courts " read contracts as a whole, giving harmonious effect, if possible, to each word and phrase."*Id.* at 50 n 11. When the words used in a contract are clear, the contract must be enforced as written unless a provision is unlawful or violates public policy. *Id.* at 51.

Additional rules of construction apply when a party claims a contractual right to lifetime employment, or claims that an employment relationship is subject to termination only for just cause. In general, a contract of employment for an indefinite term is terminable at will by either party. *Toussaint v Blue Cross & Blue Shield of Michigan,* 408 Mich. 579, 596;292 NW2d 880 (1980)."[T]he presumption of at will employment may be overcome by proof of an express contract for a definite term or by a provision forbidding discharge without just cause." *Bracco v Michigan Technological University,* 231 Mich.App 578, 598;588 NW2d 467 (1998). When a party asserts that oral statements form the basis for employment security, "the oral statements of job security must be clear and unequivocal to overcome the presumption of employment at will."*Rowe v. Montgomery Ward & Co,* 437 Mich. 627, 636;473 NW2d 268 (1991). Moreover, " 'lifetime' employment contracts are extraordinary and, being

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.W.2d                                                                                                   Page 6

Not Reported in N.W.2d, 2006 WL 2061499 (Mich.App.)
**(Cite as: Not Reported in N.W.2d)**

so, 'must be expressed in clear and unequivocal terms before a court will conclude that an employer intended to enter into such a weighty obligation." ' *Bracco, supra* at 595, n 11, quoting *Bullock v Automobile Club of Michigan,* 432 Mich. 472, 517; 444 NW2d 114 (1989) (Griffin, J., concurring in part and dissenting in part). See, also, *Rowe, supra* at 640-641.

In this case, plaintiff relies on the parties' 1982 agreement to form the corporation. The agreement names plaintiff Mark Wojcik as the company's first vice-president and first secretary, "until their respective successors are duly elected and qualified.. .." Further, the agreement states that plaintiff Mark Wojcik "shall also be General Manager for the Corporation," and also provides for compensation and perquisites for that service. The agreement does not provide for the term of office for vice-president, secretary, or general manager. Accordingly, the agreement, to the extent it is an employment contract, is presumed to be for an indefinite term subject to termination at will by either party. *Bracco, supra* at 598.

**\*7** In addition, the 1982 agreement to form the corporation contains no express provision forbidding discharge without just cause. To establish a contractual right to employment terminable only on just cause requires proving with objective evidence that the employer and the employee mutually assented to such a term of the contract. *Rowe, supra* at 640."The test for whether there was mutual assent to a just-cause provision is an objective one, looking at the express words of the parties and their visible acts."*Bracco, supra* at 598, citing *Rowe, supra.*Here, the parties' written contract contains no express words indicating mutual assent to a provision forbidding discharge without just cause. Further, plaintiff failed to identify any specific promises of just cause employment by McNish. Thus, there is no express written, or clear and unequivocal oral promise, to overcome the presumption that plaintiff's indefinite contract of employment as general manager was terminable at the will of either party.

Moreover, plaintiff cannot base his claim to lifetime employment on his "reasonable expectation" of

lifetime employment as the company's general manager. "The practice of interpreting contracts on the basis of reasonable expectations rather that the plain language of the contract was repudiated by [our Supreme] Court in *Wilkie, supra* at 63."*Rory v. Continental Ins Co,* 473 Mich. 457, 461, 481 n 48; 703 NW2d 23 (2005).

Similarly, plaintiff has no claim to employment subject only to just-cause termination under the " legitimate expectations" leg of *Toussaint* and its progeny. As explained by our Supreme Court in *Rood v. General Dynamics Corp,* 444 Mich. 107, 137-138;507 NW2d 591 (1993), quoting *Toussaint* at 613, the rationale for enforcing an employers policies and procedures relating to employee discharge is grounded on "the intuitive recognition that such policies and procedures tend to enhance the employment relationship and encourage an ' orderly, cooperative and loyal work force' for the ultimate benefit of the employer."But this extra-contractual enforcement policy applies only to "employer policy statements that are disseminated either 'to the work force in general or to specific classifications of the work force, rather than to an individual employee." ' *Rood, supra* at 138, quoting *In re Certified question (Bankey v Storer Broadcasting Co),* 432 Mich. 438, 443, n 3;443 NW2d 112 (1989). So, the *Toussaint* "legitimate expectations" theory for enforcing an employer's policies and procedures relating to employee discharge is "inappropriate where [the] policies and procedures are applicable only to an individual employee." *Rood, supra* at 138 n 31.

Plaintiff's categorization of his resignation as a " constructive discharge" is unavailing. A constructive discharge occurs when an employer deliberately makes an employee's working conditions so intolerable that the that a reasonable person in the employee's position would feel compelled to resign. *Vagts v. Perry Drug Stores, Inc,* 204 Mich.App 481, 487;516 NW2d 102 (1994) . We find it unnecessary to address Wojcik's claim that his promotion to president was actually inferior to Beaudoin's position as vice-president, and therefore, a "demotion" that supports his constructive discharge claim. Likewise, it is not necessary to consider whether a demotion or change

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.W.2d

Not Reported in N.W.2d, 2006 WL 2061499 (Mich.App.)
**(Cite as: Not Reported in N.W.2d)**

in job assignments without any reduction in pay, benefits, or perquisites, may support a constructive discharge claim. Such issues are irrelevant here because "constructive discharge is not in itself a cause of action," but rather, "is a defense against the argument that no suit should lie in a specific case because the plaintiff left the job voluntarily."*Id.* at 487.Because plaintiff has no underlying cause of action for wrongful discharge based on contract or his legitimate expectations, his claim fails.

### B. Stock Purchase Agreement

**\*8** The parties' 1982 agreement to form the corporation states in ¶ 12: "The Subscribers agree to sign, and cause the corporation to sign, the Stock Purchase Agreement attached as Exhibit E." Paragraph 3 of the attached stock purchase agreement provides: "If MARK H. WOJCIK terminates his employment, he must offer his stock for sale to the Corporation and the Corporation must purchase."The parties do not dispute that plaintiff Mark Wojcik was a "subscriber" of the 1982 agreement, that plaintiff owned 30% of the issued common stock of the company, and that plaintiff terminated his employment with the company. Defendants claim that the parties never reached an agreement, or that if they did, plaintiff repudiated his right to have the company buy his shares in the company. We find defendants' argument without merit.

First, the contract was complete in 1982 when the corporation was formed. Second, the doctrine of anticipatory breach, or repudiation, applies when a party to a contract prior to the time of performance unequivocally indicates through words or actions the intent not to perform; the other party may either sue immediately for breach of contract or wait until after the repudiating party fails to perform. *Paul v. Bogle,* 193 Mich.App 479, 493-494;484 NW2d 728 (1992). Here, plaintiff had fully performed his part of the contract. Plaintiff had subscribed to the 1982 agreement to form the corporation, contributed cash to acquire his shares in the company, worked in excess of twenty years as the company's manager, terminated his employment with the company, and offered his shares of stock for sale to the company.

The parties' failure to reach agreement on the details of defendants' required performance; "the Corporation must purchase" language cannot negate that plaintiff fully performed his part of the bargain.

Moreover, defendants' claim that plaintiff repudiated the contract by insisting on a personal guarantee by McNish of the company's installment payments to purchase plaintiff's stock, is factually inaccurate. Paragraphs 6 of the stock purchase agreement provides: "The purchase price will be paid by downpayment of twenty-five (25%) at closing and the balance payable over twenty-four (24) equal monthly installments at nine percent (9%) interest, with right of prepayment and provision for acceleration in the event of default, *and provision for personal guarantee by the remaining shareholder."*(Emphasis added).

Thus, the trial court erred by dismissing plaintiff's claim that defendants breached the agreement to form the corporation and its incorporated stock purchase agreement. Plaintiff had performed all of the clearly stated prerequisites to trigger his contractual right to have the company purchase his stock, with a personal guarantee of payment by defendant McNish. The parties' contract regarding plaintiff's right to have the company purchase his stock is clear and equivocal. "An unambiguous contract must be enforced according to its terms." *Burkhardt v. Bailey,* 260 Mich.App 636, 656;680 NW2d 453 (2004).

### VI

**\*9** Plaintiff also argues that he is a member of a protected class and established a prima facie case of age discrimination by showing that he suffered an adverse employment action and that Beaudoin, a younger man, was treated dissimilarly. We disagree. Plaintiff's age discrimination claim fails because plaintiff failed to produce sufficient evidence that he suffered a materially adverse employment action. Plaintiff's claim also fails because the facts and circumstances of this case do not create an inference of unlawful animus.

Section 202 of Michigan's Civil Rights Act, MCL

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.W.2d, 2006 WL 2061499 (Mich.App.)
**(Cite as: Not Reported in N.W.2d)**

37.2202, provides in relevant part:
(1) An employer shall not do any of the following:
(a) Fail or refuse to hire or recruit, *discharge, or otherwise discriminate* against an individual with respect to employment, compensation, or a term, condition, or privilege of employment, *because of* religion, race, color, national origin, *age*, sex, height, weight, or marital status. [Emphasis added.]

The essence of an age discrimination claim requires proving that age was a determining factor in an adverse employment action. *Matras v. Amoco Oil Co,* 424 Mich. 675, 682-683;385 NW2d 586 (1986) . A person may prove unlawful age discrimination under § 202(1)(a) with either direct or indirect evidence.*Matras, supra* at 683.When a plaintiff presents direct evidence of discrimination, the case is one of "intentional discrimination," sometimes referred to as a "mixed-motive" case. See *Wilcoxon v Minnesota Mining & Manufacturing Co,* 235 Mich.App 347, 360;597 NW2d 250 (1999). In a " mixed motive" case, "where the adverse employment decision could have been based on both legitimate and legally impermissible reasons, a plaintiff must prove that the defendant's discriminatory animus was more likely than not a ' substantial' or 'motivating' factor in the decision." *Sniecinski v Blue Cross & Blue Shield of Michigan,* 469 Mich. 124, 133;666 NW2d 186 (2003).

A person may alternatively prove unlawful age discrimination by circumstantial evidence, employing the burden-shifting framework adopted in *McDonnell Douglas v. Green,* 411 U.S. 792;93 S Ct 1817;36 L.Ed.2d 668 (1973).*Matras, supra* at 683.Under the *McDonnell Douglas* approach, a prima facie case consists of evidence that the plaintiff (1) belongs to a protected class, (2) suffered an adverse employment action, (3) was qualified for the position, and (4) the adverse employment action was taken under circumstances giving rise to an inference of unlawful discrimination. *Hazle v. Ford Motor Co,* 464 Mich. 456, 463;628 NW2d 515 (2001). If a plaintiff establishes a prima-facie case, the burden shifts to the employer to come forward with a legitimate nondiscriminatory reason for the adverse employment action. If the employer does so, the

burden returns to the plaintiff to establish that the employer's stated legitimate reason is merely a pretext for discrimination. *Sniecinski, supra* at 134; *Wilcoxon, supra* at 359.

**\*10** Whether a plaintiff attempts to prove unlawful discrimination by using direct evidence or under the *McDonnell Douglas* approach, an element of the plaintiff's discrimination claim is an adverse employment action. *Wilcoxon, supra* at 362.An " adverse employment action" for the purposes of proving unlawful discrimination "(1) must be materially adverse in that it is more than 'mere inconvenience or an alteration of job responsibilities,' and (2) must have an objective basis for demonstrating that the change is adverse, rather than the mere subjective impressions of the plaintiff."*Meyer v. City of Centerline,* 242 Mich.App 560, 569;619 NW2d 182 (2000). There is no exhaustive list of adverse employment actions, but "typically it takes the form of an ultimate employment decision, such as 'a termination in employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation." ' *Peña v. Ingham Co Rd Comm,* 255 Mich.App 299, 312;660 NW2d 351 (2003), quoting *White v Burlington Northern & Santa Fe Co,* 310 F3d 443, 450 (CA 6, 2002).

Here, defendants did not terminate plaintiff's employment. Although plaintiff asserts his resignation was a constructive discharge, he must still prove an adverse employment action created conditions so intolerable that it would cause a reasonable person to feel compelled to resign. *Vagts, supra* at 487.In other words, plaintiff cannot use his resignation as evidence he suffered an adverse employment action. *Id.* at 486 (The plaintiff's claim that she was constructively discharged for refusing to violate the law failed " because she use[d] her resignation as proof of both a constructive discharge and a refusal to violate the law.").

Plaintiff claims that he was demoted in favor of Beaudoin and that company minutes of a shareholders' meeting on January 9, 2003 evidence

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.W.2d                                                                Page 9

Not Reported in N.W.2d, 2006 WL 2061499 (Mich.App.)
**(Cite as: Not Reported in N.W.2d)**

his claim. On our review of the minutes in the light most favorable to plaintiff, we conclude that the minutes do not support the claim that plaintiff's position was inferior to Beaudoin's position. Quite to the contrary, the minutes evidence that Beaudoin held an inferior position, but changes might occur in the future.

Plaintiff also asserts that a January 23, 2003 memorandum shows that his position as president was inferior to Beaudoin's as vice-president of company. But plaintiff in his brief on appeal concedes that this memorandum is dated the same day that plaintiff met for breakfast with McNish to resign his position and demanded that the company buy his stock.

Plaintiff owned 30% of the outstanding common stock of the company and was promoted to president of the company when Beaudoin was named vice-president. Plaintiff admits that his pay, benefits, and other perquisites were not reduced. Although McNish asked plaintiff to work with Beaudoin and to train him, plaintiff fails to highlight any objective evidence of statements or actions by defendants that evidence plaintiff's position with the company was inferior to that of Beaudoin. Rather, plaintiff testified about his subjective belief that he "knew" that he was being replaced by Beaudoin. For example, plaintiff testified, "I became painfully aware at one point in time that Chris [Beaudoin] was going to run the company and I was out, you know, those are all things that [McNish] and Chris decided somewhere between them...."

**\*11** In sum, plaintiff failed to produce objective evidence that he suffered a materially adverse employment action that was more than a mere inconvenience or an alteration of job responsibilities. Plaintiff's testimony established only that he was concerned that Beaudoin would replace him in the future. Plaintiff's age discrimination claim fails because the alleged adverse employment action is based only plaintiff's own subjective impression regarding what might happen in the future. *Meyer, supra* at 569;*Wilcoxon, supra* at 364.

Moreover, regardless of the evidentiary approach a plaintiff takes to prove unlawful discrimination, a causal link between the adverse employment action and the unlawful animus must be established. *Sniecinski, supra* at 134-135;*Matras, supra* at 682-683.If a plaintiff establishes a prima facie case of discrimination under the *McDonnell Douglas* burden-shifting framework, a presumption of unlawful discrimination is created and a causal link is presumed, requiring the employer to rebut the presumption. *Sniecinski, supra* at 135;*Hazle, supra* at 464-465.But, a claimant must first establish a prima facie case under the *McDonnell Douglas* framework before the causal presumption arises. To establish a prima facie case of discrimination under the *McDonnell Douglas* approach, the adverse employment action must occur in circumstances that give rise to an inference of unlawful discrimination. *Hazle, supra* at 463;*Wilcoxon, supra* at 359.Although the *McDonnell Douglas* framework is flexible and "should be tailored to the facts and circumstances of each case,"*Sniecinski, supra* at 134 n 7, the circumstances must at a minimum give rise to an inference of unlawful discrimination.

In the present case, an experienced fifty-year-old manager was asked to train a less-experienced forty-year-old manager. This commonplace occurrence hardly gives rise to an inference of discrimination on the basis of age. Further, the circumstances of this case suggest that any favorable treatment accorded the younger person was based on nepotism, not age. Indeed, plaintiff's own testimony establishes that the company did not discriminate against older workers. Plaintiff testified that a "bunch of bald headed old guys" worked for the company. Further, after plaintiff resigned from the company, a sixty-year-old person replaced him. Simply put, the facts and circumstances of this case do not give rise to an inference that age was a motivating factor in any of defendants' actions that plaintiff claims to be adverse employment action. Consequently, plaintiff failed to establish a prima-facie case of age discrimination. The trial court properly granted defendants summary disposition on this claim.

VII

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.W.2d, 2006 WL 2061499 (Mich.App.)
**(Cite as: Not Reported in N.W.2d)**

Plaintiff argues that trial court erred by dismissing his claim under MCL 450.1487 to inspect the books and records of the corporation. We disagree. Because plaintiffs did not allege in their complaint that defendants had denied them access to company records, and defendants affirmatively allege they have provided or offered to provide access to records, there is "no genuine issue as to any material fact, and [defendants are] entitled to judgment or partial judgment as a matter of law." MCR 2.116(C)(10).

### VIII

***12** Plaintiffs next argue that the trial court erred by dismissing their "derivative" claim. We hold that the trial court properly dismissed this claim because plaintiffs do not seek damages on behalf of the company but rather sought damages from the company for themselves as individuals and a shareholder.

" 'Derivative proceeding' means a civil suit in the right of a domestic corporation or a foreign corporation that is authorized to or does transact business in this state."MCL 450.1491a(a). It is a suit to enforce the right of the corporation. MCL 450.1492a(b)." 'Any recovery runs in favor of the corporation, for the shareholders do not sue in their own right. They derive only an incidental benefit. If the defendants account, it must be to the corporation and not to the shareholders." ' *Futernick v. Statler Builders, Inc,* 365 Mich. 378, 386;112 NW2d 458 (1961), quoting *Dean v. Kellogg,* 294 Mich. 200, 207;292 NW 704 (1940) (citations omitted). Generally, an action to enforce corporate rights or to redress or prevent injury to the corporation must be brought in the name of the corporation and not that of a stockholder, officer or employee. *Michigan Nat'l Bank v. Mudget,* 178 Mich.App 677, 679;444 NW2d 534 (1989).MCL 450.1492a provides an exception to this general rule, but the shareholder must "fairly and adequately represents the interests of the corporation in enforcing the right of the corporation." MCL 450.1492a(b). "The minimum requirements for such a suit are proof of fraud or abuse of trust in the board of directors of the corporation in failing

or refusing to enforce a corporation right or claim, plus demand on said board by the stockholder for such action or proof that the demand would be useless." *Futernick, supra* at 387;MCL 450.1493a.

In their "derivative" claim, plaintiffs generally allege breach of fiduciary duty, fraud, breach of contracts, minority oppression, and wrongful termination, which have caused unspecified damages to plaintiffs and the company. Plaintiffs do not further allege in their complaint, or explain in their brief on appeal, the nature of the damages to the corporation, or proffer evidence to support such a claim. Plaintiffs pray for judgment against " defendants" for "hundreds of thousands of dollars," and for an order for the dissolution of the company, or "the purchase of Mark Wojcik's shares by Defendants."Thus, plaintiff Mark Wojcik, as a shareholder, does not seek damages from McNish for the benefit of the company. Rather, plaintiff seeks damages from McNish *and* the company for alleged injures to plaintiff in his capacity as a party to a contract, as a minority shareholder, and as an employee. Accordingly, plaintiffs claim is not a true derivative action on behalf of the company but only a restatement of plaintiffs other claims for his alleged personal injuries as a party to a contract, as an employee, and as an alleged oppressed minority shareholder. Although plaintiffs assert breach of fiduciary duty and fraud, the essence of their claim is that majority stockholder McNish exercised poor business judgment promoting less qualified Beaudoin over more qualified Mark Wojcik. Such purported poor judgment is not the type of fraud or abuse of trust that will support a derivative suit. The trial court properly dismissed this claim.

### IX

***13** Last, plaintiffs argue defendants were not entitled to summary disposition on plaintiffs' count I (breach of fiduciary duty), count IV (wrongful termination), count V (constructive discharge), count VII (accounting), and count VIII (derivative action), because defendants failed to identify the issues for which there was no genuine dispute of any material fact. MCR 2.116(G)(4); *Meyer, supra* at 575.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.W.2d                                             Page 11

Not Reported in N.W.2d, 2006 WL 2061499 (Mich.App.)
**(Cite as: Not Reported in N.W.2d)**

We find this argument without merit. As required
by MCR 2.116(G)(4), defendants specifically
identified the issues of material fact they believed
were undisputed and argued they were entitlement
to judgment as matter of law on all of the theories
that plaintiffs advanced in their shotgun complaint.
Further, MCR 2.116(I)(1) requires the trial court to
render judgment without delay, "[i]f the pleadings
show that a party is entitled to judgment as a matter
of law, or if the affidavits of other proofs show that
there is no genuine issue of material fact."
Additionally, for the reasons discussed *supra,* the
trial court reached the correct result regarding the
issues that plaintiffs assert were decided on
defective procedure. " 'This Court will not reverse
a trial court's order if it reached the right result for
the wrong reason." ' *Yee v Shiawassee Co Bd of
Comm'rs,* 251 Mich.App 379, 407 n 72;651 NW2d
756 (2002), quoting *Detroit v. Presti,* 240
Mich.App 208, 214;610 NW2d 261 (2000).

We affirm in part, reverse in part, and remand for
further proceedings consistent with this opinion. We
do not retain jurisdiction.

Mich.App.,2006.
Wojcik v. McNish
Not Reported in N.W.2d, 2006 WL 2061499
(Mich.App.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.