## UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

| | |
|---|---|
| COLLINS & AIKMAN CORPORATION and COLLINS & AIKMAN PRODUCTS CO., as Debtors in Possession,<br><br>Plaintiffs,<br><br>v.<br><br>DAVID A. STOCKMAN, J. MICHAEL STEPP, BRYCE M. KOTH, DAVID R. COSGROVE, PAUL C. BARNABA, ROBERT A. KRAUSE, JOHN A. GALANTE, CHARLES E. BECKER, ELKIN B. MCCALLUM, THOMAS E. EVANS, CYNTHIA HESS, DANIEL P. TREDWELL, W. GERALD MCCONNELL, SAMUEL VALENTI, III, HEARTLAND INDUSTRIAL PARTNERS, L.P., HEARTLAND INDUSTRIAL ASSOCIATES, L.L.C., HEARTLAND INDUSTRIAL GROUP, L.L.C., PRICEWATERHOUSECOOPERS LLP, and KPMG LLP,<br><br>Defendants. | Case No: 1:07-cv-00265-***<br><br>Assigned to: Vacant Judgeship |

## BRIEF IN SUPPORT OF DAVID A. STOCKMAN'S MOTION TO DISMISS

Dated: September 14, 2007

OF COUNSEL:

Andrew B. Weissman
Nicole Rabner
Michele L. Taylor
Jenny R. Chou
Wilmer Cutler Pickering Hale and Dorr, LLP
1875 Pennsylvania Avenue, NW
Washington, DC 20006
(202) 663-6000

Andrew Goldman
Wilmer Cutler Pickering Hale and Dorr, LLP
399 Park Avenue
New York, New York 10022
(212) 230-8800

THE BAYARD FIRM, P.A.

Peter B. Ladig (No. 3513)
Stephen B. Brauerman (No. 4952)
222 Delaware Avenue, Suite 900
P.O. Box 25130
Wilmington, DE 19899-5130
pladig@bayardfirm.com
sbrauerman@bayardfirm.com
(302) 655-5000

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................ iii

Statement of Nature and Stage of Proceedings ............................................... 1

Summary of Argument ...................................................................................... 1

Introduction ...................................................................................................... 2

Facts .................................................................................................................. 5

Plaintiffs' Allegations ...................................................................................... 10

Argument .......................................................................................................... 10

I.     THE COMPLAINT FAILS TO STATE A SECTION 10(b) CLAIM. .................................. 10

  A.    Plaintiffs Do Not Allege any Loss Caused by Allegedly Misleading Statements or
        Omissions ................................................................................................ 11

  B.    Plaintiffs Do Not Plead Securities Fraud with the Required Particularity ........................ 16

    1.   The allegations regarding the Joan Fabrics transactions are not stated with sufficient
         particularity .......................................................................................... 17

    2.   The allegations regarding improperly booked supplier rebates are not stated with
         sufficient particularity. ......................................................................... 18

    3.   The allegations regarding pre-billing receivables and delayed write-downs of
         goodwill and deferred tax assets are not stated with sufficient particularity. .................. 19

  C.    Plaintiffs' Allegations Do Not Give Rise to a "Cogent and Compelling" Inference of
        Scienter. ................................................................................................. 20

    1.   No facts alleged show Mr. Stockman had any plausible motive to mislead investors ..... 21

    2.   No facts or circumstances alleged give rise to a strong inference of Mr. Stockman's
         scienter .................................................................................................. 24

      a)   No alleged facts support an inference that Mr. Stockman knowingly or recklessly
           caused C&A to book false rebates from Joan Fabrics by means of "round-trip"
           transactions. ..................................................................................... 25

b)  No alleged facts support an inference that Mr. Stockman knowingly or
recklessly caused C&A to book rebates improperly. .................................... 27

c)  No facts alleged regarding the accounts receivable facility support any inference
of Mr. Stockman's scienter in connection with the August 2004 Senior Notes
sale. ................................................................................................................... 29

d)  No facts alleged support a claim that Mr. Stockman knew, or was reckless in
not knowing, that C&A should have reduced its goodwill and deferred tax
assets before March 2005. .................................................................................. 30

e)  Disclosures about management's rebate review and C&A's financial situation
in March and April 2005 do not support any inference of Mr. Stockman's
scienter in connection with the August 2004 Senior Notes sale. ....................... 30

(i)  Disclosures in the March 17 press release about the rebate review are
inconsistent with scienter. ...................................................................31

(ii)  Mr. Stockman's statements about liquidity, EBITDA, and capital
expenditures are inconsistent with any inference of scienter. ....................31

D.  The Allegations Do Not Satisfy the Required Element of Materiality. ............................ 34

II.  THE COMPLAINT FAILS TO STATE A SECTION 14(a) CLAIM. ..................................... 36

III.  PLAINTIFFS' CLAIMS ARE BARRED BY THE DOCTRINE OF *IN PARI DELICTO*. . 39

IV.  THE COURT SHOULD DECLINE TO EXERCISE SUPPLEMENTAL
JURISDICTION OVER PLAINTIFFS' STATE LAW CLAIMS. .......................................... 40

Conclusion ........................................................................................................................... 40

## TABLE OF AUTHORITIES

### CASES

*Baena v. KPMG LLP*, 453 F.3d 1 (1st Cir. 2006) ..........................................................39

*Baker v. MBNA Corp.*, C.A. No. 05-272, 2007 WL 2009673 (D. Del. July 6, 2007) ...................18

*Basic Inc. v. Levinson*, 485 U.S. 224 (1988) ..........................................................34

*Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955 (2007) ...........................................25

*Berckeley Investment Group, Ltd. v. Colkitt*, 455 F.3d 195 (3d Cir. 2006) ....................11

*Bloor v. Carro, Spanbock, Londin, Rodman & Fass*, 754 F.2d 57 (2d Cir. 1985) ...............14, 16

*Cal. Pub. Employees' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126 (3d Cir. 2004) ...............34, 36

*Citibank, N.A. v. K-H Corp.*, 968 F.2d 1489 (2d Cir. 1992) ........................................16

*Cowin v. Bresler*, 741 F.2d 410 (D.C. Cir. 1984) ....................................................38

*D.E. & J Ltd. P'ship v. Conaway*, 284 F. Supp. 2d 719 (E.D. Mich. 2003) ....................15

*Dura Pharm., Inc. v. Broudo*, 544 U.S. 336 (2005) ..................................................11

*First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763 (2d Cir. 1994) ....................16

*Froid v. Berner*, 649 F. Supp.1418 (D.N.J. 1986) ....................................................15

*GSC Partners CDO Fund v. Washington*, 368 F.3d 228 (3d Cir. 2004) .............................. *passim*

*General Elec. Co. v. Cathcart*, 980 F.2d 927 (3d Cir. 1992) ........................................38

*Globis Capital Partners, L.P. v Stonepath Group, Inc.*, No. 06-2560, 2007 WL 1977236 (3d Cir. July 10, 2007) ..........................................................................24

*In re Advanta Corp. Secs. Litig.*, 180 F.3d 525 (3d Cir. 1999) ................................14, 28

*In re Alpharma, Inc. Secs. Litig.*, 372 F.3d 137 (3d Cir. 2004) .................................24, 27

*In re Astea Int'l Inc. Secs. Litig.*, Civ. Act. No. 06-1467, 2007 WL 2306586 (E.D. Pa. Aug. 9, 2007) .........................................................................................27

*In re Astropower, Inc. Secs. Litig.*, No. Civ. A. 03-260-JJF, 2006 WL 288120 (D. Del. Feb. 7, 2006) .........................................................................................35

670393-1

*In re Bio-Technology Gen. Corp. Secs. Litig.*, 380 F. Supp. 2d 574 (D.N.J. Aug. 10, 2005) ..................................................................................................................................25

*In re Bristol-Myers Squibb Secs. Litig.*, 312 F. Supp. 2d 549 (S.D.N.Y. 2004) ................24, 26, 29

*In re Burlington Coat Factory Secs. Litig.*, 114 F.3d 1410 (3d Cir. 1997) ..........................4, 34, 35

*In re Citx Corp.*, 448 F.3d 672 (3d Cir. 2006) ....................................................................12, 13, 14

*In re Cross Media Mktg. Corp. Secs. Litig.*, 314 F. Supp. 2d. 256 (S.D.N.Y. 2004) ....................22

*In re Digital Island Secs. Litig.*, 357 F.3d 322 (3d Cir. 2004).......................................................24

*In re Duke Energy Corp. Secs. Litig.*, 282 F. Supp. 2d 158 (S.D.N.Y. 2003), *aff'd*, 113 Fed. App'x 427 (2d Cir. Nov. 15, 2004).............................................................................35

*In re Exxon Mobil Corp. Secs. Litig.*, No. 05-4571, ---F.3d ---, 2007 WL 2410129 (3d Cir. Aug. 27, 2007) ..............................................................................................................36

*In re NAHC, Inc. Secs. Litig.*, 306 F. 3d 1314 (3d Cir. 2002) .........................................................4

*In re Parmalat Secs. Litig.*, No. 04 MD 1653 (LAK), 2007 WL 2263893 (S.D.N.Y. Aug. 8, 2007) ..................................................................................................................................13

*In re Remec Inc. Secs. Litig.*, 388 F. Supp. 2d 1170 (S.D. Cal. 2005).............................................20

*In re Rockefeller Ctr. Props., Inc. Secs. Litig.*, 311 F.3d 198 (3d Cir. 2002) ...............................25

*In re Stonepath Group, Inc. Secs. Litig.*, 397 F. Supp. 2d 575 (E.D. Pa. 2005) ............................22

*In re Suprema Specialties, Inc. Secs. Litig.*, 438 F.3d 256 (3d Cir. 2006)...............................11, 16

*In re Teleglobe Commc'ns Corp.*, 493 F.3d 345 (3d Cir. 2007).................................................12, 13

*In re Westinghouse Secs. Litig.*, 90 F.3d 696 (3d Cir. 1996) .........................................................34

*Klein v. Autek Corp.*, 147 Fed. App'x. 270 (3d Cir. 2005)........................................................22, 23

*McCabe v. Ernst & Young, LLP*, No. 06-1318, ---F.3d---, 2007 WL 2301916 (3d Cir., July 23, 2007)........................................................................................................................11, 15

*Mut. Shares Corp. v. Genesco, Inc.*, 384 F.2d 540 (2d Cir.1967) ..................................................14

*Official Comm. of Unsecured Creditors of Allegheny Health, Ed. & Research Found. v. Pricewaterhouse Coopers, LLP*, No. 2:00cv684, 2007 WL 141059 (W.D. Pa. Jan. 17, 2007) ............................................................................................................................39

*Official Comm. of Unsecured Creditors v. R. F. Lafferty & Co.*, 267 F.3d 340 (3d Cir. 2001) ..................................................................................................................................39

*Payne v. DeLuca*, 433 F. Supp. 2d 547 (W.D. Pa. 2006) ...........................................20, 29

*Powers v. British Vita, P.L.C.*, 57 F.3d 176 (2d Cir. 1995) ..............................................16

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430 (3d Cir. 1997) ..................40

*Rochelle v. Marine Midland Grace Trust Co. of New York*, 535 F.2d 523 (9th Cir. 1976) ..........13

*Rombach v. Chang*, 355 F.3d 164 (2d Cir. 2004) ..............................................................32

*San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos.*, 75 F.3d 801 (2d Cir. 1996) ......................................................................................................22, 24

*TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438 (1976) ..................................................34

*Teachers' Ret. Sys. v. Hunter*, 477 F.3d 162 (4th Cir. 2007) ...........................................26

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 127 S. Ct. 2499 (2007) ...........................4, 21

*Trenwick Am. Litig. Trust v. Ernst & Young, L.L.P.*, 906 A.2d 168 (Del. Ch. 2006), *aff'd*, *Trenwick Am. Litig. Trust v. Billett*, 2007 WL 2317768 (Del. Aug. 14, 2007) .......................12, 14

*Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083 (1991) ........................................37

## STATUTES & RULES

Fed. R. Civ. P. 9(b) ................................................................................................... *passim*

15 U.S.C. § 78u-4 ........................................................................................................16, 20

28 U.S.C. § 1367(c) ............................................................................................................40

## Statement of Nature and Stage of Proceedings

Collins & Aikman Corporation ("C&A") and Collins & Aikman Products Co. ("C&A Products") brought this action as debtors in possession, asserting claims under sections 10(b) and 14(a) of the Securities Exchange Act of 1934 ("Exchange Act"), rules promulgated thereunder, and state law, for the benefit of the creditors of their respective estates. (Compl. ¶ 8.) Defendant David A. Stockman respectfully submits this brief in support of his motion to dismiss pursuant to Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure.

## Summary of Argument

Plaintiffs' claims against Mr. Stockman should be dismissed for the following reasons.

1.      The allegations do not support an inference that plaintiffs suffered a loss caused by any allegedly misleading disclosures or omissions.

2.      The complaint does not specify each allegedly false statement and why it was false.

3.      The facts alleged do not support a "cogent and compelling" inference that Mr. Stockman (or any defendant) knowingly or recklessly disseminated false or misleading statements.

4.      The allegations do not support an inference that any allegedly misleading disclosures were material.

5.      Plaintiffs may not assert damage claims for their own alleged misconduct.

Since the federal claims comprise the sole basis alleged for this Court's subject matter jurisdiction, once those claims are dismissed, the Court should decline to exercise supplemental jurisdiction over plaintiffs' state law claims and dismiss the complaint in its entirety.

1

## Introduction

Plaintiffs' complaint is a failed effort to fit a square peg into a round hole. Even though plaintiffs are the corporate entities allegedly responsible for the misleading disclosures alleged – and plaintiffs *benefited* from the alleged misconduct – they proceed with allegations that, even if adequately pleaded (which they are not), support only claims by persons other than plaintiffs. The complaint parrots allegations made in other actions – filed against C&A's officers and directors by shareholders, bondholders, and the Securities and Exchange Commission – without regard to the vastly different nature of those claims compared to claims asserted here in C&A's name. As a consequence, the federal claims in the complaint, which provide the sole alleged ground for this Court's subject matter jurisdiction, essentially make no sense.

Plaintiffs' federal securities claims are brought under sections 10(b) and 14(a) of the Exchange Act. They are, by their nature, limited to claims for losses proximately caused by (i) fraud in connection with plaintiffs' purchase or sale of securities (in the case of section 10(b)), or (ii) reliance on false statements in proxy filings (in the case of section 14(a)). Neither theory supports a claim by C&A or C&A Products here.

As to section 10(b), the only purchase or sale of securities conceivably at issue is C&A's August 2004 sale of Senior Notes. That transaction allowed C&A to obtain $415 million in cash in exchange for its promise to creditors to timely pay interest and repay principal. Given plaintiffs' allegations of C&A's troubled financial condition at the time, it is hard to conceive how the company suffered a loss by exchanging these promises for cash. Notably, plaintiffs do not allege the company was worse off *immediately at the conclusion of the Notes sale* than it was before the transaction. Instead, the claim of loss flows from how the proceeds from the Notes were used. Not surprisingly, the case law rejects the concept of such a section 10(b) claim. Moreover, the numerous allegations of fraudulent conduct or breaches of duty *after* the August

2

2004 Notes sale (a) provide no basis for claiming fraud in connection with the then long-concluded Notes sale, and (b) actually undercut any such claims because they allege intervening, loss-causing events after the Notes sale.

As to section 14(a), the claim fails because it identifies no reasonable nexus between a shareholder vote based on the alleged misrepresentations or omissions in the proxy materials and any damages supposedly suffered by plaintiffs. Any financial impact on plaintiffs derives not from who was elected to the Board of Directors, or any resolution approved by a shareholder vote, but instead from acts taken by plaintiffs' officers and directors in the exercise of business judgment in pursuing plaintiffs' business affairs. It is doubtful there are any such valid claims, but if there were, they would be state law claims, not federal securities claims for alleged misleading proxy materials. Once again, allegations of misconduct or breaches of duty *after* the last proxy solicitation – that is, after September 30, 2004, provide no assistance for plaintiffs' claims and actually undercut them because they involve intervening acts supposedly causing plaintiffs' losses.

Plaintiffs' claims fail for another reason: they seek to convert losses from a business failure in a viciously competitive market into compensable securities claims by making plaintiffs' officers, directors and auditors into guarantors against failure.

Since at least the end of 2001, the auto industry has been in significant distress and experienced fierce pricing pressures. The auto industry suffered from a deteriorating economy, increasing oil prices, and lagging demand. As car sales declined precipitously and the costs of key raw materials rapidly increased, the economic repercussions filtered down through the entire automotive supply chain. (*See* Compl. ¶ 38.) Automakers offered large cash discounts to consumers and sought to compensate for lost revenue by pressuring their parts suppliers, such as C&A, to decrease prices and provide "givebacks" or "rebates." (*See* App. 5, 7-8 (C&A 2003

3

Form 10-K (Mar. 16, 2004) ("2003 Form 10-K")).)[1/]  The constant pressure to yield to price concessions was well-publicized in the industry.  (*See, e g*, App. 207 (Maryann Keller, *Crisis in the Automotive Parts Industry*, Auto. Indus. (Mar. 1, 2005)).)  After cutting prices in response to the automakers' pressures, C&A in turn sought price discounts and rebates from its own suppliers.  (*See* App. 5, 7-8 (2003 Form 10-K).)  Supplier rebates became common in the automotive industry as part of ongoing price deflation in which contracts were subject to continuous negotiation and adjustment.  (*See id.* at 13; *see also* Compl. ¶ 54.)

Through its officers and directors, C&A candidly discussed the serious difficulties and uncertainties it faced.  In its 2003 SEC Form 10-K, C&A noted that automakers were reducing production and inventory significantly while demanding "price decreases and givebacks" from suppliers, that C&A complied with some of these demands, and that it would have difficulty getting price relief from its own suppliers.  (App. 4-5, 7-8 (2003 Form 10-K).)  Mr. Stockman warned investors that "the industry today is facing extremely challenging conditions, probably an environment that hasn't existed in the last thirty or forty years," and that both C&A and the industry were "in a maelstrom."  (App. 112 (C&A Q4 and Year-End Earnings Call Transcript (Mar. 17, 2005) ("Investor Call Tr.")).)  In the end, the automotive supplier industry was decimated by these conditions.  More than a dozen companies, including C&A, filed for bankruptcy.  (*See* App. 209-222 (Mark Douglas, *The Year in Bankruptcy  2006* (Jan. 30, 2007)).)  Plaintiffs' action should be seen for what it is: a brazen effort to convert the federal securities laws into insurance against plaintiffs' decline and fall as a result of unbearably harsh business conditions.

---

[1/]    The Court may consider documents filed with the SEC, as well as documents "integral to or explicitly relied upon in the complaint." *In re NAHC, Inc. Secs. Litig*, 306 F. 3d 1314, 1331 (3d Cir. 2002); *In re Burlington Coat Factory Secs. Litig*, 114 F.3d 1410, 1426 (3d Cir. 1997). *Accord Tellabs, Inc. v. Makor Issues & Rights, Ltd*, 127 S. Ct. 2499, 2509 (2007).

4

This attempt fails in the end, however, because plaintiffs' allegations do not satisfy the

basic elements of the alleged securities claims. As noted above, the wholesale importation of

copycat allegations from pending private or SEC actions defies common sense and fails to

support the securities claims asserted by *these plaintiffs*. The claims also fail because: the

allegations do not present any reasonable theory for the required elements of loss causation or

reliance as to any of the alleged misrepresentations or omissions; the allegations of fraud lack

required specificity under Rule 9(b) and the Private Securities Litigation Reform Act

("PSLRA"), and fail to provide grounds supporting a "strong inference" of scienter, as required

by the PSLRA; the allegations do not satisfy the required element of materiality for any of the

alleged misrepresentations or omissions; and the allegations on their face show that plaintiffs

were responsible for the alleged misrepresentations or omissions, and may not assert claims for

damages arising out of their own alleged misconduct.

For these reasons, set forth in greater detail below, the federal securities claims should be

dismissed, and the Court should decline to retain jurisdiction over the state law causes of action.

### Facts

C&A designed, engineered, and manufactured automotive interior components for sale to

automobile Original Equipment Manufacturers ("OEMs"). (Compl. ¶¶ 5, 36.) Mr. Stockman

became a member of C&A's Board of Directors in February 2001, Chairman of the Board in

August 2002, and Chief Executive Officer in August 2003, serving until May 12, 2005. (*Id.* ¶ 9.)

Mr. Stockman received no salary, bonuses, or options from C&A as compensation for his

services. (*See* App. 15-16 (2003 Form 10-K).)

Heartland Industrial Partners, L.P. (together with its general managing partner, Heartland

Industrial Associates, L.L.C., "Heartland"), which Mr. Stockman helped manage, acquired 27

million shares, or approximately 60%, of C&A's stock in 2001, bought additional shares on many

670393-1

occasions from 2002 to 2004, and held 32,714,147 shares by the end of 2004. Mr. Stockman

personally spent $1.5 million in the second half of 2004 for 331,000 shares of C&A stock. Both

Mr. Stockman and Heartland were still buying C&A stock in the last days of 2004.[2] Plaintiffs do

not allege Mr. Stockman or Heartland ever sold C&A stock, and there were no such sales. As a

result, Heartland and Mr. Stockman were the biggest losers from C&A's demise. Plaintiffs'

theory is in essence that Mr. Stockman defrauded himself by misrepresenting C&A's "true"

financial condition at the same time he invested $1.5 million in C&A, and caused Heartland to

invest tens of millions more, for stock he knew to be worthless.

   Following Heartland's initial investment in early 2001, C&A initiated a series of

acquisitions to position the company as a primary supplier to the OEMs. (*See* App. 26 (C&A

2001 Form 10-K/A ("2001 Form 10K/A")).) C&A made several significant acquisitions in 2001,

including (1) Becker Group, L.L.C., an auto plastics manufacturer controlled by defendant

Charles Becker, valued at around $160 million (*id.* at 30); (2) Textron Automotive Company's

Trim division ("TAC-Trim"), a supplier of instrument panels and fully-assembled cockpit

modules, valued at around $940 million (*id.* at 29); and (3) Joan Automotive Fabrics ("Joan"), an

automobile fabrics supplier owned by defendant Elkin McCallum, valued at about $190 million

(*id.* at 30). In these transactions, Mr. Becker received 14.8 million, Textron 18 million, and Mr.

McCallum 12.8 million C&A shares. Mr. Becker and Mr. McCallum became C&A directors, and

---

[2]    *See* Compl. ¶ 29; App. 158-59 (Heartland Schedule 13D (Mar. 1, 2001)) ($260 million
initial investment); App. 164 (Heartland Schedule 13D/A (Amendment 1) (Jan. 3, 2002)) ($78
million additional investment); App. 129-156 (Stockman Forms 4 and 4/A) (purchases of
331,000 shares in May-December 2004); App. 169-170 (Heartland Schedule 13D/A
(Amendment 87) (Jan. 6, 2005)) (Heartland/Stockman stock purchases on December 30-31,
2004, and Heartland holdings). The share totals are adjusted to reflect a 1:2.5 reverse stock split
in May 2002. (*See id.* at 169.)

their shares were subject to severe restrictions pursuant to a Stockholders Agreement.[3/]

**McCallum Transactions.**  In 2001 C&A also entered into fabric supply agreements with entities controlled by Mr. McCallum, including Joan Fabrics Corporation ("Joan Fabrics").  (App. 28 (2001 Form 10-K/A).)  In 2001-03, C&A received price concessions from Joan Fabrics in the form of quarterly rebates for the materials C&A purchased.  (*See* Compl. ¶ 50.)  In 2002 and 2003, C&A acquired additional small businesses and assets controlled by Mr. McCallum, including Southwest Laminates and Dutton Yarns.  (*See id.* ¶¶ 51, 93-94; App. 9, 12 (2003 Form 10-K).)

In 2003, C&A's Audit Committee, with outside counsel and an accounting expert, commenced an extensive investigation into certain accounting issues and related-party transactions, including those with Mr. McCallum.  (*See* App. 86-87 (C&A Form 8-K, Ex. 99.1, Press Release (Mar. 12, 2004) ("March 12, 2004 Press Release").)  The Committee ultimately concluded each transaction had a legitimate business purpose, was negotiated fairly, and was properly accounted for by C&A.  (*Id.*)

**Accounting for Supplier Rebates.**  While completing its 2004 financial reports, C&A's management learned of potential errors in the accounting for certain vendor rebates.  (*See* App. 93-102 (C&A Form 8-K, Ex. 99.2, Press Release (Mar. 17, 2005) ("March 17 Press Release")).)  Management undertook an intensive review of vendor rebates booked by C&A in 2002-2004 to determine whether they were recorded in appropriate periods.  (*See id.*)  On March 17, 2005, C&A disclosed that some rebates were booked in incorrect quarters and that it expected to restate its earnings for the first three quarters of 2004, and possibly 2003.  (*See id.*; *see also* Compl. ¶ 65.)  C&A cautioned that management's "preliminary" findings were subject to "material change," as

---

[3/]     *See* App. 172-190 (Becker Schedule 13D (July 16, 2001); McCallum Schedule 13D (Oct. 1, 2001); Textron Schedule 13D (Dec. 28, 2001)); App. 157-162 (Heartland Schedule 13D/A (Jan. 3, 2002)).

well as further review by C&A's auditor.  (App. 93-102 (March 17 Press Release).)

 The key accounting issue was whether up-front cash rebates should be recognized when agreed-to or over the life of any related contract or business award.  During this period the Emerging Issues Task Force ("EITF") of the Financial Accounting Standards Board ("FASB") considered a number of rebate accounting issues, including the specific question: "Under what circumstances up-front nonrefundable cash consideration given by a vendor to a customer should be recognized immediately in the customer's income statement rather than as a liability."  (A-192 (FASB EITF Abstracts, Issue No. 02-16).)[4/]  The EITF reached a consensus on some rebate accounting issues, noting the importance of "many factors and circumstances that will vary from case to case" (*id.* at 195), but could not provide guidance on the proper treatment of "up-front nonrefundable cash consideration" "due to the broad, general nature of related questions." (*Id.*)

 **August 2004 Senior Notes Offering.**  As part of an effort to "enhance [its] financial and operating flexibility," C&A sold approximately $415 million in Senior Notes in August 2004. (App. 66 (Offering Memorandum for 12.875% Notes Due 2012 ("Offering Memorandum")); Compl. ¶ 60.)  Like C&A's 2003 Form 10-K, the offering memorandum made candid disclosures about the difficulties facing the company.  (*See* App. 67-68 (Offering Memorandum).)

 **Proxy Statements.**  C&A filed proxy statements on April 25, 2002, April 23, 2003, and September 30, 2004.  Those proxy statements disclosed that defendants Heartland, Becker, and McCallum, who together owned more than 50% of C&A shares at all relevant times, intended to

---

[4/] The FASB is "the designated organization in the private sector for establishing standards of financial accounting and reporting."  FASB, Facts About FASB, http://www.fasb.org/facts. The EITF was created "to assist the FASB in improving financial reporting through the timely identification, discussion, and resolution of financial accounting issues within the framework of existing authoritative literature."  FASB, Emerging Issues Task Force (EITF), http://www.fasb.org/eitf/about_eitf.shtml.  Plaintiffs allege that C&A's financial statements violated EITF Abstracts, Issue No. 02-16.  (Compl. ¶ 100(a).)

8

vote for each of the proposals in the statements.[5/]

**Accounts Receivable Facility with GECC.**  In December 2004, C&A Products entered

into an accounts receivable facility agreement with General Electric Capital Corporation

("GECC"), whereby, based on a complicated formula, C&A Products received money in

exchange for transferring "eligible accounts receivables" to GECC.  (*See* Compl. ¶ 63.)  On June

22, 2005, more than a month after C&A's bankruptcy filing, GECC filed a motion in bankruptcy

court alleging that C&A had "pre-billed" some receivables, *i.e.*, included them in the pool of

eligible receivables before they were permitted to be billed to the customer.  The GECC debt has

since been fully paid by C&A collecting the pledged receivables as they came due.[6/]

**March 17, 2005 Press Release and Investor Conference Call.**  On March 17, 2005,

C&A issued a press release and hosted a conference call addressing a number of issues, including

the rebate accounting issues described above, delayed filing of C&A's Form 10-K, preliminary

financial results for fiscal year 2004, and a first quarter earnings projection.  (Compl. ¶¶ 65, 67.)

The financial results included a write-off of $500 million of goodwill and $175 million of deferred

tax assets.  (*Id.* ¶¶ 103, 108.)  In his communications, Mr. Stockman emphasized the highly

volatile and challenging environment in which C&A was competing, including statements that

"the industry today is facing extremely challenging conditions, probably an environment that

hasn't existed in the last thirty or forty years"; that both C&A and the industry were "in a

---

[5/]      *See* App. 40, 42 (C&A Schedule 14A (Apr. 25, 2002) ("2002 Proxy Statement")); App. 51-53 (C&A Schedule 14A (Apr. 25, 2003) ("2003 Proxy Statement")); and App. 62 (C&A Schedule 14A (Sept. 30, 2004) ("2004 Proxy Statement")).

[6/]      *See* App. 206 (Amended Disclosure Statement for the First Amended Joint Plan of Collins & Aikman Corporation and Its Debtor Subsidiaries, *In re Collins & Aikman Corp*, Case No. 05-55927 (SWR) (Bankr. E.D. Mich. Jan. 24, 2007)) ("As the receivables were converted to cash through payments by customers, and no new receivables were added to the pool, the outstanding balance under the Receivables Facility was eliminated.").

maelstrom"; that for C&A "in the current environment, cash management [and] liquidity is a challenge"; and that because of these near-"turbulent" conditions, the EBITDA projection was "subject to major uncertainties." (*See* App. 112, 119-20 (Investor Call Tr.).)

Like many other automotive parts suppliers, C&A eventually fell victim to this economic turmoil. C&A and C&A Products filed for bankruptcy in May 2005. (Compl. ¶ 6.)

**Plaintiffs' Allegations**

Plaintiffs essentially challenge the business judgments of the officer and director defendants from February 2001 through May 2005. Plaintiffs' securities law claims are based on allegations that various public disclosures were inaccurate because: (i) C&A entered into "round-trip" transactions with Mr. McCallum in 2001-2003 for the purpose of generating fictitious cost reductions (Compl. ¶¶ 48-52); (ii) C&A prematurely recognized rebates in 2001-2004 (*id.* ¶¶ 53-58; 98-102); (iii) C&A inflated receivables through pre-billing in 2005 (*id.* ¶¶ 63-64); (iv) C&A overstated goodwill and deferred tax assets before March 2005 (*id.* ¶¶ 103, 110); and (v) C&A falsely described management's rebate review, and C&A's liquidity, EBITDA, and capital expenditures, in March and April 2005 (*id.* ¶¶ 65-67, 71).

**Argument**

## I.    THE COMPLAINT FAILS TO STATE A SECTION 10(b) CLAIM.

To state a section 10(b) claim, plaintiffs "must allege 'with particularity' that defendants (1) made a misstatement or omission of material fact (2) with scienter (3) in connection with the purchase or the sale of a security (4) upon which the plaintiffs reasonably relied and (5) the plaintiffs' reliance was the proximate cause of their injury." *GSC Partners CDO Fund v. Washington*, 368 F.3d 228, 236 (3d Cir. 2004).[2/] To plead loss causation, plaintiffs must

---

[2/]    Unless otherwise indicated, internal citations are omitted.

10

identify a cognizable theory of "a causal connection between the material misrepresentation and

the loss." *Dura Pharm., Inc.* v. *Broudo*, 544 U.S. 336, 341-42, 345-46 (2005); *see also In re*

*Suprema Specialties, Inc. Secs. Litig.*, 438 F.3d 256, 275 (3d Cir. 2006).

**A.    Plaintiffs Do Not Allege any Loss Caused by Allegedly Misleading Statements or Omissions.**

The section 10(b) claim fails on its face because plaintiffs do not plead the required

element of causation. To plead a claim under section 10(b), a plaintiff must show both

transaction causation and loss causation – *i.e.*, that the transaction was caused by the alleged

fraud, and that plaintiff's loss flowed from the alleged misrepresentations or omissions and not

other sources. *See Dura*, 544 U.S. at 345-46. To establish reliance, or transaction causation,

plaintiff must prove that "'but for the wrongful conduct, the transaction would not have gone

through, at least in the form that it eventually took.'" *Berckeley Investment Group, Ltd. v.*

*Colkitt*, 455 F.3d 195, 222 (3d Cir. 2006). To satisfy the loss causation requirement, "plaintiff

must show that the defendant misrepresented or omitted the very facts that were a substantial

factor in causing the plaintiff's economic loss." *McCabe v. Ernst & Young, LLP.*, No. 06-1318, -

--F.3d---, 2007 WL 2301916, at *6 (3d Cir., July 23, 2007). In other words, even "if the

investment decision is induced by misstatements or omissions that are material and that were

relied on by the claimant, but are not the proximate reason for his pecuniary loss, recovery under

[10(b)] is not permitted." *Id.* at *8.

As to all alleged misrepresentations or omissions after August 2004 (when the Notes sale,

plaintiffs' only purchase or sale of securities at issue in the complaint, occurred), plaintiffs

cannot satisfy the transaction causation requirement. By definition and common sense, events

that occur after a transaction is completed cannot cause that transaction to take place or alter its

terms. As a result, for purposes of the section 10(b) claims, many allegations in the complaint,

including those relating to the GECC credit facility (Comp. ¶¶ 63-64), and the March and April 2005 press releases and conference call (*id.* ¶¶ 65-72), are irrelevant.

Plaintiffs' theory of loss causation apparently is that allegedly fraudulent statements by C&A before August 2004 enabled C&A to sell the August 2004 Senior Notes, and that the sale of those securities harmed C&A by creating more debt, which it then failed to use to its advantage, thereby "deepen[ing] the Company's insolvency." (*See* Compl. ¶ 156 (various fraudulent schemes resulted in "[t]he issuance of . . . securities [which] deepened the Company's insolvency").) The allegations utterly fail, however, to show how the sale of the Notes could have caused any loss by deepening C&A's insolvency, whatever that may mean. *See Trenwick Am. Litig. Trust v. Ernst & Young, L.L.P.*, 906 A.2d 168, 174, 205 (Del. Ch. 2006) ("deepening insolvency . . . . does not express a coherent concept"), *aff'd, Trenwick Am. Litig. Trust v. Billett*, 2007 WL 2317768 (Del. Aug. 14, 2007).[8]

As an initial matter, plaintiffs never define "insolvency" and never allege grounds for inferring that C&A actually was insolvent under that definition at the time of the August 2004 offering. Plaintiffs assert only – without factual support – that *in January 2005* C&A "did not have the money to pay what it owed GECC," and that *in March 2005* C&A was on the "brink of bankruptcy." (*See* Compl. ¶¶ 64, 104.)

Nevertheless, plaintiffs charge that the August 2004 Senior Notes offering somehow harmed C&A. (*See id.* ¶ 60.) But as the Third Circuit has held, the infusion of cash into a company through the issuance of fraudulently inflated securities "did nothing to 'deepen' [the company's] insolvency. It did the opposite." *In re Citx Corp.*, 448 F.3d 672, 677 (3d Cir. 2006).

---

[8]    "Deepening insolvency" is not a cognizable cause of action in Delaware. *See In re Teleglobe Commc'ns Corp.*, 493 F.3d 345, 385 n.36 (3d Cir. 2007) ("In *Trenwick*, the Vice Chancellor put to rest the notion that there is such a thing as a cause of action for so-called 'deepening insolvency' in Delaware law.").

As a result, the "investment was hardly harmful." *Id.* at 678; *see also id.* at 677-678 (finding no evidence under deepening insolvency theory to allow a reasonable jury to find harm and noting the "deepening of a firm's insolvency is not an independent form of corporate damage").  The mere act of incurring more debt does not deepen a company's insolvency because the cash received is "an asset that directly offsets the newly incurred liability.…  The difference between the company's assets and liabilities therefore remains the same.  Its ability to pay its debts as they become due is no worse; indeed it may be better." *In re Parmalat Secs. Litig*, No. 04 MD 1653 (LAK), 2007 WL 2263893, at \*9 (S.D.N.Y. Aug. 8, 2007).  *See also Rochelle v. Marine Midland Grace Trust Co. of New York*, 535 F.2d 523, 530 (9th Cir. 1976) (trustee for bankrupt corporation cannot assert section 10(b) claim where the corporation "received full value for the securities; that the directors later frittered away the funds on losing…ventures does not mean that [the company] suffered a loss compensable under the federal securities fraud laws.").

Plaintiffs' theory is one of pure hindsight: because C&A ultimately was forced to join other auto suppliers in bankruptcy nine months later, the sale of the Notes harmed C&A by creating additional debt C&A could not repay.  The gravamen of this theory is that C&A's officers and directors should serve as guarantors of the success of their business judgments.  But "insolvency does not render a corporation's fiduciaries guarantors of that corporation's success; rather, it merely expands the universe of people with standing to assert a beneficial interest in the fiduciaries' obligation to maximize the value of the corporation." *Teleglobe Commc'ns. Corp*, 493 F.3d at 385 (citing *Trenwick*, 906 A.2d at 205).  Directors "may, in the appropriate exercise of their business judgment, take action that might, if it does not pan out, result in the firm being painted in a deeper hue of red.  The fact that the residual claimants of the firm at that time are creditors does not mean that the directors cannot choose to continue the firm's operations in the hope that they can expand the inadequate pie such that the firm's creditors get a greater

recovery." *Trenwick*, 906 A.2d at 174. C&A's officers and directors exercised their business judgment for the benefit of the company; that their efforts were ultimately fruitless provides no basis to make them liable for committing corporate resources to those efforts. Moreover, even if management's operational or financial judgments were misguided – and no allegations support such a conclusion – that provides no grounds for a section 10(b) claim. *See In re Advanta Corp. Secs. Litig.*, 180 F.3d 525, 537 (3d Cir. 1999) ("[S]ection 10(b) does not 'regulate transactions which constitute no more than internal corporate mismanagement.'").

Even if, under the worst possible scenario, C&A's officers and directors caused C&A to raise capital based on fraudulent misstatements and then squandered the proceeds with no possible business justification – which has not been, and cannot be, alleged here – plaintiffs' section 10(b) claims would still fail. Management's decisions about how to use C&A's corporate funds after the Notes offering was completed cannot form the basis for a section 10(b) claim because those subsequent decisions were not themselves connected to the Notes sale. *See In re Citx Corp.*, 448 F.3d at 677-78 (management's failure to use an equity infusion to turn the company around harmed the company, not the equity infusion itself); *Bloor v. Carro, Spanbock, Londin, Rodman & Fass*, 754 F.2d 57, 62 (2d Cir. 1985) ("Any damage sustained . . . occurred later, after the securities transactions were completed, when the proceeds of those transactions were allegedly funneled into unwise investments or diverted to . . . personal use . . . ."); *Mut. Shares Corp. v. Genesco, Inc.*, 384 F.2d 540, 546 (2d Cir.1967) ("corporate abuse and diversion" claims are not cognizable under securities laws; the causal connection between any relevant acts by defendants and any damage suffered by plaintiffs "is slim indeed").

Finally, even assuming, as plaintiffs would have this Court do, that C&A's later use of cash is somehow connected to the sale of securities that generated the cash, plaintiffs *still* do not plead loss causation that would support a section 10(b) claim. Plaintiffs allege no reasonable

14

nexus between alleged fraudulent misrepresentations or omissions before the August 2004 Notes

sale and C&A's eventual demise, which arose out of auto industry competitive pressures and the

decisions made to try to succeed in that business environment. *See Froid v. Berner*, 649 F.Supp.

1418, 1423 (D.N.J. 1986) (recovery not permitted if economic loss resulted from "intervening

cause"); *see also McCabe*, 2007 WL 2301916, at *14 (intervening cause a consideration in

determining loss causation); *D.E. & J Ltd. P'ship v. Conaway*, 284 F. Supp. 2d 719, 749 (E.D.

Mich. 2003) (no loss causation if "intervening cause" was responsible for economic loss).

Plaintiffs acknowledge that C&A's worsening condition was a result of a general collapse

of the domestic automotive parts supply industry: "the impact of increases in raw material prices,

pricing pressures from customers, general economic conditions, the state of the automotive

industry, and other factors beyond management's control. . . . were in existence long before

Collins & Aikman was on the brink of bankruptcy in March 2005." (Compl. ¶ 104; *see also id.*

¶ 118 ("[I]nternal adversities, coupled with the problems experienced by the U.S. automobile

industry in general, created substantial doubt about Collins & Aikman's ability to continue as a

going concern at least as early as 2003.").) Without question, the extraordinary auto industry

circumstances and harsh economic conditions that felled numerous competitors were responsible

for C&A's eventual collapse.[9] There can be no serious suggestion that the relatively minor

errors relating to accounting issues before August 2004 (when compared to C&A's overall costs

and revenues) caused C&A to fail. Courts have found such intervening causes to preclude loss

---

[9]    *See, e.g., In re Dana Corp.*, No. 06-10354 (BRL) (Bankr. S.D.N.Y., filed Mar. 3, 2006);
*In re Delphi Corp.*, No. 05-44481 (RDD) (Bankr. S.D.N.Y., filed Oct. 8, 2005); *In re Meridian
Auto. Sys., Inc.*, No. 05-11169 (MFW) (Bankr. D. Del., filed Apr. 26, 2005); *In re Tower Auto.,
Inc.*, No. 05-10578 (ALG) (Bankr. S.D.N.Y., filed Feb. 2, 2005); *In re Oxford Auto., Inc.*, No.
04-74377 (SWR) (Bankr. E.D. Mich., filed Dec. 7, 2004); *In re Intermet Corp.*, No. 04-67597
(MBM) (Bankr. E.D. Mich., filed Sept. 29, 2004); *In re Citation Corp.*, No. 04-08130-TOM11
(Bankr. N.D. Ala., filed Sept. 18, 2004).

causation in a variety of contexts and claims. *See, e.g., Powers v. British Vita, P.L.C.*, 57 F.3d

176, 189 (2d Cir. 1995) (market value of stock fell as a result of recession); *First Nationwide*

*Bank v. Gelt Funding Corp.*, 27 F.3d 763, 772 (2d Cir. 1994) (investor's loss caused by

marketwide real estate crash); *Citibank, N.A. v. K-H Corp.*, 968 F.2d 1489, 1495-1496 (2d Cir.

1992) (loss to plaintiff from loans made on the basis of fraudulent misrepresentation were the

result of a decline in value of collateral unrelated to the fraud); *Bloor,* 754 F.2d at 62 (loss caused

not by misrepresentations in various documents used to attract investment but by looting and

mismanagement of these funds by controlling stockholders). Because plaintiffs do not, and

cannot conceivably, tie C&A's alleged accounting misrepresentations or omissions to its alleged

insolvency, their claims fail for lack of required loss causation.

### B.      Plaintiffs Do Not Plead Securities Fraud with the Required Particularity.

Section 10(b) claims must satisfy the heightened pleading standards of Fed. R. Civ. P. 9(b)

and the PSLRA. *GSC Partners*, 368 F.3d at 236-37. "Rule 9(b) requires, at a minimum, that

plaintiffs support their allegations of securities fraud with all of the essential factual background

that would accompany the 'first paragraph of any newspaper story' – that is, the 'who, what,

when, where and how' of the events at issue." *Suprema Specialties*, 438 F.3d at 276 (3d Cir.

2006). The PSLRA requires plaintiffs to "specify each statement alleged to have been misleading

[and] the reason or reasons why the statement is misleading," and, for allegations made on

information and belief, to "state with particularity all facts on which that belief is formed." 15

U.S.C. § 78u-4(b)(1).

Plaintiffs fail to comply with the mandates of Rule 9(b) and the PSLRA. The complaint

contains unacceptably broad statements such as: "[d]efendants concealed the true financial results

of operations and condition of the Company" (Compl. ¶ 39); "[d]efendants' positive statements

falsely portrayed the Company as well positioned to succeed and financially sound" (*id.* ¶ 75); and

16

the disclosures defendants caused C&A to file were false and misleading because, "among other reasons," they contained financial results that were inflated by the improper accounting practices "detailed herein" (*id.*). Such statements are unacceptable under Rule 9(b) and the PSLRA because they fail to specify which disclosure allegedly is misleading, who made it, and why it was misleading. Defendants and the Court are left to guess which alleged accounting practice and/or unspecified "other reason" allegedly impacted which disclosure.

> **1.    The allegations regarding the Joan Fabrics transactions are not stated with sufficient particularity.**

Plaintiffs allege Mr. Stockman, defendant J. Michael Stepp, and unspecified "others acting at their direction" engaged in "round-trip" transactions with Joan Fabrics "designed to enable Collins & Aikman to improperly increase its reported income." (Compl. ¶ 48.) As noted above, C&A received quarterly price concessions for materials purchased from Joan Fabrics. Instead of alleging facts – *e.g.*, when Mr. Stockman or others allegedly "personally negotiated" so-called round-trip transactions with Mr. McCallum, who Mr. Stockman allegedly directed and how, and who said what to whom at which meeting – plaintiffs make unsupported charges that the payments were "falsely characterized" as rebates because they were repaid in subsequent transactions. (*See id.* ¶¶ 50-51.) For example, plaintiffs allege C&A purchased Southwest Laminates ("<u>SWL</u>") from Mr. McCallum for "at least $7 million more than the Company estimated it was worth" (*id.* ¶ 51), but provide no basis for alleging the "worth" of SWL – which business operations were included in the estimate, what methodology was used to make the valuation, who made the valuation, who received or knew about the estimate, or if the estimate was accepted as reliable. Similarly, plaintiffs allege C&A gave Joan Fabrics looms "worth $3.1 million for no consideration" (*id.*), purchased other looms from Joan Fabrics for $4.7 million "even though they were only worth approximately $2 million" (*id.*), purchased Dutton Yarns from Mr. McCallum for $4.2 million even though it had a "fair value" of $2 million (*id.* ¶ 93), and

17

otherwise "deliberately overpaid" an unnamed Joan Fabrics subsidiary an unspecified amount for air jet texturing machines (*id* ¶ 51), but fail to provide *any* basis for these alleged valuations. Moreover, plaintiffs describe no evidence whatsoever suggesting C&A overpaid for these assets as a means of repaying the Joan Fabrics rebates.

### 2. The allegations regarding improperly booked supplier rebates are not stated with sufficient particularity.

Plaintiffs' allegations regarding C&A's accounting for supplier rebates are likewise inadequate. Plaintiffs allege unnamed "Defendants" caused C&A to book rebates improperly in three respects: (1) price reductions based on projected purchases over future quarters were "pulled forward" into the current quarter (Compl. ¶ 55); (2) rebates "contingent on future events, usually additional business" were "recognized immediately" (*id*); and (3) C&A purchased equipment and maintenance services for "above-market, deliberately inflated prices," took back the difference between the cost and the "true market price," and booked the difference as a rebate rather than a reduction in the cost basis of the equipment or maintenance (*id.*). Plaintiffs further allege C&A used "side letters" to hide its rebate accounting practices. (*Id.* ¶¶ 55, 98-99, 126-128.)

These allegations fail to provide the required who, what, when, where, how, and why of the alleged fraud. Plaintiffs do not identify all the rebates they allege were improper,[10] the terms of those rebates, or which defendant participated in or knew about which transaction. "[B]lanket allegations against 'the defendants' and 'management' do not meet the particularity requirements of Rule 9(b) or the PSLRA." *Baker v. MBNA Corp.*, C.A. No. 05-272, 2007 WL 2009673, at *7 (D. Del. July 6, 2007). Nor do plaintiffs allege what was improper about "pulling forward" rebates if a supplier made an earlier commitment, recognizing income in the quarter a rebate was

---

[10] Plaintiffs allege that the 22 rebates named in the complaint are only "some of the improperly accounted for rebates." (*Id.* ¶¶ 56-57.)

negotiated or agreed-to, or negotiating rebates to lower the cost of supplies rather than seeking reduced prices for the equipment. Finally, although plaintiffs conclusorily allege "it was highly irregular and implausible that the Company needed to procure numerous side-agreements since nearly all of the Company's original contracts with its suppliers either did not contain key terms or contained terms contrary to those set forth in the side letters regarding its entitlement to multi-million dollar rebates" (*see* Compl. ¶ 128), plaintiffs allege no facts to support that assertion – no data whatsoever about the actual contracts involved or the terms of those contracts.[11]

Plaintiffs recite, in cursory fashion, a litany of GAAP principles defendants allegedly violated. (*See* Compl. ¶¶ 98-100.) But plaintiffs do not tie any of these principles to the actual terms of any of the rebates. In short, plaintiffs fail to allege with particularity *why* C&A's accounting for supplier rebates was improper.

### 3.    The allegations regarding pre-billing receivables and delayed write-downs of goodwill and deferred tax assets are not stated with sufficient particularity.

As noted above, because plaintiffs' only securities transactions at issue are the August 2004 Senior Note sales, and section 10(b) provides a cause of action only for losses caused by material misstatements or omissions in connection with the purchase or sale of a security (*GSC Partners*, 368 F.3d at 236), plaintiffs' allegations of alleged misrepresentations or omissions in C&A disclosures after August 2004 have no bearing on their section 10(b) claims. Thus, despite plaintiffs' blanket incorporation statement (Compl. ¶ 153), no allegations about post-August 2004 events (*e.g.*, *id.* ¶¶ 62-72) should be considered in evaluating the securities fraud claim.

Nevertheless, plaintiffs' allegations of post-August 2004 misleading disclosures about the

---

[11]    The allegation that many of C&A's original supplier contracts did not contain rebate provisions actually supports the need to obtain so-called side-letters to document rebate agreements that were negotiated in a business environment of continuous price adjustment.

GECC credit facility and C&A's goodwill and tax asset write-downs are plainly insufficient under Rule 9(b) and the PSLRA:

- As to the alleged pre-billing to the GECC accounts receivable facility, plaintiffs do not identify a single example of a receivable that was improperly included in the borrowing base, nor allege when that might have occurred, who was involved, how much money was involved, and why inclusion was improper.

- As to the alleged improper delay in writing-down goodwill and deferred tax assets, plaintiffs allege C&A should have taken these write-downs at some unspecified earlier time, pointing to general industry conditions C&A faced (and disclosed to investors), plus two isolated allegations regarding a restructuring initiative in the U.S. and Mexico plastics division, and a money-losing contract with DaimlerChrysler (*id.* ¶ 105). This is an impermissible exercise in pure hindsight. Plaintiffs have alleged no facts showing when and why C&A's particular financial condition and outlook at any earlier time required write-downs of goodwill or deferred tax assets. *See, e.g., Payne v. DeLuca*, 433 F. Supp. 2d 547, 579 (W.D. Pa. 2006) ("'[A] delinquent write-down of the impaired asset[ ], without anything more, does not state a claim of securities fraud, stating at best a bad business decision.'"); *In re Remec Inc. Secs. Litig.*, 388 F. Supp. 2d 1170, 1174-75 (S.D. Cal. 2005) (dismissing claim that goodwill write-down should have occurred earlier where plaintiffs failed to explain why).

## C.    Plaintiffs' Allegations Do Not Give Rise to a "Cogent and Compelling" Inference of Scienter.

The complaint also fails to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind," as required by the PSLRA. *See* 15

U.S.C. § 78u-4(b)(2).[12/]    The Supreme Court recently held the inference of scienter "must be more

than merely 'reasonable' or 'permissible' – it must be cogent and compelling, thus strong in light

of other explanations." *Tellabs*, 127 S. Ct. at 2510. "To determine whether the plaintiff has

alleged facts that give rise to the requisite 'strong inference' of scienter, a court must consider

plausible nonculpable explanations for the defendant's conduct, as well as inferences favoring the

plaintiff." *Id.* In this Circuit, the requisite "strong inference" of scienter may be established by

alleging either (a) facts that show a defendant had both motive and opportunity to commit fraud,

or (b) facts that constitute strong circumstantial evidence of conscious misbehavior or

recklessness. *GSC Partners*, 368 F.3d at 236.

### 1. No facts alleged show Mr. Stockman had any plausible motive to mislead investors.

Plaintiffs' allegations of Mr. Stockman's motive to commit fraud are plainly insufficient.

"Motive must be supported by facts stated 'with particularity.'" *GSC Partners*, 368 F.3d at 237.

Plaintiffs make conclusory allegations, minus the requisite supporting facts, that Mr. Stockman

wanted to ensure C&A could satisfy its debt covenants (Compl. ¶ 59), secure additional financing

from Credit Suisse First Boston ("CSFB") (*id.* ¶ 70), and continue collecting a portion of the fees

that C&A paid to Heartland (*id.* ¶ 33). Plaintiffs do not allege what the debt covenants were or

why or how C&A would have triggered them absent the alleged fraud, the terms of C&A's

borrowing arrangements with CSFB and how they were affected by the alleged fraud, or any basis

for alleging that Mr. Stockman received $22 million in fees from C&A. Moreover, even if all

these things were adequately pleaded, none of them provides a basis for inferring motive to engage

in fraud.

---

[12/]    The PSLRA's particularity requirement for the scienter component of claims under
section 10(b) supersedes Rule 9(b)'s provision that state of mind may be averred generally. *See*
*GSC Partners*, 368 F.3d at 236.

Plaintiffs' allegations that Mr. Stockman wanted to satisfy debt covenants and obtain

additional financing are insufficient because they are the type of common or universal corporate

desires courts repeatedly find inadequate to infer a motive to commit fraud. "[M]otives that are

generally possessed by most corporate directors and officers do not suffice" because they do not

show a "concrete and personal benefit to the individual defendant[]." *GSC Partners*, 368 F.3d at

237. *See also Klein v. Autek Corp.*, 147 Fed. App'x. 270, 279 (3d Cir. 2005) (allegation that

defendant wanted to "obtain capital from the securities investment to cover corporate expenses or

debt" is "a motive so generic that almost every corporate officer in [defendant's] position would

possess it" that it "must fail as a matter of law"); *In re Stonepath Group, Inc. Secs. Litig.*, 397 F.

Supp. 2d 575, 593 (E.D. Pa. 2005) ("At most, the need to comply with debt covenants can be a

contributing motive to commit securities fraud, but standing alone even severe cash flow problems

are insufficient to establish motive. . . . Otherwise, any corporation that was subject to debt

covenants and whose stock price declined would be susceptible to a securities fraud action."); *In re*

*Cross Media Mktg. Corp. Secs. Litig.*, 314 F. Supp. 2d. 256, 265 (S.D.N.Y. 2004) ("alleged desires

. . . to maintain compliance with the financial covenants of a company loan agreement . . . are . . .

inadequate to support an allegation of intent to commit fraud"). On plaintiffs' theory, every

accounting error by a leveraged company could be charged as fraud. *See San Leandro Emergency*

*Med. Group Profit Sharing Plan v. Philip Morris Cos.*, 75 F.3d 801, 814 (2d Cir. 1996) ("'[I]f

scienter could be pleaded on that basis alone, virtually every company in the United States that

experiences a downturn in stock price could be forced to defend securities fraud actions.'").

Mr. Stockman's personal compensation surely provided no grounds to engage in fraud:

despite his arduous efforts, he received no salary, stock options or other form of direct

compensation from C&A, and he never sold C&A stock (*see* App. 15-16 (2003 Form 10-K)).

Plaintiffs' sole basis for claiming that Mr. Stockman was motivated by personal gain is the

22

assertion that Mr. Stockman wanted to continue receiving a portion of the fees paid by C&A to Heartland for financial services. (*See* Compl. ¶ 33.) The allegations that Mr. Stockman received a large portion of amounts paid by C&A to Heartland, which were copied from other complaints, are simply wrong.[13/] But even if they were correct, they would not give rise to a strong inference of Mr. Stockman's scienter. *See GSC Partners*, 368 F.3d at 237 (allegations that "the corporation and its officers have a desire to complete the transaction, and officers will . . . reap financial benefits from a successful transaction," are insufficient because such allegations would apply to nearly every corporate transaction); *Klein*, 147 Fed. App'x. at 277 ("[I]t is well-established that an allegation of motive based solely upon a desire to receive professional fees is insufficient.") Moreover, plaintiffs' sole theory for establishing motive makes no sense because Heartland's fees were not dependent on C&A's financial performance.[14/]

Mr. Stockman's investment decisions totally debunk any theory that he was motivated to overstate C&A's financial performance. Personally and through Heartland, he was a consistent and large *purchaser* of C&A stock, and he never sold a share. He paid $1.5 million for 331,000 shares of C&A stock between May and December 2004, and approved Heartland's purchase of millions of additional shares from 2002 to 2004. In the final days of December 2004, Mr.

---

[13/]    The $44 million figure is wrong because it reflects amounts billed, not paid. Of the lesser amounts actually paid, the portion allegedly received by Mr. Stockman is also grossly incorrect. Half of the fees were allocated to benefit the limited partners of the entity that owned the C&A stock. The remaining half was first used to defray Heartland's substantial costs of providing financial services to C&A, with the remainder distributed among Heartland's partners in proportion to their stake in the firm. In that capacity, Mr. Stockman received considerably less than $22 million.

[14/]    Heartland earned more than half of its fees from investment banking services for two 2001 transactions not alleged to be part of any securities fraud – Heartland's initial investment in C&A and C&A's Tac-Trim acquisition. (*See* App. 28 (2001 Form 10-K/A) ($12 million and $12.5 million fees, respectively).) The bulk of the remainder came from the fixed annual $4 million fee, and $6 million of investment banking fees charged in 2004 ($5 million of which was recorded and disclosed but never paid). (*See* App. 79 (C&A Form S-4 (Jan. 27, 2005)).)

Stockman and Heartland were still pouring funds into purchases of C&A stock.[15] It is nonsensical to contend that Mr. Stockman invested millions in C&A stock while knowing C&A was inflating its financial performance. These facts alone negate any inference of motive. *See In re Alpharma, Inc. Secs. Litig.*, 372 F.3d 137, 152 (3d Cir. 2004) (no strong inference of scienter where company's controlling shareholder did not engage in any stock sales during the class period); *Globis Capital Partners, L.P. v. Stonepath Group, Inc.*, No. 06-2560, 2007 WL 1977236, at *4 (3d Cir. July 10, 2007) (where defendants acquired substantial amounts of stock throughout the period in which they were allegedly acting recklessly, "'we have no basis to infer the sort of conscious disregard and deliberate ignorance required to plead scienter'"). *Accord San Leandro*, 75 F.3d at 814 (scienter cannot be inferred where defendant was a net buyer of stock during the relevant period); *In re Bristol-Myers Squibb Secs. Litig.*, 312 F. Supp. 2d 549, 561 (S.D.N.Y. 2004) (increases to stock holdings are "wholly inconsistent with fraudulent intent").

### 2. No facts or circumstances alleged give rise to a strong inference of Mr. Stockman's scienter.

Having failed to show that Mr. Stockman had any motive to engage in alleged fraud, plaintiffs must allege facts constituting strong circumstantial evidence of his conscious misbehavior or recklessness. *GSC Partners*, 368 F.3d at 236. Recklessness involves "not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *Alpharma*, 372 F.3d at 149. "Recklessness is not intended to encompass 'claims essentially grounded on corporate mismanagement.'" *In re Digital Island Secs. Litig.*, 357 F.3d 322, 332 (3d Cir. 2004).

---

[15]    *See* note 2, above.

Assuming the truth of all well-pleaded facts (but not conclusions masquerading as facts),[16] plaintiffs' allegations do not support a "cogent and compelling" inference that their section 10(b) losses were the result of intentional or reckless misconduct. Plaintiffs' vague charges, many of which concern events that occurred after the August 2004 Notes offering, cannot support a claim of fraud in connection with that offering. Missing from the complaint are *facts* creating a strong inference that Mr. Stockman *knowingly or recklessly*: (i) inflated the prices of acquisitions from Mr. McCallum in exchange for rebates from another McCallum entity; (ii) booked rebate transactions incorrectly, or directed anyone to do so; (iii) inflated any receivables in January 2005, or ordered anyone to do so; (iv) overstated goodwill and deferred tax assets; (v) or made inaccurate statements in March and April 2005.

> **a)**  **No alleged facts support an inference that Mr. Stockman knowingly or recklessly caused C&A to book false rebates from Joan Fabrics by means of "round-trip" transactions.**

Plaintiffs' allegations regarding C&A's transactions with Joan Fabrics, unparticularized as they are, fail to give rise to a strong inference of Mr. Stockman's scienter. Plaintiffs conclusorily allege Mr. Stockman "personally negotiated" subsequent "round trip" payments with Mr. McCallum (Compl. ¶ 50), but do not allege one shred of evidence to support an inference that Mr. Stockman knowingly overpaid for acquisitions from Joan Fabrics, or that he did so as a means of repaying the rebates. *GSC Partners*, 368 F.3d at 240 (plaintiffs failed to plead scienter with the requisite particularity where they failed to "provide any source to connect [their] accusation to record evidence"); *In re Bio-Technology Gen. Corp. Secs. Litig.*, 380 F. Supp. 2d 574, 596 (D.N.J.

---

[16]    *See, e.g.*, *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1965 (2007) ("labels and conclusions" are insufficient to state a claim); *In re Rockefeller Ctr. Props., Inc. Secs. Litig.*, 311 F.3d 198, 216 (3d Cir. 2002) ("[C]ourts are not required to credit bald assertions or legal conclusions improperly alleged in the complaint . . . . Similarly, legal conclusions draped in the guise of factual allegations may not benefit from the presumption of truthfulness.").

Aug. 10, 2005) (plaintiff fails to create a strong inference of scienter where plaintiff "neglects the critical step of connecting" the defendants to the alleged source of information contrary to public disclosures.) This inadequacy is even more pronounced here, because C&A's Audit Committee undertook an extensive investigation of these transactions in 2003-2004 and, after scrutinizing each transaction plaintiffs now question, concluded the rebates "had a legitimate business purpose" and "were negotiated fairly." (*See* App. 86-87 (March 12, 2004 Press Release).) Plaintiffs do not allege any reason for their summary rejection of the Audit Committee's findings.

Plaintiffs' vague allegations of fraudulent "round-trip" transactions because C&A supposedly overpaid for certain acquisitions (without explaining how Mr. Stockman supposedly knew or intended that result) does not create the required inference of scienter. The Fourth Circuit recently rejected allegations of round-tripping fraud based on the contention that one party or another paid more than the transaction was worth. *See Teachers' Ret. Sys. v. Hunter*, 477 F.3d 162 (4th Cir. 2007). After noting that a "fair" acquisition price depends on a wide variety of factors, including market value, dividends, earning prospects, the nature of the enterprise, and future business prospects, the court held that a fraud claim cannot proceed absent reliable grounds for challenging the good faith of the transaction price. *Id.* at 181. The plaintiff in *Hunter* arbitrarily equated "worth" with "book value," much like plaintiffs here assume that some value estimate of unspecified origin is dispositive. But the *Hunter* court found this allegation "does not suggest an excessive price, much less a fraudulent price." *Id.*

Moreover, "the basis for alleging 'round-tripping' does not exist when either of the transactions have economic substance," and "[t]he mere existence of reciprocal dealing does not suggest 'round-tripping.'" *Id.* at 178. Plaintiff "must allege facts sufficient to support a reasonable belief that both legs of the round-tripping were a sham" for the fraud claim to survive. *Id.* at 179; *see Bristol-Myers Squibb*, 312 F. Supp. 2d at 566 (finding bona fide transactions where

670393-1

"real products [were] shipped to real customers who then paid with real money"). Absent specific

facts showing Mr. Stockman knowingly or recklessly paid excessive amounts in sham transactions

in exchange for the Joan Fabrics rebates – which are totally lacking here – the allegations of a

"round-tripping" scheme fail to give rise to a strong inference of scienter under the PSLRA.

> **b)    No alleged facts support an inference that Mr. Stockman knowingly or recklessly caused C&A to book rebates improperly.**

The allegations regarding C&A's supplier rebate transactions also fail to give rise to a

strong inference of scienter. Plaintiffs generally attribute the "rebate scheme" to unspecified

"[d]efendants," in contravention of Rule 9(b) and the PSLRA. (*See* Compl. ¶ 53.) They also

make conclusory allegations that C&A's rebate accounting practices violated various GAAP

provisions, but do not allege what those provisions require, how C&A's accounting for specific

rebate transactions allegedly violated those provisions, and which defendants, if any, were aware

of such alleged violations. (*See id.* ¶ 100.) Mere allegations of GAAP violations are insufficient

to plead scienter. *See, e.g., In re Astea Int'l Inc. Secs. Litig.*, Civ. Act. No. 06-1467, 2007 WL

2306586, at *18 (E.D. Pa. Aug. 9, 2007), *citing Novak v. Kasaks*, 216 F.3d 300, 309 (2d Cir.

2000). In *Alpharma*, the Third Circuit held that plaintiffs failed to plead scienter where they

failed to indicate how defendants were involved in the alleged GAAP violations. 372 F.3d at

150. Here, plaintiffs fail to allege a single fact to support an inference that Mr. Stockman (i) was

involved in or knew about any rebate transactions, (ii) understood or recklessly failed to

understand the principles governing rebate accounting, or (iii) knew, or as CEO recklessly failed

to learn, enough about the facts and circumstances of any rebate transaction to determine

whether C&A's accounting was proper.

The alleged improper accounting practices started in early 2002 (*see* Compl. ¶ 55), long

before Mr. Stockman became CEO. No allegations tie Mr. Stockman to any of the 22 rebate

transactions identified in the complaint. (*See id.* ¶¶ 56-57.) Plaintiffs do not identify a single document or other source showing Mr. Stockman knew any rebate arrangement was incorrectly booked or inaccurately described. Absent such allegations, plaintiff necessarily falls back on charges that Mr. Stockman was one of the unnamed "Defendants" who must have known about rebate accounting errors by virtue of his position and access to unspecified company documents. (*See id.* ¶ 27.) These grounds for alleging fraud routinely fail. *See, e.g., Advanta*, 180 F.3d at 539 ("It is well established that a pleading of scienter 'may not rest on a bare inference that a defendant "must have had" knowledge of the facts.'").

Even if Mr. Stockman had known the terms of deals between C&A and its suppliers, there are no grounds alleged to conclude he knew, or recklessly ignored, that the accounting judgments for those transactions by C&A's accounting professionals were wrong. During the period at issue, the proper accounting for rebates was an "emerging issue" in accounting for which the FASB asked for EITF guidance, including on the precise issue faced by C&A's accountants: "Under what circumstances up-front nonrefundable cash consideration given by a vendor to a customer should be recognized immediately in the customer's income statement rather than as a liability." (App. 192 (FASB EITF Abstracts, Issue No. 02-16).) While resolving other rebate accounting issues with an emphasis on the importance of the facts of each case, the EITF could not reach consensus on this issue "due to the broad, general nature of related questions." (*Id.* at 195.)

C&A, however, did not have the luxury of avoiding the issue; it had to book specific rebate agreements. Plaintiffs' theory of accounting errors replaces the complexities of real life agreements with simplistic assumptions, and avoids the wide range of facts and circumstances that C&A actually faced. For example, plaintiffs allege that "[u]nder GAAP, rebates should be recorded as reductions in cost. Rebates can only be recognized when the promised purchases have been made." (Compl. ¶ 54.) Plaintiffs assume away circumstances where the customer is entitled

28

to the rebate whether or not later purchases occur – a situation often encountered by C&A. Even

if a clear principle had controlled, the application of that principle to facts would be complex.

Under these circumstances, plaintiffs have failed to plead facts giving rise to a cogent and

compelling inference of Mr. Stockman's scienter. *See, e.g., Bristol-Myers Squibb*, 312 F. Supp.

2d at 564-67 (no scienter pled based on accounting errors involving complex judgments); *Payne*,

433 F. Supp. 2d at 580 ("[P]laintiff cannot satisfy the reckless behavior prong of showing scienter

where the disputed 'items involve complex issues of accounting as to which reasonable

accountants could reach different conclusions.'").

> **c)    No facts alleged regarding the accounts receivable facility
> support any inference of Mr. Stockman's scienter in
> connection with the August 2004 Senior Notes sale.**

As noted above, plaintiffs' allegations about the GECC accounts receivable facility and

various disclosures in *2005* are plainly irrelevant to a securities fraud claim founded on the sale of

Senior Notes in August *2004*. Events that occurred after the sale could not possibly give rise to a

cogent or compelling inference of Mr. Stockman's scienter at or before the time of the sale.

In any event, with regard to the GECC facility, plaintiffs make only conclusory allegations

that Mr. Stockman and "others acting at his direction" "included tens of millions of dollars of

receivables in the borrowing base that were not eligible for inclusion." (Compl. ¶ 64.) Plaintiffs

do not allege with particularity any facts that give rise to a strong inference of knowing or reckless

misleading disclosures about C&A's short-term borrowing capacity. No allegations describe the

terms of the GECC agreement, the terms of the receivables, how Mr. Stockman knew about those

terms, how Mr. Stockman allegedly knew that certain receivables were not eligible, what Mr.

Stockman did to "include" such receivables, who allegedly acted at Mr. Stockman's "direction,"

and what Mr. Stockman allegedly said to them.[17/]

    **d)**    **No facts alleged support a claim that Mr. Stockman knew, or was reckless in not knowing, that C&A should have reduced its goodwill and deferred tax assets before March 2005.**

  Plaintiffs' allegations that C&A should have reduced its goodwill and deferred tax assets at some unspecified time before March 2005 also fail to give rise to a strong inference of Mr. Stockman's scienter, for the simple reason that the complaint never alleges Mr. Stockman, who was not an accountant, understood the required factual predicates for such write-downs under GAAP, or knew that C&A allegedly had met those predicates before March 2005. (*See* Compl. ¶¶ 103-110.)[18/]

    **e)**    **Disclosures about management's rebate review and C&A's financial situation in March and April 2005 do not support any inference of Mr. Stockman's scienter in connection with the August 2004 Senior Notes sale.**

  Plaintiffs further allege that press releases and other public statements in March and April 2005 contained false statements about (i) management's rebate review, and (ii) C&A's liquidity and projected EBITDA and capital expenditures. (Compl. ¶¶ 65-67, 69, 71.) Even if these allegations were relevant to Mr. Stockman's state of mind in *August 2004*, which they logically cannot be, they would not give rise to a strong inference of his scienter.

---

[17/]    It is particularly difficult to conjure up any securities fraud from plaintiffs' allegations, as public bankruptcy filings make it clear the GECC debt was fully paid by collecting the pledged receivables as they came due. *See* note 6, above.

[18/]    For similar reasons, even if they were sufficiently particularized under Rule 9(b) and the PSLRA – which they are not – plaintiffs' allegations that (i) C&A's accountants issued false and misleading audit reports (Compl. ¶¶ 83-86), (ii) C&A has admitted violating its internal accounting policies and procedures (*id.* ¶ 89), (iii) C&A's financial statements failed to make required disclosures about related party-transactions with Mr. Becker and Mr. McCallum (*id.* ¶ 113), (iv) C&A's financial statements failed to disclose concerns about C&A's ability to continue as a going concern (*id.* ¶¶ 115-119, 146-148), and (v) PriceWaterhouseCoopers identified certain reportable conditions relating to C&A's internal controls in the summer of 2003 (*id.* ¶ 137) do not give rise to a strong inference of Mr. Stockman's scienter.

670393-1

###### (i)  Disclosures in the March 17 press release about the rebate review are inconsistent with scienter.

In a March 17, 2005 press release, C&A disclosed it had booked some rebates in incorrect quarters and that it expected to restate its earnings for the first three quarters of 2004, and possibly 2003. (*See* App. 99 (March 17 Press Release); *see also* Compl. ¶ 65.) Plaintiffs allege the press release contained misleading statements about the scope of rebate accounting problems because, "[a]s Defendants knew, the rebate accounting issue spanned a period as far back to late 2001 and covered substantially all of the rebates that the Company had recognized during that time." (Compl. ¶ 66.) Plaintiffs allege no factual basis for their assertions about defendants' knowledge or the extent of problematic rebates. In particular, plaintiffs do not identify a single transaction they contend Mr. Stockman knew had to be restated that was excluded from the preliminary figures in the March 17 press release.

Moreover, plaintiffs' allegations are plainly inconsistent with the actual communications. As plaintiffs themselves note, C&A made clear it "was continuing to evaluate whether a restatement of [periods prior to 2004] was necessary." (*Id.* ¶ 65; *see also* App. 99 (March 17 Press Release) ("These preliminary results remain subject to material change and have not been reviewed by our outside auditors.").)

###### (ii)  Mr. Stockman's statements about liquidity, EBITDA, and capital expenditures are inconsistent with any inference of scienter.

Plaintiffs also allege the March 17 and April 4 disclosures misrepresented C&A's liquidity, financial situation, and business outlook. But those communications themselves show there was no intent to mislead. Far from seeking to hide C&A's business challenges, Mr. Stockman discussed with unusual candor the serious difficulties and uncertainties facing C&A. (*See, e.g.,* App. 112, 119-20 (Investor Call Tr.) ("the industry today is facing extremely

31

challenging conditions, probably an environment that hasn't existed in the last thirty or forty years"; both C&A and the industry are "in a maelstrom"; for C&A "in the current environment, cash management [and] liquidity is a challenge"; and because of these near-"turbulent" conditions, the EBITDA projection was "subject to major uncertainties").)

Plaintiffs ignore the meaning and intent of the disclosures as a whole, and instead contest isolated comments that: (i) C&A had $86 million in liquidity as of December 31, 2004, and $81 million in liquidity as of March 31, 2005 (Compl. ¶¶ 65-66, 71); (ii) C&A would have $65-75 million of EBITDA for the first quarter of 2005 (*id* ¶ 67); and (iii) C&A's capital expenditures ("CapEx") for the first quarter of 2005 would be $30 million (*id*). Plaintiffs further allege Mr. Stockman misleadingly "denied that the Company was experiencing liquidity issues." (*Id.*)

First, plaintiffs allege the $86 and $81 million figures were inaccurate because C&A had only $12 and $9 million of liquidity on the respective dates. (*Id* ¶ 71.) But plaintiffs allege no factual basis for their $12 million and $9 million figures. Plaintiffs vaguely allege that C&A had only $12 million of liquidity on December 31, 2004 "due to restrictions on its borrowings," but allege no facts about those restrictions. Most importantly, plaintiffs allege no facts showing Mr. Stockman played any role in calculating the liquidity figures, or had any reason to question their validity. *See Rombach v. Chang*, 355 F.3d 164, 176 (2d Cir. 2004) (plaintiffs who "d[id] not allege facts and circumstances that would support an inference that defendants knew of specific facts that are contrary to their public statements" failed to plead scienter).

Second, plaintiffs allege Mr. Stockman gave a $65-75 million first quarter projected EBITDA range "even though at that time internal information indicated that the figure would be half that amount." (Compl. ¶ 67.) But plaintiffs do not allege what form that "internal information took," what it was based on, and, most importantly, that Mr. Stockman ever saw it. Plaintiffs also disregard Mr. Stockman's extensive caveats qualifying the projection, including

32

that "EBITDA is still subject to major uncertainties, particularly with respect to the magnitude and timing of our success with customer recovery initiatives." (App. 119 (Investor Call Tr.).)

Third, with regard to Mr. Stockman's statements about C&A's projected CapEx, plaintiffs attempt to elevate what was at most an inconsequential turn-of-phrase into fraud. (*See* Compl. ¶ 67.) Plaintiffs try to convert repeated annual projections in the $120 to $130 million range, "or about $30 million a quarter,"[19] into a firm projection that CapEx would not exceed $30 million in the first quarter. Securities fraud is not a "gotcha" game applicable to every shorthand reference a company or executive might make in the course of more extensive communications. Absent some challenge to the *substance* of Mr. Stockman's annual projection, and not the *style* in which it was expressed, the allegations of fraud relating to the 2005 CapEx projection should be dismissed.

Finally, plaintiffs' allegation that Mr. Stockman "denied that the Company was experiencing liquidity issues when he knew that the Company was then experiencing a severe liquidity crisis" are belied by Mr. Stockman's statements on the March 17 call. In fact, Mr. Stockman stated candidly: "Well, in the current environment, cash management [and] liquidity is a challenge. I would be remiss if I didn't state that very clearly." (App. 120 (Investor Call Tr.).) Mr. Stockman also explained in detail how reduced revenues and receivables and heavy interest obligations had contributed to this liquidity "challenge." (*See id.* ("[w]e did have a build up, we'll say very directly here of some backlog of our payables") and *id.* at 123 ("the environment . . . gave rise to some back up in our trade payables").)

---

[19]    *See* App. 110 (C&A SEC Form 8-K Ex. 99.3, Presentation Materials (Mar. 17, 2005)) ("2005 capex will be capped at $120 to $130 million – well below 2004 levels"); App. 115 (Investor Call Tr.) (projecting that C&A would be "undertaking and implementing a strict cap this year on CapEx of $120 million or about $30 million a quarter"); *id.* at 119 ("CapEx, as I mentioned a moment ago will be strictly limited, 120, 130 kind of range. Hopefully at the lower end of that and it's well below last year's level, which you know was more than $160 million.").

**D.     The Allegations Do Not Satisfy the Required Element of Materiality.**

Plaintiffs' allegations also fail to provide a basis for inferring that any alleged

misstatements were material.[20/]  A misrepresentation or omission is material only if there is "a

substantial likelihood that the disclosure would have been viewed by the reasonable investor as

having 'significantly altered the "total mix" of information available to that investor.'" *In re*

*Westinghouse Secs. Litig.*, 90 F.3d 696, 714 (3d Cir. 1996).  "Although questions of materiality

have traditionally been viewed as particularly appropriate for the trier of fact, complaints alleging

securities fraud often contain claims of omissions or misstatements that are obviously so

unimportant that courts can rule them immaterial as a matter of law at the pleading stage."

*Burlington Coat Factory*, 114 F.3d at 1426.

As to C&A's financial disclosures, plaintiffs never attempt to allege the net impact in any

period of the alleged accounting errors.  The rebate allegations charge that C&A reported agreed-

upon cost reductions from suppliers in the wrong period, *not* that they were fictitious.  But

plaintiffs never attempt to allege the net impact of these changes in any reporting period, which is

critical since moving these entries between periods could easily offset each other in significant

part.  In other words, plaintiffs do not state what the financial statements *should* have disclosed

absent the alleged misstatements.  The critical element of materiality cannot be inferred absent

---

[20/]     In addition to plaintiffs' section 10(b) claim, plaintiffs' section 14(a) claim requires that
"a proxy statement contain[] a *material* misrepresentation or omission."  *See Cal. Pub.*
*Employees' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 144 (3d Cir. 2004) (emphasis added).  In the
proxy solicitation context, "[a]n omitted fact is material if there is a substantial likelihood that a
reasonable shareholder would consider it important in deciding how to vote."  *TSC Indus., Inc. v.*
*Northway, Inc.*, 426 U.S. 438, 449 (1976).  As this materiality standard is equivalent to the
standard imposed for claims under section 10(b) (*see Basic Inc. v. Levinson*, 485 U.S. 224, 232
n. 8 (1988)), and, as plaintiffs rely on the same series of allegations to support their section 10(b)
and 14(a) claims, the claims suffer, and ultimately die, together.

34

such allegations.[21] *See In re Astropower, Inc. Secs. Litig.*, No. Civ. A. 03-260-JJF, 2006 WL 288120, at *4 (D. Del. Feb. 7, 2006) ("Without some properly supported allegation of the amount by which Defendants overstated [the company's] revenue, the Court cannot conclude that Plaintiffs have alleged, with the particularity required by the PSLRA, that Defendants' alleged misrepresentations or omissions of fact were material.").

Moreover, the alleged rebate accounting errors are immaterial as a matter of law. Supplier rebates are accounted for as reductions in costs of goods sold. (*See* Compl. ¶ 54.) The rebates from Joan Fabrics allegedly totaled $15 million over six quarters, from Q4 2001 and Q1 2003. (*See id.* ¶ 50.) In this period, C&A's costs of good sold totaled $4.734 *billion*.[22] The impact of the Joan rebates on that figure (0.3%) is plainly immaterial. *See In re Duke Energy Corp. Secs. Litig.*, 282 F. Supp. 2d 158, 161 (S.D.N.Y. 2003), *aff'd*, 113 Fed. App'x 427 (2d Cir. Nov. 15, 2004) (materiality is measured by relative impact on appropriate line item of financial statements, and alleged $217 million inflation of revenues is immaterial when it represents 0.3% of revenues for the period). *Accord Burlington Coat Factory*, 114 F.3d at 1427 (the failure to disclose reduced cost discounts was immaterial as a matter of law where total costs only increased 0.2% in the relevant time period). Likewise, the alleged improperly booked rebates from other suppliers totaled $28.6 million over twelve quarters, from Q4 2001 through Q3 2004. (*See* Compl. ¶ 101 (alleging $43.6 million total vendor rebates, including the $15 million in Joan rebates).) C&A's

---

[21] Plaintiffs set forth a chart ostensibly identifying the impact of vendor rebates from Q4 2001 to Q3 2004 (Compl. ¶ 101), but provide no factual support for the figures alleged in the chart. The chart does not purport to set forth the net impact of all alleged misstatements in any period, which is necessary to determine materiality. This is critical since the alleged misreporting of supplier rebates affects the timing of expense reductions, not their existence.

[22] *See* App. 23 (C&A 2002 Form 10-K ("2002 Form 10-K")) ($440 million for Q4 2001); App. 17-18 (2003 Form 10-K) ($3.368 billion for FY 2002 and $926 million for Q1 2003).

costs of goods sold during that period was more than $10 *billion*,[23/] making the alleged rebate errors less than 0.3% of the total, even without considering the impact of netting out the alleged errors against one another.

## II.    THE COMPLAINT FAILS TO STATE A SECTION 14(a) CLAIM.

To state a section 14(a) claim, plaintiffs "must aver that (1) a proxy statement contained a material misrepresentation or omission which (2) caused [them] injury and (3) that the proxy solicitation itself ...was an essential link in the accomplishment of the transaction." *Cal. Pub. Employees' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 144 (3d Cir. 2004) ("*CALPERS*"). Plaintiffs' section 14(a) claims fail because plaintiffs do not allege with required particularity a material misstatement or omission in any proxy statement.[24/] Additionally, plaintiffs cannot show that any injury was caused by the proxy statements because (1) the proxy solicitations were not an "essential link" in accomplishing the corporate action requiring shareholder approval; and (2) any monetary loss was not the direct result of the corporate action.

Plaintiffs allege that in 2002-2004, defendants caused C&A to disseminate proxy statements that reported financial results artificially inflated by "a variety of improper accounting practices" and failed to disclose that C&A was experiencing "severe liquidity constraints." (Compl. ¶¶ 77, 160.) Plaintiffs claim these proxies were an "essential link" in the continuation of the defendants' alleged misconduct because "revelations of the truth" would have caused

---

[23/]    *See* App. 23 (2002 Form 10-K) ($440 million for Q4 2001); App. 17 (2003 Form 10-K) ($3.368 billion for FY 2002 and $3.540 billion for FY 2003); App. 33 (C&A Q3 2004 Form 10-Q) ($2.688 billion for Q1-Q3 2004).

[24/]    Plaintiffs' section 14(a) claims are grounded in the same allegations of fraud as the section 10(b) claims and therefore must also meet the particularity requirements of Rule 9(b). *See CALPERS,* 394 F.3d at 144, 145 n.9. Moreover, any claims arising out of the 2002 Proxy Statement, filed April 25, 2002, are time-barred. *See In re Exxon Mobil Corp. Secs. Litig.*, No. 05-4571, ---F.3d ---, 2007 WL 2410129, at *6 (3d Cir. Aug. 27, 2007) (section 14(a) claims subject to one-year statute of limitations and three-year statute of repose).

670393-1

shareholders to withdraw their support from the company's officers and directors. (*Id.* ¶ 162.)

Section 14(a) was designed to regulate the solicitation of proxies, and the Supreme Court recognizes a private right of action under 14(a) for the protection of shareholders who show their votes were necessary to authorize a corporate action, thereby making the proxy solicitation an "essential link" in accomplishing the transaction. *See Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1087, 1099-1100 (1991). The Court does not, however, extend this cause of action to minority shareholders whose votes were *not* required to authorize the proposed action because those shareholders cannot demonstrate that any allegedly misleading disclosures impacted shareholder rights. *See id.* at 1103.

Here, the corporate action at issue is the re-election of directors and approval of executive compensation policies. (*See* Compl. ¶ 162.) Plaintiffs have not identified a single shareholder who would have withheld a proxy based on different proxy disclosures. More importantly, because more than 50% of the shareholder vote was controlled by defendants Heartland, Becker, and McCallum, and the proxy statements clearly indicated these shareholders would vote for the directors proposed in the statements, plaintiffs cannot show that any inaccuracies in the proxy statements materially impacted the result of the shareholder vote.[25/] Additionally, Heartland, Mr. Becker and Mr. McCallum each held their shares of C&A stock subject to the terms of a stockholders agreement (the "Becker/Joan Stockholders Agreement") which provided, among other things, that each party must vote their stock to ensure that the other parties would retain their positions on C&A's Board.[26/] In other words, the election of C&A's directors was a foregone conclusion based on the voting power and contractual obligations of the majority shareholders –

---

[25/]     *See* App. 51, 53 (2003 Proxy Statement); and App. 62 (2004 Proxy Statement).

[26/]     *See* App. 55 (2003 Proxy Statement); App. 63 (2004 Proxy Statement).

Mr. Becker, Mr. McCallum, and Heartland's designees[27/] would have been elected to C&A's Board regardless of voting decisions by the remaining shareholders. Under *Virginia Bankshares*, no private action for alleged misleading proxy disclosures is cognizable under those circumstances.

Plaintiffs also fail to demonstrate the necessary causal connection between any monetary losses suffered by C&A and the re-election of directors solicited by the allegedly misleading proxy statements. In *General Elec. Co v. Cathcart*, 980 F.2d 927 (3d Cir. 1992), the Third Circuit rejected an attempt to prove causation under similar circumstances, stating that "the mere fact that omissions in proxy materials, by permitting directors to win re-election, *indirectly* led to financial loss through mismanagement will not create a sufficient nexus with the alleged monetary loss. Rather, damages are recoverable under Section 14(a) only when the votes for a specific corporate transaction requiring shareholder authorization, such as a corporate merger, are obtained by a false proxy statement, and that transaction was the direct cause of the pecuniary injury for which recovery is sought." *Id* at 933 (emphasis in original). *See also Cowin v. Bresler*, 741 F.2d 410, 428 (D.C. Cir. 1984) (causation element is not satisfied because any damage resulting from continued fraudulent acts by elected directors was not the direct result of misleading proxy statement). Plaintiffs do not, and cannot, tie their alleged loss directly to any corporate action that was subject to or authorized by a misleading proxy statement.

Having failed to show the allegedly misleading proxy statements were an "essential link" in the re-election of C&A's directors, or that the alleged monetary loss was caused by any shareholder vote taken pursuant to the proxies, plaintiffs' section 14(a) claim should be dismissed.

---

[27/]    Pursuant to the terms of the "Initial Stockholders Agreement" between Heartland and C&A, Heartland can designate at least seven members of C&A's board. *See* App. 54 (2003 Proxy Statement); App. 64 (2004 Proxy Statement).

### III.    PLAINTIFFS' CLAIMS ARE BARRED BY THE DOCTRINE OF *IN PARI DELICTO*.

Additionally, the complaint should be dismissed under the doctrine of *in pari delicto*, which provides that "a plaintiff may not assert a claim against a defendant if the plaintiff bears fault for the claim." *Official Comm. of Unsecured Creditors v. R. F. Lafferty & Co*, 267 F.3d 340, 354-55 (3d Cir. 2001). Where, as here, a corporate officer allegedly commits fraud either in the course of his employment or for the benefit of the company, the alleged wrongdoing will be imputed to the company. *Id.* at 359. Under one limited exception, which does not apply in this case, an officer's conduct will not be imputed to the company if the officer's interests were adverse to and "not for the benefit of" the company. *See id.* But as long as there is "any benefit" to the company from the officer's acts, his conduct is imputed to the company. *See Official Comm. of Unsecured Creditors of Allegheny Health, Ed. & Research Found. v. Pricewaterhouse Coopers, LLP*, No. 2:00cv684, 2007 WL 141059, at *10 (W.D. Pa. Jan. 17, 2007) ("[T]he question is a relatively simple one – whether any benefit accrued to [the debtors].").

There can be no doubt that C&A's August 2004 sale of Senior Notes was made for the benefit of C&A, which received the entire proceeds of the sale. Even assuming Mr. Stockman received some economic benefit as a result of generating increased funds for C&A, there is no question his actions were taken in the course of his employment, and they provided some "benefit" to C&A. *See, e.g., Baena v. KPMG LLP,* 453 F.3d 1, 7-8 (1st Cir. 2006) (company is subject to civil and criminal liability for fraud by company officers overstating earnings to facilitate stock sales even if they might have benefited personally); *Allegheny*, 2007 WL 141059, at *9-13 (adverse interest exception does not apply even if defendants acted to preserve employment, compensation, or reputations). Consequently, the doctrine of *in pari delicto* applies to bar any claims by C&A or C&A Products for which plaintiffs themselves bear responsibility.

IV.    **THE COURT SHOULD DECLINE TO EXERCISE SUPPLEMENTAL JURISDICTION OVER PLAINTIFFS' STATE LAW CLAIMS.**

Where plaintiffs have failed to state a cause of action under the federal securities laws, and alleged no other basis for the Court's subject matter jurisdiction, the Court should decline to exercise supplemental jurisdiction over plaintiffs' state law claims. *See* 28 U.S.C. § 1367(c); *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 444 (3d Cir. 1997) (district court properly declined supplemental jurisdiction over remaining state law claims where "all federal claims were correctly dismissed and dismissal of the remaining contract claims would not be unfair to the litigants or result in waste of judicial resources").

### Conclusion

For all of the foregoing reasons, the claims against defendant David Stockman should be dismissed pursuant to Fed. R. Civ. P. 9(b) and 12(b)(6).

Dated: September 14, 2007

OF COUNSEL:

Andrew B. Weissman
Nicole Rabner
Michele L. Taylor
Jenny R. Chou
Wilmer Cutler Pickering Hale and Dorr, LLP
1875 Pennsylvania Avenue, NW
Washington, DC 20006
(202) 663-6000

Andrew Goldman
Wilmer Cutler Pickering Hale and Dorr, LLP
399 Park Avenue
New York, New York 10022
(212) 230-8800

THE BAYARD FIRM, P.A.

Peter B. Ladig (No. 3513)
Stephen B. Brauerman (No. 4952)
222 Delaware Avenue, Suite 900
P.O. Box 25130
Wilmington, DE  19899-5130
pladig@bayardfirm.com
sbrauerman@bayardfirm.com
(302) 655-5000

Counsel for Defendant David A. Stockman

670393-1

## CERTIFICATE OF SERVICE

I, Stephen B. Brauerman, Esquire hereby certify that on the 14th day of September, 2007, a true and correct copy of the foregoing **Brief in Support of Defendant David A. Stockman's Motion to Dismiss** has been served upon the following parties as indicated.

## VIA CM/EFC

Joseph A. Rosenthal, Esquire
Carmella P. Keener, Esquire
Rosenthal, Monhait & Goddess, P.A.
Mellon Bank Center, Suite 1401
919 Market Street
Wilmington, DE 19899-1070

Thomas P. Preston, Esquire
Blank Rome LLP
1201 North Market Street, Suite 800
Wilmington, DE 19801-4226

James L. Holzman, Esquire
J. Clayton Athey, Esquire
Prickett, Jones & Elliott, P.A.
1310 King Street
Wilmington, DE 19899

Andrew Auchincloss Lundgren, Esquire
Christian D. Wright, Esquire
Young, Conaway, Stargatt & Taylor
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE 19899-0391

Anne Churchill Foster, Esquire
Robert J. Stearn, Jr., Esquire
Richards, Layton & Finger
One Rodney Square
Wilmington, DE 19899

Michael J. Maimone, Esquire
Joseph Benedict Cicero, Esquire
Edwards Angell Palmer & Dodge LLP
919 North Market Street
Wilmington, DE 19801

Richard L. Horwitz, Esquire
Potter Anderson & Corroon, LLP
1313 N. Market St., Hercules Plaza,
6th Flr.
P.O. Box 951
Wilmington, DE 19899-0951

Vernon R. Proctor, Esquire
Proctor Heyman LLP
1116 West Street
Wilmington, DE 19801

Kenneth J. Nachbar, Esquire
Morris, Nichols, Arsht & Tunnell
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899

Robert Scott Saunders, Esquire
Skadden, Arps, Slate, Meagher & Flom
One Rodney Square
P.O. Box 636
Wilmington, DE 19899

Thomas G. Macauley, Esquire
Elizabeth Dianne Power, Esquire
Zuckerman Spaeder LLP
919 Market Street, Suite 1705
P.O. Box 1028
Wilmington, DE 19899

Michael J. Maimone, Esquire
Joseph Benedict Cicero, Esquire
Edwards Angell Palmer & Dodge LLP
919 North Market Street
Suite 1500
Wilmington, DE 19801

Stephen B. Brauerman (No. 4952)