**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

COLLINS & AIKMAN CORPORATION and COLLINS )
& AIKMAN PRODUCTS CO., as Debtors in Possession, )
                                                  )
Plaintiffs,                                       )
                                                  )
v.                                                )
                                                  )      C.A. No. 07-265-***
                                                  )
                                                  )
DAVID A. STOCKMAN, J. MICHAEL STEPP, BRYCE )
M. KOTH, DAVID R. COSGROVE, PAUL C.               )
BARNABA, ROBERT A. KRAUSE, JOHN A.                )
GALANTE, CHARLES E. BECKER, ELKIN B.              )
MCCALLUM, THOMAS E. EVANS, CYNTHIA HESS, )
DANIEL P. TREDWELL, W. GERALD MCCONNELL, )
SAMUEL VALENTI, III, HEARTLAND INDUSTRIAL )
PARTNERS, L.P., HEARTLAND INDUSTRIAL             )
ASSOCIATES, L.L.C., HEARTLAND INDUSTRIAL         )
GROUP, L.L.C., PRICEWATERHOUSECOOPERS LLP )
and KPMG LLP,                                     )
                                                  )
Defendants.                                       )

**OPENING BRIEF IN SUPPORT OF CERTAIN**
**DEFENDANTS' MOTION TO TRANSFER VENUE**

Thomas P. Preston (Del. I.D. 2548)
BLANK ROME LLP
1201 Market Street, Suite 800
Wilmington, DE 19801
Telephone: (302) 425-6478
E-mail: preston-t@blankrome.com

*Attorneys for Defendants Bryce M. Koth and*
*Robert A. Krause*

OF COUNSEL:

Michael Joseph
Joseph O. Click
BLANK ROME LLP
600 New Hampshire Avenue, NW
Washington, DC 20037
Telephone: (202) 772-5800
E-mail: click@blankrome.com

**COUNSEL FOR ALL MOVING**
**DEFENDANTS ARE LISTED IN THE**
**SIGNATURE BLOCK**

Dated: September 19, 2007

TABLE OF CONTENTS

INTRODUCTION ...................................................................................................................1

A. Nature and Stage of Proceedings ...................................................................................1

B. Summary of Argument....................................................................................................2

FACTUAL BACKGROUND....................................................................................................3

OTHER RELEVANT PROCEEDINGS....................................................................................8

ARGUMENT..........................................................................................................................10

UPON BALANCING THE RELATIVE CONVENIENCE TO THE PARTIES, AND IN
CONSIDERATION OF THE RELEVANT PRIVATE AND PUBLIC FACTORS, THE
INTERESTS OF JUSTICE, AND THE TOTALITY OF CIRCUMSTANCES, THIS CASE
SHOULD BE TRANSFERRED TO THE EASTERN DISTRICT OF MICHIGAN. .................10

    1.    The Plaintiffs' Choice of Forum and Defendants' Preference.............................12

    2.    The Convenience of the Parties. .......................................................................13

    3.    The Convenience of the Expected Non-party Witnesses.....................................15

    4.    The Location of Books and Records and Practical Considerations That Could
          Make the Trial Easy, Expeditious, or Inexpensive. ............................................17

    5.    Availability of Process to Compel Attendance of Witnesses. .............................18

    6.    Whether the Claim Arose Elsewhere and The Enforceability of a Judgment. .....18

    7.    The Relative Administrative Difficulty in the Two Fora Resulting From Court
          Congestion. ......................................................................................................19

    8.    The Local Interest in Deciding Local Controversies at Home. ..........................19

CONCLUSION.......................................................................................................................21

# TABLE OF AUTHORITIES

## FEDERAL CASES

*APV N. America, Inc. v. Sig Simonazzi N. America, Inc.*,
   295 F. Supp. 2d 393 (D. Del. 2002)...................................................................12

*Burstein v. Applied Extrusion Technologies, Inc.*,
   829 F. Supp. 106 (D. Del. 1992)..............................................................13, 17

*In re Collins & Aikman Corp. Sec. Litigation*,
   438 F. Supp. 2d 392 (S.D.N.Y. 2006).....................................................................8

*Kirschner Brothers Oil, Inc. v. Pannill*,
   697 F. Supp. 804 (D. Del. 1988)....................................................10, 12, 18, 19

*Mentor Graphics Corp. v. Quickturn Design System*,
   77 F. Supp. 2d 505 (D. Del. 1999)......................................................15, 16, 19, 20

*Van Dusen v. Barrack*,
   376 U.S. 612 (1964).............................................................................................15

## STATE CASES

*Media Group, Inc. v. Turtle Wax, Inc.*,
   1996 WL 756760 (D. Del. Dec. 23, 1996)...........................................................12

*Weisler v. Barrows*,
   2006 WL 3201882 (D. Del. 2006) .......................................................... passim

## DOCKETED CASES

*In re Collins & Aikman Corporation*,
   Case No. 05-55927 (SWR) .............................................................................2, 9

*Egleston v. Heartland Industrial Partners, L.P., et al.*,
   No. 2:06-cv-13555-AJT-SDP (E.D. Mich.)...................................2, 8, 9, 10, 14

*MainStay High Yield Bond Fund v. Heartland Industrial Partners L.P.*,
   No. 2:07-cv-10542-AJT-SDP (E.D. Mich.)...........................................2, 8, 9, 14

**FEDERAL STATUTES**

28 U.S.C. § 1404(a) ............................................................................. passim

Fed. R. Civ. P. 45(b)(2)..............................................................................18

Defendants J. Michael Stepp, Bryce M. Koth, David R. Cosgrove, Paul C. Barnaba, Robert A. Krause and John A. Galante submit this brief in support of their motion to transfer venue to the United States District Court for the Eastern District of Michigan pursuant to 28 U.S.C. § 1404(a).

## INTRODUCTION

### A.     <u>Nature and Stage of Proceedings</u>

In this action, plaintiffs Collins & Aikman Corporation and Collins & Aikman Products Co. (collectively C&A or the "Company") assert claims under Sections 10(b) and 14(a) of the Securities Exchange Act of 1934 and for breach of fiduciary duty under Delaware Corporate Law against a number of former officers and directors of the Company and its controlling stockholder, as well as claims for accounting malpractice against C&A's former auditors. The claims stem from losses associated with an alleged "liquidity crisis" that lasted from early 2001 until May 17, 2005. The alleged misconduct concerns the accuracy of disclosures made by the defendant officers and directors about C&A's business, operations, and financial results during this four-year period, which plaintiffs allege constitute knowing and intentional violations of the individual defendants' obligations as officers and directors of the Company and the absence of good faith on their parts in performing their duties to the Company, its stockholders and its creditors.

The only connection between this action and the State of Delaware is that C&A is incorporated under Delaware law. In contrast, the connections between this litigation and the Eastern District of Michigan are overwhelming. C&A maintains its corporate headquarters in Troy, Michigan, a Detroit suburb. C&A produced automobile interior components that it sold to automobile manufacturers such as General Motors, Ford Motor Company, and DaimlerChrysler.

Detroit, of course, is the capital of the U.S. automotive industry. On May 17, 2005, C&A, and thirty-six of its subsidiaries, filed for bankruptcy protection under Chapter 11 of the United States Bankruptcy Code in the Eastern District of Michigan. Those cases were consolidated and are pending as *In re Collins & Aikman Corporation*, Case No. 05-55927 (SWR) (Bankr. Ct., E.D. Mich.).

Also pending in the District Court for the Eastern District of Michigan are two class action lawsuits brought against the Heartland defendants and many of the individual defendants here, one on behalf of purchasers of C&A's publicly traded securities generally, the other on behalf of investors in C&A bonds purchased through one investment advisor/manager. *See Egleston v. Heartland Industrial Partners, L.P., et al.*, No. 2:06-cv-13555-AJT-SDP (E.D. Mich.); *MainStay High Yield Bond Fund v. Heartland Industrial Partners L.P.*, No. 2:07-cv-10542-AJT-SDP (E.D. Mich.).

### B.     Summary of Argument

C&A alleges in the Complaint (¶ 3) that this Court is an appropriate venue for this action because many of the acts and practices complained of occurred "in substantial part" in this district. This is incorrect. It is clear from the face of the Complaint that virtually all of operative events giving rise to plaintiff's claims took place in or around Troy, Michigan and none took place in Delaware.

For the following reasons and legal theories, this case should be transferred to the Eastern District of Michigan:

1.   Almost all of the key documents are located at C&A's corporate headquarters in Michigan.

2.   Almost all of the key witnesses are current or former C&A employees who during the Class Period resided, and likely still reside, in Michigan.

3.   Transferring the case to Michigan furthers judicial economy, prevents waste, and conserves the resources of the federal courts, the parties, and third parties because lawsuits with virtually identical allegations are currently pending in the Eastern District of Michigan, and C&A is in bankruptcy reorganization there. Transfer of the case will permit better coordination of discovery with these other matters.

4.   The central events at issue in the case occurred in Michigan. All of the alleged misrepresentations were prepared, reviewed and disseminated by C&A employees at C&A's Michigan headquarters.

5.   None of the operative events relating to this case took place in Delaware. The only connection between the matters raised in the Complaint and Delaware is that plaintiffs are incorporated under Delaware law.

6.   Many of the critical witnesses are subject to the subpoena power of the Eastern District of Michigan and not this District, and the defendants could suffer substantial prejudice if the case is not transferred and some or all of these witnesses do not volunteer to testify in this District.

Accordingly, the Court should transfer this case to the Eastern District of Michigan pursuant to 28 U.S.C. § 1404(a).

## FACTUAL BACKGROUND

C&A was engaged in the design, manufacture and supply of automotive interior components. *See* Compl. ¶ 36. C&A sold its products to the automobile manufacturers, including GM, Ford, and Chrysler. *Id.*

**C&A's Corporate Operations.** C&A's corporate headquarters is located in Troy, Michigan, known as the "Automotive Alley" area of Metro-Detroit. *See* C&A History, *available at* www.collinsaikman.com/profile/history.html. The Company's corporate management functions are based in one set of facilities in Troy ("C&A headquarters" or the "C&A campus").

3

*See Id.* Throughout the period relevant to the Complaint, apart from employees of the Soft Trim division located in North Carolina, members of C&A's corporate management team and corporate employees in the sales, engineering, design, finance, accounting, treasury, and purchasing departments were located at the C&A campus. See Declaration of Joseph O. Click ¶9(b), and Ex. H ¶2 thereto (hereinafter, "Click Decl."). The Company's independent auditor, KPMG, also maintained a presence at C&A's headquarters. *Id.* ¶ 9(d), Ex. H ¶4. In sum, at all times relevant to the complaint, C&A's corporate activities as they relate to the matters raised in the Complaint were conducted almost exclusively in Michigan. None were conducted in Delaware.

**Automotive Industry Background.** Plaintiffs' allegations find their origins in business trends that affected the entire automobile industry. Beginning as early as 2000, Detroit's automobile supply industry was starting to show signs of distress. In its 2000 Annual Report to Shareholders, C&A noted that domestic auto manufacturers drastically cut production for two consecutive months. *See* Click Decl. Ex. D (Excerpts from C&A 2000 Annual Report at 2). Industry conditions worsened after the events of September 11, 2001. In the ensuing period, Detroit's automobile industry was staggered by the combined effects of an economic recession, increasing oil prices, and lagging consumer confidence. Car sales by the "Big Three" auto manufacturers—GM, Ford and Chrysler—declined precipitously while the costs of key raw materials increased rapidly. (*See* Click Decl. Ex. E (Excerpts from C&A 2003 SEC Form 10-K.) The economic repercussions of these events filtered down through the entire automotive supply chain.

In response to these pressures, the automobile manufacturers started offering unprecedented price incentives to customers. The manufacturers sought to compensate for lost

revenue by cutting their own costs in several ways, including laying off workers, closing plants, and pressuring suppliers to decrease prices. *See* Click Decl. Ex. G, *Big 3 Take a Battering*, 80 Automotive News 6183 (Jan. 2, 2006), *available at* 2006 WLNR 275669; Jason Roberson, *Lear, DCX Fight Is a Trend*, Detroit Free Press (Dec. 3, 2005), at Bus. 1. Suppliers like C&A faced substantial pressures from the manufacturers to reduce prices. *See* Click Decl. Ex. G, Jeffrey McCracken, *Chrysler 300 Faced Idling*, Detroit Free Press (July 27, 2005), 2d Ed.). In turn, suppliers such as C&A began demanding price concessions from *their* suppliers. In an effort to maintain longer-term price stability, the concessions often came in the form of supplier "rebates" rather than reductions in list price. *See* Click Decl. ¶ 11, Ex. H ¶ 6. These "rebates," and their proper accounting treatment, are at the core of most of C&A's allegations.

C&A was one of many companies that fell victim to this economic turmoil. Like other auto-industry suppliers, C&A faced constant financial pressures and consistently disclosed the seriousness of these problems to its investors. *See, e.g.,* Click Decl. Ex. E (Excerpts from C&A 2003 SEC Form 10-K). Ultimately, however, C&A, like many other auto-industry suppliers (*e.g.*, Delphi Corp., Tower Automotive Inc., Meridian Automotive Systems Inc., Oxford Automotive Inc., Intermet Corp., and Citation Inc.), found the pressures too great and sought bankruptcy protection. *See* Click Decl. Ex. 6 (*Auto Suppliers' 2005 Woes May Well Continue in 2006*, Standard & Poor's Analyst Report (Nov. 29, 2005)).

**C&A's Allegations.** C&A alleges that during this period the defendant directors and officers committed fraud, violated their fiduciary duties and were unjustly enriched by knowingly causing C&A to overstate its revenues by accounting for vendor rebates improperly and by including ineligible receivables in its allowable borrowing base under a factoring arrangement with General Electric Credit Corporation (GECC). The operative events related to

5

these issues took place principally at the Company's corporate headquarters in Michigan, as follows:

**Rebates**. Whether rebates were accounted for properly will necessarily depend in large part upon the rebate arrangement between C&A and the particular supplier. C&A's Purchasing Department, located at the C&A headquarters, was responsible for negotiating contracts and rebate agreements with C&A's suppliers. *See* Click Decl. ¶¶ 9(e), 11, Ex. H ¶ 7. Many employees in that department who have relevant testimony about those rebate arrangements live in the Detroit metropolitan area. Click Dec. ¶¶10(b), 11, Ex. H ¶¶ 11a, 11b.

In early March 2005, C&A's senior management commenced an internal review of supplier contracts that included vendor rebates. *See* Compl. ¶ 65. That review occurred primarily at the Company's corporate headquarters in Michigan. Most of the members of that review team, including C&A's then-Controller, Chief Financial Officer (both of whom are defendants here), and General Counsel, resided in the Detroit metropolitan area during the relevant period and are believed to continue to reside there. *See* Click Decl. ¶¶ 9(h), 10(f), 11, 14, Ex. H ¶ 10.

On March 17, 2005, the Company through its officers disclosed that it had discovered issues related to the accounting for supplier rebates and that it expected to restate its earnings for the first three quarters of 2004, and possibly 2003. *See* Compl. ¶ 65. On March 24, 2005, the Company issued another press release stating that C&A's Audit Committee had retained outside counsel to assist in the investigation of the Company's accounting for vendor rebates. *See id*. ¶ 69. These and all other Company press releases were disseminated from C&A's corporate headquarters in Michigan. *See* Click Decl. Ex. G (C&A Press Releases); Ex. H ¶ 13.

6

**Ineligible Receivables.**     With respect to the GECC factoring arrangement, determinations as to those receivables eligible for inclusion in the borrowing base were made in C&A's Treasury Department, located at C&A's headquarters. *See* Click Decl. Ex. H ¶ 8.  The Company's former Treasurer during that period (a defendant here), as well as other Treasury Department employees, were familiar with the process for certifying that C&A's borrowing on its receivables facility complied with the formula set forth in the factoring agreement, worked at C&A's headquarters and resided in the Detroit metropolitan area during the relevant period. Several Treasury Department employees also likely continue to reside there.  Click Decl. Ex. H ¶ 11f.

**Accounting Determinations and Corporate Disclosures**.     Employees working in different departments at the C&A campus played a role in preparing C&A's corporate disclosures.  Click Decl. Ex. H ¶ 13.  The Finance Department, which was responsible for collecting financial reports from the operating divisions and generating the consolidated financial statement, is located at C&A headquarters.  Click Decl. ¶¶ 9(g), 11, Ex. H ¶ 9.  C&A's Controller (a defendant here) resided in the Detroit metropolitan area during the relevant period and continues to reside there, as are other employees in the department who may be able to provide relevant testimony.  Click Decl. ¶¶ 9(g), 11, 14, Ex. H ¶ 9.  With the exception of the Soft Trim Division, the executives for C&A's primary operating divisions are likewise located in Michigan at the C&A campus.  Key executives in those operating divisions resided in the Detroit metropolitan area during the relevant period and are believed to continue to reside there.  Click Decl. ¶¶ 9(c), 11, Ex. H ¶ 3.

## OTHER RELEVANT PROCEEDINGS

**The *MainStay* Action.**  A related case, *MainStay High Yield Bond Fund v. Heartland Industrial Partners L.P.*, No. 2:07-cv-10542-AJT-SDP (E.D. Mich.), filed on February 5 of this year, is pending in the Eastern District of Michigan.  *See* Click Decl. Ex. C.  C&A's Complaint here tracks the allegations made in the *MainStay* case.  The *MainStay* action alleges that many of the same C&A directors and officers named as defendants here were responsible for most (if not all) of the same allegedly false statements regarding the Company's financial results as are involved here.  Further, in the *MainStay* case, the securities involved were C&A bonds—the same bonds that serve as partial basis for C&A's securities fraud claim here.

**The *Egleston* Action.**  Another related case, *Egleston v. Heartland Industrial Partners, L.P., et al.*, No. 2:06-cv-13555-AJT-SDP (E.D. Mich.), is also pending in the Eastern District of Michigan.  *See* Click Decl. Ex. B.  C&A's Complaint here tracks many of the allegations made in the *Egleston* case.  The Second Amended Complaint in the *Egleston* case also alleges that several of the C&A directors and officers named as defendants here were responsible for most (if not all) of the same allegedly false statements regarding the Company's financial results as are involved here.  The plaintiff in *Egleston* seeks to represent a class composed of all purchasers of C&A securities.

The *Egleston* case was originally filed in the Southern District of New York in May 2005.  Significantly, on July 11, 2006, that court issued an order transferring that case to the Eastern District of Michigan pursuant to 28 U.S.C. § 1404(a).  *See In re Collins & Aikman Corp. Sec. Litig.*, 438 F. Supp. 2d 392 (S.D.N.Y. 2006).  In determining that transfer to Michigan was appropriate, the New York court specifically found that:

- the "critical mass" of non-party witnesses resides in Michigan (*id* .at 396);

8

- most of the relevant documents are located in the Eastern District of Michigan (*id.* at 397);

- "the locus of operative facts ... strongly favors Michigan" because "C&A's Michigan headquarters was the principal home of C&A's corporate management team, its major departments (including treasury, finance, accounting, and purchasing), all but one of its divisions, and its corporate communications operations, as well as where the company's independent auditor, KPMG, conducted its audit" (*id.* at 397);

- the availability of process to compel attendance of witnesses favored transfer to Michigan because of the number of non-party witnesses located there (*id.* at 397); and

- "trial efficiency and the interests of justice strongly favored transfer" to Michigan because of the other similar lawsuits pending there (*id.* at 398).

**The Bankruptcy Proceeding.**    As noted, C&A is the debtor in a Chapter 11 reorganization proceeding in the Eastern District of Michigan.  *See In re Collins & Aikman Corporation*, Case No. 05-55927 (SWR) (Bankr. E.D. Mich.).  In that bankruptcy proceeding, C&A sought to obtain a stay of the *Egleston* action while it was pending in New York, and also of a predecessor action to the *MainStay* lawsuit that was then pending in Detroit.  In doing so, C&A made clear that the Company itself views the claims made in this case and the virtually identical allegations made the *Egleston* and *MainStay* cases as having a significant bearing on its bankruptcy case.  *See* Click Decl. Ex. A (Complaint for Declaratory and/or Injunctive Relief ¶ 25(a)-(f).  Indeed, in contrast to its claims here that the defendants' conduct harmed the Company, C&A there repeatedly (1) emphasized the identity of interests between C&A, on the one hand, and the Heartland defendants and officer and director defendants, on the other, (2) asserted that those other actions against the defendants were "tantamount to actions that are 'against the debtor' or 'seek to recover a claim against the debtor' with the meaning of Section 362(a)(1) of the Bankruptcy Code" and (3) claimed unequivocally that allowing the plaintiffs in

the *Egleston* and then-pending bondholders' actions to litigate their allegations—again, the same allegations that C&A itself makes here—would potentially inflict "irreparable harm" on C&A.

## ARGUMENT

**UPON BALANCING THE RELATIVE CONVENIENCE TO THE PARTIES, AND IN CONSIDERATION OF THE RELEVANT PRIVATE AND PUBLIC FACTORS, THE INTERESTS OF JUSTICE, AND THE TOTALITY OF CIRCUMSTANCES, THIS CASE SHOULD BE TRANSFERRED TO THE EASTERN DISTRICT OF MICHIGAN.**

28 U.S.C. § 1404(a) provides: "For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." The moving Defendants seek a transfer of this case to the Eastern District of Michigan. There can be no dispute that this action might have been brought in that District. An action may be brought in the district wherein any act or transaction resulting in the violation occurred. *Kirschner Bros. Oil, Inc. v. Pannill*, 697 F. Supp. 804, 806 (D. Del. 1988). Almost all of the conduct about which C&A complains here originated or occurred at C&A's principal place of business in Troy, Michigan, which is within the Eastern District of Michigan.

Whether to transfer a case pursuant to section 1404(a) rests within the court's discretion. In making such a determination, "the court must consider whether transferring this action would convenience (1) the parties and (2) the witnesses while (3) serving the interests of justice." *Weisler v. Barrows*, 2006 WL 3201882, at *2 (D. Del. 2006). Accordingly, the court must weigh the following factors concerning certain private and public interests:

(1) a plaintiff's choice of forum;

(2) a defendant's preference;

(3) whether the claim arose elsewhere;

(4) the convenience of the parties;

10

(5) the convenience of the expected witnesses;

(6) the location of books and records, to the extent that they could not be produced in the alternative forum;

(7) the enforceability of the judgment;

(8) practical considerations that could make the trial easy, expeditious, or inexpensive;

(9) the relative administrative difficulty in the two fora resulting from court congestion;

(10) the local interest in deciding local controversies at home; and

(11) the public policies of the fora.

*Id.* at \*2 (citing *Jumara v. State Farm Ins. Co.*, 55 F.3d 873, 879-880 (3d Cir. 1995)). Courts typically consider the first six factors together as "private interest" factors, and the last five factors together as "public interest" factors. *Weisler*, 2006 WL 3201882, at \*2-\*3. Finally, "the moving party is not required to show truly compelling circumstances for a change of venue, but rather that all relevant things considered, the case would be better off transferred to another district." *Weisler*, 2006 WL 3201882 at \*2.

*Weisler v. Barrows, supra*, provides a recent example of how this Court analyzes and weighs the various factors. In *Weiser*, a shareholder brought a derivative action on behalf of Sycamore Networks, Inc. essentially alleging (as C&A does here) that Sycamore's officers and directors had breached their fiduciary duties by preparing, or failing to prevent the issuance of, false financial statements. Although Sycamore was incorporated under Delaware law, the Court found that transfer to Massachusetts was appropriate because none of the defendants were residents of Delaware, the company's principal place of business was in Massachusetts, the allegedly false financial statements (and press releases based thereon) were prepared in and disseminated from Massachusetts, many of the witnesses were located in Massachusetts and not

11

subject to process in Delaware, the operative events occurred in Massachusetts, and there were two other shareholder derivative actions pending in Massachusetts based on the same facts. The facts relevant to the transfer analysis here could hardly be closer.

### 1.     The Plaintiffs' Choice of Forum and Defendants' Preference.

Usually, a plaintiff's choice of forum is given "paramount consideration" in deciding upon a transfer request. However, "[i]f the plaintiff chooses a forum which is not his 'home turf' and which has no connection to any of the acts giving rise to the lawsuit, [] the convenience to the plaintiff of litigating in his chosen forum is not as great." *Kirschner*, 697 F. Supp. 804 at 806 (citing *Shutte v. Armco Steel Corp.*, 431 F.2d 22, 25 (3d Cir. 1970)). The Court has defined "home turf" as the plaintiff's principal place of business, or the forum closest to the plaintiff's principal place of business in which personal jurisdiction over the principal defendant can be effectuated. *Media Group, Inc. v. Turtle Wax, Inc.*, 1996 WL 756760 at * (D. Del. Dec. 23, 1996). Thus, the plaintiffs' choice of forum "is not controlling 'when the forum chosen is only the statutory home state of the [] corporation.'" *Kirschner*, 697 F. Supp. at 807. Accordingly, "[w]here an alternative forum is more convenient and has more substantial connection with the litigation 'incorporation in Delaware will not prevent transfer.'" *Weisler*, 2006 WL 3201882, at *3; *see also APV N. Am., Inc. v. Sig Simonazzi N. Am., Inc.*, 295 F. Supp. 2d 393, 398-99 (D. Del. 2002).

Here, as in *Weiser*, plaintiff C&A's only connection to Delaware is that it is incorporated under Delaware law. C&A's assertions that a substantial part of the transactions occurred in Delaware is simply wrong. C&A's principal place of business is in the Eastern District of Michigan, the alleged misrepresentations and allegedly false financial statements giving rise to the suit were prepared in and released to the public from that district, and there are other class

12

action suits containing many of the same allegations currently pending in that district.  As a result, the mere fact that plaintiffs are incorporated in Delaware should not prevent the Court from transferring this case, and C&A's choice of Delaware as the forum is entitled to less deference.

2.      **The Convenience of the Parties.**

C&A's principal place of business is in a suburb of Detroit, and the convenience to C&A of litigating this case in Delaware plainly is "not as great as it would be were [it] litigating at or near [its] principal place of business or at the site of the activities at issue" in this suit.  *Burstein v. Applied Extrusion Technologies, Inc.*, 829 F. Supp. 106, 110 (D. Del. 1992)

On the other hand, four of the moving defendants here (Barnaba, Cosgrove, Hess and Koth) currently reside in the Detroit area, making Detroit a much more convenient forum than Delaware for them.  And while most of the other individual defendants are not located in the Detroit area, none are located in Delaware.  Moreover, during the time of the events alleged in the Complaint, these other defendants traveled to C&A's Michigan headquarters as needed, creating a reasonable inference that Detroit is a more convenient forum—an inference made conclusive as to at least the seven moving defendants by the very fact that they are making this motion.

Further with respect to the parties' convenience, the litigation currently pending against defendants in the Eastern District of Michigan weighs heavily in favor of transfer.  "Where related lawsuits exist, 'it is in the interests of justice to permit suits involving the same parties and issues to proceed before one court.'"  *Weisler*, 2006 WL 3201882, at *3 (citing *Liggett Group, Inc. v. R. J. Reynolds Tobacco Co.*, 102 F. Supp. 2d 518, 537 (D.N.J. 2000) (citations omitted)).  Here, the Heartland defendants and many of the individual defendants are also

13

defendants in one or both of the *MainStay* and *Egleston* class actions in Detroit. The allegations in those lawsuits involve the same alleged misrepresentations and allegedly false financial statements as are alleged here by C&A. The factual issues raised in these cases will thus overlap considerably, as will the discovery needs. Transferring this case to Michigan will enable defendants and C&A to save considerable time and expense and will help prevent duplicative litigation and inconsistent results.

Moreover, although C&A is not a party to the cases pending in the Eastern District of Michigan, this is only because it filed for bankruptcy. C&A itself has a significant interest in those actions—as evidenced by its previous attempt to stay the *Egleston* action and the predecessor to the *MainStay* action—and will ultimately be heavily involved in discovery conducted in those actions. That discovery will surely occur in the Eastern District of Michigan given that most of the relevant documents are in C&A's possession at its Michigan headquarters. Click Decl. ¶¶ 9(i), 11, Ex. H ¶ 12. Plainly, discovery in those other actions will demand significant time and attention from C&A's Michigan employees. And, as noted, the allegedly false disclosures and financial statements were prepared, reviewed and disseminated by current or former C&A employees, most of whom still reside in the Detroit area. Click Decl. ¶¶ 9(g), 11, Ex. H ¶ 9. Transferring this case to the Eastern District of Michigan, where C&A conducted virtually all of its corporate activities, will thus greatly reduce the burden on current and former employees and the plaintiffs themselves.

Finally, "[t]he most important factor is the avoidance of duplicative litigation: Adjudicating almost identical issues in separate [forums] would waste judicial resources." *Weisler*, 2006 WL 3201882, at *3. If the Court does not transfer this action, defendants will be forced to defend three lawsuits involving almost identical facts and issues in different federal

14

courts.  Separate proceedings in different districts would result in duplicative discovery and a waste of judicial resources.  Moreover, separate proceedings may lead to inconsistent results. Since such needless and wasteful expense is precisely what the transfer statute aims to prevent, this factor strongly supports transfer to Michigan.  *See Van Dusen v. Barrack*, 376 U.S. 612, 616 (1964) (the purpose of § 1404(a) is to "prevent the waste 'of time, energy and money' and 'to protect litigants, witnesses and the public against unnecessary inconvenience and expense'") (citation omitted).

3.    **The Convenience of the Expected Non-party Witnesses.**

The convenience of non-party witnesses is an important factor in a transfer inquiry under section 1404(a).  *Mentor Graphics Corp. v. Quickturn Design Sys.*, 77 F. Supp. 2d 505, 510 (D. Del. 1999).  Although it cannot at this time be determined exactly which witnesses each party will call, it is undeniable that both sides will rely on current and former C&A employees to provide key testimony regarding the factual issues in this case.  Most of these individuals are located in the Detroit metropolitan area.  The only C&A corporate officials in departments with responsibilities relating to the matters addressed in the Complaint who were not located at the C&A campus were at the Soft Trim division in North Carolina, and, given modern modes of transportation, Delaware is no more convenient than Michigan to individuals in North Carolina. *See* Click Decl. Ex. H ¶¶ 2-3, 7-9.

The following list identifies some of the potential witnesses (other than the four individual defendants identified above) who defendants believe still reside in the Detroit area, and the matters about which they may testify (*see* Click Decl. ¶¶ 10-13, Ex. H ¶ 11):

- C&A's Senior Vice President Global Procurement & Supply Chain Management, Dianna Kokkinos, should be able to testify about the role of supplier rebates in C&A's business, the procedures and policies of the Purchasing Department,

negotiations with C&A's suppliers over price concessions, and particular rebate agreements.

- Several C&A purchasing managers or buyers should be able to testify about the circumstances and terms of the rebate agreements they negotiated. These include Michael Doyle, Amarish Kapadia, Dan Mutarelli, Andy Heilmann, Chris Duvall, Joseph Nowacki, Jason Clark, Scott Mors, Tim Knight, and other persons operating out of the C&A campus.

- Several persons currently or formerly employed in C&A's Finance Department at C&A headquarters are also likely to have relevant testimony on these issues.

- C&A's Investor Relations and Public Affairs Manager, David Youngman, should be able to testify about corporate communications with investors, including the press releases and conference calls alleged to have been misleading.

- KPMG accountant Mike McAleer and other employees of KPMG and PWC, C&A's independent auditors for the years at issue, should be able to provide testimony about annual audits and quarterly reviews of the Company's financial statements.

- Jay Knoll, who served as C&A's general counsel and was a member of the C&A management team that reviewed C&A's supplier contracts and rebates in the first quarter of 2005 .

- Thomas Gougherty, controller of C&A's International Plastics Division, who should have information concerning accounting for supplier rebates.

- Christopher M. Williams, C&A's Director of Commercial Management for the Company's contracts with Ford from 2000 to November 2004, and C&A's Executive Vice President of Business Development and Specialty Products from November 2004 to May 2005, who should have information concerning the GECC factoring arrangement.

In sum, most of the facts giving rise to the allegations lie within the knowledge of C&A's current or former corporate employees and auditors, who have knowledge of contracting arrangements, associated accounting practices, revenue-recognition policies, financing arrangements, and operations. Even though the convenience of witnesses that are "employees of a party" usually does not carry weight "because the parties are obligated to procure their attendance at trial," employees as well as former employees are located overwhelmingly in the Detroit metropolitan area. *Mentor Graphics Corp.*, 77 F. Supp. 2d at 510. Thus, "the interests of

16

justice would be better served by transferring the action to the [Eastern District of Michigan] where [the employees' and former employees'] attendance could be assured, not merely presumed." *Burstein*, 829 F. Supp. 106 at 113. The convenience of witnesses thus weighs heavily in favor of transfer.

4.     **The Location of Books and Records and Practical Considerations That Could Make the Trial Easy, Expeditious, or Inexpensive.**

Document production will be a major part of this litigation, and most of the relevant documents and other sources of proof are virtually certain to be among C&A's corporate records. Documentary evidence will include C&A's books and records, draft financial statements, supplier purchase agreements, sales contracts, and records of internal communications between C&A employees. Paper documents were maintained at C&A's corporate headquarters in Troy, Michigan. Click Decl. ¶¶ 9(i), 11, Ex. H ¶12. Thus, the bulk of the original documentary and physical evidence likely to be the subject of the parties' discovery is located in the Eastern District of Michigan. The location of the documents and ease of access to sources of proof weigh in favor of transfer.

The "locus of the operative facts" is a key consideration in deciding a motion to transfer. *Weisler*, 2006 WL 3201882, at *3. Where the majority of the events giving rise to the action occurred in a particular district, which is also the location of one of the party's principal offices and the location of many witnesses, this Court is inclined to grant a transfer since those factors weigh heavily in this Court's analysis. *Weisler*, 2006 WL 3201882, at *3. The events that generated the operative facts in this case occurred in Michigan and bear little or no connection to Delaware.

With the exception of one operating division, C&A's primary corporate operations are centralized at the Company's headquarters in Troy, Michigan. Throughout the Class Period,

17

virtually all members of the Company's senior management team, as well as all corporate employees in the sales, engineering, finance, accounting, treasury, and purchasing departments, were located on the C&A campus.  *See* Click Decl. ¶¶ 9(a)-9(c), 11, Ex. H ¶¶ 2-3.  The Company's independent auditors, KPMG and PWC, also defendants in this case, maintained a presence on the C&A campus.  Click Decl., ¶¶ 9(d), 10(e), 11, Ex. H ¶ 4.

In contrast, C&A's complaint does not mention any event or conduct that took place in Delaware.  These factors thus weigh heavily in favor of transfer.

### 5.      Availability of Process to Compel Attendance of Witnesses.

A critical factor the Court should consider is "[t]he comparative abilities of transferor and transferee forums to subpoena non-party witnesses."  *Kirschner*, 697 F. Supp. 804 at 808.  This Court can enforce a subpoena served on a witness who resides, conducts business or has an office in Delaware or within one hundred miles of Wilmington.  Fed. R. Civ. P. 45(b)(2).  Each of the potential witnesses identified above is believed to reside within 100 miles of the Eastern District of Michigan courthouse.  Thus, to the extent any of these key non-party witnesses do not volunteer to testify, the Michigan court could compel their presence at trial.  Not only are these witnesses outside this Court's subpoena power, defendants are unaware of any witness, party or non-party, that resides within this District.  This factor thus weighs heavily in favor of transfer.

### 6.      Whether the Claim Arose Elsewhere and The Enforceability of a Judgment.

As described above, virtually all of the alleged conduct giving rise to C&A's claims occurred in Michigan.  None occurred in Delaware.  Further, there is no reason why a judgment entered in this action by the federal court in Michigan would be any less enforceable than a judgment entered by this Court.

18

7.    **The Relative Administrative Difficulty in the Two Fora Resulting From Court Congestion.**

"The relative congestion of the dockets is the legitimate factor to be weighed in a venue transfer analysis." *Mentor Graphics Corp.*, 77 F.Supp. 2d 505 at 514. Although 2006 statistics published by the Administrative Office of the United States Courts show that the Eastern District of Michigan had 4,533 cases pending, while this District had 1,433 cases pending, these numbers do not tell the fully story. According to this Court's Web site, this District currently has three district judges, one vacant judgeship (with the magistrate judges handling those cases in the interim), and thus has over 350 cases per judgeship. In contrast, the Web site of the Eastern District of Michigan reveals that that district has 21 district judges, for a caseload of 215 cases per judge.[1] Further, since there are related cases with identical issues already pending in Michigan, transferring this case there would not appreciably add to the Michigan court's workload. Accordingly, "[t]ransfer would not result in [additional] judicial preparations" and Delaware would not have its "efforts going to waste," because this case has been on its docket for only a brief period. *Kirschner*, 697 F. Supp 804 at 808. Therefore, this factor heavily favors transfer.

8.    **The Local Interest in Deciding Local Controversies at Home.**

The only connection that this District has with this case is, as noted, that the plaintiffs are incorporated in Delaware. The Complaint raises no new issue under Delaware corporate law, and while one of the claims asserts that the officer and director defendants breached their fiduciary duties, even this claim, as well as all the others, rest upon allegations of fraud. *See* Compl., ¶ 166. This connection with Delaware is hardly a local interest that supports deciding

---

[1] http://www.uscourts.gov/caseload2006/contents.html (follow "Table C" hyperlink).

this controversy here and is in any event negligible when compared with the local interest of Michigan. It is undisputed that C&A's home offices currently are, and at all relevant times were, located in the Eastern District of Michigan, the conduct alleged in the Complaint occurred in Michigan and all relevant documentation and many key witnesses are located in Michigan. Its residents have a clear interest in the case because it involves conduct that occurred in that State and an industry in distress that is of great significance to the Michigan economy. Thus, Michigan has a cognizable and compelling "local interest" in the resolution of this matter—an interest that weighs heavily in favor of transfer.

## CONCLUSION

For the foregoing reasons, the Court should grant the motion to transfer pursuant to 28

U.S.C. § 1404(a), and transfer this case to the Eastern District of Michigan.

Respectfully submitted,

BLANK ROME LLP

*/s/ Thomas P. Preston*

By:_____

Thomas P. Preston
(Del. Bar No. 2548)
1201 Market Street, Suite 800
Wilmington, DE  19801
(302) 4256478
preston-t@blankrome.com

*Attorneys for Defendants Bryce M.*
*Koth and Robert A. Krause*

OF COUNSEL:

Michael Joseph
Joseph O. Click
BLANK ROME LLP
600 New Hampshire Avenue, NW
Washington, DC  20037
Telephone:  (202) 772-5800
E-mail:  click@blankrome.com

PROCTOR HEYMAN LLP

*/s/ Vernon R. Proctor*

By:_____

Vernon R. Proctor
Del. Bar No.1019
1116 West Street
Wilmington, DE  19801
(302) 472-7300
vproctor@proctorheyman.com

*Attorneys for Defendant David R.*
*Cosgrove*

21

ZUCKERMAN SPAEDER LLP


*/s/ Thomas g. Macauley*

By:_____

Thomas G. Macauley
Del. Bar No. 3411
919 Market Street, Suite 1705
Wilmington, DE 19899
(302) 427-0400
tmacauley@zuckerman.com

*Attorneys for Defendant Paul C.
Barnaba*


POTTER ANDERSON & CORROON


*/s/ Richard L. Horwitz*

By:_____

Richard L. Horwitz
Del. Bar No. 2246
Peter J. Walsh, Jr.
Del. Bar No. 2437
1313 North Market Street
Wilmington, DE 19801
(302) 984-6000
rhorwitz@potteranderson.com
pwalsh@potteranderson.com

*Attorneys for Defendant J. Michael
Stepp*

OF COUNSEL:

Gandolfo V. DiBlasi
Karen Patton Seymour
Stacey R. Friedman
David E. Swarts
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004-2498
Telephone: (212) 558-4000
E-mail: swartsd@sullcrom.com

22

STILLMAN, FRIENDMAN &
SHECHTMAN, P.C.

*/s/ Michael Shapiro*

By: _____

      Michael Shapiro
      Scott M. Himes
      425 Park Avenue
      New York, NY 10022
      (212) 223-0200
      mshapiro@stillmanfriedman.com
      shimes@stillmanfriedman.com

*Attorney for Defendant John Galante*

September 19, 2007

**UNREPORTED CASE 1**

Westlaw.

Not Reported in F.Supp.                                                          Page 1

Not Reported in F.Supp., 1996 WL 756760 (D.Del.)
**(Cite as: Not Reported in F.Supp.)**

**C**
Media Group, Inc. v. Turtle Wax, Inc.
D.Del.,1996.
Only the Westlaw citation is currently available.
United States District Court, D. Delaware.
The MEDIA GROUP, INC., Howe Laboratories,
Inc., American Direct Marketing, Inc., Dura Lube
Corporation, Plaintiffs,
v.
TURTLE WAX, INC., Plastone Company, and
Script to Screen Productions, Defendants.
**Civ.A. No. 96-234 MMS.**

Dec. 23, 1996.

Richard K. Herrmann, Stradley, Ronon, Stevens &
Young, LLP, Wilmington, DE (Barbara S. Wahl,
Lewis Rose, and John P. Feldman, Arent Fox
Kintner Plotkin & Kahn, Washington, DC, of
counsel), for plaintiffs.
Robert W. Whetzel, and Francis DiGiovanni,
Richards, Layton & Finger, Wilmington, DE (J.
Patrick Herald, Philip J. Zadeik, and David J. Davis
, Baker & McKenzie, Chicago, IL, of counsel), for
defendants.

*MEMORANDUM OPINION*
MURRAY M. SCHWARTZ, Senior District Judge.

### I. INTRODUCTION

*\*1* On May 7, 1996, The Media Group, Inc., Howe
Laboratories, Inc., American Direct Marketing,
Inc., and Dura Lube Corp. (collectively, "plaintiffs"
) filed suit against defendants Turtle Wax, Inc. ("
Turtle Wax"), Plastone Co.[FN1] (collectively, "
Turtle Wax") and Guthy-Renker Corp. for false
advertising, product disparagement, trademark
infringement, false designation of origin, consumer
fraud, and deceptive trade practices under federal
and Delaware law. Docket Item ("D.I.") 1. This
action arises from Turtle Wax's promotion of two
automotive products-an engine treatment formula

called LUBRICATOR 2001 and an auto polish
called VISION. On May 24, 1996, plaintiffs
amended their complaint to include a new
defendant, Script to Screen, Inc. ("Script to Screen"
or collectively with Turtle Wax, "defendants"),
which wrote and produced an infomercial for
LUBRICATOR 2001. D.I. 6.[FN2] Defendants
answered and counterclaimed for violations of the
Lanham Act, 15 U.S.C. § 1125(a), Delaware law,
and the common law. D.I. 9. This Court has
jurisdiction pursuant to 28 U.S.C. § 1338.

> FN1. Plastone Corporation is a fictitious
> name for Turtle Wax. Therefore, the
> Court will refer to both Plastone Corp. and
> Turtle Wax, Inc. as "Turtle Wax."

> FN2. Soon after the addition of Script to
> Screen as a defendant, plaintiffs stipulated
> to a dismissal of Guthy-Renker
> Corporation from the case without
> prejudice. D.I. 19.

Script to Screen filed a motion to dismiss for lack of
personal jurisdiction under Rule 12(b)(2). During
oral argument, plaintiffs stipulated to the dismissal
of Script to Screen. Pending before the Court is
Turtle Wax's motion to transfer this case to the
Northern District of Illinois. For the reasons
below, the Court will deny transfer.

### II. FACTUAL BACKGROUND

This case is a result of an advertising war waged
between two rival corporate groups that sell
automobile accessories. Each of the plaintiffs has
its principal place of business in Stamford,
Connecticut. D.I. 6 at ¶ 3-6. Three of the four
plaintiffs are incorporated in Delaware.[FN3] *Id.*
Turtle Wax, on the other hand, is both incorporated
and headquartered in Chicago, Illinois. D.I. 6 at ¶
7. The efforts of the parties, however, have a

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                Page 2

Not Reported in F.Supp., 1996 WL 756760 (D.Del.)
**(Cite as: Not Reported in F.Supp.)**

national focus. In particular, this case centers on how the parties have vied for a larger share of the automotive products market in two sizable categories: engine treatment and car polish.

> FN3. The Media Group is a New York corporation. D.I. 6 at ¶ 2.

### A. Engine Treatment Products

Plaintiffs produce DURA LUBE, an automotive engine treatment product that purportedly enhances the performance and longevity of the engine. D.I. 6 at ¶ 14. DURA LUBE has been sold since 1991; plaintiffs have marketed it successfully by saturating national television audiences with infomercials touting DURA LUBE's attributes. D.I. 6 at ¶ 14-15.

In 1995, Turtle Wax-perhaps best known for helping keep the exterior of a car shiny and clean-decided to move "under the hood"; namely, by producing engine treatment products. D.I. 13 at ¶ 8. Turtle Wax worked with a Chicago firm, Olympic Oil, to develop a new engine treatment formula which was ultimately given the trademark LUBRICATOR 2001. Turtle Wax chose to introduce LUBRICATOR 2001 to the American buying public through the use of infomercials.

Turtle Wax is in the business of auto care products. It is not, as a rule, an especially adept producer of infomercials. So Turtle Wax turned to somebody who was: Script to Screen Productions. Script to Screen is "one of the top five direct response/infomercial production companies in the business." Melinda Fulmer, *'Corporate' Hawkers: Kerrys' Script to Screen near $8 million mark,*ORANGE COUNTY BUS.J., Feb. 15, 1996, 1.

**\*2** Script to Screen is incorporated in California, and its main offices are there. It also has a branch office in Chicago. Script to Screen proceeded to produce an infomercial for Turtle Wax. Turtle Wax retained all copyrights in the infomercial, and Turtle Wax independently arranged for distribution of the infomercial. D.I. 17 at ¶ 4. All of the

footage was shot in California, Nevada, and Illinois, and all the pre- and post-production activities took place in either Chicago or California. D.I. 13 at ¶ 9.

One of the more notable segments of the infomercial [FN4] depicts an endurance contest between two cars of similar make, model, and mileage-one treated with LUBRICATOR 2001 and the other with DURA LUBE.[FN5] D.I. 6 at ¶ 43. After being treated with LUBRICATOR 2001 and DURA LUBE, respectively, the cars are drained of oil. *Id.* The cars are then driven, ostensibly without oil in their engines, across the Mojave Desert-a scorching stretch of 140 sandy miles between Baker, California, and Las Vegas, Nevada. *Id.*

> FN4. The following description of the infomercial is derived from the unsworn allegations in plaintiffs' Amended Complaint, D.I. 6.

> FN5. Printed subtitles in the infomercial indicate each car is a 1994 Chevy Corsica purchased from a major rental company and each car had been driven approximately 31,000 miles. D.I. 6 at ¶ 43.

In the infomercial, the car treated with DURA LUBE sputters and dies at thirty-two miles. D.I. 6 at ¶ 44. The drivers gravely deliver the postmortem diagnosis in a voice-over: the engine of the DURA LUBE-treated car "seized" as it underwent high engine temperatures. *Id.* Curiously, though, note plaintiffs, as the driver of the DURA LUBE car examines the engine after it " seized," there is no smoke, no steam, no visible evidence of overheating. D.I. 6 at ¶ 45.

The car treated with LUBRICATOR 2001, on the other hand, successfully completes its trek across the Mojave desert. D.I. 6 at ¶ 46. After it crosses the finish line in Las Vegas amid great fanfare, the engine is examined: no damage, no evidence of engine heat. D.I. 6 at ¶ 46. In fact, plaintiffs assert, the car is "completely clean," without a trace of dirt or dust. *Id.* The implication

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                 Page 3

Not Reported in F.Supp., 1996 WL 756760 (D.Del.)
**(Cite as: Not Reported in F.Supp.)**

of the infomercial is clear: "a car treated with LUBRICATOR 2001 will outperform the same car treated with DURA LUBE." Throughout the infomercial, there is no acknowledgment that "dramatizations" or "re-enactments" were used. D.I. 6 at ¶ 48.

Like any savvy marketeer, Turtle Wax did not use only one medium in its advertising blitz. Rather, it harnessed the considerable power of the printed word. To this end, Turtle Wax had several independent Chicago-area laboratories conduct testing on the LUBRICATOR 2001 and compare it to DURA LUBE. D.I. 12 at ¶ 8.[FN6] One of these laboratories, Falex Corporation ("Falex") has developed an "extreme pressure" test for engine treatment products: the so-called Falex Pin and V-block test. D.I. 12 at ¶ 10. Falex subjected LUBRICATOR 2001 to the Pin and V-block test at its facilities. D.I. 15 at ¶ 9(a). Significantly, Falex may have also done testing for plaintiffs, since DURA LUBE packaging states the Pin and V-block test was performed on DURA LUBE. D.I. 15 at ¶ 10.

> FN6. Results of the independent testing were also allegedly shown in the infomercial. D.I. 6 at ¶¶ 42, 49.

Another Chicago company, the ALI Corporation ("ALI") conducted comparative testing of LUBRICATOR 2001, DURA LUBE, and other unspecified engine treatment products. ALI subjected each engine treatment product to what it calls the "modified L38 Engine Wear Test" and the "three engine torture test." D.I. 15 at ¶ 9(b). ALI conducted this testing at its Chicago-area laboratories. *Id.*

*3 Presumably on the basis of the testing done by Falex and ALI, Turtle Wax issued print advertisements, and advertisements on the packaging of LUBRICATOR 2001. The print advertisements flatly state "new LUBRICATOR 2001 provides better metal wear protection than Dura Lube and Slick 50. Independent lab tests prove it." D.I. 6 at ¶ 54; D.I. 23 at Exh. 2. Print advertisements further depict a bar graph, as does

the LUBRICATOR 2001 box, which indicates that under the "Pressure Test," LUBRICATOR 2001 performed adequately at 4000 "load pounds," while DURA LUBE fizzled at "@1250 lbs." D.I. 6 at ¶ 56; D.I. 23 at Exh. 2. Finally, the side panel of the LUBRICATOR 2001 box states, with an accompanying bar graph, that LUBRICATOR 2001 outperformed DURA LUBE in the "Modified L-38 Engine Test." D.I. 6 at ¶ 40.

### B. Car Polish

Turtle Wax introduced another new automotive product in 1995: a car polish dubbed VISION. D.I. 13 at ¶ 13. Plaintiffs have their own car polish product, called DURA SHINE. Plaintiffs have alleged that statements made by Turtle Wax on the VISION packaging are false and misleading. D.I. 6 at ¶¶ 74-76. VISION was developed and manufactured in Turtle Wax's Chicago laboratories. D.I. 12 at ¶¶ 5, 7.

### III. DISCUSSION

### A. Motion to Transfer

28 U.S.C. § 1404(a) provides "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." It is apparent this action could have been brought in the Northern District of Illinois.[FN7] Turtle Wax now seeks to transfer this action there.

> FN7. An action, like this one, based on a violation of federal law can "be brought only in.... (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated [.] ..."28 U.S.C. § 1391(b). Since most of the events giving rise to this litigation-lab testing, the design and manufacture of

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp., 1996 WL 756760 (D.Del.)
**(Cite as: Not Reported in F.Supp.)**

LUBRICATOR 2001 and DURA LUBE-took place in Chicago, the action could have properly been brought in the Northern District of Illinois.

As the text of the statute indicates, the Court must examine (1) the convenience of the parties, (2) the convenience of the witnesses, (3) and the interest of justice, in determining whether transfer is proper. The Third Circuit Court of Appeals has emphasized this is a broad inquiry; a district court must examine "all relevant factors to determine whether on balance the litigation would more conveniently proceed and the interests of justice be better served by transfer to a different forum." *Jumara v. State Farm Ins. Co.,* 55 F.3d 873, 879 (3d Cir.1995). While cautioning "there is no definitive formula or list of factors to consider,"*id.,* the court identified potential factors which it characterized as either private or public interests.

Among the private interests are: (1) plaintiff's forum preference as manifested in the original choice, (2) the defendant's preference, (3) whether the claim arose elsewhere, (4) the convenience of the parties as indicated by their relative physical and financial condition, (5) the convenience of the witnesses-but only to the extent that the witnesses may actually be unavailable for trial in one of the fora, (6) the location of books and records (similarly limited to the extent that the files could not be produced in the alternative forum). *Id.* (citations omitted).

*4 Public interests include: (1) the enforceability of the judgment, (2) practical considerations that could make the trial easy, expeditious, or inexpensive, (3) the relative administrative difficulty in the two fora resulting from court congestion, (4) the local interest in deciding local controversies at home, and (5) the public policies of the fora. *Id.* (citations omitted). With these standards in mind, and recognizing the list offered by the *Jumara* court is merely illustrative, not exhaustive, the Court will analyze the interests of the parties as implicated by Turtle Wax's motion to transfer.

1. Private Interests

(a) Plaintiffs' Forum Preference

As always, the plaintiff's choice of forum is entitled to substantial deference and "should not be lightly disturbed." *Shutte v. Armco Steel Corp.,* 431 F.2d 22, 25 (3d Cir.1970) (citations omitted), *cert. denied,*401 U.S. 910 (1971). The party seeking the transfer-in this case, Turtle Wax-bears the heavy burden of establishing transfer is appropriate. *Id.* This deference is especially due when the plaintiffs have chosen their forum because of "legitimate, rational concerns." *Waste Distillation Technology, Inc. v. Pan American Resources, Inc.,* 775 F.Supp. 759, 764 (D.Del.1991).

Nevertheless, Turtle Wax argues the Court should not accord deference to plaintiffs' forum choice because Delaware is not plaintiffs' "home turf." The "home turf" rule holds that if Delaware is a plaintiff's "home turf," the presumption against transfer is especially strong. *See Kirschner Bros. Oil, Inc. v. Pannill,* 697 F.Supp. 804, 806 (D.Del.1988). In claims brought by corporate entities, "home turf" was once limited to a plaintiff's principal place of business. *See General Instrument Corp. v. Mostek Corp.,* 417 F.Supp. 821, 822-23 (D.Del.1976). The concept of "home turf" has since been expanded to include the forum closest to a plaintiff's principal place of business in which personal service over the principal defendant can be effectuated. *See Joint Stock Soc'y "Trade House of Descendants of Peter Smirnoff, Official Purveyor to the Imperial Court" v. Heuhlein, Inc.,* 936 F.Supp. at 186; *Kirschner Bros.,* 697 F.Supp. at 806.

It is immediately apparent Delaware is not plaintiffs' "home turf." Plaintiffs' principal place of business is in Connecticut, and in all likelihood Turtle Wax would be amenable to process in at least five federal fora closer to Connecticut than Delaware.FN8 This does not end the inquiry, however. As another court in this district has recently noted, *see Joint Stock Society,* 936 F.Supp. at 186, litigants have increasingly viewed the "home turf" rule as the lodestar of a motion to transfer; as the "home turf" analysis goes, litigants seem to assume, so goes the motion to transfer. This grossly overstates the role

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                 Page 5

Not Reported in F.Supp., 1996 WL 756760 (D.Del.)
**(Cite as: Not Reported in F.Supp.)**

of "home turf" in the comprehensive analysis of a motion to transfer. In other words, "[t]he use of the 'home turf' rule in this manner is not only undesirable but also inconsistent with the precedent of this court and the Court of Appeals for the Third Circuit." [FN9] *Id.* Thus, the Court will proceed to examine the other legitimate and rational reasons plaintiffs have for litigating in this forum, and the countervailing reasons offered by Turtle Wax as to why venue is proper in the Northern District of Illinois.

> FN8. The Eastern District of New York, the Southern District of New York, the District of New Jersey, the District of Rhode Island, and the Eastern District of Pennsylvania are all closer to plaintiffs' Connecticut home than the District of Delaware.

> FN9. Indeed, this Court recently decided a motion to transfer and did not mention the " home turf" rule in its analysis for this very reason. *See Sherwood Medical Co. v. IVAC Medical Sys., Inc.,* No. Civ.A 96-305-MMS, 1996 WL 700261 (D.Del. Nov. 25, 1996).

> (b) Other Private Interests

> (1) Convenience of Parties

**\*5** Turtle Wax has not met its burden to demonstrate that convenience of the parties strongly weighs in favor of transferring this action to the Northern District of Illinois. Plaintiffs state they chose Delaware as a forum because it is so convenient and cost-efficient to litigate here. Delaware is extremely close to their principal place of business, they argue, and is conducive to commuting. Chicago, on the other hand, is 775 miles away, and would require airfare, hotel, and meal costs for travel. In short, they argue, transfer would disrupt their business.

This argument is extremely persuasive in the abstract, but considerably less convincing when the

cold facts are considered. To arrive from Stamford, Connecticut by train in Wilmington in time for a ten o'clock trial time, plaintiffs [FN10] would have to depart by 1:47 a.m. D.I. 25 at Exh. A. Then, assuming trial ended at four o'clock, plaintiffs could catch the 5:39 p.m. Amtrak to Stamford, by which they would arrive in Stamford at 8:58 p.m. *Id.* This allows for a little less than five hours of sleep; not unheard of, but certainly not healthy or practical.

> FN10. When the word "plaintiffs" is used, of course, the Court is referring to agents of the plaintiffs.

Or, plaintiffs could commute from Stamford to New York-about an hour ride by car or train, *id.*-and take a 8 a.m. train in time for trial in Wilmington. Then, assuming trial ends at four o'clock on the button, plaintiffs could catch the 4:22 Amtrak to New York and arrive in New York at 6:02 p.m. *Id.* With an hour commute to Stamford, plaintiffs could be back in work by 7 p.m.

This brief exposition just demonstrates plaintiffs' businesses will be disrupted whether trial is held in Wilmington or Chicago. Further, even if trial is held in Wilmington, plaintiffs will incur substantial transportation, lodging, and meal costs. Nevertheless, it is true plaintiffs will incur less expenses, and their businesses will be less disrupted, if trial is held in Delaware.

Turtle Wax, on the other hand, has its business operations in Chicago. If litigation were conducted in the Northern District of Illinois, its costs would be substantially reduced. Key officers and employees would be able to conduct company business during trial. *See Kenics Corp. v. Luwa Corp.,* 208 U.S.P.Q. 334 (D.Del.1979). In short, while trial in Delaware is only somewhat convenient for plaintiffs, trial in Illinois is extremely convenient for Turtle Wax.

But both parties are national corporations, with revenues in the millions of dollars. *See Sherwood Medical Co. v. IVAC Medical Sys., Inc.,* No. Civ.A 96-305-MMS, 1996 WL 700261, at \*3 (D.Del.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                    Page 6

Not Reported in F.Supp., 1996 WL 756760 (D.Del.)
**(Cite as: Not Reported in F.Supp.)**

Nov. 25, 1996). Thus, the relative economic burden to Turtle Wax in litigating in Delaware is minimal. Transfer to the Northern District of Illinois would merely shift the relative inconvenience of litigating from Turtle Wax to plaintiffs. This fact, combined with the strong deference accorded a plaintiff's choice of forum, *see Northwood Corp. v. K Mart Corp.,* 1996 WL 250054, at *4, 1996 U.S.Dist. LEXIS, at *15 (D.Del. April 11, 1996), does not warrant transfer.

### (2) Convenience of Witnesses

**\*6** Plaintiffs assert another legitimate and rational reason they chose a Delaware forum: Delaware is a central location for their nonparty witnesses. Plaintiffs expect to call as witnesses the two professional race car drivers who participated in the Mojave Desert "torture test" depicted in the infomercial; both live in Charlotte, North Carolina. Plaintiffs also plan to call witnesses from their testing labs in Wharton, New Jersey, which is only approximately 95 miles from Wilmington and within the subpoena power of this Court. Lastly, they point to the affidavit of another witness, Richard Frazer, the president of a Buffalo manufacturer of DURA LUBE and a person familiar with the comparison tests of DURA LUBE and LUBRICATOR 2001. Frazer states he would voluntarily appear in Wilmington, but would not set foot in Chicago for trial. D.I. 22 at Exh. 7.[FN11]

> FN11. Frazer's distaste for Chicago is unexplained.

Turtle Wax, on the other hand, notes other known likely non-party witnesses are in the subpoena power of the Northern District of Illinois, but not the District of Delaware. Turtle Wax's product development and advertising planning was conducted entirely in Chicago. D.I. 12 at ¶¶ 3-6. In addition, trial, or preparation for trial, will likely include testimony from Falex employees-workers in the laboratories used by both parties for comparative performance testing. The other independent laboratories used by Turtle Wax are located in or near Chicago, and all are within

the subpoena power of the Northern District of Illinois. *Id.* at ¶ 7. Script to Screen, which wrote and produced the infomercial, has an office in Chicago. D.I. 6. Significantly, however, Turtle Wax has not represented that any of these witnesses would be unavailable for trial if trial were held in Delaware.

Unfortunately, neither party has provided the Court with a list of potential witnesses, their respective residences, the matters about which each witness would testify, whether a witness is a key witness and finally, whether the witness is an employee or retained expert or might otherwise be willing to attend trial in Delaware even if not subject to the subpoena power of the Court. *Cf. Sherwood,* 1996 WL 700261, at *4-5 (considering representations from counsel that certain witnesses will be either available or unavailable for trial); *Northwood Corp.,* 1996 WL 250054, at 5, 1996 U.S.Dist. LEXIS 6320, at *15-16 (considering list of potential witnesses and their respective states of residence and distances witnesses must travel in connection with litigation). The Court can only conclude this: some of plaintiffs' likely witnesses are within the subpoena power of District of Delaware, some of defendants' likely witnesses are within the subpoena power of the Northern District of Illinois. Litigating in either forum will inevitably cause some inconvenience to the witnesses of the opponent. Put bluntly, it is a wash. Thus, Turtle Wax's arguments concerning this factor are insufficient to disturb plaintiffs' choice of forum.

### (3) Access to Documents

**\*7** Plaintiffs implicate one final private interest in explaining their motivation for filing suit in Delaware: this forum has easy access to pertinent documents in this case. The documents of one of the independent laboratories used by plaintiffs are located in New Jersey, and within the subpoena power of this Court.

Turtle Wax, on the other hand, notes that most of its documentary evidence is located either in Illinois or in California. This is documentary evidence upon

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                    Page 7

Not Reported in F.Supp., 1996 WL 756760 (D.Del.)
**(Cite as: Not Reported in F.Supp.)**

which all parties are likely to rely; it deals with the factual basis of plaintiffs' claims. With the advent of technology, however, documents can be easily transferred from one locale to another. Further, similar to the convenience of witnesses factor, some relevant documents are within the subpoena power of the District of Delaware, and some are within the subpoena power of the Northern District of Illinois. Therefore, this factor does not warrant an order of transfer.

2. Public Interests

(a) Practical Considerations of Efficiency and Expense

Plaintiffs candidly acknowledge they have chosen the District of Delaware as the forum in which they would like to try their case, in part, because of the Court's relatively light docket and speedy disposition of cases. This has been repeatedly recognized as a legitimate reason by both the Third Circuit Court of Appeals and this district. *See e.g., Solomon v. Continental Am. Life Ins. Co.,* 472 F.2d 1043, 1047 (3d Cir.1973); *Joint Stock Society,* 936 F.Supp. at 190. Plaintiffs have cited statistics showing that from 1990-95, there were approximately 213 cases pending per active judge in the District of Delaware, compared to 328 cases pending per active judge in the Northern District of Illinois. D.I. 22 at Exh. 8. Further, for the most recent period for which statistics are available, 1994-95, the median time from the filing of a civil action to trial in the District of Delaware was seven months shorter than in the Northern District of Illinois. *Id.*

Turtle Wax concedes the disposition of cases is quicker in Delaware, but stresses the cost of litigation will not necessarily be lower. As support for this argument, they point out that, by filing in Delaware, plaintiffs forced both parties to retain local counsel. But if this action were transferred, Turtle Wax notes, only plaintiffs-who already have committed to the added expense of local counsel-need retain local counsel. Nonetheless, plaintiffs have demonstrated a rational and

legitimate reason for filing in Delaware: they may be accorded a quicker disposition of their case. Where the trade-off is between plaintiffs' desire for faster resolution as opposed to the desire of Turtle Wax, a financially secure corporation, to spare the expense of local counsel, speedy resolution takes the nod. Therefore, this factor militates against transfer.

(b) Local Interest in Deciding Local Controversies at Home

Plaintiffs have alleged violations of Delaware law, as has Turtle Wax in its counterclaim. Further, "it is preferable for the court of the state whose substantive law controls to hear the case." *In re ML-Lee Acquisition Fund II, L.P.,* 816 F.Supp. 973, 979 (D.Del.1993).

**\*8** But Turtle Wax undercuts the efficacy of this argument in two ways. First, Turtle Wax notes, the Lanham Act, a federal statute, provides the primary basis for the claims and counterclaims in this case; the Lanham Act is not unique to Delaware and can be resolved by any federal district court. The importance of the state law claims pales in comparison.[FN12]

> FN12. Damages flowing from violation of Delaware statutes would be relatively minimal; counsel might perceive some nebulous advantage in the availability of different types of damages or attorney fees by alleging violations of state law.

Second, the supplemental state claims allege consumer fraud and deceptive trade practice violations. Both the Illinois Deceptive Trade Practices Act, ILL.REV.STAT. ch. 815, para. 510/2 (1996), and the Delaware Deceptive Trade Practices Act, DEL.CODE ANN. tit. 6, § 2532 (1995), are modeled on the Uniform Deceptive Trade Practices Act. Further, the texts of both statutes are similar. Thus, according to Turtle Wax, the supplemental state law claims will provide no novel issue of Delaware law to a district court in Illinois; this militates against retention of the case

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                Page 8

Not Reported in F.Supp., 1996 WL 756760 (D.Del.)
**(Cite as: Not Reported in F.Supp.)**

to determine a local controversy.

But Turtle Wax has not cited to any cases in which
the Illinois and Delaware statutes have been
interpreted in the same way. Delaware courts have
differed in statutory interpretation from other state
courts, even when the language of the statutes are
nearly identical. *Compare Sears, Roebuck & Co.
v. Sears plc,* 744 F.Supp. 1289 (D.Del.1990), and
*Ramada Inns, Inc. v. Drinkhall,* No. CIV.A.
83C-AU-56, 1984 WL 247023 (Del.Super.Ct. May
17, 1984), *with Murphy v. Erwin-Wasey, Inc.,* 460
F.2d 661 (1st Cir.1972), and *Gray v. American
Radiator & Standard Sanitary Corp.,* 176 N.E.2d
761 (Ill.1961) (according different interpretations to
textually similar state long-arm statutes).
Therefore, while the law underlying the parties'
supplemental Delaware claims may not be unique, it
is far from a settled matter that Delaware
jurisprudence interpreting the Delaware Deceptive
Trades Act is identical, or would be identical in this
case, to its Illinois counterparts. This factor also
militates against transfer.

(c) Public Policies of the Fora

Delaware has an interest in this controversy since it
involves alleged consumer deception based on sales
of Turtle Wax products in Delaware. Although
Turtle Wax points out this interest is
undifferentiated from the other fifty states in which
Turtle Wax products are sold, it does not contend it
does not do significant business in Delaware.
Therefore, as with the other private and public
interests, this factor does not strongly favors
transfer.

IV. CONCLUSION

After carefully considering the arguments offered
by both plaintiffs and Turtle Wax, the Court holds
transfer is inappropriate in this case. Accordingly,
Turtle Wax's motion to transfer will be denied.

D.Del.,1996.
Media Group, Inc. v. Turtle Wax, Inc.
Not Reported in F.Supp., 1996 WL 756760 (D.Del.)

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

END OF DOCUMENT

**UNREPORTED CASE 2**

Westlaw.

Slip Copy                                                                     Page 1

Slip Copy, 2006 WL 3201882 (D.Del.)
**(Cite as: Slip Copy)**

**c**
Weisler v. Barrows
D.Del.,2006.
Only the Westlaw citation is currently available.
United States District Court,D. Delaware.
Yakov WEISLER, Plaintiff,
v.
Timothy A. BARROWS, et al., Defendants.
**Civil No. 06-362 GMS.**

Nov. 6, 2006.

A. Zachary Naylor, Daniel J. Brown, Pamela S.
Tikellis, Chimicles & Tikellis, LLP, Wilmington,
DE, for Plaintiff.
William O. Lamotte, III, Morris, Nichols, Arsht &
Tunnell, Wilmington, DE, for Defendants.

GREGORY M. SLEET, District Judge.

**I. INTRODUCTION**

**\*1** Yakov Weisler ("Weisler") has brought this
shareholder derivative action against various
directors and officers of Sycamore Networks, Inc. ("
Sycamore"), including its chairman of the board,
Gururaj Deshpande ("Deshpande"), chief executive
officer and director Daniel E. Smith ("Smith"),
directors Timothy A. Barrows ("Barrows"), Paul
W. Chisholm ("Chisholm"), Paul J. Ferri ("Ferri"),
and John W. Gerdelman ("Gerdelman"), chief
financial officer, Richard J. Gaynor ("Gaynor"),
former chief financial officer, treasurer and
secretary Frances M. Jewels ("Jewels"), and
officers Anita Brearton ("Brearton"), Kurt
Trampedach ("Trampedach"), Jeffry A. Kiel ("Kiel"
), and Kevin J. Oye ("Oye") (collectively, the "
defendants"). According to the complaint, "this
action seeks redress for the harm done to Sycamore,
by certain of its top executives who breached their
fiduciary duties of loyalty and good faith to the
Company [Sycamore] by intentionally manipulating

stock option grant dates between 1999 and 2004, in
order to provide certain employees with huge
financial windfalls at the expense of Sycamore and
by misstating Sycamore's financial results from
fiscal year 1999 to the present."(D.I. 42 ¶ 2.) The
complaint consists of six counts: (1) one count
against the directors for violations of section 14(a)
of the Securities and Exchange Act of 1934 (the "
Exchange Act"); (2) one count against Deshpande,
Smith, Gaynor, and Jewels for disgorgement under
the Sarbanes-Oxley Act of 2002 section 304 ("
Sarbanes-Oxley"); (3) one count against the
officers, and Chisholm, Gerdelman, Ferri, and
Barrows for unjust enrichment; (4) one count
against all defendants for breach of fiduciary duty;
(5) one count against all defendants for gross
mismanagement; and (6) one count against all
defendants for waste of corporate assets.

Presently before the court is the defendants' motion
to transfer pursuant to 28 U.S.C. § 1404(a).
Because the court finds that transfer will
convenience the parties and the witnesses while
serving the interests of justice, it will grant the
motion.

**II. BACKGROUND.**

Sycamore is a Delaware corporation with its
principal place of business in Chelmsford,
Massachusetts. According to the complaint,
Sycamore engages in the development and
marketing of optical networking products for
domestic and international wire line and wireless
network service providers, and government entities
with private fiber networks. (D.I. 42 ¶ 18.)
Sycamore's product portfolio includes optical
switching products, network management products,
and design and planning tools. (*Id.*)

Weisler accuses the defendants of collective and
individual breaches of their fiduciary duties of
loyalty, good faith, candor, due care, and their gross

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                    Page 2

Slip Copy, 2006 WL 3201882 (D.Del.)
**(Cite as: Slip Copy)**

negligence in: (1) failing to discover or prevent the improper manipulation of employee stock option grants; (2) failing to discover or prevent the public misreporting of earnings caused by the manipulation of employee stock options, including its effect on stock option expenses and tax liabilities; (3) failing to properly implement, oversee, and maintain appropriate and adequate accounting and internal controls, practices and procedures, namely concerning the administration of Sycamore's stock-based compensation plan; (4) failing to ensure that Sycamore operated in compliance with all applicable federal and state laws, rules, and regulations requiring the dissemination of accurate financial statements and restricting the misuse of material non-public information; (5) failing to ensure that Sycamore did not engage in any unsafe, unsound, or illegal business practices; and (6) failing to ensure that Sycamore's financial statements were prepared in accordance with Generally Accepted Accounting Principles ("GAAP").(*Id.*¶ 11.)Weisler claims that this conduct violates Section 14(a) of the Exchange Act and section 304 of Sarbanes-Oxley.

**\*2** Weisler also accuses the defendants of authorizing, modifying, or failing to halt the backdating of six new employee stock options, and canceling and reissuing existing stock option grants to provide a lower exercise price for the options, in both cases, from 1999 to 2004. (*Id.*¶ 5.) Weisler alleges that the employees were unjustly enriched to the detriment of Sycamore and its shareholders as a result of the defendants' actions. Weisler claims that the unlawful conduct occurred while certain defendants were directing the company, and that these defendants were, therefore, breaching their fiduciary duties of care, loyalty, and good faith.

### III. DISCUSSION.

Pursuant to section 1404(a), the court may transfer a civil action "for the convenience of parties and witnesses, in the interest of justice, ... to any other district ... where it might have been brought."28 U.S.C. § 1404(a). It is within the court's discretion whether to transfer a case according to an individualized case-by-case consideration of

conveniences and the interests of justice. *Stewart Org., Inc. v. Ricoh Corp.,* 487 U.S. 22, 29 (1988); *Affymetrix, Inc. v. Synteni, Inc.,* 28 F.Supp.2d 192, 197 (D.Del.1998). In making its determination under section 1404(a), the court must consider whether transferring this action would convenience (1) the parties and (2) the witnesses while (3) serving the interests of justice. *Affymetrix,* 28 F.Supp.2d at 196. It is the movant's burden to establish the need to transfer, and "the plaintiff's choice of venue [will] not be lightly disturbed." *Jumara v. State Farm Ins. Co.,* 55 F.3d 873, 879 (3d Cir.1995) (internal quotations omitted); *see Truth Hardware Corp. v. Ashland Prods, Inc.,* No C.A. 02-1541 GMS, 2003 WL 118005, at \* 1 (D.Del. Jan. 13, 2003). However, the moving party is not required to show truly compelling circumstances for change of venue, but rather that all relevant things considered, the case would be better off transferred to another district. *Dominy v. CSX Transp., Inc.,* Civ. A. No. 05-487, 2006 WL 573801, \* \* 2-3 (E.D.Pa. Mar. 9, 2006) (citing *In re United States,* 273 F.3d 380, 399 (3d Cir.2001)).

There is no dispute here that Weisler could have brought this action in the District of Massachusetts. Thus, the court will continue with its inquiry as directed by the Third Circuit. *See Jumara,* 55 F.3d at 879. When considering a motion to transfer, the court must determine "whether on balance the litigation would more conveniently proceed and the interest of justice be better served by transfer to a different forum."*Id.* This inquiry requires a " multi-factor balancing test," embracing not only the statutory criteria of convenience of the parties and the witnesses and the interests of justice, but all relevant factors, including certain private and public interests. *Id.* at 875.These private interests include: (1) the plaintiff's choice of forum; (2) the defendant's preference; (3) whether the claim arose elsewhere; (4) the convenience of the parties; (5) the convenience of the expected witnesses; and (6) the location of books and records, to the extent that they could not be produced in the alternative forum. [FN1]*Id.* at 879.Among the relevant public interests are: (1) the enforceability of the judgment; (2) practical considerations that could make the trial easy, expeditious, or inexpensive; (3) the relative administrative difficulty in the two fora resulting

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                          Page 3

Slip Copy, 2006 WL 3201882 (D.Del.)
**(Cite as: Slip Copy)**

from court congestion; (4) the local interest in deciding local controversies at home; and (5) the public policies of the fora. *Id.* at 879-880.

> FN1. The first three of these private interest factors collapse into other portions of the *Jumara* analysis. Thus, the court will consider them in the context of the entire inquiry only. *See Afymetrix,* 28 F.Supp.2d 192.

**\*3** After having considered the relevant factors, the court finds that the defendants have met their burden of demonstrating that transfer to the District of Massachusetts is appropriate. The present suit is one of four federal actions commenced in three different districts [FN2] based upon substantially the same transactions and occurrences. As previously mentioned, Sycamore is principally based in Massachusetts. As a result, many of the witnesses with knowledge of the events giving rise to this lawsuit are located there. Indeed, Gaynor submitted a declaration, which states that Sycamore has identified several potential fact witnesses, all current or former employees of Sycamore with knowledge of the facts and circumstances regarding the allegations in the complaint, who reside in Massachusetts. (D.I. 34 ¶ 7.) These individuals would not appear to be subject to compulsory process in Delaware. *See* Fed.R.Civ.P. 45(b)(2) (2006). Additionally, Weisler is a New York resident, and none of the defendants are Delaware residents.[FN3] Moreover, in a shareholder's derivative suit, a plaintiff's choice of forum is entitled to little weight. *Koster v. (American) Lumbermen's Mutual Cas. Co.,* 330 U .S. 518, 524 (1947).

> FN2. The following are the names of the federal actions, which have been filed in Delaware, Massachusetts, and New York: *Weisler v. Barrows, et al.,* Civ. A. No. 06-362-GMS (Commenced on May 31, 2006, D. Del.), *Vanpraet v. Deshpande, et al.,* Civ. A. No. 06-11130-RCL (commenced on June 28, 2006, D. Mass.), *Patel v. Deshpande, et al.,* Civ. A. No.

06-11207-RCL (commenced on July 13, 2006, D. Mass.), and *Ariel v. Barrows, et al.,* Civ. A. No. 06-3601(JG)(RLM) (commenced on July 21, 2006, E.D.N.Y.). Additionally, there are two separate actions pending in the Delaware and Massachusetts state courts.

> FN3. Deshpande, Smith, Barrows, Chisholm, Ferri, Gaynor, Jewels, Brearton, Trampedach, Kiel, and Oye are all Massachusetts residents. Gerdelman is a Virginia resident.

Further, there is little connection between Delaware and this action. In fact, the only connection that Weisler points to the fact that Sycamore is incorporated in Delaware. *See APV N. Am., Inc. v. Sig Simonazzi N. Am., Inc.,* 295 F. supp.2d 393, 398-99 (D .Del.2002) (A party's incorporation in Delaware is not dispositive of a motion to transfer. " Where an alternative forum is more convenient and has more substantial connection with the litigation ' incorporation in Delaware will not prevent transfer.' ") On the other hand, Massachusetts is Sycamore's principal place of business, and all aspects of its day-to-day business occur in Chelmsford, Massachusetts. (D.I. 34 ¶ 2.) In addition, the Gaynor declaration states that all press releases and Securities Exchange Commission ("SEC") filings are prepared, reviewed, signed and issued from Sycamore's headquarters. (*Id.*¶ 4.) The financial information that Sycamore reports in the press releases and SEC filings is based on accounting work performed by Sycamore's accountants at its headquarters.(*Id.*) Thus, the locus of the operative facts appears to be Massachusetts. Accordingly, the majority of the events giving rise to this action occurred in Massachusetts, which is the location of the principal offices of Sycamore and, as a result, the location of many of the witnesses. These factors weigh heavily in the court's transfer analysis. As a result, the court concludes that the applicable private interest factors weigh in favor of a transfer.

Likewise, the public interest factors weigh in favor of transfer to Massachusetts. Most relevant to the court's inquiry, is whether there are practical considerations that would make trial "easy,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2006 WL 3201882 (D.Del.)
**(Cite as: Slip Copy)**

expeditious, or inexpensive." *Jumara,* 55 F.3d at 879. There are two shareholder derivative actions currently pending in the District of Massachusetts, which are based on the same facts and circumstances as the present case. The plaintiffs have moved to consolidate those cases and any subsequently filed shareholder derivative actions because they "involve common questions of law and fact concerning the defendants' alleged breaches of fiduciary duties, statutory violations, and other violations of law."(D.I. 12 ¶ 2, filed in *Vanpraet v. Deshpande, et al.,* Civ. A. No. 06-11130-RCL (D.Mass.)) Transferring the present case will permit the Massachusetts court to consolidate all actions with one lead plaintiff and lead counsel, thereby eliminating some of the expense for individual plaintiffs. Where related lawsuits exist, "it is in the interests of justice to permit suits involving the same parties and issues to proceed before one court."*Liggett Group, Inc. v. R .J. Reynolds Tobacco Co.,* 102 F.Supp.2d 518, 537 (D.N.J.2000) (citations omitted); *see In re Amendt,* 169 Fed. Appx. 93, 96 (3d Cir.2006) (non-precedential) ("[T]he most important factor is the avoidance of duplicative litigation: Adjudicating almost identical issues in separate fora would waste judicial resources."). Finally, the court is not persuaded that any disparity in court congestion, to the extent that there is any, will be so great as to weigh against transfer.[FN4]Therefore, the court concludes that, on balance, the public interest factors favor transfer in the instant case.

> FN4. The parties seem to agree that no particular local interests or public policies are implicated by this action.

*4 For the reasons stated in the court's Memorandum of this same date, IT IS HEREBY ORDERED that:

1. The defendants' Motion to Transfer this Case to the United States District Court for the District of Massachusetts (D.I.28) is GRANTED.

2. The above-captioned action is hereby

TRANSFERRED to the United States District Court for the District of Massachusetts.

D.Del.,2006.
Weisler v. Barrows
Slip Copy, 2006 WL 3201882 (D.Del.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

## CERTIFICATE OF SERVICE

I, Thomas P. Preston, hereby certify that on this 19th day of September, 2007, a copy of

the foregoing **OPENING BRIEF IN SUPPORT OF CERTAIN DEFENDANTS' MOTION**

**TO TRANSFER VENUE** was served on the following counsel:

| **BY ELECTRONIC SERVICE** | **BY FIRST-CLASS MAIL** |
|---|---|
| Joseph A. Rosenthal<br>Carmella P. Keener<br>Rosenthal, Monhait & Goddess, P.A<br>919 N. Market Street, Suite 1401<br>Wilmington, DE 19899 | Samuel H. Rudman<br>Lerach Coughlin Stoia Geller Rudman &<br>  Robbins LLP<br>58 South Service Road, Suite 200<br>Melville, NY 11747 |
| **BY ELECTRONIC SERVICE** | **BY FIRST-CLASS MAIL** |
| Robert S. Saunders<br>Skadden, Arps, Slate, Meagher & Flom LLP<br>One Rodney Square<br>P.O. Box 636<br>Wilmington, DE 19899 | Craig A. Stewart<br>Ken L. Hashimoto<br>Monique A. Gaylor<br>Arnold & Porter LLP<br>399 Park Avenue<br>New York, NY 10022 |
| **BY ELECTRONIC SERVICE** | **BY FIRST-CLASS MAIL** |
| Michael J. Maimone<br>Joseph B. Cicero<br>Edwards Angell Palmer & Dodge LLP<br>919 North Market Street, 15th Floor<br>Wilmington, DE 19801 | Michael Joseph<br>Joseph O. Click<br>Blank Rome LLP<br>600 New Hampshire Ave., N.W.<br>Washington, DC 20037 |
| **BY ELECTRONIC SERVICE** | **BY FIRST-CLASS MAIL** |
| Anne C. Foster<br>Robert J. Stearn, Jr.<br>Richard Layton & Finger, P.A.<br>One Rodney Square<br>920 North King Street<br>Wilmington, DE 19801 | Jonathan J. Lerner<br>Lea Haber Kuck<br>Skadden, Arps, Slate, Meagher & Flom LLP<br>Four Times Square<br>New York, NY 10036 |

| **BY ELECTRONIC SERVICE** | **BY FIRST-CLASS MAIL** |
|---|---|
| Christian Douglas Wright<br>Young, Conaway, Stargatt & Taylor<br>1000 West Street, 17th Floor<br>P.O. Box 391<br>Wilmington, DE 19899-0391 | Gandolfo V. DiBlasi<br>Stacey R. Friedman<br>David E. Swarts<br>Sullivan & Cromwell LLP<br>125 Broad Street<br>New York, NY 10004 |
| **BY ELECTRONIC SERVICE** | **BY FIRST-CLASS MAIL** |
| Thomas G. Macauley<br>Zuckerman Spaeder LLP<br>919 Market Street, Suite 990<br>Wilmington, DE 19801 | Christopher Harris<br>Seth L. Friedman<br>Latham & Watkins LLP<br>885 Third Avenue<br>New York, NY 10022 |
| **BY FIRST-CLASS MAIL** | **BY FIRST-CLASS MAIL** |
| Andrew B. Weissman<br>Michele L. Taylor<br>Wilmer Cutler Pickering Hale and Dorr LLP<br>1875 Pennsylvania Ave., N.W.<br>Washington, DC 20006 | Thomas G. Rafferty<br>Antony L. Ryan<br>Cravath, Swaine & Moore LLP<br>825 Eighth Avenue<br>New York, NY 10019-7475 |
| **BY FIRST-CLASS MAIL** | **BY FIRST-CLASS MAIL** |
| Michael Shapiro<br>Gerald Griffin<br>Carter Ledyard & Milburn LLP<br>2 Wall Street<br>New York, NY 10005 | Richard M. Strassberg<br>Jeffrey A. Simes<br>Laurie L. Leven<br>599 Lexington Avenue<br>New York, NY 10022 |
| **BY FIRST-CLASS MAIL** | **BY FIRST-CLASS MAIL** |
| Carl S. Kravits<br>Zuckerman Spaeder LLP<br>1800 M Street, N.W.<br>Washington, DC 20036 | Richard A. Spehr<br>Joseph De Simone<br>Mayer, Brown, Rowe & Maw LLP<br>1675 Broadway<br>New York, NY 10019-5820 |

2

| **BY FIRST-CLASS MAIL** | **BY FIRST-CLASS MAIL** |
|---|---|
| Stephen L. Ascher<br>Jenner & Block<br>919 Third Avenue<br>New York, NY 10022-3908 | Lynn Brimer<br>Strobl & Sharp, P.C.<br>300 East Long Lake Road, Suite 200<br>Bloomfield Hills, MI 48304-2376 |

/s/ Thomas P. Preston
_____

Thomas P. Preston
I.D. No. 2548

3