UNITED STATES DISTRICT COURT
DISTRICT OF DELAWARE

| | |
|---|---|
| COLLINS & AIKMAN CORPORATION and COLLINS & AIKMAN PRODUCTS CO., as Debtors in Possession, <br><br>                      *Plaintiffs,* <br><br>    vs. <br><br> DAVID A. STOCKMAN, et al.,. <br><br>                      *Defendants.* | C.A. No. 07-265*** |

**DECLARATION OF JOSEPH O. CLICK IN SUPPORT
OF DEFENDANTS' MOTION TO TRANSFER VENUE**

I, Joseph O. Click, declare as follows:

1.     I am a partner with the law firm Blank Rome LLP.  My office is located at 600 New Hampshire Ave. N.W., Washington, D.C.  20037.  With respect to this action, I have been working with Thomas P. Preston, a partner in Blank Rome's Wilmington, Delaware office who represents defendants Bryce M. Koth and Robert A. Krause in the above-captioned action.

2.     I also am lead counsel to Messrs. Koth and Krause in two lawsuits pending in the United States District Court for the Eastern District of Michigan, *MainStay High Yield Bond Fund v. Heartland Industrial Partners L.P.*, No. 2:07-cv-10542-AJT-SDP (E.D. Mich.) and *Egleston v. Heartland Industrial Partners, L.P., et al.*, No. 2:06-cv-13555-AJT-SDP (E.D. Mich.).  The latter case, a securities fraud class action, was originally filed in the United States District Court for the Southern District of New York.  In July 2006, the New York court transferred the case to Eastern District of Michigan for the convenience of the parties and witnesses pursuant to 28 U.S.C. § 1404(a).  *See In re Collins & Aikman Corp. Sec. Litig.*, 438 F. Supp. 2d 392 (S.D.N.Y. 2006).

3.     Attached hereto as Exhibit A is a true and correct copy of the Complaint for Declaratory and Injunctive Relief filed in the bankruptcy proceeding *In re Collins & Aikman Corporation*, Case No. 05-55927 (SWR) (Bankr. Ct., E.D. Mich.).

4.      Attached hereto as Exhibit B is a true and correct copy of the Second Amended Complaint pending in the United States District Court for the Eastern District of Michigan in *Egleston v. Heartland Industrial Partners, L.P., et al.*, No. 2:06-cv-13555-AJT-SDP (E.D. Mich.).

5.      Attached hereto as Exhibit C is a true and correct copy of the Amended Class Action Complaint pending in the United States District Court for the Eastern District of Michigan in *MainStay High Yield Bond Fund v. Heartland Industrial Partners L.P.*, No. 2:07-cv-10542-AJT-SDP (E.D. Mich.).

6.      Attached hereto as Exhibit D is a true and correct copy of relevant excerpts from the 2000 Annual Report of Collins & Aikman Corporation.

7.      Attached hereto as Exhibit E is a true and correct copy of relevant excerpts from the 2003 SEC Form 10-K filed by Collins & Aikman Corporation.

8.      Attached hereto as Exhibit F are true and correct copies of press releases that were issued by Collins & Aikman Corporation on March 17, 2005, March 24, 2005 and May 12, 2005.

9.      Attached hereto as Exhibit G are true and correct copies of various articles that were published and available to the public, specifically *Big 3 Take a Battering*, 80 Automotive News 6183 (Jan. 2, 22006); Jason Roberson, *Lear, DCX Fight is a Trend*, Detriot Free Press (Dec. 3, 2005); Jeffrey McCracken, *Chrysler 300 Faced Idling*, Detroit Free Press (July 27, 2005), 2d ed; *Auto Suppliers' 2005 Woes May Well Continue in 2006*, Standard & Poor's Analyst Report (Nov. 29, 2005).

10.     Attached hereto as Exhibit H is a true and correct copy of the sworn Declaration of David A. Stockman, dated March 1, 2006, in Support of Defendants' Motion to Transfer Venue Pursuant to 28 U.S.C. § 1404(a).  Mr. Stockman's Declaration was filed in the United States District Court for the Southern District of New York on March 2, 2006 in support of the defendants' motion to transfer the *Egleston* case from New York to the Eastern District of Michigan.  In that Declaration, Mr. Stockman explained that:

(a)     C&A's corporate headquarters was located at all relevant times in Troy Michigan (¶ 2).

(b)     Except for the Soft Trim Division, C&A's corporate management team and corporate employees in the sales, engineering, design, finance, accounting, treasury, and purchasing departments were located principally at C&A's headquarters in Michigan, his understanding that many of these employees resided in the Detroit metropolitan area, and his belief that many current or former senior managers and corporate employees continued to reside in that area as of March 1, 2006 (¶ 2).

(c)     Except for the Soft Trim Division, the corporate executives for C&A's primary operating divisions were located at C&A headquarters in Michigan, his understanding that the key executives in those operating divisions resided in the Detroit metropolitan area, and his belief that many of those persons continued to reside in that area  as of March 1, 2006 (¶ 3).

(d)     KMPG, C&A's auditor for several years, maintained a presence at C&A's Michigan headquarters (¶ 4).

(e)     C&A's purchasing department negotiated rebates with C&A suppliers from C&A Michigan headquarters (¶ 6).

(f)     C&A's Treasury Department, located in C&A's Michigan headquarters, was responsible for considering and evaluating the inclusion of C&A's accounts receivables as collateral for C&A's accounts receivable financing facility with General Electric Capital Corporation (¶ 8).

(g)     C&A's Finance Department, located at C&A's Michigan Headquarters, was responsible for collecting financial statements for C&A's various operating divisions, and merging them together to create C&A's consolidated financial statements (¶ 9).

(h)     A team drawn from C&A's senior management, working out of C&A's headquarters in Michigan, conducted an internal review of supplier contracts and vendor rebates in the first quarter of 2005 (¶ 10).

(i)     C&A stored its paper documents and records at the Company's headquarters in Michigan (¶ 12).

(j)     C&A's press releases and SEC filings were prepared at C&A's Michigan headquarters (¶ 13).

10.     In addition, Mr. Stockman identified in his March 2006 Declaration a number of persons who are not parties to this action who likely have information concerning its subject

3

matter, and who he understood to reside at that time in the Detroit metropolitan area. These included:

> (a)     Dianna Kokkinos, C&A's Senior Vice President Global Procurement & Supply Chain Management, who should have information about the role of vendor rebates in C&A's business, procedures and policies of the Purchasing Department, negotiations with C&A's suppliers over price concessions, and certain particular rebate agreements (¶ 11a).

> (b)     Michael Doyle, Amarish Kapadia, Dan Mutarelli, Andy Heilmann, Chris Duvall, Joseph Nowacki, Jason Clark, Scott Mors, Tim Knight, all of whom were C&A purchasing managers and buyers who should have information about the circumstances and terms of the rebate agreements they negotiated (¶11b).

> (c)     David Youngman, C&A's Investor Relations and Public Affairs Manager, who should have information about corporate communications with investors, including the press releases and conference calls alleged to contain false or misleading statements (¶ 11f).

> (d)     Jerry Mosingo, C&A's chief executive officer prior to August 2003, who should have information regarding C&A's operations during his tenure as CEO.

> (e)     Partners and employees of KPMG, C&A's independent auditor from at least 2003 until the Company filed for bankruptcy (11g).

> (f)     Jay Knoll, who served as C&A's general counsel and was a member of the C&A management team that reviewed C&A's supplier contracts and rebates in the first quarter of 2005 (¶ 10).

11.     Nothing that I have learned in my representation of Messrs. Koth and Krause in the actions that are pending in Michigan has given me any reason to believe that the facts discussed in Mr. Stockman's March 2006 Declaration that are described in paragraph 9 do not hold true today. It is a matter of common sense that many of the departments and activities described by Mr. Stockman, and set forth in paragraph 9, took place at C&A's Michigan headquarters. According to C&A's Web site, it still maintains its corporate headquarters in Michigan. Moreover, it is more than reasonable to infer that C&A filed its bankruptcy petition in

the Eastern District of Michigan because its Michigan headquarters is the nerve-center for the

activities listed above.

12.    I do not have the knowledge of C&A's personnel, their particular jobs and

responsibilities, and their current whereabouts that is reflected in Mr. Stockman's March 2006

Declaration.. However, I have no reason to believe those persons identified by Mr. Stockman in

his March 2006 Declaration as having lived in the Eastern District of Michigan at the relevant

times, and who Mr. Stockman believed as of March 1, 2006 to reside in the Eastern District of

Michigan, do not continue to reside in that District today.

13.    Other defendants in the *MainStay* action pending in the Eastern District of

Michigan who are alleged in that lawsuit to reside in Michigan are:

(a)    Thomas Gougherty, controller of C&A's International Plastics Division,
who should have information concerning accounting for supplier rebates.

(b)    Christopher M. Williams, C&A's Director of Commercial Management
for C&A's contracts with Ford from 2000 to November 2004, and C&A's
Executive Vice President of Business Development and Specialty Products from
November 2004 to May 2005, who should have concerning C&A's accounts
receivable facility with GECC.

14.    Defendant Bryce Koth continues to reside in the Eastern District of Michigan.  It

is also my understanding that moving defendants David Cosgrove, Cynthia Hess, and Paul

Barnaba also reside in the Eastern District of Michigan.  While Mr. Stockman's Declaration

identifies moving defendant John Galante as residing in the Eastern District of Michigan as of

March 2006, it is my understanding Mr. Galante no longer resides in Michigan.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this

17th day of September, 2007.

5

Joseph O. Click
BLANK ROME LLP
600 New Hampshire Ave. N.W.
Washington, D.C.  20037
(202)-772-5800

.

# EXHIBIT A

## IN THE UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| COLLINS & AIKMAN CORPORATION, et al.,[1] | ) | Case No. 05-55927 (SWR) |
| | ) | (Jointly Administered) |
| Debtors. | ) | |
| | ) | (Tax Identification #13-3489233) |
| _____ | ) | |
| | ) | |
| COLLINS & AIKMAN CORPORATION, et al., | ) | Honorable Steven W. Rhodes |
| | ) | |
| Plaintiffs, | ) | Adversary No. _____ |
| | ) | |
| v. | ) | |
| | ) | |
| K. J. EGLESTON, et al., KLEINPETER- | ) | |
| FLECK, et al., MORRIS AKERMAN, et al., | ) | |
| MASSIMO GARIDDI, et al., MACKAY | ) | |
| SHIELDS LLC, JOHN DOES 1-1000, and JANE | ) | |
| DOES 1-1000, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## COMPLAINT FOR DECLARATORY AND/OR INJUNCTIVE RELIEF

Plaintiffs Collins & Aikman *et al.*, the debtors and debtors-in-possession (collectively,

the "Debtors" or "Collins & Aikman") in the above-captioned jointly administered chapter 11

---

[1]    The Debtors in the jointly administered cases include: Collins & Aikman Corporation; Amco Convertible Fabrics, Inc., Case No. 05-55949; Becker Group, LLC (d/b/a/ Collins & Aikman Premier Mold), Case No. 05-55977; Brut Plastics, Inc., Case No. 05-55957; Collins & Aikman (Gibraltar) Limited, Case No. 05-55989; Collins & Aikman Accessory Mats, Inc. (f/k/a the Akro Corporation), Case No. 05-55952; Collins & Aikman Asset Services, Inc., Case No. 05-55959; Collins & Aikman Automotive (Argentina), Inc. (f/k/a Textron Automotive (Argentina), Inc.), Case No. 05-55965; Collins & Aikman Automotive (Asia), Inc. (f/k/a Textron Automotive (Asia), Inc.), Case No. 05-55991; Collins & Aikman Automotive Exteriors, Inc. (f/k/a Textron Automotive Exteriors, Inc.), Case No. 05-55958; Collins & Aikman Automotive Interiors, Inc. (f/k/a Textron Automotive Interiors, Inc.), Case No. 05-55956; Collins & Aikman Automotive International, Inc., Case No. 05-55980; Collins & Aikman Automotive International Services, Inc. (f/k/a Textron Automotive International Services, Inc.), Case No. 05-55985; Collins & Aikman Automotive Mats, LLC, Case No. 05-55969; Collins & Aikman Automotive Overseas Investment, Inc. (f/k/a Textron Automotive Overseas Investment, Inc.), Case No. 05-55978; Collins & Aikman Automotive Services, LLC, Case No. 05-55981; Collins & Aikman Canada Domestic Holding Company, Case No. 05-55930; Collins & Aikman Carpet & Acoustics (MI), Inc., Case No. 05-55982; Collins & Aikman Carpet & Acoustics (TN), Inc., Case No. 05-55984; Collins & Aikman Development Company, Case No. 05-55943; Collins & Aikman Europe, Inc., Case No. 05-55971; Collins & Aikman Fabrics, Inc. (d/b/a Joan Automotive Industries, Inc.), Case No. 05-55963; Collins & Aikman Intellimold, Inc. (d/b/a M&C Advanced Processes, Inc.), Case No. 05-55976; Collins & Aikman Interiors, Inc., Case No. 05-55970; Collins & Aikman International Corporation, Case No. 05-55951; Collins & Aikman Plastics, Inc., Case No. 05-55960; Collins & Aikman Products Co., Case No. 05-55932; Collins & Aikman Properties, Inc., Case No. 05-55964; Comet Acoustics, Inc., Case No. 05-55972; CW Management Corporation, Case No. 05-55979; Dura Convertible Systems, Inc., Case No. 05-55942; Gamble Development Company, Case No. 05-55974; JPS Automotive, Inc. (d/b/a PACJ, Inc.), Case No. 05-55935; New Baltimore Holdings, LLC, Case No. 05-55992; Owosso Thermal Forming, LLC, Case No. 05-55946; Southwest Laminates, Inc. (d/b/a Southwest Fabric Laminators Inc.), Case No. 05-55948; Wickes Asset Management, Inc., Case No. 05-55962; and Wickes Manufacturing Company, Case No. 05-55968.

K&E 10889551.6

cases, allege for their Complaint, upon knowledge of their own acts and upon information and belief as to all other matters, as follows:

### Introduction

1.    The Debtors file this Complaint seeking the entry of an Order, issued pursuant to Sections 362 and 105 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code"), and Rule 7065 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), providing the following relief: (i) a declaration that during the pendency of the Debtors' chapter 11 cases, the prosecution of the Court Actions (as the term is defined below) and the commencement of any similar future actions against the Debtors and Non-Debtor D&Os (as the term is defined below) constitute a violation of the automatic stay; and/or (ii) preliminary and permanent injunctions enjoining the pursuit of the Court Actions (as the term is defined below) and any similar future actions against the Debtors and Non-Debtor D&Os (as the term is defined below) during the pendency of the Debtors' chapter 11 cases.

### Jurisdiction and Venue

2.    On May 17, 2005 (the "Petition Date"), the Debtors filed their voluntary petitions for relief under chapter 11 of the Bankruptcy Code (collectively, the "Chapter 11 Cases") in the United States Bankruptcy Court for the Eastern District of Michigan. Pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code, the Debtors continue to operate their businesses and manage their properties as debtors-in-possession.

3.    This Court has jurisdiction to hear the matters set forth in this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334.

4.    This adversary proceeding constitutes a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (G) and (O).

2

5.    Venue for this adversary proceeding is proper in this judicial district pursuant to 28 U.S.C. § 1409.

6.    The statutory bases for the relief requested herein are Sections 362(a) and 105(a) of the Bankruptcy Code.

7.    This adversary proceeding has been instituted in accordance with Bankruptcy Rule 7001.

8.    No prior request for the relief requested herein has been made to this or any other court.

## Background

### I.    The Parties

9.    The Debtors and their non-debtor affiliates are leading global suppliers of automotive components, systems and modules to all of the world's largest vehicle manufacturers, including DaimlerChrysler AG, Ford Motor Company, and General Motors Corporation.

10.    Defendants in this Adversary Proceeding are individuals and entities who have filed complaints between April and July 2005 (collectively, the "Court Actions") against the Debtors, and/or former and current senior officers and/or directors of the Debtors (the "Non-Debtor D&Os"), alleging violations of federal securities laws or Michigan common law (collectively, the "Securities-Related Claims"). The Court Actions[2] include the following:

(a)    On April 13, 2005, Hanna Kleinpeter-Fleck filed a purported class action, individually and on behalf of all others similarly situated, against the Debtors and three current and former senior officers and/or directors of the Debtors, captioned *Hanna Kleinpeter-Fleck v. Collins & Aikman Corp., David A. Stockman, J. Michael Stepp and Bryce M. Koth*, Civ. No. 05-CV-3791 (MBM) in the United States District Court for the Southern District of New York (the "*Kleinpeter-Fleck* Complaint"). The class was purportedly filed

---

2    Throughout this Complaint, the *Eglaston, Akerman, Kleinpeter-Fleck, Gariddi,* and *MacKay Shields* actions collectively are referred to as the "Court Actions."

on behalf of purchasers of the common stock of the Debtors between May 6, 2004, and March 17, 2005.

(b)    On May 23, 2005, K.J. Egleston filed a purported class action, individually and on behalf of all others similarly situated, against four current and former senior officers and/or directors of the Debtors, captioned *K.J. Egleston v. Jerry L. Mosingo, David A. Stockman, J. Michael Stepp, and Bryce M. Koth*, Civ. No. 05-CV-04950 (MBM) in the United States District Court for the Southern District of New York (the "*Egleston* Complaint"). The class was purportedly filed on behalf of purchasers of the common stock of Debtors between May 15, 2003, and March 17, 2005.

(c)    On May 27, 2005, Morris Akerman filed a purported class action, on behalf of himself and a class of persons similarly situated, against the Debtors and three current and former senior officers and/or directors of the Debtors, captioned *Akerman v. Collins & Aikman Corp., David A. Stockman, J. Michael Stepp, and Bryce M. Koth*, Civ. No. 05-CV-5098 (MBM) in the United States District Court for the Southern District of New York (the "*Akerman* Complaint"). The class was purportedly filed on behalf of purchasers of the common stock of the Company between May 6, 2004, and March 17, 2005.

(d)    On June 2, 2005, Massimo Gariddi filed a purported class action, individually and on behalf of all others similarly situated, against four current and former senior officers and/or directors of the Debtors, captioned *Gariddi v. Jerry L. Mosingo, David A. Stockman, J. Michael Stepp, and Bryce M. Koth*, Civ. No. 05-CV-5251(MBM) in the United States District Court for the Southern District of New York (the "*Gariddi* Complaint"). The class was purportedly filed on behalf of purchasers of the common stock of the Company between May 15, 2003, and March 17, 2005.

(e)    On July 8, 2005, MacKay Shields LLC filed a state court action in the State of Michigan, Circuit Court of Wayne County, captioned *MacKay Shields LLC v. Heartland Industrial Partners, L.P., et al*, File No. 05-520229CZ (the "*MacKay Shields* Complaint"), against Heartland Industrial Partners, L.P., Heartland Industrial Associates, L.L.C., and various former and current officers and directors of the Debtors and Heartland, including David A. Stockman, J. Michael Stepp, Timothy D. Leuliette, Daniel P. Tredwell, W. Gerald McConnell, Samuel Valenti, III, John A. Galante, Bryce M. Koth and Robert Krause (collectively, the "Defendants").

11.    A motion to consolidate the *Kleinpeter-Fleck, Egleston, Akerman,* and

*Gariddi* Complaints and a motion to appoint lead plaintiffs for the purported class are currently

4

pending before Judge Mukasey in the Southern District of New York.    In addition, a consolidated class action complaint was filed on behalf of plaintiffs on January 13, 2006.

12.    On November 9, 2005, the *MacKay Shields* Complaint was removed to the United States District Court for the Eastern District of Michigan, where a motion for remand is currently pending.

13.    The individual defendants named in the Court Actions are former officers and former and current directors of the Debtors (collectively referred to as the "Non-Debtor D&Os"). While the Court Actions focus primarily on the actions of former officers and directors of the Debtors, notably, the plaintiffs have sued current directors as well. Specifically, Timothy Leuliette, Daniel Tredwell, W. Gerald McConnell, and J. Michael Stepp are all current directors of the Debtors. Messrs. Leuliette and Tredwell were appointed to the Board of Directors on February 12, 2001, Mr. McConnell was appointed on April 10, 2001, and Mr. Stepp was appointed on March 6, 2001.

14.    The Court Actions also collectively name six former senior directors and officers of the Debtors, including the following: Jerry Mosingo, former executive vice president of Global Manufacturing Operations, Plastics & Cockpit Systems, former C&A president and chief executive officer, and member of the Board of Directors; David Stockman, former chief executive officer and member of the Board of Directors; Bryce Koth, former senior vice president and chief financial officer, and member of the Board of Directors; Samuel Valenti, former member of the Board of Directors; John Galante, former Director of Strategic Planning, vice president, treasurer, and member of the Board of Directors; and Robert Krause, former senior vice president and member of the Board of Directors.    With the exception of Mr. Mosingo, who resigned in 2003, all of the foregoing former officers and directors resigned in late 2004 or 2005, with some as late as May 2005.

5

## II.   The Securities-Related Claims Against the Debtors and Non-Debtor D&Os

15.   The Non-Debtor D&Os have been named as defendants either alone or with the Debtors in the Court Actions alleging Securities-Related Claims. More specifically, the *Kleinpeter-Fleck*, *Egleston*, *Akerman*, and *Gariddi* Complaints allege violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (15 U.S.C. §§ 78(b) and 78t(a)) and Rule 10b-5 (17 C.F.R. § 240.10b-5) promulgated thereunder in connection with the purchase of the Debtors' common stock. The *MacKay Shields* Complaint alleges violations of common law fraud, negligent and innocent misrepresentation, conversion and unlawful use and receipt of funds, promissory estoppel, and vicarious liability and/or aiding and abetting of such alleged common law violations, in connection with the purchase of $153 million face amount of Debtors' debt.

16.   Exhibit A to this Complaint is a list of the individuals who are known to be asserting the Court Actions against the Non-Debtor D&Os and who have been named as the primary Defendants in this Adversary Proceeding. Exhibit A further identifies the attorney(s) representing each such individual, where known.

17.   The Debtors are concerned that, in the future, additional Securities-Related Claims will be filed against the Non-Debtor D&Os. Putative claimants for such future Securities-Related Claims have been denominated as Defendants John Does 1-1000 and Jane Does 1-1000 herein.

### Nature of Relief Requested

18.   Section 362(a) of the Bankruptcy Code has automatically stayed the prosecution and enforcement of the Court Actions against the Debtors. By this Complaint, the Debtors seek this Court's declaration that, pursuant to Sections 362(a)(1) and (a)(3) of the Bankruptcy Code, the automatic stay is extended to stay the continued prosecution of the above

6

Court Actions and the commencement of any similar Securities-Related Claims against the Non-Debtor D&Os during the pendency of the Chapter 11 Cases.

19.    Alternatively, to the extent prosecution of the Court Actions is not automatically stayed by operation of Section 362 of the Bankruptcy Code, the Debtors request the entry of a supplemental injunction, pursuant to Section 105 of the Bankruptcy Code, prohibiting both the continued prosecution of the Court Actions and the commencement of any similar Securities-Related Claims against the Non-Debtor D&Os during the pendency of the Chapter 11 Cases.

20.    As a result of the automatic stay triggered by the Debtors' bankruptcy filing, and in the absence of a declaration or injunction prohibiting the prosecution of the Court Actions and similar Securities-Related Claims against the Non-Debtor D&Os, the Debtors believe that:

    (a)    those claimants who have sued the Debtors and one or more of the Non-Debtor D&Os for Securities-Related Claims in the Court Actions will attempt to proceed with their litigation against the Non-Debtor D&Os, while staying the action with respect to the Debtors;

    (b)    those claimants who have named one or more of the Non-Debtor D&Os as a defendant will attempt to proceed with their litigation against the Non-Debtor D&Os; and

    (c)    future claimants will assert Securities-Related Claims against the Non-Debtor D&Os, but not the Debtors.

21.    In fact, the proposed lead plaintiff in the pending *Kleinpeter-Fleck, Egleston, Akerman* and *Gariddi* actions has indicated his intention, by letter to Judge Mukasey in the Southern District of New York, to pursue the purported Court Actions against the Non-Debtor D&Os despite the Debtors' chapter 11 proceedings.  (*See* Letter to Chief Judge Mukasey from G. Bruckner dated 11/2/05, attached hereto as Exhibit B.)

7

**Count I -- Declaratory Relief Pursuant to 11 U.S.C. § 362(a)(1)**
**The Court Actions and Securities-Related Claims Against Non-Debtor D&Os**

22.    The averments of each of the foregoing paragraphs are incorporated by reference as though fully set forth herein.

23.    Upon the filing of a bankruptcy petition, Section 362(a) of the Bankruptcy Code operates automatically to stay, among other actions, "the commencement or continuation . . . of a . . . proceeding against the debtor . . . or to recover a claim against the debtor." 11 U.S.C. § 362(a)(1) (2005).

24.    Application or extension of the automatic stay to the Court Actions against the Non-Debtor D&Os is warranted in this case because these claims are inextricably intertwined with the Securities-Related Claims against the Debtors, and hence constitute actions that are "against the debtor" or seek "to recover a claim against the debtor" within the meaning of Section 362(a)(1) of the Bankruptcy Code.  Likewise, because of the identity of interest between the Non-Debtor D&Os and the Debtors, the Court Actions and any similar Securities-Related Claims brought only against the Non-Debtor D&Os are tantamount to actions that are "against the debtor" or seek "to recover a claim against the debtor" within the meaning of Section 362(a)(1) of the Bankruptcy Code.

25.    If the automatic stay is not extended to the Non-Debtor D&Os in the Court Actions and any similar Securities-Related Claims, the Debtors will suffer irreparable harm and potential impairment of their ability to reorganize under chapter 11.  The potential irreparable harm faced by the Debtors includes the following:

(a)    Collateral Estoppel: To the extent that the Court Actions and similar Securities-Related Claims continue against the Non-Debtor D&Os, adverse judgments or findings against the Non-Debtor D&Os in such actions may put the Debtors at risk of collateral estoppel on questions of damages, liability, and/or the ultimate allocation of liability between the Debtors and Non-Debtor D&Os.

8

(b)  Evidentiary Prejudice:  In light of the identity of interest that makes the Court Actions and similar Securities-Related Claims against the Non-Debtor D&Os tantamount to claims against the Debtors, if such claims are permitted to proceed against the Non-Debtor D&Os, such litigation may lead to the creation of a prejudicial evidentiary record that will, directly or indirectly, fix the liability of the Debtors.

(c)  Diversion of the Debtors' Resources and Resulting Impact on Reorganization:  If allowed to proceed, the Court Actions and any similar Securities-Related Claims will demand significant time and attention from several of the Debtors' current directors and employees, as well as the Debtors' themselves.  Distraction of individuals critical to the Debtors' reorganization could prove fatal to the Debtors' restructuring efforts.  In addition, because the interests of the Debtors and Non-Debtor D&Os are inextricably intertwined and Debtors may be deemed vicariously liable for the actions of the Non-Debtor D&Os, the Debtors will be forced to participate in the pending cases to protect their interests, thereby eliminating the intended benefits of the automatic stay in favor of Debtors.  Devoting such significant time and resources to defending the Debtors' interests at this vital stage of the Debtors' cases would impede the administration of the Debtors' bankruptcy estates and adversely impact their ability to achieve a successful reorganization.  In addition, any advancement of defense costs by Debtors to engage in the Court Actions and similar Securities-Related Claims, and any resulting judgment against Debtors -- vicarious or otherwise -- may not be covered by Debtors' applicable insurance policies, further depleting the Debtors' limited resources.

(d)  Discovery of Debtors:  Any discovery relating to the Court Actions and similar Securities-Related Claims inevitably will be directed, primarily toward the Debtors.  All of the Non-Debtor D&Os are former and current directors and officers of Debtors and are being sued allegedly by virtue of their responsibilities in the administration and management of the Debtors' financial and business operations.  At a minimum, significant document discovery of Debtors is likely, which again will require the diversion of the Debtors' time and resources during a critical period of its reorganization process.

(e)  Dissipation of Assets of the Estates:  The Court Actions may implicate indemnification obligations of the Debtors to the Non-Debtor D&Os, thereby imposing a risk to the Debtors' assets -- assets which are critical to the Debtors' efforts to reorganize.  Currently, the Non-Debtor D&Os are covered by Debtors' applicable insurance policies, but should those policies be insufficient for any reason, the Non-Debtor D&Os may seek

9

indemnification against the Debtors for all liabilities, costs, and expenses arising out of any lawsuits or judgments. Because such claims could substantially reduce the assets in the estate, staying the prosecution of the Court Actions and similar Securities-Related Claims is necessary to preserve the assets of the Debtors' estates. In addition, it is possible that claims made by the Debtors against certain Non-Debtor D&Os for alleged breaches of duties, negligence, misstatements, or other wrongful acts taken by the Non-Debtor D&Os in their capacity as officers and directors of the Debtors, may be covered by applicable insurance policies. If such claims are covered, any defense costs incurred by the Non-Debtor D&Os in the Court Actions and any future Securities-Related Claims will diminish the aggregate amount of coverage available under such policies, and, by extension, potential assets of the estates.

(f)     Hampering of Government Investigations:  The Securities Exchange Commission and Department of Justice are conducting ongoing investigations of the Debtors' financial and business operations, including, upon information and belief, the actions of various of Debtors' former officers and directors.  If the pending Court Actions and any similar Securities-Related-Claims are allowed to proceed, discovery of Debtors may hamper the government's ongoing investigations and the Debtors' ability to comply with those investigations.

26.    In short, if allowed to continue, the Court Actions and any similar Securities-Related Claims against the Non-Debtor D&Os will impair the Debtors' prospects for a timely and effective reorganization, and thwart both the letter and Congressional purpose of providing the Debtors with a breathing spell from litigation pressures in their efforts to reorganize.

WHEREFORE, the Debtors respectfully request that this Court declare that the commencement or continued prosecution of the Court Actions and any future, similar Securities-Related Actions against the Non-Debtor D&Os by the Defendants or any other party or person during the pendency of the Chapter 11 Cases violates the automatic stay imposed by Section 362(a)(1) of the Bankruptcy Code.

10

**Count II – Preliminary and Final Injunctive Relief Pursuant to 11 U.S.C. §§ 362 and 105 – The Court Actions and Securities-Related Claims Against Non-Debtor D&Os**

27.    The averments of each of the foregoing paragraphs are incorporated by reference as though fully set forth herein.

28.    Section 105(a) of the Bankruptcy Code authorizes and empowers this Court to issue any orders that will further the purposes and goals of the Bankruptcy Code, assist in the orderly and effective administration of the Debtors' Chapter 11 Cases, aid in the preservation of the assets of the Debtors' estates, and aid in the promulgation and confirmation of a chapter 11 plan that maximizes recovery to all of the Debtors' creditors.

29.    Pursuant to Section 105(a) of the Bankruptcy code, this Court may enjoin actions against third parties other than the Debtors where necessary to prevent an adverse impact upon the Debtors' estates or to assure the orderly administration of the Debtors' chapter 11 estates and proceedings.

30.    If the Court Actions and any similar, future Securities-Related Claims against the Non-Debtor D&Os are not automatically stayed under Section 362(a)(1) of the Bankruptcy Code as requested in Count I, the Debtors submit that the issuance of an injunction is appropriate, pursuant to Section 105(a), because it is necessary to protect the Debtors' ability to reorganize in a timely and effective manner.

31.    There is a substantial likelihood that the Debtors will be able to reorganize in a timely and effective manner if the injunctive relief herein is granted. (*See* Affidavit of John Boken in Support of Motion for Preliminary and/or Injunctive Relief ("Boken Aff."), at ¶¶ 25-28, incorporated herein by reference.) As the Court recognized in granting Debtors' motion seeking an extension of exclusivity on January 5, 2006, the Debtors have made substantial progress in the immense task of successfully reorganizing their companies. Debtors expect to

11

K&E 10889551.6

complete their comprehensive business plan in late January, which will be the foundation for developing a plan of reorganization. (Boken Aff. at ¶ 25.)

32.     The Debtors are substantially likely to prevail upon the merits of their Complaint, including a preliminary and permanent injunction upon a final hearing.  The injunctive relief sought by the Debtors is necessary to permit the Debtors an unobstructed opportunity to effectuate a plan of reorganization acceptable to themselves and all relevant third parties.  Indeed, the likelihood that the Debtors will successfully reorganize depends, in large part, upon the continued participation and focus of key personnel, including, the Board of Directors.  With such participation and focus, the Debtors fully expect the continued support of their customers, suppliers, creditors, business partners and employees in their efforts to reorganize their financial affairs.  Injunctive relief to prevent the continued prosecution of the Court Actions against the Non-Debtor D&Os is therefore vital in allowing the Debtors an unobstructed opportunity to reorganize their affairs and business, including developing and proposing a plan of reorganization acceptable to creditors.  (*See* Boken Aff. at ¶ 28, incorporated herein by reference.)

33.     The prosecution of the Court Actions and future, similar Securities-Related Claims against the Non-Debtor D&Os in the absence of a preliminary injunction would result in irreparable harm to the Debtors for all of the reasons outlined above in paragraphs 25-26.

34.     The likelihood of such irreparable harm to the Debtors and their estates in the absence of injunctive relief far outweighs any harm to the claimants in the Court Actions.  Claimants in the Court Actions have incurred only the expense associated with filing the Complaint.  No other litigation activity has occurred -- no responsive pleadings have been filed, no discovery has commenced, and no trial dates have been set.  In fact, upon information and

12

belief, the *Kleinpeter-Fleck*, *Egleston*, *Akerman*, and *Gariddi* Complaints have been placed on the court's suspense calendar, pending the outcome of Debtors' requests in this Complaint.

35.    The injunctive relief requested herein will serve the public interest by promoting compliance with the Congressional purpose underlying the automatic stay and furthering the Debtors' successful reorganization by preserving the status quo for a limited period of time while the Debtors' focus their limited time and resources on the reorganization. Granting the requested relief will thereby prevent a "race to the courthouse" by holders of Securities-Related Claims against the Non-Debtor D&Os, which would inevitably divert the attention of critical parties and individuals from the Debtors' reorganization.

36.    Moreover, allowing Debtors to focus on a successful reorganization serves the public interest because Debtors and their non-debtor affiliates are leading global suppliers of automotive components, systems and modules to all of the world's largest vehicle manufacturers, including DaimlerChrysler AG, Ford Motor Company, and General Motors Corporation (the "Big Three"). In fact, Debtors manufacture products that are included in approximately 90% of the vehicles produced by the Big Three.  Today, Debtors maintain operations in North America (Canada, Mexico and United States) in over 55 locations (54 manufacturing sites) and currently employ over 17,000 individuals.  (*See* Boken Aff. at ¶ 4.)

37.    Given these competing interests, an injunction barring the Defendants from continuing to pursue the Court Actions and any similar, future Securities-Related Claims against the Non-Debtor D&Os during the pendency of the Chapter 11 Cases is appropriate and essential to the orderly and effective administration of the Debtors' chapter 11 estates. Accordingly, good cause exists for the entry of injunctive relief pursuant to Sections 105(a) and 362(a) of the Bankruptcy Code and Bankruptcy Rule 7065.

WHEREFORE, the Debtors respectfully request that this Court, after notice and a hearing, issue a preliminary injunction, and, in due course, a permanent injunction in the same form and substance as the other injunctive relief sought herein, prohibiting the further prosecution of the Court Actions and the commencement of any future Securities-Related Claims against the Non-Debtor D&Os by the Defendants or any other party or person during the pendency of the Chapter 11 Cases.

Dated: February 1, 2006                    **KIRKLAND & ELLIS LLP**

                                           */s/ Ray C. Schrock*
                                           Richard M. Cieri (NY RC 6062)
                                           Citigroup Center
                                           153 East 53rd Street
                                           New York, New York 10022
                                           Telephone: (212) 446-4800
                                           Facsimile: (212) 446-4900

                                           -and-

                                           David L. Eaton (IL 3122303)
                                           Ray C. Schrock (IL 6257005)
                                           Marc J. Carmel (IL 6272032)
                                           200 East Randolph Drive
                                           Chicago, Illinois 60601
                                           Telephone: (312) 861-2000
                                           Facsimile: (312) 861-2200

                                           -and-

                                           **CARSON FISCHER, P.L.C.**

                                           Joseph M. Fischer (P13452)
                                           4111 West Andover Road
                                           West - Second Floor
                                           Bloomfield Hills, Michigan 48302
                                           Telephone: (248) 644-4840
                                           Facsimile: (248) 644-1832

                                           Co-Counsel for the Debtors

14

K&E 10889551.6

# EXHIBIT B
# PART 1

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN

K.J. EGLESTON, individually and on behalf of all
others similarly situated,

        Plaintiff,

v.

HEARTLAND INDUSTRIAL PARTNERS, L.P.,
a Delaware limited liability partnership,
HEARTLAND INDUSTRIAL ASSOCIATES,
L.L.C., a Delaware limited company, DAVID A.
STOCKMAN, J. MICHAEL STEPP,
and BRYCE M. KOTH,

        Defendants.

Case No. 2:06-cv-13555-AJT-SDP

Honorable Arthur J. Tarnow

## SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

Plaintiff, individually and on behalf of all others similarly situated, by plaintiff's undersigned attorneys, alleges the following based upon the investigation by plaintiff's counsel, for plaintiff's complaint (the "Complaint"), except for those allegations pertaining to plaintiff, which are based upon personal knowledge, alleges upon the investigation made by and through plaintiff's counsel, which included, among other things, a review of relevant public filings by Collins & Aikman Corporation ("C&A" or the "Company" or "C&A") with the Securities and Exchange Commission ("SEC"), press releases issued by the Company, media reports and publicly-available trading data about the Company as well as a review of reports issued by analysts who followed C&A.

1.    Plaintiff also relies on the allegations of confidential informants working with the money management firm MacKay Shields in a litigation against some of the Defendants, which was originally brought in the Circuit Court of Michigan, County of Wayne, *MacKay Shields LLC*

*v. Heartland Industrial Partners LP, et al.*, Case No. 2:05-cv-520229 (the "MacKay Shields Class Action"). Then, on February 5, 2007, the MacKay Shields Class Action was re-filed in this Court by the Mainstay High Yield Corporate Bond Fund (Case No. 2:07-cv-10542). In the MacKay Shields Class Action, counsel for MacKay Shields has described the roles of two people, called "Confidential Informant 1" (or "CI 1") and "Confidential Informant 2" (or "CI 2"), and has pleaded allegations in that action based on their experiences and first-hand knowledge obtained while employed at C&A during the Class Period. Class counsel has spoken with counsel for MacKay Shields, and has confirmed that MacKay Shields' counsel has spoken with CI 1 and CI 2, and believes their accounts are credible.

  2.  Plaintiff further relies on consultation with experts in the area of public-company accounting and Generally Accepted Accounting Principles ("GAAP"). In addition, Plaintiff relies on the federal indictment of David A. Stockman, J. Michael Stepp, David R. Cosgrove, and Paul Barnaba, filed by U.S. prosecutors in the Southern District of New York on March 26, 2007 (the "Indictment," annexed as Exhibit A hereto), and the complaint filed by the SEC against C&A, Stockman, Stepp, Cosgrove, Barnaba, Gerald E. Jones, Elkin B. McCallum, John G. Galante, Christopher M. Williams, and Thomas V. Gougherty on March 26, 2007 (the "SEC Complaint," annexed as Exhibit B hereto). Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## SUMMARY OF THE ACTION

  3.  This is a federal securities class action on behalf of all purchasers of the publicly-traded securities of C&A between August 6, 2002 and May 17, 2005, inclusive (the "Class Period"), against certain officers and directors of C&A and its majority owner, Heartland (defined below) for violations of the Securities Exchange Act of 1934 (the "1934 Act" or the "Exchange Act").

2

4.     C&A's business is the design, engineering and manufacture of automotive interior components, systems and modules. As of April 13, 2005, C&A employed 24,000 individuals and had a network of more than 100 technical centers, sales offices and manufacturing sites in 17 countries. Until it sought federal bankruptcy protection, C&A common stock traded under the symbol "CKC" on the New York Stock Exchange.

5.     C&A imploded and spiraled into bankruptcy and probably dissolution, beginning on March 17, 2005, with an announcement that it was delaying its 2004 earnings report due to improper accounting practices related to supplier rebates. Two months later, C&A was bankrupt and the Board had fired its Chief Executive Officer ("CEO"), Defendant David A. Stockman. In the course of the subsequent bankruptcy litigation and government investigation, it has become clear that during the entire Class Period, Defendants engaged in large-scale and sophisticated accounting schemes involving related party transactions and false documentation; schemes that have led to both the Indictment and the SEC Complaint. In addition, during the Class Period, C&A's business was riddled with fundamental problems that Defendants sought to hide from investors, lenders and even its own customers.

6.     As the market first learned of the use of improper accounting and that C&A's business was in dire straits, C&A stock dropped to less than ten cents ($0.10) per share. Prices for C&A's publicly traded fixed income securities also fell precipitously, ultimately trading below $0.10 per share. The Company's 10-3/4% Notes, which had previously traded at $90, fell to just $23, a drop of 74.4%.

7.     The accounting techniques C&A employed are described in detail below, and involve the deliberate, premature or improper booking of vendor rebates, mischaracterization of rebates on capital equipment, mischaracterization of expenses, use of round-trip transactions that

3

should have had no net effect, and pre-billing of receivables under a factoring arrangement to inflate C&A's borrowing base and create the appearance of liquidity. Each set of reported financial results during the Class Period was materially false and misleading with regards to -- at least -- sales, earnings and EBITDA (or Earnings Before Interest, Taxes, Depreciation and Amortization, which is a measure of earnings designed to approximate operating cash flow), and violated GAAP.

8.     Moreover, Defendants represented to the public that C&A was a successful automotive supply company, while concealing a deteriorating business. As set forth at length below, Defendants, *inter alia*:

> (a)     omitted the material fact that C&A was locked into a significant number of money-losing contracts, particularly with Daimler Chrysler;
>
> (b)     omitted the material fact that C&A was grossly understaffing projects, and misleading major customers such as Ford to cover up for its inability to pay for the staffing required by its contracts;
>
> (c)     omitted the material fact that C&A had such serious quality problems that it failed product approval processes over and over, finally losing significant contracts from GM as a result of its poor quality; and
>
> **(d)**     misrepresented that C&A's Hermosillo, Mexico plant was state-of-the-art, when it was both understaffed and stocked with used equipment shipped from other locations. This situation damaged C&A's relationship with Ford, a major customer.

4

## JURISDICTION AND VENUE

9.      The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§ 78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the SEC [17 C.F.R. § 240.10b-5].

10.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337 and Section 27 of the Exchange Act [15 U.S.C. § 78aa].

11.     Venue is proper in this District pursuant to Section 27 of the Exchange Act, and 28 U.S.C. § 1391(b).

12.     In connection with acts, transactions and conduct alleged herein, Defendants used the means and instrumentalities of interstate commerce, including the United States mails, interstate telephone communications and the facilities of national securities exchanges and markets.

## THE PARTIES

### Plaintiff

13.     Plaintiff K. J. Egleston purchased C&A common stock at artificially inflated prices during the Class Period and suffered damages as shown in Plaintiff's Certification (on file with the Court) when C&A's financial condition became known to the market.

### Non-Party

14.     Non-party Collins & Aikman is incorporated under the laws of the State of Delaware, with its principal executive offices located at 250 Stephenson Highway, Troy, Michigan 48083.  On May 17, 2005, C&A announced that it and substantially all of its domestic subsidiaries had filed voluntary petitions to reorganize under Chapter 11 of the Bankruptcy Code in the U.S. Bankruptcy Court for the Eastern District of Michigan.  But for the protection

5

afforded to C&A by the automatic stay provisions of the United States Bankruptcy Code, C&A would be a defendant in this action.

**The Individual Defendants**

*David A. Stockman*

15.    Defendant David A. Stockman ("Stockman") served as C&A's Chief Executive Officer from August 11, 2003 until he was terminated on May 12, 2005; the last week of the Class Period. Stockman has been a Director of C&A since February 2001, and Chairman of C&A's Board of Directors since August 2002. Stockman served on C&A's compensation committee from April 2002 through at least September 2004. Stockman did not receive any compensation from C&A for serving as the Company's CEO; instead, his services were provided by Heartland under a services agreement which obligated the Company to pay Heartland a $4.0 million annual advisory fee and reimburse Heartland's out-of-pocket expenses related to the services it provided. According to a private placement memorandum used to sell debt securities to institutional investors in 2004 (the "PPM"), Stockman was central to C&A's operations, and the loss of his services could have a material adverse effect on the Company.

16.    Defendant Stockman was formerly a senior managing director of The Blackstone Group LP, a highly successful private equity group. Prior to joining Blackstone, Stockman was a managing director in the corporate finance department of Salomon Brothers, Inc. Before Salomon Brothers, Stockman served as the director of the Office of Management and Budget in the Reagan Administration. Stockman is the Managing Member of Heartland LLC (defined below), and is a founding partner and a Senior Managing Director of Heartland LP (defined below).

17.    Defendant Stockman approved C&A's materially false and misleading press releases and signed the Company's Fiscal Year 2003 fourth quarter and year-end report on Form

6

10-K, and the Company's quarterly reports on Form 10-Q for the periods ending June 30, 2003 and September 30, 2004, respectively, which were filed with the SEC during the Class Period. Stockman signed C&A's Form 10-K for the Fiscal Year ended December 31, 2003.

18.    Defendant Stockman also provided certifications pursuant to Sections 302 and 906 of the Sarbanes-Oxley Act attesting to the accuracy of C&A's Forms 10-Q for the Periods Ended June 30, 2003, September 30, 2003, March 31, 2004, June 30, 2004 and September 30, 2004; C&A's Forms 10-Q/A for the Periods Ended June 30, 2003, September 30, 2003 and September 30, 2004; and C&A's Form 10-K for the Fiscal Year Ended December 31, 2003.

19.    Defendant Stockman is a named defendant in both the Indictment and the SEC Complaint.

### *J. Michael Stepp*

20.    Defendant J. Michael Stepp ("Stepp") served as C&A's Vice President and Chief Financial Officer ("CFO") until October 13, 2004, when he stepped down as CFO.  During the Class Period, Stepp was Vice Chairman of the Company's Board of Directors.

21.    Defendant Stepp approved C&A's materially false and misleading press releases and signed the Company's Fiscal Year 2003 fourth quarter and year-end report on Form 10-K, and the Company's quarterly reports on Form 10-Q for the periods ending June 30, 2002, September 30, 2002, March 31, 2003, June 30, 2003, September 30, 2003, March 31, 2004 and June 30, 2004, respectively, which were filed with the SEC during the Class Period.  Since March 2001, Stepp has also been a Senior Managing Director of Heartland LP.  Stepp signed C&A's Forms 10-Q for the Periods Ended March 31, 2003, June 30, 2003, September 30, 2003, March 31, 2004 and June 30, 2004; C&A's Forms 10-Q/A for the Periods Ended June 30, 2003 and September 30, 2003; and C&A's Form 10-K for the Fiscal Years Ended December 31, 2003.

22.     Defendant Stepp also provided certifications pursuant to Sections 302 and 906 of the Sarbanes Oxley Act attesting to the accuracy of C&A's Forms 10-Q for the Periods Ended June 30, 2002, September 30, 2002, March 31, 2003, June 30, 2003, September 30, 2003, March 31, 2004 and June 30, 2004, and C&A's Form 10-K for the Fiscal Year Ended December 31, 2003.

23.     Defendant Stepp is a named defendant in both the Indictment and the SEC Complaint.

### *Bryce Koth*

24.     Defendant Bryce Koth ("Koth") served as C&A's CFO from October 13, 2004 through the end of the Class Period.  Defendant Koth approved C&A's materially false and misleading press releases and signed the Company's quarterly report on Form 10-Q for the period ending September 30, 2004, which was filed with the SEC during the Class Period. He was previously Vice President, Finance & Controller, and head of Tax of the Company since May 2004. He joined the Company in December 2002 as Vice President, Tax. Koth signed C&A's Form 10-Q for the period ended September 30, 2004 and C&A's Form 10-Q/A for the period ended September 30, 2004. Koth also provided certifications pursuant to Sections 302 and 906 of the Sarbanes Oxley Act of the accuracy of C&A's Form 10-Q for the period ended September 30, 2004 and C&A's Form 10-Q/A for the period ended September 30, 2004.  Koth resigned in the summer of 2005.

### **The Heartland Entities**

### *Heartland Industrial Partners, L.P.*

25.     Defendant Heartland Industrial Partners, L.P. ("Heartland LP") is a limited partnership organized under the laws of Delaware.  Heartland LP is a $1 billion private equity firm.  Defendant Stockman is the founding partner and a Senior Managing Director of Heartland

LP, and C&A Directors Timothy D. Leuliette, Daniel P. Tredwell, W. Gerald McConnell, and Samuel Valenti, III are all Senior Managing Directors of Heartland LP. The managing general partner of Heartland LP is Heartland LLC (defined below). C&A is one of Heartland LP's largest investments, representing at least 30% of Heartland LP's total investments.

26.     C&A and the Individual Defendants, as officers and/or directors of a publicly-traded Company, had a duty to disseminate truthful and accurate information with respect to, and to correct any public statements issued by or on behalf of, the Company that had become false and misleading.

27.     By reason of their positions with the Company, the Individual Defendants had access to internal documents, reports and other information, including adverse non-public information concerning the Company's business and financial condition, and attended management and/or board of director meetings. As a result of the foregoing, they were responsible for the truthfulness and accuracy of the Company's public reports and releases described herein.

28.     Each Individual Defendant knew of or recklessly disregarded the misleading statements and omissions complained of herein, and that these statements would adversely affect the integrity of the market for the Company's securities and would cause the price of the Company's securities to become artificially inflated. Each of the Individual Defendants acted knowingly or in such a reckless manner as to constitute a fraud and deceit upon plaintiff and the other members of the Class.

### *Heartland Industrial Associates, LLC*

29.     Defendant Heartland Industrial Associates, LLC ("Heartland LLC") is a limited liability company organized under the laws of Delaware. As of July 1, 2004, Heartland LLC beneficially owned 33,574,772 shares of C&A (34,314,147 shares as of January 1, 2005, and

32,714,147 shares as of March 17, 2005, exclusive of Heartland's partners and affiliates) as the general partner of several limited partnerships.

30.     For purposes of exercising control over C&A, Heartland LP and Heartland LLC are essentially one entity, and are referred to herein collectively as "Heartland." Heartland LLC is the managing general partner of Heartland LP and, as such, exercises complete control over Heartland LP, and beneficially owns and exercises control over all of the C&A common stock held by Heartland LP.

31.     During all periods relevant to this action, Heartland's ownership constituted a controlling stake in C&A and Heartland effectively controlled and operated the Company. Heartland's stake in C&A in 2001 was 59.7%. As of January 1, 2005, Heartland owned approximately 41% of C&A's outstanding common stock.

32.     C&A conceded Heartland's control in 2001, in the PPM which stated:

> Heartland and its affiliates are able to strongly influence or effectively control actions to be taken by our stockholders or directors . . . In addition, Mr. Stockman, the Chairman of the C&A Board and our Chief Executive Officer, and Mr. Stepp, our Financial Officer, are both Senior Managing Directors of Heartland.

33.     Indeed, throughout the Class Period, at least half of the C&A Board was affiliated with Heartland. Furthermore, the Company's most senior officers, Defendants Stockman and Stepp were Senior Managing Directors of Heartland LP, and John A. Galante, C&A's Treasurer since October 2004, was a Vice President of Heartland LP. Stockman was not paid any compensation by C&A for serving as CEO and Chairman; rather his salary was paid directly to Heartland.

34.    During 2001, 2002, 2003 and 2004, Heartland received total advisory fees from C&A of $24.5 million, $5.7 million, $4.0 million, and $10.6 million, respectively – a total of more than $44 million. Of that, $22 million went to Defendant Stockman personally.

35.    Heartland LP employs as Senior Managing Directors Stockman, Tredwell, Leuliette, and McConnell (the latter three are discussed below), all of whom are members of Heartland LLC and directors of C&A.  In addition, Defendant Stockman, a founding partner, Senior Managing Director and "Buyout Partner" of Heartland LP, is the Managing Member of Heartland LLC, and as such had and exercised the authority to act on behalf of Heartland LLC and Heartland LP, as demonstrated by, among other things, signing SEC filings on behalf of Heartland LLC and Heartland LP.

36.    Defendants are liable, jointly and severally, as direct participants in the co-conspirators of the wrongs complained of herein.

## SUBSTANTIVE ALLEGATIONS

37.    Prior to filing for bankruptcy, C&A purported to be one of the world's foremost designers, manufacturers and suppliers of automotive interior components.  C&A sold its products to automotive original equipment manufacturers ("OEMs") such as GM, Ford and Chrysler, and others.

38.    Because the automotive supply industry is very competitive, maintaining sufficient liquidity and working capital was critical to C&A's success. In securing new business from OEMs, C&A typically was forced to expend significant amounts of capital for engineering, development, tooling and other costs that generally were not recouped until the launch of a vehicle line, or over time based upon projected build levels.  Because C&A's business requires significant investment in its products before money is recouped, any decline in liquidity and/or

11

working capital materially impacts C&A's ability to achieve new business and fulfill its existing contracts.

39.     C&A's liquidity problems and need to maintain access to capital are central to understanding the conduct of Defendants alleged below.

## RELATED-PARTY TRANSACTIONS
## AND OTHER EVENTS AFFECTING LIQUIDITY

40.     In 1999, Stockman and others formed Heartland with the stated goal of acquiring and expanding industrial companies. As part of his initial investment strategy on behalf of Heartland, Stockman targeted C&A as a company which he planned to control and expand through acquisitions.

41.     Heartland purchased a controlling interest in C&A in February 2001. C&A's 2001 Form 10-K stated: "During the first quarter of 2001, Heartland acquired a controlling interest in the Company."

42.     Control by Heartland was evidenced by the fact that throughout the Class Period, a *majority* of the C&A Board was affiliated with Heartland. In particular:

43.     **In 2001**, as set forth in C&A's April 20, 2001 Proxy on Form DEF 14A, the following individuals were placed on the Board of C&A in conjunction with Heartland's acquisition of 59.7% of the Company's common stock in February 2001, comprising *8 out of 13 Board members*:

(a)     Defendant Stockman, CEO during most of the Class Period, and a senior managing director and the founder of Heartland.

(b)     Defendant Stepp, CFO during much of the Class Period and a senior managing director of Heartland.

12

(c)    Timothy D. Leuliette, a senior managing director and one of the co-founders of Heartland.

(d)    Daniel P. Tredwell, a senior managing director and a co-founder of Heartland.

(e)    W. Gerald McConnell, a senior managing director of Heartland since its founding.

(f)    Cynthia L. Hess, a senior managing director of Heartland.

(g)    Samuel Valenti, a senior managing director of Heartland.

(h)    Marshall A. Cohen, who served on the Advisory Board of Heartland.

44.    **In 2002**, as set forth in C&A's April 25, 2002 Proxy on Form DEF 14A, the same Heartland-affiliated individuals sat on the C&A Board, comprising *8 out of 14 Board members.*

45.    **In 2003**, as set forth in C&A's April 24, 2003 Proxy on Form DEF 14A, the same Heartland-affiliated individuals sat on the C&A Board, comprising *8 out of 14 Board members.*

46.    **In 2004**, as set forth in C&A's September 20, 2004 Proxy on Form DEF 14A, the same Heartland-affiliated individuals sat on the C&A Board, minus Ms. Hess and Mr. Valenti, comprising *6 out of 11 Board members.*

47.    Further, Heartland's control was evidenced by its majority voting stake in the Company's common stock throughout the Class Period, as set for in:

(a)    C&A's April 20, 2001 Proxy on Form DEF 14A: "As of March 15, 2001, Heartland and its affiliates, Blackstone Partners and its affiliates and the Wasserstein L.L.C., which is controlled by WP Partners, and its affiliates (collectively, the "Investors") beneficially own or have the right to vote in the aggregate *approximately 91%* of the outstanding Common Stock." (Emphasis added.)

13

(b)    C&A's April 25, 2002 Proxy on Form DEF 14A: "As of March 12, 2002,
Heartland and its affiliates, Blackstone Partners and its affiliates and Wasserstein L.L.C.,
which is controlled by WP Partners, and its affiliates, Charles E. Becker and Becker
Ventures, Elkin McCallum and Joan Fabrics, and Textron and its affiliates (collectively,
the "Investors") beneficially own or have the right to vote in the aggregate *approximately
84.7%* of the outstanding Common Stock." (Emphasis added.)

(c)    C&A's April 24, 2003 Proxy on Form DEF 14A: "As of March 18, 2003,
Heartland, Blackstone Partners, Wasserstein L.L.C., Charles E. Becker, Elkin McCallum
and Textron and their affiliates (collectively, the "Investors") beneficially own or have
the right to vote in the aggregate *approximately 72%* of the outstanding Common Stock."
(Emphasis added.)

(d)    C&A's September 30, 2004 Proxy on Form DEF 14A: "As of August 30, 2004,
Heartland Industrial Partners LLC, Charles E. Becker and Elkin McCallum and their
affiliates beneficially own or have the right to vote in the aggregate *approximately 55%*
of the Company's outstanding common stock." (Emphasis added.)

48.    From the outset, Heartland began extracting huge sums from C&A, as evidenced
by the following discussion in C&A's 2001 Form 10-K:

> The Company is a party to a services agreement with Heartland
> under which Heartland provides it with advisory and consulting
> services, including services with respect to developments in the
> automotive industry and supply markets, advice on financial and
> strategic plans and alternatives and other matters as it may
> reasonably request and are within Heartland's expertise. The
> services agreement terminates on the earlier of its 10th anniversary
> or the date upon which Heartland ceases to own Company shares
> equivalent to 25% of that owned by them on February 23, 2001.
>
> **Under the services agreement, the Company is obligated to pay
> to Heartland a $4.0 million annual advisory fee on a quarterly**

**basis and to reimburse its out-of-pocket expenses related to the services it provides. The Company has also agreed to pay a fee of 1% of the total enterprise value of certain acquisitions and dispositions. In connection with Heartland's initial investment in the Company on February 23, 2001, it paid Heartland a fee of $12.0 million and reimbursed it for its reasonable out-of-pocket expenses incurred in connection with its initial investment. A fee of $12.5 million was paid by the company to Heartland as a result of its advisory services in connection with the TAC-Trim acquisition.** (Emphasis added.)

49.    During 2001, as directed by Stockman and in accordance with Heartland's planned strategy, C&A purchased three other auto parts businesses and in the process doubled its size.

**Becker Acquisition**

50.    Within weeks of gaining control of C&A and functioning as advisor "in connection with acquisitions," Heartland caused C&A to acquire Becker Group LLC, a company that manufactured plastic parts for automobiles. Charles E. Becker ("Becker"), the individual behind Becker Group LLC, was directly or indirectly a Heartland limited partner (according to a March 11, 2004 press release). Following the late Class Period firing of Stockman on May 12, 2005, Becker was placed as CEO of C&A.

51.    On May 15, 2001, C&A filed its Form 10-Q for the quarterly period ended March 31, 2001 with the SEC. This document stated, in relevant part:

> The Company announced on March 21, 2001 that it had signed a letter of intent to acquire the Becker Group LLC ("Becker"), a supplier of plastic components to the automotive industry, with fiscal 2000 sales of approximately $235 million. Under terms of the letter, the Company would acquire all of the equity interests of Becker. The owners of Becker would receive 17 million shares of the Company's common stock and a three year warrant for 500,000 shares at an exercise price of $5.00 per share. In connection with the acquisition, approximately $60 million of debt of Becker would be repaid and, to the extent debt balances are less than $60 million, the sellers would receive cash for the difference. **The three individual sellers would be required to enter into non-compete**

**agreements that would provide for aggregate payments to
them over five years totaling $18 million.** Completion of the
transaction is subject to certain terms and conditions, including
negotiation of definitive documentation, and it is expected to close
during the second quarter of 2001. (Emphasis added.)

52.     On July 5, 2001, C&A issued a press release announcing it had completed its

acquisition of the Becker Group, LLC ("Becker"). The press release stated:

**As previously indicated, consideration included $60 million in
cash, an $18 million non-compete agreement (to be paid out
over five years),** 17 million shares of Collins & Aikman common
stock and warrants for 500,000 shares at an exercise price of $5.00
per share. . . Chuck Becker, former principal and owner of Becker,
has joined Collins & Aikman's Board of Directors as Vice
Chairman. (Emphasis added.)

53.     A Form 8-K which was filed with the SEC on July 13, 2001 contained a copy of

the Agreement and Plan of Merger (dated as of May 14, 2001). It defined the "Non-Compete

Agreement" as "the non-compete agreement by and between Purchaser [C&A] and each of

Becker, McInerney and Hohnel" and stated that: "Each Seller shall have entered into a

Non-Compete Agreement with Purchaser for an aggregate payments to all Sellers of $18,000,000

ratably over five years, and each such agreement shall be in full force and effect."

54.     This was misleading:  as subsequently disclosed in the Company's September 17,

2001 Form 8-K/A, the $18 million was to be paid solely to Becker:

The consideration for the acquisition included an aggregate of 17
million shares of common stock of the Company and warrants to
purchase 500,000 shares of common stock of the Company at an
exercise price of $5.00 per share, $60.0 million in cash and **an
$18.0 million non-compete agreement with Charles E. Becker
to be paid out over five years**. (Emphasis added.)

**Joan Fabrics Acquisition**

55.     In or about September 2001, C&A acquired Joan Automotive Fabrics, which was

part of Joan Fabrics, a privately held fabrics manufacturing company.

16

56.    Specifically, on September 24, 2001, the Company disclosed that it had completed its acquisition of "the automotive fabric operations of Joan Fabrics (Joan) and all of the operating assets in Joan's affiliated yarn dying operation, Western Avenue Dyers, [where] consideration included $100 million in cash and 12,760,000 shares of Collins & Aikman common stock."

57.    Additionally, the press release announced that Elkin B. McCallum, former principal owner of Joan Fabrics, was joining C&A's Board of Directors.

**TAC-Trim Acquisition**

58.    On August 7, 2001, C&A initially announced that it had signed a definitive agreement with Textron, Inc. ("Textron") to acquire its automotive trim division ("TAC-Trim"), a leading supplier of fully-integrated cockpits. The transaction closed on December 20, 2001. Defendants Stockman and Heartland caused C&A to finance the purchase of TAC-Trim, in part by issuing an additional $500 million in 10-year notes.

59.    Various documents filed with the SEC disclosed that beginning in 2001 Heartland and its affiliates extracted at least $303.5 million from C&A as follows:

  a.    $12.0 million (plus reimbursed for out-of-pocket expenses) to Heartland in 2001 in connection with its initial investment in C&A.

  b.    $100.0 million to McCallum and affiliates in 2001 in connection with the acquisition of Joan Automotive Industries, Inc. and Western Avenue Dyers, L.P.

  c.    $61.8 million to Becker and affiliates in 2001 in connection with the acquisition of Becker Group, LLC.

  d.    $12.5 million to Heartland in 2001 as a result of its advisory services in connection with the TAC-Trim acquisition.

  e.    $0.3 million to Becker in 2002 for his temporary service as Vice Chairman of the Company during that year.

17

f.      $9.2 million to McCallum in 2002 in connection with the acquisition of a lamination company wholly owned by McCallum.

g.      $57.8 million to entities controlled by Mr. McCallum in 2002 in "for goods and services purchased."

h.      $4.2 million to Dutton Yarns (an affiliate of McCallum) for its air jet texturing business equipment, inventory and intellectual property.

i.      $5.7 million to Heartland in 2002 for advisory services.

j.      $11.3 to Becker in 2003 in connection with termination of the non-compete agreement as discussed above.

k.      $4.7 million to Joan Fabrics (a company controlled by McCallum) in 2003 for equipment and for entering into a supply agreement with C&A whereby Joan Fabrics would perform certain marketing, design, customer service, distribution and sales functions.

l.      $4.0 million to Heartland in 2003 for advisory services.

m.      $19.0 million to entities controlled by Mr. McCallum in 2003 in "for goods and services purchased."

n.      $1.0 million to Heartland in March 2004, for services rendered in connection with the 2004 amendments to the Company's credit facility.

**Fast-Pay Program**

60.    During March 2002, C&A entered into an accelerated customer payment program ("Fast-Pay Program") for the collection of accounts receivables from two of its larger customers (June 11, 2002 Registration Statement and Prospectus). Pursuant to this program, C&A was able to increase its cash receipts by receiving early payment on receivables.

61.    Major auto makers historically paid their suppliers' invoices 60 days after receipt (Detroit Free Press, February 3, 2005; Crain's Detroit Business, November 8, 2004). From time to time, suppliers who needed to accelerate their cash flow for specific business reasons engaged in arrangements with financial institutions whereby their receivables (invoiced amounts) were

converted to cash immediately at a discount. C&A, however, used such arrangements on a regular basis. In using these "factoring-type" arrangements, C&A sacrificed long-term cash flow for immediate cash.

62.    According to a November 8, 2004 *Crain's Detroit Business* article, General Electric Capital Corporation ("GECC") implemented a factoring-type of program (sometimes referred to as GECC's "Fast-Pay Program" or "accelerated payment program") whereby GECC would, upon issuance of an invoice by a supplier to General Motors Corp., Ford and the Chrysler Group:

(i)    purchase the supplier's newly created receivable from the supplier at a discount, after obtaining assurance (a guarantee) from General Motors Corp., Ford or the Chrysler Group that the receivable was valid and that it would be paid in 60 days.

(j)    pay the supplier the discounted amount within ten days.

(k)    collect the full invoice amount from General Motors Corp., Ford or the Chrysler Group after 60 days.

63.    Having obtained a new source of increased liquidity in the fast-pay program, Defendants once again wasted no time funneling additional funds to insiders. By year end 2002, C&A had utilized its Fast-Pay Program to mortgage its future cash flow in the amount of $98 million (according to C&A's February 20, 2003 conference call). A substantial portion of this $98 million found its way into the pockets of the Individual Defendants. On April 12, 2002, C&A acquired from Mr. McCallum, a lamination company that was wholly owned by Mr. McCallum (*see supra* ¶ 59(f)). As consideration in the transaction, Mr. McCallum received 400,000 shares of Common Stock, $2.5 million in cash, and $6.7 million in payment of debt. In addition, during 2002, "entities controlled by Mr. McCallum" received $57.8 million "for goods

and services purchased", and Becker received $300,000.00 "as compensation... for his temporary service as Vice Chairman."

## MAJOR MISLEADING ACCOUNTING TECHNIQUES

### Pre-Billing Receivables (the "GECC Scheme")

64.     Starting in or about January 2005, Defendant Stockman and his co-conspirators engaged in a scheme to defraud GECC. On or about January 6, 2005, C&A's Treasury Department prepared a daily report for GECC which revealed that C&A had to make an immediate payment to GECC of approximately $21.8 million. Employees in C&A's Treasury Department realized that C&A did not have sufficient liquidity to make the payment to GECC. Thus, C&A was in default of its obligations under the GECC facility if it did not make the payment. Stockman was immediately informed of both the need for an immediate payment to GECC and the fact that C&A could not make the payment. With Defendant Stockman's knowledge and approval, employees from the Treasury Department intentionally misled GECC about the status of the daily report and the approximate $21.8 million payment. First, with Stockman's knowledge and approval, C&A employees failed to disclose to GECC that C&A owed GECC approximately $21.8 million and that C&A could not afford to make that payment. Second, using a computer systems error that prevented C&A from generating a complete borrowing base report as an excuse, C&A employees delayed providing daily reports due to GECC on January 6 and January 7, 2005.

65.     With Defendant Stockman's knowledge and approval, in response to this crisis, C&A employees began trying to find receivables that could be invoiced, and thus, used to increase the level of the borrowing base by the next business day, Monday, January 10, 2005. With Defendant Stockman's knowledge and approval, C&A employees manually invoiced millions of dollars worth of receivables over the weekend for the sole purpose of inflating the

borrowing base and misleading GECC about the default that had already occurred. Since C&A's customers had not yet agreed to pay many of the receivables invoiced over the weekend, these receivables were not eligible to be included in the borrowing base. Defendant Stockman and other C&A employees thus improperly inflated the borrowing base by invoicing ineligible receivables.

66.     The following Monday, with Defendant Stockman's knowledge and approval, employees of the Treasury Department prepared and submitted a daily report to GECC that failed to disclose the fact that C&A had created invoices for receivables that C&A's customers had not yet agreed to pay for the sole purpose of improperly inflating the borrowing base and avoiding the full approximately $21.8 million payment to GECC. In addition, C&A failed to disclose the fact that C&A had been in default of its agreement with GECC. Including the improperly invoiced receivables, the amount due to GECC was brought down to approximately $11.8 million, which by then C&A could manage to pay.

67.     As a result of the early January 2005 crisis, during the first and second quarters of 2005, Defendant Stockman reviewed C&A's liquidity situation on a daily basis. Each day, Defendant Stockman personally decided which of C&A's suppliers and creditors would get paid, and Stockman personally managed all of C&A's liquidity.

68.     After the early January 2005 scheme, Defendant Stockman and others continued to defraud GECC by intentionally including ineligible receivables in the borrowing base of the accounts receivable securitization facility to obtain cash and increase liquidity. The majority of these ineligible receivables were invoices to OEMs for equipment, or "tooling," used to make auto parts. Under C&A's agreement with GECC, as with any other receivable, invoices for such equipment could only be included in the borrowing base if the customer had agreed to make

payment. In the automotive industry, OEMs agree to make payments on tooling in two ways: they either certify that the equipment is performing to specifications, through the Production Part Approval Process, or "PPAP," or an OEM can expressly agree to be billed for tooling in advance of that approval. Although target dates for completion of PPAP are often set, typically, the OEM agrees to pay for tooling only once PPAP is completed and the OEM has certified that C&A's production line makes parts properly. In fact, as discussed below, C&A failed PPAP again and again during the Class Period. Thus, as Defendant Stockman and his co-conspirators well knew, a target date for PPAP was no guarantee of OEM approval, and OEMs generally only agreed to make payment on tooling once PPAP had been completed.

69.    At Defendant Stockman's direction, in or about January 2005, C&A began putting such invoices for tooling in the borrowing base prior to achieving PPAP and without customer agreement based on a calculated guess as to when C&A might expect to achieve PPAP and thus be eligible to get paid by the OEMs. At Stockman's initiative, invoices for tooling were created and loaded into the system that calculated the GECC borrowing base 60 days prior to the PPAP target date. At the time these tooling invoices were created, Stockman and others knew that there was no customer agreement to pay the invoices, and thus they were ineligible receivables under C&A's agreement with GECC. These invoices were created and entered into the system for the sole purpose of improperly inflating the GECC borrowing base, thus generating cash and liquidity for C&A.

70.    Between in or about January 2005 and in or about April 2005, C&A added a total of well over $100 million in ineligible receivables to the borrowing base. In many cases, the resulting invoice was not immediately sent to the OEM because Stockman and others knew that

it would not be paid. In order to avoid bankruptcy and stay solvent, C&A borrowed from GECC against these fraudulent invoices in order to pay its bills throughout the first months of 2005.

71.    Eventually, the GECC Scheme unraveled. On or about June 22, 2005, GECC filed a motion in the United States Bankruptcy Court for the Eastern District of Michigan seeking relief from the automatic stay imposed by the Bankruptcy Code. According to that motion, at the time of C&A's bankruptcy filing C&A owed GECC at least $78 million and GECC held a security interest in C&A's accounts receivables. The parties' agreements required C&A to deposit any collections in a lockbox for the benefit of GECC. However, C&A was instead converting such collections for its own use, rather than providing them to GECC. As a result, GECC was asking the Court to allow it to seize records maintained by C&A regarding its receivables and collections, and to receive the collections directly.

72.    According to exhibits filed in support of that motion, KZC Services, LLC, the financial consultants to C&A Products, advised GECC in writing that a "potentially material portion of the Receivables owned by [C&A] may constitute pre-billed tooling Receivables which had been incorrectly identified as Eligible Receivables." The letter noted that GECC was "gravely concerned" about this revelation and "expected to receive a comprehensive accounting of the nature and amount" of the Company's receivables.

73.    When C&A failed to satisfy GECC by providing information, GECC demanded to exercise its right under its agreement with C&A to conduct an "onsite audit" on June 14 to verify C&A's receivables.  According to GECC's motion, which was filed on June 22, 2005, as of that date, GECC had still not received a satisfactory paper trial for the receivables in question.

74.    The information relating to C&A's accounts receivables that GECC requested are the fundamental records supporting outstanding accounts receivable which companies typically

and routinely maintain, and such information should have been readily available from the records of C&A, specifically, within C&A's accounts receivables department. Keeping them was C&A's contractual obligation to GECC, and a basic function of business.

75.    In all, between January 2005 and April 2005, C&A employees, at Defendant Stockman's direction, added approximately $120 million in ineligible receivables to the borrowing base under the GECC agreement.

76.    Defendant Stockman was primarily responsible for the scheme to inflate C&A's reported liquidity, through the fraudulent use of the GECC accounts receivable securitization facility. Stockman directed Christopher M. Williams, C&A's Executive Vice President of the Business Development and Specialty Products, and others to create invoices prematurely and include those invoices in the borrowing base, knowing that this violated the agreement with GECC. Mr. Williams ensured that his employees in C&A's Business Group carried out Defendant Stockman's instructions.

**Fraudulent Accounting For Supplier Payments**

77.    For the reasons stated above, Defendants Stockman, Stepp, and Heartland continually faced pressure to keep C&A's financial performance at a level that would (a) enable C&A to comply with the covenants in its credit facilities; and (b) satisfy investors that Stockman and Heartland were successfully managing C&A.

78.    In response to these operational pressures, Defendant Stockman orchestrated a scheme, joined in by Defendant Stepp, and others, to defraud C&A's investors, banks, and creditors by manipulating C&A's reported revenues and earnings in an effort to, *inter alia*, (1) enable C&A to avoid violating covenants in its credit facilities agreements and thus C&A's financial ruin; and (2) raise additional capital in the debt markets to assist C&A in solving its business problems.

24

79.     Throughout the Class Period, C&A inflated its quarterly earnings by improperly accounting for payments from suppliers – including so-called "vendor rebates." C&A entered into numerous improper "round-trip" transactions with Mr. McCallum, a member of C&A's Board of Directors and a supplier to C&A.  In fact, C&A treated more than $14 million in payments received from Mr. McCallum in 2001, 2002, and 2003 as indirect increases to C&A's income, when in fact C&A surreptitiously repaid Mr. McCallum for each such payment. These round-trip transactions should have had no impact on C&A's income statement.

80.     The next year, beginning in 2002, Defendants further inflated C&A's quarterly earnings by improperly recognizing in income numerous rebates (on purchases of raw materials) received from suppliers in return for anticipated future business and other benefits.

81.     By 2004, Defendants extended this fraudulent rebate scheme to purchases of capital equipment, improperly recording discounts on equipment as rebates for past purchases of non-capital goods or services. Some of these rebates were recognized in income prematurely, while others should never have been recognized at all.

82.     As part of each of these schemes, Defendants induced suppliers, including Mr. McCallum, to provide false or misleading documentation regarding the payments they made or promised to C&A. C&A then used these false documents to justify accounting for these payments contrary to GAAP.

**Round-Trip Transactions With McCallum**

83.     The fraudulent accounting for supplier payments began in late 2001 when C&A sought $3 million from Mr. McCallum to increase C&A's income for the fourth quarter. Defendant Stepp told Mr. McCallum that the $3 million would be returned to him in 2002. Mr. McCallum agreed and transferred $3 million to C&A in January 2002. This round-trip transaction was essentially a loan arrangement and should not have had any impact on C&A's

25

income. Nevertheless, C&A recognized $2.8 million of the $3 million as a reduction of operating costs for the fourth quarter of 2001, thus inflating its earnings for that quarter. In March 2002, Defendant Stockman and Mr. McCallum agreed that C&A would repay the loan by transferring equipment worth approximately $3 million to Mr. McCallum at no cost.

84.    Also, in March 2002, Defendant Stockman agreed to buy one of Mr. McCallum's businesses -- Southwest Laminates -- for more than its actual value, in exchange for future "rebate" payments to C&A from another Mr. McCallum company -- Joan Fabrics. C&A then purchased Southwest Laminates for $17 million, at least $7 million more than C&A estimated it was worth. In return, Mr. McCallum agreed that Joan's Fabrics would pay C&A almost $7 million in rebates that could be improperly recognized in income.

85.    At additional meetings in late 2002, Defendant Stockman offered to overpay for another Mr. McCallum business and for furniture looms Mr. McCallum owned, in return for additional payments from Joan Fabrics. Mr. McCallum agreed to these round-trip transactions, and C&A paid him $4.2 million for Dutton Yarns, which had been appraised at just above $2 million, and $4.7 million for furniture looms -- worth about $2 million. Mr. McCallum and Joan Fabrics then made payments to C&A corresponding to the inflated purchase prices, and provided documentation falsely characterizing the payments as rebates on a supply contract between C&A and Joan Fabrics.

86.    In total, C&A recognized approximately $14.8 million in payments from Mr. McCallum from 2001 through 2003. All were round-trip transactions in which Mr. McCallum made payments that C&A labeled as "rebates," but repaid indirectly. C&A accounted for these payments as reductions in costs, increasing its pre-tax operating income, accordingly to the SEC Complaint, as shown below, in millions:

26

|  | 4Q, 2001 | 1Q, 2002 | 2Q, 2002 | 3Q, 2002 | 4Q, 2002 | 1Q, 2003 |
|---|---|---|---|---|---|---|
| Operating Income/(Loss) *Without* McCallum Payments | ($16.3) | $49.4 | $79.7 | ($6.3) | $34.1 | $18.0 |
| McCallum Payments | $2.8 | $5.0 | $1.8 | $2.0 | $2.0 | $1.2 |
| Operating Income/(Loss), As Reported | ($13.5) | $54.4 | $81.5 | ($4.3) | $36.1 | $19.2 |
| % Change Due To McCallum Payments | 17% | 10% | 2% | 32% | 6% | 7% |

87.    Defendant Stockman personally negotiated the round-trip transactions with Mr. McCallum, and Defendant Stepp helped arrange and collect the payments from Mr. McCallum. Defendants Stockman and Stepp, among others, knew, or were reckless in not knowing, that the Mr. McCallum payments were actually improper round-trip transactions intended to inflate C&A's earnings and that the false earnings figures would materially affect C&A's financial statements and the reports and registration statements C&A filed with the SEC.

88.    In August 2003, the Audit Committee of C&A's Board of Directors began an investigation of certain related party transactions, including the "rebates" paid by Joan Fabrics to C&A. In or about August 2003, the SEC opened an investigation into the matter. Knowing that the Audit Committee would keep the SEC apprised of its findings, Defendants Stockman and Stepp sought to mislead the Audit Committee, and directed others to do so, including by concealing the true nature of the "rebate" transactions with Joan Fabrics and by creating false and fraudulent justifications for the "rebates." In particular, Stockman and Stepp made false statements to C&A's Audit Committee and provided the Audit Committee with false position papers regarding the transactions.   Mr. McCallum also made false statements to the Audit

27

Committee and signed a false or misleading representation letter regarding his payments. Each knew, or was reckless in not knowing, that KPMG would rely of these false statements and documents in connection with its audit of C&A's financial statement for 2003.

## Vendor Rebates

### *Goods and Services*

89.     Supply contracts in the automotive industry frequently provide that suppliers will pay rebates to their customers in return for a specified volume or type of future business. Rebates are properly recorded by the customer as reductions in cost, which has the effect of increasing income. However, because the customer is not entitled to the rebate until the promised purchases have been made; immediate recognition of the entire rebate is inconsistent with GAAP.

90.     In early 2002, in order to respond to the financial pressures on C&A outlined above, Stockman, Stepp and others schemed to inflate C&A's quarterly earnings by improperly and systematically recognizing rebates tied to the future purchases of goods and services. As part of this scheme, C&A's Purchasing Department arranged for suppliers to create false or misleading documents stating that the rebates were based on past purchases. The false documentation was held by C&A for use in the event auditors questioned its recognition of the rebate in income.

91.     One of the first fraudulent rebates C&A's Purchasing Department negotiated was from PPG Industries, Inc. ("PPG"), a paint supplier. In April 2002, PPG agreed to pay C&A a rebate in exchange for a specified volume of new business. At the direction of C&A's finance department, Paul C. Barnaba, Director of Financial Analysis for C&A's Purchasing Department, worked with the Purchasing Department to solicit a side letter from PPG falsely stating that the rebate was based on past purchases. This letter provided a pretext for C&A's immediate recognition of the full amount of the rebate ($500,000) in the second quarter of 2002. Mr.

28

Barnaba knew that the purpose of obtaining the side letter was to allow C&A to account for the rebate improperly. The PPG side letter became the template used in preparing side letters for subsequent rebate transactions.

92.     C&A extended the rebate scheme to several other Plastics Division agreements during the remainder of 2002. C&A improperly recognized income based on rebate agreements with, among others, Brown Corporation ($900,000 rebate recognized in Q3 2002), Jackson Plastics, Inc. ($138,750 rebate recognized in Q3 2002), Flambeau Corporation ($235,000 rebate recognized in Q3 2002), ATC, Inc. ($123,470 rebate recognized in Q4 2002), Pine River Plastics, Inc. ($67,000 rebate recognized in Q4 2002), and (again) Jackson Plastics, Inc. ($46,250 rebate recognized in Q4 2002).

93.     By the first quarter of 2003 it was standard operating procedure for C&A's Purchasing Department to solicit false or misleading side letters in connection with agreements negotiated on behalf of the Plastics Division. David R. Cosgrove, C&A's Vice President of Finance, who was in charge of C&A's Financial Planning and Analysis Group, instructed the Purchasing Department to obtain the side letters and provided detailed language for these letters. Mr. Barnaba ensured that Purchasing Department employees obtained the side letters and that these letters provided an apparent justification for the improper accounting.

94.     Defendant Stockman played a hands-on role in C&A's day-to-day operations even before he became CEO in August 2003. From at least the second quarter of 2003, Stockman met with Purchasing Department employees at least quarterly and emphasized the importance of negotiating supplier rebates. He routinely identified the suppliers to target, the size of the rebates to demand, and the incentives to offer. Defendant Stockman directed that the rebates be used to boost income in the current quarter even though he knew, or was reckless in not knowing, that

such recognition was improper because the rebate income was contingent on future purchases from the suppliers. One such meeting took place on May 27, 2003, when Defendant Stockman -- who was Chairman and a Heartland Managing Director, but not yet an officer of C&A -- spoke via conference call with purchasing officials from all three C&A divisions. During that call, Defendant Stockman directed C&A's purchasing officials to increase income in the second quarter of 2003 by "pulling ahead" rebates that would otherwise be properly recognized in future quarters.

95.    During the second quarter of 2003, C&A improperly recognized rebates from, among others, Brown Corporation ($500,000), Dow ($400,000), and Manufacturer's Products ($150,000). C&A also recognized a $1.2 million rebate from DuPont Textiles & Interiors ("DuPont") in the second quarter of 2003, even though this was actually a short-term loan similar to Mr. McCallum's payments. Both Defendants Stockman and Stepp were directly involved in C&A's fraudulent accounting for the DuPont transaction.

96.    Defendant Stockman became CEO in August 2003 and continued to direct the rebate scheme. In the third quarter of 2003, Defendant Stockman was personally involved in negotiating a $1.56 million rebate agreement with Exxon Mobil Corp. ("Exxon"). Defendant Stockman met with Exxon representatives as part of the negotiations, was regularly briefed on the status of the negotiations, and knew the terms of the final rebate agreement. As finalized, the supply contract with Exxon provided that the $1.56 million rebate was not due until the next quarter (Q4 2003), was contingent on purchases by C&A in that next quarter, and was to be partially refunded if C&A did not make additional purchases the following year. Nevertheless, C&A improperly recognized the entire $1.56 million in income in the third quarter of 2003. Defendant Stockman knew, or was reckless in not knowing, that it was improper to immediately

30

recognize rebates that were contingent on future purchases and that accounting for the Exxon rebate in this way improperly inflated C&A's income.

97.    In late 2003, Defendant Stockman instructed C&A's Purchasing Department to obtain a $1 million rebate from Flambeau Corporation ("Flambeau") by promising future business. Mr. Cosgrove advised Stepp and C&A purchasing officials on how to prepare a side letter to justify immediate recognition of the potential rebate. This letter was false or misleading in that it stated that the Flambeau rebate was for past purchases. C&A nevertheless improperly recognized the anticipated $1 million Flambeau rebate in the third quarter of 2003. Defendant Stepp, like Stockman, knew, or were reckless in not knowing, that this immediate recognition was improper and designed to inflate C&A's income.

98.    Similarly, in December 2003, C&A persuaded Reko International Group, Inc. ("Reko") to provide a $250,000 rebate in exchange for a guarantee of future business. Defendant Stockman determined what the terms of the rebate agreement would be and John G. Galante, C&A's Director of Strategic Planning, negotiated the agreement with Reko. Mr. Galante arranged for the rebate to be described in one letter and the guarantee of future business to be expressed in a separate letter. Mr. Cosgrove approved the use of the two letters, and Defendants Stockman and Stepp knew that Reko was providing a side letter not referring to the future business contingency. C&A recognized the anticipated $250,000 rebate during the fourth quarter of 2003 as if there were no contingency. Defendants Stockman and Stepp knew, or were reckless in not knowing, that this recognition was improper and designed to inflate C&A's income.

99.    In June 2004, C&A negotiated a $1.5 million rebate from GE Advanced Materials ("GE") contingent on future purchases. At C&A's request, GE signed a side letter intended to hide the contingency. C&A then demanded and received a revised version of the side letter, in

31

order to better hide the true terms of the agreement. Defendant Stockman knew that the anticipated GE rebate was contingent on future purchases and that C&A was nevertheless recognizing the rebate in the second quarter of 2004. The GE agreement eventually fell apart, C&A did not provide GE the promised business, and GE never paid the rebate. Nevertheless, C&A retained the previously recorded rebate on its books with Stockman's knowledge and approval.

100.    In mid-2004, Stockman drew the Fabrics Division into the rebate scheme. During a meeting in North Carolina in May 2004, Stockman directed the Fabrics Division to solicit rebates based on future business but paper the transactions to justify the immediate recognition. In the second quarter of 2004, the Fabrics Division improperly recognized a $200,000 rebate from Unifi, a $150,000 rebate from M. Dohmen, U.S.A., Inc., and a $49,000 rebate from Clariant Corporation, in each case obtaining fraudulent side letters. Defendant Stockman knew, or was reckless in not knowing, that these transactions were recognized improperly. Mr. Jones, the head of C&A's Fabrics Division, knew that employees in his division were carrying out Defendant Stockman's instructions.

101.    At about the same time, C&A also expanded the rebate scheme to other products and services. In June 2004, C&A negotiated a $150,000 rebate agreement with Allied Waste, contingent on future business. Here too C&A solicited a side letter falsely tying the rebate to past business. Although the Allied Waste agreement was executed in October 2004, C&A improperly recognized the rebate in income in the second quarter of 2004. Defendants Stockman and Stepp knew the rebate was contingent on future business, and therefore knew, or were reckless in not knowing, that its immediate recognition was improper.

102.    During the second quarter of 2004 C&A also negotiated rebates for its European operations, including an agreement calling for LVM to provide a €350,000 rebate (approximately $430,000) when a new supply contract was signed. The new contract was not signed until February 2005. Thomas V. Gougherty, the Controller for C&A's International Plastics Division, nevertheless directed his subordinates to recognize improperly the anticipated LVM rebate in the second quarter of 2004. Mr. Gougherty knew at that time that the new supply contract had not been signed and consequently knew, or was reckless in not knowing, that the rebate could not be recognized consistent with GAAP.

103.    C&A continued to improperly recognize rebates on future purchases of goods and services through the third quarter of 2004, the last quarter for which C&A filed a quarterly or annual report with the SEC. This included rebates from Angell Manufacturing ($97,197), Exxon ($44,000), and Trim Stamping ($227,850).

104.    During the fourth quarter C&A continued to record rebates in income improperly, including rebates from Aerotek ($40,000), Vichem ($75,000), and Meurdter ($69,000). The fraudulent accounting for these rebates was included in earnings figures released by C&A in March 2005.

105.    Defendant Stockman was aware of, approved, and directed the scheme to increase income by prematurely recognizing rebates on supply contracts. Stockman knew, or was reckless in not knowing, that C&A was not entitled to the rebates if it did not provide the promised future business, and that C&A's immediate recognition of the rebates in income was improper.

106.    Defendant Stockman also participated personally in many of the rebate transactions, including Exxon, Flambeau and Reko. Defendant Stepp supervised Mr. Galante in the negotiation of the Reko rebate, participated in Purchasing Department meetings at which the

33

rebate scheme was discussed, and knew that the Flambeau agreement had been "papered" so as justify immediate recognition of the rebate in income. When taking these actions, Defendants Stockman and Stepp knew, or were reckless in not knowing, that C&A's treatment of the rebates did not reflect the true terms of the supply contracts and was intended to falsely inflate C&A's reported current earnings. Likewise, Defendants Stockman and Stepp knew, or were reckless in not knowing, that the side letters and other false documents were intended to mislead KPMG and that KPMG did in fact rely on some of the false documents.

### *Capital Equipment Expenditures*

107.    In 2004, C&A expanded the fraudulent rebate scheme to include capital equipment expenditures. Under GAAP, discounts on capital equipment affect the book value of the purchased asset and are not immediately recognizable in income. Nevertheless, at Mr. Cosgrove's direction and with Defendant Stockman's approval, C&A began requiring suppliers to falsely state that price discounts on capital equipment they sold to C&A were rebates for past purchases of non-capital goods or services. C&A then improperly recognized the rebates in income.

108.    In April 2004, Demag Plastics Group ("Demag") agreed to a $1 million rebate in lieu of a discount on the purchase price of machinery it was selling to C&A. Knowing that C&A was receiving the rebate in place of a discount, Defendant Stockman instructed Mr. Cosgrove (through Mr. Barnaba) to ensure that the rebate was falsely documented so that it could be treated as an increase to income. At Mr. Cosgrove's direction, C&A personnel obtained documentation from Demag falsely attributing the rebate to past purchases by C&A of spare parts and other services. C&A improperly recognized the $1 million in income in the second and third quarters of 2004.

34

109.    When C&A negotiated a $1 million discount on machinery purchased from Cincinnati Milacron, Defendant Stockman again directed Mr. Barnaba to work with Mr. Cosgrove to prepare paperwork that could be used to provide false justification for immediate recognition in income. The resulting documentation falsely ascribed the rebate to the purchase of "implementation training services, technical support and continuous improvements." The $1 million was recognized in the third quarter of 2004. Mr. Gougherty, who had become Controller of the Global Plastics Division, directed the improper recognition of at least $600,000 of this rebate.

110.    C&A's fraudulent accounting for capital equipment purchases materially increased C&A's reported income for the second and third quarters of 2004. During this period, C&A improperly recognized at least $7.2 million in pre-tax operating income based on capital expenditure rebates.

111.    C&A continued to use rebates on capital equipment to fraudulently inflate income in the fourth quarter of 2004. Pursuant to directions from Mr. Gougherty, the Global Plastics Division played a prominent role in the rebate scheme during this period, using rebates to compensate for deterioration in its earnings. In December 2004, Mr. Gougherty assisted in obtaining false documentation from Krauss Maffei to disguise a €165,000 discount (approximately $224,000) on capital equipment C&A was purchasing. Mr. Gougherty instructed a subordinate to obtain false documents attributing the rebate to prior purchases of non-capital items. Similarly, during the fourth quarter of 2004 C&A also improperly recorded rebates on capital equipment purchases from Demag ($92,000), RPT ($100,000), and Conair ($38,000).

112.    Defendant Stockman directed and participated in the scheme to improperly treat discounts on capital equipment as rebates, knowing that the documentation was fraudulent and

would improperly inflate C&A's income. Mr. Cosgrove instructed Purchasing Department employees to obtain documents falsely attributing the rebates to past purchases of other items to justify accounting for the rebates improperly and thereby inflate C&A's income. Mr. Gougherty had his subordinates solicit false documentation for the Krauss Maffei rebate designed to falsely inflate C&A's income. Defendant Stockman knew, or was reckless in not knowing, that the false documents were intended to mislead KPMG.

**Effect Of The Misleading Accounting On Financial Statements**

113.    As a result of the above-described scheme, C&A materially overstated its income, or reduced its losses, in its quarterly reports (Form 10-Q) and annual reports (Form 10-K) for each reporting period during the Class Period.. Defendant Stockman and Mr. McCallum signed C&A's annual reports (Form 10-K) for each year from 2002 through 2003. Stepp signed all of C&A's filings from the 10-K for 2001 through the quarterly report (Form 10-Q) for the second quarter of 2004. The following table identifies the impact (in millions) of the improper recognition of the McCallum round-trip payments and the other improper supplier transactions on C&A's pre-tax operating income (or pretax operating loss) in each reported quarter:

| Year | Quarter | Operating Income/ (Loss) Without Improper Transactions | Improper Supplier Transactions | Operating Income/(Loss) As Reported | % Change Due To Improper Transactions |
|------|---------|------|------|------|------|
| 2001 | Q4 | ($16.3) | $2.8 | ($13.5) | 17% |
| 2002 | Q1 | $49.4 | $5.0 | $54.4 | 10% |
|      | Q2 | $79.2 | $2.3 | $81.5 | 3% |
|      | Q3 | ($7.6) | $3.3 | ($4.3) | 43% |
|      | Q4 | $33.9 | $2.2 | $36.1 | 6% |
| 2003 | Q1 | $17.5 | $1.7 | $19.2 | 10% |
|      | Q2 | $41.1 | $3.0 | $44.1 | 7% |
|      | Q3 | $4.1 | $4.2 | $8.3 | 102% |
|      | Q4 | $25.7 | $4.7 | $30.4 | 18% |
| 2004 | Q1 | $28.8 | $1.1 | $29.9 | 4% |

| Year | Quarter | Operating Income/ (Loss) Without Improper Transactions | Improper Supplier Transactions | Operating Income/(Loss) As Reported | % Change Due To Improper Transactions |
|------|---------|------|------|------|------|
|  | Q2 | $20.7 | $5.4 | $26.1 | 26% |
|  | Q3 | $1.6 | $7.9 | $9.5 | 494% |
| Total |  |  | $43.6 |  |  |

114.    In August 2004, C&A sold $415 million in restricted senior subordinated notes. C&A's offering memoranda incorporated C&A's financial statements from 2001 through the second quarter of 2004. On January 27, 2005, C&A filed a registration statement with the SEC in connection with an anticipated exchange, for unrestricted notes, of the $415 million in restricted senior subordinated notes sold in August 2004. The registration statement for each of these offerings included C&A's quarterly and annual financial statements from for the three prior years. These financial statements materially overstated C&A's earnings and consequently the registration statements were false or misleading. Stockman and Stepp signed each registration statement knowing it contained false or misleading financial information.

## FURTHER UNDISCLOSED ADVERSE INFORMATION

### Financial Statements

115.    Defendants' statements regarding C&A's operating income and EBITDA were materially false and misleading for at least the following reasons:

116.    First, C&A has conceded that it must restate its 2003 and 2004 financial results because it accounted improperly for rebates received from vendors, some of whom are related parties.  The materially false financial reporting during the Class Period impacted revenues, cost of sales, operating income, earnings and EBITDA.

117.    Second, Defendants were improperly classifying tens of millions of dollars of actual operating costs as "restructuring" or "impairment" charges. When reporting EBITDA,

37

Defendants repeatedly emphasized EBITDA before any extraordinary or unusual charges (such as restructuring or impairment charges) were incurred. Defendants did so because they understood that investors would largely ignore these restructuring and impairment charges when making their investment decisions, because investors considered them to be "non-operating" or "nonrecurring" charges which did not impact the Company's core operations or future cash flow.

118.    Concerning Defendant Stockman's role in the materially false and misleading statements, specifically, Confidential Informant Number 1 ("CI 1"), who was a Quality Manager at a C&A plant in Canton, Ohio from March 2000 through September 2003, stated that the carpet and acoustics division held Financial Business Operating Systems meetings, commonly known within the Company as "BOSS" meetings, approximately once a month, with Defendant Stockman participating. Those meetings addressed the financial operations of twelve C&A plants. CI 1 attended those meetings along with Millard King, the President of the Global Soft Trim operating unit, Michael Geaghan, the Canton plant's Vice President of Operations, and Daniel Bednarz, Divisional Controller. CI 1 described Stockman as having a comprehensive knowledge of each plant's financial results. Specifically, Stockman carried large binders containing each plant's financial data, and was intimately familiar with each plant's operations and finances.

119.    Confidential Informant No. 2 ("CI 2"), a former Vice President and General Manager at a C&A facility in Troy, Michigan, who was with the Company from February 2000 through December 2004, and who had direct interaction with Stockman from mid-2003 through the end of 2004, also stated that Defendant Stockman had complete mastery over C&A's finances, and that at every quarterly management meeting, Stockman recited financial information down to single digit thousands of dollars on each line of a plant's financial

38

statements, at times even questioning CI 2 about matters as minute as the potential cost savings of replacing two security guards with cameras.

120.    Defendants Stockman and Stepp also familiarized themselves with C&A's operations in order to monitor and preserve Heartland's huge equity stake in C&A's business. As principles in Defendant Heartland, Messrs. Stockman and Stepp had an incentive to (and did) closely monitor Heartland's huge investment of 33,574,772 shares of C&A (which was approximately 30% of Heartland's assets under management). It was critically important to each of these Defendants that C&A remain solvent in order to ensure the value of Heartland's investment.  Moreover, as of August 2004, Defendants Stockman and Stepp personally owned 150,175 and 30,067 shares of C&A, respectively.

121.    Defendants, including Stockman, manipulated EBITDA before restructuring and impairment charges by improperly classifying ordinary operating costs as "restructuring" and "impairment" charges. These manipulations were confirmed by CI 2, who said that he and his staff were always under pressure to categorize ordinary expenses as capital expenditures or non-operating expenses to avoid an immediate impact to EBITDA. In fact, CI 2 said that C&A frequently tried to interpret routine operating expenses as "restructuring expenses," and that Defendant Stockman was always creative in the way he transformed expenses into capital outlays.

122.    CI 2 also said it was the Company's "standard mode of business" to evaluate every expenditure in an attempt to classify it as either capital or non-operating, and that during every quarter from at least mid-2003 through the end of 2004, Defendant Stockman encouraged C&A facilities to classify operating expenses as non-operating, in a Company-wide effort to increase EBITDA.

**Defendants Misrepresented C&A's Carrying Values for Goodwill and Deferred Tax Assets.**

123.    Defendants also misrepresented C&A's goodwill and deferred tax assets.

124.    As discussed in more detail below, on March 17, 2005, Defendants announced that C&A would write off $500 million of goodwill for the Company's U.S./Mexico Plastics and Global Fabrics reporting units, and $177 million of deferred tax assets related to the U.S. and Italy. Under relevant generally accepted accounting principles, Statement of Financial Accounting Standards No. 142, "Goodwill and Other Intangible Assets" ("SFAS 142"), Statement of Financial Accounting Standards No. 109 "Accounting for Income Taxes", those write-offs mean that (a) the present value of the discounted cash flow from those two reporting units was insufficient to support the carrying value of goodwill, and (b) the anticipated taxable income was insufficient to support carrying the deferred tax assets.

**Adverse Business Developments**

125.    In addition to misstating the Company's financial results, Defendants also made a series of material false statements regarding C&A's business. In the months leading up to C&A's private placement in August 2004, Defendants consistently touted C&A's supposedly "world-class" business facilities and operations, including its purported "new business wins," "unique and unusually attractive competitive position" and "superior business model." These statements were designed to convince investors that C&A was a leader in its industry that was overcoming difficult market conditions, and was a healthy company with bright future prospects.

126.    For example, in the August 2, 2004 Press Release, Defendants highlighted the supposedly superior quality of C&A's business, and touted the Company's "high-quality products," which it described as "the most effective in the industry." The press release also touted C&A's "New Business Wins," stating that "during the second quarter of 2004, C&A continued to achieve good progress on increasing new business by adding $450 million of annual

newly booked business." Defendants expanded on these statements on the August 2, 2004 conference call, where Defendant Stockman stated, among other things, that "we are continuing to be awarded new business at a very healthy pace that will sustain our growth trajectory that we have talked to you about previously."

127.    Defendant Stockman also emphasized the importance to C&A of being positioned "green" by the Company's major customers (i.e., in the view of its customers, C&A was able to honor its contracts by consistently delivering conforming parts on a timely basis), stating "Now in order to take advantage of these opportunities -- the long-term awards in a regular way and transfer or capture of business in the short run - we need to be positioned green, to quote, in the eyes of our major customers."

128.    The August 2004 Presentation also specifically highlighted C&A's new facility located in Hermosillo, Mexico. C&A had designed and constructed the Hermosillo facility to build the interiors for the Ford Fusion, which was the largest and most important project in C&A's history. The presentation called the Hermosillo project a "World Class Facility" with state-of-the-art equipment, and further noted that the facility was a "Strong Validation of C&A's Business Model."

129.    Defendants' statements regarding C&A's business and operations were materially false and misleading for several reasons:

130.    First, C&A was not properly staffing and tooling its projects. These problems were causing C&A's customers to cancel contracts and withhold payments, which, in turn, had a devastating effect on the Company's available cash and credit.

131.    According to CI 1 and CI 2, OEMs required C&A to assign specific numbers of appropriate personnel to construction projects. However, because of C&A's deteriorating

41

financial condition, during the summer of 2004 the Company did not have anywhere near the number of staff required to service its existing projects, let alone the number needed to service any new business

132.    According to CI 2: when a particular OEM demanded to meet with a project team it was not unusual for C&A to "play a shell game" by pulling design and engineering staff from other projects in order to show the OEM the required number of personnel. These personnel were not actually assigned to these projects, however, and usually within a week, the counterfeit staff was back manning their original projects until the next time the OEM required a meeting. For instance, CI 2 recounted occasions when Ford, which had required twenty-two designers and engineers to staff a project for the Mustang, called meetings of the C&A staff. At the direction of his superiors, CI 2 first combed through C&A organization charts to try to dig up the required number of personnel. When he failed to find enough people, Defendant Stockman appeared at two meetings with Ford to explain why C&A could not have all of the personnel in attendance.

133.    The problems experienced by C&A in staffing projects were confirmed by a former C&A executive, who was quoted in press reports in May 2005. The former C&A executive, who left C&A in 2004, stated that C&A often cut back engineering, design and manpower for automaker programs, even though the Company had promised certain levels of engineering, or a certain number of people on a program.

134.    Another striking example of C&A's inability to properly staff its projects was the Hermosillo facility. According to the former C&A executive, the Hermosillo project was severely understaffed. This executive stated that while C&A had committed to Ford that it would have a certain number of people for this project, it only had half that number of employees

42

involved. This situation put the entire project at risk. According to a May 18, 2005 article in the Detroit Free Press:

> We committed to a certain number of people for Ford on the Fusion, but we had half as many as we said we did. Ford wanted regular meetings with us on the Fusion, so we'd send people to Dearborn who were managers that knew nothing about design or about the Fusion and tell Ford they were a designer to make it look like we had X number of bodies for Ford. They were just placeholders. Had Ford asked them a question about the Fusion it would have been ugly. It was outright deceit.

135. Moreover, C&A was not properly supplying the Hermosillo facility with high-quality, modern equipment. Even though C&A represented that the facility would be a "world class" facility with all new equipment, C&A was actually stocking it with secondhand machinery. According to the May 17, 2005 article in the Detroit Free Press, after Ford learned of this it became "frustrated that C&A [had] sent secondhand machinery to the plant" and was "worried that, among other things, C&A's angry vendors could disrupt production and not deliver parts on time."

136. Second, C&A was increasingly producing non-conforming parts that did not meet its customers' specifications and manufacturing parts that OEM's would not pay for caused the Company to burn through its available cash and revolving credit.

137. According to CI 2, the Company had a regularly recurring problem with the Production Part Approval Process, or "PPAP." Under PPAP, when C&A was ready to finally produce a part, the Company provided its customer with a prototype part for the customer's inspection. This normally occurred thirty days before the OEM's scheduled start of production. However, by the summer of 2004, the Company's production had become so poor that, according to CI 2, it increasingly had "bad launches" of components, and was frequently unable to pass PPAP on a timely basis. As set forth below, this created significant liquidity issues for C&A,

43

and seriously undermined C&A's relationships with OEMs, because those OEMs could not start production until C&A's parts passed PPAP.

138.    For example, CI 2 described how C&A's production issues created significant problems with General Motors, which accounted for approximately 22% of the Company's revenue in 2003. During the early summer of 2004, C&A had six companywide "bad launches" of GM components. The problems were so severe and pervasive that GM warned C&A that one more "bad launch" would automatically result in GM putting the Company on "new business hold," also known as "going red." This meant that, in GM's view, C&A was unable to consistently deliver conforming parts and did not have a plan to remedy the problem.

139.    The seventh bad launch occurred in October 2004, while C&A was in position to be awarded contracts for GM's Hummer HX Mini Van and Theta Platform. As a result, C&A lost both contracts.

140.    C&A's increasingly substandard production was also draining the Company's available cash and credit, which was critical to C&A's viability as a going concern.

141.    For a company such as C&A, manufacturing substandard products which do not conform to customer specifications or requirements often results in liquidity issues. That is because automotive parts companies like C&A have to pay their vendors in order to keep supplies coming in, but do not get paid themselves until the parts they deliver are approved under PPAP by their OEM customers. Indeed, C&A customarily advanced all costs incurred in connection with tool and design projects, and was only paid when the parts passed PPAP. This meant that C&A was forced to front what were often millions of dollars in costs until PPAP occurred. PPAP was supposed to occur thirty days before an OEM's start of production. However, according to CI 2, because of C&A's increasing incidents of production failure, C&A

44

often did not pass PPAP until ninety days or more after the OEM's scheduled start of production. Thus, instead of being paid thirty days before the start of production, the Company was not being paid in many instances until ninety days or more after the start of production. This had a significantly negative effect on the Company's cash flow and liquidity.

142.    During the early summer of 2004, the cash and credit drain caused by the PPAP situation became so bad that, according to CI 2, C&A became what is known in the automotive parts industry as a "distressed supplier." C&A's manufacturing difficulties were so pervasive that it essentially had to beg OEMs to pay at least some portion of the contract price for those components that were close to conforming.

143.    By the end of the Class Period, these problems had already caused a substantial adverse effect on C&A's relationship with its own suppliers. According to CI 1, C&A routinely held its accounts payable until the Company started to receive collection notices from suppliers in a desperate measure to conserve cash. And CI 2 stated that C&A's practice of delaying payments to suppliers became so prevalent that, beginning no later than the second quarter of 2004, C&A's Treasurer established an unwritten "rule" that no supplier would be paid unless that supplier first sent C&A a written threat to shut down delivery.

**C&A Was Locked Into Money-Losing Contracts**

144.    During the Class Period, Defendants knew or should have known that C&A's operating results and industry conditions existing at the time required Defendants to undertake an impairment analysis and an assessment as to whether or not deferred tax assets would be realized. Such an analysis would have revealed that the carrying values of the goodwill and deferred tax assets were materially overstated and would have required C&A to record a substantial impairment charge.

45

145.    According to an article in the July 27, 2005 edition of the *Detroit Free Press*, on May 24, 2004, DaimlerChrysler pressed C&A into signing an agreement to give back to DaimlerChrysler 8.5% of the value of the contract that C&A had with DaimlerChrysler to produce plastic trim for the 300 Magnum Charger vehicle. C&A was already losing money on that contract, even before the give-back. DaimlerChrysler also compelled C&A to give back more than 10% of the value of the contract that it had with DaimlerChrysler to produce parts for the Town & Country minivan and the Dodge Ram and Dodge Durango pick-up trucks.  This material adverse information was not disclosed in the August 2, 2004 press release or in the June 30, 2004 Form 10-Q.

146.    According to the article "C&A was losing an estimated $50 million a year on the contract to make plastics and fabric parts on the Chrysler 300/ Dodge Magnum/ Dodge Charger platform." In addition, according to this article, C&A had been locked into numerous other loss contracts at least as early as the date of issuance of the June 18, 2002 Registration Statement and as of May 2004 was "fighting a losing effort to stave off bankruptcy."  The article (byline by Jeffrey McCracken) stated:

> Production of Detroit's hottest car in years, the Chrysler 300 sedan, came perilously close to a complete shutdown this spring as a crucial and desperate supplier threatened to pull the plug unless Chrysler paid more for parts.
>
> Such a warning is the auto industry equivalent of a nuclear weapon -- rarely threatened and almost never used.
>
> But in the days and weeks before struggling auto parts maker Collins & Aikman Corp. ousted its chief executive, David Stockman, on May 12, the former Michigan congressman warned his largest customer, the Chrysler Group, he was going to stop sending instrument panels to the Brampton, Ontario, assembly plant. That plant makes one of the most popular cars in the country -- the Chrysler 300.

46

A shutdown would have been devastating to Chrysler, because the much-hyped Chrysler 300 and other cars from that plant have been the backbone of Chrysler's recent market-share gains and are those rare vehicles that sell largely without incentives. **However, Troy-based Collins & Aikman was running out of cash and was burdened by a series of unprofitable contracts, the biggest of which was probably this one**, said two senior auto officials.

"A shutdown was within days," said one top auto official, who asked not to be named because of lawsuits surrounding C&A.

Three automotive officials familiar with the tense negotiations spoke to the Free Press for this report but asked not to be named for various reasons.

**Stockman, fighting a losing effort to stave off bankruptcy, made the threat because C&A was losing an estimated $50 million a year on the contract to make plastics and fabric parts on the Chrysler 300/ Dodge Magnum/ Dodge Charger platform.** C&A filed for bankruptcy protection May 17 and is now being propped up by hundreds of millions of dollars from the automakers.

**Two senior auto officials estimated C&A was providing about $700 in parts for each one of those Chrysler vehicles -- and losing up to $150 on each one.** Chrysler is on pace to build about 260,000 of the Chrysler 300, Dodge Magnum and Dodge Charger models this year.

*     *     *

[The] biggest buy was the plastic-trim business from Textron Automotive for $1.2 billion in August of 2001. The contract to make parts for Chrysler on the 300, Magnum and Charger was included in the purchase.

A senior auto official familiar with C&A said Heartland's people "weren't experienced enough to understand pricing on instrument panels. They didn't see that Textron had lowered the price a lot to make sure they got the business, so **it was underwater from the beginning."**

*     *     *

A May 24, 2004, agreement between Chrysler and C&A, a copy of which was read to the Free Press, shows **C&A agreed to give**

47

**back 8.5% to Chrysler on the 300 contract — even though it
was already unprofitable.**

"There was no choice. The contract was going to get moved
otherwise," said an auto official who asked not to be named
because the person is still in the industry.

**C&A also gave double-digit percentage breaks on parts it
made for the Chrysler Town & Country minivan, Dodge Ram
and Dodge Durango, according to the agreement. In
bankruptcy court, it has been estimated C&A has at least 35
unprofitable contracts, some of which were unprofitable from
the beginning, others of which became unprofitable as plastic
prices rose or because C&A gave more concessions to keep the
contracts.** (Emphasis added.)

147.   Defendants not only concealed the existence of loss contracts from the investment

community during the Class Period, they made affirmative statements which caused the

investment community to believe that "low margin" business was being dropped. For example,

during the February 20, 2003 conference call, Defendant Stepp stated: "Sales during the fourth

quarter of 2002 were positively impacted by cockpit module growth and new product launches

partially offset by production adjustments by DaimlerChrysler, the elimination of the extended

enterprise business with JCI **and other low margin businesses primarily in Europe**...."

(Emphasis added.)

148.   Additionally, during the February 20, 2003 conference call, Millard King,

Executive Vice President Of Global Manufacturing Operations For Carpet And Acoustic

Systems stated:

> In December 2002, we've closed a herd setter (ph) Sweden plant
> where we discontinued low margin businesses and moved the
> higher margin businesses such as the Volvo, truck rear shaft
> absorbers and luggage trim to other C&A plants...While we see our
> 2003 European carpet and acoustic sales decreasing by about 25 to
> 30 percent, including **loss of low margin business, as a result of
> our improvement actions** we will be significantly increasing the

48

2003 EBITDA performance as a percent of sales over the 2002 levels. (Emphasis added.)

149.   Similarly, during the Company's November 13, 2003 conference call, Defendant Stockman stated that Defendants had performed a review of C&A's backlog and concluded that certain programs were not worth keeping:

> ...we have evaluated certain future business awards already in our backlog and concluded that certain programs are not consistent with these higher hurdle rates. A case in point are the Daimler Chrysler desizing of midsize vehicle on which C&A was awarded the interior trim package last April, but which would not produce revenue until mid 2006 at the earliest.
>
> This program in particular would have required front end investment for E and D, Capex and so forth of over $50 million over 2003 to 2005. And what we believe to be in addition excessive givebacks on current business in return for this award. Because of the inherent volume risks in this congested segment, the returns look less promising than many alternatives the company is currently pursuing. Therefore C&A has fully accommodated Chrysler's effort to transition the desegment to another supplier.
>
> **In this context let me be very clear. We are and remain in the business of gaining more business, but not at any price**. Let us also make clear that this episode involves a discrete and specific investment decision on a specific platform. We obviously value or relationship with Daimler Chrysler and remain dedicated to world-class performance and all existing and future work they may award us. In fact Collins & Aikman is currently launching multiple programs for Daimler Chrysler that are critical for both companies and we remain fully committed to supporting [inaudible] launches in all of these programs. (Emphasis added.)

150.   Other affirmative statements by Defendants during the Class Period were also materially false and misleading. For example, during a November 14, 2002 conference call, Defendant Stepp stated: "We talked about some of the Chrysler shut-downs, for example. Virtually all of those were very high content vehicles. **You're talking probably 6 to 700 per vehicle on those vehicles. And those are good profitable programs. Probably at least 30, 35**

**percent margins.**" (Emphasis added.) This statement was materially false and misleading as

confirmed in the news article specified above ("Two senior auto officials estimated C&A was

providing about $700 in parts for each one of those Chrysler vehicles -- and losing up to $150 on

each one"), and it was never corrected.

151.  During a March 11, 2004 conference call, Defendant Stockman stated: "**Number**

**one, the first quarter is highlighted by the launch of the new Dodge Magnum and Chrysler**

**300C**, Chrysler's new large car rear-wheel drive platform. Collins and Aikman has significant

content on these vehicles, including the instrument panel and cockpit assembly sequencing, the

center console, acoustics package, flooring, doors, including the sequencing of doors into the

assembly plant at Brampton, accessory maps, key fabrics and other trend items. **These vehicles**

**are key to both our and Chrysler's success**." (Emphasis added.) This statement was materially

false and misleading as confirmed above ("A May 24, 2004, agreement between Chrysler and

C&A, a copy of which was read to the Free Press, shows C&A agreed to give back 8.5% to

Chrysler on the 300 contract -- **even though it was already unprofitable**."). (Emphasis added.)

### PRE-CLASS CLASS PERIOD EVENTS AND FALSE STATEMENTS

152.   On August 1, 2002, C&A issued a press release announcing that Thomas E.

Evans, the Company's previous Chairman and CEO, has elected to retire.  Further, that C&A's

Board of Directors had appointed Jerry L. Mosingo, as its CEO and as a member of the

Company's Board of Directors.  In addition, the press releases announced the following

concerning Defendants Stockman and Stepp:

> J. Michael Stepp, age 58, the Company's current Executive Vice
> President, Chief Financial Officer and a Director of the Company,
> will become Vice Chairman of the Board of Directors and will
> assume an expanded role in managing corporate staff functions.
>
> David A. Stockman, age 55, Senior Managing Director of the

Company's largest shareholder, Heartland Industrial Partners, will become non-executive Chairman of the Board of Directors.

153.    On August 5, 2002, C&A issued a press release announcing financial results for the second quarter ended June 30, 2002, noting "net sales of $1.085 billion, operating income of $81.5 million, income before income taxes of $29.7 million and net income of $16.0 million." The press release also stated, in relevant part: "At June 30, 2002 our balance sheet debt was $1,326 million, there were no outstandings under the accounts receivable securitization facility and cash was $113 million."

## ADDITIONAL CLASS PERIOD EVENTS AND FALSE STATEMENTS

### Second Quarter 2002

154.    On August 6, 2002, C&A issued a press release announcing "Heartland's Plan to Purchase Additional Common Shares." In particular, the press release noted:

> Collins & Aikman Corporation (NYSE:CKC) announced today that it has been advised by Heartland Industrial Partners, L.P., its largest shareholder, that Heartland and certain directors of the Company associated with Heartland may seek to purchase up to an aggregate of 5,000,000 shares of the Company's common stock. The purchases may be made from time to time in the open market, with the amount and the timing of the purchases depending on market conditions, at the direction of Heartland or the particular directors.

155.    In the August 6, 2002 press release, Defendant Stepp commented: "The Company appreciates the support of our largest stockholder and the individual directors that are interested in purchasing additional stock." The August 6 press release also noted that directors of the Company indicating that they may purchase shares including Defendant Stockman, among others.

156.    On or about August 14, 2002, C&A's financial results for the second quarter of 2002 were repeated and reaffirmed in the Company's Report on Form 10-Q filed with the SEC,

which was signed by Defendant Stepp.   That Form 10-Q disclosed substantially the same financial data as was contained in the August 5, 2002 press release.   It also stated:

> The condensed consolidated financial statements include the accounts of the Company and its subsidiaries. **In the opinion of management, the accompanying condensed consolidated financial statements reflect all adjustments necessary for a fair presentation of financial position and results of operations.** Certain prior year items have been reclassified to conform to the 2002 presentation. **(Emphasis added).**

157.   The financial results stated for this fiscal quarter were materially false and misleading because during this period Defendants caused C&A to engage in several of the schemes described above, including at least round-trip and incompletely disclosed related-party transactions, improper recording of vendor rebates, and mischaracterization of expenses as non-recurring, and generally because these previously issued financial statements were required to be restated.   In addition, the statements are misleading in that they did not disclose the effect of related party transactions on the Company, that the Company was locked into money-losing contracts, that the Company was short-staffing projects.   Touting the support of Heartland was misleading in the absence of a discussion of the weakness of C&A in light of the money drained from it by the Defendants, so that investors could understand Defendants' motivation to protect their investment by inflating the stock price and stave off C&A's collapse.

**Third Quarter 2002**

158.   On November 14, 2002, C&A issued a press release announcing financial results for the third quarter ended June 30, 2002, and "Above Market Revenue Growth And Rapid Integration Progress in Third Quarter." In particular, the Company reported that for the third quarter, C&A "reported sales of $922.5 million as well as operating income before restructuring charges of $29.5 million. Comparable sales and operating income for the third quarter of 2001 were $430.4 million and $11.5 million, respectively."

159.   In the November 12, 2002 press release, Collins & Aikman also reported reduced debt at $1.31 billion and cash of $77 million, as of September 30, 2002. Defendant Stepp commended that:

> "Our strong financial discipline has been maintained ... with quarter-end net debt at $1.23 billion or 8% below where we started the year. We anticipate that continued aggressive reduction of working capital and disposal of excess assets will offset the significant cash restructuring costs we are now experiencing -- thereby positioning the Company for steady leverage reduction in the periods ahead."

160.   C&A's financial results for the third quarter of 2002 were repeated and reaffirmed in the Company's Report on Form 10-Q filed with the SEC on or about November 14, 2002, which was signed by Defendant Stepp.   That Form 10-Q disclosed substantially the same financial data as was contained in the November 14, 2002 press release.  It also stated:

> The accompanying condensed consolidated financial statements include the accounts of the Company and its subsidiaries and **in the opinion of management, contain all adjustments, including adjustments of a normal and recurring nature, necessary for a fair presentation of financial position and results of operations**. Certain prior year items have been reclassified to conform to the 2002 presentation. Results of operations for interim periods are not necessarily indicative of results for the full year. The accompanying consolidated financial statements and footnotes should be read in conjunction with the Company's 2001 Annual Report on Form 10-K/A. (Emphasis added.)

161.   The financial results stated for this fiscal quarter were materially false and misleading because during this period Defendants caused C&A to engage in several of the schemes described above, including at least round-trip and incompletely disclosed related-party transactions, improper recording of vendor rebates, and mischaracterization of expenses as non-recurring, and generally because these previously issued financial statements were required to be restated.  Statements about expenses, discipline and restructuring above were misleading because

53

expenses were mischaracterized as nonrecurring.  In addition, the statements are misleading in that they did not disclose the effect of related party transactions on the Company, that the Company was locked into money-losing contracts, that the Company was short-staffing projects.

162.    On January 9, 2003, the Company issued a press release announcing that it had named Defendant Koth as Vice President of Tax, reporting directly to CFO, Defendant Stepp. "Koth will be responsible for global tax planning and management, and will direct recently implemented initiatives to improve the Company's effective tax rate."

**Fourth Quarter 2002**

163.    On February 20, 2003, C&A issued a press release regarding its financial results for the fourth quarter of 2002, as well as the fiscal year ended December 31, 2002. The press releases touted "sharply improved fourth-quarter performance, reflecting the impact of acquisitions, strong internal sales growth, new product launches and increased operating efficiency." C&A also reported a "*370 percent* climb in operating income for full year 2002, an improvement that far outpaced the 113 percent sales growth the company achieved through acquisitions and internal growth." (Emphasis added.)

164.    C&A's then-President and CEO noted that: "Excluding the restructuring and impairment charges, we are in the black." In further relevant part, the February 20, 2003 press release stated:

> **EBITDA discussion**
> EBITDA before restructuring and impairment charges increased by 150 percent for the year and 414 percent for the fourth quarter. After giving effect to the acquisitions, fourth quarter 2002 EBITDA before restructuring and impairment charges increased approximately 50 percent to $82.3 million from the pro forma amount of $55.4 million.
>
> *                *                *
>
> **Full Year 2002 business wins**

54

> "We won new programs in 2002 that will result in excess of $800 million in annual business. These wins demonstrate our customers' appreciation for the capabilities and competencies our company now offers. After a year of highly successful integration, we are doing a much better job of cross-selling our products and featuring many new technologies and product combinations," stated CEO Mosingo.

165.   C&A's financial results for the fourth quarter of 2002, and fiscal year ended December 31, 2002, were repeated and reaffirmed in the Company's Report on Form 10-K filed with the SEC on or about March 26, 2003, which was signed by Defendants Stockman and Stepp. This Form 10-K disclosed substantially the same financial data as was contained in the February 20, 2003 press release.

166.   The financial results stated for this fiscal quarter were materially false and misleading because during this period Defendants caused C&A to engage in several of the schemes described above, including at least round-trip and incompletely disclosed related-party transactions, improper recording of vendor rebates, and mischaracterization of expenses as non-recurring, and generally because these previously issued financial statements were required to be restated.   Statements about restructuring above were misleading because expenses were mischaracterized as nonrecurring restructuring expenses.   In addition, the statements are misleading in that they did not disclose the effect of related party transactions on the Company, that the Company was locked into money-losing contracts, that the Company was short-staffing projects.

**First Quarter 2003**

167.   On May 15, 2003, the Company issued a press release regarding its financial results for the first quarter of 2003. The press release stated in pertinent part:

> [C&A] today announced mixed results for its first quarter - with record sales and significant future year new business wins accompanied by a disappointing decline in profitability. According

to Jerry Mosingo, C&A President and CEO, "First quarter 2003 sales of $1.035 billion represented an increase of $120 million or 13 percent over 2002 first quarter sales of $915 million."

The company reported first quarter 2003 operating income of $17.4 million, a net loss from continuing operations of $28.7 million or 34 cents per share, and EBITDA of $50.8 million. These results compared to operating income in the first quarter of 2002 of $54.4 million, a net loss from continuing operations of $6.7 million or 10 cents per share, and EBITDA of $84.9 million. The first quarter 2003 results include $18.1 million in charges for the impairment of long-lived assets and the first quarter 2002 results include $9.1 million of restructuring charges.

\*\*\*\*\*

The first quarter 2003 impairment of long-lived assets included a $10.4 million write-off of a non-compete agreement. . .

168.   C&A's financial results for the first quarter of 2003 were repeated and reaffirmed in the Company's Report on Form 10-Q filed with the SEC on or about May 15, 2003, which was signed by Defendant Stepp. That Form 10-Q disclosed substantially the same financial data as was contained in the May 15, 2003 press release. It also stated:

The condensed consolidated financial statements include the accounts of the Company and its subsidiaries. In the opinion of management, **the accompanying condensed consolidated financial statements reflect all adjustments, including adjustments of a normal and recurring nature necessary for a fair presentation of financial position and results of operation.** Certain prior year items have been reclassified to conform to the 2003 presentation. (Emphasis added).

169.   The press release was silent as to vendor rebates except for one sentence: "**a non-recurring rebate" was "received in the first quarter of 2002.**" (Emphasis added.)

170.   Discussing the Becker non-compete agreement, the March 31, 2003 Form 10-Q stated:

On March 27, 2003, the Company entered into a termination agreement and release to buyout the non-compete agreement between the Company and Charles E. Becker, a member of the

56

Company's Board of Directors. The Company paid $11.3 million in April 2003 as part of the termination agreement and release. The non-compete agreement was entered into as part of the Becker acquisition. As a result of this transaction, the Company incurred a loss of $10.4 million, which is primarily due to the write-off of intangible assets initially recorded in conjunction with the Becker acquisition.

171.  The March 31, 2003 Form 10-Q contained a certification pursuant to Section 906 of the Sarbanes Oxley Act ("Section 906 certification") by Defendant Stepp. These certifications stated:

> Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 (Chapter 63, Title 18 U.S.C. sub-sections 1350(a) and (b)), each of the undersigned hereby certifies that the Quarterly Report on Form 10-Q for the period ended March 31, 2003 of Collins & Aikman Corporation (the "Company") fully complies with the requirements of Section 13(a) or a Section 15(d) of the Securities Exchange Act of 1934 and that the information contained in such Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

172.  In addition, the March 31, 2003 Form 10-Q contained a representation which stated: "In the opinion of management, the accompanying condensed consolidated financial statements reflect all adjustments, including adjustments of a normal and recurring nature necessary for a fair presentation of financial position and results of operations."

173.  The financial results stated for this fiscal quarter were materially false and misleading because during this period Defendants caused C&A to engage in several of the schemes described above, including at least round-trip and incompletely disclosed related-party transactions, improper recording of vendor rebates, and mischaracterization of expenses as non-recurring, and generally because these previously issued financial statements were required to be restated. Statements about restructuring above were misleading because expenses were mischaracterized as nonrecurring. In addition, the statements are misleading in that they did not

57

# EXHIBIT B
# PART 2

disclose the effect of related party transactions on the Company, that the Company was locked into money-losing contracts, and that the Company was short-staffing projects.

174.    On August 11, 2003, the Company announced the appointment of Defendant Stockman as Chief Executive Officer.  Mr. Mosingo resigned as President, Chief Executive Officer and a Director of the Company.

**Second Quarter 2003**

175.    On August 15, 2003, C&A issued a press release announcing financial results for the second quarter ended June 30, 2003.  It stated, in relevant part:

> Collins & Aikman Corporation (C&A) (NYSE: CKC) today reported second quarter and year-to-date results for the six months ended June 30, 2003. For the second quarter 2003, the company reported earnings per share of 13 cents from continuing operations versus a loss of 46 cents for the same period of 2002. **The company reported second quarter 2003 sales of $1.034 billion and operating income of $43.5 million, which includes restructuring and asset impairment charges of $5.7 million. On a comparable basis for the second quarter 2002, Collins & Aikman reported sales of $1.085 billion and operating income of $81.5 million.** The company's independent auditors have not completed their review of these second quarter financial results, as discussed below. Commenting on the company's improved second quarter results, **David Stockman, C&A Chairman and recently appointed CEO, stated, "Despite difficult market conditions which caused vehicle builds to decline considerably versus last year, our employees pulled together and delivered on most facets of the operations including program launches, cost containment and performance improvement.** But I think we can still do better. The EBITDA margin achieved in the second quarter is far from satisfactory considering our net capital employed and extensive vertical integration."

176.    On August 15, 2003, the Company filed its Form 10-Q for the quarterly period ended June 30, 2003 with the SEC. This document, which was signed by Defendant Stepp, disclosed substantially the same financial data as was contained in the August 15, 2003 press release and it  contained a  disclosure regarding termination  of the  Becker non-compete

agreement which was substantially similar to the disclosure which was contained in the March 31, 2003 Form 10-Q. It was silent with regard to vendor rebates except to refer to an undisclosed sum of "rebates received in the six months ending June 30, 2002."

177.    The August 15, 2003 Form 10-Q disclosed the existence of certain unspecified accounting-related assertions "**made by two former executives of the Company**" (Emphasis added.) regarding "transactions between the Company and affiliates of Elkin McCallum" and "issues concerning the original acquisition of Becker Group by the Company from certain persons, including Charles E. Becker, presently a director of the Company." The disclosure stated:

> The Company was recently advised of assertions concerning certain related party transactions and other matters described below. The Audit Committee was promptly advised of these assertions and determined to thoroughly investigate them. The Audit Committee has retained an independent counsel for that purpose, and the Audit Committee investigation is underway. The Company has been advised by its independent auditors, KPMG LLP, that they will be unable to complete their SAS 100 review of the Company's second quarter results prior to completion of the Audit Committee's independent investigation. Accordingly, the Company's independent accountants, KPMG LLP, have not reviewed the accompanying unaudited consolidated financial statements as June 30, 2003 and for the three month period then ended in accordance with Rule 10-01(d) of Regulation S-X promulgated by the SEC.
>
> **The assertions were made by two former executives of the Company**. Based on the initial work of the Audit Committee, the Company believes that the principal assertions relate to (1) a concern with certain terms of previously disclosed transactions between the Company and affiliates of Elkin McCallum, a director of the Company, and a related potential accounting implication for one of these transactions and (2) non-accounting related issues concerning the original acquisition of Becker Group by the Company from certain persons, including Charles E. Becker, presently a director of the Company. In addition, based on the former employees' communications, the Audit Committee is

expected to review the management environment, including that of
the finance staff. (Emphasis added.)

178.    The August 15, 2003 Form 10-Q contained Section 906 certifications by
Defendants Stockman and Stepp. In addition, it contained a representation which stated: "In the
opinion of management, the accompanying condensed consolidated financial statements reflect
all adjustments, including adjustments of a normal and recurring nature, necessary for a fair
presentation of financial position and results of operations."

179.    The financial results stated for this fiscal quarter were materially false and
misleading because during this period Defendants caused C&A to engage in several of the
schemes described above, including at least round-trip and incompletely disclosed related-party
transactions, improper recording of vendor rebates, and mischaracterization of expenses as non-
recurring, and generally because these previously issued financial statements were required to be
restated. Statements about cost containment above were misleading because expenses were
mischaracterized as nonrecurring. In addition, the statements are misleading in that they did not
disclose the effect of related party transactions on the Company, that the Company was locked
into money-losing contracts, and that the Company was short-staffing projects.

### Third Quarter 2003

180.    On November 13, 2003, the Company issued a press release entitled "Collins &
Aikman Announces Improved Third Quarter Financial Results," regarding its financial results
for the third quarter of 2003. The press release stated in pertinent part:

> Collins and Aikman Corporation today reported third quarter and
> year-to-date results for the nine months ended September 30, 2003.
> For the third quarter, which is the company's seasonally weakest
> quarter, the company reported net sales of $902 million compared
> to $923 million in the third quarter of 2002, a 2% decline which
> mainly reflected reduced North American customer build volumes.
> **The company also reported a loss of 38 cents per share from
> continuing operations versus a loss of 54 cents per share in the**

**same period in 2002. The third quarter results included after-tax charges for restructuring and long-lived asset impairments of $16.0 million (or 19 cents per share) and $21.4 million (or 26 cents per share) in 2003 and 2002, respectively.**

**EBITDA was $41.9 million for the third quarter of 2003 as compared to $21.8 million for the third quarter of 2002. The third quarter 2003 EBITDA was reduced by charges of $21.9 million for restructuring and $2.2 million for the impairment of long-lived assets.** Results for the third quarter of 2002 included pre-tax charges of $25.1 million for restructuring and $8.7 million for the impairment of long-lived assets. (Emphasis added.)

181.    On November 14, 2003, the Company filed its Form 10-Q for the quarterly period ended September 30, 2003 with the SEC ("the September 30, 2003 Form 10-Q"). This document, which was signed by Defendant Stepp, disclosed substantially the same financial data as was contained in the November 13, 2003 press release. It was silent with regard to vendor rebates and it contained a disclosure regarding termination of the Becker non-compete agreement which was substantially similar to the disclosure which was contained in the June 30, 2003 Form 10-Q.

182.    The September 30, 2003 Form 10-Q contained Section 906 certifications by Defendants Stockman and Stepp.  In addition, the September 30, 2003 Form 10-Q contained a representation which stated: "In the opinion of management, the accompanying condensed consolidated financial statements reflect all adjustments, including adjustments of a normal and recurring nature, necessary for a fair presentation of financial position and results of operations."

183.    The financial results stated for this fiscal quarter were materially false and misleading because  during  this period Defendants caused C&A to engage in several of the schemes described above, including at least round-trip and incompletely disclosed related-party transactions, improper recording of vendor rebates, and mischaracterization of expenses as non-recurring, and generally because these previously issued financial statements were required to be restated.  Statements about restructuring charges above were misleading because expenses were

mischaracterized as nonrecurring. In addition, the statements are misleading in that they did not

disclose the effect of related party transactions on the Company, that the Company was locked

into money-losing contracts, and that the Company was short-staffing projects.

184.    On February 17, 2004, the Company reported that it closed on a syndication of a

material financing facility:

> Collins and Aikman Corporation announced today that the
> company on Friday, February 13, 2004 closed on its syndication of
> a $100 million Supplemental Revolving Credit Facility and a $185
> million Tranche A-1 Term Loan. The Supplemental Revolving
> Credit Facility will be available for revolving credit loans and
> letters of credit. The proceeds of the Tranche A-1 Term Loan will
> be used to further improve liquidity by voluntarily prepaying the
> existing two term loans in forward order of maturity and will also
> reduce the applicable interest rate margins. Other terms and
> conditions are substantially the same as the existing facilities and
> term loans. These financings mature on December 31, 2005. J.P.
> Morgan Securities, Inc. and Deutsche Bank Securities, Inc. served
> as Joint Bookrunners and Lead Arrangers for these transactions.

## Fourth Quarter 2003

185.    On March 11, 2004, C&A filed a press release entitled "Collins & Aikman

Announces Record Sales and Fourth Quarter Financial Results," announcing record financial

results for the fourth quarter and year-end Fiscal Year 2003. Specifically, the Company reported

net sales of $1.013 billion in the fourth quarter of Fiscal Year 2003, as compared to $963 million

in the fourth quarter of 2002, a 5% increase. The Company further reported a loss of $0.14/share

from operations in the fourth quarter of 2003, which included after-tax charges for restructuring

and long-lived asset impairments of $16.7 million (or 20 cents per share), compared to a loss of

$0.04 cents per share in the comparable period in 2002, which included after-tax charges for

restructuring and long-lived asset impairments of $13.0 million (or 16 cents per share). The

press release elaborated on the Company's financial results as follows:

The fourth quarter 2003 pre-tax restructuring charge of $13.8 million included costs associated with the previously announced third quarter restructuring actions that would reduce the Company's salaried workforce by almost 800 or 15%. This restructuring initiative and related actions are expected to reduce the company's fixed-cost structure by $80 million per year.

**For the full-year 2003, the company reported sales of $3.98 billion compared to $3.89 billion in the same period of 2002.** The company also reported a net loss available to common shareholders from continuing operations of $59.1 million or 71 cents per share, which included $49.9 million (or 60 cents per share) of after-tax charges for restructuring and long-lived asset impairments. For the comparable 2002 period, the net loss available to common shareholders from continuing operations was $86.7 million of $1.15 per share, which included after tax charges for restructuring and long-lived asset impairments of $40.9 million (or 53 cents per share).

C&A's net debt, including outstandings under an off-balance sheet accounts receivable facility, was $1.346 billion at December 31, 2003. (Emphasis added.)

*****

EBITDA was $69.4 million for the fourth quarter of 2003, which was reduced by charges of $13.8 million for restructuring and $7.3 million for the impairment of long-lived assets. The fourth quarter 2003 EBITDA was $68.2 million, which was reduced by charges of $4.8 million for restructuring and $9.3 million for the impairment of long-lived assets.

186.    This press release also discussed the Company's Audit Committee findings:

As separately announced today, the company's Audit Committee inquiry into certain assertions made by two former executives and related matters has been completed. **The Audit Committee's inquiry extended into the following areas: (1) assertions regarding the company's accounting for revenue and tooling, (2) a comprehensive review of related party transactions and (3) certain corporate governance procedures.** The primary findings of the Audit Committee include that (1) it did not become aware of any events that would necessitate a restatement of any previously issued financial statements and (2) that all related party transactions had a legitimate business purpose, were negotiated fairly, and were intended to advance the interests of the company and not to benefit the related parties at the company's expense. The

Audit Committee, however, has made certain corporate governance and disclosure recommendations concerning related party transactions that are summarized in the company's separate press release.

The company intends to file amended Quarterly Reports on Form 10-Q for the quarters ended June 30, 2003 and September 30, 2003, to reflect the conclusion of the Audit Committee's inquiry and its recommendations, but, as indicated above, no restatement of any previously issued financial statements is required or being made.  The 2003 Form 10-K is expected to include audited financial statements and the required CEO and CFO certifications under Sarbanes-Oxley. (Emphasis added.)

187.    A second press release issued by C&A on March 11, 2004 disclosed a previously undisclosed (in violation of federal securities laws) $300,000.00 payment to Mr. Becker in 2002 "as compensation...for his temporary service as Vice Chairman" of the Company during that year. It also stated that disclosures concerning a "description of the 2003 fabrics transactions with Mr. McCallum and (3) the dollar volume of previously disclosed ordinary course arrangements with Mr. McCallum, specifically, from transition services, supply and rebate arrangements" would be forthcoming.  The press release stated:

Collins & Aikman Corporation (NYSE: CKC) announced today that its Audit Committee inquiry into certain assertions made by two former executives and related matters has been completed. The Audit Committee, aided by its independent counsel, Davis Polk & Wardwell, and by an outside accounting expert, reported its findings and recommendations to the company's full Board of Directors. In general, **the Audit Committee's inquiry extended into the following areas: (1) assertions regarding the company's accounting for revenue and tooling, (2) a comprehensive review of related party transactions** and (3) certain corporate governance procedures. The following summarizes the Committee's principal findings and recommendations:

o        The Audit Committee has not become aware of any events that would necessitate a restatement of any previously issued financial statements.

o    While the assertions concerning related party transactions were limited to certain transactions involving Charles Becker and Elkin McCallum and entities controlled by them, the Audit Committee reviewed all material transactions entered into between the company, on the one hand, and Heartland Industrial Partners, Mr. McCallum and Mr. Becker and their respective affiliates. **Both Mr. Becker and Mr. McCallum are directors and significant shareholders of the company and are, directly or indirectly, limited partners in Heartland, the company's largest shareholder**.

The Audit Committee concluded that each of these transactions had a legitimate business purpose, was negotiated fairly, and was intended to advance the interests of the company and not to benefit the related parties at the company's expense. The Audit Committee further concluded that, by and large, these transactions were appropriately presented to and approved by the Board of Directors of the company, were properly documented and **adequately disclosed**.

The Audit Committee concluded that certain related party matters referred to below had not been formally submitted for Board approval, and that others should have been more appropriately documented. The Audit Committee recommended that disinterested members of the Board review those matters and take whatever procedural action may be deemed appropriate. After Board discussion with the Audit Committee on March 10, 2004, the Board has scheduled a meeting prior to the filing of its Annual Report on Form 10-K to formally review and consider ratification of these matters. Specifically, the matters to be reviewed are (1) with respect to Mr. Becker and his affiliates: leases of two buildings adjacent to the company's headquarters, which was already the subject of a Board-approved lease from an affiliate of Mr. Becker; an amendment reducing the rent at the company's headquarters to the rent at these two additional buildings; and amendments of existing plant leases with an affiliate of Mr. Becker to extend the term and reduce the rent for the initial term; and (2) with respect to Mr. McCallum and his affiliates, an amendment of the previously Board-approved Joan Automotive merger agreement clarifying ownership of certain equipment listed in a schedule attached to that agreement; and the final terms of a supply agreement contemplated at the time the Board approved a January 2003 purchase of certain fabrics equipment from an affiliate of Mr. McCallum.

The Audit Committee also recommended that the company review its public filings to determine whether disclosure of certain aspects of the related party transactions reviewed by the Audit Committee should be enhanced and additionally, it proposed a resolution for the Board that will require pre-approval of all future related party transactions, even where pre-approval of the Board is not legally required. The resolution also reiterates procedures for ensuring proper documentation and disclosure of such transactions. This resolution will also be considered at the next Board meeting.

The company intends to file amended Quarterly Reports on Form 10-Q for the quarters ended June 30, 2003 and September 30, 2003, to reflect the conclusion of the Audit Committee's inquiry and its recommendations, but, as indicated above, **no restatement of any previously issued financial statements is required or being made.** The company also expects to enhance the disclosure in its Form 10-K for 2003 with respect to the recommended matters. The 2003 Form 10-K is expected to include audited financial statements and the required CEO and CFO certifications under Sarbanes-Oxley. **The enhanced disclosure is expected to include (1) disclosure of the Board-approved payment of $300,000 as compensation to Mr. Becker in 2002 for his temporary service as Vice Chairman of the company during that year, (2) an improved description of the 2003 fabrics transactions with Mr. McCallum and (3) the dollar volume of previously disclosed ordinary course arrangements with Mr. McCallum, specifically, from transition services, supply and rebate arrangements.** (Emphasis added.)

188.    The financial results stated for this fiscal quarter were materially false and misleading because  during  this period Defendants caused C&A to engage in several of the schemes described above, including at least round-trip and incompletely disclosed related-party transactions, improper recording of vendor rebates, and mischaracterization of expenses as non-recurring, and generally because these previously issued financial statements were required to be restated.  Statements about fixed cost structure and restructuring above were misleading because expenses were mischaracterized as nonrecurring.  In addition, the statements are misleading in that they did not disclose the effect of related party transactions on the Company, that the

Company was locked into money-losing contracts, and that the Company was short-staffing

projects.  Further, the disclosures regarding the related party transactions and internal

investigation were materially false and misleading because in fact a restatement was required,

because the wrongdoing was not exposed, and because Defendants had deliberately deceived

both external and internal auditors by the use of false documents and other means.

189.    On March 17, 2004, C&A filed with the SEC its Annual Report on Form 10-K for

the fiscal year ended December 31, 2003, which was signed by Defendants Stockman and Stepp.

The 2003 10-K repeated and reaffirmed the same materially false and misleading financial

information that was contained in the March 11, 2004 press release, and further stated that:

> The preparation of consolidated financial statements in conformity
> with accounting principles generally accepted in the United States
> of America requires management to make estimates and
> assumptions that affect the reported amounts of assets and
> liabilities and disclosure of contingent assets and liabilities at the
> date of the consolidated financial statements and the reporting
> period.  Considerable judgment is often involved in making these
> determinations, the use of different assumptions could result in
> significantly different results.    Management believes its
> assumptions and estimates are reasonable and appropriate,
> however actual results could differ from those estimates.  Certain
> of the Company's more critical accounting estimates are described
> below.
>
> *****
>
> As of the end of the period covered by this report, the Company's
> Chief Executive Officer and the Company's Chief Financial
> Officer, the "Certifying Officers," evaluated the effectiveness of
> the design and operation of the Company's "disclosure controls
> and procedures" (as defined in the Securities Exchange Act of
> 1934).  Based on that evaluation, **the Certifying Officers have
> concluded that the Company's disclosure controls and
> procedures are effective to ensure that information required to
> be disclosed by the Company in the reports that it files and
> submits under the Exchange Act is recorded, processed,
> summarized and reported as and when required, and are
> effective to ensure that such information is accumulated and
> communicated to the Company's management,** including its

Certifying Officers, as appropriate to allow timely decisions regard required disclosure. In addition, the Certifying Officers also disclosed to the Company's auditors and the audit committee of the Board of Directors all significant deficiencies in the design or operation of internal controls that could adversely affect the Company's ability to record, process, summarize and report financial data. A summary of the key items disclosed and the changes in internal controls resulting from corrective actions are discussed below.

b.  Changes in internal controls:

An evaluation of internal controls was conducted for the year ended December 31, 2003. The following paragraphs detail management's significant areas of focus to further enhance internal controls: Other than the above, there were no significant changes in the Company's internal controls or in other factors that could significantly affect internal controls. The Company also intends to refine its internal control procedures on an ongoing basis as deemed appropriate with a view towards making improvements. (Emphasis added.)

190.  The 2003 Form 10-K was materially false and misleading because Defendants were actively defeating accounting controls and creating false documents to support misleading accounting that violated GAAP.

191.  The 2003 Form 10-K disclosed that previously undisclosed vendor rebates had been received from related parties during 2002 and during 2003, and that these rebates materially impacted the Company's reported earnings and margins during 2002 and 2003. In addition, the 2003 Form 10-K disclosed the existence of certain other previously undisclosed related party transactions as follows:

In 2002 and 2003, the Company engaged in ordinary course transactions with entities controlled by Mr. McCallum for the purchase and sale of goods and services as part of ongoing business relationships. **The Company recorded purchases from entities controlled by Mr. McCallum, of $17.8 million (net of $1.2 million of rebates) in 2003, and $47.3 million (net of $10.5 million of rebates) in 2002 for goods and services purchased.** These rebates received from Mr. McCallum relate to knit and woven automotive fabrics provided by entities controlled by Mr.

McCallum under the Supply Agreement and Transition Agreement executed in connection with the 2001 Joan acquisition, which are described above. **Supplier rebates such as these are common in the automotive industry** as part of ongoing price negotiations and adjustments. These **rebates from Mr. McCallum totaled $14.7 million over the duration of the agreements**. In addition, the Company recorded sales to entities controlled by Mr. McCallum, of $6.4 million in 2003 and $31.8 million in 2002.  (Emphasis added.)

192.  As subsequently disclosed (in the March 31, 2004 Form 10-Q), the **$1.2 million of rebates** which were received from entities controlled McCallum in 2003 were recognized as income in the first quarter of 2003. The $1.2 million was material to the reported 2003 first quarter operating income of $17.4 million.

193.  Significantly, although the 2003 Form 10-K stated that supplier rebates "are common in the automotive industry", the accounting policy followed by the Company in accounting for these rebates were not disclosed in the Company's financial statements in contravention of GAAP (APB Opinion No. 22).

194.  The 2003 Form 10-K contained a certification pursuant to Section 302 of the Sarbanes-Oxley Act (Section 302 certification) by Defendants Stockman and Stepp. It stated:

1.  I have reviewed this Annual Report on Form 10-K of Collins & Aikman Corporation;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e) and internal

control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f) for the registrant and have:

a.    Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b.    Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c.    Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d.    Disclosed in this annual report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonable likely to materially affect, the registrant's internal control over financial reporting; and

5.    The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal controls over financial reporting, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent functions):

a.    All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b.    Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

195.    The financial results stated for this fiscal quarter were materially false and misleading because during this period Defendants caused C&A to engage in several of the

schemes described above, including at least round-trip and incompletely disclosed related-party transactions, improper recording of vendor rebates, and mischaracterization of expenses as non-recurring, and generally because these previously issued financial statements were required to be restated.    Statements about restructuring above were misleading because expenses were mischaracterized as nonrecurring.  In addition, the statements are misleading in that they did not disclose the effect of related party transactions on the Company, that the Company was locked into money-losing contracts, and that the Company was short-staffing projects. The statements regarding the related party transactions and internal investigation did not expose the wrongdoing or fully explain the related party transactions or their impact, or that the Defendants had misled internal or external auditors, or the full array and impact of the improper vendor rebate accounting.

**First Quarter 2004**

196.    On May 6, 2004, C&A issued a press release entitled "Collins & Aikman Announces First Quarter Financial Results And Record First Quarter Sales," announcing its financial results for the first quarter of 2004, the period ending March 31, 2004.   More specifically, the Company reported:

> **The company reported record first quarter net sales in 2004 of $1.066 billion compared to $1.035 billion in the first quarter of 2003,** a 3% increase which mainly reflects improved currency impact.  The company reported a loss of $23.3 million or 28 cents per share in the first quarter of 2004, which included after-tax charges for restructuring, long-lived asset impairments and costs related to early extinguishment of debt of $10.6 million (or 13 cents per share).
>
> In the comparable 2003 quarter, the company had a loss of $26.2 million or 31 cents per share, which included after-tax charges for restructuring and long-lived asset impairments of $13.2 million (or 15 cents per share).

Commenting on the company's first quarter operating results, David A. Stockman, C&A Chairman and CEO stated, **"We are pleased with the significant performance improvement in EBITDA before restructuring and impairment charges. For the third consecutive quarter our EBITDA results were up double digits from the prior year on a comparable basis.** We are also seeing our previous problem plants turning around their financial results from the 2003 levels."

The first quarter 2004 pre-tax restructuring charge of $9.5 million included costs associated with additional rightsizing efforts to reduce corporate overhead and salaried headcount and to close additional manufacturing facilities. This restructuring initiative is expected to further reduce the company's fixed-cost structure by approximately $13 million when fully implemented. C&A's net debt, including outstandings under an off-balance sheet accounts receivable facility, was $1.432 billion at March 31, 2004. (Emphasis added.)

197.    The May 6, 2004 press release also stated that "Charles Becker and Elkin McCallum have resigned as directors of the company effective as of May 6, 2004."

198.    On May 7, 2004, the Company filed its Form 10-Q for the quarterly period ended March 31, 2004 with the SEC ("the March 31, 2004 Form 10-Q"). This document, which was signed by Defendant Stepp, contained financial information which was substantially identical to the financial information that was contained in the May 6, 2004 press release. It did not disclose the Company's accounting policy with regard to rebates, although it provided certain information concerning related party rebates as follows:

In 2004 and 2003, the Company engaged in ordinary course transactions with entities controlled by Mr. McCallum for the purchase and sale of goods and services as part of ongoing business relationships. **The Company recorded purchases for goods and services from entities controlled by Mr. McCallum of $1.3 million for the quarter ended March 31, 2004, and $5.4 million (net of $1.2 million of rebates) for the quarter ended March 31, 2003 for goods and services purchased.** The rebates received from Mr. McCallum relate to knit and woven automotive fabrics provided by entities controlled by Mr. McCallum under the Supply Agreement and Transition Agreement executed in connection with the 2001 Joan acquisition. Supplier rebates such as

72

these are common in the automotive industry as part of ongoing price negotiations and adjustments. The rebates from Mr. McCallum totaled $14.7 million over the duration of the agreements. **In addition, the Company recorded sales to entities controlled by Mr. McCallum, of $3.4 million for the quarter ended March 31, 2004 and $3.3 million for the quarter ended March 31, 2003.** (Emphasis added.)

199.    C&A's financial results for the first quarter of 2004, the period ending March 31, 2004, were repeated and reaffirmed in the Company's Report on Form 10-Q filed with the SEC on or about May 7, 2004, which was signed by Defendant Stepp. That Form 10-Q also stated:

> The condensed consolidated financial statement includes the accounts of the Company and its consolidated subsidiaries and in the opinion of management, contain all adjustments, including adjustments of a normal and recurring nature necessary for a fair presentation of financial position and results of operations.

200.    The March 31, 2004 Form 10-Q disclosed that Heartland continued to extract huge sums from C&A by arranging for C&A to pay Heartland an additional $6 million. In this regard, C&A's 2001 Form 10-K stated that the services agreement with Heartland called for Heartland to provide "advisory and consulting services, including services with respect to developments in the automotive industry and supply markets, advice on financial and strategic plans and alternatives and other matters as it may reasonably request and are within Heartland's expertise." The March 31, 2004 Form 10-Q stated:

> . . .the Services Agreement with Heartland contemplates that the Company may pay additional fees to Heartland for services rendered in connection with a range of financing transactions. In March 2004, the Company's Board of Directors, including the disinterested and independent directors of **the Board, approved a fee of $1 million to Heartland for its services rendered in connection with the 2004 amendments to the Company's credit facility** to add a supplemental revolving credit facility. On May 6, 2004, the Company's Board of Directors, including the disinterested and independent directors of **the Board, approved an amendment of the Services Agreement to provide for a fee of up to $5.0 million related to services rendered in connection with the expected notes offering** and a fee of 1% of the gross

> proceeds of certain future financings, excluding the amendment
> and restatement of our senior secured credit facility.  (Emphasis
> added.)

201.    The financial results stated for this fiscal quarter were materially false and

misleading because  during  this period Defendants caused C&A to engage in several of the

schemes described above, including at least round-trip and incompletely disclosed related-party

transactions, improper recording of vendor rebates, and mischaracterization of expenses as non-

recurring, and generally because these previously issued financial statements were required to be

restated.    Statements about restructuring above were misleading because expenses were

mischaracterized as nonrecurring.  In addition, the statements are misleading in that they did not

disclose the effect of related party transactions on the Company, that the Company was locked

into money-losing contracts, and that the Company was short-staffing projects. The statements

regarding the related party transactions and internal investigation did not expose the wrongdoing

or fully explain the related party transactions or their impact, or that the Defendants had misled

internal or external auditors, or the full array and impact of the improper vendor rebate

accounting.

**Second Quarter 2004**

202.    On August 2, 2004, C&A issued a press release announcing its financial results

for the second quarter of 2004, the period ending June 30, 2004.   More specifically, the

Company, in its press release, stated:

> **The company reported record second quarter 2004 net sales of
> $1.036 billion.**  The company reported a loss of 35 cents per share
> in the second quarter of 2004, which included after-tax charges for
> restructuring and long-lived asset impairments of $26.0 million (or
> 31 cents per share).  In the comparable 2003 quarter, the company
> had income of 13 cents per share, which included after-tax charges
> for restructuring and long-lived asset impairments of $4.4 million
> (or 5 cents per share).

Commenting on the company's second quarter operating results, David A. Stockman, C&A Chairman and CEO, stated, **"For the fourth consecutive quarter our EBITDA performance, excluding restructuring and impairment charges was up significantly from the prior year on a comparable basis.** The savings from the restructuring program that began in the third quarter of 2003 is resulting in significant fixed cost savings as indicated by our year-over-year decline in selling, general and administrative expenses."

The second quarter 2004 pre-tax restructuring charge of $10.4 million included costs associated with additional actions to right size its overhead structure, further reduce salaried headcount and streamline the senior management team on a worldwide basis. This restructuring initiative is expected to further reduce the company's cost structure by approximately $11 million when fully implemented. During the second quarter 2004, the company recognized $27.4 million of impairments of long-lived assets primarily related to $13.6 million of Intellimold assets and $11.0 million of customer contracts as a result of changes in customer sourcing.

**For the six months ended June 30, 2004, the company reported sales of $2.103 billion compared to $2.069 billion for the comparable period of 2003.** The company also reported a net loss of $53.0 million or 63 cents per share, which included $35.6 million (or 43 cents per share) of after-tax charges for restructuring and long-lived asset impairments. For the comparable 2003 period, the net loss was $15.5 million or 19 cents per share, which included after-tax charges for restructuring and long-lived asset impairments of $17.2 million (or 21 cents per share).

C&A's net debt, including outstandings under an off-balance sheet accounts receivable facility, was $1.439 billion at June 30, 2004. (Emphasis added.)

203.    On or about August 3, 2004, the Company filed its Form 10-Q for the quarterly period ended June 30, 2004 with the SEC ("the June 30, 2004 Form 10-Q"). This document, which was signed by Defendant Stepp, contained financial information which was substantially identical to the financial information that was contained in the August 2, 2004 press release. It did not disclose the Company's accounting policy with regard to rebates. However, it repeated

the information quoted in the August 3, 2004 press release concerning rebates received from related parties.

204.    In connection with filing of C&A's Form 10-Q for the second quarter of fiscal year 2004, Defendants Stockman and Stepp executed a certification pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. Specifically, Defendants Stockman and Stepp certified that they were "responsible" for establishing and maintaining C&A's disclosure controls and procedures, and that they had:

> a.    Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under their supervision, to ensure that material information relating to C&A, including its consolidated subsidiaries, was made known to them by others within those entities;
>
> b.    Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under their supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles; and
>
> c.    Evaluated the effectiveness of the Company's disclosure controls and procedures and presented in the 2Q04 10-Q their conclusions about the effectiveness of the disclosure controls and procedures.

205.    The Form 10-Q also contained Section 906 certifications by Defendants Stockman and Stepp, and a representation that stated: "The consolidated financial statements...in the opinion of management, contain all adjustments necessary for a fair presentation of financial position and results of operations."

206.    That same day, August 3, 2004, C&A held a conference call for institutional investors. During this conference call, Defendant Stockman again emphasized C&A's EBITDA and represented that C&A was succeeding in spite of difficult market factors:

I am pleased to report that we have now had our fourth straight quarter of very strong EBITDA gains in both dollars and margins. . . [W]e came in at $100.4 million before restructuring and impairment charges, in line with our expectations. This represents a 20 percent increase over the prior year, so we are making demonstrable progress. This also comes in light of some of the headwinds that we've had to push against, such as upward pressure on commodity costs and downward pressure on our selling prices. But since August 2003, when we made a change in our top management, we have accelerated the pace and the intensity of our consolidation cost-cutting and platform growth strategy, and have been able to overcome these adverse forces.

207.    The financial results stated for this fiscal quarter were materially false and misleading because  during  this period Defendants caused C&A to engage in several of the schemes described above, including at least round-trip and incompletely disclosed related-party transactions, improper recording of vendor rebates, improper accounting for rebates on capital equipment, and mischaracterization of expenses as non-recurring, and generally because these previously issued financial statements were required to be restated.    Statements about restructuring above were misleading because expenses were mischaracterized as nonrecurring. In addition, the statements are misleading in that they did not disclose the effect of related party transactions on the Company, that the Company was locked into money-losing contracts, and that the Company was short-staffing projects.

208.    As stated above (*see supra* ¶ 145), according to an article in the July 27, 2005 edition of the *Detroit Free Press*, on May 24, 2004, DaimlerChrysler coerced C&A into signing an agreement to give back to DaimlerChrysler 8.5% of the value of the contract that C&A had with DaimlerChrysler to produce plastic trim for the 300 Magnum Charger vehicle. C&A was already losing money on that contract, even before the give-back. DaimlerChrysler also compelled C&A to give back more than 10% of the value of the contract that it had with DaimlerChrysler to produce parts for the Town & Country minivan and the Dodge Ram and

Dodge Durango pick-up trucks. This material adverse information was not disclosed in the August 2, 2004 press release or in the June 30, 2004 Form 10-Q, and did not come to light until after C&A had declared bankruptcy.

209.    On August 26, 2004, the Company issued a press release announcing the completion of its offering of $415 aggregate principal amount of Senior Subordinated Notes:

> Troy, Michigan – Collins & Aikman Corporation [NYSE: CKC], today announced that its wholly owned subsidiary, Collins & Aikman Products Co. ("Products"), completed an offering of $415 million in aggregate principal amount of its senior subordinated notes due 2012 for gross proceeds of approximately $400 million. The notes bear interest at a rate of 12⅞%. The notes are guaranteed by Collins & Aikman Corporation and each of Products' domestic subsidiaries that is a guarantor under its senior credit facility. As previously announced, the gross proceeds from the notes offering will be used to redeem all $400 million in principal amount of Products' 11½% senior subordinated notes due 2006.

**Third Quarter 2004**

210.    On November 9, 2004, C&A announced the Company's financial results for the third quarter of 2004, the period ending September 30, 2004. Specifically, the Company reported third quarter 2004 net sales of $864.8 million, resulting in a loss of 67 cents per share in the third quarter of 2004, which included after-tax charges for restructuring and long-lived asset impairments and loss on early extinguishment of debt of $25.1 million (or 30 cents per share). The Company further stated that:

> The third quarter 2004 pre-tax restructuring of $9.0 million included costs associated with additional actions to right-size the company's overhead structure, further reduce salaried headcount and streamline the senior management team on a worldwide basis. This restructuring initiative is expected to further reduce the company's cost structure by approximately $20 million when fully implemented. During the third quarter of 2004, the company also recognized $10.3 million of impairments of long-lived assets primarily related to plant closings.

**For the nine months ended September 30, 2004, the company reported sales of $2,968 million** compared to $2,971 million for the comparable period of 2003. The company also reported a net loss of $108.6 million or $1.30 per share, which included $61.7 million (or 74 cents per share) of after-tax charges for restructuring and long-lived asset impairments and loss on early extinguishment of debt. For the comparable 2003 period, the net loss was $47.6 million or 57 cents per share, which included after-tax charges for restructuring and long-lived asset impairments of $33.1 million (or 40 cents per share).

Collins & Aikman's net debt, including outstandings under an off-balance sheet accounts receivable facility, was $1,552 million at September 30, 2004. During the third quarter of 2004, the company completed the refinancing of its senior subordinated debt and senior credit facilities.

**EBITDA was $48.7 million for the third quarter of 2004, which was reduced by charges of $9.0 million for restructuring and $10.3 million for the impairment of long-lived assets.** The third quarter 2003 EBITDA was $41.9 million, which was reduced by charges of $21.9 million for restructuring and $2.2 million for the impairment of long-lived assets. **EBITDA was $178.2 million for the nine months ended September 30, 2004, which was reduced by charges of $28.9 million for restructuring and $40.7 million for impairment of long-lived assets. EBITDA for the nine months ended September 30, 2003 was $172.8 million, which was reduced by charges of $26.8 million for restructuring and $21.1 for the impairment of long-lived assets.** (Emphasis added.)

211.    Defendants Stockman touted the Company's results, stating: "For the fifth consecutive quarter our EBITDA performance, excluding restructuring and impairment charges, was up from the prior year on a comparable basis. This was achieved despite the headwinds from increased commodity costs and OEM production cuts. The savings from the restructuring program that began in the third quarter of 2003 has generated significant fixed cost reductions."

212.    On November 9, 2004, the Company filed its Form 10-Q for the quarterly period ended September 30, 2004 with the SEC ("the September 30, 2004 Form 10-Q"). This document, which was signed by Defendant Koth, contained financial information which was substantially

identical to the financial information that was contained in the November 9, 2004 press release. It did not disclose the Company's accounting policy with regard to rebates. However, it provided the same information contained in the press release, concerning rebates received from related parties.

213.   The September 30, 2004 Form 10-Q contained Section 906 certifications by Defendants Stockman and Koth. In addition, the September 30, 2004 Form 10-Q contained a representation which stated: "The accompanying condensed consolidated financial statements...in the opinion of management, contain all adjustments, including adjustments of a normal and recurring nature, necessary for a fair presentation of financial position and results of operations." The September 30, 2004 Form 10-Q, including the certifications which were signed by Defendants Stockman and Koth, was materially false and misleading for the reasons specified below.

214.   On December 13, 2004, the Company issued a press release announcing that Collins & Aikman Products Co. ("Products"), a wholly owned subsidiary of C&A, and CARCORP, Inc., a wholly owned subsidiary of Products, amended their existing receivables transfer agreement related to its off-balance sheet accounts receivable financing facility. The amended terms included extending the term of the facility to March 10, 2006, and installing a new Administrative Agent. Additionally, Products and CARCORP entered into a commitment letter agreement with GECC whereby GECC committed to provide a new 5 year, $300 million accounts receivable facility to replace the existing receivables facility, subject to the terms and conditions described therein.

215.   The financial results stated for this fiscal quarter were materially false and misleading because  during  this period Defendants caused C&A to engage in several of the

schemes described above, including at least round-trip and incompletely disclosed related-party transactions, improper recording of vendor rebates, improper accounting for rebates on capital equipment, and mischaracterization of expenses as non-recurring, and generally because these previously issued financial statements were required to be restated. Statements about restructuring above were misleading because expenses were mischaracterized as nonrecurring. In addition, the statements are misleading in that they did not disclose the effect of related party transactions on the Company, that the Company was locked into money-losing contracts, and that the Company was short-staffing projects.

216.    Each and every statement for each of the periods referenced above was materially false and misleading when made in several respects, including at least the following:

a.    C&A's earnings, operating income and EBITDA were materially overstated during the Class Period because the Company was improperly characterizing ordinary expenses as capital expenses and nonrecurring items, mischaracterizing vendor rebates and round-trip and other related party transactions. This conduct continued throughout the Class Period and every financial result and certification thereof is materially false and misleading as a result.

b.    C&A omitted the material fact that, as described below, before and during the Class Period it became locked into material money-losing contracts with OEMs including DaimlerChrysler.

c.    C&A omitted the material fact that, as described below, it was grossly understaffing projects, and was deceiving major customers such as Ford to cover up for its inability to pay for the staffing required by its contracts. Nor did C&A disclose that it was at substantial risk that it could lose contracts if OEMs objected to its staffing practices.

d.      C&A omitted the material fact that, as described below, it had such serious quality problems such that it failed product approval processes over and over, finally losing significant contracts from GM as a result of its poor quality.

e.      C&A omitted the material fact that its Hermosillo, Mexico plant, which it touted to OEMs and private investors as state-of-the-art, was in fact both understaffed and stocked with used equipment shipped from other locations.  Nor did C&A disclose that it was at substantial risk of losing contracts if OEMs objected to the way C&A ran the Hermosillo facility.

## THE FIRST ADMISSION OF FINANCIAL TROUBLE

217.    In late 2004, KPMG learned of C&A's widespread effort to obtain rebates and requested documentation for all rebates negotiated in 2004. In early 2005, Stockman reluctantly agreed to begin an internal investigation by C&A management of the rebates. But rather than aggressively pursuing the investigation, Defendant Stockman attempted to limit its scope, minimize the significance of the violations, and conceal his involvement and the involvement of other senior C&A managers. Stockman also orchestrated an effort to conceal C&A's dire financial condition.

218.    In a March 17, 2005 press release, an earnings call on the same date, and a presentation to potential bond purchasers one week later, C&A materially misrepresented its financial condition. This deception enabled C&A to obtain $75 million in additional financing.

219.    Specifically, on March 17, 2005, C&A issued a press release entitled "Collins & Aikman Audit Committee Retains Independent Counsel for Investigation of Previously-Reported Accounting Matters," in which the Company disclosed that it would be delaying its financial results for Fiscal Year 2004.  The Company stated it had initiated an internal review of how it was accounting for supplier rebates, which revealed that the Company was prematurely or

inappropriately recognizing revenue.  The Company stated that it expects to restate its results for

the nine months ended September 30, 2004 to reflect the correct accounting for these rebates and

that it was continuing to evaluate whether a restatement of its fiscal year 2003 results would be

necessary.  The Company stated that it expected to reduce its previously reported operating

income by $10 - $12 million for the nine months ended September 30, 2004.  The press release

stated:

> **The Company did not file its Annual Report on Form 10-K
> containing fiscal 2004 audited financial statements by its due
> date yesterday** since it requires additional time to complete the
> review of the accounting issues referred to below, the financial
> reporting process, and the Company's assessment of controls over
> financial reporting.
>
> *****
>
> During the course of finalizing its financial statements for its fiscal
> year ended December 31, 2004, **the Company identified certain
> accounting for supplier rebates that led to premature or
> inappropriate revenue recognition or that was inconsistent
> with relevant accounting standards and the Company's policies
> and practices.**  The Company immediately initiated an internal
> review of these matters and expects to restate its results for the
> nine months ended September 30, 2004 to reflect the correct
> accounting for these rebates.  The Company is continuing to
> evaluate whether a restatement of its 2003 results will be
> necessary.  **The Company presently expects to reduce its
> previously reported operating income by $10 - $12 million for
> the nine months ended September 30, 2004.**  The Company's
> outside auditors have not reviewed these conclusions, and
> additional adjustments may be required.
>
> *****
>
> **Internal Accounting Investigation and Related Matters**
>
> In the ordinary course, the Company has received and continues to
> receive rebates as a result of arm's length transactions with its
> vendors.  Depending upon the terms of the rebate agreement, these
> rebates are either recognizable in the quarter in which the rebate
> agreement is reached or recognized over an appropriate future
> period.  In the course of finalizing the Company's 2004 financial

results, the Company identified certain issues related to accounting for supplier rebates that led to premature or inappropriate income recognition or that was inconsistent with relevant accounting standards and the Company's policies and practices. The Company immediately initiated a review of all vendor rebates it received from 2002 through 2004 to ensure that it has properly recognized the rebates in the appropriate quarterly period. The Company has completed its accounting review of these rebates, but expects to undertake a thorough review of its controls, procedures and other circumstances that led to the premature or inappropriate income recognition and that was inconsistent with relevant accounting standards and the Company's policies and practices. The nature and scope of that review is under consideration. The Company's Audit Committee and outside auditors have been informed of these issues and are evaluating an appropriate course of action.

**The Company's internal review of vendor rebates covered an aggregate of approximately $88 million of vendor transactions in fiscal years 2002 through 2004. Of such amount, the Company believes that net adjustments of approximately $10 - $12 million are required primarily occurring during fiscal 2004. The Company expects to restate its results for the nine months ended September 30, 2004 to reflect these revisions.** The Company is continuing to evaluate whether a restatement of its 2003 results will be necessary. We have not taken into account this impact in our preliminary report of 2004 results. These preliminary results remain subject to material change and have not been reviewed by our outside auditors. (Emphasis added.)

The press release further discussed the material weaknesses in C&A's financial controls:

**The Company is working towards completion of its assessment of internal controls over financial reporting required under Section 404 of the Sarbanes-Oxley Act and has concluded that certain material weaknesses, in addition to the matters leading to the restatement described above, existed at December 31, 2004,** but its assessment of the effectiveness of the Company's control over financial reporting is ongoing and the extent of those material weaknesses remains under review. (Emphasis added.)

\*\*\*\*\*

The potential material weaknesses identified include the following: (i) the adequacy of the Company's resources with appropriate accounting expertise to address accounting and reporting matters in

84

certain areas, including revenue recognition, vendor arrangements and post-retirement benefits, and to supervise the Company's decentralized and disparate accounting environment and ensure an appropriate segregation of duties; (ii) the adequacy of the Company's internal audit function's resources and ability to monitor compliance with established policies and procedures; (iii) the effectiveness of certain information technology controls and the sufficiency of documentation to assess the effectiveness of such controls including embedded system application controls; (iv) the adequacy of procedures to consistently identify and reconcile fixed assets and periodically review assets for impairment; and (v) the completeness and consistent adherence to Company policies and procedures. These issues include a range of documentation-related issues and reconciliation issues. Other material weaknesses may be identified as a result of further investigation of the circumstances surrounding the expected restatement arising from vendor rebates. Our review and the audit is ongoing.

*****

The same press release disclosed that the accounting problems impacted C&A's financing.

**Impact on Financing Arrangements**

The Company intends to operate in the ordinary course, but it cannot presently comment upon the timing for completion of, or the ultimate scope or outcome of, the internal accounting investigation, the audit and the restatements. Until the audit and any restatements are complete, it will be difficult to determine the full scope of any financial restatement or prior period adjustments arising from these irregularities. Consequently, the Company is still evaluating its financial covenant compliance under its senior credit facility, as well as other compliance issues under other financing arrangements. If necessary or desirable, the Company will seek a waiver of relevant provisions.

The Company is obligated to provide audited financial statements under a number of its debt, receivables facility, operating lease and other agreements within prescribed periods. The Company relies upon its receivables facility with GE Capital Corporation for its liquidity and the unavailability of funds thereunder would be material and adverse. The Company has received waivers of various provisions of its receivables financing facility and its Hermosillo, Mexico funding arrangements, both of which are held by GE Capital Corporation, so that it will continue to provide the Company with access to financing under those facilities in the

ordinary course of business until May 20, 2005, absent certain new adverse developments. The Company also intends to seek waivers and amendments of its bank credit facilities and of various lease agreements, as required or desirable. There can be no assurance that any other required or desirable waivers will be received on a timely basis and the failure to obtain waivers could be material and adverse.

220.    Upon this disclosure, shares of the Company's stock fell $0.39 per share, or about 24% to close at $1.24 per share, on unusually heavy trading volume. Though the markets reacted to the news, and in particular the news that vendor rebate accounting at C&A had been improper and financial controls compromised, the full wrongdoing was not known and all the inflation caused by the wrongdoing had not left the stock.

221.    Significantly, although the Audit Committee had focused its previous investigation upon non-disclosed rebates during 2003 and the first quarter of 2004 and caused the Company's financial statements to disclose certain information concerning "rebate arrangements" (March 11, 2004 press release), the March 17, 2005 press release disclosed that more than 10% of the Company's rebates had been improperly recognized as income, and that a portion of the improperly recognized rebate might necessitate "a restatement of its 2003 results."

222.    The March 17 press release attributed C&A's improper rebate accounting to a failure of "controls" and "procedures." This gave the false impression that the improper accounting was caused by inadvertence or negligence. In truth, the improper rebate accounting was the intended product of a concerted scheme.

223.    Further, the March 17 press release stated that C&A's liquidity on December 31, 2004, was $86 million. The majority of that liquidity was undrawn commitments under its accounts receivable facility. But C&A could not have borrowed the full amount of the undrawn commitments without breaching financial covenants. In fact, only approximately $12 million in liquidity was available to C&A on December 31, 2004. C&A's use of the $86 million liquidity

86

figure without reference to the covenant restrictions was inconsistent with C&A's prior disclosure practices and materially misleading. Defendant Stockman understood the impact of the restrictive covenants, was aware of C&A's prior disclosure practices, and knew that far less than $86 million would have been available to C&A on December 31, 2004.

224.    The press release further disclosed "reduced volumes in the fourth quarter on several key North American programs" and a $500 million write-off of goodwill and deferred tax assets due the expectation of future losses - contract-related losses that were known to Defendants during the Class Period but were not previously considered in connection with assessment of impairment losses or realization of deferred tax assets, thereby materially overstating goodwill and deferred tax assets throughout the Class Period.

225.    The March 17 press release also contained material misrepresentations concerning the scope of management's internal investigation and the impact of the improper accounting for rebates. C&A stated in this press release that the rebates recognized in 2002 had been reviewed, and implied that no restatement was necessary for 2002, when in fact there had been little or no scrutiny of the 2002 rebates. The March 17 press release also intentionally understated the degree to which restatements would be required due to the rebates in 2003 and 2004.

226.    Defendant Stockman drafted portions of the March 17 press release which he knew, or was reckless in not knowing, would mislead the public about C&A's fourth quarter earnings, its liquidity situation, the scope of the rebate scheme, and the involvement of senior managers in the rebate scheme.

227.    Also on March 17, 2005, Defendant Stockman presided over a conference call in which C&A's 2004 earnings were publicly presented. Defendant Stockman prepared the charts

discussed during that call, made C&A's presentation, and took questions. During the call he made several material misrepresentations regarding C&A's financial condition.

228. Defendant Stockman provided an unreasonable forecast of C&A's anticipated EBITDA for the first quarter of 2005. Stockman stated that EBITDA would be between $65 million and $75 million, even though he knew, or was reckless in not knowing, that EBITDA for the first quarter would be roughly half that figure.

229. Defendant Stockman also stated that capital expenditures in 2005 would be limited to $30 million quarterly. Defendant Stockman knew, or was reckless in not knowing, when he made this statement that C&A had already exceeded $30 million in capital expenditures for the first quarter of 2005, and was projected to incur over $50 million in capital expenditures for the quarter.

230. When asked during the call whether C&A was "tapping out" its liquidity, Defendant Stockman answered "no." Stockman knew at that time, or was reckless in not knowing, that C&A did not have enough liquidity to pay its bills and that his negative response was untrue.

231. All of the March 17 statements were materially false and misleading for another reason: Defendants had begun the GECC scheme, detailed above. C&A's liquidity had been dependent since early 2005 on borrowing against pre-billed receivables in violation of its factoring agreement with GECC.

232. On March 24, 2005, C&A issued a press release entitled "Collins & Aikman Audit Committee Retains Independent Counsel for Investigation of Previously-Reported Accounting Matters." Therein the Company stated:

> Collins & Aikman Corporation (NYSE: CKC) announced today
> that its Audit Committee has retained independent counsel to assist

it in its investigation of the Company's accounting for certain supplier rebates.

*****

The Audit Committee has determined to conduct an independent investigation into these matters. It has retained independent counsel, Davis Polk & Wardwell, for that purpose, and they expect to retain such other advisors, including an accounting expert, as they deem appropriate.

As previously announced, **the company's internal review of vendor rebates covered an aggregate of approximately $88 million of vendor transactions in fiscal years 2002 through 2004.** Of such amount, the company's management believes that net adjustments of approximately $10-$12 million are required primarily occurring during fiscal 2004. For further clarification, the company announced that management's preliminary analysis indicates that, of such amounts, approximately $8-$10 million would impact the previously reported nine months ended September 30, 2004 with the balance impacting 2003. The company expects to restate its results for the nine months ended September 30, 2004 to reflect these revisions and is continuing to evaluate whether a restatement of its 2003 results will be necessary. (Emphasis added.)

*****

The company further announced that it initiated a process for obtaining waivers of the financial statement delivery requirements for a period of time from its lenders under its senior credit facility and for modifications of certain of its financial covenants. There can be no assurance that any of the required or desirable waivers from our senior lenders, lessors or others will be received on a timely basis, and the failure to obtain waivers could materially and adversely affect the company and its liquidity.

233. On April 4, 2005, C&A issued a press release stating that "the Company's available liquidity (cash and unutilized commitments under revolving credit and account receivables facilities) was approximately $81 million at March 31, 2005, as compared with approximately $86 million at December 31, 2004." Defendant Stockman approved the use of those figures in the press release.

89

234.    The liquidity figures in the April 4 press release were false. Due to its debt covenants, C&A had approximately $12 million in liquidity on December 31, 2004, rather than $86 million. Similarly, on March 31, 2005, C&A had materially less than the claimed $81 million in liquidity. The $81 million liquidity figure in the April 4 press release was also false or misleading because it relied on amounts borrowed under false pretenses from GECC by using more than $100 million in pre-billed receivables. C&A used the additional liquidity generated by this scheme to create a false $52 million liquidity cushion. This liquidity cushion constituted most of the $81 million reported in the April 4 press release.

235.    When drafting the April 4 press release, Stockman knew, or was reckless in not knowing, that the liquidity figure provided for March 31, 2005, was false or misleading because it was inflated by $52 million that had been obtained from the fraudulently inflated GECC borrowing base.

236.    On May 12, 2005 the C&A Board unanimously sought Defendant Stockman's resignation over concerns that he was misleading the Board. According to press reports:

> It was unanimous and it was fast. Go. Now, there seemed to be a pattern of not sharing all of the information with his financial staff and with the board. The first quarter was worse than he said it would be and the board got hot.

Defendant Stockman was replaced by Mr. Becker, another Heartland insider.

237.    The May 12, 2005 announcement confirmed that the March 17, 2005 press release was materially false and misleading and, for the first time, exposed just how severe the problems facing C&A were:

> The company further commented on the status of the ongoing investigation by the Board's audit committee into the company's accounting for certain supplier rebates. The company previously reported that it had identified certain accounting for supplier rebates that led to premature or inappropriate revenue recognition or that was inconsistent with relevant accounting standards and the

company's policies and practices. While the investigation is
ongoing, the audit committee has preliminarily indicated that it
believes that the company's previously announced adjustments to
reported periods to correct the accounting for these rebates will
likely be understated, but it has not yet quantified the extent of this
and has not submitted its findings to management for review at this
time.    In addition to vendor rebates, the audit committee's
investigation also is reviewing the company's forecasts for the first
quarter of 2005 and related matters, as well as other matters that
have arisen in the course of its investigation. The company cannot
currently comment upon the timing for completion of, or the
ultimate scope or outcome of, the audit committee investigation,
the audit or any necessary restatements. As previously discussed,
the company has not yet filed its annual report on Form 10-K for
2004 due to this accounting matter and the need for additional time
for completion of the 2004 audit and the review of internal controls
over financial reporting under Section 404 under Sarbanes-Oxley,
and it does not expect to make its first quarter 2005 filing on a
timely basis.

238.    This press release admitted that previously announced rebate income adjustments

were low ("While the investigation is ongoing, the audit committee has preliminarily indicated

that it believes that **the company's previously announced estimated adjustments to reported**

**periods to correct the accounting for these rebates will likely be understated**, but it has not

yet quantified the extent of this and has not submitted its findings to management for review at

this time."). (Emphasis added.)  In addition, the Company revealed (in the May 12, 2005 press

release) that:

    a.    the Company had breached a debt covenant ("consolidated
        leverage ratio, or consolidated debt to EBITDA, as defined
        in the covenant"); and

    b.    the company had "a significant foreign factoring
        arrangement, under which outstanding factored balances
        were approximately $96 million at March 31, 2005" and a
        "material European factoring arrangement that relates
        principally to one customer is due to expire at the end of
        this month."

239.    Five days later, on May 17, 2005, C&A announced that it had sought Chapter 11 bankruptcy protection the previous day in the United States Bankruptcy Court for the Eastern District of Michigan, and warned of significant near-term liquidity problems. On May 25, 2005, the New York Times reported in an article entitled "A Reagan Budget Czar Grapples With Investment Woes," that Stockman had turned over control of Heartland to two of his partners.

240.    The market's reaction to this news was dramatic. The value of C&A common stock dropped precipitously. After falling approximately 25% on March 17, the final acknowledgements of the Company's sorry state saw the stock drop from $.78 to $.11 in the days following the May 12 disclosures and May 17 bankruptcy filing. The price of C&A's 12.875% Notes also nose-dived from an offering price of $96.416 down to $7.00, and the price of the 10.75% Notes, which was trading above $90 before the truth about C&A was revealed, dropped to $23.00.

## C&A'S VIOLATION OF GAAP
## IN ITS FINANCIAL STATEMENTS AND PRESS RELEASES

241.    C&A has conceded that its financial statements materially violated GAAP, cannot be relied upon and must be restated. However, the restatement has not been completed and so the Company has not disclosed all of the ways in which the financial statements are materially false and violative of GAAP.

242.    Financial statements filed in any documents with the SEC are required by Regulation S-X to conform to GAAP. The Company's financial statements which were included in the Company's public filings with the SEC during the Class Period were not prepared in accordance with GAAP because at least the following GAAP were violated:

> a.    The principle that financial reporting should provide information that is useful to present and potential investors and creditors and other users in making rational investment,

credit and similar decisions (FASB Statement of Concepts No. 1).

b.    The principle that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and the effects of transactions, events, and circumstances that change resources and claims to those resources (FASB Statement of Concepts No. 1).

c.    The principle that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it. To the extent that management offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective investors and to the public in general (FASB Statement Concepts No. 1).

d.    The principle that financial reporting should provide information about an enterprise's financial performance during a certain time period. Investors and creditors often use information about the past to help in assessing the prospects of an enterprise. Thus, although investment and credit decisions reflect investors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance (FASB Statement of Concepts No. 1).

e.    The principle that the quality of reliability and, in particular, of representational faithfulness leaves no room for accounting representations that subordinate substance to form. (Statement Of Financial Accounting Concepts No. 2).

f.    The principle that financial reporting should be reliable in that it represents what it purports to represent. That information should be reliable as well as relevant is a notion that is central to accounting. (FASB Statement of Concepts No. 2 )

g.    The principle of completeness, which means that nothing is left out of the information that may be necessary to insure that it validly represents underlying events and conditions. (FASB Statement of Concepts No. 2)

      h.    The principle that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered. The best way to avoid injury to investors is to try to ensure that what is reported represents what it purports to represent. (FASB Statement of Concepts No. 2).

243.    The financial statements which were contained within the Company's press releases and filings with the SEC as particularized above were also not presented fairly in conformity with generally accepted accounting principles (AU Section 411) because the:

      a.    accounting principles selected and applied in the preparation of the Company's financial statements did not have general acceptance or they were not appropriate in the circumstances. In this regard, for example, the Company's financial statements failed to reflect losses on purchase commitments, contract losses, and rebate income as prescribed by GAAP.

      b.    Company's financial statements, including the related notes, were not informative of matters that affected their use, understanding, and interpretation. In this regard, for example, the Company's financial statements failed to disclose related party transactions, the nature and magnitude of the Company's loss contracts, and the nature of the risks associated with the Company's loss contracts as required by GAAP (SOP 94-6).

**Related Party Disclosure**

244.    GAAP (FASB Statement No. 57, paragraph 15) notes that "it is possible for related party transactions to be arranged to obtain certain results desired by the related parties, the resulting accounting measures may not represent what they usually would be expected to represent." Therefore, paragraph 18 of the same Statement states that "information about transactions with related parties **that would make a difference in decision making should be disclosed** so that users of the financial statements can evaluate their significance." (Emphasis supplied.)

245.   In addition, GAAP (FASB Statement No. 57, paragraph 2) mandates that "financial statements shall include disclosures of material related party transactions" and that disclosures "shall" include:

> A description of the transactions, including transactions in which no amounts or nominal amounts were ascribed, for each of the periods for which income statements are presented, and such other information deemed **necessary to an understanding of the effects of the transactions on the financial statements.** (Emphasis supplied.)

246.   Related party transaction disclosures are not just part of GAAP, but are adopted into SEC Regulation S-X as part of Accounting Series Release No. 280, General Revisions of Regulation S-X.

247.   No documents filed with the SEC during the Class Period disclosed information which was necessary to an understanding of the effects of the related party transactions on the financial statements.   The related party transactions with the Becker and McCallum entities were key elements in the fraud.   Their key elements (including secret agreements to repay sums and the creation of false documentation) and their critical effects on C&A's financial statements were not disclosed.

**Money Losing Contracts**

248.   GAAP (FASB Statement No. 5, paragraph 5) requires that an estimated loss "**shall** be accrued by a charge to income" (Emphasis added.) if both of the following conditions are met:

(1)    Information available prior to issuance of the financial statements indicated that it is probable that an asset had been impaired or a liability had been incurred at the date of the financial statements.

(2)    The amount of the loss can be reasonably estimated.

249.    At all relevant times, C&A had been locked into loss contracts for the production of products (thus, impairing C&A's cash and inventory) and the amounts of such losses were reasonably estimable.  GAAP (FASB Statement No. 5, paragraph 5) requires disclosure of the accrual when it is "necessary for the financial statements not to be misleading."  In addition, where no accrual is made because one or both of the conditions above are not met, GAAP (FASB Statement No. 5, paragraph 10) requires that disclosure "**shall** be made when there is at least a reasonable possibility that a loss or an additional loss may have been incurred.  The disclosure shall indicate the nature of the contingency and shall give an estimate of the possible loss or range of loss or state that such an estimate cannot be made."  (Emphasis added.)  In contravention of this GAAP and SEC disclosure mandates, no documents filed with the SEC during the Class Period disclosed an accrual for contract losses, and they failed to provide the required disclosures which were necessary for C&A's financial statements and filings with the SEC not to be misleading.

250.    GAAP (Accounting Research Bulletin No. 43, chapter 4, paragraph 17) requires "recognition in a current period of losses arising from...firm, uncancelable, and unhedged commitments for the future purchase of inventory items" and it states that they should be "separately disclosed in the income statement."  At all relevant times, C&A had been locked into firm, uncancelable, and unhedged commitments for the future purchase of inventory items in connection with its loss contracts.  In contravention of GAAP, C&A neither recognized these losses for financial reporting purposes in the period in which the losses arose, nor separately disclosed these losses in income statements which were contained in any documents filed with the SEC during the Class Period.

251.    Additional GAAP, (Statement of Position 94-6, <u>Disclosure of Certain Significant</u> <u>Risks and Uncertainties</u> -- "SOP 94-6") is intended to inform the financial statement reader of any vulnerabilities arising due to the fact that the business is exposed to certain risks that might have a "severe impact" (defined in SOP 94-6 as: "A significant financially disruptive effect on the normal functioning of the entity" -- bankruptcy is a "severe impact").  Among other things, it requires disclosure of information that is adequate to inform users of financial statements of the nature of the company's operations and "the general nature of the risk associated with concentrations" in "business transacted with a particular customer, supplier, lender, grantor, or contributor," that make "the enterprise vulnerable to the risk of a near-term severe impact."

252.    The Company's financial statements which were disseminated to the investing public during the Class Period failed to comply with the disclosure provisions of Statement of Position 94-6.  In particular, these financial statements failed to disclose:

a.    the existence, nature, and magnitude of C&A's loss contracts with DaimlerChrysler (C&A's largest customer) and other OEM's.

b.    the impact of C&A's loss contracts with DaimlerChrysler and other OEM's on C&A's liquidity.

c.    the general nature of the risk associated with concentrations in the volume of business transacted with DaimlerChrysler and other OEM's.

d.    C&A's vulnerability to a severe impact as a result of "a" through "c" above.

**Vendor Rebates**

253.    During the entire Class Period, the accounting for vendor rebates elevated form over substance in violation of Statement Of Financial Accounting Concepts No. 2.  In addition, during 2002, the Emerging Issues Task Force ("the EITF") became aware of a divergence in the manner in which companies were accounting for consideration received from a vendor in

connection with the sale of the vendor's products, or for the promotion of sales of the vendor's products.

254.    On November 21, 2002, the Emerging Issues Task Force ("EITF") clarified in EITF 02-16 that consideration received from vendors should be reflected as a decrease in prices paid for inventory and recognized in cost of sales as the related inventory is sold, unless very restrictive criteria was met which qualified the consideration for treatment as reimbursement of specific, identifiable incremental costs. Moreover, the EITF concluded that:

> ...a rebate or refund of a specified amount of cash consideration that is payable pursuant to a binding arrangement only if the customer completes a specified cumulative level of purchases or remains a customer for a specified time period should be recognized as a reduction of the cost of sales based on a systematic and rational allocation of the cash consideration offered to each of the underlying transactions that results in progress by the customer toward earning the rebate or refund provided the amounts are probable and reasonably estimable. If the rebate or refund is not probable and reasonably estimable, it should be recognized as the milestones are achieved.

255.    This GAAP was required to be applied to new arrangements, including modifications of existing arrangements, entered into after December 31, 2002. It was also required to be discussed in the Company's December 31, 2002 Form 10-K which was incorporated by reference into the March 31, 2003 Form 10-Q in observance of SEC Staff Accounting Bulletin 74 (Topic 11M) ("SAB 74").

256.    Because the provisions of EITF 02-16 were to apply prospectively to financial statements for periods after December 31, 2002, a discussion of the rule and its impact on rebates received by C&A from vendors was required to be disclosed in the Company's 2002 Form 10-K. However, though C&A's 2002 Form 10-K discussed other accounting changes, it elided any discussion of EITF 02-16 or changes to vendor rebate accounting.

257.    Disclosure of the impact of adopting EITF 02-16 (spreading rebate income over multiple reporting periods) would have forced the Individual Defendants to address the Company's accounting for rebates. In this regard, the Company's financial statements would have had to discuss the accounting method applied during 2002, the changes that would occur subsequent to 2002, and the negative impact on the Company's financial statements. Such disclosure would have put a spotlight on one of the principal techniques of the accounting fraud.

258.    In view of the fact that Defendants provided SAB 74 disclosures for some of the recently promulgated accounting standards but not the one that would have significantly impacted reported earnings, there is a strong inference that the nondisclosure was intentional. This inference is supported by the fact that C&A's financial statements also failed to disclose its accounting policy for vendor rebates even though they were common in the automotive industry, in contravention of the disclosure requirements of APB Opinion No. 22, "Disclosure of Accounting Policies." For these reasons, the above specified documents filed with the SEC during the Class Period were materially false and misleading.

## ADDITIONAL SCIENTER ALLEGATIONS

259.    As alleged herein, Defendants acted with scienter in that Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

260.    For example, Defendant Stockman personally directed the mischaracterization of operating expenses as non-operating or capital expenditures. He also personally negotiated money-losing arrangements with DaimlerChrysler which were not disclosed. In addition,

99

Defendant Stockman personally directed or knew of the following already-explained scheme, *inter alia*:

      (a)      the false accounting for vendor rebates;

      (b)      the false accounting for capital equipment rebates;

      (c)      the use of round-trip transactions; and

      (d)      the pre-billing of receivables to GECC under the Fast-Pay Program.

261.    Defendant Stockman also personally made numerous statements that he knew to be materially false and misleading, including statements of C&A's EBITDA and liquidity on March 17, 2005.

262.    C&A changed auditors suspiciously, in a way that raises an inference of scienter. C&A was historically audited by Arthur Andersen, which ceased auditing public companies after its criminal conviction in the Enron matter. C&A then went to PricewaterhouseCoopers, which audited the 2002 financial statements. However, having opined on only one year's statements, PriceWaterhouseCoopers was "dismissed" in the Summer of 2003 after sending a letter to Company's audit committee and management which described "reportable conditions." C&A took on KPMG as an auditor for its 2003 financial statements, reported in March, 2004.

263.    Specifically, on June 26, 2003, C&A filed a Form 8-K, which stated:

> In connection with its 2001 audit, PricewaterhouseCoopers LLP communicated to the Audit Committee and to management reportable conditions in the Company's internal control systems, attributable primarily to integration issues from an acquisition completed during the third quarter of 2001, personnel turnover at the corporate and plant level and failure of two manufacturing facilities to follow Company procedures related to account reconciliations. Corrective actions were implemented in 2002. **In connection with its 2002 audit, PricewaterhouseCoopers LLP communicated to the Audit Committee and to management reportable conditions in the Company's internal control system related to timely preparation of cash account**

**reconciliations, review of non-standard journal entries, revenue accounting and currency translation at foreign locations and compliance with established Company accounting policies and procedures.** These conditions were attributable primarily to computer systems, process harmonization and personnel integration issues from the December 20, 2001, TAC-Trim acquisition. (Emphasis added.)

264. Significantly, the existence of these "reportable conditions" were not disclosed in the 2002 Form 10-K or the March 31, 2003 Form 10-Q. Instead, the 2002 Form 10-K (which was incorporated by reference into the March 31, 2003 Form 10-Q) misleadingly led the investment community to believe that the Company's internal controls were well-functioning and were, in fact, being strengthened.

265. During the Class Period, C&A's audit committee conducted an internal investigation that examined related party transactions (as described above), which included vendor rebates, and required further disclosure of those transactions in March 2004. Despite looking directly at vendor rebates, the Company did not then disclose that more than 10% of its vendor rebates were improperly accounted for, a fact C&A concealed for a further year.

266. In fact, Defendants Stockman and Stepp personally participated in the creation of false documentation under at least the round-trip transactions; vendor rebate and other supplier payment schemes intended to mislead auditors and the C&A Audit Committee. In addition, Defendant Stockman personally acted to limit and thwart internal investigations into the related party transactions and accounting misconduct.

**Further Allegations Of Motive**

267. Defendants were motivated to, and did, mislead the investing public because they had a motive to conceal C&A's dire financial straits during the Class Period. Heartland and its handpicked management team injured C&A's long-term cash flow with factoring arrangements

that accelerated payment; created quality problems that postponed payment on major contracts; and engaged in related-party transactions that funneled hundreds of millions to Heartland and its partners and affiliates. Stockman, himself, received $22 million in fees from C&A related to Heartland's roles as advisor.

268. Having so injured C&A, from the beginning of the Class Period, Defendants were in search of an exit strategy to permit them to either turn C&A around, or protect themselves from a loss if it were to collapse. In order to do that, Defendants had to preserve C&A's access to capital, which meant concealing from lenders and the bond market that the Company was in trouble. For example, Defendants were motivated to engage in this course of conduct in order to (i) complete an offering of $415 million in aggregate principal amount of its senior subordinated notes; and (ii) enter into a new credit facility on more favorable terms.

269. Defendants Stockman and Stepp were personally motivated to hide C&A's problems because their jobs and personal fortunes were at stake. Stockman was the founder of Heartland and the CEO of C&A, and he had personal wealth tied up in both. If he were to reveal the problems with C&A during the Class Period, he stood to (1) lose his job; (2) lose his position at the head of Heartland; and (3) lose a great deal of personal wealth. In the event, when C&A could no longer be propped up, all three of these things came to pass. Defendant Stockman was fired and replaced with another Heartland insider at C&A; he lost control of Heartland to two of his colleagues; and his personal holdings in C&A became virtually worthless.

270. Worse, the techniques Defendant Stockman used to try to keep C&A afloat, despite the siphoning of its assets and the weakness of its business operations, have resulted in a felony indictment. Defendant Stockman now faces a possible prison sentence.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

271.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of all those who purchased or otherwise acquired the securities of C&A during the Class Period and who suffered damages (the "Class"). Throughout the Class Period, C&A's common stock actively traded on the NYSE under the ticker symbol "CKC." Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns and any entity in which Defendants have or had a controlling interest, and the members and executives of Heartland.

272.    The members of the Class are so numerous that joinder of all members is impracticable. According to the Company's report filed on Form 10-Q with the SEC on November 17, 2004, C&A had approximately 83,630,087 shares of common stock outstanding, and tens or hundreds of millions in registered fixed income securities. While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by C&A or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

273.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

274.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

275.   Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(l)   whether the federal securities laws were violated by Defendants' acts as alleged herein;

(m)   whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations, financial condition and management of C&A;

(n)   whether Defendants acted knowingly or recklessly in making materially false and misleading statements during the Class Period;

(o)   whether the market prices of the Company's securities were artificially inflated or distorted during the Class Period because of Defendants' conduct complained of herein; and

(p)   whether the members of the Class have sustained damages and the proper measure of such damages.

276.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## APPLICABILITY OF PRESUMPTION OF RELIANCE:
## FRAUD ON THE MARKET DOCTRINE

277.    At all relevant times, the market for C&A securities was an efficient market for the following reasons, among others:

(q)    C&A's common stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(r)    As a regulated issuer, C&A filed periodic public reports with the SEC and the NYSE;

(s)    C&A regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(t)    C&A was followed by several securities analysts employed by major brokerage firms who wrote reports, which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace;

(u)    C&A fixed income securities were rated by the three major credit rating agencies, Standard & Poors, Moody's and Fitch.   Credit analysts followed C&A's creditworthiness; and

(v)    10-3/4% Notes were registered with the SEC and traded publicly throughout the Class Period.  Investors in these Notes further had available to them the price of C&A common stock.  C&A Notes, as demonstrated by their precipitous drop at the end of the Class Period, reacted rapidly to material new information about the Company.

278.    As a result of the foregoing, the market for C&A's securities promptly digested current information regarding C&A from all publicly available sources and reflected such information in C&A's stock price. Under these circumstances, all purchasers of C&A's securities during the Class Period suffered similar injury through their purchase of C&A's securities at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

279.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of C&A who knew that those statements were false when made.

## LOSS CAUSATION

280.    During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the prices of C&A's securities and operated as a fraud or deceit on Class Period purchasers of C&A securities by misrepresenting the Company's financial and business performance and future business prospects. Defendants achieved this facade of success, growth and strong future business

prospects, and concealed C&A's serious financial problems by blatantly misrepresenting the Company's results and business prospects. Later, however, when Defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, prices for C&A securities fell precipitously as the prior artificial inflation was removed from C&A's securities.

281.    C&A successfully concealed its accounting problems until March 17, 2005, when it conceded that it would need to restate its 2003 and 2004 performance. On that day, the stock dropped substantially as a result of the disclosures. The resulting losses by Class members are attributable to the Company's materially misleading financial results.

282.    C&A securities also suffered significant decreases in value during the early months of 2005 and up to May 17, 2005. These decreases were the result of the materialization of the effects of the adverse business developments that the Company had concealed during the Class Period, and of the materialization of the adverse conditions concealed by C&A's accounting improprieties during the Class Period. When the consequences of, *inter alia*, the Company's reduced cash flow, money-losing contracts and quality problems finally became unavoidable, C&A was forced into bankruptcy and its securities dropped substantially in value, thereby injuring the members of the Class.

283.    Defendants' false and misleading statements had the intended effect and caused C&A securities to trade at artificially inflated levels throughout the Class Period. As a result of their purchases of C&A securities during the Class Period, plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

## CLAIMS ALLEGED

## FIRST CLAIM

### Violation Of Section 10(b) Of The Exchange Act And Rule
### 10b-5 Promulgated Thereunder Against The Individual Defendants

284.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

285.    During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public regarding C&A's business, operations, management and the intrinsic value of C&A common stock; (ii) enable the Company to complete an offer of $415 million in aggregate principal amount of its senior subordinated notes; (iii) enable the Company to enter into a new credit facility on more favorable terms than it would have had the truth been known; and (iv) cause plaintiff and other members of the Class to purchase C&A's securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

286.    Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for C&A's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. Defendants are sued either as a primary participant in the wrongful and illegal conduct charged herein or as a controlling person as alleged below.

287.    Defendants, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of C&A as specified herein.

288.    Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of C&A's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about C&A and its business operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of C&A securities during the Class Period.

289.    The Defendants' primary liability, and controlling person liability, arises from the following facts: (i) Defendants were high-level executives (Defendants Stockman and Stepp were also Chairman and Vice Chairman, respectively, of the Company) at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) Defendants, by virtue of their responsibilities and activities as a senior officers and/or directors of the Company were privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) Defendants enjoyed significant personal contact and familiarity with the other controlling persons of the Company and were advised of and had access to other members of the Company's management team,

internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) Defendants were aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

290.    Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.  Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing C&A's operating and reporting condition and future business prospects from the investing public and to create and supporting the artificially inflated price of its securities.  As demonstrated by Defendants' overstatements, misstatements and omissions regarding the Company's business, its business prospects and the financial health of the Company, throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

291.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of C&A's securities was artificially inflated during the Class Period.  In ignorance of the fact that the market prices of C&A's publicly-traded securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants but not disclosed in public statements by Defendants

during the Class Period, plaintiff and the other members of the Class acquired C&A securities during the Class Period at artificially high prices and were damaged thereby.

292.    At the time of said misrepresentations and omissions, plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had plaintiff and the other members of the Class and the marketplace known the truth with regard to the distribution, adoption, and integration of its products, which were not disclosed by Defendant, plaintiff and other members of the Class would not have purchased or otherwise acquired their C&A securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

293.    By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

294.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## SECOND CLAIM

### Violation Of Section 20(a) Of The
### Exchange Act Against The Individual Defendants

295.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

296.    Defendants acted as controlling persons of C&A within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, and ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, Defendants had the power to influence and control and

111

did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which plaintiffs contend are false and misleading. Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

297.  In particular, Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

298.  As set forth above, C&A and Defendants violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their position as controlling persons, Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## THIRD CLAIM

### Violation Of Section 20(a) Of The
### Exchange Act Against Heartland

299.  Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

300.  Heartland acted as controlling persons of C&A within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of its majority ownership, control of voting rights, the presence of Heartland-affiliated persons in a majority of the board positions, its

112

placement of Heartland-affiliated persons in senior management roles including CEO and CFO, its role in providing C&A's CEO without salary pursuant to an advisory contract, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, Heartland had and exercised the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which plaintiffs contend are false and misleading. Heartland was provided with or had unlimited access to, through Defendants Stockman, Stepp, and others, copies of the Company's reports, press releases, public filings and other statements alleged by plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

301.   In particular, Heartland had direct and supervisory involvement in the day-to-day operations of the Company through its board members and senior management and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

302.   As set forth above, C&A and the Individual Defendants violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of its position as a controlling person, Heartland is liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Heartlands' wrongful conduct, plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for relief and judgment, as follows:

A.  Determining that this action is a proper class action, designating plaintiff as class representative under Rule 23 of the Federal Rules of Civil Procedure and plaintiff's counsel as Lead Counsel;

B.  Awarding compensatory damages in favor of plaintiff and the other Class members against Defendants, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.  Awarding plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.  Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: May 4, 2007

*Respectfully submitted,*

**THE MILLER LAW FIRM, P.C.**

**By:**   /s/ Marc L. Newman
E. Powell Miller (P39487)
Marc L. Newman (P51393)
950 W. University Drive, Suite 300
Rochester, Michigan 48307
Telephone: (248) 841-2200
mln@millerlawpc.com

**WOLF HALDENSTEIN ADLER
FREEMAN & HERZ LLP**
Fred T. Isquith, Esq.
Thomas H. Burt, Esq.
Paulette S. Fox, Esq.
270 Madison Avenue
New York, New York 10016
Telephone: (212) 545-4600
Facsimile: (212) 545-4653

**GAINEY & McKENNA**
Thomas J. McKenna
485 Fifth Avenue, 3rd Floor
New York, NY 10017
Tel: (212) 983-1300
Fax: (212) 983-0383

**ATTORNEYS FOR PLAINTIFF**

115

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on May 4, 2007, I electronically filed the foregoing paper with the Clerk of the Court using the ECF System which will send notification to the following ECF attorneys of record:

- **Joseph O. Click**
click@blankrome.com

- **Timothy R. Graves**
tgraves@allardfishpc.com

- **Fred K. Herrmann**
fkh@krwlaw.com, brm@krwlaw.com, ecf@krwlaw.com

- **Simon J. Hill**
shill@hsspc.com,sshaw@hsspc.com

- **Patrick M. McCarthy**
PMcCarthy@Howardandhoward.com,CHodge@Howardandhoward.com

- **Thomas G. McNeill**
TMcNeill@dickinsonwright.com,LMolisee@dickinsonwright.com

- **William A. Sankbeil**
was@krwlaw.com,cjv@krwlaw.com

- **Michele L. Taylor**
michele.taylor@wilmerhale.com,marycarol.flynn@wilmerhale.com

- **Andrew B. Weissman**
Andrew.Weissman@wilmerhale.com,Michele.Taylor@wilmerhale.com

and via first class mail to the following non-ECF attorneys:

Thomas H. Burt
Paulette S. Fox
Fred T. Isquith
Wolf, Haldenstein
270 Madison Avenue
New York, NY 10016

Harris N. Cogan
Blank Rome
405 Lexington Avenue
New York, NY 10174

Gandolfo V. DiBlasi
David E. Swarts
Sullivan & Cromwell
125 Broad Street
New York, NY 10004-2498

Samuel H. Rudman
Lerach, Coughlin,
58 S. Service Road
Melville, NY 11747

By:    /s/    Marc L. Newman
Marc L. Newman (P51393)
The Miller Law Firm, PC
Liaison Counsel for Plaintiff K.J. Egleston
950 West University Drive, Suite 300
Rochester, Michigan 48307
(248) 841-2200
mln@millerlawpc.com
www.millerlawpc.com

117

# EXHIBIT C
# PART 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MAINSTAY HIGH YIELD
CORPORATE BOND FUND,
on behalf of itself and all others
similarly situated,

        Plaintiff,                  Case No. 2:07-cv-10542-AJT-SDP

v

HEARTLAND INDUSTRIAL PARTNERS, L.P.,
a Delaware limited liability partnership,
HEARTLAND INDUSTRIAL ASSOCIATES, L.L.C.,
a Delaware limited company, DAVID A. STOCKMAN,
J. MICHAEL STEPP, TIMOTHY D. LEULIETTE,
DANIEL P. TREDWELL, W. GERALD MCCONNELL,
SAMUEL VALENTI, III, JOHN A. GALANTE,
BRYCE M. KOTH, ROBERT A. KRAUSE,
GERALD E. JONES, DAVID R. COSGROVE,
ELKIN B. MCCALLUM, PAUL C. BARNABA,
THOMAS V. GOUGHERTY and
CHRISTOPHER M. WILLIAMS

        Defendants.

_____/

| | |
|---|---|
| MAX W. BERGER | MAYER MORGANROTH (P17966) |
| STEVEN B. SINGER | JEFFREY B. MORGANROTH (P41670) |
| JOHN C. BROWNE | MORGANROTH & MORGANROTH, |
| JEREMY P. ROBINSON | PLLC |
| BERNSTEIN LITOWITZ BERGER & | *Local Counsel for Plaintiff* |
| GROSSMANN, LLP | 3000 Town Center, Suite 1500 |
| *Counsel for Plaintiff* | Southfield, MI 48075 |
| 1285 Avenue of the Americas | (248) 355-3084 |
| New York, New York 10019 | |
| (212) 554-1400 | |

_____/

**AMENDED CLASS ACTION**
**COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiff MainStay High Yield Corporate Bond Fund ("Plaintiff") brings this case as a

class action, individually and on behalf of all other persons and entities who purchased or

otherwise acquired Collins & Aikman Corporation ("C&A" or the "Company") 12.875% Notes

and 10.75% Notes (together, "C&A Notes") through their duly authorized investment adviser,

MacKay Shields LLC ("MacKay Shields"), during the period between August 11, 2004 through

and including May 17, 2005 ("the Class Period").[1]  Plaintiff alleges the following upon

knowledge, with respect to its own acts, and upon other facts obtained through an investigation

conducted by counsel, which included, *inter alia*, review of the Indictment filed in *United States

of America v. David A. Stockman et al.*, 07 Crim. 0220 (SDNY) (the "Criminal Indictment"), the

complaint filed by the United States Securities and Exchange Commission (the "SEC") action

captioned *Securities and Exchange Commission v. Collins & Aikman Corp., et al.*, 07-CV-2419

(SDNY) (the "SEC Complaint"), filings with the SEC made by C&A and Heartland; press

releases and other public statements; media reports; interviews with former C&A employees; and

a review of documents Defendants provided MacKay Shields to induce MacKay Shields to

---

[1]        Defendants in this Action are the individuals and entities that owned and operated C&A during the Class
Period: (i) Heartland Industrial Partners, L.P.; (ii) Heartland Industrial Associates, L.L.C. (together with Heartland
Industrial Partners, L.P., "Heartland"); (iii) David A. Stockman ("Stockman"), Chairman and Chief Executive
Officer of C&A and Senior Managing Director of Heartland; (iv) J. Michael Stepp ("Stepp"), Chief Financial
Officer of C&A and Senior Managing Director of Heartland; (v) John A. Galante ("Galante"), Vice President and
Treasurer of C&A and Vice President of Heartland; (vi) Bryce M. Koth ("Koth"), Senior Vice President and Chief
Financial Officer of C&A; Robert A. Krause ("Krause"), Senior Vice President, Finance and Administration of
C&A; (vii) Timothy D. Leuliette ("Leuliette"), Director of C&A and Senior Managing Director of Heartland; (viii)
Daniel P. Tredwell ("Tredwell"), Director of C&A and Senior Managing Director of Heartland; (ix) W. Gerald
McConnell ("McConnell"), Director of C&A and Senior Managing Director of Heartland; (x) Samuel Valenti, III
("Valenti"), Director of C&A and Senior Managing Director of Heartland; (xi) Gerald E. Jones ("Jones"), Chief
Operating Officer and Executive Vice President of C&A's Fabrics Division; (xii) David R. Cosgrove ("Cosgrove"),
C&A's Vice President of Finance, Vice President for Financial Planning and Analysis and, as of October 2004,
C&A's Senior Vice President, Financial Planning and Controller; (xiii) Elkin B. McCallum ("McCallum"), Director
of C&A and the Chief Executive officer and owner of Joan Fabrics; (xiv) Paul C. Barnaba ("Barnaba"), Director of
Financial analysis for C&A's Purchasing Department and, eventually, vice president and the Director of Purchasing
for the Plastics Division (xv) Thomas V. Gougherty ("Gougherty"), Controller of C&A's International Plastics
Division and subsequently Vice President of Finance and CFO of C&A's Global Plastics Division; and (xvi)
Christopher M. Williams ("Williams"), Executive Vice President of C&A's Business Development and Specialty
Products groups from November 2004 through May 2005 (collectively, the "Defendants").

purchase approximately $153 million worth of C&A Notes on behalf of Plaintiff and other members of the Class (as defined below).

## NATURE OF THE ACTION

1.      Plaintiff brings this class action on behalf of a class of institutional investors who purchased, through their investment adviser, MacKay Shields, more than $153 million face value of C&A Notes (the "Class") during the Class Period. The Class asserts claims under the Securities Exchange Act of 1934 (the "Exchange Act") against the individuals and entities that owned and operated C&A, a now-bankrupt automotive parts manufacturer located in Michigan. The Defendants include David Stockman, C&A's former CEO and Chairman, and his investment fund, Heartland, which owned a controlling stake in C&A and employed the Company's Chairman and CEO, Vice Chairman and CFO, Treasurer, and a majority of its Board.

2.      Between August 2004 and May 2005, Defendants conducted several face-to-face meetings with MacKay Shields' representatives for the sole purpose of inducing MacKay Shields to purchase C&A Notes on behalf of Plaintiff and the Class. In marketing C&A Notes to MacKay Shields and in public filings on which MacKay Shields relied, Defendants touted C&A as one of the world's foremost designers, manufacturers and suppliers of automotive interior components, and highlighted the Company's supposedly improving financial results. MacKay Shields reasonably relied upon this information and purchased tens of millions of dollars worth of C&A Notes on behalf of Plaintiff and the Class.

3.      As would later become clear, Defendants' statements were materially false and misleading. From at least 2001 through May 2005, Defendants were engaged in a pervasive fraud designed to conceal from MacKay Shields and others the true state of C&A's business and operations. Indeed, four of the Defendants—including Defendant Stockman, C&A's CEO and the founding partner of Heartland—have been <u>criminally indicted for, among other things, lying</u>

2

to MacKay Shields. Specifically, in August 2004, an investment banker acting at the request of

Defendant Stockman contacted MacKay Shields regarding a $415 million Private Placement of

C&A Notes. At Defendant Stockman's request, representatives of MacKay Shields agreed to a

face-to-face meeting, which took place on or about August 11, 2004. At that meeting, Defendant

Stockman—with the knowledge and approval of the other Defendants—made a presentation

about C&A's financial condition, and also provided MacKay Shields with a Private Placement

Memorandum dated August 3, 2004 (the "PPM"), and an "August 2004 Presentation to Potential

Bond Investors" (the "August 2004 Presentation").

    4.     Both the PPM and the August 2004 Presentation Defendants provided to MacKay

Shields contained numerous materially false and misleading statements about C&A's financial

results and business operations. Indeed, as stated in the Criminal Indictment:

> In or about August 2004, C&A offered, and the public purchased,
> approximately $415 million in [C&A Notes] based, in part, on offering
> materials that were false and fraudulent in that they included results of
> operations that had been falsely and materially inflated.

Criminal Indictment¶48 (emphasis added). At the August 11, 2004 meeting, Defendants also

misrepresented and concealed from MacKay Shields a number of serious business and

operational problems facing the Company. These problems were diminishing C&A's ability to

obtain new business and severely straining the Company's working capital. In fact, C&A's

liquidity problems were so severe that it could not afford to pay for the supplies it needed to

manufacture parts for its customers. None of this was disclosed to MacKay Shields.

    5.     In reliance on Defendants' misrepresentations about C&A, between August 12,

2004 and August 20, 2004, MacKay Shields purchased on behalf of Plaintiff and the other

members of the Class approximately $83 million face value of C&A's 12.875% Notes offered in

the Private Placement. Between October 15, 2004 and March 2, 2005, MacKay Shields

purchased on behalf of Plaintiff and the other Class members an additional $45 million face

value of C&A Notes.

6.    Defendants continued to lie to Plaintiff and C&A's other investors.  On March 17,

2005, the Company announced that:  (i) it would restate its reported financial results for the first

three quarters of 2004 and perhaps 2003 as a result of accounting irregularities; (ii) it was going

to take a $500 million goodwill impairment charge and a $177 million charge to write off certain

deferred tax assets; and (iii) the Audit Committee of the Board had undertaken an internal

investigation of the accounting improprieties.  However, these disclosures were also materially

false and misleading and failed to disclose the true disastrous state of C&A's financial and

*business situation.  Indeed, as stated in the Criminal Indictment, the Company's March 17, 2005*

announcement was "materially misleading" and "intended to mislead investors."  Criminal

Indictment¶74.

7.    Following the materially misleading March 17, 2005 announcement, Defendants

arranged another face-to-face meeting with MacKay Shields where they, once again, lied about

C&A's true financial and operational condition.  On March 23, 2005, Defendants Stockman,

Koth and Galante—with the knowledge and approval of the other Defendants—met with

MacKay Shields.  The Criminal Indictment confirms that, at this meeting, Defendants made false

statements directly to MacKay Shields in order to induce MacKay Shields to purchase C&A

Notes on behalf of the Class.  As stated in the Criminal Indictment:

> On March 23, 2005, C&A <u>made a presentation to MacKay Shields,</u> holders
> of C&A's bonds.  Defendant Stockman presented the same slides he had
> used during the March 17, 2005 earnings call, <u>which contained the material
> misrepresentations regarding EBITDA and capital expenditures described
> above.  In addition, defendant Stockman sought to assure the MacKay
> Shields investors that C&A had sufficient liquidity to meet its needs, when
> he knew that it did not.</u>

*Criminal Indictment¶76 (emphasis added).*

4

8.    As a direct result of these false statements, between April 6, 2005 and May 11,

2005, MacKay Shields, on behalf of the Class, reasonably relied on Defendants'

misrepresentations and purchased on behalf of Plaintiff and the other Class members

approximately $17 million face value of the 12.875% C&A Notes and $4.5 million face value of

other C&A Notes.

9.    On May 12, 2005—just one day after MacKay Shields made its final purchase of

C&A debt—C&A stunned the market by announcing that the restatement would likely be larger

than previously announced, the Company was now investigating "other matters that have arisen

in the course of its investigation," and Defendant Stockman had resigned from the Company.

The price of C&A's Notes dropped dramatically as a result of this disclosure.

10.    On May 16, 2005—only nine months after C&A successfully completed the

Private Placement—C&A filed for bankruptcy in the United States Bankruptcy Court for the

Eastern District of Michigan.  The price of the Company's 12.875% Notes dropped from an

offering price of $96.416 down to approximately $3.00, and the price of the 10.75% Notes,

which were trading above $90 before the truth about C&A was revealed, dropped to

approximately $23.00.

11.    On or about March 26, 2007, after investigating the circumstances surrounding

C&A's collapse for nearly two years, the United States Attorney for the Southern District of

New York released the detailed sixty-four page Criminal Indictment against Defendants

Stockman, Stepp, Cosgrove and Barnaba, charging them with, among other things, securities

fraud, conspiracy to commit securities fraud, and wire fraud.  On the same day, the United States

Attorney announced that Defendants Galante, Williams, Jones and Gougherty had pled guilty to

criminal violations of the securities laws.  Also on March 26, 2007, the SEC filed the SEC

Complaint against Defendants Stockman, Stepp, Jones, Cosgrove, McCallum, Barnaba, Galante, Williams and Gougherty, charging each of them with, among other things, violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

12.    As described below, the wide-ranging accounting fraud perpetrated by Defendants is staggering in its scope and audacity. For more than three years (from at least the fourth quarter of 2001 until May 2005), Defendants—including the highest ranking officers and directors of C&A and Heartland—caused the Company to artificially inflate its earnings by (i) conducting numerous fraudulent "round-trip" transactions; (ii) improperly recognizing income from supplier rebates; (iii) improperly booking price discounts on purchases of capital equipment as "income" in violation of Generally Accepted Accounting Principles ("GAAP"); (iv) manipulating EBITDA by improperly categorizing operating expenses as restructuring and impairment charges; and (v) reporting artificially inflated carrying values for goodwill.

13.    This fraudulent scheme was designed to conceal from investors the Company's deteriorating financial condition, secure additional financing for the Company, and allow C&A to maintain the appearance of financial viability. The fraud also permitted Defendant Heartland to collect approximately $45 million in management fees and other payments from C&A (which, in turn enriched the Defendants who were partners of Heartland). Further, as the Criminal Indictment acknowledges, the scheme allowed C&A to avoid filing for bankruptcy, "which would have acknowledged the failure of Stockman's leadership and resulted in the loss of Stockman's and [Heartland's] investment in C&A." Criminal Indictment ¶ 49.

14.    On March 26, 2007, in commenting on the Criminal Indictment and the Guilty Pleas, the United States Attorney for the Southern District of New York confirmed the following:

6

> In the years that Stockman and his co-conspirators forestalled bankruptcy through lies and fraud, Collins & Aikman sold hundreds of millions of new bonds to public investors [...] <u>Those bond [] holders are now left with nothing as a direct result of the fraud we have charged today.</u>

(Emphasis added). The bondholders that the United States Attorney described as being "left with nothing" include Plaintiff and other members of the Class. This Action has been commenced to recover the substantial damages that Plaintiff and the other Class members suffered as a result of Defendants' materially false and misleading statements during the Class Period.

## JURISDICTION AND VENUE

15.    The claims alleged herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. § 78j(b) and 78t(a), and Rule 10b-5, 17 C.F.R. § 240.10b-5 promulgated thereunder.

16.    The jurisdiction of this Court is based on Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331 and 1337.

17.    Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b).

18.    In connection with the acts, transactions and conduct alleged herein, the Defendants used the means and instrumentalities of interstate commerce, including the United States mails, interstate telephone communications and the facilities of national securities exchanges and markets.

## PARTIES

### I.    PLAINTIFF AND RELATED NON-PARTY MACKAY SHIELDS

19.    Plaintiff MainStay High Yield Corporate Bond Fund is a separate investment series of The Mainstay Funds, a Massachusetts business trust that is registered with the Securities and Exchange Commission as an open-end investment company under the Investment

Company Act of 1940, as amended (the "1940 Act"). Plaintiff is a mutual fund having its own

investment objectives and policies. MacKay Shields is the duly authorized investment adviser

for Plaintiff and has full discretionary authority to make investment decisions on its behalf.

MacKay Shields is an "investment adviser" of Plaintiff, as defined in Section 2(a)(20) of the

1940 Act. As set forth in the certification attached hereto as Exhibit A, Plaintiff purchased C&A

12.875% Notes and 10.75% Notes through MacKay Shields during the Class Period as follows:

(a) $33,645,000 in face value of the 12.875% Notes; and (b) $6,430,000 in face value of the

10.75% Notes.

20.      Non-party MacKay Shields is a multi-product investment advisory firm that

manages assets across the capital markets on behalf of a wide range of institutional clients,

including state and local pension systems. As investment adviser for Plaintiff and the Class,

MacKay Shields had full investment discretion to make all investment decisions with respect to

the Plaintiff's and the Class's transactions in C&A Notes. As set forth below, beginning in

August 2004, MacKay Shields purchased for the benefit of Plaintiff and the Class approximately

$129 million face value of C&A's 12.875% Notes for approximately $107 million, and more

than $24 million face value of C&A's 10.75% Notes for approximately $21 million.

## II.    **DEFENDANTS**

### A.    **The Heartland Entities**

21.      **Heartland Industrial Partners, L.P.:** Heartland LP is a limited partnership

organized under the laws of Delaware. Heartland LP is a $1 billion private equity firm

purportedly established for the purpose of acquiring and expanding industrial companies

operating in various sectors of the North American economy that are well positioned for global

consolidation and growth. During the relevant period, Defendant Stockman was the founding

partner and a Senior Managing Director of Heartland LP, and also during the relevant period,

8

Defendants Leuliette, Tredwell, McConnell, and Valenti, III were all Senior Managing Directors of Heartland LP. The managing general partner of Heartland LP was Heartland LLC. C&A was one of Heartland LP's largest investments, representing at least 30% of Heartland LP's total investments.

22.    **Heartland Industrial Associates, L.L.C.:** Heartland LLC is a limited liability company organized under the laws of Delaware. As of July 1, 2004, Heartland LLC beneficially owned 33,574,772 shares of C&A (34,314,147 shares as of January 1, 2005, and 32,714,147 shares as of March 17, 2005) as the general partner of each of the following limited partnerships, which hold the indicated shares directly: Heartland Industrial Partners (FF), L.P., a Delaware limited partnership; HIP Side-by-Side Partners L.P., a Delaware limited partnership; HIP Side-By-Side I-A, LLC, a Delaware limited liability company; Heartland Industrial Partners (C1), L.P., a Delaware limited partnership; and Heartland LP. At the time MacKay Shields first purchased C&A Notes on behalf of Plaintiff and other members of the Class and thereafter, Defendant Stockman was the Managing Member of Heartland LLC; and Defendant Stepp, a Director of C&A and the Company's Vice Chairman and CFO, and Defendants Tredwell, Leuliette and McConnell, each a Director of C&A, were members of Heartland LLC.

23.    During the time period relevant to this Action, Heartland owned a controlling stake in C&A and controlled and operated the Company. As of January 1, 2005, Heartland owned approximately 41% of C&A's outstanding common stock. As the PPM stated:

> Heartland and its affiliates are able to strongly influence or effectively control actions to be taken by our stockholders or directors . . . In addition, Mr. Stockman, the Chairman of the C&A Board and our Chief Executive Officer, and Mr. Stepp, our Chief Financial Officer, are both Senior Managing Directors of Heartland.

9

According to the Criminal Indictment, from at least February 2001 through May 2005, Heartland had a "controlling share of C&A's equity," and Stockman and Heartland "were in control of C&A" and had "operating control of C&A." Criminal Indictment¶8, 11, 18.

24.    Indeed, a majority of C&A's Board (six of eleven directors) were affiliated with Heartland. Further, the Company's most senior officers, Defendants Stockman and Stepp were Senior Managing Directors of Heartland LP, and Defendant Galante, C&A's Treasurer since October 2004, was a Vice President of Heartland LP. Stockman was not paid any compensation by C&A for serving as CEO and Chairman; rather, his salary was paid directly by Heartland.

25.    C&A and Heartland entered into a services agreement under which Heartland provided advisory and consulting services in return for a $4.0 million annual advisory fee and additional fees of 1% of the total enterprise value of certain acquisitions. According to the PPM, Heartland provided C&A with strategic, operational and financial guidance, and the loss of such guidance could have a material adverse effect upon the Company. Heartland, in turn, benefited significantly from its relationship with C&A. During 2001, 2002, 2003 and 2004, Heartland received total advisory fees from C&A of $24.5, $5.7 million, $4.0 million, and $10.6 million, respectively—a total of more than $44 million. According to the SEC Complaint, over $22 million of this amount was eventually paid directly to Defendant Stockman.

26.    During the relevant period, Heartland LP and Heartland LLC were effectively one entity for purposes of exercising control over C&A. Heartland LLC was the managing general partner of Heartland LP, and as such exercised complete control over Heartland LP, and beneficially owned and exercised control over all of the C&A common stock held by Heartland LP. Heartland LP employed as Senior Managing Directors Defendants Stockman, Tredwell, Leuliette, and McConnell, all of whom were members of Heartland LLC and directors of C&A.

10

In addition, Defendant Stockman, a founding partner, Senior Managing Director and "Buyout Partner" of Heartland LP, was the Managing Member of Heartland LLC, and as such had and exercised the authority to act on behalf of Heartland LLC and Heartland LP, as demonstrated by, among other things, signing SEC filings on behalf of Heartland LLC and Heartland LP.

27.     C&A, which is headquartered in Troy, Michigan, is not named as a defendant in this action because it filed a petition for bankruptcy protection under Chapter 11 of the U.S. Bankruptcy Code on May 16, 2005.

28.     According to a March 26, 2007 press release issued by the United States Attorney's Office for the Southern District of New York ("USAO"), the Government has entered into a non-prosecution agreement with C&A.  In that press release, United States Attorney Michael J. Garcia stated that the USAO had:

> reached a non-prosecution agreement with the Collins & Aikman corporation [sic].  While the fraud at Collins & Aikman went to the highest levels of the company . . . , the extensive cooperation provided by Collins & Aikman to date, as well as its current financial circumstances, prompted our conclusion that the public interest did not require that the company be charged.

(Emphasis added.)  The SEC named C&A as a defendant in the SEC Complaint.  According to a March 26, 2007 press release issued by the SEC, C&A has consented to the entry of a final judgment permanently enjoining the Company from violating the anti-fraud, reporting, record-keeping, and internal controls provisions of the federal securities laws.

**B.     The Individual Defendants**

29.     **David A. Stockman.**  Defendant Stockman is a resident of Greenwich, Connecticut.  Until his resignation in May 2005, Stockman was C&A's CEO (appointed in August 2003), was a Director of C&A (beginning in February 2001), and was Chairman of C&A's Board of Directors (beginning in August 2002).  Stockman served on C&A's

compensation committee from April 2002 through at least September 2004. According to the

SEC Complaint, "Stockman played a hands-on role in C&A's day-to-day operations before he

became CEO in August 2003." Stockman did not receive any compensation from C&A for

serving as the Company's CEO; instead, his services were provided by Heartland under a

services agreement which obligated the Company to pay Heartland a multi-million annual

advisory fee and reimburse Heartland's out-of-pocket expenses related to the services it

provided. According to the PPM, Stockman was central to C&A's operations, and the loss of his

services could have a material adverse effect on the Company.

30.     Stockman was formerly a senior managing director of The Blackstone Group,

L.P. a highly successful private equity group. Prior to joining Blackstone, Stockman was a

managing director in the corporate finance department of Salomon Brothers, Inc. Before

Salomon Brothers, Stockman served as the director of the Office of Management and Budget in

the Reagan Administration. During the relevant period, Stockman was also the Managing

Member of Heartland LLC, and was a founding partner and a Senior Managing Director of

Heartland LP, which listed him as its "Buyout Partner."

31.     Stockman personally participated in C&A's "road shows" to sell C&A's 12.875%

Notes, met with senior portfolio managers of MacKay Shields in August of 2004, and was the

Company's main spokesman to the financial media. In face-to-face meetings with

representatives of MacKay Shields, Stockman personally made statements concerning C&A's

operations, income, liquidity and financial performance, including EBITDA, on which MacKay

Shields relied in connection with its purchases of the C&A Notes on behalf of Plaintiff and the

other members of the Class. As of January 1, 2005, Stockman personally owned 331,000 shares

of C&A common stock. On May 12, 2005, Stockman was forced to resign as Chairman and

CEO of C&A for withholding information from C&A's Board. Stockman signed C&A's Forms 10-K for the Fiscal Years ended December 31, 2001, December 31, 2002 and December 31, 2003 and C&A's Form 10-K/A for the Fiscal Year ended December 31, 2001. Stockman also signed C&A's Form S-4 dated April 16, 2002, Form S-4 dated January 27, 2005 (which incorporated each of C&A's previous documents filed with the SEC, including the Company's previous-filed From 10-Qs and Form 10-Ks, and attached C&A's financial statements for the years ended December 31, 2003, 2002 and 2001 and for the quarters ended September 30, 2004 and 2003), Form S-3 dated April 16, 2002, Form S-3/A dated May 21, 2002, Form S-3/A dated May 23, 2002, Form S-3/A dated June 5, 2002, Form S-4/A dated June 17, 2002 and Form S-3 dated June 24, 2002. In addition, Stockman provided certifications pursuant to Sections 302 and 906 of the Sarbanes Oxley Act attesting to the accuracy of C&A's Forms 10-Q for the Periods Ended June 30, 2003, September 30, 2003, March 31, 2004, June 30, 2004 and September 30, 2004; C&A's Forms 10-Q/A for the Periods Ended June 30, 2003, September 30, 2003 and September 30, 2004, and C&A's Form 10-K for the Fiscal Year Ended December 31, 2003.

32.    **J. Michael Stepp.** Defendant Stepp is a resident of Charlotte, North Carolina. From February 2001 until his resignation on April 27, 2006, Stepp was a Director of the Company, and was Vice Chairman of the Board of Directors. From 1995 through 1999 Stepp was C&A's CFO, and served as a consultant and Executive Vice President to the Company from 1999 through 2002. In May 2002, Stepp returned as the Company's CFO and remained in that position until he left the Company in October 2004. He previously served as interim CFO from January 2002 through April 2002, and as Executive Vice President and CFO from April 1995 through December 1999. Stepp was also a Senior Managing Director of Heartland (from March 2001).

33.     Stepp signed C&A's Forms 10-Q for the Periods Ended March 31, 2002, June 30,

2002, September 30, 2002, March 31, 2003, June 30, 2003, September 30, 2003, March 31, 2004

and June 30, 2004; C&A's Forms 10-Q/A for the Periods Ended March 31, 2002, June 30, 2003

and September 30, 2003.  Stepp also signed C&A's Form 10-K for the Fiscal Years Ended

December 31, 2001, December 31, 2002 and December 31, 2003 and C&A's 10-K/A for the

Fiscal Year ended December 31, 2001.  Stepp signed C&A's Form S-4 dated January 27, 2005,

Form S-4 dated April 16, 2002, Form S-3 dated April 16, 2002, Form S-3/A dated May 21, 2002,

Form S-3/A dated May 23, 2002, Form S-3/A dated June 5, 2002, Form S-4/A dated June 17,

2002, Form S-3 dated June 24, 2002 and Form 8-K dated August 5, 2002.  Moreover, Stepp

provided certifications pursuant to Sections 302 and 906 of the Sarbanes Oxley Act attesting to

the accuracy of C&A's Forms 10-Q for the Periods Ended March 31, 2003, June 30, 2003,

September 30, 2003, March 31, 2004 and June 30, 2004, C&A's Forms 10-Q/A for the Periods

Ended June 30, 2003 and September 30, 2003, and C&A's Form 10-K for the Fiscal Year Ended

December 31, 2003.

34.     **Timothy D. Leuliette.**  Defendant Leuliette is a resident of Michigan.  During the

relevant period, Leuliette was a Director of C&A (beginning in February 2001).  Leuliette was

also a Senior Managing Director and one of the co-founders of Heartland LP, and a Member of

Heartland LLC.  Leuliette signed C&A's Forms 10-K for the Fiscal Years ended, December 31,

2001, December 31, 2002 and December 31, 2003, and C&A's 10-K/A for the Fiscal Year ended

December 31, 2001.  Leuliette also signed C&A's Form S-4 dated January 27, 2005m Form S-4

dated April 16, 2002, Form S-3 dated April 16, 2002, Form S-3/A dated May 21, 2002, Form S-

3/A dated May 23, 2002, Form S-3/A dated June 5, 2002, Form S-4/A dated June 17, 2002 and

Form S-3 dated June 24, 2002.

35. **Daniel P. Tredwell.** Defendant Tredwell is a resident of Connecticut. From February 2001 until he resigned on May 10, 2006, Tredwell was a Director of C&A. From April 2002 through at least September 2004, Tredwell served on C&A's Compensation Committee. Tredwell was also a Senior Managing Director and a co-founder of Heartland LP and a member of Heartland LLC. Tredwell signed C&A's Forms 10-K for the Fiscal Years ended, December 31, 2001, December 31, 2002 and December 31, 2003, and C&A's 10-K/A for the Fiscal Year ended December 31, 2001. Tredwell also signed C&A's Form S-4 dated January 27, 2005, Form S-4 dated April 16, 2002, Form S-3 dated April 16, 2002, Form S-3/A dated May 21, 2002, Form S-3/A dated May 23, 2002, Form S-3/A dated June 5, 2002, Form S-4/A dated June 17, 2002 and Form S-3 dated June 24, 2002.

36. **W. Gerald McConnell.** Defendant McConnell is a resident of New York. From February 2001 until his resignation on May 10, 2006, McConnell served as a Director of C&A. McConnell was also a Senior Managing Director of Heartland LP throughout the relevant period (and had been since its founding). At all relevant times, he was also a member of Heartland LLC. McConnell signed C&A's Forms 10-K for the Fiscal Years ended, December 31, 2001, December 31, 2002 and December 31, 2003, and C&A's 10-K/A for the Fiscal Year ended December 31, 2001. McConnell also signed C&A's Form S-4 dated January 27, 2005, Form S-4 dated April 16, 2002, Form S-3 dated April 16, 2002, Form S-3/A dated May 21, 2002, Form S-3/A dated May 23, 2002, Form S-3/A dated June 5, 2002, Form S-4/A dated June 17, 2002 and Form S-3 dated June 24, 2002.

37. **Samuel Valenti, III.** Defendant Valenti is a resident of Michigan. Valenti was a Director of C&A from February 2001 through September 30, 2004. During the relevant period, Valenti was also a Senior Managing Director of Heartland LP. Valenti signed C&A's Forms 10-

K for the Fiscal Years ended, December 31, 2001, December 31, 2002 and December 31, 2003,

and C&A's 10-K/A for the Fiscal Year ended December 31, 2001. Valenti also signed C&A's

Form S-4 dated April 16, 2002, Form S-3 dated April 16, 2002, Form S-3/A dated May 21, 2002,

Form S-3/A dated May 23, 2002, Form S-3/A dated June 5, 2002, Form S-4/A dated June 17,

2002 and Form S-3 dated June 24, 2002.

      38.    **John A. Galante.**  Defendant Galante is a resident Frisco, Texas.  From October

2004 until his employment terminated on July 29, 2005, Galante was Vice President and

Treasurer, and an Executive Officer, of the Company.  He was previously Director, Strategic

Planning from October 2002 to October 2004.  At all relevant times, Galante was also a Vice

President of Heartland LP, which he joined in October 2002.  According to a March 26, 2007

press release issued by the USAO, Defendant Galante has "entered a plea of guilty to a three-

count Information charging him with conspiracy, securities fraud, and bank fraud."  Galante is

also a named defendant in the SEC Complaint and is charged with, among other things,

violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

Galante signed C&A's Form S-4 dated January 27, 2005.

      39.    **Bryce M. Koth.**  Defendant Koth is a resident of Michigan.  During the relevant

period, Koth was Senior Vice President and CFO of the Company (beginning in October 2004).

He was previously Vice President, Finance & Controller, and head of Tax of the Company since

May 2004.  He joined the Company in December 2002 as Vice President, Tax.  Koth signed

C&A's Form 10-Q for the Period Ended September 30, 2004 and C&A's Form 10-Q/A for the

Period Ended September 30, 2004, C&A's Form S-4 dated January 27, 2005, and certain Form

8-K's as specified below.  Koth also provided certifications pursuant to Sections 302 and 906 of

the Sarbanes Oxley Act of the accuracy of C&A's Form 10-Q for the Period Ended September

30, 2004 and C&A's Form 10-Q/A for the period Ended September 30, 2004.

40.    **Robert A. Krause.** Defendant Krause is a resident of Michigan. During the

relevant period, Krause was Senior Vice President, Finance and Administration of the Company

(beginning in October 2004). He was previously Vice President and Treasurer of the Company

(beginning in October 2002). Krause was also a director of Collins & Aikman Products Co., a

wholly-owned subsidiary of C&A.

41.    **Gerald E. Jones.** Defendant Jones is a resident of Bahama, North Carolina.

From 2000 through the end of 2006, he served as Chief Operating Officer and Executive Vice

President of C&A's Fabrics Division. According to a March 26, 2007 press release issued by the

USAO, Defendant Jones has "entered a plea of guilty to a one-count Information charging him

with obstruction of an agency proceeding." Jones is also a named defendant in the SEC

Complaint and is charged with, among other things, violations of Section 10(b) of the Exchange

Act and Rule 10b-5 promulgated thereunder. Jones signed C&A's Form S-4 dated April 16,

2002, Form S-3 dated April 16, 2002, Form S-3/A dated May 21, 2002, Form S-3/A dated May

23, 2002, Form S-3/A dated June 5, 2002 and Form S-4/A dated June 17, 2002 (each of which

contained C&A's publicly reported financial information for previous quarters).

42.    **David R. Cosgrove.** Defendant Cosgrove is a resident of Rochester, Michigan.

Cosgrove was C&A's Vice President of Finance from February to August 2002, and Vice

President for Financial Planning and Analysis from August 2002 until October 2004. In October

2004, Cosgrove became C&A's Senior Vice President, Financial Planning and Controller,

remaining in that position through May 2005. Cosgrove resides in Rochester, Michigan.

Cosgrove is a named defendant in the Criminal Indictment, in which he is charged with, among

other things, conspiracy, securities fraud, and wire fraud. Cosgrove is also a named defendant in

the SEC Complaint and is charged with, among other things, violations of Section 10(b) of the

Exchange Act and Rule 10b-5 promulgated thereunder. Cosgrove signed C&A's Form S-4 dated

January 27, 2005.

    43.    **Elkin B. McCallum.** Defendant McCallum is a resident of Tyngsboro,

Massachusetts. McCallum is the Chief Executive officer and owner of Joan Fabrics, a supplier

to C&A. From September 2001 through May 2004, McCallum served on C&A's Board of

Directors. McCallum also sold businesses to C&A during the relevant period. According to the

SEC Complaint, McCallum was a significant shareholder in C&A during the relevant period.

Cosgrove is also a named defendant in the SEC Complaint and is charged with, among other

things, violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

McCallum signed C&A's Forms 10-K for the Fiscal Years ended, December 31, 2001,

December 31, 2002 and December 31, 2003, and C&A's 10-K/A for the Fiscal Year ended

December 31, 2001. McConnell also signed C&A's Form S-4 dated April 16, 2002, Form S-3

dated April 16, 2002, Form S-3/A dated May 21, 2002, Form S-3/A dated May 23, 2002, Form

S-3/A dated June 5, 2002, Form S-4/A dated June 17, 2002 and Form S-3 dated June 24, 2002.

    44.    **Paul C. Barnaba.** Defendant Barnaba is a resident of Orion, Michigan. Barnaba

was the Director of Financial analysis for C&A's Purchasing Department from April 2002 until

December 2004. In December 2004, Barnaba became a vice president and the Director of

Purchasing for the Plastics Division. Barnaba left C&A in April 2005. Barnaba is a named

defendant in the Criminal Indictment, in which he is charged with, among other things,

conspiracy, securities fraud, and wire fraud. Barnaba is also a named defendant in the SEC

Complaint and is charged with, among other things, violations of Section 10(b) of the Exchange

Act and Rule 10b-5 promulgated thereunder.

45.     **Thomas V. Gougherty.** Defendant Gougherty is a resident of Gosslie, Michigan.

Gougherty was Controller of C&A's International Plastics Division from July 2003 until

September 2004, when he became Vice President of Finance and CFO of C&A's Global Plastics

Division.  He remained at C&A through at least May 2005.  According to a March 26, 2007

press release issued by the USAO, Defendant Gougherty has "a plea of guilty to a two-count

Information charging him with conspiracy and securities fraud."  Gougherty is also a named

defendant in the SEC Complaint and is charged with, among other things, violations of Section

10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

46.     **Christopher M. Williams.** Defendant Williams is a resident of Troy, Michigan.

Williams joined C&A in 2000 as Director of Commercial Management for its contracts with

Ford Motor Company.  He was the Executive Vice President of the Business Development and

Specialty Products groups from November 2004 through May 2005.  Williams left C&A in

January 2006.  According to a March 26, 2007 press release issued by the USAO, Defendant

Williams has "a plea of guilty to a one-count Information charging him with conspiracy."

Gougherty is also a named defendant in the SEC Complaint and is charged with, among other

things, violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

47.     Defendants Stockman, Stepp, Galante, Barnaba, Cosgrove, Gougherty, Jones,

Williams, McCallum, Krause, and Koth, as a result of their senior operating and financial

employment positions with C&A; their role as directors of C&A; and/or their employment with

Heartland LP, which controlled C&A; their membership in Heartland LLC, which controlled

Heartland LP as its managing general partner, possessed the power and authority to control the

19

contents of the oral and written statements that were made to MacKay Shields' representatives in

connection with their one-on-one meetings with the C&A Defendants, as well as the contents of

C&A's quarterly reports, annual reports and press releases, all of which MacKay Shields

reviewed and relied upon when deciding to purchase C&A Notes on behalf of Plaintiff and the

other Class members. Further, on information and belief, these Defendants were provided with

copies of the presentations, SEC filings and press releases alleged herein to be misleading prior

to or shortly after their issuance and had the ability and opportunity to prevent their issuance or

cause them to be corrected.

48.    Because of their positions and access to material non-public information, these

Defendants each knew that the material facts described herein had not been disclosed to MacKay

Shields and, in fact, were being concealed from MacKay Shields, and that numerous

representations made to MacKay Shields during its representatives' one-on-one meetings with

Defendants Stockman, Stepp, Galante, Krause and Koth were materially false and misleading at

the time they were made. Pursuant to the "group pleading" doctrine, these Defendants are liable

for each of the false and misleading statements alleged herein, for each of those statements

constituted "group published" information and, thus, were the result of the collective actions of

these defendants in connection with their direct involvement and participation in the one-on-one

meetings with MacKay Shields, as well as the day-to-day business of the Company.

49.    Defendants Tredwell, Leuliette, McConnell and Valenti, through their positions as

Senior Managing Directors at Heartland and members of the C&A Board of Directors, had the

power to, and did, directly and indirectly exercise control over C&A, including the content and

dissemination of statements to representatives of MacKay Shields that Plaintiff alleges were false

and misleading. Indeed, as alleged herein, these Defendants regularly certified the accuracy of

C&A's (materially false and misleading) financial statements and other statements that were
filed with SEC and disseminated to the public.

### C.    Defendants' Knowledge of C&A's Financial Results and Operations

50.    Defendants were intimately familiar with C&A's operating results. As described
above, Heartland was C&A's largest shareholder and exercised complete control over C&A.
Further, Defendants Stockman, Stepp, Leuliette, Tredwell, McConnell, Valenti, and Galante
were closely affiliated with Heartland as employees or partners, as well as having senior roles at
C&A. As C&A's majority shareholder, Heartland placed each of these Defendants on C&A's
Board of Directors, and/or made him an officer of C&A, so that Heartland could exercise control
over C&A. Defendants Stockman, Stepp, Galante, Barnaba, Cosgrove, Gougherty, Jones,
Williams, McCallum, Krause, and Koth were senior officers of C&A with intimate knowledge of
C&A's financial and operational condition. Defendant McCallum was a Director of C&A and,
as described in more detail below, was directly involved in efforts to manipulate C&A's reported
financial results.

51.    Each of these Defendants reviewed, approved, and, by operation of applicable
laws and regulations, had a duty to know and understand the representations about C&A's
financial and business condition made in C&A's public disclosures and in the materials that
Defendants provided to MacKay Shields. Further, each of these Defendants knew or should
have known that MacKay Shields would rely on C&A's publicly filed financial statements, its
public disclosures, and on the information provided to MacKay Shields by Defendants, when
deciding whether to purchase C&A Notes on behalf of its clients.

52.    According to the Criminal Indictment, at all relevant times, C&A tracked its sales,
EBITDA, operating income, capital expenditures and other financial metrics on a monthly basis
through a series of internal reports. These internal reports were generated at each C&A plant,

which would update an internal computer system with that plant's monthly or quarterly forecasts as compared to actual results. The results from each plant were then "rolled-up" to the corresponding divisions, which then consolidated the results into divisional reports. The divisional reports, in turn, were sent to the Financial Planning and Analysis group (which was headed by Defendant Cosgrove) and were consolidated into a company-wide reports that tracked actual results as compared to forecasted results. According to the Criminal Indictment, Defendant Stockman led periodic meetings to discuss C&A's operating results and, in connection with those meetings, Defendants "Stockman, Stepp, Cosgrove, <u>and others</u> reviewed documents that summarized information, including sales, expenses, and other anticipated accounting entries that would affect C&A's revenues in the current quarter and in following months." Criminal Indictment¶17 (emphasis added).

53.    Defendant Stockman, acting on behalf of Heartland, was particularly familiar with C&A's finances and operations. According to Confidential Informant Number 1 ("CI 1"), a former Quality Manager at a Collins & Aikman plant in Canton, Ohio from March 2000 through September 2003, the carpet and acoustics division held Financial Business Operating Systems meetings, commonly known within the Company as BOSS meetings, approximately once a month with Stockman. Those meetings would address the financial operations of twelve plants. CI 1 attended those meetings along with Millard King, the President of the Global Soft Trim operating unit, Michael Geaghan, the Canton Plant's Vice President of Operations, and Daniel Bednarz, Divisional Controller. CI 1 described Stockman as smart and numbers-oriented, with a comprehensive knowledge of each plant's financial results. Specifically, Stockman carried large binders of each plant's financial data, and was intimately familiar with each plant's operations and finances.

54.     Confidential Informant No. 2 ("CI 2"), a former Vice President and General Manager at a C&A facility in Troy, Michigan, who was with the Company from February 2000 through December 2004, and who had direct interaction with Stockman from mid-2003 through the end of 2004, also said that Stockman had complete mastery over C&A's finances, and that at every quarterly management meeting Stockman recited financial information down to single digit thousands on each line of a plant's financial statements, at times even questioning CI 2 about matters as small as the potential cost savings of replacing two security guards with cameras.

55.     The information provided by CI 1 and CI 2 is confirmed and corroborated by the Criminal Indictment. As stated in the Criminal Indictment, Defendant Stockman "regularly met with C&A employees to discuss the financial results and projections reflected in [] various documents." Criminal Indictment¶17.

56.     Defendants Stockman, Stepp, Leuliette, Tredwell, McConnell, Valenti and Galanti also familiarized themselves with C&A's operations in order to monitor and preserve Heartland's huge equity stake in C&A's business. As Senior Managing Directors of Heartland, these defendants had an incentive to (and did) closely monitor Heartland's huge investment of 33,574,772 shares of C&A (which was approximately 30% of Heartland's total fund). It was critically important to each of these defendants that C&A remain solvent in order to ensure the value of Heartland's investment. Moreover, as of August 2004, defendants Stockman and Stepp personally owned tens of thousands of shares of C&A, respectively. Defendant Stepp also received a "special recognition" bonus of $112,500.00 in 2003, which was in addition to his salary and other compensation at C&A. If C&A failed, Heartland would suffer disastrous losses, and these Defendants' own personal fortunes would be significantly impacted.

57.    In addition, on information and belief, Defendants Stockman, Stepp, Galante, Barnaba, Cosgrove, Gougherty, Jones, Williams, McCallum, Krause, and Koth personally owned shares of C&A stock and participated in C&A's employee stock option plan, pursuant to which 68,218 options to purchase shares of restricted C&A stock were issued to Company employees and executive officers on June 29, 2004. These options were scheduled to vest in three equal annual installments on June 29, 2005, June 29, 2006 and June 29, 2007. Accordingly, these Defendants knew that a bankruptcy filing by C&A would render their stock holdings and restricted stock options essentially worthless, imperil their own lucrative positions at the Company, and expose them to personal liability for previous public statements they had made about C&A's financial condition.

58.    As described below, Defendant McCallum knowingly participated and helped to engineer a series of fraudulent "round-trip" transactions that had no legitimate business purpose and were designed to artificially inflate C&A's reported financial results. McCallum benefited directly from these arrangements through, among other things, sales of McCallum-owned business to C&A for amounts worth millions of dollars more than the actual value of the business.

59.    Additional allegations regarding Defendants' knowledge of C&A's financial results and operations, as well as allegations regarding their involvement in the fraudulent scheme set forth herein, are described below.

## CLASS ACTION ALLEGATIONS

60.    Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of itself and all other persons and entities for whom MacKay Shields, acting as their investment adviser, purchased or otherwise acquired C&A 12.875%

24

Notes and 10.75% Notes during the period August 11, 2004 through and including May 17, 2005.

61.    The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  During the Class Period, MacKay Shields purchased C&A Notes on behalf of more than sixty persons, including Plaintiff.

62.    There is a well-defined community of interest in the questions of law and fact involved in this case.  MacKay Shields was authorized to invest in securities on behalf of each member of the Class, and each member of the Class purchased or otherwise acquired C&A Notes through MacKay Shields.  In addition, questions of law and fact common to the members of the Class, which predominate over questions which may affect individual Class members, include:

- Whether Defendants violated the Exchange Act;

- Whether Defendants omitted and/or misrepresented material facts;

- Whether Defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

- Whether Defendants knew or deliberately disregarded that their statements were false and misleading;

- Whether the prices of C&A Notes were artificially inflated; and

- The extent of damages sustained by Class members and the appropriate measure of damages.

63.    Plaintiff's claims are typical of the claims of the other members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

64.    Plaintiff will adequately protect the interests of the other members of the Class

and have retained counsel competent and experienced in class action securities litigation.

Plaintiff has no interests which may conflict with other members of the Class.

65.    A class action is superior to other available methods for the fair and efficient

adjudication of this controversy since joinder of all members is impracticable.

### SUBSTANTIVE ALLEGATIONS

**I.    C&A'S BUSINESS AND OPERATIONS**

66.    Prior to filing for bankruptcy, C&A held itself out as one of the world's foremost

designers, manufacturers and suppliers of automotive interior components. C&A sold its

products to automotive original equipment manufacturers ("OEMs") such as GM, Ford and

Chrysler, and others. As the PPM that Defendants provided to MacKay Shields stated:

> We are a global leader in the design, engineering and manufacturing of
> automotive interior components, including instrument panels, fully
> assembled cockpit modules, floor and acoustic systems, automotive fabric,
> interior trim and convertible top systems.
>
> * * *
>
> Our customers include all North American automotive original equipment
> manufacturers (or OEMs), transplants (such as Toyota, Honda and Nissan)
> and certain Tier I auto suppliers.

67.    C&A supplied its products through three operating segments: (i) U.S. and Mexico

Plastics, (ii) International Plastics, and (iii) Global Soft Trim. Through its U.S. and Mexico

Plastics and International Plastics segments, C&A manufactured "nearly every kind of

component of the plastic interior trim within a vehicle," including cockpit modules, automotive

instrument panels, door panels, sidewall trim, airflow systems, consol systems, headrests, and

cupholders. C&A's Global Soft Trim segment produced carpet, acoustic management products,

fabric and convertible top systems, including floor carpets and mats, trunk trim, seat fabrics and

headliner fabrics.

26

68.    Because the automotive supply industry is very competitive, maintaining

sufficient liquidity and working capital was critical to C&A's success.  In securing new business

from OEMs, C&A typically was forced to expend significant amounts of capital for engineering,

development, tooling and other costs that generally were not recouped until the launch of a

vehicle line, or over time based upon projected build levels.  Accordingly, any decline in

liquidity and/or working capital materially impacted C&A's ability obtain to achieve new

business and fulfill its existing contracts.

## II.    DEFENDANTS' FRAUDULENT SCHEME

69.    As discussed above, in or about February 2001, Heartland acquired a controlling

stake in C&A.  Soon thereafter, in accordance with Heartland's stated investment strategy,

Defendants Stockman, Heartland and others caused C&A to embark on a series of acquisitions

designed to transform C&A into a "Mega Tier II" supplier of fabrics and other automotive

components.  First, in or about July 2001, C&A acquired Becker Group L.L.C., a company that

manufactured plastic parts for automobiles.  Second, in or about September 2001, C&A acquired

Joan Automotive Fabrics, which was part of Joan Fabrics—a supplier to C&A that was owned

by Defendant McCallum.  In December 2001, C&A made its largest acquisition by purchasing

the trim division of Textron Automotive Company—known as "TAC-trim," for approximately

$1.3 billion.  According to a press release issued by C&A on December 2001:

> David Stockman, founder of Collins & Aikman's largest shareholder,
> Heartland Industrial Partners, stated, "It is extremely gratifying to have
> completed this acquisition.  When Heartland was formed nearly two years
> ago, my vision was to do exactly this - take advantage of industry
> cyclicality to buy premier automotive properties, like TAC-Trim, at
> attractive prices.  This vision, in tandem with the support of Heartland's
> investors . . . have enabled us to rapidly build and grow Collins & Aikman
> into a global leader in the automotive interiors industry."

70.    These acquisitions were an important part of the overall financial plan and
investment story that Defendants Stockman, Heartland and others had developed for C&A.
However, it soon became apparent to Defendants that the financial climate was declining, and
C&A began to face increasing pressures in its business operations (which represented C&A's
major expense).  The Company was squeezed between cost-reduction mandates from its OEM
clients and increases to the price of raw materials the Company needed to make its products.
C&A's operating results faced further negative pressures from the high costs of integrating the
businesses acquired during 2001 into the existing C&A operations.  By December 2001, these
severe operational pressures, among other issues, placed C&A in danger of violating a series of
financial covenants in its credit facilities.

71.    A failure to satisfy its covenants would have been catastrophic to C&A and
devastating to Defendants' personal reputations and fortunes.  At the time, C&A had between
$575 million and $675 million in outstanding revolving credit facilities and term loans, which
required that C&A satisfy certain financial covenants.  For example, C&A was required to
satisfy a "leverage covenant," which was computed by dividing C&A's net debt by its EBITDA.
If C&A failed to satisfy the "leverage covenant" or other covenants, it would be deemed to be in
default under its credit facilities.  According to the Criminal Indictment, C&A's financial
covenants became more stringent over time, such that C&A was expected to meet more rigorous
performance targets and/or reduce its overall debt levels in order to remain in compliance with
its covenants.  Failure to satisfy these covenants would not only place C&A in default on its
credit facilities with its lenders, but due to a series of cross-default provisions in the Company's
agreements with its bondholders, a default on the credit facilities would also trigger a default on

C&A's Notes. In essence, a default on its covenants would place C&A in danger of immediate collapse and bankruptcy.

72.    Consequently, Defendants faced significant pressure to keep C&A's financial performance at a level that would (a) satisfy investors that Heartland's financial plan for C&A was successful; and (b) enable C&A to comply with the covenants in its credit facilities.

73.    As described below, rather than face the dire consequences of C&A's failing business, Defendants embarked on a massive fraudulent scheme designed to misstate C&A's publicly-reported financial results and raise hundreds of millions of dollars from unsuspecting investors, including the clients for whom MacKay Shields acted as investment adviser. This fraudulent scheme involved (1) fraudulent "round-trip" transactions designed to artificially inflate C&A's reported financial results; (2) improper recognition of supplier and other rebates; and (3) improper treatment of discounts on capital equipment purchases as "income" in violation of GAAP.

**A.    The Fraudulent "Round Trip" Transactions With Defendant McCallum**

74.    In response to the operational pressures outlined above, starting in late 2001, Defendants orchestrated a series of "round-trip" transactions between C&A and Defendant McCallum for the purpose of misrepresenting C&A's financial condition. In September 2001, at Stockman's direction, C&A acquired a company called Joan Automotive Fabrics, which was a supplier of automotive fabrics and a division of Joan Fabrics. Following that acquisition, Defendant McCallum, the CEO of Joan Fabrics, became a member of C&A's Board of Directors.

75.    Starting in or about late 2001, Defendants caused C&A to enter into numerous improper "round-trip" transactions with Defendant McCallum. These sham transactions had no legitimate business purpose and were designed solely to falsify C&A's publicly-reported

financial statements. Specifically, in a series of meetings over the course of several years,

Defendants Stockman, Stepp and Jones agreed with Defendant McCallum that McCallum would

make approximately $14.8 million in cash payments to C&A on a quarterly basis starting in the

fourth quarter 2001 and continuing through the first quarter of 2003. At the same time each of

these agreements was reached, these Defendants agreed that C&A and McCallum would arrange

a series of sham transactions to surreptitiously repay McCallum, with the net result being that

these payments were simply transfers of cash from McCallum to C&A and then from C&A back

to McCallum. Despite the round-trip nature of these transfers, C&A improperly recorded the

payments received from McCallum as supplier "rebates" that increased C&A's reported income

and artificially inflated its EBITDA and other financial results. Under GAAP and other relevant

accounting rules and regulations, these round-trip transactions should have had no impact on

C&A's income statement.

76.     The Criminal Indictment describes the "round-trip" transactions between C&A

and Joan Fabrics as follows:

> In the fourth quarter of 2001, Stockman, Stepp, and others realized that
> C&A's fourth quarter results were going to fall short of expectations.
> Therefore, Stepp, with Stockman's knowledge and approval, asked
> [Defendant McCallum] for a $3 million payment from Joan Fabrics to C&A
> that would be used to boost C&A's EBITDA for the fourth quarter of 2001.
> In return, Stockman, Stepp, and others promised to repay Joan Fabrics in
> the future. As Stockman and Stepp intended, this $3 million payment was
> characterized as a supplier rebate to allow C&A to account for it as a
> reduction in cost for the fourth quarter of 2001, and therefore increase
> C&A's EBITDA for that period. This characterization was false, as
> Stockman and Stepp had agreed that C&A would make Joan Fabrics
> "whole" for the payment at some point in the future. Therefore the
> transaction was a round trip of cash, not a supplier rebate, and should not
> have factored into C&A's EBITDA.
>
> After this first "rebate," Stockman negotiated additional payments from
> Joan Fabrics in order to boost C&A's EBITDA. Stockman negotiated these
> payments personally with [Defendant McCallum], which totaled nearly $15
> million in "rebates" between the fourth quarter of 2001 and the first quarter

of 2003.  As with the first "rebate," C&A booked each payment as a reduction in cost, and increased its EBITDA.  Neither Joan Fabrics nor entities controlled by [Defendant McCallum] had a contractual obligation to make these payments, and they in fact only agreed to do so with the understanding that Joan Fabrics would be repaid.

Criminal Indictment¶28, 29 (emphasis added).

77.     C&A falsely characterized the payments received from Defendant McCallum as "supplier rebates," so that C&A could account for them as a reduction in costs, which would artificially increase the Company's reported operating income and EBITDA for the corresponding quarter.  This characterization, however, was a blatant violation of GAAP and other relevant accounting rules and regulations because Defendants had agreed that C&A would "repay" McCallum for the full amounts of the so-called "rebates."  Thus the transactions were simply sham round-trip transactions of cash, not supplier rebates, and should not have impacted C&A's financial results or reported EBITDA.  *See* Criminal Indictment¶28.

78.     According to the Criminal Indictment and the SEC Complaint, Defendants Stockman and Stepp agreed to repay the approximately $14.8 million in total "rebate" payments that McCallum extended to C&A by structuring additional sham transactions with McCallum.  Each of these sham transactions lacked any legitimate business purpose and was designed solely to allow C&A to repay the "rebates" extracted from McCallum.  These sham transactions included:

a.     On or about April 19, 2002, C&A returned to Joan Fabrics certain looms that C&A had obtained as part of the original purchase of Joan Automotive.  While these looms were worth approximately $3.1 million, they were returned by C&A for no consideration to Joan Fabrics in order to "repay" McCallum for the $3 million received for the fourth quarter of 2002.

31

b.    In March 2002, Stockman caused C&A to purchase one of McCallum's businesses, Southwest Laminates, Inc., for approximately $17 million, at least $7 million more than it was worth.

c.    In late 2002, Stockman and McCallum agreed that C&A would overpay for additional businesses and assets owned by McCallum, in order to repay additional "rebate" payments received from Joan Fabrics.  Soon thereafter, Stockman caused C&A to pay McCallum $4.2 million for Dutton Yarns (which had just been appraised at approximately $2 million), and $4.7 million for furniture looms that were worth only about $2 million.

79.    The sham "round-trip" transactions resulted in C&A falsely reporting its pre-tax operating income for each of the fourth quarter 2001 through the first quarter 2003 (as discussed herein, this information was publicly-filed with the SEC and set forth in the PPM that Defendants provided to MacKay Shields to induce MacKay Shields to purchase C&A Notes on behalf of the Class).  The impact of these misrepresentations are reflected in the following chart:

| | 4Q 2001 | 1Q 2002 | 2Q 2002 | 3Q 2002 | 4Q 2002 | 1Q 2003 |
|---|---|---|---|---|---|---|
| C&A's reported Operating Income | ($13.5) | $54.4 | $81.5 | ($4.3) | $36.1 | $19.2 |
| C&A's actual Operating Income (not including improper McCallum payments) | ($16.3) | $49.4 | $79.7 | ($6.3) | $34.1 | $18.0 |
| Percent impact due to McCallum payments | 17% | 10% | 2% | 32% | 6% | 7% |

80.    According to the SEC Complaint, Defendants Stockman, Stepp, McCallum and Jones were directly involved in each of these fraudulent round-trip transactions.  Specifically, Stockman personally negotiated the transactions with McCallum, Stepp arranged and collected

the payments from McCallum, while Jones helped collect the payments from McCallum and

assisted in the transactions through which McCallum was repaid.  As stated in the SEC

Complaint, "Stockman, McCallum, Stepp, and Jones knew, or were reckless in not knowing, that

the McCallum payments were actually improper round-trip transactions intended to inflate

C&A's earnings and that the false earnings figures would materially affect C&A's financial

statements and the reports . . . C&A filed with the SEC."  SEC Complaint¶25.

**B.**     **Improper Accounting for Supplier And Purchaser Rebates**

81.     It is commonplace in the automotive industry for customers who consume raw

materials (such as C&A) to negotiate rebate payments from their suppliers in return for specified

volume purchases or guarantees of future business.  Under relevant accounting rules, customers

such as C&A are permitted to record those rebates as reductions in cost (which, in turn, increase

income) in certain circumstances.  However, because the customer is not permitted to receive the

rebate until the promised volume of purchases is made, or the promised future business is

provided, it is a violation of GAAP for the customer to immediately recognize the entire amount

of the future rebate.

82.     During the Class Period, C&A sought to negotiate rebates from its suppliers.

Thus, when C&A was awarded a contract from an OEM—for instance, a contract to make

interior components for the Ford Fusion—C&A would attempt to negotiate long-term contracts

with its own suppliers who would be providing the raw materials for the components that C&A

would construct for the OEM.  As part of these efforts, C&A often negotiated certain price

reductions in the contracts so that C&A would be entitled to either volume discounts or an

upfront lump sum payment.  According to the Criminal Indictment, Defendant Stockman

referred to these lump sum payments as, among other things, "pay-to-play," or "slotting fees."

*See* Criminal Indictment¶36.  C&A's suppliers advanced these "pay-to-play" lump sum

payments in return from a commitment from C&A to provide the supplier with future business.
In the case of either volume discounts or lump-sum payments, the "rebates" due to C&A were
contingent on C&A either purchasing larger amounts of product from the supplier in the future
(in the case of volume discounts), or entering into future business arrangements with the supplier
(in the case of lump-sum payments). Pursuant to GAAP and other relevant accounting
principles, these "rebates" could not be recognized on C&A's books (and thus reduce C&A's
costs and increase its income) until C&A had "earned" the rebate by satisfying all of its
contractual obligations to its supplier. For example, in the case of volume discounts, C&A
would have to purchase the required amount of product from the supplier, while in the case of
lump-sum payments, C&A would have to provide the supplier with the contractually-guaranteed
amount of future business (which would entitle C&A to retain the lump-sum payment).

83.     According to the Criminal Indictment and the SEC Complaint, for each financial
quarter beginning in early 2002 and continuing through March 2005, Defendants Stockman,
Stepp, Galante, Cosgrove, Barnaba, Jones and Gougherty participated in a fraudulent scheme
designed to recognize the cost reductions from the "rebate" transactions before the rebates had
been earned by C&A. In blatant violation of GAAP, these "rebates" were recognized so that
C&A could artificially lower its costs in each quarter and thereby inflate its earnings and
EBITDA for that period. The Criminal Indictment describes this scheme as follows:

> Defendants Stockman, Stepp, and Cosgrove routinely attended meetings
> with members of the C&A Purchasing Department, including Barnaba, and
> knew that Barnaba and other employees from the C&A Purchasing
> Department were promising future business to suppliers in order to obtain
> up-front "rebates." In many cases, Stockman directed C&A employees to
> get rebates from specific suppliers; Stockman would specify the amount of
> the rebate to be requested and the specific future business to be promised to
> the supplier. Once Stockman identified a rebate, it became part of the C&A
> Purchasing Department's target goal for the quarter. At times relevant to
> this Indictment, Stockman, Stepp, and Cosgrove received weekly written

34

> reports from the C&A Purchasing Department which included updated
> information concerning rebate transactions. These weekly updates often
> referred to the fact that future business was being promised to suppliers in
> exchange for rebates being booked immediately.
>
> Beginning at least as early as in or about March 2002, defendants Stockman
> and Cosgrove directed employees in C&A's Purchasing Department to pull
> income forward into the current reporting period and thereby falsely pad
> C&A's reported income. Defendants Stockman and Cosgrove understood
> that C&A's employees were therefore soliciting false documentation from
> suppliers to allow C&A to account for rebates improperly, using a template
> letter approved by Cosgrove. In particular, defendants Stockman and
> Cosgrove directed C&A's employees, when documenting supplier rebates
> that were contingent on future business, to obtain side letters or separate
> documents that falsely attributed the supplier rebate to past purchases. . . . .
> Stockman, Stepp, Cosgrove and Barnaba used the false documents to justify
> immediate recognition of the supplier rebates in C&A's books and records
> and in its financial reports filed with the SEC.

Criminal Indictment¶40.

84.    The Criminal Indictment sets out in detail the role Defendants Stockman, Stepp,

Barnaba and Cosgrove played in this aspect of the fraudulent scheme, stating:

> Stockman specifically approved various contingent supplier rebates that
> were improperly booked in the current quarter. For example, Stockman
> approved the following rebates, with the knowledge and approval of Stepp
> and Cosgrove, each of which, as they each well knew, was contingent on
> future business, each of which was falsely documented to hide the
> contingency, and each of which was recognized in whole or in part in the
> current quarter:
>
>> a. Third quarter 2003: $1 million rebate from a plastic parts supplier;
>>
>> b. Fourth quarter 2003: $250,000 rebate from a tooling supplier.
>
> Stockman directed employees, such as Barnaba, to seek Cosgrove's
> guidance in "booking" the "rebates" in the current quarter, despite knowing
> that it would be improper to book the "rebates" in the current quarter
> because they were contingent on future events. Cosgrove reviewed false
> side letters obtained or prepared by Barnaba and C&A's Purchasing
> Department, with knowledge that they did not accurately reflect the true
> nature of the "rebates," and edited false side letters for the purpose of
> removing references to future business.

Criminal Indictment¶41-42.

35

85.   The SEC Complaint confirms the allegations above and sets forth additional information regarding the fraudulent rebate transactions effected by Defendants.  *See* SEC Complaint ¶¶ 26-42.  These fraudulent transactions included the following:

a.   On April 2002, PPG Industries, Inc. ("PPG") agreed to pay C&A a $500,000 rebate in exchange for a specified volume of new business.  Defendant Barnaba solicited a side letter from PPG that falsely stated that the rebate was based on past purchases.  Barnaba knew that the purpose of obtaining the side letter was to give C&A a pretext to improperly recognize the full amount of the $500,000 "rebate" in the second quarter of 2002.

b.   Defendants Stockman, Stepp, Cosgrove and Barnaba used the PPG side-letter as a template to improperly recognize income from "rebate" payments received from a number of other suppliers throughout 2002, including a $900,000 rebate paid by Brown Corporation and improperly recognized in the third quarter 2002, a $138,750 rebate paid by Jackson Plastics, Inc. and improperly recognized in the third quarter 2002, a $123,470 rebate paid by ATC, Inc. and improperly recognized in the fourth quarter 2002, a $67,000 rebate paid by Pine River Plastics, Inc. and improperly recognized in the fourth quarter 2002, and another $46,250 rebate paid by Jackson Plastics, Inc. and improperly recognized by C&A in the fourth quarter 2002.

c.   In the second quarter of 2003, C&A improperly recognized rebates paid from Brown Corporation (in the amount of $500,000), Dow (in the amount of $400,000), and Manufacturer's Products (in the amount of $150,000).  In addition, in the second quarter 2003, C&A improperly recognized a $1.2 million "rebate" from DuPont Textiles

36

& Interiors ("DuPont") even though the "rebate" was actually a loan from DuPont to C&A.

      d.     In the third quarter of 2003, C&A improperly recognized a $1.56 million "rebate" from Exxon Mobil Corp. ("Exxon"), even though the agreement with Exxon provided that the rebate was not due until the fourth quarter of 2003 and was contingent on purchases by C&A in that next quarter, and C&A was obligated to refund part of the "rebate" if the Company did not make additional purchases from Exxon in 2004. In the third quarter of 2003, C&A also improperly booked a $1 million "rebate" from Flambeau Corporation ("Flambeau") by promising future business to Flambeau.

      e.     In the fourth quarter of 2003, C&A improperly recognized a $250,000 "rebate" payment received from Reko International Group, Inc. ("Reko"), even though the payment was contingent on C&A providing Reko with a guarantee of future business.

      f.     In the second quarter of 2004, C&A improperly recognized a $1.5 million "rebate" payment received from GE Advanced Materials ("GE"), even though the rebate was negotiated such that it would be contingent on future purchases by C&A from G&E, and the deal between G&E and C&A never materialized and the rebate was never paid by G&E. Also in the second quarter of 2004, C&A's Fabric Division (headed by Defendant Jones) was directly involved in improperly recognizing "rebate" payments in the amounts of $200,000 (from Unifi), $150,000 (from M. Dohmen, U.S.A.), $150,000 (Allied Waste), and $49,000 (from Clariant Corp). In addition, during the second quarter of 2004, C&A improperly recognized a "rebate" payment from LVM in the amount of $430,000 even though the contract was not signed until February 2005.

g.      In the third quarter of 2004, C&A improperly recognized "rebate"

payments from Angell Manufacturing ($97,197), Exxon ($44,000), and Trim Stamping

($227,850).

h.      While C&A did not file a report with the SEC reflecting its results for the

fourth quarter of 2004, the Company released fraudulent earnings figures for this quarter

on March 17, 2005 (as described in more detail below). For this period, C&A improperly

recognized "rebate" payments in the amount of $40,000 (from Aerotex), $75,000 (from

Vichem) and $69,000 (from Meurdter).

*See* SEC Complaint¶28-29, 32-41.

86.     Defendants Stockman, Stepp, Cosgrove, Barnaba, Galante, Jones, and Gougherty

directly participated in these rebate schemes and knew, or were reckless in not knowing, that

C&A's recognition of the rebate payments was improper and resulted in the overstatement of

C&A's publicly-reported financial results.

87.     According to the SEC Complaint, Stockman was aware of, approved, and directed

the scheme to increase income by prematurely recognizing rebates on supply contracts . . .

Stockman knew, or was reckless in not knowing, that C&A was not entitled to the rebates . . .and

that C&A's immediate recognition of the rebates in income was improper." SEC Complaint¶42.

From at least the second quarter of 2003, Stockman himself met quarterly with employees of

C&A's Purchasing Department and emphasized the importance of negotiating supplier rebates.

For instance, in one meeting, held on May 27, 2003, Defendant Stockman spoke on a conference

call with employees of three C&A divisions. During that call, Defendant Stockman instructed

C&A employees to increase income for the second quarter of 2003 by "pulling ahead" rebates

that should have properly been recognized, if at all, in future quarters. In addition, during all

38

relevant times, Stockman identified the suppliers most likely to extend rebates, chose the amount

of rebates to be sought and the incentives to offer the suppliers in order to induce the "rebate"

payments. Further, Stockman personally directed that the rebates be used to artificially inflate

income in the quarter in which the rebate was negotiated, even though he knew or should have

known that such recognition was improper. *See* SEC Complaint¶31. Stockman also

participated personally in the Exxon rebate transaction (indeed, he personally negotiated the

rebate agreement, was regularly briefed on the status of the negations and knew the terms of the

final rebate agreement), as well as the Flambeau and Reko transactions, and approved of

recording the GE rebate on C&A's books. *Id.*¶36, 42. Defendant Stockman and Defendant

Stepp were also directly involved in C&A's fraudulent accounting for the DuPont transaction.

88.      Defendant Stepp was directly involved, along with Defendants Stockman and

Galante in the negotiation of the Reko rebate and also participated in internal meetings of C&A's

purchasing department employees at which the rebate scheme was discussed (along with

Defendants Stockman, Cosgrove and Barnaba). Further, Stepp was aware that the Flambeau

rebate was improper. *See* SEC Complaint¶42; Criminal Indictment¶38-40. In addition,

Defendant Stepp, along with Defendants Stockman and Cosgrove "received weekly written

reports from the C&A Purchasing Department which included information concerning rebate

transactions . . . these weekly updates often referred to the fact that future business was being

promised to suppliers in exchange for rebates being booked immediately." Criminal Indictment¶

39.

89.      Defendants Cosgrove and Barnaba were directly involved with the rebate scheme

from its inception through the end of the Class Period. Defendant Cosgrove obtained the side

letters and provided the language for those letters, while Defendant Barnaba ensured that C&A

employees obtained the side letters and that the letters provided an apparent basis for C&A's improper accounting. Defendant Cosgrove obtained the side letters and provided the language for those letters, while Defendant Barnaba ensured that C&A employees obtained the side letters and that the letters provided an apparent basis for C&A's improper accounting. *See* SEC Complaint¶42.

90.    Defendant Galante was directly involved in the Reko transaction and personally arranged for that "rebate" payment to be described in one letter and the guarantee of future business to be set forth in a separate letter. *Id.*

91.    Defendant Jones was involved in the "rebate" transactions that were conducted through the Fabrics Division and, according to the SEC Complaint, Jones "knew that employees in his division were carrying out Stockman's instructions and therefore knew, or was reckless in not knowing, that the rebates were accounted for improperly." SEC Complaint¶37.

92.    Defendant Gougherty instructed employees in C&A's International Plastics Division to improperly recognize the $430,000 "rebate" payment from LVM booked in the second quarter of 2004 (as described above). *See* SEC Complaint¶42.

93.    As stated in the SEC Complaint, Defendants "Stockman, Stepp, Jones, Cosgrove, Barnaba, and Gougherty knew, or were reckless in not knowing, that C&A's treatment of the rebates . . . was intended to falsely inflate C&A's reported current earnings." SEC Complaint¶ 42. The Criminal Indictment similarly confirms that Defendants "Stockman, Stepp, Cosgrove, and Barnaba schemed to inflate C&A's income by systematically recognizing 'rebates' from C&A's suppliers before those cost reductions had in fact been earned by C&A." Criminal Indictment¶34.

C.    **Improper Recognition of Rebates on Purchases of Capital Equipment**

94.    By the beginning of 2004, Defendants realized that the "rebate" scheme described above was coming to an end. The Company had obtained or tried to obtain volume purchase rebates from the vast majority of its suppliers, and had already leveraged most of its new business opportunities in order to obtain up-front lump some payments. As the costs of raw materials continued to rise, suppliers were becoming more and more reluctant to make lump sum payments to customers such as C&A. In the face of these circumstances, it became obvious to Defendants that C&A needed to find a new source of "rebates" in order to continue to misstate the Company's financial condition and continue to perpetrate their fraudulent scheme. Thus, Defendants Stockman, Stepp, Cosgrove, Barnaba and Gougherty expanded the rebate scheme to capital equipment being purchased by C&A. *See* Criminal Indictment¶43-45; SEC Complaint¶ 43-48.

95.    As Defendants knew, under GAAP, any discounts on the purchase of capital equipment are reflected in the cost basis of the asset and would have no impact whatsoever on EBITDA. Defendants were also aware that C&A had historically accounted for any discounts it received on capital equipment by reflecting those discounts in the cost basis of the equipment. By 2004, however, Defendants Stockman, Stepp, Cosgrove, Barnaba and Gougherty decided to inflate C&A's reported EBITDA and operating income by negotiating discounts on C&A's purchases of capital equipment and falsely documenting those discounts as "rebates" for past purchases of non-capital items.

96.    These Defendants convinced C&A's suppliers to provide documentation falsely showing that price discounts C&A negotiated on capital equipment were "rebates" received for past purchases of non-capital goods and services. C&A would then improperly recognize the rebates in income. Defendants convinced the Company's suppliers to agree to pay—and falsely

41

document—these "rebates" by having C&A offer to pay a higher price for the equipment than originally requested by the supplier, in return for a "rebate" for the difference (or a part of the difference) and false documentation attributing the rebate to non-capital items (such as the purchase of spare parts), which would appear to justify booking the rebate as income.

97.    According to the Criminal Indictment and the SEC Complaint, Defendants engaged in the following improper transactions relating to recognition of income on discounts negotiated for purchases of capital equipment:

    a.    In February and April 2004, C&A negotiated a $1 million "rebate" in the cost of new machines the Company purchased through its Hermosillo plant.  These machines were purchased from Demag Plastics Group ("Demag").  Defendant Stockman instructed Defendant Cosgrove (through Defendant Barnaba) to ensure that the rebate was falsely documented by requiring Demag to submit paperwork saying that the rebate was for the purchase of spare parts and other services.  C&A improperly recognized the $1 million in "income" from this transaction in the second and third quarters of 2004.  *See* SEC Complaint¶44; Criminal Indictment¶44.

    b.    Later in 2004, C&A obtained a $1 million discount on machinery purchased from a company called Cincinnati Milacron.  Stockman against instructed Defendants Cosgrove and Barnaba to prepare paperwork that could be used to falsely characterize the "rebate," this time as "implementation of training services technical support and continuous improvements."  This $1 million was recognized in the third quarter of 2004, with at least $600,000 being recognized by Defendant Gougherty.  *See* SEC Complaint¶45; Criminal Indictment¶44.

c.      In the fourth quarter of 2004, at the direction of Defendant Gougherty,

C&A engaged in additional transactions similar to the ones described above, including a

$224,000 transaction with Krauss Maffei, another $92,000 transaction from Demag, a

$100,000 transaction from RPT and a $38,000 transaction from Conair. *See* SEC

Complaint¶47.

98.      Each of these transactions were reviewed and approved by Defendants Stockman,

Stepp and Cosgrove, each of whom knew or should have known that they were fraudulent, and

lacked any legitimate business purpose. Criminal Indictment¶44. Indeed, Stockman directed

and participated in this scheme with full knowledge that it would improperly inflate C&A's

income. Cosgrove instructed C&A's purchasing department employees to obtain the false

documents relating to the rebates, and Defendant Barnaba directed employees in implementing

the false transactions. Defendant Gougherty instructed employees under his supervision and

control to recognize the Cincinnait Milacron rebate as income and to solicit false documentation

for the Krauss Maffei rebate. *See* Sec Complaint¶48.

### D.      Impact on Financial Statements

99.      By engaging in improper round-trip transactions and improperly accelerating the

recognition of rebates in violation of GAAP, Defendants artificially increased the Company's

operating results and EBITDA. As stated in the Criminal Indictment, the fraudulent scheme set

forth above "made C&A's reported revenue and EBITDA materially misleading in reporting

periods between the first quarter of 2002 and the first quarter of 2005." Criminal Indictment

¶46. As stated in the SEC Complaint, "[a]s a result of the round-trip transactions with McCallum

and the fraudulent rebate scheme, C&A materially overstated its income, or reduced its losses, in

its quarterly reports (Form 10-Q) and annual reports (Form 10-K) for each reporting period from

43

the fourth quarter of 2001 through the third quarter of 2004." SEC Complaint¶51. The impact
of these misstatements on C&A's operating income are set forth in the following chart:

| Period | As stated operating income ($ millions) | Operating income restated | Percentage change |
|--------|-----------------------------------------|---------------------------|-------------------|
| 4Q01 | ($13.5) | ($16.3) | 17% |
| 1Q02 | $54.4 | $49.4 | 10% |
| 2Q02 | $81.5 | $79.2 | 3% |
| 3Q02 | ($4.3) | ($7.6) | 43% |
| 4Q02 | $36.1 | $33.9 | 6% |
| 1Q03 | $19.2 | $17.5 | 10% |
| 2Q03 | $44.1 | $41.1 | 7% |
| 3Q03 | $8.3 | $4.1 | 102% |
| 4Q03 | $30.4 | $25.7 | 18% |
| 1Q04 | $29.9 | $28.8 | 4% |
| 2Q04 | $26.1 | $20.7 | 26% |
| 3Q04 | $9.5 | $1.6 | 494% |

100.    As discussed below, C&A has admitted that it improperly accounted for tens of
millions of dollars worth of vendor rebates in 2004 and possibly 2003, and that it will be forced
to restate its financial statements for certain of those periods as a result.

101.    In addition, as described in more detail below, while C&A did not file a 10-Q for
the fourth quarter of 2004 or the first quarter 2005, Defendants issued numerous materially false
and misleading statements regarding the Company's financial performance for those periods.

## III.    DEFENDANTS ADDITIONAL MISREPRESENTANTATIONS MADE IN CONNECTION WITH MARKETING C&A NOTES TO MACKAY SHIELDS

102.    In addition to the fraudulent scheme set forth above, Defendants made numerous additional material misstatements in the course of marketing the C&A Notes to MacKay Shields and for the purpose of inducing MacKay Shields to purchase the C&A Notes on behalf of Plaintiff and the other members of the Class. These include (1) misrepresentations and distortions of C&A's EBITDA; (2) misrepresentations concerning C&A's business and operations; (3) misrepresentations concerning C&A's carrying value for goodwill; and (4) misrepresentations concerning C&A's internal controls over financial reporting.

### A.    Defendants' Additional Misrepresentations of C&A's EBITDA

103.    EBITDA is an important consideration for debt investors because it measures a company's ability to generate sufficient operating cash to service and ultimately repay its debt – a fact which Defendants readily acknowledged. Indeed, in C&A's Form 10-Q for 2Q04 (the "2Q04 10-Q"), which was filed with the SEC on or about August 3, 2004, C&A emphasized the importance of EBITDA, calling it a "Key Indicator[s] of Performance." As the 2Q04 10-Q stated:

> [M]anagement . . . considers EBITDA to be a useful proxy for measuring the cash generated by our business and it is commonly used in the industry to analyze operating performance, liquidity and entity valuation . . . Management believes EBITDA to be a good measure of operating performance because cash generation is necessary for the Company to achieve many of the critical success factors outlined above, including investment in cost reduction activities, reducing leverage and improving liquidity.

104.    Accordingly, in the months leading up to the August 2004 Private Placement, Defendants repeatedly emphasized C&A's purportedly improving financial results and EBITDA in public filings, press releases, conference calls, and marketing materials provided to MacKay Shields and other investors.

45

105.    For example, on August 2, 2004, in a press release carried over *PR Newswire*,

Defendants reported C&A's earnings for the second quarter of 2004 and the six months ended

June 30, 2004 (the "August 2, 2004 Press Release").    That same day, the Company filed a Form

8-K with the SEC, signed by Defendant Stepp, which attached the August 2, 2004 Press Release.

On information and belief, all of the Defendants reviewed, approved and authorized the press

release before it was issued to the public.

106.    The August 2, 2004 Press Release reported "record second quarter 2004 net sales

of $1.036 billion" and highlighted the Company's fourth consecutive quarter of improved

EBITDA performance.    Defendant Stockman was quoted in the August 2, 2004 Press Release as

follows:

> [f]or the fourth consecutive quarter [C&A's] EBITDA performance,
> excluding restructuring and impairment charges was up significantly from
> the prior year on a comparable basis.

107.    That same day, C&A held a conference call for institutional investors, which

MacKay Shields participated in.    During the conference call, Defendant Stockman again

emphasized C&A's EBITDA and represented that C&A was succeeding in spite of difficult

market factors:

> I am pleased to report that we have now had our fourth straight quarter of
> very strong EBITDA gains in both dollars and margins. . . [W]e came in at
> [$]100.4 million before restructuring and impairment charges, in line with
> our expectations. This represents a 20 percent increase over the prior year,
> so we are making demonstrable progress. This also comes in light of some
> of the headwinds that we've had to push against, such as upward pressure on
> commodity costs and downward pressure on our selling prices. But since
> August 2003, when we made a change in our top management, we have
> accelerated the pace and the intensity of our consolidation cost-cutting and
> platform growth strategy, and have been able to overcome these adverse
> forces.

108.    Shortly after the Company announced its purportedly strong second quarter

results, Defendant Stockman and other representatives of C&A contacted MacKay Shields—an

entity which Defendants knew was an investment adviser—and asked to set up a meeting to

market C&A Notes to MacKay Shields, for a potential investment on behalf of its clients.

MacKay Shields agreed to the meeting.

109.    Before meeting with C&A, MacKay Shields reviewed the Company's most recent

prior filings with the SEC, including the Company's 2003 Form 10-K and its 2Q04 10-Q.

Note 2 to the Condensed Consolidated Financial Statements in the 2Q04 10-Q included the

following representation from C&A management:

> The consolidated financial statements include the accounts of the Company
> and its consolidated subsidiaries and in the opinion of management, contain
> all adjustments necessary for a fair presentation of financial position and
> results of operations.

Further, pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, defendants Stockman and

Stepp certified that:

> the Report on Form 10-Q for the period ended June 30, 2004 of Collins &
> Aikman Corporation (the "Company") fully complies with the requirements
> of Section 13(a) or a Section 15(d) of the Securities Exchange Act of 1934
> and that the information contained in such Report fairly presents, in all
> material respects, the financial condition and results of operations of the
> Company.

110.    On or about August 11, 2004, MacKay Shields met with Defendants Stockman

and Stepp.  At this meeting, Defendants Stockman and Stepp represented that they had authority

to speak on behalf of Heartland, C&A and the other Defendants, and provided MacKay Shields

with the August 2004 Presentation and the PPM.  The PPM included C&A's materially

misleading financial statements for the fourth quarter 2001 through the second quarter of 2004.

The PPM also included a section entitled "Selected Historical Financial Data", which included

the Company's financial results for the fiscal years 2001, 2002, 2003 and the three months ended

March 31, 2004.  The PPM also attached C&A's consolidated financial statements for the years

ended 2003 and 2002, and expressly incorporated each of C&A's previous filings with the SEC,

47

including the Company's Forms 10-Q for the fourth quarter 2001 through the second quarter of

2004, and its Form 10-K's for the fiscal years ended 2001, 2002, and 2003. MacKay Shields

reviewed and relied on the information in the PPM in making its decision to purchase C&A

Notes on behalf of Plaintiff and the Class. Both the SEC Complaint and the Criminal Indictment

state that the offering materials by which Defendants marketed C&A Notes in August 2004 were

"false and fraudulent" and "materially false or misleading." *See* Criminal Indictment¶48; SEC

Complaint¶49.

      111.    Like the PPM, the August 2004 Presentation—which was created for the sole

purpose of marketing C&A Notes to debt investors such as MacKay Shields—was designed to

create the impression that C&A was a healthy company with strong financials and good future

prospects. For example, the August 2004 Presentation highlighted C&A's "2003 North

American Interior Revenue", noting that it was more than double its next closest competitor. It

also repeatedly focused on the Company's EBITDA for the second quarter of 2004. Among

other things, the August 2004 Presentation stated that C&A's 2Q04 EBITDA, adjusted to

exclude so-called non-operating restructuring and impairment charges, was $100.4 million,

which (i) represented a "20% increase over prior year Q2"; (ii) was the "4th consecutive quarter

of EBITDA improvement"; (iii) the "Best margin in last 8 quarters"; and (iv) "LTM EBITDA

performance has rebounded significantly since the management change in August 2003,

improving 15% from the Q2 2003 trough." Further, in a section entitled "2004 Guidance

Update", the August 2004 Presentation confirmed that the Company was on track to achieve its

EBITDA guidance for 2004 stating, among other things, "Our March guidance projected 2004

EBITDA before restructuring and impairment at levels between $355-$370 million . . . [d]uring

the second half we expect comparable results and to achieve the lower end of our range for the year."

112.    The August 2004 Presentation also favorably compared C&A's reported EBITDA for the first and second quarters of 2003 against those same quarters for 2004.  It stated that EBITDA for the first quarter of 2003 was $70.7, compared to $79.4 for the first quarter of 2004, a 12% increase.  Similarly, the presentation stated that EBITDA for the second quarter of 2003 was $70.7, compared to $79.4 for the second quarter of 2004, for a 20% gain.

113.    Based on these EBITDA numbers, the August 2004 presentation calculated the Company's "net leverage" (calculated by dividing C&A's last twelve months [LTM] EBITDA by its net outstanding debt) and its "pro forma credit statistics" (calculated based on C&A's reported $333.6 LTM [Last Twelve Months] EBITDA).  The presentation stated that the Company had a net leverage ratio of 4.3x for 2Q04, and that this net leverage ratio was an improvement from the 4.5x net leverage ratio for 1Q04.  According to the August 2004 Presentation, C&A's "pro forma credit statistics" were as follows:

| | |
|---|---|
| Senior Secured Debt/ Adjusted EBITDA | 1.7x |
| Senior Debt/Adjusted EBITDA | 3.2x |
| Total Debt/Adjusted EBITDA | 4.4x |
| Adjusted EBITDA/Pr Forma Cash Interest | 2.4x |
| (Adjusted EBITDA-Capex)/Pro Forma Cash Interest | 1.2x |

114.    Defendants' statements regarding C&A's EBITDA were materially false and misleading as a result of the fraudulent scheme described above.  Defendants' statements

regarding C&A's EBITDA were also materially false and misleading for the following additional reasons.

115.    *First*, Defendants were improperly classifying tens of millions of dollars of actual operating costs as "restructuring" or "impairment" charges. When reporting EBITDA, Defendants repeatedly emphasized EBITDA <u>before</u> any extraordinary or unusual charges (such as restructuring or impairment charges) were incurred. Defendants did so because they understood that investors would largely ignore these restructuring and impairment charges when making their investment decisions, because investors considered them to be "non-operating" or "nonrecurring" charges which did not impact the Company's core operations or future cash flow. Debt investors are not concerned with "non-operating" charges because they do not have an impact on EBITDA in subsequent periods and thus have little if any impact on the Company's ability to make its interest payments.

116.    Unbeknownst to MacKay Shields or Plaintiff, however, Defendants manipulated EBITDA before restructuring and impairment charges by improperly classifying ordinary operating costs as "restructuring" and "impairment" charges. These manipulations were confirmed by CI 2, who said that he and his staff were always under pressure to categorize ordinary expenses as capital expenditures or non-operating expenses to avoid an immediate impact to EBITDA. In fact, CI 2 said that C&A frequently tried to interpret routine operating expenses as "restructuring expenses," and that Stockman was always creative in the way he transformed expenses into capital outlays.

117.    CI 2 also said it was the Company's "standard mode of business" to evaluate every expenditure in an attempt to classify it as either capital or non-operating, and that during every quarter from at least mid-2003 through the end of 2004, Stockman encouraged C&A

facilities to classify operating expenses as non-operating, in a Company-wide effort to increase

EBITDA. CI 2 even noted that when the President of his division, Reed White, retired in the

third quarter of 2004, C&A recorded White's salary through the end of 2004, which is a classic

example of a normal operating expense, as a restructuring expense.

118.    Had MacKay Shields known that the Company's EBITDA was materially

overstated because Defendants were classifying routine operating expenses as "restructuring"

and "impairment" charges, MacKay Shields would have known that the Company's financial

condition was far worse than represented and, therefore, would not have purchased the C&A

Notes on behalf of Plaintiff and the other members of the Class.

119.    *Second*, on information and belief, the Company's reported revenues and

EBITDA were materially misrepresented because C&A artificially inflated its reported sales and

receivables. As described in the Criminal Indictment (and discussed in more detail below), C&A

"pre-billed" millions of dollars of receivables, and fabricated the documentation needed to

support those receivables. On or about June 22, 2005, General Electric Capital Corporation

("*GECC*") *filed a motion in the United States Bankruptcy Court for the Eastern District of*

Michigan seeking relief from the automatic stay imposed by the Bankruptcy Code. According to

that motion, at the time of C&A's bankruptcy filing C&A owed GECC at least $78 million and

GECC held a security interest in C&A's accounts receivables. The parties' agreements required

C&A to deposit any collections in a lockbox for the benefit of GECC. However, C&A was

instead converting such collections for its own use, rather than providing them to GECC. As a

result, GECC was asking the Court to allow it to seize records maintained by C&A regarding its

receivables and collections, and to receive the collections directly.

120.    According to exhibits filed in support of that motion, C&A was also pre-billing receivables, and was repeatedly unable to provide information GECC had requested to verify that the Company's receivables were valid. Specifically, on June 3, 2005, GECC sent a letter to C&A stating that "this morning, we were advised by KZC Services, LLC, the financial consultants to C&A Products, that a potentially material portion of the Receivables owned by [C&A] may constitute pre-billed tooling Receivables which had been incorrectly identified as Eligible Receivables in various reports" provided to GECC. The letter noted that GECC was "gravely concerned" about this revelation and "expected to receive a comprehensive accounting of the nature and amount" of the Company's receivables. The letter further stated that C&A and its financial consultant "will be working over this weekend [i.e., June 4-5, 2005] to obtain detailed information concerning these Receivables," and would report their findings to GECC on Monday, June 6.

121.    Significantly, C&A was unable to provide the information requested by GECC. On June 13, 2005, GECC sent another letter to C&A, reiterating its concerns and stating that while "we have received copies of invoices and purchase orders for the 50 largest tooling Receivables as of April 30, 2005, we have yet to receive a full accounting of current balances nor, despite our repeated requests, have we received copies of source documentation such as customer acceptances, written consents to billing, or evidence that tooling is in volume production." As a result, GECC demanded to exercise its right under its agreement with C&A to conduct an "onsite audit" on June 14 to verify C&A's receivables, which would include "reconciliation of account receivable balances, recent customer remittances and recent payments from the [customers], as well as review of the purchase orders, invoices and other documentation relating to the Receivables." Ultimately, GECC did not receive or obtain this information.

According to GECC's motion, which was filed on June 22, 2005, as of that date "GECC had been provided virtually no information by C&A."

122.    The information relating to C&A's accounts receivables that GECC requested are the fundamental records supporting outstanding accounts receivable which companies typically and routinely maintain, and such information should have been readily available from the records of C&A, specifically, within C&A's accounts receivables department. Indeed, C&A's contract with GECC specifically required C&A to "keep and maintain all documents, books, records and other information reasonably necessary or advisable for the collection of all Receivables (including, without limitation, records adequate to permit the daily identification of each new Receivable and all Collections of and adjustments to each existing Receivable)", and as set forth above also allowed GECC to review such documents upon request. Had this information existed, and C&A's accounts receivables been in order, C&A would have had no reason not to provide it to GECC, and in fact would have readily provided it to GECC.

123.    C&A's fraudulent manipulations of its sales and receivables and the falsification of the Company's documentation of its outstanding receivables is described in more detail below.

124.    Defendants' misrepresentations concerning C&A's EBITDA were material. While C&A's reported financial results and EBITDA showed a company with ample liquidity and strong future prospects, C&A's true operating results would have depicted a company on the brink of financial ruin. Had MacKay Shields known the truth about C&A's reported EBITDA, MacKay Shields would not have purchased C&A Notes on behalf of Plaintiff and the other members of the Class.

## B. Defendants' Misrepresentations Concerning C&A's Business and Operations

125.    In addition to misstating the Company's financial results, Defendants also made a

series of material false statements regarding C&A's business.  In the months leading up to

C&A's private placement in August 2004, Defendants consistently touted C&A's supposedly

"world-class" business facilities and operations, including its purported "new business wins,"

"unique and unusually attractive competitive position" and "superior business model."  These

statements were designed to convince investors that C&A was a leader in its industry that was

overcoming difficult market conditions, and was a healthy company with bright future prospects.

126.    For example, in the August 2, 2004 Press Release, Defendants highlighted the

supposedly superior quality of C&A's business, and touted the Company's "high-quality

products," which it described as "the most effective in the industry."  The press release also

touted C&A's "New Business Wins," stating that "during the second quarter of 2004, Collins &

Aikman continued to achieve good progress on increasing new business by adding $450 million

of annual newly booked business."  Defendants expanded on these statements on the August 2,

2004 conference call, where Defendant Stockman stated, among other things, that "we are

continuing to be awarded new business at a very healthy pace that will sustain our growth

trajectory that we have talked to you about previously."

127.    Defendant Stockman also emphasized the importance to C&A of being positioned

"green" by the Company's major customers (*i.e.*, in the view of its customers, C&A was able to

honor its contracts by consistently delivering conforming parts on a timely basis), stating "Now

in order to take advantage of these opportunities—the long-term awards in a regular way and

transfer or capture of business in the short run—we need to be positioned green, to quote, in the

eyes of our major customers."

128.    The August 2004 Presentation and the PPM—the documents provided to MacKay Shields in connection with the August 11, 2004 meeting—likewise made unduly positive and misleading statements about C&A's business.  For example, among other things, the August 2004 Presentation stated that "C&A occupies a unique and unusually attractive competitive position," and stressed C&A's high-quality services and "competitive advantages," including an "extensive production footprint that can efficiently service nearly every OEM assembly plant." According to the August 2004 Presentation, C&A had recently achieved "Seven New World-Class Facility Launches" and had a "World class 'lean' manufacturing culture."

129.    The August 2004 Presentation also specifically highlighted C&A's new facility located in Hermosillo, Mexico.  C&A had designed and constructed the Hermosillo facility to build the interiors for the Ford Fusion, which was the largest and most important project in C&A's history.  The presentation called the Hermosillo project a "World Class Facility" with state-of-the-art equipment, and further noted that the facility was a "Strong Validation of C&A's Business Model."  These statements, as well as the others set forth herein, were designed to convince MacKay Shields that C&A had a bright future and a strong relationship with its customers.

130.    Defendants' statements regarding C&A's business and operations were materially false and misleading for several reasons.

131.    *First*, unbeknownst to MacKay Shields, C&A was not properly staffing and tooling its projects.  These problems were causing C&A's customers to cancel contracts and withhold payments, which, in turn, had a devastating effect on the Company's available cash and credit, two factors that were critical to MacKay Shields' determination to purchase the C&A Notes on behalf of Plaintiff and the other members of the Class.

55

# EXHIBIT D



COLLINS & AIKMAN





*2000 Annual Report*

# To our shareholders:

Thomas E. Evans



## Financial Performance

Fiscal 2000 was a challenging year for Collins & Aikman. While the first half of the year started out at a record pace of production, by the fourth quarter, conditions significantly worsened, as the major automotive manufacturers cut production 13 percent in November and 23 percent in December. In addition to these rapidly changing industry conditions, Collins & Aikman was negatively impacted by one-time costs and asset write-offs. Despite our record sales of over $1.9 billion, operating income decreased to $108 million. In terms of our financial leverage, the Company maintained its focus on cash generation and debt reduction with a $38 million early retirement of the JPS bonds - more than 40% of the total outstanding balance. In addition, free cash flow for the year of $173 million remained quite strong, outpacing 1999's level of $168 million.

## Major Achievements

The Company continued to capitalize on its leading positions across its broad product portfolio, winning new business throughout 2000. In North America, some of our new bodycloth launches included the Pontiac Grand Am, Ford Explorer and Dodge Durango. We also continued to win new business due to our industry expertise as a leader in convertible roof systems. Recognized and honored for our patented Advanced Hydraulic Actuation (AHA™) systems, Collins & Aikman began production of the convertible roof system for the new Chrysler Sebring convertible, a vehicle we have supplied since it was first launched in 1995. In terms of acoustics, we continued to broaden our NVH (noise, vibration and harshness) and acoustic predictive modeling capabilities, as demonstrated by our acquisition of Comet® Acoustics Software, a computer-aided engineering solution for reducing low frequency noise in vehicle interiors.

In Europe, several key management changes coupled with proactive cost-cutting actions are paving the way for a more efficient operation. With production of approximately 18 million units in 2000, Europe represents one of Collins & Aikman's greatest opportunities for growth. In terms of new business, we capitalized on our successful pillar trim package currently supplied for the Volvo S80 and C70, and were awarded the interior trim package for Volvo's newly-launched S60. In acoustics, we continued to gain recognition as a leading integrator of NVH solutions, with Ford Motor Company selecting Collins & Aikman as the NVH integrator for its new European Transit van. Business wins such as these continue to demonstrate the global vote of customer confidence we continue to receive in our quality products and technologies.

## A Look Ahead

2000 was an extremely challenging year, but it was also a year of exciting and positive changes, all achieved by the hard work and dedication of nearly 15,000 Collins & Aikman employees worldwide. Together, we've made significant progress in improving and executing a business strategy that I believe positions our Company for a bright future.

A testament to this vision for growth is the recently announced decision by Heartland Industrial Partners, L.P. (Heartland) to purchase from our former controlling shareholders, Blackstone Capital Partners, L.P. and Wasserstein Perella Partners L.P., 27 million shares of Collins & Aikman stock. Even more importantly, Heartland will also purchase 25 million shares of stock directly from the Company, providing us with a significant capital infusion. We're extremely excited about this transaction, as in the near term, this investment affords us the opportunity to pay down debt, and in the longer term, provides the financial support for funding our growth initiatives.

While we currently face challenging industry conditions, I'm confident that our strong market positions, unique business model and broad product portfolio will continue to set us apart from the competition and make Collins & Aikman a premier, value-added automotive supplier of integrated acoustic and surface design products.

Thomas E. Evans
Chairman and Chief Executive Officer
February 14, 2001



# Global Presence:
## North America



### Manufacturing Locations

| USA | Canada | Corporate, Sales, Design & |
|-----|--------|----------------------------|
| Michigan | Ontario | Technical Centers |
| Adrian* | Gananoque | Newport Beach, CA |
| Manchester | Ingersoll | Adrian, MI |
| Marshall | Kitchener* | Bloomfield Hills, MI |
| Plymouth* | Mississauga | Plymouth, MI* |
| St. Clair | Scarborough | Troy, MI |
| St. Joseph | Stratford | New York, NY |
| Williamston* | | Charlotte, NC |
| | Quebec | Farmville, NC |
| North Carolina | Farnham | Old Fort, NC |
| Albemarle | Lacolle | Roxboro, NC |
| Farmville* | | Canton, OH |
| Old Fort* | Mexico | Scarborough, ON |
| Roxboro* | Guadalupe | |
| Troy | Puebla | |
| | Querétaro | |
| Ohio | Toluca | |
| Canton | | |
| Holmesville | | |
| Ravenna | | |
| Zanesville | | |
| | | |
| South Carolina | | |
| Greenville | | |
| | | |
| Tennessee | | |
| Springfield | | |




## Europe & East Asia

### Manufacturing Locations

| Austria | Sweden | Corporate, Sales, Design & |
|---------|--------|----------------------------|
| Kapfenberg | Åmotfors | Technical Centers |
| | Högsäter | Cologne, Germany |
| Belgium | Saeve | Bezons, France |
| Gent | Skara | Heidelberg, Germany |
| | | Munich, Germany |
| Germany | United Kingdom | Turin, Italy |
| Heidelberg | Alcester | Tokyo, Japan |
| Lambrecht | Carlisle | Skara, Sweden |
| | Newcastle-under-Lyme | Newcastle-under-Lyme, UK |
| Netherlands | Redditch* | Redditch, UK |
| Deurne | St. Neots | St. Neots, UK |
| | Sunderland | Walkden, UK |
| Spain | Walkden | |
| Vitoria | Warwick | |

* Indicates multiple facilities



## Safe Harbor Statement

This Annual Report contains statements which, to the extent are not historical fact, constitute forward-looking statements within the meaning of Section 27A of the Securities Act of 1933 and Section 21E of the Securities Exchange Act of 1934 (the "Safe Harbor Acts"). All forward-looking statements involve risks and uncertainties. The forward-looking statements in this Annual Report are intended to be subject to the safe harbor protection provided by the Safe Harbor Acts.

Risks and uncertainties that could cause actual results to vary materially from those anticipated in the forward-looking statements included in this Annual Report, include but are not limited to, general economic conditions in the markets in which Collins & Aikman operates, fluctuations in the production of vehicles for which the Company is a supplier, changes in the popularity of particular car models or particular interior trim packages, the loss of programs on particular car models, labor disputes involving the Company or its significant customers, changes in consumer preferences, dependence on significant automotive customers, the level of competition in the automotive supply industry, pricing pressure from automotive customers, the substantial leverage of the Company and its subsidiaries, limitations imposed by the Company's debt facilities, charges made in connection with the integration of operations acquired by the Company, the implementation of the reorganization plan, risks associated with conducting business in foreign countries and other risks detailed from time-to-time in the Company's Securities and Exchange Commission filings.

## Board of Directors:

**Robert C. Clark**
Dean
Harvard Law School

**Thomas E. Evans**
Chairman and Chief Executive Officer
Collins & Aikman Corporation

**Cynthia L. Hess**
Senior Managing Director
Heartland Industrial Partners, L.P.

**Timothy D. Leuliette**
Senior Managing Director
Heartland Industrial Partners, L.P.

**W. Gerald McConnell**
Senior Managing Director
Heartland Industrial Partners, L.P.

**Stephen V. O'Connell**
Senior Managing Director
Wasserstein Perella & Co. Inc.

**Warren B. Rudman**
Partner
Paul, Weiss, Rifkind, Wharton & Garrison

**Neil P. Simpkins**
Senior Managing Director
The Blackstone Group L.P.

**J. Michael Stepp**
Senior Managing Director
Heartland Industrial Partners, L.P.

**Daniel P. Tredwell**
Senior Managing Director
Heartland Industrial Partners, L.P.

**David A. Stockman**
Senior Managing Director
Heartland Industrial Partners, L.P.

**Samuel Valenti**
Chief Executive Officer
Valenti Capital, L.L.C.

## Senior Management Team

**Brian J. Batey**
President
European Automotive Interior Systems (EAIS)

**Thomas E. Evans**
Chairman and Chief Executive Officer

**Stephen N. Jeske**
Senior Vice President
Sales and Marketing

**Ronald T. Lindsay**
Senior Vice President
General Counsel and Corporate Secretary

**Jonathan L. Peisner**
Senior Vice President
Corporate Communications,
Investor Relations and Business Planning

**Joseph P. Robich**
Senior Vice President
Procurement and Supply Chain Management

**Rajesh K. Shah**
Executive Vice President and
Chief Financial Officer

**Greg L. Tinnell**
Senior Vice President
Human Resources

**Graham Tompson**
Senior Vice President
Global Product Development Division

**Reed A. White**
President
Convertible Systems and
Mexican Operations

# Strategically Positioned for Growth

## Unique Business Model

- ❖ Strong North American & European market penetration
- ❖ Integration of innovative NVH technologies with surface design and styling expertise
- ❖ Market-leading positions and extensive product portfolio
- ❖ Individual component, modular and complete system capabilities
- ❖ Positioning as a "Mega Tier 2" supplier to serve both OEM and Tier 1 global integrators
- ❖ Premier acoustic testing and development capabilities including the largest hemi-anechoic testing chamber of any Tier 1 supplier in North America
- ❖ Expanding global presence through targeted alliances and acquisitions



Collins & Aikman is extremely honored by the recognition and customer awards we have received for outstanding service, quality, value, and innovation. Dedication to serve our customers — understanding their needs and delivering on our promises — will remain a central focus for our organizations as we continue to deliver innovative solutions to the automotive marketplace.

We have a dedicated Global Product Development Division (GPDD) and Advanced Sales & Marketing Group (ASG) are enhancing customer service through their day-to-day interactions with our customers. ASG:

- Communicates customer feedback directly to our GPDD to facilitate the development of new technologies in response to our customers' needs.

- Proactively introduces Collins & Aikman's innovative products to the automotive marketplace.

       

       

    

## 2000 Highlights

- **Achieved all-time record sales of $1.9 billion**
  Focused on top line growth

- **Acquired COMET® Acoustic Software, a leading acoustic predictive software**
  Enhancing C&A's leading "bumper-to-bumper" NVH capabilities

- **Early-retired $38 million of JPS bonds**
  Reducing financial leverage

- **Received customer quality, service and product awards from DaimlerChrysler, SAE, Toyota, Saturn and Kia**
  Acknowledging Company's strong commitment to outstanding customer service, quality, value delivery and innovation

- **Established Global Product Development Division (GPDD)**
  Aligning organization for innovation and technology-driven growth

- **Formed Advanced Sales & Marketing Group (ASG)**
  Aggressively targeting future vehicle program opportunities



## Integrated Acoustic & Surface Solutions

In addition to superior sound performance, Collins & Aikman's integrated acoustic technologies provide custom engineered and stylized products, such as the interior pillar trim the Company supplies for the Volvo S80 and the innovative thermoplastic flooring, Tuflor™, found in Ford's Explorer Sport Trac. In addition to its acoustic products and services, Collins & Aikman is continuing to expand its design expertise to stylistically impact nearly every surface of a vehicle's interior. From automotive seat fabric on the Dodge Stratus, and the non-woven flooring system on the Mazda Tribute, to the stylized trim on the GM Silverado, Collins & Aikman is helping its customers create harmonized interiors for nearly 90% of all vehicles manufactured in North America.

## Packaging Solutions

Collins & Aikman's extensive product offering spans the automotive interior. From airflow vents, luggage trim and floor systems in the Honda Civic, to the intricately engineered instrument panel, door panel and center console systems for the Cadillac DeVille, Collins & Aikman's engineering services offer automotive manufacturers unique packaging design solutions. Recognized for our exclusive design of the Slimline retractable cupholder found in the Saab 9-5, Collins & Aikman is continuing to capitalize on its engineering expertise, winning new Slimline business in Europe.



Product Portfolio

Interior & Acoustic Products
Molded Floor Carpets
Accessory Floormats
Luggage Compartment Trim
Package Trays
Console Components & Systems
Instrument Panel Components & Systems
Airflow Systems
Door Panel Systems

Cupholders
Pillar & Garnish Trim
Headliners
Dash Insulators
Interior & Engine Side Insulators
Hood Liners
Melt Sheets & Damping Materials

Automotive Fabrics
Seat Bodycloth
Interior Fabric
Headliner Fabric

Convertible Systems
Convertible Roof Systems
Actuation Systems
Tonneau Covers





**COLLINS & AIKMAN**

Collins & Aikman Corporation

| Global Headquarters | European Headquarters |
| --- | --- |
| 250 Stephenson Highway | Rue de la Fusee |
| Troy, Michigan 48083 | B-1130 Brussels, Belgium |
| (248) 824-2500 | 011-32-2-716-5000 |

Investor Contact
Sandra A. Hamm
(248) 824-1363
Fax (248) 824-1512

www.collinsaikman.com

# EXHIBIT E

# UNITED STATES SECURITIES AND EXCHANGE COMMISSION
## WASHINGTON, D.C. 20549

# Form 10-K

(Mark One)

☑ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**
**For the fiscal year ended December 31, 2003**

or

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**Commission file number 1-10218**

# Collins & Aikman Corporation
*(Exact name of registrant as specified in its charter)*

**Delaware**
*(State or other jurisdiction of incorporation or organization)*

**13-3489233**
*(I.R.S. Employer Identification Number)*

**250 Stephenson Highway
Troy, Michigan 48083**
*(Address of principal executive offices, including zip code)*

**Registrant's telephone number, including area code:
(248) 824-2500**

**Securities registered pursuant to Section 12(b) of the Act:**

| Title of each class | Name of each exchange on which registered |
|---|---|
| Common Stock, $.01 par value | New York Stock Exchange |

**Securities registered pursuant to Section 12(g) of the Act:
None**

Indicate by check mark whether the Registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the Registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☐  No ☑

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of Registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☑

Indicate by check mark whether the registrant is an accelerated filer (as defined in Exchange Act Rule 12b-2). Yes ☑  No ☐.

The aggregate market value of voting stock held by non-affiliates of the Registrant was $168,794,241 as of March 1, 2004.

As of February 26, 2004, the number of outstanding shares of the Registrant's common stock, $.01 par value, was 83,630,087 shares.

## WEBSITE ACCESS TO COMPANY'S REPORTS:

Collins & Aikman's internet website address is www.collinsaikman.com. The Company's annual report on Form 10-K, quarterly reports on Form 10-Q, current reports on Form 8-K and amendment to those reports filed or furnished pursuant to Section 13(a) or 15(d) of the Exchange Act are available free of charge through the Company's website and as soon as reasonably practicable after the reports are electronically filed with, or furnished to the Securities and Exchange Commission.

The Company's Code of Business Conduct is available free of charge through the Company's internet website. Any amendments to the Company's Code of Business Conduct and any waivers of the Code of Business Conduct involving executive officers or directors of the Company will also be made available on the Company's internet website. Printed copies of the Company's Code of Business Conduct are also available free of charge to any shareholder upon request to: Corporate Secretary, Collins & Aikman Corporation, 250 Stephenson Highway, Troy, MI 48083.

COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES

FORM 10-K ANNUAL REPORT INDEX

Page

**PART I**

Item 1.   Business ................................................................    8
Item 2.   Properties ...............................................................   16
Item 3.   Legal Proceedings .........................................................   17
Item 4.   Submission of Matters to a Vote of Security Holders...............................   17

**PART II**

Item 5.   Market for Registrant's Common Equity and Related Stockholder Matters ............   17
Item 6.   Selected Financial Data ....................................................   18
Item 7.   Management's Discussion and Analysis of Financial Condition and Results of Operations   19
Item 7A.  Quantitative and Qualitative Disclosures About Market Risk ........................   44
Item 8.   Financial Statements and Supplementary Data ...................................   44
Item 9.   Changes in and Disagreements with Accountants on Accounting and Financial
          Disclosure ..............................................................   45
Item 9A.  Controls and Procedures ...................................................   46

**PART III**

Item 10.  Directors and Executive Officers of the Registrant ...............................   47
Item 11.  Executive Compensation ...................................................   52
Item 12.  Security Ownership of Certain Beneficial Owners and Management ...................   63
Item 13.  Certain Relationships and Related Transactions ..................................   65
Item 14.  Principal Accounting Fees and Services .........................................   68

**PART IV**

Item 15.  Exhibits, Financial Statement Schedules and Reports on Form 8-K .................   70

i

## PART I

**Cautionary Statements Regarding Forward-Looking Information and Risk Factors**

This Report on Form 10-K contains "forward-looking" information, as that term is defined by the federal securities laws, about our financial condition, results of operations and business. You can find many of these statements by looking for words such as "may," "will," "expect," "anticipate," "believe," "estimate," "should," "continue," "predict" and similar words used in this Annual Report. The forward-looking statements in this Form 10-K are intended to be subject to the safe harbor protection provided by the federal securities laws.

These forward-looking statements are subject to numerous assumptions, risks and uncertainties (including trade relations and competition). Because the statements are subject to risks and uncertainties, actual results may differ materially from those expressed or implied by the forward-looking statements. We caution readers not to place undue reliance on the statements, which speak only as of the date of this Annual Report.

The cautionary statements set forth above should be considered in connection with any subsequent written or oral forward-looking statements that Collins & Aikman Corporation (the "Company") or persons acting on its behalf may issue. The Company does not undertake any obligation to review or confirm analysts' expectations or estimates or to release publicly any revisions to any forward-looking statements to reflect events or circumstances after the date of this report or to reflect the occurrence of unanticipated events.

This Report on Form 10-K contains forward-looking statements within the meaning of the Private Securities Litigation Reform Act of 1995. Actual results and events may differ materially from those that are anticipated because of certain risks and uncertainties, including but not limited to general economic conditions in the markets in which the Company operates and industry based factors such as:

*Demand in the automotive industry is significantly dependent on the U.S. and the global economies and the Company's business and profitability are exposed to current and future uncertainties.*

The Company's financial performance depends, in large part, on conditions in the global automotive markets and, generally, on the U.S. and global economies. Demand in the automotive industry fluctuates in response to overall economic conditions and is particularly sensitive to changes in interest rate levels, consumer confidence and fuel costs. The threat or act of terrorism and war, the recession and other recent developments adversely affected consumer confidence throughout the U.S. and much of the world and exacerbated the uncertainty in the Company's markets. The future impact on us is difficult to predict. We would be harmed by any sustained weakness in demand or continued downturn in the economy.

The Company's sales are impacted by retail inventory levels and production schedules. In 2003, Original Equipment Manufacturer ("OEM") customers continued to significantly reduce their production and inventory levels due to the uncertain economic environment. In the current environment, it is extremely difficult to predict future production rates and inventory levels and the sustainability of any recovery.

*The base of customers which the Company serves is concentrated, and the loss of business from a major customer or the discontinuation of particular vehicle models could reduce the Company's sales and harm the Company's profitability.*

Because of the relative importance of a few large customers and the high degree of concentration of OEMs in the automotive industry, the Company's business is exposed to a high degree of risk related to customer concentration. DaimlerChrysler AG, General Motors Corporation and Ford Motor Company and their respective affiliates were the Company's three largest customers, and they directly or indirectly accounted for approximately 28%, 22% and 25% of the Company's 2003 net sales, respectively. A loss of significant business from, or adverse performance by, any of these customers would be harmful to the Company's profitability. Although the Company receives purchase orders from most of the Company's customers, these purchase orders typically provide for the supply of a customer's annual requirements for a particular model or assembly plant, renewable on a year-to-year basis, rather than for the purchase of a

2

specific quantity of products. It is difficult to accurately predict the level of new production for 2004 car sales. The loss of business with respect to significant vehicle models could have a material adverse effect.

In addition, there is substantial and continuing pressure from automotive manufacturers to reduce costs, including costs associated with outside suppliers like Collins & Aikman. For example, OEM customers in the automotive industry attempted to impose price decreases and givebacks throughout 2003. Such attempted price decreases were generally in the 2% to 4% range. Several reductions have been agreed to, and others are currently being negotiated with OEMs and pressures may increase if overall economic and industry conditions do not improve. It is difficult for the Company to offset downward pricing pressures through alternative, less costly sources of raw materials. In addition, throughout 2003, the Company has experienced pricing pressure from its suppliers. The Company cannot assure you that it will not be materially and adversely affected by substantial and continuing pricing pressures.

*The prices that the Company can charge some of the Company's customers are predetermined, and the Company bears the risk of costs in excess of its estimates.*

Sales contracts with some of the Company's customers require it to provide its products at predetermined prices. In some cases, these prices decline over the course of the contract. The costs that the Company incurs in fulfilling these contracts may vary substantially from its initial estimates. Unanticipated cost increases may occur as a result of several factors, including increases in the costs of labor, components or materials. In some cases, the Company may be permitted to pass on cost increases associated with specific materials to its customers. Cost overruns that the Company cannot pass on to its customers could have a material adverse effect.

*The Company may not be able to successfully integrate the Company's acquired operations or realize the intended benefits of the Company's acquisitions.*

The Company's future operations and cash flow will depend largely upon its ability to integrate acquisitions, achieve the strategic operating objectives for these acquisitions and realize significant synergies and cost savings as a result. Acquisitions since January 2001 account for 48 of the Company's current 102 plants and facilities and approximately 58% of the Company's approximately 23,900 employees. The Textron Automotive Company's Trim division ("TAC-Trim") acquisition in 2001, at that time, individually accounted for 41 of the Company's plants and facilities and approximately 12,000 of the Company's employees located across seven different countries, including two countries where the Company did not previously operate. The Company has not previously undertaken an integration process as large or complex as the integration plans required by these recent acquisitions collectively or by the TAC-Trim acquisition individually. In order to succeed, the Company will need to realize projected synergies and cost savings on a timely basis, consolidate information technologies, capitalize on the Company's increased purchasing power, effectively control the progress of the Company's integration process and associated costs, consolidate the Company's program management, research and development and engineering operations, capitalize on the Company's prime contractor strategy and the opportunities afforded by the Company's broader products offering and maintain strong relationships with Tier I integrators and OEMs.

To the extent the Company has misjudged the nature and extent of industry trends or its competition, it may have difficulty in achieving its operating and strategic objectives. In addition, the Company's integration activities will place substantial demands on its management, operational resources and financial and internal control systems. The Company's future operating results will depend upon the Company's ability to implement and improve its operating and financial controls and to combine, train and manage the Company's employee base. There is a risk that the diversion of management attention, particularly in a difficult operating environment, will affect sales and the attention that management can devote to this and other operational, financial and strategic issues. In addition, in some of the Company's past non-U.S. acquisitions, the Company has encountered integration and systems difficulties typical of foreign transactions, which have given rise to material weaknesses that had to be subsequently corrected. The Company cannot assure you that it will not encounter similar difficulties going forward. All statements concerning the benefits, cost savings and synergies the Company expects to realize from its acquisitions are forward-looking statements.

3

*The Company may pursue additional acquisitions that further the Company's current strategies.*

The Company may selectively identify and acquire other businesses with complementary products, manufacturing capabilities or geographic markets, and the Company expects to continually evaluate such opportunities. The Company cannot assure you that any business acquired will be successfully integrated with other operations or prove to be complementary in the manner expected or be profitable. The Company could incur further indebtedness in connection with the Company's acquisition strategy and increase the Company's leverage. Acquisitions outside of North America may present unique difficulties and increase the Company's exposure to the risks attendant to international operations. The process of integrating acquired companies and operations into the Company's existing operations may result in unforeseen operating difficulties and may require significant financial resources that would otherwise be available for the ongoing development or expansion of existing operations.

*The Company may incur unanticipated contingent liabilities as a result of acquisitions and may experience unanticipated liabilities associated with former discontinued operations.*

The Company might incur unforeseen environmental, tax, pension, litigation or other liabilities in connection with the Company's recent or future acquisitions, or the Company might underestimate the known liabilities. If such liabilities materialize or are greater than the Company estimates, they could have a material adverse effect on us. In addition, the Company has significant responsibilities related to some of its formerly owned businesses, or discontinued operations, such as those relating to post-retirement, casualty, environmental, product liability, lease and other matters. Based upon the information presently available and the Company's insurance coverage, the Company does not believe that any of these liabilities will have a material adverse effect upon the Company's financial condition or results of operations, however, the Company might be incorrect in its assumptions; and the extent of those contingent liabilities of which the Company is aware could exceed its expectations. In addition, there may be other such liabilities of which the Company presently has no knowledge.

*If the Company is unable to meet future capital requirements, the Company's competitive position may be adversely affected.*

In securing new business, the Company typically is required to expend significant amounts of capital for engineering, development, tooling and other costs. Generally, the Company seeks to recoup these costs through pricing over time, but the Company may be unsuccessful due to competitive pressures and other market constraints or if a customer ceases production of a particular vehicle. While the Company believes that it will be able to fund capital expenditures through cash flow from operations, borrowings under the Company's credit facilities, sale and leaseback agreements and sales of receivables including sales under the Company's receivables facility and factoring arrangements, there can be no assurance that it will have adequate funds to make all the necessary capital expenditures or that the amount of future capital expenditures will not be materially in excess of its anticipated expenditures.

*Recent trends among the Company's customers will increase competitive pressures in the Company's businesses.*

In recent years, the competitive environment among suppliers to the vehicle manufacturers in the automotive industry has changed significantly as these manufacturers have sought to outsource more vehicular components, modules and systems and to use on-line auctions in order to obtain further price reductions. In addition, these sectors have experienced substantial consolidation as OEMs have sought to lower costs, improve quality and increasingly purchase complete systems and modules rather than separate components. This consolidation has caused, and its continuation will continue to amplify, the pricing pressures outlined above in the discussion of the concentration of the Company's customers. The Company's competitive strategy will be to position itself as the prime contractor of choice to both Tier I integrators and OEM assembly plants by supplying a full spectrum of integrated interior trim components. This strategy presents the risk that some of the Company's customers may be in competition with the Company as well. Furthermore, the trend toward consolidation among automotive parts suppliers is resulting in a smaller number of large

4

# EXHIBIT F



Home
Corporate Profile
Investor Center
Products & Services
Working at C&A

Corporate Profile ▶ Media Center ▶ **Press Release**

MEDIA CENTER **Collins & Aikman**

Current News
News Archive
Downloadable Documents
Downloadable Images

**COLLINS & AIKMAN ANNOUNCES DELAY IN FORM 10-K FILING, RESTATEMENT AND UNAUDITED SUMMARY RESULTS FOR 2004**

*March 17, 2005*

**TROY, Mich.** – Collins & Aikman Corporation (NYSE: CKC) announced today the following:

- The Company did not file its Annual Report on Form 10-K containing fiscal 2004 audited financial statements by its due date yesterday since it requires additional time to complete the review of the accounting issues referred to below, the financial reporting process, and the Company's assessment of controls over financial reporting. As permitted by Rule 12b-25 under the Securities Exchange Act of 1934, the Company today filed a notification providing that, among other things, its Form 10-K filing nonetheless being timely filed if it is filed no later than 15 calendar days after its original due date. The audit, and other necessary work required for the Form 10-K to be filed, may not be completed within that extended time frame.
- During the course of finalizing its financial statements for its fiscal year ended December 31, 2004, the Company identified certain accounting for supplier rebates that led to premature or inappropriate revenue recognition or that was inconsistent with relevant accounting standards and the Company's policies and practices. The Company immediately initiated an internal review of these matters and expects to restate its results for the nine months ended September 30, 2004 to reflect the correct accounting for these rebates. The Company is continuing to evaluate whether a restatement of its 2004 results will be necessary. The Company presently expects to reduce its previously reported operating income by $10 - $12 million for the nine months ended September 30, 2004. The Company's outside auditors have not reviewed these conclusions, and additional adjustments may be required.

Preliminary Summary Results

The Company further announced today anticipated summary results for 2004, which reflect the Company's present assessment of the impact of the accounting issues referred to above, and are subject to change. The Company announced fourth quarter 2004 net sales of $937 million compared to $1.013 billion in the fourth quarter of 2003, a 7.5% decrease which mainly reflects reduced volumes in the fourth quarter on several key North American programs and the delay in new program launches that were scheduled for the fourth quarter. For the full-year 2004, the Company reported sales of $3.904 billion compared to $3.983 billion for 2003. Additional information regarding the Company's results of operations will be available via the teleconference and related slide presentation referred to elsewhere in this press release.

During the fourth quarter 2004, the Company continued to achieve solid marketing progress by adding more than $175 million of annual newly booked business. This brings the last-twelve-months' total to over $880 million. These programs begin with model years incepting 2005 to 2008. A significant win for the quarter included an instrument panel, cockpit and console program for a valued European customer. Additionally, the Company secured numerous contracts for our instrument panel, carpet and acoustic, accessory mat and plastic interior trim products.

The Company has completed its annual impairment test as required by SFAS 142 as of November 1, 2004 and took into consideration, among other factors, the impact of increased raw material prices in 2004, increased pricing pressure from customers, general economic conditions, the state of the automotive industry, and other factors beyond management's control. The Company determined that the fair values of its U.S. and Mexico Plastics reporting unit and its Global Fabrics reporting unit were less than the respective units' carrying value. As a result, the Company expects to recognize an impairment charge of approximately $500 million, which will reduce U.S. and Mexico Plastics' goodwill by approximately $325 million and Global Fabrics' goodwill by approximately $175 million.

The Company has also performed an analysis of future taxable income and believes that there is now sufficie negative evidence and uncertainty as to the timing of when the appropriate level of taxable income will be generated in the U.S. to recover the deferred tax assets, necessitating a full valuation allowance against tho deferred tax assets. As a result, the Company's provision for income taxes for the fourth quarter of 2004 includes a write down of the U.S. and Italian net deferred tax assets of $175 million. In addition, the impac the valuation allowance on the 2004 operating results for the U.S. and Italy was approximately $25 million.

The above preliminary results have not been audited or reviewed by the Company's outside auditors and ma be impacted by our continuing review of the accounting matters referred to herein, any expansion in the number of transactions under review and new information or situations that may arise prior to completion of the audit. These results are summary and a complete disclosure of financial statements would necessarily reveal additional information that the Company is not presently in a position to provide.

EBITDA before Restructuring and Impairment Charges

EBITDA before restructuring and impairment charges is expected to be approximately $72 – $73 million for ' fourth quarter of 2004. The fourth quarter 2003 EBITDA before restructuring and impairment charges was $ million. EBITDA before restructuring and impairment charges for the full year 2004 is expected to be approximately $320 - $321 million. The comparable result for 2003 was $311 million. Due to the status of accounting investigation and the pending audit, we are not presenting net income at this time. A reconciliat of our EBITDA before restructuring and impairment charges, a non-GAAP financial measure, to U.S. GAAP operating income, our most comparable GAAP figure, is set out in the attached reconciliation schedule. The Company believes that EBITDA is a meaningful measure of performance as it is commonly utilized in the industry to analyze operating performance. EBITDA should not be construed as income from operations, ne income (loss) or cash flow from operating activities as determined by generally accepted accounting principle Other companies may calculate EBITDA differently.

Net Debt and Liquidity

The Company's net debt, including outstandings under an off-balance sheet accounts receivable facility, was $1.613 billion at December 31, 2004. As of December 31, 2004 the Company had undrawn commitments under its revolver and accounts receivable facility, along with cash equivalents, of $86 million. The liquidity available to the Company in the ordinary course is impacted by seasonal factors, the timing of cash inflows a outflows and the general level and timing of industry build volumes. In general, the Company's cash requirements are highest during the first two to three weeks of a month. In the first quarter, the Company' cash requirements increased due primarily to slow industry build volumes, the timing of interest payments a the termination of certain accelerated pay programs. The Company has taken several actions to enhance its liquidity position, including agreements with customers, and modifying its accounts receivable securitization facility to increase the advance rate and availability. Continued access to credit facilities in satisfactory amounts is essential to the Company. Adverse developments in our cash flows or credit terms could materi impact us. Certain impacts of the delay in our Form 10-K filing and the accounting matters under our faciliti are discussed below.

Internal Accounting Investigation and Related Matters

In the ordinary course, the Company has received and continues to receive rebates as a result of arms lengt transactions with its vendors. Depending upon the terms of the rebate agreement, these rebates are either recognizable in the quarter in which the rebate agreement is reached or recognized over an appropriate futu period. In the course of finalizing the Company's 2004 financial results, the Company identified certain issue related to accounting for supplier rebates that led to premature or inappropriate income recognition or that inconsistent with relevant accounting standards and the Company's policies and practices. The Company immediately initiated a review of all vendor rebates it received from 2002 through 2004 to ensure that it ha properly recognized the rebates in the appropriate quarterly period. The Company has completed its accounting review of these rebates, but expects to undertake a thorough review of its controls, procedures a other circumstances that led to the premature or inappropriate income recognition and that was inconsistent with relevant accounting standards and the Company's policies and practices. The nature and scope of that review is under consideration. The Company's Audit Committee and outside auditors have been informed of these issues and are evaluating an appropriate course of action.

The Company's internal review of vendor rebates covered an aggregate of approximately $88 million of venc transactions in fiscal years 2002 through 2004. Of such amount, the Company believes that net adjustment of approximately $10 - $12 million, are required primarily occurring during fiscal 2004. The Company expec to restate its results for the nine months ended September 30, 2004 to reflect these revisions. The Compan is continuing to evaluate whether a restatement of its 2003 results will be necessary. We have not taken int

account this impact in our preliminary report of 2004 results. These preliminary results remain subject to material change and have not been reviewed by our outside auditors.

The Company is working towards completion of its assessment of internal controls over financial reporting required under Section 404 of the Sarbanes-Oxley Act and has concluded that certain material weaknesses, addition to the matters leading to the restatement described above, existed at December 31, 2004, but its assessment of the effectiveness of the Company's control over financial reporting is ongoing and the extent those material weaknesses remains under review. The Company's outside auditor is in the process of completing its audit of internal controls over financial reporting and has communicated the existence of material weaknesses. The potential material weaknesses identified include the following: (i) the adequacy of the Company's resources with appropriate accounting expertise to address accounting and reporting matters certain areas, including revenue recognition, vendor arrangements and post-retirement benefits, and to supervise the Company's decentralized and disparate accounting environment and ensure an appropriate segregation of duties; (ii) the adequacy of the Company's internal audit function's resources and ability to monitor compliance with established policies and procedures; (iii) the effectiveness of certain information technology controls and the sufficiency of documentation to assess the effectiveness of such controls including embedded system application controls; (iv) the adequacy of procedures to consistently identify and reconcile fixed assets and periodically review assets for impairment; and (v) the completeness and consistent adherence to Company policies and procedures. These issues include a range of documentation-related issues and reconciliation issues. Other material weaknesses may be identified as a result of further investigation of the circumstances surrounding the expected restatement arising from vendor rebates. Our review and the audit ongoing.

While the Company has implemented remediation steps with respect to certain significant deficiencies and material weaknesses, a number of issues still need to be addressed. The Company's remediation plans include the assignment of specific resources with given timelines for each finding. Measurement criteria have also been established to monitor the progress of these remediation efforts. To ensure that the Company address these issues thoroughly, effectively, and timely, the internal audit department has been supplemented with services of several outside specialists. Further required remediation will be identified and undertaken as a result of the internal accounting investigation.

Impact on Financing Arrangements

The Company intends to operate in the ordinary course, but it cannot presently comment upon the timing for completion of, or the ultimate scope or outcome of, the internal accounting investigation, the audit and the restatements. Until the audit and any restatements are complete, it will be difficult to determine the full scope of any financial restatement or prior period adjustments arising from these irregularities. Consequently, the Company is still evaluating its financial covenant compliance under its senior credit facility, as well as other compliance issues under other financing arrangements. If necessary or desirable, the Company will seek a waiver of relevant provisions.

The Company is obligated to provide audited financial statements under a number of its debt, receivables facility, operating lease and other agreements within prescribed periods. The Company relies upon its receivables facility with GE Capital Corporation for its liquidity and the unavailability of funds thereunder would be material and adverse. The Company has received waivers of various provisions of its receivables financing facility and its Hermosillo, Mexico funding arrangements, both of which are held by GE Capital Corporation, so that it will continue to provide the Company with access to financing under those facilities in the ordinary course of business until May 20, 2005, absent certain new adverse developments. The Company also intends to seek waivers and amendments of its bank credit facilities and of various lease agreements, as required or desirable. There can be no assurance that any other required or desirable waivers will be received on a timely basis and the failure to obtain waivers could be material and adverse.

Heartland Investment in Preferred Stock held by Textron

The Company also announced today that it has been informed that its largest shareholder, Heartland Industrial Partners, L.P., has entered into an agreement with Textron Inc. that gives Heartland and its designees the right to acquire all of the Series A-1 and B-1 Preferred Stock currently outstanding. It is presently anticipated that Heartland will acquire a majority of the outstanding preferred stock itself and will seek co-investors for the balance, although such co-investment may not occur.

Public Briefing

As previously announced, the Company will hold a briefing with automotive institutional investors and securities analysts, news media representatives and other interested parties, including its security holders, at 10:00 a

EST on Thursday, March 17, 2005 to discuss the matters described in this press release.

To participate by phone, please dial (973) 582-2745. The briefing will also be audio webcast, on our website at: www.collinsaikman.com/investor/confcalls.html. A slide presentation will also be used in conjunction with this teleconference and will be available on the Company's website.

Collins & Aikman Corporation, a Fortune 500 company, is a global leader in cockpit modules and automotive floor and acoustic systems and is a leading supplier of instrument panels, automotive fabric, plastic-based trim and convertible top systems. Headquartered in Troy, Michigan, we have a workforce of approximately 23,000 and a network of more than 100 technical centers, sales offices and manufacturing sites in 17 countries throughout the world. Information about Collins & Aikman is available on the Internet at http://www.collinsaikman.com.

*Cautionary Statement Concerning Forward-Looking Information*

The foregoing reflects the Company's views about the accounting investigation, its financial condition, performance and other matters that constitute "forward-looking" statements, as that term is defined by the federal securities laws. You can find many of these statements by looking for words such as "may," "will," "expect," "anticipate," "believe," "estimate," "should," "continue," "predict," "preliminary" and similar words used herein. These forward-looking statements are intended to be subject to the safe harbor protection provided by the federal securities laws. These forward-looking statements are subject to numerous assumptions, risks and uncertainties. Because the statements are subject to risks and uncertainties, actual developments and results may differ materially from those expressed or implied by the forward-looking statements. Readers are cautioned not to place undue reliance on the statements, which speak only as of the date hereof.

Various factors that may affect actual outcomes and performance and results include, but are not limited to, general economic conditions in the markets in which the Company operates, declines in North American, South American and European automobile and light truck builds; labor costs and strikes at the Company's major customers and at the Company's facilities; fluctuations in the production of vehicles for which we are a supplier; changes in the popularity of particular car models, particular interior trim packages or the loss of programs on particular vehicle models; dependence on significant automotive customers; the level of competition in the automotive supply industry and pricing pressure from automotive customers; risks associated with conducting business in foreign countries; and fluctuation in the price of certain raw materials including resins and other petroleum-based products. In addition, the following may have a material impact actual outcomes and performance and results: the results of the pending investigation; the Company's ability to maintain satisfactory relations with its sources of liquidity, suppliers, customers and creditors; the Company's high leverage and ability to service its debt; and the impact of any defaults under its material agreements and debt instruments.

The cautionary statements set forth above should be considered in connection with any subsequent written or oral forward-looking statements that the Company or persons acting on its behalf may issue. The Company does not undertake any obligation to review or confirm analysts' expectations or estimates or to release publicly any revisions to any forward-looking statements to reflect events or circumstances after the date of this report or to reflect the occurrence of unanticipated events.

Contact: **Bryce Koth**             **David A. Youngman**

Chief Financial Officer         Director of Corporate Communications

(248) 824-1520               (248) 733-4355

bryce.koth@colaik.com        david.youngman@colaik.com

**COLLINS & AIKMAN**
**SUPPLEMENTAL DATA – PRELIMINARY EBITDA RECONCILIATION SCHEDULE**
(unaudited)

| | **Three months ended** | **Year ended** |
| --- | --- | --- |
| | **December 31,** | **December 31,** |

|                                         | 2004   | 2003   | 2004    | 2003  |
|-----------------------------------------|--------|--------|---------|-------|
|                                         |        | (In millions) |  |       |
| Operating income.............................. | $(475) | $ 30   | $(409)  | $102  |
| Depreciation and amortization.................. | 42     | 39     | 155     | 140   |
| EBITDA ................................... | $(433) | $ 69   | $(254)  | $242  |
| MEMO:                                   |        |        |         |       |
| Goodwill Impairment ........................ | $ 500  | --     | $ 500   | --    |
| Restructuring charges....................... | 1      | $ 14   | 30      | $ 41  |
| Impairment of long-lived assets.............. | 5      | 7      | 45      | 28    |
| Total restructuring and impairment charges.... | $ 506  | $ 21   | $ 575   | $ 69  |

This supplemental data presented above is a reconciliation of a certain financial measure which is intended t
facilitate analysis of Collins & Aikman Corporation's business and operating performance.

EBITDA is defined as operating income plus depreciation and amortization. The Company believes that EBIT
is a meaningful measure of performance as it is commonly utilized in the industry to analyze operating
performance. EBITDA should not be construed as income from operations, net income (loss) or cash flow fr
operating activities as determined by generally accepted accounting principles. Other companies may calcul
EBITDA differently.



Home
Corporate Profile
Investor Center
Products & Services
Working at C&A

Corporate Profile ▶ Media Center ▶ **Press Release**

MEDIA CENTER  Collins & Aikma

**Collins & Aikman Audit Committee Retains Independent Counsel for Investigation of Previously-Reported Accounting Matters**

*March 24, 2005*

TROY, MI – Collins & Aikman Corporation (NYSE: CKC) announced today that its Audit Committee has retain independent counsel to assist it in its investigation of the Company's accounting for certain supplier rebates. The company previously reported that it had identified certain accounting for supplier rebates that led to premature or inappropriate revenue recognition or that was inconsistent with relevant accounting standards and the Company's policies and practices. The company's management immediately initiated an internal rev of these matters while keeping the company's Audit Committee and outside auditors, KPMG LLP, informed o the status of its review. The Audit Committee has determined to conduct an independent investigation into these matters. It has retained independent counsel, Davis Polk & Wardwell, for that purpose, and they expe to retain such other advisors, including an accounting expert, as they deem appropriate.

As previously announced, the company's internal review of vendor rebates covered an aggregate of approximately $88 million of vendor transactions in fiscal years 2002 through 2004. Of such amount, the company's management believes that net adjustments of approximately $10 - $12 million are required primarily occurring during fiscal 2004. For further clarification, the company announced that management's preliminary analysis indicates that, of such amounts, approximately $8 - 10 million would impact the previou reported nine months ended September 30, 2004 with the balance impacting 2003. The company expects to restate its results for the nine months ended September 30, 2004 to reflect these revisions and is continuing evaluate whether a restatement of its 2003 results will be necessary. The company's Audit Committee and t Company's outside auditors, KPMG LLP, have not commented upon management's current expectations. The company cannot presently comment upon the timing for completion of, or the ultimate scope or outcome of, the Audit Committee investigation, the audit or any necessary restatements. Nor can it comment upon whet the outcome of the investigation will impact the foregoing adjustments.

As previously disclosed, the company has not yet filed its annual report on Form 10-K for 2004 due to this accounting matter and the need for additional time for completion of the 2004 audit and the review of intern controls over financial reporting under Section 404 under Sarbanes-Oxley. The company further announced that it initiated a process for obtaining waivers of the financial statement delivery requirements for a period time from its lenders under its senior credit facility and for modifications of certain of its financial covenants. There can be no assurance that any of the required or desirable waivers from our senior lenders, lessors or others will be received on a timely basis, and the failure to obtain waivers could materially and adversely aff the company and its liquidity.

Collins & Aikman Corporation, a Fortune 500 company, is a global leader in cockpit modules and automotive floor and acoustic systems and is a leading supplier of instrument panels, automotive fabric, plastic-based tr and convertible top systems. Headquartered in Troy, Michigan, we have a workforce of approximately 23,00 and a network of more than 100 technical centers, sales offices and manufacturing sites in 17 countries throughout the world. Information about Collins & Aikman is available on the Internet at http://www.collinsaikman.com.

Cautionary Statement Concerning Forward-Looking Information
The foregoing reflects the Company's views about the accounting investigation, its financial condition, performance and other matters that constitute "forward-looking" statements, as that term is defined by the federal securities laws. You can find many of these statements by looking for words such as "may," "will," "expect," "anticipate," "believe," "estimate," "should," "continue," "predict," "preliminary" and similar words used herein. These forward-looking statements are intended to be subject to the safe harbor protection provided by the federal securities laws. These forward-looking statements are subject to numerous assumptions, risks and uncertainties. Because the statements are subject to risks and uncertainties, actual

developments and results may differ materially from those expressed or implied by the forward-looking statements. Readers are cautioned not to place undue reliance on the statements, which speak only as of the date hereof.

Various factors that may affect actual outcomes and performance and results include, but are not limited to, general economic conditions in the markets in which the Company operates, declines in North American, South American and European automobile and light truck builds; labor costs and strikes at the Company's major customers and at the Company's facilities; fluctuations in the production of vehicles for which we are a supplier; changes in the popularity of particular car models, particular interior trim packages or the loss of programs on particular vehicle models; dependence on significant automotive customers; the level of competition in the automotive supply industry and pricing pressure from automotive customers; risks associated with conducting business in foreign countries; and fluctuation in the price of certain raw materials including resins and other petroleum-based products. In addition, the following may have a material impact actual outcomes and performance and results: the results of the pending investigation; the Company's ability to maintain satisfactory relations with its sources of liquidity, suppliers, customers and creditors; the Company's high leverage and ability to service its debt; and the impact of any defaults under its material agreements and debt instruments.

The cautionary statements set forth above should be considered in connection with any subsequent written oral forward-looking statements that the Company or persons acting on its behalf may issue. The Company does not undertake any obligation to review or confirm analysts' expectations or estimates or to release publicly any revisions to any forward-looking statements to reflect events or circumstances after the date of this report or to reflect the occurrence of unanticipated events.

Contact:

Bryce Koth
Chief Financial Officer
(248) 824-1520

David A. Youngman
Director of Corporate Communications
(248) 733-4355



Current News
News Archive
Downloadable Documents
Downloadable Images

**Collins & Aikman Announces Stockman Resignation and Appointment of Becker as Acting Chief Executive Officer**

*May 12, 2005*

TROY, Mich. – Collins & Aikman Corporation (NYSE: CKC) today announced that its Board of Directors has accepted the resignation of David A. Stockman as Chief Executive Officer, Chairman of the Board and a direc of the company. Charles E. Becker, a former director of the company, has agreed to serve as acting Chief Executive Officer of the company. In addition, the Board has asked three directors, Anthony Hardwick, Timo D. Leuliette and Daniel P. Tredwell, to support Mr. Becker as a Temporary Steering Committee of the Board while it spearheads a search for a full time replacement to serve as Chief Executive Officer of the company. addition, Marshall Cohen, a current director of the company, was named as non-executive interim Chairman the Board of Directors.

Mr. Becker was Vice Chairman of the Board from July 2001 until July 2002 and ceased to serve as a director May 2004. For over 25 years, through 1998, Mr. Becker was the Chief Executive Officer and co-owner of Becker Group, Inc., a global automotive interior components supplier. Mr. Becker is the owner and Chairmar Becker Ventures, which was established in 1998 to invest in a variety of business ventures, including the manufacturing, real estate and service industries, and which is a lessor of properties to the company. Mr. Becker is also a director of Metaldyne Corporation and TriMas Corporation. Mr. Hardwick has been a director since September 2004 and is currently Executive Vice President and Chief Financial Officer of Easley Custom Plastics, Inc. He was employed by the company from 1976 through 1995, when he served as Vice President, Administration and Control of the company's automotive group and then Vice President and Controller of the company. Messrs. Leuliette and Tredwell are each Senior Managing Directors and co-founders of Heartland Industrial Partners, the company's largest shareholder. Mr. Leuliette is currently the Chief Executive Officer Metaldyne Corporation, and also serves on a number of corporate and charitable boards, and served as a director of The Federal Reserve Bank of Chicago, Detroit Branch. In 1996, Mr. Leuliette joined Penske Corporation as President and Chief Operating Officer to address operational and strategic issues. From 1991 1996, he served as President and Chief Executive Officer of ITT Automotive. Mr. Tredwell also serves on a number of corporate boards and has two decades of leveraged financing and buyout experience. Prior to co-founding Heartland, he served as a Managing Director at Chase Securities Inc. and had been with Chase Securities since 1985.

The company further announced today that it had obtained an amendment and waiver of its accounts receivables facility to address immediate liquidity issues arising from the recent simultaneous credit ratings downgrades of Ford Motor Company and General Motors Corporation by Standard & Poor's Corporation to below investment grade status. In addition, the company obtained a conditional waiver of a financial covena relating to first quarter 2005 performance in its accounts receivable facility and the company also intends to seek a waiver under its senior credit facility for a breach of the same financial covenant. The company is cautioning all investors and its creditors that any previous forecasts, guidance or outlook concerning financia information for all or any part of 2005 should not be relied on at this time.

Under the terms of the company's receivables facility, the downgrades of Ford and General Motors resulted i change in receivables concentration limits relative to these customers and, consequently, required a partial paydown of the receivables facility and reduced ongoing availability under the receivables facility. The amendment phases in modified customer concentration limits that take account of the changed credit rating Ford and General Motors and also increases the margins applicable to both base rate and LIBOR-based advances by 0.75% per annum. Based on receivables balances on the day following the downgrades, the company would have been obligated to reduce its receivables balances by approximately $70 million. An amendment and waiver was required since the company lacked the financial resources to timely make the paydown and availability would otherwise have been clearly inadequate for the company's ongoing operating obligations. As a result of the amendment, no immediate paydown was required. If the final phased-in term: that go into effect on May 23, 2005 were immediately in effect, the required reduction would have been approximately $15 million. The company is seeking more favorable payment terms from the downgraded customers to further benefit the company's liquidity prior to the final phase-in. With or without more favorab terms from these customers, the modified terms of the receivables facility will remain a challenge for the company.

The waiver and amendment of the accounts receivable facility also provides relief for a financial covenant breach related to first quarter 2005 performance. The covenant at issue is the consolidated leverage ratio, o consolidated debt to EBITDA, as defined in the covenant. This covenant is the same under both the company senior credit facility and receivables facility and was recently modified. The company is still reviewing its firs quarter 2005 performance and is not yet in a position to comfortably disclose estimated first quarter 2005 results. However, it expects EBITDA to be materially lower than previously provided guidance and to not sat the covenant requirement. The financial covenant waiver under the receivables facility expires if similar relie not timely obtained from lenders under the company's senior credit facility. The amendment also extends th previously granted waiver for financial statement delivery requirements until June 15, 2005, absent certain adverse events prior to that date (such as termination events). If the company is unable to obtain further necessary waivers or modifications, the company, its financial condition and performance will be materially a adversely impacted.

The company continues to face significant near term liquidity challenges. The company is currently fully dra under its senior credit facility and relies upon timely access to its receivables facility, foreign receivables factoring arrangement and fast pay financing programs to fund ongoing operations. In addition to the receivables facility, the company has a significant foreign factoring arrangement, under which outstanding factored balances were approximately $96 million at March 31, 2005. These are generally terminable on sho notice. A material European factoring arrangement that relates principally to one customer is due to expire a the end of this month. If this facility is not extended or renewed on acceptable terms, the company will seek more favorable payment terms from the customer. As a general matter, the company has sought with some success and will continue to seek earlier collections or more favorable payment terms from customers or through third party fast pay programs. The company is in the process of transitioning the General Motors fa pay program administered by GECC to one administered by GMAC that will provide a commitment to Octobe 2005. In addition, the company is continuing to work with its largest customers and suppliers to enhance commercial terms to improve operating results, cost recovery and liquidity. There can be no assurance that company will be successful in these efforts or any other efforts to improve results or enhance liquidity.

As of May 11, 2005, the company had cash and availability under its financing arrangements of approximate $13.4 million. Taking account of the amended terms of the receivables facility, depending upon many factor the company expects to operate for the near future on a global basis with approximately $15 million or less daily available liquidity. The company's near term cash requirements, apart from financing its ongoing operating obligations, include capital expenditures and a scheduled interest payment on debt securities of approximately $26.9 million on June 30, 2005 and $26.7 million on August 15, 2005. Capital expenditures fc 2005 may be higher than previous guidance and, for the first quarter, capital expenditures were approximat $50 million. The company continues to expect that the first quarter will be the highest quarter for capital expenditures in 2005. During this period of difficult liquidity, the company has extended payables to ensure adequate cash balances to support its operations and may continue to do so as it works with customers, suppliers and creditors. The company's ability to meet its obligations and to make necessary capital expenditures will depend on a number of factors, including, without limitation, its continuing cash flow from operations, its ability to address financial covenant defaults, continued compliance with its debt instruments generally and sufficient continuing availability to the previously mentioned financing arrangements. The company will also be impacted by the mounting competitive challenges facing its customers and the continu pressure being placed upon it by rising raw material and other costs in the face of lower demand.

Due to the previously announced and ongoing investigation into certain accounting matters, the company ha not completed its 2004 audited financial statements and is still in the process of reviewing results for the firs quarter 2005. Its first quarter financial results continue to be subject to some uncertainty due to a number c issues, including the impact of the ongoing accounting investigation. As noted above, the company expects t initiate a process with its senior lenders to seek a similar waiver under the senior credit facilities and the fail to obtain such a waiver will terminate its receivables facility waiver period and permit a termination of the receivables facility. The company cannot predict whether it will receive the relief it is requesting from its sen lenders. The existence of an event of default under the senior credit agreement permits the acceleration of amounts outstanding thereunder and foreclosure by the senior lenders on the company's assets securing the obligations. In addition, this may have adverse consequences under the company's material lease agreemen The company's existing waivers of financial statement delivery requirements have a limited duration (June 1 2005) and are premised on certain conditions, including continued compliance with financial covenants and r material adverse developments. The continued effectiveness of these waivers and the ability to timely obtair any further necessary waivers or amendments cannot be assured.

The company further commented on the status of the ongoing investigation by the Board's audit committee into the company's accounting for certain supplier rebates. The company previously reported that it had identified certain accounting for supplier rebates that led to premature or inappropriate revenue recognition that was inconsistent with relevant accounting standards and the company's policies and practices. While th investigation is ongoing, the audit committee has preliminarily indicated that it believes that the company's previously announced estimated adjustments to reported periods to correct the accounting for these rebates will likely be understated, but it has not yet quantified the extent of this and has not submitted its findings t management for review at this time. In addition to vendor rebates, the audit committee's investigation also reviewing the company's forecasts for the first quarter of 2005 and related matters, as well as other matters that have arisen in the course of its investigation. The company cannot currently comment upon the timing i completion of, or the ultimate scope or outcome of, the audit committee investigation, the audit or any

necessary restatements.

As previously discussed, the company has not yet filed its annual report on Form 10-K for 2004 due to this accounting matter and the need for additional time for completion of the 2004 audit and the review of intern controls over financial reporting under Section 404 under Sarbanes-Oxley, and it does not expect to make it first quarter 2005 filing on a timely basis.

\* \* \* \* \*


Collins & Aikman Corporation, a Fortune 500 company, is a global leader in cockpit modules and automotive floor and acoustic systems and is a leading supplier of instrument panels, automotive fabric, plastic-based tr and convertible top systems. Headquartered in Troy, Michigan, we have a workforce of approximately 23,00 and a network of more than 100 technical centers, sales offices and manufacturing sites in 17 countries throughout the world. Information about Collins & Aikman is available on the Internet at http://www.collinsaikman.com.

Cautionary Statement Concerning Forward-Looking Information

The foregoing reflects the Company's views about the accounting investigation, its financial condition, performance and other matters that constitute "forward-looking" statements, as that term is defined by the federal securities laws. You can find many of these statements by looking for words such as "may," "will," "expect," "anticipate," "believe," "estimate," "should," "continue," "predict," "preliminary" and similar words used herein. These forward-looking statements are intended to be subject to the safe harbor protection provided by the federal securities laws. These forward-looking statements are subject to numerous assumptions, risks and uncertainties. Because the statements are subject to risks and uncertainties, actual developments and results may differ materially from those expressed or implied by the forward-looking statements. Readers are cautioned not to place undue reliance on the statements, which speak only as of th date hereof.

Various factors that may affect actual outcomes and performance and results include, but are not limited to, general economic conditions in the markets in which the Company operates, declines in North American, Sou American and European automobile and light truck builds; labor costs and strikes at the Company's major customers and at the Company's facilities; fluctuations in the production of vehicles for which we are a supplier; changes in the popularity of particular car models, particular interior trim packages or the loss of programs on particular vehicle models; dependence on significant automotive customers; the level of competition in the automotive supply industry and pricing pressure from automotive customers; risks associated with conducting business in foreign countries; and increases in the price of certain raw materials, including resins and other petroleum-based products. In addition, the following may have a material impact actual outcomes and performance and results: the results of the pending investigation; the change in leadership at the Company, the Company's ability to maintain access to its receivables facility and other financing arrangements, the Company's ability to otherwise maintain satisfactory relations with its creditors, suppliers, customers and creditors; the Company's ability to maintain current trade credit terms and manag its cash and liquidity, the Company's high leverage and ability to service its debt; and the impact of defaults under its material agreements and debt instruments.

The cautionary statements set forth above should be considered in connection with any subsequent written oral forward-looking statements that the Company or persons acting on its behalf may issue. The Company does not undertake any obligation to review or confirm analysts' expectations or estimates or to release publicly any revisions to any forward-looking statements to reflect events or circumstances after the date of this report or to reflect the occurrence of unanticipated events.


Contact:
Bryce Koth
Chief Financial Officer
(248) 824-1520
bryce.koth@colaik.com

David A. Youngman
Director of Corporate Communications
(248) 733-4355
david.youngman@colaik.com

# EXHIBIT G

Westlaw.                                                                                    NewsRoom

1/2/06 **Automotive** News 3
2006 WLNR 275669

**Automotive** News
Copyright 2006 Crain Communications Inc.

**January 2, 2006**

Volume 80; Issue 6183

Section: News

Big 3 take a battering

It was not a happy year for the domestic **auto industry**.

The first six of 2005's top 10 stories involved events or situations that the Big 3 and their suppliers wish had never happened.

There was no question about the Story of the Year. It was the Delphi bankruptcy, by a wide margin, in the voting by the **Automotive** News editorial staff.

Delphi Corp., the world's second-largest **auto** supplier, filed for Chapter 11 on Oct. 8 after failing to secure a financial bailout from General Motors, its former owner. It's a continuing story, so stay tuned. Delphi wants to cut wages in half, trim benefits, close plants and fire workers. The UAW is not amused.

Rick Wagoner, GM's CEO, was the principal player in the No. 2 story - GM's effort to surface from a sea of red ink. Wagoner took over North American operations and plans to close eight plants and cut 30,000 jobs. He must deal with Kirk Kerkorian, who owns 7.8 percent of GM, and with Ron Gettelfinger, whose UAW has already granted health care and pension concessions and will resist further demands.

The third-place choice was GM's and Ford's pricing maneuvers. Throughout the summer, they sold cars and light trucks at prices below dealer invoice. Then, when the 2006 models arrived, they adopted ``value pricing,'' which involved sticker price reductions - but not nearly to the level of the summer giveaway. Now GM and Ford are raising prices.

Another bad chapter for the domestic **industry**: After Hurricane Katrina devastated Louisiana, Big Oil raised the pump price to more than $3 a gallon, and sales of large pickups and SUVs tumbled. They are the Big 3's most profitable models.

Gasoline prices went down to about $2 a gallon, then rose to around $2.20. Will those models come back? One way or the other, it could be one of 2006's major stories.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Bill Ford's effort to revive his company was the fifth-place story. Ford Motor Co, like GM, is stumbling and needs help. Will it come from the Mark and Anne Show? Mark Fields now is in charge of North American operations, and Anne Stevens is the No. 2.

The No. 6 story was record transplant production in the United States and North America. If John Doe buys a transplant, he doesn't buy a Big 3 product. Chalk up another setback for the Big 3.

Next in line in the voting were Dieter Zetsche's promotion to head DaimlerChrysler and Nissan North America's decision to move its headquarters from Southern California to Nashville, Tenn.

Rounding out the top 10 were 2005 sales, which will flirt with an excellent 16.9 million, accompanied by another loss in Big 3 market share; and the rise in hybrid sales, with Toyota's Prius the pacesetter at 100,000-plus deliveries.

1. Delphi forces the issue

Raising the ante on labor costs in the auto industry, giant auto supplier Delphi Corp. filed for Chapter 11 reorganization on Oct. 8. With assets of $16.6 billion and 185,000 employees worldwide, Delphi's bankruptcy protection case dwarfed all others in automotive history.

The case quickly morphed into a crisis for General Motors, which buys about half of Delphi's $28 billion in annual parts production. The mere threat of a strike at Delphi - and the likely resulting shutdown of GM production - caused concern on Wall Street about GM's own viability.

GM, which spun off Delphi in 1999, also could face up to $12 billion in various pension and health care liabilities for Delphi retirees.

Led by CEO Steve Miller, Delphi sparked a national debate about wages paid to union workers and the preservation of the American middle class. Saying it no longer can compete with foreign labor or even other nonunion domestic suppliers, Delphi pushed for massive wage and benefit cuts for its 35,000 hourly workers in North America.

The UAW and other unions responded with threats of strikes and bitterly criticized Delphi for paying lucrative management-retention bonuses. Miller, who replaced J.T. Battenberg III at the helm, cut his annual pay to $1 but kept a $3 million signing bonus.

The case promises to remain atop the U.S. automotive agenda for much of 2006.

2. Rick Wagoner's terrible, horrible, no-good, very bad year

For General Motors, 2005 ``started out bad and it got worse,'' CEO Rick Wagoner said in an interview with Automotive News in December.

Weak sales meant production cuts. Rising gasoline prices turned consumers away from highly profitable big SUVs. Some of GM's new car offerings, such as the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Pontiac G6, performed below expectations.

Then suppliers **Collins & Aikman** Corp. and Delphi Corp. filed for Chapter 11 reorganization. The Delphi crash put GM in a particularly perilous position; a Delphi strike could cripple GM production quickly.

To avert such a disaster, GM might have to fork over billions of dollars to help placate Delphi workers.

In the midst of it all, billionaire investor Kirk Kerkorian bought up 9.9 percent of GM stock, blandly saying that he was a passive investor. Kerkorian dumped part of his stake at year end.

Wagoner's response? GM negotiated a steep cut in UAW health care benefits, then unveiled a plan to close eight plants and lay off 30,000 employees. That will reduce GM's structural costs. But Wall Street analysts question whether it will be sufficient.

3. GM, Ford try value pricing

General Motors had been casting about for the next hot incentive for months when it launched its ``Employee Discount for Everyone'' deal in June. The offer succeeded beyond GM's wildest dreams - GM sold 550,829 light vehicles in the United States that month, gaining a 32.8 percent share.

Ford Motor Co. and the Chrysler group followed in July, creating a summer of scorching sales. Employee discounts continued into August, but by then the celebratory atmosphere was gone. Payback loomed large for the fall.

To complicate matters, GM and Ford had vowed to institute forms of ``value pricing'' with 2006 models. That strategy calls for lower sticker prices and fewer incentives to wean customers from the deal-of-the-month mentality.

But the summer blowout massively reinforced consumers' hunger for incentives. Sales cratered in October - and Ford and GM had to bring back the spiffs in November.

4. Katrina pummels Detroit, too

A week after Hurricane Katrina hit the Gulf Coast, the national average retail price for regular unleaded gasoline sky-rocketed nearly 50 cents to a record $3.07 a gallon.

Buyers reacted quickly by shunning big pickups and SUVs. The Big 3, whose sales depend heavily on light trucks, were hit hard - especially in October. That month, their combined market share fell to an all-time low of 53.2 percent.

The pain was intense. Only four of the 42 truck-based SUVs - domestic and imported - showed a year-to-year sales gain in October. Although gasoline prices fell below $2.20 by mid-December, that was still significantly more than the $1.87 price a year earlier. Light-truck sales were down 9.7 percent through November, while car sales were up 5.7 percent.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Analysts expect that trend to continue, not only because of gasoline prices. The added problem for the Big 3: Increasingly, consumers see cars, not SUVs, as fashion-statement vehicles.

5. Bill Ford's new top guns

As Ford Motor Co. approached year end, employees and outside observers were keenly interested in the ``Mark and Anne'' plan.

That's the turnaround plan being devised by Mark Fields, president for the Americas, and Anne Stevens, COO for the Americas.

The very existence of the plan and its authorship speak volumes about the kind of year Bill Ford has had at the helm of the battered automaker.

Fields arrived from Europe after Bill Ford shifted Greg Smith to a vice chairman role. Bill Ford subsequently promoted Stevens. Other major executive moves in 2005 included the departures of product development head Phil Martens; Matt DeMars, vice president of North America vehicle operations; hybrid chief Mary Ann Wright; and Earl Hesterberg, group vice president of marketing, sales and service.

Through it all, Ford suffered serious sales declines in its bread-and-butter light trucks. For instance, it sold only 11,792 Explorers in November, fewer than half the year-ago total.

That left Bill Ford scrambling to restructure his restructuring plan, setting the stage for ``Mark and Anne.''

6. Transplant factories hum

The contrast couldn't be more striking: As Ford and GM trimmed production and pondered which plants to close in 2005, North America's import-brand manufacturers pushed factory volumes to record levels.

Japanese, German and Korean-owned auto factories in North America turned out an estimated 4,966,000 cars and trucks in 2005. That was up 11 percent from the 4,472,477 vehicles they built in 2004, and up 27.6 percent from the 3,892,155 vehicles they built just five years ago.

The volumes, which exclude Big 3 nameplates produced by the transplants, crept upward as the group spread into new U.S. market segments.

Nissan's 2-year-old Canton, Miss., factory now builds a luxury-class Infiniti QX56 SUV, along with a full-sized Nissan pickup and SUV.

Honda's East Liberty, Ohio, plant supplies the Generation-X Element, while Toyota's Cambridge, Ontario, plant produces the first non-Japanese Lexus.

An expanded Mercedes-Benz U.S. International Inc., which opened in Alabama with a single SUV model in 1997, ended 2005 preparing to launch its third model on the same line - a product that bridges the gap between the stylish M class and the brawnier European-built G class.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

7. Dieter moves on - and up

When Dieter Zetsche parachuted into Detroit from Stuttgart in November 2000, the Chrysler group's sales, profits and morale were sinking. Five years later, Zetsche returns to Germany to lead DaimlerChrysler AG as CEO.

Zetsche, a charismatic leader noted for his sense of humor, led a Chrysler group revival that cut costs and created a rich product portfolio.

He took risks: the Hemi V-8 rear-wheel-drive Chrysler 300, and car-based Jeeps. And he solidified Chrysler's lineup through the end of the decade.

He also restored pride to Chrysler's Auburn Hills headquarters, which had felt relegated to second-class status since the merger of Daimler-Benz and Chrysler Corp.

And he installed protege Tom LaSorda - a Chrysler guy, not a Mercedes guy - as his successor in the CEO spot.

Now Zetsche's main focus is restoring the glow to the Mercedes-Benz car group.

8. Music City, here we come!

Leave California? That's heresy for many executives of Asian automakers nurtured by the state's vibrant car culture.

But that's exactly what the headquarters staff of Nissan North America Inc. will do in May. About 1,300 top executives and employees will move to Nashville, Tenn.

The move was bitterly opposed by many diehard Californians at Nissan. But Nissan CEO Carlos Ghosn decided much would be gained.

Nissan will get a windfall from selling its 13 buildings and 43-acre corporate campus in California. And the move will put Nissan's marketing and sales staff near its manufacturing headquarters in Tennessee, improving communication.

The company concedes that about half of its California staffers may refuse to move. But that's a price Ghosn is willing to pay.

9. Not a bad sales year overall

Ford and GM paid heavily for their summer of employee pricing. But their highly publicized woes distorted the overall sales picture.

By year end, U.S. light-vehicle sales were expected to approach 16.9 million for 2005. Heavy year-end blowout sales by Big 3 and Japanese makes - including Lexus, with its ``December to Remember'' - were the industry's insurance that 2005 wouldn't be a dud.

Despite the incentive spending, Big 3 share isn't expected to recover - and may, in fact, fall further from the 11-month level of 57.1 percent, down from 58.7 percent a year earlier.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not surprisingly, the market share of Japanese brands rose to 32.3 through November, up from 30.4 percent. Korean **automakers** are gaining, but only slightly. And European brands, handicapped by the weak dollar-strong euro, face declining shares.

10. Toyota leads hybrid surge

Naysayers called hy-brids nothing more than a glorified marketing strategy.

They trotted out numbers showing that the driver's gasoline savings would never pay for the price premium on the sticker.

No matter. Consumers flocked to hybrids for the feel-good factor.

The Toyota Prius sold more than 100,000 units in 2005, outselling entire brands such as Suzuki, Audi, Hummer and Mini.

As Toyota expands its hybrid presence to the Highlander, Camry and several Lexus vehicles, everyone else is starting to realize that hybrids have potential.

Ford can't build Escape Hybrids fast enough and will expand its hybrid offerings. GM says it will have hybrid full-sized SUVs in 2007. German **automakers**, who initially pooh-poohed hybrids in favor of diesels, are joining the parade.

Better late than never.

\* \* \*

**autonews.com**

See our Web site for 53 years of top stories.

---- INDEX REFERENCES ----

COMPANY: GENERAL MOTORS CORP; NISSAN NORTH AMERICA INC; NISSAN MOTOR CO LTD; FORD MOTOR CO; RENCO GROUP INC; TOYOTA MOTOR CORP; DELPHI CORP; **COLLINS** AND **AIKMAN** CORP; DAIMLERCHRYSLER AG; AUDI AG

NEWS SUBJECT: (Corporate Financial Data (1XO59); HR & Labor Management (1HR87); Business Management (1BU42); Layoffs (1LA48); Sales & Marketing (1MA51); Plant Closings (1PL71); Financially Distressed Companies (1FI85); Major Corporations (1MA93); Labor Relations (1LA21); Market Share (1MA91); Economics & Trade (1EC26))

INDUSTRY: (Manufacturing (1MA74); Transportation (1TR48); Land Transportation (1LA43); **Automotive** Models (1AU61); Passenger Transportation (1PA35); **Automobiles** (1AU45); **Automotive** (1AU29))

REGION: (North America (1NO39); Western Europe (1WE41); Germany (1GE16); Europe (1EU83); Central Europe (1CE50); California (1CA98); Americas (1AM92); USA (1US73); Michigan (1MI45); Tennessee (1TE37))

Language: EN

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

OTHER INDEXING:   (AUDI; **AUTOMOTIVE** NEWS; CHRYSLER; CHRYSLER CORP; **COLLINS AIKMAN**
CORP; COO; DAIMLER BENZ; DAIMLERCHRYSLER; DAIMLERCHRYSLER AG; DELPHI; DELPHI CORP;
FORD MOTOR CO; GENERAL MOTORS; GENERATION X ELEMENT; GM; HUMMER; LEXUS; MERCEDES;
MERCEDES BENZ; NISSAN NORTH AMERICA; NISSAN NORTH AMERICA INC; PONTIAC; SUV; SUVS;
SUZUKI; US INTERNATIONAL INC; UAW)   (2.; 5.; Anne; Anne Show; Anne Stevens; Big
Oil; Bill Ford; Carlos Ghosn; Chalk; Dieter; Dieter Zetsche; Earl Hesterberg;
Escape Hybrids; Fields; Ford; Ghosn; Greg Smith; Honda; J.T. Battenberg;
Kerkorian; Kirk Kerkorian; Leave California; Mark; Mark Fields; Mary Ann Wright;
Matt DeMars; Miller; Mini; Nissan; Payback; Phil Martens; Rick Wagoner; Ron
Gettelfinger; Rounding; Steve Miller; Stevens; Tom LaSorda; Toyota; Wagoner; Wall
Street; Zetsche)

KEYWORDS: 2005: Lists of 10; top stories

Word Count: 2560
1/2/06 **AUTOMTVN** 3

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1/2/06 AUTOMTVN 3                                                          Page 8

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

5 of 45 DOCUMENTS

Copyright 2005 Detroit Free Press
All Rights Reserved
Detroit Free Press

December 3, 2005 Saturday Metro final Edition

**SECTION:** BIZ; BUSINESS; Pg. 1

**LENGTH:** 822 words

**HEADLINE:** LEAR, DCX FIGHT IS A TREND;
SUPPLIER IS ORDERED TO KEEP SHIPPING

**BYLINE:** By JASON ROBERSON

**BODY:**

It's round three this year in the match between auto suppliers and the car companies.

First there was David Stockman, the former CEO of auto interiors supplier **Collins & Aikman Corp.**, who threatened to shut down production on DaimlerChrysler AG's most-popular new vehicle, the Chrysler 300, unless the automaker paid more for C&A's parts.

Then came wheel manufacturer Topy Corp., which threatened last month to stop deliveries to General Motors Corp. if the automaker didn't pay more to offset higher steel prices.

And on Thursday, Lear Corp., a seat and interior trim manufacturer, became the latest supplier to take on a Goliath automaker, DaimlerChrysler AG's ChryslerGroup. Lear, which is paying more for its raw materials, threatened to stop supplying parts if Chrysler didn't pay more money.

Oakland County Circuit Judge Colleen O'Brien issued a temporary restraining order Thursday forcing Lear to continue to supply interior trim to DaimlerChrysler. O'Brien scheduled a Dec. 14 hearing to consider a preliminary injunction.

Topy eventually dropped its claim against GM. And C&A's dispute with Chrysler was dropped after Stockman left the company.

Such nasty squabbles over who should help pay for increased raw materials costs are likely to continue, analysts say. The adversarial relationship is more than a decade old.

Lear executives, burdened with the rising costs of oil-based resins used to make foams and plastics, sent a letter on Nov. 21 to DaimlerChrysler saying that Learcould not afford to continue paying its own suppliers.

DaimlerChrysler sued, saying that within two days of stopped product, it would have to shut down 12 global plants.

"As times get leaner, and we're operating on much smaller margins, we'll see the suppliers challenge the automakers even more," said Robert Chiaravalli, a principal of Strategic Labor & Human Resources, a consulting firm in West Bloomfield.

The difficulty that exists between the buyer and seller relationship in the U.S. auto industry surrounds competitiveness, said Neil DeKoker, managing director of the Original Equipment Suppliers Association, an organization representing 386 suppliers with a combined $300 billion in sales. DeKoker said the sour relationship between U.S. automakers and suppliers started in 1992. GM's cost-cutting phenomenon, J. Ignacio Lopez de Arriortua, came onto the scene, squeezing suppliers by rebidding nearly every parts contract in an effort to get cheaper components. The moves pit supplier against supplier in an unhealthy competition, DeKoker said.

Page 2

LEAR, DCX FIGHT IS A TREND;SUPPLIER IS ORDERED TO KEEP SHIPPING Detroit

In a survey of 259 auto suppliers released in May, 85% of the suppliers who work with GM reported a poor working relationship, according to Birmingham-based Planning Perspectives Inc. Suppliers also reported poor relationships with Ford Motor Co.

Toyota Motor Corp. and Honda Motor Co. ranked at the top in the survey.

"GM scored the worst out of any industry we've surveyed in the last 15 years," said John Henke, president of the consulting firm. Planning Perspectives interviews suppliers in the construction, aircraft, food and electronics industries.

In recent years, several automakers have announced initiatives to improve their relationships with suppliers.

GM CEO Rick Wagoner called for increased cooperation with suppliers in a 2004 technology conference in Detroit. Both sides are needed to tackle daunting issues such as growing competition from overseas, Wagoner said.

"All around us ... we face global competitors who are committed to advancing as fast as, or faster, than we are," Wagoner said. "And they will not hesitate to pass us by. If we pause to fight among ourselves, the competition will eat us alive."

Ford said in September it will reduce by half the number of companies from which it buys 20 key parts and commodities such as seats, axles, brake systems and bumpers for its vehicles. Ford will give its preferred suppliers longer-term contracts in return for a promise for increased technological innovation. The preferred-supplier program affects about half the company's $70-billion annual production buy.

The move represented a major overhaul of the way Ford did business with parts makers.

Honda says it works with its suppliers to make them operate more efficiently, even as raw materials prices rise. Quarterly, Honda's suppliers meet to share their "improvement themes," says Honda spokesman Ron Lietzke.

"This is a way for suppliers to share their ideas to help others succeed," Lietzke said.

Honda also hosts what it calls a lean network, where its 600 North American suppliers work with Honda to create a lean manufacturing process. The more efficient suppliers are managed, the better chance they have at absorbing price increases of raw materials, Lietzke said.

Contact JASON ROBERSON at 313-222-8763 or jroberson@freepress.com.

DISCLAIMER: THIS ELECTRONIC VERSION MAY DIFFER SLIGHTLY FROM THE PRINTED ARTICLE

LOAD-DATE: December 7, 2005

37 of 45 DOCUMENTS

Copyright 2005 Detroit Free Press
All Rights Reserved
Detroit Free Press

July 27, 2005 Wednesday 2 EDITION

**LENGTH:** 1398 words

**HEADLINE:** Chrysler 300 faced idling;
C&A threatened part supply

**BYLINE:** BY JEFFREY McCRACKEN; FREE PRESS BUSINESS WRITER

**BODY:**

Production of Detroit's hottest car in years, the Chrysler 300 sedan, came perilously close to a complete shutdown this spring as a crucial and desperate supplier threatened to pull the plug unless Chrysler paid more for parts.

Such a warning is the auto industry equivalent of a nuclear weapon -- rarely threatened and almost never used.

But in the days and weeks before struggling auto parts maker **Collins & Aikman Corp.** ousted its chief executive, David Stockman, on May 12, the former Michigan congressman warned his largest customer, the Chrysler Group, he was going to stop sending instrument panels to the Brampton, Ontario, assembly plant. That plant makes one of the most popular cars in the country -- the Chrysler 300.

A shutdown would have been devastating to Chrysler, because the much-hyped Chrysler 300 and other cars from that plant have been the backbone of Chrysler's recent market-share gains and are those rare vehicles that sell largely without incentives. However, Troy-based **Collins** & Aikman was running out of cash and was burdened by a series of unprofitable contracts, the biggest of which was probably this one, said two senior auto officials.

"A shutdown was within days," said one top auto official, who asked not to be named because of lawsuits surrounding C&A.

Three automotive officials familiar with the tense negotiations spoke to the Free Press for this report but asked not to be named for various reasons.

Stockman, fighting a losing effort to stave off bankruptcy, made the threat because C&A was losing an estimated $50 million a year on the contract to make plastics and fabric parts on the Chrysler 300/ Dodge Magnum/ Dodge Charger platform. C&A filed for bankruptcy protection May 17 and is now being propped up by hundreds of millions of dollars from the automakers.

Two senior auto officials estimated C&A was providing about $700 in parts for each one of those Chrysler vehicles -- and losing up to $150 on each one. Chrysler is on pace to build about 260,000 of the Chrysler 300, Dodge Magnum and Dodge Charger models this year.

Stockman was pressing for small price increases from Chrysler, with the hope he could leverage a deal to get similar concessions from General Motors Corp. and Ford Motor Co., C&A's second- and third-largest customers, and keep C&A out of bankruptcy. Detroit's automakers are reluctant to give price increases to their suppliers for a part that is in production and are even more resistant to let it become public.

The showdown between C&A and Chrysler is a glimpse into the increasingly adversarial relations between Detroit's automakers, who are fighting a product onslaught from Asian automakers, and the parts suppliers, who've been squeezed between rising steel and plastics prices and automaker demands for lower prices.

Now that C&A is in bankruptcy, it is costing the automakers dearly -- maybe even more than the original concessions would have. When Chrysler reports its second-quarter earnings on Thursday, the Free Press has learned the auto-

Chrysler 300 faced idling;C&A threatened part supply   Detroit Free

maker will tell Wall Street it had to take a special provision for extra costs associated with propping up C&A. There could also be a cost associated with the third quarter, said two auto officials.

Automakers have ponied up about $335 million to keep C&A going, money that will last only through the end of September, a deal that includes 15% price increases on their C&A contracts.

Automakers and suppliers have butted heads for years over everything from prices to who pays the bill in a product recall, but rarely do relations get so bad that a shutdown is threatened. Longtime auto observers said they could not recall a time when a supplier intentionally shut down an automaker, but with bankruptcy staring C&A in the face, they said perhaps Stockman felt he had no other choice.

"Suppliers have that power to shut down automakers, they've got that nuclear button at their fingertips, but they never push it because they are afraid how automakers will react," said Jim Gillette of CSM Worldwide who has worked in the industry since 1988.

"There is lip service out there that automakers and suppliers are getting along now, but that doesn't fly. I think it is more tense than ever with the global pressure and low-price parts from China forcing everyone, even Toyota, to be more cost-conscious. If you want to blame it on someone, I guess blame it on the consumer who wants more and more for a lower price," he said.

Chrysler spokesman Mike Aberlich declined to comment.

C&A's restructuring officer John Boken, who came in after Stockman departed, said he did not know the details of Stockman's negotiations with Chrysler, except that the ousted CEO was trying to get price increases from various automakers.

Didn't understand pricing

The tension between Chrysler and C&A goes back to when Stockman took over in August of 2003 as chief executive for C&A, a $4-billion supplier that he had helped put together through a series of acquisitions. He had been chairman of C&A and helped run a private equity fund called Heartland Partners that was buying up other suppliers to merge them into C&A.

His biggest buy was the plastic-trim business from Textron Automotive for $1.2 billion in August of 2001. The contract to make parts for Chrysler on the 300, Magnum and Charger was included in the purchase.

A senior auto official familiar with C&A said Heartland's people "weren't experienced enough to understand pricing on instrument panels. They didn't see that Textron had lowered the price a lot to make sure they got the business, so it was underwater from the beginning."

After Stockman took over, he immediately began to butt heads with Chrysler over pricing. Chrysler took some contracts from C&A and gave them to rivals;meanwhile Stockman walked away from a contract to make parts on the Dodge Stratus and Chrysler Sebring.

The two sides fought over pricing well into 2004, with Chrysler shopping around much of the $1.2 billion it did in annual business with C&A. In the spring of 2004, Chrysler threatened to yank the 300-Magnum-Charger contract from C&A and give it to Intier, a rival plastics supplier.

C&A, which had already spent about $50 million gearing up for the contract, agreed to give price concessions to Chrysler to keep the business, figuring it was better to lose some money on the contracts than to not have the contract at all. That was a no-win situation C&A apparently found itself in often through 2004 and 2005, said senior auto officials.

A May 24, 2004, agreement between Chrysler and C&A, a copy of which was read to the Free Press, shows C&A agreed to give back 8.5% to Chrysler on the 300 contract -- even though it was already unprofitable.

"There was no choice. The contract was going to get moved otherwise," said an auto official who asked not to be named because the person is still in the industry.

C&A also gave double-digit percentage breaks on parts it made for the Chrysler Town & Country minivan, Dodge Ram and Dodge Durango, according to the agreement. In bankruptcy court, it has been estimated C&A has at least 35 unprofitable contracts, some of which were unprofitable from the beginning, others of which became unprofitable as plastic prices rose or because C&A gave more concessions to keep the contracts.

Page 3

Chrysler 300 faced idling;C&A threatened part supply    Detroit Free

The Chrysler 300 contract was underwater for all of those reasons.

As the cost for plastics went up with rising oil prices through late 2004 and early 2005, C&A went back to Chrysler around March of this year and demanded some price relief on the contract. C&A's target was to get 5-10% increases, or about $35-$65 relief per car.

The two companies haggled through from March until Stockman's departure in mid-May. While C&A officials pushed, Chrysler resisted.

Officials familiar with C&A's perspective said a deal for a price increase was close and would have been followed by deals from GM and Ford. An official familiar with Chrysler said no deal was imminent, so a shutdown was probably more likely.

Either way, something unusual in the auto industry was about to happen -- but didn't.

Instead the outcome is something that is becoming more common: A supplier goes into bankruptcy and gets the same or better price concessions it sought before.

Contact JEFFREY McCRACKEN at 313-222-8763 or mccracken@freepress.com

**LOAD-DATE:** July 27, 2005



CLO

**Print**

# Auto Suppliers' 2005 Woes May Well Continue In 2006

Primary Credit Analysts:
Robert Schulz, CFA, New York (1) 212-438-7808;
robert_schulz @ standardandpoors.com
Martin King, New York (1) 212-438-7800;
martin_king @ standardandpoors.com
Secondary Credit Analysts:
Daniel R DiSenso, New York (1) 212-438-7693;
daniel_disenso @ standardandpoors.com
Nancy C Messer, CFA, New York (1) 212-438-7672;
nancy_messer @ standardandpoors.com

Publication date: 29-Nov-05, 10:50:57 EST
Reprinted from RatingsDirect

] **Quick Links**

2006: Better Or Worse?

Restructuring Will Continue
In 2006

Main Rating Concerns For
2006

Sidebar: Success Factors

The auto supplier sector has experienced an especially difficult time in 2005. Production levels for key customers Ford Motor Co. and General Motors Corp. have fallen throughout the year while these automakers reduced high levels of dealer inventory. October sales for the two companies were especially weak following the employee-discount-induced sales surge during the summer. While the discount programs were effective at reducing inventories, they also seem to have sharply reduced demand in the fall. Meanwhile, factors such as high gas prices have further hurt sales, which are expected to remain soft for the rest of the year. This raises concerns about whether automakers can achieve even slight year-over-year increases in fourth-quarter vehicle production schedules, as they had hoped.

We see few reasons to be optimistic about 2006. Auto sales are almost certain to start off the year somewhat weak, so production levels are likely to be at risk from the outset--notwithstanding potential volume increases for certain new models. A better 2006 would mean more stable or increased production by Ford and GM. Another serious problem for auto suppliers is higher raw material costs, which, because in many cases they are not being fully recovered, are cutting into earnings and cash flow.

These issues--earnings, cash flow, and liquidity pressures--have troubled virtually every rated auto supplier in 2005, and they will continue to plague companies next year. Only the magnitude of the threat remains unknown.

There have been abundant negative rating actions among these predominantly speculative-grade companies in 2005. Among the 50 suppliers rated by Standard & Poor's Ratings Services (including auto retailers, which have been more stable) there have been 60 rating actions, more than half of them downgrades. The number of investment-grade companies in the sector dwindled from 10 at the end of 2004 to six in November 2005. The number of companies with negative outlooks, meanwhile, has risen by more than 50% since December 2004. For most suppliers downgraded in 2005, the common problem has been the aforementioned combination of production cuts, raw material cost spikes, and liquidity erosion.

Casting companies Citation Inc. and Intermet Inc. filed for bankruptcy protection late in 2004. In 2005, three rated midsize auto suppliers declared bankruptcy--Tower Automotive Inc. (which has $3 billion in sales), Meridian Automotive Systems Inc. ($1 billion), and Collins & Aikman Corp. ($4 billion). These three have always been rated below investment grade, and all have been burdened by heavy debt loads due to past acquisitions. When industry demand softened and raw material costs increased, they suffered from insufficient cash flow and liquidity to meet their onerous debt service requirements.

Delphi Corp., the largest U.S. auto supplier, sought the protection of Chapter 11 in October 2005. However, the company has a fair liquidity position, and we believe that the decision to file at that time was a tactical one made by the company's new management, installed in midyear. Meanwhile, Visteon Corp., a former Ford supplier facing challenges similar to Delphi's, was restructured in a complex transaction that allowed it to avoid bankruptcy.

Actually, it is somewhat surprising that there have only been four defaults so far in 2005--given that there are 26 companies rated in the 'B' category or lower. One reason, it seems, is that some struggling companies in the 'B' category have managed to cobble together solutions to avoid bankruptcy, both by finding some raw material price relief and contriving alternative financing.

In any case, these companies are ending 2005 with a weaker credit profile on the whole. Sales are weak, product mix is deteriorating, and inventory levels are rising to levels that are higher than the ideal. These conditions do not bode well for the rated auto supplier universe in 2006. The recent decline of retail gasoline prices from hurricane-induced highs is perhaps one of the only few pieces of good news as these companies move into the new year.

## 2006: Better Or Worse?

For industry conditions to improve in 2006, several things must happen.

- North American retail sales must remain at levels close to those in 2005--at about 17 million units. Consumer confidence is a crucial factor.
- For Detroit Three automakers, production and dealer inventory levels must remain more balanced than they were in 2005, when a glut led to steady rounds of production cuts. The critical factors for better inventory are the impact of gas prices on product mix; the pricing landscape; and the acceptance by consumers of new 2006 products.
- Raw material prices must remain stable, if not decline.
- Suppliers must continue to manage their liquidity carefully.

In our view, such improvements in 2006 are far from certain, so many ratings will remain tenuous.

2005 was a very difficult year, but it was not an anomaly. While

by some measures these are the good times--overall sales are near record levels--what is different is that there is a fairly dramatic change in product mix underway--and no reversal is in sight in 2006. Down sharply are the highly profitable sales of midsize and large sport utility vehicles (SUVs) and light trucks. High gasoline prices, a shift in consumer tastes, and the increasing demand for so-called "crossover" SUVs are driving this phenomenon. While certain major SUV platforms are fairly dated and will be renewed in 2006-2007, a factor that may also be contributing to the sales decline, we believe the best volumes of the SUV segment are behind us.

↑ back to top

## Restructuring Will Continue In 2006

We believe the negative trends will have broader rating implications in 2006. Because of the increasing time, costs, and operational risk involved in dealing with troubled suppliers, the domestic automakers have announced a new round of strategies that will allow them to deal with fewer vendors. Ford, for instance, has said it will work toward a much smaller group of large strategic suppliers. GM, while not necessarily changing suppliers, has focused on the supplier cost footprint, and supports the movement of that footprint to lower cost areas. DaimlerChrysler AG's approach seems to be emphasizing a more collaborative relationship with the supply base.

Even though the rated suppliers are constantly working to improve their operating profiles--by reducing excess capacity, lowering headcount, and taking steps to blunt the impact of higher raw material costs--they are negotiating with a customer base that is often unresponsive. Some companies have a better record of success than others. Still, the combination of production cuts, raw material cost spikes, and liquidity challenges have increased the urgency to improve. The current industry turmoil has not yet led to any notable manufacturing capacity reductions, but this could change in 2006. Most companies that have recently defaulted have reorganized rather than liquidate.

The increase of production capacity by new domestic automakers and their need to build a supply base could be a boon to some fortunate U.S. suppliers. Still, this opportunity has a double edge: If the transplants continue to take market share from Ford and GM, it is a negative for the two auto giants' vendors as well.

Meanwhile, investors seeking distressed assets have taken large positions in the debt of defaulted suppliers. The possible asset sales of both bankrupt and nonbankrupt suppliers are not only being eyed by other industry participants--there is also a highly publicized level of interest by financial sponsors. Several companies in recent years have proved to be very profitable investments for their former equity owners--American Axle & Manufacturing Inc. and Lear Corp. for example--even though there are also companies, such as Collins & Aikman, that have been far less profitable as investments. Because automotive demand has actually been fairly steady in recent years (it is mainly the market share declines of GM and Ford that have been the challenge for suppliers) financial sponsors attempting to consolidate troubled businesses at a discount will need to focus

as much on end-customer mix as on other aspects of the business--specifically on the amount of business the suppliers have with non-U.S. manufacturers. It is not so much the financing of the transactions that poses a barrier to financial sponsors as it is their ability to run the business profitably in the face of continuing industry challenges. Any assets attained in such restructurings will have faced operational and financial distress, and the fundamental product issues will need to be addressed in an industry environment that can prove fatal, or at least debilitating, for companies with high financial leverage. In any case, an auto supplier with a large proportion of value-added business from a well-diversified base of major automakers is unlikely to be the target of this sort of restructuring or roll-up in the first place.

↑ back to top

## Main Rating Concerns For 2006

Our concerns vary by company, but an important one is liquidity, especially as we descend the rating scale. Even certain investment-grade companies may be cash flow negative this year. During 2005, the launch process for 2006 models required substantial liquidity from many suppliers, who needed to gear up their investments in tooling to support the new platforms. The need for such investments may moderate, in early 2006 at least. Still, despite all of the recent downgrades, we are likely to see even more in the near term, and without question they will continue to outpace upgrades.

↑ back to top

## Sidebar: Success Factors

Regardless of how difficult 2006 turns out to be, certain companies will fare better than others. Those few that prove resilient will already possess a combination of the qualities described below.

1) Diversity. This can be measured by:

- Customer diversity. A broad customer base is desirable-- including a more balanced percentage of sales both from major Detroit-based automakers and from European and Asian automakers;
- Platform diversity. Specifically, this means extensive product penetration on the top 20 vehicle platforms;
- End-market diversity (in the aftermarket and in heavy trucks and light vehicles). This balances business cycles;
- Geographic diversity, including more balance between North America and the rest of the world; and
- Product diversity, including broader lines of products and businesses.

2) High operating efficiency and low cost structures. These are measured by:

- Operating margins;
- Capacity utilization;
- Return on assets;
- The mix of fixed costs and variable costs; and
- The cost of raw materials and their percentage as a cost of goods sold (COGS).

3) Product segments that have solid growth prospects. These are measured by:

- New products as a percentage of sales; and
- Sales growth year to year.

4) Design and engineering and new product development capabilities. These can be measured by:

- R&D as a percentage of sales;
- New products as a percentage of sales; and
- Sales content per vehicle.

5) Scale and strong customer relationships. These can be measured by:

- Market share;
- Content per vehicle; and
- Revenues.

6) New business quoting skills and product launch capabilities. These are evidenced by:

- The profitability of new business; and
- Product launch successes or delays.

7) Financial resilience, including liquidity and access to capital. These are indicated by:

- Strong cash balances and demonstrated access to capital markets;
- Strong, stable internal cash flow relative to obligations; and
- The term structure of debt and the magnitude of off-balance-sheet obligations.

↑ back to top

Disclaimers    Privacy Notice    Terms of Use    Regulatory Disclosures    Site Map    Help
Copyright (c) 2006 Standard & Poor's, a division of The McGraw-Hill Companies, Inc. All rights reserved.

# EXHIBIT H

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE COLLINS & AIKMAN CORPORATION SECURITIES LITIGATION | 2:05-CV-03791 (MBM) |

## DECLARATION OF DAVID A. STOCKMAN IN SUPPORT OF DEFENDANTS' MOTION TO TRANSFER VENUE PURSUANT TO 28 U.S.C. § 1404(a)

I, David A. Stockman, hereby declare as follows:

1. I served as Collins & Aikman Corporation's ("C&A" or the "Company") Chief Executive Officer from August 2003 to May 12, 2005. I was Chairman of C&A's Board of Directors from August 2002 to May 12, 2005, and I was a member of the Board of Directors starting in February 2001. I make this declaration upon my personal knowledge and belief.

2. Throughout the Class Period (May 15, 2003 to May 17, 2005), C&A's corporate headquarters was located in Troy, Michigan, and I believe that remains true today. During the Class Period, apart from the Soft Trim division, which is located in North Carolina, members of C&A's corporate management team and corporate employees in the sales, engineering, design, finance, accounting, treasury, and purchasing departments were located principally at C&A's headquarters. I understood many of these employees resided in the Detroit metropolitan area during the Class Period, and I believe many current or former senior managers and corporate employees continue to reside in that area.

3. During the Class Period, with the exception of the Soft Trim division, the corporate executives for C&A's primary operating divisions were located at the C&A campus in Troy, Michigan. I understood the key executives in those operating divisions during that period resided in the Detroit metropolitan area, and I believe many of those persons continue to reside in that area.

4. During the Class Period C&A's independent auditor, KPMG, maintained a presence at the Company's headquarters in Troy, Michigan.

5. During the period he served as CEO of C&A, I understood Jerry Mosingo resided in the Detroit metropolitan area. I believe he still resides in that area.

1

6. During the Class Period, C&A sometimes negotiated price concessions from the Company's suppliers. These price concessions often came in the form of rebates rather than reductions to list price, as was common in the industry. Likewise, C&A sometimes gave price concessions to its customers, the auto manufacturers.

7. To the best of my knowledge and belief, C&A's Purchasing Department, with periodic advice and input from the Accounting Department, was responsible for negotiating contracts and rebate agreements with the Company's suppliers. Both departments were located at the Company's headquarters in Troy, Michigan. I understood that most, if not all, key executives in those departments resided in the Detroit metropolitan area during the Class Period, as did most of the employees in those departments. I believe many of those persons continue to reside in that area.

8. During the Class Period, I understood C&A's Treasury Department, located at the Company's headquarters, was responsible for considering and evaluating the inclusion of tooling receivables as collateral for C&A's accounts receivable financing facility. During the latter part of that period, I understood the Company's Treasurer, John Galante, was familiar with the process for certifying C&A's borrowing levels on the receivables facility complied with the formula set forth in the relevant borrowing agreement. I understood Mr. Galante lived in the Detroit metropolitan area during the Class Period, and I believe he continues to live in that area.

9. During the Class Period, I understood C&A's Finance Department was responsible for collecting financial reports from the operating divisions and generating the Company's consolidated financial statements. During the latter part of that period, I understood C&A's Controller, David Cosgrove, resided in the Detroit metropolitan area, as did other members of the Finance Department. I believe Mr. Cosgrove and many of these other persons continue to reside in that area.

10. In early March 2005, C&A's senior management learned of potential errors in the accounting treatment for certain vendor rebates. The Company commenced an internal review of supplier contracts that included vendor rebates. I understood that most members of that review team, including C&A's then-Controller (Mr. Cosgrove), Chief Financial Officer (Mr. Bryce Koth), and General Counsel (Mr. Jay Knoll), resided in the Detroit metropolitan area at the time, and I believe these persons continue to live in that area.

11. To the best of my knowledge and belief, each of the following individuals was involved in one or more aspects of the factual circumstances relating to allegations made in the complaint, and should have information about those events. During the Class Period, I understood each of the following persons resided in the Detroit metropolitan area, and I believe they continue to live in that area:

    a. C&A's Senior Vice President Global Procurement & Supply Chain Management, Dianna Kokkinos, should have information about the role of vendor rebates in

2

C&A's business, procedures and policies of the Purchasing Department, negotiations with C&A's suppliers over price concessions, and certain particular rebate agreements.

b.  Several C&A purchasing managers and buyers should have information about the circumstances and terms of the rebate agreements they negotiated. These include Michael Doyle, Amarish Kapadia, Dan Mutarelli, Andy Heilmann, Chris Duvall, Joseph Nowacki, Jason Clark, Scott Mors, Tim Knight, and other persons operating in the Purchasing Department at C&A's headquarters.

c.  C&A's Corporate Controller, David Cosgrove, should have information about the accounting standards that C&A applied to determine the revenue impact of rebate agreements, as well as the 2005 management review of rebates. Other persons currently or formerly employed in the Finance Department at C&A headquarters are also likely to have information on these issues.

d.  The Presidents of C&A's Global Plastics and Global Convertible Systems, Michael Torakis and Reed White, should have information about the operations of those divisions, including allegations that C&A was understaffing projects and disguising quality control problems at manufacturing plants.

e.  C&A's Treasurer, John Galante, should have information about C&A's accounts receivable facility and calculations made regarding the collateral available for those borrowings, including the treatment of tooling receivables.

f.  C&A's Investor Relations and Public Affairs Manager, David Youngman, should have information about corporate communications with investors, including the press releases and conference calls alleged to be misleading.

g.  Partners or employees of KPMG, C&A's independent auditor, should have information about annual audits and quarterly reviews of the Company's financial statements.

12. To the best of my knowledge and belief, at all times relevant to the Complaint, C&A stored paper documents at the Company's headquarters in Troy, Michigan.

13. During the Class Period, I understood C&A's press releases, earnings statements, and SEC filings were generally prepared and disseminated by multiple C&A employees working in various departments at the Company's headquarters in Troy, Michigan. During that period, I understood many of these employees resided in the Detroit metropolitan area, and I believe many of these persons continue to live in that area.

3

I declare under penalty of perjury that the foregoing is true and correct.

Executed March 1, 2006.

David A. Stockman

4

## CERTIFICATE OF SERVICE

I, Thomas P. Preston, hereby certify that on this 19th day of September, 2007, a copy of

the foregoing **DECLARATION OF JOSEPH O. CLICK IN SUPPORT OF DEFENDANTS'**

**MOTION TO TRANSFER VENUE** was served on the following counsel:

| BY ELECTRONIC SERVICE | BY FIRST-CLASS MAIL |
|---|---|
| Joseph A. Rosenthal<br>Carmella P. Keener<br>Rosenthal, Monhait & Goddess, P.A<br>919 N. Market Street, Suite 1401<br>Wilmington, DE 19899 | Samuel H. Rudman<br>Lerach Coughlin Stoia Geller Rudman &<br>  Robbins LLP<br>58 South Service Road, Suite 200<br>Melville, NY 11747 |
| **BY ELECTRONIC SERVICE** | **BY FIRST-CLASS MAIL** |
| Robert S. Saunders<br>Skadden, Arps, Slate, Meagher & Flom LLP<br>One Rodney Square<br>P.O. Box 636<br>Wilmington, DE 19899 | Craig A. Stewart<br>Ken L. Hashimoto<br>Monique A. Gaylor<br>Arnold & Porter LLP<br>399 Park Avenue<br>New York, NY 10022 |
| **BY ELECTRONIC SERVICE** | **BY FIRST-CLASS MAIL** |
| Michael J. Maimone<br>Joseph B. Cicero<br>Edwards Angell Palmer & Dodge LLP<br>919 North Market Street, 15th Floor<br>Wilmington, DE 19801 | Michael Joseph<br>Joseph O. Click<br>Blank Rome LLP<br>600 New Hampshire Ave., N.W.<br>Washington, DC 20037 |
| **BY ELECTRONIC SERVICE** | **BY FIRST-CLASS MAIL** |
| Anne C. Foster<br>Robert J. Stearn, Jr.<br>Richard Layton & Finger, P.A.<br>One Rodney Square<br>920 North King Street<br>Wilmington, DE 19801 | Jonathan J. Lerner<br>Lea Haber Kuck<br>Skadden, Arps, Slate, Meagher & Flom LLP<br>Four Times Square<br>New York, NY 10036 |

| **BY ELECTRONIC SERVICE**<br><br>Christian Douglas Wright<br>Young, Conaway, Stargatt & Taylor<br>1000 West Street, 17th Floor<br>P.O. Box 391<br>Wilmington, DE 19899-0391 | **BY FIRST-CLASS MAIL**<br><br>Gandolfo V. DiBlasi<br>Stacey R. Friedman<br>David E. Swarts<br>Sullivan & Cromwell LLP<br>125 Broad Street<br>New York, NY 10004 |
| --- | --- |
| **BY ELECTRONIC SERVICE**<br><br>Thomas G. Macauley<br>Zuckerman Spaeder LLP<br>919 Market Street, Suite 990<br>Wilmington, DE 19801 | **BY FIRST-CLASS MAIL**<br><br>Christopher Harris<br>Seth L. Friedman<br>Latham & Watkins LLP<br>885 Third Avenue<br>New York, NY 10022 |
| **BY FIRST-CLASS MAIL**<br><br>Andrew B. Weissman<br>Michele L. Taylor<br>Wilmer Cutler Pickering Hale and Dorr LLP<br>1875 Pennsylvania Ave., N.W.<br>Washington, DC 20006 | **BY FIRST-CLASS MAIL**<br><br>Thomas G. Rafferty<br>Antony L. Ryan<br>Cravath, Swaine & Moore LLP<br>825 Eighth Avenue<br>New York, NY 10019-7475 |
| **BY FIRST-CLASS MAIL**<br><br>Michael Shapiro<br>Gerald Griffin<br>Carter Ledyard & Milburn LLP<br>2 Wall Street<br>New York, NY 10005 | **BY FIRST-CLASS MAIL**<br><br>Richard M. Strassberg<br>Jeffrey A. Simes<br>Laurie L. Leven<br>599 Lexington Avenue<br>New York, NY 10022 |
| **BY FIRST-CLASS MAIL**<br><br>Carl S. Kravits<br>Zuckerman Spaeder LLP<br>1800 M Street, N.W.<br>Washington, DC 20036 | **BY FIRST-CLASS MAIL**<br><br>Richard A. Spehr<br>Joseph De Simone<br>Mayer, Brown, Rowe & Maw LLP<br>1675 Broadway<br>New York, NY 10019-5820 |

2

| **BY FIRST-CLASS MAIL** | **BY FIRST-CLASS MAIL** |
|---|---|
| Stephen L. Ascher<br>Jenner & Block<br>919 Third Avenue<br>New York, NY 10022-3908 | Lynn Brimer<br>Strobl & Sharp, P.C.<br>300 East Long Lake Road, Suite 200<br>Bloomfield Hills, MI 48304-2376 |

*/s/ Thomas P. Preston*

Thomas P. Preston
I.D. No. 2548

3

# EXHIBIT C
# PART 2

132.    According to CI 1 and CI 2, OEMs required C&A to assign specific numbers of

appropriate personnel to construction projects.  However, because of C&A's deteriorating

financial condition, during the summer of 2004 the Company did not have anywhere near the

number of staff required to service its existing projects, let alone the number needed to service

any new business.

133.    According to CI 2, when a particular OEM demanded to meet with a project team

it was not unusual for C&A to "play a shell game" by pulling design and engineering staff from

other projects in order to show the OEM the required number of personnel.  These personnel

were not actually assigned to these projects, however, and usually within a week, the counterfeit

staff was back manning their original projects until the next time the OEM required a meeting.

For instance, CI 2 recounted occasions when Ford, which had required twenty-two designers and

engineers to staff a project for the Mustang, called meetings of the C&A staff.  At the direction

of his superiors, CI 2 first combed through C&A organization charts to try to dig up the required

number of personnel.  When he failed to find enough people, Stockman appeared at two

meetings with Ford to explain why C&A could not have all of the personnel in attendance.

134.    The problems experienced by C&A in staffing projects were confirmed by a

former C&A executive, who was quoted in press reports in May 2005.  The former C&A

executive, who left C&A in 2004, stated that C&A often cut back engineering, design and

manpower for automaker programs, even though the Company had promised certain levels of

engineering, or a certain number of people on a program.

135.    Another striking example of C&A's inability to properly staff its projects was the

Hermosillo facility.  According to the former C&A executive, the Hermosillo project was

severely understaffed.  This executive stated that while C&A had committed to Ford that it

56

would have a certain number of people for this project, it only had half that number of employees

involved. This situation put the entire project at risk. According to a May 18, 2005 article in the

Detroit Free Press:

> We committed to a certain number of people for Ford on the Fusion, but we
> had half as many as we said we did . . . Ford wanted regular meetings with
> us on the Fusion, so we'd send people to Dearborn who were managers that
> knew nothing about design or about the Fusion and tell Ford they were a
> designer to make it look like we had X number of bodies for Ford. They
> were just placeholders. Had Ford asked them a question about the Fusion it
> would have been ugly. It was outright deceit.

136.    Moreover, C&A was not properly supplying the Hermosillo facility with high-

quality, modern equipment. Even though C&A represented that the facility would be a "world

class" facility with all new equipment, C&A was actually stocking it with secondhand

machinery. According to the May 17, 2005 article in the Detroit Free Press, after Ford learned of

this it became "frustrated that C&A [had] sent secondhand machinery to the plant" and was

"worried that, among other things, C&A's angry vendors could disrupt production and not

deliver parts on time."

137.    *Second*, unbeknownst to MacKay Shields, C&A was increasingly producing non-

conforming parts that did not meet its customers' specifications. This, in turn, led the Company

to burn through its available cash and revolving credit.

138.    According to CI 2, the Company had a regularly recurring problem with the

Production Part Approval Process, or "PPAP." Under PPAP, when C&A was ready to finally

produce a part, the Company provided its customer with a prototype part for the customer's

inspection. This normally occurred thirty days before the OEM's scheduled start of production.

However, by the summer of 2004, the Company's production had become so poor that,

according to CI 2, it increasingly had "bad launches" of components, and was frequently unable

to pass PPAP on a timely basis. As set forth below, this created significant liquidity issues for

C&A, and seriously undermined C&A's relationships with OEMs, because those OEMS could not start production until C&A's parts passed PPAP.

139.    For example, CI 2 described how C&A's production issues created significant problems with General Motors, which accounted for approximately 22% of the Company's revenue in 2003. During the early summer of 2004, C&A had <u>six</u> companywide "bad launches" of GM components. The problems were so severe and pervasive that GM warned C&A that one more "bad launch" would automatically result in GM putting the Company on "new business hold," also known as "going red." This meant that, in GM's view, C&A was unable to consistently deliver conforming parts and did not have a plan to remedy the problem.

140.    The seventh bad launch occurred in October 2004, while C&A was in position to be awarded contracts for GM's Hummer HX Mini Van and Theta Platform. As a result, C&A lost both contracts.

141.    *Third*, unbeknownst to MacKay Shields, C&A's increasingly substandard production was draining the Company's available cash and credit, which was critical to MacKay Shields' decision to purchase the C&A Notes on behalf of Plaintiff and the other members of the Class.

142.    For a company such as C&A, manufacturing substandard products which do not conform to customer specifications or requirements often results in liquidity issues. That is because automotive parts companies like C&A have to pay their vendors in order to keep supplies coming in, but do not get paid themselves until the parts they deliver are approved under PPAP by their OEM customers. Indeed, C&A customarily advanced all costs incurred in connection with tool and design projects, and was only paid when the parts passed PPAP. This meant that C&A was forced to front what was often millions of dollars in costs until PPAP

occurred. PPAP was supposed to occur thirty days before an OEM's start of production. However, according to CI 2, because of C&A's increasing incidents of production failure, C&A often did not pass PPAP until ninety days or more _after_ the OEM's scheduled start of production. Thus, instead of being paid thirty days before the start of production, the Company was not being paid in many instances until ninety days or more after the start of production. This had a significantly negative effect on the Company's cash flow and liquidity.

143.    During the early summer of 2004, the cash and credit drain caused by the PPAP situation became so bad that, according to CI 2, C&A became what is known in the automotive parts industry as a "distressed supplier." C&A's manufacturing difficulties were so pervasive that it essentially had to beg OEMs to pay at least some portion of the contract price for those components that were close to conforming.

144.    By the time Defendants solicited MacKay Shields to purchase C&A Notes on behalf of its clients, these problems had already caused a substantial adverse effect on C&A's relationship with its own suppliers. According to CI 1, C&A routinely held its accounts payable until the Company started to receive collection notices from suppliers in a desperate measure to conserve cash. And CI 2 stated that C&A's practice of delaying payments to suppliers became so prevalent that, beginning no later than the second quarter of 2004, C&A's Treasurer, Defendant Galante, established an unwritten "rule" that no supplier would be paid unless that supplier first sent C&A a written threat to shut down delivery. The statements of CI 1 and CI2 are corroborated and confirmed by the Criminal Indictment. As stated in the Criminal Indictment, by no later than at least January 2005, "at Stockman's direction, C&A delayed paying its bills as long as possible, and many of C&A's suppliers were being paid only when they threatened to stop supplying C&A with goods." Criminal Indictment¶54.

145.    Defendants' misrepresentations concerning C&A's business and operating

condition were material.  The materials Defendants provided to MacKay Shields and disclosed to

the markets described a "world-class" company with sufficient staff, top-of-the-line equipment,

good relationships with its customers, significant "new business wins," and ample liquidity.  The

truth, however, was that C&A's business was in chaos; its relationships with its suppliers were

deteriorating; it was unable to properly staff and tool its projects; and its cash and credit were

quickly evaporating.

146.    Had MacKay Shields known the truth about C&A's business and operating

condition, MacKay Shields would not have purchased the C&A Notes on behalf of Plaintiff and

the other members of the Class.

**C.    Defendants' Misrepresentations Concerning C&A's Carrying Values for
Goodwill and Deferred Tax Assets**

147.    Defendants also misrepresented C&A's goodwill and deferred tax assets.

148.    At the time Defendants were marketing the C&A Notes to MacKay Shields, the

goodwill and intangible assets reported by C&A were approximately 45% of the Company's

assets.  For instance, the 2Q04 10-Q reported goodwill of $1.361 billion and other intangible

assets of $47.8 billion.  In C&A's financial statements for the year ended December 31, 2003,

which were attached to the PPM provided to MacKay Shields in connection with the August 11,

2004 meeting, C&A stated that it had net deferred tax assets of $203.3 million.  These materials

further stated:

> Management has reviewed the Company's operating results for recent years
> as well as the outlook for its continuing operations and concluded that it is
> more likely than not that the net deferred tax assets of $203.3 million at
> December 31, 2003 will be realized.

149.    These statements were false. As discussed in more detail below, on March 17,

2005, Defendants announced that C&A would write off $500 million of goodwill for the

Company's U.S./Mexico Plastics and Global Fabrics reporting units, and $177 million of deferred tax assets related to the U.S. and Italy. Under relevant generally accepted accounting principles, Statement of Financial Account Standards No. 142, "Goodwill and Other Intangible Assets" ("SFAS 142"), those write-offs mean that (a) the present value of the discounted cash flow from those two reporting units was insufficient to support the carrying value of goodwill, and (b) the anticipated taxable income in the U.S. and Italy was insufficient to support carrying the deferred tax assets.

150.    At the time they were marketing C&A Notes to MacKay Shields, Defendants knew or recklessly disregarded that C&A's operating results and industry conditions existing at the time Defendants offered C&A debt to MacKay Shields required Defendants to undertake an impairment analysis. Such an analysis would have revealed that the carrying values of the goodwill and deferred tax assets were materially overstated and would have required C&A to record a substantial impairment charge. Moreover, an impairment charge would have indicated to MacKay Shields that C&A's underlying business was not nearly as healthy as it was portrayed, and that the Company's liquidity and creditworthiness was not nearly as MacKay Shields had been lead to believe.

151.    Had MacKay Shields known about the insufficiency of C&A's operating cash flow to support the carrying values of the Company's goodwill or deferred tax assets, MacKay Shields would not have purchased the C&A Notes on behalf of Plaintiff and the other members of the Class.

**D.    Defendants' Misrepresentations Concerning C&A's Substantial Material Weaknesses in Internal Controls**

152.    Defendants also made public statements about the quality of C&A's internal controls over its financial reporting. Defendants knew that an important consideration for

investors is whether the company has sufficient internal controls in order to provide accurate

financial information to investors. Internal controls are critical safeguards for investors because

they provide comfort that the Company keeps accurate financial information and can

meaningfully evaluate operating performance. Internal controls are particularly important in a

large and diverse company such as C&A, which had operations and employees all over the

world.

153.     In connection with filing C&A's 2Q04 10-Q, Defendants Stockman and Stepp

executed a certification pursuant to Section 302 of the Sarbanes-Oxley Act of 2002.

Specifically, Stockman and Stepp certified that they were "responsible" for establishing and

maintaining C&A's disclosure controls and procedures, and that they had:

      a.     Designed such disclosure controls and procedures, or caused such

disclosure controls and procedures to be designed under their supervision, to ensure that

material information relating to C&A, including its consolidated subsidiaries, was made

known to them by others within those entities;

      b.     Designed such internal control over financial reporting, or caused such

internal control over financial reporting to be designed under their supervision, to provide

reasonable assurance regarding the reliability of financial reporting and the preparation of

financial statements for external purposes in accordance with generally accepted

accounting principles; and

      c.     Evaluated the effectiveness of the Company's disclosure controls and

procedures and presented in the 2Q04 10-Q their conclusions about the effectiveness of

the disclosure controls and procedures.

154.    Likewise, each of the Company's SEC filings for previous periods contained

similar Section 302 certifications regarding C&A's internal controls: (i) C&A's Form 10-Q for

the First Quarter of 2003 was certified by defendant Stepp; (ii) its Form 10-Q for the Second

Quarter of 2003 was certified by defendants Stockman and Stepp; (iii) its Form 10-Q for the

Third Quarter of 2003 was certified by defendants Stockman and Stepp; (iv) its Form 10-K for

the fiscal year ended December 31, 2003 was certified by defendants Stockman and Stepp; and

(v) its Form 10-Q for the First Quarter of 2004 was certified by defendants Stockman and Stepp.

155.    These statements were materially false and misleading.  According to CI 2, at the

time Defendants were marketing and selling C&A Notes to MacKay Shields, C&A was suffering

from a variety of material weaknesses over its internal controls that were well known inside the

Company.  Indeed, C&A's internal control weaknesses were reported to C&A management by

PricewaterhouseCoopers in December 2003, but never disclosed to investors.  CI 2 stated that

C&A failed in seven out of eight categories in the PricewaterhouseCoopers review, and these

failures, which included basic internal controls over things like accounts receivables and

payables recognition, were not rectified.

156.    Defendants knew about or recklessly disregarded C&A's substantial material

weaknesses in internal controls and Defendants' failure to correct them.  Had MacKay Shields

known these facts, it would not have purchased the C&A Notes on behalf of Plaintiff and the

other members of the Class.

**III.    IN RELIANCE ON DEFENDANTS' STATEMENTS ABOUT C&A, MACKAY
          SHIELDS PURCHASED ON BEHALF OF CLASS MEMBERS ROUGHLY $83
          MILLION FACE VALUE OF THE C&A NOTES IN AUGUST 2004**

157.    Based on the materially false and misleading representations outlined above, and

without knowledge of their falsity, MacKay Shields purchased on behalf of Plaintiff and the

other Class members $75,820,000 face amount of the 12.875% Notes on the offering on August

12, 2004 for over $73.1 million, and another $6,960,000 face amount of those C&A Notes on

August 20, 2005 for approximately $5.9 million, for a total purchase of $82,780,000 face amount

of 12.875% Notes for approximately $79 million.

158.    As described above, Defendants knew or recklessly disregarded that the

statements made to MacKay Shields and publicly disclosed to the market concerning C&A's

financial health, business and operating condition, goodwill and deferred tax assets, and internal

controls were materially false and misleading.  Defendants also knew or should have known that

MacKay Shields would rely on these statements in making their decision whether to purchase

C&A Notes on behalf of its clients.

159.    The Criminal Indictment confirms that:

> In or about August 2004, C&A offered, and the public [including MacKay Shields on behalf of Plaintiff and other Class members] purchased, approximately $415 million in 12.875% Senior Subordinated Notes due 2012 based, in part, on offering materials that <u>were false and fraudulent in that they included results of operations that had been falsely and materially inflated by the rebate schemes described above.</u>

Criminal Indictment¶48 (emphasis added).

160.    Had MacKay Shields known the truth about C&A's financial and operating

condition, MacKay Shields would not have purchased the C&A Notes on behalf of Plaintiff and

the other members of the Class.

## IV.    DEFENDANTS' SUBSEQUENT MATERIAL MISREPRESENTATIONS INDUCE MACKAY SHIELDS TO PURCHASE MORE C&A NOTES ON BEHALF OF PLAINTIFF AND THE CLASS

161.    Following the August 2004 Private Placement, Defendants continued to issue

false statements about the Company.  Indeed, Defendant Stockman periodically made phone

calls directly to representatives of MacKay Shields to assure it that C&A's financial information

was accurate and that C&A's business and financial condition enabled it to continue paying interest on its debt, and would allow it to redeem the debt at maturity.

**October 7, 2004 Presentation**

162.    On October 7, 2004, Defendants Stockman, Stepp and Krause participated in the Deutsche Bank 12th Annual Global High Yield Conference.  The presentation materials Defendants provided to MacKay Shields (the "October 7, 2004 Presentation") at this conference were substantially the same as the August 2004 Presentation, but added the fact that C&A had completed the private placement of the 12.875% Notes.  Based on statements made by Defendants Stockman, Stepp and Krause, MacKay Shields understood that all Defendants had reviewed and approved the October 7, 2004 Presentation before it was provided to MacKay Shields.

163.    The October 7, 2004 Presentation materially misrepresented C&A's EBITDA, financial performance and business prospects, and was materially false and misleading for the reasons described herein.  Among others, the false statements included in the October 7, 2004 Presentation included that (1) "for the LTM period ended June 30, 2004, C&A has an EBITDA margin of 8.4%, 130 bps higher than the next best performer", (2) "Free Cash from operations was positive $26 million during Q1/Q2004," (3) the Company had "Improving Operating Free Cash Flow", and (4) the Company had $4,018 million in sales for LTM ended June 30, 2004. The presentation also falsely stated the Company's EBITDA for prior quarters as $55.6 (3Q02), $82.3 (4Q02), $70.7 (1Q03, $84.0 (2Q03), $66.0 (3Q03), $90.5 (4Q 03), $79.4 (1Q04), $100.4 (2Q04).

164.    Defendants knew or recklessly disregarded that these statements were materially false and misleading.  Defendants also knew that MacKay Shields and other investors would rely

65

on these statements in making their decision whether to purchase the C&A Notes. Had MacKay

Shields known that these statements were materially false and misleading, it would not have

purchased the C&A Notes on behalf of Plaintiff and the other members of the Class.

165.    In reliance on Defendants' materially false and misleading representations, and

without knowledge of their falsity, MacKay Shields purchased on behalf of Plaintiff and the

other members of the Class another $2,000,000 face amount of the 12.875% Notes on October

15, 2004 for over $1.6 million.

**November 9, 2004 Press Release**

166.    On November 9, 2004, in a press release carried over *PR Newswire*, Defendants

published C&A's earnings for 3Q04 and the nine months ended September 30, 2004. The

November 9, 2004 Press Release was attached to a Form 8-K filed with the SEC, which was

signed by Defendant Koth. On information and belief, all Defendants reviewed, approved and

authorized the November 9, 2004 Press Release before it was issued. The November 9, 2004

press release included the following statement by Defendant Stockman:

> For the fifth consecutive quarter our EBITDA performance, excluding
> restructuring and impairment charges, was up from the prior year on a
> comparable basis.

167.    This statement was materially false and misleading for the reasons described

herein, including that C&A's EBITDA for 3Q04 did not represent the "fifth consecutive quarter"

of increasing EBITDA. Further, the November 9, 2004 press release materially misrepresented

C&A's EBITDA, financial performance and business prospects, and was materially false and

misleading for the reasons described herein

168.    Defendants knew or recklessly disregarded that these statements were materially

false and misleading. Defendants also knew or should have known that MacKay Shields and

other investors would rely on these statements in making their decision whether to purchase

C&A Notes.  Had MacKay Shields known that these statements were materially false and

misleading, it would not have purchased the C&A Notes on behalf of Plaintiff and the other

members of the Class.

### November 9, 2004 Conference Call and 3Q04 Presentation

169.    Also on November 9, 2004, Defendants, through Stockman, Krause and Koth,

held an earnings call, and provided a presentation (the "3Q04 Earnings Presentation") to

MacKay Shields.  On information and belief, all Defendants approved and authorized the

statements made on the conference call and in the 3Q04 Earnings Presentation.

170.    On the call, Defendant Stockman spoke positively about the Company's

continuing "EBITDA improvement," stating:

> We are pleased to announce that this marks the fifth consecutive quarter of
> EBITDA improvement for C&A.  Our Q3 EBITDA was 68 million before
> restructuring and impairment.  That's up 3% over prior year.  We achieved
> these gains despite a [$]37 million, or 4%, decline in sales versus Q3'03,
> principally due to lower Big 3 volume as all of you are aware.  Our
> resulting EBITDA margin with sales down and EBITDA up was 7.9%, a
> 60-basis point improvement over Q3, 2003

171.    Similarly, Defendant Koth stated:

> the Company also has—had ample liquidity at September 30, with
> approximately [$]175 million of availability under its existing credit
> facilities.

172.    The 3Q04 Earnings Presentation Defendants provided to MacKay Shields was

similar in form to the August 2004 Presentation and the October 7, 2004 Presentation.  Among

other things, it stated that C&A's 3Q04 EBITDA for the quarter, adjusted to exclude so-called

non-operating restructuring and impairment charges, was $68 million, and that this represented a

7.9% 3Q04 lagging twelve-month EBITDA margin; the Company's lagging twelve-month

EBITDA was $338 million and had improved 15% since 2Q03, and that there was a trend since

2Q03 of five straight quarters with increasing lagging twelve-month EBITDA; and C&A's

lagging twelve-month EBITDA margin for 2Q04 was 8.4%, or was 130 basis points (1.3%)

higher than the next best performer in the Company's peer group, and 300 basis points (3.0%)

higher than the 5.7% average margin for the entire peer group.

173.    These statements were materially false and misleading for the reasons set forth

herein.  The Defendants knew or recklessly disregarded that the statements made on the

conference call and in the 3Q04 Earnings Presentation were materially false and misleading.

The Defendants also knew that investors like MacKay Shields would rely on these statements in

making their decision whether to purchase the C&A Notes.  Had MacKay Shields known that

these statements were materially false and misleading, it would not have purchased the C&A

Notes on behalf of Plaintiff and the other members of the Class.

**The Company's 3Q04 10-Q**

174.    On or about November 9, 2004, Defendants filed with the SEC C&A's Form 10-

Q for 3Q04 (the "3Q04 10-Q"), and on or about November 17, 2004 filed with the SEC C&A's

amended Form 10-Q for 3Q04 (the "3Q04 10-Q/A").  The 3Q04 10-Q was signed by Defendant

Koth and, as discussed below, certified by Defendants Stockman and Koth.  On information and

belief, all Defendants reviewed, approved and authorized the 3Q04 10-Q before it was filed with

the SEC.

175.    The 3Q04 10-Q and 3Q04 10-Q/A repeated the materially misleading financial

information contained in the November 9, 2004 3Q04 earnings release, and was materially false

and misleading for the reasons described herein.  Defendants Stockman and Koth represented

that "in the opinion of management, contain all adjustments necessary for a fair presentation of

financial position and results of operations."  Moreover, pursuant to Section 906 of the Sarbanes-

Oxley Act of 2002, Defendants Stockman and Koth certified that these documents "fairly

68

present[], in all material respects, the financial condition and results of operations of the Company." Stockman and Koth also certified, pursuant to Section 302 of the Sarbanes-Oxley Act of 2002, that C&A's internal controls over financial reporting "provide reasonable assurance regarding the reliability of financial reporting and the preparation of the financial statements for external purposes in accordance with generally accepted accounting principles."

176.    These statements were materially false and misleading. As discussed above, Defendants improperly classified operating expenses as non-operating "restructuring" and "impairment" charges, failed to properly account for supplier rebates, failed to perform an impairment analysis of the carrying values of C&A's goodwill and deferred tax assets, and concealed C&A's material weaknesses in its internal controls over financial reporting.

177.    The Defendants knew or recklessly disregarded that the statements made in the 3Q04 10-Q were materially false and misleading. The Defendants also knew that investors such as MacKay Shields would rely on the 3Q04 10-Q in making their decision whether to purchase the C&A Notes. Had MacKay Shields known that the 3Q04 10-Q was materially false and misleading, it would not have purchased the C&A Notes on behalf of Plaintiff and the other members of the Class.

### January 12, 2005 Presentation

178.    On January 12, 2005, Defendants provided another presentation to MacKay Shields (the "January 12, 2005 Presentation), and encouraged MacKay Shields to purchase additional C&A Notes on behalf of its clients. On information and belief, all Defendants reviewed and approved the January 12, 2005 Presentation before it was provided to MacKay Shields.

179.    Among other things, the January 12, 2005 Presentation misleadingly highlighted the Ford Fusion and the Hermosillo facility.  For example, it touted the Fusion project as a "Multi-Billion $ Ford Mid-Sized Vehicle Award"; devoted an entire page to showcasing the organization of the Hermosillo factory; and referred to it as one of the Company's "2005 Launch Highlights."  As discussed herein, Defendants knew or recklessly disregarded that C&A had substantially understaffed the Fusion project, and tooled the "world class" Hermosillo facility with secondhand machinery.  The January 12, 2005 Presentation also misrepresented the Company's "Interior & Exterior Trim" sales for 2003 as $2.5 billion.

180.    Based on Defendants' materially false and misleading representations, and without knowledge of their falsity, MacKay Shields purchased on behalf of Plaintiff and the Class another $26,559,000 face amount of the 12.875% Notes between January 31, 2005 and March 2, 2005 for over $17.8 million, and purchased on behalf of Plaintiff and the Class $19,635,000 face amount of the 10.75% Notes on March 2, 2005 and March 4, 2005 for approximately $18 million.

181.    Defendants knew or recklessly disregarded that the statements made in the January 12, 2005 Presentation were materially false and misleading.  Defendants also knew that MacKay Shields would rely on the statements set forth in the January 12, 2005 Presentation in making their decision whether to purchase C&A Notes.  Had MacKay Shields known that the January 12, 2005 Presentation was materially false and misleading, it would not have purchased the C&A Notes on behalf of Plaintiff and the other members of the Class.

## V.    THE FIRST QUARTER 2005 LIQUIDITY CRISES

182.    Unbeknownst to investors, By January 2005, the problems at C&A had reached crisis proportions.  The Company was fully drawn on its revolving credit facilities and was lacking sufficient liquidity to pay its bills.  Rather than face reality and admit that they could no

longer conceal C&A's problems from the market, Defendants hatched yet another fraudulent

scheme designed to prolong C&A's survival. As the Criminal Indictment puts it, the motivation

behind this scheme was to "avoid filing for bankruptcy, which would have acknowledged the

failure of Stockman's leadership and resulted in the loss of Stockman's and [Heartland's]

investment in C&A." Criminal Indictment¶49. This scheme involved falsification of invoices in

order to increase available liquidity under C&A's accounts receivable securitization facility. The

scheme also involved making false statements to C&A's investors. *See* Criminal Indictment¶49-

61.

183.    As discussed above, C&A was party to a credit facility with GECC, pursuant to

which GECC extended a line of credit to C&A that was secured by the Company's outstanding

accounts receivable. C&A's accounts receivables often consisted of millions of dollars because

there was a delay between the time that C&A would send an invoice for payment to its OEM

customers and when the OEM would actually pay the invoice (typically, this delay was between

60 and 120 days). Under C&A's credit agreement with GECC, GECC agreed to provide C&A a

"borrowing base" calculated by reference to the amount of "eligible receivables" the Company

had outstanding on any given day. In order to constitute an "eligible receivable" (and thus be

included in the calculation of the borrowing base), C&A was required to have sent an invoice

that an OEM had ***agreed*** to pay.

184.    C&A was required to send daily reports to GECC that updated the status of the

outstanding invoices and payment agreements and thus the current amount of the borrowing

base. These reports were prepared by employees in the Treasury Department, acting under the

supervision and direction of, among others, Defendant Galante. It typically took C&A two days

to prepare the daily reports, such that each report that GECC received actually reflected the state

71

of play from two business days earlier. The reports included a calculation of the level of eligible

receivables and also stated whether C&A was able to borrow more money from GECC (if the

borrowing base had increased) or whether C&A had to make a payment to GECC (if the

borrowing base had decreased). Because the cost of financing was lower under C&A's

agreement with GECC than it was with C&A's other lenders, Defendants typically sought to

borrow the maximum amount from GECC that was supported by the pool of eligible receivables

and the borrowing base available each day.

185.    On or about January 6, 2005, C&A prepared a daily report showing that the

eligible receivables had decreased (thus diminishing the borrowing base) and that C&A had to

make an immediate payment to GECC of $21.8 million. Defendants realized that C&A did not

have sufficient liquidity to make the payment to GECC. With the knowledge and approval of

Defendant Stockman, Defendant Galante and others in C&A's treasury department concealed the

fact that the Company owed $21.8 million to GECC and falsely stated to GECC that a computer

malfunction had delayed their ability to provide the required daily reports until the following

Monday, January 10, 2005.

186.    At the same time, and with the knowledge and approval of Defendant Stockman,

C&A employees began a systematic effort to send out invoices by January 10, 2005 such that the

pool of eligible receivables (and the borrowing base) would be artificially increased (and the

payment owed to GECC artificially decreased). At Defendants' direction, C&A employees

worked throughout the weekend to manually invoice millions of dollars of receivables for the

sole purpose of inflating the borrowing base and avoiding the $21.8 million payment due to

GECC—a payment that C&A lacked the liquidity to make. Because these invoices were just

being sent out, C&A's OEM customers had obviously not yet *agreed* to pay these invoices, and

therefore they could not be properly included in the pool of eligible receivables. Nonetheless, on January 10, 2005—just two days before the meeting with MacKay Shields described above—Defendants submitted a report to GECC that falsely stated that C&A owed GECC only $11.8 million.

187.    Following this narrowly-averted crises, Defendant Stockman began to personally review C&A's liquidity situation on a daily based and choose himself which of C&A's suppliers and creditors would get paid.

188.    As discussed above, following the January 2005 liquidity crises, Defendants also began to fraudulently "pre-bill" GECC for "tooling" receivables relating to payment for tools and other machines used to make auto parts. In the automotive industry, OEMs typically agree to pay for tooling receivables only after certifying that the equipment is performing to specifications (through a process called the Production Part Approval Process, or "PPAP"). While target dates for completion of the PPAP process are typically agreed upon, it was common industry knowledge, shared by Defendants, that the PPAP process often was not complete until after the target date, and OEMs usually withheld an agreement to make a payment until after the PPAP process was *actually* complete.

189.    Nonetheless, in January 2005, C&A began to include tooling receivables in the calculation of the borrowing base under its agreement with GECC even though the PPAP approval had not been completed and the OEM had not agreed to pay the invoice. Defendants knew or should have known that there was no agreement to pay the invoices and that the invoices were therefore not eligible for inclusion in the calculation of borrowing base. Nonetheless, Defendants included these invoices for "the sole purpose of improperly inflating the GECC borrowing base, thus generating cash and liquidity for C&A." Criminal Indictment¶

73

60 (C&A added more than $100 million in ineligible receivables to the borrowing base between January 2005 and April 2005); *see* SEC Complaint¶71 (Defendants Stockman, Williams and Galante knew of, and participated, in the fraudulent scheme to misrepresent C&A's liquidity to investors).

## VI.    ON MARCH 17, 2005, C&A ANNOUNCES THAT IT IS UNABLE TO FILE ITS FORM 10-K FOR FISCAL YEAR 2004

190.    On March 17, 2005, C&A announced that the filing of its 2004 Form 10-K was going to be delayed because, among other things, the Company had to restate its previously reported financial results for 2004 and potentially 2003 as a result of improper accounting. The Form 8-K filed with the SEC and attaching the March 17, 2005 press release was signed by Defendant Koth. On information and belief, all Defendants had reviewed and approved the March 17, 2005 press release before it was issued.

191.    The press release disclosed for the first time that the Company had improperly accounted for its supplier rebates, which would impact its previously reported EBITDA. Among other things, the press release stated:

> During the course of finalizing its financial statements for its fiscal year ended December 31, 2004, the Company identified certain accounting for supplier rebates that led to premature or inappropriate revenue recognition or that was inconsistent with relevant accounting standards and the Company's policies and practices.

192.    With respect to C&A's previously reported amounts for goodwill, the press release stated:

> The Company determined that the fair values of its U.S. and Mexico Plastics reporting unit and its Global Fabrics reporting unit were less than the respective units' carrying values. As a result, the Company expects to recognize an impairment charge of approximately $500 million, which will reduce U.S. and Mexico Plastics' goodwill by approximately $325 million and Global Fabrics' goodwill by $175 million.

193.   With respect to C&A's previously reported amounts for deferred tax assets, the

press release stated:

> The Company has also performed an analysis of future taxable income and
> believes that there is now sufficient negative evidence and uncertainty as to
> the timing of when the appropriate level of taxable income will be generated
> in the U.S. to recover the deferred tax assets, necessitating a full valuation
> allowance against those deferred tax assets.  As a result, the Company's
> provision for income taxes for the fourth quarter of 2004 includes a write
> down of the U.S. and Italian net deferred tax assets of $175 million.  In
> addition, the impact of the valuation allowance on the 2004 operating
> results for the U.S. and Italy was approximately $25 million.

194.   In the March 17, 2005 press release, C&A also announced a series of material

weaknesses reported by its auditor:

> The Company is working towards completion of its assessment of internal
> controls over financial reporting required under Section 404 of the
> Sarbanes-Oxley Act and has concluded that certain material weaknesses, in
> addition to the matters leading to the restatement described above, existed at
> December 31, 2004, but its assessment of the effectiveness of the
> Company's control over financial reporting is ongoing and the extent of
> those material weaknesses remains under review.  The Company's outside
> auditor is in the process of completing its audit of internal controls over
> financial reporting and has communicated the existence of material
> weaknesses.  The potential material weaknesses identified include the
> following: (i) the adequacy of the Company's resources with appropriate
> accounting expertise to address accounting and reporting matters in certain
> areas, including revenue recognition, vendor arrangements and post-
> retirement benefits, and to supervise the Company's decentralized and
> disparate accounting environment and ensure an appropriate segregation of
> duties; (ii) the adequacy of the Company's internal audit function's
> resources and ability to monitor compliance with established policies and
> procedures; (iii) the effectiveness of certain information technology controls
> and the sufficiency of documentation to assess the effectiveness of such
> controls including embedded system application controls; (iv) the adequacy
> of procedures to consistently identify and reconcile fixed assets and
> periodically review assets for impairment; and (v) the completeness and
> consistent adherence to Company policies and procedures.  These issues
> include a range of documentation-related issues and reconciliation issues.
> Other material weaknesses may be identified as a result of further
> investigation of the circumstances surrounding the expected restatement
> arising from vendor rebates.  Our review and the audit is [sic] ongoing.

75

195.    As discussed below (and recognized in the Criminal Indictment and the SEC
Complaint), these statements were materially false and misleading.

## VII.    DEFENDANTS CONTINUE TO LIE TO MACKAY SHIELDS AND OTHERS ABOUT C&A'S FINANCIAL AND OPERATION PERFORMANCE

196.    Defendants immediately tried to downplay the probable impact of the issues
raised in the press release on C&A's financial results and business operations.  Just a few hours
after issuing the March 17, 2005 press release, C&A held a conference call with investors (the
"March 17, 2005 Conference Call").  On that call, Defendant Stockman made a series of
statements designed to allay investor concerns over the scope and size of the accounting issues
and internal investigation disclosed in the March 17, 2005 press release, and to reassure investors
that C&A was a healthy company with ample liquidity and strong future prospects.

197.    For example, Stockman stressed that C&A would obtain waivers from its lenders
and would continue to have access to its credit facilities, stating "flatly, clearly, and
unequivocally, we will remain in compliance with our covenants . . . ."  Stockman also reassured
investors that the Company had thoroughly investigated the supplier rebate issues identified in
the press release.  In defendant Stockman's words, "the prudent thing to do, the right thing to do,
and the proactive thing to do" was to "look at every entry" relating to supplier rebates made
since January 2002.  Stockman characterized this as an "around-the-clock effort" involving "a
large group of people," and that it represented "management's best effort."  According to
Stockman, "it was comprehensive, it was intensive, it covered everything, <u>it left no stone
unturned</u> . . . it is our assessment at the moment and, as we indicated, that [the investigation]
may lead to a restatement of a – <u>of a modest magnitude</u> in '04."

198.    Moreover, Defendant Stockman reassured investors that the Company's
"restructuring" program was completed, stating:  "we have taken a million dollar restructuring

charge. We expect to this quarter, <u>and that will be it</u>." As discussed above, Stockman knew that

debt investors such as MacKay Shields would be reassured by this statement, because it

confirmed that C&A's restructuring charges were limited, one-time "non-operating" charges that

would not impact the Company's EBITDA results in future periods.

199.    In connection with the conference call, C&A prepared and distributed a

presentation entitled "Fourth Quarter and Full Year 2004 Results" (the "March 17, 2005

Presentation"). The March 17, 2005 Presentation repeated many of the points addressed by

Stockman on the conference call, and was similarly designed to minimize investor concerns

about the overall scope and impact of the issues disclosed in the March 17, 2005 press release.

For example, the presentation stated that C&A expected "2005 sales will be modestly up from

2004 level," and "Full year EBITDA before restructuring and impairment is expected to <u>meet or</u>

<u>exceed comparable 2004 levels</u>." The presentation further boasted about the EBITDA

performance of the Company in the period since Defendants Stockman and Heartland had taken

over, stating that "LTM EBITDA performance has rebounded significantly since the

management change in August 2003, improving 10% from the Q2 2003 trough."

200.    In addition, the March 17, 2005 Presentation devoted an entire section to

addressing—and minimizing—the issues relating to the Company's improper accounting for

supplier rebates. In a section titled "Results of Comprehensive Internal Review of 2002-2004

Supplier Rebates," the presentation made statements designed to lead investors to believe that the

Company had thoroughly investigated this issue and determined that it would not have any

further impact on C&A's financial results. Among other things, the presentation stated that

C&A had reviewed "more than 350 supplier rebate entries . . . for 12 quarter period (2002-

2004)", and that "approximately 315 <u>or about 90%</u> were found to conform to relevant accounting standards (EITF 02-16) and the Company's internal policies and practices regarding rebates."

201.    The Criminal Indictment has confirmed that Defendants' statements in the March 17, 2005 Press Release and in the accompanying earnings call and investor presentation were false and misleading.  Criminal Indictment¶64.  For instance, as stated in the Criminal Indictment:

a.    "Stockman's description of the internal investigation of the improper accounting for supplier rebates in the March 17, 2005 press releases was intended to mislead investors and the public by minimizing the size of the restatement of C&A's financial statements, and exaggerating the degree to which management had explored, quantified and rectified the situation."

b.    Contrary to the statements in the press release, "no meaningful review of 2002 rebates was conducted, and 2002 rebates, including those negotiated with Joan Fabrics . . . were not restated even though Stockman knew they were clearly accounted for improperly."

c.    "the figures included in the press release regarding the proposed amount to be restated did not accurately reflect the true income earned for prior periods."

d.    "the press release understated the degree to which previous financial statements needed to be restated based on 2003 and 2004 rebates, because the internal investigation upon which the press release was designed to justify C&A's previous accounting, rather than account for rebates properly."

e.    "the press release attributed the improper accounting to a failure of 'controls' and 'procedures' and to 'other circumstances.'  This description was intended

to give the impression that the improper accounting was inadvertent and at worst the result of negligence. As described above, however, the truth was that the improper accounting was intentional and the result of a concerted scheme by Stockman, Stepp, Cosgrove, Barnaba, and other C&A employees."

  f.  During the March 17, 2005 earnings call "Stockman provided a forecast for EBITDA for the first quarter of 2005 that he knew would not be attained. He stated that EBITDA would be between $65-75 million for the first quarter of 2005, even though the most current financial information for the company, including the actual results for January and February, showed that EBITDA for the first quarter would only be roughly half that figure."

  g.  "Stockman highlighted a slide representing that capital expenditures in 2005 would be limited to $30 million quarterly as a sign that C&A was conserving cash. This statement was misleading because Stockman knew that his projections showed that C&A would spend more than $50 million in the first quarter of 2005 and knew that C&A had actually already spent more than $30 million in capital expenditures during January and February 2005. This misrepresentation was material because, among other reasons, Stockman emphasized this limitation on capital expenditures to reassure investors and the public that C&A was preserving cash and holding down its costs."

  h.  Stockman concealed C&A's liquidity crises by responding to a question 'intra quarter are you tapping out your liquidity?' with the answer 'no.' . . . this statement was a lie designed to hide the fact, well known to Stockman, that C&A was suffering a major liquidity crises."

Criminal Indictment¶66-75; *see also* SEC Complaint¶56 (the March 17, 2005 Press Release stated that fourth quarter 2004 EBITDA was $72-73 million, which "included at least $5.8 million in improperly recorded rebates, making the press release false or misleading.")

202.    All Defendants knew, or were reckless in not knowing, that the statements in the March 17, 2005 Press Release, earnings call and accompanying investor presentation were false and misleading, and Defendants had a duty to correct those statements. *See* SEC Complaint¶66 (Defendant Cosgrove reviewed the charts that Stockman used on the call and Cosgrove "knew, or was reckless in not knowing, that these charts contained false or misleading statements regarding EBITDA and capital expenditures.")

203.    In a further effort to convince investors that the issues identified in the March 17, 2005 press release would not have a materially negative impact on C&A's future performance, Defendants announced that Heartland had entered into an agreement to purchase approximately $300 million face value of C&A preferred stock from Textron Inc. ("Textron"). This announcement was designed to convince debt investors that Defendants continued to have complete confidence in C&A's financial health and viability. Indeed, during the March 17, 2005 conference call, defendant Stockman stated:

> We remain convinced ... that we have a business model that can work, and that we have a place in the industry where we can thrive economically and in terms of our earnings and cash flow over time. For that reason, Heartland Industrial Partners, of — of which I am the founding partner, as you know, has reached an agreement in recent days with Textron, that owns all of our preferred stock, that it got at the time of the original transaction. Face value today is around $300 million. We've reached an agreement to buy a majority of that stock, and an option on the rest, at a total price of around $45 million. So we will be able to take control of all of the equity, the preferred equity, and our position in the common, but the preferred equity for about $45 million, or 15, 16 percent of its liquidation value. We see that as a very strong vote of confidence in our future as a company, and in the strategies and initiatives we're going to talk about now that we're

<u>undertaking to deal with some very unprecedented and some very unusual</u>
<u>circumstances.</u> (Emphasis added.)

This agreement was also highlighted in the March 17, 2005 Presentation, which stated that
"Heartland <u>has committed</u> to purchase a majority of the Preferred Stock for cash and an
exchange of various securities and rights." [Emphasis added]

204.    Defendants knew that investors such as MacKay Shields would rely on these
statements because, if Heartland was willing to purchase C&A's stock, investors would
reasonably believe that Defendants, including Heartland, believed that there was still ample
liquidity and significant value in C&A's business.

205.    In reality, however, Heartland's so-called "commitment" to purchase C&A
preferred stock from Textron was a ruse designed to bolster investor confidence in C&A without
actually obligating Heartland to purchase any shares of the Company. Defendants did not
disclose that, under the terms of the agreement between Textron and Heartland, Heartland had no
obligation to purchase Textron's shares until C&A filed a Form 10-K for 2004 (which it still has
not done). Moreover, Heartland could unilaterally terminate the agreement if C&A did not file a
Form 10-K for 2004 by December 31, 2005, or if C&A experienced an event of bankruptcy or
insolvency. In other words, unbeknownst to MacKay Shields and the market, rather than show
"confidence" in C&A, Heartland was deliberately misrepresenting its supposed "commitment" to
purchase C&A preferred stock.

### March 23, 2005 Presentation

206.    In furtherance of their fraudulent scheme to mislead investors about the true scope
of C&A's financial and business problems, Defendants met with MacKay Shields on March 23,
2005 and encouraged MacKay Shields to purchase additional C&A Notes on behalf of its clients.
At this meeting, Defendants Stockman, Koth and Galante reiterated the positive statements

81

regarding C&A's future prospects and the status of the accounting investigation that were made in the March 17, 2005 Conference Call and in the accompanying March 17, 2005 Presentation. These Defendants assured MacKay Shields that the disclosures in the March 17, 2005 press release were complete and accurate, and that there was no additional materially negative information about C&A that was yet to be disclosed. Further, they assured MacKay Shields that C&A had ample liquidity and a strong business and financial outlook, and repeatedly referenced the supposed agreement by Heartland to purchase Textron's holdings of C&A preferred stock as proof that Heartland and the other Defendants continued to believe in the financial viability of C&A. Based on the statements that these defendants made at this meeting, MacKay Shields understood that they were speaking with the authority and approval of Heartland, C&A and the other Defendants.

207. Defendants knew or recklessly disregarded that these statements were materially false and misleading. Defendants also knew that MacKay Shields and other investors would rely on these statements in making their decision whether to purchase C&A Notes. Had MacKay Shields known that these statements were materially false and misleading, it would not have purchased C&A Notes on behalf of Plaintiff and the other members of the Class.

208. The Criminal Indictment confirms that Defendants' March 23, 2005 presentation to MacKay Shields was materially false and misleading:

> On March 23, 2005, C&A made a presentation to MacKay Shields, holders of C&A's bonds. Defendant Stockman presented the same slides he had used during the March 17, 2005 earnings call, which contained the material misrepresentations regarding EBITDA and capital expenditures described above. In addition, defendant Stockman sought to assure the MacKay Shields investors that C&A had sufficient liquidity to meet its needs, when he knew that it did not.

82

Criminal Indictment¶76 (emphasis added). As explained above, Defendants Koth and Galante also participated in this presentation and presented to MacKay Shields the materially false information set forth above.

### March 24, 2005 Press Release

209. On March 24, 2005, C&A issued a press release (the "March 24, 2005 Press Release"), which was attached to a Form 8-K filed with the SEC and signed by Defendant Koth. As stated in the Criminal Indictment, in this press release "C&A repeated its earlier disclosures concerning the scope of the rebate accounting problem, with the intent of minimizing investors' concerns about the size of the restatement to C&A's financial statements." Criminal Indictment¶ 81.

### April 4, 2005 Press Release

210. On April 4, 2005, C&A issued a press release (the "April 4, 2005 Press Release"), which was attached to a Form 8-K filed with the SEC and signed by Defendant Koth. The press release stated "The Company's available liquidity (cash and unutilized commitments under revolving credit and account receivables facilities) was approximately $81 million at March 31, 2005, as compared with approximately $86 million at December 31, 2004."

211. This statement was materially false and misleading because (1) C&A had no more than $12 million in available liquidity as of December 31, 2004; (2) C&A had less than $9 million of available liquidity on March 31, 2005; and (3) it did not disclose that any liquidity C&A did have was a result of the fraudulent scheme described above. *See* Criminal Indictment¶ 87-88 (explaining that the April 4, 2005 Press Release was materially false and misleading).

212. In reliance on the materially false and misleading statements set forth above (including the Company's Form S-4 that was filed on January 27, 2005), MacKay Shields

purchased $17,511,000 face value of the 12.875% Notes between April 6, 2005 and May 10,

2005 for over $8.5 million, and $4,455,000 face value of the 10.75% Notes May 10, 2005 and

May 11, 2005 for approximately $3 million, for total purchases of $21,966,000 face value of the

C&A Notes for over $11.5 million on behalf of Plaintiff and the other members of the Class.

## VIII.   C&A FILES FOR BANKRUPTCY PROTECTION ON MAY 17, 2005

213.   Defendants' scheme finally unraveled just weeks after their last face-to-face

meeting with MacKay Shields.

214.   On May 12, 2005—just *one day* after MacKay Shields' final purchase of C&A

Notes on behalf of Plaintiff and the Class—the C&A Board unanimously sought Stockman's

resignation over concerns that he was misleading the Board.  According to a May 13, 2005

article in the *Detroit Free Press*, a C&A source stated that:

> It was unanimous and it was fast.  Go.  Now.  There seemed to be a pattern
> of not sharing all of the information with his financial staff and with the
> board.  The first quarter was worse than he said it would be and the board
> got hot.

215.   C&A also announced on May 12, 2005 that the Company had effectively burned

through its available cash and credit, with just $13.4 million left, that the investigation into the

accounting matters was continuing, that the previously disclosed amounts necessary to restate

previously reported financial results were likely understated, and that the continuing

investigation also was looking into whether the Company issued misleading forecasts for 1Q05

and related matters, as well as other matters that had arisen in the course of the investigation.

216.   The May 12, 2005 announcement confirmed that the March 17, 2005 press release

was materially false and misleading and, for the first time, exposed just how severe the problems

facing C&A were.  The May 12, 2005 announcement stated:

> The company further commented on the status of the ongoing investigation
> by the Board's audit committee into the company's accounting for certain

84

supplier rebates. The company previously reported that it had identified
certain accounting for supplier rebates that led to premature or inappropriate
revenue recognition or that was inconsistent with relevant accounting
standards and the company's policies and practices. <u>While the investigation
is ongoing, the audit committee has preliminarily indicated that it believes
that the company's previously announced estimated adjustments to reported
periods to correct the accounting for these rebates will likely be understated,
but it has not yet quantified the extent of this and has not submitted its
findings to management for review at this time.</u> In addition to vendor
rebates, the audit committee's investigation also is reviewing the company's
forecasts for the first quarter of 2005 and related matters, as well as other
matters that have arisen in the course of its investigation. The company
cannot currently comment upon the timing for completion of, or the
ultimate scope or outcome of, the audit committee investigation, the audit or
any necessary restatements. As previously discussed, the company has not
yet filed its annual report on Form 10-K for 2004 due to this accounting
matter and the need for additional time for completion of the 2004 audit and
the review of internal controls over financial reporting under Section 404
under Sarbanes-Oxley, and it does not expect to make its first quarter 2005
filing on a timely basis. (Emphasis added.)

217.    Five days later, on May 17, 2005, C&A announced that it had sought Chapter 11

bankruptcy protection the previous day in the United States Bankruptcy Court for the Eastern

District of Michigan, and warned of significant near-term liquidity problems. On May 25, 2005,

the *New York Times* reported in an article entitled "A Reagan Budget Czar Grapples With

Investment Woes," that Stockman had turned over control of Heartland to two of his partners,

Defendants Leuliette and Tredwell.

218.    The market's reaction to this news was dramatic. The value of the C&A Notes

dropped precipitously. The price of the 12.875% Notes nose-dived from an offering price of

$96.416 down to $3.00, and the price of the 10.75% Notes, which was trading above $90 before

the truth about C&A was revealed, dropped to $23.00. Had Defendants been truthful about

C&A's operations, finances and financial condition, MacKay Shields would not have purchased

the C&A Notes. As a result of Defendants' fraudulent misrepresentations, MacKay Shields'

clients, including Plaintiff and the other members of the Class, suffered substantial damages.

## GAAP VIOLATIONS

219.    GAAP are the generally accepted accounting principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practices at a particular time.  GAAP principles are the official standards accepted by the SEC and promulgated in part by the American Institute of Certified Public Accountants ("AICPA").  GAAP consists of a hierarchy of authoritative literature.  The highest authority is comprised of Financial Accounting Standards Board ("FASB") Statements of Financial Accounting Statements ("SFAS"), followed by FASB Interpretations ("FIN"), Accounting Principles Board Opinions ("APB Opinion"), and AICPA Accounting Research Bulletins ("ARB").  GAAP provides other authoritative pronouncements including, among others, the FASB Concept Statements ("FASCON").

220.    SEC Regulation S-X (17 C.F.R.§210.4-01(a)(1)) provides that financial statements filed with the SEC which are not prepared in accordance with GAAP will be presumed to be false or misleading, despite footnote or other disclosures.

221.    As detailed above, C&A issued materially false financial statements from at least the fourth quarter 2001 through the third quarter 2003, and made further false statements regarding its financial performance through May 2005.

222.    By failing to disclose the recurring, "round-trip" transactions between the Company and Defendant McCallum, described above, C&A violated SFAS No. 57, Related Party Transactions, which states in relevant part:

> Financial statements shall include disclosures of material related party transactions, other than compensation arrangements, expense allowances, and other similar items in the ordinary course of business. However, *disclosure of transactions that are eliminated in the preparation of* consolidated or combined financial statements is not required in those statements.  The disclosures shall include:

a.    The nature of the relationship(s) involved;

b.    A description of the transactions, including transactions to which no amounts or nominal amounts were ascribed, for each of the periods for which income statements are presented, and such other information deemed necessary to an understanding of the effects of the transactions on the financial statements;

c.    The dollar amounts of transactions for each of the periods for which income statements are presented and the effects of any change in the method of establishing the terms from that used in the preceding period; [and]

d.    Amounts due from or to related parties as of the date of each balance sheet presented and, if not otherwise apparent, the terms and manner of settlement.

223.    C&A's financial statements also violated several general principles of GAAP, including:

- FASCON No. 1¶34: "Financial reporting should provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit, and similar decisions."

- FASCON No. 1¶40: "Financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and the effects of transactions, events, and circumstances that change resources and claims to those resources."

- FASCON No. 1¶50: "Financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it . . . . To the extent that management offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective investors and to the public in general."

- FASCON No. 2¶58-59: "That information should be reliable as well as relevant is a notion that is central to accounting . . . . The reliability of a measure rests on the faithfulness with which it represents what it purports to represent . . . ."

- FASCON No. 2¶79, 80: Financial statements should be complete and contain all material information necessary for investors and creditors to make informed economic decisions.

87

- **FASCON No. 2¶95, 97:** Conservatism in financial reporting should be used as a prudent reaction to uncertainty to ensure that risk is adequately considered. "The best way to avoid the injury to investors that imprudent reporting creates is to try to ensure that what is reported represents what it purports to represent."

- **FASCON No. 6¶145:** "[R]ecognition of revenues, expenses, gains, and losses and the related increments or decrements in assets and liabilities-including matching of costs and revenues, allocation, and amortization is the essence of using accrual accounting to measure performance of entities."

224.    The Company's financial statements were not prepared in accordance with these general principles of GAAP because, as described above, the Company had engaged in fraudulent round-trip transactions that served no legitimate business purpose, improperly recognized supplier "rebates" as income, improperly recognized discounts on purchases of capital equipment as "income," manipulated the Company's reported EBITDA, and overstated the Company's carrying values for goodwill.

225.    SEC Staff Accounting Bulletin No. 101 ("SAB 101"), <u>Revenue Recognition in Financial</u> Statements, drawing from Regulation S-K, Article 303, and Financial Reporting Release 36, also reiterated the importance of MD&A in financial statements:

> Management's Discussion & Analysis (MD&A) requires a discussion of liquidity, capital] resources, results of operations and other information necessary of a registrant's financial condition, changes in financial condition and results of operations. This includes unusual or infrequent transactions, known trends, or uncertainties that have had, or might reasonably be expected to have, a favorable or unfavorable material effect on revenue, operating income or net income and the relationship between revenue and the costs of the revenue. Changes in revenue should not be evaluated solely in terms of volume and price changes, but should also include an analysis of the reasons and factors contributing to the increase or decrease. The Commission stated in Financial Reporting Release 36 that MD&A should "give investors an opportunity to look at the registrant through the eyes of management by providing a historical and prospective analysis of the registrant's financial condition and results of operations, with a particular emphasis on the registrant's prospects for the future."

226.   Item 7 of Form 10-K and Item 2 of Form 10-Q, requires the issuer to furnish information required by Item 303 of Regulation S-K [17 C.F.R. § 229.303]. In discussing results of operations, Item 303 of Regulation S-K requires the registrant to "[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable or unfavorable impact on net sales or revenues or income from continuing operations."

227.   The Instructions to Paragraph 303(a) further state, "[t]he discussion and analysis shall focus specifically on material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results." Thus, under these standards, the management of a public corporation must disclose in its periodic reports filed with the SEC, "known trends or any known demands, commitments, events or uncertainties" that are reasonably likely to have a material impact on a company's sales revenues, income or liquidity, or cause previously reported financial information not to be indicative of future operating results. 17 C.F.R. § 229.303(a)(I)-(3) and Instruction 3.

228.   As described herein, C&A's filings with the SEC during the Class Period failed to comply with applicable MD&A disclosure requirements because the MD&A in each of these filings was materially false and misleading as a result of the fraudulent scheme described herein.

## LOSS CAUSATION

229.   Throughout the Class Period, as detailed above, the prices of the C&A Notes were artificially inflated as a result of Defendants' misrepresentations and omissions regarding the Company. Following the Company's March 17, 2005 disclosure that the Company would need to restate its financial results for 2004 and potentially 2003 as a result of improper accounting, the price of C&A 12.875% Notes fell from $68.75 to $44.50—a decline of 35.3%—and the price

of C&A 10.75% Notes dropped 7.5%. Then, at the time of C&A's announcement on May 12,

2005 that (i) the Company had effectively burned through its available cash and credit, (ii) the

investigation into the accounting was continuing, and (iii) the previously disclosed amounts

necessary to restate previously reported financial results were likely understated, the price of

C&A's 12.875% Notes fell from $28.25 to $7.00—a 75% decline in value—while C&A's

10.75% Notes dropped from $70.5 on May 10, 2005 to $32.875 on May 16, 2005—a decline of

more than 53% over a six day period.

230.    The declines in the value of C&A Notes following the Company's incomplete and

misleading disclosure in March 2005 and the Company's subsequent announcement in May

2005, and the resulting damages suffered by Plaintiff and the other members of the Class, are

directly attributable to the market's reaction to the disclosure of information that had been

previously misrepresented or concealed by Defendants, and to the market's adjustment of the

Company's securities prices to reflect the newly emerging truth about the Company's financial

condition.  Had MacKay Shields known of the material adverse information not disclosed by

Defendants, or been aware of the truth behind Defendants' material misstatements, it would not

have purchased the C&A Notes on behalf of Plaintiff and the other Class members at artificially

inflated prices.

## INAPPLICABILITY OF THE STATUTORY SAFE HARBOR

231.    The statutory safe harbor provided for forward-looking statements under certain

circumstances does not apply to any of the allegedly false or misleading statements pleaded in

this Complaint.  The statements alleged to be false or misleading herein all relate to then-existing

facts and conditions.  In addition, to the extent certain of the statements alleged to be false or

misleading may be characterized as forward-looking, they were not adequately identified as

forward-looking statements when made, and there were no meaningful cautionary statements

identifying important facts that could cause actual results to differ materially from those in the

purportedly forward-looking statements. To the extent that the statutory safe harbor is intended

to apply to any forward-looking statements pleaded herein, defendants are liable for those false

forward-looking statements because at the time each of those forward-looking statements was

made, the defendants had actual knowledge that the particular forward-looking statement was

materially false or misleading. In addition, to the extent any of the statements set forth above

were accurate when made, they became inaccurate or misleading because of subsequent events,

and defendants failed to update the those statements which later became inaccurate.

## STATUTE OF LIMITATIONS

232.    The claims asserted herein were properly asserted within the applicable statute of

limitations. Specifically, the claims were brought within two years after the discovery of the

fraud and within five years of the making of the statements alleged herein to be materially false

and misleading. Moreover, the claims asserted herein have been tolled by, and relate back to the

date of, the filing of the initial class action complaint in this action on February 5, 2007, as well

as the filing of the complaint in *MacKay Shields LLC v. Heartland Industrial Partners, LP., et.*

*al.,* Case No. 05-520229-CZ (State of Michigan, Circuit Court for Wayne County) on July 8,

2005 (the "State Court Action"). Further, following C&A's disclosures stated above, proposed

lead counsel for the class conducted a diligent investigation into the facts and circumstances

surrounding the fraudulent activity (which investigation included contacting knowledgeable

witnesses and drafting and filing the complaint in the State Court Action and the initial class

complaint in this action). To the extent that new information regarding the fraud is included in

this Complaint, that information was not discovered—and could not have been discovered

through a diligent investigation—until the Criminal Indictment and the SEC Complaint were released on or about March 26, 2007.

## COUNT I

### Against Defendants Stockman, Stepp, Leuliette, Tredwell, McConnell, Valenti, Galante, Koth, Krause, Jones, Cosgrove, McCallum, Barnaba, Gougherty and Williams For Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder

233.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

234.    Throughout the Class Period, Stockman, Stepp, Leuliette, Tredwell, McConnell, Valenti, Galante, Koth, Krause, Jones, Cosgrove, McCallum, Barnaba, Gougherty and Williams (the "Section 10(b) Defendants"), directly and indirectly, by the use of means and instrumentalities of interstate commerce, the United States mails and a national securities exchange, employed a device, scheme and artifice to defraud, made untrue statements of material fact and omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, and engaged in acts, practices and a course of business which operated as a fraud and deceit upon Plaintiff and the members of the Class. The materially false statements and omissions made by the Section 10(b) Defendants, and/or their role in the fraudulent schemes are set forth above. The fraudulent statements alleged above include statements made in face-to-face meetings with MacKay Shields (including the PPM), statements made in documents provided directly to MacKay Shields, statements made in documents publicly filed with the SEC (including Form S-3's, Form S-3/A's, Form S-4's, Form 10-Q's, Form 10-Q/A's, Form 8-K's and accompanying press releases, and Form 10-K's), statements made on earnings conference calls and other statements as set forth above, which MacKay Shields relied upon in deciding to purchase C&A Notes on behalf of the Class. With respect to the documents filed with the SEC, each of these documents contained

materially false and misleading financial information relating to C&A's earnings, revenue, income, sales and other measures of financial performance, as set forth above. As set forth in the SEC Complaint "C&A materially overstated its income, or reduced its losses, in its quarterly reports (Form 10-Q) and annual reports (Form 10-K) for each reporting period from the fourth quarter of 2001 through the third quarter of 2004." SEC Complaint¶51. The Criminal Indictment also confirms that "the quarterly and annual reports filed by C&A for the fourth quarter of 2001 through the third quarter of 2004 included financial statements that reflected . . . fraudulent adjustments to C&A's expenses and revenue." Criminal Indictment¶92. MacKay Shields reasonably relied, on behalf of Plaintiff and the Class, on these materially false and misleading statements.

235.    The Section 10(b) Defendants, as the most senior officers of C&A during the time when the false and misleading statements were made, are liable as direct participants in all of the wrongs complained of herein. As described above, during numerous one-on-one meetings with MacKay Shields' representatives, many of the Section 10(b) Defendants personally made false and misleading statements regarding C&A's finances and operations, which MacKay Shields reasonably relied upon when deciding whether to purchase C&A Notes for Plaintiff and the Class. Moreover, through their positions of control and authority, the Section 10(b) Defendants were in a position to and did control all of the Company's false and misleading statements and omissions, including the false and misleading statements contained in C&A's public filings and press releases as more particularly set forth above. In addition, the false and misleading statements made in the Company's published documents (including its press releases and publicly issued financial statements) constitute "group published information," which the Section 10(b) Defendants were responsible for creating. Each of the Section 10(b) Defendants had direct

involvement in the daily business of the Company and participated in the preparation and dissemination of the Company's "group published documents."

236.    As detailed above, the Section 10(b) Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were readily available to them. The material misrepresentations and/or omissions detailed above were made knowingly or recklessly and for the purpose and effect of concealing C&A's operating condition and future business prospects from investors such as MacKay Shields and supporting the artificially inflated price of the Company's securities. In addition to the information set forth above, the scienter of the Section 10(b) Defendants is further established by the following facts:

    a.    The Criminal Indictment charges Defendants Stockman, Stepp, Cosgrove and Barnaba with, among other things, securities fraud and violations of Section 10(b) and Rule 10b-5 in connection with the activities alleged above.

    b.    The SEC Complaint charges Defendants Stockman, Stepp, Jones, Cosgrove, McCallum, Barnaba, Gougherty, Galante, and Williams with, among other things, securities fraud and violations of Section 10(b) and Rule 10b-5 in connection with the activities alleged above.

    c.    Defendants Galante, Jones, Williams and Gougherty have pled guilty to criminal violations of various laws arising out of the activities alleged above. For instance:

        (i)    Galante pled guilty to, among other things, conspiracy to commit fraud in the connection with the purchase and sale of securities, making false and

misleading statements to the SEC, and falsifying books and records of C&A. In so doing, Galante, among other things, admitted that he was "aware of the false and misleading statements concerning, among other things, Collins & Aikman's earnings and liquidity being presented to the investing public," and that he "prepared documents in support of the misleading statements that were made to the public investors." Galante Guilty Plea at 14-15.

(ii) Jones pled guilty to conspiracy and obstruction of justice. In so doing, Jones admitted, among other things, that "beginning in approximately 2003 . . . I learned of illegal conduct by [C&A] corporate executives the purpose of which was to disguise the company's true operating performance and financial results. I learned that certain figures for EBITDA, operating income and other financial information had been falsely inflated on the company's books by improperly recognizing cost reductions. . . I and other executives knew that the effect of these transactions . . . was to present a false and misleading picture of the company's true operating performance and financial results." Jones Guilty Plea at 10-11.

(iii) Williams pled guilty to conspiracy. In so doing, Williams admitted, among other things, that he was involved in the falsification of invoices and other records as they related to the fraudulent scheme surrounding GECC's accounts receivables securitization facility, as described above. *See generally* Williams Guilty Plea.

(iv) Gougherty pled guilty to securities fraud, conspiracy to commit securities fraud, and making false statements in SEC filings. In so doing, Gougherty

95

admitted, among other things, "During 2004 and 2005 I, along with others,

engaged in conduct by which Collins & Aikman wrongly included certain

supplier rebates as income . . . for certain SEC reporting periods, even though

these rebates were contingent on future events or actually for capital equipment

purchases and, therefore, they could not be properly included as income for

those periods" and that he was "involved in the making of false financial

statements that [he] knew would go into documents that were going to be filed

with the SEC." Gougherty Guilty Plea at 10-12.

     d.    As described above, Defendant McCallum was directly involved with

numerous blatantly fraudulent "round-trip" transactions with C&A.  McCallum knew or

was reckless in not knowing that these transactions were fraudulent and rendered C&A's

publicly-filed financial statements materially false and misleading (including the SEC

filings that he signed).  Nonetheless, McCallum participated in these fraudulent

transactions because it enabled him to profit through lucrative business deals with C&A,

as described above.  Indeed, McCallum had a long history of profiting through his deals

with Defendants Stockman and Heartland.  According to a March 11, 2004 press release,

McCallum was "directly or indirectly" a limited partner in Heartland.  Indeed, McCallum

and his affiliates received approximately $100.0 million from C&A in 2001 in connection

with C&A's purchases of Joan Automotive Industries, Inc. and Western Avenue Dyers,

L.P., businesses in which McCallum had a substantial ownership interest.  As a result of

his close ties to Defendants Stockman and Heartland, as well as his status as a Director of

C&A (with whom he conducted numerous business transactions), McCallum had a

special relationship with the Company and had the same access to information as the
other corporate insiders.

       e.     According to former employees who worked closely with the Defendants,
Stockman and Stepp had "a comprehensive knowledge of each plant's financial results"
and were "intimately familiar with each plant's operations and finances."

       f.     According to a press release issued on March 26, 2007 by the USAO:

> Stockman did not have only money at stake: his reputation was on
> the line as well.  In 2003 he told a reporter with the *New York Times*
> "[C&A's business plan] was my idea; I'm going to stick with it.  I'm
> going to make it happen and make sure it becomes a success."
> Stockman stuck with it at the cost of the investing public, the
> financial integrity of the company and the truth.

       g.     CI 1 also stated that C&A management (including Stockman and Stepp)
exerted constant pressure on the executives at certain facilities to report financial results
that were better than they actually were.

       h.     CI 1 stated that C&A management was "cooking the books" in order to
show improving results to the Company's lenders.

       i.     CI 2 stated that Stockman did everything in his power to make C&A's
financial results appear better than they actually were.  Indeed, CI 2 stated that Stockman
improperly manipulated all of the accurate data that plant management provided to him to
achieve whatever results he wanted to show to outsiders.

       j.     CI 2 also stated that Stockman participated in the fraud by, among other
things, encouraging C&A facilities to classify operating expenses as non-operating for
the purpose of increasing the Company's EBITDA.

k.    CI 1 and CI 2 further stated that, by the summer of 2004, Stockman knew

that C&A could not adequately staff its projects, and appeared at two meetings with Ford

to explain why C&A could not have sufficient personnel in attendance.

l.    Stockman and Stepp regularly certified C&A's internal controls pursuant

to Section 302 of the Sarbanes-Oxley Act of 2002.  According to CI 2, however,

PricewaterhouseCoopers reported internal control weaknesses to C&A management

(including Stockman and Stepp) in December 2003.  Further, CI 2 stated that C&A failed

in seven out of eight categories in PricewaterhouseCoopers' review, and these failures,

which included basic internal controls over things like accounts receivables and payables

recognition, were not rectified.

m.    In June 2005, the Section 10(b) Defendants knew or should have known

that GECC had informed C&A's management that it was "gravely concerned" that C&A

was pre-billing certain receivables.  Moreover, the Section 10(b) Defendants knew or

should have known that, when C&A could not find any documentation to verify that

these receivables were valid, GECC demanded an on-site audit of C&A's receivables.

n.    The Section 10(b) Defendants' scienter is further demonstrated by the fact

that, after auditing C&A for only one year, PricewaterhouseCoopers withdrew in the

Summer of 2003 after sending a letter to the Company's management describing certain

"reportable conditions."

o.    Defendants Stockman, Galante, Leuliette, Valenti, Tredwell, McConnell

and Koth also misled investors like MacKay Shields in March 2005 regarding

Heartland's so-called "commitment" to purchase approximately $300 million face value

of C&A's preferred stock from Textron.  In reality, these Defendants knew or should

have known that, under this "commitment," Heartland was under no obligation to purchase these preferred shares until C&A filed a Form 10-K for 2004 (which it still has not done), and that Heartland could unilaterally terminate the agreement if C&A experienced an event of bankruptcy or insolvency.

p.      As detailed above, the Section 10(b) Defendants also had a motive and opportunity to commit fraud. The fraudulent scheme allowed C&A to avoid bankruptcy for years and thus preserve the massive investment made by Heartland (of which Defendants Stockman, Stepp, Galanti, Tredwell, McConnell, Leuliette and Valenti were senior directors, partners and/or employees). Accordingly, if these Defendants were to reveal C&A's problems, they stood to lose tens of millions of dollars in connection with their personal ownership of C&A stock, as well as Heartland's ownership of approximately 41% of C&A.

q.      These Defendants' senior positions at Heartland also provided them with a motive and opportunity to commit fraud, as Heartland received lucrative consulting fees, totaling more than $44 million between 2001 and 2004. Moreover, approximately 30% of Heartland's investment portfolio was dedicated to C&A.

r.      The remaining Section 10(b) Defendants also had a motive and opportunity to commit fraud, as, on information and belief, they personally owned shares of C&A stock and/or participated in C&A's employee stock option plan, pursuant to which 68,218 options to purchase shares of restricted C&A stock were issued to Company employees and executive officers on June 29, 2004. These options were scheduled to vest in three equal annual installments on June 29, 2005, June 29, 2006 and June 29, 2007. Accordingly, the Section 10(b) Defendants knew that a bankruptcy filing

99

by C&A would render these stock holdings and restricted stock options essentially worthless, endanger their lucrative positions at C&A (and, for certain Section 10(b) Defendants, endanger their lucrative positions at Heartland—which was heavily invested in C&A), and subject them to personal liability regarding the false and misleading financial statements that he signed and certified.

237.    The scienter of Defendants Leuliette, Tredwell, McConnell and Valenti is further demonstrated by the fact that they were each Senior Members and Directors of Heartland, as well as Directors of C&A. As Directors of both Heartland and C&A, these Defendants were part of a small group of insiders who effectively owned and controlled C&A. They worked closely with Defendants Stockman, Stepp and Galante (also members of Heartland) both at Heartland and in connection with the management of C&A. By virtue of their status as directors of both C&A and Heartland, these Defendants had a special relationship with the Company, which enabled them to have access to the same information as other corporate insiders. Indeed, as the consummate insiders, these Defendants had unfettered access to C&A's books and records and an undisputed duty to monitor the information within their control in order to ensure that the Company's financial statements were accurate.

238.    Despite their positions of seniority and control, Defendants Leuliette, Tredwell, McConnell and Valenti knowingly or recklessly permitted the fraudulent scheme to continue unabated for years. In doing so, each of these insiders either knew about, or was willfully blind toward, a host of red flags concerning the fraudulent scheme. Indeed, as the Criminal Indictment and the SEC Complaint make clear, the fraudulent scheme could have been discovered from a review of the most basic Company documents—documents which these Defendants had access to and a duty to monitor. The Criminal Indictment explains that:

100

at the close of each month and each quarter of C&A's fiscal year, employees in C&A's finance and accounting departments collected and summarized information reflecting C&A's operating performance and financial results for the particular period in question. <u>This information was reflected in various financial statements and reports</u> . . .

at all times relevant to this Indictment, <u>C&A tracked its sales, EBITDA, operating income, capital expenditures and other financial metrics on a monthly basis through the use of internal reports</u> . . .

At the corporate level, the results from each division were aggregated and combined with the home office results . . . <u>the consolidated reports tracked actual results and compared them to forecasted results.</u>

Criminal Indictment¶15-17 (emphasis added). The Criminal Indictment also confirms that certain Defendants "received weekly written reports . . . which included updated information concerning rebate transactions. These weekly updates often referred to the fact that future business was being promised to suppliers in exchange for rebates being booked immediately [*i.e.,* the fraudulent "rebate" scheme described above]." *Id.*¶39.

239.    Thus, readily-available internal C&A reports tracked on a weekly, monthly and quarterly basis C&A's most critical financial metrics—including the EBITDA, operating income and capital expenditure numbers that MacKay Shields and other investors relied upon (and which were falsely stated in C&A's public filings). These reports also compared C&A's actual results to its forecasted results. Had any of Defendants Leuliette, Tredwell, McConnell and Valenti (or the other Defendants) bothered to review these reports, it would have been readily apparent to them that C&A's publicly reported financial information was materially false and misleading. For instance, it would have been readily apparent from the face of the reports that C&A's actual results were falling so far behind its forecasted results that C&A's financial statements were obviously falsified. Moreover, the Criminal Indictment makes clear that these documents were available to the Defendants and that Defendant Stockman held numerous

101

meetings where these reports were discussed: "Stockman regularly met with C&A employees to discuss the financial results and projections reflected in the various documents presented during these meetings." Defendants Leuliette, Tredwell, McConnell and Valenti either reviewed these reports and/or attended these meetings (which would have alerted them to the fraud) or recklessly failed to do so in abdication of their duties.

240.    Defendants Leuliette, Tredwell, McConnell and Valenti also either knew, or were reckless in not knowing, that Defendant Stockman's statements on March 17, 2005 were materially false and misleading. As stated in the Criminal Indictment, on March 17, 2005, Stockman told investors that C&A's "EBITDA would be between $65-75 million for the first quarter of 2005, even though the most current financial information for the company, _including the actual results for January and February, showed that EBITDA for the first quarter would only be roughly half that figure._" *Id.*¶71 (emphasis added). Had these Defendants bothered to consult the Company's actual results for January and February, as they should have done, it would have been obvious to them that Stockman's statements on March 17, 2005 were false and misleading. The failure of these Defendants (who were also partners in Heartland) to review these most basic Company document was egregiously reckless, particularly given that, Stockman also disclosed on March 17, 2005 that Heartland (of which these Defendants were Directors) was purportedly "committed" to purchase $300 million in additional C&A stock. As set forth above, this statement of Heartland's "commitment" was itself materially misleading (as each of Defendants Leuliette, Tredwell, McConnell and Valenti also knew or should have known).

241.    Plaintiff and the other members of the Class, through MacKay Shields, relied upon the false and misleading statements alleged above in purchasing C&A Notes at artificially inflated prices.

242.    As a direct and proximate cause of the wrongful conduct described herein,

Plaintiff and the other members of the Class suffered damages in connection with their purchases

of C&A Notes through MacKay Shields.  Had MacKay Shields known of the material adverse

information not disclosed by Defendants, or been aware of the truth behind Defendants' material

misstatements, it would not have purchased C&A Notes at artificially inflated prices on behalf of

Plaintiff and the other members of the Class.

243.    By virtue of the foregoing, the Section 10(b) Defendants violated Section 10(b) of

the Exchange Act and Rule 10b-5 promulgated thereunder and, therefore, are liable to Plaintiff

and the members of the Class, each of whom has been damaged as a result of such violations.

## COUNT II

### For Violations of Section 20(a) of the Exchange Act
### Against Defendants Heartland, Stockman, Stepp, Leuliette, Tredwell,
### McConnell, Valenti, Galante, Koth, Cosgrove, and McCallum

244.    Plaintiff repeats and realleges each and every allegation contained above as if

fully set forth herein.

245.    This claim is asserted against Defendants Heartland, Stockman, Stepp, Leuiliette,

Tredwell, McConnell, Valenti, Galante, Koth, Cosgrove, and McCallum (collectively, the

"Section 20(a) Defendants").  Throughout the Class Period, the Section 20(a) Defendants, by

virtue of their positions, stock ownership and/or specific acts described above, were controlling

persons of C&A within the meaning of Section 20(a) of the Exchange Act.

246.    As alleged herein, C&A violated Section 10(b) of the Exchange Act and Rule

10b-5 promulgated thereunder by making false and misleading statements in connection with the

purchase or sale of securities and by participating in a fraudulent scheme and course of business

or conduct, all in connection with the purchase or sale of securities.  This fraudulent conduct was

undertaken with scienter because C&A is charged with the knowledge and scienter of its senior

directors, officers and employees (including Stockman and the Defendants who have entered

Guilty Pleas) who knew of or recklessly disregarded the falsity of the Company's statements and

of the fraudulent nature of its scheme. But for the fact that C&A has filed for bankruptcy

protection, the Company would be named as a Defendant on the Section 10(b) claim alleged

herein.

247.    The Section 20(a) Defendants had the power to, and did, directly and indirectly,

exercise control over C&A, including the content and dissemination of statements which

Plaintiff alleges are false and misleading. The Section 20(a) Defendants were each provided

with and/or had access to reports, filings, press releases and other statements alleged to be

misleading prior to and/or shortly after they were issued and had the ability to prevent the

issuance or correct the statements. Defendants had direct and supervisory involvement in the

day-to-day operations of the Company and induced C&A to engage in the acts constituting

violations of the federal securities laws, as set forth in Count One above.

248.    Defendant Stockman exercised control over the Company through his positions as

Chief Executive and Chairman of the Board of Directors, membership on the Company's

Compensation Committee, and his role as (i) a Managing Member of Heartland, (ii) a Senior

Managing Director of Heartland, and (iii) the "Buyout Partner" of Heartland.  In the PPM, C&A

admitted that Stockman was central to C&A's operations, and the loss of his services could

materially and adversely affect the Company.  Additionally, as alleged above, Stockman had the

power to control the Company's public statements, and exercised such control throughout the

Class Period, both by personally making false and misleading statements to MacKay Shields

regarding C&A's finances and operations during one-on-one meetings, and by directly

disseminating false information to the market or causing such information to be disseminated

through press releases and analyst conference calls. Finally, Stockman exercised control over C&A's financial reporting through his management responsibilities and his certification of the Company's fraudulent financial statements.

249.   Defendant Stepp exercised control over the Company through his positions as the Vice Chairman of C&A's Board and the Company's CFO until October 2004 and as a Senior Managing Director of Heartland. He controlled the contents of C&A's public financial statements and exercised further influence through his certification of those statements. Additionally, as alleged above, Stepp had the power to control the Company's public statements about C&A's finances and operations, and he exercised such control throughout the Class Period by personally making false and misleading statements to MacKay Shields regarding C&A's finances and operations during one-on-one meetings, and by making and participating in various statements about the Company's performance to the market, both through press releases and analyst conference calls.

250.   Defendant Koth exercised control over the Company through his positions as the Senior Vice President and CFO of the Company since October 2004, and previously was C&A's Vice President, Finance & Controller, and head of tax since May 2004. Additionally, as alleged above, Koth had the power to control the Company's public statements about C&A's finances and operations, and he exercised such control throughout the Class Period by personally making false and misleading statements to MacKay Shields regarding C&A's finances and operations during one-on-one meetings, and by participating in various statements about the Company's performance, both, through press releases and analyst conference calls.

251.   Defendant Krause exercised control over the Company through his position as Senior Vice President, Finance and Administration of the Company since October 2004, and his

position as the Company's Vice President and Treasurer from October 2002 through September 2004.  Additionally, as alleged above, Krause had the power to control the Company's public statements about C&A's finances and operations, and he exercised such control during the Class Period through his involvement in preparing the Company's press releases, quarterly reports and annual reports, each of which was relied upon by MacKay Shields.

252.    Defendant Cosgrove exercised control over the Company through his senior positions as Vice President of Finance, Vice President for Financial Planning and Analysis, and Senior Vice President, Financial Planning and control.  Additionally, as alleged above, Cosgrove had the power to control the Company's public statements about C&A's finances and operations, and he exercised such control during the Class Period through his involvement in preparing the Company's press releases, quarterly reports and annual reports, each of which was relied upon by MacKay Shields.

253.    Defendant McCallum exercised control over the Company through his position as a Director and significant shareholder of C&A.  Further, as alleged above, McCallum was a limited partner in Heartland and had engaged in numerous fraudulent transactions with C&A (which had personally enriched McCallum by many millions of dollars).  McCallum's close relationship with Defendants Stockman and Heartland enabled him to exercise dominion and control over C&A for his own personal gain.

254.    Defendant Galante exercised control over the Company through his position as Vice President and Treasurer of C&A since October 2004, and his position as Vice President of Heartland.  Additionally, as alleged above, Galante had the power to control the Company's public statements about C&A's finances and operations, and he exercised such control throughout the Class Period by personally making false and misleading statements to MacKay

106

Shields regarding C&A's finances and operations during one-on-one meetings, and through his

involvement in preparing C&A's press releases, quarterly reports and annual reports, each of

which was relied upon by MacKay Shields.

255.    Defendants Tredwell, Leuliette, McConnell and Valenti exercised control over the

Company through their positions as Directors of C&A and Senior Managing Directors of

Heartland, which owned approximately 41% of C&A.  Additionally, as alleged above, Tredwell,

Leuliette, McConnell and Valenti had the power to control the Company's public statements

about C&A's finances and operations, and exercised such control throughout the Class Period by

reviewing and approving the false and misleading information that certain Section 10(b)

Defendants provided to MacKay Shields during face-to-face meetings, and through their

involvement in preparing the Company's press releases, quarterly reports and annual reports,

each of which was relied upon by MacKay Shields.

256.    Defendant Heartland controlled C&A throughout the Class Period.  Specifically,

as of January 1, 2005, Heartland owned approximately 41% of the Company.  In addition to the

facts set forth above, Heartland's control over C&A is demonstrated by the following:

a.    There were six members of C&A's eleven-member Board that were

affiliated with Heartland.

b.    Stockman, the Chairman of the C&A Board and the Company's CEO, and

Stepp, the Vice Chairman of the C&A Board and the Company's CFO, both were Senior

Managing Directors of Heartland LP.

c.    Galante, a Vice President of Heartland, served as C&A's Treasurer.

d.    In the PPM provided directly to MacKay Shields by Defendants and on

which MacKay Shields relied, C&A expressly stated that "[w]e are controlled by

Heartland," and further disclosed that Heartland provided C&A with valuable strategic, operational and financial guidance, and that the loss of such guidance also could have a material adverse effect upon the Company.

   e. When Stockman, Stepp and Galante met with MacKay Shields, they expressly stated that they had authority to speak on behalf of Heartland.

   f. C&A's Form 10-K for the year ended 2001 stated "During the first quarter of 2001, Heartland acquired a controlling interest in the Company."

   g. C&A's April 20, 2001 Proxy statement on Form DEF 14A stated "As of March 15, 2001, Heartland . . . beneficially owned or has the right to vote in the aggregate approximately 91% of the outstanding Common Stock."

   h. Heartland regularly forced C&A to enter into transactions that enriched Heartland. For instance, in addition to the multi-millions of dollars in management fees set forth above, C&A's Form 10-K for the year ended 2001 stated that C&A "has also agreed to pay [to Heartland] a fee of 1% of the total enterprise value of certain acquisitions and dispositions . . . a fee of $12.5 million was paid by the company to Heartland as a result of [Heartland's] advisory services in connection with the TAC-Trim acquisition."

   i. In 2001, Heartland caused C&A to acquire Becker Group LLC, which was owned directly or indirectly by Thomas Becker, who, according to press reports, was a Heartland limited partner. Becker benefited immensely from this transaction, realizing in excess of $18 million.

  257. Accordingly, throughout the Class Period, Heartland exercised domination and control over facet of C&A's business and operations.

258.    The Section 20(a) Defendants culpably participated in the matters alleged herein because, among other things, they knew, or were reckless in not knowing, that the statements set forth above were materially false and misleading, or omitted material information.  Facts giving rise to the Section 20(a) Defendants' culpable participation are set forth in detail above.  In addition to those facts, Defendant Heartland culpably participated in the matters alleged herein by virtue of Defendant Stockman (Heartland's founding partner)'s role in designing, orchestrating and carrying out the fraudulent schemes set forth above.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

Determining this action to be a proper class action pursuant to Rule 23 of the Federal Rules of Civil Procedure;

A.    Awarding Plaintiff and the members of the Class compensatory damages;

B.    Awarding Plaintiff and the members of the Class pre-judgment interest and post-judgment interest, as well as their reasonable attorneys' fees, expert witness fees, and costs;

D.    Awarding extraordinary, equitable and/or injunctive relief as permitted by law, equity and the applicable federal statutory provisions, pursuant to Rules 64 and 65 of the Federal Rules of Civil Procedure to assure that the Class has an effective remedy; and

E.    Awarding such other relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury of all issues so triable.

Respectfully submitted,

> BERNSTEIN LITOWITZ BERGER
> & GROSSMANN, LLP
>
> By:    /s/ Steven B. Singer
> MAX W. BERGER
> STEVEN B. SINGER
> JOHN C. BROWNE
> JEREMY P. ROBINSON
> *Counsel for Plaintiff*
> 1285 Avenue of the Americas
> New York, New York  10019
> (212) 554-1400
>
> MORGANROTH & MORGANROTH, PLLC
> MAYER MORGANROTH (P17966)
> JEFFREY B. MORGANROTH (P41670)
> *Local Counsel for Plaintiff*
> 3000 Town Center, Suite 1500
> Southfield, MI  48075
> (248) 355-3084

Dated:  May 4, 2007

## CERTIFICATE OF SERVICE

I hereby certify that on May 4, 2007, I electronically filed Plaintiff's Amended Class Action Complaint and Demand for Jury Trial with the Clerk of the Court using the ECF system, which will send notification of such filings to those parties registered with the ECF system.

In addition, I hereby certify that a copy Plaintiff's Amended Class Action Complaint and Demand for Jury Trial will also be sent by United States Postal Service and email to the parties listed below:

Lea Haber Kuck
Jeffrey S. Geier
**Skadden, Arps, Slate, Meagher & Flom LLP**
Four Times Square
New York, New York 10036
Tel: (212) 735-2978
Fax: (212) 735-2000/1

Michael Joseph
Joseph Click
**Blank Rome LLP**
Watergate
600 New Hampshire Avenue NW
Washington, DC 20037
Tel: (202) 772-5800
Fax: (202) 772-5858

Michael Shapiro
Gerald Griffin
**Carter Ledyard & Milburn LLP**
2 Wall Street
New York, NY 10005
Tel: (212) 238-8676
Fax: (212) 732-3232

Gandolfo V. DiBlasi
David E. Swarts
**Sullivan & Cromwell**
125 Broad Street
New York, NY 10004
Tel: (212) 558-4000
Fax: (212) 558-3588

Andrew B. Weissman
**Wilmer Cutler Pickering Hale and Dorr LLP**
1875 Pennsylvania Avenue, NW
Washington, DC 20006
Tel: (202) 663-6612
Fax: (202) 663-6363

Charles A. Stillman
Scott M. Himes
**Stillman, Friedman & Shechtman, P.C.**
425 Park Avenue
New York, NY 10022
Tel: (212) 223-0200
Fax: (212) 223-1942

Thomas G. McNeill (P36895)
**Dickinson Wright, PLLC**
500 Woodward Avenue, Suite 4000
Detroit, MI 48226
(313) 223-3500

Further, the following parties will be served pursuant to the Federal Rules of Civil Procedure:

> Paul C. Barnaba
> David R. Cosgrove
> Thomas V. Gougherty
> Gerald E. Jones
> Elkin B. McCallum
> Christopher M. Williams

MAX W. BERGER
STEVEN B. SINGER
GERALD H. SILK
JOHN C. BROWNE
STEPHEN W. TOUNTAS
BERNSTEIN LITOWITZ BERGER &
GROSSMANN LLP
Attorneys for Plaintiff
(Pro Hac Vice Motions To Be Filed)
1285 Avenue of the Americas, 38th Floor
New York, New York 10019
212-554-1400

/s/ Jeffrey B. Morganroth
MAYER MORGANROTH
MORGANROTH & MORGANROTH, PLLC
Local Counsel for Plaintiff
3000 Town Center, Suite 1500
Southfield, MI 48075
(248) 355-3084
Email: jmorganroth@morganrothlaw.com
[P17966]