## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| COLLINS & AIKMAN CORPORATION and COLLINS & AIKMAN PRODUCTS CO., as Debtors in Possession,<br><br>Plaintiffs,<br><br>v.<br><br>DAVID A. STOCKMAN, J. MICHAEL STEPP, BRYCE M. KOTH, DAVID R. COSGROVE, PAUL C. BARNABA, ROBERT A. KRAUSE, JOHN A. GALANTE, CHARLES E. BECKER, ELKIN B. MCCALLUM, THOMAS E. EVANS, CYNTHIA HESS, DANIEL P. TREDWELL, W. GERALD MCCONNELL, SAMUEL VALENTI, III, HEARTLAND INDUSTRIAL PARTNERS, L.P., HEARTLAND INDUSTRIAL ASSOCIATES, L.L.C., HEARTLAND INDUSTRIAL GROUP, L.L.C., PRICEWATERHOUSECOOPERS LLP, and KPMG LLP,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)  C.A. No. 07-265-SLR<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## DECLARATION OF STACEY R. FRIEDMAN

### VOLUME 3 OF 3

### EXHIBITS E THROUGH K

OF COUNSEL:

Gandolfo V. DiBlasi
Karen Patton Seymour
Stacey R. Friedman
David E. Swarts
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004
(212) 558-4000

Dated: April 28, 2008

Richard L. Horwitz (2246)
Peter J. Walsh, Jr. (2437)
POTTER ANDERSON & CORROON LLP
Hercules Plaza, 6th Floor
1313 N. Market Street
Wilmington, Delaware 19801
Tel: (302) 984-6000
Fax: (302) 658-1192
rhorwitz@potteranderson.com
pwalsh@potteranderson.com

*Attorneys for Defendant J. Michael Stepp*

# UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

COLLINS & AIKMAN CORPORATION and COLLINS & AIKMAN PRODUCTS CO., as Debtors in Possession,

Plaintiffs,

v.

DAVID A. STOCKMAN, *et al.*,

Defendants.

C.A. No. 07-265-SLR

The Honorable Sue L. Robinson

## <u>DECLARATION OF STACEY R. FRIEDMAN</u>

STACEY R. FRIEDMAN hereby declares:

1.      I am a member of Sullivan & Cromwell LLP, counsel for defendant J. Michael Stepp in the above-captioned action.  I submit this declaration for the purpose of placing before the Court certain documents referred to in the Memorandum of Law of J. Michael Stepp in Support of His Motion to Dismiss the First Amended Complaint.

2.      Attached hereto as Exhibit A is a true and correct copy of C&A SEC Form 10-Q, filed November 14, 2001.

3.      Attached hereto as Exhibit B is a true and correct copy of C&A SEC Form 10-K/A, filed June 7, 2002.

4.      Attached hereto as Exhibit C is a true and correct copy of C&A SEC Form 10-K, filed March 26, 2003.

5.      Attached hereto as Exhibit D is a true and correct copy of C&A SEC Form 10-K, filed March 17, 2004.

6.    Attached hereto as Exhibit E is a true and correct copy of C&A SEC Form 10-Q, filed November 9, 2004.

7.    Attached hereto as Exhibit F is a true and correct copy of the closing stock prices of Collins & Aikman Corp. for the period May 1, 2003 through May 17, 2005, from Factiva, a Dow Jones and Reuters Company.

8.    Attached hereto as Exhibit G is a true and correct copy of the closing stock prices of Dana Corp. for the period May 1, 2003 through March 3, 2006, from Factiva, a Dow Jones and Reuters Company.

9.    Attached hereto as Exhibit H is a true and correct copy of the closing stock prices of Delphi Corp. for the period May 1, 2003 through October 10, 2005, from Factiva, a Dow Jones and Reuters Company.

10.    Attached hereto as Exhibit I is a true and correct copy of the closing stock prices of Tower Automotive, Inc. for the period May 1, 2003 through February 2, 2005, from Factiva, a Dow Jones and Reuters Company.

11.    Attached hereto as Exhibit J is a true and correct copy of the closing stock prices of Intermet Corp. for the period May 1, 2003 through September 29, 2004, from Factiva, a Dow Jones and Reuters Company.

12.    Attached hereto as Exhibit K is a true and correct copy of the Restated Certificate of Incorporation of Collins & Aikman Corporation, filed August 10, 1999.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on April 22, 2008 in New York, New York.

Stacey R. Friedman

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

### CERTIFICATE OF SERVICE

I, Peter J. Walsh, hereby certify that on April 28, 2008, the attached document was

electronically filed with the Clerk of the Court using CM/ECF which will send notification to the

registered attorney(s) of record that the document has been filed and is available for viewing and

downloading.

Joseph A. Rosenthal
Carmella P. Kenner
Rosenthal, Monhait & Goddess, P.A.
919 N. Market Street, Suite 1401
Wilmington, DE 19899

Thomas P. Preston
Blank Rome LLP
1201 North Market Street, Suite 800
Wilmington, DE 19801-4226

Thomas G. Macauley
Zuckerman Spaeder LLP
919 Market Street, Suite 1705
P. O. Box 1028
Wilmington, DE 19899

Andrew Auchincloss Lundgren
Young, Conaway, Stargatt & Taylor
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, DE 19899-0391

Michael J. Maimone
Joseph Benedict Cicero
Edwards Angell Palmer & Dodge LLP
919 North Market Street, Suite 1500
Wilmington, DE 19801

Peter B. Ladig
Stephen B. Brauerman
The Bayard Firm
222 Delaware Avenue, Suite 900
P. O. Box 25130
Wilmington, DE 19899

Vernon R. Proctor
Proctor Heyman LLP
1116 West Street
Wilmington, DE 19801

James L. Holzman
J. Clayton Athey
Stephen L. Ascher
Prickett, Jones & Elliott, P.A.
1310 King Street
P. O. Box 1328
Wilmington, DE 19899

Anne Churchill Foster
Robert J. Stearn, Jr.
Richards, Layton & Finger
One Rodney Square
P.O. Box 551
Wilmington, DE 19899

I further certify that on April 28, 2008, the attached document was sent via First Class

Mail to the following person(s):

Samuel H. Rudman
Lerach Coughlin Stoia Geller Rudman &
    Robbins LLP
58 South Service Road, Suite 200
Melville, NY  11747

Joseph O. Click
Blank Rome, LLP
600 New Hampshire Ave., N.W.
Washington, DC  20037

Carl S. Kravitz
Zuckerman Spaeder LLP
1800 M Street, NW, Suite 1000
Washington, DC  20036

Stephen L. Ascher
Jenner & Block LLP
919 Third Avenue, 37th Floor
New York, NY  10022

Joseph De Simone
Mayer Brown LLP
1675 Broadway
New York, NY  10019

Jonathan Lerner
Skadden, Arps, Slate, Meagher & Flom LLP
Four Times Square
New York, NY  10036

Seth L. Friedman,
Latham & Watkins LLP
885 Third Avenue
New York, NY  10022

Andrew Weissman
Wilmer Cutler Pickering Hale and
    Dorr LLP
1875 Pennsylvania Ave., N.W.
Washington, DC  20006

Craig A. Stewart
Arnold & Porter LLP
399 Park Avenue
New York, NY  10022

Michael Shapiro
Carter Ledyard & Milburn LLP
2 Wall Street
New York, NY  10005

Richard M. Strassberg
Goodwin Proctor LLP
599 Lexington Avenue
New York, NY  10022

Lynn Brimer
Strobl & Sharp, P.C.
300 East Long Lake Road, Suite 200
Bloomfield Hills, MI  48304

Thomas G. Rafferty
Cravath, Swaine & Moore LLP
825 Eighth Avenue
New York, NY  10019

By:  */s/ Peter J. Walsh, Jr.*
      Richard L. Horwitz (#2246)
      Peter J. Walsh (#2437)
      Hercules Plaza, 6th Floor
      1313 N. Market Street
      Wilmington, Delaware 19899-0951
      Tel:  (302) 984-6000
      rhorwitz@potteranderson.com
      pwalsh@potteranderson.com

# Exhibit E

# COLLINS & AIKMAN CORP

## FORM 10-Q
### (Quarterly Report)

## Filed 11/9/2004 For Period Ending 9/30/2004

| | |
|---|---|
| Address | 250 STEPHENSON HWY |
| | TROY, Michigan 48083 |
| Telephone | 248-824-2500 |
| CIK | 0000846815 |
| Industry | Auto & Truck Parts |
| Sector | Consumer Cyclical |
| Fiscal Year | 12/31 |

Generated by EDGAR Online Pro
http://pro.edgar-online.com

EDGAR® Online

Contact EDGAR Online
Customer Service: 203-852-5666
Corporate Sales: 212-457-8200

# UNITED STATES SECURITIES AND EXCHANGE COMMISSION
### Washington D.C. 20549

---

# Form 10-Q

(Mark One)

☑    **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d)
OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the quarterly period ended September 30, 2004**

or

☐    **TRANSITION REPORT PURSUANT TO SECTION 13 or 15(d)
OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the transition period from    to**

**Commission file number 1-10218**

---

# Collins & Aikman Corporation

*(Exact name of registrant, as specified in its charter)*

| | |
|---|---|
| **DELAWARE** | **13-3489233** |
| *(State or other jurisdiction of incorporation or organization)* | *(IRS Employer Identification No.)* |

**250 Stephenson Highway
Troy, Michigan 48083**
*(Address of principal executive offices, including zip code)*

**(248) 824-2500**
*(Registrant's telephone number, including area code)*

Indicate by check mark whether the Registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the Registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.    Yes ☐    No ☑  .

Indicate by check mark whether the Registrant is an accelerated filer (as defined in Exchange Act Rule 12b-2).    Yes ☑    No ☐  .

As of October 31, 2004 the number of outstanding shares of the Registrant's common stock, $.01 par value, was 83,630,087 shares.

### WEBSITE ACCESS TO COMPANY'S REPORTS:

Collins and Aikman's internet website address is www.collinsaikman.com. The Company's annual report on Form 10-K, quarterly reports on Form 10-Q, current reports on Form 8-K, and amendment to those reports filed or furnished pursuant to Section 13(a) or 15(d) of the

Exchange Act are available free of charge through the Company's website and as soon as reasonably practicable after the reports are electronically filed with, or furnished to, the Securities and Exchange Commission.

The Company's Code of Business Conduct is available free of charge through the Company's internet website. Any amendments to the Company's Code of Business Conduct and any waivers of the Code of Business Conduct involving executive officers or directors of the Company will also be made available on the Company's internet website. Printed copies of the Company's Code of Business Conduct are also available free of charge to any shareholder upon request to: Corporate Secretary, Collins & Aikman Corporation, 250 Stephenson Highway, Troy, MI 48083.

---

### COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES

### FORM 10-Q QUARTERLY REPORT INDEX

|  |  | Page |
|---|---|---|
| **PART I** | **FINANCIAL INFORMATION** |  |
| Item 1. | Financial Statements | 1 |
| Item 2. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 32 |
| Item 3. | Quantitative and Qualitative Disclosures About Market Risk | 45 |
| Item 4. | Controls and Procedures | 46 |
| **PART II** | **OTHER INFORMATION** |  |
| Item 1. | Legal Proceedings | 47 |
| Item 6. | Exhibits and Reports on Form 8-K | 48 |
| Signature |  | 50 |
| Computation of Earnings Per Share |  |  |
| Computation of Ratio of Earnings to Fixed Charges |  |  |
| Section 302 Certification |  |  |
| Section 302 Certification |  |  |
| Section 906 Certification |  |  |

# PART I — FINANCIAL INFORMATION

**Item 1.**   *Financial Statements*

## COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES

## CONDENSED CONSOLIDATED STATEMENTS OF OPERATIONS

| | Quarter Ended | | Nine Months Ended | |
|---|---|---|---|---|
| | September 30, 2004 | September 30, 2003 | September 30, 2004 | September 30, 2003 |
| | (Unaudited) | | | |
| | (in millions, except for per share data) | | | |
| Net sales | $864.8 | $902.2 | $2,967.5 | $2,970.8 |
| Cost of goods sold | 800.8 | 812.1 | 2,687.7 | 2,658.3 |
| Gross profit | 64.0 | 90.1 | 279.8 | 312.5 |
| Selling, general and administrative expenses | 35.2 | 57.7 | 144.7 | 193.0 |
| Restructuring charge | 9.0 | 21.9 | 28.9 | 26.8 |
| Impairment of long-lived assets | 10.3 | 2.2 | 40.7 | 21.1 |
| Operating income | 9.5 | 8.3 | 65.5 | 71.6 |
| Interest expense | 46.9 | 37.8 | 127.4 | 111.3 |
| Interest expense from subsidiary preferred stock dividends | 10.5 | 9.2 | 30.5 | 22.4 |
| Interest expense from subsidiary preferred stock accretion | 0.6 | 0.4 | 1.6 | 4.8 |
| Loss on sale of receivables | 2.4 | 1.8 | 7.2 | 4.5 |
| Loss on early extinguishment of debt | 18.8 | — | 20.3 | — |
| Other expense (income), net | (0.7) | (0.2) | 4.1 | (23.9) |
| Loss from continuing operations before income taxes | (69.0) | (40.7) | (125.6) | (47.5) |
| Income tax expense (benefit) | (13.4) | (8.6) | (17.0) | 0.1 |
| Net loss | $ (55.6) | $ (32.1) | $ (108.6) | $ (47.6) |
| Net loss per basic and diluted common share | $ (0.67) | $ (0.38) | $ (1.30) | $ (0.57) |
| Average common shares outstanding: | | | | |
| Basic and diluted | 83.6 | 83.6 | 83.6 | 83.6 |

The Notes to Consolidated Financial Statements are an integral part
of these consolidated financial statements.

1

## COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES

### CONDENSED CONSOLIDATED BALANCE SHEETS

|  | September 30, 2004 | December 31, 2003 |
|---|---|---|
|  | (Unaudited) | |
|  | (in millions) | |
| **ASSETS** | | |
| Current Assets: | | |
| Cash and cash equivalents | $ 3.5 | $ 13.2 |
| Accounts and other receivables, net of allowances of $6.4 and $9.2 | 255.1 | 257.3 |
| Inventories | 178.8 | 169.4 |
| Other | 217.1 | 212.2 |
| Total current assets | 654.5 | 652.1 |
| Property, plant and equipment, net | 806.0 | 834.1 |
| Deferred tax assets | 206.0 | 178.1 |
| Goodwill | 1,378.5 | 1,363.1 |
| Intangible assets, net | 45.7 | 66.9 |
| Other assets | 106.0 | 96.9 |
|  | $3,196.7 | $3,191.2 |
| **LIABILITIES AND COMMON STOCKHOLDERS' EQUITY** | | |
| Current Liabilities: | | |
| Short-term borrowings | $ 25.3 | $ 16.0 |
| Current maturities of long-term debt and capital lease obligations | 8.5 | 31.5 |
| Accounts payable | 636.3 | 638.9 |
| Accrued expenses | 225.1 | 238.9 |
| Total current liabilities | 895.2 | 925.3 |
| Long-term debt and capital lease obligations | 1,361.2 | 1,237.7 |
| Mandatorily redeemable preferred stock of subsidiary | 193.3 | 161.2 |
| Other, including pensions and postretirement benefit obligation | 404.6 | 423.4 |
| Commitments and contingencies (Note 15) | | |
| Minority interest in consolidated subsidiary | 2.3 | 3.3 |
| Total liabilities | 2,856.6 | 2,750.9 |
| Common stock ($0.01 par value, 300.0 shares authorized, 83.6 shares issued and outstanding at September 30, 2004 and December 31, 2003) | 0.8 | 0.8 |
| Other paid-in capital | 1,282.3 | 1,282.3 |
| Accumulated deficit | (938.7) | (830.1) |
| Accumulated other comprehensive loss | (4.3) | (12.7) |
| Total common stockholders' equity | 340.1 | 440.3 |
|  | $3,196.7 | $3,191.2 |

The Notes to Consolidated Financial Statements are an integral part
of these consolidated financial statements.

2

**COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES**

**CONDENSED CONSOLIDATED STATEMENTS OF CASH FLOW**

| | Nine Months Ended September 30, | |
|---|---|---|
| | **2004** | **2003** |
| | (Unaudited) (in millions) | |
| **OPERATING ACTIVITIES** | | |
| Net loss | $(108.6) | $ (47.6) |
| Adjustments to derive cash flow provided by (used in) operating activities: | | |
| Impairment of long lived assets | 40.7 | 21.1 |
| Deferred income tax benefit | (24.1) | (4.9) |
| Subsidiary preferred stock requirements | 32.1 | 27.2 |
| Depreciation | 101.6 | 83.7 |
| Amortization of other assets | 11.1 | 17.5 |
| Gain on curtailment of postretirement benefit plans other than pensions | (9.4) | — |
| Loss on early extinguishment of debt | 20.3 | — |
| Loss (gain) on sale of property, plant and equipment | 2.5 | (2.6) |
| Changes in assets and liabilities: | | |
| Increase (decrease) in postretirement benefit obligations | (4.6) | 6.6 |
| Decrease (increase) in net customer funded tooling | (9.0) | 7.5 |
| Decrease (increase) in accounts and other receivables | (49.0) | 22.1 |
| Proceeds from (reduction of) participating interests in accounts receivable, net of redemptions | 86.9 | (30.8) |
| Increase (decrease) in accounts receivable factored | (35.7) | 43.0 |
| Increase in inventories | (9.4) | (15.4) |
| Increase (decrease) in accounts payable | (2.6) | 9.5 |
| Increase in interest payable | 9.4 | 28.6 |
| Other, net | (61.1) | (121.5) |
| Net cash provided by (used in) operating activities | (8.9) | 44.0 |
| **INVESTING ACTIVITIES** | | |
| Additions to property, plant and equipment and other non-current assets | (151.3) | (119.9) |
| Sales of property, plant and equipment | 60.4 | 15.2 |
| Payments for acquisitions and related costs, net of cash acquired | (3.2) | (37.8) |
| Net cash used in investing activities | (94.1) | (142.5) |
| **FINANCING ACTIVITIES** | | |
| Issuance of long-term debt | 848.9 | — |
| Repayment of long-term debt and capital lease obligations | (802.6) | (22.4) |
| Payments for debt issuance costs | (15.6) | |
| Net borrowings on revolving credit facilities | 53.1 | 58.5 |
| Increase in short-term borrowings | 8.9 | 2.1 |
| Net cash provided by financing activities | 92.7 | 38.2 |
| Effect of exchange rate changes on cash | 0.6 | 1.5 |
| Net decrease in cash and cash equivalents | (9.7) | (58.8) |
| Cash and cash equivalents at beginning of period | 13.2 | 81.3 |
| Cash and cash equivalents at end of period | $   3.5 | $  22.5 |
| Supplementary information: | | |
| Taxes paid | $   7.6 | $ 18.2 |
| Interest paid | $ 106.6 | $ 73.1 |
| Capital lease obligations incurred | $   1.1 | $   1.9 |

The Notes to Consolidated Financial Statements are an integral part
of these consolidated financial statements.

## COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES

## NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS (Unaudited)

### 1. Organization

Collins & Aikman Corporation (the "Company") is a Delaware corporation, headquartered in Troy, Michigan. The Company conducts all of its operating activities through its wholly owned Collins & Aikman Products Co. ("Products") subsidiary. The Company is a global leader in design, engineering and manufacturing of automotive interior components, including instrument panels, fully assembled cockpit modules, floor and acoustic systems, automotive fabric, interior trim and convertible top systems. The Company changed the composition of its reportable segments beginning January 1, 2003 and further redefined the segments July 1, 2003 to reflect organizational changes and restated prior period segment data to be comparable. The Company operates through three segments: U.S. and Mexico Plastics, International Plastics and Global Soft Trim.

### 2. Summary of Significant Accounting Policies

#### a.    *Basis of Presentation*

The consolidated financial statements include the accounts of the Company and its consolidated subsidiaries and in the opinion of management, contain all adjustments necessary for a fair presentation of financial position and results of operations. All significant intercompany items have been eliminated in the preparation of the consolidated financial statements. Certain prior quarter and prior year items have been reclassified to conform to the current quarter and fiscal 2004 presentation. Specifically, for the third quarter and nine months ending 2004, the Company reclassified $4.2 million from cost of goods sold to selling, general and administrative expense. In addition, for the third quarter and nine months ending 2003, the Company reclassified $5.4 million and $17.1 million, respectively, in facility lease costs from selling, general, and administrative expenses to cost of goods sold. Results of operations for interim periods are not necessarily indicative of results for the full year. The accompanying consolidated financial statements and footnotes should be read in conjunction with the Company's 2003 Annual Report on Form 10-K.

#### b.    *Stock-Based Compensation*

Statement of Financial Accounting Standards ("SFAS") No. 148, "Accounting for Stock-Based Compensation — Transition and Disclosure," amended SFAS No. 123, "Accounting for Stock-Based Compensation," to provide alternative methods of transition for a voluntary change to the fair value based method of accounting for stock based employee compensation and amends the required disclosures. SFAS No. 123 encourages companies to adopt the fair value method for compensation expense recognition related to employee stock options. The accounting requirements of Accounting Principles Board Opinion ("APB") No. 25, "Accounting for Stock Issued to Employees" use the intrinsic value method in determining compensation expense, which represents the excess of the market price of the stock over the exercise price on the measurement date. The Company has elected to continue to utilize the accounting provisions of APB No. 25 for stock options and is required to provide pro forma disclosures of net income and earnings per share had the Company adopted the fair value method for recognition purposes.

In June 2004, the Compensation Committee of the Board of Directors approved a Voluntary Stock Option Exchange Program ("Program"). The Company offered option holders of grants under the 2002 Employee Stock Option Plan ("Plan") the opportunity to participate in the Program and exchange all of their existing $8.00 options for a combination of restricted stock units and stock options. The Program provided one restricted stock unit for every 50 stock options exchanged. Additionally, participants will be provided 98 options for every 100 options exchanged to be priced at the then market closing price no earlier than December 31, 2004. On June 29, 2004, 3.4 million options were exchanged, and the Company awarded 68,218 shares of restricted stock units. The restricted stock units vest in three equal annual installments on June 29, 2005, June 29, 2006 and June 29, 2007. The fair value of the restricted shares is amortized ratably over the vesting period. Compensation expense of $0.03 million was recognized in the restricted stock for the quarter ended September 30, 2004.

4

If we accounted for all stock-based compensation using the fair value recognition of SFAS No. 123 and related amendments, our net loss and basic and diluted earnings per share would have been as follows (in millions, except per share amounts):

| | Quarter Ended | | Nine Months Ended | |
| --- | --- | --- | --- | --- |
| | September 30, 2004 | September 30, 2003 | September 30, 2004 | September 30, 2003 |
| Net loss attributable to common shareholders: | | | | |
| As reported | $(55.6) | $(32.1) | $(108.6) | $(47.6) |
| Total employee stock based compensation expense determined under fair value based method for all awards, net of tax | (0.7) | (1.5) | (2.5) | (4.4) |
| Pro forma, net loss | $(56.3) | $(33.6) | $(111.1) | $(52.0) |
| Basic and diluted EPS: | | | | |
| As reported | $(0.67) | $(0.38) | $ (1.30) | $(0.57) |
| Pro forma | $(0.67) | $(0.40) | $ (1.33) | $(0.62) |

For the above information, the fair value of each option grant was estimated on the date of grant using the Black-Scholes option pricing model with the following assumptions used for grants:

| | September 30, 2004 | September 30, 2003 |
| --- | --- | --- |
| Weighted average expected volatility | 81.29% | 77.50% |
| Expected lives | 7 years | 7 years |
| Weighted average risk free interest rate | 4.02% | 3.72% |
| Expected dividend rate | — | — |
| Weighted average grant date fair value of an option granted during the quarter | $ 2.77 | $ 2.77 |

All shareholder plans have been approved by stockholders. Stock option activity under the plans is as follows for the nine months ended September 30, 2004 and the year ended December 31, 2003:

| | September 30, 2004 | | December 31, 2003 | |
| --- | --- | --- | --- | --- |
| | Number of shares | Weighted Average Exercise Price | Number of shares | Weighted Average Exercise Price |
| Outstanding beginning of year | 5,009,456 | $8.32 | 4,427,248 | $10.12 |
| Awarded | 354,000 | 8.00 | 1,723,000 | 8.00 |
| Exchanged, cancelled or expired | (5,006,256) | 8.23 | (1,140,792) | 8.55 |
| Outstanding at end of year | 357,200 | $9.72 | 5,009,456 | $ 8.32 |

During the first quarter of 2003, the Company repriced 3,559,256 options with an exercise price of $10.00 to an exercise price of $8.00. As a result of repricing the Company's stock options, the options are treated as variable-based awards in accordance with APB No. 25. Because these options are considered to be variable-based awards, the Company will incur future compensation expense if the stock price exceeds the $8.00 exercise price established at the time of the repricing. At September 30, 2004, 293,200 options subject to repricing remain outstanding.

5

## 3.    Acquisitions and Goodwill

### a.    *Acquisitions*

During the third quarter of 2004, the Company acquired an injection molding business and a sequencing business for $3.2 million.

On January 17, 2003, the Company acquired the remaining 50% interest in an Italian automotive joint venture from Textron Inc., a related party, for $15 million, which also terminated a $28 million put-option by Textron Inc., that was exercisable in December 2004. The Company incurred fixed asset impairments of $7.5 million relating to the 50% interest owned previously.

On January 2, 2003, the Company acquired Delphi Corp's plastic injection molding plant and related equipment in Logroño, Spain for $18 million. The 300,000 square foot Logroño facility includes 24 injection molders and one Class-A paint line.

### b.    *Goodwill*

In accordance with SFAS No. 142, "Goodwill and Other Intangible Assets," goodwill is no longer amortized. Instead, goodwill and indefinite-lived intangible assets are tested for impairment in accordance with the provisions of SFAS No. 142. The Company employed a discounted cash flow analysis and a market comparable approach in conducting its impairment tests. The Company completed its annual impairment test as of November 1, 2003 indicating that the fair value of the reporting units exceeded the carrying values.

Fair value for all tests was determined based upon the discounted cash flows of the reporting units using discount rates ranging from 11.5% to 14.0% dependent on the reporting unit and a residual growth rate of 2%. The market comparable approach consisted of earnings multiples ranging from 5.2 to 6.5 times current year and forecasted Earnings Before Interest, Taxes, Depreciation and Amortization ("EBITDA") (operating income plus depreciation and amortization) and a control premium on equity. Future cash flows and EBITDA are affected by future operating performance, which will be impacted by economic conditions, car builds, financial, business and other factors, many of which are beyond the Company's control. The U.S. and Mexico Plastics reporting unit can be significantly impacted by an adverse change in assumptions. Considerable judgment is often involved in making these determinations and the use of different assumptions could result in significantly different results. An approximate 50 basis point change in discount rates or an approximate 4% reduction in profit would have resulted in further goodwill impairment analysis as part of the annual impairment test conducted as of November 1, 2003 as required by SFAS No. 142. The U.S. and Mexico Plastics reporting unit achieved expected results for the first quarter of 2004 but lower than expected EBITDA for the second and third quarters. The U.S. and Mexico Plastics unit is expected to return to forecast EBITDA levels for the fourth quarter, however, the Company will closely evaluate this unit's performance for the year and its related goodwill when completing its annual impairment test as of November 1, 2004. Management believes its assumptions and estimates are reasonable and appropriate, however actual results could differ from those estimates.

### c.    *Acquired Intangible Assets*

The components of the Company's acquired and other amortizable intangible assets as of September 30, 2004 and December 31, 2003 were as follows (in millions):

| | September 30, 2004 | | | December 31, 2003 | | |
|---|---|---|---|---|---|---|
| | Cost | Accumulated Amortization | Net Carrying Amount | Cost | Accumulated Amortization | Net Carrying Amount |
| Customer contracts | $40.0 | $18.2 | $21.8 | $51.0 | $13.1 | $37.9 |
| Patents and other | 36.9 | 13.0 | 23.9 | 39.2 | 10.2 | 29.0 |
| | $76.9 | $31.2 | $45.7 | $90.2 | $23.3 | $66.9 |

6

As of September 30, 2004, scheduled amortization expenses for intangible assets are as follows:

|  | Amortization Expenses |
|---|---|
| Remainder of 2004 | $ 2.3 |
| 2005 | 10.3 |
| 2006 | 9.5 |
| 2007 | 7.1 |
| 2008 | 5.2 |
| 2009 and thereafter | 11.3 |

During the second quarter 2004, the Company impaired a $2.7 million Intellimold patent, a finite intangible asset that was acquired as part of the TAC-Trim acquisition. Additionally, in the second quarter 2004, the Company impaired $11.0 million of customer contracts as a result of changes in customer sourcing.

4.   **Inventories**

Inventory balances are summarized below (in millions):

|  | September 30, 2004 | December 31, 2003 |
|---|---|---|
| Raw materials | $106.9 | $ 95.0 |
| Work in process | 26.1 | 24.6 |
| Finished goods | 45.8 | 49.8 |
|  | $178.8 | $169.4 |

5.   **Customer Engineering and Tooling**

The Company had tooling assets of approximately $161.6 million and $141.7 million as of September 30, 2004 and December 31, 2003, respectively. As of September 30, 2004, $133.5 million, $7.3 million and $20.8 million were classified as current other assets, long term other assets and property, plant and equipment, respectively. As of December 31, 2003, $122.7 million, $10.8 million and $8.2 million were classified as current other assets and long term other assets and property, plant and equipment, respectively. Customer engineering and tooling balances are summarized below (in millions):

|  | September 30, 2004 | December 31, 2003 |
|---|---|---|
| Contractual reimbursement of pre-production design and development costs | $ 16.0 | $ 6.8 |
| Molds, dies and other tools reimbursable by customers | 115.9 | 124.9 |
| Molds, dies and other tools company owned | 29.7 | 10.0 |
|  | $161.6 | $141.7 |

6.   **Short-Term Borrowings**

The Company utilizes uncommitted lines of credit to satisfy a portion of its short-term working capital requirements of certain of its foreign affiliates. As of September 30, 2004, the Company had lines of credit from international credit facilities of $44.8 million, of which $25.3 million was outstanding with $19.5 million available. As of December 31, 2003, the Company had lines of credit from international credit facilities of $37.1 million, of which $16.0 million was outstanding with $21.1 million available. The weighted average interest rate on the outstanding borrowings at September 30, 2004 and December 31, 2003 was approximately 20% and 16%, respectively.

7

**7. Long-Term Debt and Capital Lease Obligations**

Long-term debt and capital lease obligations are summarized below (in millions):

|  | September 30, 2004 | December 31, 2003 |
|---|---|---|
| Senior Secured Credit Facilities: |  |  |
| Tranche A Term Loan Facility | $ — | $ 62.9 |
| Tranche B Term Loan Facility | — | 287.2 |
| Tranche B-1 Term Loan Facility | 400.0 | — |
| Revolving Credit Facility | 0.5 | 6.3 |
| Supplemental Revolving Credit Facility | 58.9 | — |
| Public Debt: |  |  |
| 11 1/2% Senior Subordinated Notes, due 2006. | — | 400.0 |
| 10 3/4% Senior Notes, due 2011 | 500.0 | 500.0 |
| 12 7/8% Senior Subordinated Notes, due 2012. | 400.3 | — |
| Other (including capital lease obligations) | 10.0 | 12.8 |
| Total debt | 1,369.7 | 1,269.2 |
| Less current maturities (including current portion of capital lease obligations) | (8.5) | (31.5) |
| Total long-term debt and capital lease obligations | $1,361.2 | $1,237.7 |

During the third quarter of 2004, the Company refinanced its existing Senior Secured Credit Facilities and its 11 1/2 Senior Subordinate Notes in order to extend its debt maturities and enhance financial and operating flexibility.

*Senior Secured Credit Facilities*

In February 2004, the Company entered into the fifth amendment to the Senior Secured Credit Facilities, which allowed the establishment of a new $100 million Supplemental Revolving Credit Facility and the $185 million Tranche A-1 Term Loan. In connection with these new expanded facilities, $181.5 million was used to prepay existing Tranche A and Tranche B Term Loans in direct order of maturity. The Company recognized a $1.5 million loss on early extinguishment of debt in relation to the repayments.

On September 1, 2004, the Company amended and restated its existing Senior Secured Credit Facilities, which are now comprised of a $400.0 million Tranche B-1 term loan that matures on August 31, 2011, a $170.0 million supplemental revolving credit facility that matures on August 31, 2009 and a $105.0 million revolving credit facility that also matures on August 31, 2009. In connection with the amendment and restatement of the credit facilities, proceeds from the Tranche B-1 term loan were used to repay in full the term loans outstanding and to repay, in part, revolving credit facility outstandings, in each case under the original credit agreement. Proceeds from the amended and restated supplemental revolving credit facility were used to repay, in part, revolving credit facility outstandings and to repay in full supplemental revolving credit facility outstandings, in each case under the original credit agreement. The Company recognized a $14.8 million loss on early extinguishment of debt as a result of this transaction.

The Tranche B-1 term loan has scheduled repayments of $1.0 million due each December 1, March 1, June 1 and September 1 prior to the final maturity date when the balance becomes due and payable. Borrowings under the credit facility are secured by all the assets of the Company, Products and certain of Products' subsidiaries, and are unconditionally and irrevocably guaranteed jointly and severally by the Company and substantially all of its existing and subsequently acquired or organized domestic subsidiaries (other than the Company's special purpose receivables subsidiary, captive insurance subsidiaries and charitable subsidiaries).

8

At September 1, 2004, interest on borrowings, at the Company's option, were either (a) adjusted LIBOR plus a 4.00% margin in the case of the Tranche B-1 term loan and supplemental revolving credit facility and a 3.00% margin in the case of the revolving credit facility or (b) the highest of (i) JPMorgan Chase Bank's prime rate, (ii) the federal funds effective rate plus 1/2 of 1.00% and (iii) the base CD rate plus 1.00% plus a 3.00% margin in the case of the Tranche B-1 term loan facility and supplemental revolving credit facility and 2.00% margin in the case of the revolving credit facility. A commitment fee on any unused commitments under the revolving credit facility equal to 0.75% per annum is payable quarterly in arrears and is subject to downward adjustment based on attaining certain performance targets. The weighted average rate of interest on the Senior Secured Credit Facilities at September 30, 2004 and December 31, 2003 was 5.79% and 7.60%, respectively.

The amended and restated credit facility requires that the Company meet certain financial tests, including, without limitation, the following tests: a maximum leverage ratio, a minimum interest coverage ratio and certain prescribed limitations on capital expenditures at levels agreed upon between Products and the agents. The amended and restated credit facility also contains covenants and restrictions, including, among others, limitations or prohibitions on declaring dividends and other distributions, redeeming and repurchasing capital stock, prepaying, redeeming and repurchasing other indebtedness, loans and investments, additional indebtedness, liens, sale-leaseback transactions, preferred stock, recapitalizations, mergers, acquisitions, asset sales and transactions with affiliates.

The amended and restated credit facility contains certain customary events of default, including, among others cross-default and cross-acceleration to other indebtedness (including the Company's receivables facility). Upon the occurrence and during the continuation of a non-bankruptcy event of default, all obligations due under the amended and restated credit facilities may be accelerated and become immediately due and payable if the Administrative Agent so directs either at its discretion or at the request of the lenders holding an aggregate of a majority of the outstanding loans and unused commitments under the amended and restated credit facilities. In addition, upon the occurrence and during the continuance of a bankruptcy event of default, all obligations under the amended and restated credit facilities shall automatically accelerate and become immediately due and payable.

### Public Debt

On August 26, 2004, Products issued $415 million aggregate principal amount of 12 7/8% Senior Subordinated Notes due 2012 at a discount of $14.9 million, which is being amortized during the life of the debt using the effective interest method. The gross proceeds of the Notes offering, or approximately $400.1 million, were used to redeem the outstanding $400 million of 11 1/2% Senior Subordinated Notes due 2006. As a result of this transaction, Products incurred a $4.0 million loss on early extinguishment of debt.

The Notes were sold in the United States only to accredited investors pursuant to an exemption from the Securities Act of 1933, as amended, and subsequently resold to qualified institutional buyers pursuant to Rule 144A under the Securities Act and to non-U.S. persons in accordance with Regulation S under the Securities Act. The Notes have not been registered under the Securities Act and may not be offered or sold in the United States absent registration or an applicable exemption from registration requirements.

The Notes will mature on August 15, 2012 and will accrue interest at the rate of 12 7/8% per year. Interest on the notes will be payable semi-annually in arrears on each February 15 and August 15, commencing on February 15, 2005. Products may redeem some or all of the Notes at any time at 100% of the principal amount plus a make-whole premium. In addition, prior to August 15, 2007, it may redeem up to 35% of the aggregate principal amount of the Notes with the proceeds of certain equity offerings at a redemption price equal to 112.875% of the principal amount of the Notes, plus accrued and unpaid interest, if any.

If Products experiences a change of control, it may be required to offer to purchase the Notes at a purchase price equal to 101% of the principal amount, plus accrued and unpaid interest, if any.

The Notes are fully and unconditionally guaranteed on a senior subordinated unsecured basis by the Company and by each of Products' existing wholly owned domestic subsidiaries (other than its special purpose

9

receivables, insurance and charitable subsidiaries). Future domestic subsidiaries of Products may also be required to guarantee the Notes.

The Notes have been issued under an indenture with BNY Midwest Trust Company, as trustee. The indenture governing the Notes contains covenants that will limit the ability of Products and the ability of its restricted subsidiaries to, among other things: incur or guarantee additional indebtedness; pay dividends or make other distributions or repurchase or redeem its stock; make investments; sell assets; create liens; enter into agreements restricting its restricted subsidiaries' ability to pay dividends; enter into transactions with affiliates; and consolidate, merge or sell all or substantially all of its assets. If an event of default, as specified in the indenture governing the Notes, shall occur and be continuing, either the Trustee or the holders of at least 25% in aggregate principal amount of Notes may accelerate the maturity of all the Notes. The covenants, events of default and acceleration rights described in this paragraph are subject to important exceptions and qualifications, which are described in the indenture.

Under a registration rights agreement, Products and the guarantors have agreed to use their reasonable best efforts to file and cause to become effective a registration statement with respect to an offer to exchange the Notes for other senior subordinated notes issued by Products and guaranteed by the guarantors, which are registered with the SEC and which have substantially identical terms as the Notes. If Products and the guarantors are not able to affect this exchange offer, they will use their reasonable best efforts to file, and cause to become effective, a shelf registration statement relating to resales of the notes and the guarantees. Products will be obligated to pay additional interest on the notes if it does not complete this exchange offer within 270 days after the closing date.

*Other*

As of September 30, 2004, the Company believes it is in compliance with all covenants under our various obligations. The Company believes cash flow from operations, together with its revolving credit facility, receivables arrangements and sale and leaseback arrangements will provide adequate sources of liquidity for the Company to fund its operations. The Company continues to seek means to generate additional cash for debt reduction and its growth strategy. Among its potential cash generation projects, the Company seeks to further improve working capital management (including factoring of receivables) and to continue to utilize lease financings.

The Company was recently informed that certain of the accelerated payment collection programs with its larger customers will be discontinued in 2005 and that one of those customers, Ford Motor Company, intends to phase out its accelerated payment collection program from September 2004 through December 2004. At September 30, 2004, the Company had approximately $10.2 million collected under the Ford program. These programs have materially enhanced our liquidity in the past. At September 30, 2004, the Company had approximately $130.9 million collected under these arrangements, including the Ford program. The impact of the discontinuance of these programs is expected to be partially offset by a greater utilization of our existing $250 million accounts receivable securitization facility. The existing receivables facility expires on December 20, 2004, and the Company expects to have a multi-year replacement facility established before that time. The Company will also consider replacement accelerated payment programs offered on behalf of our customers or through other financial intermediaries. However, we may not be able to timely or fully replace these arrangements, and the new terms of any such program may be less advantageous than current arrangements. If the Company is unable to replace these arrangements, it could adversely affect its liquidity under its senior secured credit facilities.

**8.     Subsidiary Preferred Stock Requirements**

In connection with the TAC-Trim acquisition on December 20, 2001, Products issued to Textron Inc. preferred stock with a liquidation preference of $326.4 million and an estimated fair market value of $146.9 million. The difference between the initial recorded value and the initial liquidation preference is being accreted over the life of the stock using the effective interest method. During the third quarter of 2004, interest expense from subsidiary preferred stock accretion and dividend costs were $0.6 million and $10.5 million,

respectively. The third quarter of 2003 interest expense from preferred stock accretion and dividend costs was $0.4 million and $9.2 million, respectively. For the nine months ended September 30, 2004 interest expense from subsidiary preferred stock accretion and dividend costs were $1.6 million and $30.5 million, respectively. For the nine months ended September 30, 2003 interest expense from subsidiary preferred stock accretion and dividend costs were $4.8 million and $22.4 million, respectively.

Effective April 2004, all 20,000 shares of the Series C Preferred Stock, which were held by Textron Inc, were converted to Series B Preferred Stock on an equivalent share basis. The primary difference between the Series C and Series B Preferred Stock is that Series C holders were entitled to participation in distributions of Products common equity tied to the appreciation in the value of Products common equity subsequent to the issuance date of the securities. Each holder received one share of Series B Preferred Stock for each share of Series C Preferred Stock.

## 9. Receivables Facility and Non Recourse Factoring Facilities

### Receivables Facility

As of September 30, 2004 and December 31, 2003, Carcorp, Inc.'s total receivables pool, as defined under the receivables facility, was $225.7 million and $165.4 million, respectively. As of September 30, 2004, the utilization of the Receivables Facility was $160.7 million and was fully drawn. At December 31, 2003, the utilization of the Receivables Facility was $73.7 million, and an additional $9.1 million was available, subject to limitations imposed under the Senior Secured Credit Facilities. The receivables facility expires on December 20, 2004, and the Company expects to have a replacement facility established before that time.

The Company is required to pay a fee of 0.50% on the unused portion of the facility. A discount on the sold receivables is approximately equal to the interest rate paid by the conduits to the holders of the commercial paper plus a usage fee that ranges from 1.50% to 2.25%. The discount rate at September 30, 2004 was 3.37%.

### Non-Recourse Factoring Facilities

The Company had entered into various agreements with international lenders to sell accounts receivables of certain international operations on a non-recourse basis. As of September 30, 2004, the Company has utilized $90.9 million from these commitments. The funding levels and commitments by the lenders are based on the eligible receivables in the Company's subsidiaries in the various countries, including subsidiaries in Belgium, Brazil, Czech Republic, Germany, Italy, Mexico, Netherlands, Spain and Sweden. As of September 30, 2004, under the agreements, approximately $98.1 million of receivables have been sold, while the Company had retained an interest in $7.2 million of these sold receivables. At December 31, 2003, under the agreements, approximately $132.7 million of receivables had been sold, while the Company had retained an interest in $6.1 million of these sold receivables. The retained interest remains classified on the Company's balance sheet as trade receivables. Under the agreements, the Company usually pays a factoring fee and a discount on the daily utilization of the facility. The expenses related to these agreements are recorded in loss on sale of receivables on the income statement.

For the third quarter and year-to-date ended September 30, 2004, the loss on sale of receivables under the Receivables Facility and the non-recourse factoring facilities totaled $2.4 million and $7.2 million, respectively, compared to $1.8 million and $4.5 million for the third quarter and year-to-date ended September 30, 2003, respectively.

11

**10.  Employee Benefit Plans**

The 2004 and 2003 amounts shown below reflect the defined benefit pension and other postretirement benefit expense for the three and nine months ended September 30 for each year:

| | Quarter ended September 30 | | | | Nine months ended September 30 | | | |
| | Pension Benefits | | Other Postretirement Benefits | | Pension Benefits | | Other Postretirement Benefits | |
| | 2004 | 2003 | 2004 | 2003 | 2004 | 2003 | 2004 | 2003 |
|---|---|---|---|---|---|---|---|---|
| Service cost | $ 3.8 | $ 3.5 | $ 0.2 | $ 0.3 | $ 11.4 | $ 10.5 | $ 0.8 | $ 1.0 |
| Interest cost | 6.7 | 6.5 | 1.3 | 1.4 | 20.1 | 19.5 | 4.1 | 4.3 |
| Expected return on plan assets | (7.4) | (6.8) | — | — | (22.2) | (20.4) | — | — |
| Amortization of prior service cost (gain) | 0.1 | 0.1 | (2.1) | (1.9) | 0.3 | 0.3 | (5.8) | (5.7) |
| Curtailment credits | — | — | (9.4) | — | — | — | (9.4) | — |
| Amortization of net loss/(gain) | 1.6 | 1.5 | (0.3) | (0.3) | 4.8 | 4.5 | (0.9) | (0.9) |
| Net periodic benefit cost (gain) | $ 4.8 | $ 4.8 | $(10.3) | $(0.5) | $ 14.4 | $ 14.4 | $(11.2) | $(1.3) |

The Company expects to contribute $10.9 million to its pension plans in 2004. Through the third quarter ended September 30, 2004, $8.6 million has been contributed.

The "Medicare Prescription Drug, Improvement and Modernization Act of 2003," (the "Act") reduced the net periodic postretirement benefit cost by $0.1 million and $0.2 million for the three and nine months ended September 30, 2004, respectively, including service cost, interest cost and amortization of the actuarial experience gain. The total impact of the Act on our actuarial liability was $3.0 million and is being accounted for as an actuarial gain, in accordance with guidance from the Financial Accounting Standards Board ("FASB") Staff Position 106-2 "Accounting and Disclosure Requirements Related to the Medicare Prescription Drug, Improvement and Modernization Act of 2003." As a result, the gain will be amortized as a reduction of our periodic expense and balance sheet liability over the estimated future lifetime of the active employees, depending on the plan.

On June 24, 2004, the Company announced that postretirement medical subsidies for all non-union medical plans and all postretirement life insurance (except for union and executive plans) would be eliminated effective January 1, 2006. Accordingly, these events are treated as an amendment with curtailments as appropriate for each plan. The effect of the plan amendments for the nine months ended September 30, 2004 resulted in the Company recognizing $9.4 million of curtailment credits and a $0.4 million gain in amortization of prior service costs. These gains are recognized as a $5.2 million benefit in selling, general and administrative expenses and a $4.6 million benefit in cost of goods sold. For the fourth quarter of 2004 the Company expects to recognize approximately $10.5 million in postretirement benefits, of which approximately $2.5 million ($1.8 million, net of taxes) will be classified as income from discontinued operations. Additionally, in 2005, the Company expects to recognize approximately $50.0 million in postretirement benefits, of which approximately $11.0 million ($7.0 million, net of taxes) will be classified as income from discontinued operations, relating to the effect of the plan amendments.

12

**11. Restructuring and Impairment**

Activity related to the restructuring reserve is as follows (in millions):

| | Severance Costs | Lease Commitments and Other Exit Costs | Total |
|---|---|---|---|
| Restructuring reserves: | | | |
| Balance at beginning of year | $ 21.6 | $ 9.3 | $ 30.9 |
| | | | |
| 2004 Expense: | | | |
| 2nd quarter 2003 program | 0.1 | — | 0.1 |
| 3rd quarter 2003 program | 0.8 | — | 0.8 |
| 4th quarter 2003 program | 0.2 | — | 0.2 |
| 1st quarter 2004 program | 7.6 | 1.8 | 9.4 |
| 2nd quarter 2004 program | 9.1 | 1.3 | 10.4 |
| 3rd quarter 2004 program | 10.3 | 1.7 | 12.0 |
| Adjustments to prior period programs | (4.0) | — | (4.0) |
| | | | |
| Total net expense | 24.1 | 4.8 | 28.9 |
| | | | |
| Costs paid | (22.1) | (7.1) | (29.2) |
| | | | |
| Ending balance at September 30, 2004 | $ 23.6 | $ 7.0 | $ 30.6 |
| | | | |
| 3rd quarter 2003 restructuring: | | | |
| Costs expected | $ 21.2 | $ 6.8 | $ 28.0 |
| Costs paid in 2004 | 4.4 | 1.0 | 5.4 |
| Costs paid to date | 12.2 | 4.1 | 16.3 |
| 4th quarter 2003 restructuring | | | |
| Costs expected | $ 6.8 | $ 1.7 | $ 8.5 |
| Costs paid in 2004 | 3.0 | 1.1 | 4.1 |
| Costs paid to date | 5.8 | 1.1 | 6.9 |
| 1st quarter 2004 restructuring | | | |
| Costs expected | $ 7.6 | $ 1.8 | $ 9.4 |
| Costs paid in 2004 | 4.9 | 0.9 | 5.8 |
| Costs paid to date | 4.9 | 0.9 | 5.8 |
| 2nd quarter 2004 restructuring | | | |
| Costs expected | $ 9.1 | $ 1.3 | $ 10.4 |
| Costs paid in 2004 | 3.7 | 0.1 | 3.8 |
| Costs paid to date | 3.7 | 0.1 | 3.8 |
| 3rd quarter 2004 restructuring | | | |
| Costs expected | $ 10.3 | $ 1.7 | $ 12.0 |
| Costs paid in 2004 | 2.0 | 0.6 | 2.6 |
| Costs paid to date | 2.0 | 0.6 | 2.6 |

13

Table of Contents

During the third quarter 2004, the Company continued its initiative to right size its overhead structure, further reduce salaried headcount and strengthen the senior management team on a worldwide basis resulting in a restructuring charge of $12.0 million. The third quarter charge included $10.3 million of severance cost and $1.7 million of costs related to the establishment of accruals for lease commitments and other exit costs. Also included in the third quarter 2004 charges is adjustments related to previously established accruals which did not require cash outlays of $3.0 million resulting in a net charge of $9.0 million. Additionally, the Company recognized an $10.3 million write down of assets primarily related to the closing of an International Plastic location totaling $7.0 million. The $3.3 million remaining fixed asset write down was related to Global Soft Trim locations.

| | U.S. and Mexico Plastics | International Plastics | Global Soft Trim | Other | Total |
|---|---|---|---|---|---|
| 3rd Quarter 2004 Restructuring: | | | | | |
| Total costs expected | $ 1.5 | $ 5.1 | $ 3.2 | $2.2 | $12.0 |
| Costs incurred in 2004 | 1.5 | 5.1 | 3.2 | 2.2 | 12.0 |
| Costs incurred to date | 1.5 | 5.1 | 3.2 | 2.2 | 12.0 |
| Headcount Reduction | 103 | 528 | 235 | 16 | 882 |

During the second quarter 2004, the Company undertook a restructuring program to right size its overhead structure, further reduce salaried headcount and strengthen and streamline the senior management team on a worldwide basis resulting in a restructuring charge of $10.4 million. Additionally, the Company recognized a $27.4 million write down of assets related to the Company impairing $13.6 million of Intellimold assets, including a $2.7 million patent, a finite intangible asset, acquired as part of the TAC-Trim acquisition. The Company also impaired $11.0 million of customer contracts as a result of changes in customer sourcing. The $2.8 million remaining fixed asset write down was related primarily to Global Soft Trim locations.

| | U.S. and Mexico Plastics | International Plastics | Global Soft Trim | Other | Total |
|---|---|---|---|---|---|
| 2nd Quarter 2004 Restructuring: | | | | | |
| Total costs expected | $ 1.3 | $0.8 | $ 5.9 | $2.4 | $10.4 |
| Costs incurred in 2004 | 1.3 | 0.8 | 5.9 | 2.4 | 10.4 |
| Costs incurred to date | 1.3 | 0.8 | 5.9 | 2.4 | 10.4 |
| Headcount Reduction | 250 | 10 | 250 | 40 | 550 |

During the first quarter 2004, the Company undertook a restructuring program to right size its overhead structure, further reduce salaried headcount and strengthen and streamline the senior management team on a worldwide basis resulting in a restructuring charge of $9.4 million. Additionally, the Company recognized a $3.0 million write down of fixed assets related primarily to Global Soft Trim locations. The Company also incurred and recorded restructuring charges of $1.1 million for prior year programs along with an adjustment related to a previously established accrual, which did not require cash outlays of $1.0 million.

| | U.S. and Mexico Plastics | International Plastics | Global Soft Trim | Other | Total |
|---|---|---|---|---|---|
| 1st Quarter 2004 Restructuring: | | | | | |
| Total costs expected | $1.3 | $ 1.9 | $1.7 | $4.5 | $ 9.4 |
| Costs incurred in 2004 | 1.3 | 1.9 | 1.7 | 4.5 | 9.4 |
| Costs incurred to date | 1.3 | 1.9 | 1.7 | 4.5 | 9.4 |
| Headcount Reduction | 30 | 170 | 30 | 30 | 260 |

During the fourth quarter 2003, the Company undertook a restructuring program to right size its overhead structure, reduce salaried headcount and strengthen and streamline the senior management team on a worldwide basis with the primary focus on domestic operations resulting in a restructuring charge of

14

$9.3 million. Additionally, the Company recognized a $4.6 million write down of fixed assets related to U.S. and Mexico Plastics and Global Soft Trim locations.

| | U.S. and Mexico Plastics | International Plastics | Global Soft Trim | Other | Total |
|---|---|---|---|---|---|
| **4th Quarter 2003 Restructuring:** | | | | | |
| Total costs expected | $ 0.9 | $ 4.0 | $ 2.6 | $1.0 | $ 8.5 |
| Costs incurred in 2004 | — | 0.2 | (1.0) | — | (0.8) |
| Costs incurred to date | 0.9 | 4.0 | 2.6 | 1.0 | 8.5 |
| Headcount Reduction | 100 | 500 | 400 | — | 1,000 |

During the third quarter 2003, the Company undertook a restructuring program to right size its overhead structure, reduce salaried headcount and strengthen and streamline the senior management team on a worldwide basis with the primary focus on domestic operations resulting in a restructuring charge of $27.2 million. Additionally, the Company recognized a $2.2 million write down of fixed assets related primarily to International Plastics locations.

Included in the third quarter 2003 restructuring charge severance cost were charges related to the separation agreement with Jerry L. Mosingo, the former President and CEO. In August 2003, the Company's Board of Directors appointed David Stockman as CEO, in addition to retaining his position of Chairman. Under the terms of his separation agreement, Mr. Mosingo received $0.6 million in the third quarter of 2003 and will receive $0.2 million per quarter through December 31, 2004 and $0.1 million for the quarter ending March 31, 2005, and other fringe and retirement benefits. The resulting third quarter 2003 restructuring charge was $5.3 million, which includes the present value of future benefits of $2.8 million, included in pension liability.

| | U.S. and Mexico Plastics | International Plastics | Global Soft Trim | Other | Total |
|---|---|---|---|---|---|
| **3rd Quarter 2003 Restructuring:** | | | | | |
| Total costs expected | $ 6.3 | $ 5.6 | $ 5.9 | $10.2 | $ 28.0 |
| Costs incurred in 2004 | — | 0.6 | 0.2 | — | 0.8 |
| Costs incurred to date | 6.3 | 5.6 | 5.9 | 10.2 | 28.0 |
| Headcount Reduction | 500 | 300 | 600 | 200 | 1,600 |

During the second quarter 2003, the Company undertook a restructuring program to rationalize operations on a worldwide basis with the primary focus on U.S. and Mexico operations resulting in a restructuring charge of $4.9 million. The 2003 charge included approximately $4.2 million of severance cost and $0.7 million of costs related to the establishment of reserves for lease commitments and other exit costs. The Company's restructuring plan includes severance of over 500 personnel. Of the 500 personnel approximately 450 were terminated in the second quarter of 2003 with approximately 170 personnel at the Company's International Plastics segment, approximately 160 at Global Soft Trim segment and approximately 120 at the Company's corporate locations. Additionally, the Company recognized a $0.8 million write down of fixed assets related to an International Plastics location. Restructuring charges related to the first quarter of 2004 for this program were $0.1 million for severance costs with less than $0.1 million of severance costs remaining to be charged during 2004 and 2005.

Reserves for lease terminations costs are paid in conjunction with the remaining terms of the leases, while severance and other exit costs are generally paid within one year of the restructuring program.

During 2003, the Company recognized a $7.5 million write-down of fixed assets related to its 50% interest in an Italian joint venture acquired in 2001 and $10.4 million impairment of the Becker non-compete agreement.

15

## 12.  Related Party Transactions

### Heartland Transactions

The Company is a party to a Services Agreement with Heartland under which Heartland provides advisory and consulting services, including services with respect to developments in the automotive industry and supply markets, advice on financial and strategic plans and alternatives and other matters as it may reasonably request and are within Heartland's expertise. The Services Agreement terminates on the earlier of its tenth anniversary or the date upon which Heartland ceases to own Company shares equivalent to 25% of that owned by them on February 23, 2001.

Under the Services Agreement, the Company is obligated to pay to Heartland a $4.0 million annual advisory fee payable in quarterly installments and reimburse its out-of-pocket expenses related to the services it provides. The Company has also agreed to pay a fee of 1% of the total enterprise value of certain acquisitions and dispositions and 1% of the gross proceeds of certain financings.

In March 2004, the Company's Board of Directors, including the disinterested and independent directors of the Board, approved a fee of $1.0 million to Heartland for its services rendered in connection with the 2004 amendments to the Company's credit facility to add a supplemental revolving credit facility.

In May 2004, the Company's Board of Directors, including the disinterested and independent directors of the Board, approved an amendment of the Services Agreement to provide for a fee of up to $5.0 million related to services rendered in connection with the notes offering and a fee of 1% of the gross proceeds of certain future financings, excluding the amendment and restatement of our senior secured credit facility. The $1.0 million fee for the February 2004 amendments to the Company's credit facility was subsequently waived when the Company completed its credit facility and notes refinancing during the third quarter of 2004, as part of which Heartland received a fee of $5.0 million.

For the quarter and nine months ended September 30, 2004, the Company recorded total fees to Heartland of $6.3 million and $8.5 million, respectively. For the quarter and nine months ended September 30, 2003, the Company recorded total fees of $1.0 million and $3.0 million, respectively.

### Charles E. Becker Transactions

For the quarter and nine months ended September 30, 2004, the Company recorded total lease payments of $2.2 million and $6.5 million, respectively, under various lease agreements with entities controlled by Charles E. Becker, a former director of the Company. For the quarter and nine months ended September 30, 2003, the Company recorded total lease payments of $2.3 million and $6.9 million, respectively, under various lease agreements.

Mr. Becker resigned as director of the Company effective as of May 6, 2004.

### Elkin McCallum Transactions

In 2004 and 2003, the Company engaged in ordinary course transactions with entities controlled by Elkin McCallum, a former director of the Company, for the purchase and sale of goods and services as part of ongoing business relationships. The Company recorded purchases for goods and services from entities controlled by Mr. McCallum of $0.7 million and $4.1 million for the quarter and nine months ended September 30, 2004, respectively, and $4.1 million and $15.2 million (net $1.2 million of rebates) for the quarter and nine months ended September 30, 2003, respectively, for goods and services purchased. The rebates received from Mr. McCallum relate to knit and woven automotive fabrics provided by entities controlled by Mr. McCallum under the Supply Agreement and Transition Agreement executed in connection with the 2001 Joan acquisition. Supplier rebates such as these are common in the automotive industry as part of ongoing price negotiations and adjustments. The rebates from Mr. McCallum totaled $14.7 million over the duration of the agreements. In addition, the Company recorded sales to entities controlled by Mr. McCallum of $0.6 million and $4.0 million for the quarter and nine months ended September 30, 2004, respectively, and $0.8 million and $5.3 million for the quarter and nine months ended September 30, 2003, respectively.

16

The following table summarizes the balances outstanding from entities controlled by Mr. McCallum (in millions):

|  | September 30, 2004 | December 31, 2003 |
|---|---|---|
| Accounts Receivable | $4.4 | $2.7 |
| Accounts Payable | 2.7 | 1.0 |

Mr. McCallum resigned as director of the Company effective as of May 6, 2004.

### 13.  Income Taxes

The Company recognized an income tax benefit of $13.4 million and $8.6 million for the quarters ended September 30, 2004 and 2003, respectively. The Company recognized an income tax benefit of $17.0 million and an income tax expense of $0.1 million for the nine months ended September 30, 2004 and 2003, respectively. The primary reasons for the Company's effective tax rate being different from its statutory rate are non-deductible preferred stock dividends and accretion, foreign losses for which tax benefits are not recorded and state and foreign taxes that do not fluctuate directly with income, partially offset by the effect of a financing arrangement and tax credits.

### 14.  Information About the Company's Operations

In conjunction with the 2003 restructurings, the Company changed its reportable segments to align with organization changes and senior management responsibilities. The Company's reportable segments consist of U.S. and Mexico Plastics, International Plastics and Global Soft Trim. International Plastics includes international plastics operations, including Canada but excluding Mexico. The U.S. and Mexico Plastics and International Plastics segments include interior trim components such as door panels, instrument panels, consoles, package trays and cargo management systems, exterior trim components such as bumper fascias and cladding and fully assembled cockpit systems and components thereof. The Global Soft Trim segment includes molded non-woven and tufted carpet, alternative molded flooring, accessory mats and acoustics systems consisting of absorbing materials, damping materials, engine compartment noise vibration and harshness systems, interior insulators, seat body cloth, insert fabric, headliner fabric, convertible roof systems, hard top retractable roof systems, tonneau covers and actuation systems. The Company changed the composition of its reportable segments beginning July 1, 2003 and restated prior period segment data to be comparable.

The Company evaluates performance based on operating profit or loss. Information about the Company's segments is presented below (in millions):

|  | Quarter Ended September 30, 2004 | | | | |
|---|---|---|---|---|---|
|  | U.S. and Mexico Plastics | International Plastics | Global Soft Trim | Other(a) | Total |
| External revenues | $261.7 | $319.6 | $283.5 | $  — | $864.8 |
| Inter-segment revenues | 8.2 | 3.3 | 1.1 | (12.6) | — |
| Interest expense from preferred stock requirement | — | — | — | 11.1 | 11.1 |
| Depreciation and amortization | 11.4 | 11.6 | 13.9 | 2.3 | 39.2 |
| Operating income (loss) | 13.8 | (8.8) | 11.9 | (7.4) | 9.5 |
| Capital expenditures | 23.6 | 29.8 | 15.4 | 0.4 | 69.2 |

17

|  | Quarter Ended September 30, 2003 | | | | |
|  | U.S. and Mexico Plastics | International Plastics | Global Soft Trim | Other(a) | Total |
| --- | --- | --- | --- | --- | --- |
| External revenues | $312.0 | $273.8 | $316.4 | $ — | $902.2 |
| Inter-segment revenues | 3.0 | 4.1 | 0.3 | (7.4) | — |
| Interest expense from preferred stock requirement | — | — | — | 9.6 | 9.6 |
| Depreciation and amortization | 10.2 | 9.3 | 11.9 | 2.2 | 33.6 |
| Operating income (loss) | 17.5 | 1.3 | 27.6 | (38.1) | 8.3 |
| Capital expenditures | 11.1 | 15.5 | 18.0 | 0.2 | 44.8 |

|  | Nine Months Ended September 30, 2004 | | | | |
|  | U.S. and Mexico Plastics | International Plastics | Global Soft Trim | Other(a) | Total |
| --- | --- | --- | --- | --- | --- |
| External revenues | $ 947.6 | $1,072.8 | $947.1 | $ — | $2,967.5 |
| Inter-segment revenues | 21.7 | 10.6 | 1.5 | (33.8) | — |
| Interest expense from preferred stock requirement | — | — | — | 32.1 | 32.1 |
| Depreciation and amortization | 35.0 | 32.7 | 37.8 | 7.2 | 112.7 |
| Operating income (loss) | 38.1 | 0.9 | 73.8 | (47.3) | 65.5 |
| Capital expenditures | 50.6 | 56.8 | 40.1 | 3.8 | 151.3 |
| As of September 30: |  |  |  |  |  |
| Goodwill | 757.2 | 346.9 | 274.4 | — | 1,378.5 |
| Total assets | 1,092.2 | 852.2 | 675.6 | 576.7 | 3,196.7 |

|  | Nine Months Ended September 30, 2003 | | | | |
|  | U.S. and Mexico Plastics | International Plastics | Global Soft Trim | Other(a) | Total |
| --- | --- | --- | --- | --- | --- |
| External revenues | $1,018.2 | $917.9 | $1,034.7 | $ — | $2,970.8 |
| Inter-segment revenues | 9.8 | 12.9 | 1.1 | (23.8) | — |
| Interest expense from preferred stock requirement | — | — | — | 27.2 | 27.2 |
| Depreciation and amortization | 31.6 | 28.7 | 35.0 | 5.9 | 101.2 |
| Operating income (loss) | 49.8 | (18.0) | 118.4 | (78.6) | 71.6 |
| Capital expenditures | 28.2 | 34.3 | 52.0 | 5.4 | 119.9 |
| As of September 30: |  |  |  |  |  |
| Goodwill | 707.3 | 343.5 | 274.5 | — | 1,325.3 |
| Total assets | 1,049.1 | 803.6 | 697.2 | 633.1 | 3,183.0 |

(a) Other includes the Company's non-operating units and the effect of eliminating entries. During 2004 and 2003, certain corporate costs that were previously included at the divisional units were included in the Other category. Those costs that could be attributed to a divisional unit were allocated back to the appropriate division. Operating income (loss) for the nine months ended September 30, 2004 reflects: $46.1 million, $58.1 million and $35.5 million of corporate costs allocated back to U.S. and Mexico Plastics, International Plastics and Global Soft Trim, respectively. Operating income (loss) for the nine months ended September 30, 2003 reflects: $40.8 million, $51.6 million, and $24.6 million of corporate costs allocated back to U.S. and Mexico Plastics, International Plastics and Global Soft Trim, respectively.

18

Direct and indirect sales to significant customers in excess of ten percent of consolidated net sales from continuing operations are as follows:

| | Quarter Ended | | Nine Months Ended | |
|---|---|---|---|---|
| | September 30, 2004 | September 30, 2003 | September 30, 2004 | September 30, 2003 |
| DaimlerChrysler AG | 30.1% | 28.3% | 31.5% | 29.1% |
| General Motors Corporation | 20.5% | 24.4% | 19.7% | 22.2% |
| Ford Motor Company | 24.0% | 24.1% | 26.1% | 24.7% |

## 15.   Commitments and Contingencies

Except as described below, the Company and its subsidiaries are not party to any material pending legal proceedings, but is involved in ordinary routine litigation incidental to the business.

### Environmental

The Company is subject to federal, state, local and foreign environmental, and health and safety, laws and regulations that (i) affect ongoing operations and may increase capital costs and operating expenses in order to maintain compliance with such requirements and (ii) impose liability relating to contamination at facilities, other locations such as former facilities, facilities where we have sent wastes for treatment or disposal and other properties to which the Company may be linked. Such liability may include, for example, investigation and cleanup of the contamination, personal injury and property damage caused by the contamination and damages to natural resources. Some of these liabilities may be imposed without regard to fault and may also be joint and several (which can result in a liable party being held responsible for the entire obligation, even where other parties are also liable).

Management believes that it has obtained, and is in material compliance with, those material environmental permits and approvals necessary to conduct the Company's various businesses. Environmental compliance costs for continuing businesses are accounted for as normal operating expenses or capital expenditures, except for certain costs incurred at acquired locations. Environmental compliance costs relating to conditions existing at the time of an acquisition are generally charged to reserves established in purchase accounting. The Company accrues for environmental remediation costs when such obligations are known and reasonably estimable. In the opinion of management, based on the facts presently known to it, such environmental compliance and remediation costs will not have a material effect on the Company's business, consolidated financial condition, future results of operations or cash flows.

The Company is legally or contractually responsible or alleged to be responsible for the investigation and remediation of contamination at various sites and for personal injury or property damages, if any, associated with such contamination. At some of these sites, the Company has been notified that it is a potentially responsible party ("PRP") under the federal Superfund law or similar state laws. Other sites at which the Company may be responsible for contamination may be identified in the future, including with respect to divested and acquired businesses.

The Company is currently engaged in investigating or remediating certain sites, as discussed in the paragraphs below. In estimating the cost of investigation and remediation, the Company considered, among other things, its prior experience in remediating contaminated sites, remediation efforts by other parties, data released by the United States Environmental Protection Agency ("USEPA"), the professional judgment of the Company's environmental experts, outside environmental specialists and other experts and the likelihood that other identified PRPs will have the financial resources to fulfill their obligations at sites where they and the Company may be jointly and severally liable. It is difficult to estimate the total cost of investigation and remediation due to various factors including:

• incomplete information regarding particular sites and other PRPs;

• uncertainty regarding the nature and extent of environmental problems and the Company's share, if any, of liability for such problems;

19

• the ultimate selection among alternative approaches by governmental regulators;

• the complexity and evolving nature of environmental laws, regulations and governmental directives;

• changes in cleanup standards.

The Company is a party to a Consent Decree with the State of New Hampshire to remediate a former industrial landfill known as the Cardinal Landfill in Farmington, New Hampshire. Pursuant to that Consent Decree, the Company is currently conducting a pilot test for a proposed remediation of chlorinated compound contaminants in groundwater. The Consent Decree calls for a remedy to be in place during 2005. The Company is a defendant in three lawsuits filed by a total of 91 individual plaintiffs for alleged personal injuries arising from Cardinal Landfill conditions. The Company will vigorously contest these allegations. As of September 30, 2004, the Company has accrued $11.0 million for Cardinal Landfill.

The Company is a party, as a member of a PRP workgroup, to a Consent Decree entered with the USEPA for the remediation of a former municipal landfill in Dover, New Hampshire. The town of Dover, New Hampshire is also a member of the PRP group and a party to the Consent Decree. Pursuant to the terms of the Consent Decree, the PRP group has recently completed an alternative remediation design. The USEPA and the State of New Hampshire have reviewed, provided for public comment and approved the alternative remedial design and subsequently issued an amended Record of Decision. As of September 30, 2004, the Company has accrued $8.2 million for Dover.

Pursuant to a Consent Decree signed with the USEPA, the Company is currently engaged in a full-scale remediation for groundwater and soil contamination at the former Stamina Mills manufacturing facility in North Smithfield, Rhode Island. Remediation activities have been ongoing since 1998. Another Consent Decree resolving the USEPA claim for past oversight costs was signed during 2003, and a payment of $7.3 million was made during the third quarter of 2003. As of September 30, 2004, the Company has accrued $6.4 million for Stamina Mills.

The Company is working with the Michigan Department of Environmental Quality ("MDEQ") to investigate and remediate soil and groundwater contamination at a former manufacturing plant in Mancelona, Michigan and at adjacent owned property formerly used for the treatment and disposal of plating waste. MDEQ is likely to require remediation of groundwater contamination.

The current owner of one of the Company's former manufacturing plants located in Bowling Green, Ohio has entered into an Administrative Order on Consent with the Ohio Environmental Protection Agency ("OEPA") requiring investigation and remediation of contamination at the site. The Company is reimbursing the current owner for costs associated with ongoing groundwater monitoring and, following selection of an appropriate remedy by OEPA, will assume 90% of future remediation costs.

In the 1980's and 1990's, the California Regional Water Quality Control Board ("CRWQCB") and other state agencies ordered a predecessor of the Company to investigate and remediate soil and groundwater contamination at a former lumber treatment plant in Elmira, CA. In 1996, the Company entered into an agreement with the State of California to conduct long-term operation and maintenance of the remedy implemented at the site. Currently, the Company is conducting a pilot test of an alternative treatment option that will reduce the cost and time for clean up at this site.

The Company has entered into an Administrative Order by Consent with the USEPA requiring investigation, delineation and removal of contamination from a vacant three acre site in Zanesville, Ohio. The delineation report has been submitted to USEPA for comment, and the Administrative Order by Consent calls for the submittal and implementation of an action plan during 2004. Based on ongoing investigations at the site in regards to potential lead contamination in soil and groundwater, the USEPA has requested additional studies of groundwater and site wide soil stability studies in preparation for cap installation. Initial results of these studies indicate that there is no lead contamination in groundwater. The issue of cap installation is being evaluated in light of these recent findings.

In 2003, the Company signed a Consent Agreement with the State of South Carolina Department of Health and Environmental Control requiring soil and groundwater investigations at a former manufacturing

20

facility in Cowpens, South Carolina. The Company had ceased operations at this location in 1981. Initial investigations will delineate potential groundwater contamination that has migrated under a residential area. These studies are scheduled to be completed in 2004.

The Company has established accruals for certain contingent environmental liabilities and management believes such reserves comply with accounting principles generally accepted in the United States of America. The Company accrues for environmental investigatory and non-capital remediation costs when litigation has commenced or a claim or assessment has been asserted or is imminent, the likelihood of an unfavorable outcome is probable, and the financial impact of such outcome is reasonably estimable. As of September 30, 2004 and December 31, 2003, total reserves for these environmental costs are approximately $45.7 million and $51.2 million, respectively.

In the opinion of management, based on information presently known to it, identified environmental costs and contingencies will not have a material effect on the Company's consolidated financial condition, future results of operations or cash flows. However, management can give no assurance that they have identified or properly assessed all potential environmental liabilities arising from the business or properties, and those of present and former subsidiaries and their corporate predecessors.

### Legal Proceedings

The Company and its subsidiaries have lawsuits and claims pending against them and have certain guarantees outstanding which were made in the ordinary course of business.

As of September 30, 2004, the Company was a party to approximately 1,102 pending cases alleging personal injury from exposure to asbestos containing materials used in boilers manufactured before 1966 by former operations of the Company which were sold in 1966. Asbestos-containing refractory bricks lined the boilers and, in some instances, the Company's former operations installed asbestos-containing insulation around the boilers. These pending cases do not include cases that have been dismissed or are subject to agreements to dismiss due to the inability of the plaintiffs to establish exposure to a relevant product and cases that have been settled or are subject to settlement agreements. Total settlement costs for these cases have been less than $1.3 million or an average of less than $6,250 per settled case. The defense and settlement costs have been substantially covered by the Company's primary insurance carriers under a claims handling agreement that expires in August 2006. The Company has primary, excess and umbrella insurance coverage for various periods available for asbestos-related boiler and other claims. The Company's primary carriers have agreed to cover approximately 80% of certain defense and settlement costs up to a limit of approximately $70.5 million for all claims made, subject to reservations of rights. The excess insurance coverage, which varies in availability from year to year, is approximately $615 million in aggregate for all claims made. The coverage may be impacted by matters described below. Based on the age of the boilers, the nature of the claims and settlements made to date and the insurance coverage, management does not believe that these cases will have a material impact on the Company's financial condition, results of operations or cash flows. However, the Company cannot assure that it will not be subjected to significant additional claims in the future in respect of these or other matters for which the insurance could be utilized, that insurance will be available as expected, that the matters described below may not impact the Company's coverage or that unanticipated damages or settlements in the future would not exceed insurance coverage.

In 1988, the Company divested its retail lumber and building materials business to Wickes Lumber Co. (now Wickes Inc.), which filed a voluntary petition for reorganization under Chapter 11 of the U.S. Bankruptcy Code in early 2004. As part of this divestiture, Wickes assumed responsibility for all liabilities associated with this business, including those associated with certain asbestos-related claims, and the Company agreed to give them access to its general liability insurance policies for such liabilities. These are, in several instances, the same policies referred to in the preceding paragraph. Wickes has been making claims against these policies for settlements of asbestos-related claims that it has characterized as insignificant as of late 2003 in its filings with the Securities and Exchange Commission. The Company has agreed to suspend making claims for other than defense costs to permit agreement upon a framework within the bankruptcy proceedings or otherwise for coordinating these claims as between the Company and Wickes. It is possible

that resolution of these issues will await confirmation of a plan of reorganization for Wickes and that an equitable portion of the insurance will be made available for Wickes asbestos or other claimants, thereby reducing the coverage available to the Company for its own claims. Based upon the information available to the Company concerning Wickes' claims history, management does not believe these matters will materially and adversely affect the Company.

A purported class action was filed on March 24, 2003 in the United States District Court for the Eastern District of Michigan, against the Company, Heartland and ten current and former senior officers and/ or directors of the Company, alleging violations of Sections 10(b) and 20 (a) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated there under. Four similar actions were subsequently filed in the United States District Court for the Eastern District of Michigan, purportedly filed on behalf of purchasers of the common stock of the Company between August 7, 2001 and August 2, 2002, which is identical to the purported class identified in the previously disclosed lawsuit, except in one instance in which the complaint alleges a class period beginning on July 5, 2001. On August 4, 2003, the court consolidated all five pending actions and appointed lead plaintiffs for the purported class. The Company believes that the claims are without merit and intends to vigorously defend the lawsuits. The Company does not believe that the suit will have a material impact on its financial condition, results of operations or cash flows.

The Company is a defendant in a lawsuit involving a sales commission arrangement inherited from a predecessor company and its partial ownership of an extinguished joint venture. In September 2003, the Oakland County Circuit Court entered a judgment by default against the company for $4.2 million based upon an inadvertent failure to produce a small number of documents that were to be produced with thousands of other documents that were delivered in the discovery process. The Company and its counsel believe that the default judgment was improperly entered and that damages were improperly assessed, and it has filed an appeal of the judgment with the Michigan Court of Appeals. The Company intends to vigorously pursue its appeal in this matter and has posted a letter of credit in the amount of the judgment as part of the normal appeal process. While management believes it has no liability to the plaintiff, the Company has established an appropriate reserve for this matter in an amount less than the amount of the current judgment.

The ultimate outcome of the legal proceedings to which the Company is a party will not, in the opinion of the Company's management, based on the facts presently known to it, have a material effect on the Company's consolidated financial condition, future results of operations or cash flows.

### Other Commitments

As of September 30, 2004, the Company's continuing operations had approximately $69.0 million in outstanding capital expenditure commitments. The majority of the leased properties of the Company's previously divested businesses have been assigned to third parties. Although releases have been obtained from the lessors of certain properties, Products remains contingently liable under most of the leases. Products' future liability for these leases, in management's opinion, based on the facts presently known to it, will not have a material effect on the Company's consolidated financial condition, future results of operations or cash flows.

22

### 16.    Other Comprehensive Loss

Total comprehensive loss for the quarter and nine months ended September 30, 2004 and September 30, 2003 are as follows (in millions):

|  | Quarter Ended | | Nine Months Ended | |
|  | September 30, 2004 | September 30, 2003 | September 30, 2004 | September 30, 2003 |
| --- | --- | --- | --- | --- |
| Comprehensive loss: |  |  |  |  |
| Net loss | $(55.6) | $(32.1) | $(108.6) | $(47.6) |
| Other comprehensive income (loss): |  |  |  |  |
| Foreign currency translation adjustments | 20.5 | (2.0) | 8.4 | 57.5 |
|  | $(35.1) | $(34.1) | $(100.2) | $  9.9 |

### 17.    Consolidating Financial Statements

Products issued Senior Notes in a total principal amount of $500.0 million in December 2001. The Senior Notes are guaranteed by the Company and all of the Company's wholly owned domestic subsidiaries other than its receivable, insurance and charitable subsidiaries (Guarantor Subsidiaries). In conjunction with certain sale-leaseback transactions, Products has issued lease payment guarantees on behalf of certain guarantor and non-guarantor subsidiaries. Since these lease payments are guaranteed, the leases are treated as capital lease obligations in the separate financial statements of those subsidiaries, but eliminated for consolidated financial statement purposes. The following are consolidating financial statements of the Company, Products, and its guarantor and non-guarantor subsidiaries:

**SUPPLEMENTAL GUARANTOR CONDENSED CONSOLIDATION FINANCIAL STATEMENTS**

**CONSOLIDATING STATEMENT OF OPERATIONS**

| | Parent | Issuer | Guarantors | Non-Guarantors | Eliminations | Consolidated Total |
|---|---|---|---|---|---|---|
| | | | | (in millions) | | |
| Net sales | $    — | $ 73.7 | $413.1 | $388.2 | $(10.2) | $864.8 |
| Cost of goods sold | — | 52.5 | 393.1 | 365.4 | (10.2) | 800.8 |
| Selling, general and administrative expenses | — | 39.7 | (6.4) | 2.0 | (0.1) | 35.2 |
| Restructuring charge | — | 0.3 | 2.3 | 6.4 | — | 9.0 |
| Impairment of long-lived assets | — | — | 3.3 | 7.0 | — | 10.3 |
| Operating income (loss) | — | (18.8) | 20.8 | 7.4 | 0.1 | 9.5 |
| Interest expense, net of interest income | — | 43.7 | (0.1) | 3.8 | (0.5) | 46.9 |
| Interest expense from subsidiary preferred stock dividends | — | 10.5 | — | | | 10.5 |
| Interest expense from subsidiary preferred stock accretion | — | 0.6 | — | — | — | 0.6 |
| Intercompany interest | — | (2.7) | (4.5) | 7.2 | — | — |
| Loss (gain) on sale of receivables | — | (0.2) | — | 2.6 | — | 2.4 |
| Loss on early extinguishment of debt | — | 18.8 | — | — | — | 18.8 |
| Other expense (income), net | — | (1.0) | 3.2 | (2.1) | (0.8) | (0.7) |
| Income (loss) from continuing operations before income taxes | — | (88.5) | 22.2 | (4.1) | 1.4 | (69.0) |
| Income tax expense (benefit) | — | (33.5) | 9.2 | 10.9 | — | (13.4) |
| Income (loss) from continuing operations | — | (55.0) | 13.0 | (15.0) | 1.4 | (55.6) |
| Equity in net income (loss) of subsidiaries | (55.6) | (0.6) | (18.4) | — | 74.6 | — |
| Net income (loss) | $(55.6) | $(55.6) | $  (5.4) | $(15.0) | $ 76.0 | $ (55.6) |

24

**SUPPLEMENTAL GUARANTOR CONDENSED CONSOLIDATION FINANCIAL STATEMENTS**

**CONSOLIDATING STATEMENT OF OPERATIONS**

For the Quarter Ended September 30, 2003

| | Parent | Issuer | Guarantors | Non-Guarantors | Eliminations | Consolidated Total |
|---|---|---|---|---|---|---|
| | | | | (in millions) | | |
| Net sales | $ — | $ 74.3 | $388.4 | $448.4 | $(8.9) | $902.2 |
| Cost of goods sold | — | 51.9 | 342.3 | 426.8 | (8.9) | 812.1 |
| Selling, general and administrative expenses | — | 44.5 | 2.8 | 10.4 | — | 57.7 |
| Restructuring charge | — | 18.4 | 0.2 | 3.3 | — | 21.9 |
| Impairment of long-lived assets | — | 0.7 | | 1.5 | — | 2.2 |
| Operating income (loss) | — | (41.2) | 43.1 | 6.4 | — | 8.3 |
| Interest expense, net of interest income | — | 35.6 | (0.2) | 2.4 | — | 37.8 |
| Interest expense from subsidiary preferred stock dividends | — | 9.2 | — | — | — | 9.2 |
| Interest expense from subsidiary preferred stock accretion | — | 0.4 | — | — | — | 0.4 |
| Intercompany interest | — | (4.1) | (4.2) | 8.3 | — | — |
| Loss on sale of receivables | — | — | — | 1.8 | — | 1.8 |
| Loss on early extinguishment of debt | — | — | — | — | — | — |
| Other expense (income), net | — | (2.3) | 4.5 | (2.6) | 0.2 | (0.2) |
| Income (loss) from continuing operations before income taxes | — | (80.0) | 43.0 | (3.5) | (0.2) | (40.7) |
| Income tax expense (benefit) | — | (22.7) | 19.9 | (5.8) | — | (8.6) |
| Income (loss) from continuing operations | — | (57.3) | 23.1 | 2.3 | (0.2) | (32.1) |
| Cumulative effect of change in accounting principle | — | (0.2) | — | 0.2 | — | — |
| Equity in net income (loss) of subsidiaries | (32.1) | 25.4 | (0.4) | — | 7.1 | — |
| Net income (loss) | $(32.1) | $(32.1) | $ 22.7 | $ 2.5 | $ 6.9 | $(32.1) |

25

## SUPPLEMENTAL GUARANTOR CONDENSED CONSOLIDATION FINANCIAL STATEMENTS

### CONSOLIDATING STATEMENT OF OPERATIONS

|  | Parent | Issuer | Guarantors | Non-Guarantors | Eliminations | Consolidated Total |
|---|---|---|---|---|---|---|
|  | | | | (in millions) | | |
| Net sales | $ — | $ 237.6 | $1,464.5 | $1,291.8 | $(26.4) | $2,967.5 |
| Cost of goods sold | — | 174.7 | 1,331.1 | 1,208.3 | (26.4) | 2,687.7 |
| Selling, general and administrative expenses | — | 160.3 | (24.9) | 1.9 | 7.4 | 144.7 |
| Restructuring charge | — | 6.0 | 6.3 | 16.6 | — | 28.9 |
| Impairment of long-lived assets | — | — | 28.6 | 12.1 | — | 40.7 |
| Operating income (loss) | — | (103.4) | 123.4 | 52.9 | (7.4) | 65.5 |
| Interest expense, net of interest income | — | 118.3 | (0.1) | 10.7 | (1.5) | 127.4 |
| Interest expense from subsidiary preferred stock dividends | — | 30.5 | — | — | | 30.5 |
| Interest expense from subsidiary preferred stock accretion | — | 1.6 | — | — | | 1.6 |
| Intercompany interest | — | (9.7) | (13.2) | 22.9 | — | — |
| Loss on sale of receivables | — | 0.1 | — | 7.1 | — | 7.2 |
| Loss on early extinguishment of debt | — | 20.3 | — | — | | 20.3 |
| Other expense (income), net | — | — | 11.3 | (6.5) | (0.7) | 4.1 |
| Income (loss) from continuing operations before income taxes | — | (264.5) | 125.4 | 18.7 | (5.2) | (125.6) |
| Income tax expense (benefit) | — | (70.8) | 47.9 | 5.9 | — | (17.0) |
| Income (loss) from continuing operations | — | (193.7) | 77.5 | 12.8 | (5.2) | (108.6) |
| Equity in net income (loss) of subsidiaries | (108.6) | 85.1 | 3.8 | — | 19.7 | — |
| Net income (loss) | $(108.6) | $(108.6) | $ 81.3 | $ 12.8 | $ 14.5 | $ (108.6) |

## SUPPLEMENTAL GUARANTOR CONDENSED CONSOLIDATION FINANCIAL STATEMENTS

### CONSOLIDATING STATEMENT OF OPERATIONS

For the Nine Months Ended September 30, 2003

|  | Parent | Issuer | Guarantors | Non-Guarantors | Eliminations | Consolidated Total |
|---|---|---|---|---|---|---|
|  |  |  |  | (in millions) |  |  |
| Net sales | $ — | $ 237.5 | $1,585.7 | $1,167.6 | $(20.0) | $2,970.8 |
| Cost of goods sold | — | 167.7 | 1,410.5 | 1,100.1 | (20.0) | 2,658.3 |
| Selling, general and administrative expenses | 0.1 | 143.7 | 16.6 | 32.6 | — | 193.0 |
| Restructuring charge | — | 18.4 | 3.7 | 4.7 | — | 26.8 |
| Impairment of long-lived assets | — | 0.7 | 10.4 | 10.0 | — | 21.1 |
| Operating income (loss) | (0.1) | (93.0) | 144.5 | 20.2 | — | 71.6 |
| Interest expense, net of interest income | — | 106.4 | (0.2) | 5.1 | — | 111.3 |
| Interest expense from subsidiary preferred stock dividends | — | 22.4 | — | — | — | 22.4 |
| Interest expense from subsidiary preferred stock accretion | — | 4.8 | — | — | — | 4.8 |
| Intercompany interest | — | (17.8) | (13.5) | 31.3 | — | — |
| Loss on sale of receivables | — | — | — | 4.5 | — | 4.5 |
| Other expense (income), net | — | (1.8) | 16.6 | (39.8) | 1.1 | (23.9) |
| Income (loss) from continuing operations before income taxes | (0.1) | (207.0) | 141.6 | 19.1 | (1.1) | (47.5) |
| Income tax expense (benefit) | — | (55.9) | 52.1 | 3.9 | — | 0.1 |
| Income (loss) from continuing operations | (0.1) | (151.1) | 89.5 | 15.2 | (1.1) | (47.6) |
| Equity in net income (loss) of subsidiaries | (47.5) | 103.6 | (3.6) | — | (52.5) | — |
| Net income (loss) | $(47.6) | $ (47.5) | $ 85.9 | $ 15.2 | $(53.6) | $ (47.6) |

27

**SUPPLEMENTAL GUARANTOR CONDENSED CONSOLIDATION FINANCIAL STATEMENTS**

**CONSOLIDATING BALANCE SHEET**

As of September 30, 2004

| | Parent | Issuer | Guarantors | Non-Guarantors | Eliminations | Consolidated Total |
|---|---|---|---|---|---|---|
| | | | | (in millions) | | |
| **ASSETS** | | | | | | |
| Current Assets: | | | | | | |
| Cash and cash equivalents | $ — | $ (57.4) | $ 58.9 | $ 2.0 | $ — | $ 3.5 |
| Accounts and other receivables, net | — | 8.0 | 55.2 | 189.6 | 2.3 | 255.1 |
| Inventories | — | 14.3 | 97.3 | 67.3 | (0.1) | 178.8 |
| Other | — | 37.7 | 113.5 | 65.9 | — | 217.1 |
| Total current assets | — | 2.6 | 324.9 | 324.8 | 2.2 | 654.5 |
| Investment in subsidiaries | 340.1 | 1,748.6 | (25.9) | — | (2,062.8) | — |
| Property, plant and equipment, net | — | 51.7 | 337.2 | 464.6 | (47.5) | 806.0 |
| Goodwill | — | — | 1,101.7 | 276.8 | — | 1,378.5 |
| Other assets | — | 277.5 | 15.8 | 64.4 | — | 357.7 |
| | $340.1 | $2,080.4 | $1,753.7 | $1,130.6 | $(2,108.1) | $3,196.7 |
| **LIABILITIES & STOCKHOLDERS' EQUITY** | | | | | | |
| Current Liabilities: | | | | | | |
| Short-term borrowings | $ — | $ — | $ — | $ 25.3 | $ — | $ 25.3 |
| Current maturities of long-term debt and capital lease obligations | — | 5.1 | — | 3.4 | — | 8.5 |
| Accounts payable | — | 47.0 | 286.0 | 303.4 | (0.1) | 636.3 |
| Accrued expenses | — | 123.7 | 24.6 | 76.8 | — | 225.1 |
| Total current liabilities | — | 175.8 | 310.6 | 408.9 | (0.1) | 895.2 |
| Long-term debt and capital lease obligations | — | 1,355.9 | 5.9 | 40.8 | (41.4) | 1,361.2 |
| Mandatorily redeemable preferred stock of subsidiary | — | 193.3 | — | — | — | 193.3 |
| Intercompany payable (receivable) | — | (233.9) | (279.0) | 512.9 | — | — |
| Other, including pensions and post-retirement benefit obligation | — | 249.2 | 48.2 | 109.5 | — | 406.9 |
| Total liabilities | — | 1,740.3 | 85.7 | 1,072.1 | (41.5) | 2,856.6 |
| Total common stockholders' equity (deficit) | 340.1 | 340.1 | 1,668.0 | 58.5 | (2,066.6) | 340.1 |
| | $340.1 | $2,080.4 | $1,753.7 | $1,130.6 | $(2,108.1) | $3,196.7 |

28

## SUPPLEMENTAL GUARANTOR CONDENSED CONSOLIDATION FINANCIAL STATEMENTS

### CONSOLIDATING BALANCE SHEET

As of December 31, 2003

| | Parent | Issuer | Guarantors | Non-Guarantors | Eliminations | Consolidated Total |
|---|---|---|---|---|---|---|
| | | | | (in millions) | | |
| **ASSETS** | | | | | | |
| Current Assets: | | | | | | |
| Cash and cash equivalents | $ — | $ (71.2) | $ 78.4 | $ 6.0 | $ — | $ 13.2 |
| Accounts and other receivables, net | — | 1.1 | 34.4 | 220.4 | 1.4 | 257.3 |
| Inventories | — | 14.2 | 96.2 | 59.0 | — | 169.4 |
| Other | — | 47.8 | 105.4 | 59.0 | — | 212.2 |
| Total current assets | — | (8.1) | 314.4 | 344.4 | 1.4 | 652.1 |
| Investment in subsidiaries | 440.3 | 1,655.0 | (1.6) | — | (2,093.7) | — |
| Property, plant and equipment, net | — | 55.9 | 348.1 | 442.8 | (12.7) | 834.1 |
| Goodwill | — | — | 948.9 | 414.2 | — | 1,363.1 |
| Other assets | — | 276.0 | 11.4 | 54.5 | — | 341.9 |
| | $440.3 | $1,978.8 | $1,621.2 | $1,255.9 | $(2,105.0) | $3,191.2 |
| **LIABILITIES & STOCKHOLDERS' EQUITY** | | | | | | |
| Current Liabilities: | | | | | | |
| Short-term borrowings | $ — | $ — | $ — | $ 16.0 | $ — | $ 16.0 |
| Current maturities of long-term debt and capital lease obligations | — | 27.8 | 0.1 | 3.6 | — | 31.5 |
| Accounts payable | — | 46.0 | 301.4 | 291.5 | — | 638.9 |
| Accrued expenses | — | 146.9 | 2.2 | 90.4 | (0.6) | 238.9 |
| Total current liabilities | — | 220.7 | 303.7 | 401.5 | (0.6) | 925.3 |
| Long-term debt and capital lease obligations | — | 1,230.1 | — | 20.0 | (12.4) | 1,237.7 |
| Mandatorily redeemable preferred stock of subsidiary | — | 161.2 | — | — | — | 161.2 |
| Intercompany payable (receivable) | — | (317.3) | (215.7) | 533.0 | — | — |
| Other, including pensions and post-retirement benefit obligation | — | 243.8 | 74.9 | 108.0 | — | 426.7 |
| Total liabilities | — | 1,538.5 | 162.9 | 1,062.5 | (13.0) | 2,750.9 |
| Total common stockholders' equity (deficit) | 440.3 | 440.3 | 1,458.3 | 193.4 | (2,092.0) | 440.3 |
| | $440.3 | $1,978.8 | $1,621.2 | $1,255.9 | $(2,105.0) | $3,191.2 |

29

**SUPPLEMENTAL GUARANTOR CONDENSED CONSOLIDATION FINANCIAL STATEMENTS**

**CONSOLIDATING STATEMENT OF CASH FLOWS**

| | Parent | Issuer | Guarantors | Non-Guarantors | Eliminations | Consolidated Total |
|---|---|---|---|---|---|---|
| | | | | (in millions) | | |
| **OPERATING ACTIVITIES** | | | | | | |
| Net cash provided by (used in) operating activities | $ — | $ 13.8 | $(43.9) | $ 21.2 | $ — | $ (8.9) |
| **INVESTING ACTIVITIES** | | | | | | |
| Additions to property, plant and equipment and other non-current assets | — | (3.3) | (62.7) | (85.3) | — | (151.3) |
| Sales of property, plant and equipment | — | — | 26.6 | 33.8 | — | 60.4 |
| Payments of acquisitions and related costs | — | — | (2.7) | (0.5) | — | (3.2) |
| Net cash used in investing activities | — | (3.3) | (38.8) | (52.0) | — | (94.1) |
| **FINANCING ACTIVITIES** | | | | | | |
| Issuance of long-term debt | — | 848.9 | — | — | — | 848.9 |
| Repayment of long-term debt | — | (799.7) | (0.1) | (2.8) | — | (802.6) |
| Payments for debt issuance costs | — | (15.6) | — | — | — | (15.6) |
| Decrease in short-term borrowings | — | — | — | 8.9 | — | 8.9 |
| Net borrowings (repayments) on revolving credit facilities | — | 53.1 | — | — | — | 53.1 |
| Intercompany transfers to (from) subsidiary | — | (83.4) | 63.3 | 20.1 | — | — |
| Net cash provided by financing activities | — | 3.3 | 63.2 | 26.2 | — | 92.7 |
| Effect of exchange rate changes on cash | — | — | — | 0.6 | — | 0.6 |
| Increase (decrease) in cash and cash equivalents | — | 13.8 | (19.5) | (4.0) | — | (9.7) |
| Cash and cash equivalents at beginning of period | — | (71.2) | 78.4 | 6.0 | — | 13.2 |
| Cash and cash equivalents at end of period | $ — | $ (57.4) | $ 58.9 | $ 2.0 | $ — | $ 3.5 |

30

**SUPPLEMENTAL GUARANTOR CONDENSED CONSOLIDATION FINANCIAL STATEMENTS**

### CONSOLIDATING STATEMENT OF CASH FLOWS

| | Parent | Issuer | Guarantors | Non-Guarantors | Eliminations | Consolidated Total |
|---|---|---|---|---|---|---|
| | | | | For the Nine Months Ended September 30, 2003 | | |
| | | | | (in millions) | | |
| **OPERATING ACTIVITIES** | | | | | | |
| Net cash provided by (used in) operating activities | $ — | $ 6.8 | $115.0 | $(77.8) | $ — | $ 44.0 |
| **INVESTING ACTIVITIES** | | | | | | |
| Additions to property, plant and equipment and other non-current assets | — | (11.7) | (54.9) | (53.3) | — | (119.9) |
| Sales of property, plant and equipment | — | — | 0.5 | 14.7 | — | 15.2 |
| Payments of acquisitions and related costs | — | — | (37.8) | — | — | (37.8) |
| Net cash used in investing activities | — | (11.7) | (92.2) | (38.6) | — | (142.5) |
| **FINANCING ACTIVITIES** | | | | | | |
| Issuance of long-term debt | — | — | — | — | — | — |
| Repayment of long-term debt | — | (21.6) | — | (0.8) | — | (22.4) |
| Decrease in short-term borrowings | — | — | — | 2.1 | — | 2.1 |
| Net borrowings (repayments) on revolving credit facilities | — | — | — | 58.5 | — | 58.5 |
| Intercompany transfers to (from) subsidiary | — | (21.4) | 26.2 | (4.8) | — | — |
| Net cash provided by (used in) financing activities | — | (43.0) | 26.2 | 55.0 | — | 38.2 |
| Effect of exchange rate changes on cash | — | — | — | 1.5 | — | 1.5 |
| Increase (decrease) in cash and cash equivalents | — | (47.9) | 49.0 | (59.9) | — | (58.8) |
| Cash and cash equivalents at beginning of period | — | 0.2 | 0.3 | 80.8 | — | 81.3 |
| Cash and cash equivalents at end of period | $ — | $(47.7) | $ 49.3 | $ 20.9 | $ — | $ 22.5 |

31

**Item 2.**    *Management's Discussion and Analysis of Financial Condition and Results of Operations*

**GENERAL**

*The following discussion and analysis of our financial condition and results of operations includes statements concerning our expectations for our industry and our performance. These statements are forward-looking statements and are subject to numerous risks and uncertainties, including those highlighted elsewhere under "Cautionary Statements Concerning Forward-Looking Information and Risk Factors." Our actual results may differ materially from those contained or implied by the following discussion.*

**Introduction**

The Company is a global leader in the design, engineering and manufacturing of automotive interior components, including instrument panels, fully assembled cockpit modules, floor and acoustic systems, automotive fabric and interior trim, as well as exterior trim and convertible roof systems. In reviewing the Company's results for the periods discussed, consideration should be given to the following critical events: the impact of the material acquisitions that we have made, the numerous restructuring and acquisition integration activities that we have undertaken, the material impact of general economic conditions in North America and within our industry specifically, the increasingly difficult customer and competitive environment, the capital intensive nature of our business and our high degree of leverage and liquidity and debt maturity position.

*Key Factors Impacting Our Reported Results.* Critical factors affecting our ability to succeed include the following:

• *Automotive Sales and OEM Production Levels.* In North America, the Company manufactures components for approximately 90% of all light vehicle production platforms. Sales are primarily made to North American based global OEMs, as well as Asian and European based global OEMs. The automotive supply industry in which the Company competes is cyclical and is influenced by the level of North American and Western European vehicle production. The Company's sales results are influenced heavily by the volume of OEM production of light vehicles ("builds") in the markets it serves. Industry wide NAFTA builds were down almost 1% for the quarter ended September 30, 2004 versus the same period of 2003 and were flat for the nine month comparable periods. Within NAFTA, the builds of the Big 3 OEM's were down approximately 4% and 3% for the quarter and nine month period over period, respectively. Industry wide, for Europe, third quarter and nine month builds were up 2% and 1% for 2004 compared to 2003, respectively, while builds in South America were up 30% for the third quarter and nine month period over period.

• *Our relationships with our customers.* Collins & Aikman does business with all of the world's largest vehicle manufacturers including Ford, General Motors, DaimlerChrysler, Toyota, Honda, Nissan, Volkswagen, Renault and Porsche. These relationships have typically developed over a period of many years, and have, in many cases, been enhanced by the Company's recent acquisitions, which have provided the Company with a resulting global footprint and capacity to supply a full range of interior products. In each case, there is a complex mutual dependency and cooperation between the Company and its customers necessary to ensure that vehicle programs are successful in key areas of quality, timing and cost. At the same time, customer expectations are evolving, as vehicle manufacturers continue to outsource more design and integration responsibilities to the Company and other Tier 1 suppliers. As a result, customer satisfaction, especially at critical inflexion points (such as new vehicle launches and vehicle refreshes), has become more complicated and places significant demands on the Company's resources. Also, there is an inherent tension between the Company and its customers resulting from intense competition and pricing pressures within the industry. For example, OEM customers in the automotive industry attempted to impose price decreases and givebacks. Such attempted price decreases were generally in the 2% to 4% range. Several reductions have been agreed to, and others are currently being negotiated with OEMs and pressures may increase if overall economic and industry conditions do not improve. Finally, on some vehicle programs involving component integration at the Tier 1-level, the Company is either a supplier to, or a customer of, some of its largest Tier 1 competitors, such as Delphi, Visteon and Lear. These types of arrangements are

32

becoming more common within the industry and add a new level of complexity to customer relationships, including the relationship with the vehicle manufacturer as the ultimate customer.

- *Our ability to secure profitable new business.* The Company actively pursues new business opportunities with its traditional customer base as well as with potential new customers. The Company seeks to distinguish itself on a variety of factors, including its global footprint, its capacity to supply a full range of interior products and its full-service capabilities (such as design, engineering, manufacturing and quality services). There is intense competition and pricing pressure on all of these opportunities. Price is typically achieved through direct negotiations with the customer, but in certain instances customers have utilized auctions or relied on benchmarking data that have included reputed world class suppliers in emerging markets. At the same time, the Company seeks to manage its cost structure through a variety of strategies, such as vertical integration initiatives that provide greater cost control opportunities. For example, since the Company is a major purchaser of raw materials like resins, it can arrange favorable supply contracts and benefit broadly from material science developments and product simplification. Additionally, the Company believes that it has the world's largest fleet of injection molding equipment for automotive products, which provides a unique ability to benefit from process improvements and best practices with respect to its plastics products on a global basis.

- *Our ability to successfully realize the benefits of our restructuring and integration initiatives.* The Company has undertaken a series of restructuring and integration initiatives to rationalize first its global manufacturing footprint and more recently its salaried workforce, including home office headcount. These activities are expected to have the following primary benefits: First, the Company has closed about 20 subscale plants and other facilities such as warehouses and consolidated activity into 80 world-class operations, which will result in a significant densification of production and resulting gains in fixed cost absorption and operating efficiencies. Second, the Company is beginning to win more "bundled" awards — with a full range of slush molded, injection molded and carpet, acoustics and fabric components on new vehicle programs. And third, the Company's salaried workforce will shrink by more than 20% from the legacy levels, while effectiveness and customer service levels will improve due to consolidation, standardization and level-loading of support infrastructure.

- *The impact of raw materials and energy costs.* The Company is a significant consumer of plastic resins and polyester and nylon fibers, which presents both a challenge and an opportunity for the Company. The challenge results from the Company's sensitivity to price movements in these raw materials (such as those related to recent short run spikes in the oil market), while the opportunity arises from the Company's ability to leverage its buying power as, in management's opinion, the largest single automotive grade resin buyer in the world. The Company has largely been able to avoid these pricing pressures due to its ability to negotiate with a variety of global suppliers and to shift volume from one supplier to another. However, it is possible that the Company may begin to see increased cost pressure if the spikes in the oil market continue. The Company's customers have historically been reluctant to provide pricing relief based on this type of raw material cost increases, as recently demonstrated in the handling of the recent near tripling of global steel prices.

- *Our liquidity and capital resources.* The Company is highly leveraged, due primarily to financing associated with recent acquisitions. Another contributing factor has been that most new business awards in the automotive industry require that suppliers advance certain costs relating to tooling and engineering and design services, which in some cases are incurred years before vehicle launch and are reimbursed over many years following vehicle launch as part of the piece price. In February 2004, the Company obtained amendments to its credit facilities that significantly loosened the principal financial covenants. The Company also obtained an additional revolving credit facility of $100 million and a new term loan in the amount of $185 million, the proceeds of which were used to pre-fund debt amortization requirements. As a result, the Company has greatly improved its financial flexibility and liquidity and has no significant amortization requirements until June 2005.

*Impact of Acquisitions.* Our results for the periods discussed have been impacted by several key acquisitions, which, together with related financing transactions, have substantially increased revenues and cash flow and materially altered the Company's capital and operating structure.

For example, in 2001, the Company completed three key acquisitions: (1) the acquisition of Becker Group L.L.C., a leading supplier of plastic components to the automotive industry, (2) the acquisition of Joan Automotive Fabrics, a leading supplier of body cloth to the automotive industry, and Joan's affiliated yarn dyeing operation, Western Avenue Dyers, L.P., and (3) the acquisition of Textron Automotive Company's Trim division (TAC-Trim), one of the largest suppliers of instrument panels and fully assembled cockpit modules and a major automotive plastics manufacturer of interior and exterior trim components in North America, Europe and South America. These acquisitions, together with the Company's 2002 acquisition of Southwest Laminates, a fabric lamination business, contributed approximately $2 billion of additional net sales in 2002 and drove the 113% increase in net sales from the prior year. In addition, these acquisitions were financed by varying combinations of the Company's common stock and preferred stock, warrants to purchase the Company's common stock, cash on hand and borrowings under a revolving credit facility, public issuances of debt and sales of the acquired companies' accounts receivable under the receivables facility.

The Company also completed the following acquisitions in 2002 and 2003: (1) the acquisition of Dutton Yarns' yarn texturizing business, (2) the acquisition of Delphi Corp.'s plastic injection molding plant and related equipment in Logroño, Spain, and (3) the acquisition from Textron of the remaining 50% interest of an Italian automotive joint venture. These transactions have likewise impacted the Company's financial results and capital structure, although not to the same degree as the transactions described above.

*Impact of Integration Activities and Restructuring Initiatives.* We have devoted considerable efforts beginning in 2001 to properly integrate the acquired companies. We have also implemented a series of restructuring initiatives to ensure that the resulting combined operations have the proper structure and necessary resources to perform on a profitable basis. These initiatives were directed initially at establishing a proper, global manufacturing footprint and included combining and rationalizing the Company's legacy and acquired operations in North America, Europe and South America. More recent restructuring initiatives have focused on developing an appropriate overhead structure, including strengthening and streamlining the senior management team on a worldwide basis. As a consequence of these restructuring initiatives, the Company has incurred significant restructuring and impairment charges in each of 2001, 2002, 2003 and 2004 for severance costs, plant and office closures, equipment and lease impairments, contractual obligations and other restructuring activities, which have impacted cash flow, operating income and net income. For a more detailed description of these charges, see Note 11, "Restructuring and Impairment."

*Key Indicators of Performance.* In evaluating our business, our management uses operating income as an important indicator of performance. In addition, management also considers EBITDA to be a useful proxy for measuring the cash generated by our business, and it is commonly used in the industry to analyze operating performance, liquidity and entity valuation. We define EBITDA as operating income plus depreciation and amortization. Management believes EBITDA to be a good measure of operating performance because cash generation is necessary for the Company to achieve many of the critical success factors outlined above, including investment in cost reduction activities, reducing leverage and improving liquidity. Additionally, management reviews return on invested capital, working capital changes and capital expenditures as critical financial performance metrics. Management also uses certain non-financial metrics of performance, including equipment utilization and efficiency; service, production and first time quality performance; set up and tool changeover time; employee turnover and absenteeism; and safety performance.

34

**Results of Operations**
(Dollars in millions)

*Quarter Ended September 30, 2004 versus Quarter Ended September 30, 2003*

Analysis of sales for each of our segments for the third quarter of 2004 and 2003 are as follows:

| | Quarter Ended September 30, | | | | | | |
|---|---|---|---|---|---|---|---|
| | Net Sales | | | | Composition of Dollar Change | | |
| | 2004 | 2003 | Dollar Change | % Change | Foreign Exchange Effects | Commercial Items(1) | Volume, Mix & Other(2) |
| U.S. and Mexico Plastics | $261.7 | $312.0 | $(50.3) | (16.1)% | $  — | $ (3.9) | $(46.4) |
| International Plastics | 319.6 | 273.8 | 45.8 | 16.7% | 21.2 | (3.7) | 28.3 |
| Global Soft Trim | 283.5 | 316.4 | (32.9) | (10.4)% | 4.5 | (6.5) | (30.9) |
| Other | — | — | — | — | — | — | — |
| Consolidated | $864.8 | $902.2 | $(37.4) | (4.1)% | $25.7 | $(14.1) | $(49.0) |

(1)  Commercial items include customer price increases and decreases affecting reported sales revenue.

(2)  Volume, Mix and Other is the remaining impact after excluding the effects of currency movements and commercial items

Overall sales revenue for the quarter declined primarily due to longer summer vacation shutdowns largely related to adjustments to dealer inventory levels and new model year changeover on several significant programs on which the Company was the incumbent supplier. The strengthening of the Euro, British Pound and Canadian dollar against the U.S. dollar since the third quarter of 2003 had a positive impact on our sales revenue. Several other factors decreasing third quarter revenue were competitive bidding, discontinued products and customer assembly plant production schedule adjustments on programs where the Company has significant content.

U.S. and Mexico Plastics experienced a sales decline resulting from the aforementioned items and a transfer of assembly content to an International Plastics segment location in Canada. This shift in content to Canada was part of a major new award of cockpit and sequencing business on a vehicle that launched in the first quarter of 2004.

In addition to the favorable currency gains mentioned above, International Plastics sales revenue increased due to volume growth for incremental cockpit and sequencing business. Also, a strategic initiative increased export business at our South American operations. A significant increase in third quarter volume on a major car platform in Europe also accounted for additional growth in sales revenue in the International Plastics segment.

Global Soft Trim segment sales declined primarily as a result of discontinued business. Along with the aforementioned items new model year changeovers also significantly reduced Global Soft Trim sales revenues.

*Gross Profit Analysis by Segment*

| | Quarter Ended September 30, | | | | | | | |
| | Gross Profit | | | | As a Percentage of Sales | | | |
| | 2004 | 2003 | Dollar Change | % Change | 2004 | 2003 | Increase (Decrease) | % Change |
|---|---|---|---|---|---|---|---|---|
| U.S. and Mexico Plastics | $14.3 | $27.3 | $(13.0) | (47.6)% | 5.5% | 8.8% | (3.3)% | (37.5)% |
| International Plastics | 18.2 | 14.3 | 3.9 | 27.3% | 5.7% | 5.2% | 0.5% | 9.6% |
| Global Soft Trim | 31.0 | 46.7 | (15.7) | (33.6)% | 10.9% | 14.8% | (3.9)% | (26.4)% |
| Other | 0.5 | 1.8 | (1.3) | (72.2)% | — | — | — | — |
| Consolidated | $64.0 | $90.1 | $(26.1) | (29.0)% | 7.4% | 10.0% | (2.6)% | (26.0)% |

Overall gross profit was impacted by the aforementioned decline in sales and higher lease costs due to the sale-leasebacks of buildings and equipment previously owned by the Company. Also, customer price reductions could not be offset by raw material cost savings to the extent previously expected due to higher costs for injection resins. Partially offsetting the decrease in gross profit was $4.6 million due to the termination of post-retirement benefits. To conform to the current year presentation, the 2003 amounts reflect a reclassification to costs of sales of $5.4 million in manufacturing facility lease costs previously recognized as selling, general and administrative expenses.

Gross profit at the U.S. and Mexico Plastics segment has decreased primarily due to the reduction in sales. Pressure in resin pricing resulted in higher material costs. These negative gross profit impacts, along with customer givebacks, were partially offset by positive influences from manufacturing efficiencies and savings from a plant closure.

The International Plastics segment's gross profit was positively impacted by the increase in their sales highlighted above, as well as material cost savings initiatives at several plants, partially offset by commercial items.

Global Soft Trim's gross profit decline was mainly due to the reduction in sales and commercial items, offset by savings realized from manufacturing efficiencies.

| | Quarter Ended September 30, | | |
| | 2004 | 2003 | Dollar Change |
|---|---|---|---|
| Selling, General and Administrative Expenses | $35.2 | $57.7 | $(22.5) |

Selling, general and administrative expenses decreased from 6.4% of sales in the third quarter 2003 to 4.1% in 2004. Contributing to the cost decrease were savings realized in connection with the salaried workforce restructuring programs and realization of the Company's cost cutting initiatives. Also impacting the decrease is the termination of post-retirement benefits, which per actuary calculations decreased selling, general and administrative expenses by $5.2 million.

*Restructuring Charges:* During the third quarter 2004, the Company continued its initiative to right size its overhead structure, further reduce salaried headcount and strengthen and streamline the senior management team on a worldwide basis resulting in a restructuring charge of $12.0 million. The 2004 third quarter charge included approximately $10.3 million of severance cost, affecting approximately 882 personnel and $1.7 million of costs related to the establishment of accruals for lease commitments and other exit costs. Offsetting the third quarter restructuring charge are adjustments to previously established accruals, not requiring cash outlays, totaling $3.0 million, resulting in a net expense of $9.0 million.

In the third quarter of 2003, the Company undertook a restructuring program to rationalize operations on a worldwide basis with the primary focus on domestic operations resulting in a restructuring charge of $21.9 million. The 2003 charge included approximately $16.8 million of severance cost and $5.1 million of costs related to the establishment of reserves for lease commitments and other exit costs.

*Impairment of Long-Lived Assets:* During the third quarter 2004, the Company recognized an $10.3 million write-down of fixed assets primarily related to the closing of an International Plastics plant totaling $7.0 million. The $3.3 million remaining fixed asset write down was related to Global Soft Trim locations.

In the third quarter 2003, the Company recognized a $2.2 million write-down of fixed assets related to an International Plastics location.

|  | Quarter Ended September 30, | | |
|  | 2004 | 2003 | Dollar Change |
|---|---|---|---|
| Operating Income | $9.5 | $8.3 | $1.2 |

The positive effect of lower selling, general and administrative costs along with a decrease in restructuring costs more than offset the decline in sales and gross profit described above. The net result was an increase in operating income of $1.2 million for the third quarter 2004 when compared to the same quarter in 2003.

|  | Quarter Ended September 30, | | |
|  | 2004 | 2003 | Dollar Change |
|---|---|---|---|
| Interest Expense | $46.9 | $37.8 | $9.1 |

The increase in interest expense is related to approximately $6.2 million of additional interest on the new Senior Subordinated Notes due 2012 as they overlapped for 41 days with the prior Senior Subordinated Notes due 2006 which were refinanced. The remainder of the increase is due to higher average debt balances period over period.

|  | Quarter Ended September 30, | | |
|  | 2004 | 2003 | Dollar Change |
|---|---|---|---|
| Loss on Sale of Receivables | $2.4 | $1.8 | $0.6 |

Throughout the normal course of business, receivables are sold to non-recourse facilities and through factoring arrangements, and a loss is recorded. The increase in loss is due to higher facility usage of existing agreements and new facilities entered into in 2004.

|  | Quarter Ended September 30, | | |
|  | 2004 | 2003 | Dollar Change |
|---|---|---|---|
| Other Expense (Income), Net | $(0.7) | $(0.2) | $(0.5) |

In the third quarter 2004, other expense (income), net included $2 million of foreign currency transaction gains, offset by minority interest share of gains of a consolidated subsidiary and losses related to derivatives used in the Company's foreign currency hedging strategy.

In the third quarter 2003, other expense (income), net primarily included $1 million of losses related to credit default swaps used in the Company's U.S. accounts receivable securitization program, offset by minority interest in a consolidated subsidiary of $2 million.

|  | Quarter Ended September 30, | | |
|  | 2004 | 2003 | Dollar Change |
|---|---|---|---|
| Income Tax Benefit | $(13.4) | $(8.6) | $(4.8) |

The primary reasons for the Company's effective tax rate being different from its statutory rate are non-deductible preferred stock interest and accretion, foreign losses for which tax benefits are not recognized and

state and foreign taxes that do not fluctuate directly with income, partially offset by the effect of intercompany financing and tax credits. Net cash taxes paid during the period were $2.3 million

*Nine Months Ended September 30, 2004 versus Nine Months Ended September 30, 2003*

Analysis of sales for each of our segments for the first nine months of 2004 and 2003 are as follows:

| | Nine Months Ended September 30, | | | | | | |
|---|---|---|---|---|---|---|---|
| | Net Sales | | | | Composition of Dollar Change | | |
| | 2004 | 2003 | Dollar Change | % Change | Foreign Exchange Effects | Commercial Items(1) | Volume, Mix & Other(2) |
| U.S. and Mexico Plastics | $ 947.6 | $1,018.2 | $(70.6) | (6.9)% | $ — | $(15.6) | $(55.0) |
| International Plastics | 1,072.8 | 917.9 | 154.9 | 16.9% | 89.8 | (10.0) | 75.1 |
| Global Soft Trim | 947.1 | 1,034.7 | (87.6) | (8.5)% | 17.9 | (16.8) | (88.7) |
| Other | — | — | — | — | — | — | — |
| Consolidated | $2,967.5 | $2,970.8 | $ (3.3) | (0.1)% | $107.7 | $(42.4) | $(68.6) |

(1)  Commercial items include customer price increases and decreases affecting reported sales revenue.

(2)  Volume, mix and Other is the remaining impact after excluding the effects of currency movements and commercial items

Total sales for the nine months ended September 30, 2004 when compared to the same 2003 period were relatively flat. New program launches and the strengthening of the Euro, British Pound and Canadian dollar against the U.S. dollar during the first nine months of 2004 compared to 2003 had a positive impact on our sales revenue. The negative volume mix change relates to elevated dealer inventory levels, competitive bidding, discontinued products and new model year changeover on several large programs on which the Company is the incumbent supplier. Finally, customer assembly plant production schedule adjustments on programs where the Company has significant content had a negative effect on sales.

U.S. and Mexico Plastics experienced a sales decline resulting from the aforementioned items and a transfer of assembly content to an International Plastics segment location in Canada. This shift in content to Canada was part of a major new award of cockpit and sequencing business on a vehicle that launched in the first quarter of 2004. Partially offsetting these decreases was new business from a major new program launch.

In addition to the favorable currency gains mentioned above, International Plastics sales revenue increased due to volume growth for incremental cockpit and sequencing business. Also, a strategic initiative increased export business at our South American operations. A 20% increase in third quarter volume on a major car platform in Europe also accounted for additional growth in sales revenue in the International Plastics segment.

Global Soft Trim segment sales declined primarily as a result of discontinued business. Along with the aforementioned items, new model year changeovers also significantly reduced Soft Trim sales revenues.

38

*Gross Profit Analysis by Segment*

| | Gross Profit | | | | As a Percentage of Sales | | | |
| | 2004 | 2003 | Dollar Change | % Change | 2004 | 2003 | Increase (Decrease) | % Change |
|---|---|---|---|---|---|---|---|---|
| U.S. and Mexico Plastics | $ 78.0 | $ 94.7 | $(16.7) | (17.6)% | 8.2% | 9.3% | (1.1)% | (11.8)% |
| International Plastics | 62.8 | 35.4 | 27.4 | 77.4% | 5.9% | 3.9% | 2.0% | 51.3% |
| Global Soft Trim | 137.2 | 179.3 | (42.1) | (23.5)% | 14.5% | 17.3% | (2.8)% | (16.2)% |
| Other | 1.8 | 3.1 | (1.3) | (41.9)% | — | — | — | — |
| Consolidated | $279.8 | $312.5 | $(32.7) | (10.5)% | 9.4% | 10.5% | (1.1)% | (10.5)% |

(header spanning: **Nine Months Ended September 30,**)

Overall gross profit was impacted by the aforementioned decline in sales and higher lease costs from sale-leasebacks of buildings and equipment. Partially offsetting the decrease in gross profit was $4.6 million due to the termination of post-retirement benefits. To conform to the current year presentation, the 2003 amounts reflect a reclassification to cost of sales of $17.1 million in manufacturing facility lease costs previously recognized as selling, general and administrative expenses.

Gross profit at the U.S. and Mexico Plastics segment has decreased primarily due to the reduction in sales. Pressure in resin pricing resulted in higher material costs. These negative gross profit impacts, along with customer givebacks, were partially offset by positive influences from manufacturing efficiencies and savings from a plant closure.

The International Plastics segment's gross profit was positively impacted by their sales highlighted above, as well as manufacturing efficiencies and material cost savings initiatives at several plants, partially offset by commercial items.

Global Soft Trim's gross profit decline was mainly due to the reduction in sales, commercial items and material price increases, offset by savings realized from manufacturing efficiencies

| | Nine Months Ended September 30, | | |
| | 2004 | 2003 | Dollar Change |
|---|---|---|---|
| Selling, General and Administrative Expenses | $144.7 | $193.0 | $(48.3) |

Selling, general and administrative expenses decreased from 6.5% of sales in the first nine months of 2003 to 4.9% in the comparable period of 2004. Contributing to the cost decrease were savings realized in connection with the salaried workforce restructuring programs and realization of the Company's cost cutting initiatives. Also impacting the decrease is the termination of post-retirement benefits, which per actuary calculations decreased selling, general and administrative expenses by $5.2 million.

*Restructuring Charges:* During the third quarter 2004, the Company continued its initiative to right size its overhead structure, further reduce salaried headcount and strengthen and streamline the senior management team on a worldwide basis resulting in a restructuring charge of $12.0 million. The third quarter 2004 charge included $10.3 million of severance cost, affecting approximately 882 personnel and $1.7 million of costs related to the establishment of accruals for lease commitments and other exit costs. Offsetting the third quarter restructuring charge are adjustments to previously established accruals not requiring a cash outlay totaling $3.0 million, resulting in a net expense of $9.0 million.

In the second quarter 2004, the Company undertook a restructuring program to right size its overhead structure, further reduce salaried headcount and strengthen and streamline the senior management team on a worldwide basis resulting in a restructuring charge of $10.4 million. The 2004 charge included approximately $9.1 million of severance cost, affecting approximately 550 personnel and $1.3 million of costs related to the establishment of accruals for lease commitments and other exit costs.

The Company under took a restructuring program costing $9.5 million in the first quarter of 2004. The 2004 charge included $7.6 million of severance cost and $1.8 million of other exit costs and affected approximately 260 personnel. Also included in the restructuring charge are expenses related to 2003 programs of $1.1 million, offset by an adjustment related to a previously established accrual, which did not require cash outlays of $1.0 million.

During the third quarter 2003, the Company undertook a restructuring program to rationalize operations on a worldwide basis with the primary focus on domestic operations resulting in restructuring charge of $21.9 million. The 2003 charge included approximately $16.8 million of severance cost and $5.1 million of costs related to the establishment of reserves for lease commitments and other exit costs.

During the second quarter 2003, the Company undertook a restructuring program to rationalize operations on a worldwide basis with the primary focus on domestic operations resulting in a restructuring charge of $4.9 million. The 2003 charge included approximately $4.2 million of severance cost and $0.7 million of costs related to the establishment of reserves for lease commitments and other exit costs.

*Impairment of Long-Lived Assets:* During the third quarter 2004, the Company recognized an $10.3 million write-down of fixed assets primarily related to the closing of an International Plastics plant totaling $7.0 million. The $3.3 million remaining fixed asset write down was related to Global Soft Trim locations.

In the second quarter 2004, the Company recognized a $27.4 million write-down of fixed assets primarily related to the Company impairing $13.6 million of Intellimold assets, including a $2.7 million patent, a finite intangible asset, acquired as part of the TAC-Trim acquisition. Additionally, the Company impaired $11.0 million of customer contracts as a result of changes in customer sourcing. The $2.8 million remaining fixed asset write down was related primarily to Global Soft Trim locations.

During the first quarter 2004, the Company recognized a $3.0 million write-down of fixed assets as a result of the first quarter restructuring program.

Throughout the nine months ended September 30, 2003, the Company recognized a $10.7 million write-down of fixed assets, $7.7 million of which related to the initial 50% interest acquired in an Italian joint venture and $3.0 million related to an International Plastics location. The Company also recognized a $10.4 million impairment of the Becker non-compete agreement.

|  | Nine Months Ended September 30, | | |
|  | 2004 | 2003 | Dollar Change |
| --- | --- | --- | --- |
| Operating Income | $65.5 | $71.6 | $(6.1) |

The positive effect of lower selling, general and administrative costs partially offset the increase in restructuring costs and the decline in sales and gross profit described above. The net result was a decrease in operating income of $6.1 million for the nine months ended September 30, 2004 when compared to the same period in 2003.

|  | Nine Months Ended September 30, | | |
|  | 2004 | 2003 | Dollar Change |
| --- | --- | --- | --- |
| Interest Expense | $127.4 | $111.3 | $16.1 |

The increase in interest expense is related to approximately $6.2 million of additional interest on the new Senior Subordinated Notes due 2012 as they overlapped for 41 days with the prior Senior Subordinated Notes due 2006 which were refinanced. The remainder of the increase is due to higher average debt balances period over period and additional amortization of financing fees.

|  | Nine Months Ended September 30, | | |
|  | 2004 | 2003 | Dollar Change |
| --- | --- | --- | --- |
| Loss on Sale of Receivables | $7.2 | $4.5 | $2.7 |

Throughout the normal course of business, receivables are sold to non-recourse facilities and through factoring arrangements, and a loss is recorded. The increase in loss is due to higher facility usage of existing agreements and new facilities entered into in 2004.

|  | Nine Months Ended September 30, | | |
| --- | --- | --- | --- |
|  | **2004** | **2003** | **Dollar Change** |
| Other Expense (Income), Net | $4.1 | $(23.9) | $28.0 |

In the nine months ended September 30, 2004, other expense (income), net included $4 million of foreign currency transaction losses and $2 million of losses related to derivatives used in the Company's foreign currency hedging strategy, offset by minority interest share of losses of a consolidated subsidiary of $2 million.

In the nine months ended September 30, 2003, other expense (income), net primarily included $24 million of foreign currency transaction gains and minority interest share of losses of a consolidated subsidiary of $4 million primarily offset by $3 million of losses related to derivatives used in the Company's hedging strategies.

|  | Nine Months Ended September 30, | | |
| --- | --- | --- | --- |
|  | **2004** | **2003** | **Dollar Change** |
| Income Tax Expense (Benefit) | $(17.0) | $0.1 | $(17.1) |

The primary reasons for the Company's effective tax rate being different from its statutory rate are non-deductible preferred stock interest and accretion, foreign losses for which tax benefits are not recognized and state and foreign taxes that do not fluctuate directly with income, partially offset by the effect of intercompany financing and tax credits. Net cash taxes paid during the period were $7.6 million

**Liquidity and Capital Resources**

The Company and its subsidiaries had cash and cash equivalents totaling $3.5 million and $13.2 million at September 30, 2004 and December 31, 2003, respectively.

The Company's principal sources of funds are cash generated from operating activities and borrowings under its revolving credit facilities, receivables arrangements and sale leaseback arrangements. In addition, to facilitate the collection of funds from operating activities, the Company has sold receivables under its receivables facility and has also entered into accelerated payment collection programs with its larger customers. If those additional liquidity sources were to become unavailable or limited by customer concentration or credit quality or otherwise, the Company would require additional capital, access to which is not assured.

The Company believes that cash flow from operations, together with its revolving credit facilities, receivables arrangements, leasing arrangements and cash generations projects will provide adequate sources of liquidity to fund operations. The Company continues to seek means to generate additional cash for debt reduction and its growth strategy. Among its potential cash generation projects, the Company seeks to further improve working capital management (including factoring of receivables) and to continue to utilize lease financings.

Aggregate unutilized availability under the Company's financing facilities at September 30, 2004 was $182.7 million, consisting of $163.2 million under the Company's senior secured credit facilities and $19.5 million under uncommitted bank facilities in foreign locations. At September 30, 2004 the Company's receivables facility was fully drawn relative to available collateral. Limitations on the Company's availability are based on financial performance and target levels established by the covenants. At September 30, 2004, of the $182.7 million in aggregate unutilized availability under the facilities, $6.8 million would not have been

41

available due to covenant constraints. As of September 30, 2004, the Company believes it is in compliance with all covenants under our various obligations.

The Company was recently informed that certain of the accelerated payment collection programs with its larger customers will be discontinued in 2005 and that one of those customers, Ford Motor Company, intends to phase out its accelerated payment collection program from September 2004 through December 2004. At September 30, 2004, the Company had approximately $10.2 million collected under the Ford program. These programs have materially enhanced our liquidity in the past. At September 30, 2004, the Company had approximately $130.9 million collected under these arrangements, including the Ford program. The impact of the discontinuance of these programs is expected to be partially offset by a greater utilization of our existing $250 million accounts receivable securitization facility. The existing receivables facility expires on December 20, 2004, and the Company expects to have a multi-year replacement facility established before that time. The Company will also consider replacement accelerated payment programs offered on behalf of our customers or through other financial intermediaries. However, we may not be able to timely or fully replace these arrangements, and the new terms of any such program may be less advantageous than current arrangements. If the Company is unable to replace these arrangements, it could adversely affect its liquidity under its senior secured credit facilities.

### Operating Activities

Net cash used in operating activities was $8.9 million for the nine months ended September 30, 2004, compared to net cash provided by operating activities of $44.0 million for the nine months ended September 30, 2003. The 2004 decrease is primarily the result of an increase in net loss, an increase in accounts receivable and increases in other assets, offset by improvements in working capital changes, an increase in proceeds from participating interests in accounts receivable, and a decrease in accounts receivable factored.

### Investing Activities

Net cash used in investing activities was $94.1 million for the nine months ended September 30, 2004, compared to $142.5 million for the nine months ended September 30, 2003. The decrease in cash used in investing activities is primarily the result of receiving $45.2 million more of proceeds from the sale of property, plant and equipment primarily sale-leaseback transactions and a decrease of $34.6 million of business acquisition costs offset by $31.4 million more of capital expenditures.

### Financing Activities

Net cash provided by financing activities for the nine months ended September 30, 2004 was $92.7 million compared to net cash provided by financing activities for the nine months ended September 30, 2003 of $38.2 million. This increase in cash provided from financing activities is the result of $54.5 million increase in net borrowings.

In the third quarter of 2004, the Company refinanced its existing senior secured credit facilities in order to extend debt maturities and enhance financial and operating flexibility. Through a syndicate of financial institutions the Company entered into debt agreements for a 5 year $105 million revolving credit facility and a 5 year $170 million supplemental credit facility. In addition, the Company issued $415 million aggregate principal amount of 12 7/8% Senior Subordinated Notes due 2012 at a $14.7 million discount.

The Company incurred an $18.8 million loss on debt extinguishment as a result of these transactions due primarily to the write-off of existing debt issuance costs. The proceeds of the new financing were primarily used to repay outstanding borrowings under the prior Senior Subordinated Notes and pay fees and expenses related to the refinancing. The remaining proceeds were used for general corporate purposes.

During the first quarter of 2004, in conjunction with the fifth amendment to its Senior Secured Credit Facilities, the Company recognized a $1.5 million loss on early extinguishment of debt.

## Outlook

To further enhance North American automobile revenues, OEM's continue to offer incentives to increase sales volumes. However, sales for the fourth quarter of 2004 are projected to be 5%-10% lower than the prior

year primarily due to reduced OEM production levels and inventory adjustments on several vehicle platforms in North America and Europe.

The Company's principal uses of funds from operating activities and borrowings for the next several years are expected to fund interest and principal payments on its indebtedness, growth related working capital increases, capital expenditures, product launches and lease expenses. Consistent with the automotive supply industry, the Company continues to experience significant competitive pressure and expects to face continued downward cost pressure from vehicle manufacturers. The Company has an ongoing aggressive plan to improve the various operating performance at all of its facilities. While improvements are being made, further work remains to bring all plants to a profitable level on a continuing basis. In addition, the Company recently confirmed its strategy for new business, which involves pursuing sales growth based on criteria intended to more effectively allocate the Company's resources to the most promising new business opportunities. As part of this strategy, the Company reviewed its parts profitability for each plant and program worldwide.

Management believes cash flow from operations, together with its revolving credit facility, receivables arrangements and sale and leaseback arrangements will provide adequate sources of liquidity for the Company to fund its operations. However, the Company's sources of liquidity may be inadequate if the Company is unable to meet its operating targets, which would cause the Company to seek covenant relief from its existing lenders in the near future. In addition, matters affecting the credit quality of our significant customers could adversely impact the availability of our receivables arrangements and our liquidity. The Company continues to explore other sources of liquidity, including additional debt, but existing debt instruments may limit the Company's ability to incur additional debt, and the Company may be unable to secure equity or other financing.

We continually discuss commercial issues and broader relationship issues with our customers. While we seek to improve the profitability of our programs with our customers, there can be no assurance that we will not lose desirable programs over time. While we continue to believe that issues will be resolved to the mutual satisfaction of the parties on an ongoing basis, there can be no assurances that such a resolution will be timely obtained or, whether or not obtained, will not have a material adverse impact on us.

### Contractual Obligations

Below is the table that identifies the Company's significant contractual obligations. Following the table is a more detailed description of these obligations.

|  | Payment due by Period | | | | |
|  | Total | Less than 1 Year | 1-3 Years | 4-5 Years | After 5 Years |
|---|---|---|---|---|---|
|  | | | (In millions) | | |
| Short-term borrowings | $ 25.3 | $ 25.3 | $ — | $ — | $ — |
| Long-term debt and capital lease obligations | 1,369.7 | 8.5 | 13.5 | 67.4 | 1,280.3 |
| Preferred stock(a) | 193.3 | — | — | — | 193.3 |
| Operating leases(b) | 371.2 | 27.0 | 86.1 | 76.0 | 182.1 |
| Environmental reserves | 45.7 | 2.0 | 20.4 | 9.3 | 14.0 |
| Capital expenditure commitments | 69.0 | 69.0 | — | — | — |
| Total obligations | $2,074.2 | $131.8 | $120.0 | $152.7 | $1,669.7 |

(a) Mandatorily Redeemable Preferred Stock of Subsidiary

(b) Includes operating leases related to restructuring charges. See Note 11, "Restructuring and Impairment." In addition to the operating lease obligations, at the end of the Textron Leasing Transaction for certain equipment leases (including the expiration of all renewal options), the Company is required to guarantee a minimum value of the equipment to the lessor of up to approximately $21 million.

*Capital Expenditures:* The Company incurs capital expenditures on a recurring basis for replacements and improvements. During the nine months ended September 30, 2004, the Company had approximately $151.3 million in capital expenditures for continuing operations. Capital expenditures in future years will depend upon demand for the Company's products and changes in technology.

Estimates for capital expenditures in 2004 range from approximately $175 to $185 million. A portion of capital expenditures are expected to be financed through leasing arrangements.

*Other Commitments*

As of September 30, 2004, the Company's continuing operations had approximately $69.0 million in outstanding capital expenditure commitments. The majority of the leased properties of the Company's previously divested businesses have been assigned to third parties. Although releases have been obtained from the lessors of certain properties, Products remains contingently liable under most of the leases. Products' future liability for these leases, in management's opinion, based on the facts presently known to it, will not have a material effect on the Company's consolidated financial condition, future results of operations or cash flows.

## Safe Harbor Statement

This Report on Form 10-Q contains "forward-looking" information, as that term is defined by the federal securities laws, about our financial condition, results of operations and business. You can find many of these statements by looking for words such as "may," "will," "expect," "anticipate," "believe," "estimate," "should," "continue," "predict" and similar words used in this Form 10-Q. The forward-looking statements in this Form 10-Q are intended to be subject to the safe harbor protection provided by the federal securities laws.

These forward-looking statements are subject to numerous assumptions, risks and uncertainties (including trade relations and competition). Because the statements are subject to risks and uncertainties, actual results may differ materially from those expressed or implied by the forward-looking statements. We caution readers not to place undue reliance on the statements, which speak only as of the date of this Quarterly Report.

The cautionary statements set forth above should be considered in connection with any subsequent written or oral forward-looking statements that the Company or persons acting on its behalf may issue. The Company does not undertake any obligation to review or confirm analysts' expectations or estimates or to release publicly any revisions to any forward-looking statements to reflect events or circumstances after the date of this report or to reflect the occurrence of unanticipated events.

This Quarterly Report contains forward-looking statements within the meaning of the Private Securities Litigation Reform Act of 1995. Actual results and events may differ materially from those that are anticipated because of certain risks and uncertainties, including, but not limited to, general economic conditions in the markets in which the Company operates and industry based factors such as:

• declines in the North American, South American and European automobile and light truck builds,

• labor costs and strikes at the Company's major customers and at the Company's facilities,

• fluctuations in the production of vehicles for which we are a supplier,

• changes in the popularity of particular car models, particular interior trim packages or the loss of programs on particular vehicle models,

• dependence on significant automotive customers,

• the level of competition in the automotive supply industry and pricing pressure from automotive customers,

• risks associated with conducting business in foreign countries and

44

• fluctuation in the price of certain raw materials, including resins and other petroleum-based products, and steel.

For a discussion of certain of these and other important factors which may affect the Company's operations, products and markets, see our Annual Report on Form 10-K filed with the Securities and Exchange Commission on March 16, 2004, and our other filings with the Securities and Exchange Commission.

**Item 3.**    *Quantitative and Qualitative Disclosures About Market Risk*

**Foreign Currency and Interest Rate Risk Management**

The Company operates on a global basis and is exposed to the risk that its earnings, cash flows and stockholders' equity could be adversely impacted by fluctuations in currency exchange rates and interest rates. To manage the volatility relating to these exposures, the Company aggregates the exposures on a consolidated basis to take advantage of natural offsets. For exposures that are not offset within its operations, the Company may enter into various derivative transactions pursuant to its risk management policies. The primary purpose of the Company's foreign currency and interest rate risk management policies and activities is to manage these risks to acceptable levels.

To manage its risks, the Company primarily utilizes forward exchange contracts and purchased options with durations of generally less than 12 months. The Company has in place forward exchange contracts and purchased options with third parties, denominated in multiple currencies, which will mature during fiscal 2004. The details are as follows (amounts in millions, except average contract rate):

| Derivative Type | Currency Sold | Currency Purchased | USD Equivalent of Notional Amount | Weighted Average Contract Rate (per Convention) | Unrealized Gain/(Loss) |
|---|---|---|---|---|---|
| Options | CAD | USD | $50.0 | 1.50 CAD per USD | $0.1 |

In order to manage the interest rate risk associated with our debt portfolio, the Company may enter into derivative transactions to manage its exposures to changes in global interest rates, although the Company did not have in place any interest rate derivatives at September 30, 2004.

Gains and losses on derivatives qualifying as hedges under SFAS No. 133 "Accounting for Derivative Instruments and Hedging Activities" are recorded on the balance sheet as a component of "Accumulated other comprehensive loss" to the extent that the hedges are effective until the underlying transactions are recognized in earnings. As of September 30, 2004, the Company had no derivatives designated as hedges under SFAS No. 133. Gains and losses from all derivatives that do not qualify as hedges under SFAS No. 133 are recorded in the income statement as required by SFAS No. 133, and the fair value is recorded in the balance sheet.

**Concentration of Credit Risk**

In the normal course of business, the Company provides credit to its customers who are concentrated in the automotive industry, performs credit evaluations of these customers and maintains reserves for potential credit losses. When realized, the losses have been within the range of management's allowance for doubtful accounts.

**Other Concentrations of Risk**

The Company invests the majority of its excess cash in money market accounts and, where appropriate, diversifies the concentration of cash among financial institutions. With respect to financial institutions, the Company has diversified its selection of counterparties and has arranged master-netting agreements, where allowed by law and the Company's policies, to minimize the risk of loss.

45

**Item 4.**    *Controls and Procedures*

*a. Evaluation of disclosure controls and procedures:*

We maintain disclosure controls and procedures designed to ensure that both non-financial and financial information required to be disclosed in our periodic reports is recorded, processed, summarized and reported as and when required. Based on our third quarter evaluation, our principal executive officer and principal financial officer have concluded that our disclosure controls and procedures are effective as of the end of the period covered by this report.

*b. Changes and modifications in internal controls:*

We are currently undertaking a comprehensive assessment of our internal controls for financial reporting in connection with Section 404 of the Sarbanes-Oxley Act of 2002. This assessment consists of evaluating and testing applicable controls, and, as control deficiencies are identified, remediating the deficiency and then verifying the new or modified control. The scope of our assessment includes our plant and corporate operations worldwide and covers, among other things, assessments of inventory, revenue, purchasing, payroll, fixed assets, accounting and reporting cycles, information technologies general controls and business process application controls.

During the course of our evaluation, we have identified certain control deficiencies, including reviews of non-routine journal entries, account reconciliations and supporting documentation, reviews of financial data sourced from manual spreadsheets, segregation of duties, system access and user authorization, and business process application controls. Our independent auditors, KPMG LLP, previously identified certain of these items as reportable conditions in connection with the completion of their audit of our 2003 financial information. We believe that these deficiencies are primarily attributable to reduction-in-force cost reduction initiatives and residual process harmonization and personnel integration issues from prior acquisitions.

We do not believe that any of the deficiencies identified to date constitute material weaknesses in our internal controls over financial reporting. Further, while we have identified various compensating controls that mitigate the risks associated with these deficiencies, we are nevertheless implementing rigorous remediation plans to improve each of these deficiencies through new or modified controls, and we have supplemented our internal project team with the services of several outside specialists for this task.

Some of the required remediation efforts have been completed. For example, we have adopted new control procedures to catalog manual spreadsheets used as sources for financial reporting and to centralize lease contracts with related lease data to facilitate periodic reconciliations at the corporate and plant levels. We have also initiated modifications of certain existing internal controls, such as new documentation requirements of relevant business process controls — to ensure information technology applications are processing data as intended — and information technologies general controls. System access and user authorization controls are also being enhanced.

We have made our assessment of our internal controls for financial reporting a top priority and are committed to continuously refining and improving our internal control procedures. However, there can be no assurances that all control deficiencies identified and validated will be remediated before the end of our fiscal year or that the remaining unresolved control deficiencies, or control deficiencies that we may subsequently identify, will not rise to the level of material weaknesses.

46

### c. Changes in Audit Committee:

Effective September 29, 2004, Anthony Hardwick and Richard C. Jelinek were appointed to the Board of Directors of the Company. Mr. Hardwick was also appointed to the Audit Committee of the Board of Directors, and Mr. Jelinek was also appointed to the Compensation Committee (as Chairman) and Nominating and Governance Committee of the Board of Directors.

Mr. Hardwick and Mr. Jelinek, both of whom the Board of Directors has determined are "independent", are replacing Samuel Valenti III and Cynthia L. Hess, who resigned as directors of the Company to accommodate the restructuring of the Company's board to meet the new independence requirements.

## PART II — OTHER INFORMATION

**Item 1.**   *Legal Proceedings*

The Company and its subsidiaries have lawsuits and claims pending against them and have certain guarantees outstanding, which were made in the ordinary course of business.

As of September 30, 2004, the Company was a party to approximately 1,102 pending cases alleging personal injury from exposure to asbestos containing materials used in boilers manufactured before 1966 by former operations of the Company which were sold in 1966. Asbestos-containing refractory bricks lined the boilers and, in some instances, the Company's former operations installed asbestos-containing insulation around the boilers. These pending cases do not include cases that have been dismissed or are subject to agreements to dismiss due to the inability of the plaintiffs to establish exposure to a relevant product and cases that have been settled or are subject to settlement agreements. Total settlement costs for these cases have been less than $1.3 million or an average of less than $6,250 per settled case. The defense and settlement costs have been substantially covered by the Company's primary insurance carriers under a claims handling agreement that expires in August 2006. The Company has primary, excess and umbrella insurance coverage for various periods available for asbestos-related boiler and other claims. The Company's primary carriers have agreed to cover approximately 80% of certain defense and settlement costs up to a limit of approximately $70.5 million for all claims made, subject to reservations of rights. The excess insurance coverage, which varies in availability from year to year, is approximately $615 million in aggregate for all claims made. The coverage may be impacted by matters described below. Based on the age of the boilers, the nature of the claims and settlements made to date and the insurance coverage, management does not believe that these cases will have a material impact on the Company's financial condition, results of operations or cash flows. However, the Company cannot assure that it will not be subjected to significant additional claims in the future in respect of these or other matters for which the insurance could be utilized, that insurance will be available as expected, that the matters described below may not impact the Company's coverage or that unanticipated damages or settlements in the future would not exceed insurance coverage.

In 1988, the Company divested its retail lumber and building materials business to Wickes Lumber Co. (now Wickes Inc.), which filed a voluntary petition for reorganization under Chapter 11 of the U.S. Bankruptcy Code in early 2004. As part of this divestiture, Wickes assumed responsibility for all liabilities associated with this business, including those associated with certain asbestos-related claims, and the Company agreed to give them access to its general liability insurance policies for such liabilities. These are, in several instances, the same policies referred to in the preceding paragraph. Wickes has been making claims against these policies for settlements of asbestos-related claims that it has characterized as insignificant as of late 2003 in its filings with the Securities and Exchange Commission. The Company has agreed to suspend making claims for other than defense costs to permit agreement upon a framework within the bankruptcy proceedings or otherwise for coordinating these claims as between the Company and Wickes. It is possible that resolution of these issues will await confirmation of a plan of reorganization for Wickes and that an equitable portion of the insurance will be made available for Wickes asbestos or other claimants, thereby reducing the coverage available to the Company for its own claims. Based upon the information available to the Company concerning Wickes' claims history, management does not believe these matters will materially and adversely affect the Company.

A purported class action was filed on March 24, 2003 in the United States District Court for the Eastern District of Michigan, against the Company, Heartland and ten current and former senior officers and/or directors of the Company, alleging violations of Sections 10(b) and 20 (a) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated there under. Four similar actions were subsequently filed in the United States District Court for the Eastern District of Michigan, purportedly filed on behalf of purchasers of the common stock of the Company between August 7, 2001 and August 2, 2002, which are identical to the purported class identified in the previously disclosed lawsuit, except in one instance in which the complaint alleges a class period beginning on July 5, 2001. On August 4, 2003, the court consolidated all five pending actions and appointed lead plaintiffs for the purported class. The Company believes that the claims are without merit and intends to vigorously defend the lawsuits. The Company does not believe that the suit will have a material impact on its financial condition, results of operations or cash flows.

The Company is a defendant in a lawsuit involving a sales commission arrangement inherited from a predecessor company and its partial ownership of an extinguished joint venture. In September 2003, the Oakland County Circuit Court entered a judgment by default against the Company for $4.2 million based upon an inadvertent failure to produce a small number of documents that were to be produced with thousands of other documents that were delivered in the discovery process. The Company and its counsel believe that the default judgment was improperly entered and that damages were improperly assessed, and it has filed an appeal of the judgment with the Michigan Court of Appeals. The Company intends to vigorously pursue its appeal in this matter and has posted a letter of credit in the amount of the judgment as part of the normal appeal process. While management believes it has no liability to the plaintiff, the Company has established an appropriate reserve for this matter in an amount less than the amount of the current judgment.

The ultimate outcome of the legal proceedings to which the Company is a party will not, in the opinion of the Company's management, based on the facts presently known to it, have a material effect on the Company's consolidated financial condition, future results of operations or cash flows.

**Item 6.**    *Exhibits and Reports on Form 8-K*

**(a) Exhibits**

| Exhibit Number | Description |
|---|---|
| 4.1 | Indenture, dated as of August 26, 2004, among Collins & Aikman Products Co., as Issuer, the Guarantors parties thereto and BNY Midwest Trust Company, as Trustee, which is incorporated herein by reference to Exhibit 99.1 of Collins & Aikman Corporation's current report on Form 8-K dated August 26, 2004 and filed on August 31, 2004. |
| 4.2 | Credit Agreement dated as of December 20, 2001, as amended and restated as of September 1, 2004, among Collins & Aikman Products Co., as Borrower, Collins & Aikman Corporation, the lenders named therein, JPMorgan Securities Inc. and Credit Suisse First Boston, as Joint Lead Arrangers, JPMorgan Securities Inc. and Deutsche Bank Securities Inc., as Joint Bookrunners for the supplemental revolving credit facility, Deutsche Bank Securities Inc., as Documentation Agent, Credit Suisse First Boston as Syndication Agent and JPMorgan Chase Bank as Administrative Agent, which is incorporated herein by reference to Exhibit 99.1 of Collins & Aikman Corporation's current report on Form 8-K dated September 1, 2004 and filed on September 7, 2004. |
| 11 | Computation of Earnings Per Share. |
| 12.1 | Computation of Ratio of Earnings to Fixed Charges. |
| 31.1 | Certification Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. |
| 31.2 | Certification Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. |
| 32.1 | Certification Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 (Chapter 63, Title 18 U.S.C. 1350(a) and (b)). |

**(b) Reports on Form 8-K**

The Company filed or furnished the following Reports on Form 8-K covering the following items:

| | |
|---|---|
| July 8, 2004 | Item 12 Results of Operations and Financial Condition. |
| August 2, 2004 | Item 12 Results of Operations and Financial Condition. |
| August 31, 2004 | Item 2.03 Creation of a Direct Obligation or an Obligation under an Off-Balance Sheet Arrangement of a Registrant. |
| September 7, 2004 | Item 2.03 Creation of a Direct Obligation or an Obligation under an Off-Balance Sheet Arrangement of a Registrant. |
| September 30, 2004 | Item 5.02 Departure of Directors or Principal Officers; Election of Directors; Appointment of Principal Officers. |

**COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES**

**SIGNATURE**

Pursuant to the requirements of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

COLLINS & AIKMAN CORPORATION

By: /s/ BRYCE KOTH

Bryce Koth
*Chief Financial Officer*
*(Principal Financial Officer)*

Dated: November 9, 2004

50

## EXHIBIT INDEX

| Exhibit Number | Description |
| --- | --- |
| 4.1 | Indenture, dated as of August 26, 2004, among Collins & Aikman Products Co., as Issuer, the Guarantors party thereto and BNY Midwest Trust Company, as Trustee, which is incorporated herein by reference to Exhibit 99.1 of Collins & Aikman Corporation's current report on Form 8-K dated August 26, 2004 and filed on August 31, 2004. |
| 4.2 | Credit Agreement dated as of December 20, 2001, as amended and restated as of September 1, 2004, among Collins & Aikman Products Co., as Borrower, Collins & Aikman Corporation, the lenders named therein, JPMorgan Securities Inc. and Credit Suisse First Boston, as Joint Lead Arrangers, JPMorgan Securities Inc. and Deutsche Bank Securities Inc., as Joint Bookrunners for the supplemental revolving credit facility, Deutsche Bank Securities Inc., as Documentation Agent, Credit Suisse First Boston as Syndication Agent and JPMorgan Chase Bank as Administrative Agent, which is incorporated herein by reference to Exhibit 99.1 of Collins & Aikman Corporation's current report on Form 8-K dated September 1, 2004 and filed on September 7, 2004.. |
| 11 | Computation of Earnings Per Share. |
| 12.1 | Computation of Ratio of Earnings to Fixed Charges. |
| 31.1 | Certification Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. |
| 31.2 | Certification Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. |
| 32.1 | Certification Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 (Chapter 63, Title 18 U.S.C. 1350(a) and (b)). |

51

## EXHIBIT 11

## COLLINS & AIKMAN CORPORATION

## COMPUTATION OF EARNINGS PER SHARE IN MILLIONS, EXCEPT PER SHARE DATE

### (UNAUDITED)

| | QUARTER ENDED | |
| --- | --- | --- |
| | SEPTEMBER 30, 2004 | SEPTEMBER 30, 2003 |
| Average common shares outstanding during the period: | | |
| Basic............................................ | 83.6 | 83.6 |
| Incremental shares under stock options computed under the price of issuer's stock during the period...... | -- | -- |
| Total shares for basic EPS........................ | 83.6 | 83.6 |
| Loss from continuing operations before extraordinary item............................................. | (55.6) | (32.1) |
| Income from discontinued operations, net of income taxes............................................... | -- | -- |
| Cumulative effect of a change in accounting principle, Net of income taxes of $0......................... | -- | -- |
| Net loss.......................................... | (55.6) | (32.1) |
| Loss on redemption of subsidiary preferred stock | -- | -- |
| Net loss attributable to common shareholders...... | (55.6) | (32.1) |
| Net loss per basic and diluted common share: | | |
| Continuing operations............................. | (0.67) | (0.38) |
| Discontinued operations........................... | -- | -- |
| Cumulative effect of change in accounting principle | -- | -- |
| Net loss attributable to common shareholders...... | (0.67) | (0.38) |

.

.

**EXHIBIT 12.1**

Collins & Aikman Corporation and Subsidiaries
RATIO OF EARNINGS TO COMBINED FIXED CHARGES
(IN $ MILLIONS)

|  | NINE MONTHS ENDED SEPTEMBER 30, | |
|  | 2004 | 2003 |
| --- | --- | --- |
| FIXED CHARGES | | |
|   Interest expense, net | $   127.4 | $   111.3 |
|   Interest income | 0.4 | 0.2 |
|     Interest expense, gross from continuing ops | 128.8 | 111.5 |
|   Capitalized interest | -- | -- |
|   Interest expense from discontinued operations | -- | -- |
|     Total interest expense, gross(*) | 67.9 | 72.3 |
| Interest portion of rental expense | 22.6 | 24.1 |
| Pre-tax earnings required to cover preferred stock dividends and accretion | 49.4 | 42.0 |
|   FIXED CHARGES - C&A | $   199.8 | $   177.6 |
| Pre-tax income from continuing operations | $  (125.6) | $  (47.5) |
| Minority interest in (income) loss of affiliates | (2.1) | (4.1) |
| (Income) loss from equity investees | -- | -- |
|     Total | (127.7) | (51.6) |
| ADD: | | |
|   Fixed charges | 199.8 | 177.6 |
|   Distributed income of equity investees | | |
| SUBTRACT: | | |
| (A) Interest capitalized | -- | -- |
|     TOTAL EARNINGS | 72.1 | 126.0 |
| RATIO OF EARNINGS TO FIXED CHARGES | | |
| Dollar value of deficiency | (127.7) | (51.6) |

(*) - Includes amortization of debt issuance costs

## CERTIFICATION PURSUANT TO SECTION 302
## OF THE SARBANES-OXLEY ACT OF 2002

I, David A. Stockman, certify that:

1. I have reviewed this Report on Form 10-Q of Collins & Aikman Corporation;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

a. Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b. Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c. Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d. Disclosed in this annual report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonable likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal controls over financial reporting, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent functions):

a. All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b. Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting

Date: November 9, 2004                          /s/ David A. Stockman
                                                ------------------------
                                                David A. Stockman
                       Chairman of the Board and Chief Executive Officer

**EXHIBIT 31.2**

## CERTIFICATION PURSUANT TO SECTION 302
## OF THE SARBANES-OXLEY ACT OF 2002

I, Bryce M. Koth, certify that:

1. I have reviewed this Report on Form 10-Q of Collins & Aikman Corporation;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

a. Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b. Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c. Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d. Disclosed in this annual report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonable likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal controls over financial reporting, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent functions):

a. All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b. Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting

Date:  November 9, 2004

/s/ Bryce M. Koth
------------------------------
Bryce M. Koth
Chief Financial Officer
(Principal Financial Officer)

EXHIBIT 32.1

## CERTIFICATION
## ACCOMPANYING FORM 10-Q REPORT
## OF COLLINS & AIKMAN CORPORATION
## PURSUANT TO SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002
(CHAPTER 63, TITLE 18 U.S.C. SUB-SECTION 1350(A) AND (B))

Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 (Chapter 63, Title 18 U.S.C. sub-sections 1350(a) and (b)), each of the undersigned hereby certifies that the Report on Form 10-Q for the period ended September 30, 2004 of Collins & Aikman Corporation (the "Company") fully complies with the requirements of Section 13(a) or a Section 15(d) of the Securities Exchange Act of 1934 and that the information contained in such Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

```
      Dated: November 9, 2004              /s/ David A. Stockman
                                           -------------------------------
                                                   David A. Stockman
                                    Chairman of the Board and Chief Executive Officer


      Dated: November 9, 2004              /s/ Bryce M. Koth
                                           -------------------------------
                                                   Bryce M. Koth
                                           Chief Financial Officer
```

**End of Filing**

Powered By EDGAR Online

© 2005 | EDGAR Online, Inc.

# Exhibit F

Collins & Aikman Ordinary Shares (CKCRQ.PK)
Daily prices (split adjusted) from May 1, 2003 to May 17, 2005
Source: Factiva

| Date | Close |
|------|-------|
| 5/1/03 | 3.99 |
| 5/2/03 | 4.02 |
| 5/5/03 | 3.87 |
| 5/6/03 | 3.68 |
| 5/7/03 | 3.66 |
| 5/8/03 | 3.62 |
| 5/9/03 | 3.63 |
| 5/12/03 | 3.57 |
| 5/13/03 | 3.50 |
| 5/14/03 | 3.80 |
| 5/15/03 | 3.20 |
| 5/16/03 | 3.20 |
| 5/19/03 | 3.23 |
| 5/20/03 | 3.18 |
| 5/21/03 | 2.90 |
| 5/22/03 | 2.88 |
| 5/23/03 | 2.83 |
| 5/27/03 | 2.96 |
| 5/28/03 | 3.05 |
| 5/29/03 | 3.02 |
| 5/30/03 | 3.12 |
| 6/2/03 | 3.19 |
| 6/3/03 | 3.19 |
| 6/4/03 | 3.15 |
| 6/5/03 | 3.00 |
| 6/6/03 | 2.90 |
| 6/9/03 | 2.86 |
| 6/10/03 | 2.82 |
| 6/11/03 | 3.02 |
| 6/12/03 | 3.18 |
| 6/13/03 | 3.04 |
| 6/16/03 | 3.09 |
| 6/17/03 | 3.18 |
| 6/18/03 | 3.17 |
| 6/19/03 | 3.12 |
| 6/20/03 | 3.10 |
| 6/23/03 | 3.02 |
| 6/24/03 | 3.01 |
| 6/25/03 | 2.92 |
| 6/26/03 | 2.98 |
| 6/27/03 | 2.96 |
| 6/30/03 | 2.95 |
| 7/1/03 | 2.99 |
| 7/2/03 | 3.00 |
| 7/3/03 | 2.96 |
| 7/7/03 | 3.11 |
| 7/8/03 | 3.20 |

Collins & Aikman Ordinary Shares (CKCRQ.PK)
Daily prices (split adjusted) from May 1, 2003 to May 17, 2005
Source:  Factiva

| Date | Close |
|------|-------|
| 7/9/03 | 3.22 |
| 7/10/03 | 3.25 |
| 7/11/03 | 3.34 |
| 7/14/03 | 3.34 |
| 7/15/03 | 3.24 |
| 7/16/03 | 3.22 |
| 7/17/03 | 2.70 |
| 7/18/03 | 2.92 |
| 7/21/03 | 2.89 |
| 7/22/03 | 2.85 |
| 7/23/03 | 2.45 |
| 7/24/03 | 2.46 |
| 7/25/03 | 2.54 |
| 7/28/03 | 2.57 |
| 7/29/03 | 2.53 |
| 7/30/03 | 2.55 |
| 7/31/03 | 2.56 |
| 8/1/03 | 2.46 |
| 8/4/03 | 2.43 |
| 8/5/03 | 2.38 |
| 8/6/03 | 2.36 |
| 8/7/03 | 2.25 |
| 8/8/03 | 2.16 |
| 8/11/03 | 2.09 |
| 8/12/03 | 2.22 |
| 8/13/03 | 2.20 |
| 8/14/03 | 2.32 |
| 8/15/03 | 2.43 |
| 8/18/03 | 2.68 |
| 8/19/03 | 2.73 |
| 8/20/03 | 2.71 |
| 8/21/03 | 2.83 |
| 8/22/03 | 2.85 |
| 8/25/03 | 2.81 |
| 8/26/03 | 2.89 |
| 8/27/03 | 3.13 |
| 8/28/03 | 3.15 |
| 8/29/03 | 3.07 |
| 9/2/03 | 3.29 |
| 9/3/03 | 3.22 |
| 9/4/03 | 3.01 |
| 9/5/03 | 2.96 |
| 9/8/03 | 3.18 |
| 9/9/03 | 3.04 |
| 9/10/03 | 3.00 |
| 9/11/03 | 2.93 |
| 9/12/03 | 2.92 |

Collins & Aikman Ordinary Shares (CKCRQ.PK)
Daily prices (split adjusted) from May 1, 2003 to May 17, 2005
Source: Factiva

| Date | Close |
| --- | --- |
| 9/15/03 | 2.94 |
| 9/16/03 | 2.92 |
| 9/17/03 | 2.79 |
| 9/18/03 | 2.79 |
| 9/19/03 | 3.00 |
| 9/22/03 | 3.00 |
| 9/23/03 | 2.99 |
| 9/24/03 | 2.99 |
| 9/25/03 | 2.91 |
| 9/26/03 | 3.06 |
| 9/29/03 | 3.41 |
| 9/30/03 | 3.38 |
| 10/1/03 | 3.60 |
| 10/2/03 | 3.73 |
| 10/3/03 | 2.43 |
| 10/6/03 | 2.44 |
| 10/7/03 | 2.49 |
| 10/8/03 | 2.66 |
| 10/9/03 | 2.75 |
| 10/10/03 | 3.09 |
| 10/13/03 | 3.35 |
| 10/14/03 | 3.20 |
| 10/15/03 | 3.36 |
| 10/16/03 | 3.53 |
| 10/17/03 | 3.34 |
| 10/20/03 | 3.22 |
| 10/21/03 | 3.14 |
| 10/22/03 | 2.95 |
| 10/23/03 | 2.95 |
| 10/24/03 | 2.93 |
| 10/27/03 | 3.01 |
| 10/28/03 | 3.15 |
| 10/29/03 | 3.19 |
| 10/30/03 | 3.13 |
| 10/31/03 | 3.20 |
| 11/3/03 | 3.28 |
| 11/4/03 | 3.24 |
| 11/5/03 | 3.15 |
| 11/6/03 | 2.96 |
| 11/7/03 | 2.89 |
| 11/10/03 | 2.79 |
| 11/11/03 | 2.82 |
| 11/12/03 | 2.98 |
| 11/13/03 | 3.25 |
| 11/14/03 | 3.28 |
| 11/17/03 | 3.32 |
| 11/18/03 | 3.34 |

3

Collins & Aikman Ordinary Shares (CKCRQ.PK)
Daily prices (split adjusted) from May 1, 2003 to May 17, 2005
Source: Factiva

| Date | Close |
|------|-------|
| 11/19/03 | 3.30 |
| 11/20/03 | 3.28 |
| 11/21/03 | 3.22 |
| 11/24/03 | 3.27 |
| 11/25/03 | 3.50 |
| 11/26/03 | 3.72 |
| 11/28/03 | 3.57 |
| 12/1/03 | 3.85 |
| 12/2/03 | 3.80 |
| 12/3/03 | 3.71 |
| 12/4/03 | 3.99 |
| 12/5/03 | 3.90 |
| 12/8/03 | 4.10 |
| 12/9/03 | 3.97 |
| 12/10/03 | 4.08 |
| 12/11/03 | 4.04 |
| 12/12/03 | 4.05 |
| 12/15/03 | 3.85 |
| 12/16/03 | 4.06 |
| 12/17/03 | 4.01 |
| 12/18/03 | 4.10 |
| 12/19/03 | 4.30 |
| 12/22/03 | 4.18 |
| 12/23/03 | 4.14 |
| 12/24/03 | 4.14 |
| 12/26/03 | 4.11 |
| 12/29/03 | 4.15 |
| 12/30/03 | 4.29 |
| 12/31/03 | 4.33 |
| 1/2/04 | 4.20 |
| 1/5/04 | 4.87 |
| 1/6/04 | 5.06 |
| 1/7/04 | 6.44 |
| 1/8/04 | 6.02 |
| 1/9/04 | 5.96 |
| 1/12/04 | 6.11 |
| 1/13/04 | 5.82 |
| 1/14/04 | 5.49 |
| 1/15/04 | 5.70 |
| 1/16/04 | 5.70 |
| 1/20/04 | 6.58 |
| 1/21/04 | 6.76 |
| 1/22/04 | 6.46 |
| 1/23/04 | 6.20 |
| 1/26/04 | 6.46 |
| 1/27/04 | 6.42 |
| 1/28/04 | 6.25 |

Collins & Aikman Ordinary Shares (CKCRQ.PK)
Daily prices (split adjusted) from May 1, 2003 to May 17, 2005
Source: Factiva

| Date | Close |
|------|-------|
| 1/29/04 | 5.81 |
| 1/30/04 | 5.82 |
| 2/2/04 | 5.91 |
| 2/3/04 | 5.62 |
| 2/4/04 | 5.54 |
| 2/5/04 | 5.64 |
| 2/6/04 | 5.55 |
| 2/9/04 | 5.62 |
| 2/10/04 | 5.60 |
| 2/11/04 | 5.76 |
| 2/12/04 | 5.84 |
| 2/13/04 | 5.73 |
| 2/17/04 | 5.60 |
| 2/18/04 | 5.68 |
| 2/19/04 | 5.52 |
| 2/20/04 | 5.37 |
| 2/23/04 | 5.32 |
| 2/24/04 | 5.19 |
| 2/25/04 | 5.23 |
| 2/26/04 | 5.23 |
| 2/27/04 | 5.31 |
| 3/1/04 | 5.50 |
| 3/2/04 | 5.42 |
| 3/3/04 | 5.48 |
| 3/4/04 | 5.41 |
| 3/5/04 | 5.27 |
| 3/8/04 | 5.19 |
| 3/9/04 | 5.21 |
| 3/10/04 | 5.01 |
| 3/11/04 | 5.73 |
| 3/12/04 | 5.89 |
| 3/15/04 | 5.71 |
| 3/16/04 | 5.47 |
| 3/17/04 | 5.67 |
| 3/18/04 | 5.50 |
| 3/19/04 | 5.48 |
| 3/22/04 | 5.18 |
| 3/23/04 | 5.23 |
| 3/24/04 | 5.13 |
| 3/25/04 | 5.20 |
| 3/26/04 | 5.30 |
| 3/29/04 | 5.35 |
| 3/30/04 | 5.46 |
| 3/31/04 | 5.50 |
| 4/1/04 | 5.63 |
| 4/2/04 | 5.96 |
| 4/5/04 | 5.98 |

5

Collins & Aikman Ordinary Shares (CKCRQ.PK)
Daily prices (split adjusted) from May 1, 2003 to May 17, 2005
Source: Factiva

| Date | Close |
|------|-------|
| 4/6/04 | 5.99 |
| 4/7/04 | 6.04 |
| 4/8/04 | 5.90 |
| 4/12/04 | 6.03 |
| 4/13/04 | 5.91 |
| 4/14/04 | 5.95 |
| 4/15/04 | 5.90 |
| 4/16/04 | 5.86 |
| 4/19/04 | 5.91 |
| 4/20/04 | 5.76 |
| 4/21/04 | 6.01 |
| 4/22/04 | 6.02 |
| 4/23/04 | 6.04 |
| 4/26/04 | 6.29 |
| 4/27/04 | 6.56 |
| 4/28/04 | 6.42 |
| 4/29/04 | 6.11 |
| 4/30/04 | 6.14 |
| 5/3/04 | 6.15 |
| 5/4/04 | 5.88 |
| 5/5/04 | 5.92 |
| 5/6/04 | 5.57 |
| 5/7/04 | 5.15 |
| 5/10/04 | 5.05 |
| 5/11/04 | 5.41 |
| 5/12/04 | 5.24 |
| 5/13/04 | 5.14 |
| 5/14/04 | 5.04 |
| 5/17/04 | 4.85 |
| 5/18/04 | 5.09 |
| 5/19/04 | 5.01 |
| 5/20/04 | 5.00 |
| 5/21/04 | 4.92 |
| 5/24/04 | 5.02 |
| 5/25/04 | 5.20 |
| 5/26/04 | 5.27 |
| 5/27/04 | 5.35 |
| 5/28/04 | 5.31 |
| 6/1/04 | 5.20 |
| 6/2/04 | 5.31 |
| 6/3/04 | 5.49 |
| 6/4/04 | 5.54 |
| 6/7/04 | 5.68 |
| 6/8/04 | 5.70 |
| 6/9/04 | 5.61 |
| 6/10/04 | 5.68 |
| 6/14/04 | 5.45 |

Collins & Aikman Ordinary Shares (CKCRQ.PK)
Daily prices (split adjusted) from May 1, 2003 to May 17, 2005
Source: Factiva

| Date | Close |
|------|-------|
| 6/15/04 | 5.33 |
| 6/16/04 | 5.40 |
| 6/17/04 | 5.42 |
| 6/18/04 | 5.54 |
| 6/21/04 | 5.46 |
| 6/22/04 | 5.38 |
| 6/23/04 | 6.18 |
| 6/24/04 | 5.94 |
| 6/25/04 | 5.79 |
| 6/28/04 | 5.90 |
| 6/29/04 | 5.69 |
| 6/30/04 | 5.59 |
| 7/1/04 | 5.35 |
| 7/2/04 | 5.46 |
| 7/6/04 | 5.20 |
| 7/7/04 | 5.45 |
| 7/8/04 | 5.52 |
| 7/9/04 | 5.69 |
| 7/12/04 | 5.68 |
| 7/13/04 | 5.77 |
| 7/14/04 | 5.72 |
| 7/15/04 | 5.63 |
| 7/16/04 | 5.42 |
| 7/19/04 | 5.47 |
| 7/20/04 | 5.43 |
| 7/21/04 | 5.40 |
| 7/22/04 | 5.29 |
| 7/23/04 | 5.14 |
| 7/26/04 | 5.03 |
| 7/27/04 | 5.12 |
| 7/28/04 | 5.02 |
| 7/29/04 | 5.09 |
| 7/30/04 | 5.10 |
| 8/2/04 | 5.25 |
| 8/3/04 | 5.07 |
| 8/4/04 | 5.19 |
| 8/5/04 | 5.08 |
| 8/6/04 | 4.88 |
| 8/9/04 | 4.61 |
| 8/10/04 | 4.73 |
| 8/11/04 | 4.71 |
| 8/12/04 | 4.61 |
| 8/13/04 | 4.50 |
| 8/16/04 | 4.48 |
| 8/17/04 | 4.45 |
| 8/18/04 | 4.55 |
| 8/19/04 | 4.50 |

Collins & Aikman Ordinary Shares (CKCRQ.PK)
Daily prices (split adjusted) from May 1, 2003 to May 17, 2005
Source: Factiva

| Date | Close |
|------|-------|
| 8/20/04 | 4.58 |
| 8/23/04 | 4.60 |
| 8/24/04 | 4.76 |
| 8/25/04 | 4.74 |
| 8/26/04 | 4.64 |
| 8/27/04 | 4.66 |
| 8/30/04 | 4.60 |
| 8/31/04 | 4.64 |
| 9/1/04 | 4.60 |
| 9/2/04 | 4.66 |
| 9/3/04 | 4.66 |
| 9/7/04 | 4.69 |
| 9/8/04 | 4.67 |
| 9/9/04 | 4.82 |
| 9/10/04 | 4.84 |
| 9/13/04 | 4.80 |
| 9/14/04 | 4.73 |
| 9/15/04 | 4.70 |
| 9/16/04 | 4.59 |
| 9/17/04 | 4.45 |
| 9/20/04 | 4.51 |
| 9/21/04 | 4.45 |
| 9/22/04 | 4.29 |
| 9/23/04 | 4.29 |
| 9/24/04 | 4.26 |
| 9/27/04 | 4.22 |
| 9/28/04 | 4.18 |
| 9/29/04 | 4.23 |
| 9/30/04 | 4.18 |
| 10/1/04 | 4.24 |
| 10/4/04 | 4.30 |
| 10/5/04 | 4.40 |
| 10/6/04 | 4.49 |
| 10/7/04 | 4.42 |
| 10/8/04 | 4.42 |
| 10/11/04 | 4.51 |
| 10/12/04 | 4.48 |
| 10/13/04 | 4.37 |
| 10/14/04 | 4.21 |
| 10/15/04 | 4.09 |
| 10/18/04 | 3.88 |
| 10/19/04 | 3.64 |
| 10/20/04 | 3.46 |
| 10/21/04 | 3.55 |
| 10/22/04 | 3.55 |
| 10/25/04 | 3.53 |
| 10/26/04 | 3.80 |

Collins & Aikman Ordinary Shares (CKCRQ.PK)
Daily prices (split adjusted) from May 1, 2003 to May 17, 2005
Source: Factiva

| Date | Close |
|------|-------|
| 10/27/04 | 3.75 |
| 10/28/04 | 3.81 |
| 10/29/04 | 3.89 |
| 11/1/04 | 3.89 |
| 11/2/04 | 3.86 |
| 11/3/04 | 3.95 |
| 11/4/04 | 3.94 |
| 11/5/04 | 4.02 |
| 11/8/04 | 3.88 |
| 11/9/04 | 3.35 |
| 11/10/04 | 3.15 |
| 11/11/04 | 2.99 |
| 11/12/04 | 2.88 |
| 11/15/04 | 3.00 |
| 11/16/04 | 3.26 |
| 11/17/04 | 3.32 |
| 11/18/04 | 3.35 |
| 11/19/04 | 3.40 |
| 11/22/04 | 3.46 |
| 11/23/04 | 3.33 |
| 11/24/04 | 3.49 |
| 11/26/04 | 3.48 |
| 11/29/04 | 3.51 |
| 11/30/04 | 3.55 |
| 12/1/04 | 3.63 |
| 12/2/04 | 3.64 |
| 12/3/04 | 3.55 |
| 12/6/04 | 3.39 |
| 12/7/04 | 3.20 |
| 12/8/04 | 3.24 |
| 12/9/04 | 3.36 |
| 12/10/04 | 3.47 |
| 12/13/04 | 3.65 |
| 12/14/04 | 3.80 |
| 12/15/04 | 3.55 |
| 12/16/04 | 3.45 |
| 12/17/04 | 3.41 |
| 12/20/04 | 3.47 |
| 12/21/04 | 3.49 |
| 12/22/04 | 3.63 |
| 12/23/04 | 3.75 |
| 12/27/04 | 3.85 |
| 12/28/04 | 4.00 |
| 12/29/04 | 4.16 |
| 12/30/04 | 4.29 |
| 12/31/04 | 4.36 |
| 1/3/05 | 4.25 |

Collins & Aikman Ordinary Shares (CKCRQ.PK)
Daily prices (split adjusted) from May 1, 2003 to May 17, 2005
Source: Factiva

| Date | Close |
|------|-------|
| 1/4/05 | 4.01 |
| 1/5/05 | 3.85 |
| 1/6/05 | 3.76 |
| 1/7/05 | 4.02 |
| 1/10/05 | 4.01 |
| 1/11/05 | 3.91 |
| 1/12/05 | 3.85 |
| 1/13/05 | 3.86 |
| 1/14/05 | 3.79 |
| 1/18/05 | 3.81 |
| 1/19/05 | 3.69 |
| 1/20/05 | 3.51 |
| 1/21/05 | 3.67 |
| 1/24/05 | 3.63 |
| 1/25/05 | 3.57 |
| 1/26/05 | 3.54 |
| 1/27/05 | 3.54 |
| 1/28/05 | 3.53 |
| 1/31/05 | 3.46 |
| 2/1/05 | 3.36 |
| 2/2/05 | 3.38 |
| 2/3/05 | 3.16 |
| 2/4/05 | 2.95 |
| 2/7/05 | 3.03 |
| 2/8/05 | 3.00 |
| 2/9/05 | 2.95 |
| 2/10/05 | 2.93 |
| 2/11/05 | 2.95 |
| 2/14/05 | 2.97 |
| 2/15/05 | 2.88 |
| 2/16/05 | 2.88 |
| 2/17/05 | 2.87 |
| 2/18/05 | 2.86 |
| 2/22/05 | 2.80 |
| 2/23/05 | 2.61 |
| 2/24/05 | 2.34 |
| 2/25/05 | 2.37 |
| 2/28/05 | 1.99 |
| 3/1/05 | 1.95 |
| 3/2/05 | 1.80 |
| 3/3/05 | 1.91 |
| 3/4/05 | 1.91 |
| 3/7/05 | 1.96 |
| 3/8/05 | 2.03 |
| 3/9/05 | 2.01 |
| 3/10/05 | 1.82 |
| 3/11/05 | 1.81 |

Collins & Aikman Ordinary Shares (CKCRQ.PK)
Daily prices (split adjusted) from May 1, 2003 to May 17, 2005
Source: Factiva

| Date | Close |
|------|-------|
| 3/14/05 | 1.75 |
| 3/15/05 | 1.71 |
| 3/16/05 | 1.63 |
| 3/17/05 | 1.24 |
| 3/18/05 | 1.15 |
| 3/21/05 | 0.95 |
| 3/22/05 | 1.02 |
| 3/23/05 | 1.01 |
| 3/24/05 | 1.36 |
| 3/28/05 | 1.25 |
| 3/29/05 | 1.21 |
| 3/30/05 | 1.16 |
| 3/31/05 | 1.23 |
| 4/1/05 | 1.25 |
| 4/4/05 | 1.26 |
| 4/5/05 | 1.28 |
| 4/6/05 | 1.26 |
| 4/7/05 | 1.23 |
| 4/8/05 | 1.19 |
| 4/11/05 | 1.15 |
| 4/12/05 | 1.09 |
| 4/13/05 | 1.01 |
| 4/14/05 | 0.99 |
| 4/15/05 | 0.94 |
| 4/18/05 | 0.95 |
| 4/19/05 | 1.02 |
| 4/20/05 | 1.04 |
| 4/21/05 | 1.01 |
| 4/22/05 | 0.95 |
| 4/25/05 | 0.96 |
| 4/26/05 | 0.91 |
| 4/27/05 | 0.76 |
| 4/28/05 | 0.78 |
| 4/29/05 | 0.82 |
| 5/2/05 | 0.86 |
| 5/3/05 | 0.81 |
| 5/4/05 | 0.85 |
| 5/5/05 | 0.79 |
| 5/6/05 | 0.78 |
| 5/9/05 | 0.79 |
| 5/10/05 | 0.78 |
| 5/11/05 | 0.78 |
| 5/12/05 | 0.01 |
| 5/13/05 | 0.11 |
| 5/16/05 | 0.13 |
| 5/17/05 | 0.12 |

# Exhibit G

Dana Ordinary Shares (DCNAQ.PK)
Daily prices (split adjusted) from May 1, 2003 to March 3, 2006
Source: Factiva

| Date | Close |
|------|-------|
| 5/1/03 | 9.23 |
| 5/2/03 | 9.38 |
| 5/5/03 | 9.45 |
| 5/6/03 | 9.59 |
| 5/7/03 | 9.52 |
| 5/8/03 | 9.36 |
| 5/9/03 | 9.40 |
| 5/12/03 | 9.46 |
| 5/13/03 | 9.42 |
| 5/14/03 | 9.28 |
| 5/15/03 | 9.29 |
| 5/16/03 | 9.15 |
| 5/19/03 | 8.95 |
| 5/20/03 | 8.90 |
| 5/21/03 | 8.58 |
| 5/22/03 | 8.86 |
| 5/23/03 | 8.57 |
| 5/27/03 | 8.73 |
| 5/28/03 | 8.77 |
| 5/29/03 | 8.65 |
| 5/30/03 | 8.91 |
| 6/2/03 | 9.83 |
| 6/3/03 | 9.63 |
| 6/4/03 | 9.88 |
| 6/5/03 | 10.51 |
| 6/6/03 | 11.01 |
| 6/9/03 | 10.60 |
| 6/10/03 | 10.88 |
| 6/11/03 | 11.30 |
| 6/12/03 | 11.75 |
| 6/13/03 | 11.25 |
| 6/16/03 | 11.74 |
| 6/17/03 | 11.65 |
| 6/18/03 | 11.73 |
| 6/19/03 | 11.65 |
| 6/20/03 | 11.75 |
| 6/23/03 | 11.38 |
| 6/24/03 | 11.35 |
| 6/25/03 | 11.37 |
| 6/26/03 | 11.60 |
| 6/27/03 | 11.60 |
| 6/30/03 | 11.56 |
| 7/1/03 | 11.63 |
| 7/2/03 | 11.77 |
| 7/3/03 | 11.79 |
| 7/7/03 | 12.02 |
| 7/8/03 | 16.20 |

Dana Ordinary Shares (DCNAQ.PK)
Daily prices (split adjusted) from May 1, 2003 to March 3, 2006
Source: Factiva

| Date | Close |
|------|-------|
| 7/9/03 | 15.92 |
| 7/10/03 | 15.88 |
| 7/11/03 | 15.96 |
| 7/14/03 | 15.86 |
| 7/15/03 | 15.82 |
| 7/16/03 | 15.61 |
| 7/17/03 | 15.58 |
| 7/18/03 | 15.52 |
| 7/21/03 | 15.24 |
| 7/22/03 | 15.28 |
| 7/23/03 | 15.60 |
| 7/24/03 | 15.35 |
| 7/25/03 | 15.64 |
| 7/28/03 | 15.45 |
| 7/29/03 | 15.18 |
| 7/30/03 | 15.09 |
| 7/31/03 | 15.40 |
| 8/1/03 | 15.40 |
| 8/4/03 | 15.50 |
| 8/5/03 | 15.34 |
| 8/6/03 | 15.18 |
| 8/7/03 | 14.96 |
| 8/8/03 | 15.15 |
| 8/11/03 | 15.34 |
| 8/12/03 | 15.35 |
| 8/13/03 | 15.41 |
| 8/14/03 | 15.52 |
| 8/15/03 | 15.45 |
| 8/18/03 | 15.48 |
| 8/19/03 | 15.35 |
| 8/20/03 | 15.40 |
| 8/21/03 | 15.37 |
| 8/22/03 | 15.20 |
| 8/25/03 | 15.20 |
| 8/26/03 | 15.41 |
| 8/27/03 | 15.38 |
| 8/28/03 | 15.40 |
| 8/29/03 | 15.42 |
| 9/2/03 | 15.45 |
| 9/3/03 | 15.45 |
| 9/4/03 | 15.55 |
| 9/5/03 | 15.48 |
| 9/8/03 | 15.54 |
| 9/9/03 | 15.48 |
| 9/10/03 | 15.41 |
| 9/11/03 | 15.37 |
| 9/12/03 | 15.48 |

Dana Ordinary Shares (DCNAQ.PK)
Daily prices (split adjusted) from May 1, 2003 to March 3, 2006
Source: Factiva

| Date | Close |
|------|-------|
| 9/15/03 | 15.62 |
| 9/16/03 | 15.59 |
| 9/17/03 | 15.60 |
| 9/18/03 | 15.72 |
| 9/19/03 | 15.73 |
| 9/22/03 | 15.65 |
| 9/23/03 | 15.90 |
| 9/24/03 | 15.50 |
| 9/25/03 | 15.65 |
| 9/26/03 | 15.50 |
| 9/29/03 | 15.52 |
| 9/30/03 | 15.43 |
| 10/1/03 | 15.45 |
| 10/2/03 | 15.35 |
| 10/3/03 | 15.59 |
| 10/6/03 | 15.55 |
| 10/7/03 | 15.70 |
| 10/8/03 | 15.59 |
| 10/9/03 | 15.78 |
| 10/10/03 | 15.73 |
| 10/13/03 | 15.67 |
| 10/14/03 | 15.72 |
| 10/15/03 | 15.64 |
| 10/16/03 | 15.84 |
| 10/17/03 | 15.89 |
| 10/20/03 | 15.79 |
| 10/21/03 | 15.79 |
| 10/22/03 | 15.70 |
| 10/23/03 | 15.70 |
| 10/24/03 | 15.90 |
| 10/27/03 | 15.89 |
| 10/28/03 | 15.84 |
| 10/29/03 | 16.00 |
| 10/30/03 | 16.14 |
| 10/31/03 | 16.28 |
| 11/3/03 | 16.59 |
| 11/4/03 | 16.60 |
| 11/5/03 | 16.53 |
| 11/6/03 | 16.55 |
| 11/7/03 | 16.33 |
| 11/10/03 | 16.34 |
| 11/11/03 | 16.15 |
| 11/12/03 | 16.70 |
| 11/13/03 | 16.72 |
| 11/14/03 | 16.65 |
| 11/17/03 | 15.24 |
| 11/18/03 | 14.81 |

Dana Ordinary Shares (DCNAQ.PK)
Daily prices (split adjusted) from May 1, 2003 to March 3, 2006
Source: Factiva

| Date | Close |
|------|-------|
| 11/19/03 | 15.04 |
| 11/20/03 | 14.98 |
| 11/21/03 | 15.00 |
| 11/24/03 | 15.23 |
| 11/25/03 | 15.70 |
| 11/26/03 | 15.98 |
| 11/28/03 | 16.17 |
| 12/1/03 | 16.38 |
| 12/2/03 | 16.23 |
| 12/3/03 | 16.72 |
| 12/4/03 | 16.64 |
| 12/5/03 | 16.30 |
| 12/8/03 | 16.64 |
| 12/9/03 | 16.73 |
| 12/10/03 | 16.60 |
| 12/11/03 | 16.94 |
| 12/12/03 | 17.04 |
| 12/15/03 | 17.06 |
| 12/16/03 | 17.05 |
| 12/17/03 | 17.15 |
| 12/18/03 | 17.86 |
| 12/19/03 | 18.04 |
| 12/22/03 | 18.25 |
| 12/23/03 | 18.25 |
| 12/24/03 | 18.22 |
| 12/26/03 | 18.20 |
| 12/29/03 | 18.30 |
| 12/30/03 | 18.40 |
| 12/31/03 | 18.35 |
| 1/2/04 | 18.05 |
| 1/5/04 | 18.62 |
| 1/6/04 | 18.97 |
| 1/7/04 | 19.19 |
| 1/8/04 | 19.49 |
| 1/9/04 | 19.50 |
| 1/12/04 | 20.48 |
| 1/13/04 | 21.01 |
| 1/14/04 | 21.31 |
| 1/15/04 | 21.37 |
| 1/16/04 | 22.04 |
| 1/20/04 | 22.07 |
| 1/21/04 | 22.53 |
| 1/22/04 | 22.67 |
| 1/23/04 | 22.56 |
| 1/26/04 | 22.95 |
| 1/27/04 | 22.70 |
| 1/28/04 | 22.41 |

Dana Ordinary Shares (DCNAQ.PK)
Daily prices (split adjusted) from May 1, 2003 to March 3, 2006
Source: Factiva

| Date | Close |
|------|-------|
| 1/29/04 | 21.81 |
| 1/30/04 | 20.80 |
| 2/2/04 | 21.26 |
| 2/3/04 | 21.57 |
| 2/4/04 | 21.52 |
| 2/5/04 | 21.40 |
| 2/6/04 | 21.63 |
| 2/9/04 | 22.43 |
| 2/10/04 | 22.90 |
| 2/11/04 | 22.31 |
| 2/12/04 | 21.89 |
| 2/13/04 | 21.30 |
| 2/17/04 | 22.19 |
| 2/18/04 | 21.98 |
| 2/19/04 | 21.76 |
| 2/20/04 | 21.41 |
| 2/23/04 | 21.13 |
| 2/24/04 | 21.02 |
| 2/25/04 | 21.38 |
| 2/26/04 | 21.15 |
| 2/27/04 | 21.39 |
| 3/1/04 | 22.15 |
| 3/2/04 | 21.71 |
| 3/3/04 | 21.49 |
| 3/4/04 | 21.39 |
| 3/5/04 | 21.89 |
| 3/8/04 | 21.37 |
| 3/9/04 | 20.32 |
| 3/10/04 | 19.88 |
| 3/11/04 | 20.05 |
| 3/12/04 | 20.16 |
| 3/15/04 | 19.66 |
| 3/16/04 | 19.47 |
| 3/17/04 | 19.79 |
| 3/18/04 | 19.75 |
| 3/19/04 | 19.08 |
| 3/22/04 | 18.42 |
| 3/23/04 | 18.21 |
| 3/24/04 | 17.65 |
| 3/25/04 | 18.40 |
| 3/26/04 | 18.61 |
| 3/29/04 | 18.95 |
| 3/30/04 | 19.43 |
| 3/31/04 | 19.86 |
| 4/1/04 | 20.44 |
| 4/2/04 | 20.92 |
| 4/5/04 | 21.25 |

Dana Ordinary Shares (DCNAQ.PK)
Daily prices (split adjusted) from May 1, 2003 to March 3, 2006
Source: Factiva

| Date | Close |
|------|-------|
| 4/6/04 | 21.31 |
| 4/7/04 | 20.85 |
| 4/8/04 | 21.12 |
| 4/12/04 | 20.80 |
| 4/13/04 | 20.30 |
| 4/14/04 | 20.40 |
| 4/15/04 | 20.75 |
| 4/16/04 | 20.97 |
| 4/19/04 | 20.75 |
| 4/20/04 | 20.25 |
| 4/21/04 | 20.80 |
| 4/22/04 | 21.51 |
| 4/23/04 | 21.60 |
| 4/26/04 | 21.37 |
| 4/27/04 | 21.90 |
| 4/28/04 | 21.20 |
| 4/29/04 | 20.81 |
| 4/30/04 | 20.16 |
| 5/3/04 | 20.31 |
| 5/4/04 | 21.00 |
| 5/5/04 | 20.89 |
| 5/6/04 | 20.24 |
| 5/7/04 | 19.26 |
| 5/10/04 | 18.51 |
| 5/11/04 | 18.88 |
| 5/12/04 | 18.62 |
| 5/13/04 | 18.90 |
| 5/14/04 | 19.07 |
| 5/17/04 | 18.54 |
| 5/18/04 | 18.46 |
| 5/19/04 | 18.60 |
| 5/20/04 | 18.10 |
| 5/21/04 | 18.10 |
| 5/24/04 | 18.11 |
| 5/25/04 | 18.19 |
| 5/26/04 | 18.59 |
| 5/27/04 | 18.90 |
| 5/28/04 | 18.65 |
| 6/1/04 | 19.05 |
| 6/2/04 | 19.22 |
| 6/3/04 | 19.03 |
| 6/4/04 | 19.56 |
| 6/7/04 | 19.98 |
| 6/8/04 | 20.13 |
| 6/9/04 | 19.71 |
| 6/10/04 | 20.54 |
| 6/14/04 | 20.13 |

Dana Ordinary Shares (DCNAQ.PK)
Daily prices (split adjusted) from May 1, 2003 to March 3, 2006
Source: Factiva

| Date | Close |
|------|-------|
| 6/15/04 | 20.44 |
| 6/16/04 | 20.48 |
| 6/17/04 | 20.38 |
| 6/18/04 | 20.65 |
| 6/21/04 | 20.75 |
| 6/22/04 | 21.05 |
| 6/23/04 | 21.75 |
| 6/24/04 | 21.11 |
| 6/25/04 | 20.08 |
| 6/28/04 | 19.58 |
| 6/29/04 | 19.54 |
| 6/30/04 | 19.60 |
| 7/1/04 | 18.96 |
| 7/2/04 | 19.04 |
| 7/6/04 | 18.64 |
| 7/7/04 | 18.60 |
| 7/8/04 | 18.42 |
| 7/9/04 | 19.16 |
| 7/12/04 | 18.86 |
| 7/13/04 | 19.09 |
| 7/14/04 | 18.74 |
| 7/15/04 | 18.62 |
| 7/16/04 | 18.44 |
| 7/19/04 | 18.35 |
| 7/20/04 | 18.25 |
| 7/21/04 | 18.93 |
| 7/22/04 | 18.18 |
| 7/23/04 | 19.01 |
| 7/26/04 | 19.02 |
| 7/27/04 | 19.15 |
| 7/28/04 | 19.52 |
| 7/29/04 | 19.42 |
| 7/30/04 | 19.29 |
| 8/2/04 | 19.23 |
| 8/3/04 | 18.96 |
| 8/4/04 | 18.85 |
| 8/5/04 | 18.25 |
| 8/6/04 | 17.51 |
| 8/9/04 | 17.76 |
| 8/10/04 | 18.06 |
| 8/11/04 | 17.95 |
| 8/12/04 | 17.59 |
| 8/13/04 | 17.27 |
| 8/16/04 | 18.00 |
| 8/17/04 | 18.38 |
| 8/18/04 | 18.62 |
| 8/19/04 | 18.21 |

Dana Ordinary Shares (DCNAQ.PK)
Daily prices (split adjusted) from May 1, 2003 to March 3, 2006
Source: Factiva

| Date | Close |
|------|-------|
| 8/20/04 | 18.45 |
| 8/23/04 | 18.20 |
| 8/24/04 | 18.19 |
| 8/25/04 | 18.40 |
| 8/26/04 | 18.41 |
| 8/27/04 | 18.40 |
| 8/30/04 | 18.46 |
| 8/31/04 | 18.87 |
| 9/1/04 | 18.95 |
| 9/2/04 | 18.99 |
| 9/3/04 | 19.02 |
| 9/7/04 | 19.25 |
| 9/8/04 | 18.84 |
| 9/9/04 | 18.78 |
| 9/10/04 | 18.46 |
| 9/13/04 | 18.47 |
| 9/14/04 | 18.08 |
| 9/15/04 | 17.92 |
| 9/16/04 | 17.96 |
| 9/17/04 | 17.95 |
| 9/20/04 | 17.63 |
| 9/21/04 | 17.81 |
| 9/22/04 | 17.33 |
| 9/23/04 | 16.95 |
| 9/24/04 | 16.99 |
| 9/27/04 | 16.70 |
| 9/28/04 | 16.86 |
| 9/29/04 | 17.02 |
| 9/30/04 | 17.69 |
| 10/1/04 | 18.19 |
| 10/4/04 | 17.99 |
| 10/5/04 | 17.72 |
| 10/6/04 | 17.53 |
| 10/7/04 | 17.00 |
| 10/8/04 | 16.58 |
| 10/11/04 | 16.38 |
| 10/12/04 | 16.60 |
| 10/13/04 | 14.84 |
| 10/14/04 | 14.61 |
| 10/15/04 | 14.56 |
| 10/18/04 | 14.60 |
| 10/19/04 | 14.39 |
| 10/20/04 | 14.17 |
| 10/21/04 | 14.10 |
| 10/22/04 | 14.10 |
| 10/25/04 | 14.19 |
| 10/26/04 | 14.77 |

Dana Ordinary Shares (DCNAQ.PK)
Daily prices (split adjusted) from May 1, 2003 to March 3, 2006
Source: Factiva

| Date | Close |
|------|-------|
| 10/27/04 | 15.04 |
| 10/28/04 | 15.10 |
| 10/29/04 | 14.91 |
| 11/1/04 | 15.66 |
| 11/2/04 | 15.63 |
| 11/3/04 | 15.87 |
| 11/4/04 | 15.93 |
| 11/5/04 | 16.38 |
| 11/8/04 | 16.43 |
| 11/9/04 | 16.43 |
| 11/10/04 | 16.24 |
| 11/11/04 | 16.19 |
| 11/12/04 | 16.25 |
| 11/15/04 | 16.24 |
| 11/16/04 | 16.45 |
| 11/17/04 | 16.56 |
| 11/18/04 | 16.63 |
| 11/19/04 | 16.33 |
| 11/22/04 | 16.87 |
| 11/23/04 | 16.74 |
| 11/24/04 | 16.86 |
| 11/26/04 | 16.83 |
| 11/29/04 | 16.67 |
| 11/30/04 | 16.35 |
| 12/1/04 | 17.00 |
| 12/2/04 | 16.90 |
| 12/3/04 | 17.04 |
| 12/6/04 | 16.55 |
| 12/7/04 | 16.23 |
| 12/8/04 | 16.36 |
| 12/9/04 | 16.46 |
| 12/10/04 | 16.35 |
| 12/13/04 | 16.63 |
| 12/14/04 | 16.71 |
| 12/15/04 | 17.10 |
| 12/16/04 | 16.73 |
| 12/17/04 | 16.67 |
| 12/20/04 | 16.65 |
| 12/21/04 | 16.90 |
| 12/22/04 | 17.24 |
| 12/23/04 | 17.35 |
| 12/27/04 | 16.98 |
| 12/28/04 | 17.37 |
| 12/29/04 | 17.51 |
| 12/30/04 | 17.42 |
| 12/31/04 | 17.33 |
| 1/3/05 | 17.00 |

Dana Ordinary Shares (DCNAQ.PK)
Daily prices (split adjusted) from May 1, 2003 to March 3, 2006
Source: Factiva

| Date | Close |
|------|-------|
| 1/4/05 | 17.00 |
| 1/5/05 | 16.83 |
| 1/6/05 | 17.01 |
| 1/7/05 | 16.71 |
| 1/10/05 | 16.50 |
| 1/11/05 | 16.14 |
| 1/12/05 | 16.15 |
| 1/13/05 | 16.18 |
| 1/14/05 | 16.30 |
| 1/18/05 | 16.31 |
| 1/19/05 | 16.11 |
| 1/20/05 | 15.70 |
| 1/21/05 | 15.64 |
| 1/24/05 | 15.38 |
| 1/25/05 | 15.36 |
| 1/26/05 | 15.88 |
| 1/27/05 | 15.81 |
| 1/28/05 | 15.49 |
| 1/31/05 | 15.87 |
| 2/1/05 | 16.00 |
| 2/2/05 | 16.19 |
| 2/3/05 | 15.78 |
| 2/4/05 | 16.06 |
| 2/7/05 | 16.20 |
| 2/8/05 | 16.24 |
| 2/9/05 | 15.94 |
| 2/10/05 | 15.76 |
| 2/11/05 | 16.00 |
| 2/14/05 | 15.84 |
| 2/15/05 | 15.90 |
| 2/16/05 | 15.60 |
| 2/17/05 | 15.42 |
| 2/18/05 | 15.64 |
| 2/22/05 | 15.34 |
| 2/23/05 | 14.95 |
| 2/24/05 | 14.85 |
| 2/25/05 | 14.76 |
| 2/28/05 | 14.42 |
| 3/1/05 | 14.60 |
| 3/2/05 | 14.34 |
| 3/3/05 | 14.36 |
| 3/4/05 | 14.11 |
| 3/7/05 | 14.05 |
| 3/8/05 | 13.87 |
| 3/9/05 | 13.99 |
| 3/10/05 | 14.04 |
| 3/11/05 | 14.21 |

Dana Ordinary Shares (DCNAQ.PK)
Daily prices (split adjusted) from May 1, 2003 to March 3, 2006
Source: Factiva

| Date | Close |
| --- | --- |
| 3/14/05 | 14.53 |
| 3/15/05 | 14.18 |
| 3/16/05 | 14.00 |
| 3/17/05 | 13.78 |
| 3/18/05 | 13.75 |
| 3/21/05 | 13.68 |
| 3/22/05 | 13.54 |
| 3/23/05 | 13.01 |
| 3/24/05 | 13.08 |
| 3/28/05 | 12.92 |
| 3/29/05 | 12.75 |
| 3/30/05 | 12.35 |
| 3/31/05 | 12.79 |
| 4/1/05 | 12.52 |
| 4/4/05 | 12.56 |
| 4/5/05 | 12.66 |
| 4/6/05 | 12.60 |
| 4/7/05 | 12.72 |
| 4/8/05 | 12.50 |
| 4/11/05 | 12.10 |
| 4/12/05 | 11.99 |
| 4/13/05 | 11.82 |
| 4/14/05 | 11.53 |
| 4/15/05 | 10.96 |
| 4/18/05 | 11.36 |
| 4/19/05 | 11.32 |
| 4/20/05 | 11.67 |
| 4/21/05 | 12.44 |
| 4/22/05 | 12.16 |
| 4/25/05 | 12.23 |
| 4/26/05 | 11.83 |
| 4/27/05 | 11.62 |
| 4/28/05 | 11.50 |
| 4/29/05 | 11.42 |
| 5/2/05 | 11.11 |
| 5/3/05 | 11.31 |
| 5/4/05 | 12.00 |
| 5/5/05 | 11.61 |
| 5/6/05 | 11.73 |
| 5/9/05 | 11.75 |
| 5/10/05 | 11.90 |
| 5/11/05 | 11.79 |
| 5/12/05 | 11.34 |
| 5/13/05 | 11.42 |
| 5/16/05 | 11.63 |
| 5/17/05 | 11.65 |
| 5/18/05 | 12.04 |

Dana Ordinary Shares (DCNAQ.PK)
Daily prices (split adjusted) from May 1, 2003 to March 3, 2006
Source: Factiva

| Date | Close |
|------|-------|
| 5/19/05 | 12.20 |
| 5/20/05 | 12.94 |
| 5/23/05 | 12.92 |
| 5/24/05 | 12.71 |
| 5/25/05 | 12.96 |
| 5/26/05 | 12.98 |
| 5/27/05 | 13.14 |
| 5/31/05 | 13.41 |
| 6/1/05 | 13.37 |
| 6/2/05 | 13.32 |
| 6/3/05 | 13.00 |
| 6/6/05 | 13.09 |
| 6/7/05 | 13.04 |
| 6/8/05 | 14.18 |
| 6/9/05 | 14.30 |
| 6/10/05 | 14.39 |
| 6/13/05 | 14.60 |
| 6/14/05 | 14.94 |
| 6/15/05 | 14.84 |
| 6/16/05 | 14.91 |
| 6/17/05 | 15.23 |
| 6/20/05 | 14.96 |
| 6/21/05 | 14.96 |
| 6/22/05 | 14.70 |
| 6/23/05 | 14.70 |
| 6/24/05 | 14.34 |
| 6/27/05 | 13.95 |
| 6/28/05 | 14.32 |
| 6/29/05 | 14.61 |
| 6/30/05 | 14.85 |
| 7/1/05 | 15.17 |
| 7/5/05 | 15.26 |
| 7/6/05 | 15.46 |
| 7/7/05 | 15.41 |
| 7/8/05 | 16.28 |
| 7/11/05 | 16.29 |
| 7/12/05 | 16.43 |
| 7/13/05 | 16.29 |
| 7/14/05 | 16.53 |
| 7/15/05 | 16.34 |
| 7/18/05 | 16.18 |
| 7/19/05 | 16.55 |
| 7/20/05 | 16.43 |
| 7/21/05 | 15.70 |
| 7/22/05 | 15.89 |
| 7/25/05 | 15.73 |
| 7/26/05 | 15.64 |

Dana Ordinary Shares (DCNAQ.PK)
Daily prices (split adjusted) from May 1, 2003 to March 3, 2006
Source: Factiva

| Date | Close |
|------|-------|
| 7/27/05 | 15.79 |
| 7/28/05 | 15.93 |
| 7/29/05 | 15.55 |
| 8/1/05 | 15.66 |
| 8/2/05 | 15.76 |
| 8/3/05 | 15.64 |
| 8/4/05 | 15.17 |
| 8/5/05 | 14.96 |
| 8/8/05 | 15.09 |
| 8/9/05 | 15.21 |
| 8/10/05 | 14.85 |
| 8/11/05 | 14.94 |
| 8/12/05 | 14.53 |
| 8/15/05 | 14.56 |
| 8/16/05 | 14.43 |
| 8/17/05 | 14.01 |
| 8/18/05 | 13.70 |
| 8/19/05 | 13.76 |
| 8/22/05 | 13.83 |
| 8/23/05 | 13.56 |
| 8/24/05 | 13.71 |
| 8/25/05 | 13.76 |
| 8/26/05 | 13.46 |
| 8/29/05 | 13.18 |
| 8/30/05 | 13.41 |
| 8/31/05 | 13.44 |
| 9/1/05 | 13.20 |
| 9/2/05 | 13.44 |
| 9/6/05 | 13.13 |
| 9/7/05 | 13.26 |
| 9/8/05 | 13.06 |
| 9/9/05 | 12.88 |
| 9/12/05 | 12.92 |
| 9/13/05 | 12.66 |
| 9/14/05 | 12.76 |
| 9/15/05 | 9.85 |
| 9/16/05 | 9.57 |
| 9/19/05 | 9.46 |
| 9/20/05 | 8.99 |
| 9/21/05 | 9.14 |
| 9/22/05 | 9.24 |
| 9/23/05 | 9.25 |
| 9/26/05 | 9.19 |
| 9/27/05 | 9.20 |
| 9/28/05 | 9.23 |
| 9/29/05 | 9.28 |
| 9/30/05 | 9.40 |

Dana Ordinary Shares (DCNAQ.PK)
Daily prices (split adjusted) from May 1, 2003 to March 3, 2006
Source: Factiva

| Date | Close |
| --- | --- |
| 10/3/05 | 9.37 |
| 10/4/05 | 9.30 |
| 10/5/05 | 9.07 |
| 10/6/05 | 8.85 |
| 10/7/05 | 9.18 |
| 10/10/05 | 6.03 |
| 10/11/05 | 5.70 |
| 10/12/05 | 5.99 |
| 10/13/05 | 6.20 |
| 10/14/05 | 6.35 |
| 10/17/05 | 7.18 |
| 10/18/05 | 6.96 |
| 10/19/05 | 7.55 |
| 10/20/05 | 7.75 |
| 10/21/05 | 7.38 |
| 10/24/05 | 7.46 |
| 10/25/05 | 7.24 |
| 10/26/05 | 7.47 |
| 10/27/05 | 7.02 |
| 10/28/05 | 7.19 |
| 10/31/05 | 7.50 |
| 11/1/05 | 7.42 |
| 11/2/05 | 7.50 |
| 11/3/05 | 7.33 |
| 11/4/05 | 7.43 |
| 11/7/05 | 7.47 |
| 11/8/05 | 7.18 |
| 11/9/05 | 6.98 |
| 11/10/05 | 6.90 |
| 11/11/05 | 7.02 |
| 11/14/05 | 6.99 |
| 11/15/05 | 6.77 |
| 11/16/05 | 6.95 |
| 11/17/05 | 7.01 |
| 11/18/05 | 7.37 |
| 11/21/05 | 7.37 |
| 11/22/05 | 7.33 |
| 11/23/05 | 7.32 |
| 11/25/05 | 7.12 |
| 11/28/05 | 6.97 |
| 11/29/05 | 6.96 |
| 11/30/05 | 6.97 |
| 12/1/05 | 6.95 |
| 12/2/05 | 6.80 |
| 12/5/05 | 6.93 |
| 12/6/05 | 6.99 |
| 12/7/05 | 6.74 |

Dana Ordinary Shares (DCNAQ.PK)
Daily prices (split adjusted) from May 1, 2003 to March 3, 2006
Source: Factiva

| Date | Close |
|------|-------|
| 12/8/05 | 6.82 |
| 12/9/05 | 7.00 |
| 12/12/05 | 6.90 |
| 12/13/05 | 6.91 |
| 12/14/05 | 7.12 |
| 12/15/05 | 6.95 |
| 12/16/05 | 6.80 |
| 12/19/05 | 6.85 |
| 12/20/05 | 6.64 |
| 12/21/05 | 6.74 |
| 12/22/05 | 6.62 |
| 12/23/05 | 6.62 |
| 12/27/05 | 6.79 |
| 12/28/05 | 6.99 |
| 12/29/05 | 7.09 |
| 12/30/05 | 7.18 |
| 1/3/06 | 7.25 |
| 1/4/06 | 7.47 |
| 1/5/06 | 7.79 |
| 1/6/06 | 7.76 |
| 1/9/06 | 7.92 |
| 1/10/06 | 7.81 |
| 1/11/06 | 7.79 |
| 1/12/06 | 7.07 |
| 1/13/06 | 6.80 |
| 1/17/06 | 5.40 |
| 1/18/06 | 4.84 |
| 1/19/06 | 4.35 |
| 1/20/06 | 4.35 |
| 1/23/06 | 4.41 |
| 1/24/06 | 4.41 |
| 1/25/06 | 4.42 |
| 1/26/06 | 4.36 |
| 1/27/06 | 4.39 |
| 1/30/06 | 4.85 |
| 1/31/06 | 4.87 |
| 2/1/06 | 5.11 |
| 2/2/06 | 4.68 |
| 2/3/06 | 4.54 |
| 2/6/06 | 4.24 |
| 2/7/06 | 4.26 |
| 2/8/06 | 4.31 |
| 2/9/06 | 4.22 |
| 2/10/06 | 4.16 |
| 2/13/06 | 4.08 |
| 2/14/06 | 4.13 |
| 2/15/06 | 3.99 |

Dana Ordinary Shares (DCNAQ.PK)
Daily prices (split adjusted) from May 1, 2003 to March 3, 2006
Source: Factiva

| Date | Close |
|------|-------|
| 2/16/06 | 4.09 |
| 2/17/06 | 4.23 |
| 2/21/06 | 4.03 |
| 2/22/06 | 3.89 |
| 2/23/06 | 3.15 |
| 2/24/06 | 1.51 |
| 2/27/06 | 1.78 |
| 2/28/06 | 1.76 |
| 3/1/06 | 1.85 |
| 3/2/06 | 1.04 |
| 3/3/06 | 0.66 |

# Exhibit H

Delphi Corp Common Stock (DPHIQ.PK)
Daily prices (split adjusted) from May 1, 2003 to October 10, 2005
Source: Factiva

| Date | Close |
|------|-------|
| 5/1/03 | 8.29 |
| 5/2/03 | 8.28 |
| 5/5/03 | 8.46 |
| 5/6/03 | 8.59 |
| 5/7/03 | 8.55 |
| 5/8/03 | 8.51 |
| 5/9/03 | 8.37 |
| 5/12/03 | 8.38 |
| 5/13/03 | 8.56 |
| 5/14/03 | 8.77 |
| 5/15/03 | 8.69 |
| 5/16/03 | 8.62 |
| 5/19/03 | 8.35 |
| 5/20/03 | 8.27 |
| 5/21/03 | 8.16 |
| 5/22/03 | 8.14 |
| 5/23/03 | 7.95 |
| 5/27/03 | 8.47 |
| 5/28/03 | 8.44 |
| 5/29/03 | 8.52 |
| 5/30/03 | 8.82 |
| 6/2/03 | 9.04 |
| 6/3/03 | 9.08 |
| 6/4/03 | 9.13 |
| 6/5/03 | 9.51 |
| 6/6/03 | 9.70 |
| 6/9/03 | 9.38 |
| 6/10/03 | 9.52 |
| 6/11/03 | 9.52 |
| 6/12/03 | 9.59 |
| 6/13/03 | 8.58 |
| 6/16/03 | 8.70 |
| 6/17/03 | 8.91 |
| 6/18/03 | 9.06 |
| 6/19/03 | 8.79 |
| 6/20/03 | 8.95 |
| 6/23/03 | 8.84 |
| 6/24/03 | 8.80 |
| 6/25/03 | 8.71 |
| 6/26/03 | 8.71 |
| 6/27/03 | 8.68 |
| 6/30/03 | 8.63 |
| 7/1/03 | 8.49 |
| 7/2/03 | 8.55 |
| 7/3/03 | 8.40 |
| 7/7/03 | 8.53 |
| 7/8/03 | 8.86 |

Delphi Corp Common Stock (DPHIQ.PK)
Daily prices (split adjusted) from May 1, 2003 to October 10, 2005
Source: Factiva

| Date | Close |
|------|-------|
| 7/9/03 | 8.73 |
| 7/10/03 | 8.49 |
| 7/11/03 | 8.60 |
| 7/14/03 | 8.80 |
| 7/15/03 | 8.74 |
| 7/16/03 | 8.55 |
| 7/17/03 | 8.42 |
| 7/18/03 | 8.44 |
| 7/21/03 | 8.02 |
| 7/22/03 | 8.07 |
| 7/23/03 | 8.26 |
| 7/24/03 | 8.32 |
| 7/25/03 | 8.57 |
| 7/28/03 | 8.47 |
| 7/29/03 | 8.32 |
| 7/30/03 | 8.28 |
| 7/31/03 | 8.40 |
| 8/1/03 | 8.33 |
| 8/4/03 | 8.40 |
| 8/5/03 | 8.03 |
| 8/6/03 | 8.25 |
| 8/7/03 | 8.26 |
| 8/8/03 | 8.28 |
| 8/11/03 | 8.37 |
| 8/12/03 | 8.45 |
| 8/13/03 | 8.38 |
| 8/14/03 | 8.59 |
| 8/15/03 | 8.51 |
| 8/18/03 | 8.61 |
| 8/19/03 | 8.56 |
| 8/20/03 | 8.58 |
| 8/21/03 | 8.70 |
| 8/22/03 | 8.60 |
| 8/25/03 | 8.61 |
| 8/26/03 | 8.74 |
| 8/27/03 | 8.52 |
| 8/28/03 | 8.65 |
| 8/29/03 | 9.06 |
| 9/2/03 | 9.31 |
| 9/3/03 | 9.31 |
| 9/4/03 | 9.20 |
| 9/5/03 | 9.44 |
| 9/8/03 | 9.60 |
| 9/9/03 | 9.42 |
| 9/10/03 | 9.19 |
| 9/11/03 | 9.18 |
| 9/12/03 | 9.20 |

2

Delphi Corp Common Stock (DPHIQ.PK)
Daily prices (split adjusted) from May 1, 2003 to October 10, 2005
Source: Factiva

| Date | Close |
|------|-------|
| 9/15/03 | 9.34 |
| 9/16/03 | 9.68 |
| 9/17/03 | 9.66 |
| 9/18/03 | 9.62 |
| 9/19/03 | 9.56 |
| 9/22/03 | 9.42 |
| 9/23/03 | 9.41 |
| 9/24/03 | 9.20 |
| 9/25/03 | 9.33 |
| 9/26/03 | 9.18 |
| 9/29/03 | 9.30 |
| 9/30/03 | 9.05 |
| 10/1/03 | 9.31 |
| 10/2/03 | 9.34 |
| 10/3/03 | 9.33 |
| 10/6/03 | 9.26 |
| 10/7/03 | 9.12 |
| 10/8/03 | 9.10 |
| 10/9/03 | 9.05 |
| 10/10/03 | 9.03 |
| 10/13/03 | 9.09 |
| 10/14/03 | 9.24 |
| 10/15/03 | 9.34 |
| 10/16/03 | 9.22 |
| 10/17/03 | 9.04 |
| 10/20/03 | 8.93 |
| 10/21/03 | 8.90 |
| 10/22/03 | 8.80 |
| 10/23/03 | 8.79 |
| 10/24/03 | 8.55 |
| 10/27/03 | 8.81 |
| 10/28/03 | 8.90 |
| 10/29/03 | 8.97 |
| 10/30/03 | 8.86 |
| 10/31/03 | 8.90 |
| 11/3/03 | 8.92 |
| 11/4/03 | 8.93 |
| 11/5/03 | 8.92 |
| 11/6/03 | 9.01 |
| 11/7/03 | 8.80 |
| 11/10/03 | 8.67 |
| 11/11/03 | 8.60 |
| 11/12/03 | 8.51 |
| 11/13/03 | 8.79 |
| 11/14/03 | 8.59 |
| 11/17/03 | 8.48 |
| 11/18/03 | 8.38 |

Delphi Corp Common Stock (DPHIQ.PK)
Daily prices (split adjusted) from May 1, 2003 to October 10, 2005
Source: Factiva

| Date | Close |
|------|-------|
| 11/19/03 | 8.40 |
| 11/20/03 | 8.11 |
| 11/21/03 | 8.27 |
| 11/24/03 | 8.45 |
| 11/25/03 | 8.52 |
| 11/26/03 | 8.81 |
| 11/28/03 | 8.78 |
| 12/1/03 | 8.89 |
| 12/2/03 | 8.86 |
| 12/3/03 | 9.11 |
| 12/4/03 | 9.09 |
| 12/5/03 | 9.11 |
| 12/8/03 | 9.10 |
| 12/9/03 | 9.13 |
| 12/10/03 | 9.13 |
| 12/11/03 | 9.21 |
| 12/12/03 | 9.39 |
| 12/15/03 | 9.50 |
| 12/16/03 | 9.26 |
| 12/17/03 | 9.39 |
| 12/18/03 | 9.41 |
| 12/19/03 | 9.48 |
| 12/22/03 | 9.61 |
| 12/23/03 | 9.76 |
| 12/24/03 | 9.67 |
| 12/26/03 | 9.70 |
| 12/29/03 | 10.07 |
| 12/30/03 | 10.01 |
| 12/31/03 | 10.21 |
| 1/2/04 | 10.21 |
| 1/5/04 | 10.67 |
| 1/6/04 | 10.69 |
| 1/7/04 | 11.05 |
| 1/8/04 | 10.99 |
| 1/9/04 | 10.92 |
| 1/12/04 | 11.25 |
| 1/13/04 | 11.37 |
| 1/14/04 | 11.67 |
| 1/15/04 | 11.55 |
| 1/16/04 | 11.60 |
| 1/20/04 | 11.50 |
| 1/21/04 | 11.63 |
| 1/22/04 | 11.44 |
| 1/23/04 | 11.23 |
| 1/26/04 | 11.29 |
| 1/27/04 | 11.18 |
| 1/28/04 | 10.82 |

Delphi Corp Common Stock (DPHIQ.PK)
Daily prices (split adjusted) from May 1, 2003 to October 10, 2005
Source: Factiva

| Date | Close |
|------|-------|
| 1/29/04 | 10.77 |
| 1/30/04 | 10.58 |
| 2/2/04 | 10.49 |
| 2/3/04 | 10.48 |
| 2/4/04 | 10.41 |
| 2/5/04 | 10.46 |
| 2/6/04 | 10.83 |
| 2/9/04 | 10.79 |
| 2/10/04 | 10.69 |
| 2/11/04 | 10.83 |
| 2/12/04 | 10.75 |
| 2/13/04 | 10.59 |
| 2/17/04 | 10.67 |
| 2/18/04 | 10.49 |
| 2/19/04 | 10.42 |
| 2/20/04 | 10.39 |
| 2/23/04 | 10.27 |
| 2/24/04 | 10.18 |
| 2/25/04 | 10.35 |
| 2/26/04 | 10.08 |
| 2/27/04 | 10.20 |
| 3/1/04 | 10.27 |
| 3/2/04 | 10.20 |
| 3/3/04 | 10.25 |
| 3/4/04 | 10.51 |
| 3/5/04 | 10.81 |
| 3/8/04 | 10.72 |
| 3/9/04 | 10.49 |
| 3/10/04 | 10.17 |
| 3/11/04 | 10.16 |
| 3/12/04 | 10.30 |
| 3/15/04 | 10.07 |
| 3/16/04 | 10.25 |
| 3/17/04 | 10.50 |
| 3/18/04 | 10.26 |
| 3/19/04 | 10.08 |
| 3/22/04 | 9.72 |
| 3/23/04 | 9.72 |
| 3/24/04 | 9.44 |
| 3/25/04 | 9.60 |
| 3/26/04 | 9.79 |
| 3/29/04 | 9.88 |
| 3/30/04 | 10.03 |
| 3/31/04 | 9.96 |
| 4/1/04 | 10.02 |
| 4/2/04 | 10.14 |
| 4/5/04 | 10.39 |

5

Delphi Corp Common Stock (DPHIQ.PK)
Daily prices (split adjusted) from May 1, 2003 to October 10, 2005
Source: Factiva

| Date | Close |
|------|-------|
| 4/6/04 | 10.64 |
| 4/7/04 | 10.32 |
| 4/8/04 | 10.16 |
| 4/12/04 | 10.25 |
| 4/13/04 | 9.92 |
| 4/14/04 | 9.74 |
| 4/15/04 | 9.83 |
| 4/16/04 | 9.80 |
| 4/19/04 | 10.16 |
| 4/20/04 | 10.38 |
| 4/21/04 | 10.33 |
| 4/22/04 | 10.56 |
| 4/23/04 | 10.58 |
| 4/26/04 | 10.58 |
| 4/27/04 | 10.54 |
| 4/28/04 | 10.23 |
| 4/29/04 | 9.99 |
| 4/30/04 | 10.20 |
| 5/3/04 | 10.45 |
| 5/4/04 | 10.26 |
| 5/5/04 | 10.22 |
| 5/6/04 | 10.10 |
| 5/7/04 | 9.99 |
| 5/10/04 | 9.96 |
| 5/11/04 | 10.06 |
| 5/12/04 | 10.03 |
| 5/13/04 | 10.00 |
| 5/14/04 | 10.01 |
| 5/17/04 | 9.88 |
| 5/18/04 | 9.99 |
| 5/19/04 | 9.92 |
| 5/20/04 | 9.63 |
| 5/21/04 | 9.83 |
| 5/24/04 | 9.98 |
| 5/25/04 | 10.16 |
| 5/26/04 | 10.25 |
| 5/27/04 | 10.30 |
| 5/28/04 | 10.19 |
| 6/1/04 | 10.30 |
| 6/2/04 | 10.37 |
| 6/3/04 | 10.39 |
| 6/4/04 | 10.44 |
| 6/7/04 | 10.51 |
| 6/8/04 | 10.61 |
| 6/9/04 | 10.66 |
| 6/10/04 | 10.80 |
| 6/14/04 | 10.65 |

Delphi Corp Common Stock (DPHIQ.PK)
Daily prices (split adjusted) from May 1, 2003 to October 10, 2005
Source: Factiva

| Date | Close |
|------|-------|
| 6/15/04 | 10.86 |
| 6/16/04 | 10.81 |
| 6/17/04 | 10.81 |
| 6/18/04 | 10.80 |
| 6/21/04 | 10.72 |
| 6/22/04 | 10.75 |
| 6/23/04 | 10.97 |
| 6/24/04 | 10.72 |
| 6/25/04 | 10.71 |
| 6/28/04 | 10.52 |
| 6/29/04 | 10.52 |
| 6/30/04 | 10.68 |
| 7/1/04 | 10.27 |
| 7/2/04 | 10.11 |
| 7/6/04 | 10.04 |
| 7/7/04 | 9.88 |
| 7/8/04 | 9.84 |
| 7/9/04 | 10.01 |
| 7/12/04 | 9.88 |
| 7/13/04 | 9.90 |
| 7/14/04 | 9.84 |
| 7/15/04 | 9.71 |
| 7/16/04 | 9.63 |
| 7/19/04 | 9.73 |
| 7/20/04 | 9.78 |
| 7/21/04 | 9.75 |
| 7/22/04 | 9.67 |
| 7/23/04 | 9.53 |
| 7/26/04 | 9.52 |
| 7/27/04 | 9.57 |
| 7/28/04 | 9.70 |
| 7/29/04 | 9.52 |
| 7/30/04 | 9.51 |
| 8/2/04 | 9.63 |
| 8/3/04 | 9.49 |
| 8/4/04 | 9.42 |
| 8/5/04 | 9.27 |
| 8/6/04 | 9.10 |
| 8/9/04 | 9.02 |
| 8/10/04 | 9.23 |
| 8/11/04 | 9.23 |
| 8/12/04 | 9.04 |
| 8/13/04 | 9.00 |
| 8/16/04 | 9.20 |
| 8/17/04 | 9.27 |
| 8/18/04 | 9.34 |
| 8/19/04 | 9.18 |

Delphi Corp Common Stock (DPHIQ.PK)
Daily prices (split adjusted) from May 1, 2003 to October 10, 2005
Source: Factiva

| Date | Close |
|------|-------|
| 8/20/04 | 9.24 |
| 8/23/04 | 9.18 |
| 8/24/04 | 9.20 |
| 8/25/04 | 9.25 |
| 8/26/04 | 9.24 |
| 8/27/04 | 9.28 |
| 8/30/04 | 9.12 |
| 8/31/04 | 9.16 |
| 9/1/04 | 9.18 |
| 9/2/04 | 9.28 |
| 9/3/04 | 9.25 |
| 9/7/04 | 9.49 |
| 9/8/04 | 9.56 |
| 9/9/04 | 9.36 |
| 9/10/04 | 9.02 |
| 9/13/04 | 9.19 |
| 9/14/04 | 9.03 |
| 9/15/04 | 8.90 |
| 9/16/04 | 8.99 |
| 9/17/04 | 9.10 |
| 9/20/04 | 8.94 |
| 9/21/04 | 9.03 |
| 9/22/04 | 9.04 |
| 9/23/04 | 9.03 |
| 9/24/04 | 9.07 |
| 9/27/04 | 9.00 |
| 9/28/04 | 9.25 |
| 9/29/04 | 9.17 |
| 9/30/04 | 9.29 |
| 10/1/04 | 9.40 |
| 10/4/04 | 9.36 |
| 10/5/04 | 9.31 |
| 10/6/04 | 8.85 |
| 10/7/04 | 8.84 |
| 10/8/04 | 8.73 |
| 10/11/04 | 8.86 |
| 10/12/04 | 8.78 |
| 10/13/04 | 8.75 |
| 10/14/04 | 8.45 |
| 10/15/04 | 8.44 |
| 10/18/04 | 8.24 |
| 10/19/04 | 8.28 |
| 10/20/04 | 8.35 |
| 10/21/04 | 8.36 |
| 10/22/04 | 8.36 |
| 10/25/04 | 8.26 |
| 10/26/04 | 8.30 |

Delphi Corp Common Stock (DPHIQ.PK)
Daily prices (split adjusted) from May 1, 2003 to October 10, 2005
Source: Factiva

| Date | Close |
|------|-------|
| 10/27/04 | 8.52 |
| 10/28/04 | 8.54 |
| 10/29/04 | 8.41 |
| 11/1/04 | 8.43 |
| 11/2/04 | 8.46 |
| 11/3/04 | 8.45 |
| 11/4/04 | 8.63 |
| 11/5/04 | 8.80 |
| 11/8/04 | 8.99 |
| 11/9/04 | 8.87 |
| 11/10/04 | 8.91 |
| 11/11/04 | 9.11 |
| 11/12/04 | 9.14 |
| 11/15/04 | 9.18 |
| 11/16/04 | 9.11 |
| 11/17/04 | 9.15 |
| 11/18/04 | 9.09 |
| 11/19/04 | 8.92 |
| 11/22/04 | 8.96 |
| 11/23/04 | 8.93 |
| 11/24/04 | 8.93 |
| 11/26/04 | 9.05 |
| 11/29/04 | 8.98 |
| 11/30/04 | 9.00 |
| 12/1/04 | 9.17 |
| 12/2/04 | 9.03 |
| 12/3/04 | 9.07 |
| 12/6/04 | 8.98 |
| 12/7/04 | 8.81 |
| 12/8/04 | 8.78 |
| 12/9/04 | 8.64 |
| 12/10/04 | 8.30 |
| 12/13/04 | 8.28 |
| 12/14/04 | 8.45 |
| 12/15/04 | 8.45 |
| 12/16/04 | 8.45 |
| 12/17/04 | 8.50 |
| 12/20/04 | 8.44 |
| 12/21/04 | 8.47 |
| 12/22/04 | 8.52 |
| 12/23/04 | 8.55 |
| 12/27/04 | 8.62 |
| 12/28/04 | 8.76 |
| 12/29/04 | 8.95 |
| 12/30/04 | 9.01 |
| 12/31/04 | 9.02 |
| 1/3/05 | 8.83 |

Delphi Corp Common Stock (DPHIQ.PK)
Daily prices (split adjusted) from May 1, 2003 to October 10, 2005
Source: Factiva

| Date | Close |
| --- | --- |
| 1/4/05 | 8.55 |
| 1/5/05 | 8.40 |
| 1/6/05 | 8.44 |
| 1/7/05 | 8.32 |
| 1/10/05 | 8.22 |
| 1/11/05 | 8.09 |
| 1/12/05 | 8.12 |
| 1/13/05 | 7.99 |
| 1/14/05 | 8.00 |
| 1/18/05 | 7.97 |
| 1/19/05 | 7.94 |
| 1/20/05 | 7.81 |
| 1/21/05 | 7.64 |
| 1/24/05 | 7.58 |
| 1/25/05 | 7.50 |
| 1/26/05 | 7.60 |
| 1/27/05 | 7.57 |
| 1/28/05 | 7.50 |
| 1/31/05 | 7.59 |
| 2/1/05 | 7.52 |
| 2/2/05 | 7.63 |
| 2/3/05 | 7.45 |
| 2/4/05 | 7.63 |
| 2/7/05 | 7.55 |
| 2/8/05 | 7.50 |
| 2/9/05 | 7.41 |
| 2/10/05 | 7.30 |
| 2/11/05 | 7.26 |
| 2/14/05 | 7.13 |
| 2/15/05 | 7.13 |
| 2/16/05 | 7.09 |
| 2/17/05 | 7.08 |
| 2/18/05 | 7.06 |
| 2/22/05 | 6.92 |
| 2/23/05 | 6.90 |
| 2/24/05 | 6.87 |
| 2/25/05 | 6.89 |
| 2/28/05 | 6.87 |
| 3/1/05 | 6.89 |
| 3/2/05 | 6.46 |
| 3/3/05 | 6.37 |
| 3/4/05 | 5.46 |
| 3/7/05 | 5.15 |
| 3/8/05 | 5.01 |
| 3/9/05 | 4.89 |
| 3/10/05 | 5.07 |
| 3/11/05 | 5.12 |

Delphi Corp Common Stock (DPHIQ.PK)
Daily prices (split adjusted) from May 1, 2003 to October 10, 2005
Source: Factiva

| Date | Close |
|------|-------|
| 3/14/05 | 5.19 |
| 3/15/05 | 4.94 |
| 3/16/05 | 4.67 |
| 3/17/05 | 4.56 |
| 3/18/05 | 4.38 |
| 3/21/05 | 4.36 |
| 3/22/05 | 4.51 |
| 3/23/05 | 4.49 |
| 3/24/05 | 4.55 |
| 3/28/05 | 4.42 |
| 3/29/05 | 4.51 |
| 3/30/05 | 4.49 |
| 3/31/05 | 4.48 |
| 4/1/05 | 4.32 |
| 4/4/05 | 4.34 |
| 4/5/05 | 4.27 |
| 4/6/05 | 4.25 |
| 4/7/05 | 4.19 |
| 4/8/05 | 4.10 |
| 4/11/05 | 3.99 |
| 4/12/05 | 3.96 |
| 4/13/05 | 3.91 |
| 4/14/05 | 3.75 |
| 4/15/05 | 3.69 |
| 4/18/05 | 3.73 |
| 4/19/05 | 3.76 |
| 4/20/05 | 3.59 |
| 4/21/05 | 3.81 |
| 4/22/05 | 3.79 |
| 4/25/05 | 3.79 |
| 4/26/05 | 3.65 |
| 4/27/05 | 3.52 |
| 4/28/05 | 3.32 |
| 4/29/05 | 3.30 |
| 5/2/05 | 3.24 |
| 5/3/05 | 3.41 |
| 5/4/05 | 3.84 |
| 5/5/05 | 3.56 |
| 5/6/05 | 3.49 |
| 5/9/05 | 3.65 |
| 5/10/05 | 3.78 |
| 5/11/05 | 3.67 |
| 5/12/05 | 3.39 |
| 5/13/05 | 3.79 |
| 5/16/05 | 3.50 |
| 5/17/05 | 3.35 |
| 5/18/05 | 3.80 |

Delphi Corp Common Stock (DPHIQ.PK)
Daily prices (split adjusted) from May 1, 2003 to October 10, 2005
Source: Factiva

| Date | Close |
|------|-------|
| 5/19/05 | 4.34 |
| 5/20/05 | 4.94 |
| 5/23/05 | 4.67 |
| 5/24/05 | 4.55 |
| 5/25/05 | 4.69 |
| 5/26/05 | 4.59 |
| 5/27/05 | 4.40 |
| 5/31/05 | 4.34 |
| 6/1/05 | 4.38 |
| 6/2/05 | 4.53 |
| 6/3/05 | 4.51 |
| 6/6/05 | 4.37 |
| 6/7/05 | 4.57 |
| 6/8/05 | 4.67 |
| 6/9/05 | 4.45 |
| 6/10/05 | 4.62 |
| 6/13/05 | 4.60 |
| 6/14/05 | 5.04 |
| 6/15/05 | 5.24 |
| 6/16/05 | 5.18 |
| 6/17/05 | 5.16 |
| 6/20/05 | 5.07 |
| 6/21/05 | 5.26 |
| 6/22/05 | 5.04 |
| 6/23/05 | 4.99 |
| 6/24/05 | 4.74 |
| 6/27/05 | 4.54 |
| 6/28/05 | 4.67 |
| 6/29/05 | 4.67 |
| 6/30/05 | 4.65 |
| 7/1/05 | 4.55 |
| 7/5/05 | 4.64 |
| 7/6/05 | 4.72 |
| 7/7/05 | 4.89 |
| 7/8/05 | 5.03 |
| 7/11/05 | 5.15 |
| 7/12/05 | 5.04 |
| 7/13/05 | 5.08 |
| 7/14/05 | 5.20 |
| 7/15/05 | 5.20 |
| 7/18/05 | 5.23 |
| 7/19/05 | 5.20 |
| 7/20/05 | 5.19 |
| 7/21/05 | 5.08 |
| 7/22/05 | 5.09 |
| 7/25/05 | 5.10 |
| 7/26/05 | 5.22 |

Delphi Corp Common Stock (DPHIQ.PK)
Daily prices (split adjusted) from May 1, 2003 to October 10, 2005
Source: Factiva

| Date | Close |
|------|-------|
| 7/27/05 | 5.18 |
| 7/28/05 | 5.19 |
| 7/29/05 | 5.30 |
| 8/1/05 | 5.30 |
| 8/2/05 | 5.33 |
| 8/3/05 | 5.24 |
| 8/4/05 | 5.78 |
| 8/5/05 | 4.96 |
| 8/8/05 | 5.03 |
| 8/9/05 | 5.49 |
| 8/10/05 | 5.49 |
| 8/11/05 | 5.42 |
| 8/12/05 | 5.56 |
| 8/15/05 | 5.53 |
| 8/16/05 | 5.78 |
| 8/17/05 | 5.92 |
| 8/18/05 | 5.92 |
| 8/19/05 | 6.36 |
| 8/22/05 | 6.22 |
| 8/23/05 | 6.34 |
| 8/24/05 | 6.33 |
| 8/25/05 | 6.32 |
| 8/26/05 | 6.04 |
| 8/29/05 | 5.81 |
| 8/30/05 | 5.66 |
| 8/31/05 | 5.55 |
| 9/1/05 | 5.02 |
| 9/2/05 | 4.79 |
| 9/6/05 | 4.67 |
| 9/7/05 | 4.39 |
| 9/8/05 | 4.49 |
| 9/9/05 | 4.24 |
| 9/12/05 | 4.21 |
| 9/13/05 | 4.39 |
| 9/14/05 | 4.34 |
| 9/15/05 | 3.96 |
| 9/16/05 | 3.86 |
| 9/19/05 | 3.37 |
| 9/20/05 | 3.02 |
| 9/21/05 | 3.48 |
| 9/22/05 | 3.12 |
| 9/23/05 | 3.46 |
| 9/26/05 | 2.99 |
| 9/27/05 | 2.75 |
| 9/28/05 | 2.65 |
| 9/29/05 | 2.52 |
| 9/30/05 | 2.76 |

Delphi Corp Common Stock (DPHIQ.PK)
Daily prices (split adjusted) from May 1, 2003 to October 10, 2005
Source: Factiva

| Date | Close |
|------|-------|
| 10/3/05 | 2.80 |
| 10/4/05 | 2.78 |
| 10/5/05 | 2.50 |
| 10/6/05 | 2.20 |
| 10/7/05 | 1.12 |
| 10/10/05 | 0.33 |

# Exhibit I

Tower Automotive Ordinary (TWRAQ.PK)
Daily prices (split adjusted) from May 1, 2003 to February 2, 2005
Source: Factiva

| Date | Close |
|------|-------|
| 1-May-03 | 2.77 |
| 2-May-03 | 2.98 |
| 5-May-03 | 3.00 |
| 6-May-03 | 3.00 |
| 7-May-03 | 2.95 |
| 8-May-03 | 2.93 |
| 9-May-03 | 3.03 |
| 12-May-03 | 3.00 |
| 13-May-03 | 3.03 |
| 14-May-03 | 3.21 |
| 15-May-03 | 3.37 |
| 16-May-03 | 3.07 |
| 19-May-03 | 3.14 |
| 20-May-03 | 3.09 |
| 21-May-03 | 3.16 |
| 22-May-03 | 3.48 |
| 23-May-03 | 3.46 |
| 27-May-03 | 3.50 |
| 28-May-03 | 3.30 |
| 29-May-03 | 3.39 |
| 30-May-03 | 3.59 |
| 2-Jun-03 | 3.77 |
| 3-Jun-03 | 3.72 |
| 4-Jun-03 | 3.45 |
| 5-Jun-03 | 3.47 |
| 6-Jun-03 | 3.32 |
| 9-Jun-03 | 3.24 |
| 10-Jun-03 | 3.61 |
| 11-Jun-03 | 3.83 |
| 12-Jun-03 | 3.90 |
| 13-Jun-03 | 3.77 |
| 16-Jun-03 | 3.93 |
| 17-Jun-03 | 3.90 |
| 18-Jun-03 | 3.84 |
| 19-Jun-03 | 3.84 |
| 20-Jun-03 | 3.81 |
| 23-Jun-03 | 3.73 |
| 24-Jun-03 | 3.58 |
| 25-Jun-03 | 3.57 |
| 26-Jun-03 | 3.57 |
| 27-Jun-03 | 3.67 |
| 30-Jun-03 | 3.66 |
| 1-Jul-03 | 3.61 |
| 2-Jul-03 | 3.77 |
| 3-Jul-03 | 3.68 |
| 7-Jul-03 | 3.83 |
| 8-Jul-03 | 4.04 |

Tower Automotive Ordinary (TWRAQ.PK)
Daily prices (split adjusted) from May 1, 2003 to February 2, 2005
Source:  Factiva

| | |
|---|---|
| 9-Jul-03 | 4.20 |
| 10-Jul-03 | 4.09 |
| 11-Jul-03 | 4.00 |
| 14-Jul-03 | 4.07 |
| 15-Jul-03 | 4.20 |
| 16-Jul-03 | 4.28 |
| 17-Jul-03 | 4.20 |
| 18-Jul-03 | 4.32 |
| 21-Jul-03 | 4.09 |
| 22-Jul-03 | 4.60 |
| 23-Jul-03 | 4.68 |
| 24-Jul-03 | 4.55 |
| 25-Jul-03 | 4.52 |
| 28-Jul-03 | 4.55 |
| 29-Jul-03 | 4.57 |
| 30-Jul-03 | 4.47 |
| 31-Jul-03 | 4.54 |
| 1-Aug-03 | 4.30 |
| 4-Aug-03 | 4.25 |
| 5-Aug-03 | 4.25 |
| 6-Aug-03 | 4.05 |
| 7-Aug-03 | 3.80 |
| 8-Aug-03 | 3.90 |
| 11-Aug-03 | 3.97 |
| 12-Aug-03 | 4.04 |
| 13-Aug-03 | 3.77 |
| 14-Aug-03 | 3.82 |
| 15-Aug-03 | 3.83 |
| 18-Aug-03 | 3.95 |
| 19-Aug-03 | 4.10 |
| 20-Aug-03 | 4.10 |
| 21-Aug-03 | 4.19 |
| 22-Aug-03 | 4.22 |
| 25-Aug-03 | 4.15 |
| 26-Aug-03 | 4.14 |
| 27-Aug-03 | 4.18 |
| 28-Aug-03 | 4.14 |
| 29-Aug-03 | 4.36 |
| 2-Sep-03 | 4.55 |
| 3-Sep-03 | 4.64 |
| 4-Sep-03 | 4.65 |
| 5-Sep-03 | 4.76 |
| 8-Sep-03 | 4.90 |
| 9-Sep-03 | 4.90 |
| 10-Sep-03 | 4.52 |
| 11-Sep-03 | 4.78 |
| 12-Sep-03 | 4.72 |
| 15-Sep-03 | 4.68 |

Tower Automotive Ordinary (TWRAQ.PK)
Daily prices (split adjusted) from May 1, 2003 to February 2, 2005
Source: Factiva

| | |
|---|---|
| 16-Sep-03 | 4.85 |
| 17-Sep-03 | 4.99 |
| 18-Sep-03 | 5.31 |
| 19-Sep-03 | 5.34 |
| 22-Sep-03 | 5.28 |
| 23-Sep-03 | 5.37 |
| 24-Sep-03 | 5.23 |
| 25-Sep-03 | 5.05 |
| 26-Sep-03 | 4.86 |
| 29-Sep-03 | 4.67 |
| 30-Sep-03 | 4.50 |
| 1-Oct-03 | 4.74 |
| 2-Oct-03 | 4.56 |
| 3-Oct-03 | 4.70 |
| 6-Oct-03 | 4.90 |
| 7-Oct-03 | 4.71 |
| 8-Oct-03 | 4.69 |
| 9-Oct-03 | 4.75 |
| 10-Oct-03 | 4.82 |
| 13-Oct-03 | 4.95 |
| 14-Oct-03 | 5.15 |
| 15-Oct-03 | 4.43 |
| 16-Oct-03 | 4.47 |
| 17-Oct-03 | 4.42 |
| 20-Oct-03 | 4.50 |
| 21-Oct-03 | 4.45 |
| 22-Oct-03 | 4.41 |
| 23-Oct-03 | 4.02 |
| 24-Oct-03 | 3.48 |
| 27-Oct-03 | 3.36 |
| 28-Oct-03 | 3.39 |
| 29-Oct-03 | 3.29 |
| 30-Oct-03 | 3.70 |
| 31-Oct-03 | 3.98 |
| 3-Nov-03 | 3.86 |
| 4-Nov-03 | 3.78 |
| 5-Nov-03 | 3.77 |
| 6-Nov-03 | 3.96 |
| 7-Nov-03 | 3.99 |
| 10-Nov-03 | 3.93 |
| 11-Nov-03 | 3.96 |
| 12-Nov-03 | 4.25 |
| 13-Nov-03 | 4.43 |
| 14-Nov-03 | 4.44 |
| 17-Nov-03 | 4.42 |
| 18-Nov-03 | 4.43 |
| 19-Nov-03 | 4.50 |
| 20-Nov-03 | 4.46 |

3

Tower Automotive Ordinary (TWRAQ.PK)
Daily prices (split adjusted) from May 1, 2003 to February 2, 2005
Source: Factiva

| | |
|---|---|
| 21-Nov-03 | 4.42 |
| 24-Nov-03 | 4.42 |
| 25-Nov-03 | 4.72 |
| 26-Nov-03 | 4.65 |
| 28-Nov-03 | 4.55 |
| 1-Dec-03 | 4.67 |
| 2-Dec-03 | 4.81 |
| 3-Dec-03 | 4.85 |
| 4-Dec-03 | 4.89 |
| 5-Dec-03 | 5.00 |
| 8-Dec-03 | 5.13 |
| 9-Dec-03 | 5.07 |
| 10-Dec-03 | 5.18 |
| 11-Dec-03 | 5.30 |
| 12-Dec-03 | 5.45 |
| 15-Dec-03 | 5.45 |
| 16-Dec-03 | 5.53 |
| 17-Dec-03 | 6.15 |
| 18-Dec-03 | 6.33 |
| 19-Dec-03 | 6.55 |
| 22-Dec-03 | 6.88 |
| 23-Dec-03 | 6.89 |
| 24-Dec-03 | 6.65 |
| 26-Dec-03 | 6.90 |
| 29-Dec-03 | 7.00 |
| 30-Dec-03 | 7.11 |
| 31-Dec-03 | 6.83 |
| 2-Jan-04 | 6.89 |
| 5-Jan-04 | 7.08 |
| 6-Jan-04 | 7.16 |
| 7-Jan-04 | 7.20 |
| 8-Jan-04 | 7.29 |
| 9-Jan-04 | 7.37 |
| 12-Jan-04 | 7.53 |
| 13-Jan-04 | 7.48 |
| 14-Jan-04 | 7.29 |
| 15-Jan-04 | 6.73 |
| 16-Jan-04 | 6.68 |
| 20-Jan-04 | 7.24 |
| 21-Jan-04 | 7.03 |
| 22-Jan-04 | 6.92 |
| 23-Jan-04 | 7.10 |
| 26-Jan-04 | 6.78 |
| 27-Jan-04 | 6.60 |
| 28-Jan-04 | 6.40 |
| 29-Jan-04 | 6.20 |
| 30-Jan-04 | 6.06 |
| 2-Feb-04 | 6.07 |

Tower Automotive Ordinary (TWRAQ.PK)
Daily prices (split adjusted) from May 1, 2003 to February 2, 2005
Source: Factiva

| | |
|---|---|
| 3-Feb-04 | 5.93 |
| 4-Feb-04 | 5.50 |
| 5-Feb-04 | 5.76 |
| 6-Feb-04 | 5.98 |
| 9-Feb-04 | 5.96 |
| 10-Feb-04 | 6.07 |
| 11-Feb-04 | 6.07 |
| 12-Feb-04 | 6.51 |
| 13-Feb-04 | 6.50 |
| 17-Feb-04 | 6.70 |
| 18-Feb-04 | 6.53 |
| 19-Feb-04 | 6.06 |
| 20-Feb-04 | 6.24 |
| 23-Feb-04 | 6.01 |
| 24-Feb-04 | 5.92 |
| 25-Feb-04 | 6.06 |
| 26-Feb-04 | 6.03 |
| 27-Feb-04 | 6.07 |
| 1-Mar-04 | 6.06 |
| 2-Mar-04 | 6.19 |
| 3-Mar-04 | 5.92 |
| 4-Mar-04 | 5.99 |
| 5-Mar-04 | 6.01 |
| 8-Mar-04 | 5.51 |
| 9-Mar-04 | 5.38 |
| 10-Mar-04 | 4.95 |
| 11-Mar-04 | 5.05 |
| 12-Mar-04 | 5.34 |
| 15-Mar-04 | 5.30 |
| 16-Mar-04 | 5.09 |
| 17-Mar-04 | 5.26 |
| 18-Mar-04 | 5.06 |
| 19-Mar-04 | 4.69 |
| 22-Mar-04 | 4.60 |
| 23-Mar-04 | 4.45 |
| 24-Mar-04 | 4.35 |
| 25-Mar-04 | 4.40 |
| 26-Mar-04 | 4.66 |
| 29-Mar-04 | 4.81 |
| 30-Mar-04 | 4.98 |
| 31-Mar-04 | 5.04 |
| 1-Apr-04 | 5.16 |
| 2-Apr-04 | 5.33 |
| 5-Apr-04 | 5.46 |
| 6-Apr-04 | 5.34 |
| 7-Apr-04 | 5.55 |
| 8-Apr-04 | 5.80 |
| 12-Apr-04 | 5.83 |

Tower Automotive Ordinary (TWRAQ.PK)
Daily prices (split adjusted) from May 1, 2003 to February 2, 2005
Source: Factiva

| | |
|---|---|
| 13-Apr-04 | 5.54 |
| 14-Apr-04 | 5.45 |
| 15-Apr-04 | 5.38 |
| 16-Apr-04 | 5.70 |
| 19-Apr-04 | 5.57 |
| 20-Apr-04 | 5.51 |
| 21-Apr-04 | 5.65 |
| 22-Apr-04 | 5.79 |
| 23-Apr-04 | 5.80 |
| 26-Apr-04 | 5.62 |
| 27-Apr-04 | 5.76 |
| 28-Apr-04 | 5.53 |
| 29-Apr-04 | 5.13 |
| 30-Apr-04 | 5.12 |
| 3-May-04 | 5.27 |
| 4-May-04 | 4.96 |
| 5-May-04 | 4.70 |
| 6-May-04 | 4.58 |
| 7-May-04 | 4.61 |
| 10-May-04 | 4.18 |
| 11-May-04 | 4.30 |
| 12-May-04 | 4.40 |
| 13-May-04 | 4.06 |
| 14-May-04 | 4.00 |
| 17-May-04 | 3.33 |
| 18-May-04 | 3.54 |
| 19-May-04 | 3.51 |
| 20-May-04 | 3.64 |
| 21-May-04 | 3.58 |
| 24-May-04 | 3.61 |
| 25-May-04 | 3.67 |
| 26-May-04 | 3.62 |
| 27-May-04 | 3.62 |
| 28-May-04 | 3.71 |
| 1-Jun-04 | 3.77 |
| 2-Jun-04 | 3.83 |
| 3-Jun-04 | 3.67 |
| 4-Jun-04 | 3.66 |
| 7-Jun-04 | 3.81 |
| 8-Jun-04 | 3.81 |
| 9-Jun-04 | 3.80 |
| 10-Jun-04 | 3.85 |
| 14-Jun-04 | 3.83 |
| 15-Jun-04 | 3.85 |
| 16-Jun-04 | 3.86 |
| 17-Jun-04 | 3.85 |
| 18-Jun-04 | 3.72 |
| 21-Jun-04 | 3.68 |

Tower Automotive Ordinary (TWRAQ.PK)
Daily prices (split adjusted) from May 1, 2003 to February 2, 2005
Source: Factiva

| | |
|---|---|
| 22-Jun-04 | 3.55 |
| 23-Jun-04 | 3.67 |
| 24-Jun-04 | 3.69 |
| 25-Jun-04 | 3.65 |
| 28-Jun-04 | 3.66 |
| 29-Jun-04 | 3.72 |
| 30-Jun-04 | 3.64 |
| 1-Jul-04 | 3.43 |
| 2-Jul-04 | 3.70 |
| 6-Jul-04 | 3.72 |
| 7-Jul-04 | 3.71 |
| 8-Jul-04 | 3.59 |
| 9-Jul-04 | 3.51 |
| 12-Jul-04 | 3.44 |
| 13-Jul-04 | 3.47 |
| 14-Jul-04 | 3.40 |
| 15-Jul-04 | 3.53 |
| 16-Jul-04 | 3.49 |
| 19-Jul-04 | 3.45 |
| 20-Jul-04 | 3.58 |
| 21-Jul-04 | 3.42 |
| 22-Jul-04 | 3.43 |
| 23-Jul-04 | 3.47 |
| 26-Jul-04 | 3.39 |
| 27-Jul-04 | 3.25 |
| 28-Jul-04 | 3.28 |
| 29-Jul-04 | 3.16 |
| 30-Jul-04 | 3.15 |
| 2-Aug-04 | 3.21 |
| 3-Aug-04 | 3.11 |
| 4-Aug-04 | 3.06 |
| 5-Aug-04 | 2.99 |
| 6-Aug-04 | 2.85 |
| 9-Aug-04 | 2.95 |
| 10-Aug-04 | 2.98 |
| 11-Aug-04 | 2.91 |
| 12-Aug-04 | 2.81 |
| 13-Aug-04 | 2.74 |
| 16-Aug-04 | 2.78 |
| 17-Aug-04 | 2.86 |
| 18-Aug-04 | 2.87 |
| 19-Aug-04 | 2.77 |
| 20-Aug-04 | 2.78 |
| 23-Aug-04 | 2.71 |
| 24-Aug-04 | 2.71 |
| 25-Aug-04 | 2.88 |
| 26-Aug-04 | 2.98 |
| 27-Aug-04 | 2.91 |

Tower Automotive Ordinary (TWRAQ.PK)
Daily prices (split adjusted) from May 1, 2003 to February 2, 2005
Source: Factiva

| Date | Price |
|---|---|
| 30-Aug-04 | 2.90 |
| 31-Aug-04 | 2.98 |
| 1-Sep-04 | 2.93 |
| 2-Sep-04 | 2.97 |
| 3-Sep-04 | 2.98 |
| 7-Sep-04 | 2.94 |
| 8-Sep-04 | 2.90 |
| 9-Sep-04 | 2.82 |
| 10-Sep-04 | 2.91 |
| 13-Sep-04 | 2.95 |
| 14-Sep-04 | 2.89 |
| 15-Sep-04 | 2.88 |
| 16-Sep-04 | 2.85 |
| 17-Sep-04 | 2.82 |
| 20-Sep-04 | 2.60 |
| 21-Sep-04 | 2.69 |
| 22-Sep-04 | 2.42 |
| 23-Sep-04 | 2.34 |
| 24-Sep-04 | 2.46 |
| 27-Sep-04 | 2.25 |
| 28-Sep-04 | 2.08 |
| 29-Sep-04 | 2.10 |
| 30-Sep-04 | 2.09 |
| 1-Oct-04 | 2.10 |
| 4-Oct-04 | 2.14 |
| 5-Oct-04 | 1.99 |
| 6-Oct-04 | 1.92 |
| 7-Oct-04 | 1.80 |
| 8-Oct-04 | 1.61 |
| 11-Oct-04 | 1.64 |
| 12-Oct-04 | 1.53 |
| 13-Oct-04 | 1.44 |
| 14-Oct-04 | 1.25 |
| 15-Oct-04 | 1.20 |
| 18-Oct-04 | 1.21 |
| 19-Oct-04 | 1.26 |
| 20-Oct-04 | 1.22 |
| 21-Oct-04 | 1.22 |
| 22-Oct-04 | 1.21 |
| 25-Oct-04 | 1.22 |
| 26-Oct-04 | 1.33 |
| 27-Oct-04 | 1.33 |
| 28-Oct-04 | 1.47 |
| 29-Oct-04 | 1.49 |
| 1-Nov-04 | 1.40 |
| 2-Nov-04 | 1.55 |
| 3-Nov-04 | 1.68 |
| 4-Nov-04 | 1.90 |

Tower Automotive Ordinary (TWRAQ.PK)
Daily prices (split adjusted) from May 1, 2003 to February 2, 2005
Source: Factiva

| | |
|---|---|
| 5-Nov-04 | 2.04 |
| 8-Nov-04 | 1.91 |
| 9-Nov-04 | 1.90 |
| 10-Nov-04 | 1.96 |
| 11-Nov-04 | 2.04 |
| 12-Nov-04 | 2.26 |
| 15-Nov-04 | 2.28 |
| 16-Nov-04 | 2.32 |
| 17-Nov-04 | 2.34 |
| 18-Nov-04 | 2.40 |
| 19-Nov-04 | 2.37 |
| 22-Nov-04 | 2.22 |
| 23-Nov-04 | 2.07 |
| 24-Nov-04 | 1.95 |
| 26-Nov-04 | 1.91 |
| 29-Nov-04 | 1.96 |
| 30-Nov-04 | 1.80 |
| 1-Dec-04 | 2.15 |
| 2-Dec-04 | 2.18 |
| 3-Dec-04 | 2.12 |
| 6-Dec-04 | 2.00 |
| 7-Dec-04 | 2.00 |
| 8-Dec-04 | 1.99 |
| 9-Dec-04 | 1.98 |
| 10-Dec-04 | 2.00 |
| 13-Dec-04 | 1.99 |
| 14-Dec-04 | 1.99 |
| 15-Dec-04 | 1.94 |
| 16-Dec-04 | 1.93 |
| 17-Dec-04 | 1.89 |
| 20-Dec-04 | 1.86 |
| 21-Dec-04 | 1.78 |
| 22-Dec-04 | 1.90 |
| 23-Dec-04 | 2.06 |
| 27-Dec-04 | 2.32 |
| 28-Dec-04 | 2.40 |
| 29-Dec-04 | 2.36 |
| 30-Dec-04 | 2.37 |
| 31-Dec-04 | 2.39 |
| 3-Jan-05 | 2.37 |
| 4-Jan-05 | 2.69 |
| 5-Jan-05 | 2.47 |
| 6-Jan-05 | 2.43 |
| 7-Jan-05 | 2.40 |
| 10-Jan-05 | 2.28 |
| 11-Jan-05 | 2.17 |
| 12-Jan-05 | 2.39 |
| 13-Jan-05 | 2.24 |

Tower Automotive Ordinary (TWRAQ.PK)
Daily prices (split adjusted) from May 1, 2003 to February 2, 2005
Source: Factiva

| | |
|---|---|
| 14-Jan-05 | 2.27 |
| 18-Jan-05 | 2.39 |
| 19-Jan-05 | 2.36 |
| 20-Jan-05 | 1.72 |
| 21-Jan-05 | 0.75 |
| 24-Jan-05 | 0.94 |
| 25-Jan-05 | 1.04 |
| 26-Jan-05 | 1.16 |
| 27-Jan-05 | 0.95 |
| 28-Jan-05 | 0.93 |
| 31-Jan-05 | 0.81 |
| 1-Feb-05 | 0.77 |
| 2-Feb-05 | 0.51 |

# Exhibit J

Internet Corporation (INMT#Q)
Daily prices (split adjusted) from May 1, 2003 to September 29, 2004
Source: Factiva

| Date | Close |
|------|-------|
| 5/1/03 | 3.82 |
| 5/2/03 | 3.92 |
| 5/5/03 | 3.87 |
| 5/6/03 | 3.91 |
| 5/7/03 | 3.87 |
| 5/8/03 | 3.85 |
| 5/9/03 | 3.79 |
| 5/12/03 | 3.79 |
| 5/13/03 | 3.86 |
| 5/14/03 | 3.82 |
| 5/15/03 | 3.81 |
| 5/16/03 | 3.58 |
| 5/19/03 | 3.56 |
| 5/20/03 | 3.63 |
| 5/21/03 | 3.57 |
| 5/22/03 | 3.40 |
| 5/23/03 | 3.35 |
| 5/27/03 | 3.56 |
| 5/28/03 | 3.46 |
| 5/29/03 | 3.70 |
| 5/30/03 | 3.65 |
| 6/2/03 | 3.74 |
| 6/3/03 | 3.65 |
| 6/4/03 | 3.80 |
| 6/5/03 | 3.85 |
| 6/6/03 | 3.66 |
| 6/9/03 | 3.51 |
| 6/10/03 | 3.54 |
| 6/11/03 | 3.70 |
| 6/12/03 | 3.56 |
| 6/13/03 | 3.61 |
| 6/16/03 | 3.54 |
| 6/17/03 | 3.51 |
| 6/18/03 | 3.44 |
| 6/19/03 | 3.43 |
| 6/20/03 | 3.35 |
| 6/23/03 | 3.20 |
| 6/24/03 | 3.28 |
| 6/25/03 | 3.19 |
| 6/26/03 | 3.17 |
| 6/27/03 | 3.32 |
| 6/30/03 | 3.45 |
| 7/1/03 | 3.43 |
| 7/2/03 | 3.40 |
| 7/3/03 | 3.50 |
| 7/7/03 | 3.45 |
| 7/8/03 | 3.68 |

Internet Corporation (INMT#Q)
Daily prices (split adjusted) from May 1, 2003 to September 29, 2004
Source: Factiva

| Date | Close |
|------|-------|
| 7/9/03 | 3.52 |
| 7/10/03 | 3.68 |
| 7/11/03 | 3.75 |
| 7/14/03 | 3.79 |
| 7/15/03 | 3.79 |
| 7/16/03 | 3.77 |
| 7/17/03 | 3.90 |
| 7/18/03 | 3.95 |
| 7/21/03 | 3.84 |
| 7/22/03 | 3.84 |
| 7/23/03 | 3.78 |
| 7/24/03 | 3.59 |
| 7/25/03 | 3.51 |
| 7/28/03 | 3.59 |
| 7/29/03 | 3.69 |
| 7/30/03 | 3.63 |
| 7/31/03 | 3.69 |
| 8/1/03 | 3.46 |
| 8/4/03 | 3.60 |
| 8/5/03 | 3.79 |
| 8/6/03 | 3.63 |
| 8/7/03 | 3.90 |
| 8/8/03 | 3.85 |
| 8/11/03 | 3.70 |
| 8/12/03 | 3.78 |
| 8/13/03 | 3.80 |
| 8/14/03 | 3.66 |
| 8/15/03 | 3.70 |
| 8/18/03 | 3.75 |
| 8/19/03 | 3.90 |
| 8/20/03 | 3.70 |
| 8/21/03 | 3.75 |
| 8/22/03 | 3.65 |
| 8/25/03 | 3.68 |
| 8/26/03 | 3.85 |
| 8/27/03 | 3.81 |
| 8/28/03 | 3.84 |
| 8/29/03 | 3.79 |
| 9/2/03 | 3.95 |
| 9/3/03 | 4.08 |
| 9/4/03 | 4.30 |
| 9/5/03 | 4.32 |
| 9/8/03 | 4.30 |
| 9/9/03 | 4.64 |
| 9/10/03 | 4.29 |
| 9/11/03 | 4.53 |
| 9/12/03 | 4.47 |

Intermet Corporation (INMT#Q)
Daily prices (split adjusted) from May 1, 2003 to September 29, 2004
Source: Factiva

| Date | Close |
|------|-------|
| 9/15/03 | 4.67 |
| 9/16/03 | 4.66 |
| 9/17/03 | 4.57 |
| 9/18/03 | 4.62 |
| 9/19/03 | 4.52 |
| 9/22/03 | 4.41 |
| 9/23/03 | 4.40 |
| 9/24/03 | 4.37 |
| 9/25/03 | 4.15 |
| 9/26/03 | 4.14 |
| 9/29/03 | 4.19 |
| 9/30/03 | 4.30 |
| 10/1/03 | 4.31 |
| 10/2/03 | 4.30 |
| 10/3/03 | 4.26 |
| 10/6/03 | 4.25 |
| 10/7/03 | 4.27 |
| 10/8/03 | 4.47 |
| 10/9/03 | 4.50 |
| 10/10/03 | 4.50 |
| 10/13/03 | 4.39 |
| 10/14/03 | 4.88 |
| 10/15/03 | 5.23 |
| 10/16/03 | 4.55 |
| 10/17/03 | 4.60 |
| 10/20/03 | 4.30 |
| 10/21/03 | 4.43 |
| 10/22/03 | 4.35 |
| 10/23/03 | 4.27 |
| 10/24/03 | 4.31 |
| 10/27/03 | 4.16 |
| 10/28/03 | 4.30 |
| 10/29/03 | 4.21 |
| 10/30/03 | 4.18 |
| 10/31/03 | 4.40 |
| 11/3/03 | 4.85 |
| 11/4/03 | 4.86 |
| 11/5/03 | 4.96 |
| 11/6/03 | 4.85 |
| 11/7/03 | 4.86 |
| 11/10/03 | 4.87 |
| 11/11/03 | 4.93 |
| 11/12/03 | 4.99 |
| 11/13/03 | 4.81 |
| 11/14/03 | 4.68 |
| 11/17/03 | 4.72 |
| 11/18/03 | 4.73 |

Intermet Corporation (INMT#Q)
Daily prices (split adjusted) from May 1, 2003 to September 29, 2004
Source: Factiva

| Date | Close |
|------|-------|
| 11/19/03 | 4.80 |
| 11/20/03 | 4.79 |
| 11/21/03 | 4.79 |
| 11/24/03 | 4.80 |
| 11/25/03 | 4.86 |
| 11/26/03 | 4.88 |
| 11/28/03 | 4.87 |
| 12/1/03 | 5.00 |
| 12/2/03 | 4.90 |
| 12/3/03 | 5.07 |
| 12/4/03 | 4.97 |
| 12/5/03 | 5.00 |
| 12/8/03 | 5.04 |
| 12/9/03 | 5.14 |
| 12/10/03 | 4.97 |
| 12/11/03 | 5.00 |
| 12/12/03 | 5.41 |
| 12/15/03 | 4.80 |
| 12/16/03 | 4.85 |
| 12/17/03 | 5.07 |
| 12/18/03 | 4.99 |
| 12/19/03 | 5.00 |
| 12/22/03 | 5.20 |
| 12/23/03 | 5.21 |
| 12/24/03 | 5.15 |
| 12/26/03 | 5.22 |
| 12/29/03 | 5.41 |
| 12/30/03 | 5.42 |
| 12/31/03 | 5.44 |
| 1/2/04 | 5.38 |
| 1/5/04 | 5.41 |
| 1/6/04 | 5.40 |
| 1/7/04 | 5.60 |
| 1/8/04 | 5.66 |
| 1/9/04 | 5.62 |
| 1/12/04 | 5.64 |
| 1/13/04 | 5.47 |
| 1/14/04 | 5.63 |
| 1/15/04 | 5.65 |
| 1/16/04 | 5.46 |
| 1/20/04 | 5.50 |
| 1/21/04 | 5.38 |
| 1/22/04 | 5.36 |
| 1/23/04 | 5.50 |
| 1/26/04 | 5.40 |
| 1/27/04 | 5.51 |
| 1/28/04 | 5.45 |

4

Intermet Corporation (INMT#Q)
Daily prices (split adjusted) from May 1, 2003 to September 29, 2004
Source: Factiva

| Date | Close |
|------|-------|
| 1/29/04 | 5.40 |
| 1/30/04 | 5.41 |
| 2/2/04 | 5.49 |
| 2/3/04 | 5.13 |
| 2/4/04 | 5.09 |
| 2/5/04 | 4.95 |
| 2/6/04 | 5.06 |
| 2/9/04 | 5.05 |
| 2/10/04 | 5.20 |
| 2/11/04 | 5.10 |
| 2/12/04 | 5.08 |
| 2/13/04 | 4.76 |
| 2/17/04 | 4.89 |
| 2/18/04 | 4.93 |
| 2/19/04 | 4.90 |
| 2/20/04 | 5.03 |
| 2/23/04 | 4.82 |
| 2/24/04 | 4.86 |
| 2/25/04 | 4.69 |
| 2/26/04 | 4.70 |
| 2/27/04 | 4.76 |
| 3/1/04 | 4.86 |
| 3/2/04 | 5.01 |
| 3/3/04 | 5.02 |
| 3/4/04 | 5.05 |
| 3/5/04 | 4.93 |
| 3/8/04 | 5.01 |
| 3/9/04 | 4.76 |
| 3/10/04 | 4.89 |
| 3/11/04 | 4.80 |
| 3/12/04 | 4.67 |
| 3/15/04 | 4.24 |
| 3/16/04 | 4.25 |
| 3/17/04 | 4.61 |
| 3/18/04 | 4.46 |
| 3/19/04 | 4.38 |
| 3/22/04 | 4.29 |
| 3/23/04 | 4.25 |
| 3/24/04 | 4.05 |
| 3/25/04 | 4.16 |
| 3/26/04 | 4.30 |
| 3/29/04 | 4.28 |
| 3/30/04 | 4.42 |
| 3/31/04 | 4.43 |
| 4/1/04 | 4.50 |
| 4/2/04 | 4.58 |
| 4/5/04 | 4.66 |

5

Internet Corporation (INMT#Q)
Daily prices (split adjusted) from May 1, 2003 to September 29, 2004
Source: Factiva

| Date | Close |
|------|-------|
| 4/6/04 | 4.70 |
| 4/7/04 | 4.60 |
| 4/8/04 | 4.71 |
| 4/12/04 | 4.73 |
| 4/13/04 | 4.68 |
| 4/14/04 | 4.50 |
| 4/15/04 | 4.25 |
| 4/16/04 | 4.30 |
| 4/19/04 | 4.08 |
| 4/20/04 | 4.08 |
| 4/21/04 | 4.18 |
| 4/22/04 | 4.33 |
| 4/23/04 | 4.49 |
| 4/26/04 | 4.30 |
| 4/27/04 | 4.28 |
| 4/28/04 | 4.19 |
| 4/29/04 | 4.11 |
| 4/30/04 | 4.05 |
| 5/3/04 | 4.05 |
| 5/4/04 | 4.19 |
| 5/5/04 | 4.06 |
| 5/6/04 | 4.15 |
| 5/7/04 | 4.04 |
| 5/10/04 | 4.25 |
| 5/11/04 | 4.14 |
| 5/12/04 | 4.15 |
| 5/13/04 | 4.07 |
| 5/14/04 | 4.10 |
| 5/17/04 | 4.08 |
| 5/18/04 | 4.20 |
| 5/19/04 | 4.18 |
| 5/20/04 | 4.18 |
| 5/21/04 | 4.19 |
| 5/24/04 | 4.32 |
| 5/25/04 | 4.24 |
| 5/26/04 | 4.24 |
| 5/27/04 | 4.18 |
| 5/28/04 | 4.11 |
| 6/1/04 | 4.02 |
| 6/2/04 | 4.14 |
| 6/3/04 | 3.93 |
| 6/4/04 | 3.87 |
| 6/7/04 | 4.00 |
| 6/8/04 | 4.18 |
| 6/9/04 | 3.90 |
| 6/10/04 | 3.93 |
| 6/14/04 | 3.87 |

Internmet Corporation (INMT#Q)
Daily prices (split adjusted) from May 1, 2003 to September 29, 2004
Source: Factiva

| Date | Close |
|------|-------|
| 6/15/04 | 3.87 |
| 6/16/04 | 3.93 |
| 6/17/04 | 4.05 |
| 6/18/04 | 4.02 |
| 6/21/04 | 4.05 |
| 6/22/04 | 3.95 |
| 6/23/04 | 3.88 |
| 6/24/04 | 3.87 |
| 6/25/04 | 3.86 |
| 6/28/04 | 3.82 |
| 6/29/04 | 3.89 |
| 6/30/04 | 4.24 |
| 7/1/04 | 4.15 |
| 7/2/04 | 4.21 |
| 7/6/04 | 4.05 |
| 7/7/04 | 4.01 |
| 7/8/04 | 4.08 |
| 7/9/04 | 3.96 |
| 7/12/04 | 3.91 |
| 7/13/04 | 3.89 |
| 7/14/04 | 3.80 |
| 7/15/04 | 3.78 |
| 7/16/04 | 3.48 |
| 7/19/04 | 3.55 |
| 7/20/04 | 3.69 |
| 7/21/04 | 3.50 |
| 7/22/04 | 3.40 |
| 7/23/04 | 3.40 |
| 7/26/04 | 3.40 |
| 7/27/04 | 3.41 |
| 7/28/04 | 3.68 |
| 7/29/04 | 3.46 |
| 7/30/04 | 3.72 |
| 8/2/04 | 3.54 |
| 8/3/04 | 3.54 |
| 8/4/04 | 3.70 |
| 8/5/04 | 3.48 |
| 8/6/04 | 3.50 |
| 8/9/04 | 3.35 |
| 8/10/04 | 3.51 |
| 8/11/04 | 3.58 |
| 8/12/04 | 3.35 |
| 8/13/04 | 3.36 |
| 8/16/04 | 3.50 |
| 8/17/04 | 3.47 |
| 8/18/04 | 3.47 |
| 8/19/04 | 3.37 |

Internet Corporation (INMT#Q)
Daily prices (split adjusted) from May 1, 2003 to September 29, 2004
Source: Factiva

| Date | Close |
|------|-------|
| 8/20/04 | 3.43 |
| 8/23/04 | 3.50 |
| 8/24/04 | 3.30 |
| 8/25/04 | 3.25 |
| 8/26/04 | 3.39 |
| 8/27/04 | 3.29 |
| 8/30/04 | 3.29 |
| 8/31/04 | 3.20 |
| 9/1/04 | 3.03 |
| 9/2/04 | 2.99 |
| 9/3/04 | 2.87 |
| 9/7/04 | 2.72 |
| 9/8/04 | 2.78 |
| 9/9/04 | 2.72 |
| 9/10/04 | 2.55 |
| 9/13/04 | 2.36 |
| 9/14/04 | 2.36 |
| 9/15/04 | 2.29 |
| 9/16/04 | 2.06 |
| 9/17/04 | 2.16 |
| 9/20/04 | 0.76 |
| 9/21/04 | 0.76 |
| 9/22/04 | 0.56 |
| 9/23/04 | 0.47 |
| 9/24/04 | 0.36 |
| 9/27/04 | 0.39 |
| 9/28/04 | 0.35 |
| 9/29/04 | 0.54 |

# Exhibit K

# COLLINS & AIKMAN CORP

250 STEPHENSON HWY
TROY, MI 48083
248. 824.2500

# EX–3.(I)

**EXHIBIT 3.1**
**10–Q Filed on 08/10/1999 – Period: 06/26/1999**
File Number 001–10218



EXHIBIT 3.1

RESTATED CERTIFICATE OF INCORPORATION

of

COLLINS & AIKMAN CORPORATION

Under Section 245 of the General Corporation Law
of the State of Delaware

This Restated Certificate of Incorporation of Collins & Aikman Corporation (originally incorporated under the name WCI Holdings Corporation) amends and restates such corporation's Certificate of Incorporation, as amended, which was originally filed with the Secretary of State of the State of Delaware on September 21, 1988, and was duly adopted in the manner and by the vote prescribed by Section 242, in accordance with the provisions of Section 245 and Section 228 of the General Corporation Law of the State of Delaware.

FIRST: The name of the Corporation is Collins & Aikman Corporation (the "Corporation").

SECOND: The address of the registered office of the Corporation in the State of Delaware is 32 Loockerman Square, Suite L-100, in the City of Dover, County of Kent. The name of the registered agent at such registered office is The Prentice-Hall Corporation System, Inc.

THIRD: The purpose of the Corporation is to engage in any lawful act or activity for which corporations may be organized under the General Corporation Law of the State of Delaware.

FOURTH: The total number of shares of stock which the Corporation shall have authority to issue is 166,000,000, consisting of:

(a) 150,000,000 shares of Common Stock, par value $0.01 per share, which shall be designated "Common Stock". Each share of Common Stock shall be entitled to one vote per share; and

(b) 16,000,000 shares of Preferred Stock, par value $0.01 per share ("Preferred Stock"). The Board of Directors of the Corporation is hereby expressly authorized to provide for the issuance of shares of Preferred Stock in one or more series, by resolution or resolutions and by

filing a certificate pursuant to the applicable laws of the State of Delaware (any such certificate a "Preferred Stock Designation"), to establish from time to time the number of shares to be included in each such series, and to fix the designation, powers, preferences and rights of the shares of each series and the qualifications, limitations or restrictions thereof. Before any shares of any such series are issued, the Board of Directors shall fix, and hereby is expressly empowered to fix, the provisions of the shares thereof including, but not limited to, the following:

(1) the distinctive designation of such series, the number of shares to constitute such series and the stated value thereof if different from the par value thereof;

(2) whether the shares of such series shall have voting rights, in addition to any voting rights provided by law, and, if so, the terms of such voting rights, which may be general or limited;

(3) the dividends, if any, payable on such series, whether any such dividends shall be cumulative, and, if so, from what dates, the conditions and dates upon which such dividends shall be payable, the preference or relation which such dividends shall bear to the dividends payable on any shares of stock of any other class or any other series of this class;

(4) whether the shares of such series shall be subject to redemption by the Corporation and, if so, the times, prices and other conditions of such redemption;

(5) the amount or amounts payable upon shares of such series upon, and the rights of the holders of such series in, the voluntary or involuntary liquidation, dissolution or winding-up, or upon any distribution of the assets, of the Corporation;

(6) whether the shares of such series shall be subject to the operation of a retirement or sinking fund and, if so, the extent to and manner in which any such retirement or sinking fund shall be applied to the purchase or redemption of the shares of such series for retirement or other corporate purposes and the terms and provisions relative to the operation thereof;

3

      (7) whether the shares of such series shall be convertible into, or exchangeable for, shares of stock of any other class or any other series of this class or any other securities and, if so, the price or prices or the rate or rates of conversion or exchange and the method, if any, of adjusting the same, and any other terms and conditions of conversion or exchange;

      (8) the limitations and restrictions, if any, to be effective while any shares of such series are outstanding upon the payment of dividends or the making of other distributions on, and upon the purchase, redemption or other acquisition by the Corporation of, the Common Stock or shares of stock of any other class or any other series of this class;

      (9) the conditions or restrictions, if any, upon the creation of indebtedness of the Corporation or upon the issue of any additional stock, including additional shares of such series or of any other series of this class or of any other class; and

      (10) any other powers, preferences and relative, participating, optional and other special rights, and any qualifications, limitations and restrictions thereof.

The powers, preferences and relative, participating, optional and other special rights of each series of Preferred Stock, and the qualifications, limitations or restrictions thereof, if any, may differ from those of any nd all other series at any time outstanding. All shares of any one series of Preferred Stock shall be identical in all respects with all other shares of such series, except that shares of any one series issued at different times may differ as to the dates from which dividends thereon shall be cumulative.

* * * *

Rights, Preferences, Privileges and Restrictions
of 15-1/2% Cumulative Exchangeable Redeemable
Preferred Stock

RESOLVED that, pursuant to authority conferred upon the Board of Directors by the Certificate of Incorporation of the Company, as amended (hereinafter called the "Certificate of Incorporation"), the Board

4

of Directors hereby provides for the issuance of a series of Preferred Stock (as such term is defined in the Certificate of Incorporation) of the Company to consist of 16,000,000 shares, and fixes the powers, designation, preferences and relative, participating, optional or other rights, and the qualifications, limitations or restrictions of the shares of such series of Preferred Stock, in addition to those set forth in the Certificate of Incorporation, as follows:

1. Designation. There is hereby designated series of Preferred Stock known as the 15 1/2% Cumulative Exchangeable Redeemable Preferred Stock, par value $0.01 per share (the "Merger Preferred Stock"), consisting of 16,000,000 shares, issuable by the Company pursuant to authority granted to the Board of Directors in Article FOURTH of the Certificate of Incorporation, which authorizes the issuance of Preferred Stock having such rights and other terms as may be determined by the Board of Directors.

2. Rank. The Merger Preferred Stock shall, with respect to dividend rights and rights on liquidation, winding-up and dissolution of the Company, rank senior to the Company's Common Stock, and to all other classes and series of stock of the Company now or hereafter authorized, issued or outstanding, other than any stock of the Company ranking senior to or pari passu with the Merger Preferred Stock as to dividend rights or rights upon liquidation, winding-up or dissolution of the Company either authorized after the date hereof in compliance with paragraph 10(c)(i) or issued after the date hereof in compliance with paragraph (10)(c)(i) (the Common Stock and such other classes and series of stock collectively referred to herein as the "Junior Securities"). The Merger Preferred Stock shall be subject to the creation of such senior stock, such pari passu stock and Junior Securities to the extent not expressly prohibited by this Certificate.

3. Dividends. (a) The holders of shares of the Merger Preferred Stock shall be entitled to receive, when, as and if declared by the Board of Directors of the Company and out of the assets of the Company available for the payment of dividends

5

under the provisions of the General Corporation Law of the State of Delaware, dividends payable at the rate of $3.875 per share per annum (subject to increase as provided below). Such dividends shall be payable quarterly on the first day of February, May, August, and November in each year (each of such dates a "Dividend Payment Date") commencing with the later of (i) August 1, 1989 and (ii) the first such date after the time the merger of WCI Acquisition Corporation, a Delaware corporation, into Wickes Companies, Inc., a Delaware corporation ("Wickes"), shall become effectiv (the "Merger Effective Time"); except that if such first day is not a business day then such dividends shall be payable on the next succeeding business day. (As used herein, the term "business day" shall mean any day except a Saturday, a Sunday or a day on which banking institutions are authorized or required by law to close in the City of New York.) Dividends on each share of Merger Preferred Stock shall begin to accrue and be cumulative on outstanding shares of the Merger Preferred Stock (whether or not in any quarterly period there shall be assets of the Company legally available for the payment of such dividends) from and including the date of initial issuance of such share. The amount of any dividends "accrued" on any share of Merger Preferred Stock at any Dividend Payment Date shall be deemed to be the amount of any unpaid dividends accumulated thereon to and excluding such Dividend Payment Date, whether or not earned or declared, and the amount of dividends "accrued" on any share of Merger Preferred Stock at any date other than a Dividend Payment Date shall be calculated as the amount of any unpaid dividends accumulated to and excluding the last preceding Dividend Payment Date, whether or not earned or declared, plus an amount calculated on the basis of the annual dividend rate for the period from and including such last preceding Dividend Payment Date to and excluding the date as of which the calculation is made.

All dividends on the Merger Preferred Stock shall be computed on the basis of the number of days elapsed in a 360-day year consisting of 12 months of 30 days each. Such dividends shall

6

be paid to the holders of record of shares of the Merger Preferred Stock as they appear on the stock register of the Company on such date as shall be fixed by the Board of Directors of the Company; provided, however, that such date shall not be less than 10 days nor more than 60 days prior to the date of payment.

Dividend arrearage for any past dividend periods may be declared and paid at any time to holders of record on such date as may be fixed by the Board of Directors of the Company; provided, however, that such date shall not be less than 10 days nor more than 60 days prior to the date of payment.

(b) All dividends on the Merger Preferred Stock shall be payable in cash, except that dividend payments with respect to quarterly dividends accruing on or prior to February 1, 1995 (whenever such dividends are actually paid), may be paid in whole or in part in additional shares of the Merger Preferred Stock if the Board of Directors of the Company so directs. All such dividends paid in additional shares of Merger Preferred Stock shall be paid at a rate of 0.04 shares of Merger Preferred Stock for each $1 of such dividends not paid in cash. The issuance of Merger Preferred Stock at the prescribed rate shall constitute full payment of the portion of such dividends payable in kind. Except as described below with respect to fractional shares of Merger Preferred Stock, all dividends paid with respect to shares of the Merger Preferred Stock, whether and to the extent in cash or in kind, shall be paid pro rata to the holders entitled thereto. No interest or sum of money in lieu of interest or additional shares of Merger Preferred Stock shall be payable in respect of any accumulated unpaid dividends on the Merger Preferred Stock (whether such unpaid dividends are subsequently paid in kind or in cash).

(c) Only whole shares of Merger Preferred Stock will be issued upon the payment of dividends in kind on the Merger Preferred Stock. In lieu of the fractional portion of the aggregate number of shares of Merger Preferred Stock otherwise payable

7

to a record holder of Merger Preferred Stock at any time as dividends in kind ("Fractional Shares"), such record holder will receive a payment in cash equal to such record holder's proportionate interest in the net proceeds from the sale or sales in the open market of the aggregate of all Fractional Shares otherwise payable as a dividend. Such sale or sales shall be effected promptly after the record date fixed for determining the holders entitled to payment of the dividend.

(d) (i) Holders of shares of the Merger Preferred Stock shall be entitled to receive the dividends provided for in paragraph 3(a) in preference to and in priority over any dividends upon any of the Junior Securities.

(ii) The Company shall not (x) declare, pay or set apart funds for payment of any cash dividends on shares of Common Stock or any other shares of Junior Securities, (y) purchase, redeem or otherwise retire any Junior Securities or warrants, rights or options exercisable for shares of Junior Securities (and shall not set apart funds for such payment with respect thereto), or (z) make any distributions with respect to Junior Securities or any warrants, rights or options exercisable for any Junior Securities (except dividends or distributions on shares of Junior Securities in shares of any Junior Securities), unless (I) full cumulative dividends on the Merger Preferred Stock shall have been paid prior to, or shall be paid concurrently with, the time of such declaration, payment, setting apart, purchase, redemption, retirement or distribution for each Dividend Payment Date on or prior to such time and (II) any redemption required to have been made on or prior to such time pursuant to paragraph 4(b) and, if such time is on or after the 10th anniversary of the Merger Effective Time, the redemption of Merger Preferred Stock set forth in paragraph 4(a) shall have been made prior to, or shall be made concurrently with, such time (it being

8

understood that the failure of the Company to effect such a redemption as a result of the absence of assets legally available therefor shall not constitute compliance with this clause (II)).

(iii) Notwithstanding anything contained in this Certificate to the contrary, no dividends on shares of the Merger Preferred Stock shall be declared by the Board of Directors of the Company or paid or set apart for payment by the Company at such time as the terms and provisions of any contract or other agreement of the Company or any of its subsidiaries entered into or assumed at or prior to the Merger Effective Time, or any refinancings (including multiple refinancings) of such contracts or agreements, prohibit such declaration, payment or setting apart for payment or provide that such declaration, payment or setting apart for payment would constitute a breach thereof or a default thereunder; provided, however, that nothing contained in this Certificate shall in any way or under any circumstances be construed or deemed to require the Board of Directors of the Company to declare or the Company to set apart for payment any dividends on shares of the Merger Preferred Stock, whether or not permitted by any of such agreements. The failure of the Board of Directors of the Company to declare a dividend in reliance upon the immediately preceding sentence shall not be construed or deemed to prevent the accrual of such undeclared dividend.

(e) Subject to the foregoing provisions of this paragraph 3 and to the provisions of paragraph 9, the Board of Directors may declare, and the Company may pay, make or set apart for payment, dividends and other distributions on, and the Company may purchase, redeem or otherwise retire, any Junior Securities or any warrants, rights or options exercisable for shares of Junior Securities, and the holders of shares of Merger Preferred Stock shall not be entitled to share therein.

9

(f) If, at any time on or after the second anniversary of the Merger Effective Time, the Affiliated Common Equity Interest shall be less than $75,000,000, from and after such time the dividend rate for all outstanding Merger Preferred Stock shall be increased to $3.9375 per share per annum. "Affiliated Common Equity Interest" means from time to time the amount of the aggregate of all equity contributions to WCI Holdings II Corporation, a Delaware corporation ("Parent"), on or before such time by Blackstone Capital Partners L.P., a Delaware limited partnership, or any successor thereto ("Blackstone Partners"), Wasserstein, Perella Partners, L.P., a Delaware limited partnership, or any successor thereto ("WP Partners"), and all owners of a limited partnership interest in, or employees of Blackstone Partners or WP Partners who had co-investment rights or a similar opportunity to invest in investments made by Blackstone Partners or WP Partners at the time of their equity contribution to Parent (Blackstone Partners, WP Partners and all such persons who on or before such time shall have made such equity contributions, or any successor thereto, collectively, the "Affiliated Investors") minus any amounts received by Affiliated Investors as dividends on, redemptions of or sales of equity interests in Parent (other than sales by an Affiliated Investor to another Affiliated Investor), it being understood that payments to an Affiliated Investor of amounts characterized for this purpose by Parent (in its sole discretion and notwithstanding the characterization of such payments for any other purpose) as fees or expenses shall not constitute dividends. As used in this Certificate, a "Person" shall include any individual, corporation, partnership, joint venture, association, joint-stock company, trust, unincorporated organization or government or political subdivision thereof. The Company will by first-class mail send to each record holder a written notice of any such change in the dividend rate on the Merger Preferred Stock within 15 days of such change.

4. Scheduled Redemption. (a) Subject to the Company having funds legally available

10

therefor, the Company shall be obligated to redeem all outstanding shares of Merger Preferred Stock on the 10th anniversary of the Merger Effective Time. Such redemption of shares of Merger Preferred Stock pursuant to this paragraph 4(a) shall be at a redemption price equal to the Liquidation Preference (as defined below) per share together with accrued but unpaid dividends (whether or not declared) through the date fixed for redemption.

(b) To the extent the Company shall have funds legally available therefor, if at any time prior to the second anniversary of the Merger Effective Time, the Affiliate Common Equity Interest is less than $75,000,000, the Company will be obligated within 45 days (or the next following business day if the 45th following day is not a business day) to set apart out of funds legally available therefor, funds sufficient to redeem all shares of Merger Preferred Stock then outstanding. Such a redemption shall be at the Optional Redemption Price (as defined below) plus all accrued and unpaid dividends (whether or not declared) to the date fixed for redemption.

(c) If the funds of the Company legally available for any redemption pursuant to this paragraph 4 at the redemption date are insufficient to redeem such Merger Preferred Stock, funds to the extent legally available for the purpose will be used to redeem the number of shares of Merger Preferred Stock that legally may be redeemed. If the Company at any time shall fail to discharge any obligation to redeem shares of Merger Preferred Stock pursuant to this paragraph 4, such obligation shall be discharged as soon as the Company is able to do so.

5. Optional Redemption. All or any part of the Merger Preferred Stock may be redeemed by the Company at its election at any time and from time to time in whole or in part, by resolution of the Board of Directors, at a cash price per share equal to the sum of (i) the Optional Redemption Price plus (ii) any accrued and unpaid dividends thereon, whether or not declared, to the date fixed for the redemption; provided, however, that,

if and when any quarterly dividend shall have accrued on the Merger Preferred Stock and shall not have been paid or declared and a sufficient sum set apart for payment for any Dividend Payment Date on or prior to the date fixed for redemption, the Company may not redeem any shares of the Merger Preferred Stock unless all shares of the Merger Preferred Stock then outstanding are redeemed. The Optional Redemption Price shall equal for redemptions with a date fixed for redemption (a) that is on or prior to the first anniversary of the Merger Effective Time, 101% of the Liquidation Preference per share, (b) after the first anniversary of the Merger Effective Time to and including the second anniversary of the Merger Effective Time, 101.5% of the Liquidation Preference per share, and (c) thereafter, 102% of the Liquidation Preference per share.

    6. Selection of the Merger Preferred Stock To Be Redeemed. If fewer than all the outstanding shares of the Merger Preferred Stock not previously called for redemption or exchange are to be redeemed pursuant to paragraph 5, the Board of Directors of the Company shall select the shares of the Merger Preferred Stock to be redeemed from outstanding shares not previously called for redemption by lot or pro rata as determined by the Board of Directors of the Company, in its sole discretion; provided, however, that the Board of Directors of the Company may in selecting shares for redemption choose to redeem all shares of Merger Preferred Stock held by holders of a number of such shares not to exceed 99 as may be specified by the Board of Directors (with all other shares to be redeemed, if any, so selected by lot or pro rata).

    7. Notice of Redemption. At least 30 days but not more than 60 days prior to the date fixed for any redemption of shares of the Merger Preferred Stock, written notice of such redemption shall be mailed to each holder of record of shares of Merger Preferred Stock to be redeemed at the address shown on the stock transfer books of the Company or, if no such address appears or is given, at the place where the principal executive office of the Company is located; provided,

12

however, that no failure to give such notice or any defect therein or in the mailing thereof shall affect the validity of the proceedings for such redemption. Each such notice shall specify (i) the number of shares to be redeemed from such holder, (ii) the numbers of the certificates of the shares being redeemed, (iii) the date fixed for redemption, (iv) the redemption price, (v) the place or places at which payment may be obtained, (vi) the provision of this Certificate pursuant to which the shares are to be redeemed and (vii) that dividends on the shares to be redeemed shall cease to accrue on the date fixed for such redemption.

8. Status of Shares of Merger Preferred Stock upon Redemption. (a) Upon due surrender of the certificates for any shares of Merger Preferred Stock to be redeemed, such shares of Merger Preferred Stock shall be redeemed by the Company at the applicable redemption price. In case fewer than all the shares of Merger Preferred Stock represented by any such certificate are redeemed, a new certificate or certificates shall be issued representing the unredeemed shares of Merger Preferred Stock without cost to the holder thereof. Unless there shall have been a default in payment of the redemption price, from and after any date fixed for redemption, dividends on the shares of Merger Preferred Stock so called for redemption shall cease to accrue, such shares of Merger Preferred Stock shall no longer be deemed to be outstanding and shall not have the status of shares of Merger Preferred Stock and all rights of the holders thereof as stockholders of the Company (except the right to receive from the Company the redemption price without interest) shall cease with respect to such shares. From and after any date fixed for redemption, shares of the Merger Preferred Stock redeemed by the Company shall be restored to the status of authorized but unissued shares of Preferred Stock, without designation as to series until such shares are once more designated as part of a particular series by the Board of Directors of the Company.

(b) If at any time the Company shall have irrevocably deposited in trust with a trustee for the benefit of the holders of all shares of Merger

Preferred Stock money or direct noncallable obligations of the United States maturing as to principal and interest in such amounts and at such times as are sufficient to pay all future dividends on all shares of Merger Preferred Stock at the scheduled Dividend Payment Dates through the 10th anniversary of the Merger Effective Time (or any earlier date duly fixed for an optional redemption thereof), and the redemption price thereof, then, from and after the date on which such provision has been made, such Merger Preferred Stock shall no longer be deemed to be outstanding except for purposes of accruals of quarterly dividends and shall not have the status of shares of Merger Preferred Stock, and all rights of the holders thereof as stockholders of the Company (except the right to receive from the Company quarterly dividends and the applicable redemption price without interest) shall cease with respect to such shares. Without limiting the foregoing, any shares deemed not to be outstanding pursuant to this paragraph 8(b) shall not be subject to the provisions of paragraphs 3(f) and 4(b).

(c) All moneys so deposited with or held by such trustee which remain unclaimed by the holders of shares of Merger Preferred Stock 730 days after the date such moneys are payable to holders of shares of such Merger Preferred Stock shall be paid by such trustee to the Company, and thereafter the holders of such shares of Merger Preferred Stock shall look only to the Company for payment.

9. Liquidation, Dissolution or Winding-Up. In the event of any voluntary or involuntary liquidation, dissolution or winding-up of the Company, holders of the Merger Preferred Stock shall be entitled to be paid out of the assets of the Company available for distribution to its stockholders, whether from capital, surplus or earnings, an amount in cash equal to $25.00 per share (the "Liquidation Preference") plus any accrued and unpaid dividends to the date fixed for liquidation, dissolution or winding-up, whether or not declared, before any distribution is made on any Junior Securities, including the Common Stock.

14

If upon any voluntary or involuntary liquidation, dissolution or winding-up of the Company, the assets of the Company available for distribution to holders of the Merger Preferred Stock shall be insufficient to pay the holders of outstanding Merger Preferred Stock the full amounts to which they shall be entitled under this paragraph 9, the holders of the Merger Preferred Stock shall share equally and ratably in any distribution of assets of the Company in proportion to the full amount to which they would otherwise be respectively entitled. After payment of the full amount of Liquidation Preference to which they are entitled plus all accrued and unpaid dividends, whether or not declared, the holders of the Merger Preferred Stock shall not be entitled to any further participation in any distribution of assets of the Company. However, neither the voluntary sale, conveyance, exchange or transfer (for cash, shares of stock, securities or other consideration) of all or any part of the property or assets of the Company, nor the consolidation or merger or other business combination of the Company with or into any other corporation or corporations, shall be deemed to be a voluntary or involuntary liquidation, dissolution or winding-up of the Company, unless such voluntary sale, conveyance, exchange or transfer shall be in connection with a plan of liquidation, dissolution or winding-up of the Company.

10. Voting Rights. (a) The holders of shares of Merger Preferred Stock shall not be entitled to any voting rights except as expressly provided in this paragraph 10 or as otherwise provided by law.

(b) (i) If at any time or times dividends payable on the then outstanding Merger Preferred Stock shall be in arrears and unpaid in an aggregate amount equal to the amount of five consecutive quarterly dividends on the then outstanding Merger Preferred Stock, the then number of directors constituting the Board of Directors of the Company, without further action, shall be increased by two and the holders of Merger Preferred Stock shall have the exclusive right, voting separately as a class, to elect the

15

directors of the Company to fill such newly created directorships, the remaining directors to be elected by the other class or classes of stock entitled to vote therefor, at each meeting of stockholders held for the purpose of electing directors.

(ii) Whenever such voting right shall have vested, such right may be initially exercised at a special meeting of the holders of Merger Preferred Stock called as hereinafter provided, at any annual meeting of stockholders held for the purpose of electing directors or by the written consent of the holders of Merger Preferred Stock pursuant to Section 228 of the General Corporation Law of the State of Delaware. Such voting right shall continue until such time as all cumulative dividends on Merger Preferred Stock accrued through the latest Dividend Payment Date on or before such time shall have been paid in full, at which time such voting right of the holders of Merger Preferred Stock shall terminate, but such voting right shall again vest in the event of each and every subsequent arrearage in dividends in the requisite amount as described above.

(iii) At any time when such voting right shall have vested in the holders of Merger Preferred Stock and if such right shall not already have been initially exercised, a proper officer of the Company shall, upon the written request of any holder of record of Merger Preferred Stock then outstanding, call a special meeting of holders of Merger Preferred Stock; provided, however, no such special meeting shall be called during a period within 90 days immediately preceding the date fixed for the next annual meeting of stockholders. Such meeting shall be held at the earliest practicable date upon the notice required for annual meetings of stockholders. Any holder of Merger Preferred Stock which would be entitled to vote at such meeting shall have access to the stock books of the Company for the purpose of causing a meeting

16

of stockholders to be called pursuant to the provisions of this
paragraph 10(b)(iii).

(iv) At any meeting at which the holders of Merger Preferred
Stock shall have the right to elect directors as provided in this
paragraph 10(b), the presence in person or by proxy of the holders
of at least a majority of the then outstanding shares of Merger
Preferred Stock shall be required and be sufficient to constitute a
quorum. At any such meeting or adjournment thereof, the absence of a
quorum of the holders of Merger Preferred Stock shall not prevent
the election of directors other than those to be elected by the
holders of Merger Preferred Stock and the absence of a quorum or
quorums of the holders of capital stock entitled to elect such other
directors shall not prevent the election of directors to be elected
by the holders of Merger Preferred Stock.

(v) For so long as the aforesaid voting rights are vested in
the holders of Merger Preferred Stock, the term of office of all
directors elected by the holders of Merger Preferred Stock shall
terminate upon the election of their successors by the holders of
Merger Preferred Stock; provided, however, that any director who
shall have been elected by holders of the Merger Preferred Stock may
be removed at any time, either with or without cause, only by the
affirmative vote of the holders of record of a majority of the
outstanding shares of the Merger Preferred Stock at a duly called
stockholders meeting. Upon any termination of such voting rights in
accordance with paragraph 10(b)(ii), the term of office of all
directors elected by the holders of Merger Preferred Stock shall
thereupon terminate and upon such termination the number of
directors constituting the Board of Directors shall, without further
action, be reduced by two.

(vi) In case of any vacancy occurring among the directors so
elected by holders of Merger Preferred Stock, the remaining

director who shall have been so elected may appoint a successor to hold office for the unexpired term of the director whose place shall be vacant. If both directors so elected by the holders of Merger Preferred Stock shall cease to serve as directors before their terms shall expire, the holder of Merger Preferred Stock then outstanding may, in the manner provided in paragraph 10(b)(ii), elect successors to hold office for the unexpired terms of the directors whose places shall be vacant.

(c) (i) Subject to paragraph 10(c)(ii), so long as any shares of Merger Preferred Stock are outstanding, the Company will not, without the affirmative vote, or the written consent pursuant to Section 228 of the General Corporation Law of the State of Delaware, of the holders of at least the Required Majority of the outstanding shares of Merger Preferred Stock (or such greater number as may be required by law), voting separately as a class:

> (I) increase the authorized number of shares of Merger Preferred Stock or create, authorize or issue any class or series of stock of the Company (other than the shares of the Merger Preferred Stock) ranking pari passu with the Merger Preferred Stock as to dividend rights or rights upon liquidation, winding-up or dissolution of the Company;

> (II) make any amendment, alteration or repeal of any of the provisions of the Certificate of Incorporation or of any certificate amendatory thereof or supplemental thereto so as to change the terms of the Merger Preferred Stock to affect adversely the rights, powers, preferences or privileges of the Merger Preferred Stock; or

> (III) create, authorize or issue any class or series of stock of the Company ranking senior to the Merger Preferred

Stock as to dividend rights or rights upon liquidation, winding-up or dissolution of the Company.

The "Required Majority" for any action referred to in clause (II) and (III) shall be two-thirds, and for any other action referred to in this paragraph 10(c)(i) shall be a simple majority.

(ii) Notwithstanding paragraph 10(a) or paragraph 10(c)(i), holders of the Merger Preferred Stock will have no voting rights in connection with a merger or consolidation of the Company with or into Wickes, as the surviving corporation in the merger referred to above, in which the Merger Preferred Stock is converted into stock of Wickes with substantially the same terms as those set forth in this Certificate (as determined in good faith by the Board of Directors of the Company).

(d) In connection with any matter on which holders of the Merger Preferred Stock are entitled to vote including, without limitation, the election of directors as set forth in this paragraph 10 or any matter on which the holders of the Merger Preferred Stock are entitled to vote as a class or otherwise pursuant to the General Corporation Law of the State of Delaware or the provisions of the Certificate of Incorporation of the Company, each holder of the Merger Preferred Stock shall be entitled to one vote for each share of Merger Preferred Stock held by such holder.

11. Exchange Provisions. (a) On any Dividend Payment Date, the Company, at its sole option, may require the exchange of all or any part of the shares of the Merger Preferred Stock then outstanding for the Company's 15 1/2% Junior Subordinated Exchange Debentures (the "Exchange Debentures") on the notice set forth below. Holders of record of outstanding shares of the Merger Preferred Stock as they appear on the stock register of the Company at the close of business on the record date for such exchange shall be entitled to receive Exchange Debentures having a

principal amount equal to the sum of the Liquidation Preference plus any accrued and unpaid dividends, whether or not declared, on the Merger Preferred Stock to the date of such exchange in exchange for each share of Merger Preferred Stock held by them. At the time of such exchange (an "Exchange Date"), the rights of the holders of the Merger Preferred Stock then outstanding as stockholders of the Company shall cease (except for the right to receive the Exchange Debentures) and the persons entitled to receive the Exchange Debentures issuable upon exchange shall be treated for all purposes as the holders of record of such Exchange Debentures. In the event such exchange would result in the issuance of any Exchange Debenture in a principal amount which is less than $1,000 or which is not an integral multiple of $1,000 (such principal amount less than $1,000 or the difference between such principal amount and the highest integral multiple of $1,000 that is less than such principal amount, as the case may be, being hereinafter referred to as a "Fractional Principal Amount"), each holder of Merger Preferred Stock otherwise entitled to a Fractional Principal Amount shall be entitled to receive a cash payment in lieu thereof equal to such holder's proportionate interest in the net proceeds by the Company or any agent appointed for the purpose from the sale or sales on the open market of the aggregate amount of such Exchange Debentures. The person or persons entitled to receive the Exchange Debentures issuable upon exchange shall be treated for all purposes as the registered holder or holders of such Exchange Debentures as of the related Exchange Date. The Exchange Debentures will be issued under an Indenture (the "Indenture") between the Company and United States Trust Company of New York, as trustee, substantially in the form filed as an Exhibit to the Company's and Wickes' Registration Statement on Form S-4 as filed with the Securities and Exchange Commission (File No. 33-27143), as amended pursuant to the terms of the Indenture. When no Exchange Debentures are outstanding, the Indenture may be changed as may be required by law, stock exchange rules or usage, or as may otherwise be agreed to by the Company and holders of a majority of the then outstanding shares of

20

Merger Preferred Stock. The Exchange Debentures shall have the terms and benefits provided in the Indenture.

(b) If fewer than all the outstanding shares of the Merger Preferred Stock are to be exchanged, the Board of Directors of the Company shall select the shares of the Merger Preferred Stock to be exchanged from the outstanding shares by lot or pro rata as determined by the Board of Directors of the Company, in their sole discretion; provided, however, that the Board of Directors of the Company may in selecting shares to be exchanged choose to exchange all shares of the Merger Preferred Stock held by holders of a number of such shares not to exceed 100 as may be specified by the Board of Directors.

(c) At least 30 days but not more than 60 days prior to the Exchange Date, written notice of such exchange shall be mailed to each holder of record of shares of the Merger Preferred Stock to be exchanged at the address shown on the stock transfer books of the Company or, if no such address appears or is given, at the place where the principal executive office of the Company is located; provided, however, that no failure to give such notice or any defect therein or in the mailing thereof shall affect the validity of the proceedings for such exchange. Each such notice shall specify (i) the number of shares of Merger Preferred Stock to be received in the exchange from such holder, (ii) the numbers of the certificates of the shares of Merger Preferred Stock being exchanged, (iii) the principal amount of Exchange Debentures to be issued in exchange for such shares, (iv) the Exchange Date, (v) the place or places at which the shares of the MergerPreferred Stock shall be exchanged for Exchange Debentures and (vi) that dividends on the shares to be exchanged shall cease to accrue on the Exchange Date.

(d) Upon surrender of the certificates for any of the Merger Preferred Stock so exchanged, such shares of Merger Preferred Stock shall be exchanged by the Company at the required exchange rate. In case fewer than all the shares of Merger

Preferred Stock represented by any such certificate are exchanged, a new certificate or certificates shall be issued representing the unexchanged shares of Merger Preferred Stock without cost to the holder thereof. From and after the Exchange Date, dividends on the shares of the Merger Preferred Stock so called for exchange shall cease to accrue, such shares of Merger Preferred Stock shall no longer be deemed to be outstanding and shall not have the status of shares of Merger Preferred Stock, and all rights of the holders thereof as stockholders of the Company (except the right to receive from the Company the Exchange Debentures upon exchange and the right to receive cash payments in lieu of Fractional Principal Amounts) shall cease with respect to such shares. From and after the related Exchange Date, shares of Merger Preferred Stock exchanged for the Exchange Debentures shall be restored to the status of authorized but unissued shares of Preferred Stock, without designation as to series until such shares are once more designated as part of a particular series by the Board of Directors of the Company.

FIFTH: (a) The business of the Corporation shall be managed by or under the direction of the Board of Directors, except as may be otherwise provided by statute or by this Certificate of Incorporation. The number of directors of the Corporation shall be fixed by, or in the manner provided in, the By-laws of the Corporation; provided, however, that such number of directors shall not exceed nine. The directors of the Corporation, other than those who may be elected pursuant to any Preferred Stock Designation, shall be divided into three classes (Class I, Class II and Class III), with the term of office of one class expiring each year. Each class shall consist, as nearly as may be possible, of one-third of the total number of directors constituting the entire Board of Directors. The membership of each class initially shall be as set forth in a resolution adopted by the Board of Directors of the Corporation on or prior to June 30, 1994 (the "Effective Date"). The initial term of Class I directors shall expire at the first annual meeting of stockholders following the Effective Date; the initial term of Class II directors shall expire at the second annual meeting of stockholders following the Effective Date; and the initial term of Class III directors shall expire at the third annual meeting of

stockholders following the Effective Date. At each annual meeting of stockholders, each class of directors whose term shall then expire shall be elected to hold office for a three year term. If the number of directors is changed, any increase or decrease shall be apportioned among the classes so as to maintain the number of directors in each class as nearly equal as possible, but in no case shall a decrease in the number of directors shorten the term of any incumbent director. A director shall hold office until the annual meeting for the year in which such director's term expires and until such director's successor shall be elected and shall qualify, subject, however, to prior death, resignation, retirement, disqualification or removal from office.

(b) There shall be a nominating committee of the Board of Directors (the "Nominating Committee") consisting of all directors serving on the Board of Directors, excluding directors that are salaried employees of the Corporation. The Nominating Committee shall be authorized to nominate, by a majority vote thereof and subject only to the restrictions set forth in this paragraph (b) of this Article FIFTH, persons for election to the Board of Directors at any annual meeting of stockholders or at any special meeting of stockholders called for the purpose of electing directors; provided, however, that if the Nominating Committee does not nominate a person by majority vote with respect to any directorship to be voted upon at such meeting and the incumbent director holding such directorship is affiliated with Blackstone Capital Partners L.P. ("Blackstone Partners"), Wasserstein Perella Partners, L.P. ("WP Partners") or a Transferee (as defined in Section 3.01 of that certain Voting Agreement dated as of June 29, 1994 between Blackstone Partners and WP Partners, as the same may be amended from time to time) of either, in lieu of any Nominating Committee nomination, the Corporation shall place in nomination the name of the incumbent director or a similarly affiliated person designated by the party with whom such incumbent director is affiliated (i.e., Blackstone Partners, WP Partners or a Transferee, as the case may be) for election to the Board of Directors at such meeting, and the Corporation shall nominate no other person for election to such director position. For purposes of the preceding sentence and paragraph (d) of this Article FIFTH, a person shall be affiliated with Blackstone Partners, WP Partners or a Transferee if such person is a general partner, limited partner, director or officer of such entity or any affiliate of such entity or is otherwise an "affiliate" of such entity

23

as defined in the rules and regulations under the Securities Act of 1933. Except as provided herein, the Board of Directors, or any committee thereof, shall not be authorized to nominate persons for election to the Board of Directors.

(c) Unless and except to the extent that the By-laws of the Corporation shall so require, the election of directors of the Corporation need not be by written ballot.

(d) Newly created directorships resulting from any increase in the authorized number of directors or any vacancies in the Board of Directors resulting from death, resignation, retirement, disqualification or removal from office shall be filled solely by the Nominating Committee, by a majority vote thereof, and not by the stockholders; provided, however, that if a vacancy in the Board of Directors results from the death, resignation, retirement, disqualification or removal from office of a director affiliated with (as defined in paragraph (b) of this Article FIFTH) Blackstone Partners, WP Partners or a Transferee(excluding, however, a resignation by a director affiliated with Blackstone Partners or WP Partners pursuant to Section 3.01 of the Voting Agreement referred to in paragraph (b) of this Article FIFTH), such vacancy shall automatically be filled with a similarly affiliated person designated by the party with whom such incumbent director was affiliated (i.e., Blackstone Partners, WP Partners or a Transferee, as the case may be), such affiliation being a qualification for election to such directorship. Any director elected to fill a newly created directorship or any vacancy on the Board of Directors resulting from death, resignation, retirement, disqualification or removal from office, shall hold office for the remainder of the full term of the class of directors in which the new directorship was created or the vacancy occurred and until such director's successor shall have been elected and qualified. Directors shall continue in office until others are chosen and qualified in their stead.

(e) Notwithstanding the foregoing, whenever the holders of any one or more classes or series of Preferred Stock issued by the Corporation, if any, shall have the right, voting separately by class or series, to elect directors at an annual or special meeting of stockholders, the election, term of office, filling of vacancies and other features of such directorships shall be governed by the terms of the applicable resolution or resolutions of the Board of Directors adopted pursuant to Article FOURTH.

(f) Any director or the entire Board of Directors of the Corporation may be removed from office only for cause and only by the affirmative vote of the holders of a majority of the shares of capital stock of the Corporation then entitled to vote in the election of such director or directors. For purposes of this paragraph and to the extent permitted by law, "cause" shall be limited to (i) action by a director involving wilful malfeasance, which conduct has a material adverse effect on the Corporation, (ii) conviction of a director of a felony or (iii) the wilful and continuous failure of a director substantially to perform such director's duties to the Corporation (including any such failure resulting from incapacity due to physical or mental illness).

(g) In furtherance and not in limitation of the powers conferred upon it by law, the Board of Directors is expressly authorized to adopt, alter, amend or repeal any provision of the By-laws of the Corporation (including, without limitation, By-laws governing the conduct of, and the matters which may properly be brought before, meetings of the stockholders and By-laws specifying the manner and extent to which prior notice shall be given of the submission of proposals to be submitted at any meeting of stockholders or of nominations of elections of directors to be held at any such meeting) by the vote of a majority of the entire Board of Directors.

(h) In addition to the powers and authorities herein or by statute expressly conferred upon it, the Board of Directors may exercise all such powers and do all such acts and things as may be exercised or done by the Corporation, subject, nevertheless, to the provisions of the laws of the State of Delaware, this Restated Certificate of Incorporation and the By-laws of the Corporation; provided, however, that no By-laws hereafter adopted by the stockholders shall invalidate any prior act of the directors which would have been valid if such By-laws had not been adopted.

SIXTH: Any action required or permitted to be taken by the stockholders of the Corporation may be effected only at a duly called annual or special meeting of such stockholders and may not be effected by consent in writing by such stockholders. Except as otherwise provided by any Preferred Stock Designation, special meetings of stockholders for any purpose or purposes may be called only by the Chairman or a Co-Chairman of the Board, if there be one, or by resolution of the Board of Directors, acting by

25

not less than a majority of the entire Board, and the power of stockholders to call a special meeting is specifically denied. No business shall be transacted and no corporate action shall be taken at a special meeting of stockholders other than that stated in the notice of such meeting.

SEVENTH: (a) In addition to any requirements of law and any other provision of this Restated Certificate of Incorporation or any resolution or resolutions of the Board of Directors adopted pursuant to Article FOURTH of this Restated Certificate of Incorporation (and notwithstanding the fact that a lesser percentage may be specified by law, this Restated Certificate of Incorporation or any such resolution or resolutions), a Business Combination (as hereinafter defined) shall require the affirmative vote of the holders of 66-2/3% or more of the combined voting power of the then outstanding shares of Voting Stock, voting together as a single class.

(b) For the purposes of this Article SEVENTH, "Business Combination" shall mean:

(1) any merger or consolidation of the Corporation (whether or not the Corporation is the surviving corporation);

(2) any sale, lease, exchange, mortgage, pledge, transfer or other disposition (in one transaction or a series of related transactions) of all or substantially all the assets of the Corporation;

(3) the adoption of any plan or proposal for the liquidation, dissolution, spinoff, splitup, splitoff, or winding up of the affairs of the Corporation (whether voluntary or involuntary); or

(4) any agreement, contract or other arrangement providing for any of the transactions described in this definition of Business Combination.

EIGHTH: To the fullest extent that the General Corporation Law of the State of Delaware as it exists on the date hereof or as it may hereafter be amended permits the limitation or elimination of the liability of directors, no director of the Corporation shall be liable to the Corporation or its stockholders for monetary damages for breach of fiduciary duty as a director. No amendment to or repeal of this Article EIGHTH shall apply to or have any effect on the liability or alleged liability of any director of the

26

Corporation for or with respect to any acts or omissions of such director occurring prior to such amendment or repeal.

NINTH: The Corporation reserves the right at any time and from time to time to amend, alter or repeal any provision contained in this Restated Certificate of Incorporation, in the manner now or hereafter prescribed by law. In addition to any requirements of law and any other provision of this Restated Certificate of Incorporation or any resolution or resolutions of the Board of Directors adopted pursuant to Article FOURTH of this Restated Certificate of Incorporation (and notwithstanding the fact that a lesser percentage may be specified by law, this Restated Certificate of Incorporation or any such resolution or resolutions), the affirmative vote of the holders of 66-2/3% or more of the combined voting power of the then outstanding shares of Voting Stock, voting together as a single class, shall be required to adopt, amend, alter or repeal any provision of this Restated Certificate of Incorporation.

IN WITNESS WHEREOF, the Corporation has caused this Restated Certificate of Incorporation to be signed in the name and on behalf of the Corporation, and attested to, by the duly elected officers of the Corporation as indicated below this 13th day of July, 1994.

COLLINS & AIKMAN CORPORATION

by          Paul W. Meeks
----------------------------
Name: Paul W. Meeks
Title: VP/Treasurer

Attest:

Elizabeth Philipp
----------------------------
Name:  Elizabeth Philipp
Title: Secretary

CERTIFICATE OF AMENDMENT

OF

RESTATED CERTIFICATE OF INCORPORATION

OF

COLLINS & AIKMAN CORPORATION


        Collins & Aikman Corporation, a corporation organized and existing under
the General Corporation Law of the State of Delaware (the "Corporation"), hereby
certifies that the amendments set forth below to the Corporation's Restated
Certificate of Incorporation were duly adopted in accordance with Section 242 of
the General Corporation Law of the State of Delaware:
        FIRST:  Article FOURTH of the Restated  Certificate of  Incorporation is
hereby  amended so that paragraph (b) of such Article FOURTH shall read in its
entirety as follows:
        (b) 16,000,000 shares of Preferred Stock, par value $.01 per share
("Preferred Stock"). The Board of Directors is hereby expressly authorized, by
resolution or resolutions, to provide, out of the unissued and undesignated
shares of Preferred Stock, for the issuance of one or more series of Preferred
Stock and, with respect to each such series, to fix the number of shares
constituting such series and the designation of such series, the powers (if any)
of the shares of such series, and the preferences and relative, participating,
optional and other special rights, if any, and any qualifications,
limitations or restrictions thereof, of the shares of such series. The powers,
preferences and relative, participating, optional and other special rights of
each series of Preferred Stock, and the qualifications,

limitations or restrictions thereof, if any, may differ from those of any and all series at any time outstanding.

SECOND:  Article FIFTH of the Restated  Certificate of  Incorporation is hereby amended so that paragraphs  (b) and (f) of such Article  FIFTH shall read in their entirety as follows:

(b) There shall be a nominating committee of the Board of Directors (the "Nominating Committee") consisting of all directors serving on the Board of Directors, excluding directors that are salaried employees of the Corporation. The Nominating Committee shall be authorized to nominate, by a majority vote thereof and subject only to the restrictions set forth in this paragraph (b) of this Article FIFTH, persons for election to the Board of Directors at any annual meeting of stockholders or at any special meeting of stockholders called for the purpose of electing directors; provided, however, that if the Nominating Committee does not nominate a person by majority vote with respect to any directorship to be voted upon at such meeting and the incumbent director holding such directorship is affiliated with Blackstone Capital Partners L.P. ("Blackstone Partners"), Wasserstein Perella Partners, L.P. ("WP Partners") or a Transferee (as defined in Section 3.01 of that certain Voting Agreement dated as of June 29, 1994 between Blackstone Partners and WP Partners, as the same may be amended from time to time) of either, in lieu of any Nominating Committee nomination, the Corporation shall place in nomination the name of the incumbent director or a similarly affiliated person designated by the party with whom such incumbent director is affiliated (i.e., Blackstone Partners, WP Partners or a Transferee, as the case may be) for election to the Board of Directors at such meeting, and the Corporation shall nominate no other person for election to such director position. For purposes of the preceding sentence and paragraphs (d) and (f) of this Article FIFTH, a person shall be affiliated with Blackstone Partners, WP Partners or a Transferee if such person is a general partner, limited partner, director, officer or employee of such entity or any affiliate of such entity or is otherwise an "affiliate" of such entity as defined in the rules and regulations under the Securities Act of 1933. Except as provided herein, the Board of Directors, or any committee

thereof, shall not be authorized to nominate persons for election to the Board of Directors.

(f) Except as set forth below, any director or the entire Board of Directors of the Corporation may be removed from office only for cause and only by the affirmative vote of the holders of a majority of the shares of capital stock of the Corporation then entitled to vote in the election of such director or directors. For purposes of this paragraph and to the extent permitted by law, "cause" shall be limited to (i) action by a director involving willful malfeasance, which conduct has a material adverse effect on the Corporation, (ii) conviction of a director of a felony or (iii) the willful and continuous failure of a director substantially to perform such director's duties to the Corporation (including any such failure resulting from incapacity due to physical or mental illness). In addition to the foregoing, if any director was at the time of his election to the Board of Directors of the Corporation affiliated with (as defined in paragraph (b) of this Article Fifth) Blackstone Partners or WP Partners, it shall be a qualification for such director to hold office that such director continue to remain affiliated with Blackstone Partners or WP Partners and upon any failure of such director to remain so affiliated, such director shall automatically be removed from office.

Dated as of August 2, 1999