# UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

COLLINS & AIKMAN CORPORATION and COLLINS
& AIKMAN PRODUCTS CO., as Debtors in Possession,

Plaintiffs,

v.

DAVID A. STOCKMAN, *et al.*,

Defendants.

Case No: 1:07-cv-00265-SLR

<u>**BRIEF IN SUPPORT OF DAVID A. STOCKMAN'S MOTION TO DISMISS**</u>

OF COUNSEL:

Andrew B. Weissman
Michele L. Taylor
Wilmer Cutler Pickering Hale and Dorr, LLP
1875 Pennsylvania Avenue, NW
Washington, DC 20006
(202) 663-6000

BAYARD, P.A.

Peter B. Ladig (No. 3513)
Stephen B. Brauerman (No. 4952)
222 Delaware Avenue, Suite 900
P.O. Box 25130
Wilmington, DE 19899-5130
pladig@bayardfirm.com
sbrauerman@bayardfirm.com
(302) 655-5000

Dated: April 28, 2008

Counsel for Defendant David A. Stockman

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ iv

Statement of Nature and Stage of Proceedings ............................................................. 1

Summary of Argument ..................................................................................................... 1

Facts ................................................................................................................................... 4

Plaintiff's Allegations ...................................................................................................... 9

Argument ........................................................................................................................... 9

I.      THE COMPLAINT LACKS REQUIRED ELEMENTS OF A §10(b) CLAIM . ................. 9

    A.    Plaintiff Cannot Bring a Securities Claim Because It Suffered No Loss from the only
        Securities Transaction at Issue. ............................................................................... 10

    B.    No Allegations Support the Elements of Reliance or Loss Causation. ............................. 12

        1.   The allegations preclude any viable theory of reliance. ................................................. 12

        2.   Misrepresentations after the Notes Sale was completed cannot support a claim of fraud
            in connection with that transaction. .................................................................................. 13

        3.   Plaintiff does not allege any injury suffered by C&A proximately caused by the
            allegedly misleading disclosures. .................................................................................... 15

    C.    No Allegations Satisfy the Element of Materiality. ........................................................ 16

    D.    Plaintiff Does Not Plead Securities Fraud with the Required Particularity. ..................... 19

        1.   The allegations regarding the Joan Fabrics transactions are not stated with sufficient
            particularity. ................................................................................................................... 20

        2.   The allegations regarding improperly booked supplier rebates are not stated with
            sufficient particularity. .................................................................................................. 21

    E.    No Allegations Support a "Cogent and Compelling" Inference of Scienter. .................. 22

        1.   No facts alleged show Mr. Stockman had any plausible motive to  mislead investors.
            ........................................................................................................................................ 26

2.   No facts or circumstances alleged give rise to a strong inference of Mr. Stockman's scienter....................................................................................................... 26

a)   No alleged facts support an inference that Mr. Stockman intentionally caused C&A to book false rebates from Joan Fabrics by means of "round-trip" transactions. .... 27

b)   No alleged facts support an inference that Mr. Stockman intentionally caused C&A to book rebates improperly. ................................................................................... 28

c)   No facts alleged regarding events after August 2004 support any inference of Mr. Stockman's scienter in connection with the August 2004 Notes Sale...................... 30

II.   THE COMPLAINT FAILS TO STATE A SECTION 14(a) CLAIM. ................................. 34

III.  THE COURT SHOULD DECLINE TO EXERCISE SUPPLEMENTAL JURISDICTION OVER PLAINTIFF'S STATE LAW CLAIMS. ................................................................ 37

# TABLE OF AUTHORITIES

## CASES

*Baena v. KPMG LLP*, 389 F. Supp. 2d 112 (D. Mass. 2005) .......................................................11

*Baker v. MBNA Corp., C.A. No. 05-272*, 2007 WL 2009673 (D. Del. July 6, 2007)...................21

*Basic Inc. v. Levinson*, 485 U.S. 224 (1988).........................................................................17

*Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955 (2007) ...................................................26

*Berckeley Inv. Group, Ltd. v. Colkitt*, 455 F.3d 195 (3d Cir. 2006) .................................12

*Bloor v. Carro, Spanbock, Londin, Rodman & Fass*, 754 F.2d 57 (2d Cir. 1985).................15

*Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723 (1975)........................................10

*Cal. Pub. Employees' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126 (3d Cir. 2004)................16, 34, 35

*Cowin v. Bresler*, 741 F.2d 410 (D.C. Cir. 1984) ........................................................37

*Dura Pharm., Inc. v. Broudo*, 544 U.S. 336 (2005).........................................................10, 12, 15

*GSC Partners CDO Fund v. Washington*, 368 F.3d 228 (3d Cir. 2004) ............................. passim

*Gen. Elec. Co. v. Cathcart*, 980 F.2d 927 (3d Cir. 1992) .....................................................36, 37

*Globis Capital Partners, L.P. v. Stonepath Group, Inc.*, No. 06-2560, 2007 WL 1977236 (3d Cir. July 10, 2007) .......................................................................................................23

*In re Advanta Corp. Sec. Litig.*, 180 F.3d 525 (3d Cir. 1999) .......................................29

*In re Alpharma, Inc. Sec. Litig.*, 372 F.3d 137 (3d Cir. 2004)...........................................23, 29

*In re Astea Int'l Inc. Sec. Litig.*, Civ. Act. No. 06-1467, 2007 WL 2306586 (E.D. Pa. Aug. 9, 2007), ....................................................................................................................29

*In re Astropower, Inc. Sec. Litig., No. Civ. A. 03-260-JJF*, 2006 WL 288120 (D. Del. Feb. 7, 2006) ........................................................................................................................17

*In re Bio-Technology Gen. Corp. Sec. Litig.*, 380 F. Supp. 2d 574 (D.N.J. Aug. 10, 2005).........27

*In re Bristol-Myers Squibb Sec. Litig.*, 312 F. Supp. 2d 549 (S.D.N.Y. 2004) .................24, 28, 30

*In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410 (3d Cir. 1997)................................17, 18

*In re Cigna Corp. Sec. Litig.*, 459 F. Supp. 2d 338 (E.D. Pa. 2006) .............................................10

*In re Citx Corp.*, 448 F.3d 672 (3d Cir. 2006) .....................................................................11, 15

*In re Cross Media Mktg. Corp. Sec. Litig.*, 314 F. Supp. 2d. 256 (S.D.N.Y. 2004) .....................25

*In re Digital Island Sec. Litig.*, 357 F.3d 322 (3d Cir. 2004) ..........................................26

*In re Duke Energy Corp. Secs. Litig.*, 282 F. Supp. 2d 158 (S.D.N.Y. 2003), *aff'd*, 113 Fed. App'x 427 (2d Cir. Nov. 15, 2004) ...............................................................................18

*In re Exxon Mobil Corp. Sec. Litig.*, 500 F.3d 189 (3d Cir. 2007) .................................34

*In re NAHC, Inc. Sec. Litig.*, 306 F. 3d 1314 (3d Cir. 2002) ..........................................4

*In re Parmalat Sec. Litig.*, 501 F. Supp. 2d 560 (S.D.N.Y. 2007) .................................11

*In re Remec Inc. Secs. Litig.*, 388 F. Supp. 2d 1170 (S.D. Cal. 2005) ...........................15

*In re Rockefeller Ctr. Props., Inc. Sec. Litig.*, 311 F.3d 198 (3d Cir. 2002)..................26

*In re Stonepath Group, Inc. Sec. Litig.*, 397 F. Supp. 2d 575 (E.D. Pa. 2005) ..............25

*In re Suprema Specialties Sec. Lit.*, 438 F.3d 256 (3d Cir. 2006) ..................................19

*In re Teleglobe Commc'ns Corp.*, 493 F.3d 345 (3d Cir. 2007) ...............................11, 16

*In re Westinghouse Sec. Litig.*, 90 F.3d 696 (3d Cir. 1996)............................................17

*Kehr Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406 (3d Cir. 1991) (Rule 12(b)(1) .................37

*Klein v. Autek Corp.*, 147 F. App'x. 270, 277 (3d Cir. 2005) ..................................24, 25

*Maio v. Aetna, Inc.*, 221 F.3d 472 (3d Cir. 2000)...........................................................37

*McCabe v. Ernst & Young, LLP.*, 494 F.3d 418 (3d Cir. 2007) ......................................15

*Mut. Shares Corp. v. Genesco, Inc.*, 384 F.2d 540 (2d Cir. 1967) .................................15

*Official Comm. of Unsecured Creditors v. R. F. Lafferty & Co.*, 267 F.3d 340 (3d Cir. 2001) .............................................................................................................................13

*Payne v. DeLuca*, 433 F. Supp. 2d 547 (W.D. Pa. 2006) .........................................14, 30

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430 (3d Cir. 1997)...............37

*Rochelle v. Marine Midland Grace Trust Co. of New York*, 535 F.2d 523 (9th Cir. 1976) ..........11

*Rombach v. Chang*, 355 F.3d 164 (2d Cir. 2004) ...................................................................33, 35

*San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos.*, 75 F.3d 801 (2d Cir. 1996)...................................................................................................................24, 25

*Santa Fe Indus. v. Green*, 430 U.S. 462 (1977)....................................................................35, 36

*Scattergood v. Perelman*, 945 F.2d 618 (3d Cir. 1991)..................................................................35

*Semerenko v. Cendant Corp.*, 223 F.3d 165 (3d Cir. 2000) .........................................................10

*Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 128 S. Ct. 761 (2008) .............12, 13, 14

*TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438 (1976) ..............................................................17

*Teachers' Ret. Sys. v. Hunter*, 477 F.3d 162 (4th Cir. 2007) ........................................................28

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 127 S. Ct. 2499 (2007) ........................................4, 22

*Trenwick Am. Litig. Trust v. Ernst & Young, L.L.P.*, 906 A.2d 168 (Del. Ch. 2006), *aff'd*, *Trenwick Am. Litig. Trust v. Billett*, 2007 WL 2317768 (Del. Aug. 14, 2007)..................11, 13, 16

*Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083 (1991) ....................................................3 5

## STATUTES AND RULES

Fed. R. Civ. P. 9(b) ................................................................................................................20, 22, 23

Fed. R. Civ. P. 12(b)(1).................................................................................................................37, 38

15 U.S.C. § 78u-4(b)(1) ..................................................................................................................19, 22

28 U.S.C. § 1367(C) .............................................................................................................................37

## Statement of Nature and Stage of Proceedings

Plaintiff Collins & Aikman Litigation Trust brought this action as successor in interest to Collins & Aikman Corporation ("C&A") and Collins & Aikman Products Co. ("C&A Products") (collectively, the "Debtors") asserting claims under sections 10(b) and 14(a) of the Securities Exchange Act of 1934 ("Exchange Act"), rules promulgated thereunder, and state law.  (Am. Compl. ¶¶ 1, 5, 6.)  Defendant David A. Stockman respectfully submits this brief in support of his motion to dismiss pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure.

## Summary of Argument

Plaintiff's securities claims should be dismissed for the following reasons:

1.      There is no injury: C&A did not suffer any economic loss arising out of either a purchase or sale of securities, or allegedly misleading proxy statements.  Therefore, plaintiff has no standing to pursue either of the federal securities claims.

2.      There is no reliance: As a matter of law, C&A could not have sold securities in reliance on alleged misstatements and omissions *by its own officers and directors*, and supposedly misleading disclosures made months after C&A's securities transaction and the final proxy statement could not have affected either the C&A securities sale or any shareholder vote.

3.      There is no loss causation: No allegations support an inference that C&A incurred securities or proxy-related losses proximately caused by the allegedly misleading disclosures.

4.      There is no materiality: No allegations support the required inference that any of the alleged misleading disclosures were material.

5.      The fraud pleadings are insufficient: Plaintiff does not specify each allegedly false statement and why it was false, and the facts alleged do not support a "cogent and compelling" inference that Mr. Stockman acted with scienter.

In the absence of colorable federal securities claims, the Court lacks subject matter jurisdiction over any claim. But even if it is permitted to assert supplemental jurisdiction over the state law claims, the Court should decline to do so and dismiss the complaint in its entirety.

## Introduction

Plaintiff's amended complaint is a failed effort to fit a square peg into a round hole. Plaintiff attempts to assert claims as successor in interest to C&A and its debtor subsidiaries, but these corporate entities (i) were responsible for the allegedly misleading disclosures, and (ii) actually *benefited* from the alleged misconduct. The complaint parrots allegations made in other actions – filed against C&A's officers and directors by shareholders, bondholders, and the Securities and Exchange Commission – without regard to the critical fact that those actions alleged that *third parties* were misled by C&A's disclosures. Plaintiff, standing in C&A's shoes, cannot assert that C&A was misled by its own disclosures. As a consequence, the federal claims – the sole alleged ground for subject matter jurisdiction – make no sense.

Plaintiff's federal securities claims are brought under sections 10(b) and 14(a) of the Exchange Act. A section 10(b) claim must be founded on losses actually and proximately caused by fraud in connection with a purchase or sale of securities. A section 14(a) claim must seek compensation for losses incurred in reliance on false statements in proxy filings. Since C&A suffered neither type of loss, plaintiff's federal securities claims fail as a matter of law.

**Section 10(b).** C&A's only alleged purchase or sale of securities is its August 2004 sale of Senior Subordinated Notes due 2012 (the "Notes Sale"). C&A plainly did not suffer any loss from the Notes Sale. The Notes Sale allowed C&A to exchange its unsecured promise to timely pay interest and principal for $415 million in cash – an extraordinarily beneficial exchange given C&A's allegedly troubled financial condition at the time. Moreover, the net proceeds ($400.1

- 2 -

million) were used to redeem $400 million in outstanding Senior Subordinated Notes due 2006.[1/]

Since C&A used the $400 million in proceeds to extinguish $400 million in debt, it plainly

suffered no loss arising out of that transaction. Plaintiff does *not* allege C&A was any worse off

*immediately at the conclusion of the Notes Sale* than before the transaction, or that C&A was

worse off after it used the proceeds of the Notes Sale to redeem an equal amount of existing debt.

Accordingly, no claim is cognizable under section 10(b).

In addition, C&A did not make the Notes Sale in reliance on any alleged

misrepresentations. Allegedly false statements made in 2005, months *after* the August 2004

Notes Sale (and redemption of the earlier debt), are plainly irrelevant to any securities fraud

claim founded on the Notes Sale. And allegedly false statements leading up to the Notes Sale, or

included in the Offering Memorandum for that transaction, could not have been relied on by

C&A. C&A acted only through its officers and directors, who plaintiff alleges were responsible

for the false statements. C&A therefore both knew about, and was responsible for, any alleged

misrepresentations. Plaintiff, C&A's successor, may not assert claims for damages arising out of

C&A's own alleged misconduct.

**Section 14(a).** Plaintiff's proxy claim fails because it identifies no reasonable nexus

between a shareholder vote based on proxy materials and any economic loss suffered by C&A.

To begin, the officer and director defendants and their affiliates controlled more than 50 percent

of the shareholder vote and were committed to voting in favor of all proxy proposals. As a

result, the alleged misstatements in the proxy materials could not have altered any shareholder

decision, making them both immaterial and incapable of causing loss as a matter of law.

---

[1/]     Through this transaction, C&A successfully extended the maturity of the outstanding
$400 million in debt by six years, from 2006 to 2012, but did not increase its net debt. The
Board of Directors' decision that it was in C&A's overall corporate interest to do this is a classic
business judgment, which no allegation in the complaint provides grounds for questioning.

Moreover, plaintiff cannot forge any reasonable tie between the alleged losses suffered by C&A and any shareholder vote: C&A's financial setbacks did not flow from who was elected to the Board of Directors or any shareholder resolution, but instead from the actions taken by C&A's officers and directors in pursuing the company's business affairs through the exercise of their business judgment. It is doubtful there are any viable claims based on those actions, but if there were, they would be state law claims, not federal securities claims for alleged proxy violations.

Plaintiff's securities claims fail for other reasons as well: the allegations do not support the required inference of materiality for any of the alleged misrepresentations; and the allegations of fraud fail to comply with pleading requirements imposed by Fed. R. Civ. P. 9(b) and the Private Securities Litigation Reform Act ("PSLRA").

For these reasons, the federal securities claims should be dismissed. Those claims are so plainly insubstantial that they provide no basis for this Court's subject matter jurisdiction. But even if the Court is permitted to assert jurisdiction over the remaining state law claims, it should decline to do so at this preliminary stage.

### Facts

C&A designed and manufactured automotive interior components for sale to automobile manufacturers (the "OEMs"). (Am. Compl. ¶¶ 6, 35.) Mr. Stockman joined C&A's Board of Directors in February 2001, became Chairman of the Board in August 2002, and was named Chief Executive Officer in August 2003, serving until May 12, 2005. (*Id.* ¶ 7.) Mr. Stockman received no salary, bonuses, or options from C&A as compensation for his services. (*See* App. 15-16 (C&A 2003 Form 10-K).)[2/]

_____

[2/]    On a motion to dismiss, this Court may consider SEC filings and documents "integral to or explicitly relied upon in the complaint." *In re NAHC, Inc. Sec. Litig.*, 306 F. 3d 1314, 1331 (3d Cir. 2002); *see Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 127 S. Ct. 2499, 2509 (2007).

Heartland Industrial Partners, L.P. (together with its general managing partner, Heartland Industrial Associates, L.L.C., "Heartland"), which Mr. Stockman helped manage, acquired 27 million shares, or approximately 60 percent, of C&A's stock in 2001, bought additional shares on many occasions from 2002 to 2004, and held 32,714,147 shares by the end of 2004. Mr. Stockman personally spent $1.5 million in the second half of 2004 buying 331,000 shares of C&A stock. Both he and Heartland were still buying C&A stock in the last days of 2004.[3/] Plaintiff does not allege that either Mr. Stockman or Heartland ever sold C&A stock, and there were no such sales.

Following Heartland's initial investment in early 2001, C&A initiated a series of acquisitions. (*See* App. 26 (C&A 2001 Form 10-K/A ("2001 Form 10K/A")).) In 2001, C&A acquired (1) Becker Group, L.L.C., an auto plastics manufacturer controlled by defendant Charles Becker, valued at around $160 million (*id.* at 30); (2) Textron Automotive Company's Trim division ("TAC-Trim"), a supplier of instrument panels and fully-assembled cockpit modules, valued at around $940 million (*id.* at 29); and (3) Joan Automotive Fabrics, an automobile fabrics supplier owned by defendant Elkin McCallum, valued at about $190 million (*id.* at 30). In these transactions, Becker received 14.8 million, Textron 18 million, and McCallum 12.8 million C&A shares. Becker and McCallum became C&A directors, and their shares were subject to restrictions pursuant to a Stockholders Agreement.[4/]

---

[3/]    *See* Am. Compl. ¶ 28; App. 158-59 (Heartland Schedule 13D (Mar. 1, 2001)) ($260 million initial investment); App. 164 (Heartland Schedule 13D/A (Amendment 1) (Jan. 3, 2002)) ($78 million additional investment); App. 129-156 (Stockman Forms 4 and 4/A) (purchases of 331,000 shares in May-December 2004); App. 169-170 (Heartland Schedule 13D/A (Amendment 87) (Jan. 6, 2005)) (Heartland/Stockman stock purchases on December 30-31, 2004, and Heartland holdings). The share totals are adjusted to reflect a 1:2.5 reverse stock split in May 2002. (*See id.* at 169.)

[4/]    *See* App. 172-190 (Becker Schedule 13D (July 16, 2001)), (McCallum Schedule 13D (Oct. 1, 2001)), (Textron Schedule 13D (Dec. 28, 2001)); App. 157-162 (Heartland Schedule

**McCallum Transactions.** In 2001, C&A also entered into fabric supply agreements with entities controlled by McCallum, including Joan Fabrics Corporation ("Joan Fabrics"). (App. 28 (2001 Form 10-K/A).) In 2001-03, C&A received price concessions from Joan Fabrics in the form of quarterly rebates for materials C&A purchased. (*See* Am. Compl. ¶ 55.) In 2002 and 2003, C&A acquired additional small businesses and assets controlled by McCallum, including Southwest Laminates and Dutton Yarns. (*See id.* ¶¶ 56, 119-20; App. 9, 12 (2003 Form 10-K).)

In 2003, C&A's Audit Committee, with outside counsel and an accounting expert, commenced an extensive investigation into certain accounting issues and related-party transactions, including those with McCallum. (*See* App. 86-87 (C&A Form 8-K, Ex. 99.1, Press Release (Mar. 12, 2004) ("March 12, 2004 Press Release")).) The Committee ultimately concluded each transaction had a legitimate business purpose, was negotiated fairly, and was properly accounted for by C&A. (*Id.*)

**Accounting for Supplier Rebates.** In March 2005, while completing C&A's 2004 financial statements and Form 10-K, C&A's management learned of potential errors in the accounting for certain vendor rebates. (*See* App. 93-102 (C&A Form 8-K, Ex. 99.2, Press Release (Mar. 17, 2005) ("March 17 Press Release")).) Management undertook an intensive review of vendor rebates booked by C&A in 2002-2004 to determine whether they were recorded in appropriate periods. (*See id.*) On March 17, 2005, C&A disclosed that some rebates were booked in incorrect quarters and that it expected to restate its earnings for the first three quarters of 2004, and possibly 2003. (*See id.*; *see also* Am. Compl. ¶ 80.) C&A cautioned that management's "preliminary" findings were subject to "material change," as well as further review by C&A's auditor. (App. 93-102 (March 17 Press Release).)

---

13D/A (Jan. 3, 2002)).

The key accounting issue was whether up-front cash rebates should be recognized when agreed-to or over the life of any related contract or business award. During this period the Emerging Issues Task Force ("EITF") of the Financial Accounting Standards Board ("FASB") considered a number of rebate accounting issues, including the specific question: "Under what circumstances up-front nonrefundable cash consideration given by a vendor to a customer should be recognized immediately in the customer's income statement rather than as a liability." (App. 192 (FASB EITF Abstracts, Issue No. 02-16).)[5/] The EITF reached a consensus on some rebate accounting issues, noting the importance of "many factors and circumstances that will vary from case to case" (*id.* at 195), but could not provide guidance on the proper treatment of "up-front nonrefundable cash consideration" "due to the broad, general nature of related questions." (*Id.*)

**August 2004 Senior Notes Offering.** As part of an effort to "enhance [its] financial and operating flexibility," C&A sold approximately $415 million in Senior Notes in August 2004. (App. 66 (Offering Memorandum for 12.875% Notes Due 2012 ("Offering Memorandum")); Am. Compl. ¶ 71.) The Offering Memorandum stated that the proceeds of the Notes Sale would be used "to redeem in full our outstanding $400 million" of Senior Notes due to mature in 2006. (App. 66A, 66.) C&A later reported that $400 million of existing Senior Notes were redeemed using the $400 million received by C&A from the August 2004 Notes Sale. (*See* App. 225 (C&A 2004 Q3 Form 10-Q/A at 9).)

**Proxy Statements.** C&A filed proxy statements on April 25, 2002, April 23, 2003, and September 30, 2004. Those proxy statements disclosed that defendants Heartland, Becker, and

---

[5/]     The FASB is "the designated organization in the private sector for establishing standards of financial accounting and reporting." FASB, Facts About FASB, http://www.fasb.org/facts. The EITF was created "to assist the FASB in improving financial reporting through the timely identification, discussion, and resolution of financial accounting issues within the framework of existing authoritative literature." FASB, Emerging Issues Task Force (EITF), http://www.fasb.org/eitf/about_eitf.shtml.

McCallum, who together owned more than 50% of C&A shares at all relevant times, intended to vote for each of the proposals in the statements.[6]

**Accounts Receivable Facility with GECC.**  In December 2004, C&A Products entered into an accounts receivable facility agreement with General Electric Capital Corporation ("GECC"), whereby, based on a complicated formula, C&A Products received money in exchange for transferring "eligible accounts receivables" to GECC.  (*See* Am. Compl. ¶ 74.)  On June 22, 2005, more than a month after C&A's bankruptcy filing, GECC filed a motion in bankruptcy court alleging that C&A had "pre-billed" some receivables, *i.e.*, included them in the pool of eligible receivables before they were permitted to be billed to the customer.  C&A's debt to GECC was fully paid by collecting the pledged receivables as they came due.[7]

**March 17, 2005 Press Release and Investor Conference Call.**  On March 17, 2005, C&A issued a press release and hosted a conference call addressing a number of issues, including the rebate accounting issues described above, delayed filing of C&A's Form 10-K, preliminary financial results for fiscal year 2004, and a first quarter 2005 earnings projection.  (Am. Compl. ¶¶ 80, 83.)  The preliminary financial results included a write-off of $500 million of goodwill and $175 million of deferred tax assets.  (*Id.* ¶¶ 130, 135.)  In his communications, Stockman emphasized the highly volatile and challenging environment in which C&A was competing, including statements that "the industry today is facing extremely challenging conditions, probably

---

[6]     *See* App. 40, 42 (C&A Schedule 14A (Apr. 25, 2002)); App. 51-53 (C&A Schedule 14A (Apr. 25, 2003) ("2003 Proxy Statement")); and App. 62 (C&A Schedule 14A (Sept. 30, 2004) ("2004 Proxy Statement")).

[7]     *See* App. 206 (Amended Disclosure Statement for the First Amended Joint Plan of Collins & Aikman Corporation and Its Debtor Subsidiaries, *In re Collins & Aikman Corp.*, Case No. 05-55927 (SWR) (Bankr. E.D. Mich. Jan. 24, 2007)) ("As the receivables were converted to cash through payments by customers, and no new receivables are added to the pool, the outstanding balance under the Receivables Facility was eliminated.").

an environment that hasn't existed in the last thirty or forty years"; that both C&A and the industry were "in a maelstrom"; that for C&A "in the current environment, cash management [and] liquidity is a challenge"; and that because of these near "turbulent" conditions, the EBITDA projection was "subject to major uncertainties." (*See* App. 112, 119-20 (Investor Call Tr.).)

Like many other automotive parts suppliers, C&A eventually fell victim to this economic turmoil. C&A and C&A Products filed for bankruptcy in May 2005. (Am. Compl. ¶¶ 6, 91.)

### Plaintiff's Allegations

Plaintiff's securities law claims are based on allegations that various public disclosures were inaccurate because: (i) C&A entered into "round-trip" transactions with McCallum in 2001-2003 to generate fictitious cost reductions (Am. Compl. ¶¶ 53-57); (ii) C&A prematurely recognized rebates in 2001-2004 (*id.* ¶¶ 58-69; 125-129); (iii) C&A inflated receivables through pre-billing in 2005 (*id.* ¶¶ 74-79); (iv) C&A overstated goodwill and deferred tax assets before March 2005 (*id.* ¶¶ 130-33); and (v) C&A falsely described management's rebate review, and C&A's liquidity, EBITDA, and capital expenditures, in March and April 2005 (*id.* ¶¶ 80-84, 88).

### Argument

## I.    THE COMPLAINT LACKS REQUIRED ELEMENTS OF A §10(b) CLAIM .

To state a section 10(b) claim, plaintiff "must allege 'with particularity' that defendants (1) made a misstatement or omission of material fact (2) with scienter (3) in connection with the purchase or the sale of a security (4) upon which the plaintiffs reasonably relied and (5) the plaintiffs' reliance was the proximate cause of their injury." *GSC Partners CDO Fund v. Washington*, 368 F.3d 228, 236 (3d Cir. 2004).[8] The complaint lacks allegations supporting the required elements of injury, reliance, loss causation, materiality, and scienter.

---

[8]    Unless otherwise indicated, internal citations are omitted.

## A.    Plaintiff Cannot Bring a Securities Claim Because It Suffered No Loss from the Only Securities Transaction at Issue.

Standing to assert a section 10(b) claim is limited to persons who purchased or sold securities and suffered actual losses from those securities transactions. *See Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 749 (1975); *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 341-42 (2005) (section 10(b) claim requires "economic loss"); *Semerenko v. Cendant Corp.*, 223 F.3d 165, 185 (3d Cir. 2000) (same); *In re Cigna Corp. Sec. Litig.*, 459 F. Supp. 2d 338, 349 (E.D. Pa. 2006) (same). C&A's only securities transaction identified in the complaint is the August 2004 Notes Sale. (*See* Am. Compl. ¶ 71.) The Offering Memorandum for that transaction stated that the entire proceeds would be used to redeem previously issued Senior Notes due 2006. (*See* App. 66, 66A.) In its ensuing public SEC filing, C&A confirmed that the proceeds of the Notes were used to retire the previously issued Senior Notes. (*See* App. 225 (2004 Q3 Form 10-Q/A at 9).) As a result, C&A received full value in extinguished debt for its use of the proceeds of the Notes Sale and suffered no loss whatsoever from the securities transaction. Plaintiff therefore has no standing to assert any claim arising out of the Notes Sale and has no section 10(b) claim.

Even if C&A had not used the proceeds of the Notes Sale to retire an equal amount of existing debt, and instead used them for general corporate purposes, plaintiff fails to identify any economic loss to C&A arising out of the Notes Sale. Plaintiff's theory of loss is that the Notes Sale harmed C&A by "prolong[ing] the life" of an "already insolvent Company." (*See* Am. Compl. ¶ 184.)[9] That theory fails because the infusion of cash through the sale of notes could not itself have caused C&A any economic injury.

---

[9]    Plaintiff never defines "insolvency" and never alleges grounds for inferring that C&A was insolvent at the time of the August 2004 offering. Plaintiff asserts only – without factual support – that *in January 2005* C&A "did not have the money to pay what it owed GECC," and that *in March 2005* C&A was on the "brink of bankruptcy." (*See* Am. Compl. ¶¶ 75, 131.)

"Deepening insolvency" has been rejected as a basis for inferring loss. *See Trenwick Am. Litig. Trust v. Ernst & Young, L.L.P.*, 906 A.2d 168, 174 (Del. Ch. 2006) ("deepening insolvency . . . does not express a coherent concept"), *aff'd, Trenwick Am. Litig. Trust v. Billett*, 2007 WL 2317768 (Del. Aug. 14, 2007).[10/] Plaintiff's attempt to avoid this precedent by using different terms is unavailing. The allegation that C&A's Notes Sale (i) increased C&A's debt load, and (ii) prolonged the life of the "already insolvent" company, is a transparent attempt to dress the same debunked theory in different clothes. *See Baena v. KPMG LLP*, 389 F. Supp. 2d 112, 117 (D. Mass. 2005) ("[D]eepening insolvency . . . refers to fraudulent prolongation of a corporation's life beyond insolvency.").

In any event, in this Circuit it is clear that the receipt of cash for the sale of notes causes no loss to the issuer. In *In re Citx Corp.*, 448 F.3d 672, 677 (3d Cir. 2006), the Third Circuit held that an infusion of cash into a company through the issuance of fraudulently inflated securities "did nothing to 'deepen' [the company's] insolvency. It did the opposite." As a result, the "investment was hardly harmful." *Id.* at 678; *see also id.* at 677-678 (the "deepening of a firm's insolvency is not an independent form of corporate damage"). The mere act of incurring more debt does not deepen a company's insolvency because the cash received is "an asset that directly offsets the newly incurred liability. . . . The difference between the company's assets and liabilities therefore remains the same. Its ability to pay its debts as they become due is no worse; indeed it may be better." *In re Parmalat Sec. Litig.*, 501 F. Supp. 2d 560, 574 (S.D.N.Y. 2007). *See also Rochelle v. Marine Midland Grace Trust Co. of New York*, 535 F.2d 523, 529 (9th Cir. 1976) (trustee for bankrupt corporation cannot assert section 10(b) claim where the

---

[10/]    "Deepening insolvency" is not a cognizable cause of action in Delaware. *See In re Teleglobe Commc'ns Corp.*, 493 F.3d 345, 385 n.36 (3d Cir. 2007) ("In *Trenwick*, the Vice Chancellor put to rest the notion that there is such a thing as a cause of action for so-called 'deepening insolvency' in Delaware law.").

corporation "received full value for the securities; that the directors later frittered away the funds on losing . . . ventures does not mean that [the company] suffered a loss compensable under the federal securities fraud laws.").

In sum, plaintiff alleged no economic loss to C&A from its sale of securities and therefore is incapable of asserting a section 10(b) claim.

### B.    No Allegations Support the Elements of Reliance or Loss Causation.

The section 10(b) claim also fails because plaintiff does not plead the required elements of reliance or loss causation.  A section 10(b) plaintiff must plead facts showing (i) it entered into the transaction in reliance on the alleged materially misleading disclosures; and (ii) its loss flowed from those allegedly false statements.  *See Dura*, 544 U.S. at 345-46.

### 1.    The allegations preclude any viable theory of reliance.

To establish reliance, or transaction causation, a plaintiff must prove that "but for the wrongful conduct, the transaction would not have gone through, at least in the form that it eventually took."  *Berckeley Inv. Group, Ltd. v. Colkitt*, 455 F.3d 195, 222 (3d Cir. 2006).  The Supreme Court recently emphasized the importance of reliance as "an essential element" a plaintiff must establish to bring a successful securities fraud claim.  *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 128 S. Ct. 761, 769 (2008).[11/]  Here, the alleged misstatements were made *by* C&A, not *to* C&A.  (Am. Compl. ¶ 93 ("Defendants caused Collins & Aikman to circulate an [allegedly misleading] offering memorandum" to investors.).)

Under these facts, plaintiff cannot plead reliance as a matter of law.  Although the complaint alleges C&A "sold securities in reliance on Director and Officer Defendants'

---

[11/]    The Court recognized two instances where reliance might be presumed, but each of those involved reliance by members of the public on publicly disseminated information.  *See id.*  Here, C&A *issued* the allegedly misleading statements, it did not rely on statements by others.

materially false and misleading statements . . ." (*id.* ¶ 184), these very same director and officer

defendants allegedly knew the company's financial disclosures were false and misleading (*id.*

¶¶ 25, 182). Since any such knowledge of false financial disclosures by the director and officer

defendants is imputed under the law to C&A itself,[12]/ C&A could not have been misled as a

matter of law.[13]/ In the absence of reliance on the alleged misstatements, C&A – and plaintiff,

standing in its shoes – has no claim.

> **2.    Misrepresentations after the Notes Sale was completed cannot support
> a claim of fraud in connection with that transaction.**

Plaintiff's complaint is replete with allegations of fraudulent conduct *after* the August

2004 Notes Sale. (*See* Am. Compl. ¶ 71.)[14]/ By definition and common sense, events that occur

long after a transaction is completed cannot cause, or cause a loss from, *the earlier transaction.*

Because section 10(b) provides a cause of action only for losses caused by material

misstatements in connection with the purchase or sale of a security (*GSC Partners*, 368 F.3d at

236), allegedly misleading statements *after* the securities transaction cannot give rise to section

10(b) claims. *Cf. Stoneridge*, 128 S. Ct. at 770 (section 10(b)'s "in connection with" requirement

not only defines the statute's coverage but also "provide[s] some insight" into the causation

---

[12]/    *Cf. Trenwick Am. Litig. Trust*, 906 A.2d at 211-12 (in fraud case, a debtor company could
not rely to its detriment on alleged misstatements when its own directors were not misled).

[13]/    Plaintiff's claims also fail under the doctrine of *in pari delicto*, under which "a plaintiff
may not assert a claim against a defendant if the plaintiff bears fault for the claim." *Official
Comm. of Unsecured Creditors v. R. F. Lafferty & Co.*, 267 F.3d 340, 354-55 (3d Cir. 2001).
Where, as here, a corporate officer allegedly commits fraud either in the course of his
employment or for the benefit of the company, the alleged wrongdoing is imputed to the
company. *Id.* at 359. There can be no doubt that C&A's August 2004 sale of Senior Notes was
made for the benefit of C&A, which received the entire proceeds of the sale, and that the actions
of C&A's officers and directors occurred in the course of their employment.

[14]/    These allegations are also irrelevant to plaintiff's section 14(a) claims because they
occurred after September 30, 2004, the date of the last proxy solicitation at issue in the
complaint. (*See* App. 62 (2004 Proxy Statement); Am. Compl. ¶ 188.)

element).  Thus, no allegations about post-August 2004 events, including those related to the

GECC credit facility (*see id.* ¶¶ 74-79), the March and April 2005 press releases and conference

call (*id.* ¶¶ 80-89), and the allegedly improper delay in taking down goodwill and tax deferred

assets (*see id.* ¶¶ 130-37) have any bearing on plaintiff's securities fraud claim.

The alleged pre-billing of invoices to the GECC accounts receivable facility purportedly

occurred "[i]n January 2005."  (*Id.* ¶ 75.)  Some time "thereafter," plaintiff alleges "a pattern of

fraudulent conduct" to continue inflating the borrowing base by generating tooling invoices

prematurely.  (*Id.* ¶¶ 76-77.)  Plaintiff acknowledges that C&A did not even enter into the GECC

accounts receivable facility until December 2004.  (*Id.* ¶ 74.)  Accordingly, the fraudulent

conduct alleged in connection with the GECC accounts receivable facility is plainly irrelevant to

a securities fraud claim arising out of the Notes Sale completed more than four months before.

The March 17, 2005 and April 4, 2005 press releases, and the March 17 investor call,

which allegedly included inaccurate statements about C&A's rebate review (*id.* ¶¶ 80-81),

liquidity (*id.* ¶¶ 80-83), and projected EBITDA and capital expenditures (*id.* ¶ 83), involve

statements made *six* months after the Notes Sale was completed.  There is no conceivable way

those alleged misstatements caused, or caused losses from, the August 2004 Notes Sale.

As to the alleged improper delay in writing-down goodwill and deferred tax assets,

plaintiff alleges C&A should have taken these write-downs at some unspecified earlier time,

pointing to general industry conditions C&A faced (and disclosed to investors), plus two isolated

allegations regarding a restructuring initiative in the U.S. and Mexico plastics division, and a

money-losing contract with DaimlerChrysler (*id.* ¶ 132).  Plaintiff alleges no facts suggesting

C&A's particular financial condition and outlook required write-downs of goodwill or deferred

tax assets as of August 2004, when the Notes Sale occurred.  *See, e.g.*, *Payne v. DeLuca*, 433 F.

Supp. 2d 547, 579 (W.D. Pa. 2006) ("[A] delinquent write-down of the impaired asset[ ], without

anything more, does not state a claim of securities fraud, stating at best a bad business decision."); *In re Remec Inc. Sec. Litig.*, 388 F. Supp. 2d 1170, 1174-75 (S.D. Cal. 2005) (dismissing claim that goodwill write-down should have occurred earlier where plaintiffs failed to explain why).

### 3.    Plaintiff does not allege any injury suffered by C&A proximately caused by the allegedly misleading disclosures.

To satisfy the loss causation requirement, "plaintiff must show that the defendant misrepresented or omitted the very facts that were a substantial factor in causing the plaintiff's economic loss." *McCabe v. Ernst & Young, LLP.*, 494 F.3d 418, 426 (3d Cir. 2007); *see Dura*, 544 U.S. at 341-42, 345-46 (plaintiff must plead a cognizable theory of "a causal connection between the material misrepresentation and the loss"). In other words, even "if the investment decision is induced by misstatements or omissions that are material and that were relied on by the claimant, but are not the proximate reason for his pecuniary loss, recovery under [§ 10(b)] is not permitted." *McCabe,* 494 F.3d at 428.

Whatever economic impact C&A suffered in the period after the August 2004 Notes Sale flowed from the business decisions of C&A's Board and management, not the Notes Sale. The business judgments on the use of proceeds of the Notes Sale, whether to retire existing debt (as actually occurred) or for other corporate purposes, cannot form the basis for a section 10(b) claim because those subsequent decisions were unrelated to the Notes Sale transaction. *See In re Citx Corp.*, 448 F.3d at 677-78 (management's failure to use an equity infusion to turn the company around harmed the company, not the equity infusion itself); *Bloor v. Carro, Spanbock, Londin, Rodman & Fass*, 754 F.2d 57, 62 (2d Cir. 1985) ("Any damage sustained . . . occurred later, after the securities transactions were completed, when the proceeds of those transactions were allegedly funneled into unwise investments or diverted to . . . personal use . . . ."); *Mut. Shares Corp. v. Genesco, Inc.*, 384 F.2d 540, 546 (2d Cir. 1967) ("corporate abuse and

- 15 -

diversion" claims are not cognizable under securities laws; the causal connection between any relevant acts by defendants and any damage suffered by plaintiffs "is slim indeed"). There is no viable proximate tie between the Notes Sale and the economic impact of ensuing business decisions.

In truth, plaintiff's attempt to hold defendants liable for increasing C&A's debt load is not a securities claim – it is an ill-disguised, and ultimately feckless, attempt to make C&A's officers and directors guarantors of the success of their business judgments. But "insolvency does not render a corporation's fiduciaries guarantors of that corporation's success; rather, it merely expands the universe of people with standing to assert a beneficial interest in the fiduciaries' obligation to maximize the value of the corporation." *Teleglobe Commc'ns. Corp.*, 493 F.3d at 385 (citing *Trenwick*, 906 A.2d at 205). Directors "may, in the appropriate exercise of their business judgment, take action that might, if it does not pan out, result in the firm being painted in a deeper hue of red. The fact that the residual claimants of the firm at that time are creditors does not mean that the directors cannot choose to continue the firm's operations in the hope that they can expand the inadequate pie such that the firm's creditors get a greater recovery." *Trenwick*, 906 A.2d at 174. C&A's officers and directors exercised their business judgment for the benefit of the company; that their efforts were ultimately fruitless provides no basis to make them liable for committing corporate resources to those efforts.

### C.    No Allegations Satisfy the Element of Materiality.

Plaintiff's allegations also fail to provide a basis for inferring that any alleged misstatements were material.[15/] A misrepresentation is material only if there is "a substantial

---

[15/]    In addition to plaintiff's section 10(b) claim, plaintiff's section 14(a) claim requires that "a proxy statement contain[] a *material* misrepresentation or omission." *See Cal. Pub. Employees' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 144 (3d Cir. 2004) (emphasis added)

likelihood that the disclosure would have been viewed by the reasonable investor as having

'significantly altered the "total mix" of information available to that investor.'" *In re*

*Westinghouse Sec. Litig.*, 90 F.3d 696, 714 (3d Cir. 1996). "Although questions of materiality

have traditionally been viewed as particularly appropriate for the trier of fact, complaints alleging

securities fraud often contain claims of omissions or misstatements that are obviously so

unimportant that courts can rule them immaterial as a matter of law at the pleading stage." *In re*

*Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997).

As to C&A's financial disclosures, plaintiff never attempts to allege the net impact in any

period of the alleged accounting errors. The rebate allegations charge that C&A reported agreed-

upon cost reductions from suppliers in the wrong period, *not* that they were fictitious. But

plaintiff never attempts to allege the net impact of these changes in any reporting period, which is

critical since moving these entries between periods could easily offset each other in significant

part. In other words, plaintiff does not state what the financial statements *should* have disclosed

absent the alleged misstatements. The critical element of materiality cannot be inferred absent

such allegations.[16] *See In re Astropower, Inc. Sec. Litig.*, No. Civ. A. 03-260-JJF, 2006 WL

288120, at *4 (D. Del. Feb. 7, 2006) ("Without some properly supported allegation of the amount

---

("*CALPERS*"). In the proxy solicitation context, "[a]n omitted fact is material if there is a
substantial likelihood that a reasonable shareholder would consider it important in deciding how
to vote." *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976). This materiality
standard is equivalent to the standard imposed for claims under section 10(b) (*see Basic Inc. v.
Levinson*, 485 U.S. 224, 232 n. 8 (1988)). As plaintiff relies on the same series of allegations to
support the section 10(b) and 14(a) claims, the section 14(a) claim fails on the same materiality
grounds as the section 10(b) claim, as well as for the additional reasons set forth in Part II,
below.

[16]    Plaintiff sets forth a chart ostensibly identifying the impact of vendor rebates from Q4
2001 to Q3 2004 (Am. Compl. ¶ 128), but provides no factual support for the figures alleged in
the chart. The chart does not purport to set forth the net impact of all alleged misstatements in
any period, which is necessary to determine materiality. This is critical since the alleged
misreporting of supplier rebates affects the timing of expense reductions, not their existence.

- 17 -

by which Defendants overstated [the company's] revenue, the Court cannot conclude that Plaintiffs have alleged, with the particularity required by the PSLRA, that Defendants' alleged misrepresentations or omissions of fact were material.").

Moreover, the alleged rebate accounting errors are immaterial as a matter of law. Supplier rebates are accounted for as reductions in costs of goods sold. (*See* Am. Compl. ¶ 59.) The rebates from Joan Fabrics allegedly totaled $15 million over six quarters, from Q4 2001 and Q1 2003. (*See id.* ¶ 55.) In this period, C&A's costs of good sold totaled $4.734 *billion*.[17/] The impact of the Joan rebates on that figure (0.3%) is plainly immaterial. *See In re Duke Energy Corp. Secs. Litig.*, 282 F. Supp. 2d 158, 161 (S.D.N.Y. 2003), *aff'd*, 113 Fed. App'x 427 (2d Cir. Nov. 15, 2004) (materiality is measured by relative impact on appropriate line item of financial statements, and alleged $217 million inflation of revenues is immaterial when it represents 0.3% of revenues for the period). *Accord Burlington Coat Factory*, 114 F.3d at 1427 (the failure to disclose reduced cost discounts was immaterial as a matter of law where total costs only increased 0.2% in the relevant time period). Certainly by the time of the August 2004 Notes Sale, alleged accounting errors having a 0.3% impact on costs of goods sold 16-32 months earlier could not matter to investors.

Likewise, the alleged improperly booked rebates from other suppliers totaled $28.6 million over twelve quarters, from Q4 2001 through Q3 2004. (*See* Am. Compl. ¶ 128 (alleging $43.6 million total vendor rebates, including the $15 million in Joan rebates).) C&A's costs of goods sold during that period was more than $10 *billion*,[18/] making the alleged rebate errors less

---

[17/]    *See* App. 23 (C&A 2002 Form 10-K ("2002 Form 10-K")) ($440 million for Q4 2001); App. 17-18 (2003 Form 10-K) ($3.368 billion for FY 2002 and $926 million for Q1 2003).

[18/]    *See* App. 23 (2002 Form 10-K) ($440 million for Q4 2001); App. 17 (2003 Form 10-K) ($3.368 billion for FY 2002 and $3.540 billion for FY 2003); App. 33 (C&A Q3 2004 Form 10-Q) ($2.688 billion for Q1-Q3 2004).

than 0.3% of the total, even without considering the impact of netting out the alleged errors

against one another.

### D.      Plaintiff Does Not Plead Securities Fraud with the Required Particularity.

Section 10(b) claims must satisfy the heightened pleading standards of Fed. R. Civ. P. 9(b)

and the PSLRA. *GSC Partners*, 368 F.3d at 236-37. "Rule 9(b) requires, at a minimum, that

plaintiffs support their allegations of securities fraud with all of the essential factual background

that would accompany the 'first paragraph of any newspaper story' – that is, the 'who, what,

when, where and how' of the events at issue." *In re Suprema Specialties Sec. Lit.*, 438 F.3d 256,

276-77 (3d Cir. 2006). The PSLRA requires plaintiffs to "specify each statement alleged to have

been misleading [and] the reason or reasons why the statement is misleading," and, for allegations

made on information and belief, to "state with particularity all facts on which that belief is

formed." 15 U.S.C. § 78u-4(b)(1).

Plaintiff fails to comply with the mandates of Rule 9(b) and the PSLRA. The complaint

contains unacceptably broad statements such as: "[d]efendants went to extreme measures to

conceal the true financial results of operations and condition of the Company" (Am. Compl. ¶ 38);

"[d]efendants' positive statements falsely portrayed the Company as well positioned to succeed

and financially sound" (*id.* ¶ 92); and the disclosures defendants caused C&A to file were false

and misleading because, "among other reasons," they contained financial results that were inflated

by the improper accounting practices "detailed herein" (*id.*). Such statements are unacceptable

under Rule 9(b) and the PSLRA because they fail to specify which disclosure allegedly is

misleading, who made it, and why it was misleading. Defendants and the Court are left to guess

as to the nature of the "extreme measures" defendants allegedly undertook to conceal the

company's financial condition, what "positive statements" supposedly crossed the line into

actionable misrepresentations under section 10(b), and which alleged accounting practice and/or unspecified "other reasons" allegedly impacted which disclosure.

>    **1.    The allegations regarding the Joan Fabrics transactions are not stated with sufficient particularity.**

Plaintiff alleges defendants Stockman, Stepp, and unspecified "others acting at their direction" engaged in "round-trip" transactions with Joan Fabrics "designed to improperly increase Collins & Aikman's reported income." (Am. Compl. ¶ 53.) As noted above, C&A received quarterly price concessions for materials purchased from Joan Fabrics. Instead of alleging facts – *e.g.*, when Mr. Stockman or others allegedly "personally negotiated" so-called round-trip transactions with Mr. McCallum, who Mr. Stockman allegedly directed and how, and who said what to whom at which meeting – plaintiff makes unsupported charges that the payments were "falsely characterized" as rebates because they were repaid in subsequent transactions. (*See id.* ¶¶ 55-56.) For example, plaintiff alleges C&A purchased Southwest Laminates ("SWL") from Mr. McCallum for "at least $7 million more than the Company estimated it was worth" (*id.* ¶ 56), but provides no basis for alleging the "worth" of SWL – who made the valuation, when it was done, what methodology was used, who received or knew about it, or why it was reliable. Similarly, plaintiff alleges C&A gave Joan Fabrics looms "worth $3.1 million for no consideration" (*id.*), purchased other looms from Joan Fabrics for $4.7 million "even though they were only worth approximately $2 million" (*id.*), and otherwise "deliberately overpaid" an unnamed Joan Fabrics subsidiary an unspecified amount for air jet texturing machines (*id.* ¶ 56), but fails to provide *any* basis for these alleged valuations. Moreover, plaintiff describes no evidence whatsoever suggesting C&A overpaid for these assets as a means of repaying the Joan Fabrics rebates.

2.    **The allegations regarding improperly booked supplier rebates are not stated with sufficient particularity.**

Plaintiff's allegations regarding C&A's accounting for supplier rebates are likewise inadequate. Plaintiff alleges Mr. Stockman and defendants Stepp, Cosgrove, and Barnaba caused C&A to book rebates improperly in three respects: (1) price reductions based on projected purchases over future quarters were "pulled forward" into the current quarter; (2) rebates "contingent on future events, usually additional business" were immediately recognized; and (3) C&A purchased equipment and maintenance services for "above-market, deliberately inflated prices," received back the difference between the cost and the "true market price," and booked the difference as a rebate rather than a reduction in the cost basis of the equipment or maintenance. (Am. Compl. ¶ 61.) Plaintiff further alleges C&A used "side letters" to hide its rebate accounting practices. (*Id.* ¶¶ 61-62, 125-26, 153-55.)

These allegations do not provide the required who, what, when, where, and how of the alleged fraud. Plaintiff does not identify each allegedly improper booking,[19] the terms of the transactions, why the accounting was wrong, or how each defendant knew about the impropriety. Instead, plaintiff uses impermissibly broad assertions like: the "Director and Officer Defendants" improperly recognized "various" rebates. (*Id.* ¶ 66.) But "blanket allegations against 'the defendants' and 'management'" do not satisfy Rule 9(b) or the PSLRA. *Baker v. MBNA Corp.*, C.A. No. 05-272, 2007 WL 2009673, at *7 (D. Del. July 6, 2007).

The allegation that Mr. Stockman and other defendants "knew" the rebate accounting "was directly contrary to GAAP" (Am. Compl. ¶ 67) is clearly insufficient to satisfy the particularity requirements of Rule 9(b) and the PSLRA. Instead of providing any details to explain *why* the

---

[19]    Plaintiff names 22 rebates as "some of the improperly accounted for rebates" (*id.* ¶¶ 65-68), and charges that C&A improperly recorded $7.2 million of rebates involving capital expenditures but provides specifics for only a small fraction of that amount (*id.* ¶¶ 66, 68).

accounting treatment was improper or what the correct treatment should have been, plaintiff

recites, in cursory fashion, a litany of GAAP principles defendants allegedly violated.  (*See id.* ¶

127.)  But plaintiff does not tie any of these principles to the actual terms of any of the rebates.

Nor does plaintiff allege what it means to "pull forward" rebates, or why it would be improper for

C&A to agree with a supplier to do so.

Finally, plaintiff conclusorily alleges "it was highly irregular and implausible that the

Company needed to procure numerous side-agreements since nearly all of the Company's original

contracts with its suppliers either did not contain key terms or contained terms contrary to those

set forth in the side letters regarding its entitlement to multi-million dollar rebates."  (*See id.*

¶ 155.)  But there is no factual support for that bare assertion – no data about the actual contracts

involved or their terms.  Those particulars are exactly what Rule 9(b) and the PSLRA require.

### E.      No Allegations Support a "Cogent and Compelling" Inference of Scienter.

The complaint also fails to "state with particularity facts giving rise to a strong inference

that the defendant acted with the required state of mind," as required by the PSLRA.  *See* 15

U.S.C. § 78u-4(b)(2).[20]  The Supreme Court recently held the inference of scienter "must be more

than merely 'reasonable' or 'permissible' – it must be cogent and compelling, thus strong in light

of other explanations."  *Tellabs*, 127 S. Ct. at 2510.  "To determine whether the plaintiff has

alleged facts that give rise to the requisite 'strong inference' of scienter, a court must consider

plausible nonculpable explanations for the defendant's conduct, as well as inferences favoring the

plaintiff."  *Id.*  In this Circuit, the requisite "strong inference" of scienter may be established by

alleging either (a) facts that show a defendant had both motive and opportunity to commit fraud,

---

[20]     The PSLRA's particularity requirement for the scienter component of claims under
section 10(b) supersedes Rule 9(b)'s provision that state of mind may be averred generally.  *See
GSC Partners*, 368 F.3d at 236.

or (b) facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness. *GSC Partners*, 368 F.3d at 236.

**1.     No facts alleged show Mr. Stockman had any plausible motive to mislead investors.**

Plaintiff's allegations of Mr. Stockman's motive to commit fraud are plainly insufficient. "Motive must be supported by facts stated 'with particularity.'" *GSC Partners*, 368 F.3d at 237. Plaintiff makes conclusory allegations, minus the requisite supporting facts, that Mr. Stockman wanted to avoid triggering C&A's debt covenants (Am. Compl. ¶ 70), secure additional financing (*id.* ¶ 87), protect his own reputation as an "investment wizard" (*id.* ¶ 70), and continue collecting a portion of the fees C&A paid to Heartland (*id.* ¶ 32). Even if all these things were adequately pleaded, however, none of them provides a basis for inferring motive to engage in fraud.

Indisputable circumstances show Mr. Stockman had no personal motivation to engage in a fraud that allegedly overstated C&A's business performance. Personally and through Heartland, he was a consistent and large *purchaser* of C&A stock, and he *never sold a share*. From May through December 2004, in the midst of the supposed fraud, Mr. Stockman personally invested $1.5 million of his own funds to buy 331,000 shares of C&A stock. From 2002 through 2004 he approved Heartland's purchase of millions of shares of C&A stock.[21] It is nonsensical to contend that Mr. Stockman invested millions in C&A stock while knowing C&A was inflating its financial performance. These facts alone negate any inference of motive. *See In re Alpharma, Inc. Sec. Litig.*, 372 F.3d 137, 152 (3d Cir. 2004) (no strong inference of scienter where company's controlling shareholder did not engage in any stock sales during the class period); *Globis Capital Partners, L.P. v. Stonepath Group, Inc.*, No. 06-2560, 2007 WL 1977236, at *4 (3d Cir. July 10, 2007) (where defendants acquired substantial amounts of stock throughout the period in which

---

[21]     *See* note 3, above.

they were allegedly acting recklessly, "'we have no basis to infer the sort of conscious disregard and deliberate ignorance required to plead scienter'"). *Accord San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos.*, 75 F.3d 801, 814 (2d Cir. 1996) (scienter cannot be inferred where defendant was a net buyer of stock during the relevant period); *In re Bristol-Myers Squibb Sec. Litig.*, 312 F. Supp. 2d 549, 561 (S.D.N.Y. 2004) (increases to stock holdings are "wholly inconsistent with fraudulent intent").

Likewise, Mr. Stockman's personal compensation from C&A provides no basis to infer any motive to engage in fraud: He received no salary, stock options or other form of direct compensation from C&A. (*See* App. 15-16 (2003 Form 10-K).) Plaintiff's assertion that Mr. Stockman was motivated by personal gain is founded on the assertion that he sought to continue receiving a portion of the fees paid by C&A to Heartland for financial services. (*See* Am. Compl. ¶ 32.) The allegations that Mr. Stockman received a large portion of payments by C&A to Heartland, which were copied from other complaints, are simply wrong.[22] But even if they were correct, they would not give rise to a strong inference of scienter. *See GSC Partners*, 368 F.3d at 237 (allegations that "the corporation and its officers have a desire to complete the transaction, and officers will . . . reap financial benefits from a successful transaction," are insufficient because they apply equally to nearly every corporate transaction); *Klein v. Autek Corp.*, 147 F. App'x. 270, 277 (3d Cir. 2005) ("it is well-established that an allegation of motive based solely upon a desire to receive professional fees is insufficient"). Moreover, because Heartland's fees did not vary based

---

[22]    To begin, the allegations are based on disclosures of amounts charged to C&A, not actually paid. Of the lesser amounts paid, the portion allegedly received by Mr. Stockman is grossly incorrect. Half of the fees were allocated to the limited partners of the entity that owned the C&A stock. The remaining half was used to defray Heartland's costs of providing financial services to C&A, and what remained was distributed among Heartland's partners in proportion to their stake in the firm. In that capacity, Mr. Stockman received considerably less than alleged.

on C&A's earnings, they could not provide a motive for misstating C&A's net income.[23]

Plaintiff seeks to overcome Mr. Stockman's lack of any motive to commit fraud by alleging he was driven by a desire to assure that C&A stayed in compliance with its debt covenants and could obtain additional financing. These types of motivation fail to support the required inference of intent to commit fraud because they are common to all corporate executives. "[M]otives that are generally possessed by most corporate directors and officers do not suffice" because they do not show a "concrete and personal benefit to the individual defendant[]." *GSC Partners*, 368 F.3d at 237. "At most, the need to comply with debt covenants can be a contributing motive to commit securities fraud, but standing alone even severe cash flow problems are insufficient to establish motive. . . . Otherwise, any corporation that was subject to debt covenants and whose stock price declined would be susceptible to a securities fraud action." *In re Stonepath Group, Inc. Sec. Litig.*, 397 F. Supp. 2d 575, 593 (E.D. Pa. 2005); *accord Klein*, 147 F. App'x. at 279 (a desire to "obtain capital from the securities investment to cover corporate expenses or debt" is "a motive so generic that almost every corporate officer in [defendant's] position would possess [it]").[24] "[I]f scienter could be pleaded on that basis alone, virtually every company in the United States that experiences a downturn in stock price could be forced to defend securities fraud actions." *San Leandro*, 75 F.3d at 814.

---

[23]    Heartland earned more than half of its fees from investment banking services for two 2001 transactions not alleged to be part of any securities fraud – Heartland's initial investment in C&A and C&A's TAC-Trim acquisition. (*See* App. 28 (2001 Form 10-K/A) ($12 million and $12.5 million fees, respectively).) The bulk of the remainder came from the fixed annual $4 million fee, and $6 million of investment banking fees charged in 2004 ($5 million of which was recorded and disclosed but never paid). (*See* App. 79 (C&A Form S-4 (Jan. 27, 2005)).)

[24]    *See also In re Cross Media Mktg. Corp. Sec. Litig.*, 314 F. Supp. 2d 256, 265 (S.D.N.Y. 2004) ("alleged desires … to maintain compliance with the financial covenants of a company loan agreement … are … inadequate to support an allegation of intent to commit fraud").

2.     **No facts or circumstances alleged give rise to a strong inference of Mr. Stockman's scienter.**

Having failed to show that Mr. Stockman had any motive to engage in alleged fraud, plaintiff must allege facts constituting strong circumstantial evidence of his conscious misbehavior or recklessness. *GSC Partners*, 368 F.3d at 236. Recklessness involves "not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *Alpharma*, 372 F.3d at 149. "Recklessness is not intended to encompass 'claims essentially grounded on corporate mismanagement.'" *In re Digital Island Sec. Litig.*, 357 F.3d 322, 332 (3d Cir. 2004).

Assuming the truth of all well-pleaded facts (but not conclusions masquerading as facts),[25] plaintiff's allegations do not support a "cogent and compelling" inference that their section 10(b) losses were the result of intentional or reckless misconduct. Plaintiff's vague charges, many of which concern events that occurred after the August 2004 Notes Sale, cannot support a claim of fraud in connection with that offering. Missing from the complaint are *facts* creating a strong inference that Mr. Stockman *knowingly or recklessly*: (i) inflated the prices of acquisitions from Mr. McCallum in exchange for rebates from another McCallum entity; (ii) booked rebate transactions incorrectly, or directed anyone to do so; (iii) inflated any receivables in January 2005, or ordered anyone to do so; (iv) overstated goodwill and deferred tax assets; (v) or made inaccurate statements in March and April 2005.

---

[25]     *See, e.g., Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1965 (2007) ("labels and conclusions" are insufficient to state a claim); *In re Rockefeller Ctr. Props., Inc. Sec. Litig.*, 311 F.3d 198, 216 (3d Cir. 2002) ("[C]ourts are not required to credit bald assertions or legal conclusions improperly alleged in the complaint. . . . Similarly, legal conclusions draped in the guise of factual allegations may not benefit from the presumption of truthfulness.").

> a)    **No alleged facts support an inference that Mr. Stockman
> intentionally caused C&A to book false rebates from Joan
> Fabrics by means of "round-trip" transactions.**

Plaintiff's allegations regarding C&A's transactions with Joan Fabrics, unparticularized as they are, fail to give rise to a strong inference of Mr. Stockman's scienter. Plaintiff conclusorily alleges Mr. Stockman "personally negotiated" subsequent "round-trip" payments with Mr. McCallum (Am. Compl. ¶ 55), but do not allege one shred of evidence to support an inference that Mr. Stockman knowingly overpaid for acquisitions from Joan Fabrics, or that he did so as a means of repaying the rebates. *GSC Partners*, 368 F.3d at 240 (plaintiffs failed to plead scienter with the requisite particularity where they failed to "provide any source to connect [their] accusation to record evidence"); *In re Bio-Technology Gen. Corp. Sec. Litig.*, 380 F. Supp. 2d 574, 596 (D.N.J. Aug. 10, 2005) (plaintiff fails to create a strong inference of scienter where plaintiff "neglects the critical step of connecting" the defendants to the alleged source of information contrary to public disclosures). This inadequacy is especially apparent here, because C&A's Audit Committee undertook an extensive investigation of these transactions in 2003-2004 (*see* Am. Compl. ¶ 96) and, after scrutinizing each transaction plaintiff now questions, concluded the rebates "had a legitimate business purpose" and "were negotiated fairly." (*See* App. 86-87 (March 12, 2004 Press Release).) The existence of exculpatory findings by independent investigators should, at a minimum, cause plaintiff to allege detailed reasons for making directly contrary allegations of intent to defraud. But plaintiff does no more than make vague assertions that Mr. Stockman and other defendants "were not forthcoming" during the investigation, disregarding the extensive independent document and email review that was done at the time. (*See* Am. Compl. ¶ 97.)

Plaintiff's conclusory allegations of fraudulent "round-trip" transactions because C&A supposedly overpaid for certain acquisitions (without explaining how Mr. Stockman supposedly knew or intended that result) does not create the required strong inference of scienter. The Fourth

Circuit recently rejected allegations of round-tripping fraud based on the contention that one party or another paid more than the transaction was worth. *See Teachers' Ret. Sys. v. Hunter*, 477 F.3d 162 (4th Cir. 2007). After noting that a "fair" acquisition price depends on a wide variety of factors, including market value, dividends, earning prospects, the nature of the enterprise, and future business prospects, the court held that a fraud claim cannot proceed absent reliable grounds for challenging the good faith of the transaction price. *Id.* at 181. The plaintiff in *Hunter* arbitrarily equated "worth" with "book value," much like plaintiff here assumes that some valuation of unspecified origin is dispositive. But the *Hunter* court found this allegation "does not suggest an excessive price, much less a fraudulent price." *Id.*

Moreover, "the basis for alleging 'round-tripping' does not exist when either of the transactions have economic substance," and "[t]he mere existence of reciprocal dealing does not suggest 'round-tripping.'" *Id.* at 178. Plaintiff "must allege facts sufficient to support a reasonable belief that both legs of the round-tripping were a sham" for the fraud claim to survive. *Id.* at 179; *see Bristol-Myers Squibb*, 312 F. Supp. 2d at 566 (finding bona fide transactions where "real products [were] shipped to real customers who then paid with real money"). Absent specific facts showing Mr. Stockman knowingly or recklessly paid excessive amounts in sham transactions in exchange for the Joan Fabrics rebates – which are totally lacking here – the allegations of a "round-tripping" scheme fail to give rise to a strong inference of scienter under the PSLRA.

### b)    No alleged facts support an inference that Mr. Stockman intentionally caused C&A to book rebates improperly.

The allegations regarding C&A's supplier rebate transactions also fail to give rise to a strong inference of scienter. Plaintiff makes conclusory allegations that C&A's rebate accounting practices violated various GAAP provisions, but does not allege what those provisions require, how C&A's accounting for specific rebate transactions allegedly violated

- 28 -

those provisions, and which defendants, if any, were aware of such alleged violations. (See Am. Compl. ¶ 127.) Mere allegations of GAAP violations are insufficient to plead scienter. See, e.g., In re Astea Int'l Inc. Secs. Litig., Civ. Act. No. 06-1467, 2007 WL 2306586, at *18 (E.D. Pa. Aug. 9, 2007), citing Novak v. Kasaks, 216 F.3d 300, 309 (2d Cir. 2000). In Alpharma, the Third Circuit held that plaintiffs failed to plead scienter where they failed to indicate how defendants were involved in the alleged GAAP violations. 372 F.3d at 150. Here, plaintiff fails to allege a single fact to support an inference that Mr. Stockman (i) understood or recklessly failed to understand the principles governing rebate accounting, or (ii) knew, or as CEO recklessly failed to learn, enough about the facts and circumstances of any rebate transaction to determine whether C&A's accounting was proper.

Plaintiff contends the alleged improper accounting practices started in early 2002 (see Am. Compl. ¶ 58), long before Mr. Stockman became CEO. Nevertheless, plaintiff asserts Mr. Stockman must have known about rebate accounting errors by virtue of his position and access to unspecified company documents. (See id. ¶ 25.) These grounds for alleging fraud routinely fail. See, e.g., In re Advanta Corp. Sec. Litig., 180 F.3d 525, 539 (3d Cir. 1999) ("It is well established that a pleading of scienter 'may not rest on a bare inference that a defendant "must have had" knowledge of the facts.'").

Even if Mr. Stockman had learned the terms of C&A's transactions with its suppliers, there are no grounds alleged to conclude he knew, or recklessly ignored, that the accounting judgments for those transactions by C&A's accounting professionals were wrong. The accounting principles involved were far from straightforward;[26] and no CEO is expected to have that level of

---

[26]    During the period at issue, the proper accounting for cash rebates from suppliers was an "emerging issue" in accounting for which the FASB asked for EITF guidance, including on the precise issue faced by C&A's accountants: "Under what circumstances up-front nonrefundable

accounting expertise. *See, e.g., Bristol-Myers Squibb*, 312 F. Supp. 2d at 564-67 (no scienter pled

based on accounting errors involving complex judgments); *Payne*, 433 F. Supp. 2d at 580

("[P]laintiff cannot satisfy the reckless behavior prong of showing scienter where the disputed

'items involve complex issues of accounting as to which reasonable accountants could reach

different conclusions.'").  Plaintiff fails to cite even a single example where Mr. Stockman was

made aware of improper accounting for rebates and nevertheless concurred.

     Instead of providing concrete allegations of Mr. Stockman's acquiescence in specific

accounting errors, plaintiff makes the broad, simplistic, unsupported assumption that supplier

rebates were always provided to C&A in exchange for agreeing to make future purchases, the

accounting for which should somehow have been clear.  (*See* Am. Compl. ¶ 59 ("[u]nder GAAP

. . . rebates can only be recognized when the promised purchases have been made").)  Absent

factual allegations showing that rebates were in fact tied to future purchases, that these specific

rebates were accounted for improperly, and that Mr. Stockman knew C&A's accounting for these

rebates was wrong, plaintiff's simplistic theory of CEO liability is totally unfounded.

        c)       **No facts alleged regarding events after August 2004 support any inference of Mr. Stockman's scienter in connection with the August 2004 Notes Sale.**

     As noted above, plaintiff's allegations about the GECC accounts receivable facility and

various disclosures in *2005* are plainly irrelevant to a securities fraud claim founded on the sale of

Senior Notes in August *2004.*  Events that occurred after the Notes Sale could not possibly give

rise to a strong inference of scienter at or before the time of the sale.  To the extent, however, the

---

cash consideration given by a vendor to a customer should be recognized immediately in the
customer's income statement rather than as a liability."  (App. 192 (FASB EITF Abstracts, Issue
No. 02-16).)  While resolving other rebate accounting issues with an emphasis on the importance
of the facts of each case, the EITF could not reach consensus on this issue "due to the broad,
general nature of related questions."  (*Id.* at 195.)

Court believes such allegations could be relevant to scienter in connection with a transaction occurring months before, we show below that plaintiff again alleges no facts that provide "cogent and compelling" circumstantial evidence of scienter with regard to any of the 2005 disclosures.

### (i)    The GECC accounts receivable facility

Plaintiff makes only conclusory allegations that Mr. Stockman and "others acting at his direction" "included tens of millions of dollars of receivables in the borrowing base that were not eligible for inclusion." (Am. Compl. ¶ 75.) Plaintiff does not allege with particularity any facts that give rise to a strong inference of knowing or reckless misleading disclosures about C&A's short-term borrowing capacity. No allegations describe the terms of the GECC agreement, the terms of the receivables, who allegedly acted at Mr. Stockman's "direction," and what Mr. Stockman allegedly said to them.[27]

### (ii)    The reduction of goodwill and deferred tax assets

Plaintiff's allegations that C&A should have reduced its goodwill and deferred tax assets at some unspecified time before March 2005 also fail to give rise to a strong inference of Mr. Stockman's scienter, for the simple reason that the complaint never alleges Mr. Stockman, who was not an accountant, understood the required factual predicates for such write-downs under GAAP, or knew that C&A allegedly had met those predicates before March 2005. (*See* Am. Compl. ¶¶ 130-37.)

### (iii)    March and April 2005 statements about management's rebate review and C&A's financial situation

Plaintiff alleges that press releases and other public statements in March and April 2005 contained false statements about (a) management's rebate review, (b) C&A's available liquidity,

---

[27]    It is particularly difficult to conjure up any securities fraud from plaintiff's allegations, as public bankruptcy filings make it clear the GECC debt was fully paid by collecting the pledged receivables as they came due. *See* note 7, above.

(c) C&A's projected first quarter EBITDA, and (d) C&A's projected capital expenditures. (Am.
Compl. ¶¶ 80-84, 86, 88.)

**The management rebate review.** In the March 17, 2005 Press Release, C&A disclosed it
had booked some rebates in incorrect quarters and that it expected to restate its earnings for the
first three quarters of 2004, and possibly 2003. (*See* App. 99 (March 17 Press Release); Am.
Compl. ¶ 80.) Plaintiff alleges the press release contained misleading statements about the scope
of rebate accounting problems because, "[a]s Defendants knew, the rebate accounting issue
spanned a period as far back as late 2001 and covered substantially all of the rebates that the
Company had recognized during that time." (Am. Compl. ¶ 81.) Plaintiff alleges no factual basis
for asserting either the supposed scope of the accounting problem ("substantially all of the
rebates"), or defendants' supposed knowledge that there were more extensive errors. C&A
received literally thousands of rebates going back to 2001; plaintiff cites no basis for suggesting
that "substantially all" of them were accounted for incorrectly. Moreover, C&A made clear it was
"continuing to evaluate whether a restatement of [periods prior to 2004] will be necessary." (*Id.* ¶
65; *see also* App. 99 (March 17 Press Release) ("These preliminary results remain subject to
material change and have not been reviewed by our outside auditors.").) The disclosure of
uncertainty and ongoing inquiries into the issue is inconsistent with intent to deceive investors
about the nature of the problem.

**Liquidity.** In the March and April press releases, C&A disclosed it had $86 million in
liquidity as of December 31, 2004, and $81 million in liquidity as of March 31, 2005. (Am.
Compl. ¶¶ 80-81, 88.) Plaintiff alleges these figures were inaccurate because C&A had only $12
and $9 million of liquidity on the respective dates. (*Id.* ¶ 88.) But plaintiff alleges no factual basis
for the $12 and $9 million figures, nor any facts showing Mr. Stockman played any role in
drafting or reviewing the liquidity disclosures, or had any reason to question their validity. *See*

*Rombach v. Chang*, 355 F.3d 164, 176 (2d Cir. 2004) (plaintiffs failed to plead scienter because they did not allege defendants knew of specific facts contrary to their public statements). Plaintiff fails to identify a single internal document or witness statement showing that C&A's liquidity disclosures were misleading.

**First quarter EBITDA.** In March 2005, C&A projected it would end the first quarter of 2005 with $65-75 million of EBITDA. (Am. Compl. ¶ 83.) Plaintiff alleges Mr. Stockman provided this projected EBITDA range "even though at that time internal information indicated that the figure would be half that amount." (*Id.*) But plaintiff fails to provide any factual basis for alleging the statement was inconsistent with existing C&A internal reports, as the PSLRA clearly requires. The PSLRA mandates that supposed contrary "internal" documents be identified with specificity. *See CALPERS*, 394 F.3d at 147 (instructing that "a plaintiff relying on internal reports must specify the internal reports, who prepared them and when, how firm the numbers were or which company officers reviewed them). Plaintiff also disregards Mr. Stockman's extensive caveats qualifying the projection, including that "EBITDA is still subject to major uncertainties, particularly with respect to the magnitude and timing of our success with customer recovery initiatives." (App. 119 (Investor Call Tr.).) The emphasis on the unreliability of this prediction is totally inconsistent with an intent to mislead the listeners.

**Capital expenditures.** In its March 2005 disclosures, C&A stated it projected 2005 capital expenditures in the $120 to $130 million range, "or about $30 million a quarter."[28/] Plaintiff alleges this was a knowing misrepresentation because first quarter capital expenditures

---

[28/]    *See* App. 110 (C&A SEC Form 8-K Ex. 99.3, Presentation Materials (Mar. 17, 2005)) ("2005 capex will be capped at $120 to $130 million – well below 2004 levels"); App. 115 (Investor Call Tr.) (projecting that C&A would be "undertaking and implementing a strict cap this year on CapEx of $120 million or about $30 million a quarter"); *id.* at 119 ("CapEx, as I mentioned a moment ago will be strictly limited, 120, 130 kind of range. Hopefully at the lower end of that and it's well below last year's level, which you know was more than $160 million.").

were known to be in excess of $30 million. (*See* Am. Compl. ¶ 83.) In essence, plaintiff tries to convert repeated annual projections of $120 to $130 million, "or about $30 million a quarter," into a firm projection of $30 million in capital expenditures in the first quarter. That is not what was said, and certainly the repeated focus on annual figures is inconsistent with a supposedly knowing effort to mislead investors about the first quarter. Nor do plaintiffs identify any significance to investors of (or any reason to misstate) the quarter by quarter allocation of C&A's annual capital expenditures. Securities fraud is not a "gotcha" game applicable to every shorthand reference a company or executive might make in the course of more extensive communications.

## II.     THE COMPLAINT FAILS TO STATE A SECTION 14(a) CLAIM.

To state a section 14(a) claim, plaintiffs "must aver that (1) a proxy statement contained a material misrepresentation or omission which (2) caused [them] injury and (3) that the proxy solicitation itself . . . was an essential link in the accomplishment of the transaction." *CALPERS*, 394 F.3d at 144.

Plaintiff alleges that in 2002-2004, defendants caused C&A to disseminate proxy statements that reported financial results artificially inflated by "a variety of improper accounting practices" and failed to disclose that C&A was experiencing "severe liquidity constraints." (Am. Compl. ¶¶ 94, 188.)[29/] Plaintiff claims these proxies were an "essential link" in the continuation of the defendants' alleged misconduct because "revelations of the truth" would have caused shareholders to withdraw their support from the company's officers and directors. (*Id.* ¶ 190.)

Plaintiff's section 14(a) claim fails because: (1) the proxy solicitations were not essential to obtaining shareholder approval for matters subject to shareholder vote because a majority of

---

[29/]     Any claims arising out of the 2002 Proxy Statement, filed April 25, 2002, are time-barred. *See In re Exxon Mobil Corp. Sec. Litig.*, 500 F.3d 189, 197 (3d Cir. 2007) (section 14(a) claims subject to one-year statute of limitations and three-year statute of repose).

shareholder votes controlled by defendants were determinative of every shareholder vote, rendering the disclosures both immaterial and incapable of causing any loss; (2) plaintiff fails to identify an economic loss proximately caused by any disclosure in any proxy statement; and (3) the allegations of misleading proxy disclosures are not stated with required particularity.[30/]

There is no possible proxy claim because the proxy disclosures were of no consequence to any shareholder vote. A majority of shareholder votes were committed to approving the proposed director candidates and shareholder resolutions without regard to the votes of the public shareholders. The Supreme Court twice held that in these circumstances that there is no cognizable claim. First, in *Santa Fe Indus. v. Green*, 430 U.S. 462 (1977), the Court held that where minority shareholder approval is not required to complete a transaction, alleged misrepresentations or omissions in communications with shareholders regarding the transaction are immaterial as a matter of law. If the shareholders could not have altered the result in any event, the misleading disclosure was immaterial as a matter of law and there can be no claim. *See id.* at 474 n.14. Second, in *Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083 (1991), the Court ruled that in the absence of voting power to alter a transaction, a minority shareholder cannot demonstrate that any allegedly misleading proxy disclosures impacted the result of a shareholder vote and therefore cannot satisfy the requirement that the alleged proxy violation caused any loss. *See id.* at 1099-1106. *See also Scattergood v. Perelman*, 945 F.2d 618, 625 (3d Cir. 1991).

---

[30/]    Plaintiffs' section 14(a) claim is grounded in the same allegations of fraud as the section 10(b) claims and therefore must satisfy Rule 9(b), regardless of whether section 14(a) claims independently require scienter. *See CALPERS*, 394 F.3d at 144, 145 n.9; *Rombach*, 355 F.3d at 172 (where "wording and imputations of the complaint are classically associated with fraud," the claim sounds in fraud and must satisfy Rule 9(b)). As a result, these claims are subject to dismissal on the grounds set forth in Parts I.D and I.E., above.

Here, the corporate action at issue is the re-election of directors and approval of executive compensation policies. (*See* Am. Compl. ¶ 190.) Plaintiff has not identified any shareholder who would have withheld a proxy based on different proxy disclosures. But more importantly, because more than 50 percent of the shareholder vote was controlled by defendants Heartland, Becker, and McCallum, and the proxy statements clearly indicated these shareholders would vote for the directors and proposals described in the proxy statements, no alleged inaccuracies in the proxy statements did, or could have, materially impacted the result of the shareholder vote.[31/] Heartland, Becker, and McCallum held their shares of C&A stock subject to the terms of a fully disclosed Stockholders Agreement which provided, among other things, that each party must vote their stock to ensure that the other parties would retain their positions on C&A's Board.[32/] In other words, the election of C&A's directors was a foregone conclusion based on the voting power and contractual obligations of the majority shareholders. Becker, McCallum, and Heartland's designees would have been elected to C&A's Board regardless of voting decisions by the remaining shareholders.[33/] Under *Santa Fe* and *Virginia Bankshares*, no private action for alleged misleading proxy disclosures is cognizable under those circumstances.

Yet another ground for dismissal is that plaintiff also fails to demonstrate any causal connection between any economic loss suffered by C&A and the re-election of directors solicited by the allegedly misleading proxy statements. C&A's losses arose out of the business judgments exercised by C&A's directors, not the election of those directors. In *Gen. Elec. Co. v. Cathcart*, 980 F.2d 927 (3d Cir. 1992), the Third Circuit rejected an attempt to prove causation under similar

---

[31/]    *See* App. 51, 53 (2003 Proxy Statement); and App. 62 (2004 Proxy Statement).

[32/]    *See* App. 55 (2003 Proxy Statement); App. 63 (2004 Proxy Statement).

[33/]    Pursuant to the terms of the "Initial Stockholders Agreement" between Heartland and C&A, Heartland can designate at least seven members of C&A's board. *See* App. 54 (2003 Proxy Statement); App. 64 (2004 Proxy Statement).

circumstances, stating that "the mere fact that omissions in proxy materials, by permitting directors to win re-election, *indirectly* led to financial loss through mismanagement will not create a sufficient nexus with the alleged monetary loss.  Rather, damages are recoverable under Section 14(a) only when the votes for a specific corporate transaction requiring shareholder authorization, such as a corporate merger, are obtained by a false proxy statement, and that transaction was the direct cause of the pecuniary injury for which recovery is sought." *Id.* at 933 (emphasis in original).  *See also Cowin v. Bresler*, 741 F.2d 410, 428 (D.C. Cir. 1984) (causation element is not satisfied because any damage resulting from continued fraudulent acts by elected directors was not the direct result of misleading proxy statement).  Plaintiff does not, and cannot, tie any alleged economic loss by C&A to any corporate action approved by a shareholder vote.

Having failed to allege facts showing that misleading proxy disclosures were an "essential link" in the re-election of C&A's directors, or that C&A suffered any economic loss caused by any shareholder vote, plaintiff's section 14(a) claim should be dismissed.

## III.    THE COURT SHOULD DECLINE TO EXERCISE SUPPLEMENTAL JURISDICTION OVER PLAINTIFF'S STATE LAW CLAIMS.

The lack of any economic loss caused by the alleged federal securities violations raises grave doubts that the assertion of those claims is sufficient to confer subject matter jurisdiction on this Court.  *See Kehr Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406, 1408-09 (3d Cir. 1991) (Rule 12(b)(1) dismissal is proper where the claim "clearly appears to be immaterial and made solely for the purpose of obtaining jurisdiction or . . . is wholly insubstantial and frivolous"); *Maio v. Aetna, Inc.*, 221 F.3d 472, 482 n.7 (3d Cir. 2000) ("Generally speaking, motions to dismiss on the grounds of a failure to allege an "injury in fact" implicate constitutional standing principles and thus are predicated on Rule 12(b)(1) rather than Rule 12(b)(6).").  But even if the Court concludes the federal securities claims are not "wholly insubstantial," and therefore avoid

- 37 -

dismissal under Rule 12(b)(1), they should be dismissed under Rule 12(b)(6) and the Court

should decline to exercise jurisdiction to hear the remaining state law claims.  *See* 28 U.S.C.

§ 1367(c); *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 444 (3d Cir. 1997)

(district court properly declined supplemental jurisdiction over remaining state law claims where

"all federal claims were correctly dismissed and dismissal of the remaining contract claims

would not be unfair to the litigants or result in waste of judicial resources").[34]

## Conclusion

For all of the foregoing reasons, the claims against defendant David Stockman should be

dismissed pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6).

Respectfully submitted,

Dated: April 28, 2008

OF COUNSEL:

Andrew B. Weissman
Michele L. Taylor
Wilmer Cutler Pickering Hale and Dorr, LLP
1875 Pennsylvania Avenue, NW
Washington, DC 20006
(202) 663-6000

BAYARD, P.A.

Peter B. Ladig (No. 3513)
Stephen B. Brauerman (No. 4952)
222 Delaware Avenue, Suite 900
P.O. Box 25130
Wilmington, DE  19899-5130
pladig@bayardfirm.com
sbrauerman@bayardfirm.com
(302) 655-5000

Counsel for Defendant David A. Stockman

---

[34]    Mr. Stockman also joins in the motions of other defendants to dismiss the state law claims should the Court determine to address them, and incorporates by reference the grounds for dismissal of those claims set forth in the Memorandum of Law of J. Michael Stepp in Support of His Motion To Dismiss.

## CERTIFICATE OF SERVICE

I, Stephen B. Brauerman, Esquire hereby certify that on the 14th day of September, 2007, a true and correct copy of the foregoing **Brief in Support of Defendant David A. Stockman's Motion to Dismiss Amended Complaint** has been served upon the following parties as indicated.

### VIA CM/EFC

Joseph A. Rosenthal, Esq.
Carmella P. Keener, Esq.
Rosenthal, Monhait & Goddess, P.A.
Mellon Bank Center
Suite 1401
919 N. Market Street
Wilmington, DE 19899-1070
(302) 656-4433

Thomas P. Preston, Esq.
Blank Rome LLP
Chase Manhattan Centre
1201 North Market Street
Suite 800
Wilmington, DE 19801-4226
(302) 425-6400

Thomas G. Macauley, Esq.
Zuckerman Spaeder LLP
919 Market Street
Suite 990
Wilmington, DE 19810
(302) 427-0400

Anne C. Foster, Esq.
Robert J. Stearn, Jr., Esq.
Richards, Layton & Finger, P.A.
One Rodney Square
920 North King Street
Wilmington, DE 19801
(302) 651-7700

James Holzman, Esq.
J. Clayton Athey, Esq.
Prickett, Jones & Elliott, P.A.
1310 King Street, P.O. Box 1328
Wilmington, DE 19899
(302) 888-6500

Christian Douglas Wright, Esq.
Young Conaway Stargatt & Taylor LLP
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, DE 19899-0931
(302) 571-6691

Robert S. Saunders, Esq.
Skadden, Arps, Slate, Meagher & Flom LLP
One Rodney Square
P.O. Box 636
Wilmington, DE 19899
(302) 651-3000

Michael J. Maimone, Esq.
Joseph B. Cicero, Esq.
Edwards Angell Palmer & Dodge LLP
919 North Market Street
15th Floor
Wilmington, DE 19801
(302) 777-7770

Kenneth J. Nachbar, Esq.
Morris, Nichols, Arsht & Tunnell
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899

Richard L. Horowitz, Esq.
Potter Anderson & Corroon, LLP
1313 N. Market Street, Hercules Plaza,
6th Floor
P.O. Box 951
Wilmington, DE 19899-0951

Vernon R. Procter, Esq.
Proctor Heyman LLP
1116 West Street
Wilmington, DE 19801

Albert H. Manwaring, IV, Esq.
Thomas H. Kovach, Esq.
Pepper Hamilton LLP
Hercules Plaza, Suite 5100
Wilmington, DE 19801

_____
Stephen B. Brauerman (No. 4952)