UNITED STATES DISTRICT COURT
DISTRICT OF DELAWARE

COLLINS & AIKMAN CORPORATION and COLLINS
& AIKMAN PRODUCTS CO., as Debtors in Possession,

Plaintiffs,

v.

Case No: 1:07-cv-00265-SLR

DAVID A. STOCKMAN, *et al.,*
Defendants.

## APPENDIX TO BRIEF IN SUPPORT OF
## DAVID A. STOCKMAN'S MOTION TO DISMISS

OF COUNSEL:

Andrew B. Weissman
Michele L. Taylor
Wilmer Cutler Pickering Hale and Dorr, LLP
1875 Pennsylvania Avenue, NW
Washington, DC 20006
(202) 663-6000

BAYARD, P.A.

Peter B. Ladig (No. 3513)
Stephen B. Brauerman (No. 4952)
222 Delaware Avenue, Suite 900
P.O. Box 25130
Wilmington, DE 19899-5130
pladig@bayardfirm.com
sbrauerman@bayardfirm.com
(302) 655-5000

Dated: April 28, 2008

Counsel for Defendant David A. Stockman

{00863296;v1}

**TABLE OF CONTENTS**

| TAB | DOCUMENT | ORIGINAL PAGE(S) EXCERPTED | APPENDIX PAGE (Labeled "A") |
|---|---|---|---|
| 1 | C&A 2003 Form 10-K | 2-4, 19-21, 36-40, 50-51, F-3, F-52-53 | 1 |
| 2 | C&A 2002 Form 10-K | F-42 | 21 |
| 3 | C&A 2001 Form 10-K/A | 2, 13-14, F-11-12 | 24 |
| 4 | C&A Q3 2004 Form 10-Q | 1 | 31 |
| 5 | C&A Form Def. 14A (Apr. 25, 2002) ("2002 Proxy Statement") | 1-4, 9-10 | 34 |
| 6 | C&A Form Def. 14A (Apr. 25, 2003) ("2003 Proxy Statement") | 1-4, 9-10 | 45 |
| 7 | C&A Form Def. 14A (Sept. 30, 2004) ("2004 Proxy Statement") | 1-2, 16-17 | 56 |
| 8 | August 2004 Private Placement Memorandum for the 12.875% Notes Due 2012 | 4, 11-16, 21 | 65 |
| 9 | C&A Form S-4 (Jan. 27, 2005) | Table of Contents, 75 | 73 |
| 10 | C&A Form 8-K, Ex. 99.1 (Mar. 12, 2004) | All | 81 |
| 11 | C&A Form 8-K, Ex. 99.2 (Press Release) and Ex. 99.3 (Presentation Materials) (Mar. 17, 2005) | All | 93 |
| 12 | Investor Call Transcript (Mar. 17, 2005) | All | 112 |
| 13 | Stockman Forms 4 and 4/A | All | 129 |

{00863296;v1}

| TAB | DOCUMENT | ORIGINAL PAGE(S) EXCERPTED | APPENDIX PAGE (Labeled "A") |
|---|---|---|---|
| 14 | Heartland Schedule 13D (Mar. 1, 2001) | 8-12 | 157 |
| 15 | Heartland Schedule 13D/A (Amendment 1) (Jan. 3, 2002) | 8-11 | 163 |
| 16 | Heartland Schedule 13D/A (Amendment 87) (Jan. 6, 2005) | 8-10 | 168 |
| 17 | Becker Schedule 13D (July 16, 2001); Textron Schedule 13D (Dec. 28, 2001); McCallum Schedule 13D (Oct. 1, 2001) | All excluding schedules and exhibits | 172 |
| 18 | FASB EITF Abstracts, No. 02-16 | All | 191 |
| 19 | Amended Disclosure Statement for the First Amended Joint Plan of Collins & Aikman Corporation and Its Debtor Subsidiaries, *In re Collins & Aikman Corp.*, Case No. 05-55927 (SWR) (Bankr. E.D. Mich. Jan. 24, 2007) | Table of Contents, 31 | 202 |
| 20 | Maryann Keller, *Crisis in the Automotive Parts Industry*, Auto. Indus. (Mar. 1, 2005) | All | 207 |
| 21 | Mark Douglas, *The Year in Bankruptcy: 2006* (Jan. 30, 2007) | All | 209 |
| 22 | C&A 2004 Q3 Form 10-Q/A | 9 | 223 |

# Tab 1

# UNITED STATES SECURITIES AND EXCHANGE COMMISSION
### WASHINGTON, D.C. 20549

# Form 10-K

(Mark One)

☑      **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d)**
**OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the fiscal year ended December 31, 2003**

or

☐      **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d)**
**OF THE SECURITIES EXCHANGE ACT OF 1934**

**Commission file number 1-10218**

# Collins & Aikman Corporation
### (Exact name of registrant as specified in its charter)

**Delaware**
*(State or other jurisdiction of
incorporation or organization)*

**13-3489233**
*(I.R.S. Employer
Identification Number)*

**250 Stephenson Highway**
**Troy, Michigan 48083**
*(Address of principal executive offices, including zip code)*

**Registrant's telephone number, including area code:**
**(248) 824-2500**

**Securities registered pursuant to Section 12(b) of the Act:**

| Title of each class | Name of each exchange on which registered |
|---|---|
| Common Stock, $.01 par value | New York Stock Exchange |

**Securities registered pursuant to Section 12(g) of the Act:**
**None**

Indicate by check mark whether the Registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the Registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☐    No ☑

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of Registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☑

Indicate by check mark whether the registrant is an accelerated filer (as defined in Exchange Act Rule 12b-2). Yes ☑    No ☐

The aggregate market value of voting stock held by non-affiliates of the Registrant was $168,794,241 as of March 1, 2004.

A1

As of February 26, 2004, the number of outstanding shares of the Registrant's common stock, $.01 par value, was 83,630,087 shares.

### WEBSITE ACCESS TO COMPANY'S REPORTS:

Collins & Aikman's internet website address is www.collinsaikman.com. The Company's annual report on Form 10-K, quarterly reports on Form 10-Q, current reports on Form 8-K and amendment to those reports filed or furnished pursuant to Section 13(a) or 15(d) of the Exchange Act are available free of charge through the Company's website and as soon as reasonably practicable after the reports are electronically filed with, or furnished to the Securities and Exchange Commission.

The Company's Code of Business Conduct is available free of charge through the Company's internet website. Any amendments to the Company's Code of Business Conduct and any waivers of the Code of Business Conduct involving executive officers or directors of the Company will also be made available on the Company's internet website. Printed copies of the Company's Code of Business Conduct are also available free of charge to any shareholder upon request to: Corporate Secretary, Collins & Aikman Corporation, 250 Stephenson Highway, Troy, MI 48083.

## COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES

## FORM 10-K ANNUAL REPORT INDEX

|  |  | Page |
|---|---|---|
| **PART I** | | |
| Item 1. | Business | 8 |
| Item 2. | Properties | 16 |
| Item 3. | Legal Proceedings | 17 |
| Item 4. | Submission of Matters to a Vote of Security Holders | 17 |
| **PART II** | | |
| Item 5. | Market for Registrant's Common Equity and Related Stockholder Matters | 17 |
| Item 6. | Selected Financial Data | 18 |
| Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 19 |
| Item 7A. | Quantitative and Qualitative Disclosures About Market Risk | 44 |
| Item 8. | Financial Statements and Supplementary Data | 44 |
| Item 9. | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | 45 |
| Item 9A. | Controls and Procedures | 46 |
| **PART III** | | |
| Item 10. | Directors and Executive Officers of the Registrant | 47 |
| Item 11. | Executive Compensation | 52 |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management | 63 |
| Item 13. | Certain Relationships and Related Transactions | 65 |
| Item 14. | Principal Accounting Fees and Services | 68 |
| **PART IV** | | |
| Item 15. | Exhibits, Financial Statement Schedules and Reports on Form 8-K | 70 |

i

A3

# PART I

**Cautionary Statements Regarding Forward-Looking Information and Risk Factors**

This Report on Form 10-K contains "forward-looking" information, as that term is defined by the federal securities laws, about our financial condition, results of operations and business. You can find many of these statements by looking for words such as "may," "will," "expect," "anticipate," "believe," "estimate," "should," "continue," "predict" and similar words used in this Annual Report. The forward-looking statements in this Form 10-K are intended to be subject to the safe harbor protection provided by the federal securities laws.

These forward-looking statements are subject to numerous assumptions, risks and uncertainties (including trade relations and competition). Because the statements are subject to risks and uncertainties, actual results may differ materially from those expressed or implied by the forward-looking statements. We caution readers not to place undue reliance on the statements, which speak only as of the date of this Annual Report.

The cautionary statements set forth above should be considered in connection with any subsequent written or oral forward-looking statements that Collins & Aikman Corporation (the "Company") or persons acting on its behalf may issue. The Company does not undertake any obligation to review or confirm analysts' expectations or estimates or to release publicly any revisions to any forward-looking statements to reflect events or circumstances after the date of this report or to reflect the occurrence of unanticipated events.

This Report on Form 10-K contains forward-looking statements within the meaning of the Private Securities Litigation Reform Act of 1995. Actual results and events may differ materially from those that are anticipated because of certain risks and uncertainties, including but not limited to general economic conditions in the markets in which the Company operates and industry based factors such as:

*Demand in the automotive industry is significantly dependent on the U.S. and the global economies and the Company's business and profitability are exposed to current and future uncertainties.*

The Company's financial performance depends, in large part, on conditions in the global automotive markets and, generally, on the U.S. and global economies. Demand in the automotive industry fluctuates in response to overall economic conditions and is particularly sensitive to changes in interest rate levels, consumer confidence and fuel costs. The threat or act of terrorism and war, the recession and other recent developments adversely affected consumer confidence throughout the U.S. and much of the world and exacerbated the uncertainty in the Company's markets. The future impact on us is difficult to predict. We would be harmed by any sustained weakness in demand or continued downturn in the economy.

The Company's sales are impacted by retail inventory levels and production schedules. In 2003, Original Equipment Manufacturer ("OEM") customers continued to significantly reduce their production and inventory levels due to the uncertain economic environment. In the current environment, it is extremely difficult to predict future production rates and inventory levels and the sustainability of any recovery.

*The base of customers which the Company serves is concentrated, and the loss of business from a major customer or the discontinuation of particular vehicle models could reduce the Company's sales and harm the Company's profitability.*

Because of the relative importance of a few large customers and the high degree of concentration of OEMs in the automotive industry, the Company's business is exposed to a high degree of risk related to customer concentration. DaimlerChrysler AG, General Motors Corporation and Ford Motor Company and their respective affiliates were the Company's three largest customers, and they directly or indirectly accounted for approximately 28%, 22% and 25% of the Company's 2003 net sales, respectively. A loss of significant business from, or adverse performance by, any of these customers would be harmful to the Company's profitability. Although the Company receives purchase orders from most of the Company's customers, these purchase orders typically provide for the supply of a customer's annual requirements for a particular model or assembly plant, renewable on a year-to-year basis, rather than for the purchase of a

2

specific quantity of products. It is difficult to accurately predict the level of new production for 2004 car sales. The loss of business with respect to significant vehicle models could have a material adverse effect.

In addition, there is substantial and continuing pressure from automotive manufacturers to reduce costs, including costs associated with outside suppliers like Collins & Aikman. For example, OEM customers in the automotive industry attempted to impose price decreases and givebacks throughout 2003. Such attempted price decreases were generally in the 2% to 4% range. Several reductions have been agreed to, and others are currently being negotiated with OEMs and pressures may increase if overall economic and industry conditions do not improve. It is difficult for the Company to offset downward pricing pressures through alternative, less costly sources of raw materials. In addition, throughout 2003, the Company has experienced pricing pressure from its suppliers. The Company cannot assure you that it will not be materially and adversely affected by substantial and continuing pricing pressures.

*The prices that the Company can charge some of the Company's customers are predetermined, and the Company bears the risk of costs in excess of its estimates.*

Sales contracts with some of the Company's customers require it to provide its products at predetermined prices. In some cases, these prices decline over the course of the contract. The costs that the Company incurs in fulfilling these contracts may vary substantially from its initial estimates. Unanticipated cost increases may occur as a result of several factors, including increases in the costs of labor, components or materials. In some cases, the Company may be permitted to pass on cost increases associated with specific materials to its customers. Cost overruns that the Company cannot pass on to its customers could have a material adverse effect.

*The Company may not be able to successfully integrate the Company's acquired operations or realize the intended benefits of the Company's acquisitions.*

The Company's future operations and cash flow will depend largely upon its ability to integrate acquisitions, achieve the strategic operating objectives for these acquisitions and realize significant synergies and cost savings as a result. Acquisitions since January 2001 account for 48 of the Company's current 102 plants and facilities and approximately 58% of the Company's approximately 23,900 employees. The Textron Automotive Company's Trim division ("TAC-Trim") acquisition in 2001, at that time, individually accounted for 41 of the Company's plants and facilities and approximately 12,000 of the Company's employees located across seven different countries, including two countries where the Company did not previously operate. The Company has not previously undertaken an integration process as large or complex as the integration plans required by these recent acquisitions collectively or by the TAC-Trim acquisition individually. In order to succeed, the Company will need to realize projected synergies and cost savings on a timely basis, consolidate information technologies, capitalize on the Company's increased purchasing power, effectively control the progress of the Company's integration process and associated costs, consolidate the Company's program management, research and development and engineering operations, capitalize on the Company's prime contractor strategy and the opportunities afforded by the Company's broader products offering and maintain strong relationships with Tier I integrators and OEMs.

To the extent the Company has misjudged the nature and extent of industry trends or its competition, it may have difficulty in achieving its operating and strategic objectives. In addition, the Company's integration activities will place substantial demands on its management, operational resources and financial and internal control systems. The Company's future operating results will depend upon the Company's ability to implement and improve its operating and financial controls and to combine, train and manage the Company's employee base. There is a risk that the diversion of management attention, particularly in a difficult operating environment, will affect sales and the attention that management can devote to this and other operational, financial and strategic issues. In addition, in some of the Company's past non-U.S. acquisitions, the Company has encountered integration and systems difficulties typical of foreign transactions, which have given rise to material weaknesses that had to be subsequently corrected. The Company cannot assure you that it will not encounter similar difficulties going forward. All statements concerning the benefits, cost savings and synergies the Company expects to realize from its acquisitions are forward-looking statements.

3

*The Company may pursue additional acquisitions that further the Company's current strategies.*

The Company may selectively identify and acquire other businesses with complementary products, manufacturing capabilities or geographic markets, and the Company expects to continually evaluate such opportunities. The Company cannot assure you that any business acquired will be successfully integrated with other operations or prove to be complementary in the manner expected or be profitable. The Company could incur further indebtedness in connection with the Company's acquisition strategy and increase the Company's leverage. Acquisitions outside of North America may present unique difficulties and increase the Company's exposure to the risks attendant to international operations. The process of integrating acquired companies and operations into the Company's existing operations may result in unforeseen operating difficulties and may require significant financial resources that would otherwise be available for the ongoing development or expansion of existing operations.

*The Company may incur unanticipated contingent liabilities as a result of acquisitions and may experience unanticipated liabilities associated with former discontinued operations.*

The Company might incur unforeseen environmental, tax, pension, litigation or other liabilities in connection with the Company's recent or future acquisitions, or the Company might underestimate the known liabilities. If such liabilities materialize or are greater than the Company estimates, they could have a material adverse effect on us. In addition, the Company has significant responsibilities related to some of its formerly owned businesses, or discontinued operations, such as those relating to post-retirement, casualty, environmental, product liability, lease and other matters. Based upon the information presently available and the Company's insurance coverage, the Company does not believe that any of these liabilities will have a material adverse effect upon the Company's financial condition or results of operations, however, the Company might be incorrect in its assumptions; and the extent of those contingent liabilities of which the Company is aware could exceed its expectations. In addition, there may be other such liabilities of which the Company presently has no knowledge.

*If the Company is unable to meet future capital requirements, the Company's competitive position may be adversely affected.*

In securing new business, the Company typically is required to expend significant amounts of capital for engineering, development, tooling and other costs. Generally, the Company seeks to recoup these costs through pricing over time, but the Company may be unsuccessful due to competitive pressures and other market constraints or if a customer ceases production of a particular vehicle. While the Company believes that it will be able to fund capital expenditures through cash flow from operations, borrowings under the Company's credit facilities, sale and leaseback agreements and sales of receivables including sales under the Company's receivables facility and factoring arrangements, there can be no assurance that it will have adequate funds to make all the necessary capital expenditures or that the amount of future capital expenditures will not be materially in excess of its anticipated expenditures.

*Recent trends among the Company's customers will increase competitive pressures in the Company's businesses.*

In recent years, the competitive environment among suppliers to the vehicle manufacturers in the automotive industry has changed significantly as these manufacturers have sought to outsource more vehicular components, modules and systems and to use on-line auctions in order to obtain further price reductions. In addition, these sectors have experienced substantial consolidation as OEMs have sought to lower costs, improve quality and increasingly purchase complete systems and modules rather than separate components. This consolidation has caused, and its continuation will continue to amplify, the pricing pressures outlined above in the discussion of the concentration of the Company's customers. The Company's competitive strategy will be to position itself as the prime contractor of choice to both Tier I integrators and OEM assembly plants by supplying a full spectrum of integrated interior trim components. This strategy presents the risk that some of the Company's customers may be in competition with the Company as well. Furthermore, the trend toward consolidation among automotive parts suppliers is resulting in a smaller number of large

4

(3)   In 2002, the Company recorded an $11.7 million charge for the cumulative effect of a change in accounting principle related to an impairment loss. In 1999, the Company recorded an $8.8 million charge for the cumulative effect of a change in accounting principle related to start-up costs.

Item 7.    *Management's Discussion and Analysis of Financial Condition and Results of Operations*

## GENERAL

*The following discussion and analysis of our financial condition and results of operations includes statements concerning our expectations for our industry and our performance. These statements are forward-looking statements and are subject to numerous risks and uncertainties, including those highlighted elsewhere under "Cautionary Statements Concerning Forward-Looking Information and Risk Factors." Our actual results may differ materially from those contained or implied by the following discussion.*

### Introduction

The Company is a global leader in the design, engineering and manufacturing of automotive interior components, including instrument panels, fully assembled cockpit modules, floor and acoustic systems, automotive fabric and interior trim, as well as exterior trim and convertible roof systems. In reviewing the Company's results for the periods discussed, consideration should be given to the following critical events: the impact of the material acquisitions that we have made, the numerous restructuring and acquisition integration activities that we have undertaken, the material impact of general economic conditions in North America and within our industry specifically, the increasingly difficult customer and competitive environment, the capital intensive nature of our business and our high degree of leverage and liquidity and debt maturity position.

*Key Factors Impacting Our Reported Results.* Critical factors affecting our ability to succeed include the following:

- *Automotive Sales and OEM Production Levels.* In North America, the Company manufactures components for approximately 90% of all light vehicle production platforms. Sales are primarily made to North American based global OEMs, as well as Asian and European based global OEMs. The automotive supply industry in which the Company competes is cyclical and is influenced by the level of North American and Western European vehicle production. The Company's sales results are influenced heavily by the volume of OEM production of light vehicles ("builds") in the markets it serves. U.S. retail automotive sales were down 1.1% in 2003 versus 2002 and down 1.8% in 2002 versus 2001. Industry wide North American Free Trade Agreement ("NAFTA") builds were down 3.0% in 2003 versus 2002 and up 5.7% in 2002 versus 2001. Within NAFTA, the builds of the Big 3 OEM's were down 5.7% in 2003 versus 2002, and up 5.9% in 2002 versus 2001. In Western Europe, builds were down nearly 0.5% in 2003 versus 2002 and down 1.4% in 2002 versus 2001. In South America, builds were down 0.5% in 2003 versus 2002 and down 8.0% in 2002 versus 2001.

- *Our relationships with our customers.* Collins & Aikman does business with all of the world's largest vehicle manufacturers including Ford, General Motors, DaimlerChrysler, Toyota, Honda, Nissan, Volkswagen, Renault and Porsche. These relationships have typically developed over a period of many years, and have, in many cases, been enhanced by the Company's recent acquisitions, which has provided the Company with a resulting global footprint and capacity to supply a full range of interior products. In each case, there is a complex mutual dependency and cooperation between the Company and its customers necessary to ensure that vehicle programs are successful in key areas of quality, timing and cost. At the same time, customer expectations are evolving, as vehicle manufacturers continue to outsource more design and integration responsibilities to the Company and other Tier 1 suppliers. As a result, customer satisfaction, especially at critical inflexion points (such as new vehicle launches and vehicle refreshes), has become more complicated and places significant demands on the Company's resources. Also, there is an inherent tension between the Company and its customers resulting from intense competition and pricing pressures within the industry. For example, OEM customers in the automotive industry attempted to impose price decreases and givebacks throughout 2003. Such attempted price decreases were generally in the 2% to 4% range. Several reductions have

been agreed to, and others are currently being negotiated with OEMs and pressures may increase if overall economic and industry conditions do not improve. Finally, on some vehicle programs involving component integration at the Tier 1-level, the Company is either a supplier to, or a customer of, some of its largest Tier 1 competitors, such as Delphi, Visteon and Lear. These types of arrangements are becoming more common within the industry, and add a new level of complexity to customer relationships, including the relationship with the vehicle manufacturer as the ultimate customer.

- *Our ability to secure profitable new business.* The Company actively pursues new business opportunities with its traditional customer base as well as with potential new customers. The Company seeks to distinguish itself on a variety of factors, including its global footprint, its capacity to supply a full range of interior products and its full-service capabilities (such as design, engineering, manufacturing and quality services). There is intense competition and pricing pressure on all of these opportunities. Price is typically achieved through direct negotiations with the customer, but in certain instances customers have utilized auctions or relied on benchmarking data that have included reputed world class suppliers in emerging markets. At the same time, the Company seeks to manage its cost structure through a variety of strategies, such as vertical integration initiatives that provide greater cost control opportunities. For example, since the Company is a major purchaser of raw materials like resins, it can arrange favorable supply contracts and benefit broadly from material science developments and product simplification. Additionally, the Company believes that it has the world's largest fleet of injection molding equipment for automotive products, which provides a unique ability to benefit from process improvements and best practices with respect to its plastics products on a global basis.

- *Our ability to successfully realize the benefits of our restructuring and integration initiatives.* The Company has undertaken a series of restructuring and integration initiatives to rationalize first its global manufacturing footprint and more recently its salaried workforce, including home office headcount. These activities are expected to have the following primary benefits: First, the Company has closed about 20 subscale plants and other facilities such as warehouses and consolidated activity into 80 world-class operations, which will result in a significant densification of production and resulting gains in fixed cost absorption and operating efficiencies. Second, the Company is beginning to win more "bundled" awards — with a full range of slush molded, injection molded and carpet, acoustics and fabric components on new vehicle programs. And third, the Company's salaried workforce will shrink by more than 20% from the legacy levels, while effectiveness and customer service levels will improve due to consolidation, standardization and level-loading of support infrastructure.

- *The impact of raw materials and energy costs.* The Company is a significant consumer of resin and nylon feedstocks, which presents both a challenge and an opportunity for the Company. The challenge results from the Company's sensitivity to price movements in these raw materials (such as those related to recent short run spikes in the oil market), while the opportunity arises from the Company's ability to leverage its buying power as, in management's opinion, the largest single automotive grade resin buyer in the world. The Company has largely been able to avoid these pricing pressures due to its ability to negotiate with a variety of global suppliers, and to shift volume from one supplier to another. However, it is possible that the Company may begin to see increased cost pressure if the spikes in the oil market continue. The Company's customers have historically been reluctant to provide pricing relief based on this type of raw material cost increases, as recently demonstrated in the handling of the recent near tripling of global steel prices.

- *Our liquidity and capital resources.* The Company is highly leveraged, due primarily to financing associated with recent acquisitions. Another contributing factor has been that most new business awards in the automotive industry require that suppliers advance certain costs relating to tooling and engineering and design services, which in some cases are incurred years before vehicle launch and are reimbursed over many years following vehicle launch as part of the piece price. In February 2004, the Company obtained amendments to its credit facilities that significantly loosened the principal financial covenants. The Company also obtained an additional revolving credit facility of $100 million and a new term loan in the amount of $185 million, the proceeds of which were used to pre-fund debt

20

amortization requirements. As a result, the Company has greatly improved its financial flexibility and liquidity and has no significant amortization requirements until June 2005.

*Impact of Acquisitions.* Our results for the periods discussed have been impacted by several key acquisitions, which, together with related financing transactions, have substantially increased revenues and cash flow and materially altered the Company's capital and operating structure.

For example, in 2001, the Company completed three key acquisitions: (1) the acquisition of Becker Group L.L.C., a leading supplier of plastic components to the automotive industry, (2) the acquisition of Joan Automotive Fabrics, a leading supplier of body cloth to the automotive industry, and Joan's affiliated yarn dyeing operation, Western Avenue Dyers, L.P., and (3) the acquisition of Textron Automotive Company's Trim division (TAC-Trim), one of the largest suppliers of instrument panels and fully assembled cockpit modules and a major automotive plastics manufacturer of interior and exterior trim components in North America, Europe and South America. These acquisitions, together with the Company's 2002 acquisition of Southwest Laminates, a fabric lamination business, contributed approximately $2,090 million of additional net sales in 2002 and drove the 113% increase in net sales from the prior year. In addition, these acquisitions were financed by varying combinations of the Company's common stock and preferred stock, warrants to purchase the Company's common stock, cash on hand and borrowings under a revolving credit facility, public issuances of debt, and sales of the acquired companies' accounts receivable under the receivables facility.

The Company also completed the following acquisitions in 2002 and 2003: (1) the acquisition of Dutton Yarns' yarn texturizing business, (2) the acquisition of Delphi Corp.'s plastic injection molding plant and related equipment in Logroño, Spain, and (3) the acquisition from Textron of the remaining 50% interest of an Italian automotive joint venture. These transactions have likewise impacted the Company's financial results and capital structure, although not to the same degree as the transactions described above.

*Impact of Integration Activities and Restructuring Initiatives.* We have devoted considerable efforts throughout 2001, 2002 and 2003 to properly integrate the acquired companies. We have also implemented a series of restructuring initiatives to ensure that the resulting combined operations have the proper structure and necessary resources to perform on a profitable basis. These initiatives were directed initially at establishing a proper, global manufacturing footprint and included combining and rationalizing the Company's legacy and acquired operations in North America, Europe and South America. More recent restructuring initiatives have focused on developing an appropriate overhead structure, including strengthening and streamlining the senior management team on a worldwide basis. As a consequence of these restructuring initiatives, the Company has incurred significant restructuring and impairment charges in each of 2001, 2002 and 2003 for severance costs, plant and office closures, equipment and lease impairments, contractual obligations and other restructuring activities, which have impacted cash flow, operating income and net income. For a more detailed description of these charges, see footnote 15, "Results of Operations".

*Key Indicators of Performance.* In evaluating our business, our management uses operating income as an important indicator of performance. In addition management also considers EBITDA to be a useful proxy for measuring the cash generated by our business, and it is commonly used in the industry to analyze operating performance, liquidity and entity valuation. We define EBITDA as operating income plus depreciation and amortization. Management believes EBITDA to be a good measure of operating performance because cash generation is necessary for the Company to achieve many of the critical success factors outlined above, including investment in cost reduction activities, reducing leverage and improving liquidity. Additionally, management reviews return on invested capital, working capital changes and capital expenditures as critical financial performance metrics. Management also uses certain non-financial metrics of performance, including equipment utilization and efficiency; service, production and first time quality performance; set up and tool changeover time; employee turnover and absenteeism; and safety performance.

21

A9

that approximates the purchaser's financing costs. In September 2002, the Company amended the receivables facility lengthening its term to expire in December 2004.

*Restrictions:* This receivables facility contains certain restrictions on Carcorp (including maintenance of $60.0 million net worth) and on the sellers (including limitations on liens on receivables, modifications of the terms of receivables, and changes in credit and collection practices) which are customary for facilities of this type. The commitments under the receivables facility are subject to termination prior to their term upon the occurrence of certain events, including payment defaults, breach of covenants, including defined interest coverage and leverage ratios, bankruptcy, default by the Company in servicing the receivables and failure of the receivables to satisfy certain performance criteria.

### Commercial Commitments

*Put and Call Arrangement:* The Company previously entered into a put and call arrangement with respect to the acquisition of the initial 50% interest in the Italian joint venture. In January 2003, the Company acquired the remaining 50% interest in the Italian joint venture for $15 million, which also terminated the put and call arrangement. The arrangement, which was exercisable in December 2004, permitted Textron to require the Company to purchase Textron's interests in the joint venture for an aggregate of approximately $28 million.

### Stock Options

As a result of repricing the Company's stock options during 2002, the repriced options were treated as variable-based awards in accordance with APB No. 25. Subsequent to December 31, 2002, the Company approved the repricing of approximately 3.6 million options with an exercise price of $10.00 to a new exercise price of $8.00. Because these options are considered to be variable-based awards, the Company will incur future compensation expense if the stock price exceeds the new exercise price of $8.00.

## OTHER INFORMATION

### Off-balance Sheet Arrangements

Prior to the TAC Trim acquisition, TAC-Trim entered into an $86.9 million sale and leaseback transaction (the "Textron Leasing Transaction") with two separate single purpose affiliates of Textron Financial Corporation, as lessor and purchaser, with respect to a portfolio of manufacturing equipment situated in different locations throughout the United States and Canada. Payments under the Textron leasing transaction are guaranteed by Products and secured by a first perfected mortgage lien over certain real property with a value equal to $25 million. At the end of the Textron Leasing Transaction for certain equipment leases (including the expiration of all renewal options), the Company is required to guarantee a minimum value of the equipment to the lessor of up to approximately $21 million. Each lease is for an initial term of three years with three one-year renewal options. See "— Other Information — Effects of Certain Transactions with Related Parties" for additional information.

In November 2002, the Financial Accounting Standards Board ("FASB") issued FIN 45, "Guarantor's Accounting and Disclosure Requirements for Guarantees, Including Indirect Guarantees of Indebtedness of Others." FIN 45 requires a guarantor to recognize, at the inception of a qualified guarantee, a liability for the fair value of the obligation undertaken in issuing the guarantee. In conjunction with divestitures and other transactions, the Company has provided indemnifications relating to legal and environmental issues, including product liability. The Company does not believe that any pending or threatened litigation or claims related to any such retained liabilities of discontinued operations are likely to result in any material loss.

### Certain Transactions with Related Parties

#### Heartland Transactions

Heartland is a private equity firm established in 1999 for the purpose of acquiring and expanding industrial companies operating in various sectors of the North American economy that are well positioned for

global consolidation and growth. The managing general partner of Heartland is Heartland Industrial Associates, L.L.C. Certain directors and officers of the Company are members of the general partner, specifically Messrs. Stockman (a Director and our Chairman and Chief Executive Officer), Stepp (a Director and our Vice Chairman and Chief Financial Officer) and Tredwell, Leuliette, McConnell and Valenti (each Directors). Other of our directors or their affiliates, specifically Messrs. Becker and McCallum, are limited partners in Heartland with interests representing less than 5% of the commitments in Heartland. Heartland has informed us that its limited partners include many financial institutions, private and government employee pension funds and corporations, among other types of investors. The Company may, in the ordinary course of business, have on a normal, customary and arms' length basis relationships with certain of Heartland's limited partners, including banking, insurance and other relationships.

The Company is a party to a Services Agreement with Heartland under which Heartland provides advisory and consulting services, including services with respect to developments in the automotive industry and supply markets, advice on financial and strategic plans and alternatives and other matters as it may reasonably request and are within Heartland's expertise. The Services Agreement terminates on the earlier of its tenth anniversary or the date upon which Heartland ceases to own Company shares equivalent to 25% of that owned by them on February 23, 2001.

Under the Services Agreement, the Company is obligated to pay to Heartland a $4.0 million annual advisory fee payable in quarterly installments and reimburse its out-of-pocket expenses related to the services it provides. The Company has also agreed to pay a fee of 1% of the total enterprise value of certain acquisitions and dispositions. During 2003, 2002 and 2001 the Company recorded total fees of $4.0 million, $5.7 million and $24.5 million, respectively.

The Services Agreement with Heartland contemplates that the Company may pay additional fees to Heartland for services rendered in connection with a range of financing transactions. In March 2004, the Company's Board of Directors, including the disinterested and independent directors of the Board, approved a fee of $1 million to Heartland for its services rendered in connection with the 2004 amendments to the Company's credit facility to add synthetic revolving and letter of credit facilities.

*Charles E. Becker Transactions*

On March 27, 2003, the Company entered into a termination agreement and release to buyout the non-compete agreement between the Company and Charles E. Becker, a member of the Company's Board of Directors and a limited partner in Heartland. The Company paid $11.3 million in April 2003 as part of the termination agreement and release. The non-compete agreement, which was entered into as part of the Becker acquisition, required the Company to make periodic payments. As a result of this transaction, the Company incurred a loss of $10.4 million, which is primarily due to the write-off of intangible assets initially recorded in conjunction with the Becker acquisition.

During 2002, the Company engaged Mr. Becker to serve as Vice Chairman and assist the Company with strategic planning activities, such as developing sales strategies, managing key customer relationships and recruiting senior management for the Company's European operations. The Company paid Mr. Becker $300,000 for such services. Mr. Becker's consulting arrangement and position as Vice Chairman ended in 2002.

The Company entered into a lease agreement with Becker Ventures L.L.C. ("Becker Ventures"), an entity controlled by Mr. Becker, for the Company's headquarters at 250 Stephenson Highway, Troy, Michigan with the effective date of the lease being January 1, 2002. In March 2002, the Company entered into lease agreements with Becker Ventures, effective January 1, 2002, for 150 Stephenson Highway and 350 Stephenson Highway, Troy, Michigan. The base rent for all three premises is $13.25 per sq. ft., subject to annual CPI adjustments. Total square footage for all three locations is approximately 286,000. The leases have 20-year terms, and the Company has two five-year renewal options. The 2004 base rent for the facilities will be approximately $4.0 million. In 2004, these leases were amended to provide that the Company would assume responsibility for property management with a corresponding elimination of certain aspects of the property management fees. In addition, the Company is also party to a lease with Becker Ventures for five

37

manufacturing facilities totaling 884,000 square feet. In 2002, the Company extended the lease term an additional ten years to expire in 2021, with the base rent for these facilities totaling $3.6 million per year.

In June 2001, Products sold and contemporaneously leased back real property located in Troy, Michigan and Plymouth, Michigan from New King, L.L.C. and Anchor Court, L.L.C., respectively, which are affiliates of Becker Ventures, for net proceeds of $15.1 million in aggregate. The initial lease term in each transaction is 20 years and each lease has two successive ten year renewal options. The basic rent for the Troy, Michigan property is $1.3 million per year, and the basic rent for the Plymouth, Michigan property is $0.5 million per year. The rental rates in each case are subject to adjustment after expiration of the initial term.

*Elkin McCallum Transactions*

In the first quarter of 2003, the Company purchased equipment from Joan Fabrics Corporation ("Joan Fabrics"), and entered into a supply agreement with Joan Fabrics to supply certain types of fabrics. Elkin McCallum, a director of the Company, controls Joan Fabrics and is a limited partner in Heartland. Under the supply agreement, the Company supplies fabric to Joan Fabrics and Joan Fabrics is responsible for all marketing, design, customer service, distribution and sales functions related to these fabrics. The Company paid Joan Fabrics $4.7 million of consideration for these transactions, a portion of which the Company has allocated to the purchased equipment (based on its appraised value) and the remainder of which it is amortizing over the five-year term of the supply agreement.

On December 31, 2002, the Company acquired an air jet texturing business from Dutton Yarns (an affiliate of Mr. McCallum) for approximately $4.2 million. The purchased assets included equipment, inventory and intellectual property. The Company had preliminarily accounted for this transaction as an acquisition of assets, but finalized its accounting during the first quarter of 2003, and recorded the transaction as a purchase of a business.

On April 12, 2002, the Company signed and closed on a merger agreement with Mr. McCallum and a lamination company wholly owned by Mr. McCallum pursuant to which the acquired company was merged into a wholly owned subsidiary of the Company. As consideration in the transaction, Mr. McCallum received 400,000 shares of Common Stock and was repaid $2.5 million in cash as reimbursement for amounts previously invested to fund the lamination company's working capital needs. Subsequent to the merger, debt owing to Mr. McCallum of $6.7 million was repaid. The Company acquired the lamination business to optimize the supply chain on certain of its fabric products and provide low cost lamination products and services to Tier-1 customers. As part of this acquisition, the Company inherited a lease pursuant to which it leases from an entity controlled by Mr. McCallum, a portion of a manufacturing facility in El Paso, Texas. The Company continues to occupy these premises pursuant to such lease.

In April 2002, the Company amended the merger agreement with Joan Automotive to clarify ownership of certain equipment listed in a schedule attached to that agreement. The original merger agreement schedule included a list of approximately 84 looms that ultimately exceeded the Company's manufacturing requirements and facility capacity. Upon determining that the excess looms would have been uneconomically expensive to relocate and store, the Company declined to take possession of 48 of these looms, which were left in place at Joan Fabrics' Hickory, North Carolina plant. The amendment clarifies that these looms are owned by Joan Fabrics.

In September 2001, the Company completed the acquisition of Joan Automotive Industries, a leading supplier of bodycloth to the automotive industry, and all of the operating assets of Joan's affiliated yarn dying operation, Western Avenue Dyers, L.P. As a result of the Joan acquisition, Joan Fabrics became a principal stockholder of the Company. Upon completion of the Joan acquisition, Mr. McCallum became a member of the Company's Board of Directors. As part of this acquisition, the Company inherited a lease pursuant to which it leases from an entity controlled by Mr. McCallum, a technical center in Lowell, Massachusetts. The operations formerly conducted in these premises have been moved to other company facilities, however the Company remains obligated for the related lease.

38

A12

In connection with the Joan acquisition, the Company entered into a Supply Agreement dated September 21, 2001 (the "Supply Agreement") with Main Street Textiles, L.P. ("Main Street"), which is controlled by Mr. McCallum, and a Transition Services Agreement dated September 21, 2001 (the "Transition Agreement") with Joan Fabrics. Under the Supply Agreement, which was mutually terminated effective as of January 1, 2004, the Company agreed to purchase all of its requirements for flat woven automotive fabric from Main Street for a five-year period beginning on the date of the Supply Agreement. The prices which the Company agreed to pay for fabric under the agreement equaled the costs of the raw materials plus an amount representing Main Street's standard labor and overhead costs incurred in manufacturing fabric for us. Under the Transition Agreement, Joan Fabrics provided Products transitional and support services for a period not to exceed twelve months in order to support the continued and uninterrupted operation of the businesses acquired by Products in the Joan acquisition. As a part of these services, pending the Company's disassembly and removal of machinery and equipment purchased from Joan Fabrics, Joan Fabrics was permitted to continue to use that machinery and equipment to manufacture for us all of our requirements for some types of knitted and woven automotive fabrics. The terms of the Company's agreement with respect to this fabric production are substantially similar to those under the Supply Agreement. Actual prices paid by the Company for fabric under the Supply Agreement and Transition Agreement were subject to the rebates described below.

In 2002 and 2003, the Company engaged in ordinary course transactions with entities controlled by Mr. McCallum for the purchase and sale of goods and services as part of ongoing business relationships. The Company recorded purchases from entities controlled by Mr. McCallum, of $17.8 million (net of $1.2 million of rebates) in 2003, and $47.3 million (net of $10.5 million of rebates) in 2002 for goods and services purchased. These rebates received from Mr. McCallum relate to knit and woven automotive fabrics provided by entities controlled by Mr. McCallum under the Supply Agreement and Transition Agreement executed in connection with the 2001 Joan acquisition, which are described above. Supplier rebates such as these are common in the automotive industry as part of ongoing price negotiations and adjustments. These rebates from Mr. McCallum totaled $14.7 million over the duration of the agreements. In addition, the Company recorded sales to entities controlled by Mr. McCallum, of $6.4 million in 2003 and $31.8 million in 2002.

The following table summarizes the balances outstanding from entities controlled by Mr. McCallum (in millions):

|  | As of December 31, | |
| --- | --- | --- |
|  | 2003 | 2002 |
| Accounts Receivable | $ 2.7 | $ 5.9 |
| Accounts Payable | $ 1.0 | $ 8.0 |

*Textron Transactions*

As discussed above under "— Mandatorily Redeemable Preferred Stock of Subsidiary," Item 1 "Business — Technology and Intellectual Property," Item 1 "Business — Joint Ventures" and "— Commercial Commitments — Put and Call Arrangement" the Company is a party to various agreements and transactions with Textron. Textron became a related party as a result of its receipt of the consideration in the 2001 TAC-Trim acquisition. In May 2002, as part of the finalization of the purchase price and related working capital adjustments of the TAC-Trim acquisition, the Company paid Textron $15.5 million in cash.

Prior to the TAC-Trim acquisition, TAC-Trim entered into an $86.9 million sale and leaseback transaction (the "Textron Leasing Transaction") with two separate single purpose affiliates of Textron Financial Corporation, as lessor and purchaser, with respect to a portfolio of manufacturing equipment situated in different locations throughout the United States and Canada. In January 2003, the FASB issued FASB Interpretation No. ("FIN") 46, "Consolidation of Variable Interest Entities ("VIE"), an interpretation of Accounting Research Bulletin No. 51, "Consolidated Financial Statements" (see Note 2 "Summary of Significant Accounting Policies" for further information on FIN 46). As part of the Company's implementation of FIN 46,

it determined that one of the single purpose affiliates was a VIE. The Company and Textron agreed to have the lease restructured so it was required to be consolidated by the other party and not accounted for as a VIE. As consideration for this lease restructuring, the Company agreed to pay Textron Financial $150,000.

Payments under the Textron leasing transaction are guaranteed by Products and secured by a first perfected mortgage lien over certain real property with a value equal to $25 million. Each lease is for an initial term of three years with three one-year renewal options. At the end of the leases (including the expiration of all renewal options), there is the option of either purchasing all of the equipment for approximately $26 million or returning the equipment to the lessor. In the event the equipment is returned, arrangements will be made for the disposition of the equipment. The Company is required to guarantee a minimum value to the lessor of up to approximately $21 million upon expiration of the leases. As is customary, the documentation for the Textron leasing transaction incorporates covenants by reference, from the Company's credit facility, that may be amended or waived by the senior lenders, and also contain events of default.

As part of the TAC-Trim acquisition, the Company entered into three intellectual property license agreements with Textron. In two of these agreements, the Company licenses back to Textron certain intellectual property that was acquired in the transaction. In the third agreement, the Company licenses from Textron other intellectual property that was not acquired in the transaction. In addition, under the TAC-Trim acquisition agreement, the Company is permitted to use the "Textron" name for 18 months in exchange for payments of $13.0 million on December 15, 2002 and $6.5 million on December 15, 2003.

## Discontinued Operations

The Company recognized in 2003 $2.4 million from discontinued operations and $15.8 million of proceeds, respectively, representing recoveries, net of cash outflows. However, the Company has significant obligations related to post-retirement, casualty, environmental, product liability, lease and other liabilities of discontinued operations. The nature of many of these contingent liabilities is such that they are difficult to quantify and uncertain in terms of amount. The Company has accrued $21.5 million for post retirement costs and $36.7 million for environmental and product liability costs. Based upon the information available to management and the Company's experience to date, the Company believes that these liabilities will not have a material effect on its financial condition, results of operations or cash flows. In addition, the Company has primary, excess and umbrella insurance coverage for various periods that the Company expects to cover certain of these liabilities. However, there can be no assurances that contingent liabilities will not arise or that known contingent liabilities or related claims will not exceed the Company's expectations or that insurance will be available to cover these liabilities. Because the cash requirements of the Company's operations are substantially a function of these contingencies, it is possible that actual net cash requirements could differ materially from the Company's estimates.

## Recent and Future Reorganization Plans

The Company has been restructuring its operations in order to rightsize its overhead structure, reduce salaried headcount and strengthen and streamline the senior management team on a worldwide basis. While the Company believes that the majority of restructuring activities have already been undertaken, the Company is continually evaluating the business and may elect to implement additional restructuring activities as opportunities to achieve cost savings arise in future periods. Refer to "Results of Operations" above and Note 15 "Restructuring" for additional information.

## Stock Repurchase Plan

At December 31, 2003, approximately $1.0 million remained authorized by the Company's Board of Directors to repurchase shares of the Company's common stock at management's discretion. The Company believes it has sufficient liquidity under its existing credit arrangements to effect the repurchase program. The Company made no repurchases for the years ended 2003 and 2002.

## EXECUTIVE OFFICERS OF THE COMPANY

The following is a list of the names and ages, as of March 1, 2004, of the executive officers of the Company and a description of all positions and offices with the Company held by each·such person and each such person's principal occupations and employment during the past five years. All executive officers hold office at the pleasure of the Company's Board of Directors.

| Name | Age | Position |
|------|-----|----------|
| David A. Stockman | 57 | Chairman of the Board and Chief Executive Officer |
| J. Michael Stepp | 59 | Vice Chairman of the Board and Chief Financial Officer |
| Wallace W. Creek | 65 | Senior Vice President-Finance |
| Millard L. King, Jr | 59 | President, Global Soft Trim |
| Robert A. Krause | 47 | Vice President and Treasurer |
| L. Gregory Tinnell | 43 | Senior Vice President, Human Resources |
| Michael G. Torakis | 47 | President, International Plastics |
| Eric J. White | 48 | President, U.S. and Mexico Plastics |

*David A. Stockman* has been a director of the Company since February 2001 and has been Chairman of the Board of the Company since August 2002. Mr. Stockman has been Chief Executive Officer of the Company since August 2003. Mr. Stockman is also a director of Metaldyne, Springs and Trimas. He is a senior managing director and the founder of Heartland. Prior to founding Heartland, he was a senior managing director of Blackstone and had been with Blackstone since 1988. Mr. Stockman also served as director of the Office of Management and Budget in the Reagan Administration, and represented a district in southern Michigan in the U.S. House of Representatives from 1976 to 1981.

*J. Michael Stepp* has been a director of the Company since February 2001. Mr. Stepp is currently Vice Chairman of the Board of Directors and Chief Financial Officer of the Company. He was previously Executive Vice President and Chief Financial Officer of the Company from May 2002 through July 2002 (after serving as interim Chief Financial Officer from January 2002 through April 2002), and from April 1995 through December 1999. Mr. Stepp was a consultant to the Company and was an independent mergers and acquisitions advisor from January 2000 through February 2001. Since March 2001, Mr. Stepp has been a senior managing director of Heartland but has not been an employee of Heartland since April 2002. He is also a director of Products.

*Wallace W. Creek* has been Senior Vice President — Finance since December 2002, and an executive officer of the Company since December 2002. Before joining the Company in 2002, Mr. Creek was corporate comptroller for General Motors. Mr. Creek is a director of Columbus McKinnon Corp.

*Millard L. King, Jr.* has been President, Global Soft Trim since August 2003 and an executive officer of the Company since March 2002. From November 2001 to March 2002, he was Executive Vice President of Global Manufacturing Operations, Carpet and Acoustics Systems. Mr. King joined the Company in 1971. Prior to November 2001, Mr. King held the positions of Senior Vice President of Operations for Automotive Knit Fabrics and Chief Operating Officer of the U.S. automotive carpet systems and of automotive knit and woven operations.

*Robert A. Krause* has been Vice President and Treasurer since October 2002, and an executive officer of the Company since December 2002. Before joining the Company, Mr. Krause was associated with American Axle & Manufacturing Holdings, Inc., where he was Vice President and Treasurer from 1999 to August 2002, and Vice President — Investor Relations from August 2002 to October 2002, Treasurer and Acting Interim Chief Financial Officer during 1999, and Treasurer from 1998 to 1999.

*L. Gregory Tinnell* has been Senior Vice President of Human Resources and an executive officer since April 2000. Previously, he was Vice President of Human Resources for the Company's southern and Mexican operations, as well as Vice President of Global Compensation & Benefits. Mr. Tinnell joined the Company in 1995. Prior to joining the Company, he served in various management positions with Sara Lee Corporation,

Nabisco Foods Group and North American Refractories Company. Mr. Tinnell serves on the National Association of Manufacturers Human Resources Steering Committee.

*Michael G. Torakis* has been President, International Plastics since August 2003 and an executive officer of the Company since March 2004. Mr. Torakis joined the Company in August 2003. Prior to joining the Company, Mr. Torakis was President of Venture Holdings Company, LLC and Chief Executive Officer of Peguform GmbH. On or about March 28, 2003, Venture Holdings Company, LLC and certain of its affiliates filed a petition for protection under the United States Bankruptcy Code. Mr. Torakis was President of Venture Holdings Company, LLC at the time of the bankruptcy filing. In addition, on or about May 28, 2002, Peguform GmbH, a subsidiary of Venture Holdings Company, LLC, filed for bankruptcy in Germany. Mr. Torakis was Chief Executive Officer of Peguform GmbH at the time of the filing.

*Eric J. White* has been President, U.S. and Mexico Plastics since August 2003 and an executive officer of the Company since August 2002. From August 2002 to August 2003, he was Executive Vice President of Global Manufacturing, Interior Trim & Cockpit Systems. Prior to August 2002, Mr. White held the positions of Vice President Operations — Plastics with responsibility for multiple plant operations, and Vice President Operations for two operations with Textron Automotive Company, Inc.

See "Executive Compensation — Employment Agreements" for a description of the Company's employment agreements with Messrs. Stepp, King, Torakis and White. Additionally, Mr. Tinnell has a written employment agreement.

Mr. Stockman does not receive any compensation for his service to the Company as Chief Executive Officer. Mr. Stockman's services are provided to the Company by Heartland pursuant to a services agreement that is more fully described in Item 13, "Certain Relationships and Related Transactions" of this Report. The assumption by Mr. Stockman of the office of Chief Executive Officer did not change the compensation due Heartland under the services agreement.

## Section 16(a) Beneficial Ownership Reporting Compliance

Section 16(a) of the Securities Exchange Act of 1934 requires the Company's officers and directors, and persons who own more than ten percent of a registered class of the Company's equity securities, to file reports of ownership and changes in ownership with the Securities and Exchange Commission (the "SEC"). Officers, directors and greater than ten percent stockholders are required by SEC regulation to furnish the Company with copies of all Section 16(a) reports they file. Based solely on review of the copies of such reports furnished to the Company during or with respect to fiscal 2003, or written representations that no Forms 5 were required, the Company believes that during the fiscal year ended December 31, 2003, all persons subject to the Section 16(a) filing requirements filed the required reports on a timely basis.

## Code of Ethics

Products has a code of ethics entitled "Collins & Aikman Products Co. Code of Business Conduct" which is applicable to all employees, consultants and contractors of Products, its subsidiaries and affiliates, including the Company. The above-referenced Code of Business Conduct is also applicable to the Company's principal executive officer, principal financial officer, principal accounting officer or controller and persons performing similar functions for the Company ("Senior Officers").

The Code of Business Conduct is available on the Company's website at www.collinsaikman.com. All amendments to the Code of Business Conduct will also be made available on the Company's website, along with all waivers of the Code of Business Conduct involving Senior Officers of the Company.

## Audit Committee Financial Expert

The Board of Directors of the Company has determined that none of the current members of the Audit Committee is an "audit committee financial expert," as the Board interprets that requirement in its business judgment. However, each member of the Audit Committee is financially literate, and each member of the Audit Committee satisfies the heightened independence requirements of Sections 303.01(B)(2)(a) and

**COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES**

**CONSOLIDATED STATEMENTS OF OPERATIONS**
(in millions, except per share data)

| | Year Ended | | |
|---|---|---|---|
| | December 31, 2003 | December 31, 2002 | December 31, 2001 |
| Net sales | $ 3,983.7 | $ 3,885.8 | $ 1,823.3 |
| Cost of goods sold | 3,539.5 | 3,367.7 | 1,604.5 |
| Gross profit | 444.2 | 518.1 | 218.8 |
| Selling, general and administrative expenses | 273.2 | 293.5 | 164.4 |
| Restructuring charges | 40.6 | 38.9 | 11.2 |
| Impairment of long-lived assets | 28.4 | 18.0 | 7.6 |
| Operating income | 102.0 | 167.7 | 35.6 |
| Interest expense, net of interest income of $0.7, $1.4 and $2.0 | 151.3 | 148.9 | 84.3 |
| Interest expense from subsidiary preferred stock dividends | 32.0 | — | — |
| Interest expense from subsidiary preferred stock accretion | 5.3 | — | — |
| Subsidiary preferred stock dividends | — | 30.8 | 1.5 |
| Subsidiary preferred stock accretion | — | 7.6 | 0.9 |
| Loss on sale of receivables | 7.3 | 4.2 | 10.8 |
| Other expense (income), net | (32.9) | 10.0 | 14.4 |
| Loss from continuing operations before income taxes | (61.0) | (33.8) | (76.3) |
| Income tax expense (benefit) | (1.9) | 17.5 | (21.3) |
| Loss from continuing operations before extraordinary loss and cumulative effect of a change in accounting principle | (59.1) | (51.3) | (55.0) |
| Income from discontinued operations, net of income taxes of $0.8, $6.3 and $5.7 | 1.6 | 9.5 | 8.8 |
| Loss before cumulative effect of change in accounting principle | (57.5) | (41.8) | (46.2) |
| Cumulative effect of a change in accounting principle, net of income taxes of $0 | — | (11.7) | — |
| Net loss | $ (57.5) | $ (53.5) | $ (46.2) |
| Earnings per share data: | | | |
| Net loss | $ (57.5) | $ (53.5) | $ (46.2) |
| Loss on redemption of subsidiary preferred stock | — | (36.3) | — |
| Net loss attributable to common shareholders | $ (57.5) | $ (89.8) | $ (46.2) |
| Net income (loss) per basic and diluted common share: | | | |
| Continuing operations | $ (0.71) | $ (1.15) | $ (1.42) |
| Discontinued operations | 0.02 | 0.12 | 0.23 |
| Cumulative effect of a change in accounting principle | — | (0.15) | — |
| Net loss attributable to common shareholders | $ (0.69) | $ (1.18) | $ (1.19) |
| Average common shares outstanding: | | | |
| Basic and diluted | 83.6 | 76.3 | 38.9 |

The Notes to Consolidated Financial Statements are an integral
part of these consolidated financial statements.

F-3

A17

COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

The effect of the change on the first quarter 2003 is as follows (in millions):

| | Quarter Ended | |
| --- | --- | --- |
| | March 31, 2003 (As Previously Reported) | March 31, 2003 (Adjusted) |
| Net sales | $ 1,035.1 | $ 1,035.1 |
| Cost of goods sold | 928.1 | 925.7 |
| Gross profit | 107.0 | 109.4 |
| Selling, general and administrative expenses | 71.5 | 71.5 |
| Impairment of long-lived assets | 18.1 | 18.1 |
| Operating income | 17.4 | 19.8 |
| Other, net | 45.0 | 45.1 |
| Loss from continuing operations before income taxes | (27.6) | (25.3) |
| Income tax expense | 1.1 | 0.9 |
| Net loss | $ (28.7) | $ (26.2) |
| Earnings per share data: | | |
| Loss per basic and diluted common share | $ (0.34) | $ (0.31) |
| Average basic and diluted common shares outstanding | 83.6 | 83.6 |

The proforma amounts assuming the new method of accounting for holiday pay is applied retroactively to prior year periods is as follows (in millions, except per share amounts):

| | Quarter Ended March 31, 2002 | Quarter Ended June 30, 2002 | Quarter Ended September 30, 2002 | Quarter Ended December 31, 2002 |
| --- | --- | --- | --- | --- |
| Net loss attributable to common shareholders | $ (17.2) | $ (22.4) | $ (44.6) | $ (5.6) |
| Net loss per common share | $ (0.26) | $ (0.32) | $ (0.53) | $ (0.07) |

Additionally, during the second quarter of 2003, the Company implemented a change in the method of accounting for crib supply inventories held at plants. Crib supply inventories include small motors, replacement parts for production equipment and other miscellaneous repair parts for buildings, equipment and machinery. The Company implemented a perpetual crib supply inventory system and harmonized its policy to consistently account for the capitalization of crib supply inventories. Formerly, the Company had different capitalization thresholds following the various acquisitions in late 2001 and 2002, which ranged from not capitalizing any crib supply items to capitalizing only items greater than two thousand dollars. The new accounting method better matches the cost with the period benefiting from the expenditure, as such inventories are charged to expense as they are placed into service and begin generating revenue. Pro forma and the cumulative effect amounts relating to the change in accounting for crib inventories is not determinable as perpetual records of crib inventory were not maintained at all the plants prior to the application of the new method in the second quarter of 2003. The effect of the change on the three months ended June 30, 2003, for the plants that had no perpetual records was to increase inventory and reduce cost of sales by $1.8 million after tax or $0.02 per share. For the year ended December 31, 2003, the incremental effect of the adoption had an insignificant effect.

23.  **Consolidating Financial Statements**

Products issued Senior Notes in a total principal amount of $500.0 million in December 2001. The Senior Notes are guaranteed by the Company and all the Company's wholly owned domestic Subsidiaries other than its receivable, insurance and charitable subsidiaries (Guarantor Subsidiaries). The following are consolidating financial statements of the Company, Products, its guarantor and non-guarantor subsidiaries:

COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES

SUPPLEMENTAL GUARANTOR CONDENSED CONSOLIDATING FINANCIAL STATEMENTS

CONSOLIDATING STATEMENT OF OPERATIONS

For the Year Ended December 31, 2003

| | Parent | Issuer | Guarantors | Non-Guarantors | Eliminations | Consolidated Total |
|---|---|---|---|---|---|---|
| | | | (in millions) | | | |
| Net sales | $ — | $ 310.2 | $ 2,098.5 | $ 1,596.2 | $ (21.2) | $ 3,983.7 |
| Cost of goods sold | — | 207.5 | 1,850.4 | 1,502.8 | (21.2) | 3,539.5 |
| Selling, general and administrative expenses | 0.1 | 223.1 | 10.2 | 39.8 | — | 273.2 |
| Restructuring charge | — | 13.2 | 18.5 | 8.9 | — | 40.6 |
| Impairment of long-lived assets | — | 4.1 | 12.6 | 11.7 | — | 28.4 |
| Operating income (loss) | (0.1) | (137.7) | 206.8 | 33.0 | — | 102.0 |
| Interest expense, net | — | 21.3 | 121.2 | 8.8 | — | 151.3 |
| Interest expense from subsidiary preferred stock dividends | — | 32.0 | — | — | — | 32.0 |
| Interest expense from subsidiary preferred stock accretion | — | 5.3 | — | — | — | 5.3 |
| Intercompany interest expense (income) | — | (21.4) | (17.8) | 39.2 | — | — |
| Loss on sale of receivables | — | — | — | 7.3 | — | 7.3 |
| Other expense, net | — | (149.7) | 115.2 | 0.6 | 1.0 | (32.9) |
| (Loss) income from continuing operations before income taxes | (0.1) | (25.2) | (11.8) | (22.9) | (1.0) | (61.0) |
| Income tax expense (benefit) | — | (3.7) | 4.6 | (2.8) | — | (1.9) |
| Loss from continuing operations | (0.1) | (21.5) | (16.4) | (20.1) | (1.0) | (59.1) |
| Income from discontinued operations | — | 2.4 | (0.8) | — | — | 1.6 |
| Cumulative effect of a change in accounting principle | — | — | — | — | — | — |
| Equity in net income (loss) of subsidiaries | (57.4) | (38.3) | (27.0) | — | 122.7 | — |
| NET INCOME (LOSS) | $(57.5) | $ (57.4) | $ (44.2) | $ (20.1) | $ 121.7 | $ (57.5) |

For the Year Ended December 31, 2002

| | Parent | Issuer | Guarantors | Non-Guarantors | Eliminations | Consolidated Total |
|---|---|---|---|---|---|---|
| | | | (in millions) | | | |
| Net sales | $ — | $289.4 | $ 2,415.7 | $ 1,216.9 | $ (36.2) | $ 3,885.8 |
| Cost of goods sold | — | 181.8 | 2,110.0 | 1,112.1 | (36.2) | 3,367.7 |
| Selling, general and administrative expenses | 0.1 | 166.1 | 82.8 | 44.5 | — | 293.5 |
| Restructuring charges | — | 16.5 | 4.2 | 18.2 | — | 38.9 |
| Impairment of long-lived assets | — | — | 4.1 | 13.9 | — | 18.0 |
| Operating income (loss) | (0.1) | (75.0) | 214.6 | 28.2 | — | 167.7 |
| Interest expense, net | (0.1) | 15.4 | 126.2 | 7.4 | — | 148.9 |
| Intercompany interest expense (income) | (6.6) | (5.9) | (23.8) | 36.3 | — | — |
| Subsidiary preferred stock dividend | — | 30.8 | — | — | — | 30.8 |
| Subsidiary preferred stock accretion | — | 7.6 | — | — | — | 7.6 |
| Loss on sale of receivables | — | 0.6 | — | 3.6 | — | 4.2 |
| Other expense (income), net | — | (45.8) | 40.4 | 12.5 | 2.9 | 10.0 |
| Income (loss) from continuing operations before income taxes | 6.6 | (77.7) | 71.8 | (31.6) | (2.9) | (33.8) |
| Income tax expense (benefit) | 2.5 | (16.2) | 42.4 | (11.2) | — | 17.5 |
| Income (loss) from continuing operations | 4.1 | (61.5) | 29.4 | (20.4) | (2.9) | (51.3) |
| Income from discontinued operations | — | 9.5 | — | — | — | 9.5 |

A19

| | | | | | | |
|---|---|---|---|---|---|---|
| Cumulative effect of a change in accounting principle | — | — | — | (11.7) | — | (11.7) |
| Equity in net income (loss) of subsidiaries | (57.6) | (5.6) | (60.3) | — | 123.5 | — |
| NET INCOME (LOSS) | $(53.5) | $(57.6) | $    (30.9) | $    (32.1) | $    120.6 | $    (53.5) |

F-53

Tab 2

Table of Contents

# UNITED STATES SECURITIES AND EXCHANGE COMMISSION
### WASHINGTON, D.C. 20549

---

# Form 10-K

(Mark One)

☑    **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d)
OF THE SECURITIES EXCHANGE ACT OF 1934**

     **For the fiscal year ended December 31, 2002**

**or**

☐    **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d)
OF THE SECURITIES EXCHANGE ACT OF 1934**

**Commission file number 1-10218**

---

# Collins & Aikman Corporation
### *(Exact name of registrant as specified in its charter)*

| Delaware | 13-3489233 |
|---|---|
| *(State or other jurisdiction of* | *(I.R.S. Employer* |
| *incorporation or organization)* | *Identification Number)* |

**250 Stephenson Highway
Troy, Michigan 48083**
*(Address of principal executive offices, including zip code)*

**Registrant's telephone number, including area code:
(248) 824-2500**

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Name of each exchange on which registered |
|---|---|
| Common Stock, $.01 par value | New York Stock Exchange |

Securities registered pursuant to Section 12(g) of the Act:
None

     Indicate by check mark whether the Registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the Registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☑   No ☐

     Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of Registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☑

     Indicate by check mark whether the registrant is an accelerated filer (as defined in Exchange Act Rule 12b-2). Yes ☑   No ☐ .

     The aggregate market value of voting stock held by non-affiliates of the Registrant was $168,443,079 as of March 18, 2003.

As of February 28, 2003, the number of outstanding shares of the Registrant's common stock, $.01 par value, was 83,630,087 shares.

## DOCUMENTS INCORPORATED BY REFERENCE:

The information required by Part III (Items 10, 11, 12 and 13) is incorporated by reference to portions of the registrant's definitive Proxy Statement for the 2002 Annual Meeting of Stockholders, which will be filed within 120 days of December 31, 2002.

## WEBSITE ACCESS TO COMPANY'S REPORTS:

Collins and Aikman's internet website address is www.collinsaikman.com. The Company's annual report on Form 10-K, quarterly reports on Form 10-Q, current reports on Form 8-K, and amendment to those reports filed or furnished pursuant to Section 13(a) or 15(d) of the Exchange Act are available free of charge through the Company's website and as soon as reasonably practicable after the reports are electronically filed with, or furnished to the Securities and Exchange Commission.

## COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES

### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

**22.   Quarterly Financial Data (Unaudited)**

The quarterly financial data is summarized below (in millions, except per share amounts).

|  | 2002 | | | |
|---|---|---|---|---|
|  | First Quarter | Second Quarter | Third Quarter | Fourth Quarter |
| Net sales | $ 914.8 | $1,085.5 | $922.5 | $963.2 |
| Gross profit | 131.1 | 158.5 | 100.7 | 127.8 |
| Income (loss) from continuing operations | (6.7) | 3.7 | (45.2) | (3.1) |
| Income (loss) before extraordinary items | (6.7) | 3.7 | (45.2) | (3.1) |
| Net income (loss) | (18.8) | (13.2) | (45.2) | (3.1) |
| Basic and diluted earnings (loss) per share Continuing operations | (0.11) | (0.46) | (0.54) | (0.04) |
| Discontinued operations | — | 0.12 | — | — |
| Cumulative effect of change in accounting principle | (0.17) | — | — | — |
| Extraordinary loss | — | — | — | — |
| Net income available to common shareholders | (0.27) | (0.33) | (0.54) | (0.04) |
| Common stock prices: | | | | |
| High | 25.500 | 28.375 | 9.000 | 4.450 |
| Low | 16.750 | 9.000 | 2.810 | 2.450 |

|  | 2001 | | | |
|---|---|---|---|---|
|  | First Quarter | Second Quarter | Third Quarter | Fourth Quarter |
| Net sales | $ 453.1 | $ 457.6 | $ 430.5 | $ 482.1 |
| Gross profit | 58.8 | 64.3 | 53.4 | 42.3 |
| Income (loss) from continuing operations | (7.1) | 1.8 | (13.8) | (30.6) |
| Income (loss) before extraordinary items | (7.1) | 9.2 | (12.4) | (30.6) |
| Net income (loss) | (7.4) | 9.2 | (12.4) | (35.6) |
| Basic and diluted earnings (loss) per share Continuing operations | (0.26) | 0.05 | (0.32) | (0.62) |
| Discontinued operations | — | 0.21 | 0.03 | — |
| Cumulative effect of change in accounting principle | — | — | — | — |
| Extraordinary loss | — | — | — | (0.10) |
| Net income available to common shareholders | (0.26) | 0.26 | (0.29) | (0.72) |
| Common stock prices: | | | | |
| High | 14.218 | 15.500 | 21.425 | 25.750 |
| Low | 8.950 | 10.125 | 9.875 | 11.900 |

The Company's operations are not subject to significant seasonal influences.

Impact of Prior Period Adjustment — During the Company's review of its financial information, an error in the mathematical computation of foreign currency exchange gains was discovered. The third quarter 2002

F-42

A23

Tab 3

# UNITED STATES SECURITIES AND EXCHANGE COMMISSION

## WASHINGTON, D.C. 20549

# FORM 10-K/A

(MARK ONE)

[X] ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(D)
OF THE SECURITIES EXCHANGE ACT OF 1934
FOR THE FISCAL YEAR ENDED DECEMBER 31, 2001
OR
[ ] TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(D)
OF THE SECURITIES EXCHANGE ACT OF 1934

*COMMISSION FILE NUMBER 1-10218*

# COLLINS & AIKMAN CORPORATION

(Exact name of registrant as specified in its charter)

| | |
|---|---|
| DELAWARE<br>(State or other jurisdiction of<br>incorporation or organization) | 13-3489233<br>(I.R.S. Employer<br>Identification Number) |

**250 STEPHENSON
TROY, MICHIGAN 48083**
(Address of principal executive offices, including zip code)

REGISTRANT'S TELEPHONE NUMBER, INCLUDING AREA CODE:
(248) 824-2500
SECURITIES REGISTERED PURSUANT TO SECTION 12(B) OF THE ACT:

| TITLE OF EACH CLASS | NAME OF EACH EXCHANGE ON WHICH REGISTERED |
|---|---|
| Common Stock, $.01 par value | New York Stock Exchange |

SECURITIES REGISTERED PURSUANT TO SECTION 12(G) OF THE ACT:
NONE

Indicate by check mark whether the Registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the Registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes [X] No [ ] .

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of Registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. [X]

The aggregate market value of voting stock held by non-affiliates of the Registrant was $391,879,266 as of March 20, 2002. (Treats as non-affiliates certain holders of restricted shares who have relinquished Board designation and other rights and as an affiliate a shareholder as to whom there is an issue.)

As of March 20, 2002, the number of outstanding shares of the Registrant's common stock, $.01 par value, was 167,993,798 shares.

DOCUMENTS INCORPORATED BY REFERENCE:

The information required by Part III (Items 10, 11, 12 and 13) is incorporated by reference to portions of the registrant's definitive Proxy Statement for the 2002 Annual Meeting of Stockholders, which will be filed within 120 days of December 31, 2001.

**ITEM 7. MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS**

## GENERAL

The Company is a global leader in the design, engineering and manufacturing of automotive interior components, including instrument panels, fully assembled cockpit modules, floor and acoustic systems, automotive fabric, interior trim and convertible top systems. The Company has the number one or two North American market share position in seven out of ten major automotive interior categories tracked by CSM Worldwide and is also the largest North American supplier of convertible top systems. As a result of the TAC-Trim acquisition, the Company became a leading global supplier of fully assembled cockpit modules, a growing market segment. Sales are primarily made to North American and European automotive OEMs and Tier I total interior integrators. In North America, the Company manufactures components for approximately 90% of all light vehicle production platforms. The automotive supply industry in which the Company competes is cyclical and is influenced by the level of North American and European vehicle production.

The Company's net sales in 2001 were $1,823.3 million compared to $1,901.8 million in 2000. In fiscal year 2000, the Company changed its year-end to a calendar year-end. The 2000 fiscal year consisted of 53 weeks. Capitalized terms that are used in this discussion and not defined herein have the meanings assigned to such terms in the Notes to Consolidated Financial Statements.

In February 2001, Heartland acquired a controlling interest in C&A. Heartland is a private equity firm formed to focus on investments in industrial companies. As a result of the transaction, Heartland is entitled to designate a majority of the Company's Board of Directors. Heartland's strategy is to facilitate the growth of its controlled companies through acquisitions and internal growth. Since Heartland's initial investment in February 2001, the Company has aggressively pursued acquisitions in furtherance of its strategy to become a prime contractor to Tier I integrators and OEMs.

## RECENT ACQUISITIONS

The Company completed three key acquisitions in 2001. The acquisition of Becker Group L.L.C. (Becker), a leading supplier of plastic components to the automotive industry, was completed in July 2001; the acquisition of Joan Automotive Fabrics (Joan), a leading supplier of body cloth to the automotive industry, and Joan's affiliated yarn dyeing operation, Western Avenue Dyers, L.P., in September 2001. The Becker and Joan acquisitions were financed through issuances of the Company's common stock, warrants to purchase the Company's common stock, cash on hand and borrowings under a revolving credit facility and sales of the acquired companies' accounts receivable under the receivables facility. The TAC-Trim acquisition completed in December 2001, the refinancing of the Company's then existing credit agreement and the replacement of the receivables facility were funded through the offering of $500 million in notes, the issuance of $160 million of the Company's common stock for cash, borrowings under a new senior secured credit facility and sales of receivables under a new receivables facility. The Company also issued to Textron, the seller, 18 million shares of the Company's common stock and 0.3 million shares of preferred stock with an estimated fair value at the time of the acquisition of $160.9 million and $146.9 million respectively. Commitments under the new senior secured credit facility total $575.0 million, and are comprised of $400.0 million of term loans, and a $175.0 million revolving credit facility that allows funding of up to $75.0 million for Canadian subsidiaries in Canadian dollars.

These acquisitions and financing transactions will substantially increase revenues and cash flow and have materially altered the Company's capital and operating structure. As a result of these acquisitions and financing transactions, historical results of operations are not necessarily indicative of future results and will not be comparable. Key ratios and indicators may change as a result of the acquisitions. For example, while cockpit sales are expected to comprise an increasing portion of gross revenues, cockpits generally have a lower gross margin, partially offset by lower selling, general and administrative expenses. The cockpit business is generally less asset-intensive then the Company's traditional businesses.

In addition, the Company's credit facility may restrict such further acquisition or any further financing of the joint venture. While the Company will be permitted, and required, to provide certain guarantees and letters of credit support, it may not be permitted to further finance the joint venture and this may adversely affect the value of the interests which the Company could be required to purchase at a fixed price in the future.

Contingent Consideration and Purchase Price Adjustments: Under the TAC-Trim acquisition agreement, the purchase price paid by the Company is subject to adjustment based upon working capital and debt levels and the seller is entitled to a return of any cash left in the business at closing and reimbursement of certain capital expenditures made by it after September 30, 2001. The Company and Textron have agreed to a purchase price adjustment pursuant to the purchase agreement for the purchase of TAC-Trim. The Company agreed to pay to Textron, for the cash, cash equivalents or other short-term assets of TAC-Trim transferred to the Company at the closing, $10.0 million on May 24, 2002 and a further $20.0 million on or before August 31, 2002, in each case with interest at 11 1/2% from the December 20, 2001 closing. At the Company's option, through December 31, 2002, the Company can repurchase at 75% of liquidation value plus accrued dividends either approximately $133.33 million in liquidation value of the Products series A preferred stock or all of the $182.7 million in liquidation value of the series A preferred stock. If the Company repurchases $133.33 million in liquidation value of the Product series A preferred stock, the cash payment referred to above would be reduced to $15.0 million (rather than the aggregate of $30.0 million) and if the Company repurchases all, the effective cash payment would be $10.0 million (rather than $30.0 million). Additionally, the Company has an option from September 1, 2002 through August 31, 2003 to acquire all of the outstanding Products Preferred Stock owned by Textron at a discount to its liquidation value plus accrued dividends.

As part of the TAC-Trim acquisition agreement, the Company may be obligated to make additional aggregate payments to Textron of $15.0 million to $125.0 million in the event that the Company's cumulative EBITDA (which is defined in the purchase agreement to adjust for the expected effect of acquisitions after the closing of the TAC-Trim acquisition and the related financings) for the five year period ending December 31, 2006 is between $2,908.0 million and $4,691.0 million.

If the Company's material debt instruments prohibit this payment, then it will be entitled to issue additional preferred stock having terms equivalent to the series B preferred stock, except that it will be required to mandatorily redeem such preferred stock at its liquidation preference, with accrued and unpaid dividends, at such time as, and to the extent that, it is permitted to do so under our material debt instruments. In addition, under the TAC-Trim acquisition agreement, the Company is permitted to use the "Textron" name for 18 months in exchange for payments of $13.0 million on December 15, 2002 and $6.5 million on December 15, 2003.

Becker Ventures holds 4.0 million shares of the Company which were acquired as part of the financing for the TAC-Trim acquisition. Mr. Becker is the managing member of Becker Ventures and holds a controlling interest in Becker Ventures.

## OTHER INFORMATION

## EFFECTS OF CERTAIN TRANSACTIONS WITH RELATED PARTIES

### Heartland Transactions

The Company is a party to a services agreement with Heartland under which Heartland provides it with advisory and consulting services, including services with respect to developments in the automotive industry and supply markets, advice on financial and strategic plans and alternatives and other matters as it may reasonably request and are within Heartland's expertise. The services agreement terminates on the earlier of its 10th anniversary or the date upon which Heartland ceases to own Company shares equivalent to 25% of that owned by them on February 23, 2001.

Under the services agreement, the Company is obligated to pay to Heartland a $4.0 million annual advisory fee on a quarterly basis and to reimburse its out-of-pocket expenses related to the services it

13

provides. The Company has also agreed to pay a fee of 1% of the total enterprise value of certain acquisitions and dispositions. In connection with Heartland's initial investment in the Company on February 23, 2001, it paid Heartland a fee of $12.0 million and reimbursed it for its reasonable out-of-pocket expenses incurred in connection with its initial investment. A fee of $12.5 million was paid by the company to Heartland as a result of its advisory services in connection with the TAC-Trim acquisition.

## Charles E. Becker Transactions

In July 2001, the Company completed the acquisition of Becker. As a result of the Becker acquisition and a purchase of Company common stock immediately afterwards, Charles Becker became one of the Company's principal stockholders. Charles Becker became Vice Chairman and a member of the Company's Board of Directors upon closing of the Becker acquisition. The Company agreed to make $18.0 million in non-compete payments over five years to Mr. Becker at the time of the acquisition. In addition, Becker Ventures, an affiliate of Mr. Becker, acquired additional shares of Company common stock as part of the financings in connection with the TAC-Trim acquisition at a price of $5.00 per share.

As discussed above under "-- Leases," the Company is a party to certain sale-leaseback transactions with certain affiliates of Becker Ventures LLC, an entity that is controlled by Charles Becker, a director of the Company. The purpose of these sale-leaseback transactions was to reduce the Company's outstanding debt. The Company believes that the terms of the sale-leaseback transactions with Becker Ventures are on terms substantially similar to those which could have been negotiated in arms-length transactions of the same type. These sale-leaseback transactions were authorized by the independent members of the Company's board of directors.

## Elkin McCallum Transactions

In September 2001, the Company completed the acquisition of Joan Automotive Industries, a leading supplier of bodycloth to the automotive industry, and all of the operating assets of Joan's affiliated yarn dying operation, Western Avenue Dyers, L.P. As a result of the Joan acquisition, Joan Fabrics Corp., a company controlled by Elkin McCallum, became a principal stockholder of the Company. Upon completion of the Joan acquisition, Mr. McCallum became a member of the Company's Board of Directors.

In connection with the Joan acquisition, the Company entered into a Supply Agreement dated September 21, 2001 (the "Supply Agreement") with Main Street Textiles, L.P. ("Main Street"). Main Street is controlled by Elkin McCallum, a director of the Company. Under the Supply Agreement, the Company agreed to purchase all of its requirements for flat woven automotive fabric from Main Street for a five year period beginning on the date of the Supply Agreement. The prices which the Company will pay for fabric under the agreement will equal the costs of the raw materials plus an amount which represents Main Street's standard labor and overhead costs incurred in manufacturing fabric for us. During the term of the Supply Agreement, Main Street is prohibited from manufacturing automotive fabric products for third parties without the Company's prior consent but may sell seconds and close-out items in bona fide transactions. The Supply Agreement is also terminable by mutual written consent, upon the occurrence of certain events of bankruptcy, the appointment of a receiver or trustee, an assignment for the benefit of creditors, or in the event of a material breach. In addition, either party may terminate the Supply Agreement upon 270 days prior notice to the other party in the event that the parties are unable to agree on the pricing of fabric covered by the Supply Agreement.

The Company is also a party to a Transition Services Agreement dated September 21, 2001 with Joan Fabrics Corporation ("Joan Fabrics"), another company controlled by Mr. McCallum. Under this agreement Joan Fabrics will provide C&A Products with transitional and support services for a period not to exceed twelve months in order to support the continued and uninterrupted operation of the businesses acquired by C&A Products in the Joan acquisition. As a part of these services, pending the Company's disassembly and removal of machinery and equipment that we purchased from Joan Fabrics, Joan Fabrics will use that machinery and equipment to manufacture for us all of our requirements for some types of

14

COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS--(CONTINUED)

would be reported as a cumulative effect of a change in accounting principle. In accordance with the provisions of SFAS No. 142 the Company is not amortizing any of the goodwill associated with its acquisitions made subsequent to June 30, 2001 (Note 3).

In September 2000, the Financial Accounting Standards Board ("FASB") issued SFAS No. 140, "Accounting for Transfers and Servicing of Financial Assets and Extinguishments of Liabilities", which replaced SFAS No. 125, also titled "Accounting for Transfers and Servicing of Financial Assets and Extinguishments of Liabilities". SFAS No. 140 provides accounting and reporting standards for transfers and servicing of financial assets and extinguishments of liabilities. Those standards are based on consistent application of a financial-components approach that focuses on control. After a transfer of financial assets, an entity recognizes the financial and servicing assets it controls and the liabilities it has incurred, derecognizes financial assets when control has been surrendered, and derecognizes liabilities when extinguished. SFAS No. 140 became effective for recognition and reclassification of collateral and for disclosures relating to securitization transactions and collateral for fiscal years ending after December 15, 2000 (See Note 11) and for transfers and servicing of financial assets and extinguishments of liabilities occurring after March 31, 2001.

In June 1998, the FASB issued SFAS No. 133 which established accounting and reporting standards requiring that every derivative instrument (including certain derivative instruments embedded in other contracts) be recorded in the balance sheet as either an asset or liability measured at its fair value. SFAS No. 133 requires that changes in the derivative's fair value be recognized currently in earnings unless specific hedge accounting criteria are met. Special accounting for qualifying hedges allows a derivative's gains and losses to offset related results on the hedged item in the income statement, and requires that a company formally document, designate, and assess the effectiveness of transactions that receive hedge accounting. In June 1999, the FASB issued SFAS No. 137, "Accounting for Derivative Instruments and Hedging Activities - - Deferral of the Effective Date of FASB Statement No. 133, an Amendment of FASB Statement No. 133". Under SFAS No. 137, SFAS No. 133 was made effective for fiscal years beginning after June 15, 2000. In June 2000, the FASB issued SFAS No. 138, "Accounting for Certain Derivative Instruments and Certain Hedging Activities -- An Amendment of FASB Statement No. 133," which provides additional guidance for certain derivative instruments and hedging activities addressed in SFAS No. 133. SFAS No. 138 must be adopted concurrently with the adoption of SFAS No. 133.

SFAS No. 133 and SFAS 138 were effective for the Company as of January 1, 2001. Adoption of these new accounting standards had no material effect on net income, other comprehensive income, assets and liabilities.

3. ACQUISITIONS AND JOINT VENTURES

In December 2001, the Company completed its acquisition of Textron Automotive Company's automotive trim division ("TAC-Trim"). TAC-Trim is a leading supplier of fully-integrated cockpits and a major automotive plastics manufacturer in North America, Europe, and South America for instrument panels, interior trim and exterior components. The purchase price consisted primarily of: $632.2 million in cash (net of cash received and assumed debt); 18 million shares of common stock, with a market value of $160.9 million; and preferred stock of Products with an aggregate liquidation preference of $326.4 million, valued at $146.9 million. The cash purchase price was financed through a combination of the sale of an additional 32 million shares of common stock, valued at $160.0 million, to Heartland and debt financing. As part of the Textron purchase agreement, the Company may be obligated to make additional payments to Textron of $15.0 million to $125.0 million in the event that the Company's cumulative EBITDA. (Under the purchase agreement, cumulative EBITDA is defined generally as (1) the sum of consolidated net income, consolidated income tax expense, consolidated interest expense, consolidated depreciation and amortization expense, non-cash items which reduce net income, management fees paid to Heartland, nonrecurring expenses associated with financings and other identified financing expenses, less (2) amounts equivalent to those referred to in the preceding clause (1) projected

F-11

A29

COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS--(CONTINUED)

in respect of other acquisitions effected after the TAC-Trim acquisition at the time of acquisition, plus (3) amounts equivalent to those referred to in the preceding clause (1) in respect of the Company's Italian joint venture with Textron) for the five year period ending December 31, 2006 is between $2,908.0 million and $4,691.0 million. Additional payments, if necessary, would represent an adjustment to the TAC-Trim purchase price. If the then existing debt instruments prohibit these additional payments, then the Company is entitled to issue additional mandatorily redeemable preferred stock of its subsidiary.

In connection with the TAC-Trim acquisition, the Company has licensed certain of its acquired intellectual property to Textron and Textron has licensed certain retained intellectual property to the Company. These agreements contain customary limitations on use, particularly to a "restricted field." The field of use to which the intellectual property licensed by the Company is restricted is generally related to automotive businesses comparable to the Company's existing business and certain extensions thereof. The agreements relating to intellectual property provide for numerous customary continuing obligations to one another, such as with respect to cooperation concerning enhancements and extensions of use, non-infringement and engineering and other support services to ensure the proper use of the intellectual property.

In addition, under the TAC-Trim acquisition agreement, the purchase price paid by the Company is subject to adjustment based upon working capital and debt levels and the seller is entitled to a return of any cash left in the business at closing and reimbursement of certain capital expenditures made by it after September 30, 2001. Amounts paid would represent additional purchase price and would be included in goodwill.

In September 2001, the Company completed its acquisition of the automotive fabric operations of Joan Fabrics, a leading supplier of bodycloth to the automotive industry, and all of the operating assets in Joan Fabric's affiliated yarn dying operation, Western Avenue Dyers (collectively "Joan"). Consideration included $102.0 million in cash, including acquisition fees, and 12.76 million shares of the Company's common stock, valued at $90.2 million.

In July 2001, the Company completed its acquisition of Becker Group, LLC ("Becker"), a supplier of plastic components to the automotive industry. Consideration included $61.8 million in cash, including acquisition fees, $18.0 million in non-compete agreements (to be paid out over 5 years), 17.0 million shares of the Company's common stock, valued at $79.1 million, and warrants to purchase 500,000 shares of the Company's common stock at an exercise price of $5.00 per share, valued at $0.7 million.

During the first quarter of 2001, the Company purchased the remaining 50% from Courtaulds Textiles (Holdings) Limited ("Courtaulds") for $3.8 million, net of cash acquired. In December 1997, the Company had entered into a 50% joint venture with Courtaulds to manufacture automotive interior fabrics in the United Kingdom.

Also during the first quarter of 2001, the Company acquired the remaining 25% of the Collins & Aikman Carpet and Acoustics, S.A. de C.V. joint venture and related intangible assets for $3.5 million. As part of the 1996 acquisition of Perstorp, the Company acquired the initial 75% of Collins & Aikman Carpet and Acoustics, S.A. de C.V. joint venture.

The results of operations of the acquired companies are included in the Company's consolidated statements of operations from the dates of acquisition.

The acquisitions were accounted for under the purchase method of accounting. In accordance with SFAS No. 142, goodwill recorded as a result of business combinations completed during the six-month period ending December 31, 2001 was not amortized. Beginning in 2002, all goodwill and intangible assets will be tested for impairment in accordance with the provisions of SFAS No. 142. Under SFAS No. 142, amortization of goodwill, including goodwill recorded in past business combinations, will discontinue upon adoption of this standard. For acquisitions completed prior to July 1, 2001, the excess of the

F-12

A30

# Tab 4

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
Washington D.C. 20549

# Form 10-Q

(Mark One)

☑    **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d)
OF THE SECURITIES EXCHANGE ACT OF 1934**

For the quarterly period ended September 30, 2004

or

☐    **TRANSITION REPORT PURSUANT TO SECTION 13 or 15(d)
OF THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from          to

Commission file number 1-10218

# Collins & Aikman Corporation

*(Exact name of registrant, as specified in its charter)*

**DELAWARE**
*(State or other jurisdiction of
incorporation or organization)*

13-3489233
*(IRS Employer
Identification No.)*

**250 Stephenson Highway
Troy, Michigan 48083**
*(Address of principal executive offices, including zip code)*

**(248) 824-2500**
*(Registrant's telephone number, including area code)*

Indicate by check mark whether the Registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the Registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.    Yes ☐    No ☑  .

Indicate by check mark whether the Registrant is an accelerated filer (as defined in Exchange Act Rule 12b-2).    Yes ☑    No ☐

As of October 31, 2004 the number of outstanding shares of the Registrant's common stock, $.01 par value, was 83,630,087 shares.

## WEBSITE ACCESS TO COMPANY'S REPORTS:

Collins and Aikman's internet website address is www.collinsaikman.com. The Company's annual report on Form 10-K, quarterly reports on Form 10-Q, current reports on Form 8-K, and amendment to those reports filed or furnished pursuant to Section 13(a) or 15(d) of the

Exchange Act are available free of charge through the Company's website and as soon as reasonably practicable after the reports are electronically filed with, or furnished to, the Securities and Exchange Commission.

The Company's Code of Business Conduct is available free of charge through the Company's internet website. Any amendments to the Company's Code of Business Conduct and any waivers of the Code of Business Conduct involving executive officers or directors of the Company will also be made available on the Company's internet website. Printed copies of the Company's Code of Business Conduct are also available free of charge to any shareholder upon request to: Corporate Secretary, Collins & Aikman Corporation, 250 Stephenson Highway, Troy, MI 48083.

## COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES

### FORM 10-Q QUARTERLY REPORT INDEX

| | | Page |
|---|---|---|
| **PART I** | **FINANCIAL INFORMATION** | |
| Item 1. | Financial Statements | 1 |
| Item 2. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 32 |
| Item 3. | Quantitative and Qualitative Disclosures About Market Risk | 45 |
| Item 4. | Controls and Procedures | 46 |
| **PART II** | **OTHER INFORMATION** | |
| Item 1. | Legal Proceedings | 47 |
| Item 6. | Exhibits and Reports on Form 8-K | 48 |
| Signature | | 50 |
| Computation of Earnings Per Share | | |
| Computation of Ratio of Earnings to Fixed Charges | | |
| Section 302 Certification | | |
| Section 302 Certification | | |
| Section 906 Certification | | |

**PART I — FINANCIAL INFORMATION**

Item 1.    *Financial Statements*

### COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES

### CONDENSED CONSOLIDATED STATEMENTS OF OPERATIONS

| | Quarter Ended | | Nine Months Ended | |
|---|---|---|---|---|
| | September 30, 2004 | September 30, 2003 | September 30, 2004 | September 30, 2003 |
| | (Unaudited) (in millions, except for per share data) | | | |
| Net sales | $864.8 | $902.2 | $2,967.5 | $2,970.8 |
| Cost of goods sold | 800.8 | 812.1 | 2,687.7 | 2,658.3 |
| Gross profit | 64.0 | 90.1 | 279.8 | 312.5 |
| Selling, general and administrative expenses | 35.2 | 57.7 | 144.7 | 193.0 |
| Restructuring charge | 9.0 | 21.9 | 28.9 | 26.8 |
| Impairment of long-lived assets | 10.3 | 2.2 | 40.7 | 21.1 |
| Operating income | 9.5 | 8.3 | 65.5 | 71.6 |
| Interest expense | 46.9 | 37.8 | 127.4 | 111.3 |
| Interest expense from subsidiary preferred stock dividends | 10.5 | 9.2 | 30.5 | 22.4 |
| Interest expense from subsidiary preferred stock accretion | 0.6 | 0.4 | 1.6 | 4.8 |
| Loss on sale of receivables | 2.4 | 1.8 | 7.2 | 4.5 |
| Loss on early extinguishment of debt | 18.8 | — | 20.3 | — |
| Other expense (income), net | (0.7) | (0.2) | 4.1 | (23.9) |
| Loss from continuing operations before income taxes | (69.0) | (40.7) | (125.6) | (47.5) |
| Income tax expense (benefit) | (13.4) | (8.6) | (17.0) | 0.1 |
| Net loss | $ (55.6) | $ (32.1) | $ (108.6) | $ (47.6) |
| Net loss per basic and diluted common share | $ (0.67) | $ (0.38) | $ (1.30) | $ (0.57) |
| Average common shares outstanding: | | | | |
| Basic and diluted | 83.6 | 83.6 | 83.6 | 83.6 |

The Notes to Consolidated Financial Statements are an integral part
of these consolidated financial statements.

I

A33

Tab 5

SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

SCHEDULE 14A INFORMATION

PROXY STATEMENT PURSUANT TO SECTION 14(a) OF THE
SECURITIES EXCHANGE ACT OF 1934

Filed by the Registrant [X]
Filed by a Party other than the Registrant [ ]

Check the appropriate box:

[ ]     Preliminary Proxy Statement

[ ]     Confidential, for Use of the Commission Only (as permitted by Rule 14a-6(e)(2))

[X]     Definitive Proxy Statement

[ ]     Definitive Additional Materials

[ ]     Soliciting Material Pursuant to Section 240.14a-11(c) or Section 240.14a-12

Collins & Aikman Corporation

(Name of Registrant as Specified in Its Charter)

Not Applicable

(Name of Person(s) Filing Proxy Statement, if other than the Registrant)

Payment of Filing Fee (Check the appropriate box):

[X] No fee required.

[ ] Fee computed on table below per Exchange Act Rules 14a-6(i)(1) and 0-11.

   1)   Title of each class of securities to which transaction applies:

   2)   Aggregate number of securities to which transaction applies:

   3)   Per unit price or other underlying value of transaction computed pursuant to Exchange Act Rule 0-11 (set forth the amount on which the filing fee is calculated and state how it was determined):

   4)   Proposed maximum aggregate value of transaction:

5) Total fee paid:

[ ]  Fee paid previously with preliminary materials.

[ ]  Check box if any part of the fee is offset as provided by Exchange Act Rule 0-11(a)(2) and identify the filing for which the offsetting fee was paid previously. Identify the previous filing by registration statement number, or the Form or Schedule and the date of its filing.

1)  Amount Previously Paid:

2)  Form, Schedule or Registration Statement No.:

3)  Filing Party:

4)  Date Filed:



Collins & Aikman Corporation
250 Stephenson Highway
Troy, Michigan 48083

April 25, 2002

Dear Stockholder:

You are cordially invited to attend the Annual Meeting of Stockholders of Collins & Aikman Corporation to be held on May 16, 2002 at The Waldorf-Astoria Hotel, the Norse Suite, 301 Park Avenue, New York, NY 10022, at 11:00 a.m., Eastern Daylight Savings Time.

You are urged to read carefully the formal notice of the meeting and the Proxy Statement which follow. After reading them, please sign, date and mail the enclosed proxy card so that your shares will be represented at the meeting. A prepaid return envelope is provided for this purpose.

We look forward to seeing you at the meeting.

Sincerely,

Thomas E. Evans
Chairman of the Board
and Chief Executive Officer

A36

## NOTICE OF ANNUAL MEETING OF STOCKHOLDERS
### To Be Held May 16, 2002

To the Stockholders of
COLLINS & AIKMAN CORPORATION:

NOTICE IS HEREBY GIVEN that the Annual Meeting (the "Meeting") of the holders of common stock, par value $0.01 per share (the "Common Stock"), of COLLINS & AIKMAN CORPORATION, a Delaware corporation (the "Company"), will be held on May 16, 2002 at The Waldorf-Astoria Hotel, the Norse Suite, 301 Park Avenue, New York, NY 10022, commencing at 11:00 a.m., Eastern Daylight Savings Time, for the purpose of considering and voting upon the following matters:

I. the election of five directors to hold office until the 2005 Annual Meeting and thereafter until their successors are elected and qualified;

II. the approval of the Company's 2002 Employee Stock Option Plan;

III. the approval of a proposal to effect a one-for-two and one-half reverse stock split of the Company's Common Stock; and

IV. such other matters as may properly come before the Meeting or any adjournment or postponement thereof.

The Board of Directors has fixed the close of business on April 2, 2002 as the record date for the determination of stockholders entitled to notice of and to vote at the Meeting. Therefore, only holders of record of Common Stock at the close of business on such date will be entitled to notice of and to vote at the Meeting.

A complete list of stockholders entitled to notice of and to vote at the Meeting will be available at our offices at 250 Stephenson Highway, Troy, Michigan 48083, at least ten days prior to the Meeting. The list will also be available for inspection by stockholders at the Meeting.

Stockholders are requested to sign and date the enclosed proxy card and return it promptly in the enclosed pre-addressed reply envelope, whether or not they plan to attend the Meeting, so that their shares may be represented. Any proxy may be revoked by filing with the Secretary of the Company, in care of the First Union Customer Information Service Center at the address set forth in the accompanying Proxy Statement, either a written notice of revocation bearing a later date than the proxy card or a subsequent proxy relating to the same shares at any time prior to the time the proxy is voted. Further, any person who has executed a proxy card and is present at the Meeting may vote in person instead of by proxy, thereby canceling any proxy previously given.

By Order of the Board of Directors,

Ronald T. Lindsay
*Secretary*

PLEASE EXECUTE, DATE AND RETURN THE ENCLOSED PROXY CARD WHETHER OR NOT YOU INTEND TO BE PRESENT AT THE MEETING.

April 25, 2002

PROXY STATEMENT
PROPOSAL I ELECTION OF DIRECTORS
REPORT OF THE AUDIT COMMITTEE
COMPENSATION COMMITTEE REPORT ON EXECUTIVE COMPENSATION
EXECUTIVE OFFICERS OF THE COMPANY
EXECUTIVE COMPENSATION
Performance Graph
PROPOSAL II APPROVAL OF THE COMPANY'S 2002 EMPLOYEE STOCK OPTION PLAN
PROPOSAL III APPROVAL OF THE ONE-FOR-TWO AND ONE-HALF REVERSE STOCK SPLIT
CHANGES IN CERTIFYING ACCOUNTANT
STOCKHOLDER PROPOSALS
ANNUAL REPORT
OTHER MATTERS
Definitive Proxy Statement

---

## PROXY STATEMENT

---

### COLLINS & AIKMAN CORPORATION
250 Stephenson Highway
Troy, Michigan 48083

### ANNUAL MEETING OF STOCKHOLDERS
To Be Held May 16, 2002

## General Information

This Proxy Statement is furnished in connection with the solicitation by the Board of Directors of Collins & Aikman Corporation, a Delaware corporation (the "Company"), of proxies for use at the Annual Meeting of Stockholders of the Company to be held on May 16, 2002 at The Waldorf-Astoria Hotel, the Norse Suite, 301 Park Avenue, New York, NY 10022, commencing at 11:00 a.m., Eastern Daylight Savings Time, and at any adjournment or postponement thereof (the "Meeting").

The presence, in person or by proxy, of stockholders holding a majority of the shares entitled to vote at the Meeting is necessary to constitute a quorum at the Meeting.

All shares of the common stock, par value $0.01 per share (the "Common Stock"), of the Company which are entitled to vote and are represented at the Meeting by properly executed proxies received prior to or at the Meeting, and not revoked, will be voted at the Meeting in accordance with the instructions indicated on such proxies. If no instructions are indicated, such proxies will be voted for the election of the five nominees for director named below (or if any nominee becomes unavailable, such other person as the Nominating Committee of the Board of Directors or the Company selects), for the approval of the Company's 2002 Employee Stock Option Plan, for the approval of the proposed one-for-two and one-half reverse stock split and in accordance with the Board of Directors' recommendations with respect to any other matter that may properly come before the Meeting.

The Board of Directors has fixed the close of business on April 2, 2002 as the record date (the "Record Date") for the determination of stockholders entitled to notice of and to vote at the Meeting. Therefore, only holders of record of Common Stock at the close of business on the Record Date will be entitled to notice of and to vote at the Meeting.

Any proxy may be revoked by the person giving it at any time before it is voted. A proxy may be revoked by filing, with the Secretary of the Company (in care of the First Union Customer Information Service Center, Client Service Group, 1525 West W.T. Harris Boulevard, 3C3, Charlotte, North Carolina, 28288-1153, Attention: Proxy Department) at any time prior to the time the proxy is voted, either a written notice of revocation bearing a later date than the proxy card or a subsequent proxy relating to the same shares, or by attending the Meeting and voting in person (although attendance at the Meeting will not in and of itself constitute revocation of a proxy).

All expenses of this solicitation, including the cost of preparing and mailing this Proxy Statement, will be borne by the Company. In addition to solicitation by use of the mails, proxies may be solicited by directors, officers and employees of the Company in person or by telephone, telegram or other means of communication. Such directors, officers and employees will not be additionally compensated, but may be reimbursed for out-of-pocket expenses in connection with such solicitation. Arrangements will also be made with custodians, nominees and fiduciaries for forwarding of proxy solicitation materials to beneficial owners of Common Stock held of record by such custodians, nominees and fiduciaries, and the Company may reimburse such custodians, nominees and fiduciaries for reasonable expenses incurred in connection therewith.

Table of Contents

This Proxy Statement and the accompanying proxy card are being mailed to stockholders commencing on or about April 25, 2002.

**Voting Securities**

On the Record Date, 167,997,131 shares of Common Stock were outstanding. Only holders of Common Stock of record at the close of business on the Record Date are entitled to notice of and to vote at the Meeting. Each stockholder of record is entitled to one vote for each share of Common Stock held on all matters to come before the Meeting.

**Security Ownership of Management and Principal Stockholders**

Set forth in the table below is certain information as of March 12, 2002 regarding the beneficial ownership of equity securities of the Company by (i) persons who are known to the Company to own beneficially more than five percent (5%) of the Company's voting stock, (ii) directors of the Company (excepting Stephen V. O'Connell and Neil P. Simpkins, who resigned from the Board of Directors effective March 15, 2002), (iii) the executive officers of the Company named in the Summary Compensation Table set forth in this Proxy Statement (and referred to herein as the "Named Executive Officers") and (iv) the directors and executive officers of the Company as a group. Unless otherwise indicated, the beneficial owner has sole voting power and sole investment power over the securities shown below.

| Title of Class | Name of Beneficial Owner | Amount and Nature of Beneficial Ownership | Percent of Class |
|---|---|---|---|
| Common Stock, par value $0.01 per share | Brian Batey | 0 | |
| | Blackstone Capital Partners L.P.<br>345 Park Avenue<br>New York, NY | 12,225,571(1) | 7.3% |
| | Charles E. Becker | 18,848,156(2) | 11.2% |
| | Robert C. Clark | 80,000(3) | * |
| | Marshall A. Cohen | 10,000(3) | * |
| | Thomas E. Evans | 1,570,405(4) | * |
| | Heartland Industrial Partners L.P.<br>55 Railroad Avenue<br>Greenwich, CT | 67,200,000(5) | 40.0% |
| | Cynthia L. Hess | 0(14) | |
| | Joan Fabrics Corporation<br>100 Vesper Executive Park<br>Tyngsboro, MA | 12,760,000(6) | 7.6% |
| | Timothy D. Leuliette | 0(14) | |
| | Ronald T. Lindsay | 86,109(7) | * |
| | Elkin McCallum | 12,859,000(6) | 7.7% |
| | W. Gerald McConnell | 0(14) | |
| | Warren B. Rudman | 70,000(3) | * |
| | Rajesh K. Shah | 135,000(8) | * |
| | J. Michael Stepp | 75,167(9) | * |
| | David A. Stockman | 0(14) | |
| | Textron Inc.<br>40 Westminster Street<br>Providence, RI | 18,000,000(10) | 10.7% |
| | Daniel P. Tredwell | 0(14) | |

2

A40

| Title of Class | Name of Beneficial Owner | Amount and Nature of Beneficial Ownership | Percent of Class |
|---|---|---|---|
| | Samuel Valenti, III | 0(14) | |
| | Wasserstein/C&A Holdings, L.L.C.<br>1301 Avenue of the Americas<br>New York, NY | 13,199,800(11) | 7.9% |
| | Reed A. White | 115,108(12) | * |
| | Executive officers and directors as a group<br>(19 persons) | 33,854,875(13) | 20.1% |

---

\* Less than one percent of shares of Common Stock outstanding.

(1) Of these shares (i) 9,624,442 shares are held directly by Blackstone Capital Partners L.P., a Delaware limited partnership ("Blackstone Partners"), the sole general partner of which is Blackstone Management Associates L.P. ("Blackstone Associates"), (ii) 496,588 shares are held directly by Blackstone Family Investment Partnership I L.P., a Delaware limited partnership ("BFIP"), the sole general partner of which is Blackstone Management Associates I L.L.C. ("BMA"), (iii) 43,642 shares are held directly by Blackstone Advisory Directors Partnership L.P., a Delaware limited partnership ("BADP"), the sole general partner of which is Blackstone Associates, and (iv) 2,060,899 shares are held directly by Blackstone Capital Company II L.L.C., a Delaware limited liability company, all the ownership interest of which is owned directly and indirectly by Blackstone Partners, BFIP and BADP.

(2) Such shares represent (a) 13,600,000 shares acquired by Mr. Becker as consideration for the Becker acquisition, (b) 848,156 shares acquired by Mr. Becker immediately following the closing of the Becker acquisition from one of the other former Becker shareholders, (c) 400,000 shares subject to presently exercisable warrants to purchase such common stock at $5.00 per share acquired by Mr. Becker as consideration for the Becker acquisition and (d) 4,000,000 shares acquired by Becker Ventures LLC ("Becker Ventures") as part of the financing for the Company's acquisition of Textron Automotive Company's trim division ("TAC-Trim"). Mr. Becker is the managing member of Becker Ventures and holds a controlling interest in Becker Ventures. Mr. Becker became a C&A director and Vice Chairman upon completion of the Becker acquisition.

(3) Represents shares underlying options granted under the 1994 Directors Stock Option Plan which (i) are vested or (ii) will vest within 60 days unless the director ceases to be a director prior to that time.

(4) Of these shares, (i) 245,000 are held directly, (ii) 65,405 shares are held indirectly in the Stock Fund of the 401(k) and Shadow Retirement Income Plans and (iii) 1,260,000 represent shares underlying options granted under the 1994 Plan which are vested.

(5) The 67,200,000 shares beneficially owned are indirectly owned by Heartland Industrial Associates L.L.C. as the general partner of each of the following limited partnerships, which hold the shares directly: (a) 814,190 shares are held directly by Heartland Industrial Partners (FF), L.P., a Delaware limited partnership, (b) 878,516 shares are held directly by Heartland Industrial Partners (E1), L.P., a Delaware limited partnership, (c) 528,052 shares are held directly by Heartland Industrial Partners (K1), L.P., a Delaware limited partnership, (d) 264,026 shares are held directly by Heartland Industrial Partners (C1), L.P., a Delaware limited partnership, and (e) 64,715,216 shares are held directly by Heartland Industrial Partners, L.P., a Delaware limited partnership.

(6) Of these shares (a) 12,760,000 shares were acquired by Joan Fabrics Corporation ("Joan Fabrics") as a part of the consideration for the sale of Joan Automotive Industries, Inc. ("Joan Automotive") to us, (b) 75,000 shares were previously acquired by Mr. McCallum and his spouse and (c) 24,000 were shares previously acquired by the McCallum Family Foundation. The sole stockholder of Joan Fabrics is JFC Holding Trust, in which Elkin McCallum is the Trustee and has a 75% beneficial interest and his spouse, Donna McCallum, owns the balance. Mr. McCallum became a director of C&A upon the consummation of the Joan acquisition.

(7) Of these shares, (i) 7,300 are held directly, (ii) 44,924 represent shares underlying options granted under the 1993 Employee Stock Option Plan (the "1993 Plan") which are vested, (iii) 26,667 represent

shares underlying options under the 1994 Plan which are vested and (iv) 7,218 shares are held indirectly in the Stock Fund of the 401(k) and Shadow Retirement Income Plans.

(8)    Represents shares underlying options granted under the 1994 Plan which are vested.

(9)    Of these shares, (i) 65,000 are held directly and (ii) 10,167 are held indirectly in the Stock Fund of the 401(k) and Shadow Retirement Income Plans.

(10)    Such shares are beneficially owned by Textron Inc. ("Textron"). Under the purchase agreement for the TAC-Trim acquisition, Textron has the right to designate a director to serve on the Collins & Aikman Corporation Board of Directors. As of this date, it has not yet identified the individual that it will designate. Accordingly, the table does not include the Textron designee, who is expected to disclaim beneficial ownership of all securities beneficially owned by Textron.

(11)    Of these shares (i) 13,119,409 are held directly by Wasserstein/C&A Holdings, L.L.C. (the "Wasserstein L.L.C."), which is controlled by Wasserstein Perella Partners, L.P. ("WP Partners"), the sole general partner of which is Wasserstein Perella Management Partners, Inc. ("Wasserstein Management"), which is controlled by Cypress Capital Advisors, LLC ("CCA"), (ii) 18,000 are held directly by WPPN, Inc., an indirect subsidiary of WP Group, (iii) 45,000 shares are held directly 33% by each of three trusts for which Bruce Wasserstein, the Chairman and Chief Executive Officer of Wasserstein Management (who is also a director and stockholders of WP Group), is the Co-Trustee, (iv) 10,503 are owned directly by Bruce Wasserstein and (v) 6,887 are held by Bruce Wasserstein's descendants' trusts.

(12)    Of these shares, (i) 101,774 represent shares underlying options granted under the 1993 Plan which are vested and (ii) 13,334 represent shares underlying options granted under the 1994 Plan which are vested.

(13)    Excludes shares held by Heartland and its affiliates, Joan Fabrics and its affiliates, Becker Ventures and its affiliates, Textron Inc. and its affiliates, Blackstone Partners and its affiliates and Wasserstein L.L.C. and its affiliates. Also excludes shares held by Brian Batey and Rajesh K. Shah, who resigned their employment prior to March 12, 2002.

(14)    As described under (5) above, 67,200,000 shares are beneficially owned by Heartland Industrial Associates, L.L.C. Mr. Stockman is the Managing Member of Heartland Industrial Associates, L.L.C., but disclaims beneficial ownership of such shares. Messrs. Leuliette, McConnell, Stepp, Tredwell and Valenti and Ms. Hess are also members of Heartland Industrial Associates, L.L.C. and also disclaim beneficial ownership of the shares.

**Voting**

As of March 12, 2002, Heartland and its affiliates, Blackstone Partners and its affiliates and Wasserstein L.L.C., which is controlled by WP Partners, and its affiliates, Charles E. Becker and Becker Ventures, Elkin McCallum and Joan Fabrics, and Textron and its affiliates (collectively, the "Investors") beneficially own or have the right to vote in the aggregate approximately 84.7% of the outstanding Common Stock. See "Security Ownership of Management and Principal Stockholders" and "Certain Relationships and Related Transactions — Certain Relationships." The Investors have advised the Company that they intend to vote all such shares in favor of Proposals I, II and III. Accordingly, assuming that the Investors vote as indicated, the presence of a quorum at the meeting and the approval and adoption of Proposals I, II and III are assured.

**PROPOSAL I**

**ELECTION OF DIRECTORS**

The Restated Certificate of Incorporation provides that the Board of Directors of the Company is divided into three classes serving staggered three-year terms. Five Class II directors will be elected at the Meeting, each to hold office until his or her term expires at the year 2005 Annual Meeting and until his or her successor is elected and qualified, subject, however, to prior death, resignation, retirement, disqualification or removal from office. All the nominees except Mr. Dauch are currently directors of the Company. Proxies will be voted for the election of the nominees listed below and identified as Nominees for Election at the Meeting, unless contrary instructions are set forth on the proxy card. If any nominee shall be unavailable to serve as a director,

Table of Contents

managing WP Partners. Mr. O'Connell is also a director of Wasserstein & Co., LP, a newly created entity involved in merchant banking activities, which is affiliated with Wasserstein Management.

In connection with Heartland's initial investment in the Company on February 23, 2001, the Company paid WP Partners an investment banking fee of $2 million. Wasserstein Perella Securities, Inc., a wholly-owned subsidiary of WP Group, has acted, and may in the future act, as agent for the Company in the repurchase from time to time of shares of common stock.

*Charles E. Becker*

In July 2001, the Company completed the acquisition of Becker Group LLC. As a result of the Becker acquisition and a purchase of Common Stock immediately afterwards, Charles Becker became one of the Company's principal stockholders. Charles Becker became Vice Chairman and a member of the Company's Board of Directors upon closing of the Becker acquisition. The Company agreed to make $18 million in non-compete payments over five years to Mr. Becker at the time of the acquisition. In addition, Becker Ventures LLC, an affiliate of Mr. Becker, acquired additional shares of Common Stock as part of the financings in connection with the acquisition of TAC-Trim at a price of $5.00 per share. See the information under the heading "Security Ownership of Management and Principal Stockholders" for a discussion of Mr. Becker's beneficial ownership of Common Stock.

*Elkin McCallum*

In September 2001, the Company completed the acquisition of Joan Automotive, a leading supplier of body cloth to the automotive industry, and all of the operating assets of Joan Automotive's affiliated year dying operation, Western Avenue Dyers, L.P. As a result of the Joan acquisition, Joan Fabrics, a company controlled by Elkin McCallum, became a principal stockholder of the Company. Upon completion of the Joan acquisition, Mr. McCallum because a member of the Company's Board of Directors. See "Security Ownership of Management and Principal Stockholders" for a discussion of Joan Fabrics' and Mr. McCallum's beneficial ownership of Common Stock.

*Certain Agreements and Transactions*

*Blackstone/ Wasserstein/ Heartland Stockholders Agreement*

The Company is a party to a stockholders agreement (the "Initial Stockholders Agreement") with Heartland and certain affiliates (the "Heartland parties"), Blackstone and certain of its affiliates (the "Blackstone parties") and the Wasserstein L.L.C. and certain of its affiliates (the "Wasserstein parties"). The Initial Stockholders Agreement contains (i) rights of first refusal on private sales of Common Stock by the Blackstone parties and the Wasserstein parties in favor of the Heartland parties, (ii) tag-along rights in favor of the Blackstone parties and the Wasserstein parties in the event of certain transfers of Common Stock by Heartland and (iii) for so long as Heartland has a right to designate directors, a drag-along right enabling Heartland to cause the Blackstone parties and Wasserstein parties to sell all of their Common Stock with Heartland when Heartland is selling all of its Common Stock to a third party (including by merger). The Initial Stockholders Agreement further provides that the stockholder parties thereto will vote their Common Stock to ensure that seven members of the Company's board will be designated by Heartland, one by the Wasserstein parties and one by the Blackstone parties, in each case so long as each of Heartland, the Wasserstein parties and the Blackstone parties (in each case, together with its affiliates) continue to beneficially own at least 25% of the Common Stock owned by them as of February 23, 2001. In addition, there must be three independent directors not otherwise affiliated with the Company, the Blackstone parties, the Wasserstein parties or Heartland. The Company's chief executive officer will also serve as a director. Certain rights inure to the benefit of, and certain obligations bind, subsequent transferees of Common Stock, but none of the rights or obligations apply to public sales, whether under Rule 144 or under a registration statement.

The Initial Stockholders Agreement also contains certain restrictions on the Company's ability to enter into transactions with Heartland and its affiliates. The Company and its subsidiaries may not enter into any such transaction or series of related transactions involving payments or other consideration in excess of

$500,000 without the consent of (i) each of the Blackstone parties and the Wasserstein parties, so long as each holds at least 25% of the Common Stock held by it as of February 23, 2001, for so long as Heartland and its affiliates directly or indirectly beneficially own at least 50% of the outstanding Common Stock and (ii) a majority of the members of the board who are disinterested with respect to the particular transaction and were not designated for election by Heartland so long as Heartland and its affiliates own at least 25% of the Common Stock owned by them on the date of the Initial Stockholders Agreement. The restrictions described above will not apply to (i) an advisory fee on certain acquisitions and divestitures by the Company in an amount not exceeding 1% of the enterprise value thereof and related out-of-pocket fees and expenses, (ii) transactions involving the sale, purchase or lease of goods and services in the ordinary course of business and on an arms-length basis between the Company and portfolio companies of Heartland in an amount involving not more than $1.25 million in any transaction, and (iii) certain other transactions.

*Becker/ Joan/ Heartland Stockholders Agreement*

There is also a stockholders agreement (the "Becker/ Joan Stockholders Agreement") among Charles E. Becker, Michael E. McInerney and Jens Höhnel (the "Becker parties"), Joan Fabrics Corporation, JFC Holdings Trust, Mr. Elkin McCallum and Donna McCallum (the "Joan parties"), the Heartland parties and C&A. The Becker/ Joan Stockholders Agreement contains (i) rights of first refusal on private sales of Common Stock by the Becker parties and the Joan parties in favor of the Heartland parties, (ii) tag-along rights in favor of the Becker parties and the Joan parties in the event of certain transfers of Common Stock by Heartland and (iii) for so long as Heartland has a right to designate directors, a drag-along right enabling Heartland to cause the Becker parties and Joan parties to sell all of their Common Stock with Heartland when Heartland is selling all of its Common Stock to a third party (including by merger).

The Becker/ Joan Stockholders Agreement further provides that the Becker parties, the Joan parties and Heartland will each vote their Common Stock to ensure that Charles E. Becker and Elkin McCallum are each members of the Company's board of directors, so long as the Becker parties and the Joan parties, respectively, continue to hold shares representing 25% of the Common Stock originally acquired by them. The Becker/ Joan Stockholders Agreement also provides that the Becker parties will vote their shares in favor of the election of Heartland's designees to the Company's board of directors and the TAC-Trim acquisition. Certain rights inure to the benefit of, and certain obligations bind, subsequent transferees of Common Stock, but none of the rights or obligations apply to public sales, whether under Rule 144 or under a registration statement.

*Charles E. Becker Transactions*

In June 2001, the Company entered into sale-leaseback transactions with each of New King, L.L.C. ("New King") and Anchor Court, L.L.C. ("Anchor Court"), which are affiliates of Becker Ventures LLC. Becker Ventures is controlled by Charles Becker, a Company director.

In connection with these sale-leaseback transactions, C&A Products sold and contemporaneously leased back real property located in Troy, Michigan and Plymouth, Michigan from New King and Anchor Court, respectively, for net proceeds of $15.1 million in aggregate. The initial lease term in each transaction is 20 years and each lease has two successive ten-year renewal options. The basic rent for the Troy, Michigan property is $1.3 million per year, and the basic rent for the Plymouth, Michigan property is $.5 million per year. The rental rates in each case are subject to adjustment after expiration of the initial term.

The purpose of these sale-leaseback transactions was to reduce the Company's outstanding debt. The Company believes that the terms of the sale-leaseback transactions with Becker Ventures are on terms substantially similar to those which could have been negotiated in arms-length transactions of the same type. These sale-leaseback transactions were authorized by the independent members of the Company's board of directors.

In connection with the Becker acquisition, the Company entered into a lease agreement with Becker Ventures for the Company's headquarters at 250 Stephenson Highway, with the effective date of the lease being January 1, 2002. In March, 2002, the Company entered into lease agreements with Becker Ventures, effective January 1, 2002, for 150 Stephenson Highway and 350 Stephenson Highway. The base rent for all

10

# Tab 6

OMB APPROVAL

| | |
|---|---|
| OMB Number: | 3235-0059 |
| Expires: | August 31, 2004 |
| Estimated average burden hours per response | 14.73 |

# UNITED STATES
## SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

### SCHEDULE 14A

Proxy Statement Pursuant to Section 14(a) of the Securities
Exchange Act of 1934 (Amendment No.      )

Filed by the Registrant   ☐
Filed by a Party other than the Registrant   ☐

Check the appropriate box:

☐   Preliminary Proxy Statement
☐   **Confidential, for Use of the Commission Only (as permitted by Rule 14a-6(e)(2))**
☒   Definitive Proxy Statement
☐   Definitive Additional Materials
☐   Soliciting Material Pursuant to §240.14a-12

---

Collins and Aikman Corporation

---

(Name of Registrant as Specified In Its Charter)

---

(Name of Person(s) Filing Proxy Statement, if other than the Registrant)

Payment of Filing Fee (Check the appropriate box):

☒   No fee required.
☐   Fee computed on table below per Exchange Act Rules 14a-6(i)(1) and 0-11.

1) Title of each class of securities to which transaction applies:

---

2) Aggregate number of securities to which transaction applies:

---

3) Per unit price or other underlying value of transaction computed pursuant to Exchange Act Rule 0-11 (set forth the amount on which the filing fee is calculated and state how it was determined):

---

4) Proposed maximum aggregate value of transaction:

---

5) Total fee paid:

---

☐ Fee paid previously with preliminary materials.

☐ Check box if any part of the fee is offset as provided by Exchange Act Rule 0-11(a)(2) and identify the filing for which the offsetting fee was paid previously. Identify the previous filing by registration statement number, or the Form or Schedule and the date of its filing.

1) Amount Previously Paid:

_____

2) Form, Schedule or Registration Statement No.:

_____

3) Filing Party:

_____

4) Date Filed:

_____

SEC 1913 (02-02)    **Persons who potentially are to respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB control number.**

A46



Collins & Aikman Corporation
250 Stephenson Highway
Troy, Michigan 48083

April 23, 2003

Dear Stockholder:

You are cordially invited to attend the Annual Meeting of Stockholders of Collins & Aikman Corporation to be held on May 16, 2003 at 250 Stephenson Highway, Troy, Michigan 48083 at 11:00 a.m., Eastern Daylight Savings Time.

You are urged to read carefully the formal notice of the meeting and the Proxy Statement which follow. After reading them, please sign, date and mail the enclosed proxy card so that your shares will be represented at the meeting. A prepaid return envelope is provided for this purpose.

We look forward to seeing you at the meeting.

Sincerely,

*Jerry L. Mosingo*

Jerry L. Mosingo
*President
and Chief Executive Officer*

## NOTICE OF ANNUAL MEETING OF STOCKHOLDERS
### To Be Held May 16, 2003

**To the Stockholders of
COLLINS & AIKMAN CORPORATION:**

NOTICE IS HEREBY GIVEN that the Annual Meeting (the "Meeting") of the holders of common stock, par value $0.01 per share (the "Common Stock"), of COLLINS & AIKMAN CORPORATION, a Delaware corporation (the "Company"), will be held on May 16, 2003 at 250 Stephenson Highway, Troy, Michigan 48083, commencing at 11:00 a.m., Eastern Daylight Savings Time, for the purpose of considering and voting upon the following matters:

I. the election of four directors to hold office until the 2006 Annual Meeting and thereafter until their successors are elected and qualified;

II. the approval of an amendment to the 2002 Employee Stock Option Plan; and

III. such other matters as may properly come before the Meeting or any adjournment or postponement thereof.

The Board of Directors has fixed the close of business on March 18, 2003 as the record date for the determination of stockholders entitled to notice of and to vote at the Meeting. Therefore, only holders of record of Common Stock at the close of business on such date will be entitled to notice of and to vote at the Meeting.

A complete list of stockholders entitled to notice of and to vote at the Meeting will be available at our offices at 250 Stephenson Highway, Troy, Michigan 48083, at least ten days prior to the Meeting. The list will also be available for inspection by stockholders at the Meeting.

Stockholders are requested to sign and date the enclosed proxy card and return it promptly in the enclosed pre-addressed reply envelope, whether or not they plan to attend the Meeting, so that their shares may be represented. Any proxy may be revoked by filing with the Secretary of the Company, in care of the Wachovia Customer Information Service Center at the address set forth in the accompanying Proxy Statement, either a written notice of revocation bearing a later date than the proxy card or a subsequent proxy relating to the same shares, at any time prior to the time the proxy is voted. Further, any person who has executed a proxy card and is present at the Meeting may vote in person instead of by proxy, thereby canceling any proxy previously given.

By Order of the Board of Directors,

Jay B. Knoll
*Secretary*

PLEASE EXECUTE, DATE AND RETURN THE ENCLOSED PROXY CARD WHETHER OR NOT YOU INTEND TO BE PRESENT AT THE MEETING.

April 23, 2003

A48

**TABLE OF CONTENTS**

PROXY STATEMENT
ANNUAL MEETING OF STOCKHOLDERS
PROPOSAL I
ELECTION OF DIRECTORS
REPORT OF THE AUDIT COMMITTEE
COMPENSATION COMMITTEE REPORT ON EXECUTIVE COMPENSATION
EXECUTIVE OFFICERS OF THE COMPANY
EXECUTIVE COMPENSATION
PROPOSAL II APPROVAL OF AN AMENDMENT TO THE 2002 EMPLOYEE STOCK OPTION
PLAN
STOCKHOLDER PROPOSALS
ANNUAL REPORT
OTHER MATTERS
APPENDIX A
FIRST AMENDMENT TO THE COLLINS & AIKMAN CORPORATION 2002 EMPLOYEE STOCK
OPTION PLAN

**PROXY STATEMENT**

**COLLINS & AIKMAN CORPORATION**
250 Stephenson Highway
Troy, Michigan 48083

**ANNUAL MEETING OF STOCKHOLDERS**
To Be Held May 16, 2003

**General Information**

This Proxy Statement is furnished in connection with the solicitation by the Board of Directors of Collins & Aikman Corporation, a Delaware corporation (the "Company"), of proxies for use at the Annual Meeting of Stockholders of the Company to be held on May 16, 2003 at 250 Stephenson Highway, Troy, Michigan 48083, commencing at 11:00 a.m., Eastern Daylight Savings Time, and at any adjournment or postponement thereof (the "Meeting").

The presence, in person or by proxy, of stockholders holding a majority of the shares entitled to vote at the Meeting is necessary to constitute a quorum at the Meeting.

All shares of the common stock, par value $0.01 per share (the "Common Stock"), of the Company which are entitled to vote and are represented at the Meeting by properly executed proxies received prior to or at the Meeting, and not revoked, will be voted at the Meeting in accordance with the instructions indicated on such proxies. If no instructions are indicated, such proxies will be voted for the election of the four nominees for director named below (or if any nominee becomes unavailable, such other person as the Nominating Committee of the Board of Directors or the Company selects), amendment of the 2002 Employee Stock Option Plan (the "2002 Plan") and in accordance with the best judgment of the persons named in the accompanying proxy with respect to any other matter that may properly come before the Meeting.

The Board of Directors has fixed the close of business on March 18, 2003 as the record date (the "Record Date") for the determination of stockholders entitled to notice of and to vote at the Meeting. Therefore, only holders of record of Common Stock at the close of business on the Record Date will be entitled to notice of and to vote at the Meeting.

Any proxy may be revoked by the person giving it at any time before it is voted. A proxy may be revoked by filing, with the Secretary of the Company (in care of the Wachovia Customer Information Service Center, Client Service Group, 1525 West W.T. Harris Boulevard, 3C3, Charlotte, North Carolina, 28288-1153, Attention: Proxy Department) at any time prior to the time the proxy is voted, either a written notice of revocation bearing a later date than the proxy card or a subsequent proxy relating to the same shares, or by attending the Meeting and voting in person (although attendance at the Meeting will not in and of itself constitute revocation of a proxy).

All expenses of this solicitation, including the cost of preparing and mailing this Proxy Statement, will be borne by the Company. In addition to solicitation by use of the mails, proxies may be solicited by directors, officers and employees of the Company in person or by telephone, telegram or other means of communication. Such directors, officers and employees will not be additionally compensated, but may be reimbursed for out-of-pocket expenses in connection with such solicitation. Arrangements will also be made with custodians, nominees and fiduciaries for forwarding of proxy solicitation materials to beneficial owners of Common Stock held of record by such custodians, nominees and fiduciaries, and the Company may reimburse such custodians, nominees and fiduciaries for reasonable expenses incurred in connection therewith.

This Proxy Statement and the accompanying proxy card are being mailed to stockholders commencing on or about April 23, 2003.

## Voting Securities

On the Record Date, 83,630,087 shares of Common Stock were outstanding. Only holders of Common Stock of record at the close of business on the Record Date are entitled to notice of and to vote at the Meeting. Each stockholder of record is entitled to one vote for each share of Common Stock held on all matters to come before the Meeting.

## Security Ownership of Management and Principal Stockholders

Set forth in the table below is certain information as of March 18, 2003 regarding the beneficial ownership of equity securities of the Company by (i) persons who are known to the Company to own beneficially more than five percent (5%) of the Company's voting stock, (ii) directors of the Company, (iii) the executive officers of the Company named in the Summary Compensation Table set forth in this Proxy Statement (and referred to herein as the "Named Executive Officers") and (iv) the directors and executive officers of the Company as a group. Unless otherwise indicated, the beneficial owner has sole voting power and sole investment power over the securities shown below.

| Title of Class | Name of Beneficial Owner | Amount and Nature of Beneficial Ownership | Percent of Class |
|---|---|---|---|
| Common Stock, par value $0.01 per share | Blackstone Capital Partners L.P. 345 Park Avenue New York, NY | 4,515,229(1) | 5.4% |
| | Charles E. Becker | 7,539,262(2) | 9.0% |
| | Robert C. Clark | 36,000(3) | * |
| | Marshall A. Cohen | 8,000(3) | * |
| | David C. Dauch | 4,000(3) | * |
| | Thomas E. Evans | 631,556(4) | * |
| | Heartland Industrial Partners, L.P. 55 Railroad Avenue Greenwich, CT | 30,911,697(5) | 37.0% |
| | Cynthia L. Hess | 0(13) | |
| | Joan Fabrics Corporation 100 Vesper Executive Park Tyngsboro, MA | 5,104,000(6) | 6.1% |
| | Millard L. King, Jr. | 99,705(7) | * |
| | Bernd Lattemann | 0 | |
| | Timothy D. Leuliette | 0(13) | |
| | Elkin McCallum | 6,043,600(6) | 7.2% |
| | W. Gerald McConnell | 0(13) | |
| | Michael A. Mitchell | 72,000(8) | * |
| | Jerry L. Mosingo | 88,000(8) | * |
| | Warren B. Rudman | 32,000(3) | * |
| | J. Michael Stepp | 118,066(9) | * |
| | David A. Stockman | 0(13) | |
| | Textron Inc. 40 Westminster Street Providence, RI | 7,031,300(10) | 8.4% |
| | Daniel P. Tredwell | 0(13) | |
| | Samuel Valenti, III | 0(13) | |

2

| Title of Class | Name of Beneficial Owner | Amount and Nature of Beneficial Ownership | Percent of Class |
|---|---|---|---|
| | Wasserstein/C&A Holdings, L.L.C.<br>1301 Avenue of the Americas<br>New York, NY | 4,668,838(11) | 5.6% |
| | Reed A. White | 68,967(12) | * |
| | Executive officers and directors as a Group<br>(25 persons) | 14,265,401(14) | 17.1% |

\*     Less than one percent of shares of Common Stock outstanding.

(1)   Of these shares (i) 3,554,579 shares are held directly by Blackstone Capital Partners L.P., a Delaware limited partnership ("Blackstone Partners"), the sole general partner of which is Blackstone Management Associates L.P. ("Blackstone Associates"), (ii) 183,410 shares are held directly by Blackstone Family Investment Partnership I L.P., a Delaware limited partnership ("BFIP"), the sole general partner of which is Blackstone Management Associates I L.L.C., (iii) 16,107 shares are held directly by Blackstone Advisory Directors Partnership L.P., a Delaware limited partnership ("BADP"), the sole general partner of which is Blackstone Associates, and (iv) 761,133 shares are held directly by Blackstone Capital Company II L.L.C., a Delaware limited liability company, all the ownership interest of which is owned directly and indirectly by Blackstone Partners, BFIP and BADP.

(2)   Such shares represent (a) 5,440,000 shares acquired by Mr. Becker as consideration for the acquisition of Becker Group L.L.C., ("Becker"), (b) 339,262 shares acquired by Mr. Becker immediately following the closing of the Becker acquisition from one of the other former Becker shareholders, (c) 160,000 shares subject to presently exercisable warrants to purchase such Common Stock at $5.00 per share acquired by Mr. Becker as consideration for the Becker acquisition and (d) 1,600,000 shares acquired by Becker Ventures LLC ("Becker Ventures") as part of the financing for the Company's acquisition of Textron Automotive Company's trim division ("TAC-Trim"). Mr. Becker is the managing member of and holds a controlling interest in Becker Ventures. Mr. Becker became a Company director upon completion of the Becker acquisition and was Vice Chairman of the Board from July 2001 until July 2002. Mr. Becker is a limited partner of Heartland Industrial Partners, L.P., a Delaware limited partnership ("Heartland") and disclaims beneficial ownership of all shares held by Heartland.

(3)   Represents shares underlying options granted under the 1994 Directors Stock Option Plan (the "1994 Directors Plan") and the 2002 Plan which either are vested or will vest within 60 days unless the director ceases to be a director prior to that time.

(4)   Of these shares, (i) 98,000 are held directly, (ii) 29,556 shares are held indirectly in the Stock Fund of the 401(k) and Shadow Retirement Income Plans and (iii) 504,000 represent shares underlying options granted under the 1994 Employee Stock Option Plan (the "1994 Plan") which are vested or will vest within 60 days.

(5)   The 30,911,697 shares beneficially owned are indirectly owned by Heartland Industrial Associates L.L.C. as the general partner of each of the following limited partnerships, which hold the indicated shares directly: (a) 374,517 shares are held directly by Heartland Industrial Partners (FF), L.P., a Delaware limited partnership, (b) 522,242 shares are held directly by Heartland Industrial Partners (E1), L.P., a Delaware limited partnership, (c) 242,912 shares are held directly by Heartland Industrial Partners (K1), L.P., a Delaware limited partnership, (d) 72,870 shares are held directly by Heartland Industrial Partners (C1), L.P., a Delaware limited partnership, and (e) 29,699,156 shares are held directly by Heartland.

(6)   Of these shares (a) 5,104,000 shares are held by Joan Fabrics Corporation ("Joan Fabrics") as a part of the consideration for the sale of Joan Automotive Industries, Inc. ("Joan Automotive") to a Company subsidiary, (b) 30,000 shares are held by Mr. McCallum and his spouse, (c) 400,000 shares are held directly by Mr. McCallum and (d) 509,600 shares are held by the McCallum Family Foundation. The sole stockholder of Joan Fabrics is JFC Holding Trust, in which Mr. McCallum is the trustee and has a

3

75% beneficial interest and his spouse, Donna McCallum, owns the balance. Mr. McCallum became a director of the Company upon the consummation of the Joan acquisition.

(7)   Of these shares, (i) 13,679 represent shares underlying options granted under the 1993 Employee Stock Option Plan (the "1993 Plan") which are vested or will vest within 60 days, (ii) 10,000 represent shares underlying options granted under the 1994 Plan which are vested or will vest within 60 days, (iii) 75,264 represent shares underlying options granted under the 2002 Plan which are vested or will vest within 60 days and (iv) 762 shares are held indirectly in the Stock Fund of the 401(k) Plan and the non-qualified Shadow Retirement Plan (the "SRP").

(8)   Represents shares underlying options granted under the 2002 Plan which are vested or will vest within 60 days.

(9)   Of these shares, (i) 26,000 are held directly, (ii) 4,066 are held indirectly in the Stock Fund of the 401(k) Plan and the SRP, and (iii) 88,000 represent shares underlying options granted under the 2002 Plan which are vested or will vest within 60 days.

(10)  Such shares are beneficially owned by Textron Inc. ("Textron"). Under the purchase agreement for the TAC-Trim acquisition, Textron has the right to designate a director to serve on the Company Board of Directors. As of this date, it has not yet identified the individual that it will designate. Accordingly, the table does not include the Textron designee, who is expected to disclaim beneficial ownership of all securities beneficially owned by Textron.

(11)  Of these shares (i) 4,636,683 are held directly by Wasserstein/ C&A Holdings, L.L.C. ("Wasserstein L.L.C."), which is controlled by Wasserstein Perella Partners, L.P. ("WP Partners"), the sole general partner of which is Wasserstein Management Partners, L.P. ("Wasserstein Management"), which is controlled by Cypress Capital Advisors, L.L.C. ("CCA"), (ii) 7,200 are held directly by WPPN, L.P., an indirect subsidiary of CCA, (iii) 18,000 shares are held directly 33% by each of three trusts for which Bruce Wasserstein, the Chairman of CCA, is the co-trustee, (iv) 4,201 are owned directly by Bruce Wasserstein and (v) 1,639 are held by Bruce Wasserstein's Descendants' trusts and 1,115 are held by the Cranberry Dune Trust.

(12)  Of these shares, (i) 40,709 represent shares underlying options granted under the 1993 Plan which are vested or will vest within 60 days, (ii) 8,000 represent shares underlying options granted under the 1994 Plan which are vested or will vest within 60 days and (iii) 20,258 represent shares underlying options granted under the 2002 Plan which are vested or will vest within 60 days.

(13)  As described under (5) above, 30,783,098 shares are beneficially owned by Heartland Industrial Associates, L.L.C. Mr. Stockman is the Managing Member of Heartland Industrial Associates, L.L.C., but disclaims beneficial ownership of such shares. Messrs. Leuliette, McConnell, Stepp, Tredwell and Valenti and Ms. Hess are also members of Heartland Industrial Associates, L.L.C. and also disclaim beneficial ownership of the shares.

(14)  Excludes shares held by entities owning more than 5% of the Company's voting stock, except Joan Fabrics, which are included in the holdings of Mr. McCallum. Also excludes shares held by Thomas E. Evans and Bernd Lattemann, who were no longer employed by the Company on March 18, 2003.

**Voting**

    As of March 18, 2003, Heartland, Blackstone Partners, Wasserstein L.L.C., Charles E. Becker, Elkin McCallum and Textron and their affiliates (collectively, the "Investors") beneficially own or have the right to vote in the aggregate approximately 72% of the outstanding Common Stock. See "Security Ownership of Management and Principal Stockholders" and "Certain Relationships and Related Transactions — Certain Relationships." The Company expects that the Investors will vote all such shares in favor of Proposals I and II. Accordingly, assuming the presence of a quorum at the Meeting and that the Investors vote as expected, the approval and adoption of Proposals I and II are assured.

4

A53

Wasserstein Perella Group, Inc. ("WP Group") for the purpose of participating in merchant banking activities, including committing capital to the organization and consummation of private equity investments and leveraged buyout transactions. On January 3, 2001, WP Group merged with Dresdner Bank AG and spun off CCA, as a result of which Wasserstein Management and its affiliates are no longer affiliated with WP Group. Wasserstein Management serves as general partner of WP Partners and as such is engaged in managing WP Partners. Wasserstein & Co., LP, is involved in merchant banking activities and is affiliated with Wasserstein Management.

### Charles E. Becker

In July 2001, the Company completed the acquisition of Becker. As a result of the Becker acquisition and a purchase of Common Stock immediately afterwards, Charles Becker became one of the Company's principal stockholders. Charles Becker became a member of the Company's Board of Directors upon closing of the Becker acquisition and was Vice Chairman of the Board from July 2001 until July 2002. The Company agreed to make $18 million in non-compete payments over five years to Mr. Becker at the time of the acquisition. See information regarding buyout of the non-compete agreement under the heading "Certain Agreements and Transactions — Charles E. Becker Transactions." In addition, Becker Ventures, an affiliate of Mr. Becker, acquired additional shares of Common Stock as part of the financings in connection with the acquisition of TAC-Trim at a price of $5.00 per share. See the information under the heading "Security Ownership of Management and Principal Stockholders" for a discussion of Mr. Becker's beneficial ownership of Common Stock.

### Elkin McCallum

In September 2001, the Company completed the acquisition of Joan Automotive, a leading supplier of body cloth to the automotive industry, and all of the operating assets of Joan Automotive's affiliated yarn dying operation, Western Avenue Dyers, L.P. As a result of the Joan acquisition, Joan Fabrics, a company controlled by Elkin McCallum, became a principal stockholder of the Company. Upon completion of the Joan acquisition, Mr. McCallum because a member of the Company's Board of Directors. See "Security Ownership of Management and Principal Stockholders" for a discussion of Joan Fabrics' and Mr. McCallum's beneficial ownership of Common Stock.

### Certain Agreements and Transactions

### Blackstone/ Wasserstein/ Heartland Stockholders Agreement

The Company is a party to a stockholders agreement (the "Initial Stockholders Agreement") with Heartland and certain of its affiliates (the "Heartland parties"), Blackstone and certain of its affiliates (the "Blackstone parties") and Wasserstein L.L.C. and certain of its affiliates (the "Wasserstein parties"). The Initial Stockholders Agreement contains (i) rights of first refusal on private sales of Common Stock by the Blackstone parties and the Wasserstein parties in favor of the Heartland parties, (ii) tag-along rights in favor of the Blackstone parties and the Wasserstein parties in the event of certain transfers of Common Stock by Heartland and (iii) for so long as Heartland has a right to designate directors, a drag-along right enabling Heartland to cause the Blackstone parties and Wasserstein parties to sell all of their Common Stock with Heartland when Heartland is selling all of its Common Stock to a third party (including by merger). The Initial Stockholders Agreement further provides that the stockholder parties thereto will vote their Common Stock to ensure that seven members of the Company's board will be designated by Heartland, one by the Wasserstein parties and one by the Blackstone parties (Blackstone and Wasserstein waived their right to each name a member of the board on March 15, 2002), in each case so long as each of Heartland, the Wasserstein parties and the Blackstone parties (in each case, together with its affiliates) continue to beneficially own at least 25% of the Common Stock owned by them as of February 23, 2001. In addition, there must be at least three independent directors not otherwise affiliated with the Company, the Blackstone parties, the Wasserstein parties or Heartland. The Company's chief executive officer will also serve as a director. Certain rights inure to the benefit of, and certain obligations bind, subsequent transferees of Common Stock, but none of the rights or obligations apply to public sales, whether under Rule 144 or under a registration statement.

9

A54

The Initial Stockholders Agreement also contains certain restrictions on the Company's ability to enter into transactions with Heartland and its affiliates. The Company and its subsidiaries may not enter into any such transaction or series of related transactions involving payments or other consideration in excess of $500,000 without the consent of (i) each of the Blackstone parties and the Wasserstein parties, so long as each holds at least 25% of the Common Stock held by it as of February 23, 2001, for so long as Heartland and its affiliates directly or indirectly beneficially own at least 50% of the outstanding Common Stock and (ii) a majority of the members of the board who are disinterested with respect to the particular transaction and were not designated for election by Heartland so long as Heartland and its affiliates own at least 25% of the Common Stock owned by them on the date of the Initial Stockholders Agreement. The restrictions described above will not apply to (i) an advisory fee on certain acquisitions and divestitures by the Company in an amount not exceeding 1% of the enterprise value thereof and related out-of-pocket fees and expenses, (ii) transactions involving the sale, purchase or lease of goods and services in the ordinary course of business and on an arms-length basis between the Company and portfolio companies of Heartland in an amount involving not more than $1.25 million in any transaction, and (iii) certain other transactions.

### Becker/ Joan/ Heartland Stockholders Agreement

There is also a stockholders agreement (the "Becker/Joan Stockholders Agreement") among Charles E. Becker, Michael E. McInerney and Jens Höhnel (the "Becker parties"), Joan Fabrics, JFC Holdings Trust, Mr. Elkin McCallum and Donna McCallum (the "Joan parties"), the Heartland parties and the Company. The Becker/Joan Stockholders Agreement contains (i) rights of first refusal on private sales of Common Stock by the Becker parties and the Joan parties in favor of the Heartland parties, (ii) tag-along rights in favor of the Becker parties and the Joan parties in the event of certain transfers of Common Stock by Heartland and (iii) for so long as Heartland has a right to designate directors, a drag-along right enabling Heartland to cause the Becker parties and Joan parties to sell all of their Common Stock with Heartland when Heartland is selling all of its Common Stock to a third party (including by merger).

The Becker/ Joan Stockholders Agreement further provides that the Becker parties, the Joan parties and Heartland will each vote their Common Stock to ensure that Charles E. Becker and Elkin McCallum are each members of the Company's Board of Directors, so long as the Becker parties and the Joan parties, respectively, continue to hold shares representing 25% of the Common Stock originally acquired by them. The Becker/Joan Stockholders Agreement also provides that the Becker parties will vote their shares in favor of the election of Heartland's designees to the Company's Board of Directors. Certain rights inure to the benefit of, and certain obligations bind, subsequent transferees of Common Stock, but none of the rights or obligations apply to public sales, whether under Rule 144 or under a registration statement.

### Charles E. Becker Transactions

In March 2003, the Company entered into an agreement with Charles E. Becker, a member of the Company's Board of Directors, to buyout the non-compete agreement which was entered into as part of the Becker acquisition. The Company made a one-time payment to Mr. Becker of $11.3 million thereby terminating its remaining obligation of approximately $12.6 million and eliminated Mr. Becker's obligation not to compete.

In June 2001, the Company entered into sale-leaseback transactions with each of New King, L.L.C. ("New King") and Anchor Court, L.L.C. ("Anchor Court"), which are affiliates of Becker Ventures. In connection with these sale-leaseback transactions, Products sold and contemporaneously leased back real property located in Troy, Michigan and Plymouth, Michigan from New King and Anchor Court, respectively, for net proceeds of $15.1 million in the aggregate. The initial lease term in each transaction is 20 years and each lease has two successive ten-year renewal options. The basic rent for the Troy, Michigan property is $1.3 million per year, and the basic rent for the Plymouth, Michigan property is $0.5 million per year. The rental rates in each case are subject to adjustment after the expiration of the initial term.

10

# Tab 7

| OMB APPROVAL | |
|---|---|
| OMB Number: | 3235-0059 |
| Expires: | August 31, 2004 |
| Estimated average burden hours per response | 14.73 |

# UNITED STATES
## SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

### SCHEDULE 14A

Proxy Statement Pursuant to Section 14(a) of the Securities
Exchange Act of 1934 (Amendment No.    )

Filed by the Registrant    ☒

Filed by a Party other than the Registrant    ☐

Check the appropriate box:

☐    Preliminary Proxy Statement

☐    **Confidential, for Use of the Commission Only (as permitted by Rule 14a-6(e)(2))**

☒    Definitive Proxy Statement

☐    Definitive Additional Materials

☐    Soliciting Material Pursuant to §240.14a-12

Collins and Aikman Corporation

(Name of Registrant as Specified In Its Charter)

(Name of Person(s) Filing Proxy Statement, if other than the Registrant)

Payment of Filing Fee (Check the appropriate box):

☒    No fee required.

☐    Fee computed on table below per Exchange Act Rules 14a-6(i)(1) and 0-11.

    1) Title of each class of securities to which transaction applies:

    2) Aggregate number of securities to which transaction applies:

    3) Per unit price or other underlying value of transaction computed pursuant to Exchange Act Rule 0-11 (set forth the amount on which the filing fee is calculated and state how it was determined):

    4) Proposed maximum aggregate value of transaction:

    5) Total fee paid:

A56

☐     Check box if any part of the fee is offset as provided by Exchange Act Rule 0-11(a)(2) and identify the filing for which the offsetting fee was paid previously. Identify the previous filing by registration statement number, or the Form or Schedule and the date of its filing.

1) Amount Previously Paid:

2) Form, Schedule or Registration Statement No.:

3) Filing Party:

4) Date Filed:

SEC 1913 (02-02)       **Persons who potentially are to respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB control number.**



Collins & Aikman Corporation
250 Stephenson Highway
Troy, Michigan 48083

September 30, 2004

To Our Stockholders:

You are cordially invited to attend the annual meeting of stockholders of Collins & Aikman Corporation to be held at our offices located at 250 Stephenson Highway, Troy, Michigan 48083, on October 13, 2004 at 10:30 a.m., Eastern Daylight Savings Time.

Whether or not you plan to attend, submitting your proxy by completing, signing and mailing your proxy card will both assure your shares are represented at the meeting and minimize the cost of proxy solicitation. Thank you for your continued support of Collins & Aikman.

Sincerely,

David A. Stockman
*Chairman
and Chief Executive Officer*

A58



## NOTICE OF ANNUAL MEETING OF STOCKHOLDERS

|  |  |
|---|---|
| Date: | Wednesday, October 13, 2004 |
| Time: | 10:30 AM Eastern Daylight Time |
| Location: | Collins & Aikman Corporation |
|  | World Headquarters |
|  | 250 Stephenson Highway |
|  | Troy, Michigan |

To Our Stockholders,

We invite you to attend our 2004 Annual Meeting of Stockholders at our World Headquarters. At this meeting, you and the other stockholders will be able to vote for the following purpose, together with any other business that may properly come before the meeting:

*Elect four directors to the Board of Directors for three-year terms.* The Board has nominated for re-election Anthony Hardwick, Timothy D. Leuliette, W. Gerald McConnell and J. Michael Stepp, all current directors.

You may vote on this proposal in person or by proxy. If you cannot attend the meeting, we urge you to vote by proxy, so that your shares will be represented and voted at the meeting in accordance with your instructions. (See the attached proxy statement for details on voting by proxy.) Of course, if you attend the meeting, you may withdraw your proxy and vote your shares. Only stockholders of record at the close of business on August 30, 2004, will be entitled to vote at the meeting or any adjournment thereof.

By order of the Board of Directors,

Jay B. Knoll
*Secretary*

Troy, Michigan
September 30, 2004

---

## CONTENTS

| | |
|---|---|
| INTRODUCTION | 1 |
| VOTING | 1 |
| How to Vote Your Shares | 1 |
| How to Revoke Your Proxy | 2 |
| Required Vote | 2 |
| Where to Find Voting Results | 2 |
| PROPOSAL | 3 |
| Election of Directors | 3 |
| Other Matters | 4 |
| BOARD OF DIRECTORS | 4 |
| Directors Continuing in Office | 4 |
| Meetings and Committees | 5 |
| Director Compensation | 7 |
| Compensation Committee Interlocks and Insider Participation | 7 |
| Section 16(a) Beneficial Ownership Reporting Compliance | 7 |
| Director Nomination Process | 7 |
| Certain Litigation | 8 |
| INDEPENDENT AUDITORS | 8 |
| Fees | 8 |

A59

| | |
|---|---|
| Pre-Approval Policy | 9 |
| REPORT OF THE AUDIT COMMITTEE | 9 |
| CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS | 11 |
| Security Ownership of Management and Principal Stockholders | 11 |
| Other Relationships and Transactions | 12 |
| EXECUTIVE COMPENSATION | 18 |
| Executive Officers | 18 |
| Summary Compensation | 19 |
| Option Grants in Last Fiscal Year | 21 |
| Aggregate Option Exercises in Last Fiscal Year and Fiscal Year End Option Values | 21 |
| Option Cancellation/ Repricing Program | 21 |
| 2004 Option Exchange Program | 22 |
| 10-Year Option/ SAR Repricing Table | 22 |
| Defined Benefit or Actuarial Plan Disclosure | 23 |
| Pension Plan Table | 25 |
| Employment Agreements | 26 |
| COMPENSATION COMMITTEE REPORT ON EXECUTIVE COMPENSATION | 28 |
| ADDITIONAL INFORMATION | 30 |
| Annual Report | 30 |
| Code of Business Conduct | 31 |
| Stockholder Proposals and Nominations | 31 |
| Stockholder Communications with the Board of Directors | 31 |
| Appendix A — Performance Graph | A-1 |
| Appendix B — Collins & Aikman Director Independence Guidelines | B-1 |

i

**COLLINS & AIKMAN CORPORATION**
250 Stephenson Highway
Troy, Michigan 48083

---

PROXY STATEMENT

---

September 30, 2004

## INTRODUCTION

The Board of Directors is soliciting your proxy to encourage your participation in the voting at the Annual Meeting. You are invited to attend the Annual Meeting and vote your shares directly. However, even if you do not attend, you may vote by proxy, which allows you to direct another person to vote your shares at the meeting on your behalf.

There are two parts to this solicitation: the proxy card and this proxy statement. The proxy card is a means by which you may authorize another person to vote your shares in accordance with your instructions. This proxy statement provides you with a variety of information on the proposal and other matters that you may find useful in determining how to vote.

Collins & Aikman Corporation ("Collins & Aikman" or the "Company") will bear the cost of this solicitation, including the cost of preparing and mailing this proxy statement. In addition to the solicitation of the proxies by use of the mails, some of our directors, officers and employees, without extra remuneration, may solicit proxies personally, or by telephone or otherwise. The Company may retain a proxy solicitation firm for assistance in connection with the solicitation of proxies for the Annual Meeting, should the Board of Directors deem such action prudent. The Company will also make arrangements with brokerage houses and other custodians, nominees and fiduciaries to forward proxies and proxy material to their principals, and will reimburse them for their expenses in forwarding soliciting materials.

This proxy statement and accompanying proxy are being distributed on or about September 30, 2004.

## VOTING

You are entitled to one vote at the Annual Meeting for each share of the Company's common stock that you owned of record at the close of business on August 30, 2004.

On August 30, 2004, we had issued and outstanding 83,630,087 shares of common stock and there were approximately 120 stockholders of record. A list of the stockholders of record entitled to vote at the Annual Meeting will be available for review by any stockholder, for any purpose related to the meeting, between 9:00 a.m. and 5:00 p.m. at the principal offices of the Company, located at 250 Stephenson Highway, Troy, Michigan 48083, for ten days before the Annual Meeting.

### How to Vote Your Shares

You may vote your shares at the Annual Meeting in person or by proxy. To vote in person, you must attend the Annual Meeting, and obtain and submit a ballot, which will be provided at the meeting. To vote by proxy, you must complete and mail the enclosed proxy card.

By completing and submitting your proxy, you will direct the designated persons (known as "proxies") to vote your shares at the Annual Meeting in accordance with your instructions. The Board has appointed J. Michael Stepp and Jay B. Knoll to serve as the proxies for the Annual Meeting.

1

Your proxy will be valid only if it is received before the polls are closed at the Annual Meeting. If you do not provide voting instructions with your proxy, then the designated proxies will vote your shares for the election of the nominated directors. If any nominee for election to the Board of Directors is unable to serve, which is not anticipated, or if any other matters properly come before the meeting, then the designated proxies will vote your shares in accordance with their best judgment.

## How to Revoke Your Proxy

You may revoke your proxy at any time *before it is exercised* by any of the following means:

- Notifying the Company's Secretary in writing.

- Submitting a later dated proxy.

- Attending the Annual Meeting and voting. Your attendance at the Annual Meeting will not by itself revoke a proxy; you must also vote your shares.

## Required Vote

The Company's bylaws require that a majority of the Company's common stock be represented at the Annual Meeting, whether in person or by proxy, for a quorum which is needed to transact any business.

*Election of Directors.* The affirmative vote of a plurality of the votes cast at the meeting is required for the election of directors. A properly executed proxy marked "Withhold Authority" with respect to the election of one or more directors will not be voted with respect to the director or directors indicated, although it will be counted for purposes of determining whether there is a quorum.

*Other Proposals.* For proposals other than the election of directors, the affirmative vote of the holders of a majority of the shares represented in person or by proxy and entitled to vote on the proposal will be required for approval. A properly executed proxy marked "Abstain" with respect to any such matter will not be voted, although it will be counted for purposes of determining whether there is a quorum. Accordingly, an abstention will have the effect of a negative vote.

If you hold your shares in "street name" through a broker or other nominee and you do not give voting instructions, then your broker or other nominee may exercise voting discretion only with respect to matters considered to be "routine" by the New York Stock Exchange, such as the election of directors. On non-routine matters, the brokers or other nominees cannot vote your shares absent voting instructions from the beneficial holder, resulting in so-called "broker non-votes." Broker non-votes are not deemed to be votes cast, and as a result have no effect on the outcome of any matters presented, but will be counted in determining whether there is a quorum.

As of August 30, 2004, Heartland Industrial Partners LLC, Charles E. Becker and Elkin McCallum and their affiliates beneficially own or have the right to vote in the aggregate approximately 55% of the Company's outstanding common stock. (For a description of these stockholdings and relationships, see "Certain Relationships and Related Transactions," page 11.) We expect that these investors will vote all of their shares in favor of of the nominated directors. Accordingly, assuming that these investors vote as expected, the election of the nominated directors is assured.

## Where to Find Voting Results

We will publish the voting results in our 2004 Form 10-K, which we plan to file with the Securities and Exchange Commission in the first quarter of 2005.

Prior to the TAC-Trim acquisition, TAC-Trim entered into an $86.9 million sale and leaseback transaction (the "Textron Leasing Transaction") with two separate single purpose affiliates of Textron Financial Corporation, as lessor and purchaser, with respect to a portfolio of manufacturing equipment situated in different locations throughout the United States and Canada. In January 2003, the FASB issued FASB Interpretation No. ("FIN") 46, "Consolidation of Variable Interest Entities ("VIE")," an interpretation of Accounting Research Bulletin No. 51, "Consolidated Financial Statements". As part of Collins & Aikman's implementation of FIN 46, it determined that one of the single purpose affiliates was a VIE. We and Textron agreed to have the lease restructured so it was required to be consolidated by the other party and not accounted for as a VIE. As consideration for this lease restructuring, we agreed to pay Textron Financial $150,000.

Payments under the Textron leasing transaction are guaranteed by Products and secured by a first perfected mortgage lien over certain real property with a value equal to $25 million. Each lease is for an initial term of three years with three one-year renewal options. At the end of the leases (including the expiration of all renewal options), there is the option of either purchasing all of the equipment for approximately $26 million or returning the equipment to the lessor. In the event the equipment is returned, arrangements will be made for the disposition of the equipment. Collins & Aikman is required to guarantee a minimum value to the lessor of up to approximately $21 million upon expiration of the leases. As is customary, the documentation for the Textron leasing transaction incorporates covenants by reference, from our credit facility, that may be amended or waived by the senior lenders, and also contain events of default.

As part of the TAC-Trim acquisition, we entered into three intellectual property license agreements with Textron. In two of these agreements, we license back to Textron certain intellectual property that was acquired in the transaction. In the third agreement, we license from Textron other intellectual property that was not acquired in the transaction. In addition, under the TAC-Trim acquisition agreement, we are permitted to use the "Textron" name for 18 months in exchange for payments of $13.0 million on December 15, 2002 and $6.5 million on December 15, 2003.

During 2003, we also engaged in various transactions with Textron, Inc. and its affiliates (formerly the beneficial owners of 6% of Collins & Aikman's outstanding common stock). Textron, Inc. and its affiliates sold all of their remaining shares of common stock of Collins & Aikman in open market transactions in January 2004. Textron continues to own all of the outstanding redeemable preferred stock of Products.

*Becker/ Joan/ Heartland Stockholders Agreement*

There is a stockholders agreement (the "Becker/ Joan Stockholders Agreement") among Charles E. Becker, Michael E. McInerney and Jens Höhnel (the "Becker parties"), Joan Fabrics, JFC Holdings Trust, Mr. Elkin McCallum and Donna McCallum (the "Joan parties"), the Heartland parties and Collins & Aikman. The Becker/ Joan Stockholders Agreement contains (a) rights of first refusal on private sales of common stock by the Becker parties and the Joan parties in favor of the Heartland parties, (b) tag-along rights in favor of the Becker parties and the Joan parties in the event of certain transfers of common stock by Heartland and (c) for so long as Heartland has a right to designate directors, a drag-along right enabling Heartland to cause the Becker parties and Joan parties to sell all of their common stock with Heartland when Heartland is selling all of its common stock to a third party (including by merger).

The Becker/ Joan Stockholders Agreement further provides that the Becker parties, the Joan parties and Heartland will each vote their common stock to ensure that Charles E. Becker and Elkin McCallum are each members of Collins & Aikman's Board of Directors, so long as the Becker parties and the Joan parties, respectively, continue to hold shares representing 25% of the common stock originally acquired by them. The Becker/ Joan Stockholders Agreement also provides that the Becker parties will vote their shares in favor of the election of Heartland's designees to Collins & Aikman's Board of Directors. Certain rights inure to the benefit of, and certain obligations bind, subsequent transferees of common stock, but none of the rights or obligations apply to public sales, whether under Rule 144 or under a registration statement.

16

A63

*Blackstone/ Wasserstein/ Heartland Stockholders Agreement*

Collins & Aikman is also a party to a stockholders agreement (the "Initial Stockholders Agreement") with Heartland and certain of its affiliates (the "Heartland parties"), Blackstone Capital Partners, L.P. and certain of its affiliates (the "Blackstone parties") and Wasserstein L.L.C. and certain of its affiliates (the "Wasserstein parties"). The Initial Stockholders Agreement contains (a) rights of first refusal on private sales of common stock by the Blackstone parties and the Wasserstein parties in favor of the Heartland parties, (b) tag-along rights in favor of the Blackstone parties and the Wasserstein parties in the event of certain transfers of common stock by Heartland and (c) for so long as Heartland has a right to designate directors, a drag-along right enabling Heartland to cause the Blackstone parties and Wasserstein parties to sell all of their common stock with Heartland when Heartland is selling all of its common stock to a third party (including by merger).

The Initial Stockholders Agreement further provides that the stockholder parties thereto will vote their common stock to ensure that seven members of Collins & Aikman's board will be designated by Heartland, one by the Wasserstein parties and one by the Blackstone parties (Blackstone and Wasserstein waived their right to each name a member of the board on March 15, 2002), in each case so long as each of Heartland, the Wasserstein parties and the Blackstone parties (in each case, together with its affiliates) continue to beneficially own at least 25% of the common stock owned by them as of February 23, 2001. In addition, there must be at least three independent directors not otherwise affiliated with Collins & Aikman, the Blackstone parties, the Wasserstein parties or Heartland. Collins & Aikman's chief executive officer will also serve as a director. Certain rights inure to the benefit of, and certain obligations bind, subsequent transferees of common stock, but none of the rights or obligations apply to public sales, whether under Rule 144 or under a registration statement.

The Initial Stockholders Agreement also contains certain restrictions on Collins & Aikman's ability to enter into transactions with Heartland and its affiliates. Collins & Aikman and its subsidiaries may not enter into any such transaction or series of related transactions involving payments or other consideration in excess of $500,000 without the consent of (a) each of the Blackstone parties and the Wasserstein parties, so long as each holds at least 25% of the common stock held by it as of February 23, 2001, for so long as Heartland and its affiliates directly or indirectly beneficially own at least 50% of the outstanding common stock and (b) a majority of the members of the board who are disinterested with respect to the particular transaction and were not designated for election by Heartland so long as Heartland and its affiliates own at least 25% of the common stock owned by them on the date of the Initial Stockholders Agreement. The restrictions described above will not apply to (a) an advisory fee on certain acquisitions and divestitures by Collins & Aikman in an amount not exceeding 1% of the enterprise value thereof and related out-of-pocket fees and expenses, (b) transactions involving the sale, purchase or lease of goods and services in the ordinary course of business and on an arms-length basis between Collins & Aikman and portfolio companies of Heartland in an amount involving not more than $1.25 million in any transaction, and (c) certain other transactions.

Blackstone Partners is a Delaware limited partnership formed in 1987 for the purpose of, among other things, (a) committing capital to facilitate corporate restructurings, leveraged buyouts, bridge financings and other investments and (b) capitalizing affiliates that will engage in investment and merchant banking activities. The sole general partner of Blackstone Partners is Blackstone Associates, a Delaware limited partnership. At present, the business of Blackstone Associates consists of performing the function of, and serving as, the general partner of certain limited partnerships, including Blackstone Partners. Blackstone Management Partners L.L.C. is the general partner of Blackstone Management Partners L.P. ("Blackstone Management"), and Blackstone Associates, which is the general partner of BFIP.

In July 2003, Wasserstein Management and its affiliates distributed all of their shares of Collins & Aikman's common stock to the partners of WP Partners, pro-rata to their respective interests in WP Partners. In September 2003, the Blackstone parties also disposed of all of their shares of Collins & Aikman common stock. As a result of these transactions, the Wasserstein parties and Blackstone parties are no longer parties to the Initial Stockholders Agreement.

17

Tab 8

**OFFERING MEMORANDUM**                                             **CONFIDENTIAL**

$415,000,000



# Collins & Aikman Products Co.

### 12⅞% Senior Subordinated Notes due 2012

We are offering $415,000,000 aggregate principal amount of our 12⅞% Senior Subordinated Notes due 2012, or the notes.

The notes will mature on August 15, 2012. We will pay interest on the notes on February 15 and August 15 of each year, commencing on February 15, 2005.

We may redeem the notes at any time by paying to the holders thereof 100% of the principal amount plus a make-whole redemption premium. In addition, until August 15, 2007, we may redeem up to 35% of the notes with the net proceeds of certain equity offerings. If we undergo a change of control or sell certain of our assets, we may be required to offer to purchase notes from holders.

Our parent, Collins & Aikman Corporation, and each of our wholly owned domestic subsidiaries that guarantees our senior secured credit facilities will unconditionally guarantee the notes. The notes will be our senior subordinated obligations and will rank junior to all of our existing and future senior debt.

We have agreed to make an offer to exchange the notes for registered, publicly tradable notes that have substantially identical terms as the notes exchanged therefor. This offering memorandum includes additional information on the terms of the notes, including redemption and repurchase prices, covenants and transfer restrictions.

**Investing in the notes involves a high degree of risk. See "Risk Factors," beginning on page 11.**

———————————

**We have not registered the notes under the federal securities laws or the securities laws of any state. The initial purchasers named below are offering the notes only to qualified institutional buyers under Rule 144A and to persons outside the United States under Regulation S. See "Notice to Investors" for additional information about eligible offerees and transfer restrictions.**

———————————

**Price: 96.416% plus accrued interest from the issue date.**

We expect that delivery of the notes will be made in New York, New York on or about August 26, 2004.

*Joint Book-Running Managers*

# Deutsche Bank Securities

## Credit Suisse First Boston

### JPMorgan

———————————

*Co-Managers*

# NatCity Investments, Inc.

### Scotia Capital

**The date of this offering memorandum is August 12, 2004.**

A65

**The Refinancing**

This offering is part of an effort to extend the maturities of our debt and enhance our financial and operating flexibility. We will use the gross proceeds from this offering to redeem all of our outstanding 11½% senior subordinated notes due 2006. In addition, we are seeking to amend and restate our existing senior secured credit facilities to, among other things, replace our existing $275.0 million of revolving credit facilities with $275.0 million in new revolving credit facilities and our existing $353.0 million in term loans with $400.0 million in new term loans having a longer maturity. The net proceeds from the incremental term loans are expected to reduce outstanding revolving credit borrowings, thereby enhancing our availability for working capital needs. We will also seek to achieve lower effective interest margins and modify the covenants to enhance our financial and operating flexibility. As of June 30, 2004, the weighted average maturity of our debt obligations was approximately 4 years and, as a result of this offering and the proposed amendment and restatement of our senior secured credit facilities, the weighted average maturity of our debt obligations is expected to be approximately 6 years.

This offering is not conditioned upon the amendment and restatement of our senior secured credit facilities and, if such amendment and restatement is effected, there can be no assurance that we will realize the intended benefits thereof. If an amendment and restatement of our senior secured credit facilities is not timely obtained, we may need to seek covenant relief from our existing lenders in the near future and we will need to consider alternatives for addressing its maturity. We expect to recognize a loss on early extinguishment of debt, which will include unamortized deferred financing fees. References herein to the senior secured credit facilities are to the existing or the amended and restated senior secured credit facilities, as the context may suggest or require.

A66

## USE OF PROCEEDS

Our gross proceeds from this offering will be approximately $400.1 million. Our net proceeds from this offering, after deducting estimated expenses related to this offering and initial purchasers' discount or commissions, to be approximately $383.1 million. We intend to use the gross proceeds from this offering to redeem in full our outstanding $400.0 million of 11½% senior subordinated notes due 2006. We will use cash on hand and, possibly, drawings under our revolving credit facility to pay the offering expenses and initial purchasers' discount or commissions. We are also seeking to amend and restate our senior secured credit facilities to among other things, replace our existing $275.0 million of revolving credit facilities with $275.0 million in new revolving credit facilities and our existing $353.0 million in term loans with $400.0 million in new term loans having a longer maturity. The net proceeds from the incremental term loans will reduce outstanding revolving credit borrowings, thereby enhancing our availability for working capital needs. We may also seek to achieve lower effective interest margins and modify the covenants to enhance our financial and operating flexibility. This offering is not conditioned upon an amendment and restatement of our senior secured credit facilities, which will not occur until following this offering (if at all). The outstanding 11½% senior subordinated notes due 2006 will be redeemed at par plus accrued interest through the date of redemption. The weighted average interest rate of our existing senior secured credit facilities as of June 30, 2004 was approximately 6.7% per annum.

A66A

# RISK FACTORS

*You should carefully consider each of the risks described below, together with all of the other information contained in this offering memorandum, before deciding to invest in the notes.*

## Risks Related to Our Business

*Demand in the automotive industry is significantly dependent on the U.S. and global economies and our business and profitability are exposed to current and future uncertainties.*

Our financial performance depends, in large part, on conditions in the global automotive markets and, generally, on the U.S. and global economies. Demand in the automotive industry fluctuates in response to overall economic conditions and is particularly sensitive to changes in interest rate levels, consumer confidence and fuel costs. The threat or acts of terrorism and war, uncertain economic conditions and other recent developments adversely affected consumer confidence throughout the U.S. and much of the world and have created uncertainty in our markets. The continuing impact on us is difficult to predict. We would be harmed by any sustained weakness in demand or by a continued downturn in the economy.

Our sales are impacted by automotive retail inventory levels and production schedules. In 2003, our OEM customers continued to significantly reduce their production and inventory levels due to the uncertain economic environment. In the current environment, it is extremely difficult to predict future production rates and inventory levels or the sustainability of any recovery.

*The base of customers that we serve is concentrated, and the loss of business from a major customer or the discontinuation of particular vehicle models could reduce our sales and harm our profitability.*

Because of the relative importance of a few large customers and the high degree of concentration of OEMs in the automotive industry, our business is exposed to a high degree of risk related to customer concentration. DaimlerChrysler AG, Ford Motor Company and General Motors Corporation and their respective affiliates are our three largest customers, and they directly or indirectly accounted for approximately 28%, 25% and 22% of our 2003 net sales, respectively. A loss of significant business from, or adverse performance by, any of these customers would be harmful to our profitability and could have a material adverse effect on our business and results of operations. Although we receive purchase orders from most of our customers, these purchase orders typically provide for the supply of a customer's annual requirements for a particular model or assembly plant, renewable on a year-to-year basis, rather than for the purchase of a specific quantity of products. It is difficult for us to accurately predict the level of new vehicle production.

In addition, there is substantial and continuing pressure from automotive manufacturers to reduce costs, including costs associated with outside suppliers such as us. For example, OEM customers in the automotive industry attempted to impose price decreases and givebacks throughout 2003. Such attempted price decreases were generally in the range of 2% to 4%. In some cases, we have agreed to future price reductions, and in other cases we are currently negotiating future price reductions with OEMs. Pressures to reduce prices may increase if overall economic and industry conditions do not improve. It is difficult for us to offset downward pricing pressures through alternative, less costly sources of raw materials. In addition, for over a year, we have also experienced pricing increases and pressures from our own suppliers. See "Management's Discussion and Analysis of Financial Condition and Results of Operations —Outlook." We may be materially and adversely affected by substantial and continuing pricing pressures from both our customers and our suppliers.

*The prices that we can charge some of our customers are predetermined, and we bear the risk of costs in excess of our estimates.*

Sales contracts with some of our customers require us to provide our products at predetermined prices. In some cases, these prices decline over the course of the contract. The costs that we incur in fulfilling these contracts may vary substantially from our initial estimates. Unanticipated cost increases

may occur as a result of several factors, including increases in the costs of labor, components or materials. In some (but not all) cases, we may be permitted to pass on cost increases associated with specific materials to our customers. Cost overruns that we cannot pass on to our customers could have a material adverse effect on our business and results of operations.

*Recent trends among our customers will increase competitive pressures in our businesses.*

In recent years, the competitive environment among suppliers to OEMs in the automotive industry has changed significantly as OEMs have sought to outsource more vehicular components, modules and systems and to use on-line auctions in order to obtain further price reductions. In addition, component, module and systems suppliers have experienced substantial consolidation as OEMs have sought to lower costs, improve quality and increasingly purchase complete systems and modules rather than separate components. This consolidation has caused, and its continuation will continue to amplify, the pricing pressures outlined above in the discussion of the concentration of our customers. Furthermore, our competitive strategy to supply a full spectrum of integrated interior trim components presents the risk that some of our customers may be in competition with us as well. We may be unable to achieve the cost savings and operational improvements expected from our business strategy, which could harm our ability to compete favorably in the future with other larger, consolidated companies.

*We must finance significant up-front capital costs to secure new business, which can materially affect and be affected by our liquidity and financial results.*

In securing new business, we are typically required to expend significant amounts of capital for engineering, development, tooling and other costs. Generally, we seek to recoup these costs through pricing over time, but we may be unsuccessful due to competitive pressures and other market constraints or if a customer ceases production of a particular vehicle. A substantial amount of our tooling costs are associated with customer-owned tooling. Our customer contracts may provide for direct recoupment of these costs upon launch of a vehicle line or over time based upon projected build levels or otherwise. In recent years, there has been increasing customer pressure to have these costs recouped over a model's production life based on build targets. This trend, and other factors resulting in a delay in recoupment of these costs, can materially affect our liquidity and financial results at any particular time. In addition, in the past when we have collected tooling costs upon the launch of a vehicle line, we capitalized these costs. Recoupment of these costs over time through the customer contract results in our inability to capitalize these costs and can adversely affect our reported results and our ability to comply with, or to take necessary actions under, covenants in our debt agreements. Disputes with customers over these costs or other matters can delay recovery as well. If we misjudge the anticipated value of a new business award, we could be materially and adversely affected. While we believe that we will be able to fund capital expenditures through cash flow from operations, borrowings under our senior secured credit facilities, sale and leaseback agreements and sales of receivables including sales under our receivables facility and factoring arrangements, there can be no assurance that we will have adequate funds to make all the necessary capital expenditures or that the amount of future capital expenditures will not be materially in excess of our anticipated expenditures. The adequacy of our liquidity is essential to successfully managing and growing our business.

*We rely upon a number of arrangements for our liquidity, which, if unavailable, could materially and adversely affect our ability to meet our commercial and financial obligations and to grow our business.*

We have substantial on- and off-balance sheet obligations and significant capital requirements to meet our new business commitments. To meet these obligations and commitments, we rely upon a variety of sources of liquidity, particularly our revolving credit facilities, our accounts receivable securitization, factoring arrangements in foreign jurisdictions, sale-leaseback and other leasing arrangements and accelerated receivable payment programs provided by third parties to certain of our large customers. As described above, the availability of funds under our revolving credit facilities and accounts receivable securitization depends upon a number of factors, including covenant compliance, customer concentration and the nature of our receivables. We will be materially and adversely harmed if our revolving credit facilities are not renewed or extended beyond their December 31, 2005 expiration or if our accounts

receivable securitization facility is not renewed at its expiration in December 31, 2004 or if our foreign factoring arrangements or leasing alternatives are unavailable, any of which may occur within the discretion or control of unrelated third parties. We were recently informed that certain of the accelerated payment collection programs with our largest customers will be discontinued in 2005. However, on August 13, 2004, we were informed that one of those customers, Ford, intends to phase out its accelerated payment collection program from September 2004 through early 2005. In another instance, the accelerated payment collection program may possibly be terminated in early 2005. These programs have materially enhanced our liquidity in the past. At June 30, 2004, we had approximately $135.0 million outstanding under these programs. While the impact of the discontinuance of these programs will be partially offset by a greater utilization of our accounts receivable securitization facility, we will consider replacement accelerated payment programs offered on behalf of our customers. However, we may not be able to timely or fully replace these arrangements and the new terms of any such program may be less advantageous. If we are unable to replace these arrangements, it could adversely affect our liquidity and future covenant compliance under our senior secured credit facilities. An adverse change in our liquidity may not only impair our ability to meet our commercial commitments and objectives, but may make it difficult for us to meet our obligations in respect of the notes and our other debt and lease obligations.

*We have been unable to fully capitalize upon our recent material acquisitions as intended and continue to seek to improve our systems across our entire company.*

We continue to seek to achieve, but may not be successful in achieving, the strategic operating objectives of the large acquisitions that we completed during 2001. Our 2001 acquisitions account for 48 of our current 102 plants and facilities and approximately 58% of our approximately 23,900 employees. At the time of the Textron Automotive Company's Trim division ("TAC-Trim") acquisition in December 2001, it individually accounted for 41 of our plants and facilities and approximately 12,000 of our employees located across seven different countries, including two countries where we did not previously operate. We had not previously undertaken an integration process as large or complex as required by these acquisitions collectively or by the TAC-Trim acquisition individually. We have not realized all of our initially projected synergies, cost savings or anticipated benefits of increased purchasing power. The integration process and associated costs have been larger than initially anticipated and we continue to seek to achieve, but may not be successful in achieving, some of the intended benefits and opportunities afforded by our broader products offering. Our integration activities have placed substantial demands on our management, operational resources and financial and internal control systems. Our future operating results will depend upon our ability to implement and improve our operating and financial systems and controls and to more effectively train and manage our employee base. There is a risk that the diversion of management attention, particularly in a difficult operating environment, will negatively affect sales and limit the attention that management can devote to this and other operational, financial and strategic issues. In addition, in some of our past non-U.S. acquisitions, we have encountered integration and systems difficulties typical of foreign transactions, which, in 2000, gave rise to material weaknesses that were subsequently corrected. We may encounter similar difficulties going forward.

*Engaging in additional acquisitions may have a material adverse effect on our business.*

We may selectively identify and acquire other businesses with complementary products, manufacturing capabilities or geographic markets. Any business acquired may not be successfully integrated with other operations or prove to be complementary in the manner expected or be profitable. We could incur further indebtedness in connection with our acquisition strategy and increase our leverage. Acquisitions outside of North America may present unique difficulties and increase our exposure to the risks attendant to international operations. The process of integrating acquired companies and operations into our existing operations may result in unforeseen operating difficulties and may require significant financial resources that would otherwise be available for the ongoing development or expansion of existing operations.

*We may incur unanticipated contingent liabilities as a result of acquisitions and may experience unanticipated liabilities associated with former discontinued operations.*

We may incur unforeseen environmental, tax, pension, litigation or other liabilities in connection with our recent or future acquisitions, or we may underestimate the known liabilities. If such liabilities

13

materialize or are greater than we estimate, they could have a material adverse effect on us. In addition, we have significant responsibilities related to some of our formerly owned businesses, or discontinued operations, such as those relating to post-retirement, casualty, environmental, product liability, lease and other matters. Based upon the information presently available and our insurance coverage, we do not believe that any of these liabilities will have a material adverse effect upon our financial condition or results of operations; however, we may be incorrect in our assumptions and the extent of those contingent liabilities of which we are aware could exceed our expectations. In addition, there may be other such liabilities of which we presently have no knowledge. Some of the known liabilities are discussed under "Business—Legal Proceedings."

*Our products are subject to changing technology, which could place us at a competitive disadvantage relative to alternative products introduced by competitors.*

We believe that our customers rigorously evaluate their suppliers on the basis of product quality, price competitiveness, technical expertise and development capability, new product innovation, reliability and timeliness of delivery, product design capability, manufacturing flexibility, operational flexibility, customer service and overall management. Our success will depend on our ability to continue to meet customers' changing specifications with respect to these criteria. We may, therefore, require significant ongoing and recurring additional capital expenditures and investment in research and development, manufacturing and other areas to remain competitive. If we are unable to meet our customers' changing specifications or make the necessary additional capital expenditures, we may be materially and adversely affected.

*We depend on the services of other key individuals and relationships, the loss of which would materially harm us.*

Our success will depend, in part, on the efforts of our executive officers and other key employees. We have changed our Chief Executive Officer twice in the past several years and our current Chief Executive Officer and Chairman is David Stockman, the founding partner of our largest shareholder, Heartland Industrial Partners, L.P. In addition, our Chief Financial Officer, Michael Stepp, is a partner of Heartland. These individuals have been central to our efforts to build a growth platform through acquisitions, integrate our acquisitions, effect cost savings and compete in a difficult commercial and economic environment. Were we to lose one or both of their services on our behalf, we could be materially and adversely affected. Heartland itself also provides us with valuable strategic, operational and financial guidance. If, for any reason, such guidance ceased, it could have a material adverse effect upon us as well. Our future success will also depend on, among other factors, our ability to attract and retain other qualified personnel at segment, plant and corporate levels. The loss of the services of any of our key employees or the failure to attract or retain qualified employees in any number of areas could have a material adverse effect on us.

*We may be subject to work stoppages at our facilities or those of our principal customers, which could seriously impact the profitability of our business.*

As of December 31, 2003, approximately 62% of our global work force was unionized. If our unionized workers were to engage in a strike, work stoppage or other slowdown in the future, we could experience a significant disruption of our operations, which could have a material adverse effect on us. The collective bargaining agreements for 12 of our facilities are subject to renegotiation before June 30, 2005 and the agreement with respect to one of these facilities expired in April 2004 and is tentatively settled. Many OEMs and their suppliers have unionized work forces. Work stoppages or slowdowns experienced by OEMs or their suppliers could result in slowdowns or closures of assembly plants where our products are included in assembled vehicles. Furthermore, organizations responsible for shipping our customers' products may be impacted by occasional strikes staged by the unions representing transportation employees. Any interruption in the delivery of our customers' products would reduce demand for our products.

*Our strategy may not succeed if anticipated outsourcing fails to occur due to union considerations.*

Because of the economic benefits inherent in outsourcing to suppliers and the costs associated with reversing a decision to purchase automotive interior systems and components from an outside supplier,

14

we believe that automotive manufacturers' desire to purchase automotive interior systems and components from outside suppliers, particularly on a just-in-time basis, will increase. However, under the contracts presently in effect in the United States and Canada between each of Ford, General Motors and DaimlerChrysler and the United Auto Workers ("UAW") and the Canadian Auto Workers ("CAW"), in order for any of such automotive manufacturers to obtain from external sources components that it currently produces, it must first notify the UAW or the CAW of such intention. If the UAW or the CAW objects to the proposed outsourcing, some agreement will have to be reached between the UAW or the CAW and the automotive manufacturer. Factors that will normally be taken into account by the UAW, the CAW and the automotive manufacturer include whether the proposed new supplier is technologically more advanced than the automotive manufacturer, whether the new supplier is unionized, whether cost benefits exist and whether the automotive manufacturer will be able to reassign union members whose jobs are being displaced to other jobs within the same factories.

*A growing portion of our revenue may be derived from international sources, which exposes us to additional uncertainty.*

A significant portion of our sales are derived from shipments to destinations outside of the United States and Canada. As part of our business strategy, we intend to expand our international operations and customer base. For example, we recently announced our intention to open a new facility in Hermosillo, Mexico. Sales outside of the U.S. and Canada, particularly sales to emerging markets, are subject to other various risks, including: governmental embargoes or foreign trade restrictions such as antidumping duties; changes in U.S. and foreign governmental regulations; tariffs; fuel duties; other trade barriers; political, economic and social instability and foreign exchange risk. In addition, there are tax inefficiencies in repatriating funds from non-U.S. subsidiaries. To the extent such repatriation is necessary for us to meet our debt service or other obligations, this will adversely affect us. International operations frequently are conducted through joint venture arrangements that can materially limit our operational and financial control of the business.

*We may incur material losses and costs as a result of product liability and warranty claims that may be brought against us.*

We face an inherent business risk of exposure to product liability claims in the event that the use of our current and formerly manufactured or sold products results, or is alleged to result, in bodily injury and/or property damage. We may experience material product liability losses in the future or incur significant costs to defend such claims. Our product liability insurance coverage will be inadequate for any liabilities that may ultimately be incurred or may be unavailable on acceptable terms in the future. In addition, if any of our products are or are alleged to be defective, we may be required to participate in a government-required or OEM-instituted recall involving such products. Each vehicle manufacturer has its own policy regarding product recalls and other product liability actions relating to our suppliers.

In addition, as suppliers become more integrally involved in the vehicle design process and assume more of the vehicle assembly functions, vehicle manufacturers are increasingly looking to their suppliers for contribution when faced with product liability claims. A successful claim brought against us in excess of our available insurance coverage or a requirement to participate in a product recall may have a material adverse effect.

In the ordinary course of our business, contractual disputes over warranties can arise. In the past five years or more, we have not been required to make any material payments in respect of warranty claims. In most cases, financial responsibility for warranty costs are contractually retained by our customer so long as the customers' specifications are met, but we may nonetheless be subjected to requests for cost sharing or pricing adjustments as a part of our commercial relationship with the customer.

*Our business may be materially and adversely affected by compliance obligations and other liabilities under environmental laws and regulations.*

We are subject to federal, state, local and foreign environmental, and health and safety, laws and regulations, violation of which could lead to fines, penalties and/or criminal sanctions. These laws and

regulations affect ongoing operations and may increase capital costs and operating expenses in order to maintain compliance with such requirements, particularly if these laws and regulations become more stringent or more stringently enforced in the future. Without regard to knowledge or fault, these laws and regulations also impose liability relating to contamination at our facilities, at other locations such as former facilities, at facilities where we have sent wastes for treatment or disposal and other properties to which we (or a company or business for which we are responsible) are linked. See "Management's Discussion and Analysis of Financial Condition—Critical Accounting Estimates—Environmental Contingencies." "Business—Environmental Matters," note 21 to our audited consolidated financial statements for the year ended December 31, 2003 and note 15 to our unaudited consolidated financial statements for the six months ended June 30, 2004 included elsewhere in this offering memorandum.

*We are controlled by Heartland, whose interests in our business may be different than yours. Anticipated changes in C&A's Board composition as a result of the NYSE's continued listing requirements may affect how we are managed in the future.*

As of July 1, 2004, Heartland and its affiliates beneficially owned approximately 40.2% of C&A's outstanding shares of common stock. By reason of its share ownership, Heartland and its affiliates are able to strongly influence or effectively control actions to be taken by our stockholders or directors, amendments to C&A's certificate of incorporation and by-laws and approval of significant corporate transactions, including acquisitions, mergers and a sale of substantially all of our assets. In addition, Mr. Stockman, the Chairman of the C&A Board and our Chief Executive Officer, and Mr. Stepp, our Chief Financial Officer, are both Senior Managing Directors of Heartland. You should consider that the interests of Heartland as an equity investor will likely differ from yours in material respects. See "Certain Relationships and Related Party Transactions," "Management" and "Principal Shareholders."

There are currently six persons associated with Heartland in one manner or another on C&A's 11 member Board of Directors. The size and composition of the C&A Board is subject to change and will be required to change as a result of the NYSE's continued listing requirements. Under these listing requirements, C&A will be required to have, among other things, a majority of its Board comprised of persons who are "independent" within the meaning of the NYSE rules not later than its 2004 annual meeting of shareholders, which has not yet been scheduled. We are in the process of seeking qualified "independent" personnel to serve on C&A's Board and we have not yet decided upon the necessary related changes to C&A's Board size and composition to accommodate the listing requirements. Once we comply with these rules (as intended) C&A's Board will be comprised of persons whom we cannot identify at present and their identity, experience and qualifications could be material to your ongoing investment. While we intend to comply with these requirements, we may not be able to do so on a timely basis or at all. Our failure to do so could result in a delisting of C&A's common stock from the NYSE, which could materially adversely affect our future financing flexibility and subject C&A to claims by its stockholders.

**Risks Related to the Notes**

*We may not be able to manage our business as we might otherwise due to our high degree of leverage.*

We have indebtedness that is substantial in relation to our stockholders' equity and cash flow. At June 30, 2004, on an as adjusted basis to give effect to this offering and the use of proceeds therefrom as described under "Use of Proceeds," we would have had $1,356.3 million of outstanding total debt and short-term borrowings excluding borrowings under our receivables facility. The degree to which we are leveraged will have important consequences, including the following:

- our ability to obtain additional financing in the future for working capital, capital expenditures, acquisitions, business development efforts or general corporate purposes may be impaired;

- a substantial portion of our cash flow from operations will be dedicated to the payment of interest and principal on our indebtedness and capital and operating lease expense, thereby reducing the funds available to us for other purposes;

16

A72

# Tab 9

As filed with the Securities and Exchange Commission on January 27, 2005

Registration No. 333-

SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

# FORM S-4

### REGISTRATION STATEMENT
### UNDER
### THE SECURITIES ACT OF 1933

# COLLINS & AIKMAN PRODUCTS CO.

(Exact name of registrant as specified in its charter)

| Delaware | 3590 | 13-0588910 |
|---|---|---|
| (State or other jurisdiction of incorporation or organization) | (Primary Standard Industrial Classification Code Number) | (I.R.S. Employer Identification Number) |

See Table of Additional Registrants

250 Stephenson Highway
Troy, Michigan 48083
(248) 824-2500
(Address, including zip code, and telephone number, including area code, of registrant's principal executive offices)

Jay Knoll
General Counsel
Collins & Aikman Products Co.
250 Stephenson Highway

A73

Troy, Michigan 48083
(248) 824-2500

Copies to:
Jonathan A. Schaffzin, Esq.
Cahill Gordon & Reindel LLP
80 Pine Street
New York, New York 10005
(212) 701-3000

**Approximate date of commencement of proposed sale of the securities to the public:** As soon as practicable after this Registration Statement becomes effective.

If the securities being registered on this Form are being offered in connection with the formation of a holding company and there is compliance with General Instruction G, check the following box.  ☐

If this Form is filed to register additional securities for an offering pursuant to Rule 462(b) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering.  ☐

If this Form is a post-effective amendment filed pursuant to Rule 462(d) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering.  ☐

## CALCULATION OF REGISTRATION FEE

| Title of Each Class of Securities to Be Registered | Amount to Be Registered | Proposed Maximum Offering Price Per Note | Proposed Maximum Aggregate Offering Price(1) | Amount of Registration Fee(1) |
|---|---|---|---|---|
| 12 7/8% Senior Subordinated Notes due 2012 of Collins & Aikman Products Co. | $415,000,000 | 96.416% | $400,126,400 | $47,094.88 |
| Guarantees related to the 12 7/8% Senior Subordinated Notes due 2012 of Collins & Aikman Products Co.(2) | N/A | N/A | N/A | N/A |

(1)   Estimated solely for the purpose of calculating the registration fee in accordance with Rule 457(f)(2) under the Securities Act.

(2)   Pursuant to Rule 457(n) under the Securities Act of 1933, no registration fee is required with respect to the Guarantees.

The Registrants hereby amend this registration statement on the date or dates as may be necessary to delay its effective date until the Registrants shall file a further amendment which specifically states that this registration statement shall become effective in accordance with Section 8(a) of the Securities Act of 1933, as amended, or until this registration statement shall become effective on such date the Commission, acting pursuant to said Section 8(a), may determine.

A74

## TABLE OF ADDITIONAL REGISTRANTS

| Name of Additional Registrant [a] | State or Other Jurisdiction of Incorporation or Formation | Primary Standard Industrial Classification Code Number | I.R.S. Employee Identification Number |
|---|---|---|---|
| Collins & Aikman Corporation | Delaware | 2273 | 13-3489233 |
| Collins & Aikman Accessory Mats, Inc. | Delaware | 3069 | 34-1532472 |
| Collins & Aikman Automotive Mats, LLC | Delaware | 3069 | * |
| Collins & Aikman Asset Services, Inc. | Delaware | 6719 | 95-4225459 |
| Collins & Aikman Automotive Exteriors, Inc. | Delaware | 3714 | 05-0471352 |
| Collins & Aikman Automotive International, Inc. | Delaware | 6719 | 13-3376151 |
| Collins & Aikman Canada Domestic Holding Company | Delaware | 6719 | 56-2270169 |
| Collins & Aikman Carpet & Acoustics (MI), Inc. | Delaware | 3714 | 38-2831561 |
| Collins & Aikman Carpet & Acoustics (TN), Inc. | Tennessee | 3714 | 62-1301605 |
| Collins & Aikman Development Company | Delaware | 3089 | 56-2270173 |
| Collins & Aikman Fabrics, Inc. | Delaware | 2221 | 38-3024579 |
| Collins & Aikman International Corporation | Delaware | 6719 | 95-3416790 |
| Collins & Aikman Europe, Inc. | Delaware | 6719 | 88-0383716 |
| Collins & Aikman (Gibraltar) Limited | Delaware | 3714 | 52-2080949 |
| Collins & Aikman Interiors, Inc. | Delaware | 6719 | 56-2270167 |
| Collins & Aikman Automotive Interiors, Inc. | Delaware | 3714 | 02-0265330 |
| Collins & Aikman Automotive (Argentina), Inc. | Delaware | 3714 | 06-1470649 |
| Collins & Aikman Automotive (Asia), Inc. | Delaware | 3714 | 05-0505045 |
| Collins & Aikman Automotive International Services, Inc. | Delaware | 9995 | 05-0447633 |
| Collins & Aikman Automotive Overseas Investment, Inc. | Delaware | 6799 | 08-0435027 |
| Collins & Aikman Intellimold, Inc. | Michigan | 3714 | 38-3172585 |
| Collins & Aikman Plastics, Inc. | Delaware | 3089 | 34-1376202 |
| Becker Group, L.L.C. | Michigan | 3089 | 38-3451471** |
| Brut Plastics, Inc. | Michigan | 3089 | 38-2959954 |
| Collins & Aikman Properties, Inc. | Delaware | 6519 | 95-3416796 |
| Dura Convertible Systems, Inc. | Delaware | 3714 | 95-4094096 |
| Amco Convertible Fabrics, Inc. | Delaware | 2221 | 38-3254156 |
| Gamble Development Company | Minnesota | 6519 | 41-0949764 |
| Collins & Aikman Automotive Services, LLC | Delaware | 7389 | 81-0586090 |
| JPS Automotive, Inc. | Delaware | 2273 | 56-2001613 |
| Owosso Thermal Forming, LLC | Delaware | 3714 | 20-1239404 |
| Southwest Laminates, Inc. | Delaware | 3714 | 03-0424996 |
| Wickes Asset Management, Inc. | Delaware | 6519 | 95-4030704 |
| Wickes Manufacturing Company | Delaware | 6519 | 95-4001211 |

\*     This company is a single member limited liability company and for federal income tax purposes is treated as a division of Collins & Aikman Accessory Mats, Inc. There is no I.R.S. employer identification number assigned to this company.

\*\*

This company is a single member limited liability company and for federal income tax purposes is treated as a division of C&A Plastics, Inc. The I.R.S. employer identification number listed was used prior to acquisition.

a    Address and telephone number of principal executive offices are the same as Collins & Aikman Products Co.

_____

The information in this preliminary prospectus is not complete and may be changed. We may not consummate the exchange offer until the registration statement filed with the Securities and Exchange Commission is effective. This prospectus is not an offer to sell these securities and it is not soliciting an offer to buy these securities in any state where the offer or sale is not permitted.

**Subject to Completion**

**Preliminary Prospectus Dated January 27, 2005**

**P ROSPECTUS**

# Collins & Aikman Products Co.

**Offer to Exchange its $415,000,000 aggregate principal amount
of 12 7/8% Senior Subordinated Notes due 2012,
which have been registered under the Securities Act of 1933, as amended,
for $415,000,000 aggregate principal amount of
12 7/8% Senior Subordinated Notes due 2012
(CUSIP Nos. 194832 AE 1 and U19461 AC 3)**

_____

**Terms of Exchange Offer**

- Expires 9:00 a.m., New York City time, on                , 2005 unless extended.

- Subject to certain customary conditions which may be waived by us.

- All outstanding 12 7/8% Senior Subordinated Notes due 2012 (CUSIP Nos. 194832 AE 1 and U19461 AC 3) that are validly tendered and not validly withdrawn will be exchanged.

- Tenders of original notes may be withdrawn any time prior to the expiration of this exchange offer.

- The exchange of the original notes will not be a taxable exchange for U.S. federal income tax purposes.

- We will not receive any cash proceeds from the exchange offer.

- The terms of the notes to be issued in exchange for the original notes are substantially identical to the original notes, except for certain transfer restrictions and registration rights relating to the original notes.

- Any original notes not validly tendered will remain subject to existing transfer restrictions.

**See "Risk Factors," beginning on page 9, for a discussion of certain factors that should be considered by holders before tendering their original notes in the exchange offer.**

There has not previously been any public market for the exchange notes that will be issued in the exchange offer. We do not intend to list the exchange notes on any national stock exchange or on the Nasdaq National Market. There can be no assurance that an active market for such exchange notes will develop.

Neither the Securities and Exchange Commission nor any state securities commission has approved or disapproved these securities or passed upon the adequacy or accuracy of this prospectus. Any representation to the contrary is a criminal offense.

———————

The date of this prospectus is                  , 2005.

## TABLE OF CONTENTS

| | |
|---|---|
| Forward-Looking Statements | ii |
| Prospectus Summary | 1 |
| Risk Factors | 9 |
| Use of Proceeds | 20 |
| Capitalization | 21 |
| Selected Historical Financial Data | 22 |
| Management's Discussion and Analysis of Financial Condition and Results of Operations | 24 |
| Business | 50 |
| Management | 60 |
| Executive and Director Compensation | 64 |
| Principal Shareholders | 73 |
| Certain Relationships and Related Party Transactions | 75 |
| Description of Our Other Debt | 80 |
| Description of Products' Preferred Stock | 83 |

The Exchange Offer                                                               85

Description of The Exchange Notes                                                93

Material United States Federal Income Tax Considerations                         131

Plan of Distribution                                                             135

Legal Matters                                                                    136

Experts                                                                          136

Where You Can Find Additional Information                                        136

Index to Historical Financial Statements                                        F-1

i

---

## FORWARD-LOOKING STATEMENTS

This prospectus contains "forward-looking" information about our financial condition, results of operations and business. You can find many of these statements by looking for words such as "may," "will," "expect," "anticipate," "believe," "estimate," "should," "continue," "predict" and similar words used in this prospectus.

These forward-looking statements are subject to numerous assumptions, risks and uncertainties. Because the statements are subject to risks and uncertainties, actual results may differ materially from those expressed or implied by the forward-looking statements. We caution readers not to place undue reliance on the statements, which speak only as of the date of this prospectus.

The cautionary statements set forth herein should be considered in connection with any subsequent written or oral forward-looking statements that we or persons acting on our behalf may issue. We do not undertake any obligation to review or confirm analysts' expectations or estimates or to release publicly any revisions to any forward-looking statements to reflect events or circumstances after the date of this prospectus or to reflect the occurrence of unanticipated events.

Risks and uncertainties that could cause actual results and events to vary materially from those anticipated in the forward-looking statements included in this prospectus include conditions affecting the markets and industry in which we operate, including the following:

- declines in the North American, South American and European automobile and light truck builds,

- our dependence on significant automotive customers,

- the level of competition in the automotive supply industry and pricing pressure from automotive customers,

- fluctuations in the production of vehicles for which we are a supplier,

- changes in the popularity of particular car models, particular interior trim packages or the loss of programs on particular vehicle models,

A78

(8)   Excludes shares held by entities owning more than 5% of C&A's voting stock. Includes shares representing
      options granted to all directors and executive officers that were vested as of December 31, 2004 or will vest
      within 60 days thereafter.

74

---

## CERTAIN RELATIONSHIPS AND RELATED PARTY TRANSACTIONS

### Heartland Transactions

Heartland is a private equity firm established in 1999 for the purpose of acquiring and expanding industrial companies operating in various sectors of the North American economy that are well positioned for global consolidation and growth. The managing general partner of Heartland is Heartland Industrial Associates, L.L.C. Certain of our directors and officers are members of the general partner, specifically Messrs. Stockman (a Director and our Chairman and Chief Executive Officer), Stepp (a Director and our Vice Chairman) and Tredwell, Leuliette and McConnell (each a Director). Other of our directors or their affiliates, specifically Messrs. Becker and McCallum, are limited partners in Heartland with interests representing less than 5% of the commitments in Heartland. Heartland has informed us that its limited partners include many financial institutions, private and government employee pension funds and corporations, among other types of investors. We may, in the ordinary course of business, have on a normal, customary and arms' length basis relationships with certain of Heartland's limited partners, including banking, insurance and other relationships. As of January 1, 2005, Heartland beneficially owned approximately 41.0% of C&A's outstanding common stock.

We are a party to a Services Agreement with Heartland under which Heartland provides us advisory and consulting services, including services with respect to developments in the automotive industry and supply markets, advice on financial and strategic plans and alternatives and other matters as we may reasonably request and are within Heartland's expertise. The Services Agreement terminates on the earlier of its tenth anniversary or the date upon which Heartland ceases to own C&A shares equivalent to 25% of that owned by them on February 23, 2001.

Under the Services Agreement, we are obligated to pay to Heartland a $4.0 million annual advisory fee payable in quarterly installments and reimburse its out-of-pocket expenses related to the services it provides. We have also agreed to pay a fee of 1% of the total enterprise value of certain acquisitions and dispositions. During 2004, 2003, 2002 and 2001 we recorded total fees of $10.6 million, $4.0 million, $5.7 million and $24.5 million, respectively.

The Services Agreement with Heartland contemplates that we may pay additional fees to Heartland for services rendered in connection with a range of financing transactions. In March 2004, C&A's Board of Directors, including the disinterested and independent directors of the Board, approved a fee of $1 million to Heartland for its services rendered in connection with the 2004 amendments to our senior secured credit facilities to add a supplemental revolving credit facility. On May 6, 2004, C&A's Board of Directors, including the disinterested and independent directors of the Board, approved an amendment of the Services Agreement to provide for a fee of up to $5.0 million related to services rendered in connection with the original offering and a fee of 1% of the gross proceeds of certain future financings, excluding the amendment and restatement of our senior secured credit facilities.

### Charles E. Becker Transactions

In July 2001, we completed the acquisition of Becker. As a result of the Becker acquisition and a purchase of common stock immediately afterwards, Charles Becker became one of C&A's principal stockholders. Charles Becker became a member of C&A's Board of Directors upon closing of the Becker acquisition and was Vice Chairman of the Board from July 2001 until July 2002. Effective May 6, 2004, Mr. Becker resigned as a Director of C&A. In addition, Becker Ventures, an affiliate of Mr. Becker, acquired additional shares of common stock as part of the financings in connection with the acquisition of TAC-Trim at a price of $5.00 per share. At the time of his resignation, Mr. Becker beneficially owned 7,539,262 shares of common stock. A related party of Mr. Becker is also a limited partner in Heartland.

On March 27, 2003, we entered into a termination agreement and release to buy out the non-compete agreement between us and Mr. Becker. We paid $11.3 million in April 2003 as part of the termination agreement

and release. The non-compete agreement, which was entered into as part of the Becker acquisition, required us to make periodic payments. As a result of the termination of the non-compete agreement, we incurred a loss of $10.4 million, which is primarily due to the write-off of intangible assets initially recorded in conjunction with the Becker acquisition.

75

---

During 2002, we engaged Mr. Becker to serve as Vice Chairman and assist us with strategic planning activities, such as developing sales strategies, managing key customer relationships and recruiting senior management for the Company's European operations. We paid Mr. Becker $300,000 for such services. Mr. Becker's consulting arrangement and position as Vice Chairman ended in 2002.

We entered into a lease agreement with Becker Ventures L.L.C. ("Becker Ventures"), an entity controlled by Mr. Becker, for our headquarters at 250 Stephenson Highway, Troy, Michigan with the effective date of the lease being January 1, 2002. In March 2002, we entered into lease agreements with Becker Ventures, effective January 1, 2002, for 150 Stephenson Highway and 350 Stephenson Highway, Troy, Michigan. The base rent for all three premises is $13.25 per sq. ft., subject to annual CPI adjustments. Total square footage for all three locations is approximately 286,000. The leases have 20-year terms, and we have two five-year renewal options. The 2004 base rent for the facilities will be approximately $4.0 million. In 2004, these leases were amended to provide that we would assume responsibility for property management with a corresponding elimination of certain aspects of the property management fees. In addition, we are also party to a lease with Becker Ventures for five manufacturing facilities totaling 884,000 square feet. In 2002, we extended the lease term an additional ten years to expire in 2021, with the base rent for these facilities totaling $3.6 million per year.

In June 2001, Products sold and contemporaneously leased back real property located in Troy, Michigan and Plymouth, Michigan from New King, L.L.C. and Anchor Court, L.L.C., respectively, which are affiliates of Becker Ventures, for net proceeds of $15.1 million in aggregate. The initial lease term in each transaction is 20 years and each lease has two successive ten year renewal options. The basic rent for the Troy, Michigan property is $1.3 million per year, and the basic rent for the Plymouth, Michigan property is $0.5 million per year. The rental rates in each case are subject to adjustment after expiration of the initial term.

*Elkin McCallum Transactions*

In September 2001, we completed the acquisition of Joan Automotive, a leading supplier of body cloth to the automotive industry, and all of the operating assets of Joan Automotive's affiliated yarn dying operation, Western Avenue Dyers, L.P. As a result of the Joan acquisition, Joan Fabrics, a company controlled by Elkin McCallum, became a principal stockholder of C&A. Upon completion of the Joan acquisition, Mr. McCallum became a member of C&A's Board of Directors. Effective May 6, 2004, Mr. McCallum resigned as a Director of C&A. At the time of his resignation, Mr. McCallum beneficially owned 5,699,000 shares of common stock. A related party of Mr. McCallum is a limited partner in Heartland.

In the first quarter of 2003, we purchased equipment from Joan Fabrics Corporation ("Joan Fabrics"), and entered into a supply agreement with Joan Fabrics to supply certain types of fabrics. Elkin McCallum controls Joan Fabrics and is a limited partner in Heartland. Under the supply agreement, we supply fabric to Joan Fabrics and Joan Fabrics is responsible for all marketing, design, customer service, distribution and sales functions related to these fabrics. We paid Joan Fabrics $4.7 million of consideration for these transactions, a portion of which we have allocated to the purchased equipment (based on its appraised value) and the remainder of which it is amortizing over the five-year term of the supply agreement.

On December 31, 2002, we acquired an air jet texturing business from Dutton Yarns (an affiliate of Mr. McCallum) for approximately $4.2 million. The purchased assets included equipment, inventory and intellectual property. We had preliminarily accounted for this transaction as an acquisition of assets, but finalized its accounting during the first quarter of 2003, and recorded the transaction as a purchase of a business.

On April 12, 2002, we signed and closed on a merger agreement with Mr. McCallum and a lamination company wholly owned by Mr. McCallum pursuant to which the acquired company was merged into a wholly owned subsidiary of us. As consideration in the transaction, Mr. McCallum received 400,000 shares of common stock and was repaid $2.5 million in cash as reimbursement for amounts previously invested to fund the lamination company's working capital needs. Subsequent to the merger, debt owing to Mr. McCallum of $6.7 million was repaid. We acquired the lamination business to optimize the supply chain

# Tab 10

# SECURITIES AND EXCHANGE COMMISSION
## Washington, D.C. 20549

# FORM 8-K

**Current Report**

Pursuant to Section 13 or 15(d) of the Securities
Exchange Act of 1934

March 12, 2004
Date of Report (Date of earliest event reported)

# COLLINS & AIKMAN CORPORATION
(Exact name of registrant as specified in its charter)

| Delaware | 1-10218 | 13-3489233 |
|---|---|---|
| (State or other jurisdiction of incorporation or organization) | (Commission file number) | (I.R.S. Employer Identification No.) |

250 Stephenson Highway,
Troy, Michigan 48083
(Address of principal executive offices (zip code)

(248) 824-2500
(Registrant's telephone number, including area code)

None.
(Former name or former address, if changed since last report)

A81

**ITEM 9. REGULATION FD DISCLOSURE**
The attached exhibit of Other Financial Information is furnished under Form 8-K

Item 9 and Item 12 (Results of Operations and Financial Condition). The information is not filed for purposes of the Securities Exchange Act of 1934 and is not deemed incorporated by reference by any general statements incorporating by reference this report or future filings into any filings under the Securities Act of 1933 or the Securities Exchange Act of 1934, except to the extent Collins & Aikman specifically incorporates the information by reference.

**EXHIBITS.**

The following exhibits are filed herewith:

Exhibit No. Description

(99.1) Collins & Aikman 4th Quarter 2003 Earnings Release

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

Dated: March 12, 2004

**COLLINS & AIKMAN CORPORATION**

```
By:  /s/ J. Michael Stepp
     -----------------------------

Name:   J. Michael Stepp
Title:  Vice Chairman and Chief Financial Officer
        (Principal Financial Officer)
```

**EXHIBIT INDEX**

Exhibit No. Description

(99.1) Collins & Aikman 4th Quarter 2003 Earnings Release

**EXHIBIT 99.1**

**FOR IMMEDIATE RELEASE**
MARCH 11. 2004

## COLLINS & AIKMAN ANNOUNCES RECORD SALES AND
## FOURTH QUARTER FINANCIAL RESULTS

TROY, MICH. -- Collins & Aikman Corporation (C&A) (NYSE:CKC) today reported results for fourth quarter and year ended December 31, 2003. The company reported record fourth quarter 2003 net sales of $1.013 billion compared to $963 million in the fourth quarter of 2002, a 5% increase which mainly reflects sales from companies acquired in January 2003 along with improved currency impact. The company reported a loss of 14 cents per share from continuing operations in the fourth quarter of 2003, which included after-tax charges for restructuring and long-lived asset impairments of $16.7 million (or 20 cents per share). In the comparable 2002 quarter, the company had a loss of 4 cents per share, which included after-tax charges for restructuring and long-lived asset impairments of $13.0 million (or 16 cents per share).

Commenting on the company's fourth quarter operating results, David A. Stockman, C&A Chairman and CEO, stated, "We are pleased with the solid improvement in EBITDA performance, excluding restructuring and impairment charges. For the second consecutive quarter our results were up significantly from the prior year on a comparable basis. Additionally, the restructuring program that began in the third quarter is resulting in significant fixed cost savings as indicated by our year-over-year decline in selling, general and administrative expenses."

The fourth quarter 2003 pre-tax restructuring charge of $13.8 million included costs associated with the previously announced third quarter restructuring actions that would reduce the company's salaried workforce by almost 800 or 15%. This restructuring initiative and related actions are expected to reduce the company's fixed-cost structure by $80 million per year.

For the full-year 2003, the company reported sales of $3.98 billion compared to $3.89 billion for 2002. The company also reported a net loss available to common shareholders from continuing operations of $59.1 million or 71 cents per share, which included $49.9 million (or 60 cents per share) of after-tax charges for restructuring and long-lived asset impairments. For the comparable 2002 period, the net loss available to common shareholders from continuing operations was $87.6 million or $1.15 per share, which included after-tax charges for restructuring and long-lived asset impairments of $40.9 million (or 53 cents per share).

A85

C&A's net debt, including outstandings under an off-balance sheet accounts receivable facility, was $1.346 billion at December 31, 2003.

## Net Business Wins and Other Accomplishments

During the fourth quarter 2003, Collins & Aikman continued to achieve solid marketing progress by adding $200 million of annual newly booked business, bringing the year-to-date total to over $900 million in annualized revenues incepting with model year 2005. These figures are net of business being transitioned to other suppliers.

Wins for the quarter included one of the largest fabric contracts the company has received in recent history --- a contract to supply seat fabric to a North American OEM for multiple unnamed models. Wins also included numerous instrument panel, carpet and acoustic and interior trim programs. In particular, the company recently secured contracts to supply instrument panels and center consoles for multiple derivatives of a new crossover type vehicle.

## EBITDA Discussion

EBITDA was $69.4 million for the fourth quarter of 2003, which was reduced by charges of $13.8 million for restructuring and $7.3 million for the impairment of long-lived assets. The fourth quarter 2002 EBITDA was $68.2 million, which was reduced by charges of $4.8 million for restructuring and $9.3 million for the impairment of long-lived assets. A reconciliation of our EBITDA, a non-GAAP financial measure, to U.S. GAAP loss from continuing operations, our most comparable GAAP figure, is set out in the attached EBITDA reconciliation schedule. The company believes that EBITDA is a meaningful measure of performance as it is commonly utilized in the industry to analyze operating performance. EBITDA should not be construed as income from operations, net income (loss) or cash flow from operating activities as determined by generally accepted accounting principles. Other companies may calculate EBITDA differently.

## Completion of Previously Announced Audit Committee Inquiry

As separately announced today, the company's Audit Committee inquiry into certain assertions made by two former executives and related matters has been completed. The Audit Committee's inquiry extended into the following areas: (1) assertions regarding the company's accounting for revenue and tooling, (2) a comprehensive review of related party transactions and (3) certain corporate governance procedures. The primary findings of the Audit Committee include that
(1) it did not become aware of any events that would necessitate a restatement of any previously issued financial statements and (2) that all related party transactions had a legitimate business

purpose, were negotiated fairly, and were intended to advance the interests of the company and not to benefit the related parties at the company's expense.

The Audit Committee, however, has made certain corporate governance and disclosure recommendations concerning related party transactions that are summarized in the company's separate press release.

The company intends to file amended Quarterly Reports on Form 10-Q for the quarters ended June 30, 2003 and September 30, 2003, to reflect the conclusion of the Audit Committee's inquiry and its recommendations, but, as indicated above, no restatement of any previously issued financial statements is required or being made. The 2003 Form 10-K is expected to include audited financial statements and the required CEO and CFO certifications under Sarbanes-Oxley.

The members of the company's Audit Committee are Robert C. Clark, the former Dean of the Harvard Law School, Marshall A. Cohen, counsel at Cassels Brock and Blackwell, a Canadian law firm, and former Senator Warren B. Rudman. The Audit Committee was advised by Davis Polk & Wardwell and an accounting expert, Alex Arcady, a retired partner from Ernst & Young LLP.

Commenting upon the completion of the Audit Committee's work, which began in August 2003, Mr. Stockman said, "The company is deeply grateful to the members of the Audit Committee and its advisors for their tireless work in examining these matters."

**2004 Outlook**

We estimate net sales for the full year 2004 will be $4.0 billion to $4.05 billion based on a 16.2 million NAFTA vehicle build and we expect operating income to be in the $225 million to $240 million range for 2004. EBITDA is expected to be in the $355 million to $370 million range. We anticipate that in 2004 net earnings will range between a breakeven and 10 cents per common share. All of these numbers exclude the impacts of any future restructuring or impairment charges. Capital spending is expected to be in the $145 million to $155 million range for 2004.

FASB Interpretation No. 46
The company is currently evaluating whether the recently revised FASB Interpretation No. 46, "Consolidation of Variable Interest Entities," applies to certain of the company's previously-disclosed operating leases with a related party. The financial information contained in this release has been presented on the basis that FIN 46 is not applicable in this instance, but the company's Annual Report on Form 10-K will reflect its ultimate conclusion on this issue.

A87

Management believes that, if FIN 46 is applicable, the resulting implementation will not have a material effect on the company's financial statements.

The company will hold a briefing with automotive institutional investors and security analysts, news media representatives and other interested parties, including its security holders, at 10:30 a.m. EST on Thursday, March 11, 2004 to discuss its fourth quarter and year-end results and other matters. To participate by phone, please dial (973) 582-2729. The briefing will also be audio webcast, on our website at: www.collinsaikman.com/investor/confcalls.html. A slide presentation will also be used in conjunction with this teleconference and will be available on the company's website.

Collins & Aikman Corporation is a leading global supplier of automotive interior components and systems, including: instrument panels, cockpit modules, flooring and acoustic systems, automotive fabric, and interior trim, as well as exterior trim and convertible roof systems. The company's current operations include 15 countries, more than 100 facilities and nearly 24,000 employees. Information about Collins & Aikman is available on the Internet at www.collinsaikman.com.

This news release contains forward-looking statements within the meaning of the Private Securities Litigation Reform Act of 1995. Actual results may differ materially from the anticipated results because of certain risks and uncertainties, including but not limited to general economic conditions in the markets in which Collins & Aikman operates, fluctuations in the production of vehicles for which the company is a supplier, changes in the popularity of particular car models, labor disputes involving the company or its significant customers, changes in consumer preferences, dependence on significant automotive customers, the level of competition in the automotive supply industry, pricing pressure from automotive customers, the substantial leverage of the company and its subsidiaries, limitations imposed by the company's debt facilities, implementation of the reorganization plan, charges made in connection with the integration of operations acquired by the company, the risks associated with conducting business in foreign countries and other risks detailed from time-to-time in the company's Securities and Exchange Commission filings.

```
CONTACT:    J. MICHAEL STEPP           ROBERT A. KRAUSE
            VICE CHAIRMAN & CFO        VICE PRESIDENT & TREASURER
            (248) 824-1520             HEAD OF INVESTOR RELATIONS
            MIKE.STEPP@COLAIK.COM      (248) 733-4355
                                       ROBERT.KRAUSE@COLAIK.COM

                           ###
```

A88

**COLLINS & AIKMAN CORPORATION**
**CONDENSED CONSOLIDATED STATEMENTS OF OPERATIONS**
(Unaudited)

| | THREE MONTHS ENDED DECEMBER 31, | | YEAR ENDED DECEMBER 31, | |
|---|---|---|---|---|
| | 2003 | 2002 | 2003 | 2002 |
| | (IN MILLIONS, EXCEPT PER SHARE DATA) | | | |
| Net sales | $ 1,012.9 | $ 963.2 | $ 3,983.7 | $ 3,885.8 |
| Cost of goods sold | 898.3 | 835.4 | 3,539.5 | 3,367.7 |
| Gross profit | 114.6 | 127.8 | 444.2 | 518.1 |
| Selling, general and administrative expenses | 63.1 | 77.7 | 273.2 | 293.5 |
| Restructuring charges | 13.8 | 4.8 | 40.6 | 38.9 |
| Impairment of long-lived assets | 7.3 | 9.3 | 28.4 | 18.0 |
| Operating income | 30.4 | 36.0 | 102.0 | 167.7 |
| Net interest expense | (40.0) | (36.3) | (151.3) | (148.9) |
| Loss on sale of receivables | (2.8) | (1.2) | (7.3) | (4.2) |
| Interest from subsidiary preferred stock dividends | (9.6) | (6.4) | (32.0) | (30.8) |
| Interest from subsidiary preferred stock accretion | (0.5) | (2.0) | (5.3) | (7.6) |
| Other income (expense), net | 9.0 | 3.4 | 32.9 | (10.0) |
| Loss from continuing operations before income taxes | (13.5) | (6.5) | (61.0) | (33.8) |
| Income tax benefit (expense) | 2.0 | 3.4 | 1.9 | (17.5) |
| Loss from continuing operations | (11.5) | (3.1) | (59.1) | (51.3) |
| Income from discontinued ops., net | 1.6 | – | 1.6 | 9.5 |
| Cumulative effect of change in accounting principle, net | – | – | – | (11.7) |
| Net loss | $ (9.9) | $ (3.1) | $ (57.5) | $ (53.5) |
| Loss on redemption of subsidiary preferred stock | – | – | – | (36.3) |
| Net loss available to common shareholders | $ (9.9) | $ (3.1) | $ (57.5) | $ (89.8) |
| Net income (loss) per basic and diluted common share data: | | | | |
| Continuing operations | $ (0.14) | $ (0.04) | $ (0.71) | $ (1.15) |
| Discontinued operations | 0.02 | – | 0.02 | 0.12 |
| Change in acct. principle | – | – | – | (0.15) |
| Total | $ (0.12) | $ (0.04) | $ (0.69) | $ (1.18) |
| Basic and diluted shares outstanding | 83.6 | 83.6 | 83.6 | 76.3 |

A89

## COLLINS & AIKMAN
### CONDENSED CONSOLIDATED BALANCE SHEETS

|  | DECEMBER 31, 2003 | DECEMBER 31, 2002 |
|---|---|---|
|  | (UNAUDITED) | |
|  | (IN MILLIONS) | |
| **ASSETS** | | |
| Current assets: | | |
| Cash and equivalents | $ 13.2 | $ 81.3 |
| Accounts and other receivables, net | 257.3 | 373.0 |
| Inventories | 169.4 | 171.6 |
| Other | 216.0 | 177.4 |
| Total current assets | 655.9 | 803.3 |
| Property, plant and equipment, net | 825.9 | 737.8 |
| Deferred tax assets | 178.1 | 165.0 |
| Goodwill and other intangible assets, net | 1,430.0 | 1,350.8 |
| Other assets | 101.3 | 100.2 |
| Total assets | $ 3,191.2 | $ 3,157.1 |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | |
| Current liabilities | | |
| Short-term borrowings | $ 16.0 | $ 10.5 |
| Current maturities of long-term debt and lease obl. | 31.5 | 23.5 |
| Accounts payable | 638.9 | 595.5 |
| Accrued expenses | 238.9 | 299.9 |
| Total current liabilities | 925.3 | 929.4 |
| Long-term debt and lease obligations | 1,237.7 | 1,255.2 |
| Mandatorily redeemable preferred stock of subsidiary | 161.2 | 123.9 |
| Other, including pensions and post-retirement obligations | 423.4 | 438.4 |
| Minority interest | 3.3 | 12.7 |
| Stockholders' equity | 440.3 | 397.5 |
| Total liabilities and stockholders' equity | $ 3,191.2 | $ 3,157.1 |

A90

**COLLINS & AIKMAN**
**CONDENSED CONSOLIDATED STATEMENTS OF CASH FLOWS**
(unaudited)

| | THREE MONTHS ENDED DECEMBER 31, | | YEAR ENDED DECEMBER 31, | |
|---|---|---|---|---|
| | 2003 | 2002 | 2003 | 2002 |
| | (IN MILLIONS) | | | |
| **Operating activities** | | | | |
| Net loss | $ (9.9) | $ (3.1) | $ (57.5) | $ (53.5) |
| Depreciation and amortization | 39.0 | 32.2 | 140.2 | 117.0 |
| Changes in working capital | 41.5 | 20.2 | (10.7) | 51.2 |
| Other | 10.2 | 2.9 | 50.9 | 74.7 |
| Net cash flow provided by operating activities | 80.8 | 52.2 | 122.9 | 189.4 |
| **Investing activities** | | | | |
| Capital expenditures | (50.5) | (46.7) | (170.4) | (147.9) |
| Sales of property, plant and equipment | 3.1 | 13.1 | 18.3 | 13.3 |
| Additional investment in joint venture | - | (3.3) | | (5.9) |
| Payments of acquisitions and related costs, net of cash acquired | - | - | (37.8) | (45.6) |
| **Financing activities** | | | | |
| Net decrease in debt | (44.9) | (18.9) | (4.8) | (46.6) |
| Repurchase of preferred stock | - | - | - | (100.0) |
| Net proceeds from issuance of common stock | - | (0.3) | - | 150.6 |
| Effect of exchange rate changes on cash | 2.2 | 8.0 | 3.7 | 0.1 |
| Increase (decrease) in cash and equivalents | (9.3) | 4.1 | (68.1) | 7.4 |
| Cash and equivalents at beginning of period | 22.5 | 77.2 | 81.3 | 73.9 |
| Cash and equivalents at end of period | $ 13.2 | $ 81.3 | $ 13.2 | $ 81.3 |

**COLLINS & AIKMAN**
**SUPPLEMENTAL DATA -- EBITDA RECONCILIATION SCHEDULE**
(unaudited)

| | THREE MONTHS ENDED DECEMBER 31, | | YEAR ENDED DECEMBER 31, | |
| --- | --- | --- | --- | --- |
| | 2003 | 2002 | 2003 | 2002 |
| | | (IN MILLIONS) | | |
| Loss from continuing operations | $ (11.5) | $ (3.1) | $ (59.1) | $ (51.3) |
| Income tax (benefit) expense | (2.0) | (3.4) | (1.9) | 17.5 |
| Net interest expense | 40.0 | 36.3 | 151.3 | 148.9 |
| Loss on sale of receivables | 2.8 | 1.2 | 7.3 | 4.2 |
| Interest from subsidiary preferred stock dividends and accretion | 10.1 | 8.4 | 37.3 | 38.4 |
| Other income (expense), net | (9.0) | (3.4) | (32.9) | 10.0 |
| | ------- | ------- | -------- | -------- |
| Operating income | $ 30.4 | $ 36.0 | $ 102.0 | $ 167.7 |
| Depreciation and amortization | 39.0 | 32.2 | 140.2 | 117.0 |
| | ------- | ------- | -------- | -------- |
| EBITDA | $ 69.4 | $ 68.2 | $ 242.2 | $ 284.7 |
| | ======= | ======= | ======== | ======== |
| | | | | |
| Memo: | | | | |
| Restructuring charges | $ 13.8 | $ 4.8 | $ 40.6 | $ 38.9 |
| Impairment of long-lived assets | 7.3 | 9.3 | 28.4 | 18.0 |
| | ------- | ------- | -------- | -------- |
| Total restructuring and impairment charges | $ 21.1 | $ 14.1 | $ 69.0 | $ 56.9 |
| | ======= | ======= | ======== | ======== |

This supplemental data presented above is a reconciliation of a certain financial measure which is intended to facilitate analysis of Collins & Aikman Corporation's business and operating performance.

EBITDA is defined as operating income plus depreciation and amortization. The company believes that EBITDA is a meaningful measure of performance as it is commonly utilized in the industry to analyze operating performance. EBITDA should not be construed as income from operations, net income (loss) or cash flow from operating activities as determined by generally accepted accounting principles. Other companies may calculate EBITDA differently.

**End of Filing**

Powered By EDGAR Online

© 2005 | EDGAR Online, Inc.

A92

# Tab 11

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION

Washington, D.C. 20549

---

# FORM 8-K

**CURRENT REPORT**

Pursuant to Section 13 or 15(d) of the Securities
Exchange Act of 1934

March 17, 2005
Date of Report (Date of earliest event reported)

# COLLINS & AIKMAN CORPORATION

(Exact name of registrant as specified in its charter)

| DELAWARE | 1-10218 | 13-3489233 |
|---|---|---|
| (STATE OR OTHER JURISDICTION OF INCORPORATION OR ORGANIZATION) | (COMMISSION FILE NUMBER) | (I.R.S. EMPLOYER IDENTIFICATION NO.) |

250 Stephenson Highway
Troy, Michigan 48083
(Address of principal executive offices)

(248) 824-2500

(Registrant's telephone number,
including area code)

NOT APPLICABLE
(FORMER NAME OR FORMER ADDRESS, IF CHANGED SINCE LAST REPORT)

---

CHECK THE APPROPRIATE BOX BELOW IF THE FORM 8-K FILING IS INTENDED TO SIMULTANEOUSLY SATISFY THE FILING OBLIGATION OF THE REGISTRANT UNDER ANY OF THE FOLLOWING PROVISIONS:

[ ] Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

[ ] Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

[ ] Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

[ ] Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

On March 17, 2005, Collins & Aikman Products Co. ("Products"), a wholly owned subsidiary of the registrant, and CARCORP, Inc., a wholly owned subsidiary of Products, obtained a waiver under their existing receivables transfer agreement (the "Receivables Transfer Agreement") related to its off-balance sheet accounts receivable financing facility. The waiver extends to May 16, 2005, absent the occurrence of certain other events, the time period within which Products and CARCORP must deliver certain financial reports and stipulates that the failure to deliver such financial reports shall not result in a termination of the facility during the extended period. The waiver also stipulates that any failure by the registrant to comply with its leverage ratio covenant for the period ended December 31, 2004 shall not result in a termination of the facility.

The description set forth above is qualified by the Waiver to the Receivables Transfer Agreement filed herewith as exhibit 99.1.

### ITEM 2.02 RESULTS OF OPERATIONS AND FINANCIAL CONDITION.

The following information is being furnished under Item 2.02 of Form 8-K. The information is not filed for purposes of the Securities Exchange Act of 1934 and is not deemed incorporated by reference by any general statements incorporating by reference this report or future filings into any filings under the Securities Act of 1933 or the Securities Exchange Act of 1934, except to the extent Collins & Aikman Corporation specifically incorporates the information by reference.

On March 17, 2005, Collins & Aikman Corporation (the "Company") issued a press release regarding its preliminary fourth quarter and full year 2004 earnings. A copy of that release is attached as exhibit 99.2 to this Form 8-K.

The Company is holding a teleconference on March 17, 2005 to discuss its financial results for the fourth quarter and full year 2004. A copy of the visual presentation that will be used for the teleconference is currently accessible at www.collinsaikman.com and is attached as exhibit 99.3 to this Form 8-K.

### ITEM 4.02 NON-RELIANCE ON PREVIOUSLY ISSUED FINANCIAL STATEMENTS OR A RELATED AUDIT REPORT OR COMPLETED INTERIM REVIEW.

The Press Release also announced that the Company expects to restate its previously issued financial statements for the nine months ended September 30, 2004 to reflect a correction in its accounting for supplier rebates. This correction will address premature or inappropriate revenue recognition or revenue recognition that was inconsistent with relevant accounting standards and the Company's policies and practices. The Company is continuing to evaluate whether a restatement of its 2003 results will be necessary.

The Company consulted with its audit committee and has discussed this issue with the Company's registered independent accountant in identifying this issue. The Senior Officers of the Company concluded on March 16, 2005 that the historical financial statements for the periods identified above should no longer be relied upon.

1

**ITEM 9.01. FINANCIAL STATEMENTS AND EXHIBITS.**

(c) Exhibits. The following exhibit is filed herewith:

| Exhibit No. | Description |
|---|---|
| 99.1 | Waiver to Receivables Transfer Agreement, dated as of March 16, 2005 among CARCORP, Products and GECC |
| 99.2 | Press Release |
| 99.3 | Presentation Materials |

2

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

Dated: March 17, 2005

COLLINS & AIKMAN CORPORATION

```
         By:   /s/ Bryce Koth
               -------------------------
         Name:  Bryce Koth
         Title: Senior Vice President and
                Chief Financial Officer
```

3

Exhibit 99.2

 **News Release**

For Immediate Release
March 17, 2005

### COLLINS & AIKMAN ANNOUNCES DELAY IN FORM 10-K FILING, RESTATEMENT AND UNAUDITED SUMMARY RESULTS FOR 2004

**TROY, Mich.** — Collins & Aikman Corporation (NYSE: CKC) announced today the following:

- The Company did not file its Annual Report on Form 10-K containing fiscal 2004 audited financial statements by its due date yesterday since it requires additional time to complete the review of the accounting issues referred to below, the financial reporting process, and the Company's assessment of controls over financial reporting. As permitted by Rule 12b-25 under the Securities Exchange Act of 1934, the Company today filed a notification providing that, among other things, its Form 10-K filing will nonetheless be timely filed if it is filed no later than 15 calendar days after its original due date. The audit, and other necessary work required for the Form 10-K to be filed, may not be completed within that extended time frame.

- During the course of finalizing its financial statements for its fiscal year ended December 31, 2004, the Company identified certain accounting for supplier rebates that led to premature or inappropriate revenue recognition or that was inconsistent with relevant accounting standards and the Company's policies and practices. The Company immediately initiated an internal review of these matters and expects to restate its results for the nine months ended September 30, 2004 to reflect the correct accounting for these rebates. The Company is continuing to evaluate whether a restatement of its 2003 results will be necessary. The Company presently expects to reduce its previously reported operating income by $10 — $12 million for the nine months ended September 30, 2004. The Company's outside auditors have not reviewed these conclusions, and additional adjustments may be required.

Preliminary Summary Results

The Company further announced today anticipated summary results for 2004, which reflect the Company's present assessment of the impact of the accounting issues referred to above, and are subject to change. The Company announced fourth quarter 2004 net sales of $937 million compared to $1.013 billion in the fourth quarter of 2003, a 7.5% decrease which mainly reflects reduced volumes in the fourth quarter on several key North American programs and the delay in new program launches that were scheduled for the fourth quarter. For the full-year 2004, the Company reported sales of $3.904 billion compared to $3.983 billion for 2003. Additional information regarding the Company's results of operations will be available via the teleconference and related slide presentation referred to elsewhere in this press release.

During the fourth quarter 2004, the Company continued to achieve solid marketing progress by adding more than $175 million of annual newly booked business. This brings the last-twelve-months' total to over $880 million. These programs begin with model years incepting 2005 to 2008. A significant win for the quarter included an instrument panel, cockpit and console program for a valued European customer. Additionally, the Company secured numerous contracts for our instrument panel, carpet and acoustic, accessory mat and plastic interior trim products.

A97

The Company has completed its annual impairment test as required by SFAS 142 as of November 1, 2004 and took into consideration, among other factors, the impact of increased raw material prices in 2004, increased pricing pressure from customers, general economic conditions, the state of the automotive industry, and other factors beyond management's control. The Company determined that the fair values of its U.S. and Mexico Plastics reporting unit and its Global Fabrics reporting unit were less than the respective units' carrying values. As a result, the Company expects to recognize an impairment charge of approximately $500 million, which will reduce U.S. and Mexico Plastics' goodwill by approximately $325 million and Global Fabrics' goodwill by approximately $175 million.

The Company has also performed an analysis of future taxable income and believes that there is now sufficient negative evidence and uncertainty as to the timing of when the appropriate level of taxable income will be generated in the U.S. to recover the deferred tax assets, necessitating a full valuation allowance against those deferred tax assets. As a result, the Company's provision for income taxes for the fourth quarter of 2004 includes a write down of the U.S. and Italian net deferred tax assets of $175 million. In addition, the impact of the valuation allowance on the 2004 operating results for the U.S. and Italy was approximately $25 million.

The above preliminary results have not been audited or reviewed by the Company's outside auditors and may be impacted by our continuing review of the accounting matters referred to herein, any expansion in the number of transactions under review and new information or situations that may arise prior to completion of the audit. These results are summary and a complete disclosure of financial statements would necessarily reveal additional information that the Company is not presently in a position to provide.

## EBITDA before Restructuring and Impairment Charges

EBITDA before restructuring and impairment charges is expected to be approximately $72 — $73 million for the fourth quarter of 2004. The fourth quarter 2003 EBITDA before restructuring and impairment charges was $91 million. EBITDA before restructuring and impairment charges for the full year 2004 is expected to be approximately $320 — $321 million. The comparable result for 2003 was $311 million. Due to the status of the accounting investigation and the pending audit, we are not presenting net income at this time. A reconciliation of our EBITDA before restructuring and impairment charges, a non-GAAP financial measure, to U.S. GAAP operating income, our most comparable GAAP figure, is set out in the attached reconciliation schedule. The Company believes that EBITDA is a meaningful measure of performance as it is commonly utilized in the industry to analyze operating performance. EBITDA should not be construed as income from operations, net income (loss) or cash flow from operating activities as determined by generally accepted accounting principles. Other companies may calculate EBITDA differently.

## Net Debt and Liquidity

The Company's net debt, including outstandings under an off-balance sheet accounts receivable facility, was $1.613 billion at December 31, 2004. As of December 31, 2004 the Company had undrawn commitments under its revolver and accounts receivable facility, along with cash equivalents, of $86 million. The liquidity available to the Company in the ordinary course is impacted by seasonal factors, the timing of cash inflows and outflows and the general level and timing of industry build volumes. In general, the Company's cash requirements are highest during the first two to three weeks of a month. In the first quarter, the Company's cash requirements increased due primarily to slow industry build volumes, the timing of interest payments and the termination of certain accelerated pay programs. The Company has taken several actions to enhance its liquidity position, including agreements with customers, and modifying its accounts receivable securitization facility to increase the advance rate and

availability. Continued access to credit facilities in satisfactory amounts is essential to the Company. Adverse developments in our cash flows or credit terms could materially impact us. Certain impacts of the delay in our Form 10-K filing and the accounting matters under our facilities are discussed below.

Internal Accounting Investigation and Related Matters

In the ordinary course, the Company has received and continues to receive rebates as a result of arms length transactions with its vendors. Depending upon the terms of the rebate agreement, these rebates are either recognizable in the quarter in which the rebate agreement is reached or recognized over an appropriate future period. In the course of finalizing the Company's 2004 financial results, the Company identified certain issues related to accounting for supplier rebates that led to premature or inappropriate income recognition or that was inconsistent with relevant accounting standards and the Company's policies and practices. The Company immediately initiated a review of all vendor rebates it received from 2002 through 2004 to ensure that it has properly recognized the rebates in the appropriate quarterly period. The Company has completed its accounting review of these rebates, but expects to undertake a thorough review of its controls, procedures and other circumstances that led to the premature or inappropriate income recognition and that was inconsistent with relevant accounting standards and the Company's policies and practices. The nature and scope of that review is under consideration. The Company's Audit Committee and outside auditors have been informed of these issues and are evaluating an appropriate course of action.

The Company's internal review of vendor rebates covered an aggregate of approximately $88 million of vendor transactions in fiscal years 2002 through 2004. Of such amount, the Company believes that net adjustments of approximately $10 — $12 million, are required primarily occurring during fiscal 2004. The Company expects to restate its results for the nine months ended September 30, 2004 to reflect these revisions. The Company is continuing to evaluate whether a restatement of its 2003 results will be necessary. We have not taken into account this impact in our preliminary report of 2004 results. These preliminary results remain subject to material change and have not been reviewed by our outside auditors.

The Company is working towards completion of its assessment of internal controls over financial reporting required under Section 404 of the Sarbanes-Oxley Act and has concluded that certain material weaknesses, in addition to the matters leading to the restatement described above, existed at December 31, 2004, but its assessment of the effectiveness of the Company's control over financial reporting is ongoing and the extent of those material weaknesses remains under review. The Company's outside auditor is in the process of completing its audit of internal controls over financial reporting and has communicated the existence of material weaknesses. The potential material weaknesses identified include the following: (i) the adequacy of the Company's resources with appropriate accounting expertise to address accounting and reporting matters in certain areas, including revenue recognition, vendor arrangements and post-retirement benefits, and to supervise the Company's decentralized and disparate accounting environment and ensure an appropriate segregation of duties; (ii) the adequacy of the Company's internal audit function's resources and ability to monitor compliance with established policies and procedures; (iii) the effectiveness of certain information technology controls and the sufficiency of documentation to assess the effectiveness of such controls including embedded system application controls; (iv) the adequacy of procedures to consistently identify and reconcile fixed assets and periodically review assets for impairment; and (v) the completeness and consistent adherence to Company policies and procedures. These issues include a range of documentation-related issues and reconciliation issues. Other material weaknesses may be identified as a result of further investigation of the circumstances surrounding the expected restatement arising from vendor rebates. Our review and the audit is ongoing.

While the Company has implemented remediation steps with respect to certain significant deficiencies and material weaknesses, a number of issues still need to be addressed. The Company's remediation plans include the assignment of specific resources with given timelines for each finding. Measurement criteria have also been established to monitor the progress of these remediation efforts. To ensure that the Company addresses these issues thoroughly, effectively, and timely, the internal audit department has been supplemented with the services of several outside specialists. Further required remediation will be identified and undertaken as a result of the internal accounting investigation.

### Impact on Financing Arrangements

The Company intends to operate in the ordinary course, but it cannot presently comment upon the timing for completion of, or the ultimate scope or outcome of, the internal accounting investigation, the audit and the restatements. Until the audit and any restatements are complete, it will be difficult to determine the full scope of any financial restatement or prior period adjustments arising from these irregularities. Consequently, the Company is still evaluating its financial covenant compliance under its senior credit facility, as well as other compliance issues under other financing arrangements. If necessary or desirable, the Company will seek a waiver of relevant provisions.

The Company is obligated to provide audited financial statements under a number of its debt, receivables facility, operating lease and other agreements within prescribed periods. The Company relies upon its receivables facility with GE Capital Corporation for its liquidity and the unavailability of funds thereunder would be material and adverse. The Company has received waivers of various provisions of its receivables financing facility and its Hermosillo, Mexico funding arrangements, both of which are held by GE Capital Corporation, so that it will continue to provide the Company with access to financing under those facilities in the ordinary course of business until May 20, 2005, absent certain new adverse developments. The Company also intends to seek waivers and amendments of its bank credit facilities and of various lease agreements, as required or desirable. There can be no assurance that any other required or desirable waivers will be received on a timely basis and the failure to obtain waivers could be material and adverse.

### Heartland Investment in Preferred Stock held by Textron

The Company also announced today that it has been informed that its largest shareholder, Heartland Industrial Partners, L.P., has entered into an agreement with Textron Inc. that gives Heartland and its designees the right to acquire all of the Series A-1 and B-1 Preferred Stock currently outstanding. It is presently anticipated that Heartland will acquire a majority of the outstanding preferred stock itself and will seek co-investors for the balance, although such co-investment may not occur.

### Public Briefing

As previously announced, the Company will hold a briefing with automotive institutional investors and security analysts, news media representatives and other interested parties, including its security holders, at 10:00 a.m. EST on Thursday, March 17, 2005 to discuss the matters described in this press release.

To participate by phone, please dial (973) 582-2745. The briefing will also be audio webcast, on our website at: www.collinsaikman.com/investor/confcalls.html . A slide presentation will also be used in conjunction with this teleconference and will be available on the Company's website.

Collins & Aikman Corporation, a Fortune 500 company, is a global leader in cockpit modules and automotive floor and acoustic systems and is a leading supplier of instrument panels, automotive fabric, plastic-based trim, and convertible top systems. Headquartered in Troy, Michigan, we have a workforce of approximately 23,000 and a network of more than 100 technical centers, sales offices and manufacturing sites in 17 countries throughout the world. Information about Collins & Aikman is available on the Internet at http://www.collinsaikman.com .

*Cautionary Statement Concerning Forward-Looking Information*

The foregoing reflects the Company's views about the accounting investigation, its financial condition, performance and other matters that constitute "forward-looking" statements, as that term is defined by the federal securities laws. You can find many of these statements by looking for words such as "may," "will," "expect," "anticipate," "believe," "estimate," "should," "continue," "predict," "preliminary" and similar words used herein. These forward-looking

A100

statements are intended to be subject to the safe harbor protection provided by the federal securities laws. These forward-looking statements are subject to numerous assumptions, risks and uncertainties. Because the statements are subject to risks and uncertainties, actual developments and results may differ materially from those expressed or implied by the forward-looking statements. Readers are cautioned not to place undue reliance on the statements, which speak only as of the date hereof.

Various factors that may affect actual outcomes and performance and results include, but are not limited to, general economic conditions in the markets in which the Company operates, declines in North American, South American and European automobile and light truck builds; labor costs and strikes at the Company's major customers and at the Company's facilities; fluctuations in the production of vehicles for which we are a supplier; changes in the popularity of particular car models, particular interior trim packages or the loss of programs on particular vehicle models; dependence on significant automotive customers; the level of competition in the automotive supply industry and pricing pressure from automotive customers; risks associated with conducting business in foreign countries; and fluctuation in the price of certain raw materials, including resins and other petroleum-based products. In addition, the following may have a material impact on actual outcomes and performance and results: the results of the pending investigation; the Company's ability to maintain satisfactory relations with its sources of liquidity, suppliers, customers and creditors; the Company's high leverage and ability to service its debt; and the impact of any defaults under its material agreements and debt instruments.

The cautionary statements set forth above should be considered in connection with any subsequent written or oral forward-looking statements that the Company or persons acting on its behalf may issue. The Company does not undertake any obligation to review or confirm analysts' expectations or estimates or to release publicly any revisions to any forward-looking statements to reflect events or circumstances after the date of this report or to reflect the occurrence of unanticipated events.

<u>Contact</u> :   **Bryce Koth**                          **David A. Youngman**
           **Chief Financial Officer**             **Director Corporate Communications**
           **(248) 824-1520**                      **(248) 733-4355**
           <u>bryce.koth@colaik.com</u>             <u>david.youngman@colaik.com</u>

**COLLINS & AIKMAN**
**SUPPLEMENTAL DATA — PRELIMINARY EBITDA RECONCILIATION SCHEDULE**
(unaudited)

| | Three months ended December 31, | | Year ended December 31, | |
|---|---|---|---|---|
| | 2004 | 2003 | 2004 | 2003 |
| | (In millions) | | | |
| Operating income | $ (475) | $ 30 | $ (409) | $ 102 |
| Depreciation and amortization | 42 | 39 | 155 | 140 |
| EBITDA | $ (433) | $ 69 | $ (254) | $ 242 |
| Memo: | | | | |
| Goodwill impairment | $ 500 | | $ 500 | |
| Restructuring charges | 1 | $ 14 | 30 | $ 41 |
| Impairment of long-lived assets | 5 | 7 | 45 | 28 |
| Total restructuring and impairment charges | $ 506 | $ 21 | $ 575 | $ 69 |

This supplemental data presented above is a reconciliation of a certain financial measure which is intended to facilitate analysis of Collins & Aikman Corporation's business and operating performance.

EBITDA is defined as operating income plus depreciation and amortization. The company believes that EBITDA is a meaningful measure of performance as it is commonly utilized in the industry to analyze operating performance. EBITDA should not be construed as income from operations, net income (loss) or cash flow from operating activities as determined by generally accepted accounting principles. Other companies may calculate EBITDA differently.

###

**EXHIBIT 99.3**

[Collins & Aikman Logo]
Fourth Quarter and Full Year 2004 Results March 17, 2005
[Cover Page]
Safe Harbor Statement

This document contains statements relating to future results of Collins & Aikman (including certain anticipated, believed, planned, forecasted, expected, targeted, and estimated results and Collins & Aikman's outlook concerning future results) that are "forward-looking statements" as defined in the U.S. Private Securities Litigation Reform Act of 1995. Included in these forward looking statements are the company's views about the referenced accounting investigation. Readers are cautioned not to place undue reliance on these forward-looking statements and any such forward-looking statements are qualified in their entirety by reference to the following cautionary statements. All forward-looking statements speak only as of the date hereof and are based on current expectations and involve a number of assumptions, risks and uncertainties that could cause the actual results to differ materially from such forward-looking statements. Factors that could cause such material differences include, without limitation, the following: conditions affecting the markets and industry within which we operate, including declines in North American, South American and European automobile and light truck builds, our dependence on significant automotive customers, the level of competition in the automotive supply industry and pricing pressures from automotive customers, fluctuations in the productions of vehicles for which we are a supplier, changes in the popularity of particular cars and interior trim programs, labor costs and strikes at our major customers and at our facilities and risks associated with doing business in foreign countries; the adequacy of our liquidity and capital resources and required capital expenditures; our high debt levels and our ability to obtain financing and service or refinance our debt, uncertainty regarding our future operating results, prevailing levels of interest rates and other factors detailed in our filings with the Securities and Exchange Commission. This document also contains information regarding historical EBITDA and adjusted net income, non-GAAP financial measures. A reconciliation of EBITDA to U.S. GAAP operating profit is set out in historical EBITDA reconciliation schedules available in our press releases and filings, and a reconciliation of adjusted net income to U.S. GAAP net income is included in this presentation. EBITDA is defined as operating income plus depreciation and amortization. The company believes that EBITDA is a meaningful measure of performance as it is commonly utilized in its industry to analyze operating performance. The company believes that adjusted net income provides useful information regarding performance by adjusting for transaction artifacts and restructuring and impairment charges. EBITDA and adjusted net income should not be construed as income from operations, net income (loss) or cash flow from operating activities as determined by generally accepted accounting principles. Other companies may calculate EBITDA and adjusted net income differently.

[Page 1]

**CONFERENCE CALL AGENDA ITEMS**

[X] 15-Day 10-K filing extension -Credit Agreement Amendment in Process
[X] Preliminary Q4 and 2004 Financial Results
[X] Current Operational and Cash Management Highlights
[X] Results of comprehensive internal review of 2002-2004 supplier rebates and preliminary estimates of financial adjustments
[X] Preliminary estimates of 2004 goodwill write-off and tax asset impairment

[X] Heartland agreement to purchase majority of the Company's Textron-held preferred stock, and an option to purchase 100%

Case 1:07-cv-00265-SLR-LPS    Document 117-4    Filed 04/28/2008    Page 35 of 42

[Page 2]

**15-DAY 10-K FILING EXTENSION**
[X] 12b-25 filing results in automatic 15-Day extension
[X] Reasons for delay:
- Strong preference for integrated financial statement and SOX audit filing - Company and KPMG needed more time to complete combined reviews
- Company and auditors need time to review results of Company's internal audit of 2002-2004 supplier rebates
[X] Restatement of 2003 nine months ended September 30, 2004 is likely to be required.

[Page 3]

**PRELIMINARY FOURTH QUARTER RESULTS**

```
    [X]      Q4 recurring EBITDA(1) (2) was $73 million - down from prior
             year primarily due to significantly lower sales.
    [X]      Q4 EBITDA margin was 7.8% vs. 8.9% in prior year. Unrecovered
             material cost increases further pressured margins.
    [X]      Q4 2004 revenue of $936 million was down $77 million or 8% from
             prior year ($1,013 million) due to significantly lower Big 3
             volume on key programs
             Q4 EBITDA BRIDGE:
             ($ in millions)
             2003 EBITDA(1)..............................................  $ 90.5
             Changes due to:
             - Lower contribution from $77 million sales reduction (CM 22.5%)...............  (17.3)
             - Increased material prices........................................  (12.0)
             - Fixed cost reduction.............................................  $  6.9
             - In-sourcing, operating efficiencies mix and all other net subtotal,
               change.......................................................  $  4.9
             subtotal, change.................................................  $(17.5)
             2004 preliminary EBITDA(1)(2) ....................................  $ 73.0
(1) Represents EBITDA before restructuring and impairment charges.
(2) Preliminary estimate.
[Page 4]
Q4 2004 VS. Q4 2003 SALES BRIDGE
Q4 2004............................................  $   936
Q4 2003............................................  $1,013

Change in Sales....................................  $   (77)
% change...........................................      -7.6%
```

**MAJOR SALES VARIANCES BY PLATFORM**
($ millions)

```
    CUSTOMER & PLATFORM                     VARIANCE        EXPLANATION
    -------------------                     --------        -----------
    Chrysler 300C / Dodge Magnum...........  $ 40          New Model Launch - no LH Shipments in 2003
    Jeep Grand Cherokee....................  $(40)         Balance out 5/04
    Dodge Ram / Dakota.....................  $  (8)        Reduced Volume
    DCX Major Programs.....................  $  (8)
```

-2-

```
Ford Explorer...........................  $   (5)   Shift Reduction
Ford Mustang............................  $  (11)   No production due to Q1 05 Launch
Lincoln Aviator.........................  $   (8)   Reduced Volume
Ford Major Program......................  $  (24)

Cadillac DeVille........................  $   (4)   Reduced Volume
GMC Envoy...............................  $   (6)   Reduced Volume
Oldsmobile Program......................  $   (5)   Discontinued Vehicles
Chevrolet Venture / Pontiac Montana (Minivan)....  $  (13)   Slow Launch
Opel Program............................  $   (6)   Reduced Volume        `Q4 Big 3 NAFTA Volume
GM Major Programs                         $  (34)                          Change

                                                                              %(DELTA)
Mitsubishi Programs.....................  $   (5)   Reduced Volume   GM..............   -9%
All other...............................  $   (6)                   Ford...........   -8%
TOTAL...................................  $  (77)                   DCX.............    9%
                                                                   BIG THREE......   -5%
```

[Page 5]

**EBITDA(1) COMPARISON VERSUS PRIOR YEAR**
[GRAPH]
(1) Represents EBITDA before restructuring and impairment charges.
(2) Preliminary estimate.
NOTE: NOT ADJUSTED FOR VENDOR REBATE REVIEW

[Page 6]

**EBITDA(1) MARGIN COMPARISONS VERSUS PRIOR YEAR**
[GRAPH]
(1) Represents EBITDA before restructuring and impairment charges.
(2) Preliminary estimate.
NOTE: NOT ADJUSTED FOR VENDOR REBATE REVIEW

[Page 7]

**ESTIMATED 2004 PERFORMANCE DETAIL - TOTAL COMPANY**
($ in millions)

| | 2003 ACTUAL | | | | | 2004 ACTUAL | | |
|---|---|---|---|---|---|---|---|---|
| | Q1 | Q2 | Q3 | Q4 | YEAR | Q1 | Q2 | Q3 |
| Net Sales | $1,035 | $1,033 | $ 902 | $1,013 | $3,984 | $1,066 | $1,037 | $ 865 |
| Material Expense | 575 | 560 | 493 | 567 | 2,195 | 598 | 582 | 485 |
| Material Margin | $ 460 | $ 473 | $ 409 | $ 446 | $1,788 | $ 469 | $ 454 | $ 380 |
| % net sales | 44.4% | 45.8% | 45.3% | 44.0% | 44.9% | 43.9% | 43.8% | 43.9% |
| Direct Labor | $ 88 | $ 89 | $ 76 | $ 87 | $ 340 | $ 93 | $ 91 | $ 77 |
| % net sales | 8.5% | 8.6% | 8.5% | 8.6% | 8.5% | 8.7% | 8.8% | 8.8% |
| Variable Overhead | 157 | 149 | 138 | 150 | 594 | 162 | 143 | 138 |
| % net sales | 15.2% | 14.4% | 15.3% | 14.8% | 14.9% | 15.2% | 13.8% | 15.9% |
| Variable Contribution | $ 214 | $ 236 | $ 195 | $ 210 | $ 854 | $ 214 | $ 221 | $ 166 |
| % net sales | 20.7% | 22.8% | 21.6% | 20.7% | 21.4% | 20.0% | 21.3% | 19.2% |
| Fixed Cash Overhead and SG&A | $ 144 | $ 152 | $ 129 | $ 119 | $ 543 | $ 134 | $ 120 | $ 98 |
| % net sales | 13.9% | 14.7% | 14.3% | 11.8% | 13.6% | 12.6% | 11.6% | 11.3% |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Recurring EBITDA | $ | $ | $ | $ | $ | $ | $ | $ |
| % net sales ............... | 6.8% | 8.1% | 7.3% | 8.9% | 7.8% | 7.4% | 9.7% | 7.9% |
| Depreciation and Amortization .. | 33 | 34 | 34 | 39 | 140 | 37 | 36 | 39 |
| Recurring Operating Income ..... | $ 37 | $ 50 | $ 32 | $ 52 | $ 171 | $ 42 | $ 64 | $ 29 |
| % net sales ............... | 3.6% | 4.8% | 3.6% | 5.1% | 4.3% | 4.0% | 6.2% | 3.3% |
| Restructuring Charges .......... | 0 | 5 | 22 | 14 | 41 | 10 | 10 | 9 |
| Long-term Asset Impairment Charges. | 18 | 1 | 2 | 7 | 28 | 3 | 27 | 10 |
| Reported Operating Income ...... | $ 19 | $ 44 | $ 8 | $ 30 | $ 102 | $ 30 | $ 26 | $ 10 |
| %net sales ................. | 1.9% | 4.3% | 0.9% | 3.0% | 2.6% | 2.8% | 2.5% | 1.1% |

**NOTE: NOT ADJUSTED FOR VENDOR REBATE REVIEW**

[Page 8]

## TREND IN LTM EBITDA(1)

[X] LTM EBITDA(1) performance has rebounded significantly since the management change in August 2003, improving 10% from the Q2 2003 trough

**[GRAPH]**

(1) Represents EBITDA before restructuring and impairment charges.
(2) Preliminary estimate.
NOTE: NOT ADJUSTED FOR VENDOR REBATE REVIEW

[Page 9]

## PRELIMINARY Q4 RESULTS: CASH FLOW AND NET DEBT

[X] In addition to weak operating results, Q4 cash flow was adversely impacted by three items which generated $90 million in cash outflows. These outflows are being sharply curtailed in 2005:

| | 2004: Q4 | 2005 OUTLOOK |
|---|---|---|
| Core capex................................. | ($51.0) | Limited to $30 million quarterly |
| Net tooling cashflow...................... | (26.0) | Positive cashflow in 2005 |
| In-sourcing/Hermosillo investment......... | (13.0) | Negligible Treasury cash use in 2005 |
| Total Items........................ | ($90.0) | |

[X] Due to the above factors, expanded net debt (including factoring and fast pay) increased by 2.5% or $44 million in Q4.
[X] The continued shift of funding from off-balance sheet facilities to our revolvers and A/R conduit also caused covenant net debt to increase by an additional amount, rising by $62 million to $1,614 million.

[Page 10]

## KEY ELEMENTS OF C&A CASH FLOW PERFORMANCE

| | 2003 | | | 2004 | | |
|---|---|---|---|---|---|---|
| CASH FROM OPERATIONS | Q3-03 | Q4-03 | Q1-04 | Q2-04 | Q3-04 | Q4-04 |
| EBITDA(1) ..................................... | $ 66 | $ 91 | $ 79 | $ 100 | $ 68 | $ 73 |
| Cash Interest (Scheduled) ......................... | (13) | (65) | (13) | (63) | (13) | (41) |
| Cash Taxes ...................................... | (2) | (0) | (2) | (3) | (2) | (6) |
| Core Capex (Net of Leasing, Hermosillo and Insourcing) ...................... | (50) | (47) | (40) | (26) | (40) | (51) |
| FAS 87/106 Timing Adjustment .................. | 1 | (5) | 1 | (2) | (5) | (8) |
| Normal Working Capital Changes(2) ................. | (2) | (4) | (2) | 1 | 6 | (1) |
| Subtotal | $ 0 | $ (31) | $ 23 | $ 7 | $ 14 | (34) |
| ADJUSTMENT ITEMS | | | | | | |
| Restructuring Payments .......................... | $ (11) | $ (12) | $ (8) | $ (11) | $ (11) | $ (12) |
| Pre-Acquisition Final Warranty Settlement Payout ... | (3) | (3) | (3) | (3) | (3) | 0 |
| Discontinued Operations / Environmental Tails ...... | (9) | (3) | (3) | (3) | (3) | (4) |

A106

Q3 2004 Refinancing Fees, Expenses & Early
Interest

| | | | | | | |
|---|---|---|---|---|---|---|
| Other Net Cash In/Outflows(3) ..................... | 0 | 5 | (3) | (5) | (24) | (13) |
| Subtotal ..................... | $ (23) | $ (12) | $ (17) | $ (21) | $ (80) | $ (29) |
| **CASH GENERATION PROJECTS** | | | | | | |
| Factoring Programs ..................... | $ (1) | $ 46 | $ (17) | $ 9 | $ (28) | $ (4) |
| Sale/Leaseback of Facilities and Equipment ........ | 12 | 0 | 0 | 17 | 16 | 0 |
| Idle Assets Sales ..................... | 0 | 3 | 1 | 5 | 0 | 0 |
| Subtotal ..................... | $ 11 | $ 49 | $ (15) | $ 31 | $ (12) | $ (4) |
| Cash Flow Before WC Adjustments ................. | $ (11) | $ 6 | $ (9) | $ 17 | $ (78) | $ (67) |
| **WORKING CAPITAL ADJUSTMENTS** | | | | | | |
| Slower Customer Payments ..................... | $ (42) | $ 68 | $ (64) | $ (31) | $ 0 | $ 0 |
| Adjustment of Trade Payables Terms and Practices ... | (30) | (31) | (12) | (31) | 0 | 0 |
| Net Tooling Cash Flows ..................... | (3) | (33) | (13) | 36 | (31) | (28) |
| Other Working Capital Changes ..................... | (6) | (13) | 12 | 2 | (5) | 36 |
| Subtotal ..................... | $ (80) | $ (9) | $ (78) | $ (24) | $ (36) | $ 8 |
| Total Change in Net Debt ..................... | $ 92 | $ 3 | $ 87 | $ 7 | $ 113 | $ 59 |
| Net Debt ..................... | $ 1,343 | $ 1,346 | $ 1,432 | $ 1,439 | $ 1,552 | $ 1,614 |
| **MEMO** | | | | | | |
| Factoring Outstanding ..................... | $ 81 | $ 127 | $ 110 | $ 159 | $ 91 | $ 87 |
| Fast Pay Outstanding ..................... | 167 | 162 | 171 | 135 | 131 | 117 |
| | $ 248 | $ 288 | $ 281 | $ 294 | $ 222 | $ 204 |
| Total Expanded Net Debt ..................... | $ 1,591 | $ 1,634 | $ 1,714 | $ 1,733 | $ 1,774 | $ 1,818 |

(1) Represents EBITDA before restructuring and impairment charges as defined on page 1.
(2) Normal operating working capital is approximately 3.4% of net sales.
(3) Includes capital, inventory investment related to insourcing initiatives and Hermosillo capex.
NOTE: NOT ADJUSTED FOR VENDOR REBATE REVIEW

[Page 11]

## PRELIMINARY ESTIMATE OF EXPANDED DEBT BALANCE

| ($ millions) | 2003 | 2004 | | | |
|---|---|---|---|---|---|
| | Q4 | Q1 | Q2 | Q3 | Q4 |
| **NET COVENANT DEBT** | | | | | |
| Senior Secured Debt ..................... | $ 385 | $ 437 | $ 450 | $ 494 | $ 600 |
| Senior Unsecured Debt ..................... | 500 | 500 | 500 | 500 | 500 |
| Senior Subordinated Notes ..................... | 400 | 400 | 400 | 400 | 401 |
| Less: Cash on Hand ..................... | (13) | (4) | (11) | (4) | (6) |
| Subtotal: Reported Net Debt ..................... | $ 1,272 | $ 1,332 | $ 1,339 | $ 1,391 | $ 1,495 |
| Off-Balance Sheet A/R Facility ..................... | 74 | 100 | 100 | 161 | 119 |
| COVENANT DEBT ..................... | $ 1,346 | $ 1,432 | $ 1,439 | $ 1,552 | $ 1,614 |
| **OFF-BALANCE SHEET NON-RECOURSE ADVANCES AGAINST RECEIVABLES** | | | | | |
| Factoring Outstanding ..................... | $ 127 | $ 110 | $ 119(1) | $91(1) | $ 87 |
| Fast Pay Outstanding ..................... | 162 | 171 | 135 | 131 | 117 |
| Subtotal: Off-Balance Sheet Advances ................. | $ 288 | $ 281 | $ 254 | $ 222 | $ 204 |
| EXPANDED NET DEBT ..................... | $ 1,634 | $ 1,714 | $ 1,693 | $ 1,773 | $ 1,818 |

(1) Reported amount was $159 million. Excludes approximately $40 million due to
3 day late payment to factor from a customer.
[Page 12]
2004 EXPANDED NET DEBT BRIDGE
($ millions)
Q4 2003 EXPANDED NET DEBT................................................................. $ 1,634

-5-

A107

```
Cash from operations ...........................................  $     9
Restructuring payments .........................................     (43)
Discontinued operations / Environmental tails / Ford warranty ........     (19)
Refinancing fees and early interest ............................     (42)
Other operating cash flows .....................................     (45)
Net tooling cash flows .........................................     (36)
Other working capital changes ..................................      (8)
Subtotal .......................................................  $ (184)
                                                                  -------
Q4 2004 EXPANDED NET DEBT .......................................  $ 1,818
```

**NOTE: NOT ADJUSTED FOR VENDOR REBATE REVIEW**

[Page 13]

**TREND IN EXPANDED LEVERAGE**
($ millions)

| EXPANDED NET DEBT BALANCE(1) (3) | EXPANDED EBITDA(2) | EXPANDED NET LEVERAGE RATIOS(3) |
|---|---|---|
| ----------------------------------------- | --------------------- | --------------------------------- |

[GRAPH]

(1) Covenant debt + Fastpay and factoring balances outstanding.
(2) LTM EDITDA before restructuring + Fastpay and factoring expenses.
(3) Q2 2004 includes approximately $40 million adjustment to factoring balance due to 3-day late payment from Ford Europe.

**NOTE: NOT ADJUSTED FOR VENDOR REBATE REVIEW**

[Page 14]

**CASH MANAGEMENT AND TRADE CREDIT SITUATION**

- Payables terms with our major material vendors have not changed materially since September 30, 2004. The top 200 vendors account for 90% of our outstandings for productive material (NAFTA region):

| | CONTRACTUAL TERM (DAYS) | | | TREND IN DAYS PAYABLE OUTSTANDING* | |
|---|---|---|---|---|---|
| | MARCH, 05 | 30-JUN-04 | | | |
| Top 50 material vendors | 42.6 | 42.6 | 2002 | Q4........... | 63.0 |
| Top 100 material vendors | 43.2 | 43.2 | 2003 | Q1........... | 65.3 |
| Top 200 material vendors | 43.4 | 43.5 | | Q2........... | 68.0 |
| | | | | Q3........... | 63.1 |
| | | | | Q4........... | 65.9 |
| | | | 2004 | Q1........... | 65.5 |
| | | | | Q2........... | 61.7 |
| | | | | Q3........... | 64.8 |
| | | | | Q4........... | 68.3 |
| | | | | ------------------- | ---- |

\* Compared to LTM Cost of goods sold

- Nearly $60 million in fast pay funding for NAFTA Ford and Chrysler accounts has been eliminated since mid-Q4. Replacement funding has been successfully arranged thru a combination of direct customer initiatives to accelerate terms and thru an improved advance rate from the GE A / R facility.

- C&A has instituted a strict "pay your own way" policy for its largely non-debt bearing foreign operations (Brazil, Italy, balance of Europe). Compared to a $100 million outflow to foreign operations in 2004, all cash flow generated in C&A North American operations will now be reserved to service debt and trade creditors in the home markets.

[Page 15]

**OVER $880 MILLION OF LTM NEW BUSINESS**

```
Q1, 2004........................$115 million

Q2, 2004........................$450 million

Q3, 2004........................$140 million

Q4, 2004........................$175 million

-----------------------------------------------

TOTAL..........................$880 MILLION
```

### Q4 2004 AWARD HIGHLIGHTS

- Big Three Small Car: IP, Cockpit and Console in Europe

- Big Three SUV: IP, Console and Doors

- European Sedan: IP and Components

- Multiple Transplant Customers: Accessory Mats

- Transplant Pick-Up Truck: Plastic Components

[PAGE 16]

**RESULTS OF COMPREHENSIVE INTERNAL REVIEW OF 2002-2004 SUPPLIER REBATES SCOPE AND RESULTS OF REVIEW:**
- More than 350 supplier rebate entries reviewed for 12 quarter period
(2002 - 2004)
- Approximately 315 or about 90% were found to conform to relevant accounting standards (EITF 02-16) and the Company's internal policies and practices regarding rebates.
- $85 million of total supplier rebates booked to income over 2002-2004:
- About $69 million or 81% fully conformed to accounting standards and Company policy.
- About $11 million or 13% were deemed to be appropriate income items but needed to be booked over different, usually future accounting periods.
- About $5 million related primarily to capex discounts and should have been booked as a reduction to long-term asset basis. The remaining amount was determined to be uncollectible or inappropriately booked.

- These finding represent managements best judgments after an intensive and thorough review of all relevant information. However, these results are subject to final review by the Company's auditors and any required statements may vary from the ranges indicated.

[Page 17]

**PRELIMINARY 2004 GOODWILL & DTA IMPAIRMENT**
- Goodwill Impairment of $500 million
- As part of the company's annual goodwill impairment test, the implied goodwill has been determined to be less than the carrying value for two of our seven reporting units.
- U.S. / Mexico Plastics......$ 325 million
- Global Fabrics...............$ 175 million
- DTA write down of $177 million
- After analysis of the future taxable income and prior years results we wrote down the deferred tax assets related to U.S. and Italy.
- U.S............................$ 170 million
- Italy..........................$ 7 million

[Page 18]

-7-

(1) Composite index reflecting published prices for polypropylene, nylon 6,6, polyester resin, ethylene monomer, crude oil (WT1), and natural gas (Henry Hub). Indexed prices are use-weighted.

[Page 19]

**COMMODITY INFLATION COUNTER-MEASURES**
- The Company is pursuing a two-pronged approach to offsetting the impact of intensified commodity price inflation on its margins:
1. We are systematically informing each customer that we can no longer absorb these burdensome cost increases, and are proposing a comprehensive set of "recovery" measurers to each OEM. These proposals are based on the specific circumstances of our book of current business with each customer and include requests for:
- LTA or giveback deferrals
- Pass-thru of certain commodity increases (e.g. steel)
- Price increases for selective programs or business units (e.g. fabrics) which we deem to be unsustainable at current pricing
- Temporary surcharges or other relief for the cost impact of rising prices for fibers, resins, and other core commodities
- Shared cost savings from engineering, design, and material changes
2. Continued self-help initiatives including:
- Small parts in-sourcing
- Shifting of labor intensive plastic and metal components and assemblies to our low-cost Mexican and Brazilian operations
- Acceleration of vertical integration initiatives to reduce supply chain costs (e.g. internal resin compounding and reclamation, applique production, blow-molding, etc.)

[Page 20]

**2005 OUTLOOK**
- The Company is not prepared to provide detailed full year earnings guidance at this time. However, we can provide a general framework for our expectations based on current market and operating conditions which are extremely challenging and subject to rapid change. Specifically, we anticipate that:
- 2005 sales will be up modestly from 2004 levels
- The company will incur no restructuring charges in 2005, as our integration program is largely complete
- Full year EBITDA before restructuring and impairment is expected to meet or exceed comparable 2004 levels
- 2005 capex will be capped at $120 -$130 million --- well below 2004 levels
- During 2005, debt levels are expected to fluctuate around the Q4 level ($1,620 million)
- Regarding the first quarter outlook:
- Sales are estimated between $950 and $980 million, up significantly from Q4 results
- Q1 EBITDA is subject to major uncertainties --- particularly with respect to the magnitude and timing of our success with customer recovery initiatives.
- Given these constraints management's current judgment is that Q1's current EBITDA will range between $65 and $75 million

-8-

**HEARTLAND OPTION TO PURCHASE TEXTRON PREFERRED SHARES**
- Heartland Industrial Partners has negotiated an agreement with Textron Inc. that would give it and its assignees the right to acquire all of the Collins & Aikman Series A-1 and B-1 Preferred Stock currently outstanding.
- Heartland has committed to purchase a majority of the Preferred Stock for cash and an exchange of various securities and rights.

[Page 22]

Q&A
**COLLINS & AIKMAN MANAGEMENT**

[Page 23]

[COLLINS & AIKMAN LOGO]
**DELIVERING THE AUTOMOTIVE EXPERIENCE.**

-9-

**End of Filing**

Powered By EDGAR Online

© 2005 | EDGAR Online, Inc.

A111

Tab 12

 **Collins & Aikman** *Corporate Communications*

**Fourth Quarter and Year-End Earnings**
**Speaker: David Stockman**
**March 17, 2005**
**10:00 a.m. EST**

**OPERATOR:** Good morning and welcome to the Collins & Aikman <Company: Collins & Aikman Corporation; Ticker: CKC; URL: http://www.collinsaikman.com/> Fourth Quarter and Year-End Conference Call. At this time, all participants have been placed on a listen-only mode and the floor will be open for questions following the presentation. If you do have a question you may press star, one, on your touchtone phone at any time.

It is now my pleasure to turn the floor to your host, Mr. David Youngman, Collins & Aikman Director of Corporate Communications. Sir, you may begin.

**DAVID YOUNGMAN,** DIRECTOR OF CORPORATE COMMUNICATIONS, COLLINS & AIKMAN: Good morning, everyone. Thank you for joining us today and for your continued interest in Collins & Aikman. Hopefully all of you have had a chance to review our press release that was issued earlier today. If you have not you can access it through PR Newswire or from our website www.collinsaikman.com. As part of this call we will be referencing an investor presentation included on the home page and in the investor relations section of our website to assist in presenting our year-end summary results. A replay of this call will be available later today through 5:00 p.m. on March 24th, by calling 1-877-509-4471 and reference number 5776405.

But before I turn the call over to David Stockman, our Chairman and CEO, let me take a minute to read a brief statement. The matters discussed in this conference call may contain comments and forward-looking statements based on current plans, expectations, events, and financial and industry trends which may affect the company's future operating results and financial position. Such statements involve risks and uncertainties which cannot be predicted or quantified and which may cause future activities and results of operations to differ materially from those discussed. Historical results achieved are not necessarily indicative of future prospects of the company. For additional information we ask that you refer to the company's filings with the Securities and Exchange Commission for a specific listing of such factors and risks related to us. This call is also intended to be incompliance with both Reg FC and Reg G and is open to investors, security analyst, the media and other interested parties.

With that said, let's get on with the purpose of today's call by turning things over to David Stockman.

**DAVID STOCKMAN,** CEO & CHAIRMAN, COLLINS & AIKMAN CORPORATION: Good morning. I want to thank all of you for your interest and participation. Obviously we have some very important things to talk to you about this morning. Some recent developments that we want to explain and put in context. But I think a predicate for this goes without saying, the industry today is facing extremely challenging conditions, probably an environment that hasn't existed in the last thirty or forty years, at least according to almost anybody I can find in this town who has been in the industry for a long while. So we are in a maelstrom if you want to use that term both industry wide and we have in that context our own particular challenges at the company. But on the other hand as we go through the presentation today you can see that we have had some very constructive developments that will help us to manage the short term situation as well as some new initiatives that we believe will help to improve results as we go forward over the next several quarters. And we want to spend particular time this morning on our new initiatives to recover material cost increases from our major customers.

Now you know by now that we filed for a fifteen-day extension. We did not complete our work on the audit. We'll talk about why. We are in the process of talking about, talking to our banks about any amendment or waivers we might need in our covenant agreements. I want to say flatly, clearly, and unequivocally we will remain in

1

compliance with our covenants and we are confident that the banks will provide whatever adjustments may be necessary and that therefore our availability will remain intact. In fact we have already addressed that on the A/R facility and we'll get to that in a moment.

Since we haven't completed our audit what we are presenting today is management's best estimates of Q4 and our 2004 financial results. We believe since we are down towards the 95 to 98 percent completion level in our financial statements review that these represent our best shot at results and the likely outcome when we finish our audit.

We're also going to talk about our current operational and particularly some cash management highlights that have been of interest to investors in our securities as well as others in the marketplace. We have had a development in the last week which really was initiated near the end of our closing process in which we discovered that there were a few instances in which the flyer rebates, which are very common in this cost down pressure environment that we're in today, had been booked in a manner which were inconsistent with the accounting standards that are relevant and our internal policies and practices regarding supplier rebates and so we went through an extensive, round the clock five or six day review, of not only these items but of every single entry that we've booked over the last twelve quarters. That's three years worth of activity. We'll give you a summary result in a moment on management's best estimates of what the impact of that might be on our financial statements, but ultimately that will be subject to the final review by our auditors. We will be taking a write-off of good will and our tax, we'll be impairing our tax, deferred tax assets. We'll hit that briefly.

On the other hand, I want to say that notwithstanding some of the daunting challenges in the industry today and as a company as we try to manage this environment, we remain convinced and we remain convicted that we have a business model that can work and that we have a place in the industry where we can drive economically and in terms of our earnings and cash flow over time. For that reason Heartland Industrial Partners <>, of which I'm the founding partner, as you know, has reached an agreement in recent days with Textron <> that owns all of our preferred stock that it got at the time of the recent transaction. Face value today is around $300 million, we've reached an agreement to buy a majority of that stock and an option on the rest at a total price of around $45 million. So we will be able to take control of all of the equity, the preferred equity and our position in the common that the preferred equity for about $45 million or 15, 16 percent of its liquidation value. We see that as a very strong vote of confidence in our future as a company and in the strategies and initiatives that we're going to talk about now that we're undertaking to deal with some very unprecedented and some very unusual circumstances.

In our slides we'll turn to those now quickly, page three simply talks about the fifteen-day extension. There were really two reasons for it. One, our auditors felt that we were not finished frankly with our first annual SOX review and our auditors feel very strongly, and we agree, that the SOX review and audit and our financial statement audit ought to be an integrated process because one is designed to interact with and strengthen the other, and that in order to get the integrated review finished we would need more time. We filed for the extension. It's automatic and we'll be working hard to get that done.

What, compounded matters was in the very last moments as we were finishing our work this supplier rebate matter arose. We went full bore at it comprehensively with all the resources of the company to be sure that at least from a management point of view we had a good indication of what the extent of the issue is whether, it was a dump truck or a breadbox. We believe it's modest; we'll show you some indication of that in a minute, but we did not want to leave the marketplace guessing or lacking knowledge. We think there will be a restatement for the nine months of 2004 only. The slide here has a typo in it, it says 2003, but for the nine months of 2004 it's likely to be required and as that work is completed and our auditors come to their conclusions and sign off, obviously we will be doing those public filings as well as making the appropriate adjustments.

Now what I'd like to do is talk about our operating results in the regular way. You will note that in each of these slides beginning on page four we say that it is not adjusted for the vendor rebate review. I will get to that in the back. But I want to clarify that on each of these slides. I also want to clarify that since we haven't completed our audit and made our final SEC filings that these are preliminary results. They represent management's best estimate. We think they are solid judgments based on the fact that we are nearly at the end of the road of our audit process.

During Q4 our recurring EBITDA was $73 million. That was obviously down from prior years but that was primarily due to significantly lower sales. Our EBITDA margin also eroded slightly but again given the fixed cost

structure of the company we feel that we converted or flexed reasonably well given a $77 million decline in sales in the fourth quarter of this year versus the prior year, or 8 percent. A lot of that was due to Big Three volume. We'll get to a slide in a moment that will show you the other sources of that decline, which we think were kind of aberrations of the production calendar on certain big jobs where we have a lot of revenue content and those impacts were mainly third and fourth quarter. They will be reversing as we go into this year.

Nevertheless, we provided a little bridge for you so you can see that in Q3, or Q4 of last year we had $90.5 million of EBITDA before recurring, recurring EBITDA before restructuring and impairment charges. Our contribution margin as we have shown you over and over is around 20 percent for the sales decline in the areas that you will see on the next page. It's probably a little more than that, in particular because some of our so-called variable costs are sticky in the short run. So we think we probably lost about $17 million worth of contribution or EBITDA from the sales decline of $77 million. We're going to be talking more comprehensively to you today later about our material cost increases. We estimate those were in the range of $12 million in the quarter compared to the prior year. That was offset by fixed cost reductions that continue to improve our operating costs and our profit structure of $7 million during the quarter, as well as the beginning of some impacts from our in sourcing programs, operating efficiencies, mix, and everything else that reflects, impacts the bottom line. So overall we tried to claw back as much of the sales shortfall and the material increase as we could but $27 million was a pretty high mountain to climb, the impact of those two together, and as a result the net shortfall was $17.5 million. We believe we're coming in plus or minus around $73 million on a GAAP EBITDA basis for the quarter.

I won't spend a lot of time on the sales bridge other than to point out that some of revenue shortfall in the quarter of $77 million obviously stemmed from our dependence on the Big Three, which the bill was down about 5 percent as you can see over in the box at the bottom but I would like to highlight we also had what I would call aberrant seasonal or program change patterns in the second half of the year that affected our revenue in a big way. The Grand Cherokee that we had a lot of content on down south in June that was gone and near revenue in the second half. We are replacing a lot of that revenue with the build up in the LX and some other jobs that we have with Chrysler <Company: Daimler Chrysler; Ticker: DCX; URL: http://www.daimlerchrysler.com />in 2005 and future years. But that left a hole of large magnitude over the second half of last year.

One of our largest jobs with very large content as you know we make the convertible top on the Mustang at $700 or $800 content per built. Ford <Company: Ford Motor Company; Ticker: F; URL: http://www.ford.com/> basically after decades of producing the Mustang at Dearborn shut that factory down in May. The second half of the year there were no Mustangs produced. Now they are cranking up at a very rapid rate at the new factory in Flatrock where they share with Mazda <Company: Mazda Motor Corporation; URL: http://www.mazda.com/>. But again one of our key programs was sort of off the radar screen, radio silent, no revenue in the second half of last year. A similar situation occurred with the GM <Company:

General Motors Corporation; Ticker: GM; URL: http://www.gm.com/> minivan series. There's three or four different badges on that. We have a lot of content including the IP. That went in to balance out on the old one and a slow launch on the new one but that running at a very high rate. So you will see our revenue outlook for the first quarter is considerable better than the fourth because of these onetime changes reversing and notwithstanding some of the weakness that has been announced by the Big Three, that is all calculated into our revenue outlook at the present time. So that's the basis for the $77, and that is the basis for one of the big drags that we had on our results during the quarter.

Page six is the normal year over year charts. We have not been able to sustain our goal of year over year improvement but given the gale force of both the revenue and the material cost increase wind that was probably mission impossible, but we do believe that we converted reasonably successfully given the revenue base that we had a $936 million. Again margin was about 8 percent, 7.8. Much less than we would like it to be but again given the sales we believe the conversion was reasonably effective.

The next page is the details build up of our P&L that we wanted to provide to you each quarter. There's a lot of data here but I would just like to comment on the fourth quarter for about two or three items. One is if you look at the material margin notwithstanding the material cost increases we had a material margin of over 40 percent, 44 percent in the fourth quarter, sort of parallel to last year. And the answer to that is notwithstanding material increases we're beginning to see some of the benefits from our in-sourcing program. We're beginning to see some of the benefits

3

from multiple efforts to improve our material utilization, from efforts to substitute lower cost materials for higher priced in many cases version resins and also because, frankly, our product mix is a little better this year than it was in prior years. Our conversion costs, direct labor and variable overhead inside the factory were about, on a percentage of sales basis, parallel with last year, a little higher mainly because we're bringing in more work and we have more manufacturing content in some of our jobs.

Overall, our contribution margin was down 1 percent year over year, 20.7 to 19.7. We will be pursuing many initiatives that we'll talk about in a moment to get our contribution margin reliably above 20 percent because that's what we believe we need to run the company on in order to reach our EBITDA goals in the range of 10 percent. We continue to make progress. If you look at the next boxed item on our fixed cash overhead and SG&A it runs at $500 and some million a year. We were at $119 in the fourth quarter last year, $111 this quarter. That's a pretty good improvement, $8 million in the quarter, $32 million let's say on an annual run rate basis and we continue to benefit from all the restructuring and downsizing efforts that we've taken in the past. We have a little more to go in terms of impact on the dollars but we are getting our fixed costs down to a bare minimum and we think a sustainable level to run the company. Overall I think I would also point out that notwithstanding many of the challenges in the second half of the year our EBITDA came in prior to any restatements slightly higher than last year and higher, at a slightly higher margin.

The next slide is simply the LTM EBITDA so you can see the path. We're off course a little bit but we will be working on efforts to get back on a continued upward climb as we've done in the past. I want to talk a little bit about some unique items that affected cash flow and net debt in the fourth quarter. The main problem obviously was EBITDA shortfall for the reasons we've already gone into. But on top of that there were $90 million worth of cash outflows that converged in the fourth quarter that we're taking aggressive steps to ensure is not repeated and can't be repeated in the future. One is, CapEx peaked in the fourth quarter at $51 million for a lot of programs that were either being launched or in final buildup. We are undertaking and implementing a strict cap this year on CapEx of $120 million or about $30 million a quarter. So we think that item will not be repeated as we go forward.

We had a large outflow, net outflow for tooling in the fourth quarter. As you know most of our tooling is customer paid. We get paid at feedback or slightly thereafter. Sometimes feedback takes awhile after production starts. We then pay our suppliers. Usually it's a positive cash flow since we make a profit on most tools and because a lot of the tools we make ourselves and our cost is only running material and labor costs, that is tool steel and you know tool makers in our shops. Last year just to report the timing we had more disbursements to our tool supply base and collections. This year that should be reversed and will be significantly reverse of that in the first quarter. And that will be the normal expected pattern as we go forward, particularly as we push more and more of our tooling work into our two large tooling facilities, one for all of our skin and foam tools up in New Hampshire, at what we call TEG and secondly for all our injection molding tools here at Premier Mold in the Detroit area. So that item will reverse substantially. Then we did spend a significant amount of money in the third and fourth quarter on our in sourcing efforts both for inventory and for capital as well as some up front money for Hermosillo that you know the later investment is largely funded. The equipment by GE, the building is finished and occupied and getting ready for production. So with in sourcing more or less complete and Hermosillo now on its own independent funding source the use of cash for that should be negligible during 2005.

I'm only mentioning this because these items wound our debt as you can see by about $44 million on the total expanded basis including factoring and fast pay during the quarter and on a covenant basis not counting the off balance sheet facilities by about $62 million, the difference being the drift of our funding back to balance sheet revolvers and A/R facilities and away from fast pay and the factoring that's been underway for awhile.

Page eleven is the detailed cash flow that's in high test; it's the same cash flow statement that we present over and over. We did not achieve our goal of being cash positive. On this first line, cash from operations is sort of the bare bones structure that we try to run the company on, EBITDA, our cash interest which is fixed, our taxes which are low, CapEx peaked in the fourth quarter. That obviously contributed to the negative number that you see there. But that's something we'll be working very hard on to get back into the positive category as it has been for the last few quarters. We have restructuring payments and other outflows, particularly that other outflow relates to Hermosillo in sourcing and so forth. That will not be recurring next year. We have taken a million dollar restructuring charge, we expect to this quarter, and that will be it. And as we run off the balance of reserves next year these payments,

4

which were $42 million this year, will be rapidly declining, as will some of the other items on this page. Overall as you flow down the page you can see that led to a $62 million change in net debt, it says 59, there's a math mistake there. It should be 62. And then when we add in the factoring and the fast pay outstanding it's 44 and change. We'll talk on the next slide in terms of what's happening with those items.

We look on page twelve the key thing that's underway, and we'll talk more about how we're coping with it, is that our factoring outstanding at the end of the quarter was at a lower level because activity wound down in Europe but going forward it should be at a somewhat lower level than it was in the past because we're doing less factoring in Italy and other areas where activity is down. The big one that will change during the course of the year is fast pay. We are out of Ford entirely. The year-end numbers represented a partial exit of Ford. That was completed in January where, and it tends to run at about $25 million a year, or in outstandings as you know. At the end of January we got out of the Chrysler fast pay. That was running more like $35 million. I will talk separately about efforts that we have underway to replace these but my point is going forward there will be only the GM program in here, at least for this year, which will be in the $75, $85 million range. So our funding will be moving up the balance sheet towards our revolvers and A/R and also to improve terms with customers, and we'll talk about one large program we already have. Our funding requirements may well decline as a result of better terms.

The bridge on the next page is self-explanatory. This is expanded net debt. The whole thing, the whole enchilada as we say, where we were at the end of Q3 or Q4 '03, where we are now. Some of the large items that caused negative cash flow this year, as I've said before, should clearly not be repeatable. Our restructuring payments will be dramatically down. This is the cash side of it not the charge side of it. The large expenses that we had for refinancing fees and early interest when we redid the bond deal was a one time thing obviously and the net tooling cash outflow over the year, which was large again is a, very much an aberration from our inherent structural pattern on tooling and should balance to positive levels in the coming year. The next chart is basically just putting all of this in perspective. The EBITDA on here includes an add-back, as we've said before, for the discount on factoring and fast pay.

I want to talk a little bit about cash management and our trade credit situation. The world is sort of hair trigger and rife with rumors at the present but I want to assure all of you that we think we're doing a pretty credible and a pretty effective job at managing our trade, particularly our major material vendors and that's the critical lynchpin in our whole production process and supply chain. And what you've seen, what you see here is our top two hundred vendors of material of every type, raw material components, steel, fabricated parts and so forth for the NAFTA region which is the high share of our business. I want give you some indication of what the contractual terms were in days, let's say in June '04. We chose that as a good line in the sand to measure where we were with our top two hundred material vendors, 43.5 days. Where we are in March '05 is 43.4 days. The needle has not moved by detectible levels. So we have not had a deterioration in our contractual terms for most of our big suppliers, which again account for 90 percent of our outstandings and our purchases. On the other hand in this, let's call it hair trigger environment we're in, this environment that is rife with rumors there is a much more militant insistence up and down the supply chain that you get paid on time so whereas in the past we had the benefit of a little bit of float off the contractual terms increasingly we are attempting to be on time and frankly that is a two way street because we are doing the same thing with our customer base. We had the same float on our receivables outstanding to some degree as we had on our payables with the trade. We obviously were mindful of that in the past but now I would say we're getting more militant about that as we attempt to manage in a very difficult environment. So as we lose a little bit of trade availability from meeting the precise terms that we have with our vendors, we are also trying to offset that by let's say taking out or clawing back the float that we had on the receivables side of our equation and we're doing this with some good success.

I also wanted to put in context our payables outstanding. This is, again, LTM cost of goods sold. This is worldwide. This is a pretty good measure. You can see since the fourth quarter of '02 shortly after the company was formed we have obviously got seasonal variability in our days but it's floated up and down between 62 and 68. We were at the high end of that in the fourth quarter. We believe we're coming down. Some of that represents a lot of tooling on the balance sheet that may last, you know our tooling terms are particularly, usually feedback plus 90 days and sometimes we get billed early so tooling can dwell on the balance sheet for hundreds of days at some times. But overall the takeaway from this is that our days are within a historic band and we are managing both the terms of the trade contract terms as well as our days you know, I believe reasonably effectively in the environment that we're in at the moment. We've also instituted a strict pay your own way policy for our largely non-debt bearing foreign

5

operations in Brazil, Italy, balance of Europe and the way we're making ends meet there is basically going to the customers in a little more aggressive way than we have in the past and I have said North America is not going to be sending bundles of cash. You need to adjust your pricing or you need to pay us what you owe us or you need to accelerate some tooling or do other things in order so that Brazil, Italy, the balance of Europe can fund its operations as well as its investments from what it receives from the customers. That is a big change from last year where more than $100 million flowed into these foreign subsidiaries that carried only a very light piece of the debt and most of that is local. But we intend to implement that policy as a way of getting back into better alignment with our customers in terms of having them pay the bill and support the cash requirements of our non-interest bearing operations.

I won't spend a lot of time on new business. There are more critical issues here but I do want to emphasize that we booked again kind of a standard amount of new business and very large programs and also smaller ones, both in Europe with transplants with the big three in the fourth quarter. And our total bookings for the year are well in excess of what we need to replace our business and therefore continue to grow.

I want to spend now a minute or two on the results of our review and it was comprehensive, it was top to bottom of each and every one of the supplier rebates that we booked over the entire twelve quarters from '02 to '04. This originated late in our process as I indicated at the beginning because we found a few cases where the entries seemed to be not consistent with both accounting standards as well our internal standards and practices. Rather than investigating a few we decided in this environment where the same issue is occurring in many other companies in the supply base that we needed, the prudent thing to do, the right thing to do and the proactive thing to do was to you know go back to ground zero let's say, January 1, '02 when the company first came together after the merger in late December and look at every entry that we've made during that period. So we reviewed, got all the documents, had a large group of people, around the clock effort as this was an eleventh hour requirement initiative. We reviewed three hundred and fifty entries that had been made over that period. About three hundred and fifteen, or 90 percent of these were found to conform to relevant accounting standards, particularly EIPF0216, it's a mouthful but some of you who follow this know that that is the operative standard that relates to the matter of customer consideration, including rebates on material purchases. And we also reviewed all of these against our own internal policies and practices regarding rebates.

Now, 90 percent of these we've found to be in conformance with both company and external audit standards. In the totality of what we reviewed $88 million, $85 million total supplier rebates were booked to income over 2002 to 2004, including some that had been tentatively booked for the fourth quarter, which as you know is not yet closed. About $69 million or 81 percent of these bookings fully conform to accounting standards, both external and internal and there was no issue. About $11 million or 13 percent, and there's a lot of items in here but in dollar terms about $11 million were deemed to be appropriate income items but needed to be booked over different accounting periods, usually spread into the future if there was any element of contingency or possibility for a supplier to recover or get repayment. We basically concluded that we needed to amortize these items rather than book them in the quarter. And then there were about $5 million, a small amount was the total in items that related primarily to CapEx discounts and should have been properly booked. They were valid. They will save the company money but they should have been booked as a reduction in long term asset bases not as an offset to operating expense. The remaining amount we determined, and it's a small amount, to be uncollectible or inappropriately booked.

So overall this is management's best effort. It was comprehensive. It was intensive. It covered everything. It left no stone unturned but it is our assessment at the moment and as we indicated that may lead to a restatement of (inaudible) magnitude in '04. That is yet to be determined. But overall we have some issues in terms of our process that we need to address next. But we wanted to get a little information to you to indicate the four walls dimensions of this, which we believe are limited. Nevertheless these findings represent management's best judgment after what I've just described in the intensive and thorough review of all relevant information. These results obviously are subject to final review by the company's auditors and any required statements, or restatements I should say may vary in the ranges indicated. We will also have a good will impairment. We have seven reporting units for 142 impairment analysis, five of these were OK, two of them will require impairments based on the standards that are used. This is all non-cash. It is essentially a balance sheet adjustment and particularly in the sub case of fabric that business is under a lot of pressure and it was determined that most of the will is not sustainable. We will also have a write down of our deferred tax assets, mainly because of the inability to use that during the three years in front of us. I might say though that it will reduce our effective tax rate as we go forward into the future.

6

What I want to spend the last couple of moments on is the raw material increase challenge we faced and what we're doing about it. We can see here that we've given you some idea of the year over year changes in the major raw materials that we purchase. I want to be clear that this is what I call a freeze frame chart and these raw material prices are changing every day so essentially what we did was go to January 1, '04, put a pin on the board and then we went to January 1, '05, what we have in our current standard, what we're paying this minute as we speak and what we built into our forecast and outlook for the year. And you can see that in some of the heavy items that we used, there's 100 million pounds of polypropylene for instance, we're up 68 percent. SBR, which is synthetic rubber which goes on all our mats, accessory mats, it's almost impossible to get it in the world today there's such a severe squeeze and shortage. We think it's temporary but at the moment it's there, up 61 percent. We use a lot of polyethylene to back all of our carpets and we use a lot of it and you can see as we go across with the various resins that there are considerable increases across the board.

Now, on a freeze-frame basis, Jan. 1 to Jan. 1 this amounts to about $80 million or 2 percent of our sales. On the other hand this is not going to get us with a tidal wave coming over the deck in Q1 this year or in 2005 because this has been creeping into our system you know one case, one commodity, one supplier at a time over the last year. Some of the stuff we buy on (inaudible) has been rising. Some of big resins are on indexes to the underlying feedstock. Those took a big upward push in Q4 and we're now at a level that we think is flattened out and may, can obviously rise or it may come down. But we're at a, what we think is a flat total level. In many cases we had contracts with different anniversaries. Not all of them were December. Some of those contracts were renewed at higher levels. It was necessary. We had no choice in order to keep the material going. Some contracts will re-open because we usually have re-openers with some of our bigger suppliers and they took advantage of that (inaudible) type of circumstances given the massive increases in their feedstocks and so we had to negotiate some new prices in some cases late in the year or with an inception date of January 1. Now, the net of this is that as I said earlier in the fourth quarter about $12 million, or on an annual run rate basis $48 million of these freeze frame shot of commodity price changes on a year over year basis was in our numbers, was in our cost base so that it is already sort of baked in. We think this quarter it will be at about a $20 million run rate, or $20 million in the quarter. The $80 million run rate will be fully effective this quarter so relative to fourth quarter we'll have another increase in material costs baked on top of the fourth quarter of $8 million. $12 million in the fourth quarter within the quarter, around $20 million in the first quarter in the quarter and then as we go through the year the comparisons will be easier against the prior year as we move towards later quarters when these costs begin to hit our cost structure and our purchase orders.

Now, what are we doing about this, that's the important thing? We've got a two-pronged approach that we're quite encouraged and we're quite, and strongly I should say committed to implementing in an aggressive way. One of them is two pronged. The first one is very clearly the following. We are systematically informing each customer that we can no longer absorb these burdens and cost increases for fiber and resin and steel and a lot of the other commodities we buy including rubber and foam and are proposing a comprehensive set of recovery measures to each OEM. These proposals are based on the specific circumstances of our book of business and our mix of products and our exposure to raw materials, which varies from customer to customer, but they are tailored to each customer. But they all tend to include requests for the following type of time, one if we had contractual LTA's, Long Term Agreement price reductions were seeking a deferral into the future well beyond this year. We had made prior year give back commitments for this year. We're seeking deferrals or reversals of those pretty much across the board. Secondly we're seeking pass through of certain commodity increases that are so large that they're simply no way to cope with them. That would be the case with steel and all our stamping car beams and so forth. We have had to put our steel suppliers on surcharges. We'd like to pass those through. And in some cases the customers do have steel resale programs where we can put our supplier directly on the customers program and avoid the price increase. Some of that is happening right now as we speak. The third thing we're doing is we're looking for selective price increases on certain programs or business units like fabrics, which we deem to be unsustainable at current pricing and we are aggressively pursuing in a number of cases major price increases to get ourselves right in terms of the turn on capital coverage costs and so forth, both within certain business units as well as in some major programs.

Generally, we are seeking temporary surcharges or other relief for the cost impact of rising prices for fibrous resins and core commodities outside the special cases where we're looking for direct price increases. We continue to try to work with the customers on sharing in a more balanced or fair way any cost savings that may come from

7

engineering and design, material changes, normal VAVE activities that go on day in and day out. While we're doing this and this is our major focus at the moment and we have packages of what we call the recovery or sustainability package in front of all of our customers or will have in short order. We are obviously going to continue on our self-help initiatives, including many things that we've talked about before that I don't need to cover now. In sourcing, shifting operations, labor intensive operations in Mexico and Brazil, continuing to harvest the benefits of our vertical integration.

I would like to now talk about the outlook and I have to say very clearly and frankly with you today we are not prepared in this, I wouldn't say turbulent but it's something close to that, environment we're not prepared to provide detailed full year earnings guidance in a conventional sense down to the net income level at this time. However we can provide a general framework for our expectations. We're not about to allow our important investors and constituencies to be looking into darkness as go into the future. But we can give you a general framework for our expectations based on current markets and operating conditions, which we have to caution and all of you know are extremely challenging and subject to rapid change. Having said that, specifically we anticipate that 2005 sales will be up modestly from 2004 levels notwithstanding some of the production cutbacks at Ford and GM in particular that we've already factored in. We're getting fortunately some production increases at Chrysler on the LX and other vehicles where we have a lot of contents. So we factor in our best view of production levels in the industry will be up over last year primarily because we've got additional business booked, particularly in Europe and we're getting some recovery in Brazil that we didn't have last year. Secondly we can say with unequivocal certitude the company will be taking no more restructuring charges in 2005 as our integration program is largely complete. We need to run off the cash balance in our reserves, which will take few quarters, and then we'll be out of that burden. So from an income statement and a cash point of view full year EBITDA before restructuring impairment is expected to meet or exceed comparable to '04 levels and that is without any, and that is under an assumption that we have not yet made any progress in getting substantial recovery or sustainability relief from our customers of the type that I just mentioned.

CapEx, as I mentioned a moment ago will be strictly limited, 120, 130 kind of range. Hopefully at the lower end of that and it's well below last year's level, which you know was more than $160 million. We do not have a precise estimate of where our debt will be in this environment quarter to quarter but we do believe that with the fundamental business plan that we have in place it should be fluctuating around the Q4 level, up or down based on season and timing, a variety of factors as we go forward. Regarding the first quarter outlook we think sales are estimated, sales are between 950 and 980. We have pretty good visibility on that. Those will be up significantly from Q4. EBITDA is still subject to major uncertainties, particularly with respect to the magnitude and timing of our success with customer recovery initiatives. But nevertheless given these constraints we want to give some range and we believe that the likely range will be on a GAAP EBITDA basis in the $65 to $75 million dollar range. Here I wanted to stress, and I haven't before that we have made in conjunction with the cash management some major strides in the last few weeks in improving our ability to manage in the current environment. We did get an amendment to our A/R facility that GE now manages. That has a higher advance rate. We've got $200 million in collateral in that. That advance rate gives us additional liquidity. One of the large customers we have that we have lost fast pay on so you can take your pick here has put into place what I would call a shortened term program that will allow us to collect cash for a billion in shipments almost at the same rate of seventeen days on an average basis that was practiced during the fast pay period. So that has helped. So we have made some major strides in collecting cash that was owed to us by customers from toolings, for issues that were in some cases three months or even two years old that hadn't been resolved but in this environment we're finding that the bureaucracy on our customer's side is starting to move much more rapidly, issues are getting solved and that is another source of positive cash inflow that we have coming in to manage in the current environment.

I mentioned at the beginning the tax drawn shares. I don't think we need to go into that again except simply to affirm one, as I said we were able to purchase these shares, or purchase an option for all of them at a very, very attractive rate. Secondly we did that because at Heartland Industrial Partners we believe that we have a viable business, we have a solid business model that we can manage in the current environment that we're in and that we intend to go forward and do that and we wanted to obviously own more of the equity if we could. This will give us a huge increase in our position in the combined preferred and common equity of the company.

A119

So with that I'm sure there are a lot of questions and we'll be happy to turn the meeting open now for questions. I would like to say that if we could have one main question from each person that would allow us to give more people a chance to raise a question.

OPERATOR: Thank you. The floor is now open for questions. If you have a question please press star, one on your touchtone phone at this time. If at any point your question is answered you may remove yourself from the queue by pressing the pound key. We do ask that while you pose your question that you pick up your handset to provide optimum sound quality. Your first question is coming from Adam Plissner with Credit Suisse First Boston <Company: Credit Suisse Group; Ticker: CSR; URL: http://www.csfb.com >.

ADAM PLISSNER, CREDIT SUISSE FIRST BOSTON: Morning.

DAVID STOCKMAN: Yes, Adam?

ADAM PLISSNER: One question, huh? Let's start with...

DAVID STOCKMAN: You can have multiple parts but only one question.

ADAM PLISSNER: OK then, let's maybe work with liquidity. Can you tell me where your current liquidity stands today as you're, you said you're in discussions with the banks and once you expand I guess you're looking to get a covenant waiver where do you think your liquidity would be and how comfortable are you going to be with that?

DAVID STOCKMAN: Well, in the current environment cash management liquidity is a challenge. I would be remiss if I didn't state that very clearly. On the other hand, we have done some things already that I want to underscore. We have met with GE and we received a waiver so that the fact that we're late in our filing will have no impact on our A/R facility. As you know that is our major source of funding at the moment because as we moved off fast pay we moved a lot of our funding into the A/R. So that is solid. We are in discussions with the banks. We can't promise anything and I want to be very careful about this but we've had very good success in the past with the banks in getting either temporary waivers or adjustments to our covenants, particularly leverage covenants where we could demonstrate that we needed it. And given the local level of senior secured debt we have on the company, a little over two times we believe the discussions, which will start next week will give us what we need. So therefore we are reasonably confident, in fact I would say strongly confident that our major finding facilities will remain available, our two revolvers, our A/R facility. And in addition to that we have had some major pushes that are producing results here as you get into crunch time. You can get results in terms of collecting a major amount of cash from customers that simply represented tooling that was due or past commercial claims. And you know given the size of our company small arguments can turn out to be large amounts of dollars. So we've been collecting tens of millions of dollars from our customers in order, and it wasn't charity by any means, it was what we were owed in order to help manage. So with that environment we believe that we have with those things said regarding the A/R, regarding the bank facilities, regarding the inflow of cash and also regarding the big program, the benefit that we got from our largest customer in terms of going from regular terms which would have been about 46 days to short terms which are about 17 or 18 days. All of those items together have given us a way to manage or credit that are trade based and meet our obligations.

We did have a build up, we'll say very directly here of some backlog of our payables early in the year when the two fast pay programs disappeared at the very time that our interest payments, which you now all know are crunched into a shorter period of time. The bad thing about refinancing, it was mainly good because we got our maturity settled up through 2010 but the bad thing about our refinancing last summer was a coupon sixty days, I mean six months after the close so now all our coupons and our ninety-day bank payment are all within forty business days. One coupon pays December 31, the other one about December 15. We pay them all and then we have our ninety day b loan interest right in between. So now we're going to go through twice a year a period where about $55 million of interest is due. This year we can manage that but this year it came right on top of the roll off of fast pay with two customers and on top of an industry environment where production started up late and the rebuilding or our normal A/R receivables collateral lagged. We backed up some of the trade. We're now rapidly working down the backlog that maybe some of the noise that some of you have heard but we went through our terms with our largest vendors as you saw and I'd say unequivocally that we are current and we are current with most of our large vendors. We are not having any CBD or other issues that would fundamentally change our ability to manage liquidity. We

9

are having some head knocking contests but we're getting good support from the customers where people are trying to unilaterally change the terms, payment terms in our purchase orders for no good reason, but if we're current that is and we've had very strong support from the customers on that. Some small suppliers just because of skittishness about the general industry conditions for understandable conditions have decided that they really want to exit the industry or at least business with us. So until we get them replaced some of the small suppliers have been given better terms but the deal is you get better terms and then you better find a new customer because you won't be with us for any extended period of time.

ADAM PLISSNER: I guess given all that your revolver availability as of today, what was the number, David? Is there a number you can give out?

DAVID STOCKMAN: Well, no, we don't, we're not going to discuss you know in a public environment the day to day details you know of our financial…

ADAM PLISSNER: Then let me ask this. In your plan right now is there anything that you just went through I think that was helpful but is there anything that you see your cash needs coming up, you certainly took us through some of the things that will be reversing that were big cash drains in 2004, as you play out your 2005 plan and you approach even the condensed coupon period and interest payment coupon period that comes up in I guess it's June and August is there anything that you see as a trigger that could prevent you from paying that out, continuing to maintain…?

DAVID STOCKMAN: No, I think, as you know, there are a lot of rumors in the market, the number of days that allegedly we were have supposed to have filed equal about the number of days in the last sixty days, none of them are true. The short run aspect that I would make here is that once we get through our concentrated coupons if we can use that term for shorthand we then have an extended period of time, almost 135 business days where we can replenish our liquidity just from operations, no material interest payments late in the back half of February, March, a small one in April, just a ninety day debt on the B loans in May and non until the end of June. So we're now in what I would call a productive cycle, industry volume is picking up just seasonally and on top of that we have no interest obligations and so we can use that period to rebalance our operations. We will obviously not be affected as we go into the next concentrated coupon with the roll off of fast pay or those kinds of issues and we expect to be managing our cash flow in a way that will take care of that environment.

But the big thing I want to stress over and over here is that the management team and the sponsors of this company have a large cash investment and we are making more on the basis of this referred stock announcement that you saw this morning. We basically expect to get a recovery of our investment and a return and if that's true then of course it has to be true that anyone above us in the capital structure should be able to count on their coupon and their principal and that is the commitment that we give you today. We will make this work and we think it will work and we are putting in place whatever supplemental mechanisms that, and policies that we need in order to make it work including taking a much more aggressive approach in terms of getting both cash and, or income statements or cost relief from our customers on the material side of the equation.

ADAM PLISSNER: Last thing, David, the EBITDA forecast that you gave is that number include the pension income that you referred to last quarter is it also in Q4 and what would be your net impact of the revenue?

DAVID STOCKMAN: The pension income is in there. It's about $42 million for the year. It's running about $10 million a quarter. In the fourth quarter we also had pension income in the number. It was slightly smaller. I think in the order of $7.8 million in the fourth quarter.

ADAM PLISSNER: And the full $80 million of revenue is that included in your EBITDA guidance? Is that the gross impact or is there a net number that you could give us that you update?

DAVID STOCKMAN: Well, you know, what I was trying to tell you was than on a Jan. 1, '04 to Jan. 1 '05 because the only way you can measure this is on a freeze frame because every commodity is having a price increase at a different time and some of them you know in multiple stages over time. So yes relative to January 1, '04 it's all baked in. But relative to where we were as we came out of the fourth quarter in the numbers that you see here today upwards of $45 to $50 million of that increase was already baked in to the numbers, the incremental we'll get it this

quarter. I've estimated about $8 million, or $12 million in the fourth quarter, about $20 million from the starting line January 1, '04 in the first quarter. So there is a, and don't get too literal about this but there is another step of about $8 million in the first quarter sequentially over the fourth quarter. But I can say right now as we look at the environment we've had no significant except from very rare unusual commodity cases pressure for further price increases since the beginning of the year. The issue is more coping with what's out there now. In some of the markets that we're in you can begin to see a little nit of flattening out or even downturn. So I can't predict the commodities future or I should be a commodity trader. But we do feel that we've baked in pretty well a reasonable estimate of kind of the (inaudible) peak of these material prices that have kind of drifted and crept into the system over the last twelve to fifteen months. We haven't baked in any significant recovery from the customer initiatives. You can't count on that until it happens. It will be difficult. It's a very delicate balancing act because you want to be both aggressive and firm and on the other hand you want to continue to maintain or expand the business you have. But we have shifted the emphasis quite considerably, quite substantially from obtaining business in the future to obtaining a fair margin or price for the goods that we're delivering today.

ADAM PLISSNER: I appreciate it. I'll get back in the queue. Thanks.

DAVID STOCKMAN: OK, next question please.

OPERATOR: Thank you. Your next question is coming from Monica Keany with Morgan Stanley <Company: Morgan Stanley; Ticker: MWD; URL: http://www.morganstanley.com/>.

MONICA KEANY, MORGAN STANLEY: Good morning.

DAVID STOCKMAN: Yes, good morning.

MONICA KEANY: I wanted to touch back on the liquidity situation. I know you won't give us sort of what the current situation is right now but I guess it says in the press release that it was $86 million...

DAVID STOCKMAN: Yes.

MONICA KEANY: ...at the end of the year. Could you break that down for us in terms of the revolver, what were the LCs against that and how much of the securitization you could draw on?

DAVID STOCKMAN: Yeah, we could, I think the simple answer unless you want more details is that there was, in that number there's about $5 million worth of cash, the rest is what's available on the revolvers net of the LCs. The LCs, John Gallante is here, about 50 some to date...

JOHN GALLANTE: Approximately $55 million.

DAVID STOCKMAN: The total revolver availability is on the two, John, what's the total?

JOHN GALLANTE: Total facilities are 275.

DAVID STOCKMAN: Yeah, 275, so you got to back out 50. The remainder is what we can use in our operations. So the A/R is a little bit different. The A/R basically fluctuates depending on the ebb and flow of receivables from day to day. But the key point we would make on that is it's our most attractive facility, we're getting a much higher advance rate on it now and so we use that as our device of first resort, we would not ever, we would not expect to have excess capacity on that, availability. We do have a lot of capacity. It has now been increased to $300 million so we would use that as our primary funding means because it is the most attractive facility we have.

MONICA KEANY: So you have the A/R securitization?

DAVID STOCKMAN: Well, that we do it as not out of a necessity but out of pressure. It's the best place to fund but that one does fluctuate and the revolvers are more for back up liquidity. Now what I'm saying at the present time is that between you know using to the full extent of collateral availability at the higher advance rate in the mid seventies that we have today the GE facility and with the cash collection efforts that we have underway with our

customers and with the management of our payables environment with the very sharp limits that we have on CapEx we have sufficient liquidity to manage our operations. It should be apparent because all the rumors that have been around for the last two months have proved to be totally false and I can just tell you right now they will continue to be as we go forward. We're in a very good position over the next few weeks and months to improve our liquidity because as I said before we have no interest payments operating cash flow can be used to you know settle down our back log and to build some additional cushion.

MONICA KEANY: But you said in the first quarter the company's cash requirements increased? So should we expect...?

DAVID STOCKMAN: No, I didn't say that, Monica. What I said was...

MONICA KEANY: No, the press release, I'm just looking at.

DAVID STOCKMAN: Yeah, what I said was that during the first half of the first quarter we basically were in a forty day window and let me just put it forty-five days very explicitly from December 31 where we had our senior ons (ph) coupon which is, you know, $31 million and then because of the new schedule we're on we had our ninety day LIBOR payment and on the B loan in the range of $6 or $7 million early, February 5th or so and then on February 14th because of the new schedule we're on the senior sub state, all those coupons were paid, everybody in the marketplace knows that. That was another $26 million so in that forty day, forty-five day period we had $56 million in interest payments in this concentrated coupon quarter that I mentioned that we didn't have before. We managed those but that happened at the very same time that we were in transition on three things, one the fast pay at our big customer went away, the (inaudible) program, the short pay, or rapid pay lets call it is starting up so we had a bit of a gap there. Ford had rolled off and we were working that into our A/R. And in addition, you saw when you filed the amendment on the GE A/R facility that wasn't until late in the month after we had gotten through this forty-five day window of interest payments. So that's early in the quarter. Now as we go through the balance of the quarter we're working our way back from that environment. So I'm not suggesting at all for the quarter as a whole substantial negative cash flow. I was just trying to talk about the environment we had, which I think was pretty unique in the first part of the quarter. Why that gave rise to some back up in our trade payables. Maybe some rumors in the marketplace and we gave you the context for what we're trying to do to manage it. And now that that quarter of interest payments is behind us...

MONICA KEANY: Right and that seems very clear. You had a lot of cash needs at the beginning of the quarter, which should abate, but I guess my question is intra quarter are you tapping out your liquidity? (Inaudible)

DAVID STOCKMAN: No, we are not tapping out by definition our liquidity. We are managing our financial situation we think quite effectively. We are getting help from customers. There is a tendency in this environment for some suppliers to simply for their own reasons of financial risk to try to unilaterally alter the terms of contracts that we've agreed to. We're rejecting those demands and we're getting pretty good back up from our customers. So you know I don't know what I can tell you more than we have managed through the worst pressure that we have for the reasons that I gave and we can now continue to manage as we go forward and we think we'll get whatever cooperation we need from the banks in terms of access to and availability of our funding (inaudible).

MONICA KEANY: But what I'm hearing from you is intra quarter you don't tap out the revolver. You don't need to use that whole revolver?

DAVID STOCKMAN: I don't, you know, I think I've tried to answer the question four different ways and the answer is I can't obviously track day to day how much the revolver we're using or not. It's just the backup tool we have. We'll use it as we need it and we are, our monthly pattern, you know this fluctuates enormously. We get our revenue at the end of the month in large part. We get a lot of payments early in the month because we're on (inaudible) 36, which is the sixth of the month with a lot of our trade. So day-to-day financing management is what (inaudible) does. I don't think it's anything that bears on our prospects over any material period of time.

MONICA KEANY: OK, and then my last question is...

DAVID STOCKMAN: No, it was supposed to be one question altogether so I'll take this is as a last shot, OK?

MONICA KEANY: OK. Am I right in understanding that if you needed to raise incremental debt outside of this current credit facility and putting aside foreign debt can you raise $15 million?

DAVID STOCKMAN: Yes.

MONICA KEANY: OK, is that the maximum?

DAVID STOCKMAN: No, it depends on some fairly complex measures in the indentures but either we have built into our B loan the capacity to expand it. There is a market obviously for second lien. We have the capability of moving in either of those directions and raising significant cash if we felt we needed to.

MONICA KEANY: OK, thank you.

OPERATOR: Thank you. Your next question is coming from Kirk Ludtke with JP Morgan <Company: JP Morgan Chase & Company; Ticker: JPM; URL: http://www.jpmorgan.com/>.

DAVID STOCKMAN: Kirk, go ahead.

KIRK LUDTKE, JP MORGAN: Hello, guys. Yeah David, I'm on slide fifteen. It's the slide that talks about the trades?

DAVID STOCKMAN: Yeah.

KIRK LUDTKE: And I just want to make sure I understand it cause I came away hearing that you thought that your days outstanding would converge toward, closer to these contracted terms.

DAVID STOCKMAN: Yeah, over time. Yes.

KIRK LUDTKE: You know, that's an awfully big gap there, right? That a…

DAVID STOCKMAN: That's a total misinterpretation.

KIRK LUDTKE: OK.

DAVID STOCKMAN: I think it's a fair one and you try to get too much information on one page and could lead to mis-conclusion. You know, when you look at our total trade that's against COX, that's just a common measure whereas the contractual terms are actually on, our material vendors mainly raw material, resins, fibers, parts, steel, stamping and so forth. What changes the picture is the left hand if s North America, the right hand includes all of Brazil, all of Europe but more importantly is includes all our CapEx capital items and as, you know, (inaudible) year we spent a lot of money on our capital and our tooling. And at any given time we've got $150 million tooling running through our system. Now in our payables we can often have hundreds of days outstanding on tooling because our basic term is p path plus ninety days but often we get billed, as I said before, even before p path. So the tooling biases this up substantially. A lot of our CapEx programs are really very complex programs with multiple stages so we may have a billing in the system but it's subject to a variety of stages of completion, delivery to our floor, run it rate tests, post start up of remediation of items that are not meeting the specs. So a lot of our capital which is also in our comprehensive payable terms, (inaudible) in the company on a GAAP basis can have hundreds of days sit on the balance sheet for hundreds of days before they are really resolved. So that's why you see the difference between what we've narrowed in on, the biggest trade material vendors which are the keys in terms of having difficulties with operations but also the outstandings simply as a major over time of the global totality of the company. Everything that is on our balance sheet is classified as a payable and as you can see that has cycled up and down but within about a five day range over two and half years. Majors on every payable in there against the cost of goods sold on a worldwide basis. So you really can't bridge directly from one to another.

KIRK LUDTKE: Thanks. It sounds as though your trade terms; you expect your trade terms to contract…

**DAVID STOCKMAN:** No, not really. Well, no, I think if you look there to the top two hundred material vendors those terms have not moved the needle, it's pretty hard to tell the difference between 43.5 days and 43.4 days but you could try. So the needle hasn't moved at all. The only thing we did say is that almost like everybody else in the world if you can float somebody a couple of days you will. So we were getting floated on the receivables side by a few days or more. We tended to practice, return the favor down the supply chain by floating on the payable side a few days or more. The whole industry now is tightening up, getting back towards terms but for us it's a two-sided equation. We may be paying closer to the terms than we were before but I think increasingly we're collecting closer to the terms than we were before. But the key driver in all this is the fundamental trade terms, most of the top fifty vendors that we have for instance, these are the big guys, are on COX 36. That hasn't changed, which means that we pay them 51 days on average after shipments are received. So that's the key massage of this page that despite all the noise and some very load noises from competitors who are trying to take shots at us, despite all of the noise our fundamental structure of our payment terms no matter how you measure it, globally or in terms of these big North American vendors, has not shifted very much over the last period of time.

**KIRK LUDTKE:** OK, I guess as part of that, part of these numbers include the tooling and will tooling be a material source of cash in '05? Should be save a line item for that and if so how much do you think?

**DAVID STOCKMAN:** Well, I'm not going, as I said we're not putting out a detailed financial forecast and certainly we're not going to get down to the tooling line item. I think the largest point that I would make is that generally we are a positive cash generator out of tooling and increasingly so going forward because we're making more of our own tooling and that means the payment side is just caught up in our regular payroll, that is the tool makers in the shop, managers and so forth or in material purchases, OK, the tools, steel and other materials. So when we collect on a tool from a customers cause it's into production p pack that's positive cash. Generally, we're making a profit where we're out sourcing the tools so that's positive cash. Structurally tooling is in its nature a source of cash. It should be this year. I'm not going to predict here or pinpoint the magnitude but structurally it's a source of cash. Last year we had some aberrations in terms of timing of when jobs were being collected versus when some over programs were paying out. The only point I was making on that chart was that last year should be seen as the aberration generally and this year you should see a plus number on the tooling side.

**KIRK LUDTKE:** OK. And then down below this mention of the pay your own way policy for your European subs I mean should we be concerned that you know they may not be able to meet this test, or I mean…

**DAVID STOCKMAN:** No, the reason we're imposing that test is cause we felt that some customers in Europe had really taken advantage of us, particularly Fiat as part of GM had not met what we felt was fair treatment in terms of payments for amounts that were due or the way that they managed tooling payments or some fixed costs that we were being charges in certain facilities. So by taking this very firm position we have empowered substantially our local management teams to go to the customers in Europe, Ford Europe, Land Rover, Fiat and others and say you know we need to get some of these issue settled because even though we don't contribute to any of the capital costs of the company because that's all basically the interest paid in North America we have been draining cash and we're not going to be permitted to do this so pay up. And surprisingly that policy has had some fairly salutary effects, particularly in cases where, in the case of Fiat, for instance, where they no longer have the big brothers arms around them.

**KIRK LUDTKE:** OK, and if I could squeeze one more in. On CapEx the 120, the 130 I suspect that's net number. Is there a gross number that you…

**DAVID STOCKMAN:** No, that's really what we're striving for on a net basis. We don't have any particular equivalent leasing programs into that. The way I would treat it is if we can get some equipment leasing that could reduce the net or if we could get some attractive equipment leasing it may be possible to fund some programs that will be productive for the company that might otherwise be deferred. But in terms of cash from the treasury which is the key thing because that affects the security, that affects the issuer's ability to meet its obligations, that's the hammer that's coming down on the anvil.

**KIRK LUDTKE:** OK, and then I guess one other…

**DAVID STOCKMAN:** OK, I think we're sort of, one question, there's a lot of clauses there…

KIRK LUDTKE: OK. Thank you.

DAVID STOCKMAN: OK. Next?

OPERATOR: Thank you. Your next question is coming from Adrianne Dale with CIBC <Company: CIBC; Ticker: BCM; URL: http://www.cibc.com/>.

ADRIANNE DALE, CIBC: Hi, thank you. First of all, I was just wondering, Heartland has obviously been pretty supportive of the company in the past, how much additional support do you think that you could provide to the company going forward?

DAVID STOCKMAN: Excuse me. I had interference here for one second. Would you mind repeating the question?

ADRIANNE DALE: Sure. I was just wondering how much additional support Heartland could provide to the company going forward?

DAVID STOCKMAN: Well, you know, the answer is that we have concentration limits on what we can put in any one investment. We're near the limit of that. We've put substantial investment along with so-investors in the company, north of $360 million. We have some additional room. Not a lot. That would be dedicated to implementing this preferred stock transaction if we can do it over the period of time that we have under our agreement with Textron.

ADRIANNE DALE: OK. And with respect to deferring the givebacks in exchange for run trail increases. What kind of progress have you made on those and what percent off that should we be looking for?

DAVID STOCKMAN: That's one that I have to be real honest with you and say is a very open question at this point. What I said there is we are pursuing and not just pursuing and please could you help pursuing in a this is the critical to our relationship way and all of that is under discussion and I cant tell you what the answer is but I do believe that we have some confidence that not everywhere, not always and not completely but in a material way we'll get some of that kind of relief as well as some of the other items that are on this multi-pronged program to go to the customer for material cost relief or recovery.

ADRIANNE DALE: OK. And the last part is could you just discuss the split between your guarantor, non-guarantor EBITDA and tables?

DAVID STOCKMAN: That's a fairly complicated split. When they do get filed and we do get our financial statements out I think you can calculate it because we do provide in there the relevant information. We're not going to do that right now because we're dealing with partial and un-audited results. But from an operating point of view we believe fully reflect, fairly reflect where we came out in the fourth quarter.

ADRIANNE DALE: So it should be pretty similar?

DAVID STOCKMAN: Well, yeah, I don't think it's shifted a lot, no.

ADRIANNE DALE: All righty. Thank you.

DAVID STOCKMAN: Any other questions?

OPERATOR: Your next question is coming from Jeff Skoglen with UBS <Company: UBS AG; Ticker: UBS; URL: http://www.ubswarburg.com/>.

JEFF SKOGLEN, UBS: Hi. Have your auditors basically signed off on all the issues aside from the hundred (inaudible) payment or is the scope larger than that? And then is the, is getting the (inaudible) it all tied to getting the bank amendments?

**DAVID STOCKMAN:** Well, on the first part of the question as we said at the beginning there were several issues. One is we haven't completed the SOX, second we mentioned the vendor rebate and third we mentioned that we hadn't completed all the steps in our financial audit. So that's a range of things and that was the basis for the fifteen days. Second there are different kinds of arrangements with the banks. One would have to do with a time period kind of arrangement that may encompass completion of this process and filling. The other is more of a permanent change in the covenant or the leverage ratio. We'll be talking about both kinds of adjustments and it remains to be seen what mix will be appropriate or preferred by both us and the bank group. But I can tell you this we will get, we are confident we will get what we need to ensure the availability of our facilities and therefore our ability to continue to function as we have in the past. We have time for maybe one or two more questions.

**OPERATOR:** Thank you. Your next question is coming from Eric Selle with Wachovia <Company: Wachovia Corporation; Ticker: WB; URL: http://www.wachovia.com/>.

**ERIC SELLE, WACHOVIA:** Hey, guys. To dovetail that last question in your press release you have net debt of 1614. If you divide that by five the minimum EBITDA is around 323 to remain in compliance. You guys expect EBITDA in the range of 320 to 321. How are you in compliance and how do you have any (inaudible) availability at the end of the year?

**DAVID STOCKMAN:** It's different, I would say you should read the documents. I won't go through it all now but there's a different definition of EBITDA in the credit agreement that allows for certain add backs, management fee, certain impacts of discontinued operations, other things that aren't in the strict numbers that we have in the press release. So the bank EBITDA is measurably, meaningfully higher than the GAAP EBITDA.

**ERIC SELLE:** OK, I appreciate it. And then secondly what is the impact of materials for the full year 2004 to just comp it versus '05?

**DAVID STOCKMAN:** I don't know whether you can comp it for '05. I tried to explain that on a Jan. to Jan. basis it was 80. I think I tried to explain that it built up as a bow wave over '04 and we were at the $48 million run rate for the year at the end of the year. So we don't have any particular year over year average comparison but I think the better point is to take off from where we were in the fourth quarter which was at about a $48 million run rate and then go forward into this year which will be more like an $80 million run rate.

**ERIC SELLE:** Thanks a lot.

**DAVID STOCKMAN:** OK, one more question.

**OPERATOR:** Thank you. Your next question is coming from Robert Rodriguez with First Pacific Advisors.

**ROBERT RODRIGUEZ, FIRST PACIFIC ADVISORS:** Just a question with two sub sets and that is on these various initiatives that you're planning for get backs and adjustments, et cetera, how many of your customers have you already done these with and have gotten surcharges and adjustments from? Secondly what do these customers represent as a percentage of your customer core? And then one small final on after that.

**DAVID STOCKMAN:** OK, well, that's a fair question and as we get further down the road we'll try to give you some firm answers on that. We are right now in the discussion stage with most if not all of our customers. We do not have any clear results to report. My point today was to indicate what we're doing. We're not just sitting back and waiting for this tidal wave to overwhelm us. But some of these things take a while to negotiate. They take a while to fix out. There's a lot of difficulty. Our customers aren't in particularly strong position to absorb increases either so it's a push and pull. It's been optimizing. It's a mix and match kind of operation but we think you know reasonably early in the year we'll have a pretty good idea where we are. We are seeking in all cases retroactivity to January 1 and whether we can achieve that I can't predict but that is at least the program that we have on the table.

**ROBERT RODRIGUEZ:** And just a follow-up one that you alluded to it in your response there but you know with your big three customers here having very little ability to raise prices in the aftermarket that would seem to put you in a difficult position to try and get the benefit of increased prices where they can not.

16

A127

**DAVID STOCKMAN:** Well, obviously the whole supply chain is in quite a squeeze so I wouldn't gainsay that for a moment. On the other hand we have reached the point where many of our suppliers simply aren't shipping without prices that can keep them in business and reasonably you know stable from a financial point of view. And we're making that point to our customers as well. So they have to look at their trade off between you know stability of supply base, stability of productions and, you know, any impact that temporary or other kinds of relief may have on their margins. There is no easy answer to this but we think there ought to be a fair sharing of the burden in the supply chain and at the moment a lot of the tier twos of my suppliers are getting increases because they have refused to ship and the tier ones are sort of caught in the middle at the moment and we do not believe that's a sustainable position and we're making that very clear with customers that we cannot continue to be the heat shield for this bow wave of material costs, this worldwide commodity inflation that I don't think is permanent but it's here and it isn't going away tomorrow and we're not going to be the heat shield for that. We're going to seek equitable and fair and creative sharing of that burden with our customers. And that's really what our material recovery initiative is all about.

**ROBERT RODRIGUEZ:** Thank you very much.

**DAVID STOCKMAN:** OK. If there's anyone else that has an urgent question in the circumstances we're happy to respond. If not I hope this has been helpful in terms of explaining where we are at the moment.

**OPERATOR:** Thank you. At this time I'd like to turn the floor back over to management for any closing comments.

**DAVID STOCKMAN:** OK, I guess, you know, we have said pretty much tried to answer all the questions that we could. I think we've given you pretty good indication of where we are at the current moment. We'll be working hard to complete our audit. We're not certain that we will get that done in the fifteen day time period but we will endeavor to do that working with KPMG. But in any event we will make very clear here that we will do what we need to do to keep all of our financing facilities in compliance and in good order and we're in a good period of time now both from the volume builds in the industry seasonally as well as our cycle of payments to manage our cash requirements into the future and into the second quarter. So with that we will conclude. Thank you all very much for your time.

**OPERATOR:** Thank you for your participation. This does conclude today's teleconference. You may disconnect your lines at this time and have a wonderful day.

**END**

Tab 13

<table>
<tr><td>

**FORM 4**

[ ] Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. *See* Instruction 1(b).

</td><td colspan="2">

UNITED STATES SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

**STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP OF SECURITIES**

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section 17(a) of the Public Utility Holding Company Act of 1935 or Section 30(f) of the Investment Company Act of 1940

</td><td>

OMB APPROVAL
OMB Number: 3235-0287
Expires: January 31, 2005
Estimated average burden hours per response... 0.5

</td></tr>
</table>

| 1. Name and Address of Reporting Person * | 2. Issuer Name and Ticker or Trading Symbol | 5. Relationship of Reporting Person(s) to Issuer (Check all applicable) |
|---|---|---|
| STOCKMAN DAVID A <br><br> (Last)   (First)   (Middle) | COLLINS & AIKMAN CORP [ CKC ] <br> 3. Date of Earliest Transaction (MM/DD/YYYY) <br><br> 12/30/2004 | _ X _ Director          _____ 10% Owner <br> _____ Officer (give title below)    _____ Other (specify below) |
| 55 RAILROAD AVENUE <br><br> (Street) | 4. If Amendment, Date Original Filed (MM/DD/YYYY) <br><br> 12/1/2004 | 6. Individual or Joint/Group Filing (Check Applicable Line) |
| GREENWICH, CT 06830 <br> (City)    (State)    (Zip) | | _ X _ Form filed by One Reporting Person <br> _____ Form filed by More than One Reporting Person |

### Table I - Non-Derivative Securities Acquired, Disposed of, or Beneficially Owned

| 1.Title of Security (Instr. 3) | 2. Trans. Date | 2A. Deemed Execution Date, if any | 3. Trans. Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| Common Stock | 12/30/2004 | | P | | 5000 | A | $4.37 | 321000 | D | |
| Common Stock | 12/31/2004 | | P | | 5000 | A | $4.36 | 331000 | D | |

### Table II - Derivative Securities Beneficially Owned ( *e.g.* , puts, calls, warrants, options, convertible securities)

| 1. Title of Derivate Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Trans. Date | 3A. Deemed Execution Date, if any | 4. Trans. Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | 6. Date Exercisable and Expiration Date | | 7. Title and Amount of Securities Underlying Derivative Security (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of derivative Securities Beneficially Owned Following Reported Transaction (s) (Instr. 4) | 10. Ownership Form of Derivative Security: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |

**Explanation of Responses:**

**Remarks:**
(1) Heartland Industrial Associates L.L.C. ("HIA") is the general partner of Heartland funds which owns 32,714,147 shares of
common stock. Mr. Stockman is the managing partner of HIA. Mr. Stockman disclaims beneficial ownership of such shares.

**Reporting Owners**

| Reporting Owner Name / Address | Relationships | | | |
|---|---|---|---|---|
| | Director | 10% Owner | Officer | Other |
| STOCKMAN DAVID A <br> 55 RAILROAD AVENUE | X | | | |

**Signatures**

/s/ David A. Stockman

** Signature of Reporting

1/6/2005

Date

GREENWICH, CT 06830 | | | | | | Person

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

\*       If the form is filed by more than one reporting person, *see* Instruction 4(b)(v).

\*\*      Intentional misstatements or omissions of facts constitute Federal Criminal Violations. *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note:   File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.

Persons who respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB control number.

**End of Filing**

Powered By EDGAR® Online

© 2005 | EDGAR Online, Inc.

<table>
<tr><td>

**FORM 4**

[ ] Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue.
*See* Instruction 1(b).

</td><td colspan="2">

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

**STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP OF SECURITIES**

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934,
Section 17(a) of the Public
Utility Holding Company Act of 1935 or Section 30(f) of the
Investment Company Act of 1940

</td><td>

OMB APPROVAL
OMB Number: 3235-0287
Expires: January 31, 2005
Estimated average burden hours per response... 0.5

</td></tr>
</table>

| 1. Name and Address of Reporting Person * | 2. Issuer Name **and** Ticker or Trading Symbol | 5. Relationship of Reporting Person(s) to Issuer (Check all applicable) |
|---|---|---|
| **STOCKMAN DAVID A** | **COLLINS & AIKMAN CORP [ CKC ]** | _X_ Director    _____ 10% Owner |
| (Last)    (First)    (Middle) | 3. Date of Earliest Transaction (MM/DD/YYYY) | _____ Officer (give title below)    _____ Other (specify below) |
| **55 RAILROAD AVENUE** | **12/28/2004** | |
| (Street) | 4. If Amendment, Date Original Filed (MM/DD/YYYY) | 6. Individual or Joint/Group Filing (Check Applicable Line) |
| **GREENWICH, CT 06830** | **12/1/2004** | _X_ Form filed by One Reporting Person ___ Form filed by More than One Reporting Person |
| (City)    (State)    (Zip) | | |

### Table I - Non-Derivative Securities Acquired, Disposed of, or Beneficially Owned

| 1.Title of Security (Instr. 3) | 2. Trans. Date | 2A. Deemed Execution Date, if any | 3. Trans. Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| **Common Stock** | 12/28/2004 | | P | | 2500 | A | $3.99 | 316900 | D | |
| **Common Stock** | 12/29/2004 | | P | | 5000 | A | $4.19 | 321900 | D | |

### Table II - Derivative Securities Beneficially Owned ( *e.g.* , puts, calls, warrants, options, convertible securities)

| 1. Title of Derivate Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Trans. Date | 3A. Deemed Execution Date, if any | 4. Trans. Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | 6. Date Exercisable and Expiration Date | | 7. Title and Amount of Securities Underlying Derivative Security (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of derivative Securities Beneficially Owned Following Reported Transaction(s) (Instr. 4) | 10. Ownership Form of Derivative Security: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |

**Explanation of Responses:**

**Remarks:**
(1) Heartland Industrial Associates L.L.C. ("HIA") is the general partner of Heartland funds which owns 32,644,147 shares of
common stock. Mr. Stockman is the managing partner of HIA. Mr. Stockman disclaims beneficial ownership of such shares.

**Reporting Owners**

| Reporting Owner Name / Address | Relationships | | | |
|---|---|---|---|---|
| | Director | 10% Owner | Officer | Other |
| **STOCKMAN DAVID A**<br>**55 RAILROAD AVENUE** | X | | | |

**Signatures**

/s/ David A. Stockman        1/6/2005

** Signature of Reporting        Date

A131

GREENWICH, CT 06830 | | | | | Person

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

\*         If the form is filed by more than one reporting person, *see* Instruction 4(b)(v).

\*\*       Intentional misstatements or omissions of facts constitute Federal Criminal Violations. *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note:   File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.

Persons who respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB control number.

**End of Filing**

Powered By EDGAR Online

© 2005 | EDGAR Online, Inc.

# FORM 4

[ ] Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. *See* Instruction 1(b).

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

OMB APPROVAL
OMB Number: 3235-0287
Expires: January 31, 2005
Estimated average burden
hours per response... 0.5

## STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP OF SECURITIES

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934,
Section 17(a) of the Public
Utility Holding Company Act of 1935 or Section 30(f) of the
Investment Company Act of 1940

| 1. Name and Address of Reporting Person * | 2. Issuer Name and Ticker or Trading Symbol | 5. Relationship of Reporting Person(s) to Issuer (Check all applicable) |
|---|---|---|
| STOCKMAN DAVID A | COLLINS & AIKMAN CORP [ CKC ] | _ X __ Director _____ 10% Owner |
| (Last) (First) (Middle) | 3. Date of Earliest Transaction (MM/DD/YYYY) | _____ Officer (give title below) _____ Other (specify below) |
| 55 RAILROAD AVENUE | 12/23/2004 | |
| (Street) | 4. If Amendment, Date Original Filed (MM/DD/YYYY) | 6. Individual or Joint/Group Filing (Check Applicable Line) |
| GREENWICH, CT 06830 | 12/1/2004 | _ X _ Form filed by One Reporting Person ___ Form filed by More than One Reporting Person |
| (City) (State) (Zip) | | |

### Table I - Non-Derivative Securities Acquired, Disposed of, or Beneficially Owned

| 1.Title of Security (Instr. 3) | 2. Trans. Date | 2A. Deemed Execution Date, if any | 3. Trans. Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| Common Stock | 12/23/2004 | | P | | 2500 | A | $3.94 | 310650 | D | |
| Common Stock | 12/27/2004 | | P | | 3750 | A | $3.89 | 314400 | D | |

### Table II - Derivative Securities Beneficially Owned ( *e.g.* , puts, calls, warrants, options, convertible securities)

| 1. Title of Derivate Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Trans. Date | 3A. Deemed Execution Date, if any | 4. Trans. Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | 6. Date Exercisable and Expiration Date | | 7. Title and Amount of Securities Underlying Derivative Security (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of derivative Securities Beneficially Owned Following Reported Transaction (s) (Instr. 4) | 10. Ownership Form of Derivative Security: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |

**Explanation of Responses:**

**Remarks:**
(1) Heartland Industrial Associates L.L.C. ("HIA") is the general partner of Heartland funds which owns 32,585,085 shares of
common stock. Mr. Stockman is the managing partner of HIA. Mr. Stockman disclaims beneficial ownership of such shares.

**Reporting Owners**

| Reporting Owner Name / Address | Relationships | | | |
|---|---|---|---|---|
| | Director | 10% Owner | Officer | Other |
| STOCKMAN DAVID A 55 RAILROAD AVENUE | X | | | |

**Signatures**

/s/ David A. Stockman

** Signature of

12/29/2004

Date

A133

GREENWICH, CT 06830 | | | | |                                          Reporting Person

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

*        If the form is filed by more than one reporting person, *see* Instruction 4(b)(v).

**       Intentional misstatements or omissions of facts constitute Federal Criminal Violations. *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note:   File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.

Persons who respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB control number.

**End of Filing**

Powered By EDGAR® Online!

© 2005 | EDGAR Online, Inc.

**FORM 4**

[ ] Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. *See* Instruction 1(b).

UNITED STATES SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

OMB APPROVAL
OMB Number: 3235-0287
Expires: January 31, 2005
Estimated average burden hours per response... 0.5

## STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP OF SECURITIES

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934,
Section 17(a) of the Public
Utility Holding Company Act of 1935 or Section 30(f) of the
Investment Company Act of 1940

| 1. Name and Address of Reporting Person * | 2. Issuer Name and Ticker or Trading Symbol | 5. Relationship of Reporting Person(s) to Issuer (Check all applicable) |
|---|---|---|
| STOCKMAN DAVID A | COLLINS & AIKMAN CORP [ CKC ] | _ X _ Director          _____ 10% Owner |
| (Last)    (First)    (Middle) | 3. Date of Earliest Transaction (MM/DD/YYYY) | _____ Officer (give title below)    _____ Other (specify below) |
| 55 RAILROAD AVENUE | | |
| (Street) | 12/21/2004 | |
| | 4. If Amendment, Date Original Filed (MM/DD/YYYY) | 6. Individual or Joint/Group Filing (Check Applicable Line) |
| GREENWICH, CT 06830 | | _ X _ Form filed by One Reporting Person |
| (City)    (State)    (Zip) | 12/1/2004 | ___ Form filed by More than One Reporting Person |

### Table I - Non-Derivative Securities Acquired, Disposed of, or Beneficially Owned

| 1.Title of Security (Instr. 3) | 2. Trans. Date | 2A. Deemed Execution Date, if any | 3. Trans. Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| Common Stock | 12/21/2004 | | P | | 5000 | A | $3.5 | 303150 | D | |
| Common Stock | 12/22/2004 | | P | | 5000 | A | $3.9 | 308150 | D | |

### Table II - Derivative Securities Beneficially Owned ( *e.g.* , puts, calls, warrants, options, convertible securities)

| 1. Title of Derivate Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Trans. Date | 3A. Deemed Execution Date, if any | 4. Trans. Code (Instr. 8) | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | 6. Date Exercisable and Expiration Date | | 7. Title and Amount of Securities Underlying Derivative Security (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of derivative Securities Beneficially Owned Following Reported Transaction (s) (Instr. 4) | 10. Ownership Form of Derivative Security: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | |

**Explanation of Responses:**

**Remarks:**
(1) Heartland Industrial Associates L.L.C. ("HIA") is the general partner of Heartland funds which owns 32,541,335 shares of
common stock. Mr. Stockman is the managing partner of HIA. Mr. Stockman disclaims beneficial ownership of such shares.

**Reporting Owners**

| Reporting Owner Name / Address | Relationships | | | |
|---|---|---|---|---|
| | Director | 10% Owner | Officer | Other |
| STOCKMAN DAVID A 55 RAILROAD AVENUE | X | | | |

**Signatures**

/s/ David A. Stockman
** Signature of        Date

12/28/2004

A135

GREENWICH, CT 06830 | | | | | |                                    Reporting Person

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

\*        If the form is filed by more than one reporting person, *see* Instruction 4(b)(v).

\*\*       Intentional misstatements or omissions of facts constitute Federal Criminal Violations. *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note:   File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.

Persons who respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB control number.

**End of Filing**

Powered By EDGAR Online

© 2005 | EDGAR Online, Inc.

## FORM 4

[ ] Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. *See* Instruction 1(b).

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

OMB APPROVAL
OMB Number: 3235-0287
Expires: January 31, 2005
Estimated average burden hours per response... 0.5

### STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP OF SECURITIES

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section 17(a) of the Public Utility Holding Company Act of 1935 or Section 30(f) of the Investment Company Act of 1940

| 1. Name and Address of Reporting Person * | 2. Issuer Name and Ticker or Trading Symbol | 5. Relationship of Reporting Person(s) to Issuer (Check all applicable) |
|---|---|---|
| STOCKMAN DAVID A<br><br>(Last)    (First)    (Middle) | COLLINS & AIKMAN CORP [ CKC ] | _ X _ Director          _____ 10% Owner<br>_____ Officer (give title below)   _____ Other (specify below) |
| 55 RAILROAD AVENUE<br>(Street) | 3. Date of Earliest Transaction (MM/DD/YYYY)<br><br>12/16/2004 | |
| GREENWICH, CT 06830<br>(City)   (State)   (Zip) | 4. If Amendment, Date Original Filed (MM/DD/YYYY)<br><br>12/1/2004 | 6. Individual or Joint/Group Filing (Check Applicable Line)<br>_ X _ Form filed by One Reporting Person<br>___ Form filed by More than One Reporting Person |

### Table I - Non-Derivative Securities Acquired, Disposed of, or Beneficially Owned

| 1.Title of Security (Instr. 3) | 2. Trans. Date | 2A. Deemed Execution Date, if any | 3. Trans. Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| Common Stock | 12/16/2004 | | P | | 5000 | A | $3.56 | 295338 | D | |
| Common Stock | 12/20/2004 | | P | | 2812 | A | $3.54 | 298150 | D | |

### Table II - Derivative Securities Beneficially Owned ( *e.g.* , puts, calls, warrants, options, convertible securities)

| 1. Title of Derivate Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Trans. Date | 3A. Deemed Execution Date, if any | 4. Trans. Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | 6. Date Exercisable and Expiration Date | | 7. Title and Amount of Securities Underlying Derivative Security (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of derivative Securities Beneficially Owned Following Reported Transaction (s) (Instr. 4) | 10. Ownership Form of Derivative Security: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |

**Explanation of Responses:**

**Remarks:**
(1) Heartland Industrial Associates L.L.C. ("HIA") is the general partner of Heartland funds which owns 32,477,897 shares of common stock. Mr. Stockman is the managing partner of HIA. Mr. Stockman disclaims beneficial ownership of such shares.

| Reporting Owners | Relationships | | | |
|---|---|---|---|---|
| Reporting Owner Name / Address | Director | 10% Owner | Officer | Other |
| STOCKMAN DAVID A<br>55 RAILROAD AVENUE | X | | | |

**Signatures**

/s/ David A. Stockman
—————————————
** Signature of

12/27/2004
—————
Date

A137

GREENWICH, CT 06830 | | | | Reporting Person

**Reminder:** Report on a separate line for each class of securities beneficially owned directly or indirectly.

\*       If the form is filed by more than one reporting person, *see* Instruction 4(b)(v).

\*\*      Intentional misstatements or omissions of facts constitute Federal Criminal Violations. *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note:   File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.

Persons who respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB control number.

**End of Filing**

Powered By EDGAR Online

© 2005 | EDGAR Online, Inc.

**FORM 4**

[ ] Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. *See* Instruction 1(b).

UNITED STATES SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

OMB APPROVAL
OMB Number: 3235-0287
Expires: January 31, 2005
Estimated average burden hours per response... 0.5

STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP
OF SECURITIES

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934,
Section 17(a) of the Public
Utility Holding Company Act of 1935 or Section 30(f) of the
Investment Company Act of 1940

| 1. Name and Address of Reporting Person * | 2. Issuer Name **and** Ticker or Trading Symbol | 5. Relationship of Reporting Person(s) to Issuer (Check all applicable) |
|---|---|---|
| STOCKMAN DAVID A | COLLINS & AIKMAN CORP [ CKC ] | _ X _ Director  _____ 10% Owner |
| (Last)  (First)  (Middle) | 3. Date of Earliest Transaction (MM/DD/YYYY) | _____ Officer (give title below)  _____ Other (specify below) |
| 55 RAILROAD AVENUE | 12/14/2004 | |
| (Street) | 4. If Amendment, Date Original Filed (MM/DD/YYYY) | 6. Individual or Joint/Group Filing (Check Applicable Line) |
| GREENWICH, CT 06830 | 12/10/2004 | _ X _ Form filed by One Reporting Person  _____ Form filed by More than One Reporting Person |
| (City)  (State)  (Zip) | | |

**Table I - Non-Derivative Securities Acquired, Disposed of, or Beneficially Owned**

| 1.Title of Security (Instr. 3) | 2. Trans. Date | 2A. Deemed Execution Date, if any | 3. Trans. Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| Common Stock | 12/13/2004 | | P | | 2500 | A | $3.58 | 285850 | D | |
| Common Stock | 12/14/2004 | | P | | 4488 | A | $385 | 290338 | D | |

**Table II - Derivative Securities Beneficially Owned ( *e.g.* , puts, calls, warrants, options, convertible securities)**

| 1. Title of Derivate Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Trans. Date | 3A. Deemed Execution Date, if any | 4. Trans. Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | 6. Date Exercisable and Expiration Date | | 7. Title and Amount of Securities Underlying Derivative Security (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of derivative Securities Beneficially Owned Following Reported Transaction (s) (Instr. 4) | 10. Ownership Form of Derivative Security: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |

**Explanation of Responses:**

**Remarks:**
(1) Heartland Industrial Associates L.L.C. ("HIA") is the general partner of Heartland funds which owns 32,423,209 shares of
common stock. Mr. Stockman is the managing partner of HIA. Mr. Stockman disclaims beneficial ownership of such shares.

**Reporting Owners**

| Reporting Owner Name / Address | Relationships | | | |
|---|---|---|---|---|
| | Director | 10% Owner | Officer | Other |
| STOCKMAN DAVID A 55 RAILROAD AVENUE | X | | | |

Signatures

/s/ David A. Stockman                12/17/2004

** Signature of        Date

A139

| GREENWICH, CT 06830 | | | | | | | | Reporting Person |

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

\*        If the form is filed by more than one reporting person, *see* Instruction 4(b)(v).

\*\*      Intentional misstatements or omissions of facts constitute Federal Criminal Violations. *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note:   File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.

Persons who respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB control number.

**End of Filing**

Powered By **EDGAR**
Online

© 2005 | EDGAR Online, Inc.

# FORM 4

OMB APPROVAL
OMB Number: 3235-0287
Expires: January 31, 2005
Estimated average burden
hours per response... 0.5

[ ] Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. *See* Instruction 1(b).

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

## STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP OF SECURITIES

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934,
Section 17(a) of the Public
Utility Holding Company Act of 1935 or Section 30(f) of the
Investment Company Act of 1940

| 1. Name and Address of Reporting Person *  STOCKMAN DAVID A  (Last)    (First)    (Middle)  55 RAILROAD AVENUE  (Street)  GREENWICH, CT 06830  (City)    (State)    (Zip) | 2. Issuer Name and Ticker or Trading Symbol  COLLINS & AIKMAN CORP [ CKC ]  3. Date of Earliest Transaction (MM/DD/YYYY)  12/8/2004  4. If Amendment, Date Original Filed (MM/DD/YYYY)  12/10/2004 | 5. Relationship of Reporting Person(s) to Issuer (Check all applicable)  _ X _ Director            _____ 10% Owner  _____ Officer (give title below)  _____ Other (specify below)  6. Individual or Joint/Group Filing (Check Applicable Line)  _ X _ Form filed by One Reporting Person  _____ Form filed by More than One Reporting Person |

### Table I - Non-Derivative Securities Acquired, Disposed of, or Beneficially Owned

| 1.Title of Security (Instr. 3) | 2. Trans. Date | 2A. Deemed Execution Date, if any | 3. Trans. Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| Common Stock | 12/8/2004 | | P | | 10000 | A | $3.2 | 273850 | D | |
| Common Stock | 12/9/2004 | | P | | 10000 | A | $3.5 | 283350 | D | |

### Table II - Derivative Securities Beneficially Owned ( *e.g.* , puts, calls, warrants, options, convertible securities)

| 1. Title of Derivate Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Trans. Date | 3A. Deemed Execution Date, if any | 4. Trans. Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | 6. Date Exercisable and Expiration Date | | 7. Title and Amount of Securities Underlying Derivative Security (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of derivative Securities Beneficially Owned Following Reported Transaction(s) (Instr. 4) | 10. Ownership Form of Derivative Security: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |

**Explanation of Responses:**

**Remarks:**
(1) Heartland Industrial Associates L.L.C. ("HIA") is the general partner of Heartland funds which owns 32,374,297 shares of
common stock. Mr. Stockman is the managing partner of HIA. Mr. Stockman disclaims benefiical ownership of such shares.

**Reporting Owners**

| Reporting Owner Name / Address | Relationships | | | |
|---|---|---|---|---|
| | Director | 10% Owner | Officer | Other |
| STOCKMAN DAVID A  55 RAILROAD AVENUE | X | | | |

**Signatures**

/s/ David A. Stockman                    12/10/2004

** Signature of                              Date

A141

GREENWICH, CT 06830 | | | | | |

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

\*        If the form is filed by more than one reporting person, *see* Instruction 4(b)(v).

\*\*       Intentional misstatements or omissions of facts constitute Federal Criminal Violations. *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note:   File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.

Persons who respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB control number.

**End of Filing**

Powered By EDGAR Online

© 2005 | EDGAR Online, Inc.

## FORM 4

[ ] Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue.
*See* Instruction 1(b).

### UNITED STATES SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

OMB APPROVAL
OMB Number: 3235-0287
Expires: January 31, 2005
Estimated average burden
hours per response... 0.5

## STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP OF SECURITIES

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section 17(a) of the Public Utility Holding Company Act of 1935 or Section 30(f) of the Investment Company Act of 1940

| 1. Name and Address of Reporting Person * | 2. Issuer Name **and** Ticker or Trading Symbol | 5. Relationship of Reporting Person(s) to Issuer (Check all applicable) |
|---|---|---|
| STOCKMAN DAVID A<br><br>(Last)    (First)    (Middle)<br><br>55 RAILROAD AVENUE<br><br>(Street)<br><br>GREENWICH, CT 06830<br>(City)    (State)    (Zip) | COLLINS & AIKMAN CORP [ CKC ]<br>3. Date of Earliest Transaction (MM/DD/YYYY)<br><br>12/1/2004<br><br>4. If Amendment, Date Original Filed (MM/DD/YYYY) | _ X _ Director    _____ 10% Owner<br>_____ Officer (give title below)    _____ Other (specify below)<br><br>6. Individual or Joint/Group Filing (Check Applicable Line)<br><br>_ X _ Form filed by One Reporting Person<br>_____ Form filed by More than One Reporting Person |

### Table I - Non-Derivative Securities Acquired, Disposed of, or Beneficially Owned

| 1.Title of Security (Instr. 3) | 2. Trans. Date | 2A. Deemed Execution Date, if any | 3. Trans. Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| Common Stock | 12/1/2004 | | P | | 7500 | A | $3.7 | 255840 | D | |
| Common Stock | 12/6/2004 | | P | | 7500 | A | $3.5 | 263350 | D | |

### Table II - Derivative Securities Beneficially Owned ( *e.g.* , puts, calls, warrants, options, convertible securities)

| 1. Title of Derivate Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Trans. Date | 3A. Deemed Execution Date, if any | 4. Trans. Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | 6. Date Exercisable and Expiration Date | | 7. Title and Amount of Securities Underlying Derivative Security (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of derivative Securities Beneficially Owned Following Reported Transaction(s) (Instr. 4) | 10. Ownership Form of Derivative Security: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A)    (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |

**Explanation of Responses:**

**Remarks:**
(1) Heartland Industrial Associates L.L.C. ("HIA") is the general partner of Heartland funds which owns 32,314,297 shares of
common stock. Mr. Stockman is the managing partner of HIA. Mr. Stockman disclaims beneficial ownership of such shares.

**Reporting Owners**

| Reporting Owner Name / Address | Relationships | | | |
|---|---|---|---|---|
| | Director | 10% Owner | Officer | Other |
| STOCKMAN DAVID A<br>55 RAILROAD AVENUE | X | | | |

**Signatures**

/s/ David A. Stockman          12/10/2004

** Signature of          Date

A143

GREENWICH, CT 06830 | | | | | Reporting Person

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

\*      If the form is filed by more than one reporting person, *see* Instruction 4(b)(v).

\*\*     Intentional misstatements or omissions of facts constitute Federal Criminal Violations. *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note:   File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.

Persons who respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB control number.

**End of Filing**

Powered By **EDGAR** Online

© 2005 | EDGAR Online, Inc.

**FORM 4**

[ ] Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. *See* Instruction 1(b).

OMB APPROVAL
OMB Number: 3235-0287
Expires: January 31, 2005
Estimated average burden hours per response... 0.5

### UNITED STATES SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

## STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP OF SECURITIES

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section 17(a) of the Public Utility Holding Company Act of 1935 or Section 30(f) of the Investment Company Act of 1940

| 1. Name and Address of Reporting Person *<br><br>STOCKMAN DAVID A<br>(Last) (First) (Middle)<br><br>55 RAILROAD AVENUE<br>(Street)<br><br>GREENWICH, CT 06830<br>(City) (State) (Zip) | 2. Issuer Name and Ticker or Trading Symbol<br><br>COLLINS & AIKMAN CORP [ CKC ]<br><br>3. Date of Earliest Transaction (MM/DD/YYYY)<br><br>11/24/2004<br><br>4. If Amendment, Date Original Filed (MM/DD/YYYY)<br><br>11/18/2004 | 5. Relationship of Reporting Person(s) to Issuer (Check all applicable)<br><br>_X_ Director      ____ 10% Owner<br>____ Officer (give title below)   ____ Other (specify below)<br><br>6. Individual or Joint/Group Filing (Check Applicable Line)<br><br>_X_ Form filed by One Reporting Person<br>____ Form filed by More than One Reporting Person |

### Table I - Non-Derivative Securities Acquired, Disposed of, or Beneficially Owned

| 1.Title of Security (Instr. 3) | 2. Trans. Date | 2A. Deemed Execution Date, if any | 3. Trans. Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| Common Stock | 11/24/2004 | | P | | 6250 | A | $3.5 | 238350 | D (1) | |
| Common Stock | 11/29/2004 | | P | | 10000 | A | $3.5 | 248350 | D (1) | |

### Table II - Derivative Securities Beneficially Owned ( *e.g.* , puts, calls, warrants, options, convertible securities)

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Trans. Date | 3A. Deemed Execution Date, if any | 4. Trans. Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | 6. Date Exercisable and Expiration Date | | 7. Title and Amount of Securities Underlying Derivative Security (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of derivative Securities Beneficially Owned Following Reported Transaction (s) (Instr. 4) | 10. Ownership Form of. Derivative Security: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |

**Explanation of Responses:**

( 1 )  Heartland Industrial Associates L.L.C. ("HIA") is the general partner of Heartland funds which owns 32,269,297 shares of common stock. Mr. Stockman is the managing partner of HIA. Mr. Stockman disclaims beneficial ownership of such shares.

**Reporting Owners**

| Reporting Owner Name / Address | Relationships | | | |
|---|---|---|---|---|
| | Director | 10% Owner | Officer | Other |
| STOCKMAN DAVID A<br>55 RAILROAD AVENUE<br>GREENWICH, CT 06830 | X | | | |

**Signatures**

/s/ David A. Stockman

** Signature of Reporting Person

12/1/2004

Date

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

*    If the form is filed by more than one reporting person, *see* Instruction 4(b)(v).

A145

**      Intentional misstatements or omissions of facts constitute Federal Criminal Violations. *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note:   File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.

Persons who respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB control number.

**End of Filing**

Powered By EDGAR Online

© 2005 | EDGAR Online, Inc.

## FORM 4

[ ] Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue.
*See* Instruction 1(b).

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

**STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP OF SECURITIES**

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section 17(a) of the Public Utility Holding Company Act of 1935 or Section 30(f) of the Investment Company Act of 1940

OMB APPROVAL
OMB Number: 3235-0287
Expires: January 31, 2005
Estimated average burden hours per response... 0.5

| 1. Name and Address of Reporting Person * | 2. Issuer Name and Ticker or Trading Symbol | 5. Relationship of Reporting Person(s) to Issuer (Check all applicable) |
|---|---|---|
| STOCKMAN DAVID A | COLLINS & AIKMAN CORP [ CKC ] | _ X __ Director    _____ 10% Owner |
| (Last)    (First)    (Middle) | 3. Date of Earliest Transaction (MM/DD/YYYY) | _____ Officer (give title below)    _____ Other (specify below) |
| 55 RAILROAD AVENUE | 11/17/2004 | |
| (Street) | 4. If Amendment, Date Original Filed (MM/DD/YYYY) | 6. Individual or Joint/Group Filing (Check Applicable Line) |
| GREENWICH, CT 06830 | 11/18/2004 | _ X _ Form filed by One Reporting Person |
| (City)    (State)    (Zip) | | ___ Form filed by More than One Reporting Person |

**Table I - Non-Derivative Securities Acquired, Disposed of, or Beneficially Owned**

| 1.Title of Security (Instr. 3) | 2. Trans. Date | 2A. Deemed Execution Date, if any | 3. Trans. Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| Common Stock | 11/15/2004 | | P | | 6250 | A | $3.0 | 214600 | D | (1) |
| Common Stock | 11/16/2004 | | P | | 7500 | A | $3.2 | 222100 | D | (1) |
| Common Stock | 11/17/2004 | | P | | 5000 | A | $3.4 | 227100 | D | (1) |
| Common Stock | 11/18/2004 | | P | | 5000 | A | $3.4 | 232100 | D | (1) |

**Table II - Derivative Securities Beneficially Owned** ( *e.g.* , puts, calls, warrants, options, convertible securities)

| 1. Title of Derivate Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Trans. Date | 3A. Deemed Execution Date, if any | 4. Trans. Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | 6. Date Exercisable and Expiration Date | | 7. Title and Amount of Securities Underlying Derivative Security (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of derivative Securities Beneficially Owned Following Reported Transaction (s) (Instr. 4) | 10. Ownership Form of Derivative Security: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A)    (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |

**Explanation of Responses:**

( 1 )  Heartland Industrial Associates L.L.C. ("HIA") is the general partner of Heartland funds which owns 32,220,547 shares of common stock. Mr. Stockman is the managing partner of HIA. Mr. Stockman disclaims beneficial ownership of such shares.

**Reporting Owners**

| Reporting Owner Name / Address | Relationships | | | |
|---|---|---|---|---|
| | Director | 10% Owner | Officer | Other |
| STOCKMAN DAVID A 55 RAILROAD AVENUE GREENWICH, CT 06830 | X | | | |

**Signatures**

/s/ David A. Stockman

** Signature of Reporting Person

11/22/2004

Date

A147

**Reminder:** Report on a separate line for each class of securities beneficially owned directly or indirectly.

\*       If the form is filed by more than one reporting person, *see* Instruction 4(b)(v).

\*\*      Intentional misstatements or omissions of facts constitute Federal Criminal Violations. *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note:   File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.

Persons who respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB control number.

---

**End of Filing**

Powered By **EDGAR** Online

**© 2005 | EDGAR Online, Inc.**

| **FORM 4** | UNITED STATES SECURITIES AND EXCHANGE COMMISSION<br>Washington, D.C. 20549 | OMB APPROVAL |
|---|---|---|

[ ] Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. *See* Instruction 1(b).

OMB Number: 3235-0287
Expires: January 31, 2005
Estimated average burden hours per response... 0.5

## STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP OF SECURITIES

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934,
Section 17(a) of the Public
Utility Holding Company Act of 1935 or Section 30(f) of the
Investment Company Act of 1940

| 1. Name and Address of Reporting Person *<br><br>**STOCKMAN DAVID A**<br>(Last)  (First)  (Middle)<br><br>**55 RAILROAD AVENUE**<br>(Street)<br><br>**GREENWICH, CT 06830**<br>(City)  (State)  (Zip) | 2. Issuer Name **and** Ticker or Trading Symbol<br><br>**COLLINS & AIKMAN CORP [ CKC ]**<br><br>3. Date of Earliest Transaction (MM/DD/YYYY)<br><br>9/30/2004<br><br>4. If Amendment, Date Original Filed (MM/DD/YYYY)<br><br>9/20/2004 | 5. Relationship of Reporting Person(s) to Issuer (Check all applicable)<br><br>_ X _ Director  _____ 10% Owner<br>_____ Officer (give title below)  _____ Other (specify below)<br><br>6. Individual or Joint/Group Filing (Check Applicable Line)<br><br>_ X _ Form filed by One Reporting Person<br>_ Form filed by More than One Reporting Person |

### Table I - Non-Derivative Securities Acquired, Disposed of, or Beneficially Owned

| 1.Title of Security (Instr. 3) | 2. Trans. Date | 2A. Deemed Execution Date, if any | 3. Trans. Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| Common Stock | 9/9/2004 | . | P | | 5000 | A | $4.86 | 188725 | D | |
| Common Stock | 9/15/2004 | | P | | 5000 | A | $4.73 | 193725 | D | |
| Common Stock | 9/20/2004 | | P | | 4625 | A | $4.59 | 198350 | D | |
| Common Stock | 9/24/2004 | | P | | 5000 | A | $4.4 | 203350 | D | |
| Common Stock | 9/30/2004 | | P | | 5000 | A | $4.2 | 208350 | D | |

### Table II - Derivative Securities Beneficially Owned ( *e.g.* , puts, calls, warrants, options, convertible securities)

| 1. Title of Derivate Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Trans. Date | 3A. Deemed Execution Date, if any | 4. Trans. Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | 6. Date Exercisable and Expiration Date | | 7. Title and Amount of Securities Underlying Derivative Security (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of derivative Securities Beneficially Owned Following Reported Transaction (s) (Instr. 4) | 10. Ownership Form of Derivative Security: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |

Explanation of Responses:

Remarks:
(1) Heartland Industrial Associates L.L.C. ("HIA") is the general partner of Heartland funds which owns 32,149,297 shares of
common stock. Mr. Stockman is the managing partner of HIA. Mr. Stockman disclaims beneficial ownership of such shares.

**Reporting Owners**

| Reporting Owner Name / Address | Relationships | | | |
|---|---|---|---|---|
| | Director | 10% Owner | Officer | Other |
| **STOCKMAN DAVID A 55 RAILROAD AVENUE GREENWICH, CT 06830** | X | | | |

**Signatures**

/s/ David A. Stockman                10/1/2004

** Signature of Reporting Person                Date

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

*        If the form is filed by more than one reporting person, *see* Instruction 4(b)(v).

**        Intentional misstatements or omissions of facts constitute Federal Criminal Violations. *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note:    File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.

Persons who respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB control number.

**End of Filing**

Powered By EDGAR* Online

© 2005 | EDGAR Online, Inc.

A150

| FORM 4 | UNITED STATES SECURITIES AND EXCHANGE COMMISSION Washington, D.C. 20549 | OMB APPROVAL |
|---|---|---|

**FORM 4**

[ ] Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. *See* Instruction 1(b).

OMB APPROVAL
OMB Number: 3235-0287
Expires: January 31, 2005
Estimated average burden hours per response... 0.5

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

**STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP OF SECURITIES**

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section 17(a) of the Public Utility Holding Company Act of 1935 or Section 30(f) of the Investment Company Act of 1940

| 1. Name and Address of Reporting Person * | 2. Issuer Name and Ticker or Trading Symbol | 5. Relationship of Reporting Person(s) to Issuer (Check all applicable) |
|---|---|---|
| STOCKMAN DAVID A | COLLINS & AIKMAN CORP [ CKC ] | _ X _ Director   _____ 10% Owner |
| (Last)   (First)   (Middle) | 3. Date of Earliest Transaction (MM/DD/YYYY) | _____ Officer (give title below)   _____ Other (specify below) |
| 55 RAILROAD AVENUE | 8/31/2004 | |
| (Street) | 4. If Amendment, Date Original Filed (MM/DD/YYYY) | 6. Individual or Joint/Group Filing (Check Applicable Line) |
| GREENWICH, CT 06830 | 8/31/2004 | _ X _ Form filed by One Reporting Person ___ Form filed by More than One Reporting Person |
| (City)   (State)   (Zip) | | |

**Table I - Non-Derivative Securities Acquired, Disposed of, or Beneficially Owned**

| 1.Title of Security (Instr. 3) | 2. Trans. Date | 2A. Deemed Execution Date, if any | 3. Trans. Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| Common Stock | 8/18/2004 | | P | | 12500 | A | $4.5 | 162675 | D | |
| Common Stock | 8/20/2004 | | P | | 5000 | A | $4.65 | 167675 | D | |
| Common Stock | 8/24/2004 | | P | | 5000 | A | $4.71 | 172675 | D | |
| Common Stock | 8/27/2004 | | P | | 4800 | A | $4.68 | 177475 | D | |
| Common Stock | 8/31/2004 | | P | | 6250 | A | $4.60 | 183725 | D | |

**Table II - Derivative Securities Beneficially Owned ( *e.g.* , puts, calls, warrants, options, convertible securities)**

| 1. Title of Derivate Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Trans. Date | 3A. Deemed Execution Date, if any | 4. Trans. Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | 6. Date Exercisable and Expiration Date | | 7. Title and Amount of Securities Underlying Derivative Security (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of derivative Securities Beneficially Owned Following Reported Transaction (s) (Instr. 4) | 10. Ownership Form of Derivative Security: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |

**Explanation of Responses:**

**Remarks:**
(1) Heartland Industrial Associates L.L.C. ("HIA") is the general partner of Heartland funds which owns 32,075,422 shares of common stock. Mr. Stockman is the managing partner of HIA. Mr. Stockman disclaims beneficial ownership of such shares.

A151

**Reporting Owners**

| Reporting Owner Name / Address | Relationships | | | |
|---|---|---|---|---|
| | Director | 10% Owner | Officer | Other |
| STOCKMAN DAVID A 55 RAILROAD AVENUE GREENWICH, CT 06830 | X | | | |

**Signatures**

/s/ David A. Stockman

** Signature of Reporting Person

9/8/2004

Date

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

* If the form is filed by more than one reporting person, *see* Instruction 4(b)(v).

** Intentional misstatements or omissions of facts constitute Federal Criminal Violations. *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.

Persons who respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB control number.

**End of Filing**

Powered By EDGAR Online

© 2005 | EDGAR Online, Inc.

A152

| FORM 4 | UNITED STATES SECURITIES AND EXCHANGE COMMISSION | OMB APPROVAL |
|---|---|---|

**FORM 4**

[ ] Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. *See* Instruction 1(b).

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

OMB APPROVAL
OMB Number: 3235-0287
Expires: January 31, 2005
Estimated average burden hours per response... 0.5

### STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP OF SECURITIES

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934,
Section 17(a) of the Public
Utility Holding Company Act of 1935 or Section 30(f) of the
Investment Company Act of 1940

| 1. Name and Address of Reporting Person * | 2. Issuer Name **and** Ticker or Trading Symbol | 5. Relationship of Reporting Person(s) to Issuer (Check all applicable) |
|---|---|---|
| STOCKMAN DAVID A | **COLLINS & AIKMAN CORP [ CKC ]** | _ X _ Director          _____ 10% Owner |
| (Last)      (First)      (Middle) | 3. Date of Earliest Transaction (MM/DD/YYYY) | _____ Officer (give title below)   _____ Other (specify below) |
| 55 RAILROAD AVENUE | 6/23/2004 | |
| (Street) | 4. If Amendment, Date Original Filed (MM/DD/YYYY) | 6. Individual or Joint/Group Filing (Check Applicable Line) |
| GREENWICH, CT 06830 | 6/2/2004 | _ X _ Form filed by One Reporting Person _____ Form filed by More than One Reporting Person |
| (City)    (State)    (Zip) | | |

### Table I - Non-Derivative Securities Acquired, Disposed of, or Beneficially Owned

| 1.Title of Security (Instr. 3) | 2. Trans. Date | 2A. Deemed Execution Date, if any | 3. Trans. Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| Common Stock | 6/2/2004 | | P | | 10000 | A | $5.5 | 65475 | D | (1) |
| Common Stock | 6/3/2004 | | P | | 5000 | A | $5.5 | 70475 | D | (1) |
| Common Stock | 6/10/2004 | | P | | 14700 | A | $5.7 | 85175 | D | (1) |
| Common Stock | 6/16/2004 | | P | | 10000 | A | $5.4 | 95175 | D | (1) |
| Common Stock | 6/17/2004 | | P | | 5000 | A | $5.5 | 100175 | D | (1) |
| Common Stock | 6/21/2004 | | P | | 15000 | A | $5.5 | 115175 | D | (1) |
| Common Stock | 6/22/2004 | | P | | 15000 | A | $5.4 | 130175 | D | (1) |
| Common Stock | 6/23/2004 | | P | | 10000 | A | $5.5 | 140175 | D | (1) |
| Common Stock | 6/24/2004 | | P | | 10000 | A | $6.1 | 150175 | D | (1) |

### Table II - Derivative Securities Beneficially Owned ( *e.g.* , puts, calls, warrants, options, convertible securities)

| 1. Title of Derivate Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Trans. Date | 3A. Deemed Execution Date, if any | 4. Trans. Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | 6. Date Exercisable and Expiration Date | | 7. Title and Amount of Securities Underlying Derivative Security (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of derivative Securities Beneficially Owned Following Reported Transaction (s) (Instr. 4) | 10. Ownership Form of Derivative Security: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |

**Explanation of Responses:**

**( 1)**   Heartland Industrial Associates L.L.C. ("HIA") is the general partner of Heartland funds which owns 31,974,772 shares of common

stock. Mr. Stockman is the managing partner of HIA. Mr. Stockman disclaims beneficial ownership of such shares.

**Reporting Owners**

| Reporting Owner Name / Address | Relationships | | | |
|---|---|---|---|---|
| | Director | 10% Owner | Officer | Other |
| STOCKMAN DAVID A<br>55 RAILROAD AVENUE<br>GREENWICH, CT 06830 | X | | | |

.....

**Signatures**

/s/ David A.
Stockman

6/28/2004

Date

** Signature of Reporting
Person

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

\*         If the form is filed by more than one reporting person, *see* Instruction 4(b)(v).

\*\*        Intentional misstatements or omissions of facts constitute Federal Criminal Violations. *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note:   File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.

Persons who respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB control number.

**End of Filing**

Powered By EDGAR Online

© 2005 | EDGAR Online, Inc.

# FORM 4

[ ] Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue.
*See* Instruction 1(b).

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

## STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP OF SECURITIES

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section 17(a) of the Public Utility Holding Company Act of 1935 or Section 30(f) of the Investment Company Act of 1940

OMB APPROVAL
OMB Number: 3235-0287
Expires: January 31, 2005
Estimated average burden hours per response... 0.5

| 1. Name and Address of Reporting Person * | 2. Issuer Name and Ticker or Trading Symbol | 5. Relationship of Reporting Person(s) to Issuer (Check all applicable) |
|---|---|---|
| **STOCKMAN DAVID A** | **COLLINS & AIKMAN CORP [ CA ]** | _ X __ Director          _____ 10% Owner |
| (Last)    (First)    (Middle) | 3. Date of Earliest Transaction (MM/DD/YYYY) | _____ Officer (give title below)      _____ Other (specify below) |
| **55 RAILROAD AVENUE** | **5/20/2004** | |
| (Street) | 4. If Amendment, Date Original Filed (MM/DD/YYYY) | 6. Individual or Joint/Group Filing (Check Applicable Line) |
| **GREENWICH, CT 06830** | | _ X _ Form filed by One Reporting Person |
| (City)   (State)   (Zip) | | ___ Form filed by More than One Reporting Person |

### Table I - Non-Derivative Securities Acquired, Disposed of, or Beneficially Owned

| 1.Title of Security (Instr. 3) | 2. Trans. Date | 2A. Deemed Execution Date, if any | 3. Trans. Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| Common Stock | 5/19/2004 | | P | | 3950 | A | $5.17 | 3950 | D | |
| Common Stock | 5/20/2004 | | P | | 9025 | A | $5.10 | 12975 | D | |
| Common Stock | 5/21/2004 | | P | | 15000 | A | $5.03 | 27975 | D | |
| Common Stock | 5/24/2004 | | P | | 7500 | A | $5.02 | 35475 | D | |
| Common Stock | 5/26/2004 | | P | | 5000 | A | $5.40 | 40475 | D | |
| Common Stock | 5/27/2004 | | P | | 10000 | A | $5.40 | 50475 | D | |
| Common Stock | 5/28/2004 | | P | | 5000 | A | $5.30 | 55475 | D | |

### Table II - Derivative Securities Beneficially Owned ( *e.g.* , puts, calls, warrants, options, convertible securities)

| 1. Title of Derivate Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Trans. Date | 3A. Deemed Execution Date, if any | 4. Trans. Code (Instr. 8) | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | 6. Date Exercisable and Expiration Date | | 7. Title and Amount of Securities Underlying Derivative Security (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of derivative Securities Beneficially Owned Following Reported Transaction (s) (Instr. 4) | 10. Ownership Form of Derivative Security: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | |

**Explanation of Responses:**

**Remarks:**
(1) Heartland Industrial Associates L.L.C. ("HIA") is the general partner of Heartland funds which owns 31,675,672 shares of

common stock. Mr. Stockman is the managing partner of HIA. Mr. Stockman dis-claims beneficial ownership of such shares.

| Reporting Owners | | | | | Signatures | |
|---|---|---|---|---|---|---|
| | | | | | /s/ David Stockman | 6/1/2004 |
| Reporting Owner Name / Address | Relationships | | | | | Date |
| | Director | 10% Owner | Officer | Other | ** Signature of Reporting Person | |
| STOCKMAN DAVID A 55 RAILROAD AVENUE GREENWICH, CT 06830 | X | | | | | |

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

*     If the form is filed by more than one reporting person, *see* Instruction 4(b)(v).

**    Intentional misstatements or omissions of facts constitute Federal Criminal Violations. *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note:  File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.

Persons who respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB control number.

**End of Filing**

Powered By EDGAR Online

© 2005 | EDGAR Online, Inc.

# Tab 14

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
## Washington, D.C. 20549

**SCHEDULE 13D**
Under the Securities Exchange Act of 1934

# COLLINS & AIKMAN CORPORATION

(Name of Issuer)

**Common Stock**

(Title of Class of Securities)

194830 I0 5

(CUSIP Number)

Jonathan A. Schaffzin, Esq.
Cahill Gordon & Reindel
80 Pine Street,
New York, NY 10005
(212) 701-3000

(Name, Address and Telephone Number of Person Authorized to
Receive Notices and Communications)

February 23, 2001

(Date of Event which Requires Filing of this Statement)

If the filing person has previously filed a statement on Schedule 13G to report the acquisition that is the subject of this Schedule 13D, and is filing this schedule because of ss.240.13d-1(e), 240.13d-1(f) or 240.13d-(1)(g), check the following box / /.

The information required on the remainder of this cover page shall not be deemed to be "filed" for the purpose of Section 18 of the Securities Exchange Act of 1934 ("Act") or otherwise subject to the liabilities of that section of the Act but shall be subject to all other provisions of the Act (however, see the Notes).

Page 1 of 12

**Item 1. Security and Issuer.**

The class of equity securities to which this statement on Schedule 13D (this "Statement") relates is the common stock, par value $0.01 per share, of Collins & Aikman Corporation, a Delaware corporation (the "Company"). The principal executive offices of the Company are located at 5755 New King Court, Troy, Michigan 48090.

**Item 2. Identity and Background.**

This Statement is being filed jointly on behalf of Heartland Industrial Associates L.L.C., a Delaware limited liability company ("HIA"), Heartland Industrial Partners (FF), L.P., a Delaware limited partnership ("HIPFF"), Heartland Industrial Partners (E1), L.P., a Delaware limited partnership ("HIPE1"), Heartland Industrial Partners (K1), L.P., a Delaware limited partnership ("HIPK1"), Heartland Industrial Partners (C1), L.P., a Delaware limited partnership ("HIPC1"), and Heartland Industrial Partners, L.P., a Delaware limited partnership ("HIP" and, collectively with HIA, HIPFF, HIPE1, HIPK1 and HIPC1, the "Reporting Heartland Entities").

HIA is the general partner of each of the Reporting Heartland Entities. David A. Stockman is the managing member of HIA. With respect to matters unrelated to the voting or disposition of the shares of the Company, Mr. Stockman shares with the other members of HIA and the other senior managing directors of HIP certain authority regarding matters related to HIP. The agreement among the Reporting Heartland Entities relating to the joint filing of this Statement is attached as Exhibit 6 hereto.

The principal business and office address of each of the Reporting Heartland Entities and David A. Stockman is 55 Railroad Avenue, Greenwich, CT 06830.

The principal business of each of the Reporting Heartland Entities is to focus on investments in industrial companies. David A. Stockman's principal occupation is Senior Managing Director of HIP.

During the last five years, none of the Reporting Heartland Entities or David A. Stockman has been convicted in a criminal proceeding (excluding traffic violations or similar misdemeanors) or has been a party to a civil proceeding of a judicial or administrative body of competent jurisdiction and as a result of such proceeding was or is subject to a judgment, decree or final order enjoining future violations of, or prohibiting or mandating activities subject to, federal or state securities laws or finding any violation with respect to such laws.

**Item 3. Source and Amount of Funds or Other Consideration.**

The limited partners, general partner and members, as applicable, of each of the Reporting Heartland Entities contributed an aggregate of $260,000,000 to the Reporting Heartland Entities, which contributed $125,000,000 of such amount to the Company in exchange for an aggregate of 25,000,000 shares of common stock and $135,000,000 of such amount to Blackstone Capital Company II, L.L. C., Blackstone Capital Partners, L.P., Blackstone Advisory Directors Partnership, L.P. Blackstone Family Investment Partnership I L.P. (together, "Blackstone") and Wasserstein/C&A Holdings, L.L.C ("Wasserstein") in exchange for an aggregate of 27,000,000 shares of common stock of the Company. As a result of share purchases, the Reporting Heartland

Page 8 of 12

A158

Entities acquired an aggregate of 52,000,000 shares of common stock of the Company.

**Item 4. Purpose of the Transaction.**

Blackstone and Wasserstein (collectively, the "Selling Shareholders") entered into a share purchase agreement (the "Secondary Share Purchase Agreement) dated as of January 12, 2001 with HIP pursuant to which the Selling Shareholders agreed to sell an aggregate amount of 27,000,000 shares of common stock of the Company, par value $0.01 per share (the "Common Stock") to Heartland for an aggregate purchase price of $135,000,000, or $5.00 per share. The Company and HIP entered into a share purchase agreement (the "Primary Share Purchase Agreement") dated as of January 12, 2001 pursuant to which the Company agreed to sell an aggregate of 8,490,000 shares of Common Stock and 1,000,000 shares of non-voting convertible preferred shares (the "Convertible Preferred") for an aggregate purchase price of $125,000,000. Upon receiving shareholder approval at a Special Meeting scheduled for March 6, 2000, Heartland will elect to convert each Convertible Preferred share for 16.51 shares of Common Stock. As a result of the share purchases, the Heartland Reporting Entities will beneficially own 52,000,000 shares of Common Stock, or 59.8% of the total outstanding shares of Common Stock, and control the Company.

The Reporting Heartland Entities consummated the share purchases in order to acquire control of the Company and, thereafter, to seek to cause the Company to acquire other auto interior trim manufacturing companies and other companies in businesses related to the Company. The investments by the Reporting Heartland Entities in the Company, are in furtherance of HIP's and its affiliates' strategy to buy, build and grow industrial companies in sectors that are attractive for consolidation and long-term growth.

The Heartland Reporting Entities intend to review from time to time the Company's business affairs and financial position. Based on such evaluation and review, the Heartland Reporting Entities may consider from time to time various strategic alternatives. Subject to the Shareholders Agreement (as described in Item 6), such actions may include, among other things, the acquisition of additional shares of Common Stock.

**Item 5. Interest in Securities in Collins & Aikman Corporation.**

(a)-(c) At the close of business on February 23, 2001 and after giving effect to the conversion of the non-voting convertible preferred shares, the Reporting Heartland Entities beneficially owned (and have sole power to vote and sole power to dispose of) an aggregate of 52,000,000 shares of common stock, representing approximately 59.8% of the outstanding common stock. David A. Stockman and the other members of HIA may be deemed to be the beneficial owner of the securities held by the Reporting Heartland Entities. David A. Stockman and such members disclaim such beneficial ownership. The ownership of each of the Reporting Heartland Entities is set forth in the following table:

| Shareholder | Shares of Common Stock | Percent |
|-------------|------------------------|---------|
| Heartland Industrial Associates L.L.C. | 52,000,000 | 59.8* |

* By virtue of being the general partner of each of the other Reporting Persons filing this Schedule 13D.

Page 9 fo 12

| Shareholder | Shares of Common Stock | Percent |
|---|---|---|
| Heartland Industrial Partners (FF), L.P. | 576,150 | 0.7 |
| Heartland Industrial Partners (E1), L.P. | 310,669 | 1.1 |
| Heartland Industrial Partners (K1), L.P. | 455,437 | 0.5 |
| Heartland Industrial Partners (C1), L.P. | 227,719 | 0.3 |
| Heartland Industrial Partners, L.P. | 49,762,194 | 57.2 |

The foregoing percentages are based on 87,024,063 shares of common stock of the Company outstanding on February 23, 2001, after giving effect to the conversion.

By virtue of the Shareholders Agreement described in Item 6 hereto, the Reporting Heartland Entities may be deemed to be a group with all of the shareholders that are a party to such agreement. As of February 23, 2001, after giving effect to the conversion, the shareholders party to the Shareholders Agreement beneficially owned 78,760,680 shares of common stock of the Company, representing approximately 90.5% of the outstanding common stock of the Company. The Heartland Reporting Entities disclaim such beneficial ownership.

Item 6. Contracts, Arrangements, Understandings or
Relationships with Respect to Securities of Collins & Aikman Corporation

In connection with the share purchases, the Amended and Restated Stockholders Agreement, dated as of June 29, 1994, among BCP, WPP, the Company and C&A Products was terminated and the Company, the Reporting Heartland Entities, Blackstone and Wasserstein (together with Blackstone, the "Original Stockholders"), entered into a new Shareholders Agreement ("Shareholders Agreement"). The following description of certain terms of the Shareholders Agreement is qualified in its entirety by reference to the Shareholders Agreement, a copy of which is attached hereto as Exhibit 3. "Reporting Heartland Entities" as used in this Item 6 refers to the Reporting Heartland Entities, other than HIA.

Election of Directors. The Shareholders Agreement provides that the parties will vote their shares of common stock to ensure that the number of directors constituting the entire Board of Directors shall be nine (9) prior to conversion of the Convertible Preferred and thirteen (13) post-conversion. For so long as each party or its permitted transferees hold at least 25% of the shares held by it on the closing date, each party shall vote its shares to cause (i) four (4) Heartland designees to be elected directors prior to conversion and seven (7) Heartland designees to be elected directors post-conversion; (ii) one (1) individual designated by Blackstone; one (1) individual designated by Wasserstein; two (2) outside directors prior to conversion and three (3) outside directors within 60 days of conversion; and the person serving from time to time as the Company's chief executive officer.

Transfers of Common Stock. The Shareholders Agreement restricts transfers of common stock except for transfers to permitted transferees, pursuant to the "right of first offer", "tag-along" or "drag-along" provisions de-

Page 10 of 12

scribed below or pursuant to an effective registration statement or pursuant to Rule 144 under the Securities Act.

**Right of First Offer.** The Shareholders Agreement provides no stockholder may transfer any of its shares other than to a permitted transferee or pursuant to the "tag-along" and "drag-along" provisions unless such stockholder shall offer such shares to the Reporting Heartland Entities. If the Reporting Heartland Entities decline to purchase the shares, then the Company has the right to purchase such shares.

**Tag-Along Rights and Drag-Along Rights.** The Shareholders Agreement grants to the stockholders, subject to certain exceptions, in connection with a proposed transfer of common stock by the Reporting Heartland Entities, the right to require the proposed transferee to purchase a proportionate percentage of the shares owned by the other stockholders upon the same economic terms as are being offered to the Reporting Heartland Entities. The Shareholders Agreement provides that so long as the HIP is entitled to designate directors to the Company's board, the Reporting Heartland Entities have the right to require the other stockholders to sell a proportionate percentage of shares of common stock in such transaction as the Reporting Heartland Entities are selling and to otherwise vote in favor of the transactions effecting such substantial change of control.

In connection with the purchase of shares of Common Stock from the Company and from Blackstone and Wasserstein, the Reporting Heartland Entities gave the Company and Blackstone and Wasserstein contingent rights to participate in realized profits, if any, on shares purchased by the Reporting Heartland Entities up to a maximum of $6,250,000 for the Company and $6,750,000 in the aggregate for Blackstone and Wasserstein. Such maximum amounts will increase to the extent not paid by 6.8% annually (compounded quarterly). The preceding description of certain terms of the Profit Participation Agreement is qualified in its entirety by reference to such agreement, a copy of which is attached hereto as Exhibit 5.

**Item 7. Material to be Filed as Exhibits.**

Exhibit 1. Primary Share Purchase Agreement dated as of January 12, 2001 by and between the Company and HIP.

Exhibit 2. Secondary Share Purchase Agreement dated as of January 12, 2001 by and among HIP, Blackstone and Wasserstein.

Exhibit 3. Shareholders Agreement dated as of February 23, 2001 by and among the Company, HIP, HIPFF, HIPE1, HIPK1, HIPC1, Blackstone and Wasserstein.

Exhibit 4. Registration Rights Agreement dated as of February 23, 2001 by and among the Company, HIP, HIPFF, HIPE1, HIPK1, HIPC1, Blackstone and Wasserstein.

Exhibit 5. Profit Participation Agreement dated as of February 23, 2001 by and among the Company, HIP, HIPFF, HIPE1, HIPK1, HIPC1, Blackstone Capital Company II, L.L.C. and Wasserstein/C&A Holdings, L.L.C.

Exhibit 6. Joint Filing Agreement among the Reporting Heartland Entities, dated as of March 1, 2001.

**Signatures**

After reasonable inquiry and to the best of my knowledge and belief, I certify that the information set forth in this statement is true, complete and correct.

Dated: March 1, 2001

**Heartland Industrial Associates L.L.C.**

Heartland Industrial Partners (FF), L.P.,

Heartland Industrial Partners (E1), L.P.,

Heartland Industrial Partners (K1), L.P.,

Heartland Industrial Partners (C1), L.P.,

**Heartland Industrial Partners, L.P.**

By:     /s/ David A. Stockman
        -----------------------------------------
        David A. Stockman

Page 12 of 12

A162

Tab 15

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
## Washington, D.C. 20549

**SCHEDULE 13D/A**
Under the Securities Exchange Act of 1934 (Amendment No.1)*

# COLLINS & AIKMAN CORPORATION

(Name of Issuer)

**Common Stock**

(Title of Class of Securities)

194830 10 5

(CUSIP Number)

Jonathan A. Schaffzin, Esq.
Cahill Gordon & Reindel
80 Pine Street,
New York, NY 10005
(212) 701-3000

(Name, Address and Telephone Number of Person Authorized
to Receive Notices and Communications)

December 20, 2001

(Date of Event which Requires Filing of this Statement)

If the filing person has previously filed a statement on Schedule 13G to report the acquisition that is the subject of this Schedule 13D, and is filing this schedule because of sections 240.13d-1(e), 240.13d-1(f) or 240.13d-(1)(g), check the following box / /.

*The remainder of this cover page shall be filled out for a reporting person's initial filing on this form with respect to the subject class of securities, and for any subsequent amendment containing the information which would alter disclosures provided in a prior cover page.

The information required on the remainder of this cover page shall not be deemed to be "filed" for the purpose of Section 18 of the Securities Exchange Act of 1934 ("Act") or otherwise subject to the liabilities of that section of the Act but shall be subject to all other provisions of the Act (however, see the Notes).

Page 1 of 12

This Amendment No. 1 amends the Schedule 13D (the "Schedule 13D") filed with the Securities and Exchange Commission on March 5, 2001, jointly on behalf of Heartland Industrial Associates L.L.C., a Delaware limited liability company ("HIA"), Heartland Industrial Partners (FF), L.P., a Delaware limited partnership ("HIPFF"), Heartland Industrial Partners (E1), L.P., a Delaware limited partnership ("HIPE1"), Heartland Industrial Partners (K1), L.P., a Delaware limited partnership ("HIPK1"), Heartland Industrial Partners (C1), L.P., a Delaware limited partnership ("HIPC1"), and Heartland Industrial Partners, L.P., a Delaware limited partnership ("HIP and, collectively with HIA, HIPFF, HIPE1, HIPK1 and HIPC1, the "Reporting Heartland Entities"), with respect to the common stock, par value $.01 (the "Common Stock"), of Collins & Aikman Corporation, a Delaware corporation (the "Company"). Capitalized terms used but not otherwise defined herein shall have the meanings heretofore ascribed to them in the Schedule 13D.

**Item 4. Purpose of the Transaction.**

Item 4 is hereby amended and supplemented by adding the following paragraph:

On December 20, 2001, Collins & Aikman Products Co., a Delaware corporation and a subsidiary of the Company ("C&A Products"), pursuant to a Purchase Agreement dated as of August 7, 2001, as amended and restated as of November 30, 2001 (the "Purchase Agreement"), with the Company and Textron, Inc., a Delaware corporation ("Textron"), acquired the "Acquisition") the Textron exterior and interior automotive trim business currently managed as a unit of Textron Automotive Company Inc. The consideration for the Acquisition includes $735.3 million in cash and assumed debt, 18 million shares of Common Stock of the Company and $326.4 million in aggregate liquidation preference of preferred stock of C&A Products (the "C&A Products Preferred Stock"). In connection with the financing of a portion of the cash purchase price for the Acquisition, the Reporting Heartland Entities invested an aggregate of $78,000,000 in cash to purchase 15,600,000 shares of newly issued Common Stock of the Company at a purchase price of $5.00 per share.

**Item 5. Interest in Securities in Collins & Aikman Corporation**

Item 5 is hereby amended and restated as follows:

(a)-(c) At the close of business on December 20, 2001, the Reporting Heartland Entities beneficially owned and had sole power to vote and sole power to dispose of an aggregate of 67,600,000 shares of Common Stock, representing approximately 40.3% of the outstanding Common Stock of the Company. David A. Stockman and the other members of HIA may be deemed to be the beneficial owner of the securities held by the Reporting Heartland Entities. David A. Stockman and such members disclaim such beneficial ownership. The ownership of each of the Reporting Heartland Entities is set forth in the following table:

| Shareholder | Shares of Common Stock | Percent |
|---|---|---|
| Heartland Industrial Associates L.L.C. | 67,600,000 | 40.3%* |
| Heartland Industrial Partners (FF), L.P. | 807,967 | 0.5% |
| Heartland Industrial Partners (E1), L.P. | 950,196 | 0.6% |
| Heartland Industrial Partners (K1), L.P. | 564,534 | 0.3% |
| Heartland Industrial Partners (C1), L.P. | 282,268 | 0.2% |
| Heartland Industrial Partners, L.P. | 64,995,035 | 38.7% |

The foregoing percentages are based on 167,822,130 shares of Common Stock of the Company outstanding on December 20, 2001.

By virtue of the Shareholders Agreement described in Item 6 of the Schedule 13D and by virtue of the Becker/Joan Stockholders Agreement described in Item 6 of this Amendment No. 1, the Reporting Heartland Entities may be deemed to be a group with all of the shareholders that are a party to such agreements. As of December 20,

* By virtue of being the general partner of each of the other Reporting Persons filing this Schedule 13D.

2001, the shareholders party to the Shareholders Agreement and the Becker/Joan Stockholders Agreement beneficially owned 128,196,998 shares of Common Stock of the Company, and warrants to purchase an additional 500,000 shares of Common Stock of the Company, representing approximately 76.7% of the outstanding Common Stock of the Company. The Heartland Reporting Entities disclaim such beneficial ownership.

**Item 6. Contracts, Arrangements, Understandings or**
Relationships with Respect to Securities of Collins & Aikman Corporation.

**Item 6 is amended and supplemented by adding the following paragraphs:**

In connection with an Agreement and Plan of Merger, dated May 14, 2001 (the "Becker Merger Agreement"), by and among the Company, C&A Products, Becker Group L.L.C., the Becker Investors and the other parties named therein, and the Agreement and Plan of Merger, dated as of August 7, 2001 (the "Joan Merger Agreement") by and among the Company, C&A Products, JAII Acquisition Co., Elkin McCallum, Joan Fabrics Corporation and Joan Automotive Industries, Inc., a Stockholders Agreement, dated July 3, 2001, as amended as of September 21, 2001 (the "Becker/Joan Stockholders Agreement"), was entered into by the Company, the Heartland Reporting Entities, the Becker Stockholders party thereto and the Joan Stockholders party thereto. The following description of certain terms of the Becker/Joan Stockholders Agreement is qualified in its entirety by reference to the Becker/Joan Stockholders Agreement, a copy of which is attached hereto as Exhibit 7. "Reporting Heartland Entities" as used in Item 6 refer to the Reporting Heartland Entities, other than HIA.

Election of Directors. The Becker/Joan Stockholders Agreement provides that the parties will vote their shares of Common Stock of the Company to ensure that: (a) Charles A. Becker is a member of the Board of Directors and Vice Chairman of the Board of Directors so long as the Becker Stockholders continue to hold at least 25% of the shares held by them on the closing date of the Becker Merger Agreement; and (b) Elkin McCallum is a member of the Board of Directors and so long as the Joan Stockholders continue to hold at least 25% of the shares held by them on the closing date of the Joan Merger Agreement.

Right of First Offer. The Becker/Joan Stockholders Agreement provides that the Becker/Joan Stockholders may not transfer any of their shares other than to a permitted transferee or pursuant to the "tag-along" and "drag-along" provisions unless such stockholders shall offer such shares to the Reporting Heartland Entities. If the Reporting Heartland Entities decline to purchase any or all of such shares, then the Company has the right to purchase such remaining shares.

Tag-Along Rights and Drag-Along Rights. The Becker/Joan Stockholders Agreement grants to each stockholder, subject to certain exceptions, in connection with a proposed transfer of Common Stock of the Company by the Reporting Heartland Entities, the right to require the proposed transferee to purchase a proportionate percentage of the shares owned by such stockholder upon the same economic terms as are being offered to the Reporting Heartland Entities. The Becker/Joan Stockholders Agreement provides that so long as HIP is entitled to designate directors to the Company's Board of Directors, the Reporting Heartland Entities have the right to require the other stockholders to sell a proportionate percentage of shares of common stock in such transaction as the Reporting Heartland Entities are selling and to otherwise vote in favor of the transactions effecting such substantial change of control.

Pursuant to the Purchase Agreement, Textron is entitled, but not required, to designate one member to serve as a director (the "Textron Designee") and two representatives to serve as observers on the Board of Directors of the Company, in each case until the date upon which Textron and its affiliates cease to continuously own at least $25 million in "value" of the (1) Common Stock of the Company, having an assigned value of $5 per share, (2) shares of C&A Products Preferred Stock issued to Textron Holdco Inc. pursuant to the Purchase Agree-

A165

ment, having an assigned value of $1,000 per share, and (3) equity interest in Collins & Aikman Holdings (Italy) S.r.l. (formerly Textron Automotive Holdings (Italy) S.r.l.) retained by Textron and its affiliates pursuant to the Purchase Agreement, having an assigned value of $23.1 million. In connection with this right to elect a member of the Company's Board of Directors, HIP and its affiliates have agreed to vote, and act by written consent with respect to, all shares of capital stock of the Company held by HIP and its affiliates and take all other actions necessary to ensure that the Textron Designee (and any replacement Textron Designee) is elected to the Board of Directors of the Company within 30 days of designation by Textron. HIP has also agreed to use reasonable best efforts to cause its nominees on the Board of Directors of the Company to elect the Textron Designee (an any replacement Textron Designee) to the Company's Board.

HIP has also agreed that, for so long as Textron and/or one or more of its affiliates continuously owns C&A Products Preferred Stock representing not less than 25% of the aggregate number of shares of C&A Products Preferred Stock originally issued to Textron and/or one of its affiliates pursuant to the Purchase Agreement, neither HIP nor any of its affiliates (excluding the Company and its subsidiaries and any successors thereto) will directly or indirectly dispose of any Common Stock of the Company, other than (1) in connection with a bona fide pledge to secure a financing in favor of HIP or one of its affiliates and (2) any such disposition if, after giving effect thereto, HIP and its affiliates beneficially own at least 65% of the number of shares of Common Stock of the Company beneficially owned by HIP and its affiliates (other than the Company and its subsidiaries) as of November 30, 2001 after giving effect to all of the transactions contemplated by the Purchase Agreement.

**Item 7. Material to be Filed as Exhibits.**

**Item 7 is amended and supplemented by adding the following exhibit:**

Exhibit 7    Stockholders Agreement dated as of July 3, 2001, as
            amended as of September 21, 2001, by and among the Company,
            HIP, HIPFF, HIPE1, HIPK1, HIPC1, the Becker Stockholders
            named therein, and the Joan Stockholders named therein.

Page 10 of 12

**Signatures**

After reasonable inquiry and to the best of my knowledge and belief, I certify that the information set forth in this statement is true, complete and correct.

Dated: January 3, 2002

**Heartland Industrial Associates L.L.C.**

Heartland Industrial Partners (FF), L.P.,

Heartland Industrial Partners (E1), L.P.,

Heartland Industrial Partners (K1), L.P.,

Heartland Industrial Partners (C1), L.P.,

**Heartland Industrial Partners, L.P.**

By:     /s/ David A. Stockman
        ----------------------------------
        David A. Stockman

Pge 11 of 12

# Tab 16

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
## Washington, D.C. 20549

**SCHEDULE 13D/A**
Under the Securities Exchange Act of 1934 (Amendment No. 87)*

# COLLINS & AIKMAN CORPORATION

(Name of Issuer)

**Common Stock**

(Title of Class of Securities)

194830 10 5

(CUSIP Number)

W. Leslie Duffy, Esq.
Jonathan A. Schaffzin, Esq.
Cahill Gordon & Reindel
80 Pine Street,
New York, NY 10005
(212) 701-3000

(Name, Address and Telephone Number of Person Authorized to
Receive Notices and Communications)

December 31, 2004

(Date of Event which Requires Filing of this Statement)

If the filing person has previously filed a statement on Schedule 13G to report the acquisition that is the subject of this Schedule 13D, and is filing this schedule because of ss.240.13d-1(e), 240.13d-1(f) or 240.13d-(1)(g), check the following box / /.

*The remainder of this cover page shall be filled out for a reporting person's initial filing on this form with respect to the subject class of securities, and for any subsequent amendment containing the information which would alter the disclosures provided in a prior cover page.

The information required on the remainder of this cover page shall not be deemed to be "filed" for the purpose of Section 18 of the Securities Exchange Act of 1934 ("Act") or otherwise subject to the liabilities of that section of the Act but shall be subject to all other provisions of the Act (however, see the Notes).

Page 1 of 10

This Amendment No. 8 amends the Schedule 13D (the "Schedule 13D") previously filed with the Securities and Exchange Commission, jointly on behalf of Heartland Industrial Associates L.L.C., a Delaware limited liability company ("HIA"), Heartland Industrial Partners (FF), L.P., a Delaware limited partnership ("HIPFF"), Heartland Industrial Partners (K1), L.P., a Delaware limited partnership ("HIPK1"), Heartland Industrial Partners (C1), L.P., a Delaware limited partnership ("HIPC1"), and Heartland Industrial Partners, L.P., a Delaware limited partnership ("HIP" and, collectively with HIA, HIPFF, HIPK1 and HIPC1, the "Reporting Heartland Entities") and David A. Stockman, with respect to the common stock, par value $.01 (the "Common Stock"), of Collins & Aikman Corporation, a Delaware corporation (the "Company"). The definition of Reporting Heartland Entities is amended to exclude HIP Side-By-Side IA, L.L.C. ("HIP Side") and include HIP Side-By-Side Partners, L.P. ("HIP Side LP"). Capitalized terms used but not otherwise defined herein shall have the meanings heretofore ascribed to them in the Schedule 13D, as amended prior to the date hereof.

All share numbers in this filing (including on the cover page) give effect to the one-for-2.5 reverse stock split (The "Split") effected by the Company in May 2002. This needs to be considered in comparing the information against previous filings. This filing is being made to reflect principally certain open market purchases of 70,000 shares of Common Stock in aggregate effected by the Reporting Heartland Entities on December 30, 2004 and December 31, 2004 and 10,000 shares of Common Stock in aggregate effected by David Stockman on December 30, 2004 and December 31, 2004.

**Item 3. Source and Amount of Funds or Other Consideration.**

**Item 3 is hereby amended by the addition of the following paragraphs:**

All of the funds for purchases effected on December 30, 2004 and December 31, 2004 by the Reporting Heartland Entities were directly or indirectly derived from contributions made by the limited partners, general partner and members, as applicable, of each of the Reporting Heartland Entities. As a result of share purchases, the Reporting Heartland Entities acquired an aggregate of an additional 70,000 shares of Common Stock on December 30, 2004 and December 31, 2004.

David Stockman used his personal funds to acquire an aggregate of 10,000 shares of Common Stock on December 30, 2004 and December 31, 2004.

**Item 4. Purpose of the Transaction.**

**Item 4 is hereby amended by the addition of the following paragraph:**

The purchase of 70,000 additional shares of Common Stock on December 30, 2004 and December 31, 2004 by the Reporting Heartland Entities and the 7,500 shares of Common Stock purchased by David Stockman on December 30, 2004 and December 31, 2004, in an indi-

A169

vidual capacity, were in furtherance of their previously described intentions and was undertaken at this time in light of applicable trading prices.

**Item 5. Interest in Securities in Collins & Aikman Corporation.**

**Item 5 is hereby amended by substituting the 1st, 2nd and 3rd paragraphs** for the following:

(a)-(c) At the close of business on December 31, 2004, the Reporting Heartland Entities beneficially owned (and have sole power to vote and sole power to dispose of) an aggregate of 32,714,147 shares of common stock, representing approximately 39.1% of the outstanding common stock. David A. Stockman and the other members of HIA may be deemed to be the beneficial owner of the securities held by the Reporting Heartland Entities. David A. Stockman and such members disclaim such beneficial ownership. 70,000 shares of common stock were acquired on December 30, 2004 and December 31, 2004 in one transaction at a weighted average price of $4.37 per share. At the close of business on December 31, 2004 David Stockman, in an individual capacity beneficially owned (and has sole power to vote and sole power to dispose of) an aggregate of 331,900 shares of common stock, representing approximately .40% of the outstanding common stock at a weighted average price of $4.37 per share.

The ownership of each of the Reporting Heartland Entities is set forth in the following table.

| Shareholder | Common Stock | Shares of Percent |
|-------------|--------------|-------------------|
| Heartland Industrial Associates L.L.C. | 32,714,147 | 39.1% |
| Heartland Industrial Partners (FF), L.P. | 393,049 | .47% |
| Heartland Industrial Partners (C1), L.P. | 76,746 | .09% |
| Heartland Industrial Partners, L.P. | 31,990,479 | 38.3% |
| HIP Side-by-Side Partners, L.P. | 70,000 | .08% |

The foregoing percentages are based on 83,630,087 shares of common stock of the Company outstanding on February 26, 2004.

After reasonable inquiry and to the best of my knowledge and belief, I certify that the information set forth in this statement is true, complete and correct.

```
        Dated    January 6, 2004


                                Heartland Industrial Associates L.L.C.

                                Heartland Industrial Partners (FF), L.P.,

                                Heartland Industrial Partners (C1), L.P.,

                                Heartland Industrial Partners, L.P.

                                HIP Side-By-Side Partners, L.P.



                                By:   /s/ David A. Stockman
                                      -------------------------------
                                      David A. Stockman
```

David Stockman, in his individual capacity

```
                      /s/ David A. Stockman
                      ---------------------
```

Page 10 of 10

**End of Filing**

*Powered By* **EDGAR** Online

© 2005 | EDGAR Online, Inc.

A171

Tab 17

# SECURITIES AND EXCHANGE COMMISSION
## Washington, D.C. 20549
### SCHEDULE 13D

#### Under the Securities Exchange Act of 1934

# COLLINS & AIKMAN CORPORATION

(Name of Issuer)

**Common Stock**

(Title of Class of Securities)

194830 10 5

(CUSIP Number)

D. Kerry Crenshaw, Esq.
Clark Hill PLC
500 Woodward Avenue, Suite 3500
Detroit, MI 48226-3435
(313) 965-8300
(Name, Address and Telephone Number of Person Authorized to Receive Notices and
Communications)

July 3, 2001

(Date of Event Which Requires Filing of This Statement)

If the filing person has previously filed a statement on Schedule 13G to report

the acquisition that is the subject of this Schedule 13D, and is filing this schedule because of Rule 13d-1(e), Rule 13d-1(f) or Rule 13d-1(g), check the following box.[_]

Note: Schedules filed in paper format shall include a signed original and five copies of the schedule, including all exhibits. See Rule 13d-7(b) for other parties to whom copies are to be sent.

The remainder of this cover page shall be filled out for a reporting person's initial filing on this form with respect to the subject class of securities, and for any subsequent amendment containing information which would alter disclosures provided in a prior cover page.

The information required on the remainder of this cover page shall not be deemed to be "filed" for the purpose of Section 18 of the Securities Exchange Act of 1934 ("Act") or otherwise subject to the liabilities of that section of the Act but shall be subject to all other provisions of the Act (however, see the Notes).

**SCHEDULE 13D**

CUSIP No. 194830 10 5

---

| 1 | Names of Reporting Persons<br>I.R.S. Identification Nos. of Above Persons<br><br>CHARLES E. BECKER |
|---|---|

---

| 2 | Check the Appropriate Box if a Member of a Group (See Instructions)<br>(a) [_]<br>(b) [_] |
|---|---|

---

| 3 | SEC USE ONLY |
|---|---|

---

| 4 | Source of Funds (See Instructions)<br><br>SC, PF |
|---|---|

---

| 5 | Check if Disclosure of Legal Proceedings is Required Pursuant<br>to Items 2(d) or 2(e)                                            [_] |
|---|---|

---

| 6 | Citizenship or Place of Organization<br><br>United States |
|---|---|

---

|  | 7 | Sole Voting Power |
|---|---|---|
| NUMBER OF |  |  |
| SHARES |  | 14,848,156 |
| | 8 | Shared Voting Power |
| BENEFICIALLY |  |  |
| OWNED BY |  | None |
| EACH | 9 | Sole Dispositive Power |
| REPORTING |  |  |
| PERSON |  | 14,848,156 |
| WITH | 10 | Shared Dispositive Power |
| |  | None |

---

| 11 | Aggregate Amount Beneficially Owned by Each Reporting Person<br><br>14,848,156<br><br>* Includes 14,448,156 shares owned by Mr. Becker and warrants for an<br>  additional 400,000 shares |
|---|---|

---

| 12 | Check if the Aggregate Amount in Row (11) Excludes Certain Shares<br>(See Instructions)<br><br>[X] |
|---|---|

---

| 13 | Percent of Class Represented by Amount in Row (11)<br><br>13.78% |
|---|---|

---

| 14 | Type of Reporting Person (See Instructions)<br><br>IN |
|---|---|

---

**Item 1. Security and Issuer**

The class of equity securities to which this statement on Schedule 13D (the "Statement") relates is the common stock, par value $0.01 per share (the "Common Stock"), of Collins & Aikman Corporation, a Delaware corporation (the "Company"). The principal executive offices of the Company are located at 5755 New King Court, Troy, Michigan 48090.

**Item 2. Identity and Background**

This Statement is being filed on behalf of Charles E. Becker, a United States citizen with a principal business office at 250 Stephenson Hwy., Suite 300, Troy, Michigan 48084.

Charles E. Becker is the Vice Chairman of the Company. During the last five years, Mr. Becker has not been convicted in a criminal proceeding (excluding traffic violations or similar misdemeanors), nor has he been a party to a civil proceeding of a judicial or administrative body of competent jurisdiction and as a result of such proceeding was or is subject to a judgment, decree or final order enjoining future violations of, or prohibiting or mandating activities subject to, federal or state securities laws or finding any violation with respect to such laws.

**Item 3. Source and Amount of Funds or Other Consideration**

Charles E. Becker's acquisition of 13,600,000 shares and warrants to purchase an additional 400,000 shares of the Common Stock of the Company is the result of the merger of CE Becker, Inc., a Michigan corporation previously wholly owned by Mr. Becker, into the Company. Immediately following the merger, Mr. Becker agreed to cancel indebtedness in the amount of $4,240,780 of Jens Hohnel in exchange for 848,156 shares of Common Stock pursuant to a separate Stock Purchase Agreement between Mr. Becker and Mr. Hohnel, a copy of which Stock Purchase Agreement is attached hereto as Exhibit 4.

**Item 4. Purpose of Transaction**

Charles E. Becker, Michael E. McInerney and Jens Hohnel (collectively, the "Sellers") entered into an Agreement and Plan of Merger (the "Merger Agreement") dated as of May 14, 2001 with Collins & Aikman Corporation, Collins & Aikman Products Co., CE Becker, Inc., ME McInerney, Inc., J Hoehnel, Inc. and Becker Group, L.L.C. pursuant to which CE Becker, Inc., ME McInerney, Inc. and J Hoehnel, Inc. (collectively, the "Corporations") were merged into Collins & Aikman Corporation, resulting in the acquisition by Collins & Aikman Products Co. of 100% of the membership interests in Becker Group, L.L.C., for an aggregate purchase price of $163,000,000. Charles E. Becker received, as a portion of the purchase price, 13,600,000 shares and warrants for an additional 400,000 shares of the Common Stock. Mr. Becker and Mr. Hohnel entered into a Stock Purchase Agreement dated as of July 3, 2001, pursuant to which Mr. Becker purchased from Mr. Hohnel 848,156 shares of Common Stock, at an aggregate purchase price of $4,240,780, a copy of which Stock Purchase Agreement is attached hereto as Exhibit 4.

Mr. Becker has been appointed to the Board of Directors of the Company as Vice Chairman. Mr. Becker consummated the share acquisitions in order to effect the merger of CE Becker, Inc. into the Company and to further his investment in motor vehicle interior trim manufacturing companies.

Mr. Becker intends to review from time to time both the Company's and his own personal business affairs and financial position. Based on such evaluation and review, Mr. Becker may consider from time to time various strategic alternatives. Subject to the Stockholders Agreement (as described in Item 6), such strategic alternatives may include, among other things, the acquisition of additional shares of Common Stock or other securities of the Company or the sale of any number of shares of Common Stock or other securities of the Company, extraordinary corporate transactions or any other of the matters described in Item 4 of Schedule 13D.

**Item 5. Interest in Securities of the Issuer.**

At the close of business on July 3, 2001, Charles E. Becker beneficially owned (and had sole power to vote and sole power to dispose of) an aggregate of 14,848,156 shares of Common Stock, representing approximately 13.78 % of the outstanding Common Stock, which shares included 14,448,156 shares of Common Stock and warrants to purchase an additional 400,000 shares of Common Stock. The foregoing percentage is based upon 104,872,130 shares of Common Stock outstanding on July 3, 2001.

By virtue of the Stockholders Agreement described in Item 6 hereto, Charles E. Becker may be deemed to be a group with all of the shareholders that are a party to such agreement. As of July 3, 2001, the shareholders party to the Stockholders Agreement beneficially owned 69,000,000 shares and warrants for an additional 500,000 shares of Common Stock, representing approximately 66.27 % of the outstanding Common Stock. Charles E. Becker

disclaims any beneficial ownership of any shares of Common Stock and warrants held by other parties to the Stockholders Agreement.

### Item 6. Contracts, Arrangements, Understandings or Relationships With Respect to Securities of the Issuer.

In connection with the share acquisition relating to the merger of CE Becker, Inc. into the Company, Charles E. Becker entered into a Stockholders Agreement, dated as of July 3, 2001, among Charles E. Becker, Michael E. McInerney, Jens Hohnel, Collins & Aikman Corporation and Heartland Industrial Partners, L.P. ("Heartland"). The following description of certain terms of the Stockholders Agreement is qualified in its entirety by reference to the Stockholders Agreement, a copy of which is attached hereto as Exhibit 2.

Election of Directors. Each stockholder has agreed to vote his or its shares to ensure that Charles E. Becker is a member and Vice Chairman of the Board of Directors of the Company so long as the Becker Stockholders (as defined in the Stockholders Agreement) continue to hold at least twenty-five percent of the Common Stock owned by them as of July 3, 2001.

Transfers of Common Stock. The Stockholders Agreement places a general restriction on the sale, encumbrance or transfer of Common Stock, except for transfers to permitted transferees, pursuant to the tag-along or drag-along provisions described below, pursuant to Rule 144 or an effective registration statement under the Securities Act.

Right of First Offer. The Stockholders Agreement provides that no New Stockholder (as defined in the Stockholders Agreement) may transfer any of its shares other than to (a) a permitted transferee, (b) pursuant to the tag-along and drag-along provisions, or (c) pursuant to Rule 144 or an effective registration statement under the Securities Act unless such New Stockholder shall first offer such shares to each Investor Stockholder (as defined in the Stockholders Agreement). If the Investor Stockholders decline to purchase the shares, then the Company has the right to purchase such shares.

Tag-along and Drag-along Rights. The Stockholders Agreement grants to the stockholders, in connection with a proposed transfer of Common Stock by Heartland, the right to require the proposed transferee to purchase a proportionate percentage of the shares owned by the other stockholders upon the same economic terms as are being offered to Heartland. The Stockholders Agreement provides that so long as Heartland is entitled to designate directors to the Company's board, Heartland will have the right to require the other stockholders to sell a proportionate percentage of shares of Common Stock in such transaction as Heartland is selling upon the same economic terms and otherwise to vote in favor of the transactions.

### Item 7. Material to be Filed as Exhibits.

Exhibit 1. Agreement and Plan of Merger dated as of May 14, 2001, by and among Collins & Aikman Corporation, Collins & Aikman Products Co., Becker Group, L.L.C., Charles E. Becker, Michael E. McInerney, Jens Hohnel, CE Becker, Inc., ME McInerney, Inc. and J Hoehnel, Inc.

Exhibit 2. Stockholders Agreement dated as of July 3, 2001, by and among Charles E. Becker, Michael E. McInerney, Jens Hohnel, Collins & Aikman Corporation and Heartland Industrial Partners, L.P.

Exhibit 3. Warrant for the Purchase of Shares of Common Stock dated as of July 3, 2001, issued by Collins & Aikman Corporation.

Exhibit 4. Stock Purchase Agreement dated as of July 3, 2001, by and between Charles E. Becker and Jens Hohnel.

**Signature.**

After reasonable inquiry and to the best of my knowledge and belief, I certify that the information set forth in this statement is true, complete and correct.

<u>July 13, 2001</u>
**Date**

```
              /s/ Charles E. Becker
              ---------------------------------------------------------
              Signature
```

**Name/Title Charles E. Becker, Vice Chairman**

The original statement shall be signed by each person on whose behalf the statement is filed or his authorized representative. If the statement is signed on behalf of a person by his authorized representative (other than an executive officer or general partner of this filing person), evidence of the representative's authority to sign on behalf of such person shall be filed with the statement, provided, however, that a power of attorney for this purpose which is already on file with the Commission may be incorporated by reference. The name and any title of each person who signs the statement shall be typed or printed beneath his signature.

Attention: Intentional misstatements or omissions of fact constitute Federal

criminal violations (See 18 U.S.C. 1001).

# THIS PAGE INTENTIONALLY
# LEFT BLANK

| OMB APPROVAL |
|---------------------|
|OMB NUMBER: 3235-0145|

# UNITED STATES |EXPIRES: |

SECURITIES AND EXCHANGE COMMISSION | OCTOBER 31, 2002 |

## Washington, D.C. 20549 |ESTIMATED AVERAGE |
|BURDEN HOURS |
|PER RESPONSE ...14.90|
|---------------------|

**SCHEDULE 13D**
Under the Securities Exchange Act of 1934

(Amendment No.___)*

# Collins & Aikman Corporation

(Name of Issuer)

Common Stock, par value $.01 per share

---

(Title of Class and Securities)

194830 10 5
(CUSIP Number)

Textron Inc.
Attn: Terrence O'Donnell
Executive Vice President and General Counsel
40 Westminster Street
Providence, Rhode Island 02903
Telephone: (401) 421-2800

---

(Name, Address and Telephone Number of Person Authorized
to Receive Notices and Communications)

December 20, 2001
(Date of Event which Requires Filing of this Statement)

If the filing person has previously filed a statement on Schedule 13G to report the acquisition that is the subject of this Schedule 13D, and is filing this schedule because of Sections 240.13d-1(e), 240.13d-1(f) or 240.13d-1(g), check the following box. [ ]

Note: Schedules filed in paper format shall include a signed original and five copies of the schedule, including all exhibits. See Section 240.13d-7 for other parties to whom copies are to be sent.

\* The remainder of this cover page shall be filled out for a reporting person's initial filing on this form with respect to the subject class of securities, and for any subsequent amendment containing information which would alter disclosures provided in a prior cover page.

The information required on the remainder of this cover page shall not be deemed to be "filed" for the purpose of Section 18 of the Securities Exchange Act of 1934 ("Act") or otherwise subject to the liabilities of that section of the Act but shall be subject to all other provisions of the Act (however, see the Notes).

**SCHEDULE 13D**

---

**CUSIP No. 194830 10 5**

1. NAMES OF REPORTING PERSONS

**Textron Inc.**

**I.R.S. IDENTIFICATION NOS. OF ABOVE PERSONS (entities only)**

05-0315468

2. CHECK THE APPROPRIATE BOX IF A MEMBER OF A GROUP:

(a) ( )

(b) (X)

3. SEC USE ONLY

4. SOURCE OF FUNDS*

OO

5. CHECK BOX IF DISCLOSURE OF LEGAL PROCEEDINGS IS REQUIRED PURSUANT TO ITEMS 2(d) or 2(e) ( )

6. CITIZENSHIP OR PLACE OF ORGANIZATION

Delaware

7. SOLE VOTING POWER

18,000,000

8. SHARED VOTING POWER

-0-

9. SOLE DISPOSITIVE POWER

18,000,000

10. SHARED DISPOSITIVE POWER

-0-

11. AGGREGATE AMOUNT BENEFICIALLY OWNED BY EACH REPORTING PERSON

18,000,000

12. CHECK BOX IF THE AGGREGATE AMOUNT IN ROW 11 EXCLUDES CERTAIN SHARES ( )

13. PERCENT OF CLASS REPRESENTED BY AMOUNT IN ROW 11 10.7%

14. TYPE OF REPORTING PERSON CO

**Item 1. Security and Issuer.**

The class of equity securities to which this Statement relates is the common stock, par value $.01 per share (the "Common Stock"), of Collins & Aikman Corporation (the "Company"). The principal executive offices of the Company are located at 5755 New King Court, Troy, Michigan 48098.

**Item 2. Identity and Background.**

This Statement constitutes the initial Statement on Schedule 13D of Textron Inc. ("Textron") with respect to the acquisition by Textron Holdco Inc., an indirect wholly owned subsidiary of Textron ("Textron Holdco"), of 18,000,000 shares of Common Stock on December 20, 2001.

Textron is a Delaware corporation with its principal executive offices located at 40 Westminster Street, Providence, Rhode Island 02903. Textron is a global multi-industry company with operations in five business segments - Aircraft, Automotive, Fastening Systems, Industrial

A178

Products and Finance. Textron's products include commercial and military helicopters, light and mid-size business jets, turboprop and piston-powered aircraft, plastic fuel tanks, golf cars and utility vehicles, turf-care equipment, industrial pumps and gears, engineered fastening systems and solutions and other industrial products. Textron is also a leading commercial finance company for select markets.

Textron Holdco is the record holder of 18,000,000 shares of Common Stock. Textron Holdco, a Rhode Island corporation, is the direct wholly owned subsidiary of McCord Corporation, a Michigan corporation ("McCord"). McCord is the direct wholly owned subsidiary of Textron Automotive Company Inc., a Delaware corporation and direct wholly owned subsidiary of Textron ("TAC"). By virtue of the foregoing, each of Textron, TAC and McCord indirectly beneficially own the 18,000,000 shares of Common Stock held by Textron Holdco. This Statement is filed by Textron on behalf of itself and each of TAC, McCord and Textron Holdco.

The name, citizenship, residence or business address and present principal occupation or employment, and the name, principal business and address of any corporation or other organization in which such employment is conducted, of each executive officer and director of Textron are set forth on Schedules A and B hereto, which schedules are hereby incorporated herein by reference in their entirety.

During the past five years, neither Textron nor, to the knowledge of Textron, any of the executive officers or directors of Textron identified on Schedules A and B hereto, has been convicted in a criminal proceeding (excluding traffic violations or similar misdemeanors).

During the past five years, neither Textron nor, to the knowledge of Textron, any of the executive officers or directors of Textron identified on Schedules A and B hereto, has been a party to a civil proceeding of a judicial or administrative body of competent jurisdiction which resulted in a judgment, decree or final order enjoining future violations of, or prohibiting or mandating activities subject to, Federal or State securities laws or finding any violations with respect to such laws.

## Item 3. Source and Amount of Funds or Other Consideration.

Pursuant to a Purchase Agreement dated as of August 7, 2001, as amended and restated as of November 30, 2001 (the "Purchase Agreement"), by and among Textron, the Company and Collins & Aikman Products Co., a wholly owned subsidiary of the Company ("C&A Products"), Textron sold to the Company and its subsidiaries the exterior and interior automotive trim operations that were managed as a unit of TAC, for cash and assumed indebtedness as well as 18,000,000 shares of Common Stock and shares of preferred stock of C&A Products (the "Preferred Stock").

## Item 4. Purpose of the Transaction.

Textron caused Textron Holdco to acquire the 18,000,000 shares of Common Stock for investment purposes only. Neither Textron nor, to the knowledge of Textron, any of the executive officers or directors of Textron identified on Schedules A and B hereto, has any plans or proposals which relate to or would result in any of the actions specified in clauses (a) through (j) of Item 4 of Schedule 13D, except that Textron reserves the right to sell or otherwise dispose of shares of Common Stock from time to time.

## Item 5. Interest in the Securities of the Issuer.

(a) According to the Company, on December 20, 2001, there were 167,882,130 shares of Common Stock issued and outstanding. Textron, TAC and McCord indirectly beneficially own, and Textron Holdco directly beneficially owns, approximately 10.7% of such shares.

(b) The shares of Common Stock indirectly beneficially owned by Textron are held of record by Textron Holdco. However, Textron indirectly possesses the sole power to direct the voting and disposition of such shares.

(c) None of Textron, TAC, McCord or Textron Holdco has effected any transaction in the Company's Common Stock during the past sixty days.

(d) No person other than Textron has any right to receive or direct the receipt of dividends from, or the proceeds from any sale of, the shares of Common Stock beneficially owned by Textron.

## Item 6. Contracts, Arrangements, Understandings or Relationships with Respect to Securities of the Issuer.

Pursuant to the Purchase Agreement, Textron is entitled, but not required, to designate one member to serve as a director (the "Textron Designee") and two representatives to serve as observers on the Board of Directors of the Company, in each case until the date upon which Textron and its affiliates cease to continuously own at least $25 million in "assigned value" of (1) the Common Stock, having an assigned value of $5 per share, (2) the shares of Preferred Stock issued to Textron Holdco pursuant to the Purchase Agreement, having an assigned value solely for the purposes of this calculation equal to the liquidation preference of $1000 per share, and (3) the equity interest in Collins & Aikman Holdings (Italy) S.r.l. (formerly Textron Automotive Holdings (Italy) S.r.l.) retained by Textron and its affiliates and having an aggregate assigned value of $23.1 million. "Value" is at all times determined by reference to the assigned values, without regard to subsequent changes in value or to the agreements as to the fair market value of the Preferred Stock at the time of issuance as set forth in the Purchase Agreement.

In connection with this right to elect a member of the Company's Board of Directors, Heartland Industrial Partners, L.P. ("HIP") has agreed to (and agreed to cause its affiliates to) vote, at a meeting or by written consent, all shares of capital stock of the Company held by HIP and its affiliates, and take all other actions necessary to ensure that, the Textron Designee (and any replacement Textron Designee) is elected to the Board of Directors of the Company within 30 days of designation by Textron. HIP has also agreed to use reasonable best efforts to cause its nominees on the Board of Directors of the Company to elect the Textron Designee (and any replacement Textron Designee) to the Company's Board.

HIP has also agreed that for so long as Textron and/or one or more of its affiliates continuously own Preferred Stock representing at least 25% of the aggregate number of shares of Preferred Stock originally issued to Textron and/or one of its affiliates pursuant to the Purchase Agreement, neither HIP nor any of its affiliates (excluding the Company and its subsidiaries and any successors to the Company) will directly or indirectly sell, transfer, encumber, distribute or dispose of any Common Stock, other than (1) in connection with a bona fide pledge to secure a financing in favor of HIP or one of its affiliates and (2) any such sale, transfer, encumbrance, distribution or disposition if, after giving effect thereto, HIP and its affiliates beneficially own at least 65% of the number of shares of Common Stock beneficially owned by HIP and its affiliates (other than the Company and its subsidiaries) as of November 30, 2001 after giving effect to all of the transactions contemplated by the Purchase Agreement, as such number may be appropriately and equitably adjusted to reflect any stock split, combination, dividend, distribution or exchange relating to the Common Stock.

In addition, in connection with the transactions contemplated by the Purchase Agreement, on December 20, 2001, Textron, Textron Holdco and the Company entered into a Registration Rights Agreement (filed as Exhibit 1 hereto) which entitles Textron and its subsidiaries to certain registration rights from the Company with respect to the shares of Common Stock. The foregoing description of the Registration Rights Agreement is qualified in its entirety by reference to Exhibit 1, which is incorporated herein by reference in its entirety.

**Item 7. Material to be Filed as Exhibits.**

```
Exhibit 1    Registration Rights Agreement by and between Textron
             Inc., Textron Holdco Inc. and Collins & Aikman
             Corporation dated as of December 20, 2001
```

The Index of Exhibits attached to this Statement is hereby incorporated by reference in its entirety.

## SIGNATURES

After reasonable inquiry and to the best of my knowledge and belief, I certify that the information set forth in this Statement is true, complete and correct.

Dated: December 28, 2001

**Textron Inc.**

```
By: /s/ Arnold M. Friedman
    ---------------------------
Name:  Arnold M. Friedman
Title: Vice President and
       Deputy General Counsel
```

## Schedule A

**TEXTRON INC. - BOARD OF DIRECTORS**

(Unless otherwise indicated, each of the individuals listed below is a United States citizen.)

| NAME | POSITION | BUSINESS ADDRESS |
|------|----------|------------------|
| Arnelle, H. Jesse | Of Counsel | Womble, Carlyle, Sandridge & Rice 200 West Second Street Winston-Salem, NC 27102 |
| Beck, Teresa | Former President American Stores Company | 1681 South Mohawk Way Salt Lake City, UT 84108 |
| Campbell, Lewis B. | Chairman, President and Chief Executive Officer | Textron Inc. 40 Westminster Street Providence, RI 02903 |
| Dickson, R. Stuart | Chairman of the Executive Committee | Ruddick Corporation 301 South Tyron St. |

A180

|  |  |  |
|---|---|---|
| | | Suite 1800<br>Charlotte, NC 28202 |
| Fish, Lawrence K. | Chairman, President and Chief Executive Officer | Citizens Financial Group, Inc.<br>One Citizens Plaza<br>Providence, RI 02903 |
| Ford, Joe T. | Chairman and Chief Executive Officer | ALLTEL Corporation<br>One Allied Drive<br>Little Rock, AR 72202 |
| Gagne, Paul E.<br>(Canadian citizen) | Consultant, Corporate Strategic Planning and Acquisitions | Kruger Inc.<br>3285 Bedford Road<br>Montreal<br>Quebec H3S IG5 Canada |
| Lord Powell of Bayswater KCMG<br>(United Kingdom citizen) | Former Foreign Affairs and Defense Advisor to Prime Minister Margaret Thatcher | Sagitta Asset Management Limited<br>Berkeley Square House, 4th Floor<br>Berkeley Square<br>London, W1X 5PN England |
| Macomber, John D. | Principal | JDM Investment Group<br>2806 N Street, NW<br>Washington, DC 20007 |
| Rowe, Brian H. | Retired Chairman, Consultant | GE Aircraft Engines<br>General Electric Company<br>1 Neumann Way, N178<br>Cincinnati, OH 45215 |
| Segnar, Samuel F. | Retired Chairman and Chief Executive Officer Enron Corporation | 10077 Grogan's Mill Road<br>Suite 530<br>The Woodlands, TX 77380 |
| Wheeler, Thomas B. | Retired Chairman and Chief Executive Officer | Massachusetts Mutual Financial Group<br>1295 State Street<br>Springfield, MA 01111 |
| Walker, Martin D. | Principal | MORWAL Investments<br>24650 Center Ridge Road, Suite 110<br>Westlake, OH 44145 |

## Schedule B

## TEXTRON INC. - EXECUTIVE OFFICERS

(Unless otherwise indicated, each of the individuals listed below maintains his or her office at 40 Westminster Street, Providence, RI 02903.

Each of the individuals listed below is a United States citizen.)

| NAME | POSITION/BUSINESS ADDRESS |
|---|---|
| Campbell, Lewis B. | Chairman, President and Chief Executive Officer |
| Bohlen, Kenneth C. | Executive Vice President and Chief Innovation Officer |
| Butler, John D. | Executive Vice President - Administration and Chief Human Resources Officer |
| French, Theodore R. | Executive Vice President and Chief Financial Officer |
| Howell, Mary L. | Executive Vice President - Government, Strategy Development and International, Communications and Investor Relations<br>1101 Pennsylvania Avenue, NW, Suite 400 Washington, DC 20004 |
| O'Donnell, Terrence | Executive Vice President and General Counsel |

## INDEX OF EXHIBITS

| Number | Description |
|---|---|
| Exhibit 1 | Registration Rights Agreement by and |

A181

between Textron Inc., Textron Holdco
Inc. and Collins & Aikman Corporation
dated as of December 20, 2001

THIS PAGE INTENTIONALLY

LEFT BLANK

# SECURITIES AND EXCHANGE COMMISSION
## Washington, DC 20549

**SCHEDULE 13D**

Under the Securities Exchange Act of 1934

# Collins & Aikman Corporation

(Name of Issuer)

**Common Stock, $.01 par value**

(Title of Class of Securities)

194830 10 5

(CUSIP Number)

Donald L. Shulman
Goulston & Storrs P.C.
400 Atlantic Avenue
Boston, MA 02110
(617) 482-1776

(Name, Address and Telephone Number of Person Authorized to Receive
Notices and Communications)

September 21, 2001

(Date of Event which Requires Filing of this Statement)

If the filing person has previously filed a statement on Schedule 13G to report the acquisition that is the subject of this Schedule 13D, and is filing this schedule because of Rule 13d-1(e), 13d-1(f) or 13d-1(g), check the following box [ ].

Note: Schedules filed in paper format shall include a signed original and five copies of the schedule, including all exhibits. See Rule 13d-7(b) for other parties to whom copies are to be sent.

(Continued on following pages)

(Page 1 of 8 Pages)

```
--------------------                                    -----------------------
CUSIP No. 194830 10 5              13D                    Page 2 of 8 Pages
--------------------                                    -----------------------
```

```
--------------------------------------------------------------------------------
   1.    NAME OF REPORTING PERSON
         I.R.S. IDENTIFICATION NO. OF ABOVE PERSON
              Elkin B. McCallum
--------------------------------------------------------------------------------
   2.    CHECK THE APPROPRIATE BOX IF A MEMBER OF A GROUP*
                                                              (a)  [ ]
                                                              (b)  [ ]
--------------------------------------------------------------------------------
   3.    SEC USE ONLY

--------------------------------------------------------------------------------
   4.    SOURCE OF FUNDS*
                  SC
                  AF
--------------------------------------------------------------------------------
   5.    CHECK BOX IF DISCLOSURE OF LEGAL PROCEEDINGS IS
         REQUIRED PURSUANT TO ITEMS 2(d) OR 2(e)
                                                                    [ ]
--------------------------------------------------------------------------------
   6.    CITIZENSHIP OR PLACE OF ORGANIZATION
              United States
--------------------------------------------------------------------------------
                       7.    SOLE VOTING POWER
                                  12,760,000
       NUMBER OF       ---------------------------------------------------------
        SHARES         8.    SHARED VOTING POWER
     BENEFICIALLY              99,000
      OWNED BY        ---------------------------------------------------------
        EACH           9.    SOLE DISPOSITIVE POWER
      REPORTING               12,760,000
       PERSON        ---------------------------------------------------------
        WITH          10.    SHARED DISPOSITIVE POWER
                              99,000
--------------------------------------------------------------------------------
  11.    AGGREGATE AMOUNT BENEFICIALLY OWNED BY EACH REPORTING PERSON
              12,859,000
--------------------------------------------------------------------------------
  12.    CHECK BOX IF THE AGGREGATE AMOUNT IN ROW (11) EXCLUDES
         CERTAIN SHARES*                                             [ ]
--------------------------------------------------------------------------------
  13.    PERCENT OF CLASS REPRESENTED BY AMOUNT IN ROW (11)
              10.9
--------------------------------------------------------------------------------
  14.    TYPE OF REPORTING PERSON*
              IN
--------------------------------------------------------------------------------
                 *SEE INSTRUCTIONS BEFORE FILLING OUT!
```

Item 1.  SECURITY AND ISSUER.

  The class of equity securities to which this statement on Schedule 13D (the "Statement") relates is the common stock, par value $.01 per share (the "Common Stock"), of Collins & Aikman Corporation, a Delaware corporation (the "Company"). The principal executive offices of the Company are located at 5755 New King Court, Troy, Michigan 48090.

Item 2.  IDENTITY AND BACKGROUND.

  This Statement is filed by Elkin B. McCallum. Mr. McCallum's business address is 100 Vesper Executive Park, Tyngsboro, Massachusetts 01879. Mr. McCallum is Chairman of the Board of Directors of Joan Fabrics Corporation.

  During the five years prior to the date hereof, Mr. McCallum has not been convicted in a criminal proceeding (excluding traffic violations or similar misdemeanors), nor has Mr. McCallum been a party to a civil proceeding of a judicial or administrative body of competent jurisdiction which as a result of such proceeding Mr. McCallum was or is subject to a judgment, decree or final order enjoining future violations of, or prohibiting or mandating activities subject to, federal or state securities laws or finding any violation with respect to such laws.

  Mr. McCallum is a citizen of the United States.

Item 3.  SOURCE AND AMOUNT OF FUNDS OR OTHER CONSIDERATION.

  Mr. McCallum's acquisition of 12,760,000 shares of Common Stock of the Company is a result of the merger of JAII Acquisition Co., a Delaware corporation, and a wholly owned subsidiary of the Company, into Joan Automotive Industries, Inc. ("JAI"), a Delaware Corporation and a wholly owned subsidiary of Joan Fabrics Corporation (the "Merger"). Upon completion of the Merger, JAI became a wholly owned subsidiary of the Company.

  Prior to the Merger, JAI was a wholly owned subsidiary of Joan Fabrics Corporation and Joan Fabrics Corporation was and continues to be a wholly owned subsidiary of JFC Holdings Trust, a Massachusetts Business Trust (the "Trust"). Mr. McCallum is the sole trustee and the beneficial owner of seventy five percent (75%) of the beneficial interest of the Trust.

A185

Item 4.    PURPOSE OF THE TRANSACTION.

Elkin McCallum, Joan Fabrics Corporation and JAI. (collectively, the "Sellers") entered into an Agreement and Plan of Merger dated as of August 17, 2001, as amended by the First Amendment to the Agreement and Plan of Merger dated September 21, 2001 (attached hereto as Exhibits 1 and 2 respectively) with the Company, Collins & Aikman Products Co. and JAII Acquisition Co. pursuant to which JAII Acquisition Co. was merged into JAI, resulting in the acquisition by the Company of JAI. In consideration for the JAI stock, the Company assumed (and subsequent to the Merger repaid) $55,000,000 of Joan Fabrics Corporation's outstanding debt and, in connection with the Merger, converted Joan Fabrics Corporation's outstanding shares of JAI stock into 12,760,000 shares of Common Stock. Mr. McCallum consummated the acquisition of the Company Common Stock in order to effect the merger of JAII Acquisition Co. into JAI and to further his investment in fabric manufacturing companies.

Pursuant to the terms of the Stockholders Agreement, a copy of which is attached hereto as Exhibit 3, Mr. McCallum shall be appointed to the Board of Directors of the Company and, as a director of the Company, plans to be involved in future decisions regarding the operation and direction of the Company.

Mr. McCallum has no plans to purchase additional securities of the Company or to sell any securities of the Company. Mr. McCallum intends to review from time to time both the Company's and his own business affairs and financial position. Based on such evaluation and review, Mr. McCallum may consider from time to time various strategic alternatives such as the acquisition or disposition of Common Stock or any other matters set forth in paragraphs (a) - '(j) of Item 4 of the Instructions to Schedule 13D.

Except as set forth above, the reporting person has no plans or proposals with respect to the matters set forth in paragraphs (a) - (j) of Item 4 of the Instructions to Schedule 13D.

Item 5.    INTEREST IN SECURITIES OF THE ISSUER.

(a) The aggregate number of shares of Common Stock beneficially owned by Mr. McCallum is 12,859,000. This number includes the following securities: 12,760,000 shares of Commons Stock owned by Joan Fabrics Corporation, 75,000 shares of Common Stock owned directly by Mr. McCallum and his wife Donna McCallum and 24,000 shares of Common Stock owned by The McCallum Family Foundation of which Mr. McCallum acts as one of three Trustees. For purposes of Section 13, Mr. McCallum beneficially owns 10.9% of the Company. This percentage is based upon 117,882,130 shares of outstanding Common Stock.

(b) Mr. McCallum has the sole power to vote or direct the vote

of, and to dispose or direct the disposition of, 12,760,000 shares of Common Stock.1 Mr. McCallum shares the power to vote or direct the vote of, or to dispose or direct the disposition of 99,000 shares of Common Stock.

(c) The reporting person had no transactions within the last 60 days.

(d) Not applicable.

(e) Not applicable.

By virtue of the Stockholders Agreement described in Item 6 hereto, Mr. McCallum may be deemed to be a group with all of the shareholders that are a party to such agreement. Elkin McCallum disclaims any beneficial ownership of any shares of Common Stock and warrants held by other parties to the Stockholders Agreement.

Item 6.    CONTRACTS, ARRANGEMENTS, UNDERSTANDINGS OR RELATIONSHIPS WITH RESPECT TO SECURITIES OF THE ISSUER.

In connection with the share acquisition relating to the merger of JAII Acquisition Co. into JAI, Elkin McCallum entered into a Stockholders Agreement, dated as of September 21, 2001, among the Company, Heartland Industrial Partners, L.P. ("Heartland"), Charles Becker, Michael E. McInerney, Jens Hohnel, Joan Fabrics Corporation, JFC Holdings Trust, Donna McCallum and Elkin McCallum. The following description of certain terms of the Stockholders Agreement is qualified in its entirety by reference to the Stockholders Agreement, a copy of which is attached hereto as Exhibit 3:

1.    Election of Directors: Each stockholder has agreed to vote his or its shares to ensure that Mr. McCallum is a member of the Board of Directors of the Company so long as the Joan Stockholders (as defined in the Stockholders Agreement) continue to hold at least twenty-five percent (25%) of the Common Stock (subject to equitable adjustments for stock splits, stock combinations and similar events) which the Joan Stockholders held on September 21, 2001.

-----------------

(1) Joan Fabrics Corporation owns 12,760,000 shares of Common Stock and the Board of Directors of Joan Fabrics Corporation will have the authority to vote such shares. As the sole trustee of the trust that owns 100% of Joan Fabrics Corporation, Mr. McCallum controls the Board of Directors and therefore has ultimate voting and investment control of the Common Stock.

2.    Right of First Offer: The Stockholders Agreement provides that no
      New Stockholder (as defined in the Stockholders Agreement) may
      transfer any of its shares other than to (i) a Permitted
      Transferee (as defined in the Stockholders Agreement), (ii)
      pursuant to the tag-along and drag-along provisions, or (iii)
      pursuant to Rule 144 or an effective registration statement under
      the Securities Act of 1933 unless such New Stockholder shall
      first offer such shares to each Investor Stockholder (as defined
      in the Stockholders Agreement). If the Investor Stockholders
      decline to purchase the offered shares, then the Company shall
      have the right to purchase such shares. If the Company declines
      to purchase the offered shares, the New Stockholder may sell the
      offered shares to a third party pursuant to the terms of
      Stockholders Agreement.

3.    Tag-along and Drag-along Rights: The Stockholders Agreement
      grants to the Stockholders (as defined in the Stockholders
      Agreement), in connection with a proposed transfer of Common
      Stock by Heartland, the right to require the proposed transferee
      to purchase shares owned by the other stockholders upon the same
      economic terms as are being offered the Heartland. The
      Stockholders Agreement provides that so long as Heartland is
      entitled to designate directors to the Company's board, if
      Hearland receives a bona fide offer to purchase all or
      substantially all of the shares of Common Stock held by
      Heartland, Heartland will have the right to require the other
      Stockholders to sell all of their shares of Common Stock in such
      transaction upon the same economic terms and otherwise to vote in
      favor of the transactions.

The Common Stock owned by Joan Fabrics Corporation is also subject to
certain rights and restrictions in that certain Registration Rights
Agreement dated July 3, 2001 (effective with respect to Joan Fabrics
Corporation as of September 21, 2001) among the Company, Charles E.
Becker, Michael E. McInerney, Jens Hohnel, Joan Fabrics Corporation,
JFC Holdings Trust, Donna McCallum and Elkin McCallum. The following
description of certain terms of the Registration Rights Agreement is
qualified in its entirety by reference to the Registration Rights
Agreement, a copy of which is attached hereto as Exhibit 4:

1.    Demand Registration: The Registration Rights Agreement grants the
      Joan Stockholders (as defined in the Registration Rights
      Agreement) the right to request that the Company register the
      Registrable Securities (as defined in the Registration Rights
      Agreement), and the Company shall register the Registrable
      Securities provided, however, that the Company shall not be
      obligated to effect more than two such demand registrations at
      the request

of the Joan Stockholders and the Company shall not be obligated to proceed with such demand registration at any time prior to July 1, 2003.

2.  "Piggy-Back" Registration": The Registration Rights Agreement provides that a Designated Holder (as defined in the Registration Rights Agreement) may request, and the Company shall use its reasonable best efforts to cause, a managing underwriter or underwriters to permit each Designated Holder making such a request to include such Designated Holder's Registrable Securities in an offering of Common Stock by the Company for its own account or for the account of Non-Designated Stockholders (as defined in the Registration Rights Agreement), under the same terms and conditions as the securities of the Company or the securities of such Non-Designated Stockholders, as the case may be. The Company shall not be required to include any Registrable Securities in such underwritten offering unless the Designated Holders thereof accept the terms of the underwritten offering as agreed upon between the Company, such Non-Designated Stockholders, if any, and the underwriter, and then only in such quantity as the underwriter believes will not jeopardize the success of the offering.

3.  Restrictions on Public Sale: The Registration Rights Agreement provides for certain restrictions on the sale or distribution of Registrable Securities, and the ability to request the registration of securities pursuant to the Registration Rights Agreement in the event of a public offering.

Item 7.    MATERIAL TO BE FILED AS EXHIBITS.

Exhibit 1        Agreement and Plan of Merger.

Exhibit 2        First Amendment to Agreement and Plan of Merger

Exhibit 3        Stockholders Agreement

Exhibit 4        Registration Rights Agreement

```
---------------------                              ---------------------
 CUSIP No. 194830 10 5              13D              Page 8 of 8 Pages
---------------------                              ---------------------
```

SIGNATURE

    After reasonable inquiry and to the best of my knowledge and belief, I certify that the information set forth in this statement is true, complete and correct.

Dated: October 1, 2001

                                      /s/ Elkin McCallum
                                      ------------------------------------
                                      Elkin McCallum

      ATTENTION:    Intentional misstatements or omissions of fact constitute Federal criminal violations (See 18 U.S.C. 1001).

# Tab 18

# EITF ABSTRACTS

**Issue No. 02-16**

**Title:**  Accounting by a Customer (Including a Reseller) for Certain Consideration Received from a Vendor

**Dates Discussed:**  September 11–12, 2002; November 21, 2002; January 23, 2003; March 20, 2003

**References:**  FASB Statement No. 3, *Reporting Accounting Changes in Interim Financial Statements*
FASB Statement No. 5, *Accounting for Contingencies*
FASB Statement No. 116, *Accounting for Contributions Received and Contributions Made*
FASB Statement No. 131, *Disclosures about Segments of an Enterprise and Related Information*
FASB Concepts Statement No. 5, *Recognition and Measurement in Financial Statements of Business Enterprises*
FASB Concepts Statement No. 6, *Elements of Financial Statements*
APB Opinion No. 20, *Accounting Changes*
APB Opinion No. 29, *Accounting for Nonmonetary Transactions*
AICPA Audit and Accounting Guide, *Agricultural Producers and Agricultural Cooperatives*
International Accounting Standard 20, *Accounting for Government Grants and Disclosure of Government Assistance*

## ISSUE

1.    Issue No. 01-9, "Accounting for Consideration Given by a Vendor to a Customer (Including a Reseller of the Vendor's Products)," addresses the accounting by a **vendor**[1] for consideration given to a **customer,** including both a **reseller** of the vendor's products and an entity that purchases the vendor's products from a reseller.  That Issue provided accounting guidance on how a vendor should characterize consideration given to a customer and when to recognize and how to measure that consideration in its income statement.

---

[1] Terms defined in Exhibit 02-16B, the glossary, are set forth in **boldface type** the first time they appear.

Copyright © 2003, Financial Accounting Standards Board                                    Not for redistribution

2.    Questions have arisen regarding how a reseller of a vendor's products should account for **cash consideration** (as that term is defined in Issue 01-9) received from a vendor.

3.    The issues are:

Issue 1—The circumstances under which cash consideration received from a vendor by a reseller should be considered (a) an adjustment of the prices of the vendor's products or services and, therefore, characterized as a reduction of cost of sales when recognized in the reseller's income statement, (b) an adjustment to a cost incurred by the reseller and, therefore, characterized as a reduction of that cost when recognized in the reseller's income statement, or (c) a payment for assets or services delivered to the vendor and, therefore, characterized as revenue when recognized in the reseller's income statement

Issue 2—If a vendor offers a customer a rebate or refund of a specified amount of cash consideration that is payable only if the customer completes a specified cumulative level of purchases or remains a customer for a specified time period, when the customer should recognize the rebate and how the customer should measure the amount of the offer

Issue 3—Under what circumstances up-front nonrefundable cash consideration given by a vendor to a customer should be recognized immediately in the customer's income statement rather than as a liability

Copyright © 2003, Financial Accounting Standards Board

Not for redistribution

Issue 4—How to measure and when to recognize the reduction of a liability incurred upon receipt of up-front nonrefundable cash consideration in the customer's income statement.

## EITF DISCUSSION

4.    At the November 21, 2002 meeting, the Task Force reached a consensus on Issue 1 that cash consideration received by a customer from a vendor is presumed to be a reduction of the prices of the vendor's products or services and should, therefore, be characterized as a reduction of cost of sales when recognized in the customer's income statement. However, that presumption is overcome when the consideration is either (a) a payment for assets or services delivered to the vendor, in which case the cash consideration should be characterized as revenue (or other income, as appropriate) when recognized in the customer's income statement, or (b) a reimbursement of costs incurred by the customer to sell the vendor's products, in which case the cash consideration should be characterized as a reduction of that cost when recognized in the customer's income statement.

5.    The Task Force reached a consensus that cash consideration represents a payment for assets or services delivered to the vendor and should be characterized as revenue (or other income, as appropriate) when recognized in the customer's income statement if the vendor receives, or will receive, an identifiable benefit (goods or services) in exchange for the consideration. In order to meet that condition the identified benefit must be sufficiently separable from the customer's purchase of the vendor's products such that the *customer* would have entered into an exchange transaction with a party other than the

Copyright © 2003, Financial Accounting Standards Board                    Not for redistribution

vendor in order to *provide* that benefit, and the customer can reasonably estimate the fair value of the benefit provided. If the amount of cash consideration paid by the vendor exceeds the estimated fair value of the benefit received, that excess amount should be characterized as a reduction of cost of sales when recognized in the customer's income statement.

6.    The Task Force reached a consensus that cash consideration represents a reimbursement of costs incurred by the customer to sell the vendor's products and should be characterized as a reduction of that cost when recognized in the customer's income statement if the cash consideration represents a reimbursement of a specific, incremental, identifiable cost incurred by the customer in selling the vendor's products or services. If the amount of cash consideration paid by the vendor exceeds the cost being reimbursed, that excess amount should be characterized in the customer's income statement as a reduction of cost of sales when recognized in the customer's income statement.

7.    The Task Force reached a consensus on Issue 2 that a rebate or refund of a specified amount of cash consideration that is payable pursuant to a binding arrangement only if the customer completes a specified cumulative level of purchases or remains a customer for a specified time period should be recognized as a reduction of the cost of sales based on a systematic and rational allocation of the cash consideration offered to each of the underlying transactions that results in progress by the customer toward earning the rebate or refund provided the amounts are probable and reasonably estimable. If the rebate or refund is not probable and reasonably estimable, it should be recognized as the milestones are achieved.

Copyright © 2003, Financial Accounting Standards Board

Not for redistribution

8.   The Task Force observed that the ability to make a reasonable estimate of the amount of future cash rebates or refunds depends on many factors and circumstances that will vary from case to case.  However, the Task Force reached a consensus that the following factors may impair a customer's ability to determine whether the rebate or refund is probable and reasonably estimable:

a.   The rebate or refund relates to purchases that will occur over a relatively long period.
b.   There is an absence of historical experience with similar products or the inability to apply such experience because of changing circumstances.
c.   Significant adjustments to expected cash rebates or refunds have been necessary in the past.
d.   The product is susceptible to significant external factors (for example, technological obsolescence or changes in demand).

9.   The Task Force reached a consensus that changes in the estimated amount of cash rebates or refunds and retroactive changes by a vendor to a previous offer (an increase or a decrease in the rebate amount that is applied retroactively) are changes in estimate that should be recognized using a cumulative catch-up adjustment.  That is, the customer would adjust the cumulative balance of its rebate recognized to the revised cumulative estimate immediately.  The Task Force observed that entities should consider whether any portion of the cumulative-effect adjustment impacts, for example, inventory, in which case only a portion of that adjustment would be reflected in the income statement.

10.   The Task Force agreed to discontinue consideration of Issues 3 and 4 regarding whether up-front nonrefundable cash consideration given by a vendor to a customer results in a liability or should be recognized immediately in the customer's income statement due to the broad, general nature of related questions.

Copyright © 2003, Financial Accounting Standards Board                    Not for redistribution

11.    The SEC Observer commented that, until further guidance is issued, resellers that provide goods or services to a vendor from which they also purchase goods or services should consider whether certain transactions between the two parties (for example, a reseller providing goods or services to a vendor with a contemporaneous agreement to purchase an equal amount of that vendor's goods or services) are subject to the guidance contained in paragraph 21 of Opinion 29.

12.    The examples in Exhibit 02-16A illustrate the consensuses reached in this Issue.

**Transition**

**Issue 1**

13.    The consensus on Issue 1 should be applied to new arrangements, including modifications of existing arrangements, entered into after December 31, 2002.    If determinable, pro forma disclosure of the impact of the consensus on prior periods presented is encouraged.    Early application of the consensus is permitted as of the beginning of periods for which financial statements have not been issued.    Recasting of prior-period financial statements for comparative purposes is permitted provided that previously reported net income would not change as a result of applying the consensus.

14.    An entity that has not issued financial statements also is permitted to report the change in accounting as a cumulative-effect adjustment in accordance with Opinion 20 and Statement 3 when the effect of applying the consensus on prior-period financial statements results in a change to previously reported net income.    For example, an entity with a calendar year-end that has not issued financial statements for the year ended December 31, 2002, may adopt the consensus as a cumulative-effect adjustment as of

Copyright © 2003, Financial Accounting Standards Board                    Not for redistribution

either January 1, 2002, or January 1, 2003. However, an entity with a January 31 fiscal year-end that has not issued financial statements for the fiscal year ended January 31, 2003, could only adopt the consensus as a cumulative-effect adjustment as of February 1, 2002. An entity should disclose the selected method of adopting the consensus on Issue 1.

15.   The SEC Observer reminded registrants to consider the MD&A disclosure requirements regarding the comparability of financial statement information.

**Issue 2**

16.   The consensus on Issue 2 is effective for arrangements entered into after November 21, 2002.

**STATUS**

17.   No further EITF discussion is planned.

Copyright © 2003, Financial Accounting Standards Board

Not for redistribution

**Exhibit 02-16A**

## EXAMPLES OF THE APPLICATION OF THE
## EITF CONSENSUS ON ISSUE 02-16

**Example 1**

Vendor manufactures toys that are sold by Retailer.  Vendor offers a **cooperative advertising** arrangement through which Retailer receives an allowance for qualifying advertising costs of up to 2 percent of the total purchases from Vendor if certain qualitative criteria are met.  Retailer must maintain documentation of advertising performed and related costs.

**Evaluation:**  The cash consideration received for cooperative advertising, to the extent that it represents a reimbursement of specific, incremental, identifiable costs incurred by the customer to sell Vendor's products, should be characterized as a reduction of those costs when recognized in the customer's income statement, provided that the cash consideration received does not exceed such costs incurred.  If the amount of cash consideration paid by Vendor exceeds the costs being reimbursed, that excess amount should be characterized as a reduction of cost of sales when recognized in Retailer's income statement.

**Example 2**

Retailer enters into an agreement with Vendor to perform a significant amount of market research for Vendor related to the launch of a new product.  Vendor believes that it is paying for the expertise and knowledge available from Retailer.  Retailer believes

Copyright © 2003, Financial Accounting Standards Board                    Not for redistribution

Vendor is electing to purchase its knowledge of the market rather than internally developing such knowledge. Retailer would offer such services to a nonvendor.

**Evaluation:** The cash consideration received is in return for Retailer providing goods or services that provide an identifiable benefit to Vendor that is sufficiently separable from Retailer's purchase of Vendor's goods. Since Retailer offers those research services to a nonvendor and the fair value of the research services is determinable, the cash consideration received from the vendor represents revenue (or other income, as appropriate) and should be characterized as such when recognized in Retailer's income statement, provided that the cash consideration received does not exceed the estimated fair value of the benefit received by Vendor. If the amount of cash consideration paid by Vendor exceeds the estimated fair value of related benefits received, that excess amount should be characterized as a reduction of cost of sales when recognized in Retailer's income statement.

**Example 3**

On January 1, 20X1, in a binding arrangement, Vendor offers a cash refund of $1,000 to Customer if during the calendar year 20X1, Customer purchases 1,000 units. Customer, on average, purchases 1,700 units each year.

**Evaluation:** Since Customer is entitled to the refund offered by Vendor based on the purchase of 1,000 units of inventory, Customer should accrue the refund offer over the purchase of the 1,000 units, provided that it is probable and reasonably estimable that Customer will purchase 1,000 units during 20X1.

Copyright © 2003, Financial Accounting Standards Board

Not for redistribution

Exhibit 02-16B

## GLOSSARY

This exhibit contains definitions of certain terms used in this Issue.

**Cash consideration**

For purposes of this Issue, cash consideration includes cash payments and "credits" that the customer can apply against trade amounts owed to the vendor. In addition, under the consensus on Issue 2 of Issue No. 96-18, "Accounting for Equity Instruments That Are Issued to Other Than Employees for Acquiring, or in Conjunction with Selling, Goods or Services," consideration in the form of equity instruments is recognized "in the same period(s) and in the same manner (that is, capitalize versus expense) as if the enterprise had paid cash for the goods or services or used cash rebates as a sales discount instead of paying with or using the equity instruments." Accordingly, for purposes of this Issue, guidance with respect to cash consideration is applicable to consideration that consists of equity instruments (regardless of whether a measurement date has been reached). For purposes of this Issue, cash consideration may be referred to by terms such as sales incentives, discounts, coupons, rebates, price reductions, and so forth.

**Cooperative advertising**

A vendor agrees to reimburse a customer for a portion of the advertising costs incurred by the customer. Cooperative advertising programs generally provide that a vendor will participate in the cost of a customer's advertising. The amount reimbursed to the customer typically is limited to a specified percentage of that customer's purchases from the vendor. The program may or may not require the customer to provide documentation of the actual costs incurred to advertise the vendor's products.

**Customer**

A reseller or a consumer (either an individual or a business that purchases a vendor's products or services for end use rather than for resale). Customer should be defined consistent with paragraph 39 of Statement 131, which states that "a group of entities known to a reporting enterprise to be under common control shall be considered as a single customer, and the federal government, a state government, a local government (for example, a county or municipality), or a foreign government each shall be considered as a single customer." For purposes of this Issue, customer includes any purchaser of the vendor's products at any point along the distribution chain, regardless of whether the purchaser acquires the vendor's products directly or indirectly (for example, from a distributor) from the vendor. For example, a vendor may sell its products to a distributor who in turn resells the products to a retailer. The retailer in that example is a customer of the vendor as that term is used in this Issue.

Copyright © 2003, Financial Accounting Standards Board

Not for redistribution

**Reseller**
Any entity that purchases another vendor's products for resale, regardless of whether that entity is a distributor or wholesaler, retailer, or other type of reseller.

**Vendor**
For purposes of this Issue, the term vendor is used to represent a service provider or product seller, such as a manufacturer, distributor, or reseller.

Copyright © 2003, Financial Accounting Standards Board

Not for redistribution

A201

# Tab 19

THIS IS NOT A SOLICITATION OF ACCEPTANCES OF THE FIRST AMENDED JOINT PLAN OF COLLINS & AIKMAN CORPORATION AND ITS DEBTOR SUBSIDIARIES. ACCEPTANCES MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE COURT. THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT YET BEEN APPROVED BY THE COURT.

**IN THE UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| COLLINS & AIKMAN CORPORATION, et al.[1] | ) | Case No. 05-55927 (SWR) |
| | ) | (Jointly Administered) |
| Debtors. | ) | |
| | ) | (Tax Identification #13-3489233) |
| | ) | |
| | ) | Honorable Steven W. Rhodes |

---

**AMENDED DISCLOSURE STATEMENT FOR THE FIRST AMENDED JOINT PLAN**
**OF COLLINS & AIKMAN CORPORATION AND ITS DEBTOR SUBSIDIARIES**

---

KIRKLAND & ELLIS LLP

Richard M. Cieri (NY RC 6062)
Citigroup Center
153 East 53rd Street
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900

CARSON FISCHER, P.L.C.

Joseph M. Fischer (P13452)
Lawrence A. Lichtman (P35403)
4111 West Andover Road - Second Floor
Bloomfield Hills, Michigan 48302
Telephone: (248) 644-4840
Facsimile: (248) 644-1832

Co-Counsel for the Debtors

---

[1]   The Debtors in the jointly administered cases include: Collins & Aikman Corporation; Amco Convertible Fabrics, Inc., Case No. 05-55949; Becker Group, LLC (d/b/a/ Collins & Aikman Premier Mold), Case No. 05-55977; Brut Plastics, Inc., Case No. 05-55957; Collins & Aikman (Gibraltar) Limited, Case No. 05-55989; Collins & Aikman Accessory Mats, Inc. (f/k/a the Akro Corporation), Case No. 05-55952; Collins & Aikman Asset Services, Inc., Case No. 05-55959; Collins & Aikman Automotive (Argentina), Inc. (f/k/a Textron Automotive (Argentina), Inc.), Case No. 05-55965; Collins & Aikman Automotive (Asia), Inc. (f/k/a Textron Automotive (Asia), Inc.), Case No. 05-55991; Collins & Aikman Automotive Exteriors, Inc. (f/k/a Textron Automotive Exteriors, Inc.), Case No. 05-55958; Collins & Aikman Automotive Interiors, Inc. (f/k/a Textron Automotive Interiors, Inc.), Case No. 05-55956; Collins & Aikman Automotive International, Inc., Case No. 05-55980; Collins & Aikman Automotive International Services, Inc. (f/k/a Textron Automotive International Services, Inc.), Case No. 05-55985; Collins & Aikman Automotive Mats, LLC, Case No. 05-55969; Collins & Aikman Automotive Overseas Investment, Inc. (f/k/a Textron Automotive Overseas Investment, Inc.), Case No. 05-55978; Collins & Aikman Automotive Services, LLC, Case No. 05-55981; Collins & Aikman Canada Domestic Holding Company, Case No. 05-55930; Collins & Aikman Carpet & Acoustics (MI), Inc., Case No. 05-55982; Collins & Aikman Carpet & Acoustics (TN), Inc., Case No. 05-55984; Collins & Aikman Development Company, Case No. 05-55943; Collins & Aikman Europe, Inc., Case No. 05-55971; Collins & Aikman Fabrics, Inc. (d/b/a Joan Automotive Industries, Inc.), Case No. 05-55963; Collins & Aikman Intellimold, Inc. (d/b/a M&C Advanced Processes, Inc.), Case No. 05-55976; Collins & Aikman Interiors, Inc., Case No. 05-55970; Collins & Aikman International Corporation, Case No. 05-55951; Collins & Aikman Plastics, Inc., Case No. 05-55960; Collins & Aikman Products Co., Case No. 05-55932; Collins & Aikman Properties, Inc., Case No. 05-55964; Comet Acoustics, Inc., Case No. 05-55972; CW Management Corporation, Case No. 05-55979; Dura Convertible Systems, Inc., Case No. 05-55942; Gamble Development Company, Case No. 05-55974; JPS Automotive, Inc. (d/b/a PACJ, Inc.), Case No. 05-55935; New Baltimore Holdings, LLC, Case No. 05-55992; Owosso Thermal Forming, LLC, Case No. 05-55946; Southwest Laminates, Inc. (d/b/a Southwest Fabric Laminators Inc.), Case No. 05-55948; Wickes Asset Management, Inc., Case No. 05-55962; and Wickes Manufacturing Company, Case No. 05-55968.

K&E 11593018.1

-and-

David L. Eaton (IL 3122303)
Ray C. Schrock (IL 6257005)
Marc J. Carmel (IL 6272032)
Scott R. Zemnick (IL 6276224)
200 East Randolph Drive
Chicago, Illinois 60601
Telephone:  (312) 861-2000
Facsimile:  (312) 861-2200

Co-Counsel for the Debtors                    Dated:  January 24, 2007

**TABLE OF CONTENTS**

ARTICLE I. SUMMARY ............................................................................................................... 1
    A.    The Debtors' Principal Assets and Indebtedness ................................................ 2
    B.    Foreign Subsidiaries and European Affiliates ................................................... 2
    C.    The Purpose of the Plan ..................................................................................... 2
    D.    Treatment of Claims and Equity Interests .......................................................... 2
    E.    The Litigation Trust Interests ............................................................................ 4
    F.    Claims Estimates ............................................................................................... 4
    G.    Preservation of Rights of Action ....................................................................... 5
    H.    The Releasing Parties and Debtor Releasees ..................................................... 6
    I.    Compromise and Settlement .............................................................................. 7
    J.    Releases by the Debtors and the OEMs ............................................................. 7
    K.    Third Party Release ........................................................................................... 8
    L.    Exculpation ....................................................................................................... 9
    M.    Injunction ........................................................................................................ 10
    N.    Limitation on Discharge of Pension Plan Liabilities ....................................... 10
    O.    Sales Engineering Letter of Credit ................................................................... 10
    P.    The RLI Bonds ................................................................................................ 11
    Q.    Consummation of the Plan ............................................................................... 11
    R.    Certain Factors to Be Considered Prior to Voting ........................................... 11
    S.    Voting and Confirmation ................................................................................. 11

ARTICLE II. GENERAL INFORMATION ............................................................................... 13
    A.    The Debtors' Businesses .................................................................................. 13
    B.    The Debtors' Industry ...................................................................................... 15
    C.    Prepetition Capital Structure of the Debtors .................................................... 16
    D.    Directors of Collins & Aikman Corporation .................................................... 17

ARTICLE III. THE CHAPTER 11 CASES .................................................................................. 17
    A.    Events Leading to the Chapter 11 Cases ......................................................... 17
    B.    Crisis Period Surrounding the Filing of the Chapter 11 Cases ......................... 19
    C.    Initiation of the Chapter 11 Cases ................................................................... 20
    D.    Appointment of the Creditors Committee ........................................................ 20
    E.    The Debtors' Initial Stabilization Initiatives .................................................... 20
    F.    The Debtors' Aggressive Restructuring Initiatives .......................................... 22
    G.    The Debtors' Attempts to Reorganize .............................................................. 23
    H.    Certain Administrative Matters in the Chapter 11 Cases ................................. 28
    I.    Litigation and Investigations ........................................................................... 34

ARTICLE IV. THE SALE PROCESS .......................................................................................... 40
    A.    Customer Agreement with the OEMs ............................................................... 41
    B.    Sale of Carpet & Acoustics .............................................................................. 42
    C.    Sale of Plastics ................................................................................................. 43
    D.    Labor, Pension and Retiree Benefits ................................................................ 44

ARTICLE V. SUMMARY OF THE PLAN ................................................................................. 45
    A.    Overview of Chapter 11 ................................................................................... 46
    B.    Classification and Treatment of Claims and Equity Interests ........................... 46
    C.    Means for Implementation of the Plan .............................................................. 52
    D.    Treatment of Executory Contracts and Unexpired Leases ............................... 59

K&E 11593018.1

E.  Provisions Governing Distributions ........................................................................................ 61
F.  Procedures for Resolving Disputed Claims ............................................................................ 64
G.  D&O Insurance ...................................................................................................................... 64
H.  Conditions Precedent to Confirmation and Consummation of the Plan .................................. 65
I.  Cramdown .............................................................................................................................. 66
J.  Settlement, Release, Injunction and Related Provisions ......................................................... 66
K.  Injunction .............................................................................................................................. 69
L.  Retention of Jurisdiction ....................................................................................................... 70
M.  Miscellaneous Provisions ...................................................................................................... 70

ARTICLE VI. STATUTORY REQUIREMENTS FOR CONFIRMATION OF THE PLAN ............... 70
A.  The Confirmation Hearing ..................................................................................................... 70
B.  Confirmation Standards ......................................................................................................... 71
C.  Financial Feasibility .............................................................................................................. 72
D.  Best Interests of Creditors Test .............................................................................................. 72
E.  Acceptance by Impaired Classes ............................................................................................ 74
F.  Confirmation without Acceptance by All Impaired Classes .................................................... 74

ARTICLE VII. CERTAIN FACTORS TO BE CONSIDERED PRIOR TO VOTING ......................... 75
A.  Certain Bankruptcy Considerations ........................................................................................ 75
B.  Risks Relating to the Sale Process .......................................................................................... 77
C.  Other Risks ............................................................................................................................ 78
D.  Liquidation under Chapter 7 ................................................................................................... 79

ARTICLE VIII. CERTAIN FEDERAL INCOME TAX CONSEQUENCES ...................................... 80
A.  Certain United States Federal Income Tax Consequences to the Debtors ............................... 80
B.  Certain United States Federal Income Tax Consequences to the Holders of Class 1 and Class 2
    Claims .................................................................................................................................... 81
C.  Certain United States Federal Income Tax Consequences to the Holders of Class 3 Claims ... 81
D.  Certain United States Federal Income Tax Consequences to the Holders of Class 5 Claims,
    Class 6 Claims and Class 7 Claims ......................................................................................... 82
E.  Receipt of Interests in Post-Consummation Trust and in the Litigation Trust ......................... 83

ARTICLE IX. VOTING INSTRUCTIONS ....................................................................................... 84
A.  Voting Record Date ................................................................................................................ 84
B.  Voting Deadline ..................................................................................................................... 84
C.  Holders of Claims Entitled to Vote ........................................................................................ 85
D.  Voting Procedures .................................................................................................................. 85
E.  Tabulation of Votes ................................................................................................................ 86
F.  Votes Required for Acceptance by a Class .............................................................................. 89

ARTICLE X. RECOMMENDATION ............................................................................................... 89

iii

Claims are without merit and intend to object to all such Claims, there can be no assurance that these objections will be successful.

6.     Properties Subject to Ongoing Environmental Remediation

The Debtors own or lease certain properties that are the subject of ongoing environmental investigation or remediation activities under environmental laws, for which a prospective buyer has not yet been identified. The properties are located in Mancelona, Michigan, Dover and Farmington, New Hampshire, and Zanesville, Ohio. During the Chapter 11 Cases, the Debtors believe they have fulfilled their commitments to environmental agencies at these properties, modified in some instances by the Debtors to reflect the Debtors' reduced resources. Certain environmental authorities believe the Debtors have not fulfilled their commitments and may have future environmental obligations for such properties.

The Debtors' ongoing management of such properties and the ultimate disposition thereof will be in accordance with applicable law, including the Bankruptcy Code and relevant federal and state environmental statutory and case law. No later than 18 calendar days before the Voting Deadline and the deadline to object to the Confirmation Hearing, the Debtors will supply relevant local, state and federal environmental agencies with any additional information that exists regarding the Debtors' plans at such time for disposition of the properties. The alternatives for disposition under the Plan are: (a) as to the owned properties (i) sale or transfer to entities that will assume responsibility for environmental investigation and cleanup, (ii) where sale or transfer is not possible before the Effective Date, transfer to a residual trust with details of any such trust agreement, including a budget as it relates to environmental matters (which shall include a description of any insurance proceeds or pending insurance claims upon which the budget is based), to be supplied to the relevant local, state and federal agencies no later than 12 calendar days before the Voting Deadline and the deadline to object to the Confirmation Hearing, and (iii) as the least preferred alternative, abandonment, if found by the Bankruptcy Court after notice and hearing to be permissible under applicable law; (b) as to any leased properties, rejection of applicable leases; and (c) as to owned or leased properties, some other potential resolution under applicable law.

The Debtors will continue to seek agreement with environmental agencies and others with concerns regarding the disposition of the properties. The Debtors and the relevant environmental agencies are continuing efforts to seek the most beneficial outcome and, therefore, the Plan does not specify the ultimate disposition. The Customer Agreement does not waive any claims for environmental remediation or other environmental claims the Debtors may have against other parties to the Customer Agreement.

The State of Michigan believes that if any of the Debtors' properties located in Michigan that are the subject of ongoing environmental investigation or remediation activities are sold, any environmental responsibility language in agreements documenting such sales should be subject to the approval of the Michigan Department of Environmental Quality, and the Debtors reserve all of their rights with respect thereto. The State of Michigan believes that if any of the Debtors' properties located in Michigan that are the subject of ongoing environmental investigation or remediation activities are abandoned, the State of Michigan should be named as beneficiaries to any insurance proceeds or pending insurance claims related to such properties, and the Debtors reserve all of their rights with respect thereto.

7.     Receivables Facility Paydown

As set forth in Article II.C.2.b herein, the Debtors utilized the Receivables Facility as a source of liquidity prepetition. As of the Petition Date, there was approximately $127 million outstanding under the Receivables Facility. Postpetition, the Debtors have not sold receivables to Carcorp, and have repaid these obligations as they receive payments on account of the receivables sold to Carcorp prepetition. The Debtors serviced, administered and collected the receivables on behalf of Carcorp and GECC. After the Petition Date, the Debtors and GECC worked together to collect the prepetition accounts receivable. As the receivables were converted to cash through payments by customers, and no new receivables are added to the pool, the outstanding balance under the Receivables Facility was eliminated. On October 13, 2006, the Court entered an order approving the stipulation between the Debtors and GECC fixing the amount of the final payoff and resolving all claims under Receivables Facility. The Debtors have no further obligations under the Receivables Facility.

31

Tab 20

Copyright 2005 Gale Group, Inc.
ASAP
Copyright 2005 Diesel & Gas Turbine Publications
Automotive Industries

March 1, 2005

**SECTION:** No. 3, Vol. 185; Pg. 12; ISSN: 1099-4130

**IAC-ACC-NO:** 130938080

**LENGTH:** 812 words

**HEADLINE:** Crisis in the automotive parts industry; Opinion & Analysis

**BYLINE:** Keller, Maryann

**BODY:**

For the past decade, being an auto parts supplier to General Motors, Ford and Chrysler has been frustrating and often unprofitable. The insults and injuries began with the arrival of Inaki Lopez, the idiosyncratic Basque, who was briefly credited by Jack Smith for lowering GM Europe's costs. (He was later credited for destroying the quality of GM Europe's cars by awarding contracts to companies with the lowest price that often lacked the engineering or capacity to deliver.) Lopez brought with him the warrior diet and the conviction that he could raise productivity and asset utilization at GM's parts suppliers and capture those savings for GM in the form of lower prices. After he had ruined GM's relations with its suppliers, Lopez left his benefactor literally standing at the altar as he jumped to Volkswagen taking with him thousands of sensitive GM documents before he fled the country.

Lopez was followed by a GM purchasing philosophy that brow beat price cuts from suppliers during multiple rounds of bidding. I personally witnessed the jubilant knuckle wrapping on the conference table by the purchasing group after getting the low bidder to again reduce his price after he was told he had lost the bidding.

GM wasn't alone, and for many years Ford was the least-liked auto company. Ford's Carlos Mazarin practiced the same arbitrary tactics toward suppliers. Long-term contracts were rebid even when annual price reductions were agreed to and Ford and GM wanted access to the supplier's technology. Raw material price reductions were supposed to be passed on but higher prices became the problem of the supplier. No one cared that the automotive supply industry was becoming increasingly fragile.

In the last two years Chrysler and GM demanded more price concessions along with rebates on past business. Chrysler sometimes reduced the amounts it paid on existing invoices while GM demanded, and often got, cash rebates.

During the second half of the 1990s, high vehicle production and the ability, of some companies to sell modules and systems resulted in more dollars and content per vehicle. The parts industry consolidated in a wave of multinational acquisitions among Tier 1 and Tier 2 suppliers that allowed some companies to have better economies of scale for a time. Into this benign environment GM spun out Delphi, and Ford hunched Visteon hoping that they were permanently rid of their uncompetitive parts divisions.

Now it's payback time for the parts industry. Not only are GM and Ford facing direct or indirect compensation to Delphi and Visteon as the former sees its credit rating slip to near junk status and the latter engages Ford in discussions to take back factories that will never be competitive and should never have been included in the spinout of the operation. The consolidation of parts companies into fewer larger entities only means there isn't anywhere to go when

a company fails. Internet and Citation were decent companies in the 1990s. But neither could survive contracts that failed to compensate for higher raw materials prices. With both companies in bankruptcy, the auto companies and some Tier 1 suppliers will have to pay more for their components.

The latest company to make headlines has been Tower Automotive, another entity cobbled together from a series of acquisitions in the 1990s when it was a favorite on Wall Street. Fixing this one is also going to mean higher prices as well as a reduction In capacity and Tower getting out of some contracts where it can't make a profit. Tower noted that it faced a liquidity crisis brought on in part by slow payments from customers. A quick look at GM's balance sheet tells you that GM has increased its trade payables by some $ 6 billion over three years as it uses supplier credit to fund its operations.

Two months ago a small seat cloth manufacturer briefly shut down because its factory was losing money. This action threatened production of seats for some pickup tracks since there was no one to pick up the slack. Oxford Automotive is bankrupt again and dozens of smaller companies have simply closed their doors for good.

The auto parts industry cannot continue to financially support the auto companies. Higher prices, fewer suppliers and less engineering help are the consequences of years of shortsighted behavior toward suppliers that have pushed many companies to the brink. In the 1980s, MIT investigated the competitive advantage Toyota had through its close and symbiotic relationship with its suppliers. It's a lesson Detroit never learned or maybe something got "Lost in Translation."

Maryann Keller is a veteran auto industry analyst and author of the books "Rude Awakening: The Rise, Fall and Struggle to Recover at General Motors" and "Collision: GM, Toyota and Volkswagen and the Race to Own the 21st Century."

IAC-CREATE-DATE: March 29, 2005

LOAD-DATE: March 30, 2005

A208

# Tab 21

1/30/07 Mondaq Bus. Briefing (Pg. Unavail. Online)
2007 WLNR 1766867

Mondaq
Copyright 2007 Mondaq Ltd.

**January 30, 2007**

The Year in **Bankruptcy** : 2006

Mr Mark Douglas

By Mr Mark Douglas

In light of the continued favorable business climate and ample liquidity in the U.S., the fall-off in business **bankruptcy** filings in 2006 should come as no big surprise.00A0, Unlike 2005, which added three new stars to the all-time hit parade of chapter 11 "mega" cases, 2006 saw no new additions to the top ten list for public company chapter 11 filings.00A0, Overall, the number of business **bankruptcy** filings dropped twenty-percent in fiscal year 2006, the fifth straight year a decline was reported, according to statistics released by the Administrative Office of the U.S. Courts in October of 2006.00A0, Only 27,333 businesses sought **bankruptcy** protection for the fiscal year ending September 30, 2006, compared with 34,222 in fiscal year 2005.00A0, Of those, the number of chapter 11 cases fell from 6,637 to 6,003.00A0, Public business **bankruptcy** filings fell to a 25-year low in 2006.00A0, Sixty-six public companies filed for **bankruptcy** protection in 2006, the lowest number of filings since 1980, when 62 public companies filed for **bankruptcy** .

Even so, 2006 saw a handful of notable billion dollar chapter 11 cases. Two of the Top 10 chapter 11 filings in 2006 involved automobile part suppliers, adding another grim chapter to the continuing saga of an industry that has been slammed by declining market share, overcapacity and high labor costs. Toledo, Ohio-based **Dana** Corp., a key supplier of axles, brakes and truck frames to Detroit **auto** makers, filed for chapter 11 protection in March of 2006, citing its customers' shrinking market share (a quarter of **Dana's** revenue comes from Ford) and higher costs of raw materials and energy. Listing over $9 billion in assets, **Dana's** chapter 11 case was the largest **bankruptcy** filing of 2006.

Components supplier Dura Automotive Systems Inc., together with its U.S. and Canadian subsidiaries, filed for chapter 11 protection at the end of October of 2006, blaming an accelerating deterioration of the North American automotive industry, including escalating raw materials costs, for the decision. Dura's filing was the third largest in 2006, the company listing over $2 billion in assets. **Bankruptcy** filings by **Dana** and Dura follow those of, among others, Tower Automotive, **Collins** & **Aikman** Corp. and **Delphi** Corp., the last of which is the largest U.S. **auto**-parts supplier. Six of the 20 largest North America-based **auto**-parts suppliers are trying to reorganize their finances in **bankruptcy**. At least 36 U.S. **auto**-parts suppliers have filed for **bankruptcy** since 1999, including eight in 2006.

Coming in at No. 2 on the Top 10 ten public chapter 11 filing hit parade for 2006 was Sea Containers Ltd., the London and Bermuda-based shipping and railroad company. Blaming higher fuel prices and fallout from the July 2005 London terrorist bombings, the company filed for chapter 11 protection on October 15, 2006, after failing to make a scheduled $115 million debt payment. Sea Containers listed nearly $2.75 billion in assets at the time of its **bankruptcy** filing.

The fourth largest public chapter 11 case of 2006 was filed by Satelites Mexicanos, S.A. de C.V. The Mexican satellite services company filed a chapter 11 petition on

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

August 11, 2006, after finalizing the terms of a pre-negotiated chapter 11 plan with noteholders who had filed an involuntary **bankruptcy** case against the company in 2005 that was subsequently dismissed in favor of a Mexican insolvency proceeding and a companion U.S. ancillary proceeding under section 304 of the **Bankruptcy** Code. Plagued by financial woes dating as far back as 2001, when it was battered by an economic downturn in Mexico and the U.S. that severely cut into demand for its telecommunications services, Satelites Mexicanos listed approximately $925 million in assets at the time of its **bankruptcy** filing.

Spot No. 5 on the Top 10 list for 2006 went to Pliant Corporation.  The Schaumberg, Illinois-based packaging company filed for chapter 11 on January 3, 2006, citing severe increases in resin prices and tightening of trade terms with key suppliers as the reason for the filing.  Pliant listed total assets of $777 million and total debts of nearly $1.2 billion.

Orthodontic Centers for America Inc., a Metairie, Louisiana-based provider of business services to orthodontic and dental practices worldwide, filed a chapter 11 petition on March 14, 2006.  OCA cited the need to protect its contractual relationship with its affiliated practices and to provide necessary "breathing room" to restructure its balance sheet and operations as the reason for seeking chapter 11 protection.  At the time of the filing, the company listed over $660 million in assets.  The case was the sixth largest public chapter 11 case filed in 2006.

The seventh largest chapter 11 case in 2006 was filed by Silicon Graphics, Inc., which sought **bankruptcy** protection on May 8, 2006, after pre-negotiating a plan of reorganization with its bondholders under which they agreed to swap their debt for a stake in the reorganized company.  Silicon Graphics does high-end computer design and engineering work and manufactures supercomputers for clients such as NASA. Employing more than 1,800 people worldwide, the company listed assets of over $450 million at the time of its **bankruptcy** filing.

Houston, Texas-based electrical contractor Integrated Electrical Services, Inc. and its subsidiaries filed for chapter 11 protection on February 14, 2006.  Listing over $416 million in assets, the companies' filings were the eighth largest of 2006. Rounding out the Top 10 public chapter 11 filings on 2006 were cases filed by Granite Broadcasting Corp., an operator of 23 television stations throughout the U.S., which filed for chapter 11 protection on December 12, 2006, listing over $405 million in assets, and Tulsa, Oklahoma-based designer and manufacturer of natural gas turbine equipment Global Power Equipment Group, Inc., which filed a chapter 11 petition on September 28, 2006, listing over $381 million in assets.

2006 was notable for the absence of any new airline chapter 11 cases, suggesting that the industry may at last be headed for better times, as the nation's troubled air carriers struggle to reinvent themselves through rounds of consolidation and cost cutting.  In fact, the resurgent airline industry in 2006 experienced its first profitable year since before the 2001 terrorist attacks, and analysts expect even healthier earnings in 2007.  Higher fares, continued seat-demand and lower operating costs have helped to revive an industry that saw little reason for optimism in 2005, as major carriers Delta and Northwest scrambled for cover in chapter 11 in an effort to sort out their financial and operational problems. Provisions in sweeping pension reforms enacted in 2006 designed to give air carriers more time to fund shortfalls in their pension plans may also help the ailing industry to get back on its feet.  It remains to be seen what impact the consolidation frenzy sparked in late 2006 by US Air's hostile buyout bid for Delta will have on the industry in 2007 and beyond.

Largest Public Company **Bankruptcy** Filings in 2006

| Company | Filing Date | Assets |
|---|---|---|
| **Dana** Corporation | 3/3/2006 | $9,047,000,000 |
| Sea Containers Ltd. | 10/15/2006 | $2,736,100,000 |
| Dura Automotive Systems, Inc. | 10/30/2006 | $2,075,209,000 |
| Satelites Mexicanos, S.A. de | | |

©  2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

C.V.8/11/2006$925,271,000
Pliant Corporation1/3/2006$777,092,000
OCA Inc.3/14/2006$660,303,000
Silicon Graphics, Inc.5/8/2006$452,145,000
Integrated Electrical Services,
Inc.2/14/2006$416,372,000
Granite Broadcasting Corp.12/11/2006$405,836,710
Global Power Equipment Group,
Inc.    9/28/2006$381,131,000
J.L. French Automotive Castings,
Inc.2/10/2006$366,681,000
Radnor Holdings Corp.8/21/2006$361,454,000
Oneida Ltd.3/19/2006$328,812,000
Curative Health Services, Inc.3/27/2006$283,784,000
Premier Entertainment Biloxi
LLC9/19/2006$240,896,996
AMTROL Inc. 12/18/2006$222,451,000
G+G Retail, Inc.1/25/2006$202,868,000
Werner Holding Co. (DE), Inc.6/12/2006$201,042,000
Vesta Insurance Group, Inc.8/8/2006$195,325,000
Home Products International,
Inc.12/20/2006$192,488,000

Notable Decisions of 2006

**Bankruptcy** Court Authority/Jurisdiction

A New York district court fired the latest salvo in a battle concerning the
prerogative of a **bankruptcy** court to authorize the modification or termination of
contracts regulated by the Federal Energy Regulatory Commission ("FERC") under the
Federal Power Act.   In In re Calpine Corp., 337 B.R. 27 (S.D.N.Y. 2006), the court
ruled that a **bankruptcy** court did not have the power to authorize rejection of a
FERC-regulated power contract because the debtor's justification for rejection
involved the rate in the contract.   In doing so, the court adopted an even more
restrictive approach than that applied by the Fifth Circuit Court of Appeals in its
controversial 2004 ruling in In re Mirant Corp., 337 B.R. 511 (5th Cir. 2004), where
the Court of Appeals held that a debtor could reject a FERC-regulated contract, but
only because the rationale for rejection had nothing to do with the rates under the
contract, but was based upon the fact that the debtor simply did not need the power
covered by the agreement.

Conflicts between the **Bankruptcy** Code and another federal statute -- the Federal
Arbitration Act -- were the subject of rulings handed down by the Second and Third
Circuits Courts of Appeal in 2006, both of which suggest that the scope of a
**bankruptcy** court's retained discretion to deny arbitration may be even less broad
than is generally understood.  In MBNA America Bank, N.A. v. Hill, 436 F.3d 104 (2d
Cir. 2006), the Second Circuit reversed an order denying arbitration of a dispute
between the debtor and a bank involving allegations of willful violation of the
automatic stay because the governing credit agreement contained a valid arbitration
clause, the litigation was styled as a class action and even a "core" stay-violation
proceeding may be subject to arbitration.  Claims asserted by a chapter 13 debtor
against a lender under the Truth in Lending Act as well as various federal and state
consumer protection laws were also subject to arbitration according to the Third
Circuit, which ruled in Mintze v. American General Financial Services Inc. (In re
Mintze), 434 F.3d 222 (3d Cir. 2006), that the party opposing arbitration of a
dispute covered by an arbitration clause is obligated to prove that there is "an
inherent conflict between arbitration and the **Bankruptcy** Code" that manifests
Congress's intent to preclude a waiver of judicial remedies for the statutory rights
at issue.

A **bankruptcy** court's authority to order the substantive consolidation of two or more
related entities was the subject of a ruling handed down in 2006 by the Fifth

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Circuit Court of Appeals.  In Wells Fargo Bank of Texas N.A. v. Sommers (In re Amco Insurance), 444 F.3d 690 (5th Cir. 2006), the Court held that the **bankruptcy** court abused its discretion in nunc pro tunc substantively consolidating a debtor corporation with its non-debtor sole shareholder, because the court had previously authorized a secured creditor to pursue its remedies against the shareholder in state court.

Good Faith Requirements

A ruling handed down by the Ninth Circuit Court of Appeals in 2006 examined whether the motive of non-consumer chapter 7 debtors bears on their ability to file for **bankruptcy** protection.  In Sherman v. SEC (In re Sherman), 441 F.3d 794 (9th Cir. 2006), the Ninth Circuit ruled that misconduct by a debtor cannot constitute "cause" for dismissal under section 707(a) of the **Bankruptcy** Code if it can be remedied by applying other provisions of the **Bankruptcy** Code.

A debtor's motives in connection with a **bankruptcy** filing were also addressed in 2006 by a Michigan district court, albeit in a slightly different context.  In Monroe Bank & Trust v. Pinnock, 349 B.R. 493 (E.D. Mich. 2006), the court ruled that a chapter 11 debtor does not have the absolute right to convert its chapter 11 case to a chapter 7 liquidation even though section 1112(a) expressly provides that the debtor "may" do so, because the statute does not state that the court "shall" honor the debtor's request.  Concluding that dismissal would better serve the interests of the estate and creditors, the court denied the debtor's conversion request and instead granted a creditor's motion to dismiss the chapter 11 case.

Enforcement, Allowance and Priority of Claims

A controversial decision rendered in 2005 by the New York **bankruptcy** court overseeing the chapter 11 cases of Enron Corp. and its affiliates sent traders in the multi-billion dollar distressed claims market scrambling to devise better ways to minimize exposure and maximize profit in connection with acquired claims against **bankrupt** entities.  In Enron Corp. v. Avenue Special Situations Fund II, LP (In re Enron Corp.), 333 B.R. 205 (Bankr. S.D.N.Y. 2005), the court ruled that a claim can be equitably subordinated even if it is transferred to an entity that did not engage in any misconduct.

This "caveat emptor" cautionary tale continued in 2006, with yet another controversial ruling by the same court in the same chapter 11 case.  In In re Enron Corp., 340 B.R. 180 (Bankr. S.D.N.Y. 2006), the court held that a transferred claim should be disallowed altogether under section 502(d) of the **Bankruptcy** Code unless and until the transferor returns payments to the estate that are allegedly preferential.  The practical ramifications of caveat emptor as the prevailing rule of law have already spurred traders to build greater protections into loan/claim transfer agreements and to focus far more attention on the indemnities commonly given in distressed trades.

The Fourth Circuit Court of Appeals examined the consequences of a creditor neglecting to seek temporary allowance of its claim for the purpose of voting on a chapter 11 plan in Jacksonville Airport, Inc. v. Michkeldel, Inc., 434 F.3d 729 (4th Cir. 2006).  In that case, the Court held that if the debtor objects to a claim, it is incumbent upon the creditor to seek temporary allowance of the claim for voting purposes pending resolution of the objection on the merits, failing which the creditor does not have the right to vote.

A **bankruptcy** court's authority as a court of equity to recharacterize debt as equity in appropriate circumstances was the subject of a ruling in 2006 by the Fourth Circuit Court of Appeals.  In Fairchild Dornier GMBH v. Official Committee of Unsecured Creditors (In re Official Committee Of Unsecured Creditors for Dornier Aviation (North America), Inc.), 453 F.3d 225 (4th Cir. 2006), the Court held that a **bankruptcy** court has the power to order that obligations denominated as debts be treated as equity interests, and affirmed a **bankruptcy** court's ruling recharacterizing a parent corporation's claim arising from the sale of spare parts to its chapter 11 debtor-subsidiary as an equity contribution.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Courts have wrestled for 20 years over the priority of claims asserted by workers if a chapter 11 debtor fails to comply with its obligations under a collective bargaining agreement. Some courts, reasoning that such claims do not meet the traditional standards for administrative priority, relegate them to the pool of general unsecured claims. Other courts focus on the special protections afforded workers covered by a bargaining agreement under section 1113 of the **Bankruptcy** Code as grounds for granting such claims priority. The Tenth Circuit Court of Appeals injected its voice into the debate in 2006, staking out a middle-ground position in a widening rift regarding this controversial issue among the circuit courts of appeal. In Peters v. Pikes Peak Musicians Association, 462 F.3d 1265 (10th Cir. 2006), the Court ruled that the debtor's obligation under a collective bargaining agreement for payments to employees that became due between the chapter 11 petition date and the date that the debtor rejected the agreement was payable as a priority administrative expense.

In an issue of first impression in the federal circuit courts of appeal, the Third Circuit ruled in Cohen v. KB Mezzanine Fund II, LP (In re SubMicron Systems Corporation), 432 F.3d 448 (3d Cir. 2006), that creditors whose claims are only partially secured because of inadequate collateral value are entitled to credit bid their claims at full face value rather than the economic value of the claims (i.e., the value of the collateral) in any sale of the collateral proposed during the **bankruptcy** case.

Compensation of Professionals

A pair of court rulings handed down in 2006 dealt with the allowance of professional fees incurred by an official committee as an expense of administration even though the committee's constituency was "out of the money." In In re Veltri Metal Products, Inc., 2006 WL 1716732 (6th Cir. June 22, 2006), the Sixth Circuit Court of Appeals reversed a **bankruptcy** court's order denying compensation to counsel for a creditors' committee because no distribution was likely to unsecured creditors. Benefit to the estate, the Court emphasized, need not be quantified monetarily to qualify a claim for administrative status.

In In re Gadzooks, Inc., 352 B.R. 796 (Bankr. N.D. Tex. 2006), the **bankruptcy** court ruled that counsel for a committee of equity security holders could receive a professional fee award for services provided prior to the date on which it became clear that the committee's proposed plan would not be confirmed, regardless of whether the committee could show any "identifiable, tangible, and material benefit" to the estate. According to the court, the services were reasonable and necessary when rendered, the work was beneficial to the estate when performed, and, based upon its complexity, the work was performed in a timely manner at rates customarily charged by comparably skilled practitioners.

Rejection of Collective Bargaining Agreements

Employers' reliance on chapter 11 as a way to revise, restructure or eliminate obligations under collective bargaining agreements figured prominently in both the headlines and court rulings of 2006, particularly in connection with the continuing efforts of troubled U.S. air carriers to regain profitability. In In re Delta Air Lines, 342 B.R. 685 (Bankr. S.D.N.Y. 2006), the **bankruptcy** court denied a request by Delta Air Lines subsidiary Comair to reject its bargaining agreement with flight attendants under section 1113 of the **Bankruptcy** Code, finding that the debtor did not comply with the requirement that it "confer in good faith in attempting to reach mutually satisfying modifications" to the agreement prior to seeking to reject it. In a subsequent decision, In re Delta Air Lines, 351 B.R. 67 (Bankr. S.D.N.Y. 2006), the court granted Comair's renewed motion to reject the collective bargaining agreement, ruling that the modifications proposed by Comair to the agreement were necessary to the airline's reorganization, given the fact that Comair's flight attendant costs significantly exceeded those of all other regional carriers with which it was in direct competition, and that it had to bring these costs in line with those of its competitors to obtain contracts with other airlines to provide regional service. Finally, in In re Delta Air Lines, Inc., 2006 WL 3771049 (Bankr.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S.D.N.Y. Dec. 21, 2006), the **bankruptcy** court authorized Comair to reject the collective bargaining agreement with its unionized pilots.

Regional carrier and chapter 11 debtor Mesaba Aviation also encountered a rocky road in seeking to terminate its collective bargaining agreements with pilots, mechanics and flight attendants. After denying the carrier's initial request to reject the agreements in In re Mesaba Aviation, Inc., 341 B.R. 693 (Bankr. D. Minn. 2006), based on the debtor's refusal to provide adequate information to the unions' bargaining representative, the **bankruptcy** court subsequently authorized rejection of the agreements in In re Mesaba Aviation, Inc., 2006 WL 2739047 (Bankr. D. Minn. Jul. 14, 2006), finding that the debtor had remedied its earlier indiscretions and that the proposed cost reductions were necessary to Mesaba's reorganization. That ruling, however, was reversed in part on appeal. In Association of Flight Attendants-CWA, AFL-CIO v. Mesaba Aviation, Inc., 350 B.R. 435 (D. Minn. 2006), the district court held that the debtor demonstrated bad faith by wholly refusing to negotiate regarding "snap-backs" restoring employee wages in the future. Upon remand of the case for additional consideration of the issue, the **bankruptcy** court ultimately authorized Mesaba to reject the agreements and to impose new work rules and conditions on its union employees.

The **bankruptcy** court overseeing the chapter 11 cases of Northwest Airlines and its affiliates authorized rejection of the air carrier's collective bargaining agreement with its flight attendants in In re Northwest Airlines Corp., 346 B.R. 307 (Bankr. S.D.N.Y. 2006). The **bankruptcy** court concluded that rejection was necessary to the debtors' reorganization, given the fact that they had lost approximately $4 billion in the four years prior to seeking **bankruptcy** protection and were currently losing approximately $4 to $5 million per day, their borrowing capacity was limited by the absence of unencumbered assets, and $195 million in flight attendant concessions was both a necessary and integral part of their business plan.

Northwest's subsequent unilateral imposition of new labor terms and conditions on employees covered by the rejected bargaining agreement led to calls for a strike by the flight attendants' union. Northwest responded by seeking to enjoin any strike. In Northwest Airlines Corp. v. Assoc. of Flight Attendants-CWA (In re Northwest Airlines Corp.), 346 B.R. 333 (Bankr. S.D.N.Y. 2006), the **bankruptcy** court ruled that the Norris-LaGuardia Act deprived it of jurisdiction to enjoin the strike. The district court reversed that determination on appeal. In Northwest Airlines Corp. v. Assoc. of Flight Attendants-CWA (In re Northwest Airlines Corp.), 349 B.R. 338 (S.D.N.Y. 2006), the court ruled that Northwest's rejection of the bargaining agreement did not constitute an act of bad faith that would relieve the union of its obligation under the Railway Labor Act to bargain in good faith, and that a preliminary injunction was warranted to prevent the strike.

Chapter 11 Plan Issues

The continued vitality of what has become a common practice in chapter 11 cases -- senior class "gifting" to junior classes of creditors as a way to achieve a consensus on the terms of a consensual chapter 11 plan -- was called into doubt in 2005 by the Third Circuit Court of Appeals, which ruled in In re Armstrong World Indus., Inc., 432 F.3d 507 (3d Cir. 2005), that senior class give-ups violate the "absolute priority rule" if an intervening objecting class of creditors is not paid in full. In 2006, a Delaware **bankruptcy** court examined the legacy of Armstrong, ruling in In re World Health Alternatives, Inc., 344 B.R. 291 (Bankr. D. Del. 2006), that a "carve-out" from a senior secured creditor's recovery to be distributed to unsecured creditors as part of a settlement agreement outside of a chapter 11 plan violated neither the dictates of Armstrong nor the absolute priority rule, where the funds in question were not estate property because the senior creditor was fully secured and the only intervening class of creditors did not object to the settlement.

A pair of rulings handed down in 2006 addressed the circumstances under which an order confirming a chapter 11 plan can be revoked in the face of allegations of fraud. In Haskell v. Goldman, Sachs & Co. (In re Genesis Health Ventures, Inc.), 340 B.R. 729 (D. Del. 2006), the Delaware district court upheld an order dismissing

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

a lawsuit seeking revocation in which it was alleged that the debtor and its senior lenders fraudulently misrepresented the debtor's enterprise value in connection with confirmation of a chapter 11 plan, because the complaint was filed after the 180-day period specified in section 1144 of the **Bankruptcy** Code.  The inability to restore the status quo ante and protect innocent third parties prompted a New York **bankruptcy** judge to deny a request to revoke an order confirming a plan in Salsberg v. Trico Marine Services, Inc. (In re Trico Marine Services, Inc.), 337 B.R. 811 (Bankr. S.D.N.Y.), disposition unaltered on reargument, 343 B.R. 68 (Bankr. S.D.N.Y. 2006).  According to the court, because the plan of reorganization, which contemplated the issuance of new stock that had already been widely traded, was substantially consummated at the time of the revocation request, a far less disruptive and potentially damaging remedy would be to allow the parties seeking revocation to sue for damages arising from the alleged misrepresentations concerning projected revenues made by the debtor during the plan confirmation hearing.

Pension Plan Termination

Termination of one or more defined benefit pension plans has increasingly become a significant aspect of a debtor-employer's reorganization strategy under chapter 11 of the **Bankruptcy** Code, providing a way to contain spiraling labor costs and facilitate the transition from defined benefit-based programs to defined contribution programs such as 401(k) plans.  Although the Employee Retirement Income Security Act ("ERISA"), rather than the **Bankruptcy** Code, establishes the rules and procedures governing an employer's obligations under a defined benefit pension plan, a **bankruptcy** filing can provide a vehicle for an employer to effectuate a "distress termination" of its pension plan.

A landmark ruling handed down by the Third Circuit Court of Appeals in 2006 examined a matter of first impression in the federal circuit courts of appeal -- how ERISA's "reorganization test" for distressed pension plan terminations should be applied in cases where a chapter 11 debtor-employer seeks to terminate multiple pension plans. In In re Kaiser Aluminum Corp., 456 F.3d 328 (3d Cir. 2006), the Court held that a chapter 11 debtor's pension plans should be considered in the aggregate rather than separately when applying the "reorganization test."

Cross-Border **Bankruptcies**

October 17, 2006 marked the one-year anniversary of new chapter 15 of the **Bankruptcy** Code.  As the volume of chapter 15 filings steadily increases, the **bankruptcy** courts are being called upon to iron out the details of an as yet largely untested legislative framework.  One issue that is unclear based upon the provisions of chapter 15 -- whether a **bankruptcy** court can recognize and provide assistance to a foreign **bankruptcy** case as a secondary ("nonmain") proceeding when no primary ("main") proceeding is pending -- was the subject of a ruling handed down in 2006 by a New York **bankruptcy** court.  In In re SPhinX, Ltd., 351 B.R. 103 (Bankr. S.D.N.Y. 2006), the court denied a petition seeking recognition of liquidation proceedings in the Cayman Islands as foreign "main" proceedings under chapter 15, because the evidence did not support a finding that the "center of main interest" of the companies involved was in the Cayman Islands and it appeared that the liquidators' motive for seeking recognition was to gain a tactical advantage in pending litigation involving the debtors.  Even so, the court recognized the Cayman Islands liquidation proceedings as foreign "nonmain" proceedings.

Deepening Insolvency

An emerging but controversial theory of tort liability based upon actions that allegedly cause or contribute to the "deepening insolvency" of a company was addressed in several significant **bankruptcy** and appellate court decisions issued during 2006.  In Seitz v. Detweiler, Hershey & Assoc. (In re CitX Corp.), 448 F.3d 672 (3d Cir. 2006), the Third Circuit Court of Appeals considered whether an accountant for an internet company could be held liable for the deepening insolvency of the company because the accountant was allegedly negligent in his review of the company's finances.  The Court concluded that a claim of negligence cannot sustain a deepening insolvency cause of action, explaining that, notwithstanding its

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

descriptions of deepening insolvency in a previous ruling as a "type" or "theory" of injury, it had never held that deepening insolvency was "a valid theory of damages for an independent cause of action." Shortly after the Third Circuit issued its ruling in CitX, the Delaware Chancery Court rejected deepening insolvency as a valid cause of action under Delaware law in Trenwick Am. Litig. Trust v. Ernst & Young, LLP, 906 A.2d 168 (Del. Ch. 2006).

Taking its cue from the Third Circuit and the Delaware Chancery Court, the **bankruptcy** court in In re Greater Southeast Community Hosp. Corp. I, 2006 WL 2793177 (Bankr. D.D.C. 2006 Sept. 21, 2006), ruled that deepening insolvency is properly treated as a theory of harm, not as a separate cause of action under Delaware law. Finally, in In re Southwest Florida Heart Group, P.A., 346 B.R. 897 (Bankr. M.D. Fla. 2006), the **bankruptcy** court held that no viable claim exists under Florida law against members of a **bankrupt** physicians' association for prolonging the association's existence and thereby deepening its insolvency. According to the court, the alleged deepening of the association's insolvency was relevant only to the measure of damages on breach of fiduciary duty and other claims, and was not a viable claim in its own right.

From the Top

The U.S. Supreme Court issued three rulings on the subject of **bankruptcy** during 2006. In Central Virginia Community College v. Katz, 126 S. Ct. 990 (2006), a 5-4 majority of the Court ruled that an adversary proceeding brought by a chapter 11 trustee to set aside alleged preferential transfers to state agencies was not barred by the agencies' sovereign immunity. In ratifying the **Bankruptcy** Clause of the U.S. Constitution, the Court emphasized, the individual states acquiesced in the subordination of whatever sovereign immunity they might otherwise have asserted in proceedings brought to enforce the in rem jurisdiction of the **bankruptcy** court, such as litigation to avoid preferences.

In Marshall v. Marshall, 126 S. Ct. 1735 (2006), the Court held that the probate exception to federal jurisdiction did not deprive a **bankruptcy** court of jurisdiction over a debtor's counterclaim asserting that her stepson tortiously interfered with her expectancy of inheritance from her deceased husband, because the counterclaim sought a judgment against the stepson personally and did not involve probate or annulment of the husband's will or administration of his estate, or seek to reach property in the custody of the state probate court.

Finally, in Howard Delivery Service, Inc. v. Zurich American Ins. Co., 126 S. Ct. 2105 (2006), a 6-3 majority of the Court ruled that an insurance company's unsecured claim against a chapter 11 debtor-employer for unpaid premiums for workers' compensation coverage was not entitled to priority status as a claim for "contributions to an employee benefit plan arising from services rendered."

**Bankruptcy** issues to be addressed by the Supreme Court in 2007 include whether a chapter 7 debtor's alleged bad faith has any bearing on the debtor's right to convert his chapter 7 case to a case under chapter 11 or 13 of the **Bankruptcy** Code. The Court heard oral argument in Marrama v. Citizens Bank of Massachusetts (In re Marrama), 313 B.R. 525 (Bankr. 1st Cir. 2004), aff'd, 430 F.3d 474 (1st Cir. 2005), cert. granted, 126 S. Ct. 2859 (2006), on November 6, 2006 and is expected to issue its ruling in the Spring of 2007. On January 16, 2007, the Court heard argument in Travelers Casualty & Surety Co. of America v. Pacific Gas & Electric Co., 2006 WL 285977 (9th Cir. Feb. 7, 2006), cert. granted, 127 S. Ct. 377 (2006), to consider whether a creditor who engages an attorney to assert its claim in a **bankruptcy** proceeding is entitled to an award of attorneys fees from the **bankruptcy** estate, where a pre-**bankruptcy** contract between the creditor and the debtor provides for an award of such fees.

Largest Public Airline Chapter 11 Filings

| Company | Petition Date | Assets |
|---|---|---|
| UAL Corp. | 12/9/02 | $25.2 billion |
| Delta Air Lines, Inc. | 9/14/05 | $21.8 billion |

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

A216

Northwest Airlines Corp.9/14/05$14.04 billion
US Airways Group, Inc. (2004)9/12/04$8.35 billion
US Airways Group, Inc. (2002)8/11/02$8.025 billion
Continental Airlines Holdings, Inc.12/03/90$7.66 billion
Eastern Air Lines, Inc.3/09/89$4.04 billion
Trans World Airlines, Inc. (1992)1/31/92$2.86 billion
Trans World Airlines, Inc. (1995)6/30/95$2.5 billion
Pan Am Corp. (1991) 1/08/91$2.44 billion
Trans World Airlines, Inc. (2001)1/10/01$2.14 billion
Atlas Air Worldwide Holdings, Inc.1/30/04$2.08 billion
America West Airlines, Inc.6/27/91$1.17 billion
Kitty Hawk, Inc.5/01/00$983 million
ATA Holdings Corp.10/26/04$870 million
FLYi, Inc.11/07/05$678 million
Midway Airlines, Inc. (1991) 3/25/91$468 million
Tower Air, Inc.2/29/00$351 million
Midway Airlines Corp. (2001)8/13/01$349 million
Hawaiian Airlines, Inc.3/21/03$305 million
Fine Air Services Corp.9/27/00$303 million
Braniff, Inc.9/28/89$238 million
Western Pacific Airlines, Inc. 10/05/97$120 million
HAL, Inc.9/21/93$106 million


Legislative Update

The end of 2006 heralded the completion of the first full year that the **Bankruptcy** Abuse Prevention and Consumer Protection Act ("BAPCPA") applied to U.S. **bankruptcy** filings. Developments during 2006 indicate that the new legislative regime may have created new problems in its attempt to curb perceived **bankruptcy** abuse and to streamline the process for business **bankruptcies**. For example, the new chapter 7 means test, the credit counseling requirements applicable to all individual **bankruptcy** cases and the new restrictions on "debt relief agencies" have ignited a flurry of protest and litigation over, among other things, the fairness of the means test as a gatekeeper for consumer chapter 7 cases, confusion concerning the credit counseling rules, and application by some courts of the restrictions governing debt relief agencies to preclude **bankruptcy** attorneys from charging fees for services rendered in anticipation of individual **bankruptcy** filings. The latter dispute has already resulted in a handful of court rulings declaring the debt relief agency rules to be unconstitutional -- the application to attorneys of the **Bankruptcy** Code's prohibition of advice from a paid provider of "**bankruptcy**" assistance" to incur additional debt in contemplation of a **bankruptcy** filing has been deemed to violate the First Amendment right to free speech. This and other problems encountered in applying the new rules have already provoked calls on Capitol Hill to roll back the reforms.

BAPCPA also made significant and controversial changes to the rules and procedures governing business **bankruptcy** cases. Notable among these are limitations on the duration of a chapter 11 debtor's exclusive period to propose and solicit acceptances for chapter 11 plan, creditors' committee disclosure requirements, significant limitations on a debtor's ability to defer the decision to assume or reject commercial real property leases, and strict limitations on a chapter 11 debtor's ability to institute key employee retention and severance programs. Other significant changes include new rules governing the modification of employee benefits by insolvent companies that later file for chapter 11 protection, and the newly-created administrative priority for trade debts incurred in the ordinary course of business by a debtor within 20 days of filing for **bankruptcy**. Certain of these amendments have already sparked a significant volume of litigation. In

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

addition, the new commercial real property lease and chapter 11 exclusivity limitations are likely to have a marked impact on the progress of some chapter 11 cases.

BAPCPA implemented sweeping changes to the **Bankruptcy** Code's provisions governing financial contracts to ensure that a **bankruptcy** filing by any party to a securities contract, forward contract, commodities contract, swap agreement or other type of financial contract does not in any way hinder the free operation of the market. Even so, the new rules proved to be deficient in certain respects, prompting lawmakers to devise legislation in 2006 designed to fix the problems. President George W. Bush gave his imprimatur on December 12, 2006 to the Financial Netting Improvements Act of 2006 (the "FNIA"). The FNIA builds on BAPCPA and is intended to clarify the treatment of certain financial contracts in the event of the insolvency of a counterparty and to promote a reduction of systemic risk.

The creation of an entirely new framework of rules to govern cross-border **bankruptcy** cases was a prominent feature of BAPCPA. New chapter 15 of the **Bankruptcy** Code replaced section 304 of the statute, which allowed an accredited representative of a debtor in a foreign **bankruptcy** proceeding to file an ancillary **bankruptcy** case in the U.S. for the purpose of protecting the foreign debtor's U.S. assets. Chapter 15 is patterned on the Model Law on Cross-Border Insolvency (the "Model Law"), a system of legal principles formulated by the United Nations Commission on International Trade Law in 1997 to deal with the rapidly expanding volume of international insolvency cases. Chapter 15 significantly expands the power of U.S. **bankruptcy** courts to grant relief for the purpose rendering assistance to foreign **bankruptcy** or insolvency proceedings.

Chapter 15 is still very much in its infancy, but it is maturing rapidly. Over 80 chapter 15 petitions were filed in U.S. **bankruptcy** courts by the end of 2006, with the Southern District of New York by far being the preferred forum (54 cases). During that same period, the courts entered over 60 orders officially recognizing qualified foreign **bankruptcy** proceedings.

The United Kingdom enacted its own version of the Model Law in April of 2006. On November 23, 2006, the first application seeking recognition of a foreign **bankruptcy** proceeding -- a U.S. chapter 7 **bankruptcy** case pending in a Georgia **bankruptcy** court -- was filed under the U.K.'s Cross-Border Insolvency Regulations on behalf of the U.S. **bankruptcy** trustee for the purpose of recovering the chapter 7 debtor's U.K. assets.

The perceived ease with which financially-strapped chapter 11 debtors such as United Airlines and US Air, and most recently Delta Air Lines, were able to jettison nearly $12 billion in pension liabilities has figured prominently in recent headlines. Assumption of these obligations by the beleaguered Pension Benefit Guaranty Corporation ("PBGC") contributed to a deficit that aggregated nearly $23 billion at the end of fiscal year 2005 and was reported at $18.1 billion at the end of fiscal year 2006. Lawmakers responded to the crisis in 2006 by passing the most sweeping pension reform in 30 years. The Pension Protection Act of 2006 became law on August 17, 2006, and includes provisions that require employers to make sufficient contributions to their single-employer defined benefit pension plans over the next seven years to achieve 100 percent funding.

According to some commentators, the reforms are unlikely to restore PBGC to solvency, but they may improve the embattled insurer's financial outlook, at least in the short term. In fact, the $4.7 billion net improvement in PBGC's financial picture from 2005 to 2006 is attributable mainly to the airline relief provisions in the Pension Protection Act that led to a sharp reduction in the amount of "probable" liabilities reflected on the agency's balance sheet. Even so, as more and more employers make the transition away from defined benefit plans because of stricter funding requirements, PBGC's premium base may actually diminish in the long run. Moreover, the rules governing pension plan funding are not the only factors influencing PBGC's troubled financial condition -- legislation can do little to stave off major business failures that are inevitable in a volatile economy.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Pension Plans Assumed by PBGC in 2005-2006

(b) = in **bankruptcy**

| Company | Date | Shortfall Assumed |
|---|---|---|
| Republic Storage Systems Co., Inc. (b) | October 23, 2006 | $29 million |
| Levitz Home Furnishings, Inc. (b) | October 3, 2006 | $23.5 million |
| Plymouth Rubber Co. (b) | July 19, 2006 | $11.9 million |
| Victory Memorial Hospital | July 5, 2006 | $29 million |
| Pittsburgh Brewing Co. (b) | May 23, 2006 | $11 million |
| Jernberg Industries Inc. | May 5, 2006 | $10.2 million |
| Aloha Airlines Inc. (b) | April 28, 2006 | $117 million |
| Falcon Products Inc. and sub. Shelby Williams Industries Inc. (b) | November 25, 2005 | $31.6 million |
| Huffy Corp. (b) | October 5, 2005 | $80 million |
| Westpoint Stevens Corp. (b) | August 19, 2005 | $286 million |
| Amcast Industrial Corporation (b) | July 28, 2005 | $83 million |
| Techneglas Inc. (b) | June 30, 2005 | $70 million |
| United Airlines (b) | April 22, 2005 | $6.6 billion |
| Liam Ventures Inc. | March 31, 2005 | $133 million |
| Lobdell Emery Corp. and Howell Industries, subsidiaries of Oxford Automotive Inc. (b) | February 25, 2005 | $35 million |
| Penn Traffic Co. (b) | February 24, 2005 | $125 million |
| US Airways (b) | February 2, 2005 | $2.3 billion |
| Murray Inc. (b) | January 19, 2005 | $103 million |

2006 was also the year that China finally enacted a permanent **bankruptcy** law designed to establish a comprehensive legal framework for corporate **bankruptcies** and the discharge of debts and interests. China's National People's Congress approved the PRC Enterprise **Bankruptcy** Law on August 26, 2006, although the legislation is not slated to become effective until June 1, 2007. With limited exceptions, the law applies to all types of business entities, including state-owned enterprises and foreign invested enterprises. For the first time, the law sets out clear procedures regarding the **bankruptcy** of China's financial institutions, an issue that had long been a grey area. It also creates a mechanism for corporate reorganizations similar to chapter 11 of the U.S. **Bankruptcy** Code -- a clear departure from current rules, which focus on liquidation as the sole mechanism for dealing with a **bankrupt** enterprise.

Significant Autopart Supplier **Bankruptcies** 2004-06

| Company | Filing Date |
|---|---|
| Citation Corp. | September 21, 2004 |
| Intermet Corp. | September 30, 2004 |
| Amcast Industrial Corp. | November 30, 2004 |
| Oxford Automotive Inc. | December 7, 2004 |
| Tower Automotive Inc. | February 2, 2005 |
| Meridian Automotive Systems Inc. | April 26, 2005 |
| **Collins** & **Aikman** Corp. | May 17, 2005 |
| Universal Automotive Industries Inc. | May 27, 2005 |
| Metalforming Technologies Inc. | June 16, 2005 |
| Uniboring | June 9, 2005 |
| Jernberg Industries Inc. | June 29, 2005 |
| **Delphi** Corp. | October 5, 2005 |

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

J.L. French Automotive CastingsFebruary 10, 2006
**Dana** Corp.March 3, 2006
Oris Automotive Parts AL, Ltd.March 16, 2006
Q.C. Onics Ventures LPMay 2, 2006
Steel Parts Corp.September 15, 2006
Creative Engineered Polymer ProductsSeptember 20, 2006
Union Stamping & Assembly Inc.October 3, 2006
Dura Automotive Systems, Inc.October 30, 2006


The content of this article is intended to provide a general guide to the subject matter. Specialist advice should be sought about your specific circumstances.


  Mr Mark Douglas
Jones Day
Jones Day
222 East 41st Street
New York
10017
UNITED STATES
  Tel: 2165863939
Fax: 2165790212


E-mail: mimakarchuk@jonesday.com
  URL: www.jonesday.com


 Click Here for related articles
(c) Mondaq Ltd, 2007 - Tel. +44 (0)20 8544 8300 - http://www.mondaq.com

      ---- INDEX REFERENCES ----

COMPANY: CONTINENTAL AIRLINES INC; UAL CORP; INTERNORTH INC; HOME PRODUCTS INTERNATIONAL INC; AMERICAN INTERNATIONAL GROUP INC; ACCELERATED COMPUTER TECHNOLOGIES INC; SEA CONTAINERS LTD; MIDWAY AIRLINES CORP; PENN TRAFFIC CO (THE); PG&E CORP; G AND G RETAIL INC; DORNIER AVIATION NIGERIA AIEP LTD; OXFORD AUTO; CURATIVE TECHNOLOGIES INC; DANA CORP; FINE AIR SERVICES INC; WERNER HOLDING CO (PA) INC; SILICON GRAPHICS INC; AMERICA WEST HOLDINGS CORPORATION; MONROE BANK AND TRUST; WHINNEY MURRAY AND CO; CITX CORP INC; VESTA INSURANCE GROUP INC; TEXAS AIR CORP; MBNA AMERICA BANK N A; ERNST AND YOUNG (JORDAN); DELPHI CORP; TRINITY CAPITAL ENTERPRISE CORP; ADVANCED COMPOSITE TECHNOLOGY INC; KAISERTECH LTD; DELPHI AUTOMOTIVE SYSTEMS CORP; ERNST AND YOUNG (KENYA); G&G RETAIL INC; WORLD HEALTH ALTERNATIVE INC; HUFFY CORP; ERNST AND YOUNG (MALTA); ERNST AND YOUNG (ZIMBABWE); COLLINS AND AIKMAN CORP; TRANS WORLD AIRLINES INC; FINE AIR; TRANS WORLD AIRLINES INC (OLD); CITIZENS FINANCIAL GROUP INC; LIAM VENTURES INC; SHELBY WILLIAMS INDUSTRIES INC; NORTHWEST AIRLINES CORP; EASTERN AIRLINES; WELLS FARGO AND CO; CITATION CORP; CURATIVE HEALTH SERVICES; WELLS FARGO BANK NORTHWEST NA; JERNBERG INDUSTRIES INC; ONEIDA LTD; ERNST ET YOUNG (BELGIUM); HUNTSMAN PACKAGING CORP; ERNST AND YOUNG (BARBADOS); GRANITE BROADCASTING CORP; MIRANT CORPORATION; AMTROL INC; ERNST AND YOUNG (CHINA); ERNST YOUNG (COLOMBIA); HAWAIIAN AIRLINES INC; REPUBLIC; CITIZENS BANK OF MASSACHUSETTS; DURA AUTOMOTIVE SYSTEMS INC; RADNOR HOLDINGS CORP; ALLEGIS CORP; ERNST AND YOUNG (SYRIA); G G RETAIL INC; INTEGRATED ELECTRICAL SERVICES; PACIFIC GAS ELECTRIC; SEA CONTAINERS LTD (FOREIGN FILING); SEI HOLDINGS INC; UNITED AIRLINES; DANA; ENRON CORP; GENESIS HEALTH VENTURES INC; FEDERAL ENERGY REGULATORY COMMISSION; U S AIR GROUP INC; HAWAIIAN HOLDINGS INC; MESABA AVIATION INC; TRICO MARINE SERVICES INC; MERIDIAN AUTOMOTIVE SYSTEMS INC; FIRST INTERSTATE BANCORP; LAS VEGAS AMERICA CORP; FALCON PRODUCTS INC; INTEGRATED ELECTRICAL SERVICES INC; PENN TRAFFIC CO; ERNST AND YOUNG (BERMUDA); NORTHWEST AIRLINES; ERNST AND YOUNG (LEBANON); NORTHERN NATURAL GAS CO; ERNST AND YOUNG (BAHRAIN); WESTERN PACIFIC AIRLINES INC; TOWER AUTOMOTIVE INC; TOWER AIR INC; FALCON CO; ADVANCED COMPUTER TECHNOLOGY; GOLDMAN SACHS GROUP INC (THE); SUBMICRON SYSTEMS INC; ERNST AND YOUNG;

   © 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

COMAIR HOLDINGS INC; OCA INC; LESCOA INC; APPLIED COMPUTER TECHNOLOGY IN; ERNST ET
YOUNG (IVORY COAST); SOUTHERN ENERGY INC; AMCAST INDUSTRIAL CORP; CONTINENTAL
AIRLINES HOLDINGS INC; PLIANT CORP; ERNST AND YOUNG SL; HNG INTERNORTH; GLOBAL POWER
EQUIPMENT GROUP INC; US AIRWAYS GROUP INC; STEEL PARTS CORP; OXFORD AUTOMOTIVE INC;
SUBMICRON SYSTEMS CORP; ALOHA AIRLINES INC; DELTA AIR LINES INC; INTERMET CORP;
AMERICA WEST AIRLINES INC; CALPINE CORP; FIA CARD SERVICES N A; UNITED AIR LINES
INC; INTERACT INC (NEW YORK NEW YORK); KAISER ALUMINUM CORP; FAIRCHILD DORNIER CORP;
ATLAS AIR WORLDWIDE HOLDINGS INC ATLAS AIR WORLDWIDE; LEVITZ FURNITURE INC; MIDWAY
AIRLINES INC; MIRANT CORP; ATLAS AIR WORLDWIDE HOLDINGS INC; MESABA HOLDINGS INC;
UNIVERSAL AUTOMOTIVE INDUSTRIES INC; DURA AUTOMOTIVE SYSTEMS; AMERICAN AIRLINES INC;
ERNST YOUNG (ARGENTINA); SEC SOCIETE EUROPEENNE DE COMMUNICATION; ERNST AND YOUNG
LLP; PENSION BENEFIT GUARANTY CORP

NEWS SUBJECT:  (Economic Statistics (1EC52); Business Lawsuits & Settlements
(1BU19); Business Litigation (1BU04); Economics & Trade (1EC26); Economic Indicators
(1EC19))

INDUSTRY:  (Electric Utilities Brokering (1EL75); Land Transportation (1LA43);
Electric Utilities (1EL82); Automotive Models (1AU61); Passenger Transportation
(1PA35); Transportation (1TR48); Utilities (1UT12); Automobiles (1AU45); Commercial
Vehicles (1CO09); Automotive (1AU29))

REGION:  (Americas (1AM92); North America (1NO39); Latin America (1LA15); Mexico
(1ME48); Canada (1CA33))

Language:  EN

OTHER INDEXING:  (ACT; ADMINISTRATIVE OFFICE; ALOHA AIRLINES INC; AMCAST INDUSTRIAL
CORP; AMERICA; AMERICA WEST AIRLINES INC; AMERICAN GENERAL FINANCIAL SERVICES INC;
AMTROL INC; ARMSTRONG; ARMSTRONG WORLD INDUS INC; ATLAS AIR WORLDWIDE HOLDINGS INC;
AVENUE SPECIAL SITUATIONS; BR; **BANKRUPTCY**; **BANKRUPTCY** COURT AUTHORITY; BAPCPA;
CALPINE CORP; CENTRAL VIRGINIA COMMUNITY COLLEGE; CIRCUIT COURT; CIRCUIT COURT OF
APPEALS; CIRCUITS COURTS OF APPEAL; CITATION CORP; CITIZENS BANK OF MASSACHUSETTS;
CITX; CITX CORP; COLLECTIVE BARGAINING AGREEMENTS; **COLLINS AIKMAN** CORP; COMAIR;
COMMITTEE OF UNSECURED CREDITORS; CONGRESS; CONTINENTAL AIRLINES HOLDINGS INC; CORP;
COURT; COURT OF APPEALS; CREATIVE ENGINEERED POLYMER PRODUCTS; CROSS BORDER
INSOLVENCY REGULATIONS; CURATIVE HEALTH SERVICES INC; **DANA**; **DANA** CORP; DELAWARE;
DELAWARE CHANCERY COURT; **DELPHI** CORP; DELTA; DELTA AIR LINES; DELTA AIR LINES INC;
DORNIER AVIATION; DURA AUTOMOTIVE SYSTEMS INC; EASTERN AIR LINES INC; EMPLOYEE
RETIREMENT INCOME SECURITY ACT ("ERISA; ENRON CORP; ERISA; ERNST YOUNG; FAIRCHILD
DORNIER GMBH; FALCON PRODUCTS INC; FEDERAL ARBITRATION ACT; FEDERAL ENERGY
REGULATORY COMMISSION; FEDERAL POWER ACT; FERC; FINE AIR; FNIA; FOURTH CIRCUIT
COURT; FOURTH CIRCUIT COURT OF APPEALS; FRENCH AUTOMOTIVE; G+G RETAIL INC; GENESIS
HEALTH VENTURES INC; GLOBAL POWER EQUIPMENT GROUP; GLOBAL POWER EQUIPMENT GROUP INC;
GOLDMAN SACHS CO; GOOD FAITH REQUIREMENTS; GRANITE BROADCASTING CORP; HAL; HAWAIIAN
AIRLINES INC; HOLDINGS CORP; HOME PRODUCTS INTERNATIONAL INC; HOWELL INDUSTRIES;
HUFFY CORP; INTEGRATED ELECTRICAL SERVICES; INTEGRATED ELECTRICAL SERVICES INC;
INTERMET CORP; JERNBERG INDUSTRIES INC; KAISER ALUMINUM CORP; KB; LARGEST PUBLIC
AIRLINE; LEVITZ HOME FURNISHINGS INC; LIAM VENTURES INC; LOBDELL EMERY CORP; MBNA
AMERICA BANK; MERIDIAN AUTOMOTIVE SYSTEMS INC; MESABA; MESABA AVIATION; MESABA
AVIATION INC; METALFORMING TECHNOLOGIES INC; MICHIGAN; MIDWAY AIRLINES CORP; MIDWAY
AIRLINES INC; MIRANT CORP; MONROE BANK TRUST; NY DEC; NASA; NATIONAL PEOPLES
CONGRESS; NINTH CIRCUIT; NINTH CIRCUIT COURT OF APPEALS; NORTHWEST; NORTHWEST
AIRLINES; NORTHWEST AIRLINES CORP; OCA INC; OFFICIAL COMMITTEE OF UNSECURED
CREDITORS; ONEIDA LTD; ORIS AUTOMOTIVE PARTS AL LTD; OXFORD AUTOMOTIVE INC; PACIFIC
GAS ELECTRIC CO; PBGC; PENN TRAFFIC CO; PENSION; PENSION BENEFIT GUARANTY CORP;
PENSION PLAN TERMINATION; PENSION PROTECTION ACT; PIKES PEAK MUSICIANS ASSOCIATION;
PLIANT; PLIANT CORP; PLYMOUTH RUBBER CO; PRC ENTERPRISE **BANKRUPTCY** LAW; PREMIER
ENTERTAINMENT BILOXI LLC; RADNOR HOLDINGS CORP; RAILWAY LABOR ACT; REPUBLIC; SEA
CONTAINERS LTD; SEC; SERVICES CORP; SHELBY WILLIAMS INDUSTRIES INC; SIGNIFICANT
AUTOPART SUPPLIER; SILICON GRAPHICS INC; SIXTH CIRCUIT COURT OF APPEALS; SOUTHWEST
FLORIDA HEART GROUP; STEEL PARTS CORP; STORAGE SYSTEMS CO; SUBMICRON SYSTEMS CORP;
SUPREME COURT; TENTH CIRCUIT COURT OF APPEALS; TOWER AIR INC; TOWER AUTOMOTIVE INC;
TRANS WORLD AIRLINES; TRANS WORLD AIRLINES INC; TRAVELERS CASUALTY SURETY CO;

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

A221

TRENWICK AM; TRICO MARINE SERVICES INC; TRUST; US CONSTITUTION; US COURTS; US
SUPREME COURT; UAL CORP; UNION STAMPING ASSEMBLY INC; UNITED AIRLINES; UNITED
NATIONS COMMISSION; UNIVERSAL AUTOMOTIVE INDUSTRIES INC; US AIRWAYS; US AIRWAYS
GROUP; US AIRWAYS GROUP INC; VELTRI METAL PRODUCTS INC; VESTA INSURANCE GROUP INC;
VICTORY MEMORIAL HOSPITAL; WELLS FARGO BANK; WERNER HOLDING CO; WESTERN PACIFIC
AIRLINES INC; WESTPOINT STEVENS CORP; WORLD HEALTH ALTERNATIVES INC)  (126 S. Ct.;
127 S. Ct.; 729 (D. Del; Braniff; C.V .The; Co; Co., 126 S. Ct.; Comair; Components;
D. Del; Day; Detweiler, Hershey Assoc; Douglas Jones; FLYi; George W. Bush; Hill;
Jones Day; Katz, 126 S. Ct.; Kitty Hawk; Mark; Marshall, 126 S. Ct.; Michkeldel;
Murray Inc.; Pan; Pinnock; Q.C. Onics; S.D.; Satelites Mexicanos; Southeast
Community Hosp.; Specialist; Spot No.; Techneglas Inc.; Uniboring)

Word Count: 8675
1/30/07 MONDAQ (No Page)
END OF DOCUMENT

©  2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

A222

Tab  22

# UNITED STATES SECURITIES AND EXCHANGE COMMISSION
### Washington D.C. 20549

---

# Form 10-Q/A

## (Amendment No. 1)

(Mark One)

☑   **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the quarterly period ended September 30, 2004**

or

☐   **TRANSITION REPORT PURSUANT TO SECTION 13 or 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the transition period from          to**

**Commission file number 1-10218**

---

# Collins & Aikman Corporation

*(Exact name of registrant, as specified in its charter)*

| **DELAWARE** | **13-3489233** |
|---|---|
| *(State or other jurisdiction of incorporation or organization)* | *(IRS Employer Identification No.)* |

**250 Stephenson Highway**
**Troy, Michigan 48083**
*(Address of principal executive offices, including zip code)*

**(248) 824-2500**
*(Registrant's telephone number, including area code)*

Indicate by check mark whether the Registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the Registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.     Yes ☐          No ☑     .

Indicate by check mark whether the Registrant is an accelerated filer (as defined in Exchange Act Rule 12b-2).     Yes ☑          No ☐     .

As of October 31, 2004 the number of outstanding shares of the Registrant's common stock, $.01 par value, was 83,630,087 shares.

**WEBSITE ACCESS TO COMPANY'S REPORTS:**

A223

Collins and Aikman's internet website address is www.collinsaikman.com. The Company's annual report on Form 10-K, quarterly reports on Form 10-Q, current reports on Form 8-K, and amendment to those reports filed or furnished pursuant to Section 13(a) or 15(d) of the Exchange Act are available free of charge through the Company's website and as soon as reasonably practicable after the reports are electronically filed with, or furnished to, the Securities and Exchange Commission.

The Company's Code of Business Conduct is available free of charge through the Company's internet website. Any amendments to the Company's Code of Business Conduct and any waivers of the Code of Business Conduct involving executive officers or directors of the Company will also be made available on the Company's internet website. Printed copies of the Company's Code of Business Conduct are also available free of charge to any shareholder upon request to: Corporate Secretary, Collins & Aikman Corporation, 250 Stephenson Highway, Troy, MI 48083.

A224

Table of Contents

At September 1, 2004, interest on borrowings, at the Company's option, were either (a) adjusted LIBOR plus a 4.00% margin in the case of the Tranche B-1 term loan and supplemental revolving credit facility and a 3.00% margin in the case of the revolving credit facility or (b) the highest of (i) JPMorgan Chase Bank's prime rate, (ii) the federal funds effective rate plus 1/2 of 1.00% and (iii) the base CD rate plus 1.00% plus a 3.00% margin in the case of the Tranche B-1 term loan facility and supplemental revolving credit facility and 2.00% margin in the case of the revolving credit facility. A commitment fee on any unused commitments under the revolving credit facility equal to 0.75% per annum is payable quarterly in arrears and is subject to downward adjustment based on attaining certain performance targets. The weighted average rate of interest on the Senior Secured Credit Facilities at September 30, 2004 and December 31, 2003 was 5.79% and 7.60%, respectively.

The amended and restated credit facility requires that the Company meet certain financial tests, including, without limitation, the following tests: a maximum leverage ratio, a minimum interest coverage ratio and certain prescribed limitations on capital expenditures at levels agreed upon between Products and the agents. The amended and restated credit facility also contains covenants and restrictions, including, among others, limitations or prohibitions on declaring dividends and other distributions, redeeming and repurchasing capital stock, prepaying, redeeming and repurchasing other indebtedness, loans and investments, additional indebtedness, liens, sale-leaseback transactions, preferred stock, recapitalizations, mergers, acquisitions, asset sales and transactions with affiliates.

The amended and restated credit facility contains certain customary events of default, including, among others cross-default and cross-acceleration to other indebtedness (including the Company's receivables facility). Upon the occurrence and during the continuation of a non-bankruptcy event of default, all obligations due under the amended and restated credit facilities may be accelerated and become immediately due and payable if the Administrative Agent so directs either at its discretion or at the request of the lenders holding an aggregate of a majority of the outstanding loans and unused commitments under the amended and restated credit facilities. In addition, upon the occurrence and during the continuance of a bankruptcy event of default, all obligations under the amended and restated credit facilities shall automatically accelerate and become immediately due and payable.

### Public Debt

On August 26, 2004, Products issued $415 million aggregate principal amount of 12 7/8% Senior Subordinated Notes due 2012 at a discount of $14.9 million, which is being amortized during the life of the debt using the effective interest method. The gross proceeds of the Notes offering, or approximately $400.1 million, were used to redeem the outstanding $400 million of 11 1/2% Senior Subordinated Notes due 2006. As a result of this transaction, Products incurred a $4.0 million loss on early extinguishment of debt.

The Notes were sold in the United States only to accredited investors pursuant to an exemption from the Securities Act of 1933, as amended, and subsequently resold to qualified institutional buyers pursuant to Rule 144A under the Securities Act and to non-U.S. persons in accordance with Regulation S under the Securities Act. The Notes have not been registered under the Securities Act and may not be offered or sold in the United States absent registration or an applicable exemption from registration requirements.

The Notes will mature on August 15, 2012 and will accrue interest at the rate of 12 7/8% per year. Interest on the notes will be payable semi-annually in arrears on each February 15 and August 15, commencing on February 15, 2005. Products may redeem some or all of the Notes at any time at 100% of the principal amount plus a make-whole premium. In addition, prior to August 15, 2007, it may redeem up to 35% of the aggregate principal amount of the Notes with the proceeds of certain equity offerings at a redemption price equal to 112.875% of the principal amount of the Notes, plus accrued and unpaid interest, if any.

If Products experiences a change of control, it may be required to offer to purchase the Notes at a purchase price equal to 101% of the principal amount, plus accrued and unpaid interest, if any.

The Notes are fully and unconditionally guaranteed on a senior subordinated unsecured basis by the Company and by each of Products' existing wholly owned domestic subsidiaries (other than its special purpose

9

## CERTIFICATE OF SERVICE

I, Stephen B. Brauerman, Esquire hereby certify that on the 14th day of September, 2007, a true and correct copy of the foregoing **Appendix to Brief in Support of Defendant David A. Stockman's Motion to Dismiss Amended Complaint** has been served upon the following parties as indicated.

### VIA CM/EFC

Joseph A. Rosenthal, Esq.
Carmella P. Keener, Esq.
Rosenthal, Monhait & Goddess, P.A.
Mellon Bank Center
Suite 1401
919 N. Market Street
Wilmington, DE 19899-1070
(302) 656-4433

James Holzman, Esq.
J. Clayton Athey, Esq.
Prickett, Jones & Elliott, P.A.
1310 King Street, P.O. Box 1328
Wilmington, DE 19899
(302) 888-6500

Thomas P. Preston, Esq.
Blank Rome LLP
Chase Manhattan Centre
1201 North Market Street
Suite 800
Wilmington, DE 19801-4226
(302) 425-6400

Christian Douglas Wright, Esq.
Young Conaway Stargatt & Taylor LLP
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, DE 19899-0931
(302) 571-6691

Thomas G. Macauley, Esq.
Zuckerman Spaeder LLP
919 Market Street
Suite 990
Wilmington, DE 19810
(302) 427-0400

Robert S. Saunders, Esq.
Skadden, Arps, Slate, Meagher & Flom LLP
One Rodney Square
P.O. Box 636
Wilmington, DE 19899
(302) 651-3000

Anne C. Foster, Esq.
Robert J. Stearn, Jr., Esq.
Richards, Layton & Finger, P.A.
One Rodney Square
920 North King Street
Wilmington, DE 19801
(302) 651-7700

Michael J. Maimone, Esq.
Joseph B. Cicero, Esq.
Edwards Angell Palmer & Dodge LLP
919 North Market Street
15th Floor
Wilmington, DE 19801
(302) 777-7770

Kenneth J. Nachbar, Esq.
Morris, Nichols, Arsht & Tunnell
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899

Richard L. Horowitz, Esq.
Potter Anderson & Corroon, LLP
1313 N. Market Street, Hercules Plaza,
6th Floor
P.O. Box 951
Wilmington, DE 19899-0951

Vernon R. Procter, Esq.
Proctor Heyman LLP
1116 West Street
Wilmington, DE 19801

Albert H. Manwaring, IV, Esq.
Thomas H. Kovach, Esq.
Pepper Hamilton LLP
Hercules Plaza, Suite 5100
Wilmington, DE 19801

Stephen B. Brauerman (No. 4952)