## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| COLLINS & AIKMAN CORPORATION et al., | ) | |
| | ) | |
| Plaintiffs, | ) | C.A. No. 07-265 SLR-LPS |
| | ) | |
| v. | ) | |
| | ) | |
| DAVID A. STOCKMAN, et al., | ) | |
| | ) | |
| Defendants. | ) | |

### DEFENDANT KPMG LLP'S MOTION TO DISMISS
### FIRST AMENDED COMPLAINT

Defendant KPMG, LLP, by and through its undersigned counsel, hereby respectfully moves the Court to dismiss Plaintiffs' claims for failure to state a claim for relief pursuant to Fed. R. Civ. P. 12(b)(6). The basis for this motion is more fully set forth in KPMG's Opening Brief filed contemporaneously herewith.

EDWARDS ANGELL PALMER & DODGE LLP

*/s/ Michael J. Maimone*
_____
Michael J. Maimone (#3592)
Paul D. Brown (#3903)
Joseph B. Cicero (#4388)
919 North Market Street, 15th Floor
Wilmington, DE  19801
(302) 777-7770
mmaimone@eapdlaw.com
pdbrown@eapdlaw.com
jcicero@eapdlaw.com

OF COUNSEL:

Peter W. Devereaux
Christopher Harris
Latham & Watkins LLP
885 Third Avenue
New York, NY 10022
(212) 906-1200

April 28, 2008

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| Collins & Aikman Corp., et al., | ) | |
| | ) | C.A. No. 07-265-SLR-LPS |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| David A. Stockman, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**AFFIDAVIT OF PAUL D. BROWN IN SUPPORT OF**
**KPMG LLP'S MOTION TO DISMISS THE FIRST AMENDED COMPLAINT**

I, Paul D. Brown, being first duly sworn according to law, do hereby depose and say:

1.    I am a member of the bar of the State of Delaware and an attorney in the law firm of Edwards, Angell, Palmer & Dodge, LLP ("EAPD") located at 919 North Market Street, 15th Floor, Wilmington, DE, and along with the law firm of Latham & Watkins LLP ("Latham"), represent KPMG LLP ("KPMG") in the above-captioned case and, as such, I am familiar with all the facts and circumstances hereinafter set forth.

2.    I submit this Affidavit in support of KPMG's Motion to Dismiss the First Amended Complaint.

3.    On or around June 24, 2003, the parties entered into an agreement regarding KPMG's provision of professional services to Collins & Aikman Corporation. A true and correct copy of that agreement is attached hereto as Exhibit 1.

4.    On or around July 15, 2004, the parties entered into a second agreement regarding KPMG's provision of professional services to Collins & Aikman Corporation. A true and correct copy of that agreement is attached hereto as Exhibit 2.

WLM 513391.1

5. On or around March 21, 2007, the United States unsealed an indictment against David Stockman and other members of Collins & Aikman's management.  A true and correct copy of that indictment has been attached hereto as <u>Exhibit 3</u>.

6. On or around March 26, 2007, the Securities and Exchange Commission commenced a civil action against Collins & Aikman Corp. et al. in the Southern District of New York.   A true and correct copy of the complaint in that action is attached hereto as <u>Exhibit 4</u>.

7. A true and correct copy of an excerpt from Collins & Aikman's 2003 Annual Report is attached hereto as <u>Exhibit 5</u>.

8. A true and correct copy of an excerpt from Collins & Aikman's Third Quarter 2003 Quarterly Report is attached hereto as <u>Exhibit 6</u>.

_____
Paul D. Brown (#3903)

SWORN TO AND SUBSCRIBED before
me this 2 8 day of _Apri l_ 2008.

_____
Notary Public in and for the State of Delaware

My commission expires: _____

CAROLYN B. FOX
NOTARY PUBLIC
STATE OF DELAWARE
My Commission Expires  Feb. 22, 2010

- 2 -

# EXHIBIT 1

A

**KPMG**

Suite 1200
150 West Jefferson
Detroit, MI 48226-4429

Telephone 313 983 0200
Fax 313 983 0006
313 983 0007
313 983 0008

AUG 0 1 2003

J. Michael Stepp

June 24, 2003

Collins & Aikman Corporation
250 Stephenson Highway
Troy, MI 48083

Attention: Dean Robert C. Clark - Chairman of the Audit Committee

This letter will confirm our understanding of our engagement to provide professional services to Collins & Aikman Corporation.

**Audit Services**

We will issue a written report upon our audit of the consolidated balance sheets of Collins & Aikman Corporation as of December 31, 2003, the related consolidated statements of operations, common stockholders' deficit, and cash flows for the year ended December 31, 2003, and schedules supporting such financial statements, all of which are to be included in the annual report (Form 10-K) proposed to be filed by Collins & Aikman Corporation under the Securities Exchange Act of 1934. We will also issue written reports for our audits of the subsidiary companies listed on Exhibit I.

Should Collins & Aikman Corporation wish to include or incorporate these consolidated financial statements, schedules, and our report thereon by reference into a future filing under the Securities Act of 1933 or other offering document, we would consider our consent to the inclusion of our report and the terms thereof at that time.

We have a responsibility to conduct and will conduct the audit in accordance with auditing standards generally accepted in the United States of America, with the objective of expressing an opinion as to whether the presentation of the consolidated financial statements and schedules, taken as a whole, conforms with accounting principles generally accepted in the United States of America. It should be understood that our report and the consolidated financial statements and schedules may be subject to review by the Securities and Exchange Commission staff and to the application by them of their interpretation of the relevant rules and regulations.

In conducting the audit, we will perform tests of the accounting records and such other procedures as we consider necessary in the circumstances to provide a reasonable basis for our opinion on the consolidated financial statements. We also will assess the accounting principles used and significant estimates made by management, and evaluate the overall consolidated financial statement presentation.



KPMG LLP. KPMG LLP, a U.S. limited liability partnership, is a member of KPMG International, a Swiss association.

KPMG

Page 2
Collins & Aikman Corporation
June 24, 2003

Our report will be addressed to the board of directors of the Company and will be in a form that is in accordance with the published rules and regulations of the Securities and Exchange Commission. We cannot provide assurance that an unqualified opinion will be rendered. Circumstances may arise in which it is necessary for us to modify our report or withdraw from the engagement. In such circumstances, our findings or reasons for withdrawal will be communicated to the audit committee.

We will read the other information in your annual report (Form 10-K) and consider whether such information, or the manner of its presentation, is materially inconsistent with information, or the manner of its presentation, appearing in the consolidated financial statements. However, our audit does not include the performance of procedures to corroborate such other information (including forward-looking statements).

Collins & Aikman Corporation agrees that all records, documentation, and information we request in connection with our audit will be made available to us, that all material information will be disclosed to us, and that we will have the full cooperation of Collins & Aikman Corporation's personnel. As required by auditing standards generally accepted in the United States of America, we will make specific inquiries of management about the representations embodied in the consolidated financial statements and the effectiveness of internal control, and obtain a representation letter from management about these matters. The responses to our inquiries, the written representations, and the results of audit tests, among other things, comprise the evidential matter we will rely upon in forming an opinion on the consolidated financial statements.

The management of Collins & Aikman Corporation has responsibility for the consolidated financial statements, schedules, and all representations contained therein. Management also is responsible for identifying and ensuring that the Company complies with laws and regulations applicable to its activities, for preventing and detecting fraud, including the design and implementation of programs and controls to prevent and detect fraud, for adopting sound accounting policies, and for establishing and maintaining effective internal controls and procedures for financial reporting to maintain the reliability of the consolidated financial statements and to provide reasonable assurance against the possibility of misstatements that are material to the consolidated financial statements.

Our audit is planned and performed to obtain reasonable, but not absolute, assurance about whether the consolidated financial statements are free of material misstatement, whether caused by error or fraud. Absolute assurance is not attainable because of the nature of audit evidence and the characteristics of fraud. Therefore, there is a risk that material errors, fraud (including fraud that may be an illegal act), and other illegal acts may exist and not be detected by an audit performed in accordance with auditing standards generally accepted in the United States of America. Also, an audit is not designed to detect matters that are immaterial to the consolidated financial statements.



Page 3
Collins & Aikman Corporation
June 24, 2003

To the extent that they come to our attention, we will inform management about any material errors and any instances of fraud or illegal acts. Further, to the extent that they come to our attention, we will inform the audit committee about fraud and illegal acts that involve senior management, fraud that in our judgment causes a material misstatement of the consolidated financial statements of Collins & Aikman Corporation, and illegal acts, unless clearly inconsequential, that have not otherwise been communicated to the committee. In the case of illegal acts which in our judgment would have a material effect on the consolidated financial statements of Collins & Aikman Corporation, we are also required to follow the procedures set forth in the Private Securities Litigation Reform Act of 1995, which under certain circumstances requires us to communicate our conclusions to the Securities and Exchange Commission.

Management is responsible for adjusting the consolidated financial statements to correct material misstatements and for affirming to the auditor in the representation letter that the effects of any uncorrected misstatements aggregated by the auditor during the current engagement and pertaining to the latest period presented are immaterial, both individually and in the aggregate, to the consolidated financial statements being reported upon taken as a whole.

In planning and performing our audit, we will consider Collins & Aikman Corporation's internal control in order to determine the nature, timing, and extent of our audit procedures for the purpose of expressing an opinion on the consolidated financial statements and not to provide assurance on internal control.

While we are not being engaged to report on Collins & Aikman Corporation's internal control and are not obligated to search for reportable conditions, we will communicate reportable conditions to you to the extent they come to our attention. Reportable conditions are significant deficiencies in the design or operation of internal control which could adversely affect the organization's ability to record, process, summarize and report financial data consistent with the assertions of management in the consolidated financial statements. The definition of *reportable conditions* does not include potential future internal control problems, that is, control problems coming to our attention that do not affect the preparation of consolidated financial statements for the period under audit.

**Quarterly Review Services**

We will review the condensed consolidated balance sheets of Collins & Aikman Corporation as of June 30, and September 30, 2003, and the related condensed consolidated statements of operations, and cash flows for the quarterly and year-to-date periods then ended, which are to be included in the quarterly reports (Form 10-Q) proposed to be filed by Collins & Aikman Corporation under the Securities Exchange Act of 1934. Additionally, we will perform a retrospective review of the condensed consolidated balance sheet of the company as of March 31, 2003 and the related condensed consolidated statement of operations, and cash flows for the quarterly period then ended. We will also review the selected quarterly financial data specified by Item 302 of Regulation S-K, which is required to be included in the annual report (Form 10-

*KPMG*

Page 4
Collins & Aikman Corporation
June 24, 2003

K) proposed to be filed by Collins & Aikman Corporation under the Securities Exchange Act of 1934.

We have a responsibility to conduct our reviews in accordance with the provisions of Statement on Auditing Standards No. 100, *Interim Financial Information*, issued by the American Institute of Certified Public Accountants. The objective of a review of interim financial information is to provide us with a basis for communicating whether we are aware of any material modifications that should be made to such interim financial information for it to conform with accounting principles generally accepted in the United States of America. Our procedures will be substantially less in scope than an audit of financial statements performed in accordance with auditing standards generally accepted in the United States of America, the objective of which is the expression of an opinion regarding the financial statements taken as a whole. Accordingly, we will not express an opinion on the Company's interim financial information.

Our reviews will consist principally of performing analytical procedures applied to financial data and making inquiries of Company personnel responsible for financial and accounting matters. Our reviews will include obtaining sufficient knowledge of the Company's business and its internal control as it relates to the preparation of both annual and interim financial information to (a) identify the types of potential material misstatements in the interim financial information and consider the likelihood of their occurrence, and (b) select the inquiries and analytical procedures that will provide us with a basis for communicating whether we are aware of any material modifications that should be made to the interim financial information for it to conform with accounting principles generally accepted in the United States of America.

At the conclusion of each review of interim financial information, we will obtain a representation letter from management confirming certain representations made during the review. It should be understood that the management of Collins & Aikman Corporation is responsible for the fair presentation of the Company's interim financial information in conformity with accounting principles generally accepted in the United States of America, and for establishing and maintaining effective internal controls and procedures for financial reporting. Further, management is responsible for making all financial records and related information available to us. Management is also responsible for identifying and ensuring that the Company complies with the laws and regulations applicable to its activities.

A review does not contemplate tests of internal controls or accounting records, tests of responses to inquiries by obtaining corroborating evidential matter, and certain other procedures ordinarily performed during an audit. Thus, a review does not provide assurance that we will become aware of all significant matters that would be disclosed in an audit. Further, a review is not designed to provide assurance on internal control or to identify reportable conditions. However, we will communicate to the audit committee any reportable conditions that come to our attention.

Our review cannot be relied upon to disclose errors, fraud, or illegal acts that may exist. However, to the extent that they come to our attention in completing our review procedures, we will inform management about any material errors and any instances of fraud or illegal acts.

KPMGCA-WP-010971

KPMG

Page 5
Collins & Aikman Corporation
June 24, 2003

Further, to the extent that they come to our attention, we will inform the audit committee about fraud and illegal acts that involve senior management, fraud that in our judgment causes a material misstatement of the interim financial information, and illegal acts, unless clearly inconsequential, that have not otherwise been communicated to the committee.

If we become aware of matters during our review that cause us to believe that interim financial information, filed or to be filed with the Securities and Exchange Commission is probably materially misstated as a result of a departure from accounting principles generally accepted in the United States of America, we will discuss the matter with management and, if appropriate, communicate such matters to the audit committee.

Management is responsible for adjusting the interim financial information to correct material misstatements and for affirming to us in the representation letter that the effects of any uncorrected misstatements aggregated by us during the current engagement and pertaining to the current-year periods under review are immaterial, both individually and in the aggregate, to the interim financial information taken as a whole.

As agreed, we will not issue a written report upon completion of each review. However, we will inform you if we become aware of any material modifications that should be made to the interim financial information for it to be in conformity with accounting principles generally accepted in the United States of America. Should conditions preclude us from completing a review, we will advise you and the audit committee of Collins & Aikman Corporation promptly. Collins & Aikman Corporation agrees that it will not state in any document filed with the Securities and Exchange Commission or issued to stockholders that the interim financial information was reviewed by us, as such statement may require us to issue a written report.

**Registration Statements and Other Offering Documents**

We understand that the consolidated financial statements and schedules and our written report(s) thereon, as described above, are to be included by Collins & Aikman Corporation in its annual report (Form 10-K), and that in so doing Collins & Aikman Corporation will be incorporating by reference these consolidated financial statements and schedules and our report(s) thereon in previously filed and effective Form S-3 and S-8. Prior to issuing our consent to the incorporation by reference in these registration statements of our report with respect to the consolidated financial statements and schedules described above, we will perform procedures as required by Statement on Auditing Standards No. 37, *Filings Under Federal Securities Statutes*, including, but not limited to, reading information incorporated by reference in these registration statements and performing subsequent event procedures.

Should Collins & Aikman Corporation wish to include or incorporate by reference these consolidated financial statements and our report thereon into a future filing under the Securities Act of 1933, or an exempt offering, prior to our consenting to include or incorporate by reference our report on such consolidated financial statements, we will be required to perform



Page 6
Collins & Aikman Corporation
June 24, 2003

procedures as required by Statement on Auditing Standards No. 37, *Filings Under Federal Securities Statutes*, including, but not limited to, reading other information incorporated by reference in the registration statement or other offering document and performing subsequent event procedures. Our reading of the other information included or incorporated by reference in the offering document will consider whether such information, or the manner of its presentation, is materially inconsistent with information, or the manner of its presentation, appearing in the consolidated financial statements. However, we will not perform procedures to corroborate such other information (including forward-looking statements). The specific terms of our future services with respect to future filings or other offering documents will be determined at the time the services are to be performed.

*Comfort Letters*

Should a comfort letter be requested in connection with a future filing under the Securities Act of 1933, or an exempt offering, the specific terms of our services will be determined at that time. Prior to our issuance of a comfort letter, management of the Company agrees to supply us with a representation letter that will, among other things, confirm that no events have occurred that would require adjustments to (or additional disclosures in) the audited consolidated financial statements referred to above and confirm the Company's responses to certain inquiries made in connection with our issuance of the comfort letter.

\* \* \* \*

The work papers for this engagement are the property of KPMG LLP (KPMG). In the event KPMG is requested pursuant to subpoena or other legal process to produce its documents relating to this engagement for Collins & Aikman Corporation in judicial or administrative proceedings to which KPMG is not a party, Collins & Aikman Corporation shall reimburse KPMG at standard billing rates for its professional time and expenses, including reasonable attorney's fees, incurred in responding to such requests.

While the audit report may be sent to Collins & Aikman Corporation electronically by the KPMG engagement partner for Collins & Aikman Corporation's convenience, only the manually signed audit report constitutes the Company's record copy.

We estimate that our fees for these services will be $1,060,000. This estimate is based on the level of experience of the individuals who will perform the services and assumes no significant changes in foreign currency exchange rates during the audit period. Should foreign currency exchange rates change significantly, our fees for services provided outside the United States will be adjusted accordingly. In addition, expenses for items such as travel, telephone, postage, and typing, printing, and reproduction of financial statements are billed for reimbursement as incurred. Circumstances encountered during the performance of these services that warrant additional time or expense could cause us to be unable to deliver them within the above estimates. We will endeavor to notify you of any such circumstances as they are assessed.

*KPMG*

Page 7
Collins & Aikman Corporation
June 24, 2003

It is our practice to obtain progress payments as our work progresses. On this basis, we will invoice Collins & Aikman $132,500 monthly commencing in July 2003, with a final invoice on January 31, 2004.

*In accordance with your instructions, we have forwarded copies of this letter to Mr. Jerry L. Mosingo, President and Chief Executive Officer, and Mr. J. Michael Stepp, Vice Chairman and Chief Financial Officer.*

We shall be pleased to discuss this letter with you at any time. For your convenience in confirming these arrangements, we enclose a copy of this letter. Please sign and return it to us.

Very truly yours,

KPMG LLP

*Michael J. Miller*

Michael J. McAleer
*Partner*

cc:   Jerry L. Mosingo, President & Chief Executive Officer
      J. Michael Stepp, Vice Chairman and Chief Financial Officer


ACCEPTED:

Collins & Aikman Corporation:

_____
Dean Robert C. Clark, Chairman – Audit Committee


_____
Date

Collins & Aikman Corporation

_____
Mr. J. Michael Stepp, Vice Chairman and Chief Financial Officer

8/12/07
Date

**KPMG**

Exhibit I

## Subsidiary Company Audits

| | |
|---|---|
| Collins & Aikman Holdings, S.A. de C.V. | Mexico |
| Dura Convertible Systems de Mexico, S.A. de C.V. | Mexico |
| Amco de Mexico, S.A. de C.V. | Mexico |
| Servitop, S.A. de C.V. | Mexico |
| Collins & Aikman Carpet & Acoustics, S.A. de C.V. | Mexico |
| Collins & Aikman de Mexico, S.A. de C.V. | Mexico* |
| Collins & Aikman Automotive Company de Mexico, S.A. de C.V. | Mexico |
| Collins & Aikman Automotive Management Services Company | |
|    Mexico S.A. de C.V. | Mexico |
| Industrias Enjema, S.A. de C.V. | Mexico |
| Plascar Participacoes Industriais S. A. | Brazil* |
| Collins & Aikman Automotive Fabrics Limited | United Kingdom |
| Collins & Aikman Automotive Limited | United Kingdom * |
|  Collins & Aikman Automotive Systems Limited | United Kingdom |
|   Collins & Aikman Automotive Carpet Products (UK) Limit | United Kingdom |
|  Collins & Aikman Automotive Trim Limited | United Kingdom* |
|   AS Collins & Aikman UK Ltd. | United Kingdom |
|   Collins & Aikman Automotive UK Limited | United Kingdom |
|  Premier Springs & Pressings Limited | United Kingdom |
|  Manchester Kigass International Limited | United Kingdom |
|  Abex Plastic Products Limited | United Kingdom |
| Collins & Aikman Automotive Systems S.L. | Spain |
| Collins & Aikman Products GmbH | Austria |
| Collins & Aikman Holding AB | Sweden |
|  Collins & Aikman Automotive Systems AB | Sweden* |
| Collins & Aikman Automotive Systems GmbH | Germany* |
| Collins & Aikman Automotive B.V.B.A. | Belgium(1)* |
|  Collins & Aikman Automotive Trim GmbH | Germany* |
| Collins & Aikman Automotive Trim B.V. | Netherlands* |
|  Collins & Aikman Automotive  s.r.o. ** | Czech Republic (1)* |
| Collins & Aikman Europe B.V. | Netherlands |
|  Collins & Aikman Automotive Floormats Europe, B.V. | Netherlands |
| Collins & Aikman Automotive Systems Italy, S.r.l. | Italy (1)* |

*Timely locations
Note:  Indentations represent parent/subsidiary relationships by country

   (1)   Change in scope – fees to be determined

KPMGCA-WP-010975

# EXHIBIT 2

 

A. U
THT
11/04

**KPMG LLP**
Suite 1200
150 West Jefferson
Detroit, MI 48226-4429

Telephone 313 983 0200
Fax 313 983 0006
313 983 0007
313 983 0008

July 15, 2004

Collins & Aikman Corporation
250 Stephenson Highway
Troy, MI 48083

Attention: Dean Robert C. Clark, Chairman of the Audit Committee

**PRIVATE**

This letter will confirm our understanding of our engagement to provide professional services to Collins & Aikman.

**Objectives and Limitations of Services**

*Integrated Audit Services*

We will perform an audit of Collins & Aikman's consolidated financial statements and an audit of its internal control over financial reporting (collectively, the Integrated Audit).

Based on our Integrated Audit, we will issue our reports on:

- The consolidated financial statements of Collins & Aikman as set forth in appendix I

- Schedules supporting such financial statements

- Management's assessment regarding the effectiveness of Collins & Aikman's internal control over financial reporting and the effectiveness of internal control over financial reporting as set forth in appendix I

- Reports for our audits of the subsidiary companies listed on appendix I

These reports will be included in the annual report (Form 10-K) proposed to be filed by Collins & Aikman under the Securities Exchange Act of 1934.

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of the financial reporting and preparation of financial statements for external purposes in accordance with U.S. generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with U.S. generally accepted accounting principles and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.



KPMG LLP, a U.S. limited liability partnership, is the U.S. member firm of KPMG International, a Swiss cooperative.

KPMG

Collins & Aikman Corporation
July 15, 2004
Page 2

The Public Company Accounting Oversight Board (PCAOB), created as a result of the Sarbanes-Oxley Act of 2002 (Sarbanes-Oxley Act), has the authority to establish auditing, quality control, ethics, independence, and other standards relating to the preparation of audit reports for issuers, as that term is defined in the Sarbanes-Oxley Act, subject to oversight by the Securities and Exchange Commission (SEC).

We have a responsibility to conduct and will conduct the:

    (a) audit of the consolidated financial statements in accordance with the standards of the PCAOB (United States), with the objective of expressing an opinion as to whether the presentation of the consolidated financial statements and schedules taken as a whole conforms with U.S. generally accepted accounting principles

    (b) audit of internal control over financial reporting in accordance with the standards of the PCAOB (United States), with the objective of obtaining reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects

It should be understood that the consolidated financial statements and schedules, management's assessment of the effectiveness of internal control over financial reporting, and our reports thereon may be subject to review by the SEC staff and to the application by them of their interpretation of the relevant rules and regulations.

Our Integrated Audit will include:

    (a) performing tests of the accounting records and such other procedures as we consider necessary in the circumstances to provide a reasonable basis for our opinions

    (b) assessing the accounting principles used and significant estimates made by management and evaluating the overall consolidated financial statement presentation

    (c) obtaining an understanding of internal control over financial reporting, evaluating management's related assessment, testing and evaluating the design and operating effectiveness of internal control over financial reporting, and performing such other procedures as we considered necessary in the circumstances

Our Integrated Audit:

    (a) will be planned and performed to obtain reasonable, but not absolute, assurance about whether the consolidated financial statements are free of material misstatement, whether caused by error or fraud. Absolute assurance is not attainable because of the nature of audit evidence and the characteristics of fraud. Therefore, there is a risk that material errors, fraud (including fraud that may be an illegal act), and other illegal acts may exist and not be detected by an Integrated Audit performed in accordance with the standards of the PCAOB (United States). Also, an audit is not designed to detect matters that are immaterial to the consolidated financial statements. Our Integrated Audit will be planned and performed with an objective to obtain reasonable assurance that no material weaknesses exist in internal control over financial reporting as of Collins & Aikman's fiscal year-end and that the consolidated financial statements are free from material misstatement.

KPMG

Collins & Aikman Corporation
July 15, 2004
Page 3

(b) cannot provide absolute assurance of achieving financial reporting objectives because of its inherent limitations. Internal control over financial reporting is a process that involves human diligence and compliance, and is subject to lapses in judgment and breakdowns resulting from human failures. Internal control over financial reporting can be circumvented by collusion or improper management override. Because of such limitations, there is a risk that material misstatements may not be prevented or detected on a timely basis by internal control over financial reporting. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions or that the degree of compliance with the policies or procedures may deteriorate.

Our reports will be addressed to the board of directors of Collins & Aikman and will be in a form that is in accordance with the published rules and regulations of the SEC and the standards of the PCAOB (United States). We cannot provide assurance that unqualified opinions will be rendered. Circumstances may arise in which it is necessary for us to modify our reports or withdraw from the engagement.

As part of our Integrated Audit, we will read the other information in your annual report (Form 10-K) and consider whether such information, or the manner of its presentation, is materially inconsistent with information, or the manner of its presentation, appearing in the consolidated financial statements or is inconsistent with the results of our audit of internal control over financial reporting. However, our Integrated Audit does not include the performance of procedures to corroborate such other information (including forward-looking statements).

*Quarterly Review Services*

We will review the condensed consolidated balance sheets of Collins & Aikman as set forth in appendix I, and the related condensed consolidated statements of operations and cash flows for the quarterly and year-to-date periods, which are to be included in the quarterly reports (Form 10-Q) proposed to be filed by Collins & Aikman under the Securities Exchange Act of 1934. We will also review the selected quarterly financial data specified by Item 302 of Regulation S-K, which is required to be included in the annual report (Form 10-K) proposed to be filed by Collins & Aikman under the Securities Exchange Act of 1934.

We have a responsibility to conduct our reviews in accordance with the provisions of the standards of the PCAOB (United States). The objective of a review of interim financial information is to provide us with a basis for communicating whether we are aware of any material modifications that should be made to such interim financial information for it to conform with U.S. generally accepted accounting principles. Our procedures will be substantially less in scope than an Integrated Audit performed in accordance with the standards of the PCAOB (United States), the objective of which is the expression of opinions regarding the financial statements taken as a whole and internal control over financial reporting. Accordingly, we will not express an opinion on Collins & Aikman's interim financial information.

Our reviews will consist principally of performing analytical procedures applied to financial data and making inquiries of Collins & Aikman personnel responsible for financial and accounting matters. Our reviews will include obtaining sufficient knowledge of Collins & Aikman's business and its internal control as it relates to the preparation of both annual and interim financial information to (a) identify the types of potential material misstatements in the interim financial information and consider the likelihood of their occurrence and (b) select the inquiries and analytical procedures that will provide us with a basis for communicating whether we are aware of any material modifications that should be made to the interim financial information for it to conform with U.S. generally accepted accounting principles.

KPMG

Collins & Aikman Corporation
July 15, 2004
Page 4

A review does not contemplate tests of internal controls or accounting records, tests of responses to inquiries by obtaining corroborating evidential matter, and certain other procedures ordinarily performed during an Integrated Audit. Thus, a review does not provide assurance that we will become aware of all significant matters that would be disclosed in an Integrated Audit. Further, a review is not designed to provide assurance on internal control or to identify significant deficiencies or material weaknesses, and cannot be relied on to detect errors, fraud, or illegal acts.

As agreed, we will not issue a written report upon completion of each review. Collins & Aikman understands that any reference to interim financial information as reviewed by us when such information is included in documents issued to stockholders or third parties (including the SEC) will necessitate the issuance of a written review report, which must accompany the interim financial information in the document.

*Registration Statements and Other Offering Documents*

We understand that the consolidated financial statements and schedules, management's assessment regarding the effectiveness of internal control over financial reporting, and our written audit reports thereon, as described above, are to be included by Collins & Aikman in its annual report (Form 10-K), and that in so doing, Collins & Aikman will be incorporating by reference the consolidated financial statements and schedules, management's assessment regarding the effectiveness of internal control over financial reporting, and our reports thereon in previously filed and effective Form S-8. Prior to issuing our consent to the incorporation by reference in these registration statements of our reports with respect to the consolidated financial statements and schedules and internal control over financial reporting described above, we will perform procedures as required by the standards of the PCAOB (United States), including, but not limited to, reading information incorporated by reference in these registration statements and performing subsequent-event procedures.

Should Collins & Aikman wish to include or incorporate by reference the consolidated financial statements, management's assessment regarding the effectiveness of internal control over financial reporting, and our audit reports thereon into a future filing under the Securities Act of 1933, or an exempt offering, prior to our consenting to include or incorporate by reference our reports on the consolidated financial statements and internal control over financial reporting, we would consider our consent to the inclusion of our reports and the terms thereof at that time. We will be required to perform procedures as required by the standards of the PCAOB (United States), including, but not limited to, reading other information incorporated by reference in the registration statement or other offering document and performing subsequent-event procedures. Our reading of the other information included or incorporated by reference in the offering document will consider whether such information, or the manner of its presentation, is materially inconsistent with information, or the manner of its presentation, appearing in the consolidated financial statements or is inconsistent with the results of our audit of internal control over financial reporting. However, we will not perform procedures to corroborate such other information (including forward-looking statements). The specific terms of our future services with respect to future filings or other offering documents will be determined at the time the services are to be performed.

*Comfort Letters*

Should a comfort letter be requested in connection with a future filing under the Securities Act of 1933, or an exempt offering, the specific terms of our services will be determined at that time. Prior to our issuance of a comfort letter, management of Collins & Aikman agrees to supply us with a representation letter that will, among other things, confirm that no events have occurred that would require adjustments to (or

**KPMG**

Collins & Aikman Corporation
July 15, 2004
Page 5

additional disclosures in) the audited consolidated financial statements or management's assessment
regarding the effectiveness of Collins & Aikman's internal control over financial reporting referred to
above and confirm Collins & Aikman's responses to certain inquiries made in connection with our
issuance of the comfort letter.

**Our Responsibility to Communicate with the Audit Committee**

In conjunction with management, which is responsible for establishing Collins & Aikman's accounting
policies, we will discuss our judgments of the quality and understandability, not just the acceptability, of
Collins & Aikman's accounting policies and disclosures prior to the filing of our audit reports with the
SEC. We believe verbal communication is the appropriate forum to provide open and frank dialogue.

We will report to you, in writing, the following matters prior to the filing of our audit reports with the SEC:

- All significant deficiencies[1] and material weaknesses[2] identified during the Integrated Audit. If a
  significant deficiency or material weaknesses exist because of the oversight of the company's
  external financial reporting and internal control over financial reporting by the audit committee, we
  report such deficiency in writing to the board of directors.

- Audit adjustments arising from the Integrated Audit that could, in our judgment, either individually
  or in aggregate, have a significant effect on Collins & Aikman's financial reporting process. In this
  context, audit adjustments, whether or not recorded by the entity, are proposed corrections of the
  financial statements that, in our judgment, may not have been detected except through the auditing 
  procedures performed.

- Uncorrected misstatements aggregated during the current engagement and pertaining to the latest
  period presented that were determined by management to be immaterial, both individually and in
  aggregate.

- All relationships between KPMG LLP and its related entities and Collins & Aikman and its related
  entities that, in our judgment, may reasonably be thought to bear on independence.

- Alternative treatments within GAAP for accounting policies and practices related to material items
  that have been discussed with management during the current audit period, including
  (i) ramifications of the use of such alternative disclosures and treatments and the treatment
  preferred by us and (ii) the process used by management in formulating particularly sensitive
  accounting estimates.

- Disagreements with management or other serious difficulties encountered in performance of our
  audit or review services.

---

[1] A significant deficiency is a control deficiency, or combination of control deficiencies, that adversely affects an entity's ability to
initiate, authorize, record, process, or report external financial data reliably in accordance with U.S. generally accepted accounting
principles such that there is more than a remote likelihood that a misstatement of the entity's annual or interim financial statements
that is more than inconsequential will not be prevented or detected.

[2] A material weakness is a significant deficiency, or combination of significant deficiencies, that results in more than a remote
likelihood that a material misstatement of the annual or interim financial statements will not be prevented or detected.

KPMGCA-WP-028777

**KPMG**

Collins & Aikman Corporation
July 15, 2004
Page 6

- Critical accounting policies and practices applied in the consolidated financial statements and our assessment of management's disclosures regarding such policies and practices, including why certain policies and practices are or are not considered critical, and how current and anticipated future events impact those determinations.

- Other matters required to be communicated by the standards of the PCAOB (United States).

We will also read minutes, if any, of audit committee meetings for consistency with our understanding of the communications made to you and determine that you have received copies of all material written communications between ourselves and management. We will also determine that you have been informed of (i) the initial selection of, or the reasons for any change in, significant accounting policies or their application during the period under audit, (ii) the methods used by management to account for significant unusual transactions, and (iii) the effect of significant accounting policies in controversial or emerging areas for which there is a lack of authoritative guidance or consensus.

To the extent that they come to our attention, we will inform you and management about any material errors and any instances of fraud or illegal acts. Further, to the extent they come to our attention, we will also communicate to you fraud that involves senior management or that, in our judgment, causes a material misstatement of the financial statements and illegal acts that come to our attention, unless they are clearly inconsequential. In the case of illegal acts which, in our judgment, would have a material effect on the consolidated financial statements of Collins & Aikman, we are also required to follow the procedures set forth in the Private Securities Litigation Reform Act of 1995, which, under certain circumstances, require  us to communicate our conclusions to the SEC.

If, during the performance of our Integrated Audit procedures, circumstances arise which make it necessary to modify our reports or withdraw from the engagement, we will communicate to you our reasons for withdrawal. Similarly, if during performance of our quarterly review services we become aware of matters that cause us to believe the interim information filed, or to be filed, with the SEC is probably materially misstated as a result of a departure from U.S. generally accepted accounting principles, we will discuss such matters with management and, if appropriate, communicate such matters to you.

In addition, if we become aware of information that relates to the consolidated financial statements and/or management's assessment regarding the effectiveness of internal control over financial reporting after we have issued our reports or completed our interim review procedures, but which was not known to us at the date of our reports or completion of our interim review procedures, and which is of such a nature and from such a source that we would have investigated that information had it come to our attention during the course of our Integrated Audit and/or interim review procedures, we will, as soon as practicable: (1) communicate such an occurrence to you and (2) undertake an investigation to determine whether the information is reliable and whether the facts existed at the date of our reports or completion of our interim review procedures. In conducting that investigation, we will have the full cooperation of Collins & Aikman's personnel. If the subsequently discovered information is found to be of such a nature that (a) our reports or completion of our interim review procedures would have been affected if the information had been known as of the date of our reports or completion of our interim review procedures and (b) we believe that the reports or interim review procedures are currently being relied upon or are likely to be relied upon by someone who would attach importance to the information, appropriate steps will be taken to prevent further reliance on our reports or interim review procedures. Such steps include appropriate disclosures by Collins & Aikman of the newly discovered facts and the impact to the financial statements.



**KPMG**

Collins & Aikman Corporation
July 15, 2004
Page 7

**Audit Committee Responsibilities**

The audit committee is directly responsible for the appointment of KPMG as independent auditor, determining our compensation, and oversight of our Integrated Audit work, including resolution of disagreements between management and us regarding financial reporting. We understand that we report directly to the audit committee. The audit committee is responsible for preapproval of all audit and nonaudit services provided by us.

**Management Responsibilities**

The management of Collins & Aikman is responsible for the fair presentation, in accordance with U.S. generally accepted accounting principles, of the consolidated financial statements, schedules, and interim financial information and all representations contained therein. Management also is responsible for identifying and ensuring that Collins & Aikman complies with laws and regulations applicable to its activities and for informing us of any known material violations of such laws and regulations. Management also is responsible for preventing and detecting fraud, including the design and implementation of programs and controls to prevent and detect fraud, for adopting sound accounting policies, and for establishing and maintaining effective internal control over financial reporting and procedures for financial reporting to maintain the reliability of the consolidated financial statements or interim financial information and to provide reasonable assurance against the possibility of misstatements that are material to the consolidated financial statements or interim financial information. Management is also responsible for informing us of all significant deficiencies and material weaknesses in the design or operation of such controls of which it has knowledge. 

The management of Collins & Aikman is also responsible for:

1.  Accepting responsibility for the effectiveness of Collins & Aikman's internal control over financial reporting

2.  Evaluating the effectiveness of Collins & Aikman's internal control over financial reporting using a suitable control criteria

3.  Supporting its evaluation with sufficient evidence, including documentation

4.  Presenting a written assessment of the effectiveness of Collins & Aikman's internal control over financial reporting as of Collins & Aikman's fiscal year-end.

If management does not fulfill these responsibilities, we cannot complete the Integrated Audit.

Management of Collins & Aikman agrees that all records, documentation, and information we request in connection with our Integrated Audit will be made available to us, that all material information will be disclosed to us, and that we will have the full cooperation of Collins & Aikman's personnel. As required by the standards of the PCAOB (United States), we will make specific inquiries of management about the representations embodied in the consolidated financial statements or interim financial information and the effectiveness of internal control over financial reporting, and obtain a representation letter from management about these matters. The responses to our inquiries, the written representations, and the results of audit tests, among other things, comprise the evidential matter we will rely upon in forming an opinion on the consolidated financial statements, management's assessment of internal control, and the effectiveness of internal control over financial reporting.

KPMGCA-WP-028779



Collins & Aikman Corporation
July 15, 2004
Page 8

Management is responsible for adjusting the annual consolidated financial statements and interim financial information to correct material misstatements and for affirming to us in the representation letter that the effects of any uncorrected misstatements aggregated by us during the current engagement and pertaining to the latest period presented are immaterial, both individually and in the aggregate, to the consolidated financial statements being reported upon, or the interim information being reviewed, taken as a whole.

### Dispute Resolution

Any dispute or claim arising out of or relating to the engagement letter between the parties, the services provided thereunder, or any other services provided by or on behalf of KPMG or any of its subcontractors or agents to Collins & Aikman or at its request (including any dispute or claim involving any person or entity for whose benefit the services in question are or were provided) shall be resolved in accordance with the dispute resolution procedures set forth in appendix II, which constitute the sole methodologies for the resolution of all such disputes. By operation of this provision, the parties agree to forego litigation over such disputes in any court of competent jurisdiction. Mediation, if selected, may take place at a place to be designated by the parties. Arbitration shall take place in New York, New York. Either party may seek to enforce any written agreement reached by the parties during mediation, or to confirm and enforce any final award entered in arbitration, in any court of competent jurisdiction.

Notwithstanding the agreement to such procedures, either party may seek injunctive relief to enforce its rights with respect to the use or protection of (i) its confidential or proprietary information or material or (ii) its names, trademarks, service marks, or logos solely in the courts of the State of New York or in the courts of the United States located in the State of New York. The parties consent to the personal jurisdiction thereof and to sole venue therein only for such purposes. 

### Other Matters

This letter shall serve as Collins & Aikman's authorization for the use of e-mail and other electronic methods to transmit and receive information, including confidential information, between KPMG LLP (KPMG) and Collins & Aikman and between KPMG and outside specialists or other entities engaged by either KPMG or Collins & Aikman. Collins & Aikman acknowledges that e-mail travels over the public Internet, which is not a secure means of communication, and thus, confidentiality of the transmitted information could be compromised through no fault of KPMG. KPMG will employ commercially reasonable efforts and take appropriate precautions to protect the privacy and confidentiality of transmitted information.

Further, for purposes of the services described in this letter only, Collins & Aikman hereby grants to KPMG a limited, revocable, nonexclusive, nontransferable, paid-up and royalty-free license, without right of sublicense, to use all names, logos, trademarks and service marks of Collins & Aikman solely for presentations or reports to Collins & Aikman or for internal KPMG presentations and intranet sites.

KPMG is a limited liability partnership comprising both certified public accountants and certain principals who are not licensed as certified public accountants. Such principals may participate in the engagements to provide the services described in this letter.

Without our prior written approval, Collins & Aikman will not solicit for employment, nor will Collins & Aikman hire, any current or former partner or any professional employee of KPMG LLP or any of its affiliated member firms in a financial reporting oversight role (as defined in the SEC independence rules) if such partner or professional employee previously participated in the audit of Collins & Aikman's

**KPMG**

Collins & Aikman Corporation
July 15, 2004
Page 9

consolidated financial statements or quarterly review procedures until the applicable "cooling off" period under the SEC independence rules has expired. That period would commence with the latest date on which the individual participated in the annual audit or quarterly review procedures and would expire upon the filing by Collins & Aikman of its Form 10-K for the succeeding fiscal year.

*Workpaper Access by Regulators and Others*

The workpapers for this engagement are the property of KPMG. In the event KPMG is requested pursuant to subpoena or other legal process to produce its documents relating to this engagement for Collins & Aikman in judicial or administrative proceedings to which KPMG is not a party, Collins & Aikman shall reimburse KPMG at standard billing rates for its professional time and expenses, including reasonable attorney's fees, incurred in responding to such requests.

However, we may be requested to make certain workpapers available to the PCAOB pursuant to authority given to it by law or regulation. If requested, access to such workpapers will be provided under the supervision of KPMG personnel. Furthermore, upon request, we may provide photocopies of selected workpapers to the PCAOB. The PCAOB may intend, or decide, to distribute the photocopies or information contained therein to others, including the SEC. We agree to communicate to you on a timely basis any requests by the PCAOB for direct contact with members of the audit committee.

*Additional Reports and Fees for Services*

Appendix I to this letter lists the additional reports we will issue as part of this engagement and our fees for professional services to be performed per this letter.

In addition, fees for any special audit-related projects, such as research and/or consultation on special business or financial issues, will be billed separately from the audit fees for professional services set forth in appendix I and may be subject to written arrangements supplemental to those in this letter.

\* \* \* \* \* \* \*

Pursuant to our arrangement as reflected in this letter, we will audit and report on the financial statements set forth in appendix I for each of its subsequent fiscal years until either the audit committee or we terminate this agreement or mutually agree to the modification of its terms. The fees for each subsequent year will be annually subject to negotiation and approval by the audit committee.

In accordance with your instructions, we have forwarded a copy of this letter to J. Michael Stepp, vice chairman and chief financial officer.

KPMGCA-WP-028781

**KPMG**

Collins & Aikman Corporation
July 15, 2004
Page 10

We shall be pleased to discuss this letter with you at any time. For your convenience in confirming these arrangements, we enclose a copy of this letter. Please sign and return it to us.

Very truly yours,

KPMG LLP

*Michael J. McAleer*

Michael J. McAleer
*Partner*

cc:   J. Michael Stepp, Vice Chairman and Chief Financial Officer

Aug. 6. 2004 12:52PM    PUTNAM CENTRAL RECEP
Aug-05-04    11:51am    From-Mike Stepp    Collins & Aikman HQ    2480241504    T-702    NO. 4146    P. 2/72

KPMG

Collins & Aikman Corporation
July 15, 2004
Page 11

ACCEPTED:

Collins & Aikman Corporation:

*Robert C. Clark*

Dean Robert C. Clark, Chairman – Audit Committee

*Aug. 10, 2004*

Date

Collins & Aikman Corporation

Mr. J. Michael Stepp, Vice Chairman and Chief Financial Officer

Date

KPMGCA-WP-028783

KPMG

Appendix I

### Fees for Services [19]

Based upon our discussions with and representations of management, our fees for services we will perform are estimated as follows:

Integrated Audit:
Audit of consolidated balance sheets of Collins & Aikman as of
December 31, 2004 and 2003 and the related consolidated
statements of operations, stockholders' equity (deficit), and
cash flows for each of the years in the two-year period
ended December 31, 2004 .......................................... $2,350,000

Audit of internal control over financial reporting:
Our initial estimate of the fees related to our audit of
internal control over financial reporting as of
December 31, 2004 .......................................... $1,600,000 – $2,100,000

Quarterly Review Procedures:
Quarter ended September 30, 2004 .......................................... $50,000
Quarter ended March 31, 2005 .......................................... $50,000

However, we are unable to assure you that we can complete the audit of internal control over financial reporting within this estimated range due to the following:

- Collins & Aikman has not yet provided us with the complete documentation of its internal control over financial reporting.

- Collins & Aikman has not completed its tests of design effectiveness or operating effectiveness.

- Management of Collins & Aikman has not rendered its own assessment of internal control over financial reporting.

We will provide you updates of our estimate of fees as management provides this information to us, and we will finalize our professional fees once we have completed our work and know the extent of actual professional hours that were expended. We will bill for these services based upon actual hours incurred and the rates set forth below.

Billing Rates for Audit of Internal Control Over Financial Reporting:

| Country | Partner | Manager | Senior/Staff |
|---|---|---|---|
| United States | $ 400 | 320 | 170 |
| Canada | 400 | 320 | 170 |
| United Kingdom | 520 | 240 | 150 |
| Italy | 260 | 170 | 130 |
| Mexico | 270 | 60 | 30 |
| Germany | 430 | 270 | 180 |
| Belgium | 390 | 210 | 130 |
| Czech Republic | 300 | 190 | 130 |
| Netherlands | 480 | 290 | 160 |
| Sweden | 350 | 230 | 180 |
| Spain | 310 | 140 | 80 |
| Brazil | 110 | 70 | 50 |
| Other | 400 | 320 | 170 |



12

(Continued)

KPMGCA-WP-028784

KPMG

**Other Reports**

The reports that we will issue for subsidiary companies as part of this engagement are as follows:

| | |
|---|---|
| Collins & Aikman Holdings, S.A. de C.V. | Mexico |
|    Dura Convertible Systems de Mexico, S.A. de C.V. | Mexico |
|    Amco de Mexico, S.A. de C.V. | Mexico |
|    Servitop, S.A. de C.V. | Mexico |
|    Collins & Aikman Carpet & Acoustics, S.A. de C.V. | Mexico |
|    Collins & Aikman de Mexico, S.A. de C.V. | Mexico* |
|    Collins & Aikman Automotive Company de Mexico, S.A. de C.V. | Mexico |
|    Collins & Aikman Automotive Management Services Company | |
|       Mexico S.A. de C.V. | Mexico |
|    Industrias Enjema, S.A. de C.V. | Mexico |
| Plascar Participacoes Industriais S.A. | Brazil* |
| Collins & Aikman Automotive Fabrics Limited | United Kingdom |
| Collins & Aikman Automotive Limited | United Kingdom* |
|    Collins & Aikman Automotive Systems Limited | United Kingdom |
|       Collins & Aikman Automotive Carpet Products (UK) Limited | United Kingdom |
|    Collins & Aikman Automotive Trim Limited | United Kingdom* |
|       AS Collins & Aikman UK Ltd. | United Kingdom |
|       Collins & Aikman Automotive UK Limited | United Kingdom |
|    Premier Springs & Pressings Limited | United Kingdom |
|    Manchester Kigass International Limited | United Kingdom |
|    Abex Plastic Products Limited | United Kingdom |
| Collins & Aikman Automotive Systems S.L. | Spain |
| Collins & Aikman Products GmbH | Austria |
| Collins & Aikman Holding AB | Sweden |
|    Collins & Aikman Automotive Systems AB | Sweden* |
| Collins & Aikman Automotive Systems GmbH | Germany* |
| Collins & Aikman Automotive B.V.B.A. | Belgium* |
|    Collins & Aikman Automotive Trim GmbH | Germany* |
|    Collins & Aikman Automotive Trim B.V. | Netherlands* |
| Collins & Aikman Automotive s.r.o. ** | Czech Republic* |
| Collins & Aikman Europe B.V. | Netherlands |
|    Collins & Aikman Automotive Floormats Europe, B.V. | Netherlands |
| Collins & Aikman Automotive Systems Italy, S.r.l. | Italy* |
| Rosario Project S.A. | Argentina |
| Waterstone Insurance, Inc. | United States |

*Timely locations

Note: Indentations represent parent/subsidiary relationships by country.

The above estimates are based on the level of experience of the individuals who will perform the services. In addition, expenses for items such as travel, telephone, postage, and typing, printing, and reproduction of financial statements are billed for reimbursement as incurred. Circumstances encountered during the performance of these services that warrant additional time or expense could cause us to be unable to deliver them within the above estimates. We will endeavor to notify you of any such circumstances as they are assessed.

(Continued)

KPMGCA-WP-028785

KPMG

## Dispute Resolution Procedures

The following procedures are the sole methodologies to be used to resolve any controversy or claim ("dispute"). If any of these provisions are determined to be invalid or unenforceable, the remaining provisions shall remain in effect and binding on the parties to the fullest extent permitted by law.

### Mediation

Any party may request mediation of a dispute by providing a written Request for Mediation to the other party or parties. The mediator, as well as the time and place of the mediation, shall be selected by agreement of the parties. Absent any other agreement to the contrary, the parties agree to proceed in mediation using the CPR Mediation Procedures (effective April 1, 1998) issued by the Center for Public Resources, with the exception of paragraph 2, which shall not apply to any mediation conducted pursuant to this agreement. As provided in the CPR Mediation Procedures, the mediation shall be conducted as specified by the mediator and as agreed upon by the parties. The parties agree to discuss their differences in good faith and to attempt, with facilitation by the mediator, to reach a consensual resolution of the dispute. The mediation shall be treated as a settlement discussion and shall be confidential. The mediator may not testify for any party in any later proceeding related to the dispute. No recording or transcript shall be made of the mediation proceeding. Each party shall bear its own costs in the mediation. Absent an agreement to the contrary, the fees and expenses of the mediator shall be shared equally by the parties.

### Arbitration

Arbitration shall be used to settle the following disputes: (1) any dispute not resolved by mediation 90 days after the issuance by one of the parties of a written Request for Mediation (or, if the parties have agreed to enter or extend the mediation, for such longer period as the parties may agree) or (2) any dispute in which a party declares, more than 30 days after receipt of a written Request for Mediation, mediation to be inappropriate to resolve that dispute and initiates a Request for Arbitration. Once commenced, the arbitration will be conducted either (1) in accordance with the procedures in this document and the Rules for Non-Administered Arbitration of the CPR Institute for Dispute Resolution ("CPR Arbitration Rules") as in effect on the date of the engagement letter or contract between the parties or (2) in accordance with other rules and procedures as the parties may designate by mutual agreement. In the event of a conflict, the provisions of this document and the CPR Arbitration Rules will control.

The arbitration will be conducted before a panel of three arbitrators, two of whom may be designated by the parties using either the CPR Panels of Distinguished Neutrals or the Arbitration Rosters maintained by any United States office of the Judicial Arbitration and Mediation Service (JAMS). If the parties are unable to agree on the composition of the arbitration panel, the parties shall follow the screened selection process provided in Section B, Rules 5, 6, 7, and 8 of the CPR Arbitration Rules. Any issue concerning the extent to which any dispute is subject to arbitration, or any dispute concerning the applicability, interpretation, or enforceability of these procedures, including any contention that all or part of these procedures are invalid or unenforceable, shall be governed by the Federal Arbitration Act and resolved by the arbitrators. No potential arbitrator shall be appointed unless he or she has agreed in writing to abide and be bound by these procedures.

The arbitration panel shall issue its final award in writing. The panel shall have no power to award non-monetary or equitable relief of any sort. Damages that are inconsistent with any applicable agreement between the parties, that are punitive in nature, or that are not measured by the prevailing party's actual damages shall be unavailable in arbitration or any other forum. In no event, even if any other portion of these provisions is held to be invalid or unenforceable, shall the arbitration panel have power to make an award or impose a remedy that could not be made or imposed by a court deciding the matter in the same jurisdiction.

(Continued)

KPMGCA-WP-028786

Discovery shall be permitted in connection with the arbitration only to the extent, if any, expressly authorized by the arbitration panel upon a showing of substantial need by the party seeking discovery.

All aspects of the arbitration shall be treated as confidential. The parties and the arbitration panel may disclose the existence, content or results of the arbitration only as provided in the CPR Arbitration Rules. Before making any such disclosure, a party shall give written notice to all other parties and shall afford such parties a reasonable opportunity to protect their interests.

The award reached as a result of the arbitration will be binding on the parties, and confirmation of the arbitration award may be sought in any court having jurisdiction.

KPMGCA-WP-028787

# EXHIBIT 3

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - -x

UNITED STATES OF AMERICA                    :

              -v-                           :

DAVID A. STOCKMAN,                          :
J. MICHAEL STEPP,
DAVID R. COSGROVE, and                      :
PAUL C. BARNABA,
                    Defendants.             :

- - - - - - - - - - - - - - - - -x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: 
DATE FILED MAR 2 1 2007

'07 CR.

# 07 CRIM.    0220

**JUDGE JONES**

## COUNT ONE

(Conspiracy To Commit Securities Fraud, Make False Statements In
Annual and Quarterly Reports, Make False Entries In Books And
Records, Lie To Auditors, Commit Bank Fraud, Wire Fraud, and
Obstruction of An Agency Proceeding)

The Grand Jury charges:

### RELEVANT PERSONS AND ENTITIES

1.    At all times relevant to this Indictment, Collins
& Aikman, Inc. ("C&A") was a corporation organized under the laws
of the State of Michigan with its headquarters in Troy, Michigan.
At all times relevant to this Indictment, C&A's common stock was
listed under the symbol "CKC" on the New York Stock Exchange.

2.    DAVID A. STOCKMAN, the defendant, served on C&A's
board of directors from in or about 2000 through in or about May
2005.  From on or about August 1, 2002 until in or about May
2005, STOCKMAN served as Chairman of the Board of Directors of
C&A, and from in or about August 2003 until in or about May 2005,
STOCKMAN served as Chief Executive Officer of C&A.  At all times

relevant to this Indictment, STOCKMAN was a partner in a private equity firm (the "Private Equity Firm"), which was the largest single shareholder in C&A.

3.    At all times relevant to this Indictment, J. MICHAEL STEPP, the defendant, was a partner in the Private Equity Firm.    From in or about 2000 until in or about April 2006, STEPP served as Vice Chairman of the C&A Board of Directors.    In or about 2001, STEPP was an advisor to C&A and from in or about January 2002 until in or about October 2004, STEPP served as the Chief Financial Officer of C&A.

4.    At all times relevant to this Indictment, DAVID R. COSGROVE, the defendant, was employed by C&A or an entity later purchased by C&A.    At various times relevant to this Indictment, COSGROVE served as Group Controller for the Plastics Group, Vice President of Finance for the North American Plastics Group (from in or about February 2002 to in or about August 2002), Vice President of the Financial Planning and Analysis Group (from in or about August 2002 to in or about October 2004), and Senior Vice President, Financial Planning and Controller (from in or about October 2004 to at least May 2005).

5.    At various times relevant to this Indictment, PAUL BARNABA, the defendant, was employed by C&A in the Purchasing Department.    From Spring 2002 to December 2004, BARNABA was the Director of Financial Analysis for the Purchasing Department.

2

From December 2004 until in or about April 2005, BARNABA held the
position of Vice President and Director of Purchasing for the
Plastics Division.

## BACKGROUND

### C&A's Business

6.    At all times relevant to this Indictment, C&A
provided to businesses around the world a broad range of
automotive supply parts, including, among other things,
instrument panels and almost all other parts of an automobile
interior, carpets, acoustics, fabrics, and convertible tops.  C&A
owned and operated factories in North America, South America, and
Europe, and supplied parts to both domestic and foreign auto
manufacturers, such as Ford Motor Company, General Motors,
DaimlerChrysler, and others.  The automobile manufacturers are
commonly referred to within the industry as original equipment
manufacturers or "OEMs."  C&A operated primarily as a Tier I
supplier in the automotive industry, meaning that C&A supplied
its products directly to the OEMs.  C&A also operated as a Tier
II supplier, in that it supplied certain products to other
automotive parts suppliers, who in turn supplied the OEMs.  By
2005, C&A had grown to be one of the largest automotive parts
suppliers in the world.

7.    At all times relevant to this Indictment, in order
to produce automobile interiors and parts for the OEMs, C&A had

3

to purchase either raw materials or certain component parts from vendors.  The costs of these raw materials and component parts were among C&A's largest expenses.

### The Private Equity Firm's Investment in C&A

8.    In 1999, DAVID A. STOCKMAN and others formed the Private Equity Firm with the stated goal of acquiring and expanding industrial companies.  As part of his initial investment strategy on behalf of the Private Equity Firm, STOCKMAN targeted C&A as a company which he planned to control and expand through acquisitions.  In or about February 2001, the Private Equity Firm acquired a controlling share of C&A's equity; thereafter, STOCKMAN and other representatives of the Private Equity Firm became members of the C&A Board of Directors.  C&A entered into a services agreement with the Private Equity Firm under which the Private Equity Firm provided advisory and consulting services, in return for a $4.0 million annual advisory fee and additional fees of 1% of the total enterprise value of certain acquisitions.

9.    During 2001, as directed by STOCKMAN and in accordance with the Private Equity Firm's planned strategy, C&A purchased three other auto parts businesses and in the process doubled its size.  First, in or about July, 2001, C&A acquired Becker Group L.L.C., a company that manufactured plastic parts for automobiles.  In or about September 2001, C&A acquired Joan

4

Automotive Fabrics, which was part of Joan Fabrics, a privately held fabrics manufacturing company. These two acquisitions were part of STOCKMAN and the Private Equity Firm's specific plan to form C&A into a "Mega Tier II" supplier of fabrics and plastic parts to other automotive parts suppliers. Finally, in December 2001, C&A made its largest acquisition, purchasing the trim division of Textron Automotive Company, known as "TAC-Trim." This acquisition was intended to further STOCKMAN's strategy of garnering a larger share of the Tier I market, towards C&A's goal of producing almost any part of an automobile interior to OEMs worldwide.

### C&A's Capital Structure

10. At all times relevant to this Indictment, in addition to capital raised in the equity markets, C&A availed itself of a variety of sources of debt financing. At various times relevant to this Indictment, C&A's capital structure included (1) between approximately $400 million and $900 million in notes; (2) revolving credit facilities and term loans from banks between approximately $575 million and $675 million; and (3) an accounts receivable securitization facility of between approximately $170 million and $250 million.

11. Once STOCKMAN and the Private Equity Fund were in control of C&A in 2001, they caused C&A to finance its purchase of Tac-TRIM in December 2001 in part through issuing an

additional $500 million in 10-year notes.  Between that note issuance and other increases in its debts, under STOCKMAN's control, C&A's net debt increased from approximately $884 million as of December 30, 2000 to approximately $1.6 billion as of December 31, 2004.

12.    At all times relevant to this Indictment, C&A's credit facilities were governed by certain financial covenants. Failure to comply with these covenants would, under terms of the credit facilities, constitute a default by C&A and warrant a demand for immediate payment of the full amount of the credit facilities.  For example, C&A had to maintain a certain ratio of performance, measured by dividing C&A's net debt by a specific formula for "Earnings Before Interest, Taxes, Depreciation, and Amortization" ("EBITDA"), referred to as a leverage covenant.  If the ratio of C&A's net debt to its EBITDA fell below the covenant requirements, C&A would be in default of its leverage covenant. The credit facility agreements provided that, over time, the leverage covenant would become more stringent, meaning that C&A was expected to continue to meet increasing performance targets and/or reduce its overall indebtedness to maintain compliance with its covenants.  If C&A could not comply with its covenants, C&A could attempt to negotiate a less stringent financial test with its lenders, but such waivers of covenants were not guaranteed and were costly to C&A.

6

13.  In the event that C&A were to default on its credit facilities, cross-default provisions in its indentures would trigger a default event on C&A's notes as well.

### C&A's Financial Reporting Process

14.  At all times relevant to this Indictment, C&A employed independent auditors who performed year-end audits of C&A's financial statements.  In addition, auditors completed quarterly reviews of selected C&A financial information.

15.  At all times relevant to this Indictment, at the close of each month and each quarter of C&A's fiscal year, employees in C&A's finance and accounting departments collected and summarized information reflecting C&A's operating performance and financial results for the particular period in question. This information was reflected in various financial statements and reports.

16.  At all times relevant to this Indictment, C&A tracked its sales, EBITDA, operating income, capital expenditures and other financial metrics on a monthly basis through the use of internal reports.  Each C&A plant was required to update an internal computer system with its monthly or quarterly forecasts and actual results.  The results from the plants then rolled up to corresponding divisions.  Each division then reviewed the plants' reports and consolidated them into divisional reports, which were sent to the Financial Planning and Analysis group,

7

which, from at least 2003 until 2005, was headed by DAVID R.
COSGROVE.  At the corporate level, the results from each division
were aggregated and combined with the home office results, which
typically consisted of corporate overhead and any "top side"
adjustments.  The consolidated reports tracked actual results and
compared them to forecasted results.  As months went by,
forecasted results were updated with the latest information,
including the latest estimates of future sales to the OEMs.
STOCKMAN and STEPP reviewed the internal forecasts and STOCKMAN
often made changes to the internal forecasts or suggested ways to
improve C&A's results.

        17.  At all times relevant to this Indictment, STOCKMAN
led periodic meetings to discuss C&A's operating results for the
upcoming months, with a focus on the current quarter.  In
connection with these meetings, STOCKMAN, STEPP, COSGROVE, and
others reviewed documents that summarized information, including
sales, expenses, and other anticipated accounting entries that
would affect C&A's revenues in the current quarter and in
following months.  STOCKMAN regularly met with C&A employees to
discuss the financial results and projections reflected in the
various documents presented during these meetings.

## THE SCHEME TO DEFRAUD

### Introduction And Overview

18.    Beginning in or about 2001, after the Private
Equity Firm and STOCKMAN took operating control of C&A and
undertook their plan of expansion, C&A faced increasing pressures
in its business operations.  Over time, C&A was squeezed between
cost-reduction mandates from the OEMs and raw material price
increases from its vendors.  In addition, C&A's operating results
were further depressed by the high costs of integrating the
businesses it had acquired during 2001 into the existing C&A
operations.  From as early as in or about December 2001, these
operational pressures, among other issues, threatened to cause
C&A's financial performance to fall to levels that might trigger
default on the financial covenants governing the credit
facilities and the cross-default provisions in C&A's notes.
Thus, STOCKMAN, STEPP, COSGROVE, and the Private Equity Firm
continually faced pressure to keep C&A's financial performance at
a level that would (a) enable C&A to comply with the covenants in
its credit facilities; and (b) satisfy investors that STOCKMAN's
and the Private Equity Firm's financial plan was successful.

19.    In response to these operational pressures,
STOCKMAN orchestrated a scheme, joined in by COSGROVE, STEPP,
BARNABA, and others, to defraud C&A's investors, banks, and
creditors by manipulating C&A's reported revenues and earnings in

9

an effort to, among other things, (1) enable C&A to avoid
violating covenants in its credit facilities agreements and thus
C&A's financial ruin; and (2) raise additional capital in the
debt markets to assist C&A in solving its business problems.

20.   In furtherance of that scheme, from at least as
early as in or about December 2001, STOCKMAN, STEPP, COSGROVE,
and BARNABA caused C&A's reported figures for EBITDA, operating
income, and other financial metrics to be falsely and
fraudulently inflated by systematically and improperly
recognizing cost reductions based on supplier rebates, as
detailed in paragraphs 26 to 48, below.

21.   In furtherance of the scheme, STOCKMAN and his
co-conspirators made repeated public statements in which they (a)
falsely described C&A's operating performance and financial
results, and (b) omitted material facts necessary to make the
statements that they made about C&A's operating performance and
financial results complete, accurate, and not misleading.  In
addition, STOCKMAN and his co-conspirators caused C&A to file
financial statements with the SEC that presented a materially
false and misleading description of C&A's operating performance
and financial results.  STOCKMAN and others made similarly false
and misleading statements to C&A's creditors and lenders, which
falsely described C&A's operating performance and financial
results, and omitted material facts necessary to make the

10

statements that they made about C&A's operating performance and financial results complete, accurate, and not misleading, as detailed in paragraphs 26 to 48, below.

22.    As C&A's true operating results substantially deteriorated at the end of 2004 and the beginning of 2005, causing an unprecedented liquidity crisis, STOCKMAN directed a scheme to further defraud C&A's creditors by, among other things, misrepresenting to a lender the nature of C&A's portfolio of accounts receivable, against which C&A was borrowing over a hundred million dollars on a daily basis, as detailed in paragraphs 49 to 61, below.

23.    As C&A's true operating results continued to deteriorate in the first quarter of 2005 and as its improper rebate accounting practices came under scrutiny from its auditors, STOCKMAN directed a scheme to further defraud C&A's investors and creditors by making numerous false statements to the public and to C&A's creditors concerning (a) C&A's current liquidity situation, (b) C&A's forecasted EBITDA for the first quarter of 2005, and (c) the scope of the improper rebate recognition practices that C&A's outside auditors and Audit Committee were beginning to examine, as detailed in paragraphs 62 to 90, below.

24.    On or about March 17, 2005, as part of its regularly scheduled public earnings call, C&A announced that it

11

would have to delay the filing of its 2004 Annual Report on SEC
Form 10-K because C&A had been improperly recognizing cost
reductions attributed to supplier rebates.  STOCKMAN falsely
sought to reassure C&A's investors, creditors, outside auditors,
and the Board of Directors that the rebate issue was small in
scale and did not reflect fundamental operating problems at C&A.
In early April 2005, STOCKMAN repeated many of these assurances
to Credit Suisse First Boston ("Credit Suisse"), in order to
secure $75 million in additional financing.  These additional
funds, however, were not sufficient to meet C&A's needs and were
depleted by late April 2005.  Ultimately, in or about May 2005,
the Board of Directors discovered that C&A had run out of cash
and had, at STOCKMAN's direction, misled C&A's investors about
C&A's true operating performance.  The Board of Directors also
discovered that STOCKMAN had understated to the Board and C&A's
investors the scope of the rebate accounting issue.  On or about
May 12, 2005, the Board of Directors requested STOCKMAN's
resignation.

          25.  On or about May 17, 2005, C&A filed for
bankruptcy. As a result, C&A's common stock became nearly
worthless, and the price of C&A's bonds (Senior Subordinated
Notes, due 2012 and Senior Subordinated Notes, due 2011) also
plummeted.  The fraud carried out by STOCKMAN, STEPP, COSGROVE,

BARNABA, and others caused hundreds of millions of dollars in investor and creditor losses.

## THE JOAN FABRIC REBATE FRAUD SCHEME

26.  Starting in or about late 2001, STOCKMAN and STEPP, along with others, arranged for round trip transactions between C&A and Joan Fabrics in order to improperly manipulate C&A's EBITDA, as detailed below.

27.  On or about September 21, 2001, at STOCKMAN's direction, C&A acquired Joan Automotive Fabrics, a supplier of automotive fabric, from Joan Fabrics.

28.  In the fourth quarter of 2001, STOCKMAN, STEPP, and others realized that C&A's fourth quarter results were going to fall short of expectations.  Therefore, STEPP, with STOCKMAN's knowledge and approval, asked the Chief Executive Officer of Joan Fabrics ("the Joan CEO") for a $3 million payment from Joan Fabrics to C&A that would be used to boost C&A's EBITDA for the fourth quarter of 2001.  In return, STOCKMAN, STEPP, and others promised to repay Joan Fabrics in the future.  As STOCKMAN and STEPP intended, this $3 million payment was characterized as a supplier rebate to allow C&A to account for it as a reduction in cost for the fourth quarter of 2001, and therefore increase C&A's EBITDA for that period.  This characterization was false, as STOCKMAN and STEPP had agreed that C&A would make Joan Fabrics "whole" for the payment at some point in the future.  Therefore,

13

the transaction was a round trip of cash, not a supplier rebate, and should not have factored into C&A's EBITDA.

29.    After this first "rebate," STOCKMAN negotiated additional payments from Joan Fabrics in order to boost C&A's EBITDA.  STOCKMAN negotiated these payments personally with the Joan CEO, which totaled nearly $15 million in "rebates" between the fourth quarter of 2001 and the first quarter of 2003.  As with the first "rebate," C&A booked each payment as a reduction in cost, and increased its EBITDA.  Neither Joan Fabrics nor entities controlled by the Joan CEO had a contractual obligation to make these payments, and they in fact only agreed to do so with the understanding that Joan Fabrics would be repaid.

30.    At STOCKMAN and STEPP's direction, C&A repaid these "rebates" to Joan Fabrics through a series of subsequent transactions.  For example, on or about April 19, 2002, C&A gave back to Joan Fabrics certain looms that C&A had obtained as part of the original purchase of Joan Automotive, worth approximately $3.1 million, for no consideration and without approval by the C&A Board of Directors.  At STOCKMAN's direction, C&A repaid Joan Fabrics by systematically overpaying Joan Fabrics or entities controlled by the Joan CEO for additional purchases, including:

a.    C&A's purchase of Southwest Laminates, Inc., from the Joan CEO;

14

b.   C&A's purchase of air jet texturing machines
     from a subsidiary of Joan Fabrics; and

c.   the purported purchase of looms from Joan
     Fabrics for the purpose of running a
     furniture fabrics business at C&A.

31.   Thus, C&A improperly recognized approximately
$14.9 million in "rebates" from Joan entities between 2001 and
2003.

32.   In August 2003, the Audit Committee of C&A's
Board of Directors began an investigation of certain related
party transactions, including the "rebates" paid by Joan Fabrics
to C&A.   In or about August 2003, the Securities and Exchange
Commission ("SEC") opened an investigation into the matter.
Knowing that the Audit Committee would keep the SEC apprised of
its findings, STOCKMAN and STEPP sought to mislead the Audit
Committee, and directed others to do so, including by concealing
the true nature of the "rebate" transactions with Joan Fabrics
and by creating false and fraudulent justifications for the
"rebates."

33.   STOCKMAN, STEPP, and their co-conspirators,
through their misrepresentations, convinced the Audit Committee
that the "rebates" paid by Joan Fabrics had a legitimate business
purpose, were not loans to C&A, and were not repaid through other
transactions between C&A and Joan Fabrics.   Thus, based on

15

misleading and incomplete information, the Audit Committee authorized a report concluding that the "rebate" transactions were legitimate, and communicated that report to the SEC in or about March 2004 in connection with the SEC's investigation.

### THE SUPPLIER REBATE FRAUD SCHEME

34.  Beginning in or about 2002, in order to respond to the financial pressures on C&A outlined above, STOCKMAN, STEPP, COSGROVE, and BARNABA schemed to inflate C&A's income by systematically recognizing "rebates" from C&A's suppliers before those cost reductions had in fact been earned by C&A, as detailed below.

35.  During the time period relevant to this Indictment, OEMs typically sought to secure long-term supply contracts for each part of each automobile they made for the life of the "program." If awarded business from an OEM, C&A would typically sign a long-term – or "life of the program" – contract to produce specified parts of a vehicle for the OEM. These contracts, which often lasted for several years, helped the OEM ensure it had a steady stream of parts which met the OEM's quality and engineering standards. Once C&A had been awarded such business, C&A frequently sought to secure long-term supply agreements with its suppliers who would provide raw materials or component parts for the awarded program.

36.  In negotiating long-term supply agreements with

16

its suppliers, C&A would often demand price reductions.  C&A
demanded such price reductions, in part, due to increasing cost
pressure on C&A from the OEMs.  Price reductions could take
different forms: (i) a per piece price reduction or volume
discount, i.e., a reduction in the cost of each component part or
each pound of raw material supplied to C&A; or (ii) an upfront
lump sum payment, referred to by STOCKMAN and others as a
"rebate," "pay to play," or "slotting fee."  Where the contract
between C&A and a raw material supplier called for a volume
discount per pound of material supplied, any such discount would
normally be calculated at the end of a quarter or year, based
upon the actual amount of raw materials supplied to C&A in that
period.  To the extent that C&A negotiated a one-time "rebate" or
"slotting fee," it would take the form of an upfront, lump sum
payment that the supplier would agree to pay to C&A in exchange
for future business.  In these instances, at STOCKMAN's direction
or with his knowledge and approval, C&A either agreed to source
new business to that supplier, or maintained existing business
with a supplier, instead of resourcing the business to a cheaper
source of supply.  In either event, C&A negotiated "rebates" that
were contingent on C&A making future purchases from the supplier
granting the rebate.  Thus, C&A's right to retain the total
amount of a "rebate" was typically conditioned on C&A meeting its

17

contractual obligations, including sourcing particular business to the supplier.

37. At all times relevant to this Indictment, according to relevant accounting principles, and as STOCKMAN, STEPP, COSGROVE, and BARNABA knew, C&A could properly recognize and record rebates as a reduction in cost of sales only after C&A earned the rebate from the vendors, i.e., when C&A satisfied all the contractual terms that would entitle it to receive payment or keep any up-front lump sum payments.

38. Beginning in or about 2002, STOCKMAN, STEPP, COSGROVE, and BARNABA participated in a scheme to recognize the cost reductions from their "rebate" transactions before the rebates had been earned by C&A, in order to lower C&A's costs in the present quarter and thereby inflate its EBITDA for that period. C&A continuously faced pressure to improve performance, in order to meet external expectations and to comply with the covenants in its credit facilities agreements.

39. STOCKMAN, STEPP, and COSGROVE routinely attended meetings with members of the C&A Purchasing Department, including BARNABA, and knew that BARNABA and other employees from the C&A Purchasing Department were promising future business to suppliers in order to obtain up-front "rebates." In many cases, STOCKMAN directed C&A employees to get rebates from specific suppliers; STOCKMAN would specify the amount of the rebate to be requested

18

and the specific future business to be promised to the supplier. Once STOCKMAN identified a rebate, it became part of the C&A Purchasing Department's target goal for the quarter. At times relevant to this Indictment, STOCKMAN, STEPP, and COSGROVE received weekly written reports from the C&A Purchasing Department which included updated information concerning rebate transactions. These weekly updates often referred to the fact that future business was being promised to suppliers in exchange for rebates being booked immediately.

40. Beginning at least as early as in or about March 2002, STOCKMAN and COSGROVE directed employees in C&A's Purchasing Department to pull income forward into the current reporting period and thereby falsely pad C&A's reported income. STOCKMAN and COSGROVE understood that C&A's employees were therefore soliciting false documentation from suppliers to allow C&A to account for rebates improperly, using a template letter approved by COSGROVE. In particular, STOCKMAN and COSGROVE directed C&A's employees, when documenting supplier rebates that were contingent on future business, to obtain side letters or separate documents that falsely attributed the supplier rebate to past purchases. Purchasing employees, acting at BARNABA's direction, then solicited false documentation from suppliers knowing that such false documents would be used for immediate and improper recognition of cost reductions. STOCKMAN, STEPP,

19

COSGROVE, and BARNABA used the false documents to justify
immediate recognition of the supplier rebates in C&A's books and
records and in its financial reports filed with the SEC.

41.  STOCKMAN specifically approved various contingent
supplier rebates that were improperly booked in the current
quarter.  For example, STOCKMAN approved the following rebates,
with the knowledge and approval of STEPP and COSGROVE, each of
which, as they each well knew, was contingent on future business,
each of which was falsely documented to hide the contingency, and
each of which was recognized in whole or in part in the current
quarter:

> a.  Third quarter 2003: $1 million rebate from a
> plastic parts supplier;
>
> b.  Fourth quarter 2003:  $250,000 rebate from a
> tooling supplier.

42.  STOCKMAN directed employees, such as BARNABA, to
seek COSGROVE's guidance in "booking" the "rebates" in the
current quarter, despite knowing that it would be improper to
book the "rebates" in the current quarter because they were
contingent on future events.  COSGROVE reviewed false side
letters obtained or prepared by BARNABA and C&A's Purchasing
Department, with knowledge that they did not accurately reflect
the true nature of the "rebates," and edited false side letters
for the purpose of removing references to future business.  The

20

false side letters were typically then provided to C&A's outside auditors as "proof" that the rebates were properly booked in the current reporting period.

### Expansion Of The Rebate Scheme To Capital Equipment

43.    By 2004, C&A had obtained or tried to obtain rebates from nearly all of its raw material suppliers and C&A had already leveraged nearly all of its new business opportunities for up-front lump sum rebates. Moreover, with rising costs of raw materials, it was becoming more difficult to obtain commitments to make lump sum payments from any suppliers, particularly resin and steel producers. As a result, STOCKMAN, STEPP, COSGROVE, and BARNABA and their co-conspirators expanded the rebate scheme to capital equipment being purchased by C&A. STOCKMAN, STEPP, COSGROVE, and BARNABA each knew that, under generally accepted accounting principles, any discounts on the purchase of capital would result in a reduction of the cost basis of that asset, and would have no impact whatsoever on EBITDA. As the defendants knew, historically, C&A had accounted for any discounts on capital equipment in this manner. For the sole purpose of inflating C&A's reported EBITDA and operating income, STOCKMAN and COSGROVE, with STEPP's knowledge and approval, directed C&A employees, including BARNABA, to negotiate discounts on purchases of capital equipment and falsely document those discounts as "rebates" for past purchases of non-capital items.

21

In order to convince the equipment suppliers to agree to the "rebate," C&A generally agreed to pay a higher price for the equipment than originally requested by the equipment supplier, in return for a "rebate" for the difference, coupled with documentation that falsely attributed the rebate to items, such as the purchase of spare parts, which appeared to justify a decrease in expenses, rather than a discount on the cost of capital.

   44. For example, as STOCKMAN and his co-conspirators knew, C&A obtained the following capital cost reductions in 2004, among others:

     a. In or about February 2004, C&A negotiated a $1 million reduction in the cost of a large number of new machines for the Hermosillo plant with an equipment supplier.

     b. In or about 2004, C&A obtained two separate $500,000 rebates from an equipment supplier.

     c. In or about July 2004, C&A negotiated a $1 million rebate from a press manufacturer.

All of these rebates were in reality discounts in the purchase price of equipment, but at STOCKMAN's and COSGROVE's direction, C&A obtained documentation from the equipment suppliers falsely representing that the rebates were given for purchases of non-capital items or services, which was used to justify an increase

22

to EBITDA.  These "rebates" were reviewed with STOCKMAN, STEPP, and COSGROVE, and each were aware that the discounts were being falsely justified as rebates on non-capital expenses.

45.  In 2004, C&A improperly recognized approximately $7.2 million in pre-tax operating income based on capital expenditure "rebates."

### Booking The "Rebates"

46.  In furtherance of this scheme, from in or about 2002 through in or about 2005, rather than disclosing C&A's true financial condition and operating performance, STOCKMAN, STEPP, COSGROVE, and BARNABA directed C&A employees to falsely and fraudulently book the above-described rebates as cost reductions in the then-current quarter, in order to decrease artificially C&A's reported expenses, resulting in, among other things, artificially-inflated figures for C&A's EBITDA and operating income, among other financial metrics.  In light of their aggregate amount and timing, these entries made C&A's reported revenue and EBITDA materially misleading in reporting periods between the first quarter of 2002 and the first quarter of 2005.

47.  As a result of the above-described "rebate" schemes, between 2001 and 2004, C&A improperly inflated pre-tax operating income (or lowered pre-tax operating loss) by at least approximately $43.6 million.

23

### C&A's 2004 Debt Offering

48.    In or about August 2004, C&A offered, and the public purchased, approximately $415 million in 12.875% Senior Subordinated Notes due 2012 based, in part, on offering materials that were false and fraudulent in that they included results of operations that had been falsely and materially inflated by the rebate schemes described above.

### C&A's LIQUIDITY CRISIS IN THE FIRST QUARTER OF 2005

49.    In January 2005, as industry pressures on C&A increased, C&A faced an unprecedented liquidity crisis. Throughout much of the first quarter of 2005, C&A was fully drawn on its revolving credit facilities, and C&A did not have sufficient liquidity to pay its bills.    In order to avoid filing for bankruptcy, which would have acknowledged the failure of STOCKMAN's leadership and have resulted in the loss of STOCKMAN's and the Private Equity Firm's investment in C&A, STOCKMAN assumed personal responsibility for management of C&A's liquidity position on a daily basis.    STOCKMAN directed subordinates from various departments to commence a fraudulent invoicing scheme in order to increase the available liquidity under C&A's accounts receivable securitization facility.    As part of his effort to conceal the dire liquidity situation, STOCKMAN made various false statements about the problem, both to the public and to C&A's creditors.

24

## C&A's Credit Arrangements As Of January 2005

50.    As of January 2005, C&A had credit facilities totaling approximately $675 million.  C&A had obtained these credit facilities from J.P. Morgan Chase ("JPMC") and they consisted primarily of a $400 million term loan and two revolving credit facilities.  The revolving credit facilities could be drawn upon as needed.

51.    In or about December 2004, C&A entered into an agreement with General Electric Capital Corporation ("GECC") to become C&A's lender under its existing accounts receivable securitization facility.  At any given time, C&A had billed or invoiced the OEMs for millions of dollars worth of goods already sold.  Once an OEM received an invoice, that OEM then had a certain amount of time to pay for the parts made by C&A.  The amounts owed for these goods which had been sold but not yet paid for were listed as a receivable in C&A's books and records.  In order to increase its liquidity and speed up receipt of cash, the agreement with GECC allowed C&A to borrow against the outstanding balance in C&A's accounts receivable.  The maximum amount that C&A could borrow under the agreement with GECC was $250 million. The amount that could be borrowed from GECC at any given time depended on the amount of outstanding unpaid receivables, referred to as the borrowing base.

52.    Under C&A's agreement with GECC, only certain
receivables could be included in the calculation of the pool of
eligible receivables, or borrowing base.  The size of the
borrowing base changed on a daily basis to reflect the addition
of new receivables, the payment of outstanding receivables, and
the ineligibility of old receivables.  Among other requirements,
in order to constitute an "eligible receivable," C&A had to be
entitled to payment from the OEM once C&A generated an invoice
and sent it to the OEM.  This requirement is common to these
types of facilities, as GECC agreed to lend C&A money on the
understanding that GECC could collect from the OEMs were C&A to
default on its payment to GECC.  Under the relevant agreement
between an OEM and C&A, OEMs were obligated to pay on the terms
that had been otherwise agreed upon with C&A, but the maximum
allowable term of payment under the agreement between C&A and
GECC was 60 days.  Once an invoice was 60 days "past due," it was
automatically excluded from the borrowing base.  Thus,
theoretically, the maximum amount of time an unpaid receivable
could remain in the borrowing base was 120 days – 60 days to take
into account the time within which the OEM was supposed to pay
C&A and 60 days in "past due" status.

53.    Each day, under its agreement with GECC, C&A was
required to send a report to GECC which updated GECC on the
status of the borrowing base.  Among other information, this

26

daily report included a calculation of the level of eligible
receivables.  The daily report also stated whether C&A could
borrow more money from GECC – where the size of the borrowing
base had increased – or whether C&A had to make a payment to GECC
– because the level of the borrowing base had decreased.  These
reports were signed by employees from the Treasury Department,
who certified to the accuracy of each day's report.  C&A was
allowed a grace period of two days to report the borrowing base
calculation to GECC, and it typically took C&A the full two days
to prepare the report, given the amount of information that
needed to be gathered and the calculations that needed to be
done.  Thus, the report prepared each day, although it reflected
the "events" of two business days earlier, either required an
immediate payment to GECC or allowed an immediate increase in the
amount of money that C&A could borrow from GECC.  Typically, at
STOCKMAN's direction, C&A's Treasury Department sought to borrow
the maximum amount supported by the pool of eligible receivables
each day because of the low cost of financing under the GECC
agreement.

　　　　54.  From at least in or about early January 2005,
STOCKMAN and other employees knew that C&A faced a severe
liquidity crisis.  At STOCKMAN's direction, C&A delayed paying
its bills as long as possible, and many of C&A's suppliers were
being paid only when they threatened to stop supplying C&A with

goods.  Although the amount borrowed from JPMC on the revolving credit facilities fluctuated, starting in January 2005, C&A was beginning to fully draw on its revolving credit facilities, which essentially meant that C&A had run out of credit.

### The Scheme To Defraud GECC

55.  Starting in or about January 2005, STOCKMAN and his co-conspirators engaged in a scheme to defraud GECC.  On or about January 6, 2005, C&A's Treasury Department prepared a daily report for GECC which revealed that C&A had to make an immediate payment to GECC of approximately $21.8 million.  Employees in C&A's Treasury Department realized that C&A did not have sufficient liquidity to make the payment to GECC.  Thus, C&A was in default of its obligations under the GECC facility if it did not make the payment.  STOCKMAN was immediately informed of both the need for an immediate payment to GECC and the fact that C&A could not make the payment.  With STOCKMAN's knowledge and approval, employees from the Treasury Department intentionally misled GECC about the status of the daily report and the approximate $21.8 million payment.  First, with STOCKMAN's knowledge and approval, C&A employees failed to disclose to GECC that C&A owed GECC approximately $21.8 million and that C&A could not afford to make that payment.  Second, using a computer systems error that prevented C&A from generating a complete borrowing base report as an excuse, C&A employees delayed

28

providing daily reports due to GECC on January 6 and January 7, 2005.

56.   With STOCKMAN's knowledge and approval, in response to this crisis, C&A employees began trying to find receivables that could be invoiced, and thus, used to increase the level of the borrowing base by the next business day, Monday, January 10, 2005.   With STOCKMAN's knowledge and approval, C&A employees manually invoiced millions of dollars worth of receivables over the weekend for the sole purpose of inflating the borrowing base and misleading GECC about the default that had already occurred.   Since C&A's customers had not yet agreed to pay many of the receivables invoiced over the weekend, these receivables were not eligible to be included in the borrowing base.   STOCKMAN and other C&A employees thus improperly inflated the borrowing base by invoicing ineligible receivables.

57.   The following Monday, with STOCKMAN's knowledge and approval, employees of the Treasury Department prepared and submitted a daily report to GECC that failed to disclose the fact that C&A had created invoices for receivables that C&A's customers had not yet agreed to pay for the sole purpose of improperly inflating the borrowing base and avoiding the full approximately $21.8 million payment to GECC.   In addition, C&A failed to disclose the fact that C&A had been in default of its agreement with GECC.   Including the improperly invoiced

29

receivables, the amount due to GECC was brought down to approximately $11.8 million, which by then C&A could manage to pay.

58. As a result of the early January 2005 crisis, during the first and second quarters of 2005, STOCKMAN reviewed C&A's liquidity situation on a daily basis. Each day, STOCKMAN personally decided which of C&A's suppliers and creditors would get paid, and STOCKMAN personally managed all of C&A's liquidity.

59. After the early January 2005 scheme, STOCKMAN and others continued to defraud GECC by intentionally including ineligible receivables in the borrowing base of the accounts receivable securitization facility to obtain cash and increase liquidity. The majority of these ineligible receivables were invoices to OEMs for equipment, or "tooling," used to make auto parts. Under C&A's agreement with GECC, as with any other receivable, invoices for such equipment could only be included in the borrowing base if the customer had agreed to make payment. In the automotive industry, OEMs agree to make payments on tooling in two ways: they either certify that the equipment is performing to specifications, through the Production Part Approval Process, or "PPAP," or an OEM can expressly agree to be billed for tooling in advance of that approval. Although target dates for completion of PPAP are often set, typically, the OEM agrees to pay for tooling only once PPAP is completed and the OEM

30

has certified that C&A's production line makes parts properly.
Thus, as STOCKMAN and his co-conspirators well knew, a target
date for PPAP was no guarantee of OEM approval, and OEMs
generally only agreed to make payment on tooling once PPAP had
been completed.

60.   At STOCKMAN's direction, in or about January 2005,
C&A began putting such invoices for tooling in the borrowing base
prior to achieving PPAP and without customer agreement based on a
calculated guess as to when C&A might expect to achieve PPAP and
thus be eligible to get paid by the OEMs.  At STOCKMAN's
initiative, invoices for tooling were created and loaded into the
system that calculated the GECC borrowing base 60 days prior to
the PPAP target date.  At the time these tooling invoices were
created, STOCKMAN and others knew that there was no customer
agreement to pay the invoices, and thus they were ineligible
receivables under C&A's agreement with GECC.  These invoices were
created and entered into the system for the sole purpose of
improperly inflating the GECC borrowing base, thus generating
cash and liquidity for C&A.

61.   Between in or about January 2005 and in or about
April 2005, C&A added a total of well over $100 million in
ineligible receivables to the borrowing base.  In many cases, the
resulting invoice was not immediately sent to the OEM because
STOCKMAN and others knew that it would not be paid.  In order to

31

avoid bankruptcy and stay solvent, C&A borrowed from GECC against these fraudulent invoices in order to pay its bills throughout the first months of 2005.

**FALSE STATEMENTS TO INVESTORS IN 2005**

**C&A's Rebate Fraud Comes To Light**

62.    Beginning in or about November 2004, C&A's outside auditors at KPMG raised questions about supplier rebates generally and about some of the specific rebates fraudulently booked early at STOCKMAN's and COSGROVE's direction.  KPMG ultimately requested more documentation for supplier rebates negotiated by C&A.  As a result of this request and other events, STOCKMAN knew that C&A's practice of soliciting false side letters in regard to rebate transactions would likely be disclosed to KPMG and to C&A's Board of Directors.  Therefore, in March 2005, STOCKMAN reluctantly agreed to conduct an investigation of C&A's rebate accounting.  STOCKMAN sought, however, to take control of the investigation in order to minimize its scope and control its conclusions.  STOCKMAN also wanted to hide his own and other senior C&A management's involvement in the fraudulent scheme.

63.    For example, STOCKMAN, COSGROVE, and the other members of C&A's senior management limited the number of rebates examined and refused to restate certain improperly booked rebates.  STOCKMAN thereafter prepared conclusions of the

32

investigation's findings, which were presented to C&A's outside auditors with COSGROVE's knowledge, that minimized the financial impact of the rebate accounting errors and falsely characterized the source of the rebate accounting errors as "separation of duties," rather than the intentional fraud that it was, as evidenced by the pattern of false side letters.

64.    On March 17, 2005, C&A issued a press release announcing lagging 2004 financial results and disclosing the existence of an internal investigation into improper accounting for supplier rebates.  On the same date, STOCKMAN also participated in a public earnings call, for which he provided written slides to the investing public and analysts.  To mitigate the negative impact of these announcements, STOCKMAN presented false and misleading information concerning the internal investigation into the supplier rebates.

65.    On March 17, 2005, in the slides accompanying the public earnings call, in the press release, and on the earnings call itself, STOCKMAN sought to reassure investors and the public concerning the rebate issue.  STOCKMAN disclosed that as a result of a "comprehensive internal review" of more than "350 supplier rebate entries ... for 12 quarter period (2002-2004)" led by STOCKMAN, C&A would likely have to issue restated financial statements for 2003 and the first three quarters of 2004.

66.    STOCKMAN's description of the internal

investigation of the improper accounting for supplier rebates in
the March 17, 2005 press release was intended to mislead
investors and the public by minimizing the size of the
restatement of C&A's financial statements, and exaggerating the
degree to which management had explored, quantified, and
rectified the rebate situation.  First, the press release
asserted that the internal investigation reviewed 2002 rebates,
but did not indicate that any restatement was necessary.
However, no meaningful review of 2002 rebates was conducted, and
2002 rebates, including those negotiated with Joan Fabrics and a
$900,000 rebate from a steel supplier, were not restated even
though STOCKMAN knew they were clearly accounted for improperly.
Thus, the figures included in the press release regarding the
proposed amount to be restated did not accurately reflect the
true income earned for prior periods.

        67.  Second, the press release understated the degree
to which previous financial statements needed to be restated
based on 2003 and 2004 rebates, because the internal
investigation upon which the press release was designed to
justify C&A's previous accounting, rather than account for the
rebates properly.

        68.  Finally and most importantly, the press release
attributed the improper accounting to a failure of "controls" and
"procedures" and to "other circumstances."  This description was

34

intended to give the impression that the improper accounting was inadvertent and at worst the result of negligence. As described above, however, the truth was that the improper accounting was intentional and the result of a concerted scheme by STOCKMAN, STEPP, COSGROVE, BARNABA, and other C&A employees.

69. These misstatements were material in that they falsely suggested to the public, investors and C&A's outside auditors that the improper accounting for rebates was minor in scope and impact and did not involve intentional misconduct by senior management. STOCKMAN personally crafted these disclosures with the intent of misleading the public about his role and the impact of the rebate fraud.

## Other Misleading Disclosures In 2005

### March 17, 2005 Earnings Call

70. On March 17, 2005, the same day the press release was issued, STOCKMAN presided over an earnings call with investors and securities analysts. STOCKMAN personally drafted the slides used on that call, presented the slides, and took questions. During the call he made at least three material misstatements or omissions regarding C&A's results of operations and financial condition. Part of the information routinely provided by STOCKMAN and others to members of the investing public was so-called "guidance" concerning C&A's operational and financial results for upcoming reporting periods. The "guidance"

provided by STOCKMAN and others concerned various measures of C&A's operational and financial performance, including its EBITDA, net income, operating income, and capital expenditures. STOCKMAN knew that securities analysts, ratings agencies, and investors relied on the "guidance" provided by STOCKMAN and others and their public statements in general concerning C&A's predicted performance in the automobile parts supply industry to gauge C&A's performance, to predict C&A's expected earnings, and to disseminate estimates of C&A's expected performance to the larger investing public.

71.    First, merely two weeks before the end of C&A's first quarter, STOCKMAN provided a forecast for EBITDA for the first quarter of 2005 that he knew would not be attained.  He stated that EBITDA would be between $65-75 million for the first quarter of 2005, even though the most current financial information for the company, including the actual results for January and February, showed that EBITDA for the first quarter would only be roughly half that figure.  Moreover, STOCKMAN represented that his projection did not assume that C&A would be able to obtain cost concessions from its customers, the OEMs, when in fact his forecast included millions of dollars of such assumed recoveries.

72.    Second, during the presentation STOCKMAN highlighted a slide representing that capital expenditures in

36

2005 would be limited to $30 million quarterly as a sign that C&A
was conserving cash.  This statement was misleading because
STOCKMAN knew that his projections showed that C&A would spend
more than $50 million in the first quarter of 2005 and knew that
C&A had actually already spent more than $30 million in capital
expenditures during January and February 2005.  This
misrepresentation was material because, among other reasons,
STOCKMAN emphasized this limitation on capital expenditures to
reassure investors and the public that C&A was preserving cash
and holding down its costs.

        73.  At the time of the March 17, 2005 press release,
C&A had virtually no liquidity, with only about $4 million
available to it from its revolving credit facilities and a
growing payables backlog.  STOCKMAN was personally managing C&A's
cash on a daily basis and was well aware that C&A was unable to
pay its bills on time, did not pay some bills at all, and did not
have sufficient liquidity to meet the needs of a company its
size.  To hide this fact, and to falsely reassure the public
about C&A's liquidity situation, STOCKMAN purposely omitted from
the March 17, 2005 press release any liquidity figures for 2005,
but instead chose to disclose C&A's liquidity as of December 31,
2004.  STOCKMAN knew that C&A was suffering an unprecedented
liquidity crisis, and that the failure to disclose current

liquidity information, given this crisis, made the press release materially misleading.

74.    While the press release did provide a liquidity figure for December 31, 2004, this disclosure was itself materially misleading.  In discussing C&A's liquidity, the press release reported that C&A had undrawn commitments of $86 million on that date, but failed to disclose that C&A was unable to actually borrow such an amount without breaching the leverage covenant in C&A's Credit Facilities agreements because it had reached its maximum permissible debt given its earnings. Instead, only about $12 million of that $86 million was actually available to C&A as of December 31, 2004.  The failure to disclose what C&A could actually use of the $86 million reported liquidity was intentional.  STOCKMAN understood the impact of covenants on liquidity availability and that C&A, when it made public liquidity figures, had always disclosed what was available, not just the gross liquidity figure.

75.    Finally, when asked during the March 17, 2005 earnings call, "intra quarter are you tapping out your liquidity?" STOCKMAN answered "no."  Given that C&A did not have enough liquidity at this time to pay its bills, this statement was a lie designed to hide the fact, well known to STOCKMAN, that C&A was suffering a major liquidity crisis.

**March 23, 2005 bond presentation**

76.    On March 23, 2005, C&A made a presentation to MacKay Shields, holders of C&A's bonds. STOCKMAN presented the same slides he had used during the March 17, 2005 earnings call, which contained the material misrepresentations regarding EBITDA and capital expenditures described above. In addition, STOCKMAN sought to assure the MacKay Shields investors that C&A had sufficient liquidity to meet its needs, when he knew that it did not.

**March 24, 2005 presentation to C&A's lenders**

77.    On March 24, 2005, STOCKMAN presided over a conference call with JP Morgan Chase and Credit Suisse (formerly known as Credit Suisse First Boston), among others, for the purpose of securing a waiver of compliance with C&A's financial covenants in its credit agreements. STOCKMAN personally reviewed the slides and materials used on that call, presented the slides, and took questions. During the call he made at least three material misstatements or omissions regarding C&A's results of operations and financial condition.

78.    First, now merely one week before the end of C&A's first quarter, STOCKMAN provided a forecast for EBITDA for the first quarter of 2005 that he knew would not be attained. He stated that EBITDA would be $65.3 million for the first quarter of 2005, even though he knew that the most current financial

information for the company, including the actual results for January and February, showed that EBITDA for the first quarter would only be roughly half that figure. Moreover, STOCKMAN again falsely represented that his projection did not assume that C&A would be able to obtain cost concessions from the OEMs and STOCKMAN added that his projection for the first quarter of 2005 included a "contingency allowance" of $13 million, which was supposed to provide a "cushion for volume shortfalls or unplanned operating variances." In fact, STOCKMAN knew that C&A would need cost concessions from the OEMs to meet the targeted EBITDA, and that with one week left in the quarter, C&A would neither get the necessary cost concessions from the OEMs nor meet the target he had stated.

79. Second, STOCKMAN represented that capital expenditures would be $24 million for the first quarter of 2005, when he knew that C&A had already exceeded $30 million in expenditures for the quarter and was projected to spend over $50 million in the quarter. This misrepresentation was material because, among other reasons, STOCKMAN emphasized this limitation on capital expenditures to reassure C&A's creditors that C&A was preserving cash and holding down its costs.

80. To continue to hide the liquidity problems at C&A, and to falsely reassure the banks about its liquidity situation, STOCKMAN purposely omitted any liquidity figures from 2005 from

this presentation, but instead chose to disclose C&A's liquidity as of December 31, 2004. STOCKMAN knew that C&A was suffering a liquidity crisis, and that the failure to disclose current liquidity information, given this crisis, made the presentation materially misleading.

### March 24, 2005 Press Release

81.    On or about March 24, 2005, C&A announced that the audit committee had retained independent counsel to conduct a review of the rebate accounting related to supplier rebates.   In this press release, with STOCKMAN's knowledge and approval, C&A repeated its earlier disclosures concerning the scope of the rebate accounting problem, with the intent of minimizing investors' concerns about the size of the restatement to C&A's financial statements.

### April 3, 2005 Due Diligence Presentation to Credit Suisse

82.    In or about early April 2005, desperate for cash, STOCKMAN and others sought additional financing from Credit Suisse.   In connection with that request, STOCKMAN participated in an April 3, 2005 conference call with Credit Suisse to answer questions about C&A.   During the call, STOCKMAN reiterated many of the same false statements he had made on the March 17, 2005 and March 24, 2005 calls described above.

83.    First, STOCKMAN misled the lenders concerning liquidity at C&A.   STOCKMAN stated in this call that he believed

that C&A currently had approximately $110 million in liquidity
when STOCKMAN knew that C&A's revolving credit facilities were
fully drawn prior to April 3, 2005 and C&A had no other
substantial source of liquidity available at that time.  STOCKMAN
also told CSFB and other lenders that C&A had approximately $80-
85 million in liquidity as of March 31, 2005.  This statement was
false because C&A did not have $80-85 million in available
liquidity on March 31, 2005, as this figure did not take into
account covenant restrictions.  Despite having recently obtained
the leeway to assume more debt and still be in compliance with
the financial covenants under its Credit Facilities, C&A was
again at the debt ceiling given its level of earnings, and
therefore could not engage in any additional borrowing without
violating the new covenant.  As a result, C&A had only
approximately $8.6 million of available liquidity on March 31,
2005 when covenant restrictions were taken into account.

        84.   Second, STOCKMAN misled the lenders concerning
C&A's EBITDA and capital expenditures for the first quarter of
2005.  In the April 3, 2005 call, STOCKMAN reiterated the same
projections he had made in the March 17 and March 24, 2005
presentations, and stated in substance that there had been no
material changes to his forecast.  In fact, STOCKMAN had reviewed
current EBITDA calculations at the end of March 2005, which still
showed that C&A would miss the projected EBITDA target by a wide

                                42

margin and STOCKMAN knew that C&A had not yet received any of the hoped for recoveries from the OEMs, which were integral to his achieving his forecast for the first quarter.

85.   After the April 3, 2005 due diligence call, CSFB agreed to lend C&A an additional $75 million in financing, which C&A received on or about April 8, 2005.

### April 4, 2005 press release

86.   On April 4, 2005, C&A issued a press release stating that it had a commitment from Credit Suisse to obtain $75 million in financing.  That press release stated that "the Company's available liquidity (cash and unutilized commitments under revolving credit and account receivables facilities) was approximately $81 million at March 31, 2005, as compared with approximately $86 million at December 31, 2004."  This disclosure was false and misleading for several reasons.

87.   First, as discussed above, C&A did not have $86 million in available liquidity on December 31, 2004.  Because of covenant restrictions, C&A had no more than about $12 million in available liquidity on that date.  Second, as discussed above, C&A did not have $81 million in available liquidity on March 31, 2005, because this figure also did not take into account covenant restrictions.  As a result, C&A had only less than $9 million of available liquidity on March 31, 2005 when covenant restrictions were taken into account.  In reviewing the press release,

43

STOCKMAN knew the impact of covenants on liquidity availability and that C&A, when it publicly disclosed liquidity figures, had always disclosed what was available, not just the gross liquidity figure.

88.    Third, the $81 million figure, even if all of it had been available, would still have been materially misleading in that the press release did not disclose that this level of liquidity had only been attained by the scheme to defraud GECC. STOCKMAN knew that the liquidity number was false and misleading because he knew it was created by fraudulently inflating the GECC borrowing base.

### April 22, 2005 Presentation to GECC

89.    On or about April 22, 2005, STOCKMAN and others participated in a conference call with employees of GECC.  In addition to the credit that GECC provided to C&A through the accounts receivable securitization facility, GECC also provided substantial off-balance sheet financing to C&A.  Thus, the primary purpose of the conference call was to discuss C&A's financial condition, as GECC was concerned about, among other things, the March 2005 disclosures regarding the investigation into accounting related to supplier rebates and about the liquidity situation at C&A.  During this conference call, STOCKMAN used the same slides from his March 17, 2005 presentation, and thus repeated the same false statements

44

described above concerning first quarter 2005 EBITDA and capital expenditures. Although STOCKMAN indicated in substance that C&A might have some difficulty making the first quarter 2005 EBITDA, which the slides indicated would be between $65 million and $75 million, STOCKMAN sought to reassure GECC that 2005 EBITDA would be higher than 2004 levels, and was budgeted at $360 million for the year, which he indicated included a substantial cushion for unexpected events. STOCKMAN knew these statements were false because the first quarter had already ended with EBITDA at well below STOCKMAN's projections. Moreover, by April 22, 2005, STOCKMAN had not yet secured contractual commitments from the OEMs to provide C&A with the relief it needed to stay afloat.

90. At the time of the conference call, STOCKMAN told GECC in substance that C&A had improved its liquidity position from January 2005, despite knowing that C&A had already spent nearly all of the $75 million in additional financing obtained from Credit Suisse in early April. Finally, although the Audit Committee's independent investigation into the rebate accounting issue was ongoing, STOCKMAN repeated his earlier misleading statements concerning the limited scope of the rebate accounting problem, noting that 90% of the rebate transactions were properly booked.

## FALSE STATEMENTS AND MISLEADING OMISSIONS
## IN C&A'S SEC FILINGS

91.   As a result of the public listing of its
securities, at all relevant times C&A was required by federal
securities laws to make certain filings with the United States
Securities and Exchange Commission ("SEC") and to maintain
certain books and records.  In particular, applicable securities
statutes and regulations required C&A to, among other things, (a)
file with the SEC annual financial statements audited by an
independent accountant; (b) file with the SEC quarterly updates
of its financial statements that disclosed its financial
condition and the results of its business operations for each
three-month period; (c) devise and maintain a system of internal
accounting controls sufficient to provide reasonable assurances
that the company's transactions were recorded as necessary to
permit preparation of financial statements in conformity with
Generally Accepted Accounting Principles and other applicable
criteria; and (d) make and keep books, records, and accounts that
accurately and fairly reflected the company's business
transactions.

92.   The quarterly and annual reports filed by C&A for
the fourth quarter of 2001 through the third quarter of 2004
included financial statements that reflected the above-described
fraudulent adjustments to C&A's expenses and revenue.

93.  By directing these adjustments to be made, and falsely concealing the adjustments from the C&A's auditors, STOCKMAN, STEPP, COSGROVE, BARNABA, and their co-conspirators disguised C&A's true operating performance and financial condition from the investing public.  As a result, STOCKMAN, STEPP, COSGROVE, BARNABA, and their co-conspirators caused C&A to report financial results, which, as STOCKMAN, STEPP, COSGROVE, BARNABA, and their co-conspirators knew, exceeded by material amounts C&A's actual financial results in each reporting period.

### THE CONSPIRACY

94.  From in or about December 2001 through in or about May 2005, in the Southern District of New York and elsewhere, DAVID A. STOCKMAN, J. MICHAEL STEPP, DAVID R. COSGROVE, and PAUL C. BARNABA, the defendants, and others known and unknown, un-lawfully, willfully, and knowingly did combine, conspire, confederate, and agree together and with each other to commit offenses against the United States, namely (a) to commit fraud in connection with the purchase and sale of securities issued by C&A, in violation of Title 15, United States Code, Sections 78j(b) and 78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5; (b) to make and cause to be made false and misleading statements of material fact in applications, reports, and documents required to be filed under the Securities Exchange Act of 1934 and the rules and regulations thereunder, in

47

violation of Title 15, United States Code, Sections 78m(a) and
78ff; (c) to falsify books, records, and accounts of C&A, in
violation of Title 15, United States Code, Sections 78m(b)(2)(A),
78m(b)(5) and 78ff, and Title 17, Code of Federal Regulations,
Section 240.13b2-1; (d) to make false and materially misleading
statements to C&A's auditors, in violation of Title 17, Code of
Federal Regulations, Section 240.13b2-2 and Title 15, United
States Code, Section 78ff; (d) to commit bank fraud, in violation
of Title 18, United States Code, Section 1344; (e) to commit wire
fraud, in violation of Title 18, United States Code, Section
1343; and (f) to obstruct an agency proceeding, in violation of
Title 18, United States Code, Section 1505.

## Objects Of The Conspiracy

### Fraud In Connection With The
### Purchase And Sale Of Securities

95.    It was a part and an object of the conspiracy that
DAVID A. STOCKMAN, J. MICHAEL STEPP, DAVID R. COSGROVE, and PAUL
C. BARNABA, the defendants, and others known and unknown, un-
lawfully, willfully, and knowingly, directly and indirectly, by
use of the means and instrumentalities of interstate commerce,
the mails, and the facilities of national securities exchanges,
would and did use and employ manipulative and deceptive devices
and contrivances in connection with the purchase and sale of
securities issued by C&A, in violation of Title 17, Code of
Federal Regulations, Section 240.10b-5, by (a) employing devices,

48

schemes, and artifices to defraud; (b) making and causing C&A to make untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon the purchasers and sellers of C&A securities, in violation of Title 15, United States Code, Sections 78j(b) and 78ff.

### False Statements In
### Annual And Quarterly SEC Reports

96.   It was further a part and an object of the conspiracy that DAVID A. STOCKMAN, J. MICHAEL STEPP, DAVID R. COSGROVE, and PAUL C. BARNABA, the defendants, and others known and unknown, unlawfully, willfully, and knowingly, in applications, reports, and documents required to be filed under the Securities Exchange Act of 1934 and the rules and regulations thereunder, would and did make and cause to be made statements that were false and misleading with respect to material facts, in violation of Title 15, United States Code, Sections 78m(a) and 78ff.

### False Books And Records

97.   It was further a part and an object of the conspiracy that DAVID A. STOCKMAN, J. MICHAEL STEPP, DAVID R. COSGROVE, and PAUL C. BARNABA, the defendants, and others known and unknown, unlawfully, willfully, and knowingly would and did,

49

directly and indirectly, falsify and cause to be falsified books,

records, and accounts subject to Section 13(b)(2) of the

Securities Exchange Act of 1934, namely books, records, and

accounts of C&A, an issuer with a class of securities registered

pursuant to the Securities Exchange Act of 1934, which C&A was

required to make and keep, accurately and fairly reflecting, in

reasonable detail, the transactions and dispositions of the

assets of C&A, in violation of Title 15, United States Code,

Sections 78m(b)(2)(A), 78m(b)(5) and 78ff, and Title 17, Code of

Federal Regulations, Section 240.13b2-1.

Lying To The Auditors

98.    It was further a part and an object of the

conspiracy that DAVID A. STOCKMAN, J. MICHAEL STEPP, and DAVID R.

COSGROVE, the defendants, being directors and officers of C&A, an

issuer with a class of securities registered pursuant to Section

12 of the Act, and others known and unknown, unlawfully,

willfully, and knowingly, would and did, directly and indirectly

(a) make and cause to be made materially false and misleading

statements; and (b) omit to state, and cause other persons to

omit to state, material facts necessary in order to make the

statements made, in the light of the circumstances under which

such statements were made, not misleading to accountants in

connection with (i) audits and examinations of the Financial

Statements of C&A; and (ii) the preparation and filing of

50

documents and reports, required to be filed with the SEC pursuant
to rules and regulations enacted by the SEC, in violation of
Title 17, Code of Federal Regulations, Section 240.13b2-2 and
Title 15, United States Code, Section 78ff.

## Bank Fraud

99. It was a part and an object of the conspiracy that
DAVID A. STOCKMAN, the defendant, and others known and unknown,
unlawfully, willfully, and knowingly would and did execute and
attempt to execute a scheme and artifice to defraud financial
institutions, the deposits of which were then insured by the
Federal Deposit Insurance Corporation, and to obtain moneys,
funds, credits, assets, securities, and other property owned by,
and under the custody and control of said financial institutions,
by means of false and fraudulent pretenses, representations, and
promises, in violation of Title 18, United States Code, Section
1344.

## Wire Fraud

100. It was a part and an object of the conspiracy
that DAVID A. STOCKMAN, the defendant, and others known and
unknown, unlawfully, willfully and knowingly, having devised and
intending to devise a scheme and artifice to defraud, and for
obtaining money and property by means of false and fraudulent
pretenses, representations and promises, would and did transmit
and cause to be transmitted by means of wire communication in

51

interstate commerce, writings, signs, signals, pictures, and
sounds for the purpose of executing such scheme and artifice, in
violation of Title 18, United States Code, Section 1343.

### Obstruction Of Agency Proceeding

101.    It was further a part and an object of the
conspiracy that DAVID A. STOCKMAN and J. MICHAEL STEPP, the
defendants, unlawfully, willfully and knowingly would and did
corruptly influence, obstruct, and impede and endeavor to
influence, obstruct, and impede the due and proper administration
of the law under which any pending proceeding was being had
before a department and agency of the United States, to wit, the
United States Securities and Exchange Commission, in violation of
Title 18, United States Code, Section 1505.

### Means And Methods Of The Conspiracy

102.    Among the means and methods by which DAVID A.
STOCKMAN, J. MICHAEL STEPP, DAVID R. COSGROVE, and PAUL C.
BARNABA, and others would and did carry out the conspiracy were
the following:

a.    STOCKMAN and STEPP negotiated "rebates" with
Joan Fabrics that were in fact loans, and used the "rebates" to
improperly recognize cost reductions, thereby causing, among
other things, figures for C&A's publicly reported EPS, EBITDA and
net income to be false and materially misleading.

b.    With STEPP's knowledge and approval, STOCKMAN, COSGROVE, and BARNABA directed members of C&A's Purchasing Department to solicit false side letters in connection with certain supplier "rebate" transactions, in order to improperly recognize, or accelerate the recognition, of cost reductions, thereby causing, among other things, figures for C&A's publicly reported EPS, EBITDA, revenue growth rate, and net income to be false and materially misleading.

c.    STOCKMAN, STEPP, COSGROVE, BARNABA and their co-conspirators caused C&A to file publicly with the SEC quarterly and annual reports that materially misstated, among other things, figures for C&A's EPS and net income.

d.    STOCKMAN and STEPP provided and directed others to provide false and misleading financial information to the investing public and analysts.

e.    STOCKMAN provided and directed others to provide false and misleading financial information to financial institutions and investment banks.

## Overt Acts

103.   In furtherance of the conspiracy and to effect its illegal objects, DAVID A. STOCKMAN, J. MICHAEL STEPP, DAVID R. COSGROVE, PAUL C. BARNABA, and others committed the following overt acts, among others, in the Southern District of New York and elsewhere:

a. In or about 2002, STEPP solicited a rebate payment from the Joan CEO.

b. In or about 2002, STOCKMAN promised to repay a rebate received from the Joan CEO.

c. In or about May 2003, STOCKMAN, with STEPP's knowledge and approval, directed employees of the Purchasing Department to negotiate "rebates" with C&A's suppliers, in return for promises of future business.

d.   In or about Summer 2003, STOCKMAN and STEPP approved an improper "pull ahead" rebate transaction.

e.   In or about 2003, COSGROVE edited false documents in connection with rebate transactions.

f.   In or about 2003, BARNABA obtained approval from COSGROVE to create false documents in connection with rebate transactions.

g.   In or about 2004, BARNABA advised another employee to solicit false documents in connection with capital rebate transactions.

54

h.    In or about 2004, COSGROVE drafted false contract language for BARNABA and others to use in connection with capital rebate transactions.

i.    On or about March 16, 2004, STOCKMAN and STEPP signed C&A's Annual Report on Form 10-K for the Year Ending December 31, 2003.

j.    In or about August 2004, STOCKMAN and STEPP gave false and misleading information to bond investors.

k.    In or about January 2005, STOCKMAN directed that C&A mislead GECC concerning the accounts receivable securitization facility.

l.    On or about March 17, 2005, STOCKMAN provided false and misleading financial information to securities analysts and the investing public.

m.    On or about March 24, 2005, STOCKMAN provided false and misleading financial information to its lenders.

n.    On or about April 22, 2005, STOCKMAN provided false and misleading financial information to GECC.

(Title 18, United States Code, Section 371.)

## COUNT TWO

### (Securities Fraud)

The Grand Jury further charges:

104.  The allegations contained in paragraphs 1 through 93 and paragraphs 102 and 103 of this Indictment are repeated and realleged as if fully set forth herein.

105.  From in or about December 2001 up to and including in or about May 2005, in the Southern District of New York and elsewhere, DAVID A. STOCKMAN, J. MICHAEL STEPP, DAVID R. COSGROVE, and PAUL C. BARNABA, the defendants, unlawfully, willfully and knowingly, directly and indirectly, by the use of the means and instrumentalities of interstate commerce, and of the mails, and of facilities of national securities exchanges, in connection with the purchase and sale of the common stock of C&A, used and employed manipulative and deceptive devices and contrivances in violation of Title 17, Code of Federal Regulations, Section 240.10b-5 by (a) employing devices, schemes and artifices to defraud; (b) making untrue statements of material fact and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices and courses of business which operated and would operate as a fraud and deceit upon purchasers and sellers of the common stock of C&A.

(Title 15, United States Code, Sections 78j(b) and 78ff;
Title 17, Code of Federal Regulations, Section 240.10b-5;
Title 18, United States Code, Section 2.)

### COUNT THREE

### (Securities Fraud)

The Grand Jury further charges:

106.   The allegations contained in paragraphs 1 through 93 and paragraphs 102 and 103 of this Indictment are repeated and realleged as if fully set forth herein.

107.   From in or about December 2001 up to and including in or about May 2005, in the Southern District of New York and elsewhere, DAVID A. STOCKMAN, J. MICHAEL STEPP, DAVID R. COSGROVE, and PAUL C. BARNABA, the defendants, unlawfully, willfully and knowingly, directly and indirectly, by the use of the means and instrumentalities of interstate commerce, and of the mails, and of facilities of national securities exchanges, in connection with the purchase and sale of the 10.75% Senior Subordinated Notes, due 2011, of C&A, used and employed manipulative and deceptive devices and contrivances in violation of Title 17, Code of Federal Regulations, Section 240.10b-5 by (a) employing devices, schemes and artifices to defraud; (b) making untrue statements of material fact and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices and courses of

57

business which operated and would operate as a fraud and deceit

upon purchasers and sellers of the 10.75% Senior Subordinated

Notes, due 2011, of C&A.

(Title 15, United States Code, Sections 78j(b) and 78ff;
Title 17, Code of Federal Regulations, Section 240.10b-5;
Title 18, United States Code, Section 2.)

### COUNT FOUR

### (Securities Fraud)

The Grand Jury further charges:

108. The allegations contained in paragraphs 1 through

93 and paragraphs 102 and 103 of this Indictment are repeated and

realleged as if fully set forth herein.

109. From in or about December 2001 up to and including

in or about May 2005, in the Southern District of New York and

elsewhere, DAVID A. STOCKMAN, J. MICHAEL STEPP, DAVID R.

COSGROVE, and PAUL C. BARNABA, the defendants, unlawfully,

willfully and knowingly, directly and indirectly, by the use of

the means and instrumentalities of interstate commerce, and of

the mails, and of facilities of national securities exchanges, in

connection with the purchase and sale of 12.875% Senior

Subordinated Notes, due 2012, of C&A, used and employed

manipulative and deceptive devices and contrivances in violation

of Title 17, Code of Federal Regulations, Section 240.10b-5 by

(a) employing devices, schemes and artifices to defraud; (b)

making untrue statements of material fact and omitting to state

58

material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices and courses of business which operated and would operate as a fraud and deceit upon purchasers and sellers of 12.875% Senior Subordinated Notes, due 2012, of C&A.

(Title 15, United States Code, Sections 78j(b) and 78ff;
Title 17, Code of Federal Regulations, Section 240.10b-5;
Title 18, United States Code, Section 2.)

## COUNT FIVE

### (Bank Fraud)

The Grand Jury further charges:

110.    The allegations contained in paragraphs 1 through 93 and paragraphs 102 and 103 of this Indictment are repeated and realleged as if fully set forth herein.

111.    From in or about January 2005 through in or about May 2005, in the Southern District of New York and elsewhere, DAVID A. STOCKMAN, the defendant, unlawfully, willfully, and knowingly did execute and attempt to execute a scheme and artifice to defraud a financial institution, the deposits of which were then insured by the Federal Deposit Insurance Company, and to obtain moneys, funds, credits, assets, securities, and other property owned by, and under the custody and control of said financial institution, by means of false and fraudulent

pretenses, representations, and promises, to wit, a scheme to defraud General Electric Capital Corporation.

(Title 18, United States Code, Sections 1344 and 2.)

### COUNT SIX

### (Bank Fraud)

The Grand Jury further charges:

112.    The allegations contained in paragraphs 1 through 93 and paragraphs 102 and 103 of this Indictment are repeated and realleged as if fully set forth herein.

113.    From in or about February 2005 through in or about May 2005, in the Southern District of New York and elsewhere, DAVID A. STOCKMAN, the defendant, unlawfully, willfully, and knowingly did execute and attempt to execute a scheme and artifice to defraud a financial institution, the deposits of which were then insured by the Federal Deposit Insurance Company, and to obtain moneys, funds, credits, assets, securities, and other property owned by, and under the custody and control of said financial institution, by means of false and fraudulent pretenses, representations, and promises, to wit, a scheme to defraud JP Morgan Chase.

(Title 18, United States Code, Sections 1344 and 2.)

## COUNT SEVEN

### (Wire Fraud)

The Grand Jury further charges:

114.    The allegations contained in paragraphs 1 through 93 and paragraphs 102 and 103 of this Indictment are repeated and realleged as if fully set forth herein.

115.    From in or about March 2005 up to and including in or about April 2005, in the Southern District of New York and elsewhere, DAVID A. STOCKMAN, the defendant, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, to wit, a scheme to defraud Credit Suisse First Boston of $75 million, transmitted and caused to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, a writing, sign, signal, picture and sound for the purpose of executing such scheme and artifice, to wit, STOCKMAN made misleading and false statements during a due diligence conference telephone call on or about April 3, 2005 between participants in New York, New York and participants outside New York.

(Title 18, United States Code, Sections 1343 and 2.)

61

## COUNT EIGHT

### (Obstruction of Agency Proceeding)

The Grand Jury further charges:

116.   The allegations contained in paragraphs 1 through 93 and paragraphs 102 and 103 of this Indictment are repeated and realleged as if fully set forth herein.

117.   From at least in or about August 2003 up to and including at least in or about March 2004, in the Southern District of New York, DAVID A. STOCKMAN and J. MICHAEL STEPP, the defendants, unlawfully, willfully and knowingly, did corruptly influence, obstruct, and impede and endeavor to influence, obstruct, and impede the proper administration of the law under which a pending proceeding was being had before a department and agency of the United States, to wit, the SEC, by causing to be provided false and misleading information to the SEC relating to the Joan Fabrics Scheme.

(Title 18, United States Code, Sections 1505 and 2.)

### FORFEITURE ALLEGATION

118.     As a result of committing one or more of the foregoing securities fraud offenses, in violation of Title 15, United States Code, Sections 77x, 78j(b), 78o(d), and 78ff; and Title 17, Code of Federal Regulations, Sections 240.10b-5 and 240.15d-2, as alleged in Counts One, Two, Three, and Four; wire fraud offenses, in violation of Title 18, United States Code,

Section 1343, as alleged in Counts One and Sixteen of this
Indictment, DAVID A. STOCKMAN, the defendant, J. MICHAEL STEPP,
the defendant (as to the acts alleged in Counts One, Two, Three
and Four), DAVID COSGROVE, the defendant (as to acts alleged in
Counts One, Two, Three, and Four), and PAUL BARNABA, the
defendant, (as to acts alleged in Counts One, Two, Three, and
Four), shall forfeit to the United States pursuant to Title 18,
United States Code, Section 981(a)(1)(C) and Title 28, United
States Code, Section 2461, all property, real and personal, that
constitutes or is derived from proceeds traceable to the
commission of the securities and wire fraud offenses.

      119.    As a result of committing one or more of the
foregoing bank fraud offenses, in violation of Title 18 United
States Code, Section 1344, as alleged in Counts Fourteen and
Fifteen of this Indictment, DAVID A. STOCKMAN, the defendant,
shall forfeit to the United States pursuant to Title 18, United
States Code, Section 982, any property constituting or derived
from the proceeds obtained directly or indirectly as a result of
the bank fraud offenses and all property traceable to the
commission of the bank fraud offenses.

      120.    The property subject to forfeiture includes, but
is not limited to the following:

63

a.   At least $775 million in United States currency, representing the amount of proceeds obtained as a result of the charged bank fraud offenses.

b.   At least $575 million in United States currency, representing the amount of proceeds obtained as a result of the charged securities and wire fraud offenses, for which the defendants are jointly and severally liable.

### SUBSTITUTE ASSETS PROVISION

121.    If any of the above-described forfeitable property, as a result of any act or omission of the defendants:

(i)   cannot be located upon the exercise of due diligence;

(ii)  has been transferred or sold to, or deposited with, a third party;

(iii)  has been placed beyond the jurisdiction of the court;

(iv)  has been substantially diminished in value; or

(v)   has been commingled with other property which cannot be divided without difficulty;

64

it is the intent of the United States, pursuant to Title 18,

United States Code, Section 982 and Title 21, United States Code,

Section 853(p), to seek forfeiture of any other property of said

defendants up to the value of the forfeitable property described

above.

(Title 18, United States Code, Sections 371, 981, 982, 1343,
1344; Title 15, United States Code, Sections 77x, 78j(b), 78o(d),
78ff; Title 17, Code of Federal Regulations, Sections 240.10b-5,
240.15d-2; Title 21, United States, Section 853(p); and Title 28,
United States Code, Section 2461.)

_____
FOREPERSON

_____
MICHAEL J. GARCIA
United States Attorney

65

Form No. USA-33s-274 (Ed. 9-25-58)

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

- v -

**DAVID A. STOCKMAN,**
**J. MICHAEL STEPP,**
**DAVID A. COSGROVE, and**
**PAUL C. BARNABA**

**Defendants.**

## INDICTMENT

07 Cr.

Title 15, United States Code, Sections 78j(b) and 78ff;
Title 17, Code of Federal Regulations, Section 240.10b-5;
Title 18, United States Code, Section 2;
Title 18, United States Code, Section 371;
Title 18, United States Code, Section 1344;
Title 18, United States Code, Section 1343;
Title 18, United States Code, Section 1505.

MICHAEL J. GARCIA
United States Attorney.

**A TRUE BILL**

Foreperson.

HR  3/21/07    Indictment filed under seal. A/w issued for all defendants.
— Francis, J.

# EXHIBIT 4

**JUDGE PRESKA**

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) ) |
| COLLINS & AIKMAN CORPORATION, DAVID A. STOCKMAN, J. MICHAEL STEPP, GERALD E. JONES, DAVID R. COSGROVE, ELKIN B. McCALLUM, PAUL C. BARNABA, JOHN G. GALANTE, CHRISTOPHER M. WILLIAMS, and THOMAS V. GOUGHERTY, | ) ) ) ) ) ) ) ) |
| Defendants. | ) ) ) |



Civil Action No.

**07 CV 2419**

## COMPLAINT

The Securities and Exchange Commission ("SEC" or "Commission") alleges as

follows as to Collins & Aikman Corporation, David A. Stockman, J. Michael Stepp,

David R. Cosgrove, Elkin B. McCallum, Paul C. Barnaba, John G. Galante, Gerald E.

Jones, Christopher M. Williams, and Thomas V. Gougherty ("Defendants").

## NATURE OF THIS ACTION

1.       This action arises out of pervasive accounting fraud by Collins & Aikman

Corporation ("C&A") and several of its former officers and employees, including Chief

Executive Officer ("CEO") David A. Stockman ("Stockman").   For more than three years,

from the fourth quarter of 2001 until early 2005, C&A inflated its quarterly earnings by

improperly accounting for payments from suppliers.  Beginning in late 2001, C&A

entered into numerous improper "round-trip" transactions with Elkin B. McCallum

("McCallum"), a member of C&A's Board of Directors and a supplier to C&A.  C&A

treated more than $14 million in payments received from McCallum in 2001, 2002, and 2003 as indirect increases to C&A's income, when in fact C&A surreptitiously repaid McCallum for each such payment. These round-trip transactions should have had no impact on C&A's income statement. Beginning in 2002, C&A further inflated its quarterly earnings by improperly recognizing in income numerous rebates received from suppliers in return for anticipated future business and other benefits. In 2004 C&A extended this fraudulent rebate scheme to purchases of capital equipment, improperly recording discounts on equipment as rebates for past purchases of non-capital goods or services. Some of these rebates were recognized in income prematurely, while others should never have been recognized at all. As part of each of these schemes, C&A induced suppliers, including McCallum, to provide false or misleading documentation regarding the payments they made or promised to C&A. C&A then used these false documents to justify accounting for these payments contrary to generally accepted accounting principles ("GAAP"). C&A's materially inflated earnings figures were disclosed to the investing public in reports and registration statements filed with the Commission, in press releases, and in other public statements.

2.      Stockman negotiated the round-trip transactions with McCallum and directed the rebate fraud. McCallum engaged in the round-trip transactions knowing they were intended to improperly inflate C&A's earnings and provided C&A with false documents to justify the improper accounting. Other C&A executives knowingly or recklessly played important roles in connection with the McCallum round-trip transactions or the supplier rebate scheme, or both, including J. Michael Stepp, who helped arrange the round-trip transactions with McCallum, knew about the rebate

2

scheme, and directed at least one of the improper rebate transactions; Gerald Jones, who

helped arrange the round-trip transactions with McCallum and participated in the

improper recognition of rebates in the second quarter of 2004; David R. Cosgrove, who

advised C&A purchasing employees on the language to be used in false documentation

regarding the rebates, knowing the documentation was being used to recognize the

rebates improperly; Paul C. Barnaba, who directed Purchasing Department personnel to

solicit side letters falsely describing the rebate terms, knowing the letters were being used

to recognize the rebates improperly; and Thomas V. Gougherty, who solicited false

documents and directed accounting personnel to recognize rebates, despite knowing that

key documents were falsified and that such recognition was not in conformance with

GAAP.

3.       C&A improperly accounted for at least 132 supplier payment transactions.

This resulted in an aggregate overstatement of C&A's pre-tax operating income, as

reported in C&A's filings with the SEC, of over $43.6 in twelve quarters (the fourth

quarter of 2001 through the third quarter of 2004). Additionally, C&A improperly

included over $5.6 million in rebates in its earnings for the fourth quarter of 2004, which

C&A reported in its press release of March 17, 2005.

4.       When C&A's accounting manipulations came under scrutiny in early

2005, C&A attempted to minimize the fraud and conceal the company's perilous financial

condition. During March and April, in two press releases, a conference call with

analysts, and a presentation to potential investors, C&A made materially false or

misleading representations regarding its liquidity situation, its financial outlook, and the

scope and impact of the rebate fraud. These materially false or misleading statements were designed in part to enable C&A to obtain additional financing.

5. Stockman directed C&A's effort in March and April 2005 to minimize the rebate fraud and hide C&A's financial condition. Other C&A executives knowingly or recklessly contributed to this concealment, including David R. Cosgrove, who reviewed investor presentation materials in March 2005 and knew that they contained false information to be disseminated to the public; John G. Galante, who helped draft a March 17, 2005 press release knowing that it contained false information and also provided false information for inclusion in an April 4, 2005 press release; and Christopher M. Williams, who participated in a scheme, directed by Stockman, to generate false documents regarding the company's borrowing base and thereby inflate the company's liquidity figures, knowing these liquidity figures would be reported to the public. The materially false or misleading public statements in March 2005 enabled C&A to secure millions of dollars in additional financing. Soon after C&A obtained these funds, its true financial condition became known and C&A filed for bankruptcy.

6. Stockman had major financial incentives to engage in the fraud. Stockman and his private equity firm Heartland Industrial Partners ("Heartland") had invested approximately $360 million in C&A and knew that they would lose that investment if C&A's financial condition became public. By fraudulently inflating C&A's earnings and cash flow figures, Stockman was able to conceal C&A's true financial condition, secure additional funding, and maintain the appearance of financial viability. Moreover, throughout this period Heartland collected millions of dollars in management fees and other payments from C&A. Heartland received approximately $45 million in

fees from C&A between 2001 and 2004, with approximately $22 million ultimately going to Stockman. The other individual defendants also benefited from the fraud because it enabled them to continue receiving salary payments from C&A or, in the case of McCallum, to continue profitable business dealings with C&A.

## JURISDICTION AND VENUE

7.     The Court has jurisdiction over this action pursuant to Section 22(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77v(a)] and Sections 21(e) and 27 of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78(u)(e) and 78aa].

8.     Venue is proper in this district pursuant to Section 20(b) of the Securities Act [15 U.S.C. § 77v(b)] and Section 27 of the Exchange Act.

9.     Defendants used the means or instrumentalities of interstate commerce or the mails in connection with the transactions described in this Complaint.

## DEFENDANTS

10.     C&A, a Delaware corporation headquartered in Troy, Michigan, manufactures and assembles parts used in automobile production. C&A operates facilities throughout North America and has approximately 12,000 employees. Prior to May 2005, C&A's common stock was registered with the Commission pursuant to Section 12(b) of the Exchange Act and was traded on the New York Stock Exchange. On May 17, 2005, C&A petitioned for Chapter 11 bankruptcy. On June 29, 2005, the Commission deregistered C&A's common stock and granted a New York Stock Exchange petition to delist C&A. C&A's fiscal year ends December 31st.

5

11.    David A. Stockman is a co-founder and partner in Heartland, which acquired a controlling interest in C&A in 2001. Stockman became a member of C&A's Board of Directors in 2001 and in August 2003 became C&A's CEO, remaining in that position until May 2005. Stockman resides in Greenwich, Connecticut.

12.    J. Michael Stepp ("Stepp") was C&A's Chief Financial Officer ("CFO") from 1995 to 1999. From 1999 to 2002 he was a consultant to C&A. He returned as C&A's CFO in January 2002 and remained in that position until he left C&A in October 2004. He served on C&A's board of directors from 2001 until April 2006. Stepp resides in Charlotte, North Carolina.

13.    Gerald E. Jones ("Jones") served as Chief Operating Officer and Executive Vice President of C&A's Fabrics Division from 2000 to the end of 2006. He resides in Bahama, North Carolina.

14.    David R. Cosgrove ("Cosgrove") was C&A's Vice President of Finance from February to August 2002, and Vice President for Financial Planning and Analysis from August 2002 until October 2004. In October 2004, Cosgrove became C&A's Corporate Controller, remaining in that position through May 2005. Cosgrove resides in Rochester, Michigan.

15.    Elkin B. McCallum, 62, resides in Tyngsboro, Massachusetts. McCallum owns Joan Fabrics, a supplier to C&A, and sold businesses to C&A during the relevant period. He was a significant shareholder in C&A during the relevant period and served on its Board of Directors from September 2001 until May 2004.

16.    Paul C. Barnaba ("Barnaba") was the Director of Financial Analysis for C&A's Purchasing Department from April 2002 until December 2004. In December

6

2004, Barnaba became a vice president and the Director of Purchasing for the Plastics Division. Barnaba left C&A in April 2005. He resides in Orion, Michigan.

17.    Thomas V. Gougherty ("Gougherty") was Controller of C&A's International Plastics Division from July 2003 until September 2004, when he became Vice President of Finance and CFO of C&A's Global Plastics Division. He remained at C&A through at least May 2005. Gougherty resides in Gosslie, Michigan.

18.    John G. Galante ("Galante") was C&A's Director of Strategic Planning from October 2002 to October 2004. He was Treasurer from October 2004 until July 2005. Galante resides in Frisco, Texas.

19.    Christopher M. Williams ("Williams") joined C&A in 2000 as Director of Commercial Management for its contracts with Ford Motor Company. He was the Executive Vice President of the Business Development and Specialty Products groups from November 2004 through May 2005. Williams left C&A in January 2006. He resides in Troy, Michigan.

## FRAUDULENT ACCOUNTING FOR SUPPLIER PAYMENTS

20.    Heartland purchased a controlling interest in C&A in February 2001. Later that year C&A began inflating its earnings by engaging in round-trip transactions with McCallum. The next year C&A began immediately recognizing rebates (on purchases of raw materials) to which C&A was not then entitled. By 2004, C&A was also improperly recording rebates on purchases of capital equipment. These fraudulent schemes were designed in part to create the appearance that C&A's financial performance was improving under Stockman's direction.

7

A.    **Round-Trip Transactions With McCallum**

21.    The fraudulent accounting for supplier payments began in late 2001 when C&A sought $3 million from McCallum to increase C&A's income for the fourth quarter. Stepp told McCallum that the $3 million would be returned to him in 2002. McCallum agreed and transferred $3 million to C&A in January 2002. This round-trip transaction was essentially a loan arrangement and should not have had any impact on C&A's income. Nevertheless, C&A recognized $2.8 million of the $3 million as a reduction of operating costs for the fourth quarter of 2001, thus inflating its earnings for that quarter. In March 2002 Stockman and McCallum agreed that C&A would repay the loan by transferring equipment worth approximately $3 million to McCallum at no cost.

22.    Also in March 2002, Stockman agreed to buy one of McCallum's businesses (Southwest Laminates) for more than its actual value, in exchange for future "rebate" payments to C&A from another McCallum company (Joan Fabrics). C&A then purchased Southwest Laminates for $17 million, at least $7 million more than C&A estimated it was worth. In return, McCallum agreed that Joan's Fabrics would pay C&A almost $7 million in rebates that could be improperly recognized in income.

23.    At additional meetings in late 2002, Stockman offered to overpay for another McCallum business and for furniture looms McCallum owned, in return for additional payments from Joan Fabrics. McCallum agreed to these round-trip transactions, and C&A paid him $4.2 million for Dutton Yarns (which had been appraised at just above $2 million), and $4.7 million for furniture looms (worth about $2 million). McCallum and Joan Fabrics then made payments to C&A corresponding to the

8

inflated purchase prices, and provided documentation falsely characterizing the payments

as rebates on a supply contract between C&A and Joan Fabrics.

24.    In total, C&A recognized approximately $14.8 million in payments from

McCallum from 2001 through 2003. All were round-trip transactions in which

McCallum made payments that C&A labeled as rebates but repaid indirectly. C&A

accounted for these payments as reductions in costs, increasing its pre-tax operating

income (or reducing its pre-tax operating loss) as shown below, in millions:

|  | 2001 (4th Q) | 2002 (1st Q) | 2002 (2nd Q) | 2002 (3rd Q) | 2002 (4th Q) | 2003 (1st Q) |
|---|---|---|---|---|---|---|
| Operating income/ (loss) w/o McCallum payments | ($16.3) | $49.4 | $79.7 | ($6.3) | $34.1 | $18.0 |
| McCallum payments | $2.8 | $5.0 | $1.8 | $2.0 | $2.0 | $1.2 |
| Operating income (loss), as reported | ($13.5) | $54.4 | $81.5 | ($4.3) | $36.1 | $19.2 |
| % change due to McCallum payments | 17% | 10% | 2% | 32% | 6% | 7% |

25.    Stockman personally negotiated the round-trip transactions with

McCallum. Stepp helped arrange and collect the payments from McCallum, while Jones

helped collect the payments from McCallum and assisted in the transactions through

which McCallum was repaid. Stockman, McCallum, Stepp, and Jones knew, or were

reckless in not knowing, that the McCallum payments were actually improper round-trip

transactions intended to inflate C&A's earnings and that the false earnings figures would

materially affect C&A's financial statements and the reports and registration statements

C&A filed with the SEC. Further, during an investigation by C&A's Audit Committee in

2003, Stockman, Stepp, McCallum and Jones continued to conceal the true nature of the McCallum transactions. McCallum made false statements to the Audit Committee and signed a false or misleading representation letter regarding his payments. Stockman, Stepp, and Jones made false statements to C&A's Audit Committee and provided the Audit Committee with false position papers regarding the transactions. Each knew, or was reckless in not knowing, that KPMG would rely of these false statements and documents in connection with its audit of C&A's financial statement for 2003.

**B.**   **Purchasing Rebates**

**(i)**   **Goods and Services**

26.   Supply contracts in the automotive industry frequently provide that suppliers will pay rebates to their customers in return for a specified volume or type of future business. Rebates are properly recorded by the customer as reductions in cost, which has the effect of increasing income. However, because the customer is not entitled to the rebate until the promised purchases have been made, immediate recognition of the entire rebate is inconsistent with GAAP.

27.   In early 2002 C&A began to further inflate its quarterly earnings by improperly recognizing rebates tied to the future purchases of goods and services. As part of this scheme, C&A's Purchasing Department arranged for suppliers to create false or misleading documents stating that the rebates were based on past purchases. The false documentation was held by C&A for use in the event auditors questioned its recognition of the rebate in income.

28.   One of the first fraudulent rebates C&A's Purchasing Department negotiated was from PPG Industries, Inc. ("PPG"), a paint supplier. In April 2002, PPG

10

agreed to pay C&A a rebate in exchange for a specified volume of new business. At the direction of C&A's finance department, Barnaba worked with the Purchasing Department to solicit a side letter from PPG falsely stating that the rebate was based on past purchases. This letter provided a pretext for C&A's immediate recognition of the full amount of the rebate ($500,000) in the second quarter of 2002. Barnaba knew that the purpose of obtaining the side letter was to allow C&A to account for the rebate improperly. The PPG side letter became the template used in preparing side letters for subsequent rebate transactions.

29.    C&A extended the rebate scheme to several other Plastics Division agreements during the remainder of 2002. C&A improperly recognized income based on rebate agreements with, among others, Brown Corporation ($900,000 rebate recognized in Q3 2002), Jackson Plastics, Inc. ($138,750 rebate recognized in Q3 2002), Flambeau Corporation ($235,000 rebate recognized in Q3 2002), ATC, Inc. ($123,470 rebate recognized in Q4 2002), Pine River Plastics, Inc. ($67,000 rebate recognized in Q4 2002), and (again) Jackson Plastics, Inc. ($46,250 rebate recognized in Q4 2002).

30.    By the first quarter of 2003 it was standard operating procedure for C&A's Purchasing Department to solicit false or misleading side letters in connection with agreements negotiated on behalf of the Plastics Division. Cosgrove, who was in charge of C&A's Financial Planning and Analysis Group, instructed the Purchasing Department to obtain the side letters and provided detailed language for these letters. Barnaba ensured that Purchasing Department employees obtained the side letters and that these letters provided an apparent justification for the improper accounting.

31.     Stockman played a hands-on role in C&A's day-to-day operations before he became CEO in August 2003. From at least the second quarter of 2003, Stockman met with Purchasing Department employees at least quarterly and emphasized the importance of negotiating supplier rebates. He routinely identified the suppliers to target, the size of the rebates to demand, and the incentives to offer. Stockman directed that the rebates be used to boost income in the current quarter even though he knew, or was reckless in not knowing, that such recognition was improper because the rebate income was contingent on future purchases from the suppliers. One such meeting took place on May 27, 2003, when Stockman spoke via conference call with purchasing officials from all three C&A divisions. During that call, Stockman directed C&A's purchasing officials to increase income in the second quarter of 2003 by "pulling ahead" rebates that would otherwise be properly recognized in future quarters.

32.     During the second quarter of 2003, C&A improperly recognized rebates from, among others, Brown Corporation ($500,000), Dow ($400,000), and Manufacturer's Products ($150,000). C&A also recognized a $1.2 million rebate from DuPont Textiles & Interiors ("DuPont") in the second quarter of 2003, even though this was actually a short-term loan similar to the McCallum payments. Both Stockman and Stepp were directly involved in C&A's fraudulent accounting for the DuPont transaction.

33.     Stockman became CEO in August 2003 and continued to direct the rebate scheme. In the third quarter of 2003, Stockman was personally involved in negotiating a $1.56 million rebate agreement with Exxon Mobil Corp. ("Exxon"). Stockman met with Exxon representatives as part of the negotiations, was regularly briefed on the status of the negotiations, and knew the terms of the final rebate agreement. As finalized, the

supply contract with Exxon provided that the $1.56 million rebate was not due until the next quarter (Q4 2003), was contingent on purchases by C&A in that next quarter, and was to be partially refunded if C&A did not make additional purchases the following year. Nevertheless, C&A improperly recognized the entire $1.56 million in income in the third quarter of 2003. Stockman knew, or was reckless in not knowing, that it was improper to immediately recognize rebates that were contingent on future purchases and that accounting for the Exxon rebate in this way improperly inflated C&A's income.

34.    In late 2003 Stockman instructed C&A's Purchasing Department to obtain a $1 million rebate from Flambeau Corporation ("Flambeau") by promising future business. Cosgrove advised Stepp and C&A purchasing officials on how to prepare a side letter to justify immediate recognition of the potential rebate. This letter was false or misleading in that it stated that the Flambeau rebate was for past purchases. C&A nevertheless improperly recognized the anticipated $1 million Flambeau rebate in the third quarter of 2003. Cosgrove and Stepp, like Stockman, knew, or were reckless in not knowing, that this immediate recognition was improper and designed to inflate C&A's income.

35.    Similarly, in December 2003 C&A persuaded Reko International Group, Inc. ("Reko") to provide a $250,000 rebate in exchange for a guarantee of future business. Stockman determined what the terms of the rebate agreement would be and Galante negotiated the agreement with Reko. Galante arranged for the rebate to be described in one letter and the guarantee of future business to be expressed in a separate letter. Cosgrove approved the use of the two letters, and Stockman and Stepp knew that Reko was providing a side letter not referring to the future business contingency. C&A

13

recognized the anticipated $250,000 rebate during the fourth quarter of 2003 as if there were no contingency. Stockman, Stepp, Galante and Cosgrove knew, or were reckless in not knowing, that this recognition was improper and designed to inflate C&A's income.

36.    In June 2004, C&A negotiated a $1.5 million rebate from GE Advanced Materials ("GE") contingent on future purchases. At C&A's request, GE signed a side letter intended to hide the contingency. C&A then demanded and received a revised version of the side letter, in order to better hide the true terms of the agreement. Stockman knew that the anticipated GE rebate was contingent on future purchases and that C&A was nevertheless recognizing the rebate in the second quarter of 2004. The GE agreement eventually fell apart, C&A did not provide GE the promised business, and GE never paid the rebate. Nevertheless, C&A retained the previously recorded rebate on its books with Stockman's knowledge and approval.

37.    In mid-2004 Stockman drew the Fabrics Division into the rebate scheme. During a meeting in North Carolina in May 2004, Stockman directed the Fabrics Division to solicit rebates based on future business but paper the transactions to justify the immediate recognition. In the second quarter of 2004, the Fabrics Division improperly recognized a $200,000 rebate from Unifi, a $150,000 rebate from M. Dohmen, U.S.A., Inc., and a $49,000 rebate from Clariant Corporation, in each case obtaining fraudulent side letters. Stockman knew, or was reckless in not knowing, that these transactions were recognized improperly. Jones, the head of C&A's Fabrics Division, knew that employees in his division were carrying out Stockman's instructions and therefore knew, or was reckless in not knowing, that the rebates were accounted for improperly.

14

38.    At about the same time, C&A also expanded the rebate scheme to other products and services. In June 2004, C&A negotiated a $150,000 rebate agreement with Allied Waste, contingent on future business. Here too C&A solicited a side letter falsely tying the rebate to past business. Although the Allied Waste agreement was executed in October 2004, C&A improperly recognized the rebate in income in the second quarter of 2004. Stockman and Stepp knew the rebate was contingent on future business, and therefore knew, or were reckless in not knowing, that its immediate recognition was improper.

39.    During the second quarter of 2004 C&A also negotiated rebates for its European operations, including an agreement calling for LVM to provide a €350,000 rebate (approximately $430,000) when a new supply contract was signed. The new contract was not signed until February 2005. Gougherty, the Controller for C&A's International Plastics Division, nevertheless directed his subordinates to recognize improperly the anticipated LVM rebate in the second quarter of 2004. Gougherty knew at that time that the new supply contract had not been signed and consequently knew, or was reckless in not knowing, that the rebate could not be recognized consistent with GAAP.

40.    C&A continued to improperly recognize rebates on future purchases of goods and services through the third quarter of 2004, the last quarter for which C&A filed a quarterly or annual report with the SEC. This included rebates from Angell Manufacturing ($97,197), Exxon ($44,000), and Trim Stamping ($227,850).

41.    C&A never filed a report with the SEC reflecting the fourth quarter of 2004. However, during the fourth quarter C&A continued to record rebates in income

15

improperly, including rebates from Aerotek ($40,000), Vichem ($75,000), and Meurdter ($69,000). The fraudulent accounting for these rebates was included in earnings figures released by C&A in March 2005.

42.    Stockman was aware of, approved, and directed the scheme to increase income by prematurely recognizing rebates on supply contracts. Stockman knew, or was reckless in not knowing, that C&A was not entitled to the rebates if it did not provide the promised future business, and that C&A's immediate recognition of the rebates in income was improper. Stockman also participated personally in many of the rebate transactions, including Exxon, Flambeau and Reko. Stepp supervised Galante in the negotiation of the Reko rebate, participated in Purchasing Department meetings at which the rebate scheme was discussed, and knew that the Flambeau agreement had been "papered" so as justify immediate recognition of the rebate in income. Jones was aware of the rebate scheme as it related to the Fabrics Division, participated in the meeting where Stockman directed Fabrics Division personnel to negotiate rebates, and understood that his employees were obtaining false documentation for such rebates. Cosgrove advised C&A's Purchasing Department on the language for the side letters, knowing that these letters were false or misleading and designed for use in improperly accounting for the rebates. Barnaba initially served as a liaison between Cosgrove and C&A's Purchasing Department, knowingly conveying Cosgrove's directions on how the rebates should be structured to implement the fraud and ensuring that Cosgrove's instructions were carried out. Later Barnaba supervised Purchasing Department employees in soliciting documentation he knew was false and designed for use in improperly accounting for the rebates. Gougherty directed accounting employees in the International Plastics Division to recognize the

16

rebate in income immediately in connection with the LVM transaction, despite knowing

that the rebate was contingent on future events. When taking these actions, Stockman,

Stepp, Jones, Cosgrove, Barnaba, and Gougherty knew, or were reckless in not knowing,

that C&A's treatment of the rebates did not reflect the true terms of the supply contracts

and was intended to falsely inflate C&A's reported current earnings. Likewise,

Stockman, Stepp, Jones, Cosgrove, Barnaba, and Gougherty knew, or were reckless in

not knowing, that the side letters and other false documents were intended to mislead

KPMG and that KPMG did in fact rely on some of the false documents.

### (ii)    **Capital Equipment Expenditures**

43.    In 2004 C&A expanded the fraudulent rebate scheme to include capital

equipment expenditures. Under GAAP, discounts on capital equipment affect the book

value of the purchased asset and are not immediately recognizable in income.

Nevertheless, at Cosgrove's direction and with Stockman's approval, C&A began

requiring suppliers to falsely state that price discounts on capital equipment they sold to

C&A were rebates for past purchases of non-capital goods or services. C&A then

improperly recognized the rebates in income.

44.    In April 2004, Demag Plastics Group ("Demag") agreed to a $1 million

rebate in lieu of a discount on the purchase price of machinery it was selling to C&A.

Knowing that C&A was receiving the rebate in place of a discount, Stockman instructed

Cosgrove (through Barnaba) to ensure that the rebate was falsely documented so that it

could be treated as an increase to income. At Cosgrove's direction, C&A personnel

obtained documentation from Demag falsely attributing the rebate to past purchases by

17

C&A of spare parts and other services. C&A improperly recognized the $1 million in income in the second and third quarters of 2004.

45.     When C&A negotiated a $1 million discount on machinery purchased from Cincinnati Milacron, Stockman again directed Barnaba to work with Cosgrove to prepare paperwork that could be used to provide false justification for immediate recognition in income. The resulting documentation falsely ascribed the rebate to the purchase of "implementation training services, technical support and continuous improvements." The $1 million was recognized in the third quarter of 2004. Gougherty, who had become Controller of the Global Plastics Division, directed the improper recognition of at least $600,000 of this rebate.

46.     C&A's fraudulent accounting for capital equipment purchases materially increased C&A's reported income for the second and third quarters of 2004. During this period, C&A improperly recognized at least $7.2 million in pre-tax operating income based on capital expenditure rebates.

47.     C&A continued to use rebates on capital equipment to fraudulently inflate income in the fourth quarter of 2004. Pursuant to directions from Gougherty, the Global Plastics Division played a prominent role in the rebate scheme during this period, using rebates to compensate for deterioration in its earnings. In December 2004, Gougherty assisted in obtaining false documentation from Krauss Maffei to disguise a €165,000 discount (approximately $224,000) on capital equipment C&A was purchasing. Gougherty instructed a subordinate to obtain false documents attributing the rebate to prior purchases of non-capital items. Similarly, during the fourth quarter of 2004 C&A

also improperly recorded rebates on capital equipment purchases from Demag ($92,000),
RPT ($100,000), and Conair ($38,000).

48.    Stockman directed and participated in the scheme to improperly treat
discounts on capital equipment as rebates, knowing that the documentation was
fraudulent and would improperly inflate C&A's income.  Cosgrove knew that
immediately recording rebates on capital equipment purchases in income was contrary to
GAAP.  However, he instructed Purchasing Department employees to obtain documents
falsely attributing the rebates to past purchases of other items to justify accounting for the
rebates improperly and thereby inflate C&A's income.  Barnaba directed Purchasing
Department employees in implementing the false rebate transactions, knowing that the
transactions were fraudulent.  Gougherty instructed employees under his direction to
recognize the Cincinnati Milacron rebate as income in the third quarter of 2004 although
he knew, or was reckless in not knowing, that this was improper.  He later had his
subordinates solicit false documentation for the Krauss Maffei rebate although he knew,
or was reckless in not knowing, that this was improper and designed to falsely inflate
C&A's income. Stockman, Cosgrove, Barnaba and Gougherty knew, or were reckless in
not knowing, that the false documents were intended to mislead KPMG and that KPMG
did in fact rely on some of the false documents.

## OVERSTATEMENT OF EARNINGS

49.    In August 2004, C&A sold $415 million in restricted senior subordinated
notes.  C&A's offering memoranda incorporated C&A's financial statements from 2001
through the second quarter of 2004.  Because C&A's financial statements for the fourth
quarter of 2001 through the second quarter of 2004 were materially false or misleading,

the offering memoranda were false or misleading. Stockman, Stepp, and Cosgrove participated in drafting these memoranda or in the marketing presentations relating to sale of the restricted senior subordinated notes, knowing that the memoranda and the marketing materials contained false or misleading financial information due to C&A's improper recognition of supplier payments.

50.    In connection with C&A's quarterly reports for the second quarter of 2003 through the third quarter of 2004 and C&A's annual report for 2003, Stockman signed certifications stating that the C&A financial statements and other financial information included in the reports fairly presented C&A's financial condition, results of operations, and cash flows for the reporting period. Stepp signed such certifications in connection with C&A's quarterly reports for the third quarter of 2002 through the second quarter of 2004 and C&A's annual reports for 2002 and 2003. These certifications were false or misleading, and were known by Stockman and Stepp to be false or misleading.

51.    As a result of the round-trip transactions with McCallum and the fraudulent rebate scheme, C&A materially overstated its income, or reduced its losses, in its quarterly reports (Form 10-Q) and annual reports (Form 10-K) for each reporting period from the fourth quarter of 2001 through the third quarter of 2004. Stockman and McCallum signed C&A's annual reports (Form 10-K) for each year from 2001 through 2003. Stepp signed all of C&A's filings from the 10-K for 2001 through the quarterly report (Form 10-Q) for the second quarter of 2004. The following table identifies the impact (in millions) of the improper recognition of the McCallum round-trip payments and the other improper supplier transactions on C&A's pre-tax operating income (or pre-tax operating loss) in each reported quarter:

20

| Year | Quarter | Operating income/(loss) w/o improper transactions | Improper supplier transactions | Operating income / (loss) as reported | % change due to improper transactions |
|---|---|---|---|---|---|
| 2001 | Q4 | ($16.3) | $2.8 | ($13.5) | 17% |
| 2002 | Q1 | 49.4 | 5.0 | 54.4 | 10% |
|  | Q2 | 79.2 | 2.3 | 81.5 | 3% |
|  | Q3 | (7.6) | 3.3 | (4.3) | 43% |
|  | Q4 | 33.9 | 2.2 | 36.1 | 6% |
| 2003 | Q1 | 17.5 | 1.7 | 19.2 | 10% |
|  | Q2 | 41.1 | 3.0 | 44.1 | 7% |
|  | Q3 | 4.1 | 4.2 | 8.3 | 102% |
|  | Q4 | 25.7 | 4.7 | 30.4 | 18% |
| 2004 | Q1 | 28.8 | 1.1 | 29.9 | 4% |
|  | Q2 | 20.7 | 5.4 | 26.1 | 26% |
|  | Q3 | 1.6 | 7.9 | 9.5 | 494% |
| Total |  |  | $43.6 |  |  |

52.     C&A has not filed any quarterly or annual reports with the Commission since filing its Form 10-Q for the third quarter of 2004 in November 2004.

53.     On January 27, 2005, C&A filed a registration statement with the SEC in connection with an anticipated exchange, for unrestricted notes, of the $415 million in restricted senior subordinated notes sold in August 2004. The registration statement included C&A's quarterly and annual financial statements from 2001 through the third quarter of 2004. These financial statements materially overstated C&A's earnings and consequently the January 2005 registration statement was false or misleading. Stockman, Stepp, and Cosgrove signed this registration statement knowing it contained false or misleading financial information.

**FALSE PUBLIC STATEMENTS IN EARLY 2005**

54.     In late 2004, KPMG learned of C&A's widespread effort to obtain rebates and requested documentation for all rebates negotiated in 2004. In early 2005, Stockman reluctantly agreed to begin an internal investigation by C&A management of the rebates.

21

But rather than aggressively pursuing the investigation, Stockman attempted to limit its scope, minimize the significance of the violations, and conceal his involvement and the involvement of other senior C&A managers. Stockman also orchestrated an effort to conceal C&A's dire financial condition. In a March 17 press release, an earnings call on the same date, and a presentation to potential bond purchasers one week later, C&A materially misrepresented its financial condition. This deception enabled C&A to obtain $75 million in additional financing. Further, C&A's April 4, 2005 press release announcing this additional financing contained false or misleading financial information.

A.    **March 17, 2005 Press Release**

55.    On March 17, 2005, C&A issued a press release announcing its fourth-quarter and year-end results for 2004 and disclosing that there had been improper accounting for rebates. This press release also provided information on C&A's liquidity situation and management's internal investigation of the rebates. Much of the information C&A provided with regard to its fourth quarter income, current liquidity situation, and the rebate investigation was materially false or misleading.

56.    The March 17, 2005 press release stated that C&A's earnings before interest, taxes, depreciation, and amortization (commonly referred to as "EBITDA") for the fourth quarter of 2004 were $72-73 million. This included at least $5.8 million in improperly recorded rebates, making the press release false or misleading.

57.    When the March 17 press release was issued, C&A was facing a liquidity crisis and did not have enough money to pay its bills. To hide this fact, Stockman directed that all 2005 liquidity figures be omitted from the press release. The only liquidity figure used in the press release was from December 31, 2004, more than two

22

months earlier. Stockman and Galante knew, or were reckless in not knowing, that in view of the liquidity crisis being experienced by C&A, the failure to disclose current liquidity information in the March 17 press release made that release materially misleading.

58.    The March 17 press release stated that C&A's liquidity on December 31, 2004, was $86 million. The majority of that liquidity was undrawn commitments under its accounts receivable facility. But C&A could not have borrowed the full amount of the undrawn commitments without breaching financial covenants. In fact, only approximately $12 million in liquidity was available to C&A on December 31, 2004. C&A's use of the $86 million liquidity figure without reference to the covenant restrictions was inconsistent with C&A's prior disclosure practices and materially misleading. Stockman and Galante understood the impact of the restrictive covenants, were aware of C&A's prior disclosure practices, and knew that far less than $86 million would have been available to C&A on December 31, 2004.

59.    The March 17 press release also contained material misrepresentations concerning the scope of management's internal investigation and the impact of the improper accounting for rebates. C&A stated in this press release that the rebates recognized in 2002 had been reviewed, and implied that no restatement was necessary for 2002, when in fact there had been little or no scrutiny of the 2002 rebates. The March 17 press release also intentionally understated the degree to which restatements would be required due to the rebates in 2003 and 2004

60.    The March 17 press release attributed C&A's improper rebate accounting to a failure of "controls" and "procedures." This gave the false impression that the

23

improper accounting was caused by inadvertence or negligence. In truth, the improper

rebate accounting was the intended product of a concerted scheme.

61.     Stockman drafted portions of the March 17 press release which he knew,

or was reckless in not knowing, would mislead the public about C&A's fourth quarter

earnings, its liquidity situation, the scope of the rebate scheme, and the involvement of

senior managers in the rebate scheme. Galante participated in drafting the release and

knew, or was reckless in not knowing, that statements therein concerning C&A's liquidity

situation and the internal investigation were false and misleading. On March 17, 2005,

C&A filed this press release with the Commission as a current report (on Form 8-K).

**B.**    **March 17, 2005 Earnings Call**

62.     On March 17, 2005, Stockman presided over a conference call in which

C&A's 2004 earnings were publicly presented. Stockman prepared the charts discussed

during that call, made C&A's presentation, and took questions. During the call he made

several material misrepresentations regarding C&A's financial condition.

63.     Stockman provided an unreasonable forecast of C&A's anticipated

EBITDA for the first quarter of 2005. Stockman stated that EBITDA would be between

$65 million and $75 million, even though he knew, or was reckless in not knowing, that

EBITDA for the first quarter would be roughly half that figure.

64.     Stockman also stated that capital expenditures in 2005 would be limited to

$30 million quarterly. Stockman knew, or was reckless in not knowing, when he made

this statement that C&A had already exceeded $30 million in capital expenditures for the

first quarter of 2005, and was projected to incur over $50 million in capital expenditures

for the quarter.

24

65.    When asked during the call whether C&A was "tapping out" its liquidity, Stockman answered "no." Stockman knew at that time, or was reckless in not knowing, that C&A did not have enough liquidity to pay its bills and that his negative response was untrue.

66.    Prior to the March 17 earnings call, Cosgrove previewed the charts Stockman intended to use during the call. Cosgrove was responsible for C&A's forecasting and budgeting and he knew, or was reckless in not knowing, that these charts contained false or misleading statements regarding EBITDA and capital expenditures. Nevertheless, Cosgrove did not correct these statements or ask that they be corrected.

**C.    March 23, 2005 Bond Presentation**

67.    On March 23, 2005, Stockman led a presentation to potential bond investors. The notes C&A had sold in August 2004 were now being resold by their original purchasers, and C&A was helping to promote the resale. During this presentation Stockman used the same charts he had presented during the March 17, 2005 earnings call. These charts contained material misrepresentations regarding EBITDA and capital expenditures, as described above in connection with the March 17 call. Based on this presentation, which Stockman knew or was reckless in not knowing contained misrepresentations, investors bought millions of dollars of senior subordinated notes.

**D.    April 4, 2005 Press Release**

68.    On April 4, 2005, C&A issued a press release stating that "the Company's available liquidity (cash and unutilized commitments under revolving credit and account receivables facilities) was approximately $81 million at March 31, 2005, as compared with approximately $86 million at December 31, 2004." Galante provided the liquidity

figures for the press release and Stockman approved the use of those figures in the release.

69. The liquidity figures in the April 4 press release were false. Due to its debt covenants, C&A had approximately $12 million in liquidity on December 31, 2004, rather than $86 million. Similarly, on March 31, 2005, C&A had materially less than the claimed $81 million in liquidity.

70. The $81 million liquidity figure in the April 4 press release was false or misleading for an additional reason. General Electric Capital Corporation ("GECC") made loans to C&A through an accounts receivable securitization facility. Between January 2005 and April 2005, C&A employees, at Stockman's direction and under Williams' supervision, added approximately $120 million in ineligible receivables to the borrowing base under the GECC agreement. C&A used the additional liquidity generated by this scheme to create a false $52 million liquidity cushion. This liquidity cushion constituted most of the $81 million reported in the April 4 press release.

71. Stockman was primarily responsible for the scheme to inflate C&A's reported liquidity, through the fraudulent use of the GECC accounts receivable securitization facility. Stockman directed Williams and others to create invoices prematurely and include those invoices in the borrowing base, knowing that this violated the agreement with GECC. Williams ensured that his employees in C&A's Business Group carried out Stockman's instructions, even though he knew, or was reckless in not knowing, that they were improper and that the inflated liquidity figures would be reported to the public. When drafting the April 4 press release, Stockman and Galante knew, or were reckless in not knowing, that the liquidity figure provided for March 31, 2005, was

26

false or misleading, because it was inflated by $52 million that had been obtained from

the fraudulently inflated GECC borrowing base.

72.     On April 5, 2005, C&A filed this press release with the Commission as a

current report (Form 8-K).

## FIRST CLAIM FOR RELIEF

### Violations of Section 17(a) of the Securities Act
### (C&A, Stockman, Stepp, and Cosgrove)

73.     Paragraphs 1-72 are incorporated herein with the same force and

effect as if set out in full.

74.     Pursuant to 17(a) of the Securities Act [15 U.S.C. § 77q(a)], it is unlawful

for any person, in the offer or sale of any security by the use of any means or instruments

of transportation or communication in interstate commerce or by use of the mails, to (i)

employ any device, scheme, or artifice to defraud, (ii) obtain money or property by

means of any untrue statement of a material fact or any omission of a material fact

necessary to make the statements made, in light of the circumstances under which they

were made, not misleading; or (iii) engage in any transaction, practice, or course of

business which operates or would operate as a fraud or deceit upon the purchaser.

75.     C&A, Stockman, Stepp, and Cosgrove, acting knowingly, recklessly, or

negligently, violated Section 17(a) in August 2004 when C&A sold $415 million in

senior subordinated notes, as described in Paragraph 49. The offering memorandum

relating to these notes included financial information from 2001 through June 30, 2004,

that was materially false or misleading due to the fraudulent payment and rebate

recognition schemes. Stockman, Stepp and Cosgrove participated in the road shows

27

and/or prepared the materials for those road shows, knowing that those materials contained false or misleading financial information.

76.     C&A, Stockman, Stepp, and Cosgrove, acting knowingly, recklessly, or negligently, violated Section 17(a) on January 27, 2005 when C&A filed a registration statement containing materially false or misleading financial information for the period from 2001 through September 30, 2004, as described in Paragraph 53. Stockman, Stepp, and Cosgrove signed this registration statement.

77.     Stockman, acting knowingly, recklessly, or negligently, violated Section 17(a) by making materially false or misleading statements to potential bond investors at the March 23, 2005 meeting, as described in Paragraph 67.

78.     Unless restrained, C&A, Stockman, Stepp, and Cosgrove will continue to violate Section 17(a).

### SECOND CLAIM FOR RELIEF

**Violations of Sections 10(b) of the Exchange Act
and Exchange Act Rule 10b-5
(C&A, Stockman, Stepp, Jones, Cosgrove, McCallum,
Barnaba, Gougherty, Galante, and Williams)**

79.     Paragraphs 1-72 are incorporated herein with the same force and effect as if set out in full.

80.     Pursuant to Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Exchange Act Rule 10b-5 [17 C.F.R. § 240.10b-5], it is unlawful for any person in connection with the purchase or sale of any security, by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly, to (a) employ any device, scheme, or artifice to defraud; (b) obtain money or property by means of any untrue statement of a material fact or any

28

omission of a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

81.    C&A, Stockman, McCallum, Stepp, and Jones, acting knowingly or recklessly, violated Section 10(b) and Rule 10b-5 in connection with the round-trip transactions with McCallum as described in Paragraphs 20-25. Their acts and omissions resulted in material overstatement of C&A's earnings from October 2001 through March 31, 2003. These overstatements were included in the offering memorandum issued in August 2004, the registration statement filed on January 27, 2005, and in quarterly, annual, and current reports filed with the Commission, as described in Paragraphs 3, 24, 49-51, and 53.

82.    C&A, Stockman, Jones, Cosgrove, McCallum, Barnaba, and Gougherty, acting knowingly or recklessly, violated Section 10(b) and Rule 10b-5 in connection with C&A's purchasing rebate scheme as described in Paragraphs 20 and 26-48 above. Their acts and omissions resulted in material overstatement of C&A's reported earnings from April 2002 through September 2004. These overstatements were included in the offering memorandum issued in August 2004, the registration statement filed on January 27, 2005, and in quarterly, annual, and current reports filed with the Commission, as described in Paragraphs 3, 24, 49-51, 53, 55-61.

83.    C&A, Stockman, and Galante, acting knowingly or recklessly, violated Section 10(b) and Rule 10b-5 connection with the press release of March 17, 2005, as described in Paragraphs 55-61.

84.     C&A, Stockman, and Cosgrove, acting knowingly or recklessly, violated Section 10(b) and Rule 10b-5 in connection with the earnings call of March 17, 2005, as described in Paragraphs 62-66.

85.     C&A and Stockman, acting knowingly or recklessly, violated Section 10(b) and Rule 10b-5 during the bond presentation on March 23, 2005, as described in Paragraph 66.

86.     C&A, Stockman, Galante, and Williams, acting knowingly or recklessly, violated Section 10(b) and Rule 10b-5 in connection with press release of April 4, 2005, as described in Paragraphs 68-72.

87.     Unless restrained, C&A, Stockman, Stepp, Jones, Cosgrove, McCallum, Barnaba, Gougherty, Galante, and Williams will continue to violate Section 10(b) and Rule 10b-5.

### THIRD CLAIM FOR RELIEF

**Aiding and Abetting Violations of Section 10(b) of the Exchange Act and Exchange Act Rule 10b-5**
**(Jones, Barnaba, Gougherty, and Williams)**

88.     Paragraphs 1-72 are incorporated herein with the same force and effect as if set out in full.

89.     C&A violated Section 10(b) of the Exchange Act and Exchange Act Rule 10b-5 as stated above in the Second Claim For Relief.

90.     Pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)] whoever "knowingly provides substantial assistance" to another person in connection with a violation of the Exchange Act, or any regulation thereunder, is "deemed to be in

violation of such provision to the same extent as the person to whom such assistance is provided."

91.    As described in Paragraphs 20-48 and 54-72, Jones, Barnaba, Gougherty, and Williams knowingly provided substantial assistance to C&A in connection with C&A's violations of Section 10(b) and Rule 10b-5, and thereby violated Section 10(b) and Rule 10b-5 to the same extent as C&A.

92.    Unless restrained, Jones, Barnaba, Gougherty, and Williams will continue to aid and abet violations of Section 10(b) and Rule 10b-5 .

### FOURTH CLAIM FOR RELIEF

#### Violations of Section 13(a) of the Exchange Act and Exchange Act Rules 12b-20, 13a-1, 13a-11, and 13a-13 (C&A)

93.    Paragraphs 1-72 are incorporated herein with the same force and effect as if set out in full.

94.    Pursuant to Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Exchange Act Rules 12b-20, 13a-1, 13a-11, and 13a-13 [17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a.-11, and 240.13a-13], every issuer of a security registered pursuant to Section 12 of the Exchange Act must file accurate quarterly, annual, and current reports with the Commission. Rule 12b-20 further requires that in addition to the information expressly required to be included in a statement or report, there shall be added such further material information, if any, as may be necessary to make the required statements, in the light of the circumstances under which they are made, not misleading.

95.    The quarterly reports (Form 10-Q) filed by C&A for the fourth quarter of 2001 through the third quarter of 2004, the annual reports (Form 10-K) filed by C&A for

31

2001, 2002, and 2003, and the current reports (Form 8-K) filed by C&A on March 17 and

April 5, 2005, were inaccurate because they contained materially false or misleading

financial information, and failed to provide such additional material information as

necessary to make the statements therein not misleading, as described in Paragraphs 49-

72.

96.    C&A failed to file an annual report for 2004 and failed to file a quarterly

report for the first quarter of 2005.

97.    By reason of the foregoing, C&A violated Section 13(a) of the Exchange

Act and Rules 12b-20, 13a-1, 13a-11, and 13a-13, and unless restrained will continue to

violate those provisions.

## FIFTH CLAIM FOR RELIEF

**Aiding and Abetting C&A's Violations of Section 13(a) of the Exchange
Act and Exchange Act Rules 12b-20, 13a-1, 13a-11, and 13a-13
(Stockman, Stepp, Jones, Cosgrove, McCallum,
Barnaba, Gougherty, Galante, and Williams)**

98.    Paragraphs 1-72 are incorporated herein with the same force and

effect as if set out in full.

99.    C&A violated Section 13(a) of the Exchange Act and Exchange Act Rules

12b-20, 13a-1, 13a-11, and 13a-13 by failing to file accurate quarterly, annual, and

current reports as alleged in the Fourth Claim For Relief.

100.    Pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)]

whoever "knowingly provides substantial assistance" to another person in connection

with a violation of the Exchange Act, or any regulation thereunder, is "deemed to be in

violation of such provision to the same extent as the person to whom such assistance is

provided."

101.    Stockman, Stepp, Jones, Cosgrove, McCallum, Barnaba, Gougherty, Galante, and Williams each knowingly provided substantial assistance to C&A in connection with one or more inaccurate quarterly, annual, or current reports filed by C&A between April 2002 and April 2005, as described in Paragraphs 1-6 and 20-72, and thereby violated Section 13(a) and Rule 12b-20, as well as Rule 13a-1 (for annual reports), Rule 13a-11 (for current reports), or Rule 13a-13 (for quarterly reports).

102.    Unless restrained, Stockman, Stepp, Jones, Cosgrove, McCallum, Barnaba, Gougherty, Galante, and Williams will continue to aid and abet violations of these reporting provisions.

### SIXTH CLAIM FOR RELIEF

**Violations of Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act
(C&A)**

103.    Paragraphs 1-72 are incorporated herein with the same force and effect as if set out in full.

104.    Pursuant to Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act [15 U.S.C. § 78m(b)(2)], every issuer of a registered security must (i) maintain books and records accurately and fairly reflecting its transactions and the disposition of its assets, and (ii) establish a system of internal accounting controls that provides reasonable assurances that transactions are recorded as necessary to permit preparation of financial statements in conformity with GAAP.

105.    C&A violated Sections 13(b)(2)(A) and 13(b)(2)(B) from the fourth quarter of 2001 through the first quarter of 2005 by failing to (i) maintain books and records accurately and fairly reflecting its transactions and the dispositions of its assets, and (ii) establish a system of internal accounting controls that provides reasonable

assurances that transactions are recorded as necessary to permit preparation of financial

statements in conformity with GAAP, as described in Paragraphs 1-6, 20-53, and 70-71.

106.    Unless restrained, C&A will continue to violate Sections 13(b)(2)(A) and

13(b)(2)(B).

## SEVENTH CLAIM FOR RELIEF

### Aiding and Abetting C&A's violations of Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act (Stockman, Stepp, Jones, Cosgrove, McCallum, Barnaba, Gougherty, Galante, and Williams)

107.    Paragraphs 1-72 are incorporated herein with the same force and

effect as if set out in full.

108.    C&A violated Sections 13(b)(2)(A) and 13(b)(2) (B) of the Exchange Act

as alleged in the Sixth Claim For Relief.

109.    Pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)]

whoever "knowingly provides substantial assistance" to another person in connection

with a violation of the Exchange Act, or any regulation thereunder, is deemed to be "in

violation of such provision to the same extent as the person to whom such assistance is

provided."

110.    As described in paragraphs 1-6, 20-48, and 70-71, Stockman, Stepp,

Jones, Cosgrove, McCallum, Barnaba, Gougherty, Galante, and Williams knowingly

provided substantial assistance to C&A in connection with C&A's failure to maintain

accurate books and records and C&A's failure to establish an adequate system of internal

controls, and thereby violated Sections 13(b)(2)(A) and 13(b)(2)(B) to the same extent as

C&A.

111.   Unless restrained, defendants Stockman, Stepp, Jones, Cosgrove, McCallum, Barnaba, Gougherty, Galante, and Williams will continue to aid and abet C&A's violations of these record-keeping and internal control provisions.

### EIGHTH CLAIM FOR RELIEF

**Violations of Section 13(b)(5) of the Exchange Act
(Stockman, Stepp, Jones, Cosgrove, McCallum,
Barnaba, Gougherty, Galante, and Williams)**

112.   Paragraphs 1-72 are incorporated herein with the same force and effect as if set out in full.

113.   Pursuant to Section 13(b)(5) of the Exchange Act, no person may knowingly circumvent or fail to implement a system of internal accounting controls or knowingly falsify any book, record, or account maintained pursuant to Section 13(b)(2) of the Exchange Act.

114.   As described in Paragraphs 1-6, 20-48, and 70-71, Stockman, Stepp, Jones, Cosgrove, McCallum, Barnaba, Gougherty, Galante, and Williams knowingly circumvented C&A's internal accounting controls and knowingly falsified books, records, and accounts maintained by C&A pursuant to Section 13(b)(2) of the Exchange Act.

115.   By reason of the foregoing, Stockman, Stepp, Jones, Cosgrove, McCallum, Barnaba, Gougherty, Galante, and Williams violated Section 13(b)(5), and unless restrained will continue to violate this provision.

35

### NINTH CLAIM FOR RELIEF

#### Violations of Exchange Act Rule 13b2-1
#### (Stockman, Stepp, Jones, Cosgrove, McCallum,
#### Barnaba, Gougherty, Galante, and Williams)

116.    Paragraphs 1-72 are incorporated herein with the same force and

effect as if set out in full.

117.    Exchange Act Rule 13b2-1 [17 C.F.R. § 240.13b2-1] provides that no

person shall directly or indirectly falsify any book, record, or account subject to Section

13(b)(2)(A) of the Exchange Act.

118.    As described in paragraphs 1-6, 20-48, and 70-71, Stockman, Stepp,

Jones, Cosgrove, McCallum, Barnaba, Gougherty, Galante, and Williams falsified or

caused the falsification of books, records, and accounts maintained by C&A and within

the scope of Section 13(b)(2)(A) of the Exchange Act.

119.    By reason of the foregoing, Stockman, Stepp, Jones, Cosgrove,

McCallum, Barnaba, Gougherty, Galante, and Williams violated Rule 13b2-1 and unless

restrained will continue to violate that rule.

### TENTH CLAIM FOR RELIEF

#### Violations of Exchange Act Rule 13b2-2
#### (Stockman, Stepp, Jones, Cosgrove, McCallum,
#### Barnaba, and Galante)

120.    Paragraphs 1-72 are incorporated herein with the same force and

effect as if set out in full.

121.    Exchange Act Rule 13b2-2 [17 C.F.R. § 240.13b2-2] provides, inter alia,

that no officer or director of an issuer, and no person acting under the direction of such

officer or director, may directly or indirectly take any action to mislead an independent

public or certified public accountant engaged in an audit or review of the financial statements of that issuer if such statements are required to be filed with the Commission and the person knew or should have known that such action, if successful, could result in rendering the issuer's financial statements materially misleading.

122.    As described in Paragraphs 1-6, 20-48, and 54-72, Stockman, Stepp, Jones, Cosgrove, McCallum, Barnaba, Gougherty, and Galante took actions to mislead C&A's public accountants in the performance of audits and reviews of financial statements required to be filed by C&A with the Commission, and knew or should have known that such actions could result in rendering these financial statements materially misleading.

123.    By reason of the foregoing, defendants Stockman, Stepp, Jones, Cosgrove, McCallum, Barnaba, Gougherty, and Galante violated Rule 13b2-2 and, unless restrained, will continue to violate that rule.

## ELEVENTH CLAIM FOR RELIEF

### Violation of Exchange Act Rule 13a-14
### (Stockman and Stepp)

124.    Paragraphs 1-72 are incorporated herein with the same force and effect as if set out in full.

125.    Rule 13a-14 under the Exchange Act [17 C.F.R. § 240.13a-14] provides that each report filed with the Commission pursuant to Section 13(a) of the Exchange Act must include a certification, in a form identified by the Commission, signed by the principle executive officer and the principal financial officer of the issuer.

126.    As described in Paragraph 50, Stockman signed such certifications as part of C&A's quarterly reports (Form 10-Q) for each quarter from the second quarter of 2003

through the third quarter of 2004, and as part of C&A's annual report (Form 10-K) for

2003. Stepp signed such certifications as part of C&A's quarterly reports for each quarter

from the third quarter of 2002 through the second quarter of 2004, and as part of C&A's

annual reports for 2002 and 2003. The certifications by Stockman and Stepp stated that

C&A's financial statements and the other financial information in the report fairly

presented C&A's financial condition, results of operations, and cash flows for the

reporting periods. These certifications were false or misleading, and were known by

Stockton and Stepp to be false or misleading.

127. By reason of the foregoing, Stockman and Stepp violated Rule 13a-14,

and unless restrained will continue to violate that rule.

## PRAYER FOR RELIEF

WHEREFORE, the Commission requests that the Court enter judgment:

(a) permanently enjoining C&A from violating Section 17(a) of the Securities Act,

Sections 10(b), 13(a), 13(b)(2)(A), and 13(b)(2)(B) of the Exchange Act, and Rules 10b-5,

12b-20, 13a-1, 13a-11, and 13a-13 under the Exchange Act;

(b) permanently enjoining Stockman and Stepp from violating Section 17(a) of the

Securities Act, Sections 10(b) and 13(b)(5) of the Exchange Act, and Rules 10b-5, 13b2-1,

13b2-2 and 13a-14 under the Exchange Act, and from aiding and abetting violations of

Sections 13(a), 13(b)(2)(A), and 13(b)(2)(B) of the Exchange Act and Rules 12b-20, 13a-1,

13a-11, and 13a-13 under the Exchange Act; requiring each of them to disgorge his ill-

gotten gains, with prejudgment interest; requiring each of them to pay civil penalties; and

permanently barring each of them from acting as an officer or director of any issuer that has

a class of securities registered pursuant to Section 12 of the Exchange Act or is required to file reports pursuant to Section 15(d) of that Act;

(c)  permanently enjoining Cosgrove from violating Section 17(a) of the Securities Act, Sections 10(b) and 13(b)(5) of the Exchange Act, and Rules 10b-5, 13b2-1 and 13b2-2 under the Exchange Act, and from aiding and abetting violations of Sections 13(a), 13(b)(2)(A), and 13(b)(2)(B) of the Exchange Act and Rules 12b-20, 13a-1, 13a-11, and 13a-13 under the Exchange Act; requiring him to disgorge his ill-gotten gains, with prejudgment interest; requiring him to pay civil penalties; and permanently barring him from acting as an officer or director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act or is required to file reports pursuant to Section 15(d) of that Act;

(d)  permanently enjoining Jones, Barnaba, and Gougherty from violating Sections 10(b) and 13(b)(5) of the Exchange Act and Rules 10b-5, 13b2-1, and 13b2-2 under the Exchange Act, and from aiding and abetting violations of Sections 10(b), 13(a), 13(b)(2)(A), and 13(b)(2)(B) of the Exchange Act and Rules 10b-5, 12b-20, 13a-1, 13a-11, and 13a-13 under the Exchange Act; requiring each of them to disgorge his ill-gotten gains, with prejudgment interest; requiring each of them to pay civil penalties; and permanently barring each of them from acting as an officer or director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act or is required to file reports pursuant to Section 15(d) of that Act;

(e) permanently enjoining Galante and McCallum from violating Sections 10(b) and 13(b)(5) of the Exchange Act, and Rules 10b-5, 13b2-1,  and 13b2-2  under the Exchange Act, and from aiding and abetting violations of Sections 13(a), 13(b)(2)(A), and

39

13(b)(2)(B) of the Exchange Act and Rules 12b-20, 13a-1, 13a-11, and 13a-13 under the Exchange Act; requiring each of them to disgorge his ill-gotten gains, with prejudgment interest; requiring each of them to pay civil penalties; and permanently barring each of them from acting as an officer or director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act or is required to file reports pursuant to Section 15(d) of that Act;

(f)    permanently enjoining <u>Williams</u> from violating Sections 10(b) and 13(b)(5) of the Exchange Act and Rules 10b-5 and 13b2-1 under the Exchange Act, and from aiding and abetting violations of Sections 10(b), 13(a), 13(b)(2)(A), and 13(b)(2)(B) of the Exchange Act and Rules 10b-5, 12b-20, and 13a-11 under the Exchange Act; requiring him to disgorge his ill-gotten gains, with prejudgment interest; requiring him to pay civil penalties; and permanently barring him from acting as an officer or director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act or is required to file reports pursuant to Section 15(d) of that Act; and

(g)    providing such other relief as may be appropriate.

Date: March **23**, 2007

*John D. Worland Jr.*

Of Counsel
Christopher Conte
Mark Kreitman
David Fielder
James Eichner
Securities and Exchange Commission

Robert B. Blackburn
Associate Regional Director
Securities and Exchange Commission
Room 437
3 World Financial Center
New York, New York 10281-1022

John D. Worland, Jr. (JW1962)
Securities and Exchange Commission
100 F Street, N.E.
Washington, D.C. 20549
Tel: 202-551-4438
Fax: 202-772-9246
WorlandJ@sec.gov

H. Michael Semler (HS2943)
Securities and Exchange Commission
100 F Street, N.E.
Washington, D.C. 20549
Tel: 202-551-4429
Fax: 202-772-9246
Attorneys for Plaintiff

40

# EXHIBIT 5

Case 1:07-cv-00265-SLR-LPS    Document 120-7    Filed 04/28/2008    Page 2 of 6

10-K 1 k82476e10vk.htm ANNUAL REPORT FOR THE FISCAL YEAR ENDED 12/31/2003

# UNITED STATES SECURITIES AND EXCHANGE COMMISSION
## WASHINGTON, D.C. 20549

---

# Form 10-K

(Mark One)

☑ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d)
OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the fiscal year ended December 31, 2003**

**or**

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d)
OF THE SECURITIES EXCHANGE ACT OF 1934**

**Commission file number 1-10218**

---

# Collins & Aikman Corporation

*(Exact name of registrant as specified in its charter)*

| | |
|---|---|
| **Delaware** | **13-3489233** |
| *(State or other jurisdiction of incorporation or organization)* | *(I.R.S. Employer Identification Number)* |

**250 Stephenson Highway
Troy, Michigan 48083**
*(Address of principal executive offices, including zip code)*

**Registrant's telephone number, including area code:
(248) 824-2500**

**Securities registered pursuant to Section 12(b) of the Act:**

| Title of each class | Name of each exchange on which registered |
|---|---|
| Common Stock, $.01 par value | New York Stock Exchange |

**Securities registered pursuant to Section 12(g) of the Act:
None**

Indicate by check mark whether the Registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the Registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☐  No ☑

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of Registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☑

Indicate by check mark whether the registrant is an accelerated filer (as defined in Exchange Act Rule 12b-2). Yes ☑ No ☐.

The aggregate market value of voting stock held by non-affiliates of the Registrant was $168,794,241 as of March 1, 2004.

As of February 26, 2004, the number of outstanding shares of the Registrant's common stock, $.01 par value, was 83,630,087 shares.

## WEBSITE ACCESS TO COMPANY'S REPORTS:

Collins & Aikman's internet website address is www.collinsaikman.com. The Company's annual report on Form 10-K, quarterly reports on Form 10-Q, current reports on Form 8-K and amendment to those reports filed or furnished pursuant to Section 13(a) or 15(d) of the Exchange Act are available free of charge through the Company's website and as soon as reasonably practicable after the reports are electronically filed with, or furnished to the Securities and Exchange Commission.

The Company's Code of Business Conduct is available free of charge through the Company's internet website. Any amendments to the Company's Code of Business Conduct and any waivers of the Code of Business Conduct involving executive officers or directors of the Company will also be made available on the Company's internet website. Printed copies of the Company's Code of Business Conduct are also available free of charge to any shareholder upon request to: Corporate Secretary, Collins & Aikman Corporation, 250 Stephenson Highway, Troy, MI 48083.

## COLLINS & AIKMAN CORPORATION AND SUBSIDIARIES

### FORM 10-K ANNUAL REPORT INDEX

|  |  | Page |
|---|---|---|
| **PART I** | | |
| Item 1. | Business | 8 |
| Item 2. | Properties | 16 |
| Item 3. | Legal Proceedings | 17 |
| Item 4. | Submission of Matters to a Vote of Security Holders | 17 |
| **PART II** | | |
| Item 5. | Market for Registrant's Common Equity and Related Stockholder Matters | 17 |
| Item 6. | Selected Financial Data | 18 |
| Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 19 |
| Item 7A. | Quantitative and Qualitative Disclosures About Market Risk | 44 |
| Item 8. | Financial Statements and Supplementary Data | 44 |
| Item 9. | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | 45 |
| Item 9A. | Controls and Procedures | 46 |
| **PART III** | | |
| Item 10. | Directors and Executive Officers of the Registrant | 47 |
| Item 11. | Executive Compensation | 52 |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management | 63 |
| Item 13. | Certain Relationships and Related Transactions | 65 |
| Item 14. | Principal Accounting Fees and Services | 68 |
| **PART IV** | | |
| Item 15. | Exhibits, Financial Statement Schedules and Reports on Form 8-K | 70 |

i

# INDEPENDENT AUDITORS' REPORT

The Board of Directors and Stockholders
Collins & Aikman Corporation:

We have audited the 2003 consolidated financial statements of Collins & Aikman Corporation and subsidiaries as listed in the accompanying index. These consolidated financial statements and financial statement schedules are the responsibility of the Company's management. Our responsibility is to express an opinion on these consolidated financial statements and financial statement schedules based on our audit.

We conducted our audit in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audit provides a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of Collins & Aikman Corporation and subsidiaries as of December 31, 2003, and the results of their operations and their cash flows for the year then ended, in conformity with accounting principles generally accepted in the United States of America. Also in our opinion, the related 2003 financial statement schedules, when considered in relation to the basic consolidated financial statements taken as a whole, present fairly in a material respects, the information set forth herein.

As discussed in Note 2 to the financial statements, the Company changed its method of accounting for crib supply inventories in 2003.

/s/ KPMG LLP

Detroit, Michigan
March 15, 2004

F-1

# EXHIBIT 6

10-Q 1 k79985e10vq.htm QUARTERLY REPORT FOR PERIOD ENDED 09/30/03

**Table of Contents**

# UNITED STATES SECURITIES AND EXCHANGE COMMISSION
### Washington D.C. 20549

---

# Form 10-Q

(Mark One)

☑           **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d)
OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the quarterly period ended September 30, 2003**

or

☐           **TRANSITION REPORT PURSUANT TO SECTION 13 or 15(d)
OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the transition period from      to**

**Commission file number 1-10218**

---

# Collins & Aikman Corporation

*(Exact name of registrant, as specified in its charter)*

| DELAWARE | 13-3489233 |
|---|---|
| *(State or other jurisdiction of* | *(IRS Employer* |
| *incorporation or organization)* | *Identification No.)* |

**250 Stephenson Highway
Troy, Michigan 48083**
*(Address of principal executive offices, including zip code)*

**(248) 824-2500**
*(Registrant's telephone number, including area code)*

Indicate by check mark whether the Registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the Registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.     Yes ☐          No ☑.

Indicate by check mark whether the Registrant is an accelerated filer (as defined in Exchange Act Rule 12b-2)     Yes ☑          No ☐.

The interim financial statements included in this quarterly report were prepared by the Company and have not been reviewed by an independent public accountant as required by Rule 10-01(d) of Regulation S-X.

As of October 31, 2003 the number of outstanding shares of the Registrant's common stock, $.01 par value, was 83,630,087 shares.

### WEBSITE ACCESS TO COMPANY'S REPORTS:

Collins and Aikman's internet website address is www.collinsaikman.com. The Company's annual report on Form 10-K, quarterly reports on Form 10-Q, current reports on Form 8-K, and amendment to those reports filed or furnished pursuant to Section 13(a) or 15(d) of the Exchange Act are available free of charge through the Company's website and as soon as reasonably practicable after the reports are electronically filed with, or furnished to, the Securities and Exchange Commission.

# TABLE OF CONTENTS

STATEMENT REGARDING REVIEW OF FINANCIAL STATEMENTS; AUDIT
COMMITTEE INVESTIGATION
   Item 1. Financial Statements
CONDENSED CONSOLIDATED STATEMENTS OF OPERATIONS
CONDENSED CONSOLIDATED BALANCE SHEETS
CONDENSED CONSOLIDATED STATEMENTS OF CASH FLOW
NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS (Unaudited)
   Item 2. Management's Discussion and Analysis of Financial Condition and Results of
Operations
   Item 3. Quantitative and Qualitative Disclosures About Market Risk
   Item 4. Controls and Procedures
PART II -- OTHER INFORMATION
SIGNATURE
EXHIBIT INDEX
Amendment & Waiver
Third Amendment to Credit Agreement
Fourth Amendment to Credit Agreement
Resignation and Separation Agreement
Employment Agreement - Gerald E. Jones
Letter re: Amendment to Employment Agreement
Employment Agreement - Eric White
Employment Agreement - Millard L. King
Letter re: Amendment to Employment Agreement
Employment Agreement - Michael G. Torakis
Letter re: Amendment to Employment Agreement
Computation of Earnings Per Share
Computation of Ratio of Earnings to Fixed Charges
Certification Pursuant to Section 302
Certification Pursuant to Section 302
Certification Pursuant to Section 906

Table of Contents

**STATEMENT REGARDING REVIEW OF FINANCIAL STATEMENTS;
AUDIT COMMITTEE INVESTIGATION**

As previously disclosed in the Company's Form 10-Q for the quarter ended June 30, 2003, the Company was advised of assertions concerning certain related party transactions and other matters and promptly advised the Audit Committee of these assertions. The Company's Audit Committee, represented by an independent counsel, is conducting an inquiry into these matters. The Company has been advised by its independent auditors, KPMG LLP, that they will be unable to complete their SAS 100 review of the Company's quarterly results prior to completion of the Audit Committee's inquiry and their review of the results of that inquiry. Accordingly, the Company's independent accountants, KPMG LLP, have not reviewed the accompanying unaudited consolidated financial statements as of September 30, 2003 and for the three-month period then ended in accordance with Rule 10-01(d) of Regulation S-X promulgated by the SEC. For the same reasons, KPMG, LLP has not completed its review of the Company's unaudited consolidated financial statements as of June 30, 2003, and for the three-month period then ended in accordance with such rule. While senior management of the Company believes the assertions to be without merit, the Company cannot predict the outcome of the Audit Committee's investigation and whether or not it will impact its financial reporting. In addition, there can be no assurance that additional assertions will not be made in the future and that the scope of the investigation will not expand.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| COLLINS & AIKMAN CORPORATION, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | C.A. No. 07-265-SLR-LPS |
| | ) | |
| v. | ) | |
| | ) | |
| DAVID A. STOCKMAN, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## <u>ORDER</u>

The Court, having considered the motion of defendant KPMG LLP to dismiss the first amended complaint (the "Motion"), and good cause having been shown therefor, hereby orders this _____ day of _____ 2008 that:

A.    The Motion is GRANTED; and

B.    The First Amended Complaint is DISMISSED WITH PREJUDICE as to defendant KPMG LLP.

_____
UNITED STATES DISTRICT JUDGE

## CERTIFICATE OF SERVICE

I, Michael J. Maimone, Esq., hereby certify that on April 28, 2008, I caused to be electronically filed a true and correct copy of the foregoing document with the Clerk of the Court using CM/ECF, which will send notification that such filing is available for reviewing and downloading to the following counsel of record:

| | |
|---|---|
| Joseph A. Rosenthal, Esquire<br>Carmella P. Keener, Esquire<br>Rosenthal, Monhait & Goddess, P.A.<br>919 N. Market Street, Suite 1401<br>P. 0. Box 1070<br>Wilmington, DE 19899<br>(Counsel to Plaintiffs) | Peter B. Ladig, Esquire<br>Stephen B. Brauerman, Esquire<br>The Bayard Firm<br>222 Delaware Avenue<br>Suite 900<br>P. 0. Box 25130<br>Wilmington, DE 19899 |
| Thomas G. Macauley, Esquire<br>Zuckerman Spaeder LLP<br>919 Market Street, Suite 1705<br>P. 0. Box 1028<br>Wilmington, DE 19899 | Vernon R. Proctor, Esquire<br>Proctor Heyman LLP<br>1116 West Street<br>Wilmington, DE 19801 |
| Thomas P. Preston, Esquire<br>Blank Rome LLP<br>Chase Manhattan Centre<br>1201 Market Street<br>Suite 800<br>Wilmington, DE 19801 | James L. Holzman, Esquire<br>J. Clayton Athey, Esquire<br>Prickett Jones & Elliott, P.A.<br>1310 King Street<br>P. 0. Box 1328<br>Wilmington, DE 19899 |
| Christian D. Wright, Esquire<br>Andrew A. Lundgren, Esquire<br>Young, Conaway, Stargatt & Taylor, LLP<br>The Brandywine Building<br>1000 West Street, 17th Street<br>P. 0. Box 391<br>Wilmington, DE 19899-0391 | Stephen L. Ascher, Esquire<br>Zenner & Block<br>919 Third Avenue<br>New York, NY 10022-3908 |

| | |
|---|---|
| Albert H. Manwaring, IV, Esquire<br>Pepper Hamilton LLP<br>1313 Market Street, Suite 5100<br>P.O. Box 1709<br>Wilmington, DE 19899-1709<br>(302) 777-6500 | Thomas Henry Kovach, Esquire<br>Parkowski, Guerke & Swayze, P.A.<br>800 King Street<br>Suite 203<br>Wilmington, DE 19801<br>(302) 594-3313<br>Fax: (302 654-3033 |
| Richard L. Horwitz, Esquire<br>Potter Anderson & Corroon, LLP<br>131.3 N.. Market St., Hercules Plaza, 6th Flr.<br>P.O. Box 951<br>Wilmington, DE 19899-0951<br>(Counsel to Defendant Stepp) | Robert S. Saunders, Esquire<br>Skadden, Alps, Slate, Meagher & Flom LLP<br>One Rodney Square<br>P. 0. Box 636<br>Wilmington, DE 19899 |

I further certify that on April 28, 2008, I caused a copy of the foregoing document

to be served on the following non-registered participants in the manner indicated:

**BY EMAIL**

Samuel H. Rudman
srudman@csgrr.com
David A. Rosenfeld
drosenfeld@csgrr.com
Coughlin Stoia Geller Rudman & Robbins LLP
58 South Service Road, Suite 200
Melville, NY 11747

/s/ Michael J. Maimone
Michael J. Maimone (#3592)