IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE


COLLINS & AIKMAN CORPORATION, ET AL.          C.A. No. 07-265-SLR-LPS

      vs.

DAVID A. STOCKMAN, ET AL.


**COMPENDIUM OF UNREPORTED DECISIONS CITED IN
THE OPENING BRIEF IN SUPPORT OF
DEFENDANT KPMG, LLP'S MOTION TO DISMISS
THE FIRST AMENDED COMPLAINT**


OF COUNSEL:

Peter W. Devereaux
Christopher Harris
Latham & Watkins LLP
885 Third Avenue
New York, NY 10022
Phone: (212) 906-1200

DATED: April 28, 2008

EDWARDS ANGELL PALMER & DODGE LLP
Michael J. Maimone (#3592)
Paul D. Brown (#3903)
Joseph B. Cicero (34388)
919 North Market Street, 15th Floor
Wilmington, DE  19801
Phone: (302) 777-7770
Fax: (302) 777-7263

# INDEX

**Cases**                                                            **TAB**

*Begier v. Price Waterhouse*,
   1992 WL 236175 (E.D. Pa. Sept. 14, 1992)....................................................... 1

*Cambridge Biotech Corp. v. Deloitte & Touche*,
   1997 WL 42516 (Mass. Super. Ct. Jan. 28, 1997) .............................................. 2

*Chase Bank of Texas v. Grant Thornton, L.L.P.*,
   2003 WL 21350362 (Mich. Ct. App. June 10, 2003)......................................... 3

*Johnson v. Metabolife International, Inc.*,
   2002 WL 32494514 (N.D. Tex. Oct. 23, 2002) .................................................. 4

*Krieger v. Gast*,
   2000 WL 288442 (W.D. Mich. Jan. 21, 2000) .................................................... 5

*Maxwell v. KPMG, LLP*,
   2008 WL 746849 (7th Cir. Mar. 21, 2008)......................................................... 6

*Official Comm. of Unsecured Creditors of Corell Steel v. Fishbein & Co., P.C.*,
   1992 WL 196768 (E.D. Pa. Aug. 10, 1992) ........................................................ 7

*Pew v. Cardarelli*,
   No. 03-742, 2005 U.S. Dist. LEXIS 40018 (N.D.N.Y. Mar. 17, 2005), *aff'd*,
   164 Fed. Appx. 31 (2d Cir. N.Y. 2006)............................................................... 8

*Pilot Industrial, Inc. v. Grant Thornton, LLP*,
   2006 WL 2033996 (Mich. Ct. App. July 20, 2006) .......................................... 11

*Scalici v. Bank One, NA*,
   2005 WL 2291732 (Mich. Ct. App. Sept. 20, 2005).......................................... 12

*Shivers v. McMartin, Wasek & Assoc., Inc.*,
   2005 WL 1959480 (Mich. Ct. App. Aug. 16, 2005) .......................................... 13

*Transation Title Ins. Co. v. Livingston*,
   2004 WL 203075 (Mich. Ct. App. Feb. 3, 2004)............................................... 14

1



Not Reported in F.Supp.                                                                                    Page 1
Not Reported in F.Supp., 1992 WL 236175 (E.D.Pa.)
(Cite as: Not Reported in F.Supp., 1992 WL 236175)

Begier v. Price Waterhouse
E.D.Pa.,1992.
Only the Westlaw citation is currently available.
United States District Court, E.D. Pennsylvania.
Harry P. BEGIER, Jr., Trustee in Bankruptcy of
AIA Industries, Inc. and American International
Airways, Inc.
v.
PRICE WATERHOUSE.
**Civ. A. No. 87-6096.**

Sept. 14, 1992.

David S. Fishbone, Ciardi, Fishbone & Di Donato,
Phila, Pa., Michael H. Kaliner, Jackson & Sullivan,
Fairless Hills, Pa., Gloria M. Satriale, Philadelphia,
Pa., for plaintiff.
Patricia L. Freeland, John G. Harkins, Jr., Pepper,
Hamilton & Scheetz, Philadelphia, Pa., for defend-
ant.

MEMORANDUM AND ORDER

DITTER, Senior District Judge.
**\*1** Plaintiff, Harry Begier, is AIA Industries, Inc.'s,
trustee in bankruptcy. In this action, Mr. Begier ori-
ginally alleged breach of contract, negligence, a
claim under 11 U.S.C. § 544, and claims under sec-
tion 10(b) and 13(b)(2) of the Securities and Ex-
change Act of 1934 against Price Waterhouse
(PW), AIA's accounting firm. As a result of a series
of rulings, only a portion of Mr. Begier's contract
claim remains. Citing a breach of contract, he seeks
the return of professional fees which AIA paid to
PW for audits performed in 1982 and 1983.

PW has moved for summary judgment on this final
issue, and I will grant its motion.

### I. BACKGROUND

In 1981, Gayle Moneyhan and Arthur Toll formed
AIA Industries, Inc., and its wholly owned subsidi-

ary, American International Airways, Inc., to
provide charter airline service to casinos in Atlantic
City, New Jersey. AIA quickly grew to be the
fourth largest scheduled carrier flying from Phil-
adelphia, Pennsylvania, but the expansion proved
unsuccessful. AIA recorded large losses, there were
accusations of fraud, and in July, 1984, the airline
filed for bankruptcy.

PW's work included auditing AIA's November 30,
1982, and November 30, 1983, financial statements.
Mr. Begier claims PW did not follow generally ac-
cepted accounting standards, failed to uncover vari-
ous material facts, failed to present an accurate de-
piction of AIA's financial health, and therefore
breached its contract with AIA.

PW claims the reporting arrangements were gov-
erned by contracts which required AIA's manage-
ment to provide accurate and truthful information
concerning AIA and its finances. PW contends
AIA's management provided false and misleading
information as part of a massive fraud to inflate
AIA's value and obfuscate the company's true fin-
ancial position. Based on this assertion, PW con-
structs three defenses to the contract allegations.

First, PW claims AIA contracted to provide, to the
best of AIA's knowledge, accurate accounting fig-
ures and therefore breached by intentionally provid-
ing false and misleading financial information.
Second, PW claims AIA deliberately interfered
with PW's ability to do a full and fair audit. PW ar-
gues AIA should not benefit from its own obstruc-
tion. Third, PW claims the misrepresentations
fraudulently induced PW to perform the auditing
work.

### II. ANALYSIS

Since this is PW's motion for summary judgment, I
must view all of the facts in a light most favorable
to Mr. Begier. Summary judgment is appropriate if
there is no genuine issue of material fact and PW is

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                Page 2
Not Reported in F.Supp., 1992 WL 236175 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp., 1992 WL 236175)**

entitled to prevail as a matter of law. In this case, PW has met its burden.

### A. The Management Representation Letters.

Prior to each audit, the parties memorialized their agreement in an engagement letter.[FN1] Each letter provided PW would perform the audits in accordance with generally accepted accounting standards (GAAS).

When performing an audit in accordance with GAAS, an auditor must obtain certain written statements from the audited company's management. In these statements, the audited company's management must acknowledge its responsibility to present the company's financial statements fairly, and it must affirm the truthfulness of the information it provides to the auditor during the examination. *See AICPA Professional Standards,* AU § 333.01 (June 1982). If the auditor does not receive these materials, or if he cannot satisfy any of the other GAAS requirements, he may not express an unqualified opinion concerning the company's financial statements, and he must explain why. *See Id.* at §§ 333.10-333.13.

**\*2** AIA's top managers provided the company's affirmation in several management representation letters. Arthur Toll (AIA's chairman), Bruce Edmondson (vice president), George Phelan (vice president and treasurer), and Allan Marmon (vice president and corporate counsel) prepared the first letter for the November 30, 1982, audit on March 16, 1983. Among other things, it said:

1. We acknowledge management's responsibility for the fair presentation in the financial statements of financial position, results of operations and changes in financial position in conformity with generally accepted accounting principles.

2. [A]ll financial and accounting records and related data have been made available to you. We are not aware of any accounts, transactions or material agreements not fairly described and properly recor-

ded in the financial and accounting records underlying the financial statements.

3. We are not aware of (a) any irregularities involving management or employees who have significant roles in the system of internal accounting control, or any irregularities involving other employees that could have a material effect on the financial statements....

5. The receivables ... at November 30, 1982 represent bona fide claims against debtors for sales or other charges arising on or before that date....

9. The financial statements and appended notes include all disclosures necessary for a fair presentation of the financial position and results of operations of the company in accordance with generally accepted accounting principles, and disclosures otherwise required to be included therein by the laws and regulations to which the company is subject....

10. No matters or occurrences have come to our attention up to the date of this letter which would materially affect the financial statements and related disclosures of the period ended November 30, 1982 or, although not affecting such financial statements or disclosures, have caused or are likely to cause any material change, adverse or otherwise, in the financial position or results of operations of the company. We have no plans or intentions that may materially affect the carrying value or classification of assets and liabilities.

11. We have carefully reviewed a draft of the consolidated financial statements for the period ended November 30, 1982, in addition to the related consolidated statements and are in agreement herewith.

12. Deferred operating costs ... at November 30, 1982, are recoverable from future operations and relate to aircraft training and preparation for operations, initial marketing, advertising, incremental operating costs, and other start-up costs connected with CAB certification commencement of scheduled operations.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                 Page 3
Not Reported in F.Supp., 1992 WL 236175 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp., 1992 WL 236175)**

AIA also prepared management representation letters for the first audit on May 31, 1983, and on the 18th, 21st, and 28th of July, 1983. For the second audit, AIA prepared management representation letters on February 27, 1984, March 21, 1984, and the 2nd and 9th of May, 1984. These letters were not as lengthy or detailed, but they provided similar assurances.[FN2]

**\*3** All of PW's arguments flow from the premise that AIA's management representation letters were deliberately false and misleading. The first question, then, is whether the uncontested record supports this assertion. There can be no question it does.

Even the most cursory glance at the uncontested facts reveals the management letters were riddled with misrepresentations and false statements. AIA's top management clearly prepared and signed these letters at the same time it was orchestrating a complex web of fraudulent transactions and other financial misdealings.

ITG, Inc., was an air charter services broker. The company was a major creditor of AIA, and ultimately became AIA's exclusive charter agent. Before the first management representation letter on March 16, 1983, Arthur Toll and Bruce Edmondson conceived and began orchestrating fraudulent deals between AIA and ITG. These transactions substantially inflated AIA's trade accounts receivables and other accounts receivables. The dealings included a series of short term loans (including one for $160,000) that AIA treated as income and used to fund its negative cash flow and to meet payroll obligations. AIA also began adding false invoices to its books before March 16, 1983. These entries recorded non-existent flights, undelivered services, and services at inflated rates. AIA's management also recorded penalties to ITG for flights when no penalty was warranted.

In addition to the ITG transactions, AIA's management began a series of fraudulent payments to Steve Homick, a building contractor, and other entities before the March 16, 1983, management representation letter. In a related case, Mr. Begier has already admitted Messrs. Toll, Phelan, and Edmondson either made these payments or had direct knowledge of them, and Mr. Phelan testified at his deposition that Mr. Toll directed him to draft the checks to Mr. Homick.

This illicit activity began before the November 30, 1982, management representation letter. It continued through and beyond the last letter of May 9, 1984. There were more short term loans from ITG (eventually totalling over $1 million), and more fraudulent invoices, payments, and accounting entries. AIA even faked the purchase of two airplane engines to raise over $2 million to pay off ITG receivables. In this scheme, AIA procured money to buy and reported that it actually bought two jet engines even though it had only leased them. AIA put the engines on its books as assets and used the purchase money to balance its receivables.

All of this activity directly controverts the first letter's affirmations.

As I wrote when I granted summary judgment for PW on Mr. Begier's negligence claim, "the record plainly shows AIA's management, directors, and owners were intimately acquainted with all of the fraud and illicit dealings that occurred." In this way, there can be no doubt that AIA's management deliberately provided false and misleading information to PW.

*B. The Contract Claim.*

**\*4** Given that the management representation letters were deliberately false and misleading, the issue turns to whether these materials created a breach, a deliberate attempt to thwart PW's efforts, or a fraudulent inducement.

PW's engagement letter for each audit specifically stated PW would perform its audit of AIA's financial statements in accordance with GAAS. In addi-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

tion, AIA's first management representation letter for each audit reported it presented AIA's financial figures in accordance with GAAS. Under the circumstances, one can conclude the parties intended auditing in accordance with GAAS to be a material provision of their contract. The contract obligated AIA to present its financial position to PW fairly before PW could begin its work. AIA clearly failed to do so. In fact, the uncontested record indicates AIA's top management deliberately presented false and misleading financial information to PW. After all, the very men who were falsifying the books at AIA signed the letters to PW. As a result, AIA breached the agreement, and any performance failure by PW is excused. *See Ott v. Buehler Lumber Co.,* 541 A.2d 1143, 1145 (Pa.Super.1988); *Restatement (Second) of Contracts* § 245 (1979). *See also Cenco Inc. v. Seidman & Seidman,* 686 F.2d 449, 453 (7th Cir.1982).

Similarly, AIA's behavior excused PW from performing a proper audit because AIA deliberately interfered with PW's efforts. *See Craig Coal Mining Co. v. Romani,* 513 A.2d 437, 440 (Pa.Super 1986) ("Manifestly, a plaintiff cannot prevail in an action for non-performance of a contract if he alone is responsible for the non-performance."); *Restatement (Second) of Contracts* § 245 (1979). In addition, the uncontested evidence shows AIA's promise to present its financial figures fairly to PW was material to the contract. The uncontested evidence further shows that PW relied on the promise when entering the contract, and that AIA never intended to make good on the promise. For this reason, PW prevails on its fraudulent inducement argument. *See First Federation Savings & Loan Association v. Reggie,* 546 A.2d 62, 66 (Pa.Super 1988) ("The recipient of misrepresentation may avoid a contract by showing that the misrepresentation was material.").

### C. Mr. Begier's Response.

Mr. Begier does not contest the facts concerning the fraud at AIA, and he does not dispute any of the facts concerning the contracts. He simply argues

the record does not demonstrate AIA hindered PW's ability to do a proper audit by presenting the fraudulent management representation letters. Yet, even if I accepted his argument, his brief has not even contested the breach and fraudulent inducement arguments. Consequently, Mr. Begier has failed to raise an issue of material fact that precludes summary judgment.

### III. CONCLUSION

PW has presented undisputed facts that demonstrate AIA's management representation letters were deliberately false and misleading. PW has produced similar proof that the GAAS requirements were a material part of the parties' contracts. PW's defenses are therefore valid, and it is entitled to judgment as a matter of law on the remaining portion of Mr. Begier's contract claim. I will grant summary judgment in favor of PW and against Mr. Begier.

**\*5** An order follows.

### ORDER

AND NOW, this 14th day of September, 1992, it is hereby ordered that:

1. The motion of defendant, Price Waterhouse, for summary judgment on the remainder of trustee's contract claim against Price Waterhouse is granted.

2. On Count I, summary judgment is entered in favor of Price Waterhouse and against Harry P. Begier, Jr., Trustee in Bankruptcy of AIA Industries, Inc., and American International Airways, Inc.

> FN1. There were two engagement letters for the November 30, 1982, audit. The first was dated October 21, 1982, and a modified version was dated November 4, 1982. The engagement letter for the November 30, 1983, audit was dated November 28, 1983.

> FN2. Messrs. Toll and Edmondson signed

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                      Page 5
Not Reported in F.Supp., 1992 WL 236175 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp., 1992 WL 236175)**


     all of the letters. Allan Marmon only
     signed the first letter.
E.D.Pa.,1992.
Begier v. Price Waterhouse
Not Reported in F.Supp., 1992 WL 236175 (E.D.Pa.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**2**



Not Reported in N.E.2d                                                                          Page 1
Not Reported in N.E.2d, 6 Mass.L.Rptr. 367, 1997 WL 42516 (Mass.Super.)
**(Cite as: Not Reported in N.E.2d, 1997 WL 42516)**

**C**
Cambridge Biotech Corp. v. Deliotte & Touche
Mass.Super.,1997.

Superior Court of Massachusetts.
CAMBRIDGE BIOTECH CORP., Plaintiff,
v.
DELIOTTE & TOUCHE, Defendant.
**Civ. A. No. 96-1480-A.**

Jan. 28, 1997.

*MEMORANDUM OF DECISION and ORDER ON
DEFENDANT'S MOTION TO DISMISS COM-
PLAINT*

FREMONTSMITH.
**\*1** This action alleges that plaintiff's own account-
ants, defendant Deliotte & Touche, LLP (Deliotte),
provided deficient audits to the company in 1991
and 1992 which resulted in plaintiff's bankruptcy.
Defendant has moved to dismiss the complaint on
statute of limitations and other grounds. For the
reasons stated below, defendant's motion is *denied.*

BACKGROUND

Plaintiff Cambridge Biotech Corporation contracted
with defendant Deliotte & Touche for independent
auditor services for fiscal years 1991 and 1992. De-
fendant conducted the audits and rendered a
"Report of Independent Accounts" ("Report") for
each year, which plaintiff included in its Form 10-K
and filed with the United States Securities and Ex-
change Commission ("SEC"). The 1991 Report was
dated March 6, 1992 and the 1992 Report was dated
March 19, 1993. Each year plaintiff filed the 10-K
forms, with the Report, with the SEC by March 31
of the same year.

On March 19, 1996, plaintiff filed this complaint
alleging that defendant failed to conduct its audit in
accordance with Generally Accepted Auditing

Standards (GAAS) and Generally Accepted Ac-
counting Principles (GAAP), resulting in revenue
overstatement for 1991 and 1992. Plaintiff's com-
plaint alleges negligence (Count I) and breach of
contract (Count II) for each of the reports. Plaintiff
claims damages due to loss of credibility and repu-
tation, resulting in harm to its business
forced it to file for bankruptcy.

Defendant moves to dismiss the complaint on sev-
eral grounds. First, defendant claims that with re-
spect to the 1992 audit plaintiff's claims are barred
by the applicable three year statute of limitations
under G.L. c. 260 § 4, for actions of tort or contract
for malpractice. Defendant further argues that be-
cause plaintiff's counsel did not apply for nor re-
ceive permission from the Bankruptcy Court to rep-
resent plaintiff in this action pursuant to 11 U.S.C.
§ 327(a), the complaint was a "nullity" even with
respect to the 1992 audit, so that any claims in that
regard are now time barred as well.

Defendant further contends that, even if not time
barred, plaintiff's negligence claim fails to state a
claim and that the contract count also fails to state a
claim and is, in any event, duplicative of plaintiff's
malpractice cause of action, which sounds in tort.
Defendant also argues that plaintiff's participation
in defendant's alleged fraud bars it from pursuing
this action, and, finally, that plaintiff's complaint
should be dismissed because there is a prior
pending claim by the company's stockholders, who
are the "real party in interest," involving the same
facts and issues.[FN1]

> FN1. Plaintiff assigned 90% of any recov-
> ery in this action to a class of its stock-
> holders who are suing defendant in Federal
> District Court in New York.

For the reasons stated below, the motion to dismiss
is denied.

DISCUSSION

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.E.2d                                                                                    Page 2
Not Reported in N.E.2d, 6 Mass.L.Rptr. 367, 1997 WL 42516 (Mass.Super.)
**(Cite as: Not Reported in N.E.2d, 1997 WL 42516)**

When evaluating the sufficiency of a complaint pursuant to Mass.R.Civ.P. 12(b)(6), the court must accept as true the well pleaded factual allegations of the complaint, as well as any inference which can be drawn therefrom in the plaintiff's favor. *Eyal v. Helen Broadcasting Corp.,* 411 Mass. 426, 429 (1991) and cases cited.

I.

*Timeliness of Plaintiff's Action*

1.*Timeliness of Plaintiff's Claims Arising from the 1991 Report*

**\*2** On their face, plaintiff's claims arising from the 1991 Report, filed in March of 1992, appear to be time-barred.[FN2] However, plaintiff argues that the three year statute of limitations for malpractice actions, G.L. c. 260 § 4, was tolled pursuant to the continuous representation doctrine.

> FN2. Plaintiff's claims arising from the 1992 audit are not, on their face, time barred as the 1992 audit Report was filed no later than March 31, 1993, whereas plaintiff's complaint was filed on March 19, 1996.

The continuing representation doctrine arose in the context of medical malpractice and has since been expanded to other professions, including attorneys and, in two jurisdictions, accountants. *Cuccolo v. Lipsky, Goodkin & Co.,* 826 F.Supp. 763, 768 (S.D.N.Y.1993). The essence of the doctrine is that "when the course of treatment which includes the wrongful acts or omissions has run continuously and is related to the same original condition or complaint, the accrual comes only at the end of the treatment ... The continuous treatment we mean, however, is treatment for the same or related illnesses or injuries, continuing after the alleged acts or malpractice, not mere continuity of a general physician-patient relationship." *F.D.I.C. v. Deloitte & Touche,* 834 F.Supp. 1129, 1148-1149

(E.D.Ark.1992) (citing *Borgia v. New York,* 12 N.Y.2d 151 (1962)).

As with medical and legal professionals, "[c]ontinuous representation tolls the statute of limitations until an accountant stops rendering professional services to his or her client on a particular matter ... The mere recurrence of professional services does not constitute continuous representation where the later services performed were not related to the original service." *Cuccolo,* at 768. Allegations of annual audits, without reference to the same or related problems for which "treatment" was sought, will not support application of the continuous representation doctrine: "[if the doctrine applied in such a case,] it almost certainly would apply in every case involving an accountant that had performed audits for a client in consecutive years. That result is unacceptable, nor is it called for by the doctrine described in *Borgia.*" *F.D.I.C.,* at 1149.

The Supreme Judicial Court has expanded the doctrine of continuous representation to the legal malpractice field, *Murphy v. Smith,* 411 Mass. 133, 137 (1991), but it has not yet applied it to accountants.

It is true that applying the doctrine in a case where nothing more than consecutive annual audits were involved would mean that any and all yearly audits would amount to continuous treatment, rendering the three year statute of limitations of Chapter 260, § 4, virtually meaningless whenever a defendant accountant had performed consecutive year audits. As the court in *F.D.I.C.* stated: "[t]he mere possibility of continuous treatment, which can be imagined but which has not been alleged, is not enough...." *Id.,* at 1151.

Here, however, the complaint alleges that Deloitte's audit letter for the 1992 audit stated that

"In our opinion, based on our audits and the report of the other auditors, such consolidated financial statements present fairly, in all material respects, the financial position of Cambridge Biotech Corp.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

and subsidiaries as of December 31, 1991 and 1992, and the results of their operations and their cash flows for each of the three years in the period ended December 31, 1992 in conformity with generally accepted accounting principles."

**\*3** Accordingly, as the 1992 audit letter itself indicated, a related continuous representation since 1991 was involved, there is a disputed issue of material fact for the jury whether continuous representation can be proved in this case. In these circumstances, the Appellate Courts of the Commonwealth should be provided with a full record on which to decide whether the doctrine of continuous representation, if found as a factual matter to exist, should be applied to accountants in Massachusetts. Accordingly, the defendant's motion to dismiss the complaint, insofar as the 1991 audit is concerned, is denied.[FN3]

> FN3. A motion to dismiss pursuant to Mass.R.Civ.P. 12(b)(6) is a appropriate vehicle to raise a statute of limitations defense. *Epstein v. Seigal,* 396 Mass. 278, 279 (1985). And, plaintiff has the burden of proving facts that would take the case outside the impact of the statute of limitations. *Franklin v. Albert,* 381 Mass. 611, 619 (1980). Here, however, it does not appear beyond doubt that the plaintiff can prove no set of facts in support of his [continuous representation argument] to surmount defendant's statute of limitations defense. Cf. *Nader v. Citron,* 372 Mass. 96, 98 (1977).

**2.** *Effect of Debtor's Failure to Seek Bankruptcy Court Approval of Counsel*

Defendant contends that, even with respect to the 1992 audit, the suit was late-filed because it was not authorized by the bankruptcy court when filed in March, 1996.

Pursuant to 11 U.S.C. § 327(a) a bankruptcy court must approve the trustee's employment of professionals to represent or assist in carrying out Chapter

11 duties.[FN4] The trustee's application to the court must set out facts enabling the court to make a conflict of interest or adverse interest determination regarding the professional and the estate.[FN5]

> FN4. Section 327(a) provides, in pertinent part, "the trustee, with the court's approval, may employ ... attorneys ... that do not hold or represent an interest adverse to the estate, and that are disinterested persons, to represent or assist the trustee in carrying out the trustees duties under this title."

> FN5. Bankruptcy Rule 2014 provides, in pertinent part, "[a]n order approving the employment of attorneys ... pursuant to § 327 ... shall be made only on application of the trustee or committee ... The application shall state the specific facts showing the necessity for the employment, the name of the person to be employed, the reasons for the selection, the professional serviced to be rendered, any proposed arrangement for compensation, and, to the best of the applicant's knowledge, all of the person's connections with the debtor, creditors, any other party in interest, their respective attorneys and accountants, the United States trustee, or any person employed in the office of the United States trustee. The application shall be accompanied by a verified statement of the person to be employed setting forth the person's connections [to the same parties listed above]."

The recognized sanction for non-compliance with section 327(a) and Rule 2014, however, is not dismissal, but denial of attorneys' fees. With one exception, all of the cases involving issues of representation without prior bankruptcy court approval have discussed the effect on attorneys' fees rather than any effect on the validity of the complaint. See, e.g., *In Re Atkins,* 69 F.3d 970, 973 (9th Cir.1995) ("[i]n bankruptcy proceedings, professionals who perform services for a debtor in possession cannot recover fees for services rendered to the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.E.2d                                                                          Page 4
Not Reported in N.E.2d, 6 Mass.L.Rptr. 367, 1997 WL 42516 (Mass.Super.)
**(Cite as: Not Reported in N.E.2d, 1997 WL 42516)**

estate unless those services have been previously authorized by a court order," citing section 327(a) and Rule 2014); *In Re Kendavis Industries Int., Inc.,* 91 B.R. 742, 748 (N.D.Tex.1988) ("where an attorney for a debtor is found to be interested, disallowance of attorney fees is appropriate ... [i]f an attorney holds an undisclosed adverse interest, a court is empowered to deny all compensation").

While a bankruptcy, moreover, stays any action against the bankrupt, it does not prohibit a suit by a bankrupt in possession. Thus, in *In Re Interwest Business Equipment, Inc.,* 23 F.3d 311, 318 (10th Cir.1994), the court held that the Bankruptcy Code and Rules may not limit an attorney's choice of whom to work for: "[the code and rules] do not provide authority for the court to prohibit a professional from working for any client it chooses. Thus, there can be no question of the court either permitting or prohibiting unapproved representation. Instead, any professional not obtaining approval is simply considered a volunteer if it seeks payment from the estate." Recently, courts have mitigated even this sanction, allowing retroactive attorneys' fees for unauthorized services which were later authorized. See, e.g., *In Re Atkins,* 69 F.3d, at 973 ("bankruptcy courts in this circuit possess the equitable power to approve retroactively a professional's valuable but unauthorized services").[FN6]

> FN6. See also Stephen R. Grensky, *The Problem Presented By Professionals Who Fail To Obtain Prior Court Approval Of Their Employment Or Nunc Pro Tunc Est Bunc,* 62 Am.Bankr.L.J. 185 (1988), describing the purpose of Section 327(a) and Rule 2014 as overseeing the employment of professionals to prevent "vounteerism," and criticizing courts that award fees to unauthorized professionals on equitable grounds.

**\*4** The court is aware of only one case wherein a motion to dismiss was filed on the ground of unauthorized bankruptcy representation, and that motion was denied. In *In Re Chocklett,* 274 F.Supp. 821,

822 (W.D.Va.1967), the court held that a suit filed by the trustee's attorney was not subject to dismissal merely because the attorney did not comply with the appointment provision,[FN7] the court finding that "the appointment of counsel to represent the estate in the absence of a verified petition should not withdraw counsel's authority to file a valid suit against the petitioner." *Id.,* at 824, citing *Widett v. D'Andria,* 241 F.2d 680 (1st Cir.1957) (where the court had noted that the only cases litigated under Order 44 dealt with attorneys' fees and that none of them addressed "the question of the authority of counsel to act for a trustee, receiver or debtor in possession when not appointed by the court as the Order requires." *Id.,* at 682). The court held that the sanction of denial of attorneys' fees provided for in the Order was "adequate to effectuate its purpose ... We see no point in adding lack of authority to file notice of appeal to the sanction stated in the Order." *Id.,* at 683.[FN8]

> FN7. The attorney in *In Re Chocklett* 274 F.Supp. at 824, was appointed pursuant to General Order in Bankruptcy No. 44, a predecessor to Section 327(a) and Rule 2014, the purpose of which was to "protect the estate by insuring employment of competent counsel who have no adverse interest ..."*Id.*While counsel did seek and obtain the appointment, he did not submit a verified petition, as required by the Order.

> FN8. While General Order 44 explicitly provided that the court may deny attorneys' fees where appropriate, and Section 327(a) does not, 11 U.S.C. § 328(a) provides that the court may modify the terms and conditions of employment, including fees, at the conclusion of employment if "such terms and conditions prove to have been improvident in light of developments not capable of being anticipated at the time of the fixing of such terms and conditions." Therefore, Section 327(a) and Rule 2014, viewed in the context of the overall stat-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.E.2d                                                                    Page 5
Not Reported in N.E.2d, 6 Mass.L.Rptr. 367, 1997 WL 42516 (Mass.Super.)
**(Cite as: Not Reported in N.E.2d, 1997 WL 42516)**

utory scheme and purpose, as well as rel-
evant case law, serve the same purpose as
General Order 44, i.e., to control the debt-
or's employment and compensation of pro-
fessionals in the interest of the estate.
There is nothing to suggest that any broad-
er sanctions are authorized. *See also*
Grensky, *supra,* n. 4, at 193 ("section
327(a) and B.R.2014(a) are not signific-
antly different than General Order 44
which they replaced ...").

Accordingly, defendant's argument that this Court
should dismiss plaintiff's complaint, even as it
relates to the 1992 audit, as a "nullity," because
plaintiff's counsel allegedly did not receive timely
court permission, is unavailing.

II. *The Negligence Count*

Defendant claims that plaintiff fails to state a claim
for negligence in that plaintiff fails to specify facts
to support the duty, breach, and causation elements
of negligence. Defendant also asserts that plaintiff's
failure to specify which specific Generally Accep-
ted Auditing Standards ("GAAS") defendant al-
legedly violated is grounds for dismissal of
plaintiff's complaint. Plaintiff argues that such spe-
cificity of pleading is unnecessary, but offers to
amend its complaint pursuant to Mass.R.Civ.P.
15(a) if the court finds plaintiff must plead detailed
GAAS violations.

In Massachusetts it has been held that a complaint
for accountant malpractice must allege "with clarity
and certainty specific facts concerning (1) the neg-
ligent acts or omissions of the defendants; (2) the
content of the auditors' reports and certificates; (3)
the work which the defendants had agreed to do,
had stated that they had done or omitted, and had
actually done; (4) the extent to which the defend-
ants' representations were qualified, contained dis-
claimers, or were expressed as opinions; (5) the
generally accepted principles of accounting which
the defendants were alleged to have violated; and

(6) the facts misrepresented and what the plaintiffs
allege the defendants knew, or (after reasonable in-
vestigation) should have known, concerning them."
*Blank v. Katz,* 350 Mass. 779 (1966). *See also* 3
Mass.Jur. § 30.117, at 101 (1992).

Under this standard, plaintiff's complaint is defi-
cient. Plaintiff's conclusory allegations notwith-
standing, plaintiff fails to specify facts concerning
defendant's alleged negligent acts or omissions,
specific GAAS violations, and what facts defendant
knew or should have known concerning plaintiff.

*5 Although Rule 8(a)'s notice pleading require-
ments, effective in 1974, after the *Blank* case, may
be argued to have required less in the way of
"specific facts" in the complaint than did *Blank,*
that case is still good law and is generally cited as
the standard. *See,* e.g., *Massachusetts Jurispru-
dence* and *Mottla's Proof of Cases.* Accordingly,
defendant's motion to dismiss the complaint for
lack of specificity is allowed, but with leave to
amend within thirty days.

III. *The Contract Count*

Defendant claims that plaintiff fails to state a claim
for breach of contract because the complaint does
not allege that plaintiff performed its duties under
the contract. However, plaintiff's complaint, though
not detailed, satisfies the pleading requirements for
a breach of contract action. *U.S. Funding, Inc. v.
Bank of Boston,* 28 Mass.App.Ct. 404, 406 (1990)
(complaint "does not show beyond doubt that the
plaintiff can prove no set of facts in support of his
claim which would entitle him to relief," citing
*Nader v. Citron,* 372 Mass. 96, 98 104-105 (1977)).

Defendant also argues that the court should dismiss
the contract count because it is duplicative of the
tort count, citing cases from other states holding
that accountant malpractice actions have their "true
basis" in negligence, not contract. For example, in
*F.D.I.C. v. Clark,* 978 F.2d 1541, 1551-1552 (10th.
Cir.1992), the court held that the trial court prop-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.E.2d                                                                                          Page 6
Not Reported in N.E.2d, 6 Mass.L.Rptr. 367, 1997 WL 42516 (Mass.Super.)
**(Cite as: Not Reported in N.E.2d, 1997 WL 42516)**

erly treated attorney malpractice claims as "one hybrid tort claim for malpractice [sounding in negligence]" for purposes of Colorado's proportional liability statute. Similarly, in *F.D.I.C. v. Regier Carr & Monroe,* 996 F.2d 222, 224 (10 Cir.1993) the court held that, for statute of limitations purposes, an accountant malpractice action sounded in tort, not contract, where the contract contained nothing beyond the ordinary standard of care applicable to accountants, i.e., GAAP.[FN9]

> FN9. Defendant also points out that the Massachusetts General Court has seen fit to give a contract action for accountant malpractice a three year statute of limitations, G.L. c. 260, § 4, the same as for tort actions, G.L. c. 260, § 2A.

The SJC, however, has held that, in the analogous context of legal malpractice, "the plaintiff's complaint need not ... label the action as an action of contract or as an action of tort ... Under our traditional practice, a plaintiff may elect to bring either an action of contract or an action of tort in such a case, but he need not choose between the two labels." *Hendrickson v. Sears* 365 Mass. 83, 86 (1974). The Court also noted that the traditional view of legal malpractice is that "the gist of the action, regardless of its form, is the attorney's breach of contract." *Id.,* at 86. See also *Brown v. Gerstein,* 17 Mass.App.Ct. 558, 572 (1984) (the attorney client relationship is essentially contractual in nature).

Accordingly, defendant's motion to dismiss the contract count is denied.

**IV.** *Plaintiff's Participation in Alleged GAAP violations*

Defendant further contends, that in view of plaintiff's counsel's own admission that plaintiff provided defendant with false financial statements (made in his capacity as counsel for the stockholder class in its suit against plaintiff), plaintiff's own wrongdoing is a bar to the suit, citing *Cenco, Inc. v.*

*Seidman & Seidman,* 686 F.2d 449, 454-456 (7th Cir.1982) (a "wrongdoing corporation may not sue its independent auditor in negligence or contract for failing to discover and expose the very fraud the corporation itself perpetrated through its preparation of false financial statements.").

**\*6** However, *Cenco* did not involve a motion to dismiss, but involved jury instructions advising that "a participant in a fraud cannot also be a victim entitled to recover damages" (holding that such an instruction was "proper in the circumstances.") *Id.* Similarly here, such facts, if undisputed, or if proven at trial, may constitute a bar for purposes of summary judgment, directed verdict, or jury instructions and a special jury question, but are not germane to a motion to dismiss.

**V.** *Prior Pending New York Class Action*

Finally, defendant argues that plaintiff's complaint should be dismissed because there is a pending class action in Federal District Court against defendant concerning the same events alleging violations of federal securities laws. Defendant claims that the stockholder class in that action is the real party in interest here because plaintiff in this action assigned 90% of any recovery in this action to the class. Therefore, claims defendant, since all of the claims asserted in this action could have been filed in district court in New York, this action should be dismissed as a matter of issue preclusion, citing *Caspian Investments, Ltd. v. Vicom Holdings, Ltd.,* 770 F.Supp 880, 884 (S.D.N.Y.1991).

Here, however, the parties are not the same in the two actions. As stated in *Caspian Investments,* "comity requires that the parties and issues in both cases must be sufficiently similar that doctrine of res judicata would apply." *Id.,* at 884, citing *Herbstein v. Bruetman,* 743 F.Supp. 184, 188 (S.D.N.Y.1990). Nor can there be any *res judicata,* in any event, until one or another of the actions is litigated to final judgment.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.E.2d                                                    Page 7
Not Reported in N.E.2d, 6 Mass.L.Rptr. 367, 1997 WL 42516 (Mass.Super.)
**(Cite as: Not Reported in N.E.2d, 1997 WL 42516)**

ORDER

For the reasons stated above, defendant's motion to dismiss is *denied,* except that plaintiff is ordered to file an amended complaint within thirty days after receipt of this order setting forth with specificity the matters specified in *Blank v. Katz,* 12, *supra.*

Mass.Super.,1997.
Cambridge Biotech Corp. v. Deliotte & Touche
Not Reported in N.E.2d, 6 Mass.L.Rptr. 367, 1997 WL 42516 (Mass.Super.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**3**



Not Reported in N.W.2d                                                                                           Page 1
Not Reported in N.W.2d, 2003 WL 21350362 (Mich.App.)
**(Cite as: Not Reported in N.W.2d, 2003 WL 21350362)**

Chase Bank of Texas, N.A. v. Grant Thornton LLP
Mich.App.,2003.
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.

Court of Appeals of Michigan.
CHASE BANK OF TEXAS, N.A., Residential
Funding Corporation, Bank One Texas, N.A., The
Bank of New York, and Lasalle Bank, N.A.,
Plaintiffs-Appellants,
v.
GRANT THORNTON LLP and Doeren Mayhew &
Company, P.C., Defendants-Appellees.
**No. 236237.**

June 10, 2003.

Before: CAVANAGH, P.J., and GAGE and
ZAHRA, JJ.

[UNPUBLISHED]

PER CURIAM.
**\*1** Plaintiffs State Bank of Texas, N.A. (also re-
ferred to as Chase Bank), Residential Funding Cor-
poration, Bank One Texas, N.A., The Bank of New
York, and LaSalle Bank, N.A., appeal by right from
an order granting summary disposition to defend-
ants Grant Thornton, LLP, and Doeren Mayhew &
Co., PC, pursuant to MCR 2.116(C)(8). We affirm.

I. Facts and Procedure

Plaintiffs bring this action for fraud and aiding and
abetting fraud against the accountants for plaintiffs'
borrower, Mortgage Company of America (MCA),
to recover money that was lost by plaintiffs when
MCA became bankrupt. MCA was in the business
of originating, selling and servicing mortgages.
Plaintiffs entered into an ongoing business relation-
ship with MCA commencing in October 1997,
when plaintiffs loaned funds to MCA and various
MCA-related entities pursuant to "warehouse" loan
funding agreements. The loans were pledged with
the intent that the loan proceeds would finance
MCA's mortgage banking operations. Defendants,
two accounting firms, jointly conducted annual
audits of MCA and five of MCA's related entities,
for the fiscal years between 1993 and 1998. De-
fendants' final audit of MCA's related entities was
on January 31, 1998, and no audit reports or opin-
ions were issued regarding MCA after January
1998. In early 1999, MCA and its related entities
collapsed, became bankrupt, and defaulted on out-
standing obligations to plaintiffs and other credit-
ors. Plaintiffs suffered substantial financial loss
upon MCA's collapse.

Plaintiffs' amended complaint alleges that plaintiffs'
loss was caused by defendants' willful or reckless
misrepresentation of the actual financial condition
of MCA in their audit reports between 1993 and
1998, thereby fraudulently inducing plaintiffs to
loan millions of dollars to MCA. Defendants filed a
motion for summary disposition of plaintiffs'
amended complaint, claiming that plaintiffs failed
to state a cause of action pursuant to MCR
2.116(C)(8) and MCR 2.112(B)(1). The trial court
granted summary disposition in favor of defend- ants.

II. Analysis

On appeal, plaintiffs argue they properly pleaded
their claim for fraud with sufficient specificity. We
disagree.

This Court reviews de novo the trial court's ruling
on a motion for summary disposition pursuant to
MCR 2.116(C)(8).*Beaudrie v. Henderson,* 465
Mich. 124, 129;631 NW2d 308 (2001). Motions
brought under MCR 2.116(C)(8) test the legal suffi-
ciency of the claim with regard to the pleadings

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.W.2d                                                          Page 2
Not Reported in N.W.2d, 2003 WL 21350362 (Mich.App.)
(Cite as: Not Reported in N.W.2d, 2003 WL 21350362)

alone. *Id.* All well-pleaded facts are accepted as true and are construed in a light most favorable to the nonmoving party. *Butler v. Ramco-Gershenson, Inc,* 214 Mich.App 521, 534;542 NW2d 912 (1995)."Summary disposition under MCR 2.116(C)(8) is proper when the claim is so clearly unenforceable as a matter of law that no factual development could establish the claim and justify recovery."*Corley v. Detroit Bd of Ed,* 246 Mich.App 15, 18;632 NW2d 147 (2001), lv held in abeyance 654 NW2d 329 (2002), quoting *Smith v. Stolberg,* 231 Mich.App 256, 258;586 NW2d 103 (1998). Mere conclusions unsupported by allegations of fact will not suffice to state a cause of action under MCR 2.116(C)(8).*Butler, supra* at 534.Under MCR 2.112(B)(1), "[i]n allegations of fraud or mistake, the circumstances constituting fraud ... must be stated with particularity."

**\*2** The elements of a fraud claim are well settled:

(1) That defendant made a material representation; (2) that it was false; (3) that when he made it he knew that it was false, or made it recklessly, without any knowledge of its truth and as a positive assertion; (4) that he made it with the intention that it should be acted upon by plaintiff; (5) that plaintiff acted in reliance upon it; and (6) that he thereby suffered injury. [*Kassab v Michigan Basic Prop Ins Ass'n,* 441 Mich. 433, 442;491 NW2d 545 (1992), citing *Hi-Way Motor Co v. Int'l Harvester Co,* 398 Mich. 330, 336;247 NW2d 813 (1976), quoting *Candler v. Heigho,* 208 Mich. 115, 121;175 NW 141 (1919).]

In *DiLeo v. Ernst & Young,* 901 F.2d 624, 627 (CA 7, 1990), the Seventh Circuit Court of Appeals stated the following regarding a claim of fraud under FRCP 9(b), the federal counterpart to MCR 2.112(B)(1):

[FRCP] 9(b) requires the plaintiff to state 'with particularity' any 'circumstances constituting fraud.' Although states of mind may be pleaded generally, the 'circumstances' must be pleaded in detail. This means the who, what when, where,

and how: the first paragraph of any newspaper story.

These same pleading requirements exist under MCR 2.112(B)(1).

The amended complaint in the present case does not plead fraud with the requisite specificity, and instead pleads general conclusory statements alleging that defendants misrepresented MCA's financial condition. For example, the amended complaint fails to sufficiently set forth specific facts showing that defendants knew the financial representations were false or that they intended to make plaintiff rely on the representations. As noted in *DiLeo, supra* at 629:

The complaint does not allege that [the accountants] had anything to gain from any fraud by Continental Bank.... [The accountants'] partners shared none of the gain from any fraud and were exposed to a large fraction of the loss. It would have been irrational for any of them to have joined cause with Continental.... The complaint does not come close. It does not identify any of [the accountants'] auditors or explain what that person might have to gain from covering up Continental's wrongs.... What the [plaintiffs] needed to show, if not that [the accountants] had something to gain from deceit, was at least that [the accountants] knew that particular loans had gone bad and could not be collected.

Similarly, in the present case, plaintiffs offered merely the "conclusory" statements that defendants fraudulently misrepresented the financial position of MCA with the intent that plaintiffs would rely on the misrepresentations.

Moreover, the substance of plaintiffs' allegations is negligence rather than fraud. "If a [litigant] attempts to characterize a malpractice claim as a fraud or other type of claim, a court will look through the labels placed on the claim and will make its determination on the basis of the substance and not the form."*Brownell v. Garber,* 199

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Mich.App 519, 532-533;503 NW2d 81 (1993). It is the substance of the claim, which must be scrutinized. *US Fidelity & Guar Co v. Citizens Ins Co of America,* 201 Mich.App 491, 494;506 NW2d 527 (1993). The amended complaint in the present case refers to defendants' "unqualified opinions" regarding MCA's audited financial statements, and it states that if defendants had properly followed GAAS and GAAP, the audited financial statements would have revealed MCA's fraudulent conduct. The amended complaint actually specifies the accounting standards that defendants allegedly failed to meet under GAAP and GAAS. Thus, the substance of the claim in the present case is negligence, not fraud. We view plaintiffs' focus on defendants' representations regarding the quality and standard of their work as an attempt to depict a negligence claim as a fraud claim.

**\*3** As a claim for professional negligence, the Michigan Accountant Liability Act, M.C.L. § 600.2962, which limits defendants' liability to three possible situations, specifically barred plaintiffs' suit. Under subsection (a) of the act, liability may be imposed if the claimant is the accountant's client; under (b), liability may be imposed if the action is grounded upon "fraud or an intentional misrepresentation"; and under (c), liability may be imposed where the accountant was "informed in writing by the client at the time of the engagement that a primary intent of the client was for the professional public accounting services to benefit or influence the person bringing the action for damages."In the present case, plaintiffs were never defendants' clients, and plaintiffs did not allege the existence of a writing sufficient to meet the requirements of the act, thus liability cannot be imposed on defendants under subsections (a) and (c). Because this is an action for professional negligence, and not fraud, liability also cannot be imposed on defendants in the present case under subsection (b) of the act.

This case is analogous to *Yadlosky v. Grant Thornton,* 120 F Supp 2d 622 (ED Mich, 2000),

where the court dismissed a negligent misrepresentation claim brought by a non-client against defendants arising out of the same group of audits involved in the present case. The federal district court found that there was no basis for liability under Michigan's Accountant Liability Act. In *Yadlosky,* the plaintiff, an investor who purchased securities from MCA, alleged that he was deceived into the purchases by "false and misleading" financial statements prepared by the defendant accounting firms; that if the accountants had performed their duties in accordance with GAAS, MCA's financial problems would have been disclosed to the investors; and the plaintiff, having relied upon these statements in making his investment decision, would not have lost his investment. Under a FRCP 12(b)(6) motion for failure to state a claim upon which relief can be granted, the court rejected the plaintiffs' arguments and found that they were barred by the act. *Yadloski, supra* at 634-635.

Likewise, in the present case, plaintiffs made similar allegations in the amended complaint, and claimed that a proper audit by defendants, following the standards set forth under GAAS and GAAP, would have revealed MCA's fraudulent activities to plaintiffs, and thus, plaintiffs would not have decided to loan funds to MCA, and would not have suffered any damages. Just as in *Yadlosky,* in the present case, plaintiffs' claim is barred by the act. In short, plaintiffs have not alleged fraud with the requisite particularity, and their claim appears to be a claim for professional negligence, and not fraud. Thus, defendants are protected under the Michigan Accountant Liability Act, M.C.L. § 600.2962. Accordingly, the trial court did not err in dismissing plaintiffs' claim under MCR 2.116(C)(8).[FN1]

> FN1. Although the trial court did not address the possibility that the fraud claim was actually a claim for negligence, it properly dismissed plaintiffs' claim. Where the right result is reached for the wrong reason, reversal is improper. *Hilgendorf v St John Hosp & Medical Ctr Corp,* 245

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.W.2d                                                                    Page 4
Not Reported in N.W.2d, 2003 WL 21350362 (Mich.App.)
**(Cite as: Not Reported in N.W.2d, 2003 WL 21350362)**

Mich.App 670, 685 n 8;630 NW2d 356 (2001); *Detroit v. Presti,* 240 Mich.App 208, 214;610 NW2d 261 (2000).

**\*4** Next, plaintiffs argue that defendants have "substantially assisted" MCA in its perpetration of fraud, and have therefore aided and abetted MCA's fraudulent conduct. We disagree. An essential element of a claim for aiding and abetting fraud is that the defendant provides "substantial assistance" to the fraudulent scheme. Restatement Torts, 2d, § 876(b). Under *Dileo, supra* at 628, the alleged abettor is required to have the same degree of scienter as the person committing the actual fraud. As previously discussed, plaintiffs have failed to demonstrate that defendants had or should have had any knowledge that MCA was engaged in fraudulent activity. We note that our analysis with regard to the "fraud" claim applies equally to the "aiding and abetting fraud" claim.

Plaintiffs also argue that the trial court erred in granting summary disposition pursuant to MCR 2.116(C)(8) on the grounds that "[p]laintiffs have presented no evidence that [d]efendants made any material representations that resulted in a loss to [p]laintiffs."Plaintiffs assert that evidence does not need to be presented in response to a motion under MCR 2.116(C)(8), because as stated in*Singerman v. Muni Serv Bureau, Inc,* 455 Mich. 135, 139;565 NW2d 383 (1997), "[a] motion for summary disposition brought under MCR 2 .116(C)(8) tests the legal sufficiency of a claim and is tested on the pleadings alone. All factual allegations must be taken as pleaded, as well as any reasonable inferences that may be drawn therefrom."However, plaintiffs rely only on the trial court's use of the word "evidence" in its oral ruling. Although the trial court used the word "evidence," a review of the record reveals that the trial court did in fact apply the correct standard for deciding a motion for summary disposition, and on the correct elements required for stating a claim of fraud. The use of the word "evidence" by the trial court was actually in reference to the lack of factual allegations to sup-

port the fraud claim in the amended complaint.

Finally, plaintiffs add that the trial court erred in ruling that plaintiffs were required to allege a contractual relationship in the amended complaint, because a fraud claim does not require privity of contract. However, examination of the record reveals the learned trial judge was not referring to plaintiffs' complaint. The trial court was also ruling on a second motion to dismiss brought in a related case that arose out of the same audits that were performed by the same defendants in the present case. Both cases were dismissed on the same day as a result of a single ruling from the trial court. The second matter included a claim for negligent misrepresentation, which does require privity of contract. Therefore, the trial court's mention of the absence of a contractual relationship between the parties was not directed at plaintiffs in the present case.[FN2]

> FN2. This Court recently affirmed the trial court's dismissal of the claims asserted against defendants in this related case. See *Bd of Trustees et al v Grant Thornton, LLP and Doeren Mayhew, PC,* unpublished opinion per curiam of the Court of Appeals, issued March 11, 2003 (Docket No. 236415).

Affirmed.

Mich.App.,2003.
Chase Bank of Texas, N.A. v. Grant Thornton LLP
Not Reported in N.W.2d, 2003 WL 21350362 (Mich.App.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**4**



Not Reported in N.W.2d                                                                           Page 1
Not Reported in N.W.2d, 2008 WL 375992 (Mich.App.)
**(Cite as: Not Reported in N.W.2d, 2008 WL 375992)**

City of Pontiac v. Pricewaterhouse Coopers, L.L.P.
Mich.App.,2008.
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.
UNPUBLISHED
Court of Appeals of Michigan.
CITY OF PONTIAC, Plaintiff-Appellant,
v.
PRICEWATERHOUSE COOPERS, L.L.P., De-
fendant-Appellee.
**Docket No. 275416.**

Feb. 12, 2008.

Oakland Circuit Court; LC No. 06-076389-NM.

Before: FITZGERALD, P.J., and MURPHY and
BORRELLO, JJ.

PER CURIAM.
**\*1** Plaintiff appeals by leave granted from the trial
court's order granting partial summary disposition
in favor of defendant. We affirm.

I. Background

Plaintiff's August 2, 2006, complaint alleges that
defendant contractually agreed to provide
"accounting and auditing services," including
audits of its financial statements beginning in 1993.
Defendant also allegedly agreed to provide addi-
tional professional services and training to
plaintiff's employees to make them proficient in im-
plementing Governmental Accounting Standards
Board No. 34 (GASB 34), entitled "Basic Financial
Statement and Management's Discussion and Ana-
lysis for State and Local Governments ."In count I,
plaintiff sought damages for breach of the profes-
sional standard of care applicable to audits for the
years 2000 through 2003. In count II, plaintiff
sought damages for defendant's alleged breach with

respect to GASB 34 services. In count III, plaintiff
sought the same damages as counts I and II for a
claim labeled "breach of contract." In count IV,
plaintiff sought damages for "quantum merit."

In lieu of filing an answer, defendant moved for
summary disposition of each count. The trial court
dismissed count I pursuant to MCR 2.116(C)(7) and
(8), finding that plaintiff's claims involving audit
services for the fiscal years ending in 2002 and be-
fore were barred by the applicable statute of limita-
tions, and that certain alleged breaches of duty for
each audit year failed to state a claim. The trial
court also dismissed counts III and IV pursuant to
MCR 2.116(C)(8), for failure to state a claim. On
appeal, plaintiff challenges the trial court's dis-
missal of counts I and III.

II. Standard of Review

We review de novo a trial court's grant of summary
disposition to determine whether the moving party
was entitled to judgment as a matter of law. *Maiden
v. Rozwood,* 461 Mich. 109, 118;597 NW2d 817
(1999). Issues of statutory construction are also re-
viewed de novo. *Trentadue v. Buckler Automatic
Lawn Sprinkler Co.,* 479 Mich. 378, 386;738 NW2d
664 (2007).

Summary disposition is appropriate under MCR
2.116(C)(7) if a claim is barred by the statute of
limitations. A party may support a motion under
this subrule by affidavits, depositions, admissions,
or other documentary evidence, but the substance
or content of the evidence must be admissible.
*Maiden, supra* at 119;MCR 2.116(G)(6). All well-
pleaded allegations in the complaint are accepted as
true and construed most favorably to the plaintiff,
unless contradicted by the documentary evidence.
*Xu v. Gay,* 257 Mich.App 263, 266;668 NW2d 166
(2003)."If the pleadings or other documentary evid-
ence reveal no genuine issues of material fact, the
court must decide as a matter of law whether the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.W.2d                                                                    Page 2
Not Reported in N.W.2d, 2008 WL 375992 (Mich.App.)
**(Cite as: Not Reported in N.W.2d, 2008 WL 375992)**

claim is statutorily barred."*Holmes v. Michigan Capital Medical Ctr.,* 242 Mich.App 703, 706;620 NW2d 319 (2000). A trial court may hold a trial to determine disputed issues of fact. MCR 2.116(I)(3); *Al-Shimmari v. Detroit Medical Ctr.,* 477 Mich. 280, 288;731 NW2d 29 (2007).

**\*2** A motion under MCR 2.116(C)(8) tests the legal sufficiency of the complaint on the pleadings alone. MCR 2.116(G)(5); *Maiden, supra* at 119-120."All well-pleaded factual allegations are accepted as true and construed in a light most favorable to the non-movant. *Id.* at 119.Summary disposition is proper only where the plaintiff's claims are so clearly un-enforceable as a matter of law that no factual development could possibly justify recovery.*Id.* at 119.

### III. Statute Of Limitations For Audit Services

Plaintiff first challenges the trial court's application of the two-year statute of limitations for malpractice actions, MCL 600.5805(6), to count I of the complaint. Plaintiff argues that the "last treatment" rule in MCL 600.5838 should have been applied to determine the accrual date of its claim because it had an ongoing professional relationship with defendant.

MCL 600.5805(6) provides that "[e]xcept as provided in this chapter, the period of limitations is 2 years for an action charging malpractice."MCL 600.5838(1) provides:

> Except as otherwise provided in section 5838a, a claim based on the malpractice of a person who is, or holds himself or herself out to be, a member of a state licensed profession accrues at the time that person discontinues serving the plaintiff in a professional ... capacity as to the matters out of which the claim for malpractice arose, regardless of the time the plaintiff discovers or otherwise has knowledge of the claim.

The parties dispute when defendant discontinued serving plaintiff "as to the matters out of which the claim for malpractice arose."

In *Morgan v. Taylor,* 434 Mich. 180, 186-187;451 NW2d 852 (1990), our Supreme Court explained that MCL 600.5838(1) represents a codification of the judicially created "last treatment rule" that was applied to medical malpractice claims. The Court commented on the rationale for the rule in the context of a medical malpractice claim involving treatment for a particular injury or illness, explaining that the physician-patient relationship, and its accompanying air of trustworthiness, would induce the patient to take no action against the doctor while the treatment continued. *Id.* at 188.In such cases, the limitation period did not begin to run until there was an "occurrence" indicating that the original physician-patient relationship, and its accompanying air of trustworthiness, was terminated. *Id.* at 189.

The "last treatment rule," as codified in MCL 600.5838(1), was construed in *Morgan, supra* at 191-194, to also apply to routine, periodic services for preventative care provided during an ongoing physician-patient relationship. The Court determined that the air of trustworthiness that formed the rationale for the rule still existed because the "doctor's assurance upon completion of the periodic examination that the patient is in good health ... induces the patient to take no further action other than scheduling the next periodic examination."*Id.* at 194.As applied in *Morgan,* the Court determined that the plaintiff's medical malpractice claim predicated on the defendant's failure to refer the plaintiff to a specialist for a problem detected in a 1981 eye examination did not accrue at the time of that examination, but rather at the time of the next eye examination in 1983, when the plaintiff was referred to the specialist. In holding that it could not be said that the relationship between the plaintiff and the defendant terminated after each examination, our Supreme Court took particular note of the fact that the plaintiff was entitled to periodic eye examinations from the defendant under a contract executed by his employer and union with the defendant. *Id.* at 182, 194.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.W.2d                                                              Page 3
Not Reported in N.W.2d, 2008 WL 375992 (Mich.App.)
**(Cite as: Not Reported in N.W.2d, 2008 WL 375992)**

**\*3** As amended by 1986 PA 178, the "last treatment rule" in MCL 600.5838(1) no longer applies to medical malpractice actions arising after October 1, 1986, *Morgan, supra*, at 189 n 14, but continues to apply to other malpractice claims, including accountant malpractice claims. See generally *Local 164, RWDSU AFL-CIO v. Ernst & Young,* 449 Mich. 322;535 NW2d 187 (1995).

In *American Industries Int'l Corp. v. Arthur Andersen & Co.,* 961 F Supp 1078, 1091 (WD Mich, 1997), the court applied MCL 500.5838(1) in deciding a motion to dismiss an accounting malpractice claim arising out of the defendant's preparation for audits for the years 1986 through 1988. The defendant had also performed an audit for 1989. Its last date of service was October 3, 1990. Despite evidence that the defendant separately agreed to each audit in independent engagement letters, the plaintiff argued that a question of fact existed regarding whether October 3, 1990, should be used as the accrual date for each audit. *Id.* at 1091.In support of this argument, the plaintiff argued that each financial statement depended on earlier statements and was presented in connection with at least two years' prior statements, and that each year's audit was planned on the basis of work and information from prior statements. *Id.* at 1091.The plaintiff also argued that the defendant continued to be listed as the plaintiff's auditor with the Security Exchange Commission until its discharge on October 3, 1990, and that the defendant provided a broad range of services throughout each year. *Id.* at 1091.In denying the motion to dismiss, the federal court observed that some evidence suggested that the defendant provided ongoing continuous and interrelated services and concluded that "whether the parties are engaged in a continuous relationship or in a series of discrete agreements to perform particular services is a question of fact for the jury."*Id.* at 1094.

In *Levy v. Martin,* 463 Mich. 478;620 NW2d 292 (2001), our Supreme Court applied MCL 600.5838(1) in reversing a trial court's grant of summary disposition under MCR 2.116(C)(7). The defendants in *Levy* were accountants who prepared annual tax returns from 1974 until 1996. The plaintiffs sought damages allegedly caused by the defendants' malpractice in preparing the 1991 and 1992 returns, but did not file their complaint until 1997. *Id.* at 480-481.Unlike *American Industries Int'l Corp., supra,* the defendants' motion for summary disposition was based solely on the allegations in the plaintiffs' complaint. Applying the "last treatment rule" as construed in *Morgan, supra,* to the allegations in the plaintiffs' complaint, the Court determined that the accrual date for the limitations period did not begin until 1996, when the professional relationship ended. *Id.* at 485-487.

The Court explained that the statute of limitations for a nonmedical malpractice claim does not begin to run when professional services cease for a single matter, but "only when the professional has ceased providing services as to the broad 'matters' out of which the claim arises" and that the statutory requirement of "discontinuing services" should not be overlooked. *Id.* at 489 n 18.The Court cautioned, however, that the result might have been different if there was evidence that the preparation of each tax return involved a discrete transaction:

> **\*4** Plaintiffs alleged that defendants prepared their income tax returns from 1974 to 1996. Defendants have failed to present any evidence that this is untrue-or that each income tax preparation was a discrete transaction that should be considered to separately constitute "the matters out of which the claim for malpractice arose,"MCL 600.5838(1); MSA 27A.5838(1), for purposes of the last treatment rule. Accordingly, we conclude that defendants have not established that plaintiffs' claims are barred by the statute of limitations. We note that the result may have been different if defendants had come forward with documentary evidence that each annual income tax preparation was a discrete transaction that was in no way interrelated with other transactions. Accordingly, this opinion does not mean,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.W.2d                                                                            Page 4
Not Reported in N.W.2d, 2008 WL 375992 (Mich.App.)
**(Cite as: Not Reported in N.W.2d, 2008 WL 375992)**

for example, that if an accountant prepared income tax returns for a party annually over a period of decades, the statute of limitations for alleged negligence in preparing the first of these tax returns would not run until the overall professional relationship ended. [*Id.* at 490 n 19.]

Here, plaintiff's complaint alleges a continuing relationship. In particular, plaintiff alleges that "during the period of approximately 1993 and continuing to the present, the City of Pontiac, in return for valuable consideration, engaged PWC and/or its predecessor, Coopers & Lybrand, for certain accounting services for the fiscal years June 30, 1993, through the present."

We note, however, that despite alleging the existence of a contractual relationship for accounting and auditing services, as well as training and other services related to GASB 34, plaintiff did not attach a copy of any written contract or refer to any written contract in its complaint. Indeed, it cannot be determined from the allegations in the complaint whether plaintiff was claiming the existence of an oral or written contract for services. To the extent that plaintiff's claim is based on a written instrument, plaintiff should have attached the instrument to the complaint or explained its failure to do so, as provided in MCR 2.113(F).[FN1] See also *Laurel Woods Apartments v. Roumayah,* 274 Mich.App 631, 635;734 NW2d 217 (2007) (written contract attached to complaint becomes part of pleadings); *Belobradich v. Sarnsethsiri,* 131 Mich.App 241, 247;346 NW2d 83 (1983) (purpose of any specificity requirement for pleadings is to provide a defendant with sufficient notice to provide a defense).

FN1.MCR 2.113(F)(1) provides:

If a claim or defense is based on a written instrument, a copy of the instrument or its pertinent parts must be attached to the pleading as an exhibit unless the instrument is

(a) a matter of public record in the county in which the action is commenced and its location in the record is stated in the pleading;

(b) in the possession of the adverse party and the pleading so states;

(c) inaccessible to the pleader and the pleading so states, giving the reason; or

(d) of a nature that attaching the instrument would be unnecessary or impractical and the pleading so states, giving the reason."

Nonetheless, we are not limited to the allegations in the complaint in reviewing defendant's motion under MCR 2.116(C)(7) because defendant submitted evidence in support of its motion. Defendant filed copies of specific engagement letters for the audits for the fiscal years ending on June 30 of 2001, 2002, and 2003, respectively, and provided plaintiff with reports regarding the audits. Each letter specified the estimated fee for the audit engagement and indicated that it reflected the parties' entire agreement relating to the services covered by the letter. The letter for the fiscal year ending June 30, 2003, contained an estimated fee for additional work required to implement GASB 34, and specified that any additional services that may be requested would be the subject of separate written agreements. Plaintiff's finance director signed it on December 15, 2003, approximately eight months after the April 4, 2003, date on defendant's audit report for the fiscal year ending June 30, 2002.

**\*5** Defendant also submitted the affidavit of one of its senior managers to support its position that it considered, but never entered into, an agreement to assist plaintiff in updating its accounting procedures for GASB 34, so that it could maintain its independence when auditing plaintiff's financial statements. In response to defendant's motion, plaintiff provided documentary evidence of a written contract that indicates that it was signed by rep-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.W.2d                                                                          Page 5
Not Reported in N.W.2d, 2008 WL 375992 (Mich.App.)
**(Cite as: Not Reported in N.W.2d, 2008 WL 375992)**

resentatives of both parties between February 17 and April 10, 2003, for the purpose of refuting defendant's claim that there was no agreement for GASB 34 services. Plaintiff argued that the contract constituted a special agreement between the parties, independent of the audit services for 2003.

Plaintiff did not refute defendant's evidence that the engagement letters formed the basis of their relationship for audit services, but rather submitted the affidavit of its finance director, which confirmed that defendant's last audit was for the fiscal year ending June 30, 2003. Although plaintiff argues on appeal that multi-year contracts existed for audit services in addition to the engagement letters, and seeks an opportunity to expand the record on appeal if the contracts would be helpful to this Court, this evidence should have been presented in the trial court with plaintiff's complaint, as provided in MCR 2.113(F), or when opposing defendant's motion for summary disposition, as permitted under MCR 2.116(G)(5). A trial court considers all of the submitted evidence to the extent that the content or substance is admissible when deciding a motion under MCR 2.116(C)(7). *Maiden, supra* at 119; *Patterson v. Kleiman,* 447 Mich. 429, 434; 526 NW2d 879 (1994). We find no basis here for overlooking the general rule that our review is limited to the record presented to the trial court. *Amorello v. Monsanto Corp.,* 186 Mich.App 324, 330; 463 NW2d 487 (1990).

We further note that while plaintiff referred in its response to defendant's motion for summary disposition to the comprehensive annual financial report for the fiscal year ending June 30, 2003, only defendant's independent auditors' report, dated December 14, 2004, appears in the lower court record. But even if the entire report was submitted to the trial court, it would not aid plaintiff in establishing a genuine issue of material fact.

Independent certified public accountants performing audits, as in this case, generally assume a responsibility that transcends any employment relationship with the client. See *Comm'r of Ins. v. Al-*

*bino,* 225 Mich.App 547, 565; 572 NW2d 21 (1997); but see MCL 600.2962(c) (limiting third-party negligence actions to circumstances where "certified public accountant was informed in writing by the client at the time of engagement that a primary intent of the client was for the professional public accounting services to benefit or influence the person bringing the action for civil damages"). "An audit report represents the auditor's opinion of the accuracy of the client's financial statements at a given period of time. The financial statements themselves are the representations of management, not the auditor." *Raritan River Steel Co. v. Cherry, Bekaert & Holland,* 322 NC 200, 207; 367 S.E.2d 609 (1988) (citations omitted).

**\*6** Although audit reports for each fiscal year may guide a plaintiff in preparing its financial statements for each subsequent year, the mere fact that there might be some connection between annual financial statements does not support an inference that a professional relationship continued between the parties, with its accompanying air of trustworthiness, from year to year without interruption.

The evidence of defendant's separate engagement letters detailing the terms of each audit shows that each audit constituted the type of discrete transaction that our Supreme Court in *Levy, supra* at 490 n 19, observed could separately constitute "the matters out of which the claim for malpractice arose." We are not persuaded that plaintiff has established anything about the separate contract for GASB 34 services that supports a different result. That matter constituted a discrete transaction from the independent audit services that defendant was hired to perform.

Upon de novo review, we conclude that no genuine issue of material fact was shown to preclude summary disposition under MCR 2.116(C)(7). The critical date for the fiscal year ending June 30, 2002, was the April 4, 2003, date of defendant's audit report. Defendant's completion of that audit constituted the "occurrence" that terminated the parties' professional relationship. The trial court properly

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.W.2d                                                                                          Page 6
Not Reported in N.W.2d, 2008 WL 375992 (Mich.App.)
**(Cite as: Not Reported in N.W.2d, 2008 WL 375992)**

granted summary disposition in favor of defendant with respect to fiscal year 2002, and the earlier years, because the complaint was filed on August 2, 2006, more than two years after April 4, 2003.

### IV. Standard Of Care For Auditing Services

Plaintiff next challenges the trial court's determination that defendant was also entitled to summary disposition under MCR 2.116(C)(8) with respect to six specific auditing duties alleged in count I of the complaint. Plaintiff argues that MCL 141.428 supports the alleged duties.

A negligence claim consists of the following elements: "(1) duty, (2) general standard of care, (3) specific standard of care, (4) cause in fact, (5) legal or proximate cause, and (6) damage."*Malik v. William Beaumont Hosp.,* 168 Mich.App 159, 168;423 NW2d 920 (1988)."The term 'malpractice' denotes a breach of the duty owed by one rendering professional services to a person who has contracted for such services."*Id.*

Plaintiff's argument involves the specific standard of care required for defendant to avoid breaching the general standard of reasonable care applicable to a negligence action. See *Case v. Consumers Power Co.,* 463 Mich. 1, 4 n 8;615 NW2d 17 (2000); *Moning v. Alfono,* 400 Mich. 425, 438-443;254 NW2d 759 (1977).

In Michigan, a violation of a statute creates a rebuttal presumption of negligence. *Kennedy v. Great Atlantic & Pacific Tea Co.,* 274 Mich.App 710, 721;737 NW2d 179 (2007). In this case, however, we are not persuaded that plaintiff pleaded a statutory violation in any of the six allegations at issue. The provision of the Uniform Budgeting and Accounting Act, MCL 141.428, only prescribes the contents of the audit report that local units may provide pursuant to MCL 141.426, by retaining certified public accountants to perform the audit. The local unit has a duty to obtain audits of its financial records, accounts, and procedures pursuant to MCL 141.425.

**\*7** Construed in a light most favorable to plaintiff, none of the six allegations are directed at deficiencies in an audit report. Paragraphs (17)(a) to (d) allege that certain funds were improperly reported, resulting in the overstatement or understatement of funds. Paragraph (17)(e) alleges that defendant failed to record certain subsidy transfers as a journal entry, resulting in the overstatement or understatement of funds. Paragraph (17)(w) alleges only that defendant failed to "adhere to basic accounting principles."

Because MCL 141.428 provides no support for the six allegations against defendant, we affirm the trial court's dismissal of these allegations pursuant to MCR 2.116(C)(8). As a matter of law, plaintiff has not established that the allegations fall within the specific standard of care applicable to defendant's audit services.

### V. Breach of Contract

Finally, plaintiff argues that the trial court erred in dismissing count III under MCR 2.116(C)(8) on the ground that plaintiff was improperly attempting to restate the professional malpractice claim as a breach of contract claim to circumvent the statute of limitations. Alternatively, plaintiff argues that it should be permitted to proceed under a breach of contract theory with respect to the GASB 34 services because the parties had a special agreement with regard to those services independent of the audit services.

Plaintiff has failed to fully recognize the basis of the trial court's decision. Although the trial court expressed agreement with defendant's argument that plaintiff's breach of contract claim was an attempt to circumvent the statute of limitations, it dismissed count III on the basis of its determination that it was a verbatim restatement of counts I and II, except for ¶ 29(y) of count III, which alleged that defendant "breached its obligation to provide

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.W.2d                                                                                            Page 7
Not Reported in N.W.2d, 2008 WL 375992 (Mich.App.)
**(Cite as: Not Reported in N.W.2d, 2008 WL 375992)**

services, training, and systems to make employees of the City of Pontiac more proficient in compliance with GASB 34."[FN2] The trial court explained that it wanted to "establish an efficient framework" for the lawsuit.

> FN2. We note that the corresponding allegations in ¶¶ 23-24 of count II, while not identical, also allege a failure to provide agreed-upon services. Plaintiff alleged that defendant agreed to, but failed to provide, the services, training, and systems.

Although the trial court treated count I as a professional malpractice claim based on defendant's audit services, the court treated plaintiff's claim in count II regarding GASB 34 services as a breach of contract claim, even though it was labeled "PROFESSIONAL LIABILITY GASB 34 SERVICE" in the complaint. In concluding that count II sufficiently stated a claim to avoid summary disposition under MCR 2.116(C)(8), the trial court ruled, "Plaintiff's count two is a breach of contract claim" and found that the complaint alleged a breach. Moreover, we find nothing in the trial court's decision or order to indicate that it dismissed count II based on the statute of limitations. It ordered only that the claims "as to audit years 2002 and earlier are dismissed under MCR 2.116(C)(7) as these claims are time-barred.

A court is not bound by a parties' choice of labels for a cause of action because this would exalt form over substance. *Johnston v. Livonia,* 177 Mich.App 200, 208;441 NW2d 41 (1989). A professional malpractice action is a tort claim predicated on the failure to exercise the requisite professional skill. *Stewart v. Rudner,* 349 Mich. 459, 468;84 NW2d 816 (1957); see also *Malik, supra* at 168 (malpractice claim is grounded in negligence). Where there is a failure to perform a specific act, the action can sound in contract. *Stewart, supra* at 468;*Penner v. Seaway Hosp.,* 169 Mich.App 502, 509;427 NW2d 584 (1988); *Barnard v. Dilley,* 134 Mich.App 375, 378;350 NW2d 887 (1984) (claim sounded in legal malpractice, not negligence, where

damages flowed from the attorney's failure to provide adequate representation, rather than the failure to provide the representation).

**\*8** Further, the failure to address an issue that necessarily must be reached can preclude appellate relief. *Roberts & Son Contracting, Inc. v. North Oakland Dev. Corp.,* 163 Mich.App 109, 113;413 NW2d 744 (1987)."It is axiomatic that where a party fails to brief the merits of an allegation of error, the issue is deemed abandoned by this Court."*Prince v. MacDonald,* 237 Mich.App 186, 197;602 NW2d 834 (1999).

We deem abandoned any argument that the trial court erred in treating the breaches of duty alleged in count III, which were duplicative of the specific standards of care that plaintiff alleged were breached in count I, as sounding in professional malpractice because plaintiff has not briefed this issue. Accordingly, we affirm the trial court's holding that plaintiff failed to state a breach of contract claim pursuant to MCR 2.116(C)(8) with respect to these allegations.

Similarly, any claim that the trial court erred in treating count II as a breach of contract claim is also abandoned because plaintiff likewise has not briefed that issue. Because the trial court's ruling, in substance, permits plaintiff to pursue the same failure to perform allegation set forth in count III, ¶ 29(y), of the complaint with respect to the GASB 34 services, the trial court's dismissal of this allegation pursuant to MCR 2.116(C)(8) is harmless. See MCR 2.613(A).

Although the allegation in ¶ 29(u) of count III that "[f]ailure to properly train City of Pontiac employees in order to achieve GASB 34 compliance" could be construed as sounding in malpractice, not breach of contract, this allegation is duplicative of the specific standard of care for auditing services that plaintiff alleged was breached in count I, ¶ 17(u). We express no opinion regarding the legal sufficiency of plaintiff's allegation in ¶ 17(u) with respect to auditing services because this issue is not

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.W.2d                                                Page 8
Not Reported in N.W.2d, 2008 WL 375992 (Mich.App.)
**(Cite as: Not Reported in N.W.2d, 2008 WL 375992)**

properly before us. Limiting our review to
plaintiff's claim on appeal that the trial court erred
in dismissing count III, we hold that plaintiff has
not established any basis for relief.

Affirmed.

Mich.App.,2008.
City of Pontiac v. Pricewaterhouse Coopers, L.L.P.
Not Reported in N.W.2d, 2008 WL 375992
(Mich.App.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**5**



**C**
Johnson v. Metabolife Intern., Inc.
N.D.Tex.,2002.
Only the Westlaw citation is currently available.
United States District Court,N.D. Texas, Dallas Division.
Brenda JOHNSON, Plaintiff,
v.
METABOLIFE INTERNATIONAL, INC., Defendant.
**No. Civ.A.3:01-CV-2082-G.**

Oct. 23, 2002.

Edward Blizzard, Blizzard McCarthy & Nabers, Houston, TX, C. L. Mike Schmidt, Law Office of C L Mike Schmidt, Dallas, TX, for Plaintiff.
Baxter W. Banowsky, Banowsky Betz & Levine, Dallas, TX, for Defendants.

*MEMORANDUM ORDER*

FISH, Chief J.
**\*1** Before the court is the motion of the defendant Metabolife International, Inc. ("Metabolife") to strike and/or dismiss, pursuant to FED. R. CIV. P. 9(b), 12(b)(6), and 12(e), the state law claim of deceit and fraud brought by the plaintiff Brenda Johnson ("Johnson"). Also before the court is Johnson's motion for leave to amend her complaint. For the following reasons, Metabolife's motion is granted and Johnson's motion is denied.

## I. BACKGROUND

This is a personal injury case. Metabolife, a corporation with its principal place of business in the state of California, Notice of Removal at 3, is engaged in the business of marketing and selling weight loss supplements, including a product known as "Metabolife 356" ("M-356"), to the general public. Defendant's Third Amended Answer and Affirmative Defenses ("Defendant's Third Amended Answer") ¶¶ 6-7. Metabolife markets its products throughout the nation, including Texas. *See* Defendant's Third Amended Answer ¶¶ 4, 7. Johnson is an individual domiciliary and resident of the state of Texas. Plaintiff's Original Petition ("Complaint") ¶ 2, *attached to* Notice of Removal as Exhibit A. Johnson brought her claim initially in the District Court of Dallas County, 101st Judicial District, on May 30, 2001. Metabolife then removed the case to this court pursuant to 28 U.S.C. § 1441(a).*See* Notice of Removal. The crux of the case is Johnson's allegation that she suffered serious injuries following her consumption of M-356. *See* Complaint ¶ 11.

On October 5, 2001, Johnson filed her first amended complaint, which added a state law cause of action for "deceit and fraud." *See* Plaintiff's First Amended Original Petition ("First Amended Complaint") ¶¶ 15-21, *attached to* Notice of Removal as Tab 22 of Exhibit A. The factual allegations in that claim, however, failed to state with particularity the circumstances constituting fraud, which is required by FED. R. CIV. P. 9(b) of any claim of fraud.[FN1]Consequently, on March 5, 2002, this court granted Metabolife's motion for a more definite statement, pursuant to FED. R. CIV. P. 12(e), and ordered Johnson to replead her deceit and fraud claim. *See* Order, March 5, 2002. In response, Johnson filed her second amended complaint on July 5, 2002.

> FN1. The deceit and fraud claim in the first amended complaint merely stated that:
>
> Defendant made material representations to the general public and potential users of [M-356] such as Plaintiff, that [M-356] was thoroughly tested and proven safe. Plaintiff reasonably relied on such representations in deciding to use [M-356] and, but for such representations of safety, she would not have used [M-356]. At the time the representations were made, they were false and Defend-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 2
Not Reported in F.Supp.2d, 2002 WL 32494514 (N.D.Tex.)
**(Cite as: Not Reported in F.Supp.2d, 2002 WL 32494514)**

ant knew they were false. Defendant also failed to represent to Plaintiff that [M-356] could cause serious health problems including neurologic injury, seizure, heart failure and sudden death. This omission was material and induced Plaintiff to use [M-356] ... This omission by Defendant was material and intentional and it had the desired effect-to induce the continued use by Plaintiff and millions of others.

First Amended Complaint ¶¶ 16-21 (paragraph numbers omitted from text).

On August 12, 2002, Metabolife filed the instant motion to strike and/or dismiss, pursuant to FED. R. CIV. P. 9(b), 12(b)(6), and 12(e), the deceit and fraud cause of action in Johnson's second amended complaint. *See* Defendant's Motion to Strike and/or [sic] Dismiss ("Defendant's Motion") at 6. Specifically, Metabolife requests that the court strike paragraphs 15-21 of Johnson's second amended complaint and/or dismiss her deceit and fraud claim in its entirety. *Id.* Johnson responded on September 6, 2002 by filing a motion for leave to further amend her complaint. *See* Plaintiff's Motion for Leave of Court to Amend Plaintiff's Complaint ("Plaintiff's Motion").[FN2] Metabolife opposes the motion for leave to further amend. Defendant's Response to Plaintiff's Motion to Amend Pleadings ("Defendant's Response") at 1. The court now addresses both Metabolife's motion to strike and/or dismiss and Johnson's motion for leave to amend.

FN2. Johnson has appended a copy of her proposed third amended complaint to her motion for leave to amend. *See* Plaintiff's Third Amended Complaint ("Third Amended Complaint"), *attached to* Plaintiff's Motion as Exhibit A.

## II. *ARGUMENT*

### 1. *Defendant's Motion to Strike and/or Dismiss*

#### a. *The Legal Standard*

**\*2** Federal Rule of Civil Procedure 12(b)(6) authorizes dismissal of a complaint for "failure to state a claim upon which relief can be granted."However, a motion under Rule 12(b)(6) should be granted only if it appears beyond doubt that the plaintiff could prove no set of facts in support of her claim that would entitle her to relief. *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *Leffall v. Dallas Independent School District,* 28 F.3d 521, 524 (5th Cir.1994); see also *Kaiser Aluminum & Chemical Sales, Inc. v. Avondale Shipyards, Inc.,* 677 F.2d 1045, 1050 (5th Cir.1982), *cert. denied,*459 U.S. 1105, 103 S.Ct. 729, 74 L.Ed.2d 953 (1983). In determining whether dismissal should be granted, the court must accept all well-pleaded facts as true and view them in the light most favorable to the plaintiff. See *Capital Parks, Inc. v. Southeastern Advertising and Sales System, Inc.,* 30 F.3d 627, 629 (5th Cir.1994); *Norman v. Apache Corporation,* 19 F.3d 1017, 1021 (5th Cir.1994); *Chrissy F. by Medley v. Mississippi Department of Public Welfare,* 925 F.2d 844, 846 (5th Cir.1991).

Under Federal Rule of Civil Procedure 9(b), a plaintiff must state with particularity the circumstances constituting a claim of fraud. *See*FED. R. CIV. P. 9(b); see also *Tuchman v. DSC Communications Corporation,* 14 F.3d 1061, 1067 (5th Cir.1994); *Guidry v. Bank of LaPlace,* 954 F.2d 278, 288 (5th Cir.1992). Although Rule 9(b) permits the plaintiff to allege generally the defendant's intent to commit fraud, a mere allegation that the defendant had the requisite intent will not satisfy Rule 9(b). See *Melder v. Morris,* 27 F.3d 1097, 1102 (5th Cir.1994); *Tuchman,* 14 F.3d at 1068. To adequately plead fraudulent intent, the plaintiff must set forth specific facts that support an inference of fraud. *Tuchman,* 14 F.3d at 1068.

What constitutes particularity "will necessarily differ with the facts of each case."*Guidry,* 954 F.2d at 288. Generally, this circuit has interpreted Rule

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

9(b) as requiring the plaintiff to include specific details of the time, place, contents, and nature of the activities which form the basis of the allegedly fraudulent conduct, as well as the speaker's identity and what was obtained thereby. See *Williams v. WMX Technologies, Inc.,* 112 F.3d 175, 177 (5th Cir.), *cert. denied,*522 U.S. 966, 118 S.Ct. 412, 139 L.Ed.2d 315 (1997); *Tel-Phonic Services, Inc. v. TBS International, Inc.,* 975 F.2d 1134, 1139 (5th Cir.1992); see also 5 CHARLES A. WRIGHT & ARTHUR MILLER, FEDERAL PRACTICE AND PROCEDURE § 1297 (2d edition 1990).“Anything less fails to provide defendants with adequate notice of the nature and grounds of the claim.”*Hart v. Bayer Corporation,* 199 F.3d 239, 248 (5th Cir.2000) (citing *Tuchman,* 14 F.3d at 1067). Dismissal of a fraud claim for failure to plead the claim with particularity under Rule 9(b) is treated as a dismissal for failure to state a claim under Rule 12(b)(6). See *Lovelace v. Software Spectrum, Inc.,* 78 F.3d 1015, 1017 (5th Cir.1996); *Shushany v. All-waste, Inc.,* 992 F.2d 517, 520 (5th Cir.1993); *Guidry,* 954 F.2d at 281.

### b. *Johnson's Deceit and Fraud Claim*

**\*3** Johnson filed her current live pleading, the second amended complaint, on July 5, 2002. This pleading was filed after the court granted Metabolife's motion for a more definite statement, pursuant to FED. R. CIV. P. 12(e), and ordered Johnson to replead her claim for deceit fraud with the specificity required by FED. R. CIV. P. 9(b). In the instant motion to strike and/or dismiss, Metabolife argues that Johnson's second amended complaint again fails to meet the minimum pleading requirements for a claim of fraud under Rule 9(b). The court agrees with this assertion.

Johnson took four months to file her second amended complaint.[FN3]A careful review of that complaint, however, reveals that the only change of any significance made to the deceit and fraud claim was the addition of language to paragraph number 16. In the first amended complaint, paragraph 16

stated that:

> FN3. The court granted Metabolife's motion for more definite statement on March 5, 2002, and, as mentioned, Johnson did not file her second amended complaint until July 5, 2002. *See* Docket Sheet.

Defendant made material representations to the general public and to potential users of [M-356] such as Plaintiff, that [M-356] was thoroughly tested and proven safe.

First Amended Complaint ¶ 16. Plaintiff amended this paragraph in the second amended complaint to assert that:

Defendant made material representations to the general public and to potential users of [M-356] such as Plaintiff, *through billboard, television and other media advertisements,* that [M-356] was *an all-natural product and safe to use.*

Plaintiff's Second Amended Original Petition (“Second Amended Complaint”) ¶ 16 (italicized words indicate new language).

However, even with the additional language alleging that Metabolife made material representations “through billboard, television and other media advertisements, that [M-356] was an all-natural product and safe to use,” Johnson's claim for deceit and fraud falls well short of the specificity required for a claim of fraud. “At a minimum, Rule 9(b) requires that [Johnson] specify the particulars of ‘time, place, and contents of the [allegedly] false representations.’ ” *Williams,* 112 F.3d at 179 (quoting *Tuchman,* 14 F.3d at 1068). Johnson's repled deceit and fraud claim identifies neither the time nor the place of these alleged misrepresentations. In fact, Johnson flatly admits that she cannot “remember the location of the billboard or the precise date and time the advertising was on the [television] or radio.” Plaintiff's Response to Defendant's Motion to Strike and/or Dismiss (“Plaintiff's Response”) ¶ 3. Nor does she allege the specific contents, context, or speaker of these ad-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

vertisements. Johnson has also failed to present any facts to support an inference of Metabolife's alleged fraudulent intent. Finally, Johnson does not adequately show how any alleged statements on behalf of Metabolife were actually fraudulent. Thus, the deceit and fraud claim in Johnson's second amended complaint lacks sufficient particularity to comply with Rule 9(b).

Johnson responds to these deficiencies by simply arguing that "[n]o one could be expected to remember those details," Plaintiff's Response ¶ 3, and by pointing her finger at Metabolife, whom she alleges failed to provide adequate information concerning the missing details of where, when and what, which she sought through written discovery. *Id.* The court acknowledges that Rule 9(b) imposes a more onerous standard for pleading fraud, one which is significantly more difficult to satisfy than the usual standard of FED. R. CIV. P. 8(a). However, as the Fifth Circuit has stated:

**\*4** [T]he requirement for particularity in pleading fraud does not lend itself to refinement, and it need not in order to make sense. Directly put, the who, what, when, and where must be laid out *before* access to the discovery process is granted ... We remind that this bite of Rule 9(b) was part of the pleading revolution of 1938. In short, we apply the rule with force, without apology.

*Williams,* 112 F.3d at 178 (italics in original).

Johnson alone must "specify the statements contended to be fraudulent, identify the speaker, state when and where the statements were made, and explain why the statements were fraudulent" in order to satisfy the minimum requirements of Rule 9(b).*Id.* at 177 (adopting the standards of *Mills v. Polar Molecular Corporation,* 12 F.3d 1170, 1175 (2d. Cir.1993)). Metabolife has no duty to assist Johnson in her attempt to plead deceit and fraud. Nevertheless, the record reflects that Metabolife actually provided Johnson with some materials concerning Metabolife's advertising of M-356. Plaintiff's Response ¶ 3; Defendant's Reply to

Plaintiff's Response to Defendant's Motion to Strike and/or Dismiss ("Defendant's Reply") at 3-4. Even with the benefit of these materials, however, Johnson has been unable to plead her claim of fraud with the particularity required by Rule 9(b). Consequently, this court must dismiss Johnson's deceit and fraud claim, pursuant to FED. R. CIV. P. 12(b)(6), for failure to state a claim upon which relief can be granted.[FN4] See *Lovelace,* 78 F.3d at 1017.

> FN4. Concluding that Johnson's deceit and fraud claim should be dismissed under FED. R. CIV. P. 12(b)(6), the court finds it unnecessary to address Metabolife's alternative request to strike paragraphs 15-21 of the deceit and fraud claim pursuant to FED. R. CIV. P. 12(e).

### 2. *Plaintiff's Motion for Leave to Amend*

On September 6, 2002, Johnson requested yet another bite at the apple by filing a motion for leave to amend her complaint for the third time. Johnson filed this motion following Metabolife's motion to strike and/or dismiss.[FN5] Importantly, Johnson has provided a copy of the proposed third amended complaint, which allows the court to determine whether the proposed changes are detailed enough to comply with Rule 9(b). For the reasons discussed below, the court finds that Johnson has again failed to plead her claim of fraud with the requisite specificity and, therefore, denies her motion for leave to amend.

> FN5. Johnson filed the motion for leave to amend contemporaneously with her response to Metabolife's motion to strike and/or dismiss.

Under Federal Rule of Civil Procedure 15(a), leave to amend should be "freely given when justice so requires."This and the other federal rules "reject the approach that pleading is a game of skill in which one misstep by counsel may be decisive to the outcome and accept the principle that the purpose of

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                          Page 5
Not Reported in F.Supp.2d, 2002 WL 32494514 (N.D.Tex.)
**(Cite as: Not Reported in F.Supp.2d, 2002 WL 32494514)**

pleading is to facilitate a proper decision on the merits."*Conley,* 355 U.S. at 48. The Fifth Circuit has repeatedly held that Rule 15(a) evinces a liberal amendment policy. See, *e.g., Lowrey v. Texas A & M University System,* 117 F.3d 242, 245 (5th Cir.1997); *Nance v. Gulf Oil Corporation,* 817 F.2d 1176, 1180 (5th Cir.1987); *Youmans v. Simon,* 791 F.2d 341, 348 (5th Cir.1986). That liberal amendment policy, however, does not require the federal courts to engage in "futile gestures." *DeLoach v. Woodley,* 405 F.2d 496, 497 (5th Cir.1968); see also *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962) (amendment of pleading need not be allowed if amendment would be futile). Thus, "[w]here a complaint, as amended, would be subject to dismissal, leave to amend need not be granted."*DeLoach,* 405 F.2d at 497. Finally, "the circumstances and terms upon which leave is to be 'freely given' is committed to the informed, careful judgment and discretion of the Trial Judge as he superintends the development of a cause toward its ultimate disposition."*Lone Star Motor Import, Inc. v. Citroen Cars Corporation,* 288 F.2d 69, 75 (5th Cir.1961).

**\*5** In the instant case, Johnson seeks to augment her deceit and fraud claim in an attempt to comply with FED. R. CIV. P. 9(b). In addition to the information provided in the second amended complaint, Johnson now proposes a complaint that avers:

Plaintiff began taking the drug in late 1998. Before she bought the product, she saw billboards advertising the product as being "all natural". She also saw television advertising and heard radio advertising which indicated that the product was safe because it was all natural. When she first purchased a bottle of [M-356] pills, the label on the bottle said that the pills contained natural herbs that were independently laboratory tested for safety. Plaintiff reasonably relied upon such representations that the product was all natural and safe in deciding to use [M-356] to her detriment and, but for such representations of safety, she would not have used

[M-356]. At the time the representations were made, the Defendant had received hundreds of reports from users of its products indicating that the product could cause serious health problems and therefore, it knew that the representations of safety were false.

Third Amended Complaint ¶¶ 16-18 (paragraph numbers omitted from text).

Unfortunately, while Johnson's proposed third amended complaint provides more detail as to the nature of Metabolife's allegedly deceitful and fraudulent activities, the proposed amendment still lacks the particularity required by Rule 9(b). As previously discussed, a claim of fraud must include specific details as to the time, place, contents, and nature of the activities which form the basis of the allegedly fraudulent conduct. See *Tel-Phonic Services,* 975 F.2d at 1139. Moreover, even though a plaintiff may allege additional facts in support of a claim of fraud, it is the quality, not the quantity, of those facts which is significant under Rule (9)(b). As the Fifth Circuit has stated, "[a] complaint can be long-winded, even prolix, without pleading with particularity.... [S]uch a garrulous style is not an uncommon mask for an absence of detail."*Williams,* 112 F.3d at 178. Here, each of Johnson's new allegations misses the mark.

First, while Johnson now alleges that "[b]efore she bought the product, she saw billboards advertising the product as being 'all natural," ' she fails to state where she saw these billboards, the content of the billboards, or even how the statement of "all natural" is fraudulent. *See* Plaintiff's Third Amended Complaint ¶ 16. In addition, a claim of fraud requires a more specific statement of time than to simply allege "before she bought the product." Second, Johnson also alleges that she "saw television advertising and heard radio advertising which indicated that the product was safe because it was all natural." *Id.* Nevertheless, Johnson continues to admit that she is unable to remember any of the dates or times when she saw these advertisements on the television or heard them on the radio. Plaintiff's

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 6
Not Reported in F.Supp.2d, 2002 WL 32494514 (N.D.Tex.)
**(Cite as: Not Reported in F.Supp.2d, 2002 WL 32494514)**

Motion ¶ 2. And again, she fails to allege the specific contents, context, or speaker of these advertisements. This is insufficient to state a claim of fraud with the particularity required by Rule 9(b). Third, Johnson now alleges that she purchased a bottle of M-356, which on its label "said that the pills contained natural herbs that were independently laboratory tested for safety." Third Amended Complaint ¶ 16. However, she never alleges that M-356 is not "all natural" or that it was not "independently laboratory tested for safety." Johnson also fails to allege any specific statement located on the label of the M-356 bottles, other than the assertion that the pills were "all natural" and "independently laboratory tested for safety." *Id.* Finally, Johnson's third amended complaint contains absolutely no statement of where or when Metabolife received the "hundreds of reports from users of its products," how these reports should have put Metabolife on notice that M-356 might cause serious health problems, or how such reports might indicate the fraudulent intent of Metabolife. See *id.* ¶ 18.Thus, as with her previous complaint, Johnson's proposed third amended complaint lacks sufficient detail to satisfy the requirements of Rule 9(b).

**\*6** Johnson again blames any inadequacies in her amended pleading on Metabolife's failure to produce information though discovery. Plaintiff's Motion ¶ 2. However, as discussed above, the heightened pleading requirements of Rule 9(b) must be met before access to the discovery process will be granted. *Williams,* 112 F.3d at 178. Consequently, while Johnson's proposed third amended complaint may have designated Metabolife as the "who" responsible for the alleged deceit and fraud, she has again failed to provide sufficient facts concerning the "what, where, when, and how" required by FED. R. CIV. P. 9(b). See *id.*This court, therefore, will not engage in the futile gesture of allowing Johnson to substitute one insufficiently-pled claim for another. Accordingly, Johnson's motion for leave to amend her complaint is denied.

III. *CONCLUSION*

For the reasons discussed above, Metabolife's motion to dismiss Johnson's claim for deceit and fraud in her second amended complaint is GRANTED. Additionally, because Johnson's proposed third amended complaint fails to cure the deficiencies in her deceit and fraud claim, Johnson's motion for leave to amend her second amended complaint is DENIED.

SO ORDERED.

N.D.Tex.,2002.
Johnson v. Metabolife Intern., Inc.
Not Reported in F.Supp.2d, 2002 WL 32494514 (N.D.Tex.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**6**



Not Reported in F.Supp.2d                                                                  Page 1
Not Reported in F.Supp.2d, 2000 WL 288442 (W.D.Mich.)
(Cite as: Not Reported in F.Supp.2d, 2000 WL 288442)

▷
Krieger v. Gast
W.D.Mich.,2000.
Only the Westlaw citation is currently available.
United States District Court, W.D. Michigan,
Southern Division.
Mark A. KRIEGER, Plaintiff,
v.
Warren E. GAST, et al., Defendants.
No. 4:99-CV-86.

Jan. 21, 2000.

Thomas A. Baird, White, Przybylowicz, Schneider
& Baird, PC, Okemos, MI, Ingham, Charles R.
Watkins, Robert J. Emanuel, Susman & Watkins,
Chicago, IL, for Mark A. Krieger, individually and
on behalf of all others similarly situated, pltf.
Jon R. Muth, Miller, Johnson, Snell & Cummiskey,
Grand Rapids, MI, Kent, Anne N. DePrez, Barnes
& Thornburg, Indianapolis, IN, for Warren E. Gast,
deft.
Jon R. Muth, Anne N. DePrez, (See above), for
William E. Johnson, deft.
Jon R. Muth, Anne N. DePrez, (See above), for
Kevin C. Gast, deft.
Jon R. Muth, Anne N. DePrez, (See above), for Jay
Van Den Berg, deft.
Jon R. Muth, (See above), for Marcella Schalon, deft.
Jon R. Muth, Anne N. DePrez, (See above), for Al-
lan Westmaas, deft.
Kevin Abraham Rynbrandt, Varnum, Riddering,
Schmidt & Howlett LLP, Grand Rapids, MI, Kent,
Kevin J. O'Brien, Butler, Rubin, Saltarelli & Boyd,
Chicago, IL, for Gast Manufacturing Corporation,
deft.
Jon R. Muth, Anne N. DePrez, (See above), for Mc-
Donald & Company Securities, Incorporated, deft.
Jon R. Muth, Anne N. DePrez, (See above), for Mc-
Donald & Company Investments, Inc., deft.

*ORDER*

QUIST, J.
**\*1** In accordance with the Opinion filed on this date,

IT IS HEREBY ORDERED that the Amended Mo-
tion Of The McDonald Companies And The Direct-
or Defendants To Dismiss Complaint (docket no.
15) is GRANTED IN PART AND DENIED IN
PART. The motion is granted with respect to all
Counts against Defendants McDonald & Company
Securities, Inc. and McDonald & Company Invest-
ments, Inc., and those defendants are hereby DIS-
MISSED from this case. The motion is denied with
respect to all Counts against the Director Defend-
ants (Warren E. Gast, William E. Johnson, Kevin
C. Gast, Jay Van Den Berg, and Allan Westmaas)
with the exception of Count V against Defendants
William E. Johnson, Kevin C. Gast, Jay Van Den
Berg, and Allan Westmaas, which is DISMISSED
against those defendants. However, Defendant
Warren E. Gast may renew the motion on Count V
in the event that Plaintiff fails to amend his com-
plaint as set forth below.

IT IS FURTHER ORDERED that the Motion Of
Defendant Gast Manufacturing Corporation To Dis-
miss Complaint (docket no. 6) is GRANTED IN
PART AND DENIED IN PART. The motion is
granted with respect to Count II and denied as to all
other Counts. However, Defendant may renew its
motion on Count V-negligent misrepresentation-in
the event that Plaintiff fails to amend his complaint
as set forth below.

IT IS FURTHER ORDERED that within fourteen
(14) days of this date, Plaintiff shall file an
amended complaint specifically alleging that he at-
tended the August 21, 1996, shareholders meeting,
heard the statements allegedly made by Defendant
Warren Gast, and relied on them, if that is in fact
what occurred. Plaintiff's failure to file an amended
complaint within that time shall result in dismissal
of Count V.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                      Page 2
Not Reported in F.Supp.2d, 2000 WL 288442 (W.D.Mich.)
**(Cite as: Not Reported in F.Supp.2d, 2000 WL 288442)**

### OPINION

Plaintiff, Mark A. Krieger ("Krieger"), on behalf of a putative class, filed the instant action against Defendants, Gast Manufacturing Corporation ("GMC"), Warren E. Gast, William E. Johnson, Kevin C. Gast, Jay Van Den Berg, Allan Westmaas, McDonald & Company Securities, Inc. ("McDonald & Co."), and McDonald & Company Investments, Inc. ("McDonald Investments" and together with McDonald & Co. the "McDonald Companies"), alleging state law claims for breach of fiduciary duty (Count I), aiding and abetting/inducement and conspiracy to commit a breach of fiduciary duty (Count II), common law fraud (Counts III and IV), negligent misrepresentation (Count V), conspiracy (Count VI), and unjust enrichment (Count VII).[FN1] Krieger's claims arise out of an August 1996 merger in which the GMC minority shareholders were "squeezed out," as well as certain post-merger transactions. More specifically, Krieger alleges that the merger and other transactions were part of a plan by the directors and major shareholders of GMC to appropriate for themselves part of the value of Krieger's and the other minority shareholders' stock. Presently before the Court are GMC's motion to dismiss and the McDonald Companies' and the Director Defendants' motion to dismiss.

> FN1. Krieger also sued Marcella Schalon and Gast Investment Corporation. Those defendants have since been dismissed pursuant to stipulation of the parties.

### Facts and Procedural History

**\*2** GMC is a Michigan corporation engaged in the business of manufacturing and selling compressors, pumps, blowers, and related items. Prior to September 1996, Krieger owned 500 shares of GMC Class A common stock. During the period of time relevant to Krieger's claims, Defendants Warren E. Gast, William E. Johnson, Kevin C. Gast, Jay Van Den Berg, and Allan Westmaas (collectively referred to as the "Inside Group") were officers and/or directors of GMC and, along with others, owned approximately 82% of the outstanding shares of GMC Class A and Class B common stock and 73% of the outstanding shares of GMC preferred stock.

Krieger alleges that in 1994, Warren Gast, the president, chief executive officer, secretary, and chairman of the board of GMC, decided to liquidate his holdings in GMC by either taking GMC public through an initial public offering ("IPO") or selling GMC to a third party. (*See* Compl. ¶ 33(b).) In order to facilitate the IPO or sale of GMC, the Inside Group met with various investment bankers, and in or about August 1995, GMC retained Defendant McDonald & Co. as its investment banker. (*See id.*) McDonald & Co. then introduced the Inside Group to RDV Corporation ("RDV").

According to Krieger, in a series of meetings held sometime in late 1995 or early 1996, the Inside Group, McDonald & Co., and RDV formulated a plan, dubbed by Krieger as the "Wrongful Plan," to enable the Inside Group, McDonald & Co., and RDV to profit at the expense of the minority shareholders. Krieger alleges that under this plan, the Inside Group and RDV, which was to purchase an interest in GMC, would increase the value of their shares by appropriating part of the value of the minority shareholders' shares through a "squeeze out" at an unfairly low price and thereby gain the ability to realize substantial profits through a subsequent IPO or sale of GMC. Krieger also claims that McDonald & Co. would share in the profits through "success" or finders fees paid by GMC. (*See id.* ¶¶ 33(e), 34, 38.)

The Wrongful Plan was implemented in July 1996, when the Inside Group and other GMC officials formed a shell corporation called Gast Investment Corporation ("GIC"), into which they transferred all the GMC common and preferred shares that they owned or controlled, which amounted to 82% of the common stock and 73 % of the preferred stock. On August 8, 1996, the Inside Group caused GMC and GIC to enter into an Agreement and Plan of Merger merging GIC into GMC and leaving GMC as the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                Page 3
Not Reported in F.Supp.2d, 2000 WL 288442 (W.D.Mich.)
**(Cite as: Not Reported in F.Supp.2d, 2000 WL 288442)**

surviving corporation (the "Merger"). The terms of the agreement provided that all GMC stock owned by minority shareholders would be converted into the right to receive $140 per share for common stock and $10 per share for preferred stock.

On August 9, 1996, a notice of a special shareholders meeting (the "Notice") signed by Warren Gast was sent to GMC shareholders. The Notice stated that a meeting would be held on August 21, 1996, to approve the Merger. The Notice also informed the shareholders that GIC would vote its shares in favor of the Merger, that GIC's vote would ensure that the Merger would occur, and that the minority shareholders' shares would be converted into the right to receive $140 and $10 cash, respectively, for common and preferred shares. (*Seeid.* ¶¶ 39-42.)In addition, the Notice stated that after the Merger the continuing shareholders (who included the Inside Group and others with interests in GIC) would sell to GMC 325,533 shares of GMC stock at $140 per share for an approximate total price of $45.5 million. (*Seeid.* ¶ 45(a).)

**\*3** The Merger was approved at the August 21, 1996, shareholders' meeting. Krieger and the other minority shareholders were paid the amounts specified in the Notice for their shares and did not exercise their appraisal rights under Michigan law. *See*M.C.L. §§ 450.1762, 1772-73. Following the Merger, the Inside Group sold 325,533 of their shares to GMC, and RDV and its affiliates purchased from GMC a 49% interest for $4.2 million plus a loan of $4.2 million, as described in the Notice.[FN2]In May of 1997, nine months after the Merger, GMC entered into negotiations with IDEX Corporation ("IDEX") for the sale of GMC. In January 1998, the continuing shareholders sold GMC to IDEX and received in excess of $300 per share, or over twice the amount the minority shareholders received for their shares. (*Seeid.* ¶ 51.)Krieger claims that GMC common stock was worth $300 per share on August 21, 1996, and that Defendants either knew or should have been aware of that fact. Krieger further claims that Defendants

prevented the minority shareholders from discovering that fact by dissuading them from exercising their statutory appraisal rights by means of misleading statements or omissions in the Notice.

> FN2. Krieger also alleges that a reverse stock split occurred, although he does not allege the terms of the split, i.e., one for two.

Krieger initially filed suit against Defendants and others on May 22, 1998, in the United States District Court for the Northern District of Illinois. In that case, Krieger alleged violations of the Securities Exchange Act of 1934 and various state law claims. The district court dismissed Krieger's federal securities law claims under Fed.R.Civ.P. 12(b)(6) for failure to state a claim and dismissed his state law claims pursuant to 28 U.S.C. § 1367(c).*SeeKrieger v. Gast,* No. 98 C 3182, 1998 U.S. Dist. LEXIS 15422, at *21 (N.D.Ill. Sept. 22, 1998) (mem.op.). Krieger then filed a new action in state court in Cook County, Illinois, asserting state law claims. The Illinois state court dismissed that case because it did not have personal jurisdiction over several of the defendants. Krieger filed the instant action in Michigan asserting state law claims under Michigan law.

*Standards for Review*

An action may be dismissed if the complaint fails to state a claim upon which relief can be granted. Fed.R.Civ.P. 12(b)(6). The moving party has the burden of proving that no claim exists. Although a complaint is to be liberally construed, it is still necessary that the complaint contain more than bare assertions of legal conclusions. *SeeAllard v. Weitzman* (*In re DeLorean Motor Co.*), 991 F.2d 1236, 1240 (6th Cir.1993) (citing *Schied v. Fanny Farmer Candy Shops, Inc.,* 859 F.2d 434, 436 (6th Cir.1988)). All factual allegations in the complaint must be presumed to be true, and reasonable inferences must be made in favor of the non-moving party. *See* 2A James W. Moore, *Moore's Federal*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 4
Not Reported in F.Supp.2d, 2000 WL 288442 (W.D.Mich.)
**(Cite as: Not Reported in F.Supp.2d, 2000 WL 288442)**

*Practice,* ¶ 12.34[1][b] (3d ed.1997). The Court need not, however, accept unwarranted factual inferences. *SeeMorgan v. Church's Fried Chicken,* 829 F.2d 10, 12 (6th Cir.1987). Dismissal is proper "only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations."*Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 2232 (1984) (citing *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 101-02 (1957)).

**\*4** In addition to moving for dismissal under Rule 12(b)(6), the Inside Group and the McDonald Companies contend that with the exception of Count V, Krieger's complaint must be dismissed because it fails to comply with Fed.R.Civ.P. 9(b). Under that rule, "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity," although circumstances regarding state of mind "may be averred generally." Fed.R.Civ.P. 9(b)."The purpose of Rule 9(b) is to provide fair notice to the defendant so as to allow him to prepare an informed pleading responsive to the specific allegations of fraud ."*Advocacy Org. for Patients & Providers v. Auto Club Ins. Ass'n,* 176 F.3d 315, 322 (6th Cir.1999) (citing *Michaels Bldg. Co. v. Ameritrust Co., N.A.,* 848 F.2d 674, 679 (6th Cir.1988)). In addition, Rule 9(b) serves to protect a defendant's reputation by precluding unfounded allegations of fraud and to reduce the number of strike suits and fishing expeditions. *SeeGuidry v. Bank of LaPlace,* 954 F.2d 278, 288 (5th Cir.1992) (stating that "[t]his higher [pleading] standard stems from the obvious concerns that general, unsubstantiated charges of fraud can do damage to a defendant's reputation"); *Arazie v. Mullane,* 2 F.3d 1456, 1465 (7th Cir.1993) (noting that burden of the heightened pleading standard is to prevent "strike suits brought by disgruntled investors").

The Sixth Circuit has adopted a liberal approach to the application of Rule 9(b).*SeeCoffey v. Foamex L.P.,* 2 F.3d 157, 161-62 (6th Cir.1993). To satisfy the requirements of the rule, a plaintiff must "

'allege the time, place, and content of the alleged misrepresentation on which he or she relied; the fraudulent scheme; the fraudulent intent of the defendants; and the injury resulting from the fraud."' *Id.* at 161-62 (quoting (*Ballan v. Upjohn Co.,* 814 F.Supp. 1375, 1385 (W.D.Mich.1992)); *see also Vild v. Visconsi,* 956 F.2d 560, 567 (6th Cir.1992). A plaintiff's allegations must satisfy Rule 9(b)'s particularity requirement with regard to each element of the claim of fraud and with regard to each defendant against whom fraud is alleged. *SeePicard Chem. Inc. Profit Sharing Plan v. Perrigo Co.,* 940 F.Supp. 1101, 1114 (W.D.Mich.1996).

In *Michaels Building,* the court held that the particularity requirement under Rule 9(b) must be "read in harmony" with the policy of Rule 8 of requiring only a "short and plain statement of the claim" in pleadings.*Michaels Bldg.,* 848 F.2d at 679. The court observed that although a plaintiff is required to plead with greater specificity when fraud is alleged in the complaint, courts should not be "too exacting" and should "not demand clairvoyance from pleaders" in determining whether the requirements of Rule 9(b) have been met. *Id.* at 681.Thus, so long as the plaintiff's allegations inform the defendant of the circumstances constituting the fraud with enough specificity to permit the defendant to respond to and defend the claim, the complaint should not be dismissed. *Seeid.* at 680.This is especially true where facts relating to the plaintiff's claim are within the defendant's knowledge or control. *Seeid.*

*Discussion*

I. Inside Group's and McDonald Companies' Motion To Dismiss

A. Compliance with Rule 9(b)

**\*5** The Inside Group's and McDonald Companies' first argument is that all counts of Krieger's com-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

plaint, except Count V for negligent misrepresenta-
tion, must be dismissed because those claims fail to
comply with Fed.R.Civ.P. 9(b). Although Krieger
alleges fraud claims only in Counts III and IV, the
Inside Group asserts that Rule 9(b)'s requirements
apply to the other claims as well because they are
based upon allegations of fraud perpetrated as part
of the Wrongful Plan. Therefore, as an initial mat-
ter, the Court must decide whether Rule 9(b)'s re-
quirements apply only to those claims expressly
pled as fraud or whether they extend to other non-
fraud claims.

By its own terms, Rule 9(b) is limited to claims of
fraud or mistake. While the language of the rule ap-
pears to preclude its application to other types of
claims, courts have applied the more stringent
pleading requirements of Rule 9(b) to claims de-
nominated as something other than fraud, such as
breach of fiduciary duty, where such claims are
grounded in allegations of intentional wrongdoing.
*See, e.g.,Torchetti v. International Bus. Machs.
Corp.,* 986 F.Supp. 49, 51 (D.Mass.1997) (holding
that breach of fiduciary duty claims asserted under
the Employee Retirement Income Security Act of
1974 "stemming from fraud" were subject to Rule
9(b)); *Burt v. Danforth,* 742 F.Supp. 1043, 1051
(E.D.Mo.1990) (concluding in shareholder derivat-
ive action that "although plaintiff's claims are form-
ally cast in terms of breach of fiduciary duty, the
pleading requirements of Rule 9(b) are no less ap-
plicable to plaintiff's allegations of intentional
wrongdoing").

As the cases cited by the parties demonstrate, a di-
vergence of opinion exists among the courts with
regard to whether Rule 9(b) may be applied to
claims other than fraud. Krieger relies on a recent
decision by the Eighth Circuit, *Carlon v. Thaman*
(*In re NationsMart Corp. Sec. Litig.*), 130 F.3d 309
(8th Cir.1997), in support of his contention that
Rule 9(b) does not apply to claims other than fraud.
In *NationsMart,* the Eighth Circuit held that the dis-
trict court erred in dismissing the plaintiffs' claim
under § 11 of the Securities Act because the

plaintiffs were not alleging fraud in the context of
their § 11 claim, and even if the plaintiffs were al-
leging that the defendants engaged in fraudulent
conduct under § 11, application of Rule 9(b) to the
claim would simply mean that the fraud allegations
would be disregarded since a § 11 claim may be
premised upon innocent or negligent misrepresenta-
tions. *SeeNationsMart,* 130 F.3d at 314-15. The
court bolstered its conclusion that dismissal was not
required under Rule 9(b) by noting that the
plaintiffs had expressly disclaimed any claim of
fraud in their § 11 count. *Seeid.* at 315.Krieger con-
tends that this Court should follow the reasoning in
*NationsMart,* especially because Krieger expressly
disavowed any allegations of fraud in his breach of
fiduciary duty claims.

**\*6** Defendants rely on several cases which applied
Rule 9(b) to claims not requiring proof of fraudu-
lent intent based on the rationale that the claims in-
cluded allegations of fraud which triggered the ap-
plication of Rule 9(b). In one such case, *Anderson
v. Clow* (*In re Stac Elecs. Sec. Litig.*), 89 F.3d 1399
(9th Cir.1996), the Ninth Circuit held that Rule 9(b)
applied to the plaintiff's claim under § 11 of the Se-
curities Act, even though the plaintiff, as in this
case, expressly disclaimed any allegations of fraud
in its § 11 claim, because the claim was grounded
in fraud. *SeeIn re Stac Elecs. Sec. Litig.,* 89 F.3d at
1404-05 & 1405 n. 2. The court reasoned:

Rule 9(b) serves to give defendants adequate notice
to allow them to defend against the charge and to
deter the filing of complaints "as a pretext for the
discovery of unknown wrongs," to protect profes-
sionals from the harm that comes from being sub-
ject to fraud charges, and to "prohibit [ ] plaintiff
[s] from unilaterally imposing upon the court, the
parties and society enormous social and economic
costs absent some factual basis."Because the same
policy considerations apply to Section 11 claims
sounding in fraud, we hold that persons making
such claims must state with particularity the cir-
cumstances constituting the alleged fraud.

*Id.* at 1405 (citation omitted) (alterations in origin-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 6
Not Reported in F.Supp.2d, 2000 WL 288442 (W.D.Mich.)
**(Cite as: Not Reported in F.Supp.2d, 2000 WL 288442)**

al) (quoting *Semegen v. Weidner,* 780 F.2d 727, 731 (9th Cir.1985)). Several other circuits have adopted the same reasoning with respect to claims under the Securities Act that are not based on fraud. *SeeMelder v. Morris,* 27 F.3d 1097, 1100 n. 6 (5th Cir.1994); *Shapiro v. UJB Fin. Corp.,* 964 F.2d 272, 288 (3d Cir.1992); *Sears v. Likens,* 912 F.2d 889, 892-93 (7th Cir.1990). The First Circuit in *Shaw v. Digital Equipment Corp.,* 82 F.3d 1194 (1st Cir.1996), a case cited by Krieger, noted that Rule 9(b) would have applied to claims not requiring proof of fraud if they were based upon allegations amounting to a "unified course of fraudulent conduct...." *Shaw,* 82 F.3d at 1223. However, the court found that Rule 9(b) was inapplicable to the plaintiff's claims because the "complaint avoid[ed] grounding its Section 11 and 12(2) claims on any allegations of fraud."*Id.*

Although the Sixth Circuit has not addressed the issue, this Court concludes that the cases holding that Rule 9(b) applies to non-fraud claims "grounded in fraud" reach the proper result. In this regard, the Court agrees with the court's analysis in *Taam Associates, Inc. v. Housecall Medical Resources, Inc.,* No. 1:96-CV-2214A-JEC, 1998 U.S. Dist. LEXIS 22372 (N.D.Ga. Mar. 30, 1998). In that case, the court reasoned that Rule 9(b) should transcend the label affixed to a claim by a plaintiff because "[a] mere allegation, or 'averment,' of [fraud] could still serve to injure a defendant's reputation, regardless of whether such allegation is necessary to establish liability under the cause of action."*Taam Assoc.,* 1998 U.S. Dist. LEXIS 22372, at *40. Thus, where fraud is alleged, the claim should be tested under Rule 9(b)'s requirements even if the claim may be established without proof of fraud. *Seeid.* at *40-41 (citing *Shapiro,* 964 F.2d at 288).[FN3]

> FN3. The Court also agrees with the *Taam Associates* court's conclusion that application of Rule 9(b) to non-fraud claims grounded in fraud does not run afoul of the Supreme Court's decision in *Leatherman v. Tarrant County Narcotics Intelligence and*

*Coordination Unit,* 507 U.S. 163, 113 S.Ct. 1160 (1993), in which the Court held that Rule 9(b) is limited only to the claims enumerated in the rule, i.e., fraud and mistake. *SeeLeatherman,* 507 U.S. at 168, 113 S.Ct. at 1163. The *Leatherman* holding did not address instances where fraud forms the basis for a non-fraud claim, and this Court finds no reason to conclude that *Leatherman* precludesthe application of Rule 9(b) in such circumstances.

**\*7** Having concluded that Rule 9(b) applies to non-fraud claims grounded in fraud, the Court must determine whether claims other than the fraud claims alleged in Counts III and IV are based upon allegations of fraud. The Court determines, based upon its review of the complaint, that Counts I and II, which allege claims for breach of fiduciary duty and aiding and abetting breach of fiduciary duty, are subject to Rule 9(b) even though Krieger has expressly disclaimed any allegations of fraud. The crux of the allegations in those counts, which specifically reference the Wrongful Plan, is that the Inside Defendants dissuaded Krieger and the minority shareholders from exercising their appraisal rights by misleading them about the true value of their GMC stock. (*See* Compl. ¶¶ 62,63, 68, 70.) Moreover, according to Krieger's own allegations, the Wrongful Plan was steeped in fraud. Likewise, the Court finds that Krieger's conspiracy claim in Count VI is grounded in fraud and subject to Rule 9(b).[FN4] In particular, the complaint alleges that Defendants were "parties to an agreement, the Wrongful Plan, the purpose of which was unlawful, to defraud" Krieger. (Compl.¶ 94.) In contrast to the other claims, the Court finds that Krieger's unjust enrichment claim alleged in Count VII is not subject to Rule 9(b) because fraud is not required to establish the claim and Krieger did not include any allegations of fraud in that claim.

> FN4. As with breach of fiduciary duty claims, several courts have also held that Rule 9(b) applies to civil conspiracy

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

claims where the conspiracy is linked to fraud. *SeeHayduk v. Lanna,* 775 F.2d 441, 443 (1st Cir.1985); *Heinrich v. Sweet,* 49 F.Supp.2d 27, 45 (D.Mass.1999); *Cohabaco Cigar Co. v. United States Tobacco Co.,* No. 98 C 1580, 1998 WL 773696, at *6 (N.D.Ill.1998) (mem.op.).

1. Inside Group

The Court first determines whether the complaint satisfies Rule 9(b) with respect to the allegations against the Inside Group (Warren Gast, Kevin Gast, Johnson, Westmaas, and Van Den Berg). Based upon its review of the allegations against those defendants, the Court concludes that, in general, Krieger has sufficiently complied with Rule 9(b) to avoid dismissal. The complaint outlines the details and purpose of the alleged fraudulent scheme, namely, that the Inside Group adopted a plan to maximize their profit from a planned sale or IPO of GMC by causing GMC to merge with GIC and squeeze Krieger and the other minority shareholders out at an unfairly low price. (*See* Compl. ¶¶ 33(e), 34.) The complaint further alleges that in order to accomplish the Wrongful Plan, the Inside Group drafted and sent to the minority shareholders the misleading Notice, which was intended to cause the minority shareholders to accept the amount offered for their shares and forego their right to an appraisal that would have revealed that the real value of their GMC shares was substantially in excess of the price offered in the merger. (*Seeid.* ¶¶ 36, 39, 40.) Moreover, the complaint alleges in sufficient detail the time, place, and content of the alleged misrepresentations or omissions. In contrast to many complex securities cases where plaintiffs allege a host of misrepresentations and omissions by various defendants at different times and places, the misrepresentations and omissions that allegedly occurred in this case, with the exception of two allegedly misleading statements made by Warren Gast at the August 21, 1996, shareholders meeting, are limited to the statements made in or the information omitted from the Notice sent to the shareholders by Warren Gast on August 9, 1996.[FN5]

> FN5. Having reviewed the alleged misrepresentations set forth in paragraphs 40 through 45 of the complaint, the Court has some doubt about whether some or possibly all of those statements can be considered false or misleading in light of information disclosed in the Notice, which explains the details of the merger, and the subsequent occurrence of all of the events described in the Notice. However, because the Inside Group Defendants have not challenged the sufficiency of those allegations under Rule 12(b)(6), the Court need not address whether those allegations suffice to support a fraud claim. *SeeMidwest Commerce Bank Ins. Co. v. Elkhart City Ctr.,* 4 F.3d 521, 523 (7th Cir.1993) (stating that "Rule 9(b) does not require that the complaint explain the plaintiff's theory of the case, but only that it state the misrepresentation, omission, or other action or inaction that the plaintiff claims was fraudulent. The plaintiff's theory of the case is tested by a motion to dismiss for failure to state a claim ...." (citations omitted)).

**\*8** The Inside Group's primary contention is that the complaint fails to comply with Rule 9(b) because it does not allege any specific conduct by Van Den Berg and the other Inside Group defendants, other than Warren Gast, who prepared and signed the notice, apart from conclusory allegations that they "controlled and directed the actions complained of,""caused the misleading Notice to be mailed" to Krieger, and "intentionally misstated and omitted material facts from the notice and other documents related to the Merger."Krieger responds that his allegations against Van Den Berg and the other Inside Group Defendants are sufficient because they show that as directors, those Defendants authorized and consented to the Notice and saw it before it was sent out. In addition, Krieger contends

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 8
Not Reported in F.Supp.2d, 2000 WL 288442 (W.D.Mich.)
**(Cite as: Not Reported in F.Supp.2d, 2000 WL 288442)**

that he is entitled to rely on the "group published information" presumption because the Notice was sent out as part of a corporate group decision-making process.

The Court agrees with Defendants that Krieger has not alleged any specific conduct by Van Den Berg, Kevin Gast, Westmaas, and Johnson. Thus, because the Notice is central to Krieger's fraud claim, Krieger can meet Rule 9(b) with respect to the Inside Group defendants other than Warren Gast only if the "group published information" presumption applies in this case. Under that presumption, "[i]dentifying the individual sources of statements is unnecessary when the fraud allegations arise from misstatements or omissions in group-published documents such as annual reports, which presumably involve collective actions of corporate directors or officers." *Schwartz v. Celestial Seasonings, Inc.,* 124 F.3d 1246, 1254 (10th Cir.1997); *see also Berry v. Valence Tech., Inc.,* 175 F.3d 699, 706 (9th Cir.1999). The "group published information" or "group pleading doctrine," as it is also called, has been applied in securities cases to various types of corporate communications and reports, including prospectuses, SEC filings, registrations, and other documents intended for dissemination to the public. *See Benedict v. Cooperstock,* 23 F.Supp.2d 754, 763 (E.D.Mich.1998) (mem.op.).

The Inside Group Defendants appear to concede that the presumption applies to Defendants Johnson and Westmaas, who were also officers of GMC. They contend that the presumption is inapplicable to Defendants Van Den Berg and Kevin Gast, who were outside directors. They assert that the presumption does not apply to Van Den Berg and Kevin Gast because Krieger failed to allege that Van Den Berg and Kevin Gast either participated in the day-to-day operations of GMC or had a special relationship with GMC.[FN6] Many courts, particularly those in the Ninth Circuit, have limited the application of the presumption to outside directors to instances where the "outside director either participated in the day-to-day corporate activities, or

had a special relationship with the corporation, such as participation in preparing or communicating group information at particular times." *Decker v. Glenfed, Inc.* (*In re Glenfed, Inc. Sec. Litig.*), 60 F.3d 591, 593 (9th Cir.1995). The justification for requiring plaintiffs to allege more specific involvement by outside directors in the preparation and dissemination of allegedly misleading materials is that outside directors are not employees of the company with ongoing responsibilities and are thus less connected to the company's day-to-day affairs. *See In re Syntex Corp. Sec. Litig.,* 855 F.Supp. 1086, 1100 (N.D.Cal.1994); *Haltman v. Aura Sys., Inc.,* 844 F.Supp. 544, 548-49 (C.D.Cal.1993).

> FN6. The Inside Group Defendants do not dispute that the "group published information" doctrine applies to the inside directors, Johnson and Westmaas.

**\*9** The Inside Defendants are correct that Krieger has not specifically alleged that Van Den Berg and Kevin Gast either participated in GMC's day-to-day affairs or had a special relationship with GMC. However, the Court finds that the "group published information" presumption may be applied in this case even in the absence of such allegations. Typically, the presumption is applied in securities fraud cases where the misleading statements tend to occur in prospectuses, financial reports, and other documents prepared under the direction of corporate officers with intimate knowledge of the matters contained in those documents. Because outside directors lack "operational involvement," their "boardroom titles" alone are insufficient to warrant the presumption. *Syntex Corp.,* 855 F.Supp. at 1100. The difference in this case is that unlike prospectuses, financial statements, and reports, the Notice involved a merger-a matter requiring approval by the board in the first instance as well as notice by the board to the shareholders regarding approval of the Merger.[FN7] *See* M.C.L.A. § 450.1703a. Because the Merger was a matter in which the board was intimately involved, the Court concludes that Krieger may rely on the "group published informa-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                              Page 9
Not Reported in F.Supp.2d, 2000 WL 288442 (W.D.Mich.)
**(Cite as: Not Reported in F.Supp.2d, 2000 WL 288442)**

tion" presumption to satisfy Rule 9(b) with respect to the Inside Group Defendants other than Warren Gast. However, because the presumption applies only to written documents, it encompasses statements or omissions in the Notice but does not apply to the oral statements which Krieger alleges Warren Gast made at the shareholders meeting. (*See* Compl. ¶¶ 46(h), 47.)

> FN7. In fact, the Notice states that it was sent "By Order of the Board of Directors" and the proxy statement indicates that it was sent "by the Company's Board of Directors...." (Notice at 3, Compl. Ex. A.)

The Court does conclude, however, that the complaint fails to satisfy Rule 9(b) in two respects. First, in paragraphs 76 and 82, Krieger alleges that the Inside Group intentionally misstated and omitted material facts from the Notice and "other documents related to the Merger," but does not identify what the "other documents" are. Second, Krieger alleges that he relied on the Notice but fails to allege that he relied on the alleged statements by Warren Gast at the shareholders meeting. Therefore, Krieger must amend his complaint to sufficiently identify the "other documents" and to allege reliance upon Warren Gast's statements if he did in fact rely on them.

2. McDonald Companies

The McDonald Companies also contend that the complaint fails to comply with Rule 9(b). The Court agrees with Defendants that the complaint lacks the required specificity in the allegations against McDonald Investments. The complaint alleges nothing more than McDonald Investments is the parent of McDonald & Co., is a citizen of Ohio, and "received the fruits of the fraud committed by McDonald & Co. and the other defendants."(Compl.¶¶ 4, 18.) These allegations are insufficient because Krieger has not alleged any acts or conduct by McDonald Investments to support any of his claims against that defendant, even under the

more generous pleading requirements of Rule 8.

**\*10** The Court also agrees with Defendants that the complaint fails to comply with Rule 9(b) with respect to the claims against McDonald & Co. for fraud under Count IV. The complaint fails to allege any conduct by McDonald & Co. which constitutes fraud, and Krieger may not rely on the "group published information" presumption to meet Rule 9(b) with respect to this defendant. Although a plaintiff should normally be given the opportunity to amend in the face of a Rule 9(b) challenge, the Court finds that further amendment would be futile, as Krieger has already had several opportunities to develop his claims against the McDonald Companies and he has not demonstrated that amendment would cure the deficiencies in his complaint.

B. Failure to Plead Scienter

1. The Inside Group

The Inside Group contends that Counts II, III, IV, and VI must be dismissed because Krieger's allegations not only fail to demonstrate intent, but also suggest that the members of the Inside Group acted irrationally. More specifically, the Inside Group contends that if Krieger's premise is true, i.e., that shares of GMC stock were actually worth $300 at the time the Merger was approved, then the Inside Group gave up millions of dollars when they sold 325,533 shares of their stock to GMC for $140 per share-the same amount paid to Krieger and the minority shareholders-and when GMC sold a 49% interest to RDV for $140 per share.[FN8]The Inside Group asserts that because "[n]o rational person would give such discounts, let alone enter into a complicated conspiracy to do so," (Inside Group Defs.' Br. at 8), Krieger's own allegations dispel any reasonable inference of fraudulent intent.

> FN8. Using Krieger's numbers, the Inside Group asserts that they lost over $52 million on the sale of their stock to GMC (($300 per share x 325,533 shares)-($140 x

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 10
Not Reported in F.Supp.2d, 2000 WL 288442 (W.D.Mich.)
**(Cite as: Not Reported in F.Supp.2d, 2000 WL 288442)**

325,533)) and over $30.3 million when GMC sold the 49% interest to RDV for $140 per share (($300 per share x 387,074 total Inside Group shares)-($45.6 million paid to Inside Group)) x 49%-$4.2 million paid by RDV) when they could have had $116 million without going through the Merger and other transactions. The Inside Group asserts that because "[n]o rational person would give such discounts, let alone enter into a complicated conspiracy to do so," (Inside Group's Br. at 8), Krieger's own allegations dispel any reasonable inference of fraudulent intent.

Krieger responds that the Inside Group's argument misconstrues the complaint because Krieger is not alleging that the Inside Group sold their GMC shares on the same terms as the minority shareholders. Rather, Krieger contends that the sale by the Inside Group was a sham because the Inside Group actually sold their shares for $140 *plus* an ownership interest in the new GMC entity. With respect to the RDV transaction, Krieger asserts that RDV actually paid $8.4 million for its shares because the $4.2 million loan was really just more equity and the RDV transaction included elements of value beyond the $8.4 million equity infusion/loan. In addition, Krieger contends that RDV's purchase of a 49% interest in post-merger GMC for $8.4 million is proof that the stock was worth more than $140 because all of GMC's shares had allegedly been redeemed for full value and GMC was worthless. This last argument ignores the fact, as set forth in the Notice, that GMC did not redeem 61,743 of the Inside Defendants' GMC shares. (*See*Notice at 12, Compl. Ex. A.) Based upon the $140 per share, GMC would have still been worth approximately 8.6 million dollars after the redemption, an amount which corresponds closely to the price paid by RDV for its 49% interest.[FN9]

FN9. At $140 per share, 61,643 shares equals approximately $8.6 million. A 49% share of the company would thus equal roughly $4.2 million.

While the Inside Group's argument seems persuasive, for purposes of a Rule 12(b)(6) motion, the Court finds that Krieger's allegations are not so incredible as to negate any inference of scienter on the part of the Inside Group. A plaintiff may show fraudulent intent "either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness."*Shields v. Citytrust Bancorp, Inc.,* 25 F.3d 1124, 1128 (2d Cir.1994). Krieger's allegations fall more into the former means of proof rather than the latter. Those facts essentially show that the Inside Group desired to maximize their profits on an eventual sale of GMC stock by offering the minority shareholders less than fair value for their stock. Krieger's complaint includes at least a few allegations supporting an inference of fraud, namely, the failure to disclose the plan to sell GMC to a third party following the Merger and the failure to disclose the existence of a GMC valuation performed by DeLoitte & Touche. As described by the court in *Sealy Mattress Co. of New Jersey, Inc. v. Sealy, Inc.,* 532 A.2d 1324 (Del. Ch.1987), it was incumbent on the Inside Defendants to make full disclosure to the minority shareholders:

**\*11** As fiduciaries seeking to "cash out" the minority stockholders of a Delaware corporation in a non-arm's length merger, the defendants had a duty to be entirely and scrupulously fair to the plaintiffs in all respects. The majority stockholder was obliged not to time or structure the transaction, or to manipulate the corporation's values, so as to permit or facilitate the forced elimination of the minority stockholders at an unfair price. The corporation's directors were obliged to make an informed, deliberate judgment, in good faith, that the merger terms, including the price, were fair and that the merger would not become a vehicle for economic oppression. And finally, the directors (and the majority stockholder, to the extent that it involved it-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                         Page 11
Not Reported in F.Supp.2d, 2000 WL 288442 (W.D.Mich.)
**(Cite as: Not Reported in F.Supp.2d, 2000 WL 288442)**

self in such matters) were obliged to disclose with entire candor all material facts concerning the merger, so that the minority stockholders would be able to make an informed decision as to whether to accept the merger price or to seek judicial remedies such as appraisal, an injunction, or a post merger damage action.

*Sealy Mattress Co.,* 532 A.2d at 1335 (citation omitted); *see also* *Thompson v. Walker,* 253 Mich. 126, 135, 234 N.W. 144, 147 (1931).

Krieger's allegations in this case are similar to those in *Lydon v. Estate of Winston,* 715 F.Supp. 600 (S.D.N.Y.1989) (mem.op.). In *Lydon,* the plaintiff, a minority shareholder in Winston Network, Inc. ("WNI"), alleged that the majority shareholders violated the federal securities laws in connection with a squeeze-out merger between WNI and a corporation formed by the majority shareholders for the purpose of acquiring WNI. Seventeen months after the merger, the majority shareholder group sold WNI for a substantial profit even though, according to the plaintiffs, no business developments or changes had occurred. *See* *Lydon,* 715 F.Supp. at 601. The plaintiff alleged that the majority shareholder group failed to disclose that it planned to re-sell WNI at a higher price but did not allege that the group had a specific buyer in mind or that it had engaged in any level of purchase negotiations. The court rejected the plaintiff's contention that the post-merger sale alone was sufficient to infer fraudulent intent because the plaintiff failed to allege the price of the shares at the time of the merger or that the majority shareholder group had made any efforts prior to the merger to determine whether WNI could be sold. *See* *id.* The court also found that "[e]ven if the fact of such a plan is an actionable omission, there are no factual allegations that support an inference that the alleged plan to find a buyer in the future had been formulated prior to the merger." Without such allegations, the court concluded that the plaintiff failed to establish fraud under the federal securities laws.[FN10] *See* *id.* at 602.

FN10. As an alternate basis for dismissal,

the court held that the plaintiff failed to state a claim under the Supreme Court's holding in *Santa Fe Industries, Inc. v. Green,* 430 U.S. 462, 97 S.Ct. 1292 (1977).

In addition to the fact that Krieger alleges common law fraud rather than fraud under the securities laws, this case differs from *Lydon* because Krieger has alleged that the Merger was part of the Inside Group's plan to sell GMC for a profit after cashing out the minority shareholders. Furthermore, Krieger alleges that prior to the Merger, the Inside Group actually hired an investment banker and examined the options for maximizing its investment in GMC, including a possible sale to a third party. While the Inside Group's argument may ultimately support a Rule 56 motion, the Court finds that at this juncture Krieger's allegations are sufficient to proceed against the Inside Group.[FN11]

FN11. The parties have devoted substantial time to debating whether the redemption of the continuing shareholders' shares reduced the value of GMC. The Court does not find the issue to be determinative of the motion. "When a corporation redeems stock, the stock it receives is offset by a corresponding liability. The value of the corporation is reduced by the amount of the liability, and there is no change in the value of the remaining shares." *Smith v. Smith,* 197 W. Va. 505, 510, 475 S.E.2d 881, 886 (1996). However, the value of the remaining shares may increase if fair market value was not paid for the redeemed shares. *See* *id.* Thus, if Krieger is correct that the minority shareholders received less than fair market value, the continuing shareholders' shares would have actually increased in value as alleged.

2. The McDonald Companies

**\*12** The Court agrees with the McDonald Companies that the complaint fails to establish scienter in

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                 Page 12
Not Reported in F.Supp.2d, 2000 WL 288442 (W.D.Mich.)
(Cite as: Not Reported in F.Supp.2d, 2000 WL 288442)

the claims against the McDonald Companies. The only allegations made by Krieger that might even arguably support an inference of scienter is that McDonald & Co. was paid a "success fee" and other compensation for its role in structuring the Merger and other transactions and that its fees were dependent upon the success of the transactions at issue. However, an allegation that a defendant received a fee which, by itself, was legitimate is insufficient to support an inference of scienter. *SeeAdvocacy Org.,* 176 F.3d at 324 (stating that "[t]he mere possibility that an otherwise lawful payment system could be used to defraud does not create a inference of fraud sufficient to withstand a 12(b)(6) motion"); *Melder v. Morris,* 27 F.3d 1097, 1104 (5th Cir.1994) (holding that the plaintiff's allegation that the underwriters received substantial fees in connection with securities offerings failed to support an inference of scienter). Because Krieger has failed to allege that the McDonald Companies knowingly participated in the alleged fraud, the Court finds that the fraud claim under Count IV must be dismissed, as well as the aiding and abetting/inducement and conspiracy to commit breach of fiduciary duty claim and conspiracy claim in Counts II and VI, because those claims require at least some degree of knowing participation, which is not supported by the allegations in the complaint. *SeeEstate of Goldman v. National Bank of Detroit,* 236 Mich.App. 517, 523, 601 N.W.2d 126, 129 (1999) (per curiam) (concluding that the petitioners failed to allege facts to support a reasonable inference that the respondent knowingly participated in the alleged breach of fiduciary duty); *Veriden v. McLeod,* 180 Mich. 182, 191, 146 N.W. 619, 622 (1914) (stating that a plaintiff alleging civil conspiracy must prove joint assent of the minds of two or more persons); *Cousineau v. Ford Motor Co.,* 140 Mich.App.19, 32, 363 N.W.2d 721, 728 (1985) (noting requirement of a "tacit understanding" among conspirators) (citing William L. Prosser, *Handbook on the Law of Torts,* § 46, at 292 (4th ed.1971)); *cf.In re North Dakota Personal Injury Asbestos Litig. No. 1,* 737 F.Supp. 1087, 1096 n. 4 (D.N.D.1990) (stating that "[w]here an alleged civil

conspiracy is grounded in deceit or fraud, the court must be vigilant in the requirement of scienter).

C. Count II

The Inside Group Defendants and the McDonald Company Defendants contend that Count II, titled "Aiding and Abetting/Inducement and Conspiracy to Commit a Breach of Fiduciary Duty and/or Abuse of Confidential Relationship Against All Defendants" must be dismissed because: (1) Krieger did not allege that the interest of any fiduciary was antagonistic to Krieger's interest; and (2) Krieger did not allege knowing participation by the McDonald Companies. Krieger's claim is essentially one for knowing participation in a fiduciary's breach of duty.

**\*13** The Michigan Court of Appeals recently addressed a claim based upon participation in the breach of a fiduciary duty in *Estate of Goldman.*In that case, the petitioner alleged that the respondent bank assisted the trustee of a marital trust in improperly distributing the assets of the trust to the surviving spouse for the purpose of creating a new trust. While not expressly recognizing an action for participation in a fiduciary's breach of his fiduciary duty, the court acknowledged that the claim was consistent with prior Michigan cases, including *L.A. Young Spring & Wire Corp. v. Falls,* 307 Mich. 69, 11 N.W.2d 329 (1943) (en banc), which held that a defendant was liable for profits he received as a willing and active participant in a conspiracy to defraud General Motors. *SeeEstate of Goldman,* 236 Mich.App. at 522-23, 601 N.W.2d at 128-29 (discussing *L.A. Young* ). The *Estate of Goldman* court noted the *L.A. Young* court's quotation of the following passage from *Irving Trust Co. v. Deutsch,* 73 F.2d 121 (2d Cir.1934): "one who knowingly joins a fiduciary in an enterprise where the personal interest of the latter is or may be antagonistic to his trust becomes jointly and severally liable with him for the profits of the enterprise."*Irving Trust,* 73 F.2d at 125. The *Estate of Goldman* court affirmed the dismissal of the peti-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                     Page 13
Not Reported in F.Supp.2d, 2000 WL 288442 (W.D.Mich.)
**(Cite as: Not Reported in F.Supp.2d, 2000 WL 288442)**

tioners' claim because it found that the petitioners' allegations did not show that the bank took affirmative steps to assist the fiduciary in violating his duties to the beneficiaries or that the bank profited from the breach. *SeeEstate of Goldman,* 236 Mich.App. at 523, 601 N.W.2d at 129.

The Inside Group contends that Krieger has failed to state a claim because his allegations are inconsistent with any inference that their interests were antagonistic to Krieger's interests. This argument incorporates the Inside Group's argument that scienter cannot be inferred from Krieger's allegations because those allegations establish that the Inside Group sold their stock for the same price Krieger received for his stock. In other words, the Inside Group contends that because they did not receive more than Krieger received, their interests were congruent with, and not opposed to, Krieger's interest.

As discussed above, while this argument does have merit on its surface, Krieger has alleged sufficient facts from which it may be inferred that the Inside Group intentionally failed to disclose information relating to the value of GMC at the time of the Merger and the purpose of the Merger. If Krieger is correct in his assertion that the value of GMC shares was much higher than $140 at the time of the Merger and the Inside Defendants were aware of that fact, the Inside Group's interest would certainly be antagonistic to those of Krieger and the minority shareholders to the extent that they received less than fair market value for their stock because the continuing shareholders would have reaped the benefit of the difference. Therefore, the Court will not dismiss Count II against the Inside Defendants at this stage.

**\*14** The McDonald Companies contend that Count II should be dismissed against them because the allegations do not establish that they profited from the transaction. One of the reasons given by the *Estate of Goldman* court for its conclusion that the petitioners failed to allege knowing participation was that the respondent bank did not profit from the

breach of fiduciary duty. *SeeEstate of Goldman,* 236 Mich.App. at 523, 601 N.W.2d at 129. The Mc-Donald Companies acknowledge that McDonald & Company received fees as a result of the Merger and other transactions but contend that such fees are insufficient to constitute knowing participation in a breach of fiduciary duty. In support of their position, the McDonald Companies rely on the *Irving Trust* case cited in *Estate of Goldman* and *L.A. Young.*In *Irving Trust,* the bankruptcy trustee for Acoustic Products Company sued various directors of the company based upon their alleged appropriation of a corporate opportunity to acquire shares of stock in a company controlled by W.R. Reynolds & Co. ("Reynolds").*SeeIrving Trust,* 73 F.2d at 122-23. The trustee sued Reynolds on the theory that it knowingly participated with the directors in breaching their fiduciary duties. The court found that Reynolds "was not obligated to ... investigate scrupulously the intracorporate affairs of Acoustic" and concluded that Reynolds could not be held liable for participating in the breach "[s]ince it received no benefit from the transaction aside from completing the sale of the stock...."*Id.* at 125.

Here, Krieger has not alleged that McDonald & Co. received any benefits from the alleged breach of fiduciary duty apart from its receipt of investment fees. Krieger has only alleged that McDonald & Co. received investment fees that were incident to the transactions. Because Krieger has not alleged that McDonald & Co. received any benefit beyond its fees, the Court finds that Count II fails to state a claim against the McDonald Companies.

### D. Count V

Count V alleges a claim for negligent misrepresentation. A negligent or innocent misrepresentation claim "eliminates the elements of scienter and intention that the misrepresentation be acted upon, [but] it preserves the requirements of affirmative representation, reliance, and causation."*Dix v. American Bankers Life Assurance Co. of Florida,* 141 Mich.App. 650, 659, 367 N.W.2d 896, 900-01

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                    Page 14
Not Reported in F.Supp.2d, 2000 WL 288442 (W.D.Mich.)
**(Cite as: Not Reported in F.Supp.2d, 2000 WL 288442)**

(1985) (per curiam) (citing *United States Fidelity & Guar. Co. v. Black,* 412 Mich. 99, 116-19, 313 N.W.2d 77, 83-85 (1981)), *aff'd in part, rev'd on other grounds,* 429 Mich. 410, 415 N.W.2d 206 (1987). Krieger asserts that his claim is based upon the misrepresentations and omissions in the Notice and the misrepresentations made by Warren Gast at the shareholders meeting.

The Court finds that Krieger has failed to state a claim against the McDonald Companies for negligent misrepresentation for two reasons. First, the allegations do not show that the McDonald Companies owed a duty to Krieger or the minority shareholders. *SeeOhio Farmers Ins. Co. v. Shamie,* 235 Mich.App. 417, 426, 597 N.W.2d 553, 558 (1999) (finding the plaintiff's allegations that the defendants had a duty to exercise due care to the plaintiff were sufficient to support a negligent misrepresentation claim); *Boumelhem v. Bic Corp.,* 211 Mich.App. 175, 185, 535 N.W.2d 574, 579 (1995) (stating that the defendant had no duty to warn the plaintiff of the dangerous character of its lighters). Second, the complaint contains no allegation stating that the McDonald Companies made any sort of affirmative misrepresentation to Krieger.

**\*15** Krieger has also failed to state a claim against Defendants Westmaas, Kevin Gast, Johnson, and Van Den Berg. Krieger's claim against these Defendants depends entirely upon misrepresentations or omissions in the Notice. However, a negligent misrepresentation claim may not be based upon an omission. *SeePlatsis v. E.F. Hutton & Co.,* 946 F.2d 38, 41 (6th Cir.1991) (stating that the requirement of a false representation "can be satisfied only by an affirmative misstatement, not by an omission") (applying Michigan law). Thus, Krieger cannot rely upon the omissions set forth in his complaint to support his claim. The Court also finds that the statements set forth in paragraphs 44 and 45 of the complaint do not constitute misrepresentations of fact because those statements reflect opinions or describe events which were "anticipated to occur after the Merger," (*see*Notice at 11, Compl.

Ex. A), and which in fact occurred. Therefore, Count V will be dismissed as to those Defendants.

Finally, Krieger may not rely on the statements Warren Gast allegedly made at the shareholders meeting because he did not allege that he actually attended the meeting and heard those statements and he did not allege that he relied on the statements. Because Krieger is required to prove both reliance and causation, he also fails to state a claim against Warren Gast. However, the Court will grant Krieger leave to file an amended complaint to include specific allegations showing reliance and causation.

E. Count VII

Defendants contend that Krieger's unjust enrichment claim in Count VII must be dismissed because Krieger did not allege that they were enriched by the Wrongful Plan. To establish his claim, Krieger is required to show that Defendants received a benefit from him. *SeeDumas v. Auto Club Ins. Ass'n,* 437 Mich. 521, 546, 473 N .W.2d 652, 663 (1991). The Court agrees with Defendants that Krieger has not alleged that the McDonald Companies received a benefit from him. The allegations in the complaint show that the only thing that the McDonald Companies received was their fee-which Krieger did not pay. On the other hand, the Court finds that Krieger's allegations are sufficient to show that the Inside Group received a benefit from Krieger and the minority shareholders. Assuming that Krieger can sustain his allegations with evidence and show that the Inside Group was aware that GMC's stock was worth more than $300 at the time the Notice was sent out, he will be able to show that the Inside Group received a benefit, namely, the difference between the fair market value of the stock and the $140 per share paid to Krieger and the minority shareholders. Therefore, the claim will be dismissed against the McDonald Companies but not against the Inside Group.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                          Page 15
Not Reported in F.Supp.2d, 2000 WL 288442 (W.D.Mich.)
**(Cite as: Not Reported in F.Supp.2d, 2000 WL 288442)**

II. GMC's Motion to Dismiss

GMC has moved for dismissal of all claims. The Court will discuss each claim separately.

A. Count II

GMC first contends that Krieger's claim of knowing participation in breach of fiduciary duty alleged in Count II fails to state a claim against GMC because the complaint fails to allege that GMC did anything to aid or abet the Inside Defendants in breaching their fiduciary duties. Although Krieger protests that he refers to GMC as a wrongdoer throughout the complaint, those allegations, including those under Count II and elsewhere in the complaint, are at best, conclusory, and fail to identify any specific participation by GMC in the alleged breach of fiduciary duty. Therefore, Count II will be dismissed against GMC.

B. Count VI

**\*16** GMC next contends that the conspiracy claim in Count VI must be dismissed because GMC, as a corporation, cannot conspire with its own officers and directors under the intra-corporate conspiracy doctrine. Generally, "there can be no conspiracy between a corporation and its directors if the directors are acting on behalf of the corporation."*Blair v. Checker Cab Co.,* 219 Mich.App. 667, 674, 558 N.W.2d 439, 442 (1996). However, an exception to this rule exists "where the directors have an independent personal stake in a particular action and, therefore, are actually acting on their own behalf."*Id.* at 674-75, 558 N.W.2d at 442.

Construing all inferences in Krieger's favor, the Court finds that Krieger has sufficiently alleged that the director defendants had a personal stake in the outcome of the Wrongful Plan because they personally stood to benefit from its success in the form of an increase in the value of their shares. Although GMC contends that Krieger does not differentiate between the gain sought by GMC and the gain

sought by the directors, GMC has cited no case law imposing an obligation upon Krieger to do so. Instead, the cases establish that so long as the allegations in the complaint show that the agents of the corporation had a personal stake, the intra-corporate conspiracy doctrine will not bar a conspiracy claim against a corporate defendant. *SeeBrever v. Rockwell Int'l Corp.,* 40 F.3d 1119, 1127 (10th Cir.1994); *Blair,* 219 Mich.App. at 675-76, 558 N.W.2d at 443. Thus, Count VI states a claim against GMC.

C. Count V

GMC contends that Krieger's negligent misrepresentation claim must be dismissed because Krieger did not allege that GMC owed a duty of care to supply correct information. Citing *Radol v. Thomas,* 772 F.2d 244 (6th Cir.1985), GMC correctly notes that a corporation has no fiduciary duty to its shareholders. *SeeRadol,* 772 F.2d at 258. GMC contends that because it did not have any fiduciary duty to Krieger, his negligent misrepresentation claim must fail.[FN12]

> FN12. The Court rejects GMC's reliance on the economic loss doctrine. That doctrine has been applied by Michigan courts only in cases involving the sale of goods under the Uniform Commercial Code. *SeeNeibarger v. Universal Coops., Inc.,* 439 Mich. 512, 515-21, 486 N.W.2d 612, 613-15 (1992). In addition, the Uniform Commercial Code specifically excludes "investment securities" from the definition of "goods." *See*M.C.L. § 440.2105(1).

Krieger does not contend that GMC owed him a fiduciary duty. Krieger cites *Molecular Technology Corp. v. Valentine,* 925 F.2d 910 (6th Cir.1991) as support for his assertion that he may maintain a negligent misrepresentation claims against GMC without regard to whether GMC owed him a fiduciary duty. In *Molecular Technology,* the Sixth Circuit found that under Michigan law, a special rela-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                          Page 16
Not Reported in F.Supp.2d, 2000 WL 288442 (W.D.Mich.)
**(Cite as: Not Reported in F.Supp.2d, 2000 WL 288442)**

tionship, such as privity, need not exist in order for a defendant to owe a duty of care to provide accurate information to a third party. *SeeMolecular Tech.,* 925 F.2d at 915-16. Rather, the court held that a defendant owes a duty to "all those ... who defendant knows will rely on the information *and* to third parties who defendant should reasonably foresee will rely on the information."*Id.* at 916 (italics in original). The court relied on *Williams v. Polgar,* 391 Mich. 6, 215 N.W.2d 149 (1974) (en banc) in support of its position. In *Polgar,* the Michigan Supreme Court held that the existence of a duty does not depend on privity. *SeeWilliams,* 391 Mich. at 9-10, 18, 215 N.W.2d at 150, 154. The *Polgar* court extended liability, specifically to an abstractor who prepared an erroneous abstract of title, beyond those known to be relying on the abstract to those persons the abstractor could reasonably foresee as relying on the accuracy of the abstract. *Seeid.* at 157, 215 N.W.2d at 157.

**\*17** Applying *Polgar* and *Molecular Technology* to the instant case, the Court finds that Krieger has alleged sufficient facts to establish that GMC had a duty to ensure Krieger received accurate information about the Merger and other transactions. The facts in the complaint show that the board of directors approved the Merger and, acting through Warren Gast, prepared and sent the Notice to the shareholders explaining the details of the Merger. At the time the Notice was sent out, the directors knew that it would be received and read by a defined group of individuals-the GMC shareholders. Thus, Krieger was within the group of persons that the directors knew would rely on the Notice. Although GMC contends that Krieger has not alleged any facts showing that GMC performed any act that created a duty, GMC's duty arises because the directors were acting on behalf of GMC when they prepared and sent the Notice. Thus, Krieger has alleged sufficient facts to support a finding that GMC owed a duty to furnish accurate information. As noted above, however, Krieger may not rely on the Notice to establish his claim because the representations in the Notice were not false and omissions

cannot support a claim for negligent misrepresentation. Thus, the only statements left are those allegedly made by Warren Gast at the shareholders meeting.

### D. Count III

GMC, like the Inside Group, contends that Krieger's fraud claim must be dismissed because the allegations negate any inference of intent to defraud. GMC's argument tracks the argument made by the Inside Group, namely, that if the stock was actually worth in excess of $300 per share at the time of the Merger, the Inside Group Defendants' sale of their stock and the sale of a 49% interest to RDV at $140 per share was totally irrational and contrary to the Inside Defendants' economic interests. As discussed above, the Court concludes that Krieger has alleged sufficient facts to raise the possibility that Defendants intentionally failed to disclose material information which may have been material to Krieger's decision whether to exercise his appraisal rights. Therefore, the Court will not dismiss the fraud claim at this stage.

### E. Count VII

Finally, GMC argues that Krieger's claim for unjust enrichment must be dismissed because Krieger does not allege that GMC received a benefit from Krieger. However, if Krieger's allegation that he was paid less than the true value of his stock is true, then GMC will have received a benefit from Krieger, i.e., Krieger's stock at less than true value. Therefore, the Court will deny the motion with respect to Count VII.

### III. Request For Leave To Amend

Krieger has requested leave to amend his complaint in the event that the Court finds that dismissal is appropriate. While leave to amend should generally be granted, the Court declines to grant Krieger leave to amend his complaint with regard to the dis-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 17
Not Reported in F.Supp.2d, 2000 WL 288442 (W.D.Mich.)
**(Cite as: Not Reported in F.Supp.2d, 2000 WL 288442)**

missed claims against the McDonald Companies and the dismissed claims against GMC because Krieger has had several opportunities to correct any deficiencies in his complaint and has not demonstrated how further amendment will save the dismissed claims. However, the Court will order Krieger to file an amended complaint to allege that he attended the shareholders meeting, heard the alleged statements by Warren Gast, and relied on them.

### Conclusion

**\*18** For the foregoing reasons, the Court will grant in part and deny in part the Inside Group's and the McDonald Companies' motion to dismiss. The Court will deny the motion with regard to the Inside Group on all counts except Count V against Defendants William E. Johnson, Kevin C. Gast, Jay Van Den Berg, and Allan Westmaas. The Court will allow Defendant Warren Gast to renew the motion again with respect to Count V in the event that Krieger fails to allege that he heard and relied on the statements allegedly made by Warren Gast at the shareholders meeting. The motion will be granted on all claims against the McDonald Companies. The Court will also grant in part and deny in part GMC's motion. Count II will be dismissed and the motion will be denied with regard to all other Counts. GMC will also be given the opportunity to renew its motion to dismiss Count V in the event Krieger fails to amend his complaint as required by the Court.

W.D.Mich.,2000.
Krieger v. Gast
Not Reported in F.Supp.2d, 2000 WL 288442 (W.D.Mich.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

7



--- F.3d ----                                                                                          Page 1
--- F.3d ----, 2008 WL 746849 (C.A.7 (Ill.)), 49 Bankr.Ct.Dec. 188
**(Cite as: --- F.3d ----, 2008 WL 746849)**

Maxwell v. KPMG LLP
C.A.7 (Ill.),2008.
Only the Westlaw citation is currently available.
United States Court of Appeals,Seventh Circuit.
Andrew J. MAXWELL, Plaintiff-Appellant,
v.
KPMG LLP, Defendant-Appellee.
**No. 07-2819.**

Argued Feb. 27, 2008.
Decided March 21, 2008.

**Background:** Trustee of Chapter 7 estate of cor-
poration that was allegedly doomed as result of its
decision to acquire "dot.com" company shortly pri-
or to collapse of "dot.com" market brought ad-
versary proceeding against accounting firm that had
audited corporation's books for firm's alleged pro-
fessional malpractice. Reference was withdrawn,
and the United States District Court for the North-
ern District of Illinois, Joan B. Gottschall, J., 2007
WL 2091184, granted defendant's motion for sum-
mary judgment. Trustee appealed.

**Holding:** The Court of Appeals, Posner, Circuit
Judge, held that accounting firm's alleged malprac-
tice was not cause, in any meaningful sense, of in-
jury to debtor or its creditors.

Affirmed.

**[1] Accountants 11A** ⟨image⟩**9**

11A Accountants
    11Ak9 k. Duties and Liabilities to Third Per-
sons. Most Cited Cases
Even assuming that accounting firm was negligent
in approving statement of fourth quarter earnings
that allegedly overstated significantly the fourth
quarter earnings of corporation that had entered in-
to negotiations to buy larger "dot.com" company,
and even assuming that, but for accounting firm's
negligence, this "dot.com" company would not
have allowed itself to be acquired by corporation

and that the acquiring corporation would not have
been doomed as result, by tying its fortunes to those
of the acquired company prior to collapse of
"dot.com" market, accounting firm's alleged negli-
gence was merely a "necessary condition" and not a
"cause" in any meaningful sense of word of harm
that corporation or its creditors sustained when
"dot.com" market collapsed and corporation was
forced into bankruptcy; accordingly, Chapter 7
trustee could not recover from accounting firm on
professional malpractice theory.

**[2] Negligence 272** ⟨image⟩**375**

272 Negligence
    272XIII Proximate Cause
        272k374 Requisites, Definitions and Distinc-
tions
            272k375 k. In General. Most Cited Cases

**Negligence 272** ⟨image⟩**379**

272 Negligence
    272XIII Proximate Cause
        272k374 Requisites, Definitions and Distinc-
tions
            272k379 k. "But-For" Causation; Act
Without Which Event Would Not Have Occurred.
Most Cited Cases

**Negligence 272** ⟨image⟩**422**

272 Negligence
    272XIII Proximate Cause
        272k420 Concurrent Causes
            272k422 k. Possibility of Multiple
Causes. Most Cited Cases
Necessary condition is sine qua non, but it is rarely
a "cause" in any meaningful sense of the word;
among the myriad of necessary conditions for any-
thing to occur, the one designated "the cause" is the
one that is significant from the standpoint of the
person making the designation, and may of course
be more than one such necessary condition.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----
--- F.3d ----, 2008 WL 746849 (C.A.7 (Ill.)), 49 Bankr.Ct.Dec. 188
**(Cite as: --- F.3d ----, 2008 WL 746849)**

Page 2

**[3] Accountants 11A ☜9**

11A Accountants
    11Ak9 k. Duties and Liabilities to Third Persons. Most Cited Cases
It was duty of accounting firm, in deciding whether to approve financial statements issued by corporation, to protect creditors of and investors in corporation from being misled to their harm by financial statements that contained errors that would be material to creditors or investors; it was not accounting firm's duty to give company business advice, such as advice on whether to acquire another company.

**[4] Accountants 11A ☜9**

11A Accountants
    11Ak9 k. Duties and Liabilities to Third Persons. Most Cited Cases
Even assuming that accounting firm was negligent in approving statement of fourth quarter earnings that allegedly overstated significantly the fourth quarter earnings of corporation that had entered into negotiations to buy larger "dot.com" company, and even assuming that, but for accounting firm's negligence, this "dot.com" company would not have allowed itself to be acquired by corporation, accounting firm's alleged negligence was a wrong to the company being acquired, not to the acquiring corporation, and firm's mistake did not turn it into insurer against folly of the acquiring corporation in deciding to purchase "dot.com" company shortly before "dot.com" market collapsed, a business decision unrelated to what accounting firm was hired to do.

**[5] Bankruptcy 51 ☜2187**

51 Bankruptcy
    51II Courts; Proceedings in General
        51II(C) Costs and Fees
            51k2182 Grounds and Circumstances
                51k2187 k. Frivolity or Bad Faith; Sanctions. Most Cited Cases
Judges must be vigilant in policing the litigation

judgment exercised by trustees in bankruptcy, and in appropriate case, must give consideration to imposing sanctions for the filing of frivolous suit.

**[6] Bankruptcy 51 ☜2187**

51 Bankruptcy
    51II Courts; Proceedings in General
        51II(C) Costs and Fees
            51k2182 Grounds and Circumstances
                51k2187 k. Frivolity or Bad Faith; Sanctions. Most Cited Cases

**Bankruptcy 51 ☜3152**

51 Bankruptcy
    51IX Administration
        51IX(E) Compensation of Officers and Others
            51IX(E)1 In General
                51k3152 k. Trustees. Most Cited Cases
Bankruptcy Code forbids reimbursing trustees for expenses incurred in actions not reasonably likely to benefit debtor's estate, and authorizes appropriate sanction against parties who file such a claim. 11 U.S.C.A. § 330(a)(4)(A)(ii)(I); Fed.Rules Bankr.Proc.Rule 9011(b)(2), (c)(1)(B), 11 U.S.C.A.

**[7] Federal Civil Procedure 170A ☜2771(1)**

170A Federal Civil Procedure
    170AXX Sanctions
        170AXX(B) Grounds for Imposition
            170Ak2767 Unwarranted, Groundless or Frivolous Papers or Claims
                170Ak2771 Complaints, Counterclaims and Petitions
                    170Ak2771(1) k. In General. Most Cited Cases
Frivolousness of suit, for purpose of award of sanctions, depends not on the net expected value of suit in relation to cost of suing, but on probability of the suit's succeeding; if that probability is very low, then suit is "frivolous."

Alyssa M. Campbell, Williams Montgomery & John, Chicago, IL, Steven J. Roeder (argued), for

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----
--- F.3d ----, 2008 WL 746849 (C.A.7 (Ill.)), 49 Bankr.Ct.Dec. 188
**(Cite as: --- F.3d ----, 2008 WL 746849)**

Page 3

Plaintiff-Appellant.
James R. Figliulo (argued), Michael K. Desmond, Figliulo & Silverman, Chicago, IL, for Defendant-Appellee.

Before EASTERBROOK, Chief Judge, and POSNER and WOOD, Circuit Judges.

POSNER, Circuit Judge.
**\*1** The plaintiff is the Chapter 7 bankruptcy trustee of a company named marchFIRST. He brought this suit against KPMG, the accounting firm, claiming that marchFIRST had been harmed as a result of the accounting firm's having breached its duty of care in violation of Illinois tort law. He seeks more than $600 million in damages. The district judge withdrew the case from the bankruptcy court and ultimately granted summary judgment in the defendant's favor.

KPMG was the auditor of a firm called Whittman-Hart, which offered consulting services in information technology. In the fall of 1999 Whittman-Hart became interested in buying a firm larger than itself called U.S. Web/CKS, which provided consulting services primarily to companies that used the Internet to sell goods or services. The purchase was consummated on March 1, 2000; the date became Whittman-Hart's new name. Whittman-Hart paid the owners of U.S. Web more than $7 billion. It paid entirely in the form of stock, a risky currency; for beginning in the following month many Internet-related ("dot.com") businesses experienced deep, often terminal, reverses. By virtue of the acquisition of U.S. Web, marchFIRST was such a business, and the following April, thirteen months after the acquisition, it declared bankruptcy.

The trustee argues that while the acquisition was being negotiated, KPMG approved a statement of WhittmanHart's fourth-quarter 1999 earnings that it should have known was false. It should have known, the trustee argues, that Whittman-Hart had engaged in a form of what is called "round-tripping." A company makes a loan to a firm controlled by it, with the understanding that

the borrower will purchase services from the lender in an amount equal to the amount of the loan, though the services may never be performed or if performed may have little value and thus cost the lender little or nothing. In effect the loan is reclassified from an account receivable by the lender to operating income to him minus only the zero or nominal cost of the services that he renders or pretends to render the borrower.

The trustee also complains that KPMG should not have approved Whittman-Hart's classifying prepaid consulting fees that it had received in the fourth quarter of 1999 as revenue in that quarter, rather than allocating them to 2000, when the fees were earned. Cf. *Indiana Lumbermens Mutual Ins. Co. v. Reinsurance Results, Inc.,* 513 F.3d 652, 653-55 (7th Cir.2008).

[1] As a result of these accounting maneuvers, WhittmanHart's fourth-quarter 1999 earnings were significantly overstated. We'll assume, without having to decide, that KPMG was negligent in approving the maneuvers that generated the overstatement. Had the earnings been correctly stated, U.S. Web would have learned that they had been considerably lower than Whittman-Hart's third-quarter earnings and its anticipated as opposed to realized fourth-quarter earnings. Therefore, the trustee argues, U.S. Web would have lost interest in being acquired by Whittman-Hart and the acquisition would have fallen through. There is no "therefore." Whittman-Hart was eager to make the acquisition and so might have paid more for U.S. Web to offset, as it were, the poor fourth-quarter results-in which event KPMG's alleged negligence would actually have saved Whittman-Hart's shareholders money had marchFIRST prospered. But we'll accept the trustee's argument, though just to move the analysis along, and also accept his further argument that had the acquisition fallen through, Whittman-Hart, though presumably not U.S. Web, would have survived the travails of the dot.com sector. US Web was larger than Whittman-Hart and more of a dot.com business. It was, the argument goes, only

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----                                                                                    Page 4
--- F.3d ----, 2008 WL 746849 (C.A.7 (Ill.)), 49 Bankr.Ct.Dec. 188
**(Cite as: --- F.3d ----, 2008 WL 746849)**

because Whittman-Hart was chained to a drowning U.S. Web by virtue of the acquisition that it too drowned.

**\*2** An immediate problem, unremarked by the parties, is that the principal beneficiaries should the trustee prevail in this suit would be the former shareholders of U.S. Web, even though there is no claim that U.S. Web would have survived had it not been acquired. The trustee is asking for damages far in excess-more than $500 million in excess-of the $93.6 million owed marchFIRST's unsecured creditors. The bulk of the recovery would thus go to the shareholders, and U.S. Web's shareholders received 57 percent of the stock of marchFIRST. Yet the linchpin of the trustee's case is that U.S. Web pulled marchFIRST down to its doom. US Web cannot be at once the cause of the bankruptcy and its principal beneficiary.

More important, to say that had it not been for KPMG's negligence the acquisition would have fallen through and Whittman-Hart would have survived, and therefore KPMG was a cause of the debacle, conflates a necessary condition-confusingly called by lawyers a "but-for cause"-with a real "cause," confusingly called by them a "proximate cause" and enigmatically defined as something "that produces an injury through a natural and continuous sequence of events unbroken by any effective intervening cause."*Cleveland v. Rotman,* 297 F.3d 569, 573 (7th Cir.2002) (Illinois law). Conventional as these usages are, they are unhelpful.

[2] A necessary condition is a sine qua non, but it is rarely a "cause" in any meaningful sense of the word. No one would say that Whittman-Hart's demise was "caused" by the invention of the Internet, though had it not been invented and enticed U.S. Web, Whittman-Hart would, if the trustee is correct, be fine. Cf. *Movitz v. First National Bank of Chicago,* 148 F.3d 760, 762 (7th Cir.1998). Among the myriad of necessary conditions for anything to occur, the one designated "the cause" is the one that is significant from the standpoint of the person making the designation. There may of course be

more than one such necessary condition, and there was here. There are also cases in which a condition that is not necessary, but is sufficient, is deemed the cause of an injury, as when two fires join and destroy the plaintiff's property and each one would have destroyed it by itself and so was not a necessary condition; yet each of the firemakers (if negligent) is liable to the plaintiff for having "caused" the injury. *Kingston v. Chicago & N.W. Ry.,* 191 Wis. 610, 211 N.W. 913 (Wis.1927); cf. *Summers v. Tice,* 33 Cal.2d 80, 199 P.2d 1 (Cal.1948). This is not such a case.

The necessary conditions for Whittman-Hart's demise that are relevant to this appeal were first its decision to buy U.S. Web and second the precipitate decline of the dot.com business. The decision to buy U.S. Web was not influenced by KPMG's approving Whittman-Hart's accounting decisions, and neither, of course, were the dot.com troubles. US Web's agreement to be bought may have been influenced by KPMG's advice to Whittman-Hart, but that is irrelevant because U.S. Web was doomed by the coming collapse of its market and so was not harmed by the advice.

**\*3** [3] The same conclusions can be reached by a different route, by asking what duty, enforceable by tort law, was assumed by KPMG as Whittman-Hart's auditor. It was the duty to protect creditors of and investors in Whittman-Hart from being misled to their harm by financial statements issued by Whittman-Hart that contained errors that would be material to a creditor or an investor. E.g., 15 U.S.C. § 77k(a)(4); 225 ILCS 450/30.1; *FDIC v. Ernst & Young LLP,* 374 F.3d 579, 580-81 (7th Cir.2004) (Illinois law). It was not a duty to give the company business advice, such as advice on whether to acquire another company. *Johnson Bank v. George Korbakes & Co.,* 472 F.3d 439, 443 (7th Cir.2006) (Illinois law); *Fehribach v. Ernst & Young LLP,* 493 F.3d 905, 911-12 (7th Cir.2007). The knowledge required to give such advice is possessed by the business itself and by business-consulting firms, as distinct from auditors. The auditors' concern is

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----
--- F.3d ----, 2008 WL 746849 (C.A.7 (Ill.)), 49 Bankr.Ct.Dec. 188                                    Page 5
(Cite as: --- F.3d ----, 2008 WL 746849)

with the accuracy of the company's books rather than with the demand for the company's products or services or the attractiveness of its investment opportunities. It is true that many accounting firms offer business consulting as well as auditing services and that KPMG is one of them and did some consulting for Whittman-Hart and hoped to continue doing so for marchFIRST. But the suit complains only about KPMG's auditing services, and there is no contention that they were influenced by the firm's consulting wing.

[4] The failure to state Whittman-Hart's fourth-quarter earnings accurately, insofar as it was due to KPMG, may as we said have been a wrong to U.S. Web (though a wrong that did no harm if indeed that firm was doomed), but it was not a wrong to Whittman-Hart, as the auditor neither was asked to nor did advise Whittman-Hart to buy U.S. Web. By swallowing a larger company, and one concentrated in the dot.com business, Whittman-Hart assumed the risk of being injured, fatally as it turned out, by a downturn in that business. It wants to make its auditor the insurer against the folly (as it later turned out) of a business decision (the decision to try to acquire U.S. Web) unrelated to what an auditor is hired to do.

Nothing in Illinois law permits such an attempt to succeed. As we explained in the *Movitz* decision, also a case governed by Illinois law, "The distinction between 'but for' causation and actual legal responsibility for a plaintiff's loss is particularly well developed in securities cases, where it is known as the distinction between 'transaction causation' and 'loss causation.' Suppose an issuer of common stock misrepresents the qualifications or background of its principals, and if it had been truthful the plaintiff would not have bought any of the stock. The price of the stock then plummets, not because the truth is discovered but because of a collapse of the market for the issuer's product wholly beyond the issuer's control. There is 'transaction causation,' because the plaintiff would not have bought the stock, and so would not have sustained

the loss, had the defendant been truthful, but there is no 'loss causation,' because the kind of loss that occurred was not the kind that the disclosure requirement that the defendant violated was intended to prevent. To hold the defendant liable for the loss would produce overdeterrence by making him an insurer against conditions outside his control.... Also, it is bad policy to encourage people harmed in some natural or financial disaster to cast about for someone on whom to lay off the consequences who had, however, committed only a technical breach of duty. The legal system is busy enough without shouldering the burden of providing insurance against business risks. Had [the investor] diversified his investments, he would not have taken such a big hit when the Houston real estate market collapsed." 148 F.3d at 763 (citations omitted).

*4 As if this were not bad enough, the evidence that the trustee presented to prove damages was outlandish. The plaintiff's expert, a financial analyst named Paul Marcus, testified that had it not been for the acquisition of U.S. Web, Whittman-Hart would have had a "fair market value" (whatever exactly that means) of $535 million on the day that instead marchFIRST declared bankruptcy. He based this estimate on the market capitalizations that day, compared with what they had been at the time of the acquisition, of companies that he deemed comparable to marchFIRST. But he admitted that before the high-tech stock market bubble burst, movements in the stock prices of those companies were not correlated with each other or with movements in the price of Whittman-Hart's stock. He suggested no basis for thinking that nevertheless they would have been affected the same way by the events that caused the bubble to burst.

In addition, he based his estimate of what WhittmanHart's stock would have been worth in April 2001 on the average decline in the stock prices of his comparison group of companies without taking account of their capital structures. Yet an external shock will cause a company's stock price to fall farther the more debt the company has.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----                                                                    Page 6
--- F.3d ----, 2008 WL 746849 (C.A.7 (Ill.)), 49 Bankr.Ct.Dec. 188
**(Cite as: --- F.3d ----, 2008 WL 746849)**

If the value of a company's assets falls by 50 percent, and it has no debt, its stock price (setting aside any other influences on that price besides asset value) will fall by 50 percent. But if the company has 40 percent debt before the shock, its stock price will fall by 83 percent. For, originally worth $1 million, the company now is worth only $500,000 yet owes its creditors $400,000, leaving only $100,000 of value for the shareholders. The original equity value was $600,000 ($1 million minus the $400,000 in debt), and the decline in equity value was $500,000, which is 83 percent of $600,000.

The expert also failed to correct for the fact that although his valuation of what Whittman-Hart would have been worth in April 2001 assumed that U.S. Web would not have been acquired, 57 percent of that value, if awarded as damages, would go to the former shareholders of U.S. Web, contradicting the premise of his analysis that they would never have had an interest in Whittman-Hart. The trustee's lawyer confused matters at argument by stating incorrectly that he was representing only the unsecured creditors of Whittman-Hart. In fact he is representing the entire bankrupt estate of marchFIRST and, as we know, seeking damages far in excess of the claims of the creditors.

[5][6] The extreme weakness of the trustee's case, both on liability and on damages, invites consideration of the exercise of litigation judgment by a Chapter 7 trustee. The filing of lawsuits by a going concern is properly inhibited by concern for future relations with suppliers, customers, creditors, and other persons with whom the firm deals (including government) and by the cost of litigation. The trustee of a defunct enterprise does not have the same inhibitions. A related point is that while the management of a going concern has many other duties besides bringing lawsuits, the trustee of a defunct business has little to do besides filing claims that if resisted he may decide to sue to enforce. Judges must therefore be vigilant in policing the litigation judgment exercised by trustees in bankruptcy, and

in an appropriate case must give consideration to imposing sanctions for the filing of a frivolous suit. The Bankruptcy Code forbids reimbursing trustees for expenses incurred in actions not "reasonably likely to benefit the debtor's estate,"11 U.S.C. § 330(a)(4)(A)(ii)(I), and authorizes an "appropriate sanction" against parties who file such a claim. Bankruptcy Rule 9011(b)(2), (c)(1)(B); *In re Bryson,* 131 F.3d 601, 603-04 (7th Cir.1997); *In re Cohoes Industrial Terminal, Inc.,* 931 F.2d 222, 227 (2d Cir.1991). Not "reasonably likely to benefit the debtor's estate" may well be a correct description of this suit.

**\*5** We are particularly disturbed by the damages claim. It is not only groundless, as we have seen; it is intimidating, because of its size. Nor is it a good plea that yes, the damages claim of $626 million is preposterous, but suppose that therefore the probability of its succeeding is only 1 in 1000; well, .001 x $626 million is $626,000, and that "expected value" of suing may exceed the cost of the suit to the bankrupt estate. There is something wrong with this reasoning. For if .001 is too high an estimate, the trustee can up his damages claim to $6.26 billion-the probability of success will be even lower, but even if it is only 1 in 10,000 (and how exactly would one demonstrate that it is less?), the expected value of suing will still be $626,000. A frivolous appeal has *some* chance of success: lightning may strike, or the law may change while the appeal is pending; and a trustee who succeeds in obtaining a judgment will share in it. 11 U.S.C. §§ 326(a), 330.

[7] But frivolous suits are forbidden. So frivolousness must depend not on the net expected value of a suit in relation to the cost of suing, but on the probability of the suit's succeeding. If that probability is very low, the suit is frivolous; really that is all that most courts, including ours, mean by the word. See, e.g., *Murray v. GMAC Mortgage Corp.,* 434 F.3d 948, 952 (7th Cir.2006); *Moreland v. Wharton,* 899 F.2d 1168, 1170 (11th Cir.1990). By that standard, this suit may well be frivolous. We note, therefore,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----                                                                                        Page 7
--- F.3d ----, 2008 WL 746849 (C.A.7 (Ill.)), 49 Bankr.Ct.Dec. 188
**(Cite as: --- F.3d ----, 2008 WL 746849)**

that the defendant can file a motion in the district court for an award of reasonable attorney's fees, *In re Roete,* 936 F.2d 963, 966-67 (7th Cir.1991) (of course to be paid by the trustee personally, not by the bankrupt estate), and a corresponding motion in this court under Fed. R.App. P. 38. We do not, however, prejudge the outcome of either type of motion.

AFFIRMED.

C.A.7 (Ill.),2008.
Maxwell v. KPMG LLP
--- F.3d ----, 2008 WL 746849 (C.A.7 (Ill.)), 49 Bankr.Ct.Dec. 188

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

8

Westlaw.

Not Reported in N.W.2d                                                                                          Page 1
Not Reported in N.W.2d, 2005 WL 957425 (Mich.App.)
**(Cite as: Not Reported in N.W.2d, 2005 WL 957425)**

Montcalm Fibre Co., Inc. v. Advanced Organics
Mich.App.,2005.
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.

Court of Appeals of Michigan.
MONTCALM FIBRE COMPANY, INC, James
Trent, Thomas Bruinsma, Trustee of the Estate of
Montcalm Fibre Company, and Elizabeth Chalmers,
Trustee of the Estate of James Trent, Plaintiffs-
Appellants,
v.
ADVANCED ORGANICS, Defendant/
Cross-Defendant-Appellee,
andAMVD CENTER, INC., and Anthony Van
Dillen, Defendants/Cross-Plaintiffs-Appellees.
**No. 249642.**

April 26, 2005.

Before: MURRAY, P.J., and MARKEY and
O'CONNELL, JJ.

[UNPUBLISHED]

PER CURIAM.
**\*1** Plaintiffs appeal by right the dismissal of all
claims for losses alleged to have resulted from a
fire that destroyed a warehouse. We affirm.

The trial court ruled that plaintiff James Trent and
his bankruptcy trustee, Elizabeth Chalmers, lacked
standing to assert personal claims. The court there-
fore granted defendants' motion for summary dis-
position under MCR 2.116(C)(8). The trial court
also ruled that Montcalm Fibre Company, Inc.
(MFC) and its bankruptcy trustee, Thomas Bru-
insma, failed to create a genuine issue of fact that
the fire caused damage beyond that which was
compensated for by insurance. So, the court granted
defendants' summary disposition. MCR

2.116(C)(10).

We review de novo a trial court's grant of a sum-
mary disposition motion.*Spiek v. Dep't of Trans-
portation,* 456 Mich. 331, 337;572 NW2d 201
(1998). A party's motion under MCR 2.116(C)(8)
asserts the opposing party failed to state a claim
upon which relief may be granted. The motion tests
the sufficiency of the complaint on the basis of the
pleadings alone. MCR 2.116(G)(5); *Corley v. De-
troit Bd of Ed,* 470 Mich. 274, 277;681 NW2d 342
(2004). The motion must be granted if no factual
development could justify the claim for relief. *Id.*

A party's motion for summary disposition under
MCR 2.116(C)(10) tests the factual sufficiency of a
claim and must be supported by affidavits, depos-
itions, admissions, or other documentary evidence.
MCR 2.116(G)(3)(b); *Corley, supra* at 278.The
moving party must specifically identify the undis-
puted factual issues, MCR 2.116(G)(4), and has the
initial burden of supporting its position with docu-
mentary evidence, *Smith v. Globe Life Ins Co,* 460
Mich. 446, 455;597 NW2d 28 (1999). The trial
court must consider the submitted documentary
evidence in the light most favorable to the nonmov-
ing party. MCR 2.116(G)(5); *Corley, supra* at
278.If the moving party fulfills its initial burden,
the party opposing the motion must proffer legally
admissible evidence that demonstrates a genuine is-
sue of material fact exists, and upon failure to do
so, summary disposition is properly granted as a
matter of law. *Id.;Maiden v. Rozwood,* 461 Mich.
109, 120-121;597 NW2d 817 (1999).

In this case, MFC, owned by plaintiff James Trent,
recycled industrial waste. MFC leased to purchase
the warehouse from defendant AMVD Center, Inc
(AMVD), owned by defendant Anthony Van
Dillen. A part of the warehouse was already occu-
pied by defendant Advanced Organics (AO) and an-
other tenant. The fire started in AO's portion of the
warehouse and spread to MFC's portion, destroying
its inventory of partially recycled waste. Plaintiffs

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.W.2d                                                                                    Page 2
Not Reported in N.W.2d, 2005 WL 957425 (Mich.App.)
(Cite as: Not Reported in N.W.2d, 2005 WL 957425)

claim a plastic parts manufacturer, Composite Technology Company (CTC), failed to buy MFC's assets because of the fire, which plaintiffs allege caused MFC's primary lender, Huntington Bank (the bank), to call its loan, forcing MFC and Trent into bankruptcy.

Plaintiffs commenced the instant action in the Calhoun Circuit Court, seeking damages from AO under theories of negligence, gross negligence and nuisance, and to recover against Van Dillen and AMVD under theories of negligence, breach of contract and nuisance. AMVD Center and Van Dillen filed a cross-complaint against AO.

*2 The trial court granted AO's motion for summary disposition against plaintiffs Trent and Elizabeth Chalmers, trustee of the Estate of James Trent by order entered on February 24, 2003. The court then granted summary disposition against the same plaintiffs and in favor of defendants AMVD and Van Dillen by order entered on March 18, 2003. On April 9, 2003, the trial court granted summary disposition in favor of defendants on all plaintiffs' remaining claims.

Plaintiffs filed a claim of appeal in Docket No. 248268 on April 29, 2003. This Court dismissed plaintiffs' first claim of appeal on June 2, 2003 because the cross-claim, which also sought damages for having to defend plaintiffs' complaint, had not yet been dismissed so the trial court's April 9, 2003 order was not final. Subsequently, the trial court dismissed the cross-claim without prejudice pursuant to the cross-parties' stipulation. On September 25, 2003, this Court denied defendants' motion to dismiss plaintiffs' second claim of appeal. Our Supreme Court denied defendants' application for leave to appeal on February 27, 2004.

Trent and his bankruptcy trustee first argue that the trial court erred by ruling they lack standing to assert claims for damages as a result of the fire. We disagree.

We conclude the trial court correctly dismissed

Trent's claims for personal damages as a result of alleged injuries sustained by MFC. As a shareholder, officer, and potential beneficiary of successful corporate activities, Trent has no standing to allege personal injury because of damage to MFC. *Belle Isle Grill Corp v. Detroit,* 256 Mich.App 463, 473-474;666 NW2d 271 (2003); *Michigan Nat'l Bank v. Mudget,* 178 Mich.App 677, 679-680;444 NW2d 534 (1989). Chalmers' claim as trustee of Trent's bankruptcy estate also fails because the trustee stands in the shoes of the bankrupt and can assert no greater claim. *Hays and Co v Merrill Lynch, Pierce, Fenner & Smith, Inc,* 885 F.2d 1149, 1153 (CA 3, 1989).

The real party in interest must prosecute a cause of action. MCR 2.201(B). In general, "a suit to enforce corporate rights or to redress or prevent injury to the corporation, whether arising out of *contract or tort,* must be brought in the name of the corporation and not that of a stockholder, officer, or employee."*Environair, Inc v. Steelcase, Inc,* 190 Mich.App 289, 292;475 NW2d 366 (1991), citing *Mudget, supra* at 679.Further, Michigan law "treats a corporation as entirely separate from its shareholders, even where one person owns all the corporate stock."*Belle Isle Grill, supra* at 473-474.To avoid the application of the general rule an individual must establish the violation of a duty owed directly to the individual that is independent of the corporation. *Id.* at 474."This exception does not arise, however, merely because the acts complained of resulted in damage both to the corporation and to the individual, but is limited to cases where the wrong done amounts to a breach of duty owed to the individual personally."*Mudget, supra* at 679-680.In other words, when a person asserts claims for injuries only on the basis that a duty owed to the corporation was violated that in turn resulted in injury to the individual, the claims are merely derivative and the individual has no right of action against a third party that injured the corporation.*Id.* at 680.

*3 Here, one corporation, AMVD leased space in

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.W.2d                                                                                    Page 3
Not Reported in N.W.2d, 2005 WL 957425 (Mich.App.)
**(Cite as: Not Reported in N.W.2d, 2005 WL 957425)**

the same building to two other corporations, AO and MFC. Plaintiffs' do not allege the existence of a contract between Trent as an individual and AMVD or Van Dillon, and do not allege Trent occupied or stored his own personal property in the building. Rather, plaintiffs allege in Count I of their second amended complaint that AO's negligence permitted the fire to start and spread to that part of the building MFC occupied. But this is an allegation of a breach of a duty owed to MFC. Similarly, Count II alleges gross negligence by AO, which again asserts a breach of a duty owed to MFC. The same analysis applies to plaintiffs' nuisance claim in Count III. Plaintiffs' allege breach of contract between AMVD and MFC in Count IV but raise no allegations that would sustain a claim that the contract was specifically intended to directly benefit Trent so as to permit him to enforce the contract as a third-party beneficiary. See MCL 600.1405; *Koenig v. South Haven,* 460 Mich. 667;597 NW2d 99 (1999). Further, plaintiffs allege in Count V that AMVD and Van Dillen were negligent but again fail to allege a duty owed directly to Trent as an individual. In addition, plaintiffs allege no special relationship that would impose a duty of care on Van Dillen in favor of Trent as an individual. *Williams v Cunningham Drug Stores, Inc,* 429 Mich. 495, 499;418 NW2d 381 (1988). Finally, plaintiffs' claim of nuisance against AMVD and Van Dillen in Count VI also does not allege a duty owed directly to Trent. Moreover, a cause of action for emotional distress as result of injury to MFC's property is unrecognized in Michigan even if a duty were owed directly to Trent. See *Bernhardt v Ingham Regional Medical Center,* 249 Mich.App 274;641 NW2d 868 (2002)."Compensatory damages are not given for emotional distress caused merely by the loss of the things, except that in unusual circumstances damages may be awarded for humiliation caused by deprivation, as when one is deprived of essential elements of clothing."*Id.* at 281.Because Trent and his bankruptcy trustee do not allege claims distinct from those of MFC they lacked standing to sue defendants. *Belle Isle Grill, supra* at 474.

II.

Next, plaintiffs argue the trial court erred by ruling that insufficient evidence existed to create a genuine issue of material fact that the fire caused damage to MFC beyond that which was compensated by insurance. Again, we disagree.

A.

Plaintiffs claim that defendants are responsible for a fire that destroyed MFC inventory and thereby caused (1) the bank to prematurely foreclose on its 90-day $1,200,000 note, (2) CTC to abandon its proposed purchase of MFC's assets, and (3) MFC to declare bankruptcy. But plaintiffs produced insufficient evidence from which reasonable jurors could infer it more likely than not that but for the fire the asserted injuries would not have occurred. *Skinner v. Square D Co,* 445 Mich. 153, 165;516 NW2d 475 (1994); *Davis v. Thorton,* 384 Mich. 138, 145;180 NW2d 11 (1970). Further, even if the fire contributed to plaintiffs' asserted injuries, the evidence failed to establish the fire as a substantial factor. *Id.;Brisboy v. Fibreboard Corp,* 429 Mich. 540, 547, 418 NW2d 650 (1988). Giving plaintiffs the benefit of the doubt, reasonable jurors would be unable to find that it was more likely than not that the fire was both the factual and a proximate cause of plaintiffs' injuries. Consequently, the trial court properly granted summary disposition to defendants. *West v. GMC,* 469 Mich. 177, 183;665 NW2d 468 (2003); *Davis, supra* at 146.

**\*4** Plaintiffs assert theories of negligence, gross negligence, breach of contract, and nuisance. All of these legal theories require proof that defendants' conduct proximately caused the claimed injuries. "To establish a prima facie case of negligence, a plaintiff must be able to prove four elements: (1) a duty owed by the defendant to the plaintiff, (2) a breach of that duty, (3) causation, and (4) damages."*Haliw v. City of Sterling Heights,* 464 Mich. 297, 309-310;627 NW2d 581 (2001). Likewise, private nuisance requires proof that " 'the invasion

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.W.2d                                                                                          Page 4
Not Reported in N.W.2d, 2005 WL 957425 (Mich.App.)
**(Cite as: Not Reported in N.W.2d, 2005 WL 957425)**

results in significant harm [and] the actor's conduct is the legal cause of the invasion." ' *Cloverleaf Car Co v. Phillips Petroleum Co,* 213 Mich.App 186, 193;540 NW2d 297 (1995), quoting *Adkins v. Thomas Solvent Co,* 440 Mich. 293, 304;487 NW2d 715 (1992). Further, a "party asserting a breach of contract has the burden of proving its damages with reasonable certainty, and may recover only those damages that are the direct, natural, and proximate result of the breach." *Alan Custom Homes, Inc v. Krol,* 256 Mich.App 505, 512;667 NW2d 379 (2003).

To establish the element of causation, plaintiffs must prove both cause in fact and proximate cause. *Haliw, supra* at 310;*Skinner, supra* at 162-163.Cause in fact requires establishing that the claimed injuries would not have occurred but for defendants' conduct. *Id.* at 163.Although a plaintiff may prove cause in fact by circumstantial evidence, the evidence must facilitate reasonable inferences of causation rather than mere speculation to be adequate. *Id* at 164.Our Supreme Court explained in *Skinner, supra* at 164:

As a theory of causation, a conjecture is simply an explanation consistent with known facts or conditions, but not deducible from them as a reasonable inference. There may be 2 or more plausible explanations as to how an event happened or what produced it; yet, if the evidence is without selective application to any 1 of them, they remain conjectures only. On the other hand, if there is evidence which points to any 1 theory of causation, *indicating a logical sequence of cause and effect,* then there is a juridical basis for such a determination, notwithstanding the existence of other plausible theories with or without support in the evidence. [Emphasis added.]

Because of the necessity of a logical connection of cause to effect, causation is the element most susceptible basis for the granting of summary disposition on a tort claim. *Davis, supra* at 145.To survive a defense motion in that regard, "the plaintiff must present substantial evidence from which a jury may

conclude that more likely than not, but for the defendant's conduct, the plaintiff's injuries would not have occurred."*Skinner, supra* at 164-165.A mere possibility that a defendant's conduct caused the claimed injury is not enough. When the element of cause in fact remains one of pure speculation or conjecture, "or the probabilities are at best evenly balanced, it becomes the duty of the court to direct a verdict for the defendant."*Id.* at 165, quoting *Mulholland v. DEC Int'l,* 432 Mich. 395, 416, n 18;443 NW2d 340 (1989), in turn quoting Prosser & Keeton, Torts (5th ed.), § 41, p 269. Thus, a plaintiff need not present evidence to negate all other possible causes, but the evidence "must exclude other reasonable hypotheses with a fair amount of certainty" so that the hypothesis on which the plaintiff relies "is more probable than any other hypothesis reflected by the evidence."*Skinner, supra* at 166, quoting and concurring with 57A Am Jur 2d, Negligence, § 461, p. 442.

**\*5** The issue of proximate causation does not arise until cause in fact is established. *Skinner, supra* at 163.In general, "proximate cause" involves whether the consequences of the defendant's conduct were foreseeable, and whether a defendant should be held legally responsible for such consequences.*Id.* Proximate cause is that which, in a natural and continuous sequence, unbroken by new and independent causes, produces the injury. *McMillan v. Vliet,* 422 Mich. 570, 576;374 NW2d 679 (1985). There may be more than one proximate cause of an injury. *Brisboy, supra* at 547.When several factors contribute to produce an injury, "one actor's negligence will not be considered a proximate cause of the harm unless it was a substantial factor in producing the injury."*Id.* Whether a defendant's conduct is a proximate cause of a plaintiff's claimed injuries is usually a factual question to be decided by the factfinder, but if reasonable minds could not differ, then the court should decide the issue as a matter of law. *Davis, supra* at 146;*Nichols v. Dobler,* 253 Mich.App 530, 532;655 NW2d 787 (2002).

After carefully reviewing the record, we believe

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.W.2d                                                                    Page 5
Not Reported in N.W.2d, 2005 WL 957425 (Mich.App.)
**(Cite as: Not Reported in N.W.2d, 2005 WL 957425)**

that reasonable minds could not differ on whether but for the fire CTC would have completed its proposed purchase of MFC assets. There simply is no evidence, much less substantial evidence, from which reasonable jurors could find a logical sequence of cause and effect resulting in the claimed damage: CTC's abandoning its proposed purchase of MFC assets. Rather, the evidence shows that more likely than not the proposed deal was abandoned because MFC could not consistently produce the desired quality of product at a cost CTC found acceptable. Moreover, because the fire-destroyed MFC "inventory" was at best works-in-progress requiring additional expenditures to be transformed into saleable product and at worse, assets with a negative worth, reasonable minds could not differ on whether but for the fire MFC would have remained solvent. But to the extent the fire was a factor in MFC's financial difficulties and insolvency, the evidence fails to establish the fire as a substantial factor in light of MFC's huge pre-fire debts, MFC's failure to meet its financial obligations both before and after the fire, and the collapse of the MFC asset purchase for reasons unrelated to the fire. In sum, even if the fire contributed to MFC's financial problems it was not a proximate cause of MFC's insolvency and eventual bankruptcy.

Plaintiffs' arguments that disputed questions of material fact remain for trial do not withstand scrutiny. First, plaintiffs posit before the fire (positive) and after the fire (insolvent) pictures of MFC and argue the fire is the reason for the difference. But the evidence does not establish a logical sequence of cause and effect between the positive before the fire picture and the insolvency of MFC after the fire. Plaintiffs point to the affidavit of bank officer Scott Miller and the projection of profits in June letters by CTC's general manager Rick Sofia and his boss at parent company Modern Technologies Corporation (MTC), David Gutridge, as evidence of the positive pre-fire outlook for MFC. In fact, the projections and proposed purchase of MFC's assets precede and form the basis for the bank's 90-day

loan to serve as "short term bridge financing until the transaction closed."Further, the evidence shows that the positive projections assumed that MFC could provide a high-volume, low-cost, high-quality stream of plastic resin that CTC could use in its plastic injection molding business. As Sofia testified, "if [MFC] could give me that polymer, I could make gold out of it, ... [CTC] could process it in our process, so this [the acquisition of MFC] looked fantastic."Unfortunately, the evidence supports Gutridge's testimony that MFC "could not in fact manufacture the product on a consistent basis to the same level of quality at the cost we had been led to believe they could do it at."

**\*6** Trent's statements to bank officer Steve George and to Sofia that the fire indefinitely delayed the MFC-CTC closing because of lack of raw material necessary to demonstrate compliance with CTC purchase criteria are inadmissible hearsay if offered to prove the truth of the matter asserted. MRE 801, 802. Evidence necessary to withstand a motion for summary disposition must be substantively admissible at trial. *Maiden, supra* at 121.

Plaintiffs also point to the sworn statement of Charles Johnson, MFC vice-president of operations, that it did not make sense for MFC to add more densifiers [FN1] to increase its output because MFC did not have enough raw materials to meet demand for finished plastic resin. But Johnson also testified that the MFC had sufficient raw materials coming in to its Howard City plant to supply its manufacturing capacity and that the fire had no affect on MFC's ability to manufacture the low-cost, high-quality resin CTC desired. Read as a whole, Johnson's testimony does not support the conclusion that but for the fire MFC would have been able to manufacture the high-volume, low-cost, high-quality resin that CTC desired, which both Trent and Sofia envisioned would generate a pot of gold.

> FN1. A machine used to process industrial waste into marketable plastic resin. A densifier consisted of a cylinder or tub into which waste was fed at the top and then

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

ground, shredded and melted by blades at the bottom that were driven by a high-horsepower motor.

Similarly, Trent's testimony, on information and belief, that the fire caused CTC to abandon its proposed purchase of MFC assets, resulting in MFC's financial problems, is insufficient to withstand defendants' summary disposition motion. MCR 2.116(G)(4).“ ‘Matters upon information and belief and alleged common knowledge are not enough. [A] party must come forward with at least some evidentiary proof, some statement of specific fact upon which to base his case. If he fails, the motion for summary judgment is properly granted.” ’ *Skinner, supra* at 161, quoting *Durant v. Stahlin,* 375 Mich. 628, 640, 135 NW2d 392 (1965).

Trent admitted that he could not dispute testimony of then MFC managers Johnson and James Malkowski that MFC had problems reducing moisture and fiber in the resin it produced. Indeed, Trent admitted MFC was having problems with moisture using the cylinder (densifier) process and acknowledged that MFC had “quality issues related to our production” and “consistency problems.” Trent believed this was not really a problem but was instead the result of “tweaking,” which would work itself out. Although MFC never achieved CTC's quantity and quality goals for resin production, Trent nevertheless believed it would not be a problem for MFC to do so. Trent also admitted that from Gutridge's perspective, MFC's “tweaking” was producing inconsistent results. Trent testified that after the fire when MFC was demonstrating the cylinder (densifier) process for Gutridge, as the resin “came out of the machine it wasn't the right moisture content or the same moisture ... so [Gutridge] concluded, ‘You've got to work on the consistency,’ and left, and that was all I heard from it, and it was basically, [w]e will talk to you in a couple of months, and then in a couple [of] months, we got a Dear John....”

**\*7** Trent testified that he believed the spectacle of the burned facility “squelched” the MFC-CTC deal.

He testified, “I believe that [Sofia's observing the burned warehouse] spooked them and I think their attitude, which they plainly said, was, well we are going to sit back and wait and see what happens. So I think the fire definitely squelched that deal.”This testimony, like Trent's testimony that he did not believe either the quality of resin MFC produced or the ability produce the quantities desired by CTC was a problem preventing CTC from going forward with the proposed purchase, is not fact-specific evidence from which a logical sequence of cause and effect can be constructed leading to the conclusion that but for the fire the MFC-CTC deal would have closed. *Skinner, supra* at 160-161.This is particularly true here where either party could have abandoned the proposed purchase for any or no reason.

Plaintiffs also contend that bank officer George's affidavit raises a disputed factual issue of whether the fire caused MFC insolvency by motivating the bank to start early collection efforts on its 90-day note. But George's affidavit does not relate specific facts from which it could be inferred the fire caused MFC's insolvency. The affidavit contains Trent's hearsay statements that are inadmissible to prove the truth of the matter stated. So the affidavit proffers neither admissible fact-specific evidence that the fire affected the financial well being of MFC nor fact-specific evidence supporting an inference that but for the fire the MFC-CTC deal would have closed. Rather, the bank called its loan not because fire actually affected MFC but because Trent made statements to bank employees about alleged effects of the fire, which caused the bank to lose confidence that MFC would complete its asset sale to CTC, which was the purpose of the loan. In addition, the loss of the warehouse inventory could not have immediately affected MFC's solvency because stored materials were not readily saleable, and the evidence shows there was no shortage of raw material to supply MFC's only pre-fire operating production facility in Howard City. In sum, the evidence does not create a genuine issue of material fact whether the fire affected MFC's solvency, MFC's

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

ability to meet CTC's resin-production criteria, or MFC's ability to pay its 90-day bank note when due. Reasonable jurors could not disagree: the fire did not cause MFC's problems.

For many of the same reasons, the opinion evidence plaintiffs offered does not create a genuine issue of material fact regarding the effect of the fire on MFC's solvency. Ed Dupke, plaintiffs' business valuation expert, opined that the fire impacted MFC because it was a leveraged company that could not withstand the loss of its inventory, diminished cash flow, and the bank's losing confidence its loan would be repaid.

Specially, Dupke testified regarding the fire's financial impact on MFC as follows:

**\*8** Cash flow was the thing that put the company in trouble. What disappeared as a result of the fire was saleable inventory that the company had. Sale of that in the normal course of business would have generated a substantial amount of dollars for the company, potentially as much as three to four hundred thousand dollars, and that disappeared from the company's cash flow, as well as the requirement to put out additional cash to rebuild that inventory, and the company was not structured financially strong enough to absorb that hit.

As I mention, it's a two-fold impact: One, the loss of the immediate cash flow that would be generated through the sale of the existing inventory that was on hand, and secondly, the working capital which is out-of-pocket cash required to rebuild the inventory into saleable merchandise and to replace the equipment. [Dupke deposition, p. 101.]

The data and the methodology underlying an expert's theories and by which the expert draws his conclusions must be reliable. MRE 702; *Gilbert v. DaimlerChrysler Corp*, 470 Mich. 749, 779;685 NW2d 391 (2004); *Tobin v. Providence Hospital*, 244 Mich.App 626, 647;624 NW2d 548 (2001)."The facts or data in the particular case on

which an expert bases an opinion or inference shall be in evidence"MRE 703. Thus, expert testimony may be excluded when the basis of assumptions on which it relies do not comport with the established facts. *Badalamenti v. Wm Beaumont Hospital-Troy,* 237 Mich.App 278, 286;602 NW2d 854 (1999). Because Dupke's opinion is premised on assumptions that do not comport with the evidence, it does not provide admissible evidence to create genuine issue of material fact for trial. *Maiden, supra* at 121.

The testimony by witnesses with knowledge of MFC's destroyed inventory established that almost all of it was unmarketable. MFC asserted in its insurance claim that the lost inventory consisted of 2,928 tons of boxed material and 1,943 tons of bailed material. Johnson in his sworn statement to the insurance company stated that none of the material was in saleable form and at best was semi-processed "works-in-progress." It is also undisputed that two months before the fire, MFC had stopped all manufacturing at the burned warehouse facility.

Trent testified he had observed marketable resin stored at the warehouse but never counted it. Trent identified Johnson as the MFC employee with the best knowledge of the facilities contents at the time of the fire. Johnson testified that he could not say what marketable resin was stored in the warehouse at the time of the fire and told the insurance company, as noted above, that the inventory destroyed in the fire was not saleable. According to Johnson, marketable resin could be sold for $210 to $230 a ton.

Gino Guarniere, an MFC employee at the warehouse, testified in an affidavit that he and others made concerted efforts to remove any marketable resin from the facility in the months before the fire. Guarniere stated when he was terminated for economic reasons one month before the fire, there were fewer than 25 Gaylord boxes [FN2] of marketable resin in the warehouse.

     FN2. A "Gaylord box," named after the

Not Reported in N.W.2d                                                                                    Page 8
Not Reported in N.W.2d, 2005 WL 957425 (Mich.App.)
**(Cite as: Not Reported in N.W.2d, 2005 WL 957425)**

Gaylord Paper Company, is a cardboard box about the size of a four-foot cube, which sits on a pallet and could hold 1,000 pounds of finished resin.

**\*9** Michael Walker worked for MFC in manufacturing and sales out of the warehouse facility. Walker testified that he and other employees in the months before the fire had sorted through what was in warehouse and moved what was marketable to where it could be easily shipped. He attempted to sell anything of value he could find. According to Walker, by the time of the fire only 40 to 48 Gaylord boxes of marketable resin and 20 Gaylord boxes of marketable PBT remained. To the best of Walker's knowledge, no other saleable material was in the burned warehouse. Viewing the testimony of Trent, Johnson, Guarniere and Walker in the light most favorable to plaintiffs, the 70 boxes of marketable product at 1000 pounds a box would yield $8,050 a ton if sold for top dollar of $230.

Moreover, Trent testified that the fire did not affect the MFC's ability to continue its revenue-generating activity of collecting tipping fees (being paid to haul away other businesses' waste), brokerage, and making fuel pellets. Likewise, Johnson testified that MFC's ability to collect sufficient tipping-fee material to supply its Howard City fuel pellet operation was unaffected by the fire. According to Johnson, at the time of the fire although MFC wanted to increase its capacity at its Howard City plant to manufacture resin, MFC "didn't have the manufacturing capacity at a level that could manage the materials coming into Howard City as well as ... begin to take the materials out of [the warehouse]." Thus, the fire did not affect MFC's cash flow.

In summary, the premises on which Dupke's opinion rests, that the fire impacted MFC by (1) loss of immediate cash flow and (2) the need to spend working capital to replace saleable inventory and equipment, are simply not supported by the evidence. Because the facts and data on which Dupke draws his conclusions are not reliable, his opinion testimony is inadmissible. MRE 702; *Gilbert, supra*

at 779;*Badalamenti, supra* at 286.

Thus, plaintiffs failed to present substantial evidence from which a jury could conclude that more likely than not, but for the fire the MFC-CTC deal would have closed, and MFC would have remained solvent. *Skinner, supra* at 164-165.Moreover, to the extent the fire was a factor in CTC's failing to buy MFC's assets, or MFC's failure to meet its financial obligations, reasonable minds could not differ in concluding that the fire was not a substantial factor, i.e., not a proximate cause of a plaintiffs' claimed injuries.*Brisboy, supra* at 547;*Nichols, supra* at 532.Accordingly, the trial court properly granted defendants summary disposition as a matter of law.MCR 2.116(C)(10), (I)(1); *Corley, supra* at 278.

### B.

Next, plaintiffs argue the trial court erred because it presented evidence that the burned inventory was valued at more than $300,000, yet MFC collected only $64,725 in a fire insurance settlement. Defendants concede a small portion of the destroyed property could have been sold, in the light most favorable to plaintiffs, for less than $10,000. The trial court determined that "the evidence establishes that Plaintiff has in fact been compensated for the loss of its ... garbage/waste/product which was 'damaged' by the fire."We agree that the trial court correctly granted summary disposition to defendants because in "any tort action, recovery is not permitted for remote, contingent or speculative damages."*Law Offices of Lawrence J Stockler, PC v Rose,* 174 Mich.App 14, 33;436 NW2d 70 (1989).

**\*10** Plaintiffs presented evidence that the vast majority of the destroyed property was either waste material other businesses had paid MFC to remove or similar waste that had been semi-processed in the hope it could be converted to profitable, marketable resin. But the process for manufacturing resin at the burned facility had been abandoned before the fire because it was not profitable. So, to

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.W.2d                                                                          Page 9
Not Reported in N.W.2d, 2005 WL 957425 (Mich.App.)
**(Cite as: Not Reported in N.W.2d, 2005 WL 957425)**

convert the semi-processed waste to marketable resin, MFC would have had to transport the material to its Howard City plant and then incur further manufacturing expenses. Likewise, MFC would have to incur further shipping and processing expenses to convert any of the waste material stored at the warehouse into its marginally profitable fuel pellets.

Moreover, the $300,000 value plaintiffs placed on the burned inventory was derived from expenses MFC incurred to ship, process and store the destroyed property. MFC included in its value estimate all of its related business overhead expenses, including taxes, workers' compensation and health insurance, trailer rental, fuel, repair, and maintenance. But plaintiffs cite no authority that supports its position that it may recover as damages in a tort action MFC's expenses related to the damaged property.

Plaintiffs first cites Restatement Torts, 2d, § 903 that "compensatory damages" are "the damages awarded to a person as compensation, indemnity or restitution for harm sustained by him."This truism provides little support for plaintiffs' position. Plaintiffs also cite Restatement Torts, 2d, § 911 that "value means exchange value or the value to the owner if this is greater than the exchange value."Comment *"e"* of § 911 states the "phrase 'value to the owner' denotes the existence of factors apart from those entering into exchange value that cause the article to be more desirable to the owner than to others."But plaintiffs provide no evidence that MFC's costs related to the burned property is synonymous with the property's value. Rather, we find more applicable to the facts of this case Restatement Torts, 2d, § 906, which provides compensatory damages will not be awarded without proof of pecuniary loss for (a) harm to property and (b) harm to earning capacity. Further, the victim of a tort "is entitled to compensatory damages for the harm if, but only if, he establishes by proof the extent of the harm and the amount of money representing adequate compensation with as much cer-

tainty as the nature of the tort and the circumstances permit."Restatement Torts, 2d, § 912. Plaintiffs point to no evidence from which it can be reasonably calculated what further expenses would have been necessary to convert the waste and semi-processed waste into marketable product and whether revenues might thereby have exceeded its total costs thus generated.

Plaintiffs also mistakenly rely on *Moline Furniture Works v. Club Holding Co,* 280 Mich. 587;274 NW2d 338 (1937) and *Detroit Power Screwdriver v. Ladney,* 25 Mich.App 478;181 NW2d 828 (1970). These are contract cases that hold a manufacturer of unique goods may recover costs and lost profits on a buyer's unjustified repudiation of the contract. *Fabrini Family Foods, Inc v. United Canning Corp,* 90 Mich.App 80;280 NW2d 877 (1979) also does not support plaintiffs' argument because in that breach of warranty case the plaintiff provided evidence taking the issue of damages, including lost profits, beyond the realm of speculation and conjecture. *Id.* at 85-86.

**\*11** " 'A party asserting a claim has the burden of proving its damages with reasonable certainty." ' *Ensink v Mecosta County General Hosp,* 262 Mich.App 518, 525;687 NW2d 143 (2004), quoting *Hofmann v. Auto Club Ins Ass'n,* 211 Mich.App 55, 108;535 NW2d 529 (1995). Although damages cannot be founded upon mere speculation and conjecture, "this does not require absolute mathematical demonstration, ... [and] compensation may be [awarded] for a pecuniary injury which has resulted from the natural and probable result of a wrong even though the extent of the injury is not capable of precise proof." *Wolverine Upholstery Co v. Ammerman,* 1 Mich.App 235, 244;135 NW2d 572 (1965). Thus, in general, where injury is clear and the amount of damages are uncertain, recovery is not precluded. *Id.* But "uncertainty as to the *fact* of legal damages ... is fatal to recovery." *Id.* Here, although it is undisputed that plaintiffs suffered some injury, uncertainty over the amount of that injury and whether insurance compensated it, renders the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.W.2d                                                                Page 10
Not Reported in N.W.2d, 2005 WL 957425 (Mich.App.)
**(Cite as: Not Reported in N.W.2d, 2005 WL 957425)**

determination of whether plaintiffs have, in fact, any remaining legal damages entirely speculative. Because on the evidence plaintiffs produced, its claim for damages to waste it had accumulated and partially processed remains remote, contingent or speculative, the trial court properly granted summary disposition to defendants. *Ensink, supra* at 524; *Stockler, supra* at 33.

### III.

To summarize, Trent has no standing to allege personal injury because of damage to MFC; therefore, the trial court correctly dismissed his derivative claims for personal damages as a result of alleged injuries MFC sustained. Chalmers' claims as bankruptcy trustee also fail because the trustee stands in the shoes of the bankrupt, and he can assert no greater claim.

Plaintiffs failed to present substantial evidence from which reasonable jurors could conclude that more likely than not, but for the fire the MFC-CTC deal would have closed, and MFC would have remained solvent. Moreover, to the extent the fire was a factor in CTC's failing to buy MFC's assets, or MFC's failure to meet its financial obligations, reasonable minds could not differ in concluding that the fire was not a substantial factor or a proximate cause of a plaintiffs' claimed injuries. Accordingly, the trial court properly granted defendants summary disposition as a matter of law.

Finally, because the evidence showed plaintiffs' claim for uncompensated damages for fire-destroyed waste it had accumulated and partially processed was remote, contingent and speculative, the trial court properly granted summary disposition to defendants.

We affirm.

Mich.App.,2005.
Montcalm Fibre Co., Inc. v. Advanced Organics
Not Reported in N.W.2d, 2005 WL 957425 (Mich.App.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**9**



Not Reported in F.Supp.                                                    Page 1
Not Reported in F.Supp., 1992 WL 196768 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp., 1992 WL 196768)**

Official Committee of Unsecured Creditors of Co-
rell Steel on Behalf of Corell Steel v. Fishbein and
Co., P.C.
E.D.Pa.,1992.
Only the Westlaw citation is currently available.
    United States District Court, E.D. Pennsylvania.
    The OFFICIAL COMMITTEE OF UNSECURED
    CREDITORS OF CORELL STEEL on Behalf of
              CORELL STEEL
                    v.
      FISHBEIN AND COMPANY, P.C., et al.
            **Civ. A. No. 91-4919.**

              Aug. 10, 1992.

Martin J. Weis, Ralph J. Kelly, Dilworth, Paxson,
Kalish & Kauffman, Philadelphia, Pa., for The Of-
ficial Unsecured Creditors' Committee.
Jacqueline H. Canter, Philip B. Toran, Jay S. Roth-
man, Marshall, Dennehey, Warner, Coleman and
Goggin, Philadelphia, Pa., for defendants.
Ralph J. Kelly, Dilworth, Paxson, Kalish & Kauff-
man, Philadelphia, Pa., Douglas H. Weiss, Marlton,
N.J., for Corell Steel Company.

               *MEMORANDUM*

LOUIS H. POLLAK, Senior District Judge.
**\*1** Plaintiff, The Official Committee of Unsecured
Creditors of Corell Steel ("Committee"), has filed
this accountant malpractice action on behalf of Co-
rell Steel ("Corell"), against defendants, Fishbein
and Company, P.C., and its partners ("Fishbein"),
alleging that Fishbein's performance of audits for
Corell in 1986 and 1987 led to the dissipation of
Corell's assets and, ultimately, its insolvency.
Presently before the court is Defendants' Motion to
Dismiss plaintiff's complaint.

Defendants' motion asserts the following grounds
for dismissal of the complaint: (1) plaintiff lacks
standing to pursue this action; (2) plaintiff's claims
are barred by the applicable statutes of limitations;

(3) plaintiff has failed to state an adequate claim for
breach of contract; (4) plaintiff's claims sounding in
fraud have not been pled with the requisite level of
specificity; and (5) plaintiff has failed to allege
breach of any duty owed to it by defendants.


                      A.

Defendants argue that plaintiff lacks standing to
bring this action. This suit was initiated in the
Bankruptcy Court of the Eastern District of
Pennsylvania, ostensibly on Corell's behalf, after
that court granted plaintiff leave, by order dated
April 11, 1991, to bring an adversary proceeding
against defendants, Plaintiff's Complaint at ¶ 4, and
to employ the law firm of Dilworth, Paxson, Kalish
& Kauffman as special counsel to prosecute this
claim. Defendants contend that plaintiff may not
bring the case because it is unable to demonstrate
that the debtor has unjustifiably failed to pursue its
claims itself against defendants. Defendants argue
that the bankruptcy court's order of April 11, 1991
authorizing initiation of the suit is not determinat-
ive of the standing question, and recommend dis-
missal of the action or remand to the bankruptcy
court for "determination as to whether the debtor
unjustifiably refused to bring an action against
Fishbein, and accordingly as to whether the Unse-
cured Creditors Committee has standing to bring
this action, as well as whether such an adversary
proceeding would ultimately benefit the debtor's es-
tate and hence the creditors." [FN1] Defendants' Mo-
tion to Dismiss at 24.

Defendants' argument is without merit. In either of
two approaches used by courts in this circuit,
plaintiff has standing to bring this suit on behalf of
Corell.

One approach used by Third Circuit courts has been
to permit a creditors committee to maintain an ac-
tion, in its own right or on behalf of a debtor, de-
pending on the circumstance, upon "only a showing

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp., 1992 WL 196768 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp., 1992 WL 196768)**

that a Committee's cause has merit and that the [debtor-in-possession] refused to sue ... as opposed to requiring a Committee to make any further showing of extenuating circumstances." *In re Nicolet, Inc.,* 80 B.R. 733, 737-38 (E.D.Pa.1987). *See also Coral Petroleum, Inc. v. Banque Paribas-London,* 797 F.2d 1351, 1362-63 (5th Cir.1986) (to bring suit on behalf of unwilling debtor in possession, committee of unsecured creditors need only show that the claim has merit and that the debtor in possession refused to sue; no further showing is necessary). *Cf. In re McKeesport Steel Castings Co.,* 799 F.2d 91, 94 (3d Cir.1986) (individual creditors may act in lieu of trustee when debtor in possession refuses to act and creditors have a colorable claim).

**\*2** In *Nicolet,* the bankruptcy court entertained a motion by an unsecured creditor's committee to file a legal action on behalf of the debtor to recover payments made out of the debtor's estate. The court surveyed various holdings of the Third Circuit Court of Appeals, which has not directly addressed the question of creditors' standing to sue in such circumstances, and concluded that:

[W]e infer that the Court would utilize a functional approach in the analogous instant situation and determine that a Committee could maintain an action on behalf of a [debtor-in-possession] as long as the claim had any merit and the [debtor] was, for any reason at all or for no reason, failing to maintain the action in prompt fashion.

[W]e do not think that the reasons why a [debtor] has failed to proceed are really very important, or that a Committee must undertake to prove the existence of any such reason to be allowed to proceed with an action in its own name on the [debtor's] behalf. Rather, we believe that, upon proving the potential merit of its case and the [debtor's] failure to proceed, the Committee should be allowed to proceed on its own without establishing anything further.

*Nicolet,* 80 B.R. at 738, 739. I will follow the ap-

proach outlined in *Nicolet.*[FN2]

Plaintiff has made the requisite showing to proceed with this complaint. The bankruptcy court's order of April 11, 1991 granting plaintiff leave to bring this adversary proceeding and authorizing the retention of special counsel to prosecute this action, specifically contained the court's finding that good cause had been shown to maintain the suit. Bankruptcy Court Order of April 11, 1991, No. 89-20656. While not determinative, the bankruptcy court's acknowledgment of good cause certainly encourages a finding that plaintiff's claims are potentially meritorious. In addition, personal review of the plaintiff's complaint and applicable law demonstrates that plaintiff has stated colorable claims, pleading in detail defendants' alleged misconduct and Corell's injuries supposedly suffered as a result. As will be discussed in the remainder of this memorandum, the Committee has stated claims for which they are possibly entitled to relief.[FN3]

Second, plaintiff points out that, as of the time the bankruptcy court granted it leave to file this action, the debtor had been in bankruptcy for nearly two years [FN4] but had not pursued these claims. This seems sufficient proof of the second element of the standing formula, that the debtor, "for any reason at all or for no reason, [is] failing to maintain the action in prompt fashion." *See Nicolet,* 80 B.R. at 738. Thus, absent superseding events in the bankruptcy court, such as the debtor itself bringing an action against defendants, *see id.* 739-40, the Committee may pursue its claims of accountant malpractice on Corell's behalf.

Even if plaintiff could not at this stage make a showing sufficient under the *Nicolet* standard, the Committee may establish standing in yet another way. Where the debtor's legal claims arose prior to the filing of bankruptcy, as is the case in this instance, the claims become part of the debtor's estate under 11 U.S.C. § 541. It is well established that a committee of unsecured creditors may pursue these claims on behalf of the debtor or trustee upon a showing that the bankruptcy court has appointed

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                                                Page 3
Not Reported in F.Supp., 1992 WL 196768 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp., 1992 WL 196768)**

the committee to enforce the debtor's claims and that the committee is a representative of the estate. *Committee of Unsecured Creditors v Doemling,* 127 B.R. 945, 949 (W.D.Pa.1991) (citing *In re Amarex, Inc.,* 96 B.R. 330, 334 (W.D.Okla.1989). A committee is a representative of an estate if a " 'successful recovery by the appointed representative would benefit the debtor's estate and particularly the unsecured creditors.' " *Doemling,* 127 B.R. at 950 (quoting *In re Sweetwater,* 884 F.2d 1323, 1327 (10th Cir.1989)); *see also Amarex,* 96 B.R. at 334; *In re Kroh Bros. Development Co.,* 100 B.R. 487, 499-500 (Bkrtcy.W.D.Mo.1989); *In re Tennessee Wheel & Rubber Co.,* 64 B.R. 721, 725-26 (Bkrtcy.M.D.Tenn.1987). Whether a committee is a representative of an estate is determined on a case-by-case basis. *Doemling,* 127 B.R. at 949-950.

**\*3** Under *Doemling,* plaintiff has standing to bring suit on behalf of Corell. As noted above, the bankruptcy court appointed the Committee for the purpose of bringing suit against defendants, satisfying the first condition of *Doemling.* Moreover, the Committee is acting as representative of the estate since success in the suit will increase the assets of the debtor's estate and benefit the unsecured creditors.

## B.

Defendants contend that the applicable statutes of limitations bar all but one count of plaintiff's complaint. They argue that, under Pennsylvania law, a four-year period applies to plaintiff's breach of contract claim (Count I), and that a two-year period applies to plaintiff's causes of action for negligent misrepresentation (Count II), negligence (Count III), breach of fiduciary duty (Count IV), and fraudulent misrepresentation (Count V). Defendants further argue that, in cases involving alleged reliance on an accountant's report, the statute of limitations begins to run upon plaintiff's receipt of the accountant's report, such that the periods in this case commenced to run on receipt of Fishbein's 1986 audit

on December 5, 1986, and on receipt of Fishbein's 1987 audit on December 9, 1987. Since plaintiff filed its complaint April 23, 1991, defendants calculate that plaintiff is time-barred from asserting all counts of its complaint save the Count I claim of breach of contract based upon the 1987 audit.

Defendants' calculation fails to take into account Corell's state of bankruptcy and the slight latitude the law gives bankrupt businesses in bringing their claims. Section 108(a) of the Bankruptcy Code provides:

If applicable nonbankruptcy law, an order entered in a nonbankruptcy proceeding, or an agreement fixes a period within which the debtor may commence an action, and such period has not expired before the date of the filing of the petition, the trustee may commence such action only before the later of-

(1) the end of such period, including any suspension of such period occurring on or after the commencement of the case; or

(2) two years after the order for relief.

11 U.S.C. § 108(a). Corell filed its Chapter 11 Petition on *April 24, 1989.* Pursuant to section 108(a), any causes of action that were not time-barred as of April 24, 1989 could be filed by the later of the running of the statute of limitations or April 24, 1991, two years after the order for relief was entered in the bankruptcy court.[FN5] Because plaintiff's complaint was filed in the bankruptcy court on April 23, 1991, within the two-year extension period prescribed by section 108(a)(2), plaintiff need only establish that the statutes of limitations on each count had not run as of April 24, 1989.[FN6]

### 1. Breach of contract

Plaintiff disputes defendants' contention that the Pennsylvania statute of limitations for breach of contract in an accountant malpractice action is four years; it argues instead that the applicable period is

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                      Page 4
Not Reported in F.Supp., 1992 WL 196768 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp., 1992 WL 196768)**

six years. Whether the applicable statute of limitations is four or six years is of no consequence given the applicability of § 108. Even assuming the statute of limitations commenced to run on the breach of contract claim on the day Corell received the audits, the breach of contract claims based on either the 1986 audit or the 1987 were not time-barred as of April 24, 1989 under either the four- or six-year statute of limitation periods.

2. *Negligent Misrepresentation, Negligence, Breach of Fiduciary Duty, and Fraudulent Misrepresentation*

a. Claims based on the 1987 Audit

**\*4** The parties agree that the applicable statute of limitations for the tort claims in counts II through V is two years. The earliest date the statute of limitations on the 1987 audit could have commenced to run was December 9, 1987, the day Corell received the audit. Thus none of the tort claims associated with the 1987 audit had expired by April 24, 1989.

b. Claims based on the 1986 Audit

Defendants argue that the statute of limitations with respect to the claims arising out of the 1986 audit began to run the day the plaintiff received the accountant's report, December 5, 1986. Plaintiff responds that the statute of limitations does not begin to run until Corell discovered the tortious conduct. Plaintiff is correct. Under Pennsylvania's well established equitable discovery rule, the statute of limitations does not begin to run until the injured party "knew or using reasonable diligence should have known of the claim." *Vernau v. Vic's Market, Inc.,* 896 F.2d 43, 45-46 (3rd Cir.1990). *See also School District of the Borough of Aliquippa v. Maryland Casualty Company,* 587 A.2d 765 (Pa.Super.1991) (plaintiffs had two years from time they learned of injury to determine whether accountants were negligent).

In applying the discovery rule, the court must de-

termine when Corell learned or, using reasonable diligence should have learned, of the injury to the company. In *Urland v. Merrell-Dow Pharmaceuticals, Inc.,,* 822 F.2d 1268, 1273 (3rd Cir.1987), the court defined "reasonable diligence" as follows:

There are very few facts which diligence cannot discover, but there must be some reason to awaken inquiry and direct diligence in the channel in which it would be successful.

Arguably, there was reason to awaken Corell's inquiry as to defendants' alleged injury to the company prior to April 24, 1987 such that the tort claims would have expired prior to April 24, 1989. In its complaint plaintiff states:

during the 1986 fiscal year, Corell was experiencing certain conditions and events which when considered in the aggregate indicated that there could be substantial doubt about Corell's ability to continue as a going concern for a reasonable period of time, [including a substantial drop in sales, a meager net profit, a cash flow problem, and a decrease in working capital.]

Plaintiff's Complaint at ¶ 43. Receiving a rosy audit on December 5, 1986, in light of these serious indicators might "awaken inquiry." *Urland,* 822 F.2d at 1273. Plaintiff also notes that the 1987 fiscal year indicators were even more foreboding. Id. at ¶ 49. Such poor business after a glowing audit might also alert Corell of some accounting problems.

However, poor sales or financial difficulties may not implicate one's accountant so much as the current financial conditions. "Financial problems do not necessarily suggest accounting fraud,"*Gruber v. Price Waterhouse,* 697 F.Supp. 859, 865 (E.D.Pa.1988) (quoting *Mosesian v. Peat, Marwick, Mitchell & Co.,* 727 F.2d 873, 878 (9th Cir.), *cert. denied,*469 U.S. 932 (1984). Further development of the facts through discovery is called for to determine when Corell knew or, using reasonable diligence should have known, of Fishbein's fraudulent conduct toward them.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                   Page 5
Not Reported in F.Supp., 1992 WL 196768 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp., 1992 WL 196768)**

C.

**\*5** Defendants claim that, aside from being time-
barred, count I fails to state a claim for breach of
contract. Plaintiff claims that Fishbein entered into
a contract with Corell in which Fishbein agreed to
perform auditing and accounting services in accord-
ance with both generally accepted auditing stand-
ards ("GAAS") and generally accepted accounting
principles ("GAAP"). Plaintiff's Complaint at ¶ 27.
In failing to comply with various elements of
GAAS and GAAP, defendants allegedly breached
their contract with Corell. *Id.* at ¶¶ 56-61.

GAAS represents auditing standards approved and
adopted by the membership of the American Insti-
tute of Certified Public Accountants (AICPA), AU
§ 150.02, and GAAP "encompasses the conven-
tions, rules, and procedures necessary to define ac-
cepted accounting practice at a particular time,"
AICPA, AU § 411.02. In essence, GAAS and
GAAP delineate due professional care owed by ac-
countants to their clients as stated by the accounting
community.

Failure to perform a service with the requisite level
of professional care typically constitutes a claim of
negligence, not breach of contract. *See, e.g. Yosuf v.
U.S.,* 642 F.Supp. 415, 426-27 (M.D.Pa.1986)
(physician who fails to provide services with reas-
onable skill and diligence subject to malpractice
suit sounding in tort); *Hoyer v. Frazee,* 470 A.2d
990, 992-93 (Pa.Super.1984) (standard of care in an
attorney malpractice case is whether attorney has
exercised ordinary skill and knowledge). That is, an
accountant's failure to perform an audit in accord-
ance with GAAS and GAAP classically precipitates
a claim for negligence, not breach of contract. *See
Robert Wooler Co. v. Fidelity Bank,* 479 A.2d
1027, 1032 (Pa.Super.1984) (where accounting firm
violated duty of care owed to client, it could be
found liable for plaintiff's losses if accountant's
negligence was a substantial factor in causing the
loss).

Plaintiff argues, though, that Fishbein had not

merely a general duty, but a *contractual obligation*
to perform up to a certain standard. Plaintiff's argu-
ment is problematic in two respects, though. First,
it is not clear under basic contract law that Corell's
agreement with Fishbein, even as characterized by
plaintiff, creates a cause of action in contract.
Second, even if the agreement does create a cause
of action in contract, plaintiff has failed properly to
state a claim of breach of contract in accordance
with Pennsylvania law. Both weaknesses in
plaintiff's pleading derive from the basic inad-
equacy in the claim: count I sounds in negligence,
not contract.

According to Corpus Juris Secundum (C.J.S.):

an action in contract is for the breach of a duty
arising out of a contract either express or implied,
while an action in tort is for a breach of duty im-
posed by law, which arises from an obligation cre-
ated by a relation, ordinarily unconnected with a
contract, but may arise either independently of any
contract or by virtue of contract relations.

**\*6** 1A C.J.S. *Actions* § 85 (1985). The source of the
duty determines the appropriate cause of
action.FN7 *Id.*

Although Fishbein contracted to act in accordance
with GAAP and GAAS, the contract is not the
source of Fishbein's duty to act with professional
care. Rather, Fishbein's duty to act in compliance
with GAAS and GAAP arises by law. Fishbein's
agreement to work in accordance with GAAS and
GAAP represents no more than its recognition of a
legal duty to provide services with the ordinary
skill and knowledge required by both Pennsylvania
law and AICPA rules.

Under Pennsylvania law, accountants who contract
to provide services must "use such skill in the per-
formance of their agreement as reasonably prudent,
skillful accountants would use under the circum-
stances." *Wooler,* 479 A.2d at 1031 (quoting
*O'Neill v. Atlas Automobile Finance Corp.,* 11 A.2d
782, 786 (Pa.Super.1940)). In addition, Rules 202

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                          Page 6
Not Reported in F.Supp., 1992 WL 196768 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp., 1992 WL 196768)**

and 203 of the Rules of Conduct of the Code of Professional Ethics of the AICPA require account-ants to comply with GAAS and GAAP in the per-formance of their professional services. Fishbein's duty to act in accordance with GAAS and GAAP existed notwithstanding the contract with Corell, suggesting count I more properly lies in tort than in contract.

Even if Fishbein's duty arose by contract, plaintiff has failed to plead a claim in breach of contract un-der Pennsylvania law standards. In an effort to pre-vent plaintiffs from circumventing the two-year limitation on tort actions by pleading claims as breaches of contract, Pennsylvania courts have es-tablished different pleading requirements for the breach of contract and tort causes of action. In *Sherman Industries, Inc. v. Goldhammer,* 683 F.Supp. 502, 506 (E.D.Pa.1988), the court ex-plained:

[I]n order to distinguish a contract malpractice claim from a tort claim, the plaintiff claiming under a contract theory must raise an issue as to whether it specifically instructed the defendant to perform a task that the defendant failed to perform, or as to whether the defendant made a specific promise upon which plaintiff reasonably relied to its detri-ment.

*See also Hoyer,* 470 A.2d at 992-993 (since com-plaint did not aver breach of specific provision of contract, complaint did not state a breach of con-tract claim, but rather a negligence claim). A plaintiff need only allege breach of a general duty of care to properly plead malpractice based in tort. *Sherman Industries, Inc.,* 683 F.Supp. at 506.

As defendants properly note, plaintiff has failed to specify a breach of a specific promise or instruction as required under *Sherman.* Instead, the Committee broadly alleges that defendants "fraudulently, reck-lessly, negligently" failed to do a number of things required under GAAP and GAAS. Plaintiff's Com-plaint at ¶¶ 56-61. Not only is plaintiff's language in the form of a prototypical negligence claim (such

that the claim literally sounds in tort), but none of the averments refers to a breach of a specific con-tract provision. An agreement to act with the leg-ally required level of care cannot constitute a spe-cific contractual promise. Otherwise, claims in tort and in breach of contract, at least within the context of service contracts, would be indistinguishable. Plaintiff's true complaint is not that Fishbein failed to perform the contract-for the financial statements were delivered-but that Fishbein performed the contract without the requisite level of care.

**\*7** Plaintiff argues that *Sherman* and *Hoyer* have no bearing on this case since they involve attorney malpractice claims not accountant malpractice. This distinction is unconvincing. Plaintiff gives neither reasoning nor Pennsylvania law in support of the assertion that malpractice claims against attorneys based in contract should be pled differently than similar claims against accountants. More likely, the manner of asserting malpractice claims against at-torneys and accountants is comparable given the quite analogous relationships of attorney-client and accountant-client. In both cases, the client has sought professional advice, and expects in return service performed with skill, knowledge, and con-fidentiality.

Moreover, *Sherman* has a broader application than simply attorney malpractice. While the case spe-cifically concerns attorney malpractice, as plaintiff notes, the pleading standards articulated by the court make no reference to attorneys, but state quite universally the different pleading requirements for contract and tort claims. The similarity of the ac-countant-client and attorney-client relationships, to-gether with the nonexclusive language used by the court in *Sherman,* demonstrate that the standards outlined in *Sherman* have significant bearing upon this case.

As opposed to *Sherman* and *Hoyer,* plaintiff argues that two other cases are controlling in the present circumstances: *Foster v. Peat Marwick Main & Co.,* 587 A.2d 382 (1991) and *Baehr v. Touche-Ross & Co.,* 62 B.R. 793 (E.D.Pa.1986).[FN8]

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                   Page 7
Not Reported in F.Supp., 1992 WL 196768 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp., 1992 WL 196768)**

Neither of the cases provides guidance for this case.

*Foster* and *Baehr* do involve breach of contract claims against accountants for failure to provide services in accordance with GAAP and GAAS. However, neither case directly addresses the issue of whether the breach of contract claim is sufficiently stated. The courts' silence on the sufficiency of the breach of contract claims in the absence of direct challenges thereto [FN9] ought not be read as an affirmation of the sufficiency of the pleading. The opinions in *Foster* and *Baehr* provide no information on how the claims were formulated. The cases, therefore, can hardly serve as a guide for how breach of contract claims may be adequately pled in accountant malpractice cases.

In sum, plaintiff has failed to state a cause of action in breach of contract. The true nature of Corell's complaint lies in tort, involving a breach of duty arising in law, not contract. Moreover, the broad averments in the complaint do not satisfy Pennsylvania law pleading requirements for breach of contract. As the very same negligence claim is pled in count III, incorporating the allegations listed in count I paragraphs 34 through 55, dismissal of count I will be granted.[FN10]

## D.

Defendants also move to dismiss plaintiff's fraud allegations raised throughout the complaint and count V sounding in fraudulent misrepresentation. Defendants tender two arguments. First, they contend that the Committee failed to plead fraud with the particularity required under Fed.R.Civ.P. 9(b). Second, defendants assert that even if the claims are sufficiently pled pursuant to Rule 9(b), the Committee has failed to allege scienter, one of the elements of fraud. Neither argument withstands scrutiny.

**\*8** Rule 9(b) reads:

In all averments of fraud and mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge and other condition of mind of a person may be averred generally.

With respect to motions to dismiss under Rule 9(b), the Third Circuit has stated that "focusing exclusively on its 'particularity' language is 'too narrow an approach and fails to take account of the simplicity and flexibility contemplated by the rules.' " *Christidis v. First Pennsylvania Mortg. Trust,* 717 F.2d 96, 100 (3rd Cir.1983) (quoting 5 C. Wright & A. Miller Federal Practice and Procedure § 1298, at 407 (1968)). The purpose of Rule 9(b) is to give defendants notice of the "precise misconduct with which they are charged and to safeguard defendants against spurious charges of immoral and fraudulent behavior." *Seville Industrial Machinery Corp. v. Southmost Machinery Corp.,* 742 F.2d 786, 791 (3rd Cir.1984), *cert. denied,*469 U.S. 1211 (1985).

In a case with substantially similar facts, *In re U.S. Healthcare, Inc. Securities Litigation,* 122 F.R.D. 467 (E.D.Pa.1988), the court found that the plaintiffs had sufficiently pled a fraud claim against defendant accountants where plaintiffs "identified numerous accounting and auditing standards which, they allege, were not followed by [their accountants,] ... identified the financial statements which they allege were materially false and ... particularly identified the allegedly misleading portion of the documents." [FN11] Likewise, in *In re Fiddler's Woods Bondholders Litigation,* 102 F.R.D. 291-294 (E.D.Pa.1984), the court ruled that plaintiffs had sufficiently pled a fraud claim against the defending accounting firm where the plaintiff identified the "established principles" defendant supposedly violated. *See also Christidis,* 717 F.2d at 100 (plaintiffs did not aver fraud with sufficient particularity since they failed to disclose how defendants knowingly departed from accounting standards).

In view of the standard for pleading with specificity outlined in *In re U.S. Healthcare, In re Fiddler's Woods,* and *Christidis,* the Committee has pled its fraud claims with sufficient particularity. In paragraph 59, (a) through (t), the Committee identifies

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                          Page 8
Not Reported in F.Supp., 1992 WL 196768 (E.D.Pa.)
(Cite as: Not Reported in F.Supp., 1992 WL 196768)

the specific accounting and auditing standards al-legedly violated by Fishbein.[FN12] Plaintiff is also quite specific as to which financial statements it al-leges were materially false and how these state-ments were fraudulent. Plaintiff's Complaint at ¶¶ 37-55.[FN13] The averments in the complaint are sufficiently particular within the contemplation of Rule 9(b): the complaint provides Fishbein ad-equate notice of its alleged misconduct and protects them from frivolous allegations of fraud.

Defendants also argue that the fraud claims must be dismissed because plaintiff has failed to plead sci-enter, one of the five elements of fraud.[FN14] "[F]raud can take many forms ..., whether by direct falsehood or innuendo." *Delahanty v. First Pennsylvania Bank, N.A.,* 464 A.2d 1243, 1251 (Pa.Super.1983). As such, it is not always neces-sary, let alone possible, to demonstrate specific in-tent. Under Pennsylvania law, a showing of gross negligence or recklessness is sufficient to plead sci-enter in fraud claims. *Rosen and Co. Inc. v. Seidman,* 48 D. & C. 3d 411, 421 (1988).

**\*9** In *Rosen,* the court held that "either gross negli-gence or reckless misstatements would support a finding of fraud, even without a finding of specific intent to deceive." *Rosen,* 48 D. & C. 3d at 421 (citing *Ultramares Corp. v. Touche,* 174 N.E. 441 (1931)). Similarly, in *Delahanty,* the court stated: "It is well settled that fraud is proved when it is shown that the false representation was made knowingly, or in conscious disregard of the truth, or *recklessly without caring whether it be true or false.*" *Delahanty,* 464 A.2d at 1252 (citing *Warren Balderston Co. v. Integrity Trust Co.,* 170 A. 282 (1934)) (emphasis added).

The Committee's complaint has certainly alleged gross negligence and/or recklessness on the part of Fishbein. Plaintiff does not simply assert "Fishbein's conduct was fraudulent," as defendants suggest. Rather, the Committee alleges numerous misrepresentations and omissions by Fishbein which, if proved, would constitute recklessness or gross negligence. The Committee's allegations of

fraud and fraudulent misrepresentation are suffi-ciently pled and dismissal of the claims will be denied.

E.

Finally, defendants argue that all of the Commit-tee's tort claims against Fishbein must be dismissed because Fishbein owed no duty of care to the Com-mittee. Further, defendants contend that Fishbein did not owe a fiduciary duty to either Corell or the Committee, and therefore, count IV of plaintiff's complaint alleging breach of a fiduciary duty should be dismissed. Neither argument has merit.

As discussed in Part A, the Committee has properly instituted this suit "on behalf of Corell." Since the Committee is acting "on behalf of Corell," the Committee has stepped into the shoes of the com-pany and thus may assert any claims accrued by Corell, including Fishbein's breach of duty toward the company.[FN15] Fishbein certainly owed a duty of care to Corell, the client. Plaintiff's claims will not be dismissed on these grounds.

Concerning defendants' fiduciary duty toward Co-rell or the Committee, defendants correctly note that it is generally established that an accountant is not necessarily in a fiduciary relationship with a client. *See, e.g. Stainton v. Tarantino,* 637 F.Supp. 1051, 1066 (E.D.Pa.1986); *Rubin v. Katz,* 347 F.Supp. 322, 324 (E.D.Pa.1972). However, a fidu-ciary relationship may be shown where the plaintiff can prove that the "accounting services and confid-ential advice ... provided them gave rise to a confid-ential relationship." *Stainton,* 637 F.Supp. at 1066.

The court in *Stainton* explains that a confidential relationship arises "only if parties surrender sub-stantial control over some part of their business af-fairs." *Id.* In more recent years, courts have stated a somewhat different, though similar, definition of fi-duciary relationships. The court in *Antinoph v. Laverell Reynolds Securities, Inc.,* 703 F.Supp. 1185, 1188 (E.D.Pa.1989), describes a fiduciary re-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp., 1992 WL 196768 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp., 1992 WL 196768)**

lationship as follows:

**\*10** a fiduciary relationship 'arises whenever a trust, continuous or temporary, is specially reposed in the skill or integrity of another, or the property, or pecuniary interest, in the whole or in a part ... is placed in the charge of another.'.. [I]n addition ... the defendant must also have accepted the fiduciary relationship (quoting *Consolidated Oil and Gas, Inc. v. Ryan,* 250 F.Supp. 600, 604 (W.D.Ark.1966), *aff'd,* 368 F.2d 177 (8th Cir.1966).

Whether Corell yielded "substantial control," *Stainton,* 637 F.Supp. at 1066, to Fishbein, or whether Corell placed its business "in the charge of," *Antinoph,* 703 F.Supp. at 1188, Fishbein is not completely clear from the complaint. Nor do we know if Fishbein accepted the fiduciary relationship.

The standard for determining the sufficiency of a complaint is quite liberal, though. A complaint should only be dismissed where "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 102 (1957). *See also D.P. Enterprises, Inc. v. Bucks County Community College,* 725 F.2d 943, 944 (3rd Cir.1985) (claim should be dismissed only if no relief could be granted under any set of facts which could be proved). Further development of the facts through discovery may offer some substantiation of the claim that a fiduciary relationship did exist between Corell and Fishbein, and transitively between Fishbein and the Committee, or may conclusively demonstrate the contrary. Accordingly, dismissal of count IV on its face, in advance of such further factual development, would be premature.

*CONCLUSION*

For the foregoing reasons, defendants' motion to dismiss will be granted in part and denied in part. The Defendants' Motion to Dismiss will be granted with respect to striking count I for failure to state a breach of contract claim. Defendants' Motion to Dismiss will be denied in all other respects.

*ORDER*

Upon consideration of defendants motion to dismiss, for the reasons given in the accompanying memorandum, it is hereby ORDERED and DIRECTED that:

(1) Defendants' motion to dismiss count I for failure to state a claim is GRANTED, and count I is dismissed; and

(2) In all other respects, defendants' motion to dismiss is DENIED.

> FN1. In a motion to stay these proceedings, filed simultaneously with this Motion to Dismiss, defendants urged this court to stay this litigation until the bankruptcy court determines whether plaintiff's authority to prosecute this claim should be excluded from a plan of reorganization approved by that court for the debtor. In a separate memorandum, I denied the motion to stay on a finding that plaintiff's ability to fund this litigation by leave of the bankruptcy court was a matter independent of the merits of this case. I will not revisit in this memorandum defendants' arguments on that issue made under the guise of a motion to dismiss rather than a motion to stay. However, I note that in concluding that this action need not await a finding by the bankruptcy court that this litigation would ultimately benefit the debtor's estate, I made no judgment as to whether plaintiff met the applicable standing test to prosecute this case on the debtor's behalf.

> FN2. Defendants argue that an unsecured creditors committee lacks standing to sue on behalf of a debtor in possession unless the committee can show that the debtor *unjustifiably* refused to bring suit. Defend-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                    Page 10
Not Reported in F.Supp., 1992 WL 196768 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp., 1992 WL 196768)**

ants' Motion to Dismiss at 21-26 (citing *STN Enterprises, Inc. v. Noyes,* 779 F.2d 901, 904 (2d Cir.1985). I am persuaded by Bankruptcy Judge Scholl's conclusion in *Nicolet* that the Third Circuit would be more likely to employ a less exacting standard than that used by the Second Circuit.

FN3. Defendants argue in their Reply Brief that plaintiff must "prove" the potential merit of their claim to some court before plaintiff has standing. Defendants seem to suggest that plaintiff lacks standing unless it can show now they will ultimately prevail. A potentially meritorious claim is not the same as a meritorious claim-and a motion to dismiss is not the same as a motion for summary judgment.

FN4. Corell initiated its Chapter 11 proceeding on April 24, 1989.

FN5. The "order for relief" was issued on the date debtor filed for bankruptcy, not on the date the bankruptcy court authorized the Committee to proceed on behalf of Corell. According to 2 *Collier on Bankruptcy* ¶ 102.7 (15th Ed.1992), "In a voluntary case the filing of the petition under section 301 commences the voluntary case and is itself entry of the order for relief from which time periods are to be measured." Corell's bankruptcy was such a voluntary case. *See also Jackson v. Security Finance Group,* 42 B.R. 76, 84 (Bkrtcy.D.C.1984) (§ 108(a) allows commencement of suit within two years from date bankruptcy petition filed, as long as statute of limitations has not run by the date of filing); *Ellenberg v. Dekalb County Georgia,* 23 B.R. 384, 391 (Bkrtcy.N.D.Ga.1982) (in voluntary bankruptcy case, date of filing of petition is considered the date relief ordered under § 108(a)).

FN6. In holding that the tolling provision of § 108(a) is applicable to plaintiff's causes of action, I reject defendants' arguments, advanced in their Reply Memorandum, that the Committee may not invoke the benefits of § 108. Defendants state that "no court has gone as far as to permit a creditors committee to invoke § 108 even when suing derivatively on behalf of the debtor.... In the case *sub judice,* the Committee is not acting as a collection agent of the debtor. Rather, an agreement was entered into between the debtor and the Unsecured Creditor's Committee whereby the debtor assigned its rights to any claim over and against Fishbein." Reply of Defendant, Fishbein & Company to Plaintiff's Response to Defendant's Motion to Dismiss ("Reply Brief") at 2-3.

In support of this position, defendants cite *Motor Carrier Audit and Collection Company v. Light Products, Inc.,* 113 B.R. 424 (N.D.Ill.1989). There, the court determined that "a mere purchaser or assignee" of the debtor's rights could not be the beneficiary of the § 108 tolling provision where the complaint did not allege that the action was brought on the trustee's behalf. The court explained, though, that if the plaintiff can show that it is an agent of the trustee, as opposed to an assignee, the plaintiff is entitled to the benefits of § 108. *Motor Carrier,* 113 B.R. at 426.

The Committee is not an assignee, as defendants contend. Rather, the Committee is acting on behalf of Corell, the debtor-in-possession. *See* Plaintiff's Complaint at ¶ 2. In a Chapter 11 case, a debtor-in-possession has the powers and duties of a trustee. 11 U.S.C. § 1107(a). The Committee, therefore, both because it is standing in the shoes of Corell in bring-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                          Page 11
Not Reported in F.Supp., 1992 WL 196768 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp., 1992 WL 196768)**

ing these claims and because it is "acting on behalf of or as an agent for the trustee," *Motor Carrier,* 113 B.R. at 426, is entitled to invoke the statutory protections of § 108.

FN7. Of course, there are occasions where an action may be brought in both contract and tort. *See Sherman Industries, Inc. v. Goldhammer,* 683 F.Supp. 502, 506 (E.D.Pa.1988) (noting that malpractice actions may be raised in both tort and in contract where the defendant pleads each claim properly).

FN8. Plaintiff also refers to *Robert Wooler Co. v. Fidelity Bank,* 479 A.2d 1027 (1984). *Wooler* is inapposite, however. The case does not even involve a breach of contract claim, but rather upholds a finding of accountant liability for tortious malpractice.

FN9. The contract claims were challenged on different grounds. In *Foster,* defendant contended plaintiff brought the breach of contract claim on behalf of too wide a group. *Foster,* 587 A.2d at 384-85. And in *Baehr,* defendants challenged the breach of contract claim by arguing that plaintiff was not a real party of interest and that defendants' conduct did not cause plaintiff's loss. *Baehr,* 62 B.R. at 796.

FN10. Since count I will be dismissed, defendants' argument that plaintiff is not entitled to consequential damages for the alleged breach of contract is no longer relevant.

FN11. Defendants rely on Second Circuit law in citing the standard for pleading with specificity. Third Circuit courts have rejected Second Circuit case law on Rule 9(b) as too stringent. *In re U.S. Healthcare, Inc. Securities Litigation,* 122 F.R.D. at 470

(citing *Recchion v. Westinghouse Electric Corp.,* 606 F.Supp. 889, 894 (W.D.Pa.1985)).

FN12. In four averments, (p) through (s), plaintiff does not indicate a specific accounting standard breached by defendants. However, the language of the four averments, particularly in the context of the eleven other allegations that do refer to standards, adequately notifies Fishbein of the misconduct with which it is charged, thereby defeating a Rule 9(b) motion. *See In re Fiddler's Woods,* 102 F.R.D. at 294 (while not clear that plaintiffs' alleged violation was of "established" principles, Rule 9(b) motion failed since allegations specific enough to give defendant notice of the claims against it and to prevent frivolous claims).

FN13. For example, plaintiff lists seven very specific problems with Fishbein's performance of the 1987 audit, including failure "to discover and deduct from the inventory certain inventory on hand but held on consignment for third parties," and failure "to make sufficient inquiry and provide allowance for scrap and/or obsolete inventory." Plaintiff's Complaint at ¶ 47.

FN14. Under Pennsylvania law, the five elements of fraud include: (1) false representation of an existing fact, (2) materiality of the misrepresentation, (3) scienter, (4) reliance, and (5) damage to the person relying thereon. *Rosen and Co., Inc. v. Seidman,* 48 D. & C. 3d 411, 415-16 (1988).

FN15. Moreover, as mentioned in Part A, the Committee is entitled to raise Corell's claims as the appointed representative of the estate. *See Doemling,* 127 B.R. at 948 (committee of unsecured creditors could bring tort claim against defendant where

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                           Page 12
Not Reported in F.Supp., 1992 WL 196768 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp., 1992 WL 196768)**

       committee appointed by court and commit-
       tee representative of estate). Under 11
       U.S.C. § 541, the property of the debtor's
       estate includes the debtor's legal or equit-
       able causes of action. In that Corell's cause
       of action against Fishbein arose prior to the
       filing for bankruptcy, Corell's cause of ac-
       tion is part of the estate.

E.D.Pa.,1992.
Official Committee of Unsecured Creditors of Co-
rell Steel on Behalf of Corell Steel v. Fishbein and
Co., P.C.
Not Reported in F.Supp., 1992 WL 196768 (E.D.Pa.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**10**

LEXSEE 2005 U.S. DIST LEXIS 40018



Positive
As of: Apr 28, 2008

**JOHN PEW, JR., BARBARA E. PEW, HAROLD PEW, DONNA PEW, II. NANCY HANN, JULIA HUDASKY, KATHLEEN PRICKETT, MIRIAM V. PRICKET, on behalf of themselves and all others similarly situated, Plaintiffs, v. DONALD P. CARDARELLI, PETER J. O'NEILL and PRICE WATERHOUSECOOPERS LLP, Defendants.**

**5:03-CV-742 (NAM)**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF NEW YORK**

*2005 U.S. Dist. LEXIS 40018*

**March 17, 2005, Decided**

**SUBSEQUENT HISTORY:** Affirmed by *Pew v. Cardarelli, 164 Fed. Appx. 41, 2006 U.S. App. LEXIS 2132 (2d Cir. N.Y., Jan. 24, 2006)*

**COUNSEL:** [*1] Mackenzie, Hughes Law Firm, Kenneth E. Ackerman, Esq., of Counsel, David M. Garber, Esq., of Counsel, Syracuse, New York and Wechsler Harwood LLP, Robert I. Harwood, Esq., of Counsel, William R. Weinstein, Esq., of Counsel, Joshua D. Glatter, Esq., of Counsel, New York, New York and Dilworth Paxson LLP, Stuart Savett, Esq., of Counsel, James J. Rodgers, Esq., of Counsel, Philadelphia, Pennsylvania and Dilworth Paxson LLP, Harold G. Cohen, Esq., of Counsel, Cherry Hill, New Jersey, Attorneys for Plaintiffs, Wilmer, Cutler Law Firm, Charles E. Davidow, Esq., of Counsel, Washington, D.C. and Hiscock, Barclay Law Firm, Douglas J. Nash, Esq., of Counsel, John P. Langan, Esq., of Counsel, Syracuse, New York, Attorneys for Defendants Donald P. Cardarelli and Peter J. O'Neill.

Hancock, Estabrook Law Firm, Daniel B. Berman, Esq., of Counsel, Syracuse, New York and Orrick, Herrington Law Firm, Diana L. Weiss, Esq., of Counsel, New York, New York, Attorneys for Defendant Pricewaterhouse-Coopers LLP.

**JUDGES:** Norman A. Mordue, U.S. District Judge.

**OPINION BY:** Norman A. Mordue

**OPINION**

**Hon. Norman A. Mordue, D.J.:**

**MEMORANDUM-DECISION AND ORDER**

**INTRODUCTION**

Defendants move to dismiss [*2] the amended complaint in this action, commenced May 13, 2003, to recover damages allegedly stemming from defendants' violations of federal securities law and state law in the sale of subordinated Money Market Certificates ("Certificates") offered by Agway, an agricultural cooperative. Plaintiffs, who sue on behalf of a putative class defined as all persons who acquired Certificates during the class period, claim that defendants made false and misleading statements in the applicable Registration Statements, Annual Reports, Quarterly Reports and Current Reports during the relevant period, in violation of section 11 of the Securities Act (*15 U.S.C. § 77k*) and *section 349 of New York General Business Law*. Defendant Donald P. Cardarelli, then Agway's Chief Executive Officer, and defendant Peter J. O'Neill, then Agway's Senior Vice President, Finance and Control, signed allegedly false and misleading Registration Statements and other public filings during the class period. Defendant PricewaterhouseCoopers LLP ("Pricewaterhouse"), an accounting firm, audited Agway's financial statements and issued

Case 1:07-cv-00265-SLR-LPS    Document 123-11    Filed 04/28/2008    Page 3 of 14

Page 2
2005 U.S. Dist. LEXIS 40018, *

allegedly false and misleading audit reports which, with the knowledge [*3] and express consent of Pricewaterhouse, were incorporated into and made part of Agway's Registration Statements and Annual Reports filed with the Securities and Exchange Commission ("SEC") during the class period. For the reasons stated herein, the Court dismisses the federal causes of action, that is, claims one, two and three, with prejudice. It dismisses without prejudice claim four, the state law cause of action.

## GENERAL BACKGROUND

Since the 1960's, Agway was a large agricultural supply and marketing cooperative engaged primarily in providing agriculture-related products and services. Membership in the cooperative was open to owners and operators of working farms and their immediate family members, and the purchase of at least one share of Agway stock for $ 25 was required. In its annual report and other disclosures to its members, Agway represented that it was "honest and ethical" in its business dealings and that it viewed itself as "the steward[]" of the organization's resources and as "accountable for their use."

Agway traditionally financed much of its working capital with proceeds from the sales of Certificates, fixed-interest debt instruments subordinated to [*4] Agway's other debt. Plaintiffs purchased Certificates during the period from November 1, 2000, through November 3, 2001, pursuant to the 1998 Registration Statement (filed August 31, 1998, effective September 21, 1998) and the 2001 Registration Statement (filed April 30, 2001, effective July 9, 2001). Agway's public filings, beginning in 1999 and continuing through September 2002, disclosed that Agway had substantial financial difficulties; that by June 2000 it had a negative cash flow and had begun selling assets in an effort to restructure; that it was relying on the debt markets as a primary source of financing; that it was compelled to enter into increasingly restrictive loan covenants in order to obtain credit; and that, as disclosed in its Annual Reports filed in June 2000 and June 2001, it had repeatedly breached the loan covenants, resulting in even more burdensome requirements in exchange for waivers of the breaches.

On March 6, 2002, Agway announced a temporary suspension of sales of Certificates; it never resumed selling them. On June 17, 2002, Agway announced the suspension of its practice of repurchasing Certificates prior to maturity. Agway's turnaround efforts failed [*5] and on September 30, 2002, it announced its intention to file a petition for reorganization under Chapter 11 of the Bankruptcy Code. It filed the petition in October 2002.

## AMENDED COMPLAINT

In their amended complaint, plaintiffs state that they bring the action as a class action pursuant to *Fed. R. Civ. P. 23(a)* and *(b)(3)* on behalf of all persons who acquired Certificates between September 21, 2000, and September 21, 2002, and were injured thereby. Plaintiffs aver that questions of law and fact common to the class include whether defendants violated federal securities laws and/or *New York General Business Law § 349*, whether the Registration Statements contained false and misleading statements, and whether defendants were negligent in omitting and/or misrepresenting material facts in the public filings. Plaintiffs assert that the controversy is best adjudicated as a class action because they believe there are thousands of class members, because joinder of all class members is impracticable and because it is impracticable for class members to sue individually.

Plaintiffs claim that defendants made numerous false [*6] and misleading statements in the following SEC filings relevant to the Certificates issued to and purchased by the class: the 1998 and 2001 Registration Statements (Forms S-3), which incorporated by reference all pertinent annual, quarterly and current reports, and which included by consent the Pricewaterhouse unqualified audit reports for the relevant fiscal years ending in June 1999, 2000 and 2001; the 2000 and 2001 Annual Reports (Forms 10-K), which included by consent the Pricewaterhouse unqualified audit reports; the five Quarterly Reports (Forms 10-Q) for the quarters ending September 2000, December 2000, March 2001 and December 2001; and the two Current Reports (Forms 8-K) dated March 1, 2001 and March 31, 2001. All of these documents were signed either by O'Neill alone or by O'Neill and Cardarelli.

More particularly, in paragraph 88 of the amended complaint, plaintiffs claim that statements in the Registration Statements and incorporated SEC filings were false and misleading because they either concealed or failed to disclose that:

(i) the only substantial liquid source of funds available to discharge the hundreds of millions of dollars of Money Market Certificates [*7] maturing during the Class Period and thereafter was "other peoples' money" derived from the sale of the new Money Market Certificates; (ii) because substantially all of Agway's most valuable assets were either pledged to senior debt or otherwise unavailable in connection with maturity obligations, the sale of Agway's presently available assets would be insufficient to fully satisfy its payment obligations with respect to the currently maturing Money Market Certifi-

2005 U.S. Dist. LEXIS 40018, *

cates, let alone newly sold Certificates; (iii) the potential proceeds from substantially dismantling all of Agway's remaining businesses (the antithesis of a "going concern") were only a fraction of the Money Market Certificates outstanding and maturing in the future; (iv) Agway's inability to satisfy its obligations concerning the maturing Money Market Certificates from the results of its operations created serious doubt as to whether Agway could continue as a "going concern," and the imminent risk of default; and (v) therefore, at the time of purchase, the newly issued Money Market Certificates were worth, at most, only a small fraction of the face amount that Agway collected from plaintiffs and the Class.

Based on [*8] these allegations, the amended complaint states four causes of action. Claim one is against Pricewaterhouse for violating section 11 of the Securities Act, 15 U.S.C. § 77k, by issuing unqualified audit reports which were incorporated into the Registration Statements, which were misleading and untrue, and which omitted and failed adequately to disclose material facts. Claim Two avers that the individual defendants violated *section 11* in that they caused Certificates to be sold to plaintiffs and the class pursuant to the misleading Registration Statements. Claim Three asserts that, as controlling persons under section 15 of the Securities Act, *15 U.S.C. § 77o*, the individual defendants are liable for Agway's wrongful conduct. The fourth claim alleges that all defendants engaged in materially deceptive acts or practices in the conduct of business, trade or commerce in violation of *section 349 of New York General Business Law*.

Plaintiffs claim that at the time they acquired the Certificates, neither plaintiffs nor any class member knew or by the exercise of reasonable care could have known of the facts concerning the inaccurate and misleading [*9] statements and omissions alleged. They further claim that the action is timely under section 13 of the Securities Act, *15 U.S.C. § 77m*, because it was brought within one year after they discovered the untrue statements. The amended complaint seeks class certification, a declaration that defendants have violated federal and New York laws, money damages and an award of attorneys fees and expenses.

**THE MOTION**

Defendants, in moving to dismiss the amended complaint, argue that it fails to state a claim because defen-

dants properly disclosed the existing facts; that plaintiffs' *section 11* claims fail under the Second Circuit's "bespeaks caution" doctrine and the "safe harbor" doctrine; that the *section 11* claims are time-barred; that plaintiffs' reliance on defendants' failure to issue a "going concern" qualification lacks merit; and that the claim under *section 349 of New York General Business Law* lacks merit.

**APPLICABLE LAW**

**Motion to dismiss complaint**

In addressing defendants' motion to dismiss the complaint under *Fed. R. Civ. P. 12(b)(6)*, the Court reads the complaint generously, accepting the truth [*10] of and drawing all reasonable inferences from all well-pleaded factual allegations. *See Mills v. Polar Molecular Corp., 12 F.3d 1170, 1174 (2d Cir. 1993)*. Dismissal is proper only if it appears beyond doubt that plaintiffs can prove no set of facts which would entitle them to relief. *See Valmonte v. Bane, 18 F.3d 992, 998 (2d Cir. 1994)*.

For purposes of a motion to dismiss, a complaint in a securities case is deemed to include "any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference, as well as public disclosure documents required by law to be, and that have been, filed with the SEC, and documents that the plaintiffs either possessed or knew about and upon which they relied in bringing the suit." *Rothman v. Gregor, 220 F.3d 81, 88 (2d Cir. 2000)* (citations omitted).

*Section 11*

Defendants contend that the amended complaint fails to state a claim because the public filings properly disclose the existing material facts. Section 11(a) of the Securities Act of 1933 imposes liability for a Registration Statement that "contain[s] an untrue statement of a material fact [*11] or omit[s] to state a material fact ... necessary to make the statements therein not misleading." *15 U.S.C. § 77k(a)*. The test for whether a statement is materially misleading within the meaning of *section 11* is not whether particular statements, taken separately, were literally true, but whether defendants' representations, taken together and in context, would have misled a reasonable investor about the nature of the investment. *See Rombach v. Chang, 355 F.3d 164, 178, n.11 (2d Cir. 2004)*; *Olkey v. Hyperion 1999 Term Trust, 98 F.3d 2, 5 (2d Cir. 1996)*. Those who may be liable include anyone who signed the registration statement and any accountant who has with his consent been named as having prepared or certified any part of the registration statement, *see 15 U.S.C. § 77k(a)(1), (4)*, as well as every person "who, by or through stock ownership,

2005 U.S. Dist. LEXIS 40018, *

agency or otherwise ... controls any persons liable" under *section 11. 15 U.S.C. § 77o*.

### "Bespeaks caution" doctrine and safe harbor provision

Defendants contend that the Registration Statements and related SEC filings [*12] in question are protected by both the "bespeaks caution" doctrine and the safe harbor provision of the Private Securities Litigation Reform Act ("PSLRA"). Under the bespeaks caution doctrine, a defendant may not be liable for misrepresentations in an offering if the alleged misrepresentations were sufficiently balanced by cautionary language such that no reasonable investor would be misled about the nature and risk of the offered security. *See Halperin v. eBanker USA.COM, Inc., 295 F.3d 352, 357 (2d Cir. 2002)*. The doctrine applies to forward-looking, prospective representations and not to material omissions or misstatements of historical fact. *See P. Stolz Family Partnership L.P. v. Daum, 355 F.3d 92, 96-97 (2d Cir. 2004)*. As explained by the Second Circuit: "The cautionary language associated with the 'bespeaks caution' doctrine is aimed at warning investors that bad things may come to pass -- in dealing with the contingent or unforeseen future. Historical or present fact -- knowledge within the grasp of the offeror -- is a different matter. Such facts exist and are known; they are not unforeseen or contingent." *Id. at 97*. Thus, [*13] "cautionary words about future risk cannot insulate from liability the failure to disclose that the risk has transpired." *Rombach, 355 F.3d at 173*.

In applying the bespeaks caution doctrine, the Court's task is not to inquire whether isolated statements within a document were true, but rather "whether defendants' representations or omissions, considered together and in context, would affect the total mix of information and thereby mislead a reasonable investor regarding the nature of the securities offered." *Halperin, 295 F.3d at 357*. The Court thus examines the cautionary language in the context of the representations to determine whether the language warns of the specific contingency that lies at the heart of the alleged misrepresentation. *See P. Stolz, 355 F.3d at 97*.

In the PSLRA, the safe-harbor provision states, in part, that an issuer of securities "shall not be liable with respect to any forward-looking statement ... if and to the extent that -- (A) the forward-looking statement is (i) identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could [*14] cause actual results to differ materially from those in the forward-looking statement; or (ii) immaterial[.]" *15 U.S.C. §§ 77z-2(a), (c)(1)(A)*.

### Limitations period

Defendants further argue that the amended complaint is time-barred because all material facts bearing on plaintiffs' claims were disclosed more than a year prior to the commencement of the action. *Section 13* of the Securities Act provides that *section 11* actions must be brought "within one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence[.]" *15 U.S.C. § 77m*. It has been stated that a plaintiff is held to the constructive notice -- or "inquiry notice" -- standard set forth in *section 13* "where the circumstances are such to suggest to a person of ordinary intelligence the probability that he has been defrauded." *In re Ames Dep't Stores, Inc. Note Litig., 991 F.2d 968, 979 (2d Cir. 1993)* (citation omitted). Stated otherwise, *section 13* requires the plaintiff to bring suit within one year after "the plaintiff obtains actual knowledge of the facts [*15] giving rise to the action or notice of the facts, which in the exercise of reasonable diligence, would have led to actual knowledge." *Kahn v. Kohlberg, Kravis, Roberts & Co., 970 F.2d 1030, 1042 (2d Cir. 1992)*.

### DISCUSSION

#### Failure to state a claim under *section 11*

In considering whether it appears beyond doubt, based on the complaint and the SEC filings, that plaintiffs can prove no set of facts which would entitle them to relief, the Court first reviews the amended complaint to identify the alleged misstatements or omissions. Upon thorough review of the amended complaint, the Court finds no allegations that defendants misstated or omitted specific financial data. Rather, plaintiffs point to factual disclosures which are in themselves undisputedly accurate, but complain that, taken together and in context, they would have been misleading to a reasonable investor because defendants either concealed or failed to disclose the following:

> (i) the only substantial liquid source of funds available to discharge the hundreds of millions of dollars of Money Market Certificates maturing during the Class Period and thereafter was "other peoples' money" [*16] derived from the sale of the new Money Market Certificates; (ii) because substantially all of Agway's most valuable assets were either pledged to senior debt or otherwise unavailable in connection with maturity obligations, the sale of Agway's presently available assets would be insufficient to fully satisfy the Company's payment obligations with respect to the currently maturing Money

Case 1:07-cv-00265-SLR-LPS     Document 123-11     Filed 04/28/2008     Page 6 of 14

Page 5
2005 U.S. Dist. LEXIS 40018, *

Market Certificates, let alone newly sold Certificates; (iii) the potential proceeds from substantially dismantling all of Agway's remaining businesses (the antithesis of a "going concern") were only a fraction of the Money Market Certificates outstanding and maturing in the future; (iv) Agway's inability to satisfy its obligations concerning the maturing Money Market Certificates from the results of its operations created serious doubt as to whether Agway could continue as a "going concern" and the imminent risk of default; and (v) therefore, at the time of purchase, the newly issued Money Market Certificates were worth, at most, only a small fraction of the face amount that Agway collected from plaintiffs and the Class.

Amended complaint, P88.

For example, plaintiffs point to Agway's guarantee [*17] of the Certificates and state that it was misleading because it concealed the fact that the guarantee was subject to substantial present likelihood of default and therefore essentially worthless for the reasons stated in paragraph 88. Likewise, they urge that the Registration Statements misleadingly represented the amounts of interest payable by the Certificates, because default was "imminent and inevitable" and therefore, any interest actually paid was just a limited advance return of capital. They further take issue with the Registration Statements' provisions regarding the company's repurchase practice; plaintiffs argue that these were misleading because Agway had "no reasonably foreseeable possibility of discharging its mandatory maturity obligations from operations" and default was imminent and inevitable. Plaintiffs further complain that the subordination disclosures and other disclosures of risk factors in the Registration Statements were misleading because Agway's available assets were insufficient to satisfy the company's obligations with respect to currently maturing Certificates, and Agway's default, insolvency and bankruptcy were imminent and inevitable, not just possible. [*18] And plaintiffs contend that the statements regarding redemptions of Certificates prior to maturity were misleading because Agway had no reasonable possibility of discharging its obligations to redeem even the mature Certificates and default was imminent and inevitable.

In addressing the large amount of material relevant to the question of whether, based on the amended complaint and the public filings, it appears beyond doubt that plaintiffs can prove no set of facts which would entitle them to relief, the Court finds it useful to examine each

of the five points set forth in paragraph 88. These five points are the foundation of plaintiffs' argument that, while not actually inaccurate, the financial data set forth in the public filings would have misled a reasonable investor.

First is the question of whether defendants concealed or failed to disclose that "the only substantial liquid source of funds available to discharge the hundreds of millions of dollars of Money Market Certificates maturing during the Class Period and thereafter was 'other peoples' money' derived from the sale of the new Money Market Certificates." The Court notes that this point concerns Agway's future prospects [*19] for discharging its obligations on the Certificates in the upcoming months and years. The Court agrees with defendants that Agway disclosed the relevant presently-existing facts as to its available sources of funds, its use of borrowing and/or proceeds from the sale of new Certificates to redeem outstanding Certificates, and the possibility that it might be required to abandon its past practice of repurchasing Certificates presented prior to maturity. In particular, these disclosures were made prior to and contemporaneous with the first purchase of Certificates by plaintiffs on November 1, 2000. For example, the 1998 Registration Statement stated that proceeds from the sale of Certificates would be used to redeem outstanding Certificates; that, in the event of bankruptcy, Agway's assets would be available to pay obligations under the Certificates only after all senior debt had been paid; that there may not be sufficient assets remaining to pay amounts due on any or all of the outstanding Certificates; and that as of August 26, 1998, there was outstanding senior debt of over $ 19 million.

Agway's 1999 Annual Report stated that in October 1999, $ 58 million of Certificates issued by [*20] AFC would mature. It further stated that Agway "expects to refinance this debt either through a new issue of subordinated debt, through short-term bank borrowings, or a combination of both."

Similarly, Agway's 2000 Annual Report, filed September 21, 2000, for the fiscal year ending June 24, 2000, stated that in October 2000 over $ 50 million of Certificates would mature and that Agway "expects to refinance this debt either through a new issue of subordinated debt, through cash from operations, through sales of discontinued assets, through short-term bank borrowings, or a combination thereof." That cash from operations would not likely be sufficient to meet Agway's obligations on the maturing Certificates was clear from disclosures in the 2000 Annual Report such as the following: total current liabilities were about $ 587 million; total current assets were almost $ 570 million (including only $ 29 million in cash); there was a net loss of $ 9 million; and there was a net cash flow from continuing

operations of negative $ 38 million. Agway's other expected resources for meeting this obligation, as stated in the report, included "short-term bank borrowings"; however, Agway clearly had [*21] serious credit problems. For example, Agway disclosed that its earnings level as of June 2000 was not adequate to support its borrowing level, that it had violated the loan covenants imposed by its lenders, that it was in negotiations for new credit facilities, and that "there [was] no assurance that the Company [would] achieve the desired levels of financing[.]" It further disclosed that the demands of its lenders might cause it to cease the practice of repurchasing the Certificates prior to maturity. Agway's only other expected resources for refinancing the maturing Certificates as stated in the report were sales of discontinued assets and/or a new issue of subordinated debt, that is, a new issue of Certificates. The 2000 Annual Report reported "net assets of discontinued operations," obviously a finite resource, as about $ 34 million. In other words, the reported facts concerning resources for repurchasing Certificates demonstrate the probability that proceeds from the sales of new Certificates (*i.e.*, "other people's money") would be a substantial source of funds used to discharge the hundreds of millions of dollars of Certificates maturing during the class period and [*22] thereafter. Less than six weeks after this report was filed, plaintiffs made their first purchase of Certificates.

In subsequent Annual Reports and other filings, Agway continued to report information relevant to its resources for repurchasing Certificates, including the amount of currently maturing Certificates, the amount of cash on hand and working capital available, its declining financial picture, its efforts to restructure and their effects, its deteriorating credit situation, and its worsening ratio of assets to liabilities. It also specifically addressed the impact of these factors on its ability to repurchase Certificates prior to maturity. For example, in its 2001 Annual Report Agway disclosed that certain of its credit agreements were "designed in part to allow and enable [it] to continue its past practice of repurchasing, at face value, certain subordinated debt and preferred stock when presented for repurchase prior to maturity."

The 2001 Registration Statement (filed April 30, 2001, effective July 9, 2001) disclosed that proceeds from the sale of securities would be used for general corporate purposes, which may include the repayment of debt and that, in the event [*23] of bankruptcy, the company's assets would be available to pay obligations under the Certificates only after all senior debt had been paid. It explained that in certain circumstances the restrictions imposed by its credit agreement prevented it from repurchasing or repaying principal of the subordinated debt, that it was not obligated to repurchase Certificates, and that it might stop or suspend the repurchase practice at

any time. And it disclosed that as of March 24, 2001, there was outstanding senior debt of over $ 84 million.

To conclude with respect to the first material misstatement and omission of fact alleged in paragraph 88, the Court finds that as a matter of law Agway disclosed the presently-existing facts material to the question of the sources of funds available to discharge the Certificates maturing during the Class Period and thereafter; that is, it disclosed its financial situation and the fact that it was redeeming Certificates using credit and the proceeds from the sale of new Certificates. Moreover, Agway included significant cautionary statements with respect to this subject. [1] The Court finds nothing in the filings which renders the disclosures misleading with [*24] respect to the first point.

> 1   The Court will discuss cautionary statements in greater detail hereinafter.

The second alleged material misstatement and omission of fact upon which plaintiffs rely is that "because substantially all of Agway's most valuable assets were either pledged to senior debt or otherwise unavailable in connection with maturity obligations, the sale of Agway's presently available assets would be insufficient to fully satisfy the Company's payment obligations with respect to the currently maturing Money Market Certificates, let alone newly sold Certificates."

A reading of the relevant SEC filings demonstrates that throughout the period in question, defendants disclosed in detail the value of the company's assets, the amount of senior debt, the amount of assets "pledged to senior debt," the amount of assets "otherwise unavailable," the amount of the company's obligations with respect to maturing Certificates, and its resources for repurchasing Certificates. Indeed, plaintiffs do not claim [*25] otherwise, nor do plaintiffs question the accuracy of the disclosures themselves. Essentially, the "omission" of which plaintiffs complain is defendants' omission to predict the future. Particularly in view of the cautionary language discussed hereinafter, this argument lacks merit. *See generally Jackson National Life Ins. Co. v. Merrill Lynch & Co., 32 F.3d 697, 702-03 (2d Cir. 1994).*

The third alleged "material misstatement and omission of fact" upon which plaintiffs rely is that "the potential proceeds from substantially dismantling all of Agway's remaining businesses were only a fraction of the amount of Money Market Certificates newly sold and outstanding and maturing in the future." The Court concludes that, as with the first two alleged misstatements and omissions, Agway disclosed extensive relevant data, including data bearing on the assets and liabilities of each separate business within the company. Again, plain-

tiffs do not allege that the data was inaccurate or that any specific fact or figure was omitted, nor do they allege that defendants withheld or incorrectly reported any information concerning any existing offers for Agway's businesses. Nor was the [*26] information misleading in any manner. The Court agrees with defendants that this alleged misstatement and omission of fact "is, on its face, clearly a prediction: it speculates as to the price at which existing businesses might, in the future, be sold."

The fourth alleged material misstatement and omission of fact is: "Agway's inability to satisfy its obligations concerning the maturing Money Market Certificates from the results of its operations and available assets created serious doubt as to whether Agway could continue as a 'going concern' and the imminent risk of default." Plaintiffs assert that Pricewaterhouse's audits of Agway's financial statements for the periods ending June 2000 and June 2001 should have included a "going concern" qualification, that is, a statement that there was substantial doubt as to Agway's ability to continue as a going concern for another twelve months. A going concern statement is defined by auditing standards 341.02 and 341.04 issued by the Auditing Standards Board of the American Institute of Certified Public Accountants as follows:

> The auditor has a responsibility to evaluate whether there is substantial doubt about the entity's ability [*27] to continue as a going concern for a reasonable period of time, not to exceed one year beyond the date of the financial statements being audited (hereinafter referred to as a reasonable period of time)....
>
> The auditor is not responsible for predicting future conditions or events. The fact that the entity may cease to exist as a going concern subsequent to receiving a report from the auditor that does not refer to substantial doubt, even within one year following the date of the financial statements, does not, in itself, indicate inadequate performance by the auditor. Accordingly, the absence of reference to substantial doubt in an auditor's report should not be viewed as providing assurance as to an entity's ability to continue as a going concern.

Inasmuch as Agway did continue as a going concern until October 2002, well over a year after the 2001 Annual Report and the 2001 Registration Statement, Pricewaterhouse's failure to include such a qualification can-

not have constituted a material omission or misrepresentation. *See, e.g., In re Integrated Resources Real Est., Ltd, 815 F. Supp. 620, 670 (S.D.N.Y. 1993); Schick v. Ernst & Young, 808 F. Supp. 1097, 1102-03 (S.D.N.Y. 1992).* [*28] Moreover, in view of the extensive factual disclosures and cautionary statements, the absence of a going concern qualification did not render the Annual Reports or Registration Statements misleading. *See In re Integrated, 815 F. Supp. at 670.* The Court notes also that the auditing standards state that "the absence of reference to substantial doubt in an auditor's report should not be viewed as providing assurance as to an entity's ability to continue as a going concern."

The fifth alleged material misstatement and omission of fact is: "therefore, at the time of purchase, the newly issued Money Market Certificates were worth, at most, only a fraction of the face amount that Agway collected from plaintiffs and the Class." This alleged "fact" is not a fact at all, but rather a conclusion; it does not in itself constitute a false or misleading material statement or omission of fact. Indeed, on page 34 of their Memorandum of Law (Dkt. No. 24), plaintiffs treat this fifth alleged material misstatement/omission not as a fact but rather as a "risk," that is, a consequence of Agway's financial circumstances. In this respect, plaintiffs contend that "no investor was told of [*29] the most pertinent risk facing plaintiffs and the Class -- that the lack of a real market and independent underwriting, combined with assets comprising only a fraction of Agway's obligations under the outstanding and newly sold Money Market Certificates, meant the Certificates could be and were worth only a fraction of their face value being charged by Agway." This conclusion regarding value is based on facts which, as discussed above, were disclosed and were not false or misleading.

**The bespeaks caution doctrine and the safe harbor provision**

In considering the cautionary language and forward-looking statements in the filings as factors relevant to whether a reasonable investor could have been misled, the Court notes again that the allegedly undisclosed risk was that Agway would be unable to meet its obligations on plaintiffs' Certificates, or, as plaintiffs put it, that the Certificates were worth only a fraction of their face value. Defendants argue that the public filings disclosed the risks presented by the investments, including the consequences if Agway entered bankruptcy, and that therefore defendants are protected by the bespeaks caution doctrine. Defendants further [*30] argue that the company's forward-looking statements regarding its expectations and beliefs are not misleading and fall within the safe harbor afforded by the PSLRA. As will be discussed below, the Court agrees on both points and concludes

that no reasonable investor could have been misled into thinking that the risk that materialized and resulted in his loss did not actually exist. *See Halperin, 295 F.3d at 359.*

The Court first considers the application of the bespeaks caution doctrine. As stated, under this doctrine, a defendant may not be liable for forward-looking, prospective misrepresentations in an offering if the alleged misrepresentations were sufficiently balanced by cautionary language such that no reasonable investor would be misled about the nature and risk of the offered security. *See P. Stolz, 355 F.3d at 96-97*; *Halperin, 295 F.3d at 357.* Accordingly, the Court examines the cautionary language in the overall context of the public filings to determine whether it warns of the specific risk as to which plaintiffs claim to have been misled. *See P. Stolz, 355 F.3d at 97.*

Both the 1998 and the 2001 Registration [*31] Statements disclosed that the securities were unsecured obligations, that they were subordinated to all of the company's senior debt, and that there were no specific assets to which holders of the securities could look for repayment. Both Registration Statements disclosed that if Agway's assets were distributed as a result of bankruptcy, liquidation or reorganization, Agway might not have enough assets to pay investors the amounts owed to them under the securities. Further, both Registration Statements stated that the securities were not underwritten, that there was no market for the securities, that Agway did not intend to create or encourage a trading mechanism for the securities, and that it was highly unlikely that any secondary trading market would develop. Both disclosed the risk that Agway's financial condition could be directly affected by factors affecting the agricultural economy. And both stated that Agway's concentration of customers in the Northeast region may affect its overall credit risk because the repayment of Agway's receivables may be affected by inherent risks associated with the economic environment of the region, the impact of regional weather on the conditions [*32] of crops and the impact on the agricultural economy. Further, the 2001 Registration Statement stated that if Agway were unable to compete successfully with its competitors, it would likely result in the loss of customers which could have a significant negative impact on its financial condition and results of operations.

In its Annual Report filed September 16, 1999, for the fiscal year ending June 30, 1999, Agway reported a 96% decline in earnings and disclosed that it had breached certain of its covenants on its short-term bank financing. Agway's lenders agreed to waive these breaches in exchange for Agway's agreement to further restrictive covenants in its credit agreements.

Agway's Annual Report for the fiscal year ending June 24, 2000, reported over $ 9 million in net losses and negative cash flow of almost $ 38 million. Agway again breached its loan covenants and again obtained waivers by agreeing to even more burdensome restrictions. These waivers, however, were effective only through December 2000. Agway disclosed that "the revised borrowing limits and financial covenants are expected to continue to be restrictive through December 2000, and, given the historical volatility [*33] of Agway's operating results, may be violated in ensuing months." Agway also reported that it was attempting to negotiate new credit facilities with its lenders in order to meet its ongoing needs, but that "there [was] no assurance that the Company [would] achieve the desired level of financing, and the terms of such financing, as ultimately negotiated, [could not] be determined at [that] time." It further stated that "the terms or conditions of the lines of credit discussed above, as ultimately negotiated, may cause [Agway] to limit or cease its past practices with regard to the repurchase of subordinated debt."

Thereafter, Agway reported that it was selling assets in an effort to restructure its business and return to profitability. The Current Report filed August 3, 2000, disclosed the sale of six of Agway's pipeline terminal storage facilities; the Current Report filed August 15, 2000, disclosed the sale of Agway's consumer wholesale dealer business; and the Current Report filed December 14, 2000, reported its plan to "realign the Agricultural segment of Agway's business in an effort to convert that segment's historic operating losses to profits by fiscal 2003."

On [*34] or about November 1, 2000 (the date of plaintiffs' first purchases), Agway filed a supplemental prospectus amending its offering to extend maturity dates. Agway continued to report declining financial performance, defaults under its loan covenants, the imposition of more restrictive covenants and the existence of ongoing negotiations to obtain waivers of its debt covenants. The Quarterly Report of September 23, 2000, disclosed a $ 20 million decrease in net cash for the quarter; the December 23, 2000 Quarterly Report disclosed that "negotiations for new credit facilities have not been completed; therefore, there is no assurance that the Company will achieve the desired levels of financing"; the Current Report filed March 1, 2001, stated that "failure to obtain the adequate level of financing could have a material adverse impact on Agway .... Negotiations for new credit facilities have not been completed; therefore, there is no assurance that the Company will achieve the desired levels of financing"; the Current Report dated March 30, 2001, disclosed that Agway had refinanced its lines of credit through the establishment of a new senior debt facility, which contained a number of requirements

[*35] and restrictions; the Quarterly Report of March 24, 2001, and Current Report filed August 20, 2001, reported that Agway was in violation of its debt covenants and was negotiating waivers and amendments.

Throughout this period Agway continued to report losses and working capital deficits. The Annual Report for the fiscal year ended June 30, 2001, filed September 18, 2001, disclosed the renegotiated loan covenants and the restrictive terms of credit, as well as almost $ 9 million losses, a $ 19 million decline in net cash and an increase in Agway's working capital deficit by $ 34 million over the prior year. It also disclosed additional violations of the company's loan covenants, efforts to sell its retail store distribution system, and sales of discontinued operations. It further reported that its lenders had required it to collateralize additional assets and to restrict repurchases of subordinated debt and preferred stock. And it warned that it might stop or suspend the repurchase of Certificates or that it might be required to do so.

To summarize, reports of presently existing negative financial circumstances were accompanied by cautionary language regarding forward-looking risks, [*36] including the disclosures that if Agway's assets were distributed as a result of bankruptcy, Agway might not have enough assets to pay investors the amounts owed to them under the securities; that it was highly unlikely that any secondary trading market for the Certificates would develop; that Agway's financial condition could be directly affected by factors affecting the agricultural economy; that Agway's concentration of customers in the Northeast region may affect its overall credit risk; that if Agway were unable to compete successfully with its competitors, it would likely result in the loss of customers which could have a significant negative impact on its financial condition and results of operations; that the financial covenants may be violated in ensuing months; that there was no assurance that Agway would achieve the desired level of financing; that the terms or conditions of credit as ultimately negotiated may cause Agway to limit or cease its past practices with regard to the repurchase of subordinated debt; and that failure to obtain the adequate level of financing could have a material adverse impact on Agway.

The above disclosures directly bear on the risk of which [*37] plaintiffs now complain, that is, the risk that -- due to the subordinated status of the Certificates and Agway's accelerating financial deterioration, particularly its credit problems -- Agway would be unable to meet its obligations on plaintiffs' Certificates. It is undisputed that the disclosures of then-existing facts were accurate. The Court concludes that, as a matter of law, no reasonable investor, reading the cautionary statements in context, could have been misled about the future risks

inherent in the investment. *See, e.g., Halperin, 295 F.3d at 357, 359; Olkey, 98 F.3d at 9.*

The Court now turns to the safe harbor provision of the PSLRA, which protects an issuer of securities from liability with respect to any forward-looking statement not contained within financial statements [2] if and to the extent that the forward-looking statement is "identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward looking statement[.]" *15 U.S.C. § 77z-2(c)(1)(A)(i).* In their amended [*38] complaint, in particular paragraphs 96 and 98, plaintiffs set forth allegedly misleading statements in the 2000 and 2001 Annual Reports concerning Agway's ability to meet its financing needs, as follows:

> -- Agway finances its operations and the operations of all its business and subsidiaries through Agway Financial Corporation (AFC). External sources of short-term financing for Agway and all its other continuing operations include revolving credit lines, letters of credit, and a commercial paper program[.]

> -- Agway expects to continue to have appropriate and adequate financing to meet its ongoing needs.

> -- Adequate collateral existed throughout 2000 to permit AFC to borrow amounts to meet the ongoing needs of Agway and is expected to do so.

> -- Management believes that adequate collateral exists and will continue to exist so that Agway senior debt financing is, and will continue to be, adequate to meet ongoing needs of Agway.

> -- In October 2000, $ 50,700[,000] of money market certificates issued by AFC will mature. Agway expects to refinance this debt either through a new issue of subordinated debt, through cash from operations, through sales of discontinued assets, [*39] through short-term bank borrowings, or a combination thereof.

Paragraph 100 of the amended complaint refers to similar statements in the quarterly reports.

2    PSLRA does not apply to disclosures contained within financial statements. *15 U.S.C. § 77z-2(b)(2)(A).*

2005 U.S. Dist. LEXIS 40018, *

Except for the first statement, which is a statement of existing fact which is not alleged to be incorrect, these are all statements of general optimism concerning Agway's future ability to obtain financing. Indeed, as defendants point out, "in a sense the entire Amended Complaint is directed at forward looking statements, consisting of Agway's purported failure to inform investors that it 'had no reasonably foreseeable possibility' of meeting its obligations and that 'default was imminent and inevitable.'"

The Court rejects plaintiffs' contention that these statements are not "identified" as forward-looking statements. Both the 2000 and 2001 Annual Reports include express cautionary provisions to the effect that words [*40] such as "believe" and "expect" identify forward-looking statements. In any event, the terms "believe" and "expect" cannot reasonably be interpreted otherwise. Further, the statements complained of are accompanied by extensive information bearing on Agway's future prospects for obtaining financing. And, as has already been discussed in connection with the bespeaks caution doctrine, the filings are replete with "meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the statements."

The Court further rejects plaintiffs' contention that the safe harbor provision does not apply because the person making the statements and/or authorizing them actually knew they were false when made. Plaintiffs correctly state that "cautionary words about future risk cannot insulate from liability the failure to disclose that the risk has transpired." *Rombach, 355 F.3d at 173*. Here, however, the filings accurately stated the existing problems and the future risks. The risks of which plaintiffs complain had not yet transpired during the period in issue. Indeed, Agway continued to operate its business and pursue its [*41] turnaround efforts for almost two years after plaintiffs' first purchases on November 1, 2000, and for almost a year after the last purchases by plaintiffs on November 3, 2001.

**Section 11-conclusion**

The Court concludes that, taken together and in context, defendants' representations would not have led a reasonable investor to believe that the risk which materialized and resulted in plaintiffs' losses did not exist. Accordingly, plaintiffs have failed to state a claim under *section 11*.

**Limitations period**

As noted, *section 13* imposes a duty of inquiry which requires a plaintiff to bring suit within one year after obtaining "actual knowledge of the facts giving rise to the action or notice of the facts, which in the exercise of reasonable diligence, would have led to actual knowledge." *Kahn v. Kohlberg, Kravis, Roberts & Co., 970 F.2d 1030, 1042 (2d Cir. 1992)*. A duty to inquire arises where "the circumstances are such as to suggest to a person of ordinary intelligence the probability that he has been defrauded." *In re Ames, 991 F.2d at 979*.

Defendants contend that plaintiffs were on inquiry notice of "the adverse developments [*42] on which their claim is based more than a year before the commencement of this litigation." They point out that Agway had made the following disclosures more than one year before this lawsuit was commenced, that is, prior to May 13, 2002: that Agway was relying on bank borrowing (and, until March 6, 2002, the sales of new Certificates) to provide funding with which to redeem maturing Certificates; that its poor performance had repeatedly placed it in breach of the loan covenants upon which that borrowing was predicated; that it was unable to complete negotiations for a new credit line and thereafter was able to obtain credit only under extremely onerous terms; that it had negative cash flow from continuing operations; that it had a cash balance of zero at the end of fiscal 2001 and 2002; that it had suffered net losses in 2000 and 2001; and that it was attempting to sell assets in an effort to restructure its business and return to profitability.

The Court concludes that no later than the Current Report filed March 6, 2002, plaintiffs were made aware of the factual circumstances bearing on Agway's financial situation, its repeated losses, its efforts to restructure, the risk that [*43] those efforts might fail, and the risks inherent in the Certificates' status as subordinated unsecured debt. As the Second Circuit stated in *Jackson, 32 F.3d at 702-03*, the disclosures "provided actual notice of potential insolvency, much less inquiry notice sufficient to trigger the duty to timely investigate and file the complaint." Plaintiffs cannot claim that they lacked notice of the company's potential insolvency when the company's public disclosures warned of the very contingency about which plaintiffs now complain. *See id. at 703*.

Plaintiffs argue that the negative financial information that actually was disclosed "focuses almost exclusively on the bank line of credit and results of operations, and does not specifically discuss and is not directly relevant to the Certificates and their true, economically illusory, Ponzi scheme-like nature." While in certain circumstances, disclosures of losses and other negative financial data may not necessarily put a plaintiff on inquiry notice for limitations purposes as a matter of law, *see. e.g., In re Ames, 991 F.2d at 980-81*, here, matters such as the credit arrangements and the results [*44] of operations bear directly on the cause of plaintiffs' losses, *viz.,* the company's inability to meet its obligations on the Certificates.

2005 U.S. Dist. LEXIS 40018, *

Plaintiffs also point out that defendants identify no revelation or materially new and different piece of information disclosed more than one year prior to May 13, 2003, that would constitute a "red flag" or "storm warning." There is, however, no requirement that there be a particular "red flag" or "storm warning" in order to trigger inquiry notice; in any event, the public filings as of March 2002 were replete with "storm warnings" and amply disclosed Agway's financial situation, its gradual deterioration, and the potential impact on plaintiffs' Certificates so as to place plaintiffs on inquiry notice.

Plaintiffs claim that they were not able to discern the possibility of material misstatements and omissions until the May 15, 2002 Quarterly Report in which Agway for the first time treated Telmark and the insurance subsidiary, which Agway was attempting to sell, as discontinued operations. Plaintiffs argue:

> In the financial statements, for the first time, the minimal assets of Agway were separated from the discontinued operations of [*45] Telmark and the insurance subsidiary, foreshadowing the reality that defendants had previously been able to conceal -- that Agway itself had virtually no remaining assets and no operating income by which to discharge its obligations and its "guarantee" with respect to the more than $ 420 million of Money Market Certificates outstanding at that date, and that the only possible source to meet those obligations was its "ability" -- now on hold -- to sell new Money Market Certificates in furtherance of its now unraveling Ponzi scheme.

Again, plaintiffs do not claim that any of the figures or events set forth in any of the filings were inaccurate.

There is no merit to the implication that Agway concealed its financial problems by misleadingly reporting its financial data in combination with that of Telmark's leasing operation and the insurance subsidiary. Beginning with the 1998 Registration Statement and in all the SEC filings thereafter, Agway disclosed sufficient information to enable the reader to evaluate the operations and assets of Telmark and the insurance subsidiary separately from those of the company as a whole and from other operations. Indeed, it appears in the Annual [*46] Report for the fiscal year ending June 24, 2000, that Telmark's leasing operation contributed significantly to the company's overall assets and income. The report separately reported Telmark's increased revenues, its lease receivables, its credit facilities, its growing lease portfolio, and its compliance with all covenants in its borrowing arrangements. It also disclosed Agway's net loss, its decrease in net earnings, its violations of financial covenants with its lenders, its restructured and restrictive borrowing arrangements and its plan to discontinue its retail services business. The 2000 Annual Report separately reported subordinated debt and sources of financing of Agway, AFC and Telmark. In reporting assets, it separately reported leases receivable, both current and long term. [3]

> 3   For example, the 2000 Annual Report showed almost $ 570 million in total current assets, including only $ 29 million in cash. Of these current assets, over $ 152 million was attributed to leases receivable.

Significantly, [*47] the 2001 Annual Report disclosed that on September 14, 2001, Agway pledged its membership interest in Telmark as additional collateral to secure Agway's obligations under its credit agreement with lenders, thus giving lenders the option to foreclose on Agway's membership interest in Telmark in the event Agway defaulted on its obligations under the credit agreement. Again, the Annual Report disclosed sufficient information to enable the reader to evaluate the operations and assets of Telmark and the insurance subsidiary separately from those of the company as a whole and from other operations.

The Court has reviewed the SEC filings and concludes as a matter of law that, more than a year prior to the commencement of this action, plaintiffs were on inquiry notice -- if not actual notice -- of the risk of which they now complain, that is, Agway's deteriorating condition and the risk that Agway would be unable to meet its obligations on the Certificates. Accordingly, plaintiffs' federal claims are time-barred under *section 13*.

**Claims against Pricewaterhouse**

For the same reasons, the amended complaint also fails to state a claim against Pricewaterhouse.

**CONCLUSION**

Reading [*48] the amended complaint and public filings generously, accepting the truth of and drawing all reasonable inferences from all well-pleaded factual allegations, the Court concludes that no reasonable investor could have been misled into thinking that the risk that materialized and resulted in plaintiffs' claimed losses did not actually exist. Thus, it appears beyond doubt that plaintiffs can prove no set of facts which would entitle them to relief on their *section 11* claims. Moreover, based on the public filings, the Court concludes as a matter of law that plaintiffs' federal claims are time-barred

2005 U.S. Dist. LEXIS 40018, *

under *section 13* because, more than a year prior to the commencement of this action, plaintiffs were on inquiry notice -- if not actual notice -- of the risk of which they now complain, that is, the risk that Agway would be unable to meet its obligations on the Certificates. Accordingly, plaintiffs' federal claims are dismissed with prejudice.

The Court in its discretion declines to exercise jurisdiction over plaintiffs' state law claim under *New York General Business Law section 349* and it is dismissed without prejudice.

Despite the fact that plaintiffs' federal [*49] claims lack merit as a matter of law, the Court finds that plaintiffs' claims were not so untenable as a matter of law as to constitute a frivolous legal position for purposes of *Rule 11* sanctions. Nor did they constitute the type of abuse of the adversary system that *Rule 11* was designed to guard against. Accordingly, the Court does not award sanctions under *Fed. R. Civ. P. 11*.

It is therefore

ORDERED that defendants' motion to dismiss the amended complaint is granted; and it is further

ORDERED that claims one, two and three of the amended complaint are dismissed with prejudice; and it is further

ORDERED that claim four of the amended complaint is dismissed without prejudice.

IT IS SO ORDERED.

March 17, 2005

Syracuse, New York

Norman A. Mordue

U.S. District Judge

```
                                                              1236NC
********** Print Completed **********

Time of Request: Monday, April 28, 2008  15:06:28 EST

Print Number:    1823:89766337
Number of Lines: 596
Number of Pages:
```

```
Send To:  SCHIERBAUM, JARED
          EDWARDS ANGELL PALMER DODGE
          919 N MARKET ST
          WILMINGTON, DE 19801-3023
```

# 11



Pilot Industries, Inc. v. Grant Thornton, LLP
Mich.App.,2006.
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.

Court of Appeals of Michigan.
PILOT INDUSTRIES, INC., Plaintiff-Appellant,
andRobert A. Davis, Frederick W. Woodward, and
M. Lawrence Parker, Plaintiffs,
v.
GRANT THORNTON, LLP and Russell G. Wie-
man, Defendants-Appellees.
**Docket No. 258689.**

July 20, 2006.

Washtenaw Circuit Court; LC No. 01-001355-NM.

Before: DONOFRIO, P.J., and O'CONNELL and
SERVITTO, JJ.

[UNPUBLISHED]

PER CURIAM.
**\*1** Plaintiff Pilot Industries, Inc. (Pilot), appeals as
of right from the trial court's finding of no cause of
action following a bench trial. We affirm. This case
arose when Grant Thornton, LLP (Thornton), while
auditing Pilot for fiscal year 2000, found an error in
Pilot's 1999 financial documents that Thornton had
missed in its 1999 audit.

Although Pilot argues that the trial court committed
legal error by misapplying the legal standard, Pi-
lot's proposed standard would inappropriately hold
defendant strictly liable for any material misrepres-
entations in Pilot's 1999 financial statements. This
is not the standard. "Accountants, like physicians
and lawyers, owe a duty to perform their services
with that degree of skill and competence reasonably
expected of persons in their profession in the com-

munity."*FDIC v. Schoenberger,* 781 F Supp 1155,
1157 (ED La 1992). An auditor's certification does
not usually guarantee that the audit's results are
flawless, but represents that the audit complied with
professional standards. See *Id.*In Michigan, a public
accountant is not liable to a client unless the ac-
countant's acts or omissions are negligent. MCL
600.2962(A). Therefore, the existence of errors or
misstatements in the audit report does not automat-
ically justify legal relief, and the trial court cor-
rectly held Thornton to the professional-negligence
standard.[FN1]

> FN1. We note that if errors automatically
> led to liability, then the law would discour-
> age accountants from responsibly revisit-
> ing, revising, and, when necessary, repudi-
> ating their earlier audits.

Pilot next claims the trial court clearly erred when
it found that Pilot failed to prove by a preponder-
ance of the evidence that Thornton breached its
standard of care. We disagree. "This Court reviews
a trial court's findings of fact in a bench trial for
clear error and reviews de novo its conclusions of
law."*Ambs v. Kalamazoo Co Rd Comm,* 255
Mich.App 637, 651;662 NW2d 424 (2003)."A find-
ing is clearly erroneous where, although there is
evidence to support the finding, the reviewing court
on the entire record is left with the definite and firm
conviction that a mistake has been made."*Id.* at
652.This case revolved around Thornton's confirm-
ation of an $6.7 million account receivable as an in-
ternal account between Pilot and a subsidiary
(which would have no real effect on Pilot's overall
financial picture) and an unrealized, outside ac-
count (which would leave Pilot without real funds).
The trial court heard evidence that Pilot's manage-
ment verified that the account was offset by a $6.5
million account payable, which accorded with
Thornton's expectations and with the subsidiary's
previously audited financial statements. The trial
court heard competing expert testimony regarding
whether Thornton sufficiently tested these figures

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.W.2d                                                                                    Page 2
Not Reported in N.W.2d, 2006 WL 2033996 (Mich.App.)
**(Cite as: Not Reported in N.W.2d, 2006 WL 2033996)**

to verify competently the averments of Pilot's man-
agement. Ultimately, the trial court held that Pilot
conformed to the standard of care, and we defer to
the trial court's superior ability to observe the wit-
nesses and weigh their credibility and the import-
ance of their testimony. *Zeeland Farm Services, Inc
v. JBL Enterprises, Inc,* 219 Mich.App 190,
195;555 NW2d 733 (1996). Because this case came
down to a closely drawn question whether Thornton
should have done more to root out apparently sub-
stantiated misrepresentations by Pilot's manage-
ment, we cannot confidently say that the trial court
misinterpreted the facts.

**\*2** However, according to Pilot, the trial court erred
when it found that Thornton reasonably relied on
the unsupported categorization of the $6.7 million
dollar account as an essentially internal debt. Pilot
correctly argues that auditors are supposed to eval-
uate the validity and reliability of internal financial
statements. *Ameriwood Industries Int'l Corp v Ar-
thur Andersen,* 961 F Supp 1078, 1090 (WD Mich,
1997). It is the duty of an auditor to independently
analyze a company's books as a "watchdog" on be-
half of a company's creditors, stockholders, and the
investing public at large. *Comm'r of Insurance v.
Albino,* 225 Mich.App 547, 565-566;572 NW2d 21
(1997). Therefore, the "discovery of negligent mis-
representations is an anticipated purpose of the
audit...."*Ameriwood, supra.*Nevertheless, Pilot mis-
characterizes the trial court's findings. The trial
court did not find that Pilot's misstatements auto-
matically exonerated Thornton from investigating
the accounts, but that the misunderstanding and
misrepresentations suggested that no problem exis-
ted, making it harder to detect. The trial court heard
testimony that Pilot's mischaracterization of the
$6.7 million account was tested, but that the tests
Thornton used failed to reveal any problem. In oth-
er words, the trial court concluded that everybody,
including Pilot's internal accountants, failed to de-
tect the problem, which was evidence that the prob-
lem was not as easily detectable as Pilot alleged.
Because the trial court did not misinterpret the pur-
pose behind the audit or give conclusive weight to

the misrepresentations of Pilot's management, Pilot
has failed to demonstrate any error requiring re-
versal.

Affirmed.

Mich.App.,2006.
Pilot Industries, Inc. v. Grant Thornton, LLP
Not Reported in N.W.2d, 2006 WL 2033996
(Mich.App.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**12**



Not Reported in N.W.2d                                                                                                    Page 1
Not Reported in N.W.2d, 2005 WL 2291732 (Mich.App.)
(Cite as: Not Reported in N.W.2d, 2005 WL 2291732)

Scalici v. Bank One, NA
Mich.App.,2005.
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.

Court of Appeals of Michigan.
Paolo SCALICI and Victoria Scalici, Plaintiffs-
Appellants,
v.
BANK ONE, NA and Amy Okoroafo, Defendants-
Appellees.
Theodore FORMAN, Thomas Fowler, Rodney Mc-
Grain, Juanita Mcgrain, James A. Ropicky, Susan
Scalici, Bradley Wildberg, Kristan Wildberg, Bruce
Ollman, and Susan Ollman, Plaintiffs-Appellants,
v.
BANK ONE, NA and Amy Okoroafo, Defendants-
Appellees.
Terry PALAZZOLO, Jessee Bays, and Gary
Middleton, Plaintiffs-Appellants,
v.
BANK ONE, NA and Amy Okoroafo, Defendants-
Appellees.
No. 254632, 254633, 254634.

Sept. 20, 2005.

Before: SMOLENSKI, P.J., and MURPHY and
DAVIS, JJ.

[UNPUBLISHED]

PER CURIAM.
*1 In these consolidated appeals, plaintiffs appeal
as of right the trial court's dismissal of their claims
with prejudice for failure to state a claim on which
relief could be granted. MCR 2.116(C)(8). We af-
firm.

I. Facts and Procedural History

Plaintiffs' claims against defendants arose out of
their participation in an investment scheme with
Daniel Broucek, who was doing business under the
name of Pupler Distributing Company (Pupler).
Pursuant to the investment scheme, plaintiffs would
lend money to Pupler in exchange for a promissory
note and a post-dated check. Under the terms of the
promissory note, plaintiffs would receive the prin-
cipal amount of the loan along with a "financing
fee" on the maturity date of the loan. The checks is-
sued with the promissory notes were written for the
full amount of the principal plus the "financing fee"
and were post-dated to the maturity date of the
loan. The post-dated checks were drawn on Pupler's
account with defendant Bank One, NA (Bank One).
By November of 2002, Pupler's account with Bank
One was frozen and, after Broucek entered involun-
tary bankruptcy, plaintiffs were left holding worth-
less promissory notes and checks.

In February of 2003, plaintiffs filed their respective
suits against defendants. Plaintiffs claimed they
would not have "invested" with Pupler had it not
been for the misrepresentations of Bank One's em-
ployees, including primarily the representations of
defendant Amy Okoroafo, who was the banking
center manager for one of Bank One's branches.
Based on the alleged misrepresentations and other
theories, plaintiffs argued defendants should be li-
able for the losses plaintiffs sustained as a result of
investing in Pupler. In each case, Bank One respon-
ded by filing a motion for a more definite statement
wherein it asked the court to require plaintiffs to at-
tach copies of the notes and checks upon which
plaintiffs based their claims, as required by MCR
2.113(F)(1). After plaintiffs filed amended com-
plaints with copies of the promissory notes and, in
some cases, copies of the checks attached, Bank
One filed a motion for summary disposition under
MCR 2.116(C)(8).[FN1] In these motions, Bank One
argued plaintiffs' claims were based on losses sus-
tained after their criminally usurious loans became
uncollectible and, therefore, the claims were unen-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.W.2d                                                                                              Page 2
Not Reported in N.W.2d, 2005 WL 2291732 (Mich.App.)
**(Cite as: Not Reported in N.W.2d, 2005 WL 2291732)**

forceable under Michigan's wrongful conduct rule. On July 10, 2003, the trial court held a joint hearing on this issue.[FN2] The trial court agreed that plaintiffs' claims were barred by the wrongful conduct rule and granted summary disposition in favor of defendants under MCR 2.116(C)(8). Plaintiffs then appealed as of right.

> FN1. In each case, Okoroafo filed a motion under MCR 2.116(C)(8), which relied upon Bank One's law and arguments.

> FN2. While the three cases were not consolidated until this appeal, see *Scalici v. Bank One,* unpublished order of the Court of Appeals, entered May 10, 2004 (Docket No 254632), all three were assigned to the same trial court and were handled jointly for judicial efficiency.

### II. Standards of Review

This Court reviews de novo the resolution of a summary disposition motion.*Corley v. Detroit Bd of Ed,* 470 Mich. 274, 277;681 NW2d 342 (2004). A motion under MCR 2.116(C)(8) tests the legal sufficiency of the complaint on the basis of the pleadings alone. *Id.;*MCR 2.116(G)(5). All well-pleaded factual allegations in support of the claim are accepted as true and construed in the light most favorable to the nonmoving party. *Adair v. Michigan,* 470 Mich. 105, 119;680 NW2d 386 (2004)."A motion under MCR 2.116(C)(8) may be granted only where the claims alleged are 'so clearly unenforceable as a matter of law that no factual development could possibly justify recovery." ' *Maiden v. Rozwood,* 461 Mich. 109, 119;597 NW2d 817 (1999), quoting *Wade v. Dep't of Corrections,* 439 Mich. 158, 162;483 NW2d 26 (1992).

**\*2** This Court also reviews de novo the proper interpretation of a statute.*Macomb Co Prosecutor v. Murphy,* 464 Mich. 149, 157;627 NW2d 247 (2001). This Court begins the interpretation of a statute by examining the language of the statute itself. *Id.* at 158.If the language is not ambiguous, the

court shall not construe it, but rather will enforce it as written. *Id.* Where ambiguity exists, "this Court seeks to effectuate the Legislature's intent through a reasonable construction, considering the purpose of the statute and the object sought to be accomplished."*Id.* Furthermore, an act must be construed as a "whole to harmonize provisions and carry out the purpose of the Legislature."*Id.*

### III. Analysis

As a preliminary matter, we note that the wrongful conduct rule does not attack plaintiffs' prima facie cases, but rather seeks to foreclose plaintiffs from proceeding for reasons unrelated to their prima facie cases. For this reason, the wrongful conduct rule is properly understood to be an affirmative defense. *Campbell v. St John Hosp,* 434 Mich. 608, 615-616;455 NW2d 695 (1990). Normally, the defendant has the burden of establishing the existence of an affirmative defense. *Nationwide Mut Ins Co v. Quality Builders, Inc,* 192 Mich.App 643, 646;482 NW2d 474 (1992). However, where a complaint shows on its face that relief is barred by an affirmative defense, the trial court may dismiss the complaint for failing to state a claim on which relief can be granted. See *Rauch v. Day and Night Mfg Corp,* 576 F.2d 697, 702 (CA 6, 1978); see also, e.g., *Glazier v. Lee,* 171 Mich.App 216;429 NW2d 857 (1988) (granting summary disposition under MCR 2.116(C)(8) based on the wrongful conduct rule). In the present case, the promissory notes, which are the basis of plaintiffs' losses, were attached to their respective amended complaints and became part of the pleadings. See MCR 2.113(F)(2). Consequently, the trial court could properly consider whether the wrongful conduct rule barred plaintiffs' claims when ruling on defendants' motions for summary disposition under MCR 2.116(C)(8). However, the relevant inquiry remains whether any factual development under the facts pleaded by plaintiffs could possibly justify recovery. *Maiden, supra* at 119.

### A. The Wrongful Conduct Rule

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.W.2d                                                                 Page 3
Not Reported in N.W.2d, 2005 WL 2291732 (Mich.App.)
**(Cite as: Not Reported in N.W.2d, 2005 WL 2291732)**

Under Michigan's wrongful conduct rule, a plaintiff's claim will be barred if it is based, in whole or in part, on the plaintiff's own illegal conduct.*Orzel v. Scott Drug Co,* 449 Mich. 550, 558;537 NW2d 208 (1995). This is true even where the defendant has participated equally in the illegal activity. *Id.* at 559.In *Manning v. Bishop of Marquette,* 345 Mich. 130, 133;76 NW2d 75 (1956), our Supreme Court succinctly stated the rule: "Our doors are open to both the virtuous and the villainous. We do not, however, lend our aid in the furtherance of an unlawful project, nor do we decide, as between 2 scoundrels, who cheated whom the more."The Court in *Orzel* noted that the rationale behind the wrongful conduct rule is rooted in public policy considerations. *Orzel, supra* at 559.The Court explained,

**\*3** If courts chose to regularly give their aid under such circumstances, several unacceptable consequences would result. First, by making relief potentially available for wrongdoers, courts in effect would condone and encourage illegal conduct. Second, some wrongdoers would be able to receive a profit or compensation as a result of their illegal acts. Third, and related to the two previously mentioned results, the public would view the legal system as a mockery of justice. Fourth, and finally, wrongdoers would be able to shift much of the responsibility for their illegal acts to other parties. [*Id.* at 559-560 (citations omitted).]

However, the Court in *Orzel* also noted that the wrongful conduct rule is a general rule and that there are limitations and exceptions to its application.*Id.* at 561.

There are two limitations on the application of the wrongful conduct rule. First, the plaintiff's conduct must be mostly or entirely prohibited by a penal or criminal statute and must constitute sufficiently serious misconduct to warrant application of the wrongful conduct rule. *Id.* at 561.Where the plaintiff's conduct amounts to a violation of a safety statute, that violation will not be sufficient to bar his or her claim. *Id.* Second, "a sufficient causal

nexus must exist between the plaintiff's illegal conduct and the plaintiff's asserted damages."*Id.* at 564.

In addition to these limitations, there are two exceptions that will preclude application of the wrongful conduct rule to bar a plaintiff's claims: the differing degrees of culpability exception and the statutory basis for recovery exception. Under the first exception, where the "plaintiff has engaged in serious illegal conduct and the illegal conduct has proximately caused the plaintiff's injuries, a plaintiff may still seek recovery against the defendant if the defendant's culpability is greater than the plaintiff's culpability for the injuries...."*Id.* at 569.The second exception applies where the plaintiff alleges the defendant violated a statute, which, either explicitly or implicitly, allows the plaintiff to recover for injuries suffered as a result of the violation. *Id.* at 570.

B. The Application of the Wrongful Conduct Rule

Plaintiffs first argue that the trial court erred by granting summary disposition under MCR 2.116(C)(8) based on the wrongful conduct rule where facts could be developed that would demonstrate that the criminal usury statute, MCL 438.41, did not prohibit their conduct. Specifically, plaintiffs state, because the promissory notes did not mention an interest rate, but rather referred to a "financing fee" and because they thought they were dealing with a corporation, they could not be found to have knowingly charged simple interest in excess of 25% per year without being authorized or permitted by law to do so. Consequently, plaintiffs contend, the first requirement for application of the wrongful conduct rule could not be met. We disagree.

**\*4** Under MCL 438.41,

[a] person is guilty of criminal usury when, not being authorized or permitted by law to do so, he knowingly charges, takes or receives any money or

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.W.2d                                                                Page 4
Not Reported in N.W.2d, 2005 WL 2291732 (Mich.App.)
**(Cite as: Not Reported in N.W.2d, 2005 WL 2291732)**

other property as interest on the loan or forbearance of any money or other property, at a rate exceeding 25% at simple interest per annum or the equivalent rate for a longer or shorter period. Any person guilty of criminal usury may be imprisoned for a term not to exceed 5 years or fined not more than $10,000.00, or both.

Hence, according to its plain language, a person is guilty of violating MCL 438.41 when they charge, take or receive money or other property as interest on a loan, while knowing that the interest charged, taken or received exceeded a simple interest rate of 25% per year.

In the present case, plaintiffs claim they were unaware that the "financing fee" referenced in the promissory notes attached to their amended complaints, constituted interest and, therefore, did not knowingly charge, take or receive simple interest in excess of 25% per year. We find this argument to be disingenuous. According to plain usage, a "fee" is "a sum charged or paid, as for professional services or for a privilege."*Random House Webster's College Dictionary* (1992). Likewise, "financing" is the "act of obtaining or furnishing funds for a purchase or enterprise."*Id.* Hence, in the context of these promissory notes, which clearly involve the lending of money,[FN3] the "financing fee" is a sum charged by the lender (i.e.plaintiffs) for the furnishing of funds to the borrower (i.e.Pupler). This is synonymous with the charging of interest on a loan. See *id.*(defining the word "interest" as "a sum paid or charged for the use of money or for borrowing money."). Furthermore, many of the promissory notes have a notation at the bottom that clearly identifies the portion of the payment that constitutes the repayment of principal and the portion that constitutes the payment of interest. Finally, while the notes do not directly state the applicable annual percentage rate, the fact that the rate of return invariably exceeded an annual rate of 25% was self-evident from the amounts listed on the notes.[FN4]Consequently, the promissory notes attached to the pleadings clearly indicate that

plaintiffs knowingly charged, took or received interest on a loan at a rate exceeding 25% at simple interest per annum contrary to MCL 438.41.

> FN3. While plaintiffs repeatedly refer to these transactions as "investments", the promissory notes clearly state that Pupler will be in default if it fails to pay the principal and "financing fee" upon the maturity of the note. The use of the word principal contemplates the repayment of a loan.

> FN4. By way of example, in a note executed on October 28, 2002, Pupler promised to pay plaintiff Susan Scalici $880,000 on November 14, 2002. The note identified $80,000 of the payment as the "financing fee." Hence, on its face the note purports to pay a 10% return on the principal amount over a loan period of 17 days. No reasonable person could be unaware that a 10% return over a period of 17 days amounted to an annual rate of return in excess of 25%.

Plaintiffs also state that they were unaware that Pupler was not a valid corporate entity when the notes were executed. Plaintiffs argue that, because they believed Pupler was a corporate entity and corporations are permitted by MCL 450.1275 to agree in writing to rates of interest in excess of the legal rate, the notes did not violate MCL 438.41. We disagree.

MCL 450.1275, which is part of the Business Corporation Act, MCL 450.1101 *et seq,* states:

A domestic or foreign corporation, whether or not formed at the request of a lender or in furtherance of a business enterprise, may by agreement in writing, and not otherwise, agree to pay a rate of interest in excess of the legal rate and the defense of usury shall be prohibited.

**\*5** Under the plain meaning of this statute, one of the powers possessed by corporations is the power

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.W.2d                                                                                                    Page 5
Not Reported in N.W.2d, 2005 WL 2291732 (Mich.App.)
**(Cite as: Not Reported in N.W.2d, 2005 WL 2291732)**

to agree to pay a rate of interest in excess of the legal rate. However, while the statute permits corporations to agree to pay potentially usurious interest, nothing within this language necessarily absolves the corporation's lenders of criminal liability under MCL 438.41. Furthermore, this grant of power is consistent with MCL 438.61, which creates exceptions to the usury statutes for loans made to a business entities. Under MCL 438.61(2), a limited class of lenders, such as banks, may lawfully charge a business entity any rate of interest, notwithstanding both the civil and criminal usury statutes.[FN5]Conversely, while MCL 438.61(3) does allow persons other than those identified in MCL 438.61(2) to charge a business entity an interest rate in excess of the civil usury statutes, it also provides that the interest rate charged may not exceed the criminal usury limits. Thus, while corporations do have the power to agree to pay a rate in excess of the legal rate, only certain classes of lenders may actually charge a rate in excess of the rate provided by MCL 438.41 without incurring criminal liability. The provision for continued criminal liability under MCL 438.61(3) for persons who charge business entities an interest rate in violation of MCL 438.41 directly contradicts plaintiffs' contention that MCL 450.1275 removes plaintiffs' loans from operation of the criminal usury laws. Consequently, the trial court properly determined that plaintiffs violated MCL 438.41 and that this violation warranted application of the wrongful conduct rule.

> FN5. The civil usury statutes are MCL 438.31 and MCL 438.32. The criminal usury statutes are MCL 438.41 and MCL 438.42.

Plaintiffs next argue there was an insufficient causal nexus between the charging of interest in excess of 25% and their losses to warrant application of the wrongful conduct rule. Specifically, plaintiffs contend that their losses were incurred because Pupler was a bad investment and not because of the rate of interest charged. We disagree.

In order to bar a plaintiff from recovery under the wrongful conduct rule, the injury suffered " 'must be traceable to his own breach of the law and the breach must be an integral and essential part of his case." ' *Manning, supra* at 136, quoting *Meador v. Hotel Grover,* 193 Miss 392, 405, 406;9 So2d 782 (1942). In the present case, plaintiffs' losses directly resulted from their inability to collect the sums due on the promissory notes received from Pupler. While plaintiffs claim the notes are merely evidence of their "investment" in Pupler and that the actual losses were sustained because Pupler was not a sound investment, the reality is plaintiffs' entire case arises out of their decision to lend Pupler money, which loans Pupler was unable to repay. Indeed, plaintiffs cannot even establish their losses without the notes. In addition, plaintiffs' attempt to minimize the role the usurious interest rate played in the investment scheme by emphasizing the role of Bank One's employees in convincing plaintiffs to loan the money to Pupler is unconvincing. Even accepting that Bank One's employees influenced plaintiffs' decisions to loan money to Pupler, a significant factor in any decision to loan money will be the rate of return. Given the staggeringly high rate of return for most of the notes, one can reasonably conclude that the rate of return was a significant motivational factor for plaintiffs. As the trial court aptly noted, "-a lot of money can be made if you're willing to trip over a few penal statutes along the way." Hence, we conclude that plaintiffs' claims are directly and causally related to their decision to engage in usurious lending. Therefore, there is a sufficient causal nexus between plaintiffs' illegal conduct and the losses suffered to warrant application of the wrongful conduct rule.

**\*6** Because it is clear from plaintiffs' pleadings that their losses are causally linked to their engagement in serious misconduct prohibited by a penal or criminal statute, the trial court properly concluded that the wrongful conduct rule applied to their claims.

C. The Exceptions to the Wrongful Conduct Rule

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.W.2d                                                                          Page 6
Not Reported in N.W.2d, 2005 WL 2291732 (Mich.App.)
(Cite as: Not Reported in N.W.2d, 2005 WL 2291732)

Plaintiffs next argue that, even if a penal or criminal statute prohibited their conduct and there were a causal connection between that conduct and their losses, their claims should not be barred because both exceptions to the wrongful conduct rule apply. Specifically, plaintiffs claim defendants' conduct is more culpable than their own and recovery is explicitly or implicitly permitted by statute. We dis- agree.

In discussing the nature of the culpability exception to the application of the wrongful conduct rule, the Court in *Orzel* noted that a plaintiff might still seek recovery against the defendant if the defendant's culpability is greater than the plaintiff's culpability for the injuries. *Orzel, supra* at 569.However, the Court explained that such cases arise when the plaintiff has acted under circumstances of oppression, imposition, hardship, undue influence, or great inequality of condition or age. *Id.* In interpreting this language, the Court in *Stopera v. DiMarco,* 218 Mich.App 565, 571-572 n 5;554 NW2d 379 (1996) stated,

As we stressed in the preceding paragraph, this case involves a defendant who was significantly more culpable than the plaintiff. We consider this necessary for application of the culpability exception. In its discussion of the applicability of the exception, the *Orzel* Court listed only situations where a defendant was egregiously more at fault than a plaintiff, *Orzel, supra* at 569, without suggesting that a slight difference in the degree of culpability would be sufficient for its application. Further, to apply the culpability exception in cases where a defendant is only slightly more blameworthy would likely eviscerate the wrongful conduct rule entirely; presumably, a plaintiff will almost always be able to argue that, if the allegations of a complaint are proved, a defendant's misconduct will be shown to be at least somewhat greater than the plaintiff's....

Hence, in order for plaintiffs to assert this exception, defendants must be significantly more culpable than plaintiffs for the losses suffered by plaintiffs.

In the present case, plaintiffs cannot demonstrate that defendants' actions make them more culpable than plaintiffs, let alone significantly more culpable. First, as the trial court noted, plaintiffs pleaded that defendants' conduct was tortious whereas plaintiffs' conduct was clearly felonious. In addition, defendants' culpability is limited to their role in convincing defendants to participate in the Pupler investment scheme. However, the final decisions to enter into usurious loan agreements with Pupler and continue to reinvest with Pupler, were made by the individual plaintiffs. Therefore, while plaintiffs might be able to develop facts that demonstrate defendants' culpability, and may even be able to demonstrate that defendants were equally culpable, we conclude that there are no factual developments which could lead to the conclusion that defendants were significantly more culpable than plaintiffs. Therefore, the trial court properly rejected this exception to the application of the wrongful conduct rule.

**7** Plaintiffs next argue that there is a statutory basis for recovery from defendants. Plaintiffs contend that, because MCL 438.32 prevents a usurious lender from recovering usurious interest charges, it must necessarily permit the recovery of the principal. Hence, MCL 438.32 implicitly permits recovery against defendants. We disagree.

In order for the statutory basis exception to apply, plaintiffs must allege defendants violated a statute, which, either explicitly or implicitly, allows them to recover for injuries suffered as a result of defendants' violation.*Orzel, supra* at 570.Yet plaintiffs have not pleaded that defendants violated a statute, which either explicitly or implicitly, permits them to recover their loan losses from defendants. Indeed, plaintiffs' argument relies solely on their own violations of the usury statutes to implicitly find authority for recovery of their losses. Even if reliance on their own violation of a statute were sufficient, because MCL 438.32 seeks to punish lenders who violate the civil usury law, we cannot conclude that the statutory purpose of MCL

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.W.2d                                                                    Page 7
Not Reported in N.W.2d, 2005 WL 2291732 (Mich.App.)
**(Cite as: Not Reported in N.W.2d, 2005 WL 2291732)**

438.32 was to protect the usurious lender's princip-          END OF DOCUMENT
al. See *Orzel, supra* at 571.Therefore, the statutory
basis exception does not apply to plaintiffs' claims.

### D. Motion to Amend

Finally, plaintiffs argue that the trial court should
have given them leave to amend their respective
complaints to plead facts, which would establish
the existence of greater culpability on the part of
defendants. We decline to address this issue be-
cause it was not raised in the statement of the ques-
tions presented, *People v. Miller,* 238 Mich.App
168, 172;604 NW2d 781 (1999), and was inad-
equately briefed and, therefore, abandoned on ap-
peal, *People v. Van Tubbergen,* 249 Mich.App 354,
365;642 NW2d 368 (2002). Furthermore, as noted
above, we have determined that no factual develop-
ment could establish that defendants were signific-
antly more culpable for plaintiffs' losses than
plaintiffs. Therefore, leave to amend would have
been futile and was properly denied. *Hakari v. Ski
Brule, Inc,* 230 Mich.App 352, 355;584 NW2d 345
(1998).

### IV. Conclusion

The trial court properly determined plaintiffs'
claims against defendants, as pleaded, were based
on losses proximately caused by plaintiffs' own
criminal conduct and, therefore, were subject to the
wrongful conduct rule. In addition, the trial court
correctly determined that neither exception to the
wrongful conduct rule applied to plaintiffs' claims.
Consequently, the trial court did not err when it dis-
missed plaintiffs' claims for failing to state a claim
on which relief can be granted.

Affirmed.

Mich.App.,2005.
Scalici v. Bank One, NA
Not Reported in N.W.2d, 2005 WL 2291732
(Mich.App.)

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**13**



Not Reported in N.W.2d                                                                              Page 1
Not Reported in N.W.2d, 2005 WL 1959480 (Mich.App.)
**(Cite as: Not Reported in N.W.2d, 2005 WL 1959480)**

Shivers v. McMartin, Wasek and Associates, Inc.
Mich.App.,2005.
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.

Court of Appeals of Michigan.
William SHIVERS, Plaintiff-Appellant,
v.
MCMARTIN, WASEK AND ASSOCIATES, INC.,
Defendant-Appellee.
**No. 251569.**

Aug. 16, 2005.

Before: METER, P.J., and BANDSTRA and BOR-
RELLO, JJ.

[UNPUBLISHED]

PER CURIAM.
**\*1** Plaintiff appeals as of right from an order grant-
ing defendant's motion for summary disposition un-
der MCR 2.116(C)(8). We affirm.

Plaintiff's first argues that the trial court erred in
granting summary disposition with respect to Count
I of the complaint. We disagree.

A trial court's ruling with regard to a motion for
summary disposition is reviewed de novo. *Taxpay-
ers of Michigan Against Casinos v State of
Michigan,* 471 Mich. 306, 317;685 NW2d 221
(2004).“A motion under MCR 2.116(C)(8) tests the
legal sufficiency of a claim[.]”*Mable Cleary Trust
v. Edward-Marlah Muzyl Trust,* 262 Mich.App 485,
491;686 NW2d 770 (2004).“Granting a motion pur-
suant to MCR 2.116(C)(8) is proper when the op-
posing party has failed to state a claim on which re-
lief can be granted, the claim is clearly unenforce-
able as a matter of law, and no factual development
could support recovery. When reviewing such a

motion, only the pleadings are considered; no docu-
mentary evidence may be examined.”*Id.* Factual al-
legations in support of the claim are accepted as
true and construed in the light most favorable to the
nonmoving party. *Adair v. State,* 470 Mich. 105,
119;680 NW2d 386 (2004). However, mere
“[c]onclusory statements, unsupported by factual
allegations, are insufficient to state a cause of ac-
tion.”*Churella v Pioneer State Mutual Ins Co,* 258
Mich.App 260, 272;671 NW2d 125 (2003).

Count I of plaintiff's amended complaint alleged
that defendant violated its duties to the insured to
fairly and honestly service and adjust their property
loss claims. Plaintiff asserted that defendant
breached its duties by way of the following:

a. Misrepresentation of the terms and conditions of
property insurance contracts by advising the in-
sureds the market value was the actual cash value
within the meaning of the insurance policy.

b. Making payment to the insureds based on market
value rather than the coinsurance formula as set
forth in the insurance policies.

c. Misrepresenting the applicable Michigan Public
Acts covering file loss monies to be disbursed to
the municipal governments and the amounts for-
warded to such governmental units.

d. Misrepresenting that repairs or demolition must
be completed in order to recover the repair or de-
molition costs up to the maximum amount of cover-
age where the loss exceeds the amount of coverage
contrary to the Michigan Public Acts in such case
so made and provided.

e. Whether Defendant's conduct is subject to liabil-
ity under common law principles of fraud/negligent
misrepresentation.

Count I of plaintiff's amended complaint also asser-
ted that defendant actively concealed material facts
and misled consumers into believing that they were

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.W.2d                                                                                                                                Page 2
Not Reported in N.W.2d, 2005 WL 1959480 (Mich.App.)
**(Cite as: Not Reported in N.W.2d, 2005 WL 1959480)**

receiving the actual benefits afforded by their policies. Plaintiff asserted that "consumers relied on the representations of the defendant to their damages."Although plaintiff's amended complaint does not identify the precise legal theory underlying Count I, both parties described the claim as sounding in fraud/misrepresentation.

**\*2** To establish a claim of fraudulent misrepresentation, a plaintiff must show that:

(1) the defendant made a material representation; (2) the representation was false; (3) when the defendant made the representation, the defendant knew that it was false, or made it recklessly, without knowledge of its truth as a positive assertion; (4) the defendant made the representation with the intention that the plaintiff would act upon it; (5) the plaintiff acted in reliance upon it; and (6) the plaintiff suffered damage. [*Bergen v. Baker,* 264 Mich.App 376;691 NW2d 770 (2004) (internal citations and quotations omitted).]

In addition to being based on false assertions, fraud may also be committed by suppression of facts and suppression of the truth. *Hord v Environmental Research Institute of Michigan,* 463 Mich. 399, 412;617 NW2d 543 (2000).

To the extent that plaintiff's amended complaint presents a fraudulent misrepresentation or silent fraud theory, whether defendant owed plaintiff a duty to adjust his claim fairly and honestly-as argued by plaintiff-is irrelevant, because duty is not one of the elements of fraudulent misrepresentation. See *Mable Cleary Trust, supra* at 499-500.At any rate, plaintiff failed to state a claim for fraudulent misrepresentation or silent fraud. Indeed, although plaintiff asserted that "consumers relied on the representations of the defendant to their damages," he did not support this assertion with any factual allegations of reliance or damages. Mere conclusory statements, unsupported by factual allegations, are insufficient to state a cause of action. *Churella, supra* at 272.

Additionally, even when viewed in the light most favorable to the nonmoving party, plaintiff's pleadings indicate that he did not act in reliance on the alleged misrepresentations. Plaintiff's amended complaint states:

17. Plaintiff, as a result of Defendant's Acts as set forth herein above instituted a civil action as against his insurer Auto Owners Insurance Company for recovery of the benefits due and owing him as a result of the file [sic] loss to his home located at 2215 Chippewa, Flint, Michigan.

18. That Plaintiff had to enlist the services of Attorney Douglas M. Philpott to process said suit in the Genesee Count Circuit Court, which concluded by a case evaluation award.

Plaintiff's pleadings indicate that he did not act in reliance on defendant's alleged misrepresentations, but rather rejected defendant's alleged misrepresentations, filed suit against Auto Owners Insurance Company to recover benefits, and accepted the case evaluation award.

It is possible that Count I of the complaint was based on negligent misrepresentation. To establish a claim of negligent misrepresentation, a plaintiff must prove that he " 'justifiably relied to his detriment on information prepared without reasonable care by one who owed the relying party a duty of care.' " *Mable Cleary Trust, supra* at 502, quoting *Law Offices of Lawrence J Stockler, PC v Rose,* 174 Mich.App 14, 30;436 NW2d 70 (1989). Even assuming, without deciding, that the tort of negligent misrepresentation applies to insurance adjusters, we hold that plaintiff failed to state a claim for negligent misrepresentation because plaintiff failed to allege that he "justifiably relied to his detriment on information prepared without reasonable care by one who owed the relying party a duty of care." *Mable Cleary Trust, supra* at 502.Indeed, as discussed above, plaintiff's pleadings do not sufficiently allege reliance and indicate that plaintiff did *not* justifiably rely to his detriment on the information prepared by defendant. Summary disposition

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.W.2d                                                    Page 3
Not Reported in N.W.2d, 2005 WL 1959480 (Mich.App.)
**(Cite as: Not Reported in N.W.2d, 2005 WL 1959480)**

was appropriate.

**\*3** Although the trial court granted summary dis-
position on different grounds than those asserted
here, the trial court's decision granting summary
disposition will be affirmed because the right result
was reached. *Pro-Staffers, Inc v. Premier Mfg Sup-
port Servs,* 252 Mich.App 318, 322;651 NW2d 811
(2002).

Plaintiff next argues that the trial court erred in dis-
missing his claim based on MCL 445.911, a provi-
sion of the Michigan Uniform Consumer Protection
Act (MCPA), MCL 445.901 *et seq.* We disagree.

Even assuming that 2000 PA 432-which removed
the ability of a plaintiff to bring a private cause of
action under MCL 445.911 for misconduct made
unlawful by Chapter 20 of the Insurance Code-
should not be applied retroactively to bar plaintiff's
claim, the claim nonetheless fails. Indeed, MCL
445.911(2) states that "[e]xcept in a class action, a
person who *suffers loss* as a result of a violation of
this act may bring an action to recover actual dam-
ages or $250.00, whichever is greater, together with
reasonable attorneys' fees" (emphasis added). The
pleadings in this case simply do not adequately al-
lege a loss on the part of plaintiff that resulted from
defendant's conduct. The complaint, in fact, indic-
ates that plaintiff *refused to accept* the information
set forth (in an allegedly unfair, deceptive, or un-
conscionable manner) by defendants and eventually
accepted a case evaluation award in the lawsuit
against Auto Owners Insurance Company. Under
the circumstances, we conclude that plaintiff failed
to establish a valid MCPA claim. We therefore af-
firm the trial court's grant of summary disposition,
albeit on alternative grounds. *Pro-Staffers, supra* at
322.

Given our disposition of this case, we need not ad-
dress the additional argument raised by plaintiff on
appeal.

Affirmed.

Mich.App.,2005.
Shivers v. McMartin, Wasek and Associates, Inc.
Not Reported in N.W.2d, 2005 WL 1959480
(Mich.App.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**14**



Not Reported in N.W.2d                                                           Page 1
Not Reported in N.W.2d, 2004 WL 203075 (Mich.App.)
**(Cite as: Not Reported in N.W.2d, 2004 WL 203075)**

**C**
Transnation Title Ins. Co. v. Livingston
Mich.App.,2004.
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.

Court of Appeals of Michigan.
TRANSNATION TITLE INSURANCE COM-
PANY, an Arizona corporation, for itself, and as
subrogee of Janet Mulloy, Martin Mulloy, Dean
Livingston, and Caren Okins, Plaintiff/
Counterdefendant-Appellee,
v.
Brian LIVINGSTON and Joan Livingston, Defend-
ants/Counterplaintiffs-Appellants.
**No. 243509.**

Feb. 3, 2004.

Before: OWENS, P.J., and SCHUETTE and BOR-
RELLO, JJ.

[UNPUBLISHED]

PER CURIAM.
**\*1** Defendants appeal as of right the trial courts'
grant of summary disposition in favor of plaintiff
under MCR 2.116(C)(10) and dismissal of defend-
ants' counterclaim in this breach of contract
and fraud action. We affirm.

Defendants contend that summary disposition was
inappropriate because questions of fact existed per-
taining to plaintiff's status as a holder in due course
and defendants' claim of negligence. We review a
trial court's decision on a motion for summary dis-
position de novo. *Dressel v. Ameribank,* 468 Mich.
557, 561;664 NW2d 151 (2003). A motion for sum-
mary disposition pursuant to MCR 2.116(C)(10)
tests whether there is sufficient factual support for a
claim. *Spiek v. Dep't of Transportation,* 456 Mich.
331, 337;572 NW2d 201 (1998). A motion for sum-

mary disposition pursuant to MCR 2.116(C)(10)
may be granted when the moving party is entitled to
judgment as a matter of law, or the affidavits or
other proofs show that there is no genuine issue of
material fact. *Morales v. Auto-Owners Ins Co,* 458
Mich. 288, 294;582 NW2d 776 (1998).

Defendants claim that they presented a genuine ma-
terial issue of fact regarding their fraud claim. We
disagree. A claim of common law fraud is com-
prised of the following elements: (a) a material rep-
resentation by the defendant, (b) the representation
was false, (c) when the defendant made the repres-
entation, he knew it was false or made it recklessly,
without knowledge of its truth as a positive asser-
tion, (d) the defendant made the representation with
the intention the plaintiff would act on it, (e) the
plaintiff acted in reliance on it, and (f) the plaintiff
suffered damages. *Belle Isle Grill Corp v. Detroit,*
256 Mich.App 463, 477;666 NW2d 271 (2003).
Fraud may also exist when facts and truth were sup-
pressed as well as where a party made false asser-
tions. A legal duty to disclose arises in situations
where a plaintiff makes inquiry into a matter but
the defendant replies incompletely with answers
that are truthful but which omit material informa-
tion. *Hord v Environmental Institute of Michigan
(After Remand),* 463 Mich. 399, 412;617 NW2d
543 (2000).

Plaintiff has sufficiently complied with the require-
ments of MCR 2.116(G)(4). Defendants do not
deny the second mortgage was not paid, rendering
defendant's claim of negligence moot. Defendants
have not met their burden of demonstrating that a
genuine issue of material fact exists regarding
fraud.MCR 2.116(G)(6); *Veenstra v. Washtenaw
Country Club,* 466 Mich. 155, 163;645 NW2d 643
(2002).

While a claim of fraud must be established by clear
and convincing evidence and cannot be presumed,
fraud may be established by circumstantial evid-
ence. Fraudulent conduct may be inferred from oth-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.W.2d                                                                                    Page 2
Not Reported in N.W.2d, 2004 WL 203075 (Mich.App.)
**(Cite as: Not Reported in N.W.2d, 2004 WL 203075)**

er evidence. *Foodland Distributors v. Al-Naimi,* 220 Mich.App 453, 457-458;559 NW2d 379 (1996). In light of this standard, the retention and expenditure of monies by defendants that should have been used to discharge the second mortgage, coupled with defendants' unpersuasive arguments that they were uninformed or mistaken regarding their own financial obligations, are sufficient to establish fraud. Plaintiff has also adequately pleaded a claim for innocent misrepresentation.

**\*2** Plaintiff's claims of fraud and innocent misrepresentation are alternative theories of liability. Although the trial court erred finding in favor of plaintiff on both the fraud and innocent misrepresentation claims, the error is harmless because the court did not provide for separate damage recovery under both theories. MCR 2.613(A). The trial court's correct result is affirmed, despite its failure to properly delineate the basis for its ruling. *Minicuci v Scientific Data Management, Inc,* 243 Mich.App 28, 42;620 NW2d 657 (2000).

Defendants next argue that the trial court exceeded its authority in dismissing their countercomplaint. A trial court has broad authority to resolve all issues before it. Pursuant to MCR 2.116(I)(1), a court need not specify the ground on which the motion for summary disposition is granted. *Yakowich v Dep't of Consumer & Industry Services,* 239 Mich.App 506, 510 n 6;608 NW2d 110 (2000). The documentary evidence comprised a sufficient basis for the court's determination that summary disposition was appropriate. It was not error for the trial court to consider defendants' claims, as contained in their countercomplaint, even if not raised by plaintiff's motion for summary disposition. In this instance, resolution of the primary issue of defendants' liability to plaintiff renders the need to address the remaining issues raised unnecessary. *Zander v. Ogihara Corp,* 213 Mich.App 438, 446;540 NW2d 702 (1995), citing *McFadden v. Imus,* 192 Mich.App 629, 634;481 NW2d 812 (1992).

Defendants next contend the trial court failed to address their claim that plaintiff is not a holder in due course. While we agree plaintiff was not a holder in due course, defendants' asserted defenses are insufficient to raise genuine issues of material fact necessary to overcome plaintiff's right to summary disposition. Plaintiff acknowledges it acquired the assignment of the note and mortgage only after defendants defaulted on payment. *Thomas v. State Mortgage, Inc,* 176 Mich.App 157, 161-164;439 NW2d 299 (1989). If plaintiff is not a holder in due course, it is not insulated from defenses raised to the instrument by defendants. MCL 440.9206; *Cessna Finance Corp v. Warmus,* 159 Mich.App 706, 710-711;407 NW2d 66 (1987).

However, not all defenses raised were related to the instrument from which plaintiff's status as an assignee arose, and thus, they were not impacted by whether plaintiff attained the status of a holder in due course. Defendants allege that plaintiff was negligent in undertaking a title search that did not reveal the recorded second mortgage. Notice of existence of the mortgage relieves the title company of any duty they may have had to inform defendants that a second mortgage existed. Given that defendants were the grantors of the second mortgage, it is disingenuous to suggest they were damaged by the failure of plaintiff to warn them of its existence. Moreover, the insurer undertook only to insure the properties and did not undertake to list all encumbrances on the subject properties.

**\*3** Defendants also claim that defendant Joan Livingston is relieved of liability because plaintiff violated the Equal Credit Opportunity Act, 12 CFR 202.7. With reference to the promissory note and second mortgage, there is no violation of the act. Joan Livingston had substantial rights and interests in the properties as both a homestead and for purposes of dower. The promissory note and mortgage signed by the parties conveyed an interest in properties owned by both defendants. Pursuant to the requirements of and legislative intent behind MCL 566.108, all owners of jointly held property must sign a contract conveying an interest in the property. Absence of the co-owner's signature renders

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

the contract void. *Forge v. Smith,* 458 Mich. 198, 206;580 NW2d 876 (1998). This is also applicable to Joan Livingston's dower because her husband cannot bargain away her dower interest. *Slater Management Corp v. Nash,* 212 Mich.App 30, 33;536 NW2d 843 (1995). Joan Livingston's signature was not required for purposes of establishing creditworthiness in violation of 12 CFR 202.7(d)(1). Rather, the signature of Joan Livingston was mandated by statute to create a valid contract conveying her interest.

Defendants also contend that plaintiffs defamed them by accusing them of fraud and that the defamation has negatively impacted defendants' relationship with their bank and others. First and foremost, a determination by the lower court that defendants engaged in fraud precludes defendants from proceeding on this claim. "Substantial truth is an absolute defense to a defamation claim." *Collins v. Detroit Free Press, Inc,* 245 Mich.App 27, 33;627 NW2d 5 (2001). In any event, defendants have not identified any statements by plaintiff that impaired their relationship with their bank. It is equally probable that defendants' default on the second mortgage was the source of impairment of their credit.

Defendants also make vague allegations that statements by plaintiff have negatively impacted defendant Brian Livingston's reputation in business. However, defendants failed to come forward with any proof thereof, aside from broad allegations that any negative business impact experienced is attributable to plaintiff. While defendants are not required to plead slander with great particularity, they cannot merely rest on broad allegations and must support their assertions by documentary evidence. *Burden v Elias Bros Big Boy Restaurants,* 240 Mich.App 723, 726;613 NW2d 378 (2000). Defendants have failed to demonstrate damage to reputation. Given the court's determination that defendants' actions were fraudulent, coupled with the insufficiency of defendants' own pleadings, the court did not clearly err in dismissing the countercomplaint.

Defendants next argue that the trial court erred in holding Joan Livingston liable to plaintiff despite her purported lack of knowledge regarding the status of any liens on the marital homestead and for the acts and representations of her husband, who acted as her attorney-in-fact. Joan Livingston contends she cannot be liable for misrepresentations pertaining to the sale of the properties because she had no knowledge or involvement in the transactions, other than to sign, without questioning, whatever documents were presented to her. Quite simply, Joan Livingston asserts her purposeful ignorance of the facts shields her from any liability and that her lack of knowledge made her incapable of making false representations because she could not have possessed the requisite intent. It is well-established that a party who signs a contract cannot avoid its enforcement because she failed to read or understand the terms. *Farm Bureau Mut Ins Co v. Nikkel,* 460 Mich. 558, 567;596 NW2d 915 (1999). Thus, liability may be imposed based on breach of contract.

**\*4** Joan Livingston further asserts she did not involve herself in the transactions and had no knowledge to make any representations, let alone representations that were fraudulent. Joan Livingston does not claim she was precluded from obtaining information pertaining to the transactions or that the information she received was deceptive. Rather, she elected to remain ignorant. Again, it is well settled that a mistake of law or ignorance of the law is no defense. *Young v. Young,* 211 Mich.App 446, 448;536 NW2d 254 (1995). Joan Livingston's failure to affirmatively take steps to make certain she was properly informed regarding the documents she was signing does not excuse her from liability. Although Joan Livingston asserts she had no duty and ignores she was a direct beneficiary of the transactions, she had a contractual relationship with and duty to the bank based on signing the note securing the second mortgage. "It is well established that those who undertake particular activities or enter into special relationships assume a distinctive duty to procure knowledge and experience regarding that

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.W.2d                                                                 Page 4
Not Reported in N.W.2d, 2004 WL 203075 (Mich.App.)
**(Cite as: Not Reported in N.W.2d, 2004 WL 203075)**

activity, person, or thing."*Schultz v. Consumers Power Co,* 443 Mich. 445, 450;506 NW2d 175 (1993). Joan Livingston cannot avoid liability on the contract based on her election to remain ignorant, particularly when she received a monetary benefit.

Joan Livingston also contends that if her attorney-in-fact exceeded his authority, she cannot be liable for his actions. Her argument ignores the fact that her liability arose when she personally signed the note securing the second mortgage.

Joan Livingston had only a dower interest in one of the properties sold. A dower right is "entitled to protection as well before as after it has become vested, and no act of the husband alone can prejudice this right."*Bonfoey v. Bonfoey,* 100 Mich. 82, 85;58 NW 620 (1894). Nonetheless, the power of attorney executed by Joan Livingston was a broad grant of authority and power and was unambiguous in granting authority to do all acts necessary to convey her interest in the subject property. Joan Livingston retained the monetary benefit from her attorney-in-fact's exercise of authority and never disclaimed his actions. In the law of agency, the "adverse interest exception" is not applicable when an agent acts both for himself and the principal. *Hoekzema v. Van Haften,* 313 Mich. 417, 426;21 NW2d 183 (1946). The adverse interest exception is not applied if the agent is acting at least in part on behalf of the principal's interest. *Id.* Thus, we reject Joan's assertion that her husband acted outside his authority.

The final issue is whether the trial court erred in granting plaintiff summary disposition on both breach of contract and unjust enrichment theories of recovery. A breach of contract claim and a claim for unjust enrichment are inconsistent claims as a contract will only be implied under a theory of unjust enrichment if no express contract covering the same matter or issue exists.*Keywell & Rosenfeld v. Bithell,* 254 Mich.App 300, 328;657 NW2d 759 (2002). Although the trial court erred in finding in favor of plaintiff on both the unjust enrichment and

breach of contract claims, the error is harmless because the court did not provide for separate damage recovery under both theories.

**\*5** Affirmed.

Mich.App.,2004.
Transnation Title Ins. Co. v. Livingston
Not Reported in N.W.2d, 2004 WL 203075 (Mich.App.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

## <u>CERTIFICATE OF SERVICE</u>

I, Michael J. Maimone, Esq., hereby certify that on April 28, 2008, I caused to be electronically filed a true and correct copy of the foregoing document with the Clerk of the Court using CM/ECF, which will send notification that such filing is available for reviewing and downloading to the following counsel of record:

| | |
|---|---|
| Joseph A. Rosenthal, Esquire<br>Carmella P. Keener, Esquire<br>Rosenthal, Monhait & Goddess, P.A.<br>919 N. Market Street, Suite 1401<br>P. 0. Box 1070<br>Wilmington, DE 19899<br>(Counsel to Plaintiffs) | Peter B. Ladig, Esquire<br>Stephen B. Brauerman, Esquire<br>The Bayard Firm<br>222 Delaware Avenue<br>Suite 900<br>P. 0. Box 25130<br>Wilmington, DE 19899 |
| Thomas G. Macauley, Esquire<br>Zuckerman Spaeder LLP<br>919 Market Street, Suite 1705<br>P. 0. Box 1028<br>Wilmington, DE 19899 | Vernon R. Proctor, Esquire<br>Proctor Heyman LLP<br>1116 West Street<br>Wilmington, DE 19801 |
| Thomas P. Preston, Esquire<br>Blank Rome LLP<br>Chase Manhattan Centre<br>1201 Market Street<br>Suite 800<br>Wilmington, DE 19801 | James L. Holzman, Esquire<br>J. Clayton Athey, Esquire<br>Prickett Jones & Elliott, P.A.<br>1310 King Street<br>P. 0. Box 1328<br>Wilmington, DE 19899 |
| Christian D. Wright, Esquire<br>Andrew A. Lundgren, Esquire<br>Young, Conaway, Stargatt & Taylor, LLP<br>The Brandywine Building<br>1000 West Street, 17th Street<br>P. 0. Box 391<br>Wilmington, DE 19899-0391 | Stephen L. Ascher, Esquire<br>Zenner & Block<br>919 Third Avenue<br>New York, NY 10022-3908 |

| | |
|---|---|
| Albert H. Manwaring, IV, Esquire<br>Pepper Hamilton LLP<br>1313 Market Street, Suite 5100<br>P.O. Box 1709<br>Wilmington, DE 19899-1709<br>(302) 777-6500 | Thomas Henry Kovach, Esquire<br>Parkowski, Guerke & Swayze, P.A.<br>800 King Street<br>Suite 203<br>Wilmington, DE 19801<br>(302) 594-3313<br>Fax: (302 654-3033 |
| Richard L. Horwitz, Esquire<br>Potter Anderson & Corroon, LLP<br>131.3 N.. Market St., Hercules Plaza, 6th Flr.<br>P.O. Box 951<br>Wilmington, DE 19899-0951<br>(Counsel to Defendant Stepp) | Robert S. Saunders, Esquire<br>Skadden, Alps, Slate, Meagher & Flom LLP<br>One Rodney Square<br>P. 0. Box 636<br>Wilmington, DE 19899 |

I further certify that on April 28, 2008, I caused a copy of the foregoing document

to be served on the following non-registered participants in the manner indicated:

**BY EMAIL**

Samuel H. Rudman
srudman@csgrr.com
David A. Rosenfeld
drosenfeld@csgrr.com
Coughlin Stoia Geller Rudman & Robbins LLP
58 South Service Road, Suite 200
Melville, NY 11747

/s/ Michael J. Maimone
Michael J. Maimone (#3592)

WLM 513401.1