# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| **COLLINS & AIKMAN CORPORATION** <br> **and COLLINS & AIKMAN PRODUCTS CO.,** <br> **as Debtors in Possession,** )<br><br>Plaintiffs, )<br><br>**DAVID A. STOCKMAN,** *et al.*, )<br><br>Defendants. ) | C.A. No. 07-265-SLR-LPS <br><br> *Electronically Filed* |

## OPENING BRIEF IN SUPPORT OF DEFENDANT
## PAUL C. BARNABA'S MOTION TO DISMISS
## PLAINTIFFS' FIRST AMENDED COMPLAINT

Thomas G. Macauley (ID No. 3411)
ZUCKERMAN SPAEDER LLP
919 Market Street, Suite 990
Wilmington, DE 19801
(302) 427-0400 Telephone
(302) 427-8242 Fax

Laura Neish, Esq. (admitted *pro hac vice*)
ZUCKERMAN SPAEDER LLP
1540 Broadway, Suite 1604
New York, NY 10036
(212) 704-9600 Telephone
(212) 704-4256 Fax

Carl S. Kravitz, Esq. (admitted *pro hac vice*)
Lenora Miles Rigby, Esq. (admitted *pro hac vice*)
ZUCKERMAN SPAEDER LLP
1800 M Street, N.W., Suite 1000
Washington, D.C. 20036
(202) 778-1800 Telephone
(202) 822-8106 Fax

*Attorneys for Defendant Paul Barnaba*

Dated: April 28, 2008
       Wilmington, Delaware

## <u>TABLE OF CONTENTS</u>

NATURE AND STAGE OF PROCEEDINGS ........................................................................1

SUMMARY OF ARGUMENT ............................................................................................1

STATEMENT OF FACTS ...................................................................................................5

I.     THE TRUST HAS FAILED TO STATE A CLAIM AGAINST MR.
BARNABA UNDER EXCHANGE ACT SECTION 10(b) AND RULE 10b-5 .........9

     A.     The Trust Fails To Allege That Mr. Barnaba Engaged in
Conduct Constituting a Primary Violation of Section 10(b) ...........................9

          1.     *The Trust Does Not Allege That Mr. Barnaba Made a Statement* ........9

          2.     *The Group Pleading Doctrine Is No Longer Viable* ...........................10

          3.     *Mr. Barnaba's Alleged Behind-the-Scenes Conduct Is Not
Actionable Under Section 10(b)* .........................................................11

          4.     *A Section 10(b) Claim Against Mr. Barnaba Based on the Same
Conduct Alleged Was Dismissed for Failure To State a Claim* ..........14

     B.     The Trust Cannot Allege Reliance on Its Own False Statements ...................16

     C.     The Trust Has Not Alleged a Loss ................................................................17

     D.     The Trust Fails To Plead Scienter as to Mr. Barnaba ...................................19

          1.     *The Trust Has Not Alleged That Mr. Barnaba Had Motive or
Opportunity To Commit Fraud* ...........................................................20

          2.     *The Trust Has Not Alleged Strong Circumstantial Evidence of
Recklessness or Intentional Misconduct by Mr. Barnaba* ..................22

          3.     *Other Inferences of Non-Fraudulent Intent from the Facts
Alleged Preclude Finding a Strong Inference of Scienter
as to Mr. Barnaba* ..............................................................................23

II.    THE TRUST HAS FAILED TO STATE A CLAIM AGAINST MR.
BARNABA UNDER EXCHANGE ACT SECTION 14(a) AND RULE 14a-9 .........24

     A.     The Trust Does Not Allege That Mr. Barnaba Made a Material
Misrepresentation or Omission in a Proxy Statement ...................................24

B.      The Trust Cannot Sue for False Statements in C&A's Own Proxy Materials ...................................................................................26

C.      The First Amended Complaint Also Does Not Allege an "Essential Link" Between the Proxy Statements and the Alleged Damage ...............................27

D.      The Trust Has Not Adequately Pled That Mr. Barnaba Acted with Negligence with Respect to the Proxy Statements ..........................................28

III.     THE COURT SHOULD DECLINE TO EXERCISE JURISDICTION OVER THE STATE LAW CLAIMS AGAINST MR. BARNABA.......................................29

IV.    THE TRUST FAILS TO STATE A CLAIM FOR COMMON LAW FRAUD AGAINST MR. BARNABA .....................................................................................30

A.      The Trust Fails to Allege That Mr. Barnaba Made a Material Misstatement or Omission ..................................................................30

B.      The Trust Cannot Allege Reliance on a Misstatement or Omission by Mr. Barnaba ..........................................................................31

C.      The Trust Cannot Establish Damages.............................................................32

D.      The Fraud Claim Is Barred by the Doctrine of *In Pari Delicto* ......................33

V.     THE FIRST AMENDED COMPLAINT FAILS TO STATE A CLAIM THAT MR. BARNABA VIOLATED FIDUCIARY DUTIES.......................................................34

A.      Mr. Barnaba Did Not Owe Fiduciary Duties as a Director or Officer of Collins & Aikman ..........................................................................34

B.      Even If Mr. Barnaba Could Be Considered an Officer of the Company Following His 2004 Promotion at the End of 2004, He Did Not Violate Any Fiduciary Duties ....................................................................35

1.      *The First Amended Complaint Fails to Allege Breaches of the Duty of Loyalty or Due Care Against Mr. Barnaba* .....................35

2.      *The Trust Does Not State a Claim for a Violation of the Duty of Good Faith Against Mr. Barnaba* ....................................................37

VI.    THE UNJUST ENRICHMENT CLAIM MUST BE DISMISSED BECAUSE THE TRUST DOES NOT ALLEGE THAT MR. BARNABA RECEIVED A BENEFIT OR THAT C&A SUSTAINED A RELATED LOSS ............................39

CONCLUSION.................................................................................................................40

# TABLE OF AUTHORITIES

## CASES

*In re Advanta Corp. Sec. Litig.*,
  180 F.3d 525 (3rd Cir. 1999) ...................................................................................22

*AES v. Corp. v. Dow Chem. Co.*,
  No. Civ. A. 99-673-JJF, 2001 WL 34367296, at *3 (D. Del. Jan. 19, 2001) .............................13

*Albert v. Alex. Brown Mgmt. Serv., Inc.*,
  No. Civ.A. 762-N, Civ.A. 763-N, 2005 WL 2130607, 11 (Del. Ch. Aug. 26, 2005)...........31, 40

*Anixter v. Home-Stake Prod. Co.*,
  77 F.3d 1215 (10th Cir.1996) .....................................................................................9

*Ash v. GAF Corp.*,
  723 F.2d 1090 (3d Cir. 1983)....................................................................................27

*In re Astea Int'l Inc. Secs. Litig.*,
  Civ. Act. No. 06-1467, 2007 WL 2306586, at *18 (E.D. Pa. Aug. 9, 2007)..............................22

*Avis Budget Group v. California State Teachers Retirement System*,
  128 S. Ct. 1119 (2008) ...........................................................................................14

*Bond Opportunity Fund v. Unilab Corp.*,
  No. 99 Civ. 11074(JSM), 2003 WL 21058251, at *3 (S.D.N.Y. May 9, 2003).............25, 28, 29

*Brehm v. Eisner*, 7
  46 A.2d 244 (Del. 2000) ..........................................................................................36

*In re Burlington Coat Factory Sec. Litig.*,
  114 F.3d 1410 (3d Cir. 1997).........................................................................19, 20, 21

*Burnett v. Rowzee*,
  Nos. DACV 07-0393 DOC (ANx), SACV 02-0641 DOC,  2008 WL 638503 (C.D. Cal.
  Feb. 11, 2008) ...................................................................................................14

*In re Caremark Int'l Inc. Derivative Litig.*,
  698 A.2d 959 (Del. Ch. 1996)....................................................................................37

*Cede & Co. v. Technicolor, Inc.*,
  634 A.2d 345 (Del. 1993). ........................................................................................35

*Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*,
  511 U.S. 164 (1994),...................................................................................................9

*In re Charter Commc's, Inc., Sec. Litig.*,
  443 F.3d 987 (8th Cir. 2006) ............................................................................12, 13

*Ciro, Inc. v. Gold*,
  816 F. Supp. 253 (D. Del. 1993)......................................................................30

*Citron v. Fairchild Camera & Instrument Corp.*,
  569 A.2d 53 (Del. 1989) ..................................................................................36

*In re Citx Corp., Inc.*,
  448 F.3d 672 (3d Cir. 2006)...........................................................................2, 18

*In re Collins & Aikman Corp., et al.*,
  No. 05-55927-swr, 2008 WL 859220 (Bkrtcy. E.D. Mich. Apr. 1, 2008) ..................................8

*In re Color Tile Inc.*,
  475 F.3d 508 (3d Cir. 2007)………...............................................................................32

*DCV Holdings, Inc. v. Conagra, Inc.*,
  889 A.2d 954 (Del. 2005) .............................................................................30, 31

*DeBakey Corp. v. Raytheon Serv. Corp.*,
  No. 14947, 2000 WL 1273317, at *25 (Del. Ch. Aug. 25, 2000).............................................31

*Diceon Elecs. Inc. v. Calvary Partners, L.P.*,
  772 F. Supp. 859 (D. Del. 1992)......................................................................26, 27

*In re Digital Island Sec. Litig.*,
  223 F. Supp. 2d 546 (D. Del. 2002).................................................................25

*DiLeo v. Ernst & Young*,
  901 F.2d 624 (7th Cir. 1990) ..........................................................................22

*Gen Elec. Co. v. Cathcart*,
  980 F. 2d 927 (3d Cir. 1992)...........................................................................3,

*Globis Capital Partners, L.P. v. Stonepath Group, Inc.*
  241 F. App'x 832 (3d Cir. 2007) ....................................................................20

*Gould v. American-Hawaiian S.S. Co.*,
  535 F.2d 761 (3d Cir. 1976...........................................................................25

*GSC Partners CDO Fund v. Washington*,
    368 F.3d 228 (3d Cir. 2004)..................................................................................19, 20, 22

*Guttman v. Huang*,
    823 A.2d 492 (Del. Ch. 2003)....................................................................................37, 38

*Howard v. Everex Sys., Inc.*,
    228 F.3d 1057 (9th Cir. 2000) ..........................................................................................9

*In re IKON Office Solutions, Inc. Sec. Litig.*,
    277 F.3d 658 (3d Cir. 2002)............................................................................................19

*J.I. Kislak Mortg. Corp. of Del. v. William Matthews Builder., Inc.*,
    287 A.2d 686 (Del. Super. 1972)................................................................................31, 32

*Jackson Nat'l Life Ins. Co. v. Kennedy*,
    741 A.2d 377 (Del. Ch. 1999)........................................................................................39

*Kalnit v. Eichler*,
    264 F.3d 131 (2d Cir. 2001)......................................................................................21, 22

*Katz v. Image Innovations Holdings, Inc.*,
    No. 06 Civ. 3707 (ANx), (JGK), 2008 WL 762105 (S.D.N.Y. Mar. 24, 2008) ..................13, 14

*Lazard Debt Recovery GP, LLC v. Weinstock*,
    864 A.2d 955 (Del. Ch. 2004)........................................................................................34

*Levine v. Metal Recovery Techs., Inc.*,
    182 F.R.D. 102 (D. Del. 1998) ......................................................................................13

*Mainstay High Yield Corp. Bond Fund v. Heartland Indus. Partners, L.P.*,
    Case No. 07-10542 (E.D. Mich.) .............................................................................3, 4, 8, 14

*Malone v. Brincat*,
    722 A.2d 5 (Del. 1998) ................................................................................................37

*McCabe v. Ernst & Young LLP*,
    494 F.3d 418 (3d Cir. 2007)..........................................................................................17

*Merrill v. Crothall-Am., Inc.*,
    606 A.2d 96, 10 (Del. 1992) ........................................................................................32

*Metro Commc'n Corp. BVI v. Advanced Mobilecomm Techs. Inc.*,
    854 A.2d 121 (Del. Ch. 2004)........................................................................................37

*Mills v. Elec. Auto-Lite Co.,*
  395 U.S. 375 (1970) ...................................................................................................27

*Morschbach v. Household Int'l, Inc.,*
  No. Civ.A.01-262 GMS, 2002 WL 187514, at *5 (D. Del. Feb. 6, 2002).................................39

*Novak v. Kasaks,*
  216 F.3d 300, 309 (2d Cir. 2000)..................................................................................22

*Official Comm. of Unsecured Creditors v. R.F. Lafferty & Co., Inc.,*
  267 F.3d 340 (3d Cir. 2001)..........................................................................................33

*In re Parmalat Sec. Litig.,*
  501 F. Supp. 2d 560 (S.D.N.Y. 2007 ........................................................................14, 40

*Pugh v. Tribune Co.,*
  __ F.3d __, Nos. 06-3898, 06-3909, 2008 WL 867739 (7th Cir. Apr. 2, 2008)...............13, 14

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.,*
  124 F.3d 430 (3d Cir. 1997)..........................................................................................29

*Rattner v. Bidzos,*
  No. Civ. A. 19700, 2003 WL 22284323, at *12 (Del. Ch. Oct. 7, 2003) ...................................38

*Regents of the Univ. of Cal. v. Credit Suisse First Boston (USA), Inc.,*
  482 F.3d 372 (5th Cir. 2007) .........................................................................................12

*In re Reliance Sec. Litig.,*
  135 F. Supp. 2d 480 (D. Del. 2001) .................................................................... *passim*

*Robbins v. Banner Indus., Inc.,*
  285 F. Supp. 758 (S.D.N.Y. 1966)..................................................................................24

*In re Rockefeller Ctr. Props., Inc. Sec. Litig.,*
  184 F.3d 280 (3d Cir. 1999)......................................................................................7, 19

*Rochelle v. Marine Midland Grace Trust Co. of New York,*
  535 F.2d 523 (9th Cir. 1976) ....................................................................................18, 40

*Santa Fe Indus., Inc. v. Green*, 430 U.S. 462 (1977)...........................................................28, 29

*Satellite Fin. Planning Corp. v. First Nat'l Bank of Wilmington,*
  633 F. Supp. 386(D. Del. 1986).................................................................................16, 26

*SEC v. Collins & Aikman,*
  524 F. Supp. 2d 477 (S.D.N.Y. 2007)............................................................................15

*Simpson v. AOL Time Warner Inc.*,
  452 F.3d 1040 (9th Cir. 2006) ................................................................................13

*In re Sofamor Danek Group, Inc.*,
  123 F.3d 394 (6th Cir. 1997)………………………………………………………....9

*Steinman v. Levine*,
  No. Civ.A.19107, 2002 WL 31761252, at *13 (Del. Ch. Nov. 27, 2002) .................................37

*Stephenson v. Capano Dev., Inc.*,
  462 A.2d 1069 (Del. 1983) ................................................................................30

*Stoneridge Inv. Partners LLC v. Scientific-Atlanta, Inc.*,
  128 S. Ct. 761 (2008) .................................................................................... *passim*

*Studebaker Corp. v. Gittlin*,
  360 F.2d 692 (2d Cir. 1966) ................................................................................27

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*
  127 S. Ct. 2499, 2509 (2007) ............................................................................20, 23

*Trenwick Am. Litig. Trust v. Ernst & Young, L.L.P.*,
  906 A.2d 168 (Del. Ch. 2006) ........................................................................... *passim*

*In re Tyson Foods, Inc. Sec. Litig.*,
  155 F. App'x 53 (3d Cir. 2005). ........................................................................3, 9, 10

*Virginia Bankshares, Inc. v. Sandberg*,
  501 U.S. 1083 (1991) ......................................................................................28

*Winer Family Trust v. Queen*,
  503 F.3d 319 (3d Cir. 2007) ............................................................................11, 20

*Wright v. Ernst & Young, LLP*,
  152 F.3d 169 (2d Cir. 1998) ................................................................................9

*Ziemba v. Cascade Int'l, Inc.*,
  256 F.3d 1194 (11th Cir. 2001) ............................................................................9

## STATUTES

15 U.S.C. § 78j(b), Securities Exchange Act of 1934 § 10(b)............................................1, 2, 4, 9

15 U.S.C. § 78n(a), Securities Exchange Act of 1934 § 14(a). ...................................... 1, 2, 3, 23

15 U.S.C. § 78u-4, Securities Exchange Act of 1934 § 21D ......................................10, 19, 23, 25

28 U.S.C. § 1367 ..........................................................................................................................29

**REGULATIONS**

Exchange Act Rule 10b-5, 17 C.F.R. § 240.10b-5 ........................................................................1

Exchange Act Rule 14a-9, 17 C.F.R. § 240.14a-9.............................................................1, 23, 26

## NATURE AND STAGE OF PROCEEDINGS

Plaintiff, the Collins & Aikman Litigation Trust (the "Trust" or "Plaintiff"), filed this action "as successor to Collins & Aikman Corporation and its subsidiary debtors pursuant to the First Amended Plan of Reorganization of Collins & Aikman Corporation ("C&A" or the "Company") and its Debtor subsidiaries dated July 9, 2007." First Amended Complaint ("FAC") ¶ 5. In that capacity, the Trust stands in the shoes of C&A and purports to assert claims by the Company against Defendant Paul C. Barnaba for violations of § 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Exchange Act Rule 10b-5 thereunder; § 14(a) of the Exchange Act and Rule 14a-9 thereunder; and common law claims for fraud, breach of fiduciary duty and unjust enrichment. Mr. Barnaba is hereby moving to dismiss all of these claims with prejudice.

## SUMMARY OF ARGUMENT

Mr. Barnaba was not a director or officer of C&A at any relevant time, but rather a mid-level employee in C&A's Purchasing Department. Nor was he an owner of C&A or alleged to have been related to Heartland in any way. Nor was Mr. Barnaba an accountant or is he alleged to have made any of the Company's allegedly improper accounting decisions.

Mr. Barnaba did not sign any of the Company's public filings or proxy materials and is not alleged to have drafted, prepared or reviewed any of the false financial statements supposedly contained in those documents. Nor is he alleged to have made any of the other allegedly false statements identified in the FAC (all of which are attributed to others), much less any in connection with the only purchase or sale of a security mentioned in the FAC (the $415 million "August [2004] Senior Note Offering"). *See* FAC ¶ 71.

Instead, Mr. Barnaba allegedly assisted in obtaining certain rebates from C&A's suppliers that C&A's accountants then used to improperly inflate the Company's financial

1

results, by recognizing the rebates currently rather than in future periods. The faulty accounting, in turn, was the basis for the false financials statements that the Trust complains of in this case.

> ### A.    The Federal Securities Claims Against Mr. Barnaba Must Be Dismissed.
>
> > 1.    The Trust's Federal Securities Claims Under Exchange Act §§ 10(b) and 14(a) Are Structurally Defective.
> >
> > > (a)    *The Litigation Trust Is Not a Proper Plaintiff To Assert the Claims*.

The Trust, because it stands in the shoes of C&A and is asserting the Company's claims, is in substance complaining that it was harmed by its own false statements. Under § 10(b), reliance is a required element. The Company cannot, as a matter of law, have relied on statements made in its own public filings, and on its behalf by its top executives, that it knew, according to the allegations of the FAC, were false. Under § 14(a), shareholders have an implied cause of action for false statements in a company's proxy materials. But there is no such cause of action for a company to sue its own directors, officers and employees for false statements in its own proxy materials, as the Trust has done here.

> > > (b)    *The Trust Has Not Alleged a Legally Cognizable Loss That Was Caused by or Was an Essential Link to the Alleged Misconduct.*

Under § 10(b), a plaintiff must establish "loss causation" – namely, that it suffered a loss actually caused by the alleged misconduct. Here, the Trust claims that the Company, by misrepresenting its financial results, was able to borrow $415 million dollars in August 2004 that it would not otherwise have been able to borrow. C&A allegedly kept itself afloat longer, and "increased its debt load" by borrowing the money. Beyond the facts that the Company did not suffer any loss (it benefited by selling the notes and obtaining the proceeds) and selling the notes did not even increase the Company's debt load (the proceeds were used to retire existing debt), "deepening insolvency," the harm alleged, is not a legally cognizable theory of damages under Third Circuit law. *In re Citx Corp., Inc*., 448 F. 3d 672, 677-78 (3d Cir. 2006). The Trust, in

short, has not alleged any legally cognizable loss caused by the alleged accounting improprieties and false statements.

Under § 14(a), a plaintiff must allege that false proxy materials were an "essential link" to its damage. Here, the Trust claims that its false proxy statements helped re-elect the Company's executives, who then continued to mismanage the Company's assets. The Third Circuit, however, has squarely rejected a § 14(a) claim based on that theory of damage, holding that in those circumstances the harm is too attenuated to satisfy the "essential link" test. *Gen. Elec. Co. v. Cathcart*, 980 F. 2d 927, 932 (3d Cir. 1992).

> 2.    In Any Event, The Litigation Trust's Specific Allegations As To Mr. Barnaba Do Not State Federal Securities Claims Against Him.

> > (a)    *There Are Additional Reasons Why the Section 10(b) Claim Must Be Dismissed*.

*First*, under established Third Circuit law, in a false statements case such as this one, only the person who actually makes the false statement – by drafting, preparing or reviewing – can be held liable. *In re Tyson Foods, Inc. Sec. Litig.*, 155 F. App'x 53, 56 (3d Cir. 2005). Because Mr. Barnaba is not alleged to have drafted, prepared or reviewed, or otherwise made, the allegedly false statements, he did not engage in any conduct prohibited by the statute. Instead, the Trust alleges that he assisted in obtaining certain rebates from C&A's suppliers that were then used by C&A's accountants to falsely inflate the Company's financial statements. But the Supreme Court confirmed earlier this year in *Stoneridge Inv. Partners, LLC v. Scientific Atlanta*, 128 S. Ct. 761, 770 (2008), that such behind-the-scenes conduct leading to a false statement is "too remote" to be actionable under § 10(b), even when challenged by a proper plaintiff. In so holding, the Court in *Stoneridge* made clear that the outcome is no different if the plaintiff alleges that the defendant was a participant in a "scheme to defraud," as the Trust attempts to do here. As a result, in *Mainstay High Yield Corporate Bond Fund v. Heartland Indus. Partners,*

3

*LP*, Case No. 2:07-cv-10542 (E.D. Mich.) (Complaint attached to Appendix as Exhibit A), a case brought by a class of investors who purchased the notes offered by C&A in August 2004 – *i.e.*, proper plaintiffs as opposed to the Trust – against most of the same defendants for the same accounting improprieties and false statements, the district court dismissed the § 10(b) claim against Mr. Barnaba.  (Order attached to Appendix as Exhibit B).  *Second*, the § 10(b) claim must be dismissed because the Trust has not alleged scienter with the required particularity as to Mr. Barnaba.

> (b)  *There Are Additional Reasons Why the § 14(a) Claim Must Be Dismissed.*

*First*, as would be required to state a claim, the Trust does not allege that Mr. Barnaba signed, reviewed, or approved any of the offending proxy statements or that he had any involvement whatsoever with their creation or issuance.  *Second*, the Trust avers broadly that an unnamed number of proxy statements issued over a three-year period were misstated in an unspecified way and does not meet the PSLRA's specificity requirements.  *Third*, the Trust does not plead with particularity the requisite strong inference of negligence as to Mr. Barnaba.

**B.    The Common Law Claims Against Mr. Barnaba Must Be Dismissed.**

Because the federal claims must be dismissed, this Court should decline to exercise supplemental jurisdiction over the state claims and dismiss those claims on that basis.  They also must be dismissed on the merits.

> 1.    Common Law Fraud

The common law fraud claim suffers from the same defects as the federal claims: namely, (i) Mr. Barnaba did not make any of the alleged false statements concerning C&A's finances (making such a misrepresentation is an element of common law fraud); (ii) the Trust is again complaining of C&A's own false statements, by which C&A (including its board) could

not have been deceived and upon which C&A could not have relied, because C&A knew they were false; and (iii) the Trust has not alleged a legally cognizable damage that it suffered as a proximate result of the misrepresentations ("deepening insolvency," the only harm alleged, has been rejected in Delaware). In addition, the common law fraud claim is barred by the doctrine of *in pari delicto*, because Mr. Barnaba's alleged fraud was committed in the course of his employment, at the direction of C&A's CEO, for the benefit of C&A.

### 2.      Breach of Fiduciary Duty

The Trust has not stated a claim against Mr. Barnaba because he was not an officer or director of C&A and therefore did not owe fiduciary duties to the Company's shareholders. He allegedly became a divisional vice president for the last few months he was at the Company, but is not listed as an officer or director of the Company in C&A's public filings. Even if Mr. Barnaba had been an officer, there is no claim because the FAC does not allege self-dealing in violation of the duty of loyalty, does not allege a failure to disclose in violation of the duty of care, and does not allege that Mr. Barnaba had responsibility over C&A's financial statements, such that omissions in them violated his duty of good faith.

### 3.      Unjust Enrichment

The unjust enrichment claim fails because the Litigation Trust has not alleged that Mr. Barnaba received any benefit from his activities at C&A, or that C&A sustained a related loss.

## STATEMENT OF FACTS

The Trust alleges that, beginning in 2001, C&A, along with the major automakers and other parts manufacturers, was coming under "increasing competitive threats and adverse business conditions" and that "[b]y early 2002, these negative factors were dramatically depressing the Company's financial results …." FAC ¶¶ 37-38. The *gravamen* of the FAC is that the Company, in response, engaged in a "variety of fraudulent schemes" intended to conceal

5

and misrepresent the true state of the Company's finances.  FAC ¶ 39.  The FAC alleges that these "fraudulent schemes" were all directed, controlled, and known by the Company's CEO, David Stockman, and its other top executives.  *E.g.*, FAC ¶¶ 39, 70.

First, the Trust alleges that between the fourth quarter of 2001 and the first quarter of 2003, defendants "Stockman, Stepp and others acting at their direction" engaged in fraudulent "round-trip" transactions with Joan Fabrics, Inc., a company controlled by defendant McCallum. FAC ¶¶ 53-57.  Second, it alleges that between 2002 and 2004, "Defendants caused or allowed" the Company to account improperly for rebates from the Company's suppliers.  FAC ¶¶ 58-69. Specifically, it alleges that C&A agreed to future price reductions and improperly booked the rebates in the then-current quarters, or purchased capital equipment for inflated prices and received the difference back as a "rebate."  FAC ¶ 61.  Finally, the Trust alleges that in December 2004 and January 2005, "Stockman and others acting at his direction" manipulated Company accounts to reduce the amount of money the Company owed General Electric Capital Corporation ("GECC").  FAC ¶¶ 74-75.

Mr. Barnaba, however, is alleged to have participated only in the "rebate" transactions. Specifically, the Trust alleges that he "promised future business" in exchange for rebates, FAC ¶ 60, "directed other Collins & Aikman employees to solicit [] false documents from suppliers" that had been drafted by the Company's CFO, FAC ¶ 62, and "directed and participated in the scheme to treat discounts on capital equipment as rebates," FAC ¶ 67.  Plaintiff does not, and could not, allege that Mr. Barnaba, a non-accountant, made or even participated in any of the allegedly improper accounting decisions.  Nor is there any allegation that Mr. Barnaba's behind-the-scenes conduct was communicated to investors.

The Trust alleges that because of the accounting improprieties resulting from these three schemes, C&A misrepresented its financial results.  In particular, it alleges that the Company's SEC filings from late 2001 through early 2005, August 2004 offering memorandum, and proxy statements from 2002 through 2004 contained false and misleading statements.  FAC ¶¶ 92-94. It alleges further that, in 2005, "Stockman and others" made false statements on multiple occasions to investors, FAC ¶¶ 84, 87, and that C&A's press releases twice contained false and misleading statements.  FAC ¶¶ 80-82, 86.  Plaintiff does not allege that Mr. Barnaba drafted, prepared, or reviewed the Company's public filings or press releases.  Nor does it allege that he made, or indeed had anything to do with, any of the other false statements identified in the FAC.

Although the FAC identifies a number of allegedly false statements by the Company and by individuals other than Mr. Barnaba, the FAC alleges that false statements were made in connection with the purchase or sale of only one security:  the "$415 million in 12,875 % Senior Subordinated Notes due 2021 (the 'August Senior Note Offering')".  FAC ¶ 73.  It alleges that "Stockman, Stepp and Cosgrove participated in drafting the marketing materials relating to the sale of the notes," *id.*, but makes no allegation that Mr. Barnaba participated in any way.  The Trust asserts that the proceeds of the notes sale "increased the Company's debt load and prolonged the life of the already insolvent Company."  FAC ¶ 184.  In fact, C&A's Q3 2004 10-Q, attached to Appendix as Exhibit C, establishes that the note sale did not increase the Company's debt load, because the proceeds were used to retire outstanding debts.[1]  (Offering Memorandum and 10-Q, respectively).

---

[1]    The Court may rely on a company's public filings referred to in a complaint in considering a motion to dismiss.  *In re Rockefeller Ctr. Props., Inc. Sec. Litig.*, 184 F.3d 280, 293 (3d Cir. 1999) (holding district court could properly consider the authenticated copies of SEC filings submitted by defendants on a motion to dismiss).

The FAC, finally, alleges that Mr. Barnaba "served as the Director of Financial Analysis for the Company's Purchasing Department (the third ranking position in the Purchasing Department) from April 2002 to December 2004, when he became Vice President and Director of Purchasing for the Plastics Division, a position he held until April 2005." FAC ¶ 11. Even though this description makes clear that Mr. Barnaba was at most a mid-level manager, whose assignment was to the Purchasing Department, the remainder of the FAC improperly lumps Mr. Barnaba together with the "Officer and Director Defendants," a group that includes the Company's directors and Chief Executive and Chief Financial Officers.

Contrary to the way the Trust bundles Mr. Barnaba is bundled with Mr. Stockman and the other top executives, Mr. Barnaba did not even obtain the title of divisional vice president until several months after the August Senior Note Offering. And even though he attained that divisional title in December 2004, public filings referenced in the FAC show that Mr. Barnaba was neither a director nor an officer of the Company. *See* Collins & Aikman Corp., Proxy Statement (Apr. 25, 2002) at 5-8, 19-20 (identifying directors and officers); Collins & Aikman Corp., Form 10-K for the fiscal year ended December 31, 2003 at 47-51 (same); Collins & Aikman Corp., Proxy Statement (Sep. 30, 2004) at 3-5, 18 (same); Statement of Financial Affairs, ¶ 21(b), *In re Collins & Aikman Corp., et al.*, No. 05-55927-swr, 2008 WL 859220 (Bankr. E.D. Mich. Apr. 1, 2008) (same). (Excerpts from these public filings attached to Appendix as Exhibits D through G, respectively).

Finally, the purchasers of the notes from the August Senior Note Offering sued Mr. Barnaba and the other individual defendants in the *Mainstay* case in Michigan, complaining of the same misrepresentations. Because of Mr. Barnaba's position, and because he did not sign any public filings, the district court dismissed the claims against him. If the investors cannot sue

Mr. Barnaba under the federal securities laws, the entity that actually made the misrepresentations certainly cannot do so.

## I.   **THE TRUST HAS FAILED TO STATE A CLAIM AGAINST MR. BARNABA UNDER EXCHANGE ACT SECTION 10(b) AND RULE 10b-5.**

### A.   **The Trust Fails To Allege that Mr. Barnaba Engaged in Conduct Constituting a Primary Violation of Section 10(b).**

#### 1.   *The Trust Does Not Allege That Mr. Barnaba Made a Statement.*

The Trust alleges that the Director and Officer Defendants, including Mr. Barnaba, violated § 10(b) because they "caused Collins & Aikman to issue materially false and misleading statements" and Collins & Aikman "sold securities in reliance on [those] materially false and misleading statements." FAC ¶¶ 182, 184.

In *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 199 n.10 (1994), the Supreme Court held that there is no private cause of action for aiding and abetting under § 10(b) and that only "primary violators" can be held liable under the statute. Following *Central Bank*, all courts of appeals that considered the issue held that, in cases involving false statements, only the person who actually makes the statement, or at a minimum has intricate involvement in its drafting and properties, can be held liable as a primary violator. *In re Tyson Foods, Inc. Sec. Litig.*, 155 F. App'x 53, 56 (3d Cir. 2005); *Wright v. Ernst & Young, LLP*, 152 F.3d 169, 175 (2nd Cir. 1998), *cert. denied*, 525 U.S. 1104 (1999); *In re Sofamor Danek Group, Inc.*, 123 F.3d 394, 400 (6th Cir. 1997); *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1061 (9th Cir. 2000); *Anixter v. Home-Stake Prod. Co.*, 77 F.3d 1215, 1225-27 (10th Cir. 1996); *Ziemba v. Cascade Int'l, Inc.*, 256 F.3d 1194, 1204-06 (11th Cir. 2001). As the Second Circuit said, "anything short of [actually making the false statement] is merely aiding and abetting, and … is not enough to trigger liability under Section 10(b)." *Wright v. Ernst & Young*, 152 F.3d at 175 (internal quotations omitted).

In *Tyson Foods*, the Third Circuit said that it did not have to decide between the Second Circuit's more restrictive test for making the statement (attributed to the defendant at the time of dissemination) and the Ninth Circuit's test (intricate involvement in drafting and preparation), because either way, "make" the statement. 155 F. App'x at 56-57. It held the defendants there could not have "made" the alleged misrepresentations under § 10(b) because they had no role in drafting or preparing the allegedly false press releases and did not issue the releases themselves. *Id*. at 57. Here, as in *Tyson Foods*, the Trust does not allege that Mr. Barnaba drafted, edited or signed C&A's public filings (or accompanying press releases). Nor does it allege that he had any role in the direct presentations to investors. Indeed, with respect to the August Senior Note Offering in 2004, the only misrepresentations allegedly made in connection with the purchase or sale of a security, and therefore the only misrepresentations that even theoretically could give rise to a claim, it specifically alleges that the misrepresentations were made by individuals others than Mr. Barnaba. FAC ¶ 71. Because he is alleged only to have acted behind the scenes in the supposed "rebate scheme," and is not alleged to have "made" a statement, Mr. Barnaba cannot be held liable under § 10(b). *Tysons Foods*, 155 F. App'x at 58-59.

2.    <em>The Group Pleading Doctrine Is No Longer Viable.</em>

The Trust cannot plead around the fact that Mr. Barnaba did not make any statement identified in the FAC by relying on the "group pleading doctrine." That doctrine, when it was recognized, created a judicial presumption at the pleading stage that a company's public filings are the collective work of a limited class of high-ranking executives and thereby relieved the plaintiff of the obligation to attribute particular misrepresentations to particular defendants. The Private Securities Litigation Reform Act of 1995 ("PSLRA"), however, requires that each misrepresentation be plead with specificity as to "*the* defendant." 15 U.S.C. § 78u-4(b)(2)

10

(emphasis added). Like the other courts of appeals that have addressed the issue, the Third Circuit has held that "the group pleading doctrine is no longer viable in private securities actions after the enactment of the PSLRA." *Winer Family Trust v. Queen*, 503 F.3d 319, 337 (3d Cir. 2007). As a consequence, the Trust's group allegations that all the "Officer and Director Defendants" made statements are legally ineffective, and the fact that Mr. Barnaba did not make any of false statement identified in the FAC is fatal to the § 10(b) claim.

      3.     *Mr. Barnaba's Alleged Behind-the-Scenes Conduct Is Not Actionable Under Section 10(b).*

Moreover, the Supreme Court's recent decision in *Stoneridge Inv. Partners LLC v. Scientific-Atlanta, Inc.*, 128 S. Ct. 761, 771 (2008), confirms that Mr. Barnaba cannot be held liable under § 10(b) for his alleged behind-the-scenes participation in the "rebate scheme," even if that conduct ultimately led to a false statement.

In *Stoneridge*, Respondents Scientific-Atlanta and Motorola allegedly participated in a scheme to inflate Charter Communications' revenues. Respondents entered into sales agreements with Charter in which Charter agreed to overpay them for set top cable boxes, with the understanding that they would later repay the overcharge by purchasing advertising from Charter. *Id*. at 766. Respondents and Charter created documentation, such as backdated contracts, designed to give the false appearance that the set top purchases and advertising sales were unrelated, allowing Charter to report the advertising sales as revenue and inflate its earnings in violation of accounting rules. *Id*.

The petitioner in *Stoneridge*, an investor in Charter, sued Scientific-Atlanta and Motorola under § 10(b) on the theory that they "engaged in conduct with the purpose and effect of creating a false appearance of material fact to further a scheme to misrepresent Charter's revenue." *Id*. at 770. Scientific-Atlanta and Motorola, however, did not make any of the false statements that

allegedly inflated the price of Charter's stock. Those misrepresentations were made by Charter. The Supreme Court, assuming that the allegations of the complaint were true, affirmed the district court's dismissal, holding that the petitioner could not have relied on the respondents' (Scientific-Atlanta and Motorola) conduct and that it was too remote for liability:

> Respondents had no duty to disclose; and their deceptive acts were not communicated to the public. No member of the investing public had knowledge, either actual or presumed, of respondents' deceptive acts during the relevant times. Petitioner, as a result, cannot show reliance upon any of respondents' actions except in an indirect chain that we find too remote for liability.

*Id*. at 769.

Like the defendants in *Stoneridge*, Mr. Barnaba's supposed involvement in obtaining rebates – or promis[ing] "future business to suppliers in exchange for immediate recognition of rebates," FAC ¶ 60; obtaining false rebate letters drafted by others FAC ¶ 62; and "direct[ing] other Collins & Aikman employees to solicit the false documents from suppliers." (FAC ¶ 60) – allegedly was done for the purpose of inflating C&A's financials and ultimately led to misrepresentations by the Company. The Trust, however, does *not* allege Mr. Barnaba's conduct was known to or relied upon by the public, and this alleged behind-the-scenes conduct is precisely the type that the Supreme Court said in *Stoneridge* "was too remote for liability."

In *Stoneridge* the petitioner tried to avoid this defect by arguing that the defendants could be liable merely for participating in a "scheme to defraud." The Supreme Court rejected the argument and held that alleging participation in a scheme "does not answer the objection that [plaintiffs] did not in fact rely upon [the defendants'] own deceptive conduct." *Stoneridge*, 128 S.Ct. at 770.[2] For that same reason, the Trust cannot convert Mr. Barnaba's behind-the-scenes

---

[2] The Third Circuit had not yet specifically addressed the viability of "scheme liability" before *Stoneridge*, but two of the three circuits that had considered the theory had rejected it. *Regents of the Univ. of Cal. v. Credit Suisse First Boston (USA), Inc.*, 482 F.3d 372, 386-90 (5th Cir. 2007); *In re*

conduct, which was plainly several steps short of actually making a statement, into actionable conduct by labeling it as participation in a scheme to defraud.

Nor can *Stoneridge* be distinguished on the ground that Mr. Barnaba was an employee of C&A, whereas the defendants in *Stoneridge* were business counter-parties of Charter. Both Mr. Barnaba and the *Stoneridge* defendants are alleged to have engaged in conduct that was used by accountants to generate false financial statements. Indeed, in the three months since *Stoneridge* was decided, the case has been applied by the Seventh Circuit and at least two district courts to dismiss § 10(b) claims against insider defendants who allegedly participated in fraudulent schemes within the companies for which they worked. *Pugh v. Tribune Co.*, __ F.3d __, Nos. 06-3898, 06-3909, 2008 WL 867739 (7th Cir. Apr. 2, 2008); *Katz v. Image Innovations Holdings, Inc.*, No. 06 Civ. 3707 (ANx), (JGK), 2008 WL 762105 (S.D.N.Y. Mar. 24, 2008); *Burnett v. Rowzee*, Nos. SACV 07-0393 DOC (ANx), SACV 07-0641 DOC, 2008 WL 638503 (C.D. Cal. Feb. 11, 2008).

In *Pugh*, purchasers of Tribune Company common stock brought federal securities claims alleging that two subsidiaries of Tribune, the newspapers *Newsday* and *Hoy*, falsely boosted their circulation figures in order to increase the amount they were able to charge advertisers, thereby inflating Tribune's revenues. 2008 WL 867739 at *1. Among the plaintiffs' claims was one

---

*Charter Commc's, Inc., Sec. Litig.*, 443 F.3d 987, 992 (8th Cir. 2006)), *aff'd sub nom. Stoneridge*, 128 S. Ct. 761. The Ninth Circuit had approved a very narrow version of the doctrine, but the Supreme Court vacated the judgment and remanded in light of *Stoneridge* and the Ninth Circuit then vacated its opinion. *Simpson v. AOL Time Warner Inc.*, 452 F.3d 1040, 1048 (9th Cir. 2006), *judgment vacated sub nom Avis Budget Group v. Cal. State Teachers Ret. Sys,*, 128 S. Ct. 1119 (2008), *opinion vacated* 519 F.3d 1041 (9th Cir. 2008). Nonetheless, previous decisions by this Court permitted § 10(b) claims premised upon participation in an alleged "scheme" or "conspiracy" to defraud. *E.g., AES v. Corp. v. Dow Chemical Co.*, No. Civ. A. 99-673-JJF, 2001 WL 34367296, at *3 (D. Del. Jan. 19, 2001); *Levine v. Metal Recovery Techs., Inc.*, 182 F.R.D. 102, 106 (D. Del. 1998); *Levine v. Metal Recovery Techs., Inc.*, 182 F.R.D. 112, 114-115 (D. Del. 1998). Mr. Barnaba respectfully submits that this Court's decisions are no longer valid precedent after *Stoneridge*.

under § 10(b) against Defendant Sito, the publisher of *Hoy*, who allegedly "participated in (and was the 'mastermind' of) the scheme to defraud the investors." *Id*. at *7. Citing *Stoneridge*, the Seventh Circuit affirmed the dismissal of the § 10(b) claim against Sito:

> Sito may have foreseen (or even intended) that the advertising scheme would result in improper revenue for *Newsday* and *Hoy*, which would eventually be reflected in Tribune's revenues and finally published in its financial statements. *But Stoneridge indicates that an indirect chain to the contents of false public statements is too remote to establish primary liability.*

*Id*. (emphasis added).

Here, Mr. Barnaba's participation in the allegedly fraudulent rebate scheme is minimal as compared to Defendant Sito's, who was alleged to have been the "mastermind" of the advertising scheme. But even setting the degree of Mr. Barnaba's participation aside, his alleged backstage conduct is simply "too remote" from the contents of C&A's false public statements for him to be held liable under § 10(b). *See also Katz*, 2008 WL 762105, at *3 (under *Stoneridge*, dismissing § 10(b) claims against insider defendants who allegedly participated in fraudulent scheme because purchasers of the company's stock could not have relied on their conduct); *Burnett*, 2008 WL 63805, at *5 (dismissing § 10(b) claim against Halstead, the owner and controller of a company that Halstead used as part of a PIPES scheme to defraud investors, because Halstead's allegedly deceptive acts were not relied upon by investor plaintiffs to purchase securities).

4.    *A Section 10(b) Claim Against Mr. Barnaba Based on the Same Conduct Alleged Was Dismissed for Failure To State a Claim.*

The result in *Mainstay High Yield Corp. Bond Fund v. Heartland Industrial Partners, L.P.*, Case No. 07-10542 (E.D. Mich.), further confirms that dismissal is appropriate. In Mainstay, purchasers of the "2004 Senior Note Offering" – *i.e.,* proper plaintiffs, as opposed to the Trust – sued most of the same defendants for the same accounting improprieties and false

statements. Just as the Trust does here, the Mainstay plaintiffs alleged that Mr. Barnaba helped

obtain "false side letters" from C&A's suppliers (Mainstay Compl. ¶¶ 83, 84, 85, 89, 97, 98) and

that Mr. Barnaba "participated in a scheme" masterminded by C&A's highest ranking corporate

officers, including Mr. Stockman, to inflate C&A's earnings in violation of GAAP, by

recognizing rebates as a reduction of current costs, rather than accounting for the savings later

(Mainstay Compl. ¶ 83).

Mr. Barnaba moved to dismiss, arguing that he could not be held liable because he did

not sign or participate in any of C&A's public filings (*i.e.*, did not make a statement), and

because under *Stoneridge*, his conduct, even if part of an indirect chain to the allegedly false

statements, was too remote for liability. On March 18, 2008, the district court dismissed the

§ 10(b) claim as to Mr. Barnaba from the bench, noting that he "was not an officer. He didn't

sign anything. And while he may have participated in the side letters, he had no duty to

disclose." Transcript of Motion to Dismiss Complaint Hearing at 57-58, *Mainstay* (argued Mar.

18, 2008) (transcript excerpt attached to Appendix as Exhibit H). Just as in the present case, the

allegations in *Mainstay* that Mr. Barnaba participated in a behind-the-scenes scheme were

insufficient to state a claim under § 10(b).

If the § 10(b) claim does not lie for an investor who purchased securities based on the

Company's misrepresentations – a proper plaintiff – it certainly does not lie for the Company,

suing on its own misrepresentations.[3]

---

[3]    The Securities and Exchange Commission has also filed claims against Mr. Barnaba, including under
§ 10(b), which the United States District Court for the Southern District of New York declined to dismiss.
*SEC v. Collins & Aikman*, 524 F. Supp. 2d 477 (S.D.N.Y. 2007). The Southern District Court held that
because the SEC was not required to show reliance, the required standard of conduct for a private cause
of action (*i.e.,* that the defendant "make" a statement) did not apply to the SEC. *Id.* at 490, 495. While
Mr. Barnaba disagrees with Southern District's holding, it has no bearing on the claims asserted here
because the Trust is a private plaintiff and must allege reliance.

**B.    The Trust Cannot Allege Reliance On Its Own False Statements.**

The FAC alleges in the § 10(b) count that the Director and Officer Defendants "caused Collins & Aikman to issue materially false and misleading statements," FAC ¶ 183, and that "Collins & Aikman sold securities in reliance on Director and Officer Defendants' materially false and misleading statements . . . ." FAC ¶ 184.   C&A cannot have been misled by these statements, however, because the FAC further alleges that C&A's CEO, Mr. Stockman, and CFO, Mr. Cosgrove, "directed Collins & Aikman employees to falsely inflate the Company's reported income," FAC ¶ 62, and that the Director and Officer defendants should have known that the Company's statements were false or misleading.  FAC ¶ 189.

It is axiomatic that the knowledge of a company's officers and directors is imputed to the company through ordinary principles of agency.  *E.g., Satellite Fin. Planning Corp. v. First Nat. Bank of Wilmington*, 633 F. Supp. 386, 400 (D. Del. 1986) ("Knowledge and actions of a corporation's agent ordinarily are imputed to the corporation when the agent acts on the corporation's behalf.")   Thus, because the FAC alleges that the Company's highest ranking officers directed that its reported income be inflated, and that the Officers and Directors knew that the Company made false and misleading statements, C&A allegedly had knowledge as a matter of law.   Therefore, C&A (including its successor, the Trust) could not have been deceived and cannot claim to have relied on the allegedly false statements.

*Trenwick Am. Litig. Trust v. Ernst & Young, L.L.P.*, 906 A.2d 168 (Del. Ch. 2006), illustrates the point.   There, the Delaware Court of Chancery rejected a similar fraud claim asserted by the litigation trust of the bankrupt Trenwick America against the company's directors.  The Court of Chancery held the claim "ma[de] no sense" as to the directors because the company could not have relied on their purported misstatements.  *Id*. at 211.  The Court explained:

> By the Litigation Trust's own admission, Trenwick America's board of directors knew the true facts about all the issues said to have been misrepresented. As a result, Trenwick America – as an entity – did not rely to its detriment on any of the misstatements … To the extent the Litigation Trust is referring to Trenwick America, its statement makes no sense because the complaint alleges that those who controlled Trenwick America knew the statements were inaccurate.

*Id.* at 211-12. As in *Trenwick*, the Trust's § 10(b) claim is doomed as a matter of law because it alleges that the "those who controlled [C&A] knew the statements were inaccurate." Indeed, in the present case, the Trust alleges those who controlled C&A directed that the statements be inaccurate. *E.g.,* FAC ¶¶ 62, 64, 67. Under these circumstances, C&A knew that its statements were false and could not have relied upon them, which in itself provides an independent reason to dismiss. *Stoneridge*, 128 S.Ct. at 769 (holding reliance "is an essential element").

### C. The Trust Has Not Alleged a Loss.

The Trust's § 10(b) claim also fails because it has not alleged a loss. To plead a claim under § 10(b), a plaintiff must show that its loss flowed from the alleged misrepresentations or omissions and not from other sources, a requirement known as "loss causation." *Dura Pharm., Inc. v. Broodo*, 544 U.S. 344-45, (2005). In other words, the "plaintiff must show that the defendant misrepresented or omitted the very facts that were a substantial factor in causing the plaintiff's economic loss." *McCabe v. Ernst & Young LLP*, 479 F.3d 418, 426 (3d Cir. 2007).

The Trust alleges that C&A was damaged because it "sold securities in reliance on the Director and Officer Defendants' materially false and misleading statements" and C&A "used the proceeds [of the securities] to prop up and sustain a business that was hemorrhaging cash." FAC ¶ 184. The only securities sale described in the FAC is the "August Senior Note Offering [in 2004]." FAC ¶ 71. In essence, then, the Trust claims that C&A's own false statements allowed it to raise $415 million through the sale of notes that it otherwise would not have been

able to sell, thereby causing it to incur additional debt.  The Ninth Circuit rejected a similar theory of loss in *Rochelle v. Marine Midland Grace Trust Co. of New York*, where the trustee of a bankrupt company, Sunset, alleged it was injured when the defendants misrepresented the company's financial health in order to secure loans that the company was unable to pay.  535 F.2d 523 (9th Cir. 1976).  The Ninth Circuit held that because Sunset received the full value of the amount of the loans, it suffered no loss on the transactions in question.  *Id*. at 528-29.  *See also In re Parmalat Sec. Litig.*, 501 F. Supp. 2d 560, 574 (S.D.N.Y. 2007) (citing *Rochelle*).  The same conclusion applies here.

To escape this obvious problem, the Trust alleges a "deepening insolvency" theory – namely, that the sale of notes "increased the Company's debt load and prolonged the life of the already insolvent Company."  FAC ¶ 184.  "Deepening insolvency," however, cannot support a § 10(b) claim because the Third Circuit has rejected it as an independent theory of damages.  *In re Citx Corp., Inc.*, 448 F.3d 672, 677-78 (3d Cir. 2006).  In *Citx*, the court held that while "deepening insolvency" had been recognized as a valid cause of action under certain state laws (not Delaware)[4], it "should not be interpreted to create a novel theory of damages for an independent cause of action…"  *Id*. at 677.  Put another way, "deepening insolvency," the only loss alleged, is not a viable damages theory under Third Circuit law for an independent claim such as the one alleged under § 10(b).  Our research has not unearthed a single case where a deepening insolvency theory of damages was held sufficient to support a claim under the federal securities laws.

Moreover, even if "deepening insolvency" were a cognizable damages theory, which it is not, the Trust cannot establish that the sale of the Notes in 2004 increased C&A's debt load, an

---

[4] The Delaware Court of Chancery rejected the doctrine in *Trenwick Am. Litig. Trust v. Ernst & Young, L.L.P.*, 906 A.2d 168, 174 (Del. Ch. 2006).

allegation that would be essential to the theory. *See Citx*, 448 F.3d at 677 (defining deepening insolvency as "an injury to a debtor's corporate property from the fraudulent expansion of corporate debt and prolongation of corporate life") (citations omitted). C&A's 93 2004 10-Q indicates that $400.1 million of the proceeds from the August 2004 Senior Notes were used to redeem $400 million in Senior Notes due to be paid by C&A in 2006 (Exhibit C at 9).[5] These documents prove that C&A's debt load was not increased and therefore, would defeat any allegation of deepening insolvency.[6]

**D.    The Trust Fails To Plead Scienter as to Mr. Barnaba.**

Under the PSLRA, a plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind," 15 U.S.C. § 78u-4(b)(2), which for a § 10(b) claim is "'a mental state embracing [an] intent to deceive, manipulate or defraud.'" *In re IKON Office Solutions, Inc. Sec. Litig.*, 277 F.3d 658, 667 (3d Cir. 2002) (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976)). Moreover, "boilerplate and conclusory allegations will not suffice" to establish scienter. *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1418 (3d Cir. 1997). Under Third Circuit precedent, a plaintiff may establish a "strong inference" that the defendants acted with scienter by "either (a) alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness."

---

[5]    As discussed *supra* at n.1, this Court may consider public filings referred to in the Complaint on a motion to dismiss. *In re Rockefeller*, 184 F.3d at 293.

[6]    Not only has the Trust failed to allege that it suffered a loss, it has failed to allege a loss proximately caused by the alleged misstatements or omissions in the 2004 Note Offering. First, for the reasons stated in  Mr. Stepp's Brief in Support of Motion to Dismiss, C&A's insolvency was actually caused by the declining economic conditions in the automotive parts supply industry.  Second, whatever economic impact C&A suffered after the 2004 Notes Sale flowed from the business decision of C&A's Board and management, not the Notes Sale, as addressed in Mr. Stockman's Brief in Support of Motion to Dismiss.

*GSC Partners CDO Fund v. Washington*, 368 F.3d 228, 237 (3d Cir. 2004) (citing *Burlington*, 114 F.3d at 1418).

But as the Supreme Court recently held in *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, a court must consider whether "all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation meets that standard." 127 S. Ct. 2499, 2509 (2007); *see also Winer Family Trust v. Queen*, 503 F.3d 319, 327 (3d Cir. 2007) (quoting *Tellabs*). Further, "in determining whether the pleaded facts give rise to a 'strong' inference of scienter, the court must take into account plausible opposing inferences." *Id*. In other words, "the inference of scienter must be more than merely 'reasonable' or 'permissible' – it must be cogent and compelling, thus strong in light of other explanations. A complaint will survive, we hold, only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id*. at 2510. In the words of the Third Circuit, "'The Court's *Tellabs* decision removes any doubt the PSLRA's scienter pleading requirement is a significant bar to litigation….'" *Winer Family*, 503 F.3d at 326 (quoting *Globis Capital Partners, L.P. v. Stonepath Group, Inc.* 241 F. App'x. 832, 837 (3d Cir. 2007).

        1.     *The Trust Has Not Alleged That Mr. Barnaba Had Motive or Opportunity To Commit Fraud.*

"Blanket assertions of motive and opportunity' will not suffice, and 'catch-all allegations that defendants stood to benefit from wrongdoing and had the opportunity to implement a fraudulent scheme are no longer sufficient, because they do not state facts with particularity or give rise to a strong inference of scienter." *GSC Partners*, 368 F.3d at 237 (citation omitted). Moreover, "[m]otives that are generally possessed by most corporate directors and officers do not suffice; instead, plaintiffs must assert a concrete and personal benefit to the individual

defendants resulting from this fraud." *Id.* (citing *Kalnit v. Eichler*, 264 F.3d 131, 139 (2d Cir. 2001)).

Here, the Trust has wholly failed to plead either motive or opportunity as to Mr. Barnaba. For example, the FAC does not allege that any of the Officer and Director Defendants, including Mr. Barnaba, personally sold Company stock on the basis of material undisclosed information. *See Burlington*, 114 F.3d at 1424 (holding that plaintiffs may establish a strong inference of scienter if they allege insider trades "made at times and in quantities that were suspicious enough" to support such an inference). Nor does the Trust allege that any of the Officer and Director Defendants, including Mr. Barnaba, were compensated on the basis of the activities alleged in the FAC. In fact, the Trust does not use the word "motive" even once in its 246-paragraph First Amended Complaint.

As to opportunity, the bulk of the allegations concern purported improper accounting. *See, e.g.*, FAC ¶¶ 70-73. But the FAC contains no allegations that Mr. Barnaba was an accountant, had accounting responsibility, or communicated with C&A's auditors. Instead, the FAC suggests that Mr. Barnaba was involved in "improperly recognizing rebates" along with Messrs. Stockman, Stepp, and Cosgrove.[7] But the allegations that Mr. Barnaba "recognized" rebates are belied by Mr. Barnaba's positions at C&A – Director of Financial Analysis for the Purchasing Department, followed by a Vice President and the Director of Purchasing for that division for less than six months, FAC ¶ 58 – which do not indicate that he had any accounting responsibility. Nor does the FAC, other than through impermissible group-pled allegations, allege that Mr. Barnaba was involved in drafting the Company's statements or ever reviewed

---

[7]    FAC ¶ 58. *See also* ¶ 62 ("Stockman, Stepp, Cosgrove and Barnaba used the side letters to prematurely recognize the rebates in the Company's financial records and financial statements."); ¶ 62 ("Stockman, assisted by Cosgrove and Barnaba, directed and participated in the scheme to treat discounts on capital equipment as rebates.").

them prior to issuance.[8]  Given these failings and the strictures of the PSLRA, the Trust has not

pled a strong inference of scienter via motive or opportunity.

> 2. *The Trust Has Not Alleged Strong Circumstantial Evidence of Recklessness or Intentional Misconduct by Mr. Barnaba.*

Nor has the Trust established scienter by the alternative means of alleging strong

circumstantial evidence of recklessness or intentional conduct.  *See GSC Partners*, 368 F.3d at

237.  Further, because it has not pled motive and opportunity, the strength of its allegations

indicating conscious behavior would need to be correspondingly greater in order to establish

scienter.  *See id.* at 238 (citing *Kalnit*, 264 F.3d at 142).  As with motive and opportunity,

plaintiffs may not plead a strong inference of recklessness or intentional misconduct with

"conclusory assertions that the defendants acted 'knowingly.'"  *In re Advanta Corp. Sec. Litig.*,

180 F.3d 525, 539 (3rd Cir. 1999).  Instead, because the PSLRA requires plaintiffs to plead

scienter with particularity, they "must support their allegations with the essential factual

background that would accompany 'the first paragraph of any newspaper story' – that is, the

'who, what, when, where and how of the events at issue.'"  *GSC Partners*, 368 F.3d at 239

(quoting *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990)).

The Trust has failed to plead recklessness or intentional conduct with particularity here.

The Trust alleges that Mr. Barnaba participated in the purported "rebate scheme" by soliciting

side letters from suppliers and instructing other employees in the department to do the same.

(FAC ¶¶ 61, 66.)  But the FAC does not provide specific facts to suggest that Mr. Barnaba knew

the letters he obtained from suppliers were false and thus that he was reckless in obtaining them.

*See GSC Partners*, 368 F.3d at 239.  How did Mr. Barnaba know the letters were false?  What on

---

[8]    Even if Mr. Barnaba did have some involvement in the allegedly improper accounting for C&A's rebates, which he did not, mere violations of GAAP are insufficient to plead scienter.  *E.g., In re Astea Int'l Inc. Secs. Litig.*, Civ. Act. No. 06-1467, 2007 WL 2306586, at *18 (E.D. Pa. Aug. 9, 2007) (citing *Novak v. Kasaks*, 216 F.3d 300, 309 (2d Cir. 2000).

the face of the letters indicated their falsity?  Who told Mr. Barnaba that the rebates had not, in

fact, been earned?  These questions are not answered by the FAC.

> ### 3. Other Inferences of Non-Fraudulent Intent from the Facts Alleged Preclude Finding a Strong Inference of Scienter as to Mr. Barnaba.

The wrongdoing at C&A was allegedly masterminded by Mr. Stockman and other top

executives, not by Mr. Barnaba.  According to the FAC, Mr. Barnaba was acting on the

instructions of these corporate executives and the Company's accounting professionals.  *E.g.*,

FAC ¶ 67 ("Stockman, assisted by Cosgrove and Barnaba, directed and participated in the

scheme to treat discounts on capital equipment as rebates.")  As an employee in the Purchasing

Department, with no alleged accounting responsibility, it is fair to infer that Mr. Barnaba

believed that the letters from suppliers, all of whom were third parties, were appropriate, that the

Company's business model was lawful, that a man of Mr. Stockman's background and stature

was pursuing legitimate means, and that the accounting professionals knew what they were

doing.[9]

Given the absence of allegations in the FAC as to Mr. Barnaba's mental state and the

competing non-fraudulent inferences that exist as to him, the facts alleged do not collectively

plead a strong inference of scienter.  *Tellabs*, 127 S. Ct. at 2509.  Therefore, the Trust's § 10(b)

claim against Mr. Barnaba must be dismissed for the additional reason that the Trust has not

adequately pled scienter.

---

[9]   The numerous allegations as to "Defendants" or the "Director and Officer Defendants" are no substitute for alleging specific facts establishing Mr. Barnaba's scienter and are legally insufficient under the PSLRA.  *See* 15 U.S.C. § 78u-4(b)(2) (requiring plaintiff to "state with particularity facts giving rise to a strong inference that *the defendant* acted with the required state of mind") (emphasis added).

## II.    THE TRUST HAS FAILED TO STATE A CLAIM AGAINST MR. BARNABA UNDER EXCHANGE ACT SECTION 14(a) AND RULE 14a-9.

The Trust further asserts a claim that "the Director and Officer Defendants" violated Rule 14a-9, 17 C.F.R. § 240.14a-9, promulgated under § 14(a) of the Exchange Act, 15 U.S.C. § 78n(a).  FAC ¶¶ 186-191.  Rule 14a-9 prohibits solicitation of proxies by means of false or misleading proxy statements.  *In re Reliance Sec. Litig.*, 135 F. Supp. 2d 480, 511 (D. Del. 2001) (citing the Rule).  To prevail on a § 14(a) claim, a plaintiff must show that (1) the defendant made a material misrepresentation or omission in a proxy statement (2) with the requisite state of mind (3) that caused the plaintiff's injury and (4) the proxy solicitation was "an essential link in the accomplishment of the transaction."  *Id*.  Like § 10(b) claims, claims under § 14(a) are subject to the heightened pleading requirements of the PSLRA.  *Bond Opportunity Fund v. Unilab Corp.*, No. 99 Civ. 11074(JSM), 2003 WL 21058251, at *3 (S.D.N.Y. May 9, 2003).

### A.    The Trust Does Not Allege That Mr. Barnaba Made a Material Misrepresentation or Omission in a Proxy Statement.

Under this court's decision in *Reliance*, a plaintiff must plead that "*the defendant* made a material misrepresentation or omission in a proxy statement."  135 F. Supp. 2d at 511 (emphasis added).  As a result, only defendants to whom misstatements or omissions are attributable can be liable under § 14(a).  *Id.* at 512.  Misstatements or omissions, however, cannot be attributed to every employee in a corporation.  *See Robbins v. Banner Indus., Inc.*, 285 F. Supp. 758, 762 (S.D.N.Y. 1966) (holding complaint did not state a claim against individual under § 14(a) because plaintiff's attorney conceded that the individual was not the author of the offending proxies).  Rather, "[p]laintiffs can attribute the misstatements or omissions of the [p]roxy [s]tatement to the defendants *that approved the document*, if they can show that the defendants knew or should have known that the [p]roxy [s]tatement contained material misrepresentations at the time of approval."  *Reliance*, 135 F. Supp. 2d at 512 (emphasis added).  *See, also Gould v.*

24

*American-Hawaiian S.S. Co.*, 535 F.2d 761, 776 (3d Cir. 1976) (holding a corporation's director liable for misrepresentations in proxy statement because he "saw and approved a draft of the proxy statement subsequently issued.").

The Trust does not allege that Mr. Barnaba drafted the proxy statements. Nor does it allege "review" or "approval" by any particular Defendant, much less by Mr. Barnaba, who it alleges was a mid-level manager in C&A's Purchasing Department. As alleged, Mr. Barnaba did not even become a divisional vice president until the end of 2004 and there is nothing in the FAC indicating, or supporting the facially illogical conclusion, that a mid-level employee in the Purchasing Department had, or would have had, involvement with the Company's proxy statements.[10]

In addition to the fact that Mr. Barnaba is not alleged to have played any role in the proxy materials, which in itself is fatal to the § 14(a) claim, the Trust has also failed to allege the misrepresentations in the proxies with the particularity required by the PSLRA, which governs all claims under the Exchange Act, including § 14(a). Under the PSLRA, a complaint must specify "each statement that is alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made upon information and belief, all facts with particularity on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). *See also Bond Opportunity Fund*, 2003 WL 21058251, at *3 (applying particularity requirement to § 14(a) claim). The FAC, however, provides no such specificity and

---

[10]    Moreover, to the extent the Trust attempts to rely on group pleading to resurrect its § 14(a) claim, as discussed above, group pleading is no longer viable after the enactment of the PSLRA. *In re Digital Island Sec. Litig.*, 223 F. Supp. 2d 546, 553 (D. Del. 2002); *Bond Opportunity Fund*, 2003 WL 21058251, at *4 (disregarding group pled allegations supporting § 14(a) claim because doctrine eliminated by the PSLRA). To allow the 14(a) claim to survive as pled would be tantamount to holding that every corporate employee, no matter his rank or responsibility, is potentially liable for misstatements or omissions in the corporation's proxy statements.

instead pleads only one substantive paragraph regarding the allegedly misstated proxy statements:

> During 2002, 2003 and 2004 … Collins & Aikrnan … file[d] and disseminate[d] to its shareholders materially false and misleading Proxy Statements which failed to disclose that the Company was reporting financial results which were artificially inflated by the improper accounting practices detailed herein. In each of the Proxy Statements, Collins & Aikman sought shareholder approval for, among other things, the election of directors, employee stock option plans and compensation policies.

FAC ¶ 94.

The Trust does not identify what was disclosed or omitted in the proxy statements. Nor does the Trust even cite a single specific proxy statement that was materially false. The Trust's blanket allegation that some unknown number of Company statements issued over a period of several years were misstated does not meet the applicable pleading standards.

### B.    The Trust Cannot Sue for False Statements in C&A's Own Proxy Materials.

Moreover, the § 14(a) claim suffers from the same fatal flaw as the § 10(b) claim – namely, that C&A is complaining of false statements in *its own proxy materials*. Thus, apart from the fact that the FAC does not allege any involvement by Mr. Barnaba with C&A's proxy statements, the Company cannot have been deceived by its own misleading statements. The FAC alleges that the Director and Officer Defendants should have known that the proxy materials were false. FAC ¶ 189. Because the knowledge of a company's officers and directors is imputed to the company through ordinary principles of agency, *e.g., Satellite Fin. Planning Corp. v. First Nat. Bank of Wilmington*, 633 F. Supp. 386, 400 (D. Del. 1986), the Company knew as a matter of law that the statements were false and cannot have been misled by them.

In addition, § 14(a) was intended to protect shareholders, not the company issuing the proxy, from misleading proxy statements. *Diceon Elecs. Inc. v. Calvary Partners, L.P.*, 772

F. Supp. 859, 869 (D. Del. 1992) ("Section 14(a) was not enacted for the 'especial benefit' of management, but rather, was intended to curb their abuse of the proxy solicitation process."). For this reason, standing to raise claims for damages under § 14(a) is generally limited to shareholders. *See id*. at 866 ("Shareholders have an implied right of action under § 14(a) of the 1934 Act whether they sue in their individual capacities or derivatively."); *see also Ash v. GAF Corp.*, 723 F.2d 1090, 1092 (3d Cir. 1983) (holding that the language of Rule 14a-9 "dictates that as a prerequisite to recovery, a complainant initially must prove that his proxy was solicited in contravention of an SEC rule or regulation).[11]   Even assuming, for the sake of argument, that the proxy materials were false or misleading and that the other elements of a § 14(a) claim were met, the Trust, which is not a C&A shareholder, is not the right plaintiff to bring such a claim.

### C.    The FAC Also Does Not Allege an "Essential Link" Between the Proxy Statements and the Alleged Damage.

Damages are recoverable under § 14(a) only when the proxy solicitation itself, rather than the particular defect in the solicitation, was an "essential link in the accomplishment of the transaction [which caused the alleged injury]." *Mills v. Elec. Auto-Lite Co.,* 396 U.S. 375, 385 (1970).   Here, the FAC alleges only that "the proxy statements were an essential link in the accomplishment of the continuation of Defendants' fraudulent scheme, as revelations of the truth would have immediately thwarted a continuation of shareholders' endorsement of the directors' positions, the executive officers' compensation and the Company's compensation policies." FAC ¶ 190.   In other words, the only transactions about which the Trust complains are the shareholder votes that allowed the Directors and Officers to win reelection and continue

---

[11]    Some courts have found a narrow exception to the general rule which allows corporations targeted by hostile proxy solicitations to sue under § 14(a) for limited remedies, *e.g., Studebaker Corp. v. Gittlin*, 360 F.2d 692, 695 (2d Cir. 1966), but the Trust's claims, which do not arise out of a corporate takeover, do not fit within that exception.

managing C&A, which indirectly led to continuation of the alleged schemes to misrepresent the company's finances.

The Third Circuit, in *Gen. Elec. Co. v. Cathcart*, 980 F. 2d 927 (3d Cir. 1992), squarely rejected a § 14(a) claim premised on these facts.  There, a shareholder brought a derivative action against corporate directors to recover damages allegedly caused by corporate misconduct, including fraudulent billing practices, mismanagement, and improper supervision of subsidiaries. *Id*. at 929-30.  The Third Circuit affirmed the district court's dismissal of the § 14(a) claim, holding that "the mere fact that omissions in proxy materials, by permitting directors to win re-election, indirectly lead to financial loss through mismanagement will not create a sufficient nexus with the alleged monetary loss." *Id*. at 933.  To the contrary, "[that] is precisely the sort of claim that courts have repeatedly found insufficient to satisfy the transaction causation requirement." *Id*.  Under *Cathcart*, the § 14(a) claim must be dismissed because it does not meet the "essential link" test.[12]

>  **D.    The Trust Has Not Adequately Pled That Mr. Barnaba Acted with Negligence with Respect to the Proxy Statements.**

Finally, under the PSLRA, a plaintiff must plead with particularity facts that give rise to a "strong inference of negligence" as to each defendant.  *Bond Opportunity Fund*, 2003 WL 21058251, at *4.  *See also Reliance*, 135 F. Supp. 2d at 511 (unlike § 10(b) claims, negligence required under § 14(a)).  The FAC utterly fails to plead that Mr. Barnaba was negligent as to C&A's proxy statements because it does not allege that Mr. Barnaba had any involvement with

---

[12]    As discussed in Mr. Stockman's Brief in Support of Motion to Dismiss, the § 14(a) claim fails for the additional reason that the proxy solicitations were not essential to obtaining shareholder approval for any matter because defendants controlled a majority of shareholder votes and thus the votes of the public shareholders were immaterial.  *Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 474 n.14 (1977); *Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1099-1106 (1991).

them.  Mr. Barnaba obviously cannot have been negligent as to something in which he did not participate.

The Trust's group allegation that "Heartland and the Director and Officer Defendants should have known that the Proxy Statements were materially false or misleading," FAC ¶ 189, fails because it is not specific as to any defendant.  Moreover, pleading only that insiders "must have known" the true facts of the proxy statement will not suffice.  *Bond Opportunity Fund*, 2003 WL 21058251, at *4 (citing *Reliance*, 135 F. Supp. 2d at 506).  The Trust offers nothing else as to Mr. Barnaba.

## III. THE COURT SHOULD DECLINE TO EXERCISE JURISDICTION OVER THE STATE LAW CLAIMS AGAINST MR. BARNABA.

Because the Trust's federal claims against the Officer and Director Defendants must be dismissed, the court should decline to exercise jurisdiction over its state law claims.  *See* 28 U.S.C. § 1367(c); *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 444 (3d Cir. 1997) (district court properly declined supplemental jurisdiction over remaining state law claims where "all federal claims were correctly dismissed and dismissal of the remaining contract claims would not be unfair to the litigants or result in waste of judicial resources.").  There would be no waste of judicial resources if this Court were to dismiss the state law claims at this early stage of the litigation.  Nor would there be any prejudice to the Trust.

Further, as demonstrated above, the Trust's claims are not cognizable under the federal securities laws.  If anything, they raise issues of state corporate governance law.  *See Stoneridge*, 128 S. Ct. at 771 ("The Court's precedents counsel against petitioner's attempt to extend the § 10(b) private cause of action beyond the securities markets into the realm of ordinary business operations, which are governed, for the most part, by state law."); *Santa Fe*, 430 U.S. at 479-480, 497 (1977) ("There may well be a need for uniform federal fiduciary standards. . . . But those

29

standards should not be supplied by judicial extension of § 10(b) and Rule 10b-5 to cover the corporate universe.") (quotation omitted).  Exercising supplemental jurisdiction over the state law claims against Mr. Barnaba, and allowing the Trust's state law claims to remain in federal court after the securities claims are dismissed, would encourage plaintiffs to forum-shop by repackaging potential state law claims as claims under the federal securities laws.  The Trust should not be rewarded with a federal forum for its state law claims in these circumstances. *Ciro, Inc. v. Gold*, 816 F. Supp. 253, 271 (D. Del. 1993) (dismissing federal securities law claims based on corporate mismanagement because not cognizable under Section 10(b) and declining to exercise supplemental jurisdiction over remaining Delaware breach of fiduciary duty and corporate governance claims because they were more properly "the province of the Delaware Chancery Court.").  But if the Court does exercise supplemental jurisdiction, the state law claims should be dismissed on the merits.

## IV.    THE TRUST FAILS TO STATE A CLAIM FOR COMMON LAW FRAUD AGAINST MR. BARNABA.

In order to state a claim for common law fraud under Delaware law, a plaintiff must allege facts establishing that "(1) the defendants falsely represented or omitted facts that the defendant had a duty to disclose; (2) the defendants knew or believed that the representation was false or made the representation with a reckless indifference to the truth; (3) the defendants intended to induce the plaintiff to act or refrain from acting; (4) the plaintiff acted in justifiable reliance on the representation; and (5) the plaintiff was injured by its reliance."  *Trenwick America Litig. Trust v. Ernst & Young, L.L.P.*, 906 A.2d 168, 207 (Del. Ch. 2006) (citing *DCV Holdings, Inc. v. ConAgra, Inc.*, 889 A.2d 954, 958 (Del. 2005); *Stephenson v. Capano Dev., Inc.*, 462 A.2d 1069, 1074 (Del. 1983)).  The Trust has failed to plead several elements.

### A. The Trust Fails To Allege that Mr. Barnaba Made a Material Misstatement or Omission.

The Trust alleges for its fraud claim that the "Director and Officer Defendants made misrepresentations of material facts to Collins & Aikman's Board of Directors and Audit Committee relating to the true financial condition of the company."  FAC ¶ 200.  Nonetheless, the Trust does not identify a single affirmative misrepresentation made by Mr. Barnaba, much less a statement he made to the Board of Directors or the Audit Committee relating to the Company's financial condition.  As noted in the discussion of the § 10(b) claim, *supra*, Section I.A, the Trust's only allegations as to Mr. Barnaba are that he participated in the alleged "rebate scheme," FAC ¶¶ 58-69.  Because a common law fraud claim lies only for misrepresentations or omissions, *DCV Holdings, Inc.*, 889 A.2d at 958, the fraud claim against Mr. Barnaba must be dismissed.

### B. The Trust Cannot Allege Reliance on a Misstatement or Omission by Mr. Barnaba.

"A [second] essential element of a claim for fraud is that the alleged victim be ignorant of the true facts that are misrepresented."  *DeBakey Corp. v. Raytheon Serv. Corp.*, No. 14947, 2000 WL 1273317, at *25 (Del. Ch. Aug. 25, 2000).  By alleging that the "Director and Officer Defendants" misrepresented the financial condition to the board and audit committee, FAC ¶ 200, the Trust is literally alleging that the directors misrepresented the Company's financial condition to themselves.  Apart from the fact that Mr. Barnaba did not make any of these misrepresentations, it is logically inconceivable that the defendants could have deceived themselves.

Moreover, C&A unquestionably had knowledge of its true financial condition.  Here, the Trust has alleged that its senior management directed and controlled the various schemes and knew or should have known the financials were false.  *E.g.*, FAC ¶¶ 25, 61, 62, 67, 64, 84.

31

Under Delaware law, "the knowledge of an agent acquired while acting within the scope of his or her authority is imputed to the principal." *Albert v. Alex. Brown Mgmt. Services, Inc.*, No. Civ.A. 762-N, Civ.A. 763-N, 2005 WL 2130607 at *, 11 (Del. Ch. Aug. 26, 2005) (citing *J.I. Kislak Mortg. Corp. of Del. v. William Matthews Builder., Inc.*, 287 A.2d 686, 689 (Del. Super. 1972), *aff'd*, 303 A.2d 648 (Del. 1972)). *See also In re Color Tile Inc.*, 475 F.3d 508, 513 (3d Cir. 2007) (citing cases). Therefore, the knowledge of C&A's directors and top executives, who allegedly controlled the schemes to misrepresent the company's financial condition, must be imputed to the Company. C&A, like its board, could not have been deceived by what it already knew.

Thus, in *Trenwick*, 906 A.2d at 1-12, where a litigation trust made a similar claim to the one asserted here, the court ruled that the plaintiff's allegation of reliance "ma[de] no sense" given that "the entity would not have been relying to its detriment on the fraudulent statement because its controllers were aware of the actual state of affairs." *See* discussion *supra*, Section I.B. *See also Merrill v. Crothall-Am., Inc.*, 606 A.2d 96, 100 (Del. 1992) (no fraud claim exists where plaintiff is aware of "true facts which are [allegedly] misrepresented"); *DeBakey Corp.*, 2000 WL 1273317, at *25. For the same reason, the Trust's fraud claim fails.

### C.   The Trust Cannot Establish Damages.

The Trust alleges that, because of the alleged misconduct of the Director and Officer Defendants, C&A was damaged "in that it was denied the opportunity to continue as a going concern and its value as a business enterprise significantly decreased" and "incurred unnecessary operating expenses and suffered unwieldy debt, resulting in its filing for bankruptcy protection in May of 2005." FAC ¶ 204. As discussed *supra*, Section I.C, the allegation that C&A incurred additional debt fails because C&A's public filing shows that the proceeds of the August Senior

Note Offering were used to retire existing debt.  Moreover, the alleged damage is "deepening insolvency," and that theory has been squarely rejected in Delaware.  *Trenwick*, 906 A.2d at 174.

### D.    The Fraud Claim Is Barred by the Doctrine of *In Pari Delicto*.

"The doctrine of *in pari delicto* provides that a plaintiff may not assert a claim against a defendant if the plaintiff bears fault for the claim."  *Official Comm. of Unsecured Creditors v. R.F. Lafferty & Co., Inc.,* 267 F.3d 340, 354 (3d Cir. 2001).  Fraud committed by the agent of a corporation is imputed to the corporation if committed (1) in the course of employment, and (2) for the benefit of the corporation.  *Id*. at 358. If committed in the course of employment, an agent's fraud is considered to be for the corporation's benefit unless the agent acts on "adverse interests," relative to those of the corporation.  *Id*. at 359.

Mr. Barnaba's alleged "fraud" consisted of his assistance in obtaining rebates from suppliers in the course of his Purchasing Department duties, all of which allegedly was done at the direction of his superiors, including the CEO of the company.  *See* FAC ¶¶ 11, 60-63, 66, 67, 126.  Whether lawful or not, he was conducting C&A's business and plainly acting in the course of his employment as an employee in the Purchasing Department.  FAC ¶ 11.  According to the FAC, the purpose of the rebate scheme was to "inflate" C&A's earnings, so C&A could borrow more money, on more favorable terms, in issuing securities such as the "August Senior Note Offering."  *See, e.g.*, FAC ¶ 71. The FAC, therefore, alleges that Mr. Barnaba's actions were performed for the benefit of C&A, and not in furtherance of any "adverse interest" of his own. Accordingly, any fraud on the part of Mr. Barnaba and the other individual defendants must be imputed to C&A, and the doctrine of *in pari delicto* therefore bars the Trust's claim against Mr. Barnaba.

# V.    THE FIRST AMENDED COMPLAINT FAILS TO STATE A CLAIM THAT MR. BARNABA VIOLATED FIDUCIARY DUTIES.

## A.    Mr. Barnaba Did Not Owe Fiduciary Duties as a Director or Officer of Collins & Aikman.

The Trust's fiduciary duty claim against Mr. Barnaba, as one of the Officer and Director Defendants, fails because Mr. Barnaba was not a director or officer of the Company and did not owe fiduciary duties to its creditors or shareholders.  Put simply, he is improperly lumped together with the Company's directors and top executives.

As described above, Mr. Barnaba was an employee in C&A's Purchasing Department. *See* FAC ¶ 11.  He is not listed as an officer of the Company in C&A's public filings referred to in the FAC.  And, the district court, un *Mainstay*, in dismissing the complaint against Mr. Barnaba in *Mainstay*, noted that he was not an officer.  (Hearing Transcript, Exhibit H, at 57-58).  As a result, unlike the Company's directors or senior management, Mr. Barnaba did not have the "ability to control the business affairs of Collins & Aikman." FAC ¶ 23.  Rather, as a C&A employee, Mr. Barnaba acted as an agent of the Company.  *See* RESTATEMENT (THIRD) OF AGENCY § 1.01 (2006).  It is well-established that "an agent's fiduciary duty is not without limits.  To the contrary, an agent's fiduciary duty is limited by the scope of the agency…." *Lazard Debt Recovery GP, LLC v. Weinstock*, 864 A.2d 955, 966 (Del. Ch. 2004).  In *Lazard*, the court dismissed breach of fiduciary duty claims against two investment professionals because their alleged misconduct did not relate to investment decisions, the only area in which they owed fiduciary duties to investors.  *Id.*  Similarly, Mr. Barnaba cannot be held responsible for any corporate obligations that were beyond the scope of his authority at the Company.

The Trust does not even attempt to plead what Mr. Barnaba's responsibilities were, let alone how he may have violated them.  By pleading his position, however, it acknowledges that Mr. Barnaba was only a mid-level manager.  It also does not allege that he had any role in the

Company's accounting practices or in the preparation of its financial statements. The FAC nonetheless alleges that Mr. Barnaba had a fiduciary duty to, among other things, "[e]xercise reasonable control and supervision over public statements to the securities markets" and "[m]aintain and implement an adequate, functioning system of internal legal, financial and accounting controls." FAC ¶ 24e. It is clear from the Trust's own description of Mr. Barnaba that he had no authority to do any of these things, and the fiduciary duty claims against him should therefore be dismissed.

### B.    Even If Mr. Barnaba Could Be Considered an Officer of the Company Following His 2004 Promotion at the End of 2004, He Did Not Violate Any Fiduciary Duties.

Even assuming, *arguendo*, that Mr. Barnaba's position as Vice President and Director of Purchasing for the Plastics Division made him an "officer" of the Company from December 2004 until April 2005, a conclusion contradicted by the Company's public filings and the district court's finding in *Mainstay*, the Trust does not state a claim that he breached his fiduciary duties of "loyalty, good faith and care." FAC ¶¶ 193-194.

### 1.    *The First Amended Complaint Fails To Allege Breaches of the Duty of Loyalty or Due Care Against Mr. Barnaba.*

The duty of loyalty "mandates that the best interest of the corporation and its shareholders takes precedence over any interest possessed by a director, officer or controlling shareholder and not shared by the stockholders generally." *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 361 (Del. 1993). *See also Reliance*, 135 F. Supp. 2d at 520 n.7 (breach of duty of loyalty involves "some form of self-dealing or misuse of corporate office for personal gain"). "Classic examples" of breaches of the duty of loyalty involve a corporate director or officer "appearing on both sides of a transaction or … receiving a personal benefit from a transaction not received by the shareholders generally." *Cede*, 634 A.2d at 362.

The duty of due care is the duty of corporate directors and officers to "act on an informed basis." *Id*. at 367. A court considering a due care claim is confined to examining the process of the corporate official's decision-making, rather than the merits of the decision. *Citron v. Fairchild Camera & Instrument Corp.*, 569 A.2d 53, 66 (Del. 1989); *see also Brehm v. Eisner*, 746 A.2d 244, 264 (Del. 2000) ("Due care in the decisionmaking context is process due care only."). The claim may only survive if the plaintiff pleads facts to overcome the presumption that the officers' and directors' decisions are subject to the protections of the business judgment rule. *Citron*, 569 A.2d at 64.

The Trust does not allege that Mr. Barnaba engaged in any interested transaction or any form of self-dealing. Nor does the FAC challenge the process behind any corporate decision. Instead, it asserts that the Director and Officer Defendants had a duty "to promptly disseminate accurate and truthful information with respect to the Company's operations and financial condition" and to "disclose material adverse information regarding Collins & Aikman." FAC ¶¶ 25. While corporate disclosures may implicate the fiduciary duties of care and loyalty, *see Reliance*, 135 F. Supp.2d at 520, the Trust's allegations fail to state such a claim against Mr. Barnaba.

A board of directors of a Delaware corporation has a duty to disclose "all material information within the board's control *when it seeks shareholder action*." *Malone v. Brincat*, 722 A.2d 5, 9 (Del. 1998) (emphasis in original; internal quotation and citation omitted). The FAC does not allege that Mr. Barnaba participated in the dissemination of the Company's proxy statements or other materials seeking shareholder action. Apart from the fact that he was never a director, none of the alleged misstatements in the five-month period in which he was a divisional vice president occurred under circumstances in which shareholder action was requested. *See*

FAC ¶¶ 80-90.  Mr. Barnaba thus had no obligation to "disclose material adverse information" concerning the Company, even if he were a corporate officer for that brief period of time, which he was not.

When no shareholder action is sought, the fiduciary duty to disclose is much more limited, and prohibits "deliberately misinforming shareholders about the business of the corporation." *Malone*, 722 A.2d at 14.  A plaintiff asserting such a claim must plead that the director or officer actually intended to mislead the shareholders, a "level of proof … even more stringent than … the level of scienter required for common law fraud." *Metro Commc'n Corp. BVI v. Advanced Mobilecomm Techs. Inc.*, 854 A.2d 121, 158 (Del. Ch. 2004).  *See also Steinman v. Levine*, No. Civ.A.19107, 2002 WL 31761252, at *13 (Del. Ch. Nov. 27, 2002) (dismissing breach of fiduciary duty claim where alleged misrepresentations were "not false communications from directors *who were deliberately misinforming shareholders*").  No allegation in the FAC even remotely meets this standard.

> 2.    *The Trust Does Not State a Claim for a Violation of the Duty of Good Faith Against Mr. Barnaba.*

The duty of good faith is a sub-part of the duty of loyalty.  *See, e.g., Guttman v. Huang*, 823 A.2d 492, 506 n.34 (Del. Ch. 2003).  To the extent the Trust pleads any facts related to the Director and Officer Defendants' duty of good faith, its appears to be alleging an  "oversight" claim as recognized in *In re Caremark Int'l Inc. Derivative Litig.*, 698 A.2d 959, 971-72 (Del. Ch. 1996).  *See* FAC ¶ 24 & subparas. (a)-(g) (alleging that the Director and Officer Defendants had a duty to "exercise reasonable and prudent supervision over the management, policies, practices and controls" of Collins & Aikman).

In *Caremark*, Chancellor Allen held that a breach of the duty of good faith lies if "director defendants were guilty of a sustained failure to exercise their oversight function."  698

A.2d at 971.  Because it requires particularized facts showing gross negligence, "a claim for failure to exercise proper oversight is one of, if not the, most difficult theories upon which to prevail."  *Rattner v. Bidzos*, No. Civ. A. 19700, 2003 WL 22284323, at *12 (Del. Ch. Oct. 7, 2003).  In *Guttman*, 823 A.2d at 507, the court dismissed a Caremark oversight claim because the

> conclusory complaint [was] empty of the kind of fact pleading that is critical to a *Caremark* claim, such as contentions that the company lacked an audit committee, that the company had an audit committee that met only sporadically and devoted patently inadequate time to its work, or that the audit committee had clear notice of serious accounting irregularities and simply chose to ignore them or, even worse, to encourage their continuation.

The same is true of the FAC.  It is impossible to determine from the allegations of the FAC "what role, if any, the Board or its members played in the internal processes of collecting and disseminating financial information."  *Rattner*, 2003 WL 22284323, at *13.  Rather, the Trust makes clear that C&A did have an audit committee, and that the audit committee instituted "corrective actions" when informed by its outside auditors of internal control issues.  *See* FAC ¶ 164.

The Trust's putative oversight claim is even more deficient with respect to Mr. Barnaba. Not having been a director or a member of the audit committee, it strains credulity to imagine how Mr. Barnaba, in his positions within the Purchasing Department, had any oversight over the finances of the Company as a whole.  Similarly, the Trust's allegations that "the Director and Officer Defendants acted in bad faith as they knowingly permitted Defendant Stockman to have unfettered control over the Company's finances, accounting practices, acquisition strategy, and other business decisions," and "acted with gross regard for their fiduciary responsibilities" by "failing to require that Defendant Stockman be subject to checks and balances and appropriate

oversight," FAC ¶ 26, are absurd as to Mr. Barnaba who was a mid-level employee in Purchasing.[13]

Because the Trust does not state a claim that Mr. Barnaba breached any fiduciary duties to the Company or its shareholders, the fiduciary duty claims against him must be dismissed.

## VI.    THE UNJUST ENRICHMENT CLAIM MUST BE DISMISSED BECAUSE THE TRUST DOES NOT ALLEGE THAT MR. BARNABA RECEIVED A BENEFIT OR THAT C&A SUSTAINED A RELATED LOSS.

To state a claim for unjust enrichment, a plaintiff must allege: "(1) an enrichment; (2) an impoverishment; (3) a relation between the enrichment and the impoverishment; (4) the absence of justification; and (5) the absence of a remedy provided by law." *Morschbach v. Household Int'l, Inc.*, No. Civ.A.01-262 GMS, 2002 WL 187514, at *5 (D. Del. Feb. 6, 2002) (citing *Jackson Nat'l Life Ins. Co. v. Kennedy*, 741 A.2d 377, 393-94 (Del. Ch. 1999)).

Other than the vague allegation that the Director and Officer Defendants acted "in order to continue in their positions and personally profit therefrom," FAC ¶ 197, the Trust does not even attempt to allege how Mr. Barnaba was "enriched." There is no allegation that his continued employment at C&A was conditioned on his participation in the "scheme." Furthermore, there is no allegation that Mr. Barnaba received a bonus or increase in his base salary connected to his alleged participation in the "rebate scheme," nor that any portion of his compensation was derived from such participation. It is impossible to ascertain from the FAC what "benefit" the Trust seeks to recoup from Mr. Barnaba, much less why his retention of this benefit would be "unjust."

---

[13]    The FAC alleges at ¶ 97 that, with respect to the alleged "round-trip" transactions, "Stockman, Stepp, McCallum and others were not forthcoming with the Audit Committee . . . in breach of their fiduciary duties." Nowhere in the FAC does the Trust suggest that Mr. Barnaba was involved in the McCallum transactions; "and others" therefore cannot be read to include him.

Nor can the Trust establish an "impoverishment" related to the alleged enrichment.  As discussed above in Section II.C, the Trust alleges that Mr. Barnaba participated in a "scheme" to inflate earnings, thus permitting C&A to raise money through the sale of notes it would not otherwise have been able to sell, or would have sold at a less favorable price.  Such an outcome is not a loss – *i.e.*, is not an "impoverishment" – because C&A received an inflow of capital in exchange for the notes.  *Rochelle v. Marine Midland Grace Trust Co. of New York*, 535 F.2d 523 (9th Cir. 1976); *In re Parmalat Sec. Litig.*, 501 F. Supp. 2d 560, 574 (S.D.N.Y. 2007).  Nor is the supposed deepening of C&A's insolvency, an "impoverishment" because it is not a legitimate theory of loss under Delaware law.  *Trenwick*, 906 A.2d at 174 ("Put simply, under Delaware law, 'deepening insolvency' is no more of a cause of action when a firm is insolvent than a cause of action for 'shallowing profitability' would be when a firm is solvent.")

The unjust enrichment claim should be dismissed.  *See Albert v. Alex. Brown Mgmt. Serv., Inc.*, Nos. 762-N, 763-N, 2005 WL 2130607, at *8 (Del. Ch. Aug. 26, 2005) (dismissing "bald claim that the [defendants] were unjustly enriched at the [plaintiffs'] expense").

## CONCLUSION

For the reasons stated above, all claims against Mr. Barnaba should be dismissed.


Dated: April 28, 2008                    Respectfully submitted,
       Wilmington, Delaware


                                         By:  /s/ Thomas G. Macauley
                                         Thomas G. Macauley (ID No. 3411)
                                         ZUCKERMAN SPAEDER LLP
                                         919 Market Street, Suite 990
                                         Wilmington, DE 19801
                                         (302) 427-0400 Telephone
                                         (302) 427-8242 Fax

                                         -and-

Carl S. Kravitz, Esq. (admitted *pro hac vice)*
Lenora Miles Rigby, Esq. (admitted *pro hac vice)*
ZUCKERMAN SPAEDER LLP
1800 M Street, N.W., Suite 1000
Washington, D.C. 20036
(202) 778-1800 Telephone
(202) 822-8106 Fax

-and-

Laura Neish, Esq. (admitted *pro hac vice*)
ZUCKERMAN SPAEDER LLP
1540 Broadway, Suite 1604
New York, NY 10036
(212) 704-9600 Telephone
(212) 704-4256 Fax

*Attorneys for Defendant Paul Barnaba*

41

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 28, 2008, I caused to be electronically filed the "Opening Brief in Support of Defendant Paul C. Barnaba's Motion to Dismiss Plaintiffs' First Amended Complaint" with the Clerk of Court using CM/ECF, which will send notification of such filing to the following:

Joseph A. Rosenthal
Carmella P. Keener
Rosenthal, Monhait & Goddess, P.A.
Mellon Bank Center
919 N. Market Street, Suite 1401
P.O. Box 1070
Wilmington, DE 19899-1070
(302) 656-4433
Email: jrosenthal@rmgglaw.com
Email: CKeener@rmgglaw.com

David A. Rosenfeld
Samuel H. Rudman
Coughlin Stoia Geller Rudman & Robbins LLP
52 Duane Street, 7th Floor
New York, NY 10007
(212) 693-1058
Email: drosenfeld@csgrr.com
Email: srudman@csgrr.com

Peter B. Ladig
Stephen B. Brauerman
The Bayard Firm
222 Delaware Avenue, Suite 900,
P.O. Box 25130
Wilmington, DE 19899
(302) 429-4219/(302) 429-4232
Email: bankserve@bayardfirm.com
Email: sbrauerman@bayardlaw.com

Andrew Goldman
WilmerHale
399 Park Avenue
New York, New York 10022
(212) 230-8800
Email: andrew.goldman@wilmerhale.com

Andrew B. Weissman
Jenny R. Chou
Michele L. Taylor
WilmerHale
1875 Pennsylvania Avenue, NW
Washington, DC 20006
(202) 663-6000
Email: andy.weissman@wilmerhale.com
Email: jenny.chou@wilmerhale.com
Email: michele.taylor@wilmerhale.com

Richard L. Horowitz
Potter Anderson & Corron, LLP
1313 N. Market St., Hercules Plaza
6th Floor
P.O. Box 951
Wilmington, DE 19899-0951
(302) 984-6000
Email: rhorwitz@potteranderson.com

David E. Swartz
Stacey Friedman
Sullivan & Cromwell LLP
125 Broad Street
New York, New York 10004-2498
United States
(212) 558-4000
Email: swartsd@sullcrom.com
Email: friedmans@sullcrom.com

Thomas P. Preston
Blank Rome LLP
1201 North Market Street
Suite 800
Wilmington, DE 19801-4226
(302) 425-6400
Email: preston-t@blankrome.com

Vernon R. Proctor
Proctor Heyman LLP
1116 West Street
Wilmington, DE 19801
(302) 472-7300
Email: vproctor@proctorheyman.com

James L. Holzman
J. Clayton Athey
Prickett, Jones & Elliott, P.A.
1310 King Street
Wilmington, DE 19899
(302) 888-6500
Email: jlholzman@prickett.com
Email: jcathey@prickett.com

Daniel B. Tehrani
Stephen L. Ascher
Jenner & Block
919 Third Avenue
37th Floor
New York, NY 10022-3908
212-891-1600
Email: dtehrani@jenner.com
Email: sascher@jenner.com

Kenneth J. Nachbar
Morris, Nichols, Arsht & Tunnell
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 575-7294
Email: knachbar@mnat.com

Andrew Auchincloss Lundgren
Christian D. Wright
Young Conaway Stargatt & Taylor LLP
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, DE 19899-0391
(302) 571-6743/(302) 571-6691
Email: alundgren@ycst.com
Email: cwright@ycst.com

Albert H. Manwaring, IV
Pepper Hamilton LLP
1313 Market Street, Suite 5100
P.O. Box 1709
Wilmington, DE 19899-1709
(302) 777-6500
Email: manwaringa@pepperlaw.com

Thomas Henry Kovach
Parkowski, Guerke & Swayze, P.A.
800 King Street, Suite 203
Wilmington, DE 19801
(302) 594-3313
Email: tkovach@pgslegal.com

Robert Scott Saunders
Skadden, Arps, Slate, Meagher & Flom
One Rodney Square
P.O. Box 636
Wilmington, DE 19899
(302) 651-3000
Email: rsaunder@skadden.com

Anne Churchill Foster
Robert J. Stearn Jr.
Richards, Layton & Finger
One Rodney Square
P.O. Box 551
Wilmington, DE 19899
(302) 658-6541/(302) 651-7700
Email: foster@rlf.com
Email: stearn@rlf.com

Michael J. Maimone
Joseph Benedict Cicero
Edwards Angell Palmer & Dodge LLP
919 N. Market Street, Suite 1500
Wilmington, DE 19801
(302) 777-7770
Email: mmaimone@eapdlaw.com
Email: jcicero@eapdlaw.com

 /s/ Thomas G. Macauley
        Thomas G. Macaulay